# EXHIBIT C
# (Part 4 of 5)

### 3. Arab Bank

The <u>Federal</u> Plaintiffs claim Arab Bank is a financial institution headquartered in Egypt with branch offices throughout the world, including New York. <u>Federal</u> Complaint ¶ 357. Arab Bank claims it is actually a Jordanian bank headquartered in Amman, Jordan. Arab Bank allegedly has "long provided financial services and other forms of material support to terrorist organizations, including al Qaeda." <u>Federal</u> Complaint ¶ 358. Further, these Plaintiffs allege that the September 11 attacks were a "direct, intended and foreseeable product of Arab Bank's participation in al Qaeda's jihadist campaign." <u>Id.</u> ¶¶ 364, 363. These claims are based on the allegation that Arab Bank has "long known that accounts it maintained were being used to solicit and transfer funds to terrorist organizations [and despite this knowledge] Arab Bank has continued to maintain those accounts." <u>Id.</u> ¶ 362. Specifically, the <u>Federal</u> Plaintiffs claim Arab Bank accounts have been used for al Qaeda money transfers throughout the world and that Arab Bank maintains accounts for Defendant charities including IIRO, MWL, WAMY, BIF, Blessed Relief (Muwaffaq) Foundation, and Al Haramain. <u>Id.</u> ¶¶ 359, 360. Israeli officials allegedly have seized funds associated with several Arab Bank accounts maintained on behalf of known fronts for Hamas and identified by Arab Bank employees, "confirming the bank's specific knowledge that accounts it maintained were being used to sponsor terrorist activity." <u>Id.</u> ¶ 361.

The <u>Burnett</u> Plaintiffs claim that members of the Spanish al Qaeda cell used Arab Bank to make wire transfers. <u>Burnett</u> Complaint ¶ 138 (alleging Arab Bank is "used regularly by al Qaeda's Spanish cell for transfers of cash to members of al Qaeda operating in Germany, Pakistan, Afghanistan, Lebanon, Yemen, Bosnia, and elsewhere"); <u>id.</u> ¶¶ 139, 528 (alleging $6,400 wire transfer through Arab Bank from member of Spanish al Qaeda cell to an extremist associated with Chej Salah in Spain). These Plaintiffs conclude that "Arab Bank PLC has materially supported, aided, and abetted and financed al Qaeda." <u>Id.</u> ¶ 138.

The <u>Federal</u> and <u>Burnett</u> complaints do not include any facts to support the inference that Arab Bank knew or had to know that it was providing material support to terrorists by providing financial services to the charity Defendants or by processing wire transfers in Spain. The paragraphs do not allege any involvement by, knowledge of, or participation in any wrongful conduct by Arab Bank. These Plaintiffs do not claim that Arab Bank ignored any regulations regarding their customer accounts. Providing routine banking services, without having knowledge of the terrorist activities, cannot subject Arab Bank to liability. While claiming Arab Bank has ties with known Hamas fronts, the <u>Federal</u> complaint does not contain any allegation of a connection between Hamas and Osama bin Laden, al Qaeda, or the September 11 attacks. A complaint alleging conclusions without supporting facts will not survive a Rule 12(b)(6) motion. <u>In re Cross Media Mktg. Corp. Sec. Litig.</u>, 314 F. Supp. 2d 256, 261 (S.D.N.Y. 2004). The <u>Federal</u> Plaintiffs asked for leave to amend their complaint with respect to Arab Bank, but they have not offered any facts to support an amendment. Therefore, Arab Bank's motions to dismiss the <u>Federal</u> and <u>Burnett</u> complaints are granted in their entirety.

### 4. Al Baraka Investment & Development Corporation and Saleh Abdullah Kamel

The <u>Ashton</u> and <u>Burnett</u> complaints detail nearly identical claims against Al Baraka Investment & Development Corp. ("Al Baraka") and Saleh Abdullah Kamel. <u>Ashton</u> Complaint

¶¶ 583-601; <u>Burnett</u> Complaint ¶¶ 47-66. Saleh Abdullah Kamel was born in Saudi Arabia in 1941 and founded Dallah Albaraka Group LLC in 1969. <u>Ashton</u> Complaint ¶ 587; <u>Burnett</u> Complaint ¶ 51. Dallah Albaraka is a diversified conglomerate based in Jeddah and includes twenty-three banks in Arab and Islamic countries. <u>Ashton</u> Complaint ¶ 588; <u>Burnett</u> Complaint ¶ 52. Dallah Albaraka is a shareholder of Aqsa Islamic Bank, a bank that Israel has refused to approve, "citing its obvious ties with known terrorists." <u>Ashton</u> Complaint ¶¶ 596, 597; <u>Burnett</u> Complaint ¶¶ 60, 61. One of Dallah Albaraka's subsidiaries is Dallah Avco Trans-Arabia Co., based in Jeddah. <u>Ashton</u> Complaint ¶ 589; <u>Burnett</u> Complaint ¶ 53. Omar al Bayoumi, a suspect wanted by the FBI in connection with the September 11 attacks, was the Assistant to the Director of Finance for Dallah Avco and paid rent in San Diego for the house occupied by two September 11 hijackers of American Airlines Flight 77. <u>Ashton</u> Complaint ¶¶ 590, 592; <u>Burnett</u> Complaint ¶¶ 55, 54. Mr. Kamel is also one of three founders of Defendant Al Shamal Islamic Bank. <u>Ashton</u> Complaint ¶ 594; <u>Burnett</u> Complaint ¶ 58.

Dallah Albaraka's financial arm is Al Baraka Investment & Development Corp., a wholly owned subsidiary based in Jeddah. <u>Ashton</u> Complaint ¶ 593; <u>Burnett</u> Complaint ¶ 57. Al Baraka is a holding company with 43 subsidiaries, which are mainly banks in Arab and Islamic countries. <u>Ashton</u> Complaint ¶ 583; <u>Burnett</u> Complaint ¶ 47. It also has banks in Chicago, Illinois and Houston, Texas. <u>Burnett</u> Complaint ¶ 47. Al Baraka allegedly provided financial infrastructures in Sudan to Osama bin Laden through Defendant charity Al Haramain. <u>Ashton</u> Complaint ¶¶ 584, 585, 598; <u>Burnett</u> Complaint ¶¶ 48, 49, 62.

Plaintiffs do not offer any factual allegations against Al Baraka or Mr. Kamel to withstand their motions to dismiss. The majority of the complaints' allegations regarding Al Baraka actually concern Dallah Albaraka. The specific allegations against Al Baraka are that through Al Haramain it provided financial infrastructures in Sudan, it provided support to Al Haramain, and it is present in the Sudan banking business through banks it holds. The complaints do not allege that Al Baraka knew or had any reason to know that Al Haramain was supporting terrorism, nor do they allege facts from which such an inference could be drawn.

