# Exhibit C



2550 M Street, NW
Washington, DC 20037-1350
202-457-6000

Facsimile 202-457-6315
www.pattonboggs.com

August 21, 2008

Mitchell R. Berger
202-457-5601
mberger@pattonboggs.com

**BY COURIER**

The Honorable Frank Maas
United States Magistrate Judge
United States District Court for the
  Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street, Room 740
New York, NY 10007-1312

> Re: *In re Terrorist Attacks on September 11, 2001*, MDL 03-1570 (GBD)(FM)
> This document relates to: All Cases

Dear Judge Maas:

     In three coordinated but unconsolidated applications,[1] plaintiffs propose a sledgehammer program of what they ironically call "targeted" further jurisdictional discovery from The National Commercial Bank ("NCB"). Plaintiffs ask the Court to authorize: at least 92 additional document production requests to NCB[2]; another 128 document production requests to two other, separately represented defendants[3]; at least five depositions of NCB, other defendants, and non-parties, pursuant to notices issued by the *Federal Insurance* plaintiffs[4]; and three more depositions of witnesses

---

[1] Kreindler & Kreindler letter dated August 15, 2008 on behalf of the *Ashton* and *Burnett* plaintiffs ("*Ashton/Burnett* Ltr."); Cozen O'Connor letter dated August 15, 2008 on behalf of the *Federal Insurance* plaintiffs ("*Fed. Ins.* Ltr."); Anderson Kill & Olick letter dated August 15, 2008 on behalf of the *O'Neill, New York Marine, Continental Casualty,* and *Cantor Fitzgerald* plaintiffs ("*O'Neill* Ltr.").

[2] *See* The Federal Insurance Plaintiffs' First and Second Sets of Jurisdictional Requests for Production of Documents directed to The National Commercial Bank.

[3] *See* The Federal Insurance Plaintiffs' First Sets of Jurisdictional Requests for Production of Documents Directed to Yassin Abdullah Al Kadi and to Khalid Bin Mahfouz. As with the deposition notices directed to Mr. Kadi and Mr. Mahfouz, we understand that those two defendants object to all discovery directed to them pursuant to Case Management Order No. 2, ¶ 17, given that they have pending motions to dismiss based on lack of personal jurisdiction.

[4] *See* Notices of Deposition to National Commercial Bank, Ali Madany, Khalid Bin Mahfouz, Yassin Abdullah Al Kadi, and Jamal Salim.

**PATTON BOGGS** LLP
ATTORNEYS AT LAW

Honorable Frank Maas
August 21, 2008
Page 2

whose affidavits support NCB's Renewed Motion to Dismiss for Lack of Personal Jurisdiction ("Motion to Dismiss") (MDL Dkt. ## 2110-2115). Along the way, plaintiffs ask the Court, expressly or implicitly, to reconsider or to vacate the key holdings of every jurisdictional discovery order that Your Honor issued as to NCB in 2006 and 2007. For the reasons explained below, the Court should deny plaintiffs' applications for additional jurisdictional discovery from NCB, and should order plaintiffs to submit a consolidated set of papers in opposition to NCB's Motion to Dismiss not later than September 22, 2008

I.     **The Second Circuit's Recent *Terrorist Attacks* Decision Forecloses Plaintiffs' Theory of Specific Jurisdiction and Related Jurisdictional Discovery.**

        With minor exceptions (*see infra* at Section IV.A), plaintiffs' new discovery requests relate to their "theories of specific jurisdiction" based on their allegation that NCB officers or consultants provided "financial and other forms of support" to Islamic charities—"largely, although not exclusively, ... the Muwafaq Foundation"—that, in turn, allegedly provided financial support to al Qaeda.[5]  The Second Circuit, however, now has emphatically rejected that theory of specific jurisdiction in this litigation, affirming Judge Casey's dismissal of government and private Saudi defendants. *In re Terrorist Attacks on September 11, 2001*, --- F.3d ----, 2008 WL 3474167 (2d Cir. Aug. 14, 2008) ("*Terrorist Attacks III*").  Because plaintiffs' theory of specific jurisdiction as to NCB is the same one that the Second Circuit has held to be legally insufficient, plaintiffs' requests to take jurisdictional discovery in support of that theory should be rejected in their entirety.

        Key holdings of *Terrorist Attacks III* are directly applicable to NCB's motion to dismiss, and to plaintiffs' efforts to pursue specific-jurisdiction discovery:

- "The plaintiffs have the burden of showing that [defendants] have certain minimum contacts with [the United States] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Id.* at *17 (citations and internal quotations omitted).

- "In determining whether a plaintiff has met this burden, we will not draw argumentative inferences in the plaintiff's favor. Moreover, we are not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* (citations and internal quotations omitted).

- "[P]ersonal jurisdiction is proper where the defendant took 'intentional, and allegedly tortious, actions expressly aimed' at the forum state. *Calder v. Jones*, 465 U.S. 783, 789 (1984); *see also In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 208 (2d Cir. 2003) (citing *Calder* for proposition that a 'court may exercise personal jurisdiction over defendant consistent with due process when defendant is a primary participant in intentional wrongdoing—albeit

---

[5] *Fed. Ins.* Ltr. at 2; *see also id.* at 5-10; *Ashton/Burnett* Ltr. at 2-3, 4-5, and 7-8.



extraterritorially— expressly directed at forum'). Mere foreseeability of harm in the forum state is insufficient. *Burger King [v Rudzewicz]*, 471 U.S. [462,] 474 [(1986)]." *Id.*

- "The plaintiffs do not allege that [defendants] directed the September 11 attacks or commanded an agent (or authorized al Qaeda) to commit them. Rather, the plaintiffs rely on a causal chain to argue a concerted action theory of liability: the [defendants] supported Muslim charities knowing that their money would be diverted to al Qaeda, which then used the money to finance the September 11 attacks." *Id.* at *18 (internal citations omitted).

- "<u>Even if the [defendants] were reckless in monitoring how their donations were spent, or could and did foresee that recipients of their donations would attack targets in the United States, that would be insufficient to ground the exercise of personal jurisdiction.</u> Rather, the plaintiffs have the burden of showing that the [defendants] engaged in intentional, and allegedly tortious, actions ... expressly aimed at residents of the United States." *Id.* (citations and internal quotations omitted; emphasis added).

- "<u>That burden is not satisfied by the allegation that the [defendants] intended to fund al Qaeda through their donations to Muslim charities.</u> Even assuming that the [defendants] were aware of Osama bin Laden's public announcements of jihad against the United States and al Qaeda's attacks on the African embassies and U.S.S. Cole, their contacts with the United States would remain far too attenuated to establish personal jurisdiction in American courts. <u>It may be the case that acts of violence committed against residents of the United States were a foreseeable consequence of the [defendants'] alleged indirect funding of al Qaeda, but foreseeability is not the standard for recognizing personal jurisdiction.</u> Rather, the plaintiffs must establish that the [defendants] expressly aimed intentional tortious acts at residents of the United States. <u>Providing indirect funding to an organization that was openly hostile to the United States does not constitute this type of intentional conduct. In the absence of such a showing, American courts lacked personal jurisdiction over the [defendants]." *Id.* (internal citations and quotations omitted; emphasis added).

- "<u>It may be that, but for access to financial institutions, al Qaeda could not have funded its terrorist attacks. But that does not mean that the managers of those financial institutions purposefully directed their activities at residents of [this] forum. ... [W]e decline ... to say that the provision of financial services to an entity that carries out a terrorist attack on United States citizens could make [a defendant] subject to the jurisdiction of American courts." *Id.* at *19 (emphasis added; quotations omitted).

- "Since [plaintiffs] did not establish a prima facie case that the district court had jurisdiction over [the defendants], the district court did not err in denying discovery on that issue." *Id.* at *20 (citations and internal quotations omitted).


**PATTON BOGGS**LLP
ATTORNEYS AT LAW

Honorable Frank Maas
August 21, 2008
Page 4

## II. Plaintiffs Already Have Had All of the Jurisdictional Discovery to which They Are Entitled.

As this Court knows quite well, the plaintiffs already have had substantial jurisdictional discovery from NCB, directed largely to their theories of general ("doing business") jurisdiction over NCB. Moreover, this Court already has held that plaintiffs' complaints fail to make a *prima facie* showing that NCB was involved in a conspiracy to commit the 9/11 attacks, and that plaintiffs accordingly are not entitled to obtain discovery in support of their conspiracy-jurisdiction theory. *See infra* at Section III.C. Pursuant to Your Honor's orders, which were either affirmed by Judge Daniels or simply accepted by plaintiffs, jurisdictional discovery as to NCB has proceeded as follows since mid-2006:

- NCB produced documents "concerning its United States contacts for the six-year period preceding commencement of these suits." *In re Terrorist Attacks on September 11, 2001* (Discovery Order), 440 F. Supp. 2d 281, 285 (S.D.N.Y. 2006).

- Plaintiffs took the Court-monitored deposition of a former officer of NCB who had supervised NCB's New York branch until its closure in 1992.

- NCB obtained confirmation from its regulator, the Saudi Arabian Monetary Agency ("SAMA") that—contrary to plaintiffs' allegations— NCB had not been audited, examined, investigated, or sanctioned for alleged involvement in the financing of terrorism.

- Your Honor conducted an *in camera* review of a SAMA audit report on NCB, and found "nothing ... which relates to the issues presently pending before the Court concerning NCB." MDL Dkt. # 1971 (Order).

- Following that *in camera* review, Your Honor expressly "decline[d] to direct any further discovery (not previously ordered) related to NCB." *Id.*

- Your Honor denied plaintiffs' September 2007 application to take jurisdictional discovery depositions concerning NCB's former U.S. subsidiary, finding that they "would be a fishing expedition." MDL Dkt. # 2038 (Order), *aff'd*, MDL Dkt. # 2057 (Order).

- Recognizing plaintiffs' burden of proof on personal jurisdiction, Your Honor held in September 2007 that this litigation had reached the "stage" where "NCB is entitled to answers to its contention interrogatories" concerning plaintiffs' theories of personal jurisdiction. MDL Dkt. # 2037 (Order), *aff'd*, MDL Dkt. # 2057 (Order).

- Finding that plaintiffs had not provided "meaningful answers to [NCB's] contention interrogatories" by "merely referenc[ing] a mass of documents," Your Honor required plaintiffs "to provide revised interrogatory answers, in narrative form, by February 1, 2008." MDL Dkt. # 2060 (Order).



- On February 1, 2008, plaintiffs provided revised and narrative answers to NCB's jurisdictional contention interrogatories.

After receiving plaintiffs' revised contention discovery responses, NCB informed Judge Daniels that "NCB is ready to renew its motion to dismiss focusing upon plaintiffs' jurisdictional theories as fully stated in their contention discovery responses."[6]  NCB accordingly sought leave to file a renewed and consolidated motion to dismiss for lack of personal jurisdiction all of the *Terrorist Attacks* lawsuits in which NCB had appeared. *Id.* All plaintiffs opposed NCB's application for leave to renew its motion to dismiss, contending that they required additional jurisdictional discovery. In reply, NCB contended that there was no factual or legal basis for further jurisdictional discovery.[7]

On July 11, 2008, Judge Daniels granted NCB's application for leave to file its renewed and consolidated motion to dismiss for lack of personal jurisdiction, and further provided: "To the extent that plaintiffs believe that additional jurisdictional discovery is necessary prior to filing a response, a specific discovery request and a request for a stay or extension of the time in which to respond to the motion should be made to the magistrate judge." MDL Dkt. # 2106.

