```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:        _____
DATE FILED:    1/13/10
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
In Re:                                                   :

        TERRORIST ATTACKS ON
        SEPTEMBER 11, 2001              :

-------------------------------------------------------x

**MEMORANDUM
DECISION AND ORDER**

03 MDL 1570 (GBD)(FM)

**FRANK MAAS**, United States Magistrate Judge.

I.    Introduction

        The plaintiffs in the civil actions comprising this multi-district litigation

seek to recover damages arising out of the atrocities committed by terrorists on September

11, 2001.  Since the first of these actions was filed in 2002, the plaintiffs – consisting of

persons who were injured, representatives of those who died, property owners, and

insurers bringing subrogation claims (collectively "Plaintiffs") – have sought to proceed

against a host of defendants alleged to have had a direct or indirect connection to the

terrorists' attacks in this country.  The defendants named in the Plaintiffs' complaints

include not just alleged terrorists, but also certain potentially deep pockets, such as

foreign banks, Islamic charities and wealthy Saudi citizens.

        The battle to recover money damages from these defendants has been

waged before District Judges Richard C. Casey and George B. Daniels (who replaced

Judge Casey following his untimely death), as well as in the United States Court of

Appeals for the Second Circuit and the United States Supreme Court, which, in June

2009, denied the Plaintiffs' certiorari petition seeking to contest the Second Circuit's

rulings concerning personal jurisdiction over some of the defendants.  My principal role

has been to resolve discovery disputes, of which there has been no dearth over the last

few years.

This Memorandum Decision and Order relates to certain jurisdictional

discovery sought by the Plaintiffs with respect to National Commercial Bank ("NCB"), a

Saudi bank named as a defendant in the Ashton, Burnett, Federal Insurance, and O'Neill[1]

complaints.  The Plaintiffs argue principally that NCB should be required to respond to

the Federal Insurance plaintiffs' latest round of discovery requests (as they have been

narrowed), as well as several other outstanding discovery requests, before they are

required to answer NCB's renewed motion to dismiss their complaints as against NCB for

lack of personal jurisdiction.[2]  That motion was filed on July 22, 2008.  (Docket No.

2110).  Through this further discovery, the Plaintiffs hope to establish that there is a basis

for this Court to assert personal jurisdiction over NCB.

For the reasons set forth below, the Plaintiffs' application for further

jurisdictional discovery is conditionally denied.

----

[1]	The plaintiffs in the O'Neill, Cantor, Continental, and New York Marine actions
are collectively referred to as the "O'Neill plaintiffs" in this Memorandum Decision and Order.

[2]	The Plaintiffs also seek jurisdictional discovery concerning NCB from two of
NCB's co-defendants, Khalid Bin Mahfouz and Yassim al Qadi.  Those defendants' own
motions to dismiss are pending.

II.     Factual and Procedural Background

        Before addressing the present discovery disputes, it is useful to review some

of the extensive prior proceedings involving NCB.

        A.     In re Terrorist Attacks Trilogy

        In 2005, Judge Casey denied without prejudice NCB's first motion to

dismiss, which asserted, in part, that NCB was an instrumentality of the Kingdom of

Saudi Arabia and therefore immune from suit under the Foreign Sovereign Immunities

Act ("FSIA"), 28 U.S.C. § 1602, et seq.  See In re Terrorist Attacks on Sept. 11, 2001

(Terrorist Attacks I), 349 F. Supp. 2d 765, 792 (S.D.N.Y. 2005).  Judge Casey reasoned

that, before he decided that threshold motion, the Plaintiffs were entitled to "limited"

discovery as to whether the Saudi Public Investment Fund, the majority owner of NCB,

constituted an agency, instrumentality or organ of the Kingdom, thereby rendering NCB

immune from suit in this country under the FSIA.  Id.  Judge Casey also held that the

contacts between NCB and the United States upon which the Plaintiffs had relied –

including the presence of an NCB subsidiary in New York City until 2001 – were

insufficient to establish personal jurisdiction, but that "limited jurisdictional discovery"

might enable the Plaintiffs to make the requisite showing.  Id. at 820.  The Plaintiffs were

directed to explore the FSIA issue first.  Id. at 836.

        Apparently not anticipating the labyrinthine discovery that might ensue,

NCB moved for reconsideration, asking that the Court address its motion to dismiss the

claims against NCB on personal jurisdictional grounds before turning, if necessary, to its motion to dismiss those claims on subject matter grounds pursuant to the FSIA. NCB asserted that this would lead to a quicker result and limit any "intrusion into Saudi affairs since personal jurisdiction discovery would involve only NCB's contacts with the United States and not Saudi Arabia's relationship to NCB." In re Terrorist Attacks on Sept. 11, 2001 (Terrorist Attacks II), 392 F. Supp. 2d 539, 575 (S.D.N.Y. 2005). Judge Casey acceded to NCB's request in a second decision. See id.

Following Judge Casey's two decisions, the Plaintiffs appealed to the Second Circuit from the dismissal of twelve of the defendants named in their complaints. See In re Terrorist Attacks on Sept. 11, 2001 (Terrorist Attacks III), 538 F.3d 71, 75 (2d Cir. 2008). Although most of the Terrorist Attacks III decision concerned the applicability of the FSIA, see id. at 80-92, the Court of Appeals also affirmed the dismissal of the claims against four Saudi princes and an individual who managed Saudi banks on personal jurisdictional grounds, id. at 93-97. Distinguishing case law from other circuits, the Court of Appeals noted that "those cases all addressed defendants who were primary participants in terrorist acts." Id. at 93-94. As the court explained, that the princes may have "intended to fund al Qaeda through their donations to Muslim charities," and foreseen that violence in this country would result, was not enough to establish personal jurisdiction over them because "foreseeability [of harm in the United States] is not the standard;" rather the princes must themselves have "'expressly aimed'

4

intentional tortious acts at residents of the United States." Id. at 95 (citing Calder v. Jones, 465 U.S. 783, 789 (1984)). The court held that the mere provision of "indirect funding to an organization that was openly hostile to the United States does not constitute this type of intentional conduct." Id.

The Plaintiffs had asked the Second Circuit to draw a "reasonable inference" that the body of Islamic law known as Sharia, which prohibits the payment or earning of interest, caused Islamic banks and their owners to have a close business relationship with their customers, such that a banker whose bank held the deposits of terrorists, or received investments from them, should be considered to have provided material support directly to terrorists. Id. The Court of Appeals conceded that al Qaeda might not have been able to fund its terrorist acts without access to financial institutions, but held that this did "not mean that the managers of those financial institutions 'purposefully directed' their 'activities at residents of [this] forum.'" Id. at 96 (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472 (1985)). Noting that the Saudi banker whose dismissal motion had been granted was never a "director, officer, shareholder or employee of the banks that purportedly held [the] terrorists' deposits," the court stated that the mere "provision of financial services to an entity that carries out a terrorist attack on United States citizens" was not enough to subject the banker to the jurisdiction of a United States court. Id.

