**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
_____

IN RE:  TERRORIST ATTACKS ON                    **Civil Action No.**
SEPTEMBER 11, 2001                              **03 MDL 1570 (GBD)**
_____

*This document relates to:  All Actions*

## PLAINTIFFS' OBJECTIONS TO THE JANUARY 13, 2010 MEMORANDUM DECISION AND ORDER OF MAGISTRATE JUDGE FRANK MAAS

Pursuant to Rule 72 of the Federal Rules of Civil Procedure and 28 U.S.C. §636(b)(1)(A), Plaintiffs hereby object to the January 13, 2010 Memorandum Decision and Order of Magistrate Judge Frank Maas.

## I.        INTRODUCTION

Through his Memorandum Decision and Order of January 13, 2010, Magistrate Judge Maas issued rulings on several long-outstanding discovery disputes between Plaintiffs and defendant National Commercial Bank ("NCB").  Broadly speaking, those disputes concerned Plaintiffs' efforts to obtain the following relevant discovery in support of their theories of personal jurisdiction as to NCB:  (1) discovery from NCB concerning the character of NCB's relationship to the government of Saudi Arabia; (2) discovery from NCB concerning NCB Aviation, an arm of NCB that according the FAA documents has extensive contacts with the United States; (3) 10 discrete discovery requests to NCB concerning the relationships among NCB, Khalid bin Mahfouz, Yassin al Kadi, and Muwafaq Foundation, relevant to Plaintiffs' claim that NCB purposefully directed its conduct at the United States by knowingly sponsoring al Qaeda; and (4) discovery from bin Mahfouz and Al Kadi, two former executives of NCB who are also defendants in this litigation, and are alleged on the basis of particularized facts to have been instrumental in directing NCB's sponsorship al Qaeda.

The discovery disputes at issue were initially presented to this Court for resolution via letters submitted by Plaintiffs to Judge George Daniels on April 25, 2008, in opposition to NCB's request for leave to file a Renewed Motion to Dismiss for Lack of Personal Jurisdiction. Via an Order issued on July 11, 2008, Judge Daniels authorized NCB to file its Renewed Motion to Dismiss, but expressly reserved Plaintiffs' right to seek further discovery before responding to the Renewed Motion through application to the Magistrate Judge.[1]  Consistent with that directive, Plaintiffs submitted three letters to Magistrate Judge Maas on August 15, 2008, seeking to compel various discovery relevant to the NCB personal jurisdiction analysis.

The Court held an initial hearing on these discovery disputes on April 30, 2009.  At that hearing, the parties offered extensive arguments concerning the proper interpretation of the Second Circuit's Due Process ruling in *In Re Terrorist Attacks on September 11, 2001*, 538 F.3d 71 (2d Cir. 2008) (*Terrorist Attacks III*), and its significance to certain of the pending NCB discovery disputes.  After hearing from both sides, Magistrate Judge Maas asked Plaintiffs to submit a supplemental letter brief concerning the jurisdictional relevance of 10 discrete document requests to NCB concerning the relationship between and among NCB, bin Mahfouz, al Kadi and Muwafaq Foundation (the NCB-Muwafaq discovery)

Plaintiffs submitted their supplemental letter brief on May 7, 2009, to which NCB responded on May 14, 2009.  The Court then held a second hearing on May 19, 2009.  At the May 19, 2009 hearing, Magistrate Judge Maas noted that resolution of the dispute concerning the

---

[1]     All of the letters and exhibits submitted by Plaintiffs in relation to the four NCB discovery disputes at issue are incorporated herein by reference.  Given the size of these documents, they will not be re-filed via the electronic filing system.  However, courtesy printed copies will be provided to the Court via mail.  Additional documents are attached to the Affirmation of Robert T. Haefele in Support of Plaintiffs' Objections to the January 13, 2010 Memorandum Decision and Order of Magistrate Judge Frank Maas (Haefele Affirmation), Exhibit A to this pleading, and are incorporated throughout this pleading by reference.

NCB-Muwafaq discovery would likely require him "to predict in a sense what Judge Daniels might conclude the Second Circuit meant in its decision in *Terrorist Attacks III*."  Transcript of May 19, 2009 hearing before Judge Maas, at 34.  For that reason, Magistrate Judge Maas asked Plaintiffs' counsel whether it would be appropriate to let Judge Daniels opine in the first instance as to the jurisdictional relevance of the requested discovery.  In response, counsel for Plaintiffs noted that Plaintiffs would suffer irreparable harm from any further delays in the resolution of the discovery disputes:

> Judge Daniels is unlikely to deal with the motions to dismiss for lack of personal jurisdiction for some time and so we are left in abeyance.  This is not an insignificant problem for us. Witnesses have literally died while this case has been pending
>
> I will be honest – Khalid bin Mahfouz, as I understand it, is not a young man, and so these kind of delays have a real impact on us.

Transcript of May 19, 2009 hearing before Judge Maas, at 35.  In response, Magistrate Judge Maas acknowledged that Plaintiffs' concerns about the severe prejudice that could result from further delays in the resolution of the dispute were well founded:

> <u>Sure</u>.  I think I told you I was sort of doing my damndest to avoid some of this hoping that the test would settle either with a decision by Judge Daniels or *cert* being granted.  <u>And it is precisely because a lot of time has passed and is passing that I decided to convene a session to talk about these issues.</u>

<u>Id</u> at 35, emphasis added.  On May 30, 2009, the United States filed an *amicus* brief, at the invitation of the United States Supreme Court, concerning Plaintiffs' then-pending Petition for Certiorari, which sought review of three aspects of the Second Circuit's *Terrorist Attacks III* decision, including the Second Circuit's Due Process holding.  In its *amicus*, the United States argued that the Second Circuit's Due Process ruling concerning the claims against four Saudi Princes should be read narrowly, as merely reflecting perceived deficiencies in "the allegations to establish that the defendants' intentional acts of funding the charities where done with

knowledge that they would support al Qaeda's jihad against the United States."  U.S. Amicus at 20.[2]  The United States further explained that this Court may properly exercise jurisdiction for the claims at issue in this litigation over defendants who sponsored al Qaeda indirectly, so long as Plaintiffs have alleged facts "that could support the conclusion that the defendant acted with the requisite intention and knowledge."  *Id.* at 19-20.  Thus, under the United States' interpretation of the Second Circuit's decision, personal jurisdiction is satisfied where Plaintiffs have presented allegations sufficient to make plausible the claim that a defendant's contributions of support, whether direct or indirect, were made with knowledge that those contributions would be used to support terrorism, or with reckless disregard for that potentiality.  *Id*. at pp. 18-20.  The United States also made clear that pursuant to Supreme Court precedent "[i]t does not matter … that the individual defendant is not 'able to control' the means by which the tortious injury is caused in the foreign jurisdiction, as long as he acted with the 'kn[owledge] that the brunt of th[e] injury' from his tortious act 'would be felt' in the foreign forum."  *Id*. at p. 18 (*quoting Calder v. Jones*, 465 U.S. 783, 789 (1984)).

