92 CIV. 5096 (MGC)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - -

BOARD OF GOVERNORS OF THE
FEDERAL RESERVE SYSTEM,

          Plaintiff,

    v.

KHALID BIN MAHFOUZ,

          Defendant.

- - - - - - - - - - - - - - - - x

RECEIVED 7/9/92 a
OFFICE OF THE CLERK
U.S. DISTRICT CT.

**DECLARATION OF
THOMAS C. BAXTER, JR.**

92 Civ. 5096 (MGC) (PJL)

FILED
JUL 9 1992
U.S. DISTRICT COURT
S.D. OF N.Y.

      Thomas C. Baxter, Jr., hereby declares under the penalty of perjury as follows:

      1.    I am an officer of the Federal Reserve Bank of New York, holding the position of Counsel in the Legal Department.  Pursuant to an Order of Investigation issued by the Board of Governors of the Federal Reserve System ("Board"), Richard A. Small (Special Counsel to the Board) and I have conducted the Board's investigation into, _inter alia_, whether BCCI Holdings (Luxembourg) S.A., Luxembourg ("BCCI Holdings"), the Bank of Credit and Commerce International, S.A., Luxembourg ("BCCI S.A."), and/or the Bank of Credit and Commerce International (Overseas) Limited, George Town, Grand Cayman ("BCCI Overseas") acquired control of Credit and Commerce American Holdings, N.V. Netherlands, Antilles ("CCAH").[1]  The investigation into BCCI's control of CCAH has uncovered information regarding the acquisition of control of CCAH by defendant Khalid bin Mahfouz ("Mahfouz"), which acquisition is

-------------------

    [1]    BCCI Holdings, BCCI S.A., and BCCI Overseas are collectively referred to herein as "BCCI."

the subject matter, <u>inter alia</u>, of the instant action.

2.   I make this Affidavit upon information and belief in support of the application by the Board, pursuant to Section 8(i)(4) of the Federal Deposit Insurance Act (the "FDI Act"), as amended by the Crime Control Act of 1990, Pub. L. No. 101-6467, 104 Stat. 4789, 4864-65 (November 29, 1990), 12 U.S.C. § 1818(i)(4), and the Debt Collection Act, 28 U.S.C. § 3001, <u>et seq.</u>, for a preliminary injunction preventing the transfer, removal, dissipation, or disposal of any assets in the United States owned by Mahfouz during the pendency of the Board's administrative enforcement action against Mahfouz, and, if the Court deems it necessary, for the appointment of a receiver to administer the injunction.   The source of my information and belief is documentary evidence and deposition testimony obtained in the course of the investigation.   For the Court's convenience, a copy of the Board's Notice of Assessment of Civil Money Penalties against Mahfouz, Haroon Rashid Kahlon ("Kahlon"), and National Commercial Bank ("NCB"), issued on July 2, 1992 (the "Notice of Assessment"), is annexed hereto as Exhibit A.

## A.  Acquisition of Control of CCAH and BCCI Shares by Mahfouz and Others.

### 1.  <u>Mahfouz's Decision to Acquire Control of CCAH and BCCI</u>

3.   In the course of the investigation, I have learned that in 1985 Mahfouz became interested in expanding his family's banking operations by means of a significant acquisition.   After considering the possibilities for acquiring several other

financial institutions, Mahfouz decided, during the first quarter of 1986, to make a substantial investment in BCCI Holdings.

4.   Between January and May 1986, Mahfouz and Kahlon met on several occasions, in Jeddah and in London, with Agha Hasan Abedi ("Abedi") and Swaleh Naqvi ("Naqvi"), both of whom, at all times pertinent to this action, were senior officers of BCCI.  The circumstances surrounding these meetings are more fully set forth in the Notice of Assessment of Civil Money Penalty issued by the Board against BCCI and others on July 29, 1991 (the "July 29, 1991 Notice of Assessment"), a copy of which is annexed hereto as Exhibit B.  Kahlon was, at all times pertinent to this Notice, an officer or employee of NCB, which is a bank organized under the laws of Saudi Arabia.

5.   When negotiations concerning the acquisition of a controlling interest in BCCI Holdings reached an impasse, Abedi asked Mahfouz whether he would also be interested in acquiring a controlling interest in CCAH.  Mahfouz was attracted to the idea, because he envisioned merging BCCI Holdings and CCAH under the supervision of a single supervisor in the future.

