UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - X
BOARD OF GOVERNORS OF THE
FEDERAL RESERVE SYSTEM,            :

             Plaintiff,
    v.                              :

KHALID BIN MAHFOUZ,                :

             Defendant.         :
- - - - - - - - - - - - - - - - - - X

COMPLAINT

92 Civ.

92 CIV 5096

       The Board of Governors of the Federal Reserve System (the "Board"), by its attorney, Otto G. Obermaier, United States Attorney for the Southern District of New York, for its complaint herein, alleges as follows:

### PRELIMINARY STATEMENT

       1. This is an action pursuant to Section 8(i) of the Federal Deposit Insurance Act, 12 U.S.C. § 1818(i) (the "FDI Act"), and the Debt Collection Act, 28 U.S.C. § 3001, et seq., for preliminary relief to prevent the transfer, removal, dissipation or disposal of any assets in the United States owned by defendant Khalid bin Mahfouz ("Mahfouz"). The Board has filed this civil action in aid of an administrative enforcement proceeding that was commenced by the Board against Mahfouz on July 2, 1992 under Section 8(i) of the FDI Act. That administrative proceeding seeks, inter alia, a civil money penalty against Mahfouz for violations of the Change in Bank Control Act, 12 U.S.C. § 1817(j) (the "Control Act") and the Banking Holding Company Act of 1956, as amended, 12 U.S.C. § 1841, et seq. (the "BHC Act"). The relief sought by the Board in this civil action is specifically authorized by Section 8(i)(4)

of the FDI Act, 12 U.S.C. § 1818(i)(4).

## THE PARTIES AND OTHER RELEVANT PERSONS

2.  The Board is an independent agency of the United States established by the Federal Reserve Act, 12 U.S.C. § 221 et seq. The Board is authorized under the FDI Act, the BHC Act and the International Banking Act of 1978, 12 U.S.C. § 3101 et seq., to regulate the conduct of the affairs of bank holding companies and foreign financial institutions doing business in the United States, to provide for their safe and sound operations, and to ensure their compliance with all applicable federal laws and regulations through the use of formal enforcement actions, including the assessment of civil money penalties.

3.  The National Commercial Bank ("NCB") is a bank organized under the laws of Saudi Arabia. NCB is certified by the Ministry of Finance of the Kingdom of Saudi Arabia to conduct all types of banking operations within and without Saudi Arabia. Branches of NCB outside Saudi Arabia are known by the name The Saudi National Commercial Bank, and one such branch is located in New York, New York.

4.  BCCI Holdings (Luxembourg) S.A., Luxembourg ("BCCI Holdings"), is a foreign bank holding company chartered in Luxembourg. BCCI Holdings owned or controlled two foreign banks, Bank of Credit and Commerce International, Luxembourg ("BCCI S.A.") and Bank of Credit and Commerce International (Overseas), George Town, Cayman Islands ("BCCI Overseas"). BCCI Holdings and its two principal bank subsidiaries (collectively referred to as

"BCCI"), acting through various individuals and corporate agents and nominees, also acquired ownership and control of more than 25% of the voting shares of Credit and Commerce American Holdings N.V., Netherland Antilles ("CCAH") and its subsidiaries, without the prior approval of the Board as required under Section 3 of the BHC Act (12 U.S.C. § 1842). BCCI's acquisition of ownership and control of the voting shares of CCAH are the subject of an administrative action which is explained more fully in the notice of Assessment of Civil Money Penalty issued by the Board against BCCI and others on July 29, 1991 (the "Board's July 29, 1991, Notice of Assessment"). A copy of the Board's July 29, 1991, Notice of Assessment is annexed to the accompanying declaration of Thomas C. Baxter, Jr. dated July 8, 1992 (the "Baxter Declaration") as Exhibit B.

5. CCAH and its direct subsidiary, Credit and Commerce American Investment, B.V. Amsterdam, Netherlands ("CCAI"), are corporations that were formed in 1978 for the purpose of acquiring control of Financial General Bankshares, Inc., Washington, D.C. ("Financial General"), a registered bank holding company pursuant to the BHC Act. In April 1982, CCAH and CCAI acquired all of the voting shares of Financial General and renamed the company First American Bankshares, Inc. ("First American"). By virtue of their acquisition of First American, CCAH and CCAI themselves became bank holding companies as defined by Section 2 of the BHC Act (12 U.S.C. § 1841 (a)) and depository institution holding companies for purposes of the Control Act (12

U.S.C. §§ 1813(w)(1), 1817(j)(18)(A)).

