Albania for alleged terrorist activity. Kadi denies being aware that Saleh was involved in terrorism and suggests that it may be a case of mistaken identity. AR 10.

- Kadi invested in BMI, a company whose money, according to its accountant, may have been transferred overseas to finance the two U.S. embassy bombings in Kenya and Tanzania in 1998. AR 20-21. Kadi claims that he was merely a "passive investor," but one of his co-investors, according to FBI Agent Robert Wright, was SDT Marzook, the Hamas leader who was also associated with SDT Salah. AR 783.

- Kadi acknowledges that he had meetings with Usama bin Ladin in Chicago in 1980-81, Pakistan in 1988-89, and Sudan in 1992-93. AR 1373. OFAC also noted the following: "A letter found in 2002 and apparently addressed to Usama bin Ladin referenced [Kadi's] managing money for Bin Ladin in Sudan. The letter also referred to [Kadi] as one of Bin Ladin's former managers. . . . [Kadi] often boasted of personally knowing and occasionally meeting with Bin Ladin in Afghanistan, Saudi Arabia and the Sudan." AR 15.

- Kadi "owned several firms in Albania that funneled money to extremists or employed extremists in positions where they controlled the firms' funds. Bin Ladin allegedly provided the working capital for four of five of [Kadi's] companies in Albania, according to information available to the U.S. Government." AR 11.

All of these grounds, in addition to other reasons discussed in the 2004 Memorandum, *see* AR 3-22, and 2004 redacted evidentiary, *see* AR 2786-2817, demonstrate that OFAC had a rational basis for maintaining Kadi's designation as an SDGT and denying his request for reconsideration.

**4.    The Classified Record Includes Additional Evidence of Kadi's Ties to Terrorism.**

The classified and privileged administrative record, along with a Supplemental Memorandum addressing the classified portions of the record, has been lodged with the Court for its *ex parte* and *in camera* review. As previously noted, the classified section of the record was submitted pursuant

to 50 U.S.C. § 1702(c), which permits the government to submit to the Court classified information on which it relied "*ex parte* and *in camera*." *See id.*

For all these reasons, OFAC reasonably determined that the administrative record supports the designation of Kadi as an SDGT. Therefore, summary judgment should be entered for Defendants on Plaintiff's APA claim.

**B.     Plaintiff's Challenge to His EU Designation Does Not Affect the Validity of OFAC's 2004 Action.**

Plaintiff's complaint includes allegations concerning events that occurred after OFAC's 2004 decision was issued. Plaintiff describes procedural developments in a separate challenge he brought in the European courts, which culminated in a September 2008 decision by the European Court of Justice ("ECJ"), *see* Compl. ¶¶ 35-41, and developments concerning prosecutorial actions in Turkey and Albania, *see id.* ¶¶ 42-43. Plaintiff also describes the status of two Freedom of Information Act ("FOIA") requests pending at the U.S. Department of the Treasury. *Id.* ¶ 46. Kadi's complaint does not allege that any of these allegations – none of which relate to (or are part of the record of) the 2004 OFAC decision at issue in this case – provide a basis for any count in his complaint. *See id.* ¶¶ 49-78.

Although Kadi prevailed before the ECJ on a procedural argument, the procedural error – that the European Union ("EU") had failed to communicate the grounds for listing to Kadi – has been corrected and the EU sanctions against Kadi remained in place after a summary of evidence against Kadi was provided to him. *See* Comm'n Reg. (EC) No. 1190/2008 (Nov. 28, 2008), *available at* OJ 2008 L322/25. In any event, the procedural defects that Kadi identified in challenging his EU designation are inapposite, because the U.S. has provided Kadi with ample explanation for his E.O. 13224 designation. Moreover, the EU blocked Kadi's assets on the basis

-25-

of Kadi's UN designation and without independently developing an administrative evidentiary record that identified Kadi's ties to terrorism and without providing review of the merits at an administrative or judicial level. *Id.*

Kadi's citation to other jurisdictions that have failed to criminally prosecute him is similarly unhelpful. OFAC action does not require the standard of proof necessary for prosecution. Nor is there any evidence that Turkey and Albania had the same level of evidence, both classified and unclassified, that OFAC had in determining that it had a reasonable basis to believe that Kadi, *inter alia*, provided financial support to terrorism.

## II.   PLAINTIFF'S CONSTITUTIONAL CLAIMS MUST BE DISMISSED BECAUSE KADI, AS A FOREIGN NATIONAL, LACKS CONSTITUTIONAL RIGHTS

Plaintiff has alleged various violations of the First, Fourth, and Fifth Amendments to the U.S. Constitution. Compl. ¶¶ 55-78. Plaintiff describes himself as "a prominent Saudi Arabian businessman and philanthropist," *id.* ¶ 1, but his complaint contains no description of his connections with the United States. To survive a motion to dismiss, the complaint "must set forth sufficient information to suggest that there is some recognized legal theory upon which relief can be granted." *District of Columbia v. Air Florida, Inc.*, 750 F.2d 1077, 1078 (D.C. Cir. 1984). Although the administrative record contains references to certain contacts between Kadi and the United States, those contacts do not rise to the level of "substantial connections" with the United States – a standard that must be satisfied in order to assert rights under the U.S. Constitution. *See People's Mojahedin Org. of Iran ("PMOI") v. U.S. Dep't of State*, 182 F.3d 17, 22 (D.C. Cir. 1999) (citing *United States v. Verdugo-Urquidez*, 494 U.S. 259, 271 (1990)). In fact, at the time Kadi was designated, Kadi's only connection to the United States may have been through his indirect role (due to his ownership of an investment company separately incorporated in the British Virgin Islands)

as a director in Global Diamond Resources, Inc., a corporation headquartered in La Jolla, California. AR 39, 113, 244. Absent a showing of more substantial connections to the United States, Plaintiff's constitutional claims should fail for this threshold reason.

The D.C. Circuit rigorously imposed the constitutional presence requirement when reviewing the State Department's designations of the People's Mojahedin Organization of Iran ("MEK") and the Liberation Tigers of Tamil Eelam ("LTTE") as "foreign terrorist organizations" under the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 18 U.S.C. § 2339B. Both organizations claimed that the designations deprived them of due process of law because the State Department provided MEK and LTTE with "no adversary hearing, no presentation of what courts and agencies think of as evidence, [and] no advance notice to the entity affected by the Secretary's internal deliberations" prior to the designation of these entities. *See PMOI*, 182 F.3d at 19. The D.C. Circuit noted that "[f]rom all that appears, the LTTE and the MEK have no presence in the United States. Their status as foreign is uncontested." *See id.* at 22. The D.C. Circuit then dispelled any notion that these organizations could assert rights under the U.S. Constitution:

> A foreign entity without property or presence in this country has no constitutional rights, under the due process clause or otherwise. . . . No one would suppose that a foreign nation had a due process right to notice and a hearing before the Executive imposed an embargo on it for the purpose of coercing a change in policy.

*Id.* at 22 (citations omitted). In a similar case under AEDPA, the D.C. Circuit upheld the designation of three Irish political organizations as foreign terrorist organizations and concluded that they were not entitled to due process rights because "the affidavits . . . demonstrate only that some of their American 'members' personally rented post office boxes and utilized a bank account to transmit funds and information." *32 County Sovereignty Comm. v. Dep't of State*, 292 F.3d 797, 799

-27-

(D.C. Cir. 2002). Just as in *PMOI* and *32 County Sovereignty Committee*, Kadi has not alleged, much less established, the type of substantial connections that must be found prior to entertaining Plaintiff's panoply of constitutional claims.[8]

A review of the administrative record reveals no evidence that Kadi could overcome his pleading deficiencies and establish his entitlement to rights under the U.S. Constitution. Other than his role as a director in Global Diamond Resources, it appears that Kadi merely can claim a period of residency nearly 30 years ago, as well as cite a couple of old investments and corporate registrations in the United States that were defunct long before he was designated by OFAC. Kadi's current contacts do not rise to the higher threshold that was found to be sufficient in other cases. In *Nat'l Council of Resistance of Iran ("NCRI") v. Dep't of State*, the D.C. Circuit "determine[d] that NCRI can rightly lay claim to having come within the territory of the United States and developed substantial connections with this country" and emphasized in particular that NCRI had "an overt presence within the National Press Building in Washington, D.C." 251 F.3d 192, 201-02 (D.C. Cir. 2001). Plaintiff has not alleged that he, like NCRI, resided in the United States and maintained an overt presence here when he was designated, or that he has any current, substantial ties to the United States.

