# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____
                                               )
In Re TERRORIST ATTACKS on          )    03 MDL 1570 (GBD) (FJM)
SEPTEMBER 11, 2001                        )    ECF Case
                                               )
_____)

This document relates to:  *All Cases*


**PLAINTIFFS' FACTUAL AVERMENT SUPPORTING**
**PLAINTIFFS' THEORIES OF GENERAL JURISDICTION**
**AS TO NATIONAL COMMERCIAL BANK**

**I.      THE SCOPE OF NCB'S BUSINESS ACTIVITIES IS BROAD AND – IN**
**ADDITION TO RETAIL BANKING – INCLUDES INVESTMENT AND**
**MANAGEMENT SERVICES, OVERSEAS OPERATIONS, AND CORPORATE**
**FINANCING**

1.      In addition to NCB's retail banking activities, NCB has also long considered its

core business to include a multitude of additional services other than retail banking – including,

inter alia, investment and management services, overseas operations, and corporate banking.

Throughout more than at least a decade before any complaint was filed in this litigation, NCB

has demonstrated persistent contacts with the United States within these various categories that

NCB has itself acknowledged are within its core business.   [Exhibit 1,1992 NCB Annual Report

at MR_NCB000441, MR_NCB000447, MR_NCB000448-461.][1]

2.      Besides the more traditional retail banking services, another core component of

NCB's business has involved providing access to multiple investment and management services.

NCB has derived substantial revenue from its 'Private Banking' sector, a significant sector

within NCB since 1993 that offers multi-faceted financial and investment services to wealthy

individuals.  [Exhibit 2, 1996 NCB Annual Report at MR_NCB000956 ("Private Banking has become a significant contributor to the bank's revenue stream.").]

3.      As a part of its services, NCB has provided its customers with access to and management of both national and international investment services, including money market and mutual funds, investment trusts, bonds, equities, trade finances, commodities, real estate, and currency funds.  [Exhibit 1, 1992 NCB Annual Report at MR_NCB000457.]

4.      Coincidental with the closing of its New York-based branch in 1992, NCB introduced international brokerage services, facilitating direct access to major stock exchanges in the United States, allowing NCB to offer the service of purchasing and selling stocks of major international companies, a service not previously available. [Exhibit 1, 1992 NCB Annual Report at MR_NCB000457.]

5.      In 2001, again coincidental with winding down NCB's SNCB office in the U.S., NCB established an interactive on-line trading facility whose sole purpose was to allow NCB customers to access United States stock markets.  [Exhibit 3, ASH011336-11345, alahli.com online brokerage, archived April 2001-September 2002.]

6.      NCB's brokerage fees were calculated and collected in U.S. dollars and in an acknowledgment of its activity pursuant to United States Government regulatory authority, NCB collected U.S. government taxes and remitted them to the U.S. Treasury.  [Exhibit 3, ASH011336-11345, alahli.com online brokerage (which is NCB's website), archived April 2001- September 2002.]

---

[1] An Attorney Declaration of Robert T. Haefele identifying each of the exhibits referenced herein is appended to this Factual Averment and true and correct copies of each exhibit are attached thereto.  Citations herein to exhibits are to the exhibits attached to the Haefele Declaration.

_____

7.      This activity was on-going at the time of the complaints in this litigation were filed. [Exhibit 3, ASH011336-11345, alahli.com online brokerage (which is NCB's website), archived April 2001- September 2002.]

8.      NCB in Jeddah, SNCB in New York and various contracted agents, managed a set of investment trusts, nominally registered in the British Virgin Islands, but whose assets, largely real estate assets, were in the United States.  The funds were invested on behalf of wealthy individuals, principally Saudi investors.  The funds included the U.S. Tampa Management I Corp, U.S. Tampa Management II Corp, U.S. Second IRE Management Corp, Medical Equipment Leasing Partners, NCB Palm Beach Real Estate Fund and Hospitality Investment Partners.  Most of the investments were in commercial real estate, including hotels, shopping centers and apartment blocks. At least one fund intended to take advantage of the U.S. Government's Resolution Trust Corporation, set up to acquire and dispose of properties through bankruptcy proceedings following the Savings & Loan collapse of the late 1980s.   [Exhibit 4, NCB011693-698, Investment Highlights; Exhibit 5, ASH011371-11379, Resolution Trust.]

9.      These were not passive investments but were actively managed by NCB in Jeddah and SNCB in New York. [Exhibit 6, NCB000877, SNCB to Chase; Exhibit 7, NCB006649, NCB Jeddah to Riegels.]

10.      These investments were in existence before NCB's branch closure in 1992, and became an active feature of NCB's investment strategy later, as demonstrated by this excerpt from NCB's 1998 Annual Report: "We have now begun to export our expertise, as demonstrated by the first Asset-Backed Securities transaction in Egypt and a private placing of US15,000,000 on behalf of a group of Saudi investors in an American entity."  [Exhibit 8, 1998 NCB Annual Report at MR_NCB001082.]

11.     A second set of investments in the United States were NCB-managed mutual funds.  These are funds to which any large or small investor can subscribe.  There are at least eight separate NCB-managed funds that access U.S. markets for investment.  The percentage of the assets of each fund invested in the U.S. ranges from 38.7% of the al Ahli Global Bond Fund to 100% of the al Ahli U.S. Trading Equity Fund.  [Exhibit 9, ASH009269-9316, Al Ahli Funds Factsheets.]

12.     The assets of the eight funds invested in the U.S. came to approximately $400 million as of October 2003.  [Exhibit 9, ASH009269-9316, Al Ahli Funds Factsheets.][2]

13.     Management of these mutual funds was partly provided by SNCB [Affidavit of Thomas Krohley filed in support of NCB's Re-newed Motion to Dismiss, at 6] and after SNCB left, management was continued by NCB through other agents. [Exhibit 10, ASH011433, ASH011435, Failaka Islamic Fund Review 2002.]

14.     NCB has also identified its overseas operations as among its core businesses. [Exhibit 1, 1992 NCB Annual Report at MR_NCB000461.]

15.     While much of its overseas operations have been provided through NCB's various overseas offices, including at one time its New York offices, after the New York office closed, NCB emphasized that it nonetheless continued to provide the same services to its customers "in the same manner through the bank's excellent relationship maintained with its correspondent banks worldwide" – indicating the important role that NCB's correspondent relationships played for NCB.  [Exhibit 1, 1992 NCB Annual Report at MR_NCB000461.]

---

[2] This is an estimate based on figures provided by NCB.  Where a fund only specifies North America investments, as in the al Ahli Healthcare Trading Equity Fund, plaintiffs estimated the U.S. share to be 90%.

16.     Another area that NCB has identified as one of its core business areas is corporate financing, involving complex, high-value corporate transactions for which NCB facilitates financing.  The Vela International US$300 million ship acquisition project – financing the funding for construction of two very large crude carriers – is one example of a highly lucrative project wherein NCB relied on U.S. markets.  [Exhibit 1, 1992 NCB Annual Report at MR_NCB000456.]

