**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE TERRORIST ATTACKS ON SEPTEMBER 11, 2001

03 MDL 1570 (GBD)
ECF Case

*This document relates to:*

*All Cases*

# PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO RENEWED MOTION TO DISMISS OF DEFENDANT NATIONAL COMMERCIAL BANK FOR LACK OF PERSONAL JURISDICTION

April 23, 2010

# TABLE OF CONTENTS

*Page*

INTRODUCTION ................................................................................................................. 1

I. PLAINTIFFS NEED MAKE ONLY A *PRIMA FACIE* SHOWING OF JURISDICTION .............. 2

    A. Plaintiffs Have Not Been Given the Opportunity to Take Jurisdictional Discovery with Respect to Specific Jurisdiction .......................................... 3

    B. Until the Court Holds an Evidentiary Hearing, a Plaintiff Need Make Only a *Prima Facie* Showing of Jurisdiction ................................................. 8

II. NCB IS SUBJECT TO PERSONAL JURISDICTION IN THE UNITED STATES BECAUSE IT WAS PROPERLY SERVED ........................................................................................ 11

    A. NCB Has Conceded That It Was Properly Served Pursuant to Statutory Authority .................................................................................................... 11

    B. NCB May Not Claim Due Process Protections ......................................... 12

    C. This Court Cannot Consider NCB's Jurisdictional Defense Without First Determining, and Permitting Discovery Into, NCB's Relationship to the Kingdom of Saudi Arabia ................................................................. 15

III. PLAINTIFFS' ALLEGATIONS ARE SUFFICIENT TO MAKE A *PRIMA FACIE* SHOWING THAT NCB HAS ESTABLISHED "MINIMUM CONTACTS" WITH THE UNITED STATES ARISING FROM THE SPECIFIC ACTS AT ISSUE IN THIS CASE ..................................... 16

    A. Foreign Sponsors of al Qaeda Direct Their Conduct at the United States and Should Reasonably Anticipate Being Haled Into Court Here in Connection with al Qaeda's Terrorist Acts ................................................. 16

    B. The Second Circuit's Due Process Ruling in *Terrorist Attacks III* Does Not Require a Showing that the Defendant Directly Participated in the September 11th Attacks ............................................................................. 18

    C. NCB's Deliberate Targeting of the United States Subjects it to Personal Jurisdiction in the United States in Connection with the September 11 Terrorist Attacks ..................................................................................... 24

    D. NCB's Contention That NCB's Most Senior Officials Were Acting Outside the Scope of Their Employment With NCB is Baseless .............. 26

    E. NCB's Claim That Al Kadi Was Not an Employee of NCB is Contradicted By Al Kadi's Own Statements and Irrelevant to the Present Jurisdictional Inquiry .................................................................. 29

i

IV.    PLAINTIFFS' FACTUAL AVERMENT IS SUFFICIENT TO MAKE A *PRIMA FACIE* SHOWING
       THAT NCB HAS MAINTAINED "CONTINUOUS AND SYSTEMATIC" CONTACTS" WITH
       THE UNITED STATES SUCH THAT IT IS SUBJECT TO GENERAL JURISDICTION .......... 31

       A.    NCB Is Subject to Jurisdiction Based on the Totally of Its Activities in
             the United States, Regardless of Whether or Not It Maintained a
             Physical Presence Here ............................................................................. 31

       B.    The Totality of NCB's Activities in the United States Is Sufficient to
             Subject it to General Jurisdiction Here ...................................................... 33

             1.    *NCB's Correspondent Account Agreements* .................................. 34

             2.    *NCB's Corporate Banking Services* ............................................... 39

             3.    *NCB's Interactive Website Services* ............................................... 40

             4.    *Activities Carried Out by SNCB* ..................................................... 41

                   (a)    SNCB's Activities Are Attributable to NCB .................... 41

                   (b)    SNCB Was Not Properly Closed and Continued to
                          Operate Through the Time this Action was Commenced .. 45

             5.    *NCB Has Had Longstanding Ties to the U.S. Through Activities
                   of its Aviation Department.* ........................................................... 47

V.     THE EXERCISE OF JURISDICTION OVER NCB COMPORTS WITH "FAIR PLAY AND
       SUBSTANTIAL JUSTICE" ......................................................................................... 48

VI.    PLAINTIFFS SHOULD BE PERMITTED ADDITIONAL JURISDICTIONAL DISCOVERY ..... 50

CONCLUSION ...................................................................................................................... 50

CERTIFICATE OF SERVICE ................................................................................................. 52

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*32 County Sovereignty Comm. v. Dep't of State*,
    292 F.3d 797 (D.C. Cir. 2002) ................................................................................. 13

*A.I. Trade Fin., Inc. v. Petra Bank*,
    989 F.2d 76 (2d Cir. 1993) ...................................................................................... 7

*Alliance for Environmental Renewal, Inc. v. Pyramid Crossgates Co.*,
    436 F.3d 82 (2d Cir. 2006) .................................................................................... 10

*Allojet PLC v. Vantage Associates*,
    2005 WL 612848, No. 04 Civ. 05223 (March 15, 2005, S.D.N.Y.) ........................... 40

*Almog v. Arab Bank, PLC*,
    471 F. Supp. 2d 257 (E.D.N.Y. 2007) ...................................................................... 28

*Amigo Foods Corp. v. Marine Midland Bank-New York*,
    39 N.Y.2d 391 (1976) ............................................................................................ 36

*Arbelaez v. Newcomb*,
    C.A No. 00-5217, 2001 WL 500337 (D.C. Cir. Jan. 18, 2001) .................................. 13

*Asto v. Mirandona*,
    372 F. Supp. 2d 702 (E.D.N.Y. 2005) ...................................................................... 27

*Baker v. Socialist People's Libyan Arab Jamahiriya*,
    Civ. No. 03-749, slip op. 11 (D.D.C. June 30, 2005) ............................................... 12

*Ball v. Metallurgie Hoboken-Overpelt, S.A.*,
    902 F.2d 194 (2d Cir. 1990) .............................................................................. passim

*Boim v. Holy Land Foundation for Relief and Development*,
    549 F.3d 685 (7th Cir. 2008) (*en banc*) ............................................................. passim

*Boim v. Quranic Literacy Inst.*,
    291 F.3d 1000 (7th Cir. 2002) .......................................................................... 29, 30

*Boit v. Gar-Tec Products, Inc.*,
    967 F.2d 671 (1st Cir. 1992) .................................................................................. 10

*Burger King Corp. v. Rudzewicz*,
    471 U.S. 462 (1985) ................................................................................ 17, 32, 48

*Burnett v. Al Baraka Inv. & Dev. Corp.*,
274 F. Supp. 2d 86 (D.D.C. 2003) ("*Burnett I*")....................................................................4, 11

*Calder v. Jones*,
465 U.S. 783 (1984)........................................................................................17, 18, 19, 25

*Careau Group v. United Farm Workers of America*,
940 F.2d 1291 (9th Cir. 1991) .........................................................................................10

*Center v. Hampton Affiliates, Inc.*,
66 N.Y.2d 782, 488 N.E.2d 828, 497 N.Y.S.2d 898 (1985) ........................................28

*Colson Services Corp. v. Bank of Baltimore*,
712 F. Supp. 28 (S.D.N.Y. 1989) ....................................................................................36

*Cutco Industries, Inc. v. Naughton*,
806 F.2d 361 (2d Cir. 1986) .............................................................................................10

*D. Klein & Son, Inc. v. Good Decision, Inc.*,
No. 04-1994, 2005 U.S. App. LEXIS 2764 (2d Cir. Feb. 15, 2005)...........................42

*Daliberti v. Republic of Iraq*,
97 F. Supp. 2d 38 (D.D.C. 2000).....................................................................................18

*Davis v. Blige*,
505 F.3d 90 (2d Cir. 2007) ................................................................................................9

*DiStefano v. Carozzi N. Am., Inc.*,
286 F.3d 81 (2d Cir. 2001) ................................................................................................7

*EEOC v. Die Fliedermaus, L.L.C.*,
77 F. Supp. 2d 460 (S.D.N.Y. 1999) ...............................................................................27

*Ehrlich-Bober & Co. v. University of Houston*,
49 N.Y.2d 574 (1980).......................................................................................................36

*First Nat. City Bank v. Banco Para el Comercio Exterior De Cuba*,
462 U.S. 611 (1983) ("*Bancec*") .....................................................................................14

*Flatow v. Islamic Republic of Iran*,
999 F. Supp. 1 (D.D.C. 1998)...........................................................................................49

*Flute, Inc. v. Rubel*,
682 F. Supp. 184 (S.D.N.Y. 1988) ..................................................................................45

*Frontera Resources Azerbaijan Corp. v. State Oil Company of the Azerbaijan Republic*,
582 F.3d 393 (2d Cir. 2009) .........................................................................13, 14, 15, 16

*Goldberg v. UBS AG,*
    660 F. Supp. 2d 410 (E.D.N.Y. 2009) ................................................................29

*Golodner v. Quessant Inc.,*
    2007 U.S. Dist. LEXIS 72948 (S.D.N.Y. Sept. 27, 2007) ...................................27

*Hamm v. United States,*
    439 F. Supp. 2d 262 (W.D.N.Y. 2006) ................................................................27

*Helicopteros Nacionales De Colombia v. Hall,*
    466 U.S. 408 (1984) ........................................................................................3, 31

*Hsin Ten Enter. United States v. Clark Enters.,*
    138 F. Supp. 2d 449 (S.D.N.Y. 2000) ...........................................................40, 41

*In re CBI Holding Co.,*
    529 F.3d 432 (2d Cir. 2008) ................................................................................27

*In re Crazy Eddie Sec. Litig.,*
    802 F. Supp. 804 (E.D.N.Y. 1992) ......................................................................28

*In re Investors Funding Corp.,*
    523 F. Supp. 533 (S.D.N.Y. 1980) ......................................................................27

*In re Magnetic Audiotape Antitrust Litigation,*
    334 F.3d 204 (2d Cir. 2003) ................................................................................10

*In re Maxwell Newspapers,*
    164 B.R. 858 (Bankr. S.D.N.Y. 1994) ................................................................27

*In re Terrorist Attacks on September 11, 2001,*
    2010 U.S. Dist. LEXIS 3880 (S.D.N.Y. January 13, 2010) ..........................5, 6, 7, 16

*In re Terrorist Attacks on September 11, 2001,*
    349 F.Supp.2d 765 (S.D.N.Y. 2005) ("*Terrorist Attacks I*") ..................................3, 50

*In re Terrorist Attacks on September 11, 2001,*
    392 F.Supp.2d 539 (S.D.N.Y. 2005) ("*Terrorist Attacks II*") ..........................4, 15, 50

*In re Terrorist Attacks on September 11, 2001,*
    538 F.3d 71 (2d Cir. 2008) ("*Terrorist Attacks III*") ............................................passim

*Independent Investor Protective League v. Time, Inc.,*
    50 N.Y.2d 259 (N.Y. 1980) ................................................................................45

*Intelligent Bank Management v. East Coast Fin. Corp.,*
    207 A.D.2d 760 (N.Y. App. Div. 1st Dep't 1994) ...............................................46

*International Shoe v. Washington,*
326 U.S. 310 (1945)...........................................................................................11, 12

*Janmark, Inc. v. Reidy,*
132 F.3d 1200 (7th Cir. 1997) ...................................................................................17

*Jifrey v. FAA,*
370 F.3d 1174 (D.C. Cir. 2004), *cert. denied,* 125 S. Ct. 1299 (2005) ...............12, 13

*Katzenbach v. McClung,*
379 U.S. 294 (1964)...........................................................................................12, 21

*Leema Enterprises, Inc. v. Willi,*
582 F. Supp. 255 (S.D.N.Y. 1984) .............................................................................36

*Linde v. Arab Bank,*
384 F. Supp. 2d 571 (E.D. N.Y. 2005)..........................................................23, 28, 29

*Marine Midland Bank, N.A. v. Miller,*
664 F.2d 899 (2d Cir. 1981) ........................................................................................8

*Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.,*
84 F.3d 560 (2d Cir. 1996) .....................................................................9, 10, 31, 32

*Morris v. Khadr,*
415 F. Supp. 2d 1323 (D. Utah 2006) .........................................................................17

*Morrison v. Amway Corp.,*
323 F.3d 920 (11th Cir. 2003) ...................................................................................10

*Mwani v. Bin Laden,*
417 F.3d 1 (D.C. Cir. 2005)........................................................................................17

*Nat'l Council of Resistance of Iran v. Dep't of State,*
252 F.3d 192 (D.C. Cir. 2001)....................................................................................13

*National Bank v. Paskow,*
75 A.D.2d 568 (N.Y. App. Div. 1st Dep't 1980).......................................................46

*Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co.,*
484 U.S. 97 (1987)......................................................................................................11

*Pension Committee of the Univ. of Montreal Pension Plan v. Banc of America Sec., LLC,*
2006 WL 708470, No. 05 Civ. 9016-SAS, * 5 (S.D.N.Y. Mar. 20, 2006) ................32

*People's Mojahedin Org. of Iran v. U.S. Dep't of State,*
182 F. 3d 17 (D.C. Cir. 1999) ("*PMOI*") ...........................................................12, 13

*Petrousky v. United States*,
  1989 U.S. Dist. LEXIS 5355 (N.D.N.Y 1989) .......................................................................27

*Pomeroy v. Quarles*,
  2001 U.S. Dist. LEXIS 18138 (N.D.N.Y 2001) .....................................................................27

*Price v. Socialist People's Libyan Arab Jamahiriya*,
  294 F.3d 82 (D.C. Cir. 2002) .................................................................................................14

*Provident Nat'l Bank v. California Fed. Savings & Loan*,
  819 F.2d 434 (3d Cir. 1987) ..................................................................................................32

*Pugh v. Socialist Peoples Libyan Arab Jamahiriya*,
  290 F. Supp. 2d 54 (D.D.C. 2003) .........................................................................................18

*Republic of Argentina v. Weltover, Inc.*,
  504 U.S. 607 (1992) ...............................................................................................................12

*Rostker v. Goldberg*,
  453 U.S. 57 (1981) .................................................................................................................21

*South Carolina v. Katzenbach*,
  383 U.S. 301 (1966) ...............................................................................................................12

*Strauss v. Credit Lyonnais, S.A.*,
  2006 U.S. Dist. LEXIS 72649 (E.D.N.Y. Oct. 5, 2006) .......................................................29

*Texas Trading & Milling Corp. v. Federal Republic of Nigeria*,
  647 F.2d 300 (2d Cir. 1981) ..................................................................................................14

