No. 08-640

# In the Supreme Court of the United States

FEDERAL INSURANCE CO., ET AL., PETITIONERS

*v.*

KINGDOM OF SAUDI ARABIA, ET AL.

*ON PETITION FOR A WRIT OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT*

**BRIEF FOR THE UNITED STATES AS AMICUS CURIAE**

ELENA KAGAN
  *Solicitor General
    Counsel of Record*
TONY WEST
  *Assistant Attorney General*
EDWIN S. KNEEDLER
  *Deputy Solicitor General*
DOUGLAS HALLWARD-DRIEMEIER
  *Assistant to the Solicitor
    General*
DOUGLAS N. LETTER
SHARON SWINGLE
  *Attorneys*

  *Department of Justice
  Washington, D.C. 20530-0001
  (202) 514-2217*

JAMES H. THESSIN
  *Acting Legal Adviser*

  *Department of State
  Washington, D.C. 20520*

### QUESTIONS PRESENTED

1.  Whether the immunity from suit of foreign governmental officials for acts within their official capacity is governed by the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. 1330, 1602 *et seq.*, or by principles of immunity recognized by the Executive Branch in the exercise of its authority over foreign affairs.

2.  Whether tort claims may be asserted against a foreign state under the FSIA's tort exception, 28 U.S.C. 1605(a)(5), where the foreign state's asserted liability is based on donations to charitable institutions outside the United States that were allegedly diverted to a terrorist group that committed acts of terrorism within the United States.

3.  Whether courts in the United States may, consistent with the Due Process Clause, exercise personal jurisdiction over civil claims against foreign nationals on the ground that those individuals made donations abroad to charitable institutions that foreseeably diverted some of those funds to a group that intended to commit terrorist attacks against the United States.

(I)

**TABLE OF CONTENTS**

Page

Interest of the United States . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
   A.  The Saudi Princes are immune from suit for
       their official acts that form the basis of
       petitioners' suit  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
   B.  The court of appeals correctly held that petition-
       ers' claims do not satisfy the domestic tort excep-
       tion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
   C.  The court of appeals' personal jurisdiction hold-
       ing, the scope of which is still unclear, does not
       warrant this Court's review . . . . . . . . . . . . . . . . . . . . . 18
Conclusion  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

**TABLE OF AUTHORITIES**

Cases:

   *Alfred Dunhill of London, Inc.* v. *Republic of Cuba*,
     425 U.S. 682 (1976)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
   *Argentine Republic* v. *Amerada Hess Shipping*
     *Corp.*, 488 U.S. 428 (1989)  . . . . . . . . . . . . 1, 11, 13, 14, 15
   *Ashcroft* v. *Iqbal*, No. 07-1015 (May 18, 2009)  . . . . 16, 17, 20
   *Asociacion de Reclamantes* v. *United Mexican*
     *States*, 735 F.2d 1517 (D.C. Cir. 1984), cert. denied,
     470 U.S. 1051 (1985)  . . . . . . . . . . . . . . . . . . . . . . . . 11, 15
   *Belhas* v. *Ya'alon*, 515 F.3d 1279 (D.C. Cir. 2008)  . . . . 8, 10
   *Bell Atlantic Corp.* v. *Twombly*, 550 U.S. 544 (2007)  . . . . 17
   *Burger King Corp.* v. *Rudzewicz*, 471 U.S. 462 (1985)  . . . 18
   *Byrd* v. *Corporacion Forestal y Indus.de Olancho*,
     182 F.3d 380 (5th Cir. 1999)  . . . . . . . . . . . . . . . . . . . . 8, 10

(III)

IV

Cases–Continued:                                                    Page

*Calder* v. *Jones*, 465 U.S. 783 (1984) . . . . . . . . . . . 18, 19, 20

*Chuidian* v. *Philippine Nat'l Bank*, 912 F.2d 1095
    (9th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*De Letelier* v. *Republic of Chile*, 748 F.2d 790
    (2d Cir. 1984), cert. denied, 471 U.S. 1125
    (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Dole Food Co.* v. *Patrickson*, 538 U.S. 468 (2003) . . . . . 7, 17

*Enahoro* v. *Abubakar*, 408 F.3d 877 (7th Cir. 2005),
    cert. denied, 546 U.S. 1175 (2006) . . . . . . . . . . . . . . . . . 8

*Greenspan* v. *Crosbie*, No. 74 Civ. 4734 (GLG),
    1976 WL 841 (S.D.N.Y. Nov. 23, 1976) . . . . . . . . . . . . . 5

*Heaney* v. *Government of Spain*, 445 F.2d 501
    (2d Cir. 1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Janmark, Inc.* v. *Reidy*, 132 F.3d 1200 (7th Cir. 1997) . . . 21

*Keller* v. *Central Bank of Nigeria*, 277 F.3d 811
    (6th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 10

*Kensington Int'l Ltd.* v. *Itoua*, 505 F.3d 147
    (2d Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Ker* v. *Illinois*, 119 U.S. 436 (1886) . . . . . . . . . . . . . . . . . . 21

*Kilburn* v. *Socialist People's Libyan Arab
    Jamahiriya*, 376 F.3d 1123 (D.C. Cir. 2004) . . . . . . . . 12

*Liu* v. *Republic of China*, 892 F.2d 1419 (9th Cir.
    1989), cert. dismissed, 497 U.S. 1058 (1990) . . . . . . . . 17

*Matar* v. *Dichter*, 563 F.3d 9 (2d Cir. 2009) . . . . . . . . . . 6, 9

*Mwani* v. *bin Laden*, 417 F.3d 1 (D.C. Cir. 2005) . . . . . . . 20

*O'Bryan* v. *Holy See*, 556 F.3d 361 (6th Cir. 2009),
    petition for cert. pending, No. 08-1384 (filed May 7,
    2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

