Nos.  05-1815, 05-1816, 05-1821, 05-1822 (consolidated)

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

————————————

**STANLEY BOIM, individually and as Administrator of the
ESTATE OF DAVID BOIM, and JOYCE BOIM,**
Plaintiffs/Appellees,
v.
**HOLY LAND FOUNDATION FOR RELIEF AND  DEVELOPMENT,
MOHAMMAD ABDUL HAMID KHALIL SALAH, et al.,**
Defendants/Appellants.

————————————

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

————————————

## BRIEF FOR THE UNITED STATES AS *AMICUS CURIAE*

————————————

**GREGORY G. KATSAS**
 *Assistant Attorney General*

**PATRICK J. FITZGERALD**
 *United States Attorney*

**JEFFREY S. BUCHOLTZ**
 *Principal Deputy Assistant*
 *Attorney General*

**DOUGLAS LETTER  (202) 514-3602**
**SHARON SWINGLE  (202) 353-2689**
 *Attorneys*
 *Civil Division, Room 7513*
 *U.S. Department of Justice*
 *950 Pennsylvania Ave, N.W.*
 *Washington, D.C.  20530-0001*

# TABLE OF CONTENTS

*Page*

STATEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    A.    Section 2333(a) Provides A  Remedy to U.S. Victims
           of International Terrorism That Incorporates Tort
           Principles Of Secondary Liability . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    B.    Section 2333(a) Permits Aiding/Abetting Liability When
           a Defendant has Provided Knowing and Substantial
           Assistance to a Tortfeasor, and the Act of International
           Terrorism that Injures the Victim Was Reasonably
           Foreseeable by the Defendant. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

CERTIFICATE OF COMPLIANCE

CERTIFICATE PURSUANT TO CIRCUIT RULE 31(e)(1)

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

*Cases*:

*Bragdon v. Abbott*, 524 U.S. 624 (1998).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Bressner v. Ambroziak*, 379 F.3d 478 (7th Cir. 2004). . . . . . . . . . . . . . . . . . . . . 17

*Central Bank, N.A. v. First Interstate Bank, N.A.*, 511 U.S. 164
    (1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 10, 11, 12, 13, 15, 16

*Damato v. Hermanson*, 153 F.3d 464 (7th Cir. 1988). . . . . . . . . . . . . . . . . . . . . 8

*Eastern Trading Co. v. Refco, Inc.*, 229 F.3d 617 (7th Cir. 2000). . . . . . . . . . . . 16

*EEOC v. Illinois*, 69 F.3d 167 (7th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Failla v. City of Passaic*, 146 F.3d 149 (3d Cir. 1998).. . . . . . . . . . . . . . . . . . . . 20

*Fassett v. Delta Kappa Epsilon (New York)*, 807 F.2d 1150 (3d Cir. 1986),
    *cert. denied*, 481 U.S. 1070 (1987).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Halberstam v. Welch*, 705 F.2d 472
    (D.C. Cir. 1983).. . . . . . . . . . . . . . . . . .   8, 16, 17, 18, 19, 20, 21, 22, 26, 27

*Harris Trust and Savings Bank v. Salomon Smith Barney Inc.*, 530 U.S.
    238 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

*Humanitarian Law Project v. Department of State*, 393 F.3d 902
    (9th Cir. 2004) (en banc).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Humanitarian Law Project v. Gonzales*, 380 F. Supp.2d 1134 (C.D. Cal.
    2005), *aff'd*, 509 F.3d 1122 (9th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . 25

*Humanitarian Law Project v. Mukasey*, 509 F.3d 1122
    (9th Cir. 2007).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24, 29

*Humanitarian Law Project v. Reno*, 205 F.3d 1130 (9th Cir. 2000),
    *cert. denied*, 532 U.S. 904 (2001). . . . . . . . . . . . . . . . . . . . . . . . . 24, 29, 31

*People's Mojahedin Organization of Iran v. Department of State*, 327 F.3d
1238 (D.C. Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Petro-Tech, Inc.. v. Western Co.*, 824 F.2d 1349 (3d Cir. 1987). . . . . . . . . . . . . 7

*Sender v. Mann*, 423 F. Supp. 2d 1155 (D. Colo. 2006). . . . . . . . . . . . . . . . . . 20

*Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004). . . . . . . . . . . . . . . . . . . . . . . . 13

*In re Temporomandibular Joint (TMJ) Implants Products Liability
Litigation*, 113 F.3d 1484 (8th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . 16

*United States v. Afshari*, 426 F.3d 1150 (9th Cir. 2005),
*cert. denied*, 127 S. Ct. 930 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 30

*United States v. Assi*, 414 F. Supp.2d 707 (E.D. Mich. 2006). . . . . . . . . 24, 25, 29

*United States v. Fountain*, 768 F.2d 790 (7th Cir. 1985). . . . . . . . . . . . . . . . . . 16

*United States v. Hammoud*, 381 F.3d 316 (4th Cir. 2004), *vacated on other
grounds*, 543 U.S. 1097 (2005), *reinstated in part*,
405 F.3d 1034 (4th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*United States v. Marzook*, 383 F. Supp.2d 1056 (N.D. Ill. 2005). . . . . . . . . 24, 29

*United States v. Taleb-Jedi*, ___ F. Supp.2d ___, 2008 WL 2832183
(E.D.N.Y. July 23, 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25, 29

**Constitution:**

United States Constitution, First Amendment. . . . . . . . . . . . . . . . . . . . . . . . . . 6

**Statutes:**

18 U.S.C. § 1964(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Antiterrorism and Effective Death Penalty Act of 1996
("Antiterrorism Act"), Pub. L. No. 104-132 § 301(a)(7). . . . . . . . . . . . . . 23

18 U.S.C. § 2331(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 14, 28

18 U.S.C. § 2333(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*
18 U.S.C. § 2337. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 14
18 U.S.C. § 2339(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
18 U.S.C. § 2339A. . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 22, 23
18 U.S.C. § 2339B . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

28 U.S.C. § 517. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Torture Victim Protection Act (TVPA) (Pub. Law No. 102-256,
      106 Stat. 73, codified as a note to 28 U.S.C. §1350 note). . . . . . . . . . 14, 15

