

## COZEN
## O'CONNOR

A PROFESSIONAL CORPORATION

1900 MARKET STREET   PHILADELPHIA, PA 19103-3508   215.665.2000   800.523.2900   215.665.2013 FAX   www.cozen.com

**Sean P. Carter**
Direct Phone   215.665.2105
Direct Fax     215.701.2105
scarter@cozen.com

April 25, 2008

**VIA FEDERAL EXPRESS**

The Honorable George B. Daniels
United States District Court for the
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street, Room 630
New York, NY 10007

      Re:    *In Re: Terrorist Attacks on September 11, 2001,* 03 MDL 1570 (GBD)
               *Federal Insurance Co., et al. v. al Qaida, et al.*, 03 CV 6978 (GBD)

Dear Judge Daniels:

      I write on behalf of the *Federal Insurance* plaintiffs, to oppose the April 21, 2008 letter application submitted by National Commercial Bank (NCB), for leave to file a "renewed" Motion to Dismiss for lack of personal jurisdiction in all of the pending cases against it.

      For the reasons set forth in greater detail below, the filing of a "renewed" Motion to Dismiss by NCB in the *Federal Insurance* action is procedurally and substantively improper. NCB has a fully briefed Motion to Dismiss pending in the *Federal Insurance* case, and is therefore procedurally prohibited from filing a "renewed" Motion to Dismiss at this time. The fact that certain jurisdictional discovery has been undertaken as to NCB in the *Burnett* and *Ashton* cases does not alter this fact, as those are separate cases and the discovery proceedings in those actions did not involve the *Federal Insurance* suit. To bind the *Federal Insurance* plaintiffs by the discovery proceedings in those separate cases would violate established Supreme Court and Second Circuit authority, and deprive the *Federal Insurance* plaintiffs of fundamental rights guaranteed by the Federal Rules of Civil Procedure.

      Rather than the illegitimate procedural course NCB seeks to pursue, this Court should extend its prior denials of NCB's Motion to Dismiss the *Ashton* and *Burnett* actions for lack of

The Honorable George B. Daniels
April 25, 2008
Page 2

_____

personal jurisdiction to the *Federal Insurance* case, and formally authorize the *Federal Insurance* plaintiffs to conduct limited jurisdictional discovery as to NCB. The conduct of such discovery is necessary to create an adequate record in the *Federal Insurance* case relative to NCB's personal jurisdiction defense, and therefore a procedural prerequisite for the disposition of that defense in *Federal Insurance*. Thus, the *Federal Insurance* plaintiffs' proposed approach represents the only valid means to harmonize the procedural status of the claims against NCB in all of the MDL cases and allow further proceedings against NCB to move forward on a consolidated basis, while at the same time protecting the procedural rights of *all* parties.

In advocating this course, the *Federal Insurance* plaintiffs by no means seek to replicate the discovery that has already been undertaken as to NCB in *Ashton* and *Burnett*. To the contrary, the *Federal Insurance* plaintiffs seek discovery as to only a few discrete issues and relationships, critical to the specific jurisdictional theories they have advanced as to NCB based on the unique allegations of their Complaint, and evidence which corroborates those detailed factual allegations. As discussed in greater detail below, the *Federal Insurance* plaintiffs have already served Requests for Production of Documents upon NCB relative to the limited topics at issue, consisting of only 28 individual requests.

By previously serving those requests, the *Federal Insurance* plaintiffs sought to promote efficiency in the MDL, by ensuring that jurisdictional discovery as to NCB in all of the MDL cases could be completed simultaneously. Unfortunately, NCB refused to substantively respond to that discovery, and also declined to voluntarily withdraw its pending Motion to Dismiss for lack of personal jurisdiction in the *Federal Insurance* case, as the *Federal Insurance* plaintiffs requested that it do in light of the prior denials of that Motion in *Ashton* and *Burnett.*

I.   PROCEDURAL BACKGROUND

On January 18, 2005, the Court issued a decision addressing NCB's then pending Motion to Dismiss the *Burnett* and *Ashton* actions only. In that decision, the Court denied without prejudice NCB's Motion to Dismiss for Lack of Subject Matter Jurisdiction Under the Foreign Sovereign Immunities Act, reasoning that NCB's entitlement to the protections of the FSIA was unclear, and that the *Ashton* and *Burnett* plaintiffs were entitled to "take discovery of the jurisdictionally relevant facts." Following that ruling, NCB urged the Court to rule on its personal jurisdiction defenses in the *Ashton* and *Burnett* cases, before permitting those plaintiffs to move forward with discovery as to the subject matter jurisdiction question. The Court consented to that approach, and thereafter issued a ruling authorizing the plaintiffs in the *Burnett* and *Ashton* cases, and no other plaintiffs, to move forward with discovery as to the jurisdictional theories advanced by those plaintiffs. In Re: Terrorist Attacks on September 11, 2001, 392 F. Supp. 2d 539, 573-75. As that decision was limited to the *Burnett* and *Ashton* cases, the Court did not consider any of the factual or legal theories of personal jurisdiction advanced by the *Federal Insurance* plaintiffs in issuing that ruling.

