The Honorable George B. Daniels
April 25, 2008
Page 8

---

referred to him, Judge Maas considered only the allegation set forth in the *Burnett* and *Ashton* complaints, and the extrinsic evidence offered by those plaintiffs. The Court heard argument only from counsel for those plaintiffs, and only those plaintiffs questioned witnesses during depositions. As a result, the existing record is devoid of any analysis of the facts and arguments relevant to determining whether the *Federal Insurance* plaintiffs have made a *prima facie* showing sufficient to warrant discovery as to facts and relationships relevant to any of their theories of jurisdiction, including the facts and relationships at issue in the discovery requests they have served upon NCB.[4]

For all of the above reasons, the jurisdictional record as to NCB in the *Ashton* and *Burnett* cases simply has no applicability to the *Federal Insurance* case. As a result, NCB cannot file a "renewed" Motion to Dismiss in *Federal Insurance* based on that unrelated and inapplicable record.

> B.   The *Federal Insurance* Plaintiffs can Demonstrate Their Entitlement to the Discovery They Seek Through Allegations and Evidence Not Considered by Judge Maas in Connection with Discovery Proceedings in *Ashton* and *Burnett*

For the reasons stated above, the analysis of the *Federal Insurance* plaintiffs' entitlement to jurisdictional discovery must be based on a comprehensive review of the allegations of the *Federal Insurance* Complaint, and the briefs already submitted by the parties. Nonetheless, the *Federal Insurance* plaintiffs anticipate that NCB will argue that the unrelated record in the *Ashton* and *Burnett* cases does provide an adequate basis to rule on the *Federal Insurance* plaintiffs' request for discovery. More specifically, the *Federal Insurance* plaintiffs anticipate that NCB will argue that: the factual and legal theories of jurisdiction advanced by the *Federal Insurance* plaintiffs are substantively identical to the theories advanced by the *Ashton* and *Burnett* plaintiffs; the discovery the *Federal Insurance* plaintiffs seek mirrors that previously served by the *Ashton* and *Burnett* plaintiffs; Judge Maas has already denied the *Ashton* and *Burnett* plaintiffs' discovery as to the topics at issue in the *Federal Insurance* plaintiffs' document request to NCB; and that Judge Maas' rulings are binding in the *Federal Insurance* plaintiffs, or should be extended to the *Federal Insurance* case in the interests of judicial economy. Given NCB's anticipated arguments, the *Federal Insurance* plaintiffs will briefly explain why they are entitled to discovery as to the discrete topics at issue.

As mentioned above, the *Federal Insurance* plaintiffs' First Set of Jurisdictional Requests for Production of Documents to National Commercial Bank consists of twenty-eight (28) discrete document requests. Generally speaking, those document requests seek discovery of facts relevant to the *Federal Insurance* plaintiffs' two theories of specific jurisdiction: (1) that NCB purposely directed its conduct at the United States by knowingly providing material support and resources to al Qaida; and (2) that NCB is subject to personal jurisdiction in New

---

[4] As explained in the Federal Insurance plaintiffs' September 14, 2007 letter, the existence of a developed record concerning the *Federal Insurance* plaintiffs' jurisdictional theories is absolutely necessary to the disposition of NCB's Motion to Dismiss in *Federal Insurance*, and in this setting requires that the *Federal Insurance* plaintiffs be afforded jurisdictional discovery. See Exhibit 4 at p. 2.

The Honorable George B. Daniels
April 25, 2008
Page 9

York under the conspiracy theory of personal jurisdiction.[5] These theories of specific jurisdiction are predicated, in part, on the detailed allegations and evidence the *Federal Insurance* plaintiffs have offered regarding NCB's knowing sponsorship of al Qaida via its relationship with the Muwafaq Foundation. In support of those theories, the *Federal Insurance* plaintiffs seek limited discovery concerning NCB's relationships with Muwafaq and Yassin al Qadi and Khalid bin Mahfouz, two senior NCB executives who founded and/or ran Muwafaq.

