

**COZEN**
**O'CONNOR**

A PROFESSIONAL CORPORATION

1900 MARKET STREET    PHILADELPHIA, PA 19103-3508    215.665.2000    800.523.2900    215.665.2013 FAX    www.cozen.com

**Sean P. Carter**
Direct Phone   215.665.2105
Direct Fax      215.701.2105
scarter@cozen.com

May 7, 2009

**VIA HAND DELIVERY**

The Honorable Frank B. Maas
United States District Court
Southern District of New York
Daniel Patrick Moynihan United States
Courthouse
500 Pearl Street, Room 740
New York, NY 10007

      Re:    *In Re: Terrorist Attacks on September 11, 2001,* 03 MDL 1570 (GBD)

Dear Judge Maas:

     I write in accordance with the Court's directive at the April 30, 2009 discovery conference, to explain why the Federal Rules of Civil Procedure require that defendant National Commercial Bank (NCB) be directed to respond to the ten (10) outstanding jurisdictional discovery requests identified in Exhibit 1 hereto.

    **A.**    <u>**Introduction**</u>

     During the course of the April 30, 2009 conference, Your Honor questioned whether the Second Circuit's Due Process holding in *In Re: Terrorist Attack on September 11, 2001,* 538 F.3d 71 (2d Cir. 2008) (*Terrorist Attacks III*) may foreclose certain asserted theories of specific jurisdiction as to NCB, and by extension, preclude plaintiffs from conducting discovery relevant to those theories.[1]  In response, the undersigned noted that various parties to the litigation had advanced differing interpretations of the Second Circuit's Due Process ruling, both in the district court and in relation to the pending Petition for *Certiorari.*  Accordingly, plaintiffs submitted that

---

[1]  As the Court is aware, plaintiffs have sought review of the Second Circuit's Due Process ruling by the Supreme Court.  The Supreme Court previously referred Plaintiffs' Petition for *Certiorari* to the Solicitor General, for the views of the United States.  Plaintiffs understand that the Solicitor General's Office intends to file its brief before the end of this month.

May 7, 2009
Page 2

---

Your Honor should consider those differing interpretations in resolving the pending discovery disputes as to NCB.

At the conclusion of the colloquy between the parties and the Court concerning these issues, Your Honor directed plaintiffs to select ten document requests relevant to plaintiffs' proffered theories of specific jurisdiction, and submit a letter brief to the Court explaining the "good faith basis" for plaintiffs' assertion that those discovery requests are reasonably calculated to lead to evidence relevant to the jurisdictional inquiry, in light of the standards of Due Process announced in *Terrorist Attacks III*. We offer this letter in response to those directives.

For the reasons discussed below, a careful reading of the Second Circuit's decision demonstrates that the exercise of personal jurisdiction over NCB based on NCB's intimate relationship with al Qaida does not run afoul of the Second Circuit's Due Process holding. For this reason, plaintiffs are entitled to the focused discovery they seek concerning the relationship between and among NCB, Muwafaq Foundation, Khaled bin Mahfouz, Yassin al Qadi, and al Qaida, as well as the limited discovery they seek concerning the duties and responsibilities of bin Mahfouz and al Qadi at NCB. The ten discovery requests plaintiffs proffer in relation to those theories differ in form and substance from any of the discovery requests previously considered by the Court in relation to the NCB jurisdictional discovery proceedings, and in many cases have been outstanding for nearly two years.

**B.      The Second's Circuit's Due Process Holding in *In Re:  Terrorist Attacks III***

In its decision in *Terrorist Attacks III*, the Second Circuit recognized that Due Process requires that a defendant's "conduct and connection with the forum state are such that it should reasonably anticipate being haled into Court there." *Terrorist Attacks III*, 538 F.3d at 94 (*quoting World Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980). The Second Circuit acknowledged that this "fair warning" requirement is satisfied if the defendant has "purposefully directed" his activities at residents of the forum, and the litigation results from alleged injuries that arise out of or relate to those activities. *Terrorist Attacks III*, 538 F.3d at 93 (*quoting Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472-73 (1985)). Thus, the Second Circuit held that "personal jurisdiction is proper where the defendant took intentional, and allegedly tortious, actions…expressly aimed at the forum state." *Terrorist Attacks III*, 538 F.3d at 93 (*quoting Calder v. Jones*, 465 U.S. 783, 789 (1984)).

