# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| YASSIN ABDULLAH KADI, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action 09-0108 (JDB) |
| | ) | |
| vs. | ) | |
| | ) | |
| TIMOTHY GEITHNER, *et al.* | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

Dated: May 22, 2009

Respectfully submitted,

TONY WEST
Assistant Attorney General

DOUGLAS N. LETTER
Terrorism Litigation Counsel

SANDRA M. SCHRAIBMAN
Assistant Branch Director (D.C. Bar #188599)

   /s/ Eric J. Beane
ERIC J. BEANE (Arizona Bar #023092)
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW., Room 7124
Washington, D.C. 20001
Telephone: (202) 616-2035
Fax: (202) 616-8470
Eric.Beane@usdoj.gov

*Counsel for Defendants*

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................ 1

STATUTORY AND REGULATORY BACKGROUND ........................................... 3

    A.    Overview .................................................................................. 3

    B.    IEEPA ...................................................................................... 4

    C.    Executive Order 13,224 .......................................................... 5

    D.    OFAC Regulations ................................................................... 6

FACTUAL AND PROCEDURAL BACKGROUND ............................................... 7

STANDARD OF REVIEW ................................................................................... 12

ARGUMENT ...................................................................................................... 15

    I.    THE OFAC MAINTENANCE OF KADI'S DESIGNATION
        HAD A RATIONAL BASIS AND WAS SUPPORTED BY THE
        ADMINISTRATIVE RECORD ..................................................... 15

        A.    The Administrative Record Supports the Denial of Kadi's
            Request for Reconsideration and Maintenance of His
            Designation as an SDGT ................................................. 15

            1.    Kadi Provided Support to Terrorism Through His
                Leadership in the Muwafaq Foundation ..................... 16

            2.    Kadi Admits That He Provided Financial Support to
                SDGTs ...................................................................... 19

            3.    Other Ties to Terrorism Also Justify the Sanctions
                Against Kadi ............................................................. 23

            4.    The Classified Record Includes Additional Evidence of
                Kadi's Ties to Terrorism .......................................... 24

        B.    Plaintiff's Challenge to His EU Designation Does Not Affect
            the Validity of OFAC's 2004 Action ................................. 25

II.   PLAINTIFF'S CONSTITUTIONAL CLAIMS MUST BE
      DISMISSED BECAUSE KADI, AS A FOREIGN NATIONAL,
      LACKS CONSTITUTIONAL RIGHTS .................................................. 26

III.  PLAINTIFF'S CONSTITUTIONAL CLAIMS ARE SUBJECT
      TO DISMISSAL FOR FAILURE TO STATE A CLAIM ................................. 30

      A.   OFAC's Blocking Action Satisfies Due Process ...................................... 30

           1.   Kadi Received Constitutionally Sufficient Process ..................... 31

           2.   OFAC May Rely on Classified Evidence ..................................... 34

           3.   Plaintiff Cannot State a Due Process Claim
                Concerning FOIA ........................................................ 35

      B.   The Freezing of Assets Does Not Constitute a Taking
           Under the Fifth Amendment .................................................... 35

      C.   The Blocking Action Does Not Violate the First
           Amendment .................................................................. 36

           1.   Freedom of Speech ...................................................... 37

           2.   Freedom of Association ................................................. 39

           3.   E.O. 13224 Does Not Contain a Specific Intent
                Requirement ........................................................... 40

      D.   Plaintiff Cannot State a Claim Under the Fourth
           Amendment .................................................................. 41

           1.   The Executive's Authority to Block the Transfer of
                Assets Historically Has Not Been Constrained by
                the Fourth Amendment ................................................. 42

           2.   Blocking Actions Pursuant to E.O. 13224 are *Per Se* "Reasonable"
                Because Governmental Interests Far
                Outweigh Any Privacy Concerns ....................................... 45

      E.   Plaintiff Cannot Sustain a Vagueness or Overbreadth
           Challenge .................................................................. 52

           1.   E.O. 13224 Is Not Unconstitutionally Overbroad ..................... 52

-ii-

2.     Plaintiff's Challenge to the Phrase "Otherwise Associated With" Should be Dismissed ...................................... 53

3.     Terms Such As "Specially Designated Global Terrorist" Are Not Unconstitutionally Vague or Overbroad ................................................................ 54

F.     E.O. 13224 Is Not a Bill of Attainder ...................................... 56

CONCLUSION ............................................................................................ 59

# TABLE OF AUTHORITIES

## CASES

*32 County Sovereignty Comm. v. Dep't of State*,
    292 F.3d 797 (D.C. Cir. 2002) ................................................................. 28, 29

*Adams v. Hinchman*,
    154 F.3d 420 (D.C. Cir. 1998) ..................................................................... 36

*Aero Continente, S.A. v. Newcomb*,
    C.A. No. 04-1168 (D.D.C. July 16, 2004) ..................................................... 28

*Al-Aqeel v. Paulson*,
    568 F. Supp. 2d 64 (D.D.C. 2008) ....................................................... 29, 31, 32

*Al Haramain Islamic Found., Inc. ("AHIF") v. U.S. Dep't of the Treasury*,
    585 F. Supp. 2d 1233 (D. Or. 2008) ...................................................... *passim*

*Arbelaez v. Newcomb*,
    C.A. No. 00-5217, 2001 WL 50337 (D.C. Cir. Jan. 18, 2001) ........................ 30

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) .................................................................................. 15

*BellSouth Corporation v. FCC*,
    144 F.3d 58 (D.C. Cir. 1998) ............................................................ 58, 59, 60

*Berger v. State of New York*,
    388 U.S. 41 (1967) .................................................................................... 51

*Boim v. Holy Land Found.*,
    549 F.3d 685 (7th Cir. 2008) ....................................................................... 19

*Broadrick v. Oklahoma*,
    413 U.S. 601 (1973) .................................................................................. 53

*Cafeteria & Restaurant Workers Union v. McElroy*,
    367 U.S. 886 (1961) .................................................................................. 33

*Camara v. Municipal Court of San Francisco*,
    387 U.S. 523 (1967) .................................................................................. 46

*Camp v. Pitts*,
    411 U.S. 138 (1973) .................................................................................. 13

*Cassidy v. Chertoff*,
    471 F.3d 67 (2d Cir. 2006) ........................................................ 49

*Chandler v. Miller*,
    520 U.S. 305 (1997) .............................................................. 49

*Chas. T. Main Int'l Inc. v. Khuzestan Water & Power*,
    651 F.2d 800 (1st Cir. 1981) ...................................................... 45

*Chichakli v. Szubin*,
    546 F.3d 315 (5th Cir. 2008) ..................................................... 31

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
    401 U.S. 402 (1971) .......................................................... 13, 40

*Clifford v. Peña*,
    77 F.3d 1414 (D.C. Cir. 1996) .................................................... 5

*Cooperativa Multiactiva de Empleados de Distribuidores de Drogas "Coopservir
    LTDA." v. Newcomb*, 221 F.3d 195 (D.C. Cir. 2000) ........................ 3, 58, 60

*Ctr. for Nat'l Sec. Studies v. U.S. Dep't of Justice*,
    331 F.3d 918 (D.C. Cir. 2003) ................................................... 35

*Dames & Moore v. Regan*,
    453 U.S. 654 (1981) ..................................................... 4, 14, 43, 44

*District of Columbia v. Air Florida, Inc.*,
    750 F.2d 1077 (D.C. Cir. 1984) .................................................. 26

*EEOC v. St. Francis Xavier Parochial Sch.*,
    117 F.3d 621 (D.C. Cir. 1997) ............................................. 5, 6, 15, 54

*Florida Power & Light v. Lorion*,
    470 U.S. 729 (1985) .............................................................. 33

*Freedom to Travel Campaign v. Newcomb*,
    82 F.3d 1431 (9th Cir. 1996) ................................................. 38, 45

*Gilbert v. Homar*,
    520 U.S. 924 (1997) .............................................................. 33

*Global Relief Found., Inc. ("GRF") v. O'Neill*,
    207 F. Supp. 2d 779 (N.D. Ill. 2002), *aff'd*, 315 F.3d 748
    (7th Cir. 2002) ........................................................... *passim*

*Griffin v. Wisconsin*,
    483 U.S. 868 (1987) ........................................................................... 49, 51

*Haig v. Agee*,
    453 U.S. 280 (1981) ................................................................................ 33

*Harisiades v. Shaughnessy*,
    342 U.S. 580 (1952) ................................................................................. 3

*Holy Land Found. for Relief & Dev. ("HLF") v. Ashcroft*,
    333 F.3d 156 (D.C. Cir. 2003) ............................................................... *passim*

*Holy Land Found. for Relief & Dev. ("HLF") v. Ashcroft*,
    219 F. Supp. 2d 57 (D.D.C. 2002) ........................................................ *passim*

*Humanitarian Law Project v. Gonzales ("HLP/AEDPA")*,
    380 F. Supp. 2d 1134 (C.D. Cal. 2005), *aff'd*, 509 F.3d 1122 (9th Cir. 2007) .............. 19

*Humanitarian Law Project v. Reno ("HLP/AEDPA")*,
    205 F.3d 1130 (9th Cir. 2000) ............................................................... *passim*

*Humanitarian Law Project v. Treasury ("HLP/IEEPA")*,
    463 F. Supp. 2d 1049 (C.D. Cal. 2006) .......................................... 19, 41, 56

*Humanitarian Law Project v. Treasury ("HLP/IEEPA")*,
    484 F. Supp. 2d 1099 (C.D. Cal. 2007) ............................................... 19, 54

*In the Matter of the Extradition of Mousa Mohammed Abu Marzook*,
    924 F. Supp. 565 (S.D.N.Y. 1996) ................................................... 20, 21

*Islamic American Relief Agency ("IARA") v. Gonzales*,
    477 F.3d 728 (D.C. Cir. 2007) ............................................................... *passim*

*Islamic American Relief Agency ("IARA") v. Unidentified FBI Agents*,
    394 F. Supp. 2d 34 (D.D.C. 2005) ........................................................ *passim*

*Jifry v. Fed. Aviation Admin.*,
    370 F.3d 1174 (D.C. Cir. 2004), *cert. denied* 125 S. Ct. 1299 (2005) .......................... 29

*Korte v. OPM*,
    797 F.2d 967 (Fed. Cir. 1986) ................................................................ 58

*MacWade v. Kelly*,
    460 F.3d 260 (2d Cir. 2006) .................................................................. 49

*Marshall v. Sawyer*,
    365 F.2d 105 (9th Cir. 1966), *cert. denied*, 385 U.S. 1006 (1967) ................................ 58

*Mathews v. Eldridge*,
    424 U.S. 319 (1976) ..................................................................... 33

*Milena Ship Mgmt. Co. v. Newcomb*,
    995 F.2d 620 (5th Cir. 1993) ........................................................ 5, 6

*Miranda v. Sec'y of Treasury*,
    766 F.2d 1 (1st Cir. 1985) ............................................................ 45

*Mistretta v. United States*,
    488 U.S. 361 (1989) ..................................................................... 43

*Morrissey v. Brewer*,
    408 U.S. 471 (1972) ..................................................................... 33

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ....................................................................... 13

*\*Nielsen v. Sec'y of the Treasury*,
    424 F.2d 833 (D.C. Cir. 1970) ............................................ 36, 44, 45

*Nixon v. Administrator of General Servs.*,
    433 U.S. 425 (1977) ............................................................... 57, 59

*Ohio v. Robinette*,
    519 U.S. 33 (1996) ....................................................................... 48

*Orvis v. Brownell*,
    345 U.S. 183 (1953) ................................................................. 4, 43

*Palestine Info. Office v. Shultz*,
    853 F.2d 932 (D.C. Cir. 1988) ............................................... 33, 38

*Paradissiotis v. Rubin*,
    171 F.3d 983 (5th Cir. 1999) .................................................. 36, 58

*Parker v. Levy*,
    417 U.S. 733 (1974) ..................................................................... 56

*Pennsylvania v. Mimms*,
    434 U.S. 106 (1977) ..................................................................... 46

*People's Mojahedin Org. of Iran ("PMOI") v. U.S. Dep't of State*,
    182 F.3d 17 (D.C. Cir. 1999) .................................................................... 27, 28

*Propper v. Clark*,
    337 U.S. 472 (1949) ............................................................................. 4, 43

*Regan v. Time, Inc.*,
    468 U.S. 641 (1984) ............................................................................ 14, 56

*\*Regan v. Wald*,
    468 U.S. 222 (1984) ........................................................................ 3, 4, 43

*Roberts v. United States Jaycees*,
    468 U.S. 609 (1984) ................................................................................. 40

*Sardino v. Fed. Reserve Bank of New York*,
    361 F.2d 106 (2d Cir. 1966) ...................................................................... 45

*Selective Service Sys. v. Minnesota PIRG*,
    468 U.S. 841 (1984) ............................................................................ 58, 59

*Skinner v. Ry. Labor Executives' Ass'n*,
    489 U.S. 602 (1987) ............................................................................ 46, 49

*Soldal v. Cook County*,
    506 U.S. 56 (1992) ................................................................................... 46

*Terry v. Ohio*,
    392 U.S. 1 (1968) .................................................................................... 46

*Tran Qui Than v. Regan*,
    658 F.2d 1296 (9th Cir. 1981) .................................................................... 37

*United States v. Flores-Montano*,
    541 U.S. 149 (2004) ................................................................................. 47

*United States v. Knights*,
    534 U.S. 112 (2001) ............................................................................ 46, 48

*United States v. O'Brien*,
    391 U.S. 367 (1968) ........................................................................ 37, 38, 39

*United States v. One 1997 E35 Ford Van, et al.*,
    50 F. Supp. 2d 789 (N.D. Ill. 1999) ........................................................ 20, 21

*United States v. Ramsey*,
      431 U.S. 606 (1977) ......................................................................... 47, 48

*United States v. Verdugo-Urquidez*,
      494 U.S. 259 (1990) ......................................................................... 27, 29

*United States v. Williams*,
      128 S. Ct. 1830 (2008) ........................................................................... 53

*Village of Hoffman Estates v. Flipside*,
      455 U.S. 489 (1992) ................................................................................ 56

*Virginia v. Hicks*,
      539 U.S. 113 (2003) ................................................................................ 53

*Walmer v. Dep't of Defense*,
      52 F.3d 851 (10th Cir.), *cert. denied*, 516 U.S. 974 (1995) ...................... 58

*Walsh v. Brady*,
      927 F.2d 1229 (D.C. Cir. 1991) ............................................................... 38

*Wayte v. United States*,
      470 U.S. 598 (1985) ................................................................................ 33

*\*Youngstown Sheet & Tube Co. v. Sawyer*,
      343 U.S. 579 (1952) ..................................................................... 43, 44, 48

## STATUTES AND REGULATIONS

Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706 ................................ 1, 13

Antiterrorism and Effective Death Penalty Act ("AEDPA"), 18 U.S.C. § 2339B ...................... 27

International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-06 ......... *passim*

22 U.S.C. § 287c ............................................................................................ 5

28 U.S.C. § 1491 ........................................................................................... 36

50 U.S.C. app. § 5(b) ....................................................................................... 4

50 U.S.C. § 1701(a) ..................................................................................... 4, 49

50 U.S.C. § 1702(c) ................................................................................... *passim*

28 U.S.C. § 1491 ................................................................................................ 36

31 C.F.R. §§ 501.806-807 ................................................................................... 7

31 C.F.R. § 536.312 .......................................................................................... 56

31 C.F.R. § 594.310 ................................................................................. 6, 7, 55

31 C.F.R. § 594.311 ..................................................................................... 7, 55

31 C.F.R. § 594.316 ....................................................................... 7, 12, 54, 55

31 C.F.R. § 594.802 ............................................................................................ 6

## **MISCELLANEOUS**

Executive Order No. 13224 ("E.O. 13224"), 66 Fed. Reg. 49,079 (2001) ......................... *passim*

Fed. R. Civ. P. 12(b)(6) .................................................................................. 15, 30

Pub. L. No. 107-56, § 106, 115 Stat. 272, 278 (2001) ................................................. 5

U.S. Const. art I, § 9, cl. 3 ............................................................................. 57, 58

U.S. Const. amend. IV ................................................................................... 46, 51

## **INTRODUCTION**

In order to preserve the national security of the United States in times of national emergency, the President depends on his authority to use all the tools that are placed at his disposal by the U.S. Constitution and by Acts of Congress.  Pursuant to Article II of the Constitution and powers conferred on him by Congress in the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-06, the President has the authority to impose economic sanctions on terrorists and those who provide financial or other support to them.  Acting pursuant to IEEPA and Executive Order No. 13224 ("E.O. 13224"), 66 Fed. Reg. 49,079 (2001), the Department of the Treasury's Office of Foreign Assets Control ("OFAC") issued a notice on October 12, 2001, designating Yassin Abdullah Kadi ("Plaintiff" or "Kadi") a supporter of terrorism and blocking all property and interests in property of Kadi in the United States or in the possession or control of a U.S. person. Plaintiff sought administrative reconsideration of that decision, which was denied on March 12, 2004 on the basis of an updated administrative record that included Kadi's submissions to OFAC and additional classified and unclassified evidence compiled by OFAC.  Almost five years later, on January 16, 2009, Plaintiff filed this lawsuit challenging the evidentiary basis for his designation pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, and raising a variety of constitutional challenges to the economic sanctions program administered by OFAC pursuant to E.O. 13224.  For the reasons that follow, this entire action should be dismissed and judgment should be entered for Defendants.

