# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| IN RE:  TERRORIST ATTACKS ON SEPTEMBER 11, 2001 | ) ) ) ) ) | **Civil Action No. 03 MDL 1570 (GBD)(FM)** |

*This document relates to:*

*Ashton v. Al Qaeda*, No. 02-CV-6977 (GBD)
*Burnett v. Al Baraka*, No. 03-CV-9849 (GBD)
*Continental Casualty v. Al Qaeda*, No. 04-CV-5970 (GBD)
*Euro Brokers v. Al Baraka*, No. 04-CV-7279 (GBD)
*Federal Insurance v. Al Qaida*, No. 03-CV-6978 (GBD)
*New York Marine v. Al Qaida*, No. 04-CV-6105 (GBD)
*World Trade Center v. Al Baraka*, No. 04-CV-7280 (GBD)

## MEMORANDUM IN SUPPORT OF
## DEFENDANT SAUDI BINLADIN GROUP'S
## RENEWED MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION
## AND FOR FAILURE TO STATE A CLAIM

## TABLE OF CONTENTS

**TABLE OF CONTENTS** ................................................................................................. i

**TABLE OF AUTHORITIES** ........................................................................................ ii

**INTRODUCTION** ........................................................................................................ 1

**BACKGROUND** .......................................................................................................... 2

**ARGUMENT** ................................................................................................................ 4

**I.   THE CLAIMS AGAINST SBG MUST BE DISMISSED BECAUSE THIS COURT DOES NOT HAVE PERSONAL JURISDICTION OVER IT** ................................................ 4

    A.   STANDARD OF REVIEW ........................................................................................ 5

    B.   PLAINTIFFS CANNOT ESTABLISH SPECIFIC JURISDICTION OVER SBG FOR CLAIMS ARISING OUT OF THE SEPTEMBER 11 ATTACKS ...................................................... 6

        1.   *None of the four factual claims on which Judge Casey ordered jurisdictional discovery supports specific jurisdiction over SBG* .............. 7

        2.   *Plaintiffs can identify no other basis for specific jurisdiction* ................. 16

        3.   *Plaintiffs cannot establish jurisdiction under a conspiracy theory* .......... 19

    C.   PLAINTIFFS HAVE NO BASIS TO ASSERT GENERAL JURISDICTION OVER SBG .......... 20

        1.   *SBG did not and does not have continuous and systematic contacts with the United States sufficient to justify personal jurisdiction* ...................... 20

        2.   *Jurisdiction over SBG cannot be based on the activities of other corporations* ................................................................................................ 28

        3.   *Activities of SBG shareholders and their families are irrelevant* ............. 32

        4.   *Zero times ten is still zero* ........................................................................ 33

**II.   PLAINTIFFS' CLAIMS ALSO FAIL UNDER RULE 12(B)(6)** ............................... 34

**CONCLUSION** ............................................................................................................ 39

# TABLE OF AUTHORITIES

## CASES

*Afram Export Corp. v. Metallurgiki Halyps, S.A.*,
    772 F.2d 1358 (7th Cir. 1985) ................................................................20

*American Ass'n of Cruise Passengers v. Cunard Line, Ltd.*,
    691 F. Supp. 379 (D.D.C. 1987) ...................................................... 24, 25

*Arar v. Ashcroft*,
    585 F.3d 559 (2d Cir. 2009),
    *cert. denied*, No. 09-923, 2010 WL 390379 (U.S. Jun. 14, 2010)..........................................38

*Ariel Maritime Group, Inc. v. Javelin Lines*,
    1989 WL 31665 (S.D.N.Y. 1989)...............................................................5

*Armco Steel Co., L.P. v. CSX Corp.*,
    790 F. Supp. 311 (D.D.C. 1991)..............................................................25

*Asahi Metal Indus. Co. v. Superior Court of Cal., Solano County*,
    480 U.S. 102 (1987)................................................................................20

*Ashcroft v. Iqbal*,
    129 S. Ct. 1937 (2009)................................................................ 34-36, 39

*Asip v. Nielsen Media Research, Inc.*,
    No. 03 Civ. 5866, 2004 WL 315269 (S.D.N.Y. Feb. 18, 2004) ................................................7

*Ball v. Metallurgie Hoboken-Overpelt, S.A.*,
    902 F.2d 194 (2d Cir. 1990), *cert. denied*, 498 U.S. 854 (1990)............................................5

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)............................................................................. 34-39

*Boit v. Gar-Tec Prods., Inc.*,
    967 F.2d 671 (1st Cir. 1992)......................................................................5

*BP Chems. Ltd. v. Formosa Chem. & Fibre Corp.*,
    229 F.3d 254 (3d Cir. 2000)................................................................27, 30

*Burger King Corp. v. Rudzewicz*,
    471 U.S. 462 (1985).............................................................................. 6, 7

*Cable/Home Comm. Corp. v. Network Prods.*,
    902 F.2d 829 (11th Cir. 1990) ....................................................................5

*Calder v. Jones*,
   465 U.S. 462 (1984)...............................................................................................6

*Chrysler Capital Corp. v. Century Power Corp.*,
   778 F. Supp. 1260 (S.D.N.Y. 1991)...................................................................19

*Conley v. Gibson*,
   355 U.S. 41 (1957)..............................................................................................34

*Donald & Co. Sec., Inc. v. U.S. Stock Transfer Corp.*,
   No. 99 CIV 9286, 2000 WL 146916 (S.D.N.Y. Jan. 21, 2000)...........................24

*Dr. Beck & Co. G.M.B.H. v. Gen. Elec. Co.*,
   210 F. Supp. 86 (S.D.N.Y 1962), *aff'd*, 317 F.2d 538 (2d Cir. 1963) .......................5

*Duravest, Inc. v. Viscardi, A.G.*,
   581 F. Supp. 2d 628 (S.D.N.Y. 2008)................................................................22

*Estate of Ungar v. The Palestinian Authority*,
   400 F. Supp. 2d 541 (S.D.N.Y. 2005).....................................................26, 27, 30

*Frontera Res. Azerbaijan Corp. v. State Oil Co. of Azerbaijan*,
   479 F. Supp. 2d 376 (S.D.N.Y. 2007),
   *vacated on other grounds*, 582 F.3d 393 (2d Cir. 2009)........................................27

*Gates Learjet Corp. v. Jensen*,
   743 F.2d 1325 (9th Cir. 1984) ............................................................................20

*Geo-Physical Maps, Inc. v. Toycraft*,
   162 F. Supp. 141 (S.D.N.Y 1958)........................................................................5

*Giar v. Centea*,
   No. 02 Civ. 7916, 2003 U.S. Dist. LEXIS 6383 (S.D.N.Y. Apr. 16, 2003),
   *aff'd*, No. 03-7546, 2004 U.S. App. LEXIS 1451 (2d Cir. Jan. 29, 2004) ............28

*Gilbert, Segall & Young v. Bank of Montreal*,
   785 F. Supp. 453 (S.D.N.Y. 1992)........................................................................5

*Helicopteros Nacionales de Colombia, S.A. v. Hall*,
   466 U.S. 408 (1984)................................................................7, 20, 26, 30

*Hoffritz for Cutlery, Inc. v. Amajac, Ltd.*,
   *763* F.2d 55 (2d Cir. 1985)..............................................................................24

*In re Burlington Coat Factory Sec. Litig.*,
   114 F.3d 1410 (3d Cir. 1997).............................................................................37

*In re Commodore Int'l, Ltd. v. Transpacific Corp.*,
   242 B.R. 243 (S.D.N.Y. 1999),
   *aff'd*, No. 00 CIV 1679, 2000 WL 977681 (S.D.N.Y. Jul. 17, 2000)......................................22

*In re Ski Train Fire in Kaprun, Austria on Nov. 11, 2000*,
   257 F. Supp. 2d 717 (S.D.N.Y. 2003)................................................................................20, 29

*In re Terrorist Attacks on September 11, 2001*,
   349 F. Supp. 2d 765 (S.D.N.Y. 2005) ("*Terrorist Attacks I*")..............1, 7, 8, 19, 21, 27, 33, 34

*In re Terrorist Attacks on September 11, 2001*,
   538 F.3d 71 (2d Cir. 2008) ("*Terrorist Attacks III*") ....................................................6, 19, 20

*In re Terrorist Attacks on September 11, 2001*,
   --- F. Supp. 2d ---, 2010 WL 2484411 (S.D.N.Y. Jun 17, 2010)
   ("*Terrorist Attacks IV*") ................................................................................ passim

*Inv. Co. Institute v. United States*,
   550 F. Supp. 1213 (D.D.C. 1982) ............................................................................24

*Jazini v. Nissan Motor Co.*,
   148 F.3d 181 (2d Cir. 1998)...........................................................................28, 29, 31

*Johnston v. Multidata Sys. Int'l Corp.*,
   523 F.3d 602 (5th Cir. 2008) ...................................................................................23

*Kadi v. Geithner*,
   No. 1:09-cv-00108-JDB (D.D.C. filed Jan. 16, 2009) ...........................................16

*Keeton v. Hustler Magazine, Inc.*,
   465 U.S. 770 (1984)..................................................................................................7, 33

*Landoil Res. Corp. v. Alexander & Alexander Servs., Inc.*,
   918 F.2d 1039 (2d Cir. 1990)...............................................................................5, 24, 34

*Mantello v. Hall*,
   947 F. Supp. 92 (S.D.N.Y. 1996)..............................................................................27, 30

*Marine Midland Bank, N.A. v. Miller*,
   664 F.2d 899 (2d Cir. 1981)...........................................................................................5

*Melnick v. Adelson-Melnick*,
   346 F. Supp. 2d 499 (S.D.N.Y. 2004).............................................................................5

*Nelson v. Mass. Gen. Hosp.*,
   No. 04-CV-5382, 2007 U.S. Dist. LEXIS 70455 (S.D.N.Y. Sept. 20, 2007),
   *aff'd*, No. 07-4642-CV, 2008 U.S. App. LEXIS 23207 (2d Cir. Nov. 7, 2008)....................34

*Philadelphia Hous. Auth. v. Am. Radiator & Standard Sanitary Corp.*,
    309 F. Supp. 1053 (E.D. Pa. 1969) ....................................................................25

*Standard Enterprises, Inc. v. Bag-It, Inc.*,
    673 F. Supp. 1216 (S.D.N.Y. 1987)......................................................................5

*Starr v. Sony BMG Music Entm't*,
    592 F.3d 314 (2d Cir. Jan. 13, 2010) ..................................................................35

*Turkmen v. Ashcroft*,
    589 F.3d 542 (2d Cir. 2009)................................................................................34

*Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.*,
    751 F.2d 117 (2d Cir. 1984)........................................................................ 28, 29

*WLC, LLC v. Watkins*,
    454 F. Supp. 2d 426 (M.D.N.C. 2006) ...............................................................29

*World Wide Minerals Ltd. v. Republic of Kazakhstahn*,
    116 F. Supp. 2d 98 (D.D.C. 2000), ....................................................................25

**STATUTES & EXECUTIVE ORDERS**

28 U.S.C. § 1350, Alien Tort Statute ("ATS") ...............................................................39

28 U.S.C. § 1350, Torture Victim Protection Act ("TVPA").........................................39

Exec. Order No 13099,
    63 Fed. Reg. 45,167 (Aug. 25, 1998).................................................................9

**RULES**

Fed. R. Civ. P. 4(k)(2)....................................................................................................27

Fed. R. Civ. P. 12(b)(2)...........................................................................................5, 34

Fed. R. Civ. P. 12(b)(6)...........................................................................................4, 34

Fed. R. Civ. P.  12(e) ..................................................................................................1, 7

Fed. R. Evid. 201 ...........................................................................................................37

**MISCELLANEOUS**

Nat'l Comm'n on Terrorist Attacks Upon the U.S. (The 9/11 Commission Report)
    (2004), *available at* http://govinfo.library.unt.edu/911/report/911Report.pdf ..................9, 18

## INTRODUCTION

Defendant Saudi Binladin Group ("SBG") first moved to dismiss the *Burnett* and *Ashton* complaints in 2003 and 2004, respectively.[1]  It argued both that Plaintiffs' baseless allegations failed to state a claim and that SBG was not subject to personal jurisdiction.  Although Judge Casey dismissed SBG's chairman and two other shareholders, *see In re Terrorist Attacks on September 11, 2001*, 349 F. Supp. 2d 765, 822 (S.D.N.Y. 2005) ("*Terrorist Attacks I*"), he denied SBG's motion without prejudice and ordered limited jurisdictional discovery in part as an alternative to requiring a more definite statement under Rule 12(e) to remedy the dearth of specificity in Plaintiffs' complaints regarding how SBG "purposefully directed its activities at the United States."  *Id.* at 822.

That discovery, which dragged on for four years, has merely confirmed SBG's original position.  As shown herein, SBG has no contacts with the United States sufficient to support personal jurisdiction.  The office of SBG's Maryland subsidiary, which Judge Casey flagged for discovery, was indisputably closed more than two years before the complaints here were filed.  Moreover, this Court's recent opinion rejected as to other defendants virtually every other basis on which Plaintiffs have asserted general jurisdiction over SBG.

