UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| IN RE: TERRORIST ATTACKS ON SEPTEMBER 11, 2001 | Civil Action No. 03 MDL 1570 (GBD)(FM) |

*This document relates to: All Actions*

## SUPPLEMENTAL DECLARATION OF BAKR BINLADIN

I, Bakr Binladin, state as follows:

1. I am a citizen of the Kingdom of Saudi Arabia and currently reside in Jeddah, Saudi Arabia. I am now, and at all relevant times was, the Chairman of both the Saudi Binladin Group ("SBG") and Mohammad Binladin Company ("MBC"). These two entities have individual shareholders in common, but have separate offices, assets, and financial records. I make this declaration from personal knowledge.

2. I previously submitted an affidavit dated January 25, 2006 in support of a motion to dismiss claims filed against me personally. I submit this supplemental declaration in support of SBG's motion to dismiss all pending complaints and to provide further detail regarding certain events summarized briefly in my prior affidavit. I understand that the evidence and detail contained herein has previously been provided to plaintiffs in connection with jurisdictional discovery. Where applicable, dates are provided both using the Hijri calendar and, in parentheses, the Gregorian calendar, but the latter are estimates derived using commercially available conversion software.

3.  Osama Bin Laden ("Osama") held a small stake (approximately 2%) in SBG from its inception in 1989 until 1993. He also held a small stake in MBC. By early 1993, Osama had become a strident critic of the Saudi government and had refused to return to the Kingdom despite demands by Saudi officials that he do so. At a meeting on or about 24/7/1413 (January 17, 1993), I personally recommended and the board of directors of MBC unanimously adopted a resolution prohibiting the payment to Osama of any profits, property or shares from MBC or any other related company in which he was a shareholder unless he personally returned to Saudi Arabia to receive the payment. A true and correct copy of the relevant portions of the meeting minutes and an English translation are attached as Exhibit 1. SBG does not have a board of directors or a supervisory board, but as Chairman of SBG, I instructed that SBG abide by the same prohibitions on payments to Osama during that period.

4.  On or about 26/12/1413 (June 16, 1993), SBG's shareholders adopted a resolution to remove Osama as a shareholder. Responsibility for seeking approval of the resolution from the Ministry of Commerce was delegated to others, so I do not recall the details of that process, but I understand that the Ministry of Commerce required certain modifications to be made to comply with Shariah law. I have recently been informed that the modifications were made as a result of an administrative review within the Ministry, rather than as a result of a judicial review by a court, as I had stated in my January 2006 affidavit. Regardless of the precise review mechanism, the resolution on its face shows that it was approved and executed in accordance with Saudi law, and it has been a matter of public record since at least May 1994. The modified resolution, a true and correct copy of which is attached as Exhibit 2, was approved by the Ministry of Commerce on 18/10/1414 (March 31, 1994) and was formally executed on 20/11/1414 (May 2, 1994) by my brother, Hassan Binladin, acting personally and pursuant to a



power of attorney on behalf of the shareholders other than Osama. These documents were also attached to my January 25, 2006 affidavit, although in that affidavit, the Hijri date on the document, 26/12/1413, was incorrectly converted as December 15, 1993. The correct conversion of that date is June 16, 1993.

5.      In compliance with Saudi law, a summary of the SBG shareholder resolution was published in an edition of the *Al-Nadwa* newspaper on or about 24/11/1414 (May 5, 1994). A true and correct copy of that publication and a translation are attached as Exhibit 3.

6.      While this process was underway, Osama sent a letter dated 15/7/1414 (December 28, 1993) to me and to my "[b]rothers, members of the board of directors of [MBC]" requesting that instructions be given "to pay me the sums I am entitled to for my partnership with you in the companies." A true and correct copy of Osama's letter and a translation are attached as Exhibit 4. After consultation with me, two members of the Supervisory Board of MBC, Muhammad Saleh Bahareth and Muhammad Noor Raheemi, sent a letter dated 24/7/1414 (January 6, 1994) rejecting Osama's request. The letter also states that "[w]e would like also to emphasize to you that the unsatisfactory news we hear about you is directly or indirectly adversely affecting the activities and reputation of the Company." A true and correct copy of the Supervisory Board's letter to Osama and a translation are attached as Exhibit 5.

