UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case |

*This document relates to:*

> *Thomas E. Burnett, Sr., et al. v. Al Baraka Investment & Development Corp., et al.*, Case No. 03-CV-9849 (S.D.N.Y.)
> *Federal Insurance Co., et al. v. Al Qaida, et al.*, Case No. 03-CV-6978 (S.D.N.Y.)
> *Continental Casualty Co., et al. v. Al Qaeda Islamic Army, et al.*, Case No. 04-CV-05970-UA (S.D.N.Y.)
> *Euro Brokers, Inc., et al. v. Al Baraka Investment and Development Corp., et al.*, Case No. 04-CV-07279-UA (S.D.N.Y.)
> *New York Marine and General Insurance Co. v. Al Qaida, et al.*, Case No. 04-CV-6105 (S.D.N.Y.)
> *World Trade Center Properties, LLC, et al. v. Al Baraka Investment and Development Corp., et al.*, Case No. 04-CV-7280 (S.D.N.Y.)

## AFFIDAVIT OF YESLAM BINLADIN

I, Yeslam Binladin, state under penalty of perjury as follows:

1.   I am one of 54 children of Mohammad Awad Binladin and I make this affidavit in support of the annexed Motion to Dismiss and to refute false allegations made against me by the above-captioned plaintiffs. All my life I have abhorred violence in all its manifestations and have said so publicly on numerous occasions. I have never knowingly provided material support to al Qaeda or any terrorist organization or activity, nor have I explicitly or implicitly authorized anyone to do so on my behalf.

2.   I was born in Saudi Arabia and was sent abroad to study at around the age of six and, with the exception of one year when I was approximately eight years old, all of my

schooling was done outside the Kingdom of Saudi Arabia. I graduated from the University of Southern California in Los Angeles in 1977.

3. My half-brother, Osama Bin Laden ("Osama"), was born to a different mother and he grew up in a different household from me. For that reason, and because I studied abroad from an early age, I had very little contact with Osama while growing up. To the best of my recollection, I have been in Osama's presence only about a half dozen times in my entire life, most of which involved large family gatherings. I have not seen or communicated with Osama Bin Laden in well over 20 years.

4. I am a citizen of both Saudi Arabia and Switzerland and have been a permanent resident of Geneva, Switzerland since approximately 1985. As a Swiss citizen, I cannot accept the jurisdiction or authority of the courts or laws of nations other than Switzerland. This affidavit is not to be considered in any form as an acceptance of the jurisdiction of the United States courts.

5. As of the date of this affidavit, I have not been to the Kingdom of Saudi Arabia or any other country in the Middle East since 1987, nor have I been to the United States since in or around 1981. I have never been to Pakistan, Afghanistan or the Sudan.

6. I have never resided at 634 Stone Canyon Road in Los Angeles, nor have I ever even seen the property. In or about 1983, my brother, Ibrahim, became the owner of that property but placed title to it in my name as his agent. On or about December 29, 1998, a grant deed was recorded transferring record ownership of the property into Ibrahim's name. Attached as Exhibit 1 is a true and correct copy of the grant deed, which recites that I had acquired title as Ibrahim's agent. Because Ibrahim had at all times been the beneficial owner of the property, the Los Angeles County Office of the Assessor issued a notice dated July 6, 1999, confirming that

the grant deed from myself to Ibrahim did not constitute a change in ownership and that no reappraisal would therefore occur. Attached as Exhibit 2 is a true and correct copy of the notice from the Los Angeles County Office of the Assessor.

7. I have never owned, nor to the best of my recollection, have I ever lived at the other two addresses which plaintiffs claim were "listed" in the late 1990's to a "Yeslam M. Binladin": 125 South Oakhurst Dr., Beverly Hills, CA or 11728 Folkstone Lane, Los Angeles, CA 90077. Although I do not recall all of the addresses I lived at while in school in the 1970's, I am certain I never owned these properties and I certainly did not live at either of these addresses in the 1990s, as I have not even been in the United States in almost 25 years.

8. In 1981 I established the Swiss company Cygnet S.A., which was later renamed Saudi Investment Company ("SICO"). While SICO has handled some investments for the Saudi Binladin Group ("SBG"), SBG did not establish SICO and does not have any ownership interest in or management control over SICO. SICO was never the "international investment office" or an "arm" of SBG, as plaintiffs claim.

