UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case |

*This document relates to:*

> *Thomas E. Burnett, Sr., et al. v. Al Baraka Investment & Development Corp., et al.*, Case No. 03-CV-9849 (S.D.N.Y.)
> *Kathleen Ashton, et al. v. Al Qaeda Islamic Army, et al.*, Case No. 1:02-6977 (S.D.N.Y.)
> *Federal Insurance Co., et al. v. Al Qaida, et al.*, Case No. 03-CV-6978 (S.D.N.Y.)
> *Continental Casualty Co., et al. v. Al Qaeda Islamic Army, et al.*, Case No. 04-CV-05970-UA (S.D.N.Y.)
> *Euro Brokers, Inc., et al. v. Al Baraka Investment and Development Corp., et al.*, Case No. 04-CV-07279-UA (S.D.N.Y.)
> *New York Marine and General Insurance Co. v. Al Qaida, et al.*, Case No. 04-CV-6105 (S.D.N.Y.)
> *World Trade Center Properties, LLC, et al. v. Al Baraka Investment and Development Corp., et al.*, Case No. 04-CV-7280 (S.D.N.Y.)

## AFFIDAVIT OF JOHANN DE VILLIERS

I, Johann de Villiers, state under penalty of perjury as follows:

1. Global Diamond Resources, Inc. ("GDRI") was originally established in the early 1990's as a British Columbia corporation. It became a Nevada corporation in 1995. From 1993 until mid-2002, I was Chairman and Chief Executive Officer of GDRI. I have personal knowledge of the matters set forth in this affidavit.

2. GDRI was a publicly traded holding company which indirectly, through a series of intermediate foreign subsidiaries, owned and operated diamond exploration and mining properties in South Africa. GDRI had a small office in La Jolla, California with two full-time employees whose principal focus was to find investors for the company.

3. In 1997 International PCM Holdings Ltd. ("IPCM") purchased a minority interest in GDRI. Throughout my tenure as Chairman and CEO of GDRI, IPCM was a minority shareholder of GDRI and had only two or three nominees on the GDRI board of directors, which varied in size between nine and eleven directors. In my capacity as Chairman and CEO of GDRI, I was responsible for the day-to-day management of the company.

4. In 1998 GDRI was in a tenuous financial position and could not continue to fund the operating expenses of its subsidiaries unless it procured substantial additional capital. For this reason, I began seeking new investors for the company. Abu-Bakr Mood introduced me to Ahmed Basodan, who I was told was a business associate of Yassin al-Kadi. It was my understanding that Mr. Mood and Mr. Basodan were neighbors and that their prior relationship was personal rather than professional.

5. At the time of these events, Mr. Mood was a director appointed to the GDRI board as a representative of IPCM, but he had offered to assist in finding investors in exchange for a finders' fee to be paid to him personally. I was later informed by IPCM that it did not know about or authorize Mr. Mood's arrangement to receive a personal finders' fee for his efforts, and that it objected to his receipt of any compensation.

6. New Diamond Corporation Ltd ("New Diamond"), a company I understood to be controlled by Mr. al-Kadi, invested in GDRI in December of 1998. As CEO of GDRI, I participated in the negotiations that led up to this investment. My primary concern was whether any potential investors could fulfill their promise to inject capital into GDRI. Mr. Mood did not make any representations to me about New Diamond or its owners other than his belief that they were capable of making the necessary investment. He did not personally "vouch" for New

Diamond or Mr. al-Kadi, and, in fact, he did not claim any prior personal or business relationship with Mr. al-Kadi.

7.     No member of the Binladin family was involved in any discussions with me relating to the identification of potential investors, and no member of that family made any representations to me regarding New Diamond or Mr. al-Kadi. Nor did any other person affiliated with IPCM or the Saudi Binladin Group make any representations regarding Mr. al-Kadi in connection with New Diamond's investment in GDRI.

8.     As a consequence of its investment in GDRI, New Diamond was entitled to nominate two directors to the board, which thus expanded the size of the board from nine to eleven directors. At the time of New Diamond's investment, IPCM reduced from three to two its representation on the 11-member board. Mr. al-Kadi was one of the two directors nominated by New Diamond. Mr. al-Kadi attended periodic board meetings as an outside director but had no role in day-to-day management of the company.

9.     When New Diamond invested in GDRI in 1998, I had no knowledge of any allegations that Mr. al-Kadi had supported terrorism. I first heard such allegations shortly after Mr. al-Kadi was listed by the U.S. government as a Specially Designated Global Terrorist in October 2001. After his designation by the U.S. government, Mr. al-Kadi submitted his resignation from the board, and the U.S. government issued an order restricting any transfer of New Diamond's shares.

10.    Throughout the time that I was CEO of GDRI, the company struggled financially. In 2002, the Board determined that GDRI should focus what assets it had left on the operation of its South African mines. For that reason, GDRI closed its U.S. office in the first half of 2002.

To my knowledge, GDRI has not had an office or any employees in the United States since that time.

11. During my tenure as GDRI's Chairman and CEO, GDRI never paid cash dividends or any other cash disbursements to its shareholders. New Diamond never received any return on its investment in GDRI, nor any other financial benefit from its shareholding in GDRI.

JOHANN de VILLIERS

Sworn to before me this
25th day of January, 2006

Notary Public
My Commission Expires 2/5/2009

OFFICIAL SEAL
KENNETH C. SHOOK
NOTARY PUBLIC-CALIFORNIA
COMM. NO. 1550095
SAN DIEGO COUNTY
MY COMM. EXP. FEB. 5, 2009

-4-