# EXHIBIT A

IRIDIUM MIDDLE EAST CORPORATION
(the "Company")

(A British Virgin Islands International Business Company)

Written Resolutions of the Sole Member
of the Company Pursuant to Regulation 72
of the Articles of Association of the Company

The undersigned, being the sole member of the Company DOES HEREBY
ADOPT the following resolutions by this written consent:

<u>Memorandum and Articles</u>

RESOLVED that the present Memorandum of Association and
Articles of Association of the Company be and hereby are abrogated, and
that the Amended and Restated Memorandum of Association and
Articles of Association attached hereto as Exhibits 1 and 2, respectively,
be and hereby are adopted as the Memorandum of Association and
Articles of Association of the Company and that a copy of such amended
and restated documents shall be filed with the British Virgin Islands
Registrar of Companies; and

RESOLVED FURTHER that the sole director of the Company be
and hereby is authorized to continue serving in such capacity until the
class M directors and class B directors of the Company are appointed
pursuant to the Memorandum of Association and Articles of Association
of the Company adopted in the foregoing Resolution.

In witness thereof a duly authorized representative of Lawrie Limited
has executed this Resolution this 21st day of July 1993.

LAWRIE LIMITED

By: _Hazel Dawn Hewlett_
Name: Hazel-Dawn Hewlett
Title: Director

0088249.02

SBG0002891

EXHIBIT 1
[to Resolutions of
Sole Member]

TERRITORY OF THE BRITISH VIRGIN ISLANDS

THE INTERNATIONAL BUSINESS COMPANIES ACT
(NO. 8 OF 1984)

AMENDED AND RESTATED MEMORANDUM OF ASSOCIATION

OF

IRIDIUM MIDDLE EAST CORPORATION

1.   The name of the Company is Iridium Middle East Corporation.

REGISTERED OFFICE

2.   The Registered Office of the Company will be at Craigmuir Chambers, P.O. Box 71, Road Town, Tortola, British Virgin Islands.

REGISTERED AGENT

3.   The Registered Agent of the Company will be HWR Services Limited of P.O. Box 71, Craigmuir Chambers, Road Town, Tortola, British Virgin Islands.

GENERAL OBJECTS AND POWERS

4.   (1)   The objects of the Company are to invest in the shares of Iridium, Inc., a Delaware corporation formed for the purpose of procuring and owning the space and system control segments of the Iridium System, which has been designed as a wireless communications system to provide global digital service to hand-held telephones and to engage in any act or activity that is not prohibited under any law for the time being in force in the British Virgin Islands.

     (2)   The Company may not

          (a)   carry on business with persons resident in the British Virgin Islands;

          (b)   own an interest in real property situate in the British Virgin Islands, other than a lease referred to in paragraph (e) of subclause (3);

          (c)   carry on banking or trust business unless it is licensed to do so under the Banks and Trust Companies Act, 1990;

0084061.12

SBG0002892

(d)    carry on business as an insurance or reinsurance company, insurance agent or insurance broker, unless it is licensed under an enactment authorizing it to carry on that business;

(e)    carry on the business of company management, unless it is licensed under the Company Management Act, 1990; or

(f)    carry on the business of providing the registered office or the registered agent for companies incorporated in the British Virgin Islands.

(3)    For purposes of paragraph (a) of subclause (2), the Company shall not be treated as carrying on business with persons resident in the British Virgin Islands if

(a)    it makes or maintains deposits with a person carrying on banking business within the British Virgin Islands;

(b)    it makes or maintains professional contact with solicitors, barristers, accountants, bookkeepers, trust companies, administration companies, investment advisers or other similar persons carrying on business within the British Virgin Islands;

(c)    it prepares or maintains books and records within the British Virgin Islands;

(d)    it holds, within the British Virgin Islands, meetings of its directors or members;

(e)    it holds a lease of property for use as an office from which to communicate with members or where books and records of the Company are prepared or maintained;

(f)    it holds shares, debt obligations or other securities in a company incorporated under the International Business Companies Act or under the Companies Act; or

(g)    shares, debt obligations or other securities in the Company are owned by any person resident in the British Virgin Islands or by any company incorporated under the International Business Companies Act or under the Companies Act.

(4)    The Company shall have all such powers as are permitted by law for the time being in force in the British Virgin Islands, irrespective of corporate benefit, to perform all acts and engage in all activities necessary or conducive to the conduct, promotion, or attainment of the object of the Company.

0084061.12

-2-

SBG0002893

CURRENCY

5.   Shares in the Company shall be issued in the currency of the United States of America.

AUTHORIZED CAPITAL

6.   The authorized capital of the Company is US$50,000.00.

CLASSES, NUMBER AND PAR VALUE OF SHARES

7.   The authorized capital is made up of 50,000 shares divided into two classes of one series each as provided in this Clause 7. The members who have agreed to guarantee the obligations which the Company has undertaken in favor of Iridium, Inc., shall hold 25,000 class M voting common shares of US$1.00 par value. The additional members who have requested the opportunity to join in the formation of the Company shall hold 25,000 class B voting common shares of US$1.00 par value.

     The consideration to be paid for shares in the Company shall consist of (i) $1.00 per share in cash and (ii) the execution of a promissory note in substantially the form attached as Exhibit A to the Articles of Association annexed hereto (the "Articles of Association").

DESIGNATIONS, POWERS, PREFERENCES, ETC. OF SHARES

8.   All Class M shares shall

     (a)   have one vote each for the election of each of the five "class M directors," as such term is defined in the Articles of Association;

     (b)   have one vote each for the election of the Chairman of the Board of the Company;

     (c)   be subject to redemption, purchase or acquisition by the Company on the terms set forth in the Articles of Association; and

     (d)   except as expressly set forth in this Memorandum of Association, have the same rights as Class B shares with regard to dividends, voting, distributions upon liquidation of the Company and in all other respects.

9.   All Class B shares shall

     (a)   have one vote each for the election of each of the five "class B directors," as such term is defined in the Articles of Association;

     (b)   be subject to redemption, purchase or acquisition by the Company on the terms set forth in the Articles of Association; and

0084061.12

-3-

SBG0002894

(c)     except as expressly set forth in this Memorandum of Association, have the same rights as class M shares with regard to dividends, voting, distributions upon liquidation of the Company and in all other respects.

DEVELOPMENT RIGHTS

10.    Except as otherwise defined herein, capitalized terms used in this Clause 10 shall have the meaning ascribed thereto in that certain Stock Purchase Agreement entered into by and among Iridium, Inc., the Company, and certain other parties and dated as of July 19, 1993 (the "Stock Purchase Agreement"). Pursuant to the Stock Purchase Agreement, the Company shall be obligated within approximately one year of the execution of the Stock Purchase Agreement to enter into a Gateway Authorization Agreement with Iridium, Inc., which the Company understands will provide for the Company's construction and operation of one Gateway in the Gateway Service Territory allocated to the Company in the Stock Purchase Agreement. In addition, pursuant to the Stock Purchase Agreement, the Company has the right to construct an unlimited number of Gateways, provide certain Gateway services, and retain Service Providers (and/or act as a Service Provider) in the Gateway Service Territory allocated to the Company (each such present or future right to be referred to herein as a "Gateway Right").

The Company shall negotiate with Iridium, Inc. to determine mutually agreeable terms for the initial Gateway Authorization Agreement and any and all subsequent Gateway Authorization Agreements. Upon agreement between the Company (as authorized by the Board of Directors of the Company) and Iridium, Inc. regarding the terms of any such Gateway Authorization Agreement, the class M members and the class B members shall have the right and obligation to participate equally in the development of the Gateway rights related to such Gateway Authorization Agreement.

To the extent the directors determine that the implementation of such a Gateway Authorization Agreement requires a new operational entity, the directors shall ensure that the class M members and the class B members have rights and obligations in such entity, including financial commitments, pari passu to their rights and obligations in the Company, unless the members agree unanimously to the contrary.

If at any time the members of one class of shares, acting as a group for these purposes, are unwilling or unable to fund their half of the development cost of any such Gateway Right, the members of the other class (the "Participating Members") shall be free to develop such Gateway Right, either through a separate operating entity owned by the Participating Members or through the Company itself, in which case the designations, powers, and preferences of the shares held by the Participating Members as set forth in this Memorandum shall be amended to provide that all costs of developing such Gateway Right shall be borne by, and all benefits accruing as a result of the utilization of such Gateway Right shall accrue to, the class of shares held by the Participating Members.

0084061.12

-4-

SBG0002895

The members of the class of shares that is unwilling or unable to participate in funding the development of the Gateway Right shall have no claim against the Company or against the Participating Members resulting from the utilization of such Gateway Right.

Except as set forth in this Clause 10, the provisions of this Clause 10 shall not affect the rank or privileges of the class M and class B shares for any purposes as set out elsewhere in this Memorandum of Association or in the Articles of Association.

DIRECTORS

11.   Class M Directors

(a)   The class M directors shall be elected by the class M members for such term as the class M members determine.

(b)   The number of class M directors shall be five, unless and until all class M directors are removed from such positions upon the redemption of the class M members' shares, as provided in the Articles of Association.

(c)   Each class M director shall hold office for the term, if any, fixed by resolution of class M members or until his earlier death, resignation or removal.

(d)   A class M director may be removed from office, with or without cause, by a resolution of the class M members or, with cause, by a resolution of the class M directors.

(e)   The class M directors, and only the class M directors, may appoint any person to be a class M director to fill a vacancy.   A vacancy occurs through the death, resignation or removal of a director, but when one or more directors resign(s) after having appointed his or their successor or successors no vacancy or vacancies shall be deemed to exist.

12.   Class B Directors

(a)   The class B directors shall be elected by the class B members for such term as the class B members determine.

(b)   The number of class B directors shall be five, unless and until all class B directors are removed from such positions upon the redemption of the class B members' shares, as provided in the Articles of Association.

(c)   Each class B director shall hold office for the term, if any, fixed by resolution of class B members or until his earlier death, resignation or removal.

0084061.12

-5-

SBG0002896

(d)     A class B director may be removed from office, with or without cause, by a resolution of the class B members or, with cause, by a resolution of the class B directors.

(e)     The class B directors, and only the class B directors, may appoint any person to be a class B director to fill a vacancy. A vacancy occurs through the death, resignation or removal of a director, but when one or more directors resign(s) after having appointed his or their successor or successors no vacancy or vacancies shall be deemed to exist.

## VARIATION OF CLASS RIGHTS

13.   The rights attached to any class or series of shares may not be varied without the consent in writing of all of the members.

## RIGHTS NOT VARIED BY THE ISSUE OF SHARES PARI PASSU

14.   The rights conferred upon the holders of the shares of any class issued with preferred or other rights shall not, unless otherwise expressly provided by the terms of issue of the shares of that class, be deemed to be varied by the creation or issue of further shares ranking pari passu therewith.

