# EXHIBIT 1

# JONES DAY

51 LOUISIANA AVENUE, N W  ·  WASHINGTON, D C  20001-2113

TELEPHONE (202) 879-3939  ·  FACSIMILE (202) 626-1700

Direct Number  (202) 879-3880
jegauch@jonesday.com

July 9, 2009

**VIA FAX AND FEDEX**

Robert Haefele, Esq.
Motley Rice, LLC
28 Bridgeside Boulevard
PO Box 1792
Mount Pleasant, SC  29465

Re: In re Terrorist Attacks on September 11, 2001, MDL No. 1570 (GBD)(FM)

Dear Robert:

This letter addresses the deficiencies in plaintiffs' responses to SBG's first set of interrogatories and requests for the production of documents. We have delayed sending this response until a final decision on plaintiffs' petition for certiorari in the hope that we could reduce the number of issues in dispute. Most of the deficiencies described below relate to plaintiffs' failure to identify witnesses or documents, or to produce evidence, supporting the specific jurisdiction theories articulated in the discovery responses and in the complaints. Most, if not all, of those specific jurisdiction theories are no longer viable under the Second Circuit's ruling. We therefore invite plaintiffs to withdraw those allegations as an alternative to wasting the Court's and the parties' time resolving disputes about whether plaintiffs have properly responded to discovery with respect to irrelevant allegations. Withdrawal is particularly warranted in light of the Supreme Court's recent decision in *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (May 18, 2009). Under *Ashcroft*, plaintiffs are obligated to set forth "well-pleaded, nonconclusory factual allegation[s]" and demonstrate that "they plausibly give rise to an entitlement to relief." *Id.* at 1950. If plaintiffs are not prepared to withdraw their allegations, we request a meet-and-confer during the weeks of July 27 or August 3 to attempt to resolve disputes relating to the adequacy of plaintiffs' discovery responses.

**GENERAL OBJECTIONS**

Your general objections to our requests reveal several problems, detailed below.

**Failure to Identify Documents and Witnesses:** The interrogatories required identification of documents and witnesses upon which you rely to support your various allegations. With few exceptions, your responses simply ignore this request: there is neither an objection (which has now been waived) nor a response. It is not an adequate substitute to cross-reference laundry lists of produced documents in response to a document demand on a related topic. SBG is entitled to know which documents you claim support each of the many factual

JONES DAY

Robert Haefele, Esq.
July 9, 2009
Page 2

allegations set forth in narrative responses which, in some cases, extend for ten pages or more. *See, e.g.*, Resp. to Interrog. 1 at 6-17. You are also required to identify witnesses on whom you intend to rely to support each of the allegations in your interrogatory responses.

**Failure Adequately to Specify Materials Relied Upon:** You claim to have relied generally on "published works" in preparing your discovery responses and cite, "merely by way of example," thirteen books that you assert contain responsive information. Interrog. Resp. at 2-3; Resp. to Doc. Req., Obj. No. 3. These published works total several thousand pages, yet you have neither identified any portion of any of them upon which you rely nor have you even cited any of them in any specific interrogatory responses. Although you need not reproduce publicly available texts, you are required to identify, in response to each interrogatory, the specific portions of text upon which you claim to have relied to support particular allegations. While such sources are not likely to be either probative or admissible, to the extent that you intend to rely on any of them, mere disclosure of assorted titles in your objections does not constitute a good faith response. *See* Local Civil Rule 33.1 ("Whenever a party answers any interrogatory by reference to records from which the answer may be derived or ascertained, as permitted in [Fed. R. Civ. P. 33(d)]: . . . The specifications of documents to be produced shall be in sufficient detail to permit the interrogating party to locate and identify the records and to ascertain the answer as readily as could the party from whom discovery is sought.").

Similarly, your objection to identifying responsive materials previously produced or filed in the litigation is unfounded. Interrog. Resp. at 3. Judge Maas ordered plaintiffs to identify the information on which they intend to rely in opposing a motion to dismiss on jurisdictional grounds. *See* Jan. 23, 2007 Order [Dkt. #1941] at 2. While it is not necessary for you to provide additional copies of produced or filed materials, you are required to specify which material – from among the voluminous quantity of documents on file in this litigation – you relied on in response to each interrogatory.

**Failure to Identify Expert Evidence:** You object to requests that in your view "improperly call for information that is properly the subject of expert reports and testimony," "the timing and sequence" of which you assert the Court has not addressed. Interrog. Resp. at 4; Resp. to Doc. Req. No. 8. Your objection assumes an additional step in jurisdictional discovery, however, that the Court has not ordered. To the extent you intend to rely on expert reports or testimony in opposition to SBG's motion to dismiss, no further order is required to authorize discovery of that information. Judge Maas sequenced discovery to allow each side to learn of the other's evidence before a renewed motion is filed. *See* Jan. 23, 2007 Order at 2. He made no reservation for later disclosure of expert reports. Rule 26(a)(2)(C) applies to expert testimony to be proffered at trial and does not immunize from discovery expert evidence to be offered in connection with preliminary motions.

JONES DAY

Robert Haefele, Esq.
July 9, 2009
Page 3

**Failure to Provide Basis for Claims of Privilege:**   You object generally to disclosure of information and production of documents subject to unspecified "confidences entrusted to Plaintiffs by third parties."  Interrog. Resp. at 4; Resp. to Doc. Req., Obj. No. 9.  Although it is unclear from your individual responses whether you have withheld any documents on this basis, you cite that objection in response to every single interrogatory and document request.  The objection itself is baseless, as there is no privilege to withhold "confidences entrusted to Plaintiffs by third parties."

Moreover, you have failed to comply with your obligation to establish the facts necessary to support any claim of privilege, whether as to "confidences from third parties" or as to recognized privileges, such as attorney-client privilege or work product protection. *See, e.g.*, *In re Grand Jury Subpoena*, 750 F.2d 223, 224-25 (2d Cir. 1984).  "Conclusory or ipse dixit assertions" are not enough. *Id.* at 225.  The Federal rules require a party to describe documents that are withheld on the grounds of privilege in a manner that will allow the other parties to assess the claim of privilege.  Fed. R. Civ. P. 26(b)(5); *see also* Local Civil Rule 26.2 (specifying the information that must be provided to justify a claim of privilege).  If you have withheld any documents on the basis of any claim of privilege or protection, we insist that you provide the information required by the rules, including stating whether any such document has been given to third parties, such as *The New York Times*.

**Supplementation:**   We recognize and accept plaintiffs' right (and obligation) to supplement their discovery responses if new information or evidence becomes available to them.  We reject, however, the make-weight argument that plaintiffs need not produce information or documents currently in their possession because plaintiffs have not yet received SBG's renewed motion to dismiss.  Interrog. Resp. at 5; Resp. to Doc. Req. at 4-5 and Doc. Req. 1.  SBG's motion challenging jurisdiction necessarily will be focused on the specific allegations and evidence produced in plaintiffs' discovery responses.  You can be certain that SBG does not intend to waste the Court's or its own time addressing hypothetical issues never raised by plaintiffs.  But if allegations or evidence currently known to you are not provided in response to these discovery demands, plaintiffs cannot raise or rely on them in opposition to the renewed motion.

## RESPONSES TO SPECIFIC DISCOVERY DEMANDS

The discussion that follows focuses on the interrogatory responses but notes, where applicable, the deficiencies in document productions on the same topics.

### Interrogatory No. 1:  General Jurisdiction (Doc. Req. No. 23)

Plaintiffs failed to respond to the request to identify the basis for their contention, if any, that various individuals and entities described in plaintiffs' response were acting on behalf of SBG.  For example, plaintiffs identify various investments allegedly made by individual

JONES DAY

Robert Haefele, Esq.
July 9, 2009
Page 4

members of the Binladin family, Resp. to Interrog. 1 at 14-16, suggesting that they are relevant to jurisdiction "to the extent that SBG supported Binladin family members' extensive U.S. property holdings or aided in their U.S. contacts," but plaintiffs identify no basis for claiming that SBG in fact provided such support. If plaintiffs claim that the actions of particular third parties are attributable to SBG for jurisdictional purposes, they are required to specify the basis for such claims.

**Interrogatory No. 2:  Conspiracy Theory of Jurisdiction**

Your answer to Interrogatory No. 2 is non-responsive, as it does not provide any of the requested information about any conspiracy theory plaintiffs may be alleging as a basis for jurisdiction. Indeed, the only reference in the entire four-page narrative to any entity associated with SBG is the brief reference to an alleged transfer in 2000 of 240 million euros by Cambridge Engineering to an account in Pakistan "held jointly by OBL and a Pakistani national." Resp. to Interrog. 2 at 20. But your interrogatory response does not identify a single witness or document that supports the allegation, and the only materials produced in response to document demands that touch on the matter are inadmissible media reports quoting your retained investigator, Jean-Charles Brisard.

We note, in particular, that plaintiffs have failed to produce the version of Yves Bruderlein's 2001 statement to Swiss authorities which plaintiffs purported to quote in their RICO statements as support for their claim that Cambridge Engineering had some ties to al Qaeda. *See WTC/Eurobrokers* RICO Statement (Binladins) [Dkt. #1123, 1125], Ex. A at 21-22. As you know, other defendants, including Bakr Binladin, have provided the Court with a verified copy of Mr. Bruderlein's statement which not only contradicts plaintiffs' claims but which is wholly at odds with what plaintiffs claimed Mr. Bruderlein said. *See* Defendants Bakr Binladin, Omar Binladin, Tariq Binladin, Mohammad Binladin Company, and Binladin Group International Company Ltd.'s Motion to Dismiss Plaintiffs' Complaints, at 6-7 and Ex. E. Plaintiffs have also failed to produce the "government memorandum" cited in various RICO statements as supposed support for this allegation. *See WTC/Eurobrokers* RICO Statement (SBG) [Dkt. #1124], Ex. A at 10.

If plaintiffs insist that they have evidence to support the claimed Bruderlein quote – or, indeed, any evidence to support the allegation that Cambridge made payments to an account somehow tied to al Qaeda – they are obligated to produce it. If, as appears likely, the quote was fabricated and no evidence exists to support these claims, plaintiffs are obligated under Rule 11 to withdraw them.

Plaintiffs have also failed to identify any witnesses or produce any evidence supporting the allegations that:

JONES DAY

Robert Haefele, Esq.
July 9, 2009
Page 5

- "Hasan Binladin managed a portion of OBL's assets and agreed to a partnership in May 2000 to invest $5M each in Safron Partners . . . ." Resp. to Interrog. 2 at 20.  Moreover, plaintiffs have not explained, much less produced evidence to support, any connection between OBL and any investment in Safron Partners, much less between Safron Partners and SBG.

- "In early 2001, two of OBL's sisters were seen by a foreign intelligence agency taking cash to an airport in Abu Dhabi where it was given to al Qaeda members." *Id.*  Plaintiffs have failed to identify any witnesses or evidence supporting this allegation, nor have they identified which sisters allegedly were involved, to whom they purportedly gave money, or what connection the allegation has to SBG.

**Interrogatory No. 3:  Alleged Support for OBL in the Sudan (Doc. Req. Nos. 2, 4, 5)**

Plaintiffs have failed to identify any documents or witnesses to support their claims that SBG provided support for OBL in the Sudan, including the following specific allegations:

- "SBG and MBC provided engineering expertise and construction equipment to OBL's companies. . . .  The equipment was valued at over $12M by the time OBL left the Sudan." Resp. to Interrog. 3 at 21-22.

- "SBG and MBC directors . . . arranged for and provided financial services necessary for the terrorist organization to invest in the Sudan and provided access to the global financial system needed to fund operations and attacks." *Id.* at 21.

- "SBG obtained the Port Sudan airport contract to induce OBL to move to the Sudan and oversee it." *Id.*

- "Working at the Port Sudan project was an SBG, MBC employee who had worked with OBL in Afghanistan." *Id.*

- "SBG and MBC assisted OBL in the Sudan by providing employees who helped OBL and his Sudanese companies." *Id.* at 22.

- "OBL relied upon SBG/MBC engineer Ibrahim Khader to help OBL construct airports and roads in the Sudan." *Id.*

- "SBG provided support to OBL's work on the Tahaddi road project." *Id.*

- Mohamed Saad was affiliated with SBG or MBC. *Id.*

JONES DAY

Robert Haefele, Esq.
July 9, 2009
Page 6

- "[W]ithout the aid and support of the SBG and the Binladin family, OBL would not have been able to participate in the beneficial relationship the Sudanese host government required." *Id.* at 23-24.

Not only have plaintiffs failed to identify any evidence supporting these claims, but even if true, these allegations would not provide a basis for personal jurisdiction over SBG. As you know, until their recent attempt to disavow their representation to the Court, plaintiffs had conceded that the Second Circuit's opinion requires the dismissal of claims against MBC. Plaintiffs' Response to Defendants' List of Defendants (Nov. 25, 2008) [Dkt. #2148] at 17. Given that fact, it is difficult to understand how those same claims could provide grounds for jurisdiction over SBG. They should be withdrawn.

**Interrogatory No. 4:  Al-Hijra, the Tahaddi Road, and OBL's Purported Role in Port Sudan (Doc. Req. No. 3)**

Plaintiffs' cross-reference to their answers to Interrogatories 3 and 6 and to various document demands is non-responsive, as none of those discovery responses identify any witnesses or documents that support the claims that Al-Hijra was a subsidiary of SBG, or that SBG had a role in the Tahaddi Road construction project. If, as appears likely, plaintiffs have no support for those allegations in the complaints, they must be withdrawn.

