# EXHIBIT 11

Vision & Mission - U.S.-Saudi Arabian Business Council



# EXHIBIT 12



EXCERPTS

MotleyRice

**Robert T. Haefele**
**Licensed in NJ & PA**
DIRECT DIAL 843.216.9184
DIRECT FAX 843.216.9450
RHaefele@motleyrice.com

March 9, 2006

Michael P. Gurdak, Esq.
Jones Day
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113

**Re: In Re Terrorist Attacks on September 11, 2001**
**03 MDL 1570 (RCC)**

Dear Michael:

We have reviewed Saudi Binladin Group's (SBG) response and objections to Plaintiffs' jurisdictional discovery requests and find them significantly deficient in several important respects.

First, we disagree with SBG's position – made repeatedly in SBG's general objections and responses to specific requests – that discovery was limited to only those Plaintiffs allegations identified by Judge Casey. Judge Casey did not state jurisdictional discovery was limited to the Plaintiffs' allegations, but rather found Plaintiffs' allegations warranted jurisdictional discovery "to determine if SBG purposefully directed its activities at the United States." *In Re Terrorist Attacks on September 11, 2001*, 349 F. Supp. 2d 765, 836 (S.D.N.Y. Jan. 18, 2005). A complete reading of Judge Casey's analysis of the due process requirements necessary for personal jurisdiction as applied to other defendants supports this conclusion (see personal jurisdiction analysis at *Id.* 804-811). Clearly, discovery was necessary to determine if SBG's contacts and activities were directed at the United States and whether those contacts and activities were sufficient and reasonable for the Court to exercise jurisdiction over SBG. Appropriately, Plaintiffs sought comprehensive information about SBG's U.S. contacts and activities from which the Court could determine whether its jurisdiction over SBG was fair and reasonable.

Second, we find it disingenuous for SBG to limit its responses to the activities of SBG, USA, of Rockville, Maryland and the "Saudi Binladin Group, Inc., a corporation organized under the laws of the Kingdom of Saudi Arabia, and not to any subsidiary or affiliate thereof", as stated in SBG's general objections to interrogatories. SBG's refusal to produce information about its subsidiaries and affiliates is an attempt to withhold information Plaintiffs clearly have a right to review. SBG, as its name implies, acts primarily as a holding company for at least 11 different operating divisions which, prior to 1990, were autonomous family businesses. In 1990 the heirs of Mohammad Binladen

www.motleyrice.com

Motley Rice LLC
Attorneys at Law


MT. PLEASANT

28 BRIDGESIDE BLVD.
P.O. BOX 1792
MT. PLEASANT, SC 29465
843-216-9000
843-216-9450 FAX

BARNWELL

1750 JACKSON ST.
P.O. BOX 365
BARNWELL, SC 29812
803-224-8800
803-259-7048 FAX

PROVIDENCE

321 SOUTH MAIN ST.
P.O. BOX 6067
PROVIDENCE, RI 02940
401-457-7700
401-457-7708 FAX

HARTFORD

ONE CORPORATE CENTER
20 CHURCH ST, 17TH FLOOR
HARTFORD, CT 06103
860-882-1681
860-882-1682 FAX

Washington, DC according to Al Jazeria.[75] MECG "is a financial institution dedicated to merchant and investment banking in the Middle East region." Headquartered in Beirut, Lebanon and incorporated in the Guernsey, Channel Islands in 1996, MECG provides "merchant banking, private equity funds, and corporate finance."[76] The Sarkissian family's United Holdings SAL Company is institutional shareholder of MECG and part owner of SBG. *Burnett* Defendants Khalid bin Mahfouz and National Commercial Bank were founders of the merchant bank[77]— obvious connections to SBG and the Binladins.

<u>Interrogatory No. 7</u>: *From the period beginning January 1990 through the present, please identify any and all investments made within the United States ("American Investments") on SBG's behalf, by individual(s) acting in the capacity as an SBG director, officer, employee, agent, trustee, advisor, and/or member of a corporation, partnership, organization or trust, or for SBG's benefit through a [sic] an individual, corporation, partnership, organization, holding company, trust, agent, or other entity; including, but not limited to, those investments made by or between SBG and in the Carlyle Group. Such American Investments shall include, but are not limited to, real estate ventures, stocks, bonds, treasury bills, and/or municipal debt instruments. Identify the nature and purpose of the investment(s), the dates of investment(s) and the parties involved in the investment(s).*

SBG refused to answer Interrogatory No. 7 asking if SBG or an entity on SBG's behalf invested in the U.S. SBG's financial affiliate SICO invested repeatedly in U.S. real estate development projects with U.S. partners Daniel Property. The extent to which SBG uses SICO is reported by Yves Bruderlein, Director of Cambridge Engineering, and a subsidiary of SICO. Bruderlein testified in Switzerland that since 1991 Cambridge took over investment accounts for SBG. In fact, SBG lawyers directed Cambridge to incorporate in the Cayman Islands. Directors of SBG would create new ad hoc companies, like Cambridge, to manage a particular investment through the company. Bruderlein further testified Cambridge is one of a "hundred" such ad hoc companies created by SBG Directors to manage investments. Bruderlein claims millions of dollars were transferred to Special Designated Terrorist Group Qadi's Bank Al Taqwa in the Cayman Islands through such ad hoc companies.

In addition to investments made with the Carlyle Group, it was also reported the Binladin family members invested $10M in the Fremont Group, which is closely associated with the Bechtel family.[78]

<u>Interrogatory No. 8</u>: *From the period beginning January 1990 through the present, please state whether SBG has ever filed a United States state and/or federal tax return with any United States tax agency or the United States*

---

75
http://www.aljazeerah.info/Opinion%20editorials/2003%20Opinion%20Editorials/May/8%20o/Why%20Americans%20supported%20the%20war%20on%20Iraq,%20Walid%20Musallam.htm

76 http://www.mecg.com.lb/board.html#sarkissian

77 http://ifcln001.worldbank.org/IFCExt/spiwebsite1.nsf/0/f872308012bc2235852568b00065e425?OpenDocument

78 http://money.cnn.com/2003/05/05/news/companies/war_bechtel/

*Internal Revenue Service. If so, please identify when the return was filed, at what office the return was filed, and give the name and address of the person(s) who prepared the filings.*

SBG failed to produce corporate income taxes for the SICO related companies Knutstorp, Kinnekulle, Falkon, Tropiville and Reflections—companies conducting business in the US. Additionally, SBG did not produce information about the US-based companies associated with Khalil Binladin–AIM, B.I.N., and Desert Bear Company.  It is likely AIM, B.I.N. Corp. and Desert Bear financing and ownership is supported by SBG through off-shore companies, one of which may be Grinsted, NV.

SBG is also likely to hold an ownership stake in Sarkissian family related companies in the US, including Techmaster, USA, Yorkbridge Capital and Bryon-Hill companies.  If so, SBG failed to produce corporate income tax and other corporate tax filings.

Interrogatory No. 9: *From the period beginning January 1990 through the present, please state whether SBG has ever filed any documentation with the Securities and Exchange Commission. If so, please state date(s) of the filing(s), and provide the name and address of the person(s) who prepared the filings.*

Given the breadth of business interests in the US, it is remarkable SBG did not file SEC related documentation.

Interrogatory No. 10: *From the period beginning January 1990 through the present, please identify all individuals whom SBG hired to provide SBG with professional services at a time when those individuals were located in the United States ("Professional Service Providers"), including but not limited to, lawyers, accountants, auditors, financial investment advisors, public relations advisors, lobbyists, marketing advisors and/or charitable advisors. Please identify the names of those Professional Service Providers, the name of their companies, their titles, the reason(s) for their employment, the time period during which they worked under SBG direction, suspension or control the [sic] compensation they received for their services, and whether SBG met them in the United States in connection with their activities on SBG's behalf.*

SBG declined to answer Interrogatory No. 10, asking for the U.S. professionals SBG hired to assist it with conducting business in the US.  SBG, USA tax records indicate Matthews & Panariello, PC of Paramus, New Jersey was SBG, USA's accountant. (See SBG0000012, SBG0000157 as examples). Not coincidentally, Matthews & Panariello was also Techmaster's accountant.[79] Note that SBG, USA paid Sarkissian company Byron-Hill, NJ $825 for "accounting services" March 19, 1997 (SBG0001729).  Privileged documents also identified the Law Offices of Arthur F. Lafionatis as performing work associated with SBG, USA's dissolution (SBG0001304). SBG, USA phone records indicate Griffin spoke frequently to Tim Metz, at Hullin Metz & Co.—identified as the Binladin family's spokesperson. (See SBG0000581 for phone number 2127521044 on January 8, 1999). SBG, USA also called a number of professionals, some of whom were white collar criminal attorneys.

---

79 December 2, 2005 State of New Jersey Business Entity Report indicating Techmaster's Principle Business Address should be directed to Matthews & Panariello.

# EXHIBIT 13

MEMO ENDORSED

**MotleyRice**

Robert T. Haefele
Licensed in SC, NJ & PA
DIRECT DIAL 843.216.9184
DIRECT FAX 843.216.9450
RHaefele@motleyrice.com

July 9, 2007

<u>Via Facsimile (212) 805-6724 and Federal Express</u>
Honorable Frank Maas
United States Magistrate Judge
United States District Court
Southern District of New York
500 Pearl Street, Room 740
New York, New York 10007-1312

Re:    *In re Terrorist Attacks on September 11, 2001 v. NCB*
       03 MDL 1570 (GBD)(FM) *As Mr. Gauch indicates in his
       responsive letter, even if I accept Mr. Haefele's
       representations at face value, they do not
       suggest a basis for jurisdiction over SBG.*

Dear Judge Maas:

Pursuant to Your Honor's direction during the recent June 29, 2007, conference regarding *Accordingly*
jurisdictional discovery from defendant Saudi Binladin Group ("SBG"), we are submitting this letter *the*
in support of plaintiffs' request that the Court direct SBG to produce information regarding its *request for*
contacts with U.S.-based Techmaster Incorporated ("Techmaster") as well as SBG's and its PCM *discovery*
Division's U.S.-based business dealings with 7000 active venders and 2,500 manufacturers from *concerning*
which it reportedly received discounts. *Techmaster/PCM is DENIED.*

*FMaas, USMJ,*
*7/26/07*

Although, as our request for discovery suggests, plaintiffs do not know all the facts
regarding Techmaster and its relationship with SBG, the following provides a summary of the
information available.

Techmaster is an engineering, procurement, and construction services company that
provides services for the industrial, power, and water resources sectors. Originally established in
Texas, in 1980, under the name Project Resources and Development, it later relocated to Fort Lee,
New Jersey and changed its name to Techmaster.

As plaintiffs expressed in our June 15, 2007 letter to the Court, for jurisdictional discovery
purposes, in addition to inquiring into SBG's various contacts in the forum, plaintiffs may also
inquire into SBG's relationships with other entities whose contacts may be imputed to SBG,
including alter egos, "agents," and "mere departments." *See, e.g, Marine Midland Bank, N.A. v Miller,*
664 F.2d 899, 904 (2nd Cir. 1981) (corporate formality ignored); *Gelfand v Tanner Motor Tours Ltd.,* 385
F.2d 116, 120-121 (2nd Cir. 1967) (agency); *Oriska Ins. Co. v Brown & Brown of Tex., Inc.,* 2005 U.S.
Dist. LEXIS 6623, *7-8 (S.D.N.Y. 2005), citing *Schenk v Walt Disney Co.,* 742 F. Supp. 838, 842
(S.D.N.Y. 1990) (mere department). The available information supports plaintiffs' contention that
Techmaster has, at least in the past, been used by SBG as an agent in the United States to perform

WWW.MOTLEYRICE.COM

Motley Rice LLC
Attorneys at Law

MT PLEASANT
28 BRIDGESIDE BLVD.
P.O. BOX 1792
MT. PLEASANT, SC 29465
843-216-9000
843-216-9450 FAX

BARNWELL
1750 JACKSON ST
P.O. BOX 365
BARNWELL, SC 29812
803-224-8800
803-259-7048 FAX

PROVIDENCE
321 SOUTH MAIN ST
P.O. BOX 6067
PROVIDENCE, RI 02940
401-457-7700
401-457-7708 FAX

HARTFORD
ONE CORPORATE CENTER
20 CHURCH ST, 17TH FLOOR
HARTFORD, CT 06103
860-882-1681
860-882-1682 FAX

ATLANTA
600 WEST PEACHTREE ST.
SUITE 800
ATLANTA, GEORGIA 30308
404-201-6900
404-201-6959 FAX

Honorable Frank Maas
Re:  In re Terrorist Attacks on September 11, 2001 v. NCB
July 9, 2007
Page 2 of 3

various U.S.-based activities.  Plaintiffs should be afforded discovery from SBG regarding its contacts with Techmaster to investigate the extent to which the Court may – when it assesses jurisdictional contacts – impute Techmaster's contacts to SBG.

