# EXHIBIT 16



HOME    CONTACT US    SITE INDEX    FAQ    FOIA    ESPAÑOL    ACCESSIBILITY    PRIVACY & LEGAL

OFFICE OF FOREIGN ASSETS CONTROL

search [SEARCH]

**News**
**Direct Links**
**Key Topics**
**Press Room**
**About Treasury**
**Offices**
   Domestic Finance
   Economic Policy
   General Counsel
   International Affairs
   Management
   Public Affairs
   Tax Policy
   Terrorism and Financial
   Intelligence
   ▸ Office of Foreign Assets
     Control
   Designation Lists & Financial
   Advisories
   Publications and Legislation
   Programs and Initiatives
   Treasurer
**Bureaus**
**Education**
**Site Policies and Notices**

## Office of Foreign Assets Control

### RECENT OFAC ACTIONS

Full List | Previous | Next

*To view or print the PDF content on this page, download the free Adobe® Acrobat® Reader®.*

**10/12/2001**

OFAC has added the names of 39 terrorists to its list of SDGTs. Their assets must be blocked immediately. All of OFAC's SDN material has been revised accordingly, including delimited and fixed field files. For details, including individual entries for all "a.k.a."s, please click on the SDN changes 🗹 button or review the SDNEW01.txt file available in the delimited files *.exe download. OFAC's Terrorism 🗹 brochure has also been updated to incorporate the new entries."

Here is a temporary posting, in addition to the permanent SDN Changes file, of the primary records for the new entries on OFAC's SDN list. This temporary posting does not have each "a.k.a." as a separate entry.

ABDULLAH, Abdullah Ahmed (a.k.a. ABU MARIAM; a.k.a. AL-MASRI, Abu Mohamed; a.k.a. SALEH), Afghanistan (DOB 1963; POB Egypt; citizen Egypt) (individual) [SDGT]

AGHA, Haji Abdul Manan (a.k.a. SAIYID, Abd Al-Man'am), Pakistan (individual) [SDGT]

AL-HAMATI SWEETS BAKERIES, Al-Mukallah, Hadhramawt Governorate, Yemen [SDGT]

AL-HAMATI, Muhammad (a.k.a. AL-AHDAL, Mohammad Hamdi Sadiq; a.k.a. AL-MAKKI, Abu Asim), Yemen (individual) [SDGT]

AL-HAQ, Amin (a.k.a. AH HAQ, Dr. Amin; a.k.a. AMIN, Muhammad; a.k.a. UL-HAQ, Dr. Amin) (DOB 1960; POB Nangahar Province, Afghanistan) (individual) [SDGT]

AL-JADAWI, Saqar (DOB 1965) (individual) [SDGT]

AL-KADR, Ahmad Sa'id (a.k.a. AL-KANADI, Abu Abd Al-Rahman) (DOB 01 Mar 1948; POB Cairo, Egypt) (individual) [SDGT]

AL-LIBY, Anas (a.k.a. AL-LIBI, Anas; a.k.a. AL-RAGHIE, Nazih; a.k.a. AL-RAGHIE, Nazih Abdul Hamed; a.k.a. AL-SABAI, Anas), Afghanistan (DOB 30 Mar 1964, Alt. DOB 14 May 1964; POB Tripoli, Libya; citizen Libya) (individual) [SDGT]

AL-MUGHASSIL, Ahmad Ibrahim (a.k.a. ABU OMRAN; a.k.a. AL-MUGHASSIL, Ahmed Ibrahim) (DOB 26 Jun 1967; POB Qatif-Bab al Shamal, Saudi Arabia; citizen Saudi Arabia) (individual) [SDGT]

AL-NASSER, Abdelkarim Hussein Mohamed (POB Al Ihsa, Saudi Arabia; citizen Saudi Arabia) (individual) [SDGT]

AL-NUR HONEY PRESS SHOPS (a.k.a. AL-NUR HONEY CENTER), Sanaa, Yemen. [SDGT]

AL-QADI, Yasin (a.k.a. KADI, Shaykh Yassin Abdullah; a.k.a. KAHDI, Yasin), Jeddah, Saudi Arabia (individual) [SDGT]

AL-SHARIF, Sa'd (DOB 1969; POB Saudi Arabia) (individual) [SDGT]

AL-SHIFA' HONEY PRESS FOR INDUSTRY AND COMMERCE, Al-Nasr Street, Doha, Qatar; By the Shrine Next to the Gas Station, Jamal Street, Ta'iz, Yemen; Al-'Arudh Square,

Khur Maksar, Aden, Yemen; P.O. Box 8089, Al-Hasabah, Sanaa, Yemen [SDGT]

AL-YACOUB, Ibrahim Salih Mohammed (DOB 16 Oct 1966; POB Tarut, Saudi Arabia; citizen Saudi Arabia) (individual) [SDGT]

ALI, Ahmed Mohammed Hamed (a.k.a. ABDUREHMAN, Ahmed Mohammed; a.k.a. ABU FATIMA; a.k.a. ABU ISLAM; a.k.a. ABU KHADIIJAH; a.k.a. AHMED HAMED; a.k.a. Ahmed The Egyptian; a.k.a. AHMED, Ahmed; a.k.a. AL-MASRI, Ahmad; a.k.a. AL-SURIR, Abu Islam; a.k.a. ALI, Ahmed Mohammed; a.k.a. ALI, Hamed; a.k.a. HEMED, Ahmed; a.k.a. SHIEB, Ahmed; a.k.a. SHUAIB), Afghanistan (DOB 1965; POB Egypt; citizen Egypt) (individual) [SDGT]

ATWA, Ali (a.k.a. BOUSLIM, Ammar Mansour; a.k.a. SALIM, Hassan Rostom), Lebanon (DOB 1960; POB Lebanon; citizen Lebanon) (individual) [SDGT1]

ATWAH, Muhsin Musa Matwalli (a.k.a. ABDEL RAHMAN; a.k.a. ABDUL RAHMAN; a.k.a. AL-MUHAJIR, Abdul Rahman; a.k.a. AL-NAMER, Mohammed K.A.), Afghanistan (DOB 19 Jun 1964; POB Egypt; citizen Egypt) (individual) [SDGT]

BIN MARWAN, Bilal (DOB 1947) (individual) [SDGT]

BIN MUHAMMAD, Ayadi Chafiq (a.k.a. AIADI, Ben Muhammad; a.k.a. AIADY, Ben Muhammad; a.k.a. AYADI CHAFIK, Ben Muhammad; a.k.a. AYADI SHAFIQ, Ben Muhammad), Darvingasse 1/2/58-60, Vienna, Austria; 28 Chaussee de Lille, Mouscron, Belgium; 129 Park Road, NW8, London, England; Helene Meyer Ring 10-1415-80809, Munich, Germany; Tunisia (DOB 21 Jan 1963; POB Safais (Sfax), Tunisia) (individual) [SDGT]

DARKAZANLI, Mamoun, Uhlenhorsterweg 34 11, 22085, Hamburg, Germany (DOB 4 Aug 1958; POB Aleppo, Syria; Passport No: 1310636262 <Germany>) (individual) [SDGT]

EL-HOORIE, Ali Saed Bin Ali (a.k.a. AL-HOURI, Ali Saed Bin Ali; a.k.a. EL-HOURI, Ali Saed Bin Ali) (DOB 10 Jul 1965, alt. DOB 11 Jul 1965; POB El Dibabiya, Saudi Arabia; citizen Saudi Arabia) (individual) [SDGT]

FADHIL, Mustafa Mohamed (a.k.a. AL MASRI, Abd Al Wakil; a.k.a. AL-NUBI, Abu; a.k.a. ALI, Hassan; a.k.a. ANIS, Abu; a.k.a. ELBISHY, Moustafa Ali; a.k.a. FADIL, Mustafa Muhamad; a.k.a. FAZUL, Mustafa; a.k.a. HUSSEIN; a.k.a. JIHAD, Abu; a.k.a. KHALID; a.k.a. MAN, Nu; a.k.a. MOHAMMED, Mustafa; a.k.a. YUSSRR, Abu) (DOB 23 Jun 1976; POB Cairo, Egypt; citizen Egypt, alt. citizen Kenya; Kenyan ID No. 12773667; Serial No. 201735161) (individual) [SDGT]

