USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  13 SEP 2010

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

IN RE: TERRORIST ATTACKS ON
SEPTEMBER 11, 2001

-------------------------------------------------------------x

GEORGE B. DANIELS, District Judge:

**MEMORANDUM DECISION
AND ORDER**
03 MDL 1570 (GBD)

In this multi-district litigation ("MDL"), plaintiffs seek to hold those who aided, abetted,

sponsored, conspired to sponsor, financed, or otherwise provided material support to Osama bin

Laden and the terrorist organization al Qaeda, liable for the physical destruction, death and

injuries suffered as a result of the terrorists attacks of September 11, 2001. Plaintiffs maintain

that the responsibility for the acts of international terrorism, perpetrated against the United States

and its citizens, rests not only with Osama bin Laden, al Qaeda, and the nineteen hijackers, but

also with the multitude of those who made it possible for the terrorist attacks to occur, as a result

of the financial and other material support they provided to al Qaeda.

The birth of al Qaeda as a terrorist organization occurred in the late 1980's. Al Qaeda

(Arabic meaning "Foundation") was intended to serve as a foundation upon which to build an

Islamic global army. By working with allied terrorist groups with similar ideological views and

anti-American sentiments, al Qaeda launched a global jihad. Plaintiffs maintain that al Qaeda

relied on a worldwide network of banks, financial institutions, governments and their officials,

charities, non-profit organizations, businesses, and individuals financiers, who conspired to

generate, launder, transfer and ultimately provide financial and other material support to al

Qaeda, in order to sponsor its terrorist activities. Charities play a key role in terrorist financing.

Under the guise of providing humanitarian aid, a legion of charities divert, to al Qaeda, the

wealth of charitable donations they amass from both witting and unwitting donors.

Plaintiffs aver that, since at least the mid-1990's, Osama bin Laden and al Qaeda have publicly proclaimed that the United States was one of the primary targets of al Qaeda's global jihad, and have called for the killing of Americans whenever and wherever they may be found. Plaintiffs, therefore, contend that all those who provided material support to al Qaeda, from at least the mid-1990's onwards, have thereby knowingly participated in al Qaeda's global conspiracy to commit terrorist attacks against the United States, of which the September 11th attacks were an intended and foreseeable result. At the time of the 9/11 terrorist attacks, al Qaeda allegedly had at its disposal an annual income of approximately fifty million dollars, and assets, accumulated over a ten year period, of approximately three hundred to five hundred million dollars. Plaintiffs maintain that, absent the material support allegedly provided by defendants, al Qaeda would not have possessed the financial resources, physical assets, membership base, technological knowledge, communication skills, and global reach required to conceive, plan, and execute a terrorist attack on such a massive scale, as those committed on September 11, 2001. It was those defendants who provided al Qaeda with the means to recruit, train, and employ thousands of terrorists, including the twenty assigned to murder United States citizens and destroy United States landmarks on 9/11.

The various complaints, comprising this MDL litigation, plead primary and concerted theories of liability for violation of international, federal and state law. The late Judge Richard C. Casey presided over this MDL litigation for several years, and, upon his passing, the matter was reassigned to this Court. At the time of the transfer, plaintiffs were actively engaged in appellate practice seeking the reversal of the partial final judgments of dismissal of the actions against many of the defendants. Seven foreign, non-resident defendants were granted dismissal

on sovereign immunity grounds and/or for lack of personal jurisdiction. The Second Circuit

Court of Appeals affirmed Judge Casey's dismissals, and the United States Supreme Court

thereafter denied plaintiffs' petition for a writ of *certiorari*. In re Terrorist Attacks on Sept. 11,

2001, 349 F.Supp.2d 765 (S.D.N.Y. 2005) ("Terrorist I"), *on reconsideration in part* 392

F.Supp.2d 539 (S.D.N.Y. 2005) ("Terrorist II"), *aff'd* 538 F.3d 71 (2d Cir.2008) ("Terrorist III"),

*cert. denied sub nom.* Federal Ins. Co. v. Kingdom of Saudi Arabia, - - U.S. - -, 129 S.Ct. 2859

(2009).

Upon the exhaustion of plaintiffs' appellate efforts, this Court directed the parties to

identify all pending motions seeking dismissal on the grounds specifically addressed by the

Second Circuit's decision. After receiving the parties' submissions, this Court immediately

proceeded to identify and decide all of the individually filed dismissal motions of each of the

fifty named defendants, identified by the parties in their submissions. See, In re Terrorist

Attacks of Sept. 11, 2001, - - F.Supp.2d - -, 2010 WL 2484411 (S.D.N.Y. June 17, 2010)

("Terrorist IV"). Shortly after the issuance of the Court's decision, the Defendants' Executive

Committee ("DEC") submitted an additional motion list, revealing eight defendants, not

previously identified by the parties, who had similar pending motions to dismiss for lack of

personal jurisdiction. Of the remaining several hundred named defendants, the DEC also

identified thirty-five defendants that it believed (in part erroneously) had pending motions to

dismiss.[1] This decision resolves all the remaining motions filed by defendants seeking dismissal

---

[1] The DEC mistakenly identifies, as pending, eleven motions filed by defendants seeking
dismissal of claims asserted in the Burnett v. Al Baraka Inv. & Dev. Corp. complaint, filed under
docket number 03 CV 5738. After this Court observed that the same complaint had been filed
under two separate docket numbers, the plaintiffs voluntarily dismissed the Burnett complaint
under docket number 03 CV 5738. On July 23, 2008, the Court so-ordered the voluntary

on various grounds, including lack of subject matter jurisdiction, lack of personal jurisdiction, ineffective service of process, and failure to state a claim upon which relief can be granted, pursuant to Fed.R.Civ.P. 12(b)(1), (2), (5) and (6), respectively.

## PRINCE ABDULLAH AL FAISAL BIN ABDULAZIZ AL SAUD

The DEC advised the Court that Prince Abdullah al Faisal bin Abdulaziz al Saud's ("Prince Abdullah") motions to dismiss for lack of personal jurisdiction and for failure to state a claim, were still pending and had not been resolved by Judge Casey, during the three years they were pending before him.  The docket sheet, however, reflects that, following Prince Abdullah's death, a Suggestion of Death was filed in 2007, and no motion for substitution of a party had ever been filed by plaintiffs.  Pursuant to Fed.R.Civ.P. 25(a)(1), if a motion for substitution is not made within ninety days after service of a statement noting the death of the defendant, "the action ... against the decedent must be dismissed."

When the Court raised this issue with the parties at the last court conference, plaintiffs expressed their belief that they had in fact timely filed a motion for substitution.  The Court granted plaintiffs' request for an opportunity to investigate the matter and to advise the Court of the date when such a motion had indeed been filed.  Having received no additional information from plaintiffs following the conference, a new motion has been filed on behalf of Prince Abdullah seeking dismissal, pursuant to Fed.R.Civ.P. 25.  The Rule 25 motion to dismiss as

---

dismissal, thereby rendering those eleven motions moot.  Similarly, the so-ordering of plaintiffs' voluntary dismissal of the New York Marine and Gen. Ins. Co. v. Al Qaeda, 04 CV 6105, action rendered moot an additional thirty-two motions on the DEC's list.

abated by death of the defendant, is granted.[2]

## PERSONAL JURISDICTION

The remaining foreign defendants moving to dismiss for lack of personal jurisdiction

are: Abdullah Naseef, Sulamain Al-Ali, Adnan Basha, Jamal Khalifa, Aqeel Al-Aqeel, Yassin

Abdullah Kadi, and Soliman H.S. Al-Buthe.  They all identify themselves as citizens of the

Kingdom of Saudi Arabia, who lack the minimum United States contacts necessary to satisfy due

process.

To withstand a Rule 12(b)(2) motion, plaintiffs have the burden of making a *prima facie*

showing of personal jurisdiction over the defendant.  Thomas v. Ashcroft, 470 F.3d 491, 495 (2d

Cir.2006).  "Such a showing entails making legally sufficient allegations of jurisdiction,

including an averment of facts that, if credited, would suffice to establish jurisdiction over the

defendant."  Penguin Group (USA) Inc. v. Am. Buddha, 609 F.3d 30, 35 (2d Cir.2010) (internal

quotation marks and alterations omitted).

