**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (GBD) ECF Case |
|---|---|

*This document relates to:  All Cases*

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO THE RENEWED MOTION TO DISMISS OF DEFENDANT SAUDI BINLADIN GROUP**

THE MDL 1570 PLAINTIFFS'
EXECUTIVE COMMITTEES
November 18, 2010

<u>TABLE OF CONTENTS</u>

I.    PLAINTIFFS HAVE ESTABLISHED SPECIFIC JURISDICTION ................................. 2

    A.  Plaintiff's Burden ................................................................................................. 3

    B.  The Law of Specific Jurisdiction ................................................................... 5

    C.  NCB's Deliberate Targeting of the United States Subjects it to Personal Jurisdiction
        in the United States in Connection with the September 11 Terrorist Attacks .............. 10

II.   PLAINTIFFS' FACTUAL AVERMENT IS SUFFICIENT TO MAKE A PRIMA
      FACIE SHOWING THAT SBG HAS MAINTAINED "CONTINUOUS AND
      SYSTEMATIC" CONTACTS WITH THE UNITED STATES SUCH THAT IT IS
      SUBJECT TO GENERAL JURISDICTION.................................................................. 17

    A.  SBG Is Subject To Jurisdiction Based On The Totally Of Its Activities In The
        United States, Regardless Of Whether Or Not It Maintained A Physical Presence
        At The Time The Complaint Was Filed ..................................................................... 18

    B.  The Totality of SBG's Activities in the United States Is Sufficient to Subject it to
        General Jurisdiction ............................................................................................... 19

        1.  SBG Has Continuously Operated within the U.S. Through its U.S.-Based
            Employee. ........................................................................................................ 20

        2.  SBG, USA's Presence and Activities In the U.S. Are Attributable to SBG. ........... 27

        3.  The Contacts Represented By Activity of Other SBG Representatives Traveling
            to the U.S. for SBG Business Must Be Considered As Part of the Totality of
            Circumstances Amounting to Minimum Contacts.................................................. 30

III.  SBG'S 12(B)(6) MOTION MUST BE DENIED .............................................................. 32

IV.   CONCLUSION................................................................................................................... 35

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*American Assoc. of Cruise Passengers v. Cunard Line, Ltd.*,
    691 F. Supp. 379 (D.D.C. 1987) ................................................................................26

*Armco Steel Co., L.P. v. CSX Corp.*,
    790 F.Supp. 311 (D.D.C. 1991) ................................................................................26

*Ashcroft v. Iqbal*,
    129 S. Ct. 1937 (2009) ......................................................................................... 32-34

*Ball v. Metallurgie Hoboken-Overpelt, S.A.*,
    902 F.2d 194 (2d Cir. 1990) .......................................................................3, 4, 5, 17

*Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*,
    171 F.3d 779 (2d Cir.1999) ........................................................................................3

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ..................................................................................................32

*Boim v. Holy Land Found. for Relief & Dev.*,
    549 F.3d 685 (7th Cir. 2008) (*en banc*) ....................................................................9

*Burger King Corp. v. Rudzewicz*,
    471 U.S. 462 (1985) ..........................................................................................2, 6, 18

*Burke v. Acosta*,
    2010 U.S. App. LEXIS 9914, 2010 WL 1932052 (2d Cir. May 14, 2010) ...........33

*Calder v. Jones*,
    465 U.S. 783, 789, 104 S. Ct. 1482, 79 L. Ed. 2d 804 (1984) ...................... passim

*Chew v. Dietrich*,
    143 F.3d 24 (2d Cir. 1998) ........................................................................... passim

*Cutco Industries Inc. v. Naughton*,
    806 F.2d 361 (2d Cir. 1986) ..................................................................................4, 5

*D. Klein & Son, Inc. v. Good Decision, Inc.*,
    No. 04-1994, 2005 U.S. App. LEXIS 2764 (2d Cir. Feb. 15, 2005) .....................28

*Daliberti v. Republic of Iraq*,
    97 F. Supp. 2d 38 (D.D.C. 2000) ......................................................................... 8-9

*Davis v. Blige*,
    505 F.3d 90 (2d Cir. 2007)............................................................................4

*Devaney v. Chester*,
    813 F.2d 566 (2d Cir. 1987)........................................................................32

*Gandler v. Nazarov*,
    1995 U.S. Dist. LEXIS 8325 (S.D.N.Y. 1995)........................................4, 5

*Halebian v. Berv*,
    590 F.3d 195 (2d Cir.2009).........................................................................33

*Hayden v. Paterson*,
    594 F.3d 150 (2d Cir.2010).........................................................................33

*Hearst Corp. v. Goldberger*,
    1997 U.S. Dist. LEXIS 2065 (S.D.N.Y. 1997)............................................4

*Helicopteros Nacionales de Colombia, S.A. v. Hall*,
    466 U.S. 408 (1984))............................................................................6, 18

*In re Magnetic Audiotape Antitrust Litig.*,
    334 F.3d 204 (2d Cir. 2003).........................................................................5

*In re Terrorist Attacks on Sept. 11, 2001*,
    2010 U.S. Dist. LEXIS 69371 (S.D.N.Y. June 16, 2010)..........................27

*In re Terrorist Attacks on September 11, 2001*,
    2010 U.S. Dist. LEXIS 96597 (S.D.N.Y. Sept. 13, 2010).................... 33-34

*Int'l Shoe Co. v. Washington*,
    326 U.S. 310, 316 (1945)........................................................................6, 7

*Keeton v. Hustler Magazine, Inc.*,
    465 U.S. 770 (1984)....................................................................................6

*Kiobel v. Royal Dutch Petroleum Co.*,
    2009 U.S. Dist. LEXIS 106798 at n. 8 (S.D.N.Y. Nov. 13, 2009) ............4

*Manning v. Utils. Mut. Ins. Co.*,
    254 F.3d 387 (2d Cir. 2001)........................................................................32

*Mastafa v. Australian Wheat Bd. Ltd.*,
    2008 U.S. Dist. LEXIS 73305 (S.D.N.Y. Sept. 25, 2008).........................33

*Metro. Life Ins. Co. v. Robertson-Ceco Corp.*,
    84 F.3d 560 (2d Cir.1996)...........................................................3, 4, 5, 18

*Morris v. Khadr*,
   415 F. Supp. 2d 1323 (D. Utah 2006)..................................................................8

*Mwani v. Bin Laden*,
   417 F.3d 1 (D.C. Cir. 2005) .................................................................................8

*Pension Committee of the Univ. of Montreal Pension Plan v. Banc of America Sec., LLC*,
   2006 WL 708470, No. 05 Civ. 9016-SAS, * 5 (S.D.N.Y. Mar. 20, 2006)............18

*Perez v. Time Moving & Storage, Inc.*,
   2009 U.S. Dist. LEXIS 17065 (S.D.N.Y. Jan. 15, 2009).......................................33

*Pfaff v. Denver Art Museum*,
   1995 U.S. Dist. LEXIS 8573 (S.D.N.Y. June 20, 1995)........................................27

*Philadelphia Hous. Auth. V. Am. Radiator & Std. Sanitary Corp.*,
   309 F. Supp. 1053 (E.D. Pa 1969) ......................................................................26

*Ponte v. Universal City Dev. Partners, LTD.*,
   2008 U.S. Dist. LEXIS 3528 (S.D.N.Y. Jan. 15, 2008)................................7, 8, 17

*Provident Nat'l Bank v. California Fed. Savings & Loan*,
   819 F.2d 434 (3d Cir. 1987)................................................................................18

*Pugh v. Socialist Peoples Libyan Arab Jamahiriya*,
   290 F. Supp. 2d 54 (D.D.C. 2003) .......................................................................8

*S.W.B. New Eng., Inc. v. R.A.B. Food Group, LLC*,
   2008 U.S. Dist. LEXIS 14892 (S.D.N.Y. Feb. 27, 2008).......................................33

*Shomo v. City of New York*,
   579 F.3d 176 (2d Cir.2009)) ...............................................................................33

*United States v. Montreal Trust Co.*,
   358 F.2d 239 (2d Cir 1966)..................................................................................4

*Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.*,
   751 F.2d 117 (2d Cir. 1984)...........................................................................4, 28

*World-Wide Volkswagen Corp. v. Woodson*,
   444 U.S. 286 (1980) .............................................................................................6

## OTHER AUTHORITIES

U.S. Constitution, Amendment V ..............................................................2, 20, 26

Fed. R. Civ. P. 12(b)(2)............................................................................................3

Fed. R. Civ. P. 12(b)(6)..........................................................................................32

Fed. R. Civ. P. 15(a) ...................................................................................................................32

Fed. R. Civ. P. 56 ...................................................................................................................3, 4

By 1988, Osama bin Laden had established his jihadist army.  In 1990, he delivered a fiery speech at his family's mosque in Jeddah announcing that "[The Americans] won't stop until we do jihad against them."  In 1992 and 1993 that jihad began with deadly strikes against American interests in Yemen and Somalia, attacks to which he was soon connected in public.

During all this time, Osama bin Laden remained a shareholder and principal of Saudi Binladin Group, one of the largest engineering and construction companies in the Arab world. According to the 9/11 Commission's *Monograph on Terrorist Financing*, SBG continued to support Osama with approximately $1,000,000 per year – or at least $5 million in all – as Osama built al Qaeda and both he and SBG performed lucrative construction work for Hassan al-Turabi's National Islamic Front regime in Sudan. While SBG claims to have cut off ties with Osama starting in 1993, the contradictory state of its own evidence on the question strongly implies that SBG support remained flowing to Osama through his brother Ghaleb, to whom Osama's shares were transferred, until the sums attributed to Osama were finally monetized and placed into an account in 2000.  Such facts, taken as a whole, are more than sufficient to provide for specific jurisdiction over SBG in the United States, and SBG's motion to dismiss on such grounds must be denied.

