# EXHIBIT

# 14

Part 1

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

In re:  3800 S. Highway 99          ) Affidavit in Support of an
       Ashland, OR  97520          ) Application for Search Warrant

       I, Colleen Anderson, being duly sworn, depose and say:

       1.     I am a Special Agent with the Internal Revenue Service - Criminal Investigation, assigned to the Medford, Oregon Post-of-Duty.  As a Special Agent, I investigate possible violations of the Internal Revenue Code (Title 26, United States Code), the Money Laundering Control Act (Title 18, United States Code), and the Bank Secrecy Act (Title 31, United States Code).

       2.     This affidavit is in support of a search warrant application for 3800 S. Highway 99 in Ashland, Oregon.  A detailed description of these premises is attached hereto and incorporated herein as Attachment A.  The affidavit will show there is probable cause to believe criminal violations of Currency and Monetary Instrument reporting requirements and Internal Revenue Laws have been committed by two officers of the Al Haramain Islamic Foundation, Inc. in Ashland, Oregon and evidence of these violations, as detailed in Attachment B, attached hereto and incorporated herein, is presently located at 3800 S. Highway 99 in Ashland, Oregon.

       3.     I make this affidavit based on my participation in this joint investigation, as well as information I have received from other members of the joint investigation, including the Federal Bureau of Investigation (FBI), the U.S. Immigration and Customs Enforcement

Affidavit in Support of Search Warrant - Page 1

AHIF 001537

(ICE), and other Internal Revenue Service personnel.

4. I have been a Special Agent with IRS-CI since December 1995 and have conducted and assisted in numerous criminal investigations involving violations of federal tax laws, money laundering laws, and other related offenses where I have gained experience in locating, tracing, and corroborating financial information pertaining to the receipt and disposition of funds.  I also have a B.S. degree in Accounting.

## INTRODUCTION

5. This affidavit will first establish that there is probable cause to believe Soliman ALBUTHE, a citizen of Saudi Arabia, traveled to Oregon in March of 2000 and obtained approximately $130,000 in traveler's checks.  Soon after obtaining the traveler's checks, ALBUTHE departed the United States (U.S.) with those traveler's checks, without declaring them on a Currency Monetary Instrument Report, as required by U.S. law, in violation of Title 31, United States Code, §5324.

6. This affidavit will then establish that there is probable cause to believe that Pirouz SEDAGHATY (a.k.a Pete SEDA), a U.S. citizen, established a tax exempt charitable organization in the U.S. known as the Al Haramain Islamic Foundation, Inc., and that he knowingly filed a materially false informational tax return on behalf of the organization, in violation of Title 26, United States Code, §7206(1).

7. To prove this tax violation, this affidavit will show that the Al Haramain Islamic Foundation, Inc.'s 2000 tax return was false in that some funds received by the organization in 2000 were omitted from the return and that the utilization of certain funds received by the organization were mischaracterized.  It will be shown that these omissions and mischaracterizations were material, in that if the transactions were properly reported,

Affidavit in Support of Search Warrant – Page 2

AHIF 001538

the organization would more likely be scrutinized by the IRS or law enforcement and the organization's tax exempt status would be in jeopardy, meaning that it could be subject to taxation.

8.    Finally, I believe that evidence of these violations will likely be found at 3800 S. Highway 99 in Ashland, Oregon.

### EVIDENCE

### BACKGROUND OF THE AL-HARAMAIN ISLAMIC FOUNDATION

9.    The investigation has established that the Al Haramain Islamic Foundation (sometimes referred to herein as "AHIF" or "AHIF, Inc.") is one of Saudi Arabia's largest Non Governmental Organizations (NGOs) with offices throughout the world.  AHIF's headquarters are in Riyadh, Saudi Arabia and its stated mission is to provide charitable services and Islamic education to people around the world.  AHIF, Inc. appears to have first established its presence in the U.S. when Pete SEDA and Soliman ALBUTHE registered it with the Oregon Secretary of State as an assumed business name in October 1997.  Oregon Secretary of State records show SEDA as the authorized representative of the organization with a principal place of business of 1257 Siskiyou Blvd. #224 in Ashland, Oregon.[1]

