# EXHIBIT 43

LAW OFFICES
## BERNABEI & KATZ, PLLC
1773 T STREET, N.W.
WASHINGTON, D.C. 20009-7139

LYNNE BERNABEI
DEBRA S. KATZ °
LISA J. BANKS
ARI M. WILKENFELD +
ALAN R. KABAT +
GENA E. WILTSEK °
AVI L. KUMIN *
RASHIDA A. ADAMS

(202) 745-1942
TELECOPIER: (202) 745-2627
E-MAIL: BERKATZLAW@AOL.COM
WEBSITE: WWW.BERNABEIANDKATZ.COM

OF COUNSEL:
DAVID J. MARSHALL
ELAINE D. KAPLAN

+ ADMITTED IN MD ALSO
° ADMITTED IN NY ALSO
* ADMITTED IN CA ALSO

By Hand Delivery
May 14, 2004

Mr. R. Richard Newcomb
Office of Foreign Assets Control
U.S. Department of Treasury
ATTN: Licensing Division
1500 Pennsylvania Avenue, N.W. (Annex)
Washington, D.C. 20220

Re: <u>Al Haramain Islamic Foundation, Inc., SDG # 305 (License Request Pending)</u>

Dear Mr. Newcomb:

The assets of Al Haramain Islamic Foundation, Inc. ("AHIF"), were blocked pending investigation on February 18, 2004. On April 23, 2004, the Office of Foreign Assets Control ("OFAC") indicated by letter that it was considering designating AHIF as a Specially Designated Global Terrorist ("SDGT"), pursuant to Executive Order 13224 and the International Emergency Economic Powers Act, 50 U.S.C. § 1701 *et seq*. The letter gave AHIF twenty-one (21) days, until May 14, 2004, in which to respond to the unclassified administrative record.

### I.   Pending Procedural Matters.

As you are aware, there are several procedural matters which remain unresolved. On May 3, 2004, we requested an extension of time within which to respond. Despite our follow-up inquiry on May 5, 2004, we have not received a response to that request. Furthermore, on March 10, 2004, our firm requested a license authorizing it to be paid legal fees and costs, and on April 30, 2004, the firm of Gessler, Hughes, Socol, Piers, Resnick & Dym requested a similar license to provide representation in conjunction with Bernabei & Katz, PLLC. OFAC has not yet responded to these requests, which I reiterated in my May 5, 2004 letter. We again request that OFAC grant AHIF additional time within which to prepare its response to the proposed designation and to assert its objections to the designation process.

On behalf of AHIF, we also object to OFAC making any designation decision prior to resolving the outstanding procedural matters. However, in light of OFAC's failure to promptly

AHIF 001871

Mr. R. Richard Newcomb
Office of Foreign Assets Control
May 14, 2004
Page 2

resolve the procedural matters, AHIF provides the following preliminary response to the proposed designation and reserves the right to supplement this response at any time.

## II. Absence of Legal Standards.

As an initial matter, AHIF objects to OFAC's failure to provide any clarification regarding the legal standards it utilizes in making designation decisions. As you are undoubtedly aware, two federal court rulings have found the Treasury Department's designation procedure to be constitutionally infirm. *See National Counsel of Resistance of Iran v. Department of State*, 251 F.3d 192 (D.C. Cir. 2001); *United States v. Rahmani*, 209 F. Supp. 2d 1045 (C.D. Cal. 2002), *appeal pending*.

