# EXHIBIT

# E

Part 1

1

0287TERC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

IN RE:  TERRORIST ATTACKS ON
SEPTEMBER 11, 2001                      03 MDL 1570

------------------------------x

                                        February 8, 2010
                                        10:30 a.m.

Before:

                  HON. FRANK MAAS

                                        Magistrate Judge

                  APPEARANCES

KREINDLER & KREINDLER
     Attorneys for Plaintiffs
BY:  JAMES KREINDLER
     ANDREW MALONEY

ANDERSON KILL & OLICK, P.C.
     Attorneys for Plaintiff O'Neill
BY:  JERRY S. GOLDMAN

COZEN O'CONNOR
     Attorneys for Plaintiff Federal Insurance
BY:  SEAN CARNER

MOTLEY RICE
     Attorneys for Burnett Plaintiffs
BY:  ROBERT HAEFELE (via telephone)

ROTTENBERG LIPMAN RICH
     Attorneys for Defendants Sana Bell, Inc
     and Sanabel Al Kheer
BY:  CHRIS MANNING
     EURYDICE KELLEY

BERNABEI & WACHTEL PLLC
     Attorneys for Defendant Al Haramain
     Islamic Foundation (USA)
BY:  ALAN R. KABAT

           SOUTHERN DISTRICT REPORTERS, P.C.
                  (212) 805-0300

0287TERC

1                    APPEARANCE (Continued)

2

3  LAW OFFICE OF STEVEN BARENTZEN
        Attorneys for Defendant Dr. Yagub Mirza
   BY:  STEVEN BARENTZEN

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

0287TERC

1  be a substitute.

2          THE COURT:  It could be, but I'm not going to require
3  it.

4          MR. BARENTZEN:  One last point I'll make just for the
5  record here, so it's all on the record:  Whatever delay may
6  have occurred quite frankly is plaintiffs' own fault.

7          Had they in the beginning of this come to Dr. Mirza
8  and asked me do you have documents, where are they, I could
9  have told you five years ago we don't have them.

10         Whatever dispute happened between the plaintiffs and
11 Sanabel, I still can't really wrap my head around it, but we
12 got caught in the crossfire here.  I found out about it and
13 jumped into this case and voluntarily said we don't have
14 documents.  That somehow Dr. Mirza and I are somehow
15 responsible for the delay the plaintiffs are suffering here is
16 just not the case at all.

17         THE COURT:  OK.  Well, I have made my ruling.
18         Should we move on to Al Haramain?
19         MR. HAEFELE:  I imagine that's me, your Honor.
20         THE COURT:  OK.

21         MR. HAEFELE:  May it please the court, first of all,
22 thank you for accepting my appearance by telephone.  I promise
23 I had multiple flights to come up there to be with you but they
24 were all canceled.

25         THE COURT:  A likely story, but that's fine.

0287TERC

1       MR. HAEFELE:  You are probably better off anyway.
2  Really, you don't need me coughing in your courtroom.
3       THE COURT:  I can probably hear you better on the
4  phone than if you were in the courtroom.  Go on.
5       MR. HAEFELE:  Well, first, I think your Honor noted
6  one of the first things that I did want to call to your
7  attention, that we're in full blown merits discovery with Al
8  Haramain, so any notion that there's any limitation as to any
9  discovery, other than any limits that the federal rules put on
10 us, they don't apply here.
11      The other point that I wanted to make, your Honor, is
12 the need to avoid discover delay, and I just believe we have
13 emphasized that to your Honor on multiple occasions, the need
14 to avoid delay and obtaining discovery.  And in your Honor's
15 most recent decision regarding discovery, your Honor recognizes
16 the need to avoid discovery delay, and those principles apply
17 no less.  That rationale your Honor provided there regarding
18 avoiding prejudice to the other side doesn't apply here where
19 we are in merits discovery with Al Haramain.
20      THE COURT:  With respect to Al Haramain U.S.
21      MR. HAEFELE:  Well, yes, your Honor, that's correct.
22 I will get into the other aspect of that in a moment, but, yes,
23 with regard to how Al Haramain, what I would call the U.S.
24 branch office of Al Haramain.
25      This court has express policy against allowing

