# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

_____
)
IN RE:  TERRORIST ATTACKS ON    )    **Civil Action No. 03 MDL 1570 (GBD)(FM)**
SEPTEMBER 11, 2001    )
)
_____)

*This document relates to:*

*Ashton v. Al Qaeda*, No. 02-CV-6977 (GBD)
*Burnett v. Al Baraka*, No. 03-CV-9849 (GBD)
*Continental Casualty v. Al Qaeda*, No. 04-CV-5970 (GBD)
*Euro Brokers v. Al Baraka*, No. 04-CV-7279 (GBD)
*Federal Insurance v. Al Qaida*, No. 03-CV-6978 (GBD)
*New York Marine v. Al Qaida*, No. 04-CV-6105 (GBD)
*World Trade Center v. Al Baraka*, No. 04-CV-7280 (GBD)

## REPLY BRIEF IN SUPPORT OF
## DEFENDANT SAUDI BINLADIN GROUP'S
## RENEWED MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION
## AND FOR FAILURE TO STATE A CLAIM

# TABLE OF CONTENTS

TABLE OF CONTENTS .................................................................................................. i

TABLE OF AUTHORITIES .......................................................................................... ii

INTRODUCTION ...........................................................................................................1

ARGUMENT ...................................................................................................................2

I.    PLAINTIFFS MISSTATE THE APPLICABLE LEGAL STANDARDS ...................2

    A.    Plaintiffs' Jurisdictional Case Must Have Evidentiary Support ..............................2
    B.    The Second Circuit Does Not Permit General Contacts With the Forum to be
    Weighed in the Balance .................................................................................................3

II.   THERE IS NO EVIDENCE THAT SBG ENGAGED IN TORTIOUS CONDUCT
INTENTIONALLY TARGETED AT THE UNITED STATES ................................................5

    A.    Plaintiffs Present No Evidence of Support for OBL After He Was Removed as a
    Shareholder Effective in 1993 .......................................................................................6
    B.    Plaintiffs' Assertions of Material Support Before 1993 Cannot Sustain
    Jurisdiction Legally or Factually .................................................................................10
        1.    *Conduct before 1993 is temporally too remote from the 9/11 attacks to
        support jurisdiction* ...................................................................................................10
        2.    *Plaintiffs have no evidence that SBG provided any material support to
        OBL or al Qaeda before 1993* ...............................................................................11
        3.    *Plaintiffs have provided no evidence that SBG knew of OBL's intention to
        attack the United States before 1993, much less intended to support such
        attacks* ......................................................................................................................14

III.  PLAINTIFFS HAVE NOT MADE A PRIMA FACIE SHOWING THAT SBG HAS
MAINTAINED "CONTINUOUS AND SYSTEMATIC" CONTACTS WITH THE
UNITED STATES SUCH THAT IT IS SUBJECT TO GENERAL JURISDICTION ........19

    A.    Dr. Fuad Rihani ..........................................................................................................20
    B.    The Existence Until 1999 of SBG-USA ....................................................................23
    C.    Sporadic U.S. Travel by SBG Employees. ................................................................23

IV.   PLAINTIFFS' CLAIM ON THE MERITS DOES NOT SURVIVE *TWOMBLY*
AND *IQBAL* ..........................................................................................................................24

CONCLUSION ..............................................................................................................25

# TABLE OF AUTHORITIES

CASES

*Am. Soc'y of Mech. Eng'rs v. Hydrolevel Corp.*,
  456 U.S. 556 (1982)...........................................................................22

*Ashcroft v. Iqbal*,
  129 S. Ct. 1937 (2009).......................................................................25

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)......................................................................24, 25

*Boit v. Gar-Tec Prods., Inc.*,
  967 F.2d 671 (1st Cir. 1992)................................................................2

*Calder v. Jones*,
  465 U.S. 783 (1984)............................................................................4

*Chew v. Dietrich*,
  143 F.3d 24 (2d Cir. 1998) ...............................................................3, 4

*Clamp-All Corp. v. Cast Iron Soil Pipe Inst.*,
  No. 84-1325-Z, 1986 U.S. Dist. Lexis 25184 (D. Mass. May 22, 1986) ................21

*Cossaboon v. Maine Med. Ctr.*,
  600 F.3d 25 (1st Cir. 2010)................................................................22

*Del Ponte v. Universal City Dev. Partners, LTD.*,
  2008 WL 169358, No. 07-CV-2360 (S.D.N.Y. Jan. 16, 2008) .................................4

*Donald & Co. Sec., Inc v. U.S. Stock Transfer Corp.*,
  No. 99 Civ. 9286, 2000 WL 146916 (S.D.N.Y. Jan. 21, 2000)................................21

*Duravest, Inc. v. Viscardi, A.G.*,
  581 F. Supp. 2d 628 (S.D.N.Y. 2008) ...................................................22

*Helicopteros Nacionales de Colombia, S.A. v. Hall*,
  466 U.S. 408 (1984)...................................................................1, 21, 24

*Hoffritz for Cutlery, Inc. v. Amajac, Ltd.*,
  763 F.2d 55 (2d Cir. 1985) ...............................................................24

*In re Commodore Int'l, Ltd. v. Transpacific Corp.*,
  242 B.R. 243 (S.D.N.Y. 1999) ...........................................................22

*In re Sept. 11 Litigation*,
  621 F. Supp. 2d 131 (S.D.N.Y. 2009) ...........................................11, 12, 13

*In re Terrorist Attacks on September 11, 2001*,
  538 F.3d (2d Cir. 2008) ("*Terrorist Attacks III*") ................................................4, 5

*In re Terrorist Attacks on September 11, 2001*,
  718 F. Supp. 2d 456 (S.D.N.Y. 2010) ("*Terrorist Attacks IV*") .............4, 5, 10, 11, 12, 23, 25

*Johnston v. Multidata Sys. Int'l Corp.*,
  523 F.3d 602 (5th Cir. 2008) ......................................................................22

*Kiobel v. Royal Dutch Petroleum Co.*,
  No. 02 Civ. 7618, 2010 U.S. Dist. LEXIS 61452 (S.D.N.Y. June 21, 2010).........................24

*Klinghoffer v. S.N.C. Achille Lauro Ed. Altri-Gestione*,
  937 F.2d 44 (2d Cir. 1991) ....................................................................22, 24

*Melnick v. Adelson-Melnick*,
  346 F. Supp. 2d 499 (S.D.N.Y. 2004) ...............................................................2

*Pension Committee of the Univ. of Montreal Pension Plan v. Banc of Am. Sec.*,
  05-Civ-9016, 2006 WL 708470 (S.D.N.Y. Mar. 20, 2006) .......................................19

*Pfaff v. Denver Art Museum*,
  1995 U.S. Dist. LEXIS 8573 (S.D.N.Y. June 20, 1995) ........................................22

*Shepherd Invs. Int'l, Ltd. v. Verizon Commc'ns, Inc.*,
  373 F. Supp. 2d 853 (E.D. Wis. 2005) ...........................................................22

*Space, Inc. v. Somowitz*,
  No. 08 CIV. 2854, 2008 WL 2676359 (S.D.N.Y. July 8, 2008) ...................................11

*Ungar v. Palestinian Auth.*,
  400 F. Supp. 2d 541 (S.D.N.Y. 2005) .............................................................24

**OTHER AUTHORITIES**

Fed. R. Civ. P. 803(8)(C)...............................................................11, 12, 13

## INTRODUCTION

Plaintiffs have failed to meet their burden of establishing that this Court has either general or specific jurisdiction over Defendant Saudi Binladin Group ("SBG"). Their theories have changed dramatically over the course of the past eight years, but neither their original allegations – now largely abandoned – nor their latest inventions are legally sufficient or factually supported. Plaintiffs still do not have a scintilla of evidence that SBG provided any material support to Osama Bin Laden's ("OBL") terrorist attacks on the United States. Nor have they demonstrated that SBG has a substantial and continuous presence in the United States sufficient to permit the exercise of general jurisdiction.

