# EXHIBIT 1



**MotleyRice**

Robert T. Haefele
Licensed in SC, NJ & PA
DIRECT DIAL 843.216.9184
DIRECT FAX 843.216.9450
RHaefele@motleyrice.com

December 28, 2007

*Via Hand Delivery*
Hon. George B. Daniels
United States District Court Judge
Southern District of New York
Daniel P. Moynihan United States Courthouse
500 Pearl Street, Room 630
New York, New York 10007-1312

   Re: *In re Terrorist Attacks on September 11, 2001*, 03 MDL 1570 (GBD)

Dear Judge Daniels:

  On behalf of the *Burnett* and *Ashton* plaintiffs (hereinafter, "the Plaintiffs"), we submit this letter asking that the Court address the four discovery issues outlined below, disputed between the plaintiffs and defendant Saudi Binladin Group (hereinafter, "SBG"). We call these issues to Your Honor's attention in accordance with the direction Your Honor gave at the June 26, 2007 status conference that all discovery disputes should be raised in a letter addressed to Your Honor and copied to Magistrate Judge Maas (Transcript of June 26, 2007 Conference, page 8 line 9 to page 9, line 4, included at attachment 1). In summary, the Plaintiffs request that the Court order the following:

1. Order SBG to answer Supplemental Interrogatories and Requests for the Production of Documents served on SBG on November 4, 2007 (included at attachments 2 and 3), to which SBG has already advised that they will not answer. The supplemental discovery requests contain narrowly tailored requests based on information SBG recently disclosed in jurisdictional discovery, particularly contradicting many of SBG's previous statements or positions asserted throughout the litigation.

2. Order SBG to produce witness Philip Griffin to complete his deposition, which was previously limited to 2 hours premised on SBG's representations that Mr. Griffin's health would be jeopardized if he were deposed; however, Mr. Griffin's preparation periods with defense counsel were double the time of his deposition and Mr. Griffin, himself, never indicated any difficulty with undergoing the questioning, indicated he was fine at the conclusion of the two hours, and characterized the deposition questioning as "gentle."

3. Order that Mr. Griffin must answer questions in areas raised during the first two hours of his deposition regarding communications with counsel for SBG, because SBG has

www.motleyrice.com

| MT. PLEASANT | BARNWELL | PROVIDENCE | HARTFORD | ATLANTA |
|---|---|---|---|---|
| 28 BRIDGESIDE BLVD. | 1750 JACKSON ST. | 321 SOUTH MAIN ST. | ONE CORPORATE CENTER | 600 WEST PEACHTREE ST. |
| P.O. BOX 1792 | P.O. BOX 365 | P.O. BOX 6067 | 20 CHURCH ST., 17TH FLOOR | SUITE 800 |
| MT. PLEASANT, SC 29465 | BARNWELL, SC 29812 | PROVIDENCE, RI 02940 | HARTFORD, CT 06103 | ATLANTA, GEORGIA 30308 |
| 843-216-9000 | 803-224-8800 | 401-457-7700 | 860-882-1681 | 404-201-6900 |
| 843-216-9450 FAX | 803-259-7048 FAX | 401-457-7708 FAX | 860-882-1682 FAX | 404-201-6959 FAX |

Motley Rice LLC
Attorneys at Law

Case 1:03-md-01570-GBD-SN   Document 2396-1   Filed 12/20/10   Page 3 of 11

Hon. George B. Daniels, U.S.D.J.
December 28, 2007
Re: *In Re Terrorist Attacks on September 11, 2001*, 03 MDL 1570
Page 2 of 10

claimed that Mr. Griffin's former employer was a subsidiary distinct from SBG that dissolved in 1999; SBG should not be permitted to disclaim identity with its subsidiary and then claim to share attorney-client privilege with its subsidiary's employees.

4. Based on new information, SBG should be compelled to respond to plaintiffs previous discovery requests regarding related companies, Techmaster and Iridium.

Thus far, Plaintiffs' discovery against SBG has been controlled by the June 16, 2004 Case Management Order (Dkt. # 247) (hereinafter, "CMO2"), Judge Casey's January 18, 2005 order (Dkt. # 632), Judge Casey's November 28, 2006 limited referral of specified discovery disputes to Magistrate Judge Maas (included at Attachment 4), and Judge Maas's resulting determinations. The plaintiffs have not been permitted to engage in substantive discovery while the issue of the Court's jurisdiction over SBG remains unresolved. On January 18, 2005, Judge Casey denied SBG's motion to dismiss without prejudice and granted the Plaintiffs' request to conduct discovery limited to jurisdictional issues. After the Plaintiffs served jurisdictional discovery on SBG and disputes among the parties arose concerning those requests, Judge Casey issued an Order of Reference to a Magistrate Judge, on November 28, 2006, referring to Magistrate Judge Maas the "specific non-dispositive ... dispute outlined in the four letters attached, two each from October 13, 2006 and October 27, 2006." (*See* Attachment 4.) Since that referral, Judge Maas made rulings concerning the issues referred to him.

