# EXHIBIT 3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
                                   :

                                   :

IN RE SEPTEMBER 11, 2001 LITIGATION    :     21 MC 101 (AKH)

                                   :

                                   :
---------------------------------------------------------------x


# PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO THE AVIATION DEFENDANTS' 9/11 COMMISSION MOTION

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................ iii

INTRODUCTION ............................................................................. 1

PRELIMINARY STATEMENT .......................................................... 4

The Staff Reports and Staff Statements Are Inadmissible Under  FED. R. EVID. 803 (8)(C)………………………………...4

The *Report* is Unreliable As Evidence Of The Aviation Defendants' Conduct…………………………………………………..4

The *Report* Sections Derived From Torture Are Untrustworthy And Inadmissible………………………………………………6

If Granted, Defendants' Motion Will Turn This Into A Trial Over Torture……………………………………………………8

Existing Evidence And The Proposed Stipulation Vitiate Any Need For The Reports……………………………………………..8

Admission Of The Materials Should Be Denied Under FED. R. EVID. 402 and 403…………………………………….10

Derivative Immunity Is Irrelevant And Addressed Elsewhere…...12

ARGUMENT ................................................................................ 12

I. THE 9/11 COMMISION REPORT, STAFF MONOGRAPH AND STAFF STATEMENTS ARE NOT ADMISSIBLE UNDER FED. R. EVID. 803 (8)(C) ................................ 12

A. It Is Within This Court's Sound Discretion To Decline To Admit The *9/11Commission Report*, Staff Monograph And Staff Statements ................................................ 13

1. The Staff Monograph And Staff Statements Are Not The Final Findings Of The Commission And Are Inadmissible Under FED. R. EVID. 803 (8)(C) ................... 15

2. The *9/11 Commission Report* Is Not Admissible Under FED. R. EVID. 803 (8)(C) ................................................ 16

a. The Commission Was Substantially Focused On

Counterterrorism, Not The Conduct Of The
Aviation Defendants .................................................16

b.  The Commission's Sources Of Information
And Other Circumstances Indicate Lack Of
Trustworthiness...........................................................19

i.      Critical Information Relied
Upon By the Commission Was The
Product Of Torture And Coercion ............20

ii.     Legal Conclusions Are Not
Admissible Pursuant to FED. R. EVID.
803(8)(C)..................................................25

iii.    Admission Of The *9/11 Commission
Report* Threatens To Create A Trial
Within A Trial ...........................................25

II.     **THE AVIATION DEFENDANTS' DESIGNATIONS
ARE IRRELEVANT  AND PREJUDICIAL, AND ARE
INADMISSIBLE UNDER FED. R. EVID.
402 AND 403**...................................................................26

A.  The Aviation Defendants' Designations Are Irrelevant And
Inadmissible ..................................................................27

1.  The Aviation Defendants' Designations Regarding
Threat Information Are Not Relevant And Duplicative
Because Discovery Has Demonstrated That The
September 11 Attacks Were Reasonably Foreseeable....28

2.  Defendants' Attempts To Blame The Government Are
Irrelevant To The Issue Of  The Aviation Defendants'
Liability........................................................................37

3.  The Defendants' Designations Relating To The Life
Histories Of The Terrorists, Their Education And
Sophistication Are Irrelevant .........................................40

B.  The Aviation Defendants' Designations Should Be Excluded
Under FED. R. EVID. 403...............................................44

**CONCLUSION** ...................................................................48

# TABLE OF AUTHORITIES

**Cases**                                                                            **Page**

*Beech Aircraft Corp. v. Rainey*, 488 U.S. 153 (1988) ..................................…..13,14

*Brown v. Mississippi*, 297 U.S. 278 (1936) ............................................................8

*City of New York v. Pullman, Inc.*, 662 F.2d 910
(2d Cir. 1981).......................................................... 1,13,15,16,19,45-46

*C.O. v. Coleman Co., Inc.,* No. C06-1779,
2008 WL 820066 (W.D. Wash. March 25, 2008) .................................19

*Dowling v. United States,* 493 U.S. 342 (1990)......................................26

*Fraley v. Rockwell Int'l Corp.*, 470 F. Supp. 1264
(S.D. Ohio 1979)...........................................................................20

*Gaines Tabb v. ICI Explosives, U.S.A. Inc.,* 995 F. Supp. 1304
(W.D. Okla. 1996) .........................................................................41,42

*Gentile v. County of Suffolk*, 926 F.2d 142 (2d Cir. 1991) ..............................12,19

*Graphic Arts Mut. Ins. Co. v. Baker Mut. Ins. Co.,* 45 N.Y.2d 551,
410 N.Y.S.2d 571 (1978) ..............................................................39

*Herman v. United Airlines Inc.*, 157 F. Supp. 65 (D. Colo. 1957) ......................42

*Hines v. Brandon Steel Decks, Inc.*, 886 F.2d 299 (11th Cir. 1989).................19,25

*In re Air Crash Disaster at Stapleton Int'l Airport*,
720 F. Supp. 1493 (D. Colo. 1989)......................................................19

*In re Sept. 11 Litigation,* 280 F. Supp. 2d 279 *(S.D.N.Y 2003)* .............29,36,41,42

*Jacqueline S. v. City of New York,* 81 N.Y.2d 288 (1993)....................................36

*McCarthy v. Sturm, Ruger & Co.,* 916 F. Supp. 366 (S.D.N.Y. 1996) ................42

*McKinnon v. Skil Corp.*, 638 F.2d 270 (1st Cir. 1981)..........................................19

*Miranda-Ortiz v. Deming*, 1998 WL 765161 (S.D.N.Y.)......................................25

*Moskal v. Fleet Bank*, 703 N.Y.S.2d 126 (2000)...................................................36

# TABLE OF AUTHORITIES (cont'd)

*Miller v. Caterpillar Tractor Co.,* 697 F.2d 141 (6th Cir. 1983)...........................19

*Nallan v. Helmsley-Spear, Inc.,* 50 N.Y.2d 507 (N.Y. 1980).................................38

*Nash v. Port Auth. of N.Y. and N.J.,*
2008 N.Y. Slip. Op. 03991 (1st Dep't  April 29, 2008) .............................36,43,44

*Old Chief v. United States*, 519 U.S. 172 (1997).....................................9

*Paolitto v. John Brown E. & C., Inc.,* 151 F.3d 60 (2d Cir. 1998) .......................46

*Port Auth. of N.Y. and N.J. v. Arcadian Corp.,*
991 F. Supp. 390 (D.N.J. 1997).....................................................41,42

*Rambus, Inc. v. Infineon Techs. AG,* 222 F.R.D. 101
(E.D. Va. 2004).............................................................19,47

*Rudel v. Nat'l Jewelry Exch. Co.*, 623 N.Y.S.2d 878 (1995) ...............................36

*Smith v. Isuzu Motors Ltd.,* 137 F.3d 859 (5th Cir. 1998) .................................13,16

*Smith v. MIT*, 877 F.2d 1106 (5th Cir. 1989).......................................13,16

*United States v. Albarado*, 495 F.2d 799 (2d Cir. 1974) .......................................30

*U.S. v. Awad*, 2007 WL 1988382 (S.D.N.Y. Jul. 3, 2007) ....................................19

*U.S. v. Durrani*, 835 F.2d 410 (2d Cir. 1987).......................................13

*U.S v. Gray*, 852 F.2d 136 (4th Cir. 1988).......................................13,16

## Statutes

14 C.F.R. § 108.101 .....................................................37

14 C.F.R. § 108.103(a)(1).................................................37

22 C. Wright & K. Graham, Federal Practice and Procedure § 5250 (1978)........10

CPLR §1401.................................................................39

# TABLE OF AUTHORITIES (cont'd)

CPLR §1402 .................................................................................................39

CPLR §1601 ..............................................................................................39,43

Fed. R. Evid. 106 .....................................................................................10,48

Fed. R. Evid. 401 ........................................................................................9,27

Fed. R. Evid. 402 ................................................................................. 1,10,26,27

Fed. R. Evid. 403 ........................................................................ 1,9,10,26,44-48

Fed. R. Evid. 404 ............................................................................................9

Fed. R. Evid. 404 (b) ......................................................................................9

Fed. R. Evid. 602 ..........................................................................................40

Fed. R. Evid. 803(8) ..................................................................................13,19

Fed. R. Evid. 803(8)(C) ............................... 1,3,4,6,8-10,12-16,19-21,25,26,45-47

Fed. R. Evid. 806 .....................................................................................10,48

## Treatises

1 McCormick 782 & n. 41 ...............................................................................10

STEPHEN A. SALTZBURG, MICHAEL M. MARTIN, DANIEL J. CAPRA,
FEDERAL RULES OF EVIDENCE MANUAL § 803.02[9][f] (8th ed. 2002). ................15

## Miscellaneous

Ben Fox, US drops charges against Saudi in Sept. 11 attacks,
Associated Press, May 12, 2008. .........................................................................24

Ernest R. May, When Government Writes History: The 9/11 Commission Report,
THE NEW REPUBLIC, Vol. 232., Issue 4,714, p. 30-35,
May 23, 2005 .............................................................................................7,23

**TABLE OF AUTHORITIES (cont'd)**

Lee H. Hamilton & Thomas H. Kean, *No Torture, No Exceptions*,
WASHINGTON MONTHLY, May 2008......................................................................7

Press Release, National Commission on Terrorist Attacks upon the United States,
9/11 Commission to Close, Transfer Records to the National Archives,
August 20, 2004...............................................................................................16

The National Archives, 9-11 Commission Records ............................................16

Thomas Kean and Lee Hamilton, <u>Without Precedent</u>, 119 (2006)........................23

All Plaintiffs in 21 MC 101, by and through Liaison Counsel and the undersigned, respectfully submit this Memorandum of Law in opposition to the Aviation Defendants' motion ("Motion") for an order that the *9/11 Commission Report* (2004) (the "*9/11 Commission Report*" or "*Report*"), of The National Commission on Terrorist Attacks Upon the United States (the "Commission" or the "9/11 Commission"), the 9/11 Commission Staff Monograph on the Four Flights and Civil Aviation Security (the "Staff Monograph") and the 9/11 Commission Staff Statement Nos. 1, 2, 3, 4, 9, 10 and 16 (the "Staff Statements") contain relevant evidence not excluded by the hearsay rule.

## **INTRODUCTION**[1]

The Aviation Defendants' Motion, which seeks a ruling on the applicability of the government report hearsay exception of Federal Rule of Evidence 803 (8)(C) to selected excerpts of the *9/11 Commission Report* and the Staff Monograph and Staff Statements, should be denied in its entirety.

As an initial matter, both the Staff Monograph and the Staff Statements are interim reports of the 9/11 Commission staff — not the 9/11 Commission itself. As such, they are *prima facie* inadmissible under FED. R. EVID. 803(8)(C), the only exception proffered by the Aviation Defendants. *See City of New York v. Pullman*, 662 F.2d 910, 914 (2d Cir. 1981) (interim staff reports do not constitute "findings" within Rule 803(8)(C)). There is simply no basis for admission of these materials under controlling Second Circuit law.

With respect to the *9/11 Commission Report* itself, it is inadmissible under FED. R. EVID. 803(8)(C), 402 and 403 for the reasons discussed herein, including the following:

---

[1]     Emphasis is added, and citations and internal quotations are omitted, throughout this Memorandum. Abbreviations used in the Defendants' memoranda are adopted in this Memorandum, except as noted. The accompanying Declaration of Timothy S. Tomasik is cited as "Tomasik Dec."

1.  The 9/11 Commission explicitly stated that it was not attempting to assess blame for the 9/11 attacks. Nonetheless, the Aviation Defendants seek to use the evidence, bearing the imprimatur of the 9/11 Commission, in a manner that the Commission did not intend and indeed sought to foreclose by making clear the limited purpose of its work.

2.  If granted, the Aviation Defendants' motion would transform the trial from an examination of the conduct of the Aviation Defendants into a trial of the 9/11 Commission. That would disserve the Commission, the Congress and President who established the Commission, and the Nation which accepted the Commission's work for the purposes it was intended to serve. It would also require Plaintiffs to attack and impeach the misuse of the Commission's work by the Aviation Defendants, putting Plaintiffs in the prejudicial position of appearing to be unfairly attacking and impeaching the respected 9/11 Commission's work. The public almost certainly will fail to understand the difference. The 9/11 Commission deserves better than what the Aviation Defendants propose.[2]

3.  Critical portions of the *9/11 Commission Report* are based upon statements obtained from "high-value" detainees who were subjected to "enhanced" interrogation techniques — *i.e.,* physical and psychological torture and coercion. As discussed more fully below and in Plaintiffs' Memorandum of Law in Opposition to the Aviation Defendants' KSM and Binalshibh Motion (the "KSM/Binalshibh Motion"), which is incorporated by reference, the information obtained from the detainee

---

[2]     Plaintiffs' opposition to the non-hearsay treatment of the *9/11 Commission Report* in this litigation is in no way intended to diminish the work of the Commissioners who deserve great credit and appreciation for their unparalleled effort and commitment to their broad mandate to investigate the actions of our government on or before 9/11.

interrogations lacks two of the key criteria for admissibility under FED. R. EVID. 803(8)(C). First, the Commission did not "find" that this detainee information was reliable and made no "factual findings" based on it. The 9/11 Commission never trusted the detainee interrogations, as is evident from statements made by the Co-Chairs of the Commission and senior staff members acknowledged to be the architects of the final *Report*. Second, recent revelations of brutal detainee torture, coercion and abuse — reportedly unknown to the Commission at the time it issued the *Report* — demonstrate untrustworthiness of the "sources of information" relied upon by the Commission within FED. R. EVID. 803(8)(C).