The allegation that an employee of a Dallah Albaraka subsidiary financially supported two of the hijackers in San Diego does not translate into an allegation that Mr. Kamel provided material support to terrorism or aided and abetted those that provided material support. An employee's actions cannot be a basis for employer liability unless the employee was acting in furtherance of the employer's business. <u>Tasso</u>, 1997 WL 16066, at *6. There is no allegation that Mr. Kamel knew Mr. al Bayoumi or directed anyone at the Della Albaraka subsidiary to support al Qaeda or the hijackers. Similarly, the allegation that Mr. Kamel was one of three founders of Al Shamal Islamic Bank in 1983, without additional allegations, does not state a claim for relief. Thus, the <u>Ashton</u> and <u>Burnett</u> claims against Al Baraka and Mr. Kamel are dismissed in their entirety.

### 5. NCB

The <u>Ashton</u> and <u>Burnett</u> Plaintiffs' allegations against NCB are outlined in Part I.B.4. The Court finds it would be premature to analyze Plaintiffs' largely conclusory claims against

NCB under Rule 12(b)(6) at this time.  NCB may be immune from suit and further discovery if it is found to be an instrumentality of the Kingdom of Saudi Arabia and its actions do not fit within the FSIA's exceptions to immunity.  Additionally, the Court is not yet convinced that it would be proper to exercise personal jurisdiction over NCB.  Accordingly, NCB's motion to dismiss for failure to state a claim is denied without prejudice.  NCB may renew its motion upon completion of the limited jurisdictional discovery – first with respect to its instrumentality status – outlined by the Court above.

### 6. Saudi Binladin Group

The <u>Ashton</u> and <u>Burnett</u> allegations against the SBG are outlined in Part II.C.8.  The same allegations that warrant limited jurisdictional discovery to investigate whether SBG purposefully directed its activities at the United States and its contacts with the United States preclude dismissal under 12(b)(6) at this time.  SBG provided construction support to Osama bin Laden. <u>Ashton</u> Complaint ¶¶ 550, 552-53; <u>Burnett</u> Complaint ¶¶ 319-22.  A branch of SBG purportedly provided shelter to an al Qaeda operative.  <u>Ashton</u> Complaint ¶ 555; <u>Burnett</u> Complaint ¶ 324. SBG has, at some point, had a close relationship with Osama bin Laden, but the complaints do not specify when or whether the relationship continues.  While these allegations are certainly not sufficient to reach a jury, if Plaintiffs demonstrate that this Court has personal jurisdiction over SBG they are entitled the opportunity to develop these claims.  SBG's motions to dismiss the <u>Ashton</u> and <u>Burnett</u> complaints for failure to state a claim are therefore denied without prejudice.

### 7. SAAR Network

The <u>Federal</u> Plaintiffs' allegations against the SAAR Network are outlined in Part II.C.9. The Court's analysis of the SAAR Network's arguments in favor of 12(b)(6) dismissal depend on a predicate finding of which entities are subject to this Court's personal jurisdiction and which entities – and under what circumstances – transferred money to terror fronts.  Accordingly, the SAAR Network's motion to dismiss is denied without prejudice.  It may be renewed upon completion of personal jurisdiction discovery.

### 8. Adel A. J. Batterjee

The <u>Burnett</u> Plaintiffs' allegations against Mr. Batterjee are outlined in Part II.C.10.  For substantially the same reasons the Court found it had personal jurisdiction over Mr. Batterjee, it denies his motion to dismiss for failure to state a claim.  The allegations against him and his designation as a terrorist are sufficient to permit the inference that he provided support to al Qaeda directly or through Al Shamal Islamic Bank, BIF, or WAMY.  <u>Burnett</u> Complaint ¶¶ 75-76, 183-84, 196, 199, 230; Exec. Order 13224.

## IV. Conclusion and Order

For the reasons explained above, Prince Sultan's motions to dismiss the <u>Burnett</u>, <u>Ashton</u>, <u>Tremsky</u>, <u>Salvo</u>, <u>Barrera</u>, and <u>Federal Insurance</u> complaints for lack of subject matter and personal jurisdiction are granted.  Prince Turki's motions to dismiss the <u>Burnett</u>, <u>Ashton</u>, <u>Tremsky</u>, <u>Salvo</u>, <u>Barrera</u>, and <u>Federal Insurance</u> complaints for lack of subject matter and personal jurisdiction are granted.  The Kingdom of Saudi Arabia's motion to dismiss the <u>Federal Insurance</u> and <u>Vigilant</u>

Insurance complaints for lack of subject matter jurisdiction are granted. Prince Mohamed's motions to dismiss the Ashton and Federal Insurance complaints for lack of personal jurisdiction are granted. Mohammad Abdullah Aljomaih's motion to dismiss the Burnett complaint for lack of personal jurisdiction is granted. Sheikh Hamad al Husani's motion to dismiss the Burnett complaint for lack of personal jurisdiction is granted. Abdulrahman bin Mahfouz's motion to dismiss the Burnett complaint for lack of personal jurisdiction is granted. Tariq, Omar, and Bakr Binladin's motion to dismiss the Burnett complaint for lack of personal jurisdiction is granted. Al Rajhi Bank's motion to dismiss the Burnett complaint for failure to state a claim is granted. Saudi American Bank's motions to dismiss the Burnett and Ashton complaints for failure to state a claim are granted. Arab Bank's motions to dismiss the Burnett and Federal Insurance complaints for failure to state a claim are granted. Al Baraka and Saleh Abdullah Kamel's motions to dismiss the Burnett and Ashton complaints for failure to state a claim are granted. NCB's motions to dismiss the Burnett and Ashton complaints for lack of subject matter and personal jurisdiction are denied without prejudice. The Burnett and Ashton negligence claims against NCB are dismissed for failure to state a claim. The Saudi Binladin Group's motions to dismiss the Burnett and Ashton complaints for lack of personal jurisdiction and failure to state a claim are denied without prejudice, but the TVPA and negligence claims against SBG are dismissed. The SAAR Network's motion to dismiss the Federal complaint for lack of personal jurisdiction and failure to state a claim is denied without prejudice. T he RICO, TVPA, assault and battery, intentional infliction of emotional distress, and negligence claims against the SAAR Network are dismissed. Adel Batterjee's motion to dismiss the Burnett complaint is denied.

So ordered.