On July 22, 2008, NCB filed its renewed and consolidated motion to dismiss for lack of personal jurisdiction. MDL Dkt. ## 2110-2115. As allowed by Rule 12(b)(2), NCB supported its motion with affidavits and other evidence outside the pleadings. *Id.* Plaintiffs now purport to submit their applications for further jurisdictional discovery pursuant to the provisions of Judge Daniels' July 11 Order.

Plaintiffs' jurisdictional discovery proposal largely ignores the years-long history of jurisdictional discovery already undertaken as to NCB. Moreover, their requests seek to prove a legally-insufficient theory of specific jurisdiction (*see supra* at Section I), and violate established limitations on the scope of jurisdictional discovery as well as procedural requirements for seeking additional jurisdictional discovery at this stage. *See infra* at Sections III & IV. Accordingly, plaintiffs' applications should be denied in their entirety, and plaintiffs should be directed to submit a single consolidated memorandum of law in opposition to NCB's Motion to Dismiss not later than September 22, 2008, pursuant to the schedule set by Case Management Order No. 4 (*see infra* at Section V).

---

[6] *See* NCB letter to Judge Daniels (April 21, 2008) (copy attached hereto as Exhibit 1).

[7] *See* NCB Ltr. to Judge Daniels (April 29, 2008) (copy attached hereto, without exhibits, as Exhibit 6).



Honorable Frank Maas
August 21, 2008
Page 6

### III.   Plaintiffs' Discovery Requests Violate Second Circuit and Case-Specific Limits on Jurisdictional Discovery from NCB.

#### A.   The Requests Violate General Limits on Jurisdictional Discovery.

In the Second Circuit, "it is not the rule" for "federal courts to conduct substantial jurisdictional discovery over foreign corporations." *In re Ski Train Fire in Kaprun, Austria on Nov 11, 2000*, 230 F. Supp. 2d 403, 413 (S.D.N.Y. 2002) (quoting *Jazini v Nissan Motor Co.*, 148 F.3d 181, 185 (2d Cir. 1998)). As Judge Daniels has held, jurisdictional "discovery need not be granted to allow plaintiff to engage in an unfounded fishing expedition for jurisdictional basis." *(888) Justice, Inc. v Just Enters., Inc.*, 2007 WL 2398504, at *3 n.4 (S.D.N.Y. Aug. 22, 2007) (quotations omitted). Similarly, Your Honor stated in related proceedings: "I recognize that jurisdictional discovery must have boundaries and that the Court and counsel have been mired at this preliminary stage for a considerable period of time." *In re Terrorist Attacks on September 11, 2001*, Order (May 21, 2008) (MDL Dkt. # 2090) at 10, *aff'd*, Order (July 14, 2008), MDL Dkt. # 2108. Equally, the Supreme Court has emphasized that: "American courts, in supervising pretrial proceedings, should exercise special vigilance to protect foreign litigants from the danger that unnecessary, or unduly burdensome, discovery may place them in a disadvantageous position." *Société Nationale Industrielle Aérospatiale v United States District Court for the So. Dist. of Iowa*, 482 U.S. 522, 546 (1987).

#### B.   The Requests Violate Case-Specific Limits on Jurisdictional Discovery.

Against this general legal framework, Judge Casey in 2005 allowed "limited jurisdictional discovery" before NCB would be authorized to renew its motion to dismiss for lack of personal jurisdiction.[8] He held that, "with the help of limited jurisdictional discovery," the Court would be able to determine whether "NCB's contacts with the United States"— which "[t]aken individually ... would not satisfy due process requirements"— might "when examined as a whole ... comport with due process." *Terrorist Attacks I*, 349 F. Supp. 2d at 820. Judge Casey specifically mentioned plaintiffs' allegations of "the presence of a branch office until 1992, a subsidiary until 2001, taking advantage of the privilege of its presence in New York by instigating a lawsuit in this forum, [and] advertisements in U.S. publications"— all of which relate to plaintiffs' theory of general jurisdiction. *Id.* In its June 2006 Discovery Order (MDL Dkt. # 1849), this Court set temporal limits on plaintiffs' general-jurisdiction discovery concerning NCB's "United States contacts." 440 F. Supp. 2d at 285.

Judge Casey did not address or authorize any discovery on plaintiffs' alternative theory of specific ("conspiracy") jurisdiction. To the contrary, in his reconsideration order, Judge Casey spoke solely of "an inquiry into NCB's contacts with the United States"— *i.e.*, general jurisdiction discovery. *Terrorist Attacks II*, 392 F. Supp. 2d at 575. Moreover, Judge Casey found that "the

---

[8] *In re Terrorist Attacks on September 11, 2001*, 349 F. Supp. 2d 765, 820 (S.D.N.Y. 2005) ("*Terrorist Attacks I*"); *In re Terrorist Attacks on September 11, 2001*, 392 F. Supp. 2d 539, 572, 575 (S.D.N.Y. 2005) ("*Terrorist Attacks II*").


PATTON BOGGS LLP
ATTORNEYS AT LAW

Honorable Frank Maas
August 21, 2008
Page 7

personal jurisdiction issue raised by NCB is 'straightforward'" and thus held that the personal jurisdiction issue should be resolved before considering (if necessary) NCB's sovereign immunity defense to subject matter jurisdiction. *Id.* at 575-76.

### C.   Plaintiffs Cannot Obtain Conspiracy-Jurisdiction Discovery Because They Have Not Established a *Prima Facie* Case of Conspiracy.

Your Honor's June 2006 Discovery Order discussed the law of this case, established by *Terrorist Attacks I*, governing plaintiffs' theory of "conspiracy jurisdiction": "To establish personal jurisdiction on a conspiracy theory, [p]laintiffs must make a prima facie showing of conspiracy, allege specific facts warranting the inference that the defendant was a member of the conspiracy, and show that the defendant's co-conspirator committed a tort in New York." 440 F. Supp. 2d at 285 (citations omitted). Your Honor held that the plaintiffs' complaints contained only "conclusory" conspiracy allegations, and that their complaints "establish neither that NCB or its customers contributed funds to organizations serving as Al Qaeda fronts with 'an awareness of the effects in New York' of such monetary contributions, nor that the co-conspirators in New York— namely, the Al Qaeda terrorists who executed the September 11 attacks— 'acted at the direction or under the control or at the request of' NCB." 440 F. Supp. 2d at 287 (quoting *Terrorist Attacks I*, 349 F. Supp. 2d at 805). Accordingly, because "plaintiffs have failed to make a prima facie showing of conspiracy which might warrant inquiry into the accounts of specific NCB customers at this preliminary stage," Your Honor denied the plaintiffs' request for "disclosure of the bank records of particular NCB customers." *Id.* That no-prima-facie-case holding applies equally to all of the plaintiffs because the *Ashton, Burnett* and *Federal Insurance* complaints make allegations against NCB that are substantively identical on all issues affecting "conspiracy" jurisdiction. *See* Chart attached as Exhibit 2.[9] Your Honor's assessment of the deficiencies in plaintiffs' conspiracy-jurisdiction allegations as to NCB has been ratified by the Second Circuit's holding in *Terrorist Attacks III* that plaintiffs' "concerted action" theory of jurisdiction is legally insufficient.

The lack of a *prima facie* case of conspiracy against NCB is no accident, and is not simply a pleading defect. In the nearly seven years since the 9/11 attacks, no governmental body of any kind has ever suggested that NCB aided, abetted or in any way was aware of those attacks or any other terrorist activity. Indeed, a key U.S. Treasury Department official confirmed in testimony before the U.S. Senate that the Office of Foreign Assets Control ("OFAC")— the government agency responsible for designating terrorist financiers[10]— had not sought or recommended any sanctions

---

[9] The remaining plaintiffs do not even attempt to argue that their complaints raise jurisdictional issues that differ from the *Ashton, Burnett* and *Federal Insurance* complaints. Accordingly, they stipulated that NCB would move to dismiss their complaints when NCB renewed its motion to dismiss the *Ashton* and *Burnett* complaints. *See* MDL Dkt. # 718.

[10] Executive Order 13224, signed by President Bush on September 23, 2001 authorizes both the Secretary of State and the Secretary of the Treasury in consultation with the Attorney General to designate and block the assets of foreign individuals and entities who have been found: "to assist in, sponsor, or provide financial, material, or technological support for, or financial or other services to or in support of, such acts of terrorism or those persons [designated by OFAC]; or … to be otherwise associated with those persons … " Thus, the President has authorized and asked the U.S.

**PATTON BOGGS** LLP
ATTORNEYS AT LAW

Honorable Frank Maas
August 21, 2008
Page 8

against NCB. Moreover, in FOIA litigation against the Treasury Department to obtain documents about many of the *Terrorist Attacks* defendants including NCB, the *Federal Insurance* plaintiffs' counsel emphasized the OFAC director's "testimony that Treasury did not make sanctions recommendations as to the National Commercial Bank of Saudi Arabia" among others. *Cozen O'Connor v. U.S. Dep't of Treasury*, --- F. Supp. 2d ----, 2008 WL 3271154, at *25 (E.D. Pa. Aug. 7, 2008). It is no surprise, therefore, that plaintiffs cannot identify any admissible evidence that NCB provided material support to, or participated in any conspiracy to commit, the 9/11 attacks.

> **D.    Plaintiffs' Requests Do Not Satisfy Rule 56(f) Requirements for Further Jurisdictional Discovery to Oppose NCB's Motion to Dismiss.**

Because NCB has made a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, plaintiffs must now meet additional requirements to obtain further jurisdictional discovery from NCB. "[W]hile [a] Rule 12(b)(2) motion is not one for summary judgment, summary judgment practice offers guidance in the handling of such motions when they involve evidence outside the pleadings." *Melnick v. Adelson-Melnick*, 346 F. Supp. 2d 499, 504-05 (S.D.N.Y. 2004) (footnote omitted). Specifically, when plaintiffs seek jurisdictional discovery in order to oppose a Rule 12(b)(2) motion, they must follow Rule 56(f) procedures to demonstrate <u>by affidavit</u> the <u>specific facts</u> that a plaintiff seeks to resist the motion to dismiss, and how those facts are reasonably expected to create a genuine issue of material fact regarding jurisdiction. *Id.*

Judge Daniels enforced this requirement in his July 11, 2008 Order (MDL Dkt. # 2106) authorizing NCB to file its motion to dismiss when he directed the plaintiffs to make "a specific discovery request" to the extent that they "believe that additional jurisdictional discovery is necessary prior to filing a response to NCB's motion." Plaintiffs have not filed the requisite Rule 56(f) affidavit; their broadside discovery requests could not fairly be called "specific;" and, they have not explained what specific jurisdictionally-material facts would be elicited from NCB by further jurisdictional discovery.