Finally, the Court of Appeals affirmed Judge Casey's denial of the Plaintiffs' motion for jurisdictional discovery regarding the princes and the banker because the Plaintiffs had failed to establish a prima facie case that the district court had jurisdiction over them.  Id.

The Plaintiffs subsequently sought a writ of certiorari contending that:  (1) the Second Circuit had misapplied the FSIA tort exception; and (2) donors to foreign charitable institutions that provide financial support to terrorists are subject to personal jurisdiction in the United States courts.  See Petition for Writ of Certiorari, Fed. Ins. Co. v. Kingdom of Saudi Arabia, 129 S. Ct. 2859 (2009) (No. 08-640), 2008 WL 4906103.  After the Solicitor General submitted an amicus brief urging denial of the writ, the Supreme Court denied the certiorari petition on June 29, 2009.  Id.; see also Letter to the Court from Mitchell R. Berger, Esq., dated June 2, 2009 (enclosing brief of Solicitor General).

B.    Prior Jurisdictional Discovery

I have been involved in refereeing the parties' disputes concerning the proper scope of jurisdictional discovery as to NCB since April 2006.  As part of that assignment, I have met with counsel frequently and have received voluminous submissions.  If the proceedings to date constitute the easier path to the resolution of issues concerning NCB's amenability to suit in this District, as NCB previously suggested, one can only wonder what the more arduous route would be.

6

After my initial meeting with counsel, I issued a discovery order, dated June 28, 2006, which recognized that the sufficiency of a defendant's contacts with a forum state must be assessed as of the date that suit is filed, "not at some earlier time." In re Terrorist Attacks on Sept. 11, 2001 (Discovery Order I), 440 F. Supp. 2d 281, 284 (S.D.N.Y. 2006). I nevertheless allowed a six-year "look-back" period to ensure that the Plaintiffs were not limited to a snapshot that gave them an inaccurate understanding of NCB's contacts with the United States in 2002, when the earliest of the suits comprising this multi-district litigation was filed. Id. at 285. In addition, I directed NCB to produce a copy of a 1998 audit by the Saudi Arabian Monetary Authority ("SAMA") – if one existed – because the Plaintiffs alleged that there was such a report, which discussed NCB's financing of terror through charities related to Osama Bin Laden and al Qaeda. Id. at 286. I declined the Plaintiffs' further request that NCB be required to produce all of the documents referenced in the audit or the banking records of particular NCB customers because the Plaintiffs had "failed to make a prima facie showing of conspiracy which might warrant [such an inquiry]." Id. at 287.

In response to Discovery Order I, NCB produced more than 60,000 pages of documents, but indicated that SAMA was unaware of any 1998 audit of NCB addressing the issue of financing terrorist activities. (See Letter to the Court from Ronald S. Liebman, Esq., dated Mar. 5, 2007, at 1). NCB also disclosed through counsel that it was the subject of regular audits by outside auditors, one of which, undertaken at the direction

7

of SAMA, had resulted in a February 1998 audit report by Arthur Andersen.  (Id. at 4-5).

Although NCB argued that the Arthur Andersen report should not be produced, (id.), I

reviewed the entire three-volume report in camera and concluded that it was not relevant

to the jurisdictional issues in this case.  (See Docket No. 1971) (Memorandum

Endorsement dated May 1, 2007).

On March 23, 2007, at the Plaintiffs' request, I directed that Lawrence G.

Smith ("Smith"), who had served as NCB's Executive Vice President and General

Manager for North America from 1984 until 1992, be deposed.  (See Docket No. 1964)

(Order dated Mar. 23, 2007).  The Smith deposition was intended to explore whether

NCB or SNCB Securities Inc. ("SNCB"), its wholly-owned subsidiary, had been doing

business in the United States at or about the time that the Plaintiffs' suits were filed.  (See

Mar. 23, 2007 Tr. at 36-37).  During the same conference, I denied the Plaintiffs' request

to depose a second witness, Virginia Pensa, and reserved decision, at the Plaintiffs'

request, regarding their application to depose a third witness, Jagan Mohan Reddy.

(See id. at 36; Docket No. 1964).  Pensa had worked for SNCB prior to its winding down

in late 2001.  Reddy was an employee of NCB and SNCB between 1991 and 2000.  (See

Decl. of Jagan Mohan Reddy, dated Mar. 21, 2007, ¶ 3).

That same day, I also denied the Plaintiffs' request that NCB be required to

produce documentation concerning its correspondent banking relationships in the United

States.  (Mar. 23, 2007 Tr. at 36).  Although the rationale is not set forth in the ensuing

order, (Docket No. 1964), the request was denied because "[c]ourts have repeatedly found that a correspondent bank relationship between a foreign bank and a New York financial institution does not provide sufficient grounds to exercise personal jurisdiction over a foreign bank." Semi Conductor Materials v. Citibank Int'l PLC, 969 F. Supp. 243, 246 (S.D.N.Y. 1997).

Ever resourceful, the Plaintiffs then subpoenaed seven domestic banks for the records of 254 potential account holders, one of which was NCB. I permitted this third-party discovery to proceed with respect to accounts at the subpoenaed banks other than those that NCB maintained in its own name or on behalf of NCB customers (the "NCB Accounts"). (See Docket No. 1987) (Discovery Order dated July 25, 2007). In addition, I permitted the banks to produce records related to the NCB Accounts if they could be obtained from the records of the other account holders whose records had been subpoenaed. (Id.). Finally, to ensure that relevant information would not be destroyed while the jurisdictional issues related to NCB were being considered, I directed the subpoenaed banks to produce their records regarding the NCB accounts to NCB's counsel for safekeeping. (Id.). On December 20, 2007, Judge Daniels overruled the Plaintiffs' objections to these discovery determinations. (Docket No. 2058).

After the Smith deposition took place before me on July 27, 2007, the Plaintiffs complained that he lacked knowledge of the activities of NCB or SNCB after 1992. Accordingly, they sought to depose Pensa and Thomas Krohley, both of whom had

worked as consultants to NCB in 2001.  (<u>See</u> Letter to the Court from Andrew J.