On January 13, 2010, Magistrate Judge Maas issued his Memorandum Decision and Order concerning the four pending NCB discovery disputes.  In that Decision, Magistrate Judge Maas declined to *presently* direct NCB to provide discovery concerning the character of its relationship to the government of Saudi Arabia, instead directing Plaintiffs to seek authorization from the district court to conduct that discovery in connection with their response to NCB's Renewed Motion to Dismiss.  Magistrate Judge Maas similarly deferred ruling on Plaintiffs' entitlement to the NCB-Muwafaq discovery, reasoning that this question also should be presented to Judge Daniels for resolution.   In addition, he declined to allow Plaintiffs to seek

---

[2]      Plaintiffs filed a Notice of Supplemental Authority Concerning the U.S. Amicus on July 14, 2009, which is incorporated herein by reference.

discovery from defendants bin Mahfouz and al Kadi, reasoning that those defendants' own motions to dismiss (which were fully briefed over three years ago) remained pending, and theorizing that those defendants may simply decline to respect the jurisdiction and authority of the Court to compel discovery from them even if their motions to dismiss were denied.  Finally, Magistrate Judge Maas denied outright Plaintiffs' request for further discovery concerning NCB Aviation, reasoning that Plaintiffs had failed to submit proof that NCB itself (as opposed to Bin Mahfouz) had ever considered NCB Aviation to be a subsidiary or affiliate of NCB, or sufficient proof that such a relationship existed.

## II.   SUMMARY OF OBJECTIONS

For the reasons discussed in further detail below, each of the Magistrate Judge's rulings concerning the NCB discovery disputes should be overturned.[3]

---

[3]   Plaintiffs feel compelled to object to the statement at the beginning of the Magistrate Judge's decision that "The defendants named in the Plaintiffs' complaints include not just alleged terrorists, but also certain potentially deep pockets, such as foreign banks, Islamic charities and wealthy Saudi citizens."  Slip op. at 1.  Whether intended or not, the statement mischaracterizes Plaintiffs' allegations and suggests that the Magistrate Judge has wrongly pre-determined that the defendant banks, ostensible charities, and wealthy Saudis are not terrorists.  And it suggests the objectionable notion that the *only* reason Plaintiffs named these defendants in the litigation is for their "deep pockets."

Significantly, it is the policy of the United States Government that those who sponsor terrorism are just as guilty as those who carry out the attacks.  This understanding pre-dates the September 11 Attacks, and includes the implementation of such measures as the Antiterrorism Act of 1991, which explicitly allows those who have been injured in their person, property or business by reason of an act of terrorism to seek justice against those who have supplied terrorists with material support.  18 U.S.C. § 2333 et seq.

The Plaintiffs involved in the *In re Terrorist Attacks of September 11, 2001* litigation include thousands of families, businesses and others devastated by the Attacks, personally, financially and otherwise.  This litigation can never make Plaintiffs whole, and Plaintiffs do not seek merely to "recover money damages" as the Memorandum Decision and Order suggests.  Slip op. at 1.  In this litigation – perhaps more than in other cases – the Plaintiffs seek justice, justice against those who sponsored the Attacks through the means provided under the law.

First, in its recent decision in *Frontera Resources Azerbaijan Corp. v. State Oil Company of the Azerbaijan Republic*, 582 F.3d 393 (2d Cir. 2009), the Second Circuit held that foreign states and their agents are not entitled to Due Process protections, and expressed serious doubt as to whether agencies of foreign states may claim Due Process rights.  In light of this intervening change in controlling precedent, discovery as to the character of NCB's relationship to the Kingdom of Saudi Arabia is now an absolute pre-condition to consideration of NCB's personal jurisdiction defense.   Indeed, absent such discovery, it is impossible to determine if NCB is entitled to claim Due Process protections at all.

Second, deferring a ruling concerning Plaintiffs' entitlement to the NCB-Muwafaq discovery will severely and irreparably prejudice Plaintiffs, as already demonstrated by the death of a critical witness during the 17 month period these discovery disputes were pending, and result in gross inefficiencies.   Furthermore, insofar as the Magistrate Judge's Order requires NCB to collect and secure all documents and information responsive to Plaintiffs' NCB-Muwafaq discovery requests, there is no basis to suggest that the production of those materials would present any burden whatsoever to NCB.  Indeed, producing the materials would merely require NCB to place the collected documents in an envelope and mail them to counsel.  As Plaintiffs have clearly demonstrated their entitlement to the requested discovery, NCB should be directed to provide it now.

Third, the rationales the Magistrate Judge offered in support of his decision to deny Plaintiffs the opportunity to pursue relevant discovery from Khalid bin Mahfouz and Yassin al Kadi are contrary to the Rules of Civil Procedure, and shockingly imply that this Court is impotent to enforce its jurisdiction.  The Magistrate Judge's reasoning reduces to an abdication of responsibility – premised upon the assumption that bin Mahfouz and al Kadi would not comply with an order to provide discovery or any subsequent efforts to compel them to fulfill

their legal obligations, and so therefore this Court should not bother to order discovery to which Plaintiffs are legally entitled.  It should be obvious that if Plaintiffs' discovery requests are within the four corners of the Federal Rules of Civil Procedure, then this Court must order bin Mahfouz and al Kadi to provide the materials to which Plaintiffs are entitled so that the motions to dismiss can be briefed upon a full record and this Court can enter appropriate orders upon them.

Fourth, the Magistrate Judge erred in refusing to allow discovery regarding the NCB Aviation Division and its U.S. contacts, particularly in light of Plaintiffs' substantial corroborating proofs in this regard.  The Court's comments about Plaintiffs' evidentiary proofs regarding NCB's U.S. contacts through its NCB Aviation Division indicates that the Court either misanalyzed or omitted from its analysis much of Plaintiffs' proofs, while affording improper value to NCB's bare denials.

## III.    ARGUMENT

### A.    Standard of Review

Rule 72 and Section 636(b)(1)(A) of Title 28 provide the standard for district court review of a federal magistrate judge's order.  A district court reviewing a magistrate judge's non-dispositive pretrial order, such as the discovery order under review here, may modify or set aside any part of that order if the order is clearly erroneous or contrary to the law.  *In re: Veeco Instruments, Inc. Securities Litigation*, 2007 U.S. Dist. Lexis 16922, *8-9 (S.D.N.Y. 2007) (citing Fed. R. Civ. Pro. 72(a)).  See also *Sheikhan v. Lenox Hill Hosp.*, 1999 U.S. Dist. Lexis 8770 (S.D.N.Y. 1999) (Rule 72(a) standard applied to discovery orders).

Findings are clearly erroneous when the reviewing court is convinced the lower court decided an issue in error.  *In re: Veeco Instruments*, 2007 U.S. Dist. Lexis 16922 at *9 (citing *Mathias v. Jacobs*, 167 F. Supp. 2d 606, 622 (S.D.N.Y. 2001)).  An order may be deemed

contrary to law "when it fails to apply or misapplies relevant statutes, case law or rules of procedure." *Id.* (citing *Tompkins v. R.J. Reynolds Tobacco Co.*, 92 F. Supp. 2d 70, 74 (N.D.N.Y. 2000).