6.   On or about May 27, 1986, Mahfouz decided to acquire a controlling interest in both CCAH and BCCI Holdings, defining the target of 30 percent as his measure of control. Mahfouz has testified under oath that he understood that, at the 30 percent level, his holdings would be roughly equal to that of the controlling shareholder, the ruling family of Abu Dhabi. Discussions between Mahfouz and Abedi then turned to the price

- 3 -

Mahfouz would pay for such an interest in the shares of BCCI and CCAH. Mahfouz was mindful that BCCI was experiencing severe liquidity problems at this time, because of losses it had suffered in the Cayman Islands. Mahfouz believed that those problems would enable him to negotiate a more favorable price for his investment in BCCI and CCAH. After some negotiation, Mahfouz and Abedi agreed to a purchase price of more than $1 billion for the shares of CCAH and BCCI. Mahfouz regarded his purchase of both CCAH and BCCI shares as comprising a single transaction.

    2.    **The Mechanics of the Acquisitions**

        a.    **June 1986 Contingent Acquisition of BCCI Shares**

    7.    At that time -- the end of May 1986 -- BCCI Holdings urgently needed additional capital, but was not yet ready to issue new shares or capital notes. Mahfouz was unwilling to inject new capital into BCCI Holdings unless he received the BCCI Holdings shares and capital notes that had not yet been issued. Mahfouz was, however, willing to borrow, on a non-recourse basis from BCCI, S.A. (Bahrain),[2] monies that he would inject into BCCI Holdings as capital. Mahfouz's loan from BCCI, S.A. (Bahrain) would be secured exclusively by the later-issued shares of BCCI Holdings. When the new BCCI Holdings shares and capital notes were issued, Mahfouz would repay the BCCI, S.A. (Bahrain) loan and thereby obtain release by BCCI, S.A. (Bahrain) of the shares and notes.

---

[2]    BCCI, S.A. (Bahrain) is a branch of BCCI S.A.

8.   Accordingly, on or about May 27, 1986, Mahfouz authorized BCCI, S.A. (Bahrain) to extend him credit in the amount of $270 million.  This credit was for the purpose of purchasing soon-to-be issued BCCI Holding shares and capital notes as described above.  BCCI, S.A. (Bahrain)'s recourse for repayment of the $270 million loan was limited to the shares and capital notes that would be issued at a future date, and Mahfouz had no personal liability on the loan.  Thus, in the event of a default, BCCI, S.A. (Bahrain) would be able to obtain repayment of the $270 million credit only by selling shares of BCCI Holdings, and could not recover any deficiency from Mahfouz.

9.   On May 30, 1986, as a token of his good faith about proceeding with the investment, Mahfouz caused NCB to transfer the sum of $270 million to a Mahfouz deposit account at BCCI, S.A. (London), account number 03046822.[3]  NCB recorded the $270 million payment on NCB's books as a deposit by NCB at BCCI, S.A. (London).

10.  On June 2, 1986, in accordance with the above-described agreement to extend credit, BCCI, S.A. (Bahrain) disbursed the sum of $183,809,840, which was to be used for Mahfouz's purchase of 4,595,246 newly-issued shares of BCCI Holdings stock.

---

[3]   At all relevant times, Mahfouz operated NCB with what he testified under oath was "absolute authority."  A majority of the capital shares of NCB is owned by the Mahfouz family.

b.   **The Procurement Deed**

11.   Mahfouz left the details of his proposed acquisition of controlling interests in BCCI Holdings and CCAH (see supra ¶ 6) in the hands of Kahlon, one of his assistants,[4] and Sterling Stover ("Stover"), an attorney who was then a partner in the London office of a U.S. law firm and who provided legal counsel to Mahfouz and NCB at all times pertinent to this action. Kahlon and Stover worked with two attorneys employed at BCCI Holdings to prepare the acquisition documents. Those documents reflected a transaction that was to be done in several stages. The basic elements of the transaction were characterized in a master agreement that was referred to by the parties as the "Procurement Deed," a copy of which is attached as Exhibit C.

12.   Under the Procurement Deed, Mahfouz's investments in CCAH and BCCI Holdings were to be nominally acquired and held by five companies wholly owned by Mahfouz[5] that were organized for this express purpose under the laws of Bermuda (collectively, the "Five Bermuda Companies"). In the Procurement Deed, ICIC Overseas[6] agreed to arrange for the sale of 30 percent of the

_____

[4]   Kahlon served as Deputy General Manager at NCB, as well as serving as an agent for Mahfouz.

[5]   These companies were Windrush Limited, Taynton Investment Limited, Sarsden Holdings Limited, Shipton Investments Limited, and Bleddington Investments Limited.

[6]   ICIC Overseas operated, at all relevant times, under the control of senior BCCI management, to further BCCI's business objectives. The ownership, management, and business activities of BCCI and ICIC Overseas were intermingled and interrelated in such a way that the two groups generally operated as a single entity.

shares of BCCI Holdings, and 30 percent of the shares of CCAH, to the Five Bermuda Companies over a period of three years.