6.  International Credit and Investment Company (Overseas) Limited ("ICIC Overseas") was, at all relevant times, a foreign bank existing and doing business under the laws of the Cayman Islands. ICIC Overseas operated under the control of and at the direction of senior BCCI management, to further the business objectives of BCCI. ICIC Overseas acted as the alter ego or agent for BCCI in connection with the acquisition of CCAH and a number of other transactions, including the transactions involving Mahfouz which are the subject of the Board's administrative action against Mahfouz described below. The ownership, management, and business activities of BCCI and ICIC Overseas were intermingled and interrelated in such a way that the two groups generally operated as a single entity.

7.  Mashriq Holding Company ("Mashriq") is a personal holding company for Hamad bin Mohammed al-Sharqi ("Sharqi"), the Ruler of the Emirate of Fujeirah, one of the United Arab Emirates. Sharqi, by a power of attorney to Agha Hasan Abedi ("Abedi"), the President of BCCI, and a sub-power of attorney to Swaleh Naqvi ("Naqvi"), the chief operating officer of BCCI, gave Naqvi full power to operate Mashriq. Mashriq was used by Naqvi as one of the nominee parties through which BCCI acquired shares of CCAH. The details of the nominee arrangements involving Mashriq are explained more fully in the Board's July 29, 1991, Notice of Assessment.

8.  Mahfouz is a Saudi Arabian businessman and banker,

4

and is a deputy manager of NCB. Under authority conferred in a power of attorney from his brother, Sheik Mohammed, Mahfouz operated NCB with what he characterizes as an "absolute authority." A majority of the capital shares of NCB is owned by the Mahfouz family. Mahfouz and his family also control, or have controlled, other financial institutions in several countries. In addition, Mahfouz was a director of BCCI from August 1986 to August 1989.

9. Haroon Rashid Kahlon ("Kahlon") is a resident of England and Saudi Arabia. At all times pertinent to this Complaint, Kahlon worked as an officer or employee of NCB.

10. Ghaith R. Pharaon ("Pharaon"), at all times pertinent to this Complaint, acted as an agent or nominee for BCCI and ICIC Overseas, as more fully set forth in the Board of Governors' Notice of Intent to Prohibit issued on July 12, 1991, and the Board of Governors' Notice of Assessment of Civil Money Penalties issued on September 17, 1991. Pharaon is a respondent in both of those Notices.

11. Ali Mohammed Shorafa ("Shorafa") is a resident of Abu Dhabi, one of the United Arab Emirates. At all times pertinent to this Complaint, Shorafa was listed as a shareholder of CCAH on its stock register, as set forth in the Board's July 29, 1991, Notice of Assessment.

12. Faisal Saud Al-Fulaij ("Fulaij") is a Kuwaiti businessman who served for a period of time as the chairman of a company affiliated with BCCI. Fulaij was also one of the nominee

parties used by BCCI to acquire shares of CCAH. The details of the nominee arrangements involving Fulaij are explained in the Board's July 29, 1991, Notice of Assessment.

## JURISDICTION AND VENUE

13. This Court has jurisdiction over this matter pursuant to Section 8(i)(4) of the FDI Act, as amended by the Crime Control Act of 1990, Pub. L. No. 101-647, 104 Stat. 4789, 4864-65 (Nov. 29, 1990), 12 U.S.C. § 1818(i)(4), and 28 U.S.C. §§ 1331 and 1345.

14. Venue is proper in this district under 28 U.S.C. § 1391(d) in that the defendant, Mahfouz, is an alien who may be sued in any district.

## STATEMENT OF FACTS

15. Mahfouz and NCB acquired control of 28.7% of the voting shares of CCAH. Control was acquired pursuant to a July 1986 Procurement Deed with ICIC Overseas and BCCI. As alleged in the Board's July 29, 1991, Notice of Assessment, BCCI, through various nominees, unlawfully owned and controlled at various times as much as 60% of the voting shares of CCAH.