Nor does the record suggest that Plaintiff had connections with the United States as substantial as those of Al-Aqeel in his due process challenge to his IEEPA-based designation. *See Al-Aqeel v. Paulson*, 568 F. Supp. 2d 64 (D.D.C. 2008). Although Defendants respectfully disagree

---

[8] *See also Aero Continente, S.A. v. Newcomb*, C.A. No. 04-1168, at 7-8 n.7 (D.D.C. July 16, 2004) (attached hereto as Exhibit C) (evaluating a similar challenge to a designation under the Foreign Narcotics Kingpin Designation Act, 21 U.S.C. §§ 1901-1908, which was modeled in part on IEEPA, and expressing doubt about whether an entity with much greater connections to the United States than Kadi was entitled to due process protections).

with that court's conclusion that Al-Aqeel had sufficient contacts to obtain due process rights under the U.S. Constitution – a ruling that could not be appealed because Defendants prevailed on the merits – Kadi cannot satisfy even the low standard applied in that case. Al-Aqeel was a founder and corporate officer of an Oregon corporation (the Al Haramain Islamic Foundation or "AHIF"), traveled to the United States several times in that capacity, executed a power of attorney in a property purchase for that company, and was acknowledged by OFAC to have "control" over the Oregon corporation. *Id.* at 70. In fact, OFAC had determined that AHIF, a U.S. entity, was subject to designation under E.O. 13224 because it was "owned or controlled by" Al-Aqeel. *Id.* at 67.

Because Plaintiff has not established "substantial connections with this country," *Verdugo-Urquidez*, 494 U.S. at 271, OFAC was not required by the Due Process clause to provide Kadi "with any particular process before designating" him as an SDGT under IEEPA and E.O. 13224. *See 32 County Sovereignty Comm.*, 292 F.3d at 799; *see also Jifry v. Fed. Aviation Admin.*, 370 F.3d 1174, 1182 (D.C. Cir. 2004) ("The Supreme Court has long held that non-resident aliens who have insufficient contacts with the United States are not entitled to Fifth Amendment protections.") (citations omitted), *cert. denied* 125 S. Ct. 1299 (2005); *Arbelaez v. Newcomb*, C.A. No. 00-5217, 2001 WL 50337, at *1 (D.C. Cir. Jan. 18, 2001) (finding that appellants could not assert constitutional claims in an OFAC matter because appellants were "foreign nationals without a substantial connection to the United States" and affirming conclusion by the district court that the existence of four plaintiffs holding two bank accounts in the United States was insufficient). Therefore, Counts Two through Eight of Plaintiff's complaint must be dismissed.

-29-

III.   **PLAINTIFF'S CONSTITUTIONAL CLAIMS ARE SUBJECT TO DISMISSAL FOR FAILURE TO STATE A CLAIM**

Assuming, *arguendo*, that due process and other constitutional safeguards do apply to Kadi, Plaintiff's constitutional claims nonetheless must be dismissed for failure to state a claim. Fed. R. Civ. P. 12(b)(6). As the D.C. Circuit previously has explained, "where an organization is found to have supported terrorism, government actions to suspend that support are not unconstitutional." *IARA*, 477 F.3d at 735; *see also HLF*, 333 F.3d at 164-67.

A.   **OFAC's Blocking Action Satisfies Due Process.**

The extent of due process rights to which U.S. citizens are entitled in the IEEPA sanctions context is now well established. *See, e.g., HLF*, 333 F.3d at 163-64 (D.C. Circuit held that post-designation notice and a 31-day period to respond before redesignation was sufficient to satisfy due process requirements). Every Court to consider the issue has upheld the general process used by OFAC to provide a post-deprivation administrative remedy on written submissions. *See GRF*, 315 F.2d at 754; *Chichakli v. Szubin*, 546 F.3d 315, 317 (5th Cir. 2008); *al-Aqeel*, 568 F. Supp. 2d at 71. Even if Kadi did have sufficient contacts to justify granting him the same constitutional rights that a U.S. person would enjoy, the process that OFAC provided in the context of his petition for reconsideration satisfies the existing standard. The process spanning 2001 through 2004 through which Plaintiff challenged his original designation as an SDGT afforded more than adequate process. The various procedural rights and requirements Plaintiff asks the Court to interpose have no basis in the relevant case law.

### 1.   **Kadi Received Constitutionally Sufficient Process**.

On October 15, 2001, OFAC sent a "Notice of Blocking" to Kadi that informed him of the blocking action, advised him of rules governing licensing and penalties, and notified him of available administrative procedures for challenging the blocking action. Prior to OFAC's March 12, 2004 decision to deny Plaintiff's request for reconsideration and maintain his designation, Plaintiff had the opportunity to submit multiple witness statements and numerous exhibits and to engage in an extensive question-and-answer exchange with OFAC. In addition, Plaintiff had the opportunity to meet face-to-face with OFAC officials and make a presentation on at least four separate occasions. AR 4-5; 2752, 2765.

On April 28, 2003, OFAC sent a five-page letter with questions addressing 12 areas of concern – "the answers to which will help us issue a determination on the petition." AR 1352-1356. Kadi unquestionably was on notice that OFAC was concerned about, *inter alia*, the lack of recordkeeping and auditing of numerous Muwafaq Foundation offices, "[i]ntermingling of funds between Muwafaq Foundation" and other Kadi businesses, assistance to terrorist groups, and ties to and support for Usama bin Laden, Al Qaeda, Chafiq Ayadi, Wa'el Julaidan, Asbat al-Ansar, Abdul Latif Saleh, Tunisian Islamic Front, QLI, and Muhammad Salah. *Id*. These questions forecast the ultimate grounds for denying Kadi's petition for delisting and provided Kadi yet another opportunity to respond to the charge that he had supported designated terrorists. OFAC waited to receive a written response from Kadi, including additional exhibits, prior to rendering its decision on his request for reconsideration. *See* AR 1357 *et seq*. It is therefore curious that Plaintiff would now argue – five years after this decision was made – that he did not have adequate "notice of the charges," "time to respond," or access to a "statement of reasons" or "assessment" of the evidence.

Compl. ¶ 57. After years of interface with OFAC and the receipt of greater process than the Constitution requires, Plaintiff cannot legitimately claim that he was unaware of the grounds for OFAC's decision to maintain his designation. Even if Plaintiff could claim that the 20-page memorandum discussed charges against him that were never raised at any point during the reconsideration process, he still could not provide a satisfactory explanation for his failure to provide OFAC with additional evidence or arguments addressing those issues at any time during the nearly five-year period that elapsed before he filed this lawsuit.

Plaintiff's assertion that he is entitled to "cross-examine any witnesses" and to demand that OFAC arrange an "independent tribunal" as part of its reconsideration process is unsupported, as numerous courts have declined to impose such requirements. Compl. ¶ 57; *see, e.g., HLF*, 333 F.3d at 163; *IARA*, 394 F. Supp. 2d at 48-50. Plaintiff seems to argue that the most robust process that the government can provide is due to him despite the existence of a Presidentially-declared national emergency and exigent circumstances surrounding a national security decision to combat terrorism by blocking assets of those who fund terrorists and their supporters.[9] Plaintiff simply cannot show

---

[9] "It is by now well established that 'due process,' unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances." *Gilbert v. Homar*, 520 U.S. 924, 930 (1997) (quoting *Cafeteria & Restaurant Workers Union v. McElroy*, 367 U.S. 886, 895 (1961)) (internal quotations omitted). Instead, "due process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). In determining what process is constitutionally required, courts must consider not only the private interests that will be affected and the risk of an erroneous deprivation of those interests, but also the particular "Government[al] interest, including the function involved" and the additional value or burdens that additional or substitute procedural requirements would entail. *See Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). "[N]o governmental interest is more compelling than the security of the Nation." *Haig v. Agee*, 453 U.S. 280, 307 (1981); *Wayte v. United States*, 470 U.S. 598, 612 (1985) ("Unless a society has the capability and will to defend itself from the aggression of others, constitutional protections of any sort have little meaning.").

that he is entitled to more process than he received during the reconsideration process.