17.     NCB also secured US$500 million funding in project financing for projects for Saudi European PetroChem.  In addition to petrochemical financing, construction financing has also been huge part of NCB's corporate banking group.  [Exhibit 1, 1992 NCB Annual Report at MR_NCB000456.]

## II.     NCB'S BUSINESS NECESSITATES CONTACTS WITH THE UNITED STATES

18.     NCB openly recognized that contacts with the US were important for its business model.  As one NCB manager has explained, "It's important to get exposed to any financial market that has the size of the U.S. market."  [Exhibit 11, Deposition of Abdelraouf Banaja, NCB Asst Gen Manager, NCB v. Morgan Stanley Asset Management, SDNY 1:94-cv-3167-DC, at PLEAD004729.]  *See also* Exhibit 12, Deposition testimony of Khalid Bin Mahfouz, May 18-19, 1992, at 63-64 [PLEAD008937-47], where Mahfouz explained his idea to merge NCB, BCCI and First American Bank under American supervision was because the bank would be stronger under American supervision, would have a better image, and reduced management costs.

19.     The importance of NCB's access to the U.S. financial system through its correspondent banking relationships is further supported by the fact that much of NCB's business requires trade in U.S. denominated currency (U.S. Dollars), requiring access to the U.S.

financial system for each of those transactions to be settled in New York.  See Exhibit 13,

Affirmation of Thomas P. Farrell, ¶¶ 22-31 ("Farrell Affirm., at __").

20.     Because NCB is one of the largest banks in petroleum-rich Saudi Arabia and

because petroleum and petroleum products are priced in U.S. Dollars (Exhibit 13, Farrell

Affirm., at ¶¶ 32-33), NCB must play a prominent role in transactions involving the petroleum

industry; and such transactions necessitate the bank having regular access to the U.S. financial

system to settle all of the U.S. Dollar transactions.  *Id*. at ¶¶ 40-43.

**III.        NCB'S BUSINESS CONTACTS IN THE U.S.**

21.     NCB does not dispute that from 1983 through August 1992, NCB had an active

bank branch in New York City that U.S. authorities ordered closed in 1992.  [See Exhibit 14,

PLEAD001081-1092, OCC Orders.]

22.     Within days after NCB was required to close its New York branch, NCB began

performing many of its financial services activities through its alter-ego SNCB subsidiary, with

offices in New York from June 1993 and active in New York State until at least late 2001.

[Exhibit 15, ASH006615-6621, SNCB Delaware Registry; Exhibit 16, NCB014332, NCB

Financial Statements 1999. ]

23.     Even after NCB ordered its SNCB offices closed, NCB continued financial,

management, and investment services activities necessitating NCB to have direct access to the

United States financial markets, thus continuing contacts with the forum forged decades earlier.

[Exhibit 3, ASH011336-11345, alahli.com online brokerage, archived April 2001-September

2002; Exhibit 9, ASH009269-9316, Al Ahli Funds Factsheets.]  Accordingly, NCB has enjoyed

continuous and systematic contacts with the United States dating back even to the early 1980's.

_____

### a. NCB Alter-Ego Subsidiary SNCB's Activities In The Forum From June 1993 Through At Least October 2001

24.     Immediately after U.S. regulators ordered the closure of NCB's New York branch in connection with its involvement in the BCCI scandal, NCB opened its SNCB office to continue to perform the investment services activities that the New York branch office had performed before its closure, activities that were not prohibited by the sanctions instituted against NCB by U.S. regulators.  As former NCB/SNCB employee Jagan Reddy explained, immediately after "NCB entered into [the] consent order with the Office of Comptroller of the Currency, severely curtailing NCB's U.S. operations … a few officers and employees of NCB became officers and employees of SNCB [and f]or all intents and purposes, SNCB began performing all of NCB's U.S. operations except those restricted by federal regulators."  [Exhibit 17, Declaration of Jagan Reddy, paragraph 4; Exhibit 16, NCB014332, SNCB Notes to Financial Statements; Exhibit 18, NCB009549, SNCB Notes to Financial Statements.]

25.     For example, at its inception, SNCB actively managed for NCB Investment Services Division five U.S.-based real estate funds (Palm Beach, IREF I, IREF II, IREF III, HIP), three other non-real estate investment funds (Medical Equipment Leasing, NCB Commodity Fund, Texas Opportunity Trust) and the legal and administrative aspects of NCB Investment Services Division's British Virgin Island-based mutual fund structure.  [Exhibit 19, NCB016240, SNCB Draft Plan of Closure]

26.     SNCB was formed, inter alia, to conduct limited activities in the U.S. for or on behalf of NCB regarding management services NCB performed for several off-shore investment funds which services were previously performed by NCB's Investment Services Division in the New York branch office.  These activities included identifying and developing investment products, helping to evaluate fund advisors, and performing administrative and clerical support

_____

services for NCB. [Exhibit 16, at NCB014332, SNCB Notes to Financial Statements; Exhibit 18, NCB009549, SNCB Notes to Financial Statements; Exhibit 20, NCB009626, SNCB Job Descriptions, ("SNCB is the main focus for development and delivery of U.S. Dollar closed-ended investment management/private placement products for the National Commercial Bank, Investment Services Division, Saudi Arabia (NCB).  The President [John K. Bouckley] is responsible for developing, evaluating and recommending products, advisors, vendors and for carefully coordinating between these parties and all entities of SNCB, LTD and IS.  In addition, SNCB is responsible for the on-going supervision (under contract from NCB) of Private Placement Funds.  In these functions, the President is assisted by a small team of investment specialists. … [The President] will be a prime contact in the U.S. for the IS for many wealthy and influential clients.  His impact on the image and success of the IS will be broad.").]

27.     Throughout the existence of the SNCB office, NCB, SNCB, and third-parties with whom they dealt regularly represented and recognized the New York office as though it was merely a branch office of the Saudi-based NCB.  [*See, e.g.,* Exhibit 21, NCB007589, Fax Pensa to Smith, (NCB describes the resources of its Investment Services Division as being comprised of 84 people in the Jeddah office, other personnel in Riyadh and Damman, as well as offices in *New York*, London, and Geneva); Exhibit 22, NCB006878, Fax NCB to GIM, (In a letter confirming details to someone who is to give a presentation at an NCB office in Jeddah, Saudi Arabia, NCB directs the recipient to "contact our respective offices in London or New York" with Visa application issues); Exhibit 23, NCB008280, Weil Realty (Letter between third-parties and copied to SNCB President Bouckley recognizing him as John Bouckley of the National Commercial Bank ("the Bank"), 33 S. 67th, New York, NY 10021.); Exhibit 24, NCB001682,

_____

HIP Executive Summary (in summary of negotiations, SNCB is identified as "New York NCB offices").]

        i.)     Common Ownership

28.    SNCB shared common ownership with NCB because, though a second-tier, it was nonetheless wholly-owned by NCB and created for the expressed purpose of performing services previously done by Investment Management Division of NCB branch in NY.  [Exhibit 16, NCB014332, SNCB Notes to Financial Statement; Exhibit 18, NCB009549, SNCB Notes to Financial Statements.]