*TMR Energy Ltd. v. State Prop. Fund of Ukr.*,
  411 F.3d 296 (D.C. Cir. 2005) ...............................................................................................14

*United States v. Davidson*,
  175 Fed. Appx. 399 (2d Cir. 2006) ........................................................................................37

*United States v. Verdugo-Urquidez*,
  494 U.S. 259 (1990) ...............................................................................................................12

*Vance v. Bradley*,
  440 U.S. 93 (1979) .................................................................................................................21

*Volksagenwerk Aktiengesellschaft v. Beech Aircraft Corp.*,
  751 F.2d 117 (2d Cir. 1984) ..................................................................................................42

*Walters v. Nat'l Ass'n of Radiation Survivors*,
  473 U.S. 305 (1985) ...............................................................................................................21

*Weiss v. Nat'l Westminster Bank PLC,*
    453 F. Supp. 2d 609 (E.D.N.Y. 2006) ........................................................................29

*Whitaker v. American Telecasting, Inc.,*
    261 F.3d 196 (2d Cir. 2001) ......................................................................................7

*World-Wide Volkswagen Corp. v. Woodson,*
    444 U.S. 286 (1980)........................................................................................16, 17

## STATUTES

18 U.S.C. § 2333(a) .............................................................................................................20

18 U.S.C. § 2334(a) .............................................................................................................11

18 U.S.C. § 2339B ...............................................................................................................12

31 U.S.C. § 5318(i)(2)(B)(i) ................................................................................................37

31 U.S.C. § 5318(k)(3)(A)(ii) ..............................................................................................37

31 U.S.C. § 5318(k)(3)(B)(i) ...............................................................................................37

31 U.S.C. § 5318(k)(3)(C)(iii) .............................................................................................37

New York Bus. Corp. Law § 1006(b) ..................................................................................45

## OTHER AUTHORITIES

2 Moore's Federal Practice – Civil, Ch. 12 § 12.33 (2010) .................................................11

Fed. R. Civ. P. 4(k)...............................................................................................................11

Fed. R. Civ. P. 9(b)...............................................................................................................26

Fed. R. Civ. P. 12 .............................................................................................................passim

Fed. R. Civ. P. 56 ...................................................................................................................9

## INTRODUCTION

Plaintiffs in this litigation are the family members of the nearly 3,000 people killed in the September 11, 2001 Terrorist Attacks, thousands of individuals were severely injured as a result of those attacks, and governmental and commercial entities that incurred billions of dollars in property damage and other losses as a result of the attacks (collectively, "Plaintiffs").

Through the respective complaints and related pleadings, Plaintiffs have brought claims against National Commercial Bank (NCB), an international banking and financial institution headquartered in Saudi Arabia.  Plaintiffs assert that NCB knowingly provided financial services, funds and logistical support to al Qaeda, in support of al Qaeda's declared jihad against the United States.  Vincent Cannistraro, the former Counter-terrorism Chief for the CIA, directly confirmed NCB's knowing sponsorship of al Qaeda during testimony before Congress in the immediate aftermath of the September 11th Attacks, explaining that "There is little doubt that a financial conduit to bin Laden was handled through the National Commercial Bank, until the Saudi government finally arrested a number of persons and closed down the channel.  It was evident that several wealthy Saudis were funneling contributions to bin Laden through this mechanism."  *Al Qaeda and the Global Reach of Terrorism,*  Hearing before the Committee on International Relations, House of Representatives, October 3, 2001, prepared statement of Vincent Cannistraro, former Chief of Counter-Terrorism Operations, Central Intelligence Agency, available at http://www.au.af.mil/au/awc/awcgate/congress/75562.pdf, at p. 20.

As is true of most of al Qaeda's material sponsors and supporters, NCB sought to conceal its sponsorship of al Qaeda by channeling its al Qaeda support through charity intermediaries, including Muwafaq Foundation, International Islamic Relief Organization (IIRO), and the Saudi Joint Relief Committee (SJRC).  NCB's most senior executives, including its then Chairman, Khalid bin Mahfouz and the architect of its Islamic Banking Division, Yassin al Kadi, played a direct role in orchestrating NCB's sponsorship of al Qaeda.  Indeed, the Muwafaq Foundation was

1

conceived within the walls of NCB by bin Mahfouz and al Kadi, who created that purported charity for the purpose of supporting al Qaeda's global jihad.  NCB served as the conduit for "wealthy Saudi businessmen" to channel financial resources to al Qaeda through Muwafaq Foundation.   In addition, NCB provided pervasive financial services and funding to IIRO and SJRC, with full knowledge of the terrorist activities of those purported charities.

In its Renewed Motion to Dismiss, NCB again argues that this Court lacks authority to exercise personal jurisdiction over it for the claims at issue in this suit.  More specifically, NCB argues that its direct targeting of the United States through its sponsorship of al Qaeda is insufficient to sustain jurisdiction under specific jurisdictional theories, under the distorted view that the Constitution requires a showing of direct participation in the September 11th Attacks themselves to support the exercise of jurisdiction.  Ignoring its pervasive business activities in the United States, NCB further argues that it lacks sufficient ongoing contacts with the United States to establish jurisdiction under general jurisdictional theories.

As discussed in further detail below, NCB's Renewed Motion to Dismiss suffers from fundamental misconceptions regarding the procedural status of the specific jurisdictional dispute, the nature of Plaintiffs' burden in this context, and as well as the legal test applicable to Plaintiffs' specific jurisdictional theories.  Further, NCB deeply mischaracterizes the extent of its contacts with the United States, which demonstrate that NCB has maintained continuous contacts with the U.S.

## ARGUMENT

### I.    PLAINTIFFS NEED MAKE ONLY A *PRIMA FACIE* SHOWING OF JURISDICTION

NCB claims that, because the Court permitted Plaintiffs to take jurisdictional discovery, Plaintiffs must now prove by a preponderance of the evidence that personal jurisdiction exists.  *See* NCB Mem. at 9.  NCB is wrong.  Plaintiffs need only make a *prima facie* showing of jurisdiction.

With respect to specific jurisdiction[1], Plaintiffs need only make a *prima facie* showing because this is *not* a post-discovery motion.  With respect to general jurisdiction, Plaintiffs need only make a *prima facie* showing because NCB is not contesting the factual predicates for jurisdiction, but rather challenging only their sufficiency.[2]  In that context, the "preponderance of the evidence" standard is completely inapplicable.

A.     **Plaintiffs Have Not Been Given the Opportunity to Take Jurisdictional Discovery with Respect to Specific Jurisdiction**

Plaintiffs were denied the opportunity to take jurisdictional discovery with respect to specific jurisdiction because, by the time the parties' dispute about the discovery Plaintiffs sought was ripe for resolution, the Magistrate Judge found that the applicable legal standard for the assertion of specific jurisdiction was insufficiently clear to allow him to determine whether or not Plaintiffs' discovery requests were proper.  This was the result of a rather complicated procedural history.

On January 18, 2005, this Court held that Plaintiffs were entitled to jurisdictional discovery with respect to the issue of whether the assertion of personal jurisdiction over NCB would comport with due process.  *In re Terrorist Attacks on September 11, 2001*, 349 F.Supp.2d 765, 820

---

[1] Plaintiffs have asserted both "general" and "specific" jurisdiction over NCB.  "General" jurisdiction arises when a defendant's activities in the forum are sufficient to subject it to jurisdiction over *any* claim, even claims that are unrelated to those activities. *Helicopteros Nacionales De Colombia v. Hall*, 466 U.S. 408, 415 & n.9 (1984).  "Specific" jurisdiction, by contrast, arises when a defendant's activities in or directed at the forum are sufficient to subject it to jurisdiction for injuries arising specifically from those activities.  *Id.* at 415 & n.8.

[2] The difference in posture between "specific" jurisdiction and "general" jurisdiction arises from the different resolution before Magistrate Judge Maas of Plaintiffs' requests for jurisdictional discovery.  In ruling on Plaintiffs' requests for discovery pertaining to general jurisdiction, Magistrate Judge Maas reached the merits of Plaintiffs' requests.  As explained in detail below, however, with respect to Plaintiffs' requests for discovery pertaining to specific jurisdiction, the Magistrate Judge found that clarification from the Court of the applicable legal standard for specific jurisdiction was necessary before the Magistrate Judge could determine whether or not Plaintiffs were entitled to the discovery they sought.  *See infra* at Point I-A.

(S.D.N.Y. 2005) ("*Terrorist Attacks I*").[3]  The parties did not, however, proceed immediately to jurisdictional discovery, because the January 18, 2005 order also envisioned discovery on the issue of whether NCB was entitled to assert a defense under the Foreign Sovereign Immunities Act ("FSIA").  NCB sought reconsideration and requested that the Court complete its inquiry into personal jurisdiction before turning to the issues under the FSIA.  On September 21, 2005, Judge Casey granted NCB's request and postponed discovery with respect to the FSIA defense, allowing the parties to proceed to jurisdictional discovery.  *In re Terrorist Attacks on September 11, 2001*, 392 F.Supp.2d 539, 575 (S.D.N.Y. 2005) ("*Terrorist Attacks II*").  Oversight of disputes in the discovery process was referred to Magistrate Judge Maas.  The parties then engaged in limited jurisdictional discovery, almost exclusively on the issue of general jurisdiction.  Progress was slow because of the number of disputes that arose and that had to be resolved by Magistrate Judge Maas.

On April 21, 2008, NCB sought leave to renew its motion to dismiss for lack of personal jurisdiction.  Plaintiffs opposed the motion on the ground that jurisdictional discovery was not complete.  On July 11, 2008, this Court granted NCB's request to file its renewed motion, but directed that any requests for additional discovery be directed, once again, to Magistrate Judge Maas.  Thereafter, on August 15, 2008, Plaintiffs wrote to Magistrate Judge Maas seeking several categories of additional jurisdictional discovery, including jurisdictional discovery related to the activities that would support an assertion of specific jurisdiction.[4]  As it turned out, the process of resolving Plaintiffs' request for additional discovery was lengthy and the Magistrate Judge did not

---

[3] The order applied only to the plaintiffs in the *Burnett* and *Ashton* cases.

[4] Some of this discovery was sought, in the first instance, by the *Federal Insurance* plaintiffs, who had been precluded from seeking discovery at the outset, because the motion to dismiss their claims had not been adjudicated by Judge Casey.

rule until January 13, 2010.  *See In re Terrorist Attacks on September 11, 2001*, 2010 U.S. Dist.

LEXIS 3880, slip op. at 14-22 (S.D.N.Y. January 13, 2010) ("January 13 Order").

 In the meantime, on August 14, 2008, the Second Circuit issued its decision on the appeals

taken from certain of this Court's rulings as to which partial final judgment had been entered.  *See*

*In re Terrorist Attacks on September 11, 2001,* 538 F.3d 71 (2d Cir. 2008) ("*Terrorist Attacks III*").

In that decision, the Second Circuit affirmed the dismissal of five individual defendants for lack of

personal jurisdiction.  538 F.3d at 93-96.  Plaintiffs had sought to assert "specific" jurisdiction over

those five individuals; the Second Circuit found Plaintiffs' allegations with respect to those

individuals insufficient to support jurisdiction.

On January 13, 2010, Magistrate Judge Maas issued his ruling concerning Plaintiffs'

requests for additional discovery.  The January 13 Order addressed on their merits Plaintiffs'

requests for additional discovery concerning general jurisdiction.   But that did not occur with

respect to Plaintiffs' request for discovery concerning specific jurisdiction, which the Magistrate

Judge found himself unable to adjudicate.

As ultimately narrowed and refined, Plaintiffs sought to establish jurisdiction over NCB

based on its support of al Qaeda and al Qaeda-front "charities," including the Muwafaq

Foundation, which, Plaintiffs allege, was set up by high-level executives at NCB for the purpose of

providing funding to al Qaeda.  Plaintiffs sought discovery to establish that NCB was not merely a

passive donor to Muwafaq, but that it was an active participant in efforts to use its "infrastructure

and resources to build and sustain Muwafaq, for the purpose of enabling al Qaeda to realize its

stated ambition to attack America."  January 13 Order at 32.  As described in the January 13 Order,

"the parties disagree as to whether these allegations, if proved, would be sufficient to establish

jurisdiction over NCB. . . ." *Id.*  If the allegations were legally sufficient, Plaintiffs would be

entitled to the discovery they sought in order to prove them, but if the allegations were legally

insufficient, allowing Plaintiffs discovery to prove allegations insufficient to establish jurisdiction

would be a waste of time.  The disagreement was based on differing interpretations of the Second

Circuit's ruling in *Terrorist Attacks III*.  The Magistrate Judge held:

> Reasonable observers could disagree as to the adequacy of the
> Plaintiffs' prima facie showing in light of the Second Circuit's
> decision in *Terrorist Attacks III*.  In these circumstances, Judge
> Daniels should have the opportunity to consider in the first instance
> whether the conduct alleged by the Plaintiffs is sufficient to bring
> NCB within the Court's jurisdiction. Because it is possible that
> Judge Daniels will conclude that the Plaintiffs' theories of specific
> jurisdiction are not viable under *Terrorist Attacks III*, NCB should
> not be subjected to extensive discovery before he decides the issue.
>
> At the same time, it is possible that Judge Daniels will determine
> that NCB's renewed jurisdictional motion should be denied, either
> because Plaintiffs have made the required jurisdictional showing or
> because further jurisdictional discovery is warranted.

January 13 Order at 32-33.  In essence, the Magistrate Judge held that the law had changed since

Judge Casey ordered jurisdictional discovery and the Magistrate Judge was not in a position to

determine whether, under *Terrorist Attacks III*, Plaintiffs were still entitled to jurisdictional

discovery with respect to specific jurisdiction.  The Magistrate Judge ordered Plaintiffs to respond

to NCB's renewed motion and ordered NCB to preserve its documents relevant to jurisdictional

discovery pending this Court's resolution of the issue.

Plaintiffs objected to the January 13 Order and urged the Court to decide the legal issue

immediately, before the parties completed briefing on the renewed motion, so that Plaintiffs could

take whatever jurisdictional discovery concerning specific jurisdiction the Court determined they

were entitled to, prior to responding to the motion.  This Court has not ruled on Plaintiffs'

objection.

As a result, with respect to specific jurisdiction, Plaintiffs do not respond to this motion in a

post-discovery posture.  Rather, as set forth in the January 13 Order, the issue for this Court is

whether Plaintiffs' *allegations*, if proven, are sufficient to establish specific jurisdiction under

*Terrorist Attacks III* and other relevant case law concerning specific jurisdiction.  *See* January 13

Order at 32.  Because the Magistrate Judge held that he could not determine if Plaintiffs were still

entitled to jurisdictional discovery after the ruling in *Terrorist Attacks III*, Plaintiffs are in the same

posture they were before Judge Casey ruled, under then-existing law, that they were entitled to

jurisdictional discovery.  The law is clear, moreover, that

> Prior to discovery, a plaintiff challenged by a jurisdiction testing
> motion may defeat the motion by pleading in good faith . . . legally
> sufficient allegations of jurisdiction. At that preliminary stage, the
> plaintiff's *prima facie* showing may be established solely by
> allegations.

*Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990).  With respect to

specific jurisdiction, then, this Court is confronted with the question whether Plaintiffs' allegations

are legally sufficient, *not* whether Plaintiffs can prove those allegations.  In relation to their

threshold burden to allege jurisdiction, it is well-settled that this Court cannot require a plaintiff to

come forward with a detailed factual proffer in support of jurisdiction without first affording the

plaintiff and opportunity to conduct discovery to develop those facts.  In the absence of allowing

discovery, plaintiff is only required to make a *prima facie* showing of jurisdiction over the

defendant. *DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001); *Whitaker v. American*

*Telecasting, Inc.*, 261 F.3d 196, 208 (2d Cir. 2001).  Moreover, this standard is extremely

deferential to plaintiffs.  When ruling on jurisdiction based upon allegations submitted solely

through competing affidavits and without the benefits of discovery, the standard under Rule

12(b)(2) is that these affidavits are "construed in the light most favorable to the plaintiff and doubts

are resolved in the plaintiffs favor, notwithstanding a controverting presentation by the moving

party." *A.I. Trade Fin., Inc. v. Petra Bank*, 989 F.2d 76, 79-80 (2d Cir. 1993).  Indeed, "Until such

a hearing  is held, a *prima facie* showing suffices, notwithstanding any controverting presentation

by the moving party, to defeat the motion." *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981).   The "preponderance" standard has no applicability whatsoever.

> **B.      Until the Court Holds an Evidentiary Hearing, a Plaintiff Need Make Only a *Prima Facie* Showing of Jurisdiction**

Even if Plaintiffs had been granted jurisdictional discovery, and with respect to general jurisdiction, the "preponderance of the evidence" standard is inapplicable because NCB has failed to contest the jurisdictional facts.   And even if NCB had contested the jurisdictional facts, the Court could not resolve that dispute on this motion, precluding application of a "preponderance" standard.

It is true that, after jurisdictional discovery, the nature of the plaintiff's burden changes, although not in the way NCB asserts.   Rather,

> After discovery, the plaintiff's *prima facie* showing, necessary to defeat a jurisdiction testing motion, must include an averment of facts that, if credited by the trier, would suffice to establish jurisdiction over the defendant. . . .   At that point, the *prima facie* showing must be factually supported.

*Ball*, 902 F.2d at 197 (citations omitted).

Thus, the primary difference between a pre-discovery jurisdictional motion and a post-discovery motion is that, after jurisdictional discovery, plaintiffs must provide factual support for their *prima facie* case, rather than relying solely on allegations.   The Court may then assess that factual showing in one of three ways:

> Where the jurisdictional issue is in dispute, the plaintiff's averment of jurisdictional facts will normally be met in one of three ways: (1) by a Rule 12(b)(2) motion, which assumes the truth of the plaintiff's factual allegations for purposes of the motion and challenges their sufficiency, (2) by a Rule 56 motion, which asserts that there are undisputed facts demonstrating the absence of jurisdiction, or (3) by a request for an adjudication of disputed jurisdictional facts, either at a hearing on the issue of jurisdiction or in the course of trial on the merits.

*Id.*

Here, NCB has chosen to renew its Rule 12(b)(2) motion, challenging the sufficiency of Plaintiffs' evidence as a matter of law.  NCB has *not* asserted that it disputes any of Plaintiffs' jurisdictional facts through any appropriate or competent procedural device and has *not* requested an evidentiary hearing.  Because NCB has challenged Plaintiffs' jurisdictional showing *as a matter of law*, rather than contesting Plaintiffs' factual averments, there is no conflicting evidence for the Court to weigh and no applicability for the "preponderance of the evidence" standard.  Rather, as the Second Circuit held in *Ball*:

> If the defendant is content to challenge only the sufficiency of the plaintiff's factual allegation, in effect demurring by filing a Rule 12(b)(2) motion, *the plaintiff need persuade the court only that its factual allegations constitute a* prima facie *showing of jurisdiction.*

*Id.* (emphasis added).  In this circumstance, moreover, the court must "credit [plaintiff's] averments of jurisdictional facts as true."  *Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567 (2d Cir. 1996).

Even if NCB had styled its motion under Rule 56 – which it did not – this Court could not weigh Plaintiffs' evidence against NCB's and require Plaintiffs to prevail by a preponderance of the evidence.  Rather, a Rule 56 motion would assert that there are no disputed facts pertaining to jurisdiction; if the Court found the jurisdictional facts to be *undisputed*, it could grant a motion for summary judgment under Rule 56 if it found the undisputed facts to be insufficient as a matter of law to sustain a finding of personal jurisdiction. *See* Fed. R. Civ. P. 56; *Davis v. Blige*, 505 F.3d 90, 97 (2d Cir. 2007) (summary judgment only appropriate where there are no genuine issues of material fact).

Only if the NCB had *disputed* Plaintiffs' factual showing *and the Court holds an evidentiary hearing* may the Court resolve the jurisdictional dispute and require Plaintiffs to prove

the existence of jurisdiction by a preponderance of the evidence.  *Ball*, 902 F.2d at 197; *see also In re Magnetic Audiotape Antitrust Litigation*, 334 F.3d 204, 206 (2d Cir. 2003) ("Where plaintiff has engaged in jurisdictional discovery, but no evidentiary hearing was conducted, 'the plaintiff's *prima facie* showing, necessary to defeat a jurisdiction testing motion, must include an averment of facts that, if credited . . . would suffice to establish jurisdiction over the defendant'"); *Metropolitan Life*, 84 F.3d at 567 (same); *Cutco Industries, Inc. v. Naughton*, 806 F.2d 361, 365 (2d Cir. 1986) ("until an evidentiary hearing is held, [a plaintiff] need make only a *prima facie* showing by its pleadings and affidavits that jurisdiction exists.").  Only at an evidentiary hearing may Plaintiffs be required to prove their jurisdictional allegations by a preponderance.  NCB's assertion that, in the absence of an evidentiary hearing, Plaintiffs must nonetheless prove jurisdiction by a preponderance of the evidence is thus belied by at least *four* controlling Second Circuit precedents, none of which NCB cites with respect to this issue and all of which hold that without an evidentiary hearing, a plaintiff need only make a *prima facie* case.[5]

---

[5] Even if this were a post-discovery motion with respect to specific jurisdiction, and even if NCB had contested Plaintiffs' factual assertions, this Court is precluded from holding an evidentiary hearing on the issue of specific jurisdiction at this time, because the jurisdictional dispute is intertwined with the merits of Plaintiffs' claims against NCB such that judicial resolution of the dispute would deprive Plaintiffs of their Seventh Amendment right to a jury trial on the merits of their claims.  In that case, the question whether personal jurisdiction exists must be left for trial. *Alliance for Environmental Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82, 88 (2d Cir. 2006) (where "overlap in the evidence is such that fact-finding on the jurisdictional issue will adjudicate factual issues required by the Seventh Amendment to be resolved by a jury, then the Court *must leave the jurisdictional issue for the trial*") (emphasis added); *see also Morrison v. Amway Corp.*, 323 F.3d 920 (11th Cir. 2003) (where jurisdictional challenge implicates the merits of the underlying claim, "[t]he proper course of action for the district court . . . is to find that jurisdiction exists and deal with the objection as a direct attack on the merits of the plaintiff's case. . . . "); *Boit v. Gar-Tec Products, Inc.*, 967 F.2d 671, (1st Cir. 1992) (where issues of personal jurisdiction intertwined with merits, resolution of factual disputes by the court raises "troubling issues," especially where plaintiff is entitled to a jury trial on the merits); *Careau Group v. United Farm Workers of America*, 940 F.2d 1291, 1293 (9th Cir. 1991) ("[W]here jurisdiction is so intertwined with the merits that its resolution depends on the resolution of the merits, the trial court should employ the standard applicable to a motion for summary judgment," and, where factual issues are present, "jurisdiction should be determined at trial on the merits").

## II.      NCB Is Subject to Personal Jurisdiction in the United States Because It Was Properly Served

A federal court may exercise personal jurisdiction over a non-resident defendant when: (1) the defendant is amenable to service of process pursuant to a statute or rule of court that authorizes such an exercise; and (2) such an exercise is consistent with due process of law. *See International Shoe v. Washington*, 326 U.S. 310 (1945); *see also Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97, 104 (1987).  Here, NCB was properly served pursuant to the Antiterrorism Act ("ATA") and/or Fed. R. Civ. P. 4(k)(2).  With respect to the due process prong of the analysis, however, recent Second Circuit precedent confirms NCB is not entitled to due process protections.

### A.      NCB Has Conceded That It Was Properly Served Pursuant to Statutory Authority

Under Federal Rule of Civil Procedure 4(k)(1)(D), service of process establishes personal jurisdiction over a defendant when so authorized by a federal statute.  Here, where Plaintiffs have asserted claims under the Antiterrorism Act ("ATA"), which permits national service, proper service confers personal jurisdiction.  18 U.S.C. § 2334(a); *Burnett v. Al Baraka Inv. & Dev. Corp.*, 274 F. Supp. 2d 86, 95-96 (D.D.C. 2003) ("*Burnett I*").

NCB has conceded, moreover, the propriety of service.  NCB's sole challenge is a Rule 12(b)(2) motion challenging the court's exercise of personal jurisdiction under the Due Process Clause.  Because it has not raised Rule 12(b)(4) or 12(b)(5) objections those are waived and service is conceded.  Fed. R. Civ. P. 12(b)(g)(2), (h)(1); 2 Moore's Federal Practice – Civil, Ch. 12 § 12.33 (2010). Nor does NCB claim that service was unauthorized by statute.  Thus, NCB has conceded the statutory prong of personal jurisdiction.[6]

---

[6] NCB inexplicably devotes a substantial portion of its brief to analysis under the New York long-arm statute, even as it concedes that on this motion, that statute is irrelevant.  *See* NCB Mem. at 4 n.5.

**B.      NCB May Not Claim Due Process Protections**

NCB, which insists that it has no connection to the United States of America, may not also assert that this Court lacks personal jurisdiction based on the due process protections of the Fifth Amendment or under *International Shoe*, 326 U.S. 310 and its progeny, because "non-resident aliens who have insufficient contacts with the United States are not entitled to Fifth Amendment protections."  *Jifrey v. FAA*, 370 F.3d 1174, 1182 (D.C. Cir. 2004), *cert. denied*, 125 S. Ct. 1299 (2005); *Baker v. Socialist People's Libyan Arab Jamahiriya*, Civ. No. 03-749, slip op. 11 (D.D.C. June 30, 2005) (quoting *Jifrey*).[7] *See also United States v. Verdugo-Urquidez*, 494 U.S. 259, 271 (1990) (Fourth Amendment did not apply to an extra-territorial search of an alien's residence even when the case was prosecuted in a U.S. court); *South Carolina v. Katzenbach*, 383 U.S. 301, 323-4 (1966) ("States of the Union are not 'persons' for purposes of the Due Process Clause."); *c.f., Republic of Argentina v. Weltover, Inc*., 504 U.S. 607, 619 (1992) (assuming without deciding that a foreign state is a person for Due Process Clause analysis, citing *Katzenbach*).

In *People's Mojahedin Org. of Iran v. U.S. Dep't of State*, 182 F. 3d 17, 22 (D.C. Cir. 1999) ("*PMOI*"), the D.C. Circuit, citing *Verdugo-Urquidez*, held that a non-citizen and non-resident must have "substantial connections" to the United States in order to be protected by the First, Fourth, and Fifth Amendments to the U.S. Constitution  The D.C. Circuit ruled that "aliens receive constitutional protections only when they have come within the territory of the United States and developed substantial connections with this country."  182 F.3d at 22.  In *PMOI*, the D.C. Circuit strictly imposed this constitutional presence requirement in reviewing designations of two groups as "foreign terrorist organizations" under 18 U.S.C. § 2339B, declaring that "a foreign

---

[7] A copy of *Baker v. Socialist People's Libyan Arab Jamahiriya* is attached as Exhibit "A" to the Affirmation of Sean P. Carter Transmitting Documents and Evidence in Support of Plaintiffs' Opposition to the Renewed Motion to Dismiss of National Commercial Bank.

entity without property or presence in this country has no constitutional rights, under the due

process clause or otherwise…." *Id.* at 22; *Accord 32 County Sovereignty Comm. v. Dep't of State*,

292 F.3d 797, 799 (D.C. Cir. 2002); *Nat'l Council of Resistance of Iran v. Dep't of State*, 252 F.3d

192, 201-2 (D.C. Cir. 2001) (foreign defendant could claim due process protections where it had

'substantial connections to this country' including an 'overt presence' in an office building in

Washington, D.C.); *Arbelaez v. Newcomb*, C.A No. 00-5217, 2001 WL 500337, at *1 (D.C. Cir.

Jan. 18, 2001) (appellants could not assert constitutional claims in an OFAC matter where they

were "foreign nationals without a substantial connection to the United States"); *Jifrey,* 370 F.3d at

1182 ("The Supreme Court has long held that non-resident aliens who have insufficient contacts

with the United States are not entitled to Fifth Amendment protections.").

Similarly, the United States Government has recently taken the position that a foreign

national who claims no contacts with the United States may not assert a due process claim.

Government's Memorandum of Law In Support of Motion to Dismiss Or, In The Alternative, For

Summary Judgment, *Yassin Abdullah Kadi v. Geithner*, Civ. Action No. 09-0108 (JDB), (D.D.C.

May 22, 2009) ("Govt. Mem.") at 26-29, *relying on PMOI.* [8]

Until recently, this line of cases had not been addressed by the Second Circuit.  This past

fall, however, in *Frontera Resources Azerbaijan Corp. v. State Oil Company of the Azerbaijan

Republic*, 582 F.3d 393, 399-401 (2d Cir. 2009), the Second Circuit held that foreign states and

their agents are not entitled to due process protections, and expressed serious doubt as to whether

agencies of foreign states may claim due process rights.  In that case, the plaintiff had brought suit

---

[8]  A copy of the Government's Memorandum of Law is attached as Exhibit "B" to the Affirmation of Sean P. Carter Transmitting Documents and Evidence in Support of Plaintiffs' Opposition to the Renewed Motion to Dismiss of National Commercial Bank.