V

Cases–Continued:                                          Page

*Panavision Int'l, L.P.* v. *Toeppen*, 141 F.3d 1316
 (9th Cir. 1998)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Permanent Mission of India to the U.N.* v. *City of
 New York*, 127 S. Ct. 2352 (2007)  . . . . . . . . . . . . . . . . . . 5

*Persinger* v. *Islamic Republic of Iran*, 729 F.2d 835
 (D.C. Cir.), cert. denied, 469 U.S. 881 (1984) . . . . . . . . 15

*Republic of Mexico* v. *Hoffman*, 324 U.S. 30 (1945)  . . . . 4, 5

*Shaffer* v. *Heitner*, 433 U.S. 186 (1977)  . . . . . . . . . . . . . . 18

*The Schooner Exch.* v. *M Faddon*, 11 U.S. (7 Cranch)
 116 (1812)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Underhill* v. *Hernandez*, 168 U.S. 250 (1897)  . . . . . . . . . . 4

*Verlinden B.V.* v. *Central Bank of Nigeria*, 461 U.S.
 480 (1983)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Waltier* v. *Thomson*, 189 F. Supp. 319 (S.D.N.Y.
 1960)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*World-Wide Volkswagen Corp.* v. *Woodson*, 444 U.S.
 286 (1980)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Yousef* v. *Samantar*, 552 F.3d 371 (4th Cir. 2009)  . . . . . 8, 9

Constitution, statutes, and regulations:

U.S. Const., Due Process Clause  . . . . . . . . . . . . . . . . . . . . 18

Antiterrorism and Effective Death Penalty Act of
 1996, Pub. L. No. 104-132, § 221(a)(1), 110 Stat.
 1241 (28 U.S.C. 1605(a)(7) (Supp. II 1996))  . . . . . . . . . 2

Foreign Sovereign Immunities Act of 1976, 28 U.S.C.
 1330, 1602 *et seq.*  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

     28 U.S.C. 1603(a)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

     28 U.S.C. 1603(b)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

     28 U.S.C. 1604  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

VI

Statutes–Continued:                                                    Page

28 U.S.C. 1605(a)(2)  . . . . . . . . . . . . . . . . . . . . . . . 2, 15

28 U.S.C. 1605(a)(5)  . . . . . . . . . . . . . . . 2, 3, 11, 14, 16

28 U.S.C. 1605(a)(5)(A)  . . . . . . . . . . . . . . . . . . . . . . 11

28 U.S.C. 1605(a)(5)(B)  . . . . . . . . . . . . . . . . . . . . . . 11

National Defense Authorization Act for Fiscal Year
2008, Pub. L. No. 110-181, 122 Stat. 3:

§ 1803(a), 122 Stat. 338 (to be codified at 28
U.S.C. 1605A (Supp. II 2008) . . . . . . . . . . . . . . 2, 11

§ 1083(a)(1):

122 Stat. 338 (to be codified at 28 U.S.C.
1605A(a)(1) (Supp. II 2008)) . . . . 2, 3, 11, 12, 13

122 Stat. 338 (to be codified at 28 U.S.C.
1605A(a)(2)(A)(i)(I) (Supp. II 2008)) . . . . . . . 12

122 Stat. 338 (to be codified at 28 U.S.C.
1605A(a)(2)(A)(iii) (Supp. II 2008)) . . . . . . . . 11

§ 1083(b)(3)(D), 122 Stat. 341 (to be codified
at 28 U.S.C. 1610(g)(1) (Supp. II 2008)) . . . . . . 7

18 U.S.C. 2339B  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

18 U.S.C. 2339C  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

28 U.S.C. 2679(b)(1)  . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Miscellaneous:

National Comm'n on Terrorist Attacks Upon the
United States, *9/11 Commission Report* (visited
May 27, 2009) <www.9-11commission.gov/report/
911Report.pdf>  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

H.R. Rep. No. 1487, 94th Cong., 2d Sess (1976)  . . . . 7, 8, 15

H.R. Rep. No. 702, 103d Cong., 2d Sess. (1994)  . . . . . . . . 13

VII

Miscellaneous—Continued:                              Page

Letter from Jack B. Tate, Acting Legal Advisor, U.S.
    Dep't of State, to Philip B. Perlman, Acting Att'y
    Gen. (May 19, 1952) ................................ 5

# In the Supreme Court of the United States

––––––––––

No. 08-640

FEDERAL INSURANCE CO., ET AL., PETITIONERS

*v.*

KINGDOM OF SAUDI ARABIA, ET AL.

––––––––––

*ON PETITION FOR A WRIT OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT*

––––––––––

**BRIEF FOR THE UNITED STATES AS AMICUS CURIAE**

––––––––––

### INTEREST OF THE UNITED STATES

This brief is filed in response to the Court's order inviting the Solicitor General to express the views of the United States. In the view of the United States, the petition for a writ of certiorari should be denied.