Alien Tort Statute 28 U.S.C. §1350. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

Foreign Sovereign Immunities Act, 28 U.S.C. § 1602 *et seq.*. . . . . . . . . . . . . . . 14

50 U.S.C. § 1705. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

ERISA, Section 502(a)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
ERISA, Section 502(*l*) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Securities Act of 1934, § 10(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11, 12, 15

Pub. L. No. 101-519, 104 Stat. 2250 (1990). . . . . . . . . . . . . . . . . . . . . . . . . . 8

Pub. L. No. 102-572, 106 Stat. 4506 (1992). . . . . . . . . . . . . . . . . . . . . . . . . . 8

## Executive Materials:

62 Fed. Reg. 52,649 (1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Executive Order 12,947, 60 Fed. Reg. 5079 (1995). . . . . . . . . . . . . . . . . . . . 4, 27

Executive Order 13,224, 66 Fed. Reg. 49,079 (2001). . . . . . . . . . . . . . . . . . . . 4

## Rules:

Federal Rule of Appellate Procedure 29(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Legislative Materials*:

137 Cong. Rec. 8143 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

H.R. Rep. No. 104-383 (1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25

S. Rep. No. 102-342, at 22 (1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 10

*Antiterrorism Act of 1990*, Hearing before the Subcommittee on
    Courts and Administrative Practice, Senate Committee on the
    Judiciary, 101st Cong. 2d Sess. (1990).. . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

*Miscellaneous*:

Brief for the United States as *Amicus Curiae*,
    *American Isuzu Motor, Inc. v. Ntsebeza*, No. 07-919 (Sup.Ct.). . . . . . . . . . 13

*Restatement (Second) of Torts*, §876(b) (1979). . . . . . . . . . . . . . . 8, 17, 18, 19, 26

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

_____

**Nos. 05-1815, 05-1816, 05-1821, 05-1822 (consolidated)**

_____

**STANLEY BOIM, individually and as Administrator of the
ESTATE OF DAVID BOIM, and JOYCE BOIM,
Plaintiffs/Appellees,
v.
HOLY LAND FOUNDATION FOR RELIEF AND DEVELOPMENT,
MOHAMMAD ABDUL HAMID KHALIL SALAH, et al.,
Defendants/Appellants.**

_____

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

_____

**BRIEF FOR THE UNITED STATES AS *AMICUS CURIAE***

_____

Pursuant to this Court's order of June 16, 2008, as well as 28 U.S.C. § 517 and

Federal Rule of Appellate Procedure 29(a), the United States files this brief as *amicus*

*curiae*.  The United States appreciates the Court's invitation to file an *amicus* brief.

The provision at issue – 18 U.S.C. § 2333(a) –  was supported by the Executive

Branch as an effective weapon in the battle against international terrorism; when

correctly applied, it discourages those who would provide financing that is later used

for terrorist attacks.

As explained below, Congress established in Section 2333(a) a civil cause of action to be defined by standard common law tort principles, under which United States nationals can sue those who injure them through acts of international terrorism. This cause of action includes, in appropriate circumstances, secondary tort liability under civil aiding/abetting and conspiracy theories. However, for such liability to be imposed, there must be a sufficient connection between the actions of the defendant and the act of international terrorism that injures the victim. The sufficiency of that connection depends on an analysis of various factors that U.S. courts have applied in the domestic civil tort law context, as well as on policies embodied in criminal anti-terrorism statutes passed shortly after Section 2333(a). These criminal statutes are helpful in  applying Section 2333(a) because they are part of the legal system Congress has put in place for deterring terrorist acts.

In the view of the United States, liability can be imposed under Section 2333(a) if common law tort standards are met even in the absence of a specific intent by the defendant to assist in acts of international terrorism – although the defendant's intent will normally be a substantial factor in the analysis. Thus, where a defendant knowingly gives significant monetary assistance to a terrorist organization, and that entity commits a terrorist attack, the defendant's financial assistance can constitute the knowing and substantial assistance necessary for secondary liability under Section

2

2333(a) for reasonably foreseeable terrorist acts.  Neither Section 2333(a) nor the Constitution requires that tort liability depend on establishing a defendant's specific intent to further the violent component of a terrorist organization.

However, the United States does not agree that a violation of 18 U.S.C. § 2339B – a criminal statute punishing provision of material support to foreign terrorist organizations designated by the Secretary of State – automatically constitutes an act of international terrorism giving rise to liability under Section 2333(a).  Through Section 2339B, Congress has imposed criminal liability when an individual knowingly provides material support to a designated organization, regardless of how the individual intends that the support be used and regardless of how the support in fact is used.  In certain factual situations, criminal conduct would not support civil tort liability under Section 2333(a), such as where the connection between a defendant's actions and the act of international terrorism that harms the victim is insubstantial.

The United States takes no position on whether the record here contains sufficient evidence to support liability by the defendants for the murder of David Boim.

## STATEMENT

**1.** This appeal arises from a civil suit brought by Joyce and Stanley Boim stemming from the 1996 murder of their son David by Hamas terrorists. The Boims filed this action under 18 U.S.C. § 2333(a), which provides:

> Any national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor in any appropriate district court of the United States and shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees.

At the time of David Boim's murder, a 1995 Executive Order prohibited U.S. persons from providing funds to Hamas, based on the President's determination that the organization threatened the Middle East peace process. See E.O. 12,947 (60 Fed. Reg. 5079, 5081 (1995)). That Executive Order has been renewed annually and remains in place. Subsequently, the Secretary of State designated Hamas as a Foreign Terrorist Organization for purposes of the Antiterrorism and Effective Death Penalty Act of 1996 – a designation that is still in force. See 62 Fed. Reg. 52,649 (1997). It is thus a criminal offense under 18 U.S.C. § 2339B to provide material support to Hamas. In addition, Hamas has been designated as a terrorist organization pursuant to Executive Order 13,224 (issued following the 9/11 terrorist attacks), which also forbids U.S. persons from donating money to it. See 66 Fed. Reg. 49,079 (2001).