During the early stages of discovery proceedings as to NCB in the *Ashton* and *Burnett* cases, several disputes arose between those plaintiffs and NCB, requiring judicial intervention. On April 18, 2006, the Court referred a number of particular disputes in those cases, outlined in an April 12, 2006 letter, to Judge Maas for resolution. Judge Maas issued a decision as to those

The Honorable George B. Daniels
April 25, 2008
Page 3

particular disputes on June 29, 2006.  During the course of subsequent discovery proceedings, Judge Maas issued orders pertaining to a number of additional disputes between NCB and the *Ashton* and *Burnett* plaintiffs.

All of the discovery proceedings as to NCB to date have been expressly limited to the *Ashton* and *Burnett* actions.  In this regard, it is notable that NCB itself designated all of its responses and objections to the discovery in question as applicable only to the *Ashton* and *Burnett* cases.  See Relevant Pages from NCB's Discovery Responses, attached hereto as Exhibit 1.  Furthermore, in resolving discovery disputes pertaining to NCB, Judge Maas considered only the allegations of the *Ashton* and *Burnett* Complaints, and the legal and factual submissions offered by those plaintiffs.  Judge Maas never considered any of the allegations of the *Federal Insurance* Complaint, or the extrinsic evidence offered by those plaintiffs in opposition to NCB's Motion to Dismiss the *Federal Insurance* action.  Judge Maas considered argument only from counsel for the *Ashton* and *Burnett* plaintiffs.

Given the fact that discovery proceedings as to NCB were expressly limited by both the Court and the parties to the *Ashton* and *Burnett* actions, the *Federal Insurance* plaintiffs were understandably surprised by NCB's assertion, in the parties' August 3, 2007 status report to the Court concerning jurisdictional discovery, that "NCB contends that *Federal Insurance* plaintiffs' counsel have participated in the jurisdictional discovery process as to NCB, without objection by NCB, and NCB's pending Motion to Dismiss the *Federal Insurance* Complaint therefore does not provide a reason to prolong the jurisdictional discovery process."  By virtue of that statement, the *Federal Insurance* plaintiffs came to realize that NCB was seeking to avoid discovery in the *Federal Insurance* action altogether, and, in effect, bind the *Federal Insurance* plaintiffs by the discovery proceedings conducted in the separate *Burnett* and *Ashton* cases.

Although it is impossible for the *Federal Insurance* plaintiffs to know the precise thinking underlying NCB's stated strategy, it is logical to presume that NCB was concerned that the *Federal Insurance* plaintiffs' Complaint and submissions relative to NCB's Motion to Dismiss could potentially open the door to additional areas of discovery relating to personal jurisdiction, and that it was therefore to NCB's advantage to limit discovery to the *Burnett* and *Ashton* matters.  Were that not the case, NCB would simply have voluntarily withdrawn its Motion to Dismiss the *Federal Insurance* case, and invited the *Federal Insurance* plaintiffs to actively participate in the jurisdictional discovery proceedings.[1]

In any event, promptly after NCB disclosed its planned strategy to avoid any jurisdictional discovery in the *Federal Insurance* action, the *Federal Insurance* plaintiffs took action to protect their rights and interests, by serving their First Set of Jurisdictional Requests for Production of Documents on NCB.  See Exhibit 2.  Following service of those discovery

---

[1] It should be noted that NCB did approach the *Federal Insurance* plaintiffs following the Court's decision to permit personal jurisdiction discovery in the *Burnett* and *Ashton* cases, to request that the *Federal Insurance* plaintiffs stipulate to postpone adjudication of NCB's Motion to Dismiss the *Federal Insurance* action.  The *Federal Insurance* rejected that proposal because, among other things, it did not provide the *Federal Insurance* plaintiffs with the right to actively participate in the jurisdictional discovery proceedings in the other cases.

The Honorable George B. Daniels
April 25, 2008
Page 4

requests, counsel for NCB and counsel for the *Federal Insurance* plaintiffs exchanged a series of letters, outlining their respective positions as to the *Federal Insurance* plaintiffs' entitlement to jurisdictional discovery, and how that discovery should be approached given the differing procedural statuses of the various cases. In its first letter relating to the *Federal Insurance* discovery requests, attached hereto as Exhibit 3, NCB argued that the *Federal Insurance* plaintiffs discovery to NCB was improper, because the Court had never authorized the *Federal Insurance* plaintiffs to conduct discovery as to NCB. More specifically, NCB's letter stated as follows:

> As you know, NCB has a pending Motion to Dismiss the *Federal Insurance* Complaint (MDL DKT. #416), and briefing of that Motion was completed on November 29, 2004…. Accordingly, under Case Management Order No. 2, paragraph 17 (MDL DKT. #247), the *Federal Insurance* plaintiffs may not proceed with merits discovery as to NCB. Equally important, however, the Court has not authorized the *Federal Insurance* plaintiffs to proceed with jurisdictional discovery as to NCB.