For the reasons set forth in greater detail in their pending Opposition to NCB's Motion to Dismiss, the detailed allegations and extrinsic evidence offered by the *Federal Insurance* plaintiffs are sufficient to make a *prima facie* showing of jurisdiction as to NCB, and trigger the *Federal Insurance* plaintiffs' entitlement to discovery. In particular, the *Federal Insurance* plaintiffs have already submitted detailed factual allegations and evidence to support their contention that NCB provided funds and banking services to Muwafaq Foundation, with full knowledge that the Foundation was an al Qaida front. The *Federal Insurance* plaintiffs' allegations of NCB's knowledge are supported by the submitted testimony of government officials, and detailed allegations and evidence regarding the overlapping management of Muwafaq and NCB, to include allegations and evidence concerning the extensive involvement of bin Mahfouz and al Qadi in the both entities.

The significance of these allegations in relation to the *Federal Insurance* plaintiffs' theories of jurisdiction is discussed in detail in plaintiffs' pending opposition to NCB's Motion to Dismiss, and will not be recited at length herein. However, it is worth noting that the Court has already held that an entity which directly or indirectly provided material support or resources to al Qaida, as those terms are defined under the Anti-Terrorism Act, is subject to personal jurisdiction in the United States for claims arising from the September 11th Attack. See In Re: Terrorist Attacks on September 11, 2001, 392 F. Supp. 2d 539 (S.D. N.Y. 2005) (in light of al Qaeda's public declaration of war against the United States, someone who is… a provider of financial and logistical support to al Qaeda, has purposely directed his activities at the United States such that the exercise of personal jurisdiction over him is reasonable.); See also In Re: Terrorist Attacks on September 11, 2001, 349 F. Supp. 2d 765 (S.D. N.Y. 2005) (finding that indirect contributions to al Qaeda are sufficient to establish a defendant's participation in al Qaeda's conspiracy to attack America, where the defendant knew the organization receiving those contributions to be a solicitor, collector, supporter, front or launderer for the terrorist organization). Consistent with these prior rulings, the submitted allegations and evidence that NCB provided material support and resources to al Qaida through Muwafaq are sufficient to make a *prima facie* showing of jurisdiction over NCB, and entitles the *Federal Insurance* plaintiffs to discovery of facts relevant to its jurisdictional theories.[6]

---

[5] While certain facts and categories of information have relevance to both of those specific theories of jurisdiction, it is important to note that they are distinct legal theories, governed by unique legal standards. Accordingly, in analyzing whether plaintiff has made a *prima facie* showing of personal jurisdiction under one of those theories, the Court must apply two separate tests.

[6] Under Rule 9, the allegations of NCB's knowledge are themselves competent to satisfy the applicable test, and need not be supported by fact pleading or evidence.

The Honorable George B. Daniels
April 25, 2008
Page 10

---

As further support for their request that the Court direct NCB to respond to the *Federal Insurance* plaintiffs' discovery requests, those plaintiffs offer for the Court's consideration an Internal United States Treasury Department Memorandum regarding the evidentiary predicates for the United States government's designation of Yassin al Qadi as an al Qaida sponsor ("Treasury Evidentiary Memorandum" or "Memorandum"), which was recently released by the Treasury Department and is attached hereto as Exhibit 6. The Treasury Evidentiary Memorandum contains additional information concerning the character of the relationships among bin Mahfouz, al Qadi and Muwafaq Foundation, and describes in detail Muwafaq Foundation's pervasive involvement in the sponsorship of al Qaida and other terrorist organizations throughout the world. For the reasons discussed below, any fair reading of the Treasury Evidentiary Memorandum demonstrates that NCB knew that Muwafaq was an al Qaida front during the period that it provided funds and banking services to that organization.

As a preliminary matter, the Treasury Department Evidentiary Memorandum indicates that Muwafaq Foundation was conceived and founded by Khaled Bin Mahfouz and Yassin al Qadi, while the two were working together as senior executives at NCB. In this regard, the Memorandum states as follows:

> Al Qadi and the Bin Mahfouz Family
>
> Kadi states in his submissions that during the 1990 to 1991 time period, he was working with Khalid Bin Mahfouz for National Commercial Bank, and they developed a relationship of mutual trust and respect. During this time period, Bin Mahfouz told Al Qadi that he wanted to start a charity in memory of his parents.