Turning to the particular claims at issue, the Second Circuit went on to conclude that Princes Sultan, Naif, Turki and Salman were not subject to personal jurisdiction in the United States for the claims at issue because, in the Court's view, "providing indirect funding to an organization that was openly hostile to the United States does not constitute this type of intentional conduct." *Terrorist Attacks III*, 538 F.3d at 95.

**C.      The Parties' Filings Concerning the Import of the Second**
**         Circuit's Decision in the Remaining Claims**

In accordance with Judge Daniels' directive, the plaintiffs and defendants submitted supplemental briefs in October and November of 2008, offering their respective interpretations

May 7, 2009
Page 3

_____

of the Second Circuit's Due Process ruling, and its import to the remaining motions to dismiss in
this litigation. Copies of the briefs submitted by each of the sides are enclosed herewith, as
Exhibits 2 through 5.[2] Broadly speaking, the defendants advocated an extraordinarily expansive
view of the Second Circuit's Due Process ruling in their supplemental briefs, essentially arguing
that the Second Circuit's ruling precluded this Court from exercising personal jurisdiction under
a specific jurisdictional theory over any party who was not *personally* involved in the planning
or commission of the September 11th Attack. Plaintiffs offered a more restrained view of the
Second Circuit's ruling, advocating that it would not serve to immunize from this Court's
jurisdiction parties with intimate or direct relationships with al Qaida.

### D.   *Boim V*

Shortly after the parties filed their supplemental briefs, the Seventh Circuit issued its *en
banc* decision in *Boim v. Quranic Literacy Institute*, 549 F.3d 685 (7th Cir. 2008) (*Boim V*). As
Your Honor is aware, the series of decisions issued by the Seventh Circuit in the *Boim* litigation
have been a focal point of the briefing by the parties in these MDL proceedings from the outset,
and the *en banc* decision issued in December of 2008 therefore prompted supplemental briefing
by the parties. Copies of the briefs submitted by the parties concerning that decision are
included as Exhibits 6 and 7 hereto.

Although as a technical matter *Boim V* focuses on principles of substantive liability under
the Anti-terrorism Act (ATA), plaintiffs offered in their Notice of Supplemental Authority that it
also provides considerable guidance concerning the personal jurisdiction questions pending
before this Court, and compellingly counsels in favor of a restrained reading of the Second
Circuit's Due Process holding in this litigation. In this regard, plaintiffs noted that although the
*Boim V* Court did not have occasion to address the Due Process clause directly, its rulings derive
from a thorough and enlightened analysis of the fundamental nature of terrorism, and the integral
role extra-territorial sponsors play in bringing about terrorist attacks against Americans. *See
Boim V* at 698. In that context, the *en banc* Court made a number of important findings, which
plaintiffs submitted should inform the analysis of personal jurisdiction in a terrorism case. Of
particular note, the *Boim V* Court correctly recognized that every contribution to a terrorist
organization, regardless of how de minimus it may be, "significantly enhance[s] the risk of
terrorist attacks, and thus the probability that [the plaintiff] would be a victim." *Id.* For this
reason, the *Boim V* Court properly found that any rule of law which serves to immunize
"knowing" sponsors of terrorism from liability for their actions – whether grounded in principles
of jurisdiction or substantive liability – would not only undermine Congress' objectives in
passing the ATA, but in fact *encourage* the sponsorship of terrorism against America from
abroad by "invit[ing] money laundering, the proliferation of affiliated organizations, and two–
track terrorism…" *Id.* at 698-99, 702.