The administrative record amply supports the designation of Kadi as a specially designated global terrorist ("SDGT") and the denial of Kadi's request for reconsideration.  Kadi has extensive ties to an international terrorist network through his leadership of the Muwafaq Foundation, a

charitable organization that OFAC reasonably believed was also being used as a cover for funding terrorism in Africa, Eastern Europe, the Middle East, and Central Asia. Kadi admits that he directly provided substantial financial support to numerous individuals who were sanctioned, indicted, or deported for terrorist activity. The wide breadth and depth of information describing Kadi's integral role in a vast network of terrorism and extremism provides more than sufficient information to uphold the regulatory decision to impose sanctions under E.O. 13224. Accordingly, summary judgment should be entered for Defendants on Plaintiff's APA claim.

Plaintiff's scattershot of constitutional claims should be dismissed for at least two reasons. First, as a foreign national who has not alleged substantial connections to the United States, Kadi is not entitled to assert rights arising from the U.S. Constitution. Second, even if Plaintiff were entitled to assert constitutional rights, each of his various constitutional claims is readily subject to dismissal. Numerous courts in this circuit have upheld the constitutionality of sanctions imposed under E.O. 13224 against First, Fourth, and Fifth Amendment challenges. Other SDGTs have challenged the sufficiency of process and the use of classified evidence, but the D.C. Circuit has rejected all such challenges. *Holy Land Found. for Relief & Dev. ("HLF") v. Ashcroft*, 333 F.3d 156, 163 (D.C. Cir. 2003) (rejecting due process challenge). Other SDGTs have tried – without success – to invoke the First Amendment to shield themselves from sanctions that attach to unprotected *conduct. See Islamic American Relief Agency ("IARA") v. Gonzales*, 477 F.3d 728, 735 (D.C. Cir. 2007) (rejecting First Amendment claim). And other SDGTs have argued that a blocking of assets constitutes an unreasonable seizure for Fourth Amendment purposes or an unconstitutional "Bill of Attainder." Courts have rejected these challenges. *IARA v. Unidentified FBI Agents*, 394 F. Supp. 2d 34, 48 (D.D.C. 2005) (rejecting Fourth Amendment challenge); *HLF v. Ashcroft*, 219

F. Supp. 2d 57, 78-79 (D.D.C. 2002) (same); *Cooperativa Multiactiva de Empleados de Distribuidores de Drogas "Coopservir LTDA." v. Newcomb*, C.A. No. 98-0949 slip op. at 10 (D.D.C. Mar. 29, 1999), *aff'd*, 221 F.3d 195 (D.C. Cir. 2000) (table)) (rejecting Bill of Attainder claim), attached hereto as Exhibit A.

Deference to the political branches of the United States government is never greater than in the present circumstances, where the Legislative and Executive Branches are acting in concert, and where foreign policy and national security concerns are paramount. As the Supreme Court stressed in *Regan v. Wald*, "[m]atters relating 'to the conduct of foreign relations . . . are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference.'" 468 U.S. 222, 242 (1984) (quoting *Harisiades v. Shaughnessy*, 342 U.S. 580, 589 (1952)). Accordingly, Defendants request that the Court enter judgment for Defendants and dismiss Plaintiff's complaint in its entirety.

## STATUTORY AND REGULATORY BACKGROUND

### A.    Overview

For many years the United States has utilized economic sanctions to further its foreign policy and national security goals. In much of the 20th century, U.S. sanctions programs were governed by the Trading With the Enemy Act ("TWEA"), enacted in 1917. *See* 40 Stat. 411 (codified as amended at 50 U.S.C. app. §§ 1-44). As amended in 1933, TWEA granted the President "broad authority" to "investigate, regulate . . . prevent or prohibit . . . transactions" in times of war or declared national emergencies. 50 U.S.C. app. § 5(b); *Dames & Moore v. Regan*, 453 U.S. 654, 670-72 (1981). Although TWEA does not use the term "block," the authority it conveyed to the Executive to regulate, prevent, or prohibit transactions consistently has been interpreted to

encompass the power to block or freeze an entity's property. *See, e.g., Orvis v. Brownell*, 345 U.S.

183, 187-88 (1953); *Propper v. Clark*, 337 U.S. 472, 483-84 (1949).

**B.     IEEPA**

In 1977, Congress amended TWEA and enacted IEEPA to delineate "the President's

authority to regulate international economic transactions during wars or national emergencies." S.

Rep. No. 95-466 at 2, *reprinted in* 1977 U.S.C.C.A.N. 4540, 4541.  IEEPA limited TWEA's

application to periods of declared wars and to certain existing TWEA programs, with IEEPA

available during other times of declared national emergency. *See Regan v. Wald*, 468 U.S. at 227-

28.  With limited exceptions, the broad authorities granted to the President under IEEPA remained

largely the same as those under TWEA.  If the President declares a national emergency concerning

"any unusual and extraordinary threat, which has its source in whole or substantial part outside the

United States, to the national security, foreign policy, or economy of the United States," *see* 50

U.S.C. § 1701(a), IEEPA authorizes the President to:

> investigate, block during the pendency of an investigation, regulate, direct and
> compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use,
> transfer, withdrawal, transportation, importation or exportation of, or dealing in, or
> exercising any right, power, or privilege with respect to, or transactions involving,
> any property in which any foreign country or a national thereof has any interest by
> any person, or with respect to any property, subject to the jurisdiction of the United
> States.

*Id.* § 1702(a)(1)(B).  Pursuant to this expansive authority, Presidents have blocked assets of

designated governments, individuals, and entities in response to a variety of declared national

emergencies, including those relating to Iran, Sudan, Burma, Syria, Lebanon, and Zimbabwe, as well

-4-

as relating to narcotics trafficking; terrorism; and proliferation of weapons of mass destruction. *See* Declaration of Adam J. Szubin ("Szubin Decl."), ¶ 4.[1]

In October 2001, Congress amended IEEPA to provide that, in case of judicial review of an action taken under IEEPA, an agency record containing classified information "may be submitted to the reviewing court ex parte and in camera," *see* 50 U.S.C. § 1702(c), *added by* Pub. L. No. 107-56, § 106, 115 Stat. 272, 278 (2001).

### C.     Executive Order 13,224

The President issued E.O. 13,224, effective September 24, 2001, declaring a national emergency with respect to the "grave acts of terrorism . . . and the continuing and immediate threat of further attacks on United States nationals or the United States." *See* E.O. 13224, Preamble. In determining that actual and threatened terrorist acts constituted "an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States," the President invoked the authority of IEEPA and the United Nations Participation Act.[2] *See id.*

The annex to E.O. 13224 listed 27 foreign terrorists, terrorist organizations, and their supporters – that is, it ordered the blocking of their property and interests in property that are in the United States, subsequently come within the United States, or come within the "possession or control" of U.S. persons. *Id.* § 1 & Annex. The Order further authorized the Secretary of the

---

[1] The Declaration of Adam J. Szubin, Director of OFAC, is attached hereto as Exhibit B. The OFAC Director's Declaration is provided as background information for IEEPA blocking actions and is thus properly before the Court, notwithstanding the fact that it is not part of the administrative record. *See Clifford v. Peña*, 77 F.3d 1414, 1418 (D.C. Cir. 1996).

[2] The United Nations Participation Act ("UNPA") authorizes the President to implement measures adopted by the United Nations Security Council pursuant to Article 41 of the U.N. charter. *See* 22 U.S.C. § 287c; *Milena Ship Mgmt. Co. v. Newcomb*, 995 F.2d 620, 622 (5th Cir. 1993).

Treasury, in consultation with the Secretary of State and the Attorney General, to designate "persons" (defined as individuals or entities) whose property or interests in property should be blocked because they "act for or on behalf of" or are "owned or controlled by" designated terrorists, or because they "assist in, sponsor, or provide financial, material, or technological support for, or financial or other services to or in support of," or are "otherwise associated" with them. *Id.* § 1(c)-(d).[3]  Persons designated under E.O. 13224 are referred to as specially designated global terrorists ("SDGTs"). *See* 31 C.F.R. § 594.310.

The Executive Order authorized the Secretary of the Treasury to "employ all powers granted to the President by IEEPA and UNPA," and to promulgate rules and regulations to carry out the purposes of the Order and to re-delegate such functions if he so chose. *See* E.O. 13224, § 7; *see also* 31 C.F.R. § 594.802 (delegating the Secretary of the Treasury's authorities under E.O. 13224 to the Director of OFAC).  Due to the exigencies of the national emergency, the President declared that:

> because of the ability to transfer funds or assets instantaneously, prior notice to such [designated] persons of measures to be taken pursuant to this order would render these measures ineffectual.  I therefore determine that for these measures to be effective in addressing the national emergency declared in this order, there need be no prior notice of a listing or determination made pursuant to this order.

*Id.* § 10.

### D.    OFAC Regulations

OFAC has published various regulatory definitions of certain words and phrases, many of which are mentioned in Plaintiff's complaint, and has issued regulations setting forth an administrative process.  With respect to specific terms, OFAC has made clear that "otherwise

---

[3] These provisions of E.O. 13224 were subsequently amended by E.O. 13284 to provide for a consultative role for the Secretary of Homeland Security.

associated with" means "(a) To own or control; or (b) To attempt, or to conspire with one or more persons, to act for or on behalf of or to provide financial, material, or technological support, or financial or other services, to." 31 C.F.R. § 594.316. Both "specially designated global terrorist" and "terrorism" also are defined by OFAC regulations. *See* 31 C.F.R. § 594.310 ("The term specially designated global terrorist or SDGT means any foreign person or person listed in the Annex or designated pursuant to Executive Order 13224 of September 23, 2001."); 31 C.F.R. § 594.311 (listing activities that constitute terrorism). OFAC also has regulations describing the process by which SDGTs may seek administrative reconsideration of their designations. *See* 31 C.F.R. §§ 501.806-807, 594.201 note 3.

## FACTUAL AND PROCEDURAL BACKGROUND[4]

On October 12, 2001, OFAC designated Plaintiff Kadi an SDGT pursuant to E.O. 13224. On October 17, 2001, pursuant to United Nations Security Council Resolutions 1267 and 1333, Kadi also was listed on the United Nations' Consolidated List established and maintained by the 1267 Committee with respect to Al-Qaida, Usama bin Laden, and the Taliban and other individuals, groups, undertakings, and entities associated with them, which obligated all United Nations member states to freeze Kadi's assets pursuant to paragraph 8(C) of Resolution 1333. *See* http://www.un.org/sc/committees/1267/pdf/consolidatedlist.pdf. Accordingly, the European Union froze his assets, pursuant to Council Regulation (EC) No. 467/2001 "imposing certain specific restrictive measures directed against certain persons and entities associated with Usama bin Laden, the Al-Qaida network and the Taliban."

---

[4] Pursuant to Local Rule 7(h)(2), this factual background is provided in lieu of a statement of material facts because judicial review in this case is based solely on the administrative record.

Kadi received notice of his designation under E.O. 13224 through a press release issued by the Department of the Treasury on October 12, 2001.  AR 123-126; 348-351.  On October 15, 2001, OFAC sent additional notice in the form of a "Notice of Blocking" informing Kadi of the blocking action, advising him of rules governing licensing and penalties, and notifying him of available administrative procedures for challenging the blocking action.  *See* AR 2784-2785.  Kadi acknowledged receipt of the Notice of Blocking in a December 21, 2001 letter he sent to OFAC. AR 25 n.4.  Notice of the designation was published in the *Federal Register* on October 26, 2001. *See* Final Rule, Blocked Persons, Specially Designated Nationals, Specially Designated Terrorists, Foreign Terrorist Organizations, and Specially Designated Narcotics Traffickers: Additional Designations of Terrorism-Related Blocked Persons, 66 Fed. Reg. 54404 (Oct. 26, 2001).

Following the U.S. Government's designation of Kadi, the Department of the Treasury faxed a two-page document to governmental officials in the United Kingdom in response to a request for additional information on Kadi.  AR 39-40.  The document explained Kadi's role in the Muwafaq Foundation, "an al-Qaeda front that receives funding from wealthy Saudi businessmen," which Usama bin Laden described as part of his organization in an interview, and listed other parts of Kadi's "vast financial empire linked to terrorist activity," including his role in a Hamas funding network.  AR 39.  Kadi was provided with a copy of this document by the U.K. government and reviewed it prior to filing a petition for reconsideration with OFAC.

On December 21, 2001, Kadi requested reconsideration of his designation.  In support of his request for reconsideration, Kadi provided substantial supplementary material to OFAC, and Kadi or his representatives met with OFAC officials on several occasions.  In support of his petition to be delisted, Kadi presented the following material: Witness Statement of Yassin Abdullah Kadi,

dated December 17, 2001, at AR 92-280; Supplemental Witness Statement of Yassin Abdullah Kadi, dated July 23, 2002, at AR 281-505; Yassin Abdullah Kadi Summary Presentation for OFAC, August 1, 2002, at AR 1068-1085; Statement of Yassin Abdullah Kadi, dated December 19, 2002, at AR 689-1067; Presentation for February 28th Meeting with OFAC, dated February 28, 2003, at AR 1184-1351.