Likewise, Plaintiffs have neither alleged, nor can they prove, any facts from which the Court might infer that SBG directed tortious conduct at the United States.  The allegations upon which Judge Casey required jurisdictional discovery are both legally deficient under the Second

---

[1] At the time of its motions, SBG had only been served with the *Ashton* and *Burnett* complaints.  Following Judge Casey's ruling, Plaintiffs and SBG agreed to stay briefing in other cases until the completion of jurisdictional discovery, *see* Order ¶¶ 12-13 (July 27, 2005) (MDL Dkt. #1071).  By agreement, Plaintiffs' counsel, including those for the *Federal Insurance* plaintiffs, participated in that discovery consistent with the Court's Case Management Orders instructing Plaintiffs to pursue discovery jointly.  *See* Case Management Order No. 2 ¶ 20 (June 16, 2004) (MDL Dkt. #247); Case Management Order No. 3 ¶ 9 (June 16, 2004) (MDL Dkt. #248).  SBG therefore moves to dismiss all the cases against it, including *Continental Casualty*, *Euro Brokers, Inc.*, *Federal Insurance*, and *World Trade Center Properties*, which were not previously subject to motions.  The allegations and relevant record in these actions are substantially similar and, in some cases, identical.

Circuit's subsequent decision and devoid of any admissible or probative factual support.  Indeed, the Court has rejected every single one of those allegations in its recent order dismissing claims against SBG's chairman and two related companies.  *See In re Terrorist Attacks on September 11, 2001*, --- F. Supp. 2d ---, 2010 WL 2484411, *4, n.4, *8 (S.D.N.Y. June 17, 2010) ("*Terrorist Attacks IV*").  Plaintiffs will doubtless argue, as they did unsuccessfully to Judge Maas and this Court two years ago, that more discovery may yet yield jurisdictional grounds that they have failed to identify in four years of discovery.  This Court should again reject those arguments and dismiss SBG from all of the cases against it.

## BACKGROUND

SBG, which was founded in 1989, is one of the largest engineering and construction companies in the Arab world.  SBG is in this case because it is owned by nineteen half-brothers of Osama Bin Laden ("OBL"), who until 1993 held a small stake (approximately 2%) in the company himself.  At that point, in response to OBL's increasingly strident criticism of the Saudi government, the owners of SBG passed a resolution to strip him of his interest in the company. In February 1994, Bakr Binladin, the senior member of the family and Chairman of SBG, publicly denounced OBL in a statement released to the media,[2] and in April 1994, the Saudi government revoked OBL's citizenship and froze his assets.  All of this occurred long before Plaintiffs claim OBL began publicly targeting the United States, and years before OBL was designated as a terrorist.[3]  The United States has never designated SBG or any of its executives, employees or shareholders as a terrorist, nor has it seized or frozen any of its assets.  Instead, the United States government has long worked with SBG and its affiliates on such projects as the

---

[2] Affidavit of Bakr Binladin ("Bakr Aff.") ¶ 9 and Ex. 3 (Jan. 25, 2006) (Attachment B); *see also id.* ¶ 12 and Ex. 4.

[3] *See infra*, pp. 8-11.

construction of an airbase and a 1200 km road to facilitate movement of U.S. forces during the first Gulf War.[4]

Plaintiffs and SBG engaged in jurisdictional discovery for four years. Judge Maas closely supervised this discovery, over the course of which he received extensive written briefing, held four hearings, and allowed two depositions, over one of which he presided personally.[5] After three years, however, Judge Maas rejected Plaintiffs' efforts to begin a new and expanded round of discovery. He ordered SBG to answer specific questions posed by the court on two topics, but he rejected the bulk of Plaintiffs' 90-plus additional discovery requests, explaining that the "substantial additional discovery" Plaintiffs sought was "of no jurisdictional significance whatsoever in this litigation," aimed at "continuing to go over old ground," or sought further information as to factual allegations that, even if true, "d[id] not suggest a basis for jurisdiction over SBG."[6] Judge Maas noted that "jurisdictional discovery must have boundaries" and that "the Court and counsel have been mired at this preliminary stage for a considerable period of time."[7] Plaintiffs objected, but this Court overruled those objections and affirmed the order.[8]

---

[4] *See* Affidavit of Omar Binladin ("Omar Aff.") ¶ 9 and Ex. 2 (Jan. 25, 2006) (Attachment D) (noting and including recognition from the U.S. military for SBG's assistance in Saudi Arabia from 1990-98). Indeed, Plaintiffs assert that this cooperation continued *after* September 11, 2001. Affidavit of James E. Gauch ("Gauch Aff.") Ex. 15 (Aug. 11, 2010) (Attachment N) (Pls.' Resp. to Interrog. No. 1 (Nov. 7, 2008) at 14-15).

[5] Plaintiffs served jurisdictional discovery requests on SBG in April 2005, and SBG responded in August of that year. After Judge Maas issued his first order clarifying the scope of discovery, SBG provided supplemental responses in March of 2007. Following two discovery conferences before Judge Maas, SBG made a second supplemental response to new inquiries posed by Plaintiffs. While recognizing that Plaintiffs were "stretching the discovery envelope," Judge Maas allowed depositions of Philip Griffin, the sole former employee of SBG's long-defunct U.S. subsidiary, and Dr. Fuad Rihani, a consultant who works for SBG in Saudi Arabia but who also maintains a home in the United States. Order (Oct. 3, 2007) (MDL Dkt. #2042). Mr. Griffin's deposition was completed in November 2007, and Judge Maas later denied Plaintiffs' motion to reopen it. Dr. Rihani's deposition was taken before Judge Maas in April 2008.

[6] Order at 3, 5, 16 (May 21, 2008) (MDL Dkt. #2090).

[7] *Id.* at 10.

[8] Order (July 14, 2008) (MDL Dkt. #2108).

Because Plaintiffs' theories have evolved over the course of discovery, this renewed motion addresses Plaintiffs' jurisdictional theories as reflected in the contention discovery to which Judge Maas required them to respond.[9]  The Court has already rejected these same theories as legally insufficient to justify the exercise of jurisdiction over other defendants, including the chairman of SBG.  Moreover, the discovery record demonstrates that none of Plaintiffs' theories has any evidentiary support.  Accordingly, SBG seeks dismissal of all of the complaints against it in this MDL action for lack of jurisdiction.  SBG also renews its Rule 12(b)(6) motion, which Judge Casey also denied without prejudice, because the intervening decisions of the Second Circuit and the Supreme Court make clear that Plaintiffs' allegations fail to state a claim.

## ARGUMENT

## I.   THE CLAIMS AGAINST SBG MUST BE DISMISSED BECAUSE THIS COURT DOES NOT HAVE PERSONAL JURISDICTION OVER IT

The uncontradicted evidence shows that there is no basis for this Court to exercise personal jurisdiction over SBG under a specific or a general jurisdiction theory.  There is no competent evidence that SBG provided material support for terrorism of any kind, much less that it engaged in tortious conduct expressly aimed at the United States that caused injury to any plaintiff.  *See Terrorist Attacks IV*, 2010 WL 2484411, at *16.  Nor can Plaintiffs establish that SBG had substantial and continuous contacts with the United States sufficient to justify the exercise of general jurisdiction.  *Id.* at *7.

---

[9] Judge Maas permitted SBG to "serve interrogatories and document requests to elicit the information upon which the plaintiffs intend to rely in opposition to SBG's renewed motion to dismiss."  Order at 2 (Jan. 23, 2007) (MDL Dkt. #1941).  Pursuant to that Order, on July 25, 2008, SBG served discovery requests on Plaintiffs to which they responded on November 7, 2008.  Although SBG notified Plaintiffs of numerous deficiencies in their responses, *see* Gauch Aff. Ex. 1 (Letter from James E. Gauch to Robert T. Haefele (July 9, 2009)), Plaintiffs never remedied them.  The time for doing so is now long past, and on the issue of jurisdiction, Plaintiffs should be precluded from relying on any allegation or evidence not disclosed in response to discovery.

## A.   Standard of Review

On a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of showing that the court has jurisdiction over the defendant. *Id.* at *5. After jurisdictional discovery, as here, plaintiffs must prove jurisdiction by a preponderance of the evidence, *Landoil Res. Corp. v. Alexander & Alexander Servs., Inc.*, 918 F.2d 1039, 1043 (2d Cir. 1990), and may not rest on their allegations but must instead "make affirmative proof." *Boit v. Gar-Tec Prods., Inc.*, 967 F.2d 671, 675 (1st Cir. 1992); *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990) (allegations must be "factually supported"), *cert. denied*, 498 U.S. 854 (1990). Deeming plaintiffs' allegations as true, as would be done before discovery, is an "elementary mistake." *Boit*, 967 F.2d at 675.

The Court may grant a motion to dismiss on the papers if Plaintiffs fail to offer factual support for their *prima facie* case of jurisdiction. "[T]he plaintiff is obliged to come forward with evidence creating a genuine issue of fact material to the existence of personal jurisdiction." *Melnick v. Adelson-Melnick*, 346 F. Supp. 2d 499, 503 (S.D.N.Y. 2004); *see also Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981) (plaintiff must make *prima facie* case "through its own affidavits and supporting materials"). A plaintiff meets that burden, such that an evidentiary hearing is required, only "if the plaintiff presents sufficient evidence to defeat a motion for [a] directed verdict." *Cable/Home Comm. Corp. v. Network Prods.*, 902 F.2d 829, 855 (11th Cir. 1990) (quotation omitted); *accord Melnick*, 346 F. Supp. 2d at 502-03.[10]

---

[10] That evidence must be admissible. *See Gilbert, Segall & Young v. Bank of Montreal*, 785 F. Supp. 453, 461 n.4 (S.D.N.Y. 1992) (in considering jurisdictional allegations, court should consider "competent evidence" such as affidavits); *Dr. Beck & Co. G.M.B.H. v. Gen. Elect. Co.*, 210 F. Supp. 86, 92 (S.D.N.Y. 1962) ("On a motion to dismiss for lack of jurisdiction, the court may only consider evidence which would be of testimonial value at a trial"), *aff'd*, 317 F.2d 538 (2d Cir. 1963). Therefore, hearsay and affidavits not based on personal knowledge are properly excluded. *Ariel Maritime Group, Inc. v. Javelin Lines*, No. 88 Civ. 6447, 1989 WL 31665, at *2 n.4 (S.D.N.Y. Mar. 29, 1989) ("[H]earsay evidence submitted by a plaintiff is not sufficient to defeat a motion to dismiss for lack of personal jurisdiction"); *accord Standard Enterprises, Inc. v. Bag-It, Inc.*, 673 F. Supp. 1216, 1219 (S.D.N.Y. 1987); *Geo-Physical Maps, Inc. v. Toycraft*, 162 F. Supp. 141, 147 (S.D.N.Y. 1958).

Plaintiffs cannot meet the evidentiary burden required to establish a *prima facie* case of personal jurisdiction.  Their discovery responses show that they do not have, and never had, any admissible evidence to support the allegations against SBG.  The Court should therefore dismiss this action on the moving papers.  If the Court finds, however, that there is any genuine dispute of fact on an issue material to jurisdiction, it should schedule an evidentiary hearing at which Plaintiffs must prove the existence of jurisdiction by a preponderance of the evidence.

### B.   Plaintiffs cannot establish specific jurisdiction over SBG for claims arising out of the September 11 attacks

Plaintiffs do not claim that SBG participated in any way in the September 11 attacks or provided contemporaneous support to the perpetrators or to any terrorist act.  Instead, they claim that SBG engaged in conduct outside the United States that somehow benefited al Qaeda and that any such conduct – no matter how temporally, geographically, or causally remote from the September 11 attacks – must necessarily constitute conduct that is "purposefully directed"  at the United States.  Both this Court and the Second Circuit have already rejected that theory in this case and set out Plaintiffs' burden:  Plaintiffs must show that defendants "'expressly aimed' intentional tortious acts at residents of the United States," *In re Terrorist Attacks on September 11, 2001*, 538 F.3d, 71, 95 (2d Cir. 2008) ("*Terrorist Attacks III*") (quoting *Calder v. Jones*, 465 U.S. 783, 789 (1984)), and that their injuries "'arise out of or relate to' those activities."  *Id.* at 93 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472-73 (1985)).  Put differently, "a defendant's alleged intentional tortious conduct aimed at the United States is conduct that is intended to directly aid in the commission of a terrorist act, with knowledge that the brunt of the injuries will be felt in the United States."  *Terrorist Attacks IV,* 2010 WL 2484411, at *16.[11]

---

[11] The Second Circuit's decision is consistent with the Supreme Court's long-established constitutional limits on specific jurisdiction.  "The Due Process Clause protects an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful contacts, ties, or relations."

Although Judge Casey likely would not have ordered jurisdictional discovery if he had the benefit of the Second Circuit's ruling,[12] that discovery now demonstrates conclusively that Plaintiffs cannot satisfy this standard with respect to SBG.