7.      On 9/9/1414 (February 19, 1994), I caused a press release to be issued to the Saudi media "express[ing] our [family's] strong condemnation and denunciation of all the behavior of Osama, which behavior we do not accept or approve of." The release was published in the *Al-Madina Al-Munawwara* newspaper on or about 9/9/1414 (February 19, 1994) and in the *Al-Nadwa* newspaper on or about 10/9/1414 (February 20, 1994). True and correct copies of these published news releases and translations are attached as Exhibits 6 and 7. Other news



media reported contemporaneously on my family's denunciation of Osama, including the *Saudi Gazette* in an article dated 10/9/1414 (February 20, 1994) and *Middle East* on or about 11/9/1414 (February 22, 1994). True and correct copies of these articles, and a translation of the latter, are attached as Exhibits 8 and 9.

8. By letter dated 10/6/1419 (October 2, 1998), the Ministry of Commerce, Jeddah Branch, wrote to SBG confirming that the effective date of Osama's removal as a shareholder was 26/12/1413 (June 16, 1993), the date of the original resolution initiating the process. That letter also noted that the Saudi government had divested Osama of his civil rights by royal decree dated 21/10/1414 (April 3, 1994), and that Osama was therefore barred from "owning any cash or in-kind shares in any . . . Saudi Company." Attached as Exhibit 10 is a true and correct copy of the letter, with a translation.

9. Pursuant to the SBG shareholder resolution, Osama's shares were assigned to my brother Ghaleb Binladin, who is also a half-brother of Osama. The SBG shares were valued as of 30/6/1413 (December 26, 1992) at 15,331,505 Saudi Riyals, and the MBC shares were valued as of 30/6/1414 (December 15, 1993) at 21,577,875 Saudi Riyals. Based on exchange rates on the effective dates of the valuations, Osama's former shares in SBG and MBC were valued at a total of approximately $9.8 million.

10. Osama never received any payment or benefit of any kind, directly or indirectly, in connection with his removal as a shareholder of either SBG or MBC. On multiple occasions between 1993 and 1999, I and members of the Supervisory Board of MBC requested direction from Saudi authorities on how to handle the value attributable to the shares formerly owned by Osama in both companies, as there was no established procedure for dealing with this unique circumstance. Finally, on or about 13/11/1420 (February 18, 2000), Saudi authorities approved a

proposal to deposit the value of the shares in an account to be established at National Commercial Bank ("NCB") in the names of members of MBC's Supervisory Board, provided that no funds could be disbursed from the account without express approval from Saudi authorities.

11.     The NCB account was established shortly thereafter and, on or about April 17, 2000, Ghaleb Binladin, who was holding the shares previously owned by Osama, transferred 36,909,380 Saudi Riyals (approximately $9.8 million) into the account. That amount equaled the original value assigned to the SBG and MBC shares at or around the time of Osama's removal as a shareholder, as described in paragraph 9. SBG guaranteed a loan from Saudi Hollandi Bank to Ghaleb to fund the payment. Prior to this payment in April 2000, the shares had never been monetized, as there was no reason to set aside funds until instructions were received from the authorities on how and to whom the money should be paid.

12.     In the period from 1993 until the funding of the NCB account in April 2000, neither Ghaleb nor anyone else received any dividends or distributions attributable to Osama's former shares of SBG, nor did Ghaleb liquidate, transfer, assign, or pledge those shares. To the best of my knowledge, Saudi authorities have never authorized the release of any funds from the NCB account, and the Saudi government's freeze on Osama's assets remains in place.

13.     My prior affidavit discusses the reasons "[m]y family took these actions in June 1993," referring to the decisions taken in 1993 and actions initiated in that year to remove Osama as a shareholder and to prevent him from receiving any further shareholder distributions. I did not state, and never intended to imply, that the NCB account was established in 1993 or that all of the steps subsequently taken to implement those decisions were completed in one year. Any

suggestion by plaintiffs to the contrary is a distortion of my January 2006 affidavit and is contradicted by the exhibits submitted with that affidavit.

14. On 20/1/1419 (May 17, 1998), Osama wrote a threatening letter to me complaining about the actions I had taken "forbidding [him] from receiving [his] rights." A true and correct copy of Osama's letter and a translation are attached as Exhibit 11. Both have been redacted to remove vitriolic language that was threatening to my family, but I understand that a complete copy of the letter has been made available to plaintiffs and will be submitted to the Court under seal if required. I did not respond to this letter.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

_____
Bakr Binladin

Executed on this 2 day of June, 2010