9. I have never held any position as an officer or director of SBG or any of its subsidiaries, and I have never been involved in the management of that company. Attached as Exhibit 3 is a true and correct copy of a declaration of the General Manager of SBG confirming that fact. In addition, Plaintiffs should know that the allegation that I am an SBG director is false, as their own consultant, Mr. Brisard, was forced to remove that same claim from versions of his book, *The Forbidden Truth*, after I filed legal proceedings against him in Switzerland in 2002.

10. By royal decree of the King of Saudi Arabia, I was appointed a member of the Board of the Mohammed Binladin Organization. At the time of the appointment by the King, I

had already left Saudi Arabia and was a resident of Geneva, Switzerland. While I could not refuse the royal decree, I have never signed any documents accepting that appointment, and I have never attended a meeting of the Board. Since my move to Geneva in 1985, I have had no involvement in the management of the Mohammed Binladin Organization or its predecessor company. Attached as Exhibit 4 is a true and correct copy of a certificate of the secretary of the Board of Directors of the Mohammed Binladin Organization attesting to that fact.

11. Plaintiffs' allegation that I was the "account manager" for two accounts at Deutsche Bank in Geneva associated with SBG and a company called Cambridge Engineering is completely false. I have never had any management relationship with Cambridge Engineering, nor have I had any involvement with the establishment or management of any of those accounts. In fact, I had no knowledge of the existence of those accounts or of Cambridge Engineering until investigators first raised questions about them at some point after September 11, 2001.

12. In August 1990, in response to Saddam Hussein's invasion of Kuwait, two of my half-brothers, Omar and Haydar Binladin, opened a master account at Swiss Bank Corporation (now UBS) in Geneva for the benefit of the heirs of my father, Mohammad Binladin, who had died in 1967. Sub-accounts were set up in the names of each of more than 50 heirs of Mohammad Binladin, including one sub-account in the name of Osama Bin Laden, and these sub-accounts were funded in August 1990 with a portion of the legal inheritance of each heir. Because I lived in Geneva, I agreed to be listed as an authorized signatory on most of the accounts.

13. On or about August 20, 1990 all of the sub-accounts were equally funded, including the sub-account held in Osama Bin Laden's name, with $450,000 to each male heir and $225,000 to each female heir of Mohammad Binladin. It is my understanding, based on a

letter from UBS to the Swiss Department of Justice (a copy of which was provided to my Swiss attorney and is attached, along with a translation, as Exhibit 5), that on or about October 28, 1991, $482,000, which constituted virtually the entire balance in the sub-account in the name of Osama, was transferred to an account of Haydar Binladin in Saudi Arabia. It is my understanding based on the same letter that there was no further activity in this sub-account other than the debit of bank fees and charges and it was subsequently closed by the bank in 1997.

14. At the time of these transfers in August 1990 and October 1991 (and, in fact, for several years thereafter), I had no knowledge of any allegations that Osama Bin Laden was involved in terrorist activities directed at the United States or at any other country. In the 1990-91 timeframe, I had not seen and, to the best of my recollection, had not even communicated with Osama in approximately a decade.

15. During the investigations that started after the events of September 11, 2001, I was questioned by Swiss authorities regarding the account at UBS, as well as other business activities and my relationship to certain family members. It was my understanding at the time that the Swiss authorities were working in cooperation with the U.S. Federal Bureau of Investigation on their investigation. Thereafter, on July 22, 2003, the Public Prosecutor's Office of the Swiss Confederation confirmed in writing to my Swiss counsel, Pierre de Preux, that "the detailed examination of Mr. Yeslam Binladin's activities has not revealed the existence of any criminal offence." The original letter and a certified translation are attached as Exhibit 6. Likewise, by letter dated April 2, 2004, the Acting Public Prosecutor confirmed yet again that its examination of banking and other documents had not led the Public Prosecutor's Office to institute criminal proceedings against me. The original letter and a certified translation are attached as Exhibit 7. To this day, more than four years after the events of September 11, 2001,

and after investigation by the Swiss, French, and presumably United States authorities, no charges have ever been filed against me by the Swiss, French, U.S., or any other government relating to alleged terrorist financing or any other alleged support to terrorist organizations. Nor have any of my personal or business banking accounts ever been frozen or seized.