## REGISTERED SHARES

15.   Shares in the Company may only be issued as registered shares and may not be exchanged for shares issued to bearer.

## TRANSFER OF SHARES

16.   Shares in the Company may only be transferred subject to the prior approval of the Company, which approval may only be evidenced by a written resolution signed by all members, except that each member shall have the right, without such approval from the other members, to transfer shares in the Company to a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the member which desires to transfer its shares. For purposes of the preceding sentence, the term "control" shall mean the power, direct or indirect, through ownership of a majority or a dominant minority of the total outstanding voting securities of an entity, or by proxy voting, contractual arrangements or other means to determine, direct, or decide matters affecting an entity.

## AMENDMENT OF MEMORANDUM AND ARTICLES OF ASSOCIATION

17.   The Company may only amend its Memorandum of Association and Articles of Association by a resolution of members adopted by members holding not less than sixty percent (60%) of all shares.

0084061.12                                    -6-

SBG0002897

DEFINITIONS

18.  The meanings of words in this Memorandum of Association are as defined in the Articles of Association.

       We, HWR SERVICES LIMITED, of Craigmuir Chambers, Road Town, Tortola, British Virgin Islands for the purpose of incorporating an International Business Company under the laws of the British Virgin Islands hereby subscribe our name to this Memorandum of Association the 7th day of May, 1993 in the presence of:

Witness

Elena Ruffel Smith

...................................
Craigmuir Chambers
Road Town, Tortola
Company Administrator

Subscriber

Richard A. Peters

.....................................................
Authorized Signatory
HWR Services Limited



0084061.12

SBG0002898

EXHIBIT 2
[to Resolutions of
Sole Member]

TERRITORY OF THE BRITISH VIRGIN ISLANDS

THE INTERNATIONAL BUSINESS COMPANIES ACT
(NO. 8 OF 1984)

AMENDED AND RESTATED ARTICLES OF ASSOCIATION

OF

IRIDIUM MIDDLE EAST CORPORATION

PRELIMINARY

1.  In these Articles, if not inconsistent with the subject or context, the words and expressions standing in the first column of the following table shall bear the meanings set opposite them respectively in the second column thereof.

| Words | Meaning |
|---|---|
| capital | The aggregate par value of all outstanding shares of the Company plus the amounts as are from time to time transferred from surplus to capital by a resolution of directors. |
| class M director | A person elected as a director of the Company pursuant to the Memorandum and these Articles. |
| class B director | A person elected as a director of the Company pursuant to the Memorandum and these Articles. |
| class M member | A person who holds class M shares in the Company. |
| class B member | A person who holds class B shares in the Company. |
| class M shares | Shares in the Company issued to the class M members pursuant hereto and having the characteristics designated in the Memorandum. |
| class B shares | Shares in the Company issued to the class B members pursuant hereto and having the characteristics designated in the Memorandum. |
| defaulting member | The term "defaulting member" shall have the meaning ascribed thereto in Regulation 16. |
| director | A class M director or a class B director. |
| directors | class M directors and class B directors. |

0084063.12

SBG0002899

| | |
|---|---|
| initial capital contribution | The term "initial capital contribution" shall have the meaning ascribed thereto in Regulation 11. |
| member | A person who holds shares in the Company. |
| person | An individual, a corporation, a trust, the estate of a deceased individual, a partnership or an unincorporated association of persons. |
| promissory note | The term "promissory note" shall have the meaning ascribed thereto in Regulation 10. |

resolution of directors

(a) A resolution approved at a duly convened and constituted meeting of directors of the Company or of a committee of such directors by the affirmative vote of sixty percent (60%) of the directors present at the meeting who voted and did not abstain; or

(b) a resolution consented to in writing by all directors or of all members of the committee, as the case may be.

resolution of members

(a) A resolution approved at a duly convened and constituted meeting of the members of the Company by the affirmative vote of sixty percent (60%) of the votes of the shares entitled to vote thereon which were present at the meeting and were voted and not abstained, or

(b) a resolution consented to in writing by sixty percent (60%) of the votes of shares entitled to vote thereon.

| | |
|---|---|
| securities | Share and debt obligations of every kind, and options, warrants and rights  to acquire shares, or debt obligations. |
| surplus | The excess, if any, at the time of the determination of the total assets of the Company over the aggregate of its total liabilities, as shown in its books of account, plus the Company's capital. |
| the Act | The International Business Companies Act (Cap. 291) including any modification, extension, re-enactment or renewal thereof and any regulations made thereunder. |

SBG0002900

| the Memorandum | The Memorandum of Association of the Company as originally framed or as from time to time amended. |
| the Seal | Any Seal which has been duly adopted as the Seal of the Company. |
| these Articles | These Articles of Association as originally framed or as from time to time amended. |

2.  "Written" or any term of like import includes words typewritten, printed, painted, engraved, lithographed, photographed or represented or reproduced by any mode of reproducing words in a visible form, including telex, facsimile, telegram, cable or other form of writing produced by electronic communication.

3.  Save as aforesaid any words or expressions defined in the Act shall bear the same meaning in these Articles.

4.  Whenever the singular or plural number, or the masculine, feminine or neuter gender is used in these Articles, it shall equally, where the context admits, include the others.

5.  A reference in these Articles to voting in relation to shares shall be construed as a reference to voting by members holding the shares except that it is the votes allocated to the shares that shall be counted and not the number of members who actually voted and a reference to shares being present at a meeting shall be given a corresponding construction.

6.  A reference to money in these Articles is, unless otherwise stated, a reference to the currency in which shares in the Company shall be issued according to the provisions of the Memorandum.

## SHARES

7.  Upon satisfaction of the respective obligations of each member to the Company set forth in the promissory note to be executed by each member pursuant to Regulation 10 below, each member holding shares in the Company shall be entitled to a certificate signed by a director or officer of the Company and under the Seal specifying the share or shares held by him, and the signature of the director or officer and the Seal may be facsimiles.

8.  Any member receiving a share certificate for shares shall indemnify and hold the Company and its directors and officers harmless from any loss or liability which it or they may incur by reason of any wrongful or fraudulent use or representation made by any person by virtue of the possession thereof. If a share certificate for shares is worn out or lost it may be renewed on production of the worn out certificate or on satisfactory proof of its loss together with such indemnity as may be required by a resolution of directors.

0084063.12                               -3-

SBG0002901

9.     If several persons are registered as joint holders of any shares, any one of such persons may give an effectual receipt for any dividend payable in respect of such shares.

### SHARES, AUTHORIZED CAPITAL, CAPITAL AND SURPLUS

10.    No share in the Company may be issued until the consideration in respect thereof is fully paid, and when issued the share is for all purposes fully paid and non-assessable save that a share issued for money and a promissory note in the form attached to these Articles as Exhibit A (a "promissory note") shall be issued subject to redemption in the manner prescribed in these Articles.

11.    Shares in the Company shall be issued only for money and a promissory note. Each promissory note shall set forth a schedule for the payment of consideration by the member in proportion to that member's shareholding in the Company including, without limitation, an agreement by the member executing such promissory note to fund, upon call by the Company such member's ratable portion of any additional purchase of shares in Iridium, Inc. or other capital contributions to Iridium, Inc. that the Company is at any time required to make pursuant to that certain Stock Purchase Agreement entered into by and among Iridium, Inc., the Company, and certain other parties and dated as of July 19, 1993.  Shares issued for money and a promissory note will be issued subject to redemption in the manner prescribed in these Articles.

12.    The amount received by the Company from any member for shares in the Company shall not be less than the par value of such shares, and in the absence of fraud the decision of the directors as to the value of the consideration received by the Company in respect of the issue is conclusive unless a question of law is involved.  The consideration in respect of the shares constitutes capital to the extent of the par value and the excess constitutes surplus.

13.    The Company may not issue fractions of a share.

14.    The Company may redeem its own shares only on the terms set forth in the Memorandum or these Articles.

15.    Subject to provisions to the contrary in

(a)    the Memorandum or these Articles;

(b)    the designations, powers, preferences, rights, qualifications, limitations and restrictions with which the shares were issued; or

(c)    the subscription agreement for the issue of the shares,

the Company may not purchase, redeem or otherwise acquire its own shares without the consent of members whose shares are to be purchased, redeemed or otherwise acquired.

0064063.12

-4-

SBG0002902

16.  If any member defaults on such member's obligations under the promissory note provided to the Company by such member in consideration for the issuance of shares in the Company (thus becoming a "defaulting member"), and the other members holding the same class of shares of the Company as the defaulting member (the "defaulted class of shares"), if any, fail to satisfy the obligations of the defaulting member to the Company, then the Company shall redeem for $1.00 per share or for par value, if different, any and all of the defaulted class of shares.

Upon redemption of the defaulted class of shares pursuant to this Regulation 16,

(a)  such shares shall be cancelled and new shares in an amount equal to the number of shares redeemed shall be issued to the members holding the class of shares other than the defaulted class of shares, pro rata in relation to their existing shareholdings;

(b)  the directors representing the members holding the defaulted class of shares shall be removed from such positions, and the members previously holding the defaulted class of shares shall have no further right to elect directors or the Chairman of the Board of Directors of the Company; and

(c)  in consideration for the cancellation of the defaulted class of shares and the issuance of new shares to the members holding the other class of shares, such continuing members shall be obligated to make the payments to the Company, pro rata in relation to their existing shareholdings, that had been required of the members that held the defaulted class of shares under the terms of their respective promissory notes.

17.  No purchase, redemption or other acquisition of shares shall be made unless the directors determine that immediately after the purchase, redemption or other acquisition the Company will be able to satisfy its liabilities as they become due in the ordinary course of its business and the realizable value of the assets of the Company will not be less than the sum of its total liabilities, other than deferred taxes, as shown in the books of account, and its capital and, in the absence of fraud, the decision of the directors as to the realizable value of the assets of the Company is conclusive, unless a question of law is involved.

18.  A determination by the directors under the preceding Regulation is not required where shares are purchased, redeemed or otherwise acquired

(a)  by virtue of a transfer of capital pursuant to Regulation 39;

(b)  by virtue of the provisions of Section 83 of the Act; or

(c)  pursuant to an order of the Court.



0064053.12                                          -5-

SBG0002903

19. Shares that the Company purchases, redeems or otherwise acquires pursuant to the preceding Regulation shall be cancelled but they shall be available for reissue.

20. The Company may purchase, redeem or otherwise acquire its shares at a price lower than the fair value if permitted by, and then only in accordance with, the terms of

    (a)   the Memorandum or these Articles; or

    (b)   a written agreement for the subscription for the shares to be purchased, redeemed or otherwise acquired.

21. The Company may by a resolution of directors include in the computation of surplus for any purpose the unrealized appreciation of the assets of the Company, and, in the absence of fraud, the decision of the directors as to the value of the assets is conclusive, unless a question of law is involved.