**Interrogatories 5 and 6:  Alleged Support for al Qaeda Operatives (Doc. Req. Nos. 6-9)**

Plaintiffs focus their response to these two interrogatories exclusively on Mohammed Jamal Khalifa. We assume, therefore, that plaintiffs do not contend that SBG "sheltered and directly supported" any other alleged al Qaeda operative (other than OBL). We will object to any attempt you might make to expand this claim in briefing on our renewed motion to dismiss.

Plaintiffs have failed to provide any evidence that the address on Khalifa's visa application was an "SBG corporate address," or that SBG or MBC knew in August 1994 that Khalifa was allegedly involved in terrorist activities. Moreover, given plaintiffs' concession that their claims against MBC cannot survive the Second Circuit's opinion, it is difficult to understand how plaintiffs could argue that jurisdiction exists as to SBG because of alleged conduct of MBC. These allegations should be withdrawn.

Plaintiffs' response also asserts that "Binladin companies aided OBL by purchasing weapons," Resp. to Interrog. 6 at 26, and that supporters of "a new terrorist group, known as Al Intiaqah. . . . currently receive funding from zakat, zadakah and charitable contributions from the Binladin group companies." *Id.* at 30. Despite the interrogatory's specific request, you provide no dates, names, places or any other supporting facts for these novel claims. Nor do you identify which "Binladin companies" supposedly are involved. The context for the first allegation suggests that it occurred in the mid-1980's, before SBG existed. If plaintiffs have some basis for

JONES DAY

Robert Haefele, Esq.
July 9, 2009
Page 7

claiming that SBG engaged in any of the conduct vaguely attributed to "Binladin companies," they are required to identify it.

**Interrogatory No. 8-10:  OBL's Shareholding in SBG (Doc. Req. Nos. 12-15)**

It is apparent from plaintiffs' response that they do not now and never have had any evidence to support the claim that OBL's name is still listed in SBG's corporate records.  We note that this is one of the specific allegations that Judge Casey relied on in finding that jurisdictional discovery was warranted, and yet it appears to have been made up out of whole cloth. *See In re Terrorist Attacks on Sept. 11, 2001*, 349 F. Supp. 2d 765, 822 (S.D.N.Y. 2005). It is remarkable that, six years after filing this lawsuit, you are still "investigat[ing] the timeliness of the original source information" for an allegation in the Complaint.  Resp. to Interrog. 8 at 32. Equally remarkable is your belated concession that plaintiffs' contentions "have not been conditioned necessarily upon his status as an SBG or MBC shareholder," Resp. to Interrog. 10 at 33, particularly given your arguments before Judge Casey on the Motion to Dismiss and your repeated representations to the Court on this subject in connection with recent discovery disputes. *See, e.g.*, Plaintiffs' Objections to Order of Magistrate Judge Maas Dated July 26, 2007 (Aug. 14, 2007) [Dkt. #2027] at 6 n.3; Letter from Robert Haefele to Judge Maas (July 10, 2007) (seeking clarification that the Court had not made a finding that OBL had been separated from SBG); June 29, 2007 Hr'g Tr. 41-42.  If plaintiffs continue to assert this frivolous allegation, SBG will seek Rule 11 sanctions.

In the response to Interrogatory No. 10, plaintiffs refer "in particular" to their answer to Interrogatory No. 3 "as evidence of SBG's and Binladin family members' continued assistance to OBL and AQ after SBG's alleged disassociation." Resp. to Interrog. 10 at 33.  However, plaintiffs' response to Interrogatory No. 3 does not contain any allegations of assistance to OBL that post-date his removal as a shareholder.   Consequently, your answer to Interrogatory No. 10 is non-responsive.

Finally, we do not understand the relevance of the statement, made in response to Interrogatory No. 8 (regarding OBL's name in the SBG corporate records), that Wadi Al Aqiq was registered to do business in Saudi Arabia. Resp. to Interrog. 8 at 32.  If plaintiffs intend to rely on that allegation as a basis for jurisdiction over SBG, they should provide further explanation.

**Interrogatory No. 11:  Disposition of OBL's Former Shares (Doc. Req. No. 18)**

Plaintiffs' answer is non-responsive.   You effectively concede that you have no evidence that OBL received any payment or other consideration in relation to the disposition of his shares of SBG, yet you continue to argue that, because you supposedly lack information on certain other issues, "there is no indication that OBL was divested from the companies." Resp. to Interrog. 11 at 33.  This is a non sequitur.  Moreover, the information you claim you lack has

JONES DAY

Robert Haefele, Esq.
July 9, 2009
Page 8

already been provided to you in discovery, so you have no excuse for failing to provide a responsive answer. *See* SBG's Supplemental Discovery Responses Pursuant to the Court's May 21, 2008 Order (June 18, 2008) [Dkt. #2090] at 3 (stating that neither Ghaleb Binladin nor anyone else received any dividends, distributions or any similar payments attributable to the former OBL shares; Ghaleb Binladin has derived no income from any transfer, assignment, pledge or liquidation of the shares).

As there is no allegation in the Complaint, the RICO statements, or even in plaintiffs' discovery responses, nor any evidence produced by plaintiffs that would support a claim, that OBL received any payment or other valuable consideration in relation to his SBG shares after 1993, plaintiffs are foreclosed from relying on that theory as a basis for personal jurisdiction.

**Interrogatory No. 12:  Ghaleb Binladin (Doc. Req. No. 17)**

Plaintiffs have failed to identify any evidentiary support for the propositions that Ghaleb Binladin was the "administrator of OBL's SBG/MBC related assets," Resp. to Interrog. 12 at 34, or that he had an obligation under Islamic law to resolve and satisfy any debts or grievances of OBL, or to care for OBL's family in Saudi Arabia.  Certainly, the latter contention would require expert testimony, which plaintiffs have refused to disclose.  Nor have they identified any evidence supporting any claim that the alleged calls by OBL to Ghaleb Binladin were made to him as an agent of SBG, or that they constitute material support for terrorism directed at the United States.  If you have any evidentiary support for any of these allegations, you are required to produce it; otherwise, the allegations should be withdrawn.

**Interrogatory No. 13:  Bank al Taqwa (Doc. Req. No. 19)**

Plaintiffs' answer is non-responsive.  The first two paragraphs of the response have nothing to do with SBG, and the third merely notes contrived "coincidences" in timing which, even if real, would not permit an inference that OBL received any benefit from Ghaleb Binladin's account.  Plaintiffs fail to identify a single witness or document that supports the bald assertion that "[t]he Binladin investments in Bank al Taqwa were done with knowledge that the investments would benefit OBL and al Qaeda activities." Resp. to Interrog. 13 at 36.  In fact, plaintiffs fail even to allege when, where or how the account benefited OBL, much less how anyone could have known about or intended this phantom benefit.

The documents produced in response to Document Request No. 19 do not cure these deficiencies.  If, as appears likely, plaintiffs have no evidence to support this theory, the allegation must be withdrawn.  It would not, in any event, survive the Second Circuit's standard for personal jurisdiction, nor the pleading standard articulated by the Supreme Court in *Ashcroft*.

JONES DAY

Robert Haefele, Esq.
July 9, 2009
Page 9

**Interrogatory No. 14: Yassin al-Kadi and Global Diamond Resources (Doc. Req. No. 11)**

Plaintiffs' response to Interrogatory No. 14 is non-responsive and, in fact, nonsensical.
With respect to specific jurisdiction theories, plaintiffs state:

> SBG's close business association with al-Kadi, is further evidence
> SBG and Al-Kadi, with whom SBG knew OBL had close financial
> ties, was in fact a method for SBG to support OBL through
> collaborative business activities.

Resp. to Interrog. 14 at 37.

Plaintiffs have failed to identify any evidence, as expressly requested by the
interrogatory, that (a) al-Kadi had "close financial ties" to OBL; (b) that SBG knew of such ties;
or (c) that al-Kadi's investment in GDR had any connection with OBL or terrorism. In fact, even
if plaintiffs' allegations were true (and they are not), it would not support jurisdiction under the
Second Circuit's opinion because SBG is not alleged to have engaged in any tortious act aimed
at residents of the United States, nor do plaintiffs' injuries arise out of Mr. al-Kadi's investment
in GDR. The allegation should be withdrawn.

**Interrogatory No. 16: Knowledge, Intent and Causation (Doc. Req. Nos. 21, 22)**

Plaintiffs provide no substantive response to Interrogatory No. 16 other than a cross-
reference to approximately 100 documents produced in response to Document Request Nos. 21
and 22. That is not a good faith response, particularly since none of the documents answer the
specific questions asked. Plaintiffs were required to identify, for each act allegedly giving rise to
personal jurisdiction, what documents and witnesses will support the contention that SBG knew
at the time that OBL intended to engage in terrorist attacks against the United States, that SBG
intended to support such attacks, and that the act or event bore a causal relationship to the 9/11
attacks. A generalized data dump of materials that have nothing to do with SBG does not
address the specific questions regarding SBG's alleged knowledge and intent. For example,
plaintiffs produce multiple copies of the Tareekh Osama files without identifying any evidence
that SBG ever knew about the matters described in those documents or had access to them prior
to this litigation. Such responses do not fulfill plaintiffs' discovery obligations under the Federal
rules and Judge Maas's order.

**Interrogatory No. 17: Travel (Doc. Req. No. 25)**

Other than the Carlyle Group conference in September 2001, plaintiffs fail to identify a
single trip that they contend is relevant to jurisdiction over SBG. The reference to documents
produced in response to Document Request No. 25 is not an adequate response, as virtually none
of those documents relate to travel to the United States by persons allegedly associated with

JONES DAY

Robert Haefele, Esq.
July 9, 2009
Page 10

SBG.  The dearth of records is particularly surprising given the strident representations you made to Judge Maas about additional travel that SBG supposedly had failed to disclose.  *See, e.g.*, June 29, 2007 Hr'g Tr. 20.

**Interrogatory No. 18:  Experts (Doc. Req. No. 1)**

Plaintiffs' objections are make-weight.  *See* discussion *supra* at 2.  If plaintiffs intend to rely on the testimony of any experts to establish personal jurisdiction over SBG, plaintiffs are required to identify them now.

**Interrogatory No. 19:  Authentication of Documents (Doc. Req. No. 27)**

Plaintiffs' refusal to identify information relevant to the authenticity and source of the documents on which plaintiffs intend to rely is unacceptable.  Your claim that "Plaintiffs' allegations [must] be held as true and correct without such need for authentication at this time" has no legal basis. Resp. to Interrog. 19 at 40.  Post-discovery, plaintiffs cannot rely on unauthenticated, hearsay statements to establish personal jurisdiction over SBG.  *See, e.g., Ariel Maritime Group, Inc. v. Pellerin Milnor Corp.*, No. 88 Civ. 6447, 1989 WL 31665 at *2 n. 4 (S.D.N.Y. 1989) ("[H]earsay evidence submitted by a plaintiff is not sufficient to defeat a motion to dismiss for lack of personal jurisdiction.").  SBG is therefore entitled to know the basis on which you claim that documents of unknown authorship or provenance are authentic and admissible.  Among the many documents for which any indicia of authenticity or reliability is lacking, only by way of example, are:

ASH011691-93 (C/V Abdalla Ibrahim Abdalla)

MR-SBG001788 (Secret – U.S. Only Release to Switzerland)

MR-SBG007552 (FBI Suspect List – Jan. 31, 2002)

MR-SBG009368-91 (Interview with "A Source" – Aug. 29, 2002)

MR-SBG010062-77 (Update on Terror Plans in Metro Manila – March 10, 08)

If plaintiffs intend to rely on these or any other non-self-authenticating documents in opposition to the motion to dismiss, they are required to provide the information requested by this interrogatory as to each such document.

**Interrogatory No. 20:  Authenticity of Documents Produced by SBG**

Plaintiffs have improperly refused to provide a substantive response to this interrogatory. If plaintiffs intend to claim that any of the documents referenced in the interrogatory are not

JONES DAY

Robert Haefele, Esq.
July 9, 2009
Page 11

authentic, they are required to say so now or waive the right to challenge authenticity.  It is no excuse that plaintiffs wish they had received more discovery on other issues.  Likewise, plaintiffs' claim that their allegations must be held true and correct at this stage of the litigation is not only incorrect, but it is beside the point.  Plaintiffs have never previously made an allegation that any of the referenced documents is not authentic, so there is no well-pled allegation upon which plaintiffs can fall back.

**Other Deficiencies**

Finally, we note that there are several instances in which plaintiffs did not produce documents that are referenced in your responses to document demands.  The missing documents are identified as ASH006040-80, ASH006386-89, ASH006475-6581, and ASH011615-52.

****

As the foregoing discussion demonstrates, plaintiffs have not identified or produced evidentiary support for any specific jurisdiction allegations that would withstand scrutiny under the Second Circuit's opinion.  We recognize that plaintiffs' responses were prepared at a time when they still hoped to overturn the Second Circuit's opinion on appeal.  Since that decision is now binding precedent in this case, we strongly encourage plaintiffs to re-evaluate and withdraw those allegations that, even under plaintiffs' view of the Second Circuit's decision, are no longer viable.  Notwithstanding plaintiffs' recent efforts to disavow their prior representation to the Court, plaintiffs have already acknowledged with respect to MBC that allegations relating to supposed support to OBL in the Sudan and Khalifa's visa cannot in good faith establish personal jurisdiction under the Second Circuit's ruling.  Given that acknowledgement, there can be no basis for arguing that those same allegations are sufficient to establish jurisdiction over SBG.