In this instance, plaintiffs assert that the Court may assert jurisdiction over SBG where it has affiliated itself with Techmaster, a resident entity, or "agent" and the agent renders services on SBG's behalf sufficiently important to SBG that it would have performed equivalent services itself had the agent not been available. *See, e.g, Frummer v Hilton Hotels Intern., Inc.*, 19 N.Y.2d 533, 537, 281 N.Y.S.2d 41, 44, 227 N.E.2d 851, 854 (1967) (jurisdiction over foreign hotel chain based on activities of affiliated reservations service); *Gelfand*, 385 F.2d 120-121 (jurisdiction over tour operator based on activities of affiliated travel agent).  For the contacts to be imputed, plaintiffs do *not* need to prove either a formal agency agreement nor that the defendant exercised direct control over the putative agent.  *See, e.g, New York Marine Managers, Inc v M.V. "Topor-1,"* 716 F.Supp. 783, 785 (S.D.N.Y. 1989); *Palmieri v Estefan*, 793 F.Supp. 1182, 1194 (S.D.N.Y. 1992).  A foreign defendant like SBG is doing business, in the traditional sense, if the resident representative provides any services beyond "mere solicitation" and the services are sufficiently important that the defendant would have done them itself in the resident representative's absence. *Gelfand*, 385 F.2d 120-121, citing *Frummer*, 19 N.Y.2d at 537, 281 N.Y.S.2d at 44, 227 N.E.2d at 854.

Under the circumstances – where SBG is a large international but privately owned company and much of its business dealings are not made public – plaintiffs have the following limited information that supports their contention that SBG has treated Techmaster as an "affiliated" entity that represents SBG's interests in the United States.  In at least one SBG company report, SBG has represented that SBG Industrial and Power Projects Division was supported by "... a network of world-wide subsidiaries and affiliates in the U.S.A. and Europe."  In another company report SBG identified Techmaster's Fort Lee, New Jersey address as SBG's United States support office.  On the website of SBG's Arabian Bemco, where SBG lists affiliate companies separately from companies with which it merely conducts business, SBG lists Techmaster as an affiliated company.  Business news articles have characterized Techmaster as SBG's United States engineering and procurement affiliate.  Each of these representations indicate a much closer relationship than has been represented either to the plaintiffs or to the Court.

One explanation for the close interactions, and further support for considering Techmaster's contacts as imputed to SBG, is that a number of the SBG-related directors overlap with Techmaster as well.  For example, Techmaster directors Henry Sarkissian and Souren Sarkissian are directors of SBG's Arabian Bemco group as well.  Henry Sarkissian has also been a board member of SBG and managing director of Binladin International Group, another entity under the SBG-control umbrella.  Henry Sarkissian, Kouren Sarkissian and Techmaster "employee" Robert McBride were all directors of SBG, USA.  Partial telephone records of SBG, USA reveal that SBG, USA communicated with Techmaster extensively over the limited period covered by the records.

The available information indicates that Techmaster has acted in the U.S. as SBG's surrogate for projects abroad.  Electronic mails between Techmaster officer Samir Akl and SBG Bemco

Honorable Frank Maas
Re:  In re Terrorist Attacks on September 11, 2001 v. NCB
July 9, 2007
Page 3 of 3

executive Henry Cabrera suggest that contract proposals were developed by SBG and then given to Techmaster to submit on SBG's behalf.  For example, one electronic mail shows Akl corresponding with Cabrera and Henry Sarkissian, asking for Cabrera's permission to submit to an Illinois corporation SBG's Arabian BEMCO's pre-qualifications for new Mideast projects and noting that Akl already had SBG prequalified with another U.S. company.  In another exchange, Akl circulates to SBG's Arabian BEMCO executives a list of U.S. Army Corp of Engineers projects in Iraq and asks for their advice regarding Arabian BEMCO's participation in the projects.

Techmaster is also tied to JEDAC, SBG's joint venture with General Electric.  Although the joint venture is to perform work in the Mideast, facts connecting Techmaster and JEDAC indicate that JEDAC's contacts in the U.S. may also be imputed to SBG as a partner in the joint venture.  JEDAC has, while purchasing hardware in the U.S., used Techmaster's physical address in Naperville, Illinois with acknowledgement for JEDAC going to Mr. Akl at Techmaster's address and faxed to Techmaster's telephone number.  Mr. Akl has also apparently used two email addresses, one for Techmaster and another for SBG's joint venture, JEDAC.

Based on the known facts and circumstances, plaintiffs contend that further discovery is warranted to uncover the full extent of SBG's business contacts with Techmaster, whether through its Arabian BEMCO entity, its JEDAC joint venture, or otherwise.

SBG's PCM Division was formed to consolidate and expand SBG's services to the petroleum, chemical and mining industries, and is another SBG entity that has had apparent contacts in the U.S. – in Houston, Texas.  One integrated aspect of the PCM Division has been the SBG-PCM EDI on-line system, which facilitates the fast and accurate flow of information between the SBG's customers, PCM and suppliers, enabling PCM to use a total interchange of stocking inventories at all warehouse facilities.  SBG's PCM Division has represented that "PCM maintains full EDI capabilities from Saudi Arabia and *from Houston, Texas, where PCM has 7000 active vendors on a database and receives discounts from 2,500 manufacturers.*"  Plaintiffs request that SBG disclose the business dealings that its PCM Division has had with the 7000 active vendors and the 2,500 manufacturers from which it has reportedly received discounts.

By: _____

Robert T. Haefele

cc:    James Gauch, Esq.
       Counsel for SBG

       Plaintiffs Executive Committee

# EXHIBIT 14

EXCERPTS

http://www.sec.gov/Archives/edgar/data/948421/0000950133-97-002535.txt

```
-----BEGIN PRIVACY-ENHANCED MESSAGE-----
Proc-Type: 2001,MIC-CLEAR
Originator-Name: webmaster@www.sec.gov
Originator-Key-Asymmetric:
 MFgwCgYEVQgBAQICAf8DSgAwRwJAW2sNKK9AVtBzYZmr6aGjlWyK3XmZv3dTINen
 TWSM7vrzLADbmYQaionwg5sDW3P6oaM5D3tdezXMm7z1T+B+twlDAQAB
MIC-Info: RSA-MD5,RSA,
 M18tOqjmS6iHTSw8Ov5Tg++0S6BnpXg/aAFfyiM1aN2ZcQ4JveVnmsF69EXn3tZd
 NElYhdIv5HOx0MU0EyONNA==
```

```
<SEC-DOCUMENT>0000950133-97-002535.txt : 19970723
<SEC-HEADER>0000950133-97-002535.hdr.sgml : 19970723
ACCESSION NUMBER:                0000950133-97-002535
CONFORMED SUBMISSION TYPE:       S-4
PUBLIC DOCUMENT COUNT:           21
FILED AS OF DATE:                19970721
SROS:                 NASD

FILER:

        COMPANY DATA:
                COMPANY CONFORMED NAME:            IRIDIUM LLC
                CENTRAL INDEX KEY:                 0000948421
                STANDARD INDUSTRIAL CLASSIFICATION:   RADIO
TELEPHONE COMMUNICATIONS [4812]
                IRS NUMBER:                        363981923
                STATE OF INCORPORATION:            DE
                FISCAL YEAR END:                   1231

        FILING VALUES:
                FORM TYPE:          S-4
                SEC ACT:            1933 Act
                SEC FILE NUMBER:    333-31741
                FILM NUMBER:        97643334

        BUSINESS ADDRESS:
                STREET 1:           1401 H ST N W
                CITY:               WASH
                STATE:              DC
                ZIP:                20005
                BUSINESS PHONE:     2023265600

        MAIL ADDRESS:
                STREET 1:           1701 PENNSYLVANIA AVE N W
                CITY:               WASHINGTON
                STATE:              DC
                ZIP:                20006

        FORMER COMPANY:
```

http://www.sec.gov/Archives/edgar/data/948421/0000950133-97-002535.txt (1 of 818) [7/26/2010 12:37:12 PM]

```
                    FORMER CONFORMED NAME:   IRIDIUM INC /DE
                    DATE OF NAME CHANGE:     19950724

    FILER:

            COMPANY DATA:
                    COMPANY CONFORMED NAME:           IRIDIUM IP LLC
                    CENTRAL INDEX KEY:                0001042683
                    STANDARD INDUSTRIAL CLASSIFICATION:    []

            FILING VALUES:
                    FORM TYPE:           S-4
                    SEC ACT:             1933 Act
                    SEC FILE NUMBER:     333-31741-01
                    FILM NUMBER:         97643335

            BUSINESS ADDRESS:
                    STREET 1:            1575 EYE STREET, N.W.
                    CITY:                WASHINGTON
                    STATE:               DC
                    ZIP:                 20005
                    BUSINESS PHONE:      2024083800

    FILER:

            COMPANY DATA:
                    COMPANY CONFORMED NAME:           IRIDIUM ROAMING LLC
                    CENTRAL INDEX KEY:                0001042684
                    STANDARD INDUSTRIAL CLASSIFICATION:    []

            FILING VALUES:
                    FORM TYPE:           S-4
                    SEC ACT:             1933 Act
                    SEC FILE NUMBER:     333-31741-02
                    FILM NUMBER:         97643336

            BUSINESS ADDRESS:
                    STREET 1:            1575 EYE STREET, N.W.
                    CITY:                WASHINGTON
                    STATE:               DC
                    ZIP:                 20005
                    BUSINESS PHONE:      2024083800

    FILER:

            COMPANY DATA:
                    COMPANY CONFORMED NAME:           IRIDIUM CAPITAL CORP
                    CENTRAL INDEX KEY:                0001042685
                    STANDARD INDUSTRIAL CLASSIFICATION:    []
```

http://www.sec.gov/Archives/edgar/data/948421/0000950133-97-002535.txt

```
         FILING VALUES:
                 FORM TYPE:              S-4
                 SEC ACT:                1933 Act
                 SEC FILE NUMBER:        333-31741-03
                 FILM NUMBER:            97643337

         BUSINESS ADDRESS:
                 STREET 1:               1575 EYE STREET, N.W.
                 CITY:                   WASHINGTON
                 STATE:                  DC
                 ZIP:                    20005
                 BUSINESS PHONE:         2024083800
</SEC-HEADER>
<DOCUMENT>
<TYPE>S-4
<SEQUENCE>1
<DESCRIPTION>IRIDIUM LLC FORM S-4
<TEXT>

<PAGE>   1
```

```
==============================================================================
                  SECURITIES AND EXCHANGE COMMISSION
                        Washington, D.C. 20549
                        ------------------------
                              FORM S-4
            REGISTRATION STATEMENT UNDER THE SECURITIES ACT OF 1933
                        ------------------------
                              IRIDIUM LLC
            (Exact name of registrant as specified in its charter)

<TABLE>
<S>                              <C>                              <C>
         DELAWARE
4800                                   52-2025291
    (State or other jurisdiction        (Primary Standard
Industrial                              (I.R.S. Employer
         of incorporation)               Classification Code
Number)              Identification Number)
</TABLE>

              1575 EYE STREET, N.W., WASHINGTON, DC 20005
                           (202) 408-3800
     (Address, including zip code, and telephone number, including area code, of
              Registrant's principal executive offices)
                        ------------------------
                   IRIDIUM CAPITAL CORPORATION
            (Exact name of registrant as specified in its charter)
```

http://www.sec.gov/Archives/edgar/data/948421/0000950133-97-002535.txt (3 of 818) [7/26/2010 12:37:12 PM]

http://www.sec.gov/Archives/edgar/data/948421/0000950133-97-002535.txt

THE IRIDIUM SYSTEM

     The satellite constellation of the IRIDIUM System, which will consist of 66
operational satellites arranged in six polar orbital planes, is being assembled
and delivered in orbit by Motorola pursuant to a fixed price contract, subject
to certain adjustments. Motorola also will operate and maintain the satellite
constellation for five years (extendible to seven years at Iridium's option)
under a fixed

                                        2

<PAGE>   9

price contract, subject to certain adjustments. Iridium believes the IRIDIUM
System will have greater signal strength than other proposed MSS systems,
thereby allowing it to better serve hand-held phones and providing a higher
degree of in-building penetration for paging services. The IRIDIUM System
utilizes adaptations of proven technologies, including GSM cellular call
processing technology, intersatellite links, FDMA/TDMA radio transmission
technology, a 2,400 bps vocoder and business support software. The IRIDIUM
satellites will feature cross-link antennas allowing telephone calls and
signaling information to be passed globally from satellite to satellite. These
intersatellite links, which enable the satellites to function as switches in the
sky, will allow the IRIDIUM System to (i) select the optimal space-to-ground
path of each call, thereby enhancing system reliability and capacity while
reducing the costs associated with the use of terrestrial phone systems, (ii)
communicate with subscribers in all regions of the world (including mid-ocean
and remote areas) regardless of their proximity to a gateway, (iii) provide full
global coverage with a relatively small number of gateways, thereby lowering
total ground segment build-out and operating costs and (iv) provide enhanced
ability to track the location of a voice customer, allowing Iridium to direct
calls and pages as customers travel globally. In addition, the communications,
station keeping and control systems of the IRIDIUM satellites can be upgraded,
maintained and reconfigured in orbit through the remote loading of software.
Iridium believes that its primary technological challenge in implementing the
IRIDIUM System is the integration of these proven technologies into a single
system.