GHAILANI, Ahmed Khalfan (a.k.a. "AHMED THE TANZANIAN"; a.k.a. "FOOPIE"; a.k.a. "FUPI"; a.k.a. AHMAD, Abu Bakr; a.k.a. AHMED, A.; a.k.a. AHMED, Abubakar; a.k.a. AHMED, Abubakar K.; a.k.a. AHMED, Abubakar Khalfan; a.k.a. AHMED, Abubakary K.; a.k.a. AHMED, Ahmed Khalfan; a.k.a. AL TANZANI, Ahmad; a.k.a. ALI, Ahmed Khalfan; a.k.a. BAKR, Abu; a.k.a. GHAILANI, Abubakary Khalfan Ahmed; a.k.a. GHAILANI, Ahmed; a.k.a. GHILANI, Ahmad Khalafan; a.k.a. HUSSEIN, Mahafudh Abubakar Ahmed Abdallah; a.k.a. KHABAR, Abu; a.k.a. KHALFAN, Ahmed; a.k.a. MOHAMMED, Shariff Omar) (DOB 14 Mar 1974, alt. DOB 13 Apr 1974, alt. DOB 14 Apr 1974, alt. DOB 1 Aug 1970; POB Zanzibar, Tanzania; citizen Tanzania) (individual) [SDGT]

HIJAZI, Riad (a.k.a. AL-AMRIKI, Abu-Ahmad; a.k.a. AL-HAWEN, Abu-Ahmad; a.k.a. AL-MAGHRIBI, Rashid; a.k.a. AL-SHAHID, Abu-Ahmad; a.k.a. HIJAZI, Raed M), Jordan (DOB 1968; POB California, U.S.A.; SSN: 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 <U.S.A.>) (individual) [SDGT]

IZZ-AL-DIN, Hasan (a.k.a. GARBAYA, AHMED; a.k.a. SA-ID; a.k.a. SALWWAN, Samir), Lebanon (DOB 1963; POB Lebanon; citizen Lebanon) (individual) [SDGT1]

JAISH-I-MOHAMMED (a.k.a. ARMY OF MOHAMMED), Pakistan [SDGT]

JAM'YAH TA'AWUN AL-ISLAMIA (a.k.a. JAM'IYAT AL TA'AWUN AL ISLAMIYYA; a.k.a. JIT; a.k.a. SOCIETY OF ISLAMIC COOPERATION), Qandahar City, Afghanistan [SDGT]

LADEHYANOY, Mufti Rashid Ahmad (a.k.a. AHMAD, Mufti Rasheed; a.k.a. LUDHIANVI, Mufti Rashid Ahmad; a.k.a. WADEHYANOY, Mufti Rashid Ahmad), Karachi, Pakistan (individual) [SDGT]

MOHAMMED, Fazul Abdullah (a.k.a. ABDALLA, Fazul; a.k.a. ADBALLAH, Fazul; a.k.a. AISHA, Abu; a.k.a. AL SUDANI, Abu Seif; a.k.a. ALI, Fadel Abdallah Mohammed; a.k.a.

FAZUL, Abdalla; a.k.a. FAZUL, Abdallah; a.k.a. FAZUL, Abdallah Mohammed; a.k.a. FAZUL, Haroon; a.k.a. FAZUL, Harun; a.k.a. HAROON; a.k.a. HAROUN, Fadhil; a.k.a. HARUN; a.k.a. LUQMAN, Abu; a.k.a. MOHAMMED, Fazul; a.k.a. MOHAMMED, Fazul Abdilahi; a.k.a. MOHAMMED, Fouad; a.k.a. MUHAMAD, Fadil Abdallah) (DOB 25 Aug 1972, alt. DOB 25 Dec 1974, alt. DOB 25 Feb 1974; POB Moroni, Comoros Islands; citizen Comoros, alt. citizen Kenya) (individual) [SDGT]

MOHAMMED, Khalid Shaikh (a.k.a. ALI, Salem; a.k.a. BIN KHALID, Fahd Bin Adballah; a.k.a. HENIN, Ashraf Refaat Nabith; a.k.a. WADOOD, Khalid Adbul) (DOB 14 Apr 1965, alt. DOB 1 Mar 1964; POB Kuwait; citizen Kuwait) (individual) [SDGT]

MSALAM, Fahid Mohammed Ally (a.k.a. AL-KINI, Usama; a.k.a. ALLY, Fahid Mohammed; a.k.a. MSALAM, Fahad Ally; a.k.a. MSALAM, Fahid Mohammed Ali; a.k.a. MSALAM, Mohammed Ally; a.k.a. MUSALAAM, Fahid Mohammed Ali; a.k.a. SALEM, Fahid Muhamad Ali) (DOB 19 Feb 1976; POB Mombasa, Kenya; citizen Kenya) (individual) [SDGT]

RABITA TRUST, Room 9A, 2nd Floor, Wahdat Road, Education Town, Lahore, Pakistan; Wares Colony, Lahore, Pakistan [SDGT]

SWEDAN, Sheikh Ahmed Salim (a.k.a. Ahmed the Tall; a.k.a. ALLY, Ahmed; a.k.a. BAHAMAD; a.k.a. BAHAMAD, Sheik; a.k.a. BAHAMADI, Sheikh; a.k.a. SUWEIDAN, Sheikh Ahmad Salem; a.k.a. SWEDAN, Sheikh; a.k.a. SWEDAN, Sheikh Ahmed Salem) (DOB 9 Apr 1969, alt. DOB 9 Apr 1960; POB Mombasa, Kenya; citizen Kenya) (individual) [SDGT]

UTHMAN, Omar Mahmoud (a.k.a. ABU ISMAIL; a.k.a. ABU UMAR, Abu Omar; a.k.a. AL-FILISTINI, Abu Qatada; a.k.a. TAKFIRI, Abu 'Umr; a.k.a. UMAR, Abu Umar; a.k.a. UTHMAN, Al-Samman; a.k.a. UTHMAN, Umar), London, England (DOB 30 Dec 1960, alt. DOB 13 Dec 1960) (individual) [SDGT]

YASIN, Abdul Rahman (a.k.a. TAHA, Abdul Rahman S.; a.k.a. TAHER, Abdul Rahman S.; a.k.a. YASIN, Abdul Rahman Said; a.k.a. YASIN, Aboud) (DOB 10 Apr 1960; POB Bloomington, Indiana U.S.A.; SSN 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 <U.S.A.>; Passport No. 27082171 <U.S.A. - issued 21 Jun 1992 in Amman, Jordan>, alt. Passport No. M0887925 <Iraq>; citizen U.S.A.) (individual) [SDGT]

YULDASHEV, Tohir (a.k.a. YULDASHEV, Takhir), Uzbekistan (individual) [SDGT]

ZIA, Mohammad (a.k.a. ZIA, Ahmad), c/o Ahmed Shah s/o Painda Mohammad al-Karim Set, Peshawar, Pakistan; c/o Alam General Store Shop 17, Awami Market, Peshawar, Pakistan; c/o Zahir Shah s/o Murad Khan Ander Sher, Peshawar, Pakistan (individual) [SDGT]

**MUGHNIYAH, Imad Fa'iz (a.k.a. MUGHNIYAH, Imad Fayiz), Senior Intelligence Officer of HIZBALLAH (DOB 07 Dec 1962, POB Tayr Dibba, Lebanon, Passport No. 432298 <Lebanon>) (individual) [SDT] (Already on SDN List)**

^ TOP

# EXHIBIT 17

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____
                                            )
YASSIN ABDULLAH KADI,                       )
                                            )
                        Plaintiff,          )          Civil Action 09-0108 (JDB)
                                            )
        vs.                                 )
                                            )
TIMOTHY GEITHNER, et al.                    )
                                            )
                        Defendants.         )
_____ )

## PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE

Plaintiff Yassin Abdullah Kadi ("Mr. Kadi"), by and through undersigned counsel, and

pursuant to Federal Rule of Evidence 201 and the Court's inherent authority, respectfully

requests that the Court take judicial notice of two Consent Orders (the "Orders") made on June 8,

2010, by the authority of The High Court of Justice, Queen's Bench Division, Administrative

Court in London which reflect the final disposition of two pieces of litigation commenced by Mr.