To determine whether the exercise of jurisdiction comports with due process, the Court

must engage in a two part analysis: "the 'minimum contacts' inquiry and the 'reasonableness'

inquiry."  Chloe v. Queen Bee of Beverly Hills, LLC, - - F.3d - - , 2010 WL 3035495, at *3 (2d

Cir. Aug. 5, 2010).  Under the minimal contacts inquiry, the Court must determine whether a

defendant has minimum contacts with the forum such that maintenance of the action does not

offend traditional notions of fair play and substantial justice.  State Oil Co. of Azerbaijan

---

[2] The Plaintiffs' Executive Committee has just advised the Court that plaintiffs do not
oppose the motion to dismiss the "deceased defendant Prince Abdullah".  (Letter of Robert T.
Haefele, Member of Plaintiffs' Executive Committee, dated 9/8/10).

Republic v. Frontera, 582 F.3d 293, 396 (2d Cir.2009) (citation omitted).  Jurisdiction over a corporation or charity's board member, officer or employee, who is sued in his individual capacity, must be premised on the defendant's own personal contacts with the forum, and not the acts and/or contacts carried out by the defendant in his official capacity. Terrorist IV, 2010 WL 2484411, at *8.  If the Court determines that the requisite minimal contacts exists, the Court must then determine whether it would be reasonable, under the circumstances of the particular case, to exercise jurisdiction over the defendant. Metro. Life Ins. Co. v. Robertson-Ceco Corp., 84 F.3d 560, 568 (2d Cir.1996).

With regard to the initial minimal contacts inquiry, "a distinction is made between 'specific' jurisdiction' and 'general' jurisdiction." Chloe, 2010 WL 3035495, at *3.  Specific jurisdiction applies where a defendant's contacts are related to the litigation, and general jurisdiction applies where they are unrelated. Helicopteros Nacionales de Columbia,, S.A. v. Hall, 466 U.S. 408, 414 n.8, 415 n. 9.  The minimal contact test for general jurisdiction is more stringent than that applicable for the exercise of specific jurisdiction. Metro Life, 84 F.3d at 568. General jurisdiction requires that, at the time of the filing the complaint, the defendant's contacts with the forum rises to the level of being continuos and systematic. Id.  In determining the strength of the contacts, the Court is to examine the totality of the defendant's contacts with the forum over a period of time that is reasonable under the circumstances, up to and including the date the suit was filed. See, Chloe, 2010 WL 3035495, at *4; Porina v. Marward Shipping Co., 521 F.3d 122, 128 (2d Cir.2008) (citation omitted).  In order for general jurisdiction to exist, the defendant must be found to have purposely availed himself of the privilege of conducting activities in the forum. Hanson v. Denckla, 357 U.S. 235, 253 (1958).

Specific jurisdiction, on the other hand, arises where the defendant's forum-related contacts give rise to, or are related to, the claims for which he is being sued. For the exercise of specific jurisdiction, due process requires that "the defendant has 'purposefully directed' his activities at residents of the forum, and the litigation resulted from alleged injuries that 'arise out of or relate to' those activities." Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472 (1985) (internal citations omitted). Specific jurisdiction over a foreign defendant may be exercise "based on his alleged: (1) intentional, tortious actions; (2) which were expressly aimed at the United States; (3) that causes harm, the brunt of which is suffered-and which the defendant knows is likely to be suffered-in the United States; and (4) the injuries that are the subject of the litigation arise from or relate to defendant's subject conduct." Terrorist IV, 2010 WL 2484411, at *15 (citing Calder v. Jones, 465 U.S. 783, 789-90 (1984)); see also Terrorist III, 538 F.3d at 95. For purposes of this litigation, "a defendant's alleged intentional tortious conduct aimed at the United States is conduct that is intended to directly aid in the commission of a terrorist act, with knowledge that the brunt of the injuries will be felt in the United States." Id. at *16. If the subject activities of a particular defendant "are intentionally performed to support some future attack to be planned by al Qaeda against the United States, reasonably anticipating that the brunt of the injuries will be felt there, the defendant need not know that the support provided is specifically for the 9/11 attacks in order to be subject to the exercise of personal jurisdiction." Id. at *17. Simply pleading, in a conclusory manner, that a defendant aided and abetted, acted in concert, or conspired with those responsible for the 9/11 terrorist attacks, is insufficient. The specific factual allegations must demonstrate that the particular defendant himself engaged in wrongful conduct with the intent to directly aid in the commission of a terrorist act against the

7

United States, from which plaintiffs' claimed injuries arise or relate.  Plaintiffs have failed to make the requisite *prima facie* showing that jurisdiction exists over the remaining moving defendants.

## YASSIN KADI

Yassin Kadi is argued to be subject to personal jurisdiction, under general and specific jurisdictional theories.  Plaintiffs allege that Kadi was designated by the United States as a Specially Designated Global Terrorist, based on his support of al Qaeda because "the Albania government had accused Kadi of utilizing business ventures to funnel money to Al Qaeda ..." (Pls.' Consolidated Opp. Mem. at 19).  Plaintiffs further allege that Kadi heads the Saudi-based charity Muwafaq, an al Qaeda front that transfers millions of dollars to the terrorist organization. Kadi allegedly incorporated a branch of Muwafaq in Delaware in 1992, and operated the ostensible charity until 1997.  During that time, Kadi allegedly spent between fifteen and twenty million dollars of his own money on the day to day operations of Muwafaq.  Kadi also allegedly made international donations to suspect charitable organizations in the United States, as well as transferred money to individuals in the United States who, in turn, transferred money in support of domestic terrorism.

Plaintiffs further allege that companies controlled by Kadi have served as a means through which he has invested millions of dollars in companies in the United States.  He also is a director of the Nevada-based company, Global Diamond Resources. Plaintiffs allege that many of the companies, that Kadi is associated with, have their own ties to terrorism.  Plaintiffs further claim that Kadi was involved in real estate investments in Massachusetts and Pennsylvania.  The

8

proffered evidentiary support for plaintiffs' assertion, however, does not demonstrate that Kadi himself owned any real estate in the United States.

Since Kadi is being sued in his individual capacity, he is only subject to general jurisdiction if his own personal contacts with the United States are found to be continuous and systematic. Thus, the United States contacts of charities or companies alleged controlled by Kadi, or in which he served as a director or officer of, cannot be considered in determining whether Kadi himself has sufficient contacts with the United States to justify the exercise of personal jurisdiction over him. See, Terrorist IV, 2010 WL 2484411, at *8 (citations omitted). The totality of Kadi's purported contacts with the United States do not rise to the requisite level of being continuous and systematic, in order to satisfy the stringent general jurisdiction test.

Allegations that Kadi was an officer, investor and/or benefactor of businesses and charities having terrorist ties, is similarly insufficient to confer specific jurisdiction. See, Id. at *19-20. Nor is Kadi's terrorist designation alone sufficient for the acquisition of personal jurisdiction. Judge Casey had observed that, "while perhaps not dispositive on its own, [a defendant's] designation as a terrorist lends substantial weight to Plaintiffs' claims that he purposefully directed his activities at the United States and that the exercise of personal jurisdiction over him comports with due process." Terrorist I, 349 F.Supp.2d at 825. While such a designation may give rise to an inference that defendant provided material support to a foreign terrorist organization, it does not automatically support an inference that the material support was intentionally provided to aid in the commission of a terrorist act expressly aimed at the United States. Plaintiffs' allegations that Kadi is a terrorist financier of several terrorist organizations, including al Qaeda, also does not demonstrate that he purposefully directed his

9

activities at the United States and its residents.

## JAMAL KHALIFA

Jamal Khalifa is argued to be subject to personal jurisdiction, under a specific jurisdictional theory.  Plaintiffs identify Khalifa as a key al Qaeda operative and known terrorist, who is also Osama bin Laden's brother-in-law.  Plaintiffs allege that Khalifa, acting on behalf of al Qaeda, opened an office in Pakistan for the Muslim World League ("MWL").  The MWL, headquartered in Saudi Arabia, is alleged to be an al Qaeda front charity which also served as an umbrella organization for other suspect charities, including defendants Al Haramain Islamic Foundation, the Rabita Trust, World Assembly of Muslim Youth, and the International Islamic Relief Organization ("IIRO").  Khalifa allegedly headed the IIRO branch in the Philippines ("IIRO-Philippines"), using it as a base to plan, launch and finance al Qaeda and international terrorism.  Both Khalifa and the IIRO-Philippines were allegedly generally implicated in the 1993 World Trade Center bombing, the 1995 plot to blow up twelve American airplanes simultaneously, the 1995 plot to assassinate President William Jefferson Clinton, and the 1998 United States embassy bombings in Kenya and Tanzania.