In the meantime, SBG's business activities in the United States both support a finding of specific jurisdiction and are sufficient in and of themselves to subject SBG to general jurisdiction.  For more than 17 years, SBG has engaged in business activities in the United States coordinated through its one-person Maryland office outside of the nation's Capitol and through its employee, Fuad Rihani, who has worked for SBG in the U.S. from a home-based office established and supported by SBG.  From at least 1993 until as late as December 2000, SBG maintained an office in Maryland and coordinated its U.S. activities directly from that office. When SBG closed that office, SBG continued to coordinate its activities in the U.S. through its

single remaining employee physically present in the United States.  SBG's activities in the

United States  in the relevant time period included business activities performed in the United

States by an individual working for SBG in the United States, using facilities paid for and

supported by SBG; as well as business activities in the United States performed by SBG's U.S.-

based subsidiary to promote, facilitate, and track SBG business with U.S. business interests.

Together, the physical presence of SBG employees and their activities represent "systematic and

continuous" contacts to meet the "minimum contacts" threshold of the Fifth Amendment, and

SBG's motion to dismiss on such grounds must be denied.

Finally, for the reasons set forth herein, SBG's 12(b)(6) arguments lack merit as well.

## I.       PLAINTIFFS HAVE ESTABLISHED SPECIFIC JURISDICTION

Plaintiffs have jurisdiction over SBG based on a specific jurisdiction theory.  Specific

jurisdiction is found and due process satisfied where "the defendant has 'purposefully directed'

his activities at residents of the forum, and the litigation resulted from alleged injuries that `arise

out of or relate to' those activities."  *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985).

First, this section reviews the law regarding specific jurisdiction to confirm that SBG is

properly before this Court. The following section of the memorandum of law reviews the two

key areas demonstrating SBG's knowing, intentional support of al Qaeda and the bin Laden's

brother, Osama: paying him millions of dollars for years after SBG knew he was building an

organization to carry out jihad against the United States, working with him in the Sudan while he

built al Qaeda, and returning to him the rewards of SBG's growth long after he was allegedly

disassociated from the company based on his anti-American terrorist activities.  It further

clarifies that Osama's alleged disassociation from SBG was based on anti-American terrorist

efforts, not anti-Saudi beliefs, and confirms that he was not cut off from SBG as thoroughly as

SBG has claimed.

A.      **Plaintiff's Burden**

Given that this Court did allow for limited jurisdictional discovery, Plaintiffs' burden is

to make a *prima facie* showing of jurisdiction:

> After discovery, the plaintiff's *prima facie* showing, necessary to
> defeat a jurisdiction testing motion, must include an averment of
> facts that, if credited by the trier, would suffice to establish
> jurisdiction over the defendant. . . .  At that point, the *prima facie*
> showing must be factually supported.

*Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990).  (citations

omitted).  See also *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 784

(2d Cir.1999). Thus, the primary difference between a pre-discovery jurisdictional motion and a

post-discovery motion is that, after jurisdictional discovery, plaintiffs must provide factual support

for their *prima facie* case, rather than relying solely on allegations.  The Court may then assess that

factual showing in one of three ways:

> Where the jurisdictional issue is in dispute, the plaintiff's averment
> of jurisdictional facts will normally be met in one of three ways: (1)
> by a Rule 12(b)(2) motion, which assumes the truth of the plaintiff's
> factual allegations for purposes of the motion and challenges their
> sufficiency, (2) by a Rule 56 motion, which asserts that there are
> undisputed facts demonstrating the absence of jurisdiction, or (3) by
> a request for an adjudication of disputed jurisdictional facts, either at
> a hearing on the issue of jurisdiction or in the course of trial on the
> merits.

*Id.* Moreover,

> If the defendant is content to challenge only the sufficiency of the
> plaintiff's factual allegation, in effect demurring by filing a Rule
> 12(b)(2) motion, *the plaintiff need persuade the court only that its
> factual allegations constitute a* prima facie *showing of jurisdiction.*

*Id.* (emphasis added).  In this circumstance, moreover, the court must "credit [plaintiff's]

averments of jurisdictional facts as true."  *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d

560, 567 (2d Cir. 1996)  Even if SBG had styled its motion under Rule 56 – which it did not –

this Court could not weigh Plaintiffs' evidence against SBG and require Plaintiffs to prevail by a

preponderance of the evidence.  Rather, a Rule 56 motion would assert that there are no disputed

facts pertaining to jurisdiction; if the Court found the jurisdictional facts to be *undisputed*, it

could grant a motion for summary judgment under Rule 56 only if it found the undisputed facts

to be insufficient as a matter of law to sustain a finding of personal jurisdiction. *See* Fed. R. Civ.

P. 56; *Davis v. Blige*, 505 F.3d 90, 97 (2d Cir. 2007) (summary judgment only appropriate where

there are no genuine issues of material fact).

      Such a weighing can only take place in the context of an evidentiary hearing, which may

be required here.  SBG generally avers that Plaintiffs "do not have, and never had, any

admissible evidence to support the allegations against SBG."  Mot. to Dismiss at 6.  "Where a

defendant contests the plaintiff's factual allegations, an evidentiary hearing is required, at which

point a plaintiff must prove the existence of jurisdiction by a preponderance of the evidence."

*Kiobel v. Royal Dutch Petroleum Co.*, 2009 U.S. Dist. LEXIS 106798, *12 at n. 8 (S.D.N.Y.

Nov. 13, 2009), citing *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567 (2d

Cir.1996).  As the Second Circuit noted twenty years ago, "If the defendant contests the

plaintiff's factual allegations, then a hearing is required, at which the plaintiff must prove the

existence of jurisdiction by a preponderance of the evidence."  *Ball*, 902 F.2d at 197, citing

*Cutco Industries Inc. v. Naughton*, 806 F.2d 361, 365 (2d Cir. 1986); *Volkswagenwerk

Aktiengesellschaft v. Beech Aircraft Corp.*, 751 F.2d 117, 120 (2d Cir. 1984); *United States v.

Montreal Trust Co.*, 358 F.2d 239, 242 n. 4 (2d Cir.), cert. denied, 384 U.S. 919, 16 L. Ed. 2d

440, 86 S. Ct. 1366 (1966)).  See, similarly, *Hearst Corp. v. Goldberger*, 1997 U.S. Dist. LEXIS

2065, * 21 (S.D.N.Y. 1997) ("The dispositive jurisdictional facts, however, are undisputed, and

thus a jurisdictional hearing is not necessary.")[1]

---

[1]    As Judge Haight reasoned through these issues in *Gandler v. Nazarov*, 1995 U.S. Dist.
LEXIS 8325 (S.D.N.Y. 1995):

*(cont'd next page …)*

If the Court holds an evidentiary hearing, then it may require Plaintiffs to prove the existence of jurisdiction by a preponderance of the evidence.  *Ball*, 902 F.2d at 197; *see also In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 206 (2d Cir. 2003) ("Where plaintiff has engaged in jurisdictional discovery, but no evidentiary hearing was conducted, 'the plaintiff's *prima facie* showing, necessary to defeat a jurisdiction testing motion, must include an averment of facts that, if credited . . . would suffice to establish jurisdiction over the defendant'"); *Metro. Life*, 84 F.3d at 567 (same); *Cutco Industries* at 365 ("until an evidentiary hearing is held, [a plaintiff] need make only a *prima facie* showing by its pleadings and affidavits that jurisdiction exists.").

### B.    The Law of Specific Jurisdiction

Plaintiffs maintain that as a foreign corporation, SBG lacks the protections of the Due Process clause under the United States Constitution.[2]

---

No party has suggested the proper procedural course to be taken here, as both appear to believe that they are entitled to relief based on the pleadings and accompanying affidavits. The Court, however, has found that no side is entitled to prevail at this stage. Plaintiffs have shown at least that they are entitled to an evidentiary hearing: the forum selection clause serving as the basis of personal jurisdiction is prima facie valid, and plaintiffs have alleged facts, which if believed, support the contention  that the clause does not suffer from any kind of contractual invalidity. Plaintiffs have thus made out a prima facie case that personal jurisdiction exists, such that judgment for defendant at this stage of the case is precluded. Defendant has attempted to rebut the prima facie case by disputing certain material allegations made by plaintiffs. Based on this showing, I have concluded that viewing the facts in a light most favorable to defendant, personal jurisdiction in this case may not exist. Thus, judgment for plaintiffs at this stage of the case is also precluded.

Given the foregoing, it is necessary to hold an evidentiary hearing in order to resolve those factual disputes material to a determination of whether personal jurisdiction over defendant may properly be asserted.

*Id.* at *25-26.

[2]    This argument was stated in full in Section II-B of Plaintiffs' Memorandum of Law in Opposition to Renewed Motion to Dismiss of Defendant National Commercial Bank for Lack of Personal Jurisdiction, and is incorporated by reference herein.  This Court has already held that

*(cont'd next page …)*

Even if SBG is entitled to invoke the protections of the Due Process clause, Plaintiffs' factual allegations and evidence are sufficient to make a *prima facie* showing that SBG has established "minimum contacts" with the United States such that it should "reasonably anticipate being haled into court" here with respect to the activities that gave rise to those contacts. *See World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980). Plaintiffs allege that SBG directed its conduct at the United States by sponsoring al Qaeda via direct support of SBG shareholder and principal Osama bin Laden long after being aware that al Qaeda was planning terrorist attacks against the United States. The legal sufficiency of these allegations is the question that should be resolved by this Court – whether the conduct Plaintiffs allege, assuming it is proven, is sufficient, as a matter of law, to meet the requirements of due process. Under prior case law, as well as under *Terrorist Attacks III*, these allegations satisfy the due process requirements for specific jurisdiction.