10.    A document obtained during the investigation shows that in October 1997, the Al Haramain Islamic Foundation in Saudi Arabia appointed Soliman ALBUTHE true and lawful attorney in Al Haramain Foundation's name, place and stead.  The document

---

[1] 1257 Siskiyou Blvd. in Ashland, Oregon is a private mail service known as the Mail Stop. A representative of the Mail Stop stated in an interview that SEDA and the Al Haramain Foundation lease private mail boxes from the Mail Stop.

Affidavit in Support of Search Warrant - Page 3

AHIF 001539

appears to give ALBUTHE broad legal authority to act on the organization's behalf within the U.S. The document is signed by Aqeel Bin Abdel-Aziz Al-Aqueel, who I know was, until recently, the general manager of AHIF.

11.    Jackson County Oregon Title company records show that, in December 1997, ALBUTHE purchased the property subject to this search warrant application at 3800 S. Highway 99 in Ashland, Oregon on behalf of the Al Haramain Islamic Foundation for approximately $190,162.50.  ALBUTHE'S bank records, Immigration Forms 94 (I-94's), and Currency Monetary Instrument Reports (CMIR's) show that between October and December of 1997, ALBUTHE brought into the U.S. from Saudi Arabia over $208,000 in Visa Traveler's checks issued by the Al Rajhi Bank in Saudi Arabia, which he used to purchase 3800 S. Highway 99 in Ashland, Oregon.

12.    I have observed the building located at 3800 S. Highway 99 in Ashland, Oregon and reviewed Jackson County Assessors records pertaining to the location. Based on Jackson County Assessors records, I know that 3800 S. Highway 99 is a one story residence built in 1973 with a basement and garage on the bottom level and a total of 4,157 livable square feet.

13.    Documents provided by AHIF, Inc. to the IRS, as well as interviews conducted, indicate that 3800 S. Highway 99 was used by AHIF, Inc. to host prayer meetings and for the publication and distribution of Islamic books that deal with spiritual issues, including the distribution of Islamic books to prisoners.  Information provided by AHIF, Inc.'s accountant shows 3800 S. Highway 99 appears to be the main facility in the U.S. in which AHIF, Inc. conducts its business activities.  Information obtained from individuals familiar with the location indicates that SEDA also used 3800 S. Highway 99 as

Affidavit in Support of Search Warrant - Page 4

AHIF 001540

a personal residence for himself and his family until approximately February of 2003, when he departed the U.S. for Saudi Arabia.  Individuals familiar with the location believe the use of 3800 S. Highway 99 as a prayer house ceased around the Spring of 2003.

14.     In February 1999, the Al Haramain Islamic Foundation incorporated through the Oregon Secretary of State and listed its corporate address as 1257 Siskiyou Blvd #224 in Ashland, Oregon which, as stated above, is a private mail facility.  Along with AHIF, Inc.'s application, the organization submitted its Articles of Incorporation. In its Articles of Incorporation, AHIF claims that the organization's purposes are:

> The corporation is organized as a public benefit corporation exclusively for religious, humanitarian, educational, and charitable purposes as defined in Section 501 ( C) (3) of the Internal Revenue Code, and ORS 65.036 of the Oregon Revised Code. The corporation shall not carry on any activities which are not permitted by the Internal Revenue Code for such corporations which are exempt from federal income tax and to which contributions are deductible for federal income tax purposes.

> Al Haramain Islamic Foundation, Inc. stands against terrorism, injustice, or subversive activities in any form and shall not support any statement or acts of terrorism.  Al Haramain Islamic Foundation, Inc. believes such conduct is contrary to Islamic principles.