Although the regulations at 31 C.F.R. § 594.101 *et seq.* articulate prohibitions governing SDGT's and procedures for licensing, AHIF is unaware of any statute, administrative rule or regulation, or any other source of law which provides standards for the designation of an entity as an SDGT after having its assets blocked pending investigation. For instance: (a) what "evidence" will be considered; (b) how does OFAC assure itself of the trustworthiness of that evidence; (c) how much evidence is required or what is the standard of proof required to establish that an entity should be designated; and, (d) how does OFAC assure itself that the entity being designated (AHIF, in this case) knew about and condoned actions by other affiliates of the al-Haramain Foundation (Saudi Arabia), if such conduct is the basis for the designation. This last factor is particularly essential here where OFAC designated the Somalian and Bosnian offices of the al-Haramain Foundation in March of 2002, and yet Treasury Secretary O'Neill expressly stated that the Saudi charity itself was not being designated because it "is dedicated to promoting Islamic teachings." See U.S. Department of State, "O'Neill Cites U.S.-Saudi Action Against Terror; Saudi Foundation's Somalia and Bosnia Offices Targeted" (Mar. 11, 2002).[1] This acknowledgment on the part of the Treasury Secretary that the Saudi al-Haramain Foundation was involved in reputable charitable work, without knowledge of the alleged bad acts of several of its overseas affiliates, undermines OFAC's position regarding AHIF, which is a wholly independent U.S. corporation, and had no relationship whatsoever with the Bosnia and Somalia affiliates.

## III. OFAC's Improper Reliance on Classified Documents.

Next, AHIF objects to OFAC's reliance on classified documents. It is not possible for AHIF to rebut evidence of which it is not aware. This point is best illustrated by reviewing the

---

[1] See U.S. Department of State, "O'Neill Cites U.S.-Saudi Action Against Terror; Saudi Foundation's Somalia and Bosnia Offices Targeted" (Mar. 11, 2002), <http://usinfo.state.gov/topical/pol/terror/02031108.htm>.

AHIF 001872

Mr. R. Richard Newcomb
Office of Foreign Assets Control
May 14, 2004
Page 3

administrative record produced in this matter. There is not a shred of evidence linking AHIF to terrorism in this administrative record. Therefore, the decision to block AHIF's assets pending investigation and the designation as an SDGT, if OFAC makes such a designation, will necessarily be based on evidence to which AHIF has had no opportunity to offer a direct and coherent response. Despite this opportunity to provide the present submission, AHIF will not have been afforded any real process to respond if it is not aware of the basis of the allegations. *See e.g., Goss v. Lopez*, 419 U.S. 565, 580 (1975) ("Fairness can rarely be obtained by secret, one-sided determination of facts decisive of rights.") (quoting *Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 170 (1951) (Frankfurter, J., concurring)).

The use of secret or classified evidence raises serious due process problems, and should only be allowed in the most extreme circumstances. *See, e.g., American-Arab Anti-Discrimination Committee v. Reno*, 70 F.3d 1045, 1070 (9th Cir. 1995) ("Because of the danger of injustice when decisions lack the procedural safeguards that form the core of constitutional due process, the *Mathews* [*v. Eldridge*, 424 U.S. 319 (1976)] balancing suggests that use of undisclosed information in adjudications should be presumptively unconstitutional. Only the most extraordinary circumstances could support [such a] one-sided process."); *Rafeedie v. INS*, 880 F.2d 506, 516 (D.C. Cir. 1989) ("Rafeedie – like Joseph K. in *The Trial* – can prevail before the Regional Commissioner only if he can rebut the undisclosed evidence against him, i.e., prove that he is not a terrorist regardless of what might be implied by the Government's confidential information. It is difficult to imagine how even someone innocent of all wrongdoing could meet such a burden."). The circumstances that might warrant the use of secret or classified evidence are not present with respect to AHIF.

### IV.  OFAC's Improper Reliance on Hearsay Evidence.

As to the "unclassified" administrative record, AHIF strenuously objects to OFAC's reliance on the hearsay evidence.[2] Many of the items contained in the administrative record are news accounts and in at least one instance the source of the account is "unidentified."[3] Several of

---

[2] OFAC's inclusion in the administrative record, without explanation, of a multi-count indictment charging one Mohammad Ali Hassan Al-Moayad with providing material support to Hamas and al Qaeda between 1997 and 2002 is particularly troubling since there is no indication or allegation that he had any contact whatsoever with AHIF, or any person affiliated with AHIF.