1    defendants to shield documents from discovery by moving
2    documents abroad, and that same principle applies concerning
3    what I will call shape shifting corporate entities to avoid
4    discovery and accountability.
5           Borrowing from the language from one of the cases I
6    cited in the brief, your Honor, Cooper Industries, 102 F.R.D.
7    918, if a defendant could so easily evade discovery, every U.S.
8    company would do the same thing.  Here in this case it would be
9    keeping documents out of the U.S. at a headquarters or
10   resisting collecting discovery until after dissolving or making
11   other branch offices disappear.
12          That principle of treating commonly controlled
13   entities as singular entities for discovery was also supported
14   in the Alcan International case that we cited, which was 176
15   F.R.D. 75.  Like in Alcan, here the Al Haramain entities are
16   unquestionably all members of a unified worldwide business
17   under common control, using the same corporate logo and with
18   regular contact, particularly given the overlap and leadership
19   of the two entities.
20          As in Alcan, the court -- in Alcan the court said it
21   was inconceivable -- and I would say that's true here -- that
22   the U.S. entity through its actors would not have access to the
23   headquarters' information, particularly through the very same
24   overlapping acts.
25          Your Honor, in both of our letters we set out a number

0287TERC

1   of factors to be considered to treat Al Haramain and the Al
2   Haramain headquarters as alter egos of each other. And what I
3   would like to do, your Honor, if you have the letter, the
4   January 5 letter that we sent your Honor, I would refer you to
5   page 2 of that letter. Do you have that?
6           THE COURT: I'm sure I do. Bear with me a second.
7           Yes.
8           MR. HAEFELE: On page 2, I think it's in the second
9   paragraph, we went through and we referenced some case law that
10  sets out a number of factors to be recognized in considering
11  whether to disregard juridical separateness of companies or
12  entities. And going through them, what I would like to do is
13  walk the court through some of the documents that we submitted
14  and show you evidence supporting treating the U.S. office as
15  the alter ego of the Riyad headquarters, if that's ripe, your
16  Honor.
17          THE COURT: Sure.
18          MR. HAEFELE: Well, if we go one through 15, through
19  the factors, the first factor that's referenced there just
20  doesn't apply here because they're talking about common or
21  overlapping stock ownership, and we are talking about entities
22  that don't have stock ownership here. So, that one wouldn't
23  apply.
24          The second fact does apply, which is common or
25  overlapping directors or officers. And we have three principal

0287TERC

1   officers or directors of the U.S. branch office. And for those
2   there, Mr. Al Akil, who is in Saudi Arabia, who is the
3   president of the U.S. branch office; the U.S. branch director,
4   GM of the Riyad headquarters. And those items are identified
5   in Exhibits 14, 15 and 16.
6       Actually 14, 15 and 16 are important for all three of
7   the directors. Mr. Al Khati, who is also in Saudi Arabia is
8   vice president of the U.S. branch, as shown on Exhibits 15 and
9   16. He is the U.S. branch director, as shown in Exhibit 14.
10  He is the deputy director of Al Haramain Riyad, as shown in
11  Exhibit 18. Mr. Al Butay is also in Saudi Arabia. He is the
12  treasure of the U.S. branch, as shown in Exhibits 15 and 16.
13  He is the U.S. branch director, as shown in Exhibit 14. He
14  worked from the Riyad office, as shown in Exhibits 19 and 20.
15  He is the lawful representative in the U.S. of Al Haramain
16  headquarters, as shown in Exhibit 10.
17      If we skip down to the next factor, your Honor, the
18  use of the same corporate offices. And what we see is that in
19  Exhibit 22 we see that the Al Haramain website, which is used
20  jointly by both the Al Haramains, identify the U.S. office as
21  the U.S. branch office of Al Haramain. The website also
22  identified Riyad as the head office and the U.S. branch office
23  as the Al Haramain Educational Center. That's in Exhibit 23.
24      Both the headquarters and U.S. branch regularly use
25  the same website, the same letterhead and the same logo without

0287TERC

1    any kind of distinction. And that's in a variety of exhibits
2    from 24 through 35 and then 50 through 58.
3            I don't actually have the exhibits referenced here,
4    but I think certainly the anticapitalization of the
5    subsidiaries, which is the next factor, there are a variety of
6    documents that show that Al Haramain branch office in the U.S.
7    pretty much lived off of the money, the funding that was coming
8    in from Al Haramain headquarters, and that's through a number
9    of correspondence back and forth between the two where Al
10   Haramain U.S.A. is asking for money to do any kind of repairs
11   to the buildings, and it indicates that the salaries paid to
12   the Al Haramain people in the U.S. came from the funding that
13   came from the headquarters.
14           The next factor, which is an overlapping factor I
15   think, is the financing of the subsidiary by the parent.
16   Exhibit 10 shows that Al Akil appointed Al Butay the power of
17   attorney on headquarters letterhead to pay any property,
18   equipment, materials, people, for the express purpose of
19   support and maintenance of the goals and objectives of Al
20   Haramain activities in the U.S. Now, that's the way that Al
21   Haramain in the U.S. branch office got open because of the
22   power of attorney given from the general manager in the Riyad
23   headquarters to the U.S. representative -- sorry, the U.S.
24   representative of the headquarters in Riyad.
25           THE COURT: That was used to acquire the building,