Plaintiffs' brief is a thinly disguised attempt at a "do-over" of the specific jurisdiction arguments that have already been soundly rejected. They do not cite at all the Second Circuit's opinion setting the applicable legal standards for jurisdiction. They cite this Court's June 2010 opinion only once. And they ignore the fact that, in that opinion, this Court dismissed identical claims against SBG's chairman, Bakr Binladin, the Mohammad Binladin Corporation ("MBC"), and other members of the Binladin family. Regarding general jurisdiction, Plaintiffs likewise all but ignore this Court's prior rulings as to other defendants, as well as the additional authorities SBG cited to show that general jurisdiction cannot rest merely on SBG-USA's former presence in the United States – which Plaintiffs now concede ended long before both the events of September 11 and the filing of Plaintiffs' complaints – and the part-time presence of one SBG consultant (they call him an employee, but the distinction is immaterial) who, for personal family reasons spends part of the year telecommuting from the United States.[1]

---

[1] Plaintiffs also continue to insist, albeit only referring to an earlier brief, that the Due Process Clause does not even apply to this Court's jurisdiction over foreign corporations. Pls.' Opp. Mem. to Def.'s Renewed Mot. to Dism. 5 & n.2 (Nov. 18, 2010) (MDL Dkt. #2385) ("Pls.' Opp. Mem."). It should be sufficient for current purposes that this Court and the Second Circuit have, in reliance on *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466

# ARGUMENT

## I.   PLAINTIFFS MISSTATE THE APPLICABLE LEGAL STANDARDS

### A.   <u>Plaintiffs' Jurisdictional Case Must Have Evidentiary Support</u>

As an initial matter, Plaintiffs misstate the standard of review.  They first concede that

after jurisdictional discovery they "must provide factual support for their *prima facie* case, rather

than relying solely on allegations," but they immediately retract that concession by asserting that

their "factual allegations" may only be challenged at an evidentiary hearing.[2]  Plaintiffs obscure

the relevant standard with selective quotations taken out of context.  They do not cite, much less

address, *Melnick v. Adelson-Melnick*, 346 F. Supp. 2d 499 (S.D.N.Y. 2004), discussed in SBG's

opening brief, which lays out the applicable Second Circuit law in this context.  After

jurisdictional discovery, "the plaintiff is obliged to come forward with evidence creating a

genuine issue of fact material to the existence of personal jurisdiction."  *Id.* at 503.  And that

evidence must be admissible.[3]  Plaintiffs "cannot rely merely on conclusory statements or

allegations."  *Id.* at 502.  Deeming such allegations true at this stage, as Plaintiffs urge, would be

an "elementary mistake."  *Boit v. Gar-Tec Prods., Inc.*, 967 F.2d 671, 675 (1st Cir. 1992).

Plaintiffs cannot meet their burden of proof by reliance on their "Summary of Allegations

and Evidence in Support of Their Theories of Specific Jurisdiction."  That document is not only

---

(continued…)

U.S. 408 (1984), and its progeny, routinely applied the due process contacts analysis to foreign corporations.  *See* Def. Saudi Binladin Group's Renewed Mot. Dism. 20, n.59 (Sept. 7, 2010) (MDL Dkt. #2283) ("SBG RMTD"); *see also* Def.'s Resp. to Pls.' Notice of Suppl. Auth. (May 3, 2010) (MDL Dkt. #2246).

[2] Pls.' Opp. Mem. 3.

[3] *See* SBG RMTD 5, n.10 (citing cases).  It is hardly surprising that, after jurisdictional discovery, courts require admissible evidence.  There would be no justification for the burden and expense of years of jurisdictional discovery if Plaintiffs could meet their post-discovery jurisdictional burden with nothing more than allegations.

procedurally improper,[4] but betrays the dearth both of well-pled allegations and of competent evidence. First, the document is not, as Plaintiffs claim, a summary of the allegations as reflected in their complaints and RICO statements. Many of the baseless allegations in their complaints are omitted, and the summary instead includes new, but largely irrelevant, material not mentioned in any pleading. More importantly at this stage, the vast majority of the sources on which Plaintiffs seek to rely are inadmissible. Plaintiffs variously cite books, magazines, newspaper articles, online media, and documents of unknown authorship and provenance,[5] nearly all of which contain multiple levels of hearsay, and every one of which lacks a sponsoring witness to verify its authenticity. Further, even if these documents were admissible, Plaintiffs misquote, exaggerate, or mischaracterize the sources in ways that could only be intended to mislead the Court. Indeed, often the cited source directly refutes Plaintiffs' allegation.[6]

Plaintiffs have failed not only to meet their evidentiary burden but even to demonstrate any legitimate dispute of material fact that would warrant an evidentiary hearing. Given that Plaintiffs could not, in eight years, come up with a single competent witness or admissible document to support their claims against SBG, there is no basis to assume that they have any admissible evidence to present at an evidentiary hearing.

**B.**     **The Second Circuit Does Not Permit General Contacts With the Forum to be Weighed in the Balance**

---

[4] Plaintiffs' Summary is not authorized by this Court's rules nor by the Court's order establishing the page limits for the briefing on this motion. Order (Sept. 7, 2010) (MDL Dkt. #2280).

[5] *See, respectively*, Pls.' Summ. Allegs. & Evid. of Spec. Jur. Exs. 3, 5, 13, 14, and 22 (Nov. 18, 2010) (MDL Dkt. ##2386-4, -6, -26, -35) ("Pls.' Spec. Jur. Summ.") (books); *id.* Exs. 6, 11, 12 (Nov. 18, 2010) (MDL Dkt. ##2386-7, -24, -25) (magazines and newspaper articles); *id.* Exs. 4, 10 (Nov. 18, 2010) (MDL Dkt. ##2386-5, -23) (online media); *id.* Ex. 2 (Nov. 18, 2010) (MDL Dkt. ##2386-3) (documents of unknown provenance).

[6] Although many instances are detailed below, *see, e.g., infra* § II.B.3 & nn.53-59, SBG will not attempt to rebut, in the limited space, Plaintiffs' assertions that are irrelevant to the issues currently before the Court.

Specific jurisdiction by definition rests on a defendant's forum contacts related to the plaintiff's cause of action.  Recognizing the weakness of their case, Plaintiffs now make the novel argument that the Second Circuit applies a "sliding scale" that would permit this Court to take into account SBG's *general* jurisdiction contacts when assessing whether *specific* jurisdiction exists.[7]  No court in this circuit – and as far as we can determine no court in any jurisdiction – has ever embraced the idea.  The Second Circuit decision Plaintiffs cite, *Chew v. Dietrich*, 143 F.3d 24 (2d Cir. 1998), did not hold that general jurisdiction contacts could lower the threshold for specific jurisdiction.  Instead, *Chew* examined the necessary causal connection between a defendant's contacts and the plaintiff's injury and opted to require proximate cause only where the defendant's forum contacts relating to the cause of action were very limited.  *See id.* at 29.  The court allowed for something less than proximate cause where the defendant's contacts *related to the cause of action* were more substantial.  *See id.*

Nor does *Del Ponte v. Universal City Dev. Partners, LTD.*, No. 07-CV-2360, 2008 WL 169358, (S.D.N.Y. Jan. 16, 2008), support Plaintiffs' argument.  There again, the court addressed the necessary link between defendant's contacts and the cause of action.  There, the plaintiff purchased a defective necklace from a kiosk operator in Florida.  Although that necklace likely came from a Pennsylvania vendor, the New York court found sufficient New York contacts *related to the claim* because much of the kiosk's inventory came from New York and that "enabled [the defendant] to stock the variety of inventory desired by consumers such as Plaintiffs.  In other words, but for [defendant's] New York-derived inventory, Plaintiffs may not have shopped at the kiosk in question." *Id.* at *11.

---

[7] Pls.' Opp. Mem. 7 & n.3.

This reasoning, which focuses on the causal connection between a defendant's forum contacts and the plaintiff's cause of action, is a far cry from lowering Plaintiffs' burden under *Calder v. Jones*, 465 U.S. 783, 789 (1984) and the Second Circuit's decision in *In re Terrorist Attacks on September 11, 2001*, 538 F.3d, 71, 95 (2d Cir. 2008) ("*Terrorist Attacks III*"). No collection of U.S. contacts unrelated to their claim can relieve Plaintiffs of their burden to show "alleged intentional tortious conduct aimed at the United States," which, as this Court has stated, is "conduct that is intended to directly aid in the commission of a terrorist act, with knowledge that the brunt of the injuries will be felt in the United States." *In re Terrorist Attacks on September 11, 2001*, 718 F. Supp. 2d 456, 480 (S.D.N.Y. 2010) ("*Terrorist Attacks IV*").[8]

## II.   THERE IS NO EVIDENCE THAT SBG ENGAGED IN TORTIOUS CONDUCT INTENTIONALLY TARGETED AT THE UNITED STATES

Plaintiffs have now abandoned most of the claims against SBG that prompted Judge Casey to deny SBG's initial motion to dismiss pending jurisdictional discovery. They make no reference to SBG's supposed "sheltering" of al Qaeda operatives, or its supposed association with Yassin al Kadi. They no longer claim that OBL remains a shareholder of SBG. They have dropped the claim that OBL's company in the Sudan, Al Hijra Construction, is a subsidiary of SBG or that SBG assisted OBL in constructing the Tahaddi Road. Plaintiffs also no longer make the wild accusation that an SBG affiliate transferred 240 million euros to OBL in 2000, or that SBG or the Binladin family devoted millions of riyals to protecting OBL after 9/11. Those false allegations never had factual support, and Plaintiffs do not pretend otherwise.