1. **SBG should be required to respond to Plaintiffs' Supplemental Discovery requests.**

On November 4, 2007, the Plaintiffs served on SBG supplemental jurisdictional discovery in the form of supplemental document requests and supplemental interrogatories (Attachments 2 and 3). Since serving that discovery, SBG has advised the Plaintiffs that SBG will not respond other than to object to the discovery. The Plaintiffs assert that the discovery, which is premised exclusively on follow-up discovery from documents produced in SBG's earlier production of documents, coupled with discrepancies in SBG's earlier statements and positions throughout the course of the litigation.

Plaintiffs' supplemental discovery requests inquiring into various aspects of SBG's relationship with Al Qaeda leader Osama bin Laden, are directly relevant to the issue of whether the Court can assert jurisdiction over SBG. Plaintiffs have sufficiently alleged, and have sought discovery regarding, SBG's general and specific contacts with the United States. As the Court has already so held in the course of this litigation on several occasions, one of the means by which the Plaintiffs may satisfy the due process requirements for personal jurisdiction over SBG is by showing that SBG purposefully directed its activities toward the United States – including, for example, by knowingly providing material support to terrorist individuals or organizations known to be targeting the United States. *See In re Terrorist Attacks on September 11, 2001*, 349 F.Supp.2d 765 (S.D.N.Y. 2005)(January 18, 2005), citing *Burger King v Rudzewicz*, 471 U.S. 462, 472, 479, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) (explaining jurisdiction is appropriate if defendant "purposefully directed his activities at residents of the forum and the litigation results from alleged injuries that arise out of or relate to those activities" and finding minimum contacts existed since dispute arose from a contract with substantial contacts with the forum) (internal quotations and citations omitted); *Calder v Jones*, 465 U.S. 783, 789, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984) (finding personal jurisdiction appropriate over non-resident defendants who "expressly aimed" intentionally tortious conduct at residents of forum state, even where defendants were never physically present in forum); *see also Daventree Ltd. v*

Case 1:03-md-01570-GBD-SN   Document 2396-1   Filed 12/20/10   Page 4 of 11

Hon. George B. Daniels, U.S.D.J.
December 28, 2007
Re: *In Re Terrorist Attacks on September 11, 2001*, 03 MDL 1570
Page 3 of 10

*Republic of Azerbaijan*, 349 F.Supp.2d 736 at 762-63 (S.D.N.Y. 2004) (finding exercise of personal jurisdiction under Rule 4(k)(2) is appropriate if defendants "purposefully directed their activities at residents of the forum, and the litigation results from alleged injuries that arise out of or related to those activities").

Throughout the course of this litigation, the Plaintiffs have sought discovery concerning the relationship between SBG and al Qaeda terrorist leader, Osama bin Ladin – an issue that is unquestionably central to the notion of whether SBG provided support to bin Laden, his terrorist network, and his plans targeting the United States.[1] Throughout the discovery process, SBG has thwarted the Plaintiffs' attempts to discover this information by providing limited, and now conflicting, information concerning that relationship. In support of its motion to dismiss, SBG relied heavily on statements in a sworn affidavit submitted by Bakr Binladin, the eldest brother of Osama bin Laden, and the chairman of SBG, wherein Bakr Binladin claims that in June 1993, SBG placed the value of Osama bin Laden's shares of SBG into a trust outside the control of his brother Osama bin Laden. *Affidavitt of Bakr Binladin*, dated January 25, 2006 (hereinafter, "*Bakr Binladin Affid.*") (included at Attachment 5). Throughout recent discovery disputes between the Plaintiffs and SBG, SBG has continued to rely upon the Bakr Binladin affidavit.