4. In order to demonstrate the unreliability of the hearsay statements that form the basis of the *9/11 Commission Report*, Plaintiffs would be required to demonstrate the methods by which evidence relied upon in the Report was obtained and the impact of those methods on the trustworthiness of the information elicited from the detainees. Plaintiffs would be forced to introduce evidence of the motivations of the detainees and how those motivations were driven by the circumstances of their detention. Plaintiffs would have to show the extent to which the CIA and intelligence agencies withheld or altered information from the Commission. The end result would be an unnecessarily extended trial (and the attendant multiplication of discovery leading up to it) complicated by additional national security issues, juror confusion, and never-ending battles over what may be disclosed without jeopardizing national security. Thus, if admitted, the detainee information would create yet another trial within a trial — with the attendant prejudice, confusion of the issues and undue delay.

5.  For the purposes for which the evidence is offered, the evidence is unreliable and, if admitted, would require Plaintiffs to demonstrate precisely what the 9/11 Commission did and did not do, which may involve focusing on every line of the *Report* and testimony of Commission members and staff.  Defendants' misuse of the evidence will therefore inevitably result in juror confusion of issues and a waste of time.  Moreover, this entire exercise is unnecessary given the extensive factual stipulation that Plaintiffs have offered the Defendants and other available evidence.

## PRELIMINARY STATEMENT

### The Staff Reports And Staff Statements Are Inadmissible Under FED. R. EVID. 803(8)(C)

The Staff Monograph and Statements are not final reports written and approved by the Commission and therefore do not meet the admissibility requirements of FED. R. EVID. 803(8)(C).

### The *Report* Is Unreliable As Evidence Of The Aviation Defendants' Conduct

The *9/11 Commission Report* is an unreliable source of information with respect to the Aviation Defendants' negligence.  The Commission made no meaningful effort to examine the conduct of the Aviation Defendants in a comprehensive way or to assess whether the Aviation Defendants were or were not negligent. Any suggestion by the Defendants that the *9/11 Commission Report* and the Staff Monograph and Statements demonstrate that the Commission somehow cleared the Aviation Defendants of responsibility, or lends credence to the notion that the government is solely responsible for the events of 9/11, would be a gross distortion of what the Commission did.  The Commission made absolutely clear in the Preface to the *9/11 Commission Report*, that "[O]ur aim has not been to assign blame." *9/11 Commission Report* at xvi.  The purpose of the trial in this case is for a jury to determine whether to assign blame to the

Aviation Defendants.  The Aviation Defendants seek the imprimatur of the *9/11 Commission Report* by using the *Report* for a purpose that was never intended.

The Commission was focused on government conduct, counterterrorism, and government problems and not at all focused on the adequacy of passenger pre-board screening and procedures for in-flight security.  Not one of the thirteen chapters or fifty-seven chapter sub-sections is dedicated to the Aviation Defendants' duty to provide aviation security, their knowledge of threats to aviation security, or to their conduct, including the adequacy of pre-board security screening and procedures and in-flight security to protect air passengers and persons and property on the ground. *9/11 Commission Report* at v-vii.  Rather, the *9/11 Commission Report* is dedicated to the overall threat of terrorism and how America should respond.  *Id.*  Of the forty-one "Recommendations" (not findings of responsibility or fault) made by the Commission in chapters 12 and 13 of the *9/11 Commission Report*, only <u>one</u> touches upon aviation security.  This single recommendation — that the government assume the responsibility for passenger pre-board screening, removing it from airline control — is itself a reflection of the years of poor security performance by the Aviation Defendants.  *9/11 Commission Report* at 361-450; *see also* GAO Report on Aviation Security: Slow Progress in Addressing Long-Standing Performance Problems (March 2000) (Tomasik Dec. Exh. 1); GAO Report on Aviation Security, Vulnerabilities Still Exist in the Aviation Security System (April 2000) (Tomasik Dec. Exh. 2); GAO Report on Aviation Security: Long-Standing Problems Impair Airport Screeners' Performance (June 2000) (Tomasik Dec. Exh. 3).  It surely does not support the admission of evidence to somehow exculpate the Aviation Defendants.

Throughout the *9/11 Commission Report*, it is clear that the Commission made <u>no</u> effort to make a determination as to whether the Aviation Defendants were negligent.  Commission

member John F. Lehman highlighted the undeniable fact that, even though Commissioners clearly thought that the Aviation Defendants were negligent, the Aviation Defendants' conduct was not the focus of the Commission's attention.  When Commissioner Lehman was interviewed for the History Channel documentary "The 9/11 Commission Report," he made clear his view of the culpability of certain of the Aviation Defendants:

> Even when they went through the magnetometers and were stopped and pulled out for questioning, they still let them go through with the knives. They didn't even bother to look in the diddy bags they were carrying which we now know had mace and tear gas and that is gross negligence.

The 9/11 Commission Report, History Channel (2004).  There is clearly a difference between what the Commissioners may have concluded about the Aviation Defendants' responsibility and what they chose to focus on in their Report.

If admitted, Plaintiffs would be forced to attack and impeach the Aviation Defendants' misuse of the *9/11 Commission Report* and would open the discovery and trial of this case up to a frolic and detour over the *Report* and the Commission, instead of the evidence and the Aviation Defendants' negligence.

### The *Report* Sections Derived From Torture Are Untrustworthy And Inadmissible

The Defendants' characterization of the *9/11 Commission Report* as "undoubtedly trustworthy" is disingenuous not only because of the Commission's focus on the government's counterterrorism efforts, but in light of facts we now know about the torture interrogations of detainees that were heavily relied upon by the Commission.  The *9/11 Commission Report* lacks the requisite indicia of trustworthiness required for admission pursuant to FED. R. EVID. 803(8)(C) because critical information relied on by the Commission was the product of torture, and is thus suspect.

Essential information derived from these interrogations was the subject of the information in chapters five and seven of the *9/11 Commission Report* which described the initial planning for the attack, the assembling of terrorist cells, and the arrival of the hijackers in the U.S. At the time of its inclusion in the *9/11 Commission Report*, the Commission was reportedly unaware that this seemingly crucial information they relied on was the product of torture — including waterboarding, starvation, sleep deprivation, exposure to extreme temperatures, and acts we will never know. The lack of trustworthiness of these chapters is highlighted by the Commission's use of an explanatory text box on page 146 of the *9/11 Commission Report* conceding that assessing the truth of these witnesses — sworn enemies of the United States — was challenging because they were not allowed to talk to the interrogators, much less the actual detainees who were the witnesses, so that they could better judge the credibility of the detainees and clarify ambiguities. *9/11 Commission Report* at 146. Equally compelling, Commission consultant and co-architect of the final report, Harvard Professor Ernest R. May, stated "We never had full confidence in the interrogation reports as historical sources." Ernest R. May, *When Government Writes History: The 9/11 Commission Report*, THE NEW REPUBLIC, Vol. 232, Issue 4,714, p. 30-35, May 23, 2005 (Tomasik Dec. Exh. 4).

Just recently, Commissioner Thomas H. Kean and Vice Commissioner Lee H. Hamilton publicly condemned the torture of prisoners and recognized that "the use of torture undermines the rule of law, the Geneva Conventions, and the Conventions against Torture…," and "The use of torture is contrary to American Values and does not serve our national interest…As a means of extracting information, torture is unreliable. It produces too much false information." Lee H. Hamilton & Thomas H. Kean, *No Torture, No Exceptions*, WASHINGTON MONTHLY, May 2008 (Tomasik Dec. Exh. 5). The law reflects what common sense tells us: "The rack and torture

chamber may not be substituted for the witness stand." *Brown v. Mississippi*, 297 U.S. 278, 285-86 (1936). Evidence derived from torture is inherently unreliable and inadmissible in a court of law. *See* KSM/Binalshibh Motion.

### If Granted, Defendants' Motion Will Turn This Into A Trial Over Torture

If the Aviation Defendants' proffered evidence is admitted, Plaintiffs will almost certainly have to explore the methods used by intelligence agencies to obtain information. Such an exploration will plunge the Court into disputed issues of classified information and national security and will put intelligence agencies on trial in lieu of the Aviation Defendants.

### Existing Evidence And The Proposed Stipulation Vitiate Any Need For The Reports

Regardless of the applicability of FED. R. EVID. 803(8)(C) to the evidence that the Aviation Defendants seek to admit, direct evidence introduced through document production and depositions has established many facts surrounding the events of 9/11. Plaintiffs do not dispute that the *9/11 Commission Report* and Staff Monograph contain some of those now uncontroverted facts. In an effort to avoid the unnecessary time and expense attendant to briefing the admissibility of the *9/11 Commission Report*, and in an effort to spare this Court the burden of having to decide the admissibility of every chapter, line and word of the *Report* and accompanying evidence, Plaintiffs tendered to the Defendants a comprehensive thirty-four page Proposed Stipulation of Facts containing 336 such facts and factual conclusions contained in the *9/11 Commission Report* and Staff Monograph. *See* Plaintiff's Proposed Stipulation of Facts; Tomasik Dec. Exh. 6. Plaintiffs asked that the Defendants hold the briefing of the Defendants' motion in abeyance pending an agreed upon stipulation. On the eve of the deadline to file their motion, the Defendants advised that they preferred to proceed with the briefing of the motion. The volume of factual information found in Plaintiffs' Proposed Stipulation of Facts

demonstrates that there is no dispute as to the vast majority of <u>facts</u> concerning the 9/11 hijackings and crashes.

Accordingly, for the Defendants to tender the entirety of *9/11 Commission Report*, Staff Monograph, and Staff Statements as exempt from the hearsay rule under FED. R. EVID. 803(8)(C) <u>and</u> as being relevant to issues that may be tried to a jury is both erroneous and misguided. This is especially true in light of the Plaintiffs' Proposed Stipulation of 336 facts, the lack of trustworthiness inherent in information relied on by the Commission and the ultimate issue the jury will have to decide in this case that the Commission chose not to address. A straightforward application of *Old Chief v. United States*, 519 U.S. 172, 184 (1997) — *i.e.,* examining the non-prejudicial, relevant evidence (the stipulation of facts) and comparing it to the non-existent or marginal probative value of the prejudicial evidence (*9/11 Commission Report* and Staff Monograph and Statements) should lead to exclusion of the disputed evidence.[3]

---

[3]    *See Old Chief v. United States*, 519 U.S. 172, 184 (1997) (A reading of the companions to Rule 403, and of the commentaries that went with them to Congress, makes it clear that what counts as the Rule 403 "probative value" of an item of evidence, as distinct from its Rule 401 "relevance," may be calculated by comparing evidentiary alternatives. The Committee Notes to Rule 401 explicitly say that a party's concession is pertinent to the court's discretion to exclude evidence on the point conceded. Such a concession, according to the Notes, will sometimes "call for the exclusion of evidence offered to prove [the] point conceded by the opponent …." Advisory Committee's Notes on Fed. Rule Evid. 401, 28 U.S.C. App., p. 859. As already mentioned, the Notes make it clear that such rulings should be made not on the basis of Rule 401 relevance but on "considerations as waste of time and undue prejudice (*see* Rule 403) …." *Ibid.* The Notes to Rule 403 then take up the point by stating that when a court considers "whether to exclude on grounds of unfair prejudice," the "availability of other means of proof may … be an appropriate factor." Advisory Committee's Notes on Fed. Rule Evid. 403, 28 U.S.C. App., p. 860. The point gets a reprise in the Notes to Rule 404(b), dealing with admissibility when a given evidentiary item has the dual nature of legitimate evidence of an element and illegitimate evidence of character: "No mechanical solution is offered. The determination must be made whether the danger of undue prejudice outweighs the probative value of the evidence in view of the availability of other means of proof and other facts appropriate for making decision of this kind under 403." Advisory Committee's Notes on Fed. Rule Evid. 404, 28 U.S.C. App., p. 861. Thus the notes leave no question that when Rule 403 confers discretion by providing that evidence "may" be excluded, the discretionary judgment

## **Admission Of The Materials Should Be Denied Under FED. R. EVID. 402 and 403**

Even if the Court were to conclude that FED. R. EVID. 803(8)(C) allows for the admission of some of the *9/11 Commission Report* excerpts, many of the portions designated by the Defendants should be excluded under Rules 402 and 403.