_____
Richard Conway Casey, U.S.D.J.

Dated:
January 18, 2005
New York, New York

# EXHIBIT G

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 3-8-05
```

/AIE.. 5.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In Re TERRORIST ATTACKS on | ) | 03 MDL 1570 (RCC) |
| SEPTEMBER 11, 2001 | ) | ECF Case |
| | ) | |

*This document relates to:*
  *O'Neill v. Al Baraka Inv. & Dev. Corp.,* 04-CV-1923 (RCC)
  *New York Marine & General Ins. Co. v. Al Qaida,* 04-CV-6105 (RCC)
  *Continental Casualty Co. v. Al Qaeda Islamic Army,* 04-CV-5970 (RCC)
  *Cantor Fitzgerald & Co. et al. v. Akida Bank Private Ltd.,* 04-CV-7065 (RCC)

### STIPULATION AND ORDER SETTING SCHEDULE FOR
### THE NATIONAL COMMERCIAL BANK TO RESPOND TO COMPLAINTS

IT IS HEREBY STIPULATED AND AGREED, by and between undersigned counsel for
the *O'Neill, New York Marine, Continental Casualty,* and *Cantor* Plaintiffs (collectively, "Plaintiffs") and
for Defendant The National Commercial Bank ("NCB"), subject to the approval of the Court, as
follows:

1.      The Court previously approved Stipulations by and between counsel for Plaintiffs
and NCB that would have required NCB to move to dismiss or otherwise respond to Plaintiffs'
complaints within forty-five (45) days from the date on which the Court decided NCB's motions to
dismiss in *Burnett* (03-CV-9849) and *Ashton* (02-CV-6977). *See* MDL Dkt. #532 (*Cantor*); MDL Dkt.
#542 (*O'Neill*); MDL Dkt. #621 (*NY Marine* and *Continental Casualty*).

2.      On January 18, 2005, the Court denied without prejudice NCB's motions to dismiss
in *Burnett* and *Ashton*, with leave to renew NCB's motion to dismiss those actions after completing
limited jurisdictional discovery. MDL Dkt. #632 (Opinion and Order). On February 1, 2005, NCB
filed a motion for reconsideration of the January 18 Opinion and Order, and that motion remains
pending. *See* MDL Dkt. #648.

3.      Subject to the disposition of NCB's pending motion for reconsideration, NCB shall
file a consolidated motion to dismiss, or otherwise file individual responses to, the Complaints in

1

*O'Neill*, *New York Marine*, *Continental Casualty*, and *Cantor* on the same date that NCB renews its motion to dismiss the *Burnett* and *Ashton* actions, as allowed by the Court's January 18, 2005, Opinion and Order. The memorandum of law in support of NCB's consolidated motion shall not exceed 25 pages in length.

4.      Plaintiffs shall have sixty (60) days from the date on which it is served with NCB's consolidated motion to dismiss to file their consolidated response to NCB's motion to dismiss. Plaintiffs' consolidated memorandum of law in response to NCB's consolidated motion shall not exceed 25 pages in length.

5.      NCB shall have 30 days thereafter to file a consolidated reply to Plaintiffs' opposition. NCB's consolidated reply memorandum of law shall not exceed 10 pages in length.

6.      The foregoing schedule is without waiver of any of NCB's defenses or of NCB's pending motion for reconsideration in the *Burnett* and *Ashton* actions.

Dated: ~~February~~ March 7, 2005

PATTON BOGGS LLP

Ronald S. Liebman (admitted *pro hac vice*)
Mitchell R. Berger (MB 4112)
Ugo Colella (admitted *pro hac vice*)
2550 M Street, N.W.
Washington, D.C. 20037
Phone: (202) 457-6000
Fax:    (202) 457-6315

*Counsel for Defendant*
*The National Commercial Bank*

Respectfully submitted,

BROWN GAVALAS & FROMM LLP

Frank J. Rubino, Jr. (FR 6202)
355 Lexington Avenue
New York, New York 10017
Phone: (212) 983-8500
Fax:    (212) 983-5946

*Counsel for Plaintiff*
*New York Marine & General Insurance Company*

FERBER FROST CHAN & ESSNER, LLP

Robert M. Kaplan (RK 1428)
530 Fifth Avenue
23rd Floor
New York, New York 10036-5101
Phone: (212) 944-2200

*Counsel for Plaintiffs*
*Continental Casualty Co. et al.*

DICKSTEIN SHAPIRO MORIN &
OSHINSKY LLP

Kenneth L. Adams (*pro hac vice* pending)
Richard W. Fields
Jonathan M. Goodman (JG 3031)
Stacey Saiontz (SS 1705)
1177 Avenue of the Americas
41st Floor
New York, New York 10036-2714
Phone: (212) 835-1400
Fax:    (212) 997-9880

*Counsel for Plaintiffs*
*The Port Authority of New York and New Jersey,*
*Cantor Fitzgerald & Co. et al.*

LAW OFFICES OF JERRY S. GOLDMAN
& ASSOCIATES, P.C.

Jerry S. Goldman
111 Broadway
13th Floor
New York, New York 10006
Phone: (212) 242-2232
Fax:    (212) 346-4665

*Counsel for Plaintiffs*
*John P. O'Neill et al.*

3

FERBER FROST CHAN & ESSNER, LLP

Robert M. Kaplan (RK 1428)
530 Fifth Avenue
23rd Floor
New York, New York 10036-5101
Phone: (212) 944-2200

*Counsel for Plaintiffs*
*Continental Casualty Co. et al.*

DICKSTEIN SHAPIRO MORIN &
OSHINSKY LLP

Kenneth L. Adams (*pro hac vic* pending)
Richard W. Fields
Jonathan M. Goodman (JG 3031)
Stacey Saiontz (SS 1705)
1177 Avenue of the Americas
41st Floor
New York, New York 10036-2714
Phone: (212) 835-1400
Fax:    (212) 997-9880

*Counsel for Plaintiffs*
*The Port Authority of New York and New Jersey,*
*Cantor Fitzgerald & Co. et al.*

LAW OFFICES OF JERRY S. GOLDMAN
& ASSOCIATES, P.C.

Jerry S. Goldman
111 Broadway
13th Floor
New York, New York 10006
Phone: (212) 242-2232
Fax:    (212) 346-4665

*Counsel for Plaintiffs*
*John P. O'Neill et al.*

3

FERBER FROST CHAN & ESSNER, LLP

Robert M. Kaplan (RK 1428)
530 Fifth Avenue
23rd Floor
New York, New York 10036-5101
Phone: (212) 944-2200

*Counsel for Plaintiffs*
*Continental Casualty Co. et al.*

DICKSTEIN SHAPIRO MORIN &
OSHINSKY LLP

Kenneth L. Adams (*pro hac vice* pending)
Richard W. Fields
Jonathan M. Goodman (JG 3031)
Stacey Saiontz (SS 1705)
1177 Avenue of the Americas
41st Floor
New York, New York 10036-2714
Phone: (212) 835-1400
Fax:    (212) 997-9880

*Counsel for Plaintiffs*
*The Port Authority of New York and New Jersey,*
*Cantor Fitzgerald & Co. et al.*

LAW OFFICES OF JERRY S. GOLDMAN
& ASSOCIATES, P.C.

Jerry S. Goldman
111 Broadway
13th Floor
New York, New York 10006
Phone: (212) 242-2232
Fax:    (212) 346-4665

*Counsel for Plaintiffs*
*John P. O'Neill et al.*

3

Dated: New York, New York
     March ⫣, 2005

SO ORDERED:

Richard C. Casey
U.S.D.J.

4

# EXHIBIT H



**KREINDLER & KREINDLER** LLP
100 Park Avenue
New York, NY 10017-5590
(212) 687-8181
Fax: (212) 972-9432
www.kreindler.com

Harry E. Kreindler (1919-1984)
Lee S. Kreindler (1949-2003)
Marc S. Moller
Steven R. Pounian
James P. Kreindler
David C. Cook
David Beekman
Noah H. Kushlefsky
Robert J. Spragg
Brian J. Alexander
Justin T. Green
Andrew J. Maloney III
Daniel O. Rose
_____
Francis G. Fleming
Paul S. Edelman
Milton G. Sincoff
John J. Veth\*°
Counsel

Susan D. Bainnson
William O. Angelley
Michael R. Sherwin
Hilary B. Taylor
Elizabeth Crotty
Megan Benett

**California Office**
Gretchen M. Nelson\*
Stuart R. Fraenkel\*
Mark I. Labaton\*
_____
Gabriel Barenfeld\*