> **E.    The *Federal Insurance* Plaintiffs Are Bound by the Discovery Rulings and the Discovery Record Because Discovery Coordination Was and Is Required.**

The *Federal Insurance* plaintiffs seek to evade all of these constraints on further jurisdictional discovery by contending that, as to their allegations, "no discovery as to NCB has been conducted to date." *Fed. Ins.* Ltr. at 1. Their position is fully refuted by Case Management Orders Nos. 2 and 3, which require the parties to coordinate discovery on issues that are "common" to their cases." The *Ashton*, *Burnett*, and *Federal Insurance* complaints make allegations against NCB that are substantively

---

government to designate entities that have been found to do precisely what plaintiffs allege that NCB has done. OFAC has acted very aggressively in pursuing this mandate, compiling a 393-page list of thousands of investigated and suspected "terrorist facilitators." *See* http://www.treas.gov/press/releases/hp191.htm; http://www.treas.gov/offices/enforcement/ofac/sdn/t11sdn.pdf. However, this list contains no mention of NCB.



Honorable Frank Maas
August 21, 2008
Page 9

identical on all issues for which those plaintiffs have sought personal jurisdiction discovery. *See* Chart attached as Exhibit 2. The *Federal Insurance* plaintiffs accordingly were required at all times to coordinate their jurisdictional discovery requests and responses with the *Ashton* and *Burnett* plaintiffs who have pursued jurisdictional discovery against NCB since 2005.

Certainly, the *Federal Insurance* plaintiffs have had every opportunity to engage in the coordinated discovery that the Case Management Orders require. Counsel for the *Federal Insurance* plaintiffs: co-chair the Plaintiffs' Executive Committee, (CMO-3, ¶ 4); attended all hearings on *Ashton/Burnett* jurisdictional discovery from NCB; participated in the review of all jurisdictional discovery documents produced by NCB; and, attended the Court-monitored deposition of former NCB officer Lawrence Smith. The *Federal Insurance* plaintiffs sought to proceed with independent jurisdictional discovery from NCB for the first time in August 2007— only after Your Honor's May 2007 order (MDL Dkt. # 1971) "decline[d] to direct any further discovery (not previously ordered) related to NCB."[11] MDL Dkt. # 1971.

Moreover, Judge Daniels already has considered the *Federal Insurance* plaintiffs' claim that they are entitled to conduct their own jurisdictional discovery without regard to the prior rulings on the *Ashton/Burnett* jurisdictional discovery requests. In their April 25, 2008 letter to Judge Daniels[12] opposing leave for NCB to renew its motion to dismiss, the *Federal Insurance* plaintiffs made precisely the same independent-discovery argument that they re-urge now. NCB, in turn, argued that the Case Management Orders required the *Federal Insurance* plaintiffs to coordinate their discovery requests with the *Ashton/Burnett* plaintiffs. *See* NCB 4/29/08 Ltr. (Exh. 6) at 3. In his July 11, 2008 Order authorizing NCB to renew its motion to dismiss, Judge Daniels established uniform requirements for **all** "plaintiffs who believe that <u>additional</u> jurisdictional discovery is necessary prior to filing a response" to NCB's motion. MDL Dkt. # 2106 (emphasis added).[13]

---

[11] After NCB served Rule 34 Objections to their unauthorized August 2007 discovery requests, the *Federal Insurance* plaintiffs did not bring those discovery requests to the attention either of this Court or of Judge Daniels until <u>after</u> NCB sought leave in April 2008 to file its post-discovery motion to dismiss. Either the *Federal Insurance* plaintiffs did not care about their discovery requests, or their delay was "tactically inspired," but in either scenario the Court is empowered to reject their belated discovery requests for that reason alone. *Enron Broadband Servs. v. Travelers Cas. & Sur. Co. (In re Enron Corp.)*, 349 B.R. 115, 121 (Bankr. S.D.N.Y. 2006) (quoting 7 James Wm. Moore et al., MOORE'S FEDERAL PRACTICE-CIVIL, § 37.05[2] (Lexis 2006)).

[12] The *Federal Insurance* plaintiffs have "incorporated ... by reference" their April 25, 2008 letter to Judge Daniels in their August 15, 2008 letter to this Court. *See Fed. Ins.* Ltr. at 2 n.1.

[13] NCB also sought leave to withdraw its pre-discovery motion to dismiss the *Federal Insurance* complaint (MDL Dkt. # 416) and to replace it with a consolidated post-discovery motion to dismiss all cases based on a single discovery record developed over the past few years. *See* NCB April 21, 2008 letter application at 3 (copy attached as Exhibit 1). In granting NCB leave in "All Cases" to file a renewed and consolidated motion to dismiss for lack of personal jurisdiction, Judge Daniels necessarily granted that request and placed the *Federal Insurance* plaintiffs on the same footing as all other plaintiffs.

**PATTON BOGGS** LLP
ATTORNEYS AT LAW

Honorable Frank Maas
August 21, 2008
Page 10

Despite the three separate applications made to Your Honor for additional jurisdictional discovery, it is clear that all of the plaintiffs are currently coordinating their efforts, that they have shared the results of the prior jurisdictional discovery, and that they believe that jurisdictional discovery obtained by any of them is relevant to all of them. *See Ashton/Burnett* Ltr. at 2 ("the discovery sought by the *Federal Insurance* plaintiffs is relevant to the jurisdictional theories of the remaining plaintiffs"), and at 8 (all of these cases should move forward "on a consolidated and expedient basis"); *O'Neill* Ltr. at 1, 6 (incorporating and adopting the jurisdictional discovery applications of the *Federal Insurance*, *Ashton*, and *Burnett* plaintiffs). For all of these reasons, the *Federal Insurance* plaintiffs are not entitled to a do-over of the last several years of jurisdictional discovery that this Court carefully supervised, and that established the jurisdictional discovery record on which NCB has based its renewed motion to dismiss.

### F.   Plaintiffs Have the Burden of Proof on Jurisdiction.

Jurisdictional discovery as to NCB proceeded for two years before NCB renewed its motion to dismiss last month. "As this Court has 'allowed the parties to conduct discovery on the jurisdictional issue, [plaintiffs bear] the burden of proving by a preponderance of the evidence that personal jurisdiction exists." *Overseas Media, Inc. v. Skvortsov*, 407 F. Supp. 2d 563, 567 (S.D.N.Y. 2006) (quoting *Landoil Res. Corp. v. Alexander & Alexander Servs., Inc.*, 918 F.2d 1039, 1043 (2d Cir. 1990)), *aff'd*, 2008 WL 19944981 (2d Cir. May 8, 2008) (unpublished); *Art Leather Mfg. Co. v. Albumx Corp.*, 888 F. Supp. 565, 567 (S.D.N.Y. 1995) (same). Moreover, Second Circuit law is clear that, following jurisdictional discovery, the district court is free to resolve the jurisdictional question without an evidentiary hearing, based on the pleadings and the affidavits submitted in connection with the motion to dismiss. *Hoffritz for Cutlery, Inc. v. Amjac, Ltd.*, 763 F.2d 55, 57 (2d Cir. 1985); *E-Z Bowz, L.L.C. v. Prof. Prod. Research Co.*, 2003 WL 22064259, at *4 (S.D.N.Y. Sept. 5, 2003). If plaintiffs have evidence, as they claim, to sustain personal jurisdiction over NCB, then they were required to come forward with that evidence no later than February 1, 2008 in response to NCB's contention discovery. MDL Dkt. # 2060 (Order); *see also* MDL Dkt. # 2037 (Order), *aff'd*, MDL Dkt. # 2057 (Order). Indeed, following jurisdictional discovery, "the Court will limit its jurisdictional analysis to the facts presented and must assume that the Plaintiffs have provided all the evidence they possess to support their jurisdictional claims." *Jacobs v. Felix Bloch Erben Verlag fur Buhne Film und Funk KG*, 160 F. Supp. 2d 722, 731 (S.D.N.Y. 2001).

Given the years already devoted to jurisdictional discovery from NCB, plaintiffs are not entitled to postpone their opposition to NCB's motion simply to "engage in an unfounded fishing expedition for jurisdictional basis." *(888) Justice*, 2007 WL 2398504, at *3 n.4 (Daniels, J.). The Court should not turn back the clock on the last several years, which have seen the completion of all authorized jurisdictional discovery and Judge Daniels' direction to proceed with NCB's renewed motion to dismiss, save only for "specific" additional discovery requests that satisfy governing legal standards. Plaintiffs have not identified a single material fact regarding general jurisdiction that additional discovery would establish. Plaintiffs also have not made out a *prima facie* case that NCB was involved in a conspiracy to commit the 9/11 attacks. Moreover, their theory of specific



Honorable Frank Maas
August 21, 2008
Page 11

jurisdiction as to NCB is the same one that the Second Circuit found legally insufficient in *Terrorist Attacks III*. Accordingly, further jurisdictional discovery from NCB should be denied.

In the next section of this letter, NCB demonstrates that— in addition to all of the foregoing substantive and procedural prohibitions on further jurisdictional discovery from NCB— the plaintiffs have not shown that any of their proposed subjects for further jurisdictional discovery would lead to evidence of a jurisdictionally-material fact.

**IV.  Plaintiffs' Discovery Requests Would Not Lead to Evidence of Any Fact Material to Personal Jurisdiction Over NCB.**

    **A.  Plaintiffs' General Jurisdiction Discovery Requests.**

NCB's Motion to Dismiss (MDL Dkt. # 2111, at 3-6 and 8-26) sets forth in detail why NCB is not subject to the general jurisdiction of the Court. We respectfully invite the Court's attention to that argument, to which we will refer in the following discussion to demonstrate that plaintiffs are not entitled to additional discovery on the general jurisdiction topics that their applications identify.

        **1.  NCB Was Not Involved in the Aviation Business in the United States.[14]**

Repeating assertions made in their contention interrogatory answers, plaintiffs once again claim that "NCB has owned or operated an aviation division in the United States" and has owned or operated aircraft (with "N-registrations") in the United States. *Ashton/Burnett* Ltr. at 5-7, and Haefele Aff. Exhs. 5-21.[15] Responding directly to those contentions in its motion to dismiss (MDL Dkt. # 2111, at 24-26), NCB submitted an affidavit of its Head of Finance and Accounting (MDL Dkt. # 2112, ¶ 3), which confirms under penalty of perjury that, from at least 1996[16] and continuing until the present:

---

[14] *See Ashton/Burnett* Ltr. at 5-7.

[15] Plaintiffs incorrectly contend that they have a motion to compel discovery on this issue currently pending before Judge Daniels that he "inadvertently overlooked." *Ashton/Burnett* Ltr. at 4-5. Judge Daniels' July 11, 2008 Order disposed of all pending requests for further jurisdictional discovery by granting NCB leave to file its renewed motion to dismiss and providing plaintiffs with the opportunity to apply to Your Honor and attempt to justify further jurisdictional discovery. Before entering the July 11 Order, Judge Daniels was advised by the plaintiffs of all of their then-pending jurisdictional discovery requests, and of the *Ashton/Burnett* December 20, 2007 letter asking the Court to compel further discovery concerning allegations that NCB was involved in aviation business in the United States.