Maloney, III, Esq., dated Aug. 16, 2007, at 1-2).  The consultancy agreements attached to

the Plaintiffs' letter-request established, however, that the services of Pensa and Krohley,

which related to the winding down of SNCB, had terminated, respectively, on February

28 and June 30, 2001.  (<u>Id.</u> Ex. B).  It further was undisputed that SNCB had filed a

voluntary surrender of its authority to do business in New York by October 17, 2001.  (<u>Id.</u>

at 2 n.3).  In the absence of any evidence that SNCB subsequently had engaged in any

activities in the United States, through agents or otherwise, I declined to direct that Pensa

and Krohley be deposed, reasoning that their depositions would constitute a "fishing

expedition."  (<u>See</u> Docket No. 2038) (Memorandum Endorsement dated Sept. 18, 2007).

On December 20, 2007, Judge Daniels overruled the Plaintiffs' objections to this ruling.

(Docket No. 2057).

       Thereafter, by letter dated April 21, 2008, NCB sought to renew its motion

to dismiss all of the cases in which it was named for lack of personal jurisdiction.  (<u>See</u>

Letter to Judge Daniels from Mitchell R. Berger, Esq., dated Apr. 21, 2009, at 1).  The

<u>Federal Insurance</u> plaintiffs opposed that application by letter dated April 25, 2008.  (<u>See</u>

Letter to Judge Daniels from Sean P. Carter, Esq., dated Apr. 25, 2008 ("Carter Letter

I")).  In that letter, the <u>Federal Insurance</u> plaintiffs argued that they were not bound by the

course of any prior proceedings concerning NCB because, unlike the other Plaintiffs, they

had been precluded from pursuing discovery while NCB's original motion to dismiss

their complaint against NCB remained pending.  On that basis, the Federal Insurance

plaintiffs urged Judge Daniels to deny NCB's original motion to dismiss their complaint,

permit them to engage in further discovery, and then set a schedule for a renewed motion

to dismiss all of the multi-district litigation cases in which NCB was named.  (Id. at 1-2).

The Federal Insurance plaintiffs argued that this was the only viable "means to harmonize

the procedural status of the claims against NCB in all of the MDL cases and allow further

proceedings against NCB to move forward on a consolidated basis, while at the same

time protecting the procedural rights of all parties."  (Id. at 2) (emphasis in original).

    The principal theory underlying the additional discovery sought by the

Federal Insurance plaintiffs was that persons closely affiliated with NCB had not only

contributed to charities that funded terrorist acts in the United States, but played a role in

the establishment and operation of those charities.  In the Federal Insurance plaintiffs'

view, this distinguished such persons (and NCB) from the passive contributors whose

indirect role in the funding of terrorism the Second Circuit previously had held, in

Terrorist Acts III, was insufficient to establish personal jurisdiction over them in the

United States.  (See  id. at 9-14).

    The Federal Insurance plaintiffs also sought discovery to bolster their claim

that NCB was subject to personal jurisdiction in New York under a "conspiracy theory of

personal jurisdiction."  (Id. at 9).  In support of that theory, the Federal Insurance

plaintiffs argued that the Muwafaq Foundation, a Saudi charity, which allegedly had

served as a conduit for financing al Qaeda, was founded by "NCB Senior Executives

Khalid Bin Mahfouz and Yassi[m] al Qadi," and that al Qadi was "responsible for the

operation of the . . . Foundation, to include the distribution of its funds."  (Id. at 13).  The

Federal Insurance plaintiffs further noted that al Qadi met with Osama bin Laden as late

as 1992 while the Muwafaq Foundation was being formed.  (Id.).

       The Ashton, Burton, and O'Neill plaintiffs joined in the request that Judge

Daniels deny NCB's request to file a renewed motion to dismiss.  In their letters to Judge

Daniels, these plaintiffs contended that there were at least two additional areas of

jurisdictional discovery that needed to be exhausted before NCB could be permitted to

file a renewed motion.[3]  (See Letter to Judge Daniels from Justin T. Green, Esq., dated

Apr. 25, 2008, at 2).  The first area related to an alleged NCB affiliate, NCB Aviation,

which the plaintiffs thought might have done business in the United States during a

jurisdictionally-relevant period of time.  (Id. at 3).  The second area concerned a trust

account at NCB that held assets of Osama bin Laden that the Saudi government had

frozen.  (Id. at 2).  The trust account previously had been the subject of jurisdictional

---

[3]     The O'Neill plaintiffs objected on the additional ground that they had "stipulated
to defer briefing subject to the understanding that such briefing would not occur until the
jurisdictional discovery in all of the MDL cases had been completed."  (Letter to Judge Daniels
from Jerry S. Goldman, Esq., dated Apr. 24, 2008 ("Goldman Letter I"), at 1).

discovery related to another defendant in this multi-district litigation, the Saudi Binladen Group.[4]  (Id. at 2-3).

Despite the Plaintiffs' objections, Judge Daniels granted NCB's request to file its renewed motion, but directed that any requests for further premotion discovery and any related applications to stay or extend the motion briefing schedule be directed to me. (See Docket No. 2106) (Order dated July 11, 2008).

C.     NCB's Renewed Motion

NCB filed its renewed motion on July 22, 2008.  (Docket No. 2110). Accompanying NCB's motion were several declarations and affidavits, including: (i) an affidavit from Krohley, the former vice president of NCB's New York branch, which indicated that the branch ceased doing business in 1992 and that SNCB (NCB's indirect securities subsidiary) ceased doing business in the United States in 2000 and was dissolved in early 2001; (ii) the declaration of Dr. Abubaker Ali Bagabir, NCB's Head of Finance and Accounting, who stated that NCB's only United States affiliate was SNCB, and that neither NCB nor any of its subsidiaries or affiliates had engaged in the airline business in the United States; and (iii) the declaration of Jorge Juco, a legal advisor

---

[4]     That discovery showed that the trust account at NCB was created pursuant to a 1993 shareholder resolution which removed bin Laden from SBG's shareholder roster.  (See Docket No. 2090) (Discovery Order dated May 21, 2008).  Following Saudi government approval, bin Laden's shares of SBG were transferred into a joint trust account at NCB which was outside of his control.  (See id.).

13

working for NCB in Jeddah, Saudi Arabia, further confirming NCB's lack of contact with the United States.  (See Docket Nos. 2112-14).

In his declaration, Juco conceded that NCB had a branch on the ground floor of its Khalidiyah Branch Building in Jeddah, Saudi Arabia, but claimed that NCB did not occupy any space on the third floor, where NCB Aviation allegedly was located. (See Docket No. 2114 at 6).  The Juco declaration further stated that NCB did not have any records indicating that any of the persons who flew aircraft that the Plaintiffs claimed were associated with NCB Aviation had ever been employed by NCB.  (Id. at 6-7). Based on records, Juco also denied that al Qadi was or ever had been an NCB employee. (Id. at 7).