In the present context, the Federal Rules provide a comprehensive framework for reviewing the Magistrate Judge's discovery rulings.  Under the Rules, a court's analysis of any discovery contest must begin with Rule 26(b)(1), which as a threshold matter provides that litigants are *entitled* to obtain discovery regarding any matter "*relevant to the claim or defense of any party*." Fed. R.Civ. P. 26(b) (emphasis supplied).  "This obviously broad rule is liberally construed."  *Deval Steel Products Div. of Francosteel Corp. v . M/V Fakredine*, 951 F.2d 1357, 1367 (2d Cir. 1991), *citing  Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978) (relevance under Rule 26(b)(1) broadly construed "to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case"). In order to conclude that requested discovery is legally irrelevant under Rule 26(b)(1), a judge must find that the requested discovery could not, as a matter of law, lead to the discovery of admissible evidence.  In other words, the judge must find that "even assuming the discovery yields the information Plaintiff suggests, that information could not be admitted at trial under Fed. R. Evid. 401 because – as a matter of law - a jury may not draw from that information the inference that Plaintiff seeks to elicit."  *Pisacane v. Enichem Am.*, 1996 U.S. Dist. LEXIS 9755, *8 (S.D. N.Y. 1996).

Rule 26(b)(1) establishes the appropriate scope of discovery not only as to the merits, but as to jurisdiction as well.  *Renner v. Lanard Toys Ltd.*, 33 F.3d 277, 283 (3d. Cir. 1994); *Edmond v. United States Postal Serv. Gen. Counsel*, 292 U.S. App. D.C. 240, 949 F.2d 415, 425 (D.C. Cir. 1991) ("As a general matter, discovery under the Federal Rules of Civil Procedure should be freely permitted, and this is no less true when discovery is directed to personal jurisdiction.").

Thus, the starting point for a court's analysis of a jurisdictional discovery dispute is simply whether the discovery sought bears on, or reasonably could lead to other matter that could bear on, the Plaintiffs' theories of jurisdiction, or any defenses raised by the defendant as to those theories of jurisdiction.  Where jurisdictional facts are in dispute, a refusal to grant discovery as to matters bearing on the factual dispute constitutes an abuse of discretion.  *Filus v. Lot Polish Airlines*, 907 F.2d 1328, 1332, (2d. Cir. 1990).

Where a plaintiff has made a *prima facie* showing of jurisdiction, he must be afforded discovery to develop evidence to support his jurisdictional theory.  A plaintiff may make a *prima facie* showing of jurisdiction through allegations.  *Ball v. Metallurgie Hoboken Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir.), *cert. denied*, 498 U.S. 854 (1990).   Moreover, the court *must* construe the pleadings in a light most favorable to plaintiff, resolving all doubts in his favor. *DiStefano v. Carozzi North America, Inc.*, 286 F.3d 81 (2d Cir. 2001).  As this Court has held:

> Because these motions are brought before discovery and decided without an evidentiary hearing, Plaintiffs need only make a prima facie showing that personal jurisdiction exists. *PDK Labs, Inc. v. Friedlander*, 103 F.3d 1105, 1108 (2d Cir. 1997); *A.I. Trade Finance, Inc. v. Petra Bank*, 989 F.2d 76, 79 (2d Cir. 1993). Plaintiffs may rely entirely on factual allegations, *Jazini v. Nissan Motor Co.*, 148 F.3d 181, 184 (2d Cir. 1998), and they will prevail even if Defendants make contrary arguments, *A.I Trade*, 989 F.2d at 79. In resolving the motions, the Court will read the complaints and affidavits in a light most favorable to Plaintiffs. *PDK Labs*, 103 F.3d at 1108.

*In re Terrorist Attacks on September 11, 2001*, 349 F. Supp. 2d. at 804.

**B.    Discovery Concerning NCB's Relationship to the Government of Saudi Arabia is an Absolute Prerequisite to Consideration of NCB's Personal Jurisdiction Defense**

The Magistrate Judge declined to require NCB *presently* to respond to Plaintiffs' discovery requests concerning its relationship to the government of Saudi Arabia, essentially deferring to Judge Casey's earlier ruling that "further inquiry in NCB's status as a foreign

sovereign" should be "postponed until the parties have completed their personal jurisdiction discovery and this Court has determined whether it has personal jurisdiction over NCB." *Terrorist Attacks II*, 392 F. Supp. 2d at 575.  Although the Magistrate Judge acknowledged that Plaintiffs were seeking the discovery as to NCB's relationship to the Kingdom for purposes of the personal jurisdiction analysis, he nonetheless "decline[d] to allow that discovery until Judge Daniels has an opportunity to consider NCB's Motion to Dismiss for lack of personal jurisdiction."  The Magistrate Judge then noted that Plaintiffs "may oppose NCB's Motion on the basis not only on the information they have set forth in their Complaints, but any additional discovery that they contend should be made available to them before Judge Daniels' rules."  Slip op. at 29.

In effectively deferring to Judge Casey's earlier decision to segregate NCB's subject matter and personal jurisdiction defenses, the Magistrate Judge failed to recognize that the Second Circuit's recent ruling in *Frontera* dramatically altered the governing legal landscape, and made the determination as to NCB's relationship to the government of the Kingdom an absolute pre-requisite in assessing whether NCB may even claim the protections of the Due Process clause.  *Frontera*, 582 F.3d at 399-401.

In *Frontera*, the Second Circuit considered the availability of Due Process protections to foreign states and their related agents and agencies.  The plaintiff had brought suit against the State Oil Company of the Azerbaijan Republic (SOCAR) in the Southern District of New York, to confirm a Swedish arbitration award pursuant to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards.  *Id.* at 395.  SOCAR moved to dismiss the Complaint for lack of personal jurisdiction, arguing that it had insufficient contacts with the United States to satisfy the requirements of the Due Process Clause.  *Id.*  The district court questioned the propriety of affording Due Process protections to SOCAR, a company owned by the government

of Azerbaijan, but held that it was bound to apply the traditional Due Process test in light of the Second Circuit's ruling in *Texas Trading & Milling Corp. v. Federal Republic of Nigeria*, 647 F.2d 300 (2d Cir. 1981). Concluding that SOCAR did not have sufficient contacts with the United States to satisfy Due Process requirements, the District Court dismissed the action, and the Plaintiffs then appealed to the Second Circuit. *Frontera*, 582 F.3d at 395.

On appeal, the Second Circuit overturned *Texas Trading*, and held that "a foreign state" is not a "person" within the meaning of the Due Process Clause. *Frontera*, 582 F.3d at 399-400. The Court then considered whether SOCAR, as an instrumentality of a foreign state rather than a foreign state itself, retained the capacity to invoke Due Process protections. *Id.* at 400. Citing the Supreme Court's decision in *First Nat. City Bank v. Banco Paralel Comercio Exterior De Cuba ("Bancec")*, 462 U.S. 611, 626-27 (1983), the Court concluded that entities over which a government exerts "sufficient control" loose their presumption of juridical independence, and are treated as the state itself. *Frontera*, 582 F.3d at 400. On that basis, the *Frontera* Court concluded that "if SOCAR is an agent of the Azerbaijani state…SOCAR lacks Due Process rights." *Id.* In addition, the Court questioned whether foreign corporations that are owned, but not controlled, by a foreign state are entitled to Due Process protection, noting that the D.C. Circuit has called this question "far from obvious." *Id.* at 401.