13.   Under the Procurement Deed, the first phase of Mahfouz's investment in CCAH involved the immediate purchase of 22,152 shares of CCAH by the Five Bermuda Companies, at a per-share price of $6,094.  At the time, 22,152 shares of CCAH constituted 9.9% of CCAH's outstanding shares.[7]  The Procurement Deed further provided that the CCAH shares were subject to a buy-back agreement with the seller of the shares, and that the seller's obligation to repurchase the CCAH shares was to be secured by a standby letter of credit issued by BCCI Overseas.

14.   The second phase of Mahfouz's investment in CCAH involved the sale to the Five Bermuda Companies, within six months of the Procurement Deed's execution, of sufficient additional CCAH shares to provide Mahfouz with control of 20% of CCAH's outstanding shares.  These shares were to be purchased by the Five Bermuda Companies at the same price per share as the first 9.9% of outstanding shares -- $6,094 per share.  This sale, however, unlike the sale of the first 9.9% of outstanding shares, was specifically "subject to, and conditional upon, the receipt of any required approvals or consents of any governmental, regulatory or monetary authority."

15.   The third phase of Mahfouz's investment in CCAH

---

[7]   The Procurement Deed did not identify the sellers of the CCAH shares; instead, it provided only that ICIC Overseas would "arrange for the purchase" of the shares by the Five Bermuda Companies.

involved the sale to the Five Bermuda Companies, within three years of the Procurement Deed's execution, of sufficient additional CCAH shares to provide Mahfouz with control of 30% of CCAH's outstanding shares. These shares were to be purchased at the same price as the first 9.9% ($6,094 per share), and were also conditioned upon the receipt of all necessary regulatory consents.

16. The Procurement Deed was executed by Mahfouz and ICIC Overseas on July 29, 1986. Although the Procurement Deed was ostensibly entered into between the Five Bermuda Companies and ICIC Overseas, Mahfouz and Kahlon signed the agreement, and the Five Bermuda Companies -- wholly-owned by Mahfouz -- acted at Mahfouz's direction.

c.   **July 1986 Acquisitions of BCCI and CCAH Shares**

17. On July 29, 1986 -- the date that the Procurement Deed was executed -- Mashriq Holding Company ("Mashriq") sold to the Five Bermuda Companies 22,152 CCAH shares, representing 9.9 % of CCAH's total number of shares outstanding at that time. Mashriq is a personal holding company for Hamad bin Mohammed al-Sharqi ("Sharqi"), the Ruler of the Emirate of Fujeirah, one of the United Arab Emirates. Sharqi, by power of attorney to Abedi and sub-power of attorney to Naqvi, gave Naqvi full power to operate Mashriq. Mashriq has operated as a nominee for BCCI, as detailed in the July 29, 1991 Notice of Assessment.

18. The purchase price of the 22,152 CCAH shares was $134,994,288. The payment of $134,994,288 divided by the 22,152

CCAH shares results in a per share price of $6,094, which is the per price share stated in the Procurement Deed for CCAH shares. At the closing, BCCI Overseas issued an irrevocable standby letter of credit to the Five Bermuda Companies in the amount of $175,492,574, to guarantee Mashriq's obligations under the buy-back agreement.

19. On July 28, 1986, on the eve of the execution of the Procurement Deed, Mahfouz caused NCB to transfer the sum of $485 million to Mahfouz's account number 03046822 at BCCI, S.A. (London) -- the same account into which Mahfouz had made the earlier transfer of $270 million (see supra ¶ 9). At the execution of the Procurement Deed, Kahlon directed that all funds collected into Mahfouz's account at BCCI (the deposits of $270 million and $485 million) be disbursed as follows:

(a) $300,000,000 for BCCI Holdings capital notes;

(b) $183,809,840 to repay the above-described loan from BCCI, S.A. (Bahrain) to Mahfouz, thereby finalizing Mahfouz's June 2, 1986 purchase of 4,595,246 BCCI Holdings shares (see supra ¶ 10);

(c) $135,523,560 to the account of Wabel Pharaon at BCCI, to pay for 3,388,089 BCCI Holdings shares purchased on July 29, 1986 by the Five Bermuda Companies from Wabel Pharaon; and

(d) $134,994,288 for the 22,152 CCAH shares acquired by the Five Bermuda Companies from Mashriq (see supra ¶¶ 17-18).

The BCCI Holdings and CCAH securities purchased with these particular disbursements were apportioned among the Five Bermuda

Companies.