16. The Procurement Deed provided that ICIC Overseas (BCCI's alter-ego) would arrange the sale of up to 30% of the shares of CCAH to five Bermuda companies owned by Mahfouz. Pursuant to the Procurement Deed, in July 1986, the Five Bermuda Companies acquired 9.9% of the voting shares of CCAH from a BCCI nominee, subject to an agreement by that nominee to repurchase the shares. At Mahfouz's direction, NCB paid $134,994,288 for

6

the shares, at the price agreed-upon in the Procurement Deed. Mahfouz caused NCB to falsely record the $134,994,288 payment as a deposit of NCB funds at BCCI, S.A.

17. In September 1986, NCB paid BCCI $256.6 million, an amount equal to the purchase price of an additional 18.8% of the voting shares of CCAH. This payment would subsequently be treated on NCB's books as loans made by NCB to two BCCI nominees (Mashriq and Fulaij), secured by 18.8% of the CCAH shares; the transaction, however, was not a secured lending, but rather a purchase by NCB, on behalf of Mahfouz, of the CCAH shares.

18. The Board incorporates by reference the statements contained in paragraphs 3 through 65 of the Baxter Declaration.

A. Control Act Violations

19. The Control Act (12 U.S.C. § 1817(j)) and Regulation Y (12 C.F.R. § 225.41) make it unlawful for any person, acting directly or indirectly through or in concert with one or more other persons, to acquire control of any bank holding company, such as CCAH, through purchase, assignment, transfer, pledge, or other disposition of voting stock, unless the appropriate Federal banking agency has been given prior written notice of the proposed acquisition and the agency does not disapprove the transaction. For purposes of the Control Act, the Board is the appropriate Federal agency with respect to bank holding companies such as CCAH. 12 U.S.C. §§ 1813 (q), (w), 1817 (j)(18).

20. Because Mahfouz knew that his purchase of a

7

controlling interest in CCAH required prior regulatory approval by the Board, the Procurement Deed was drafted to state that Mahfouz would acquire a non-controlling interest of 9.9% immediately, and that upon receipt of regulatory approval, he would increase his ownership to 20% within 6 months and to 30% within three years. Nevertheless, without the board's approval and in violation of the Control Act, in September 1986, Mahfouz caused NCB to pay $256.6 million to BCCI, in connection with the purchase of an additional 18.8% of CCAH (42,123 shares). This amount represents a price for the CCAH shares of $6,094 per share, the price set forth in the Procurement Deed. In or about July 1987, ten months after Mahfouz caused NCB to pay $256.6 million to BCCI for the purchase of an 18.8% interest in CCAH, the $256.6 million payment was falsely documented in NCB's books as "loans" to Mashriq and Fulaij.

21. As explained above, the circumstances of the transaction whereby NCB paid BCCI $256.6 million demonstrate that the purported "loans" were a sham and that Mahfouz, acting indirectly or through or in concert with NCB, actually purchased the CCAH voting shares outright in September 1986 in accordance with the Procurement Deed, keeping an option to resell the CCAH shares to BCCI within a specified time frame. At no time were any real loans ever made or intended. The sham loans enabled Mahfouz, acting indirectly or through his surrogates -- NCB, the Five Bermuda Companies, Burford Investments Limited ("Burford") (another Bermuda company owned and controlled by Mahfouz),

8

Mashriq and Fulaij -- to acquire 28.7% of CCAH's voting shares at a price that Mahfouz considered to be favorable, without disclosing to the Board or obtaining Board approval of the stock purchase as required by law.

22. Mahfouz and Kahlon also acted indirectly, or through or in concert with BCCI and its agents, to create the false appearance that the CCAH shares acquired in September 1986 were under the control of Mashriq and Fulaij, when, in fact, Mashriq and Fulaij held the shares as nominees, holding the voting rights for NCB and Mahfouz. In so structuring the transactions, Mahfouz, NCB, the Five Bermuda Companies, Mashriq and Fulaij acted in concert to control the CCAH shares. Moreover, with respect to the CCAH shares pledged to NCB, NCB had the power to demand immediate repayment of the loans and, upon default, to have the shares registered in NCB's name. NCB, however, had no expectation of receiving payment and intended to discharge the loans by retaining the CCAH shares. Accordingly, Mahfouz and NCB in fact had the power to vote the 18.8% of CCAH's shares that were pledged to NCB as well as the 9.9% of CCAH's shares held by the Five Bermuda Companies.