A due process challenge to his initial designation on October 12, 2001 is without merit. Numerous courts have noted, in rejecting almost identical due process claims brought by designated parties, that pre-deprivation notice is not required prior to the blocking of assets. *See HLF*, 333 F.3d at 163-64; *GRF*, 315 F.3d at 754; *IARA*, 394 F. Supp. 2d at 49-50. Because of the Executive's need for speed in matters of national security and foreign affairs, *see, e.g., Palestine Info. Office v. Shultz*, 853 F.2d 932, 942-43 (D.C. Cir. 1988), and the need to prevent the flight of assets and destruction of records, the President and his designees cannot practicably provide pre-deprivation notice under these circumstances.[10] *See GRF*, 207 F. Supp. 2d at 803; *see also* Szubin Decl. at ¶ 22. As courts have repeatedly held, post-designation remedies are sufficient where "earlier notification would impinge upon the security and other foreign policy goals of the United States."[11] *NCRI*, 251 F.3d at 208.

---

[10] Even if the court were to find a technical due process violation, the remedy would not be to order OFAC to lift its blocking, but would instead be to remand the case to the agency. *See, e.g., Florida Power & Light v. Lorion*, 470 U.S. 729, 744 (1985); *NCRI*, 251 F.3d at 209 (Although the D.C. Circuit found that certain pre-deprivation remedies should have been provided under the unique circumstances of the case, involving AEDPA, the court also refused to order the lifting of the designations and instead remanded the issue to the agency because of "the realities of the foreign policy and national security concerns asserted by the Secretary in support of those designations").

[11] Further, any lack of opportunity to comment prior to blocking was surely cured by the extensive opportunity to comment following blocking and prior to the denial of his petition for delisting. The D.C. Circuit already considered this fact pattern and rejected the Holy Land Foundation's similar claim: "Even if Treasury's initial designation arguably violated HLF's due process rights, HLF's funds are blocked currently by a redesignation which Treasury applied in accordance with the requirements we outlined in *NCRI*, 251 F.3d 192." *HLF*, 333 F.3d at 163; *see also GRF*, 315 F.3d at 750 ("To the extent that GRF was attacking the factual support for the interim [blocking] order, time has passed that issue by; the right question now is whether the designation of October 18 is supported by adequate information . . .").

## 2.   **OFAC May Rely on Classified Evidence**.

Plaintiff is wrong to assert that he has a constitutional right to view and/or respond to classified evidence. Compl. ¶ 57. Recognizing the important national security issues at stake in IEEPA-based actions, Congress authorized the Executive Branch to rely upon classified information and to provide the classified information to the Court *in camera* and *ex parte*. 50 U.S.C. § 1702(c). Courts reviewing challenges to IEEPA-based designations, including the D.C. Circuit, have upheld that provision as constitutional. *See HLF*, 333 F.3d at 164 (claim "that due process prevents its designation based upon classified information to which it has not had access is of no avail"); *IARA*, 394 F. Supp. 2d at 45 (same); *IARA*, 477 F.3d at 732-34 (D.C. Circuit reviewed classified record *ex parte* and *in camera*); *see also AHIF*, 585 F. Supp. 2d at 1260 ("The government's interest in keeping materials secret takes precedence over AHIF-Oregon's due process right to review the record against it."). As the Seventh Circuit stated, in rejecting an argument identical to Plaintiff's, "[a]dministration of the IEEPA is not rendered unconstitutional because that statute authorizes the use of classified evidence that may be considered *ex parte* by the district court. . . . The Constitution would indeed be a suicide pact if the only way to curtail enemies' access to assets were to reveal information that might cost lives." *GRF*, 315 F.3d at 754 (internal citation omitted). As the D.C. Circuit stated, disclosure of classified information "'is within the privilege and the prerogative of the executive, and we do not intend to compel a breach in the security which that branch is charged to protect.'" *HLF*, 333 F.3d at 164 (quoting *NCRI*, 251 F.3d at 208-09). Thus, the law is clear that Plaintiff has no due process right to see the classified material.

### 3.   Plaintiff Cannot State a Due Process Claim Concerning FOIA.

Plaintiff alleges that "Defendants violated Mr. Kadi's Fifth Amendment due process rights by . . . failing, in violation of FOIA, to provide Mr. Kadi with the information used or relied upon by OFAC in preparation of the OFAC Memorandum." Compl. ¶ 57.  Plaintiff has not brought a FOIA claim, and he cannot sustain a due process challenge on the basis of an alleged violation of FOIA.  Plaintiff appears to assume that FOIA is constitutionally compelled, but there is no constitutional right to government information. *See Ctr. for Nat'l Sec. Studies v. U.S. Dep't of Justice*, 331 F.3d 918, 935 (D.C. Cir. 2003).  To the extent Plaintiff believes that his rights under FOIA have been violated, Plaintiff should bring a claim under FOIA.  In any event, as part of this litigation Plaintiff now has the unclassified, non-privileged administrative record supporting his designation and OFAC's denial of his request for reconsideration.

### B.   The Freezing of Assets Does Not Constitute a Taking Under the Fifth Amendment.

In Count Three, Plaintiff claims that "the freezing of Mr. Kadi's assets violates Mr. Kadi's Fifth Amendment right to just compensation for the taking of Mr. Kadi's property." Compl. at 20.  This claim must be dismissed because this court lacks subject matter jurisdiction over Plaintiff's takings claim and because, in any event, the blocking of assets does not constitute a taking under the Fifth Amendment.

It is well settled that a person claiming an uncompensated taking resulting from an action taken pursuant to IEEPA must typically bring a claim for monetary relief under the Tucker Act, 28 U.S.C. § 1491, in the Court of Federal Claims. *Paradissiotis*, 171 F.3d at 989; *Adams v. Hinchman*, 154 F.3d 420, 425 (D.C. Cir. 1998).  This general case law has been applied in this circuit in the IEEPA context, and as in both *HLF* and *IARA*, Plaintiff's takings claim should be dismissed. *See*

*HLF*, 219 F. Supp. 2d at 77-78; *IARA*, 394 F. Supp. 2d at 51; *GRF*, 315 F.3d at 754 ("GRF's takings

claim . . . is in the wrong court. It belongs to the Court of Federal Claims under the Tucker Act.").

This claim is filed in the wrong court and must be dismissed.

Even if this Court had jurisdiction, Plaintiff's takings claim would fail because the blocking

of assets pursuant to E.O. 13224 does not constitute a taking under the Fifth Amendment. *IARA*, 394

F. Supp. 2d at 51 ("Moreover, to the extent that the plaintiff seeks to challenge the blocking of assets

pursuant to an Executive Order, such an order is not, as a matter of law, a takings within the

meaning of the Fifth Amendment."); *accord HLF*, 219 F. Supp. 2d at 78. As Judge Kessler

explained, takings claims have often been raised – and consistently rejected – in the IEEPA and

TWEA context. *Id.*; *see also GRF*, 207 F. Supp. 2d at 802 ("Many courts have recognized that a

temporary blocking of assets does not constitute a taking because it is a temporary action and not

a vesting of property in the United States."). Courts have recognized that a blocking of assets does

not represent a taking because, *inter alia*, it is a temporary action and not a vesting of property in

the United States. *See, e.g., Nielsen v. Sec'y of the Treasury*, 424 F.2d 833, 844 (D.C. Cir. 1970)

("The temporary blocking or freezing of the accounts of aliens within the territory of a state,

suspending the right of withdrawal but not affecting ownership, does not appear to have been

regarded as a taking of property."); *Tran Qui Than v. Regan*, 658 F.2d 1296, 1304 (9th Cir. 1981).

For all these reasons, Plaintiff's takings claim must be dismissed.

C.    **The Blocking Action Does Not Violate the First Amendment.**

Plaintiff reiterates unsuccessful claims raised by the Holy Land Foundation, the Global

Relief Foundation, IARA, and AHIF-Oregon – namely, that his designation by OFAC was based

on "protected First Amendment activities" that "violated his First Amendment rights of free speech

and free association." Compl. ¶ 63. As explained above, Plaintiff's designation was based on providing financial and other support to SDGTs, and, as this Circuit unequivocally has stated when rejecting similar claims made by other SDGTs, "'there is no First Amendment right nor any other constitutional right to support terrorists.'" *IARA*, 477 F.3d at 735 (quoting *HLF*, 333 F.3d at 166). Sanctions were not imposed due to any First Amendment-protected conduct in which Kadi may have engaged. Accordingly, the Court should dismiss Plaintiff's First Amendment claims.