29.    SNCB in New York was regularly referred to as NCB's office in New York. [Exhibit 21, NCB007586-9, Fax Pensa to Smith, Exhibit 22, NCB006878, Fax NCB to GIM.]

30.    SNCB officially recognized NCB's control when it declared in a U.S. tax filing that SNCB was a member of a controlled group of corporations with its controlling parent being National Commercial Bank.  [Exhibit 25, NCB015179, SNCB's 1999 tax return; Exhibit 16, NCB014332, SNCB Notes to Financial Statements..]

        ii.)    SNCB's Financial Dependency on NCB

31.    SNCB was completely reliant on NCB not only for all of its financing but also for how the revenue was spent.  Since its creation, every dollar of SNCB's revenue came from NCB through its service agreements with NCB.  [Exhibit 26, NCB015273-15293, Services Agreeement; Exhibit 27, NCB014345, Addendum to Services Agreement.]

32.    The NCB signature on the agreements was SNCB Chair, Frederik Crawford's; the SNCB signature was former NCB officer, Thomas Krohley's. [Exhibit 26, NCB015273-15293, Services Agreement, Exhibit 27, NCB014345, Addendum to Services Agreement.]

33.     Crawford and Krohley also had signatory authority over at least 26 NCB/SNCB bank accounts in the United States.  [Exhibit 28, NCB005863-76, NCB email on Directorships and Signatory Power]

34.     The agreements were last updated in March 2000 and intended to run through February 2005.  [Exhibit 27, NCB014345, Addendum to Services Agreement.]

35.     Although the agreements allowed SNCB to work for third-parties, no indication exists that SNCB ever even considered doing so.  [Exhibit 26, NCB015273-15293, Services Agreement.]

36.     The corporate overlap and NCB's financial control over SNCB was evident also in the fact that the manner in which SNCB used the revenue was dictated by NCB because NCB developed SNCB's annual budget as a component of NCB's annual budget and imposed the spending parameters on SNCB.  [Exhibit 29, NCB003690 to -3704, NCB 1997 Consolidated Budget; Exhibit 30, NCB003746 to -3749, NCB 1997 Consolidated Budget; Exhibit 31, NCB005247, -5249, -5266 to -5267, NCB emails on budget; Exhibit 32, NCB005324 to -5327, -5338, -5345, -5355 to -5256, NCB 1998 Budget; Exhibit 33, NCB009982-9987, NCB 1998 Projected Budget.]

       iii.)     NCB Interference in the selection and assignment of SNCB's executive personnel

37.     Frederik Crawford was Vice President and Director of the Investment Services Division of NCB Saudi Arabia. [Exhibit 34, NCB007441, Information as to directors; Exhibit 35, NCB006174, Bank's Executive Officers List.]  At the same time he was Chairman and a Director of SNCB with authority to appoint members of SNCB's board, as well as the sole stockholder of SNCB. [Exhibit 36, NCB006165, Stockholder's Consent] He held 69 positions on 24 NCB investment funds managed by SNCB.  [Exhibit 37, NCB006832; Directors and Officers

_____

of NCB-IS Funds.] He was also paid as an employee of SNCB from 1992-2000. [Exhibit 38, NCB016210, SNCB Employee Earnings Record.]

38.     John Bouckley and Thomas Krohley were NCB employees and subsequently President and Vice President of SNCB.[Affidavit of Thomas Krohley filed in support of NCB's Re-newed Motion to Dismiss, at 1; Exhibit 39, PLEAD014702, Affidavit of John K. Bouckley, Exhibit 40, PLEAD008942, Affidavit of Howard B. Dyson.]

39.     Simultaneously Crawford, Bouckley and Krohley were members of NCB's Investment Committee which met regularly at headquarters in Jeddah, Saudi Arabia.  Krohley chaired this committee at the time of SNCB's dissolution.  [Exhibit 19, NCB016240, SNCB Draft Plan of Closure; Exhibit 37, NCB006832, Directors and Officers of NCB-IS Funds.]

40.     Bouckley and Krohley's SNCB job descriptions specify that the performance of their duties will have a broad impact upon the image and success of NCB's Investment Services Division.  [Exhibit 20, NCB009626-32, SNCB Job Descriptions; Exhibit 19, NCB0016240, SNCB Draft Plan of Closure.]

41.     SNCB was reimbursed for part or all of the salaries and benefits of some employees by other sections of NCB.  [Exhibit 41, NCB007052, SNCB reconciliation September 30, 1996; Exhibit 42, NCB009327, SNCB recurring entries November 1999; Exhibit 43, NCB0012562, NCB email Ginger to Chow.]

42.     In the affidavit of Thomas Krohley submitted in support of NCB's renewed motion to dismiss, Krohley states, "SNCB's employees were selected by SNCB's Board of Directors, and NCB did not train or otherwise oversee the hiring of SNCB's employees." However, SNCB's directors were all coincidentally senior officers of NCB, including Krohley who sat on the NCB Investment Committee.  [Exhibit 37, NCB006832; Directors and Officers of

_____

NCB-IS Funds; Exhibit 36, NCB006165, Stockholder's Consent]  In addition, most or all SNCB

employees were former and/or current future NCB employees. [Exhibit 17, ASH006240-41,

Declaration of Jagan Reddy; Affidavit of Thomas Krohley filed in support of NCB's Re-newed

Motion to Dismiss, at 1; Exhibit 39, PLEAD014702, Affidavit of John K. Bouckley; Exhibit 40,

PLEAD008942, Affidavit of Howard B. Dyson; Exhibit 19, NCB0016240, SNCB Draft Plan of

Closure.]

> iv.)    NCB's control over the SNCB

43.    Major and minor operational decisions that NCB made for SNCB include the

following.  SNCB's choice of office space was controlled by NCB.  [Exhibit 44, NCB015816,

Fax Crawford to Krohley.]

44.    SNCB asked advice from NCB Saudi Arabia regarding SNCB's U.S. tax

obligation.  [Exhibit 44, NCB015816, Fax Crawford to Krohley; Exhibit 45, NCB011321 to -

1323, Fax Naughton to Krohley; Exhibit 46, NCB002369, Email Thomas to Jedlan.]

45.    One of the funds HIP (Hospitality Investment Program) was intended to take

advantage of US government funded program on distressed hotel properties.  [Exhibit 47,

NCB011693-96, Investment Highlights.]

46.    NCB's Real Estate Investment Committee (REIC) controlled the sale of all assets

managed by SNCB.  [Exhibit 48, NCB009141, NCB Email.]

47.    NCB in Jeddah even approved minor operational issues – *e.g*., improvements to a

swimming pool in a hotel investment in Marion, Indiana.  [Exhibit 45, NCB011321, Fax

Naughton to Krohley.]

48.    On numerous occasions, parties both within and without NCB did not

differentiate between NCB and SNCB.  [Exhibit 49, NCB011403, NCB Email Exhibit 23,

NCB008280, Weil Realty; Exhibit 50, NCB007589, NCB Resources Statement; Exhibit 22,

NCB006878, NCB to GIM; Exhibit 51, NCB001888, Thomas to Ginger IMD New York; Exhibit 52, NCB000584, Aoun to Krohley; Exhibit 53, NCB011847, NY City Commission; Exhibit 24, NCB001682, HIP Executive Summary; Exhibit 23, NCB008280, Weil Realty.]