As of this date no decision on the Government's motion appears on the docket, a copy of which is attached as Exhibit "C" to the Affirmation of Sean P. Carter Transmitting Documents and Evidence in Support of Plaintiffs' Opposition to the Renewed Motion to Dismiss of National Commercial Bank.

against the State Oil Company of the Azerbaijan Republic (SOCAR). *Id.* at 395.  SOCAR moved

to dismiss the Complaint for lack of personal jurisdiction, arguing that it had insufficient contacts

with the United States to satisfy the requirements of the Due Process Clause.  *Id.*  The district court

held that it was bound to apply the traditional due process test in light of Second Circuit's ruling in

*Texas Trading & Milling Corp. v. Federal Republic of Nigeria*, 647 F.2d 300 (2d Cir. 1981).

Concluding that SOCAR did not have sufficient contacts with the United States to satisfy due

process requirements, the district court dismissed the action, and the plaintiffs then appealed to the

Second Circuit.  *Frontera*, 582 F.3d at 395.

On appeal, the Second Circuit overturned *Texas Trading*, and held that "a foreign state" is

not a "person' within the meaning of the Due Process Clause.  *Frontera*, 582 F.3d at 399-400,

*citing Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 96-9 (D.C. Cir. 2002).

The Court of Appeals then considered whether SOCAR, as an instrumentality of a foreign state

rather than a foreign state itself, retained the capacity to invoke due process protections.  *Id.* at 400.

Citing the Supreme Court's decision in *First Nat. City Bank v. Banco Para el Comercio Exterior

De Cuba*, 462 U.S. 611, 626-27 (1983) ("*Bancec*"), the court concluded that entities over which a

government exerts "sufficient control" lose their presumption of juridical independence, and are

treated as the state itself.  *Frontera*, 582 F.3d at 400.  On that basis, the Frontera Court concluded

that "if SOCAR is an agent of the Azerbaijani state…SOCAR lacks Due Process rights."  *Id.*

In addition, the Second Circuit specifically questioned whether foreign corporations that

are owned, but not controlled, by a foreign state are entitled to Due Process protection, noting that

the D.C. Circuit has called this question "far from obvious."  *Id.* at 401, *citing TMR Energy Ltd. v.

State Prop. Fund of Ukr.*, 411 F.3d 296, 301-2 (D.C. Cir. 2005) ("aliens receive constitutional

protections only when they have come within the territory of the United States and developed substantial connections with this country.").

Similarly, in the present case, NCB has argued that it has no substantial connection to the U.S. while simultaneously seeking the Constitutional protection of minimum contacts requirements for personal jurisdiction. Because the law remains that nonresident aliens outside of the sovereignty of the U.S. are not entitled to most Constitutional rights, including the minimum contacts due process protections of the Fifth Amendment, NCB, which describes itself as being a nonresident alien without substantial connections to the U.S., is simply not entitled to the minimum contacts analysis that it inappropriately relies upon.

### C.   This Court Cannot Consider NCB's Jurisdictional Defense Without First Determining, and Permitting Discovery Into, NCB's Relationship to the Kingdom of Saudi Arabia

Alternatively, as a result of *Frontera*, it is impossible for this Court even to consider NCB's personal jurisdiction defense without first affording Plaintiffs discovery as to NCB's relationship to the government of Saudi Arabia. *See* Plaintiffs' Objections to the Memorandum Decision and Order of Magistrate Judge Maas dated January 13, 2010, MDL Docket No. 2220 at 6, 9-12; Plaintiffs' Reply Memorandum of Law, MDL Docket No. 2229 at 4-7. This Court already has held that the character of NCB's relationship to the government of Saudi Arabia is unclear, and that a determination as to the nature of that relationship would require discovery. *In re Terrorist Attacks II*, 392 F. Supp. 2d 539, 575. At the time of *In re Terrorist Attacks II*, however, under Second Circuit law, this Court's assertion of personal jurisdiction over NCB did not turn on the

resolution of that issue.  Under *Frontera*, resolution of that issue is now an absolute prerequisite to consideration of NCB's personal jurisdiction defense.[9]

III.   **PLAINTIFFS' ALLEGATIONS ARE SUFFICIENT TO MAKE A *PRIMA FACIE* SHOWING THAT NCB HAS ESTABLISHED "MINIMUM CONTACTS" WITH THE UNITED STATES ARISING FROM THE SPECIFIC ACTS AT ISSUE IN THIS CASE**

Even if NCB is entitled to invoke the protections of the Due Process clause, Plaintiffs' allegations are sufficient to make a *prima facie* showing that NCB has established "minimum contacts" with the United States such that it should "reasonably anticipate being haled into court" here with respect to the activities that gave rise to those contacts. *See World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).  Plaintiffs allege that NCB directed its conduct at the United States by sponsoring al Qaeda and certain al Qaeda front "charities," such as the Muwafaq Foundation, International Islamic Relief Organization (IIRO) and Saudi Joint Relief Committee (SJRC) with knowledge that al Qaeda was planning terrorist attacks against the United States.  The legal sufficiency of these allegations is the question that the Magistrate Judge held should be resolved by this Court – whether the conduct Plaintiffs allege, assuming it is proven, is sufficient, as a matter of law, to meet the requirements of due process.  January 13 Order at 30-33.  Under prior case law, as well as under *Terrorist Attacks III*, these allegations satisfy the due process requirements for specific jurisdiction.

A.   **Foreign Sponsors of al Qaeda Direct Their Conduct at the United States and Should Reasonably Anticipate Being Haled Into Court Here in Connection with al Qaeda's Terrorist Acts**

The Supreme Court has recognized that, where actions involving the defendant "were expressly aimed" at the forum, and the defendant knew "that the brunt of that injury would be felt"

---

[9] For a more extensive discussion of the due process argument, Plaintiffs incorporate the arguments set forth in Plaintiffs' Notice of Supplemental Authority in Relation to All Pending Motions to Dismiss for Lack of Personal Jurisdiction, dated April 23, 2010, (MDL Docket No. #2238.)

in the forum, a court has jurisdiction over claims against the defendant arising from that conduct. *Calder v. Jones*, 465 U.S. 783, 879-90 (1984); *see also Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985) (a defendant need only have "fair warning that a particular activity may subject [him] to the jurisdiction of a foreign sovereign").  Although the mere foreseeability of a possible injury is not alone sufficient to establish jurisdiction, "[t]his is not to say … that foreseeability is wholly irrelevant" to the inquiry.  *World-Wide Volkswagen*, 444 U.S. at 297.  Instead, the relevant question is whether the defendant could reasonably foresee that his purposeful actions might give rise to liability in the forum.  *Id.; Burger King*, 471 U.S. at 472; *Calder*, 465 U.S. at 789-90.  Interpreting these standards, the Seventh Circuit has held that in the context of a tort claim "the state in which the injury (and therefore the tort) occurs may require the wrongdoer to answer for its deeds even if events were put in train outside its borders."  *Janmark, Inc. v. Reidy*, 132 F.3d 1200, 1202 (7th Cir. 1997).  Indeed, "[t]here can be no serious doubt after *Calder v. Jones*," "that the state in which the victim of a tort suffers the injury may entertain a suit against the accused tortfeasor."  *Id*.

In keeping with the foregoing standards, federal courts have consistently upheld the exercise of jurisdiction over foreign terrorists and terror sponsors who target the United States.  *See Morris v. Khadr*, 415 F. Supp. 2d 1323, 1335-36 (D. Utah 2006) (where defendant "provided substantial financial support and personnel assistance to help [al Qaeda] achieve its international terrorism objectives," court found the case to be a "textbook example[]" of personal jurisdiction under *Calder's* affects test, "even when a defendant did not personally participate in the attack itself"); *Mwani v. Bin Laden*, 417 F.3d 1, 12-13 (D.C. Cir. 2005) (personal jurisdiction exists over individuals who participate in a "conspiracy to attack the United States, with overt acts occurring within this country's borders"; those who "engage[] in unabashedly malignant actions directed at

[and] felt in this forum" should "reasonably anticipate being haled into court" here);   *Pugh v. Socialist Peoples Libyan Arab Jamahiriya*, 290 F. Supp. 2d 54, 59 (D.D.C. 2003) (individuals who "conspired" to commit acts of terrorism against foreigners in Africa could "expect they might be haled into the courts of those nations whose citizens would die"); *Daliberti v. Republic of Iraq*, 97 F. Supp. 2d 38, 53-54 (D.D.C. 2000) (those who "sponsor terrorism [have] been given adequate warning that terrorist acts against the United States citizens, no matter where they occur, may subject them to suit in the United States courts").

**B.      The Second Circuit's Due Process Ruling in** *Terrorist Attacks III* **Does Not Require a Showing that the Defendant Directly Participated in the September 11th Attacks**

In its decision in *Terrorist Attacks III*, the Second Circuit considered the foregoing standards in the context of claims brought in this litigation against five Saudi princes.  The Second Circuit held that the exercise of jurisdiction over the princes for the claims alleged in the complaints would not comport with Due Process, noting on several occasions that the claims were based on allegations surrounding "the princes' alleged indirect funding of al Qaeda." *Terrorists Attacks III*, 538 F.3d at 95.  The Court stressed that it was not bound to accept as true a "legal conclusion couched as a factual allegation," and that allegations demonstrating the mere foreseeability to a defendant of possible harm in this country are not sufficient, standing alone, for personal jurisdiction.  *Id.* at 93.  Rather, the Court held, plaintiffs "have the burden of showing that [a defendant] engaged in 'intentional, and allegedly tortious, actions … expressly aimed' at residents of the United States." *Terrorist Attacks III*, 538 F.3d at 95 (*quoting Calder*, 465 U.S. at 789).

In interpreting the Second Circuit's Due Process ruling and applying it to the remaining claims in this litigation, this Court should be guided by the views of the United States, as expressed

in its amicus brief to the Supreme Court in this litigation (U.S. Amicus)[10], and its brief filed before the Seventh Circuit prior to its *en banc* decision in *Boim v. Holy Land Foundation for Relief and Development*, 549 F.3d 685 (7th Cir. 2008) (*en banc*) (*Boim V*).  In its amicus brief to the Supreme Court, the United States expressly rejected the notion that the Due Process portion of the Second Circuit's decision should be read to require a showing "that a defendant must specifically intend to cause injury to residents in the forum before a court there may exercise jurisdiction over him." U.S. Amicus at p. 19.  To the contrary, the United States made clear that pursuant to Supreme Court precedent "[i]t does not matter … that the individual defendant is not 'able to control' the means by which the tortious injury is caused in the foreign jurisdiction, as long as he acted with the 'kn[owledge] that the brunt of th[e] injury' from his tortious act 'would be felt' in the foreign forum."  *Id*. at p. 18 (*quoting Calder*, 465 U.S. at 789).

In light of those well established standards, the United States advocated that the Second Circuit's decision should be read narrowly, as merely reflecting perceived deficiencies in "the allegations to establish that the defendants' intentional acts of funding the charities were done with knowledge that they would support al Qaeda's jihad against the United States."  U.S. Amicus at p. 20.  The United States further explained that this Court may properly exercise jurisdiction for the claims at issue in this litigation over defendants who sponsored al Qaeda indirectly, so long as plaintiffs have alleged facts "that could support the conclusion that the defendant acted with the requisite intention and knowledge."  *Id*. at 19-20.  Thus, under the United States' interpretation of the Second Circuit's decision, personal jurisdiction is satisfied where plaintiffs have presented allegations sufficient to make plausible the claim that a defendant's contributions of support,

---

[10] A copy of the U.S. Amicus is attached as Exhibit "D" to the Affirmation of Sean P. Carter Transmitting Documents and Evidence in Support of Plaintiffs' Opposition to the Renewed Motion to Dismiss of National Commercial Bank.

whether direct or indirect, were made with knowledge that those contributions would be used to support terrorism, or with reckless disregard for that potentiality.  *Id.* at pp. 18-20.

As the United States properly recognized in its amicus brief, this interpretation is the only reading of the Second Circuit's decision that reconciles that holding with Supreme Court precedent.  For this reason, and because the Executive Branch's views in the area of national security are entitled to considerable deference, plaintiffs respectfully submit that this Court should follow the United States' interpretation of the Second Circuit's Due Process ruling.

It should be noted that the interpretation of the Second Circuit's decision advocated by the United States largely echoes the arguments offered by the United States in a separate amicus brief filed with the Seventh Circuit Court of Appeals, in conjunction with the *en banc* proceedings in *Boim V*.[11]  In that brief ("*Boim* Amicus"), the United States advocated expansive standards of liability under the ATA, noting that 18 U.S.C. § 2333(a) "was supported by the Executive Branch as an effective weapon in the battle against international terrorism; when correctly applied, it discourages those who would provide financing that is later used for terrorist attacks." *Boim* Amicus at p. 1.   In strong language, the United States rejected the notion that application of the civil liability provisions of the ATA pursuant to the expansive standards advocated by the government would raise any Constitutional concerns, specifically noting that "[a]pplication of Section 2333(a) consistently with the principles set forth in this brief would be fully consonant with First and Fifth Amendment standards." *Boim* Amicus at pp. 28-29.

The harmony between the views expressed by the United States concerning the proper interpretation of the Second Circuit's earlier decision in this case and its arguments in *Boim*

---

[11] A copy of the *Boim* Amicus is attached as Exhibit "E" to the Affirmation of Sean P. Carter Transmitting Documents and Evidence in Support of Plaintiffs' Opposition to the Renewed Motion to Dismiss of National Commercial Bank.

regarding the scope and reach of the ATA is by no means coincidental.  To the contrary, this symmetry reflects the fundamental recognition that the ATA itself embodies critical factual findings of Congress, arrived at only after thorough careful investigation and debate, concerning the primary and integral role extra-territorial sponsors of terrorism play in making terrorist attacks possible, and the degree to which such sponsorship activities uniquely target the United States and its citizens.  See *Boim* Amicus at pp. 8-10, 23-26.  In presenting its position on these issues, the United States properly recognized that Congress' findings concerning the relationship between extra-territorial sponsorship of terrorism and resulting harm in the United States are entitled to great deference, a proposition which must also guide this Court's resolution of the present motion to dismiss.  *Walters v. Nat'l Ass'n of Radiation Survivors*, 473 U.S. 305, 330 n. 12 (1985); *Rostker v. Goldberg*, 453 U.S. 57, 72-73 (1981); *Vance v. Bradley*, 440 U.S. 93, 111-112 (1979); *Katzenbach v. McClung*, 379 U.S. 294 (1964).  In all of these respects, the views of the United States confirm that the framework for analyzing personal jurisdiction is synonymous with the standards for determining whether plaintiffs have stated a claim under the ATA.