### STATEMENT

A. The Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. 1330, 1602 *et seq*., provides the sole basis for obtaining jurisdiction over a foreign state in a civil case brought in a United States court. *Argentine Republic* v. *Amerada Hess Shipping Corp.*, 488 U.S. 428, 434-435 (1989). Under the FSIA, foreign states and their agencies and instrumentalities are immune unless a claim falls within one of the specified exceptions to that immu-

(1)

2

nity. 28 U.S.C. 1604. The exceptions permit, *inter alia*, certain actions arising out of a foreign state's commercial activities, 28 U.S.C. 1605(a)(2), certain tort actions, 28 U.S.C. 1605(a)(5), and certain actions arising out of terrorist activities by designated state sponsors of terrorism, 28 U.S.C. 1605A(a)(1).[1]

B. This multi-district litigation encompasses numerous cases brought by persons injured in the September 11, 2001 terrorist attacks against the United States. Pet. App. 1a, 117a. The complaints allege in relevant part that the Kingdom of Saudi Arabia, the Saudi High Commission for Relief to Bosnia and Herzegovina (SHC), and four Saudi Princes, acting both in their capacities as high-level government officials and also in their personal capacities, made donations to ostensibly charitable organizations with knowledge that those charities were diverting funds to al Qaeda. *Id.* at 2a, 5a-8a. They also allege that a fifth Prince knowingly provided material support, including banking and financial services, to Osama bin Laden and al Qaeda. *Id.* at 8a.

The district court dismissed the claims against Saudi Arabia, SHC, and the Princes. Pet. App. 56a-82a, 144a-194a. The court held that the FSIA afforded immunity to Saudi Arabia and SHC as well as to the Princes for their official acts and that none of the FSIA's exceptions applied. *Id.* at 72a-75a, 135a-168a. The court also held

---

[1] The terrorism exception was enacted in 1996. Antiterrorism and Effective Death Penalty Act, Pub. L. No. 104-132, § 221(a)(1), 110 Stat. 1241 (28 U.S.C. 1605(a)(7) (Supp. II 1996)). In 2008, Congress repealed that provision and enacted an amended terrorism exception. National Defense Authorization Act for Fiscal Year 2008 (NDAA), Pub. L. No. 110-181, § 1083(a), 122 Stat. 338 (to be codified at 28 U.S.C. 1605A (Supp. II 2008)). All references to the NDAA here are to Supplement II (2008) of the United States Code.

3

that it lacked personal jurisdiction over the Princes for their personal actions. *Id.* at 80a-82a, 185a-194a.

C. The court of appeals affirmed. Pet. App. 1a-47a. The court held that the FSIA "protects an individual official of a foreign government acting in his official capacity" as well as the state itself. *Id.* at 13a. Petitioners' claims could not, the court held, proceed under the FSIA's domestic tort exception, 28 U.S.C. 1605(a)(5), because Congress specifically addressed terrorism-related claims in a separate exception expressly limited to states designated by the Secretary of State as sponsors of terrorism, 28 U.S.C. 1605A(a)(1). If the tort exception were applied to acts of terrorism, "[a]n important procedural safeguard [of the terrorism exception] —that the foreign state be designated a state sponsor of terrorism—would in effect be vitiated." Pet. App. 31a. The court of appeals also affirmed the dismissal for lack of personal jurisdiction of the claims against the Saudi Princes for their private acts. Pet. App. 39a-47a.

## DISCUSSION

Petitioners ask the courts of the United States to hold Saudi Arabia and several of its high-ranking officials responsible for the September 11 terrorist attacks, asserting jurisdiction on the basis of foreign actions by or on behalf of the Kingdom concerning funding for ostensible charities. Petitioners link the defendants to the September 11 attacks by alleging that respondents knew their charitable donations would be used to provide financial support to al Qaeda. The lower courts correctly concluded that Saudi Arabia and its officials are immune from suit for governmental acts outside the United States. Although the United States disagrees in certain respects with the analysis of the court of appeals, fur-

4

ther review by this Court to determine the best legal basis for that immunity is unwarranted.  Nor is review warranted as to whether petitioners' allegations concerning the Princes' support of al Qaeda permit the exercise of personal jurisdiction over those defendants.

### A.  The Saudi Princes Are Immune From Suit For Their Official Acts That Form The Basis Of Petitioners' Suit

1.  The United States has long recognized the principle that foreign sovereigns are generally immune from suit in our courts.  *The Schooner Exchange* v. *M'Faddon*, 11 U.S. (7 Cranch) 116, 137 (1812).  Wrongs perpetrated by foreign sovereigns generally have been recognized as appropriate "for diplomatic, rather than legal," resolution.  *Id.* at 146.  In addition, the Court has upheld "[t]he immunity of individuals from suits brought in foreign tribunals for acts done within their own States, in the exercise of governmental authority."  *Underhill* v. *Hernandez*, 168 U.S. 250, 252 (1897).  In fact, "the immunity which all civilized nations allow to foreign ministers" when representing their sovereigns was an established practice from which the Court extrapolated broader principles of state sovereign immunity in *The Schooner Exchange*, 11 U.S. (7 Cranch) at 138.

In light of the potentially significant foreign relations consequences of subjecting another sovereign state to suit, the Court historically looked to "the political branch of the government charged with the conduct of foreign affairs" for an indication whether immunity should be recognized.  *Republic of Mexico* v. *Hoffman*, 324 U.S. 30, 34 (1945).  The Executive similarly provided the judiciary with suggestions of immunity for foreign *officials* sued for their governmental acts, based on the Executive's judgments regarding customary interna-

5

tional law and reciprocal practice. *E.g., Greenspan* v. *Crosbie*, No. 74 Civ. 4734 (GLG), 1976 WL 841, at *2 (S.D.N.Y. Nov. 23, 1976); *Waltier* v. *Thomson*, 189 F. Supp. 319, 320-321 (S.D.N.Y. 1960). Where the Executive made no specific recommendation about immunity in a case, the courts decided the question "in conformity to the principles" the Executive had previously articulated. *Republic of Mexico*, 324 U.S. at 35 (state immunity); *Heaney* v. *Government of Spain*, 445 F.2d 501, 504-506 (2d Cir. 1971) (official immunity).