4

The Boims' amended complaint seeks to impose liability on the defendants under two theories.  First, the Boims contend that two Hamas operatives committed an act of international terrorism by murdering their son, and that the defendants are liable under conspiracy and aiding/abetting tort theories by giving money to Hamas. Second, the Boims assert that, by providing material support to Hamas, defendants committed acts of "international terrorism," which is statutorily defined (18 U.S.C. § 2331(1)) as activities involving violent or dangerous criminal acts intended to intimidate or coerce a civilian population, influence government policy, or affect the conduct of a government, and occurring primarily outside the United States.[1]

## ARGUMENT

As validly construed, Section 2333(a) provides liability under common law tort principles that include aiding/abetting and conspiracy liability in appropriate circumstances.  This construction is supported by the text and history of Section 2333(a).  It gains further support from Congress' determination that monetary assistance to a designated terrorist organization is forbidden regardless of whether the donor subjectively intends to help the organization's violent component.

---

[1] One of the defendants – Holy Land Foundation – and several of its officers are under indictment in the Northern District of Texas for providing funds to Hamas in violation of 50 U.S.C. § 1705 and 18 U.S.C. § 2339B.  Trial is expected to begin in September 2008.

When the conditions for civil aiding/abetting and conspiracy liability are met, the imposition of liability raises no serious constitutional question.  Neither the First Amendment nor any other part of the Constitution guarantees a right to provide money to a foreign terrorist organization.

### A. Section 2333(a) Provides A Remedy to U.S. Victims of International Terrorism That Incorporates Tort Principles Of Secondary Liability.

Because "Congress has not enacted a general civil aiding and abetting statute," the question whether a particular civil cause of action encompasses aiding and abetting must be determined case-by-case.  See *Central Bank, N.A. v. First Interstate Bank, N.A.*, 511 U.S. 164, 182 (1994).  As we next show, the text, history, and context of Section 2333(a) make clear that Congress intended to incorporate tort principles of secondary liability.  In this respect, Section 2333(a) differs from certain other federal statutes, discussed in more detail below, where those factors do not support the imposition of secondary liability.

**1.**  The text of Section 2333(a) supports the imposition of secondary liability. The statutory language provides that "[a]ny national of the United States injured in his or her person [or] property * * * by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor * * *."  18 U.S.C. § 2333(a). Although Congress specifically barred suits under this provision against certain types

6

of defendants (the United States and foreign states, as well as their agencies, or officers or employees acting in an official capacity or under color of legal authority, see 18 U.S.C. § 2337), Congress did not address – and thus in no way restricted – the other types of defendants who can be held liable.  Nor does the statutory text distinguish between primary and secondary tortfeasors.

Moreover, the wording of Section 2333(a) closely resembles in key ways a civil damages provision in RICO (18 U.S.C. § 1964(c)).  At the time that Section 2333(a) was passed in 1990 and 1992, this provision in RICO had been interpreted to include aiding/abetting liability.  See, *e.g.*, *Petro-Tech, Inc.. v. Western Co.*, 824 F.2d 1349, 1356 (3d Cir. 1987).  Congress' utilization of similar language in Section 2333(a) thus supports an inference that the remedy created by that provision encompasses secondary liability.  See, *e.g., Bragdon v. Abbott*, 524 U.S. 624, 645 (1998) ("When administrative and judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its administrative and judicial interpretations as well").

As we next show, the conclusion that Congress intended for Section 2333(a) to encompass secondary liability is also strongly supported by the history and context of that provision.

7

**2.**   Section 2333(a) was first enacted by Congress in 1990 (see Pub. L. No. 101-519, 104 Stat. 2250), but was repealed in 1991.  See S. Rep. No. 102-342, at 22 (1992); 137 Cong. Rec. 8143 (1991) (Sen. Grassley).  It was reenacted in 1992, in identical form to its prior version.  See Pub. L. No. 102-572, 106 Stat. 4506 (1992).

During hearings in 1990 on the provision that became Section 2333(a), former Justice Department official Joseph A. Morris explained that "American victims seeking compensation for physical, psychological, and economic injuries naturally turn to the common law of tort.  American tort law in general would speak quite effectively to the facts and circumstances of most terrorist actions not involving acts of state by foreign governments."  *Antiterrorism Act of 1990*, Hearing before the Subcommittee on Courts and Administrative Practice, Senate Committee on the Judiciary, 101st Cong., 2d Sess. (1990), at 83.  At that time, a recognized body of civil tort law extended liability not only to defendants who actually committed a tort, but also to those who aided and abetted its commission.  See, *e.g.*, *Restatement (Second) of Torts*, §876(b) (1979) (describing tort liability for concerted action); *Damato v. Hermanson*, 153 F.3d 464, 472 n.10 (7th Cir. 1988) (applying civil tort aiding/abetting liability); *Halberstam v. Welch*, 705 F.2d 472, 477-88 (D.C. Cir. 1983) (same).

At the 1990 hearing, Professor Wendy Perdue questioned whether the proposed cause of action was sufficiently broad, noting that a meaningful remedy for victims would have to extend not only to those who commit terrorist acts, who are unlikely to have assets in the United States, but also to "the organizations, businesses and nations who support, encourage and supply terrorists[,] who are likely to have reachable assets." Hearing, at 126.

Senator Grassley raised this concern about secondary tort liability with Morris, who responded that the bill would "bring all of the substantive law of the American tort law system" into play. *Id.* at 136. Morris noted that in criminal law there is a doctrine of vicarious liability, and "[t]he tort law system has similar rules where liability attaches to those who knowingly or negligently make it possible for some actor grievously to injure somebody else. As Section 2333(a) of this bill is drafted, it brings all of that tort law potential into any of these civil suits." *Ibid.*

Senator Grassley sponsored Section 2333(a), and explained that his bill "empowers victims with all the weapons available in civil litigation * * *. The [Antiterrorism Act] accords victims of terrorism the remedies of American tort law * * *." 137 Cong. Rec. 8143 (1991).