Exhibit 3 at p. 1.

Notwithstanding its assertion that the *Federal Insurance* plaintiffs were procedurally prohibited from conducted discovery as to NCB, NCB's letter went on to argue that the *Federal Insurance* plaintiffs were bound by all discovery proceedings conducted in the separate *Ashton* and *Burnett* cases. In support of this argument, NCB argued that the *Federal Insurance* plaintiffs had participated "in the jurisdictional discovery process in *Burnett* and *Ashton*" by passively attending a few proceedings concerning the jurisdictional discovery as to NCB in *Ashton* and *Burnett*. Id. at p. 2.

The *Federal Insurance* plaintiffs responded to NCB's letter on September 14, 2007. In that letter, attached hereto as Exhibit 4, counsel explained that the arguments raised in NCB's August 31, 2007 letter were misplaced, and that the conduct of limited discovery as to NCB in *Federal Insurance* matter would promote efficiency and conserve judicial resources by allowing all jurisdictional discovery as to NCB in the MDL to be completed simultaneously. As a preliminary matter, the *Federal Insurance* plaintiffs noted that NCB's argument that they were bound by the discovery conducted as to NCB in the *Ashton* and *Burnett* actions misapprehended the fundamental nature of consolidated proceedings, explaining as follows:

> As the Supreme Court and 2nd Circuit have explained, consolidation is merely a procedural devise designed to promote judicial economy, and cannot affect the merger of the actions or the claims of the separate parties. Accordingly, consolidation does not change the rights of the parties in the separate suits. As a result, the district court is required to consider the jurisdictional basis of each suit in the consolidated proceeding separately. Johnson v. Manhattan RY, 289 U.S. 479, 496-97, 77 L.Ed. 1331,

The Honorable George B. Daniels
April 25, 2008
Page 5

_____

53 S. Ct. 721 (1933); <u>Cole, et al. v. Schenley Industries, Inc., et al.</u>,
563 F.2d 35, 38 (2nd Cir. 1977).

Exhibit 4 at p. 1.

In light of the controlling authorities establishing the distinct character of individual actions within a consolidated proceeding, the *Federal Insurance* plaintiffs noted that they simply could not have "actively participated" in the discovery in the *Burnett* and *Ashton* cases as NCB argued. "Because of the distinct and separate nature of the individual actions, the *Federal* plaintiffs have no standing to conduct discovery via the *Ashton* or *Burnett* cases, direct discovery conducted as to NCB in those cases, define the arguments raised to the Court in relation to discovery disputes in those separate actions, or otherwise protect their interest via discovery in those cases." Furthermore, as a factual matter, the *Federal Insurance* plaintiffs noted that they had not presented any argument at any of the discovery hearings concerning NCB, or asked any questions during the deposition of Lawrence Smith. Id. at p. 2.

In response to the *Federal Insurance* plaintiffs' September 14, 2007 letter, NCB sent a correspondence on September 24, 2007, attached hereto as Exhibit 5, in which it advanced arguments inherently inconsistent with the positions asserted in its first letter, apparently due to an evolution in its thinking triggered by the legal authorities cited by the *Federal Insurance* plaintiffs. Specifically, despite having argued in its August 31, 2007 letter that the *Federal Insurance* plaintiffs were procedurally prohibited from conducting jurisdictional discovery as to NCB, the letter NCB sent to plaintiffs' counsel on September 24, 2007 asserted that the *Federal Insurance* plaintiffs were *compelled* to conduct discovery as to NCB in concert with the *Burnett* and *Ashton* plaintiffs. According to NCB's second letter, the *Federal Insurance* plaintiffs' "participation [in that discovery] was not elective...it was mandatory."[2] As support for its new position, NCB cited paragraph 20 of Case Management Order No. 2, which states: "***To the extent possible***, the parties shall conduct consolidated discovery..." (emphasis supplied). Exhibit 5 at p. 2.