Exhibit 6 at p. 21.

In the fulfillment of bin Mahfouz's aspiration to establish a "charity" to honor his parents, the two established the Muwafaq Foundation in 1992. Muwafaq was funded by a donation from bin Mahfouz, and al Qadi was charged with responsibility for the operation of the Foundation. In his submissions to the Treasury Department, Al Qadi acknowledges possibly meeting with Osama bin Laden as late as 1992, "during a time when Muwafaq was being initially created and funded." Id. at p. 20.

From the date of Muwafaq's establishment, the Treasury Department Evidentiary Memorandum makes clear that the organization served as a conduit for financing al Qaida and other terrorist organizations, through offices located throughout the world. Muwafaq's terrorist ties were the subject of public reporting in the years preceding the September 11th Attack, and authorities in several countries took action against the organization and its officers between 1995 and 2001. As reported in the Treasury Department Evidentiary Memorandum:

> Of [Muwafaq's] seven offices/operations:
>
> Sudan: Closed by Kadi following publication of *Africa Confidential* article linking Muwafaq to 1995 attempt on President Mubarak, and ceased operations in

The Honorable George B. Daniels
April 25, 2008
Page 11

---

1996 at about the same time that Bin Ladin left Sudan. Additionally, AL-QADI is quoted as saying the office provided assistance to "jihad activities."

Pakistan: Headed by Amir Mehdi [Redacted Text]. The Pakistani government on March 21, 1995 raided the office and Mehdi was arrested on May 29, 1995. The office shut shortly thereafter.

Ethiopia: Closed in 1995 by the Ethiopian government subsequent to the *Africa Confidential* report.

Europe: Headed by Chafiq Ayadi, who is designated as an SDGT [Specially Designated Global Terrorist], and was a leader of the radical Tunisian Islami Front.

Albania: Office was headed by Dr. Abdul Latif Saleh who founded the Albanian Islamic Jihad, and was deported from Albania in 1999 for his links to terrorism.

Id. at p. 6.

Significantly, the founders and officers of Muwafaq continued to support and operate the Foundation, in the face of the extensive reporting and evidence of its pervasive involvement in terrorist activities. In fact, certain European offices of the organization may have been operational as late as 2002. Id. at p. 20.

On the basis of the entirety of the evidence available to the U.S. government, including classified materials not appropriate for public release, the Treasury Evidentiary Memorandum concludes that Al Qadi was explicitly aware of Muwafaq's role in supporting al Qaida, and was personally involved in facilitating that support. In this regard, the Treasury Evidentiary Memorandum states as follows:

> Yassin Al Qadi is an experienced and sophisticated businessman and financier. He has operated companies, including investment vehicles and banks, in many corners of the world. He is presumed to be capable of understanding his investments, his companies, and his charities, and of being responsible for the actions of those entities which he founds, funds and/or controls.
>
> Al Qadi's defense, however, to all the charges that he has supported terrorist through his provision of funds to Muwafaq and other entities he controls and the persons with ties to terrorists is that either there is no evidence that these entities and individuals have been involved in terrorism, or that to the extent that they were, this involvement was beyond his knowledge.
>
> There is, however, substantial and credible evidence that both Muwafaq as an entity, and many of the individuals charged with operating it and distributing its funds, were engaged in a longstanding pattern of supporting terrorist and