Against that backdrop, plaintiffs' Notice of Supplemental Authority advocated that it
would be illogical and ultimately dangerous to read the Second Circuit's decision to limit this

_____

[2] The arguments advanced by the plaintiffs and defendants in support of their respective interpretations of the
decision are set forth in detail in the attached briefs. Accordingly, plaintiffs will not restate the arguments contained
in those briefs at length herein.

May 7, 2009
Page 4

_____

Court's jurisdiction over extra-territorial sponsors of al Qaida to persons who directly participated in the September 11th Attack itself, as the defendants advocated in their supplemental briefs.  Indeed, such a construction of the Second Circuit's Due Process decision would effectively provide a road-map for the financing of terrorist attacks against the United States from abroad, as sympathizers of al Qaida and other terrorist organizations at war with the United States would need only avoid any direct role in the conduct of an actual terrorist attack in order to preserve immunity from any claims by victims of their conduct.  Under such circumstances, there would simply exist no disincentive to engaging in forms of conduct that are specifically intended to promote the murder of American citizens, and the "ATA would be a dead letter."  *Id.* at 702.  Such a result would, as Justice Scalia recently observed in a related context, "almost certainly cause more Americans to be killed."  *Boumediene v. Bush*, 128 S. Ct. 2229, 2294 (2008) (J. Scalia, dissenting).

For all of the foregoing reasons, plaintiffs advocated that the decision in *Boim V* counseled in favor of a restrained reading of the Second Circuit's Due Process holding in *Terrorist Attacks III*.

### E.  The Respondents' Interpretations of the Second Circuit's Due Process Ruling in Their Briefs to the Supreme Court of the United States

At the time the Seventh Circuit handed down *Boim V*, briefing was ongoing in the Supreme Court relative to plaintiffs' Petition for a Writ of *Certiorari* relative to the *Terrorist Attacks III* decision.  In relation to that briefing, the very defendants who benefited from the Second Circuit's Due Process ruling decried the notion that it limits the federal courts' authority to exercise personal jurisdiction in terrorism cases to the terrorist operatives who plan and carry out the terrorist attack itself.  For instance, in his opposition to the Petition for *Certiorari,* Prince Turki asserted that the Second Circuit's Due Process ruling "did not address any claims involving 'primary participants.' And, with respect to non-primary participants, the decision stands only for the limited proposition that a plaintiff must establish that a defendant aimed intentional tortious acts at the United States or U.S. residents."  Embracing a similar view of the Second Circuit's ruling, Princes Sultan, Salman and Naif argued that the Second Circuit "held only that personal jurisdiction could not be based on an allegation that a defendant contributed to a foreign charity, knowing that the charity would divert funds to a terrorist group that was hostile to the United States.  Nothing in [the Second Circuit's] holding addresses the provision of direct support to *terrorist organizations themselves*, or to intermediary organizations *for the purpose* of funding terrorist attacks on the United States." [3]

### F.  The Court May Exercise Jurisdiction Over NCB Based on its Direct and Intimate Relationship With al Qaida

To this point, Judge Daniels has not issued a decision providing guidance concerning his interpretation of the Second Circuit's Due Process ruling.  However, for the reasons stated above

_____

[3] Regardless of the interpretation, Plaintiffs' Petition argues that the Second Circuit's Due Process ruling conflicts with decisions of other Circuits and the Supreme Court itself, and imperils numerous U.S. counter-terrorism measures.

May 7, 2009
Page 5

———————————————————

and in greater detail in plaintiffs' enclosed briefs, plaintiffs respectfully submit that the Second Circuit's Due Process decision does not foreclose this Court from exercising jurisdiction over a defendant which maintained a direct or intimate relationship with al Qaida, particularly where the allegations and evidence of record give rise to a logical inference that the defendant was a critical collaborator in al Qaida's campaign to attack the United States.  NCB is such a defendant.