On April 28, 2003, OFAC sent Kadi a five-page letter with questions addressing twelve areas of concern – "the answers to which w[ould] help [OFAC] issue a determination on the petition." AR 1352-1356. The letter specifically advised Kadi that OFAC had outstanding concerns about, *inter alia*, the lack of recordkeeping and auditing of numerous Muwafaq Foundation offices, "[i]ntermingling of funds between Muwafaq Foundation" and other Kadi businesses, assistance to terrorist groups, and ties to and support for Usama bin Laden, Al Qaeda, Chafiq Ayadi, Wa'el Julaidan, Asbat al-Ansar, Abdul Latif Saleh, Tunisian Islamic Front, Quranic Literacy Institute, and Muhammad Salah. *Id.* at 1353-1356. OFAC waited to receive a written response from Kadi, including additional exhibits, prior to rendering its decision on his request for reconsideration. *See* Answers to Questions Concerning the Petition to Delist Yassin Abdullah Kadi, dated July 11, 2003, at AR 1357-1391; Submission of Yassin Abdullah Kadi to the Deputy Attorney General of Switzerland, Mr. Claude Nicati, Further to the Meeting at the Swiss Embassy in Riyadh on 1 July 2003, dated August 22, 2003, at AR 2020-2406.

In reviewing Kadi's request for reconsideration, OFAC considered the compiled administrative record, which contains both classified and unclassified information, as well as Kadi's submissions to OFAC. On March 12, 2004, R. Richard Newcomb, then-director of OFAC, sent a letter to Kadi's counsel informing him that Kadi's request for reconsideration was denied because

"OFAC has determined that, based on the totality of the classified and unclassified evidence, a reasonable basis remains to continue the designation of Mr. Al-Qadi under E.O. 13224."[5] OFAC's letter enclosed a 20-page Memorandum explaining the basis for OFAC's decision. The Memorandum included a statement of the legal standard for designation, a description of the procedural history, and a summary of evidence pertaining to "Al-Qadi's Links To Terrorists, Extremists, and Terrorism-Related Activities." The Memorandum included separate sections addressing Kadi's various links to an extensive network of terrorist financing:

- The Muwafaq Foundation – Kadi was a member of the Board of Trustees and responsible for the day-to-day operations of the Muwafaq Foundation, a purported charitable organization with extensive ties to terrorism. AR 5-7.

- Affiliation with Al-Qaida and SDGT Makhtab al-Khidamat – According to information available to the U.S. Government, Muwafaq developed a global reach through its affiliations with several charities and mosques throughout the world and continued to operate until mid-2001 under the umbrella of Makhtab al-Khidamat, an SDGT listed in the Annex to E.O. 13224 that is considered to be the precursor to al-Qaida. In 2001, Makhtab al-Khidamat dissolved and was absorbed into Usama bin Ladin's al-Qaida organization. Subsequently, Muwafaq, along with a number of non-governmental organizations and organizations formerly affiliated with Makhtab al-Khidamat, joined al-Qa'ida. AR 14-15.

- Muwafaq's European Offices – The Memorandum notes that Kadi "hired Chafiq Ayadi, an SDGT designated at the same time as [Kadi] on October 12, 2001, to head Muwafaq's European operations upon the recommendation of Wa'el Julaidan," who himself was "jointly designated as an SDGT by the United States and Saudi Arabia on September 6, 2002." AR 7. Julaidan had extensive ties with well-known terrorists, including Usama bin Laden, and Ayadi was expelled from Tunisia for his involvement in the Tunisian Islamic Front. Kadi acknowledges transferring substantial sums of money to Ayadi's *personal* bank account. AR 7-10. At least two organizations currently listed as SDGTs received financial support from Muwafaq's European operation. AR 9-10.

_____

[5] Al-Qadi is an alternate transliteration of Kadi. In order to remain consistent with Plaintiff's complaint, Defendants generally will refer to Plaintiff as "Kadi."

- <u>Muwafaq's Albania Office</u> – According to information available to the U.S. Government, Dr. Abdul Latif Saleh, Kadi's business partner in Albania and the head of operations in Muwafaq's Albania office, was the founder and organizer of the Albanian Islamic Jihad ("AIJ").  AR 10-11.  Kadi was known to be an active supporter of, and fundraiser for, the AIJ and other radical activities of Dr. Saleh.  Dr. Saleh was expelled from Albania in 1999 due to his close association with known terrorists, including Usama bin Ladin.  *Id.*

- <u>Muwafaq's Pakistan Office</u> – Kadi hired Amir Mehdi to be the local director of Muwafaq's operation in Pakistan in 1992.  In 1995, the Pakistani Government raided the offices and arrested Mehdi after he had handled and distributed Muwafaq funds for over two years.  AR 13.

- <u>Muwafaq's Sudan Office</u> – According to information available to the U.S. Government, Kadi acknowledged in 2001 that the Khartoum office of Muwafaq had provided assistance to jihad activities in the Middle East and the Balkans.  AR 14.

- <u>Other Ties Directly to SDGT Usama Bin Ladin</u> – Kadi acknowledges that he has had meetings with Usama Bin Ladin.  "A letter found in 2002 and apparently addressed to Usama bin Ladin referenced [Kadi's] managing money for Bin Ladin in Sudan.  The letter also referred to [Kadi] as one of Bin Ladin's former managers. . . . [Kadi] often boasted of personally knowing and occasionally meeting with Bin Ladin in Afghanistan, Saudi Arabia and the Sudan."  AR 15.  Additionally, Kadi owned several firms in Albania that funneled money to extremists or employed extremists in positions where they controlled the firms' funds.  Bin Ladin allegedly provided the working capital for four or five of Kadi's companies in Albania, according to information available to the U.S. Government.  AR 11.

- <u>Support for SDGT Asbat al-Ansar</u> – Kadi maintained a relationship with and promised fund transfers to an official of the al-Qaida supported terrorist group Asbat al-Ansar, an SDGT listed in the Annex to E.O. 13224.  AR 16.

- <u>Provision of Funds to SDGT Wa'el Julaidan</u> – Kadi directly transferred $1.25 million to SDGT Wa'el Julaidan in 1998.  AR 16.

- <u>Provision of Funds to Admitted Hamas Operative</u> – Kadi provided hundreds of thousands of dollars to Muhammad Salah, an admitted Hamas operative and an SDT (Specially Designated Terrorist) under Executive Order 12947.  During the time period that Kadi was providing money directly to Salah, Salah admitted to Israeli officials that he engaged in activities in the United States and abroad for Hamas.  AR 17-18.

- <u>Investment in BMI</u> – Kadi provided financial support to BMI, a company whose money, according to its accountant, may have been transferred overseas to finance the U.S. embassy bombings in Kenya and Tanzania in 1998. AR 20-21.

The Memorandum concludes, *see* AR 22, with a statement of the specific grounds on which OFAC determined that there was "reason to believe" Kadi was subject to designation pursuant to E.O. 13224:

- acting for or on behalf of al Qaida, Usama bin Ladin, and Makhtab al-Khidamat, persons listed in the Annex to E.O. 13224;

- assisting in, sponsoring, or providing financial, material, or technological support for, or financial or other services to or in support of, among others, al Qaida, Usama bin Ladin, Makhtab al-Khidamat, HAMAS, the Revival of Islamic Heritage Society, Al-Haramayn (Bosnia), Chafiq Ayadi, and Wa'el Julaidan, persons subject to E.O. 13224; and

- associated with, among others, al Qaida, Usama bin Ladin, Makhtab al-Khidamat, HAMAS, the Revival of Islamic Heritage Society, Al-Haramayn (Bosnia), Chafiq Ayadi, and Wa'el Julaidan, persons subject to E.O. 13224.[6]

Kadi did not challenge OFAC's March 12, 2004 decision denying his request for reconsideration and maintaining his designation as an SDGT until filing his complaint in the present case on January 16, 2009. He made no attempt during that almost five-year period to respond to OFAC's twenty-page Memorandum or to submit additional materials or argument to OFAC.

## **STANDARD OF REVIEW**

Pursuant to the APA's limited waiver of sovereign immunity, a reviewing court must uphold an agency decision unless it is (1) arbitrary and capricious; (2) an abuse of discretion; or

---

[6] Defendants are not moving for summary judgment on the basis of this third prong. Subsequent to the March 12, 2004 decision challenged here, OFAC published a regulatory definition of the phrase "otherwise associated with" that clarified the potential reach of the provision. *See* 31 C.F.R. § 594.316. Although Defendants submit that this provision, as narrowed by definition, applies to Kadi's conduct, this alternative basis for designation is largely duplicative of the other grounds and need not be considered.

(3) otherwise not in accordance with law.  *See* 5 U.S.C. § 706(2)(A); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971); *HLF*, 333 F.3d at 162.  The scope of judicial review under this standard is a narrow and deferential one, and a court cannot substitute its judgment for that of the agency.  *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  Under arbitrary and capricious review, the court does not undertake its own fact-finding; rather, the court must review the administrative record as prepared by the agency.  *See Camp v. Pitts*, 411 U.S. 138, 142 (1973); *HLF*, 333 F.3d at 162.  As long as the agency's decision was supported by a rational basis, it must be affirmed.  As the D.C. Circuit explained in a similar challenge to an IEEPA-based action, "[w]e may not substitute our judgment for OFAC's, but we will require it to 'examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'"  *IARA*, 477 F.3d at 732 (citing *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43).

The deference due OFAC's decision is at its zenith here because it relates to the President's exercise, through OFAC, of his vast authority in the field of foreign affairs.  As the Supreme Court has explained, TWEA and IEEPA grant the President "broad authority" during times of war or declared national emergencies to impose economic sanctions on "any property in which any foreign country or a national thereof has any interest."  *See, e.g.*, *Dames & Moore*, 453 U.S. at 663.  For decades, courts consistently have accorded broad deference to sanctions programs and actions under both IEEPA and TWEA.  *Id.* at 672 (noting the "broad authority of the Executive when acting under this congressional grant of power").  Thus, in addition to the deference ordinarily due an agency, actions taken in the context of foreign affairs are entitled to even greater deference, and the judiciary's role is correspondingly limited.  *See Regan*, 468 U.S. at 242-43 ("Matters related 'to the

conduct of foreign relations . . . are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference.'") (citation omitted). That high level of deference consistently has been applied in cases challenging designations under E.O. 13224. *See Global Relief Found., Inc. ("GRF") v. O'Neill*, 207 F. Supp. 2d 779, 787-88 (N.D. Ill. 2002) (GRF is "asking this court to approach the outer limits of its constitutional authority"), *aff'd*, 315 F.3d 748 (7th Cir. 2002); *HLF*, 219 F. Supp. 2d at 84 ("[b]locking orders are an important component of U.S. foreign policy, and the President's choice of this tool to combat terrorism is entitled to particular deference"), *aff'd*, 333 F.3d 156 (D.C. Cir. 2003); *IARA*, 394 F. Supp. 2d at 45 (same), *aff'd* 477 F.3d 728 (D.C. Cir. 2007); *Al Haramain Islamic Found., Inc.* ("*AHIF*") *v. U.S. Dep't of the Treasury*, 585 F. Supp. 2d 1233, 1249 (D. Or. 2008) (same).

Because administrative actions are reviewed on the basis of a certified administrative record compiled by the agency, the determination to maintain Kadi's designation should be reviewed on the basis of the full administrative record before the agency at that time, including the classified and unclassified documents. The administrative record filed with the Court in this action includes the full record for the denial of Kadi's request for reconsideration and the maintenance of his designation. AR1-2817. The classified portion of the administrative record is filed with the Court for its *ex parte*, *in camera* review. *See* 50 U.S.C. § 1702(c).

To withstand a motion to dismiss for failure to state a claim, *see* Fed. R. Civ. P. 12(b)(6), the complaint must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (footnote omitted)

(citations omitted).  In evaluating the sufficiency of the complaint, the Court considers only "the

facts alleged in the complaint, any documents either attached to or incorporated in the complaint and

matters of which [the Court] may take judicial notice."  *See EEOC v. St. Francis Xavier Parochial

Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997).  The rules of pleading require factual allegations

"plausibly suggesting," and "not merely consistence with," the elements of a valid claim for relief.

*See Bell Atl. Corp.*, 550 U.S. at 557.

## ARGUMENT

### I.  THE OFAC MAINTENANCE OF KADI'S DESIGNATION HAD A RATIONAL BASIS AND WAS SUPPORTED BY THE ADMINISTRATIVE RECORD

#### A.  The Administrative Record Supports the Denial of Kadi's Request for Reconsideration and Maintenance of His Designation as an SDGT.

In its 2004 Memorandum to Kadi, OFAC was careful to stress that "[n]o one element, no one

contact, no one accusation of funding is taken as being determinative of the assessment that [Kadi]

has been providing support to terrorists through his actions.  Rather, when considering the number

of sources, the numbers of activities and length of time, the totality of the evidence, both classified

and unclassified, this provides a reason to believe [Kadi] has funded terrorist and extremist

individuals and operations."  AR 22.  The wide breadth and depth of information describing Kadi's

integral role in a vast network of terrorism and extremism provides more than sufficient information

to uphold this regulatory decision under the APA standard of review.  *See IARA*, 477 F.3d at 734

(the D.C. Circuit noted the "extremely deferential" standard of review and concluded that "the

record – containing various types of evidence from several different sources, and covering an

extended period of time – provides substantial evidence for the conclusion that IARA-USA is part

of IARA.").

1.      **Kadi Provided Support to Terrorism Through His Leadership in the Muwafaq Foundation.**

OFAC reasonably concluded that there is "substantial and credible evidence that both Muwafaq as an entity, and many of the individuals charged with operating it and distributing its funds, were engaged in a longstanding pattern of supporting terrorist and extremist causes." AR 21. Kadi operated at the helm of this vast network with operations in, *inter alia*, Sudan, Pakistan, Afghanistan, Ethiopia, Somalia, Bosnia/Herzegovina, and Albania. AR 7. In Kadi's own words, he was "the driving force behind the administration of the [Muwafaq] Foundation." AR 6. As a trustee and the one responsible for running the organization, he selected the managers who ran operations in various countries and delegated authority to them. *Id.*

OFAC made the following specific findings regarding the Muwafaq Foundation's ties to terrorism:

- Kadi hired Amir Mehdi to be the local director of Muwafaq's operation in Pakistan in 1992. In 1995, the Pakistani Government raided the offices and arrested Mehdi after he had handled and distributed Muwafaq funds for over two years. Mem. at 11. A news organization reported that the arrest of Ramzi Yousef for the first World Trade Center bombing prompted the raid on the Muwafaq office in Islamabad. AR 2425-2427.

- Muwafaq provided logistical support and financial support for Al-Gama'at Al-Islamiya, a mujahidin battalion in Bosnia. That organization was designated as an SDGT on October 31, 2001. AR 9.

- Muwafaq transferred $500,000 to terrorist organizations in the Balkans in the mid-1990s. AR 9.

- "[I]n the mid-1990s, Muwafaq was involved in providing financial support for terrorist activities of the mujaheddin, as well as arms trafficking from Albania to Bosnia. Some involvement in the financing of these activities had also been provided by Usama bin Ladin." AR 9.

- "As of late 2001, . . . [Kadi] continued to finance various fundamentalist institutions and organizations in the Balkans after Muwafaq ceased operations there in 1996," including two entities that were designated as SDGTs in early 2002 – The Revival of Islamic Heritage Society's Pakistan and Afghanistan offices and the Bosnia-Herzegovina branch of the Al-Haramain Foundation.  AR 9-10.