### 1. None of the four factual claims on which Judge Casey ordered jurisdictional discovery supports specific jurisdiction over SBG

Plaintiffs put numerous claims before Judge Casey regarding SBG's supposed connections to al Qaeda – including simply the family name[13] – but Judge Casey identified only four that he believed warranted "limited" discovery "to determine if SBG purposefully directed its activities at the United States." *Terrorist Attacks I*, 349 F. Supp. 2d at 822.  He did so in part on the grounds that "'allegations that are unclear due to lack of specificity are more appropriately clarified by discovery'" rather than a Rule 12(e) more definite statement.  *Id.* (quoting *Asip v. Nielsen Media Research, Inc.*, No. 03 Civ. 5866, 2004 WL 315269, at *2 (S.D.N.Y. Feb. 18, 2004)).  The four topics were: (1) whether OBL was still listed in SBG corporate records; (2) whether SBG provided construction support to OBL in the Sudan; (3) whether a "branch" of SBG "took in" a supposed al Qaeda operative, Mohammad Jamal Khalifa; and (4) SBG's alleged ties to Yassin al-Kadi.  *See id.*

_____
(continued…)

*Burger King*, 471 U.S. at 471-72 (internal quotation marks omitted).  Thus, when "a forum seeks to assert specific jurisdiction over an out-of-state defendant who has not consented to suit there, this . . . requirement is satisfied if the defendant has 'purposefully directed' his activities at residents of the forum, and the litigation results from alleged injuries that 'arise out of or relate to' those activities."  *Id.* at 472-73 (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774 (1984) and *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984)).

[12] Judge Casey assumed that allegations of any support to al Qaeda anywhere in the world after it began publicly targeting the United States were sufficient to establish specific jurisdiction, a standard that the Second Circuit ultimately rejected.  *See Terrorist Attacks I*, 349 F. Supp. 2d at 826.

[13] *See* Gauch Aff. Ex. 18 (Hr'g Tr. 44:18-20 (Oct. 12, 2004)) (comment by Plaintiff's counsel that "according to [the defendants], nobody in this courtroom has done anything, nobody ought to be here, *not even people whose names are Bin Laden*") (emphasis added).

### a. Plaintiffs have no evidence to dispute that OBL was involuntarily removed as an SBG shareholder effective in 1993 and received no compensation for his shares

Although Plaintiffs have repeatedly claimed that OBL's "name is still listed in [SBG's] corporate records," *Ashton* 6AC ¶ 412; *cf. Terrorist Attacks I*, 349 F. Supp. 2d at 821, the odd phrasing of the allegation is telling.[14]  OBL's name is "listed" in SBG's historical "corporate records" because OBL was one of 20 original shareholders of SBG when it was formed in 1989. Even if OBL remained a shareholder at the time the complaints were filed, it would have no jurisdictional significance because mere shareholdings cannot support specific jurisdiction.  *See Terrorist Attacks IV,* 2010 WL 2484411, at *23 (rejecting jurisdiction over three defendant banks in which OBL was alleged to be a shareholder).  But the undisputed evidence shows that OBL was removed as a shareholder effective in June 1993, that he received no compensation for those shares, and that he has received no distributions or benefits from SBG since that time.

Plaintiffs have persistently refused to acknowledge these facts, yet they have no evidence to justify any claim to the contrary.  When asked in discovery in 2008 – six years after the complaints were filed – to produce any evidence that OBL remained a shareholder of SBG, Plaintiffs' evasive response was that they "continue to investigate the timeliness of the original source information."[15]  Although they demanded ever-increasing discovery from SBG on OBL's status and removal as a shareholder, they later stated in discovery responses that  "Plaintiffs [sic] contentions regarding SBG's support to OBL have not been conditioned necessarily upon his

---

[14] As Judge Casey said of a similarly indirect allegation made against another defendant: "Such an allegation is not, it seems, the mere product of an inelegant pen but rather the handiwork of calculated circumlocution.  Indeed, Plaintiffs conspicuously forego any simple, straightforward statement that Saudi American Bank provided funds directly to Osama Bin Laden for the stated purpose of financing one or more of Bin Laden's own construction projects in Sudan.  The Court views this omission as a signal that Plaintiffs cannot offer such an averment in good faith."  Memorandum & Order at 3 (Jan. 23, 2007) (MDL Dkt. # 1942).

[15] Gauch Aff. Ex. 15 (Pls.' Resp. to Interrog. No. 8 (Nov. 7, 2008) at 32).

status as an SBG . . . shareholder."[16]  When asked whether they contend, and have any evidence

to prove, that OBL received any payment or other consideration for his shares in SBG, Plaintiffs'

non-answer was that, because they supposedly lack certain information, "there is no indication

that OBL was divested from the companies."[17]

In fact, however, Plaintiffs have received detailed discovery on these issues, which they

have chosen to ignore because it undermines their claims.  The undisputed facts are as follows.[18]

At a meeting on or about January 17, 1993, the board of directors of the Mohammad Binladin

Company ("MBC") adopted a resolution prohibiting the payment to OBL of any profits, property

or shares from MBC or any other related company in which he was a shareholder unless he

personally returned to Saudi Arabia to receive the payment.[19]  They took this step more than five

years before the United States designated OBL as a terrorist[20] because of OBL's increasingly

strident criticism of the Saudi government, which was an important client of both SBG and MBC.

A few months later, SBG's shareholders adopted a resolution to remove OBL as a shareholder in

SBG.  The resolution was submitted, as required by Saudi corporate law, to the Ministry of

---

[16] Gauch Aff. Ex. 15 (Pls.' Resp. to Interrog. No. 10 (Nov. 7, 2008) at 33).

[17] Gauch Aff. Ex. 15 (Pls.' Resp. to Interrog. No. 11 (Nov. 7, 2008) at 33).

[18] Except where noted, this account is supported by the Supplemental Affidavit of Bakr Binladin ("Bakr Suppl. Aff.") ¶¶ 3-14 (June 2, 2010) (Attachment A).  The substance of that affidavit was previously provided to Plaintiffs in SBG's supplemental interrogatory responses provided in response to Judge Maas's discovery orders. *See* SBG Second Supp. Resp. and Obj. to Pls.' First Set of Interrog. (Sept. 13, 2007) at 10-21.

[19] MBC is the successor to the Mohammad Binladin Organization, which was founded by the patriarch of the Binladin family in the 1930s.  Like SBG, it is owned by individual members of the Binladin family, many of whom are also SBG shareholders.  Bakr Binladin is the chairman of both MBC and SBG.  Because SBG has no board of directors, there was no comparable meeting at SBG, but Bakr, who raised the issue at the MBC board meeting, also ensured that SBG complied with this directive.  Bakr Suppl. Aff. ¶ 3.

[20] The United States first placed OBL on its list of designated terrorist individuals and organizations on August 20, 1998.  *See* Gauch Aff. Ex. 19 (Exec. Order No. 13099, 63 Fed. Reg. 45,167 (Aug. 25, 1998)).  *See also* Nat'l Comm'n on Terrorist Attacks Upon the U.S., The 9/11 Commission Report 108 (2004), *available at* http://govinfo.library.unt.edu/911/report/911Report.pdf (last visited Aug. 11, 2010) ("Until 1996, hardly anyone in the U.S. government understood that Usama Bin Ladin was an inspirer and organizer of the new terrorism.").  This Court noted that OBL declared the United States as al Qaeda's main enemy in 1996.  *Terrorist Attacks IV*, 2010 WL 2484411, at *1; *cf. Burnett* Third Amended Complaint (Burnett 1616 Dkt. #29) ("*Burnett* 3AC") ¶ 453 (alleging OBL announced his intention to target United States personnel in Saudi Arabia in August and November of 1996).

Commerce and, after further revision made in order to comply with Shariah law, was approved by that Ministry in March 1994,[21] executed by representatives of the shareholders on May 2, 1994,[22] and a summary was published in the Saudi media on May 5, 1994.  The Ministry of Commerce subsequently confirmed that the effective date of OBL's removal as a shareholder was June 16, 1993, the date of the initial shareholder resolution.

The undisputed evidence further shows that OBL received nothing directly or indirectly in connection with his involuntary removal as a shareholder.[23]  OBL's citizenship was revoked by the Saudi government in April 1994,[24] and he was thereafter barred from owning any cash or in-kind shares in any Saudi company.[25]  Several requests were made to Saudi authorities between 1993 and 1999 seeking instructions on what to do with the value of the shares, as payment could not be made to OBL.  In early 2000, authorization was received to create an account at National Commercial Bank in the names of members of the MBC Supervisory Board.  The account was established and funded in April 2000, and remains subject to the control of Saudi authorities.  Prior to April 2000, the shares had never been monetized, as there was no reason to set aside funds until instructions were received from Saudi authorities on how and to whom the money should be paid.

Although Plaintiffs claim minor perceived inconsistencies in the contemporaneous documents, they have no evidence to challenge the essential two facts that (1) OBL was removed

---

[21] An official stamp of the Ministry office in Riyadh appears on the document showing that the resolution had been reviewed and approved on or about 18/10/1414H (March 31, 1994).  Declaration of Louay Abdulla Exs. 1 & 2 (August 10, 2010) (Attachment O).

[22] *See id.* at SBG0002573 (Ex. 1) and SBG0002574 (Ex. 2).

[23] Bakr Suppl. Aff. ¶ 10.

[24] *See* Okaz newspaper dated 26/10/1414H (April 7, 1994); Um al-Qura (Official Gazette) dated 18/11/1414H (April 29, 1994).  Certified translations are attached collectively as Gauch Aff. Ex. 2.

[25] Bakr Suppl. Aff. Ex. 10 (Letter from Ministry of Commerce to SBG (Oct. 2, 1998)).

as a shareholder of SBG in 1993 and (2) he did not receive a penny for his shares.[26]  Perhaps the
most compelling proof of these facts is the letter sent by OBL in May 1998 to Bakr Binladin
complaining bitterly that he had been deprived of his rights.[27]  Plaintiffs cannot challenge this
evidence with speculation and innuendo.  If they had any evidence, they were obliged to produce
it in discovery, which they failed to do.  OBL's former shareholding in SBG thus provides no
basis for the exercise of jurisdiction over the company.

> **b.    There is no competent evidence that SBG provided material
> support to OBL in Sudan, nor would such an allegation meet
> the Second Circuit's standard**

Plaintiffs' allegation that SBG provided construction support to OBL in Sudan has no
evidentiary support, but it also fails as a matter of law under the Second Circuit's test.  Plaintiffs
have alleged that OBL assisted SBG on the construction of the Port Sudan airport, a government-
run project that SBG was awarded in 1989 and completed in 1992.[28]  They also allege that SBG
assisted OBL's construction company, Al Hijra Construction, in building the Tahaddi Road

---

[26] Plaintiffs have never in fact alleged, either in their complaints or in discovery responses, that OBL
received any funds in connection with his removal as a shareholder.  This is doubtless because any such claim would
conflict with their original allegation that OBL remains a shareholder.  Instead, Plaintiffs have merely speculated
that, with more discovery, perhaps they will find something interesting.  *See, e.g.*, Gauch Aff. Ex. 15 (Pls.' Resp. to
Interrog. No. 11 (Nov. 7, 2008) at 33-34).  Judge Maas, however, refused to allow additional discovery, concluding
that Plaintiffs' "alleged discrepancies are fully explained by SBG in their discovery responses and the documentary
evidence that they have provided to the plaintiffs. . . .  That the facts governing the placement of the value of the
shares into a trust are complex and that some of the documents are not fully consistent does not mean that SBG has
misrepresented the process."  Order at 8-9 (May 21, 2008) (MDL Dkt. #2090).  This Court upheld Judge Maas's
decision denying further discovery.  Order (July 14, 2008) (MDL Dkt. #2108).

[27] Bakr Suppl. Aff. Ex. 11 (Letter from OBL to Bakr (May 17, 1998)).  Previously, in December 1993,
OBL had written to Bakr requesting payment of "the sums I am entitled to for my partnership with you in the
companies."  *Id.* ¶ 6 & Ex. 4.  That request was rejected in a letter dated January 6, 1994, which states, *inter alia*,
"[w]e would like also to emphasize to you that the unsatisfactory news we hear about you is directly or indirectly
adversely affecting the activities and reputation of the Company."  *Id.* ¶ 6 & Ex. 5.

[28] The project was financed by a consortium that included the Saudi government and the Arab
Development Bank.  The work was done before Sudan was designated as a state sponsor of terrorism.  *See* Gauch
Aff. Ex. 20 (Sudan Determination, Dept. of State, 58 Fed. Reg. 52,523 (Oct. 8, 1993)) (Secretary of State naming
Sudan as a state sponsor of terrorism on Aug. 12, 1993).

pursuant to a contract with the Sudanese government.[29]   Neither allegation is true, but even if there were some evidentiary basis for Plaintiffs' allegations, they would not survive under the Second Circuit's test.  The conduct alleged – employing OBL to work on a government contract for the construction of an airport in the Sudan in the 1989-92 time period – (1) is not tortious conduct, (2) cannot be characterized as "expressly aimed" at the United States, and (3) has no relationship to the September 11 attacks or to Plaintiffs' claims.[30]   Indeed, as this Court has already recognized, any "material support to al Qaeda in the early 1990's, enabling it to expand its base of operations in the Sudan, is too remote to the terrorist attacks of September 11, 2001, to confer specific jurisdiction."  *Terrorist Attacks IV*, 2010 WL 2484411, at *19.