16. Plaintiffs allege that I donated money to the Muslim World League Cultural Center in Geneva in 2000 and 2001. This is utterly false. I have never made any donations to the Muslim World League Cultural Center in Geneva. Nor am I aware of any involvement by that center in supporting terrorism. I do not know Hani Ramadan.

17. In 2001, I paid the expenses for flight training at Santa Rosa Aviation in Pensacola, Florida for a friend named Philippe Acharoque. Mr. Acharoque is the former Chief of Police de l'air et des Frontières - PAF - Customs Service in Cannes, France. My private pilot at the time (who is a former United States Navy pilot) and Mr. Acharoque chose the flight school attended by Mr. Acharoque. It is my understanding that the flight instructor at Santa Rosa Aviation was, and is, a friend of my pilot. I have never paid for flight training for any person who I had any reason to believe had any association with terrorism.

18. I am informed that certain plaintiffs claim that Saudi Marketing and Trading Company is owned by "the family of Mohammed al Attas, the second husband of OBL's mother." This is false. The Saudi Marketing and Trading Company is owned by me and my three full siblings (two brothers and a sister from the same mother). Moree Investment Limited is also owned by me and my three full siblings. Plaintiffs may be confused by the fact that the director of Saudi Marketing and Trading Company is named Ahmed Al Attas. Al Attas is a very common name in Saudi Arabia and, to the best of my knowledge, Ahmed Al Attas is not related to Mohammed al Attas. In any event, no funds have ever been transferred from accounts of

these companies to or for the benefit of Osama Bin Laden or anyone who I understood to be associated with al Qaeda or terrorism.

19. Plaintiffs make a number of allegations regarding an investigation by a French investigating magistrate named Renaud Van Ruymbeke. That investigation began some four years ago, and I have repeatedly supplied information as requested by the magistrate. No charges have been brought against me. According to media reports, plaintiffs' so-called "expert," Jean-Charles Brisard, is the source of the false allegations about me that have been the basis for Mr. Van Ruymbeke's most recent investigation. Not only is Mr. Brisard a paid consultant to plaintiffs in this litigation, but I have taken legal action against him in Switzerland for defamatory publications about me, and I have written to the Chairman and to all members of the Banking, Housing and Urban Affairs Committee of the United States Senate challenging his credibility and competence as an "expert" witness. A true and correct copy of that letter is attached as Exhibit 8.

20. The events of September 11, 2001 were horrific and beyond the pale of civilized people. Since that tragic day, I have spoken publicly and repeatedly about my belief that those responsible for this reprehensible act must be brought to justice and held accountable for the pain and suffering they caused to the many innocent victims of this tragedy.

_____<br>YESLAM BINLADIN

Sworn to before me this
_____day of October 2005

_____
Notary Public
My Commission Expires _____

7

these ~~~~~ to or for the benefit of Osama Bin Laden or anyone who I understood to be ~~~~~ al Qaeda or terrorism.

19. Plaintiffs make a number of allegations regarding an investigation by a French investigating magistrate named Renaud Van Ruymbeke. That investigation began some four years ago, and I have repeatedly supplied information as requested by the magistrate. No charges have been brought against me. According to media reports, plaintiffs' so-called "expert," Jean-Charles Brisard, is the source of the false allegations about me that have been the basis for Mr. Van Ruymbeke's most recent investigation. Not only is Mr. Brisard a paid consultant to plaintiffs in this litigation, but I have taken legal action against him in Switzerland for defamatory publications about me, and I have written to the Chairman and to all members of the Banking, Housing and Urban Affairs Committee of the United States Senate challenging his credibility and competence as an "expert" witness. A true and correct copy of that letter is attached as Exhibit 8.

20. The events of September 11, 2001 were horrific and beyond the pale of civilized people. Since that tragic day, I have spoken publicly and repeatedly about my belief that those responsible for this reprehensible act must be brought to justice and held accountable for the pain and suffering they caused to the many innocent victims of this tragedy.

YESLAM BINLADIN

Sworn to before me this
27 day of October 2005

Notary Public
My Commission Expires  INDEFINITE

7

Jonathan Lippman