## MORTGAGES AND CHARGES OF SHARES

22. Members may mortgage or charge their shares in the Company and upon satisfactory evidence thereof the Company shall give effect to the terms of any valid mortgage or charge except insofar as it may conflict with any requirements contained in the Memorandum or these Articles for consent to the transfer of shares.

23. In the case of the mortgage or charge of shares there may be entered in the share register of the Company at the request of the registered holder of such shares

    (a)   a statement that the shares are mortgaged or charged;

    (b)   the name of the mortgagee or chargee; and

    (c)   the date on which the aforesaid particulars are entered in the share register.

24. Where particulars of a mortgage or charge are registered, such particulars shall be cancelled

    (a)   with the consent of the named mortgagee or chargee or anyone authorized to act on his behalf; or

    (b)   upon evidence satisfactory to the directors of the discharge of the liability secured by the mortgage or charge and the issue of such indemnities as the directors shall consider necessary or desirable.

0084083.12

SBG0002904

25.   Whilst particulars of a mortgage or charge are registered, no transfer of any share comprised therein shall be effected without the written consent of the named mortgagee or chargee or anyone authorized to act on his behalf.

LIEN

26.   The Company shall have a first and paramount lien on every share issued for a promissory note, and the Company shall also have a first and paramount lien on every share standing registered in the name of a member, whether singly or jointly with any other person or persons, for all the debts and liabilities of such member or his estate to the Company, whether the same shall have been incurred before or after notice to the Company of any interest of any person other than such member, and whether the time for the payment or discharge of the same shall have actually arrived or not, and notwithstanding that the same are joint debts or liabilities of such member or his estate and any other person, whether a member of the Company or not. The Company's lien on a share shall extend to all dividends payable thereon. The directors may at any time either generally, or in any particular case, waive any lien that has arisen or declare any share to be wholly or in part exempt from the provisions of this Regulation.

27.   Subject to the terms of these Articles, the Company shall sell any share on which the Company has a lien, but no sale shall be made unless some sum in respect of which the lien exists is presently payable nor until the expiration of fourteen days after a notice in writing, stating and demanding payment of the sum presently payable and giving notice of the intention to sell in default of such payment, has been served on the holder for the time being of the share.

28.   The net proceeds of the sale by the Company of any shares on which it has a lien shall be applied in or towards payment of discharge of the promissory note or other binding obligation to contribute money or property or any combination thereof in respect of which the lien exists so far as the same is presently payable and any residue shall (subject to a like lien for debts or liabilities not presently payable as existed upon the share prior to the sale) be paid to the holder of the share immediately before such sale.   For giving effect to any such sale the directors may authorize some person to transfer the share sold to the purchaser thereof. The purchaser shall be registered as the holder of the share and he shall not be bound to see to the application of the purchase money, nor shall his title to the share be affected by any irregularity or invalidity in the proceedings in reference to the sale.

TRANSFER OF SHARES

29.   Subject to any limitations in the Memorandum, shares in the Company may be transferred by a written instrument of transfer signed by the transferor and containing the name and address of the transferee, but in the absence of such written instrument of transfer the directors may accept such evidence of a transfer of shares as they consider appropriate.

0084063.12

-7-

SBG0002905

30.   The Company shall not be required to treat a transferee of a share in the Company as a member until the transferee's name has been entered in the share register.

31.   Subject to any limitations in the Memorandum, the Company must on the application of the transferor or transferee of a share in the Company enter in the share register the name of the transferee of the share save that the registration of transfers may be suspended and the share register closed at such times and for such periods as the Company may from time to time by resolution of directors determine provided always that such registration shall not be suspended and the share register closed for more than 60 days in any period of 12 months.

## TRANSMISSION OF SHARES

32.   The executor or administrator of a deceased member, the guardian of an incompetent member or the trustee of a bankrupt member shall be the only person recognized by the Company as having any title to his share but they shall not be entitled to exercise any rights as a member of the Company until they have proceeded as set forth in the next following three Regulations.

33.   The production to the Company of any document which is evidence of probate of the will, or letters of administration of the estate, or confirmation as executor, of a deceased member or of the appointment of a guardian of an incompetent member or the trustee of a bankrupt member shall be accepted by the Company even if the deceased, incompetent or bankrupt member is domiciled outside the British Virgin Islands if the document evidencing the grant of probate or letters of administration, confirmation as executor, appointment as guardian or trustee in bankruptcy is issued by a foreign court which had competent jurisdiction in the matter. For the purpose of establishing whether or not a foreign court had competent jurisdiction in such a matter the directors may obtain appropriate legal advice. The directors may also require an indemnity to be given by the executor, administrator, guardian or trustee in bankruptcy.

34.   Any person becoming entitled by operation of law or otherwise to a share or shares in consequence of the death, incompetence or bankruptcy of any member may be registered as a member upon such evidence being produced as may reasonably be required by the directors. An application by any such person to be registered as a member shall for all purposes be deemed to be a transfer of shares of the deceased, incompetent or bankrupt member and the directors shall treat it as such.

35.   Any person who has become entitled to a share or shares in consequence of the death, incompetence or bankruptcy of any member may, instead of being registered himself, request in writing that some person to be named by him be registered as the transferee of such share or shares and such request shall likewise be treated as if it were a transfer.

0084063.12

-8-

36.   What amounts to incompetence on the part of a person is a matter to be determined by the court having regard to all the relevant evidence and the circumstances of the case.

## REDUCTION OR INCREASE IN AUTHORIZED CAPITAL OR CAPITAL

37.   The Company may by a written resolution signed by members holding not less than sixty percent (60%) of all shares amend the Memorandum to increase or reduce its authorized capital.

38.   The capital of the Company may only by a written resolution signed by each of the members be increased by transferring an amount of the surplus of the Company to capital.

39.   Subject to the provisions of the two next succeeding Regulations, the capital of the Company may only by a written resolution signed by each of the members be reduced by transferring an amount of the capital of the Company to surplus.

40.   No reduction of capital shall be effected that reduces the capital of the Company to an amount that immediately after the reduction is less than the aggregate par value of all outstanding shares.

41.   No reduction of capital shall be effected unless the directors determine that immediately after the reduction the Company will be able to satisfy its liabilities as they become due in the ordinary course of its business and that the realizable assets of the Company will not be less than its total liabilities, other than deferred taxes, as shown in the books of the Company and its remaining capital, and, in the absence of fraud, the decision of the directors as to the realizable value of the assets of the Company is conclusive, unless a question of law is involved.

## MEETINGS AND CONSENTS OF MEMBERS

42.   The directors of the Company may convene meetings of the members of the Company at such times and in such manner and places within or outside the British Virgin Islands as the directors consider necessary or desirable.

43.   Upon the written request of members holding at least fifty percent (50%) of the outstanding voting shares in the Company the directors shall convene a meeting of members.

44.   The directors shall give not less than 7 days notice of meetings of members to those persons whose names on the date the notice is given appear as members in the share register of the Company and are entitled to vote at the meeting.

45.   The directors may fix the date notice is given of a meeting of members as the record date for determining those shares that are entitled to vote at the meeting.

SBG0002907

46.    A meeting of members may be called on short notice:

(a)    if members holding not less than sixty percent (60%) of the total number of shares entitled to vote on all matters to be considered at the meeting, or sixty percent (60%) of the votes of each class or series of shares where members are entitled to vote thereon as a class or series together with not less than a sixty percent (60%) majority of the remaining votes, have agreed to short notice of the meeting, or

(b)    if all members holding shares entitled to vote on all or any matters to be considered at the meeting have waived notice of the meeting and for this purpose presence at the meeting shall be deemed to constitute waiver.

47.    The inadvertent failure of the directors to give notice of a meeting to a member, or the fact that a member has not received notice, does not invalidate the meeting.

48.    A member may be represented at a meeting of members by a proxy who may speak and vote on behalf of the member.

49.    The instrument appointing a proxy shall be produced at the place appointed for the meeting before the time for holding the meeting at which the person named in such instrument proposes to vote.

50.    An instrument appointing a proxy shall be in substantially the following form or such other form as the Chairman of the meeting shall accept as properly evidencing the wishes of the member appointing the proxy.

(Name of Company)

I/We                              being a member of the above Company with shares HEREBY APPOINT
          of                              or failing him              of
     to be my/our proxy to vote for me/us at the meeting of members to be held on the              day of
                         and at any adjournment thereof.

(Any restrictions on voting to be inserted here.)

Signed this      day of

..........................
Member

0084063.12

SBG0002908

51.   The following shall apply in respect of joint ownership of shares:

   (a)   if two or more persons hold shares jointly each of them may be present in person or by proxy at a meeting of members and may speak as a member; and

   (b)   if only one of the joint owners is present in person or by proxy he may vote on behalf of all joint owners.

52.   A member shall be deemed to be present at a meeting of members if he participates by telephone or other electronic means and all members participating in the meeting are able to hear each other.

53.   A meeting of members is duly constituted if, at the commencement of the meeting, there are present in person or by proxy not less than sixty percent (60%) of the votes of the shares or class or series of shares entitled to vote on resolutions of members to be considered at the meeting. If a quorum be present, notwithstanding the fact that such quorum may be represented by only one person then such person may resolve any matter and a certificate signed by such person accompanied where such person be a proxy by a copy of the proxy form shall constitute a valid resolution of members.

54.   An action that may be taken by the members at a meeting may also be taken by a resolution of members consented to in writing or by telex, telegram, cable, facsimile or other written electronic communication, without the need for any notice, but if any resolution of members is adopted otherwise than by the unanimous written consent of all members, a copy of such resolution shall forthwith be sent to all members not consenting to such resolution. The consent may be in the form of counterparts, each counterpart being signed by one or more members.

### DIRECTORS

55.   The number of class M directors shall be five, and the number of class B directors shall be five; provided that either class of directors shall be subject to elimination in its entirety automatically upon the redemption of shares pursuant to Regulation 16 above.

56.   A director may resign his office by giving written notice of his resignation to the Company, and the resignation shall have effect from the date the notice is received by the Company or from such later date as may be specified in the notice.

57.   With the prior or subsequent approval by a resolution of members, the directors may, by a resolution of directors, fix the emoluments of directors with respect to services to be rendered in any capacity to the Company.

0084063.12

-11-

SBG0002909

58.    A director shall not require a share qualification and may be an individual or a company.

59.    Upon the written request of at least five (5) directors, the Chairman of the Board of Directors shall convene a meeting of the directors.

## POWERS OF DIRECTORS

60.    The business and affairs of the Company shall be managed by the directors who may pay all expenses incurred preliminary to and in connection with the formation and registration of the Company and may exercise all such powers of the Company as are not by the Act or by the Memorandum or these Articles required to be exercised by the members of the Company, subject to any delegation of such powers as may be authorized by these Articles and to such requirements as may be prescribed by a resolution of members; but no requirement made by a resolution of members shall prevail if it be inconsistent with these Articles nor shall such requirement invalidate any prior act of the directors which would have been valid if such requirement had not been made.