In addition to the legal deficiencies, plaintiffs' discovery responses confirm that they have no good faith basis for many of the factual allegations in the Complaint and RICO Statements.  Whether or not plaintiffs believed the allegations were justified when made, sanctions will be imposed when a party continues to advocate claims, or declines to withdraw them, after learning that they are groundless.  *Calloway v. Marvel Entertainment Group*, 854 F.2d 1452, 1472 (2d Cir. 1988), *rev'd in part on other grounds,* 493 U.S. 120 (1989).  Plaintiffs cannot hide behind the fact that Rule 11 does not apply to discovery:  Judge Maas has ordered plaintiffs to provide discovery responses on the allegations plaintiffs intend to rely on in opposing SBG's renewed motion to dismiss, and Rule 11 clearly does apply to those papers.  Plaintiffs must either withdraw their unsupported and legally baseless allegations, or comply with their discovery obligations to identify the evidence that supports such claims.

We look forward to meeting with you to resolve any open issues.

JONES DAY

Robert Haefele, Esq.
July 9, 2009
Page 12

Sincerely,

James E. Gauch

cc:     Andrew Maloney, Esq. (via fax)
        Sean Carter, Esq. (via fax)

# EXHIBIT 2



**GEOTEXT**
Translations, Inc.

STATE OF NEW YORK     )
                              )   ss
                              )
COUNTY OF NEW YORK   )

## CERTIFICATION

This is to certify that the attached translation is, to the best of my knowledge and belief, a true

and accurate translation from Arabic into English of the following:

      Decree No. 2/7258
      Statement from the Ministry of Interior, dated April 7, 1994

_____

Ted Bajek, Managing Editor
Geotext Translations, Inc.

Sworn to and subscribed before me

this 9th day of September, 20 07 .

_____

**VALBONA BURDA**
NOTARY PUBLIC-STATE OF NEW YORK
No. 01BU6170590
Qualified in Richmond County
My Commission Expires July 09, 2011

New York 17th Floor, New York, NY 10001, U.S.A. tel 212.631.7432 fax 212.631.7778
San Francisco 220 Montgomery Street, 3rd Floor, San Francisco, CA 94104, U.S.A. tel 415.576.9500 fax 415.520.0525
London 107-111 Fleet Street, London EC4A 2AB, United Kingdom tel +44.(0)20.7936.9002 fax +44.(0)20.7990.9909
Hong Kong 20th Floor, Central Tower, 28 Queen's Road, Central, Hong Kong tel +852.2159.9143 fax +852.3010.0082
translations@geotext.com l www.geotext.com

T0000100

Um El Qura   18 Thu Kaada 1414H

**Stripping Saudi Citizenship**

The Civil Status Administration in Mecca hereby announces that his Majesty issued decree No. 2/7258 dated 21/10/1414H to strip Saudi citizenship from the person named Osama Mohammed Awad bin Ladin.

Okaz   26 Shawal 1414 H corresponding to April 7, 1994

**Due to His Irresponsible Behavior,**

─────────────────

**Osama bin Ladin is Stripped of His Saudi Citizenship**

Saudi Arabia – Riyadh:
The Ministry of Interior issued the following statement:  Considering Osama bin Ladin's irresponsible conduct that is contrary to the Kingdom's interests and damages its relationship with friendly countries, and his disregard for the instructions conveyed to him, it was decided to strip him of his Saudi citizenship pursuant to Article 29 of the Saudi Citizenship Law.

T0000101

العدد ٣٥٠١ في ١٨ ذو القعدة ١٤١٢هـ

أم القـــرى

## منح الجنسية العربية السعودية

● تعلن ادارة الاحوال المدنية بمكة المكرمه بأنه صدر القرار الوزاري رقم ١١١٢/وز وتاريخ ١٤١٤/٨/١٤هـ القاضي بمنح الجنسية العربية السعودية للمدعو/ إيهاب حمزه سعيد فرحان وذلك بموجب المادة (٨) من نظام الجنسية.

● تعلن ادارة الاحوال المدنية بمكة المكرمه بأنه صدر القرار الوزاري رقم ٩٠٤/وز وتاريخ ١٤١٤/٦/٢٩هـ القاضي بمنح الجنسية العربية السعودية للمدعو/ صالح منصر صالح الحضرمي وذلك بموجب المادة (٨) من نظام الجنسية.

● تعلن ادارة الأحوال المدنية بالمدينة المنورة بأنه صدر الأمر السامي رقم ٦/١٨٤٠/ م وتاريخ ١٤١٣/١١/١٤هـ القاضي بمنح الجنسية العربية السعودية لـ/ نصيب النهامي بن أحمد بن محمد بن نصيب ـ وذلك بموجب المادة التاسعة من نظام الجنسية.

● تعلن ادارة الأحوال المدنية بالمدينة المنورة بأنه صدر الأمر السامي رقم ٦/١٨٤٠/ م وتاريخ ١٤١٣/١١/١٤هـ القاضي بمنح الجنسية العربية السعودية لـ/ عبدالمجيد بن نصيب النهامي بن أحمد بن محمد ـ وذلك بموجب المادة التاسعة من نظام الجنسية.

● تعلن ادارة الأحوال المدنية بالمدينة المنورة بأنه صدر الأمر السامي رقم ٦/١٨٤٠/م في ١٤١٣/١١/١١هـ القاضي بمنح الجنسية العربية السعودية لـ/ محمد الصالح بن نصيب النهامي بن أحمد بنْ محمد ـ وذلك بموجب المادة التاسعة من نظام الجنسية.

## اسقاط الجنسية السعودية

● تعلن ادارة الاحوال المدنية بمكة المكرمة بأنه صدرت الموافقة السامية الكريمة رقم ٧٢٥٨/٢ وتاريخ ١٤١٤/١٠/٢١هـ على اسقاط الجنسية السعودية عن المدعو/ أسامة محمد عوض بن لادن.

SBG0002581



بسم الله الرحمن الرحيم

## عكاظ

OKAZ

جريـدة سياسية اجتماعية يومية

رئيس التحرير
هاشم عبده هاشم

المدير العام
أمين مدني

THURSDAY, SHAWAL
26,1414H.APRIL 6 1994G. No. 10104

الخميس

○ السنة الخامسة والثلاثون ــ العدد ١٠١٠٤   الخميس
٢٦ شوال ١٤١٤ هـ الموافق ٧ ابريل ١٩٩٤م ○




# لتصرفاته غير المسؤولة :

# اسقاط الجنسية السعودية عن أسامة بن لادن

**السعودية- الرياض:**

أصدرت وزارة الداخلية البيان التالي: نظراً لما بدر من أسامة محمد بن لادن من تصرفات غير مسؤولة تتعارض مع مصلحة المملكة وتسيء الى علاقتها مع الدول الشقيقة ولعدم انصياعه للتعليمات المبلغة له.. فقد تقرر اسقاط الجنسية السعودية عنه عملاً بمقتضى المادة التاسعة والعشرين من نظام الجنسية السعودية.

SBG0002580

# EXHIBIT 3

EXCERPTS

158

```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ----------------------------------------x

3   UNITED STATES OF AMERICA

4         v.                S(7) 98 Cr. 1023

5   USAMA BIN LADEN, et al.,

6           Defendants.

7   ----------------------------------------x

8
                        New York, N.Y.
9                       February 6, 2001
                        10:00 a.m.
10

11

12  Before:

13              HON. LEONARD B. SAND,

14                  District Judge

15

16

17

18

19

20

21

22

23
```

161

1   just put them down on the floor.  That's fine, too.  It's

2   simply whatever you think will be of greatest assistance to

3   you.

4         We're now in the government's case.  Government may

5   call its first witness.

6         MR. FITZGERALD:  Yes, your Honor.  The government

7   calls as its first witness, Jamal Ahmed al-Fadl.

8         THE COURT:  All right.

9   JAMAL AHMED AL-FADL,

10      called as a witness by the government,

11      having been duly sworn, testified as follows:

12         DEPUTY CLERK:  Please state your full name.

13         THE WITNESS:  My name is Jamal Ahmed Mohamed al-Fadl.

14   DIRECT EXAMINATION

15   BY MR. FITZGERALD:

16   Q.  Sir, if you could spell your first name and your last name

17   in the English language for the record.

18   A.  The first name is J-A-M-A-L.  The last name is

19   A-L-F-A-D-L.

20   Q.  If you could try to talk as you are doing now into the

21   microphone directly in front of you, if you could also speak

22   slowly, because of your accent, to make sure that everyone

23   understands what you say, and if you could try to pause if you

240

1   outside from Sudan or you want to remove something, export it

2   to outside.

3   Q.  So it was trade in and out of the Sudan?

4   A.  Yes.

5   Q.  What other companies were established?

6   A.  Taba Investment.

7   Q.  Can you tell the jury what Taba Investment is, what its

8   business was?

9   A.  Taba Investment, when we sell our stuff, we sell it in

10  local money, Sudanese pounds.  When we sell the stuff, we

11  change the Sudanese pounds to dollars or sterling.

12  Q.  I'm sorry?

13  A.  We change the Sudanese pounds to dollars or sterling so

14  the company exchange the money.

15  Q.  The word after, you said to dollars or something?

16  A.  Sterling pounds.

17  Q.  Sterling pounds?

18  A.  Yes.

19  Q.  And what other companies were established by al Qaeda in

20  Sudan?

21  A.  Hijra Construction.

22  Q.  And can you tell us what the Hijra Construction Company

23  did?

24  A.  That time it built roads and bridge.

25  Q.  And was there any particular road or roads that Hijra was

241

1  building at the time in the Sudan when you were there?

2  A.  They build a road 83 miles between the Damazine, the

3  Damazine City and Kormuk City.

4  Q.  You said it's between Damazine City and a second city?

5  A.  Kormuk City.

6  Q.  Do you know who ran the al Hijra Company while it was in

7  the Sudan?

8  A.  At that time, few people.  The first one Dr. Sharif al Din

9  Ali Mukhtar.

10  Q.  Who else?

11  A.  Abu Hassan al Sudani, and Abu Hammam al Saudi, Abu Rida

12  Suri, and Abu Hajer.

13  Q.  The person Abu Hajer, is that the person whose picture you

14  identified about ten minutes ago?

15  A.  Yes.

16  Q.  And can you tell the jury what type of things were

17  purchased by the al Hijra Construction Company?

18  A.  Al Hijra construction built roads and bridge.

19  Q.  Did it buy things from outside the Sudan?

20  A.  Yes.

21  Q.  What types of things did al Hijra construction buy?

22  A.  They buy supplies for the road and bridge and at the same

23  time they buy explosive to open the road and bridge.

24   Q.   What other companies beside al Hijra do you recall being

25   established by al Qaeda in the Sudan?

348

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------------------------x

 3   UNITED STATES OF AMERICA

 4         v.                    S(7) 98 Cr. 1023

 5   USAMA BIN LADEN, et al.,

 6            Defendants.

 7   ------------------------------------------------x

 8
                              New York, N.Y.
 9                            February 7, 2001
                              10:00 a.m.
10