     Iridium expects to provide virtually global service initially through 11
gateways, although it will be able to provide full global service with fewer
gateways. Each of these 11 gateways will be owned, operated and financed by one
or more investors in Iridium or their affiliates.

     IRIDIUM subscriber equipment will support voice, data and paging services.
Iridium expects that portable, hand-held IRIDIUM phones will be manufactured by
at least two experienced suppliers, Motorola and Kyocera Corporation
("Kyocera"), both of which have hand-held IRIDIUM phones under development. The
phones are expected to be available in satellite-only and "multi-mode" models.
The multi-mode phone being developed by Motorola uses changeable terrestrial

http://www.sec.gov/Archives/edgar/data/948421/0000950133-97-002535.txt

communications GmbH & Co., the parent of Vebacom Holdings, Inc., a holder of
approximately 8.8% of the Class 1 Interests, was allocated a gateway service
territory consisting of several countries in or near Europe. Nippon Iridium
Corporation, an affiliate of Nippon Iridium (Bermuda) Corporation, a holder of
approximately 11.2% of the Class 1 Interests, was allocated the Japan gateway
service territory. Each of o.tel.o communications GmbH & Co. and Nippon Iridium
Corporation have entered into a Gateway Authorization Agreement, pursuant to
which they, or their affiliates, will operate their respective Gateway service
territory and provide gateway services. In addition, o.tel.o communications GmbH
& Co. and Nippon Iridium Corporation will serve as service providers to their
respective gateway territory and, as such, will be entitled to payments
associated with sales of IRIDIUM Services.

115

<PAGE>   122


     Kyocera, an affiliate of Nippon Iridium Corporation, a holder of
approximately 11.2% of the Class 1 Interests, has entered into a license
agreement with Motorola with respect to the development and manufacture of
multi-mode phones for use with the IRIDIUM System. This license agreement does
not obligate Kyocera to develop, manufacture or sell any IRIDIUM subscriber
equipment. Iridium expects that Kyocera will develop, manufacture and sell
multi-mode phones for use with the IRIDIUM System. Iridium intends to enter into
a contract with Motorola to cover the expenses associated with testing the
Kyocera subscriber equipment with the IRIDIUM System, estimated to be $12.2
million.


     Certain of the directors of IWCL are, or have been within the past year,
executive officers of suppliers of Iridium. In addition, certain of the
directors of Iridium are executive officers of gateway owners and service
providers. See "Management" and "Risk Factors -- Conflict of Interest with
Gateway Owners."

116

<PAGE>   123


          IRIDIUM'S INVESTORS, NUMBER OF CLASS 1 INTERESTS OWNED,
          PERCENTAGE OWNERSHIP AND PRINCIPAL GATEWAY SERVICE TERRITORIES


     Set forth below is a summary of the investors in Iridium, the number of
Class 1 Interests owned by each investor, their percentage ownership of Class 1
Interests and, if applicable, their principal gateway service territories at
June 13, 1997:


<TABLE>
<CAPTION>
                                     NUMBER OF
                                      CLASS 1
                                     INTERESTS       PERCENTAGE

http://www.sec.gov/Archives/edgar/data/948421/0000950133-97-002535.txt (176 of 818) [7/26/2010 12:37:12 PM]

```
PRINCIPAL GATEWAY
                 INVESTOR           OWNED(1)      OWNERSHIP(2)
SERVICE TERRITORY
- ------------------------------  ----------
------------  ------------------------------
<S>                               <C>           <C>           <C>
IWCL..........................    12,000,000      8.5         Not Applicable
Iridium Africa Corporation......   3,000,000      2.1         Africa
(excluding Morocco and

Iridium Andes -- Caribe.........   4,350,000      3.1           Egypt) and Turkey
and Caribbean(4)                                              South America
Iridium Brasil Ltda.............   2,824,725      2.0         South America
and Caribbean(4)
Iridium Canada, Inc. ...........   5,250,000(5)   3.7         North America(3)
Iridium China (Hong Kong)
   Ltd. ........................   5,250,000      3.7         China,
Mongolia, Hong Kong and

                                                             Macau
Iridium India Telecom Limited...   5,250,000      3.7         Indian Subcontinent
Iridium Italia S.p.A............   5,550,000      3.9         Certain countries
in Europe

                                                             including
Belgium, Denmark,

                                                             France,
Greece, Italy,

                                                             Luxembourg,
the Netherlands

                                                             and Switzerland(4)
Iridium Middle East
   Corporation..................   6,000,000      4.3         Middle
East, Morocco, Egypt and

                                                             Central Asia
Khrunichev State Research and
   Production Center............   6,133,125      4.3         Russia and
eight other republics

                                                             of
the Commonwealth of

                                                             Independent States
Motorola, Inc. ................   26,533,425(5)  18.8         North America
(3), Mexico(6) and

                                                             Central
America, South America

                                                             and Caribbean(4)
Nippon Iridium (Bermuda)
   Limited......................  15,750,000     11.2         Japan
Pacific Electric Wire & Cable
   Co., Ltd. ...................   5,250,000      3.7         Indonesia,
Brunei, Papua New

                                                             Guinea,
```

http://www.sec.gov/Archives/edgar/data/948421/0000950133-97-002535.txt

the Philippines and

Taiwan

SK Telecom...................... 5,250,000(5)    3.7    North Korea
and South Korea
South Pacific Iridium Holdings
  Limited...................... 7,500,000    5.3    Certain countries
in the South

Pacific

region including                                          Australia and

New Zealand
Sprint Iridium, Inc. ........... 5,250,000    3.7    North America(3)
Thai Satellite
  Telecommunications Co.,
  Ltd. ......................... 5,250,000    3.7    Southeast Asia
</TABLE>

117

<PAGE>   124

<TABLE>
<CAPTION>

| PRINCIPAL GATEWAY INVESTOR | NUMBER OF CLASS 1 INTERESTS OWNED(1) | PERCENTAGE OWNERSHIP(2) | SERVICE TERRITORY |
| --- | --- | --- | --- |
| <S> | <C> | <C> | <C> |
| Vebacom Holdings, Inc. ......... | 12,427,875 | 8.8 | Certain countries in or near Europe including Austria, Bulgaria, the Czech Republic, Finland, Germany, Hungary, Ireland, Israel, Norway, Poland, Portugal, Romania, Spain, Sweden, Slovakia, Ukraine and the United Kingdom |
| Lockheed Martin Corporation..... | 1,500,000 | 1.1 | Not Applicable |
| Raytheon Company............... | 900,000 | 0.7 | Not Applicable |

</TABLE>

http://www.sec.gov/Archives/edgar/data/948421/0000950133-97-002535.txt (178 of 818) [7/26/2010 12:37:12 PM]

http://www.sec.gov/Archives/edgar/data/948421/0000950133-97-002535.txt

- ----------------

(1) Represents each investor's direct holdings of outstanding Class 1 Interests,
    excluding Class 1 Interests issuable upon exercise of outstanding options,
    warrants (including the LLC Interest Warrants) and conversion of outstanding
    convertible securities.

(2) The percentages do not give effect to any Class 1 Interests that IWCL may
    have acquired or will acquire as a result of the application of the proceeds
    from the sale of shares of IWCL's non-voting Class B Common Stock, par value
    $.01 per share (the "Class B Common Stock") pursuant to the Global Ownership
    Program. See "IWCL -- Global Ownership Program."

(3) The North American gateway service territory, principally consisting of the
    United States and Canada, is shared by Iridium Canada, Motorola and Sprint.

(4) The South America and Caribbean gateway service territory is owned and will
    be operated by Iridium SudAmerica. Iridium SudAmerica is owned by Iridium
    Brasil, Iridium Andes-Caribe, Motorola International Development
    Corporation, a wholly owned subsidiary of Motorola, and Iridium Italia.

(5) As of April 30, 1997, SK Telecom and Sprint Iridium, Inc. each owned 13,550
    Series A Class 2 Interests in addition to the Class 1 Interest set forth
    above. Similarly, Motorola, Inc. also owns 1 Series B Class 2 Interest and
    75 Series C Class 2 Interests. BCE Mobile Communications, Inc., an affiliate
    of Iridium Canada, Inc., owns 9,206 Series Class 2 Interests.

(6) It is anticipated that the Mexican gateway service territory initially will
    be served by the North American gateway service equipment.

    IWCL was incorporated by Iridium on December 12, 1996. Its only asset is
its interest in Iridium and its only activity is participating in the management
of Iridium. See "Governance of IWCL and Relationship with Iridium."

    IRIDIUM AFRICA CORPORATION was formed by Mawarid Overseas Company Limited
to invest in Iridium. Mawarid Overseas Company Limited is related to the Mawarid
Group, one of the largest industrial groups in Saudi Arabia, with operations in
satellite broadcasting, financial services, trading, manufacturing,
construction, telecommunications, and municipal and health care services.
Iridium Africa Corporation has been allocated a gateway service territory
consisting of over 50 countries located primarily in or near Africa (excluding
Morocco and Egypt) and Turkey.

    IRIDIUM CANADA, INC. is a corporation owned one-third by a Motorola
subsidiary and one-third each by two subsidiaries of BCE, Inc. -- BCE Mobile
Communications, Inc. and Bell Canada International, Inc. BCE, Inc. is Canada's
largest telecommunications company. BCE Mobile provides a variety of wireless
telecommunications services to the Canadian market, including cellular, paging,

http://www.sec.gov/Archives/edgar/data/948421/0000950133-97-002535.txt

data and air-to-ground communications services. Iridium Canada, Inc., Motorola
and Sprint Corporation share the North American gateway service territory,
consisting of Canada, St. Pierre and Miquelon, Bermuda, Puerto Rico and the
United States.

118

<PAGE>   125

        IRIDIUM CHINA (HONG KONG) LTD. is a wholly owned subsidiary of China
Aerospace, a major diversified industrial group based in China which is also the
parent company of China Great Wall Industries Corporation, the previous owner of
all Iridium China equity interests in Iridium. China Great Wall is a
subcontractor to Motorola to launch IRIDIUM satellites on its Long March 2C
rocket. Iridium China has been allocated a gateway service territory consisting
of China, Mongolia, Hong Kong and Macau.

        IRIDIUM INDIA TELECOM LIMITED is a consortium of Indian financial
institutions that invested in Iridium initially through Infrastructure Leasing &
Financial Services Limited ("IL&FS"). The consortium includes: The Industrial
Development Bank of India, IL&FS, Exim Bank of India, State Bank of India, The
Industrial Credit and Investment Corporation of India Limited, General Insurance
Corporation of India, Housing Development Finance Corporation Limited, IL&FS
Venture Fund, Life Insurance Corporation of India, SCICI Ltd. and Unit Trust of
India. A wholly-owned subsidiary of Motorola, Inc. is also a member of the
consortium. Iridium India Telecom Ltd. has been allocated a gateway service
territory consisting of India, Bangladesh, Bhutan, Nepal, Sri Lanka and
Maldives.