Kadi in November 2001 in the United Kingdom ("UK"). The Orders are attached hereto as

Exhibits 2 and 3. In support of this Request, Mr. Kadi states as follows:

1.      The claims brought by Mr. Kadi against Her Majesty's Treasury ("HM Treasury"

or "UK Treasury") in London concerned his challenge to his "designation" by UK authorities

under UK law on October 12, 2001, a designation that took place simultaneously with his

designation by the Office of Foreign Asset Control ("OFAC") in the United States. Mr. Kadi's

name was included in identical lists issued simultaneously by the UK Treasury and the U.S.

Treasury Department on October 12, 2001.

2.      As a result of these proceedings, in December 2008, the UK Treasury removed Mr. Kadi from its UK list (a "delisting") of persons under the Terrorism (United Nations Measures) Order 2001 (the "2001 Order").  In other words, Mr. Kadi's "designation" under the 2001 Order by the UK government was withdrawn.  This delisting followed a comprehensive review by the UK Treasury of the case against Mr. Kadi, including a review of the materials which had been used to support Mr. Kadi's original designation, after which the UK Treasury concluded that "*the case against [Mr. Kadi] no longer meets the test set out in . . . the Terrorism Order*" (emphasis added).  A copy of the HM Treasury letter delisting Mr. Kadi is attached hereto as Exhibit 1.

3.      Notwithstanding the revocation of Mr. Kadi's designation under the 2001 Order, he remained designated on a second list pursuant to separate UK legislation, the Al Qaeda and Taliban (United Nations Measures) Order 2006 (the "2006 Order") which contained different listing criteria.  However, following a separate challenge, this second listing was annulled as a result of the decision of the Supreme Court of the United Kingdom (the highest appellate court in the UK for civil cases) on January 27, 2010 *[Her Majesty's Treasury (Respondent) v Ahmed and Others [2010] UKSC 2 ]*.   In that judgment, the UK's Supreme Court ruled that the operative part of the 2006 Order must be quashed as being *ultra vires*.  Thus, Mr. Kadi's removal from this second list was done as the result of the finding by the Supreme Court of the United Kingdom that any such designation (as was done in Mr. Kadi's case in contravention of his fundamental rights) was illegal.  For the convenience of the Court, a copy of the UK Supreme Court's Press Summary, explaining its ruling, and the opinion itself are attached hereto as Exhibits 4 and 5, respectively.

4.      In keeping with Mr. Kadi's complete success in having the UK government

withdraw his designations and delist him, the attached Consent Orders (Exhibits 2 and 3) reflect

the agreement of the UK Treasury to pay Mr. Kadi's legal fees and expenses ("costs") in both

actions from the inception of his designation by the UK Treasury in October 2001, which was

simultaneous with his designation by OFAC, through his delisting by the UK Treasury under the

2001 Order in December 2008.  The total costs to be paid by the UK Treasury will amount to a

substantial six-figure pound sterling sum.

5.      Given that the Consent Orders only were made on June 8, 2010, they were not

available at the time that briefing was completed on Defendants' Motion to Dismiss, or, in the

Alternative, for Summary Judgment (the "Motion") herein, or prior to the April 9, 2010, hearing

on the Motion.  However, Mr. Kadi respectfully submits that it is appropriate for the Court to

consider the Orders and what they represent given that the UK's listing of Mr. Kadi in October

2001 was the direct result of the information provided by, actions taken by, and requests made by

the United States Department of the Treasury, a defendant to this action.

6.      As the Consent Orders have been made in public pursuant to the authority of The

High Court of Justice, Queen's Bench Division, Administrative Court, and filed therein they are

a matter of public record.  This Court has repeatedly and recently recognized that it is

appropriate to take judicial notice of matters of public record in deciding a motion to dismiss.

See Simmons v. Wolff, 594 F. Supp. 2d 6, 8 (D.D.C. 2009) (Bates, J.) ("In deciding a motion

brought under Rule 12(b)(6), a court is limited to considering the facts alleged in the complaint,

documents attached as exhibits or incorporated by reference in the complaint, and matters about

which the Court may take judicial notice. . . . A court may take judicial notice of public records

from other proceedings.") (internal citations omitted); Covad Communs. Co. v. Bell Atl. Corp.,

407 F.3d 1220, 1222 (D.C. Cir. 2005) ("[W]e took judicial notice of facts on the public record -

that is, consulted the relevant opinions - as a court may do upon a motion to dismiss.") (internal

citations omitted); Marshall County Health Care Auth. v. Shalala, 988 F.2d 1221, 1228 (D.C.

Cir. 1993) (Noting a "[a] narrow exception to th[e] general rule," that precludes consideration of

matters outside of the four corners of a complaint in deciding a Rule 12(b)(6) motion, "has been

crafted, however, to allow courts to take 'judicial notice' of facts on the public record."); Uzlyan

v. Solis, No. 09-1035, 2010 U.S. Dist. LEXIS 36423, *21, n. 5 (D.D.C. Apr. 13, 2010) ("In

deciding a Rule 12(b)(6) motion, a court may take judicial notice of public records from other

proceedings.").

For the foregoing reasons, Mr. Kadi respectfully requests that the Court take judicial

notice of the two Consent Orders and consider these Orders in its determination of the pending

Motions.

Respectfully submitted,

Dated: June 22, 2010

/s/ David F. Geneson
David F. Geneson (DC Bar #267245)
Sheppard Mullin Richter & Hampton LLP
1300 I Street, N.W., 11th Floor East
Washington, DC 20005-3314
Telephone: (202) 218-0030
Facsimile: (202) 218-0020
dgeneson@sheppardmullin.com

Daniel L. Brown (*pro hac vice*)
Sheppard Mullin Richter & Hampton LLP
30 Rockefeller Plaza, Suite 2400
New York, NY 10112
Telephone: (212) 653-8700
Facsimile: (212) 653-8701
dlbrown@sheppardmullin.com

*Attorneys for Plaintiff*

-4-

Case 1:03-mc-01570-GBD-SN   Document 2300-2   Filed 09/07/10   Page 10 of 37

## CERTIFICATE OF SERVICE

I hereby certify that on this 22nd day of June, 2010, I caused a copy of the foregoing

Plaintiff's Request for Judicial Notice, via the Court's ECF system, which will send copies to the

following counsel of record:

> Eric J. Beane, Esq.
> U.S. Department of Justice
> Civil Division, Federal Programs Branch
> 20 Massachusetts Ave., N.W., Room 7124
> Washington, D.C. 20001

> /s/  David F. Geneson
> David F. Geneson

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| YASSIN ABDULLAH KADI, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action 09-0108 (JDB) |
| | ) | |
| vs. | ) | |
| | ) | |
| TIMOTHY GEITHNER, et al. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DECLARATION OF DANIEL L. BROWN, ESQ. IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE
FOR SUMMARY JUDGMENT AND IN SUPPORT OF
PLAINTIFF'S MOTION FOR DISCOVERY UNDER RULE 56(F)**

Pursuant to 28 U.S.C. § 1746, I, the undersigned, hereby declare:

1.      I am a Partner at the law firm of Sheppard, Mullin, Richter & Hampton, LLP ("Sheppard Mullin"), counsel to Plaintiff Yassin Abdullah Kadi ("Plaintiff" or "Mr. Kadi"), in the above-entitled action.  I respectfully submit this Declaration in opposition to Defendants' Motion To Dismiss Or, In The Alternative For Summary Judgment, and in Support of Plaintiff's Motion For Discovery Under Rule 56(f).  I am fully familiar with the facts and circumstances set forth herein.

2.      I possess personal knowledge and am competent to address the specific factual matters herein, except as to those which I have asserted upon information and belief.

3.      As explained below and in Plaintiff's Memorandum, there are numerous instances where Plaintiff has already demonstrated that there are disputed issues of material fact as to whether Plaintiff was properly designated as a "specially designated global terrorist" ("SDGT") and that the Administrative Record contains materials that are not credible.  However, without

any details of the conclusions set forth in the OFAC Memorandum,[1] it is currently impossible for Plaintiff fully to respond to Defendants' motion, and therefore, Mr. Kadi should be afforded the opportunity to take the discovery set forth in detail below.