Plaintiffs have failed to demonstrate that Khalifa is subject to personal jurisdiction, under a specific jurisdictional approach.  Plaintiffs do not allege that Khalifa himself played any role in the 9/11 terrorist attacks.  Although plaintiffs allege that Khalifa was a key al Qaeda operative, they do not allege that he any had authority to steward the direction of al Qaeda's terrorist operations. Cf., Morris v. Khadr, 415 F.Supp.2d 1323, 1336 (D.Utah 2006) (finding specific jurisdiction over defendant where "plaintiffs [ ] made a prima facie showing that [defendant]

actively participated in and helped plan al Qaeda's terrorist agenda ..."). The allegations of

Khalifa's involvement in terrorist activities, during the 1990's, are insufficient to demonstrate

that the injuries suffered, on September 11, 2001, are related to or arise from Khalifa's

intentional tortious activities.

## AQEEL AL-AQEEL and SOLIMAN A.S. AL-BUTHE

Plaintiffs argues that both Aqeel Al-Aqeel and Soliman H.S. Al-Buthe's contacts with

the United States are sufficient to confer jurisdiction. Al-Aqeel allegedly served as: (1) Vice

President and Secretary General of defendant Al Haramain Islamic Foundation ("AHIF"), a

purported charitable organization headquartered in Saudi Arabia with branch offices worldwide;

and (2) President of defendant Al Haramain Islamic Foundation, Inc. ("AHIF-USA"), the United

States branch of AHIF based in Oregon. Al-Buthe is allegedly one of the founders of AHIF-

USA, as well as its Treasurer. Plaintiffs claim that all the branches of AHIF are under the same

management and control, including several branches designated as global terrorists. Plaintiffs

allege that AHIF, in conjunction with its branch offices, operate as a fully integrated component

of al Qaeda. Plaintiffs further allege that, in February of 2000, Al-Buthe was indicted for his

purported role in transporting money between the AHIF offices in Oregon and Saudi Arabia, as

part of a purported scheme to divert charitable donations to al Qaeda fighters in Chechnya.

Al-Buthe asserts that he is a resident of Saudi Arabia whose only connection with the

United States was his involvement with AHIF-USA. Al-Aqeel represents that he is a citizen and

resident of Saudi Arabia, and has lived there his entire life. He further avers that he has visited

the United States on one occasion in 2000. (Al Aqeel Aff. ¶ 5). Plaintiffs, however, argue that

11

defendants' assertions are contradicted by AHIF's 1999 reincorporation papers and 1999-2001

tax filings, which all lists the same United States address, in Oregon, for both Al-Buthe and Al-

Aqeel.

Although AHIF-USA identified a United States "address" for Al-Buthe and Al-Aqeel,

the papers, upon which plaintiffs rely, do not indicate that either defendant maintained a

residence in the United States. The identical Oregon address is listed for each of the four officers

of AHIF-USA.  Plaintiffs, nevertheless, maintain that, by engaging in the running of a charity

based in the United States for several years, the defendants are precluded from now claiming that

they are somehow protected from the jurisdiction of United States' courts.  "Simply because

jurisdiction may be exercised over a charity incorporated in the United States does not render its

nonresident officer subject to jurisdiction in his individual capacity ...." Terrorist IV, 2010 WL

2494411, at *9.  Plaintiffs further argue that specific jurisdiction may be exercised over these

defendants based on the allegations that they ran a purported al Qaeda front charity for the

benefit of Osama bin Laden and al Qaeda, in furtherance of international terrorism.  Plaintiffs'

failure to demonstrate that either defendant had any contacts with the United States, outside of

their roles as officers of AHIF-USA, is fatal to the assertion of general jurisdiction over them.


### ABDULLAH NASEEF, SULAMAIN AL-ALI and ADNAN BASHA

Plaintiffs also argue that the remaining moving defendants, (*i.e.*, Naseef, Al-Ali and

Basha), are subject to personal jurisdiction for their connection to a claimed al Qaeda front

charity.  Abdullah Naseef allegedly served as the Secretary-General of the MWL, the purported

parent organization of the IIRO.  He is also alleged to be an officer of the Rabita Trust, a

12

Specially Designated Global Terrorist Entity which also is claimed to operate under the aegis of MWL. Plaintiffs contend that Naseef knowingly provided financial support to al Qaeda, through the MWL, Rabita Trust and the IIRO.[3]

As Secretary-General of the IIRO, defendant Adnan Basha allegedly provided financial support to al Qaeda. Plaintiffs allege that, at some unspecified time, Basha knew and intended that the IIRO provide al Qaeda with six hundred million dollars to fund terrorist camps in Afghanistan. Plaintiffs further alleges that several of the 9/11 hijackers received terrorist training at those camps. Plaintiffs do not, however, allege that the purported financial support was intentionally provided by Basha for the purpose of helping train al Qaeda recruits to commit acts of terrorism against the United States or its nationals.

Sulamain Al-Ali is identified as being a member of IIRO's Executive Committee and the founder of its United States branch. He is also allegedly an officer of defendant Sana-Bell, Inc., the purported United States branch of defendant Sanabel Al-Kheer. Sanabel Al-Kheer was allegedly established to raise funds for IIRO operations. Plaintiffs allege that, in addition to Al-Ali's own significant dubious charitable donations, Al-Ali made several financial investments on behalf of IIRO and Sana-Bell Inc. to provide support to al Qaeda and its charity sponsors.

Plaintiffs argue that defendants Al-Buthe, Al-Aqeel, Naseef, Al-Ali, and Basha are all subject to specific jurisdiction because they allegedly used their offices in purported al Qaeda front organizations to aim their conduct at the United States, by providing material support to al Qaeda, when it was publicly known that al Qaeda was engaged in a global terrorist agenda

---

[3] Plaintiffs also allege that Naseef was an officer of the defunct suspect charity Makkal-al-Mukairamah, Inc.

directed at the United States.  Plaintiffs maintain that no more is required to satisfy due process.

Due process, in fact, requires more.  All those, who allegedly provided material support to the

international terrorist organization al Qaeda, are not subject to the jurisdiction of the American

courts simply by virtue of the United States being identified as one of the primary targets in al

Qaeda's worldwide campaign of terror.  A defendant may be alleged to have devised the means

by which a charity serves as a conduit for al Qaeda, maintained its continued existence as such,

or actually utilized it to channel material support to al Qaeda.  There must be, however,

sufficient allegations that his actions were undertaken with the intent to further al Qaeda's efforts

in causing harm to the United States.  No such inference can automatically be drawn from the

respective pleadings against any of these defendants, and hence they are not subject to the

exercise of specific jurisdiction.

Accordingly, the motions of defendants Kadi, Khalifa, Al-Aqeel, Al-Buthe, Naseef, Al-

Ali and Basha, to dismiss for lack of personal jurisdiction, are granted.

## MOTION TO STRIKE

Related defendants Grove Corporation, Inc., Mar-Jac Investments, Inc., Mena

Corporation, Reston Investments, Inc., Sterling Management Group, Inc., African Muslim

Agency, Heritage Education Trust, International Institute of Islamic Thought ("IIIT"), Safa

Trust, Mohammed Jaghit and Ahmed Totonji have renewed their Rule 12(b)(6) motions to

dismiss the respective claims asserted against them in the Federal Ins. v. Al Qaeda, 03 CV 6978,

complaint.  Rather than responding to the motions on their merits, plaintiffs filed a motion to

strike the renewed motions to dismiss.

14

Plaintiffs argue that, pursuant to a previous Order of Judge Casey, plaintiffs are precluded from renewing their dismissal motions prior to the parties' completion of the jurisdictional discovery Judge Casey authorized.  The initial motions filed by these defendants sought dismissal of the claims asserted in the <u>Federal</u> complaint for both lack of personal jurisdiction and for failure to state a claim, pursuant to Fed.R.Civ.P. 12(b)(2) and (6) respectively.  Judge Casey concluded that jurisdictional discovery was necessary for that court to decide defendants' motions to dismiss for lack of personal jurisdiction.  Judge Casey concluded that such discovery would, as well, aid in his ability to resolve the motions to dismiss for failure to state a claim.  Judge Casey accordingly denied defendants' motions to dismiss, without prejudice to renewing the motions upon the completion of personal jurisdictional discovery.  <u>Terrorist I</u>, 349 F.Supp.2d at 837.  Defendants subsequently withdrew their personal jurisdiction defense, thereby eradicating the need for jurisdictional discovery.