It is plaintiffs' burden to demonstrate that SBG has "certain minimum contacts with [the United States] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).

Among the activities which can satisfy this fair warning requirement is if the defendant "has 'purposefully directed' his activities at residents of the forum, and the litigation results from alleged injuries that 'arise out of or relate to' those activities." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472-73 (1985) (*quoting Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774 (1984) and *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984)). Put differently, personal jurisdiction is proper where the defendant took "intentional,

---

Rule 4(k) provides a statutory basis for jurisdiction, and thus the analysis presented herein focuses solely on whether SBG's contacts with the United States as a whole satisfy Due Process.

and allegedly tortious, actions . . . expressly aimed" at the forum state. *Calder v. Jones*, 465 U.S. 783, 789, 104 S. Ct. 1482, 79 L. Ed. 2d 804 (1984).

Under Second Circuit precedent, the test for whether a cause of action arises out of or relates to a given defendant's conduct directed at the forum is judged on a sliding scale in order to determine "whether the exercise of personal jurisdiction in a particular case does or does not offend 'traditional notions of fair play and substantial justice.'" *Chew v. Dietrich*, 143 F.3d 24, 29 (2d Cir. 1998) quoting *Int'l Shoe*, 326 U.S. 310 at 316.   If the defendant's several jurisdictional ties to the forum state are more limited, "it may be appropriate to say that he will be subject to suit in that state only if the plaintiff's injury was proximately caused by those contacts." *Id.*   However, at the same time,

> Where the defendant's contacts with the jurisdiction that relate to the cause of action are more substantial, however, it is not unreasonable to say that the defendant is subject to personal jurisdiction even though the acts within the state are not the proximate cause of the plaintiff's injury.

*Id.*   As further elaborated upon, this Circuit's test allows for specific jurisdiction if the defendant has substantial contacts with the forum – even if not at a level sufficient to establish general jurisdiction – and in such cases "the court may accept a more attenuated relation between the defendant's contacts with the forum and the plaintiff's cause of action." *Ponte v. Universal City Dev. Partners, LTD.*, 2008 U.S. Dist. LEXIS 3528, *36-37 (S.D.N.Y. Jan. 15, 2008).[3]   In *Ponte*, for example, specific jurisdiction was found over the operator of a kiosk at Universal Studios Orlando which had sold the New York-based plaintiff a tainted trinket because the company had purchased a third of its inventory from New York vendors – even though the item

---

[3]     Pursuant to this authority, SBG's general jurisdictional contacts as outlined in Section II-B must be considered in relation to the specific jurisdiction analysis, and serve to lower the causal relationship required to sustain jurisdiction under *Calder*.

in question in this lawsuit was likely sourced from a Pennsylvania vendor instead and its New

York contacts.  *Id.*  And in analysis analogous to the reasoning offered in the *Boim* case, the

court found the fact that the defendant engaged in *some* activity directed at the jurisdiction

(inventory stocking in *Ponte*, material support for terrorism in this case) enabled it to commit the

specific tort at issue:

> In other words, but for Ray-Art's New York-derived inventory,
> Plaintiffs may not have shopped at the kiosk in question. And, as a
> result of this activity in New York, Ray-Art could have anticipated
> becoming a party in New York courts, either as a defendant or as a
> plaintiff. Thus, while Ray-Art's contacts with the forum may be
> only broadly related to the instant cause of action, this broad
> relation is sufficient to satisfy the constitutional requirement of
> "fair play and substantial justice."

*Id.* at *40. In keeping with the foregoing standards, federal courts have consistently

upheld the exercise of jurisdiction over foreign terrorists and terror sponsors who target the

United States. *See Morris v. Khadr*, 415 F. Supp. 2d 1323, 1335-36 (D. Utah 2006) (where

defendant "provided substantial financial support and personnel assistance to help [al Qaeda]

achieve its international terrorism objectives," court found the case to be a "textbook example[]"

of personal jurisdiction under *Calder's* effects test, "even when a defendant did not personally

participate in the attack itself"); *Mwani v. Bin Laden*, 417 F.3d 1, 12-13 (D.C. Cir. 2005)

(personal jurisdiction exists over individuals who participate in a "conspiracy to attack the

United States, with overt acts occurring within this country's borders"; those who "engage[] in

unabashedly malignant actions directed at [and] felt in this forum" should "reasonably anticipate

being haled into court" here);  *Pugh v. Socialist Peoples Libyan Arab Jamahiriya*, 290 F. Supp.

2d 54, 59 (D.D.C. 2003) (individuals who "conspired" to commit acts of terrorism against

foreigners in Africa could "expect they might be haled into the courts of those nations whose

citizens would die"); *Daliberti v. Republic of Iraq*, 97 F. Supp. 2d 38, 53-54 (D.D.C. 2000)

(those who "sponsor terrorism [have] been given adequate warning that terrorist acts against the

United States citizens, no matter where they occur, may subject them to suit in the United States courts").[4]

As Plaintiffs' allegations make clear, SBG principals provided material support directly to Osama for years, even after his announced jihadist plans against America in a series of statements between 1988 and 1992, of which SBG was expressly aware.  Unlike other defendants in this litigation whose ties to and knowledge of Osama bin Laden were more indirect, the strong, direct familial ties between SBG's principals and their half-brother Osama placed them on notice as early as 1988 and absolutely no later than 1990 that any funds going to Osama were supporting a growing anti-American terrorist organization which by 1992 had brought future 9/11 Attack mastermind Khalid Sheikh Mohammed into its fold.  This support was neither remote nor attenuated, given the nature of terrorism.  *See Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 695-700 (7th Cir. 2008) (*en banc*).  Given SBG's substantial general jurisdictional contacts with the United States as detailed in Section II-B of this brief as well as the accompanying Statement of Facts, the jurisdictional significance of even attenuated or limited support of Osama bin Laden is enhanced under the *Calder* test.  *See Chew*, 143 F.3d at 29.

It is clear that SBG did not fully separate itself from Osama in 1994 as it has claimed, even after significant alarm and concern had been raised by the Saudi government.  Its decision to continue doing so creates sufficient reasonable inference that SBG directly and intentionally

---

[4] In addition, the United States Government has strongly advanced its view that personal jurisdiction is satisfied where plaintiffs have presented allegations sufficient to make plausible the claim that a defendant's contributions of support, whether direct or indirect, were made with knowledge that those contributions would be used to support terrorism, or with reckless disregard for that potentiality.  See Section III-B of Plaintiffs' Memorandum of Law in Opposition to Renewed Motion to Dismiss of Defendant National Commercial Bank for Lack of Personal Jurisdiction, which is incorporated as though fully set forth herein.

provided material support to al Qaeda in aid of al Qaeda's plan to commit an aggressive terrorist strike against the United States, with knowledge that the United States and its residents would likely bear the brunt of the resulting injuries. The pervasiveness and intentional nature of SBG's support for Osama bin Laden and al Qaeda following all the warnings about and direct knowledge of his anti-American designs, coupled with SBG's extensive general jurisdictional contacts with the United States, compel the conclusion that the relationship between this support and the 9/11 Attack is sufficient to satisfy the constitutional requirement of "fair play and substantial justice," thus confirming specific jurisdiction.

### C.   NCB's Deliberate Targeting of the United States Subjects it to Personal Jurisdiction in the United States in Connection with the September 11 Terrorist Attacks

In keeping with the foregoing standards, plaintiffs have satisfied their *prima facie* burden to demonstrate that SBG purposefully directed its conduct at the United States, and should reasonably anticipate being haled into court here to respond to claims arising from the September 11th Attacks. Critically, SBG is not alleged to have been an ignorant participant in the indirect funding of al Qaeda. Rather, plaintiffs have alleged and offered evidence[5] that SBG maintained

---

[5] Plaintiffs' allegations are set forth in their Complaints filed on September 30, 2005. Those Complaints incorporated RICO Statements and More Definite Statements as to SBG, Abdullah bin Laden, Bakr bin Laden, Tarek bin Laden, Omar bin Laden and the Mohammed Bin Laden Organization, all of which bear directly on the jurisdictional analysis. For purposes of sustaining their threshold prima facie burden as to the specific jurisdiction theories, plaintiffs have supplemented their allegations with extrinsic evidence. The submission of those materials does not impact the prima facie standard of review.

Given the voluminous nature of the relevant allegations and documentary materials, plaintiffs have submitted a Summary of Allegations, Facts and Evidence in Support of Plaintiffs' Showing of Specific Jurisdiction as to SBG, for the Court's convenience which is incorporated herein by reference. The Summary of Allegations, Facts and Evidence is Exhibit "A" to the Affirmation of Adam C. Bonin Transmitting Documents and Evidence in Support of Plaintiffs' Opposition to the Renewed Motion to Dismiss of SBG.

a close and direct relationship with Osama bin Laden and knowingly provided him with material support for the purpose of enabling al Qaeda to wage jihad against the United States.

As noted, the facts in full, along with supporting sources, are contained in the attached Summary of Allegations, Facts and Evidence in Support of Plaintiffs' Showing of Specific Jurisdiction as to Saudi Binladin Group.  They demonstrate as follows:

**SBG, Osama bin Laden and the Sudan**.  Osama's jihadist activities in founding al Qaeda as the war in Afghanistan was winding down in late 1988 were fully supporting by his family members with contributions of money and construction equipment, used to build the infrastructure for training and sheltering the mujahideen fighters.  By 1989, he had told Saudi Prince Turki of his plans to "form a group that will, in their view, protect Muslim interests throughout the world as they identified themselves," with plans in early 1990 to send his mujahideen into battle against the government of Yemen.  Within months, he offered the Saudi royal family his ability to form and lead an army of 30,000 mujahideen to defeat Saddam Hussein.  As such, Prince Turki noted, "We were pretty much aware of bin Laden from the very beginning."[6]  Osama was an active member of the bin Laden family business during all this time, and continued that involvement upon his 1991 move to Sudan at the invitation of radical leader Hassan al-Turabi and his National Islamic Front, where Osama established numerous businesses to provide income for al Qaida's operations which worked with SBG on such projects as the Port Sudan Airport.