15.     AHIF, Inc.'s Articles of Incorporation in Oregon listed SEDA as the organization's registered agent and the following individuals as the organization's board of directors:

      (a)     Aqeel Al-Aqeel (Aqueel)

Affidavit in Support of Search Warrant - Page 5

AHIF 001541

    (b)   Mansour Al-Kadi

    (c)   Soliman H.S. Al-Buthe (ALBUTHE)

    (d)   Perouz Seda Ghaty (SEDA)

16.    In June of 2000, AHIF, Inc. purchased property located at 2151 E. Division in Springfield, Missouri for $378,291.74. Title company and bank records show that a large portion of the funds used for the purchase of 2151 E. Division came from an AHIF, Inc. bank account in Ashland, Oregon, which only SEDA and ALBUTHE control. Similar to the purchase of 3800 S. Highway 99 in Ashland, Oregon in 1997, bank records, Immigration Forms 94 (I-94's), and Currency Monetary Instrument Reports (CMIR's) show ALBUTHE brought most of the funds used to purchase 2151 E. Division, Springfield, Missouri into the U.S. with him from Saudi Arabia. These records show that in May of 2000, just before AHIF, Inc.'s purchase of the Springfield, Missouri property, ALBUTHE brought $275,000 into the U.S. from Saudi Arabia. The $275,000 brought into the U.S. by ALBUTHE consisted of American Express Traveler's checks issued by Al Rajhi Bank in Riyadh, Saudi Arabia. Bank records show these funds were deposited into a Bank of America account in Ashland, Oregon, in the name of AHIF, Inc., and then ultimately used for the purchase of 2151 E. Division in Springfield, Missouri. I know that Pete SEDA purchased a cashier's check in the amount of $318,291.74 from Bank of America in Ashland, Oregon, made payable to First Escrow, Inc. This cashier's check was used to help purchase the property in Springfield, Missouri, and was bought with the traveler's checks brought into the U.S. by ALBUTHE.

17.    Based on AHIF, Inc.'s claim that it was a public benefit corporation organized

Affidavit in Support of Search Warrant - Page 6

AHIF 001542

exclusively for religious, humanitarian, educational, and charitable purposes, the IRS granted AHIF, Inc. tax-exempt status in December of 2000.  IRS records show that on a Form 1023 *Application for Recognition of Exemption*, AHIF, Inc. listed their web site address as www.alharamain.org and provided the following information about the organization's governing body:

| Name | Address | Title of officer |
|------|---------|------------------|
| Aqeel Al-Ageel | 1257 Siskiyou Blvd. #212 Ashland, OR | President |
| Mansuor Al-Kadi | 1257 Siskiyou Blvd. #212 Ashland, OR | Vice President |
| Soliman H.S. Al-Buthe | 1257 Siskiyou Blvd. #212 Ashland, OR | Treasurer |
| Perouz Seda Ghaty | 1257 Siskiyou Blvd. #224 Ashland, OR | Secretary |

18.    In June 2003, a grand jury subpoena was served on AHIF, Inc. in Oregon for books and records, based on an investigation concerning AHIF, Inc.'s tax returns. Documents received pursuant to the subpoena served on AHIF, Inc. and other information obtained during the investigation, show that in addition to being the President of AHIF, Inc. in Ashland, Oregon, Aqeel Al-Ageel (aka Aqeel Abdul-Aziz Al-Aqeel or Aqueel Bin Abdel-Aziz Al-Aqueel) is the General Manager of Al Haramain Foundation, headquartered in the Kingdom of Saudi Arabia, Riyadh.  The investigation concerning AHIF, Inc.'s tax returns and the results of the investigation to date is more fully described below.

RESULTS OF INVESTIGATION

Affidavit in Support of Search Warrant - Page 7

AHIF 001543

19.   I have examined bank records relating to AHIF, Inc.  Bank records show that on February 24, 2000, Mahmoud T El Feki wired $149,985 to AHIF, Inc.'s Bank of America account number ████1561 in Ashland, Oregon, from an account with the National Bank of Kuwait in London, England.