[3] The U.S. Court of Appeals for the D.C. Circuit, in other contexts, has recognized the problems with relying on hearsay evidence, even that published in well-known sources. *See, e.g., United States v. Microsoft Corp.*, 253 F.3d 34, 108 (D.C. Cir. 2001) (en banc) (per curiam) ("[W]e need to state a few words about the state of the record. All we have are the published accounts .... These accounts were not admitted in evidence. They may be hearsay."); *Metropolitan Council of NAACP Branches v. FCC*, 46 F.3d 1154, 1165 (D.C. Cir. 1995) ("We seriously question whether a *New York Times* article is admissible evidence of the truthfulness of its contents.").

AHIF 001873

Mr. R. Richard Newcomb
Office of Foreign Assets Control
May 14, 2004
Page 4

the news articles from the 1990's concern an office in Albania which, according to the press accounts, called itself "Al Haramain" and an individual, allegedly associated with that organization, one Ahmed Ibrahim Assayed al-Nagar. While it appears that serious allegations have been made against Mr. al-Nagar, there is nothing in the record connecting Mr. al-Nagar or the alleged Albanian incident in 1998 to AHIF. Moreover, as AHIF was not formally incorporated until March 1999, there is no factual support for any allegation that AHIF was involved with these Albanian entities. Finally, OFAC has never designated this Albanian office as a terrorist, so it is impossible to divine what possible relevance this entity could have to the designation of AHIF.

### V. OFAC's Administrative Record Does Not Support Designating AHIF.

Mr. Newcomb, in his April 23, 2004 letter, stated that OFAC was "considering designating AHIF as a Specially Designated Global Terrorist pursuant to Executive Order 13224 and the International Emergency Economic Powers Act, 50 U.S.C. § 1701 *et seq.*" Executive Order 13224 provides for the blocking of property of persons who commit, assist, sponsor, or support "acts of terrorism that threaten the security of U.S. nationals or the national security, foreign policy, or economy of the United States," or who are associated with such persons. *See* Exec. Order 13224, at § 1. There is no evidence, hearsay or not, that AHIF has committed or assisted acts of terrorism, or that it is knowingly associated with those who do so.

AHIF is literally at a loss as to how to respond given the paucity of relevant information contained in the "unclassified" administrative record. It has, however, come to AHIF's attention that allegations have surfaced in the media, clearly based on documents seized by the U.S. government, that AHIF has assisted in distributing translated Qur'ans to American prisoners which contain an addendum that one commentator claims "call[s] for jihad against the infidels and against the West."[4] First, AHIF objects to this misleading characterization of the addendum to the version of the Qur'an distributed by AHIF, since the publication does not constitute any immediate threat, as would be required to hold AHIF liable for its contents. *Brandenburg v. Ohio*, 395 U.S. 444, 448-49 (1969) (per curiam). Second, any designation on this basis would violate the First Amendment rights of AHIF, a United States corporation.[5] *Humanitarian Law Project v. Reno*, 352 F.2d 382, 403 (9th Cir. 2003) ("When a statute criminalizes activity

---

[4] To the extent that the appendix to this publication forms any basis for any designation of AHIF, we object and request leave to offer testimony from academic and religious scholar(s) on the meaning of this appendix.

[5] It would be manifestly improper for OFAC to designate AHIF on the basis of this publication since OFAC's regulations allow for the distribution of "information and informational materials" which are defined as "publications, films, posters . . . and informational articles" by Specially Designated Terrorists ("SDNs"). *See* 31 C.F.R. §§ 595.206, 594.305-594.306.

AHIF 001874

Mr. R. Richard Newcomb
Office of Foreign Assets Control
May 14, 2004
Page 5

safeguarded by the First Amendment, we are concerned with 'the danger of tolerating, in the area of First Amendment freedoms, the existence of a penal statute susceptible of sweeping and improper application.'") (quoting *NAACP v. Button,* 371 U.S. 415, 433 (1963)); *Humanitarian Law Project v. Reno,* 205 F.3d 1130, 1137 (9th Cir. 2000) ("Someone who advocates the cause of the PKK could be seen as supplying them with personnel . . . . But advocacy is pure speech protected by the First Amendment."), *cert. denied,* 532 U.S. 904 (2001). Finally, all AHIF did was to distribute publications that were written and prepared by others, and AHIF cannot be designated on that basis any more than a book dealer is responsible for the contents of every book available in its stores.