---

[8] Plaintiffs continue to rehash arguments about the significance of a collection of terrorism cases that they claim "consistently" uphold jurisdiction over foreign terror sponsors who target the United States. *See* Pls.' Opp. Mem. 8 (citing cases). As the Second Circuit itself found, however, what those cases consistently do is to recognize specific jurisdiction over the "primary participants in terrorist acts" that injured U.S. persons. *See Terrorist Attacks III*, 538 F.3d at 94 (discussing the same cases). Plaintiffs make no attempt to connect SBG to the 9/11 attacks at all, let alone as a primary participant.

What remains are Plaintiffs' new claims that SBG provided support to OBL *before* he was removed as a shareholder in 1993 with knowledge that he was targeting the United States,[9] and the vague claim that OBL maintained some undefined "financial lifeline" to SBG after his removal as a shareholder. This Court has already found that activities in the early 1990s were too temporally remote to establish jurisdiction,[10] a ruling that Plaintiffs ignore. But, in addition to their legal insufficiency, these allegations are also wholly lacking in evidentiary support. Plaintiffs rely on distorted characterizations of fourth-hand hearsay to create an illusion of support that is undercut by the very documents upon which they rely. In the end, the only thing that distinguishes SBG from the numerous defendants this Court has already dismissed is, as Plaintiffs bluntly phrase it, the "direct familial ties between SBG's principals and their half-brother Osama."[11] As this Court has already recognized in dismissing SBG's chairman, several other half-brothers of OBL, and two related companies, that undeniable family connection cannot support an inference that SBG ever gave OBL material support or acted with intent to further terrorist attacks on the United States. The undisputed facts show precisely the opposite.

A.    **Plaintiffs Present No Evidence of Support for OBL After He Was Removed as a Shareholder Effective in 1993**

After telling the Court for years that the 1993 removal of OBL as a shareholder "never happened,"[12] Plaintiffs have effectively abandoned the allegation in their complaints that OBL is still a shareholder of SBG. Plaintiffs submit no evidence that contradicts the corporate records,

---

[9] Even this claim would not satisfy the Second Circuit's standard because it held that mere knowledge of OBL's pronouncements against the U.S. does not permit an inference of the necessary intent to support them. *See Terrorist Attacks III*, 538 F.3d at 94-95. Plaintiffs have provided no evidence from which this Court could infer that SBG intended to further OBL's agenda prior to 1993.

[10] *Terrorist Attacks IV*, 718 F. Supp. 2d at 483.

[11] Pls.' Opp. Mem. 9.

[12] *See, e.g.*, Supplemental Affidavit of James E. Gauch ("Suppl. Gauch Aff.") Ex. 1 at 3 (Dec. 20, 2010) (Letter from Robert Haefele to Hon. George B. Daniels (Dec. 28, 2007) (Attachment A)).

affidavits, and official Saudi government documents that prove that OBL was removed as a

shareholder effective June 1993, and indeed, they now make arguments about the reasons for

OBL's divestment that are expressly premised on the fact that the divestment occurred.[13]  In light

of this concession, it is difficult to understand what continuing relevance there could be in any of

the supposed "inconsistencies" in the documentary record relating to OBL's removal, a subject

that Plaintiffs previously had argued in a futile attempt to show that OBL remained a shareholder.

As Judge Maas held in rejecting the same arguments repeated here:

> [the] alleged discrepancies are fully explained by SBG in their discovery
> responses and the documentary evidence that they have provided to the
> plaintiffs. . . .  That the facts governing the placement of the value of the shares
> into a trust are complex and that some of the documents are not fully consistent
> does not mean that SBG has misrepresented the process."[14]

This Court upheld Judge Maas's decision denying further discovery on these issues on the

grounds that they lacked jurisdictional relevance.[15]

It is also notable that Plaintiffs do not make a single direct allegation that OBL received

any payment for his shares of SBG, a point directly refuted by sworn affidavits submitted by

SBG.  While they make vague references to an unidentified continuing "financial lifeline"[16] and

to an account held by Ghaleb Binladin at Bank al Taqwa,[17] there is not a single specific factual

allegation, much less an iota of evidence, that anyone associated with SBG ever directly or

---

[13] *See* Pls.' Spec. Jur. Summ. ¶ 23 ("It was [OBL's] expressed anti-American views, not anti-Saudi views, which led to his divestment by the Bin Laden family . . . ."); *Id.* ¶ 63 ("Bakr Binladin initiated action against Osama at an [sic] January 1993 MBC board meeting to prohibit payment of Osama of his share of their profits . . . .  Bakr allegedly instructed SBG to do the same."); *Id.* ¶ 64 ("these steps here [divestment of shares] were not undertaken by SBG voluntarily, but rather only occurred because the government compelled SBG to take some public action"). While SBG has disproved with sworn affidavits and contemporaneous documents Plaintiffs' characterizations of the reasons for its actions, there is no legitimate dispute that the family began taking steps to cut OBL off in January 1993, and that OBL was divested of his ownership interest in SBG effective June 1993.

[14] Order at 8-9 (May 21, 2008) (MDL Dkt. #2090).

[15] Order (July 14, 2008) (MDL Dkt. #2108).

[16] Pls.' Spec. Jur. Summ. ¶ 56.

[17] Pls.' Spec. Jur. Summ. ¶ 71.

indirectly paid OBL for his shares, whether through the Bank al Taqwa or otherwise.  Plaintiffs

do not dispute that the value of OBL's shares remains today in an account at the National

Commercial Bank under the control of the Saudi government,[18] and that SBG paid neither OBL

nor any other shareholder any distributions or dividends on account of those shares.[19]

Typical of Plaintiffs' attempts at obfuscation on this point is their mischaracterization of

the letter OBL sent to his brother Bakr in 1998 complaining about SBG's failure to pay him what

he believed he was due for his shares in the company.[20]  Plaintiffs quote from a 1993 letter in a

manner meant to suggest that they are addressing the very bitter 1998 letter.[21]  They then

characterize "the tone of both letters" as "friendly not bitter," "full of familial solicitude and

terms of endearment" and more akin "to an oversight or clerical error."[22]  This Court can judge

for itself.  This is what OBL told his brother Bakr in 1998:


[

# REDACTED

]

---

[18] Plaintiffs falsely claim that SBG did not seek guidance from the Saudi government on what to do with the value of OBL's shares until 1999, arguing that several letters to government authorities in January 1996 did not "actually make this request."  Pls.' Spec. Jur. Summ. ¶ 81 (citing T0000039-41).  But Plaintiffs omit the attachments to those letters describing the steps that had been taken to remove OBL as a shareholder, and ignore the closing lines of the letters: "we await your Highness' instructions."  [ **REDACTED** ]

[19] *See* Supplemental Declaration of Bakr Binladin ("Bakr Suppl. Decl.") ¶ 12 (June 2, 2010) (SBG RMTD, Attach. A (Sept. 7, 2010) (MDL Dkt. #2285)).

[20] *See* SBG RMTD 11.

[21] Pls.' Spec. Jur. Summ. ¶ 89 (quoting only from the 1993 letter, while citing as a single document the Bates range that includes both letters).  Plaintiffs also falsely assert that "Osama's written contact with SBG principals was *pervasive*," *id.* ¶ 88 (emphasis added), but they cite only two letters: OBL's December 1993 letter asking for a shareholder distribution, and the 1998 letter quoted above.  They ignore the only other written communication in the record: a January 1994 letter from the Supervisory Board of MBC rejecting OBL's request for a shareholder distribution and stating that "the unsatisfactory news we hear about you is directly or indirectly adversely affecting the activities and reputation of the Company."  Bakr Suppl. Decl. Ex. 5.