Those statements are contradicted by documents produced recently by SBG, only after they were ordered to produce certain items as supplemental responses to the Plaintiffs document requests, evidence quite plainly that the actions that Bakr Binladin said happened in 1993 never happened. In fact, although Osama bin Laden's shares in the company businesses were purportedly valued at approximately $ 9.9 million and placed into a trust in 1993, there is no accounting for the whereabouts of the money from 1993 until the value is placed into what appears to be a regular bank account at NCB in 2000. *Compare Bakr Binladin Affid.* at ¶ 8 (Attachment 5) ("The value of Osama's shares in SBG and MBC, estimated [in 1992 and 1993, respectively] to be approximately $9.9 million, was not paid to Osama. After consultation with and at the direction of appropriate Saudi authorities, the money was placed in a trust outside Osama's control. ... My family took these actions in June 1993... .") *with* Documents SBG recently produced as T0000121-123, -128, -132 (included at Attachment 6) and *Defendant Saudi Binladin Group's Second Supplemental Responses and Objections to Plaintiffs' First Set of Jurisdictional Interrogatories*, dated September 13, 2007 (hereinafter, "*SBG Second Supplemental Responses*") (included at Attachment 7), at page 20 (evidencing that the money was never transferred into any account until Binladin brother, Ghaleb Binladin, took a separate loan from Saudi Hollandi Bank to fund the deposit, which loan was guaranteed by SBG.)[2]

---

[1] Osama bin Laden has publicly targeted the United States since at the very least as early as August 1996, when he issued his "fatwa" entitled "Declaration of War against the Americans Occupying the Land of the Two Holy Places," which was first published in *Al Quds al Arabi*, a London-based newspaper, calling for a Jihad against the United States. After repeatedly identifying America as the enemy, he called upon Muslims worldwide "to take part in fighting against the enemy ... to do whatever you can, with one[s] own means and ability, to expel the enemy, humiliated and defeated... ." In 1998 he issued another public statement, which he again termed a fatwa, calling upon Muslims everywhere "to kill the Americans and their allies – civilians and military... ." Text of World Islamic Front's Statement Urging Jihad Against Jews and Crusaders, *Al Quds al Arabi*, Feb. 23, 1998 (transl. Foreign Broadcast Information Service).

[2] Ghaleb Binladin, the same SBG director and brother of Osama who is reported to have had all of Osama's shares "assigned" to him effective in June 1993, also invested $1 million in Bank Al Taqwa in November 1993. Affidavit of John Fawcett, dated April 18, 2006, Exhibit 2 (included herewith at Attachment 10). According to the U.S. Department of Treasury, Bank al Taqwa – which has been designated by the U.S. government as a Specially Designated Global Terrorist for its financial support to al Qaeda during the same time period – has been "providing indirect investment

The date that the actions actually took place seems to change depending on what point SBG is endeavoring to make. First, Bakr Binladin states in his sworn affidavit that the moneys were placed in a trust in 1993. Then in a recent submission to the Court, SBG contends that, notwithstanding Bakr Binladin's sworn statement, the transfer never took place in 1993, but instead took place in May 1994. *Defendant Saudi Binladin Group's Response to Plaintiffs' Objections to Order of Magistrate Judge Maas*, dated July 26, 2007 (Dkt. # 2034), at page 6. ("[A]lthough ultimately of legal effect as of June 1993, the process by which [Osama bin Laden] was removed as a shareholder was not completed and implemented until after all government approvals were obtained in May 1994.... Thus, there were no proceeds to place in trust in 1993."). Again, notwithstanding Bakr Binladin's sworn statement and SBG's statement in this recent submission, it appears no money was placed into any bank account, let alone a trust, until 2000 – completely contrary to all representations previously made to the Plaintiffs and to this Court.

Similarly, in Bakr Binladin's affidavit, Mr. Binladin swore that the SBG resolution to remove Osama bin Laden as a shareholder was approved by a Shariah Court and became final effective on December 15, 1993. Bakr Binladin Affid. at ¶ 7 ("The shareholder resolutions were approved by the Saudi Ministry of Commerce and the Shariah Court, and they became effective on or about December 15, 1993.") However, in their September 13, 2007 Second Supplemental Response, at page 16, SBG asserts, "SBG does not have and is not aware of the existence of any written opinion or court order addressing the resolution's compliance with Islamic law," thus disavowing any knowledge of any order from a Shariah court to perform an act so extraordinary under Islamic law that SBG, itself, characterized its actions as "unique and unprecedented". *SBG Second Supplemental Responses (Attachment 7)*, at page 13. A closely related concern is the complete absence from SBG's supplemental responses of any documents regarding SBG's alleged submission to the Shariah court. Although SBG was asked and ordered to produce documents submitted to the Shariah court and the court's determination, none have been produced.