The probative value of many portions of the *9/11 Commission Report* is extremely low, and the risk that the jury will be confused or misled by the *Report* is high. If portions of the *9/11 Commission Report* and Staff Monograph and Statements are admitted under Rule 403, Plaintiffs will be unfairly placed in the position of challenging, at trial, the credibility of the Commission and the *9/11 Commission Report* and impeaching the *9/11 Commission Report* and Staff Monograph and Statements pursuant to Federal Rules Evidence 106 and 806. In order to challenge the *Report* and to impeach the portions on which the Aviation Defendants are permitted to rely, the Plaintiffs will be required to place the entire *9/11 Commission Report* into evidence and go over it page-by-page in detail to assure that the jury understands how little attention the Commission paid to the Aviation Defendants' conduct as opposed to the conduct of various governmental agencies. The end result will be that the Court will have to instruct the jury in detail as to each passage of the *Report* that is admitted as substantive evidence and as to each passage that is admitted solely as impeachment evidence. Such a procedure would be as tedious for the Court as it would be confusing to the jury.

---

may be informed not only by assessing an evidentiary item's twin tendencies, but by placing the result of that assessment alongside similar assessments of evidentiary alternatives. See 1 McCormick 782 & n. 41 (suggesting that Rule 403's "probative value" signifies the "marginal probative value" of the evidence relative to the other evidence in the case); 22 C. Wright & K Graham, Federal Practice and Procedure § 5250, pp. 546-547 (1978) ("The probative worth of any particular bit of evidence is obviously affected by the scarcity or abundance of other evidence on the same point").

Thus, the probative value of admitting selected portions of the *9/11 Commission Report* and Staff Monograph and Statements is substantially outweighed by the host of dangers that would transform a trial of the Defendants' culpability into a trial of the comprehensiveness, quality and reliability of the Commission's work as it relates to the Aviation Defendants. This would result in juror confusion of the issues, an enormous and unnecessary waste of time, and significantly increased costs to all parties. Moreover, it would be poor public policy and a disservice to the Commission to require the Plaintiffs to attack the legal and factual worthiness of the *9/11 Commission Report* before the jury, when the mission of the Commission was entirely different than the mission the jury will be charged with at trial.

Contrary to the Defendants' theory, the government's fault, if any, is irrelevant to the Aviation Defendants' liability. Similarly, the life histories, education and sophistication of the terrorists are not relevant to the Aviation Defendants' negligence in this case. The government and the terrorists are not parties to this litigation. Their liability is not at issue here. Any information that the FBI, CIA and/or FAA knew but did not communicate to the Aviation Defendants relates only to the irrelevant issue of a government's fault. Equally true, any intelligence information that the FBI, CIA and/or FAA did not communicate to the Aviation Defendants is irrelevant to the issues of foreseeability and proximate cause considering the volume of threat information the Aviation Defendants did receive prior to September 11.

The Aviation Defendants were charged with the responsibility for various layers of security, including pre-screening passengers, conducting pre-board screening, and providing a secure flight on the morning of 9/11. They failed miserably to exercise anything approaching reasonable care. Nothing in the *9/11 Commission Report* suggests otherwise. The Aviation Defendants' arguments that the government's fault is relevant on these grounds should be

11

squarely rejected.

### Derivative Immunity Is Irrelevant And Addressed Elsewhere

The Aviation Defendants have inappropriately interjected the issue of derivative immunity into this evidentiary motion. These assertions are entirely irrelevant to the issue of the admissibility of the *9/11 Commission Report* and the Staff Monograph and Statements. *See* Plaintiffs' Memorandum of Law in Opposition to the Motion of the Aviation Defendants For Summary Judgment Setting Aside the Federal Bureau of Investigation's Refusal to Allow the Depositions of Certain Witnesses.

Accordingly, the Aviation Defendants' Motion should be denied.

## ARUGMENT

## I. THE *9/11 COMMISSION REPORT*, STAFF MONOGRAPH AND STAFF STATEMENTS ARE NOT ADMISSIBLE UNDER FED. R. EVID. 803(8)(C).

FED. R. EVID. 803(8)(C) provides an exception to hearsay prohibitions for government reports setting forth factual findings "resulting from an investigation made pursuant to authority granted by law…." The exception is limited: a government report is inadmissible under Rule 803(8)(C) in whole or in part where "the sources of information or other circumstances indicate lack of trustworthiness." *See id.* If the party opposing the admission of a report demonstrates the presence of negative factors that outweigh the presumption of admissibility, the report should not be admitted. *Gentile v. County of Suffolk*, 926 F.2d 142, 148 (2d Cir. 1991). For the reasons set forth below, the Court is on solid ground in holding that the *9/11 Commission Report*, Staff Monograph and Statements and Defendants' designated excerpts from those documents are not entitled to the hearsay exception set forth in Rule 803(8)(C).

The Staff Monograph and Statements are not final findings of the Commission within the meaning of the Rule, legal conclusions contained in the *9/11 Commission Report* and Staff

Monograph and Statements are outside the scope of Rule 803(8)(C) in all events, and the *9/11 Commission Report* does not meet the necessary indicia of trustworthiness required by the Rule. Accordingly, the Court must not accord non-hearsay treatment to the *9/11 Commission Report* and Staff Monograph and Statements.

### A.   It Is Within This Court's Sound Discretion To Decline To Admit The *9/11 Commission Report*, Staff Monograph and Staff Statements.

The Court has significant discretion to refuse to admit the *9/11 Commission Report* and Staff Monograph and Statements under FED. R. EVID. 803(8)(C), given the presence of substantial negative factors undermining their trustworthiness for the purpose for which they are offered.

The Second Circuit has repeatedly emphasized the district court's broad discretion in determining issues of admissibility under Rule 803(8)(C). *See City of New York v. Pullman, Inc.,* 662 F.2d 910, 914 (2d Cir. 1981) (Rule 803(8)(C) is to be applied in a commonsense manner, subject to the district court's sound exercise of discretion in determining whether the report offered in evidence has sufficient independent indicia of reliability to justify its admission); *U.S. v. Durrani,* 835 F.2d 410, 425 (2d Cir. 1987) (exclusion of Presidential Commission Report on Iran-Contra affair as hearsay was within the court's discretion).[4]

The U.S. Supreme Court further clarified the trial court's role in exercising its discretion in excluding government reports pursuant to 803(8)(C) in *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153 (1988).  In *Beech* the Court held that a "trial court has the discretion, and indeed the

---

[4]      Other circuits are in accord.  *See, e.g., Smith v. MIT*, 877 F.2d 1106, 1112-13 (5th Cir. 1989) (general agreement among the circuits that the question of admissibility is one for the discretion of the district court); *U.S. v. Gray*, 852 F.2d 136, 139 (4th Cir. 1988) (admissibility of tentative internal IRS report under FRE 803(8)(C) is permissive and not mandatory; admissibility or non-admissibility rests in the trial court's discretion); *Smith v. Isuzu Motors Ltd.,* 137 F.3d 859, 862-63 (5th Cir. 1998) (district court properly concluded internal staff memorandum did not fall within the scope of Fed.R.Evid. 803(8)).

<u>obligation</u> to exclude an entire report or portions thereof — whether narrow 'factual' statements or broader 'conclusions' — that [it] determines to be untrustworthy." *Id.* at 167. *Beech* involved an investigation by a Naval officer into the circumstances surrounding a military plane crash. *Id.* at 156. The only disputed issue at trial was whether pilot error or equipment malfunction had caused the crash. *Id.* at 157. The defendant offered into evidence the investigative report of a JAG commander, concluding that the crash was caused by "pilot error." *Id.* at 158. The trial judge initially determined that the JAG report was sufficiently trustworthy and ultimately admitted, over plaintiff's objection, certain of the report's opinions and conclusions including the statement regarding the most probable cause of the accident. *Id.* at 158-59. In *Beech*, unlike in the 9/11 litigation, because the district court found the JAG report to be trustworthy, no party challenged whether the report was reliable and the Supreme Court had no occasion to express any opinion as to the trustworthiness of the report. *Beech,* 488 U.S. at 170.

The Court explained that Rule 803(8)(C) "assumes admissibility in the first instance," but provides "ample provision for escape if sufficient negative factors are present." *Id.* at 167. The Court emphasized the Rule's "provision of escape" where "the sources of information or other circumstances indicate a lack of trustworthiness." *Id.* at 167. According to the Court, "this trustworthiness inquiry was the [Advisory] Committee's primary safeguard against the admission of unreliable evidence," and that it was "important to note that it applies to all elements of the report." *Id.* Additionally the Court pointed out that there are "safeguards, built into the other portions of the Federal Rules, such as those dealing with relevance and prejudice," that "provide the Court with additional means of scrutinizing and, where appropriate, excluding evaluative reports or portions of them." *Id.* at 167-68.

For the reasons that follow, the Court has good reason to exercise its broad discretion to

exclude the *9/11 Commission Report*, the Staff Monograph and Staff Statements in their entirety.

> ### 1. The Staff Monograph And Staff Statements Are Not The Final Findings Of The Commission And Are Inadmissible Under FED. R. EVID. 803(8)(C).

The Staff Monograph and Staff Statements are not admissible pursuant to FED. R. EVID. 803(8)(C) because they are not final reports or official findings of the 9/11 Commission.  It is well settled that preliminary or "interim" staff reports like the Staff Monograph and Staff Statements that are not approved by the government agency are properly excluded under Rule 803(8)(C).  *See, e.g.,* STEPHEN A. SALTZBURG, MICHAEL M. MARTIN, DANIEL J. CAPRA, FEDERAL RULES OF EVIDENCE MANUAL § 803.02[9][f] (8th ed. 2002).

The Second Circuit's decision in *City of New York v. Pullman, Inc*., 662 F.2d 910 (2d Cir. 1981) is dispositive.  Pullman, the manufacturer of railroad cars appealed a judgment in favor of the buyer, the City of New York, in a breach of warranty action arising from Pullman's sale of 754 subway cars to the City.  *Id.* at 912.  Pullman argued that the district court erred in refusing to admit a report prepared by the staff of the Urban Mass Transit Administration (UMTA).  *Id.* at 913.  The UMTA's staff report concluded that the retrofit installed by Pullman was the surest way to repair the safety problem on the rail cars, but it did not reach a conclusion on the question of whether the retrofit provided an effective long-term solution to the safety problem, or whether the City received what they bargained for — subway cars which would be safe and dependable for up to 35 years.  *Id.* at 914.

The Second Circuit, in affirming the district court's exclusion of the report as hearsay, held that "by its own terms, the UMTA report was not the final report or finding of a government agency within the meaning of the Rule, but was an 'interim' staff report in the form of a recommendation to the Administrator."  *Id.*  According to the Court, "a close reading of the

report makes it evident that the broad language <u>did not embody the findings of an agency, but the tentative results of an incomplete staff investigation</u>," and thus it was inadmissible under Rule 803(8)(C). *Id.* at 915.[5]

Here, as in *Pullman*, the Staff Monograph and Staff Statements were released as separate and distinct reports authored by Commission Staff, not reports approved or endorsed by the Commission.[6] They do not reflect the final findings of the 9/11 Commission and are inadmissible under FED. R. EVID. 803(8)(C).

> ### 2. The *9/11 Commission Report* Is Not Admissible Under FED. R. EVID. 803(8)(C).
>
> #### a. The Commission Was Substantially Focused On Counterterrorism, Not The Conduct Of The Aviation Defendants.

The prohibition on hearsay should not be relaxed to permit the Aviation Defendants to use the *9/11 Commission Report* for a purpose for which it was never intended. The Commission was charged with the extraordinary task of investigating the domestic and international circumstances related to the terrorist attacks of September 11, 2001. The

---

[5] *See also Smith v. Isuzu Motors Ltd.,* 137 F.3d 859, 862-63 (5th Cir. 1998) (memorandum prepared by staff members of the National Highway Traffic Safety Administration expressing preliminary or interim opinions properly excluded as hearsay because the agency declined to accept the position set forth in the report; the Court noted that its conclusion was in accord with other circuits that have held that interim agency reports or preliminary memorandum do not satisfy Rule 803(8)(C)'s requirements); *Smith v. MIT*, 877 F.2d 1106, 1112-13 (5th Cir. 1989) (internal memorandum of EEOC staff investigators did not constitute official findings by the EEOC and are not factual findings within the meaning of the Rule); *U.S. v. Gray*, 852 F.2d 136, 139 (4th Cir. 1988) (tentative internal IRS report not purporting to contain agency findings was not admissible under 803(8)(C).