**Massachusetts Office**
Anthony Tarricone\*
_____
Susan A. Friery, M.D.°
James D. Gotz\*
Joseph P. Musacchio\*

\*Admitted in CA only
\*Admitted in MA only
°Admitted in MA & DC only
\*Resident in CA office

August 16, 2007

**Federal Express**

Honorable Frank Maas
United States Magistrate Judge
United States District Court
Southern District of New York
500 Pearl Street, Room 740
New York, New York 10007-1312

Re:   *In re Terrorist Attacks on September 11, 2001 v. NCB*

Dear Judge Maas:

I am sorry to burden the Court with yet another letter in response to NCB's latest reply objecting to any more discovery, but I will be brief.

The Court, in an attempt to control and limit deposition discovery, initially declined to approve depositions of SNCB employees but granted the 3 hour Smith deposition because it was the least burdensome way to learn about NCB and SNCB's activities in New York; or so we thought.[1]

Smith provided almost no relevant information regarding NCB or SNCB's activities in the U.S. after 1992. His lack of recall, non-involvement or defendant's reluctance to disclose

_____

[1]  Smith was also supposed to provide some insight to the 1998 process review for which he swore out an affidavit for a British Court proceeding.

August 16, 2007
Page 2

pertinent information[2], should not prejudice plaintiffs. NCB's recent letter argues that plaintiffs are entitled to only one chance and that we should now be cut off from any further investigation.

NCB does not deny that SNCB was its wholly owned subsidiary and plaintiffs have produced documents that show SNCB conducted business in the U.S. on behalf of NCB after NCB was shut down in New York in1992. As an initial matter, it is unclear whether NCB admits that SNCB was its alter ego or mere agent in the U.S. Plaintiffs have produced a sample of documents that suggests this is so. If NCB denies this, plaintiffs are entitled to more discovery on this alone.

The thrust of NCB's argument however, is that SNCB completely shut down in 2001 in any event. NCB supplied the sworn affidavit of Jorge Juco that said SNCB closed in February 2001. (See attached Exhibit A, ¶ 5). That sworn statement however, is belied by documents that reflect NCB-SNCB employees continued to work as "independent contractors" throughout 2001. (See attached Exhibit B, various documents, including renewable consulting contracts, generated by or sent to Virginia Pensa and Thomas Krohley on behalf of NCB and SNCB from their homes.)[3]

Not surprisingly, those consulting contracts no longer even feign to use the SNCB shell cover, rather, they are contracts between *"NCB"* and these long time employees. Plaintiffs do not know if they were renewed, but in the case of Pensa, she appears to have worked for NCB beyond the short-term contract provided by defendant.

At a minimum, these two American citizens, who were based in New York City, should be deposed by plaintiffs to determine the relationship between NCB-SNCB and how long they and others continued to conduct business for NCB or SNCB in the United States beyond 2001. This is no fishing expedition, and plaintiffs asked for these depositions even before the Smith

---

[2] Despite opening the door and waiving attorney work product privilege, NCB was able to suppress communications Smith had with Khalid Bin Mafouz and his British libel attorneys. Testimonial use of material otherwise protected by the attorney-client privilege or the work product privilege results in "subject matter waiver" of material related to the testimony and necessary to proper evaluation of it. *Alpex Computer Corp. v. Nintendo Co.*, 1994 U.S. Dist. Lexis 9393, *5 (S.D.N.Y. 1994); *Bowne, Inc. v. AmBase Corp.*, 150 F.R.D. 465, 485 (S.D.N.Y. 1993) (voluntarily revealing only some of the communications on a subject and withholding others - waives the privilege on the entire subject matter). Smith had further submitted his affidavit and met with British counsel as an expert exposing himself to full cross examination on the subject, yet plaintiffs were cut-off.

[3] SNCB did not file its surrender of authority in New York until October 17, 2001. Nor has it provided proof that it complied with other provisions of New York Business Corporation Law in its purported dissolution, including § 1008 and 1310 and the notice criteria therein. This is more than a technicality, it may serve to change the legal force and effect of the official date SNCB no longer had a legal presence in New York.

August 16, 2007
Page 3

deposition.

Most telling is NCB's plan to "submit an affidavit of a more knowledgeable former SNCB employee to address the nature and scope of SNCB's operations." (Liebman Aug. 13, 2007 ltr., p.5). Further, the "the decision whether to authorize depositions of former SNCB employees should be made by the court when it adjudicates NCB's renewed motion to dismiss for lack of jurisdiction." *Id.*

The proposal contradicts NCB's claim that it seeks to expedite discovery and motion practice. The above is a recipe to prolong any full and fair decision on NCB's presence in the U.S. Instead, what it really wants, is to deprive plaintiffs of full and fair discovery on jurisdictional contracts and hopes that the Court finds that there are no material issues of fact when it renews its motion to dismiss.

The approach is not only fundamentally unfair and prejudicial to plaintiffs, but makes zero logistical sense from a scheduling and motion practice perspective. "Limited jurisdictional discovery" means discovery limited to a jurisdictional inquiry; it does not mean plaintiffs should be limited in gaining discovery from the very contracts that arguably evidence an ongoing presence in the jurisdiction. See *e.g., Intuit Inc. v. H&R Block Eastern Enterprises, Inc.,* 2006 WL 2504936 (N.D. Ca. 2006). Depositions of SNCB employees/consultants should be granted.

Respectfully submitted,

KREINDLER & KREINDLER LLP

By: Andrew J. Maloney III

AJM/gm
Enclosure

cc by email :   Ron Liebman, Esq.
                        Mitch Berger, Esq.

# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

THOMAS BURNETT, SR., et al.,                    )
                                                )
                    Plaintiffs,                 )
                                                )
          v.                                    )       Case No. 02-CV-01616 (JR)
                                                )
AL BARAKA INVESTMENT AND                        )
DEVELOPMENT CORPORATION, et al.,                )
                                                )
                    Defendants.                 )
                                                )