[16] This Court authorized plaintiffs to obtain discovery concerning NCB's United States contacts "for the six-year period preceding the commencement of these suits," which extended the "look-back period" until August 15, 1996, given the August 15, 2002 filing of the *Burnett* action. Discovery Order, 440 F. Supp. 2d at 285. Your Honor specifically noted, however: "This ruling should, of course, not be taken as any indication that it ultimately will be appropriate to consider this entire period in determining whether the Court should assert personal jurisdiction over NCB. Indeed, I have no opinion on that subject, which obviously is wholly within Judge Casey's purview." *Id.* at 285 n.1.



Honorable Frank Maas
August 21, 2008
Page 12

(a)     NCB has not had any United States subsidiary or affiliate, other than SNCB Securities, Inc.,
        which was liquidated in early 2001;

(b)     Neither NCB itself, nor any subsidiary or affiliate of NCB, has conducted business in the
        United States relating to the ownership or operation of aircraft;

(c)     NCB has had no ownership interest or investment in Global FBO Holdings, Inc., Ellington
        MTA, Inc., Skyways Aircraft Leasing, Inc., Skyways International, Inc., Mid East Jet, Inc.,
        Mid-East Jet, Inc., Euram Group Ltd., Sedco Services, Inc., MBKS Inc., MBKS II Inc.,
        MBKS III Inc., or Eidetics International, Inc.;

(d)     NCB has not derived any revenue from the ownership or operation of aircraft in the United
        States or from any business that owned or operated aircraft in the United States; and

(e)     NCB has had no ownership interest or investment in any N-registered aircraft, including
        those identified by the registration numbers N371BC, N737CC, N737GG, N757MA,
        N767KS, N777AS, N1779B, N1786B, or N60436.

NCB's Motion to Dismiss (MDL Dkt. # 2111, at 24 n.9) also explained that, in 1996, NCB divested
itself of its temporary, and fortuitous, interest in Southwest Airport Services ("SWAPS"), another
company identified by the plaintiffs.[17]

        As they did in their letters to Judge Daniels, plaintiffs proffer documents describing multiple
companies and individuals supposedly involved in the aviation business (both in the United States
and overseas).  Haefele Aff. Exhs. 5-21. However, the affidavit of NCB's Head of Finance and
Accounting comprehensively and specifically affirms that NCB has not conducted business in the
United States relating to the ownership or operation of aircraft, and has not owned an interest in the
aviation companies and aircraft that plaintiffs identify. Moreover, documents just recently produced
by the plaintiffs instead suggest on their face that the Bin Mahfouz family, not NCB, may have had
an ownership interest in one of the aviation companies.[18]  The circumstances here are therefore just

---

[17] Shares of SWAPS had been pledged to secure a $1.4 million loan by NCB's former New York branch in 1990, and the
loan went into default. Berger Aff. (MDL Dkt. # 2115), ¶ 18, Exh. 34, at 4. NCB did not conduct business through
SWAPS, but rather held the pledged shares until it released the pledge on June 26, 1996, as part of a settlement
agreement. *Id.* ¶ 19, Exh. 35; *see Insight Data Corp. v First Bank Sys., Inc.,* 1998 WL 146689, at *5 (S.D.N.Y. Mar. 25, 1998)
(foreclosing on assets securing a loan is not proof of "doing business" for general jurisdiction). SWAPS' current
activities are irrelevant to jurisdiction over NCB because, *inter alia,* NCB ceased long ago to have any interest in that
company.

[18] Several of these unauthenticated hearsay documents were not previously produced in connection with plaintiffs'
contention discovery responses as required by this Court's orders. Haefele Aff. Exh. 9 is a Dun & Bradstreet report
dated October 30, 2003, which lists "Khalid Bin Mahfooz" as the CEO of Mid East Jet Company of Saudi Arabia.
Haefele Aff. Exh. 10 is an "ICP Update" dated October 26, 2005, which states that Sheikh Abdulrahman Khalid Bin
Mahfouz is the Chairman of Mid East Jet Inc. (which is identified as a foreign registered limited liability company), and

**PATTON BOGGS** LLP
ATTORNEYS AT LAW

Honorable Frank Maas
August 21, 2008
Page 13

like those in *Accessory Corp. v Spotless Plastics Pty. Ltd.*, 2007 WL 2584963, at *5 & n.17 (S.D.N.Y. Sept. 7, 2007), where the court held: "Plaintiff has offered no basis for suggesting that Spotless New York is controlled by or is a department of Spotless Australia, and <u>Spotless Australia affirms to the contrary.</u> ... Accordingly, there is ·no reasonable basis for ordering discovery, as requested by plaintiff, into the business relationship between Spotless Australia and Spotless New York." (emphasis added) (citations omitted).

Further, the Bin Mahfouz family ceased to have any ownership interest in NCB as a result of transactions in 1999 and 2001 by which the Saudi government acquired majority ownership of the bank. MDL Dkt. # 487, Exh. 2. Accordingly, the alleged activities of the Bin Mahfouz family are legally immaterial to the general jurisdiction inquiry concerning NCB. *See ICC Primex Plastics Corp. v LA/ES Laminati Estrusi Termoplastici S.p.A.*, 775 F. Supp. 650, 652 n.2, 654 (S.D.N.Y. 1991) (finding no general jurisdiction over a foreign corporation, which had hired a sales representative in the forum to solicit customers from June 1987 to September 1989, because "that relationship terminated before the filing of the complaint in December 1989.").

Plaintiffs also point to a handful of unauthenticated letterheads and a business card referencing "NCB Aviation" at an address in Saudi Arabia, but these unauthenticated hearsay documents have no evidentiary value. *See Shaoulian-Tehrani v Khatami*, 2008 WL 1790386, at *2 (S.D.N.Y. Apr. 21, 2008) (hearsay cannot be used to establish a prima facie case of personal jurisdiction). Anyone can claim to operate as "NCB Aviation." *See, e.g.* http://www.ncb-aviation.com/home.htm (last visited August 20, 2008), but that does not mean that The National Commercial Bank owns or controls that entity. In fact, as NCB demonstrated in another affidavit supporting its motion to dismiss, the Saudi Arabia address listed in plaintiffs' documents for someone claiming to be "NCB Aviation" is not one occupied by NCB, and the airmen listed in those documents have never been employed by NCB. *See* Juco. Decl. (MDL Dkt. # 2114), ¶¶ 25-26).

---

that he is also a shareholder of the company along with "[u]ndisclosed shareholders." The affidavit of NCB's Head of Finance and Accounting (MDL Dkt. # 2112, ¶ 3(c)) states expressly that NCB is not and has not been a shareholder of Mid East Jet. Consistent with that affidavit, Haefele Aff. Exh. 10 states that NCB is simply one of the "principal bankers" of Mid East Jet— nothing more. Similarly, Haefele Aff. Exh. 7 is a copy of a filing with the Texas Secretary of State regarding a company called Skyways International, Inc., which is reported to have been an "inactive" company since February 12, 1999— years before the date on which the earliest of these lawsuits was filed. (As explained in NCB's motion to dismiss (MDL Dkt. # 2111, at 5-6), in determining personal jurisdiction, the Court considers only contacts with the forum that are still active at the time a lawsuit is filed.) The affidavit of NCB's Head of Finance and Accounting states expressly that NCB is not and has not been a shareholder of Skyways International. MDL Dkt. # 2112, ¶ 3(c). Although the Texas filing shows that, at some point in time, Lawrence Smith was the Chairman of Skyways International, plaintiffs are incorrect that Mr. Smith was "at the same time" an officer of NCB. *Ashton/Burnett* Ltr. at 6. To the contrary, as Mr. Smith testified in his deposition before Your Honor, he ceased to be an officer of NCB in 1992 when NCB's New York branch closed, and he went to work for the interests of Khalid Bin Mahfouz— "who had nothing to do with NCB"— and the Bin Mahfouz family. Smith Dep. at 6-7, 14, 27, 37-42, 57-58, and 63. (Excerpts of the Smith Deposition are attached hereto as Exh. 3). Mr. Smith had only two brief consulting assignments with NCB thereafter in 1997 and 1998. *Id*



Honorable Frank Maas
August 21, 2008
Page 14

Plaintiffs offer nothing more than inadmissible speculation that the "NCB Aviation" shown in their handful of unauthenticated documents must be owned or controlled by the National Commercial Bank, and (still further) must be in the aviation business in the United States. That speculation, however, is directly contradicted by the affidavits submitted in support of NCB's motion to dismiss. MDL Dkt. ## 2112, 2114. Plaintiffs are not entitled to take depositions of NCB's affiants simply because plaintiffs disbelieve their testimony. *See Spotless Plastics*, 2007 WL 2584963, at *5 & n.17; *Maturine v American Int'l Group, Inc.*, 2006 WL 2347806, at *4 (S.D.N.Y. Aug. 14, 2006) (Daniels, J.) (The required Rule 56(f) showing "cannot be satisfied by simply claiming that the declaration submitted in support of the summary judgment is not credible."); *Atlantic Mut. Ins. Co. v Alitalia-Linee Aeree*, 2005 WL 427573, at *6 (S.D.N.Y. Feb. 22, 2005) (Daniels, J.) (Rule 56(f) does not allow further discovery based on plaintiff's speculation).

As NCB explained in its motion to dismiss (MDL Dkt. # 2111, at 9), when "a defendant 'rebuts [the] plaintiff['s] unsupported allegations with direct, highly specific, testimonial evidence regarding a fact [or facts] essential to jurisdiction... the allegation[s] may be deemed refuted.'" *Accessory Corp.*, 2007 WL 2584963, at *2 (quoting *Schenker v Assicurazioni Generali S.p.A.*, 2002 WL 1560788, at *3 (S.D.N.Y. July 15, 2002)); *see also Jacobs*, 160 F. Supp. 2d at 736. There accordingly is no reason to authorize jurisdictional discovery concerning plaintiffs' groundless theory that NCB was involved in the aviation business in the United States. *Indemnity Ins. Co. of North America v K-Line America, Inc.*, 2007 WL 1732435, at *12 (S.D.N.Y. June 14, 2007) (denying a "second round of additional jurisdictional discovery" where "[t]he facts asserted do not support such a theory"); *Langenberg v Sofair*, 2006 WL 2628348, at *7 (S.D.N.Y. Sept. 11, 2006) ("Plaintiff has made no factual allegations which could be proven through additional discovery and which would change the outcome of this issue. Therefore, Plaintiff will not be granted the opportunity to engage [in] further discovery in support of her allegation . . . .").