D.    Subsequent Events

After Judge Daniels issued his July 11 order allowing NCB's renewed motion, the Plaintiffs sent me three letters, each dated August 15, 2008, which sought further discovery.  The Ashton and Burnett plaintiffs argued in their letter that additional jurisdictional discovery was warranted based upon two French diplomatic cables which indicated that, "since the end of 1998," Saudi authorities had undertaken an investigation of the possible involvement of NCB and its former Chief Executive Officer, Khalid Bin Mahfouz, in the financing of terrorist organizations.  (See Letter to the Court from James P. Kreindler, Esq., dated Aug. 15, 2008 ("Kreindler Letter I"), at 2).  Based on these cables, the Ashton and Burnett plaintiffs sought any information in NCB's control

14

relating to any investigation of NCB or Bin Mahfouz by Saudi authorities from 1990 until 2003.  (Id. at 3).  The Ashton and Burnett plaintiffs also renewed their request to depose Krohley because Smith allegedly was "less than informative about SNCB," and because NCB had submitted the affidavits of Krohley, Juco, and Bagabir in support of its renewed motion to dismiss.  (Id. at 3-4).  In the alternative, the Ashton and Burnett plaintiffs asked that these witnesses' affidavits (and the attachments thereto) be stricken from NCB's motion papers.  (Id. at 4).

    The Ashton and Burnett plaintiffs further contended that NCB had not fully complied with their prior discovery requests.  They noted that they had obtained, through means other than discovery, the business card of a Keith Monroe, which indicated that he was a flight engineer affiliated with the Aviation Department of Skyways International. That business card contained the name of NCB on its face.  (Id. at 5-7 & Ex. 5).  The Ashton and Burnett plaintiffs stated that they also had obtained a fax transmittal sheet on which a "Sandy Dalit" of "NCB Aviation" confirmed that its "complete address for courier purposes" was "The National Commercial Bank, Aviation Department, 3rd Floor, NCB Khalidiyah Branch Bldg., Prince Abdulla Street, District Khalidiyah, P.O. Box 9935, Jeddah 21423, Saudi Arabia."  (Id. Ex. 13).  From these and other documents, the plaintiffs argued that, notwithstanding NCB's protestations to the contrary, NCB had maintained an aviation business under various names, including NCB Aviation, Mid-East Jet, and Skyways International.  (Id. at 5).  The plaintiffs further contended that the chief

15

executive officer of Mid-East Jet, which used the same mailing address as NCB Aviation, was Bin Mahfouz.  (Id. Exs. 9-10).  The plaintiffs argued that the existence of NCB Aviation was jurisdictionally significant because Federal Aviation Administration flight tracking data showed that NCB Aviation aircraft had entered United States airspace on more than 130 occasions between 2000 and 2002.  (Id. at 7).[5]  Other items of discovery that the Ashton and Burnett plaintiffs contended remained open related to their request for documents concerning the account at NCB held in trust for Osama bin Laden.  (Id. at 7-8).

The O'Neill plaintiffs joined in the Ashton and Burnett plaintiffs' letter requests.  (See Letter to the Court from Jerry S. Goldman, Esq., dated Aug. 15, 2008 ("Goldman Letter II"), at 1).  Indeed, the O'Neill plaintiffs argued that the Court "should not even consider" allowing NCB to proceed with its renewed motion to dismiss until it had decided a letter-motion to compel filed by the Ashton and Burnett plaintiffs on December 20, 2007, and the Plaintiffs had an opportunity to appeal any ruling to Judge Daniels.[6]  (Id. at 4-5).  The O'Neill plaintiffs additionally contended that NCB would not be prejudiced by any delay because Judge Daniels previously had indicated that he planned to address motions relating to the Court's subject matter jurisdiction before

---

[5]     The FAA flight tracking data suggests that the planes were actually Mid-East Jet or Skyways International planes.  (Id. Exs. 14, 15)

[6]     The issues rasied in that letter-motion either have been resolved in prior conferences or are addressed in this Memorandum Decision and Order.

16

turning to any outstanding motions to dismiss defendants on personal jurisdictional grounds.  (Id. at 6).  Moreover, the O'Neill plaintiffs maintained that NCB's "unclean hands should preclude it from asserting any prejudice" resulting from further discovery delays because NCB had, in their view, improperly withheld the Krohley affidavit, which was prepared in 2007 in connection with NCB's opposition to the Plaintiffs' efforts to depose Krohley.  (Id. at 7).

Finally, the Federal Insurance plaintiffs maintained that they were entitled to obtain discovery from co-defendants al Qadi and Bin Mahfouz – whom they characterized as "former NCB executives" –  before being required to respond to NCB's renewed summary judgment motion.  (See Letter to the Court from Sean P. Carter, Esq., dated Aug. 15, 2008 ("Carter Letter II"), at 1).  The Federal Insurance plaintiffs maintained that this additional discovery would not prejudice NCB in view of the backlog of fully-submitted motions to dismiss pending before Judge Daniels, and because they sought "discovery as to only a few discrete issues and relationships[] critical to the specific jurisdictional theories they [had] advanced as to NCB."  (Id. at 2).  The Federal Insurance plaintiffs further contended that the discovery that the other Plaintiffs were granted pursuant to the Court's prior orders could not be considered their discovery because the MDL Order did not consolidate the cases comprising this multi-district litigation, and because a motion to dismiss the Federal Insurance plaintiffs' claims against

17

NCB had been pending throughout the time the other discovery was underway.  (Id. at 2-3).

NCB opposed the Plaintiffs' further discovery requests, characterizing them as a "sledgehammer" program of discovery.  (See Letter to the Court from Mitchell R. Berger, Esq., dated Aug. 21, 2008 ("Berger Letter"), at 1).  NCB noted in its letter that the allegedly "targeted" discovery that the Plaintiffs sought included "92 additional document production requests  [to NCB] . . . , another 128 document production requests to [al Qadi and Bin Mahfouz]; at least five depositions of NCB, other defendants, and non-parties, pursuant to notices issued by the Federal Insurance plaintiffs; and three more depositions of witnesses whose affidavits support[ed] NCB's Renewed Motion to Dismiss."  (Id. at 1-2) (footnotes omitted).

On August 25, 2008, in an attempt to bolster their application for further premotion discovery, the Burnett plaintiffs submitted to me several binders ("Binders") containing "sensitive" documents that they alleged "provide[d] ample support for why the requested additional discovery [was] proper and essential."  (Letter to the Court from Robert Haefele, Esq., dated Aug. 25, 2008, at 1).  Recognizing that at least some of the documents in the Binders might be classified, the Burnett plaintiffs sent them to the Court and provided a duplicate set to the United States Attorney's Office, but furnished only a copy of the cover letter to counsel for NCB and the other Plaintiffs.  Several days later, the United States Attorney's Office confirmed that the government's preliminary review

18

showed that at least some of the documents in the Binders were classified.  (See Letter to the Court from Ass't U.S. Att'y Sarah S. Normand, dated Aug. 27, 2008).  The Binders that had been furnished to both Judge Daniels and me therefore were placed in a secure area of the Courthouse, where they have remained ever since.  Additionally, at the Government's request, counsel for the Burnett plaintiffs later surrendered the copies of the materials in the Binders in their possession.  In a subsequent New York Times article, lawyers for the Burnett plaintiffs were quoted as having said that someone "anonymously slipped them [these] documents."  See Eric Lichtblau, Documents Back Saudi Link to Extremists, but May Never Be Used in 9/11 Suit, N.Y. Times, June 24, 2009, at A11.