In light of the foregoing rulings, the Second Circuit concluded that SOCAR's personal jurisdiction defense could not be evaluated until the district court first determined: (1) whether SOCAR was an agent or instrumentality of the government of Azerbaijan; and (2) whether SOCAR was entitled to Due Process protections. *Id.*

As a result of *Frontera*, it is impossible for this Court even to consider NCB's personal jurisdiction defense without first affording Plaintiffs discovery as to NCB's relationship to the government of Saudi Arabia. This Court already has held that the character of NCB's

relationship to the government of Saudi Arabia is unclear, and that a determination as to the nature of that relationship would require discovery.  *In re Terrorist Attacks II*, 392 F. Supp. 2d at 575.  Under *Frontera*, resolution of that issue is now an absolute prerequisite to consideration of NCB's personal jurisdiction defense.  Indeed, were the Court to proceed and resolve NCB's Motion to Dismiss for lack of personal jurisdiction on the basis of the present record, the Second Circuit would invariably remand the case for a determination as to the nature of NCB's relationship to the government of Saudi Arabia, in keeping with its decision in *Frontera*.

For the foregoing reasons, the Magistrate Judge's decision denying Plaintiffs discovery as to NCB's relationship to the Kingdom of Saudi Arabia is contrary to the Second Circuit's holding in *Frontera*, and must be set aside.

### C.    Further Deferring the Ruling as to Plaintiffs' Entitlement to the NCB-Muwafaq Discovery Would Severely and Irreparably Prejudice Plaintiffs

As set forth in greater detail in their submissions of April 25, 2008, August 15, 2008 and May 7, 2009, Plaintiffs have sought discovery concerning the relationships among NCB, bin Mahfouz, al Kadi and Muwafaq in support of their theory that NCB purposefully directed its conduct at the United States by knowingly sponsoring al Qaeda.[4]  Although the U.S. Amicus makes clear that this Court may properly exercise jurisdiction over indirect sponsors of al Qaeda in this litigation[5], NCB is not alleged to have been a mere participant in the indirect funding of al Qaeda, which should have foreseen that al Qaeda would use such contributions of support to carry out terrorist attacks.  Rather, Plaintiffs have alleged and offered evidence that NCB

---

[4]    Those submissions are incorporated herein by reference.

[5]    As mentioned previously, Plaintiffs filed a Notice of Supplemental Authority relative to the U.S. Amicus on July 14, 2009.  The arguments contained in that Notice of Supplemental Authority concerning the proper interpretation of the Second Circuit's Due Process ruling in Terrorist Attacks III supplement, and to large degree supplant, the arguments on that same point from Plaintiffs' prior filings.  In short, Plaintiffs submit that the interpretation offered in the U.S. Amicus is the one this Court should follow.

maintained a close and direct relationship with al Qaeda, and that senior personnel of NCB, who were in direct contact and working in concert with al Qaeda members, used the bank's infrastructure for the purpose of enabling al Qaeda to wage jihad against the United States. Plaintiffs contend that the direct and intimate relationship between NCB and al Qaeda is manifested (in part) by their collaboration relative to the Muwafaq Foundation, a financial arm of al Qaeda founded by Senior NCB executives Khalid bin Mahfouz and Yassin al Kadi.  Plaintiffs maintain that bin Mahfouz and al Kadi used the bank's infrastructure and resources to build and sustain Muwafaq, for the purpose of enabling al Qaeda to realize its stated ambition to attack America.  On these points, Plaintiffs incorporate by reference their letter submissions of April 25, 2008, August 15, 2008, and May 7, 2009.

In conditionally declining to compel NCB to respond to the 10 discrete NCB-Muwafaq discovery requests the Magistrate Judge reasoned that uncertainty remained as to how Judge Daniels would interpret the Second Circuit's Due Process ruling in *Terrorist Attacks III*.  On that grounds, the Magistrate Judge held that NCB "should not be subjected to extensive additional discovery" until Judge Daniels determines whether Plaintiffs' "theories of personal jurisdiction are [] viable under *Terrorist Attacks III*."  Slip op. at 33. However, the Magistrate Judge acknowledged that "Plaintiffs clearly have reason to fear that NCB's motion will remain pending for some time after it is fully briefed," a circumstance that according to Magistrate Judge Maas "raises the spectre that potentially valuable information will be destroyed in the ordinary course of business while the NCB motion is pending."  *Id.*  In light of Plaintiffs' "legitimate concerns regarding the possible loss of evidence the Magistrate Judge "directed [NCB] to preserve any documents relevant to jurisdictional discovery, and in particular, those documents responsive to Document Request Nos. 2 through 6 of the Plaintiffs' Revised Set of Jurisdictional Requests for Production of Documents."  *Id.* at 33-34.

Plaintiffs are uncertain as to the precise course the Magistrate Judge intended to establish through this ruling.  In particular, in holding that resolution of NCB-Muwafaq discovery dispute should be deferred until Judge Daniels determines whether Plaintiffs' "theories of personal jurisdiction are [] viable under *Terrorist Attacks III*," it is unclear to Plaintiffs whether the Magistrate Judge intended: (1) that the issue should be revisited as soon as Judge Daniels issues a decision explaining his interpretation of the Second Circuit's Due Process ruling that would provide guidance in resolving the NCB-Muwafaq discovery dispute; or (2) that the issue should be tabled until Judge Daniels eventually reaches NCB's Renewed Motion to Dismiss.

To the extent the Magistrate Judge intended to defer resolution of the NCB-Muwafaq discovery dispute until Judge Daniels eventually reaches NCB's Renewed Motion to Dismiss, Plaintiffs strenuously object to that ruling on the grounds that it would severely and irreparably prejudice Plaintiffs.

The sequence of events here is crucial.  While personal jurisdiction discovery has been ongoing for four years, the majority of that time has transpired while waiting for this Court to rule on discovery motions.  The Federal Insurance Plaintiffs' First Set of Jurisdictional Requests for Production of Documents Directed to National Commercial Bank was served on August 24, 2007.  After the parties' multiple exchanges of letters, the Federal Insurance Plaintiffs sought judicial intervention relative to this dispute via the Plaintiffs' Executive Committee's November 16, 2007 letter to the Court regarding the proposed agenda for the case management conference that had been scheduled for January 15, 2008.  Without recounting every request which followed – a history with which this Court and the parties are brutally familiar, including referral of this dispute to the Magistrate Judge in April 2008 – this process of continuing to petition this Court to resolve the issue of the Federal Insurance Plaintiffs' right to discovery against NCB continued

for *two more years after that initial request* until the Magistrate Judge finally issued his preliminary orders on January 13, 2010.