20.   The $485 million payment that increased the balance of Mahfouz's BCCI, S.A. (London) account number 03046822, as well as the earlier $270 million transfer to Mahfouz's BCCI, S.A. (London) account (see supra ¶ 9), were recorded on NCB's books as an NCB deposit at BCCI, S.A. (London) until April 1987. At or about that time, these payments were recharacterized as loans by NCB to Mahfouz's wife and children and an investment by NCB in debt of BCCI Holdings (as more fully described infra ¶¶ 40-41).

   c.   **September 1986 Acquisition of CCAH and BCCI Shares**

21.   On September 17-19, 1986, Mahfouz visited First American offices in New York and Washington, D.C.  He toured First American facilities in both cities and discussed First American business with Clark Clifford ("Clifford") and Robert Altman ("Altman"), directors and officers of CCAH and its subsidiaries and partners in the law firm of Clifford and Warnke.

22.   On September 25, 1986, NCB paid the sum of $256,667,562 to BCCI Overseas in consideration for 42,123 CCAH shares.  Ten months later, that transaction would be documented on NCB's books as two loans -- one to Mashriq and one to a Kuwaiti businessman named Faisal Saud Al-Fulaij ("Fulaij") -- secured by the 42,123 CCAH shares registered in their names.  (As detailed in the July 29, 1991 Notice of Assessment, Mashriq and Fulaij held shares of CCAH as nominees for BCCI Holdings.)

23.   On September 25, 1986, 42,123 CCAH shares

represented 18.8 percent of the total outstanding shares of CCAH. The payment of $256,667,562 divided by the 42,123 CCAH shares later pledged as collateral results in a per share price of $6,094, which is the price per share stated in the Procurement Deed for CCAH shares.  The 42,123 CCAH shares purportedly pledged to NCB, when combined with the 22,152 CCAH shares purchased by Mahfouz on July 29, 1986 (see supra ¶ 17), represented 28.7 percent of the outstanding voting shares of CCAH.

24.  On September 29, 1986, NCB transferred the sum of $160 million to BCCI to acquire 4,000,000 BCCI Holdings shares, which were thereafter registered in the names of the Five Bermuda Companies.

### d.   April-May 1987 Acquisitions and Transfers of BCCI Securities

25.  On April 24, 1987, BCCI Holdings paid a stock dividend of 2,536,315 BCCI Holdings shares to the Five Bermuda Companies.

26.   On or about May 1987, the beneficial owner of the BCCI Holdings capital notes (see supra ¶ 19(a)) was changed from the Five Bermuda Companies to NCB.

### e.   August 1987 Acquisition of CCAH Shares

27.   On August 17, 1987, the Five Bermuda Companies purchased 4,685 CCAH shares at a rights offering.

### 3. After-the-Fact Characterization of CCAH and BCCI Share Acquisitions as Sham "Loans"

#### a. Concealment of The September 1986 CCAH Share Acquisition

28.  On October 21, 1986, Stover, Mahfouz's London counsel, wrote to counsel in the Netherlands Antilles about steps to be taken to perfect a pledge of shares of an Antilles company. In that letter, Antilles counsel was told that NCB was "proposing to make a loan" secured by CCAH shares. Almost one month before the date of Stover's letter, NCB, at Mahfouz's direction, had already transferred $256,667,562 to BCCI Overseas (see supra ¶ 22)

29.  On January 15, 1987, Stover consulted an associate in the Dallas office of his firm, Steven Block ("Block"), who specialized in banking law matters, about the possibility of NCB making a loan secured by CCAH shares. Block indicated that such a loan could be made, provided that it was not a sham loan designed to conceal an acquisition. Block said that a sham loan of that kind would violate the law.

30.  On January 22, 1987, Block assembled a package of material that would be needed to file a bank holding company application with the Board. This package, which detailed the types of information that would need to be included in the application, was then transmitted to Stover.

31.  On February 19, 1987, Kahlon and Naqvi travelled from London to Washington, D.C. to meet with Altman to discuss, among other things, a bank holding company application to be

- 12 -

filed by one or more companies controlled by Mahfouz.  Block also travelled from Dallas to Washington, D.C. in the expectation that he would attend the meeting with Altman.

32.  On the morning of the meeting, Block met for a period of approximately 15 minutes with Kahlon.  During that brief meeting, Kahlon asked Block about the differences between an application filed under the Control Act and under the BHC Act. Kahlon then informed Block that his presence was not required at the meeting with Altman, and Block returned to Dallas.  Naqvi and Kahlon later met with Altman and discussed a bank holding company application.  They inquired how the time for the Board of Governors to act on a 30 percent acquisition of CCAH could be accelerated.  Altman suggested that his law firm, Clifford and Warnke, could assist Mahfouz in making the required filings with the Board.

33.  On March 10, 1987, the law firm of Milbank, Tweed, Hadley & McCloy delivered a memorandum of law ("March 10 Milbank, Tweed memorandum") to Altman, concerning "Proposed Additions to CCAH Shareholders."  The memorandum discussed the circumstances under which a Control Act notice would not be required for the acquisition of CCAH shares by the Five Bermuda Companies, and concluded:

> To summarize, we would be most comfortable if the total Mahfouz holdings are less than 15 percent, less comfortable with an aggregate Mahfouz holding of 20 percent and least comfortable with an aggregate Mahfouz position of 24.9 percent.  I trust that the foregoing gives you a clearer picture of the potential risks involved were the

Mahfouz [family] to acquire additional shares of
CCAH.