B. **BHC Act Violations**

23. The BHC Act and Regulation Y (12 C.F.R. § 225.11) make it unlawful for any company to own or control, directly or indirectly, or acting through one or more other persons, 25% or more of the voting shares of a bank, and thereby become a bank holding company, without the prior approval of the Board. 12

U.S.C. §§ 1841(a)(1), (2), 1842(a).

24. As an alternative to the Control Act violation described above, Mahfouz caused NCB, acting through the Five Bermuda Companies, to acquire direct or indirect ownership and control of 28.7% of CCAH's voting shares without the prior approval of the Board. NCB thereby became a bank holding company in violation of Section 3(a) of the BHC Act (12 U.S.C. § 1842(a)) and the Board's Regulation Y (12 C.F.R. § 225.11).

25. The Five Bermuda Companies, Burford, and NCB engaged in the transactions regarding the shares of BCCI and CCAH described above at the direction of Mahfouz, and with his knowledge and consent. Consequently, Mahfouz violated the BHC Act by virtue of the fact that he caused, brought about, participated in, counselled, and aided or abetted NCB's violation of the BHC Act. 12 U.S.C. § 1847(b)(5).

26. Mahfouz caused NCB to pay a total of $755 million with BCCI in May and July 1986, in the amounts of $270 million and $485 million respectively. This sum was used on July 29, 1986 to purchase 22,152 shares of CCAH (representing 9.9% of CCAH's outstanding shares), and also to purchase shares and capital notes of BCCI. All of the securities purchased with NCB's funds were taken in the names of the Five Bermuda Companies, as described supra, ¶ 16. NCB's $134,994,288 payment for the 9.9% of CCAH's shares was originally treated by NCB on its books as though NCB had made a $134,994,288 deposit to BCCI, S.A. In April 1987, NCB's books were change to characterize the

$134,994,288 payment for the CCAH stock as part of a "loan" by NCB to Mahfouz's wife and children.

27. In September 1986, Mahfouz and Kahlon caused NCB to pay an additional $256.6 million to BCCI for the sole purpose of allowing Mahfouz to purchase, through NCB, an additional 42,123 voting shares of CCAH (representing 18.8% of its outstanding voting shares). At that time, those CCAH shares were being held in the names of BCCI's nominees, Mashriq and Fulaij. The September 1986 purchase was carried out pursuant to the terms of the Procurement Deed, with the Five Bermuda Companies (Mahfouz's nominees) having the right to resell the shares back to the sellers.

28. Consequently, as of September 1986, Mahfouz had caused NCB to purchase directly, and indirectly through the Five Bermuda Companies, control of 28.7% of CCAH's voting shares, thereby causing NCB to be a bank holding company in violation of the BHC Act. As previously explained, to disguise the purchase, in July 1987, Mahfouz caused the September 1986 payment to be documented as two loans by NCB to Mashriq and Fulaij. Mahfouz caused officers of NCB to execute that loan documentation.

C. **Reporting Violations**

29. Section 5(c) of the BHC Act (12 U.S.C. § 1844(c)) and Section 225.5 of Regulation Y (12 C.F.R. § 225.5), require bank holding companies and, through Section 8(a) of the International Banking Act (12 U.S.C. § 3106(a)), foreign banks with U.S. branches or agencies, to submit periodic reports to the

11

Board, including, under certain circumstances, quarterly, semi-annual and yearly reports on Federal Reserve Forms Y-6, Y-7, and Y-9. In part, these reports require the disclosure of the bank holding company's or foreign bank's interests in its subsidiaries. NCB submitted these reports in connection with NCB's branch located in New York. BCCI submitted these reports in connection with its agencies in this country.

30. Pursuant to Section 5(c) of the BHC Act and Section 225.5 of Regulation Y, NCB filed with the Board annual statements including representations regarding NCB's interests in, <u>inter alia</u>, United States banks and bank holding companies. NCB's annual filings for 1986 through 1989, inclusive, were false and misleading in that they failed to disclose NCB's acquisition of over 25% of CCAH's shares on September 25, 1986. NCB violated Section 5(c) of the BHC Act and Section 225.5 of Regulation Y by filing false and misleading reports with knowledge of the falsity or misleading nature of, or with reckless disregard for the accuracy of, such reports.