### 1.    Freedom of Speech

Plaintiff asserts that strict scrutiny should be applied to OFAC's blocking action, *see* Compl. ¶¶ 63-67, but "First Amendment freedom of speech challenges to blocking decisions are analyzed under the intermediate scrutiny standard discussed in *United States v. O'Brien*." *IARA*, 394 F. Supp. 2d at 53. As the Supreme Court held in *United States v. O'Brien*, 391 U.S. 367, 376 (1968), "when 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms." In such situations, a "government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *Id.* at 377.

Sanctions were imposed on Kadi because of his financial and other support to SDGTs and not on the basis of any protected First Amendment activity, much less "pure speech." *See* AR 3-22. Assessing similar situations, courts routinely have applied the *O'Brien* test rather than strict scrutiny, holding that charitable contributions, such as those at issue in this case, "plainly do not involve

political expression, and therefore do not warrant strict scrutiny." *See HLF*, 219 F. Supp. 2d at 81

n.37, *aff'd*, 333 F.3d 156; *see also HLP/AEDPA*, 205 F.3d at 1135-36 (rejecting First Amendment

challenge by U.S. citizens and others to prohibition on providing cash and goods to foreign terrorist

organizations under AEDPA), *cert. denied*, 532 U.S. 904 (2001); *GRF*, 207 F. Supp. 2d at 806

(applying *O'Brien* standard to deny preliminary injunction for free speech challenge to IEEPA asset

freeze); *IARA*, 394 F. Supp. 2d at 52-53, *aff'd* 477 F.3d 728; *Walsh v. Brady*, 927 F.2d 1229, 1234-

35 (D.C. Cir. 1991) (declining to apply strict scrutiny to First Amendment challenge to Cuba

sanctions); *Freedom to Travel Campaign v. Newcomb*, 82 F.3d 1431, 1439 (9th Cir. 1996); *Palestine

Info. Office*, 853 F.2d at 939-40.  Application of strict scrutiny would be particularly unjustified in

this case given Plaintiff's failure to identify any speech that allegedly served as the basis for his

designation.

     As courts routinely have held in essentially identical challenges by designated charities,

OFAC's blocking of Plaintiff's assets easily satisfies the relevant four-part test detailed in *O'Brien*,

391 U.S. at 376-77, thereby passing constitutional muster under the First Amendment.  *See HLF*,

219 F. Supp. 2d at 82 ("OFAC's designation of [Holy Land] and attendant blocking order satisfy

scrutiny under the *O'Brien* test, and therefore do not violate [Holy Land's] First Amendment right

to freedom of speech."); *GRF*, 207 F. Supp. 2d at 806 (applying *O'Brien* test and concluding "that

Global Relief is unlikely to prevail in proving that defendants' actions violate the First

Amendment."); *IARA*, 394 F. Supp. 2d at 53 ( "Moreover, nothing in the IEEPA or the Executive

Order prohibits the IARA-USA from expressing its views."); *AHIF*, 585 F. Supp. 2d at 1264 n.15

("Since AHIF-Oregon's designation and redesignation were not based on speech or mere

membership in AHIF, . . . its First Amendment rights to freedom of speech and association have not

been violated."). For all these reasons, IEEPA and E.O. 13224 do not violate First Amendment rights.

### 2.    Freedom of Association

Plaintiff also cannot prevail in his First Amendment freedom of association claim because his designation was not based on mere membership, *see* AR 3-22, and there is no constitutional right to facilitate terrorism. *See HLP/AEDPA*, 205 F.3d at 1133. Although the First Amendment imposes limitations on the government's authority to bar mere membership in a group, the government remains free to prohibit the financial support of particular groups. As courts have succinctly stated, "there is no constitutional right to facilitate terrorism." *HLF*, 219 F. Supp. 2d at 81 (citing *HLP/AEDPA*, 205 F. 3d at 1133). The D.C. Circuit already has considered freedom of association claims in the context of blocking actions under E.O. 13224 and concluded that the blocking of assets "does not implicate [Plaintiff's] First Amendment right of association." *IARA*, 477 F.3d at 736-37 ("The blocking was not based on, nor does it prohibit, associational activity other than financial support. The blocking of [Plaintiff's] assets does not punish advocacy of [Plaintiff's] or any other entity's goals."). Plaintiff's claim similarly lacks merit and must be dismissed.

Kadi was not designated based on association alone. While the Constitution precludes the government from prohibiting mere membership in any particular group, the government may prohibit the provision of financial support to certain groups.[12] *See, e.g., IARA*, 477 F.3d at 736

---

[12] Even if the imposition of sanctions against Kadi did somehow implicate some First Amendment right of association, the government's compelling interest in preventing foreign terrorists from acquiring financial and other support – an interest unrelated to the restriction of association – obviously outweighs any incidental burden on associational rights that the government action might entail. *See Roberts v. United States Jaycees*, 468 U.S. 609, 623 (1984) ("Infringements on [the] right [to associate] may be justified by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through

(upholding sanctions for financial support because "the blocking was not based on, nor does it prohibit, associational activity other than financial support"); *see also HLP/AEDPA*, 205 F.3d at 1133 (rejecting First Amendment challenge to AEDPA because it "does not prohibit being a member of one of the designated groups or vigorously promoting and supporting the political goals of the group") (internal citation omitted).  As the Supreme Court explained in *Healy v. James*, "the critical line for First Amendment purposes must be drawn between advocacy, which is entitled to full protection, and action, which is not."  408 U.S. 169, 192 (1972).  As described above, there was ample evidence to conclude that Kadi actively provided support to designated terrorists and their supporters.

Nor does OFAC's blocking of Kadi's assets meaningfully impinge upon his associational rights, as it bars only action while still permitting advocacy.  Although Kadi is prevented from making financial contributions from any blocked assets, he may still engage in advocacy. *See HLF*, 333 F.3d at 166; *IARA*, 477 F.3d at 736-37.  Because the government's actions in this case serve important national interests, they clearly withstand First Amendment scrutiny.

### 3.   E.O. 13224 Does Not Contain a Specific Intent Requirement.

In addition to his speech and association claims, Plaintiff also implies that he has a First Amendment right to provide support to a foreign terrorist organization so long as he "did not and does not have a specific intent to further the illegal aims of any terrorist group or individual." Compl. ¶ 64.  The D.C. Circuit has already considered and rejected this argument because proof of "specific intent" is not required in order to block one's assets pursuant to E.O. 13224. *See IARA*, 477 F.3d 728, 737 (D.C. Cir. 2007) ("[W]e do not require a showing that IARA-USA intended its

---

means significantly less restrictive of associational freedoms.").

funding to support terrorist activities."). As another district court has recognized in rejecting a similar claim, "the EO [13,224] makes clear that President Bush did not intend to include a 'specific intent' requirement for designating individuals and groups under the EO  Indeed, the EO prohibits even the provision of humanitarian aid." *HLP/IEEPA*, 463 F. Supp. 2d at 1073.

### D.  Plaintiff Cannot State a Claim Under the Fourth Amendment.

The complaint alleges that "[t]he freezing or blocking of Mr. Kadi's assets constitute [sic] an unreasonable search and seizure without probable clause, in violation of the Fourth Amendment." Compl. ¶ 71. Two courts in this district have concluded that "OFAC's blocking of [] assets does not create a cognizable claim under the Fourth Amendment." *IARA*, 394 F. Supp. 2d at 48; *see also HLF*, 219 F. Supp. 2d at 78-79 (stating that "the freezing of [] accounts is not a seizure entitled to Fourth Amendment protection").[13]  In advancing a novel theory that all economic sanctions programs implicate the Fourth Amendment, Plaintiff ignores the weight of history; the unique nature of economic sanctions programs as a tool of foreign and national security policy; the great deference due Executive Branch activity concerning matters as serious as international terrorism; and, most strikingly, all of the jurisprudence establishing that the freezing of assets does not give rise to a cognizable Fourth Amendment claim.