49.     As for SNCB's activities under the service agreements with NCB, SNCB provided 'advice' to British Virgin Island (BVI) registered Trusts owned by another BVI registered second-tier subsidiary that was, in turn, owned by a third level of NCB-owned company, also registered in BVI.  [Affidavit of Thomas Krohley filed in support of NCB's Re-newed Motion to Dismiss, at 5 ; Exhibit 26, NCB015273-15293, Services Agreement.]

50.     The Trusts in turn owned fourth-level subsidiaries that were BVI limited companies.  Finally, these companies then owned the real estate investment companies in the United States that in turn invested in U.S. commercial real estate.  [Affidavit of Thomas Krohley filed in support of NCB's Re-newed Motion to Dismiss, at 5.]

51.     NCB produced in discovery no documentation showing that any business activity took place in BVI, aside from the use of a local firm to handle registration issues with BVI authorities. [Exhibit 54, NCB015294, Krohley to Parsons.]

52.     All practical business day-to-day activities relating to this nest of NCB entities took place principally in the United States. [Affidavit of Thomas Krohley filed in support of NCB's Re-newed Motion to Dismiss, at 5 ; Exhibit 26, NCB015273-15293, Services Agreement.]

**b.  SNCB's Incomplete "Closure" Left It Subject to Suit.**

53.     SNCB filed its Surrender of Authority with the New York Secretary of State on October 24, 2001.  The Certificate of Surrender of Authority of SNCB Securities Inc. was received by the New York Department of Taxation and Finance on October 12, 2001, and filed with the State of New York Department of State on October 24, 2001, filed by SNCB Securities

_____

Inc., 420 Lexington Avenue, Suite 460, New York, New York 10170.  [Exhibit 55, at

ASH006650-51, Surrender of Authority.]

54.     The events under which liability allegedly arose for this action occurred before

and on September 11, 2001.

55.     In the discovery that NCB produced regarding its alleged closure of the SNCB

office, no documentation was found indicating that SNCB or NCB provided public notice about

SNCB's closure required by Section 1007(a) of the Business Corporation Law of New York.

56.     In August 1998, in discussion with NCB as to the future of SNCB, SNCB officer

Krohley suggested to NCB/SNCB officer Crawford that if SNCB were closed NCB could

continue to operate in the U.S. from the employees' private homes.  [Exhibit 56, NCB009999-

10000, Krohley to Crawford.]

57.     As late as March 2000, NCB continued with long-term plans for maintaining

SNCB's presence in New York, evidenced by the renewed for another 5 years of its internal

service agreement and by SNCB's new five-year lease on office space in the Graybar building

near Grand Central Station. [Exhibit 57, NCB Letter to the Court of August 20, 2007, Exhibit 1,

Surrender Agreement.]

58.     But by October 2000 the situation had changed and SNCB was "directed by NCB

to terminate its activities."  [Exhibit 58, NCB016235, SNCB Financial Statement; Exhibit 59,

NCB016282, SNCB Board Resolution.]  The target date for closure was the end of the year.

59.     By the end of 2000, SNCB officers Thomas Krohley and Virginia Pensa entered

into renewable consultancy agreements to continue to work with NCB.  [Exhibit 60,

NCB016257-16266; Consultancy Contracts.]

_____

60.     Consistent with Krohley's earlier suggestion, Krohley and Pensa continued to work from their respective homes, managing the same investments, operating the same bank accounts and using the name of SNCB, continuing through at least the summer of 2001, with financial activity into the millions of dollars. [Exhibit 56, NCB009999-10000, Krohley to Crawford; Exhibit 61, NCB016194, Employers Annual Federal Unemployment Tax Form 940; Exhibit 62, NCB015567, Letter to Krohley, May 15, 2001.]

61.     The renewable consultancy agreements, coupled with the intention to continue to operate for NCB after the SNCB offices closed, indicates that NCB continued to operate similarly in the United States through the consultant agreements with Krohley or Pensa.

62.     Krohley, although based in the U.S., was simultaneously the chairman of NCB's Investment Committee in Saudi Arabia. [Exhibit 19, NCB016240, SNCB Draft Plan of Closure.]

   c.  **Both Before And Especially Since The Closing Of The SNCB Office In New York, NCB Has Performed Investment And Management Services That Establish Minimum Contacts With The U.S.**

   _NCB's Correspondent Account Agreements_

63.     The correspondent banking industry has undergone substantial changes, particularly over the course of the past decade, both in their manner of use and the U.S. regulatory regime applied to the foreign banks with correspondent agreements with U.S. financial institutions.  [Exhibit 13, Farrell Affirm., ¶¶ 10-33; Exhibit 63, Affirmation of Jimmy Gurulé, ¶¶ 6-9, 16-31 ("Gurulé Affirm., __").]

64.     Congress recognized the money laundering and terrorist financing threat to the U.S. presented by foreign banks engaging in correspondent banking activity with U.S. banks.  As a result, Congress included in the USA PATRIOT Act (Patriot Act) amendments to the U.S. Bank Secrecy Act that imposed on foreign banks with correspondent account agreements with

_____

U.S. banks a series of important new duties and obligations.  [Exhibit 63, Gurulé Affirm., ¶¶ 16, 26.]

66. Among these new duties are duties to disclose certain information to U.S. correspondent banks (31 U.S.C. § 5318(i)(2)(B)(i)), to identify a person to accept service of process for foreign records regarding correspondent accounts (31 U.S.C. § 5318(k)(3)(B)(i)), and to disclose foreign bank records regarding correspondent accounts (even if located outside of the country) upon receipt of a summons or subpoena issued by the Secretary of Treasury or the Attorney General (31 U.S.C. § 5318(k)(3)(A)(ii)).  In addition, they are afforded the benefit and protection of accessing the U.S. federal court to challenge a summons, subpoena, or a termination of its correspondent account relationship (31 U.S.C. § 5318(k)(3)(C)(iii)).  [Exhibit 63, Gurulé Affirm., ¶¶ 27-30.]

66. Modern correspondent banking industry has evolved far beyond being simply a means of international wire transfer.  [Exhibit 13, Farrell Affirm., ¶¶ 13-14.]

67. Correspondent banking has become "an integral part of the domestic and international banking systems [without which] it would often be impossible for banks to provide comprehensive nationwide and international banking services…."  [Exhibit 63, Gurulé Affirm., ¶ 6; *United States v. Davidson*, 175 Fed. Appx. 399, 402 n.2 (2d Cir. 2006) (quoting Hearings on the Role of U.S. Correspondent Banking in International Money Laundering, Subcommittee on Investigations of Senate Committee on Government Affairs (opening statements of Senator Susan M. Collins, Subcommittee Chairman), March 1, 2001, available at http://www.senate.gov/tildegovt-aff/030101_collins.htm (visited March 22, 2006)).