The *en banc* decision of the Seventh Circuit in *Boim V* provides the most comprehensive and well reasoned analysis of the legal principles that animate the liability analysis in terrorism sponsorship cases.  In the context of claims arising from the 1996 shooting death of David Boim at a bus stop near Jerusalem by Hamas, the *Boim V* court confirmed that the ATA establishes sweeping standards of civil liability applicable to all persons who "knowingly" provide material sponsorship to a terrorist organization, whether directly or indirectly.  549 F.3d at 688–94.  The majority confirmed that the ATA imposes liability on "donors to groups that [in turn] sponsor or engage in terrorism," *id.* at 688-89, reasoning that the definition of "international terrorism" under the ATA treats financiers and other material sponsors of terrorism as "primary" wrongdoers.  *Id.* at

21

690, 692.  Accordingly, the majority held that it followed from the text of the ATA that "a

donation to a terrorist group that targets Americans outside of the United States" constitutes a

primary violation of the ATA, if provided knowingly.  *Id.*

      Recognizing that the ATA targets intentional forms of wrongdoing, the majority logically

held that liability requires some showing of "knowledge" on the part of the defendant.  However,

in keeping with well settled legal principles, the Court found that this element of an ATA claim

could be established not only through proof that the defendant "knows" that the organization

receiving his support engages in terrorism, but also through a showing that the defendant is

"deliberately indifferent to whether it does or not, meaning that one knows there is a substantial

probability that the organization engages in terrorism, but one does not care."  *Id.* at 693.

      Finally, the *Boim V* Court turned to the question of the standard of causation for suits under

the ATA.  Given the manner in which terrorist organizations raise and aggregate funds, the Court

rejected out of hand the notion that a donor's contribution to a terrorist organization must be

substantial, or directly linked to the attack at issue, in order to sustain liability.  549 F.3d at 693.  In

support of this conclusion, the Court pointed out that terrorist organizations aggregate minimal

contributions and use the total aggregated resources "to recruit, train, equip and deploy terrorists

who commit a variety of terrorist acts."  *Id.*  Accordingly, the Court held that all knowing

contributors to a terrorist organization "significantly enhance the risk of terrorist acts and thus the

probability that (the plaintiff) would be a victim."  *Id.*

      The Court also rejected the theory that a defendant can avoid liability by arguing that it

intended to fund only the legitimate or humanitarian works of a terrorist organization or one of its

charitable sponsors, correctly holding that "anyone who knowingly contributes to the non-violent

wing of an organization that he knows to engage in terrorism, is knowingly contributing to the

22

organization's terrorist activities.  That is the only knowledge that can reasonably be required as a premise for liability.  To require proof that the donor intended that his contribution be used for terrorism – to make a benign intent a defense – would as a practical matter eliminate donor liability except in cases in which the donor was foolish enough to admit his true intent."  *Id.* at 698-99.

The majority likewise reaffirmed that a donor may not escape liability simply by channeling his donations to a terrorist organization through a chain of intermediary organizations. *Id*. at 701.  Addressing a hypothetical scenario in which "donor A gives to innocent appearing organization B which gives to innocent appearing organization C which gives a donation to Hamas," the Court concluded that A would be liable "as long as A either knows or is reckless in failing to discover that donations to B end up with Hamas."  *Id*. at 702.  The Court reasoned that "to set the knowledge and causal requirement higher than we have done in this opinion would be to invite money laundering, the proliferation of affiliated organizations, and two-track terrorism (killing plus welfare).  Donor liability would be eviscerated, and the [ATA] would be a dead letter."  *Id.; see also Linde v. Arab Bank*, 384 F. Supp. 2d 571 (E.D. N.Y. 2005) (finding ATA liability extends to "welfare" activities which serve as inducement for terrorist activity).  Finally, the majority rejected the argument that a plaintiff must allege a close temporal connection between the defendants' contribution to the responsible terrorist organization and the terrorist attack which produced the plaintiff's injuries.  *Boim V*, 549 F.3d at 700.

This Court should apply the *Boim V* standard to its due process analysis of NCB's contacts with the United States and conclude that NCB's knowing involvement with, and support of, al Qaeda satisfy the requirements of "minimum contacts" with the United States.

**C.      NCB's Deliberate Targeting of the United States Subjects it to Personal Jurisdiction in the United States in Connection with the September 11 Terrorist Attacks**

In keeping with the foregoing standards, plaintiffs have satisfied their *prima facie* burden to demonstrate that NCB purposefully directed its conduct at the United States, and should reasonably anticipate being haled into court here to respond to claims arising from the September 11th Attacks.  Critically, NCB is not alleged to have been an ignorant participant in the indirect funding of al Qaeda.  Rather, plaintiffs have alleged and offered evidence[12] that NCB maintained a close and direct relationship with al Qaeda, and that senior personnel of NCB, who were in direct contact and working in concert with al Qaeda members, knowingly used the bank's infrastructure for the purpose of enabling al Qaeda to wage jihad against the United States.  *See* Plaintiffs' Summary of Allegations, Facts and Evidence at ¶¶ 1-100.  The direct and intimate relationship between NCB and al Qaeda is manifested (in part) by NCB's collaboration relative to the Muwafaq Foundation, a financial and operational arm of al Qaeda founded by Senior NCB executives Khalid bin Mahfouz and Yassin al Kadi.  *Id* at ¶¶ 15-23; 56-65; 66-78.  Plaintiffs maintain that NCB channeled resources to Muwafaq, for the purpose of enabling al Qaeda to realize its stated ambition to attack America.  NCB provided further support for al Qaeda's jihad via its relationships with IIRO and SJRC, two other ostensible charities with intimate financial and

---

[12] Plaintiffs' allegations are set forth in their Complaints filed on September 30, 2005.  Those Complaints incorporated RICO Statements and More Definite Statements as to NCB, IIRO, SJRC, Khalid bin Mahfouz, Yassin al Kadi and Abdulrahman bin Mahfouz, all of which bear directly on the NCB jurisdictional analysis.  For purposes of sustaining their threshold prima facie burden as to the specific jurisdiction theories, plaintiffs have supplemented their allegations with extrinsic evidence.  The submission of those materials does not impact the prima facie standard of review.

Given the voluminous nature of the relevant allegations and documentary materials, plaintiffs have submitted a Summary of Allegations, Facts and Evidence in Support of Plaintiffs' Showing of Specific Jurisdiction as to NCB, for the Court's convenience which is incorporated herein by reference.  The Summary of Allegations, Facts and Evidence is Exhibit "F" to the Affirmation of Sean P. Carter Transmitting Documents and Evidence in Support of Plaintiffs' Opposition to the Renewed Motion to Dismiss of NCB.

operational ties to al Qaeda.  *Id.* at ¶¶ 62-65.  As is the case with Muwafaq, plaintiffs have offered detailed facts and evidence to demonstrate that NCB was specifically aware of the terrorist activities of the IIRO and SJRC at relevant times.[13]  *Id.* at ¶¶ 66-100.

Consistent with the views expressed in the United States Amicus, such intentional actions are expressly aimed at the United States and satisfy *Calder*'s effect test.  Contrary to the arguments advanced in NCB's Motion, it is immaterial that NCB did not directly participate in the September 11th Attacks, or that its contributions of support to al Qaeda were not specifically applied to those Attacks.  *See* United States Amicus at 18, *quoting Calder*, 465 U.S. at 789 ("[i]t does not matter … that the individual defendant is not 'able to control' the means by which the tortious injury is caused in the foreign jurisdiction, as long as he acted with the 'kn[owledge] that the brunt of th[e] injury' from his tortious act 'would be felt' in the foreign forum.").  It is likewise irrelevant whether NCB's contributions to al Qaeda are characterized as "direct" or "indirect," given NCB's awareness that its support would advance al Qaeda's jihad against the United States.[14]  Accordingly, plaintiffs have met their prima facie burden relative to their theories of personal jurisdiction, and NCB's Renewed Motion to Dismiss must be denied on this additional ground.  This Court should direct that discovery proceed immediately.

---

[13] For example, Yassin al Kadi of NCB acknowledges a close personal relationship spanning many years with Wa'el Jelaidan, a founding member of al Qaeda and the architect of al Qaeda's global financial infrastructure.  Jelaidan held senior positions in both the IIRO and SJRC, and was instrumental in directing the terrorist activities of those organizations.  According to the United States, Jelaidan regularly enlisted al Kadi's assistance to support terrorist causes.  Given al Kadi's close collaboration with Jelaidan in support of al Qaeda's jihad over a period of many years, it is absurd to suggest that he was unaware of the terrorist activities of the IIRO and SJRC.  *Id.* at ¶¶ 66-100.

[14] Beyond the legal deficiency of an approach predicated upon distinguishing between "direct" and "indirect" support, any such distinction is unworkable as a practical matter in the terrorism arena.  In particular, officials of terrorist organizations are often embedded in the charities themselves, as is the case with Muwafaq, IIRO and SJRC.  Although irrelevant, NCB's sponsorship of al Qaeda is properly characterized as direct for this very reason.

**D.**     **NCB's Contention That NCB's Most Senior Officials Were Acting Outside the Scope of Their Employment With NCB is Baseless**

Lacking any credible defense to plaintiffs' specific jurisdictional theories, NCB argues in conclusory fashion that Yassin al Kadi and Khalid bin Mahfouz were necessarily acting outside of the scope of their employment in relation to any sponsorship of al Qaeda.  In making this argument, NCB mischaracterizes Plaintiffs' claims against NCB, which are based on NCB's own conduct.  NCB also misconstrues the relevant legal standards for determining whether the actions and knowledge of an employee or agent are attributable to a corporation.  Taken to its logical end, acceptance of the bright line rule NCB proposes would require this Court to embrace the view that a corporate entity is *de facto* immune from criminal or civil liability under the ATA.[15]

Plaintiffs' claims against NCB are not premised upon "money passing through it on routine banking business" or "ordinary course banking activity by any NCB employee" as its motion to dismiss posits.  (Motion to Dismiss at 30-31).  Nor do Plaintiffs' allegations employ the doctrine of vicarious liability to attribute the conduct of distant NCB clerks to the company as a whole.  Rather, these claims are predicated on conscious actions which NCB itself knowingly took as a banking institution, providing financial services for al Qaeda fronts, facilitating transfers of funds to al Qaeda as an integrated part of its global financing mechanism.

As to whether these activities were done knowingly, Fed. R. Civ. P. 9(b) of course makes clear that such knowledge can be alleged generally.  Plaintiffs have gone further than that in their pleadings.  Moreover, under well-established legal standards any knowledge senior officials like bin Mahfouz or al Kadi possessed regarding Mufawaq's role in sponsoring al Qaeda is imputable

---

[15] NCB advanced this "scope of employment" argument before the Magistrate Judge in relation to its efforts to avoid discovery relative to the specific jurisdiction theories.  The Magistrate Judge necessarily rejected this argument, as evidenced by his directive that NCB collect and preserve evidence responsive to plaintiffs' discovery.  There is no reason for this Court to revisit that issue here.

to NCB.  See *In re Investors Funding Corp.*, 523 F. Supp. 533, 540-41 (S.D.N.Y. 1980) ("The knowledge of an agent acquired within the scope of his employment is imputed to the principal. The same rule applies to information received by corporate agents."); *In re Maxwell Newspapers*, 164 B.R. 858, 866 (Bankr. S.D.N.Y. 1994) ("Under fundamental principles of New York agency law, the acts and knowledge of an agent acting within the scope of his agency are imputed to the agent's principal.")

NCB's rebuttal to the detailed pleadings rests upon its conclusory statement that "Although the mere act of enabling a transfer of funds by a bank may be within the scope of a bank employee's job, support for terrorist organizations is not."  Motion to Dismiss at 30.  To the extent that this raises a scope-of-employment defense, any inquiry into whether bin Mahfouz and al Kadi were acting within the scope of their employment is a heavily fact-dependent one properly left for the jury to resolve.  *Golodner v. Quessant Inc.*, 2007 U.S. Dist. LEXIS 72948, * 10 (S.D.N.Y. Sept. 27, 2007); *EEOC v. Die Fliedermaus, L.L.C.*, 77 F. Supp. 2d 460, 473 (S.D.N.Y. 1999).[16]

As a preliminary matter, however, it is worth noting that under this Circuit's precedent is insufficient to claim that employee actions went beyond the scope of his work responsibilities; they must be wholly adverse to the employer's interest (such as actions which defraud the employer) for an employee's knowledge and conduct not to be imputed to the corporation as a whole.  "New York courts have cautioned that this [adverse interest] exception is a narrow one and that the guilty manager 'must have totally abandoned' his corporation's interests for it to apply."  *In re CBI*

---

[16] Critically, when the fact-sensitive scope of employment inquiry is relevant to the question of jurisdiction, as NCB argues that it is here, a 12(b)(1) motion to dismiss cannot be heard – and jurisdiction cannot be determined – until all relevant discovery as to the scope of employment has been completed.  *Hamm v. United States*, 439 F. Supp. 2d 262, 264 (W.D.N.Y. 2006); *Asto v. Mirandona*, 372 F. Supp. 2d 702, 706 (E.D.N.Y. 2005); *Pomeroy v. Quarles*, 2001 U.S. Dist. LEXIS 18138, * 9-13 (N.D.N.Y 2001); *Petrousky v. United States*, 1989 U.S. Dist. LEXIS 5355, *6-9 (N.D.N.Y 1989) (requiring that an evidentiary hearing be held to determine whether the actions complained of were undertaken within the scope of her employment, and refusing to grant a motion to dismiss or in the alternative summary judgment).  Plaintiffs have sought such discovery.

*Holding Co.*, 529 F.3d 432, 448 (2d Cir. 2008), *quoting Center v. Hampton Affiliates, Inc.*, 66 N.Y.2d 782, 784-85, 488 N.E.2d 828, 497 N.Y.S.2d 898 (1985).  It is only "when an agent is engaged in a scheme to defraud his principal, either for his own benefit or that of a third person" that the exception applies; it "cannot be invoked merely because he has a conflict of interest or because he is not acting primarily for his principal".  *Center*, 66 N.Y.2d at 785.  Indeed, this adverse interest exception is so narrow that knowledge and conduct is properly attributable to the employer even "when the agent acts both for himself and for the principal, though his primary interest is inimical to the principal."  *In re Crazy Eddie Sec. Litig.*, 802 F. Supp. 804, 817 (E.D.N.Y. 1992).[17]

Moreover, a contrary holding would gut the ATA, and NCB's argument that it can be distanced from the deliberate acts of its senior officials in furtherance of the Bank's objectives and profit motives cannot withstand scrutiny.  Indeed, this case is on all fours with the theories of liability under the Anti Terrorism Act credited by precedents including *Linde v. Arab Bank, PLC*, 384 F. Supp. 2d 571 (E.D.N.Y. 2005) and *Almog v. Arab Bank, PLC*, 471 F. Supp. 2d 257, 264 (E.D.N.Y. 2007), in which the banks as a whole were broadly engaged in a deliberate scheme to support terrorism through the provision of its services.  The pleadings as to NCB are parallel to the allegations of intentional support deemed meritorious against Arab Bank:

> Nothing in the complaints suggests that Arab Bank is a mere unknowing conduit for the unlawful acts of others, about whose aims the Bank is ignorant…given plaintiffs' allegations regarding the knowing and intentional nature of the Bank's activities, there is nothing "routine" about the services the Bank is alleged to provide.