For much of the Nation's history, the Executive followed a theory of absolute foreign sovereign immunity, "under which 'a sovereign cannot, without his consent, be made a respondent in the courts of another sovereign.'" *Permanent Mission of India to the U.N.* v. *City of New York*, 127 S. Ct. 2352, 2356 (2007) (quoting Letter from Jack B. Tate, Acting Legal Adviser, U.S. Dep't of State, to Philip B. Perlman, Acting Att'y Gen. (May 19, 1952), *reprinted in Alfred Dunhill of London, Inc.* v. *Republic of Cuba*, 425 U.S. 682, 711-715 (1976)). In 1952, however, the State Department adopted the "restrictive" theory of foreign sovereign immunity, under which foreign states would be granted immunity only for their sovereign or public acts, and not for their commercial acts. See *Alfred Dunhill*, 425 U.S. at 698. Significantly, even after endorsing the restrictive theory of immunity for foreign *states*, the Executive continued to recognize the immunity of foreign *officials* for their official acts in circumstances in which the state would not itself be immune. See *Greenspan*, 1976 WL 841, at *2.[2]

---

[2] The immunity of federal officials for official acts similarly extends beyond the immunity of the federal government. 28 U.S.C. 2679(b)(1).

6

In 1976, Congress enacted the FSIA, which, "[f]or the most part, * * * codifies, as a matter of federal law, the restrictive theory of sovereign immunity." *Verlinden B.V.* v. *Central Bank of Nigeria*, 461 U.S. 480, 488 (1983). By its terms, the FSIA governs the immunity of a "foreign state," which is defined to include an "agency or instrumentality" of the state. 28 U.S.C. 1603(a). The statute makes no reference to the immunity of foreign officials. The Executive recently has reiterated that it "generally recognizes foreign officials to enjoy immunity from civil suit with respect to their official acts—even including, at least in some situations, where the state itself may lack immunity under the FSIA." U.S. Amicus Br. at 21, *Matar* v. *Dichter*, 563 F.3d 9 (2d Cir. 2009) (No. 07-2579).

2. The court of appeals held that the Princes are immune under the FSIA for their official acts, reasoning that "an individual official of a foreign state acting in his official capacity is the 'agency or instrumentality' of the state, and is thereby protected by the" statutory immunity. Pet. App. 14a (quoting 28 U.S.C. 1603(a)). The United States agrees with the court's conclusion that the Princes are immune from petitioners' claims. But in the view of the United States, that immunity is properly founded on non-statutory principles articulated by the Executive, not the FSIA. That difference of opinion on the correct legal basis for the individual defendants' official immunity does not, however, warrant this Court's review.

a. The text, structure, and history of the FSIA demonstrate that it was not intended to address the immunity of foreign officials. Section 1603(a) provides that the phrase "foreign state" includes an "agency or instrumentality." 28 U.S.C. 1603(a). Congress's use of the

7

terms "agency" and "instrumentality" rather than "agent" suggests they were not intended to encompass natural persons. That conclusion is reinforced by Subsection (b)'s definition of "agency or instrumentality" as an "entity" that "is a separate legal person, corporate or otherwise," which indicates an exclusive concern with non-natural "entit[ies]." 28 U.S.C. 1603(b).

Other features of the FSIA confirm that understanding. For example, the statute makes "the property of an agency or instrumentality of" a designated terrorist state subject to execution to satisfy a terrorism-related judgment against the state itself. See 28 U.S.C. 1610(g)(1). It is difficult to believe that Congress intended, as would follow from the court of appeals' ruling, that the personal property of every official or employee of a state sponsor of terrorism would be available for execution to satisfy a terrorism-related judgment against the state. Similarly, the FSIA's focus on the status of an entity as an agency or instrumentality at the time suit was filed, see *Dole Food Co.* v. *Patrickson*, 538 U.S. 468, 478 (2003), would mean, if applied in the same fashion to the immunity of officials, that a plaintiff could circumvent that immunity by waiting until an official left office. Congress is unlikely to have conferred a time-limited immunity of this nature.

The FSIA's legislative history further demonstrates that Congress did not intend to supplant existing principles regarding the immunity of foreign officials. In clarifying that the FSIA would not affect diplomatic or consular immunity, notwithstanding the tort exception's reference to torts committed by foreign officials acting within the scope of their authority, the House report explained that the statute would "deal[] only with the immunity of foreign states." H.R. Rep. No. 1487, 94th

8

Cong., 2d Sess. 21 (1976) (*House Report*).  Further, the report noted that with regard to discovery, "official immunity," of a kind existing separate from and outside of the FSIA, would apply if a litigant sought to depose a "high-ranking official of a foreign government."  *Id.* at 23.

b.  As petitioners note (Pet. 15-16), the courts of appeals disagree over whether the FSIA governs the immunity of foreign officials.  Compare Pet. App. 19a (applying FSIA), *Belhas* v. *Ya'alon*, 515 F.3d 1279, 1284-1288 (D.C. Cir. 2008), *Keller* v. *Central Bank of Nigeria*, 277 F.3d 811 (6th Cir. 2002), *Byrd* v. *Corporacion Forestal y Industrial de Olancho*, 182 F.3d 380 (5th Cir. 1999), and *Chuidian* v. *Philippine Nat'l Bank*, 912 F.2d 1095, 1101 (9th Cir. 1990), with *Yousef* v. *Samantar*, 552 F.3d 371, 381 (4th Cir. 2009) (holding FSIA inapplicable, remanding for consideration of other sources of immunity), and *Enahoro* v. *Abubakar*, 408 F.3d 877, 882 (7th Cir. 2005), cert. denied, 546 U.S. 1175 (2006).  But that disagreement appears to be of little practical consequence, and is of no consequence where, as here, respondents would be immune from suit under both the FSIA and principles articulated by the Executive.