The Senate Report on Section 2333(a) emphasized that, by imposing "liability at ***any*** point along the causal chain of terrorism, it would interrupt, or at least imperil,

9

the flow of money."  S. Rep. No. 102-342, at 22 (1992) (emphasis added).  This report also explained that the substance of actions under Section 2333(a) "is not defined by the statute, because the fact patterns giving rise to such suits will be as varied and numerous as those found in the law of torts."  *Id.* at 45.

Thus, the history of Section 2333(a) and the context of its enactment show that Congress was specifically concerned with enabling victims to sue not only those who actually carry out terrorist attacks, but also those who make terrorist acts possible through, for example, donations of funds.  Congress was assured that Section 2333(a) would address this concern by incorporating domestic tort law principles of secondary liability; this provision was designed from the outset to permit recovery against those who aid and abet international terrorists.  Reading Section 2333(a) to include secondary liability effectuates Congress' goal of reaching those who support terrorist attacks through donation of funds.

**3.a.**  In *Central Bank v. First Interstate Bank*, 511 U.S. 164, the Supreme Court declined to imply a private cause of action based on aiding/abetting liability under Section 10(b) of the Securities Act of 1934.  In holding that the private cause of action implied under Section 10(b) does not extend to aiding and abetting claims, the Court relied heavily on the lack of ***any*** express private right of action (see 511 U.S.

10

at 175-78), and the fact that in other provisions of the securities laws Congress "chose to impose some forms of secondary liability, but not others." *Id.* at 184.

The interpretive considerations addressed in *Central Bank* are not present here, where the available evidence shows – in stark contrast to the context of Section 10(b) and its implied private right of action – that Congress intended for the cause of action created by Section 2333(a) to incorporate secondary liability. Compare 511 U.S. at 184 (noting that available evidence of Congress' intent suggested that the failure to impose civil liability for aiding/abetting under Section 10(b) was "a deliberate congressional choice with which the courts should not interfere"). Furthermore, because the text of Section 2333(a) is silent concerning the types of conduct that are prohibited and the types of possible defendants who can be sued, it does not violence to the text to read it – consistent with the interpretation of similar language in RICO, and with Congress' intent – to extend to aiding/abetting. The text of Section 19(b), in contrast, did set out the conduct that is prohibited, and it did not include aiding/abetting. See *Central Bank*, 511 U.S. at 176 (refusing to imply a private right of action under § 10(b) based on aiding/abetting liability, where the scope of such liability would extend beyond the statute's textual reference to persons who "directly or indirectly" engage in prohibited conduct, and would reach "persons who do not engage in the proscribed activities at all"); *id.* at 177 ("It is inconsistent with settled

11

methodology in § 10(b) cases to extend liability beyond the scope of conduct prohibited by the statutory text."). And the concerns expressed in *Central Bank* about the practical ramifications of implying a private right of action for aiding/abetting (see 511 U.S. at 188), have no applicability here, where Congress clearly intended to shut down all domestic financing of terrorist organizations.

This case is more similar to *Harris Trust and Savings Bank v. Salomon Smith Barney Inc.*, 530 U.S. 238 (2000), where the Supreme Court interpreted ERISA to reach more than the immediate wrongdoer, and allowed an action for restitution against a third party who would have been liable under the common law of trusts. *Id.* at 245-53. The Court held in *Harris Trust* that its interpretation was reinforced by ERISA Section 502(*l*), concerning imposition of civil penalties (see 530 U.S. at 247-49) – a provision enacted 15 years after Section 502(a)(3), which established the private cause of action. In the case at bar, similarly, although the criminal liability provisions of 18 U.S.C. §§ 2339A and 2339B rendering it a criminal offense to lend material assistance to terrorist organizations in certain circumstances were enacted after Section 2333(a), they shed light on that provision's appropriate construction.

**b.** It is also the position of the United States that courts should not imply a private cause of action for secondary tort liability under the Alien Tort Statute (28 U.S.C. § 1350), given the absence of any indication that Congress intended to so

provide.  See, *e.g.*, Brief for United States as *Amicus Curiae*, in *American Isuzu Motors, Inc. v. Ntsebeza*, No. 07-919 (Sup.Ct.**).**

The Alien Tort Statute is quite different from Section 2333(a).  First, because the Alien Tort Statute is purely jurisdictional (see *Sosa v. Alvarez-Machain*, 542 U.S. 692, 725, 714, 724, 729 (2004)), any private cause of action must be judicially created.  The Alien Tort Statute context is thus similar to *Central Bank*, where the Supreme Court refused to extend an implied cause of action to reach aiding/abetting liability, and unlike Section 2333(a) (and *Harris Trust*), where Congress expressly created a private remedy.  See *Sosa*, 542 U.S. at 726 (cautioning courts against exercising "innovative authority over substantive law" without "legislative guidance").  Here, the text and history of Section 2333(a) provide guidance about Congress' intent that the cause of action it creates should be informed by, and incorporate, common law tort principles of secondary liability.

Second, claims brought under the Alien Tort Statute for violation of "the law of nations or a treaty of the United States" pose a substantial threat of interference with the conduct of foreign relations.  *Sosa*, 542 U.S. at 724-33.  This is a particular concern with aiding/abetting claims, which often (such as in *American Isuzu Motors*) seek to impose liability on private entities for allegedly aiding/abetting foreign governments in mistreating their own citizens within their own borders, although the

13

governments themselves are immune from suit under the Foreign Sovereign Immunities Act (28 U.S.C. §§ 1602 *et seq.*). Such suits, by requiring judgments about the lawfulness of the conduct of foreign states with respect to their own citizens, and thereby interfering with United States foreign policy tools for influencing such conduct, threaten to entangle federal courts in an area that the Constitution assigns to the political branches. Section 2333(a) is less likely to raise similar concerns, not only because it incorporates an existing body of tort law, but also because Congress has limited the class of plaintiffs to U.S. nationals injured by reason of acts of international terrorism (which Congress has defined, see 18 U.S.C. § 2331(1)), and has also barred suits against foreign states and their agencies, officials, and employees. See 18 U.S.C. § 2337.