Following the parties' exchange of letters, the *Federal Insurance* plaintiffs sought judicial intervention relative to their dispute with NCB. Specifically, in the plaintiffs' Executive Committee's November 16, 2007 letter to the Court regarding the proposed agenda for the case management conference that had been scheduled for January 15, 2008, plaintiffs requested that the Court take up the issue at the heart of the *Federal Insurance* plaintiffs' dispute with NCB:

Decisions Applicable in Fewer Than All Cases:

Plaintiffs would like to discuss with the Court their request that the
Court extend to all cases denials of motions to dismiss that Judge
Casey issued in some, but fewer than all, cases. Defense counsel
have taken inconsistent positions … arguing in some instances that

_____

[2] That this represented a new position for NCB is self-evident from the fact that NCB designated its discovery responses as applicable only to the *Ashton* and *Burnett* cases, and only served contention discovery requests relating to jurisdiction on those plaintiffs. In simple terms, NCB did not treat the *Federal Insurance* plaintiffs as participants in the jurisdictional discovery proceedings at any time.

The Honorable George B. Daniels
April 25, 2008
Page 6

discovery cannot proceed in the cases where motions are still
pending, and in other cases that any discovery taking place now
must be applied to all cases, including those in which motions are
still pending.

The Court adjourned the January 15, 2008 case management conference until March 18,
2008, without issuing a decision relative to plaintiffs' request that the Court extend previous
denials of motions to dismiss to all remaining cases. Shortly before the scheduled March 18,
2008 conference, the Court requested that the parties identify any agenda items for the case
management conference which remained unresolved. In response to that inquiry, plaintiffs again
requested judicial intervention relative to the procedural complications and inefficiencies arising
from the differing procedural statuses of the various cases as to common defendants, including
NCB. By Order dated March 14, 2008, the Court invited the parties to submit specific
applications to have prior decisions in fewer than all cases extended to the remaining cases.

Before the *Federal Insurance* plaintiffs had an opportunity to submit such an application
as to NCB, that defendant filed its letter application for leave to file renewed Motion to Dismiss
in all of the pending actions, including the *Federal Insurance* case. In that letter, NCB argues
that it is entitled to file a renewed Motion to Dismiss in *Federal Insurance*, despite the fact that
its pending Motion to Dismiss has not been decided and it has refused to respond to discovery in
*Federal Insurance*, because (NCB theorizes) "the jurisdictional discovery record developed in
the *Ashton* and *Burnett* actions applies equally to all other MDL 1570 lawsuits because the case
management orders require all plaintiffs to conduct discovery on a consolidated basis."

For the reasons set forth below, NCB's position is fundamentally incorrect, and the
*Federal Insurance* plaintiffs are entitled to the limited discovery they seek in support of their
jurisdictional theories as to NCB.

II.     ARGUMENT

      A.    The *Federal Insurance* Plaintiffs Were Not Participants in the Discovery
             Proceedings as to NCB in the *Ashton* and *Burnett* Cases, and Cannot be Deemed
             <u>Bound by the Discovery Proceedings in Those Separate Cases</u>

NCB's contention that the jurisdictional discovery record developed in the *Ashton* and
*Burnett* actions applies equally to all other MDL 1570 lawsuits is legally and factually incorrect.
As explained in the *Federal Insurance* plaintiffs' September 14, 2007 letter to counsel for NCB,
the consolidation of these cases does not affect a merger of the actions or the claims of the
separate parties, and the district court is therefore *required* to consider the jurisdictional basis of
each suit in a consolidated proceeding separately. <u>Johnson</u>, 289 U.S. at 496-97; <u>Cole</u>, 563 F.2d
35, 38 (2nd Cir. 1977). NCB's effort to bind the *Federal Insurance* plaintiffs by the discovery
proceedings in the separate *Ashton* and *Burnett* cases runs afoul of those well established legal
principles, which at their core, serve to protect the fundamental procedural rights of litigants.

Moreover, the provisions of the relevant Case Management Orders do not (and could not)
alter this analysis. In advancing its argument based on the provisions of paragraph 20 of Case

The Honorable George B. Daniels
April 25, 2008
Page 7

Management Order No. 2, NCB conveniently ignores the qualifying language of that provision, which dictates that consolidated discovery should be undertaken "to the extent possible...."[3] Significantly, other defendants in this litigation have specifically argued that this language precludes consolidated discovery where a decision authorizing discovery has been issued in fewer than all cases. In fact, defendant Jamal Barzinji has gone so far as to argue that discovery responses provided in a certain case cannot even be shared with plaintiffs who have not yet been authorized to proceed with discovery against him:

> Dr. Barzinji objects to producing any documents to any plaintiffs other than the *Federal Insurance* Plaintiffs.... Dr. Barzinji currently has outstanding Motions to Dismiss the claims asserted against him by the Plaintiffs in *Ashton, Burnett, NY Marine, Continental,* and *World Trade Center.* Unless and until those plaintiffs are found to have stated claims against Dr. Barzinji, the *Federal Insurance* plaintiffs should be precluded from sharing any discovery with any of the other plaintiffs.

Thus, NCB's argument is not only inconsistent with the plain language of Case Management Order No. 2, but also the stated positions of other defendants in this litigation.