> extremist causes. This evidence comes from both classified and unclassified sources.
>
> Al Qadi admits his longstanding and intimate association with SDGT Julaidan, SDGT Chafiq Ayadi, Dr. Abdul Latif Saleh, and Amir Mehdi. The latter three individuals have been, according to the information available to OFAC arrested and/or deported from their countries of operation because of associations with terrorists, and Julaidan is a known close associate of Usama Bin Ladin. Each one of these individuals handled significant sums of money provided to him by Al Qadi.
>
> It strains credulity that Al Qadi could have unintentionally found himself in a repeating cycle of hiring individuals based on his assessment of their character and that these individuals kept deceiving him about their intents on providing his funds to terrorists and extremists. These are individuals who Al Qadi had opportunity to personally observe over a period of years, and he gave them significant sums of money to handle on his behalf. Indeed, Al Qadi continues to refer to Julaidan and others as trustworthy and does not question their motives.
>
> In making this determination no one element, no one contact, no one accusation of funding is taken as being determinative of the assessment that Al Qadi has been providing support to terrorists through his actions. [Redacted text] associated with Al Qadi that have connections with terrorism and dating over too long a time period, to give credence to a defense that all of the reports are in error. OFAC concludes that when considering the number of sources, the number of activities and length of time, the totality of the evidence, both classified and unclassified provides a reason to believe Yaseen Al Qadi has funded terrorist and extremist individuals and operations.

Exhibit 6 at p. 28-9.

By any fair reading, the foregoing statements directly corroborate the *Federal Insurance* plaintiffs' allegation that senior NCB executive Yassin al Qadi was expressly aware that Muwafaq was an al Qaida front.

Because the Memorandum was prepared in relation to the designation of al Qadi, it not surprisingly does not directly discuss the extent of bin Mahfouz's awareness of Muwafaq's terrorist activities. However, the content of the evidence presented in the Memorandum and other sources directly support the *Federal Insurance* plaintiffs' explicit allegation that bin Mahfouz was also expressly aware of those activities. In particular, the Memorandum makes clear that bin Mahfouz established Muwafaq in memory of his parents. Id. at p. 21. Bin Mahfouz further acknowledges that he provided the initial funding for the Foundation. Having established the Foundation to honor his parents and provided its funding, it logically follows that bin Mahfouz would have maintained some interest in the Foundation's activities, and would have been aware of the very public reporting about its terrorist ties, and the actions taken against Muwafaq by authorities throughout the world. Moreover, the Memorandum makes clear that bin

The Honorable George B. Daniels
April 25, 2008
Page 13

---

Mahfouz maintained a close relationship of "mutual trust and respect" with al Qadi, who was responsible for running Muwafaq, and that bin Mahfouz's son, Abdulrahman Khalid bin Mahfouz, sat on the Board of the Foundation. Id. at 21, 5. All of these facts corroborate the *Federal Insurance* plaintiffs' allegation that bin Mahfouz was aware of Muwafaq's terrorist ties.

Importantly, the fact that al Qadi and bin Mahfouz were aware of Muwafaq's illicit activities necessarily means that NCB also knew of the Foundation's terrorist ties. Once again, bin Mahfouz and al Qadi were both senior executives of the bank until 1999. Bin Mahfouz was in fact its Chairman, and owned a controlling interest during relevant periods. Under well established legal standards, any knowledge bin Mahfouz or al Qadi possessed regarding Muwafaq's role in sponsoring al Qaida is imputable to NCB. See In re Investors Funding Corp., 523 F. Supp. 533, 540-41 (S.D.N.Y. 1980).[7]

When considered along with the other allegations and evidence the *Federal Insurance* plaintiffs have presented in support of their specific jurisdictional theories as to NCB, the Treasury Evidentiary Memorandum confirms the *Federal Insurance* plaintiffs' entitlement to the requested discovery concerning NCB's relationships with bin Mahfouz, al Qadi and Muwafaq. Specifically, when viewed in a light most favorable to plaintiffs, as it must be in this procedural setting, the Memorandum corroborates the following critical facts and allegations underlying plaintiffs' theories of specific jurisdiction as to NCB:

(1) The Muwafaq Foundation was conceived and founded within the walls of NCB by NCB Senior Executives Yassin Al Qadi and Khaled Bin Mahfouz;

(2) Senior NCB Executive Yassin Al Qadi was responsible for the operation of the Muwafaq Foundation, to include the distributions of its funds;

(3) Senior NCB Executive Yassin Al Qadi met with Osama Bin Laden as late as 1992, during the time the Muwafaq Foundation was being funded and established;

(4) Muwafaq Foundation served as a conduit for financing al Qaida from the date of its establishment by NCB Senior Executives Al Qadi and Bin Mahfouz;