Critically, NCB is not alleged to have been a mere participant in the indirect funding of al Qaida, which should have foreseen that al Qaida would use such contributions of support to carry out terrorist attacks.  Rather, plaintiffs have alleged and offered evidence that NCB maintained a close and direct relationship with al Qaida, and that senior personnel of NCB, who were in direct contact and working in concert with al Qaida members, used the bank's infrastructure for the purpose of enabling al Qaida to wage jihad against the United States.  Plaintiffs contend that the direct and intimate relationship between NCB and al Qaida is manifested (in part) by their collaboration relative to the Muwafaq Foundation, a financial arm of al Qaida founded by Senior NCB executives Khaled bin Mahfouz and Yassin al Qadi.  Plaintiffs maintain that bin Mahfouz and al Qadi used the bank's infrastructure and resources to build and sustain Muwafaq, for the purpose of enabling al Qaida to realize its stated ambition to attack America.[4]

In support of those propositions, plaintiffs have offered not only the detailed factual allegations of their complaints and RICO Statements,[5] but also voluminous evidentiary materials.[6]  As discussed in greater detail in the *Federal Insurance* plaintiffs' April 25, 2008 and August 15, 2008 letters to the Court, the complete record relating to NCB corroborates the following critical facts and allegations underlying plaintiffs' theories of specific jurisdiction as to NCB:

> 1. Muwafaq Foundation was conceived and founded within the walls of NCB by NCB Senior Executives Yassin Al Qadi and Khaled Bin Mahfouz, contemporaneous with the establishment of NCB's Islamic Banking Division.  *See Federal Insurance* plaintiffs' RICO Statement Applicable to Khalid Bin Mahfouz ("KBM RICO") at Exhibit A; Exhibit C to the *Federal Insurance* plaintiffs' August 15, 2008 Submission to the Honorable Frank Maas, Statement of Yassin Abdullah Kadi to the Office of Foreign Assets Control ("Kadi OFAC Statement"), pp. 6-9.
>
> 2. The architect of NCB's Islamic Banking Division was designated al Qaida sponsor Yassin al Qadi, who was hand-picked for that role by Senior NCB

———————————————————

[4] By virtue of the close relationship between NCB's Senior personnel and members of al Qaida leadership, and their commitment to al Qaida's agenda, plaintiffs further assert that the record gives rise to a logical inference that NCB channeled support to al Qaidavia the IIRO and SJRC *for the purpose* of enabling al Qaida to attack America.  In this regard, plaintiffs note that designated terrorist Wa'el Jelaidan, himself a senior al Qaida member, was both a close associate of al Qadi and a Director of the SJRC.

[5] By operation of Case Management Order #2, such RICO Statements served to amend the Complaints.

[6] In its efforts to avoid discovery, NCB has repeatedly invited the Court to focus solely on the allegations of the Complaints, filed under the simple notice pleading requirements of the Federal Rules between 2002 and 2003, well before the most damning evidence concerning NCB's sponsorship of al Qaida came to light.  As the Court is aware, the relevant record is not limited to the Complaints.

May 7, 2009
Page 6

Executive Khaled bin Mahfouz. *See Federal Insurance* plaintiffs' First Amended Complaint With Incorporated More Definite Statements, RICO Statements, Rule 15(d) Supplemental Pleadings, Filed in Accordance with Paragraph 13 of Case Management Order Number 2 ("FAC"), ¶ 235; Kadi OFAC Statement at pp. 6-9; *Federal Insurance* plaintiffs' RICO Statement Applicable to Yasin Abdullah Al Qadi ("Qadi RICO") at Exhibit A.

3.    Senior NCB Executive Yassin Al Qadi was responsible for the operation of the Muwafaq Foundation, to include the distributions of its funds. *See* Qadi RICO at Exhibit A.

4.    Senior NCB Executives bin Mahfouz and al Qadi exercised authority over the operations of NCB and its Islamic Banking Division, to include authority and influence over the selection of "Islamic causes" deserving NCB's support via *zakat* and other contributions. *See* Qadi OFAC Submission at pp. 6-9.