In an apparent attempt to avoid responsibility for the activities of an organization that he led, Kadi stressed that he "administered the Foundation as a highly decentralised operation and accordingly the Foundation had no central administration."  AR 1358.  Kadi acknowledged that he "selected the managers responsible for the various countries," but then quickly added that he "delegated authority to the various country managers who in turn took day-to-day responsibility for running the Foundation in the relevant locations."  *Id*.  Kadi similarly adopted a posture of willful blindness on financial records.  When asked about auditing practices, Kadi responded as follows: "As stated above the Foundation was highly decentralized.  Therefore it had no central accounting systems nor any central bank accounts.  The individual country managers opened bank accounts for the Foundation in the various locations where the Foundation operated."  *Id*.  Kadi acknowledged that "there are no meaningful financial records available" for countries including Bosnia/Herzegovina, Croatia, Somalia, Ethiopia, Germany, and Austria.  *Id*. at 1359.  OFAC considered this information and reasonably concluded that "[i]t strains credulity that [Kadi] could have unintentionally found himself in a repeating cycle of hiring individuals based on his assessment of their character, and that these individuals kept deceiving him about their intents on [sic] providing his funds to terrorists and extremists.  These are individuals who [Kadi] had opportunity to personally observe over a period of years, and he gave them significant sums of money to handle on his behalf."  AR 22.

Kadi deflected attention from the murkier areas of Muwafaq's history by explaining in his witness statements that Muwafaq was engaged in legitimate charitable activities. It is widely known, however, that terrorist organizations have exhibited a pattern of abusing charities as a cover for raising funds for terrorist activities. *See* Szubin Decl. ¶¶ 25-26. OFAC reasonably concluded that "[t]hough Muwafaq was a charitable foundation, and [Kadi] in his submissions to OFAC has provided evidence that it was involved in substantial charitable activities, this by no means undermines the determination that the charity was, in addition, used to fund terrorism. The use of an ostensible charitable foundation is a frequently used mechanism for covertly supporting terrorism." AR 2788. Numerous courts, including the D.C. Circuit, have upheld the designation of charitable organizations that provided financial or other support to terrorist financing networks. *See IARA*, 477 F.3d 728; *HLF*, 333 F.3d 156; *GRF*, 315 F.3d 748; *AHIF*, 585 F. Supp. 2d 1233.

Even if Kadi could document every expenditure made by the Muwafaq Foundation – which he cannot, since Kadi did not require audits of Muwafaq branches or maintain adequate financial records – such an accounting could not alter the reality that money is fungible, and money intended for humanitarian purposes can free up other funds for terrorist activities. *See Humanitarian Law Project v. Reno*, 205 F.3d 1130, 1136 (9th Cir. 2000), *partially aff'd en banc*, 393 F.3d 902 (9th Cir. 2004), and on remand, *Humanitarian Law Project v. Gonzales*, 380 F. Supp. 2d 1134 (C.D. Cal. 2005), *aff'd*, 509 F.3d 1122 (9th Cir. 2007)[7]; *HLF*, 219 F. Supp. 2d at 82; *IARA*, 394 F. Supp. 2d at

---

[7] These cases will be referred to in this brief as "*HLP/AEDPA*" in order to distinguish them from another case brought by the Humanitarian Law Project challenging IEEPA and E.O. 13224, in which there are two opinions. Those opinions – *Humanitarian Law Project v. Treasury*, 463 F. Supp. 2d 1049 (C.D. Cal. 2006), and on reconsideration, *Humanitarian Law Project v. Treasury*, 484 F. Supp. 2d 1099 (C.D. Cal. 2007), *appeal docketed*, No. 07-55893 (9th Cir. June 26, 2007) – will be cited as "*HLP/IEEPA*."

-18-

49-50; *AHIF*, 585 F. Supp. 2d at 1253. Moreover, charities provide convenient and plausible cover for transfers, and insofar as the money actually reaches bona fide recipients of aid, terrorist organizations benefit from the accompanying public good will and recruiting efforts. *See* Szubin Decl. ¶ 25; *Boim v. Holy Land Found.*, 549 F.3d 685, 698 (7th Cir. 2008) (en banc) ("Hamas's social welfare activities reinforce its terrorist activities both directly . . . and indirectly by enhancing Hamas's popularity among the Palestinian population and providing funds for indoctrinating schoolchildren.").

### 2. Kadi Admits That He Provided Financial Support to SDGTs.

OFAC had a reasonable basis to believe that Kadi provided financial support to SDGTs , thus rendering him susceptible to designation pursuant to E.O. 13224, § 1(d)(i). In fact, Kadi admitted providing money directly to Muhammad Salah, who is a Specially Designated Terrorist ("SDT") under E.O. 12947 and who has admitted his role as an operative and recruiter for the military wing of Hamas, which itself is designated under E.O. 13224. Kadi also has admitted providing financial support to SDGT Chafiq Ayadi and to Wa'el Julaidan, an SDGT with close ties to Usama bin Ladin. *See* AR 5. These three examples are especially illustrative of the integral role that Kadi played in providing financial support to terrorism.

**Financial Support to Hamas via SDT Salah:** Kadi provided hundreds of thousands of dollars to Muhammad Salah, who pled guilty in Israel to illegally channeling funds to Hamas. AR 2450-2487. Salah was listed as an SDT on July 27, 1995 under Executive Order 12947, which prohibits transactions with, and freezes the assets of, terrorists who threaten to disrupt the Middle East peace process. Hamas was listed by the President as an SDT in the Annex to E.O. 12947 in 1995 and designated as an SDGT by the Secretary of State on October 31, 2001. *See* Designations

of Terrorists and Terrorist Organizations Pursuant to Executive Order 13224 of September 23, 2001, 67 Fed. Reg. 12,633 (Mar. 19, 2002). Some of the funds Kadi provided were in cash, while the majority were tied up in a complicated land deal in Woodridge, Illinois related to the Quranic Literacy Institute ("QLI"). OFAC noted that "[d]uring the time period that [Kadi] was providing money directly to Salah, Salah admitted to Israeli officials that he engaged in activities domestically and abroad for HAMAS." AR 17-18; *see also United States v. One 1997 E35 Ford Van, et al.*, 50 F. Supp. 2d 789 (N.D. Ill. 1999), at AR 2667-2688 (discussing Kadi's financial support to Salah in a case involving a civil forfeiture claim against Salah and lending support to the conclusion that Kadi's support to Salah was intended to support Hamas).

During the same period in which Kadi was providing financial support to Salah, Salah also was receiving substantial sums of money from SDT and SDGT Mousa Mohamed Abu Marzook and other HAMAS operatives. AR 2470, 2473-77, at paras. 38, 45-54; *see also In the Matter of the Extradition of Mousa Mohammed Abu Marzook ("Marzook Extradition")*, 924 F. Supp. 565, 592 (S.D.N.Y. 1996), AR 2710-2735. Salah admitted that "these funds were intended for and used to purchase weapons to carry out specified terrorist actions against Israel." *See* AR 2457-2460, at paras. 12-13, 15-19; *Marzook Extradition*, 924 F. Supp. at 587-89, AR 2710-2735.

In the civil forfeiture action against Salah, the Northern District of Illinois examined the circumstances surrounding the Woodridge land deal and concluded the following:

> These facts, taken as a whole, raise the inference that the funds used to finance the Woodridge land deal were transferred from outside the United States with the intent that they be used to promote HAMAS' alleged campaign of violence against Israel and its citizens. The circumstances surrounding the Woodridge land deal, the relationship between QLI and Salah, and the efforts of QLI to provide financial support to Salah all raise the inference that QLI ordered Kadi to transmit the money used to purchase the Woodridge land with the

> intent that it would be used to support Salah in his activities on behalf of HAMAS. . . .
>
> In conclusion, we find that the government has alleged a reasonable basis for its belief that QLI arranged for Kadi to transfer the funds to purchase the Woodridge land from abroad with the intent that they would be used to promote the carrying on of specified unlawful activity.

*One 1997 E35 Ford Van*, 50 F. Supp. 2d at 805-06. OFAC's designation of Kadi could be sustained solely on the basis of Kadi's ties to Salah, given the abundant evidence of Salah's support for and actions on behalf of Hamas.

**Financial Support to SDGT Julaidan:** Kadi also provided financial support to SDGT Wa'el Julaidan. Kadi admitted to OFAC that he transferred $1.25 million in 1998 for the alleged purpose of funding a housing development for Al Emam University in Sanaa, Yemen. AR 16. Instead of sending the money directly to the university, Kadi "accomplished this transfer by sending money from the account of his company Karavan Development Group directly to SDGT Wa'el Julaidan." *Id.* Notably, the Kingdom of Saudi Arabia also imposed sanctions on Julaidan and agreed that he had ties to Usama bin Ladin and "funneled money to al-Qaeda." AR 2689-2691.

**Financial Support to SDGT Ayadi:** Upon the recommendation of SDGT Julaidan, Kadi hired SDGT Ayadi to serve as director of Muwafaq's European operations from 1992 to 1995 or 1996. During that period, Kadi transferred substantial sums to Ayadi's *personal* account. Kadi also granted SDGT Ayadi control of his shares in Depositna Bank. AR 1377. Kadi asserts "that these transfers were for the sole purpose of the charitable objectives of Muwafaq." AR 8. Kadi states that he "had no reasons to undertake any special financial reviews of the activities of the Foundation offices headed by Chafiq Ayadi while they were in operation" because Ayadi had been

recommended by SDGT Wa'el Julaidan. AR 1376. Ayadi was deported from Bosnia because of his ties to terrorism. AR 22.

Any one of these three scenarios would be sufficient to support designation pursuant to E.O. 13224, § 1(d)(i), but OFAC did not rely exclusively on any particular piece of evidence in concluding that Kadi provided financial support to designated terrorists. As OFAC summarized in its 2004 Memorandum, "[Kadi] admits his longstanding and intimate association with SDGT Julaidan, SDGT Chafiq Ayadi, Dr. Abdul Latif Saleh, and Amir Mehdi. The latter three individuals have been, according to the information available to OFAC, arrested and/or deported from their countries of operation because of associations with terrorists, and Julaidan is a known close associate of Usama bin Ladin. Each of these individuals handled significant sums of money provided to him by [Kadi]." AR 22.

Plaintiff mistakenly assumes that he cannot be sanctioned for providing support to terrorists so long as he "did not and does not have a specific intent to further the illegal aims of any terrorist group or individual." Compl. ¶ 64. The D.C. Circuit has already considered and rejected this argument because proof of "specific intent" is not required in order to block one's assets pursuant to E.O. 13224. *See IARA*, 477 F.3d at 737 ("[W]e do not require a showing that IARA-USA intended its funding to support terrorist activities.").

Kadi also suggests that he should be held blameless for providing support to terrorists because the financial transactions occurred prior to indictment or prosecution. For example, Kadi states that "when [he] learned of Mr Salah's arrest in Israel, [he] immediately instructed his bank to stop payment of the one pending wire transfer." AR 1391-1392. Although Kadi claims that he merely intended to support charitable activities of QLI – and not to support terrorism – he

transferred money directly into Salah's personal bank account. AR 1390-1392. If Kadi's theory were to prevail, financiers simply could shift their resources to new extremists who have not been indicted or prosecuted for terrorist acts and thereby avoid accountability for their actions. Szubin Decl. ¶ 42. In order to combat terrorism by blocking sources of funding, OFAC reasonably concluded that an arms-length operator with extensive ties to terrorists, like Kadi, must be sanctioned.

Kadi similarly suggests that OFAC should ignore any support that he provided to SDGTs prior to their designation. As the D.C. Circuit has concluded, it is "clearly rational" for OFAC to consider context and history when examining an SDGT's relationship with terrorism. *HLF*, 333 F.3d at 162 ("HLF also argues that Treasury was arbitrary and capricious in relying on information that predated the 1995 designation of Hamas as a terrorist organization. However, as the district court noted, it was clearly rational for Treasury to consider HLF's genesis and history, which closely connect it with Hamas.") (citing *HLF*, 219 F. Supp. 2d at 74). Accordingly, OFAC properly considered Kadi's financial support to SDGT Julaidan and SDGT Chafiq Ayadi. *See* AR 289-290 (Kadi's admission that he "transferred substantial sums of money to the accounts of Muwafaq in Bosnia and Croatia" – accounts that Kadi admits he never audited); AR 291 (Kadi's admission that he "transferred sums of money to Chafiq Ayadi's personal account"); AR 2044 (Kadi's admission that he provided $1.25 million to SDGT Julaidan).

### 3.    Other Ties to Terrorism Also Justify the Sanctions Against Kadi.

Kadi engaged in other activities that provide additional support for OFAC's determination that Kadi was involved in funding terrorism.

- Throughout the 1990s, Kadi engaged in numerous business enterprises with Dr. Abdul Latif Saleh, who was deported from

Albania for alleged terrorist activity. Kadi denies being aware that Saleh was involved in terrorism and suggests that it may be a case of mistaken identity. AR 10.

• Kadi invested in BMI, a company whose money, according to its accountant, may have been transferred overseas to finance the two U.S. embassy bombings in Kenya and Tanzania in 1998. AR 20-21. Kadi claims that he was merely a "passive investor," but one of his co-investors, according to FBI Agent Robert Wright, was SDT Marzook, the Hamas leader who was also associated with SDT Salah. AR 783.

• Kadi acknowledges that he had meetings with Usama bin Ladin in Chicago in 1980-81, Pakistan in 1988-89, and Sudan in 1992-93. AR 1373. OFAC also noted the following: "A letter found in 2002 and apparently addressed to Usama bin Ladin referenced [Kadi's] managing money for Bin Ladin in Sudan. The letter also referred to [Kadi] as one of Bin Ladin's former managers. . . . [Kadi] often boasted of personally knowing and occasionally meeting with Bin Ladin in Afghanistan, Saudi Arabia and the Sudan." AR 15.

• Kadi "owned several firms in Albania that funneled money to extremists or employed extremists in positions where they controlled the firms' funds. Bin Ladin allegedly provided the working capital for four of five of [Kadi's] companies in Albania, according to information available to the U.S. Government." AR 11.

All of these grounds, in addition to other reasons discussed in the 2004 Memorandum, *see* AR 3-22, and 2004 redacted evidentiary, *see* AR 2786-2817, demonstrate that OFAC had a rational basis for maintaining Kadi's designation as an SDGT and denying his request for reconsideration.

### 4. The Classified Record Includes Additional Evidence of Kadi's Ties to Terrorism.

The classified and privileged administrative record, along with a Supplemental Memorandum addressing the classified portions of the record, has been lodged with the Court for its *ex parte* and *in camera* review. As previously noted, the classified section of the record was submitted pursuant

-24-

to 50 U.S.C. § 1702(c), which permits the government to submit to the Court classified information on which it relied "*ex parte* and *in camera.*"  *See id.*

For all these reasons, OFAC reasonably determined that the administrative record supports the designation of Kadi as an SDGT.  Therefore, summary judgment should be entered for Defendants on Plaintiff's APA claim.

### B. Plaintiff's Challenge to His EU Designation Does Not Affect the Validity of OFAC's 2004 Action.

Plaintiff's complaint includes allegations concerning events that occurred after OFAC's 2004 decision was issued.  Plaintiff describes procedural developments in a separate challenge he brought in the European courts, which culminated in a September 2008 decision by the European Court of Justice ("ECJ"), *see* Compl. ¶¶ 35-41, and developments concerning prosecutorial actions in Turkey and Albania, *see id.* ¶¶ 42-43.  Plaintiff also describes the status of two Freedom of Information Act ("FOIA") requests pending at the U.S. Department of the Treasury.  *Id.* ¶ 46.  Kadi's complaint does not allege that any of these allegations – none of which relate to (or are part of the record of) the 2004 OFAC decision at issue in this case – provide a basis for any count in his complaint.  *See id.* ¶¶ 49-78.