With the benefit of discovery, the Court can see that the factual basis for these claims is as lacking as the legal grounds.  Plaintiffs produced no evidence whatsoever to support the Tahaddi Road allegation, and only inadmissible media articles to support the Port Sudan allegation.  In contrast, SBG has provided affidavits from three competent witnesses denying both allegations.[31]   Moreover, testimony from a former al Qaeda operative, Jamal al Fadl, about OBL's construction activities in the Sudan contradicts Plaintiffs' position.[32]

---

[29] *See, e.g.*, *Ashton* 6AC ¶¶ 403, 406; *Burnett* 3AC ¶¶ 145; 319-22; *Cont. Cas.* 2AC ¶¶ 339-42 & p. 354; *Federal Insurance v. Al Qaida*, No. 03-CV-6978 ("*Federal Insurance*"), First Amended Complaint (MDL Dkt. #111) ("*Fed. Ins.* FAC") ¶¶ 379-80, 385; *WTC* Compl. ¶¶ 632, 635.

[30] Judge Maas rejected further Sudan discovery, describing Plaintiffs' request seeking all documents connected to the Sudanese government as "totally beyond the pale of appropriate jurisdictional discovery."  Gauch Aff. Ex. 18 (Disc. Conf. Hr'g Tr. 44:21-22 (June 29, 2007)).

[31] *See* Omar Aff. ¶¶ 11-12; Affidavit of Mohammad Qashou ("Qashou Aff.") ¶¶ 4, 6 (Sept. 18, 2006) (Attachment F); Affidavit of Musa Dawoud Mustafa ("Mustafa Aff.") ¶¶ 3, 6 (Sept. 26, 2006) (Attachment G).

[32] Plaintiffs have previously relied on al Fadl's testimony in the U.S. Embassy bombing trial about OBL's business ventures in the Sudan.  *WTC/Euro Brokers* RICO (SBG), Ex. A at 28-29 (MDL Dkt. ##1122, 1124); *WTC/Euro Brokers* RICO (Binladins), Ex. A at 23.  When asked to identify the construction projects Al Hijra worked on in the Sudan, al Fadl identified two *road* construction projects and made no mention of the Port Sudan airport.  Gauch Aff. Ex. 3 (Test. Tr. of Jamal Ahmed Al-Fadl (Feb. 6, 2001), at 240-41 and Test. Tr. of Jamal Ahmed Al-Fadl (Feb. 7, 2001), at 351-52, *United States v. Usama Bin Laden, et al.*, No. S (7) 98 Cr. 1023 (S.D.N.Y.)).  Al Fadl also made no mention of any involvement by SBG or MBC in any of Al Hijra's construction projects.

With no evidence to support their original allegation that SBG provided construction support to OBL in Sudan, Plaintiffs have speculated that certain trips by Binladin family members to Sudan in the early 1990s might support the exercise of jurisdiction.[33]  But, as Judge Maas observed, the very evidence upon which Plaintiffs rely indicates that the purpose of the trips was "to disassociate themselves from him and his conduct, and to sever their relationships with him completely."[34]  This comports with OBL's own account, given to CNN in 1997, in which he explained that the family members who visited him in the Sudan "ask[ed him] to stop and return to Arabia to apologize to King Fahd."[35]  This Court has already dismissed all claims against Bakr Binladin despite identical allegations against him personally.[36]  None of Plaintiffs' allegations regarding Sudan, therefore, provide any basis for specific jurisdiction.

c. **There is no evidence that SBG "took in" Mohammad Jamal Khalifa, a Binladin relative, nor would the allegation, if true, support jurisdiction**

Plaintiffs also have no evidentiary support for their allegation that SBG "sheltered and directly supported operatives of the al Qaida terrorist organization" and that an al Qaeda operative "was taken in by a branch of the Saudi Binladin Group, the Mohammed Binladin Organization."[37]  In discovery, Plaintiffs confirmed that the only factual basis for these vague claims is the assertion that Mohammad Jamal Khalifa, the spouse of one of the 54 Binladin

---

[33] Although Plaintiffs pleaded such isolated contacts in their Complaint, Judge Casey did not consider them worthy of jurisdictional discovery.

[34] Order at 6 (May 21, 2008) (MDL Dkt. #2090).

[35] Gauch Aff. Ex. 21 (Tr. of CNN Interview with Osama Bin Laden (Mar. 1997)).  Plaintiffs quoted from this interview in their Complaint, *see Ashton* 6AC ¶ 402; *Burnett* 3AC ¶ 318, but omitted the reference to the purpose of the visits.

[36] *Terrorist Attacks IV*, 2010 WL 2484411, at *19.

[37] *Ashton* 6AC ¶ 408; *Burnett* 3AC ¶ 324;  *Cont. Cas.* 2AC ¶ 344; *WTC* Compl. ¶ 637;  *Salvo* Compl. ¶ 342.

children, received assistance from "a Binladin company travel department to obtain US visa and coordinate travel arrangements" in 1994.[38]

The Khalifa allegations fail to support jurisdiction over SBG for several reasons: First, this Court has already held that vague associations even with U.S.-designated terrorists – which Khalifa was not – do not support jurisdiction. *See Terrorist Attacks IV,* 2010 WL 2484411, at *22. Second, Mohammad Jamal Khalifa had no relationship whatsoever with SBG, a fact that is confirmed by an affidavit Khalifa submitted in this action before his death.[39] Mr. Khalifa's visa application was prepared by a travel office at MBC, a separate company that neither owns nor is owned by and is not a "branch" of SBG.[40] Third, there is no evidence that the routine visa assistance provided by MBC's travel office to Khalifa in August 1994 was intended to, or did in fact, provide any support to terrorist activities.[41] The MBC employee who processed the application did not communicate directly with Khalifa and he had no reason to suspect that Khalifa had any alleged ties to terrorism.[42] Fourth, there is no allegation or evidence that Khalifa – much less his travel in 1994 – had any role in any terrorist attack against the United States, and

---

[38] Gauch Aff. Ex. 15 (Pls.' Resp. to Interrog. No. 5 (Nov. 7, 2008) at 24-25, 29).

[39] Gauch Aff. Ex. 4 (Declaration of Jamal Khalifa ("Khalifa Decl.") ¶ 8 (Apr. 8, 2004) (MDL Dkt. #105) (Ex. A) ("I have no associations, past or present, with the Saudi bin Laden Group.")).

[40] Bakr Aff. ¶5 (separateness of SBG and MBC); Omar Aff. ¶7 (same); Affidavit of Eulalio Dela Paz ("Dela Paz Aff.") ¶¶ 2-4 (Dec. 1, 2005) (Attachment H) (visa assistance provided by Dela Paz as employee of MBC services office). The address listed on the visa application was an MBC post office address because there were no residential addresses in common usage in Jeddah at the time. Dela Paz Aff. ¶7.

[41] Plaintiffs allege that "Khalifa is a key figure in the al Qaida network" and has been implicated in various plots, *Fed. Ins.* RICO (SBG et al.), Ex. A at 15 (MDL Dkt. #1120), but they fail to note that Khalifa was never designated by the U.S. government as a terrorist, and that he was *acquitted* by a Jordanian court in 1995 of the only terrorism charges ever brought against him. *See* Archive of SDN List Changes from 1994 to Present, http://treas.gov/offices/enforcement/ofac/sdn/archive.shtml (last visited Aug. 11, 2010) (not listing Khalifa among designated terrorists); Gauch Aff. Ex. 5 (Decision of Court of Cassation, Case No. 412/95, Decision No. 60, Nov. 27,1995 (Jordan)) (Khalifa acquittal). Moreover, Mr. Khalifa denied under oath that he had any involvement in terrorist activities. Khalifa Decl. ¶ 7. Plaintiffs cite no evidence that SBG, MBC or anyone associated with them knew in August 1994 that Khalifa was involved in any terrorist activities or intended to assist such activities.

[42] Dela Paz Aff. ¶¶ 5, 9.

thus Plaintiffs' claims do not arise out of or relate in any way to any assistance MBC provided to Khalifa.  This Court has already dismissed claims against MBC based on Plaintiffs' concession that these very same allegations do not satisfy the Second Circuit's test.  They certainly cannot provide a basis for jurisdiction over SBG, which had no involvement in the underlying conduct.

### d.  SBG's alleged "ties to Yassin Al-Kadi" provide no basis for jurisdiction

Plaintiffs allege that an SBG executive introduced Yassin al-Kadi, later designated by the United States as a supporter of terrorism, as a potential investor to Global Diamond Resources, Inc. ("GDRI"), a company that invested in diamond mines in South Africa.[43]  While Plaintiffs falsely characterize this as SBG "vouching" for al-Kadi,[44] the material undisputed facts show that there is nothing to the allegation.  In 1997, International PCM Holdings ("IPCM"), a subsidiary of SBG's PCM division, invested $3 million in GDRI, a publicly traded corporation.[45] When GDRI ran short of cash the following year, GDRI offered one of its directors, Abu-Bakr Alakhdar (also known as Mr. Mood), a finder's fee for bringing in new investors.  Although Mood was also an employee of SBG and IPCM, neither company was aware of or consented to that arrangement.[46]  Through a neighbor, Mood was introduced to al-Kadi's New Diamond Corporation.[47]  Al-Kadi's company and a second unrelated company made investments in GDRI in late 1998, three years before the U.S. government designated al-Kadi as a supporter of

---

[43] *Ashton* 6AC ¶ 345; *Burnett* 3AC ¶ 328; *Cont. Cas.* 2AC ¶ 350;  *WTC* ¶ 641.

[44] Affidavit of Johann de Villiers ("De Villiers Aff.") ¶¶ 6-7 (Jan. 25, 2006) (Attachment I) (denying that Mr. Mood or anyone else at SBG "vouched" for Mr. Kadi or his companies).

[45] Gauch Aff. Ex. 6 (Global Diamond Resources, Inc., Annual Report (Form 10-KSB), at 33 (March 31, 1998) (showing IPCM, a subsidiary of SBG, with a 37.5% interest); Global Diamond Resources, Inc., Annual Report (Form 10-KSB), at 31 (Apr. 10, 2001) (showing IPCM with a 15% interest)).

[46] De Villiers Aff. ¶¶ 4-5.  When IPCM and the new investors learned of the fee, they vehemently objected. Mood resigned from both GDRI and IPCM, and litigation ensued.

[47] De Villiers Aff. ¶¶ 4, 6.

terrorism.[48]  GDRI nevertheless continued to struggle financially and closed its U.S. office in early 2002.[49]  Al-Kadi's company lost its entire investment.

Whether or not Mr. Mood "vouched" for al-Kadi has no jurisdictional significance because: (1) there is no evidence he was acting for SBG in doing so; (2) there is no evidence that GDRI had any involvement in any terrorist activity; (3) there is no evidence or even an allegation that New Diamond's investment in GDRI provided any benefit to al-Kadi or was used to support terrorism directed at the United States; and (4) there is no evidence that SBG or anyone else involved in the GDRI transaction knew in 1998 that al-Kadi had ties to terrorism.[50]  Moreover, this Court has already rejected jurisdiction over the Al Rajhi defendants based on mere alleged associations with designated terrorists:  "Nor do[] . . . their associations with individuals and entities designated as terrorist by the United States government . . . demonstrate that they personally engaged in tortious conduct expressly aimed at the United States."  *Terrorist Attacks IV*, 2010 WL 2484411, at *22.

### 2.    *Plaintiffs can identify no other basis for specific jurisdiction*

As demonstrated above, the four allegations on which Judge Casey authorized jurisdictional discovery have no evidentiary support and cannot, in any event, survive under the

---

[48]  Al-Kadi was not so designated until after the September 11 attacks.  *See* Gauch Aff. Ex. 16 (OFAC Actions for October 12, 2001).  Al-Kadi has vigorously contested his designation.  *See Kadi v. Geithner*, No. 1:09-cv-00108-JDB (D.D.C. filed Jan. 16, 2009).

[49]  De Villiers Aff. ¶¶ 10-11.  After Mr. al-Kadi was designated in October 2001, the U.S. Government barred any transfer of his company's shares in GDRI.  *Id.* ¶ 9.  Shortly thereafter, the company became defunct.

[50]  Indeed, al-Kadi himself has vehemently denied those ties and has contested the charge vigorously in courts in the United States and elsewhere in the world.  He succeeded in having his name removed from the terrorist lists maintained by the United Kingdom and has had proceedings against him dismissed in several other European nations.  Gauch Aff. Ex. 17 (Request for Judicial Notice, *Kadi v. Geithner*, 1:09-cv-00108-JDB (D.D.C. June 22, 2010) (Dkt. #42); Declaration of Daniel L. Brown, Esq. in Opposition to Motion to Dismiss, *Kadi v. Geithner*, 1:09-cv-00108-JDB (D.D.C. Aug. 14, 2009) (Dkt. #27)).  Moreover, his company was represented in the GDRI investment by the prominent law firm of Sidley & Austin, *see* Gauch Aff. Ex. 6 (Global Diamond Resources, Annual Report (Form 10-KSB), Ex. 10.5 at 23 (Nov. 22, 1999)), a firm which doubtless would not have taken on the representation had it any basis in 1998 to believe that al-Kadi was supporting terrorists.