61.    The continuing directors may act notwithstanding any vacancy in their body, save that if their number is reduced to their knowledge below the number fixed by or pursuant to these Articles as the necessary quorum for a meeting of directors, the continuing directors or director may act only for the purpose of appointing directors to fill any vacancy that has arisen, subject to any restrictions in the Memorandum or for summoning a meeting of members.

62.    The directors may by resolution of directors exercise all the powers of the Company to borrow money and to mortgage or charge its undertakings and property or any part thereof, to issue debentures, debenture stock and other securities whenever money is borrowed or as security for any debt, liability or obligation of the Company or of any third party.

63.    All cheques, promissory notes, drafts, bills of exchange and other negotiable instruments and all receipts for moneys paid to the Company, shall be signed, drawn, accepted, endorsed or otherwise executed, as the case may be, in such manner as shall from time to time be determined by resolution of directors.

## PROCEEDINGS OF DIRECTORS

64.    The directors of the Company or any committee thereof may meet at such times and in such manner and places within or outside the British Virgin Islands as the directors may determine to be necessary or desirable.

65.    A director shall be deemed to be present at a meeting of directors if he participates by telephone or other electronic means and all directors participating in the meeting are able to hear each other.

0084063 12

-12-

66. A director shall be given not less than 3 days notice of meetings of directors, but a meeting of directors held without 3 days notice having been given to all directors shall be valid if all the directors entitled to vote at the meeting who do not attend, waive notice of the meeting and for this purpose, the presence of a director at a meeting shall constitute waiver on his part. The inadvertent failure to give notice of a meeting to a director, or the fact that a director has not received the notice, does not invalidate the meeting.

67. A director may by a written instrument appoint an alternate who need not be a director and an alternate is entitled to attend meetings in the absence of the director who appointed him and to vote or consent in place of the director.

68. A meeting of directors is duly constituted for all purposes if at the commencement of the meeting there are present in person or by alternate not less than sixty percent (60%) of the total number of directors, unless there are only 2 directors in which case the quorum shall be 2.

69. If the Company shall have only one director the provisions herein contained for meetings of the directors shall not apply but such sole director shall have full power to represent and act for the Company in all matters as are not by the Act or the Memorandum or these Articles required to be exercised by the members of the Company and in lieu of minutes of a meeting shall record in writing and sign a note or memorandum of all matters requiring a resolution of directors. Such a note or memorandum shall constitute sufficient evidence of such resolution for all purposes.

70. At every meeting of the directors the Chairman of the Board of Directors shall preside as chairman of the meeting. The Chairman of the Board of Directors shall not, however, have the right to break a tie vote or have any other voting rights in addition to his right to vote as a director. If the Chairman of the Board of Directors is not present at the meeting the directors present shall choose some one of their number to be chairman of the meeting.

71. An action that may be taken by the directors or a committee of directors at a meeting may also be taken by a resolution of directors or a committee of directors consented to in writing or by telex, telegram, cable, facsimile or other written electronic communication by all directors or all members of the committee as the case may be, without the need for any notice. The consent may be in the form of counterparts, each counterpart being signed by one or more directors.

72. The directors shall cause the following corporate records to be kept:

    (a)  minutes of all meetings of directors, members, committees of directors, committees of officers and committees of members;

    (b)  copies of all resolutions consented to by directors, members, committees of directors, committees of officers and committees of members; and

0084063.12

-13-

SBG0002911

(c)     such other accounts and records as the directors by resolution of directors consider necessary or desirable in order to reflect the financial position of the Company.

73.     The books, records and minutes shall be kept at the registered office of the Company, its principal place of business or at such other place as the directors determine.

## OFFICERS

74.     The class M members and only the class M members shall be authorized to appoint by resolution a Chairman of the Board of Directors of the Company. The Company may by resolution of directors appoint other officers of the Company at such times as shall be considered necessary or expedient, including a Secretary.

75.     The officers shall perform such duties as shall be prescribed at the time of their appointment subject to any modification in such duties as may be prescribed thereafter by resolution of directors or resolution of members, but in the absence of any specific allocation of duties it shall be the responsibility of the Chairman of the Board of Directors to preside at meetings of directors and members, and the Secretary to maintain the share register, minute books and records (other than financial records) of the Company and to ensure compliance with all procedural requirements imposed on the Company by applicable law.

76.     The emoluments of all officers shall be fixed by resolution of directors.

77.     The officers of the Company shall hold office until their successors are duly elected and qualified, but any officer elected or appointed by the directors may be removed at any time, with or without cause, by resolution of directors. Any vacancy occurring in any office of the Company may be filled by resolution of directors; provided, however, that the Chairman of the Board of Directors shall at all times be one of the directors elected by the class M members.

## CONFLICT OF INTERESTS

78.     No agreement or transaction between the Company and one or more of its directors or any person in which any director has a financial interest or to whom any director is related, including as a director of that other person, is void or voidable for this reason only or by reason only that the director is present at the meeting of directors or at the meeting of the committee of directors that approves the agreement or transaction or that the vote or consent of the director is counted for that purpose if the material facts of the interest of each director in the agreement or transaction and his interest in or relationship to any other party to the agreement or transaction are disclosed in good faith or are known by the other directors.

0084003.12

-14-

SBG0002912

79.   A director who has an interest in any particular business to be considered at a meeting of directors or members may be counted for purposes of determining whether the meeting is duly constituted.

## INDEMNIFICATION

80.   Subject to the limitations hereinafter provided the Company may indemnify against all expenses, including legal fees, and against all judgments, fines and amounts paid in settlement and reasonably incurred in connection with legal, administrative or investigative proceedings any person who

    (a)   is or was a party or is threatened to be made a party to any threatened, pending or completed proceedings, whether civil, criminal, administrative or investigative, by reason of the fact that the person is or was a director, an officer or a liquidator of the Company; or

    (b)   is or was, at the request of the Company, serving as a director, officer or liquidator of, or in any other capacity is or was acting for, another company or a partnership, joint venture, trust or other enterprise.

81.   The Company may only indemnify a person if the person acted honestly and in good faith with a view to the best interests of the Company and, in the case of criminal proceedings, the person had no reasonable cause to believe that his conduct was unlawful.

82.   The decision of the directors as to whether the person acted honestly and in good faith and with a view to the best interests of the Company and as to whether the person had no reasonable cause to believe that his conduct was unlawful is, in the absence of fraud, sufficient for the purposes of these Articles, unless a question of law is involved.

83.   The termination of any proceedings by any judgment, order, settlement, conviction or the entering of a nolle prosequi does not, by itself, create a presumption that the person did not act honestly and in good faith and with a view to the best interests of the Company or that the person had reasonable cause to believe that his conduct was unlawful.

84.   If a person to be indemnified has been successful in defence of any proceedings referred to above the person is entitled to be indemnified against all expenses, including legal fees, and against all judgments, fines and amounts paid in settlement and reasonably incurred by the person in connection with the proceedings.

85.   The Company may purchase and maintain insurance in relation to any person who is or was a director, an officer or a liquidator of the Company, or who at the request of the Company is or was serving as a director, an officer or a liquidator of, or in any other capacity is or was acting for, another company or a partnership, joint venture, trust or other enterprise, against any liability asserted

0084063.12

-15-

SBG0002913

against the person and incurred by the person in that capacity, whether or not the Company has or would have had the power to indemnify the person against the liability as provided in these Articles.

## SEAL

86.   The Company may have more than one Seal and references herein to the Seal shall be references to every Seal which shall have been duly adopted by resolution of directors. The directors shall provide for the safe custody of the Seal and for an imprint thereof to be kept at the Registered Office. Except as otherwise expressly provided herein the Seal when affixed to any written instrument shall be witnessed and attested to by the signature of a director or any other person so authorized from time to time by resolution of directors. Such authorization may be before or after the Seal is affixed, may be general or specific and may refer to any number of sealings. The Directors may provide for a facsimile of the Seal and of the signature of any director or authorized person which may be reproduced by printing or other means on any instrument and it shall have the same force and validity as if the Seal had been affixed to such instrument and the same had been signed as hereinbefore described.

## DIVIDENDS

87.   The Company may by a resolution of directors declare and pay dividends in money, shares, or other property, but dividends shall only be declared and paid out of surplus. In the event that dividends are paid in specie the directors shall have responsibility for establishing and recording in the resolution of directors authorizing the dividends, a fair and proper value for the assets to be so distributed.

## ACCOUNTS AND AUDIT

88.   The Company may by resolution of members call for the directors to prepare periodically a profit and loss account and a balance sheet. The profit and loss account and balance sheet shall be drawn up so as to give respectively a true and fair view of the profit and loss of the Company for the financial period and a true and fair view of the state of affairs of the Company as at the end of the financial period.

89.   The Company may by resolution of members call for the accounts to be examined by auditors.

90.   The first auditors shall be appointed by resolution of directors; subsequent auditors shall be appointed by a resolution of members.

91.   The auditors shall examine each profit and loss account and balance sheet required to be served on every member of the Company or laid before a meeting of the members of the Company and shall state in a written report whether or not

0084063.12

-16-

SBG0002914

(a)   in their opinion the profit and loss account and balance sheet give a true and fair view respectively of the profit and loss for the period covered by the accounts, and of the state of affairs of the Company at the end of that period; and

(b)   all the information and explanations required by the auditors have been obtained.

92.   Every auditor of the Company shall have a right of access at all times to the books of account and vouchers of the Company, and shall be entitled to require from the directors and officers of the Company such information and explanations as he thinks necessary for the performance of the duties of the auditors.

93.   The auditors of the Company shall be entitled to receive notice of, and to attend any meetings of members of the Company at which the Company's profit and loss account and balance sheet are to be presented.

NOTICES

94.   Any notice, information or written statement to be given by the Company to members may be served in the case of members holding shares in any way by which it can reasonably be expected to reach each member or by mail addressed to each member at the address shown in the share register.

95.   Any summons, notice, order, document, process, information or written statement to be served on the Company may be served by leaving it, or by sending it by registered mail addressed to the Company, at its registered office, or by leaving it with, or by sending it by registered mail to, the registered agent of the Company.

96.   Service of any summons, notice, order, document, process, information or written statement to be served on the Company may be proved by showing that the summons, notice, order, document, process, information or written statement was delivered to the registered office or the registered agent of the Company or that it was mailed in such time as to admit to its being delivered to the registered office or the registered agent of the Company in the normal course of delivery within the period prescribed for service and was correctly addressed and the postage was prepaid.

DISPUTES

97.   Whenever any difference or dispute arises between the Company on the one hand and any of the members or their executors, administrators or assigns on the other hand, touching the true intent and construction or the incidence or consequences of these Articles or of the Act, touching anything done or executed, omitted or suffered in pursuance of the Act or touching any breach or alleged breach or otherwise relating to the premises or to these Articles, or to any Act

0084063.12

-17-

SBG0002915

or Ordinance affecting the Company or to any of the affairs of the Company such difference shall, unless the parties agree otherwise, be submitted by the parties to the exclusive jurisdiction of the appropriate court in the British Virgin Islands. The law of the British Virgin Islands shall govern the resolution of any such difference between such parties.