11

12   Before:

13                HON. LEONARD B. SAND,

14                      District Judge

15

16

17

18

19

20

21

22

23
```

350

1        (Trial resumed)

2        (Robing room conference sealed, filed under separate

3   cover)

4        (Court's Exhibit A was duly marked.)

5        (Jury present)

6        THE COURT:  Good morning, ladies and gentlemen.  The

7   witness may take the stand.

8        Wednesday, February 14, we will start a little later.

9   We will start at 10:30.  I assume you will make arrangements

10  in terms of transportation if you haven't already done that.

11  JAMAL AHMED AL-FADL, resumed.

12  DIRECT EXAMINATION (Continued)

13  BY MR. FITZGERALD:

14  Q   Good morning, sir.  If you could keep your voice up and

15  try to speak slowly, again, and sit forward in your chair.

16       THE COURT:  The court reminds you, you are still

17  under oath.

18  Q   Sir, are you familiar with a business by the name of the

19  Khartoum Tannery?

20  A   Yes.

21  Q   Can you tell us what the Khartoum Tannery is.

22  A   It belong to the government of Sudan, and we buy from them

23  and we use it for business.

351

1 incomprehensible.

2 A  I want to tell her the answer and she say it in English.

3      (Through the interpreter) We treat the skins of the

4 cows, and then we export them abroad.

5 Q  Did there come a time when the Khartoum Tannery's

6 ownership changed?

7 A  Yes.

8 Q  Can you tell us when that was, approximately.

9 A  I remember end of '93.

10 Q  What happened?

11 A  We buy it from the government.

12 Q  Who is we?

13 A  Al Qaeda group.

14 Q  How much of the Khartoum Tannery did al Qaeda buy?

15 A  We owed money, the Islamic National Front, from the

16 government, from the Sudan government.

17 Q  What did the Sudanese government owe al Qaeda money for?

18 A  We build the Thaadi Road.

19      MR. FITZGERALD:  Can the interpreter translate the

20 word Thaadi from Arabic into English.

21      THE INTERPRETER:  The revolutionary road.

22 Q  Where did that road go from and to?

23 A  From Khartoum City to Atbar City, Shendi City, Hayar City.

24  Q   Who built the road?

25  A   Hijra Construction Company.

352

1  Q  Is that the construction company you described yesterday?

2  A  Yes.

3  Q  Why did the Sudanese government give al Qaeda the Khartoum

4  Tannery or a portion of it?

5  A  Because they don't have money.

6  Q  Was that in exchange, as payment for building the road?

7  A  Correct.

8  Q  During the time that you were in al Qaeda, was there any

9  discussion of how profitable the businesses were in the Sudan?

10  A  Could you repeat the question.

11  Q  Was there a discussion within al Qaeda on whether or not

12  the businesses in the Sudan were making money or not?

13  A  Yes.

14  Q  Can you tell us where those discussions took place.

15  A  I remember we got meeting with Abu Rida al Suri, and Abu

16  Abdallah Bin Laden.

17  Q  Where was that meeting?

18  A  In guesthouse, the big guesthouse.

19  Q  Do you recall approximately when that meeting was?

20  A  Maybe during '91 -- sorry, '92.

21  Q  Can you tell us what was discussed at that meeting about

22  whether the companies were making money?

23  A  We talked about Bin Laden and we asked him if we have to

24  make money because the business is very bad in Sudan, because

25  the pounds go down and the dollar is strong.  The Sudanese

# EXHIBIT 4

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| *In Re* Terrorist Attacks on September 11, 2001 | ) ) ) | 03 MDL No. 1570 (RCC) |
| | ) | |
| Thomas E. Burnett, Sr., *et al.*, | ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 03 CV 9849 (RCC) |
| Al Baraka Investment and Development Corporation, *et al.*, | ) ) ) | |
| Defendants. | ) ) | |

### DECLARATION OF JAMAL AHMAD MOSTAFA KHALIFA (D92)

I, Jamal Ahmad Mostafa Khalifa, being duly sworn, declare and state as follows:

1.      I am over 18 years of age and competent to testify to the matters set forth below of my own personal knowledge.

2.      I have been informed by my attorney that I am listed as a defendant (D92) in the above-captioned action.  I am submitting this declaration in support of my Motion to Dismiss for lack of personal jurisdiction, failure to state a claim upon which relief can be granted and improper service of process.

3.      I was born on February 1, 1957 in Madinah, Saudi Arabia, and have lived in Saudi Arabia most of my life.  I have always been a citizen of the Kingdom of Saudi Arabia.

4.      I currently manage a restaurant business in Jeddah, which I have run since the late-1990's.

5.      I have only been to the United States twice, some times in eighty's and in 1994.  I

own no real property in the United States. I also have no bank accounts, and have no investments in the United States. I do not conduct any personal business with any businesses in the United States.

6.      I do not subscribe to or read either the *International Herald Tribune* or the *Al Quds al Arabi*. The latter publication, to my knowledge, is banned in the Kingdom of Saudi Arabia.

7.      I have never supported the loss of innocent life and believe that there is no justification for the tragic attacks of September 11, 2001. I have never supported any person or organization that I have known to participate in terrorist activities. At no time did I ever knowingly participate in, or support in any way, terrorist activities, nor was anyone ever authorized by me, explicitly or implicitly, to engage in such activities.

8.      The only specific allegations against me in the Third Amended Complaint in ¶¶189, 190, 234, 240, 254, and 324 contain numerous factual errors and incorrect associations. Taken in their totality, all the allegations about me in the Third Amended Complaint portraying me as conducting business in the US and being tied, directly or indirectly, to al-Qaeda are false. I have no associations, past or present, with the Saudi bin Laden Group.

9.      I also deny having any knowledge of any terrorist activities as alleged in ¶¶ 28 of Plaintiffs' More Definite Statement as to Defendant Yousef Abdul Latif Jameel (Mar. 16, 2004)..

10.      I can read and understand English.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

_____
Jamal Khalifa

Executed on the ___8___ day of __A P r.___, 2004.

# EXHIBIT 5

EXCERPTS



مكتب سكينة للترجمة المعتمدة

**SUKAINA AUTHORIZED TRANSLATION OFFICE**

(TRANSLATION FROM ARABIC)

## The Hashemite Kingdom Of Jordan
### Ministry of Justice
Jordan Court of Cassation, in its penal capacity

Case No.    :  412/95

Decision No. :  60

# D E C I S I O N

Issued by the Court of Cassation authorized to perform trial and issue judgement in the name of His Majesty King Hussein Ibn Talal, of the Hashemite Kingdom Of Jordan.

The jury is headed by president Mr. Khleif Al-Suheimat and the membership of the following Judges: Mr. Naji Al-Tarawneh, Mr. Abdul-Latif Al-Talli, Mr. Bassam Nuweiran, and Mr. Yousef Al-Hmoud.

### The First Cassation:

Appellant

1. Khalil Tawfiq Alqam

2. Jihad Ahmad Khalid Al-Tanjeer

3. Yassin Hassan Mohammad Zahrah

   Their attorneys: lawyers Zuhair Abu Al-Ragheb, Ziad Al-Najdawi, and Mohammad Issam Al-Momani.

Appellee
The Common Right

### The Second Cassation:

Appellant

Mohammad Said Dar Odeh

His attorneys: lawyers Abdul-Fattah Lafi and Ma'an Al-Khateeb

Appellee
The Common Right

-1-



## SUKAINA AUTHORIZED TRANSLATION OFFICE

**The Third Cassation:**

|  |  |
|---|---|
| Appellant | Appellee |
| Eid Saleh Hussein Al-Jahaleen | The Common Right |
| His attorney: lawyer Abdul-Fattah Lafi | |

**The Fourth Cassation:**

Appellant        Appellee

The Common Right

1. Abdullah Kamil Abdullah Al-Hashaykeh
2. Ismail Said Khalil Al-Amayreh
3. Zakariya Mohammad Daoud Qassim
4. Jihad Ahmad Khalid Al-Tanjeer
5. Suleiman Ahmad Abdul-Al Desah
6. Hassan Hamdan Hassan Abdul-Qader
7. Khalil Tawfiq Mohammad Alqam

   Their attorneys: lawyers Zuhair Abu Al-Ragheb,
   Samih Al-Husseini, and Mohammad Issam Al-Momani.

**The Fifth Cassation:**

|  |  |
|---|---|
| Appellant | Appellee |
| Samir Ahmad Tailakh | The Common Right |
| His attorney: lawyer Omar Al-Najdawi | |

**The Sixth Cassation:**

|  |  |
|---|---|
| Appellant | Appellee |
| The Public Prosecutor's Assistant | The Common Right |
| at the State Security Court | |

The Appellant Khalil Alqam and his companions submitted their cassation on 3.8.1995, the Appellant Mohammad Dar Odeh submitted his cassation on 14.8.1995, the Appellant Eid Al-Jahaleen submitted his cassation on 14.8.1995, the Appellant Abdullah Al-Hashaykeh and his companions submitted their cassation on 15.8.1995, the Appellant Samir Tailakh submitted his cassation on

-2-



### SUKAINA AUTHORIZED TRANSLATION OFFICE

مكتب سكينة للترجمة المعتمدة

17.8.1995, and the Public Prosecutor's Assistant at the State Security Court submitted his cassation on 16.8.1995 in appeal to decision No. 207/94 dated 19.7.1995 of the State Security Court ruling as follows:

1. **As to the Appellants: Abdullah Al-Hashaykeh, Ismail Al-Amayreh, Zakariya Qassim, Jihad Al-Tanjeer, Suleiman Besah, Khalil Alqam, Yassin Zahrah and Samir Tailakh, and the criminals: Mohammad Ali Abu Abbad and Mohammad Ahmad Al-Atharbeh:**

   a. To convict each one of them of the crime of participating in a scheme aiming at committing terrorist acts, in violation of the provisions of Articles 147, 148/1, 4 and 76 of the Penal Code, and to pass a judgement of hanging to death against each one of them.

   b. To convict each one of them of the crime of possessing explosive materials without legal license for the purpose of using them in an illegal manner, in violation of the provisions of Article 12/2 of the Explosives Law No. 13 for the year 1953 and its amendments, and to pass a judgement of hanging to death against each one of them.

   c. To impose the severest punishment on each one of them, under the provisions of Article 72/1 of the Penal Code, i.e. hanging to death.

2. **As to the Appellant Hassan Hamdan Abdul-Qader:**

   a. To convict him of the crime of participating in a scheme aiming at committing terrorist acts, in violation of the provisions of Articles 147, 148/1, 4 and 76 of the Penal Code, and to pass a judgement against him within the penalties of these Articles and the indication of Article 18/3/A of the Juvenile Law No. 24 for the year 1968 of detention for twelve years.



مكتب سكينة للترجمة المعتمدة

**SUKAINA AUTHORIZED TRANSLATION OFFICE**

b. To commute the penalty issued against him for the attenuation reasons so as to become, according to the provisions of Article 99/1 of the Penal Code, seven and a half years of hard labour, reckoned from the date of his arrest.

**6. As to the suspect Mohammad Jamal Khalifa:**

To acquit him of the crime of participating in a scheme aiming at committing terrorist acts on the grounds of insufficient proofs against him and to release him immediately unless otherwise arrested or convicted for another cause.

Bearing in mind that the Court had resolved in its decision No. 207/94 dated 21.12.1994 as follows:

1. To acquit all suspects of the crime of participating in an illegal society, in violation of the provisions of Articles 159/1 and 160 of the Penal Code.

2. As to the criminal Mohammad Ahmad Al-Harithy, a fugitive from justice: to convict him of the two crimes of participating in a scheme and possessing explosive materials for the purpose of using them in an illegal manner and to sentence him to death for each crime under the provisions of Article 72/1 of the Penal Code, and to impose the severest penalty upon him, i.e. hanging to death.

3. As to the criminal Yahya Owaidat Al-Sawarkeh, a fugitive from justice: to convict him of the crime of participating in a scheme and possessing explosive materials for the purpose of using them in an illegal manner, and to sentence him to death for each one of them, under Article 72/1 of the Penal Code, and to impose the severest penalty upon him, i.e. hanging to death.

Amman - Jabal Hussein, Sukaina Comm. Complex



### SUKAINA AUTHORIZED TRANSLATION OFFICE

Mohammad Ahmad Al-Harithy, Khalil Tawfiq Mohammad Alqam, Mohammad Ali Issa Shehadeh Abu Ayad, Mohammad Ahmad Abdul-Fattah Al-Atharbeh, Samir Ahmad Mohammad Tailakh, Eid Saleh Hussein Al-Jahaleen, Yassin Hassan Mohammad Zahrah, Suleiman Ahmad Abdul-Al Besah, Hassan Hamdan Hassan Abdul-Qader, Mohammad Said Moqbel Dar Odeh and Yahya Owaidat Mohammad Al-Sawarkeh are convicted of the crime of participating in a scheme for the purpose of committing terrorist acts in violation of Articles 147, 184 and 76 of the Penal Code and of the crime of possessing explosive materials with legal license for the purpose of using them in an illegal manner in violation of Article 12/2 of the Explosives Law and its amendments.

Our Court also decided on 26.3.1995 in the Case No. 44/95 to cassate the above mentioned State Security Court decision and to return the papers to it to rehear the witnesses Saleh Owaidat Mahmoud Al-Sawarkeh, Ja'far Jamil Abdul Rahim and Mohammad Amin Jabr and to observe the Juvenile Law in respect to the convicted Hassan Hamdan Hassan Abdul-Qader. The State Security Court after adhering to the decision of cassation and hearing the above mentioned witnesses, decided the following:

1. Pursuant to Article 236 of the Law of the Rules of Penal Trials, the suspect Mohammad Jamal Khalifa is acquitted of the crime of participating in a scheme for the purpose of committing terrorist acts in violation of the provisions of Articles 147, 148 and 76 of the Penal Code and he shall be released immediately unless he is withheld or convicted under another crime.

2. Pursuant to Article 234 of the Law of the Rules of Penal Trials, the description of the crime of possessing explosive materials for the purpose of using them in an illegal manner in violation of the provisions of Article 12/2 of the Explosives Law for the year 1953 attributed to the suspect Fa'eq Saleh Al-Shaweesh shall be amended to the crime of possessing explosive materials

-23-



**SUKAINA AUTHORIZED TRANSLATION OFFICE**

<u>The cassation reasons submitted by the Public Prosecutor's Assistant before the State Security Court:</u>

The first reason: Since the evidences that the Court has heard in the absence of the suspect who was judged in default have no relation with the said suspect but they have relation with the rest of suspects, therefore, the Court's non hearing of these evidences once again after the arrest of the suspect is not a violation of the law, especially that the suspect has not insisted on hearing them to defend himself. Moreover, the Public Prosecutor, as shown on page 833 of the trial's minutes, has enumerated the evidences used by prosecution from among the evidences listed on the list of witnesses against the said suspect. Therefore, the contents of this reason must be dismissed.

The second and third reasons: The evidences presented by prosecution against the suspect Mohammad Jamal Khalifa are limited to what is indicated in the affidavit of suspect Abdullah Kamel Al-Hashykeh and in the affidavit of suspect Mohammad Ali Issa Shehadeh. Since the State Security Court has found nothing to support these two affidavits, therefore, its decision to exclude them and, consequently, declare the said suspect's acquittal, agrees with the provisions of Article 148 of the Law of the Rules of Penal Trials. This decision may not be debased on the plea that the suspect Mohammad has transferred sums of money to the suspect Abdullah, because the State Security Court made sure that these amounts had been for the purpose of the latter suspect's travel to the Philippines to work in the school administered by the suspect Mohammad there, in addition to a one month's salary paid in advance to him. Therefore, these money had no relation with the scheme that was being plotted among the suspect Abdullah and some other suspects. Therefore, there is no contradiction between the conviction of the suspect Abdullah of the crime of plotting a scheme under the penalties of Articles 147 and 148 of the Penal Code, and the acquittal of the suspect Mohammad of this crime. Therefore, these two reasons don't rebut the appealed decision and they should be dismissed.

Amman - Jabal Hussein, Sukaina Comm. Complex
P.O.BOX: 150734 TEL/ FAX: 699077 Amman - Jordan

# EXHIBIT 6

# GLOBAL DIAMOND RESOURCES INC (GDRS)

836 PROSPECT STREET
SUITE 2B
LA JOLLA, CA 92037
619. 459.1928

## 10KSB

**10KSB DATED 12/31/1997**
**Filed on 03/31/1998 − Period: 12/31/1997**
File Number 000−21635



LIVEDGAR® Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

U.S. SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

FORM 10-KSB

[X]  ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE
     ACT OF 1934

For the fiscal year ended  December 31, 1997

OR

[ ]  TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES
     EXCHANGE ACT OF 1934

For the transition period from _____ to _____

Commission file number 0-21635

Global Diamond Resources, Inc.
(Name of Small Business Issuer in its charter)

| Nevada | 33-0213535 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

| 836 Prospect Street, Suite 2B La Jolla, California | 92037 |
|---|---|
| (Address of principal executive offices) | (Zip Code) |

Issuer's telephone number, including area code  (619) 459-1928

Securities to be registered under Section 12(b) of the Act:

| Title of each class to be so registered | Name of each exchange on which each class is to be registered |
|---|---|
| None | N/A |

Securities to be registered under Section 12(g) of the Act:

Common Stock, $.0005 par value

(Title of class)

Option/SAR Grants in Last Fiscal Year

| | | Individual Grants | | |
| Name | Number of Securities Underlying Options/SARs Granted (#) | % of Total Options/SARs Granted to Employees in Fiscal Year | Exercise or Base Price ($/Sh) | Expiration Date |
|------|------|------|------|------|
| Johann de Villiers | 100,000 | | $.75 | |
| Johann de Villiers | 1,200,000 | 3% | $.75 | 12/31/00 |
| Mervyn McCulloch | 100,000 | 36% | $.75 | 11/26/02 |
| Mervyn McCulloch | 600,000 | 3% | $.75 | 12/31/00 |
| | | 18% | | 11/26/02 |

Compensation of Directors. All non-officer directors receive an attendance fee of $1,000 per meeting of the Board of Directors. All directors receive reimbursement for out-of-pocket expenses in attending Board of Directors meetings. From time to time the Company may engage certain members of the Board of Directors to perform services on behalf of the Company. The Company will compensate the members for their services at rates no more favorable than could be obtained from unaffiliated parties.

32

Item 11.  Security Ownership of Certain Beneficial Owners and Management.

   The following table sets forth certain information regarding the beneficial ownership of the shares of Common Stock as of March 23, 1998 by (i) each person who is known by the Company to be the beneficial owner of more than five percent (5%) of the issued and outstanding shares of Common Stock, (ii) each of the Company's directors and executive officers and (iii) all directors and executive officers as a group.

| Name and Address | Number of Shares | Percentage Owned |
|---|---|---|
| Johann de Villiers(1)(2) | 1,642,668 | 6.4% |
| Mervyn McCulloch(1)(3) | 1,345,500 | 5.3% |
| Pieter van Wyk(1)(4) | 600,000 | 2.4% |
| John Tyson(1)(5) | 393,920 | 1.6% |
| Charles MacDonald(1)(6) | 225,000 | (7) |
| Abu Bakr Bin Ali Al-Akhdar Mood(1) | (8) | -- |
| Said H. Ghachem(1) | (8) | -- |
| Gasem S. Al-Shaikh(1) | (8) | -- |
| Andries Janzen(1) | -- | -- |
| International PCM Holdings Limited(9) | 9,711,525 | 37.5% |
| All officers and directors as a group | 4,207,088 | 15.1% |

(1)   Address is 836 Prospect, Suite 2B, La Jolla, California 92037.

(2)   Includes 1,542,668 shares of Common Stock underlying immediately exercisable options held by Mr. de Villiers.

(3)   Includes 1,200,000 shares of Common Stock underlying immediately exercisable options held by Mr. McCulloch.

(4)   Represents 600,000 shares of Common Stock underlying immediately exercisable options.

(5)   Includes 300,000 shares of Common Stock underlying immediately exercisable options.

(6)   Includes 100,000 shares of Common Stock underlying immediately exercisable options.

(7)   Less than one percent.

(8)   Serves on the Board of Directors of the Company as the nominee of International PCM Holdings Limited.

(9)   Includes 1,807,816 shares of Common Stock issuable upon conversion of a Secured Convertible Promissory Note. Does not include 635,566 shares of Common Stock underlying warrants not immediately exercisable.

33

# GLOBAL DIAMOND RESOURCES INC (GDRS)

836 PROSPECT STREET
SUITE 2B
LA JOLLA, CA 92037
619. 459.1928

# 10KSB

**GLOBAL DIAMOND RESOURCES – 12/31/1998**
**Filed on 11/22/1999 – Period: 12/31/1998**
File Number 000−21635



**LIVEDGAR**® Information Provided by Global Securities Information, Inc.
800.669.1154
**www.gsionline.com**

U.S. SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

FORM 10-KSB

[X]   ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE
      ACT OF 1934

For the fiscal year ended   December 31, 1998

                              OR

[ ]   TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES
      EXCHANGE ACT OF 1934

For the transition period from                        to

Commission file number 0-21635

                    GLOBAL DIAMOND RESOURCES, INC.
              (NAME OF SMALL BUSINESS ISSUER IN ITS CHARTER)

    Nevada                                          33-0213535
    ---------------------                           ----------------------

    (State or other jurisdiction of
    incorporation or organization)                  (I.R.S. Employer
                                                     Identification No.)

    836 Prospect Street, Suite 2B
    La Jolla, California
    ---------------------