        IRIDIUM ITALIA S.P.A. is an affiliate of STET -- Societa Finanziaria
Telefonica per Azioni ("STET"). STET is the holding company of an integrated
telecommunication group and is one of the largest corporations in Italy. Its
largest subsidiary, Telecom Italia, is the principal provider of voice and data
telecommunications services in Italy and is the world's fifth largest telecom
operator by number of subscribers. STET (or affiliated companies) is providing
engineering support services to Motorola as part of the procurement and
operation of the IRIDIUM System. Motorola has entered into several agreements
with an affiliate of STET, Nuova Telespazio, for work related to the backup
system control facility, gateways and other portions of the IRIDIUM System. See
"Business -- Status of IRIDIUM System Development and Implementation." Iridium
Italia has been allocated a gateway service territory consisting of certain
countries in Europe including Belgium, Denmark, France, Greece, Italy,
Luxembourg, the Netherlands and Switzerland.

        IRIDIUM MIDDLE EAST CORPORATION is owned one-half by Mawarid Overseas
Company Limited and one-half by Trinford Investments S.A. Trinford Investments
is a company affiliated with the Saudi Binladin Group. Binladin is also one of
the largest diversified industrial groups in Saudi Arabia, with operations
covering major construction projects, airport maintenance and operation,
telecommunications and hotels. Both Mawarid and Binladin operate

http://www.sec.gov/Archives/edgar/data/948421/0000950133-97-002535.txt (180 of 818) [7/26/2010 12:37:12 PM]

http://www.sec.gov/Archives/edgar/data/948421/0000950133-97-002535.txt

internationally. Iridium Middle East Corporation has been allocated a gateway service territory consisting of over 20 countries located in the Middle East and Central Asia, as well as Morocco and Egypt.

IRIDIUM SUDAMERICA CORPORATION is owned by Iridium Andes-Caribe, Iridium Brasil Ltda., Iridium Italia and a wholly-owned subsidiary of Motorola. Iridium Andes-Caribe is a consortium of private Venezuelan investors with experience in consumer foodstuffs, communications, construction, finance and retailing. Inepar, the majority owner of Iridium Brasil, is a diversified Brazilian corporation with operations in telecommunications, electrical current control equipment and services, mass transport, vehicle distribution and financial markets. Iridium SudAmerica has been allocated a gateway service territory consisting of approximately 40 countries located primarily in South America and the Caribbean.

KHRUNICHEV STATE RESEARCH AND PRODUCTION SPACE CENTER is a state-owned aerospace engineering and manufacturing company in the Russian Federation. Khrunichev has been engaged in the manufacture of launch vehicles, orbital stations and other space equipment for more than 30 years. Khrunichev has contracted to provide launch services to Motorola with the Proton rocket as part of the deployment of the space segment. Khrunichev has also been allocated a gateway service territory consisting of Belarus, Estonia, Georgia, Kazakhstan, Latvia, Lithuania, Moldova, the Russian Federation and Uzbekistan.

MOTOROLA, INC. is one of the world's leading providers of wireless communications and electronic equipment, systems, components and services for worldwide markets. Motorola products include two-way radios, pagers, personal communications systems, cellular telephones and systems,

                                        119

<PAGE>   126

discrete semiconductors and integrated circuits, defense and aerospace electronics, automotive and industrial electronics, computers, data communications, and information processing and handling equipment. Motorola is the primary contractor to Iridium and the IRIDIUM gateway operators for the procurement of components of the IRIDIUM System. See "Business -- Progress to Date." Motorola has also been allocated, or otherwise received: (i) a share of the North American gateway service territory along with Iridium Canada, Inc. and Sprint Corporation; (ii) the entire Mexican/Central American gateway service territory; (iii) an interest in Iridium SudAmerica, which has been allocated the gateway service territory including South America and the Caribbean; and (iv) an interest in Iridium India Telecom Limited, which has been allocated the gateway service territory for the Indian subcontinent.

NIPPON IRIDIUM (BERMUDA) LIMITED is a wholly owned subsidiary of Nippon Iridium Corporation which is a consortium company formed in Bermuda by DDI Corporation, Japan's leading independent telecommunications company and a provider of cellular, PHS and long distance telephone service, and Kyocera

http://www.sec.gov/Archives/edgar/data/948421/0000950133-97-002535.txt (181 of 818) [7/26/2010 12:37:12 PM]

http://www.sec.gov/Archives/edgar/data/948421/0000950133-97-003008.txt

```
-----BEGIN PRIVACY-ENHANCED MESSAGE-----
Proc-Type: 2001,MIC-CLEAR
Originator-Name: webmaster@www.sec.gov
Originator-Key-Asymmetric:
 MFgwCgYEVQgBAQICAf8DSgAwRwJAW2sNKK9AVtBzYZmr6aGj1WyK3XmZv3dT1Nen
 TWSM7vrzLADbmYQaionwg5sDW3P6oaM5D3tdezXMm7z1T+B+twIDAQAB
MIC-Info: RSA-MD5,RSA,
 VwejXQvycuEFgjC2ubEV7p8osoISq+Tqr6dLvg4jH1sOqw29iW18GQkhnmQGy5MQ
 FwMMsweIh++3vsIUuOmRgQ==

<SEC-DOCUMENT>0000950133-97-003008.txt : 19970819
<SEC-HEADER>0000950133-97-003008.hdr.sgml : 19970819
ACCESSION NUMBER:            0000950133-97-003008
CONFORMED SUBMISSION TYPE:   S-4/A
PUBLIC DOCUMENT COUNT:       12
FILED AS OF DATE:            19970818
SROS:            NONE

FILER:

        COMPANY DATA:
                COMPANY CONFORMED NAME:             IRIDIUM LLC
                CENTRAL INDEX KEY:                  0000948421
                STANDARD INDUSTRIAL CLASSIFICATION: RADIO
TELEPHONE COMMUNICATIONS [4812]
                IRS NUMBER:                         521984342
                STATE OF INCORPORATION:             DE
                FISCAL YEAR END:                    1231

        FILING VALUES:
                FORM TYPE:          S-4/A
                SEC ACT:            1933 Act
                SEC FILE NUMBER:    333-31741
                FILM NUMBER:        97665520

        BUSINESS ADDRESS:
                STREET 1:           1575 EYE STREET N W
                CITY:               WASH
                STATE:              DC
                ZIP:                20006
                BUSINESS PHONE:     2023265600

        MAIL ADDRESS:
                STREET 1:           1701 PENNSYLVANIA AVE N W
                CITY:               WASHINGTON
                STATE:              DC
                ZIP:                20006

        FORMER COMPANY:
```

http://www.sec.gov/Archives/edgar/data/948421/0000950133-97-003008.txt (1 of 541) [7/26/2010 12:51:20 PM]

http://www.sec.gov/Archives/edgar/data/948421/0000950133-97-003008.txt

```
                 FORMER CONFORMED NAME:  IRIDIUM INC /DE
                 DATE OF NAME CHANGE:    19950724

     FILER:

          COMPANY DATA:
               COMPANY CONFORMED NAME:          IRIDIUM IP LLC
               CENTRAL INDEX KEY:               0001042683
               STANDARD INDUSTRIAL CLASSIFICATION:    []

          FILING VALUES:
               FORM TYPE:          S-4/A
               SEC ACT:            1933 Act
               SEC FILE NUMBER:    333-31741-01
               FILM NUMBER:        97665521

          BUSINESS ADDRESS:
               STREET 1:           1575 EYE STREET, N.W.
               CITY:               WASHINGTON
               STATE:              DC
               ZIP:                20005
               BUSINESS PHONE:     2024083800

     FILER:

          COMPANY DATA:
               COMPANY CONFORMED NAME:          IRIDIUM ROAMING LLC
               CENTRAL INDEX KEY:               0001042684
               STANDARD INDUSTRIAL CLASSIFICATION:    []

          FILING VALUES:
               FORM TYPE:          S-4/A
               SEC ACT:            1933 Act
               SEC FILE NUMBER:    333-31741-02
               FILM NUMBER:        97665522

          BUSINESS ADDRESS:
               STREET 1:           1575 EYE STREET, N.W.
               CITY:               WASHINGTON
               STATE:              DC
               ZIP:                20005
               BUSINESS PHONE:     2024083800

     FILER:

          COMPANY DATA:
               COMPANY CONFORMED NAME:          IRIDIUM CAPITAL CORP
               CENTRAL INDEX KEY:               0001042685
               STANDARD INDUSTRIAL CLASSIFICATION:    []
```

http://www.sec.gov/Archives/edgar/data/948421/0000950133-97-003008.txt

```
        FILING VALUES:
                FORM TYPE:              S-4/A
                SEC ACT:                1933 Act
                SEC FILE NUMBER:        333-31741-03
                FILM NUMBER:            97665523

        BUSINESS ADDRESS:
                STREET 1:               1575 EYE STREET, N.W.
                CITY:                   WASHINGTON
                STATE:                  DC
                ZIP:                    20005
                BUSINESS PHONE:         2024083800
</SEC-HEADER>
<DOCUMENT>
<TYPE>S-4/A
<SEQUENCE>1
<DESCRIPTION>AMENDMENT NO. 1 TO IRIDIUM S-4
<TEXT>

<PAGE>    1
```

```
=================================================================
             SECURITIES AND EXCHANGE COMMISSION
                    Washington, D.C. 20549
                    -----------------------


                        AMENDMENT NO. 1




                             TO


                          FORM S-4
       REGISTRATION STATEMENT UNDER THE SECURITIES ACT OF 1933
                    -----------------------
                          IRIDIUM LLC
       (Exact name of registrant as specified in its charter)
```

```
<TABLE>
<S>                              <C>                            <C>
        DELAWARE
4800                        52-1984342
   (State or other jurisdiction        (Primary Standard
Industrial                   (I.R.S. Employer
     of organization)          Classification Code
Number)              Identification Number)
</TABLE>
```

http://www.sec.gov/Archives/edgar/data/948421/0000950133-97-003008.txt (3 of 541) [7/26/2010 12:51:20 PM]

http://www.sec.gov/Archives/edgar/data/948421/0000950133-97-003008.txt

agreement with Motorola with respect to the development and manufacture of
multi-mode phones for use with the IRIDIUM System. This license agreement does
not obligate Kyocera to develop, manufacture or sell any IRIDIUM subscriber
equipment. Iridium expects that Kyocera will develop, manufacture and sell
multi-mode phones for use with the IRIDIUM System. Iridium intends to enter into
a contract with Motorola to cover the expenses associated with testing the
Kyocera subscriber equipment with the IRIDIUM System, estimated to be $12.2
million.

       Certain of the directors of IWCL are, or have been within the past year,
executive officers of suppliers of Iridium. In addition, certain of the
directors of Iridium are executive officers of gateway owners and service
providers. See "Management" and "Risk Factors -- Conflict of Interest with
Gateway Owners."