## A. Procedural History And Defendants' Reliance Upon Secret Evidence.

4.     On January 16, 2009, Plaintiff filed an eight-count Complaint alleging that Defendants wrongfully designated him as an SDGT, and that such designation violates the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, and numerous provisions of the U.S. Constitution (Doc. No. 1) (the "Complaint").

5.     On May 22, 2009, in response to the Complaint, Defendants filed a Motion To Dismiss Or, In The Alternative For Summary Judgment (Doc. No. 12), in which Defendants seek summary judgment with respect to Count One of the Complaint and request this Court to adopt as undisputed facts various conclusions reached in the OFAC Memorandum (the "Motion").[2]

6.     On May 22, 2009, Defendants also filed the 2,817 page public Administrative Record, *see* Doc. No. 13.

7.     Additionally, on May 22, 2009, Defendants filed *ex parte* and *in camera* (i) a classified Supplemental Memorandum in Support of Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment; and (ii) a Classified Supplement to the Administrative

---

[1]  In or about March 2004, the Office of Foreign Assets Control ("OFAC") issued a final memorandum (hereinafter the "OFAC Memorandum") which purported to specify the evidence and bases for designating Mr. Kadi as an SDGT and for freezing his assets.

[2]  By their Motion, Defendants also move to dismiss Counts Two through Eight of Plaintiff's Complaint for failure to state claims, based *inter alia*, on the ground that Mr. Kadi should not be afforded constitutional rights because he is a foreign national.  As set forth in the accompanying Memorandum, Mr. Kadi has alleged numerous contacts with the United States that entitle him to such constitutional protections.  For example, as set forth by letter from Mr. Kadi's counsel to Mr. Joseph Ferguson, Assistant United States Attorney, Plaintiff's claim to the $820,000 loan to (footnote continued)

Record.  *See* Doc. No. 14.  These materials were lodged with the Court and not served upon

Plaintiff.

8.      Since Defendants' Motion is supported by evidence that they have refused to

provide to Plaintiff or his attorneys, on June 25, 2009, Plaintiff filed a Motion to Preclude

Defendants from Relying on any Evidence that Defendants Refuse to Provide to Plaintiff or His

Counsel (Doc. No. 18) (the "Classified Evidence Motion").  The Classified Evidence Motion

seeks to preclude Defendants from relying on Classified Evidence to which Plaintiff or his

counsel have not been provided access or, in the alternative, to require Defendants to implement

reasonable less-restrictive means to relying on the Classified Evidence.

9.      On July 8, 2009, Defendants filed an Opposition to the Classified Evidence

Motion (Doc. No. 19) (the "Opposition").

10.     On July 30, 2009, Plaintiff filed a Reply in Further Support of the Classified

Evidence Motion (Doc. No. 25).  As explained in the briefing on the Classified Evidence

Motion, Defendants fail to even address their ability to provide Plaintiff with some form of

access to the information being used against him by implementing less-restrictive reasonable

alternatives to relying on secret evidence.

**B.      Defendants Have Prematurely Moved For Summary Judgment
Without Affording Plaintiff Any Opportunity To Conduct Discovery.**

11.     Defendants have moved for summary judgment on Plaintiff's First Cause of

Action in the Complaint, pursuant to the APA, despite that fact that, ***no discovery has been***

***taken in this litigation as yet.***  Moreover, Plaintiff and his counsel have not even been afforded

an opportunity to review the evidence that has been submitted *ex parte* to the Court.

-----------------------------------

QLI has been blocked as a result of the freeze.  A true and correct copy of the Letter to Joseph
Ferguson, AUSA, dated June 26, 2009, from Guy Martin, Esq. is attached hereto as Exhibit "A."

12.     As set forth in detail in the accompanying Memorandum, even under the current, undeveloped record, the Motion must be denied, because there exist numerous genuine, material issues of fact as to whether Plaintiff was properly designated as a "specially designated global terrorist," and as to the reliability of the purported evidence in the Administrative Record.

13.     However, if the Court is not persuaded by Plaintiff's submissions in opposition to the Motion that such genuine, material issues of fact now exist, as explained below, the Court should still grant Plaintiff leave to conduct discovery to develop additional evidence of such issues of fact.

14.     In the Memorandum, Plaintiff sets forth numerous disputed issues regarding the materials relied upon by the Defendants in rendering their decision to designate Plaintiff as an SDGT. In addition, set forth below are illustrative examples of discovery that Plaintiff needs, and which are likely to lead to admissible evidence that would further preclude summary judgment in Defendants' favor. These examples are not comprehensive, nor can they be at this stage, because among other things, Plaintiff has no idea which, if any, of the documents in the 2,817 page Administrative Record (or the evidence that Defendants refuse to disclose) were relied upon by Defendants. Accordingly, at this juncture, Plaintiff still cannot fully detail the specific depositions that he may wish to take, specific documents he may seek to have produced, or specific interrogatories he will propound.

15.     While, at this preliminary stage, Mr. Kadi cannot state with precision exactly what proper discovery will uncover, as explained further below, various materials contained in Plaintiff's Submissions[3] to OFAC indicate that there is a substantial probability that discovery

---

[3] The "Submissions" include: the Witness Statement of Yassin Abdullah Kadi, dated December 17, 2001, at AR 92-280; Supplemental Witness Statement of Yassin Abdullah Kadi, dated July (footnote continued)

will reveal additional evidence contradicting and undermining the conclusions set forth in the OFAC Memorandum and the evidence upon which OFAC appears to have relied. Any and all such evidence is relevant, and must be developed before summary judgment may be granted.

**C.    Plaintiff's Vindications Around The World
Are A Compelling Reason To Grant Discovery.**

16.    As explained in the Memorandum, Defendants' designation of Plaintiff as an SDGT started a worldwide chain reaction, causing Plaintiff's assets to be frozen around the world and authorities in various places to commence investigations into Plaintiff's alleged connection to terrorist activity, based on the same "evidence" relied upon by the Government.

17.    However, to date, no authority that has permitted Plaintiff to defend himself has put forward any allegation that Mr. Kadi's legal team has not been able to refute comprehensively and conclusively. Nonetheless, the United States Government continues to refuse Plaintiff any reasonable opportunity to even understand the charges against him, let alone challenge those allegations. Plaintiff's vindication before various tribunals demonstrates why it is critical for Plaintiff to understand the charges against him and be afforded an opportunity to defend himself. For example:

18.    On December 24, 2004, only months after Defendants issued the OFAC Memorandum against Mr. Kadi, authorities in Turkey issued a formal determination for Dismissal of Proceedings against Plaintiff. *See* Decision 2004/881 dated 30 December 2004, and

---

23, 2002, at AR 21-505; Yassin Abdullah Kadi Summary Presentation for OFAC, dated August 1, 2002, at AR 1068-1085; Statement of Yassin Abdullah Kadi, dated December 19, 2002, at AR 689-1067; Presentation for February 28th Meeting with OFAC, dated February 23, 2003, at AR 1184-1351; Answers to Questions Concerning the Petition to Delist Yassin Abdullah Kadi, dated July 11, 2003, at AR 1357-1391; Submission of Yassin Abdullah Kadi to the Deputy Attorney General of Switzerland, Mr. Claude Nicati, Further to the Meeting at the Swiss Embassy in Riyadh on 1 July 2003, dated August 22, 2003, at AR 2020-2406 (collectively hereinafter Plaintiff's "Submissions").

Decision 2004/22072 dated 24 December 2004, true and correct copies of which are attached hereto as Exhibit "B."  The Office of the Chief Public Prosecutor of the Republic of Turkey decided:

> ... there is no evidence or sign implying that [Mr Kadi] has relations with or assisted the illegal terrorist organisation Al-Qaida ... that the money transfers were made in conformity with the legal regulations, that there was nothing illegal about the commercial activities of the accused.

*Id.* at 3.

19.     On December 26, 2004, after three years of thorough investigation, the prosecution authorities of the Republic of Albania formally decided to terminate the penal prosecution against Mr. Kadi, a true and correct copy of the decision, dated December 26, 2004, along with a copy of a certified translation is attached hereto as Exhibit "C."  As stated by the prosecutor at the Attorney General's office:

> ... it cannot be achieved the conclusion that [Mr Kadi] has transferred funds for supporting terrorist activities through commercial companies owned by him in Albania.  Being in these circumstances, when we have no sources of evidence against the citizen under investigation, [Mr Kadi], ... I value that the penal prosecution has to be terminated.