Judge Casey's ruling that the defendants could renew their motions to dismiss, after the completion of the anticipated jurisdictional discovery, was premised on the assumption that the defendants intended to pursue their lack of personal jurisdictional defense.  Having abandoned such a defense and voluntarily submitting to the jurisdiction of the Court, jurisdictional discovery is no longer warranted.  The resolution of a motion to dismiss for failure to state a claim is not dependent on matters disclosed during jurisdictional discovery.  A Rule 12(b)(6) motion tests the sufficiency of the plaintiffs' pleadings.  A defendant is not put to the onerous task of engaging in intrusive and expensive discovery in order to assist a plaintiff in the hopes of uncovering evidence of an actionable wrong, so as to justify the maintenance of the action.  Accordingly, the <u>Federal</u> plaintiffs' motion to strike the renewed motions, is denied.

15

## FAILURE TO STATE A CLAIM

Several defendants have moved, pursuant to Fed.R.Civ.P. 12(b)(6), to dismiss the claims

asserted against them in all of the MDL-related complaints.  To survive a Rule 12(b)(6) motion

to dismiss, the complaint must contain sufficient factual allegations to state a claim for relief that

is plausible on its face.  Ashcroft v. Iqbal, - - U.S. - -, - - , 129 S.Ct. 19337, 1949 (2009)

(*quoting* Bell Atl. Corp. v. Twombly, 550 US 544, 570 (2007)).  "A claim has facial plausibility

when the plaintiff pleads factual content that allows the court to draw the reasonable inference

that the defendant is liable for the misconduct alleged."  Id.  In determining such a motion, the

Court is to consider the allegations pled in the complaint, as well as all documents that are

integral to the complaint.  Halebain v. Berv, 590 F.3d 195, 199 (2d Cir.2009) (citation omitted).[4]

The Court is to accept the factual matters pled in the complaint as true and draw all reasonable

inferences in plaintiffs' favor, unless the allegations are supported by mere conclusory

statements.  Hayden v. Paterson, 594 F.3d 150, 157 n.4 (2d Cir.2010); see also, Burke v. Acosta,

2010 WL 1932052, *1 (2d Cir. May 14, 2010) (*quoting* Shomo v. City of New York, 579 F.3d

176, 183 (2d Cir.2009)).

The requisite pleading standard demands more than the sheer possibility of a defendant's

wrongdoing.  Vaughn v. Air Lines Pilots Ass'n, Int'l, 604 F.3d 703, 709 (2d Cir.2010) (citation

omitted), *aff'd* 2010 WL 1932388 (2d Cir. May 14, 2010).  Plaintiffs cannot plead conclusory

---

[4] Several defendants argue that the allegations pled in plaintiffs' RICO and More
Definite Statements ("MDS"), should not be considered in resolving their Rule 12(b)(6) motions.
The incorporation of the RICO and MDS Statements into plaintiffs' complaint, by reference or
attachment as exhibits, is appropriate.  In any event, if such Statements contain factual
allegations that would remedy a pleading deficiency in the complaint itself, it would be
appropriate to afford plaintiffs an opportunity to amend the complaint to add such additional
allegations.

concerted theories of liability in an effort to attribute the alleged wrongdoing of others to a

particular defendant himself.  Thus, "[b]road allegations of conspiracy are insufficient; the

plaintiff 'must provide some factual basis supporting a meeting of the minds, such that

defendants entered into an agreement, express or tacit, to achieve the unlawful end.' " Arar v.

Ashcroft, 585 F.3d 559, 569 (2d Cir.2009) (quoting Webb v. Goord, 340 F.3d 105, 110 (2d

Cir.2003)).  Where the complaint merely pleads facts giving rise to an inference of a defendant's

possible wrongdoing, the claims against that defendant must be dismissed.  See, Starr v. Sony

BMG Music Entm't, 592 F.3d 314, 321 (2d Cir.2010).

It the context of a MDL litigation, it is generally appropriate for the Court to individually

analyze the sufficiency of the pleadings of each complaint challenged by a particular defendant;

a practice adhered to by Judge Casey.  It is, however, of great significance that there is no

appreciable substantive difference in the factual allegations pled against each of the moving

defendants, in the various complaints in which each is named as a defendant.  As a result of the

parties' earlier duplicative motion practice, in conjunction with Judge Casey's piecemeal initial

resolution thereof, several hundred separately docketed motions remained outstanding when the

MDL litigation was reassigned to this Court.  Many of the pending 12(b)(6) motions, that this

Court must now decide, are by defendants whose similar motions to dismiss other MDL actions,

have already been granted by a different court, utilizing the less stringent pre-Twombly/Iqbal

pleading standard.  To avoid unnecessary repetitiveness, this Court, to the extent appropriate,

analyzes each defendant's individually filed motions to dismiss in light of the pleadings as a

whole, without differentiating between the various complaints for which dismissal is sought.

Unless relevant to motions to be decided, any nondispositive distinction that exists among the

related actions need not be highlighted for purposes of this decision.

The complaints assert federal causes of action under the Anti-Terrorism Act ("ATA"), 18 U.S.C. §2333, the Alien Tort Statute, 28 U.S.C. § 1350, the Torture Victim Protection Act, 28 U.S.C. § 1350 note (a)(1), and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962.  Among the state law claims pled are causes of action for wrongful death and survival, assault and battery, intentional and negligent infliction of emotional harm, trespass, destruction of property, and negligence.  Plaintiffs do not allege that any of the moving defendants are the primary actors responsible for the planning, preparation or execution of the 9/11 terrorist attacks.  It is the alleged intentional provision of material support to sponsor acts of international terrorism that forms the basis upon which plaintiffs seek to impose liability.

Plaintiffs impermissibly attempt to broaden the scope of liability to include those who allegedly aided, abetted, conspired and/or provided material support to other terrorist organizations that were affiliated with al Qaeda.[5]  The complaints specifically identify al Qaeda as the foreign terrorist organization directly responsible for the 9/11 terrorist attacks which caused the claimed injuries suffered by the plaintiffs.  The factual allegations pled, in the complaints, fail to indicate any specific role that some al Qaeda affiliated terrorist organization played, in relation to the September 11th terrorist attacks.  Thus, plaintiffs' theory of liability against these moving defendants is limited to their alleged intentional sponsorship of al Qaeda in

---

[5] Following the holding of a terrorist summit, a declaration was allegedly issued, in February of 1998, announcing the formation of the "International Islamic Front for the Jihad Against Jews and Crusaders," a terrorist entity purportedly comprised of numerous individual terrorist organizations, including al Qaeda.  In support of their RICO claims, plaintiffs alternatively identifies the RICO enterprise as "Radical Muslim Terrorism" and/or al Qaeda and/or International Islamic Front for the Jihad Against Jews and Crusaders.

furtherance of international terrorism, of which the 9/11 attacks were a foreseeable consequence. It is the alleged intentional provision of material support to sponsor al Qaeda's acts of international terrorism that forms the basis upon which the defendants are accused of having acted in concert, aided and abetted, or conspired with the Osama bin Laden, al Qaeda and the 9/11 hijackers.  Hence, the secondary liability-based intentional tort claims (*e.g.*, wrongful death, assault and battery, destruction of property and trespass) cannot survive, if the factual predicate upon which they are based, is itself insufficiently pled in the complaint.

The Anti-Terrorism Act creates a private cause of action to recover for physical and property damages sustained by United States nationals who are the victims of international terrorism.  Because of the Anti-Terrorism Act's limited applicability, a smaller group of plaintiffs seek to utilize the Alien Tort Statute ("ATS") as a means to redress the injuries suffered by 9/11 victims who are foreign nationals.  The ATS bestows subject matter jurisdiction upon the district courts over claims by an alien for violation of a well-defined and universally-accepted rule of international law.  Additionally, the complaints plead federal causes of action for violation of the Torture Victim Protection Act ("TVPA") and for a number of separate RICO violations.  The pleadings in each of the complaints are insufficient to state an ATA, TVPA or RICO cause of action against any of the moving defendants.[6]

----

[6] Since no independent cause of action exists for punitive damages, conspiracy, or aiding and abetting, those purported causes of action are dismissed.  Dismissal is also warranted with regard to the negligence claim. The moving defendants are alleged to have acted knowingly and intentionally in providing material support to al Qaeda. The negligence claim cannot be maintained where, as here, there is no basis to find that these defendants owed a duty to plaintiffs to protected them from the intentional torts committed by others.  Finally, the causes of action for intentional infliction of emotional distress and assault and battery, pled in the Federal complaint, are dismissed as time-barred.  See, N.Y. C.P.L.R. § 215; see also, Ross v. Louise Wise Servs., Inc., 868 N.E.2d 189, 197 (N.Y.2007).