During Osama's three years in Sudan after having fled the Kingdom of Saudi Arabia, he remained a full part of SBG while operating training camps for terrorists under the protection of

---

[6]     It is reasonable to infer, given the close Binladin family ties to the regime and their mutual interest in dissuading Osama from his jihadist plans, that any such information possessed by Prince Turki was shared with SBG principals to inform their efforts to shape Osama's thinking.

al-Turabi and the NIF.  His work force grew to include militant Afghan war veterans seeking to avoid a return to their own countries, where most stood accused of subservice and terrorist activities.  During that same period, by its own admission SBG itself had a major involvement in construction and development projects in Sudan partnering with OBL's hosts, al-Turabi and the NIF.

This period in Sudan was critical to al Qaeda's development into a global organization capable of carrying out sophisticated attacks like those of September 11, 2001.  As the 9/11 Commission noted, thanks to Osama's time in Sudan:

> [Osama] Bin Ladin now had a vision of himself as head of an international jihad confederation. In Sudan, he established an "Islamic Army Shura" that was to serve as the coordinating body for the consortium of terrorist groups with which he was forging alliances. It was composed of his own al Qaeda Shura together with leaders or representatives of terrorist organizations that were still independent. In building this Islamic army, he enlisted groups from Saudi Arabia, Egypt, Jordan, Lebanon, Iraq, Oman, Algeria, Libya, Tunisia, Morocco, Somalia, and Eritrea. Al Qaeda also established cooperative but less formal relationships with other extremist groups from these same countries; from the African states of Chad, Mali, Niger, Nigeria, and Uganda; and from the Southeast Asian states of Burma, Thailand, Malaysia, and Indonesia. Bin Ladin maintained connections in the Bosnian conflict as well.  The groundwork for a true global terrorist network was being laid.

This network is what brought terrorist operators like Khalid Sheikh Mohammed in league with al Qaeda, with the 9/11 Commission noting that by this time "There were also rootless but experienced operatives, such as Ramzi Yousef and Khalid Sheikh Mohammed, who … were traveling around the world and joining in projects that were supported by or linked to Bin Ladin, the Blind Sheikh, or their associates."    Summary at ¶¶ 1-22.

**Development of Osama's Anti-American Views.**  The facts make clear that it was Osama's *anti-American* views which led to his ostracism from SBG and the Kingdom, not anti-

Saudi views *per se*.  Because of this, SBG's claims lack credibility that they had no reason to know of his intention to attack America until after it had allegedly severed ties with Osama.  By 1989, Osama's mujahideen army was created with global jihadist intentions.  In 1990, Osama spoke after evening prayers to an audience of hundreds at his family's own mosque in Jeddah, vowing "The Americans won't stop their support of Jews in Palestine until we give them a lot of blows.  They won't stop until we do jihad against them."   He send 4,000 mujahideen to Afghanistan for training that year as well, and offered the Saudi royal family to send an army of 30,000 to battle Saddam Hussein in Kuwait.  The next year, both Osama and SBG partnered with the radical al-Turabi regiment in Sudan and SBG was well aware of their brother's growing empire.

By 1992, Osama bin Laden and other senior al Qaeda leadership issued a formal *fatwah* specifically calling for jihad against the United States and other Western allies, marking the point by which SBG and others were on full notice that any support provided to Osama would inevitably support a violent attack against the United States.  Indeed, this Court has previously deemed behavior at least as far back as 1992 to be relevant as to liability:

> Plaintiffs maintain that discovery, pertaining to years prior to 1996, is directly relevant to their claims that those defendants aided and abetted, conspired with, and materially supported al Qaeda after it "was established in 1988 or earlier." Defendants contend that matters pre-dating 1998, or at the earliest 1996, are irrelevant because defendants were not put on notice of al Qaeda's terrorist activities towards the United States until Osama bin Laden's 1996 fatwah declaring war on Americans. Defendants further argue that the discovery sought is overly burdensome and outweighs any minimal benefit to plaintiffs.
>
> **Given the nature of the claims and defenses, the appropriate temporal scope of discovery should reasonably begin in 1992. 1992 is the year prior to the 1993 attacks against the United States, and the year when it is alleged that Osama bin Laden and other senior al Qaeda leadership issued a formal fatwah, specifically calling for jihad against the United States and**

**other Western allies.** If, after receipt and review of such discovery, plaintiffs can demonstrate that further pre-1992 discovery is warranted, such an application may be made to the Court, upon a specific showing of relevance as to a particular issue and defendant.

The objections asserted by these defendants to all pre-1996 discovery are hereby struck, to the extent that the defendants are directed to respond to plaintiffs' requests for discovery relating back to the period beginning in 1992.

Order of December 21, 2007.  Indeed, in 1993 Osama refused to partake in an Islamist petition drive as "he didn't want any conflict with the Saudi government,"  and the official Saudi statement accompanying the revocation of his citizenship does not at all refer to anti-Saudi activities but instead implies anti-foreign activities.  Indeed, Osama has stated that his hatred of America began when U.S. warships protected the Israelis invading Lebanon in 1982.

The 1990 stationing of US troops in the Kingdom as a result of Iraq's invasion of Kuwait was the last straw for Osama – as he made clear via public and private calls for jihad against the United States -- which in turn deeply inconvenienced SBG which had signed very lucrative contracts to provide infrastructure services to the US military stationed in the Kingdom. Meanwhile, Osama sponsored his first successful terrorist attack in December 1992 with the attempted bombing of United States military personnel staying in a hotel in Aden, Yemen where troops often stayed en route to Somalia, which by the next spring was publicly attributed to him internationally via the New York Times.  So, too, were subsequent anti-American terrorist attacks in Somalia.

These known anti-American terrorist activities and publicly stated jihadist commitments, not anti-Saudi beliefs, were what forced SBG to publicly proclaim its separation from Osama after having provided him about $1 million annually from 1970 to 1993.   Moreover, this separation was not voluntary.  As the 9/11 Commission's Monograph on Terrorism Financing stated clearly:

> **In 1994 the Saudi government forced the Bin Ladin family to find a buyer for Usama's share of the family company** and to place the proceeds into a frozen account. The Saudi freeze had the effect of divesting Bin Ladin of what would otherwise have been a $300 million fortune.

Summary at ¶¶ 23-55.

**SBG's Continuing Support of Osama Despite Alleged Divestment:** Osama bin Laden remained an SBG principal and shareholder from its founding, after the organization of his global jihadist army in 1988, after his speech announcing "[The Americans] won't stop until we do jihad against them" at his family mosque in 1990, after his terrorist strikes against the United States in Yemen and Somalia. While SBG claims that it had wholly severed financial ties with Osama starting in 1993, prior to any inkling that he harbored anti-American sentiment (already disproven above) and that such severance was complete, totally and effective, the facts are decidedly otherwise. In fact, SBG directors and Bin Laden family members kept a financial lifeline open to Osama throughout the decade leading into the September 11 Attack long after being well aware of his terrorist intent towards America.

The 9/11 Commission's staff *Monograph on Terrorist Financing* makes clear as an initial matter that any such steps only occurred because of pressure from the Saudi government to separate from someone who had increasingly become a public problem, especially given how much work SBG and its predecessors had done with the Saudi government for decades. The SBG resolution does not reflect an involuntary divestment of one already shunned by the family; it states that Osama was "represented by his lawful attorney" who "wishes" and "desired" to assign his shares to his brother Ghaleb. Such shares in question were never finally 'monetized' by the Supervisory Board until April 2000 when $9.8 million was placed into a trust account at the National Commercial Bank.

In the meantime, the multiple discrepancies in SBG's accounting for what happened to Osama's shares suggest that Ghaleb Binladin, "caretaker" of the shares, invested in preferred al

15

Qaeda conduit Bank al Taqwa and provided Osama with direct material support via the funds.
Summary at ¶¶ 46-86.

**SBG's Continuing Contacts With Osama Bin Laden:** Beyond the material support,
SBG principals maintained contact with Osama via personal visits, letters, telephone calls, and
via intermediaries during the years this Court has deemed relevant given the public nature of his
support for anti-American terrorism.

# REDACTED

Indeed, as United States counterterrorism director Richard
Clarke recalled, a 1998 visit to the Kingdom of Saudi Arabia from Treasury official Richard
Newcomb was frustrating precisely because of these continuing ties:

> Despite Saudi promises to provide additional information and
> support, little was forthcoming in the months after the visit[s]. The
> Saudis **protested [the] focus on continuing contacts between
> Usama and his wealthy, influential family, who were supposed
> to have broken all ties with him years before.** "How can we tell
> a mother not to call her son?" [the Saudis] asked.

Richard A. Clarke, *Against All Enemies* 195 (2004) (emphasis added). Summary at ¶¶ 87-
91.

Consistent with the views expressed in the United States Amicus, such intentional actions
are expressly aimed at the United States and satisfy *Calder's* effect test.  *See* United States Amicus
at 18, quoting *Calder*, 465 U.S. at 789 ("[i]t does not matter … that the individual defendant is not
'able to control' the means by which the tortious injury is caused in the foreign jurisdiction, as long
as he acted with the 'kn[owledge] that the brunt of th[e] injury' from his tortious act 'would be felt'
in the foreign forum.").  It is likewise irrelevant whether SBG's contributions to Osama bin Laden
and al Qaeda are characterized as "direct" or "indirect," given its awareness since 1992 that its
support would advance al Qaeda's jihad against the United States.   Accordingly, plaintiffs have

met their prima facie burden relative to their theories of personal jurisdiction, and SBG's Renewed

Motion to Dismiss must be denied on this additional ground.