20.   I have examined copies of e-mails received pursuant to a grand jury subpoena served on Al-Haramain in Oregon.  In one e-mail, someone with an e-mail address of "s-elfeki" wrote in part "I have the pleasure [of] informing you that I have already asked my bank in London to make a transaction to your USA account, using the details provided in an earlier e-mail, as Zakat[2] in order to participate in your nobel support to our muslim brothers in Chychnia...."  The author of this e-mail went on to state that the donation was made by "Dr. Mahmoud Talaat El-Fiki," and that he had a mailing address in Giza - Cairo, Egypt.  The author of this e-mail also asked that a letter and e-mail be sent to him confirming the $150,000 transaction.

21.   Another document provided by AHIF, Inc., in Ashland, Oregon pursuant to the grand jury subpoena shows Al-Haramain's general manager, 'Aqeel Abdul-Aziz Al-'Aqeel, sent a letter dated February 21, 2000 stating in part:

"Dear Brother Dr. Mahmoud.T. Al-Fiki, ... On behalf of Al-Haramain Foundation management and staff, I would like to thank you for your generous donation of $150,000 (One hundred-fifty thousand dollars) as zakaat.  We appreciate your trust in Al-Haramain Islamic Foundation and assure you of our

---

[2]The term "Zakat" is defined in an Islamic glossary as the fourth of the five pillars of Islam, and is the obligatory alms or charity tax imposed on all practicing Muslims.

Affidavit in Support of Search Warrant – Page 8

AHIF 001544

commitment to continue every possible effort to help ending the Chechnyan crisis",

This letter appears to bear the signature of Aqeel Abdul-Aziz Al-'Aqeel, the General Manager of Al-Haramain in Riyadh, Saudi Arabia.

22.     I have learned from a non-governmental international terrorism consultant that Chechnya is a tiny North Caucasus province ethnically comprised of Turkic-Muslim people that has had a long history of Muslim-led guerilla resistance to European occupation, including a long struggle against Russian occupation. By the Spring of 1995, the Russo-Chechen conflict over the independence of Chechnya from Russia drew the attention of several well known Arab mujahideen[3] commanders. These Arab mujahideen commanders came to Chechnya because they believed there was a jihad occurring there and they saw an opportunity to defend the Muslim world against infidel aggression. By the end of 1996, it is estimated that the total number of foreign mujahideen in Chechnya reached as high as 700. According to some Russian officials, the Chechnyan mujahideen have received substantial funding from Islamic charities and Non Governmental Organizations.

23.     The Washington Post published an article on the history behind the Chechen conflict in April of 2003, titled *How Jihad Made Its Way to Chechnya*. The article says that the goal of the Arabs who came to the Chechen region went beyond preserving Chechnya's freedom; they wanted to merge Chechnya and nearby Dagestan to create an

---

[3] I was informed by an International terrorism consultant that the word mujahideen is used by some to describe themselves as "holy warriors" who engage in a physical struggle and/or armed conflict known as a jihad to confront "infidels", who are individuals who do not practice the religion of Islam.

Affidavit in Support of Search Warrant - Page 9

AHIF 001545

Islamic state. The article goes on to say Russian intelligence officials estimate that over the past 3½ years, hundreds of Arab radicals fueled fighting in the Chechen conflict with their fervor and funds, which cost the lives of more than 4,500 Russian soldiers, thousands of rebels, and many civilians.

24.   According to a December 2003 U.S. News and World Report article titled "The Saudi Connection," some Saudi charities are well integrated into the jihadist movement. The article states that U.S. officials have concluded that one of Saudi Arabia's largest charities, the Al-Haramain Foundation (Riyadh), was providing arms or cash to terrorists, including those in Indonesia, Pakistan, and Somalia. The article states that Russian officials suspect that in Chechnya, the AlHaramain Foundation moved $1 million to the rebels and arranged the purchase of 500 heavy weapons from the Taliban.