Based on the grand jury investigation conducted in Oregon, it appears that the potential designation may be based on AHIF's efforts in early 2000 to raise money for relief work in Chechnya and the subsequent transfer of approximately $180,000 from AHIF's bank account in March of 2000 to the al-Haramain Foundation in Saudi Arabia. If this is to be the basis of a designation, it is imperative that OFAC consider the evidence that follows, which demonstrates that this relief project was authorized at the highest levels of the Saudi and Russian governments.

Beginning in the fall of 1999, Dr. Al Swailem, the chair of the Saudi Arabian Red Crescent Society ("Saudi Red Crescent"), an affiliate of the International Red Cross, was in contact with the Russian Ambassador to Saudi Arabia about the war in Chechnya (the second in five years) and its devastating impact on the Muslim community, including the refugees who were displaced to camps elsewhere in the northern Caucasus. The Saudi Joint Relief Committee on Kosovo and Chechnya ("SJRC") was negotiating the provision of humanitarian aid to the region through a consortium of charitable organizations, including the Saudi Red Crescent.[6]

Crown Prince Abdullah bin Abdulaziz Al-Saud, the *de facto* ruler of Saudi Arabia, by memorandum dated November 9, 1999 to Prince Naif (Saudi Minister of Interior and General Advisor to SJRC), reported that the Russian Ambassador to Saudi Arabia "has assured that his government welcomes the Saudi support" of providing humanitarian aid to the Chechnya refugees. Prince Abdullah also stated that the Russian Ambassador will ensure that Russia will favorably present and support the Saudi relief efforts. Thus, Prince Abdullah concluded and ordered that:

---

[6] The United Nations Secretary General has acknowledged the SJRC's ongoing work in Kosovo, and has requested that the SJRC provide further humanitarian aid. See Letter from K. Annan to HRH Crown Prince Abdullah (Mar. 20, 2001) (attached hereto as Exhibit 1); see also United Nations High Commissioner for Refugees, "UNHCR-NGO PARinAC Country Report (Saudi Arabia)" (Sept. 24, 2000) (summarizing operations of and contacts with SJRC and several other charities) (attached and incorporated hereto as Exhibit 2).

AHIF 001875

Mr. R. Richard Newcomb
Office of Foreign Assets Control
May 14, 2004
Page 6

> I appreciate your suggestion that we should provide support under the supervision of the Saudi Joint Relief Committee for Kosovo and Chechnya, and it should be reflected by the media and internationally documented.
>
> I am informing you that I approved that. So, proceed accordingly.

See Letter from HRH Prince Abdullah to Prince Naif (Nov. 9, 1999) (attached and incorporated hereto as Exhibit 3).[7]

Several weeks later, on November 30, 1999, Prince Turki bin Fahd bin Jilawi Al-Saud, Chair of the Chechnya Committee of the SJRC for Kosovo and Chechnya, sent a letter to the al-Haramain Foundation (Saudi Arabia), requesting that it collect donations for Kosovo and Chechnya. This letter established various guidelines for raising and accounting for funds, *e.g.*, use of logo, official receipts, monies to be deposited in one of two bank accounts, receipts sent to general treasury, weekly audits of accounts. See Letter from Prince Turki to al-Haramain Foundation (Nov. 30, 1999) (attached and incorporated hereto as Exhibit 4).[8]

In December 1999, the Russian Ministry for Civil Defense Affairs, Emergency and Removing Natural Disasters and the SJRC for Kosovo and Chechnya signed a Memorandum of Accord for providing humanitarian aid to the needy people of Northern Chechnya. See Memorandum of Accord (Dec. 1999) (attached and incorporated herein as Exhibit 5). Pursuant to the Accord, the Russian Ministry agreed to provide facilities for transporting aid from Saudi Arabia to Russia, exempt the aid from import taxes, and help obtain the goods from the local markets if needed. The SJRC agreed to coordinate its work with the Russian Ministry, provide detailed information about the relief delivered, and place its logos on the Russian Ministry's trucks. Id.