[22] Pls.' Spec. Jur. Summ. ¶¶ 89-90.

[

# REDACTED

]

It is a sign of their desperation that Plaintiffs cite this letter as "a strong inference that SBG had not, in fact, been separated from his family's love and support."[24]

Consistent with their obfuscation tactics, Plaintiffs "suggest" but (presumably for Rule 11 reasons) stop short of directly alleging that there is some relationship between OBL's divestment and an investment account established in November 1993 at Bank al Taqwa by Ghaleb Binladin (a half-brother of OBL to whom OBL's shares were transferred).[25]  Plaintiffs' speculation on this score has been heard and rejected three times already.  The same vague allegations were made against Bakr Binladin, who (unlike SBG) was a signatory on the Bank al Taqwa account,[26] and yet this Court dismissed the complaints against Bakr.  Judge Maas rejected the same arguments

---

[23] Pls.' Spec. Jur. Summ. Ex. 29 at T0000059-60 (Nov. 18, 2010).

[24] Pls.' Opp. Mem. 16.

[25] Pls.' Spec. Jur. Summ. ¶ 73.  Plaintiffs misleadingly suggest that Ghaleb invested in Bank al Taqwa as a shareholder. Pls.' Spec. Jur. Summ. ¶ 80.  Plaintiffs' own exhibits demonstrate he invested in a fund managed by the Bank, and did so eight years before the Bank was designated as a terrorist. Pls.' Spec. Jur. Summ. Ex. 25; Recent OFAC Actions, http://www.treasury.gov/resource-center/sanctions/OFAC-Enforcement/Pages/2001cum.aspx (last visited Dec. 20, 2010) (naming Bank Al Taqwa Limited among entities designated on Nov. 7, 2001).  The notion that a bank's customer is liable for any wrongdoing committed by the bank is, of course, silly.

[26] *Ashton* Sixth Am. Compl. ¶ 388 (Sept. 30, 2005) (MDL Dkt. #1463); *WTC RICO* (Bakr, Tariq, and Omar Binladin) Ex. A at 19-20 (Aug. 15, 2005) (MDL Dkt. #1125).

during discovery, holding that "[t]he fact that OBL's shares may have been held for some period of time in Ghaleb's name, rather than the names of all of the shareholders, does not suggest that SBG failed to remove OBL as a shareholder or that he received any monetary compensation for his shares."[27]  And this Court affirmed Judge Maas's order notwithstanding Plaintiffs' rehashing of the same concocted Bank al Taqwa "suspicions."[28]  As SBG explained at the time, Plaintiffs' own evidence contradicts their speculation that the Bank al Taqwa account was used to pay OBL for his shares.  First, the account records Plaintiffs submitted do not show any payments to anyone, much less to OBL.[29]  Second, there is no correlation between the value of OBL's shares (approximately $9.8 million) and the amount invested in the Bank Al Taqwa account in 1993 ($1 million).  Third, Plaintiffs' own exhibits demonstrate that Ghaleb sought to close the account in June 1997, and that when the bank failed to return his funds (asserting that the investment fund was being liquidated due to losses caused by the "collapse of the south-east Asian market"), he filed a lawsuit seeking to put the bank out of business.[30]  These facts eviscerate Plaintiffs' theory.

### B.  Plaintiffs' Assertions of Material Support Before 1993 Cannot Sustain Jurisdiction Legally or Factually

Given the dearth of evidence to support their theories of material support after OBL was removed as a shareholder, Plaintiffs for the first time focus most of their arguments on SBG's supposed support of OBL *before* 1993.  The factual record is equally lacking and, in light of this Court's prior opinion, the legal deficiencies are even more stark.

#### 1.  *Conduct before 1993 is temporally too remote from the 9/11 attacks to support jurisdiction*

---

[27] Order 7 (May 21, 2008) (MDL Dkt. #2090).

[28] Order (July 8, 2008) (MDL Dkt. #2108).

[29] Pls.' Spec. Jur. Summ. Exs. 24 & 25.

[30] *See* Pls.' Spec. Jur. Summ. Ex. 25.

While this Court did, as Plaintiffs note, allow discovery back to 1992,[31] it has consistently refused to find specific jurisdiction based on such temporally remote conduct. Plaintiffs' jurisdictional claims fail "without the reasonable inference of the temporal, geographical or causal connection, or proximity to the 9/11 attacks." *Terrorist Attacks IV*, 718 F. Supp. at 482. In particular, the Court rejected specific jurisdiction based on allegations of support in the early 1990s – even allegedly direct support from SBG's chairman to OBL – because such support would be "too remote to the terrorist attacks of September 11, 2001, to confer jurisdiction." *Id.* at 483. "[A]lleged acts of rendering support to al Qaeda during its formative years," the Court reiterated as to other defendants, "are too remote and attenuated to support the exercise of specific jurisdiction." *Id.* at 486-87. Plaintiffs do not mention, let alone distinguish, those prior holdings.

### 2.    *Plaintiffs have no evidence that SBG provided any material support to OBL or al Qaeda before 1993*

Even were it legally sufficient, Plaintiffs offer no evidence that SBG *ever* provided material support of any kind to OBL, before or after 1993. First, there is no evidence of any payments from SBG to OBL. For the first time, Plaintiffs assert in their brief that "SBG . . . provided him about $1 million annually from 1970 to 1993."[32] That is obviously untrue, however, because SBG was not even formed until 1989,[33] and Plaintiffs' summary of "allegations and evidence" recognizes that by asserting that those alleged payments came "*from*

---

[31] Order (Dec. 21, 2007) (MDL Dkt. #2059).

[32] Pls.' Opp. Mem. 14. Plaintiffs did not make this claim in their Complaints, RICO Statements, or in responses to interrogatories seeking all facts on which plaintiffs base their theory of specific jurisdiction. It is improper for Plaintiffs to raise these issues for the first time in their opposition to a motion to dismiss. *See Space, Inc. v. Simowitz*, No. 08 CIV. 2854, 2008 WL 2676359, at *4 (S.D.N.Y. July 8, 2008) (refusing to consider new factual allegations raised in opposition to a motion to dismiss because they "fundamentally alter the foundations of [the] claims").

[33] Affidavit of Bakr Binladin ("Bakr Aff.") ¶ 5 (Jan. 25, 2006) (SBG RMTD, Attach. B (Sept. 7, 2010) (MDL Dkt. #2286)).

*his family*" – not from SBG – since 1970.[34]  Even if such payments were relevant, however, Plaintiffs' summary cites only an inadmissible 9/11 Commission staff report to support them.[35]

During discovery, SBG submitted evidence that OBL received no distributions from SBG from at least January 1993 onward, which is the only period for which Judge Maas ordered disclosure on this issue.[36]  Plaintiffs never throughout four years of jurisdictional discovery posited a theory of jurisdiction that would make pre-1993 shareholder distributions relevant, and indeed, their interrogatory responses assert that "Plaintiffs' contentions regarding SBG's support to OBL have not been conditioned necessarily upon his status as an SBG or MBC shareholder."[37]  Even if it were proper for them, at this late date, to change their theory of the case, the burden of proof is theirs, and the absence of any evidence dooms their assertion.

The only other pre-1993 "support" that Plaintiffs allege concerns SBG's construction of a public airport in Port Sudan between February 1990 and June 1992.  But this Court has already rejected the jurisdictional import of identical allegations against Bakr, Omar, and Tariq Binladin:  "[M]aterial support to al Qaeda in the early 1990's, enabling it to expand its base of operations in

---

[34] Pls.' Spec. Jur. Summ. ¶ 45 (emphasis added).

[35] Plaintiffs' counsel have argued – successfully – in other 9/11-related litigation that the staff monographs on which they rely here are inadmissible under Rule 803(8)(C).  *See* Pls.' Memorandum of Law in Opposition to Aviation Dfs.' 9/11 Commission Mot., *In re Sept. 11 Litigation*, 21-MC-101 (AKH) (June 17, 2008) (Dkt. #489) (signed by, among others, Plaintiffs' counsel Motley Rice and Robert T. Haefele) (Suppl. Gauch Aff. Ex. 3); *In re Sept. 11 Litigation*, 621 F. Supp. 2d 131, 152, 155 (S.D.N.Y. 2009).  Plaintiffs likewise argued that major portions of the 9/11 Report are inadmissible because the Commission "based conclusions on unreliable statements by terrorist suspects made during 'enhanced methods' of interrogations, precluding admission under Rule 803(8)(C)." *Id.* at 152.  Plaintiffs have made no effort to demonstrate that the portions of the 9/11 Commission Report that they cite are reliable or admissible and, indeed, a review of the footnotes to the quoted portions of the Report – which cite media articles, books, and "intelligence reports" – clearly indicates that they are not.