SBG's supplemental responses to the Plaintiffs' document requests brought to light a number of other inconsistencies, discrepancies, and vagaries, as well. For example, in addition to the timing of the money being moved into an account outside SBG and the whereabouts and use of the money from 1993 until 2000, the discovery also calls into question the reason for the 1993 valuation of Osama bin Laden's shares; what procedures SBG used and what steps it took to ensure its resolutions were effectuated; why only the 1993 value was placed into the NCB account in 2000; what Shariah Court reviewed and approved SBG's actions (as sworn to in Bakr Binladin's affidavit); what was the determination of the Shariah Court and the basis for its determination; how SBG communicated with Osama bin Laden; what interests Osama bin Laden held in other SBG assets that appear to remain unaccounted for (*e.g.,* Mohammed Bin Laden Real Estate Development Company). Similarly, the new discovery also raised significant questions as to why Osama bin Laden brother and SBG director Ghaleb Binladin was assigned the rights to Osama's shares, but then had to take a loan in 2000 – a loan secured, no less, by SBG – to deposit the value into an account at NCB.[3]

---

services for al Qa'ida, investing funds for bin Laden, and making cash deliveries on request to the Al Qa'ida organization." *See* Letter dated January 4, 2002, from G. B. Wolfe, Deputy Gen. counsel, U.S. Department of Treasury to M.C. Nicati, Substitut du Procureur, Switzerland, attachment # 1 to Fawcett Aff. (Dkt. # 1773, included as Attachment # 10).

[3] SBG's supplemental responses also call into question the accuracy of Bakr bin Laden's affirmative representation that he has not seen Osama bin Laden since 1992. In this regard, the supplemental production contains a January 8, 1996

Case 1:03-md-01570-GBD-SN   Document 2396-1   Filed 12/20/10   Page 6 of 11

Hon. George B. Daniels, U.S.D.J.
December 28, 2007
Re: *In Re Terrorist Attacks on September 11, 2001*, 03 MDL 1570
Page 5 of 10

Any reliance SBG places on Judge Maas' July 10, 2007 endorsement concerning limitations on SBG discovery is misplaced because (1) the endorsement is premised on SBG's false representation that SBG placed Osama bin Laden's money into a trust long ago, and (2) SBG has not produced many of the documents Judge Maas ordered them to produce. A central premise underlying the July 10 endorsement is the Court's reliance on SBG's false representation that monies were actually placed in a trust long before April 2000, when in fact it appears that they have never been placed in a trust at all. In fact, the Court's comment that it sees "no reason why all the trust records for a lengthy period should be produced" appears to be especially relying upon SBG's representation that a trust has been in existence for a lengthy period of time. In fact, the money was unaccounted for from 1993 until April 2000, at which time it was apparently placed into a regular bank account rather than any trust. The fact that the money remained unaccounted for until it was placed into the NCB account in April 2000 and the fact that no documents were produced indicating any trust structure was ever created, call into question SBG's compliance with the Court's directions. Moreover, SBG has still never produced documents concerning issues that the endorsement specifically directs SBG to produce – namely, (1) documents concerning the establishment of a trust, (2) documents regarding the terms of the trust and what happened to the trust, (3) documents regarding what was submitted to the Sharia court and the Sharia court's determination, and (4) documents that address the purpose for distancing SBG from Osama bin Laden. To the extent that any documents were produced concerning any of these topics, the plaintiffs are entitled to the follow up inquiries included in the recent discovery requests.

Inasmuch as each of the supplemental requests is directed at clarifying the numerous inconsistencies, discrepancies, and vagaries created or underscored by SBG's recently produced documents, plaintiffs request that SBG be directed to produce the requested discovery. If needed, the Plaintiffs stand ready to identify to the Court individually the importance of and need for a response to each of the individual supplemental requests. However, in general, each request concerns the newly identified account at NCB bank, wherein the 1993 value of Osama bin Laden's shares of the family business was deposited in April 2000.

2.   **SBG should produce witness Philip Griffin to complete his deposition.**

On November 15, 2007, the Plaintiffs deposed Philip Griffin, who was the sole employee of SBG's United States wholly-owned and controlled subsidiary, SBG(USA). In September 2007, although not part of the referral to Magistrate Judge Maas, SBG complained to Judge Maas that the Plaintiffs should be precluded from taking Mr. Griffin's deposition. In its submission to the Court, SBG asserted that because Mr. Griffin suffers from Parkinson's disease it is difficult for him to express himself clearly and he would suffer "prolonged adverse effects" due to the deposition. Based on counsel's representation, the Plaintiffs agreed and Judge Maas ordered that Mr. Griffin's deposition would be limited to 2 hours. (Dkt. # 2042.) However, once Mr. Griffin appeared for his deposition, and certainly by the conclusion of the two hours, it became clear that SBG's representations about Mr. Griffin's health, which Plaintiff had relied upon in offering to limit the scope and time of the deposition, were misleading at best and dishonest at worst.