[6] Indeed, the Staff Monograph was not even published until August 26, 2004, five days after the 9/11 Commission was dissolved. The National Archives, 9-11 Commission Records, http://www.archives.gov/research/9-11-commission/; Plaintiffs' Dec. Exh. 7. The initial release of the Staff Monograph did not occur until five months later and the second release did not occur until September 2005, a year after the Commission dissolved. Press Release, National Commission on Terrorist Attacks upon the United States, 9/11 Commission to Close, Transfer Records to the National Archives (August 20, 2004), http://www.9-11commission.gov/press/pr_2004-08-20a.pdf ; Plaintiffs' Dec. Exh. 8.

Commission was issued an extremely broad mandate: explain how the attacks on America on September 11th occurred, and how the country could avoid such attacks again.  Contrary to the Defendants' assertion on page three of their brief, however, the Commission's mandate was not to write reports "…with the express understanding that they would constitute the central government investigatory record of the September 11 attack."  *See* AD Memo. at 3.  In fact, the *9/11 Commission Report* itself acknowledges that it contains "only a summary of what we have done, citing only a fraction of the sources we have consulted." *9/11 Commission Report* at xvii. The Commissioners admitted they did not "interview every knowledgeable person or [find] every relevant piece of paper," and "that inevitably new information would come to light." *9/11 Commission Report* at xvii.

Most significantly, the Commission made absolutely clear in the Preface to its Report that "[O]ur aim has not been to assign individual blame." *9/11 Commission Report* at xvi.  Thus, it is disingenuous for the Defendants to tender portions of the *Report* as evidence of culpability and accountability when the Commission not only did not consider but chose not to address those issues.  The *9/11 Commission Report* is clear that the Commission made no effort to report on whether the Aviation Defendants were negligent.  The statement from Commission member John F. Lehman quoted above when he was interviewed for the History Channel documentary "The 9/11 Commission Report" — describing the Aviation Defendants' "gross negligence" — exemplifies that Commission made no effort to assess the responsibility or fault of the Aviation Defendants on 9/11 in its final *Report*.  Any attempt by the Aviation Defendants to suggest that the Commission somehow cleared the Aviation Defendants of responsibility, somehow found that the Aviation Defendants exercised reasonable care, found no fault on the part of the Aviation Defendants or viewed the Aviation Defendants' conduct as reasonable would be a gross

17

distortion of what the Commission did.  Yet, this is the purpose for which Defendants seek to use

the *Report*, and it is an impermissible purpose.  In fact, the most obvious example of evidence

that is not trustworthy is a report that is generated for one purpose that is used for another

purpose that was deemed off limits when the report was generated.  That is the case here.

The *9/11 Commission Report* itself demonstrates that the Commission was focused on

government conduct, counterterrorism efforts by the government, and government problems and

not at all focused on the adequacy of aviation security measures on the ground or in-flight

security.  It contains thirteen chapters and fifty-seven chapter sub-sections.  Not one is devoted to

the Aviation Defendants performance in conducting aviation security, but rather the overall

threat of terrorism to America and how its government should respond.  *9/11 Commission Report*

at v-vii.  Similarly, Chapters 12 and 13 of the *Report* contain forty-one "Recommendations."

Only <u>one</u> recommendation touched upon aviation security – the recommendation that the

government take over checkpoint security from the airlines, and it is a *de facto* condemnation of

years of poor performance.  *See 9/11 Commission Report* at 361-450.  In short, the *9/11*

*Commission Report* is an unreliable source of information with respect to the conduct of the

Aviation Defendants.[7]

---

[7]     It is important to note that the Commission and the Commission staff lacked aviation
security expertise and experience.  At a minimum, a pre-board screener was required to undergo
52 hours of training.  *See* Dep. Tran. of Lewis Lassiter p. 170-171, 269; Tomasik Dec. Exh. 9.
Of the over eighty-eight Commissioners and staff members, none had any aviation security
experience, including training in pre-board screening.  One staff member, Gerald L. Dillingham,
was an employee of the General Accounting Office for Civil Aviation.  *See* Commission Staff
Biographies; Tomasik Dec. Exh. 10.  In the months and years leading up to 9/11, the GAO
issued scores of reports highlighting the long-standing screener performance problems and
security vulnerabilities that pervaded prior to 9/11, when the airlines and private security
companies were responsible for the operation of airport checkpoints.  *See* Tomasik Dec. Exhs. 1-
3.

### b.     The Commission's Sources Of Information And Other Circumstances Indicate Lack Of Trustworthiness.

The *9/11 Commission Report*, Staff Monograph and Statements and their designations are also not entitled to a hearsay exception under Rule 803(8)(C) because "the sources of information or other circumstances indicate lack of trustworthiness."  FED. R. EVID. 803(8)(C). It is well established that the court has the discretion to refuse non-hearsay treatment under FED. R. EVID. 803(8)(C) if sufficient "negative factors" are present indicating a lack of trustworthiness.  *See Gentile v. County of Suffolk*, 926 F.2d 142, 148 (2d Cir. 1991); *Rambus, Inc. v. Infineon Techs. AG*, 222 F.R.D. 101, 106 (E.D. Va. 2004).  The Supreme Court has made clear that a trial court has not only discretion, but "<u>indeed the obligation</u> to exclude an entire report or portions thereof" if they are found to be untrustworthy.[8]    That is the case here.

---

[8]      The Advisory Committee Note to the Rule sets forth a <u>non-exhaustive</u> list of several considerations to aid in determining the trustworthiness of a public report: the timeliness of the investigation; the skill and experience of the investigator; whether the investigator held any sort of hearing; and the investigator's impartiality.  The list has been interpreted as precisely what it purports to be — non-exhaustive.  The Second Circuit has made clear that Rule 803(8)(C) is to be applied in a commonsense manner.  *See Pullman*, 662 F.2d at 915.  A survey of federal court decisions reveals a wide variety of circumstances courts recognize as lacking sufficient indicia of trustworthiness necessary to extend non-hearsay treatment to a government report.  *See, e.g., C.O. v. Coleman Co.,* No. C06-1779, 2008 WL 820066, at *1 (W.D. Wash. Mar. 25, 2008) (reports of other incidents properly excluded despite assertion of 803(8)(C) hearsay exception because they did not contain investigative observations, lab test results or statistical analysis but relied upon second-or third-hand knowledge of previous events); *U.S. v. Awad*, 2007 WL 1988382, *6-7 (S.D.N.Y. Jul. 3, 2007) (because report had limited utility for the purpose it was advanced government report recommending the inclusion of drug as a controlled substance properly refused pursuant to Rule 803 (8) hearsay exception at criminal drug conspiracy); *Hines v. Brandon Steel Decks, Inc.,* 886 F.2d 299, 303 (11th Cir. 1989) (investigator's expertise, absence of a hearing and inability to cross-examine the investigator all factors to consider in determining trustworthiness of OSHA investigator's report); *In re Air Crash Disaster at Stapleton Int'l Airport,* 720 F. Supp. 1493, 1497 (D. Colo. 1989) (where government investigators rely on hearsay and nonhearsay in compiling a report, court may review and edit certain portions of the report in determining applicability of 803(8)(C)); *McKinnon v. Skil Corp.,* 638 F.2d 270, 278 (1st Cir. 1981) (Consumer Product Safety Reports properly excluded as untrustworthy where they contained double hearsay on issues of defect, causation and negligent design); *Miller v. Caterpillar Tractor Comp.,* 697 F.2d 141, 144 (6th Cir. 1983) (report excluded

### i.   Critical Information Relied Upon By The Commission Was The Product Of Torture And Coercion.

There are sufficient negative factors associated with the *9/11 Commission Report* indicating a lack of trustworthiness warranting its exclusion under Rule 803(8)(C).[9]

*First,* by their own admission, the Commissioners could not certify the truthfulness of the statements they released in their *Report.* Prior to the widespread public disclosure of the torture of detainees, the Commission in an "explanatory box" regarding detainee interrogation reports prefaced that the information included in chapters five and seven "rel[ies] heavily on information obtained from captured al Qaeda members." *9/11 Commission Report* at 146. The Commission acknowledged in the *Report* that "assessing the truth of statements by these witnesses — sworn enemies of the United States – is challenging." *Id.* According to the Commissioners,

> Our access to them has been limited to the review of intelligence reports based on communications received from the locations where the actual interrogations take place. We submitted questions for use in the interrogations, but had no control over whether, when or how questions of particular interest would be asked. <u>Nor were we allowed to talk to the interrogators so that we could better judge the credibility of the detainees and clarify ambiguities in the reporting</u>.

*Id.* Thus, the Commission conceded that it could **not** guarantee that any information provided by the detainees was credible or trustworthy. It was not allowed to speak with the interrogators or participate in the interrogation process. The Commissioners did not conduct any of the questioning themselves and were not in a position to judge the credibility of any of the detainees. They had virtually no first-hand access to intelligence reports and were forced to rely exclusively

because relied upon hearsay statements of witnesses interviewed by investigators); *Fraley v. Rockwell Int'l Corp.,* 470 F. Supp. 1264, 1267 (S.D. Ohio 1979) (JAG report properly excluded for lack of reliability where prepared by an inexperienced investigator in a highly complex field of investigation).

[9]   Plaintiffs have argued above that the Court has no discretion to admit the Staff Monograph and Staff Statements under Rule 803(8)(C). Thus, Plaintiffs will focus on the *9/11 Commission Report* itself in arguing untrustworthiness. But, every argument made with respect to the *Report* is equally applicable to the Staff Monograph and Staff Statements.

on second and third-hand accounts of the detainees' purported statements as reported to them by the CIA and DOD. *See, e.g.,* Robert Windrem and Victor Limjoco, *9/11 Commission Controversy*, January 7, 2008 (Tomasik Dec. Exh. 11).

Since the release of the *9/11 Commission Report*, countless disclosures have occurred regarding the torture of the detainees and the destruction of tapes of the CIA's interrogations of the 9/11 operatives. These disclosures further cast a shadow over the trustworthiness of portions of the Report that relied on such interrogations of detainees including Khalid Sheikh Mohammed and Ramzi Binalshibh.[10] In January 2008, a NBC News analysis of the *9/11 Commission Report* concluded that a substantial portion of the footnotes in the *Report* refer to CIA interrogations of al Qaeda operatives who were subject to "enhanced interrogation techniques," including physical and mental abuse, exposure to extreme heat and cold, sleep deprivation and waterboarding. Windrem & Limjoco, *9/11 Commission Controversy* (Tomasik Dec. Exh. 11).

The same analysis reported that "most of the information in Chapters five, six, and seven of the Report came from the interrogations" and that those chapters "cover the initial planning for the attack, the assembling of terrorist cells, and the arrival of hijackers in the U.S." *Id.* (Tomasik Dec. Exh. 11). These are precisely the same chapters designated by the Aviation Defendants as helpful to their defense. Philip Zelikow, Executive Director of the Commission Staff admitted in response to the analysis that "the Commission relied heavily on the information

---

[10] For example, Defendants designated the following unreliable excerpt, "Reportedly, the 9/11 hijackers were instructed to use items that would be undetectable by airport checkpoints." *See* AD Mem. at 22; *9/11 Commission Report*, p. 84. As reflected in Footnote 58 to Chapter Three of the *9/11 Commission Report*, this statement was obtained through the interrogation of Ramzi Binalshibh. *9/11 Commission Report* at 476. Any designations that rely on information obtained through a CIA interrogation lacks the sufficient indicia of trustworthiness necessary for admission pursuant to Rule 803(8)(C). The Defendants cannot successfully argue for the admission of portions of the *9/11 Commission Report* under 803(8)(C) that were obtained through torture. The Commission's own use of the word "reportedly" is consistent with their skepticism of the accuracy of this testimony. *See supra* Part I.1.b.

derived from the interrogations, but remained skeptical of it." *Id.* He stated that "quite a bit, if not most," of its (the Commission's) information on the 9/11 conspiracy "did come from the interrogations." *Id.* Zelikow further stated that "we needed more information to judge the reports we were reading….We needed information about demeanor of the detainees. We needed more information about the content, context and character of the interrogations." *Id.*

In December 2007, when the torture of detainees became public, Zelikow issued a memorandum to Commissioner Tom Kean and Vice Commissioner Lee Hamilton regarding new information confirming that hundreds of hours of CIA recordings and interrogations of al Qaeda prisoners not reviewed by the Commission had been destroyed. Memorandum from Philip Zelikow, Executive Director of 9/11 Commission Staff to Tom Kean and Lee Hamilton, Co-chairs of the 9/11 Commission regarding Interrogations and Recordings: Relevant 9/11 Commission and CIA Responses (December 13, 2007); Tomasik Dec. Exh. 12. Zelikow's memorandum outlined in detail how the Commission was previously dissatisfied with the CIA's lack of responsiveness to requests for detailed information about these interrogations, the character of the questioning, the credibility of the statements elicited, the assessments of the interrogators, the quality of language interpretation, and other matters. *Id.* According to Zelikow, prior to the *9/11 Commission Report*'s publication, the Commission wanted to talk to the interrogators, if not the detainees themselves, so the Commission could assess the credibility of the accounts that were being used by the Commission, because the Commission was not satisfied with what the CIA was giving it. *Id.* Mr. Zelikow recommended that further investigation was needed to determine whether these non-disclosures violated Federal law. *Id.*

Co-Commission Chairs Thomas Kean and Lee Hamilton acknowledged the lack of credibility and trustworthiness in the detainee interrogations in their book <u>Without Precedent</u>. In their chapter entitled "Getting the Story," Kean and Hamilton pointed out:

> We…had no way of evaluating the credibility of detainee information. How could we tell if someone such as [Khalid Sheikh Mohammed], a sworn enemy of the United States, was telling the truth? Usually, a prosecutor can question a witness directly. In this case, we were receiving information third hand—passed from the detainee, to the interrogator, to the person who writes up the interrogation report and finally to our staff in the form of reports, not even transcripts.