## DECLARATION OF JORGE JUCO

1.      My name is Jorge Juco and I am employed by The National Commercial Bank ("NCB") in Jeddah, Kingdom of Saudi Arabia ("Saudi Arabia") as a legal advisor. I submit this Declaration in support of NCB's Motion to Dismiss the Third Amended Complaint. I am advised by NCB's United States legal counsel that this Declaration is not intended to waive, in any way, NCB's claims of immunity from suit or its jurisdictional defenses, and is not intended to be a general appearance by NCB in this lawsuit. I understand and believe the following matters to be true, through the date of this Declaration, based both on my personal knowledge and on inquiries made of other NCB personnel who have knowledge about specific matters addressed in this Declaration. I have been assisted by NCB's United States legal counsel in the phrasing of this Declaration.

2.      The purpose of this Declaration is to explain that NCB is not "doing business" in or from the United States of America in light of the factors that I understand U.S. courts apply in determining jurisdiction over a foreign defendant.

3.      NCB is a joint stock corporation established under the laws of Saudi Arabia. Its headquarters and principal place of business are in Jeddah, Saudi Arabia.

4.      NCB is not registered or licensed to do business in the United States.

5.    NCB does not currently have a branch office, subsidiary, or agency in the United States.  NCB closed its branch in New York City in 1992 and has not had a branch in the United States since that time.  NCB dissolved its indirect (second-tier) United States subsidiary, SNCB Securities Inc. (Delaware) in February 2001, with its certificate of dissolution having been filed with the Delaware Secretary of State on February 23, 2001, and acknowledged by the Delaware Secretary of State on February 28, 2001.  (A certified copy of the Certificate of Dissolution of SNCB Securities Inc. (Delaware) is attached to this Declaration as Exhibit A.)  NCB has not had a direct or indirect subsidiary in the United States since that time.

6.    NCB manages its business from its headquarters in Jeddah, Saudi Arabia.  Its officers and directors reside in Saudi Arabia.  NCB has no employees or telephone number in the United States.

7.    Although NCB is organized as a joint stock company, shares of NCB are not sold in the United States and NCB does not otherwise raise capital in the United States.

8.    NCB does not own real property in the United States.

9.    As a commercial bank chartered under Saudi Arabia law and headquartered in Saudi Arabia, NCB is regulated by the Saudi Arabian Monetary Agency ("SAMA"), the central bank of the Kingdom of Saudi Arabia.  NCB is not regulated by any agency of the United States government.

10.    Under SAMA regulations, only the following may be NCB account-holders:  citizens of Saudi Arabia; non-citizens who lawfully reside in Saudi Arabia; Saudi Arabia government entities; or, business and charitable entities with lawful status in Saudi Arabia.  (A copy of the relevant SAMA regulations, as in effect when the Complaint was filed, is attached to this Declaration as Exhibit B.)

11.    NCB does not advertise or otherwise solicit business in the United States.  NCB has several web-sites that I understand are accessible from the United States.  Only NCB account-

# EXHIBIT B

**Thomas M. Krohley**

| | |
|---|---|
| **From:** | Thomas M. Krohley <krohley@ix.netcom.com> |
| **To:** | Nassif Aoun <n.aoun@alahli.com> |
| **Sent:** | Thursday, December 14, 2000 4:57 PM |
| **Subject:** | Update |

Nassif,

A mix of good and bad news:

- TV Scan decided against our space after all, surprising the leasing agent and of course me.

- The agent will "seriously consider" us forfeiting 4 months security deposit rather than 5 months, in effect using part of the deposit to pay January's rent. There are still some live prospects interested and more prospects to contact. The holidays, unfortunately, will hurt progress in the last 2 weeks of December. This remains my top priority.

- Our final sales of furniture/equipment is now $7,300 (reducing the writeoff from $20m to $13m), with our phone system (maybe a thousand or two) and some small items remaining. This is far better than I would have dreamed

- Our office will be vacant, with all sold furniture/eqipment picked up, by 12/20 and Ginger and I will be operating out of our homes from then on.

- Ginger's and my email addresses remain unchanged. My home phone is 203-259-7006 with an answering machine and a fax hooked up on the same number. For sending faxes, send them as normal except using this number; the answering machine can detect fax noise from human speech. I only ask that you phone or fax no earlier than 3 pm your time (7am my time); I don't want to disconnect the phone at night in case there are any emergencies, business or personal. Ginger's phone number is 212-692-0670 and she has the same fax/answering machine setup as me. Lastly, for some interim period, if anyone calls Ginger's or my old office numbers, they will be directed to our home numbers. We will be both carrying on with all unfinished business from our homes.

Natually, I am thoroughly pissed about TV Scan. By vacating the offices and by words to the agent, I have strongly suggested to him that we might simply walk away. I'll keep you informed.
Best regards, Tom

ONFIDENTIAL: This Document is subject to a
rotective Order regarding confidential information
03 MDL 1570 (RCC), United States District

NCB01574

## FACSIMILE TRANSMISSION

| To | Thomas Krohley | From | Ginger Pensa |
|---|---|---|---|
| Company | | Company | SNCB-NY |
| Phone | 203-259-7006 | Phone | 212-692-0670 |
| Fax | 203-259-7006 | Fax | 212-692-0670 |

In case of a problem with transmission, please call
Ginger Pensa 212-692-0670

| Date | 6 March, 2001 | No. of Pages (including cover page) | Number 02 |
|---|---|---|---|

### Message

Hi Tom, please sign the attached wire transfer request for Huck Finn Inn.

Please fax directly to Amy Koch at Chase Bank her fax no. is 212-949-1398 (phone no. is 212-661-0607) and fax a copy to me for my records.

The actual debt service amount wired by Westmont was $9,425.76. Unfortunately since we do not maintain a balance in the account, it is charged a monthly $10 service fee and there is a $25 wire transfer fee. Last month the account was overdrawn $59.49, so I will only be able to transfer $9,331.00. I will account for the difference when advising Faisal Sajini of debt service amount.

Best Regards,

NCB01561

ONFIDENTIAL: This Document is subject to a rotective Order regarding confidential information 03 MDL 1570 (RCC), United States District

# WENTZVILLE HOSPITALITY, INC.

**5847 San Felipe, Suite 4650**
**Houston, Texas 77057**
**(713) 782-9100 (Telephone)**
**(713) 782-9600 (Facsimile)**

<u>Via U. S. Mail & Facsimile:  (203) 259-7006</u>