### 2. Plaintiffs Are Not Entitled to Take the Deposition of Thomas Krohley.

As noted immediately above, Rule 56(f) does not allow a plaintiff to take a deposition of an affiant whose testimony supports a Rule 12(b)(2) motion simply because the plaintiff does not believe the affiant's testimony. Plaintiffs proffer no other reason to support their request to take the deposition of Thomas Krohley,[19] a former officer of SNCB Securities Inc. ("SNCB"), whose Affidavit (MDL Dkt. # 2113) responds to another affidavit relied on by the plaintiffs. Mr. Krohley's Affidavit primarily supports an alternative argument in NCB's Motion to Dismiss concerning SNCB that the Court may never reach, and that NCB contends the Court should not reach as a matter of law. Moreover, plaintiffs have received full documentary discovery concerning SNCB, and therefore have had a fair opportunity for discovery concerning SNCB. Finally, plaintiffs have their own affiant who addresses SNCB operations, although it seems clear that he lacks the knowledge required to make his conclusory statements admissible in opposition to NCB's Motion to Dismiss.

---

[19] *See Ashton/Burnett* Ltr. at 3-4; *O'Neill* Ltr. at 3-4, 5-6; *Fed Ins.* Ltr. at 11.



Honorable Frank Maas
August 21, 2008
Page 15

NCB's Motion to Dismiss demonstrates that SNCB's activities are irrelevant to jurisdiction over NCB because:

> It is uncontested that SNCB was an indirectly-owned, legally-distinct entity, whose legal existence was terminated before the earliest MDL complaint was filed. As a matter of law, the Court need not weigh any of plaintiffs' kitchen-sink set of contentions about how SNCB did business because the activities of a subsidiary are irrelevant to jurisdiction over a parent (NCB) when the subsidiary terminates its legal existence before suit is commenced against the parent.

MDL Dkt. # 2111 at 16-17 (citation omitted); *see also id.* at 17-19. The timing of SNCB's dissolution is established by the Certificate of Dissolution of SNCB filed with the Delaware Secretary of State. MDL Dkt. # 2114 ¶ 4 and Exh. A thereto.

As an expressly alternative argument— only if the Court does not accept that SNCB's activities are jurisdictionally irrelevant because of the timing of its dissolution— NCB's Motion to Dismiss demonstrates that SNCB did not operate as a "mere department or agent" of NCB whose activities could be imputed to NCB. MDL Dkt. # 2111 at 19-24. That alternative argument is factually supported, *inter alia*, by the Affidavit of Mr. Krohley, who served as officer and/or director of SNCB from the company's inception in 1992 until its dissolution in February 2001. MDL Dkt. # 2113.

Your Honor's June 2006 Discovery Order (MDL Dkt. # 1849) allowed plaintiffs to obtain jurisdictional discovery concerning NCB's "United States contacts for the six-year period preceding commencement of these suits." 440 F. Supp. 2d at 285. Pursuant to that order and plaintiffs' request for documents concerning NCB subsidiaries in the United States, NCB produced over 60,000 pages of documents comprising the files of SNCB. Those documents provided plaintiffs with a complete picture of how SNCB operated and the years during which it operated. After reviewing the SNCB documents, plaintiffs twice sought to take the deposition of a former officer of SNCB: first, of Virginia Pensa, which this Court denied by Order of March 23, 2007 (MDL Dkt. # 1964); and, later, of Ms. Pensa, Frederik Crawford, or Thomas Krohley (all former SNCB officers), which this Court denied on September 18, 2007. MDL Dkt. # 2038, *aff'd,* MDL Dkt. # 2057.

In litigating plaintiffs' second request to take a deposition of a former SNCB officer, NCB argued— as it does again in its Motion to Dismiss— that SNCB's activities are irrelevant to jurisdiction over NCB because "SNCB was dissolved in 2001, before any of the 9/11 lawsuits was filed." *See* NCB Ltr. dated August 13, 2007, at 2; *see also id.* at 2-3 (copy attached hereto as Exhibit 4). At that time, NCB also made the following alternative argument:

> Notwithstanding the jurisdictional irrelevance of SNCB's activities, at the March 23, 2007 hearing [before Your Honor] plaintiffs proffered an affidavit of former SNCB employee Jagan Reddy addressing SNCB's pre-dissolution activities. Plaintiffs



Honorable Frank Maas
August 21, 2008
Page 16

> apparently plan to rely on the Reddy affidavit to argue for the exercise of jurisdiction over NCB, although NCB has sought leave to propound contention interrogatories precisely to determine, *inter alia*, whether plaintiffs do indeed plan to rely upon the Reddy affidavit for that purpose. <u>If so, or if the plaintiffs' responses to contention discovery otherwise makes its advisable for NCB to do so, then NCB would submit an affidavit of a more knowledgeable former SNCB employee to address the nature and scope of SNCB's operations. However, even if both plaintiffs and NCB opt to submit affidavits concerning SNCB's operations in litigating NCB's renewed motion to dismiss for lack of jurisdiction, there is no reason to authorize depositions of former SNCB employees at this time.</u> Second Circuit law is clear that, following jurisdictional discovery, the district court is free to resolve the jurisdictional question without an evidentiary hearing, based on the pleadings and affidavits submitted in connection with the motion to dismiss. *Hoffritz for Cutlery, Inc. v Amjac, Ltd.*, 763 F.2d 55, 57 (2d Cir. 1985); *E-Z Bowz, L.L.C. v Prof. Prod. Research Co.*, 2003 WL 22064259 at *4 (S.D.N.Y. Sept. 5, 2003). Consequently, the decision whether to authorize depositions of former SNCB employees should be made by the Court when it adjudicates NCB's renewed motion to dismiss for lack of jurisdiction. At that stage, the Court will have the benefit of full legal argument and the evidentiary context that will allow it to evaluate whether the Court needs to reach and resolve any disputed factual issue concerning the activities of SNCB.

*Id.* at 5 (emphasis added; footnote omitted).

This Court thereafter denied plaintiffs' request to take a deposition of a former SNCB officer based on the time-of-dissolution point that NCB's Motion to Dismiss makes as its primary argument concerning SNCB. The Court held: "There is nothing in the materials annexed to [plaintiffs'] letter to suggest that SNCB engaged in any activities in the United States— through agents or otherwise— after 2001. Accordingly, ... it is clear that the proposed depositions of Virginia Pensa, Frederik Crawford, or Thomas Krohley would be a fishing expedition." MDL Dkt. # 2038, *aff'd*, MDL Dkt. # 2057.

This Court simultaneously allowed NCB to propound contention interrogatories to plaintiffs to determine their jurisdictional theories and supporting factual basis. MDL Dkt. # 2037, *aff'd*, MDL Dkt. # 2057; *see also* MDL Dkt. # 2060. As explained in NCB's Motion to Dismiss, plaintiffs' contention discovery responses did in fact argue that the Court could exercise personal jurisdiction over NCB based on SNCB's pre-dissolution activities. *See* MDL Dkt. # 2111 at 16-17, 18 n.7, 21 and 22 (citing plaintiffs' interrogatory responses). Plaintiffs also proffered the March 21, 2007 affidavit of Jagan Reddy (ASH006240-41) and portions of the SNCB document production to justify their contention.

In short, as forecast by NCB's August 13, 2007 letter, plaintiffs' contention discovery responses put into issue the manner in which SNCB conducted its activities prior to its dissolution.



As a result, NCB did precisely what our August 13, 2007 letter told this Court it would do under such circumstances: NCB submitted "an affidavit of a more knowledgeable former SNCB employee"—Mr. Krohley—"to address the nature and scope of SNCB's operations."[20]

Plaintiffs decry the fact that NCB obtained Mr. Krohley's affidavit in June 2007. That timing, however, is neither mysterious nor nefarious. The Krohley Affidavit itself explains (MDL Dkt. # 2113, ¶ 22) that NCB obtained Mr. Krohley's affidavit to respond to the statements made in the March 2007 Reddy affidavit. Because NCB had obtained Mr. Krohley's affidavit in June 2007, NCB was able to make an authoritative representation to this Court in its August 13, 2007 letter that NCB would submit an affidavit of a former SNCB employee "more knowledgeable" than Mr. Reddy "to address the nature and scope of SNCB's operations" if—as subsequently occurred—plaintiffs' contention discovery responses placed that subject in issue. Plaintiffs cannot claim unfair surprise or prejudice when NCB acted completely in accord with the plan that NCB expressly laid out in its August 13, 2007 letter.

NCB's August 2007 letter also argued that a deposition would not be necessary even if NCB submitted an affidavit of a knowledgeable former SNCB officer, because the district court is empowered to resolve jurisdictional-fact issues based on affidavits. Indeed, plaintiffs do not explain why they need to take Mr. Krohley's deposition to establish any jurisdictionally-material fact. By contrast, there are several reasons why the Court should not order Mr. Krohley's deposition:

- As a matter of law, Judge Daniels should not have to reach NCB's alternative argument, supported by the Krohley Affidavit, that SNCB did not operate as a "mere department" or agent of NCB. *See* NCB's Motion to Dismiss (MDL Dkt. # 2111) at 16-19.

- Regardless, NCB already has produced more than 60,000 pages of SNCB operational records to the plaintiffs. Document production is a sufficient form of jurisdictional discovery that provides plaintiffs with a fair opportunity to litigate the issue of how SNCB operated, even if that issue were deemed jurisdictionally-material. *See In re Ski Train Fire in Kaprun, Austria*, 230 F. Supp. 2d 392, 400 (S.D.N.Y. 2002) (citing *Rose v. Cont'l AG*, 2001 WL 236738, at *4 (E.D. Pa. Mar. 2, 2001) for the proposition "that plaintiffs who had been

---

[20] Plaintiffs incorrectly state that NCB "put forward" Lawrence Smith for a deposition as to how SNCB operated in New York. *Ashton/Burnett* Ltr. at 3. To the contrary, over NCB's objection, the Court ordered the deposition of Mr. Smith (the former head of NCB's New York branch until its closure in 1992) to answer questions about "how NCB and potentially SNCB operated in New York" (Haefele Exh. 3; emphasis added) and about an English High Court witness statement that Mr. Smith had submitted, in which he negated plaintiffs' claim that the Saudi central bank (SAMA) had investigated or audited NCB in 1998. On the latter subject, the Court ordered NCB to produce the exhibits to Mr. Smith's English court witness statement. *See* MDL Dkt. # 1964, ¶ 1.b. In denying plaintiffs' second application to take a deposition of a former SNCB officer, this Court specifically referenced plaintiffs' grievance that Mr. Smith was not knowledgeable about SNCB's operations, and denied plaintiffs' application regardless of "whatever the plaintiffs' views of Mr. Smith's deficiencies may be." MDL Dkt. # 2038.



Honorable Frank Maas
August 21, 2008
Page 18

> served with responses to interrogatories on personal jurisdiction had had … a fair opportunity" to litigate the jurisdictional issue).

● Moreover, plaintiffs already have obtained their own affidavit from Mr. Reddy, who briefly worked in a minor capacity at SNCB, and plaintiffs apparently plan to use his affidavit in opposition to NCB's Motion to Dismiss.[21]  When both sides have an opportunity to submit affidavits on an issue in connection with a fact-based motion, the court need not require the affiants to give depositions. *Daehan Inu Trust Mgt. Co. v J.P. Morgan Chase Bank*, 2003 WL 21297304, at *1-2 (S.D.N.Y. June 4, 2003) (defendant had the opportunity to find a counter-affiant on issues of foreign law "who likewise need not be produced for deposition").