In February 2009, evidently concerned that the Court might not consider the classified material before determining whether there should be further discovery, Plaintiffs' counsel filed a motion seeking, among other relief, a "declaratory judgment" that the Court would review the Binders in connection with its decision regarding further discovery.   (See Docket Nos. 2157-59).  The motion papers also sought a declaratory judgment that "Judge Daniels, as an Article III Judge, has [the] security clearance and authority to securely keep and review [the Binders' contents]" and "[a]fter conducting that in camera review, . . . will determine whether additional jurisdictional discovery against NCB is warranted."  (Docket No. 2157) (Notice of Motion).  On July 14, 2009, Judge Daniels issued an order denying the Plaintiffs' request for in camera review.  (See Docket No. 2182).

19

In the interim, I had met with counsel twice to discuss the other outstanding discovery issues relating to NCB.  During the first of these conferences on April 30, 2009, I denied the Plaintiffs' request to depose Krohley, Juco, and Bagabir, reasoning that, in the context of a motion to dismiss claims on personal jurisdictional grounds, not every affiant needs to be deposed.  (See Apr. 30, 2009 Tr. at 41; see also id. at 36-39).  I also denied the Plaintiffs' request for further discovery concerning an audit or investigation related to NCB's alleged financing of terrorism on the ground that NCB's prior denials that such a document existed were adequate.  (Id. at 31, 33).

The Plaintiffs also had sought documentation concerning the bin Laden trust account at NCB (as to which he apparently has no right of access).  Relying on the Second Circuit's holding in Terrorist Attacks III that the mere provision of financial services to an entity that engages in a terrorist act on United States soil was insufficient to confer personal jurisdiction, I concluded that further discovery in this area would not be productive.  I therefore denied the Plaintiffs' request.  (Id. at 49).

As noted above, the Federal Insurance plaintiffs contended that they previously had been precluded from taking discovery while the motion to dismiss their claims against NCB remained pending.  The Federal Insurance plaintiffs explained during the conference that the discovery they sought focused on the relationships among Bin Mahfouz, NCB's former chairman; al Qadi, a consultant to Bin Mahfouz who allegedly was instrumental in setting up NCB's Islamic Banking Division; and the Muwafaq

Foundation, a charity that eventually became part of al Qaeda. (Id. at 51). The Federal Insurance plaintiffs contended that they wished to explore whether, as others had alleged, the Muwafaq Foundation was created within the walls of NCB while Bin Mahfouz and al Qadi were working together, and the extent to which NCB had contributed its own funds to the Muwafaq Foundation. (Id. at 57). When I noted that the Federal Insurance plaintiffs had approximately ninety outstanding discovery requests, some of which involved an eighteen- or nineteen-year look-back period, their counsel indicated a willingness to limit themselves to ten of those requests. (Id. at 58).

By letter dated May 7, 2009, the Federal Insurance plaintiffs identified the ten discovery requests concerning jurisdiction that they wished to pursue. (See Letter to the Court from Sean P. Carter, Esq., dated May 7, 2009 ("Carter Letter III"), Ex. 1). Since the Federal Insurance plaintiffs had agreed to rely on pre-existing requests, each of their document demands covered the period from January 1990 to the present, although counsel conceded that some narrowing of the time frame might be appropriate. (See May 19, 2009 Tr. at 38). The ten requests focused on such topics as NCB's role in establishing, and relationship to, the Muwafaq Foundation (including any involvement of Bin Mahfouz and al Qadi); any direct contributions that Bin Mahfouz, al Qadi, or NCB made to the Muwafaq Foundation; and the role of NCB in funding other Islamic charities alleged to have terrorist ties, including the International Islamic Relief Organization, the

21

Saudi Joint Relief Commitee for Kosovo and Chechnya, and the Saudi Red Crescent.
(Carter Letter III at 7-8).

After receiving the May 7 letter, I met with counsel a second time on May
19, 2009.  Although the principal purpose of this conference was to discuss the <u>Federal</u>
<u>Insurance</u> plaintiffs' newly-narrowed discovery requests, much of the discussion focused
on third-party subpoenas that the Plaintiffs had served in an effort to gather more
information about NCB Aviation.  Those subpoenas resulted in the production of
documents indicating that Bin Mahfouz used an NCB account to make a $15.7 million
payment for two planes purchased in July 1998 from Raytheon by Alpha Sierra, a
company using the same address in Jeddah as NCB Aviation.  (<u>See</u> May 19, 2009 Tr.
at 5-6).

III.    <u>Discovery Requests Outstanding</u>

There are four areas of discovery, not the subject of prior rulings, that the
Plaintiffs seek to pursue before responding to NCB's renewed motion to dismiss their
claims on personal jurisdiction grounds.  First, the Plaintiffs want further information
regarding NCB Aviation.  (<u>See</u> Letter to the Court from James P. Kreindler, Esq., dated
Apr. 17, 2009, at 2-8)  Second, the Plaintiffs ask that NCB be directed to respond to the
<u>Federal Insurance</u> plaintiffs' ten narrowed requests for documents concerning the funding

of the Muwafaq Foundation and other Islamic charities alleged to have supported terrorist acts in this country.  (See Carter Letter III at 1; Kreindler Letter I at 2; Goldman Letter II at 6).  The Plaintiffs also seek to depose a representative of NCB knowledgeable about the relationship between those charities and NCB.  (Carter Letter II at 6).  Third, the Plaintiffs seek certain discovery from Bin Mahfouz and al Qadi, who, as noted above, are also defendants in this multi-district litigation.  (Letter to the Court from James P. Kreindler, Esq., dated Apr. 16, 2009, at 8-9; Carter Letter II at 9).  Finally, the Plaintiffs seek information concerning the relationship between NCB and the government of Saudi Arabia.  (Carter Letter II at 10-11).  They further suggest that they be given sixty days after all of this discovery is completed in which to submit their opposition papers.  (Carter Letter II at 12; Goldman Letter II at 1; Kreindler Letter I at 1).