At this point, this Court has acknowledged that it has an insufficient factual record upon which to rule upon the related motions to dismiss. Plaintiffs are entitled to resolution of the discovery issues now. First, merely securing documents at this late point does not eliminate the severe prejudice posed by further delay. Witnesses identified in those documents may forget critical details over time, or even die, as in the case of bin Mahfouz. Sadly, Plaintiffs warned of the potential death of bin Mahfouz during the hearings on these very disputes. He was, without exaggeration, the most critical witness as to the NCB claims, and was available to testify for nearly two years while this dispute was pending. His testimony is now forever lost, severely prejudicing Plaintiffs' ability to litigate against NCB. Plaintiffs should not have to endure further such prejudice as a result of additional delays.

In addition, Plaintiffs submit that these discovery disputes must be promptly resolved to ensure that the Plaintiffs themselves have the opportunity to see these claims through. As another Court in this district has properly recognized in a closely related context almost two years ago, concerns regarding the age and health of the plaintiffs often require the courts to work expeditiously to resolve disputes:

> There already have been two interlocutory appeals in the cases against the City, slowing progress by several years. According to newspaper reports, various of the plaintiffs have died or experienced grave consequences to their health while these cases are pending, and claim substantial prejudice from delays. More than six years have passed since September 11, 2001, and much judicial effort has been expended in moving these cases toward resolution or trial. Another delay would cause severe prejudice to many of the litigants.

WTC Captive Ins. Co. v. Liberty Mut. Fire Ins. Co., 537 F. Supp. 2d 619, 629 (S.D.N.Y. 2008). These concerns are very real in this case, given the length of time that has passed since

the filing of these actions and the procedural status of the case at this juncture.  In this regard, Plaintiffs refer the Court to the affidavits of  William Doyle Sr., whose son was killed working in the World Trade Center at the time of the Attack; Jean Hunt, who was working at the Pentagon when it was attacked; Alice Hoagland, whose son died on United Airlines flight 93; and Joan Molinaro,  mother of a New York City firefighter who perished saving lives in the World Trade Center, which are attached as Exhibits

Further, it would be grossly inefficient to proceed without granting discovery now, as it leaves the potential that discovery will have to be re-opened again at a later date. Such an approach would also require arguments in response to NCB's renewed motion to be considered under differing standards – post-discovery and pre-discovery.  Also, it imposes an undue burden upon Plaintiffs to once again litigate their entitlement to this discovery, which may require the Plaintiffs to hire experts to submit affidavits and other expenses.[6]

There is a more sensible path to follow.  This Court should first determine the contours of its jurisdiction in the wake of the United States' invitation brief before the Supreme Court in this matter, through resolution of one or more of the many pending motions to dismiss.  That decision will provide a clear roadmap for the resolution of jurisdictional discovery disputes, and permit the Court to adjust the scope of any ongoing jurisdictional discovery to match the breadth of the Court's jurisdiction.  Only then, when said discovery is completed, can this Court have the proper basis upon which to rule upon any jurisdictional motions, and further briefing on motions should be deferred until that time.  For the reasons discussed below, no significant delay would result from this approach.

---

[6]     Oddly, the Magistrate Judge mentions the potential burden to NCB of responding to discovery, but gives no consideration to the burden on Plaintiffs.  In reality allowing this discovery would impose <u>no</u> burden on NCB.  .  Indeed, given that the Magistrate Judge already directed NCB to collect and secure the responsive documents, producing them would merely require that NCB mail them to counsel.

To the extent the Magistrate Judge merely intended to defer a ruling on the NCB-Muwafaq dispute until Judge Daniels issues an instructive decision on one of the already pending motions to dismiss for lack of personal jurisdiction, Plaintiffs object to this aspect of his decision only to the extent that it requires Plaintiffs to respond to NCB's Renewed Motion to Dismiss before the NCB-Muwafaq dispute is revisited and resolved.  In this regard, Plaintiffs note that the Court previously expressed its intention to issue rulings on all the pending motions to dismiss by the end of 2009, and recently adjourned a Case Management Conference scheduled for January 13, 2010 to April 15, 2010 "to ensure the efficient use of the time and resources of both the parties and the Court."  From this background, Plaintiffs infer that the Court intends to issue rulings on certain of the pending motions to dismiss for lack of personal jurisdiction shortly.

As mentioned above, the first ruling from the Court addressing the proper interpretation of the Second Circuit' Due Process decision should provide a clear framework for resolution of the NCB-Muwafaq dispute.  Accordingly, the dispute should be revisited at that time, and it would be senseless and prejudicial to defer it to a later date.  Given the fact that an instructive decision should be issued imminently, it would be grossly inefficient and unproductive to go forward with briefing on NCB's Renewed Motion to Dismiss at this time.

This is especially the case given the burdens which an alternate approach would place on the Plaintiffs in this matter.  Were this Court to require briefing on motions to dismiss in the absence of completed jurisdictional discovery or even in the absence of announced standards for ruling on such motions, it would require Plaintiffs to address and brief countless arguments regarding the scope of jurisdiction which might have no bearing upon this Court's ultimate resolution of the issues and, more consequentially, potentially require Plaintiffs to hire experts to provide affidavits and further proof sustaining those arguments for which defendants already

possess relevant, non-privileged information and which could be easily transmitted to Plaintiffs for their review.[7]

### D. The Rationales the Court Offered in Denying Plaintiffs' Discovery From Bin Mahfouz and Al Kadi are Contrary to the Rules of Civil Procedure and Inherently Undermine the Authority of the Court

This Court has reasoned that ordering discovery against bin Mahfouz and al Kadi would be futile, and therefore it should not be sought in the first place. The Magistrate Judge's order reasons that even if bin Mahfouz were alive "there is no reason to believe that he and al Kadi will eventually respond to any of the Plaintiffs' discovery requests and deposition questions, assuming their dismissal motions are denied," such that granting the Federal Insurance discovery requests might allow Plaintiffs to avoid responding to NCB's motion to dismiss in perpetuity. Slip op. at 35. This reasoning is specious at best and degrading to all involved, for it assumes a lack of good faith or capacity from all the parties rather than simply apply the law.

This reasoning fails in three separate ways. It assumes that bin Mahfouz's estate and al Kadi will not comply with a valid court order, when there has been no such declaration from counsel. It assumes impotence on the part of this Court to enforce its discovery orders should such compliance not immediately manifest itself, despite a varied and powerful judicial toolkit at this Court's disposal to incentivize compliance with its orders. And it assumes that Plaintiffs have no interest in seeing this litigation conclude, and that the course is without recourse should a discovery order prove futile. There is simply no reason for this Court to assume futility in enforcing its orders without even having tried. This Court's institutional and legal obligation is

---

[7]     That the Magistrate Judge's interpretation and application of the discovery rules are clearly erroneous is amply evidenced by the degree to which they create innumerable violations of Rule 1 of the Federal Rules of Civil Procedure, which requires the Court to "construe[] and administer [the rules] to secure the just, speedy, and inexpensive determination of every action and proceeding." Nothing could be further from the truth in either the construction or application of the rule here.

to determine whether this is discovery to which Plaintiffs are entitled, issue an appropriate order, and, if necessary, take the appropriate steps to enforce it.