34.   On March 12, 1987, Clifford and Warnke transmitted
to Naqvi a "Memorandum to CCAH File" ("March 12 Clifford and
Warnke memorandum").   The memorandum was distributed by Naqvi to
Kahlon, who shared it with Stover.   After discussing various
legal issues, the March 12 Clifford & Warnke memorandum concluded
that:

> we would be comfortable if the total Mahfouz holdings
> are less than 20 percent without any understandings or
> agreements among or between [the Mahfouz family]
> investing in CCAH.

35.   Neither the March 10 Milbank, Tweed memorandum nor
the March 12 Clifford and Warnke memorandum mentions the fact
that Mahfouz had already obtained control of 28.7% of CCAH's
outstanding stock, through the Five Bermuda Companies and through
NCB (see supra ¶¶ 19(b), 23).

36.   In July 1987, nearly ten months after NCB had
transferred $256,667,562 to BCCI Overseas, loan and pledge
agreements for this amount were signed between NCB and Mashriq
and Fulaij.   Both sets of agreements were dated "as of" September
8, 1986.   The loan agreement with respect to Mashriq provides for
a loan in the amount of $131,966,040 secured by a pledge of
21,660 CCAH shares.   The loan agreement with respect to Fulaij
provides for a loan in the amount of $124,701,522 secured by a
pledge of 20,463 CCAH shares.   When the borrowed amount for each
of these loans is divided by number of CCAH shares pledged as
collateral, the price per share is $6,094 -- the price per share

- 14 -

for CCAH shares that is stated in the Procurement Deed.  In connection with the loan and pledge agreements, Mahfouz received transfer deeds executed in blank for the 21,060 CCAH shares recorded in Mashriq's name and for the 20,463 CCAH shares recorded in Fulaij's name.

37.  Although the transfer of funds by NCB to BCCI Overseas in September 1986 was later treated on NCB's books as loans to Mashriq and Fulaij, such "loans" were not made in accordance with commonly accepted loan practices.  Among the common practices for a bona fide loan that were not followed are:

(a)  the purported loans were made at the request of Naqvi, a BCCI executive, rather than the borrowers (Mashriq and Fulaij), and NCB had no contact or negotiations with the borrowers;

(b)  no purpose was stated for the respective borrowings;

(c)  no financial statements were obtained regarding the borrowers and no analysis was done of each respective borrower's ability to repay the loans;

(d)  no analysis was done of the borrowers' respective business needs, and NCB had no information about either of the borrowers;

(e)  no analysis was done of the value of the CCAH shares pledged as collateral;

(f)  the value assigned to the CCAH shares -- $6,094 per share -- is the product of the negotiation of the Procurement Deed rather than the loan agreements themselves;

(g)  loan documentation was executed nearly 10 months after loan proceeds were disbursed;

(h)  loan proceeds were disbursed to accounts at BCCI in accordance with directions received from Naqvi or his staff and not the borrowers; and

(i) interest payments for both borrowers were usually paid simultaneously by BCCI.

38. In a memorandum that Stover wrote to Kahlon on September 23, 1987, Stover characterized the "loan" transactions as follows:

> These transactions were structured as loans only to accommodate CCAH's concern that additional shares could not then be purchased by the [Mahfouz family] without the consent of US regulatory authorities. It was always the intention of the parties that the [Mahfouz family] would purchase such shares as soon as regulatory consent was obtained, and indeed this is set forth in the Procurement Deed itself. The amount of these 'loans' and the number of shares given as security again clearly evidences a maximum price per share of $6,094.

39. In making the transfer of $256,667,562 to BCCI Overseas in September 1986, NCB and Mahfouz did not intend to -- nor did they in fact -- extend credit to Mashriq and Fulaij. Mahfouz testified that he engaged in the purported loan transactions to "lock in" the price of the CCAH shares securing the purported loans at $6,094 per share, the same price at which the initial 9.9% block of CCAH shares was purchased by the Five Bermuda Companies controlled by Mahfouz. According to Kahlon and Stover, NCB did not expect the purported loans to be repaid and intended to set off the CCAH shares against the amounts due on the purported loans once regulatory approval for the acquisition of control of CCAH was obtained. Kahlon stated that NCB was not concerned about what happened to the $256,667,562 transferred to BCCI Overseas, because Mahfouz and NCB believed that they were buying the shares of CCAH in this transaction.