31. Mahfouz violated Section 5(c) of the BHC Act and Section 225.5 of Regulation Y because he caused, brought about, participated in, counseled and aided and abetted NCB's violations involving the Form Y-7 reports by virtue of his actions as described above.

32. In violation of the BHC Act and Regulation Y, BCCI filed Federal Reserve Form Y-7 reports with the Board for the years 1988 and 1989 that were false. As explained below, Mahfouz

12

also violated Section 5(c) of the BHC Act and Regulation Y by aiding and abetting BCCI in its filing of these false reports.

33. On April 28, 1989, BCCI filed with the Board a Form Y-7 report for 1988 that was false. The report was false in that BCCI reported that the Five Bermuda Companies together continued to own 20% of BCCI Holdings's outstanding shares as of December 31, 1988, when in fact the Five Bermuda Companies had sold all of their BCCI Holdings shares on or before September 7, 1988 and, therefore, owned no shares of BCCI Holdings as of year end 1988.

34. Mahfouz aided and abetted BCCI's violation by agreeing with Naqvi to keep secret the fact that Mahfouz was divesting his BCCI Holdings shares. In furtherance of Mahfouz's agreement with Naqvi, the sales agreements for the Five Bermuda Companies' sale of the BCCI Holdings shares to ICIC Overseas in March and May 1988 provided that the shares could continue to be registered in the name of the Five Bermuda Companies. Moreover, on October 2, 1989, Mahfouz's ownership in the Five Bermuda Companies (which were then shell companies) was transferred to ICIC Overseas for the price of one dollar.

35. By year end 1990, Mahfouz had caused NCB, Burford and the Five Bermuda Companies to sell all of their BCCI Holdings and CCAH shares. As a result of Mahfouz's purchase and sale of BCCI Holdings and CCAH stock, Mahfouz realized a personal financial gain of $120,168,672. This figure is more fully detailed in the Board's July 2, 1992 Notice of Assessment (see

infra ¶ 39), Appendix A. Mahfouz paid $2,749,674 of this profit to Kahlon.

36. BCCI also filed false statements with the Board in connection with its 1989 Form Y-7 report in that BCCI included in its financial statements a $146 million loan to Mahfouz that was not what it was represented to be. In October 1989, BCCI paid $146 million to Mahfouz not as a loan, but rather in partial payment for the repurchase by ICIC Overseas of 26,837 of CCAH's voting shares from Burford, Mahfouz's nominee. That $146 million payment was falsely booked by BCCI as loans to Mahfouz by two BCCI offices: BCC Emirates and BCCI, S.A. (Bahrain). BCCI's incorrect accounting and misrepresentation of this transaction caused the consolidated financial statements of BCCI as of year-end 1989 to be false and inaccurate, in that the financial statements reflected as an asset a loan receivable from Mahfouz, rather than a loan receivable from BCCI's affiliate ICIC Overseas for ICIC Overseas's repurchase of the CCAH stock. In violation of the BHC Act and Regulation Y, the false and inaccurate consolidated financial statements were submitted to the Board with BCCI's Form Y-7 report for 1989. Mahfouz aided and abetted this violation by authorizing false confirmations to be signed on his behalf, representing to BCCI's auditors that he owed BCC Emirates and BCCI (Bahrain) $146 million.

37. While Mahfouz was a director of BCCI, he participated in BCCI's unsafe and unsound practices, including causing NCB to engage in transactions with BCCI that permitted

BCCI to conceal from its auditors its true financial condition.

38.  In particular, Mahfouz willfully and knowingly caused NCB to engage in transactions with BCCI intended to conceal from BCCI's auditors and regulators the extent of (a) BCCI's exposure to certain large borrowers, and (b) the loans at BCCI secured by shares of CCAH.  These transactions involved $200 million in loans that NCB made to Ghaith Pharaon, Mashriq Holding Company, Ltd., and Shorafa that were secretly secured by BCCI's deposits at NCB.  Because the exposure of BCCI on its deposits pledged to NCB as security for loans made by NCB (on BCCI's behalf) to Pharaon and others was not disclosed to BCCI's auditors, the transactions enabled BCCI to misrepresent its actual financial condition.