---

[13] The court in *Holy Land Foundation* distinguished a blocking action, which the court did not consider a "seizure" cognizable under the Fourth Amendment, from the different action of crossing the threshold of Holy Land's office to secure the property for safekeeping and warehousing, which the court said did constitute a seizure under the Fourth Amendment. 219 F. Supp. 2d at 79.  This court is not faced with the latter question because the blocking order against Kadi was not a law enforcement search.

### 1.    The Executive's Authority to Block the Transfer of Assets Historically Has Not Been Constrained by the Fourth Amendment.

Plaintiff mistakenly attempts to apply a Fourth Amendment analysis to the Executive's regulatory authority under IEEPA. *See* Compl. ¶¶ 69-71. With the exception of a lone district court in Oregon that issued a partial decision regarding the Fourth Amendment without the benefit of the fuller briefing contained herein, *see AHIF*, 585 F. Supp. 2d at 1261-64, in the nearly one hundred years in which blockings have been carried out pursuant to TWEA and IEEPA, no court has ever held that the Fourth Amendment applies to the type of executive action at issue here – the blocking by the President or his delegee of the transfer of assets carried out during a national emergency with the direct authorization of Congress and with the intent of protecting our nation from foreign threats.[14] And two courts in this circuit explicitly have rejected similar claims.

Although Fourth Amendment challenges to blocking orders have not been explicitly addressed by the Supreme Court, the Supreme Court has upheld orders under TWEA- or IEEPA-based sanctions programs and has never offered any hint that these actions raise Fourth Amendment concerns. *See Regan v. Wald*, 468 U.S. at 232-33; *Dames & Moore*, 453 U.S. 654; *Orvis v. Brownell*, 345 U.S. at 187-88; *Propper*, 337 U.S. at 481-82. *Cf. Mistretta v. United States*, 488 U.S. 361, 401-02 (1989) (suggesting that precedents may "reflect at least an early understanding" about a constitutional issue even when issues are "not specifically addressed."). Moreover, no court has held that the blocking of assets under IEEPA is subject to Fourth Amendment restrictions. *IARA*, 394 F. Supp. 2d at 48; *HLF*, 219 F. Supp. 2d at 78-79; *but see AHIF*, 585 F. Supp. 2d at 1263-64 (requesting further briefing). This uninterrupted history has meaning. As the Supreme Court has

---

[14] This regulatory action of blocking assets is distinguished from crossing the threshold of an entity's office.

stated, "'traditional ways of conducting government . . . give meaning' to the Constitution." *Mistretta*, 488 U.S. at 401 (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610 (1952)).

In addition to crediting the history of nearly one hundred years of Executive practice and judicial opinions upholding the President's regulatory authority in this area, the Court also should consider the constructive and supportive role played by the Legislative branch in the creation and oversight of sanctions programs. The broad congressional grants of authority to the President in the TWEA and IEEPA contain no suggestion that the Executive branch must resort first to the judiciary for a warrant. The President has the authority to block assets and take other broad regulatory actions – that might otherwise be considered "seizures" – when faced with national emergencies or war and when armed with explicit Congressional authorization. In a concurrence often cited by the Supreme Court and lower courts in TWEA and IEEPA cases, *see, e.g., Dames & Moore*, 453 U.S. at 660, Justice Jackson stated that "[a] seizure executed by the President pursuant to an Act of Congress would be supported by the strongest presumptions and the widest latitude of judicial interpretation, and the burden of persuasion would rest heavily upon any who might attack it." *Youngstown Sheet & Tube Co.*, 343 U.S. at 635-36. Justice Jackson concurred in the finding that the President lacked authority to seize the steel mills at issue in that case because, while Congress had expressly provided the President with the power to seize industries in other circumstances, it had not passed legislation authorizing the steel mill seizures. *Id.* at 639.[15] To hold that the President needed first to obtain a warrant from a Magistrate Judge would be entirely inconsistent with what Justice Jackson referred

---

[15] In fact, the *Youngstown* opinion includes a lengthy appendix of situations in which the President has been authorized by an Act of Congress to seize assets without a warrant. *Id.* at 615-67.

to as the President's "authority at its maximum" to execute seizures with explicit authorization by Congress. *Id.* at 635; *see also id.* at 652 (noting that "executive powers may be considerably expanded to meet an emergency" and that "Congress may and has granted extraordinary authorities which lie dormant in normal times but may be called into play by the Executive in war or upon proclamation of a national emergency.").

In *Nielsen v. Sec'y of the Treasury*, 424 F.2d 833 (D.C. Cir. 1970), a case involving the blocked assets of Cuban nationals, the D.C. Circuit agreed "with the applicants that . . . blocking involves a deprivation of property." *Id.* at 843. However, the court took a "broad view of the constitutional aspects of the case to consider whether on these or other grounds there has been unfairness to plaintiffs which rises to constitutional dimensions" and held that "[w]e see no general constitutional inhibition that overrides a statute authorizing the institution, during time of national emergency, of a program that freezes the status within the United States of assets of a national of a foreign country 'designated' by the President." *Id.* at 839; *see also Sardino v. Fed. Reserve Bank of New York*, 361 F.2d 106 (2d Cir. 1966); *Miranda v. Sec'y of Treasury*, 766 F.2d 1 (1st Cir. 1985); *Chas. T. Main Int'l Inc. v. Khuzestan Water & Power*, 651 F.2d 800 (1st Cir. 1981); *Freedom to Travel Campaign*, 82 F.3d 1431. These well-established principles cannot be squared with the suggestion that the President (or OFAC) must seek the approval of a Magistrate Judge before he may prohibit the transfer of assets in which foreign nationals have an interest when there is reason to believe that those assets may be used to support terrorism.

Finally, this line of authority was applied twice in the IEEPA context by courts in this district. The district court in *Holy Land Foundation* examined a claim nearly identical to Plaintiff's and held that: "[T]he case law is clear that a blocking of this nature does not constitute a seizure.

-44-

Accordingly, the freezing of HLF's accounts is not a seizure entitled to Fourth Amendment protection." 219 F. Supp. 2d at 78-79. And another court later reached the same conclusion. *See IARA*, 394 F. Supp. 2d at 48 ("[T]o the extent the plaintiff is alleging that the OFAC's blocking of its assets violates the Fourth Amendment, this claim must fail as well . . . OFAC's blocking of the IARA-USA's assets does not create a cognizable claim under the Fourth Amendment.").

<blockquote>
2.     **Blocking Actions Pursuant to E.O. 13224 are *Per Se* "Reasonable" Because Governmental Interests Far Outweigh Any Privacy Concerns.**
</blockquote>

The Fourth Amendment states that people have a right "to be secure in their persons, houses, papers, and effects, against *unreasonable* searches and seizures. . ." U.S. Const. amend. IV (emphasis added). To hold that the Fourth Amendment is applicable to a particular search or seizure "is only to begin the inquiry into the standards governing such intrusions." *Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 619 (1987) (citations omitted). Under the Fourth Amendment, "'reasonableness is still the ultimate standard.'" *Soldal v. Cook County*, 506 U.S. 56, 71 (1992) (quoting *Camara v. Municipal Court of San Francisco*, 387 U.S. 523, 539 (1967)); *see also Pennsylvania v. Mimms*, 434 U.S. 106, 108-09 (1977) (per curiam) ("The touchstone of our analysis under the Fourth Amendment is always 'the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.'") (quoting *Terry v. Ohio*, 392 U.S. 1, 19 (1968)). Even if the Court is not persuaded by the historical judicial treatment of economic sanctions programs, the Court nonetheless should find that blocking actions pursuant to E.O. 13224 are *per se* reasonable under the Fourth Amendment and thus should not be subject to a "probable cause" standard or a warrant requirement.

While in the ordinary law enforcement context the reasonableness of a search or seizure is usually predicated on obtaining a probable cause warrant, the Supreme Court has routinely upheld warrantless searches and seizures in other contexts when the search or seizure was deemed reasonable. These decisions arise from the judgment that governmental interests often outweigh privacy interests. To state the obvious, a person's status as a donor to international terrorist groups "informs both sides of that balance" between private and governmental interests. *United States v. Knights*, 534 U.S. 112, 119 (2001). In *Virginia v. Moore*, the Supreme Court noted that "when an officer has probable cause to believe a person committed even a minor crime in his presence, the balancing of private and public interests is not in doubt." 128 S. Ct. 1598, 1604 (2008). Plaintiff's link to international terrorist organizations significantly diminishes any expectation that his property interests in the United States would remain unblocked.