68. In 2001, a Congressional study of the correspondent banking industry characterized it as enabling foreign banks "to conduct business and provide services for their

_____

customers in jurisdictions where the banks have no physical presence. … By establishing such a relationship, the foreign bank … can receive many or all of the services offered by the U.S. bank…."  [Exhibit 64, United States Senate, Permanent Subcommittee on Investigations, Committee on Governmental Affairs, Minority Staff of the Permanent Subcommittee on Investigations Report on Correspondent Banking: A Gateway For Money Laundering (Feb. 5, 2001), at 11 [Hereinafter Subcommittee Report on Correspondent Banking].

69.     By entering into correspondent agreements foreign banks like NCB have "direct access to the U.S. financial system," to "conduct business in U.S. markets" and offer an array of services that would not have been otherwise available to the foreign bank or its customers. [Exhibit 64, Subcommittee Report on Correspondent Banking, at 1, 11.]

70.     Among the financial services foreign banks provide through correspondent agreements are interest-bearing or on demand deposit accounts in multiple currencies (including U.S. dollar), international wire transfers of funds, check clearing, payable through accounts, pouch activities, foreign exchange services, overnight investment accounts, and loans and letters of credit.  .  [Exhibit 13, Farrell Affirm., ¶¶ 15; Exhibit 63, Gurulé Affirm., ¶¶ 7.]

71.     In addition to those services, as part of their correspondent agreements, foreign banks like NCB are also able to access and offer an additional array of investment services otherwise unavailable, such as money market accounts, overnight investment accounts, certificates of deposit, securities trading accounts, and other accounts bearing higher return rates. (Exhibit 63, Gurulé Affirm., ¶ 7; Exhibit 64, Subcommittee Report on Correspondent Banking, at 12.]

72.     Many of these services are precisely the services NCB identified as among those offered as part of its core financial, investment, and management services. [Exhibit 1, NCB 1992

17

_____

NCB Annual Report at MR_NCB000441, -447, -448 to -461; Exhibit 2, 1996 NCB Annual

Report at MR_NCB000956.]

73.     NCB specifically acknowledged accessing both national and international

investment services, including money market and mutual funds, investment trusts, bonds,

equities, trade finances, commodities, real estate, and currency funds.  [Exhibit 1, 1992 NCB

Annual Report at MR_NCB000457.]

74.     Similarly, in NCB's brokerage customer agreement NCB recognizes that it uses

correspondent services for its international brokerage services.  [Exhibit 65, Al-Ahli Brokerage

Customer Agreement.]

75.     After NCB's New York office closed, NCB emphasized that the same services

that were previously available through the New York office would continue to be made available

"in the same manner through the bank's excellent relationship maintained with its correspondent

banks worldwide."  [Exhibit 1, 1992 NCB Annual Report at MR_NCB000461.]

76.     NCB sought to increase its use of correspondent relationships significantly to

become the largest provider of correspondent banking services in Saudi Arabia.  [Exhibit 2, 1996

NCB Annual Report, at NCB000959.]

77.     NCB maintains at least 17 correspondent accounts with at least 11 U.S. banks

[Exhibit 66, NCB000001, Nostro Accounts; with at least four of the correspondent accounts

opened between 1998 and 2001, corresponding with the expansion of NCB's business in the

United States, and all seventeen were active on August 15, 2002. [Exhibit 66, NCB000001,

Nostro Accounts.]

78.     NCB has used the accounts both to provide services to customers and also for

NCB's own purposes.  For example, one account at Chase Manhattan Bank in New York shows

hundreds of millions of dollars flowing through the account from funds generated by NCB

investments in the United States managed by NCB's subsidiary SNCB.  Rather than being

delineated for NCB customer use, this account was apparently used for NCB's own purpose of

transferring funds from the U.S.-based investments to NCB accounts in Saudi Arabia.  [Exhibit

67, NCB007739, Transfer via correspondent account; Exhibit 68, NCB014743, Transfer via

correspondent account 2000.]

79.     NCB's objection to the discovery – i.e., that the discovery seeks "potentially

*millions of pages of documents"* – reveals just how extensive NCB's use of correspondent

account agreements was. [Exhibit 69, Selection from Objections And Responses Of The National

Commercial Bank To Plaintiffs' First Set Of Requests For Production Of Documents, September

22, 2006. Emphasis Added.]

80.     Although plaintiffs have been denied access to all but a small percentage of

NCB's correspondent account documents, those accessed reveal that the one account at Chase

Manhattan Bank that NCB used for itself was also used for a 1998 transfer to Nabil Sayadi, the

head of Treasury-designated entity Global Relief Foundation's Belgian office who was also

designated individually for his support of al Qaeda.  [Exhibit 70, MR_NCB000548, NCB

transfer to Nabil Sayadi; Exhibit 71, Treasury Designations]

### *NCB's Interactive Website Services*

81.     NCB has a highly interactive website, available at http://www.alahli.com/

("NCB's website").  [Exhibit 72, Al Ahli Interactive Website; Exhibit 3, ASH011336-345, Al

Ahli Online Brokerage]

82.     NCB's website functions as an "interactive" website because it permits "the

exchange of information."  The website presents in English, and through various pages on the

website visitors are able not only to communicate with NCB, but also to apply for and manage accounts and investment services.  *Id.*

83.     Although it is no surprise that most of the visitors to NCB's website are from Saudi Arabia (particularly because NCB touts itself as "the most prominent bank in Saudi Arabia), the percentage of website visitors from the United States is only fourth, behind Saudi Arabia, Canada, and Syria, indicating that access to the website from the U.S. is more than casual.  [Exhibit 73, selection from www.alexa.com/siteinfo/alahli.com.]

*NCB's Corporate Banking Services*

84.     Other examples of one of NCB's core businesses – Corporate Banking Services – doing business in the United States in a continuous, permanent, and substantial manner include the following:

- Since 1992, NCB has made multiple loans to U.S. corporations. To protect its investments NCB has also made use of U.S. Uniform Commercial Code (UCC) filings.  For example, on December 18, 1992, it filed a UCC filing in New York, where the debtor was Medical Equipment Leasing Partners; on February 14, 1994 and again on March 28, 2000, it filed others in Indiana, where the debtor was Marion Hospitality.  [Exhibit 74, ASH009322-9367, UCC Exhibits.]

- In its 1992 annual report, as the main example of its Corporate Banking Services, NCB wrote: "NCB acted as the Arranger, Lead Manager, and Agent for a U.S. $300-million Ship Acquisition Financing for Vela International Marine Ltd. ( a wholly owned subsidiary of Aramco), NCB assisted in funding the construction of three Very Large Crude Carriers."  [Exhibit 1, 1992 NCB Annual Report, at MR_NCB000455.]  NCB made these loans to a U.S. based corporation.  [Exhibit 75, MR_NCB000733.]  Ten years later, in October, 2002 NCB was still financing Vela International Marine.  [Exhibit 74, ASH009335-9362, UCC Exhibits.]