---

[17]  In fact, because NCB could (and did) promote its contributions to these organizations as "charitable" activities, bin Mahfouz, al Kadi and other NCB officials may well have deemed NCB's support for al Qaeda through those entities to be entirely within NCB's interests.  In this regard, it is notable that NCB publicly claimed to play a role "for the good of society and the benefit of the community" to support "worthwhile and deserving causes, locally, nationally and internationally" by donating its own funds to the IIRO and others.  *See* Plaintiffs' Summary of Allegations, Facts and Evidence at ¶ 62.

*Linde*, 384 F. Supp. 2d at 588.  In *Weiss v. Nat'l Westminster Bank PLC*, 453 F. Supp. 2d 609 (E.D.N.Y. 2006), liability was even found based on the knowledge a bank *should* have possessed regarding its terrorist customers based upon industry standard know-your-customer obligations. *See also Strauss v. Credit Lyonnais, S.A.*, 2006 U.S. Dist. LEXIS 72649 (E.D.N.Y. Oct. 5, 2006); *Goldberg v. UBS AG*, 660 F. Supp. 2d 410, 428 (E.D.N.Y. 2009) (Motion under Rule 12(b)(6) denied where "Plaintiffs have sufficiently pled [under the ATA] that the defendant consciously disregarded the fact that it was supporting a terrorist organization, despite a strong probability that the bank's services would be used to further the organization's terrorist activities.").

Taken to its logical extreme, NCB's argument would find no financial institution ever liable for its provision of material support to terrorists so long as it claimed such actions carried out by its employees were not in line with company policy.  Congress enacted the ATA to impose "liability at any point along the causal chain of terrorism," and to "interrupt, or at least imperil, the flow of money" so as to impose liability upon "anyone along the causal chain of terrorism." *Boim v. Quranic Literacy Inst*., 291 F.3d 1000, 1011 (7th Cir. 2002).  NCB consciously provided financial services and funds to al Qaeda (primarily through its relationships with Muwafaq, IIRO and SJRC), fully utilizing the bank's resources in a deliberate effort to finance terrorist activities. Such activities beyond peradventure place NCB under this Court's jurisdiction.

### E.   NCB's Claim That Al Kadi Was Not an Employee of NCB is Contradicted By Al Kadi's Own Statements and Irrelevant to the Present Jurisdictional Inquiry

NCB also challenges plaintiffs' theories to the extent based on the actions or knowledge of Yassin al Kadi, arguing on the basis of a search of its "personnel records" that al Kadi was never an "employee" of NCB.  This argument misses on both factual and procedural grounds.

As a preliminary matter, al Kadi contradicts NCB in his own submission to the United States government, asserting that he and Khalid bin Mahfouz developed a relationship of mutual trust and respect while al Kadi "was working with KBM [bin Mahfouz] for NCB."  Plaintiffs' Summary of Allegations, Facts and Evidence at ¶ 69.  Al Kadi's submission explains that bin Mahfouz hired al Kadi to develop Islamic Banking at NCB, and that NCB delegated to al Kadi significant authority over NCB's operations in relation to that initiative.  In this respect, al Kadi offers that "KBM  turned to me to help him in realizing this ambition ['to convert NCB from a bank which offered purely conventional banking services to one that could also offer Islamic banking products'].   To do this, we established a new department within NCB called the Islamic banking department."  *Id.*  Further detailing his relationship with NCB, al Kadi states that "I was a member of the Islamic Banking Services Committee, which was formed by the National Commercial Bank in July 1997 and on which I served until December 8, 1999.  This is a committee responsible for the strategic development of Islamic banking services which was chaired by the CEO of the NCB.  I served on this committee with other senior bank officials."  *Id.*  Thus, al Kadi's own statements support plaintiffs' claim that he was an official, employee and/or agent of NCB.[18]

More fundamentally, NCB may not raise any challenge to plaintiffs' factual allegations or evidence in the present procedural setting.  As noted earlier, NCB has chosen to file a Motion to Dismiss pursuant to Rule 12(b)(2), a device "which assumes the truth of the plaintiff's factual allegations for purposes of the motion."  *Ball*, 902 F.2d at 197.  Further, the Magistrate Judge's

---

[18] NCB conspicuously fails to address whether al Kadi was an *official* or *agent* of NCB, as plaintiffs have asserted throughout the proceedings on the basis of significant evidence.  This omission is no doubt deliberate.  Indeed, NCB has carefully circumscribed its inquiry to whether al Kadi is reflected as an "employee" in NCB's "personnel records."  Of course, the content of NCB's "personnel records" is not dispositive of any issue, and ultimately meaningless.  For example, an outside member of a corporation's Board of Directors likely would not be listed as an "employee" in its "personnel records."

January 13, 2010 Decision expressly dictates that the question referred to this Court in relation to plaintiffs' specific jurisdiction theories is simply "whether the conduct alleged by the Plaintiffs" is sufficient to make a "prima facie showing under Terrorist Attacks III."  January 13, 2010 Decision at p. 32-33.  *See* Point I, *supra*.  For both of these reasons, NCB lacks any valid procedural basis to raise a factual challenge to any of Plaintiff's allegations or evidence.[19]

IV.   **PLAINTIFFS' FACTUAL AVERMENT IS SUFFICIENT TO MAKE A *PRIMA FACIE* SHOWING THAT NCB HAS MAINTAINED "CONTINUOUS AND SYSTEMATIC" CONTACTS" WITH THE UNITED STATES SUCH THAT IT IS SUBJECT TO GENERAL JURISDICTION**

With respect to general jurisdiction, Plaintiffs present a "Factual Averment," as envisioned in *Ball*. *See* 902 F.2d at 197.[20]  Accompanying this Factual Averment is evidence supporting each of the assertions contained therein.  In the absence of a *factual* challenge to this Averment, this Court must accept it as true.  *Id.*  Plaintiffs' Factual Averment and the evidence accompanying it establish that NCB is subject to general jurisdiction in the United States because of its systematic and continuous activities here.

A.   **NCB Is Subject to Jurisdiction Based on the Totally of Its Activities in the United States, Regardless of Whether or Not It Maintained a Physical Presence Here**

To satisfy the requirements of "minimum contacts" for the assertion of general jurisdiction, a defendant's contacts must be "continuous and systematic."  *Helicopteros*, 415-16; *Metropolitan Life*, 84 F.3d at 568.  Lack of actual physical presence in the forum is not a bar to the exercise of

---

[19] In its Opposition to Plaintiffs' Objections to the Magistrate Judge's Order, NCB raised a variety of other meritless factual arguments and challenges.  Such arguments were improper in that setting, and would be equally improper here.  However, the responses plaintiffs offered to those arguments, shed light on the extent of NCB's efforts to mislead the Court on factual matters.  Accordingly, plaintiffs incorporate those responses (as well as the other arguments advanced in the Reply) by reference.  *See* Plaintiffs' Reply in Further Support of Plaintiffs' Objections to the Memorandum Decision and Order of January 13, 2010, pp. 9-13, Docket # 2229.

[20] Plaintiffs' Factual Averment is Exhibit A to the Affirmation of Robert T. Haefele Transmitting Documents and Evidence in Support of Plaintiffs' Opposition to the Renewed Motion to Dismiss of NCB, which is incorporated herein by reference.  The exhibits to the Factual Averment are identified in and attached to the Attorney Declaration appended to the Factual Averment, and cited herein as "Factual Averment, ¶ ___, Exhs. ____."

personal jurisdiction over a defendant. *Burger King*, 471 U.S. at 476; *Pension Committee of the Univ. of Montreal Pension Plan v. Banc of America Sec., LLC*, 2006 WL 708470, No. 05 Civ. 9016-SAS, * 5 (S.D.N.Y. Mar. 20, 2006).

In *Pension Committee of the Univ. of Montreal*, the court determined that general jurisdiction was possible notwithstanding that the defendant had no physical presence in the forum, never maintained any offices in the forum, never owned or leased property, maintained a telephone listing or bank account, paid taxes, or had a license to do business in the forum.  In assessing the defendant's "systematic and continuous" activities, the court considered the defendant's business activities by which defendant derived revenue from the forum, commenting that "revenue derived from the forum can be a persuasive factor in establishing the minimum contacts required for the exercise of general jurisdiction."  *Id*. at * 5.  *See also Metropolitan Life*, 84 F.3d at 573 (explaining that the defendant's four million dollars in sales in the forum over six years was one factor making the exercise of general jurisdiction permissible); *Provident Nat'l Bank v. California Fed. Savings & Loan*, 819 F.2d 434, 436 (3d Cir. 1987) (bank that "maintained no Pennsylvania office, employees, agents, mailing address, or telephone number" and "had not applied to do business in Pennsylvania, did no advertising in Pennsylvania, and paid no taxes there" subject to general jurisdiction in Pennsylvania based on miniscule percentage of depositors who were Pennsylvania residents, use of Pennsylvania loan servicers, and maintenance of a "controlled disbursement account" with a Pennsylvania bank).

Applying these standards to NCB, taken collectively, the activities engaged in on behalf of NCB creating contacts in the United States were neither irregular nor casual – but were systematic and continuous throughout the years in question.

**B.      The Totality of NCB's Activities in the United States Is Sufficient to Subject it to General Jurisdiction Here**

NCB's activities in the United States, taken together, are sufficient to subject it to general jurisdiction, even if none of these activities, standing alone, would be sufficient.  Over span of nearly 30 years, NCB has conducted financial services activities in the United States as part of its participation in the global financial system – activities that encompassed much more that simple retail banking.  Factual Averment, ¶¶ 1-17, Exhs. 1-10. During this time, NCB repeatedly changed the means by which it conducted its financial services activities in the United States – at some points, operating its own office in the U.S., at others through a nominal "subsidiary," at still others through correspondent banking relationships, more recently making use of an interactive website as well – but regardless of the form, there has never been a point where NCB has lacked some means for conducting business in the United States.

Thus, from 1983 to 1992, NCB maintained an office in New York and conducted its banking activities directly from that office.  When NCB was forced to close that office (after its implication in the BCCI scandals), the bank told its customers that *the same services that were previously available through the New York office would continue to be made available "in the same manner through the bank's excellent relationship maintained with its correspondent banks worldwide.*"  Factual Averment, ¶ 15, 21, Exhs. 1, 14 (emphasis added).   Also coincident with the closing of its New York branch in 1992, NCB introduced an international brokerage service, facilitating direct access to major stock exchanges in the United States, allowing NCB to offer the service of purchasing and selling stocks of major international companies, a service not previously available. Factual Averment, ¶ 4, Exh. 1.  In addition, from 1993 through 2001, NCB used a "subsidiary," SNCB, to play the role previously played by its direct New York office.  By the time NCB closed the U.S. office of SNCB, the scope of its correspondent banking relationships had

33

expanded so that it is, apparently, able to engage in the banking business without maintenance of a physical presence; in recent years, NCB has also used its interactive website to service customers in the U.S.  Factual Averment, ¶ 18, Exhs. 3, 72.

Indeed, conducting business in the United States is a necessity for a financial institution of NCB's size and stature.  As one NCB manager has explained, "It's important to get exposed to any financial market that has the size of the U.S. market."  Factual Averment, ¶ 18, Exh. 11; see also ¶ 18, Exh. 12.  The importance of NCB's access to the U.S. financial system (whether through its correspondent banking relationships or otherwise) is further supported by the fact that much of NCB's business requires trade in U.S. denominated currency (U.S. Dollars), requiring access to the U.S. financial system for each of those transactions to be settled in New York.  Factual Averment, ¶ 19, Exh. 13, Affidavit of Thomas P. Farrell, ¶¶ 22-31.  Because NCB is one of the largest banks in petroleum-rich Saudi Arabia and petroleum and petroleum products are priced in U.S. Dollars (Farrell Aff., at ¶¶ 32-33), NCB must play a prominent role in transactions involving the petroleum industry; and such transactions necessitate the bank having regular access to the U.S. financial system to settle all of the U.S. Dollar transactions.  Id. at ¶¶ 40-43.  For this reason, NCB has always maintained a "presence," actual or virtual, in the United States, sufficient to subject it to general jurisdiction.

NCB's activities in the U.S. in the relevant time period are of five principal types: (1) NCB's correspondent banking relationships; (2) NCB's corporate banking services; (3) NCB's interactive website (4) activities carried out by NCB's subsidiary, SNCB; and (5) activities of NCB's aviation department.  Together, these activities show systematic and continuous activity.

### 1. NCB's Correspondent Account Agreements

NCB does business in the United States through its correspondent bank accounts.  The bank maintains at least 17 correspondent accounts with at least 11 U.S. banks; at least four of the

correspondent accounts were opened between 1998 and 2001, during a period of expansion of NCB's business in the United States.  Factual Averment, ¶ 77, Exh. 66.  All seventeen accounts were active on August 15, 2002, the date this lawsuit was commenced.  *Id*.  NCB has used the accounts both to provide services to customers and also for NCB's own purposes.  For example, one account at Chase Manhattan Bank in New York shows hundreds of millions of dollars flowing through the account from funds generated by NCB investments in the United States managed by NCB's subsidiary SNCB.  Factual Averment, ¶ 78, Exhs. 67, 68.  Rather than being delineated for NCB customer use, this account was apparently used for NCB's own purpose of transferring funds from the U.S.-based investments to NCB accounts in Saudi Arabia.   The only apparent customer and beneficiary of the account is NCB itself.  *Id.*  Indeed, the same may be true for one or more of the other 16 accounts NCB has in the United States but access to information about those accounts was requested and denied in discovery.  However, NCB's objection to the discovery - that the discovery seeks "potentially millions of pages of documents" - reveals just how extensive NCB's use of correspondent account agreements was.

That NCB used its correspondent bank accounts in order to conduct systematic and continuous banking activities in the United States without maintaining a physical presence cannot be doubted:  as previously noted, after NCB closed its New York office, the bank assured its customer that its correspondent banking relationships would allow it to continue to provide the same services.  Factual Averment, ¶ 15, Exh. 1.   In effect, NCB was claiming that these correspondent relationships were *the equivalent* of maintaining an office in New York.  Such an admission is sufficient to subject NCB to personal jurisdiction here.