Notably, the Ninth Circuit, the first of the courts of appeals to adopt the FSIA as the framework for analyzing foreign official immunity, did so in order to *protect* foreign officials from suit and to prevent the FSIA from "be[ing] vitiated if litigants could avoid immunity simply by recasting the form of their pleadings" to name individual foreign officials as defendants.  *Chuidian*, 912 F.2d at 1102.  Where, as in *Chuidian* and this case, the lower courts apply the FSIA to provide immunity and the Executive also would recognize such immunity, the different approaches produce the same result, and the

9

divergence in rationales becomes irrelevant.  Indeed, in a case subsequent to this one, the Second Circuit held that the two sources of immunity are complementary, rather than mutually exclusive.  See *Matar*, 563 F.3d at 13 (holding that "whether the FSIA applies to former officials or not, they continue to enjoy immunity under common law").  The *Matar* holding suggests that a defendant never could be subject to suit under the FSIA where the principles of immunity recognized by the Executive afford a broader immunity, thus eliminating the possibility of this kind of conflict.[3]

Questions have emerged in two contexts in which the FSIA might provide a less expansive immunity than the principles recognized by the Executive, but whether there is any genuine divergence is still unclear.  First, as noted above, application of the FSIA framework raises the problematic prospect that, under *Dole Food*, foreign officials could lose immunity upon leaving office.  See *Yousef*, 552 F.3d at 383 (holding that FSIA does not protect former officials, but remanding for consideration of non-FSIA immunity).  But that potential anomaly so far has not led to untoward results.  In *Matar*, the Second Circuit found it unnecessary to decide how *Dole Food* would apply to official immunity under the FSIA because, as noted above, "whether the FSIA applies to former officials or not, they continue to enjoy immunity under common law."  563 F.3d at 13.  And in *Belhas*, the D.C. Circuit concluded that the temporal rule of *Dole Food* does not apply to foreign officials in light of differences between a foreign state's relationship to its officials and the state's relationship to corporate entities, as

---

[3]  Although the Executive retains the authority to decline to recognize immunity in a case in which the FSIA would provide immunity, that issue is not presented in this case.

10

in *Dole Food*. 515 F.3d at 1286. That holding again eliminated any practical difference between the FSIA and Executive principles as the source of official immunity.

A second situation of possible divergence has arisen when foreign officials are sued individually for official acts falling within the FSIA's commercial activities exception. Two appellate decisions have upheld jurisdiction over foreign government officials in this circumstance, raising the possibility that the FSIA approach to official immunity would have a narrower scope than that based on principles recognized by the Executive Branch. See *Byrd*, 182 F.3d at 382, 384-385, 389-391 (alleged conspiracy by state-owned corporation to take control of sawmill); *Keller*, 277 F.3d at 816-817 (alleged conspiracy of officials at state bank to defraud plaintiff). But, in fact, principles recognized by the Executive also might have allowed those two suits to go forward. In neither case did the Executive recommend immunity, nor did the courts consider non-statutory immunity. Recently, moreover, the Executive has indicated that "it is not clear whether (and if so, to what extent) [non-statutory] immunity applies to corporate officers of a state owned commercial enterprise." U.S. Ltr. Br. at 10, *Kensington Int'l Ltd.* v. *Itoua*, 505 F.3d 147 (2d Cir. 2007) (No. 06-1763). That issue is not, in any event, presented here, where the challenged activity is not commercial in nature. See Pet. App. 39a.

Because the judgment of the court of appeals upholding the individual officials' immunity was correct, further review by this Court regarding the precise basis of that immunity—a question that may be of limited practical significance—is unwarranted.

11

**B.  The Court Of Appeals Correctly Held That Petitioners'
Claims Do Not Satisfy The Domestic Tort Exception**

1.  When Congress adopted the FSIA in 1976, it in-
cluded an exception to immunity for certain non-
commercial claims involving injuries "occurring in the
United States and caused by the tortious act or omission
of [the] foreign state."  28 U.S.C. 1605(a)(5).  The tort
exception is limited in several significant respects.  It
retains immunity with respect to "discretionary func-
tion[s]" as well as particular torts likely to concern pub-
lic activity, such as "malicious prosecution."  28 U.S.C.
1605(a)(5)(A) and (B).  In addition, although the text "is
susceptible of the interpretation that only the effect of
the tortious action need occur" in the United States,
*Asociacion de Reclamantes* v. *United Mexican States*,
735 F.2d 1517, 1524 (D.C. Cir. 1984) (Scalia, J.), cert. de-
nied, 470 U.S. 1051 (1985), this Court has clarified that
the tort exception "covers only torts occurring within
the territorial jurisdiction of the United States," *Amer-
ada Hess*, 488 U.S. at 441.

In 1996 and again in 2008, Congress adopted a fur-
ther exception to immunity expressly addressed to
terrorism-related claims.  28 U.S.C. 1605A.  In contrast
to the domestic tort exception, the terrorism exception
has no territorial limitation; it was specifically intended
to permit United States victims to sue for injuries sus-
tained from certain acts of terrorism abroad.  See,
*e.g.*, 28 U.S.C. 1605A(a)(2)(A)(iii) (addressing "a case in
which the act occurred in the foreign state against which
the claim has been brought").  The terrorism exception
permits claims based on "torture, extrajudicial killing,
aircraft sabotage, [and] hostage taking."  28 U.S.C.
1605A(a)(1).  The exception also applies where the for-

12

eign state provided "material support or resources for such an act" of terrorism. *Ibid.* The material-support provision has been construed to permit the exercise of jurisdiction in United States courts "based on a state's general 'material support' for a terrorist organization," as long as that support was a "proximate cause" of the plaintiff's injury. *Kilburn* v. *Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1129 (D.C. Cir. 2004). The terrorism exception contains, however, a critical political check. Such claims can only be brought against a country that has been "designated as a state sponsor of terrorism" by the Secretary of State. 28 U.S.C. 1605A(a)(2)(A)(i)(I). Saudi Arabia has never been so designated.