**c.** The United States has also argued that the courts should not infer a Congressional intent to authorize secondary liability under the Torture Victim Protection Act ("TVPA") (Pub. L. No. 102-256, 106 Stat. 73, codified at 28 U.S.C. § 1350 note). That statute provides a civil damages cause of action against an individual who "subjects" another individual to torture or extra-judicial killing. In order to be liable under the statute, a defendant must be acting under "authority, or color of law, of any foreign nation." TVPA, § 2(a). The statute also defines torture

14

to mean certain acts directed at an individual who is in the "custody or physical control" of the torturer.

In such circumstances, it is clear that Congress did not intend to include secondary liability in the cause of action created by the TVPA.  If liability were imposed on those who merely give assist somewhere along the chain of events leading to torture, then Congress' express limitation of the TVPA to those who act under color of foreign law and who have custody or control over the victim would be defeated.  Secondary liability cannot be read into a statute to circumvent requirements that are explicit in the statute.  See *Central Bank*, 511 U.S. at 180 (emphasizing that implied cause of action under Section 10(b) for aiding and abetting would circumvent requirement for primary liability to show reliance).  No similar conflict is at issue here.

**B.   Section 2333(a) Permits Aiding/Abetting Liability When a Defendant has Provided Knowing and Substantial Assistance to a Tortfeasor, and the Act of International Terrorism that Injures the Victim Was Reasonably Foreseeable by the Defendant.**

Because Section 2333(a) imposes civil liability and because Congress plainly intended to incorporate civil tort law principles, this Court should look to civil aiding/abetting and conspiracy jurisprudence to define the reach of secondary liability under the statute.  That jurisprudence is summarized in the seminal D.C. Circuit

15

opinion in *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), authored by Judge Wald, joined by then-Judge Scalia and Judge Bork, which the Supreme Court has described as "a comprehensive opinion on the subject." *Central Bank*, 511 U.S. at 181. Accord *In re Temporomandibular Joint (TMJ) Implants Products Liability Litigation*, 113 F.3d 1484, 1495-96 (8th Cir. 1997) (relying on *Halberstam* discussion of civil aiding/abetting liability); *Fassett v. Delta Kappa Epsilon (New York)*, 807 F.2d 1150, 1162-64 (3d Cir. 1986) (same).

**1.** Before discussing civil secondary tort liability principles, it is worth noting that, although aiding/abetting liability is more deeply rooted in criminal law (see *Central Bank*, 511 U.S. at 181), in circumstances in which civil aiding/abetting liability applies, a lesser showing is required than is required for criminal liability. See *EEOC v. Illinois*, 69 F.3d 167, 170 (7th Cir. 1995) (criminal aiding/abetting "requires even more" than the "substantial and knowing assistance" necessary for civil aiding/abetting liability). See also *Eastern Trading Co. v. Refco, Inc.*, 229 F.3d 617, 622-24 (7th Cir. 2000).[2]

---

[2] This Court has observed that a heightened showing of intent is not always required for aiding/abetting liability even in the criminal context. In cases where a crime is especially serious, this Court has held that aiding/abetting liability can be imposed on someone who knows of the principal's purpose and knows that the aid provided will be used to further that purpose, but does not share the principal's purpose. See *United States v. Fountain*, 768 F.2d 790, 797-98 (7th Cir. 1985). Thus, for example, a gasoline seller who knows that the purchaser plans to make Molotov

16

**2.**  In *Halberstam*, the D.C. Circuit canvassed secondary civil tort liability law,

including the *Restatement (Second) of Torts*, § 876 (1979), which deals with liability

for persons acting in concert.

**a.**  The *Halberstam* court first discussed conspiracy as a distinct form of

secondary civil liability, depending upon an agreement to participate in an unlawful

act, and an injury caused by an overt act performed by one of the parties to the

agreement, done pursuant to and in furtherance of the common scheme.  705 F.2d at

477; see also *Bressner v. Ambroziak*, 379 F.3d 478, 483 (7th Cir. 2004) (describing

civil conspiracy liability standards).  The agreement can be tacit rather than explicit,

and the relevant evidence – such as the relationships between the actors and the

actions – will be useful in determining if an agreement should be inferred.

*Halberstam*, 705 F.2d at 477-81.

**b.**  The *Halberstam* court then explained that civil aiding/abetting liability

depends upon a showing that: "(1) the party whom the defendant aids must perform

a wrongful act that causes an injury; (2) the defendant must be generally aware of his

role as part of an overall illegal or tortious activity at the time that he provides

assistance; [and] (3) the defendant must knowingly and substantially assist the

---

cocktails to commit acts of terrorism would be guilty as an aider/abettor.  *Id.* at 798.

principal violation."   705 F.2d at 477.[3]   The aiding/abetting theory "focuses on whether a defendant knowingly gave 'substantial assistance' to someone who performed wrongful conduct, not on whether the defendant agreed to join the wrongful conduct."  *Id*. at 478.   Importantly, *Halberstam* also requires the specific injury-causing tort to be a "natural and foreseeable consequence" of the tort that the defendant assisted.  *Ibid.*

The *Halberstam* formulation drew on the *Restatement*'s standards for liability, under which a secondary tortfeasor must give "substantial assistance or encouragement" to the primary actor's tortious conduct.  *Restatement* § 876(b).  The injury to the plaintiff must have resulted from the tortious conduct of the primary tortfeasor.  *Ibid.*  And, if the "substantial assistance or encouragement" was given not to the tort that directly caused injury, but rather to another tort, then for liability to attach the injury-causing tort must have been done in "connection" with the other tort

---

[3]  We believe that the "principal violation" language in *Halberstam* does not refer to the direct, specific cause of injury – here, the killing of David Boim – because in *Halberstam* itself the defendant was found liable to the family of a murder victim when her assistance to the murderer consisted of helping him to launder the proceeds of his ongoing series of burglaries; the defendant was not present when the murder occurred, and knew nothing about it.  705 F.2d at 488.  Applying the six substantial assistance factors discussed below, the court reasoned that, although the amount of assistance provided "may not have been overwhelming as to any given burglary in the five-year life of this criminal operation, it added up over time to an essential part of the pattern."  *Ibid.*

18

that was assisted and must have been "foreseeable" to the person providing assistance. *Id.* at cmt. d.