Beyond the legal deficiencies in NCB's possession, its arguments fail as a factual matter, because the record makes clear that neither the Court nor the parties regarded the *Federal Insurance* plaintiffs to be participants in the jurisdictional discovery proceedings as to NCB, and consequently there has been no consideration of the factual and legal predicates underlying the *Federal Insurance* plaintiffs' jurisdictional theories as to NCB in the context of those proceedings. As mentioned previously, NCB's own actions in relation to the jurisdictional discovery proceedings demonstrate that it did not treat the *Federal Insurance* plaintiffs as participants in that process. NCB specifically labeled its responses to the discovery served upon it as applicable only to the *Ashton* and *Burnett* cases. See Exhibit 1. Furthermore, NCB limited its application for leave to serve contention discovery to the *Ashton* and *Burnett* cases, and in fact only served contention discovery upon those plaintiffs. Had NCB believed that the jurisdictional discovery proceedings concerning it were in fact consolidated and involved all plaintiffs, it most certainly would have designated its discovery responses as applicable to all actions, and served contention discovery requests relating to jurisdiction upon all plaintiffs.

More significantly, the record makes clear that the Court did not consider the *Federal Insurance* plaintiffs to be participants in the discovery as to NCB, and engaged in no consideration of the *Federal Insurance* plaintiffs' jurisdictional theories in resolving any of the discovery disputes pertaining to NCB. Indeed, in resolving the jurisdictional discovery disputes

---

[3] Paragraph 9 of Case Management Order No. 3, which discusses the rights and duties of the Plaintiffs Executive Committees, contains similar qualifying language. More fundamentally, Case Management Order No. 3 governs the organizational structure of the Plaintiffs' Executive Committees and duties and responsibilities of the Committee members, and NCB, as a defendant, has no standing to invoke any of those provisions as protection against discovery. In fact, the defendants specifically refused to have any involvement in the drafting or approval of Case Management Order No. 3, because they deemed it to have no relevance to them.

The Honorable George B. Daniels
April 25, 2008
Page 8

referred to him, Judge Maas considered only the allegation set forth in the *Burnett* and *Ashton* complaints, and the extrinsic evidence offered by those plaintiffs. The Court heard argument only from counsel for those plaintiffs, and only those plaintiffs questioned witnesses during depositions. As a result, the existing record is devoid of any analysis of the facts and arguments relevant to determining whether the *Federal Insurance* plaintiffs have made a *prima facie* showing sufficient to warrant discovery as to facts and relationships relevant to any of their theories of jurisdiction, including the facts and relationships at issue in the discovery requests they have served upon NCB.[4]

For all of the above reasons, the jurisdictional record as to NCB in the *Ashton* and *Burnett* cases simply has no applicability to the *Federal Insurance* case. As a result, NCB cannot file a "renewed" Motion to Dismiss in *Federal Insurance* based on that unrelated and inapplicable record.

B.      The *Federal Insurance* Plaintiffs can Demonstrate Their Entitlement to the Discovery They Seek Through Allegations and Evidence Not Considered by Judge Maas in Connection with Discovery Proceedings in *Ashton* and *Burnett*

For the reasons stated above, the analysis of the *Federal Insurance* plaintiffs' entitlement to jurisdictional discovery must be based on a comprehensive review of the allegations of the *Federal Insurance* Complaint, and the briefs already submitted by the parties. Nonetheless, the *Federal Insurance* plaintiffs anticipate that NCB will argue that the unrelated record in the *Ashton* and *Burnett* cases does provide an adequate basis to rule on the *Federal Insurance* plaintiffs' request for discovery. More specifically, the *Federal Insurance* plaintiffs anticipate that NCB will argue that: the factual and legal theories of jurisdiction advanced by the *Federal Insurance* plaintiffs are substantively identical to the theories advanced by the *Ashton* and *Burnett* plaintiffs; the discovery the *Federal Insurance* plaintiffs seek mirrors that previously served by the *Ashton* and *Burnett* plaintiffs; Judge Maas has already denied the *Ashton* and *Burnett* plaintiffs' discovery as to the topics at issue in the *Federal Insurance* plaintiffs' document request to NCB; and that Judge Maas' rulings are binding in the *Federal Insurance* plaintiffs, or should be extended to the *Federal Insurance* case in the interests of judicial economy. Given NCB's anticipated arguments, the *Federal Insurance* plaintiffs will briefly explain why they are entitled to discovery as to the discrete topics at issue.