(5) Muwafaq Foundation's terrorist ties were the subject of public reporting in the years preceding the September 11th Attack, and authorities in several countries took action against the organization and its officers between 1995 and 2001;

---

[7] Plaintiffs anticipate that NCB will argue that its senor most officials were acting outside the scope of their employment in using NCB's infrastructure and resources to channel resources to al Qaida through Muwafaq. However, whether an employee was acting within the scope of his employment is heavily fact-dependant, and, therefore, this question is properly left to the jury to determine. Golodner v. Quessant Inc., 2007 U.S. Dist. LEXIS 72948, * 10 (S.D.N.Y. Sept. 27, 2007).

The Honorable George B. Daniels
April 25, 2008
Page 14

---

(6) Senior NCB Executive Al Qadi was specifically aware of the terrorist activities of Muwafaq Foundation;

(7) Senior NCB Executive Khaled Bin Mahfouz was aware of the terrorist activities of Muwafaq, by virtue of his close familial and personal relationships with members of Muwafaq's Board, including al Qadi, as well as the fact that Bin Mahfouz originally suggested the establishment of Muwafaq and provided its initial funding;

(8) NCB was expressly aware of Muwafaq's terrorist activities, by virtue of the imputable knowledge of its senior officials;

(9) NCB provided financial and banking services to Muwafaq, including the transfer of several million dollars to that terrorist front, with full knowledge of Muwafaq's role in sponsoring al Qaida.

In view of the foregoing facts, the *Federal Insurance* plaintiffs respectfully submit that they have demonstrated their entitlement to the discovery at issue. As a corollary, the above discussion also defeats any argument that Judge Maas has already addressed all factual and legal arguments relevant to whether the *Federal Insurance* plaintiffs are entitled to discovery as to the topics and relationships at issue, via his rulings on the separate records in the *Ashton* and *Burnett* cases. Stated simply, the detailed allegations and evidence offered by the *Federal Insurance* plaintiffs were not considered by Judge Maas in relation to the discovery disputes addressed in the *Ashton* and *Burnett* cases.[8] Indeed, Judge Maas' decision to deny those plaintiffs certain discovery concerning accounts of Muwafaq at NCB was based on a finding that those plaintiffs failed to present any non-conclusory allegations or evidence to make a *prima facie* showing that NCB or its customers knowingly provided material support or resources to organizations serving as al Qaida fronts.[9] There is nothing conclusory about the detailed factual showing outlined above, and more fully in the *Federal Insurance* plaintiffs' Complaint and Opposition to NCB's pending Motion to Dismiss. Accordingly, Judge Maas' prior ruling cannot be viewed to speak meaningfully to the jurisdictional discovery dispute between the *Federal Insurance* plaintiffs and NCB.

---

[8] In addition, although the *Ashton* and *Burnett* plaintiffs did seek limited discovery as to Muwafaq's bank accounts with NCB, the *Federal Insurance* plaintiffs' document requests materially differ, in both form and substance, from the discovery at issue in those other cases.

[9] It should also be noted that Judge Maas' decision addresses the availability of the requested discovery only under the conspiracy theory of jurisdiction, and does not contain any analysis of the purposeful direction theory.

The Honorable George B. Daniels
April 25, 2008
Page 15

---

III.     CONCLUSION

For all of the foregoing reasons, the *Federal Insurance* plaintiffs respectfully request that the Court deny NCB's application for leave to file a renewed Motion to Dismiss in the *Federal Insurance* case, and extend the prior denials of NCB's Motion to Dismiss for lack of personal jurisdiction in *Ashton* and *Burnett* to *Federal Insurance*. Upon extension of that prior ruling to their case, the *Federal Insurance* plaintiffs should be permitted to pursue limited discovery in support of their specific jurisdictional theories, under the supervision of the Court.

                              Respectfully,

                              COZEN O'CONNOR

                              BY:    SEAN P. CARTER

SPC/bdw
Enclosures

cc:     Judge Maas (Via Federal Express) (w/enc.)
        All Counsel of Record (Via email) (w/enc.)


PHILADELPHIA\3643743\1  117430.000