5.    Senior NCB Executive Yassin Al Qadi met with Osama Bin Laden as late as 1992, during the time the Muwafaq Foundation was being funded and established. *See* Exhibit 6 to the *Federal Insurance* plaintiffs' April 25, 2008 Submission to the Honorable George B. Daniels, United States Treasury Department Memorandum regarding the United States government's designation of Yassin al Qadi as an al Qaida sponsor ("Treasury Evidentiary Memorandum"), p. 20.

6.    At the time al Qadi admits to having personally met with bin Laden, which coincided with the establishment of Muwafaq Foundation by bin Mahfouz and al Qadi, as well as the establishment of NCB's Islamic Banking Division, bin Laden was in the process of building al Qaida's global infrastructure and had already publicly declared al Qaida's intent to attack America. *See* December 21, 2007 Discovery Order from Judge Daniels stating that the appropriate temporal scope of discovery should reasonably begin in 1992 (Docket # 2059).

7.    Muwafaq was established for the express purpose of serving as a financial arm of al Qaida, to support al Qaida's jihad against America. *See* FAC ¶ 488; KBM RICO at Exhibit A; Qadi RICO at Exhibit A.

8.    The leadership of Muwafaq Foundation was populated by senior al Qaida members, who were hand-picked for those positions by Senior NCB Executive Al Qadi. *See* KBM RICO at Exhibit A; Qadi RICO at Exhibit A; Treasury Evidentiary Memorandum at p. 7; November 29, 2001 letter from U.S. Department of Treasury General Counsel David Aufhauser to Swiss Substitut du Procureur General Claud Nicati ("Aufhauser Letter"), attached as Exhibit 8 hereto.

May 7, 2009
Page 7

9.     From the date of its establishment, Muwafaq Foundation was
       indistinguishable from al Qaida itself.  Indeed, the U.S. Government has
       asserted that Muwafaq formally "merged with al Qaida."  *See* Aufhauser
       Letter.

10.    NCB channeled its own resources to Muwafaq and al Qaida, to include
       *zakat* and other contributions, and in addition provided financial and
       banking services for the benefit of Muwafaq and al Qaida.  *See* FAC ¶¶
       285-297; KBM RICO at Exhibit A; Qadi RICO at Exhibit A.

11.    NCB's direct support for al Qaida prompted Saudi authorities to arrest
       several employees of NCB in 1999, as confirmed by the October 3, 2001
       Congressional testimony of Vincent Cannistraro, the former Chief of
       Operations and Analysis at the CIA's Counterterrorism Center.[7]  *See Al
       Qaeda and the Global Reach of Terrorism,*  Hearing before the Committee
       on International Relations, House of Representatives, October 3, 2001,
       prepared statement of Vincent Cannistraro, former Chief of Counter-
       Terrorism Operations, Central Intelligence Agency, available at
       http://www.au.af.mil/au/awc/awcgate/congress/75562.pdf, at p. 20.

       Plaintiffs respectfully submit that the foregoing facts[8] (and the logical inferences to be
drawn from same) reflect a direct and intimate relationship between NCB and al Qaida, which if
proven would support the exercise of personal jurisdiction over NCB in keeping with the Second
Circuit's Due Process ruling.  Because the 10 discovery requests plaintiffs have selected from
among the outstanding discovery directed to NCB are reasonably calculated to lead to the
discovery of admissible evidence concerning NCB's direct and intimate relationship with al
Qaida, plaintiffs are entitled to full and complete answers to those requests.