Although Kadi prevailed before the ECJ on a procedural argument, the procedural error – that the European Union ("EU") had failed to communicate the grounds for listing to Kadi – has been corrected and the EU sanctions against Kadi remained in place after a summary of evidence against Kadi was provided to him.  *See* Comm'n Reg. (EC) No. 1190/2008 (Nov. 28, 2008), *available at* OJ 2008 L322/25.  In any event, the procedural defects that Kadi identified in challenging his EU designation are inapposite, because the U.S. has provided Kadi with ample explanation for his E.O. 13224 designation.  Moreover, the EU blocked Kadi's assets on the basis

of Kadi's UN designation and without independently developing an administrative evidentiary record that identified Kadi's ties to terrorism and without providing review of the merits at an administrative or judicial level. *Id.*

Kadi's citation to other jurisdictions that have failed to criminally prosecute him is similarly unhelpful. OFAC action does not require the standard of proof necessary for prosecution. Nor is there any evidence that Turkey and Albania had the same level of evidence, both classified and unclassified, that OFAC had in determining that it had a reasonable basis to believe that Kadi, *inter alia*, provided financial support to terrorism.

## II. PLAINTIFF'S CONSTITUTIONAL CLAIMS MUST BE DISMISSED BECAUSE KADI, AS A FOREIGN NATIONAL, LACKS CONSTITUTIONAL RIGHTS

Plaintiff has alleged various violations of the First, Fourth, and Fifth Amendments to the U.S. Constitution. Compl. ¶¶ 55-78. Plaintiff describes himself as "a prominent Saudi Arabian businessman and philanthropist," *id.* ¶ 1, but his complaint contains no description of his connections with the United States. To survive a motion to dismiss, the complaint "must set forth sufficient information to suggest that there is some recognized legal theory upon which relief can be granted." *District of Columbia v. Air Florida, Inc.*, 750 F.2d 1077, 1078 (D.C. Cir. 1984). Although the administrative record contains references to certain contacts between Kadi and the United States, those contacts do not rise to the level of "substantial connections" with the United States – a standard that must be satisfied in order to assert rights under the U.S. Constitution. *See People's Mojahedin Org. of Iran ("PMOI") v. U.S. Dep't of State*, 182 F.3d 17, 22 (D.C. Cir. 1999) (citing *United States v. Verdugo-Urquidez*, 494 U.S. 259, 271 (1990)). In fact, at the time Kadi was designated, Kadi's only connection to the United States may have been through his indirect role (due to his ownership of an investment company separately incorporated in the British Virgin Islands)

-26-

as a director in Global Diamond Resources, Inc., a corporation headquartered in La Jolla, California. AR 39, 113, 244. Absent a showing of more substantial connections to the United States, Plaintiff's constitutional claims should fail for this threshold reason.

The D.C. Circuit rigorously imposed the constitutional presence requirement when reviewing the State Department's designations of the People's Mojahedin Organization of Iran ("MEK") and the Liberation Tigers of Tamil Eelam ("LTTE") as "foreign terrorist organizations" under the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 18 U.S.C. § 2339B. Both organizations claimed that the designations deprived them of due process of law because the State Department provided MEK and LTTE with "no adversary hearing, no presentation of what courts and agencies think of as evidence, [and] no advance notice to the entity affected by the Secretary's internal deliberations" prior to the designation of these entities. *See PMOI*, 182 F.3d at 19. The D.C. Circuit noted that "[f]rom all that appears, the LTTE and the MEK have no presence in the United States. Their status as foreign is uncontested." *See id*. at 22. The D.C. Circuit then dispelled any notion that these organizations could assert rights under the U.S. Constitution:

> A foreign entity without property or presence in this country has no constitutional rights, under the due process clause or otherwise. . . . No one would suppose that a foreign nation had a due process right to notice and a hearing before the Executive imposed an embargo on it for the purpose of coercing a change in policy.

*Id*. at 22 (citations omitted). In a similar case under AEDPA, the D.C. Circuit upheld the designation of three Irish political organizations as foreign terrorist organizations and concluded that they were not entitled to due process rights because "the affidavits . . . demonstrate only that some of their American 'members' personally rented post office boxes and utilized a bank account to transmit funds and information." *32 County Sovereignty Comm. v. Dep't of State*, 292 F.3d 797, 799

(D.C. Cir. 2002).  Just as in *PMOI* and *32 County Sovereignty Committee*, Kadi has not alleged, much less established, the type of substantial connections that must be found prior to entertaining Plaintiff's panoply of constitutional claims.[8]

A review of the administrative record reveals no evidence that Kadi could overcome his pleading deficiencies and establish his entitlement to rights under the U.S. Constitution.  Other than his role as a director in Global Diamond Resources, it appears that Kadi merely can claim a period of residency nearly 30 years ago, as well as cite a couple of old investments and corporate registrations in the United States that were defunct long before he was designated by OFAC.  Kadi's current contacts do not rise to the higher threshold that was found to be sufficient in other cases.  In *Nat'l Council of Resistance of Iran ("NCRI") v. Dep't of State*, the D.C. Circuit "determine[d] that NCRI can rightly lay claim to having come within the territory of the United States and developed substantial connections with this country" and emphasized in particular that NCRI had "an overt presence within the National Press Building in Washington, D.C."  251 F.3d 192, 201-02 (D.C. Cir. 2001).  Plaintiff has not alleged that he, like NCRI, resided in the United States and maintained an overt presence here when he was designated, or that he has any current, substantial ties to the United States.

Nor does the record suggest that Plaintiff had connections with the United States as substantial as those of Al-Aqeel in his due process challenge to his IEEPA-based designation.  *See Al-Aqeel v. Paulson*, 568 F. Supp. 2d 64 (D.D.C. 2008).  Although Defendants respectfully disagree

---

[8] *See also Aero Continente, S.A. v. Newcomb*, C.A. No. 04-1168, at 7-8 n.7 (D.D.C. July 16, 2004) (attached hereto as Exhibit C) (evaluating a similar challenge to a designation under the Foreign Narcotics Kingpin Designation Act, 21 U.S.C. §§ 1901-1908, which was modeled in part on IEEPA, and expressing doubt about whether an entity with much greater connections to the United States than Kadi was entitled to due process protections).

with that court's conclusion that Al-Aqeel had sufficient contacts to obtain due process rights under the U.S. Constitution – a ruling that could not be appealed because Defendants prevailed on the merits – Kadi cannot satisfy even the low standard applied in that case. Al-Aqeel was a founder and corporate officer of an Oregon corporation (the Al Haramain Islamic Foundation or "AHIF"), traveled to the United States several times in that capacity, executed a power of attorney in a property purchase for that company, and was acknowledged by OFAC to have "control" over the Oregon corporation. *Id*. at 70. In fact, OFAC had determined that AHIF, a U.S. entity, was subject to designation under E.O. 13224 because it was "owned or controlled by" Al-Aqeel. *Id*. at 67.

Because Plaintiff has not established "substantial connections with this country," *Verdugo-Urquidez*, 494 U.S. at 271, OFAC was not required by the Due Process clause to provide Kadi "with any particular process before designating" him as an SDGT under IEEPA and E.O. 13224. *See 32 County Sovereignty Comm.*, 292 F.3d at 799; *see also Jifry v. Fed. Aviation Admin.*, 370 F.3d 1174, 1182 (D.C. Cir. 2004) ("The Supreme Court has long held that non-resident aliens who have insufficient contacts with the United States are not entitled to Fifth Amendment protections.") (citations omitted), *cert. denied* 125 S. Ct. 1299 (2005); *Arbelaez v. Newcomb*, C.A. No. 00-5217, 2001 WL 50337, at *1 (D.C. Cir. Jan. 18, 2001) (finding that appellants could not assert constitutional claims in an OFAC matter because appellants were "foreign nationals without a substantial connection to the United States" and affirming conclusion by the district court that the existence of four plaintiffs holding two bank accounts in the United States was insufficient). Therefore, Counts Two through Eight of Plaintiff's complaint must be dismissed.

## III. PLAINTIFF'S CONSTITUTIONAL CLAIMS ARE SUBJECT TO DISMISSAL FOR FAILURE TO STATE A CLAIM

Assuming, *arguendo*, that due process and other constitutional safeguards do apply to Kadi, Plaintiff's constitutional claims nonetheless must be dismissed for failure to state a claim. Fed. R. Civ. P. 12(b)(6). As the D.C. Circuit previously has explained, "where an organization is found to have supported terrorism, government actions to suspend that support are not unconstitutional." *IARA*, 477 F.3d at 735; *see also HLF*, 333 F.3d at 164-67.

### A. OFAC's Blocking Action Satisfies Due Process.

The extent of due process rights to which U.S. citizens are entitled in the IEEPA sanctions context is now well established. *See, e.g., HLF*, 333 F.3d at 163-64 (D.C. Circuit held that post-designation notice and a 31-day period to respond before redesignation was sufficient to satisfy due process requirements). Every Court to consider the issue has upheld the general process used by OFAC to provide a post-deprivation administrative remedy on written submissions. *See GRF*, 315 F.2d at 754; *Chichakli v. Szubin*, 546 F.3d 315, 317 (5th Cir. 2008); *al-Aqeel*, 568 F. Supp. 2d at 71. Even if Kadi did have sufficient contacts to justify granting him the same constitutional rights that a U.S. person would enjoy, the process that OFAC provided in the context of his petition for reconsideration satisfies the existing standard. The process spanning 2001 through 2004 through which Plaintiff challenged his original designation as an SDGT afforded more than adequate process. The various procedural rights and requirements Plaintiff asks the Court to interpose have no basis in the relevant case law.

### 1. **Kadi Received Constitutionally Sufficient Process**.

On October 15, 2001, OFAC sent a "Notice of Blocking" to Kadi that informed him of the blocking action, advised him of rules governing licensing and penalties, and notified him of available administrative procedures for challenging the blocking action. Prior to OFAC's March 12, 2004 decision to deny Plaintiff's request for reconsideration and maintain his designation, Plaintiff had the opportunity to submit multiple witness statements and numerous exhibits and to engage in an extensive question-and-answer exchange with OFAC. In addition, Plaintiff had the opportunity to meet face-to-face with OFAC officials and make a presentation on at least four separate occasions. AR 4-5; 2752, 2765.

On April 28, 2003, OFAC sent a five-page letter with questions addressing 12 areas of concern – "the answers to which will help us issue a determination on the petition." AR 1352-1356. Kadi unquestionably was on notice that OFAC was concerned about, *inter alia*, the lack of recordkeeping and auditing of numerous Muwafaq Foundation offices, "[i]ntermingling of funds between Muwafaq Foundation" and other Kadi businesses, assistance to terrorist groups, and ties to and support for Usama bin Laden, Al Qaeda, Chafiq Ayadi, Wa'el Julaidan, Asbat al-Ansar, Abdul Latif Saleh, Tunisian Islamic Front, QLI, and Muhammad Salah. *Id*. These questions forecast the ultimate grounds for denying Kadi's petition for delisting and provided Kadi yet another opportunity to respond to the charge that he had supported designated terrorists. OFAC waited to receive a written response from Kadi, including additional exhibits, prior to rendering its decision on his request for reconsideration. *See* AR 1357 *et seq*. It is therefore curious that Plaintiff would now argue – five years after this decision was made – that he did not have adequate "notice of the charges," "time to respond," or access to a "statement of reasons" or "assessment" of the evidence.

Compl. ¶ 57. After years of interface with OFAC and the receipt of greater process than the Constitution requires, Plaintiff cannot legitimately claim that he was unaware of the grounds for OFAC's decision to maintain his designation. Even if Plaintiff could claim that the 20-page memorandum discussed charges against him that were never raised at any point during the reconsideration process, he still could not provide a satisfactory explanation for his failure to provide OFAC with additional evidence or arguments addressing those issues at any time during the nearly five-year period that elapsed before he filed this lawsuit.

Plaintiff's assertion that he is entitled to "cross-examine any witnesses" and to demand that OFAC arrange an "independent tribunal" as part of its reconsideration process is unsupported, as numerous courts have declined to impose such requirements. Compl. ¶ 57; *see, e.g., HLF*, 333 F.3d at 163; *IARA*, 394 F. Supp. 2d at 48-50. Plaintiff seems to argue that the most robust process that the government can provide is due to him despite the existence of a Presidentially-declared national emergency and exigent circumstances surrounding a national security decision to combat terrorism by blocking assets of those who fund terrorists and their supporters.[9] Plaintiff simply cannot show

---

[9] "It is by now well established that 'due process,' unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances." *Gilbert v. Homar*, 520 U.S. 924, 930 (1997) (quoting *Cafeteria & Restaurant Workers Union v. McElroy*, 367 U.S. 886, 895 (1961)) (internal quotations omitted). Instead, "due process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). In determining what process is constitutionally required, courts must consider not only the private interests that will be affected and the risk of an erroneous deprivation of those interests, but also the particular "Government[al] interest, including the function involved" and the additional value or burdens that additional or substitute procedural requirements would entail. *See Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). "[N]o governmental interest is more compelling than the security of the Nation." *Haig v. Agee*, 453 U.S. 280, 307 (1981); *Wayte v. United States*, 470 U.S. 598, 612 (1985) ("Unless a society has the capability and will to defend itself from the aggression of others, constitutional protections of any sort have little meaning.").

that he is entitled to more process than he received during the reconsideration process.

A due process challenge to his initial designation on October 12, 2001 is without merit. Numerous courts have noted, in rejecting almost identical due process claims brought by designated parties, that pre-deprivation notice is not required prior to the blocking of assets.  *See HLF*, 333 F.3d at 163-64; *GRF*, 315 F.3d at 754; *IARA*, 394 F. Supp. 2d at 49-50.  Because of the Executive's need for speed in matters of national security and foreign affairs, *see, e.g.*, *Palestine Info. Office v. Shultz*, 853 F.2d 932, 942-43 (D.C. Cir. 1988), and the need to prevent the flight of assets and destruction of records, the President and his designees cannot practicably provide pre-deprivation notice under these circumstances.[10]  *See GRF*, 207 F. Supp. 2d at 803; *see also* Szubin Decl. at ¶ 22.  As courts have repeatedly held, post-designation remedies are sufficient where "earlier notification would impinge upon the security and other foreign policy goals of the United States."[11]  *NCRI*, 251 F.3d at 208.

---

[10]  Even if the court were to find a technical due process violation, the remedy would not be to order OFAC to lift its blocking, but would instead be to remand the case to the agency. *See, e.g., Florida Power & Light v. Lorion*, 470 U.S. 729, 744 (1985); *NCRI*, 251 F.3d at 209 (Although the D.C. Circuit found that certain pre-deprivation remedies should have been provided under the unique circumstances of the case, involving AEDPA, the court also refused to order the lifting of the designations and instead remanded the issue to the agency because of "the realities of the foreign policy and national security concerns asserted by the Secretary in support of those designations").

[11] Further, any lack of opportunity to comment prior to blocking was surely cured by the extensive opportunity to comment following blocking and prior to the denial of his petition for delisting.  The D.C. Circuit already considered this fact pattern and rejected the Holy Land Foundation's similar claim:  "Even if Treasury's initial designation arguably violated HLF's due process rights, HLF's funds are blocked currently by a redesignation which Treasury applied in accordance with the requirements we outlined in *NCRI*, 251 F.3d 192."  *HLF*, 333 F.3d at 163; *see also GRF*, 315 F.3d at 750 ("To the extent that GRF was attacking the factual support for the interim [blocking] order, time has passed that issue by; the right question now is whether the designation of October 18 is supported by adequate information . . .").