Second Circuit's jurisdictional test.  Plaintiffs have no other grounds to support specific jurisdiction over SBG.  Amongst the mass of irrelevant allegations recited, without supporting details, in Plaintiffs' interrogatory responses, the only other allegation that they even attempt to tie to SBG pertains to the conduct not of SBG but of a separate company that Plaintiffs describe as an "affiliate:"

> In 2000, SBG, through its financial affiliate, Cambridge Engineering, transferred 240 M Euros from its account held at Deutsche Bank in Switzerland to Pakistani bank accounts held jointly by OBL and a Pakistani national.[51]

This spectacular claim would be worthy of headlines were it true.  But despite demands in discovery, Plaintiffs have not identified a single witness or produced a shred of admissible evidence to support it.  And the evidence refuting this claim is overwhelming, as the facts below demonstrate.

In the immediate aftermath of the September 11 attacks, the U.S. Department of Justice ("DoJ") sent a request to Swiss authorities seeking information about any transfers that may have been made to OBL from accounts in the names of Cambridge Engineering or SBG.[52]  The letter did not mention any amount, nor did it refer to accounts in Pakistan.  The Swiss authorities took sworn testimony from Yves Bruderlein, a director of Cambridge Engineering, who denied that Cambridge had any connection to OBL or al Qaeda.[53]  Mr. Bruderlein provided account records to back up his testimony and authorized the release of his statement to U.S. authorities.  Mr.

---

[51] *See* Gauch Aff. Ex. 15 (Pls.' Resp. to Interrog. No. 2 (Nov. 7, 2008) at 20); *WTC* Compl. ¶¶ 658-59; *Eurobrokers* RICO (SBG), Ex. A at 10-11, 32 (MDL Dkt. #1122); *WTC* RICO (SBG) at 10-11, 32 (MDL Dkt. #1124).

[52] *See* Gauch Aff. Ex. 22 (Letter from Mary Ellen Warlow, Dir., Office of Int'l Affairs, Criminal Div., U.S. Dep't of Justice, to Giorgio Bomio, Div. of Int'l Legal Assistance, Fed. Office of Justice, Switz. (Sep. 20, 2001)) ("Warlow Req.").

[53] *See* Affidavit of Yves Bruderlein ("Bruderlein Aff.") ¶¶ 9, 12 (Jan. 24, 2006) (Attachment J).

Bruderlein has also categorically denied the allegations in an affidavit submitted in this action.[54] The Swiss closed their investigation into Cambridge without bringing any charges, and the U.S. government also took no action.  In the ensuing nine years, not a single Cambridge or SBG account has been frozen or seized, nor has anyone ever been charged, for the simple reason that no such payment ever took place.[55]

Plaintiffs' only "evidence" to the contrary are inadmissible media articles quoting their own paid consultant, Jean-Charles Brisard, for the proposition that the French authorities opened an investigation in 2004 into the same discredited allegations.[56]  Mr. Brisard is identified as the source of the allegations prompting the French investigation which, in any event, has resulted in no charges in the subsequent five years.  Despite discovery demands calling for the information, Plaintiffs have not even identified Mr. Brisard as a person with knowledge regarding the alleged payments, let alone have they produced any other evidence or information supporting his media statements.[57]  They have also failed to produce their copy of Mr. Bruderlein's Swiss testimony,

---

[54] *See* Bruderlein Aff. ¶ 10 and Ex. 1 at 3.  In his affidavit, Mr. Bruderlein stated:

> There has never been any transfer from Cambridge Engineering bank accounts of any amount to any account in Pakistan.  There has never been any transfer of any amount to any account in the name of Osama Bin Laden or any person or entity whom I had any reason to believe was associated with him or with al Qaeda.  Plaintiffs' allegation that $300 million (or any other amount) was transferred through the Deutsche Bank accounts in 2000 to accounts in Pakistan "belonging jointly to Osama Bin Laden and a person of Pakistani nationality" is completely false.

Bruderlein Aff. ¶ 9.

[55] *See* Bruderlein Aff. ¶ 13 (stating that Swiss investigation was closed and that U.S. government made no follow-up to him).  Significantly, the September 11 Commission, which had access to extensive government investigative materials and carefully traced the sources of OBL's and al Qaeda's financing, made no mention of any such transfer, even though it is many times larger than any source of funding it identified.  Nat'l Comm'n on Terrorist Attacks Upon the U.S., The 9/11 Commission Report (2004), *available at* http://govinfo.library.unt.edu/911/report/911Report.pdf (last visited Aug. 11, 2010).

[56] *See e.g.*, Gauch Aff. Ex. 23 ("French Judge Broadens Investigation Into Transfers of Bin Ladin Family Funds," *Le Monde* (Dec. 26, 2004) (describing the ongoing French investigation of Yeslam Bin Laden's banking history and quoting Brisard as the source for allegations that "241 million euros was transferred to Pakistan in 2000 from an account opened at Deutsche Bank . . . belonging to the Cambridge Company, a subsidiary of SBG")).

[57] Mr. Brisard is neither a competent nor a credible witness on this or any other matter related to this litigation.  *See* Memorandum in Support of Motion to Supplement Motions to Dismiss of Defendant Khalid

which they purported to quote in RICO statements filed in 2005, but in a manner that transformed Mr. Bruderlein's denials into admissions.[58]   It is apparent that this allegation was manufactured out of whole cloth by Plaintiffs and their paid investigator.  It is a basis for sanctions against Plaintiffs, not jurisdiction over SBG.

### 3.   *Plaintiffs cannot establish jurisdiction under a conspiracy theory*

As this Court has already held, Plaintiffs' pleading deficiencies "cannot be overcome simply by alleging that defendants were part of a conspiracy."  *Terrorist Attacks IV,* 2010 WL 2484411, at *22.  The Second Circuit expressly held that Plaintiffs' "concerted action theory of liability" was jurisdictionally insufficient under the Due Process Clause.  *Terrorist Attacks III*, 538 F.3d at 94.  Moreover, as Judge Casey held, "[t]o establish personal jurisdiction on a conspiracy theory, Plaintiffs must make a *prima facie* showing of conspiracy [and] allege *specific facts* warranting an inference that the defendant was a member of a conspiracy[,]" and that the co-conspirators in New York, [here, the September 11 hijackers] "acted 'at the direction or under the control' or 'at the request of or on behalf of' the out-of-state defendant."  *Terrorist Attacks I*, 349 F. Supp. 2d at 805 (emphasis supplied) (quoting *Chrysler Capital Corp. v. Century Power Corp.*, 778 F. Supp. 1260, 1268-69 (S.D.N.Y. 1991)).  Plaintiffs do not allege, nor can they prove by competent evidence, anything of the kind here.

---

(continued…)

Bin Mahfouz (Oct. 5, 2006) (MDL Dkt. #1904) (attaching witness statement signed by Mr. Brisard in which he explains in detail how his prior assertions regarding Mr. Bin Mahfouz are "entirely and manifestly false").  For example, Mr. Brisard claimed that he had been "'commissioned' by the [U.N.] Security Council or by the President of the Council" to prepare a report on terrorism for that body.  Gauch Aff. Ex. 7 (Letter from Alfonso Valdivieso to Kendall Freeman (March 12, 2004)).  The then President of the Council, however, repudiated that claim and stated that "Mr. Brisard's conduct and attitude is totally deceitful and marked by the intention to mislead."  *Id.*

[58]   *See* Bruderlein Aff. ¶ 12 and Ex. 1 at 3.  Plaintiffs' selective use and misquotation of Mr. Bruderlein's Swiss testimony is detailed in the motion to dismiss to which that affidavit was originally attached as well as in Mr. Bruderlein's affidavit itself.  *See id.*; Mem. In Support of Defs. Bakr Binladin, Omar Binladin, Tariq Binladin, Mohammad Binladin Company, and Binladin Group International Company Ltd.'s Mot. to Dismiss at 6-7 (Jan. 27, 2006) (MDL Dkt. #1645).

C.     **Plaintiffs have no basis to assert general jurisdiction over SBG**

The prerequisites for general jurisdiction are even higher than those for specific jurisdiction.  *Terrorist Attacks IV*, 2010 WL 2484411, at *7.  As a matter of fundamental fairness, due process demands substantial presence in the United States that is "continuous and systematic as of the time of the commencement of the litigation."  *Id.*; *accord Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416 (1984).[59]  This is especially true in the context of foreign companies such as SBG:  "[g]reat care and reserve should be exercised when extending our notions of personal jurisdiction into the international field."  *Asahi Metal Indus. Co. v. Superior Court of Cal., Solano County*, 480 U.S. 102, 115 (1987).  The necessary "continuous" and "substantial" contacts must therefore "approximate physical presence."  *In re Ski Train Fire in Kaprun, Austria on Nov. 11, 2000*, 257 F. Supp. 2d 717, 729-30 (S.D.N.Y. 2003) (citing *Gates Learjet Corp. v. Jensen*, 743 F.2d 1325, 1331 (9th Cir. 1984)).  Plaintiffs here have shown nothing of the kind.

1.     *SBG did not and does not have continuous and systematic contacts with the United States sufficient to justify personal jurisdiction*

a.     **SBG has no presence and does no business in the United States**

SBG is a Saudi corporation with headquarters in Jeddah.  It is one of the largest construction and engineering companies in the Middle East, but it has no operations of any kind in the United States and has not undertaken any construction or engineering projects in the United States.  SBG had tens of thousands of employees at the time the *Burnett* action was filed and approximately 90,000 employees currently, but not one of them is or was assigned to work

---

[59] Plaintiffs have elsewhere argued that alien defendants have no right to invoke the due process limitations on personal jurisdiction.  *Helicopteros* establishes the opposite.  It is "too solidly entrenched to be questioned" that foreign entities "have all the rights of U.S. citizens" to object to personal jurisdiction.  *Afram Export Corp. v. Metallurgiki Halyps, S.A.*, 772 F.2d 1358, 1362 (7th Cir. 1985).  Demonstrating that, the Second Circuit applied minimum contacts analysis to alien defendants in this very case, *see Terrorist Attacks III*, 538 F.3d at 93, as did this Court as well, *see Terrorist Attacks IV*, 2010 WL 2484411, at *6.

in the United States.[60]  SBG has no office in the United States, nor, at the time the complaints were filed, any subsidiaries with offices in the United States.  And SBG had no direct sales or distributors in the United States.[61]  Plaintiffs have offered no evidence to dispute any of these facts.

> **b.    Jurisdiction cannot be premised on SBG's defunct one-man subsidiary, SBG-USA**

In response to SBG's original motion to dismiss, Plaintiffs made numerous unsubstantiated claims regarding U.S. contacts,[62] but Judge Casey identified only one – "SBG's presence in Maryland" – that warranted discovery.  *Terrorist Attacks I*, 349 F. Supp. 2d at 822. The post-discovery record is clear: the only office relating to SBG in Maryland was that of SBG-USA, a separate subsidiary that ceased to exist at the end of 1999, nearly three years before the complaints here were filed.  For this reason, consistent with this Court's prior decision, the existence of SBG-USA is irrelevant to jurisdiction.  *See Terrorist Attacks IV*, 2010 WL 2484411, at *13 ("Neither NCB's office or that of its claimed subsidiary was in existence at the time Plaintiffs commenced their actions, and accordingly cannot be relied upon as a basis to demonstrate NCB's presence for purposes of general jurisdiction."); *see also id.* at *7 (dismissing Abdullah Binladin because his "contacts with the United States ceased to exist prior to the commencement of the cases against him, and even prior to the terrorist attacks of 9/11").

---

[60] Affidavit of Azad Iqbal ("Iqbal Aff.") ¶¶ 2-3 (June 30, 2010) (Attachment L).

[61] *Id.* ¶ 3.  Even taking SBG's subsidiaries into account, the only U.S. sale during the period for which Judge Maas allowed discovery was a single sale of marble worth $13,500 by one of SBG's Saudi subsidiaries, Marble & Granite, in October 2001.

[62] Plaintiffs cited SBG's alleged ownership of Global Diamond Resources, its investment in Carlyle Group and other unspecified U.S. entities, and its joint ventures with U.S. companies, unidentified (and never substantiated) exports to the U.S., and participation in U.S.-Saudi business conferences in the United States, among other things. *See Ashton* Opp. Br. at 10-11; *Burnett* Opp. Br. at 9-10.

Here, the material facts are not in dispute.  On December 31, 1999, the SBG-USA board of directors adopted articles of dissolution and filed them with the State of Maryland shortly thereafter.[63]  SBG-USA's lease of office space at 1700 Rockville Pike in Rockville, Maryland, also terminated on December 31, 1999.[64]  SBG-USA soon thereafter closed its checking account.[65]  Moreover, Philip Griffin, SBG-USA's lone employee, testified that there was no successor company or employee.[66]  There is no evidence to the contrary.  Therefore, regardless of the relationship between SBG and SBG-USA, the latter cannot support the exercise of jurisdiction.