### VOLUNTARY WINDING UP AND DISSOLUTION

98. The Company may voluntarily commence to wind up and dissolve by a resolution of members but if the Company has never issued shares it may voluntarily commence to wind up and dissolve by resolution of directors.

### CONTINUATION

99. The Company may by resolution of members or by a resolution passed unanimously by all directors of the Company continue as a company incorporated under the laws of a jurisdiction outside the British Virgin Islands in the manner provided under those laws.

We, HWR SERVICES LIMITED, of Craigmuir Chambers, Road Town, Tortola, British Virgin Islands for the purpose of incorporating an International Business Company under the laws of the British Virgin Islands hereby subscribe our name to these Articles of Association the 7th day of May, 1993 in the presence of:

Witness                                              Subscriber


Elena Ruffell Smith                          Richard A. Peters

.........................................        ...........................................
Craigmuir Chambers                          Authorized Signatory
Road Town, Tortola                          HWR Services Limited
Company Administrator



0054063.12                                      -18-

SBG0002916

EXHIBIT A
[to Articles of Association]

PROMISSORY NOTE

For Class M Shares

July __, 1993

[COMPANY NAME], a company organized under the laws of [Jurisdiction] (the "Member"), in partial consideration for the issuance of TWENTY-FIVE THOUSAND (25,000) of the $1 par value class M shares of IRIDIUM MIDDLE EAST CORPORATION, a British Virgin Islands International Business Company (the "Company"), hereby promises to pay to the order of the Company, in lawful money of the United States and in immediately available funds capital contributions in the maximum total amount of FIFTY MILLION DOLLARS ($50,000,000).

Terms not otherwise defined herein shall have the meaning ascribed thereto in the Articles of Association of the Company (the "Articles").

1. Capital Contributions. The Member hereby agrees to pay the following sums to the Company in the maximum amounts and on the dates set forth on the following tentative schedule (the "Capital Draw Schedule"):

| | Expected Draw Date | Maximum Dollar Amount to be Drawn |
|---|---|---|
| 1. | one week prior to the "Closing Date," as such term is defined in the Stock Purchase Agreement (which is defined below) | $5,000,000 |
| 2. | August 15, 1993 | $5,500,000 |
| 3. | October 1, 1993 | $5,000,000 |
| 4. | December 1, 1993 | $4,250,000 |
| 5. | April 1, 1994 | $2,000,000 |
| 6. | July 1, 1994 | $5,250,000 |
| 7. | September 1, 1994 | $7,500,000 |
| 8. | December 1, 1994 | $5,500,000 |
| 9. | Upon call by the Company | $10,000,000 |
| | Total | $50,000,000 |

The Member (i) acknowledges that the first eight entries on the Capital Draw Schedule set forth amounts proportionate to the amounts listed in Exhibit B to that certain Stock Purchase Agreement entered into by and among Iridium, Inc., a Delaware corporation, the Company, and certain other parties dated as of July 19, 1993 (the

SBG0002917

"Stock Purchase Agreement") and lists dates that are, except for the first date, one month prior to the dates listed in Exhibit B to the Stock Purchase Agreement, (ii) acknowledges that the ninth entry on the Capital Draw Schedule represents the Member's ratable portion (based on its percentage shareholding in the Company) of the amounts the Company may be required by Section 2(f) of the Stock Purchase Agreement to pay as a capital contribution to Iridium, Inc., (iii) acknowledges that the payments to be made pursuant to such Exhibit B and Section 2(f) might be accelerated, delayed, or otherwise altered pursuant to the terms of the Stock Purchase Agreement, and (iii) agrees that any such changes occurring from time to time shall be automatically incorporated into the Capital Draw Schedule set forth above without further action or approval by the Member or the Company.

    2.   <u>Default</u>. If the Member fails to make any single payment to the Company on the terms specified in Section 1 above when due, the Member shall be in default hereunder, and the following provisions shall apply:

    (a)   Written notice specifying the date upon which payment was supposed to have been made and the shares in respect of which payment is due shall be served by the office of the Chairman of the Board of Directors of the Company, or his designee, on the Member. If the Chairman of the Board of Directors fails to provide such notice, any other director of the Company shall be authorized to serve such notice on the Member.

    (b)   The written notice shall

       (i)   name a further date not earlier than the expiration of 14 days from the date of service of the notice on or before which the Member may cure such default by making payment to the Company of the amount due; and

       (ii)   contain a statement that in the event of non-payment at or before the time named in the notice the shares, or any of them, in respect of which payment is not made will be liable to be redeemed.

    (c)   A copy of such written notice shall also be delivered to each of the other members of the Company.

    (d)   If (i) the Member fails to make payment in the time specified in such notice, and (ii) the other members holding the same class of shares as the Member, if any, fail to satisfy the obligations of the Member to the Company hereunder by not making payment of the amount due from the Member in the time specified in such notice, then all of the shares in the Company held by each of the class M members shall automatically and immediately be redeemed by the Company on the terms set forth in the Articles, the existing class M directors of the Company shall be removed from such positions, and none of the class M members shall have any further right to elect directors of the Company.

0064063.12

SBG0002918

3.    Representations of Member. The Member represents that, (i) to the extent desired by the Member, it has received and read a copy of the Stock Purchase Agreement, the Promissory Note executed by the class B member, the Memorandum of Association of the Company, the Articles, and any other documents related to such documents, and has had an opportunity to have such documents reviewed by counsel, and (ii) understands the terms of such documents.

4.    Rights of the Company. The Company shall have the full right, in its sole discretion and without any notice to or consent from the Member, from time to time and at any time, and without affecting, impairing, or discharging, in whole or in part, the liability of the Member hereunder, to deal with Iridium, Inc. in any manner whatsoever with respect to the obligations of the Company to Iridium, Inc., including but not limited to:  (i) extending, in whole or in part, the time of performance or payment of any obligation owing by the Company under the Stock Purchase Agreement; (ii) agreeing with Iridium, Inc. to make any change, amendment, or modification whatsoever of any term or condition of the Stock Purchase Agreement, provided that such changes, amendments, or modifications do not increase the financial obligation of the Company or the Members thereunder; and (iii) settling, compromising, releasing, surrendering, modifying, or impairing, and enforcing, exercising, or failing or refusing to enforce or exercise, any claims, rights or remedies of the Company of any kind or nature against Iridium, Inc.; provided, however, that any such action that is material to the rights or obligations of the Company or any of the Members shall only be taken by the Company pursuant to a validly approved resolution of directors.  The Member hereby consents to, ratifies, and affirms any such extension, change, amendment, renewal, release, surrender, exchange, modification, impairment, settlement, or compromise, and all such actions shall be binding upon the Member.

5.    Waiver of Defenses. The Member hereby waives diligence, presentment, demand for payment, protest, or notice with respect hereto, and all demands whatsoever, and notice of acceptance hereof, and covenants that this Promissory Note will not be discharged except by complete and final payment of all amounts payable by the Member hereunder.  The Member hereby waives any legal or equitable defenses arising out of its insolvency, bankruptcy, or similar legal disability.

6.    Governing Law; Jurisdiction.  THIS PROMISSORY NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAW OF THE BRITISH VIRGIN ISLANDS WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS.  The Member, by its execution hereof, hereby submits to the exclusive jurisdiction of the courts of the British Virgin Islands, in connection with any action or proceeding relating to this Promissory Note and hereby consents to service of process or other summons in any such action or proceeding brought by the Company against it in any such court by the means and to the address of such Member set forth in section 7 below.

7.    Notices. All notices or other communications required or permitted to be given to the Member or to the Company pursuant to this Promissory Note shall be in writing and shall be considered as properly delivered (1) at the time delivered by hand, (2) one business day after transmission by telegraph or telecopier or (3) four days after

0084063.12

-3-

SBG0002919

placement with DHL Worldwide Express requesting delivery on the most expedited basis available, postage prepaid, and addressed to the respective parties as follows:

> Iridium Middle East Corporation
> [c/o Fulbright & Jaworski L.L.P.
> 801 Pennsylvania Avenue, N.W.
> Washington, D.C.  20004
> Telecopier:  202/662-0235]
>
> [Name and address of Member]

Any party may change its notice address by giving notice in writing, stating its new address, to the Company.  The newly designated address shall be such party's address for the purpose of all notices or other communications required or permitted to be given pursuant to this Promissory Note beginning on the tenth (10th) day after giving notice of such change.

8.   Expenses of Enforcement.   The Member shall pay or reimburse the Company on demand for all reasonable costs and expenses (including fees and expenses of counsel) incurred in connection with the enforcement of the Company's rights as against the Member under this Promissory Note.

9.   Amendments.  All amendments, waivers, and modifications of or to any provision of this Promissory Note shall be in writing, shall be signed and delivered by the Member, and shall be consented to in writing by the Company, and shall not otherwise be effective.

10.   Binding Effect; Assignment.  This Promissory Note shall be binding on the Member and its successors and assigns.  However, the Member shall not transfer any of its obligations hereunder without the prior written consent of the Company, which consent may only be evidenced by a written resolution signed by all members, and any purported transfer without that consent shall be void.  This Promissory Note shall inure to the benefit of the Company and its successors and assigns.

11.   Gender and Number.  All terms used herein in any one gender or number shall mean and include any other gender and number as the facts, context, or sense of this Promissory Note may require.



0084063.12

-4-

SBG0002920

12.   Headings. Section headings used herein are for descriptive purposes only and shall not control or alter the meaning of this Promissory Note as set forth in the text.

[COMPANY NAME]

[SEAL]

By:_____
Name:
Title:

Attest:

By:_____
Name:
Title:

0084063.12

-5-

SBG0002921

**EXHIBIT B**

DATED _____ 1994

ELM PARK INVESTMENTS LIMITED

[     **Redacted**     ]

[     **Redacted**     ]

[     **Redacted**     ]

[     **Redacted**     ]

SHAREHOLDERS' AGREEMENT
RELATING TO TRINFORD
INVESTMENTS S.A.