    (Address of principal executive offices)        92037

                                                     ----------------------
                                                     (Zip Code)

        ISSUER'S TELEPHONE NUMBER, INCLUDING AREA CODE  (619) 459-1928
                                                         ---------------

Securities to be registered under Section 12(b) of the Act:

    Title of each class
    to be so registered                      Name of each exchange on which
                                             each class is to be registered

        None
    ---------------------

                                                   N/A
                                             ----------------------

Securities to be registered under Section 12(g) of the Act:

                    COMMON STOCK, $.0005 PAR VALUE

    ----------------------------------------------------------------------
                          (Title of class)

Indicate by check mark whether the registrant (1) has filed all reports required
to be filed by Section 13 or 15(d) of the Exchange Act of 1934 during the past
12 months (or for such shorter period that the registrant was required to file
such reports), and (2) has been subject to such filing requirements for the past
90 days.  Yes [_]   No [X]

Check if there is no disclosure of delinquent filers pursuant to Item 405 of
Regulation S-K contained in this form, and will not be contained, to the best of
registrant's knowledge, in definitive proxy or information statements
incorporated by reference in Part III of this Form 10-KSB or any amendment to
this Form 10-KSB.  [_]

The market value of the voting stock held by non-affiliates of the registrant as
of September 30, 1999 was approximately $4,235,000.

The number of shares of the Common Stock outstanding as of September 30, 1999
was 45,600,678.

            DOCUMENTS INCORPORATED BY REFERENCE:  NONE.

Part I

Item 1.  Description of Business.

Business Development
--------------------

     Certain mining and geological terms used below are defined in the section
"Glossary," below. The Company has entered into certain financial commitments
payable in Rand, the unit of currency of the Republic of South Africa. All Rand
based amounts are designated by the symbol R.  As of September 30, 1999, the
Rand-Dollar exchange rate was 6.14 Rand to one U.S. Dollar.  Unless otherwise
indicated, all share information contained in this report has been adjusted to
give effect for a two for one split of the outstanding shares of Common Stock
effected on December 19, 1997.

     Global Diamond Resources, Inc., a Nevada corporation ("Company"), was
formed under the laws of the State of Nevada on January 7, 1987 under the name
Lohengrin, Inc. for the purpose of conducting an unspecified offering of its
securities and then applying the net proceeds towards the acquisition of one or
more businesses.  In March 1988, the Company acquired all of the outstanding
common shares of capital stock of Western Capital Leasing Corporation, a
California corporation engaged in the business of equipment financing.  At that
time, the Company changed its corporate name to Western Capital Financial
Corporation.  Between March 1988 and March 1992, the Company acted as a holding
corporation for its wholly-owned subsidiary, Western Capital Leasing
Corporation.  In 1992 Western Capital Leasing Corporation discontinued active
business operations.  Between March 1992 and July 1995, the Company and Western
Capital Leasing Corporation were both inactive.

     In July 1995, the Company acquired all of the outstanding shares of common
stock of Global Diamond Resources Inc. ("Global Diamond-BC"), a British Columbia
corporation.  At the time, Global Diamond-BC served as a holding company for its
South African operations.  Pursuant to a Securities Purchase Agreement and Plan
of Reorganization dated July 17, 1995, the Company acquired from the
shareholders of Global Diamond-BC all of the issued and outstanding capital
shares of that corporation in exchange for the Company's issuance of 8,830,000
shares of Common Stock of the Company (representing 95% of the issued and
outstanding shares of the Common Stock after giving effect to the
reorganization) and warrants to purchase 1,100,000 shares of Common Stock, at
Canadian $.375 per share, expiring on December 31, 1997.  The terms of the
reorganization were the result of arm's-length negotiations between management
of the Company and management of Global Diamond-BC.  Prior to the consummation
of the reorganization, the Company divested itself of its interest in Western
Capital Leasing Corporation by selling all of the issued and outstanding shares
of the common stock of Western Capital Leasing Corporation for $1.00.  At the
time of the divestiture, Western Capital Leasing Corporation was a dormant
corporation without assets or operations of any kind.  Subsequent to the
reorganization, the Company changed its corporate name to Global Diamond
Resources, Inc.

     On December 5, 1997, the Company entered into a Securities Purchase
Agreement with International PCM Holdings Limited ("PCM") pursuant to which PCM
has invested $6,000,000 in the Company.  Under the terms of the Agreement, PCM
purchased 7,050,482 shares of Common Stock for the purchase price of $3,000,000.
In addition, PCM agreed to lend the Company up to $3,000,000 pursuant to a
Secured Convertible Promissory Note in the original principal amount of
$3,000,000 issued by a wholly-owned offshore subsidiary of the Company.  The
Note issued to PCM is secured by 100% of the stock of the Company's South
African subsidiary, Global Diamond Resources (SA) (Pty) Limited, which holds all
of the Company's mining properties, plant and equipment.

     Under the terms of the Note, the outstanding principal accrues interest at
a rate of 15% per year, payable in arrears in bi-annual installments, with all
principal and interest due within five years from the date of the Note.  The
principal and interest under the Note is convertible in to a maximum of
1,807,816 shares of Common Stock of the Company at the rate of $.425 per share.
The Note does not contain any penalties for prepayment, however the Note does
include certain negative and affirmative financial and operational covenants on
the part of the Company.  In addition to the foregoing, PCM received warrants to
purchase up to 807,852 shares of Common Stock at prices ranging from $.25 to
$.375.  On March 11, 1998, PCM exercised warrants to purchase 172,286 shares of
Common Stock at an exercise price of Cdn$.375 per share.  The Company has used
the proceeds from the PCM financing to further its mining operations in South
Africa.  The Company agreed to expand its Board of Directors to nine members and
appoint three members of PCM to the Board.

                                        1

In December 1997, the Board of Directors approved a two for one split of the outstanding shares of Common Stock of the Company and a change in its authorized Common Stock from 25 million shares of $.001 par value Common Stock to 50 million shares of $.0005 par value Common Stock.  The effective date of the split was December 19, 1997.

On December 29, 1998, the Company entered into Securities Purchase Agreements with LIWA Diamond Company Limited and New Diamond Holdings Limited, respectively, as amended June 30, 1999, pursuant to which each investor purchased 9,238,096 shares of Common Stock of the Company for $3,000,000.  The Company agreed to expand its Board of Directors to 11 members and appoint 2 nominees of each investor to the board.  PCM agreed to reduce its nominees to the Board to two.

In connection with the investment by LIWA Diamond and New Diamond, the Company paid a finder's fee amounting to $1,363,200 and 2,750,000 shares of Common Stock to Mr. Abu Bakr Bin Ali Al-Akhdar Mood, who at the time was a director of PCM and a member of the Board of Directors of the Company.  As a result of a subsequent arbitration over the matter, Mr. Abu Bakr returned to the Company $963,165 and the 2,750,000 shares of Common Stock.  It is uncertain whether Mr. Abu Bakr will return the $400,035 balance of the cash portion of the finder's fee.  On June 3, 1999, Mr. Abu Bakr resigned from the Board of Directors of the Company.  In connection with the return of the cash and shares by Mr. Abu Bakr, 666,667 shares of common stock were issued to PCM as a fee for their assistance in the return of the finder's fee.

In July 1999, the Company and its Chairman, Johann de Villiers, were named as defendants in an action brought by Mr. Abu Bakr in the United States District Court for the Southern District of California.  In that action, Mr. Abu Bakr alleges that he acted as a finder in connection with the Company's sale of common stock to LIWA Diamond and New Diamond and that in connection with that offering, he was entitled to a finders' fee equal to approximately 28% of the gross proceeds.  Mr. Abu Bakr alleges that the Company and Mr. de Villiers fraudulently forced Mr. Abu Bakr to participate in a binding arbitration regarding his finders' fees and that as a result of this arbitration, he was forced to return the finders' fee and resign from his position as Managing Director of the Bin Ladin Group, Petroleum, Chemical and Mining Division.  Mr. Abu Bakr has alleged causes of action for breach of contract, unjust enrichment, fraud, misrepresentation and duress.  Mr. Abu Bakr also alleges interference with and breach of his employment contract with the Bin Ladin Group.  Mr. Abu Bakr seeks compensatory and punitive damages in an unspecified amount.

In August 1999, the Company and Mr. de Villiers filed an answer to Mr. Abu Bakr's complaint in which they denied all of the allegations contained therein.  The Company believes that the allegations of Mr. Abu Bakr are frivolous and, accordingly, the Company intends to vigorously defend this case.

On June 16, 1999 the Company increased its authorized Common Stock from 50 million shares of $0.0005 par value Common Stock to 100 million shares of $0.0005 par value Common Stock.  This increase was approved by a majority vote of shareholders.

Unless the context otherwise requires, all references to the Company include its wholly-owned subsidiaries, Global Diamond Resources Inc., a British Columbia corporation, Global Diamond Resources (SA) (Pty) Limited, a South African corporation, Global Diamond Resources International Limited, a British Virgin Islands corporation, and Nabas Diamonds (Pty) Limited, a South African corporation.  The Company's executive offices are located at 836 Prospect Street, Suite 2B, La Jolla, California  92037; Telephone (619) 459-1928.

2

Exhibit 10.5

NEW DIAMOND CORPORATION LIMITED

GLOBAL DIAMOND RESOURCES, INC.

SECURITIES PURCHASE AGREEMENT

December 29, 1998

TABLE OF CONTENTS
-----------------

|     |                                                              | Page |
|-----|--------------------------------------------------------------|------|
| 1.  | Purchase and Sale of Shares                                  | 1    |
| 2.  | Deliveries at Closing                                        | 2    |
| 3.  | Representations, Warranties and Covenants of the Company     | 3    |
| 4.  | Representations, Warranties and Covenants of the Purchaser   | 9    |
| 5.  | Indemnification                                              | 11   |
| 6.  | Post-Closing Covenants                                       | 12   |
| 7.  | Registration Rights                                          | 14   |
| 8.  | Miscellaneous                                                | 24   |

EXHIBITS
--------

A.   Company's Officer's Certificate

B.   Opinion of Company Counsel

C.   [Form of] Indemnification Agreements

D.   Purchaser's Officer's Certificate

87.  Miscellaneous.
     -------------

8.1  Survival of Representations.  All representations, warranties and
     ---------------------------
agreements contained herein or made in writing by the Company or the Purchaser
in connection with the transactions contemplated hereby except any
representation, warranty or agreement as to which compliance may have been
appropriately waived in writing, shall survive the execution and delivery of
this Agreement.

8.2  Expenses and Attorney Fees.  Irrespective of whether the Closing
     --------------------------
is effected, the Company shall pay all costs and expenses that it incurs with
respect to the negotiation, execution, delivery and performance of this
Agreement. If the Closing takes place on or before December 31, 1998, the
Company shall reimburse Purchaser for twenty five percent (25%) of the
reasonable fees of Mr. Ajmal Ebrahim-Hameed and Sidley & Austin, attorneys for
Purchaser, including the reasonable travel and lodging costs incurred by Mr.
Ajmal Ebrahim-Hameed in connection with his attendance at the Closing. The
foregoing obligation is in addition to the Company's separate obligation of
reimbursement to LIWA under Section 8.2 of the LIWA Agreement, it being
understood that Mr. Ajmal Ebrahim-Hameed and Sidley & Austin will be submitting
separate bills to Purchaser and LIWA.

If any party commences an action, either arbitration or court
proceedings, against any other party arising out of or in connection with this
Agreement, the prevailing party or parties shall be entitled from the losing
party or parties, both attorney's fees and costs of the arbitration and/or suit
as part of the judgment rendered.

8.3  Partial Invalidity.  If any term, covenant or condition of this
     ------------------
Agreement or the application thereof to any person or circumstance shall, to any
extent, be invalid or unenforceable, the remainder of this Agreement, or the
application of such term, covenant or condition to persons or circumstances
other than those as to which it is held invalid or unenforceable, shall not be
affected thereby and each term, covenant or condition of this Agreement shall be
valid and be enforced to the fullest extent permitted by law.

8.4  Waivers.  No waiver of any breach of this Agreement shall be held
     -------
to constitute a waiver of any other or subsequent breach.

8.5  Notices.  Any notices relating to this Agreement of the Exhibits
     -------
hereto shall be deemed sufficiently given and served for all purposes if given
in writing and delivered (a) personally, (b) by facsimile with electronic
confirmation of receipt, (c) by registered or certified mail, postage prepaid,
or (d) by international courier, addressed as follows:

If to the Company:

     Global Diamond Resources, Inc.
     836 Prospect Street, Suite 2B
     La Jolla, California  92037
     USA
     Attention: Johann de Villiers, Chief Executive Officer
     Facsimile: (619) 459-5513

-23-

# GLOBAL DIAMOND RESOURCES INC (GDRS)

836 PROSPECT STREET
SUITE 2B
LA JOLLA, CA 92037
619. 459.1928

# 10KSB

**GLOBAL DIAMOND RESOURCES, INC.**
**Filed on 04/10/2001 – Period: 12/31/2000**
File Number 000–21635



U.S. SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

FORM 10-KSB

[X]   ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES
EXCHANGE ACT OF 1934

For the fiscal year ended   December 31, 2000

OR

[ ]   TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES
EXCHANGE ACT OF 1934

For the transition period from _____ to _____

Commission file number 0-21635

GLOBAL DIAMOND RESOURCES, INC.
(NAME OF SMALL BUSINESS ISSUER IN ITS CHARTER)

| Nevada | 33-0213535 |
|---|---|
| (STATE OR OTHER JURISDICTION OF INCORPORATION OR ORGANIZATION) | (I.R.S. EMPLOYER IDENTIFICATION NO.) |

| 836 Prospect Street, Suite 2B La Jolla, California | 92037 |
|---|---|
| (ADDRESS OF PRINCIPAL EXECUTIVE OFFICES) | (ZIP CODE) |

ISSUER'S TELEPHONE NUMBER, INCLUDING AREA CODE (858) 459-1928

SECURITIES TO BE REGISTERED UNDER SECTION 12(b) OF THE ACT:

| TITLE OF EACH CLASS TO BE SO REGISTERED | NAME OF EACH EXCHANGE ON WHICH EACH CLASS IS TO BE REGISTERED |
|---|---|
| None | N/A |

SECURITIES TO BE REGISTERED UNDER SECTION 12(g) OF THE ACT:

Common Stock, $.0005 par value
(TITLE OF CLASS)

ITEM 11. SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT.

The following table sets forth certain information regarding the beneficial ownership of the shares of Common Stock as of March 22. 2001 by (i) each person who is known by the Company to be the beneficial owner of more than five percent (5%) of the issued and outstanding shares of Common Stock, (ii) each of the Company's directors and executive officers and (iii) all directors and executive officers as a group.

| NAME AND ADDRESS | NUMBER OF SHARES | PERCENTAGE OWNED |
|---|---|---|
| Johann de Villiers(1)(2) | 4,211,067 | 6.4% |
| Pieter van Wyk(1)(3) | 921,220 | 1.4% |
| John Tyson(1)(4) | 381,920 | (6) |
| Charles MacDonald(1)(5) | 275,000 | (6) |
| Said H. Ghachem(5)(7)(8) | 150,000 | (6) |
| Ahmed M. Basodan(9)(10)(11) | 200,000 | (6) |
| Yassin Abduaalh Kadi(9)(10)(11) | 200,000 | (6) |
| Mattar Abdulla Al Muhairy(9)(12)(13) | 200,000 | (6) |
| Amin Koudsi(9)(12)(13) | 200,000 | (6) |
| Andries Janzen(1)(9) | 200,000 | (6) |
| Gasem S. Al-Shaikh(7)(8)(15) | 100,000 | (6) |
| Eugene Brill(1)(9) | 371,140 | (6) |
| International PCM Holdings Limited(7)(14) | 9,924,576 | 15.0% |
| New Diamond Holdings Limited(10) | 9,188,096 | 13.9% |
| LIWA Diamond Company Limited(12) | 10,438,096 | 15.8% |
| All officers and directors as a group | 7,410,347 | 11.2% |

(1)   Address is 836 Prospect, Suite 2B, La Jolla, California 92037.
(2)   Includes 1,866,667 shares of Common Stock underlying immediately exercisable options and 2,000,000 shares of Common Stock underlying options exercisable only upon certain vesting requirements.
(3)   Includes 600,000 shares of Common Stock underlying immediately exercisable options.
(4)   Includes 350,000 shares of Common Stock underlying immediately exercisable options.
(5)   Includes 150,000 shares of Common Stock underlying immediately exercisable options.
(6)   Less than one percent.
(7)   Address is P.O. Box 33251, Jeddah 21448, Saudi Arabia..
(8)   Serves on the Board of Directors of the Company as the nominee of International PCM Holdings Limited.
(9)   Includes 200,000 shares of common stock underlying immediately exercisable options.
(10)  Address is Almahmal Center, 18th Floor, Jeddah, Saudi Arabia.
(11)  Serves on the Board of Directors of the Company as the nominee of New Diamond Holdings Limited.
(12)  Address is P.O. Box 95, Abu Dhabi, United Arab Emirates.
(13)  Serves on the Board of Directors of the Company as the nominee of LIWA Diamond Company Limited.
(14)  Address is Parade House, The Parade, Castletown, IM9 1LG, Isle of Man, British Isles.
(15)  Represents 100,000 shares of Common Stock underlying immediately exercisable options.

# EXHIBIT 7

**ALFONSO VALDIVIESO**
Abogado

Bogotá, D.C., March 12, 04

KENDALL FREEMAN
Solicitors

According to your request through Mr. José Gabriel Fernandez-Cardona I want to state some facts related to Jean-Charles Brisard and his strategy to use the United Nations and my name in order to promote documents or information on terrorism that supposedly he elaborated.

From September 15, 1998 to January 14, 2003 I was the Permanent Representative of Colombia at the United Nations and in that capacity I was President of the Security Council in July 2001 and December 2002, I was also President of the 1267 Committee of the Council dealing with terrorism during the period 2001-2002 and at the same time I was Vice chairman of the Counter Terrorism Committee established by the Security Council after the September 11th events.   I have now retired from government service and devoted to legal practice.

Actually, I personally never met with or spoke to Mr. Brisard and it is completely false that I in my capacity as President of the Security Council or as President of the 1267 Committee or in any capacity within that Organization had commissioned him on a personal or official basis to write a Report on terrorism.   He had no role whatsoever with the United Nations Security Council during the period in which I occupied the Presidency.

Let me refer to some of Mr. Brisard's moves directed- I assume - to the manipulation that he was trying to make. Some time in 2002 my assistant in the 1267 Committee of the Security Council, that I chaired, was approached by a person named Damien Peres, who mentioned the name of Mr. Brisard in connection with a lawsuit that he handled on behalf of the families affected by the September 11th tragedy. Mr. Peres volunteered to provide information on the financing of terrorism and around June 2002, an individual identified as Jean-Charles Brisard came to New York and gave my assistant a Report which supposedly had been submitted to the US Congress.

**ALFONSO VALDIVIESO**
Abogado

In December 2002, when I was chairing the Security Council, another report reached our office in New York. Immediately after there were media reports about a Report attributed to Brisard and "commissioned" by the Security Council or by the President of the Council. In a very emphatic way we explained to several journalists that no such commission had been issued and that such version was simply false.

As I have been saying in different statements, Mr. Brisard's conduct and attitude is totally deceitful and marked by the intention to mislead. It shows the kind of person that he is in that he uses the name of others – in this case UN and I – to try to validate and promote reports that probably don't have a significant value. Mr. Brisard's Report was unsolicited and I do not believe his Report was taken seriously by anyone at the UN, nor do I believe any step or action was taken by the UN with it, except the need to explain to journalists that it has not been commissioned by us as I have explained in the previous paragraph.

I am ready to provide any additional comment or information concerning this matter.

Cordially,

ALFONSO VALDIVIESO

# EXHIBIT 8

EXCERPTS