                                  119
<PAGE>    126

            IRIDIUM'S INVESTORS, NUMBER OF CLASS 1 INTERESTS OWNED,
         PERCENTAGE OWNERSHIP AND PRINCIPAL GATEWAY SERVICE TERRITORIES


       Set forth below is a summary of the investors in Iridium, the number of
Class 1 Interests owned by each investor, their percentage ownership of Class 1
Interests and, if applicable, their principal gateway service territories at
August 13, 1997:


<TABLE>
<CAPTION>

|  | NUMBER OF CLASS 1 INTERESTS | PERCENTAGE |  |
| --- | --- | --- | --- |
| INVESTOR | OWNED(1) | OWNERSHIP(2) | PRINCIPAL GATEWAY SERVICE TERRITORY |
| <S> | <C> | <C> | <C> |
| IWCL............................ | 12,000,000 | 8.5 | Not Applicable |
| Iridium Africa Corporation...... | 3,000,000 | 2.1 | Africa (excluding Morocco and Egypt) and Turkey |
| Iridium Andes -- Caribe......... | 4,350,000 | 3.1 | South America and Caribbean(4) |
| Iridium Brasil Ltda............. | 2,824,725 | 2.0 | South America and Caribbean(4) |
| Iridium Canada, Inc. ........... | 5,250,000(5) | 3.7 | North America(3) |
| Iridium China (Hong Kong) |  |  |  |

http://www.sec.gov/Archives/edgar/data/948421/0000950133-97-003008.txt (186 of 541) [7/26/2010 12:51:21 PM]

```
    Ltd. .........................    5,250,000        3.7    China,
Mongolia, Hong Kong and

                                                              Macau
Iridium India Telecom Limited...    5,250,000        3.7    Indian Subcontinent
Iridium Italia S.p.A.............    5,550,000        3.9    Certain countries
  in Europe

                                                              including
Belgium, Denmark,

                                                              France,
Greece, Italy,

                                                              Luxembourg,
the Netherlands

                                                              and Switzerland(4)
Iridium Middle East
  Corporation...................    6,000,000        4.3    Middle
East, Morocco, Egypt and

                                                              Central Asia
Khrunichev State Research and
  Production Center.............    6,133,125        4.3    Russia and
eight other republics

                                                              of
the Commonwealth of

                                                              Independent States
Motorola, Inc. .................   26,533,425(5)    18.8    North America
(3), Mexico(6) and

                                                              Central
America, South America

                                                              and Caribbean(4)
Nippon Iridium (Bermuda)
  Limited.......................   15,750,000       11.2    Japan
Pacific Electric Wire & Cable
  Co., Ltd. ....................    5,250,000        3.7    Indonesia,
Brunei, Papua New

                                                              Guinea,
the Philippines and

                                                              Taiwan
SK Telecom......................    5,250,000(5)     3.7    North Korea
and South Korea
South Pacific Iridium Holdings
  Limited.......................    7,500,000        5.3    Certain countries
in the South

                                                              Pacific
region including

                                                              Australia and
New Zealand
Sprint Iridium, Inc. ...........    5,250,000        3.7    North America(3)
Thai Satellite
  Telecommunications Co.,
  Ltd. .........................    5,250,000        3.7    Southeast Asia
</TABLE>
```

http://www.sec.gov/Archives/edgar/data/948421/0000950133-97-003008.txt

120

```
<PAGE>   127

<TABLE>
<CAPTION>
```

| PRINCIPAL GATEWAY INVESTOR SERVICE TERRITORY | NUMBER OF CLASS 1 INTERESTS OWNED(1) | PERCENTAGE OWNERSHIP(2) | |
| --- | --- | --- | --- |
| - ------------------------------- | ---------- | | |
| ------------   ------------------------------ | | | |
| <S> | <C> | <C> | <C> |
| Vebacom Holdings, Inc. ......... | 12,427,875 | 8.8 | Certain countries |
| in or near | | | |
| | | | Europe |
| including Austria, | | | |
| | | | Bulgaria, |
| the Czech Republic, | | | |
| | | | Finland, |
| Germany, Hungary, | | | |
| | | | Ireland, |
| Israel, Norway, | | | |
| | | | Poland, |
| Portugal, Romania, | | | |
| | | | Spain, |
| Sweden, Slovakia, | | | |
| | | | Ukraine and |
| the United Kingdom | | | |
| Lockheed Martin Corporation..... | 1,500,000 | 1.1 | Not Applicable |
| Raytheon Company............... | 900,000 | 0.7 | Not Applicable |

```
</TABLE>
```

- ---------------
(1) Represents each investor's direct holdings of outstanding Class 1 Interests,
    excluding Class 1 Interests issuable upon exercise of outstanding options,
    warrants (including the LLC Interest Warrants) and conversion of outstanding
    convertible securities.

(2) The percentages do not give effect to any Class 1 Interests that IWCL may
    have acquired or will acquire as a result of the application of the proceeds
    from the sale of shares of IWCL's non-voting Class B Common Stock, par value
    $.01 per share (the "Class B Common Stock") pursuant to the Global Ownership
    Program. See "Certain Matters Regarding Relationship of IWCL and
    Iridium -- Global Ownership Program."

http://www.sec.gov/Archives/edgar/data/948421/0000950133-97-003008.txt (188 of 541) [7/26/2010 12:51:21 PM]

# EXHIBIT 15

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

IN RE TERRORIST ATTACKS ON
SEPTEMBER 11, 2001

Civil Action No.
03 MDL 1570 (RCC)

--------------------------------------------------------x

This document relates to:

> Kathleen Ashton, et al. v. Al Qaeda Islamic Army, et al.,
>     Case No. 1:02-6977 (GBD) (S.D.N.Y.)
> Thomas E. Burnett, Sr., et al. v. Al Baraka Investment & Development Corp., et al.,
>     Case No. 03-CV-9849 (GBD) (S.D.N.Y.)
> Federal Insurance Co., et al. v. Al Qaida, et al.,
>     Case No. 03-CV-6978 (GBD) (S.D.N.Y.)
> Euro Brokers, Inc., et al. v. Al Baraka Investment and Development Corp., et al.,
>     Case No. 04-CV-07279-UA (GBD) (S.D.N.Y.)
> World Trade Center Properties, LLC, et al. v. Al Baraka Inv. and Dev. Corp., et al.,
>     Case No. 04-CV-7280 (GBD) (S.D.N.Y.)

## PLAINTIFFS' RESPONSES AND OBJECTIONS TO DEFENDANT SAUDI BINLADIN GROUP'S REVISED FIRST SET OF JURISDICTIONAL INTERROGATORIES TO PLAINTIFFS

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure and pursuant to the Order of Hon. Frank Maas, U.S.M.J. dated January 23, 2007 (Dkt. # 1941), Plaintiffs in the above-referenced action ("the Plaintiffs"), through undersigned counsel, respond to "Defendant Saudi Binladin Group's Revised First Set Of Jurisdictional Interrogatories To Plaintiffs" propounded upon the Plaintiffs by Defendant Saudi Binladin Group, Inc. ("SBG") as follows:

### GENERAL OBJECTIONS:

1.      Plaintiffs object to the Instructions and Definitions to the extent they seek to change, expand, or enlarge Plaintiffs' obligations under the Federal Rules of Civil Procedure or the Local Rules of the United States District Court of the Southern District of New York.

2.      Plaintiffs object to SBG's discovery demands to the extent that they require any party to respond to any discovery beyond what was authorized by the Court in paragraph 17 of Case

16.     The production of documents pursuant to any of SBG's discovery requests is not to be deemed an admission or representation that either the document requests or the documents produced by Plaintiffs are admissible or relevant to this litigation.

17.     The above-stated General Objections are hereby specifically incorporated into each of plaintiffs' following responses to discovery requests, whether or not expressly repeated in response to a particular request.

## SPECIFIC OBJECTIONS AND RESPONSES TO INTERROGATORIES

### INTERROGATORY NO. 1:

If You contend that SBG is subject to personal jurisdiction on any theory of general jurisdiction, identify with specificity the factual basis for that contention and identify all documents and all persons with discoverable knowledge on which You rely to support Your contention. Your response should include, without limitation, identification of: (a) the nature, dates, duration, purpose and locations of any activity that You contend subjects SBG to general jurisdiction; (b) the participants in such activity; and (c) the basis for Your contention that such participants were acting on behalf of SBG or that their presence or conduct is otherwise attributable to SBG.

**OBJECTIONS:**  Plaintiffs object to SBG's Interrogatory number 1, specifically for the reasons indicated in general objections 2, 3, 4, 7, 9 – 15, and incorporate each as though set forth in full.   Notwithstanding and without waiving these objections, Plaintiffs respond as follows.

**RESPONSE:** Subject to and without waiving the foregoing objections or the General Objections, Plaintiffs state SBG, its divisions, subsidiaries, affiliates and agents engaged in business activities in the United States that, when considered in total, demonstrate SBG's continuous and systematic contacts in the United States for years before, during, and after 2001.  SBG's business contacts with the U. S. include, but are not limited to, (i) employment of U.S.-based employees, (ii) the use, domination, and direction of U.S.-based affiliate companies to solicit, aid, and manage SBG's business with U.S.-based companies, (iii) membership in and business dealings with U.S. business associations, (iv) active investment in U.S. business and joint ventures with U.S. companies,

6

(v) the use of U.S. advertisements for soliciting U.S. business, and (vi) the solicitation, negotiation, and performance of U.S. government contract work.  For instance:

SBG's U.S.-Based Employees

SBG and its affiliate, the Mohammed Bin Laden Company ("MBC"), have employed U.S.-based employees to facilitate SBG's U.S. business activities.

Before and after September 2001, SBG employed Dr. Fuad Rihani.  Dr. Rihani became a U.S. citizen in 1972 and has permanently resided in the U.S. since 1968.  Dr. Rihani is married and has three adult children, all of whom are U.S. citizens residing in the U.S.  During a 30 year career with MBO and later SBG, Dr. Rihani was SBG's Director of Research and Development. Additionally, Dr. Rihani served as a board member with SBG executive, Akberali Moawalla, on the board of the German company SL Sonderkonstruktionen und Leichtbau GmbH, which held contracts with SBG.  While employed by SBG, Dr. Rihani has maintained U.S. offices in Hickory, North Carolina, and Alexandria, Virginia.  Dr. Rihani provided his U.S. office addresses as a contact for business networking and development purposes associated with SBG's U.S. business activities. SBG reimbursed Dr. Rihani for his U.S. office-related expenses, including his telephone, facsimile, copying costs, and secretarial assistance.  SBG directly wired Dr. Rihani's monthly salary to his U.S. bank account.  Dr. Rihani performed business development, research and management functions for SBG while in the U.S.

Dr. Rihani has also represented SBG in various U.S.-based business organizations and at various U.S.-based business events.  For example, SBG is a member of the U.S.-based chapter of the International Road Foundation (IRF), with its offices in Washington, D.C.  At the direction of SBG's Chairman, Bakr Binladin, Dr. Rihani has represented SBG at IRF meetings and events. Similarly, Dr. Rihani is SBG's representative to the U.S.-Saudi Business Council.  Dr. Rihani also represented SBG at the three day "USA-KSA Companies Conference" in Washington, DC on June

SBG affiliated with U.S. Companies

SBG has controlled and used U.S.-based affiliate companies to facilitate its U.S. business activities. For example, an undated SBG company report circa 1993 listed the former offices of Techmaster, USA in New Jersey as one of SBG's affiliated offices. SBG recently promoted its association with Techmaster on the website of SBG's Arabian Bemco division. Moreover, according to public information about Middle East businesses, Techmaster is a wholly-owned subsidiary of Arabian Bemco. The degree of control SBG exercises over Techmaster is demonstrated by the fact that board members of SBG and its wholly-owned U.S.-based subsidiary, SBG-USA, were also board members of Techmaster, USA, and the officers and employees of SBG's Arabian Bemco division and Techmaster overlap. For example, Samir Akl, Techmaster's president, is also General Manager of SBG's Arabian Bemco division. Other examples demonstrate SBG's Arabian Bemco division used Techmaster as its procurement group and as its negotiating and bidding partner for U.S. business and U.S. government contracts. Techmaster also performed valuable office functions for SBG-USA. According to Philip Griffin, Techmaster had the U.S. infrastructure that SBG-USA used to start SBG's U.S. operations in 1993. SBG's Arabian Bemco division's collaboration with Techmaster was promoted on the Saudi U.S. Business Council's web site. Techmaster's directors, as indicated below, demonstrate the degree of influence SBG has over Techmaster:

> Henry Sarkissian, Director of SBG's Arabian Bemco division and other SBG companies;
> Kourken Sarkissian, Director of SBG-USA;
> Souren Sarkissian, Director of SBG's Arabian Bemco division;
> Victor Pietkiewicz;
> Samir Akl, Techmaster President and SBG's Arabian Bemco division's General Manager

SBG-USA phone records, invoices from SBG member company JEDAC, and e-mails demonstrate substantial interaction between SBG and Techmaster. As one example, SBG-USA phone records produced in the litigation indicate at least 103 calls were made to Techmaster's

Marlton, NJ office.   Also, invoices from JEDAC, a member company of SBG's Al Salem Group division that is involved in electrical manufacturing, list the Illinois phone number of Techmaster's headquarters as its contact number.   JEDAC invoices further indicate the company is "[a]n affiliate of General Electric Co., USA" and provide JEDAC's address as "JEDAC-GE at 1925 McDowell Rd., Suite #204 Naperville, IL 60563 … Attn: Samir Akl." This address is Techmaster's address. As noted above, Samir Akl is Techmaster's president and a general manager at SBG's Arabian Bemco division.   These invoices document that SBG has used Techmaster to serve and manage its business dealings with GE.  Al Salem Group's JEDAC represents on its web site it has been manufacturing electrical distribution equipment under license from General Electric in the United States since 1978. E-mails between SBG's Arabian Bemco division and GE's Power Division indicated the companies have undertaken substantial work together.   Through its control of Techmaster, SBG derives substantial benefit as seen in its GE related business.