*Id.* at 4.

20.     In August and September, 2006, a Swiss financial analyst, Pascal Jequier was instructed by the Swiss Examining Judge to examine all accounts in Switzerland of Mr. Kadi or entities associated with him (the "Swiss Reports") and concluded that in the case of each and every account "*the account . . . does not include . . . blatant indications of an activity of terrorist organisation financing,*" and confirmed that the accounts of Mr. Kadi's family members were not transit accounts.  Swiss Reports at 54-62, a true and correct copy of which is attached as Exhibit "D."

21.     On December 28, 2006, the Public Prosecutor's Office of the Republic of Turkey

issued a formal decree, a true and correct copy of which is attached hereto at Exhibit "E,"

stating:

> It is not justified to initiate an investigation about the suspects [Mr
> Kadi... and others] as sufficient evidences were not collected to be
> able to institute a public action for the offences alleged.

*Id.* at 5.

22.     Following 6 years of investigation by Swiss authorities, criminal proceedings

against Plaintiff, which were initiated following his designation as an SDGT, were abandoned.

*See* Letter from Swiss Deputy Attorney General Claude Nicati to Mr. Kadi's Swiss counsel,

Marc Bonnant, dated December 17, 2007 and English translation, along with the exhibits

annexed thereto, a true and correct copy of which is attached hereto as Exhibit "F."

23.     Following his designation, as discussed in detail below, Swiss investigators

conducted a thorough investigation into Mr. Kadi, working with law enforcement agencies

throughout the world.  *Id.* at 5.  The Swiss abandoned their investigation even though OFAC

provided extensive cooperation to the Swiss, including access to OFAC's files.  *Id.* at 1.

24.     On September 3, 2008, the Grand Chamber of the European Court of Justice

("ECJ") in Luxemburg delivered a landmark decision allowing Mr. Kadi's appeal to the

European Court of Justice.  *See Kadi v. Council of the European Union*, Joined Cases C-402/05

P and C-415/05 P (Sept. 3, 2008), a true and correct copy of the decision is attached hereto as

Exhibit "G."  The 14 judges of the ECJ ruled that the earlier judgment of the Court of First

Instance must be set aside and that the contested freezing regulation must be annulled insofar as

it relates to Mr. Kadi and further held that it had jurisdiction to review *whether the contested*

*freezing regulation complied with fundamental human rights.  Id.*

-7-

25.     The ECJ concluded that Mr. Kadi's fundamental right to be heard and his right to effective judicial review were *"patently not respected." Id.* at ¶ 334.  The ECJ also decided that the freezing regulation constituted an unjustified restriction of Mr. Kadi's right to property. *Id.* at ¶ 370.

26.     On February 26, 2009, Mr. Kadi applied under Article 230 of the EC Treaty for the annulment of the latest EU freezing regulation, Commission Regulation 1190/2008, on the grounds that it lacks a sufficient legal base, infringes Mr. Kadi's right to a fair hearing and to effective judicial protection, violates the obligation to state reasons, is based on a manifest error of assessment, and is an unjustified interference with Mr. Kadi's right to property. *See, Kadi v. Commission of the European Communities*, ECR T- 85/09, (Feb. 26, 2009), a true and correct copy of which is attached hereto as Exhibit "H."  As Mr. Kadi explains in his application, three months after the Court of Justice annulled Regulation 881/2002 on the ground that the Community institutions had patently failed to respect his fundamental rights, the Commission adopted the same draconian measure without a proper legal basis, in disregard of the judgment of the Court of Justice and without adequately safeguarding Mr. Kadi's rights of defense. *Id.*  In applying for annulment of the latest freezing regulations, Mr. Kadi is seeking enforcement of the ECJ ruling of September 3, 2008, insofar as the freezing regulations relate to him.

**D.**     **The Information Relied Upon By Defendants Has Been Discredited And Discovery Should Be Permitted To Further Demonstrate Such Unreliability.**

27.     The contents of the unclassified portions of the Administrative Record reveal that OFAC has relied upon "news" reports and articles, and other "sources," which have already been discredited as unreliable and/or false.  For example, *seven* of the ten citations referred to in the 2 page document faxed from the Department of Treasury to government officials in the United Kingdom, AR 39-40 (the "Fax") are to "articles," *two* of them are to websites, and the only non-

media report cited is the Affidavit of Robert Wright, FBI, dated June 8, 1998 ("Wright Affidavit"), which has been widely discredited as discussed below.

28.     The Fax states that "Saudi businessmen have been transferring millions of dollars to Bin Laden through Blessed Relief," AR 39, and cites to a USA Today article, entitled "Saudi Money Aiding bin Laden," dated October 29, 1999, by Jack Kelley, AR 161-62.   However, Jack Kelley was forced to resign following an investigation and USA Today withdrew the article from their website and published a correction, a true and correct copy of which is attached hereto as Exhibit "I" stating that:

> Kelley a reporter **was found recently to have fabricated several high-profile stories.**

*Id.*

29.     Furthermore, the claims regarding Mr. Kadi's alleged connections to Hamas are derived from the Wright Affidavit, which contains fundamental misstatements of fact and as a result, unjustifiable conclusions and inferences regarding Plaintiff.   Mr. Wright's poorly investigated assertions and illogical conclusions have been specifically refuted in detail in the Submissions, and further below.  *E.g.*, AR 309-335.  Indeed, subsequent events have shown those conclusions to be wholly unsustainable, notably, the acquittal of Muhammad Salah of charges that he financed Hamas.  In fact, Mr. Wright has been severely discredited, following separate disciplinary charges brought by the FBI over allegations of insubordination and unprofessional conduct, resulting in the termination of his employment. *See. e.g.,* FBI TO FIRE DISSIDENT AGENT, by John Mintz, Washington Post, April 23, 2005; A10, a true and correct copy of which is attached hereto as Exhibit "J."

30.     Similarly, Defendants' allegations concerning a purported $500,000 transfer appear to be derived from an allegation contained in a document written by the discredited

investigator and journalist Jean-Charles Brisard entitled "Report on Illegal Financial Activities And Terrorism Financing on The Territory of the Federation of Bosnia Herzegovina" (the "Brisard Bosnian Banking Report"), a true and correct copy of which is attached hereto as Exhibit "K." AR 2780-82. Contrary to Mr. Brisard's claims, the Brisard Bosnian Banking Report was never requested or commissioned by the United Nations. AR 2783. To be clear, the Muwafaq Foundation never transferred any funds to any terrorist organization whatsoever, in the Balkans or elsewhere.

31. Mr. Brisard was also responsible for authoring "Terrorism financing: roots and trends of Saudi terrorism financing" ( the "UN Report"), again purportedly commissioned by the President of the UN Security Council. AR 2623 n.30 ("In their report "terrorism financing", the United Nations indicates that [Mr. Kadi] is one of the main sponsors of Al Qaeda."). Contrary to Mr. Brisard's claims, the UN Report *was never requested or commissioned by the United Nations*. AR 2783. Indeed, the President of the UN Security Council, at the time, stated in regard to such claim and with respect to Mr. Brisard "[i]n summary, I regard that Mr. Brisard's conduct and attitude have been deceitful and marked by the intention to mislead." *Id.* Subsequently, in connection with a libel action against Mr. Brisard for statements made in, *inter alia*, the UN Report, the English High Court stated "[n]ot only did M Brisard mislead the court . . . but, despite his professed intention, he has not . . . sought to justify those serious allegations . . . " *Mahfouz v Brisard & Others* (2004) EWHC 1735 (QB) at ¶ 32, a true and correct copy of which is attached hereto as Exhibit "L."

32. Thereafter, Mr. Brisard issued an apology: "the Report contain[s] very serious and highly defamatory allegations . . . alleging support for terrorism . . . we accept and acknowledge that all of those allegations . . . are entirely and manifestly false." *See* "An apology to Sheikh

Khalid Bin Mahfouz and Sheikh Abdulrahman Bin Mafouz," October 2006, a true and correct copy of which is attached hereto as Exhibit "M." Additionally, Mr. Brisard signed a statement unconditionally retracting and withdrawing his allegations, including those concerning the Muwafaq Foundation. *See* the Witness Statement of Jean-Charles Brisard, dated October 4, 2006, at ¶¶ 26-27, a true and correct copy of which is attached hereto as Exhibit "N" ("I have no evidence . . . to indicate that Sheikh Khalid [Bin Mahfouz] donated this money for anything other than humanitarian and charitable purposes.").