The ATS "'confers federal subject-matter jurisdiction when the following three conditions are satisfied: (1) an alien sues (2) for a tort (3) committed in violation of the law of nations (i.e., international law)." Kadic v. Karadzic, 70 F.3d 232, 238 (2d Cir.1995). "Congress intended the ATS to furnish jurisdiction for a relatively modest set of actions alleging violations of the laws of nations." Sosa v. Alvarez-Machain, 542 U.S. 692, 720 (2004). "An ATS claim may be brought against a non-governmental actor when his tortious acts violate norms of universal concerns that are recognized to extend to the conduct of private parties, such as the hijacking of an aircraft." Terrorist IV, 2010 WL 2484411 at *29 (citing Abdullahi v. Pfizer, Inc., 562 F.3d at 163, 173 (2d Cir.2009) and Vietnam Ass'n for Victims of Agent Orange v. Dow Chemical Co., 517 F.3d 104, 116 (2d Cir.2008)).

Judge Casey previously opined that the ATS "may provide a basis for a concerted action claim of material support by alien-Plaintiffs here." Terrorist I, 349 F.Supp.2d at 826. Simply pleading a concerted theory of liability in conjunction with allegations that a defendant intentionally provided material support to sponsor al Qaeda's acts of international terrorism, will not, however, suffice. Where an ATS claim is pled against a defendant, under a concerted theory of liability, the applicable *mens rea* standard is purpose, rather than knowledge alone. Presbyterian Church of Sudan v. Talisman Energy, Inc., 582 F.3d 244, 259 (2d Cir.2009). Therefore, for the plaintiffs to state a claim for violation of international law under the ATS, the factual allegations pled must support a reasonable inference that the defendant purposefully aided and abetted, conspired with, or materially supported al Qaeda in the commission of an act of terrorism involving the hijacking of a commercial airplane. The allegations respectively pled in each of the complaints fail to support such an inference as to any of the moving defendants.

20

Accordingly, the causes of action separately pled as violations of international law and as violations under the ATS, are dismissed against the moving defendants.

"Unlike the ATS, the TVPA expressly renders liable only those individuals who have committed torture or extrajudicial killing under actual or apparent authority, or color of law, of any foreign nation." Doe v. Constant, 354 Fed.Appx. 543, 546 (2d Cir.2009) (internal quotation marks omitted). "For purposes of the TVPA, an individual 'acts under color of law ... when he acts together with state officials or with significant state aid.' " Khulumani v. Barclay Nat'l Bank, Ltd., 504 F.3d 254, 260 (2d Cir.2007) (quoting Karadzic, 70 F.3d at 245). Although the TVPA limits primary liability to individuals only, a corporation or other entity may be held secondarily liable, under the TVPA, for aiding and abetting the primary individual actor. See, Terrorist IV, 2010 WL 2484411, at *30 (citing Khulumani, supra); cf., Terrorist I, 349 F.Supp.2d at 828 (Judge Casey found that "[o]nly individuals may be sued under the TVPA."). Once again, the allegations pled are insufficient to demonstrate that any of the moving defendants were themselves individuals acting under color of state authority, or that they were acting in concert with such an individual, in the commission of the 9/11 terrorist killings.

Also deficiently pled are the RICO causes of action. To plead a RICO claim, plaintiffs must plead: (1) defendant's violation of a RICO provision; (2) an injury to plaintiffs' business or property; and (3) proximate cause between defendant's violation and plaintiff's injury. Plaintiffs have pled RICO claims for violations of (a), (c) and (d) of § 1962. "Section 1962 of RICO outlaws (a) the use of income 'derived ... from a pattern of racketeering activity' to acquire an interest in, establish, or operate an enterprise engaged in or affecting interstate commerce; (b) the acquisition of any interest in or control of such an enterprise 'through a pattern of racketeering

activity''; (c) the conduct or participation in the conduct of such an enterprise's affairs 'through a pattern of racketeering activity'; and (d) conspiring to do any of the above." GICC Capital Corp. v. Technology Finance Group, Inc., 67 F.3d 463, 465 (2d Cir.1995).

The complaints fail to allege any injury arising from the defendants' investment of the racketeering income, as required to recover under § 1962(a). Nor do the pleadings support a factual finding that any moving defendant took some part in directing the affairs of the al Qaeda enterprise, as is required to recover under § 1962(c). See, Reeves v. Ernst & Young, 507 U.S. 170, 179 (1993). Finally, no factual basis is alleged in any of the complaints that would support a finding of a conscious agreement, among the defendants, to commit two predicate acts in furtherance of the common purpose of the RICO enterprise, as is required to recover under (d). Hecht v. Commerce Clearing Housing, Inc., 897 F.2d 1, 26 n.4 (2d Cir.1990).

## CLAIMS FOR VIOLATION UNDER THE ATA

Defendants maintain that the allegations pled in the respective complaints are insufficient to state a claim under the ATA. The arguments predominantly advanced by the defendants are that plaintiffs rely on mere conclusory statements couched as factual allegations, and that the *mens rea* and proximate cause elements are not made out. The purported failure to sufficiently plead the causation is also the grounds upon which some of the defendants are moving to dismiss for lack of subject matter jurisdiction, pursuant to Fed.R.Civ.P. 12(b)(1).

Section 2333 is the civil provision of the ATA, which provides that "[a]ny national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors or heirs may sue therefore ..." 18 U.S.C. §

22

2333(a).  In addition to other definitional requirements, the phrase "international terrorism" is statutorily defined as activities that involve violent acts or acts dangerous to human life that are prohibited under federal or state criminal law.[7]  The commission of activities that would be violative of the ATA criminal statutes, are deemed to constitute acts of terrorism which can be civilly redressed.  The knowing provision of material support to a designated foreign terrorist organization is criminalized under § 2339B.  "The material-support statute is, on its face, a preventive measure-it criminalizes not terrorist attacks themselves, but aid that makes the attacks more likely to occur."  Holder v. Humanitarian Law Project, - - U.S. - -, 130 S.Ct. 2705, 2728 (2010).  For purposes of § 2333B, the phrase "material support or resources" is statutorily defined as "any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel ..., and transportation, except medicine or religious materials".  § 2339A(b)(1).  "[T]he term 'training' means instruction or

---

[7]  The full statutory definition is as follows:
The term "international terrorism" means activities that- -
(A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State;
(B) appear to be intended- -
    (I)   to intimidate or coerce a civilian population;
    (ii)  to influence the policy of a government by intimidation or coercion; or
    (iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping; and
(C) occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum".
18 U.S.C. § 2331(1)(A-C).

teaching designed to impart a specific skill, as opposed to general knowledge", and the "term 'expert advice or assistance' means advice or assistance derived from scientific, technical or other specialized knowledge." §2339A(b)(2), (3).

To violate §2339B, a person must have knowledge that the organization is a designated terrorist organization or knowledge that the organization has engaged in terrorist activity. See, § 2339B(a)(1). "Congress plainly spoke to the necessary mental state for a [criminal] violation of § 2339B, and it chose knowledge about the organization's connection to terrorism, not specific intent to further the organization's terrorist activities." Humanitarian Law Project, 130 S.Ct. at 2717.

A defendant cannot be held secondarily liable, under § 2333, for the material support provided by others to a designated foreign terrorist organization. Boim v. Holy Land Found. for Relief and Dev., 549 F.3d 685, 689-90 (7th Cir.2008) ("Boim II"). Because only primary liability is available, "the ordinary tort requirements relating to fault, state of mind, causation, and foreseeabilty must [also] be satisfied ..." Id. 692. Traditional tort elements are incorporated within § 2333 itself, to wit: "breach of a duty (i.e., committing an act of international terrorism); injury to the person, property or business of another; and causation (injured 'by reason of')." Boim v. Quranic Literacy Inst. & Holy Land Foun. for Relief & Dev., 291 F.3d 1000, 1010 (7th Cir. 2002) ("Boim I").

To make out the breach of duty element, plaintiffs must plead factual allegations demonstrating that the defendant provided material support or resources to an organization that commits terrorist acts. It is of no import whether such material support was provided directly or indirectly to the terrorist organization. The intricate and circuitous means of transmitting funds

and other material support to al Qaeda is a necessary and fully anticipated ploy to defy the

detection of federal, state and international officials.  Such activity is specifically intended to

circumvent the banking laws intentionally enacted to thwart the financing of terrorism.  The

labyrinthine means by which al Qaeda receives material support will not act as a shield to protect

the providers of such support from liability.  Plaintiffs must, however, plead sufficient factual

allegations to show that a defendant knew, or had reason to believe, that the intermediate entities

or persons, would transfer to, or expend the financial or other material support provided by

defendant, on behalf of, or at the direction of, al Qaeda.  Intentionally channeling funds or other

material support through various intermediaries, with knowledge that the final and intended

recipient is the terrorist organization al Qaeda, exposes the initial donor and each of the knowing

intermediary actors to potential liability for their own conduct of providing material support to a

foreign designated terrorist organization.