II.     **PLAINTIFFS' FACTUAL AVERMENT IS SUFFICIENT TO MAKE A PRIMA
        FACIE SHOWING THAT SBG HAS MAINTAINED "CONTINUOUS AND
        SYSTEMATIC" CONTACTS WITH THE UNITED STATES SUCH THAT IT IS
        SUBJECT TO GENERAL JURISDICTION**

With respect to general jurisdiction, Plaintiffs present a "Factual Averment," as

envisioned in *Ball*. *See* 902 F.2d at 197.[7]   Accompanying this Factual Averment is evidence

supporting each of the assertions contained therein. In the absence of a factual challenge to this

Averment, this Court must accept it as true. *Id*. Plaintiffs' Factual Averment and the evidence

accompanying it establish, first, that SBG is subject to general jurisdiction in the United States

because of its systematic and continuous activities here, and second, that these general

jurisdiction contacts, separately and in their totality, must be considered in the Court's specific

jurisdiction analysis under prevailing Second Circuit law.  *Chew v. Dietrich*, 143 F.3d 24, 29 (2d

Cir. 1998); *Ponte v. Universal City Dev. Partners, LTD.*, 2008 U.S. Dist. LEXIS 3528, *36-37

(S.D.N.Y. Jan. 15, 2008).

---

[7] Plaintiffs' Factual Averment is Exhibit A to the Affirmation of Robert T. Haefele Transmitting
Documents and Evidence in Support of Plaintiffs' Opposition to the Renewed Motion to Dismiss
of SBG, which is incorporated herein by reference. The exhibits to the Factual Averment are
identified in and attached to the Attorney Declaration appended to the Factual Averment, and
cited herein as "Factual Averment, ¶ ___, Exhs. ____."

**A.     SBG Is Subject To Jurisdiction Based On The Totally Of Its Activities In The United States, Regardless Of Whether Or Not It Maintained A Physical Presence At The Time The Complaint Was Filed**

To satisfy the requirements of "minimum contacts" for the assertion of general jurisdiction, a defendant's contacts must be "continuous and systematic." *Helicopteros*, 415-16; *Metro. Life*, 84 F.3d at 568. Lack of actual physical presence in the forum at the time the complaint is filed is not a bar to the exercise of personal jurisdiction over a defendant. *Burger King*, 471 U.S. at 476; *Pension Committee of the Univ. of Montreal Pension Plan v. Banc of America Sec., LLC*, 2006 WL 708470, No. 05 Civ. 9016-SAS, * 5 (S.D.N.Y. Mar. 20, 2006).

In *Pension Committee of the Univ. of Montreal*, the court determined that general jurisdiction was possible notwithstanding that the defendant had no physical presence in the forum, never maintained any offices in the forum, never owned or leased property, maintained a telephone listing or bank account, paid taxes, or had a license to do business in the forum. In assessing the defendant's "systematic and continuous" activities, the court considered the defendant's business activities by which defendant derived revenue from the forum, commenting that "revenue derived from the forum can be a persuasive factor in establishing the minimum contacts required for the exercise of general jurisdiction." *Id*. at * 5. *See also Metro. Life*, 84 F.3d at 573 (explaining that the defendant's four million dollars in sales in the forum over six years was one factor making the exercise of general jurisdiction permissible); *Provident Nat'l Bank v. California Fed. Savings & Loan*, 819 F.2d 434, 436 (3d Cir. 1987) (bank that "maintained no Pennsylvania office, employees, agents, mailing address, or telephone number" and "had not applied to do business in Pennsylvania, did no advertising in Pennsylvania, and paid no taxes there" was subject to general jurisdiction in Pennsylvania based on miniscule percentage of

depositors who were Pennsylvania residents, use of Pennsylvania loan servicers, and maintenance of a "controlled disbursement account" with a Pennsylvania bank).

Applying these standards to SBG, taken collectively, the activities engaged in on behalf of SBG creating contacts in the United States were neither irregular nor casual – but were systematic and continuous throughout the years in question.

### B.    The Totality of SBG's Activities in the United States Is Sufficient to Subject it to General Jurisdiction

SBG's activities in the United States, required by law to be considered collectively, are sufficient to subject it to general jurisdiction and additionally relevant to support specific jurisdiction – *i.e.*, SBG's argument that each of the individual contacts alleged is jurisdictionally insignificant ignores the significance of each alleged general jurisdictional contact to the specific jurisdiction analysis under Second Circuit law. *Chew*, 143 F.3d at 29 . Spanning more than 17 years, SBG has engaged in business activities in the United States coordinated through its one-person Maryland office outside of the nation's Capitol and through its employee, Fuad Rihani, who has worked for SBG in the U.S. from a home-based office established and supported by SBG.[8] Thus, from at least 1993 until as late as December 2000,[9] SBG maintained an office in Maryland and coordinated its U.S. activities directly from that office. When SBG closed that

---

[8] **Factual Averment, ¶¶ 3, 5-25.**

[9] **Factual Averment, ¶ 2, Exhs. 1-6** Articles of Incorporation for Cromwell Corporation were filed on June 16, 1993 (SBG0002430-35) and amended on June 30, 1993 to change the name to SBG, USA (SBG0002436). SBG, USA was 100% wholly-owned by SBG (SBG00000012-31). The entity was officially dissolved December 31, 1999, but the affairs of the corporation were not concluded until at least November or December 2000. (SBG0000031; SBG0001385; SBG0002327)

office, SBG continued to coordinate its activities in the U.S. through its single remaining employee physically present in the U.S.[10]

SBG's activities in the U.S. in the relevant time period are of three principal types: (1) business activities performed in the U.S. by an individual working for SBG in the U.S., using facilities paid for and supported by SBG; (2) business activities in the U.S. performed by SBG's U.S.-based subsidiary to promote, facilitate, and track SBG business with U.S. business interests; coupled with (3) sundry additional activities of SBG employees within the U.S.  Together, the physical presence of SBG employees and their activities represent "systematic and continuous" contacts to meet the "minimum contacts" threshold of the Fifth Amendment.

> ### 1.    SBG Has Continuously Operated within the U.S. Through its U.S.-Based Employee.

Dr. Fuad Rihani has worked continuously for SBG, and for only SBG, since its formation and for SBG's predecessor, before SBG was formed.[11] According to Dr. Rihani, since he began working for SBG, his only employment has been for SBG at the direction of his immediate "boss", SBG Chairman, Bakr Binladin.[12]  Although SBG may quibble with Dr. Rihani's role as

---

[10] **Factual Averment, ¶¶ 3, 5-25.**

[11] **Factual Averment, ¶ 5, Exh. 7.** (Rihani dep, 22:9-11 ("The only private company I worked for is the Saudi Binladin Organization, and the Mohammed Binladin Organization, and the Saudi Binladin Group."))

[12] **Factual Averment, ¶ 5, Exh. 7.** (Rihani dep, page 22:3 ("Bakr Binladin, who is my immediate boss at SBG…."); Rihani dep, page 65:3-5 ("Q: Do you do any work for the Binladin family unrelated to the SBG company business?  A: No."); Rihani dep, page 81:2-5 ("Q: Do you have any work outside of SBG?  A: No.  Have you had any work outside of SBG?  A: No."); Rihani dep, page 83:23 to 84:3 ("Q: While you have been working with SBG, have you had any other employment?  … A: No."); Rihani dep, page 93:14 to 94:5 ("Q: You work for SBG, correct?  A: Yes.  Q: And you work directly for Mr. Bakr Binladin?  A: Bakr Binladin.  Q: And you took directions [from] Mr. Binladin; in other words, he was the one that told you what to do, correct?  A: Yes. Q: And when he told you what to do, you would do that, correct?  A: Yes. Q:

*(cont'd next page …)*

an employee of SBG, Dr. Rihani himself acknowledged the employment relationship variously

throughout his deposition.[13]   And the available facts evidence an employment relationship.

Throughout his deposition, Dr. Rihani indicated that SBG and Rihani's "boss," SBG Chairman

Bakr Binladin, maintained substantial control over the scope, manner, and means of Dr. Rihani's

work[14]; SBG provided for whatever tools Dr. Rihani needed to perform his job[15]; the exclusive

employment relationship between the parties lasted for decades without a written agreement[16];

and throughout that entire period Dr. Rihani steadily received monthly compensation and

employment benefits.[17]   Additionally, Dr. Rihani has regularly corresponded using SBG

---

And you have indicated to us that you haven't worked for anybody other than directly for the
Saudi Binladin Group, correct?  A: Correct.").

[13] **Factual Averment, ¶ 5, Exh. 7.** (Rihani dep, page 29:4-6 ("Q: While you were on the board
of the IREF, you were also *employed* by SBG, too, correct? A: Correct"; Rihani dep, page 39:24
to 40:2 "Q: While you were on the Middle East Policy Council, were you *employed* by SBG, as
well?  A: Yes"); Rihani dep, page 63:4-12 (Q: Sir, do you have healthcare benefits? A: Only in
the United States.  And reimbursable costs; that's part of the understanding under the labor law
in Saudi Arabia, that the *employer* is responsible for health benefits, health coverage.  Q: And
SBG provides them, sir? A: It reimburses me for any costs incurred for my healthcare"); Rihani
dep, page 63:18-24 ("I reside in a villa that is provided by my *employer*.  I use a car provided to
me by the *employer*") (emphasis added)).

[14] **Factual Averment, ¶ 7, Exh. 7.** (Rihani dep, page 93:14 to 94:5 ("You work for SBG,
correct? A: Yes. Q: And you work directly for Mr. Bakr Binladin? A: Bakr Binladin. Q: And you
took directions from Mr. Binladin; in other words, he was the one that told you what to do,
correct? A: Yes. Q: And when he told you what to do, you would do that, correct? A: Yes.")).