25.   Through the investigation, I know that at least six offices of the AlHaramain Foundation have been investigated for funding and providing other material and logistical support to Islamic mujahideen throughout the world, including Usama bin Laden's Al Qaida network. In March of 2002, the U.S. Department of Treasury, through the Office of Foreign Asset Control (OFAC), designated the Bosnia and Somalia offices of the AlHaramain Foundation as supporters of terrorism. In January of 2004, the Indonesia, Kenya, Tanzania, and Pakistan offices of the AlHaramain Foundation were jointly designated by the Kingdom of Saudi Arabia and the U.S. Department of Treasury, through the Office of Foreign Asset Control (OFAC), as supporters of terrorism. As a result of these designations, United States persons and/or property or interests within the United States are prohibited from engaging in transactions or dealings with these offices. In addition, in

Affidavit in Support of Search Warrant - Page 10

AHIF 001546

January 2004, the United Nations imposed sanctions on the Al-Haramain offices in Indonesia, Pakistan, Kenya and Tanzania, requiring member nations to impose a travel ban, arms embargo and asset freeze on those entities. The Al-Haramain offices in Bosnia-Herzegovina and Somalia were placed on this same list by the U.N. in March 2002.

26.    I have learned 'Aqeel Abdul-Aziz Al-'Aqeel, the general manager of the Al-Haramain Foundation in Saudi Arabia and the President of AHIF, Inc. here in Oregon, was recently fired from his position in Saudi Arabia. The Wall Street Journal reported on Friday, January 9, 2004, that the Saudi Government removed Al-'Aqeel from his position and the Al-Haramain Foundation had been the subject of intense investigation by the U.S. for possible terrorist links, with several of its regional branches being shut down by U.S. and Saudi officials.

27.    The Washington Post reported in April of 2003 that in a Russian Federal Security Service internal memo, Al-Haramain's director (Aqeel) was accused of exchanging a message with Arab commanders in Chechnya in which he reportedly stated, "Today, AlHaramain has $50 million for the needs of the mujaheddin". However, Aqeel denied allegations that AlHaramain offices used charitable donations to finance terrorist activities and stated, "We do not have any relationship with any terrorist activities. We work under the supervision of the Saudi government."

28.    During the investigation, information was found on an Al-Haramain website, www.alharamain.org , which showed The Al-Haramain Islamic Foundation in Saudi Arabia strongly supported the cause of the mujahideen fighters in Chechnya in 1999 and 2000. Information on their website included reports and articles about the mujahideen in

Affidavit in Support of Search Warrant - Page 11

AHIF 001547

Chechnya.  One report titled "The Latest News About The Jihaad in Chechnya" appeared to give specific information to its readers about the battles between the Russian forces and the mujahideen in Chechnya.  An article written by the editor of Al-Haramain, Riyadh's website, dated January 2000, appears to include prayers for the Mujahideen and reads, in part, as follows:

> "My Muslim Brother: Help from you towards us, would be that you raise your hands towards the heavens on a regular basis and make Du'aa to Allah for us and beseech Him, with the following Du'aa:

> O Allah! Who sent down The Book...Who makes the clouds drift; Who defeats the armies....Defeat Russia! O All Mighty! O All Powerful! O Allah Indeed we ask that You Scatter their firing, and Shake the earth beneath their feet, and Strike fear in their hearts. O Allah! Cripple their limbs and Blind their sight, and send upon them an epidemic and calamities. O Allah! Separate their gatherings and Scatter their unity, and make their condition severe amongst themselves, and make their plots go against them, and show us in them the amazements of your Power, and make them a lesson for those who do not learn lessons. O Allah! Hurry their destruction, and make their wealth as booty for the Muslims.

> O Allah! Aid our Mujaahideen brothers in Chechnya. O Allah! Unify their rows, and gather them on the word of truth. O Allah! Aim their firing and strengthen their determination, and make their feet firm, and

Affidavit in Support of Search Warrant - Page 12

AHIF 001548

descend upon them tranquility, and satisfy their hearts and guide them

to that which is all good. O Allah! Make for them from Yourself an

authority, and aid them with the army from Yourself, for to You belong

the armies of the heavens and the earth. O Lord of the Worlds. May

Salaah and Salaam be upon the Messenger of Allah and upon all his

followers and companions. And thusly we pray for all those fighting to

protect the honor of Allah's Deen and the protection of the Muslimeen,

Aameen, Aameen, Aameen."