According to notes from an SJRC Chechnya Committee meeting on January 1, 2000, the funds collected from Al Haramain and three other Saudi charities were to be distributed over the next three months. The Committee adopted an "Action Plan for Relief in Chechnya" which set forth various tasks to be implemented, including the establishment of an administrative team to execute and supervise the action plan, preparing a budget, planning for housing, feeding centers, medical care, and education in the field. All requests for services were to be presented to Prince Turki, the Chechnya Committee chair, who would present them to the SJRC for review, advice,

---

[7] An unofficial translation of Prince Abdullah's memorandum is included as part of Exhibit 3.

[8] As for Exhibits 4-8, we do not have official, complete translations of the Arabic originals.

AHIF 001876

Mr. R. Richard Newcomb
Office of Foreign Assets Control
May 14, 2004
Page 7

and approval. See Meeting minutes, SJRC Chechnya Committee (Jan. 1, 2000) (attached and incorporated herein as Exhibit 6).

Accordingly, on January 4, 2000, the al-Haramain Foundation made a preliminary deposit of 5,250,000 in Saudi Riyals in the Saudi Joint Relief Committee account at Al Rajhi Bank for the Chechnya project. See Deposit slip (Jan. 4, 2000) (attached and incorporated herein as Exhibit 7).

On February 14, 2000, the Chechnya Committee of the SJRC reported to Dr. Al Swailem that funds were received from Saudi charities, including the al-Haramain Foundation, with funds being transferred to the Saudi Embassy in Moscow for the Chechnya humanitarian aid projects. The Chechnya committee had a series of meetings with the Russian Ambassador to Saudi Arabia and other embassy representatives. See SJRC Chechnya Committee report (Feb. 14, 2000) (attached and incorporated hereto as Exhibit 8). Later that month, Dr. Al-Fiki of Cairo (Egypt) made a donation of $150,000 to AHIF for the Chechnya relief efforts. It is these funds that are the subject of the Oregon investigation into AHIF. These funds were transported, along with smaller donations that AHIF had received for Chechnya humanitarian relief, from AHIF's Oregon bank account, using travelers' checks and cashiers' checks, to the al-Haramain Foundation in Riyadh. The al-Haramain Foundation issued receipts for these funds, which totaled 703,514 Saudi Riyals, and confirmed that the money was spent in humanitarian relief work for the Chechen refugees. See Affidavit of Al Haramain Islamic Foundation (May 3, 2004) (attached and incorporated hereto as Exhibit 9).

Therefore, the funds that AHIF collected and transferred on behalf of the Chechnya refugees were part of a Saudi government project which was approved at the highest levels of both the Saudi and Russian governments. Even if there were some reliable evidence that a portion of this money was misspent – information of which AHIF is unaware – that information cannot form the basis for any designation of AHIF without any evidence showing that persons associated with AHIF knowingly participated in this misappropriation. In fact, the opposite is true: AHIF directors specifically took precautions to ensure that the money collected for Chechnya relief was transferred to a Saudi government entity that itself ensured that the funds went to Chechen refugees, all with the approval and assistance of the Russian government.

In conclusion, there is absolutely no evidence that we are aware of in the administrative record that indicates that AHIF knowingly aided any terrorist or terrorist organization. Therefore, we respectfully request that OFAC lift the blocking of AHIF's assets and vacate the pending designation. As we stated earlier, this is a preliminary response, and we renew our request for an additional thirty (30) day period to submit a further response.

AHIF 001877

Mr. R. Richard Newcomb
Office of Foreign Assets Control
May 14, 2004
Page 8

Sincerely,

Lynne Bernabei

Enc.

cc: Cari Stinebower, Esquire
    Mary Rowland, Esquire

AHIF 001878