[36] Order 10 (May 21, 2008) (MDL Dkt. #2090) (requiring SBG to provide information regarding any distributions to OBL or on behalf of his former shares for the period 1993-2000).  As SBG's interrogatory responses make clear, there were no shareholder distributions to anyone with respect to the shares formerly owned by OBL between January 1, 1993 and 2000.

[37] Pls.' Resp. to Interrog. No. 10 (Nov. 7, 2008) at 33 (Affidavit of James E. Gauch Ex. 15 (Aug. 11, 2010) (SBG RMTD, Attach. N (Sept. 7, 2010) (MDL Dkt. #2300)).

the Sudan, is too remote to the terrorist attacks of September 11, 2001, to confer specific

jurisdiction." *Terrorist Attacks IV*, 718 F. Supp. 2d at 483. Plaintiffs offer no response.

Aside from the legal deficiencies, there is simply no evidence that the allegation is true.

As has been the case on a multitude of issues throughout this litigation, Plaintiffs' assertions

regarding OBL's relationship to that project have been a constantly moving target. In their

complaints, Plaintiffs alleged that OBL's construction company, Al Hijra Construction, was an

SBG subsidiary, but they now concede that it was an independent company established by

OBL.[38] Plaintiffs have dropped their earlier claim that SBG assisted Al Hijra in building the

Tahaddi Road,[39] which SBG's uncontradicted affidavits refuted.[40] Plaintiffs now concede that it

was SBG, not Al Hijra, as their complaints alleged – that constructed the Port Sudan airport – but

they make the watered-down allegation that "there remains significant evidence that Osama (still

an SBG principal at the time) had an oversight role with the Port Sudan project."[41]

Even a cursory examination of Plaintiffs' "evidence" demonstrates that it is neither

"evidence" nor "significant." Plaintiffs cite a so-called "State Department Fact Sheet," but in

addition to its serious foundational flaws,[42] the "Fact Sheet" asserts that Al Hijra built the Port

---

[38] *See* Pls.' Spec. Jur. Summ. ¶ 14.

[39] *See, e.g., Ashton* Sixth Am. Compl. ¶¶ 403, 406 (Sept. 30, 2005) (MDL Dkt. #1463); *Burnett* Third Amended Complaint (Burnett 1616 Dkt. #29) ¶¶ 145, 319-22; *Continental Casualty* Second Am. Compl. ¶¶ 339-42, 354; *Federal Insurance* First Amended Complaint (MDL Dkt. #111) ¶¶ 379-80, 385; *WTC* Compl. ¶¶ 632, 635.

[40] *See, e.g.,* Affidavit of Omar Binladin ("Omar Aff.") ¶ 12 (Jan. 25, 2006) (SBG RMTD, Attach. D (Sept. 7, 2010) (MDL Dkt. #2288)) ("Neither SBG nor MBC nor Binladin Overseas (Pvt. Ltd.) nor any of their subsidiaries or affiliates participated in the construction of the Tahaddi Road project in the Sudan. Nor, to my knowledge, did any of these companies engage in any joint construction projects in the Sudan in the 1990's with Al Hijra or with any other company controlled by Osama."); Affidavit of Mohammad Qashou ("Qashou Aff.") ¶ 4 (Sept. 18, 2006) (SBG RMTD, Attach. F (Sept. 7, 2010) (MDL Dkt. #2290)); Affidavit of Musa Dawoud Musa Mustafa ("Mustafa Aff.") ¶ 5 (Sept. 26, 2006) (SBG RMTD, Attach. G (Sept. 7, 2010) (MDL Dkt. #2291)).

[41] Pls.' Spec. Jur. Summ. ¶¶ 16, 17.

[42] The "State Department Fact Sheet" has no identifying marks indicating that it is a U.S. government document, and Plaintiffs have not established its authorship. Regardless, there is no indication that it is a final report of a government agency that would be admissible under Rule 803. *See, e.g., In re Sept. 11 Litigation*, 621 F. Supp. 2d 131 (S.D.N.Y. 2009) (preliminary reports not admissible under Rule 803(8)(C)).

Sudan airport, a proposition that even Plaintiffs now concede is false. Plaintiffs' only other evidence is also rank hearsay – a BBC summary purporting to translate an excerpt of an Arabic language television interview given at an unknown time and place by Hassan al Turabi, a Sudanese politician, who claimed, some eight years after the project was completed, that "[OBL] built the Port Sudan airport."[43] Plaintiffs have no admissible evidence to refute SBG's sworn affidavits that OBL had no role in the Port Sudan airport project,[44] much less that the project constituted intentional tortious activity directed at the United States.

Lacking any admissible evidence that OBL participated in the Port Sudan project, Plaintiffs' only remaining argument is that OBL "remained a full part of SBG"[45] while the airport was under construction. OBL's mere status as a shareholder prior to 1993 cannot justify the exercise of jurisdiction over SBG. It does not constitute "material support" – a point effectively conceded by Plaintiffs in their interrogatory responses disclaiming any such argument; it cannot be considered tortious conduct by SBG "intentionally directed at the United States"; and it is temporally far too removed from the 9/11 attacks to be relevant to Plaintiffs' injuries.

### 3. Plaintiffs have provided no evidence that SBG knew of OBL's intention to attack the United States before 1993, much less intended to support such attacks

---

[43] Pls.' Spec. Jur. Summ. ¶ 20, Ex. 4.

[44] *See* Omar Aff. ¶ 11 ("To the best of my knowledge, Osama had no role in the performance of the Port Sudan airport construction project. He was not employed by Binladin Overseas (Pvt. Ltd.) or by SBG, MBC, or any of their affiliates. Al Hijra Construction Company ("Al Hijra"), a company allegedly owned by Osama, had no role in the construction project. Al Hijra is not a subsidiary or affiliate of SBG, MBC, or Binladin Overseas (Pvt. Ltd.)."); Qashou Aff. ¶ 4 (stating that neither OBL nor Al Hijra was employed, as a contractor or otherwise, on the Port Sudan Airport project or provided SBG with any type of assistance on the project); Mustafa Aff. ¶ 3 (statement by project manager that "only contact with Osama Bin Laden regarding the New Port Sudan Airport project occurred when, on a couple of occasions, [OBL] accompanied Sudanese government officials on tours of the airport construction site."). Plaintiffs do not contest these affidavits, but cite them as evidence – in fact, the only admissible evidence – regarding the project.

[45] Pls.' Opp. Mem. 11. Moreover, there is no support for Plaintiffs' claim that OBL was a "director" of SBG or held any other management role. Pls.' Spec. Jur. Summ. ¶ 18. Indeed, SBG had no board of directors so it was not possible for him to hold any such title. Bakr Suppl. Decl. ¶ 3.

Even if there were evidence that OBL received some benefit from his status as an SBG shareholder prior to 1993, there is no evidence that SBG knew of or intended to support terrorist activities directed at the United States.  Ironically, in their eagerness to demonstrate that SBG knew about OBL's anti-American sentiments prior to 1993, Plaintiffs repeatedly cite to adverse actions that SBG took against OBL supposedly in response to his anti-American stance.  For example, Plaintiffs now claim that SBG removed OBL as a shareholder specifically because of anti-American rhetoric.[46]  They acknowledge that, far from backing his calls for jihad, SBG shared with the Saudi government a "mutual interest in dissuading Osama from his jihadist plans."[47]  And they admit that ongoing "contacts" in the mid-1990s (actually Binladin family visits that Plaintiffs incorrectly ascribe to SBG) were for the express purpose of "persuad[ing him] to abandon his jihadist plans."[48]  Regardless of SBG's motives for taking action against OBL,[49] it is logically impossible to infer an intent to support terrorist attacks on the United States from SBG's acknowledged record of opposition to OBL's activities.

---

[46] Pls.' Opp. Mem. 12-13.

[47] Pls.' Opp. Mem. 11, n.6.

[48] Pls.' Spec. Jur. Summ. ¶ 51.