---

letter from SBG to the Saudi government indicating that "Bakr bin Laden and some of his brothers visited Sudan several times. *Most recently*, several brothers traveled in the company of their Uncle Abdulla bin Laden and Osama bin Laden's mother to meet him." Plaintiffs' seek discovery regarding these trips.

Case 1:03-md-01570-GBD-SN   Document 2396-1   Filed 12/20/10   Page 7 of 11

Hon. George B. Daniels, U.S.D.J.
December 28, 2007
Re: *In Re Terrorist Attacks on September 11, 2001*, 03 MDL 1570
Page 6 of 10

Indeed, examination of the video from Mr. Griffin's deposition demonstrates that, contrary to SBG's assertion, Mr. Griffin was quite capable of expressing himself. (*See CD of Video of November 15, 2007 Deposition of Philip Griffin*, included at Attachment 8.) Moreover, during the course of the deposition, Mr. Griffin testified that he had, on two occasions in the weeks immediately preceding the deposition, travelled from his home in Rockville, Maryland to the SBG's counsel's office in downtown Washington, D.C. (approximately 26 miles), to meet with counsel for at least two hours on each occasion, totally approximately twice the length of the actual deposition. *November 15, 2007, Transcript of Philip Griffin* at page 123, line 19 to page 124, line 11 (hereinafter, "*Griffin Trans.* at __"), included at Attachment 9. Then at the conclusion of the deposition, when asked how he felt, Mr. Griffin responded that he felt fine and characterized the deposition process as "gentle." *Griffin Trans.* (Attachment 9) at page 122, lines 8 to 11; page 135, lines 4 and 5.

Under the circumstances, the Plaintiffs request permission to recall Mr. Griffin to conclude his deposition. Mr. Griffin, as the sole employee of SBG's former subsidiary in the United States, remains the only witness able to testify about certain aspects of SBG's United States operation. Accordingly, the Plaintiffs request that SBG be ordered to produce Mr. Griffin and Mr. Griffin be compelled to return to continue the remainder of his deposition, at least up to the seven hour limit presumed in Rule 30(d)(2) of the Federal Rules of Civil Procedure. Given the two-hour limit on Mr. Griffin's earlier deposition, the Plaintiffs were unable to ask questions concerning a number of issues, including, among others, many documents produced from SBG (USA) files that presumably only Mr. Griffin could identify.

3. **Griffin should be compelled to respond to questions inquiring into his discussions with SBG lawyers.**

During the November 15, 2007 deposition of Philip Griffin, several inquiries prompted SBG's counsel to raise attorney-client privilege objections and instruct Mr. Griffin not to answer. *Griffin Trans.* (Attachment 9) at page 115, lines 5 to 24; page 119, lines 4 to 24; page 124, lines 13 to 23, and page 125, lines 7 to 22. However, throughout the litigation, SBG has waffled on whether SBG-USA, the entity for whom Mr. Griffin nominally worked, is or is not to be equated with defendant SBG. For instance, in support of its initial motion to dismiss, SBG argued (quite the opposite from its present position) that "SBG(USA)'s office in the United States was not an office of SBG, but instead was the headquarters of a separately incorporated company, SBG(USA).... During its existence, SBG(USA) was a wholly owned subsidiary of SBG. ... Therefore, the former presence of SBG(USA) is not relevant to the analysis of SBG's contacts with the United States." *Defendants Saudi Binladin Group, Bakr Binladin, Omar Binladin, and Tariq Binladin's Motion to Dismiss or in the Alternative for More Definite Statement* (Dkt. # 317), at 10-11. Now, trying to prevent the Plaintiffs from asking Mr. Griffin's about various communications with SBG's attorneys, SBG contends that SBG and SBG(USA) should be treated as one. SBG should not be permitted to have it both ways.