Thomas Kean and Lee Hamilton, <u>Without Precedent</u>, 119 (2006); Tomasik Dec. Exh. 13.

Thus, both the co-chairs and their Executive Director have recognized that the interrogations were fraught with suspect and multiple levels hearsay, lacking any indicia of reliability.[11]

*Second*, evidence obtained by torture and other "enhanced interrogation techniques" is inherently unreliable and inadmissible. Consequently, reports that rely on such evidence derived from torture are not reliable. The ultimate objectives and authority of the Central Intelligence Agency are different than that of our system of justice. The objectives of the Federal Rules of Evidence and the American judicial system are to reach a true and just result by ensuring that evidence that is the product of torture is not allowed to unfairly influence a jury.

The Aviation Defendants argue that chapters five and seven of the *9/11 Commission Report* demonstrate that "the primary and fundamental cause of Plaintiffs' injuries was the calculated, intentional conduct of sophisticated terrorists who did not rely upon the hope that

---

[11]     Harvard Professor Ernest R. May — a 9/11 Commission consultant who, with Zelikow, was the co-architect of the *9/11 Commission Report* — brought the unreliability of the interrogations even sharper relief when he said:   "<u>We never had full confidence in the interrogation reports as historical sources</u>."   Ernest R. May, When Government Writes History: The *9/11 Commission Report*, THE NEW REPUBLIC, Vol. 232, Issue 4,714, p. 30-35, May 23, 2005 (Tomasik Dec. Exh. 4).

security procedures would be negligently performed by the Aviation Defendants at five different checkpoints at four different airports on the morning of September 11, 2001." AD Memo. at 19. According to their brief, chapters five and seven of the *Report* provide critical information regarding the initial planning of the attacks, the assembling of terrorist cells and the arrival of the hijackers in the U.S. that the Defendants intend to use to establish the non sequitor that Plaintiffs' damages were "caused only because of the terrorists' intent to cause harm." AD Memo. at 22. It is no surprise that missing in Defendants' brief is the acknowledgement that this "critical information" they seek to admit through their designations was derived from physical and psychological torture.

By the Commission's own admission, the Commissioners were skeptical of the information reported in chapters five and seven. We now know what the Commission did not know: that the information is not trustworthy as it stems from interrogations of the detainees who were subject to physical and mental abuse, starvation, exposure to extreme heat and cold, sleep deprivation and waterboarding. The Commission's sources were tainted, and the risk of false confession was high. The Commission had no control over the interrogation process, had no ability to assess the credibility of the statements allegedly elicited from the detainees and only received the information third-hand. Ultimately, because the Commission's conclusions in the Final Report were based upon information gained through interrogations in which detainees were subject to torture, their conclusions are at a minimum suspect, untrustworthy and wholly inadmissible in a court of law.[12]

---

[12]     In May 2008, the Pentagon dropped charges against the alleged 20th hijacker Mohammed al-Qahtani. Officials previously stated that al-Qahtani had been "subjected to harsh interrogations authorized by Defense Secretary Donald Rumsfeld." Ben Fox, US drops charges against Saudi in Sept. 11 attacks," Associated Press, May 12, 2008.

ii.     **Legal Conclusions Are Not Admissible Pursuant To FED. R. EVID. 803(8)(C).**

The Aviation Defendants' designations of the *9/11 Commission Report* and Staff Monograph contain legal conclusions. *See* Plaintiffs' Response to Defendant Designations, Tomasik Dec. Exhs. 15 (a) and 15 (b). FED. R. EVID. 803(8)(C) does not extend a hearsay exception to legal conclusions contained within an otherwise qualifying public report. *Hines v. Branden Steel Decks, Inc.,* 886 F.2nd 299, 303 (11th Cir. 1989). Legal conclusions are not included because a jury would have no way of knowing whether the preparer of the report was cognizant of the requirements underlying the legal conclusion and, if not, whether the preparer might have a higher or lower standard than the law requires. *Miranda-Ortiz v. Deming,* 1998 WL 765161(S.D.N.Y.) *citing Hines v. Brandon Steel Decks, Inc.,* 886 F.2d 299, 303 (11th Cir. 1989). Accordingly, legal conclusions in the *Report* are inadmissible pursuant to Rule 803(8)(C).

iii.    **Admission Of The *9/11 Commission Report* Threatens To Create A Trial Within A Trial.**

If the Court were to admit some or all of the *Report*, Plaintiffs would be entitled to discover and adduce evidence to show not only the motivations of the detainees, but the nature of the interrogations and the manner in which the information was communicated to the 9/11 Commission so that the jury may properly evaluate the reliability of the *Report*. Discovery and trial would be multiplied exponentially — and would by necessity involve matters implicating some of the most closely guarded secrets held by our government — resulting in an enormous waste of time, burdening the parties and the government, and bearing all the attendant prejudice, burden and potential for juror confusion.

## II.   THE AVIATION DEFENDANTS' DESIGNATIONS ARE IRRELEVANT AND PREJUDICIAL, AND ARE INADMISSIBLE UNDER FED. R. EVID 402 AND 403.

Even assuming Defendants could establish that these documents fall within a Rule 803(8)(C) exception to the hearsay rule, Defendants' designations should be excluded as irrelevant or unduly prejudicial under FED. R. EVID. 402.   Moreover, their admission would confuse and mislead the jury, such that they should be excluded under FED. R. EVID. 403 in any event.

The burden of demonstrating an exhibit's relevance is on the party seeking its admission. *Dowling v. United States*, 493 U.S. 342, 351 (1990).  The Aviation Defendants have designated almost the entirety of the *9/11 Commission Report* and Staff Monograph and Statements.  By failing to specifically demonstrate the relevance of the hundreds of pages of designations tendered, Defendants have failed to satisfy their burden.   The Defendants presented eight "categories" of relevance, AD Mem. at 17-18, and four relevant "issues," AD Mem. at 18-19, but have made little or no effort to proffer specific legal and factual arguments in support of the relevance of their voluminous designations.  Moreover, they failed to identify what "categories" rationally correspond to what "issues."   In essence, they have improperly shifted the burden to the Plaintiffs to address why the hundreds of pages, paragraphs, and sentences are <u>not</u> relevant. Despite the fact that it is not Plaintiffs' burden to demonstrate irrelevance, Plaintiffs do so below.[13]

---

[13]      Plaintiffs generally agree that two of the Aviation Defendants' category descriptions — "Category 1: Screening And Security On September 11" and "Category 2: Events in Flight On The Hijacked Aircraft On September 11" — include issues that are relevant to this litigation. Plaintiffs have proposed a detailed Proposed Stipulation of Facts on these topics.  (Tomasik Dec. Exh. 6).   Aviation Defendants' "Category 3: Pre-September 11 Intelligence Regarding the Terrorist Threat," is only relevant to the extent that information was known or should have been known by the Aviation Defendants.  At the March 22, 2007 status conference, this Court granted the Aviation Defendants' request to brief the specific issue of whether any information known by

For the Court's convenience, Plaintiffs separately submit as Exhibit 15 (a) a chart of Plaintiffs' response to the Defendants' designations of the *9/11 Commission Report*. Plaintiffs separately submit as Exhibit 15 (b) a chart of Plaintiffs' response to the Defendants' designations of the Staff Monograph. Each chart identifies the Defendants' designations in the first column, the corresponding footnote, if any, in the second column, and Plaintiffs' proposed stipulation in the third column. The last column lists the Plaintiffs' objections to the designations. *See* Plaintiffs' Response to Defendants' Designations; Tomasik Dec. Exh. 15 (a) and Exh. 15 (b). The argument below addresses the relevancy of these designations in their entirety.

### A.    The Aviation Defendants' Designations Are Irrelevant And Inadmissible.

Federal Rule of Evidence 401 provides: "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to determination of the action more probable or less probable than it would be without the evidence." Rule 401 is meant to be read in conjunction with Rule 402, which states: "All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by act of Congress, by these rules, or by other rules prescribed by the Supreme Court pursuant to statutory authority."

Hundreds of the Defendants' designations pertain to non-parties whose acts or failures to act shed no light on the Defendants' culpability. These designations address (i) actions the government did or did not take on or before 9/11; (ii) intelligence information the government had but allegedly did not share with the Aviation Defendants; and (iii) information regarding the terrorists' life histories, education and their sophistication. Any information that the FBI, CIA and/or FAA knew but did not communicate to the Aviation Defendants relates only to the

---

the government but not communicated to the Aviation Defendants had relevance to this litigation. This Court remarked that, "I anticipate that I would rule that information not communicated is not relevant." Status Conf. Tr. 48, Mar. 22, 2007, Tomasik Dec. Exh. 14. Categories four through eight are vague, ambiguous and irrelevant.

irrelevant issue of the government's fault. Moreover, any intelligence information that the FBI, CIA and/or FAA did not communicate to the Aviation Defendants is irrelevant to the issues of foreseeability and proximate cause. This is especially true considering the volume of threat information the Aviation Defendants did receive. *See infra* Part II.A.1. Similarly, the terrorists' life histories, education and sophistication are not at issue here.

> 1.    **The Aviation Defendants' Designations Regarding Threat Information Are Not Relevant And Duplicative Because Discovery Has Demonstrated That The September 11 Attacks Were Reasonably Foreseeable.**

Defendants assert that the information designated in the *9/11 Commission Report* and Staff Monograph and Statements is relevant to the issues of causation, foreseeability, and whether the Aviation Defendants have derivative immunity from liability.[14] The Defendants' request to use the *9/11 Commission Report* and Staff Monograph and Staff Statements for these purposes is no different than prior requests that this Court has previously ruled on and rejected.

During the June 14, 2007 hearing on the Aviation Defendant's Motion for "focused" government discovery, this Court inquired why "the dysfunction of government administration, therefore, is an excuse for your own negligence…?" The Court expressed concern that the Defendant's request for focused government discovery was really a request to "authorize another trial of the government." In declining to permit such discovery, this Court stated that "given the issues as they are presented to me, the burden, the confusion, the expense, and I won't go into other considerations because these are enough, all dictate that I should not allow this discovery." Motions Hr'g. Tr. 116,121,128, June 14, 2007; Tomasik Dec. Exh. 16.

---

[14]    *See* AD Mem. at 18 claiming that their designations are relevant to the following issues: (1) the manner in which the September 11 attacks were planned and carried out by the terrorists; (2) the pre-September 11 intelligence regarding the terrorist threat generally and the September 11 hijackers specifically; (3) the pre-September 11 aviation security system; and (4) the role of the government in protecting the United States against terrorist attacks on civil aviation before September 11, 2001.

Moreover, as the Court recognized in *In re September 11 Litigation,* 280 F. Supp. 2d 279, 302 (S.D.N.Y. 2003), the conduct of a third party cannot preclude a finding of proximate cause if the conduct itself was a foreseeable hazard.

That a hijacking and crash of one of their airplanes was reasonably foreseeable to the Aviation Defendants is beyond dispute -- one of the central purposes of the Aviation Defendants' duty to exercise reasonable care and duty to provide service with the highest degree of safety in the public interest was to protect against exactly those hazards.  For example, defense witnesses have recognized:  the "end and aim" of checkpoint security was to prevent hijackers from getting onboard planes with weapons.[15]

Even a sampling of the documents adduced in discovery and from widely available

---

[15] *See, e.g.,* Deposition of Globe Director of Training Lewis Lassiter, p. 184-185:

"Q.  Mr. Lassiter, you were aware as a director of training, quality assurance for Globe on 9/11 that the failure of checkpoint screening to detect even one prohibited item could result in a hijacking; is that right?

A.   Yes, sir.

Q.   And were you aware as the director of training for Globe on 9/11 that a failure of checkpoint screening to detect even one prohibited item could result in a hijacker getting on board a plane with a weapon?