. April 12, 2001

Mr. Thomas M. Krohley
President
SNCB Securities, Inc.
139 Oldfield Road
Fairfield, CT 06430

Dear Mr. Krohley:

Enclosed is a copy of Check No. 100001 confirming payment of the regularly scheduled monthly payment for April 2001 on the Wentzville Hospitality, Inc. Senior Loan. Wentzville Hospitality, Inc., to its knowledge, is not in default on the payment of this Senior Loan.

If you have any questions, please let me know.

Very truly yours,

*Jerry Burrell*

Jerry Burrell
Chief Financial Officer

Enclosure

WordLtr3055.doc

ONFIDENTIAL:  This Document is subject to a
rotective Order regarding confidential information
03 MDL 1570 (RCC), United States District

NCB01568

## FACSIMILE TRANSMISSION

| To | Thomas Krohley | From | Ginger Pensa |
|----|----------------|------|--------------|
| Company | | Company | SNCB-NY |
| Phone | 203-259-7006 | Phone | 212-692-0670 |
| Fax | 203-259-7006 | Fax | 212-692-0670 |

Date  5 2 June, 2001

In case of a problem with transmission, please call
Ginger Pensa 212-692-0670

No. of Pages (including cover page)   Number 02  05

### Message

Hi Tom, please sign the attached wire transfer request for Huck Finn Inn.

Please fax directly to Amy Koch c/o Bernice or Sue at Chase Bank, their fax no. is 212-949-1398 (phone no. is 212-661-0241) and fax a copy to me for my records.

Best Regards,

*[signature]*

*These will come to your CT. home address.*

P.S. Also Faxing copy of F-S. after transfer of $350,000 to LDN. Waiting for refund checks from IRS, NYS + NYC. Will then proceed to file for carryback loss. Then we can send balance of money to LDN as Dividend Payment. *returns*

ONFIDENTIAL: This Document is subject to a
rotective Order regarding confidential information
03 MDL 1570 (RCC), United States District

NCB01558

# FACSIMILE

June 18, 2001

URGENT

TO   :   **Alvares Baretto**
FROM:   **Thomas M. Krohley**

NUMBER OF PAGES INCLUDING COVER: 6

Attached is closing documentation for Wentzville;  this is for NCB-IS records and for the auditors.

Best regards,

Tom

ONFIDENTIAL:  This Document is subject to a
rotective Order regarding confidential information
03 MDL 1570 (RCC), United States District

NCB01560

JAN. 7.1999   5:41PM   CHASE MAHN BANK   **CHASE**   NO.391   ₁ ₄.₂/₂ ⁰¹
The Chase Manhattan Bank

**Application**

| (SHADED AREAS FOR BANK USE ONLY) | | DATE | TIME |
|---|---|---|---|
| | TEST KEY | | |
| BRANCH NO. | PREFIX | | |

**TRANSFER TYPE:**

☐ WIRE   ☐ CABLE   ☐ DRAFT   ☐ Mail to Customer   ☐ Mail to Payee   ☐ Send to Branch

**FOR BACK OFFICE USE:**
INPUT   VER1   VER2   MOD

**IF TRANSFERRING FOREIGN CURRENCY:**
CONTRACT NO.   VALUE DATE   CONVERSION RATE   CONVERTED BY (Initials)

**TRANSFER AMOUNT:**   TRADER'S NAME   U.S. DOLLARS $ 10,400.66
FOREIGN CURRENCY (TYPE AND AMOUNT)

ADDITIONAL FEES $

**NOTE:**
• Foreign currency amount multiplied by the exchange rate = U.S. Dollar amount.
• U.S. Dollar amount divided by the exchange rate = Foreign Currency Amount.

TOTAL AMOUNT $

**INTERMEDIARY CORRESPONDENT BANK: (If necessary)**
ABA ROUTING NO./SWIFT CODE

**METHOD OF PAYMENT:**
DEBIT ACCOUNT NO. DEBIT BRANCH/DEPT. NO.
044-5001244-65

BANK NAME

NAME/ACCOUNT TITLE
HUCK FINN IUN LIMIBO / DEBT

ADDRESS

ADDRESS
C/O SNCB Securities INC

CITY, STATE, ZIP CODE, COUNTRY

CITY, STATE, ZIP CODE, COUNTRY
420 Lex AVE, NY NY 10070

**FOR: PAYEE/ACCOUNT OF ULTIMATE BENEFICIARY**
ACCOUNT NO. 400-026953

**TO: PAYEE/BENEFICIARY'S BANK**
BANK CODE
021000128

NAME/ACCOUNT TITLE
The National Commercial Bank

BANK NAME
Chase Manhattan Bank

ADDRESS P.O. Box 3555

ADDRESS
401 MADISON BANK

CITY, STATE, ZIP CODE, COUNTRY
Jeddah, Saudi Arabia

CITY, STATE, ZIP CODE, COUNTRY
NEW YOrK, NY 10017

BENEFICIARY REFERENCE:

**ORIGINATOR REFERENCE:**

A/C 555-03196-900-310

**SPECIAL INSTRUCTIONS: (Optional)** For FURTHER CREDIT TO
Debt Service Payment FOR HUCK FINN INN

**THE UNDERSIGNED AGREES TO THE CONDITIONS ON THE REVERSE SIDE OF THIS APPLICATION.**
CUSTOMER'S
212 692-0670

DATE OF APPLICATION
6-5-01

CUSTOMER'S SIGNATURE (If Applicable)

CUSTOMER'S SIGNATURE
Thos M. Kelly

**CUSTOMER'S TRANSFER REQUEST: (Complete appropriate boxes)**
☐ FAX   ☐ IN PERSON   ☐ PHONE   ☐ MAIL/MESSENGER

I.D. USED (Do not leave blank)

☐ TELEPHONE/FAX AGREEMENT ON FILE
☐ ONE TIME ONLY TRANSACTION
☐ HOLD PLACED

☐ CALL-BACK IF OVER $ LIMIT:
☐ By _____ ☐ Spoke to _____ ☐ Time _____   INITIALS

TEST KEY CALCULATED BY (If different than taken in by)   INITIALS

TAKEN IN BY (Print Name)

BRANCH AUTHORIZED SIGNER (Print Name)   BRANCH TELEPHONE NO. ( )   BRANCH AUTHORIZED SIGNATURE

02 3991 (3-98)

**BRANCH COPY**

ONFIDENTIAL: This Document is subject to a
rotective Order regarding confidential information
03 MDL 1570 (RCC), United States District

NCB01558

JUN.18'2001 17:20 212 949 1398          CHASE  BANK                              #1579 P.001/001

The Chase Manhattan Bank                 ◆ CHASE                    **Transfer Application**

**(SHADED AREAS FOR BANK USE ONLY)**

| BRANCH NO. | PREFIX | TEST KEY | DATE | TIME |
|---|---|---|---|---|
| | | | | |

**TRANSFER TYPE:**

☐ WIRE   ☐ CABLE   ☐ DRAFT   ☐ Mail to Customer   ☐ Mail to Payee   ☐ Send to Branch

**REP SIGNATURES (Complete appropriate boxes):**

| KEY | MODIFY | MODIFY | APPROVE |
|---|---|---|---|
| | | | |

**IF TRANSFERRING FOREIGN CURRENCY:**

| CONTRACT NO. | VALUE DATE | CONVERSION RATE | CONVERTED BY (initials) |
|---|---|---|---|
| | | | |

**TRANSFER AMOUNT:**

| FOREIGN CURRENCY (TYPE AND AMOUNT) | TRADER'S NAME | U.S. DOLLARS | $ 1,000,008.27 |
|---|---|---|---|

**NOTE:**
- Foreign currency amount multiplied by the exchange rate = U.S. Dollar Amount.
- U.S. Dollar amount divided by the exchange rate = Foreign Currency Amount.

ADDITIONAL FEES $

TOTAL AMOUNT $

**METHOD OF PAYMENT:**        INTERMEDIARY CORRESPONDENT BANK: (if necessary)

DEBIT ACCOUNT NO.   DEBIT BRANCH/DEPT. NO.        ABA ROUTING NO./SWIFT CODE
064-5001244-65

NAME/ACCOUNT TITLE                               BANK NAME
HUCK FINN INN LIMITED / DEBT

ADDRESS                                          ADDRESS
C/O SNCB Securities Inc

CITY, STATE, ZIP CODE, COUNTRY                   CITY, STATE, ZIP CODE, COUNTRY
420 LEXINGTON AVE., N.Y., N.Y 10170

**TO: PAYEE/BENEFICIARY'S BANK**                 **FOR: PAYEE/ACCOUNT OF ULTIMATE BENEFICIARY**

BANK CODE                                        ACCOUNT NO.
021000128                                        400 - 026953

BANK NAME                                        NAME/ACCOUNT TITLE
CHASE  MANHATTAN BANK                            THE NATIONAL COMMERCIAL BANK

ADDRESS                                          ADDRESS
401 MADISON AVE.                                 P.O. BOX 3555