Armed with abundant documentary information and Mr. Reddy's affidavit about SNCB, plaintiffs still do not identify a single fact about SNCB that would be material to jurisdiction over NCB and that requires cross-examination of Mr. Krohley to confirm.  As a matter of law, plaintiffs are not entitled to take Mr. Krohley's deposition simply because they do not believe his testimony. *See Spotless Plastics*, 2007 WL 2584963, at *5 & n.17; *Maturine v American Int'l Group, Inc.*, 2006 WL 2347806, at *4 (S.D.N.Y. Aug. 14, 2006) (Daniels, J.) (The required Rule 56(f) showing "cannot be satisfied by simply claiming that the declaration submitted in support of the summary judgment is not credible.").

### B.   Plaintiffs' Specific Jurisdiction Discovery Requests.

NCB's Motion to Dismiss (MDL Dkt. # 2111, at 6-9 and 26-35) sets forth in detail why NCB is not subject to the specific jurisdiction of the Court.  That argument is ratified by the Second Circuit's rejection of the plaintiffs' "concerted action" theory of specific jurisdiction in *Terrorist Attacks III. See supra* at Section I.  We respectfully invite the Court's attention to those sections of NCB's Motion to Dismiss, to which we will refer in the following discussion to demonstrate that plaintiffs are not entitled to additional discovery on the specific jurisdiction topics that their applications identify.

### 1.   Saudi Central Bank (SAMA) "Audit."

From mid-2006 to mid-2007, this Court directed discovery into plaintiffs' contention that circa 1998 the Saudi central bank (SAMA) had investigated whether NCB donated its own funds or transferred third-party funds to Islamic charities that, in turn, diverted those funds to Al Qaeda.[22] *See* MDL Dkt. # 1849 (directing NCB to "confirm with SAMA whether the Saudi government conducted an 1998 audit of NCB"); MDL Dkt. # 1964 (directing NCB to produce the SAMA "1998

---

[21] After plaintiffs proffered Mr. Reddy's affidavit at the March 23, 2007 hearing, this Court deferred decision on whether Mr. Reddy should give a deposition. MDL Dkt. # 1964, ¶ 5.

[22] *Ashton/Burnett* Ltr. at 2-3; *Fed. Ins.* Ltr. at 5-6.



Honorable Frank Maas
August 21, 2008
Page 19

audit report (for in camera review by the Court")); MDL Dkt. # 1971 (reporting that, following in camera review of the SAMA 1998 audit report, the Court found "nothing ... which relates to the issues presently pending before the Court concerning NCB" and "declin[ing] to direct any further discovery (not previously ordered) related to NCB.").

At the same time (as explained in NCB's Motion to Dismiss) NCB twice obtained confirmation from SAMA that:

- SAMA is "not aware of any audit of NCB undertaken in 1998 intended to explore whether NCB played a knowing role in the financing of terrorist activities directed against the United States or one that confirmed that NCB knowingly financed terrorist acts against the United States." MDL Dkt. # 2115, Exh. 8; see also MDL Dkt. # 2111 at 28.

- SAMA (i) has no knowledge of "any audit or examination of NCB in the general time frame of 1998 or later which examined alleged involvement in financing terrorist activities"; (ii) SAMA had "not required any such audit"; and, (iii) SAMA "has taken no ... adverse regulatory action" against NCB based on "alleged involvement in financing terrorist activities." MDL Dkt. # 2115, Exh. 10; see also MDL Dkt. # 2111 at 28-29.

These discovery efforts had been set in motion by plaintiffs' request for "a copy of an audit of NCB that the Saudi government allegedly undertook in 1998, together with all underlying documents referenced therein." MDL Dkt. # 1849 (describing plaintiffs' discovery requests). As the Ashton/Burnett plaintiffs acknowledge (Ashton/Burnett Ltr. at 3), their original discovery request referred to a multi-page English-language supposed "Summary of the Saudi National Commercial Bank Audit Report SAMA Source/AS" that was attached as an exhibit to their February 2005 document production requests to NCB. This exact same document now reappears in Haefele Affidavit Exhibit 2 accompanying the Ashton/Burnett application for further jurisdictional discovery.

Plaintiffs fail to divulge to the Court that their original source of this "audit" summary was Jean-Charles Brisard, an investigator who, in turn, claimed to have obtained this "SAMA Source" document from French intelligence sources, but who subsequently retracted his allegations that any such audit occurred. See NCB's Motion to Dismiss (MDL Dkt. # 2111) at 28 (quoting the Brisard retraction filed with the Court as MDL Dkt. # 1904, Exh. A ¶¶ 23, 24, 25.2). Specifically, Brisard's retraction informed the Court, inter alia, that: "I have no evidence to suggest that the Saudi Arabian Government ordered a special audit of the NCB to address concerns of the American authorities that "uncovered massive transfers made to charity organizations with ties to Osama bin Laden, some of which were controlled by members of the bin Mahfouz family." Id. (italics original, referring to Brisard's allegations).

Undeterred, both the Ashton/Burnett and the Federal Insurance plaintiffs now try to exhume this discredited alleged "audit" and seek further jurisdictional discovery concerning alleged Saudi



Honorable Frank Maas
August 21, 2008
Page 20

central bank investigations of NCB.[23] The *Ashton/Burnett* plaintiffs claim to have "recently acquired … two French government diplomatic cables"[24] concerning exactly this same "investigation of the Central Saudi Bank (SAMA),"[25] while the *Federal Insurance* plaintiffs proffer an "English Translation" of an undated and purported "Summary of Findings" supposedly by the "German Internal Intelligence Service" reporting that "[t]he Saudi Arabian authorities investigated Khalid bin Mahfooz in 1997" concerning "transfer of large sums from the National Commercial Bank to Islamic 'charities.'"[26] The plaintiffs do not authenticate these supposed "French" and "German" government documents, and those documents are inadmissible hearsay that cannot be used to establish a prima facie case of jurisdiction over NCB. *See Shaoulian-Tehrani v. Khatami*, 2008 WL 1790386, at *2 (S.D.N.Y. Apr. 21, 2008) (hearsay cannot be used to establish a prima facie case of personal jurisdiction); *Dr. Beck & Co., GmbH. v. General Elec. Co.*, 210 F. Supp. 86, 92 (S.D.N.Y. 1962) ("On a motion to dismiss for lack of jurisdiction, the court may only consider evidence which would be of testimonial value at a trial."), *aff'd*, 317 F.3d 538 (2d Cir. 1963). Moreover, whatever the provenance of these unauthenticated documents, it is clear that they discuss the same supposed SAMA "audit" of NCB that SAMA has disavowed and that Brisard has disowned.

Fortuitously, the Second Circuit's decision in *Terrorist Attacks III* obviates any need for this Court to dwell any longer on these recycled allegations about supposed NCB transfers of customer funds, or donations, to Islamic charities. The Second Circuit has held that these plaintiffs <u>cannot</u> obtain jurisdiction over a Saudi defendant based on a theory that:

- A defendant made donations to Islamic charities and was "reckless in monitoring how their donations were spent, or could and did foresee that recipients of their donations would attack targets in the United States" or even "intended to fund al Qaeda through their donations to Muslim charities." *Terrorist Attacks III*, 2008 WL 3474167, at *18 (citations and internal quotations omitted). Or,

- A defendant provided "financial services to an entity that carries out a terrorist attack on United States citizens." *Id.* at *19.

---

[23] These discovery requests include the *Federal Insurance* Plaintiffs' Second Requests for Production of Documents # # 34-35.

[24] Plaintiffs do not explain how or from whom they "recently" acquired these documents, which were not disclosed along with their contention interrogatory responses. The Court therefore may preclude consideration of these documents. *See, e.g., Pal v. New York University*, 2008 WL 2627614, at *5-*6 (S.D.N.Y. June 30, 2008) (Maas, U.S.M.J.); *Ayers v. SGS Control Servs.*, 2006 WL 859362, at *2 (S.D.N.Y. Apr. 3, 2006) (Ellis, U.S.M.J.); *Triola v. Snow*, 2006 WL 681203, at *1 (E.D.N.Y. Mar. 15, 2006).

[25] *Ashton/Burnett* Ltr. at 2-3 and Haefele Aff. Exhs. 1-2.

[26] *Fed Ins.* Ltr. at 5-6 and Exh. 7.



Of course, NCB emphatically denies that it took any actions that could be characterized as providing support in any way to al Qaeda, whether by charitable donations or by providing financial services to its customers. However, it is beyond dispute that plaintiffs allege nothing more against NCB than that the bank made donations to charities that in turn diverted money to al Qaeda, or that the bank provided financial services to customers who themselves aided al Qaeda. *See* Chart (Exh. 2). Even direct proof of such alleged donations or bank services would be jurisdictionally insufficient under *Terrorist Attacks III*. Proof of any Saudi government investigation into any such donations or bank services therefore would be still more remote from the jurisdictional inquiry. Accordingly— even putting aside SAMA's repeated confirmation that it knows of no such investigation— there is no reason to authorize any further jurisdictional discovery into the discredited audit/investigation allegations.

### 2.    Customer Accounts.

Plaintiffs' requests for discovery of alleged NCB customer accounts and related bank services[27] have been rejected previously and, in any event, cannot yield evidence material to jurisdiction. This Court already has held that "the plaintiffs have failed to make a prima facie showing of conspiracy that might warrant inquiry into the accounts of specific NCB customers at this preliminary stage." MDL Dkt. # 1849, at 11. Since then, that determination has only been strengthened by the Second Circuit's holding that even "the provision of financial services to an entity that carries out a terrorist attack on United States citizens" would not subject a banking defendant to the jurisdiction of the American courts. *Terrorist Attacks III*, 2008 WL 3474167 at *19. Moreover, the Court has held that there is "no basis for a bank's liability for injuries funded by money passing through it on routine banking business." *Terrorist Attacks I*, 349 F. Supp. 2d at 833; *see also Burnett v. Al Baraka Invest. & Dev. Corp.*, 274 F. Supp. 2d 86, 109 (D.D.C. 2003) ("The act of providing material support to terrorists, or 'funneling' money through banks for terrorists is unlawful and actionable, but ... Al Rajhi [Bank] is alleged only to be the funnel. Plaintiffs offer no support, and we have found none, for the proposition that a bank is liable for injuries done with money that passes through its hands in the form of deposits, withdrawals, check clearing services, or any other routine banking service.").