IV.    Discussion

For a court to assert personal jurisdiction over a party, there must be statutory authority for the court to act and its exercise of jurisdiction must not offend constitutional due process standards.  See Best Van Lines, Inc. v. Walker, 490 F.3d 239, 242 (2d Cir. 2007); Tamam v. Fransabank Sal, No. 08 Civ. 6156 (JFK), __ F. Supp. 2d __, 2010 WL 21088, at *4 (S.D.N.Y. Jan. 5, 2010) ("[T]he jurisdictional inquiry is two-fold: first, the court looks to the law of the forum state – here, New York – to

determine whether it may exert personal jurisdiction over the foreign defendant; if so, the

court then considers whether subjecting the defendant to personal jurisdiction comports

with the requirements of due process.").  In their papers, the Plaintiffs argue that the

Court's exercise of personal jurisdiction over NCB is proper under either the New York

long arm statute, N.Y. C.P.L.R. § 302(a), or Federal Rule of Civil Procedure 4(k)(2),

which provides that service is valid to establish jurisdiction with respect to a federal claim

if a party is not subject to jurisdiction in any state's courts of general jurisdiction and the

exercise of jurisdiction is consistent with federal laws and the United States Constitution.

See Porina v. Marward Shipping Co., 521 F.3d 122, 127 (2d Cir. 2008).  Since Rule

4(k)(2) allows courts to assert jurisdiction over claims arising under federal law whenever

doing so meets constitutional due process requirements, the discussion that follows

focuses on that issue.  I note that most of the briefs and prior decisions in this multi-

district litigation similarly have focused on that issue rather than statutory requirements.

        The Plaintiffs have advanced several jurisdictional theories in this litigation.

In 2004, in their response to NCB's first motion to dismiss, the Plaintiffs contended that

this Court has jurisdiction under both general and specific theories of personal

jurisdiction.  (See Docket No. 232) (Joint Mem. in Opp'n to NCB's Mot. to Dismiss).  In

Terrorist Attacks I, after a brief discussion of NCB's contacts with the United States,

Judge Casey concluded that those contacts did not suffice to establish general jurisdiction, but ordered "limited jurisdictional discovery."  Terrorist Attacks I, 349 F. Supp. 2d at 792.  Once that discovery began, the Plaintiffs pursued discovery relevant to both general jurisdiction, based upon NCB's contacts with the United States, and specific jurisdiction, based upon its alleged "conspiracy" with the September 11 hijackers.

    The Plaintiffs continue to seek additional discovery related to both general and specific theories of jurisdiction.  The court may deny such discovery if a plaintiff has failed to make a prima facie showing of jurisdiction over the defendant.  See Jazini, 148 F.3d at 185 (2d Cir. 1998); Lehigh Valley Indus., 527 F.2d at 94 (denial of jurisdictional discovery not an abuse of discretion given the plaintiff's "threshold failure . . . to establish any basis for finding that [the out-of-state defendant] committed any tortious activity in New York"); Best Van Lines, Inc. v. Walker, No. 03 Civ. 6585, 2004 WL 964009, at *7 (S.D.N.Y. May 5, 2004) (Lynch, J.), aff'd, 490 F.3d 239 (2d Cir. 2007) (observing that jurisdictional discovery would have been denied had it been requested "because the plaintiff has failed to establish a prima facie showing of jurisdiction").  A prima facie showing of jurisdiction means that the plaintiffs "must plead facts which, if true, are sufficient in themselves to establish jurisdiction."  Tamam, 2010 WL 21088, at *4.  Thus, the required showing will vary depending on the Plaintiffs' legal theory of jurisdiction.

Ultimately, whether to allow such jurisdictional discovery and, if so to what extent, are matters committed to a trial judge's broad discretion.  Frontera Res. Azerbaijan Corp. v. State Oil Co. of the Azerbaijan Republic, 582 F.3d 393, 401 (2d Cir. 2009); Lehigh Valley Inds., Inc. v. Birenbaum, 527 F.2d 87, 93 (2d Cir. 1975). In exercising its discretion, a court must balance the need to avoid subjecting a foreign defendant to extensive jurisdictional discovery against a plaintiff's potential difficulty proving jurisdiction without discovery.  Compare Jazini v. Nissan Motor Co., Ltd., 148 F.3d 181, 185-86 (2d Cir. 1998) (federal courts do not ordinarily conduct substantial jurisdictional discovery over foreign corporations), with APWU v. Potter, 343 F.3d 619, 627 (2d Cir. 2003) ("[The] court should take care to give the plaintiff ample opportunity to secure and present evidence relevant to the existence of jurisdiction.") (citation and internal quotation marks omitted).  With this in mind, I turn to whether any of the remaining requested jurisdictional discovery with respect to NCB is warranted at this stage.  I will address the Plaintiffs' discovery requests related to general jurisdiction before turning to their requests related to specific jurisdiction.

A.   General Jurisdiction

1.   NCB Aviation

There is no suggestion that NCB Aviation played any role in the terrorist attacks on United States soil.  To the extent that the Plaintiffs argue that this Court has jurisdiction over NCB on the basis of NCB Aviation's contacts with the United States,

26

they therefore are asking the Court to assert general jurisdiction.  See Helicopteros

Nacionales de Colombia v. Hall, 466 U.S. 408, 415 & n.9 (1984).  This requires the

Plaintiffs to show that NCB had "certain minimum contacts with [the forum], such that

the maintenance of the suit does not offend 'traditional notions of fair play and substantial

justice.'"  Id. at 414 (quoting Int'l Shoe Co. v. Washington, 316 U.S. 310, 316 (1945)).

"Because general jurisdiction is not related to the events giving rise to the suit, courts

impose a more stringent minimum contacts test, requiring the plaintiff to demonstrate the

defendant's "continuous and systematic business contacts'" with this forum.  Metro. Life

Ins. Co. v. Robertson Ceco Corp., 84 F.3d 560, 568 (2d Cir. 1996) (quoting Helicopteros,

466 U.S. at 416); accord Porina v. Marward Shipping Co., 521 F.3d 122, 128 (2d Cir.

2008).

      The sole nexus between NCB Aviation and NCB (as opposed to Bin

Mahfouz) that the Plaintiffs have shown is that NCB Aviation held itself out as a

department of NCB Bank and maintained offices at a location in Jeddah where NCB did

business.  Significantly, the documents that the Plaintiffs have proffered contain no

indication that NCB (as opposed to Bin Mahfouz) ever considered NCB Aviation to be a

part of NCB, much less that it was.  In the absence of such proof, the Plaintiffs simply

have not made a prima facie showing that NCB Aviation was affiliated with NCB in any

way that is jurisdictionally meaningful.[7]  Their request for further discovery concerning NCB Aviation therefore is denied.