It is manifest that this is discovery to which Plaintiffs remain entitled.  Moreover, that bin Mahfouz has passed away does not mean that discovery against him (via his properly substituted estate) need cease.  Indeed, document discovery should be easily facilitated given that bin Mahfouz's obligation to gather and preserve relevant documents long predated his death and, indeed, likely predates even the filing of the first complaint against him for his role in the 9/11 Attack.

As the Second Circuit has held, "[t]he obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation." *Fujitsu Ltd. v. Federal Express Corp.* 247 F.3d 423, 436 (2nd Cir. 2001), citing *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998). Not only was bin Mahfouz required not to destroy "unique, relevant evidence that might be useful to an adversary," (see *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 217 (S.D.N.Y. 2003) but he maintained an affirmative duty to preserve documents which he "knows, or reasonably should know, is relevant in the action, is reasonably calculated to lead to the discovery of admissible evidence, is reasonably likely to be requested during discovery and/or is the subject of a pending discovery request.'" *Id.*, quoting *Turner v. Hudson Transit Lines, Inc.*, 142 F.R.D. 68, 72 (S.D.N.Y.1991).  Moreover, this obligation to preserve relevant evidence exists whether or not the evidence has yet been specifically requested in a demand for discovery. *Kronisch*, 150 F.3d at 126; *Barsoum v. N.Y.C. Hous. Auth.,* 202 F.R.D. 396, 399 (S.D.N.Y. 2001).

It is further clear that bin Mahouz's and al Kadi's submissions of motions to dismiss are irrelevant as to whether discovery should be stayed. A party seeking to avoid discovery during

the pendency of a motion to dismiss must seek a formal protective order under Federal Rule of Civil Procedure 26(c), through a showing of "good cause." *In re Currency Conversion Fee Antitrust Litig.*, 2002 U.S. Dist. LEXIS 974, No. MDL 1409, M21-95, 2002 WL 88278, at *1 (S.D.N.Y. Jan. 22, 2002); *United States v. County of Nassau*, 188 F.R.D. 187, 188 (E.D.N.Y. 1999); [**4]  *Moore v. Painewebber, Inc.*, 1997 U.S. Dist. LEXIS 203, No. 96 Civ. 6820, 1997 WL 12805, at *1 (S.D.N.Y. Jan. 14, 1997).  Moreover, it is the movant's burden to prove that such "good cause" exists.  *Freund v. Weinstein*, 2009 U.S. Dist. LEXIS 57991, *3 (E.D.N.Y. July 8, 2009).

Of course, it is black letter law that the mere filing of a motion to dismiss the complaint does not itself constitute "good cause" for the issuance of a discovery stay.  *In re Currency Conversion Fee*, 2002 U.S. Dist. LEXIS 974, No. MDL 1409, M21-95, 2002 WL 88278, at *1; *County of Nassau*, 188 F.R.D. at 188; Moore, 1997 U.S. Dist. LEXIS 203, 1997 WL 12805, at *1.  This is especially true given the extended period of time during which these motions have remained unresolved.  Rather, good cause "'requires a showing of facts militating in favor of the stay.'"  *In re Currency Conversion Fee*, 2002 U.S. Dist. LEXIS 974, 2002 WL 88278, at *1 (quoting *American Booksellers Ass'n v. Houghton Mifflin Co.*, 1995 U.S. Dist. LEXIS 2044, No. 94 Civ. 8566, 1995 WL 72376, at *1 (S.D.N.Y. Feb. 22, 1995)).  Factors that courts have considered when determining whether or not a stay is appropriate include: (1) whether the defendant has made a strong showing that the plaintiff's claim is unmeritorious; (2) the breadth of discovery and the burden of responding to it; and (3) the risk of unfair prejudice to the party opposing the stay.  *In re Currency Conversion Fee*, 2002 U.S. Dist. LEXIS 974, 2002 WL 88278, at *1.  Significantly, a stay is especially unwarranted when it is likely that the Plaintiffs will seek amendment of their complaint to cure any defects identified in the motion to dismiss. *Moran v. Flaherty*, 1992 U.S. Dist. LEXIS 14568, *4-5 (S.D.N.Y. 1992).  In lieu of an absolute

stay, the court may limit the frequency and extent of discovery permitted during the pendency of the motion, a preferable approach to balancing the parties' interests where an outright stay would severely prejudice the plaintiff.

In the present case, the defendants have never made a showing of good cause through facts presented in a formal motion, and the inclusion of a prohibition on discovery in the early case management orders was therefore procedurally improper. More significantly, any factors which may have counseled in favor of a stay of certain discovery during the early stages of this litigation no longer outweigh the grave prejudice Plaintiffs continue to suffer due to the prohibition against discovery. The majority of the pending motions to dismiss were filed in 2004 or 2005. Since that time, key evidence has been permanently lost. In fact, two important defendants, Mohammed Jamal Khalifa and Khalid bin Mahfouz, have died. Importantly, these defendants possessed critical and unique knowledge concerning Plaintiffs' claims against a large number of defendants, which is now unavailable. For this very reason, Plaintiffs served discovery on bin Mahfouz on August 8, 2008 in support of their claims against National Commercial Bank, and requested an order from the Court directing bin Mahfouz to answer that discovery via letter application on August 15, 2008. The Court did not rule on that motion prior to bin Mahfouz's death, and his undeniably relevant testimony is now unavailable.

Plaintiffs, however, remain entitled to those documents which bin Mahfouz was obligated to preserve during his lifetime, and which can be easily placed in boxes and shipped by his estate. Moreover, whatever aspirations Judge Casey possessed in preliminarily deciding to stay certain discovery, on the basis of what he predicted to be quick resolutions to many of the motions to dismiss, have unfortunately been proven to be unfounded.

**E.      NCB Aviation**

In dismissing Plaintiffs' request for additional jurisdictional discovery about NCB's U.S. contacts, the Court gave short shrift to Plaintiffs' detailed allegations and proofs regarding the NCB Aviation Division. The Court's fleeting comment about Plaintiffs' showing regarding NCB's U.S. contacts through its NCB Aviation Division shows that the Court either misanalyzed or omitted from its review much of Plaintiffs' proofs,[8] while affording NCB's denials undue weight.

Where the plaintiff has the burden of to show defendant's contacts with the forum sufficient to give the court in personam jurisdiction, discovery on jurisdiction is proper to aid the plaintiff in discharging that burden, provided Plaintiffs' claim is not clearly frivolous. *Companie Bauxites De Guinee v. L'Union Atlantique S.A. Assurances*, 723 F.2d 357, 362 (3d Cir. 1983). The rule that discovery should be allowed has perhaps been best stated by the Court of Appeals for the First Circuit:

> A plaintiff who is a total stranger to a corporation should not be required, unless he has been undiligent, to try such an issue on affidavits without the benefit of full discovery [on the jurisdictional issue]. If the court did not choose to hear witnesses, this may well have been within its province, but in such event plaintiff was certainly entitled to file such further interrogatories as were reasonably necessary and, if he wished, to take depositions. The condemnation of plaintiff's proposed further activities as a "fishing expedition" was unwarranted. When the fish is identified, and the question is whether it is in the pond, we know no reason to deny a plaintiff the customary license.