**b.    Concealment of the July 1986 BCCI
          and CCAH Share Acquisitions**

40.    In April 1987, NCB's external auditors informed NCB that NCB could not continue to account for the July 1986 $754,327,688 purchase price for the BCCI Holdings and CCAH securities held by the Five Bermuda Companies (see supra ¶ 19(a)-(d)) as a deposit from NCB placed at BCCI (see supra ¶ 20).  The auditors indicated that the $754,327,688 was not a deposit, but rather was a purchase price and should be reflected as such on NCB's books.

41.    On April 16, 1987, Mahfouz directed that the $754,327,688 entry, recorded on NCB's books since July 1986 as a deposit, be re-characterized.  In accordance with that direction, NCB booked a loan to Mahfouz's wife and three children in the sum of $454,327,688.  This loan was secured by 7,983,335 BCCI Holdings shares (see supra ¶ 19(b)-(c)) and 22,152 CCAH shares (see supra ¶ 19(d)).  With respect to the remaining $300 million, this sum was booked as an investment by NCB in BCCI Holdings capital notes (see supra ¶ 19(a)), and it was understood that the Five Bermuda Companies were holding these BCCI Holdings capital notes as nominees for NCB.[8]

**B.  Sale of BCCI Shares by Mahfouz.**

42.    On April 30, 1987, Mahfouz and Kahlon met with

_____

[8]    At year end 1990, NCB held BCCI Holdings capital notes in the amount of $330 million.  Following the closure of BCCI on July 5, 1991, BCCI Holdings ceased paying interest or principal on the $330 million in capital notes owned by NCB.

Abedi and Naqvi in Jeddah, Saudi Arabia.  During that meeting, Mahfouz told Abedi and Naqvi that he had changed his mind about the investment, and would like to divest his BCCI Holdings and CCAH shares.  (Under the Procurement Deed, Mahfouz could not, before July 1989, require the sellers of the shares to repurchase them.)  When Abedi and Naqvi expressed concern about the public reaction to news that Mahfouz was selling his interest in BCCI Holdings, Mahfouz agreed that he would keep his decision a secret, and would continue to serve on the board of directors of BCCI until July 1989.

43.  On March 21, 1988, Mahfouz caused the Five Bermuda Companies to sell 2,753,815 BCCI Holdings shares to ICIC Overseas for the sum of $113,028,004.  On May 10, 1988, Mahfouz caused the Five Bermuda Companies to sell an additional 3,786,490 BCCI Holdings shares to ICIC Overseas for the sum of $144,474,058. The sales agreements governing these transfers provided that the shares sold could continue to be registered in the name of the Five Bermuda Companies.

44.  On September 7, 1988, Mahfouz sold an additional 4,000,000 BCCI Holdings shares to ICIC Overseas for the sum of $160 million.  On the same day, Mahfouz sold another 3,979,345 BCCI Holdings shares to ICIC Overseas for the sum of $137,041,717.[9]

---

[9]    Of the nearly $300 million needed to pay for the sales done on September 7, 1988, $115 million was borrowed from NCB. Mahfouz used his authority to cause NCB to make a loan to a Bermuda company named Fulda, Ltd. ("Fulda"), in the sum of

45.  As of the close of business on September 7, 1988, the Five Bermuda Companies no longer held any shares of BCCI Holdings.  On October 2, 1989, the Five Bermuda Companies were transferred to ICIC Holdings for a price of $1.

## C.  Sale of CCAH Shares by Mahfouz.

### 1.  Shares Nominally Held by Burford Investments, Ltd.

46.  On August 29, 1988, Mahfouz caused the Five Bermuda Companies to transfer their holdings in CCAH shares to another Bermuda company wholly-owned and controlled by Mahfouz, Burford Investments Limited ("Burford").

47.  On October 2, 1989, Burford sold all of its CCAH shares (26,837 shares) to ICIC Overseas, as agent for an undisclosed client, for the sum of $191,337,131.  The purchase price was paid in two forms:  (a) by funds transfer to Mahfouz in the amount of $146,378,838; and (b) by promissory note which, with principal and interest at the rate of 1/2 percent above the London Interbank Offering Rate ("LIBOR"), paid $44,958,293 at maturity, on July 26, 1990.

48.  The funds transfer of $146,378,838 to Mahfouz was falsely characterized on the books of Bank of Credit and Commerce (Emirates) and BCCI, S.A. (Bahrain) as loans by those two entities to Mahfouz.  Mahfouz was the nominal borrower with respect to both of these loans, but has denied under oath that he

---

$115 million.  Fulda was a company owned and controlled by ICIC.
The proceeds of the Fulda loan were paid to Mahfouz.

borrowed from the BCCI offices at that time.