## ADMINISTRATIVE ENFORCEMENT ACTIONS

39.  On July 2, 1992, the Board issued a "Notice of Assessment of Civil Money Penalty Issued Pursuant to the Change in Bank Control Act and Section 8(i) of the Federal Deposit Act, as Amended, Section 8(b) and 8(d) of the Bank Holding Company Act of 1956, as Amended" ("Notice of Assessment") against Mahfouz and others.  The Notice of Assessment initiated formal proceedings against Mahfouz for the purpose of assessing a civil money penalty against Mahfouz in the amount of one hundred seventy million dollars ($170,000,000).  The calculation of the civil money penalty is set forth with particularity in the Board's Notice of Assessment which the Board incorporates herein by

reference. A true copy of the Notice of Assessment is attached to the Baxter Declaration as Exhibit A.

40. The civil money penalties sought by the Board against Mahfouz are appropriate.

### REQUESTED RELIEF

To prevent the transfer, removal, dissipation or disposal of any assets in the United States owned by Mahfouz pending adjudication of the administrative charges, the Board requests, pursuant to Section 8(i)(4) of the FDI Act, 12 U.S.C. § 1818(i)(4), and the Debt Collection Act, 28 U.S.C. § 3001, et seq., the following relief:

(1) An injunction pending the resolution of the administrative proceedings which will do the following:

(a) Enjoin Mahfouz from withdrawing, transferring, removing, dissipating, or disposing of funds, assets or other property which he either owns or controls, directly, indirectly or through business entities he owns or controls, said funds, assets or other property being within the jurisdiction of the United States. Such property includes, but is not limited to, Mahfouz's (a) 4.9% stock ownership interest in MCorp, and (b) Apartment No. 1A in the Olympic Towers, New York, New York (collectively the "Known Mahfouz Assets"), and any proceeds deriving from the sale or transfer thereof.

(b) Enjoin (1) any employee of Mahfouz or of any corporation or business entity owned or controlled by Mahfouz, or

(2) any individual or entity acting for or in concert with Mahfouz, his employees or agents, or any corporation or business entity owned or controlled by him, from withdrawing, transferring, removing, dissipating or disposing of funds, assets or other property owned, either directly or indirectly by Mahfouz, or by any business entity owned or controlled by Mahfouz, and from withdrawing, transferring, removing, dissipating or disposing of funds, assets or other property in a way which would benefit Mahfouz, provided that these individuals or entities receive actual notice of this Court's order. Such funds, assets, or property include, but are not limited to, Mahfouz's ownership interest in the Known Mahfouz Assets, and any rights to proceeds deriving from the sale or transfer thereof.

        (c) Prevent any of the funds, assets, or other property within the jurisdiction of the United States owned or controlled, directly or indirectly by Mahfouz or by any business entity owned or controlled by Mahfouz (1) in the possession of Mahfouz, (2) in the possession of any employee or agent of Mahfouz or of any corporation or business entity owned or controlled by Mahfouz, or (3) in the possession of any individual or entity acting for or in concert with Mahfouz, his employees or agents, or by any corporation or business entity owned or controlled by him, from being withdrawn, transferred, removed, disposed of, or dissipated, by any individual or entity with actual notice of this order. Such funds, assets, or other property include, but are not limited to, Mahfouz's ownership

interest in the Known Mahfouz Assets, and any rights to proceeds deriving from the sale or transfer thereof.

(d) If the Court deems it necessary, appoint a receiver of all the property owned or controlled, directly or indirectly, by Mahfouz and direct the receiver to take immediate possession of said property and to hold and to manage it until further order of the Court.

(2) Such other and further relief as the court deem just and appropriate.

Dated:   New York, New York
         July 8, 1992

>                    OTTO G. OBERMAIER
>                    United States Attorney for the
>                    Southern District of New York
>                    Attorney for Plaintiff
>
>                    By: _____
>                    STEVEN M. HABER (SH-8315)
>                    BETH A. KASWAN (BK-0264)
>                    Assistant United States Attorney
>                    100 Church Street
>                    New York, New York 10007
>                    Tel. No.: (212) 385-6210