Some actions, such as border searches, are by their very nature reasonable and thus not subject to Fourth Amendment restrictions. The Supreme Court has upheld warrantless searches at the border, finding that the interest of the "sovereign" in protecting itself outweighs any personal privacy interest. *See United States v. Ramsey*, 431 U.S. 606, 616 (1977) ("[S]earches made at the border, pursuant to the longstanding right of the sovereign to protect itself by stopping and examining persons and property crossing into this country, are reasonable simply by virtue of the fact that they occur at the border. . . ."). In *United States v. Flores-Montano*, 541 U.S. 149, 155 (2004), the Court found that an interest in preventing drug importation outweighed the particularly invasive warrantless search of an automobile, including the removal of the gas tank (in which drugs were found). The Court explained: "[w]hile the interference with a motorist's possessory interest is not insignificant when the Government removes, disassembles, and reassembles [a] gas tank, it

nevertheless is justified by the Government's paramount interest in protecting the border." *Id.*

Cases involving searches or seizures at the border demonstrate that the existence of one compelling factor can be sufficient to render an entire category of searches and seizures reasonable. Courts have long recognized that the Legislative and Executive branches can control the border, and have repeatedly held that border searches are *per se* reasonable under the Fourth Amendment. *See, e.g., Flores-Montano*, 541 U.S. at 153 ("Congress, since the beginning of our Government, 'has granted the Executive plenary authority to conduct routine searches and seizures at the border, without probable cause or a warrant, in order to regulate the collection of duties and to prevent the introduction of contraband into this country.'") (citation omitted); *see also Ramsey*, 431 U.S. at 616-622. This case involves the President's authority to block "any property in which any foreign country or a national thereof has any interest," 50 U.S.C. § 1702(a)(1)(B), in order to address threats that have their source "in whole or substantial part outside the United States." *Id*. at § 1701(a). Surely the interest in curtailing the funding of terrorism is as great as the interest in preventing the importation of drugs or securing the border. That interest – preventing the financing of terrorism – should be sufficient to render blocking actions reasonable for Fourth Amendment purposes, especially when coupled with the presence of numerous other factors such as a Presidentially-declared period of national emergency, the special deference due to the Executive branch in matters concerning foreign policy and national security, and the close coordination of the Legislative branch and the attendant deference based on *Youngstown* principles.

Courts have found warrantless searches and seizures to be reasonable regardless of whether the circumstances fit within an established exception such as the one for "special needs" or

"administrative searches."[16]   Even if OFAC blocking actions were required to fall within an

established categorical exception to the Fourth Amendment in order to be deemed reasonable, the

blocking of assets pursuant to E.O. 13224 falls within the special needs exception.   The special

needs exception applies where (1) the primary purpose of the search or seizure is beyond ordinary

criminal law enforcement; and (2) where "special needs" make the warrant and probable cause

requirements of the Fourth Amendment impracticable. *See Griffin v. Wisconsin*, 483 U.S. 868, 873

(1987); *Chandler v. Miller*, 520 U.S. 305, 313 (1997) ("[P]articularized exceptions to the main rule

are sometimes warranted based on special needs, beyond the normal need for law enforcement.")

(internal citation omitted).

The primary purpose of E.O. 13224 is beyond ordinary criminal law enforcement.   E.O.

13224 addresses "an unusual and extraordinary threat to the national security, foreign policy, and

economy of the United States" and states that the E.O. is intended to deal with this threat. *Id.   See*

*also* 50 U.S.C. § 1701(a).   Addressing a Presidentially-declared national emergency clearly is a

"special need" beyond "the normal need for law enforcement." *Skinner*, 489 U.S. at 619; *see*

*Cassidy v. Chertoff*, 471 F.3d 67, 82 (2d Cir. 2006) ("Preventing or deterring large-scale terrorist

attacks present problems that are distinct from standard law enforcement needs and indeed go well

---

[16] In *United States v. Knights*, the Supreme Court held reasonable the warrantless search
of a probationer's home, rejecting the need to fit the search into the "special needs" exception,
and instead ruling that "the search of Knights was reasonable under our *general* Fourth
Amendment approach of 'examining the totality of the circumstances,'" which included the
diminished privacy interests of a probationer. 534 U.S. at 117-18 (emphasis added) (citing *Ohio
v. Robinette*, 519 U.S. 33, 39 (1996)). The Court found that the government's interests in
rehabilitating the probationer and in protecting society from future criminal violations
sufficiently outweighed the probationer's privacy interests.

beyond them."); *MacWade v. Kelly*, 460 F.3d 260, 270-71 (2d Cir. 2006) (seeking to prevent

terrorist attacks "serves a special need").

It is equally clear that it would be impracticable to impose a warrant requirement on the

President's ability to freeze assets in which a foreign national has an interest. *Griffin*, 483 U.S. at

873. As the Szubin Declaration makes clear, the imposition of a warrant requirement in this context

would present insuperable difficulties. *See* Szubin Decl. ¶¶ 18-20. Funds can be transferred at the

click of a button, and the Executive must often act quickly to prevent asset flight.   More

significantly, when blockings are effectuated, the Executive frequently does not know the identity

or location of all of the assets that will be blocked, as the order applies to all existing assets and

future transactions and covers a vast variety of assets including bank accounts, real property, goods,

contracts, and a host of other financial instruments. *See id.* ¶¶ 11-19.  Thus, not all assets or the

identities of those who hold them can be identified prior to carrying out the blocking.   In fact,

because "the legal obligation to block property" is created by the blocking order, assets are often

frozen by third parties without the prior knowledge of OFAC. *Id.* ¶ 12.  The Department of the

Treasury administers over 20 sanctions programs against a multitude of countries and persons. *Id.*

¶ 4.  In cases in which blockings take place pursuant to these programs, the Department of the

Treasury identifies the blocked nations, individuals, or groups, and relies on those holding assets for

these persons (or assets in which those persons have "any interest") to effectuate the blockings.

Banks play a critical role, examining the list of blocked persons and identifying assets they hold on

behalf of blocked parties. *Id.* ¶ 17.  The sanctions continue after the initial blockings are made, so

any new assets coming into the jurisdiction of the blocking order will be blocked. *Id.* ¶ 16.  For

example, a wire transfer in which a designated party has an interest will be blocked. *Id.*  Indeed,

-49-

even determining from which court to seek a warrant would be difficult because some of these programs block all the assets of a nation and its nationals. *Id.* ¶ 9. As the Declaration explains, "[b]ecause of the broad scope of property potentially subject to a blocking order, the fact that such property may be located anywhere in the world, the fact that OFAC often does not have the ability to identify and locate all property subject to a blocking order, and the fact that effective blocking of assets requires quick action to prevent their dissipation, it would be impracticable for OFAC to obtain a warrant for every account, transaction or other property that might be affected as a result of a blocking action." *Id.* ¶ 19. As a consequence, requiring a warrant prior to each blocking would substantially hamstring the Executive's ability to use these important tools to protect the foreign policy and national security of the United States. *See id.* ¶¶ 19-20.

Moreover, the manner in which economic sanctions programs are administered highlights the inappropriateness of any requirement that the President or his designee seek a warrant before freezing any assets. A primary purpose of the warrant requirement is to "particularly describ[e] the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. As described above, a blocking action has far-reaching application, potentially freezing not just bank accounts, but also a host of other financial instruments and physical assets found in the name of the designated countries or entities or in the name of anyone within U.S. jurisdiction if a designated party has any interest in the asset. Szubin Decl. ¶ 11. For a program that, by design, targets assets of any kind, case law discussing the sufficiency of warrants makes little sense. *See, e.g., Berger v. State of New York*, 388 U.S. 41, 58 (1967) (discussing requirement that warrants be "'carefully circumscribed' so as to prevent unauthorized invasions of privacy"). Unquestionably, a warrant requirement "would interfere to an appreciable degree with the [] system" for imposing economic sanctions during a

-50-

national emergency pursuant to Congressional authorization, and "the delay inherent in obtaining

a warrant would make it more difficult . . . to respond quickly to evidence of misconduct." *Griffin*,

483 U.S. at 876. Interposing a warrant requirement would require the President or OFAC to identify

every such asset, and to seek out magistrates in any jurisdiction in the United States in which such

an asset might be found. This would not only be very difficult as a practical matter, *see* Szubin

Decl. ¶¶ 19-20, but also would be inconsistent with the intent of Congress that the President have

the authority to act quickly and decisively in the face of economic or security threats to this country.