- Prior to 2003, NCB provided Letter of Credit funding to Dow Chemical.  [Exhibit 76, ASH009404, Union Carbide 10-Q, May 2, 2003.]  NCB provided the financing for a business deal which would buy rice in the United Sates, re-package it in Syria and sell it in Saudi Arabia. [Exhibit 77, ASH011496, FT article, Dec. 12, 2003.]

_____

### d. NCB Has Had Longstanding Ties to the U.S. Through Activities of its Aviation Department.

85.     NCB had a division within the bank that conducted aviation business.  [Exhibit 78, Affidavit of Robert T. Haefele filed August 15, 2008 (Docket Entry # 2122) ("Haefele Affidavit"), at Exhibits 5, 6 to Haefele Affidavit.][3]

86.     NCB's aviation division conducted its aviation business under the various banners of NCB Aviation Division, Skyways International, and Mid East Jet.  [Exhibit 78, Haefele Affidavit, at Exhibits 5, 9 – 13, and 17 to Haefele Affidavit.]

87.     Cross-referencing multiple sources, shows that NCB Aviation Division operated as Skyways International and Mid East Jet at the same locations, using the same facilities, resources, and employees, and providing the same aviation services.  Recognizing that the three entities are the same leads to the conclusion that, under the banner of Skyways International and Mid East Jet, NCB Aviation Division consistently conducted business in the United States during the relevant time period.  [Exhibit 78, Haefele Affidavit, at Exhibits 14-21 to Haefele Affidavit.]

88.     One exhibit evidencing the existence of NCB's Aviation Department is the business card of a "flight engineer" indicating employment by "The National Commercial Bank" in its "Aviation Department."  [Exhibit 78, Haefele Affidavit, at Exhibit 5 to Haefele Affidavit (NCB Aviation Department—Skyways International Business Card).]  The existence of NCB's aviation department is further corroborated as late as January 2008, when Saudi Arabian Airlines listed "NCB Aviation" as being a private domestic client.  [Exhibit 78, Haefele Affidavit, at Exhibit 6 to Haefele Affidavit (Saudi Arabian Airlines archived website

_____

[3]     The Haefele Affidavit regarding the NCB Aviation dispute and attached exhibits were filed on August 15, 2008 in support of the motion to stay NCB's renewed motion to dismiss. Docket Entry #2122.  Said documents are incorporated herein by reference.

_____

(http://web.archive.org/web/20080116014739/www.saudiairlines.com/catering/airlinesserved.jsp
) (January 16, 2008).]

89.     Once the website was identified, it has thereafter reconfigured, replacing the NCB
Aviation references with Mid-East Jet references. [Exhibit 79, Saudi Arabian Airlines Mideast
Jet.]

90.     The NCB Aviation business card also indicates that NCB Aviation used the name
"Skyways International" in its aviation operations.  [Exhibit 78, Haefele Affidavit, at Exhibit 5 to
Haefele Affidavit (NCB Aviation Department—Skyways International Business Card).]

91.     Skyways International was an Austin, Texas-based aviation company, once
chaired by Lawrence G. Smith, who was at the same time Executive Vice-President of NCB and
advisor to then-NCB-chairman Khalid bin Mahfouz.  [Exhibit 78, Haefele Affidavit, at Exhibit 7
to Haefele Affidavit (Skyway International Registration, Texas Secretary of State, 2003) and
Exhibit 8 to Haefele Affidavit (Transcript of Lawrence G. Smith 7/27/07 Deposition, at 133:11-
15).]

92.     Other exhibits corroborate that NCB Aviation and Skyways are the same.  Exhibit
78, Haefele Affidavit, at Exhibit 17 to Haefele Affidavit is a facsimile transmittal from "NCB
Aviation/Skyways," from the same fax number indicated on the NCB Aviation Division business
card (682-4827).  The fax is a confirmation from NCB Aviation confirming hotel registration for
various NCB Aviation crew members.

93.     Exhibit 78, Haefele Affidavit, at Exhibit 12 to Haefele Affidavit shows the same
address from the NCB Aviation Department – Skyways International business card again
identified with Skyways International on a credit card receipt of a Skyways International
employee in September 2002.  Exhibit 78, Haefele Affidavit, at Exhibit 12 to Haefele Affidavit

_____

(September 1, 2002 Hotel Receipt of Muhammad Tahsin).  In a series of documents indicating

hotel stays at a Paris hotel in 2001 and 2002, Mr. Tahsin is identified as a Skyways International

employee.  On one receipt for a stay in September 2002, the same address indicated for NCB

Aviation Department is identified for Skyways International – namely, P.O. Box 9935, Jeddah,

Saudi Arabia.  *Id*.

94.     The exhibits show that the NCB Aviation Department also operated as Mid East

Jet ("MEJ").  Exhibit 78, Haefele Affidavit, at Exhibit 10 to Haefele Affidavit, for example,

shows MEJ operated from the same post office box address (P.O. Box 9935, Jeddah 21423,

Saudi Arabia) identified on the NCB Aviation Division/Skyways business card and on the hotel

receipt.  [Compare Exhibit 78, Haefele Affidavit, at Exhibits 5 and 12 to Haefele Affidavit.]

95.     In addition to MEJ's street address being listed at the NCB Building, Al Khaldiah,

Prince Abdullah Street, Jeddah, Saudi Arabia; and in addition to former NCB chairman and

majority shareholder Khalid bin Mahfouz[4] also being identified as the Chairman and Chief

Executive Officer of Mid East Jet, the exhibits also identify Nadeem Farouki (a/k/a Nadim

Farouki) as the General Manager and Operation Manager of MEJ.  [Exhibit 78, Haefele

Affidavit, at Exhibit 9 to Haefele Affidavit.(Dun & Bradstreet WorldBase Report of Mid East

Jet, October 30, 2003), Exhibit 10 to Haefele Affidavit (ICP Update dated October 26, 2005),

and 11 to Haefele Affidavit (Dun & Bradstreet WorldBase Report of Mid East Jet, June 10,

2005).]

96.      In addition to being identified with MEJ, Farouki's name also shows in the fax

header (as Ndeem Farooqui) of correspondence from an NCB Aviation representative,

_____

[4]     Bin Mahfouz, now deceased, was also a defendant in this case, who Plaintiffs contend the
Saudi government ousted from NCB chairmanship after an investigation concluded he was
supporting Osama bin Laden.

_____

representing that the NCB's Aviation Department is located on the Third Floor of the NCB

Khalidiyah Branch Building, Prince Abdullah Street, District Khaldiyah, P.O. Box 9935, Jeddah

21423, Saudi Arabia – the same P.O. Box location and the same street address where Mr.

Farouki was identified as working as the General and Operating Manager for MEJ.  [Exhibit 78,

Haefele Affidavit, at Exhibit 13 to Haefele Affidavit.]

　　　　97.　　　Acting under its MEJ and Skyways names, the NCB Aviation Division has been

operating in the United States.  Exhibit 78, Haefele Affidavit, at Exhibit 14 to Haefele Affidavit

includes excerpts from the United States Federal Aviation Administration's database of U.S.

Reduced Vertical Separation Minimum (RVSM) Approvals, as of January 2008, which indicate

that at least six MEJ aircraft were approved or successfully monitored by the FAA in recent

years.  [Exhibit 78, Haefele Affidavit, at Exhibit 14 to Haefele Affidavit (Excerpts of U.S.