NCB claims that correspondent banking relationships may not provide a basis for general jurisdiction, but its argument assumes that the correspondent banking relationships stand alone as

the only contacts, rather than being part of a pattern of numerous systematic and continuous contacts.  More significantly, NCB's argument ignores substantial changes in the correspondent banking industry (both in their manner of use and the U.S. regulatory regime applied to them).

Many of the cases that have rejected correspondent bank accounts as a basis for general jurisdiction stand only for the more limited proposition that such an account "*standing by itself*" or "*without more*" are not sufficient to establish minimum contacts.  *See, e.g., Colson Services Corp. v. Bank of Baltimore*, 712 F. Supp. 28, 33 (S.D.N.Y. 1989) ("without more"); *Amigo Foods Corp. v. Marine Midland Bank-New York*, 39 N.Y.2d 391, 396 (1976) ("standing by itself"); *Leema Enterprises, Inc. v. Willi*, 582 F. Supp. 255 (S.D.N.Y. 1984) ("mere maintenance").  Indeed, in *Amigo*, the court's primary emphasis was on the "standing by itself" phrase, finding that discovery was essential to determine the nature of the relationship that resulted from the correspondent agreement.  *Amigo Foods*, 39 N.Y.2d at 396; *accord Ehrlich-Bober & Co. v. University of Houston*, 49 N.Y.2d 574, 579 (1980).  Here, as detailed in Plaintiffs' Factual Averment and as discussed below, NCB's correspondent bank accounts were not its sole contact with the U.S., but one of many.  Indeed, as discussed above and in detail in the Factual Averment, NCB's correspondent banking activities were merely the continuation through other means of business that NCB has, at other times, conducted in the United States directly or through a subsidiary.

But to the extent that the cases discussed above, and the cases cited by NCB, find correspondent bank accounts insufficient to sustain jurisdiction, they are based on an outdated understanding of correspondent banking relationships.  Both the government regulatory framework and the nature of the relationship itself have changed.  Factual Averment, ¶ 63, Exh. 13, Farrell Affirm., ¶¶ 10-33; Exh. 63, Affirmation of Jimmy Gurulé, ¶¶ 6-9, 16-31 ("Gurulé Affirm., __").]

The regulatory framework has changed because, after the September 11 Attacks, Congress recognized the potential threat, in the form of money laundering and untraceable terrorist financing, presented by correspondent banking relationships between U.S. banks and foreign banks.  As a result, Congress included in the USA PATRIOT Act (Patriot Act) amendments to the U.S. Bank Secrecy Act that imposed on foreign banks with correspondent account agreements with U.S. banks a series of important new duties and obligations.  Among these new duties are duties to disclose certain information to U.S. correspondent banks, 31 U.S.C. § 5318(i)(2)(B)(i); to identify a person to accept service of process for foreign records regarding correspondent accounts, 31 U.S.C. § 5318(k)(3)(B)(i);  and to disclose foreign bank records regarding correspondent accounts (even if located outside of the country) upon receipt of a summons or subpoena issued by the Secretary of Treasury or the Attorney General, 31 U.S.C. § 5318(k)(3)(A)(ii).  In addition, foreign banks subject to these obligations are afforded the benefit and protection of accessing the U.S. federal court to challenge a summons, subpoena, or a termination of its correspondent account relationship, 31 U.S.C. § 5318(k)(3)(C)(iii).  Significantly, these changes were enacted on October 26, 2001, well before the commencement of this lawsuit.  Factual Averment, ¶¶ 64, 65, Exhs. 63, Gurulé Affirm., ¶¶ 16, 26-31.

Nor is the regulatory framework the only thing that has changed.  The modern correspondent banking industry has evolved far beyond being simply a means of international wire transfer, the single service on which NCB focuses.  Factual Averment, ¶ 66, Exh. 13, Farrell Affirm, ¶¶ 13-14.  Correspondent banking has become "an integral part of the domestic and international banking systems [without which] it would often be impossible for banks to provide comprehensive nationwide and international banking services…." *United States v. Davidson*, 175 Fed. Appx. 399, 402 n.2 (2d Cir. 2006) (quoting HEARINGS ON THE ROLE OF U.S. CORRESPONDENT

37

BANKING IN INTERNATIONAL MONEY LAUNDERING, SUBCOMMITTEE ON INVESTIGATIONS OF SENATE COMMITTEE ON GOVERNMENT AFFAIRS (opening statements of Senator Susan M. Collins, Subcommittee Chairman), March 1, 2001, available at http://www.senate.gov/tildegovt-aff/030101_collins.htm (visited March 22, 2006)).  One Congressional study of the correspondent banking industry characterized it as enabling foreign banks "to conduct business and provide services for their customers in jurisdictions where the banks have no physical presence. … By establishing such a relationship, the foreign bank … can receive many or all of the services offered by the U.S. bank…."  UNITED STATES SENATE, PERMANENT SUBCOMMITTEE ON INVESTIGATIONS, COMMITTEE ON GOVERNMENTAL AFFAIRS, MINORITY STAFF OF THE PERMANENT SUBCOMMITTEE ON INVESTIGATIONS REPORT ON CORRESPONDENT BANKING: A GATEWAY FOR MONEY LAUNDERING (Feb. 5, 2001), at 11 [Hereinafter "SUBCOMMITTEE REPORT ON CORRESPONDENT BANKING"].  Factual Averment, ¶ 67, Exh. 63, Gurulé Affirm, ¶¶ 6.

By entering into correspondent agreements foreign banks like NCB have "*direct access to the U.S. financial system*," to "*conduct business in U.S. markets*" and *offer an array of services that would not have been otherwise available to the foreign bank or its customers*.  SUBCOMMITTEE REPORT ON CORRESPONDENT BANKING at 1, 11 (emphasis added).  Among the financial services foreign banks provide through correspondent agreements are interest-bearing or on-demand deposit accounts in multiple currencies (including the U.S. dollar), international wire transfers of funds, check clearing, "payable-through" accounts, pouch activities, foreign exchange services, overnight investment accounts, and loans and letters of credit.  In addition to those services, as part of their correspondent agreements, foreign banks like NCB are also able to access and offer an additional array of investment services otherwise unavailable, such as money market accounts, overnight investment accounts, certificates of deposit, securities trading accounts, and other

accounts bearing higher return rates.  Factual Averment, ¶ 71, Exh. 63, Affidavit of Jimmy Gurulé ¶¶ 7; Exh. 64, SUBCOMMITTEE REPORT ON CORRESPONDENT BANKING, at 12.

Many of these services are precisely the services NCB identified as among those offered as part of its core financial, investment, and management services. Factual Averment, ¶ 72, Exhs. 1, 2.  For example, NCB specifically acknowledged accessing both national and international investment services, including money market and mutual funds, investment trusts, bonds, equities, trade finances, commodities, real estate, and currency funds.  Factual Averment, ¶ 73, Exh. 1. Similarly, in NCB's brokerage customer agreement NCB recognizes that it uses correspondent services for its international brokerage services.  Factual Averment, ¶ 74, Exh. 65.  At one point, NCB sought to increase its use of correspondent relationships significantly to become the largest provider of correspondent banking services in Saudi Arabia.   And it was in this context that NCB was able to brag to its customers that, through its correspondent accounts, it could offer the *same services* that were available when NCB maintained a bricks-and-mortar office in New York. Factual Averment, ¶ 76, Exh. 2.

In this changed landscape, the extent of a foreign bank's contacts with the U.S. through correspondent banking has changed dramatically since the line of authority rejecting correspondent banking as a basis for personal jurisdiction.  In addition, the expectations of correspondent banks have changed because of the increased obligations imposed on foreign banks maintaining such accounts.  This Court should recognize that those cases are no longer good law, and that, in the modern banking world, correspondent bank accounts may indicate sufficient presence in and contacts with the U.S. to subject a foreign bank to jurisdiction here.

### 2.    *NCB's Corporate Banking Services*

NCB also carries out one of its core businesses - Corporate Banking Services – in the United States.  Since 1992, NCB has made multiple loans to U.S. corporations. To protect its

investments NCB has also made use of U.S. Uniform Commercial Code (UCC) filings.  For example, on December 18, 1992, it filed a UCC filing in New York, where the debtor was Medical Equipment Leasing Partners; on February 14, 1994 and again on March 28, 2000, it filed others in Indiana, where the debtor was Marion Hospitality.  Factual Averment, ¶ 84, Exhs. 74.

In its 1992 annual report, as the main example of its Corporate Banking Services, NCB wrote: "NCB acted as the Arranger, Lead Manager, and Agent for a U.S. $300-million Ship Acquisition Financing for Vela International Marine Ltd. ( a wholly owned subsidiary of Aramco), NCB assisted in funding the construction of three Very Large Crude Carriers."  Factual Averment, ¶ 84, Exh. 1.  NCB made these loans to a U.S. based corporation.   Ten years later, in October, 2002 NCB was still financing Vela International Marine.   *Id*. at  Exh 74.

Prior to 2003, NCB provided Letter of Credit funding to Dow Chemical.   NCB provided the financing for a business deal to buy rice in the United Sates, re-package it in Syria and sell it in Saudi Arabia.   *Id*. at Exh. 77.  These activities demonstrate that NCB continues to do business here and to avail itself of the protections of the U.S. legal system.

> 3.   *NCB's Interactive Website Services*

NCB also conducts its business in the United States through its highly interactive website, available at http://www.alahli.com/ ("NCB's website").  Factual Averment, ¶¶ 81, 82, Exhs. 3, 72.

Courts assessing whether Internet activity permits the exercise of personal jurisdiction have identified an array of fact patterns:

> At one end of the spectrum are passive websites that display, but do not permit an exchange of information.  At the other end of the spectrum are cases in which the defendant clearly does business over the internet.  Occupying the middle ground are "interactive" web sites, which permit the exchange of information between the defendant and web site viewers

*Allojet PLC v. Vantage Associates*, 2005 WL 612848, No. 04 Civ. 05223 (March 15, 2005, S.D.N.Y.)(*quoting Hsin Ten Enter. United States v. Clark Enters*., 138 F. Supp. 2d 449, 456

(S.D.N.Y. 2000))(internal quotations omitted).  Generally, an interactive website provides

sufficient contacts with the U.S. to support a finding of personal jurisdiction.  *Hsin Ten*, 138 F.

Supp. 2d at 456.

On the spectrum of company websites, NCB's website falls at least into the middle ground

category of "interactive" websites.  NCB's website functions as an "interactive" website because it

permits "the exchange of information."  The website is in English. Through various pages on the

website visitors can for and manage accounts and investment services.  Factual Averment, ¶¶ 81,

82, Exhs. 3, 72.  In addition, although it is no surprise that most of the visitors to NCB's website

are from Saudi Arabia (particularly because NCB touts itself as "the most prominent bank in Saudi

Arabia), the U.S. is fourth (behind Saudi Arabia, Canada and Syria) in the percentage of website

visits originating from it.  Clearly, access to the website from the U.S. is more than casual.  Factual

Averment, ¶ 83, Exh. 73, available at http://www.alexa.com/siteinfo/alahli.com .

### 4.      Activities Carried Out by SNCB

After it was forced to close its New York office, NCB used an alter ego subsidiary, SNCB,

to conduct business in the United States from 1993 until 2001. Moreover, although in theory,

SNCB was closed in 2001, prior to the commencement of this lawsuit, examination of the

corporate records shows that SNCB was not truly closed and maintained its corporate statute in the

U.S. through the time this action was filed.  Factual Averment, ¶ 53-62, Exhs. 19, 55-62.

### (a)      SNCB's Activities Are Attributable to NCB

SNCB's contacts with the U.S., pertinent to the jurisdictional analysis because they help

explain the "continuous and systematic" nature of NCB's contacts with the U.S. over the course of

decades, are imputed to NCB for jurisdictional analysis because SNCB was a "mere department"

of NCB.  To determine whether a subsidiary is a "mere department", the Court considers the

following four factors, which are satisfied here: (1) common ownership, (2) financial dependency

41

of the subsidiary, (3) the degree to which the parent interferes in the selection and assignment of the subsidiary's executive personnel and fails to observe corporate formalities, and (4) the degree of control the parent exercises over the marketing and operational policies. *Volksagenwerk Aktiengesellschaft v. Beech Aircraft Corp.*, 751 F.2d 117, 120-22 (2d Cir. 1984). Aside from the first factor, which is essential, the overall weighing of the remaining factors requires balancing, and not every factor need weigh entirely in the plaintiffs' favor. When applying the *Beech* test, the "exercise of personal jurisdiction over an alleged alter ego requires application of a 'less onerous standard' than that necessary for equity to pierce the corporate veil for liability purposes." *D. Klein & Son, Inc. v. Good Decision, Inc.*, No. 04-1994, 2005 U.S. App. LEXIS 2764, *2 (2d Cir. Feb. 15, 2005)(citations omitted).

**Common Ownership:** SNCB shared common ownership with NCB because, though on a second-tier, it was nonetheless wholly-owned by NCB and created for the express purpose of performing services previously done by the Investment Management Division of NCB branch in NY. SNCB in New York was regularly referred to as NCB's office in New York. In fact, SNCB officially recognized NCB's control when it declared in a U.S. tax filing that SNCB was a member of a controlled group of corporations with its controlling parent being NCB. Factual Averment, ¶ 28-30, Exhs. 16, 18, 21, 25.

**Financial Dependency:** SNCB was completely reliant on NCB not only for all of its financing but also for how the revenue was spent. Since its creation, every dollar of SNCB's revenue came from NCB through its service agreements with NCB. The NCB signature on the agreements was SNCB Chair, Frederik Crawford's; the SNCB signature was former NCB officer, Thomas Krohley's. The agreements were last updated in March 2000 and intended to run through February 2005. Although the agreements allowed SNCB to work for third-parties, no indication

exists that SNCB ever even considered doing so, and given the purpose for which SNCB was

created, the circumstance was never likely.  The corporate overlap and NCB's financial control

over SNCB was evident also in the fact that the manner in which SNCB used the revenue was

dictated by NCB because NCB developed SNCB's annual budget as a component of NCB's

annual budget and imposed the spending parameters on SNCB. Factual Averment, ¶¶ 31-36, Exhs.

26-33.

      **Interference:**  Frederik Crawford was Vice President and Director of the Investment

Services Division of NCB Saudi Arabia.  At the same time he was Chairman and a Director of

SNCB with authority to appoint members of SNCB's board. He held 69 positions on 24 NCB

investment funds managed by SNCB.  He was also paid as an employee of SNCB from 1992-

2000.  John Bouckley and Thomas Krohley were NCB employees and subsequently President and

Vice President of SNCB.  Simultaneously Crawford, Bouckley and Krohley were members of

NCB's Investment Committee which met regularly at headquarters in Jeddah, Saudi Arabia.