2. The court of appeals held that "claims based on terrorism must be brought under the Terrorism Exception, and not under any other FSIA exception." Pet. App. 33a. In fact, contrary to the court's analysis, the tort and terrorism exceptions are not mutually exclusive. But the court was correct that the tort exception's territorial limitation cannot be avoided by pleading the kind of "material support" claim that falls within the terrorism exception when brought against a country designated by the Secretary of State. To satisfy the domestic tort exception, petitioners must allege that Saudi Arabia, its officials, or employees, committed tortious acts within the United States. Petitioners' complaints do not satisfy that requirement. The court of appeals' decision is the first to consider the interplay of the domestic tort and terrorism exceptions in circumstances such as these, and its holding on this question does not warrant this Court's review.

a. The domestic tort exception is not categorically unavailable for claims that might be brought under the

13

terrorism exception if the foreign state were designated by the Secretary of State. The court of appeals' reliance (Pet. App. 33a) on language that the terrorism exception applies only in a "case not otherwise covered by this chapter," 28 U.S.C. 1605A(a)(1), was misplaced. The court reasoned from this language that "there would be no need for plaintiffs ever to rely on the Terrorism Exception" unless that provision were exclusive. Pet. App. 31a. But that conclusion is mistaken, because the tort exception is more limited than the terrorism exception in a critical respect. The tort exception "covers only torts occurring within the territorial jurisdiction of the United States," *Amerada Hess*, 488 U.S. at 441. By contrast, the terrorism exception contains no geographic limitation. This difference provides the key to understanding Congress's passage of the terrorism exception. As reflected in the legislative history of earlier versions of the legislation, Congress's concern was not to impose new limits on the domestic tort exception, but instead to expand jurisdiction to cover a narrow class of claims based on conduct abroad. See, *e.g.*, H.R. Rep. No. 702, 103d Cong., 2d Sess. 3, 5 (1994) (explaining that the bill would "expand" jurisdiction to include claims by "an American who is grievously mistreated abroad by a foreign government"). The court erred in concluding that Congress intended in 1996 to narrow the tort exception so as to exclude from its scope acts of terrorism committed within the United States.

b. The United States agrees with the court of appeals, however, that the FSIA should not be construed to allow circumvention of the important limitations Congress imposed on both the domestic tort and the terrorism exceptions to immunity. Petitioners do not allege that officials or employees of the Kingdom of Saudi Ara-

14

bia personally committed tortious acts in the United States or directed others to do so. The act of Saudi Arabia that forms the central basis of petitioners' claims is that, outside the United States, it donated funds to ostensible charities. *Id.* at 5a. Such acts taken by a foreign government outside the United States, without more, would fall outside the scope of the domestic tort exception. Petitioners seek to overcome the territorial limit on the tort exception by alleging that Saudi Arabia funneled money through those charities to al Qaeda, thereby providing "material support to [the] terrorists" who committed the September 11 attacks in the United States. *Id.* at 28a; see Pet. 4 (claim concerns Saudi Arabia's alleged "role[] in directing significant financial and logistical support to al Qaeda"). Such allegations of "material support" could establish jurisdiction under the terrorism exception over a state designated as a state sponsor of terrorism by the Secretary of State. But as the court of appeals recognized, if all allegations of extraterritorial "material support" by a state to a terrorist organization were permitted to satisfy the domestic tort exception, "[a]n important procedural safeguard [of the terrorism exception]—that the foreign state be designated a state sponsor of terrorism—would in effect be vitiated." Pet. App. 31a.

The domestic tort exception, moreover, requires not merely that the foreign state's extraterritorial conduct have some causal connection to tortious injury in the United States, but that "the tortious act or omission of that foreign state or of any official or employee" be committed within the United States. 28 U.S.C. 1605(a)(5). In *Amerada Hess*, the Court considered and rejected the argument that domestic effects of a foreign state's tortious conduct abroad satisfy the exception. 488 U.S.

15

at 441. The Court noted that, in contrast to the FSIA's commercial activity exception, 28 U.S.C. 1605(a)(2), the tort exception "makes no mention of 'territory outside the United States' or of 'direct effects' in the United States." *Amerada Hess*, 488 U.S. at 441. See *Asociacion de Reclamantes*, 735 F.2d at 1524 ("[W]here Congress intended" domestic effects to suffice "it said so more explicitly," as in Section 1605(a)(2)); *House Report* 21 (to come within the exception, "the tortious act or omission of a foreign state or its officials or employees * * * must occur within the jurisdiction of the United States"). The tort exception's territorial limitation protects against conflict that would arise from asserting jurisdiction over a foreign government's actions taken in its own territory, and also serves to deter foreign courts from exercising jurisdiction over the United States for actions taken in the United States.