Much of the analysis in *Halberstam* concerned the "substantial assistance" requirement. On this point, the *Restatement* had explained that aid that is too "slight" will not suffice, and identified five factors to which a court should look when considering whether assistance is sufficiently substantial:

1.    "the nature of the act encouraged"

2.    "the amount of assistance given by the defendant"

3.    "his presence or absence at the time of the tort"

4.    "his relation to the other," and

5.    "his state of mind."

*Restatement*, §876 cmt. d. *Halberstam* referenced these factors and added a sixth: the "duration of the assistance provided," which appears to focus in part on the relationship in time between the assistance and the act injuring the victim. 705 F.2d at 484.

The *Restatement* does not state an explicit position on whether one can have knowledge of and give "substantial assistance" to a tortious act for the purposes of liability without consciously intending to further the act. Applying the *Restatement*, some courts have said that a civil aider/abettor need not share the illegal intent of the

principal tortfeasor, as long as he knows of the offense and provides substantial assistance or encouragement to it.  See *Failla v. City of Passaic,* 146 F.3d 149, 156-58 (3d Cir. 1998); see also *Sender v. Mann*, 423 F. Supp. 2d 1155, 1176 (D. Colo. 2006) ("The knowledge element is satisfied if the defendant is 'generally aware of his role as part of an overall illegal or tortious activity * * *' and knowingly and substantially assists the principal violation. Wrongful intent is not an element; it is sufficient if the defendant 'knew of the breach of duty and participated in it.'" (citation omitted)).

    **c.**  An examination of the D.C. Circuit's application of these principles to the specific facts in *Halberstam* is helpful here.

    *Halberstam* involved a civil action brought by the heirs of Michael Halberstam against individuals after Halberstam was killed by Bernard Welch during a botched house burglary.  The D.C. Circuit's opinion focused on the liability of Linda Hamilton, who lived with Welch for over five years and took substantial actions during that time to assist his illegal burglary operation.

    As explained in *Halberstam*, Hamilton knew that Welch had no employment and spent his days at home managing their investments; she also knew that he went out most evenings, and brought into the household large amounts of money in cash. Further, she knew that Welch melted gold and silver into bars, which he sold to

20

refiners. Hamilton kept the books for Welch's business, and was aware that no money flowed out to purchase the precious metals and antiques that Welch sold. 705 F.3d at 474-76.

Premised largely on Hamilton's testimony, the district court in *Halberstam* found that she knew the purpose of Welch's evening forays and the means he used to acquire their growing considerable wealth. The court found that Hamilton was a "willing partner" in Welch's criminal activities of breaking into homes and stealing items. In addition, Hamilton was found to have knowingly assisted Welch in his illicit business as secretary and recordkeeper. Thus, she knowingly and willingly assisted in Welch's burglary enterprise. As the D.C. Circuit concluded, Hamilton and Welch "did not commit burglaries together but their activities were symbiotic. They were pursuing the same object by different but related means." 705 F.2d at 487.

Based on all of this, the D.C. Circuit held that Hamilton was civilly liable as a coconspirator for Welch's murder of Halberstam because that action "was a reasonably foreseeable consequence of the scheme." 705 F.2d at 487. In addition, Hamilton was liable under an aiding/abetting theory because she assisted Welch, knowing that he engaged in illegal acquisition of goods; and her assistance in the burglary enterprise was "indisputably important," given that it added up over five

years to an "essential part" of the overall operation, and she had an "intent and desire to make the venture succeed." *Id.* at 488.

The D.C. Circuit found Hamilton liable for Halberstam's murder even though she was not present and did not know that Welch was burglarizing Halberstam's home, and certainly did not know that Welch was going to kill Halberstam when the latter interrupted the burglary. The D.C. Circuit reasoned that Hamilton's assistance to Welch's overall burglary criminal enterprise was knowing and substantial, and, with regard to Halberstam's killing, "it was enough that [Hamilton] knew that he was involved in some type of personal property crime at night – whether as a fence, burglar, or armed robber made no difference – because violence and killing is a foreseeable risk in any of these enterprises." 705 F.2d at 488.[4]

**3.** While Section 2333(a) is defined by civil tort principles, the subsequent enactments of 18 U.S.C. §§ 2339A and 2339B reinforce the conclusion that Section 2333(a) cannot properly be limited to those who personally commit acts of

---

[4] Significantly, the court discussed Hamilton's "intent and desire" as one of the factors to be considered in determining whether Hamilton had provided substantial assistance to the criminal venture, and *not* as a separate intent element for liability. 705 F.2d at 488.

22

international terrorism.[5]  In addition, the anti-terrorism policies embodied in Section 2339B in particular reflect a complementary legislative scheme that should influence cases involving claims arising out of the provision of funds to entities designated as terrorist organizations by the United States.  Thus, in order to carry out the important Congressional purpose of deterring terrorism – reflected in both the civil provisions in Section 2333(a) and the criminal provisions in Section 2339B – tort liability under the former can in some circumstances validly be imposed on defendants who provide substantial assistance to terrorist organizations such as Hamas through donations of money, knowing that these groups have been so designated or that they engage in terrorism as part of their broader activities.

Section 2339A makes it unlawful to provide "material support or resources * * * knowing or intending that they are to be used" in preparing or carrying out certain specified terrorism-related crimes.  Section 2339B makes it unlawful to "knowingly provid[e] material support or resources," to an entity designated by the United States as a "foreign terrorist organization."  Guilt under Section 2339B does not depend on any showing of specific intent by a defendant to further the illegal activities of the terrorist organization.  See *Humanitarian Law*

---

[5]  Section 2339A was enacted in 1994, shortly after Section 2339(a), while Section 2339B was enacted in 1996.

*Project v. Mukasey*, 509 F.3d 1122, 1132 (9th Cir. 2007); *United States v. Taleb-Jedi*, ___ F. Supp.2d ___, 2008 WL 2832183, at *14-*18 (E.D.N.Y. July 23, 2008); *United States v. Assi*, 414 F. Supp.2d 707, 719-24 (E.D. Mich. 2006); *United States v. Marzook*, 383 F. Supp.2d 1056, 1068-71 (N.D. Ill. 2005).