As mentioned above, the *Federal Insurance* plaintiffs' First Set of Jurisdictional Requests for Production of Documents to National Commercial Bank consists of twenty-eight (28) discrete document requests. Generally speaking, those document requests seek discovery of facts relevant to the *Federal Insurance* plaintiffs' two theories of specific jurisdiction: (1) that NCB purposely directed its conduct at the United States by knowingly providing material support and resources to al Qaida; and (2) that NCB is subject to personal jurisdiction in New

---

[4] As explained in the Federal Insurance plaintiffs' September 14, 2007 letter, the existence of a developed record concerning the *Federal Insurance* plaintiffs' jurisdictional theories is absolutely necessary to the disposition of NCB's Motion to Dismiss in *Federal Insurance*, and in this setting requires that the *Federal Insurance* plaintiffs be afforded jurisdictional discovery. See Exhibit 4 at p. 2.

The Honorable George B. Daniels
April 25, 2008
Page 9

York under the conspiracy theory of personal jurisdiction.[5]  These theories of specific jurisdiction are predicated, in part, on the detailed allegations and evidence the *Federal Insurance* plaintiffs have offered regarding NCB's knowing sponsorship of al Qaida via its relationship with the Muwafaq Foundation.  In support of those theories, the *Federal Insurance* plaintiffs seek limited discovery concerning NCB's relationships with Muwafaq and Yassin al Qadi and Khalid bin Mahfouz, two senior NCB executives who founded and/or ran Muwafaq.

For the reasons set forth in greater detail in their pending Opposition to NCB's Motion to Dismiss, the detailed allegations and extrinsic evidence offered by the *Federal Insurance* plaintiffs are sufficient to make a *prima facie* showing of jurisdiction as to NCB, and trigger the *Federal Insurance* plaintiffs' entitlement to discovery.  In particular, the *Federal Insurance* plaintiffs have already submitted detailed factual allegations and evidence to support their contention that NCB provided funds and banking services to Muwafaq Foundation, with full knowledge that the Foundation was an al Qaida front.  The *Federal Insurance* plaintiffs' allegations of NCB's knowledge are supported by the submitted testimony of government officials, and detailed allegations and evidence regarding the overlapping management of Muwafaq and NCB, to include allegations and evidence concerning the extensive involvement of bin Mahfouz and al Qadi in the both entities.

The significance of these allegations in relation to the *Federal Insurance* plaintiffs' theories of jurisdiction is discussed in detail in plaintiffs' pending opposition to NCB's Motion to Dismiss, and will not be recited at length herein.  However, it is worth noting that the Court has already held that an entity which directly or indirectly provided material support or resources to al Qaida, as those terms are defined under the Anti-Terrorism Act, is subject to personal jurisdiction in the United States for claims arising from the September 11th Attack.  See In Re: Terrorist Attacks on September 11, 2001, 392 F. Supp. 2d 539 (S.D. N.Y. 2005) (in light of al Qaeda's public declaration of war against the United States, someone who is… a provider of financial and logistical support to al Qaeda, has purposely directed his activities at the United States such that the exercise of personal jurisdiction over him is reasonable.); See also In Re: Terrorist Attacks on September 11, 2001, 349 F. Supp. 2d 765 (S.D. N.Y. 2005) (finding that indirect contributions to al Qaeda are sufficient to establish a defendant's participation in al Qaeda's conspiracy to attack America, where the defendant knew the organization receiving those contributions to be a solicitor, collector, supporter, front or launderer for the terrorist organization).  Consistent with these prior rulings, the submitted allegations and evidence that NCB provided material support and resources to al Qaida through Muwafaq are sufficient to make a *prima facie* showing of jurisdiction over NCB, and entitles the *Federal Insurance* plaintiffs to discovery of facts relevant to its jurisdictional theories.[6]

---

[5] While certain facts and categories of information have relevance to both of those specific theories of jurisdiction, it is important to note that they are distinct legal theories, governed by unique legal standards.  Accordingly, in analyzing whether plaintiff has made a *prima facie* showing of personal jurisdiction under one of those theories, the Court must apply two separate tests.

[6] Under Rule 9, the allegations of NCB's knowledge are themselves competent to satisfy the applicable test, and need not be supported by fact pleading or evidence.

The Honorable George B. Daniels
April 25, 2008
Page 10

As further support for their request that the Court direct NCB to respond to the *Federal Insurance* plaintiffs' discovery requests, those plaintiffs offer for the Court's consideration an Internal United States Treasury Department Memorandum regarding the evidentiary predicates for the United States government's designation of Yassin al Qadi as an al Qaida sponsor ("Treasury Evidentiary Memorandum" or "Memorandum"), which was recently released by the Treasury Department and is attached hereto as Exhibit 6. The Treasury Evidentiary Memorandum contains additional information concerning the character of the relationships among bin Mahfouz, al Qadi and Muwafaq Foundation, and describes in detail Muwafaq Foundation's pervasive involvement in the sponsorship of al Qaida and other terrorist organizations throughout the world. For the reasons discussed below, any fair reading of the Treasury Evidentiary Memorandum demonstrates that NCB knew that Muwafaq was an al Qaida front during the period that it provided funds and banking services to that organization.