**G.     The Selected Discovery Requests are Reasonably Calculated to Lead to the
        Discovery of Evidence Relevant to the Jurisdictional Analysis**

       Consistent with the Court's directive, plaintiffs have selected 10 document requests
from among the outstanding NCB discovery, which are targeted at evidence directly relevant to
the theories of personal jurisdiction outlined above.  As the Court will see in reviewing those
requests, they focus on evidence concerning: (1) the character of the relationship between NCB

---

[7] It is implausible to suggest that Cannistraro testified cavalierly or without evidentiary support when he identified
NCB as a direct sponsor of al Qaida.  To the contrary, like all those who testify before Congress, Cannistraro was
subject to the criminal penalties of 18 U.S.C. § 1001 for false statements or fictitious representations.  Moreover,
neither the Agency nor any other government entity involved in counterterrorism affairs has taken any action to
correct the record or suggest in any way that Cannistraro had unfairly maligned NCB.

[8] Although plaintiffs have offered evidence in support of their position in this context, they reiterate that they are
under no burden to substantiate their theories in order to obtain discovery under the Federal Rules.  At the April 30,
2009 hearing, Your Honor referenced plaintiffs' obligation to provide a "good faith basis" for requested discovery.
Plaintiffs respectfully submit that such a showing is not contemplated by the Federal Rules, which merely require
that a plaintiff explain, in basic terms, how the discovery is relevant.  In any event, plaintiffs have unquestionably
demonstrated the good faith basis for the discovery requests at issue here, so the issue is, at least in the present
context, largely semantic.

May 7, 2009
Page 8

_____

and Muwafaq; (2) NCB's role in the establishment, oversight and supervision of Muwafaq; (3) the overlap between NCB and Muwafaq personnel; (4) NCB's own contributions to Muwafaq; (5) al Qadi's relationship with NCB and Muwafaq; and (6) transfers by al Qadi and bin Mahfouz (but not other NCB customers) to Muwafaq via NCB accounts.

With regard to the requests targeting evidence concerning the character of NCB's relationship with Muwafaq, plaintiffs submit that the relevance of these requests is self-evident from the discussion of the record offered above. The requests seeking evidence concerning Yassin al Qadi's relationship with NCB are relevant to NCB's conclusory and wholly unsupported argument that al Qadi was necessarily acting outside the scope of his agency or employment with NCB in relation to any sponsorship of al Qaida. As the scope of employment inquiry is inherently fact sensitive, plaintiffs are entitled to discovery on this issue. On this latter point, plaintiffs respectfully refer the Court to the arguments on pp. 7-9 of their August 15, 2008 letter to Your Honor, which contains a more complete discussion of these issues.[9]

### H.   NCB May Not Avoid Responding to Plaintiffs' Discovery Requests Through Unsupported Objections

For the reasons set forth above, plaintiffs have met their minimal threshold burden to demonstrate that the discovery they seek is reasonably calculated to lead to the discovery of information relevant to the jurisdictional dispute concerning NCB. In seeking to avoid such discovery, NCB may not rely on unsupported arguments and unsubstantiated assertions of irrelevance or burden. Indeed, under the Rules, the party seeking to avoid discovery has the burden of showing the Court specifically how, despite the broad and liberal construction afforded the federal discovery rules, each discovery request is not relevant, or how each request is overly broad, burdensome or oppressive. Compagnie Francaise D'Assurance Pour Le Commerce Exterieur v. Philips Petroleum Co., 105 F.R.D. 16, 42 (S.D. N.Y. 1984). In order to satisfy that burden, the resisting party must do more than "simply intone the familiar litany that the discovery is [irrelevant], burdensome, oppressive or overly broad." Arias-Zeballos v. Tan, 2007 U.S. Dist. LEXIS 40245, *4 (S.D. N.Y. 2007). Rather, the defendant must clarify and substantiate its objections by explaining, *through competent evidence submitted to the court,* why the discovery is not relevant, or should be denied based on the alleged burden or oppressiveness of responding. Id. at *4-8. Because arguments of counsel within a Memorandum of Law do not constitute evidence, such arguments are insufficient as a matter of law to sustain the objecting party's burden, and should not be considered at all in the absence of a supporting affidavit. Id. at *7. ("Although the Memorandum of Law the defendants' submitted in opposition to the Plaintiffs' Motion to Compel attempts to explain the defendant's objections to Interrogatory Nos. 2-5, 8 and 9, a Memorandum of Law is not evidence. Therefore, it cannot be relied upon solely by the defendant to support the allegation she had made in objecting to answer the plaintiffs' interrogatories").