## 2. **OFAC May Rely on Classified Evidence**.

Plaintiff is wrong to assert that he has a constitutional right to view and/or respond to classified evidence. Compl. ¶ 57. Recognizing the important national security issues at stake in IEEPA-based actions, Congress authorized the Executive Branch to rely upon classified information and to provide the classified information to the Court *in camera* and *ex parte*. 50 U.S.C. § 1702(c). Courts reviewing challenges to IEEPA-based designations, including the D.C. Circuit, have upheld that provision as constitutional. *See HLF*, 333 F.3d at 164 (claim "that due process prevents its designation based upon classified information to which it has not had access is of no avail"); *IARA*, 394 F. Supp. 2d at 45 (same); *IARA*, 477 F.3d at 732-34 (D.C. Circuit reviewed classified record *ex parte* and *in camera*); *see also AHIF*, 585 F. Supp. 2d at 1260 ("The government's interest in keeping materials secret takes precedence over AHIF-Oregon's due process right to review the record against it."). As the Seventh Circuit stated, in rejecting an argument identical to Plaintiff's, "[a]dministration of the IEEPA is not rendered unconstitutional because that statute authorizes the use of classified evidence that may be considered *ex parte* by the district court. . . . The Constitution would indeed be a suicide pact if the only way to curtail enemies' access to assets were to reveal information that might cost lives." *GRF*, 315 F.3d at 754 (internal citation omitted). As the D.C. Circuit stated, disclosure of classified information "'is within the privilege and the prerogative of the executive, and we do not intend to compel a breach in the security which that branch is charged to protect.'" *HLF*, 333 F.3d at 164 (quoting *NCRI*, 251 F.3d at 208-09). Thus, the law is clear that Plaintiff has no due process right to see the classified material.

### 3.      Plaintiff Cannot State a Due Process Claim Concerning FOIA.

Plaintiff alleges that "Defendants violated Mr. Kadi's Fifth Amendment due process rights by . . . failing, in violation of FOIA, to provide Mr. Kadi with the information used or relied upon by OFAC in preparation of the OFAC Memorandum." Compl. ¶ 57.  Plaintiff has not brought a FOIA claim, and he cannot sustain a due process challenge on the basis of an alleged violation of FOIA.  Plaintiff appears to assume that FOIA is constitutionally compelled, but there is no constitutional right to government information.  *See Ctr. for Nat'l Sec. Studies v. U.S. Dep't of Justice*, 331 F.3d 918, 935 (D.C. Cir. 2003).  To the extent Plaintiff believes that his rights under FOIA have been violated, Plaintiff should bring a claim under FOIA.  In any event, as part of this litigation Plaintiff now has the unclassified, non-privileged administrative record supporting his designation and OFAC's denial of his request for reconsideration.

### B.      The Freezing of Assets Does Not Constitute a Taking Under the Fifth Amendment.

In Count Three, Plaintiff claims that "the freezing of Mr. Kadi's assets violates Mr. Kadi's Fifth Amendment right to just compensation for the taking of Mr. Kadi's property." Compl. at 20. This claim must be dismissed because this court lacks subject matter jurisdiction over Plaintiff's takings claim and because, in any event, the blocking of assets does not constitute a taking under the Fifth Amendment.

It is well settled that a person claiming an uncompensated taking resulting from an action taken pursuant to IEEPA must typically bring a claim for monetary relief under the Tucker Act, 28 U.S.C. § 1491, in the Court of Federal Claims.  *Paradissiotis*, 171 F.3d at 989; *Adams v. Hinchman*, 154 F.3d 420, 425 (D.C. Cir. 1998).  This general case law has been applied in this circuit in the IEEPA context, and as in both *HLF* and *IARA*, Plaintiff's takings claim should be dismissed.  *See*

*HLF*, 219 F. Supp. 2d at 77-78; *IARA*, 394 F. Supp. 2d at 51; *GRF*, 315 F.3d at 754 ("GRF's takings

claim . . . is in the wrong court.  It belongs to the Court of Federal Claims under the Tucker Act.").

This claim is filed in the wrong court and must be dismissed.

      Even if this Court had jurisdiction, Plaintiff's takings claim would fail because the blocking

of assets pursuant to E.O. 13224 does not constitute a taking under the Fifth Amendment.  *IARA*, 394

F. Supp. 2d at 51 ("Moreover, to the extent that the plaintiff seeks to challenge the blocking of assets

pursuant to an Executive Order, such an order is not, as a matter of law, a takings within the

meaning of the Fifth Amendment."); *accord HLF*, 219 F. Supp. 2d at 78.  As Judge Kessler

explained, takings claims have often been raised – and consistently rejected – in the IEEPA and

TWEA context.  *Id.*; *see also GRF*, 207 F. Supp. 2d at 802 ("Many courts have recognized that a

temporary blocking of assets does not constitute a taking because it is a temporary action and not

a vesting of property in the United States.").  Courts have recognized that a blocking of assets does

not represent a taking because, *inter alia*, it is a temporary action and not a vesting of property in

the United States.  *See, e.g., Nielsen v. Sec'y of the Treasury*, 424 F.2d 833, 844 (D.C. Cir. 1970)

("The temporary blocking or freezing of the accounts of aliens within the territory of a state,

suspending the right of withdrawal but not affecting ownership, does not appear to have been

regarded as a taking of property."); *Tran Qui Than v. Regan*, 658 F.2d 1296, 1304 (9th Cir. 1981).

For all these reasons, Plaintiff's takings claim must be dismissed.

     **C.**     **The Blocking Action Does Not Violate the First Amendment**.

      Plaintiff reiterates unsuccessful claims raised by the Holy Land Foundation, the Global

Relief Foundation, IARA, and AHIF-Oregon – namely, that his designation by OFAC was based

on "protected First Amendment activities" that "violated his First Amendment rights of free speech

-36-

and free association." Compl. ¶ 63. As explained above, Plaintiff's designation was based on

providing financial and other support to SDGTs, and, as this Circuit unequivocally has stated when

rejecting similar claims made by other SDGTs, "'there is no First Amendment right nor any other

constitutional right to support terrorists.'" *IARA*, 477 F.3d at 735 (quoting *HLF*, 333 F.3d at 166).

Sanctions were not imposed due to any First Amendment-protected conduct in which Kadi may have

engaged. Accordingly, the Court should dismiss Plaintiff's First Amendment claims.

### 1. Freedom of Speech

Plaintiff asserts that strict scrutiny should be applied to OFAC's blocking action, *see* Compl.

¶¶ 63-67, but "First Amendment freedom of speech challenges to blocking decisions are analyzed

under the intermediate scrutiny standard discussed in *United States v. O'Brien*." *IARA*, 394 F. Supp.

2d at 53. As the Supreme Court held in *United States v. O'Brien*, 391 U.S. 367, 376 (1968), "when

'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently

important governmental interest in regulating the nonspeech element can justify incidental

limitations on First Amendment freedoms." In such situations, a "government regulation is

sufficiently justified if it is within the constitutional power of the Government; if it furthers an

important or substantial governmental interest; if the governmental interest is unrelated to the

suppression of free expression; and if the incidental restriction on alleged First Amendment

freedoms is no greater than is essential to the furtherance of that interest." *Id.* at 377.

Sanctions were imposed on Kadi because of his financial and other support to SDGTs and

not on the basis of any protected First Amendment activity, much less "pure speech." *See* AR 3-22.

Assessing similar situations, courts routinely have applied the *O'Brien* test rather than strict scrutiny,

holding that charitable contributions, such as those at issue in this case, "plainly do not involve

political expression, and therefore do not warrant strict scrutiny." *See HLF*, 219 F. Supp. 2d at 81

n.37, *aff'd*, 333 F.3d 156; *see also HLP/AEDPA*, 205 F.3d at 1135-36 (rejecting First Amendment

challenge by U.S. citizens and others to prohibition on providing cash and goods to foreign terrorist

organizations under AEDPA), *cert. denied*, 532 U.S. 904 (2001); *GRF*, 207 F. Supp. 2d at 806

(applying *O'Brien* standard to deny preliminary injunction for free speech challenge to IEEPA asset

freeze); *IARA*, 394 F. Supp. 2d at 52-53, *aff'd* 477 F.3d 728; *Walsh v. Brady*, 927 F.2d 1229, 1234-

35 (D.C. Cir. 1991) (declining to apply strict scrutiny to First Amendment challenge to Cuba

sanctions); *Freedom to Travel Campaign v. Newcomb*, 82 F.3d 1431, 1439 (9th Cir. 1996); *Palestine

Info. Office*, 853 F.2d at 939-40. Application of strict scrutiny would be particularly unjustified in

this case given Plaintiff's failure to identify any speech that allegedly served as the basis for his

designation.

As courts routinely have held in essentially identical challenges by designated charities,

OFAC's blocking of Plaintiff's assets easily satisfies the relevant four-part test detailed in *O'Brien*,

391 U.S. at 376-77, thereby passing constitutional muster under the First Amendment. *See HLF*,

219 F. Supp. 2d at 82 ("OFAC's designation of [Holy Land] and attendant blocking order satisfy

scrutiny under the *O'Brien* test, and therefore do not violate [Holy Land's] First Amendment right

to freedom of speech."); *GRF*, 207 F. Supp. 2d at 806 (applying *O'Brien* test and concluding "that

Global Relief is unlikely to prevail in proving that defendants' actions violate the First

Amendment."); *IARA*, 394 F. Supp. 2d at 53 ( "Moreover, nothing in the IEEPA or the Executive

Order prohibits the IARA-USA from expressing its views."); *AHIF*, 585 F. Supp. 2d at 1264 n.15

("Since AHIF-Oregon's designation and redesignation were not based on speech or mere

membership in AHIF, . . . its First Amendment rights to freedom of speech and association have not

been violated.").  For all these reasons, IEEPA and E.O. 13224 do not violate First Amendment
rights.

### 2. Freedom of Association

Plaintiff also cannot prevail in his First Amendment freedom of association claim because
his designation was not based on mere membership, *see* AR 3-22, and there is no constitutional right
to facilitate terrorism.  *See HLP/AEDPA*, 205 F.3d at 1133.  Although the First Amendment imposes
limitations on the government's authority to bar mere membership in a group, the government
remains free to prohibit the financial support of particular groups.  As courts have succinctly stated,
"there is no constitutional right to facilitate terrorism."  *HLF,* 219 F. Supp. 2d at 81 (citing
*HLP/AEDPA*, 205 F. 3d at 1133).  The D.C. Circuit already has considered freedom of association
claims in the context of blocking actions under E.O. 13224 and concluded that the blocking of assets
"does not implicate [Plaintiff's] First Amendment right of association."  *IARA*, 477 F.3d at 736-37
("The blocking was not based on, nor does it prohibit, associational activity other than financial
support.  The blocking of [Plaintiff's] assets does not punish advocacy of [Plaintiff's] or any other
entity's goals.").  Plaintiff's claim similarly lacks merit and must be dismissed.

Kadi was not designated based on association alone.  While the Constitution precludes the
government from prohibiting mere membership in any particular group, the government may
prohibit the provision of financial support to certain groups.[12]  *See, e.g., IARA*, 477 F.3d at 736

---

[12] Even if the imposition of sanctions against Kadi did somehow implicate some First
Amendment right of association, the government's compelling interest in preventing foreign
terrorists from acquiring financial and other support – an interest unrelated to the restriction of
association – obviously outweighs any incidental burden on associational rights that the
government action might entail.  *See Roberts v. United States Jaycees*, 468 U.S. 609, 623 (1984)
("Infringements on [the] right [to associate] may be justified by regulations adopted to serve
compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through

(upholding sanctions for financial support because "the blocking was not based on, nor does it prohibit, associational activity other than financial support"); *see also HLP/AEDPA*, 205 F.3d at 1133 (rejecting First Amendment challenge to AEDPA because it "does not prohibit being a member of one of the designated groups or vigorously promoting and supporting the political goals of the group") (internal citation omitted). As the Supreme Court explained in *Healy v. James*, "the critical line for First Amendment purposes must be drawn between advocacy, which is entitled to full protection, and action, which is not." 408 U.S. 169, 192 (1972). As described above, there was ample evidence to conclude that Kadi actively provided support to designated terrorists and their supporters.

Nor does OFAC's blocking of Kadi's assets meaningfully impinge upon his associational rights, as it bars only action while still permitting advocacy. Although Kadi is prevented from making financial contributions from any blocked assets, he may still engage in advocacy. *See HLF*, 333 F.3d at 166; *IARA*, 477 F.3d at 736-37. Because the government's actions in this case serve important national interests, they clearly withstand First Amendment scrutiny.

### 3.  E.O. 13224 Does Not Contain a Specific Intent Requirement.

In addition to his speech and association claims, Plaintiff also implies that he has a First Amendment right to provide support to a foreign terrorist organization so long as he "did not and does not have a specific intent to further the illegal aims of any terrorist group or individual." Compl. ¶ 64. The D.C. Circuit has already considered and rejected this argument because proof of "specific intent" is not required in order to block one's assets pursuant to E.O. 13224. *See IARA*, 477 F.3d 728, 737 (D.C. Cir. 2007) ("[W]e do not require a showing that IARA-USA intended its

---

means significantly less restrictive of associational freedoms.").

funding to support terrorist activities.").  As another district court has recognized in rejecting a

similar claim, "the EO [13,224] makes clear that President Bush did not intend to include a 'specific

intent' requirement for designating individuals and groups under the EO  Indeed, the EO prohibits

even the provision of humanitarian aid."  *HLP/IEEPA*, 463 F. Supp. 2d at 1073.

> **D.      Plaintiff Cannot State a Claim Under the Fourth Amendment**.

The complaint alleges that "[t]he freezing or blocking of Mr. Kadi's assets constitute [sic]

an unreasonable search and seizure without probable clause, in violation of the Fourth Amendment."

Compl. ¶ 71.  Two courts in this district have concluded that "OFAC's blocking of [] assets does not

create a cognizable claim under the Fourth Amendment."  *IARA*, 394 F. Supp. 2d at 48; *see also*

*HLF*, 219 F. Supp. 2d at 78-79 (stating that "the freezing of [] accounts is not a seizure entitled to

Fourth Amendment protection").[13]  In advancing a novel theory that all economic sanctions

programs implicate the Fourth Amendment, Plaintiff ignores the weight of history; the unique nature

of economic sanctions programs as a tool of foreign and national security policy; the great deference

due Executive Branch activity concerning matters as serious as international terrorism; and, most

strikingly, all of the jurisprudence establishing that the freezing of assets does not give rise to a

cognizable Fourth Amendment claim.

---

[13] The court in *Holy Land Foundation* distinguished a blocking action, which the court did not consider a "seizure" cognizable under the Fourth Amendment, from the different action of crossing the threshold of Holy Land's office to secure the property for safekeeping and warehousing, which the court said did constitute a seizure under the Fourth Amendment.  219 F. Supp. 2d at 79.  This court is not faced with the latter question because the blocking order against Kadi was not a law enforcement search.

1. **The Executive's Authority to Block the Transfer of Assets Historically Has Not Been Constrained by the Fourth Amendment**.

Plaintiff mistakenly attempts to apply a Fourth Amendment analysis to the Executive's regulatory authority under IEEPA. *See* Compl. ¶¶ 69-71. With the exception of a lone district court in Oregon that issued a partial decision regarding the Fourth Amendment without the benefit of the fuller briefing contained herein, *see AHIF*, 585 F. Supp. 2d at 1261-64, in the nearly one hundred years in which blockings have been carried out pursuant to TWEA and IEEPA, no court has ever held that the Fourth Amendment applies to the type of executive action at issue here – the blocking by the President or his delegee of the transfer of assets carried out during a national emergency with the direct authorization of Congress and with the intent of protecting our nation from foreign threats.[14] And two courts in this circuit explicitly have rejected similar claims.