### c.    The part-time U.S. residence of a single SBG consultant does not support jurisdiction

In their four years of discovery, Plaintiffs devoted inordinate attention to a single SBG consultant,[67] Dr. Fuad Rihani, who maintains homes in Saudi Arabia and in North Carolina. Whether Dr. Rihani is an "employee," as Plaintiffs assert, or a consultant, as he testified, his part-time presence in the United States does not support jurisdiction.  It is well established that the fact that an employee maintains a residence within the United States and is present in the state "does not bring the corporation within the jurisdiction of New York."  *In re Commodore Int'l, Ltd. v. Transpacific Corp.*, 242 B.R. 243, 251 (S.D.N.Y. 1999); *see also Duravest, Inc. v.*

---

[63] Affidavit of Philip Griffin ("Griffin Aff.") ¶ 5 and Ex. 6 (Nov. 4, 2009) (Attachment K).

[64] Griffin Aff. ¶ 3, Exs. 3 and 4.  *See also* Gauch Aff. Ex. 8 (Griffin Dep. Tr. 55:20-21. (Nov. 15, 2007) ("I closed the office on December 31st, 1999.")).

[65] *See* Griffin Aff. ¶¶ 6-7 & Exs. 7-8.

[66] Gauch Ex. 8 (Griffin Dep. Tr. 105:1-5 ("I had no successor in the position.  They – SBG decided to close the office and not to appoint a successor or – or to rent any other space in – somewhere else in the Washington – Washington Metropolitan area.")).

[67] Mr. Rihani's role has changed over the course of the 30-plus years that he has been associated with MBC and SBG.  While he was an SBG employee in the early 1990s, he became a part-time consultant in approximately 1997 when the need for his services diminished and he decided to spend more time with his family in the United States.

*Viscardi, A.G.*, 581 F. Supp. 2d 628, 639 (S.D.N.Y. 2008).  In particular, allowing employees to live in the forum, work at home, and report to supervisors in a foreign country because those employees "were able to perform their jobs anywhere in the world" does not subject their employer to jurisdiction in the forum.  *Johnston v. Multidata Sys. Int'l Corp.*, 523 F.3d 602, 613 (5th Cir. 2008).  Indeed, this Court itself rejected jurisdiction over defendant Dallah Avco Trans-Arabia Company based on the alleged presence of a single employee within the United States. *See Terrorist Attacks IV*, 2010 WL 2484411, at *11-12.

    As demonstrated in the deposition testimony he gave before Judge Maas, Dr. Rihani is a part-time consultant for SBG whose work focuses exclusively on construction projects in the Middle East.  Dr. Rihani's principal office is at SBG headquarters in Jeddah and he is considered a bona fide resident of Saudi Arabia for tax purposes.[68]  Although born in Jordan, he was educated in the United States, became a U.S. citizen in 1972, and married a woman from North Carolina.[69]  Dr. Rihani is now 72 years old and, for family reasons, has for the past decade spent roughly half the year in the United States, telecommuting as necessary. [70]  It is undisputed that Dr. Rihani's part-time residence in the United States is a matter of personal choice and is not done at the request of or for the benefit of SBG.

---

[68] Gauch Ex. 9 (Fuad Rihani Dep. Tr. 80:12-25 (Apr. 22, 2008)).

[69] *Id*. 6:8-12; 14:12-15:12; 18:4-11; 22:15-16; 74:22-75:5.

[70] *Id.* 63:22-24 (office in Jeddah); 61:14-23 ("It is as a result of my desire to be back with my family and [SBG's] desire for me to continue working for them on important feasibility studies.  So from the time SBG was established until now, my work was, in a technical term, on call basis.  It is things they could not forecast in advance. And when the workload went down, my involvement was done and I was spending more time with my family in the United States."); 78:10-18 ("The workload was very low and this was part of the period I was on half-time assignment and I spent half of my time in the United States with the family and telecommunicated with them whenever it is needed.").

### d.     Isolated U.S. travel by SBG employees does not support jurisdiction

Plaintiffs cannot base claims of jurisdiction on the infrequent travel of SBG employees to the United States.  As demonstrated in discovery, SBG employees took only 15 trips to the United States during the three years prior to the filing of Plaintiffs' first complaint, and most of those related to attendance at international furniture fairs and professional conferences.[71]  As this Court has explained, however, "[t]o find a non-resident defendant is present in the United States, sufficient to satisfy due process, requires more than occasional trips to the United States." *Terrorist Attacks IV*, 2010 WL 2484411, at *9 (citing, *inter alia, Hoffritz for Cutlery, Inc. v. Amajac, Ltd.*, 763 F.2d 55, 57-58 (2d Cir. 1985) (finding 54 visits insufficient to support jurisdiction)); *see also Landoil*, 918 F.2d at 1045 (thirteen business trips over a period of eighteen months did not justify exercise of general jurisdiction).

### e.     SBG's support of or membership in trade associations and other professional organizations with U.S. ties does not support jurisdiction

Similarly, jurisdiction cannot be based on SBG's participation in global organizations with U.S. ties.  Membership in a trade or professional association does not constitute "transacting business" for jurisdictional purposes.  *Am. Ass'n of Cruise Passengers v. Cunard Line, Ltd.*, 691 F. Supp. 379, 380 (D.D.C. 1987) (concluding that personal jurisdiction could not be asserted based on membership in a District of Columbia trade association).[72]  Indeed, this Court rejected jurisdiction over Al Rajhi Bank and members of the Al Rajhi family premised on their ties to the U.S.-based SAAR Foundation.  *See Terrorist Attacks IV*, 2010 WL 2484411, at *12.  Nor does

---

[71] *See* Iqbal Aff. ¶ 14.

[72] *Accord Donald & Co. Sec., Inc. v. U.S. Stock Transfer Corp.*, No. 99 Civ. 9286, 2000 WL 146916 (S.D.N.Y. Jan. 21, 2000); *see also Inv. Co. Institute v. United States*, 550 F. Supp. 1213, 1217 n.6 (D.D.C. 1982) (noting that "it would surely come as a surprise to the members of the many trade associations having offices [in the forum] that their memberships counted as intrastate business for jurisdictional purposes").

attendance at meetings or participation in other activities of such an organization constitute doing business in the forum. *See Armco Steel Co., L.P. v. CSX Corp.*, 790 F. Supp. 311, 319-20 (D.D.C. 1991); *Cunard Line*, 691 F. Supp. at 380; *Philadelphia Hous. Auth. v. Am. Radiator & Standard Sanitary Corp.*, 309 F. Supp. 1053 (E.D. Pa. 1969). Such activities lack the "substantial character" necessary to warrant the imposition of general jurisdiction. *See World Wide Minerals Ltd. v. Republic of Kazakhstan*, 116 F. Supp. 2d 98, 106 (D.D.C. 2000) (finding that defendant's founding of and participation in a D.C.-based "non-profit encouraging international trade with Central Asia" was not a basis for general jurisdiction).

Plaintiffs have identified – and taken discovery from – several organizations in the United States to which they seek to tie SBG. Nothing about SBG's involvement with these organizations provides any basis for jurisdiction. The first organization, the International Road Federation ("IRF"), maintains global program centers in Geneva, Paris, and greater Washington D.C. The IRF is a leading global industry support organization "with the mission to encourage and promote development and maintenance of better, safer and more sustainable roads and road networks."[73] Its members include companies and governmental entities in over 80 countries.[74] Dr. Rihani explained that SBG joined such professional organizations in order to "know[] what is going on in the world, get[] educated, and request[] information about certain resources that we might need for other work in the Kingdom."[75] SBG is also a member of the *Riyadh office* of the U.S.-Saudi Arabian Business Council,[76] whose "mission is to foster, develop, and expand the business relationship between the United States and Saudi Arabia by promoting trade and

---

[73] Gauch Aff. Ex. 10 (International Road Federation Introduction).

[74] *Id.*

[75] Rihani Dep. Tr. 34:19-22.

[76] *Id.* 86:4-11.

investment between the two countries and contributing to the accurate depiction of the business environment within the Kingdom of Saudi Arabia."[77]  SBG's participation was directed at business within Saudi Arabia, not the United States.

Plaintiffs have also cited a third organization, the Middle East Policy Council, which SBG's consultant Dr. Rihani joined in his personal capacity at the invitation of Senator George McGovern.  This organization is dedicated to greater political and cultural understanding, not business development.[78]  Although SBG has made charitable contributions to it, Dr. Rihani does not serve on the council as a representative of SBG.[79]  None of these activities remotely suggest that SBG was thereby "doing business" in the United States.[80]

### f.    SBG's contacts with U.S. companies abroad are irrelevant to jurisdiction

Finally, it defies logic to suggest, as Plaintiffs have, that SBG's commercial ties with U.S. companies on projects outside the United States somehow subject SBG to general jurisdiction within the United States.  Numerous decisions, dating back to the Supreme Court's seminal decision in *Helicopteros Nacionales de Colombia, S.A. v. Hall*, establish that even substantial purchases and travel within the United States in connection with foreign projects cannot establish jurisdiction.  466 U.S. 408, 416 (1984).  There, the Supreme Court rejected jurisdiction over a Colombian corporation that sent a senior executive to Texas to negotiate a contract with a Texas-based joint venture to provide helicopter services for a project in Peru.  No jurisdiction was

---

[77] Gauch Aff. Ex. 11 (U.S.-Saudi Arabian Business Council Website).

[78] *See* Rihani Dep. Tr. 34:3-9.

[79] *See id.* 35:20-37:23.

[80] *See, e.g.*, *Estate of Ungar v. The Palestinian Authority*, 400 F. Supp. 2d 541, 550 (S.D.N.Y. 2005) (Attendance at business conferences "is not so continuous or permanent" as to establish general jurisdiction.  "In addition, there is no evidence in the record that [the foreign corporation] was attempting to sell its services or otherwise transact specific business at these conferences.  A review of . . . comments at the Worldwide Wireless Conference indicates that [the foreign corporation's] business efforts were focused on the Middle East, Africa and Europe, not the United States.").

found to exist even though the Colombian defendant purchased 80 percent of its fleet of helicopters in Texas and sent pilots and maintenance personnel to Texas for training and technical assistance related to that contract for service overseas.   Numerous cases within the Second Circuit and elsewhere reach similar conclusions.  *See, e.g.*, *Frontera Res. Azerbaijan Corp. v. State Oil Co. of Azerbaijan*, 479 F. Supp. 2d 376, 386-87 (S.D.N.Y. 2007) (declining to find jurisdiction under Rule 4(k)(2) where, among other things, defendant had entered into seven production-sharing contracts with United States oil companies and signed a $750 million loan agreement with a syndicate that included a United States bank), *vacated on other grounds*, 582 F.3d 393 (2d Cir. 2009).[81]  Likewise, Judge Casey already rejected, without discovery, allegations of jurisdiction against another defendant based on business allegedly done with U.S. companies in connection with overseas projects.  *See Terrorist Attacks I,* 349 F. Supp. 2d at 817 (rejecting claim that because "Mr. Aljomaih's company does business with General Motors [in the Middle East] . . . he must have had contacts with the United States").[82]

Here, once again, the material facts are not in dispute.  Plaintiffs assert that SBG has entered into joint ventures with entities such as General Electric and York International, but readily admit that those ventures concern projects in the Middle East.[83]  Similarly, Plaintiffs

---

[81] *See also Estate of Ungar*, 400 F. Supp. 2d at 551-52 ("Petitioner cannot be subjected to general jurisdiction in New York, or even the United States as a whole, based on occasional contracts to provide services outside of the United States."); *see also BP Chems. Ltd. v. Formosa Chem. & Fibre Corp.*, 229 F.3d 254, 261 (3d Cir. 2000) (finding no basis for jurisdiction where Taiwanese corporation "availed itself of the assistance of eight U.S. based companies who solicited its business in Taiwan in order to build a plant in Taiwan"); *Mantello v. Hall*, 947 F. Supp. 92, 98 (S.D.N.Y. 1996) ("[T]he mere existence of a business relationship with entities within the forum state is insufficient to establish presence.").

[82] Plaintiffs have also cited a few advertisements published in U.S. media between 1989 and 1994.  Gauch Aff. Ex. 15 (Pls.' Resp. to Interrog. No. 1 at 7).  But those advertisements related to projects undertaken in the Middle East, and were last published eight years before the complaints were filed.  Gauch Aff. Ex. 24.

[83] Gauch Aff. Ex. 15 (Pls.' Resp. to Interrog. No. 1 at 14 (claiming that the York International joint ventures, for example, "provided air conditioning and heating management, service and sales in the Middle East")).

point to SBG's performance of contracts for the U.S. government in the Middle East.[84]  None of these projects constitutes doing business in the Unites States or provides any other basis for the exercise of general jurisdiction.