SBG0002873

## TABLE OF CONTENTS

| Clause | Subject Matter | Page |
|--------|----------------|------|
| 1. | Interpretation | 4 |
| 2. | Condition Precedent | 5 |
| 3. | Subscription for Shares | 5 |
| 4. | The Business | 5 |
| 5. | IMEC | 6 |
| 6. | Constitution of the Board | 6 |
| 7. | Shareholders' Meetings | 7 |
| 8. | Default | 7 |
| 9. | Major Matters | 8 |
| 10. | Accounting Matters | 10 |
| 11. | Finance | 10 |
| 12. | Dividends | 11 |
| 13. | Meetings of the Board | 11 |
| 14. | Prohibition Against dealing with Shares | 12 |
| 15. | Conflict | 12 |
| 16. | Deadlock | 13 |
| 17. | Termination | 14 |
| 18. | No Partnership | 14 |
| 19. | Joint Ownership | 14 |
| 20. | Announcements & Circulars | 15 |
| 21. | Confidentiality | 15 |
| 22. | Notices | 15 |
| 23. | Costs | 16 |
| 24. | Proper Law | 16 |

2

SBG0002874

__THIS AGREEMENT__ is made the  *17*   day of *APRIL*  1994

__BETWEEN__

1.  __ELM PARK INVESTMENTS LIMITED__ with Registered Office at P. O. Box 707, West Bay Road, Grand Cayman Islands, BWI   ("Elm Park")

2.  [         **Redacted**                                          ]

3.  [         **Redacted**                                          ]

4.  [         **Redacted**                                          ]

5.  [         **Redacted**                                          ]

__RECITALS__

A.  Trinford Investment S.A. ("the Company") with Registered Office at Arias Fabrega & Fabrega Trust Company BVI Ltd , Wickham's Cay, Road Town, Tortola, BVI, is an international business company limited by shares incorporated in the British Virgin Islands on 7th. July, 1993.

B.  The Company has subscribed for 25,000 B shares of US$1 each in the capital of IMEC and in part consideration for such shares has entered into a promissory note under which the Company agrees to fulfil certain obligations for the payment of capital contributions to IMEC to the maximum total amount of US$50,000,000.

C.  The Shareholders wish to invest in IMEC through the Company.

D.  The Shareholders have agreed to enter into this Agreement with a view to placing on record their agreement as to how the affairs of the Company shall be regulated.



3

**NOW IT IS HEREBY AGREED** as follows:

**1.**   **Interpretation**

1.1    In this Agreement the provisions of this Clause shall apply unless the context otherwise requires.

1.2    The following words and expressions shall bear the meanings set opposite them:

"the Auditors"          the auditors for the time being of the Company;

"the Board"             the Board of Directors for the time being of the Company;

"the Business"          the business to be carried on by the Company of investing in and holding shares in IMEC;

"Capital Draw Schedule"  the Capital Draw Schedule as defined in the Promissory Note;

"Capital Instalments"   the capital instalments due on the Shares on the Payment Dates as detailed in Schedule 1;

"IMEC"                  Iridium Middle East Corporation, a company incorporated in the British Virgin Islands with registered office at Craigmuir Chambers, P. O. Box 71, Road Town, Tortola, BVI;

"Payment Date"          any of the payment dates;

"the Promissory Note"   a promissory note dated 29th . July, 1993 under which the Company promises to pay IMEC capital contributions not exceeding US$50,000,000;

"the Shares"            the 25,000 US$1 shares in the Company allocated to the Shareholders pursuant to Clause 3.1;

"the Shareholders"      Elm Park, [ Redacted ], [ Redacted ] [ Redacted ] and   [ Redacted ]

1.3    References to statutory provisions shall be construed as references to any statutory modification or re-enactment thereof (whether before, on or after the date hereof) for the time being in force and to any former statutory provision replaced (with or

4

SBG0002876

without modification) by the provisions referred to and shall include all statutory instruments or orders from time to time made pursuant thereto.

1.4   References to persons shall include references to bodies corporate and to unincorporated associations, to the singular shall include references to the plural, and to the masculine shall include references to the feminine and vice versa.

1.5   References to clauses are to clauses of this Agreement.

1.6   Headings and underlining are included for convenience only and shall not affect the interpretation or construction of the terms of this Agreement.

2.   <u>Condition Precedent</u>

This Agreement is conditional upon the existing shareholders of the Company transferring their shares in the Company held by them to Elm Park.

3.   <u>Subscription for Shares</u>

3.1   Each of the Shareholders agrees to subscribe for the number of US$1 shares set against their respective names in the second column of Schedule 1 (in the case of Elm Park such number to include the three shares transferred in accordance with Clause 2) at par value of US$1 plus a premium of US$2,000 per share to be paid by instalments on the Payment Dates.

3.2   Each of the Shareholders agrees that on or before each Payment Date it will transfer the Capital Instalment set against its respective name for that Payment Date in Schedule 1 in immediately available US$ to the Company's bank account as follows:

Coutts & Co.,
International Private Banking Division
440 Strand
London WC2 0QS
England

For the Account of: N 128
Attention: Mrs. Nermine Harvey-Phillips

4.   <u>The Business</u>

Each of the Shareholders hereby acknowledges and confirms that the Company has been established to invest in and hold shares in IMEC.

5

SBG0002877

5.    **IMEC**

5.1   The Shareholders acknowledge that:

    (i)    the Company has entered into the Promissory Note; and

    (ii)    payments have already been made by or on behalf of the Company in accordance with the Capital Draw Schedule and that the Company may apply any funds received from the Shareholders to discharge any liabilities incurred in complying with the terms of the Promissory Note.

5.2   Each of the Shareholders agrees that if the Capital Draw Schedule is altered, the Payment Dates may be amended without further recourse to the Shareholders. The Company shall give the Shareholders 14 days notice of any such amendment.

5.3   Any decision of the Board relating to the Company's existing or future, investment or shareholding, in IMEC (not being a call by the Company on a partly paid share) or any appointment or removal of any appointee to the Board of IMEC shall require approval by the affirmative vote or the consent in writing of each of the Shareholders.

5.4   The Board shall appoint up to five directors (or such other number as the Company is from time to time entitled to appoint) to the Board of IMEC. Each Shareholder shall be entitled to put forward names of individuals suitable to be the Company's appointee.

5.5   The initial appointees to the Board of IMEC are Hasan M. Binladin, Saleh M. Binladin, Akber Moawalla, Alawi Baroom and Basil Al-Rahim.

6.    **Constitution of the Board**

6.1   The Board shall initially consist of two Directors: Noel Marechal and Yves Bruderlein.

6.2   Each of the Shareholders shall be entitled to appoint one Director to the Board and shall have the right at any time to remove any Director appointed by it and to substitute another nominee in his place. Each such appointment and removal shall be made by memorandum in writing lodged at the registered office of the Company.

6



SBG0002878

6.3   The Shareholders may appoint additional Directors of the Company by resolution signed on behalf of each of them.

## 7.   Shareholders' Meetings

7.1   No business shall be transacted at any meetings of the Company unless each of the members for the time being is present in person or by its duly represented proxy or representative. If this requirement is not satisfied within one hour of the time appointed for the meeting, the meeting may, at the request of a Shareholder, be adjourned until the same time and place on the seventh day following the date for which the meeting was originally convened. If at the adjourned meeting the requirement is not satisfied within one hour of the time appointed for the meeting, the meeting may, at the request of a Shareholder, be adjourned again until the same time and place on the fourteenth day following the date for which the meeting was originally convened, but if the requirement is not met at that meeting those present shall constitute a quorum.

7.2   All meetings of the members of the Company shall take place in Jeddah or in such other place as the Shareholders may from time to time agree and each of the Shareholders shall use all reasonable endeavours to attend such meeting.

7.3   No resolution shall be validly passed by the Company in general meeting unless each of the Shareholders present has voted in favour of it.

## 8.   Default

8.1   Any Shareholder who fails to pay the Company the Capital Instalments in accordance with Clause 3.2 shall be in default ("the Defaulting Shareholder").

8.2   If any Shareholder is in default, the Board shall demand immediate payment of any shortfall from the Defaulting Shareholder. If the Defaulting Shareholder fails to rectify the default within 7 days, it shall be deemed to have served notice on the Company of its intention to transfer all its shares in the Company ("the Default Shares") at par. The Default Shares shall be offered by the Company to each of the Shareholders not in default ("the Non-Defaulting Shareholders").

8.3   If more than one Non-Defaulting Shareholder applies for the Default Shares, those Shares shall be transferred to the Non-Defaulting Shareholders pro-rata to their respective interests in the share capital of the Company.

7

SBG0002879

8.4   The Company may, with the written approval of each Non-Defaulting Shareholder, offer the Default Shares, or part thereof, to an agreed third party.

8.5   The Default Shares shall be transferred to the Non-Defaulting Shareholder or to a third party ("the Transferee") on the following terms:

(a)   the Transferee executing an instrument of transfer in respect of any partly paid shares (thereby expressly acknowledging that the Capital Instalments due in respect of the Default Shares shall be the sole responsibility of the Transferee;

(b)   the Transferee paying the Defaulting Shareholder a sum equal to the par value of the Shares transferred;

(c)   the Transferee paying any outstanding Capital Instalments that have fallen due;

and any two Directors of the Company may act as the Defaulting Shareholders' attorney in relation to any transfer of shares in accordance with this clause.

8.6   A Defaulting Shareholder shall not, until the default has been remedied, be entitled to vote at any Shareholders meeting nor shall his appointee, if any, to the Board, be entitled to vote at any meeting of the Board nor shall the consent of the Defaulting Shareholder or his appointee be required for any purpose. Notwithstanding any other provision of this Agreement, the absence of a Defaulting Shareholder from a Shareholders meeting or his appointee from a Board meeting or the abstention of the Defaulting Shareholder or his appointee as appropriate, shall not invalidate the meeting or the business conducted at such meeting.

9.   <u>Major Matters</u>

9.1   Any decision of the Board relating to any of the following matters shall require approval by the affirmative vote or the consent in writing of each of the Shareholders:

(a)   the creation, issue or allotment of any shares, or the grant or agreement to grant any option over shares or unclad capital, of the Company or the issue of any obligations convertible into shares or the alteration of the class rights of the shares of the Company;



8

(b)    the declaration or payment of any dividend, or the making of any other distribution or payment out of the profits of the Company;

(c)    the capitalization, repayment or other forms of distribution of any amount standing to the credit of any reserve of the Company or the redemption or purchase of any shares or any other reorganisation of the share capital of the Company;

(d)    the admission of any person, whether by subscription or transfer, as a member of the Company;

(e)    the approval of the balance sheet and profit and loss account or any other account of the Company;

(f)    the sale or disposal of the whole or part of the undertaking or the assets of the Company;

(g)    the amalgamation or merger of the Company with any other Company or concern;

(h)    any alteration to the Memorandum or Articles of Association of the Company;

(i)    any resolution to place the Company in voluntary liquidation or receivership, or to appoint an administrative receiver over all or any part of the Company's assets or undertaking, or relating to a composition or arrangement with its creditors generally or any other process of a similar nature;

(j)    the commencement by the Company of any new type of business not being ancillary or incidental to the Business;

(k)    the giving of any guarantee or indemnity or security of any indebtedness, liability or obligation of any person, firm or Company whatsoever;

9.2    Any decision of the Board relating to any of the following matters shall require approval by the affirmative vote or the consent in writing of the holders of not less than 50% of the nominal issued share capital of the Company:

(a)    any transaction or dealing or contract by the Company having a duration of six months or longer or being unusual or onerous or being outside the

    9





SBG0002881

ordinary course of the Business or the making by the Company of any capital commitment in excess of US$100,000;

(b)     the formation or acquisition of any subsidiary of the Company;

(c)     the acquisition by the Company of any shares of any other company or the participation by the Company in any partnership or joint venture;

(d)     the borrowing of any moneys by the Company;

(e)     the lending of any moneys by the Company (otherwise than by way of deposit with a bank or other institution, the normal business of which includes the acceptance of deposits);

(f)     the alteration of any mandate given to the Company's bankers relating to any matter concerning the operation of the Company's bank account and the changing of the Company's bankers;

(g)     the factoring or assignment of any of the book debts of the Company;

(h)     the payment of any service or constancy fees in respect of any services supplied to the Company by or at the request of any of its members;

(i)     the appointment and removal of the Auditors of the Company;

(j)     the institution of material legal proceedings and the submission to arbitration of any material dispute or the settlement of any material dispute involving the Company.