```
  1              UNITED STATE DISTRICT COURT
               SOUTHERN DISTRICT OF NEW YORK
  2                     -   -   -
  3    IN RE:                    :
                                 :
  4    TERRORIST ATTACKS ON      :
       SEPTEMBER 11, 2001        :    03 MDL 1570 (RCC)(FM)
  5    _____ :
  6            UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF NEW YORK
  7
                                 :
  8    In re Terrorist Attacks on :
       September 11, 2001        :
  9                              :    03 MDL 1570 (RCC) ECF
       _____ :    Case
 10
               UNITED STATES DISTRICT COURT
 11        FOR THE SOUTHERN DISTRICT OF NEW YORK
 12    THOMAS E. BURNETT, SR., in :
       his own right as the father :
 13    of THOMAS E. BURNETT, JR., :
       Deceased, et al.,         :
 14                 Plaintiffs,  :
                                 :
 15         vs.                  :
                                 :
 16    AL BARAKA INVESTMENT AND  :
       DEVELOPMENT CORPORATION,  :
 17    a/k/a AL BARAKA BANK a/k/a :
       DALLAH ALBARAKA GROUP, LLC, :
 18    et al.,                   :
                    Defendants.  :
 19
                       -   -   -
 20          TUESDAY, NOVEMBER 15, 2007
                    CONFIDENTIAL
 21                    -   -   -
 22          MAGNA LEGAL SERVICES
             2 Penn Center Plaza
 23               Suite 910
           Philadelphia, Pennsylvania  19102
 24             (866) 624-6221
```

Magna Legal Services

```
 1                      -   -   -

 2                     INDEX

 3                      -   -   -

 4

 5   TESTIMONY OF:   PHILIP GRIFFIN

 6           BY MR. HAEFELE                    7

 7

 8                      -   -   -

 9                    EXHIBITS

10                      -   -   -

11

12   NO.          DESCRIPTION               PAGE

13   Griffin-1   Personal Property Return,

             1997, SBG (USA), Inc.        59

14

15

16

17

18

19

20

21

22

23

24
```

Magna Legal Services

1    in an office suite, one of these suites that has

2    multiple clients or renters.  And I had one

3    office in this suite.  And the company had

4    financial problems, and I had to get out.  And I

5    went into a similar arrangement in the same

6    neighborhood -- general neighborhood, about

7    two miles away.  I had a very similar

8    arrangement.  That was on Rockville Pike, the

9    second -- second office that I had.

10        Q.    Where was this -- where was the

11   second office?

12        A.    400 -- Suite 400, Rockville Pike,

13   Suite -- what's the name?  I can't think of it.

14   There's an office suite company.

15        Q.    All right.  Is that 1700 Rockville

16   Pike?

17        A.    1700, that's right, Rockville Pike.

18        Q..   Okay.  And how long were you at that

19   office?

20        A.    I was there until I closed the office

21   on December 31st, 1999.

22        Q.    So it had -- while the offices were

23   in the U.S., it had two -- two office locations,

24   the 30 Monroe, or wherever the address was on

```
 1        A.      He was sort of administrative officer

 2   and engineering head of Techmaster International.