The associations between SBG and Techmaster are not limited to their GE-related business. For example, other e-mails indicate Techmaster serves as SBG's bidding partner for contracts with the U.S. government. In one e-mail, from Samir Akl of Techmaster/JEDAC, USA to Henry Cabrera of SBG's Arabian Bemco division, Akl attached Techmaster's proposal to the U.S. Army Corp regarding "Solicitation DACA 78-99-R-0014 - Ras El Tin Base - Alexandria-Egypt". Akl requested help searching Henry Sarkissian's and Henry Cabrera's office for the complete proposal which include total costs, sub-contractor, and other costs associated with the project.   Other e-mails from Techmaster suggest it was jointly reviewing with SBG USAID bids to rebuild Iraq.

Other e-mail reveals Robert McBride, another SBG-USA director, was formally also General Manager at Techmaster in 1990.  Robert McBride was also a Vice-President of Yorkbridge Capital– a Byron-Hill related company owned by the Sarkissians.  Binladen Brothers for Construction incorporated itself in Texas in December 1980, and listed Robert McBride, Kourken Sarkissian, and

11

Sourken Sarkissian as officers of Binladen Brothers for Construction. The company dissolved in December 1987.   Three months later, Khalil M. Binladin incorporated Binladin USA in California and registered the company to do business in Texas.   SBG-USA called the Byron-Hill Texas Corporation at least three times.

SBG, Bakr Binladin and the Baharoon Development Group founded the company Integrated Visions, which provides e-business solutions.  According an archived version of Integrated Visions' web site, its subsidiary, Eglobal Business Inc., is a U.S. based company.  Georgia Secretary of State corporation records indicate Eglobal Business Inc., was incorporated on February 7, 2000 with its principle office located at 8302 Dunwoody Pl, Suite 130, Atlanta, Ga 30350-330. Eglobal Business Inc. was dissolved July 9, 2005. Officers of the company included Tareque Pirzada, Eric Waldbaum, and Ashfaq Syed.

The Saudi Investment Company ("SICO"), based in Geneva, Switzerland and run by Yeslam Binladin, is an investment arm of SBG and the Binladin family.  SICO partnered with U.S.-based Daniels Realty company to develop U.S. real estate projects.  SICO created the U.S. companies Tropiville, Knutstorp, and Kinnekule as part of its development of U.S. properties.  SICO also created and used the U.S. company, Roxbury Technologies.

<u>SBG's Membership in U.S. Business Organizations</u>

As noted previously, SBG is currently a member of the U.S.-Saudi Business Council, which generates business opportunities between the two countries for companies. SBG's involvement in the organization is ultimately to promote business dealings between SBG and U.S. businesses. Similarly, SBG was a member of the U.S.-Arab Chamber of Commerce and the World Affairs Council of Washington, D.C.

SBG is a member of the International Road Foundation. Dr. Rihani and Bakr Binladin, chairman of SBG, are board members of the U.S. chapter of the foundation, headquartered in

brought investor Yassin al-Qadi ("al-Qadi") to the U.S. company. Al-Qadi has been designated by the U.S. Treasury department as a terrorist sponsor.

Through its Al Salem division, SBG formed several related joint ventures with York International, a U.S. publicly traded company based in York, Pennsylvania. The joint ventures provided air conditioning and heating management, service and sales in the Middle East. SBG held a controlling interest in several of the joint ventures. SBG also proposed other joint ventures opportunities with York International.

SBG affiliated company Concorde Investments Ltd. held a stake in Massachusetts based company WorldCare and WorldCare's Malaysian division. WorldCare provides telemedicine services worldwide.

According to U.S.-based drug maker Hybridon, Inc, Yahia Binladin and Nicris Limited, a company identified as beneficially owned by Yahia Binladin and also described as a Swiss based Binladin family investment group, held almost 8% of the publically traded company. This holding was the single largest holding by an individual. Before Hybridon went public, Yahia Binladin and Nicris provided financing. The Mahfouz brothers and the Dallah Al-Baraka Group were also investors in Hybridon, Inc.

Historically, the Binladin family owned the Texas companies Binladin Aviation and Binladin Houston, which were managed by James Bath and other Texans. These investments were often made with Khalid bin Mahfouz. Binladin Aviation dissolved December 18, 1997.

SBG and its subsidiaries also formed business partnerships with U.S.-based companies H. C. Price and Company and Vector Ventures.

<u>SBG's Contracting Work for the U. S. Government</u>

SBG has performed contracting work for the U.S. government including, but not limited to, the construction of military facilities. Recently, SBG's telecommunications division, Baud

Telecommunications, performed work for the U.S. Air Force and U.S. Army. Between 2001 and 2007, Baud received contracts worth over $40M.

Similarly, Techmaster performed work for the U.S. Army under contracts worth $200,000.

<u>Binladin Family Members in the U.S.</u>

SBG and Binladin family members rely on a mix of informal business practices and overly complex, secretive off-shore business structures to conduct their U.S. business and make U.S. investments. To the extent that SBG supported Binladin family members' extensive U.S. property holdings or aided in their U.S. contacts, Plaintiffs state Massachusetts public records indicate Mohammed Binladin, Ahmed Binladin, Saad Binladin, and Nawaf Binladin purchased at least seven units at 197 Eight Street Charlestown, MA for almost $3M beginning in April 1995. Mortgages were obtained through Merrill Lynch for more than $1.5M. For these transactions, Mohammed Binladin acted as trustee for the Ahmed Binladin Real Estate Trust and acted as Saad Binladin's power of attorney in executing the 197 Eight Street purchases and sales. Beginning in 2000, five of the seven units sold for over $4.4M, a gross profit of almost $1.5M. The last unit sold was December 29, 2004 for $925,000. In September 2004, Mohammed Binladin gave attorney Barry Scheer power of attorney to execute real estate sales transactions on his behalf as trustee of the AMB Flagship Trust. Previously, beginning in 1993, Mohammed Binladin owned 199 Rice Road, Wayland, Massachusetts, which he sold in 1996 for $575,000. In 1997 Mohammed Binladin purchased property at 75-83 Cambridge Parkway, Cambridge, Massachusetts for $830,000. At various times, Mohammed Binladin and Nawaf Binladin failed to pay property taxes incurring liens that were subsequently paid.

Massachusetts Secretary of the Commonwealth records further indicate Mohammed Binladin, Saad Binladin, Barry S. Scheer, and Daliah Alkadhi are officers and directors of the Allison Corporation. Allison Corporation lists its primary office address as 197 Eighth St., Unit 215, Charlestown, MA 02129—a property purchased by Mohammed Binladin. Saad Binladin and Daliah

Alkadhi, directors of the company, reported in company filings their contact address as Prince Abdullah Street, Jeddah, 21492 SAU, an SBG corporate address.

Additionally, Yeslam Binladin owned 634 Stone Canyon Road, Los Angeles, CA 90077, claiming in his affidavit that he acted as Ibrahim Binladin's agent when purchasing the Bel Air property in California. Los Angeles county tax records show Yeslam bought the property in 1983 for $1.65M. Yeslam Binladin further stated in his affidavit this home in California was gifted to his brother in December 1998. Ibrahim Binladin and Muneera Alzoghaibi placed the home into the IMB Trust on June 22, 1999. Ownership records show Ibrahim Binladin and Muneera Alzoghaibi were trustees of the IMB Trust. The IMB Trust then sold the property in January 2003.

Yeslam Binladin was also associated with two other properties in California–11728 Folkstone Ln, Los Angeles, CA 90077 and 125 S Oakhurst Dr., Beverly Hills, CA 90212— in credit and background databases. Yeslam Binladin is head of Saudi Investment Company (SICO), an affiliate of SBG.

Other members of the Binladin family who own U.S. property are believed to be Yahya Binladin who owned 1864 Thomas Avenue, Coos Bay, OR 97420.

Furthermore, Plaintiffs state Khalil Binladin, who is a director of Desert Bear Company, aka Desert Bear Ltd., registered in Florida, is associated with properties at 17812 W Colonial Drive and 17920 W Colonial Drive, Oakland, FL. 34787. News accounts identified Khalil Binladin living in Orange County, Florida. Desert Bear Company's phone number was called by SBG-USA offices in July 1997. Khalil Binladin was president of America in Motion, B.I.N. Corporation , Binladin USA, and Desert Bear.

Additionally, media reports identified that James Bath, a Texas businessman purchased Houston Gulf Airport in the late 1970's on behalf of Salem Binladen. According to the September 27, 2001 Wall Street Journal, the airport was for sale by the Salem Binladen Estate.

16

Upon his return from Afghanistan, OBL produced a movie of himself as an Islamic warrior. He screened the movie for close friends at the Binladin company auditorium. Jamal Khashoggi, who saw the film, acknowledged that OBL had access to whatever the Binladin Company had.

Hasan Binladin managed a portion of OBL's assets and agreed to a partnership in May 2000 to invest $5M each in Safron Partners, which is an investment fund controlled by the Binladin family.

In 2000, SBG, through its financial affiliate, Cambridge Engineering, transferred 240M Euros from its account held at Deutsche Bank in Switzerland to Pakistani bank accounts held jointly by OBL and a Pakistani national. Akberali Moawalla, a Cambridge Engineering executive, and other SBG-related investments companies, performed the transfers. Moawalla was in the U.S. on September 11, 2001, accompanying Shafiq Binladin to a Carlyle Group investors meeting, and flew out of the U.S. with the Binladins immediately after September 11th.

In early 2001, two of OBL's sisters were seen by a foreign intelligence agency taking cash to an airport in Abu Dhabi where it was given to al Qaeda members.

See also Responses to Interrogatories 1, 3 and 6.

**INTERROGATORY NO. 3**: Identify with specificity the factual basis for, and all documents and all persons with discoverable knowledge on which You rely to support, Your contention, if any, that SBG is subject to jurisdiction because it had a "close relationship" with, was a "sponsor" of, or otherwise provided "material support" to OBL in the Sudan. Your response to this Interrogatory should include, without limitation, identification of: (a) the nature, timing, location, value, and duration of such material support; (b) the individuals who were allegedly involved in providing such material support on SBG's behalf; (c) the individuals who were the alleged recipients of such material support; (d) the basis for Your contention that SBG knew about and intended to support terrorist attacks against the United States at the time such material support was allegedly provided; and (e) the factual basis for Your contention that the alleged material support bore a causal relationship to the 9/11 attacks.

**OBJECTIONS:** Plaintiffs object to SBG's Interrogatory number 3, specifically for the reasons indicated in general objections 1, 2, 3, 4, 7, 9 – 15, and incorporate each as though set forth in full.   Notwithstanding and without waiving these objections, Plaintiffs respond as follows.

20

support of the SBG and the Binladin family, OBL would not have been able to able to participate in the beneficial relationship the Sudanese host government required.

As noted in Plaintiffs' response to Interrogatory No. 7, at least one Binladin relative accompanied al-Hijrah executive and al-Qaeda member Bayazid and OBL's brother-in-law, Mohammed Jamal Khalifa, on their U.S. travel in 1994.

By way of further response, plaintiffs refer defendant to the documents produced in response to Requests to Produce numbers 2, 4, and 5.

**INTERROGATORY NO. 4**: To the extent not disclosed in response to prior Interrogatories, identify with specificity the factual basis for Your allegations, if any, that (a) the company, AI-Hijra for Construction and Development, was a subsidiary of or was otherwise owned or controlled by SBG; (b) SBG had a role in the Tahaddi Road construction project; and (c) OBL or any of the companies he controlled had a role in the Port Sudan Airport construction project. For each such allegation, identify all documents and all persons with discoverable knowledge on which You rely to support Your contention.

**OBJECTIONS:** Plaintiffs object to SBG's Interrogatory number 4, specifically for the reasons indicated in general objections 2, 3, 4, 7, 9 – 15, and incorporate each as though set forth in full.   Notwithstanding and without waiving these objections, Plaintiffs respond as follows.

**RESPONSE:** Subject to and without waiving the foregoing objections or the General Objections, Plaintiffs refer to its response to Interrogatories Number 3 and 6. By way of further response, plaintiffs refer defendant to the documents produced in response to Requests to Produce numbers 2, 3, 4, 5, 7, 8, 9.