33. Moreover, numerous lengthy exchanges between the Government and Swiss authorities concerning Plaintiff, stretching from October 2001 through March 2007 (the "Swiss Documents"), a true and correct copy of which are attached hereto as Exhibit "O," further reveal the unreliable nature of the evidence relied upon by OFAC.[4]

34. The Swiss Documents demonstrate that the cooperation between the Government and Switzerland was profound and lengthy. *See generally*, the Swiss Documents. To be clear, after Switzerland thoroughly investigated *the same evidence used to brand Plaintiff an SDGT, it abandoned its investigation.*

35. Indeed, it appears that the Swiss authorities may have been provided with access to the Classified Evidence. For example, by International Rogatory Letters, dated March 23, 2007, the Swiss Federal Examining Magistrate asks the United States for *"access to the documents which are filed with OFAC in Washington . . ."* Ex. O-31 at 3.

---

[4] Upon information and belief, in early 2004 Swiss Deputy Attorney General Claude Nicati engaged Jean-Charles Brisard as an expert in the criminal investigation in Switzerland. Given the foregoing, in August 2004, Mr. Nicati was forced to withdraw the mandate he had given to Mr. Brisard.

36.     Some of the information in the Swiss Documents relates to a "Cooperating Witness." *See, e.g.,* Ex. O-18, (Cooperating Witness interview, dated June 2, 2004 hereinafter the "Cooperating Witness Statement"), Ex. O-20 (Complementary Request for Mutual Assistance in Criminal Matters, dated June 25, 2004).

37.     While OFAC has never revealed to Plaintiff whether it has relied on the "Cooperating Witness Statement," they presumably have, given that it was provided to Swiss authorities in response to a request for information about Plaintiff. However, the Cooperating Witnesses Statement is riddled with falsehoods and errors, which were detailed by Mr. Kadi's Swiss counsel, Marc Bonnant, and submitted to Mrs. Bino. *See* Letters to the Office of the Federal Investigating Magistrates, Mrs. Maria-Antonella Bino, dated April 18, 2007 and May 24, 2007, from Marc Bonnant, Esq. with English translations, true and correct copies of which are attached hereto as Exhibit "P."

38.     Notably, the Cooperating Witness Statement was not given under oath nor subject to the penalty of perjury. A deposition by contrast, would elicit sworn testimony.

39.     Finally, six-months after Plaintiff's designation, OFAC officers conducted a review in Albania of "the Kadi documents." A true and correct copy of the review (hereinafter the "Albania Trip Report") is attached hereto as Exhibit "Q." One of the "team's goals . . . was to look for evidence that supports the designation of Sheik Yassin Kadi as a Specially Designated Terrorist under U.S. Executive Order and [to] assist the Albanian government in its criminal money laundering case against the companies and Kadi." Ex. Q at 3. Following the teams' extensive document review, the Albania Trip Report concluded that any alleged support for Mr. Kadi's designation was "[u]nfortunately . . . based on the *circumstantial/hearsay evidence* that we uncovered while in Albania . . ." Ex. Q at 4 (emphasis added).

40.     In sum, Defendants have designated Plaintiff as an SDGT based on a record that, at a minimum, is unreliable and is potentially false.  Therefore, Plaintiff should be afforded discovery to demonstrate such fallibility and to determine the basis for his designation so that he has at least some opportunity to challenge the evidence being used against him.  Among other things, some discovery is necessary to determine the evidence upon which OFAC has relied.  For example, Plaintiff should be entitled to discover:

- whether the Cooperating Witness Statement[5] is part of the Classified Evidence and, if so, be provided an opportunity to rebut the allegations and challenge the credibility of the Cooperating Witness Statement, including proving that the "source" in fact, *has never even met Mr. Kadi.*

In addition, if the Government is in any way relying on the Wright Affidavit (or the subsequent proceeding spawned by the affidavit), Plaintiff should be afforded discovery:

- to further discredit the claims of the Wright Affidavit, including, Mr. Wright's disciplinary proceedings, suspension and his subsequent employment termination.

Similarly, Plaintiff must be permitted to demonstrate, if necessary, that in fact:

- Mr. Saleh, to whom OFAC claims Mr. Kadi is linked in support of his designation, appears to be a person that *Plaintiff does not even know.*[6]

---

[5] Obviously, neither Plaintiff nor his counsel were present for this interview.  Deposition of this witness, whose testimony appears relevant to the present motion, will permit Plaintiff's counsel to show the witness key documents, and ask him about key inconsistencies, in order to develop a record that includes both a truthful and a complete rendition of his actual knowledge.  The accuracy and reliability of witness testimony is essential when determining whether genuine disputes of material fact exists.  Therefore, Plaintiff may need to depose other witnesses with relevant information who would refute Defendants' allegations.

[6] Dr. Abdul Latif Saleh appears to have been confused with another individual of Egyptian nationality who allegedly belongs to the banned Muslim Brotherhood, whom Mr. Kadi does not know and has never met.  *See CIA Arrests Bin Laden Associate*, THE INDEPENDENT, November 15, 1999, a true and correct copy of which is attached hereto as Exhibit "R."

-13-

41. In order to oppose the Motion, Plaintiff must be afforded discovery which would at least provide him with some opportunity to refute the allegations in the OFAC Memorandum, including, but not limited to:

- discovery regarding the materials that OFAC relied upon in rendering its decision to designate Mr. Kadi as an SDGT, including discovery from individuals involved in the decision to designate him;

- discovery regarding the materials OFAC determined not to rely upon in rendering its decision to designate Mr. Kadi as an SDGT;

- discovery concerning any analysis by OFAC of the Submissions, including whether OFAC contests portions of Plaintiff's Submissions and in what regard; and

- discovery to determine the basis for his designation and opportunity to challenge such evidence.

42. Given the Government's bizarre conclusion in the OFAC Memorandum, that "[n]o one element, no one contact, no one accusation of funding is taken as being determinative of the assessment that [Plaintiff] has been providing support to terrorists through his actions," AR 22, Plaintiff should be afforded the discovery he seeks herein, to determine, *inter alia*, the specific basis for his designation,[7] what specific evidence in the Administrative Record OFAC is relying upon to support his designation, which statements in the Submissions are not credible to the Government and the basis for such determination, and what additional evidence OFAC requires so that Plaintiff has some opportunity to lift the designation and clear Plaintiff's name.

---

[7] For example, Defendants may have relied upon the 1 page document faxed from the Department of Treasury to government officials in the United Kingdom, a true and correct copy of which is attached as Exhibit "S," in support of their designation of Mr. Ayadi as an SDGT, which in turn supports Mr. Kadi's designation. However, this document evidences the circular and self-referential, basis for Plaintiff's designation as both Chafiq Ayadi and Plaintiff were designated on grounds of association with the other.

43.    Indeed, the OFAC Memorandum contains numerous allegations which are merely conclusory statements without any supporting detail.  Absent any detail about the conclusions set forth in the OFAC Memorandum, it is impossible for Plaintiff to respond.