A defendant must either know that the recipient of the material support provided by him

is an organization that engages in terrorist acts, or defendant must be deliberately indifferent to

whether or not the organization does so, *i.e.*, defendant knows there is a substantial probability

that the organization engages in terrorism, but does not care.   Boim II, 549 F.3d at 693.

"Foreign organizations that engage in terrorist activity are so tainted by their criminal conduct

that *any contribution to such an organization* facilitates that conduct."  Humanitarian Law

Project, 130 S.Ct. 2724 (emphasis in original) (quotation marks and alterations omitted).

Providing material support to fund a terrorist organization's non-terrorist activities, merely

"frees up other resources within the organization that may be put to violent ends."  Id. at *20.  It

is, therefore, wholly foreseeable that a terrorist organization could use any material support

25

provided to it as part of a broader strategy to promote terrorism. Those who knowingly or with deliberate indifference provide material support to a terrorist organization, regardless of their benign stated purpose for doing so, assume the risk that the support provided will be used by terrorists to commit violent terrorist acts.

The traditional causation element applicable is slightly modified in a § 2333 claim against alleged terrorist financiers.  See, Boim II, 549 F.3d at 697-88.  While there must be a causal connection between the defendant's provision of material support and plaintiffs' injuries, there need not be a direct relationship.  Thus, for pleadings purposes, plaintiffs are not required to plead factual allegations to demonstrate that the alleged material support provided by the defendant was the proximate cause of plaintiffs' claimed injuries.  Where the allegations pled demonstrate that there is a temporal proximity between the material support provided and the terrorist act which caused plaintiffs' injuries, it may be reasonable to infer that the recently provided material support made it more likely that the terrorist act would occur.  Where, however, there is a remoteness in time, there must be sufficient factual allegations of a connection between the material support provided and the acts of terrorism that caused plaintiffs' injuries, such that a reasonable trier of fact could conclude that it was more likely than not that the support provided by the defendant assisted the terrorists in the commission of the terrorist act.

## BANCA DEL GOTTARDO

Defendant Banca Del Gottardo ("BDG") is a Switzerland-based bank that is alleged to have provided al Qaeda with material support in the form of banking services.  Plaintiffs fail to

plead any factual allegations in support of such an accusation.  Rather, they rely on a 2004 newspaper article which reported, in a conclusory manner, that BDG moved money for al Qaeda via al Taqwa bank, a purported shell that operated through correspondent accounts at a BDG branch in Nassau.  Plaintiffs allege that al Taqwa bank has been sanctioned by the United States and the United Nations for funding al Qaeda and other terrorist activities.  Plaintiffs further allege that BDG handled payments for the "money network" of Iraqi leader Saddam Hussein, who himself maintained a bank account at BDG in the name of "Satan account."  Plaintiffs assert that "[t]here have been links to support Saddam's funding of the Al Qaeda."  (BDG MDS ¶ 24).

A bank cannot be held labile for the injuries sustained by an act of terrorism simply because the monies that funded the violent act passed through the bank itself, or one of its correspondent banking accounts, during the performance of routine banking services.  <u>See</u>, <u>Terrorist IV</u>, 2010 WL 2484411, at *25.  A bank cannot be held liable for the wrongdoing of its patron based solely on the allegations that the patron utilized the banking and financial services offered to all bank customers.  <u>See</u>, <u>Lerner v. Fleet Bank, N.A.</u>, 459 F.3d 273, 286 (2d Cir.2006); <u>see also</u>, <u>Stutts v. De Dietrich Group</u>, 2006 WL 1867060 (E.D.N.Y. 2006) (finding bank did not engage in international terrorist by issuing letters of credit to weapons suppliers for Hussein's Iraqi regime.).  Accordingly, BDG's Rule 12(b)(6) motion is granted.

## COUNCIL ON AMERICAN-ISLAMIC RELATIONS

The allegations pled against defendants Council on American-Islamic Relations and Council on American-Islamic Relations-Canada (collectively "CAIR") are also insufficient, and

warrant the granting of their motion to dismiss.[8]  Although CAIR purports to operate as a

Muslim civil rights and advocacy organization, plaintiffs allege that CAIR is an outgrowth of the

terrorist organization Hamas.  Plaintiffs claim that CAIR's true purpose is to legitimize the

activities of Islamic militants and neutralize opposition to Islamic extremism, and thereby serve

as "perception management" in support of al Qaeda.  Plaintiffs allege that, by engaging in

"PSYOPS" (psychological operations), "disinformation activities," and propaganda campaigns,

the CAIR organizations manipulate the legal systems of the United States and Canada in a

manner that allows them to marginalize opposition to radical Islamic terrorist groups, silencing

critics, analysts, commentators, media organizations, and government officials.  Plaintiffs further

allege that, in the years preceding the 9/11 attack, "these organizations were very effective in

helping to ensure that North American law enforcement and intelligence officials were

sufficiently deaf, dumb and blind to help pave the way for the attacks on the United States."

(O'Neill v. Al Baraka 2d Am. Compl. ¶ 88).

Defendant purportedly operates in furtherance of the goals and objectives of Hamas.

Merely because the services, defendants allegedly provide, are beneficial to terrorist

organizations generally who share the same radical religious and ideological views as Hamas,

does not expose defendants to liability for any act of terrorism committed by another one of

those organizations.  Nor is there any basis to infer a causal connection between the defendants'

alleged wrongdoing and the 9/11 terrorist attacks.  The hijacking of passenger-filled airplanes to

serve as weapons of destruction, razing prominent landmarks populated with innocent civilians,

---

[8] Although the Notice of Motion identifies only defendant Council on American-Islamic Relations as the movant, it is apparent, from the moving papers of the respective parties, that the motion to dismiss was filed on behalf of both CAIR defendants.

28

did not occur because the United States and its citizenry had been desensitized into complacency as a result of the alleged propaganda, disinformation and psychological operations attributable to the CAIR defendants.

## WORLD ASSEMBLY OF MUSLIM YOUTH

Defendant World Assembly of Muslim Youth ("WAMY"), is alleged to be an al Qaeda front charity, headquartered in Saudi Arabia, which has a physical and operational presence in at least fifty-six countries.  Plaintiffs allege that, for more than a decade WAMY has knowingly and intentionally used its international infrastructure as a tool to provide support to al Qaeda. Plaintiffs allege that WAMY disseminates literature worldwide calculated to promote global jihadist agenda, convince young Muslims to reject United States and democratic ideas, demonize Christians, Jews and non-Wahhabi Muslims, and convince young Muslims to engage in violent jihad against the West and Israel.  WAMY allegedly uses its publications, youth camps, Islamic Centers, mosques conferences and other sponsored events, to provide ideological foundation for the al Qaeda movement, actively advocating for young Muslims to take up arms and engage in a violent jihad against the United States.  Plaintiffs allege that WAMY has also supported the militant and terrorist activities of al Qaeda in Bosnia, Chechnya, Kosova, Kashmir, Pakistan, South East Asia, the United States, and elsewhere.  Acting on behalf of al Qaeda, WAMY has allegedly raised and laundered funds, performed reconnaissance missions, funded and facilitated al Qaeda training camps, and operated as a recruiting center.

Plaintiffs allege that WAMY had a physical presence in the United States, which it used to channel material support to al Qaeda.  In 1992, Osama bin Laden's nephew allegedly

established, in Virginia, the United States branch of WAMY, defendant World Assembly of Muslim Youth International ("WAMY-Int'l"). Plaintiffs further allege that, in 2002, federal authorities raided the offices of WAMY-Int'l in Virginia, in connection with an ongoing investigation into the sponsoring of al Qaeda.

Notwithstanding defendants' arguments to the contrary, the *mens rea* and causation elements are sufficiently pled against both WAMY and WAMY-Int'l. Defendants further argue that the activities, of which plaintiffs complain, fall within the constitutionally protected activities of free speech and to free association. The ATA does not prohibit mere association with a foreign terrorist organization, nor is it intended to abridge First Amendment rights. See, Humanitarian Law Project, 130 S.Ct. at 2728, 2730-31. One is free to espouse support for a foreign terrorist organization, and to engage in independent advocacy as a means to sway others into adopting one's pro-terrorist point of view. Establishing meeting places, holding public forums, or issuing publications to disseminate virulent rhetoric is not actionable, under § 2333, unless such services are being provided as support to a foreign terrorist organizations. The allegations pled against the WAMY defendants are sufficient to demonstrate that they are knowingly and intentionally providing material support to al Qaeda.