[15] **Factual Averment, ¶7, Exhs. 7, 8, 9 and 10.** (Rihani dep 77:14-25 (SBG provided for
Rihani's tools such as dedicated voice and fax lines for his home office in the U.S., fax and
photocopier machines, and "[a]nything related to [Dr. Rihani's] work…."); MEPC000004,
MEPC000041; MEPC004224 (evidencing that Dr. Rihani used an SBG email address).)

[16] **Factual Averment, ¶ 7, Exh. 7.**  (Rihani dep, page 95:13-16 ("is there any written contract
that you have with SBG? A: No, I don't.").)

[17] **Factual Averment, ¶ 7, Exh. 7.** (Rihani dep, page 68:9 to 69:13 (SBG has compensated Dr.
Rihani monthly ranging from $150,000 to $250,000 per month); Rihani dep., page 63:4 to 24
(SBG has provided Dr. Rihani with healthcare and other employee benefits).)

letterhead[18] and on websites and letterhead of organizations with which he has been affiliated, Dr. Rihani has been identified as the Director of Research and Development at SBG.[19]

For at least half of each year Dr. Rihani's employment for SBG is performed in the U.S.[20] Although SBG argues that Dr. Rihani's U.S. presence is merely for Dr. Rihani's convenience, not only has Dr. Rihani himself indicated that his presence here benefits SBG,[21] but he has identified and used the U.S. address as an SBG address both to send and receive business correspondence for SBG.[22]  Indeed, the evidence supports the conclusion that Dr. Rihani's work in the U.S. served SBG business purposes.  For example, his presence in the U.S. has afforded SBG with significant U.S. business contacts.[23]  Former SBG employee, Philip Griffin, who previously managed SBG's U.S.-based office, testified as late as November 2007, that Dr. Rihani "follows up on business relationships that need some nurturing … and assistance from time to

---

[18] See, e.g., **Factual Averment, ¶ 8, Exh. 11.** (MEPC004712; Correspondence produced by IRF, Rihani letter of July 22, 1993 to IRF on SBG letterhead and signed by Dr. Rihani as Director, SBG-Research & Development.)

[19] See, e.g., **Factual Averment, ¶ 8, Exhs. 12, 13, 14, and 15.** (MEPC000003, Rihani Deposition Exhibits 3, 4, and 5.)

[20] **Factual Averment, ¶ 7, Exh. 7.** (Rihani dep, page 61:24 to 62:3.)

[21] *See, e.g.,* **Factual Factual Averment, ¶ 10, Exh. 7.**  Rihani dep, page 24:20-25; 31:20 to 32:4 (Rihani attended meetings in the U.S. for SBG's Bakr Binladin because it was more convenient for SBG for Rihani to do so)

[22] *See, e.g.,* **Factual Averment, ¶10, Exhs. 16, 17, 18, 19, 20, 21 and 22.** Correspondence Produced by IRF, Rihani letters of August 4, 1995, August 29, 1995, May 6, 1996 to IRF on SBG letterhead using return address in Hickory, NC; IRF letters of August 7, 1995 and May 20, 1996, Addressed to "Mr. Fuad Rihani, Saudi Binladin Group, … Hickory, NC 28601; and Correspondence Produced by IREF, IREF letters of August 7, 1995 and November 30, 1995, Addressed to "Saudi Binladin Group, c/o Dr. Fuad Rihani, … Hickory, NC 28601").

[23] *See, e.g.,* **Factual Averment, ¶ 11, Exh. 23.** (MEPC003643 ("Fuad Rihani reports that [SBG representatives] Shk Yahia and Shk Bakr [Binladin] will be out of town while you're [former Ambassador Chas Freeman] in Jeddah, but [SBG representative] Shk Hassan [Binladin] will meet with you.  After talking about the council he would like to talk a little business with you.").)

time."[24]  In addition, his presence in the U.S. has facilitated SBG's active participation in a

variety of U.S.-based organizations that have ties to SBG's overall business activities, allowing

SBG to make substantial individual and organizational business contacts.

      **SBG's Contacts Through Middle East Policy Council:**  Dr. Rihani has long been

actively involved with the Middle East Policy Council, a Washington, DC-based organization.

Communications produced by MEPC indicate that, notwithstanding SBG's and Dr. Rihani's

denials, SBG not only financially supported the MEPC,[25] but Dr. Rihani was an intermediary

through which SBG officials provided guidance for Council decisions.[26]  Contacts made and

supported through the MEPC provide SBG with significant U.S. business and political

connections relevant to SBG's business interests.

      **SBG's IRF/IREF Activities in the U.S.:** Benefiting from Dr. Rihani's presence in the

U.S., SBG has long been actively involved in both the International Road Federation and the

International Road Education Foundation, related entities based in Virginia, just outside of

---

[24] **Factual Averment, ¶ 12, Exhs. 24-25.** Philip Griffin dep, page 110:23 to 111:5; see also, *e.g*.,
SBG's March 16, 2007 Supplemental Responses to Plaintiffs' First Set of Jurisdictional
Interrogatories, p. 7 (indicating that Dr. Rihani met in the US with various SBG existing or
potential business associates).

[25] *See, e.g*., **Factual Averment, ¶ 15, Exhs. 10 and 26.** (MEPC004224 and MEPC004494;
Rihani dep, page 44:17 to 45:7.)

[26] *See, e.g*., **Factual Averment, ¶¶ 15, Exhs. 9, 27 and 7.** (MEPC000041 (Email from SBG's
Rihani to MEPC's Roth, "Received your email … and will discuss it with Sheikh Bakr.  Will
provide a joint opinion soon." And "Received your email …. Will discuss the subject with
Sheikh Yahia and advise of the result."); MEPC003829 (Email from SBG's Rihani to MEPC's
Roth "Sheikh Bakr [Binladin] does not see anything wrong with MEPC accepting contributions
from Malaysia.  Please convey this message to Amb. Freeman.").  Dr. Rihani denied such
exchanges with SBG regarding positions to be advocated or espoused by MEPC.  Rihani dep,
page 44:10-16.)

Washington, D.C.[27]  In addition to being longstanding financial supporters of these organizations, SBG's Chairman, Bakr Binladin is a longstanding board member of IRF, but is active in the organization primarily through Dr. Rihani because of Dr. Rihani's presence in the U.S.[28]  Dr. Rihani is, himself, on the board of the IREF, identified by the organization as Director of R&D at the Saudi Binladin Group.[29]  Rihani regularly attends the functions of the organizations in the U.S. and SBG reimburses him the business expenses for such activity.[30]

   **SBG's U.S.-Saudi Arabian Business Council Activities in the U.S.:** Benefiting from Dr. Rihani's presence in the U.S., SBG has been active in U.S. functions of the U.S.-Saudi Arabian Business Council.  For example, on behalf of SBG, Dr. Rihani participated in annual meetings of the Council, including in Washington, DC in September and October 1999.[31]  He also facilitated, on behalf of SBG, additional functions for the Council, such as the USA-KSA Companies Conference, held in Washington, D.C., in June 1999.  Indeed, SBG was not only an active participant of the conference, but was also a primary sponsor of the event.[32]  On behalf of

---

[27] **Factual Averment, ¶17, Exh. 28.**  (Correspondence Produced by IRF, IRF letter of March 30, 2004, Addressed to "Dr. Fuad Rihani, Director, Saudi Binladin Group," indicating that SBG joined IRF in 1984 and SBG Chairman Bakr Binladin was elected to the IRF board initially in 1988.)

[28] *See, e.g.,* **Factual Averment, ¶17, Exh. 7.**  (Rihani dep, page 24:20-25; 31:20 to 32:4 (Rihani attended meetings in the U.S. for SBG's Bakr Binladin because it was more convenient for SBG for Rihani to do so).)

[29] **Factual Averment, ¶18, Exh. 15.**   (Rihani Dep., Exhibit 5, page 2.)

[30] **Factual Averment, ¶19, Exh. 7**.  (Rihani Dep., page 30:23 to 31:14; 66:21 to 67:5.)

[31] **Factual Averment, ¶20, Exh. 7**.  (Rihani Dep., page 85:23 to 86:3.)

[32] *See, e.g.,* **Factual Averment, ¶¶ 21-22, Exhs.  29 and 7.**  (Rihani Dep., Exhibit 6, page 5-6 (SBG is listed as a sponsor of the Washington, DC event and Dr. Rihani is listed as a contact for the event); Rihani dep., page 90:2-16 (Dr. Rihani acknowledges he was a contact for the event and that he was one of the leaders participating in the event).)

SBG, Dr. Rihani also attended a conference arranged by the U.S.-Saudi Arabian Business Council at the Saudi Embassy in Washington, DC, in March, 2000.[33]

**Rihani's Additional Activities for SBG in the U.S.:**  Similarly, because of his presence in the U.S., Dr. Rihani was available to facilitate SBG Chairman Bakr Binladin's attendance at the U.N. in September 2000, for which SBG reimbursed him his business expenses.[34]  Dr. Rihani's presence in the U.S. also permitted him, on behalf of SBG, to attend a seminar on toll roads in September/October 1999; to deliver gifts to the Carter Center in Atlanta, GA in March 2000; to attend a strategic seminar for SBG in Atlanta, GA in August 2000; to attend the annual meeting of the World Future Society in Minneapolis, MN in July/August 2001; to attend a meeting with the University of Miami regarding the University's program on coastal zone management and the protection of coral reefs in Miami, FL in August 2001; and to attend a meeting with T.Y. Lin International in San Franscisco, CA in November 2001.[35]

SBG's argument (see Defendant's Brief at 24-25) that the multiple business functions in which SBG has engaged in the U.S. with various U.S.-based organizations (and often facilitated by its employee physically working within the U.S.), ignores salient distinctions.