## VIOLATION OF TITLE 31 USC §5324

29.     After Mahmoud T El Feki wired approximately $150,000 from

London, England to an AHIF, Inc. bank account in Ashland, Oregon on February 24, 2000,

U.S. Immigration and Customs Enforcement records show ALBUTHE entered the U.S.

from the Kingdom of Saudi Arabia.  As documented on immigration form I-94 number

35584030208, ALBUTHE flew into John F. Kennedy (JFK) International Airport in New

York on March 7, 2000 and was admitted under admissions code B1, visitor for business.

ALBUTHE identified himself on the form as a Saudi Arabian citizen with passport number

B049614, a date of birth of ░░░░░1961, and claimed a visiting United States

address of 1257 Siskiyou Blvd., 212 in Ashland, Oregon.[4]

30.     Bank records show on March 10, 2000 ALBUTHE obtained a portion of the

funds El-Feki wired to AHIF, Inc. by purchasing one hundred thirty (130) $1,000 American

Express Travelers checks.  Al-Haramain had to pay a total of $1,300 to the Bank of

---

[4] As stated above, this is a private mailbox facility utilized by SEDA and AHIF, Inc.

Affidavit in Support of Search Warrant - Page 13

AHIF 001549

America for the purchase of the travelers' checks.  The funds used to purchase these traveler's checks and the bank fees were both withdrawn from AHIF, Inc. account number ▓▓▓▓1561 in Ashland, Oregon.  Bank records show that the only two signers on AHIF, Inc. account number ▓▓▓▓1561 are Pete SEDA and Soliman ALBUTHE.  Information provided by a Bank of America employee indicates that ALBUTHE came into the Ashland branch on March 10, 2000 with SEDA and SEDA'S son, Jonah, to purchase the traveler's checks.

31.   The bank employee was told by SEDA that they would like to negotiate a check out of the foundation's account for $130,000 worth of traveler's checks in certain denominations.  The bank employee told SEDA the bank did not have enough of those denominations and the bank employee tried to convince SEDA to take a cashier's check instead.  SEDA said he could not take a cashier's check because the money was to help people and a lot of times these people may not be able to negotiate a cashier's check.  Ultimately, the bank employee issued one hundred thirty (130) $1,000 American Express Traveler's checks to ALBUTHE.

32.   Bank records also show that on March 11, 2000 the remaining funds El-Feki wired to AHIF, Inc. were obtained by SEDA through the purchase of a $21,000 Bank of America cashier's check, check number 100104056B.  Information provided by a bank employee with Bank of America in Ashland shows SEDA came into the bank's Ashland branch on March 11th to purchase the cashier's check and authorized the check to be issued to ALBUTHE.

33.   Additional records provided pursuant to grand jury subpoena indicate that the $21,000 withdrawn from the AHIF, Inc. account by ALBUTHE and SEDA were intended to

Affidavit in Support of Search Warrant - Page 14

AHIF 001550

be distributed to persons in Chechnya. These records include a copy of the $21,000 cashier's check payable to ALBUTHE, with the notation, "Donations for Chichania Refugees" handwritten on the front of the check.

34.    I have examined copies of two agreements provided under subpoena by Al-Haramain in Oregon. The agreements are between "Soliman" (who I believe to be Soliman Al-Buthe), and "Abu Yunus" (which I know through this investigation is an alias or Muslim name used by Pete SEDA). Both of the agreements appear to have been signed by ALBUTHE and SEDA, dated 4th of Thul Hijjah, 1420.[5] Both agreements state in part that SEDA was turning all monies over to ALBUTHE for the "Brothers and Sisters in Chechnya" and that Abu Yunus was relieved of all responsibilities for the money.