[49] It is immaterial whether SBG took action against OBL because of his criticism of the Saudi government, as SBG's witnesses have testified, or because of his anti-American sentiments, as Plaintiffs now contend.  The only relevant facts – and they are undisputed – are that SBG began the process to remove him as a shareholder before there was any information that OBL was promoting violent attacks on U.S. interests.  Plaintiffs attempt to discredit SBG's witnesses by arguing that OBL did not even begin to criticize the Saudi government until after it revoked his citizenship in 1994, but plaintiffs' own sources undermine that claim.  First, Plaintiffs themselves acknowledge that, when the Saudi government in 1990 rebuffed OBL's offer to help "retake Kuwait" and instead "joined the U.S.-led coalition," "Bin Laden and a number of Islamic clerics began to publicly denounce the arrangement.  The Saudi government exiled the clerics and undertook to silence Bin Ladin by, among other things, taking away his passport . . . ." Pls.' Spec. Jur. Summ. ¶ 33.  Second, Plaintiffs argue that OBL could not have been criticizing the Saudi government in 1993 because the Saudi Deputy Minister of the Interior said in an April 1993 news article that "[t]here are no demonstrations or actions opposed to the authorities," Pls.' Spec. Jur. Summ. ¶ 26 & Ex. 6, yet the same page of the exhibit quotes a member of the Saudi Communist Party stating that "[t]he Gulf war revealed 'the corruption, the military weakness, the lack of national unity and loyalty' that characterize the political and social life in Saudi Arabia." Id. Ex. 6.  Third, Plaintiffs cite, as evidence that OBL did not begin to criticize the Saudi government until 1994, a compilation of OBL public statements which starts (predictably) in 1994. Pls.' Spec. Jur. Summ. ¶ 27.  But the first statement in Plaintiffs' exhibit, dated only days after his citizenship was revoked, is identified as "Statement No. 7," refers to prior statements, and describes demands for "reform and end to injustice"

But in any event, Plaintiffs' alternative claims that SBG was aware of OBL's intention to launch terrorist attacks against the United States either in 1988, or in 1990 or in 1992,[50] are based on sheer speculation. Plaintiffs make no effort to conceal that. Regarding SBG's supposed early knowledge of OBL's anti-American aims, for example, Plaintiffs assert that "it is any beyond reasonable doubt that whatever Saudi intelligence further learned about Osama's jihadist ambitions was shared with Binladin family members."[51] Plaintiffs do not even pretend to have facts to support this, but only suppose that "it is reasonable to infer, given the close Binladin family ties to the regime and" – again – "their mutual interest in dissuading Osama from his jihadist plans, that any such information possessed by Prince Turki [Saudi Arabia's head of intelligence] was shared with [unspecified] SBG principals."[52]

Even accepting the implausible inference that the Binladin family knew everything that Saudi intelligence knew, there is no evidence that Prince Turki had any information about OBL's intention to attack the United States at any time prior to 1993. Plaintiffs' sole support for this inference is a media interview in 2006 with Prince Turki in which he purportedly stated: "We were *pretty much aware* of bin Laden from the very beginning."[53] But, as weak as that is, Plaintiffs' brief omits his caveat in the *very next sentence*:

---

(continued…)

that had been made three years earlier. Pls.' Spec. Jur. Summ. Ex. 7A, at 2-3. In addition, the first few OBL statements in Plaintiffs' exhibit make no mention of the United States while sharply criticizing the economic, social and military situation in Saudi Arabia, government corruption, and Saudi foreign policy with respect to the U.S.S.R., Algeria, Syria, Sudan, Bosnia, Lebanon, India, Israel, Yemen, and the UN. Pls.' Spec. Jur. Summ. Ex. 7A. It is revisionist history to suggest that OBL's primary focus in 1994, much less in prior years, was the United States.

[50] *See, respectively,* Pls.' Spec. Jur. Summ. ¶ 31; *id.; id.* ¶ 24.

[51] *Id.* ¶ 49.

[52] Pls.' Opp. Mem. 11 n.6.

[53] *Id.* at 11 (emphasis added).

> Not perhaps so much in terms of how dangerous he could be, but as he grew and
> as his movement grew, people became more aware of his danger.[54]

Indeed, in that same interview, Prince Turki went on to say:

> [T]he first terrorist act undertaken by bin Laden was against Saudi Arabia *in 1995*
> when an explosives truck was exploded next to a training facility for the national
> guard where I believe 11 American trainers were killed along with other
> nationalities.[55]

That obviously provides no support for the notion that the Saudi government, let alone SBG,

knew that OBL was planning terrorist attacks against the United States prior to 1993.[56]

In the same way, to support a claim that SBG, or at least unspecified Binladin family

members, "were certainly aware of [OBL's] intention to attack America by 1990,"[57] Plaintiffs

quote from a book purporting to describe a speech OBL supposedly made at a "family mosque"

in 1990 calling for "jihad" against the United States:

> The Americans won't stop their support of Jews in Palestine until we give them a
> lot of blows.  They won't stop until we do jihad against them.[58]

Plaintiffs omit the very next paragraph of the account, however, which describes, as the author

expressly notes, how OBL *stopped short* of calling for violence:

> There he stood, on the threshold of advocating violence against the United States,
> but he suddenly stopped himself.  *"What is required is to wage an economic war
> against America,"* he continued.  *"We have to boycott all American*

---

[54] Pls.' Spec. Jur. Summ. Ex. 10 at 10.

[55] *Id.* (emphasis added).

[56] Plaintiffs' brief also points to a terrorist attack on a hotel in Yemen that occurred on December 29, 1992, Pls.' Spec. Jur. Summ. ¶ 39, but that attack fails in two respects to support their point.  First, it was not immediately linked to OBL, and by the time media reports surfaced in March 1993 suggesting that he had some ties to the Yemeni perpetrators, SBG and its affiliates had already ensured that OBL could not receive any shareholder distributions.  Bakr Suppl. Decl. ¶ 3 & Ex. 1.  Second, there was no suggestion until years later that the attack may have had any connection to the United States.  Although the 9/11 Commission report noted that U.S. troops stopped at the same hotel en route to Somalia, there is no evidence that the troops were at the hotel at the time of the bombing.  Indeed, the March 1993 media article cited by Plaintiffs mentions an Austrian casualty but makes no mention of any U.S. connection.  Pls.' Spec. Jur. Summ. Ex. 12 (Nov. 18, 2010) (MDL Dkt. ##2386-25).

[57] Pls.' Spec. Jur. Summ. ¶ 31.

[58] *Id.* (citing Lawrence Wright, *The Looming Tower* 150-51 (Vintage 2006)).

*products . . . ."* The man who had made his name in combat against the Soviets now invoked Mahatma Gandhi, who brought down the British empire "by boycotting its products and wearing non-Western clothes." He urged a public-relations campaign. *"Any American we see, we should notify of our complaints,"* bin Ladin meekly concluded. "We should write to American embassies."[59]

While it is jarring to read today of OBL urging peaceful means, it reveals the central flaw of Plaintiffs' argument. OBL's aims and his actions evolved over time. Quoting a few sentences out of context cannot change the fact that neither these statements – even if they were known to SBG at the time – or any others cited in Plaintiffs' brief put SBG on notice of OBL's eventual terrorist aims against the United States.

Lastly, Plaintiffs for the first time allege that SBG should have known about a 1992 fatwa that OBL allegedly issued while in the Sudan.[60] They cite the 9/11 Commission Report's reference to a 1992 fatwa, but they provide no evidence that SBG, the U.S. government, or anyone outside of al Qaeda's inner circle knew about it until years later. None of the sources cited by the Commission regarding the 1992 fatwa are dated before 1996, and the only public sources are dated in 2000.[61] Indeed, the Report draws specific contrast between the 1992 fatwa and a later *"public* fatwa in August 1996."[62] Plaintiffs themselves once appeared to recognize this distinction. As recently as three years ago, they argued in a discovery dispute with SBG that "Osama bin Laden has publicly targeted the United States at the very least as early as August 1996, when he issued" the 1996 fatwa, and again "[i]n 1998 he issued another public statement"

---

[59] Lawrence Wright, *The Looming Tower* 151 (Vintage 2006) (emphasis added); *see also* Suppl. Gauch Aff. Ex. 4 (reproducing surrounding paragraphs Plaintiffs omitted from same).