SBG, as the party asserting the privilege, bears the burden of establishing the facts that are essential elements of the privilege claimed, *von Bulow v von Bulow*, 811 F.2d 136, 144 (2d Cir.), *cert. denied*, 481 U.S. 1015 (1987) (quoting *In re Grand Jury Subpoena Dated Jan. 4, 1984*, 750 F.2d 223, 224 (2d Cir. 1984)), and must establish each of the elements for the privilege to apply. *In re Horowitz*, 482 F.2d 72, 82 (2d Cir.), cert. denied, 414 U.S. 867 (1973). To meet this burden, SBG may not rely upon "mere conclusory or *ipse dixit* assertions." *von Bulow*, 811 F.2d at 146 (quoting *In re Bonanno*, 344 F.2d 830, 833 (2d Cir. 1965)).

Case 1:03-md-01570-GBD-SN   Document 2396-1   Filed 12/20/10   Page 8 of 11

Hon. George B. Daniels, U.S.D.J.
December 28, 2007
Re: *In Re Terrorist Attacks on September 11, 2001*, 03 MDL 1570
Page 7 of 10

New York law governing the attorney-client privilege is defined by C.P.L.R. § 4503, which protects "confidential communications made between the attorney ... and the client in the course of professional employment...." The privilege is to be narrowly construed. *Bowne of New York City, Inc., v. AmBASE Corp.*, 150 F.R.D. 465, 473 (S.D.N.Y. 1993). To sustain a claim of privilege, SBG must demonstrate that the information at issue was a communication between client and counsel, that the communication was intended to be and was in fact kept confidential, and that it was made to assist in obtaining or providing legal advice or services to the client. Bowne of New York City, Inc., v. AmBASE Corp., 150 F.R.D. at 470-71 (S.D.N.Y. 1993), see, e.g., People v. Mitchell, 58 N.Y.2d at 373, 461 N.Y.S.2d at 269, 270, 448 N.E.2d at 122, 123. If the communication concerns business matters, the privilege does not apply. *Bowne*, 150 F.R.D. at 471; *see, e.g., Rossi v. Blue Cross & Blue Shield of Greater New York*, 73 N.Y.2d 588, 592-93 (1989); *Matter of Bekins Record Storage Co.*, 62 N.Y.2d 324, 329 (1984). Moreover, the privilege is vitiated if the contents of the communication are disclosed to others for reasons other than assistance of the attorney in the performance of legal services. *Bowne*, 150 F.R.D. at 471.

SBG cannot sustain the privilege where communications where shared not with the client, but with an employee of what SBG has taken pains to point out was a separate legal entity that no longer exists. Although courts have upheld the privilege for communications shared by the parent with its subsidiary, they have done so only upon a showing that a common attorney was representing both corporate entities, or that the two corporations shared a common legal interest and thus came within the joint-client rule, or that the disclosure was made to an employee of the subsidiary for the principal or sole purpose of eliciting assistance to the attorney in rendering legal advice or other legal services to the client. *Bowne*, 150 F.R.D. at 491; *see, e.g., Roberts v. Carrier Corp.*, 107 F.R.D. 678, 687-88 (N.D. Ind. 1985); *United States v. American Tel. & Tel. Co.*, 86 F.R.D. 603, 616 (D.D.C. 1979); *Admiral Insur. Co. v. U.S. District Court*, 881 F.2d 1486, 1493 n.6 (9th Cir. 1989); *see also Medcom Holding Co. v. Baxter Travenol Labs.*, 689 F. Supp. 841 at 844-45 (N.D. Ill. 1988).

In this instance, Mr. Griffin is not a client, not an employee of the client, not a former employee of a client, and not even an employee of a subsidiary of a client. Throughout the entire time of the attorney representation of SBG, Mr. Griffin has been merely a former employee of a separate legal entity that no longer exists. As a separate legal entity that was never represented by counsel for SBG-USA, SBG-USA was never a client of SBG's counsel. Inasmuch as SBG-USA dissolved in 2000, neither SBG-USA nor Mr. Griffin ever shared common interest with SBG in a manner pertinent to SBG's counsel's representation. Thus, unless SBG abandons its position that there is a formal distinction between SBG and SBG-USA, the privilege does not apply. Moreover, any "assistance" Mr. Griffin might supply in the course of his discussion with counsel would be no more beneficial to the attorney or client than would assistance of any other third-party witness with whom counsel might have met in anticipation of a deposition – certainly discussions with other third-party witnesses would not be afforded the kind of attorney-client protection that SBG seeks here. Nor should the discussions with Mr. Griffin.