A.   Yes, sir.

Q.   And, in fact, the check points were there on 9/11 to stop exactly this from happening; is that right? … Among other things? …

A.   Yes, sir.

Q.   And would you agree with me that this was the end and aim of checkpoint security, to prevent hijackers from getting onboard planes with weapons? …

A.   Yes, sir."

(Tomasik Dec. Exh. 17) (Ellipses indicate removal of objections).

sources—some of which are discussed below—demonstrate that the prospect of hijackers commandeering commercial aircraft to use them as flying bombs and crash them into buildings was not only imaginable, it was imagined and had been attempted.  Indeed, as the Second Circuit noted nearly two decades before 9/11:

> Depriving a hijacker of his weapon is critical, because by means of a weapon like a pistol or even a knife the hijacker may literally turn the plane itself into a weapon, threatening not only those within it, but those on the ground as well.  **In short, the plane may become a weapon of mass destruction that no ordinary person would have any way of obtaining except through a hijacking**.

*United States v. Albarado*, 495 F.2d 799, 804-05 (2d Cir. 1974).  *See also* Brian M. Jenkins, Ph.D., Rand Report, Seminar on Aviation Security, 1989 ("The nightmare of governments is that suicidal terrorists will hijack a commercial airliner and by killing or replacing its crew, crash it into a city or some vital facility.").

The Aviation Defendants received scores of warnings regarding al Qaeda's intent to attack American civil aviation domestically, as well as the possible use of aircraft as flying suicide bombs.  The government advised the Aviation Defendants that terrorism experts were saying it was not a matter of "when" there would be an attack in the United States, but "where and when."  U.S. DEP'T. OF TRANSP. OFF. OF INTELLIGENCE AND SEC., *"The Terrorist Threat Overview for the United States,"* Feb. 2001; Tomasik Dec. Exh. 18.  The following sampling of documents produced by the Aviation Defendants in this litigation, discussed in chronological order, provides compelling evidence of the Defendants' knowledge of that threat:

**(i)** On March 5, 1999, Massport hosted an airport security meeting at Boston Logan International Airport—the airport from which American Flight 11 and United Flight 175 departed on 9/11.  This meeting was attended by the air carriers, including American Airlines and United Airlines, as well as the FAA and the FBI.  The prepared minutes from this meeting

include a summary of a presentation given by Ted Distaso, FBI Special Agent from the Boston Office, who was assigned to a joint task force (which included the FBI, Secret Service, the ATF, and Boston State Police) to monitor terrorism in the area.  The minutes state in pertinent part:

> [Distaso] suggested complacency about airport security exists because nothing has happened in a while.  He stated he knows of no immediate specific threat, but he mentioned **the bin-Laden terrorists in the Middle East who have made threats against the United States, and that it is only a matter of time before terrorists attack**.  He stated his belief that they targeted the embassies to bomb because of their usually-compromised security, that airports have had the perception of very tight security.  Ted stated he found for himself this is not true; he was able to walk unchallenged into one of Logan's gate areas.  He suggested it was in everyone's best interest to harden security.

Tomasik Dec. Exh. 19.

**(ii)** Each air carrier was required to have certain Customer Service Representatives trained as Ground Security Coordinators (GSCs).  GSCs were responsible for overseeing checkpoint screening at airports at all times as well as being available to respond to any security issues that arose.  The Aviation Defendants provided GSCs recurrent training on an annual basis.  The *May 2000 American Airlines Ground Security Coordinator Recurrent Training Reference Handout* included a section dedicated solely to Osama bin-Laden.  The GSCs were also shown a video entitled *The Terrorist and the Super Power*, and then given a written test on Osama bin-Laden.  The questions included:

> Q20:  Who does the United States Department recognize as the **number one terrorist** who is bankrolling events against U.S. interests?
>
> A:  **Osama bin-Laden**.

Tomasik Dec. Exh. 20.  *See also* Deposition Transcript of Bronwen McKenzie, p. 190-204; Tomasik Dec. Exh. 21.

**(iii)** In October 2000 the FAA's Office of Civil Aviation Security Intelligence

released a report to air carriers entitled "*World Wide Threats Against Civil*

*Aviation.*"  Throughout this 31-page report there are multiple references to the threat

posed by Osama bin-Laden and al-Qaeda.  Specifically, this report included the following:

> Q:    **What is the most serious terrorist threat to the United States at present?**
>
> A:    **The Osama bin-Laden network** is considered the single most serious threat to the United States and its interests at the present time….

Tomasik Dec. Exh. 22.  The report explained how Osama bin-Laden uses the multi-international

ties that al-Qaeda developed, and can call on individuals and groups worldwide to prepare for, or

carry out, terrorist attacks.

    **(iv)** In February 2001 a report prepared by the Department of Transportation Office of

Intelligence and Security (DOT) entitled *"The Terrorist Threat Overview for the United States,"*

was disseminated to the air carriers, including American Airlines who produced it in discovery.

In this report, the DOT stated that "the United States has become a more attractive target for

terrorist attacks."  The report further advised:

> In July 1999, the National Intelligence Community assessed that foreign terrorists probably will attempt an attack in the United States in the next year or two.  The assessment highlighted the attractiveness of transportation and the transportation infrastructure such as subways, buses, trains, cruise lines, civil aviation, and pipelines - as potential targets.

This report reiterated the great concern about Osama bin-Laden:

> In testimony before Congress in February, 2000, CIA Director George Tenet said **the most serious threat overall terrorist threat that the United States faces worldwide comes from Islamic extremists, most notably Osama bin-Laden**.

The report discussed the changing nature of the terrorist threat, citing to the 1993 bombing of the

World Trade Center, concluding that Islamic extremists had crossed a threshold for more large

scale terrorist attacks and raised the profile of U.S. vulnerability to a terrorist attack.  According

to the report, domestically, the World Trade Center bombing in 1993 was a watershed event because it demonstrated that terrorists changed the way they look at conducting attacks against the United States.  In terms of targeting, this report warned:

> TARGETING. The attack on the WTC also represented a change in targeting by international terrorists.  The bombing makes it clear that symbols of U.S. capitalism, trade, and commerce can be considered viable terrorist targets, a point that was underscored by the planned bombings of the Lincoln and Holland tunnels, the George Washington bridge in New York City.  Consequently, it is believed that the threat within the United States has increased, as terrorists are beginning to recognize the value of attacks against targets not previously considered symbols of the United States.

This Spring 2001 report concludes by ominously stating that **"counter terrorism experts are in agreement that the pressing question for the future is not whether there will be additional terrorist attacks in the U.S., but when and where."**  Tomasik Dec. Exh. 18.

(v) In March 2001 the DOT disseminated a report to air carriers entitled "Transportation, Security and Terrorism Review."  Specifically, it was a *Special Edition* entitled *USA v. Osama bin-Laden: Technical and Tactical Insights From the Trial.*  The DOT discussed how the New York trial of four defendants in the 1998 bombing of U.S. embassies in Kenya and Tanzania provided revealing details on Osama bin-Laden's al-Qaeda network, methods and thinking.

The report examined the terrorist operational cycle and advised air carriers, including American Airlines and United Airlines, that there are four groups involved in attacking a target. The first group is the *Surveillance Group*, which collects information on targets and sends it to the "Bosses."  The *"Bosses,"* who comprise the second group, decide which target to attack. Then a third, *Logistical Group,* provides the weapons and explosives needed to attack the target. The fourth group then arrives and carries out the attack.[16]

---

[16]     This notice the Aviation Defendants received regarding the terrorist operational cycle is

In terms of target selection, this report warned air carriers that the FBI advised that the embassy bombings would *pave the way for attacks inside the U.S.* The report not only linked Osama bin-Laden directly to the attacks in Africa but commented on bin-Laden's intent to utilize a suicide bomber. The report quotes terrorism expert Brian M. Jenkins, Ph.D. as stating, "They want a lot of people watching and a lot of people dead." The report also advised air carriers that al-Qaeda is not only training terrorists in explosives and small arms, but training them in operational principles, including collecting target intelligence and communications. The report advised that al-Qaeda selected individuals to send to specialized schools for training in electronics and flying aircraft. Tomasik Dec. Exh. 24.

(**vi**) In April 2001, the FAA's Office of Civil Aviation Security Intelligence gave regional briefings to all commercial air carriers and disseminated a CD-ROM that included current threat information regarding Osama bin-Laden and the possibility of suicide hijackings.[17] This report advised air carriers that they needed to have a better understanding of the current threat to U.S. air carriers and focused on the groups and state sponsors deemed likeliest to attack symbols of the United States. There are numerous references to the threat posed by Osama bin-Laden, including:

---

relevant because Plaintiffs have uncovered facts demonstrating that surveillance by the terrorists was taking place prior to 9/11 at Logan and other locations. For example, one American Airlines employee observed Mohammed Atta videotaping the Logan checkpoint prior to 9/11 — one of the many key facts *not* found in the *9/11 Commission Report*. Prior to 9/11, the FAA mandated that any such surveillance be immediately reported to the FAA. American Airlines did not report this incident to the FAA. Stephen Wallace Dep. Tr. p. 103-144, 217-220 (Tomasik Dec. Exh. 23).

[17]     Through discovery, the distribution list of persons who received a copy of the FAA's CD-ROM presentation was produced. Those persons included Christopher Bidwell, Manager, Corporate Security, American Aviation Defendants; Robert Runion, Director of Security, Colgan, Inc.; Richard Davis, Manager, Corporate Security, United Aviation Defendants; and Thomas F. Farrell, Director, Corporate Security, US Airways, Inc. *See* Tomasik Dec. Exh. 25.

There is significant motivation for associates of bin-Laden to conduct a terrorist hijacking.   Successful intelligence and law enforcement operations around the world have led to the arrest and imprisonment of many individuals linked to his organization. . . .   With the hijacking of Indian Aviation Defendants as a model, we're concerned that bin-Laden's followers may look to duplicate that success by seizing a U.S. airliner to exchange hostages for the release of these prisoners and others.

Considering everything, we assess that a terrorist attack of a U.S. airliner is more likely to occur overseas than in the United States. A domestic hijacking would likely result in a greater number of American hostages, but would be operationally more difficult to accomplish. . . . **If, however, the intent of hijackers is not to exchange hostages for prisoners, but to commit suicide and a spectacular explosion, a domestic hijacking would probably be preferable.**   Fortunately, we have no indication that any group is currently thinking in that direction.

While the FAA considers the suicide bombing of a U.S. airliner to be a low probability, a non-suicide bombing continues to be a major concern. For example, convicted members of the Manilla plot to bomb U.S. airliners in Asia had links to bin-Laden and members of that bombing conspiracy are still at large.  **Also, statements attributed to bin-Laden following the U.S. missile attack on his camp specifically threatened to bring down and hijack U.S. and Israeli aircraft**.

Tomasik Dec. Exh. 26.  This presentation included slides that reference a 1994 Air France hijacking where an Islamic extremist planned to crash a plane into the Eiffel Tower, and a discussion regarding terrorist use of planes as "*Flying Bombs.*"  Tomasik Dec. Exh. 26.

(**vii**) American Airlines was a client of Pinkerton International, a private security intelligence firm.[18]  Pinkerton provided American Airlines with intelligence reports on a weekly basis regarding terrorist threats worldwide.   On September 7, 2001, <u>just four days before September 11</u>, Pinkerton reported to American Airlines in its weekly intelligence forecast the following:

The FAA announced on September 3 that a notice had been issued throughout the summer to U.S. airports to **update their vulnerability**

---

[18]     Document production is ongoing and may reveal that other Aviation Defendants were clients of Pinkerton or other private security intelligence firms.

**assessments in light of a terrorist claim that U.S. airports and/or airlines were a potential target.**

Tomasik Dec. Exh. 27.

As evidenced by these compelling documents, and many, many others that have been exchanged in discovery and/or are in the public domain, the Aviation Defendants' claim that the government failed to apprise them of the risk is simply not true and, in any event, irrelevant. The Defendants were put on notice by the government and knew from their own intelligence that a domestic hijacking was not only foreseeable, but likely to occur. Consequently, the Defendants' designations pertaining to what intelligence information, if any, was <u>not</u> communicated or what the government failed to do are not relevant considering the volume of intelligence information the Aviation Defendants knew.

The law does not require that notice of a risk of third-party criminality must invariably be based on precedent incidence involving identical circumstances. *Nash v. Port Authority of N. Y. and N. J.*, 2008 N.Y. Slip. Op. 03991 at 6-7 (1st Dep't 2008). The precise manner in which the harm was inflicted need not be perfectly predicted in order to be considered foreseeable. *In re September 11 Litigation,* 280 F. Supp. 2d 279, 295 (S.D.N.Y. 2003). When determining the extent of a tortfeasor's duty to afford protection from foreseeable third party criminal conduct, courts have measured the likelihood of third party criminality by inquiring as to whether there were precedent crimes that should have alerted the defendant to the circumstances that it was in some measure probable that a person would be victimized as the plaintiff was. *Nash,* at 6-7 (1st Dep't 2008), *citing Jacqueline S. v. City of New York*, 81 N.Y.2d 288, 294-295 (1993); *Moskal v. Fleet Bank*, 703 N.Y.S.2d 126 (2000), *Rudel v. Nat'l Jewelry Exch. Co.*, 623 N.Y.S.2d 878 (1995). As long as there is evidence to support an inference that a defendant could or should have been aware of a real risk that the alleged crime would occur, the law permits an inference of

notice and imposition of a duty of care.  *Nash,* at 7 (1st Dep't 2008).