CITY, STATE, ZIP CODE, COUNTRY                   CITY, STATE, ZIP CODE, COUNTRY
NEW YORK N.Y. 10017                              JEDDAH, SAUDI ARABIA

ORIGINATOR REFERENCE:                            BENEFICIARY REFERENCE:

SPECIAL INSTRUCTIONS: (Optional)   FOR FURTHER CREDIT TO: A/C 555-03196-900-310

WENTZVILLE SETTLEMENT

**THE UNDERSIGNED AGREES TO THE CONDITIONS ON THE REVERSE SIDE OF THIS APPLICATION.**

CUSTOMER'S TELEPHONE NO.                         DATE OF APPLICATION
203-259-7006                                     6/19/01

CUSTOMER'S SIGNATURE                             CUSTOMER'S SIGNATURE (if Applicable)
Thom M. Kidley

**CUSTOMER'S TRANSFER REQUEST: (Complete appropriate boxes)**

☐ FAX   ☐ IN PERSON   ☐ PHONE   ☐ MAIL/MESSENGER   |   I.D. USED (Do not leave blank)   |   ☐ TELEPHONE/FAX AGREEMENT ON FILE

☐ CALL-BACK IF OVER $ LIMIT:                                                          ☐ ONE TIME ONLY TRANSACTION

☐ By ___   ☐ Spoke to ___   ☐ Time ___                                              ☐ HOLD PLACED

| TAKEN IN BY (Print Name) | INITIALS | TEST KEY CALCULATED BY (if different than taken in by) | INITIALS |
|---|---|---|---|

| BRANCH AUTHORIZED SIGNER (Print Name) | BRANCH TELEPHONE NO. ( ) | BRANCH AUTHORIZED SIGNATURE |
|---|---|---|

02330-* (4-99) 4-99                              **BRANCH COPY**

CONFIDENTIAL: This Document is subject to a Protective Order regarding confidential information 03 MDL 1570 (RCC), United States District

NCB01561

## CONSULTANCY AGREEMENT

Consultancy Agreement, dated as of October _____, 2000, between Virgina I. Pensa ("Pensa") and The National Commercial Bank, Jeddah, Saudi Arabia ("NCB").

1. Scope of Consultancy

(a) NCB appoints Pensa, and Pensa accepts such appointment, as a consultant to assist and advise NCB on matters described below subject to the limitations described in Section 2 hereof:

(i) Advising and assisting NCB in activities involved with the closure of SNCB Securities Inc., an indirectly owned subsidiary of NCB, including the termination of its activities and liquidation of its corporate entity;

(ii) Advising and assisting NCB in activities involved with the transfer and subsequent on-going administration, of administrative functions of NCB's Investment Services Division's off-shore mutual fund structure in the British Virgin Islands, formerly provided by SNCB Securities Inc., to NCB and NCB's Saudi Arabian-based legal counsel;

(iii) Advising and assisting NCB in activities involved with the liquidation of the assets of Hospitality Investment Partners, an investment vehicle formed by and indirectly controlled by NCB; and

(iv) Advising and assisting NCB in activities involved with other general matters of the NCB's Investment Services Division as may arise and be mutually agreed upon by NCB and Pensa during the term of this Agreement.

2. Limitations

Notwithstanding anything to the contrary set forth in Section 1 or otherwise in this Agreement, unless specifically granted such authority in writing by the party to be bound after the date of this Agreement, Pensa shall have no power or authority to bind or contract for NCB or SNCB Securities Inc. except, if during the term of this Agreement, Pensa remains an Officer and/or Director of SNCB Securities Inc. in which case Pensa shall have those powers as are granted to an Officer and/or Director of SNCB Securities Inc.

3. Fees and Expenses

(a) As consideration for services rendered under this Agreement, Pensa shall be entitled to receive fees and expenses as set forth below:

(i) Monthly Fee: NCB agrees to pay Pensa a monthly fee equal to US$6,520 per month, payable on the 15th day of each month.

(ii) Expenses: NCB agrees to reimburse Pensa for expenses incurred in the course of rendering services under this Agreement, including but not limited to expenses for telephone and fax, office supplies, courier, domestic and international travel and entertainment and miscellaneous office expenses provided that no travel and

CONFIDENTIAL: This Document is subject to a Protective Order regarding confidential information in 03 MDL 1570 (RCC), United Stated District Court for the Southern District of New York

NCB016258

entertainment expense, and no expense exceeding $300 is to be incurred without NCB's prior approval. Pensa will invoice for reimbursement of expenses each month such expenses are incurred and reimbursement is payable by NCB on the 15th of each month.

   (iii) Payment of Monthly Fee and Expenses: Payment of monthly fee and Expenses shall be made by NCB by money transfer from NCB to:

> Routing #021000089 Citibank, N.A.
> For credit account #50713818 Citibank Checking
> Virginia I. Pensa, 45 Grant Dr., N. Valley Stream, N.Y. 11580

### 4.   Indemnification

NCB shall indemnify and hold harmless Pensa from and against any and all liabilities, claims, demands, losses, damages, causes of actions, attorneys' fees and disbursements, costs or expenses of any nature whatsoever arising out of or incidental to Pensa's performance of the activities covered herein, including activities Pensa may conduct in the capacity of Officer and/or Director of SNCB Securities Inc. after December 31, 2000, except in cases of gross negligence or willful misconduct by Pensa. This right of indemnification shall survive termination of this Agreement.

### 5.   Term

This Agreement shall be effective as of January 1, 2001. This Agreement shall continue in force for a period from such effective date until February 28, 2001 unless it is extended by mutual consent of NCB and Pensa. This Agreement is non-cancelable by NCB, Pensa or NCB successors and assigns.

### 6.   Amendments

This Agreement shall not be changed, modified, terminated, or discharged in whole or in part except by an instrument in writing signed by the parties hereto, or NCB successors or assigns.

### 7.   Assignment

No party hereto may assign any of its rights or obligations hereunder without the prior written consent of the other party.

### 8.   Notices

All notices and communications required or permitted hereunder shall be in writing and sent to the address set forth below:

To NCB:

The National Commercial Bank

CONFIDENTIAL: This Document is subject to a
Protective Order regarding confidential information in
03 MDL 1570 (RCC), United Stated District Court for
the Southern District of New York

2

NCB016259

Al Nakeel Center
Jeddah 214881, Saudi Arabia
Attention: Investment Services Division

To Pensa:

Virginia I. Pensa
45 Grant Dr.
N. Valley Stream, New York 11580
USA

9. Governing Law

This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York.

IN WITNESS WHEREOF, Virginia I. Pensa and The National Commercial Bank, the latter by an authorized officer, have caused this Agreement to be duly executed on October _____, 2000.