Further, in related proceedings, this Court already has dealt with plaintiffs' request for discovery concerning a trust established to hold the proceeds of shares formerly owned by Osama Bin Laden in the Saudi Binladin Group ("SBG") and other Binladin companies. According to SBG, these proceeds were placed into a trust account at NCB in 2000 and immediately frozen by order of the Saudi Ministry of Interior. *See* MDL Dkt. # 2098, at 14. There is no allegation or evidence that NCB provided anything other than routine banking services in connection with this alleged trust account. Accordingly, it is not surprising that this Court has focused on plaintiffs' requests for

---

[27] *Ashton/Burnett* Ltr. at 7-8 (seeking discovery concerning a trust account allegedly established to hold proceeds of shares in Binladin companies, including Saudi Binladin Group); *Fed. Ins.* Ltr. at 10 and *Fed. Ins.* 2nd Doc. Reqs. ## 1-9, 59-62 (seeking discovery concerning seven alleged account-holders and the operations of the "Thalia Branch of NCB").



discovery from SBG only regarding the liquidation and disposition of the OBL shareholdings <u>prior</u> to the time that the trust account allegedly was established at NCB. *See* MDL Dkt. # 2090 (Discovery Order), *aff'd*, MDL Dkt. # 2108 (Order). Plaintiffs provide no justification for seeking discovery from NCB concerning the records of this alleged trust account.

More egregiously, the *Federal Insurance* plaintiffs refuse to disclose the "sensitive investigative materials" that they claim would justify their request for discovery concerning seven supposed NCB account-holders and the operational records of NCB's "Tahlia Branch." *Fed. Ins.* Ltr. at 10 & n.10. The *Federal Insurance* plaintiffs have studiously ignored NCB's demand for access to these supposed "materials."[28] No plaintiff is entitled to judicial relief— whether discovery or liability— based on information and documents that they refuse to disclose to the defendant. *Weiss v. Nat'l Westminster Bank, PLC*, 242 F.R.D. 33, 68 (E.D.N.Y. 2007) ("information and documents may not be used by the plaintiffs as a sword and, to the extent they seek protection from disclosure, as a shield"); *Strauss v. Credit Lyonnais, S.A.*, 242 F.R.D. 199, 237-38 (E.D.N.Y. 2007) (same). In any event, even if plaintiffs' meagerly described mystery documents refer to banking services provided by NCB to customers in Saudi Arabia, then discovery of such services would have to be denied because proof of such financial services could not support jurisdiction under *Terrorist Attacks III*.

In seeking account information solely to support a legally insufficient jurisdictional theory, plaintiffs assert that NCB could nonetheless easily assemble and disclose that information. *Fed. Ins.* Ltr. at 7; *Ashton/ Burnett* Ltr. at 8. Plaintiffs, of course, are not entitled to discovery in support of a deficient jurisdictional theory no matter what logistical barriers exist to retrieval of such information. More crucially, however, plaintiffs ignore NCB's obligations under Saudi law, which requires banks to maintain the confidentiality of all customer account information. Even if the requested account information were jurisdictionally material, international comity would require the Court to determine whether "confidentiality obligations imposed by foreign law" prohibit such discovery under the multi-factor test used by the Second Circuit. *First Am. Corp. v. Price Waterhouse LLP*, 154 F.3d 16, 22 (2d Cir. 1998); *accord Lyondell-Citgo Refining L.P. v. Petroleos de Venezuela, S.A.*, 2004 WL 2698218, at *3 (S.D.N.Y. Nov. 19, 2004); *see* SAMA Circular MAT/150 (Sept. 7, 2002) (issued to all banks operating in the Kingdom of Saudi Arabia, and prohibiting them from "disclosing any financial or banking information of your clients or your banking dealings to any party, whether individuals, establishments, or government authorities or any other party" without SAMA approval) (copy attached hereto as Exhibit 7); *see also* MDL Dkt. # 2115, Exh. 10 (April 22, 2007 letter from SAMA to NCB concerning application of Saudi bank confidentiality requirements to 1998 report of examination of NCB); MDL Dkt. # 2115, Exh. 8 (August 28, 2006 letter from SAMA to NCB

---

[28] On August 11, NCB's counsel wrote to *Federal Insurance* plaintiffs' counsel as follows: "Please immediately send me a copy of all of the 'sensitive investigative materials' on which, according to page 10 of your proposed letter to Magistrate Judge Maas, the *Federal Insurance* plaintiffs are basing their application for further jurisdictional discovery. Regardless of how you may choose to resolve the issue of the public filing of any such materials (see your letter at page 10 n.10), we need these materials right away in order for NCB to be able to respond fully to your proposed application." NCB's demand has been ignored.



Honorable Frank Maas
August 21, 2008
Page 23

concerning application of Saudi bank confidentiality requirements to *Ashton* and *Burnett* jurisdictional discovery requests); MDL Dkt. # 1849 (discovery order) (recognizing SAMA role in enforcing confidentiality of bank account information under Saudi law); MDL Dkt. # 1964 (discovery order providing for *in camera* submission of SAMA audit report). Plaintiffs have not identified a jurisdictionally-material fact that would be established by account information of any NCB customer. Accordingly, the Court cannot elevate plaintiffs' desire for such irrelevant information over NCB's Saudi law obligation to keep banking and account information confidential.

### 3. Charities.

The Second Circuit rejected as jurisdictionally insufficient plaintiffs' "concerted action theory of liability" under which plaintiffs claim that all defendants, including NCB, "supported Muslim charities knowing that their money would be diverted to al Qaeda, which then used the money to finance the September 11 attacks." *Terrorist Attacks III*, 2008 WL 3474167, at *18. The Second Circuit held that plaintiffs' burden of proof on jurisdiction "is not satisfied by the allegation that the [defendants] intended to fund al Qaeda through their donations to Muslim charities." *Id.* "Even if the [defendants] were reckless in monitoring how their donations were spent, or could and did foresee that recipients of their donations would attack targets in the United States, that would be insufficient to ground the exercise of personal jurisdiction." *Id.*

These holdings unmistakably render irrelevant all of plaintiffs' jurisdictional discovery requests concerning NCB's relationships with Islamic charities: (i) the *Federal Insurance* Plaintiffs' First Set of Document Production Requests, which deal in their entirety with the alleged relationship between NCB or others and the Muwafaq Foundation (*see Fed. Ins.* Ltr. at 5-6);[29] (ii) the *Federal Insurance* Plaintiffs' Second Set of Document Production Requests ("*Fed. Ins.* 2nd R/P"), ## 16-33, which deal with NCB's alleged relationship with unidentified other Islamic charities or "crises... facing Muslim communities" throughout the world to which charities responded; (iii) *Fed. Ins.* 2nd R/P ## 10-15, which deal with Khalid Bin Mahfouz and his alleged relationship with Muwafaq Foundation and other Islamic charities, including the International Islamic Relief Organization ("IIRO") and the Saudi Joint Relief Committee for Kosovo and Chechnya ("SJRC") (*see also Fed. Ins.* Ltr. at 6-10); (iv) *Fed. Ins.* 2nd R/P ## 36-44, which deal with Yassin Kadi and his alleged relationships with both NCB and Islamic charities, including Muwafaq, IIRO and SJRC (*see also Fed. Ins.* Ltr. at 5-9); and (v) *Fed. Ins.* 2nd R/P ## 53-58, which deal with Abdulrahman Bin Mahfouz and his alleged relationship with Islamic charities, including Muwafaq, IIRO and SJRC.

---

[29] The allegations of the *Ashton*, *Burnett*, and *Federal Insurance* complaints about NCB's supposed relationship with Muwafaq are substantively identical. *Compare Federal Insurance* 1st Am. Complt. (¶¶ 292-294) *with Burnett* 3rd Am. Complt. (¶¶ 89, 95-96) and *Ashton* 6th Am. Complt. (¶¶ 424, 430-434); *see* Chart (Exhibit 2). Counsel for the *Federal Insurance* plaintiffs confirmed the commonality of the *Ashton/Burnett/Federal Insurance* allegations when he argued to Judge Casey (during an October 2004 hearing on NCB's personal jurisdiction motion to dismiss) that: "[T]here is an entire section of the *Federal*, *Ashton*, and *Burnett* complaints dedicated to setting forth allegations regarding the conduct of the Muwafaq Foundation... . All of that must be read as a whole." *See* 10/12/04 Tr. at 77:8-15 (excerpts attached as Exhibit 5) (emphasis added).



Honorable Frank Maas
August 21, 2008
Page 24

Moreover, plaintiffs have not established either: (i) that any charity-related activity undertaken by the Mahfouz family was within the scope of their employment while affiliated with NCB; or, (ii) that Kadi ever was employed by NCB and, in any event, that his charity-related actions had anything to do with NCB. *See* NCB's Motion to Dismiss (MDL Dkt. # 2111), at 30-35. "An employee's actions cannot be a basis for employer liability unless the employee was acting in furtherance of the employer's business." *Terrorist Attacks I*, 349 F. Supp. 2d at 836; *see also Burnett v Al Baraka Invest. & Dev Corp.*, 274 F. Supp. 2d 86, 109 n.18 (D.D.C. 2003) (plaintiffs must show that a bank official was "acting within the scope of his bank employment when he allegedly provided support to al Qaeda ... to impose vicarious liability on the bank for acts of its officers and employees.").[30] Thus, any charity-related actions that those individuals may have undertaken would not be material to the NCB jurisdictional inquiry even if *Terrorist Attacks III* had not already rendered NCB's relationships with Islamic charities jurisdictionally irrelevant.

Indeed, the record in this litigation confirms the absence of a scope-of-employment link between NCB and whatever charity-related actions these three individuals may have undertaken:

- **Khalid Bin Mahfouz.** In his own motion to dismiss the *Burnett* complaint, Khalid Bin Mahfouz stated: "Plaintiffs make additional allegations regarding NCB, but they do not allege that Mr. Mahfouz participated in, or even that he knew about, those alleged acts. ... They likewise offer no explanation why Mr. Mahfouz or any other NCB employee should have known that support for reputable Saudi charities, acknowledged by the Plaintiffs to enjoy Saudi government support and approval, would effectively support the cause of an outlaw who had been stripped of his citizenship and sought the overthrow of the Saudi regime. ... Plaintiffs do not even allege that Mr. Mahfouz knew that donations to such charities were being made from or through NCB's facilities." *Burnett*, 1:02-cv-01616 (D.D.C.), Dkt. # 319, at 7, 27 (footnote and citations omitted).

- **Abdulrahman Bin Mahfouz.** Notably, plaintiffs named the junior Mr. Mahfouz as a defendant in these actions, and they relied on his alleged affiliation with Muwafaq to argue that he was a participant in a conspiracy that culminated in the September 11 attacks. *See Terrorist Attacks I*, 349 F. Supp. 2d at 820. Judge Casey, however, dismissed the plaintiffs' claims against him for lack of personal jurisdiction because the plaintiffs did not allege "any specific actions by Mr. bin Mahfouz from which the Court could infer that he purposefully directed his activities at the United States." *Id* Because plaintiffs' alleged connections

---

[30] Plaintiffs' allegations that these individuals' activities can be imputed to NCB are substantively the same as plaintiffs' insufficient allegations concerning Al Rajhi Bank, which also were based on the conclusory allegation that the bank "aided and abetted the September 11 terrorists by donating to certain Defendant charities and acting as the bank for these Defendants." *Terrorist Attacks I*, 349 F. Supp. 2d at 832. The Court held that "allegations concerning the Al Rajhi family cannot support a claim against Al Rajhi Bank because there is no allegation that the family members were acting in furtherance of Al Rajhi Bank business." *Id* at 833. Plaintiffs had alleged that the Al Rajhi family owns and controls Al Rajhi Bank, has ties to Osama bin Laden and donors to Osama bin Laden, and is a major donor to the SAAR Network. *See id* at 832.