2.  Relationship Between NCB and the Kingdom of Saudi Arabia

In 1999, the Saudi government, acting through the Public Investment Fund of its Ministry of Finance, acquired a controlling interest in NCB.  (See Carter Letter II at 11 (citing NCB website, http://www.alahli.com/en-US/About%20Us/Corporate%20 Profile/Pages/CorporateProfileHome_Page.aspx)).  The NCB website reveals that a further restructuring occurred on or before January 1, 2006, when NCB "applied the principles of corporate governance to separate between ownership and management of the Bank."  (Id.).  From this, the Federal Insurance plaintiffs reason that the Saudi government must have owned and directed the operations of NCB between 1999 and January 1, 2006.  They argue that they consequently are entitled to obtain written discovery and take depositions regarding the relationship between the Saudi government

---

[7]      In their letter seeking further discovery, the Ashton and Burnett plaintiffs note that Smith was listed as the "Chairman, Director" of Skyways International in a filing with the Texas Secretary of State.  (Kreindler Letter I at 6 & Ex. 7).  These plaintiffs further assert that Smith was simultaneously an Executive Vice President of NCB.  (Id. at 7).  If so, the Texas filing might help fill the gap between NCB Aviation and NCB.  The filing plainly shows, however, that Skyways International was an inactive corporation by mid-February 1999, years before the first of the lawsuits comprising this multi-district litigation was filed.  (Id. Ex. 7).  Moreover, Smith testified at his deposition that he ceased to be an officer of NCB in 1992, at which point he began to do work for Bin Mahfouz, his family, and a related company.  (Smith Dep., taken on July 27 2007, at 14, 27, 37-38).  Smith's only other involvement with NCB was in 1997 and 1998, when he completed two assignments as a consultant.  (Id. at 38-39).  The fact that Smith was affiliated with Skyways International therefore in no way suggests that NCB had an interest in that corporation.

and the bank "in order to assess whether Saudi Arabia's contacts with the United States are attributable to NCB for purposes of the personal jurisdiction analysis."  (Id.).

In effect, the Federal Insurance plaintiffs seek to argue that NCB is an alter ego of Saudi Arabia, and that the Kingdom's presence in the United States enables this Court to obtain personal jurisdiction over NCB.  In Terrorist Acts II, however, Judge Casey determined that any "[f]urther inquiry into NCB's status as a foreign sovereign" should be "postponed until the parties have completed their personal jurisdiction discovery and this Court has determined whether it has personal jurisdiction over NCB." Terrorist Attacks II, 392 F. Supp. 2d at 575.  While I recognize that the discovery sought now relates to personal rather than subject matter jurisdiction, the inquiry would be no less intrusive in that context.  I therefore decline to allow that discovery until Judge Daniels has had an opportunity to consider NCB's motion to dismiss for lack of personal jurisdiction.

In that regard, it bears mention that the Plaintiffs may oppose NCB's motion on the basis not only of the information they have set forth in their complaints, but any additional discovery that they contend should be made available to them before Judge Daniels rules.  See Melnick v. Adelson-Melnick, 346 F. Supp. 2d 499 (S.D.N.Y. 2004). Accordingly, if the Plaintiffs believe that they need further information to oppose NCB's

jurisdictional motion, they may provide an affidavit explaining what they need and why it potentially is material.[8]

    B.    <u>Specific Jurisdiction</u>

        1.    NCB's Relationship to the Muwafaq
                <u>Foundation and Other Islamic Charities</u>

The ten <u>Federal Insurance</u> document requests that remain in dispute seek proof that NCB was sufficiently involved in the planning, funding, or commission of the terrorist attacks on September 11, 2001, to justify this Court's exercise of jurisdiction over it based on a "purposefully directed" theory of specific jurisdiction.[9] <u>See</u> <u>Burger King</u>, 471 U.S. at 472 ("fair warning" requirement of due process is satisfied if "defendant has 'purposefully directed' his activities at residents of the forum")

As noted earlier, the Court of Appeals held in <u>Terrorist Attacks III</u>, that the mere foreseeability of harm in this country is not a sufficient basis for personal jurisdiction. "Rather, the [P]laintiffs have the burden of showing that [a defendant]

---

[8]    As Judge Kaplan explained in <u>Melnick</u>, "while the Rule 12(b)(2) motion is not one for summary judgment, summary judgment practice offers guidance in the handling of such motions when they involve evidence outside the pleadings." 346 F. Supp. 2d at 504. Any affidavit opposing NCB's motion to dismiss therefore should show "(1) what facts are sought to resist the motion and how they are to be obtained, (2) how those facts are reasonably expected to create a genuine issue of material fact, (3) what effort affiant has made to obtain them, and (4) why the affiant was unsuccessful in those efforts." <u>See</u> <u>id.</u> at 504-05 (footnotes and internal quotation marks omitted).

[9]    The <u>Federal</u> <u>Insurance</u> plaintiffs also argue they are entitled to this discovery on the basis of "conspiracy" jurisdiction. (<u>See</u> Carter Letter I at 9 n.5). I adhere to my prior ruling that the Plaintiffs have not made a prima facie showing of jurisdiction under this theory. <u>See</u> <u>Discovery Order I</u>, 440 F. Supp. 2d at 287.

engaged in 'intentional, and allegedly tortious, actions . . . expressly aimed' at residents of the United States."  538 F.3d at 95 (quoting Calder, 465 U.S. at 789).  The court further observed that "[p]roviding indirect funding to an organization that [is] openly hostile to the United States does not constitute this type of intentional conduct."  Id. (emphasis added).  This last observation gives rise to uncertainty.

The Solicitor General's brief, submitted to the Supreme Court in response to its invitation to express the views of the United States, notes in that regard that the Second Circuit's language is subject to at least two interpretations.  See Brief for the United States as Amicus Curiae at 19, Fed. Ins. Co. v. Kingdom of Saudi Arabia, 129 S. Ct. 2859 (2009) (No. 08-640), 2009 WL 1539068.  First, it could be read to "suggest[] that a defendant must specifically intend to cause injury to residents in the forum before a court there may exercise jurisdiction over him."  Id.  Second, the decision may solely have focused on the inadequacy of the Plaintiffs' allegations regarding the four princes, which were simply that the princes "intended to fund al Qaeda through their donations to Muslim charities," although they knew that Osama bin Laden had publicly announced his plans for a jihad against the United States.  Id.