*Surpitski v. Hughes-Keenan Corp.*, 362 F.2d 254, 255-56 (1st Cir. 1966).

Accordingly, although Plaintiffs should not be required to establish conclusive evidence to get each scrap of discovery, once the Plaintiffs identified a jurisdictionally relevant issue

---

[8]     To even have to speak of Plaintiffs' "proofs" and "evidence" which have been submitted in order to establish the basic right to take jurisdictional discovery demonstrates the extraordinary burdens placed on Plaintiffs in this litigation.

discovery concerning that issue was proper.  Here, Plaintiffs not only met their obligation to

identify a non-frivolous, relevant jurisdictional issue – namely, NCB's "continuous and

systematic contacts" with the U.S. through its NCB Aviation Division – but Plaintiffs also

offered evidence corroborating their allegations.  But rather than accepting Plaintiffs' allegations,

considering the proofs, and permitting additional jurisdictional discovery on the specifically

identified issue, instead the Court inappropriately began a process of over-valuing NCB's bare

denials, while giving no weight either to Plaintiffs' allegations or the corroborating evidence.

     Plaintiffs offered substantial proof indicating that NCB has engaged, continuously and

systematically, throughout the 1990s and into at least 2002 or 2003, in business dealings in the

United States, through its NCB aviation division.  Plaintiffs first offered evidence indicating,

contrary to NCB's claims, that NCB had a division within the bank that conducted aviation

business.  Haefele Affidavit, Exhibits 5, 6.[9]  Next, Plaintiffs offered evidence that NCB Aviation

conducted its aviation business under the various banners of NCB Aviation Division, Skyways

International, and Mid East Jet.  Exhibits 5, 9 – 13, and 17.  Cross-referencing multiple sources,

Plaintiffs showed that NCB Aviation Division operated as Skyways International and Mid East

Jet at the same locations, using the same facilities, resources, and employees, and providing the

same aviation services.  Once clear that these three entities represent the same entity, Plaintiffs

then offered evidence that, under the banner of Skyways International and Mid East Jet, NCB

Aviation Division consistently conducted business in the United States during the relevant time

period.  Exhibits 14 – 21.

     One exhibit evidencing the existence of NCB's Aviation Department is the business card

of a "flight engineer" indicating employment by "The National Commercial Bank" in its

---

[9]    The Haefele Affidavit regarding the NCB Aviation dispute and attached exhibits were
filed  on August 15, 2008 in support of the motion to stay NCB's renewed motion to dismiss.
Docket Entry #2122.  Said documents are incorporated herein by reference.

"Aviation Department."  Haefele Affidavit, Exhibit 5 (NCB Aviation Department—Skyways International Business Card).  The existence of NCB's aviation department is further corroborated as late as January 2008, when Saudi Arabian Airlines listed "NCB Aviation" as being a private domestic client.  Haefele Affidavit, Exhibit 6 (Saudi Arabian Airlines archived website (http://web.archive.org/web/20080116014739/www.saudiairlines.com/catering/airlinesserved.jsp) (January 16, 2008).[10]

In addition to evidencing the existence of the NCB Aviation Department, the NCB Aviation business card also indicates that NCB Aviation used the name "Skyways International" in its aviation operations.  Haefele Affidavit, Exhibit 5 (NCB Aviation Department—Skyways International Business Card).  Skyways International was an Austin, Texas-based aviation company, once chaired by Lawrence G. Smith, who was at the same time Executive Vice-President of NCB and advisor to then-NCB-chairman Khalid bin Mahfouz.  Haefele Affidavit, Exhibit 7 (Skyway International Registration, Texas Secretary of State, 2003) and Exhibit 8 (Transcript of Lawrence G. Smith 7/27/07 Deposition, at 133:11-15).

Other exhibits corroborate that NCB Aviation and Skyways are the same.  Exhibit 17 is a facsimile transmittal from "NCB Aviation/Skyways," from the same fax number indicated on the NCB Aviation Division business card (682-4827).  Exhibit 17.  The fax is a confirmation from NCB Aviation confirming hotel registration for various NCB Aviation crew members.  Exhibit 12 shows the same address from the NCB Aviation Department – Skyways International business card again identified with Skyways International on a credit card receipt of a Skyways International employee in September 2002.  Haefele Affidavit, Exhibit 12 (September 1, 2002

---

[10]     Notably, and further evidencing the relationship between the companies, once the website was identified, it has thereafter reconfigured, replacing the NCB Aviation references with Mid-East Jet references. See the Partners link of http://www.saudicatering.com.

Hotel Receipt of Muhammad Tahsin).  In a series of documents indicating hotel stays at a Paris hotel in 2001 and 2002, Mr. Tahsin is identified as a Skyways International employee.  On one receipt for a stay in September 2002, the same address indicated for NCB Aviation Department is identified for Skyways International – namely, P.O. Box 9935, Jeddah, Saudi Arabia.  Exhibit 12.

The exhibits show that the NCB Aviation Department also operated as Mid East Jet ("MEJ").  Exhibit 10, for example, shows MEJ operated from the same post office box address (P.O. Box 9935, Jeddah 21423, Saudi Arabia) identified on the NCB Aviation Division/Skyways business card and on the hotel receipt.  Exhibits 5, 12.  In addition to MEJ's street address being listed at the NCB Building, Al Khaldiah, Prince Abdullah Street, Jeddah, Saudi Arabia; and in addition to former NCB chairman and majority shareholder Khalid bin Mahfouz11 also being identified as the Chairman and Chief Executive Officer of Mid East Jet, the exhibits also identify Nadeem Farouki (a/k/a Nadim Farouki) as the General Manager and Operation Manager of MEJ. Haefele Affidavit, Exhibits 9 (Dun & Bradstreet WorldBase Report of Mid East Jet, October 30, 2003), 10 (ICP Update dated October 26, 2005), and 11 (Dun & Bradstreet WorldBase Report of Mid East Jet, June 10, 2005).  In addition to being identified with MEJ, Farouki's name also shows in the fax header (as Ndeem Farooqui) of correspondence from an NCB Aviation representative, representing that the NCB's Aviation Department is located on the Third Floor of the NCB Khalidiyah Branch Building, Prince Abdullah Street, District Khaldiyah, P.O. Box 9935, Jeddah 21423, Saudi Arabia – the same P.O. Box location and the same street address where Mr. Farouki was identified as working as the General and Operating Manager for MEJ. Exhibit 13.

---

[11]     Bin Mahfouz, now deceased, was also a defendant in this case, who Plaintiffs contend the Saudi government ousted from NCB chairmanship after an investigation concluded he was supporting Osama bin Laden.