49.   During 1990, loan confirmations for the BCC
Emirates and BCCI, S.A. (Bahrain) loans to Mahfouz were prepared
to be submitted to BCCI's auditors, the accounting firm of Price
Waterhouse.   After a meeting that Naqvi had with Kahlon and
Mahfouz in a conference room at BCCI's London office, Naqvi
presented loan confirmations with Mahfouz's name on them to Price
Waterhouse.

50.   On June 1, 1990, Kahlon demanded from ICIC the
amount due on the promissory note -- $44,958,293 (see supra ¶
47).   On July 26, 1990, ICIC made this payment.   Of this amount,
Mahfouz retained the sum of $42,208,619.   As compensation for the
work that Kahlon had done on the acquisition and divestiture of
the BCCI and CCAH shares, Mahfouz paid Kahlon the balance,
$2,749,674.

51.   On July 17, 1990, Mahfouz sold ownership of
Burford to ICIC for the sum of $1.   This sale was to enable ICIC
to continue to show Burford as a CCAH shareholder.

   2.   **Shares Nominally Owned by NCB**

52.   On July 17, 1990, NCB released from its nominal
lien the 42,123 CCAH shares that secured its purported loans to
Mashriq and Fulaij (see supra ¶ 36).   As substitute collateral,
NCB received a deposit of $263 million from BCCI.

53.   On September 28, 1990, NCB discharged the
purported loans that it had made to Mashriq and Fulaij by
offsetting the aggregate loan amounts against the $263 million

BCCI deposit.  A final payment of $264,262 was made by BCCI on
October 9, 1990.  In addition to these payments, NCB also
received payments from various BCCI entitities that were booked
as interest earned on the Mashriq and Fulaij "loans" between
September 1986 and March 1990.  Those payments totaled
approximately $77,910,709.

### D.   Mahfouz's Financial Gain From CCAH and BCCI Transactions

54.  By year end 1990, Mahfouz had caused NCB, Burford
and the Five Bermuda Companies to divest all of their BCCI and
CCAH shares.  As a result of the investments, Mahfouz received a
personal financial gain of $120,168,472 (see Notice of
Assessment, Appendix A), of which Mahfouz paid $2,749,674 to
Kahlon.

55.  At no time relevant to this Notice did Mahfouz,
NCB, or the Five Bermuda Companies file with the Board of
Governors a notice under the Control Act or an application under
the BHC Act for the acquisition of any shares of CCAH.

### E.   Participation by Mahfouz in Certain Transactions that Obscured BCCI's True Financial Condition.

#### 1.   Loan to Pharaon

56.  Ghaith R. Pharaon ("Pharaon") was a significant
customer and shareholder of BCCI at all times relevant to this
action.  In late 1985, one of Pharaon's companies, Saudi Research
and Development Corporation ("REDEC"), experienced severe

- 21 -

financial difficulties.  These financial difficulties had many
effects on Pharaon, his investments, and his bankers, one of whom
was BCCI Overseas.  BCCI's auditors, Price Waterhouse, devoted
increasing attention to the size of BCCI Overseas's credit
exposure to Pharaon.

57.  In response to the attention of the auditors, BCCI
Overseas decided to reduce the size of its credit exposure to
Pharaon. Mahfouz agreed that NCB would assist BCCI Overseas in
this effort.  On September 12, 1986, Mahfouz caused NCB to lend
$70 million to Pharaon.  NCB secured the loan with a deposit to
NCB by BCCI.  The repayment of the $70 million loan was also
guaranteed by BCCI, S.A., which represented to NCB that it was
holding "marketable securities" that Pharaon intended to use to
repay the NCB loan at maturity.  The $70 million loan proceeds
disbursed by NCB were used by BCCI Overseas to reduce the size of
its credit exposure to Pharaon.  On September 28, 1990, NCB
discharged the $70 million loan that it had made to Pharaon by
offsetting the loan amount against the BCCI Overseas deposit.

2.  **Loan to Mashriq II**

58.  During 1987, BCCI's auditors, Price Waterhouse,
also became increasingly concerned about the magnitude of BCCI
Overseas loans secured by CCAH shares.  In reaction to Price
Waterhouse, Naqvi agreed to reduce the magnitude of BCCI Overseas
loans secured by CCAH shares.

59.  In August 1987, CCAH needed to raise $115 million
in a rights offering, and BCCI Overseas had to finance the

- 22 -

participation in the rights offering of its nominee shareholders in CCAH.  On August 17, 1987, Mahfouz -- at the request of BCCI Overseas -- caused NCB to make a loan in the sum of $75 million to a company named Mashriq Holding Company, Ltd. ("Mashriq II"), a separate company from the Mashriq that was then currently a CCAH shareholder.  BCCI Overseas guaranteed repayment of this loan, and it was secured by a $75 million deposit by BCCI Overseas with NCB. In a letter of August 12, 1987, Naqvi, on behalf of BCCI Overseas, agreed that:  "[I]n the event of the nonpayment of the said loan, on the maturity date, unless mutually extended, the placement can be used by you to repay the loan."  Out of the total proceeds of NCB's loan to Mashriq II, $64.4 million was paid to the First American Bank of New York in connection with CCAH's 1987 rights offering.  On September 28, 1990, NCB discharged the $75 million loan that it had made to Mashriq II by offsetting the loan amount against the BCCI Overseas deposit.