It would also be inconsistent with the admonition that in this area of national security and foreign

policy, the authority of the President is at its zenith and that of the judiciary at its nadir. The

practical and theoretical implications of imposing a warrant requirement strongly weigh in favor of

post-blocking judicial review of sanctions decisions, instead of pre-blocking review.

As the Supreme Court has recognized, and as explained above, a showing of less than

probable cause "satisfies the Constitution when the balance of governmental and private interests

makes such a standard reasonable." *Knights*, 534 U.S. at 121 ("The same circumstances that lead

us to conclude that reasonable suspicion is constitutionally sufficient also render a warrant

requirement unnecessary."). For all these reasons, the Court should conclude that blocking actions

pursuant to E.O. 13224 are *per se* reasonable.[17]

---

[17] Alternatively, the Court could rule that OFAC's decision to maintain Kadi's
designation and deny his request for reconsideration was reasonable – and thus exempt from any
Fourth Amendment restrictions – for the same reasons discussed in Section I.A *supra*. Plaintiff
alleges that a "probable cause" standard should be imposed, *see* Compl. ¶71, but the ultimate
question on the merits is whether OFAC's decision was "rational" and "supported by the
administrative record." *See* Standard of Review section, *supra*; *see also AHIF*, 585 F. Supp. 2d.
at 1252-53 (applying APA standard to designation challenge). It defies logic to conclude that a
higher standard should be applied during the period of heightened emergency – when unblocked
assets may be used to support global terrorism – than at the end of a lengthy post-blocking

E.    **Plaintiff Cannot Sustain a Vagueness or Overbreadth Challenge**.

    1.    **E.O. 13224 Is Not Unconstitutionally Overbroad**.

Aside from using the word "overbroad," *see* Compl. ¶¶ 73, 75-76, Plaintiff does not advance a legal argument specifically tailored to his overbreadth claim. Even if E.O. 13224 arguably might be construed to touch upon some conduct protected by the First Amendment, "there comes a point at which the chilling effect of an overbroad law, significant though it may be, cannot justify prohibiting all enforcement of that law – particularly a law that reflects 'legitimate state interests in maintaining comprehensive controls over harmful, constitutionally unprotected conduct.'" *Virginia v. Hicks*, 539 U.S. 113, 119 (2003) (citing *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973)). Just last term, the Supreme Court reiterated that "[i]nvalidation for overbreadth is 'strong medicine' that is not to be 'casually employed'" because "invalidating a law that in some of its applications is perfectly constitutional . . . has obvious harmful effects." *United States v. Williams*, 128 S. Ct. 1830, 1838 (2008). That is why the Supreme Court "vigorously enforce[s] the requirement that a statute's overbreadth be *substantial*, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep." *Id.*

There can be no doubt that E.O. 13224 furthers governmental interests of the highest order – protecting national security by freezing out sources of terrorism financing. It cannot be seriously disputed that the heart of E.O. 13224 is combatting terrorism financing, and courts repeatedly have held that there is no constitutional right to fund terrorist activities. *See, e.g., HLP/AEDPA*, 205 F.3d at 1133 ("[T]here is no constitutional right to facilitate terrorism . . . [or] to provide resources with

_____

briefing process in federal court (initiated almost five years after the final agency action in question).

which terrorists can buy weapons and explosives."); *HLF*, 333 F.3d at 165 ("[T]he law is established that there is no constitutional right to fund terrorism."); *IARA*, 477 F.3d at 735 (same). This court should follow the Supreme Court's instruction in *Williams*: If, "[i]n the vast majority of its applications, [a law] raises no constitutional problems whatever," then an overbreadth claim must be dismissed. *Williams*, 128 S. Ct. at 1844.

> **2.   Plaintiff's Challenge to the Phrase "Otherwise Associated With" Should be Dismissed.**

Plaintiff alleges that the phrase "otherwise associated with" in E.O. 13324 is "unconstitutionally vague and overbroad on [its] face and as applied to Mr. Kadi." Compl. ¶ 73; *see* E.O. 13224, § 1(d)(ii). This claim does not present a live case or controversy. First, subsequent to the March 12, 2004 decision challenged here, OFAC published a regulatory definition of the phrase "otherwise associated with" that clarified the scope of that provision. *See* 31 C.F.R. § 594.316 ("Otherwise associated with" means "(a) To own or control; or (b) To attempt, or to conspire with one or more persons, to act for or on behalf of or to provide financial, material, or technological support, or financial or other services, to."). Any facial challenge to the previously undefined term is now moot. Second, as noted above, Defendants are not moving for summary judgment on the basis of Kadi's designation under this prong and thus are not "applying" it to Kadi in any meaningful sense. Defendants submit that Kadi's designation should be upheld because of the satisfaction of other E.O. 13224 criteria and the sufficiency of the evidence supporting those separate grounds for designation.

Even if the application of section 1(d)(ii) to Kadi did present a live controversy for the Court, Plaintiff's claim must be rejected because Kadi engaged in conduct that satisfies even the more restrictive criteria set out in the regulatory definition of this prong (e.g., providing financial support

to terrorists). *See* E.O. 13224, § 1(d)(ii); 31 C.F.R. § 594.316. The term "otherwise associated with," as defined, applies to types of conduct that extend beyond mere association and requires that the designated party engage in that conduct before E.O. 13224 can be applied. *See HLP/IEEPA*, 484 F. Supp. 2d at 1106-07 (discussing regulatory definition of "otherwise associated with," 31 C.F.R. § 594.316, and holding that the phrase is neither vague nor overbroad). Both courts to consider the constitutionality of this provision, as defined by regulation, have held that its language is sufficiently clear to withstand vagueness and overbreadth challenges. *See id.*; *AHIF*, 585 F. Supp. 2d at 1267, 1270 ("[T]he possibility of designation for being 'otherwise associated with' a designated entity has been circumscribed by its regulatory definition. . . . The language requires the designated party to engage in unprotected conduct before the entity can come within its purview."). For all these reasons, the Court should not entertain Plaintiff's challenge to this provision.

### 3.   Terms Such As "Specially Designated Global Terrorist" Are Not Unconstitutionally Vague or Overbroad.

Plaintiff asserts that "[t]he provisions of IEEPA, E.O. 13,224, and the implementing regulations impose vague and overbroad restrictions . . . because they do not define such critical terms as 'terrorist organization,' 'specially designated global terrorist,' or any other term related to 'terrorism.'" Compl. ¶ 75. According to his Complaint, these "vague and overbroad provisions . . . have prevented Mr. Kadi from properly contesting evidence set forth against him and have failed to provide Mr. Kadi with an adequate independent tribunal in violation of his first and fifth amendment rights." *Id.* ¶ 76. For a variety of factual and legal reasons, this claim must be dismissed.

First, Plaintiff is wrong to state that the regulations do not define these terms. *Id.* ¶ 75. Both "specially designated global terrorist" and "terrorism" are defined by OFAC regulations. *See* 31

C.F.R. § 594.310 ("The term specially designated global terrorist or SDGT means any foreign person or person listed in the Annex or designated pursuant to Executive Order 13224 of September 23, 2001."); 31 C.F.R. § 594.311 (listing activities that constitute terrorism). OFAC utilizes the administrative term "specially designated global terrorist" or "SDGT" to identify persons who have been designated for blocking under E.O. 13224, as opposed to designations that are made under other economic sanctions programs. Szubin Decl. ¶ 29. For example, OFAC refers to persons designated under E.O. 12978 as "specially designated narcotics traffickers" or "SDNTs." *Id.*; 31 C.F.R. § 536.312. The specific criteria that apply to blocking designations are set forth in the Executive Order itself, as explained above. *See IARA v. Unidentified FBI Agents*, 394 F. Supp. 2d 34, 46 (D.D.C. 2005) ("Executive Order 13,224 clearly designates the procedures for designating organizations for SDGTs.").