RVSM Approvals, January 18, 2008, pages 1, 8 and 9).]

　　　　98.　　　Exhibit 78, Haefele Affidavit, at Exhibit 15 to Haefele Affidavit includes excerpts

from FAA Flight Tracking Data of flights with tail numbers of the NCB aircraft, showing more

than 130 flights into United States airspace between 2000 and 2002.  [Exhibit 78, Haefele

Affidavit, at Exhibit 15 to Haefele Affidavit (excerpts of FAA Flight Tracking Data).]

　　　　99.　　　Other exhibits show that Skyways International pilots have been U.S. residents

with FAA certifications.  For example, Keith Monroe, a National Commercial Bank Aviation

Department flight engineer [Exhibit 78, Haefele Affidavit, at Exhibit 5 to Haefele Affidavit

(NCB Aviation Department business card)], resided in the United States and was registered and

certified by the FAA.  [Exhibit 78, Haefele Affidavit, at Exhibit 16 to Haefele Affidavit (Monroe

FAA certification).]

_____

100.    Other Skyways International employees were similarly registered and/or certified by the FAA.  [See, e.g., Exhibit 78, Haefele Affidavit, at Exhibit 17 to Haefele Affidavit (February 18, 1998 facsimile transmittal of NCB Aviation identifying list of NCB Aviation crew, including "Buddy" Rogers and Johnny Antoon); Exhibit 18 to Haefele Affidavit (Rogers FAA Registration), and Exhibit 19 to Haefele Affidavit (Antoon FAA certification).]

101.    In addition, the FAA registered Skyway International employee Muhammad Tahsin at the Jeddah, Saudi Arabia address of MEJ (P.O. Box 9935, Jeddah, Saudi Arabia) and certified him.  [Exhibit 78, Haefele Affidavit, at Exhibit 20 to Haefele Affidavit (Tahsin FAA certification).]

102.    Skyways International employee Tahsin was also identified in December 2002, by the U.S. Customs Service to French authorities as being suspected of having provided financially support to Ahmed al Ghamdi, one of the September 11, 2001 hijackers.  [Exhibit 78, Haefele Affidavit, at Exhibit 21 to Haefele Affidavit (U.S. Customs December 30, 2002 correspondence).]

103.    Rather than considering a single source, the totality of the documents offered indicates that NCB Aviation is part of NCB.

104.    The business card identifies the business as a division of NCB bank, including the bank's logo and type-set.  [Exhibit 78, Haefele Affidavit, at Exhibit 5 to Haefele Affidavit.]

105.    All of the interconnections among the addresses, post office boxes, employees, and officers, suggest nothing contrary to the plain language interpretation that the NCB Aviation Division is, indeed, a division of NCB Bank.  Moreover, the various facsimile covers, including one from MEJ general and operating manager Farouki, represent that the Aviation Department is

_____

part of The National Commercial Bank.  [See, *e.g*., Exhibit 78, Haefele Affidavit, at Exhibit 13,

17 to Haefele Affidavit.]

Respectfully submitted,

PLAINTIFFS' EXECUTIVE COMMITTEES


Date:  April 23, 2010                    BY:    _____/s/_____
                                                Robert T. Haefele

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (GBD)<br>ECF Case |

**DECLARATION OF ROBERT T. HAEFELE TRANSMITTING DOCUMENTS AND EVIDENCE IN OPPOSITION TO THE RENEWED MOTION TO DISMISS OF NATIONAL COMMERCIAL BANK**

Robert T. Haefele, Esq., affirms as follows:

1.      I am an attorney admitted to practice *pro hac vice* in the above-captioned matter, and associated with the law firm Motley Rice LLC.  I submit this Declaration to transmit to the Court the following documents and evidence submitted in Opposition to the Renewed Motion to Dismiss of National Commercial Bank and referenced in Plaintiffs' Factual Averment.

- Attached as Exhibit 1 is a true and accurate copy of the National Commercial Bank's 1992 Annual Report, bates numbered MR NCB000439-492;

- Attached as Exhibit 2 is a true and accurate copy of the National Commercial Bank's 1996 Annual Report, bates numbered MR_NCB000939-979;

- Attached as Exhibit 3 is a true and accurate copy of alahli.com online brokerage, archived April 2001-September 2002, bates numbered ASH011336-11345;

- Attached as Exhibit 4 is a true and accurate copy of Investment Highlights, bates numbered NCB011693-698;

- Attached as Exhibit 5 is a true and accurate copy of Resolution Trust, bates numbered ASH011371-11379;

- Attached as Exhibit 6 is a true and accurate copy of SNCB to Chase, bates numbered NCB000877;

- Attached as Exhibit 7 is a true and accurate copy of NCB Jeddah to Riegels, bates numbered NCB006649;

- Attached as Exhibit 8 is a true and accurate copy of 1998 NCB Annual Report, bates numbered MR NCB001072-1171;

- Attached as Exhibit 9 is a true and accurate copy of Al Ahli Funds Factsheets, bates numbered ASH009269-9316;

- Attached as Exhibit 10 is a true and accurate copy of Failaka Islamic Fund Review 2002, bates numbered ASH011406-11495;

- Attached as Exhibit 11 is a true and accurate copy of Deposition of Abdelraouf Banaja, NCB Asst Gen Manager, NCB v. Morgan Stanley Asset Management, SDNY 1:94-cv-3167-DC, bates numbered PLEAD004693-4855;

- Attached as Exhibit 12 is a true and accurate copy of Deposition testimony of Khalid Bin Mahfouz, May 18-19, 1992, at 63-64, bates numbered PLEAD008937-8947;

- Attached as Exhibit 13 is a true and accurate copy of the Affidavit of Thomas P. Farrell;

- Attached as Exhibit 14 is a true and accurate copy of the Office of Comptroller of the Currency Orders, bates numbered PLEAD001081-1092;

- Attached as Exhibit 15 is a true and accurate copy of SNCB Delaware Registry, bates numbered ASH006615-6621;

- Attached as Exhibit 16 is a true and accurate copy of, SNCB Notes to Financial Statements, bates numbered NCB014332;

- Attached as Exhibit 17 is a true and accurate copy of the Declaration of Jagan Reddy, bates numbered ASH006240-41;

- Attached as Exhibit 18 is a true and accurate copy of SNCB Notes to Financial Statements, bates numbered NCB009549;

- Attached as Exhibit 19 is a true and accurate copy of SNCB Draft Plan of Closure, bates numbered NCB016240;

- Attached as Exhibit 20 is a true and accurate copy of SNCB Job Descriptions, bates numbered NCB009626-32;

- Attached as Exhibit 21 is a true and accurate copy of a fax from Pensa to Smith, bates numbered NCB007586-9;

- Attached as Exhibit 22 is a true and accurate copy of a fax from NCB to GIM, bates numbered NCB006878;

- Attached as Exhibit 23 is a true and accurate copy of a Weil Realty letter, bates numbered NCB008280