Krohley chaired this committee at the time of SNCB's dissolution.  Bouckley and Krohley's

SNCB job descriptions specify that the performance of their duties will have a broad impact upon

the image and success of NCB's Investment Services Division   SNCB was reimbursed for part or

all of the salaries and benefits of some employees by other sections of NCB.  Factual Averment, ¶¶

37-42, Exhs. 17, 19, 20, 34-43.

      Krohley in his affidavit in support of NCB's renewed motion to dismiss states, "SNCB's

employees were selected by SNCB's Board of Directors, and NCB did not train or otherwise

oversee the hiring of SNCB's employees."  This statement is disingenuous for two reasons.  First,

SNCB's directors were all simultaneously senior officers of NCB, including Krohley who sat on

the NCB Investment Committee.  Second, most or all SNCB employees were former or current

NCB employees.  Factual Averment, ¶ 42, Exhs. 17, 19, 39, 40.

**Control:**  NCB made all major and many minor operational decisions for SNCB.  SNCB's

choice of office space was controlled by NCB.   SNCB asked advice from NCB Saudi Arabia

regarding SNCB's U.S. tax obligation.   NCB's Real Estate Investment Committee (REIC)

controlled the sale of all assets managed by SNCB.   NCB in Jeddah even approved minor

operational issues - e.g., improvements to a swimming pool in a hotel investment in Marion,

Indiana.  On numerous occasions, parties both within and without NCB did not differentiate

between NCB and SNCB.  Factual Averment, ¶¶ 43-52, Exhs. 22-24, 26, 44-54.

As for SNCB's activities under the service agreements with NCB, this indirect subsidiary

provided 'advice' to British Virgin Island (BVI) registered Trusts owned by another BVI registered

second-tier subsidiary that was, in turn, owned by a third level of NCB-owned company, also

registered in BVI.  The Trusts in turn owned fourth-level subsidiaries that were BVI limited

companies.  Finally, these companies then owned the real estate investment companies in the

United States that in turn invested in U.S. commercial real estate.   While the necessity for such

corporate layering is suspiciously unclear, the bottom-line is that NCB's U.S. subsidiary was

managing NCB's U.S. real estate investments with little distinction.  NCB produced no

documentation showing that any business activity took place in BVI, aside from the use of a local

firm to handle registration issues with BVI authorities.  All practical business day-to-day activities

relating to this nest of NCB entities took place principally in the United States.  Factual Averment,

¶¶ 49-52, Exhs. 26, 54.

(b)     SNCB Was Not Properly Closed and Continued to Operate Through the Time this Action was Commenced

Although NCB maintains that SNCB was closed before this action was commenced – and thus that its activities are irrelevant for purposes of jurisdiction -- irregularities with the closure of the SNCB office indicate either that the office was not properly closed.  As a result, SNCB continues to be subject to legal suit in New York, or, alternatively, those who performed the duties for NCB within its New York SNCB office continued to perform those responsibilities in the U.S. as agents of NCB after the closure.

SNCB filed its Surrender of Authority with the New York Secretary of State on October 24, 2001.  Factual Averment, ¶ 53, Exh. 55.  But this attempted dissolution does not affect liability for corporate activities prior to dissolution.  Section 1006 (b) of the Business Corporation Law of New York ("BCL") provides:

> The dissolution of a corporation shall not affect any remedy available to or against such corporation, its directors, officers or shareholders for any right or claim existing or any liability incurred before such dissolution, except as provided in [sections 1007 or 1008 (which do not apply here)]

Because the events under which liability arose for this action occurred before and on September 11, 2001, the October 24, 2001 attempted dissolution does not affect the propriety of the action.  *See also* BCL § 1006(a)(4); *Flute, Inc. v. Rubel*, 682 F. Supp. 184 (S.D.N.Y. 1988) (a corporation no longer in existence remains responsible for its liabilities until its affairs are fully adjusted); *Independent Investor Protective League v. Time, Inc.*, 50 N.Y.2d 259, 262-263 (N.Y. 1980).

Section 1007 (a) of the BCL allows corporations to limit the time-frame under which they are open to liability during dissolution through the provision of notice to creditors and claimants:

> At any time after dissolution, the corporation may give a notice requiring all creditors and claimants, including any with

45

> unliquidated or contingent claims and any with whom the
> corporation has unfulfilled contracts, to present their claims in
> writing and in detail at a specified place and by a specified day,
> which shall not be less than six months after the first publication of
> such notice. Such notice shall be published at least once a week for
> two successive weeks in a newspaper of general circulation in the
> county in which the office of the corporation was located at the date
> of dissolution.

But claims against SNCB were never limited under this provision because no public notice about SNCB's closure was ever filed pursuant to the requirement of Section 1007(a). Because notice was never proffered, the company remained subject to civil suit initiated after its attempted dissolution for actions that accrued prior to dissolution.

Moreover, even if SNCB had dissolved properly and with notice, the evidence indicates that NCB merely shifted from using SNCB to having the individuals who had performed the same responsibilities at SNCB now perform the same tasks directly for NCB. Factual Averment, ¶¶ 59, 60, 61, Exhs. 19, 56, 60-62. Thus, SNCB continued to operate as a *de facto* corporation. And liability continues to attach to de facto corporations. *See* BCL § 1005(a)(1); *Intelligent Bank Management v. East Coast Fin. Corp.*, 207 A.D.2d 760, 761 (N.Y. App. Div. 1st Dep't 1994) ("All the same, the fact that the respondent corporation was dissolved in another State is of no moment, as it continues as a *de facto* corporation."); *National Bank v. Paskow*, 75 A.D.2d 568, 569 (N.Y. App. Div. 1st Dep't 1980) (same).

The evidence reveals either that SNCB was operating as a *de facto* corporation through its former officers under the guise of NCB or the individuals themselves because NCB agents here in the U.S. Thus, either because it had not dissolved or because it was still operating as a *de facto* corporation, SNCB remained amendable to suit in the United States in August, 2002, when the first of these actions was commenced.

5.     *NCB Has Had Longstanding Ties to the U.S. Through Activities of its Aviation Department.*

NCB has also engaged, continuously and systematically, throughout the 1990s and into at least 2002 or 2003, in business dealings in the United States through its NCB aviation division. NCB had a division within the bank that conducted aviation business.  Haefele Affidavit, Exhibits 5, 6.   NCB's aviation division conducted its aviation business under the various banners of NCB Aviation Division, Skyways International, and Mid East Jet.  Factual Averment, ¶¶ 85-105, Exh. 78 and Exhibits 5, 9 - 13, and 17 attached thereto.  By cross-referencing multiple sources, Plaintiffs have been able to establish that NCB Aviation Division operated as Skyways International and Mid East Jet at the same locations, using the same facilities, resources, and employees, and providing the same aviation services.  Skyways International was an Austin, Texas-based aviation company, once chaired by Lawrence G. Smith, who was at the same time Executive Vice-President of NCB and advisor to then-NCB-chairman Khalid bin Mahfouz.  Factual Averment, ¶¶ 85-105, Exh. 78, and Exhibits 7, 8 attached thereto.

Recognizing that NCB Aviation Division, Skyways International, and Mid East Jet are the same leads to the conclusion that, acting under its MEJ and Skyways names, the NCB Aviation Division has been operating in the United States systematically and continuously for years. Factual Averment, ¶¶ 85-105, Exh. 78, and Exhibits attached thereto. The United States Federal Aviation Administration's database of U.S. Reduced Vertical Separation Minimum (RVSM) Approvals, as of January 2008, indicates, for example, that at least six MEJ aircraft were approved or successfully monitored by the FAA in recent years.   Factual Averment, ¶¶ 85-105, Exh. 78, and Exhibits 14, 15 attached thereto.  Exhibit 15 includes excerpts from FAA Flight Tracking Data of flights with tail numbers of the NCB aircraft, showing more than 130 flights into United States airspace between 2000 and 2002.  *Id*., Exh. 78, and Exhibit 15 attached thereto.  Other exhibits

show that Skyways International pilots have been U.S. residents with FAA certifications. *Id*., Exh. 78, and Exhibit 5, 16, 18-20 attached thereto.

## V.     THE EXERCISE OF JURISDICTION OVER NCB COMPORTS WITH "FAIR PLAY AND SUBSTANTIAL JUSTICE"

Once it is clear that a defendant has the requisite minimum contacts with the forum, "these contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with 'fair play and substantial justice.'" *Burger King,* 471 U.S. at 476. Here, it is clear that is the case.

In *Burger King*, the Supreme Court listed certain factors, which it held, may "serve to establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required." 471 U.S. at 477. These factors include "the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering fundamental substantive social policies." *Id.* By contrast, "where a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a *compelling* case that the presence of some other considerations would render jurisdiction unreasonable." *Id.* (emphasis added).

In this case, the *Burger King* factors point to the propriety of jurisdiction on a lesser showing of minimum contacts than would otherwise be required, and NCB can point to no compelling reasons that the assertion of jurisdiction would be unreasonable.

As to the burden on the defendant, NCB is a large commercial bank that, as described above, has made loans to numerous U.S. corporations, maintains numerous correspondent banking relationships, and previously maintained an office in New York. Asking NCB to defend itself in

48

one of the premier world financial centers not only does *not* present a special burden, but in fact weighs in favor of the reasonableness of jurisdiction in this situation.

The Plaintiffs' and forum's interests, moreover, weigh heavily of recognizing the reasonableness of jurisdiction on a lesser showing of minimum contacts that might be required without those interests.  If ever a case called for recognition of the policy considerations that determine what process is due, it is this one. The reasonableness of subjecting defendants to jurisdiction in the U.S. must be assessed in light of the cold-blooded manner in which the United States, U.S. residents and U.S. landmarks were attacked for no reason other than that they were here, on United States soil. The policies of "fair play" and "substantial justice" cannot be applied without recognition of the deliberate devastating attacks on the United States that gave rise to plaintiffs' claims. When a defendant purposefully directs its activities so as to cause this kind of harm to and in the United States, it should not be heard to say that it would be unreasonable to subject it to jurisdiction here.  *See Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 22-23 (D.D.C. 1998) (policy behind statute giving terrorism victims remedy "could significantly lower the threshold of constitutional requirements").  The question for the Court is whether it would violate "fair play" and "substantial justice" to subject a defendant to jurisdiction in the United States when that defendant has knowingly and purposefully provided financial support to al Qaeda and its associated entities, assisting them in their preparations to commit terrorist acts against the United States.  As discussed at the beginning, *see supra* Point I, the point here is not whether Plaintiffs have proved that NCB did that, but rather whether, *assuming that it did*, it would be in any way "unfair" to subject it to jurisdiction here.[21]  The answer to that question must be "no."

---

[21] It should be evident that if the Court finds NCB's contacts to be so systematic and continuous as to subject it to general jurisdiction, it would not be "unfair" to assert such jurisdiction, for in that circumstance, a defendant has made such extensive use of the forum that it cannot possibly be unfair to ask it to answer for its conduct here.

Indeed, it would be "unfair" and violative of "substantial justice" to deprive those who suffered the greatest brunt of the September 11 attacks a forum in the United States for their claims against those who knowingly and intentionally assisted the perpetrators of those acts.

## VI.   PLAINTIFFS SHOULD BE PERMITTED ADDITIONAL JURISDICTIONAL DISCOVERY

For the reasons set forth herein and in the accompanying Affirmation of Sean P. Carter in Support of Plaintiffs' Request for Discovery Relevant to Plaintiffs' Theories of Specific Jurisdiction and Affirmation of Robert T. Haefele in Support of Plaintiffs' Request for Discovery Relevant to Plaintiffs' Theories of General Jurisdiction, and the exhibits thereto, if this Court believes that the Plaintiffs have not satisfied their burden in any way, Plaintiffs respectfully request the opportunity to take additional jurisdictional discovery.  Plaintiffs note, in particular, that, with respect to specific jurisdiction, this is still a pre-discovery motion; to the extent that the Court finds that Plaintiffs' allegations make a *prima facie* showing of personal jurisdiction and NCB contests any of these allegations, Plaintiffs should be given the opportunity to take jurisdictional discovery to obtain evidence to support their allegations.  *See Terrorist Attacks I*, 392 F. Supp.2d at 820.

## CONCLUSION

For the foregoing reasons, NCB's motion to dismiss for lack of personal jurisdiction should be denied in its entirety. In the alternative, Plaintiffs should be granted jurisdictional additional discovery with respect to specific jurisdiction.

Dated:  April 23, 2010                    Respectfully Submitted,


                                          /s/_____
                                          Ronald L. Motley
                                          rlmotley@motleyrice.com
                                          Jodi Westbrook Flowers
                                          Michael Elsner
                                          Robert T. Haefele
                                          Vincent I. Parrett

MOTLEY RICE LLC
28 Bridgeside Boulevard
P.O. Box 1792
Mount Pleasant, South Carolina 29465
Tel:  (843) 216-9000

Stephen A. Cozen
Sean P. Carter
Adam C. Bonin
J. Scott Tarbutton
scarter@cozen.com
COZEN O'CONNOR
1900 Market Street
Philadelphia, PA 19103
Tel:  (215) 665-2000
Fax:  (215) 665-2013

James P. Kreindler
jkreindler@kreindler.com
KREINDLER & KREINDLER LLP
100 Park Avenue
New York, New York 10017-5590
Tel: (212) 687-8181

Paul J. Hanly, Jr.
Jayne Conroy
Andrea Bierstein
abierstein@hanlyconroy.com
HANLY CONROY BIERSTEIN SHERIDAN FISHER
 & HAYES, LLP
112 Madison Avenue
New York, NY 10016
Tel:  (212) 784-6400
Fax:  (212) 213-5949

Jerry S. Goldman
jgoldman@andersonkill.com
ANDERSON KILL & OLICK, P.C.
1251 Avenue of the Americas, 42nd Floor
New York, N.Y. 10020-1182
Telephone:  (212) 278-1498
Fax:  (212) 278-1733

For the Plaintiffs' Executive Committees

## CERTIFICATE OF SERVICE

I hereby certify that, on April 23, 2010, I caused an electronic copy of the foregoing Plaintiffs' Memorandum of Law in Opposition to Renewed Motion to Dismiss of Defendant National Commercial Bank For Lack of Personal Jurisdiction to be served electronically by the Court's Electronic Case Filing (ECF) System.

<u>  /s/    Sean P. Carter                            </u>
Sean P. Carter