Accordingly, the courts of appeals have recognized that jurisdiction under the tort exception must be based entirely on acts of the foreign state within the United States. See *Asociacion de Reclamantes*, 735 F.2d at 1525 ("the entire tort" committed by the foreign state must "have occurred here"); *Persinger* v. *Islamic Republic of Iran*, 729 F.2d 835, 842 (D.C. Cir. 1984) ("Iran is immune from tort suits here for actions taken by it on its own territory."), cert. denied, 469 U.S. 81 (1984). For example, in *O'Bryan* v. *Holy See*, 556 F.3d 361 (2009), petition for cert. pending, No. 08-1384 (filed May 7, 2009), the Sixth Circuit held that "any portion of plaintiffs' claims that relies upon acts committed by the Holy See abroad cannot survive," including "negligent supervision" abroad of clergy in the United States. *Id.* at 385.

Petitioners do not argue that jurisdiction under the tort exception could be premised entirely on acts by

16

Saudi Arabia and its officers or employees in the United States, as the cases just cited require. Rather, petitioners contend that the domestic acts of the September 11 hijackers should be ascribed to Saudi Arabia under a concerted-action theory. Pet. Reply Br. 7 (relying on "conspiracy and aiding and abetting claims" to satisfy territoriality requirement). Jurisdiction under the tort exception, however, cannot be based on the tortious acts of third parties, even if the applicable substantive law would permit holding the foreign state liable for those acts under a theory of secondary liability. The jurisdictional inquiry is one of federal law, and the FSIA tort exception strips foreign states of immunity only for injuries "caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment." 28 U.S.C. 1605(a)(5). It is the foreign state's act or omission—not that of any third party—that must occur in the United States.[4]

---

[4] The Federal Insurance complaint does allege that "a Saudi intelligence official named Omar al Bayoumi provided direct assistance to * * * two of the September 11th hijackers" to facilitate their settlement in San Diego in early 2000. C.A. App. 2004 (¶ 411). That allegation, though it does satisfy the territoriality requirement, does "not permit the court to infer more than the mere possibility of misconduct," and is therefore inadequate to sustain petitioners' burden. *Ashcroft* v. *Iqbal*, No. 07-1015 (May 18, 2009), slip op. 15. Indeed, the National Commission on Terrorist Attacks Upon the United States (9/11 Commission) found, after considering that connection and others, that al Bayoumi was "an unlikely candidate for clandestine involvement with Islamic extremists." *9/11 Commission Report* 218 (visited May 27, 2009) <http://www.9-11commission.gov/report/911Report.pdf>.

The same complaint alleges that certain charities used offices in the United States to provide financing to al Qaeda. See, *e.g.*, C.A. App. 1942 (¶ 108) (alleging Benevolence International Foundation laundered over $1 million for al Qaeda). The claims against those charities remain

17

The court of appeals' decision is the first to grapple with the interplay between the FSIA's terrorism and domestic tort exceptions in a factual circumstance of this kind. Although petitioners assert a conflict with appellate decisions permitting suit under the domestic tort exception for acts of extrajudicial killing, those cases are distinguishable because they involved acts in the United States directly attributable to the foreign governments. See *Liu* v. *Republic of China*, 892 F.2d 1419, 1421-1422 (9th Cir. 1989) (Taiwanese intelligence agent, acting in the United States, recruited assassins); see also *De Letelier* v. *Republic of Chile*, 748 F.2d 790, 791 (2d Cir. 1984) (noting one assassin was "an American citizen working for Chilean intelligence"), cert. denied, 471 U.S. 1125 (1985). No other court of appeals has considered how to apply the domestic tort exception to allegations of extraterritorial material support for terrorism on the part of a state that has not been designated a sponsor of terrorism. Although the court of appeals' analysis has

---

pending in the district court. See Pet. App. 4a; *id.* at 165a-166a & n.30. Petitioners contend (Pet. 7) that the charities were sufficiently controlled by Saudi Arabia that their acts should be ascribed to Saudi Arabia itself. Especially in light of the law's respect for corporate personality, which the FSIA recognizes, see *Dole Food*, 538 U.S. at 474-476, the complaint's "formulaic recitation," *Iqbal*, slip op. 17 (quoting *Bell Atlantic Corp.* v. *Twombly*, 550 U.S. 544, 555 (2007)), of incidents of control by Saudi Arabia—repeated verbatim with respect to eight charities, see C.A. App. CA. App. 1934-1964 (¶¶ 85, 114, 131, 151, 168, 181, 191, 208)—provides an insufficient basis for deeming the acts of the charities to be those of Saudi Arabia. Without further factual allegations supporting a conclusion that Saudi Arabia directed acts by the charities in the United States that assisted the September 11 attacks, the complaint fails to satisfy the FSIA's territoriality requirement. In any event, the sufficiency of these allegations to satisfy the FSIA's territoriality requirement as to Saudi Arabia itself presents a factbound issue that does not warrant review by this Court.

18

certain flaws, the court correctly identified the danger that a complaint making this kind of allegation would evade the limitations of the domestic tort and terrorism exceptions. Most important, the court's conclusion that petitioners had not overcome Saudi Arabia's immunity was correct. Further review by this Court is therefore unwarranted.

> ### C. The Court Of Appeals' Personal Jurisdiction Holding, The Scope Of Which Is Still Unclear, Does Not Warrant This Court's Review

1. The touchstone under the Due Process Clause for exercising personal jurisdiction in a civil case is the "requir[ement] that individuals have 'fair warning that a particular activity may subject [them] to the jurisdiction of a foreign sovereign.'" *Burger King Corp.* v. *Rudzewicz*, 471 U.S. 462, 472 (1985) (second pair of brackets in original) (quoting *Shaffer* v. *Heitner*, 433 U.S. 186, 218 (1977) (Stevens, J., concurring)). Although due process is not satisfied merely because a defendant can "foresee" that his actions will "have an effect" in the foreign jurisdiction, one who undertakes "intentional, and allegedly tortious, actions" that are "expressly aimed" at the forum is subject to suit there. *Calder* v. *Jones*, 465 U.S. 783, 789 (1984). It does not matter in such circumstances that the individual defendant is not "able to control" the means by which the tortious injury is caused in the foreign jurisdiction, as long as he acted with the "kn[owledge] that the brunt of th[e] injury" from his tortious act "would be felt" in the foreign forum. *Ibid.* Where the defendant acted with such knowledge, he "must 'reasonably anticipate being haled into court there' to answer for" his actions. *Id.* at 790 (quoting

19

*World-Wide Volkswagen Corp.* v. *Woodson*, 444 U.S. 286, 297 (1980)).