In enacting Section 2339B, Congress determined that "foreign organizations that engage in terrorist activity are so tainted by their criminal conduct that ***any*** contribution to such an organization facilitates that conduct." Antiterrorism and Effective Death Penalty Act of 1996 ("Antiterrorism Act"), Pub. L. No. 104-132 § 301(a)(7), 18 U.S.C. 2339B note (emphasis added). Because of "the fungibility of financial resources and other types of material support," any such support "helps defray the cost to the terrorist organization of running the ostensibly legitimate activities. This in turn frees an equal sum that can then be spent on terrorist activities." H.R. Rep. No. 104-383, at 81 (1995).

Given its fungibility, material support can further an organization's terrorist activities whether or not the donor intends that result. "Once the support is given, the donor has no control over how it is used." *Humanitarian Law Project v. Reno*, 205 F.3d 1130, 1134 (9th Cir. 2000).

Further, even if monetary support were not fungible and even if a donor could somehow ensure that his donation would be used only for legal purposes, that support could still further terrorist activities by allowing terrorist entities to gain goodwill that can be used for terrorist recruitment or other assistance, or to gain political legitimacy for those who carry out deadly terrorist acts.  See *Taleb-Jedi*, 2008 WL 2832183, at *7 ("[T]hese organizations use their humanitarian pursuits to garner support for their terrorist activity. * * * [C]onduct that is overtly non-terrorist, or even eleemosynary, can serve violent ends when performed on behalf of a terrorist organization").

Accordingly, Congress banned a broad array of types of material support because the risk is too great that it would wind up furthering the terrorist group's violent activities, regardless of the donor's intent.  See *Assi*, 414 F. Supp.2d at 722 ("Congress, concerned that terrorist organizations would raise funds 'under the cloak of humanitarian or charitable exercise,' sought to pass legislation that would 'severely restrict the ability of terrorist organizations to raise much needed funds for their terrorist acts within the United States.'") (quoting H.R. Rep. No. 104-383, at *43 (1995), and *Humanitarian Law Project v. Gonzales*, 380 F. Supp.2d 1134, 1146 (C.D. Cal. 2005), *aff'd*, 509 F.3d 1122 (9th Cir. 2007)).

Congress in Section 2339B imposed criminal liability not only on those who personally commit acts of terrorism, but also on those who assist such acts by

25

providing material support to terrorists or terrorist organizations. It did so because such support to a foreign terrorist organization undermines the anti-terrorism policies of the United States even if the donor does not have any specific intent to further the violent activities of such an organization. The support alone, regardless of the intent of the donor, is the underpinning of criminal liability for material support because terrorist organizations such as Hamas do not actually have dual and independent capacities. Rather, the two components are inseparable parts of the same organization that has an overall goal that is to be achieved in part through terrorism.

**4.** Taking *Halberstam*'s reasoning and the Congressional intent behind Section 2333(a) and Section 2339B into account, we believe that the answer to this Court's specific question in its June 16 order is that a donor to a terrorist organization can be civilly liable for a terrorist act on an aiding/abetting theory even if the donor does not intend to advance the violent component of the recipient organization's activities. Nevertheless, in order to recover under an aiding/abetting claim, a plaintiff under Section 2333(a) must show that the defendant knowingly provided substantial assistance to a terrorist organization. Whether the assistance provided qualifies as substantial will depend on an analysis of the relevant conduct by reference to the six *Restatement* and *Halberstam* factors. The plaintiff must then also show that the act

26

of international terrorism that actually injured the victim was reasonably foreseeable by the defendant.

We do not believe that it is sufficient for liability under Section 2333(a) to show simply that a defendant provided funds to a terrorist group, and that group later committed an act of international terrorism injuring a U.S. national.  However, the provision of funds could be a basis for liability if the donor knew that the group had been designated as a terrorist organization or was aware of the group's terrorist activity, and if the provision of funds was sufficiently substantial and the ultimate terrorist act was reasonably foreseeable.  In the case at bar, the required analysis is more complex because it involves support provided by the defendants to Hamas in part before that entity had been designated by the United States as a terrorist organization, although the murder of David Boim occurred after donations of money to Hamas by U.S. persons were already illegal under Executive Order 12,947.  Accordingly, in this specific case, application of Section 2333(a) may be most properly carried out by reference simply to the standard secondary tort liability principles described in *Halberstam* without reference to the policy embodied in Section 2339B.

**5.**  The United States disagrees with the plaintiffs' alternative argument that, by giving money to Hamas, defendants directly committed an act of "international

27

terrorism" defined by Section 2331(1), and are therefore liable under Section 2333(a).[6]

Section 2331(1) may have a broad reach, but this Court need not decide its precise boundaries because, even if the contribution of funds to Hamas by defendants constituted an "act of international terrorism," it would not necessarily follow that plaintiffs could recover damages from those defendants. A plaintiff in a Section 2333(a) suit must show that he has been injured "by reason of an act of international terrorism." 18 U.S.C. § 2333(a). Hence, treating the provision of funds to Hamas by defendants as an act of international terrorism in and of itself would not relieve plaintiffs of the necessity under Section 2333(a) to establish that David Boim was murdered "by reason of" defendants' donations of money to Hamas.

**6.** It is essential to emphasize that the United States strongly disagrees with Holy Land's contention in its supplemental *en banc* brief (at 24-29) that imposition of civil tort liability under Section 2333(a) depends upon proof that a defendant specifically intended to further the terrorist goals of an entity designated by the United States as a terrorist organization. Application of Section 2333(a) consistently

---

[6] Among other requirements, to constitute "international terrorism" under 18 U.S.C. § 2331(1), the relevant activities must "involve violent acts or acts dangerous to human life * * *."