As a preliminary matter, the Treasury Department Evidentiary Memorandum indicates that Muwafaq Foundation was conceived and founded by Khaled Bin Mahfouz and Yassin al Qadi, while the two were working together as senior executives at NCB. In this regard, the Memorandum states as follows:

> Al Qadi and the Bin Mahfouz Family
>
> Kadi states in his submissions that during the 1990 to 1991 time period, he was working with Khalid Bin Mahfouz for National Commercial Bank, and they developed a relationship of mutual trust and respect. During this time period, Bin Mahfouz told Al Qadi that he wanted to start a charity in memory of his parents.

Exhibit 6 at p. 21.

In the fulfillment of bin Mahfouz's aspiration to establish a "charity" to honor his parents, the two established the Muwafaq Foundation in 1992. Muwafaq was funded by a donation from bin Mahfouz, and al Qadi was charged with responsibility for the operation of the Foundation. In his submissions to the Treasury Department, Al Qadi acknowledges possibly meeting with Osama bin Laden as late as 1992, "during a time when Muwafaq was being initially created and funded." Id. at p. 20.

From the date of Muwafaq's establishment, the Treasury Department Evidentiary Memorandum makes clear that the organization served as a conduit for financing al Qaida and other terrorist organizations, through offices located throughout the world. Muwafaq's terrorist ties were the subject of public reporting in the years preceding the September 11th Attack, and authorities in several countries took action against the organization and its officers between 1995 and 2001. As reported in the Treasury Department Evidentiary Memorandum:

> Of [Muwafaq's] seven offices/operations:
>
> Sudan: Closed by Kadi following publication of *Africa Confidential* article linking Muwafaq to 1995 attempt on President Mubarak, and ceased operations in

The Honorable George B. Daniels
April 25, 2008
Page 11

_____

1996 at about the same time that Bin Ladin left Sudan.  Additionally, AL-QADI is
quoted as saying the office provided assistance to "jihad activities."

Pakistan:  Headed by Amir Mehdi [Redacted Text].  The Pakistani government on
March 21, 1995 raided the office and Mehdi was arrested on May 29, 1995.  The
office shut shortly thereafter.

Ethiopia:  Closed in 1995 by the Ethiopian government subsequent to the *Africa
Confidential* report.

Europe:  Headed by Chafiq Ayadi, who is designated as an SDGT [Specially
Designated Global Terrorist], and was a leader of the radical Tunisian Islami
Front.

Albania:  Office was headed by Dr. Abdul Latif Saleh who founded the Albanian
Islamic Jihad, and was deported from Albania in 1999 for his links to terrorism.

Id. at p. 6.

Significantly, the founders and officers of Muwafaq continued to support and operate the
Foundation, in the face of the extensive reporting and evidence of its pervasive involvement in
terrorist activities.   In fact, certain European offices of the organization may have been
operational as late as 2002.  Id. at p. 20.

On the basis of the entirety of the evidence available to the U.S. government, including
classified materials not appropriate for public release, the Treasury Evidentiary Memorandum
concludes that Al Qadi was explicitly aware of Muwafaq's role in supporting al Qaida, and was
personally involved in facilitating that support.  In this regard, the Treasury Evidentiary
Memorandum states as follows:

Yassin Al Qadi is an experienced and sophisticated businessman
and financier.  He has operated companies, including investment
vehicles and banks, in many corners of the world.  He is presumed
to be capable of understanding his investments, his companies, and
his charities, and of being responsible for the actions of those
entities which he founds, funds and/or controls.

Al Qadi's defense, however, to all the charges that he has supported terrorist
through his provision of funds to Muwafaq and other entities he controls and the
persons with ties to terrorists is that either there is no evidence that these entities
and individuals have been involved in terrorism, or that to the extent that they
were, this involvement was beyond his knowledge.

There is, however, substantial and credible evidence that both Muwafaq as an
entity, and many of the individuals charged with operating it and distributing its
funds, were engaged in a longstanding pattern of supporting terrorist and

The Honorable George B. Daniels
April 25, 2008
Page 12

---

extremist causes. This evidence comes from both classified and unclassified sources.

Al Qadi admits his longstanding and intimate association with SDGT Julaidan, SDGT Chafiq Ayadi, Dr. Abdul Latif Saleh, and Amir Mehdi. The latter three individuals have been, according to the information available to OFAC arrested and/or deported from their countries of operation because of associations with terrorists, and Julaidan is a known close associate of Usama Bin Ladin. Each one of these individuals handled significant sums of money provided to him by Al Qadi.