_____

[9] As set forth in that letter, and evident from the discussion above, Yassin al Qadi and Khaled bin Mahfouz also possess information and evidence directly relevant to the NCB jurisdictional analysis. As those defendants are no longer affiliated with NCB, discovery requests to NCB cannot serve to elicit the information in their possession. For this reason, plaintiffs must be afforded the opportunity to conduct discovery as to those defendants before being required to respond to NCB's Motion to Dismiss. Plaintiffs have in fact served discovery on those defendants, who have refused to respond on the grounds that they have pending Motions to Dismiss.

May 7, 2009
Page 9

Plaintiffs submit that faithful adherence to the foregoing standards is particularly critical in a case of this nature, as it prevents obstructionist behavior and unfounded objections, and thereby limits the number of disputes requiring Court intervention. As NCB has not filed any affidavit challenging the 10 discovery requests at issue on relevancy or other grounds, the Court should not entertain such objections at this time.

## I.    All Plaintiffs Are Entitled to the Requested Discovery

At the April 30, 2009 hearing, Your Honor also requested that the *Federal Insurance* plaintiffs explain in this letter brief why they should be treated differently from the *Ashton* and *Burnett* plaintiffs in relation to the discovery they now seek. Plaintiffs understand that this inquiry was prompted by the ongoing dispute between the *Federal Insurance* plaintiffs and NCB concerning NCB's contention that the *Federal Insurance* plaintiffs should be bound by the discovery proceedings in the separate *Ashton* and *Burnett* cases.

Although the *Federal Insurance* plaintiffs maintain that they are not bound by the earlier discovery proceedings as to NCB in the separate actions, the dispute on that point is of no moment in the present context, as the availability of the present discovery should not turn on whether the *Federal Insurance* plaintiffs are bound by those prior discovery proceedings. As briefly mentioned above, the majority of the discovery requests presently at issue were served by the *Federal Insurance* plaintiffs in August of 2007, when NCB first disclosed its intent to argue that the *Federal Insurance* plaintiffs should be bound by the *Ashton* and *Burnett* discovery, and while discovery as to NCB remained ongoing. Those requests targeted areas of discovery which had not been previously addressed by the *Ashton* and *Burnett* plaintiffs. The remaining requests were served in August of 2008 (at which time plaintiffs also requested that the Court compel NCB to respond to the 2007 requests), in response to Judge Daniels' July 11 2008 Order *directed to all parties*, which provided in relevant part as follows:

> To the extent that plaintiffs believe that additional jurisdictional discovery is necessary prior to filing a response (to NCB's renewed Motion to Dismiss), a specific discovery request and a request for a stay or extension of time in which to respond to the Motion should be made to the Magistrate Judge.

Pursuant to this language of the July 11, 2008 Order, the Court afforded all parties the opportunity to seek any outstanding or additional discovery necessary to create an adequate factual record to respond to NCB's "Renewed" Motion to Dismiss. In keeping with that authorization, the plaintiffs in all actions adopted the discovery served by the *Federal Insurance* plaintiffs. Accordingly, the discovery at issue was properly served on behalf of all plaintiffs, in accordance with the Court's authorization.