Although Fourth Amendment challenges to blocking orders have not been explicitly addressed by the Supreme Court, the Supreme Court has upheld orders under TWEA- or IEEPA-based sanctions programs and has never offered any hint that these actions raise Fourth Amendment concerns. *See Regan v. Wald*, 468 U.S. at 232-33; *Dames & Moore*, 453 U.S. 654; *Orvis v. Brownell*, 345 U.S. at 187-88; *Propper*, 337 U.S. at 481-82. *Cf. Mistretta v. United States*, 488 U.S. 361, 401-02 (1989) (suggesting that precedents may "reflect at least an early understanding" about a constitutional issue even when issues are "not specifically addressed."). Moreover, no court has held that the blocking of assets under IEEPA is subject to Fourth Amendment restrictions. *IARA*, 394 F. Supp. 2d at 48; *HLF*, 219 F. Supp. 2d at 78-79; *but see AHIF*, 585 F. Supp. 2d at 1263-64 (requesting further briefing). This uninterrupted history has meaning. As the Supreme Court has

---

[14] This regulatory action of blocking assets is distinguished from crossing the threshold of an entity's office.

stated, "'traditional ways of conducting government . . . give meaning' to the Constitution." *Mistretta*, 488 U.S. at 401 (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610 (1952)).

In addition to crediting the history of nearly one hundred years of Executive practice and judicial opinions upholding the President's regulatory authority in this area, the Court also should consider the constructive and supportive role played by the Legislative branch in the creation and oversight of sanctions programs. The broad congressional grants of authority to the President in the TWEA and IEEPA contain no suggestion that the Executive branch must resort first to the judiciary for a warrant. The President has the authority to block assets and take other broad regulatory actions – that might otherwise be considered "seizures" – when faced with national emergencies or war and when armed with explicit Congressional authorization. In a concurrence often cited by the Supreme Court and lower courts in TWEA and IEEPA cases, *see, e.g., Dames & Moore*, 453 U.S. at 660, Justice Jackson stated that "[a] seizure executed by the President pursuant to an Act of Congress would be supported by the strongest presumptions and the widest latitude of judicial interpretation, and the burden of persuasion would rest heavily upon any who might attack it." *Youngstown Sheet & Tube Co.*, 343 U.S. at 635-36. Justice Jackson concurred in the finding that the President lacked authority to seize the steel mills at issue in that case because, while Congress had expressly provided the President with the power to seize industries in other circumstances, it had not passed legislation authorizing the steel mill seizures. *Id.* at 639.[15] To hold that the President needed first to obtain a warrant from a Magistrate Judge would be entirely inconsistent with what Justice Jackson referred

---

[15]In fact, the *Youngstown* opinion includes a lengthy appendix of situations in which the President has been authorized by an Act of Congress to seize assets without a warrant. *Id.* at 615-67.

to as the President's "authority at its maximum" to execute seizures with explicit authorization by Congress. *Id.* at 635; *see also id.* at 652 (noting that "executive powers may be considerably expanded to meet an emergency" and that "Congress may and has granted extraordinary authorities which lie dormant in normal times but may be called into play by the Executive in war or upon proclamation of a national emergency.").

In *Nielsen v. Sec'y of the Treasury*, 424 F.2d 833 (D.C. Cir. 1970), a case involving the blocked assets of Cuban nationals, the D.C. Circuit agreed "with the applicants that . . . blocking involves a deprivation of property." *Id.* at 843. However, the court took a "broad view of the constitutional aspects of the case to consider whether on these or other grounds there has been unfairness to plaintiffs which rises to constitutional dimensions" and held that "[w]e see no general constitutional inhibition that overrides a statute authorizing the institution, during time of national emergency, of a program that freezes the status within the United States of assets of a national of a foreign country 'designated' by the President." *Id.* at 839; *see also Sardino v. Fed. Reserve Bank of New York*, 361 F.2d 106 (2d Cir. 1966); *Miranda v. Sec'y of Treasury*, 766 F.2d 1 (1st Cir. 1985); *Chas. T. Main Int'l Inc. v. Khuzestan Water & Power*, 651 F.2d 800 (1st Cir. 1981); *Freedom to Travel Campaign,* 82 F.3d 1431. These well-established principles cannot be squared with the suggestion that the President (or OFAC) must seek the approval of a Magistrate Judge before he may prohibit the transfer of assets in which foreign nationals have an interest when there is reason to believe that those assets may be used to support terrorism.

Finally, this line of authority was applied twice in the IEEPA context by courts in this district. The district court in *Holy Land Foundation* examined a claim nearly identical to Plaintiff's and held that: "[T]he case law is clear that a blocking of this nature does not constitute a seizure.

-44-

Accordingly, the freezing of HLF's accounts is not a seizure entitled to Fourth Amendment protection." 219 F. Supp. 2d at 78-79. And another court later reached the same conclusion. *See IARA*, 394 F. Supp. 2d at 48 ("[T]o the extent the plaintiff is alleging that the OFAC's blocking of its assets violates the Fourth Amendment, this claim must fail as well . . . OFAC's blocking of the IARA-USA's assets does not create a cognizable claim under the Fourth Amendment.").

### 2. Blocking Actions Pursuant to E.O. 13224 are *Per Se* "Reasonable" Because Governmental Interests Far Outweigh Any Privacy Concerns.

The Fourth Amendment states that people have a right "to be secure in their persons, houses, papers, and effects, against *unreasonable* searches and seizures. . ." U.S. Const. amend. IV (emphasis added). To hold that the Fourth Amendment is applicable to a particular search or seizure "is only to begin the inquiry into the standards governing such intrusions." *Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 619 (1987) (citations omitted). Under the Fourth Amendment, "'reasonableness is still the ultimate standard.'" *Soldal v. Cook County,* 506 U.S. 56, 71 (1992) (quoting *Camara v. Municipal Court of San Francisco*, 387 U.S. 523, 539 (1967)); *see also Pennsylvania v. Mimms*, 434 U.S. 106, 108-09 (1977) (per curiam) ("The touchstone of our analysis under the Fourth Amendment is always 'the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.'") (quoting *Terry v. Ohio*, 392 U.S. 1, 19 (1968)). Even if the Court is not persuaded by the historical judicial treatment of economic sanctions programs, the Court nonetheless should find that blocking actions pursuant to E.O. 13224 are *per se* reasonable under the Fourth Amendment and thus should not be subject to a "probable cause" standard or a warrant requirement.

While in the ordinary law enforcement context the reasonableness of a search or seizure is usually predicated on obtaining a probable cause warrant, the Supreme Court has routinely upheld warrantless searches and seizures in other contexts when the search or seizure was deemed reasonable. These decisions arise from the judgment that governmental interests often outweigh privacy interests. To state the obvious, a person's status as a donor to international terrorist groups "informs both sides of that balance" between private and governmental interests. *United States v. Knights*, 534 U.S. 112, 119 (2001). In *Virginia v. Moore*, the Supreme Court noted that "when an officer has probable cause to believe a person committed even a minor crime in his presence, the balancing of private and public interests is not in doubt." 128 S. Ct. 1598, 1604 (2008). Plaintiff's link to international terrorist organizations significantly diminishes any expectation that his property interests in the United States would remain unblocked.

Some actions, such as border searches, are by their very nature reasonable and thus not subject to Fourth Amendment restrictions. The Supreme Court has upheld warrantless searches at the border, finding that the interest of the "sovereign" in protecting itself outweighs any personal privacy interest. *See United States v. Ramsey*, 431 U.S. 606, 616 (1977) ("[S]earches made at the border, pursuant to the longstanding right of the sovereign to protect itself by stopping and examining persons and property crossing into this country, are reasonable simply by virtue of the fact that they occur at the border. . . ."). In *United States v. Flores-Montano*, 541 U.S. 149, 155 (2004), the Court found that an interest in preventing drug importation outweighed the particularly invasive warrantless search of an automobile, including the removal of the gas tank (in which drugs were found). The Court explained: "[w]hile the interference with a motorist's possessory interest is not insignificant when the Government removes, disassembles, and reassembles [a] gas tank, it

-46-

nevertheless is justified by the Government's paramount interest in protecting the border." *Id.*

Cases involving searches or seizures at the border demonstrate that the existence of one compelling factor can be sufficient to render an entire category of searches and seizures reasonable. Courts have long recognized that the Legislative and Executive branches can control the border, and have repeatedly held that border searches are *per se* reasonable under the Fourth Amendment. *See, e.g., Flores-Montano*, 541 U.S. at 153 ("Congress, since the beginning of our Government, 'has granted the Executive plenary authority to conduct routine searches and seizures at the border, without probable cause or a warrant, in order to regulate the collection of duties and to prevent the introduction of contraband into this country.'") (citation omitted); *see also Ramsey*, 431 U.S. at 616-622. This case involves the President's authority to block "any property in which any foreign country or a national thereof has any interest," 50 U.S.C. § 1702(a)(1)(B), in order to address threats that have their source "in whole or substantial part outside the United States." *Id.* at § 1701(a). Surely the interest in curtailing the funding of terrorism is as great as the interest in preventing the importation of drugs or securing the border. That interest – preventing the financing of terrorism – should be sufficient to render blocking actions reasonable for Fourth Amendment purposes, especially when coupled with the presence of numerous other factors such as a Presidentially-declared period of national emergency, the special deference due to the Executive branch in matters concerning foreign policy and national security, and the close coordination of the Legislative branch and the attendant deference based on *Youngstown* principles.

Courts have found warrantless searches and seizures to be reasonable regardless of whether the circumstances fit within an established exception such as the one for "special needs" or

"administrative searches."[16]  Even if OFAC blocking actions were required to fall within an established categorical exception to the Fourth Amendment in order to be deemed reasonable, the blocking of assets pursuant to E.O. 13224 falls within the special needs exception.  The special needs exception applies where (1) the primary purpose of the search or seizure is beyond ordinary criminal law enforcement; and (2) where "special needs" make the warrant and probable cause requirements of the Fourth Amendment impracticable.  *See Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987); *Chandler v. Miller*, 520 U.S. 305, 313 (1997) ("[P]articularized exceptions to the main rule are sometimes warranted based on special needs, beyond the normal need for law enforcement.") (internal citation omitted).

The primary purpose of E.O. 13224 is beyond ordinary criminal law enforcement.  E.O. 13224 addresses "an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States" and states that the E.O. is intended to deal with this threat.  *Id.  See also* 50 U.S.C. § 1701(a).  Addressing a Presidentially-declared national emergency clearly is a "special need" beyond "the normal need for law enforcement."  *Skinner*, 489 U.S. at 619; *see Cassidy v. Chertoff*, 471 F.3d 67, 82 (2d Cir. 2006) ("Preventing or deterring large-scale terrorist attacks present problems that are distinct from standard law enforcement needs and indeed go well

---

[16] In *United States v. Knights*, the Supreme Court held reasonable the warrantless search of a probationer's home, rejecting the need to fit the search into the "special needs" exception, and instead ruling that "the search of Knights was reasonable under our *general* Fourth Amendment approach of 'examining the totality of the circumstances,'" which included the diminished privacy interests of a probationer.  534 U.S. at 117-18 (emphasis added) (citing *Ohio v. Robinette*, 519 U.S. 33, 39 (1996)).  The Court found that the government's interests in rehabilitating the probationer and in protecting society from future criminal violations sufficiently outweighed the probationer's privacy interests.

beyond them."); *MacWade v. Kelly*, 460 F.3d 260, 270-71 (2d Cir. 2006) (seeking to prevent terrorist attacks "serves a special need").

It is equally clear that it would be impracticable to impose a warrant requirement on the President's ability to freeze assets in which a foreign national has an interest. *Griffin*, 483 U.S. at 873. As the Szubin Declaration makes clear, the imposition of a warrant requirement in this context would present insuperable difficulties. *See* Szubin Decl. ¶¶ 18-20. Funds can be transferred at the click of a button, and the Executive must often act quickly to prevent asset flight. More significantly, when blockings are effectuated, the Executive frequently does not know the identity or location of all of the assets that will be blocked, as the order applies to all existing assets and future transactions and covers a vast variety of assets including bank accounts, real property, goods, contracts, and a host of other financial instruments. *See id.* ¶¶ 11-19. Thus, not all assets or the identities of those who hold them can be identified prior to carrying out the blocking. In fact, because "the legal obligation to block property" is created by the blocking order, assets are often frozen by third parties without the prior knowledge of OFAC. *Id.* ¶ 12. The Department of the Treasury administers over 20 sanctions programs against a multitude of countries and persons. *Id.* ¶ 4. In cases in which blockings take place pursuant to these programs, the Department of the Treasury identifies the blocked nations, individuals, or groups, and relies on those holding assets for these persons (or assets in which those persons have "any interest") to effectuate the blockings. Banks play a critical role, examining the list of blocked persons and identifying assets they hold on behalf of blocked parties. *Id.* ¶ 17. The sanctions continue after the initial blockings are made, so any new assets coming into the jurisdiction of the blocking order will be blocked. *Id.* ¶ 16. For example, a wire transfer in which a designated party has an interest will be blocked. *Id.* Indeed,

even determining from which court to seek a warrant would be difficult because some of these programs block all the assets of a nation and its nationals. *Id.* ¶ 9. As the Declaration explains, "[b]ecause of the broad scope of property potentially subject to a blocking order, the fact that such property may be located anywhere in the world, the fact that OFAC often does not have the ability to identify and locate all property subject to a blocking order, and the fact that effective blocking of assets requires quick action to prevent their dissipation, it would be impracticable for OFAC to obtain a warrant for every account, transaction or other property that might be affected as a result of a blocking action." *Id.* ¶ 19. As a consequence, requiring a warrant prior to each blocking would substantially hamstring the Executive's ability to use these important tools to protect the foreign policy and national security of the United States. *See id.* ¶¶ 19-20.

Moreover, the manner in which economic sanctions programs are administered highlights the inappropriateness of any requirement that the President or his designee seek a warrant before freezing any assets. A primary purpose of the warrant requirement is to "particularly describ[e] the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. As described above, a blocking action has far-reaching application, potentially freezing not just bank accounts, but also a host of other financial instruments and physical assets found in the name of the designated countries or entities or in the name of anyone within U.S. jurisdiction if a designated party has any interest in the asset. Szubin Decl. ¶ 11. For a program that, by design, targets assets of any kind, case law discussing the sufficiency of warrants makes little sense. *See, e.g., Berger v. State of New York*, 388 U.S. 41, 58 (1967) (discussing requirement that warrants be "'carefully circumscribed' so as to prevent unauthorized invasions of privacy"). Unquestionably, a warrant requirement "would interfere to an appreciable degree with the [] system" for imposing economic sanctions during a

national emergency pursuant to Congressional authorization, and "the delay inherent in obtaining a warrant would make it more difficult . . . to respond quickly to evidence of misconduct." *Griffin*, 483 U.S. at 876.  Interposing a warrant requirement would require the President or OFAC to identify every such asset, and to seek out magistrates in any jurisdiction in the United States in which such an asset might be found.  This would not only be very difficult as a practical matter, *see* Szubin Decl. ¶¶ 19-20, but also would be inconsistent with the intent of Congress that the President have the authority to act quickly and decisively in the face of economic or security threats to this country. It would also be inconsistent with the admonition that in this area of national security and foreign policy, the authority of the President is at its zenith and that of the judiciary at its nadir.  The practical and theoretical implications of imposing a warrant requirement strongly weigh in favor of post-blocking judicial review of sanctions decisions, instead of pre-blocking review.