### 2.      Jurisdiction over SBG cannot be based on the activities of other corporations

Plaintiffs attempt to attribute the contacts of certain U.S. companies to SBG, but those efforts fail as a matter of law.  As this Court recognized, having investments in the United States is not a basis for jurisdiction.  *See Terrorist Attacks IV*, 2010 WL 2484411, at *8, 10, 11.  Even the presence of a wholly owned local subsidiary would not necessarily "create jurisdiction over a related, but independently managed, foreign corporation."  *Id.* at *11 (quoting *Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.*, 751 F.2d 117, 120 (2d Cir. 1984)); *see also Jazini v. Nissan Motor Co.*, 148 F.3d 181, 184-85 (2d Cir. 1998).  Generally, "nearly identical ownership interests" are an "essential," though not sufficient, condition "before one corporation can be considered a department of another corporation for jurisdictional purposes."  *Volkswagenwerk*, 751 F.2d at 121.  Yet even then, "[e]xcept in exceptional circumstances . . . , the law respects separate corporate identities even where one corporation may wholly own another . . . ."  *Giar v. Centea*, No. 02 Civ. 7916, 2003 U.S. Dist. LEXIS 6383, *6 (S.D.N.Y. Apr. 16, 2003), *aff'd*, No. 03-7546, 2004 U.S. App. LEXIS 1451 (2d Cir. Jan 29, 2004) (internal quotation omitted).  Therefore, the U.S. contacts of affiliated companies will not confer jurisdiction where "there are no factual allegations pled to establish that such companies are mere shells and are in fact the alter egos of" the defendant.  *Terrorist Attacks IV*, 2010 WL 2484411, at *10.

---

[84] Plaintiffs claim that SBG has performed contracts valued at $40 million for the U.S. military between 2001 and 2007.  Gauch Aff. Ex. 15 (Pls.' Resp. to Interrog. No. 1 at 14-15).

Here, Plaintiffs rely not on the activities of wholly owned subsidiaries but on SBG's indirect *minority* stakes in three U.S. companies, two of which were defunct by the time the first complaint was filed.  As demonstrated below, Plaintiffs cannot show "nearly identical ownership interests," *Volkswagenwerk*, 751 F.2d at 121, much less the exercise of "pervasive control." *Terrorist Attacks IV*, 2010 WL 2484411, at *11.

### a.    Techmaster Inc.

SBG indirectly owns a minority beneficial interest in Techmaster Inc., a New Jersey corporation that provides engineering and procurement services primarily for projects in the Middle East.  Effectively conceding that ownership is not "nearly identical," Plaintiffs describe Techmaster not as SBG's alter ego but as a company controlled by the Sarkissians, a wealthy Lebanese family with business and investments all over the world.[85]  Although Henry Sarkissian was also an executive and part-owner of an SBG affiliate (Arabian Bemco Contracting Co. Ltd. ("Bemco")),[86] there is no evidence nor any reason to believe that he served on the Techmaster board as a representative of SBG, rather than as a representative of his own investment in the company.[87]  In any event, as the Second Circuit has held, mere overlap in officers or directors does not nullify the well-established jurisdictional separateness of distinct companies.  *See Jazini*, 148 F.3d at 184-85 (rejecting reliance on allegation of overlapping directors between foreign parent and domestic subsidiary); *Ski Train*, 342 F. Supp. 2d at 216.[88]

---

[85] Gauch Aff. Ex. 12 (Letter from Robert Haefele to Michael Gurdak (Mar. 9, 2006)) at 17 (naming Techmaster as one of several "Sarkissian family related companies in the US"); *see also* Gauch Aff. Ex. 8 (Griffin Dep. Tr. 73:22-74:1 (". . . Mr. Sarkissian and his family were the controlling element of Techmaster International – Techmaster Engineering International . . .")).

[86] Gauch Aff. Ex. 8 (Griffin Dep. Tr. 72:11-13).

[87] A former employee of Bemco also became a director of Techmaster in 2002, but he had left Bemco four years before.  *See* Iqbal Aff. ¶ 12.

[88] For the same reason, it also has no significance that SBG affiliates and Techmaster occasionally referred to each other as "affiliated companies."  *See WLC, LLC v. Watkins*, 454 F. Supp. 2d 426, 434 (M.D.N.C. 2006)

Apart from the distinct ownership and management, SBG's relationship with Techmaster would not support jurisdiction because, as Plaintiffs conceded in discovery, Techmaster's occasional services for SBG related to procurement of equipment for "new Mideast projects" or other work in the Mideast.[89]   The Supreme Court held in *Helicopteros* that general jurisdiction cannot be based on purchasing goods in the United States for use abroad.  *Estate of Ungar*, 400 F. Supp. 2d at 551-52 ("Petitioner cannot be subjected to general jurisdiction in New York, or even the United States as a whole, based on occasional contracts to provide services outside of the United States"); *see also BP Chems. Ltd. v. Formosa Chem. & Fibre Corp.*, 229 F.3d 254, 261 (3d Cir. 2000) (finding no basis for jurisdiction where Taiwanese corporation worked with eight U.S. based companies to build a plant in Taiwan); *Mantello v. Hall*, 947 F. Supp. 92, 98 (S.D.N.Y. 1996) ("[T]he mere existence of a business relationship with entities within the forum state is insufficient to establish presence.").

Accordingly, Judge Maas rejected further jurisdictional discovery on Techmaster because, "even if I accept [Plaintiffs' counsel's] representations at face value, they do not suggest a basis for jurisdiction over SBG."[90]   This Court later endorsed that ruling, when Plaintiffs again raised the issue of further discovery regarding Techmaster and other issues, on the grounds that "[t]he

---

(continued…)

(rejecting attribution of jurisdictional contacts of one company to another where they were merely described as part of "a network of affiliated companies" on a website).

[89] Gauch Aff. Ex. 13 (Endorsed Letter from Robert Haefele to Judge Maas (July 26, 2007)) at 3.  Plaintiffs' Interrogatory Responses also cite an invoice for JEDAC, a joint venture between SBG and General Electric in Saudi Arabia.  Gauch Aff. Ex. 15 (Pls.' Resp. to Interrog. No. 1 at 11).  But that invoice pertains to parts being delivered *to the Middle East* for projects *in the Middle East*.

[90] Order (July 26, 2007) (MDL Dkt. # 1988).

limitation imposed by the magistrate judge was entirely reasonable given that Plaintiffs have now engaged in three and a half years of 'limited jurisdictional' discovery."[91]

### b. Global Diamond Resources, Inc.

Plaintiffs also cite SBG's indirect minority stake in GDRI, a now-defunct publicly traded Nevada corporation.  SEC filings show that IPCM, an SBG subsidiary organized in the British Virgin Islands, never held more than a 37.5% stake in GDRI and appointed at most a third of the company's directors.[92]  Other independent companies held comparable stakes and board representation.[93]  Even if IPCM's investment could be attributed to SBG for jurisdictional purposes – and it cannot – its interest in GDRI is far short of what is necessary to disregard corporate separateness between GDRI and IPCM.  *See Jazini*, 148 F.3d at 184-85.  In any case, GDRI is jurisdictionally irrelevant for the separate reason that it shut down its U.S. operations in the first half of 2002, before the complaints in this action were filed.[94]  Plaintiffs have submitted no evidence to the contrary.

### c. Iridium LLC and Iridium Middle East

Even farther afield, Plaintiffs cite SBG's small, indirect interest in Iridium LLC, a bankrupt satellite telephone company based in the United States.  SEC filings demonstrate that

---

[91] Order (July 14, 2008) (MDL Dkt. #2108).

[92] In 1997 an SBG subsidiary, IPCM, invested $3 million in GDRI, which gave IPCM a 37.5% ownership interest and the right to appoint three directors to GDRI's nine-member Board of Directors.  Gauch Aff. Ex. 6 (Global Diamond Resources, Inc., Annual Report (Form 10-KSB), at 33 (March 31, 1998)).  In 1998, two new companies invested in GDRI, diluting IPCM's ownership interest and decreasing its presence to two directors on an expanded eleven-member board.  Gauch Aff. Ex. 6 (Global Diamond Resources, Inc., Annual Report (Form 10-KSB), at 2 (Nov. 22, 1999)).  By the end of 2000, IPCM's stake had decreased to 15% of GDRI stock.  Gauch Aff. Ex. 6 (Global Diamond Resources, Inc., Annual Report (Form 10-KSB), at 31 (Apr. 10, 2001)).

[93] *Id.* (explaining that LIWA Diamond Company Ltd. and New Diamond Holdings Ltd. at the end of 2000 had 15.8% and 13.9% shareholdings respectively in GDR, and just like IPCM, each had two directors on the eleven-member board).

[94] De Villiers Aff. ¶ 10.

SBG indirectly held only a tiny stake – barely more than 2% – in Iridium.[95]  As this Court has held, investments in U.S. companies are not grounds for jurisdiction, *see Terrorist Attacks IV*, 2010 WL 2484411, at *8, 10, 11, and in any case Iridium went bankrupt in August 1999, three years before the complaints here were filed.[96]

Plaintiffs also seek to ascribe to SBG the U.S. contacts of Iridium Middle East Corporation ("IMEC"), a British Virgin Islands company through which SBG and its partners made their investment in Iridium.  Although IMEC briefly had a small office in the United States, it was closed in 1998,[97] and so is of no jurisdictional significance.  In any event, SBG held only an indirect minority interest in IMEC, and IMEC never did business in the United States.  Rather, its temporary U.S. office served as a liaison with Iridium LLC on the establishment of Iridium's Middle East "gateway," one of several planned regional gateway businesses around the world, which IMEC expected to operate.[98]  For all of these reasons, SBG's ties to Iridium cannot serve as the basis for exercising personal jurisdiction.

### 3.    *Activities of SBG shareholders and their families are irrelevant*

Stretching even farther, Plaintiffs identify as purported jurisdictional contacts a laundry list of activities and business ventures that have no connection to SBG at all, but instead concern individual members of the Binladin family.[99]  Plaintiffs refused, however, to identify the

---

[95] SBG was the beneficial owner of Elm Park Investments Ltd., a Cayman Islands company that in turn held a minority interest in a British Virgin Islands company called Trinford.  Affidavit of Mohammad Anwar Al Shukairy ("Al Shukairy Aff.") ¶ 4 (Oct. 31, 2009) (Attachment M).  Trinford owned half of another British Virgin Islands company, Iridium Middle East Corporation, *id.* ¶ 2; *see also* Gauch Aff. Ex. 14 (Iridium LLC, Registration Statement (Form S-4), at 125 (July 21, 1997)), which in turn held a 4.3% interest in Iridium LLC, *see id.* at 123; Gauch Aff. Ex. 14 (Iridium LLC, Amended Registration Statement (Form S-4/A), at 126 (Aug. 18, 1997)).  Thus, SBG's proportional interest amounted to at most 2.15% of Iridium as a whole.

[96] Al Shukairy Aff. ¶ 8.

[97] Al Shukairy Aff. ¶ 7.  The individuals in IMEC's office were not SBG employees.  *Id.*

[98] Gauch Aff. Ex. 14 (Iridium LLC, Registration Statement (Form S-4), at 9, 123 (July 21, 1997)).

[99] Gauch Aff. Ex. 15 (Pls.' Resp. to Interrog. No. 1 at 15-16; Pls.' Resp. to Interrog. No. 17 at 38-39).

evidentiary basis for any contention that any named individual or entity was acting on behalf of SBG.[100]  The Supreme Court's contacts analysis is not so free-form that Plaintiffs may amalgamate the contacts of everyone and everything who has contacts with SBG.  *See Keeton v. Hustler Magazine, Inc*., 465 U.S. 770, 781 n.13 (1984) ("Each defendant's contacts with the forum State must be assessed individually.").  As both this Court and Judge Casey found, "'allegations concerning the Al Rajhi family cannot support a claim against Al Rajhi Bank because there is no allegation that the family members were acting in furtherance of Al Rajhi Bank business.'"  *Terrorist Attacks IV*, 2010 WL 2484411, at \*21 (quoting *Terrorist Attacks I*, 349 F. Supp. at 833).  Just so here.  Moreover, Plaintiffs concede that many of these transactions date back to the 1980s or earlier, [101] and are therefore far too remote in time to have any jurisdictional significance.  *Cf. Terrorist Attacks IV*, 2010 WL 2484411, at \*8 (rejecting similar contacts on the part of Bakr Binladin).

### 4.    *Zero times ten is still zero*

Throughout this process, Plaintiffs have asserted general jurisdiction based on an amalgamation of irrelevant contacts, including those of anyone named Binladin, on SBG's contacts with U.S. persons and companies in the Middle East, and on activities that have never been found to be sufficient to establish general jurisdiction.  They argue that even if insufficient viewed in isolation, they must be assessed only in the aggregate.  The Second Circuit, however, has rejected such exercises in "contact counting."  The district court "must . . . analyze a

---

[100] Gauch Aff. Ex. 15 (Pls.' Resp. to Interrog. No. 1 at 15-16).  The only entity that Plaintiffs even allege has a connection to SBG is the Saudi Investment Company ("SICO"), which Plaintiffs have claimed is run by Yeslam Binladin as "an investment arm of SBG and the Binladin family."  *Id*. at 12.  That claim is directly contradicted by Yeslam Binladin.  *See* Affidavit of Yeslam Binladin ("Yeslam Aff.") ¶ 8 (Oct. 27, 2005) (Attachment C) ("While SICO has handled some investments for the Saudi Binladin Group ('SBG'), SBG did not establish SICO and does not have any ownership interest in or management control over SICO.  SICO was never the 'international investment office' or an 'arm' of SBG, as plaintiffs claim.").  In any event, Plaintiffs do not allege that SICO has any U.S. presence.