10.     **Accounting Matters**

10.1    The accounting reference date of the Company shall be 31st. December.

10.2    The Auditors of the Company shall be

11.     **Finance**

11.1    All capital requirements of the Company which exceed the Company's resources and which cannot be financed from external sources shall be contributed to by the Shareholders in the same proportion as the nominal value of the ordinary shares

 10



SBG0002882

beneficially owned by each of them bears to the total nominal value of the entire issued ordinary share capital of the Company by way of loan ("the Shareholders' Loans"). The Board shall give the Shareholders not less than 7 days prior written notice of this requirement. The Shareholders Loans shall be made on such terms as may be agreed between the Shareholders and the Company provided that they shall rank pari pasu with each other in all respects as to repayment and otherwise.

11.2   No repayment of the Shareholder Loans shall be made by the Company unless at the same time a proportionate repayment shall be made to each of the other Shareholders.

11.3   If any Shareholder fails to provide capital at any time in accordance with Clause 11.1 on the date specified by the Board in the notice, each of the other Shareholders shall be entitled (but not obligated and without prejudice to any or all other rights and remedies each of them have) to lend the Company all or part of the default amount, such amount to constitute a Shareholder Loan.

11.4   Any guarantee of, or other security for, any of the Company's liabilities which have been agreed by the Company  and which may from time to time be required from the Shareholders shall be provided by the Shareholders in the same proportions that each contributes capital under Clause 11.1.

## 12.   Dividends

12.1   No dividends shall be paid by the Company until all Shareholder Loans have been discharged.

12.2   Subject to Clause 12.1  and to availability of distributable profits, the policy of the Company shall be to apply all surplus cash in the payment of dividends.

12.3   No dividend shall by payable to any Defaulting Shareholder.

## 13.   Meetings of the Board

13.1   Meetings of the Board shall (unless the Shareholders shall otherwise agree) take place in Geneva at such time or times as may be required but not in any event less frequently than twice in each calendar year.

13.2   The quorum at meetings of the Directors shall be all the Directors for the time being of the Company. In the event of a quorum not being present within one hour of the

11

SBG0002883

time appointed for holding the meeting, the meeting shall be adjourned until the same time and place on the seventh working day following the date for which the meeting was originally convened and those present shall be the quorum.

13.3    Not less than 14 days' notice of a meeting of the Board shall be given in writing or by facsimile transmission by the Company to each of its Directors unless such notice is waived by the Shareholders and all the Shareholders shall use all reasonable endeavours to procure that a quorum of the Board is present at such meetings.

## 14.    Prohibition against dealing with Shares

Each of the Shareholders hereby undertakes with the other that during the continuance of this Agreement it will not mortgage, charge or otherwise encumber the whole or any part of its shareholding in the Company or assign or otherwise purport to deal with the beneficial interest therein or any right relating thereto separate from the legal ownership of such shares.

## 15.    Conflict

In the event of there being any conflict between the provisions of this Agreement and the provisions of the Memorandum and Articles of Association of the Company, the provisions of this Agreement shall, as between the Shareholders, prevail and each of the Shareholders undertakes with the other that:

(a)    it will exercise all votes, powers and rights pursuant to the Articles of Association so as to give full force and effect to the provisions and intentions of this Agreement; and

(b)    if it should be necessary, in order that any provision of this Agreement shall be effective in accordance with its terms, that the provision shall be included in the Articles of Association, it will take all such steps as may be necessary to amend the Articles of Association accordingly.



12



SBG0002884

**16.** **Deadlock**

In the event the Board serves notice on each of the Shareholders that a matter requiring the consent of all the Shareholders has not been agreed to and the Shareholders are unable to reach a unanimous decision as to how the matter should be dealt with within 28 days of the notice being served, the Board shall notify each Shareholder that a deadlock exists and the following provisions shall apply:

(a)   Shareholders representing 50% or more of the nominal share capital of the Company ("the Majority Shareholders") may serve a transfer notice on the other Shareholder(s) ("the Dissenting Shareholders") requiring the the dissenting Shareholders transfer their Shares to the Majority Shareholders;

(b)   the Majority Shareholders may allocate the Shares of the Dissenting Shareholder amongst themselves, but in the event of dispute the allocation will take into account the proportionate holding of each of the Majority Shareholders;

(c)   the Dissenting Shareholders will not be obligated to transfer any Shares unless at the same time:

(i)   the price paid for the Shares is not less than the sum of Capital Contributions made by the Dissenting Shareholder of the date of transfer;

(ii)   the transferee(s) reimburses the Dissenting Shareholder for any Shareholder Loans (together with any interest due) advanced by the Dissenting Shareholder or the proportionate part of such payments and the Company shall credit the transferee as having paid or advanced those sums;

(iii)   the transferee(s) executes an instrument of transfer in respect of any partly paid Shares;

and any two Directors of the Company may act as the Dissenting Shareholders' attorney in relation to any transfer of Shares in accordance with this clause.

13



SBG0002885

17. **Termination**

If any of the Shareholders shall:

(a) fail to take all necessary action to remedy any breach on its part of this Agreement within sixty (60) days from the service of any written notice by the other Shareholders hereto complaining of such breach;

(b) be declared bankrupt (or any comparable process) enter into any composition or arrangement with its creditors generally;

(c) be placed in voluntary liquidation (or any comparable process) otherwise than for the purpose of reconstruction or amalgamation or if any order of the relevant court is made for its compulsory liquidation;

(d) have a receiver or other encumbrancer appointed over the whole or any part of its assets or undertaking or suffer any similar act in consequence of debt; or

(e) cease to carry on business or be deemed to be unable to pay its debts

then and in any such event the Shareholder in question shall be deemed to be in default and, without prejudice to such other rights and remedies as they may have, the provisions of Clause 8 shall apply.

18. **No Partnership**

Nothing in this Agreement shall be read or construed so as to constitute the relationship of principal and agent or of partnership between the Shareholders. No Shareholder may pledge or purport to pledge the credit of another Shareholder or make or purport to make any representations, warranties or undertakings for another Shareholder.

19. **Joint Ownership**

When a Share is registered in two or more names:

(a) the liability of the registered holders shall be joint and several; and

(b) any instruction, consent or resolution signed or otherwise approved by the holder first appearing on the register of members shall be deemed to have


14


SBG0002886

been given by all registered holders without further enquiry by the Company.

## 20. Announcements and Circulars

20.1 Each of the Shareholders hereby undertakes to provide all such information known to it or which on reasonable enquiry ought to be known to it and relating to the Company, or otherwise as the other Shareholder may reasonably require for the purpose of complying with any requirement of law.

20.1 Subject as required by law all announcements and circulars by or on behalf of either of the Shareholders and relating to the transactions hereunder shall be in terms to be agreed between the Shareholders.

## 21. Confidentiality and Good Faith

21.1 Each of the Shareholders shall maintain strict confidence and secrecy in respect of all information of a proprietary nature received by it directly or indirectly pursuant to this Agreement and each Shareholder shall use its best endeavours to procure that its respective officers and employees and also that the Company maintain strict confidence and secrecy in respect of such information. The covenants and obligations of this clause shall survive the termination of this Agreement and each party shall continue to observe them regardless of whether its rights hereunder should be terminated or it should cease to be a party hereto.

21.2 It is hereby agreed between the Shareholders that during the continuance of this Agreement all transactions entered into between the Shareholders or either of them on the one hand and the Company on the other shall be conducted in good faith and on an arm's length basis.

## 22. Notices

22.1 Any notice or other document to be given hereunder shall be delivered or sent by first class post or telex or facsimile transmission to the party to be served at the party's address appearing in this Agreement or such other address as that party shall notify in accordance herewith.

22.2 Any such notice or document shall be deemed to have been served if delivered at the time of delivery or if posted at the expiration of 48 hours after the envelope

 15



containing the same shall have been put into the post or if sent by telex or facsimile transmission at the expiration of 12 hours after receipt of the same has been automatically acknowledged to the sender thereof and in providing such service it shall be sufficient to prove that delivery was made or that the envelope containing such notice or document was properly addressed and posted as a prepaid first class letter or that the telex or facsimile transmission was properly addressed and acknowledged as the case may be. Provided that the copy of such telex or facsimile transmission is delivered or sent by post in a manner aforesaid within 24 hours of such telex or facsimile transmission being automatically acknowledged.

23. <u>Costs</u>

Each party shall pay the costs and expenses incurred by it in connection with entering into this Agreement.

24. <u>Proper Law</u>

This Agreement shall be governed by and construed in accordance with English law and the parties hereby submit to the non-exclusive jurisdiction of the English courts.



16

SBG0002888

## SCHEDULE 1

### CAPITAL INSTALMENTS & PAYMENT DATES

| SHAREHOLDER | NUMBER OF $1 SHARES SUBSCRIBED | CAPITAL INSTALMENTS ON ALLOTMENT OF SHARES | CAPITAL INSTALMENTS DUE ON 01.04.94 | CAPITAL INSTALMENTS DUE ON 01.07.94 | CAPITAL INSTALMENTS DUE ON 01.09.94 | CAPITAL INSTALMENTS DUE ON 01.12.94 | CAPITAL INSTALMENTS DUE ON DEMAND | TOTAL SUBSCRIPTION PRICE US$ |
|---|---|---|---|---|---|---|---|---|
| Elm Park Investments | 8,750 | 6,921,250 | 700,000 | 1,837,500 | 2,625,000 | 1,925,000 | 3,500,000 | 17,508,750 |
| [ Redacted ] | 7,500 | 5,932,500 | 600,000 | 1,575,000 | 2,250,000 | 1,650,000 | 3,000,000 | 15,007,500 |
| [ Redacted ] | 3,125 | 2,471,875 | 250,000 | 656,000 | 937,500 | 687,500 | 1,250,250 | 6,253,125 |
| [ Redacted ] | 3,125 | 2,471,875 | 250,000 | 656,000 | 937,500 | 687,500 | 1,250,250 | 6,253,125 |
| [ Redacted ] | 2,500 | 1,977,500 | 200,000 | 525,000 | 750,000 | 550,000 | 1,000,000 | 5,002,500 |
| | 25,000 | | | | | | 10,000,000* | 50,025,000 |

* This figure of US$10,000,000 represents the amount which may be called upon by Iridium Inc. if necessary, after all the due capital instalments have been paid by IMEC.