 3        Q.      What's Techmaster?

 4        A.      It was a company controlled by the

 5   Sarkissian family that had overlapping interests

 6   from time to time -- well, no -- overlapping

 7   interests with Binladin Group, but it was not

 8   controlled by the Binladin Group.

 9        Q.      All right.  He was a director at

10   Techmaster?

11        A.      Let me explain.  Mr. Sarkissian is

12   also a director of one of the major divisions

13   within SBG, and he was -- had been interested, in

14   the context of Techmaster's work, in seeing SBG

15   develop a representational position in the U.S.,

16   as -- as we did when we opened SBG U.S.  And he

17   was supportive of opening that office -- or an

18   office like that.

19                And since he and his family

20   members --

21        Q.      And I've got to interrupt you just

22   for a second because I think the --

23        A.      Yeah.

24        Q.      -- tape's going to run out.  Let's
```

 1    switch tapes, and then we'll let you finish --

 2    reanswer the question.

 3        A.      Right.

 4                THE VIDEOTAPE OPERATOR:  We're going

 5        off the record.  The time is 12:48.  This marks

 6        the end of videotape No. 1 in the continuing

 7        deposition of Philip Griffin.

 8                (Whereupon, a brief recess was

 9            taken.)

10                (Whereupon, the court reporter

11            read back the record as requested.)

12                THE VIDEOTAPE OPERATOR:  This marks

13        the beginning of videotape No. 2 of the

14        continuing deposition of Philip Griffin.  We're

15        going back on the record.  The time is 1:07.

16    BY MR. HAEFELE:

17        Q.      Sir, did you want to finish up the

18    question that we stopped you on in the middle

19    there to change the tape?

20        A.      Ready now?

21        Q.      Yes.  Go ahead.

22        A.      Since Mr. Sarkissian and his family

23    were the controlling element of Techmaster

24    International -- Techmaster Engineering

 1   International, and he and his family had

 2   experience in opening business activities in

 3   various states, it was -- it was decided that we

 4   would use Techmaster as a supportive element in

 5   establishing SBG (USA).  What -- what I mean --

 6   meant by that is the procedures for incorporating

 7   the rudimentary budget -- budgetary oversight, et

 8   cetera.  And they did that.  And it was -- it

 9   was -- their involvement in opening of SBG (USA)

10   was always a facilitative one of -- of helping me

11   particularly get operation -- become operational.

12               Another reason was that the vice

13   president for international affairs in SBG, Mr.

14   -- Sheikh Hasan Binladin, he was in the job, his

15   job, but he had not -- had not incorporated a

16   U.S. office in his domain.  And he wasn't ready

17   to do anything -- he couldn't furnish anything or

18   provide anything that would be helpful, whereas

19   Mr. Sarkissian's family business was able to do

20   that.  And they did it.

21               And -- but they faded out of the

22   picture pretty much right away after I became

23   operational.

24       Q.    What other positions, officer

1    mentioned, the two you mentioned.

2        Q.    Sir, when you left SBG and closed

3    down the Washington, D.C. office -- or I'm sorry,

4    the -- the U.S. office, it was for personal

5    reasons on your part, correct?

6        A.    Both, personal reasons and it was

7    their will that I do so.

8        Q.    All right.  And -- well, when you

9    had -- when you wrote your letter to the people

10   that were the office manager of the building that

11   you were in, you advised them it was to spend

12   more time with your family, right?

13       A.    I don't remember whether I gave any

14   reason at all.

15       Q.    All right.

16       A.    I -- I may have.

17       Q.    The business relationships that you

18   had serviced before, while you were at SBG, did

19   they continue to be serviced?

20       A.    Now?

21       Q.    Did they -- yeah, I mean after you

22   left?

23       A.    No, they were not, except to the --

24   to -- and I'm surmising here -- let me say

1   directly, there was -- I had no successor in the

2   position.  They -- SBG decided to close the

3   office and not to appoint a successor or -- or to

4   rent any other space in -- somewhere else in the

5   Washington -- Washington Metropolitan area.

6        Q.    I'm not asking you --

7        A.    There -- there was some --

8        Q.    Sir, I'm not asking you whether or

9   not anybody continued to have an office in

10  Washington or -- or anything along those lines.

11             I'm asking you, the chores that

12  you did to service SBG with its U.S. business

13  relations, they continued to be performed by

14  someone, correct?

15       A.    I -- I think most of them dropped by

16  the wayside.

17       Q.    Well, does -- does the company still

18  service its contacts with -- with GE?

19       A.    Yeah, but I wasn't -- they didn't --

20  GE didn't -- I didn't deal with GE.  Yes, they

21  deal with GE, to the extent that the major

22  projects are still unfinished.

23       Q.    Sir, while -- while you were with

24  SBG, was it involved with a number of different

# EXHIBIT 9

```
         IN THE UNITED STATES DISTRICT COURT
      FOR THE SOUTHERN DISTRICT OF NEW YORK


IN RE:  TERRORIST ATTACKS ON SEPTEMBER 11, 2001

                              03-MDL-1570 (GBD) (FM)
_____

BURNETT, ET AL.,

       Plaintiffs,

v.                            03-CV-5738 (GBD) (FM)

AL BARAKA INVESTMENT AND
DEVELOPMENT AND CORP., ET AL.,

       Defendants.
_____)
ASHTON, ET AL,

       Plaintiffs,

v.                            02-CV-6977 (GBD) (FM)

AL QAEDA ISLAMIC ARMY,

       Defendant.
_____)


       VIDEOTAPED DEPOSITION OF FUAD RIHANI
              New York, New York
           Tuesday, April 22, 2008
```