**INTERROGATORY NO. 5**: Identify with specificity the factual basis for, and identify all documents and all persons with discoverable knowledge on which You rely to support, Your allegation, if any, that SBG "sheltered and directly supported operatives of the al Qaeda organization." Your response to this Interrogatory should include without limitation, identification of: (a) each such "operative" of the al Qaeda organization; (b) the individuals acting on SBG's behalf who allegedly provided such "shelter" or "support"; (c) the nature, location, dates, and duration of the alleged "shelter" or other "support"; (d) the information available to SBG about the alleged operative's purported ties to al Qaeda at the time the alleged "shelter" or "support" was provided; and (e) the basis for Your contention that the alleged "shelter" or "support" (i) was intended by SBG

to support terrorist attacks against the United States and (ii) bore a causal relationship to the 9/11 attacks.

**OBJECTIONS:** Plaintiffs object to SBG's Interrogatory number 5, specifically for the reasons indicated in general objections 1, 2, 3, 4, 7, 9 – 15, and incorporate each as though set forth in full.  Notwithstanding and without waiving these objections, Plaintiffs respond as follows.

**RESPONSE:** Subject to and without waiving the foregoing objections or the General Objections, Plaintiffs refer to its response to Interrogatory Numbers 2, 3, and 6. By way of further response, plaintiffs refer defendant to the documents produced in response to Requests to Produce number 6.

**INTERROGATORY NO. 6**: To the extent not disclosed in Your response to prior Interrogatories, identify with specificity the factual basis for, and identify all documents and all persons with discoverable knowledge on which You rely to support, Your allegation, if any, that Mohammed Jamal Khalifa "was taken in by a branch of the Saudi Binladin Group, the Mohammed Binladin Organization." Your response to this Interrogatory should include, without limitation, identification of: (a) the nature, timing and location of Mohammed Binladin Organization's ("MBO's") alleged conduct in "taking in" Khalifa; (b) the individual(s) who allegedly engaged in such conduct; and ( c) all facts on which You base Your allegations that (i) MBO was a branch, a subsidiary or otherwise was acting on behalf of SBG with respect to such conduct; (ii) Khalifa was an al Qaeda "operative" at the time of the alleged conduct; (iii) SBG knew that Khalifa was an al Qaeda "operative" at the time of the alleged conduct; (iv) SBG knew about and intended at the time of the alleged conduct to provide support for terrorist attacks against the United States; and (v) SBG's alleged conduct with respect to Khalifa bore a causal relationship to the 9/11 attacks or Plaintiffs' injuries.

**OBJECTIONS:** Plaintiffs object to SBG's Interrogatory number 6, specifically for the reasons indicated in general objections 1, 2, 3, 4, 7, 9 – 15, and incorporate each as though set forth in full.  Notwithstanding and without waiving these objections, Plaintiffs respond as follows.

**RESPONSE:** Subject to and without waiving the foregoing objections or the General Objections, Plaintiffs state in the late 1980s and early 1990s Mohammed Jamal Khalifa ("Khalifa"), a senior member of al Qaeda, constructed a terrorist support network in Southeast Asia to aid al Qaeda and its associated terrorist groups.  The network--comprised of businesses, Islamic charities and other non-government organizations--financed terrorist operations, laundered money, recruited

new members and provided cover and logistical support to global terrorist operations.   Khalifa and other close associates controlled the network.   Binladin family members and Binladin companies directly aided Khalifa's ability to assemble, fund, and direct the network.   Planners and hijackers of the 9/11 attacks were aided by Khalifa run organizations and supported terrorist groups in furtherance of the 9/11 plot.   Despite Khalifa's death in 2007, a branch of the Southeast Asian network still operates today funding al Qaeda associated terrorist groups using zakat money from Binladin companies.

   In or about 1976, Khalifa and OBL became close friends as first-year students at King Abdul Aziz University.   In the early 1980s, their close friendship grew into a working association when they responded to Abdullah Azzam's call Afghan resistance fighters against the Soviets.   Sometime in 1984, OBL and Sheikh Abdullah Azzam, the influential Palestinian Muslim Brotherhood scholar, founded the Peshawar based Makhtab Al-Khadamat ("Service Office"), which served as a coordination and transit point for mujahedeen and money.   On or about 1986, at the recommendation of Khalifa's half-brother, who was a senior organizer in the Saudi government charity Muslim World League ("MWL"), Khalifa was sent to Peshawar, Pakistan to open MWL's aid office.   The MWL position provided Khalifa and OBL the opportunity to work together at the Service Office coordinating recruiting and distributing donations to the mujahedeen.   During this time, the Binladin family and Binladin companies aided OBL by purchasing weapons, shipping construction equipment and providing funding.   Binladin company engineers assisted OBL in the construction of defenses and strategically important roads in the conflict.   Binladin employees were even known to assist mujahedeen at the OBL run guest houses where new recruits were vetted before being transported to the mujahedeen training camps.

   In the mid to late 1980s OBL dispatched Khalifa to the Philippines to establish a furniture business, which served as a front company for laundering money and recruiting mujahedeen.   By the

end of 1987, under the guise of MWL, Khalifa opened another MWL office in Manila, Philippines. In or about 1989, Khalifa opened a Philipino office of the International Islamic Relief Organization ("IIRO"), a subsidiary charity of the MWL, becoming its director.  Some time later, Khalifa founded another charitable organization called the International Relations Information Center ("IRIC"). Khalifa was already president of the Benevolence International Corporation, a non-governmental organization, closely associated with Benevolence International Foundation predecessor organizations.  These Khalifa-run organizations functioned as fronts for the financial and material support to Afghan mujahedeen.

With the founding of al Qaeda in August of 1988, Khalifa adapted and expanded the Southeast Asian network to support al Qaeda and its affiliated terrorist groups in the region.  To do this, Khalifa expanded on Al Qaeda's personal relationships with the Southeast Asia mujahedeen who had trained and fought with OBL in Afghanistan.  The relationship linked the regional terrorist groups with al Qaeda's international infrastructure giving the regional terrorist groups a framework within which to share resources, conduct joint training, assist with weapons and explosive purchases, launder money and conduct financial transactions.  The regional terrorist groups associated with al Qaeda were Abu Sayyaf, Moro Islamic Liberation Front ("MILF") and Jemaah Islamiyah ("JI").  In each case, the senior leadership of these groups had trained in Afghanistan at camps run by OBL. The Islamic charities founded by Khalifa or run by his close associates include MWL, IIRO, IRIC and BIF. The Khalifa businesses or those run by his close associates include Konsonjaya, Khalifa Trading Industries, ET Dizon Travel, Pyramid Trading, Manpower Services, Daw al-Iman al-Shafee Inc., Bermuda Trading Company, Green Laboratory Medicine Sdn Bhd, In-Focus Technology Sdn Bhd, Secure Valley Sdn Bhd.

On December 16, 1994, Khalifa was arrested on immigration violations by U.S. authorities near San Francisco.  Mohamed Loay Bayazid ("Bayazid"), a senior al Qaeda member, and an

unnamed Binladin relative were with Khalifa at the time of his arrest.   U.S. government prosecutors have stated the Binladin relative was OBL's brother.   Rather than use any number of his Southeast Asian organizations or businesses which might have revealed his true connection with on-going plots or terrorists, Khalifa listed a Binladin corporate address on his August 2, 1994 non-immigration visa to enter the U.S.   In an SBG company report circa 1993, the address listed on Khalifa's visa corresponds with an SBG corporate address.   In Khalifa's luggage at the time of his arrests were terrorist training materials, materials referencing plots to assassinate the Pope and bomb churches, and contact information that connected Khalifa to al Qaeda members Ramzi Yousef ("Yousef") and Wali Khan Amin Shah ("Wali Khan").

During Khalifa's U.S. detention, Yousef and Wali Khan were executing a plot to blow-up 12 American aircraft simultaneously and assassinate the Pope in Manila during his January 1995 visit. The airline plot, which became known as Oplan Bojinka ("Bojinka plot"), and the plot to assassinate the Pope were uncovered when a fire broke out January 6, 1995 in Yousef's Manila apartment. Items seized in Yousef's apartment included pictures of the Pope, two cassocks and priests' garb, bomb making materials and contact information for Khalifa and a Khalifa-run charity.   Yousef and Wali Khan were convicted for their role in the Bojinka plot.   Yousef was also convicted for his role in the 1993 World Trade Center bombing.   The connection between Khalifa and Yousef was made clear by terrorist group Abu Sayyaf leader Khadaffy A. Janjalani when he told journalists that Khalifa introduced Yousef to Abu Sayyaf.

In a 1998 interview with ABC news, OBL described Wali Khan as a "good friend."   Wali Khan was also a former student of Khalifa's when Khalifa taught high school in Medina.   In 1994, Wali Khan and another close associate of Khalifa's, Riduan Isamuddin (a.k.a. "Hambali"), created the Konsojaya company.   In coordination with the Khalifa run organization IRIC, Konsojaya obtained bomb making materials and helped finance the Bojinka plot.   Wire tap records show

frequent calls were made from the Konsojaya office in Malaysia to Khalifa.  Khalid Sheikh

Mohammed ("KSM"), who is Yousef's uncle and the self-proclaimed mastermind behind the 9/11

attacks, used Konsojaya as a cover for his international travels.

At the time of his arrest in the U.S., Khalifa had been convicted in absentia by a Jordan court

for his involvement in a series of 1993 and 1994 bombings in Jordan.  A December 1994 State

Department Cable to the U.S. Embassy in Khartoum referred to Khalifa's arrest in the U. S. and

described Khalifa as a "known financier of terrorist operations."  Khalifa's brother testified in the

deportation proceedings that Khalifa was affiliated with the Binladin family.  In fact, Khalifa married

OBL's favorite sister, Sheikha.  Khalifa's father-in-law, and OBL's step-father, Mohammed al-Attas

was a Binladin company executive.  During the 1990s, Khalifa, through his wife Shiekha, used the

Binladin company travel department to obtain US visas and coordinate travel arrangements.  In a

prior 1993 U.S. visa application, Khalifa was accompanied by a Saudi passport holder of Yemeni

decent who also applied of a U.S. visa. According to his brother, Khalifa travelled between the

Philippines and Saudi Arabia every two or three months in addition to traveling all over the world.

The alleged purpose for Khalifa's 1994 trip to the U. S. was to establish business contacts for

Khalifa's import-export food company and to purchase seeds.

Several months after Khalifa's arrest, Ayam al-Zawahiri ("Zawahiri"), al Qaeda's second in

command, entered the U.S. and stayed with an Al Qaeda operative in Santa Clara, California only

short distance from where Khalifa was arrested.   During this trip Zawahiri raised money in the U.S.,

which was later used by al Qaeda to fund the 1995 bombing of the Egyptian Embassy in Islamabad.

Documents describing the formation of al Qaeda seized from a Bosnia chapter of BIF

confirmed Khalifa, also known as Abu Bara'a, played a significant role in funding training camps and

operations during Al Qaeda's formation. Those same documents also confirm Bayazid, also known

as Abu Rida, was in charge of "purchasing" on behalf of al Qaeda.  Bayazid who was with OBL in

the Sudan, had attempted to purchase uranium for al Qaeda to develop nuclear weapons. Al Qaeda defector Jamal al-Fadl testified at the U.S. embassy trial that Bayazid was an executive at OBL's Sudanese construction company, Al Hijrah Construction and Development.  Senior Al Qaeda operatives used their positions in OBL's Sudanese businesses to obtain explosives, weapons and equipment for terrorist operations.

The network created by Khalifa and later run by his close associates supported the activities of the terrorist groups Abu Sayyaf, Moro Liberation Front ("MILF") and Jemaah Islamiyah ("JI"). A senior operative of JI, known as Hambali, was also a senior operative of al Qaeda serving as the primary contact between the two organizations.  JI received financial and logistical assistance from Khalifa organizations, which in turn supported KSM.  KSM relied upon Hambali and JI run business, which were supported by Khalifa, for cover and funding.  Additionally, at the request of KSM, Hambali hosted a January 2000 Al Qaeda Summit in Kuala Lumpur, Malaysia where two September 11 hijackers, Khalid al-Mihdhar and Nawaf al-Hazmi, attended. Hambali would also purchase plane tickets for the future hijackers' exits from Malaysia.

Khalifa's Southeast Asian funding network continued to operate after 9/11, funding Abu Sayyaf and JI.  In late 2003, Khalifa was asked to send 50,000 Philippine pesos to the account of a wife of an Abu Sayyaf operative. Khalifa refused stating it would be too difficult for him and too dangerous for the wife.  A week later, a close associate of Khalifa's wired $50,000 to the same account of the wife of the Abu Sayyaff operative.