44.    Therefore, Plaintiff should also be permitted to take discovery regarding the specific allegations in the OFAC Memorandum, including, but not limited to, discovery to determine:

- How the Muwafaq Foundation is alleged to have "operated under the umbrella of Makhtab Al-Khidamat"? Defs.' Br. at 10;

- The basis for and sources of OFAC's claim that "Dr. Abdul Latif Saleh, Kadi's business partner in Albania and the head of operations in Muwafaq's Albania office, was the founder and organizer of the Albanian Islamic Jihad ("AIJ")." Defs.' Br. at 11;

- The basis for and sources of OFAC's allegation that "Kadi acknowledged in 2001 that the Khartoum office of Muwafaq had provided assistance to jihad activities in the Middle East and the Balkans." Defs.' Br. at 11;

- Details regarding the letter allegedly found in 2002 "apparently addressed to Usama bin Laden referenced [Kadi's] managing money for Bin Laden in Sudan.  The letter also referred to [Kadi] as one of Bin Laden's former managers . . . [Kadi] often boasted of personally and occasionally meeting with Bin Laden in Afghanistan, Saudi Arabia and the Sudan," Defs.' Br. at 11, including the basis for and sources of such allegations;

- The details concerning each of the "several firms" in Albania allegedly owned by Mr. Kadi which "funneled money to extremists or employed extremists in positions where they controlled the firms' funds." Defs.' Br. at 11;

- The "working capital" allegedly provided by Bin Laden "for four or five of Kadi's companies in Albania" and the identity of such companies.  Defs.' Br. at 11;

- The details of Mr. Kadi's alleged relationship with Asbat al-Ansar and the basis for such allegations. Defs.' Br. at 11;

- The details of the "logistical and financial support" alleged to have been provided by the Foundation for a mujahadin battalion in Bosnia.  Defs.' Br. at 16;

- The details of the alleged "financial support" provided by the Foundation in the mid 1990s for the alleged terrorist activities of the mujaheddin.  Defs.' Br. at 16;

- The details of all alleged "arms trafficking" alleged to have been carried out by the Foundation from Albania to Bosnia.  Defs.' Br. at 16;

-15-

- The details of the allegation that "some involvement in the financing of these activities was provided by Usama Bin Laden." Defs.' Br. at 16; and

- The details of the allegation that Mr. Kadi "continued to finance various fundamentalist institutions and organizations in the Balkans after Muwafaq ceased operations there in 1996, including . . . The Revival of Islamic Heritage Society's Pakistan and Afghanistan offices and the Bosnia-Herzegovina branch of the Al-Haramain Foundation," Defs.' Br. at 17, including the identity of such institutions and organizations, the source for such allegation, each transaction evidencing that funds were "funneled" to such organizations and the purposes for which such funds were deployed, and how Mr. Kadi is alleged to be connected to The Revival of Islamic Heritage Society or Al-Haramain Foundation.

## CONCLUSION

45.     In sum, in the event that the Court is not already persuaded that disputed issues of material fact exist such that Defendants' summary judgment motion should be denied, discovery is absolutely necessary.

46.     Plaintiff therefore respectfully requests that Defendants' Motion To Dismiss Or, In The Alternative For Summary Judgment be DENIED, or in the alternative, continued until the completion of discovery in the ordinary course of this litigation.

**WHEREFORE**, it is respectfully requested that Defendants' Motion To Dismiss Or, In The Alternative For Summary Judgment, be denied, together with such further relief as the Court deems just and proper.

I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on August 14, 2009.

Daniel L. Brown

-17-

## CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of August 2009, I caused a copy of the foregoing Declaration of Daniel L. Brown in Opposition to Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment, and in Support of Plaintiff's Motion for Discovery Under Rule 56(f) to be filed with the Court, via the Court's ECF system, which will send copies to the following counsel of record:

Eric J. Beane, Esq.
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W., Room 7124
Washington, D.C. 20001


By:    /s/ David F. Geneson
          David F. Geneson

# EXHIBIT 18

EXCERPTS

1

4acWterC

1   UNITED STATES DISTRICT COURT
1   SOUTHERN DISTRICT OF NEW YORK
2   -----------------------------x
2
3   KATHLEEN ASHTON, et al.,
3
4            Plaintiffs,
4
5        v.                      03 MD 1570 (RCC)
5
6   EGYPTIAN ISLAMIC JIHAD, et
6   al.,
7
7            Defendants.
8
8   -----------------------------x
9                              New York, N.Y.
9                              October 12, 2004
10                              10:00 a.m.
10
11  Before:
11
12              HON. RICHARD CONWAY CASEY,
12
13                      District Judge
13
14              APPEARANCES
15  KREINDLER & KREINDLER
15      Attorneys for Ashton Plaintiffs
16  BY:  JAMES P. KREINDLER
16      JUSTIN T. GREEN
17      VINCE PARRETT
18  MOTLEY RICE, LLP
18      Attorneys for Burnett Plaintiffs
19  BY:  RONALD L. MOTLEY
19      DONALD A. MIGLIORI
20      JODI WESTBROOK FLOWERS
20      JUSTIN KAPLAN
21      -and-
21  ALLAN GERSON
22  HANLY CONROY BIERSTEIN & SHERIDAN, LLP
23      Attorneys for Burnett Plaintiffs
23  BY:  PAUL J. HANLY, JR.
24      ANDREA BIERSTEIN

44

4acWterC
1  these matters.
2       Now, your Honor, with the Court's permission, I will
3  be addressing the factual basis for two issues before your
4  Honor, and that is the targeting of the United States by these
5  defendants as it bears on the issue of jurisdiction, and the
6  conspiracy and conspiratorial conduct of these defendants and
7  their coconspirators, as it bears upon jurisdiction.  Mr. John
8  Carter will be addressing your Honor on the Supreme Court and
9  Second Circuit and other decisions which bear on directed at
10  the United States, targeting the United States and conspiracy
11  jurisdiction.
12       We will not be addressing general doing business
13  jurisdiction, as we thought that we had agreed that the primary
14  focus would be on the other two, the direction at the United
15  States.
16       I would like to start, your Honor, that the burden
17  here is not that of summary judgment, it's a prima facie
18  showing.  I've heard these defendants, and according to them,
19  nobody in this courtroom has done anything, nobody ought to be
20  here, not even people whose names are Bin Laden.  That then
21  takes me, your Honor, to September 11.
22       On the morning of September 11, your Honor, New
23  Yorkers going to business were interrupted by the sound of jets
24  roaring overhead at very high rates of speed and the horrific
25  sounds of these jets ramming into the World Trade Center, not

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

EXCERPTS

1

76trterc

1  UNITED STATES DISTRICT COURT
1  SOUTHERN DISTRICT OF NEW YORK
2  -----------------------------x
2
3  In re:  TERRORIST ATTACKS ON
3          SEPTEMBER 11, 2001
4                                          03 MDL 1570 (GBD)
4
5  -----------------------------x
5
6                                          New York, N.Y.
6                                          June 29, 2007
7                                          2:00 p.m.
7
8  Before:
8
9                     HON. FRANK MAAS
9
10                    Magistrate Judge
10
11
12       APPEARANCES
13
14  KREINDLER & KREINDLER
14  Attorneys for Ashton Plaintiffs
15      100 Park Avenue
15      New York, New York  10017
16      (212)  687-8181
16  BY:  ANDREW J. MALONEY, ESQ.
17
18  MOTLEY RICE, LLP
18  Attorneys for Burnett Plaintiffs
19      28 Bridgeside Boulevard
19      Mt. Pleasant, South Carolina  29465
20      (843) 216-9000
20  BY:  ROBERT T. HAEFELE, ESQ.
21
22  COZEN O'CONNOR
22  Attorneys for Federal Insurance Plaintiffs
23      1900 Market Street
23      Philadelphia, Pennsylvania 19103
24      (215) 665-2000
24  BY:  J. SCOTT TARBUTTON, ESQ.
25
25

WAI-2836406v1

44

76trterc

1   the attachment to our letter -- you will see a public statement

2   that Bakar bin Laden made on February 20, 1994, announcing this

3   move and explaining that the combination of Osama bin Laden and

4   his activities hostile to the kingdom at the time.

5         You will also see we threw in another one, another

6   public statement that Bakar bin Laden made in 1998, which I

7   believe was after the embassy bombings in Africa, again

8   condemning his behavior.

9         So it is a nice story the plaintiffs are trying to

10  tell, that everything changed after 9/11, but again the

11  documents reflect that that is not the case.  The reasons for

12  removing him are clear on the record.

13        THE COURT:  Some of the documents, those I have in

14  front of me certainly, reflect that.  To the extent that there

15  are the additional documents that Mr. Haefele just described, I

16  will direct that they be turned over.

17        Broadly construed, what you are asking about in terms

18  of construction projects in the Sudan, for example, would

19  require SBG to turn over for a major construction project

20  probably millions of documents.  It seems to me that goes

21  totally beyond the pale of appropriate jurisdictional

22  discovery.  So to the extent that that is the request, the

23  request is denied.