### AHIF and PEROUZ SEDAGHATY

AHIF is a purported charitable organization, headquartered in Saudi Arabia, which operated through its branch offices in nearly fifty countries. Plaintiffs allege that AHIF and its branch offices are under a single management, and are so intertwined so as to be deemed to be operating as a single entity. AHIF's website allegedly had a direct link to al Qaeda's site

30

pertaining to its Chechen operations.  Additionally, AHIF was allegedly banned from Kenya for

national security concerns related to the 1998 United States embassy bombings in Africa.

Intelligence officials throughout the world have allegedly acknowledged that AHIF is a charity

front which exploits its non-profit status for the benefit of Osama bin Laden and al Qaeda.

Several of its branches have been designated as terrorist organizations, including its branch in

the United States, AHIF-USA.  Defendant Perouz Sedaghaty purportedly was a founder of

AHIF-USA, and served as its Secretary.

        AHIF, AHIF-USA and Sedaghaty all argue that causation is inadequately pled.

However, the allegations pled against these defendants is sufficient to make out the requisite

element of causation.  AHIF-USA  further argues that the alleged wrongdoing of AHIF cannot

be imputed to it based merely on plaintiffs' conclusory assertion that AHIF-USA and AHIF are

one and the same.[9]  Such an argument is of no consequence because the allegations pertaining

specifically to AHIF-USA are themselves sufficient to state a § 2333 claim against it.  Similarly

unavailing is Sedaghaty's argument that dismissal is warranted because plaintiffs failed to plead

any allegations that he had control over, knowledge of, or participation in the activities of AHIF,

or any of its branches.  Plaintiffs' allegations that Sedaghaty was indicted, in 2000, for his

purported role in a scheme to divert charitable donations to al Qaeda fighters in Chechnya, is

sufficient to demonstrate his control over funds in the charity, as well as his knowledge and

---

        [9] Prior to the actions being consolidated by the MDL panel, Judge James Robertson,
sitting in the District of Columbia, denied AHIF-USA's motion to dismiss.  Notwithstanding the
fact that AHIF-USA had "fervently dispute[d] the allegation that it is one and the same as Al-
Haramain [AHIF]", Judge Robertson found that such a "dispute [ ] is a factual one, to be sorted
out in discovery, and with a motion for summary judgment, but not on a motion to dismiss under
Rule 12(b)(6)."  Burnett v. Al Baraka Inv. & Dev. Corp., 274 F.Supp.2d 86, 104 n.11
(D.D.C.2003)

participation in using the charity as a vehicle to provide material support to al Qaeda.[10]

## DAR AL-MAAL-AL-ISLAMI TRUST

Defendant  Dar Al-Maal-Al-Islami Trust ("DMI Trust") is alleged to be part of a network

of financial institutions that provide money laundering, and financial and banking services on

behalf of al Qaeda.  Plaintiffs allege that DMI Trust knowingly maintained accounts for al Qaeda

front charities, including AHIF, thereby facilitating the funding of al Qaeda.  Defendant is also

alleged to have actively sponsored al Qaeda through the actions undertaken by its purported

subsidiaries.  Mere allegations that defendant provided routine banking services, and of wrongful

conduct committed by independent subsidiaries, are insufficient to subject DIM Trust to liability

in this litigation.  Its motions to dismiss are, therefore, granted.

## SANABEL AL-KHEER

Sanabel Al-Kheer was established by IIRO to engage in fund-raising and make

investments designed to support the purported charitable operations of IIRO.  IIRO allegedly

---

[10] Sedaghaty and AHIF-USA's motions to dismiss for lack of personal jurisdiction, are premised upon their erroneous contention that the pleadings failed to state a § 2333 cause of action against them.  Such a claimed failure would have precluded plaintiffs from availing themselves of the nationwide service of process provision, which confers personal jurisdiction over a properly served defendant.  Since neither AHIF-USA nor Sedaghaty contend that they were improperly served, their motions to dismiss for want of personal jurisdiction, are denied. AHIF's motion to dismiss, pursuant to Fed.R.Civ.P. 12(b)(5), for ineffective service of process, is also denied.  The Court finds that the form of substitute service, authorized by Judge Casey, met the due process requirements of being  reasonably calculated, under the circumstances, to provide AHIF with notice of the pendency of the action against it and afford defendant an opportunity to defend.  See, Securities & Exch. Comm'n v. Tome, 833 F.2d 1086, 1093 (2d Cir.1987) (*quoting* Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950)).

distributes less than thirty percent (30%) of its funds for charitable works, with the rest being used to purchase weapons by and for al Qaeda.  Sanabel Al-Kheer solicited donations through full-page advertisements identifying bank account numbers, in order to facilitate the collection of donations purportedly earmarked to help the needy.  Over a period of years, IIRO and Sanabel Al-Kheer jointly held numerous high profile fund-raising events.  Their joint efforts proved to be so successful as to net a one day total of over SR29 million, of which SR12 million was transferred by Sanabel Al-Kheer to IIRO to underwrite its operations in the Balkans.  In addition to its fund-raising, Sanabel Al-Kheer's global investments had allegedly returned SR425 million in profits by the start of 1997.

The allegations are sufficient to demonstrate that Sanabel Al-Kheer served to generate and infuse al Qaeda front IIRO with the financial capital necessary to underwrite its terrorist operations.   The allegations pled also support a finding that Sanabel Al-Kheer worked together with IIRO to raise a wealth of financial support for al Qaeda, to sponsor the organization's terrorist activities. Accordingly, Sanabel Al-Kheer's Rule 12(b)(6) motion to dismiss is denied.

### SALEH KAMEL and AL-BARAKA

Dismissal is, however, warranted as to defendants Saleh Kamel, Al-Baraka Investment and Development Corporation ("ABIDC"), and Dallah Al Baraka L.L.C. ("DAB").  Plaintiffs allege that Kamel is a principal fiancier of al Qaeda, who has made substantial contributions to numerous charities operating within al Qaeda's infrastructure, with full knowledge that those funds would support terrorist activities.  Kamel is purportedly a co-founder of United States-based Sana-Bell, Inc., which was allegedly established by Sanabel Al-Kheer to generate funds

33

for, and funnel funds to, the United States arm of IIRO.  ABIDC was allegedly founded, by its

Chairman Kamel, to serve as a central financial clearing house for Islamic terrorist groups.

Plaintiffs allege that Kamel also founded and heads DAB, whose wholly owned subsidiary

ABIDC operates as its financial arm.

      Plaintiffs allege that, while Osama bin Laden was in the Sudan during the early 1990's,

defendants provided him with funding, banking services and the financial infrastructure that he

used to establish al Qaeda training camps, train terrorists, and carry out terrorist attacks against

the United States. The United States had not even been targeted by al Qaeda, when the claimed

wrongdoing occurred. Thus, the alleged provision of material support is too remote from the

9/11 terrorist attacks to establish the requisite causal connection.  It is also too attenuated to hold

DAB liable for material support provided to the 9/11 hijackers, by an employee of one of its

subsidiaries.  This Court previously found that the alleged culpable acts of that employee could

not even be imputed to the subsidiary itself.  Terrorist IV, 2010 WL 2484411, at *21.  Similarly

unavailing is plaintiffs' attempt to hold defendants liable for the alleged terrorist-related

activities of entities in which they were investors.  Nor can ABIDC be subjected to liability for

its alleged performance of routine banking services for purported al Qaeda charities.  Finally, in

pleading factual allegations to support their conclusory assertion that Kamel is a key al Qaeda

financier, plaintiffs rely on evidence that has previously been rejected as having no evidentiary

value.  See, Id. at *18.

34

## ISLAMIC ASSEMBLY OF NORTH AMERICA and SAMI AL-HUSSAYEN

Defendant Islamic Assembly of North America ("IANA") identifies itself as a Michigan-based non-profit group which promotes and teaches Islam and Islamic values in the United States and Canada.  Plaintiffs maintains that it is an al Qaeda front charity.  Plaintiffs allege that, "[i]n order to achieve its goal of promoting the spread of fundamentalist Islam, IANA and its officers have spent large sums of money on sponsoring extremist political conferences held inside the United States, publishing websites, books, and magazines written by radical anti-American ... clerics, and by obtaining controlling stakes in a number of prominent American mosques."  (IANA MDS ¶ 19).  IANA allegedly relied on Sami al-Hussayen for funding and internet development services. Plaintiffs allege that al-Hussayen maintained bank accounts, in the United States, to receive donations and large sums of money for others, including al Qaeda affiliated charities such as IANA.  Plaintiffs further allege that the monies, transferred to IANA by al-Hussayen, were used to fund IANA operations and to support jihad and the al Qaeda network.