Every case SBG uses to argue that its contacts and business activities with these U.S.-based organizations are jurisdictionally irrelevant is a non-binding district court case that analyzes the indicated activities under the Long-Arm Statute local law of the District of Columbia.  None of the cases offer any analysis of the contacts under the Due Process standards

---

[33] **Factual Averment, ¶23, Exh. 25.**  (SBG's March 16, 2007 Supplemental Responses to Plaintiffs' First Set of Jurisdictional Interrogatories, p. 6.)

[34] **Factual Averment, ¶24, Exh. 7.**  (Rihani Dep., page 65:6 to 66:7.)

[35] **Factual Averment, ¶25, Exh. 25.**  (SBG's March 16, 2007 Supplemental Responses to Plaintiffs' First Set of Jurisdictional Interrogatories, p. 5-7.)

of the U.S. Constitution, either under the Fifth or Fourteen Amendment. *See Armco Steel Co., L.P. v. CSX Corp.*, 790 F.Supp. 311 (D.D.C. 1991); *American Assoc. of Cruise Passengers v. Cunard Line, Ltd.*, 691 F. Supp. 379 (D.D.C. 1987); *Philadelphia Hous. Auth. V. Am. Radiator & Std. Sanitary Corp.,* 309 F. Supp. 1053 (E.D. Pa. 1969) (interpreting the Long Arm statute of the District of Columbia).

More specifically, none of the cases SBG cites involves a Due Process analysis that considers, in their totality, a collection of contacts similar to those attributed to SBG here, including the physical presence of SBG agents performing a variety of business activities over the span of at least two decades. Here, in addition to the membership in the various organizations, SBG is alleged to have been physically present at various seminars, conferences, and myriad other business meetings for SBG's business purposes. Moreover, the particularly active nature of SBG within the various organizations is distinctly different than the more passive involvement in the organizations referenced in the Long Arm analyses cited by SBG. Indeed, in addition to being mere members of the referenced organizations, SBG was actively involved in funding, decision-making, and in facilitating and participating in numerous activities of the organizations – and specifically, activities within the U.S.

And again, SBG's insistence that the court ignore its multiple active involvements with the various U.S.-based organizations fails to appreciate the significance of these contacts to the specific jurisdiction analysis. *Chew*, 143 F.3d at 24.

SBG's argument (see Defendant's Brief at 23) that the physical presence and activities of a single employee are jurisdictionally irrelevant is similarly flawed. To support its argument, SBG relies on this Court's decision to dismiss defendant Dallah Avco from this case based on allegations that the defendant provided a "ghost job" for an employee that performed no duties

for the defendant and appeared for work only once.  *In re Terrorist Attacks on Sept. 11, 2001*,

Docket No. 03 MDL 1570, 2010 U.S. Dist. LEXIS 69371, *90-91 (S.D.N.Y. June 16, 2010).

Here, the physical presence and the degree of involvement of both Fuad Rihani and SBG, USA

are significant more than the "ghost job" referenced in regard to Dallah Avco.  Moreover,

certainly the law is not such that a single employee physically present and active within a

jurisdiction would not be jurisdictionally significant.  *See, e.g.*, *Pfaff v. Denver Art Museum*,

Docket No. 94 Civ. 9271, 1995 U.S. Dist. LEXIS 8573, *5-8 (S.D.N.Y. June 20, 1995) (action of

a single agent physically present confers jurisdiction).  Indeed, consider the circumstance of one-

person organizations that are capable of acting only through single employees – certainly that

employee's presence and conduct has jurisdictional import.

<b>2.     SBG, USA's Presence and Activities In the U.S. Are Attributable to<br>SBG.</b>

From 1993 until 2000, SBG used its Maryland-based alter ego subsidiary, SBG, USA, to

promote and facilitate business activities in the United States.[36]  In fact, the formation documents

for SBG, USA indicate that SBG, USA was created for the purpose of dispensing business

services for SBG.[37]  Through SBG, USA, SBG (among other things) facilitated business

connections with Washington insiders helpful to promoting SBG business interests,[38] engaged a

---

[36] **Factual Averment, ¶26, Exh. 24.**  (Griffin Dep., page 66:5-14.)

[37] **Factual Averment, ¶27, Exh. 24.**  (Griffin Dep., page 59:10 to 65:8.)

[38] **Factual Averment, ¶27, Exh. 24.**   (Griffin Dep., page 27:6-18.)

variety of business-enhancing organizations and events in the U.S.,[39] and sought and actively

tracked additional U.S.-generated business opportunities and existing U.S.-based investments.[40]

SBG, USA's physical presence and its activities in the U.S., which are pertinent to the

jurisdictional analysis because they verify the "continuous and systematic" nature of SBG's

contacts with the U.S. over the course of decades, are imputed to SBG for jurisdictional analysis

because SBG, USA was a "mere department" of SBG. To determine whether a subsidiary is a

"mere department", the Court considers the following four factors, which are all satisfied here:

(1) common ownership, (2) financial dependency of the subsidiary, (3) the degree to which the

parent interferes in the selection and assignment of the subsidiary's executive personnel and fails

to observe corporate formalities, and (4) the degree of control the parent exercises over the

marketing and operational policies. *Volksagenwerk Aktiengesellschaft.,* 751 F.2d at 120-22.

Aside from the first factor, which is essential, the overall weighing of the remaining factors

requires balancing, and not every factor need weigh entirely in the plaintiffs' favor. When

applying the *Beech* test, the "exercise of personal jurisdiction over an alleged alter ego requires

application of a 'less onerous standard' than that necessary for equity to pierce the corporate veil

for liability purposes." *D. Klein & Son, Inc. v. Good Decision, Inc*., No. 04-1994, 2005 U.S.

App. LEXIS 2764, *2 (2d Cir. Feb. 15, 2005)(citations omitted).

---

[39] **Factual Averment, ¶27, Exh. 24.**   (Griffin Dep., page 31:14, 105:23 to 107:15, 108:11 to 110:22.)

[40] **Factual Averment, ¶27, Exh. 24.**   (Griffin Dep., page 80:6-14; 101:5 to 103:5.  For example, SBG's U.S.-based employees actively tracked SBG business interests in the U.S., such as SBG's interest in an entity known as Iridium, to report back to SBG supervisors in Saudi Arabia.  SBG employee Philip Griffin attended Iridium board meetings in the U.S., and otherwise communicated with Iridium representatives in the U.S. to report back to Saudi Arabia.)

**Common Ownership**: SBG, USA shared common ownership with SBG because SBG, USA was 100% wholly-owned by SBG.[41]  In fact, the sole employee of SBG, USA referred to SBG as the "mother company"[42] and recognized an SBG executive as his "boss" to whom he reported directly.[43]

**Financial Dependency**: SBG, USA was completely reliant on SBG not only for all of its financing but also for how the revenue was spent. Since its creation, every dollar of SBG, USA's revenue came from SBG.  The complete salary of SBG, USA's sole employee was paid by SBG and SBG reviewed, approved and ultimately paid for all activities of the U.S.-based office.  SBG, USA generated no independent revenue and had no source of income aside from SBG.[44]

**Interference & Control**:  The sole employee and primary operating officer of SBG, USA was hired by SBG to represent SBG in the U.S. and throughout his tenure on the job was paid directly by SBG, considered an SBG executive to be his boss to whom he reported directly, and required SBG's approval for every SBG, USA expense.[45]  And ultimately, when SBG determined to close the office, SBG, USA was closed.[46]

---

[41] **Factual Averment, ¶28, Exh. 30.**  (SBG00000026, tax filing indicating SBG owns 100% of SBG, USA.)

[42] **Factual Averment, ¶28, Exh. 24.**  (Griffin Dep., page 56:6.)

[43] **Factual Averment, ¶28, Exh. 24.**  (Griffin Dep., page 27:13-14; 97:21 to 98:4.)

[44] **Factual Averment, ¶29, Exh. 24.**  (Griffin Dep., page 69:7 to 70:13)

[45] **Factual Averment, ¶30, Exh. 24.**  (Griffin Dep., page 17:15-18; 69:7-10; 97: 21 to 98:4; 69:11 to 70:3.)

[46] **Factual Averment, ¶30, Exh. 24.**  (Griffin Dep., page 105:2-3.)

### 3.    The Contacts Represented By Activity of Other SBG Representatives Traveling to the U.S. for SBG Business Must Be Considered As Part of the Totality of Circumstances Amounting to Minimum Contacts.

In addition to the physical presence and substantial activity of Dr. Rihani and the SBG, USA office and its resident employee, Philip Griffin, the Court must also consider the presence and activity of a number of other SBG employees that have traveled to the U.S. for SBG business. SBG disclosed in discovery more than a dozen additional instances of SBG representatives – other than Dr. Rihani or Philip Griffin – traveling to the U.S. for SBG-related activities, including:

- Issam Barghooti: 5-7 day trip in or about Boston, MA Attend meeting with Bose 1999 (precise dates not available) Corporation engineers regarding sound system for Haram Grand Mosque in Mecca.[47]

- Fahd Rustom (possibly accompanied by Amr Abdel Bary): Oct. 14-22,1999 Greensboro, NC Attend High Point furniture fair; stopover in New York.[48]

- Issam Barghooti: 5-7 day trip in or about Boston, MA Attend meeting with Bose 2000 (precise dates not available) Corporation engineers regarding sound system for Haram Grand Mosque in Mecca.[49]

- Yasser Mohammed Saed Aldeein: March 12, 2000 SBG requests a US visa for decorating engineer Yasser Mohammed Saed Aldeein; the purpose of his trip is identified as to "finalize some works in your good country."[50]

- Fahd Rustom and Amr Abdel Bary: Apr. 6-12, 2000 Greensboro, NC Attend High Point furniture fair.[51]

---

[47] **Factual Averment, ¶31, Exh. 24.**   (SBG's March 16, 2007 Supplemental Responses to Plaintiffs' First Set of Jurisdictional Interrogatories, p. 5.)