35.    The two agreements are slightly different. One states ALBUTHE received $188,465 and contains, in addition to the signatures of SEDA and ALBUTHE, the signatures of two unidentified witnesses. The second agreement, however, states ALBUTHE received $186,644.70, lists a second handwritten date of March 11, 2000, and contains the notation "I deposit the amanet[6] in Alharamain head office for Chechenya Refugees", and appears to have been signed a second time by ALBUTHE.

36.    U.S. Immigration and Customs Enforcement records show that on March 12, 2000 ALBUTHE left the United States from JFK International Airport in New York on Saudi Arabian flight 36, as documented on immigration form I-94 number 35584030208. An inspector for Customs and Border Protection determined that on March 12, 2000, Saudi

---

[5] The 4th of Thul Hijjah, 1420 is from the Islamic Calendar, which translated means approximately the 11th of March, 2000.
[6] I have learned from an FBI translator that the word "amanet" in Arabic translates to the phrase "something entrusted with".

Affidavit in Support of Search Warrant - Page 15

AHIF 001551

Arabian flight 38 flew from New York, New York to Riyadh, Saudi Arabia, connecting to Dhahran.

**CMIR REQUIREMENTS:**

37.     From my training and experience, I know that Currency and Monetary Instrument Reports (CMIR's) are used by government agencies, including the IRS, to track currency and other monetary instruments coming into and leaving the U.S.  Based on the training and experience of ICE Special Agent Robert Priddy and his conversations with other experienced ICE Special Agents, I also understand the following regarding the laws relating to CMIRs:

38.     CMIR reporting requirements are imposed by U.S. Treasury regulations promulgated at Title 31 C.F.R. §103.23, pursuant to Title 31 U.S. C. §5316.  In summary, the requirements mandate that any person physically transporting currency or certain monetary instruments, including traveler's checks in any form, in an aggregate amount exceeding $10,000 at any one time, into or out of the United States, must file a CMIR with United States Customs and Border Protection.  A review of a CMIR shows that it requires the person filling out the report to provide, in part, information pertaining to the person's identity, information about the exportation or importation of funds, information about the person's business on whose behalf importation or exportation was conducted, information about the type and amount of currency and/or monetary instruments, and the signature of the person completing the report.

39.     Title 31 U.S.C. §5324 provides in most pertinent part:

(c )     International monetary instrument transactions.  No person

Affidavit in Support of Search Warrant - Page 16

AHIF 001552

shall, for the purpose of evading the reporting requirements of section 5316— (1) fail to file a report required by section 5316, or cause or attempt to cause a person to fail to file such report;...

(d)   Criminal penalty.— (1) In general.— Whoever violates this section shall be fined in accordance with title 18, United States Code, imprisoned for not more than 5 years, or both. (2) Enhanced penalty for aggravated cases.— Whoever violates this section while violating another law of the United States or as part of a pattern of illegal activity involving more than $100,000 in a 12 month period shall be fined twice the amount provided in subsection (b) (3) or (c) (3) (as the case may be) of section 3571 of title 18, United States Code, imprisoned for not more than 10 years, or both.

40.   The elements of a CMIR violation charged under Title 31 U.S.C. §.5324 most pertinent to this case are:

(a)   The violator transported, shipped, or mailed-or attempted to transport, ship, or mail-currency or other reportable monetary instruments into or out of the United States, or the violator received in the United States currency or other reportable monetary instruments transported, shipped, or mailed from abroad;

(b)   The value of the currency or other reportable monetary instruments

Affidavit in Support of Search Warrant - Page 17

AHIF 001553

involved in the violation exceeded $10,000 U.S. in an aggregate amount at any one time; and

(c)  The violator acted for the purpose of evading the requirements by failing to file a report, or causing another to fail to file a report, when required to do so.

41.   As stated above, U.S. Immigration and Customs Enforcement records show ALBUTHE left the United States from JFK International Airport in New York on Saudi Arabian flight 38 on March 12, 2000.  Officials at ICE informed me that no CMIRs were found related to this departure, nor did ALBUTHE ever file a CMIR reporting that he took the $130,000 in traveler's checks out of the country.