[60] This allegation is not made in any Complaint, RICO Statement, or even in Plaintiffs' responses to jurisdictional interrogatories. It is improper for Plaintiffs to raise a completely new theory at this late stage; for that reason alone, the Court should disregard it. *See supra*, n.32.

[61] *See* Nat'l Comm'n on Terrorist Attacks Upon the U.S., *The 9/11 Commission Report* 468 n.42 (2004), available at http://govinfo.library.unt.edu/911/report/911Report.pdf (last visited Dec. 20, 2010).

[62] *Id.* at 59 (emphasis added).

calling on Muslims to kill Americans.[63]  Despite cataloging OBL's public declarations against

America, Plaintiffs in that letter made no mention of the 1992 fatwa they now claim put "SBG

and [unspecified] others" on notice of his violent anti-American intentions.

Plaintiffs have not met their burden of showing with competent evidence that SBG

engaged in tortious conduct intentionally directed at the United States.  Indeed, Plaintiffs'

allegations that SBG provided material support to terrorist attacks on the United States are

demonstrably false, and Plaintiffs' submission makes clear that they never had any evidence to

support those allegations.  The Complaints should be dismissed for lack of jurisdiction.

## III.   PLAINTIFFS HAVE NOT MADE A PRIMA FACIE SHOWING THAT SBG HAS MAINTAINED "CONTINUOUS AND SYSTEMATIC" CONTACTS WITH THE UNITED STATES SUCH THAT IT IS SUBJECT TO GENERAL JURISDICTION

Based on Plaintiffs' opposition brief, there is no dispute that SBG has no office in the

United States, no sales into the United States, no construction or other projects in the United

States, and no distributors in the United States.  There is thus also no dispute, despite Plaintiffs'

quotation from a case off point, that SBG has no "'revenue derived from the forum.'"[64]

Plaintiffs' attempt to rest general jurisdiction on the few contacts that remain makes no effort to

respond to the contrary authority SBG cited or to the reality that SBG is a Saudi engineering and

construction company that has never performed a construction project in the United States.

SBG's opening brief addressed numerous theories on which Plaintiffs have previously

argued for general jurisdiction.  They acknowledge, however, that their argument now comes

down to three things:[65]  (1) SBG has a part-time consultant, Dr. Fuad Rihani, whose principal

---

[63] *See* Suppl. Gauch Aff. Ex. 1 at 3, n.1 (Letter from Robert T. Haefele to Hon. George B. Daniels (Dec. 28, 2007)).

[64] Pls.' Opp. Mem. 18 (quoting *Pension Committee of the Univ. of Montreal Pension Plan v. Banc of Am. Sec.*, 05-Civ-9016, 2006 WL 708470, at *5 (S.D.N.Y. Mar. 20, 2006)).

[65] Pls.' Opp. Mem. 20.

office is in Saudi Arabia but who telecommutes for a portion of the year from a second home in
the United States; (2) SBG had a subsidiary in the United States, SBG-USA, until 1999; and (3)
SBG employees took a total of 12 trips to the United States from 2000-2002, plus another in
1998.  These activities, neither alone nor together, come close to establishing the substantial and
continuous presence necessary to confer general jurisdiction.

### A.    Dr. Fuad Rihani

Plaintiffs cast Dr. Fuad Rihani, a 73-year-old semi-retired engineer working part-time for
SBG, who lives for half the year in the United States with his American-born wife, as the
lynchpin of SBG's supposed presence in the United States.[66]  Yet while devoting seven pages to
Dr. Rihani and his connections with trade associations and business councils, Plaintiffs
scrupulously avoid discussing what his job actually entails.  Dr. Rihani, who has a doctorate in
civil engineering,[67] works in research and development.  Asked to describe the sort of research
he does, Dr. Rihani gave an example, "A question came up by the higher-ups whether they could
air-condition the open court of the Grand Mosque in Mecca."[68]  His role "is basically
development of presentations and results of the feasibility studies.  I don't get involved in any
execution of the concepts or the projects I work on."[69]  None of this is disputed.  Plaintiffs claim
that his presence in the United States provided unspecified "significant U.S. business contacts,"[70]
but notably the only evidence they cite is a reference to efforts to arrange a meeting – in Jeddah,
no less – between former U.S. ambassador Charles Freeman and a Binladin family member.

---

[66] SBG provided uncontroverted evidence that Dr. Rihani's presence in the United States is for personal
reasons and not at the behest of SBG.  *See* SBG RMTD 23, n.70.

[67] Suppl. Gauch Aff. Ex. 5 (Rihani Dep. Tr. 17:25-18:11, 22:12-18 (Apr. 22, 2008)).

[68] Rihani Dep. Tr. 68:3-8.

[69] Rihani Dep. Tr. 60:12-16.

[70] Pls.' Opp. Mem. 22 n.23.

Freeman, however, had a longstanding relationship with the Binladin family stemming from his time as ambassador in Saudi Arabia.[71]  There is no evidence that Dr. Rihani or his part-time presence in the United States facilitated that relationship, or that Rihani is in the United States for any reason other than his own personal interests.[72]  He testified clearly that he does not and did not engage in business development activities.[73]

Dr. Rihani has, to be sure, participated in professional conferences in the U.S., including notably those for the appropriately named International Road Federation (IRF).  Plaintiffs criticize SBG for relying on "non-binding" District of Columbia cases for the proposition that such activities do not establish jurisdiction, but they cite *no* authority to the contrary.  Given the number of such organizations in the nation's capital, it is not surprising that cases arise there, but the principle is not unique to the District.  Another judge of this court has recognized that membership in associations does not create an agency relationship between the association and its member sufficient to subject the member to jurisdiction in the association's forum.  *See, e.g.*, *Donald & Co. Sec., Inc v. U.S. Stock Transfer Corp.*, No. 99 Civ. 9286, 2000 WL 146916 (S.D.N.Y. Jan. 21, 2000).  Other jurisdictions have held that membership and participation in the activities of an association do not satisfy "the due process requirement for exercising personal

---

[71] *Id.*

[72] Rihani Dep. Tr. 61:14-23 ("It is as a result of my desire to be back with my family and [SBG's] desire for me to continue working for them on important feasibility studies.  So from the time SBG was established until now, my work was, in a technical term, on call basis.  It is things they could not forecast in advance.  And when the workload went down, my involvement was done and I was spending more time with my family in the United States."); 78:10-18 ("The workload was very low and this was part of the period I was on half-time assignment and I spent half of my time in the United States with the family and telecommunicated with them whenever it is needed.").  Plaintiffs falsely claim that SBG paid for Dr. Rihani's "facilities" in the United States, but their evidence shows that SBG merely paid for telephone and fax lines, just as they would reimburse Dr. Rihani for telephone and fax services in his travels anywhere in the world.  Rihani Dep. Tr. 77:14-78:9.

[73] Dr. Rihani did not engage in "nurturing" any business relationships.  Rihani Dep. Tr. 70:5-25.  With the exception of a single courtesy call, he did not have contact with any SBG clients in the United States, *id.*, and he made no business contacts through, for example, SBG's membership in the International Road Federation.  *Id.* 33:6-20.  Any equipment SBG procured from other IRF members, itself not sufficient for jurisdiction regardless, *see Helicopteros*, 466 U.S. at 418, was through Saudi-based dealers and agents.  Rihani Dep. Tr. 33:6-20.

jurisdiction over the foreign member." *Clamp-All Corp. v. Cast Iron Soil Pipe Inst.*, No. 84-1325-2, 1986 U.S. Dist. Lexis 25184, at *6 (D. Mass. May 22, 1986) (citing *Am. Soc'y of Mech. Eng'rs v. Hydrolevel Corp.*, 456 U.S. 556 (1982)); *see also Shepherd Invs. Int'l, Ltd. v. Verizon Commc'ns Inc.*, 373 F. Supp. 2d 853, 866 (E.D. Wis. 2005).[74]

Plaintiffs go on at great length about whether Dr. Rihani was an "employee," as they assert, or a "consultant," as he testified,[75] but nothing turns on the distinction.  SBG's opening brief cited numerous cases holding that the presence of a single employee in the forum would not confer general jurisdiction over his foreign-corporation employer, especially where, as here, his principal place of business and tax residence are in Saudi Arabia, he periodically telecommutes from a second home in the United States, he reports to supervisors in a foreign country, and does work unrelated to the forum that can be performed "anywhere in the world."[76]  Plaintiffs do not address those cases, nor do they cite any contrary authority except *Pfaff v. Denver Art Museum*, 94 Civ. 9271, 1995 U.S. Dist. LEXIS 8573, at *5-8 (S.D.N.Y. June 20, 1995).[77]  Reliance on *Pfaff* is misplaced, however, because it addressed *specific* rather than *general* jurisdiction.  It found specific jurisdiction because the plaintiff had "demonstrate[d] that the alleged agent engaged in business activity *related to a cause of action* for the benefit of and with the

---

[74] Plaintiffs also place jurisdictional weight on the fact that Dr. Rihani was "available to facilitate SBG Chairman Bakr Binladin's attendance at the U.N. in September 2000." Pls.' Opp. Mem. 25.  But the Second Circuit has held that participation in the activities of the United Nations can never be considered for jurisdictional purposes, based in part on the analogous government contacts doctrine employed by courts in the District of Columbia. *See Klinghoffer v. S.N.C. Achille Lauro Ed. Altri-Gestione*, 937 F.2d 44, 51-52 (2d Cir. 1991).