4.  **Based on new information, SBG should be compelled to respond to plaintiffs previous discovery requests regarding related companies, Techmaster and Iridium.**

In the course of discovery, plaintiffs sought discovery regarding SBG's relationship and business dealings with a United States-based companies known as Techmaster Incorporated (hereinafter, "Techmaster") and Iridium. Techmaster is an engineering, procurement, and construction services company that provides services for industrial, power, and water resources

Case 1:03-md-01570-GBD-SN   Document 2396-1   Filed 12/20/10   Page 9 of 11

Hon. George B. Daniels, U.S.D.J.
December 28, 2007
Re: *In Re Terrorist Attacks on September 11, 2001*, 03 MDL 1570
Page 8 of 10

businesses like SBG. Iridium is a satellite telecommunications company. Plaintiffs sought discovery regarding SBG's relationships with Techmaster and Iridium based on information that indicated that Techmaster and Iridium, both U.S.-based companies, had longstanding and close business relationships with SBG.

For jurisdictional discovery purposes, in addition to inquiring into SBG's own various contacts with the forum, including SBG's various business dealings with Techmaster and/or Iridium, the Plaintiffs may also inquire into SBG's relationships with entities whose contacts may be imputed to SBG, including alter egos, "agents," and "mere departments". *See, e.g., Midland Marine Bank, N.A. v Miller*, 664 F.2d 899, 904 (2nd Cir. 1981) (corporate formality ignored); *Gelfand v Tanner Motor Tours, Ltd.*, 385 F.2d 116, 120-121(2nd Cir. 1967) (agency); *Oriska Ins. Co. v Brown & Brown of Texas, Inc.*, 2005 U.S. Dist. LEXIS 6623, *7-8 (S.D.N.Y. 2005), citing *Schenk v Walt Disney Co.*, 742 F. Supp. 838, 842 (S.D.N.Y. 1990) (mere department).

In assessing the minimum contacts necessary to exercise jurisdiction over a defendant, the defendant's various contacts with the forum must be examined as a whole and not separately or in isolation. The Second Circuit has recognized:

> The assessment of minimum contacts is fact-specific and must necessarily be tailored to the circumstances of each case. ... There is no talismanic significance to any one contact or set of contacts that a defendant may have with a forum state; courts should assess the defendant's contacts as a whole. ... [D]etermining the existence of personal jurisdiction does not ... involve an examination of each of [the defendant's] contacts with [the forum state] viewed in isolation from one another. Rather we are required to examine [the defendant's] contacts *in toto* to determine whether they constitute the kind of continuous and systematic contacts required to satisfy due process.

*Metropolitan Life Ins. Co. v Robertson-Ceco Corp.*, 84 F.3d 560 570, 571 (2nd Cir. 1996). Accordingly, where courts have rejected jurisdiction when individual contacts have been assessed independently, they have exercised jurisdiction where the circumstances considered in their totality demonstrate minimum contacts such that maintenance of the suit in the forum does not "offend traditional notions of fair play and substantial justice." *International Shoe Co. v State of Washington*, 326 U.S. 310, 316 (1945).

Accordingly, the Plaintiffs should be permitted to use discovery tools to investigate the relationship and business dealings between SBG and Techmaster and Iridium to determine both what business dealings SBG had with the companies and, for example, the degree to which the relationship between SBG and Techmaster would permit Techmaster's contact with the forum to be imputed to SBG.

Although when the matter of discovery from SBG regarding Techmaster was raised previously to Magistrate Judge Maas, he was unconvinced under the circumstances then-presented that the facts might "suggest a basis for jurisdiction," the Plaintiffs address the issue to Your Honor because new information was presented during the recent deposition of Mr. Griffin. During the November 15, 2007 deposition of Mr. Griffin – even in the very short time Plaintiffs were permitted to question Mr. Griffin – he testified to various facts suggesting a relationship between SBG and Techmaster that the Court must consider when weighing the circumstances *in their totality* to determine the jurisdictional issue. For example, during Mr. Griffin's deposition, although he denied