The Aviation Defendants were on notice that bin Laden and al-Qaeda had contemplated the use of aircraft as flying suicide bombs and that they were focused on landmarks as targets. The Aviation Defendants knew to a certainty from the 1993 bombing of the World Trade Center that it was considered a prime landmark that had been selected as a target.  The undeniable evidence is that the Aviation Defendants have no basis to support a claim that they lacked notice sufficient to foresee the hijackings and crashes on 9/11.

### 2. Defendants' Attempts To Blame The Government Are Irrelevant To The Issue Of The Aviation Defendants' Liability.

The ultimate issue in this litigation is whether the Aviation Defendants complied with the applicable standard of care in providing aviation security on the ground and in-flight, including "to protect against acts of criminal violence or aircraft piracy."  *See* 14 C.F.R. § 108.103(a)(1), as amended July 17, 2001 (security programs must "[p]rovide for the safety of persons and property traveling on flights provided by the aircraft operator against acts of criminal violence and air piracy, and the introduction of explosives, incendiaries or deadly or dangerous weapons aboard an aircraft."); 14 C.F.R. § 108.101 (requiring each aircraft operator to "adopt and carry out" a security program that meets the requirements of Section 108.103).  The government did not maintain, operate or control passenger facilities or commercial aircraft involved in the events of 9/11; the Aviation Defendants did.  The Aviation Defendants were charged with the uniquely important responsibility to provide aviation security, including preventing or deterring aircraft hijacking, sabotage, and related criminal acts.

At trial, Plaintiffs are required only to prove that the Aviation Defendants were negligent or otherwise liable for their tortious conduct.  To establish proximate cause, Plaintiffs need only establish that the Aviation Defendants' conduct was a substantial factor of the events which

produced injury. *See Nallan v. Helmsley-Spear, Inc.,* 50 N.Y.2d 507 (1980) (plaintiffs' burden in establishing a prima facie case in negligence is to show that defendants' conduct was a substantial causative factor in sequence of events that led to plaintiff's injury; fact that "instrumentality" which produced injury was the criminal conduct of a third person would not preclude a finding of proximate cause if the intervening agency was itself a foreseeable hazard). The Defendants incorrectly state the Plaintiffs' burden in this case, by asserting that "Plaintiffs seek to hold the Aviation Defendants solely responsible for failing to thwart the 9/11 attacks…" AD Mem. at 25.  Plaintiffs need not allege that the Aviation Defendants are solely responsible for the events of September 11.  Plaintiffs will show what they are required to show:  that the Aviation Defendants breached their duty to exercise reasonable care under the circumstances, including a duty to comply with all applicable provisions of state law, and a duty to implement those protective measures that they knew or should have known were required under the circumstances, and their duty to provide service with the highest possible degree of safety in the public interest.

    The Aviation Defendants' attempt to establish the government's fault is irrelevant to these claims.  On a number of occasions, this Court has recognized that the actions of other parties are not relevant and that the Court would likely rule that information not communicated by the government to the Aviation Defendants is not relevant.  *See* Hr'g. Tr. at 48, Mar. 22, 2007 ("I anticipate that I would rule that information not communicated is not relevant."); Tomasik Dec. Exh. 14; *see also* Hr'g. Tr. at 13, Feb. 26, 2007 ("But what other parties did or did not do is not relevant."); Tomasik Dec. Exh. 28.

    Evidence of government fault is also irrelevant to any contribution or apportionment defense.  No contribution claims may be made against the government under Article 14 of the

CPLR because the government is immune from suit and thus, not "subject to liability for damages." CPLR 1401 (contribution claims may be asserted only as against person "subject to liability for damages for the same personal injury, injury to property or wrongful death").  Nor will there be any apportionment of fault to the government under Article 16.  The limited liability provisions of Article 16 do not apply to claims for property damage.  *See* CPLR 1601 (limited applicability of Article 16 to personal injury actions).  Even with respect to personal injury claims, Article 16 only permits apportionment to those persons found liable for an "equitable share" of the judgment, CPLR 1601, and only those persons who may be found liable for an "equitable share" of the judgment are persons who are "liable for contribution," *see* CPLR 1402 ("equitable shares shall be determined in accordance with relative culpability of each person liable for contribution").  Since the government cannot be "liable for contribution," no "equitable share" may be assessed against the government, and there can be no apportionment of fault to the government, under Article 16.

If the Aviation Defendants breached their duty of care, then they are jointly and severally liable for Plaintiffs' economic damages, without regard to comparative fault.  *See Graphic Arts Mut. Ins. Co. v. Bakers Mut. Ins. Co.*, 45 N.Y.2d 551, 557; 410 N.Y.S.2d 571, 574 (1978) ("It is elementary that injured claimants may still choose which joint tortfeasor to include as defendants . . . and, regardless of the concurrent negligence of others, recover the whole of their damages from any of the particular tortfeasors sued.").

The Defendants, through their designations from the *9/11 Commission Report* and Staff Monograph and Statements, attempt to establish that the FBI and CIA had identified hijackers who were in the United States and posed a serious threat.  AD Mem. at 26.  Even if it were established that the CIA, FBI and law enforcement had missed opportunities to disrupt the

39

September 11 attacks, those facts do not tend to prove or disprove whether the Aviation Defendants were negligent or otherwise acted tortiously.

### 3. The Defendants' Designations Relating To The Life Histories Of The Terrorists, Their Education And Sophistication Are Irrelevant.

The Defendants have designated portions of the *9/11 Commission Report* that pertain to the life histories of the terrorists, their education and level of sophistication as supposedly relevant to this litigation. This information, regardless of the source, does not have any tendency to prove or disprove whether the Defendants were negligent or otherwise acted tortiously. Only competent evidence of surveillance conducted by the terrorists of the Defendants' operations prior to 9/11 is relevant to the issue of the Defendants' negligence. Similarly, only competent non-hearsay evidence of the training received by the terrorist hijackers and the tactics employed on the four hijacked aircraft are relevant to liability and damages.[19]

Here, the statements of Khalid Sheikh Mohammed, Ramzi Binalshibh and other detainees are not relevant. Mohamed Atta, not Khalid Sheikh Mohammed, was the mastermind behind the 9/11 attacks. It was Atta who organized the teams of hijackers. It was Atta that provided the domestic, oversight, management, financing, planning adjustments and coaching for the 9/11 mission up until moments before take off. The real engineer behind the 9/11 attacks is now dead. Khalid Sheikh Mohammed and Ramzi Binalshibh were not even on the same continent as Atta and the teams of hijackers and have no "personal knowledge" of the actual hijackers' actions in the months leading up to the attacks.[20] Consequently, their statements are nothing more than inadmissible hearsay not relevant to this case.

---

[19] The only competent and reliable evidence Plaintiffs do not dispute regarding these topics is reflected in Plaintiff's proposed stipulation of facts included in Tomasik Dec. Exh. 6.

[20] A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. FED. R. EVID. 602.

Defendants mistakenly rely on *Gaines-Tabb, v ICI Explosives, USA, Inc.*, 995 F. Supp. 1304 (W.D. Okla. 1996) and *Port Auth. of N.Y. and N. J. v. Arcadian Corp.,* 991 F. Supp. 390 (D.N.J. 1997) in arguing that evidence pertaining to the terrorists' life histories, education and sophistication is relevant to demonstrate that the attacks were a result of the intentional conduct of the terrorists who sought to inflict harm and who did not rely on the negligence of the Defendants. They argue that they cannot be found negligent when the acts of third parties are responsible for Plaintiffs' injuries and that "other negligence actions against third parties arising out of terrorist attacks have failed precisely because the terrorists' actions were determined to be the supervening cause of the plaintiff's damages." AD Mem. at 19.

These cases involved plaintiffs who sued manufacturers and distributors of ammonium nitrate fertilizer for damages caused by the Oklahoma City bombing and the 1993 attack on the World Trade Center. The courts held in both cases that the manufacturers did not owe a duty to the plaintiff because they did not expose the plaintiffs to a recognizable high degree of risk of harm through the misconduct of third persons, which a reasonable person would take into account. This Court previously rejected these authorities when Defendants sought to rely on them *In re September 11 Litigation*, 280 F. Supp. 2d 279, 297 (S.D.N.Y. 2003). In distinguishing both of these decisions as inapplicable to Plaintiffs' case against the Aviation Defendants this Court stated:

> Ammonium nitrate is a socially and economically useful product. To require manufacturers to prevent the appropriation of their products for an unintended purpose when manufacturers have no control over who purchases and alters the fertilizer would be an undue burden. Unlike the manufacturers, however, the Aviation Defendants controlled who came onto the planes and what was carried aboard. They had the obligation to take reasonable care in screening precisely because of the risk of terrorist hijackings, and the dangerous consequences that would inevitably follow. The consequences that in fact followed were within the scope of the duty that the Aviation Defendants undertook to carry out.

41

*Id.* at 296. This Court noted that, unlike the plaintiffs in *Gaines-Tabb* and *Arcadian Corp.*, the Plaintiffs in this case sustained injuries that were within a class of foreseeable risks resulting from negligently performed security screening. *Id.* at 296-297. Nothing in the Aviation Defendants' Motion, or the discovery adduced in this case, suggests a different analysis is called for.[21]

The Aviation Defendants were exclusively responsible for the pre-board procedures and security screening of passengers at the checkpoint and for in-flight security. They had a duty to protect those on board and on the ground from the intentional and criminal acts of terrorists. Due to their unique role in the aviation security process, they were in the best position to prevent hijackers with deadly and dangerous weapons from getting aboard and taking control of the aircraft due to their special role in the aviation security process. They failed in that duty when they screened the terrorist hijackers, allowed all nineteen of them on the planes with weapons, and allowed them to take control of the aircraft.

There is little support for the Aviation Defendants' contention that negligence actions against third parties arising out terrorist attacks have failed because of the intentional heinous

---

[21]   The Aviation Defendants' reliance on *Herman v. United Airlines, Inc.,* 157 F. Supp. 65 (D. Colo. 1957) and *McCarthy v. Sturm, Ruger & Co.*, 916 F. Supp. 366 (S.D.N.Y. 1996) is also misplaced. *Herman* involved an action on behalf of passengers killed by a dynamite bomb placed onboard a United Airlines flight by a passenger's son in 1955. *Herman v. United Airlines*, *Inc.* 157 F. Supp. 65 (D. Colo. 1957). The court in *Herman* did not find the passenger's son to be the superseding cause of the crash, but only held that the doctrine of *res ipsa loquitor* did not apply and that the court could not take judicial notice of an allegation contained in the pleadings in a different action arising out of the same crash. *Id.* at 66-7. The plaintiffs in *McCarthy* brought an action against the manufacturer of Black Talon ammunition for Colin Ferguson's infamous murderous shooting spree on the Long Island Railroad passenger train. *McCarthy v. Sturm, Ruger & Co.*, 916 F. Supp. 366, 368 (S.D.N.Y. 1996). The court held the ammunition manufacturer was not liable for the criminal misuse of its products in the absence of a relationship between the manufacturer and Ferguson. *Id.* at 369-70. The Aviation Defendants' reliance on this case suffers from the same fatal flaws as the cases involving ammonium nitrate producers that this Court has already rejected. *In re September 11 Litigation*, 280 F. Supp. 2d 279, 297 (S.D.N.Y. 2003).

conduct of terrorists.  The recent decision of *Nash v. Port Auth. of N.Y. and N.J.*, 2008 N.Y. Slip

Op. 03991 (1st Dep't 2008) provides compelling reasoning on this issue.  *Nash* involved

plaintiffs injured by the 1993 bombing of the public parking garage in the World Trade Center

who sought to recover damages allegedly attributable to the defendant landlord's breach of its

proprietary duty to maintain its premises in a reasonably safe condition.  *Id.* at 2.  At trial,

evidence was presented that years before the bombing, consultants had advised the defendant

that the World Trade Center was vulnerable to terrorist attack through its public parking garage.

*Id.*  The jury assigned 68 percent of the fault to the defendant owner for the negligence and the

circumstances under which it occurred and contributed to the bombing. *Id.* at 13.