THE NATIONAL COMMERCIAL BANK

_____
By: Nassif L. Aoun, Investment Services
    Division Head
    The National Commercial Bank

VIRGINIA I. PENSA

_____
By: Virginia I. Pensa

CONFIDENTIAL: This Document is subject to a
Protective Order regarding confidential information in
03 MDL 1570 (RCC), United Stated District Court for
the Southern District of New York

NCB016260

خدمات الإستثمار

Investment Services

## CONSULTANCY AGREEMENT

Consultancy Agreement, dated as of October __/ 4__, 2000, between Thomas M. Krohley ("Krohley") and The National Commercial Bank, Jeddah, Saudi Arabia ("NCB").

### 1.  Scope of Consultancy

(a) NCB appoints Krohley, and Krohley accepts such appointment, as a consultant to assist and advise NCB on matters described below subject to the limitations described in Section 2 hereof:

(i)  Advising and assisting NCB in activities involved with the closure of SNCB Securities Inc., an indirectly owned subsidiary of NCB, including the termination of its activities and liquidation of its corporate entity;

(ii) Advising and assisting NCB in activities involved with the transfer and subsequent on-going administration, of administrative functions of NCB's Investment Services Division's off-shore mutual fund structure in the British Virgin Islands, formerly provided by SNCB Securities Inc., to NCB and NCB's Saudi Arabian-based legal counsel;

(iii) Advising and assisting NCB in activities involved with the liquidation of the assets of Hospitality Investment Partners, an investment vehicle formed by and indirectly controlled by NCB; and

(iv) Advising and assisting NCB in activities involved with other general matters of the NCB's Investment Services Division as may arise and be mutually agreed upon by NCB and Krohley during the term of this Agreement.

### 2.  Limitations

Notwithstanding anything to the contrary set forth in Section 1 or otherwise in this Agreement, unless specifically granted such authority in writing by the party to be bound after the date of this Agreement, Krohley shall have no power or authority to bind or contract for NCB or SNCB Securities Inc. except, if during the term of this Agreement, Krohley remains an Officer and/or Director of SNCB Securities Inc. in which case Krohley shall have those powers as are granted to an Officer and/or Director of SNCB Securities Inc.

### 3.  Fees and Expenses

(a) As consideration for services rendered under this Agreement, Krohley shall be entitled to receive fees and expenses as set forth below:

(i)  Monthly Fee:  NCB agrees to pay Krohley a monthly fee equal to US$12,600 per month, payable on the 15th day of each month.

(ii) Expenses:  NCB agrees to reimburse Krohley for expenses incurred in the course of rendering services under this Agreement, including but not limited to expenses for telephone and fax, office supplies, courier, domestic and international travel and entertainment and miscellaneous office expenses provided that no travel and entertainment expense, and no expense exceeding $300 is to be incurred without NCB's prior approval. Krohley will invoice for reimbursement of expenses each month such expenses are incurred and reimbursement is payable by NCB on the 15th of each month.



CONFIDENTIAL: This Document is subject to a Protective Order regarding confidential information in 03 MDL 1570 (RCC), United Stated District Court for the Southern District of New York

NCB016264



(iii) <u>Payment of Monthly Fee and Expenses:</u>  Payment of monthly fee and Expenses shall be made by NCB by money transfer from NCB to:

> Routing #021001088 HSBC Bank USA
> For credit account #000112046 Vanguard Incoming Wire Account
> In favor of #45 tax exempt money market fund
> Account #9868934270
> Thomas M. Krohley, 139 Oldfield Road, Fairfield, CT 06430

### 4.  Indemnification

NCB shall indemnify and hold harmless Krohley from and against any and all liabilities, claims, demands, losses, damages, causes of actions, attorneys' fees and disbursements, costs or expenses of any nature whatsoever arising out of or incidental to Krohley's performance of the activities covered herein, including activities Krohley may conduct in the capacity of Officer and/or Director of SNCB Securities Inc. after December 31, 2000, except in cases of gross negligence or willful misconduct by Krohley.  This right of indemnification shall survive termination of this Agreement.

### 5.  Term

This Agreement shall be effective as of January 1, 2001.  This Agreement shall continue in force for a period from such effective date until June 30, 2001 unless it is extended by mutual consent of NCB and Krohley.  This Agreement is non-cancelable by NCB, Krohley or NCB successors and assigns.

### 6.  Amendments

This Agreement shall not be changed, modified, terminated, or discharged in whole or in part except by an instrument in writing signed by the parties hereto, or NCB successors or assigns.

### 7.  Assignment

No party hereto may assign any of its rights or obligations hereunder without the prior written consent of the other party.

### 8.  Notices

All notices and communications required or permitted hereunder shall be in writing and sent to the address set forth below:

To NCB:

> The National Commercial Bank
> Al Nakeel Center
> Jeddah 214881, Saudi Arabia
> Attention:  Investment Services Division

CONFIDENTIAL: This Document is subject to a
Protective Order regarding confidential information in
03 MDL 1570 (RCC), United Stated District Court for
the Southern District of New York

NCB016265



To Krohley:

Thomas M. Krohley
139 Oldfield Road
Fairfield, CT 06430
USA

9. Governing Law

This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York.

IN WITNESS WHEREOF, Thomas M. Krohley and The National Commercial Bank, the latter by an authorized officer, have caused this Agreement to be duly executed on October ___ / 4 ___, 2000.

THE NATIONAL COMMERCIAL BANK

By: Nassif L. Aoun, Investment Services
      Division Head
      The National Commercial Bank

THOMAS M. KROHLEY

By: Thomas M. Krohley

CONFIDENTIAL: This Document is subject to a Protective Order regarding confidential information in 03 MDL 1570 (RCC), United Stated District Court for the Southern District of New York

NCB016266

## Jerry S. Goldman

| | |
|---|---|
| **From:** | Andrew Maloney [AMaloney@kreindler.com] |
| **Sent:** | Thursday, August 16, 2007 6:18 PM |
| **To:** | zRonald S. Liebman; zMitchell Berger |
| **Cc:** | zRobert Haefele; zSean P. Carter; zScott Tarbutton; Jerry S. Goldman; zJodi W. Flowers; zAndrea Bierstein; Jim Kreindler; John Fawcett; Elizabeth Crotty |
| **Subject:** | Letter to J. Maas re NCB |



IR5570_FAX-Excha
nge-08162007-1...

The enclosed letter is being over nighted to J. Maas  regarding the latest dispute with
NCB.