Honorable Frank Maas
August 21, 2008
Page 25

between Mr. Mahfouz and Muwafaq have been found insufficient to establish jurisdiction over Mr. Mahfouz himself, those same allegations cannot establish jurisdiction over NCB simply because of his prior affiliation with the bank. Of course, this jurisdictional deficiency is reinforced by the Second Circuit's decision in *Terrorist Attacks III*.

- **Yassin Kadi.** Mr. Kadi never was an officer or employee of NCB (Juco Decl. (MDL Dkt. #2114), ¶27),[31] and plaintiffs contend only that Kadi long ago helped NCB to establish its capabilities in the Islamic banking business. *Fed. Ins.* Ltr. at 5. Kadi's former work as an outside consultant to NCB could not make him into an NCB employee for all times and for all purposes. Moreover, there is nothing about Islamic banking that could be viewed as intentionally tortious activity directed at the United States. *See Terrorist Attacks III*, 2008 WL 3474167, at *19. For example, addressing the 2005 Arab Bankers Association of North America Conference on Islamic Finance, the Executive Vice President of the Federal Reserve Bank of New York "emphasize[d] that we— and here I am referring broadly to U.S. regulators— are open to Islamic financial products." Berger Aff. (MDL Dkt. #2115), ¶17, Exh. 33, at 1.

In earlier jurisdictional discovery rulings, this Court considered and rejected plaintiffs' requests for discovery concerning NCB's alleged relationship with the Muwafaq Foundation.[32] That decision was manifestly correct given this Court's broader holding that plaintiffs had not established a prima facie case of NCB involvement in a conspiracy to commit the September 11 attacks. *See supra* at 6-7. *Terrorist Attacks III* now emphatically closes the door on any jurisdictional discovery in aid of a legally deficient theory that tries to base jurisdiction on a foreign bank's donations to Islamic charities.

### 4. NCB Government Ownership.

The *Federal Insurance* plaintiffs are alone in seeking jurisdictional discovery concerning "the relationship between NCB and the Saudi government" on the theory that "the jurisdictional contacts of the government of Saudi Arabia may be attributable to NCB." *Fed. Ins.* Ltr at 10-11 and *Fed. Ins.* 2nd R/P ##45-52. In support of its sovereign immunity challenge to subject matter jurisdiction,

---

[31] In a sworn statement to the U.S. Office of Foreign Assets Control ("OFAC"), Mr. Kadi confirmed that: he had been only a consultant to NCB in 1990-1991, and had consulted with other financial institutions including Merrill Lynch and Chase Manhattan; and, that the Muwafaq Foundation "has never had any account with the National Commercial Bank (NCB)." Berger Aff. (MDL Dkt. #2115) Exh. 59 (excerpts of Dec. 19, 2002 Kadi OFAC Stmt.), at 8 ¶19 and 19 ¶41.

[32] *Compare Burnett* and *Ashton* Document Request 33 ("For the period beginning January 1990 through the present, provide all documents relating to the transfer of money through NCB accounts to MUWAFFAQ ('Blessed Relief') Foundation"), and April 30, 2007 Ltr. to Hon. Frank Maas from Andrew J. Maloney, III at pp. 2-3 & n.2, 5 (seeking information concerning transfer of NCB or NCB customer funds or assets to Muwafaq Foundation), *with* Discovery Order (June 28, 2006) (MDL Dkt. #1849) (denying plaintiffs' request for information about NCB customer accounts) and Order (May 1, 2007) (MDL Dkt. #1971) ("declin[ing] to direct any further discovery (not previously ordered) related to NCB.").



Honorable Frank Maas
August 21, 2008
Page 26

NCB demonstrated that it is a majority-owned instrumentality of the Saudi government. *E.g.,* MDL Dkt. # 487, Exhs. 1 & 2. However, Judge Casey expressly held: "Further inquiry into NCB's status as a foreign sovereign [instrumentality] is postponed until the parties have completed their personal jurisdiction discovery and this Court has determined whether it has personal jurisdiction over NCB." *Terrorist Attacks II,* 392 F. Supp. 2d at 575. The *Federal Insurance* discovery requests seek to evade that ruling. Regardless, any effort by the *Federal Insurance* plaintiffs to "attribute" the Kingdom's U.S. "jurisdictional contacts" to NCB has been made moot by the Second Circuit's decision affirming the Kingdom's dismissal from this litigation on grounds of sovereign immunity. *Terrorist Attacks III,* 2008 WL 3474167 at *1.

> **5.      Depositions.**

As explained earlier, Rule 56(f) forecloses plaintiffs' attempt to take depositions simply to challenge the testimony of the three affiants supporting NCB's Motion to Dismiss. *See supra* at Section IV.A.1. Moreover, plaintiffs already have had ample jurisdictional discovery through other means on the issues authorized in this Court's earlier orders. Equally, the *Federal Insurance* plaintiffs should not be authorized to proceed with their notices to take the deposition of NCB pursuant to Rule 30(b)(6) and of Ali Madany, whom plaintiffs contend was formerly an NCB branch manager. Both depositions are intended to address the same subjects as the *Federal Insurance* plaintiffs' document requests in aid of their legally-deficient specific jurisdiction theory. *See Fed. Ins.* Ltr. at 6, 7, 9, 10, 11 and 12. Because documentary discovery on those subjects is legally unjustified, deposition discovery on those subjects is prohibited as well.

> **C.      "Additional Jurisdictional Discovery" Should Not Be Allowed.**

Judge Daniels' July 11, 2008 Order provided plaintiffs with an opportunity to demonstrate a need for "specific" "additional jurisdictional discovery." However, his Order did not alter the legal framework requiring that any such discovery be material to a legally sufficient theory of jurisdiction. Nor did his Order imply that the ample jurisdictional discovery record, developed under this Court's supervision, fell short of Judge Casey's three-year-old mandate for only "limited jurisdictional discovery."

As this Court observed in related proceedings, "the Court and counsel have been mired at th[e] preliminary stage [of jurisdictional discovery] for a considerable period of time." MDL Dkt. # 2090, at 10. In authorizing NCB to file its renewed and consolidated Motion to Dismiss, Judge Daniels recognized that it was time to bring that "preliminary stage" to a close, absent a legally supported entitlement to "specific" further discovery. Plaintiffs' broadside of discovery requests has abused Judge Daniels' invitation to make such a showing.

NCB respectfully submits that, for all of the reasons explained above, the plaintiffs have not demonstrated a need for, or entitlement to, any "additional jurisdictional discovery." The Second Circuit's recent decision in *Terrorist Attacks III* provides clear and binding parameters for the exercise of personal jurisdiction over foreign defendants like NCB. That decision was equally clear in

**PATTON BOGGS** LLP
ATTORNEYS AT LAW

Honorable Frank Maas
August 21, 2008
Page 27

upholding the district court's authority to deny applications for jurisdictional discovery— let alone "additional jurisdictional discovery"— when the plaintiffs fail to establish a prima facie case of jurisdiction. *Terrorist Attacks III*, 2008 WL 3474167, at *20. As explained both in NCB's Motion to Dismiss and in this letter, plaintiffs have not established a prima facie case of jurisdiction over NCB, and their requests for further jurisdictional discovery should be denied.

**V.     Plaintiffs Should Be Directed to Submit a Consolidated Opposition to NCB's Motion to Dismiss by September 22, 2008.**

Case Management Order No. 4 establishes a "presumptive briefing schedule" under which the plaintiffs have 60 days post-filing of a motion to dismiss to submit their opposition papers, and defendants have 30 days post-filing of an opposition to submit their reply. MDL Dkt. # 1546, ¶ 5. The plaintiffs acknowledge that CMO-4 establishes the schedule for further briefing of NCB's Motion to Dismiss filed July 22, 2008. *Fed. Ins.* Ltr. at 4; *O'Neill* Ltr. at 3. Accordingly, plaintiffs' papers in opposition to NCB's Motion to Dismiss are due September 22, 2008.

CMO-4 also states that: "With respect to motions to dismiss that have not yet been filed, the Court prefers consolidated briefing as much as possible." CMO-4, ¶ 5. Judge Daniels accordingly authorized NCB "to submit a single supporting memorandum of law not to exceed 35 pages." MDL Dkt. # 2106. Plaintiffs, however, appear to believe that they may file multiple briefs in opposition to NCB's Motion to Dismiss. *E.g.*, *O'Neill* Ltr. at 3. Separate briefs would be contrary to the preference expressed in CMO-4, and to Judge Daniels' implicit direction that the parties brief NCB's Motion to Dismiss on a consolidated basis. Moreover, it would unfairly disadvantage NCB— having filed a single 35-page supporting brief— to have to reply to multiple opposition briefs. NCB therefore respectfully requests that this Court order the plaintiffs to consolidate their opposition brief into a single memorandum not to exceed 35 pages.

Plaintiffs appear to believe that there is no reason to promptly complete the briefing of NCB's Motion to Dismiss given the number of other dispositive motions pending before the Court. *See Fed. Ins.* Ltr. at 2; *Ashton/Burnett* Ltr. at 1-2. However, NCB has been waiting since 2005 to renew its motion to dismiss for lack of personal jurisdiction and would be prejudiced by being required to wait any longer, particularly given Judge Daniels' announced intention to address "all personal jurisdiction motions to dismiss" as soon as he resolves the "subject matter jurisdiction motions to dismiss on the grounds of sovereign immunity [that] are currently under consideration." Order of March 14, 2008 (MDL Dkt. # 2072). Judge Daniels' July 11 Order clearly envisions that NCB's Motion to Dismiss should be ready for consideration at the time that the Court takes up the other pending personal jurisdiction motions. Further delay therefore should be rejected.


PATTON BOGGS LLP
ATTORNEYS AT LAW

Honorable Frank Maas
August 21, 2008
Page 28

## Conclusion

For the foregoing reasons, NCB respectfully requests that this Court deny plaintiffs' requests for additional jurisdictional discovery in their entirety,[33] and direct the plaintiffs to submit their papers in opposition to NCB's Motion to Dismiss not later than September 22, 2008 accompanied by a single opposition memorandum of law not to exceed 35 pages.

Respectfully submitted,

Mitchell R. Berger
*Counsel for Defendant*
*The National Commercial Bank*

cc:     The Honorable George B. Daniels
        All Counsel

---

[33] Because none of plaintiffs' proposed jurisdictional discovery has been authorized by the Court, NCB does not plan to file separate Rule 34 objections to the *Federal Insurance* plaintiffs' Second Set of Jurisdictional Requests for Production of Documents directed to NCB, or separately to move for a protective order with respect to their notices to take depositions.