The Solicitor General contended that the first alternative interpretation of Terrorist Attacks III is incorrect since it is sufficient that a "defendant took 'intentional * * * tortious[] actions' and 'knew that the brunt of th[e] injury would be felt' in the foreign forum."  Id. (quoting Calder, 465 U.S. at 789-90).  As the Solicitor General

further noted, the second possible reading of the Second Circuit's language, which focuses on the indirect nature of the princes' funding, is consistent with Calder's holding that, "[w]here the connection between the defendant and direct tortfeasor is separated by intervening actors, the requirement of showing an 'intentional * * * tortious[] act[]' on the part of the defendant . . . demands" that the plaintiff "allege facts that could support the conclusion that the defendant acted with the requisite intent and knowledge." Id. at 19-20 (quoting Calder, 465 U.S. at 789, and citing Ashcroft v. Iqbal, 129 S. Ct. 1937, 1950-52 (2009)).  The Solicitor General observed that if Terrorist Attacks III is read that way, the Second Circuit's language also can be harmonized with Judge Casey's determination in Terrorist Attacks I that the Plaintiffs' allegations regarding the princes were inadequate because they were conclusory.  See id. at 20.

Through discovery, the Plaintiffs hope to establish that NCB was not merely a passive donor to organizations that financed al Qaeda's terrorist activities, but an active participant in the efforts of Bin Mahfouz and al Qadi to use its "infrastructure and resources to build and sustain Muwafaq, for the purpose of enabling al Qa[e]da to realize its stated ambition to attack America."  (Carter Letter III at 5).  Predictably, the parties disagree as to whether these allegations, if proved, would be sufficient to establish jurisdiction over NCB on a "purposefully directed" theory.

Reasonable observers could disagree as to the adequacy of the Plaintiffs' prima facie showing in light of the Second Circuit's decision in Terrorist Attacks III.  In

these circumstances, Judge Daniels should have the opportunity to consider in the first instance whether the conduct alleged by the Plaintiffs is sufficient to bring NCB within the Court's jurisdiction. Because it is possible that Judge Daniels will conclude that the Plaintiffs' theories of specific jurisdiction are not viable under <u>Terrorist Attacks III</u>, NCB should not be subjected to extensive additional discovery before he decides the issue.

At the same time, it is possible that Judge Daniels will determine that NCB's renewed jurisdictional motion should be denied, either because the Plaintiffs have made the required jurisdictional showing or because further jurisdictional discovery is warranted. Moreover, the Plaintiffs clearly have reason to fear that NCB's motion will remain pending for some time after it is fully briefed because Judge Daniels has expressed an intention to deal first with defense motions challenging the Court's subject matter jurisdiction. (<u>See</u> Docket No. 2072) (Order dated Mar. 14, 2008). This raises the spectre that potentially valuable information responsive to the Plaintiffs' document requests might be destroyed in the ordinary course of business while the NCB motion is pending. In light of these considerations, and in an effort to accommodate the Plaintiffs' legitimate concerns regarding the possible loss of evidence, NCB will be directed to preserve any documents relevant to jurisdictional discovery, and in particular, those documents responsive to Document Request Nos. 2 through 6 of the Plaintiffs' Revised

Set of Jurisdictional Requests for Production of Documents (annexed to Carter Letter III).[10]

      2.   <u>Bin Mahfouz and al Qadi</u>

The <u>Federal Insurance</u> plaintiffs also seek to have defendants Bin Mahfouz and al Qadi respond to "targeted discovery requests" before the Plaintiffs are required to respond to NCB's motion.  (<u>See</u> Carter Letter II at 9).  Their first set of jurisdictional discovery requests to these defendants consists of 55 separate requests to Bin Mahfouz and 73 requests to al Qadi.  (<u>See</u> <u>id.</u> Exs. E, F).  In addition to these requests, the <u>Federal Insurance</u> plaintiffs seek to depose Bin Mahfouz and al Qadi before they respond to the motion.  (<u>Id.</u> at 9 & n.8).

There are several practical problems with these requests apart from their potential overbreadth.  First, the Court has been advised that Bin Mahfouz is dead.  (<u>See</u> Docket No. 2189) (Suggestion of Death Pursuant to Fed. R. Civ. P. 25, dated Aug. 21, 2009).[11]  Second, even before Bin Mahfouz died, both he and al Qadi had submitted their own motions to dismiss for want of personal jurisdiction.  (<u>See</u> Docket Nos. 295, 1013).  To grant the <u>Federal Insurance</u> plaintiffs' application would therefore require further

---

      [10]     Although I have focused on requests related to jurisdiction, I note that a party has an obligation to preserve all relevant information once it reasonably anticipates litigation.  <u>See</u> <u>Fujitsu Ltd. v. Fed. Exp. Corp.</u>, 247 F.3d 423, 436 (2d Cir. 2001).

      [11]     Perhaps predictably, even the filing of the suggestion of Bin Mahfouz's death has spawned litigation.  (<u>See, e.g.</u>, Docket Nos. 2194 (Pls.' Mot. to Strike Suggestion of Death); 2196 (Pls.' Mot. to Substitute the Estate of Bin Mahfouz and his Immediate Family Members)).

extensive delays while these motions, and the Plaintiffs' motion to substitute Bin Mahfouz's estate and the members of his family in his stead, remain <u>sub judice</u>.  Third, even if Bin Mahfouz were alive, there is no reason to believe that he and al Qadi will eventually respond to any of the Plaintiffs' discovery requests and deposition questions, assuming their dismissal motions are denied.  To grant the <u>Federal Insurance</u> plaintiffs' motion consequently might mean that they would, as a practical matter, never have to respond to NCB's motion.

Finally, it has been more than five years since NCB filed its first motion to dismiss and more than four years since personal jurisdictional discovery as to NCB was authorized.  In the interim, although the Plaintiffs certainly have not been given all the items they requested, the Court has afforded them considerable jurisdictional discovery regarding NCB's activities and related matters.  At this juncture, as noted above, Judge Daniels should be given an opportunity to decide whether the alleged activities of NCB, including those attributed to Bin Mahfouz and al Qadi, are potentially sufficient to permit this Court to assert personal jurisdiction over NCB.  If so, discovery with respect to NCB will continue; if not, NCB should not be held captive while Bin Mahfouz and al Qadi's motions to dismiss remain pending.

V.    <u>Conclusion</u>

The Plaintiffs' requests for further jurisdictional discovery are conditionally denied.  Additionally, unless the parties agree to another schedule, the Plaintiffs are

directed to respond to NCB's renewed motion to dismiss within sixty days from the date of this Memorandum Decision and Order.  The Plaintiffs are further directed to submit a single brief not exceeding fifty pages in length in opposition to the motion.  NCB's reply brief, if any, shall be submitted thirty days thereafter and shall not exceed twenty-five pages.  Finally, NCB is expressly directed to preserve any documents relevant to jurisdictional discovery, and in particular, those responsive to Document Request Nos. 2 through 6 of the Plaintiffs' Revised Set of Jurisdictional Requests for Production of Documents.

SO ORDERED.

Dated:      New York, New York
            January 13, 2010


                                        _____
                                            FRANK MAAS
                                   United States Magistrate Judge


Copies to:

Honorable George B. Daniels
United States District Judge

All Counsel Via ECF