Plaintiffs also provided the Court with exhibits showing the Court that, acting under its MEJ and Skyways names, the NCB Aviation Division has been operating in the United States. Exhibit 14 includes excerpts from the United States Federal Aviation Administration's database of U.S. Reduced Vertical Separation Minimum (RVSM) Approvals, as of January 2008, which indicate that at least six MEJ aircraft were approved or successfully monitored by the FAA in recent years.   Haefele Affidavit, Exhibit 14 (Excerpts of U.S. RVSM Approvals, January 18, 2008, pages 1, 8 and 9).  Exhibit 15 includes excerpts from FAA Flight Tracking Data of flights with tail numbers of the NCB aircraft, showing more than 130 flights into United States airspace between 2000 and 2002.  Haefele Affidavit, Exhibit 15 (excerpts of FAA Flight Tracking Data).

In addition, other exhibits show that Skyways International pilots have been U.S. residents with FAA certifications.  For example, Keith Monroe, a National Commercial Bank Aviation Department flight engineer (see Haefele Affidavit, Exhibit. 5, NCB Aviation Department business card), resided in the United States and was registered and certified by the FAA.  Haefele Affidavit, Exhibit 16 (Monroe FAA certification).  Other Skyways International employees were similarly registered and/or certified by the FAA.  See, e.g., Haefele Affidavit, Exhibit 17 (February 18, 1998 facsimile transmittal of NCB Aviation identifying list of NCB Aviation crew, including "Buddy" Rogers and Johnny Antoon); Exhibit 18 (Rogers FAA Registration), Exhibit 19 (Antoon FAA certification).  In addition, the FAA registered Skyway International employee Muhammad Tahsin at the Jeddah, Saudi Arabia address of MEJ (P.O. Box 9935, Jeddah, Saudi Arabia) and certified him.  Haefele Affidavit, Exhibit 20 (Tahsin FAA certification).  Skyways International employee Tahsin was also identified in December 2002, by the U.S. Customs Service to French authorities as being suspected of having provided financially support to Ahmed al Ghamdi, one of the September 11, 2001 hijackers.  Haefele Affidavit, Exhibit 21 (U.S. Customs December 30, 2002 correspondence).

Given the ample evidence Plaintiffs have produced that NCB Aviation has been operating in the United States as Mid East Jets and as Skyways International, including extensive documentation from several FAA databases, Plaintiffs' allegations cannot be dismissed, either by NCB or by the Court, based merely on NCB's contrarian denials.  Far too many interconnections exist among NCB, Skyways International, and Mid East Jets and their contacts with the United States, for the Court to blindly accept NCB's self-serving affidavits and ignore the overwhelming interconnections evidencing NCB's connection with the aviation business and its U.S. activities.

In its decision, the Court ascribes unnecessary value to the fact that only bin Mahfouz, and not NCB, characterized NCB Aviation as part of NCB.  First, the observation is not particularly accurate, because all of the documents read together clearly suggest that reading. The business card identifies the business as a division of NCB bank, including the bank's logo and type-set.  Exhibit 5.  All of the interconnections among the addresses, post office boxes, employees, and officers, suggest nothing contrary to the plain language interpretation that the NCB Aviation Division is, indeed, a division of NCB Bank.  Moreover, the various facsimile covers, including one from MEJ general and operating manager Farouki, represent that the Aviation Department is part of The National Commercial Bank.  *See, e.g.*, Exhibits 13, 17.  To insist that the proofs must be read otherwise is to ignore logic and evidence to reach a preconceived result.

The Court's focus on bin Mahfouz's perspective as distinct from the bank's is misplaced. The Court's distinction between bin Mahfouz's perspective and the bank's fails to take into account that during much of the time involved, bin Mahfouz was both the chairman and overwhelmingly majority shareholder of NCB.  Indeed, bin Mahfouz himself characterized his manner of operating the bank as "absolute authority."  Under the circumstances, it would be inappropriate to draw a distinction between bin Mahfouz's and NCB's indications about NCB

Aviation.  *See* Declaration of Thomas C. Baxter, Jr., filed in *Board of Governors of the Federal Reserve System v. Khalid Bin Mahfouz* (United States District Court for the Southern District of New York, 92 Civ. 5096 (MGC) (received July 9, 1992)), page 5, footnote 3 ("At all relevant times, Mahfouz operated NCB with what he testified under oath was 'absolute authority.'"); Complaint in *Board of Governors of the Federal Reserve System v. Khalid Bin Mahfouz* (United States District Court for the Southern District of New York, 92 Civ. 5096 (MGC), filed July 8, 1992 ("Mahfouz operated NCB with what he characterizes as "absolute authority."); see also "Khalid Bin Mahfuz Returns to NCB," Middle East Economic Survey (July 29, 1996) ("NCB points out that, despite his relinquishment of the chief operating officer's role, Mr. Mahfuz has remained involved in decisions on the strategic questions affecting the bank because of his controlling interest in the bank's stock."); A. Sidahmed, Saudi Husband, Wife Sole Owners Of Bank, UNITED PRESS INTERNATIONAL, July 22, 1996 ("Though officially distancing himself from the NCB … [bin Mahfouz] was active behind the scenes in running the bank.").

## IV.    CONCLUSION

For the reasons stated above, this Court should overturn each of the Magistrate Judge's rulings concerning the discovery disputes regarding National Commercial Bank, and order that Plaintiffs' requested discovery shall proceed forthwith.


Dated: February 1, 2010                    Respectfully Submitted,


                                          /s/_____
                                          Ronald L. Motley
                                          rlmotley@motleyrice.com
                                          Jodi Westbrook Flowers
                                          Michael Elsner
                                          Robert T. Haefele
                                          Vincent I. Parrett
                                          MOTLEY RICE LLC

28 Bridgeside Boulevard
P.O. Box 1792
Mount Pleasant, South Carolina 29465
Tel:  (843) 216-9000

Stephen A. Cozen
Sean P. Carter
scarter@cozen.com
Adam C. Bonin
COZEN O'CONNOR
1900 Market Street
Philadelphia, PA 19103
Tel:  (215) 665-2000
Fax:   (215) 665-2013

James P. Kreindler
jkreindler@kreindler.com
KREINDLER & KREINDLER LLP
100 Park Avenue
New York, New York 10017-5590
Tel: (212) 687-8181

Paul J. Hanly, Jr.
Jayne Conroy
Andrea Bierstein
abierstein@hanlyconroy.com
HANLY CONROY BIERSTEIN SHERIDAN FISHER
 & HAYES, LLP
112 Madison Avenue
New York, NY 10016
Tel:  (212) 784-6400
Fax:  (212) 213-5949

Jerry S. Goldman
jgoldman@andersonkill.com
ANDERSON KILL & OLICK, P.C.
1251 Avenue of the Americas, 42nd Floor
New York, N.Y. 10020-1182
Telephone:  (212) 278-1498
Fax:  (212) 278-1733

For the Plaintiffs' Executive Committees

## CERTIFICATE OF SERVICE

I hereby certify that, on February 1, 2010, I caused an electronic copy of the foregoing Plaintiffs' Objections to the January 13, 2010 Memorandum Decision and Order of Magistrate Judge Frank Maas to be served electronically by the Court's Electronic Case Filing (ECF) System.


       /s/  Adam C. Bonin
      Adam C. Bonin