### 3.   Loan to Shorafa

60.   On March 5, 1989, Mahfouz -- again at the request of BCCI Overseas -- caused NCB to make a loan of $55 million to a resident of Abu Dhabi named Ali Mohammed Shorafa ("Shorafa") for a term of six months.  The loan was secured by a deposit with NCB from BCCI Overseas in the amount of $55 million.  An officer of BCCI Overseas pledged that:  "[I]n the event of nonpayment of the said loan on maturity date, unless mutually extended, the deposit can be used by you to repay the loan. . . ."  On September 28, 1990, NCB discharged the $55 million loan that it had made to

- 23 -

Shorafa by offsetting the loan amount against the BCCI deposit.

61.   Confirmations by NCB to BCCI Overseas's auditors did not reflect that the $200 million in deposits by BCCI Overseas at NCB were in fact security for $200 million in loans made by NCB to Pharaon, Shorafa and Mashriq II at the request of BCCI.

**E.   False Filings with the Board**

62.   On May 20, 1990, BCCI submitted to the Board an annual report on Form FR Y-7 that included consolidated financial statements of BCCI as of year-end 1989.  The total amount of loans receivable and advances reported on these consolidated financial statements included the amount of the $146,378,838 funds transfer to Mahfouz (see supra ¶¶ 47-48).  Although this figure represented a substantial part of the price paid for Mahfouz's CCAH shares, this amount was not reported as a loan to ICIC Overseas, a BCCI affiliate and the purchaser of Mahfouz's CCAH shares.

63.   On April 28, 1989, BCCI submitted to the Board an annual report on Form FR Y-7 as of year-end 1988 that falsely stated that the Five Bermuda Companies controlled 20% of the shares of BCCI Holdings as of December 31, 1988 (see supra ¶ 45).

64.   For year-end 1988 and 1989, BCCI submitted to the Board annual reports on Form FR Y-7.  Each annual report included consolidated financial statements of BCCI that failed to disclose that part of the balances reported on the statements as "due from banks" or as certificates of deposit were in fact security for loans to third parties made by NCB, the Mahfouz-controlled bank that held the BCCI balances (see supra ¶¶ 57-61).

**F.   There Is a Substantial Risk that Mahfouz
      Will Attempt to Move his U.S. Assets
      Beyond the Jurisdiction of this Court**

65.   Upon information and belief, Mahfouz has significant assets in the United States, and there exists a substantial risk that Mahfouz will attempt to liquidate those assets and move the proceeds offshore and beyond the jurisdiction of this Court.   I base that statement upon the following:

(a)   Mahfouz has been charged with violating U.S. laws and regulations, and faces potential civil and criminal liability for such violations.   In particular, Mahfouz was indicted on July 1, 1992, by a grand jury sitting in New York County.   That indictment charged Mahfouz with, inter alia, fraud with respect to his acquisition of CCAH and BCCI stock.   (A copy of the indictment is attached as Exhibit D.);

(b)   Mahfouz is not a citizen of the United states and is not now in the United States.   Additionally, he is not likely to enter the United States in the foreseeable future;

(c)   Mahfouz maintains accounts with foreign banks located in secrecy jurisdictions, controls a bank in Luxembourg, and could liquidate his U.S. investments and transfer the proceeds to such accounts or banks in a very short time;

(d)   Mahfouz is represented by sophisticated financial consultants, and is himself a sophisticated business person; and

(e)   BCCI, a bank with which Mahfouz has significant dealings, has been taken over by governmental authorities in multiple jurisdictions.   Other related BCCI entities with which Mahfouz had dealings also have had their assets restrained or seized, as of July 5, 1991, potentially creating a severe liquidity crisis for Mahfouz by virtue of the freezing of his accounts and necessitating the disposition of his assets around the world.

66. No previous request for this relief has been sought.

- 25 -

I declare under the penalty of perjury that the foregoing is true and correct.

Executed on July 8, 1992

Thomas C. Baxter, Jr.

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that before 5:00 p.m. on the 9th day of July, 1992, I caused to be delivered by hand copies of the attached Declaration of Thomas C. Baxter, Jr., upon the following:

Michael A. Cooper, Esq.
Sullivan & Cromwell
125 Broad Street
New York, New York   10004

Olympic Towers -- Apt. 31A
641 Fifth Avenue
New York, New York
Attn:  Khalid bin Mahfouz

_____
Steven M. Haber