Two, Plaintiff cannot bring a facial vagueness challenge because E.O. 13224 clearly applies to him. *Village of Hoffman Estates v. Flipside*, 455 U.S. 489, 495 (1992) ("A plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others."); *see Parker v. Levy*, 417 U.S. 733, 756 (1974) ("One to whose conduct a statute clearly applies may not successfully challenge it for vagueness."); *see also Regan v. Time, Inc.*, 468 U.S. 641, 649-50 (1984) (rejecting vagueness challenge where statute clearly applied to plaintiff, despite statute's implication of First Amendment concerns). Because E.O. 13224 clearly applies to Kadi, as discussed in Section I.A *supra*, Plaintiff cannot succeed in a facial vagueness challenge predicated on hypothetical situations unrelated to his own activities.[18]

---

[18] In any event, Plaintiff's purported vagueness challenge bears none of the hallmarks of a proper claim. *See Flipside*, 455 U.S. at 497-500. He does not allege any chilling effect, describe any constitutionally-protected conduct in which he wishes to engage, or raise questions about

Third, a vagueness challenge to these terms would fail anyway. In *HLP/IEEPA*, the court

faced a similar vagueness challenge to the term "SDGT" and summarily rejected it. 463 F. Supp.

2d 1049, 1065-66 (C.D. Cal. 2006) ("Plaintiffs' challenges to the term 'specially designated terrorist

group' and to the EO's designation procedure both fail.").

Setting aside the various legal flaws in this purported vagueness/overbreadth claim, Plaintiff

is wrong to assert that these terms prevent "an adequate independent tribunal" from adjudicating his

rights. Compl. ¶ 76. As explained above, designated persons can challenge designation decisions

in United States District Court under the APA. *See, e.g., HLF*, 219 F. Supp. 2d 57 (rejecting on their

merits plaintiff's APA record-review and constitutional challenges to its designation under E.O.

13224); *IARA*, 394 F. Supp. 2d 34 (denying plaintiffs' designation and constitutional challenges).

For all these reasons, Count Seven must be dismissed.

### F.    E.O. 13224 Is Not a Bill of Attainder.

Article I of the Constitution prohibits Congress from passing a "Bill of Attainder." U.S.

Const. art. I, § 9, cl. 3. Plaintiff's claim must fail because a blocking action is not a legislative

activity subject to the provisions of the Bill of Attainder Clause and does not inflict constitutionally

proscribed punishment. Although the Constitution does not define the term, the Supreme Court has

recognized that a bill of attainder is "a law that legislatively determines guilt and inflicts punishment

upon an identifiable individual without provision of the protections of a judicial trial." *Nixon v.*

*Administrator of General Servs.*, 433 U.S. 425, 468 (1977)). Neither OFAC's blocking order nor

the IEEPA provisions it relied upon constitute a "legislative punishment." The agency action

challenged here is so far removed from what the framers of the Constitution had in mind –

---

what conduct is, or is not, prohibited by E.O. 13224.

"parliamentary acts sentencing named persons to death without the benefit of a judicial trial" – that

Plaintiff cannot state a claim under the Bill of Attainder Clause. *BellSouth Corporation v. FCC*, 144

F.3d 58, 62 (D.C. Cir. 1998).

The Bill of Attainder Clause is properly restricted to legislative enactments and does not

apply to regulatory actions of administrative agencies, which routinely make decisions concerning

specific individuals. The actions of OFAC do not "legislatively determine[] guilt." *Selective*

*Service Sys. v. Minnesota PIRG*, 468 U.S. 841, 846-47 (1984) (emphasis added). Courts have

rejected nearly identical bill of attainder claims arising out of other IEEPA-based sanctions. *See,*

*e.g., GRF*, 207 F. Supp. 2d at 799 ("'No circuit court has yet held that the bill of attainder clause,

U.S. Const. art I, § 9, cl. 3, applies to regulations promulgated by an executive agency.'") (citing

*Paradissiotis v. Rubin*, 171 F.3d 983, 988 (5th Cir. 1999)); *see also Coopservir LTDA.*, Civ. No. 98-

0949 slip op. at 10 (D.D.C. Mar. 29, 1999), *aff'd*, 221 F.3d 195 (D.C. Cir. 2000) (table)). Congress

did not place Kadi on any list of supporters of terrorism. As the Seventh Circuit has recognized,

"[a]pplication of the IEEPA is not a bill of attainder; implementation of the statute is in the hands

of the Executive and Judicial Branches, while a bill of attainder is a decision of guilt made by the

Legislative Branch." *GRF*, 315 F.3d at 755 (citing *United States v. Lovett*, 328 U.S. 303, 315

(1946)). *See also Walmer v. Dep't of Defense*, 52 F.3d 851, 855 (10th Cir.) ("bulk of authority

suggests" that provision should be so understood), *cert. denied*, 516 U.S. 974 (1995); *Korte v. OPM*,

797 F.2d 967, 972 (Fed. Cir. 1986) ("The clause is a limitation on the authority of the legislative

branch . . . [not] the executive branch."); *Marshall v. Sawyer*, 365 F.2d 105, 111 (9th Cir. 1966),

*cert. denied*, 385 U.S. 1006 (1967).

Even if the Bill of Attainder clause did apply to regulatory actions by an executive agency, the blocking action does not inflict constitutionally proscribed punishment. Determining whether legislation inflicts "punishment" such that it implicates the Bill of Attainder clause requires consideration of (1) historical treatment of that type of legislation, (2) the presence or absence of a non-punitive legislative purpose, and (3) the existence of evidence of "congressional intent to punish." *See Selective Service Sys.*, 468 U.S. at 852. First, economic sanctions are not "traditionally judged to be prohibited by the Bill of Attainder Clause." *Nixon*, 433 U.S. at 473-75. Potentially prohibited punishments include death sentences, imprisonment, banishment, the punitive confiscation of property, and legislative bans on participation by individuals or groups in specific jobs or professions. The blocking order does not single out any specified line of business; it instead restricts transactions in property because OFAC had reason to believe that Kadi was providing financial support to foreign terrorists.

Second, E.O. 13224 "reasonably can be said to further nonpunitive legislative purposes." *Nixon*, 433 U.S. at 475-76. The government's vital interest in protecting national security by seeking to eliminate sources of terrorism financing cannot seriously be disputed. *See BellSouth*, 144 F.3d at 65 (describing this factor as "the most important"). OFAC's order plainly furthers the non-punitive purpose of identifying and cutting off the sources of funding for foreign terrorists. "That burdens are placed on citizens by federal authority does not make those burdens punishment." *Selective Service Sys.*, 468 U.S. at 851. As explained above, E.O. 13224 reasonably furthers the President's interest in protecting the security of U.S. citizens and the nation's security, foreign policy, and economy by preventing future terrorist attacks against the United States or its interests.

-58-

Lastly, Plaintiff has not presented any evidence of "a congressional intent to punish" him. *Selective Service Sys.*, 468 U.S. at 852. Plaintiff simply cannot "come forward with the kind of 'unmistakable evidence of punitive intent which . . . is required before a Congressional enactment of this kind may be struck down' as an attainder." *BellSouth*, 144 F.3d at 67 (citing *Selective Service Sys.*, 468 U.S. at 855-56 n.15). Kadi can point to nothing in the legislative history of IEEPA or the history of E.O. 13224 that evinces any intent to punish him specifically. *See Coopservir*, slip op. at 12. For all these reasons, Plaintiff's bill of attainder claim must fail.

## CONCLUSION

For all the foregoing reasons, Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment should be granted, and this case should be dismissed in its entirety.

Dated: May 22, 2009

Respectfully submitted,

TONY WEST
Assistant Attorney General

DOUGLAS N. LETTER
Terrorism Litigation Counsel

SANDRA M. SCHRAIBMAN
Assistant Branch Director (D.C. Bar #188599)

   /s/ Eric J. Beane
ERIC J. BEANE (Arizona Bar #023092)
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
Mailing Address
P.O. Box 883
Washington, D.C. 20044
Delivery Address
20 Massachusetts Ave., NW., Room 7124
Washington, D.C. 20001
Telephone: (202) 616-2035
Fax: (202) 616-8470

-59-

Eric.Beane@usdoj.gov

*Counsel for Defendants*