- Attached as Exhibit 24 is a true and accurate copy of HIP Executive Summary, bates numbered NCB001682;

- Attached as Exhibit 25 is a true and accurate copy of SNCB 1999 tax return, bates numbered NCB015179;

- Attached as Exhibit 26 is a true and accurate copy of Services Agreement, bates numbered NCB015273-15293;

- Attached as Exhibit 27 is a true and accurate copy of Addendum to Services Agreement, bates numbered NCB014345;

- Exhibit 28 is a true and accurate copy of NCB email on Directorships and Signatory Power, bates numbered NCB005863-76;

- Attached as Exhibit 29 is a true and accurate copy of NCB 1997 Consolidated Budget, bates numbered NCB003690-3704;

- Attached as Exhibit 30 is a true and accurate copy of NCB 1997 Consolidated Budget, bates numbered NCB003746-49;

- Attached as Exhibit 31 is a true and accurate copy of NCB emails on budget, bates numbered NCB005247-67;

- Attached as Exhibit 32 is a true and accurate copy of NCB 1998 Budget, bates numbered NCB005324-56;

- Attached as Exhibit 33 is a true and accurate copy of NCB 1998 Projected Budget, bates numbered NCB009982-9987;

- Attached as Exhibit 34 is a true and accurate copy of Information as to directors, bates numbered NCB007441;

- Attached as Exhibit 35 is a true and accurate copy of Bank's Executive Officers List, bates numbered NCB006174;

- Attached as Exhibit 36 is a true and accurate copy of Stockholder's Consent, bates numbered NCB006165;

- Attached as Exhibit 37 is a true and accurate copy of Directors and Officers of NCB-IS Funds, bates numbered NCB006832;

- Attached as Exhibit 38 is a true and accurate copy of SNCB Employee Earnings Record, bates numbered NCB016210;

- Attached as Exhibit 39 is a true and accurate copy of the Affidavit of John K. Bouckley, bates numbered PLEAD014702;

- Attached as Exhibit 40 is a true and accurate copy of the Affidavit of Howard B. Dyson, bates numbered PLEAD008942;

- Attached as Exhibit 41 is a true and accurate copy of SNCB reconciliation September 30, 1996, bates numbered NCB007052;

- Attached as Exhibit 42 is a true and accurate copy of SNCB Recurring Entries November 1999, bates numbered NCB009327;

- Attached as Exhibit 43 is a true and accurate copy of NCB email Ginger to Chow, bates numbered NCB0012562;

- Attached as Exhibit 44 is a true and accurate copy of a fax from Crawford to Krohley, bates numbered NCB015816;

- Attached as Exhibit 45 is a true and accurate copy of a fax from Naughton to Krohley, bates numbered NCB011321-1323

- Attached as Exhibit 46 is a true and accurate copy of an email from Thomas to Jedlan, bates numbered NCB002369;

- Attached as Exhibit 47 is a true and accurate copy of Investment Highlights, bates numbered NCB011693-96;

- Attached as Exhibit 48 is a true and accurate copy of NCB email, bates numbered NCB009132-44;

- Attached as Exhibit 49 is a true and accurate copy of NCB email, bates numbered NCB011403;

- Attached as Exhibit 50 is a true and accurate copy of NCB Resources Statement, bates numbered NCB007589;

- Attached as Exhibit 51 is a true and accurate copy of Thomas to Ginger IMD New York, NCB001888

- Attached as Exhibit 52 is a true and accurate copy of Aoun to Krohley, bates numbered NCB000584;

- Attached as Exhibit 53 is a true and accurate copy of New York City Commission, bates numbered NCB011847;

- Attached as Exhibit 54 is a true and accurate copy of Krohley to Parsons, bates numbered NCB015294;

- Attached as Exhibit 55 is a true and accurate copy of Certificate of Surrender, bates numbered ASH006650-51;Attached as is a true and accurate copy of Krohley to Crawford, bates numbered NCB009999-10000;

- Attached as Exhibit 57 is a true and accurate copy of NCB Letter to the Court of August 20, 2007;

- Attached as Exhibit 58 is a true and accurate copy of  SNCB Financial Statement, bates numbered NCB016235;

- Attached as Exhibit 59 is a true and accurate copy of SNCB Board Resolution, bates numbered NCB016282;

- Attached as Exhibit 60 is a true and accurate copy of Consultancy Contracts, bates numbered NCB016257-16266;

- Attached as Exhibit 61 is a true and accurate copy of Employers Annual Federal Unemployment Tax Form 940, bates numbered NCB016194;

- Attached as Exhibit 62 is a true and accurate copy of Letter to Krohley, May 15, 2001, bates numbered NCB015567

- Attached as Exhibit 63 is a true and accurate copy of Affirmation of Jimmy Gurulé;

- Attached as Exhibit 64 is a true and accurate copy of United States Senate, Permanent Subcommittee on Investigations, Committee on Governmental Affairs, Minority Staff of the Permanent Subcommittee on Investigations Report on Correspondent Banking: A Gateway For Money Laundering (Feb. 5, 2001);

- Attached as Exhibit 65 is a true and accurate copy of, Al-Ahli Brokerage Customer Agreement;

- Attached as Exhibit 66 is a true and accurate copy of Nostro Accounts, bates numbered NCB000001;

- Attached as Exhibit 67 is a true and accurate copy of Transfer via correspondent account 1997, bates numbered NCB007739;

- Attached as Exhibit 68 is a true and accurate copy of Transfer via correspondent account 2000, bates numbered NCB014743;

- Attached as Exhibit 69 is a true and accurate copy of Selection from Objections and Responses of the National Commercial Bank to Plaintiffs' First Set of Requests for Production of Documents, September 22, 2006;

- Attached as Exhibit 70 is a true and accurate copy of NCB transfer to Nabil Sayadi, bates numbered MR NCB000548;

- Attached as Exhibit 71 is a true and accurate copy of Treasury Designations;

- Attached as Exhibit 72 is a true and accurate copy of Al Ahli Interactive Website;

- Attached as Exhibit 73 is a true and accurate copy of a printout from www.alexa.com/siteinto/alahli.com;

- Attached as Exhibit 74 is a true and accurate copy of UCC Exhibits, bates numbered ASH009322-9367

- Attached as Exhibit 75 is a true and accurate copy of UCC Vela, bates numbered MR NCB000733;

- Attached as Exhibit 76 is a true and accurate copy of Union Carbide 10-Q, May 2, 2003, bates numbered ASH009404;

- Attached as Exhibit 77 is a true and accurate copy of Financial Times article, Dec. 12, 2003, bates numbered ASH011496;

- Attached as Exhibit 78 is a true and accurate copy of Affidavit of Robert T. Haefele filed August 15, 2008 (Docket Entry # 2122), with exhibits 1-21, and

- Attached as Exhibit 79 is a true and accurate copy of a printout regarding Saudi Arabian Airlines Mideast Jet.

2.      I declare under penalty of perjury that the foregoing is true and correct, based on

my knowledge, information and belief.

Executed on April 23, 2010,

Mount Pleasant, South Carolina


_____**/S/**_____

Robert T. Haefele