2. It is unclear precisely what legal standard the court of appeals applied in affirming the district court's holding that it lacked personal jurisdiction over the Princes for their personal actions. Petitioners focus (Pet. 26) on the court of appeals' statement that allegations that the Princes "intended to fund al Qaeda through their donations to Muslim charities," "[e]ven assuming that [they] were aware of Osama bin Laden's public announcements of jihad against the United States," could not form the basis of jurisdiction. Pet. App. 43a-44a. To the extent the court of appeals' language suggests that a defendant must specifically intend to cause injury to residents in the forum before a court there may exercise jurisdiction over him, that is incorrect. It is sufficient that the defendant took "intentional * * * tortious, actions" and "knew that the brunt of th[e] injury would be felt" in the foreign forum. *Calder*, 465 U.S. at 789-790.

The court of appeals' decision, however, is subject to a more limited construction, which focuses on the inadequacy of the particular allegations before it. At several points, the court of appeals stressed that petitioners' claims were based on "the princes' alleged *indirect* funding of al Qaeda." Pet. App. 44a (emphasis added). See *id.* at 42a-43a (stressing the "causal chain" petitioners rely upon). Where the connection between the defendant and direct tortfeasor is separated by intervening actors, the requirement of showing an "intentional, * * * tortious, act[]" on the part of the defendant, *Calder*, 465 U.S. at 789, demands more than a simple allegation. Petitioners would need to allege facts that could support the conclusion that the defendant acted with the

20

requisite intention and knowledge. See *Ashcroft* v. *Iqbal*, No. 07-1015 (May 18, 2009), slip op. 16-19.

Read in that fashion, the court of appeals' opinion comports with the opinions of the district court that were under review. That court stressed the inadequacy of petitioners' conclusory allegations to show that the Princes had knowledge that their donations to the charities were being diverted to support international terrorism. See, *e.g.*, Pet. App. 187a (despite "conclusory allegations that Prince Sultan aided and abetted terrorism," petitioners did "not offer any facts to lend support to their allegation that Prince Sultan purposefully directed his activities at this forum by donating to charities that he knew at the time supported international terrorism"); *id.* at 188a ("Conclusory allegations that [Prince Turki] donated money to charities, without specific factual allegations that he knew they were funneling money to terrorists, do not suffice."). Thus, the district court rightly focused on the sufficiency of the allegations to establish that the defendants' intentional acts of funding the charities were done with the knowledge that they would support al Qaeda's jihad against the United States. Regardless whether those conclusions of insufficiency were correct, the court's case-specific holdings on this score do not warrant review by this Court.

3. Even assuming that the court of appeals intended to establish a new legal standard for personal jurisdiction in this case, the presence of a circuit split is doubtful. In each of the three appellate cases cited by petitioners as evidence of a conflict (Pet. 28-29), the defendant was a primary wrongdoer—not, as here, a person whose alleged tortious act consisted of providing material support to another party engaged in tortious conduct. See *Mwani* v. *bin Laden*, 417 F.3d 1, 13 (D.C. Cir.

21

2005) (Osama bin Laden and al Qaeda "orchestrated the bombing of the American embassy in Nairobi" and other attacks against the United States.); *Panavision Int'l, L.P.* v. *Toeppen*, 141 F.3d 1316, 1322 (9th Cir. 1998) (defendant sought to extort money from plaintiff); *Janmark, Inc.* v. *Reidy*, 132 F.3d 1200, 1202 (7th Cir. 1997) (defendant threatened plaintiff's customers in an "effort[] to ruin [plaintiff's] business"). Whatever uncertainties inhere in the court of appeals' decision, it should not be construed to extend to cases of this different kind and thus to create a circuit conflict.

Nor, contrary to the petitioners' suggestion (Pet. 31-32), is the court's error likely to interfere with the government's ability to combat terrorism through criminal prosecutions under the material support provisions of 18 U.S.C. 2339B or terrorism financing provisions of 18 U.S.C. 2339C. The court of appeals' decision concerns only personal jurisdiction. It does not speak to the legislative jurisdiction of Congress to apply federal law extraterritorially. Pet. App. 39a. Moreover, in a criminal case, personal jurisdiction is based on the physical presence of the defendant in the forum, independent of any minimum-contacts analysis. See *Ker* v. *Illinois*, 119 U.S. 436, 443-444 (1886).

22

**CONCLUSION**

The petition for a writ of certiorari should be denied.

Respectfully submitted.

|  | ELENA KAGAN<br>*Solicitor General* |
|---|---|
|  | TONY WEST<br>*Assistant Attorney General* |
|  | EDWIN S. KNEEDLER<br>*Deputy Solicitor General* |
|  | DOUGLAS HALLWARD-DRIEMEIER<br>*Assistant to the Solicitor<br>General* |
| JAMES H. THESSIN<br>*Acting Legal Adviser* | DOUGLAS N. LETTER<br>SHARON SWINGLE<br>*Attorneys* |

MAY 2009