28

with the principles set forth in this brief would be fully consonant with First and Fifth Amendment standards. Indeed, the crux of Holy Land's constitutional arguments has been overwhelmingly rejected by the courts. In the following cases, the courts (including *en banc* panels in the Fourth and Ninth Circuits) have correctly denied either or both of the constitutional arguments being reiterated here by Holy Land: *Humanitarian Law Project v. Mukasey*, 509 F.3d at 1130-33; *United States v. Afshari*, 426 F.3d 1150, 1159-62 (9th Cir. 2005), *cert. denied*, 127 S. Ct. 930 (2007); *Humanitarian Law Project v. Department of State*, 393 F.3d 902 (9th Cir. 2004) (*en banc*); *United States v. Hammoud*, 381 F.3d 316, 327-29 (4th Cir. 2004) (*en banc*), *vacated on other grounds*, 543 U.S. 1097 (2005), *reinstated in part*, 405 F.3d 1034 (4th Cir. 2005); *People's Mojahedin Organization of Iran v. Department of State*, 327 F.3d 1238, 1244 (D.C. Cir. 2003); *Taleb-Jedi*, 2008 WL 2832183, at *6-*19; *Assi*, 414 F. Supp.2d at 712-24; *Marzook*, 383 F. Supp.2d at 1067-71.

As the Ninth Circuit has consistently held in the *Humanitarian Law Project* litigation, there is no constitutional right to provide funds to foreign terrorist organizations. See, *e.g.*, *Humanitarian Law Project*, 205 F.3d at 1133-36. Because the defendants here had no constitutional rights to donate money to Hamas in the first place, imposing liability on them in the same way that secondary liability would be imposed under standard civil tort principles against a defendant who provided funds

29

to a domestic entity that then engaged in tortious activity obviously does not violate any constitutional rules.   Indeed, Holy Land's argument would have startling consequences because it would mean that the Constitution forbids a tort judgment based on facts showing that a defendant provided knowing and substantial assistance to an associate in carrying out a criminal enterprise, who then engaged in a specific tortious act that harmed a third party victim.   We are aware of no support for such a proposition.

It is important to recognize that the "specific intent to further illegal aims" standard advocated by Holy Land under Section 2333(a), or its complementary criminal provisions, would also mean that defendants would have a constitutional right to donate funds to al Qaeda, so long as those funds were meant by the donor for "political" or "humanitarian" activities.   As noted above, in cases involving Section 2339B, this argument has been rejected by courts on many occasions.

The Ninth Circuit most recently explained that donations of money to foreign terrorist organizations "are not akin to donations to domestic political parties or candidates."   *Afshari*, 426 F.3d at 1160.   The court made clear that this conclusion is based in part on the "[t]he deference due the Executive Branch in the area of national security * * *."   *Id.* at 1162.   As the court concluded, "[w]e must allow the political branches wide latitude in selecting the means to bring about the desired goal' of

30

'preventing the United States from being used as a base for terrorist fundraising.'"

*Id.* at 1162 (quoting *Humanitarian Law Project*, 205 F.3d at 1136).

## CONCLUSION

For the foregoing reasons, the United States believes that civil tort liability can be imposed under Section 2333(a) on a defendant who knowingly provides substantial assistance to an organization engaged in terrorist activities, the operatives of which then carry out a reasonably foreseeable act of international terrorism. Such liability can be imposed on a defendant in appropriate circumstances even if the defendant did not have a specific intent to further terrorist activities or the violent components of a terrorist organization.

Respectfully submitted,

GREGORY G. KATSAS
 *Assistant Attorney General*

PATRICK J. FITZGERALD
 *United States Attorney*

JEFFREY S. BUCHOLTZ
 *Principal Deputy Assistant*
 *Attorney General*

DOUGLAS LETTER  (202) 514-3602 /s/
SHARON SWINGLE  (202) 343-2689
 *Attorneys*
 *Civil Division, Room 7513*
 *U.S. Department of Justice*
 *950 Pennsylvania Ave, N.W.*
 *Washington, D.C.  20530-0001*

August 21, 2008

**CERTIFICATE OF COMPLIANCE**

I certify that the foregoing brief is proportionally spaced, has a serif type face (Times New Roman) of 14 points, in Wordperfect 12, and contains 6,929 words, according to the word processing system used to prepare this brief.  I understand that a material misrepresentation can result in the Court striking the brief or imposing sanctions.

__/s/_____
Douglas Letter
*Attorney*

**CERTIFICATE PURSUANT TO CIRCUIT RULE 31(e)(1)**

I hereby certify that I have filed electronically, pursuant to Circuit Rule 31(e), a digital version of the brief in non-scanned PDF format.

__/s/_____
Douglas Letter
*Attorney*

33

**CERTIFICATE OF SERVICE**

I hereby certify that on this 21th day of August, 2008, I caused the foregoing

Brief for the United States as *Amicus Curiae* to be served upon the Court by causing

fifteen copies to be send by overnight delivery to:

> Mr. Gino J. Agnello
> Clerk, U.S. Court of Appeals
>   for the Seventh Circuit
> U.S. Courthouse and Federal Office
>   Building, Room 2722
> 219 South Dearborn Street
> Chicago, IL  60604

and by causing two copies to be delivered by overnight delivery to:

John W. Boyd
Nancy Hollander
Freedman Boyd Hollander
  Goldberg & Ives P.A.
20 First Plaza, Suite 700
Albuquerque, New Mexico  87102

Stephen J. Landes
Richard M. Hoffman
Wildman, Harrold, Allen & Dixon LLP
225 West Wacker Drive, Suite 3000
Chicago, Illinois   60606-1229

John M. Beal
Attorney at Law
53 West Jackson Blvd.
Suite 1108
Chicago, Illinois   60604

Nathan Lewin
Alyza D. Lewin
Lewin & Lewin, LLP
1828 L Street, N.W., 1000
Washington, DC  20036

34

Matthew J. Piers, Esq.
Maru M. Rowland, Esq.
Frederick S. Rhine, Esq.
Gessler Hughes Socol Piers
   Resnick & Dym, LTD
70 West Madison Street, Suite 4000
Chicago, Illinois   60602-4205

Brendan Shiller
Law Office of Brendan Shiller
36 S. Wabash, Suite 1310
Chicago, Illinois   60603

James R. Fennerty, Esq.
James R. Fennerty & Associates, LLC
36 South Wabash, Suite 1310
Chicago, Illinois   60603

  /s/_____
DOUGLAS LETTER
  *Appellate Litigation Counsel*

35