It strains credulity that Al Qadi could have unintentionally found himself in a repeating cycle of hiring individuals based on his assessment of their character and that these individuals kept deceiving him about their intents on providing his funds to terrorists and extremists. These are individuals who Al Qadi had opportunity to personally observe over a period of years, and he gave them significant sums of money to handle on his behalf. Indeed, Al Qadi continues to refer to Julaidan and others as trustworthy and does not question their motives.

In making this determination no one element, no one contact, no one accusation of funding is taken as being determinative of the assessment that Al Qadi has been providing support to terrorists through his actions. [Redacted text] associated with Al Qadi that have connections with terrorism and dating over too long a time period, to give credence to a defense that all of the reports are in error. OFAC concludes that when considering the number of sources, the number of activities and length of time, the totality of the evidence, both classified and unclassified provides a reason to believe Yaseen Al Qadi has funded terrorist and extremist individuals and operations.

Exhibit 6 at p. 28-9.

By any fair reading, the foregoing statements directly corroborate the *Federal Insurance* plaintiffs' allegation that senior NCB executive Yassin al Qadi was expressly aware that Muwafaq was an al Qaida front.

Because the Memorandum was prepared in relation to the designation of al Qadi, it not surprisingly does not directly discuss the extent of bin Mahfouz's awareness of Muwafaq's terrorist activities. However, the content of the evidence presented in the Memorandum and other sources directly support the *Federal Insurance* plaintiffs' explicit allegation that bin Mahfouz was also expressly aware of those activities. In particular, the Memorandum makes clear that bin Mahfouz established Muwafaq in memory of his parents. Id. at p. 21. Bin Mahfouz further acknowledges that he provided the initial funding for the Foundation. Having established the Foundation to honor his parents and provided its funding, it logically follows that bin Mahfouz would have maintained some interest in the Foundation's activities, and would have been aware of the very public reporting about its terrorist ties, and the actions taken against Muwafaq by authorities throughout the world. Moreover, the Memorandum makes clear that bin

The Honorable George B. Daniels
April 25, 2008
Page 13

Mahfouz maintained a close relationship of "mutual trust and respect" with al Qadi, who was responsible for running Muwafaq, and that bin Mahfouz's son, Abdulrahman Khalid bin Mahfouz, sat on the Board of the Foundation. Id. at 21, 5. All of these facts corroborate the *Federal Insurance* plaintiffs' allegation that bin Mahfouz was aware of Muwafaq's terrorist ties.

Importantly, the fact that al Qadi and bin Mahfouz were aware of Muwafaq's illicit activities necessarily means that NCB also knew of the Foundation's terrorist ties. Once again, bin Mahfouz and al Qadi were both senior executives of the bank until 1999. Bin Mahfouz was in fact its Chairman, and owned a controlling interest during relevant periods. Under well established legal standards, any knowledge bin Mahfouz or al Qadi possessed regarding Muwafaq's role in sponsoring al Qaida is imputable to NCB. See In re Investors Funding Corp., 523 F. Supp. 533, 540-41 (S.D.N.Y. 1980).[7]

When considered along with the other allegations and evidence the *Federal Insurance* plaintiffs have presented in support of their specific jurisdictional theories as to NCB, the Treasury Evidentiary Memorandum confirms the *Federal Insurance* plaintiffs' entitlement to the requested discovery concerning NCB's relationships with bin Mahfouz, al Qadi and Muwafaq. Specifically, when viewed in a light most favorable to plaintiffs, as it must be in this procedural setting, the Memorandum corroborates the following critical facts and allegations underlying plaintiffs' theories of specific jurisdiction as to NCB:

(1)   The Muwafaq Foundation was conceived and founded within the walls of NCB by NCB Senior Executives Yassin Al Qadi and Khaled Bin Mahfouz;

(2)   Senior NCB Executive Yassin Al Qadi was responsible for the operation of the Muwafaq Foundation, to include the distributions of its funds;

(3)   Senior NCB Executive Yassin Al Qadi met with Osama Bin Laden as late as 1992, during the time the Muwafaq Foundation was being funded and established;

(4)   Muwafaq Foundation served as a conduit for financing al Qaida from the date of its establishment by NCB Senior Executives Al Qadi and Bin Mahfouz;

(5)   Muwafaq Foundation's terrorist ties were the subject of public reporting in the years preceding the September 11th Attack, and authorities in several countries took action against the organization and its officers between 1995 and 2001;

---

[7] Plaintiffs anticipate that NCB will argue that its senor most officials were acting outside the scope of their employment in using NCB's infrastructure and resources to channel resources to al Qaida through Muwafaq. However, whether an employee was acting within the scope of his employment is heavily fact-dependant, and, therefore, this question is properly left to the jury to determine. Golodner v. Quessant Inc., 2007 U.S. Dist. LEXIS 72948, * 10 (S.D.N.Y. Sept. 27, 2007).