Furthermore, the ten discrete discovery requests presently at issue differ in both form and substance from any of the discovery previously considered by the Court in the *Ashton* and *Burnett* cases. As discussed in further detail above, the instant requests seek evidence concerning the character of the relationship between and among NCB, Muwafaq Foundation, Yassin al Qadi, Khaled bin Mahfouz, and al Qaida, to include evidence concerning NCB's

involvement in supporting Muwafaq's terrorist activities through the channeling of NCB's own funds and resources to that organization. Although a few discovery requests were served in the *Ashton* and *Burnett* cases at a early stage of the NCB discovery proceedings referencing Muwafaq Foundation, those discovery requests focused solely on NCB's potential involvement in carrying out transfers of *customers' funds* to Muwafaq via the accounts of those customers. In connection with that dispute, and a similar dispute concerning nearly identical discovery requests relating to the IIRO, this Court concluded that the *Ashton* and *Burnett* plaintiffs were not entitled to conduct discovery relative to customer accounts. Here, plaintiffs do not presently seek any discovery as to NCB customer accounts (other than accounts under the control of bin Mahfouz and al Qadi), but rather discovery targeted to demonstrate that senior executives at NCB, working directly with senior members of al Qaida, used NCB's resources and infrastructure to directly support al Qaida, through a joint venture known as the Muwafaq Foundation. Thus, aside from the fact that certain of the prior discovery requests referenced Muwafaq Foundation, they bear absolutely no similarity to the requests presently before the Court.

For all of the foregoing reasons, all plaintiffs are entitled to the discovery presently at issue, and the disputes arising from the differing procedural statuses of the various cases are immaterial to the Court's present deliberations.

With respect to the merits of the *Federal Insurance* plaintiffs' contention that they are not bound by the prior discovery in the *Ashton* and *Burnett* cases, the *Federal Insurance* plaintiffs respectfully refer the Court to their April 25, 2008 and August 15, 2008 letters, which set forth the relevant procedural history and arguments in detail. With respect to the application of those arguments to the discovery presently at issue, the *Federal Insurance* plaintiffs would merely emphasize the following points:

- The *Federal Insurance* plaintiffs have endeavored diligently, since the issuance of the Court's denial of NCB's Motion to Dismiss in the *Ashton* and *Burnett* cases, to achieve a consolidation of discovery proceedings as to NCB. Those efforts have included a specific request that NCB stipulate to permit the *Federal Insurance* plaintiffs to actively participate in the discovery proceedings in the other cases in 2005; consistent requests, in virtually every letter concerning case management issues, that the Court decide NCB's Motion to Dismiss in the *Federal Insurance* action, to ensure consolidated discovery as to NCB; and the service of discovery requests upon NCB in 2007, while discovery proceedings as to NCB were ongoing in the other cases.

- NCB has worked diligently to exclude the *Federal Insurance* plaintiffs from participating in the discovery process. Of particular note, following service of the *Federal Insurance* plaintiffs' 2007 discovery requests, NCB sent the *Federal Insurance* plaintiffs a letter arguing that the *Federal Insurance* plaintiffs were not authorized to conduct discovery as to NCB, by virtue of its pending Motion to Dismiss.

May 7, 2009
Page 11

---

- The discovery presently at issue is directly relevant to theories of jurisdiction advanced by the *Federal Insurance* plaintiffs and is discovery that has not been sought by the plaintiffs in the other cases.

- The *Federal Insurance* plaintiffs had no standing to participate in the discovery proceedings in the separate cases, and consequently no standing to preserve their rights in an appeal relative to such discovery proceedings.

- Unlike a fourth or fifth party defendant who is joined late in an action, the *Federal Insurance* plaintiffs have been parties to the MDL proceedings throughout the course of the discovery as to NCB, and persistently sought the opportunity to participate in those discovery proceedings.

For all of the foregoing reasons, the *Federal Insurance* plaintiffs again submit that they cannot be deemed bound by the separate discovery proceedings in the *Ashton* and *Burnett* cases, although the Court need not resolve that question in relation to the instant request for jurisdictional discovery.

Respectfully submitted,

COZEN O'CONNOR

BY:     SEAN P. CARTER

SPC/bdw

cc:     The Honorable George B. Daniels (Via Hand Delivery)
        All counsel of Record (Via email)

PHILADELPHIA\5127714\1  117430.000