As the Supreme Court has recognized, and as explained above, a showing of less than probable cause "satisfies the Constitution when the balance of governmental and private interests makes such a standard reasonable." *Knights*, 534 U.S. at 121 ("The same circumstances that lead us to conclude that reasonable suspicion is constitutionally sufficient also render a warrant requirement unnecessary.").  For all these reasons, the Court should conclude that blocking actions pursuant to E.O. 13224 are *per se* reasonable.[17]

_____

[17] Alternatively, the Court could rule that OFAC's decision to maintain Kadi's designation and deny his request for reconsideration was reasonable – and thus exempt from any Fourth Amendment restrictions – for the same reasons discussed in Section I.A *supra*.  Plaintiff alleges that a "probable cause" standard should be imposed, *see* Compl. ¶71, but the ultimate question on the merits is whether OFAC's decision was "rational" and "supported by the administrative record."  *See* Standard of Review section, *supra*; *see also AHIF*, 585 F. Supp. 2d. at 1252-53 (applying APA standard to designation challenge).  It defies logic to conclude that a higher standard should be applied during the period of heightened emergency – when unblocked assets may be used to support global terrorism – than at the end of a lengthy post-blocking

E.      **Plaintiff Cannot Sustain a Vagueness or Overbreadth Challenge**.

1.      **E.O. 13224 Is Not Unconstitutionally Overbroad**.

Aside from using the word "overbroad," *see* Compl. ¶¶ 73, 75-76, Plaintiff does not advance a legal argument specifically tailored to his overbreadth claim.  Even if E.O. 13224 arguably might be construed to touch upon some conduct protected by the First Amendment, "there comes a point at which the chilling effect of an overbroad law, significant though it may be, cannot justify prohibiting all enforcement of that law – particularly a law that reflects 'legitimate state interests in maintaining comprehensive controls over harmful, constitutionally unprotected conduct.'" *Virginia v. Hicks*, 539 U.S. 113, 119 (2003) (citing *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973)).  Just last term, the Supreme Court reiterated that "[i]nvalidation for overbreadth is 'strong medicine' that is not to be 'casually employed'" because "invalidating a law that in some of its applications is perfectly constitutional . . . has obvious harmful effects." *United States v. Williams*, 128 S. Ct. 1830, 1838 (2008).  That is why the Supreme Court "vigorously enforce[s] the requirement that a statute's overbreadth be *substantial*, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep." *Id.*

There can be no doubt that E.O. 13224 furthers governmental interests of the highest order – protecting national security by freezing out sources of terrorism financing.  It cannot be seriously disputed that the heart of E.O. 13224 is combatting terrorism financing, and courts repeatedly have held that there is no constitutional right to fund terrorist activities. *See, e.g., HLP/AEDPA*, 205 F.3d at 1133 ("[T]here is no constitutional right to facilitate terrorism . . . [or] to provide resources with

---

briefing process in federal court (initiated almost five years after the final agency action in question).

-52-

which terrorists can buy weapons and explosives."); *HLF*, 333 F.3d at 165 ("[T]he law is established that there is no constitutional right to fund terrorism."); *IARA*, 477 F.3d at 735 (same). This court should follow the Supreme Court's instruction in *Williams*: If, "[i]n the vast majority of its applications, [a law] raises no constitutional problems whatever," then an overbreadth claim must be dismissed. *Williams*, 128 S. Ct. at 1844.

### 2. Plaintiff's Challenge to the Phrase "Otherwise Associated With" Should be Dismissed.

Plaintiff alleges that the phrase "otherwise associated with" in E.O. 13324 is "unconstitutionally vague and overbroad on [its] face and as applied to Mr. Kadi." Compl. ¶ 73; *see* E.O. 13224, § 1(d)(ii). This claim does not present a live case or controversy. First, subsequent to the March 12, 2004 decision challenged here, OFAC published a regulatory definition of the phrase "otherwise associated with" that clarified the scope of that provision. *See* 31 C.F.R. § 594.316 ("Otherwise associated with" means "(a) To own or control; or (b) To attempt, or to conspire with one or more persons, to act for or on behalf of or to provide financial, material, or technological support, or financial or other services, to."). Any facial challenge to the previously undefined term is now moot. Second, as noted above, Defendants are not moving for summary judgment on the basis of Kadi's designation under this prong and thus are not "applying" it to Kadi in any meaningful sense. Defendants submit that Kadi's designation should be upheld because of the satisfaction of other E.O. 13224 criteria and the sufficiency of the evidence supporting those separate grounds for designation.

Even if the application of section 1(d)(ii) to Kadi did present a live controversy for the Court, Plaintiff's claim must be rejected because Kadi engaged in conduct that satisfies even the more restrictive criteria set out in the regulatory definition of this prong (e.g., providing financial support

to terrorists). *See* E.O. 13224, § 1(d)(ii); 31 C.F.R. § 594.316. The term "otherwise associated

with," as defined, applies to types of conduct that extend beyond mere association and requires that

the designated party engage in that conduct before E.O. 13224 can be applied. *See HLP/IEEPA*, 484

F. Supp. 2d at 1106-07 (discussing regulatory definition of "otherwise associated with," 31 C.F.R.

§ 594.316, and holding that the phrase is neither vague nor overbroad). Both courts to consider the

constitutionality of this provision, as defined by regulation, have held that its language is sufficiently

clear to withstand vagueness and overbreadth challenges. *See id.*; *AHIF*, 585 F. Supp. 2d at 1267,

1270 ("[T]he possibility of designation for being 'otherwise associated with' a designated entity has

been circumscribed by its regulatory definition. . . . The language requires the designated party to

engage in unprotected conduct before the entity can come within its purview."). For all these

reasons, the Court should not entertain Plaintiff's challenge to this provision.

### 3. Terms Such As "Specially Designated Global Terrorist" Are Not Unconstitutionally Vague or Overbroad.

Plaintiff asserts that "[t]he provisions of IEEPA, E.O. 13,224, and the implementing

regulations impose vague and overbroad restrictions . . . because they do not define such critical

terms as 'terrorist organization,' 'specially designated global terrorist,' or any other term related to

'terrorism.'" Compl. ¶ 75. According to his Complaint, these "vague and overbroad provisions . . .

have prevented Mr. Kadi from properly contesting evidence set forth against him and have failed

to provide Mr. Kadi with an adequate independent tribunal in violation of his first and fifth

amendment rights." *Id.* ¶ 76. For a variety of factual and legal reasons, this claim must be

dismissed.

First, Plaintiff is wrong to state that the regulations do not define these terms. *Id.* ¶ 75. Both

"specially designated global terrorist" and "terrorism" are defined by OFAC regulations. *See* 31

-54-

C.F.R. § 594.310 ("The term specially designated global terrorist or SDGT means any foreign person or person listed in the Annex or designated pursuant to Executive Order 13224 of September 23, 2001."); 31 C.F.R. § 594.311 (listing activities that constitute terrorism). OFAC utilizes the administrative term "specially designated global terrorist" or "SDGT" to identify persons who have been designated for blocking under E.O. 13224, as opposed to designations that are made under other economic sanctions programs. Szubin Decl. ¶ 29. For example, OFAC refers to persons designated under E.O. 12978 as "specially designated narcotics traffickers" or "SDNTs." *Id.*; 31 C.F.R. § 536.312. The specific criteria that apply to blocking designations are set forth in the Executive Order itself, as explained above. *See IARA v. Unidentified FBI Agents*, 394 F. Supp. 2d 34, 46 (D.D.C. 2005) ("Executive Order 13,224 clearly designates the procedures for designating organizations for SDGTs.").

Two, Plaintiff cannot bring a facial vagueness challenge because E.O. 13224 clearly applies to him. *Village of Hoffman Estates v. Flipside*, 455 U.S. 489, 495 (1992) ("A plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others."); *see Parker v. Levy*, 417 U.S. 733, 756 (1974) ("One to whose conduct a statute clearly applies may not successfully challenge it for vagueness."); *see also Regan v. Time, Inc.*, 468 U.S. 641, 649-50 (1984) (rejecting vagueness challenge where statute clearly applied to plaintiff, despite statute's implication of First Amendment concerns). Because E.O. 13224 clearly applies to Kadi, as discussed in Section I.A *supra*, Plaintiff cannot succeed in a facial vagueness challenge predicated on hypothetical situations unrelated to his own activities.[18]

---

[18] In any event, Plaintiff's purported vagueness challenge bears none of the hallmarks of a proper claim. *See Flipside*, 455 U.S. at 497-500. He does not allege any chilling effect, describe any constitutionally-protected conduct in which he wishes to engage, or raise questions about

Third, a vagueness challenge to these terms would fail anyway.  In *HLP/IEEPA*, the court faced a similar vagueness challenge to the term "SDGT" and summarily rejected it.  463 F. Supp. 2d 1049, 1065-66 (C.D. Cal. 2006) ("Plaintiffs' challenges to the term 'specially designated terrorist group' and to the EO's designation procedure both fail.").

Setting aside the various legal flaws in this purported vagueness/overbreadth claim, Plaintiff is wrong to assert that these terms prevent "an adequate independent tribunal" from adjudicating his rights.  Compl. ¶ 76.  As explained above, designated persons can challenge designation decisions in United States District Court under the APA.  *See, e.g., HLF*, 219 F. Supp. 2d 57 (rejecting on their merits plaintiff's APA record-review and constitutional challenges to its designation under E.O. 13224); *IARA*, 394 F. Supp. 2d 34 (denying plaintiffs' designation and constitutional challenges). For all these reasons, Count Seven must be dismissed.

### F.    E.O. 13224 Is Not a Bill of Attainder.

Article I of the Constitution prohibits Congress from passing a "Bill of Attainder."  U.S. Const. art. I, § 9, cl. 3.  Plaintiff's claim must fail because a blocking action is not a legislative activity subject to the provisions of the Bill of Attainder Clause and does not inflict constitutionally proscribed punishment.  Although the Constitution does not define the term, the Supreme Court has recognized that a bill of attainder is "a law that legislatively determines guilt and inflicts punishment upon an identifiable individual without provision of the protections of a judicial trial."  *Nixon v. Administrator of General Servs.*, 433 U.S. 425, 468 (1977)).  Neither OFAC's blocking order nor the IEEPA provisions it relied upon constitute a "legislative punishment."  The agency action challenged here is so far removed from what the framers of the Constitution had in mind –

what conduct is, or is not, prohibited by E.O. 13224.

"parliamentary acts sentencing named persons to death without the benefit of a judicial trial" – that Plaintiff cannot state a claim under the Bill of Attainder Clause. *BellSouth Corporation v. FCC*, 144 F.3d 58, 62 (D.C. Cir. 1998).

The Bill of Attainder Clause is properly restricted to legislative enactments and does not apply to regulatory actions of administrative agencies, which routinely make decisions concerning specific individuals. The actions of OFAC do not "<u>legislatively</u> determine[] guilt." *Selective Service Sys. v. Minnesota PIRG*, 468 U.S. 841, 846-47 (1984) (emphasis added). Courts have rejected nearly identical bill of attainder claims arising out of other IEEPA-based sanctions. *See, e.g., GRF*, 207 F. Supp. 2d at 799 ("'No circuit court has yet held that the bill of attainder clause, U.S. Const. art I, § 9, cl. 3, applies to regulations promulgated by an executive agency.'") (citing *Paradissiotis v. Rubin*, 171 F.3d 983, 988 (5th Cir. 1999)); *see also Coopservir LTDA.*, Civ. No. 98-0949 slip op. at 10 (D.D.C. Mar. 29, 1999), *aff'd*, 221 F.3d 195 (D.C. Cir. 2000) (table). <u>Congress</u> did not place Kadi on any list of supporters of terrorism. As the Seventh Circuit has recognized, "[a]pplication of the IEEPA is not a bill of attainder; implementation of the statute is in the hands of the Executive and Judicial Branches, while a bill of attainder is a decision of guilt made by the Legislative Branch." *GRF*, 315 F.3d at 755 (citing *United States v. Lovett*, 328 U.S. 303, 315 (1946)). *See also Walmer v. Dep't of Defense*, 52 F.3d 851, 855 (10th Cir.) ("bulk of authority suggests" that provision should be so understood), *cert. denied*, 516 U.S. 974 (1995); *Korte v. OPM*, 797 F.2d 967, 972 (Fed. Cir. 1986) ("The clause is a limitation on the authority of the legislative branch . . . [not] the executive branch."); *Marshall v. Sawyer*, 365 F.2d 105, 111 (9th Cir. 1966), *cert. denied*, 385 U.S. 1006 (1967).

Even if the Bill of Attainder clause did apply to regulatory actions by an executive agency, the blocking action does not inflict constitutionally proscribed punishment. Determining whether legislation inflicts "punishment" such that it implicates the Bill of Attainder clause requires consideration of (1) historical treatment of that type of legislation, (2) the presence or absence of a non-punitive legislative purpose, and (3) the existence of evidence of "congressional intent to punish." *See Selective Service Sys.*, 468 U.S. at 852. First, economic sanctions are not "traditionally judged to be prohibited by the Bill of Attainder Clause." *Nixon*, 433 U.S. at 473-75. Potentially prohibited punishments include death sentences, imprisonment, banishment, the punitive confiscation of property, and legislative bans on participation by individuals or groups in specific jobs or professions. The blocking order does not single out any specified line of business; it instead restricts transactions in property because OFAC had reason to believe that Kadi was providing financial support to foreign terrorists.

Second, E.O. 13224 "reasonably can be said to further nonpunitive legislative purposes." *Nixon*, 433 U.S. at 475-76. The government's vital interest in protecting national security by seeking to eliminate sources of terrorism financing cannot seriously be disputed. *See BellSouth*, 144 F.3d at 65 (describing this factor as "the most important"). OFAC's order plainly furthers the non-punitive purpose of identifying and cutting off the sources of funding for foreign terrorists. "That burdens are placed on citizens by federal authority does not make those burdens punishment." *Selective Service Sys.*, 468 U.S. at 851. As explained above, E.O. 13224 reasonably furthers the President's interest in protecting the security of U.S. citizens and the nation's security, foreign policy, and economy by preventing future terrorist attacks against the United States or its interests.

Lastly, Plaintiff has not presented any evidence of "a congressional intent to punish" him. *Selective Service Sys.*, 468 U.S. at 852. Plaintiff simply cannot "come forward with the kind of 'unmistakable evidence of punitive intent which . . . is required before a Congressional enactment of this kind may be struck down' as an attainder." *BellSouth*, 144 F.3d at 67 (citing *Selective Service Sys.*, 468 U.S. at 855-56 n.15). Kadi can point to nothing in the legislative history of IEEPA or the history of E.O. 13224 that evinces any intent to punish him specifically. *See Coopservir*, slip op. at 12. For all these reasons, Plaintiff's bill of attainder claim must fail.

## CONCLUSION

For all the foregoing reasons, Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment should be granted, and this case should be dismissed in its entirety.

Dated: May 22, 2009

Respectfully submitted,

TONY WEST
Assistant Attorney General

DOUGLAS N. LETTER
Terrorism Litigation Counsel

SANDRA M. SCHRAIBMAN
Assistant Branch Director (D.C. Bar #188599)

   /s/ Eric J. Beane                 
ERIC J. BEANE (Arizona Bar #023092)
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
Mailing Address
P.O. Box 883
Washington, D.C. 20044
Delivery Address
20 Massachusetts Ave., NW., Room 7124
Washington, D.C. 20001
Telephone: (202) 616-2035
Fax: (202) 616-8470

-59-

Eric.Beane@usdoj.gov

*Counsel for Defendants*