[101] *See, e.g.*, Gauch Aff. Ex. 15 (Pls.' Resp. to Interrog. No. 1 at 16).

defendant's connections to the forum state not for the sake of contact-counting, but rather for whether such contacts show a continuous, permanent and substantial activity in New York." *Landoil*, 918 F.2d at 1043 (internal quotation omitted). "[S]imply adding up contacts that carry little or no jurisdictional weight in and of themselves does not provide an adequate basis for jurisdiction." *Nelson v. Mass. Gen. Hosp.*, No. 04-cv-5382, 2007 U.S. Dist. LEXIS 70455 at *52 (S.D.N.Y. Sept. 20, 2007) , *aff'd*, No. 07-4642-cv, 2008 U.S. App. LEXIS 23207 (2d Cir. Nov. 7, 2008). As demonstrated above, none of the asserted contacts, alone or together, evidences a "systematic and continuous" presence in the United States.

## II.     PLAINTIFFS' CLAIMS ALSO FAIL UNDER RULE 12(B)(6)

In 2005, Judge Casey denied without prejudice SBG's motion to dismiss for failure to state a claim based on "[t]he same allegations that warrant limited jurisdictional discovery to investigate whether SBG purposefully directed its activities at the United States . . . ." *Terrorist Attacks I*, 349 F. Supp. 2d at 836. The court reached that decision, however, under the oft-cited but misconceived notion – which Plaintiffs cited repeatedly on both Rule 12(b)(2) and 12(b)(6) issues[102] – that a complaint should not be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). Since Judge Casey's ruling, the Supreme Court has declared that formulation officially "retired." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1944 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007); *Turkmen v. Ashcroft*, 589 F.3d 542, 546-47 (2d Cir. 2009) (noting that *Iqbal* and *Twombly* replaced *Conley*'s "no set of facts" test,

---

[102] *See, e.g.*, Ashton Plaintiffs' Memorandum of Law in Opposition to Saudi Bin Laden Group's Motion to Dismiss 5 (May 14, 2004) (MDL Dkt. #235);  Plaintiffs' Consolidated Memorandum of Law in Opposition to the Motion to Dismiss of Bakr Bin Ladin, Omar Bin Ladin, Tariq Bin Ladin, Mohammad Bin Ladin Company, and Bin Ladin Group International Company Ltd. 17 (Apr. 18, 2006) (MDL Dkt. #1773).

which was an "outdated pleading standard"). Instead, Plaintiffs must establish a plausible claim for relief:

> A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"

*Iqbal*, 129 S. Ct. at 1949 (internal citations and brackets omitted). Therefore, "[w]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct . . . dismissal is appropriate." *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 321 (2d Cir. 2010); *Terrorist Attacks IV*, 2010 WL 2484411, at *27.

Had Judge Casey had the benefit of the *Iqbal* decision, it is unlikely he would have permitted Plaintiffs to engage in lengthy and burdensome jurisdictional discovery on the basis of the vague, implausible and legally insufficient allegations made against SBG in the complaints. None of those allegations – lacking any detail as to time, place or connection to terrorist attacks against the United States – meets the plausibility test set forth in *Iqbal*.[103] This Court need not evaluate the evidence showing the falsity of Plaintiffs' allegations to determine that, even if true, they would not state a claim for relief.

Judge Casey already discounted many of the allegations against SBG, such as its alleged support of Afghan rebels in the U.S.-sponsored resistance to the Soviet occupation of

---

[103] The Supreme Court in *Iqbal* applied this standard to the same kinds of issues of intent and knowledge that are presented here. In *Iqbal*, the plaintiff alleged that the defendants "knew of, condoned, and willfully and maliciously agreed to" subject him to harsh confinement on account of his race and national origin, and that named defendants were respectively the "principal architect" of and "instrumental" in adopting and executing that policy. 129 S.Ct. at 1951 (quoting complaint). Such conclusory allegations were "not entitled to be assumed true" but instead were subject to the need for plausible support in "well-pleaded facts." *Id.* As shown below, Plaintiffs' conclusory allegations of what SBG "intended" or "knew," much less "should have known," *see Burnett* 3AC p. 217, are precisely the sort of allegations that under *Twombly* and *Iqbal* are not assumed to be true.

Afghanistan.  Such allegations are far too remote in time to support a claim.  *Cf. Terrorist Attacks IV*, 2010 WL 2484411, at *19.  The same is true, however, of SBG's alleged construction of the Port Sudan airport and the Tahhadi Road in the early 1990s.  Plaintiffs themselves describe them merely as government "construction projects" and do not tie them to any terrorist activities.[104]  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'"  *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 557).  Moreover, for the same reason that such allegations cannot support specific jurisdiction, *see Terrorist Attacks IV*, 2010 WL 2484411, at *19, they are far too geographically and temporally remote to support a claim relating to the September 11 attacks.

Plaintiffs also allege, as discussed above, that OBL's name is on SBG's "corporate records."[105]  Plaintiffs' complaints and RICO statements do not say what significance that allegation, even were it true, would have to Plaintiffs' claims.  They do not claim that OBL received any benefit from having his name in SBG's corporate records, much less that his former shareholding somehow aided him in carrying out any terrorist attack.  Indeed, they stop short of alleging any facts that rebut the removal of OBL as a shareholder, which has been a matter of public record since 1994.

Nor are there any well-pled allegations that OBL received any payment for his former shares, or indeed, any other financial support from SBG.  Plaintiffs selectively quote from an investigative demand from DoJ to Swiss authorities in September 2001 to suggest that U.S.

---

[104] *Ashton* 6AC ¶ 402; *Burnett* 3AC ¶ 318; *Salvo* Compl. ¶ 336; *WTC* Compl. ¶ 631; *Cont. Cas.* 2AC ¶ 338; *see also Ashton* 6AC ¶ 403; *Burnett* 3AC ¶ 319; *Salvo* Compl. ¶ 337; *WTC* Compl. ¶ 632; *Cont. Cas.* 2AC ¶ 339 (SBG "provided support and contributions *to these public works*") (emphasis added).

[105] *Ashton* 6AC ¶ 412; *Burnett* 3AC ¶ 329; *Salvo* Compl. ¶ 346; *WTC* Compl. ¶ 642; *Cont. Cas.* 2AC ¶ 348.

authorities concluded that OBL "'received a buyout payment. . . .'"[106]  But the ellipses in the complaint is used to omit DoJ's caveat, "which, *if it occurred*, may assist in establishing a violation of U.S. laws that make it illegal to provide material support to foreign terrorist organizations."[107]  This Court may, on a motion to dismiss, consider the full context of documents Plaintiffs purport to quote in their complaint.  *See, e.g.*, *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997).  That context is critically important under *Twombly*, because it makes the difference between a "reasonable inference" that SBG is liable for the conduct alleged and "a mere possibility of misconduct" where dismissal is appropriate.  Given that Plaintiffs do not allege that any charges have been brought against anyone in the nine years since this investigation began, it is not plausible to infer even the "possibility" of wrongdoing, much less the higher standard required under *Twombly*.[108]

To these allegations, Plaintiffs add vague associations between SBG and two supposed terrorist supporters, but again with no facts that would support an inference of any wrongful conduct.  Plaintiffs allege that Mohammed Jamal Khalifa was "taken in by a branch" of SBG

---

[106] *WTC* Compl. ¶ 658 (ellipses in original).

[107] Warlow Req. at 3 (emphasis added).

[108] Although not in any complaint or RICO Statement directed to SBG, Plaintiffs have in RICO statements directed to other defendants alleged that "[t]he Department of Justice expressed its belief that approximately $300 million was transferred through these [Cambridge Engineering] Deutsche Bank accounts in 2000 to accounts in Pakistan 'belonging jointly to Osama Bin Laden and a person of Pakistani nationality.'"  *See. e.g.*, *WTC/Euro Brokers* RICO (Bakr, Tariq, and Omar Binladin), Ex. A at 4-5.  But the Department of Justice letter quoted by Plaintiffs makes no reference to any such $300 million transfer, Warlow Req. at 3, and the director of Cambridge Engineering expressly denied any such transfers in an interview with Swiss authorities that Plaintiffs selectively misquote in their RICO statements.  *See supra*, note 58.  In evaluating the sufficiency of Plaintiffs' allegations, the Court may look at the actual documents quoted in Plaintiffs' complaints, rather than rely on Plaintiffs' misrepresentations about their contents.  *Twombly*, 550 U.S. at 568 n.13 ("the District Court [is] entitled to take notice of the full contents of [documents] referenced in the complaint, from which . . . truncated quotations were drawn") (citing Fed. R. Evid. 201).  Those documents demonstrate that Plaintiffs' allegations were not made in good faith and do not plausibly show a right to relief.

(MBC) as evidenced by Khalifa's use of MBC's address on a visa application.[109]  Apart from the

fact that this allegation is also temporally remote – concerning conduct more than seven years

before the September 11 attacks – it fails to meet the *Twombly* standard in two ways.  First,

because it concerns the conduct of MBC, which has already been dismissed from the case, it

cannot support a claim against SBG.  Second and more importantly, Plaintiffs allege no

supporting facts suggesting any connection between the visa application and terrorist activities of

any kind, much less facts to indicate that SBG knew of and intended to support such activities.

Plaintiffs also allege that an unspecified SBG "executive" introduced Yassin al-Kadi,

who after September 11 was placed on the U.S. designated-terrorist list, to the chairman of

Global Diamond Resources, on whose board Binladin family representatives sat.[110]  Even were

the executive's activities assumed to be attributable to SBG, however, Plaintiffs allege no facts to

suggest that he or SBG either knew of or intended to support any wrongful conduct by al-Kadi,

who was not designated as a terrorist until three years after the alleged introduction.  Moreover,

there is no allegation that al-Kadi received any benefit from his investment in GDR, much less

that the investment in any way provided any support to terrorism.

Nor can Plaintiffs fall back on their undifferentiated allegations of a conspiracy among

the defendants.[111]  As the Second Circuit held in *Arar v. Ashcroft*, 585 F.3d 559 (2d Cir. 2009),

allegations against "undifferentiated" defendants, without "specify[ing] any culpable action

taken by any *single* defendant" or facts showing a "meeting of the minds that a plausible

conspiracy claim requires" fail to state a claim under *Twombly.  Id.* at 569 (emphasis added);

---

[109] *Ashton* 6AC ¶ 408; *Burnett* 3AC ¶ 324; *Salvo* Compl. ¶ 342; *Tremsky* Compl. ¶ 169; *WTC* Compl. ¶ 637; *Cont. Cas.* 2AC ¶ 344.

[110] *Ashton* 6AC ¶ 345; *Burnett* 3AC ¶ 328; *Salvo* Compl. ¶ 348; *Tremsky* Compl. ¶ 170; *Federal Ins.* FAC ¶ 488; *WTC* Compl. ¶ 641; *Cont. Cas.* 2AC ¶ 350.

[111] *See, e.g.*, *Ashton* 6AC ¶ 5; *Burnett* 3AC ¶¶ 678-682; *Cont. Cas.* 2AC ¶ 27; *Fed. Ins.* FAC ¶¶ 66, 72-74; *WTC* Compl. ¶¶ 1164-67.

*Terrorist Attacks IV*, 2010 WL 2484411, at *27.  Because the complaints against SBG lack any well-pled allegations of fact that support a reasonable inference of wrongdoing, all of them should be dismissed for failure to state a claim.[112]

## CONCLUSION

For the foregoing reasons, SBG's renewed motion to dismiss all of the complaints against it in the above-captioned litigation should be granted.

DATED:          September 7, 2010

    _/s/ James E. Gauch_____
    Stephen J. Brogan
    Mary Ellen Powers
    James E. Gauch
    JONES DAY
    51 Louisiana Avenue, N.W.
    Washington, D.C. 20001
    Tel: (202) 879-3939
    Fax: (202) 626-1700

    *Counsel for Defendant Saudi Binladin Group*

---

[112] Certain claims suffer from individual deficiencies that the Court has already recognized with respect to other defendants.  *See Terrorist Attacks IV*, 2010 WL 2484411, at *28, n.14 (dismissing separate causes of action for aiding and abetting and civil conspiracy), *29 (dismissing separate claims under the Alien Tort Statute, 28 U.S.C. § 1350, and international law), *30 (dismissing TVPA claim against corporate defendant), *31 (dismissing RICO claims in the absence of allegations that the defendant participated in directing the al Qaeda enterprise and dismissing *Federal Insurance* claims for intentional infliction of emotional dismiss and assault and battery as time barred).  Were any of these claims against SBG to pass scrutiny under *Iqbal* and *Twombly*, they would be appropriately dismissed on these independent grounds.