17

SBG0002889

**AS WITNESS** the hands of duly authorised officers of the parties on the date first before written

Signed by

for and on behalf of ELM PARK
INVESTMENTS LIMITED in the
presence of:

[   Redacted   ]

Signed by

[     Redacted     ]

in the presence of:"

Signed by

[ Redacted ] in the
presence of:

[     Redacted     ]

Signed by

[ Redacted ] in
the presence of:

Signed by [ Redacted ]

[     Redacted     ]
in the presence of

ALAWI M BAROUM

HASAN M BINLADEN.

18

SBG0002890

**EXHIBIT C**

PROMISSORY NOTE

For Class B Shares

July 2❭, 1993

Trinford Investments S.A., an International Business Company organized under the laws of the British Virgin Islands (the "Member"), in partial consideration for the issuance of TWENTY-FIVE THOUSAND (25,000) of the $1 par value class B shares of IRIDIUM MIDDLE EAST CORPORATION, a British Virgin Islands International Business Company (the "Company"), hereby promises to pay to the order of the Company, in lawful money of the United States and in immediately available funds capital contributions in the maximum total amount of FIFTY MILLION DOLLARS ($50,000,000).

Terms not otherwise defined herein shall have the meaning ascribed thereto in the Articles of Association of the Company (the "Articles").

1. <u>Capital Contributions</u>. The Member hereby agrees to pay the following sums to the Company in the maximum amounts and on the dates set forth on the following tentative schedule (the "Capital Draw Schedule"):

| | Expected Draw Date | Maximum Dollar Amount to be Drawn |
|---|---|---|
| 1. | one week prior to the "Closing Date," as such term is defined in the Stock Purchase Agreement (which is defined below) | $5,000,000 |
| 2. | August 15, 1993 | $5,500,000 |
| 3. | October 1, 1993 | $5,000,000 |
| 4. | December 1, 1993 | $4,250,000 |
| 5. | April 1, 1994 | $2,000,000 |
| 6. | July 1, 1994 | $5,250,000 |
| 7. | September 1, 1994 | $7,500,000 |
| 8. | December 1, 1994 | $5,500,000 |
| 9. | Upon call by the Company | $10,000,000 |
| | Total | $50,000,000 |

0091445

29.7.93

SBG0002922

The Member (i) acknowledges that the first eight entries on the Capital Draw schedule set forth amounts proportionate to the amounts listed in Exhibit B to that certain Stock Purchase Agreement entered into by and among Iridium, Inc., a Delaware corporation, the Company, and certain other parties dated as of July 19, 1993 (the "Stock Purchase Agreement") and lists dates that are, except for the first date, one month prior to the dates listed in Exhibit B to the Stock Purchase Agreement, (ii) acknowledges that the ninth entry on the Capital Draw Schedule represents the Member's ratable portion (based on its percentage shareholding in the Company) of the amounts the Company may be required by Section 2(f) of the Stock Purchase Agreement to pay as a capital contribution to Iridium, Inc., (iii) acknowledges that the payments to be made pursuant to such Exhibit B and Section 2(f) might be accelerated, delayed, or otherwise altered pursuant to the terms of the Stock Purchase Agreement, and (iii) agrees that any such changes occurring from time to time shall be automatically incorporated into the Capital Draw Schedule set forth above without further action or approval by the Member or the Company.

  2. <u>Default</u>. If the Member fails to make any single payment to the Company on the terms specified in Section 1 above when due, the Member shall be in default hereunder, and the following provisions shall apply:

  (a) Written notice specifying the date upon which payment was supposed to have been made and the shares in respect of which payment is due shall be served by the office of the Chairman of the Board of Directors of the Company, or his designee, on the Member. If the Chairman of the Board of Directors fails to provide such notice, any other director of the Company shall be authorized to serve such notice on the Member.

  (b) The written notice shall

    (i) name a further date not earlier than the expiration of 14 days from the date of service of the notice on or before which the Member may cure such default by making payment to the Company of the amount due; and

    (ii) contain a statement that in the event of non-payment at or before the time named in the notice the shares, or any of them, in respect of which payment is not made will be liable to be redeemed.

  (c) A copy of such written notice shall also be delivered to each of the other members of the Company.

  (d) If (i) the Member fails to make payment in the time specified in such notice, and (ii) the other members holding the same class of shares as the Member, if any, fail to satisfy the obligations of the Member to the Company hereunder by not making payment of the amount due from the

0091445

-2-

SBG0002923

Member in the time specified in such notice, then all of the shares in the Company held by each of the class B members shall automatically and immediately be redeemed by the Company on the terms set forth in the Articles, the existing class B directors of the Company shall be removed from such positions, and none of the class B members shall have any further right to elect directors of the Company.

3.    <u>Representations of Member</u>.  The Member represents that, (i) to the extent desired by the Member, it has received and read a copy of the Stock Purchase Agreement, the Promissory Note executed by the class M member, the Memorandum of Association of the Company, the Articles, and any other documents related to such documents, and has had an opportunity to have such documents reviewed by counsel, and (ii) understands the terms of such documents.

4.    <u>Rights of the Company</u>.  The Company shall have the full right, in its sole discretion and without any notice to or consent from the Member, from time to time and at any time, and without affecting, impairing, or discharging, in whole or in part, the liability of the Member hereunder, to deal with Iridium, Inc. in any manner whatsoever with respect to the obligations of the Company to Iridium, Inc., including but not limited to:  (i) extending, in whole or in part, the time of performance or payment of any obligation owing by the Company under the Stock Purchase Agreement; (ii) agreeing with Iridium, Inc. to make any change, amendment, or modification whatsoever of any term or condition of the Stock Purchase Agreement, provided that such changes, amendments, or modifications do not increase the financial obligation of the Company or the Members thereunder; and (iii) settling, compromising, releasing, surrendering, modifying, or impairing, and enforcing, exercising, or failing or refusing to enforce or exercise, any claims, rights or remedies of the Company of any kind or nature against Iridium, Inc.; <u>provided</u>, however, that any such action that is material to the rights or obligations of the Company or any of the Members shall only be taken by the Company pursuant to a validly approved resolution of directors.  The Member hereby consents to, ratifies, and affirms any such extension, change, amendment, renewal, release, surrender, exchange, modification, impairment, settlement, or compromise, and all such actions shall be binding upon the Member.

5.    <u>Waiver of Defenses</u>.  The Member hereby waives diligence, presentment, demand for payment, protest, or notice with respect hereto, and all demands whatsoever, and notice of acceptance hereof, and covenants that this Promissory Note will not be discharged except by complete and final payment of all amounts payable by the Member hereunder.  The Member hereby waives any legal or equitable defenses arising out of its insolvency, bankruptcy, or similar legal disability.

6.    <u>Governing Law; Jurisdiction</u>.  THIS PROMISSORY NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAW OF THE BRITISH VIRGIN ISLANDS WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS.  The Member, by its execution hereof, hereby submits to the exclusive

0091445

-3-

SBG0002924

risdiction of the courts of the British Virgin Islands, in connection with any action or proceeding relating to this Promissory Note and hereby consents to service of process or other summons in any such action or proceeding brought by the Company against it in any such court by the means and to the address of such Member set forth in section 7 below.

7. <u>Notices</u>. All notices or other communications required or permitted to be given to the Member or to the Company pursuant to this Promissory Note shall be in writing and shall be considered as properly delivered (1) at the time delivered by hand, (2) one business day after transmission by telegraph or telecopier or (3) four days after placement with DHL Worldwide Express requesting delivery on the most expedited basis available, postage prepaid, and addressed to the respective parties as follows:

> Iridium Middle East Corporation
> c/o Fulbright & Jaworski L.L.P.
> 801 Pennsylvania Avenue, N.W.
> Washington, D.C. 20004
> Telecopier: 202/662-0235
>
> Trinford Investments S.A.
> c/o Farrer & Co.
> 66 Lincoln's Inn Fields
> London WC2A 3LH
> Telecopier: 4471-831-6301

Any party may change its notice address by giving notice in writing, stating its new address, to the Company. The newly designated address shall be such party's address for the purpose of all notices or other communications required or permitted to be given pursuant to this Promissory Note beginning on the tenth (10th) day after giving notice of such change.

8. <u>Expenses of Enforcement</u>. The Member shall pay or reimburse the Company on demand for all reasonable costs and expenses (including fees and expenses of counsel) incurred in connection with the enforcement of the Company's rights as against the Member under this Promissory Note.

9. <u>Amendments</u>. All amendments, waivers, and modifications of or to any provision of this Promissory Note shall be in writing, shall be signed and delivered by the Member, and shall be consented to in writing by the Company, and shall not otherwise be effective.

10. <u>Binding Effect; Assignment</u>. This Promissory Note shall be binding on the Member and its successors and assigns. However, the Member shall not transfer any of its obligations hereunder without the prior written consent of the Company, which

0091445

-4-

consent may only be evidenced by a written resolution signed by all members, and any purported transfer without that consent shall be void.  This Promissory Note shall inure to the benefit of the Company and its successors and assigns.

11.    _Gender and Number_.  All terms used herein in any one gender or number shall mean and include any other gender and number as the facts, context, or sense of this Promissory Note may require.

12.    _Headings_.  Section headings used herein are for descriptive purposes only and shall not control or alter the meaning of this Promissory Note as set forth in the text.

TRINFORD INVESTMENTS S.A.

[SEAL]

By:_____
Name:  Maitre Yves Bruderlein
Title:  Director

Attest:

By:_____
Name:
Title:

0091445

-5-

SBG0002926

**EXHIBIT D**

TO                          19- 4-96 ;   9:56 ;   MAKARID GRP. TRSRY→        00966 2 6676809;# 2

P(2)

# IRIDIUM MIDDLE EAST CORPORATION

P.O. Box 1011
Riyadh 11431
Kingdom of Saudi Arabia


11 April 1996


Mr. Robert Kinzie
Chairman & Chief Executive Officer
Iridium, Inc.
Washington, D.C.
U. S. A


Dear Mr. Kinzie:

I understand that after the Board Meeting in Rome next Wednesday 17th April 1996,
Iridium Middle East Corporation's representation in the board of Iridium, Inc. will be
reducing from two Directors to one Director. Consequently, I am pleased to
convey to you that Iridium Middle East Corporation will be nominating Sheikh
Hassan M. Binladin to the Board of Directors of Iridium, Inc. as its designated
Board Member. Sheikh Hassan M. Binladin will be replacing Mr. Ali S. Al-Shihabi
and Mr. Basil Al-Rahim.

Best regards,


Fahd Bin Khalid Bin Abdullah Al-Saud
Chairman

SBG0002927