```
Reported by: CAPRICE LATHE
Job No.:   10523
```

01385149-72b3-49ec-9962-bda3e258fadd

1                          F. RIHANI

2      Rihani, R-I-H-A-N-I.  My address is 4320 Fourth

3      Street Circle, Northwest, Hickory, North Carolina

4      28601.

5           Q    And how long have you lived at that

6      residence, sir?

7           A    It would be since 1989.

8           Q    Can you please tell us the place of your

9      birth and the date of your birth, sir?

10          A    My birth date is September 30, 1937.  I

11     was born in Jordan in a small town called Al-Husn,

12     A-L, dash, H-U-S-N.

13          Q    How long have you lived in the United

14     States, sir?

15          A    I have been permanently residing here

16     since 1968.

17          Q    And, sir, we understood from the lawyers

18     for the Saudi Binladin Group that you had some

19     health concerns recently.  Are you feeling well

20     today?

21          A    I don't understand the question.

22          Q    I understand from the lawyers for the

23     Saudi Binladin Group that you have had some health

24     concerns lately.  Are you feeling well today?

25          A    Actually, I do.  Thank you very much.

Page 14

1                          F. RIHANI
2        Q    Did Mr. Abdullah Binladin tell you any
3   facts related to the case, sir?
4             MR. GAUCH:   I am going to object on the
5        grounds of privilege.
6             THE COURT:   No, I will allow a yes or a
7        no answer.
8        A    The question again, please.
9        Q    Did he provide you with any factual
10  information related to the case?
11       A    No.
12       Q    Sir, you are a U.S. citizen now, correct?
13       A    Yes.
14       Q    Since when have you been a U.S. citizen?
15       A    Since 1972.
16       Q    How is it that you became a U.S. citizen?
17       A    Through parents.  My father was an
18  American citizen.
19       Q    And before you were a U.S. citizen in
20  1972, what citizenship did you hold?
21       A    I carried the Jordanian passport.
22       Q    Do you still carry a Jordanian passport?
23       A    No, sir.
24       Q    Do you have any other citizenship other
25  than U.S. citizenship at this point?

01385149-72b3-49ec-9962-bda3e258fadd

Page 15

                    F. RIHANI

1

2        A    No, sir.

3        Q    Are you married, sir?

4        A    Married?

5        Q    Yes.

6        A    Yes, I am.

7        Q    What is your wife's name, sir?

8        A    Katherine Ketner Rihani.

9        Q    Is Mrs. Rihani a U.S. citizen?

10       A    Yes, sir.

11       Q    Does she lives with you in Hickory?

12       A    Yes.

13       Q    At the same address?

14       A    Yes.

15       Q    Do you have children, sir?

16       A    I do.

17       Q    How many children do you have?

18       A    Three children.

19       Q    And can you tell me their names and ages,

20   sir?

21       A    The oldest, Elizabeth Rihani.  The second

22   is Kristin, K-R-I-S-T-I-N.  And the boy is John.

23       Q    And are all of their last names Rihani,

24   sir?

25       A    Yes, sir.  Except for the second one, who

01385149-72b3-49ec-9962-bda3e258fadd

1                       F. RIHANI

2    referring to you as Dr. Rihani; that means you have

3    a doctorate, I take it?

4         A    I have a doctorate in civil engineering in

5    transportation.

6         Q    Civil engineering in transportation?

7         A    Yes.

8         Q    Where did you go to school, sir?

9         A    Undergraduate at the American University

10   of Beirut.  Master's -- I have a Ph.D -- at North

11   Carolina State University.

12        Q    Are you fluent in Arabic, sir?

13        A    Yes.

14        Q    What is your native language?

15        A    My native language?

16        Q    Yes, your first language.

17        A    Arabic.

18        Q    Are you related in any way to the Binladin

19   family, sir?

20        A    No.

21        Q    How long did you know the Binladin family?

22        A    My first encounter was with the father in

23   1966.

24        Q    When you say "the father," what was his

25   name?

01385149-72b3-49ec-9962-bda3e258fadd

1                          F. RIHANI

2    King Abdullah that he enjoyed with King Fahd?

3          A    I really don't know.

4          Q    Sir, you have served in directorship roles

5    with various organizations, right?

6          A    Again, please.

7          Q    You have served in directorship roles in

8    various organizations, correct?

9          A    The only private company I worked for is

10   the Saudi Binladin Organization, and the Mohammed

11   Binladin Organization, and the Saudi Binladin Group.

12         Q    I am talking about other organizations

13   that you were not employed by, but you served in

14   directorship roles.

15         A    I taught at the North Carolina State

16   University.  I worked for the North Carolina

17   Department of Transportation.  And I worked for the

18   City of Amman in Jordan.

19         Q    What was the city, Amman?

20         A    The capital city, Amman, A-M-M-A-N.

21         Q    Sir, are you familiar with an entity known

22   as the International Road Federation?

23         A    Yes, I do.  I am.

24         Q    The short for that is IRF?

25         A    IRF, correct.

01385149-72b3-49ec-9962-bda3e258fadd

Page 34

F. RIHANI

1

2      A      Yes, I am.

3      Q      Can you tell us what the Middle East

4  Policy Council is?

5      A      I believe it is a U.S. non-profit

6  organization.  Its mission is to improve the

7  understanding of the American people and the

8  decision-makers in it, a better understanding of the

9  Arab world and Islam.

10     Q      Can you turn back, sir, for a minute to

11  the IRF.

12                What's the rationale, what's the

13  reason why SBG has a membership in the IRF?

14     A      SBG is the largest road contractor in the

15  Arab world and we believe that -- SBG believes that

16  their association with professional organizations is

17  helpful.

18     Q      Helpful in what way, sir?

19     A      In knowing what is going on in the world,

20  getting educated, and requesting information about

21  certain resources that we might need for other work

22  in the Kingdom.

23     Q      And what in that realm has SBG benefited

24  from its membership in the IRF?

25     A      To my knowledge, nothing until now.  It is

1                          F. RIHANI

2    called a fellowship, or networking, understanding

3    who are the players in the road industry, and having

4    a resource to find out what is happening in the road

5    industry all over the world.

6              This would help SBG to fine tune its

7    competitive position and allows them to improve

8    their management skills in the highway projects.

9        Q    Why is SBG's membership in the Washington

10   base for IRF versus the other bases for the IRF?

11       A    Because the Ministry of Transport in the

12   Kingdom of Saudi Arabia decided at one time to join

13   the Washington and then they recommended that major

14   contractors in the Kingdom of Saudi Arabia, it would

15   be beneficial to them if they could join the same

16   organization.

17       Q    Where is the Middle East Policy Council

18   located, sir?

19       A    Washington, D.C.

20       Q    And you have been a member of the board of

21   the Middle East Policy Council for some years,

22   right?

23       A    Yes.

24       Q    When did you start with the Middle East

25   Policy Council?

01385149-72b3-49ec-9962-bda3e258fadd

Page 36

                              F. RIHANI

1

2     A     Around 1992, '93.

3     Q     And when you joined the Middle East Policy

4  Council, did you become a director of the board

5  right away?

6     A     No.

7     Q     When did you become a director of the

8  board of the Middle East Policy Council?

9     A     A year after that.

10    Q     So about '93, '94?

11    A     I would say '93, yes.

12    Q     How was it that you became a board member

13 of the Middle East Policy Council?

14    A     The president of the Middle East Policy

15 Council at the time was Senator George McGovern, who

16 I met in Jeddah, and through his acquaintance and

17 our informal discussions about the council, he

18 invited me to join the board.

19    Q     As a board member of the Middle East

20 Policy Council, did you attend meetings?

21    A     Did I?

22    Q     Yes, sir.

23    A     I did not hear the question, please.

24    Q     I am sorry.  Did you attend meetings as a

25 board member of the Middle East Policy Council?

01385149-72b3-49ec-9962-bda3e258fadd

                         F. RIHANI

1

2       A    Yes, I did.

3       Q    How frequently were those meetings?

4       A    Once a year.

5       Q    Where were those meetings held, sir?

6       A    Washington, D.C.

7       Q    Were minutes kept of those meetings, sir?

8       A    I think they were.

9       Q    Did you ever receive copies of those

10   minutes?

11      A    No.  They don't distribute them.

12      Q    Did you ever make notes regarding those

13   meetings?

14      A    No.

15      Q    Did you ever report back to anybody at the

16   Saudi Binladin Group regarding the happenings at the

17   Middle East Policy Council meetings?

18      A    No.

19      Q    Did you ever report back or report on

20   anything that was going on, any events that were

21   happening sponsored by the Middle East Policy

22   Council?

23      A    No.

24      Q    What publications, if any, did the Middle

25   East Policy Council have, sir?

01385149-72b3-49ec-9962-bda3e258fadd

1                           F. RIHANI

2    to me, so...

3         Q    Sir, when did your title change from the

4    title that is represented on the websites, the

5    director of research and development, to the title

6    you told us it changed to today, which is

7    consultant?

8         A    Research, it was ten years ago.

9         Q    Ten years ago, sir?

10        A    Yes.

11        Q    Other than the change in title, was there

12   any shift that happened at that time that was

13   particular to that time, sir?

14        A    No.  It is as a result of my desire to be

15   back with my family and their desire for me to

16   continue working for them on important feasibility

17   studies.  So from the time SBG was established until

18   now, my work was, in a technical term, on call

19   basis.  It is things they could not forecast in

20   advance.

21                  And when the workload went down, my

22   involvement was done and I was spending more time

23   with my family in the United States.

24        Q    Over the past ten years, how much time

25   have you spent in the United States per year?

01385149-72b3-49ec-9962-bda3e258fadd

1            F. RIHANI

2       Q    And when you were in the U.S., did you

3   work for -- did you do your work for SBG while you

4   were at home in your home office, as well?

5       A    Yes.

6       Q    And what was the reason why you moved from

7   Alexandria, Virginia to Hickory, North Carolina?

8       A    Two reasons.  We wanted to get away from

9   Hickory, North Carolina and we wanted to be close to

10  my daughter here in Washington, D.C.

11      Q    I am confused because my question was:

12  Why did you move from Alexandria to Hickory?

13      A    Why did we go back?  We were in Hickory,

14  North Carolina -- in our home in Hickory, North

15  Carolina.

16      Q    I may have misspoke.  Where do you live

17  now, sir, when you are in the U.S.?

18      A    I lived in Raleigh, North Carolina.  I

19  lived in Hickory, North Carolina.  And I lived in

20  Alexandria, Virginia.

21      Q    In what order?

22      A    We started our marriage in Raleigh, North

23  Carolina.  Then we moved to Hickory.  Then we went

24  back to Raleigh.  Came back to Hickory.  Came to

25  Alexandria.  And went back to Hickory.  My wife is

01385149-72b3-49ec-9962-bda3e258fadd

1                          F. RIHANI

2    from Hickory.

3         Q    So each of the times you went to Hickory,

4    it was because your wife is from Hickory?

5         A    Yes.

6         Q    What was your telephone number when you

7    were in Alexandria, Virginia?

8         A    I don't remember.

9         Q    Do you recognize the Hickory, North

10   Carolina number of (828) 381-9886?

11        A    381?

12        Q    381- 9886?

13        A    No, I don't.

14        Q    Was that your phone number?

15        A    That's not the one we have, no.

16        Q    Was that a fax number for you?

17        A    I don't remember.

18        Q    Was there any other individuals in

19   Hickory, North Carolina that performed any

20   SBG-related work?

21        A    No.  Except for when I need some

22   secretarial services for typing or something like

23   that, and I did the weekend in Saudi Arabia,

24   Thursday and Friday, I would go to a walk-in

25   secretary center and they would type a couple of

01385149-72b3-49ec-9962-bda3e258fadd

Page 78

F. RIHANI

1
    Q    What was the work phone number that they

2

3 provided you with or reimbursed you for?

4
    A    (828) 327-7704.

5
    Q    Was that a voice line as well as a fax

6 line?

7
    A    No.  It is a voice line.

8
    Q    What was the fax line, if you recall?

9
    A    It is (828) 327-2305.

10
    Q    Were there any particular personal reasons

11 or health reasons that caused you to spend any

12 changed amount of time telecommuting in or around

13 1997?

14
    A    The workload was very low and this was

15 part of the period I was on half-time assignment and

16 I spent half of my time in the United States with

17 the family and telecommunicated with them whenever

18 it is needed.

19
    Q    Can you tell me why U.S. citizens in Saudi

20 Arabia experienced a difficult security environment

21 during that time period?

22
    A    Yes.

23
    Q    Why?

24
    A    I think it started with terrorist

25 activities, I don't remember the years, but that was

01385149-72b3-49ec-9962-bda3e258fadd

1                         F. RIHANI

2          MR. HAEFELE:  Yes.

3          THE WITNESS:  Yes.

4     Q    How about foreign residency deductions?

5     A    I don't know the difference, but I know

6  that as an American working abroad, I am eligible

7  for federal tax credits.  That has varied over the

8  years.  I know that it has been in the calculations

9  of our CPA.

10    Q    Do you know how you qualify for those

11 credits?

12    A    My CPA told me that there were two

13 criteria that could be used:  One is physical

14 presence in a foreign country outside the United

15 States and the other is being a bona fide resident

16 of a foreign country.  And I qualified for the

17 second.

18    Q    How is it you qualified as a bona fide

19 resident outside of the U.S.?

20    A    The legal description is location of my

21 income having a permanent address, telephone number,

22 driver's license, and no work in the United States.

23    Q    Is it the case that you don't have any

24 work in the United States?

25    A    I don't.

01385149-72b3-49ec-9962-bda3e258fadd

1                        F. RIHANI

2    Council?

3         A     Yes, I did.

4         Q     Is SBG a member of the U.S. Saudi Arabian

5    Business Council?

6         A     Yes, the Riyadh office.  Again, the U.S.

7    Saudi Arabian Business Council has two entities:

8    One headquartered in Riyadh with a chairman and

9    staff and one in Washington, D.C. with a chairman

10   and staff.  And the Saudi -- SBG does attend

11   meetings both in Riyadh and Washington, D.C.

12        Q     Were you involved in any conferences in

13   the United States aimed at identifying U.S. business

14   opportunities for SBG?

15        A     No.

16        Q     Have you attended a conference called the

17   USA-KSA Companies Conference?

18        A     USA-KSA?

19        Q     Yes, sir.  USA-KSA Companies Conference.

20        A     Companies Conference?  No.

21        Q     Do you recall a conference called USA-KSA

22   Companies Conference that was held in Washington,

23   D.C. from June 25 to June 27, 1999?

24        A     The only thing I remember is -- that was

25   in association with the meeting of the U.S. Saudi

01385149-72b3-49ec-9962-bda3e258fadd

# EXHIBIT 10

**Introduction**

**Mission Statements**

**Policies**

**About IRF : Mission Statements**

The mission of the IRF is to further the development of well designed, safe, efficient, user-oriented, technologically appropriate and environmentally sustainable road networks worldwide.

**The IRF's purposes are:**

The IRF has three Programme Centres:

**IRF Geneva Programme Centre**
www.irfnet.ch

2 chemin de Blandonnet,
1214 Vernier Geneva, Switzerland
Telp: +41 22 306 0260
Fax : +41 22 306 0270
**info@irfnet.org**

**IRF Brussels Programme Centre**
www.irfnet.eu

Place Stéphanie, 6/B
B-1050 Brussels, Belgium
Telp: +32 2 644 58 77
Fax : +32 2 647 59 34
**info@irfnet.eu**

**IRF Washington Programme Centre**
www.irfnews.org

Madison Place, 500 Montgomery Street, 5th Fl.
Alexandria, Virginia 22314, USA
Telp: +1 703 535 1001
Fax : +1 703 535 1007
**info@irfnews.org**

If you have any inquiries or need more information about IRF, please email us or use our **online contact form.**

- to promote the education and understanding of both the general public and governments throughout the world of the social, economic and environmental benefits that flow from developing modern road networks, road transport systems and road traffic control;

- to encourage and support the planning and execution, by governments and international governmental organisations throughout the world, of economically and environmentally sound programmes for the improvement and extension of road networks and allied systems;

- to provide educational and training programmes relating to the development and maintenance of road and road transport systems worldwide;

- to cooperate with, advise and exchange experience with international institutions and other international, national and local organisations having objectives similar or complementary to those of the IRF;

- to advise, assist and promote the endeavours of existing national and regional road associations, and to support the formation of national and regional road associations in countries where these do not exist;

- to collect, collate and distribute relevant statistical, technical, economic, educational and other material pertaining to the improvement of road systems and standards;

- to stimulate and support the regional and global harmonisation of standards;

- to support research aimed at delivering socially responsible, economically viable, environmentally friendly, effective, safe and intelligent road transport systems as required by users and businesses; and

- to encourage and promote the improvement of road safety through the application of appropriate road safety standards and guidelines.

**Read the abbreviated summary of the IRF statutes**

*\* Copies of the full statutes are available upon request from IRF offices*

Home | About IRF | Membership | Activities | Training | Events | Publications | Media | Statistics | Partnership | IREF | IRFRC | Contact | Links | Member' s Area
Copyright © 2010 - International Road Federation. All rights reserved.

Introduction

**Mission Statements**

**Policies**

**About IRF : Introduction**



The International Road Federation (IRF) is a nongovernmental, not-for-profit organisation with the mission to encourage and promote development and maintenance of better, safer and more sustainable roads and road networks. Working together with its members and associates, the IRF promotes social and economic benefits that flow from well-planned and environmentally sound road transport networks. It helps put in place technological solutions and management practices that provide maximum economic and social returns from national road investments.

The IRF has a major role to play in all aspects of road policy and development worldwide.

The IRF has three Programme Centres:

**IRF Geneva Programme Centre**
www.irfnet.ch

2 chemin de Blandonnet,
1214 Vernier Geneva, Switzerland
Telp: +41 22 306 0260
Fax : +41 22 306 0270
**info@irfnet.org**

**IRF Brussels Programme Centre**
www.irfnet.eu

Place Stéphanie, 6/B
B-1050 Brussels, Belgium
Telp: +32 2 644 58 77
Fax : +32 2 647 59 34
**info@irfnet.eu**

**IRF Washington Programme Centre**
www.irfnews.org

Madison Place, 500 Montgomery Street, 5th Fl.
Alexandria, Virginia 22314, USA
Telp: +1 703 535 1001
Fax : +1 703 535 1007
**info@irfnews.org**

If you have any inquiries or need more information about IRF, please email us or use our **online contact form.**

- For governments and financial institutions, the IRF provides a wide base of expertise for planning road development strategy and policy.

- For its members, the IRF is a business network, a link to external institutions and agencies, such as the United Nations and the European Union, and a business card of introduction to government officials and decision makers.

- For the community of road professionals, the IRF is a source of support and information for national road associations, advocacy groups, companies and institutions dedicated to the development of road infrastructure.

Through the International Road Educational Foundation the IRF awards grants to graduate engineers and other transportation professionals from around the world in support of full-time academic training. With this the IRF actively supports the future generations who will build the road networks.

With a wide network across over eighty countries on six continents, the IRF believes that it can make a difference by providing best practices and expert advice to today's multi-faceted world of transport.

**Brief History**

The International Road Federation, since its foundation in 1948, has had many successes over the past 60 years and has much to be proud of. Not only has it been instrumental in providing leadership for global road infrastructure development, but it also brought road professionals and people of the world together in a common mission in a way that no other road organisation could.

IRF's history is rich in events and has been closely linked to the development of the world economies. Facing new challenges every decade, the IRF has never stopped promoting efficient, well-maintained, safe, environmentally and economically sustainable roads and road networks.



To read Fifty years of Service 1948 – 1997, please **download the PDF here**.



**Available now!** The IRF 60 Years Anniversary Movieclip Slideshow - Price per CD-Rom (PC and Mac): Euro 20.- Order your copy

Home | About IRF | Membership | Activities | Training | Events | Publications | Media | Statistics | Partnership | IREF | IRFRC | Contact | Links | Member's Area

Copyright © 2010 - International Road Federation. All rights reserved.