Debriefings from the arrest of terror suspects in Manila in 2008 revealed a new terrorist group, known as Al Intiaqah, is using the Khalifa network to fund terrorist operations directed at Western targets.  Al Intiaqah's supporters are Saudis who had close associations with Khalifa and his Southeast Asian organizations and currently receive funding from zakat, zadakah and charitable contributions from the Binladin group companies.

By way of further response, plaintiffs refer defendant to the documents produced in response to Requests to Produce numbers 7, 8, 9.

**INTERROGATORY NO. 7**: To the extent not disclosed in Your response to the Interrogatories above, identify with specificity the factual basis for, and identify all documents and all witnesses with discoverable knowledge on which You rely to support, Your contention that SBG provided material support to terrorist attacks against the United States. Your response to this Interrogatory should include, without limitation, identification of: (a) the nature, timing, location, value, and duration of such material support; (b) the individuals who were allegedly involved in providing such material support on SBG's behalf; (c) the individuals who were the alleged recipients of such material support; (d) the basis for Your contention that SBG knew support was provided; and (e) identification of the causal relationship between such material support and the 9/11 attacks.

**OBJECTIONS:** Plaintiffs object to SBG's Interrogatory number 7, specifically for the reasons indicated in general objections 1, 2, 3, 4, 7, 9 – 15, and incorporate each as though set forth in full.   Notwithstanding and without waiving these objections, Plaintiffs respond as follows.

**RESPONSE:** Subject to and without waiving the foregoing objections or the General Objections, Plaintiffs refer to its response to Interrogatory numbers 2, 3 and 6.

By way of further response, plaintiffs refer defendant to the documents produced in response to Requests to Produce numbers 20, 21, and 22.

**INTERROGATORY NO. 8**: Identify with specificity the factual basis for, and identify all documents and all persons with discoverable knowledge on which You rely to support, Your allegation, if any, that "Osama bin Laden's name is still listed in the Saudi Binladin Group's corporate records." Your response to this Interrogatory should include, without limitation, identification of: (a) the "corporate records" in which OBL's name allegedly was still listed at the time the Complaints were filed in the above-captioned actions; (b) the nature and purpose of each such alleged listing in the "corporate records"; (c) the date of such listing and the time period during which it remained in effect; and (d) the factual basis for Your contention, if any, that the presence of OBL's name in SBG's corporate records was intended to or did in fact provide material support to the 9/11 attacks or otherwise provides a basis for the exercise of jurisdiction over SBG.

**OBJECTIONS:** Plaintiffs object to SBG's Interrogatory number 8, specifically for the reasons indicated in general objections 1, 2, 3, 4, 7, 9 - 15 and incorporate each as though set forth in full.   Notwithstanding and without waiving these objections, Plaintiffs respond as follows.

**RESPONSE:** Subject to and without waiving the foregoing objections or the General Objections, Plaintiffs continue to investigate the timeliness of the original source information for this allegations as well as the identify of the actual beneficiaries of the Binladin family companies' activities.  Plaintiffs also note that OBL's holding company Wadi Al Aqiq was registered to do business in Saudi Arabia, according to its Sudanese bank Al Shamal.

By way of further response, plaintiffs refer defendant to the documents produced in response to Requests to Produce number 12.

**INTERROGATORY NO. 9**: Identify with specificity the factual basis for, and identify all documents and all persons with discoverable knowledge on which You rely to support Your contention, if any, that OBL's ownership of shares in SBG in or before 1993 was intended by SBG to support OBL's terrorist attacks against the United States, or bore a causal relationship to the 9/11 attacks.

**OBJECTIONS:** Plaintiffs object to SBG's Interrogatory number 9, specifically for the reasons indicated in general objections 1, 2, 3, 4, 7, 9 – 15, and incorporate each as though set forth in full.   Notwithstanding and without waiving these objections, Plaintiffs respond as follows.

**RESPONSE:** Subject to and without waiving the foregoing objections or the General Objections, Plaintiffs refer its response to Interrogatory Numbers 2, 3 and 6.

By way of further response, plaintiffs refer defendant to the documents produced in response to Requests to Produce numbers 13 and 14.

**INTERROGATORY NO. 10**: Identify with specificity the factual basis for, and identify all documents and all persons with discoverable knowledge on which You rely to support, Your allegation, if any, that OBL retained a direct or indirect ownership interest in SBG after the effective date of the shareholder resolution produced at SBG0002569-73.

**OBJECTIONS:** Plaintiffs object to SBG's Interrogatory number 10, specifically for the reasons indicated in general objections 2, 3, 4, 7, 9 – 15, and incorporate each as though set forth in full.   Notwithstanding and without waiving these objections, Plaintiffs respond as follows.

**RESPONSE:** Subject to and without waiving the foregoing objections or the General Objections, Plaintiffs note that Plaintiffs contentions regarding SBG's support to OBL have not been conditioned necessarily upon his status as an SBG or MBC shareholder.  Plaintiffs refer SBG to Plaintiffs' other Interrogatory responses as evidence of SBG's and Binladin family members' continued assistance to OBL and AQ after SBG's alleged disassociation.  In particular, Plaintiffs refer its response to Interrogatory Number 3.

By way of further response, plaintiffs refer defendant to the documents produced in response to Requests to Produce number 15.

**INTERROGATORY NO. 11**: Identify with specificity the factual basis for, and identify all documents and all persons with discoverable knowledge on which You rely to support, Your contention, if any, that any payment or other valuable consideration was provided to OBL in or after 1993 in relation to any shares of SBG, including without limitation, any payment relating to the transfer of his former SBG shares to Ghaleb Binladin.

**OBJECTIONS:** Plaintiffs object to SBG's Interrogatory number 11, specifically for the reasons indicated in general objections 2, 3, 4, 7, 9 – 15, and incorporate each as though set forth in full.   Notwithstanding and without waiving these objections, Plaintiffs respond as follows.

**RESPONSE:** Subject to and without waiving the foregoing objections or the General Objections, Plaintiffs refer SBG to Plaintiffs' other Interrogatory responses as evidence of SBG's and Binladin family members' continued assistance to OBL and AQ after SBG's alleged disassociation.  In addition, Plaintiffs state that seven years elapsed between April 1993 when SBG claims it stopped providing funds to OBL and when $9.8 million dollars was deposited into an account at the National Commercial Bank.  In the absence of any SBG accounting for the disposition of these shares, account of proceeds distributed to other shareholders and information about those shareholders' financial activities,  as well as information about the dividends accrued to them over this seven year period, there is no indication that OBL was divested from the companies.

As only the principal was eventually deposited in the NCB account, any revenue or dividends from these shares has been unaccounted for.

By way of further response, plaintiffs refer defendant to the documents produced in response to Requests to Produce numbers 3, 15 and 18.

**INTERROGATORY NO. 12:** Identify with specificity the factual basis for, and identify all documents and all persons with discoverable knowledge on which You rely to support, Your allegation, if any, that Ghaleb Binladin has "been shown to be very sympathetic to Osama Bin Ladin," or that Ghaleb Binladin has knowingly provided material support to terrorists attacks against the United States by OBL and/or al Qaeda.

**OBJECTIONS:** Plaintiffs object to SBG's Interrogatory number 12, specifically for the reasons indicated in general objections 1, 2, 3, 4, 7, 9 – 15, and incorporate each as though set forth in full.   Notwithstanding and without waiving these objections, Plaintiffs respond as follows.

**RESPONSE:** Subject to and without waiving the foregoing objections or the General Objections, Plaintiffs state Ghaleb Binladin flew money to OBL in Pakistan in late April 1989. Ghaleb Binladin, as administrator of OBL's SBG/MBC related assets, would have had an obligation under Islamic law to resolve and satisfy any debts or grievances of OBL. Furthermore, Ghaleb would have been obligated to care for OBL's family who remained or returned to Saudi Arabia. Lastly, OBL called Ghaleb on several occasions as late as 1998.

By way of further response, plaintiffs refer defendant to the documents produced in response to Requests to Produce number 17.

**INTERROGATORY NO. 13:** Identify with specificity the factual basis for, and identify all documents and all persons with discoverable knowledge on which You rely to support, Your allegation, if any, that the account at Bank al Taqwa in the name of Ghaleb Binladin was intended to be or was in fact used in any manner to provide material support to OBL or to al Qaeda's terrorist attacks against the United States.

United States, (b) SBG intended to support terrorist attacks against the United States, and (c) the act, event, or conduct bore a causal relationship to the 9/11 attacks.

**OBJECTIONS:** Plaintiffs object to SBG's Interrogatory number 16, specifically for the reasons indicated in general objections 1, 2, 3, 4, 7, 9 – 15, and incorporate each as though set forth in full.   Notwithstanding and without waiving these objections, Plaintiffs respond as follows.

**RESPONSE:** Subject to and without waiving the foregoing objections or the General Objections, Plaintiffs reserve the right to supplement their responses as information and its significance is known. Plaintiffs' refer Defendant to Plaintiffs' responses to other relevant Interrogatories.

By way of further response, plaintiffs refer defendant to the documents produced in response to Requests to Produce numbers 21 and 22.

**INTERROGATORY NO. 17**: Identify all travel to the United States on behalf of SBG which You contend supports the exercise of jurisdiction over SBG, and identify all documents and all persons with discoverable knowledge on which You rely concerning such travel (other than documents and persons with knowledge concerning travel previously identified in SBG's Supplemental Responses and Objections to Plaintiffs' First Set of Jurisdictional Interrogatories and the documents produced therewith).

**OBJECTIONS:** Plaintiffs object to SBG's Interrogatory number 17, specifically for the reasons indicated in general objections 2, 3, 4, 7, 9 – 15, and incorporate each as though set forth in full.   Notwithstanding and without waiving these objections, Plaintiffs respond as follows.

**RESPONSE:** Subject to and without waiving the foregoing objections or the General Objections, in addition to the extensive travel in the U.S. by Dr. Fuad Rihani, referenced in Response to Interrogatory 1, Plaintiffs reference the U.S. travel and extended periods of stay in the U.S. by Shafiq Binladin, Hassan Binladin, Khalid Binladin, Akbar Moawalla, Dr. Fuad Rihani, Petroleum Mining and Chemical Division executives and the other Binladin family members living, working, or studying in the U.S.

At least 13 Binladin family members and an SBG executive who were in U. S. on September

11, 2001, were permitted to leave the U. S. immediately after September 11, 2001. Shafiq Binladin

and Akberail Moawalla, an SBG executive, attended a Carlyle Group investor's conference in

Washington D. C. area on September 11, 2001.

By way of further response, plaintiffs refer defendant to the documents produced in

response to Requests to Produce number 25.

**INTERROGATORY NO. 18**: Identify all experts, investigators, consultants, or other agents upon
whose findings, testimony, affidavit, declaration, or other work product You intend to rely in
opposing SBG's renewed motion to dismiss, and for each such expert or other agent, set forth the
substance of his or her anticipated testimony or other submission, and identify with specificity all
documents, information, and evidence considered by the individual in developing such findings,
testimony, or other submission.

**OBJECTIONS:** Plaintiffs object to SBG's Interrogatory number 18, specifically for the

reasons indicated in general objections 1, 2, 3, 4, 7, 9 - 15, and incorporate each as though set forth

in full. Plaintiffs' object to the disclosure of attorney work product particularly when it can not

anticipate which of Defendants' legal and factual allegations it will rely upon. Plaintiffs object to

SBG's discovery request inasmuch as it requests for the production of Plaintiffs' expert disclosures

and no schedule for expert disclosures has been set pursuant to Federal Rule of Civil Procedure

26(b)(4)(B). Moreover, inasmuch as plaintiffs do not have knowledge of the content of defendant

SBG's motion to dismiss, it would be prejudicial to require the plaintiffs to produce an expert report

or a summary of testimony before knowing whether such report or testimony is necessary or the

issues that such report or testimony must address.

**INTERROGATORY NO. 19**: For each document produced in response to SBG's Revised First
Set of Requests for Documents or identified in response to these Interrogatories which You
contend to be authentic and which is not self-authenticating under Rule 902 of the Federal Rules of
Evidence, identify the author of the document, the time, place and circumstances of its creation, the
source from which it was obtained by You, and all facts on which You base Your contention that
the document is authentic. This Interrogatory shall not apply to documents produced to You by
SBG.