24        MR. HAEFELE:  Your Honor, certainly I hope we don't

25  disagree, and I didn't hear your Honor say, that if they did

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

WAI-2836406v1

# EXHIBIT 19

Federal Register

Vol. 63, No. 164

Tuesday, August 25, 1998

# Presidential Documents

**Title 3—**

**The President**

**Executive Order 13099 of August 20, 1998**

## Prohibiting Transactions With Terrorists Who Threaten To Disrupt the Middle East Peace Process

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the International Emergency Economic Powers Act (50 U.S.C. 1701 *et seq.*), the National Emergencies Act (50 U.S.C. 1601 *et seq.*), and section 301 of title 3, United States Code,

I, WILLIAM J. CLINTON, President of the United States of America, in order to take additional steps with respect to grave acts of violence committed by foreign terrorists that disrupt the Middle East peace process and the national emergency described and declared in Executive Order 12947 of January 23, 1995, hereby order:

**Section 1.** The title of the Annex to Executive Order 12947 of January 23, 1995, is revised to read ''TERRORISTS WHO THREATEN TO DISRUPT THE MIDDLE EAST PEACE PROCESS.''

**Sec. 2.** The Annex to Executive Order 12947 of January 23, 1995, is amended by adding thereto the following persons in appropriate alphabetical order:

Usama bin Muhammad bin Awad bin Ladin (a.k.a. Usama bin Ladin)

Islamic Army (a.k.a. Al-Qaida, Islamic Salvation Foundation, The Islamic Army for the Liberation of the Holy Places, The World Islamic Front for Jihad Against Jews and Crusaders, and The Group for the Preservation of the Holy Sites)

Abu Hafs al-Masri

Rifa'i Ahmad Taha Musa

**Sec. 3.** Nothing contained in this order shall create any right or benefit, substantive or procedural, enforceable by any party against the United States, its agencies or instrumentalities, its officers or employees, or any other person.

**Sec. 4.** (a) This order is effective at 12:01 a.m., eastern daylight time on August 21, 1998.

(b) This order shall be transmitted to the Congress and published in the **Federal Register.**



THE WHITE HOUSE,

*August 20, 1998.*

[FR Doc. 98–22940

Filed 8–24–98; 8:45 am]

Billing code 3195–01–P

# EXHIBIT 20

Bank of Boston ("Bank"). However, the effective interest cost of such paper is based on the supply of, and the demand for, that and similar quality paper at the time of sale, and the interest cost has from time to time exceeded that of the base lending rate for brief periods. While it is not anticipated that the effective annual cost of borrowing through Commercial Paper will exceed the annual base-rate borrowing from the Bank, in order to obtain maximum flexibility, Commercial Paper with a maturity of not than 90 days may be issued with an effective cost in excess of the then-existing lending rate.

**West Texas Utilities Company (70–8265)**

West Texas Utilities Company ("WTU"), 301 Cypress Street, Abilene, Texas 79601–5820, an eclectic public-utility subsidiary company of Central and South West Corporation, a registered holding company, has filed an application-declaration under Sections 6(a), 7, 9(a), 10 and 12(c) of the Act and Rules 42, 50 and 50(a)(5) thereunder.

WTU proposes to issue and sell up to an aggregate principal amount of $45 million of first mortgage bonds ("New Bonds"), in one or more series, from time to time through December 31, 1996. The New Bonds will have maturities of not less than five years nor more than forty years. WTU estimates that the New Bonds will be issued at an interest rate between 4.5% and 8.5% depending on market conditions and maturity, and in no event will the interest rate on the New Bonds exceed 11%.

The New Bonds will be issued under WTU's indenture dated August 1, 1943, to Harris Trust and Savings Bank and J. Bartolini, as Trustees, as amended and supplemented, ("Indenture") and secured by a first lien on substantially all of the properties now owned and hereafter acquired by WTU, except for properties specifically excepted from such liens. The New Bonds will be issued under one or more new supplements to the Indenture and will be authenticated against available unused net expenditures for bondable property and/or previously retired first mortgage bonds.

The proceeds from the sale of the New Bonds will be used principally to redeem all or a portion of one or more series of WTU's outstanding first mortgage bonds including $12 million aggregate principal amount of Series G Bonds, 7¼%, due January 1, 1999 ("Series G Bonds") and $23 million aggregate principal amount of Series H Bonds, 7⅞%, due July 1, 2003 ("Series

H Bonds"), at the then current general redemption price (currently, 101.25% and 102.61% of the principal amount of the Series G Bonds and Series H Bonds, respectively), plus accrued and unpaid interest to the redemption date (collectively, "Old Bonds"). The Series G Bonds and Series H Bonds were issued in 1969 and 1973, respectively, under the Indenture and are currently refundable pursuant to their terms.

Any net proceeds not used for the redemption or repurchase of the Old Bonds will be used to repay outstanding short-term borrowings incurred or expected to be incurred primarily to finance construction expenditures, to provide working capital or for other general corporate purposes. In the event the proceeds from the issuance of the New Bonds are less than the amount required to redeem all of the Old Bonds, WTU will pay a portion of the redemption price from internally generated funds or available short-term borrowings.

WTU shall not redeem the Old Bonds with the proceeds of the sale of the New Bonds unless the estimated present value savings derived from the net difference between interest payments on a hypothetical new issue of bonds of a maturity comparable to the maturity remaining on the Old Bonds is, on an after-tax basis, greater than the present value of all redemption and issuance costs, assuming a discount rate based on the estimated interest rate on the New Bonds ("Net Present Value Savings"). If the New Bonds are issued with comparable maturities to the Old Bonds being redeemed, then Net Present Value Savings will be generated. However, given the current low rates of interest, WTU may wish to extend the maturities of the New Bonds beyond the maturities of the Old Bonds, in which case WTU may not realize Net Present Value Savings.

WTU requests authority to sell the New Bonds either: (1) Under competitive bidding pursuant to Rule 50 or, in the case of a delayed or continuous offering and sale pursuant to Rule 415 under the Securities Act of 1933, as amended, the alternative competitive bidding procedures as modified by the Commission's Statement of Policy dated September 2, 1982 (HCAR No. 22623); or (2) in a negotiated transaction with underwriters or agents under an exception from the requirements of competitive bidding under Rule 50(a)(5). Therefore, WTU requests authority to enter into negotiations with potential underwriters with respect to the interest rate, redemption provisions and other terms and conditions

applicable to the New Bonds. It may do so.

WTU proposes to deviate from the Commission's Statement of Policy Regarding First Mortgage Bonds Subject to the Public Utility Holding Company Act of 1935 (HCAR No. 13105, February 16, 1956, as amended by HCAR No. 16369, May 8, 1969). WTU requests authority to include in the terms of the New Bonds provisions that they will either: (1) Not be redeemable at WTU's option for a period of up to a maximum of fifteen years; or (2) be issued with a refunding restriction that WTU would not be permitted to refund the New Bonds with lower cost debt securities for a specified period not exceeding fifteen years. The exact terms of any redemption or refunding restrictions would be determined at or about the time of sale of the New Bonds. WTU further proposes to issue the New Bonds with or without a sinking or retirement fund and requests a waiver from the requirement of a limitation on dividends.

For the Commission, by the Division of Investment Management, pursuant to delegated authority.

**Margaret H. McFarland,**
*Deputy Secretary.*
[FR Doc. 93–24746 Filed 10–7–93; 8:45 am]
**BILLING CODE 8010-01-M**

# DEPARTMENT OF STATE

## Office of the Secretary

[Public Notice 1876]

### Determination Sudan

On August 12, 1993, Secretary of State Warren Christopher made the following determination:

"In accordance with section 6(j) of the Export Administration Act (50 U.S.C. App. 2405 (j)), I hereby determine that Sudan is a country which has repeatedly provided support for acts of international terrorism. The list of 6(j) countries as of this time therefore includes Cuba, Iran, Iraq, Libya, North Korea, Sudan and Syria."

**Warren Christopher,**
*Secretary of State.*
[FR Doc. 93–24838 Filed 10–7–93; 8:45 am]
**BILLING CODE 4710-10-M**

[Public Notice 1877]

### Advisory Committee on Historical Diplomatic Documentation; Meeting

The Advisory Committee on Historical Diplomatic Documentation