From 1999 to 2003, al-Hussayen allegedly functioned as an employee and official of IANA.  He provided expert computer services, advice, assistance, and support to IANA in the form of website registration, administration and maintenance.  Plaintiffs allege that "IANA and Sami al-Hussayen created and managed numerous websites that exhibited a fundamentalist Islamic trait and incited violence against the West in a manner consistent with al-Qaeda's ideology and rhetoric.  (Id. ¶ 40).  Plaintiffs allege that, by purportedly publishing al Qaeda's spiritual leaders' statements online, "IANA is supporting al-Qaeda's efforts to indoctrinate and incite followers worldwide."  (Id. ¶ 48).  Al-Hussayen is alleged to have provided material

support to al Qaeda by: (1) promoting and distributing statements issued by al Qaeda's spiritual leaders; and (2)through the collection of donations in bank accounts he maintained.

The allegations pled against IANA are insufficient, and accordingly its motion to dismiss is granted.  Any form of material support furnished "**to**" a foreign terrorist organization may give rise to liability under § 2333.  See, Humanitarian Law Project, 130 S.Ct. at 2725.  Plaintiffs, however, contend that IANA publishes the clerics' statements on their website as a means of achieving its own goal to promote the spread of fundamentalist Islam.  IANA cannot be found to have provided material support to al Qaeda, based on allegations that it engaged in independent activities on its own behalf, which also advanced the goals and objectives of al Qaeda.

The pleadings similarly fail to demonstrate that al-Hussayen's role in the publication of the clerics' statements was a service he performed as material support for al Qaeda itself.  Nor have plaintiffs pled factual allegations to support their conclusory assertion that al-Hussayen's bank accounts are used as a financial conduit for al Qaeda affiliated charities.  Although the pleadings demonstrate that al-Hussayen maintained bank accounts on behalf of IANA, they do not demonstrate that IANA is an al Qaeda affiliated charity.  Accordingly, al-Hussayen's motions to dismiss are granted.

## SAAR NETWORK DEFENDANTS

The remaining moving defendants are individuals and entities, who are alleged to be part of a network that operates on behalf of al Qaeda, which plaintiffs refer to as the SAAR

Network.[11] Plaintiffs allege the SAAR Network is comprised of approximately a hundred interrelated charities, think tanks, investment firms and related companies. It was purportedly established in the 1980's, to generate and surreptitiously transfer funds to terrorist organizations, including al Qaeda. The network entities are allegedly related through shared management, and many identify the same address as their office, but few maintain a physical presence there. Plaintiffs allege that the entities jointly operate as a fully integrated component of al Qaeda's logistical and financial support infrastructure. They allegedly launder money for al Qaeda by engaging in multiple monetary transactions among themselves, designed to disguise the true nature of the transaction and the ultimate disposition of the funds. Plaintiffs identify three specific examples of alleged multi-layered monetary transactions, occurring in 1996, 1998 and 2000; transactions that plaintiffs contend bear all the hallmarks of money laundering in support of terrorism. Plaintiffs allege that the transfer of monies, in 1998 and 2000, could not be further traced once it was transferred to a shell company located on the Isle of Man. Plaintiffs further allege that, in March of 2002, federal authorities raided the Virginia offices of the SAAR-Network entities, and residences of many of their officials. The raids were allegedly prompted by information that SAAR Network funds had been transferred to designated terrorists Yousef Nada and Ahmed Idis Nasreldin.

---

[11] The remaining moving defendants, who plaintiffs identify as "SAAR Network Entities," are: (1) Aradi, Inc.; (2) Grove Corporate, Inc.; (3) Mar-Jac Investments, Inc.; (4) Mar-Jac Poultry, Inc.; (5) Mena Corporation; (6) Reston Investments, Inc.; (7) Sterling Management Group, Inc.; (8) Sterling Charitable Gift Fund; (9) African Muslim Agency; (10) Heritage Education Trust; (11) IIIT; (12) Safa Trust; and (13) York Foundation. The remaining moving defendants, who are identified as "SAAR Network Executives," are: (1) Yaqub M. Mirza; (2) Muhammad Ashraf; (3) M. Omar Ashraf; (4) Iqbal Yunus; (5) Ahmed Totonji; (6) Mohammed Jaghlit; (7) Samir Salah; (8) Taha Al Alwani; and (9) Jamal Barzinji.

An attribution of wrongdoing is not factually pled.  Plaintiffs merely plead conclusory assertions against a large group of defendants, whom plaintiffs have independently concluded to be related and operating in unison.  None of the defendants can be held liable based on such allegations alone.  The requisite additional factual allegations are pled against Jamal Barzinji alone.  Accordingly, with the exception of defendant Barzinji, the Rule 12(b)(6) motions filed by remaining defendants denominated as SAAR Network entities and executives, are granted.

## JAMAL BARZINJI

Judge Casey determined the additional allegation pled, in the <u>Federal</u> complaint, concerning Jamal Barzinji's purported relationship with the terrorist Nada, was a sufficient basis upon which to denied Barzinji's Rule 12(b)(6) motion.  Barzinji maintains that Judge Casey was misled to believe that a business relationship presently existed, notwithstanding the allegations in other complaints that they only previously had such a relationship.  Following Judge Casey's ruling, the other complaints were amended to add the additional allegation and to harmonize any conflicting ones.

Barzinji seeks to have the amendments struck, and the claims dismissed pursuant to Fed.R.Civ.P. 12(b)(6).  His motions are denied.  As evidence that Judge Casey had erred, Barzinji cites to contradictory allegations in other complaints, but does not affirmatively represent what, if any, relationship exist between himself and Nada.  Whether there is a relationship and, if so, its true nature, are matters appropriate for discovery, and should be the subject of a summary judgment motion, not a motion to dismiss for failure to state a claim.

## CONCLUSION

Defendant Al Haramain Islamic Foundation, Inc.'s eight individually filed motions to dismiss the complaint, pursuant to Fed.R.Civ.P. 12(b)(2), for lack of personal jurisdiction, are all denied.

Defendant Perouz Sedaghaty's seven individually filed motions to dismiss the complaint, pursuant to Fed.R.Civ.P. 12(b)(2), for lack of personal jurisdiction, are all denied.

Defendant World Assembly of Muslim Youth's six individually filed motions to dismiss the complaint, pursuant to Fed.R.Civ.P. 12(b)(6), for failure to state a claim, are all denied.

Defendant World Assembly of Muslim Youth International's six individually filed motions to dismiss the complaint, pursuant to Fed.R.Civ.P. 12(b)(6), are all denied.

Defendant Perouz Sedaghaty's seven individually filed motions to dismiss the complaint, pursuant to Fed.R.Civ.P. 12(b)(6), for failure to state a claim, are all denied.

Defendant Jamal Barzinji's five individually filed motions to dismiss the complaint, pursuant to Fed.R.Civ.P. 12(b)(6), are all denied.

Defendant Al Haramain Islamic Foundation, Inc.'s eight individually filed motions to dismiss the complaint, pursuant to Fed.R.Civ.P. 12(b)(6), for failure to state a claim, are all denied.

Defendant Al Haramain Islamic Foundation's motion to dismiss the complaint, pursuant to Fed.R.Civ.P. 12(b)(6), for failure to state a claim, is denied.

Defendant Sanabel Al-Kheer's two individually filed motions to dismiss the complaint, pursuant to Fed.R.Civ.P. 12(b)(6), are both denied.

Defendant Al Haramain Islamic Foundation's motion to dismiss the complaint, pursuant

to Fed.R.Civ.P. 12(b)(5), for insufficiency of service, is denied.

The Federal plaintiffs' motion to strike the renewed motions, is denied.

All motions to dismiss by the other remaining moving defendants herein, are granted.[12]


Dated:  New York, New York
        September 13, 2010


                                    SO ORDERED:

                                    _George B. Daniels_
                                    GEORGE B. DANIELS
                                    United States District Judge


---

[12] Defendants granted dismissal are deceased defendant Prince al Faisal Bin Abdulaziz al Saud, Al-Ali, Al-Aqeel, Dar Al-Mal-Al-Islami Trust, Kadi, Al-Barakas, Khalifa, Islamic Assembly of North America, Al-Hussayen, Basha, Banca Del Gottardo, Al-Buthe, Kamel, Councils on American-Islamic Relations, Naseef; and SAAR Networks entities/individuals.

40