[48] **Factual Averment, ¶31, Exh. 25.**   (SBG's March 16, 2007 Supplemental Responses to Plaintiffs' First Set of Jurisdictional Interrogatories, p. 5.)

[49] **Factual Averment, ¶31, Exh. 25.**   (SBG's March 16, 2007 Supplemental Responses to Plaintiffs' First Set of Jurisdictional Interrogatories, p. 5.)

[50] **Factual Averment, ¶31, Exh. 31.**   (SBG0002529.)

- Bashar Al-Sibai: June 3-10, 2000 Chicago, IL to attend a seminar at Caterpillar S.A.R.L.[52]

- Bakr Binladin:  Bakr Binladin, the Chairman of SBG, traveled to the United States in September 2000 as a member of an official Saudi delegation to the Millennium Summit of the United Nations, which was held in conjunction with the opening ceremonies for the United Nations General Assembly. Bakr Binladin was accompanied in New York by Dr. Rihani.[53]

- Yasser Mohammed Saed Aldeein: October 10, 2000 SBG again requested a US visa for decorating engineer Yasser Mohammed Saed Aldeein; the purpose of his trip is again identified as to "finalize some works in your good country."[54]

- Abdullah Awad Binladin: Approximately Feb. 24 Orlando, FL to attend InfoSec World and March 6, 2001 San Diego, CA to attend the Geospatial Information and Technology Association (GITA) conference.[55]

- Abdullah Binladin stayed in San Diego between March 3, 2001 and March 7, 2001.[56]

- Yasser Bakr: Apr. 16-22, 2001 in Greensboro, NC to attend High Point furniture fair and purchase furniture.[57]

- Hesham Bendari: Aug. 2001 (precise dates not available) Los Angeles, CA to meet with JD Edwards regarding software services for SBG Public Buildings & Airports Division.[58]

---

[51] **Factual Averment, ¶31, Exh. 25.**   (SBG's March 16, 2007 Supplemental Responses to Plaintiffs' First Set of Jurisdictional Interrogatories, p. 6.)

[52] **Factual Averment, ¶31, Exh. 25.**   (SBG's March 16, 2007 Supplemental Responses to Plaintiffs' First Set of Jurisdictional Interrogatories, p. 5.)

[53] **Factual Averment, ¶31, Exh. 25.**   (SBG's March 16, 2007 Supplemental Responses to Plaintiffs' First Set of Jurisdictional Interrogatories, p. 7.)

[54] **Factual Averment, ¶31, Exh. 22.**   (SBG0002526.)

[55] **Factual Averment, ¶31, Exh. 25.**   (SBG's March 16, 2007 Supplemental Responses to Plaintiffs' First Set of Jurisdictional Interrogatories, p. 5.)

[56] **Factual Averment, ¶31, Exh. 33.**   (SBG0002524.)

[57] **Factual Averment, ¶31, Exh. 25.**   (SBG's March 16, 2007 Supplemental Responses to Plaintiffs' First Set of Jurisdictional Interrogatories, p. 5.)

[58] **Factual Averment, ¶31, Exh. 25.**   (SBG's March 16, 2007 Supplemental Responses to Plaintiffs' First Set of Jurisdictional Interrogatories, p. 5.)

- Bakr Binladin:  The text of a fax indicates that the SBG Chairman was in the U.S. in October 1998.  ("I spoke with Abu Bakr [Binladin] today and he is working with a potential investor for our group.  He is anticipating meeting with the investor in London on November 4, 1998.  He would like both of us to make tentative arrangements to be in London on November 3, 1998 to prepare for the meeting.  He will confirm whether we should come by Saturday.  I am preparing a package for him and will send it to his hotel before he leaves the US.)[59]

Considered in their totality, the physical presence and longstanding substantial business activities of SBG – through Dr. Rihani, SBG, USA, and through the various other SBG representatives that have come to the U.S. for SBG-related activities – meet the "minimum contacts" threshold for jurisdiction.  Moreover, the contact, collectively, must be considered as part of the Court's analysis of specific jurisdiction.

III.  **SBG'S 12(B)(6) MOTION MUST BE DENIED**

SBG also seeks relief under Fed. R. Civ. P. 12(b)(6) based on the Supreme Court's holdings in *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1944 (2009), and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), which affected the standards by which pleadings are to be evaluated at this stage.

As a preliminary matter, it is abundantly clear that even were the pleadings lacking, Plaintiffs would be entitled to leave to replead with more specificity.  Under Fed. R. Civ. P. 15(a) as interpreted by this Circuit, leave to replead shall be freely given when justice so requires, and said interests of justice strongly favor the right to replead to add specificity to plaintiffs' allegations.  *Manning v. Utils. Mut. Ins. Co.*, 254 F.3d 387, 402 (2d Cir. 2001); *Devaney v. Chester*, 813 F.2d 566, 569 (2d Cir. 1987) (abuse of discretion not to allow leave to replead with greater particularity).  This has been especially true in cases applying the standards of *Twombly*

---

[59] **Factual Averment, ¶31, Exh. 34.**   (SBG0002617, October 29, 1998 GDRI fax to Said Ghachem.)

and *Iqbal* to complaints filed prior to those decisions being rendered.  *See Perez v. Time Moving & Storage, Inc.*, 2009 U.S. Dist. LEXIS 17065, *2 (S.D.N.Y. Jan. 15, 2009); *Mastafa v. Australian Wheat Bd. Ltd.*, 2008 U.S. Dist. LEXIS 73305, *35 (S.D.N.Y. Sept. 25, 2008); *S.W.B. New Eng., Inc. v. R.A.B. Food Group, LLC*, 2008 U.S. Dist. LEXIS 14892, *23 (S.D.N.Y. Feb. 27, 2008).

SBG, however, is not entitled to such relief in the first place, and barely make the effort of trying.  SBG asserts that the pleadings do not meet the plausibility test set forth in *Iqbal* but do not make any arguments regarding *plausibility* – but instead uses the patina of a 12(b)(6) question dispute the temporal links between its alleged material support and the 9/11 Attack.

Even under the *Iqbal* test, a claim will have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 129 S.Ct. at 1949.  As this Court has held:

> In determining such a motion, the Court is to consider the allegations pled in the complaint, as well as all documents that are integral to the complaint. *Halebian v. Berv*, 590 F.3d 195, 199 (2d Cir.2009) (citation omitted). The Court is to accept the factual matters pled in the complaint as true and draw all reasonable inferences in plaintiffs' favor, unless the allegations are supported by mere conclusory statements. *Hayden v. Paterson*, 594 F.3d 150, 157 n.4 (2d Cir.2010); see also. *Burke v. Acosta*, 2010 U.S. App. LEXIS 9914, 2010 WL 1932052, *1 (2d Cir. May 14, 2010) (quoting *Shomo v. City of New York*, 579 F.3d 176, 183 (2d Cir.2009)).

*In re Terrorist Attacks on September 11, 2001*, 2010 U.S. Dist. LEXIS 96597, *80-81 (S.D.N.Y. Sept. 13, 2010).  This Court has further asserted that "plaintiffs must plead factual allegations demonstrating that the defendant provided material support or resources to an organization that commits terrorist acts. It is of no import whether such material support was provided directly or indirectly to the terrorist organization… A defendant must either know that the recipient of the material support provided by him is an organization that engages in terrorist

33

acts, or defendant must be deliberately indifferent to whether or not the organization does so, i.e.,
defendant knows there is a substantial probability that the organization engages in terrorism, but
does not care." *Id.* at *95-96.

SBG does not engage in such a broad attack on the pleadings.  It nowhere disputes the
pleadings' sufficiency as to any particular cause of action.  It does not challenge the plausibility
of the core pleadings  – that *if* plaintiffs have substantiated the allegations of direct SBG support
of Osama bin Laden and al Qaeda during the relevant time period, then plaintiffs have
successively raised a plausible case for liability.  Instead, they quibble as to the import of certain
factual allegations made in the past as to whether each, on an isolated basis, is sufficient, and
aver in a conclusory fashion that there are no "well-pled allegations that OBL received any
payment for his former shares, or indeed, any other financial support from SBG."

Plausibility requires "is not akin to a probability requirement," but instead requires some
showing "more than a sheer possibility that a defendant has acted unlawfully."  *Iqbal*, 129 S.Ct
at 1949.  As demonstrated in the attached Summary of Allegations and Evidence, these pleadings
easily surpass this standard.  The allegations, if proven, demonstrate that SBG provided material
support to Osama bin Laden and al Qaeda which helped facilitate the September 11th Attack,
claims upon which relief to Plaintiffs can assuredly be granted.

**IV.**     **CONCLUSION**

For the foregoing reasons, SBG's motion to dismiss should be denied in its entirety.

Dated: November 18, 2010                  Respectfully Submitted,


                                          /s/_____
                                          THE MDL 1570 PLAINTIFFS' EXECUTIVE
                                          COMMITTEES

35

## <u>Certificate of Service</u>

I hereby certify that, on November 18, 2010, I caused an electronic copy of Plaintiffs'

Memorandum of Law in Opposition to Renewed Motion to Dismiss of Defendant Saudi Binladin

Group and all accompanying papers to be served electronically in redacted form by the Court's

Electronic Case Filing (ECF) System.  The redactions are pursuant to the parties' Stipulation

Regarding Confidential Information dated August 2, 2005.  An unredacted copy has been

electronically mailed to James E. Gauch, counsel to Saudi Binladin Group, and is being provided

to the Court as well.



/s/
Adam C. Bonin