42.   Immigration Forms 94 obtained by U.S. Immigration and Customs Enforcement show between October 1997 and April 2001, ALBUTHE crossed the United States border at least thirteen times.  During this time period, ALBUTHE filed nine (9) CMIRs, showing he transported a total of $777,845 into the United States.  From the nine CMIRs filed by ALBUTHE, seven of them were filed based on ALBUTHE'S transportation of traveler's checks.  The filing of nine CMIRs by ALBUTHE, unrelated to the financial transactions detailed earlier in this affidavit, shows that he knew he was required to file the CMIR form while transporting currency or monetary instruments, including traveler's checks, into the United States.

43.   A CMIR clearly states on its face that it is required to be filled out by anyone departing or entering the United States, or a person shipping, mailing, or receiving currency or monetary instruments.  In addition, the general instructions to the form state

Affidavit in Support of Search Warrant - Page 18

AHIF 001554

that persons who must file the form are each person who physically transports, mails, or ships, or causes to be physically transported, mailed, or shipped currency or other monetary instruments in an aggregate amount exceeding $10,000 at one time from the United States to any place outside the United States or into the United States from any place outside the United States.

44.   I have reason to believe that ALBUTHE speaks, reads, and/or writes English and therefore was aware of the requirement to report funds exceeding $10,000 while departing the U.S. In addition to filling out CMIRs on nine prior occasions, the investigation has shown that ALBUTHE appears to have written, "I deposit the amanet in Alharamain head office for Chechenya Refugees", on an agreement between him and SEDA and then signed the agreement. A document containing e-mails that was provided by AHIF, Inc., pursuant to a grand jury subpoena also indicates that ALBUTHE reads English. The e-mails were conducted between SEDA and other individuals in English and ALBUTHE appears to have received a carbon copy (Cc:) of these e-mails.

45.   I have attempted to learn the disposition of the $130,000 in traveler's checks and the $21,000 cashier's check obtained by ALBUTHE from AHIF, Inc. funds. An analysis of the American Express Travelers checks indicates ALBUTHE cashed the traveler's checks on approximately March 25, 2000 at Al Rajhi Banking and Investment in the Kingdom of Saudi Arabia.

46.   An analysis of the $21,000 cashier's check ALBUTHE received from SEDA shows the check was deposited into an Al Rajhi Banking and Investment account in the Kingdom of Saudi Arabia. A date for the deposit could not be established due to illegible

Affidavit in Support of Search Warrant - Page 19

AHIF 001555

bank stamps found on the back of the check, however Arabic markings on the check indicate that the cashier's check was deposited in what appears to be a personal account for ALBUTHE at Al Rajhi Banking and Investment.

47.   In summary, I believe there is probable cause to believe that ALBUTHE knowingly failed to file a CMIR when he departed the U.S. on March 12, 2000 with the one hundred thirty (130) $1,000 American Express Traveler's checks.   I believe that because SEDA assisted ALBUTHE with the purchase of the traveler's checks, and that the agreements pertaining to the turning over of these funds to ALBUTHE appear to have emanated from AHIF, Inc. in Ashland, Oregon, it is likely additional evidence of the CMIR violation may be located at 3800 S. Highway 99, where I believe AHIF, Inc. has conducted most of its business affairs.   Further, since it appears that SEDA and ALBUTHE have attempted to conceal the movement of funds to Chechnya, as more fully described below, there may other similar transactions conducted which we have not yet detected. Therefore, I request authorization to search for evidence of all financial transactions conducted between October 1997 and February 2003 which involved cash, traveler's checks, cashier's checks or money orders, and the individuals or entities set forth in attachment B, for indications of additional CMIR violations.

**VIOLATION OF TITLE 26 U.S.C 7206(1)**

48.   The second violation to be established in this affidavit is the willful filing of a false tax return by SEDA with the IRS for the year 2000.  Support for this violation is as follows.

49.   IRS records show that SEDA filed a 2000 Form 990, *Return of Organization*

Affidavit in Support of Search Warrant - Page 20

AHIF 001556