[75] Rihani Dep. Tr. 51:23; 52:7; 61:3-10; 68:24; 73:9; 95:5.

[76] *See* SBG RMTD 23 (quoting *Johnston v. Multidata Sys. Int'l Corp.*, 523 F.3d 602, 613 (5th Cir. 2008). *See also* SBG RMTD 22-23 (citing *In re Commodore Int'l, Ltd. v. Transpacific Corp.*, 242 B.R. 243, 251 (S.D.N.Y. 1999), *Duravest, Inc. v. Viscardi, A.G.*, 581 F. Supp. 2d 628, 639 (S.D.N.Y. 2008)); *Cossaboon v. Maine Med. Ctr.*, 600 F.3d 25, 37 (1st Cir. 2010) (finding that a single employee working in New Hampshire who "provided information and consultation" on Maine corporation's work was insufficient to create general jurisdiction in the state).

[77] *See* Pls.' Opp. Mem. 27.

knowledge and consent of the non-resident principal." *Pfaff*, 1995 U.S. Dist. LEXIS 8573, at *5

(emphasis added).  Here, it is undisputed that Dr. Rihani's activities have no relationship to

Plaintiffs' cause of action.

### B.    The Existence Until 1999 of SBG-USA

Plaintiffs persuaded Judge Casey to order discovery regarding SBG-USA with an

argument that SBG might have continued to maintain an office in the United States, but Plaintiffs

now concede that SBG-USA closed by 2000 at the latest.[78]  They do not claim that SBG had any

other office in the United States.  Although Plaintiffs spend much space seeking to attribute

SBG-USA's contacts to SBG, *see* Pls. Opp. at 27-29, they ignore the fundamental legal problem

that, as this Court observed with respect to NCB, "[n]either NCB's office or that of its claimed

subsidiary was in existence at the time Plaintiffs commenced their actions, and accordingly

cannot be relied upon as a basis to demonstrate NCB's presence for purposes of general

jurisdiction." *Terrorist Attacks IV*, 718 F. Supp. 2d at 477-78.[79]  Plaintiffs concede that

conclusive fact here.

### C.    Sporadic U.S. Travel by SBG Employees

SBG and Plaintiffs essentially agree on facts surrounding the handful of U.S. trips by

SBG employees during the three years prior to Plaintiffs' suits.[80]  On their face, the trips provide

no evidence that SBG was "doing business" in the United States.  Of the 13 trips Plaintiffs list,

three relate to furniture shopping in High Point, North Carolina, two more involve visits by a

---

[78] Pls.' Opp. Mem. 27; Pls.' Factual Averment ¶¶ 26, 30 (Nov. 18, 2010) (MDL Dkt. #2387).  The record shows that SBG-USA ceased operations as of December 31, 1999.  Affidavit of Phillip Griffin ("Griffin Aff.") ¶ 5 & Ex. 6 (Nov. 4, 2009) (SBG RMTD, Attach. K (Sept. 7, 2010) (MDL Dkt. #2295)).  The only activities that occurred in 2000 were residual "winding up" activities, such as the closure of bank accounts.

[79] *See also* SBG RMTD 21-22.

[80] *Compare* Affidavit of Azad Iqbal ¶ 14 (June 30, 2010) (SBG RMTD, Attach. L (Sept. 7, 2010) (MDL Dkt. #2296)) *with* Pls.' Opp. Mem. 30-32.

"decorating engineer," and  two others expressly relate to meetings with Bose with respect to a

"sound system for Haram Grand Mosque in Mecca."[81]  Another concerns Bakr Binladin's visit to

the United Nations as a member of an official Saudi delegation, which, because it concerns

official U.N. activities, is irrelevant per se under *Klinghoffer*.  Even if all 13 trips related to

SBG's business activities, they would fall far short of the 54 forum visits that were inadequate to

establish general jurisdiction in *Hoffritz for Cutlery, Inc. v. Amajac, Ltd.*, 763 F.2d 55, 57-58 (2d

Cir. 1985), or the 145 trips over a four-year period that another judge of this district found to be

"too sporadic and occasional to constitute continuous and systematic business contacts with the

forum."  *Kiobel v. Royal Dutch Petroleum Co.*, No. 02 Civ. 7618, 2010 U.S. Dist. LEXIS 61452,

at *40, n.25  (S.D.N.Y. June 21, 2010) (citing *Helicopteros*, 446 U.S.at 416-19).  As *Kiobel*

explained, employee or even executive visits to a forum for such events are insufficient to confer

general jurisdiction on a foreign corporation, especially when the goal of these visits relates to

foreign business, rather than "generating, or otherwise conducting, business in the forum."  *Id.* at

*39; *see also Ungar v. Palestinian Auth.*, 400 F. Supp. 2d 541, 550 (S.D.N.Y. 2005) (finding that

a corporation was not subject to jurisdiction when its executives attended business conferences in

the forum because it was not "continuous or permanent" and because the business efforts of the

attendees were focused on foreign projects).  Plaintiffs cite no authority to the contrary.

## IV.  PLAINTIFFS' CLAIM ON THE MERITS DOES NOT SURVIVE *TWOMBLY* AND *IQBAL*

Plaintiffs make a circular argument that they satisfy the plausibility requirement of *Bell*

*Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).  They do not.  Plaintiffs assert that SBG does not

challenge the "plausibility of the core pleadings – that *if* plaintiffs have substantiated the

allegations of direct SBG support of [OBL]," they have stated a claim, and instead merely

---

[81]  Pls.' Opp. Mem. 30-31.

"quibble as to the import of certain factual allegations."[82]  Plaintiffs miss the point of *Twombly*
and *Iqbal*.  Their allegations of direct support are not sufficient to state a claim *unless* they have
"facial plausibility" in the sense that they provide sufficient "factual content that allows the court
to draw the reasonable inference that the defendant is liable for the misconduct alleged."
*Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009); *accord* Order 16 (Sept. 13, 2010) (MDL Dkt.
# 2312).  As explained in SBG's opening brief, Plaintiffs' sweeping allegations of vague
associations, without any factual allegations of actual support, do not provide the requisite
factual content to satisfy this standard.  Not only do many of their specific allegations stop short
of alleging more than "guilt by association," but allegations of SBG's supposed conduct in the
early 1990s are far too remote to state a claim for the same reasons that they are too remote to
support specific jurisdiction.  *See Terrorist Attacks IV*, 718 F. Supp. 2d at 483.  Plaintiffs'
opposition brief makes no substantive response, except to point generally to their supposed
"Summary of Allegations and Evidence."[83]  But most of the allegations set forth there are not
found in Plaintiffs' complaints or RICO statements, so are irrelevant to SBG's Rule 12(b)(6)
motion.  Even if they were pled, those allegations, taken as true, do not support the conclusory
claim that SBG provided material support to OBL or al Qaeda.  Plaintiffs have therefore failed
under any standard to present a claim on which relief can be granted.

## CONCLUSION

For the foregoing reasons as well as those set forth in SBG's Memorandum in Support,
SBG's renewed motion to dismiss all of the complaints against it in the above-captioned
litigation should be granted.

---

[82] Pls.' Opp. Mem. 34 (emphasis in original).

[83] Pls.' Opp. Mem. 34.

DATED:    December 20, 2010

      /s/ James E. Gauch
Stephen J. Brogan
Mary Ellen Powers
James E. Gauch
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
Tel: (202) 879-3939
Fax: (202) 626-1700

*Counsel for Defendant Saudi Binladin Group*