Case 1:03-md-01570-GBD-SN   Document 2396-1   Filed 12/20/10   Page 10 of 11

Hon. George B. Daniels, U.S.D.J.
December 28, 2007
Re: *In Re Terrorist Attacks on September 11, 2001*, 03 MDL 1570
Page 9 of 10

that Techmaster was controlled by SBG, he nonetheless testified that SBG's interests "overlapped" with Techmaster's interests (Griffin Trans. (Attachment 9), at 72:3-8), Techmaster's day-to-day operational head, Robert McBride, was also one of three directors of SBG-USA (Griffin Trans. at 71:12-16; 71:24 to 72:2; 75:3-8), and the remaining two directors of SBG-USA were the "controlling element" of Techmaster, Henry and Kouren Sarkissian. Henry Sarkissian, perhaps the primary "controlling element" of Techmaster, is also a director of SBG, heading up the SBG division with which Techmaster has most or all of its SBG dealings (Griffin Trans. at 72:11 to 18; 73:22-24; 76:6-12). Moreover, Mr. Griffin acknowledged that SBG used Techmaster executives and employees, particularly at the time they were opening the SBG office in the United States, evidencing the fact that SBG was willing and able to utilize Techmaster when it needed to us it. *Griffin Trans*. 75:3-8; 86:15 to 87:15; and 95:15-24. Mr. Griffin also acknowledged the possibility that the Binladins had an investment in Techmaster (*Griffin Trans*. at 92:17-23) and that Techmaster may have acted on SBG's behalf to negotiate contracts with U.S. businesses on smaller projects (*Griffin Trans*. at 92: 4-7).

Similarly, from Mr. Griffin's deposition, the Plaintiffs also know that SBG participated, along with U.S.-based Motorola, in a satellite communications company called Iridium. Various facts learned support the Plaintiffs further inquiry into SBG's dealings and contacts with Iridium. In particular, SBG was involved with the portion of Iridium known as Iridium Middle East. That particular segment of the Iridium operation in which SBG participated had an office in Washington, D.C. According to Mr. Griffin, he had various occasions to speak to the Washington, D.C. staff of Iridium for work Mr. Griffin did at the direction of the Binladin brother and SBG Director who oversaw his work at SBG-USA, Hasan Binladin. Moreover, Hasan Binladin, an SBG director, invited Mr. Griffin to attend and observe various Iridium board meetings. *Griffin Trans*. at pages 99-104. Based on these various contacts, Plaintiffs are entitled to have further information from SBG about its involvement with Iridium.

## CONCLUSION

For the foregoing reasons, the motion to compel should be granted in its entirety and the defendants should be ordered to produce the discovery as indicated, including:

1. Ordering SBG to answer Supplemental Interrogatories and Requests for the Production of Documents served on SBG on November 4, 2007 (attached as Exhibits 1 and 2), to which SBG has already advised that they will not answer. The supplemental discovery requests contain narrowly tailored requests based on information SBG recently disclosed in jurisdictional discovery, particularly contradicting many of SBG's previous statements or positions asserted throughout the litigation.

2. Ordering SBG to produce witness Philip Griffin to complete his deposition, which was previously limited to 2 hours premised on SBG's representations that Mr. Griffin's health would be jeopardized if he were deposed; however, Mr. Griffin's preparation periods with defense counsel were double the time of his deposition and Mr. Griffin, himself, never indicated any difficulty with undergoing the questioning, indicated he was fine at the conclusion of the two hours, and characterized the deposition questioning as "gentle."

Case 1:03-md-01570-GBD-SN   Document 2396-1   Filed 12/20/10   Page 11 of 11

Hon. George B. Daniels, U.S.D.J.
December 28, 2007
Re: *In Re Terrorist Attacks on September 11, 2001*, 03 MDL 1570
Page 10 of 10

3. Ordering that Mr. Griffin must answer questions in areas raised during the first two hours of his deposition regarding communications with counsel for SBG, because SBG has claimed that Mr. Griffin's former employer was a subsidiary distinct from SBG that dissolved in 1999; SBG should not be permitted to disclaim identity with its subsidiary and then claim to share attorney-client privilege with its subsidiary's employees.

4. Ordering SBG to respond to the Plaintiffs previous discovery requests regarding related companies, Techmaster and Iridium.

Respectfully Submitted,

MOTLEY RICE LLC

By: _____

Ronald L. Motley, Esq.
Jodi Westbrook Flowers, Esq.
Michael Elsner, Esq.
Robert Haefele, Esq.
Justin Kaplan, Esq.
    28 Bridgestone Boulevard
    P.O. Box 1792
    Mt. Pleasant, SC 29465
    Phone: (843) 216-9000

KREINDLER & KREINDLER

By: _____

James P. Kreindler, Esq. (JK7084)
Justin T. Green, Esq. (JG0318)
Andrew J. Maloney, Esq. (AM8684)
    100 Park Avenue
    New York, New York 10017
    Phone: (212) 687-8181
    Facsimile: (212) 972-9432

cc: The Honorable Frank Maas, U.S.M.J.
    James Gauch, Esq.