On appeal, defendants argued they were entitled to a jury instruction under CPLR 1601

that provided for limited liability for non-economic damages for parties 50 percent or less at

fault.  *Id.* at 13.  The defendants argued that intentional tortfeasors were categorically excluded

from the benefits of CPLR 1601 and that the "jury was powerless to assign it, as a merely

negligent tortfeasor, a percentage of fault higher than that of the parties whose intentional

conduct concurrently caused the bombing." *Id.*

In dismissing the defendant's argument, the court reasoned that the defendant's assigned

share of fault exceeded 50% and that "it does not follow that negligent tortfeasors are

automatically entitled to a release from joint and several liability whenever an intentional

tortfeasor is also responsible for the harm sued upon."  *Nash v. Port Auth. of N.Y. and N.J.*, 2008

N.Y. Slip Op. 03991 at 14 (1st Dep't  2008).  The *Nash* court stated in pertinent part:

> Neither the magnitude of a defendant's negligence, nor its moral
> blameworthiness, nor the closeness of its causal relation to a plaintiff's harm
> necessarily diminishes to subordinate significance in the attribution of fault by
> reason of the circumstance that the harm was concurrently attributable to
> intentional conduct, even when the intentional conduct is particularly heinous. To
> the contrary, as this case so vividly illustrates, the **blameworthiness of**

**negligence may actually be increased by the heinousness of the wrongdoing it directly and foreseeably facilitates**.

*Id.*

In upholding the jury's apportionment of fault, notwithstanding the terrorists' wanton conduct, the court in *Nash* held that:

> the evidence…clearly supported the view that defendant's negligence had been extraordinarily conducive to the terrorists' conduct – so much so that the fulfillment of the terrorists' plot and the ensuing harm could with clear justification have been understood as primarily attributable to that negligence.

*Id.* at 16.

In explaining why the terrorists' conduct was foreseeable and avoidable by the defendant in the discharge of its duty, the court explained:

> It is, of course, entirely possible that terrorists will employ means that not even the conscientious performance of duty would deter and, where that is established, the absence of a causal nexus between the harm and any default by a defendant in the performance of its duty will preclude the imposition of civil liability.  But, as this jury recognized, this was not such a case.  Here, the evidence overwhelmingly supported the view that the conscientious performance of the defendant's duty reasonably to secure its premises would have prevented the harm.  This civil jury had no power to decide whether the terrorists should in any meaningful sense be "absolved" of their murderous acts.  What it could and did decide was rather that the acts of these terrorists, even while obviously odious in the extreme, were not a cause for the easy absolution of this defendant from its civil obligations.

*Id.* at 17.  Likewise, the intentional, heinous conduct of the 9/11 hijackers does not absolve the Aviation Defendants from their own negligence on or before September 11.

**B.     The Aviation Defendants' Designations Should Be Excluded Under Fed. R. Evid. 403.**

Even if any of the Aviation Defendants' designations were relevant, admission of such designations would unfairly result in a trial of the comprehensiveness, quality and reliability of the Commission's work as it relates to the Aviation Defendants and their conduct on or before the 9/11 hijackings and crashes and would result in juror confusion of issues, and an enormous

and unnecessary waste of time at an increase in cost to all parties. Several Second Circuit

decisions and other federal courts have excluded government reports pursuant to Federal Rule of

Evidence 403 when the probative value of admitting such reports was outweighed by the danger

of such unfair prejudice, juror confusion of the issues, and a protracted trial. The reasoning of

these cases applies directly here.

In *City of New York v. Pullman, Inc.,* 662 F.2d 910 (2d Cir. 1981), for example, the

Second Circuit excluded a staff report by the Urban Mass Transit Administration pursuant to

Rule 803(8)(C) because the report was not the final report or finding of a government agency

within the meaning of the Rule. The Second Circuit further explained that even if the staff report

were otherwise admissible, the report should be excluded under Rule 403 "because the likelihood

it would confuse the jury and protract the proceedings outweighed its probative value." *Id.* at

915. The Second Circuit's reasoning for exclusion under Rule 403 is persuasive:

> First, <u>the report was prepared for very different purposes that those for which it
> was offered at trial</u>. The UMTA staff was attempting to determine the quickest
> solution for an immediate safety problem, and not whether The City of New York
> and The Transit Authority would get what they bargained for-subway cars which
> would be safe and dependable for up to 35 years. Second, <u>as a so-called
> government report which in fact was incomplete and based largely on hearsay, the
> report would have been presented to the jury in "an aura of special reliability and
> trustworthiness" which would not have been commensurate with its actual
> reliability</u>. Third, the <u>admission of the report would have been likely to protract
> an already prolonged trial with an inquiry into collateral issues regarding the
> accuracy of the report and the methods used in its compilation</u>."

*Id.* Here, as discussed in Part I, the *9/11 Commission Report* also was prepared for different

purposes than those for which Defendants seek to offer it at trial. The Commission made it clear

that its aim was "not to assign blame." *9/11 Commission Report* at vii. Yet, this is precisely the

purpose for which the Defendants seek to offer it at trial. And as with the UMTA report in

*Pullman*, the *9/11 Commission Report* would be perceived by the jury as a trusted historical

document with an "aura of special reliability and trustworthiness" that is not reflective of its actual reliability as many of the Commission's conclusions were based on double hearsay and information gained from torture. *See* Part II.B.2.b. Like *Pullman*, admission of the *9/11 Commission Report* and Staff Monograph and Statements would result in a prolonged trial within a trial because Plaintiffs would be forced to conduct an inquiry into collateral issues regarding the accuracy of the *Report* and the inadequacies of the methods used in its compilation.

In *Paolitto v. John Brown E.&C., Inc.,* 151 F.3d 60 (2d Cir. 1998) the defendant alleged that the district court erred by excluding from evidence the reported findings of the Connecticut Commission on Human Rights and Opportunities which concluded that Paolitto's evidence of age discrimination was insufficient. *Id.* The Second Circuit stated that the fact that evidence is within an exception to the hearsay rule, does not by itself make it admissible *per se*. *Id.* at 64. Citing *City of New York v. Pullman, Inc.,* 662 F.2d 910 (2d Cir. 1981), the court reasoned that even if the EEOC report were admissible under Rule 803(8)(C), the court may exclude it under Federal Rule of Evidence 403 "because the likelihood it would confuse the jury and protract the proceedings outweighed its probative value." *Id.*, citing *City of New York v. Pullman, Inc.,* 662 F.2d 910, 915 (2d Cir. 1981).

In affirming the district court's decision to exclude the agency report, the Second Circuit held that "the district court is in the best position to consider the quality of the report, its potential impact on the jury, and the likelihood that the trial will deteriorate into a protracted and unproductive struggle over how the evidence admitted at trial compared to evidence considered by the agency." *Id.* at 65. As the Second Circuit correctly recognized in *Paolitto*, the use of the *9/11 Commission Report* in an attempt to demonstrate "insufficient evidence" -- as a legal conclusion absolving the Aviation Defendants from any liability for the injury that occurred on

September 11 -- would only serve to confuse and mislead the jury, and protract the trial by forcing Plaintiffs to expose the weaknesses of the *Report* and how little attention the Commission devoted to the Aviation Defendants.

In *Rambus, Inc. v. Infineon Techs. AG,* 222 F.R.D. 101 (E.D.Va. 2004), the district court granted a manufacturer's motion in *limine* to exclude an "initial decision" of a Federal Trade Commission (FTC) administrative law judge (ALJ) which found that the owner of a computer program patent had not engaged in unlawful anti-competitive conduct. The district court held that the ALJ's initial decision was not sufficiently trustworthy to be admissible under Rule 803(8)(C) and excluded the decision under Rule 403 because that the probative value of the decision was substantially outweighed by the danger of unfair prejudice and its tendency to mislead the jury, confuse the issues and waste time. *Id.* at 109-110. The court expressed its concern that the jury "would give undue weight to the findings of the ALJ" and that "the jurors' ability to reach their own determinations respecting the facts at issue in this case would be undermined by the admission of the Initial Decision." *Id.* at 110.

The district court determined that if the initial decision were admitted, the manufacturer, a non-party to the FTC proceeding, would be required to simultaneously put on evidence for two trials: first, present evidence that addressed elements of the claim under the facts, and second, present evidence to prove the initial decision was unreliable. *Id.* If such a presentation of the evidence were allowed, the jury would need to be instructed as to what evidence was admissible only to prove that the initial decision is unreliable, not to prove the manufacturer's claims. *Id.* at 110-11. In excluding the evidence pursuant to Rule 403, the court stated that "one can hardly envision a more confusing and misleading scenario" and held that it would be "utterly wasteful, even if manageable at all, to overlay that evidence and those instructions with…a series of mini-

trials respecting the reliability of the findings in the Initial Decision." *Id.* at 111.

The same would occur here. The *9/11 Commission Report* and Staff Monograph and Statements must be excluded under FED. R. EVID. 403 to avoid the same type of utterly wasteful, confusing and misleading exercise the district court foresaw in *Rambus*. If admitted into evidence, Plaintiffs, pursuant to Rules 106 and 806, would be compelled to impeach the reliability, credibility and trustworthiness of the *9/11 Commission Report* page by page, in conjunction with their negligence and other tort claims against the Aviation Defendants. The probative value of the *9/11 Commission Report* is extremely low, and the risk that the jury will be confused or misled by the *Report* is high. Thus, the probative value of admitting selected portions of the reports is substantially outweighed by the host of dangers that would transform a trial of the Defendants' culpability into a trial of the comprehensiveness, quality and reliability of the Commission's work as it related to the Aviation Defendants.

## CONCLUSION

Allowing the Defendants to utilize *9/11 Commission Report* and Staff Monograph and Statements in the manner that they are suggesting would promote bad public policy. Doing so would put the Plaintiffs in the position that they would have to attack the legal basis for admitting the *9/11 Commission Report* and create the unfair perception with the jury that the Plaintiffs were attacking the Commission rather than the Aviation Defendants' misuse of the Commission's *Report.* This would be a disservice to the Commission, to the public that has been made aware of the Commission's work product, and to the jury that would almost certainly be confused by the focus on the *Report*. Moreover, Plaintiffs would have to delve into the details of the interrogations of high level terrorist suspects. The result would be to have the Court mired in national security issues and to have the jury further confused. Plaintiffs would inevitably be

putting the United States intelligence agencies on trial. Instead of a single trial on the Aviation Defendants' culpability, there would be three trials in one, the confusion would be manifest, and the burden on the Court to manage the trinity of trials would be extreme.

Given the marginal probative value of the Aviation Defendants' evidence, the availability of the extensive stipulation of facts offered by the Plaintiffs, the unreliability of the interrogations which were cited in support of crucial sections of the *Report*, the doubtful relevance of the designated sections of the *Report,* and the high probability of juror confusion, the Aviation Defendants' motion should be denied and their proposed evidence should be excluded in its entirety.

Dated: June 17, 2008

Respectfully submitted,

**CLIFFORD LAW OFFICES LLC**

By: s/ Robert A. Clifford
Robert A. Clifford (rac@cliffordlaw.com)
Timothy S. Tomasik
Kimberly M. Collins
120 N. LaSalle Street, 31st Floor
Chicago, IL 60602
(312) 899-9090
*21 MC 101 Plaintiffs' Liaison Counsel*

**MOTLEY RICE LLC**

By: s/ Ronald L. Motley
Ronald L. Motley (rmotley@motleyrice.com)
Donald Migliori
Michael Elsner
Jodi Flowers
Robert Haefele
Vincent Parrett
28 Bridgeside Boulevard
Mount Pleasant, SC 29465
(843) 216-9000
*PI/WD Plaintiffs' Liaison Counsel*

**ZELLE HOFMANN VOELBEL MASON & GETTE**

By: s/ Steven J. Badger
Steven J. Badger (sbadger@zelle.com)
Tony Parsons
1201 Main Street
Suite 3000
Dallas TX 75202
*Member, 21 MC 101 Executive Committee*

**GREGORY P. JOSEPH LAW OFFICES LLC**

By: s/ Gregory P. Joseph
Gregory P. Joseph (gjoseph@josephnyc.com)
Douglas J. Pepe
Jeffrey H. Zaiger
485 Lexington Ave, 30th Floor
New York, NY 10017
(212) 407-1200
*Member, 21 MC 101 Executive Committee*

**WARDEN TRIPLETT GRIER, P.A.**

By: s/ James M. Warden
James M. Warden (jwarden@wtglaw.com)
Michael J. Kuckelman
Jennifer E. Shafer
420 Nichols Road, Suite 200
Kansas City, MO 64112
(816) 881-8100
*Member, 21 MC 101 Executive Committee*

**SPEISER KRAUSE NOLAN & GRANITO P.C.**

By: s/ Frank H. Granito, III
Frank H. Granito, III (f3g@speiserkrause.com)
Jeanne M. O'Grady
Two Grand Central Tower
140 East 45th Street, 34th Floor
New York, NY 10017-3144
*Member, 21 MC 101 Executive Committee*