# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------x

| | |
|---|---|
| IN RE TERRORIST ATTACKS ON | CIVIL ACTION NO. |
| SEPTEMBER 11, 2001 | 03 MDL 1570 (GBD) |

-----------------------------------------------------------x

| | | |
|---|---|---|
| FIONA HAVLISH, in her own right | : | |
| and as Executrix of the ESTATE OF | : | |
| DONALD G. HAVLISH, JR., Deceased, | : | |
| | : | CIVIL ACTION NO. |
| RUSSA STEINER, in her own right | : | 03-CV-9848 – GBD |
| and as Executrix of the ESTATE OF | : | |
| WILLIAM R. STEINER, Deceased, | : | Case Transferred from the |
| | : | United States District Court |
| CLARA CHIRCHIRILLO, in her own right | : | for the District of Columbia |
| and as Executrix of the ESTATE OF | : | Case Number 1:02CV00305 |
| PETER CHIRCHIRILLO, Deceased, | : | |
| | : | |
| TARA BANE, in her own right | : | |
| and as Executrix of the ESTATE OF | : | **PLAINTIFFS'** |
| MICHAEL A. BANE, Deceased, | : | **FIRST** |
| | : | **MEMORANDUM** |
| GRACE M. PARKINSON-GODSHALK, in her | : | **OF LAW** |
| own right and as Executrix of the ESTATE OF | : | **IN SUPPORT OF** |
| WILLIAM R. GODSHALK, Deceased, | : | **MOTION FOR** |
| | : | **ENTRY OF** |
| ELLEN L. SARACINI, in her own right | : | **JUDGMENT** |
| and as Executrix of the ESTATE OF | : | **BY DEFAULT** |
| VICTOR J. SARACINI, Deceased, | : | **AGAINST** |
| | : | **SOVEREIGN** |
| THERESANN LOSTRANGIO, in her own right | : | **DEFENDANTS** |
| and as Executrix of the ESTATE OF | : | |
| JOSEPH LOSTRANGIO, Deceased, *et al.*, | : | |
| | : | |
| Plaintiffs, | : | |
| v. | : | |
| | : | |
| SHEIKH USAMAH BIN-MUHAMMAD | : | |
| BIN-LADEN, a.k.a. OSAMA BIN-LADEN, | : | |
| | : | |
| AL-QAEDA/ISLAMIC ARMY, | : | |
| an unincorporated association, *et al.*, | : | |

*FOREIGN STATE DEFENDANTS*:                    :
                                               :
THE ISLAMIC REPUBLIC OF IRAN,                  :
                                               :
AYATOLLAH ALI-HOSEINI  KHAMENEI,               :
                                               :
ALI AKBAR HASHEMI RAFSANJANI,                  :
                                               :
IRANIAN MINISTRY OF                            :
INFORMATION AND SECURITY,                      :
                                               :
THE ISLAMIC REVOLUTIONARY                      :
GUARD CORPS,                                   :
                                               :
HEZBOLLAH,                                     :
an unincorporated association,                 :
                                               :
THE IRANIAN MINISTRY                           :
OF PETROLEUM,                                  :
                                               :
THE NATIONAL IRANIAN                           :
TANKER CORPORATION,                            :
                                               :
THE NATIONAL IRANIAN                           :
OIL CORPORATION,                               :
                                               :
THE NATIONAL IRANIAN                           :
GAS COMPANY,                                   :
                                               :
IRAN AIRLINES,                                 :
                                               :
THE NATIONAL IRANIAN                           :
PETROCHEMICAL COMPANY,                         :
                                               :
IRANIAN MINISTRY OF                            :
ECONOMIC AFFAIRS AND FINANCE,                  :
                                               :
IRANIAN MINISTRY OF                            :
COMMERCE,                                      :
                                               :
IRANIAN MINISTRY OF DEFENSE                    :
AND ARMED FORCES LOGISTICS,                    :
                                               :
THE CENTRAL BANK OF THE                        :
ISLAMIC REPUBLIC OF IRAN, *et al.*,            :
                                               :
_____Defendants.            : _____

ii

**TABLE OF CONTENTS**

I.      THE FOREIGN SOVEREIGN IMMUNITIES ACT ........................................... 2

        A.      Jurisdiction under the FSIA ...................................................................... 2

        B.      The Plaintiffs' §1605A Claims Against Iran ................................... 4

        C.      Provision of Material Support Under §1605A ……………….............. 5

        D.      Claims on Behalf of Non-U.S. Nationals ………….…………..……… 7

II.     PROCEDURAL HISTORY OF *HAVLISH* …………………………………... 8

III.    STANDARD OF PROOF UNDER THE FISA ……………………………… 10

IV.     OVERVIEW OF THE EVIDENCE OF IRAN'S DIRECT AND
        MATERIAL SUPPORT OF AL QAEDA AND FOR THE 9/11 ATTACKS … 11

        A.      The 9/11 COMMISSION REPORT: "Assistance from Hezbollah
                and Iran to al Qaeda" …………………………………………………13

        B.      "Further Investigation" …………………………………………… 19

                1.      THE EXPERT WITNESSES …………………………………... 21

                        a.      Dietrich L. Snell (former 9/11 Commission staff member) …... 22
                        b.      Dr. Daniel L. Byman (former 9/11 Commission staff member) . 23
                        c.      Janice L. Kephart (former 9/11 Commission staff member) ….. 24
                        d.      Clare Lopez and Dr. Bruce Tefft (former CIA case officers) . 25
                        e.      Dr. Ronen Bergman (Israeli military and intelligence analyst ) .. 26
                        f.      Dr. Patrick Clawson (academic and recognized Iran expert) .... 27
                        g.      Jean-Louis Bruguière (French counter-terrorism Judge) ……. 29
                        h.      Edgar Adamson (former chief, U.S. Interpol) ……………... 29
                        i.      Kenneth R. Timmerman (investigative journalist and author) .. 30

                2.      THE ROBERT BAER PUBLICATIONS ……………………... 32

                3.      THE FACT WITNESSES ……………………………………… 34

                        a.      Witnesses X, Y, and Z …………………………………… 34
                        b.      Abolhassan Banisadr (former president of Iran) …………… 36
                        c.      Kenneth R. Timmerman (investigative journalist and author) .. 36

V.      IRAN IS THE WORLD'S PREEMINENT STATE SPONSOR
        OF TERRORISM ……………………………………………………………… 37

iii

    A.      The Motives, Strategy, and Tactics Behind Iran's Terrorist Policy ...... 39

    B.      Iran's Political and Revolutionary Structure ................................ 42

    C.      Iran's Terrorist Proxy War on the United States ........................... 47

          1.     Bombings ................................................................. 48
          2.     Kidnappings and Murders ............................................ 50
          3.     Hijackings ............................................................... 51
          4.     Assassinations ......................................................... 51

    D.      Bridging the Sunni-Shi'a Divide: The Iran-Hizballah-al Qaeda
          Terrorist Alliance ...................................................... 52

          1.     1991-92: The Sudanese Connection ................................ 54
          2.     The 1993 Meeting in Khartoum .................................... 56

    E.      A Coordinated Campaign by "History's Most Formidable
          Terrorist Coalition" ................................................... 59

          1.     1992: Israeli Embassy in Buenos Aires, Argentina ............... 60
          2.     1993: New York City .................................................. 60
          3.     1994: AMIA, Buenos Aires, Argentina ........................... 61
          4.     1994: Eiffel Tower, Paris, France ................................... 62
          5.     1995: Ethiopia .......................................................... 62
          6.     1996: Osama bin Laden Moves to Afghanistan ................... 63
          7.     June 1996: Khobar Towers, Dharan, Saudi Arabia ............... 63
          8.     1998: Osama bin Laden's Second *Fatwa* ........................... 65
          9.     1998: U.S. Embassies in Kenya and Tanzania .................... 65
          10.    2000: the *U.S.S. Cole* ................................................ 66

    F.      Iran's Contingency Plans for Terrorist Operations Against the U.S. ..... 67

VI.   ANALYSIS OF THE EVIDENCE OF IRAN'S DIRECT AND MATERIAL
      SUPPORT OF AL QAEDA FOR THE 9/11 ATTACKS .......................... 68

    A.      Terrorist Travel ................................................................. 68

          1.     January 2001: Ramzi Binalshibh ..................................... 71
          2.     A "Senior Operative of Hezbollah" .................................. 72

    B.      Iran's Material Support of al Qaeda After September 11, 2001 ........... 80

          1.     Abu Musab al Zarqawi ................................................ 81
          2.     January 16, 2009:  U.S. Treasury Department Designation ...... 82
          3.     Al Qaeda's Safe Haven in Iran ...................................... 84

C.     September 11, 2001: Al Qaeda Did Not Act Alone . . . . . . . . . . . . . . . 88

VII.   PLAINTIFFS' EVIDENCE IS CLEAR AND CONVINCING PROOF
       OF IRAN'S MATERIAL AND DIRECT SUPPORT FOR AL QAEDA …….. 94

VIII.  CONCLUSION …………………………………………………… 96

APPENDICES …………………………………………………………… i

APPENDIX A:  Default Judgments against Iran for materially supporting terrorist
             acts by proxies where plaintiffs' expert evidence was sufficient,
             under the clear and convincing evidence standard, to support an
             award of punitive damages against Iran ……........................ i

APPENDIX B:  28 U.S.C. §1605A (in pertinent part) ………………………… iii

APPENDIX C:  The Flatow Amendment and the Enactment of §1605A ……… iv

APPENDIX D:  *Havlish* Third Amended Complaint Allegations of "Material
             Support" ……………………………………………… vii

APPENDIX E:  The Islamic Republic of Iran's Early Terrorist Connections …. ix

APPENDIX F:  State Department Country Reports on Terrorism – Excerpts *re*:
             Iran 1989-2009 ……………………………………………... xi

APPENDIX G:  Iran's Creation of Hizballah as a Terrorist Proxy …………… xvi

APPENDIX H:  Imad Mughniyah …………………………………………… xviii

APPENDIX I:  Osama bin Laden's *al Shamal* Bank ………………………… xix

APPENDIX J:  1999-2000: Terrorist Training Camps ……………………….. xxi

APPENDIX K:  1996-98: Hekmatyar, Iran, bin Laden, and the Taliban …….. xxii

## PLAINTIFFS' FIRST MEMORANDUM OF LAW
## IN SUPPORT OF MOTION FOR ENTRY OF JUDGMENT
## BY DEFAULT AGAINST SOVEREIGN DEFENDANTS

Pending before the Court is Plaintiffs' Motion for Judgment by Default Against Sovereign Defendants (MDL Docket Document 2124) which seeks entry of judgment by default against The Islamic Republic of Iran ("Iran") and a number of Iranian officials, agencies, and instrumentalities.[1]  Plaintiffs are personal representatives and family members of victims killed in the September 11, 2001 terrorist attacks upon the United States of America.

This case was filed against, *inter alia*, the Islamic Republic of Iran, key officials, and its agencies and instrumentalities, as well as Hizballah and the Taliban of Afghanistan, based on Iran's material support of al Qaeda and Iran's direct support for, and sponsorship of, the most deadly act of terrorism in American history: the September 11, 2001 terrorist attacks.  Plaintiffs' claims against Iran are authorized by the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §1602, *et seq*., as amended.[2]

In sum, this memorandum will discuss the evidence, filed herewith, proving that Iran provided direct and material support to defendant al Qaeda, the terrorist organization

---

[1] The following officials, agencies and instrumentalities of Iran are named as defendants:  Ayatollah Ali Hoseini Khamenei, Ali Akbar Hashemi Rafsanjani, Iranian Ministry of Information and Security ("MOIS"), The Islamic Revolutionary Guard Corps ("IRGC"), Hizballah, The Iranian Ministry of Petroleum, The National Iranian Tanker Corporation, The National Iranian Oil Corporation, The National Iranian Gas Company, Iran Airlines, The National Iranian Petrochemical Company, Iranian Ministry of Economic Affairs and Finance, Iranian Ministry of Commerce, the Iranian Ministry of Defense and Armed Forces Logistics, and The Central Bank of the Islamic Republic of Iran.

[2] Plaintiffs have also asserted claims against non-sovereign defendants Usama (or Osama) bin Laden, the Taliban, Muhammad Omar, the al Qaeda/Islamic Army, and Hizballah for wrongful death, survival, intentional infliction of emotional distress, and conspiracy. The non-sovereign defendants were served with the Amended Complaint pursuant to Fed.R.Civ.P. 4 and the alternative forms of service approved by the Court, including service by publication in prominent periodicals in the Middle East.  Plaintiffs seek entry of default judgments against these defendants in a separate Motion for Judgment by Default Against Non-Sovereign Defendants (MDL Docket Document No. 2125), filed on August 29, 2008.

whose members perpetrated the September 11, 2001 murders of 2,976 people, including Plaintiffs' decedents.  Within the next few weeks, Plaintiffs will also file a supplemental brief addressing the involvement of the Defendant agencies and instrumentalities of Iran in Iran's terrorist activities, to the extent not addressed herein.

## I.   THE FOREIGN SOVEREIGN IMMUNITIES ACT

### A.   JURISDICTION UNDER THE FSIA

The FSIA provides "the sole basis for obtaining jurisdiction over a foreign state in the courts of this country." *Argentine Republic v. Amerada Hess Shipping Corp.,* 488 U.S. 428, 443, 109 S.Ct. 683, 102 L.Ed.2d 818 (1989).  The FSIA provides foreign states with immunity from suit in U.S. courts unless Congress waives that immunity. Accordingly, this Court would lack jurisdiction over Iran unless one of the FSIA's enumerated exceptions applies.  In 1996, Congress passed the Antiterrorism and Effective Death Penalty Act of 1996, 28 U.S.C.A. §1605, which created an exception to sovereign immunity for foreign states officially designated by the Department of State as terrorist states.  *See* 28 U.S.C. §1605(a)(7); *Flatow v. Islamic Republic of Iran,* 999 F.Supp. 1, 11 (D.D.C. 1998).

Countries designated, pursuant to three federal statutes, as state sponsors of terrorism are those countries that the Secretary of State has determined "have repeatedly provided support for acts of international terrorism."[3]  The U.S. Secretary of State designated Iran as a state sponsor of terrorism on January 19, 1984, and Iran has been so designated ever since.  *See* Ex. 8, Clawson Affid. ¶40; Ex. 7, Bergman Affid. ¶18; *see also Estate of Heiser v. Islamic Republic of Iran*, 466 F.Supp.2d 229 (D.D.C. 2006);

---

[3]   The Secretary of State designates state sponsors of terrorism pursuant to three statutory authorities: §6(j) of the Export Administration Act of 1979, 50 U.S.C. app. §2405(j); §620A of the Foreign Assistance Act, 22 U.S.C. §2371; and §40(d) of the Arms Export Control Act, 22 U.S.C. §2780(d).

*Flatow,* 999 F.Supp. at 11.[4]  In August 2010, the State Department published its most

recent annual *Country Reports on Terrorism*, reporting that "Iran remained the most

active state sponsor of terrorism" in 2009.  "Iran's financial, material, and logistic support

for terrorist and militant groups throughout the Middle East and Central Asia had a direct

impact on international efforts to promote peace, threatened economic stability in the

Gulf and undermined the growth of democracy."  Ex. 13, U.S. Department of State,

*Country Reports on Terrorism 2009*, p. 182.[5]  This report echoes similar State

Department conclusions about Iran's material support for terrorism for three decades.

*See* Ex. 13; Ex. 6, Lopez-Tefft Affid. ¶¶66-95; Ex. 8, Clawson Affid. ¶¶40-42.

Iran's history of providing support to organizations that commit terrorist acts that

injure and kill Americans is well chronicled in many judgments of the U.S. federal

courts.  The August 8, 2008, CONGRESSIONAL RESEARCH SERVICE REPORT, entitled

"Suits Against Terrorist States by Victims of Terrorism," identified forty-nine (49)

separate lawsuits filed against the Islamic Republic of Iran alleging acts of terrorism

and/or the Iranian state's material support for acts of terrorism.  Ex. 36.  These cases,

prosecuted in the U.S. district courts between 1997 and 2007, resulted in awards of

damages to victims of Iranian state-sponsored terrorism totaling more than $4 billion in

compensatory damages and more than $6 billion in punitive damages.  "Iran has never

appeared in these [FSIA] actions even though it is 'an experienced litigant in the United

States Federal Court System generally and in this Circuit.'"  *In re Islamic Republic of*

*Iran Terrorism Litigation,* 659 F.Supp.2d 31, 43, n. 5 (D.D.C. 2009) (Lambert, Ch.J.).

---

[4]   Beside Iran, the three other countries currently so designated as state sponsors of terrorism are Cuba,
     Sudan, and Syria.  The State Department maintains a list of countries that have been designated as state
     sponsors of terrorism.  *See* 22 C.F.R. §126.1(d); Ex. 12, U.S. Department of State, State Sponsors of
     Terrorism, http://www.state.gov/s/ct/c14151.htm.

[5]   *See* http://www.state.gov/s/ct/rls/crt/2009/index.htm.

Indeed, default judgments have been routinely entered against Iran in cases where Iran provided financial and other support to terrorist groups. *See* Appendix A.

Accordingly, as further explained below, the state-sponsored terrorism exception to sovereign immunity applies in this case.

### B.   THE PLAINTIFFS' §1605A CLAIMS AGAINST IRAN

The FSIA amendments enacted in 2008, replaced §1605(a)(7) with new §1605A. *See* Appendix B.  Not only did the new Section 1605A retain the state-sponsored terrorism exception to sovereign immunity, it also created a private cause of action by which the foreign state can be held liable for certain enumerated damages arising from terrorist activities: economic damages, solatium, pain and suffering, and punitive damages.  28 U.S.C. §1605A(c); *see Gates v. Syrian Arab Republic*, 580 F.Supp.2d 53 (D.D.C. 2008).  (*See* Appendix C regarding the history of the legal cause of action.)

The Plaintiffs seek entry of judgment against Iran, a designated state sponsor of terrorism, for its "provision of material support or resources" in furtherance of acts of terrorism committed on September 11, 2001.  *See* §1605A(a)(1).  Under §1605A(c), U.S. citizens who are victims of state-sponsored terrorism can sue a responsible foreign state directly and recover money damages for personal injury or death caused by aircraft sabotage, hostage taking, torture, or extrajudicial killing, if the damages were caused by: (1) the provision of "material support or resources" for such an act; (2) the provision of material support was engaged in by an official while acting within the scope of his office; (3) the defendant was a "state-sponsor of terrorism" at the time the act complained of occurred; and (4) the claimant or the victim was a "U.S. national" at the time of the act of terrorism.  *Id.*

4

The first element, material support, is demonstrated by the clear and convincing evidence filed by the Plaintiffs and discussed here and in Plaintiffs' Second (Sealed) Memorandum of Law in Support of Motion for Entry of Judgment by Default Against Sovereign Defendants.  The second, third, and fourth of these elements are indisputably met in this case: a variety of Iranian officials, including the two specific individuals who are named Defendants (Supreme Leader Khamenei and former president Rafsanjani) engaged in the material support discussed herein while acting within the scope of their offices; Iran is, and has been since 1984, a designated "state-sponsor of terrorism;" and the *Havlish* Plaintiffs were U.S. nationals at the time of the 9/11 attack.  (*See* Section I.D., *infra,* regarding the few Plaintiffs who were not U.S. nationals.)

## C.    PROVISION OF MATERIAL SUPPORT UNDER §1605A

28 U.S.C. §1605A(h)(3) defines "material support or resources" to parallel the federal criminal statute proscribing material support to terrorists, thus, to have "the meaning given that term in section 2339A of title 18":

> . . . the term "material support or resources" means any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel . . . and transportation, except medicine or religious materials.

18 U.S.C. §2339A(b)(1).

The most extensive judicial discussion of §1605A comes from Judge Royce Lamberth, the Chief Judge of the U.S. District Court for the District of Columbia, in *In re Islamic Republic of Iran Terrorism Litigation,* 659 F.Supp.2d 31.  In his discussion of the "material support" provision, Chief Judge Lamberth states:

> This Court has determined that "the routine provision of financial assistance to a terrorist group in support of its terrorist activities constitutes 'providing material support and resources' for a terrorist act within the meaning of the [terrorism exception of the FSIA]." (Citation omitted.)  Additionally, this Court has found that "a plaintiff need not establish that the material support or resources provided by a foreign state for a terrorist act contributed directly to the act from which his claim arises in order to satisfy 28 U.S.C. §1605(a)(7)'s statutory requirements for subject matter jurisdiction."  *Id.*

659 F.Supp.2d at 42.  *Cf.  Holder v. Humanitarian Law Project,* 561 U.S. __, 130 S.Ct. 2705 (2010)(no distinction between "material support" even to promote "lawful conduct" and support specifically for terrorist activity).

To determine whether a defendant foreign state has provided material support to terrorism, courts consider whether the defendant foreign state generally provided material support or resources to the terrorist organization that committed the act. *See e.g., Ben-Rafael v. Islamic Republic of Iran,* 540 F.Supp.2d 39, 46 (D.D.C. 2008).  The types of support that have been identified as "material" have included, for example, financing and running camps that provided military and other training to terrorist operatives, *see, e.g., Sisso v. Islamic Republic of Iran,* No. 05-0394, 2007 WL 2007582, at *4-6, 2007 U.S. Dist. LEXIS 48627, at *13-17 (D.D.C. July 5, 2007)(attached as Ex. 27); *Wachsman ex rel. Wachsman v. Islamic Republic of Iran,* 537 F.Supp.2d 85, 90 (D.D.C. 2008); allowing terrorist groups to use its banking institutions to launder money, *see, e.g., Rux v. Republic of Sudan,* 495 F.Supp.2d 541, 549-550 (E.D.Va. 2007); and allowing terrorist groups to use its territory as a meeting place and safe haven, *see, e.g., id.*; *see also Owens v. Republic of Sudan,* 412 F.Supp.2d 99, 108 (D.D.C. 2006)(insofar as Sudan "affirmatively allowed and/or encouraged al-Qaeda and Hezbollah to operate their terrorist enterprises within its borders," it provided safe haven).

### D.  CLAIMS ON BEHALF OF NON-U.S. NATIONALS

The majority of the *Havlish* Plaintiffs are U.S. nationals who are asserting claims against Iran under the FSIA.  *See* Third Amended Complaint ¶¶ 4-186.  Family members of the victims who were not U.S. citizens on September 11, 2001, have asserted claims against Iran under the Alien Tort Statute ("ATS", also called the Alien Tort Claims Act, or "ATCA"), 28 U.S.C. §1350.

The ATS, adopted in 1789 as part of the original Judiciary Act, simply asserted that "'[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States.'"  *Wiwa v. Royal Dutch Petroleum Co*., 226 F.3d 88, 103-04 (2nd Cir. 2000).  "[T]he law of nations . . . has always been part of the federal common law . . . ," *Filartiga v. Pena-Irala*,  630 F.2d 876 (2nd Cir. 1980), and the Supreme Court has recognized that a claim for violation of an "international norm" is actionable under the ATS where the norm has not "less definite content and acceptance among civilized nations than the historical paradigms familiar when §1350 was enacted [in 1789]."  *Sosa v. Alvarez-Machain*, 542 U.S. 692, 732 (2004), citing favorably *Filartiga, supra,* at 890 ("[F]or purposes of civil liability, the torturer has become — like the pirate and slave trader before him — *hostis humani generis,* an enemy of all mankind"); *Tel-Oren* v. *Libyan Arab Republic,* 726 F. 2d 774, 781 (D.C. Cir. 1984)(Edwards, J., concurring)(suggesting that the "limits of section 1350's reach" be defined by "a handful of heinous actions — each of which violates definable, universal and obligatory norms"); and *In re Estate of Marcos Human Rights Litigation*, 25 F. 3d 1467, 1475 (9th Cir. 1994)("Actionable violations of international law must be of a norm that is specific, universal, and obligatory").  Thus, after examining the history of the statute, the High Court explained

that torts such as piracy, violation of safe conduct, and assaults on ambassadors were actionable under the ATS in 1789,[6] and that, today, "courts should require any claim based on the present-day law of nations to rest on a norm of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th-century paradigms we have recognized." *Id*. at 725.  Plaintiffs here submit that the acts of hijacking (in the nature of piracy) and crashing passenger aircraft into major commercial and government buildings (in the nature of interference with safe conduct) clearly must satisfy that standard.

Moreover, in passing the Torture Victims Protection Act of 1991 ("TVPA"), 28 U.S.C. §1350 App., Congress expanded the ATS by creating "liability under U.S. law where under 'color of law, of any foreign nation' an individual is subject to 'extra judicial killing.'" *Wiwa* at 104-05.  Further, the ATS reaches private parties whose actions are taken under the color of state authority or violate a norm of international law recognized as extending to the conduct of private parties.  *Kadic v. Karadzic*, 70 F.3d 232 (2nd Cir. 1995).  Thus, the *Havlish* Plaintiffs who are not U.S. nationals properly assert tort claims here against all Defendants under the ATS.

## II.   PROCEDURAL HISTORY OF *HAVLISH*

This action was initiated in the United States District Court for the District of Columbia on February 19, 2002.  Plaintiffs served Iran and the agency and instrumentality Defendants (listed in note 1, *supra*) with summonses and copies of the

---

6   One of the inferences the High Court drew "from the history is that Congress intended the ATS to furnish jurisdiction for . . . actions alleging violations of the law of nations.  Uppermost in the legislative mind appears to have been offenses against ambassadors . . . ; violations of safe conduct were probably understood to be actionable . . . , and individual actions arising out of prize captures and piracy may well have also been contemplated."  *Sosa*, 542 U.S. at 720 (*citation omitted*).

Amended Complaint pursuant to 28 U.S.C. §1608.[7]  On November 1, 2002, Plaintiffs'

counsel filed an Affidavit of Service of Original Process Upon All Defendants, providing

the Court with a detailed description of how the Amended Complaint and Summons were

served upon each Defendant.  No Defendant answered or responded to the Amended

Complaint, nor did anyone enter an appearance on behalf of any Defendant.  The Clerk of

the U.S. District Court for the District of Columbia then entered a Rule 55(a) Default

against each of the Defendants.[8]  Fed.R.Civ.P. 55(a).

     After the *Havlish* case was consolidated into the present MDL proceedings, this

Court granted Plaintiffs' Motion for Leave to File a Second Amended Complaint, which

Plaintiffs filed on September 7, 2006 (*Havlish* Docket no. 214).[9]  Although Plaintiffs had

already served Defendants with the Amended Complaint and obtained Rule 55(a)

defaults against them, Plaintiffs again served Iran and the agency and instrumentality

Defendants with the Second Amended Complaint.  Such service was again made

pursuant to 28 U.S.C. §1608.  On August 24, 2007, Plaintiffs' counsel filed an Affidavit

of Service of the Second Amended Complaint (MDL Docket Document No. 2033).  Still,

none of the Defendants made an appearance or otherwise responded to the Second

Amended Complaint.  On December 27, 2007, the Clerk of this Court entered a Clerk's

Certificate for Default as to each Defendant.

---

[7]  Service under the FSIA is governed by 28 U.S.C. §1608.  Subsection (a) provides for service on
foreign states, while subsection (b) provides for service on an agency or instrumentality of a foreign
state.  To determine whether a foreign entity should be treated as the state itself or as an agency or
instrumentality, courts apply the "core functions" test: if the core functions of the entity are
governmental, it is treated as the state itself; and if the core functions are commercial, it is treated as an
agency or instrumentality.  *See Roeder v. Islamic Republic of Iran,* 333 F.3d 228, 232 (D.C. Cir. 2003).

[8]  For details of the steps taken to effectuate service on the defaulting Defendants, *see* Plaintiffs'
memorandum and supporting documents submitted to the Court via letter dated October 27, 2009.

[9]  Plaintiffs' Second Amended Complaint amended the prior Complaint in three areas: 1) it added certain
named Plaintiffs; 2) it removed certain Plaintiffs represented by other counsel in other cases; and 3) it
substituted certain instrumentality Defendants for those previously designated as "Unidentified
Terrorist Defendants."

In order to revise its pleading to conform to the new provisions of the FSIA, Plaintiffs filed a motion for leave to file a Third Amended Complaint, which was granted by the Court.  (*Havlish* docket no. 262.)  The Third Amended Complaint (*Havlish* docket no. 363) asserts a single claim against Iran under §1605A and alleges Iran's material support for al Qaeda.  (*See* Appendix D.)  On August 29, 2008, Plaintiffs filed the instant Motion for Judgment by Default Against Sovereign Defendants, seeking entry of judgment by default against Iran and the Defendant officials, agencies, and instrumentalities of Iran.

### III.   STANDARD OF PROOF UNDER THE FSIA

The FSIA provides that a court cannot enter a default judgment against a foreign state "unless the claimant establishes his claim or right to relief by evidence satisfactory to the court." 28 U.S.C. §1608(e); *see Roeder v. Islamic Republic of Iran,* 333 F.3d 228, 232 (D.C. Cir. 2003)("The court still has an obligation to satisfy itself that plaintiffs have established a right to relief.").  The "satisfactory to the court" standard is identical to the standard for entry of default judgments against the United States set forth in Rule 55(e), Fed.R.Civ.P., which uses the same language:  "No judgment by default shall be entered against the United States or an officer or agency thereof unless the claimant establishes a claim or right to relief by evidence satisfactory to the court." *Gates,* 580 F.Supp.2d at 63.

To prevail in a FSIA default proceeding, a plaintiff must present a legally sufficient *prima facie* case, *i.e.,* "a legally sufficient evidentiary basis for a reasonable jury to find for plaintiff." *Ungar v. Islamic Republic of Iran,* 211 F.Supp.2d 91, 98 (D.D.C. 2002).  Although a court receives evidence only from the plaintiff when a foreign sovereign defendant has defaulted, 28 U.S.C. §1608(e) does not require a court to

demand more or different evidence than it would ordinarily receive in order to render a decision.  *Commercial Bank of Kuwait v. Rafidain Bank,* 15 F.3d 238, 242 (2nd Cir. 1994).  In evaluating the plaintiff's proofs, a court may "accept as true the plaintiffs' uncontroverted evidence," *Estate of Botvin v. Islamic Republic of Iran,* 510 F.Supp.2d 101, 103 (D.C. 2007); *Elahi v. Islamic Republic of Iran,* 124 F.Supp.2d 97, 100 (D.D.C. 2000), and a plaintiff may establish proof by affidavit.  *Weinstein v. Islamic Republic of Iran,* 184 F.Supp.2d 13, 19 (D.D.C. 2002).  While a plaintiff must demonstrate only a *prima facie* case to obtain a judgment of liability in a FSIA case, a plaintiff must show entitlement to punitive damages by clear and convincing evidence.  *Peterson v. Islamic Republic of Iran,* 264 F.Supp.2d 46, 48 (D.D.C. 2003).

## IV.  OVERVIEW OF THE EVIDENCE OF IRAN'S DIRECT AND MATERIAL SUPPORT OF AL QAEDA GENERALLY, STARTING IN THE EARLY 1990S, AND FOR THE 9/11 ATTACKS

Supporting their Motion for Entry of Judgment, the *Havlish* Plaintiffs present clear and convincing evidence demonstrating that culpability for the 9/11 terrorist attacks on the United States lies not only with al Qaeda, but also with the Islamic Republic of Iran and Hizballah.  The evidence establishes that Iran provided material support to al Qaeda generally, starting in the early 1990s, and direct and material support to al Qaeda specifically for the September 11, 2001 attacks on the World Trade Center, the Pentagon, and the target of the attack on Washington, D.C. that resulted in the crash of a hijacked airliner near Shanksville, Pennsylvania.

Iran's material support to al Qaeda began years before September 11, 2001, as Iran and its proxy terrorist organization, Hizballah, entered into a terrorist alliance with al Qaeda reaching back to the early 1990s.  Thereafter, Iran, Hizballah, and al Qaeda

cooperated and coordinated with, and assisted each other in, the planning, training for, and implementation of a series of terrorist attacks against American and Western interests abroad.  This terrorist alliance continued throughout the preparations for the 9/11 attacks, involving planning, facilitation of the hijackers' travel, and training.  After the 9/11 attacks, Iran and Hizballah again gave material support to al Qaeda by facilitating the escape of some of al Qaeda's leadership, as well as many of its operatives, and their families, from the U.S.-led invasion of Afghanistan.  Iran thereafter provided – and to the present day continues to provide – safe haven for al Qaeda leaders and rank-and-file members inside Iran.  From that post-9/11 safe haven inside Iran, senior al Qaeda members have continued to direct terrorist operations against the U.S. and its allies.

In sum, Iran has directly and materially supported al Qaeda generally before, during, and after 9/11, and gave direct and material support to al Qaeda specifically in regard to the September 11, 2001 attacks upon America.

Contemporaneously with filing this Memorandum, Plaintiffs are filing a Motion For Leave to File Under Seal additional evidence comprising videotaped testimony and documents from three fact witnesses, Witnesses "X," "Y," and "Z," who are all defectors from the Iranian government.  Ex. S-1 through S-8.  The evidence from Witnesses X, Y, and Z circumstantially and directly implicates Iran and Hizballah in the 9/11 attacks, through Iran's and Hizballah's foreknowledge of, and complicity in, the overall design of, and preparations for, the 9/11 attacks, involving, but not limited to, facilitation of the hijackers' international travel, training, and through Iran's provision of safe haven for al Qaeda after the attacks.  Plaintiffs discuss the sealed evidence of Iran's material and direct support of al Qaeda, which covers many areas not addressed at all in this brief, in

12

Plaintiffs' Second (Sealed) Memorandum of Law in Support of Motion for Entry of Judgment by Default Against Sovereign Defendants.[10]  Plaintiffs are also filing a transcript of the testimony of Abolhassan Banisadr, who was the first elected president of the Islamic Republic of Iran.

### A.  THE 9/11 COMMISSION REPORT: "Assistance from Hezbollah and Iran to al Qaeda"

The *Havlish* proof begins with an important, but often overlooked, conclusion reached by The National Commission On Terrorist Attacks Upon The United States ("9/11 Commission" or "Commission") in July 2004: "In sum, there is strong evidence that Iran facilitated the transit of al Qaeda members into and out of Afghanistan before 9/11 and that some of these were future 9/11 hijackers."  FINAL REPORT OF THE NATIONAL COMMISSION ON TERRORIST ATTACKS UPON THE UNITED STATES ("9/11 REPORT"), p. 241.  (A sub-section of Chapter 7 of the 9/11 REPORT, entitled "Assistance from Hezbollah and Iran to al Qaeda," pp. 240-41, along with other excerpts from the 9/11 REPORT referenced herein, comprises Exhibit 1.)  The Commission further stated, "[w]e now have evidence suggesting that 8 to 10 of the 14 Saudi 'muscle' operatives traveled into or out of Iran between October 2000 and February 2001." *Id.* at 240.

---

[10]  Because these fact witnesses now have reason to fear for their safety, and for the safety of their families, should their identities and the content of their testimony be revealed publicly, their sworn testimony and supporting documentary evidence have been filed under seal. Ex. S-1 through S-8.  The bases for these concerns are discussed in Ex. S-9, Sealed Affidavit of Plaintiffs' Counsel.  Plaintiffs hope that these witnesses will gain a sufficient measure of security in the future to allow the unsealing of their evidence and Plaintiffs' Second (Sealed) Memorandum of Law.  This Plaintiffs' First Memorandum occasionally refers to the existence of sealed evidence associated with a particular topic, but only in very limited ways that avoid compromising the confidentiality of the witnesses.  For the same reasons, an affidavit by Kenneth R. Timmerman (Ex. S-10, "Timmerman 1st Affidavit") addressing the investigation which discovered the three defector witnesses and information gained through certain other non-testifying sources is also filed under seal.  Certain portions of the affidavits of five experts (Ex. 2, 2nd Affidavit of Kenneth R. Timmerman, Ex. 6, Affidavit of Clare M. Lopez and Dr. Bruce D. Tefft, Ex. 7, Affidavit of Dr. Ronen Bergman, and Ex. 8, Affidavit of Patrick L. Clawson, Ph.D.) are redacted in order to avoid compromising the security of the Iranian defector witnesses.  Complete unredacted copies of these experts' affidavits are filed under seal, as Ex.'s S-11, S-12, S-13, and S-14, respectively.

Indeed, the 9/11 REPORT notes a number of significant facts linking Iran and its terrorist proxy, Hizballah, to al Qaeda and the 9/11 hijackers, including "the persistence of contacts between Iranian security officials and senior al Qaeda figures after Bin Ladin's return to Afghanistan" in 1996, "a concerted effort" by Iran "to strengthen relations with al Qaeda after the October 2000 attack on the USS Cole," and "the willingness of Iranian officials to facilitate the travel of al Qaeda members through Iran, on their way to and from Afghanistan" by "not . . . plac[ing] telltale stamps in the passports of these travelers . . .", "[s]uch arrangements [being] particularly beneficial to Saudi members of al Qaeda." 9/11 REPORT, p. 240.[11]

Both the U.S. State Department and the Federal Bureau of Investigation had already found similar connections between Iran and al Qaeda.  In its *2001 Patterns of Global Terrorism*, the State Department noted "reports that Arab Afghans, including al Qaeda members, used Iran as a transit route to enter and leave from Afghanistan."[12]  *See* Ex. 13.  The FBI's criminal investigation of the 9/11 attacks (the "Penttbom investigation") had found the same linkage:

> a substantial number of the 19 al Qaeda operatives who hijacked the four targeted U.S. airliners likely transited through Iran on their way to and from Pakistan and Afghanistan, *during and in furtherance of the conspiracy*.  According to the Penttbom team, the willingness of Iranian border officials to refrain from stamping the passports of al Qaeda members helped explain the absence of a clear document trail showing the travels of those members to and from Afghanistan, the center of al Qaeda training starting in the late 1990s and leading up to September 11, 2001.

---

[11]  Islamic words and names (*e.g.*, bin Laden, al Qaeda, Hizballah) are spelled differently in different sources.  Plaintiffs have strived for consistency as much as possible, but original spellings are maintained in quoted sources.

[12]  In the ensuing years, the U.S. State Department cited Iranian support for al Qaeda after the 9/11 attacks.  "Al Qaeda members have found virtual safehaven there and may even be receiving protection from elements of the Iranian Government."  Ex. 13, *2002 Patterns of Global Terrorism*; *see also id., 2003 Patterns of Global Terrorism*, and Ex. 6, Lopez-Tefft Affid. ¶¶88-90.

Ex. 5, Snell Affid. ¶17 (*emphasis added*).  (Dietrich Snell was Senior Counsel to the 9/11 Commission and its staff Team Leader investigating the al Qaeda conspiracy.  He was a principal author and editor of Chapters 5 and 7 of the 9/11 REPORT.  In the latter appears the section entitled "Assistance from Hezbollah and Iran to al Qaeda."  *Id.*, ¶7.)

Indeed, the 9/11 Commission had information about significant pre-9/11 Iran-Hizballah-al Qaeda connections: "while in Sudan, senior managers in al Qaeda maintained contacts with Iran and the Iranian-supported worldwide terrorist organization Hezbollah" and "[a]l Qaeda members received advice and training from Hezbollah." 9/11 REPORT, p. 240.  Information about these connections became more specific in late 2000.  The Commission found evidence showing that:

> [i]n October 2000, a senior operative of Hezbollah visited Saudi Arabia to coordinate activities there.  He also planned to assist individuals in Saudi Arabia in traveling to Iran during November.  A top Hezbollah commander and Saudi Hezbollah contacts were involved.

*Id.*  The 9/11 Commission also detailed singular confluences in the travels – into Iran and Beirut[13] – of the 9/11 hijackers and "a senior Hezbollah operative" and his "associate":

> Also in October 2000, two future muscle hijackers . . . flew from Iran to Kuwait.  In November, [another muscle hijacker] apparently flew to Beirut, traveling – perhaps by coincidence – on the same flight as a

---

13  Beirut is the capital of Lebanon and Lebanon's largest city.  Beirut has a major international airport, which sits adjacent to the poor suburb of *'Ayn-al-Dilbah*, a Hizballah recruiting ground where Imad Mughniyah grew up.  The Bekaa Valley, located to the east of Beirut, and its principal city, Balabaak, are controlled by Hizballah and the IRGC, and they have terrorist training camps there.  The Bekaa was the first area in Lebanon where the IRGC established a presence in the early 1980s.  In November 1982, the IRGC, using the Lebanese militant group Islamic *Amal* as a proxy, seized the Sheikh Abdallah army barracks from the Lebanese government's police force at Balabakk in the Bekaa Valley, renaming it "Camp Imam Ali."  This camp became the headquarters of Hizballah and the IRGC in Lebanon, and it would be the place where many kidnapped hostages were imprisoned, including CIA station chief William Buckley.  Ex. 7, Bergman Affid. ¶28; Baer, See No Evil, pp. 73, 100-02; Baer, The Devil We Know, pp. 59-64, 67-68, 78-79; Ex. 6, Lopez-Tefft Affid. ¶¶109, 151, 162, 186-87, 255, 288, 293.

> senior Hezbollah operative.  Also in November, [yet another muscle
> hijacker] apparently flew from Saudi Arabia to Beirut.
>
> In mid-November, . . . three of the future muscle hijackers . . . all
> of whom had obtained their U.S. visas in late October, traveled in a group
> from Saudi Arabia to Beirut and then onward to Iran.  An associate of a
> senior Hezbollah operative was on the same flight that took the future
> hijackers to Iran.  Hezbollah officials in Beirut and Iran were expecting
> the arrival of a group during the same time period.  The travel of this
> group was important enough to merit the attention of senior figures in
> Hezbollah.
>
> Later in November, two future muscle hijackers . . . flew into Iran
> from Bahrain.  In February 2001, [another hijacker] may have taken a
> flight from Syria to Iran, and then traveled further within Iran to a point
> near the Afghan border.

9/11 REPORT, pp. 240-41.  The expert affidavits of Janice Kephart, Dietrich Snell, and

Clare Lopez-Bruce Tefft add insights into the significance of the 9/11 Commission's

findings on the Iranian government's facilitation of the 9/11 hijackers' travel through Iran

into and out of Afghanistan.  Further, the expert affidavits of Kenneth Timmerman,

Ronen Bergman, and Clare Lopez-Bruce Tefft provide details about the role of Imad

Mughniyah – the "senior Hezbollah operative" – in Iran's sponsorship of terrorism.

Finally, taken together, the sealed testimony of Witnesses X, Y, and Z contain revelations

about Mughniyah, his integral role in the Iran-Hizballah-al Qaeda terror alliance, and in

the 9/11 attacks.

The Iran-Hizballah connection to the 9/11 hijackers was only briefly and

cryptically stated at the end of section 7.3 in Chapter 7 of the 9/11 REPORT – and not

further developed.  The reason is that, other than the FBI's Penttbom investigation

information, the evidence came from intelligence reports of which the Commission staff

had only discovered and reviewed, "at virtually the last moment of the Commission's

existence and only a week before publication of the 9/11 Report."  Ex. 5, Snell Affid.

¶19.  According to two of the *Havlish* experts and a respected journalist, this evidence lay

16

within file cabinets full of thousands of hard-copy documents at the Fort Meade

headquarters of the National Security Agency ("NSA"), some of which had been moved

to the 9/11 Commission's reading room in Washington.  Ex. 6, Lopez-Tefft Affid. ¶102;

Ex.  2, Timmerman 2nd Affid. ¶¶120-29; *see* Shenon, Phillip, The Commission, pp. 155-

57; 371-73, Twelve / Grand Central Publishing, Hatchette Book Group USA (2008).  The

NSA documents, which included electronic intercepts, were described by one of the

Commission staff members who reviewed them as "'a gold mine, full of critical

information about al Qaeda and other terrorist groups dating back to the early 1990s.'"

Ex. 6, Lopez-Tefft Affid. ¶103.  Among the NSA materials were seventy-five (75)

critical documents comprising a record of operational ties between Iran and al Qaeda

during the critical months just prior to September 11, 2001.  Ex. 2, Timmerman 2nd

Affid. ¶¶120-23.  As described by the 9/11 Commission's conspiracy Team Leader, the

intelligence reports found "at virtually the last moment"

> provid[ed] clear evidence that as many as ten of the 14 Saudi muscle
> hijackers involved in the 9/11 attack traveled into or out of Iran between
> October 2000 and February 2001, a critical period in the life of the
> conspiracy when those operatives had to interrupt their training in
> Afghanistan to obtain U.S. visas in Saudi Arabia before returning for the
> final training in Afghanistan and Pakistan that would precede their
> eventual journey to the United States.  Moreover, . . . [the intelligence
> reports] established a series of links between travel apparently conducted
> by various muscle hijackers during this stage of the plot and facilitation
> activities of senior members of Hezbollah, the Iranian-supported
> international terrorist organization.

Ex. 5, Snell Affid. ¶19.   Based on other sources, it is known that these intelligence

reports were NSA materials that showed Iran had facilitated the travel of the al Qaeda

operatives and that Iranian border inspectors had been ordered not to place telltale stamps

in the operatives' passports, thus keeping their travel documents clean.  Ex. 2,

Timmerman 2nd Affid. ¶124.[14]

Although there was not time for substantial analysis or investigation of the NSA evidence, the Commission did seek out corroboration beyond the FBI's Penttbom investigation briefings.  "Given the inconclusive nature of this last-minute evidence apparently linking certain travel in furtherance of the 9/11 plot with Iran and Hezbollah, the Commission staff recognized the importance of obtaining some measure of corroboration before including the evidence in the *Report*.  Such corroboration was obtained."  Ex. 5, Snell Affid. ¶20.  The Commission staff drafted pertinent questions to be put, through U.S. intelligence, to Guantanamo detainees Ramzi Binalshibh (al Qaeda's liaison to the Mohammad Atta cell in Hamburg, Germany, *see* 9/11 REPORT, pp. 167-68; 225) and Khalid Sheikh Mohammed ("KSM" who claims to be the mastermind of the 9/11 attacks, *see* 9/11 REPORT, pp. 145, 149-50).  Responses were received on July 16, 2004, days before publication of the final 9/11 REPORT on July 22, 2004.  Ex. 5, Snell Affid. ¶20.

Both Binalshibh and KSM "'confirmed that several of the 9/11 hijackers (at least eight, according to Binalshibh) transited Iran on their way to or from Afghanistan, taking advantage of the Iranian practice of not stamping Saudi [al Qaeda] passports.'"  *Id.*, ¶21, quoting 9/11 REPORT, p. 241.  "Thus, both detainees provided information tending to corroborate the evidentiary support that already existed for the Penttbom team's theory regarding the important role played by Iran in facilitating the 9/11 attack."  Ex. 5, Snell

---

14  Kenneth Timmerman first published the story of the Commission's late discovery of the NSA material.  Ex. 2, Timmerman 2nd Affid., ¶¶120-29.  The NSA material was also discussed in a book by NEW YORK TIMES reporter Phillip Shenon.  According to Shenon, 9/11 Commission Executive Director Phillip Zelikow, commenting on the NSA files, said that "critical evidence about bin Laden's terrorist network sat buried in government files, unread to this day."  Shenon, The Commission, pp. 155-57; 371-73.

Affid. ¶21.  A third al Qaeda detainee, Tawfiq bin Attash, a/k/a "Khallad," also confirmed to interrogators "that Iranian immigration inspectors had been directed 'not to place telltale stamps in the passports of [al Qaeda] travelers.'"  *Id.*, ¶18.

Thus, the 9/11 Commission included the brief two-page summary of "Assistance from Hezbollah and Iran to al Qaeda."  However, the Commissioners ended this section with a pointed conclusion regarding the topic of Iranian and Hizballah complicity in the events of September 11, 2001:

*"We believe this topic requires further investigation by the U.S. government."*

9/11 REPORT, p. 241 (*emphasis added*).[15]  There is no public indication whatsoever that the U.S. government has, to date, pursued any such "further investigation."  The undersigned attorneys have done so, collectively making 22 trips abroad and conferring with key witnesses and innumerable officials, experts, and consultants.  Herewith, they present the evidence produced by the *Havlish* investigation.

## B.    "FURTHER INVESTIGATION"

Most importantly, the "further investigation" requested by the 9/11 Commission has been conducted, not by the government, but by the *Havlish* attorneys who have found exactly the evidence that the 9/11 Commission indicated it had not found, specifically, that Iran and Hizballah *were aware* of the planning for the 9/11 attacks, and, further, that Iran and Hizballah *were complicit* in that planning.  As detailed herein, the evidence shows that Iran provided material support, indeed, direct assistance, to al Qaeda by

---

[15] "The Executive Director of the 9/11 Commission, Phillip Zelikow, noted in an e-mail dated March 14, 2007 to NEW YORK TIMES reporter Philip Shenon regarding Iranian involvement in 9/11: 'In effect, all we could do was present a set of questions that only the US government could answer, with further work, and ask the government to do that work. . . .  I never felt complacent, and remain ready to believe that someone may, in the future, find evidence we missed or didn't know about.'"  Ex. 6, Lopez-Tefft Affid. ¶123.

facilitating the travel of the 9/11 hijackers, and by providing for the hijackers' security in the months prior to September 11, 2001, as they were preparing for the attack.  As the 9/11 attacks approached, on May 14, 2001, the head of the Supreme Leader's intelligence apparatus wrote a memorandum to Iranian intelligence operatives directing them to "support . . . al-Qaeda's future plans," alerting them to potential "negative future consequences of this cooperation [between Iran and al Qaeda], and cautioning the operatives to limit their interaction to the "existing contacts with [Imad] Mughniyah [of Hizballah] and [bin Laden deputy Ayman] al-Zawahiri."  Ex. 7, Bergman Affid. ¶¶75-76, and Ex. B thereto.  Furthermore, after the 9/11 attacks, Iran provided safe haven to al Qaeda leaders, members, and their families – inside Iran.  As is detailed in Plaintiffs' Second (Sealed) Memorandum, the evidence further shows that Iran originated the general design of the 9/11 attacks and Iran provided material support to al Qaeda in connection with the recruitment and training of the 9/11 hijackers as well.

The *Havlish* Plaintiffs submit substantial evidence from both expert witnesses and fact witnesses to support their Motion for Entry of Judgment in this case.  All of the testimony is erected upon solid foundations: the experts' affidavits are supported by their eminent qualifications in their fields of study and, as set forth below, a plethora of background evidence.  This expert and documentary evidence alone – independent of the additional compelling fact evidence filed under seal – provides clear and convincing support for the entry of judgment in this case.  Further, the fact witnesses testify in detail regarding the means by which they obtained the insider information and knowledge to which they testify.

1.   THE EXPERT WITNESSES

The *Havlish* Plaintiffs submit affidavits from ten experts in the fields of international terrorism, intelligence, and the Iranian state, including Iran's government, politics, and revolutionary institutions.  They also discuss the relationship between Shi'a Islam (Iran is Shi'a) and Sunni Islam (al Qaeda, *e.g.*, is a Sunni organization).  The evidence from these ten experts alone provides clear and convincing evidence of the Plaintiff's allegations in this case.

These experts provide detailed analyses of the factual evidence and/or thorough discussions of, *inter alia*, the historical record of Iran's involvement in terrorism and its sponsorship of, and relationships with, both Shi'a and Sunni terror groups.[16] Additionally, several of the experts analyze the 9/11 REPORT itself and provide details about the discoveries that led to the inclusion of pages 240 and 241.  The expert witnesses analyze the 9/11 REPORT, U.S. State Department terrorism reports, U.S. Treasury Department reports, court records, FBI and INTERPOL notices, declassified intelligence agency materials, other governmental documents, open source information, and information from intelligence sources.[17]  Plaintiffs' expert witnesses conclude that, based on this information alone, there is clear and convincing evidence that Iran and its

---

[16]   Evidence of Iran's extensive record of involvement in, and sponsorship of terrorism, including its use of proxies to engage in terrorist operations other than 9/11, is admissible in this case as proof of motive, intent, preparation, plan, and knowledge.  Rule 404(b), Fed.R.Evid.  *See Huddleston v. United States*, 485 U.S. 681 (1988)(similar acts evidence should be admitted under Rule 404(b) if there is sufficient evidence to support a finding that the defendant committed the similar act).  Indeed, many of these terrorist acts have themselves been adjudicated to judgment against Iran in other federal courts.  *See* Section I.A., *supra*, and Appendix A.  Moreover, the experts may use facts relating to such terrorist acts to inform their expert opinions in this case.  Rule 703, Fed.R.Evid.

[17]   The term "open source" refers to information or data obtained from overt, available sources in the public sector, as opposed to covert, secret, or classified material.  *See* Ex. 6, Lopez-Tefft Affid. p. 19, n. 8.

officials provided direct and material support to al Qaeda for their involvement in the 9/11 terrorist attacks.

In addition, two of the experts, Clare Lopez and Dr. Bruce Tefft, intensively scrutinized the fact testimony of the four Iranian defectors (including former president Banisadr).  Some of the expert affidavits contain particular factual information known by the affiants (Timmerman, Bruguière, Snell, Kephart, Bergman, and Adamson).  While none of the affiants can reveal classified information, none of them attests to any information or expert opinion which is in conflict with what he or she knows to be true based on classified information.

Plaintiffs also cite the published works of noted Middle East terrorism expert Robert Baer, a former career case officer of the U.S. Central Intelligence Agency (CIA) from 1976 to 1997.

The Experts.  The first three experts listed below are former 9/11 Commission staff members, Dietrich Snell, Daniel Byman, and Janice Kephart, who provide affidavits addressing significant factual information known to them as a result of their work on the 9/11 Commission staff.  These three 9/11 Commission staffers' affidavits detail, *inter alia*, critical information which puts in context the conclusions set forth on pages 240-241 of the 9/11 REPORT and which demonstrate Iran's and Hizballah's material and direct support of al Qaeda in regard to the 9/11 attacks.

a.      Dietrich L. Snell was a Senior Counsel on the Commission and the team leader in charge of the staff group that investigated the 9/11 conspiracy itself.  A highly experienced state and federal prosecutor, Mr. Snell was involved in the investigation and prosecution of high-profile terrorism cases, including, among others, Ramzi Yousef and

the Sheikh Omar Abel Rahman (the "Blind Sheikh).  It was Mr. Snell's responsibility to

design and coordinate the 9/11 Commission investigation of the al Qaeda plot, ensuring

that the Commission considered evidence which was both classified and public record.

Snell's 23-paragraph affidavit (Ex. 5) examines, *inter alia*, the terrorists' international

travel and the 9/11 Commission's discovery of intelligence reports that led to the

inclusion of pages 240-241 in Chapter 7 of the 9/11 REPORT.  (Snell drafted and edited

Chapter 7, which, as mentioned *supra*, has special significance to this case.)  Snell

explains why he concludes there is clear and convincing evidence that Iran and Hizballah

contributed material support to al Qaeda for the 9/11 attacks.

> . . . [T]he government of Iran provided material support to al
> Qaeda in the planning and execution of the 9/11 attack, within the
> meaning of 18 U.S.C. §2339A(b)(1) . . . .
> . . . .
> In sum, based on my experience as an investigator, prosecutor and
> senior staff member of the 9/11 Commission staff, I believe Mr. Byman,
> Ms. Kephart[ ] and Mr. Clawson are correct in their analysis that there is
> clear and convincing evidence pointing to involvement on the part of
> Hezbollah and Iran in the 9/11 attack, especially as it pertains to travel
> facilitation and safe haven.

Ex. 5, Snell Affid. ¶¶11, 23.

      b.    <u>Daniel L. Byman</u> is a former CIA analyst, former RAND analyst, MIT

Ph.D., and is currently a Georgetown University professor and a Brookings Institute

senior fellow.  Dr. Byman has worked for both the 9/11 Commission and the joint House-

Senate Intelligence Committee that investigated 9/11.  The author of several books and

dozens of articles focusing on Iran and al Qaeda, Dr. Byman is a regular consultant to the

U.S. Government on terrorism and national security.  Dr. Byman's affidavit (Ex. 3),

comprising 69 paragraphs, discusses, *inter alia*, the Iran-Hizballah-al Qaeda terror

alliance, and he concludes that Iran provided material support to al Qaeda before and

after September 11, 2001, in the forms of direct facilitation of the hijackers' travel,

training, and provision of a safe haven.  Dr. Byman also notes, significantly, that there is

no chance that any of that material and direct support was performed by rogue agents

without direct knowledge and approval of Iran's Supreme Leader and the IRGC.

> It is my professional judgment that there is clear and convincing evidence that Iran has provided material support for al Qaeda in general as defined in 18 U.S.C. Section 2339A(b)(1).  This assistance predated the 9/11 attack and continued after it, and it had profound implications for the 9/11 attack itself.  Over the years the support has included assistance with travel, a limited safe haven, and some training at the very least.
> . . . .
> . . . [I]n my expert opinion, there is strong support for the view of the 9/11 Commission that additional investigation by the U.S. Government into Iranian support for al Qaeda and terrorism in general is necessary.
> In sum, in my judgment there is strong support for [the] claim that Iran has provided important material support for al Qaeda including direct travel facilitation for the so-called "muscle hijackers" as noted in the 9/11 Commission Report.  This support comes from a range of sources, including U.S. documents and even statements by al Qaeda leaders.

Ex. 3, Byman Affid. ¶¶14, 68-69 (*emphasis omitted and font normalized*).

      c.    <u>Janice L. Kephart</u> served from 1996 to 1998 as an attorney for the U.S.

Senate Judiciary Committee's Subcommittee on Technology, Terrorism and Government

Information.  During this time, Ms. Kephart conducted research on terrorist attacks,

sharing information with the Department of Justice, the Central Intelligence Agency, and

the Senate Select Committee on Intelligence.  Ms. Kephart was a key member of the 9/11

Commission staff "border team" that traced and analyzed the hijackers' travel and ingress

into the United States.  She was a principal author of the 9/11 Commission Staff

monograph entitled 9/11 AND TERRORIST TRAVEL, published just after the 9/11 REPORT,

that examined the terrorists' travel operation in detail.  In her 78-paragraph affidavit (Ex.

4), Kephart examines the reasons the terrorists' travel operation was crucial to the 9/11

attacks.  Kephart's analysis concludes that Iran provided material and direct support for

the 9/11 operation in the form of facilitation of the hijackers' travel, which was critical to

the success of the 9/11 plot.

> This Affidavit concludes that (1) facilitation of terrorist travel is critical material support to terrorist operations; and (2) Iran's facilitation of al Qaeda operative travel, including at least eight 9/11 hijackers, amounted to essential material support, indeed, direct support that further enabled al Qaeda to perpetrate the 9/11 attacks successfully.  Iran itself, and through its surrogate, Hizballah, gave direct support to the 9/11 conspirators . . . .  Al Qaeda's complex and well-executed travel plan that, at a minimum, required complicity by Iranian government officials, including transit through Iran to Afghanistan and into Iran after acquisition of U.S. visas (likely for next-phase training or meetings), contributed to the success of the 9/11 operations.
>      . . . .  Keeping [the hijackers'] passports "clean" of Iranian or Afghani travel stamps was essential now that the critical step in acquiring U.S. visas [was] achieved.
> . . . .
>      . . . .  Thus, Iran's facilitation of the hijackers' "terrorist travel" operation, involving Imad Mughniyah, constituted material support – indeed, direct support – for al Qaeda's 9/11 attacks.

Ex. 4, Kephart Affid. ¶¶3, 4, 71 (*emphasis omitted*).

d.     <u>Clare Lopez and Dr. Bruce Tefft</u>.  With over fifty years of undercover case

operations and intelligence analysis work throughout the world, distinguished former

career CIA operatives Clare M. Lopez and Dr. Bruce D. Tefft combined to produce a

144-page, 369-paragraph affidavit (Ex. 6, redacted, and Ex. S-12, unredacted), setting

forth a thorough analysis of open source material on Iran and terrorism.  This material

includes the 9/11 COMMISSION REPORT, with significant analysis of pages 240-241, as

well as of twenty-five years of State Department reports on international terrorism, U.S.

Treasury designations of terrorist entities, and an enormous amount of material on the

history of terrorism and Iran's prominent place as the leading state sponsor of terror in

the world.  Ms. Lopez and Dr. Tefft discuss Iran's long history of using terrorism as an

instrument of foreign and domestic policy, and they debunk the prior conventional wisdom that Sunni and Shi'a terror groups cannot and do not work together.  (The late Osama bin Laden's al Qaeda are Sunni; Iran and Hizballah are Shi'a.)  They describe how the Iranian state makes decisions and the critical roles played by the Supreme Leader, the IRGC, the MOIS, and other parts of the state apparatus in matters of terrorism.  Ms. Lopez and Dr. Tefft discuss how Iran controls proxy terrorist organizations, most notably its own creation, Hizballah, Iran's close relationship with Hizballah's master terrorist Imad Mughniyah, and how the Iran-Hizballah-al Qaeda relationship began and developed over time.  Additionally, the Lopez-Tefft Affidavit examines the testimony of the three MOIS defectors, Witnesses X, Y, and Z, and former Iranian president Abolhassan Banisadr, and the reasons for crediting the testimony of each of those witnesses.

> We conclude that Imad Mughniyah, the most notable and notorious world terrorist of his time, an agent of Iran and a senior operative of Hizballah, facilitated the international travel of certain 9/11 hijackers to and from Iran, Lebanon, Saudi Arabia, and Afghanistan, and perhaps various other locations for the purpose of executing the events of September 11, 2001.  This support enabled two vital aspects of the September 11, 2001 plot to succeed:  (1) the continued training of the hijackers in Afghanistan and Iran after securing their United States visas in Saudi Arabia, and (2) entry into the United States.
> . . . .
> We conclude that the material support provided by Iran/Hizballah to al Qaeda both BEFORE and AFTER the events of September 11, 2001 involved, among other matters, planning, recruitment, training, financial services, expert advice and assistance, lodging and safe houses, false documentation and identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel, and travel facilitation.

Ex. 6, Lopez-Tefft Affid. ¶¶35, 37 (*emphasis omitted*).

> e.   <u>Dr. Ronen Bergman</u>.  Considered one of the principal experts on the

Israeli intelligence community's assessment of Iran in general, and the Iranian support of

foreign terrorist organizations in particular, Israeli investigative journalist and scholar Ronen Bergman provides an 80-paragraph affidavit (Ex. 7, redacted, and S-13, unredacted) addressing, *inter alia*, the early and continuing connections between Iran and al Qaeda, and Iran's material aid and support to al Qaeda before and after September 11, 2001. Dr. Bergman discusses Iran's long terrorist history, its place "at the center of the rise of modern terrorism," its methods, geopolitical motivations, and the founding of its terrorist proxy organization, Hizballah. Dr. Bergman details the cooperation among Iran, Hizballah (prominently, Imad Mughniyah), and al Qaeda. Dr. Bergman's affidavit includes revelations about the nature and extent of Iranian sponsorship of international terrorism known to him as a product of his special relationships with top level Israeli intelligence and military officials.

> . . . [I]t is my expert opinion that Islamic Republic of Iran was, and is, a benefactor of, and provided material aid, resources, and support to Osama bin Laden and al Qaeda, both before and after the attacks of September 11, 2001, on the United States. Further, it is my expert opinion that the Islamic Republic of Iran stands at the center of the rise of modern terrorism, and that Iran consistently supports terrorist operations against a number of targets throughout the world, including the United States.
>         . . . . This facilitation enabled the acquisition of important travel documents, passports, and visa and therefore, entry into the United States.
>         . . . . The [May 14, 2001] memo mandates that the intelligence apparatus of the Office of the Supreme Leader is to directly supervise all operations, and it conveys the Supreme Leader's "full support in the implementation of its future plans." Finally, and significantly, the [May 14, 2001] memorandum "emphasizes that, with regard to cooperation with al Qaeda, no traces must be left that might have negative and irreversible consequences, and that [the activity] must be limited to existing contacts with Mughniyah and al Zawahiri.

Ex. 7, Bergman Affid. ¶¶16-17, 75-76 and Ex. B thereto (*emphasis omitted*).

f.   <u>Dr. Patrick Clawson</u>.  Noted Iran expert Dr. Patrick L. Clawson has testified as an expert in dozens of federal court cases regarding Iran's state sponsorship of terrorism.

Perhaps the leading expert on Iran in the United States, Dr. Clawson has lectured

throughout the world on the topic of Iran and terrorism.  Over the last twenty-five years,

Dr. Clawson has served as a consultant to the Central Intelligence Agency, the Defense

Department, the State Department, the National Security Agency, and the Defense

Intelligence Agency, while also consulting with U.S. military officials.  Widely

published, Dr. Clawson has also testified before many U.S. House and Senate

Committees.  Dr. Clawson attests, in a 73-paragraph affidavit (Ex. 8, redacted, and Ex. S-

14, unredacted), to the political, religious, and cultural structure that produces Iran's state

sponsorship of terrorism, and he analyzes the economics of Iran's support for terrorism.

He also discusses U.S. governmental and non-governmental judgments on Iran and Iran's

role as a state sponsor of terrorism, and he explains why the factual and expert evidence

in this case compels the conclusion that Iran provided material support to al Qaeda in

connection with the 9/11 attacks upon America.  Dr. Clawson also highlights an often

overlooked fact, stated in the 9/11 REPORT at p. 241, that "'[a]fter 9/11 Iran and Hizbollah

wish[ed] to conceal any past evidence of cooperation with Sunni terrorist[s] associated

with al Qaeda.'"  Ex. 8, Clawson Affid. ¶50 (*emphasis omitted*).

> In addition to the State Department Annual Report, the most
> authoritative U.S. government sources have issued repeated and detailed
> descriptions of Iranian material support to al Qaeda before, during and
> after the 9/11 attacks.  .  As seen in the 9/11 Commission Report and the
> US Treasury Designations, the evidence is clear and convincing.
> . . . .
> It is my expert opinion that Iran has provided material support to
> al-Qaeda before, during and after the events of September 11, 2001.
> Iranian support of al-Qaeda through its instrumentalities, the
> Revolutionary Guard and MOIS, is consistent with its foreign policy of
> supporting terrorism against the United States.
> . . . .  [T]he central assistance of material support provided by Iran
> to al Qaeda regarding September 11, 2001 is . . . travel facilitation and safe
> haven.

*Id.*, ¶43 and Conclusion (*emphasis omitted*).

       g.     <u>Jean-Louis Bruguière</u>.  Renowned French former investigative Judge Jean-Louis Bruguière, the former Chief of France's Judicial Anti-Terrorism Division (a special anti-terrorism court), is perhaps the world's foremost investigator and prosecutor of terrorism.  Judge Bruguière has provided a sworn declaration (Ex. 9), comprising 46 paragraphs, regarding, *inter alia*, the origins of al Qaeda, its methods of recruiting, transporting, and training new members, early connections between Iran, al Qaeda, and other terrorist organizations supported by Iran, the thwarting of a 1994 terrorist operation by al Qaeda-affiliated Algerian terrorists to crash a hijacked airliner into the Eiffel Tower, and the discovery and disruption of a 2001 al Qaeda plot to bomb the U.S. Embassy in Paris.  Judge Bruguière details Iranian-al Qaeda cooperation on terrorist actions against the United States in Iraq, including significant connections between Iran and Abu Musab al Zarqawi (now-deceased), the leader of al Qaeda in Iraq.

> These investigations led me to discover the beginnings of *al Qaeda* in Europe, and *al Qaeda's* nascent ties with the Islamic Republic of Iran.
> . . . .
> . . . Abu Musab al-Zarkawi and his *al Qaeda* affiliated group, *Ansar al-Islam* . . . traveled through Iranian territory on a regular basis and used Iran for clandestine meetings, activities that implied the complicity of the intelligence services of the Islamic Republic of Iran.
> . . . .
> . . . [M]embers of Zarkawi's group never went through Baghdad but always transited through Iran, where they had excellent contacts.
> . . . .
> Senior Iranian intelligence officers met regularly with top *al Qaeda* operatives in the Mashad, Iran, close to the Afghan border, and established an [escape route] to evacuate *al Qaeda* operatives from Afghanistan after the 9/11 attacks.

Ex. 9, Bruguière Decl. ¶¶13, 33, 37, 43.

       h.     <u>Edgar Adamson</u>.  Former chief of the U.S. National Central Bureau for

INTERPOL, Edgar A. Adamson attests, in a 33-paragraph affidavit (Ex. 10), to his knowledge of Iran's unprecedented campaign to prevent INTERPOL Red Notices (*see* pp. 61-62, *infra*) from being issued naming three high-ranking Iranian government officials, which would have implicated Iran as a nation-state in the terrorist bombings of the AMIA Jewish cultural center in Buenos Aires, Argentina, in 1994.

      i.  <u>Kenneth R. Timmerman</u>.  Investigative journalist, author, and noted Iran expert Kenneth Timmerman provides an expert affidavit (his "Second Affidavit") in addition to a fact affidavit ("First Affidavit" which is sealed) described *infra*.  *See* n.11, p. 13, *infra*.  Timmerman's second affidavit (Ex. 2, redacted; Ex. S-11, unredacted), comprising 219 paragraphs, lays out his expert analysis of the early connections between Ayatollah Khomeini and Yasser Arafat, Iran's creation of Hizballah in Lebanon, the emergence of Imad Mughniyah and his long terrorist history, connections between Iran, Hizballah, al Qaeda, and the Taliban, Iran as a travel facilitator for terrorists, and other details from the *Havlish* investigation.  Timmerman reveals information he received from a 9/11 Commission staff member identifying by name the "senior operative of Hezbollah" who, as well as the operative's associate, accompanied some of the 9/11 muscle hijackers on air flights into and out of Iran and Beirut, Lebanon in the fall of 2000.  That "senior Hezbollah operative," referenced cryptically, though not identified by name, in pages 240-241 of the 9/11 REPORT, was the master terrorist Imad Mughniyah – *a known agent of Iran*.  Mughniyah, too, was the "senior operative of Hezbollah" who, in October 2000, "visited Saudi Arabia to coordinate activities there . . . [and who] also planned to assist individuals in Saudi Arabia in traveling to Iran during November."  Timmerman also relates information he received from two additional Iranian sources

who, for reasons of personal security, were unable to testify directly.  The first, "Bahram"

(a pseudonym), is an Iranian dissident who, for years, has risked his life by engaging in a

campaign of resistance to the Islamic regime.  In particular, Bahram and his organization

have investigated Iran's terrorism-related financial dealings.  Timmerman also relates

information obtained from another Iranian defector, "Colonel B" (a pseudonym), a career

officer of the IRGC who commanded a terrorist training camp inside Iran.[18]  (Other

aspects of Timmerman's second affidavit dealing with the three defector witnesses are

redacted; thus, the complete unredacted second affidavit is filed under seal.)

> . . . [T]he "coordinator" of the 9/11 plot, Ramzi Binalshibh met repeatedly
> with lead hijacker Mohamad Atta . . . in late 2000 and early 2001, then
> traveled to Afghanistan to deliver a progress report . . . to Osama bin
> Laden and his deputy, Ayman al-Zawahiri.  En route, Binalshibh stopped
> over in Iran.
> . . . .
> [According to *Bundeskriminalamt* reports that German federal prosecutors
> gave to the *Havlish* investigation,] Binalshibh . . . flew to Iran on January
> 31, 2001.  . . . [T]he Germans next picked up his trace on February 28,
> 2001, when Binalshibh returned to Hamburg to empty out the apartment
> used by the 9/11 pilots.
> . . . .
> I learned from 9/11 Commission staff that the "senior Hezbollah
> operative" was clearly identified in the NSA documents as Imad Fayez
> Mughniyah, although the Commission ultimately decided against naming
> Mughniyah in the printed version of the report.
> . . . .
> [I]t is my expert opinion that senior al Qaeda operatives, including their
> top military planners, sought — and were provided — refuge in Iran after
> the 9/11 attacks and that they used Iran as a base for additional terrorist
> attacks after 9/11, with the knowledge, approval, and assistance of the
> highest levels of Iranian government.

Ex. 2, Timmerman 2nd Affid. ¶¶148-52, 179, 127 (*emphasis omitted*).

---

[18]  For reasons of personal security, neither "Bahram" nor "Colonel B" would agree to testify directly in
this case.  However, each was debriefed extensively by Kenneth Timmerman and Timothy Fleming,
one of the *Havlish* attorneys.  Ex. S-10, Timmerman 1st Affid. ¶¶33-39; 92-93; 99-100; 112.

2.    THE ROBERT BAER PUBLICATIONS

Former CIA case officer Robert Baer[19] has written extensively on Iran, Hizballah, and Middle East terrorism.[20]   Baer's writings provide important information concerning, *inter alia*, an August 1996 meeting between an Iranian intelligence officer and Osama bin Laden in Jalalabad, Afghanistan, at which an agreement (beyond the 1993 Khartoum agreement, *see infra*, pp. 56-57, 92-93) was reached to engage in joint terrorism operations, and other evidence showing that 9/11 was not an al Qaeda operation acting alone.  Baer's writings address the Iranian government's thirty-year war against America, its involvement in a long history of terrorist acts against the United States and Americans abroad, Iran's historical, religious, and geopolitical motivations and aspirations, and the nature of the Iranian state and its government apparatus, including Iran's Supreme Leader, the IRGC and its *Qods* Force, and MOIS.  The Baer publications also discuss how and why Iran surmounted the Sunni-Shi'a theological divide, Iran's *modus operandi* of working through terrorist proxies, including not only its own creation, Hizballah and its master terrorist Imad Mughniyah, but also many Sunni terror organizations.  Finally, Baer has challenged the conventional wisdom by refuting the veracity of the "A to Z"

---

[19]  Fluent in Farsi (Persian) and Arabic, Robert Baer worked in the CIA's Directorate of Operations running agents (*i.e.*, recruited sources) in the Middle East, including extensive experience in Lebanon, Asia, and Europe.  He received the CIA's "Career Intelligence Medal" in 1998.  Baer, See No Evil, p. 267.  After his career in the CIA, Baer became a writer, journalist, and documentary film maker, and he is widely considered to be one of the foremost experts in the world on Middle East terrorism and Iran.  Baer has appeared on numerous television news and discussion programs, including on the major networks, CNN, MSNBC, HBO, BBC, both in the U.S. and in Europe, and on radio.  In 2000, Baer worked with CBS' 60 MINUTES on an overseas investigation involving an Iranian intelligence defector.

[20]  Robert Baer is the author of three non-fiction books and one novel:  See No Evil: *The True Story of a Ground Soldier in the CIA's War on Terrorism* (Crown 2002); Sleeping With The Devil: *How Washington Sold Our Soul for Saudi Crude* (Crown 2003); Blow The House Down (Crown 2006), a novel which contains a non-fiction "Author's Note" at the end; and The Devil We Know: *Dealing with the New Iranian Superpower* (Crown 2008).  Baer is a regular columnist for TIME magazine and has had articles published in VANITY FAIR, the WALL STREET JOURNAL, the WASHINGTON POST, and the ATLANTIC on the subjects of intelligence, terrorism, international and national security, and Iranian national politics.

confession of the "mastermind" of 9/11, Khalid Sheikh Mohammad ("KSM").

**Summary:**  The expert affiants provide substantial analysis of the evidence addressing the following topics:

- Iran's role as the world's preeminent sponsor of international terrorism;

- Iran's motivations for engaging in and sponsoring terrorism as a matter of foreign and domestic policy, in particular, its goals of regional hegemony and eliminating U.S. presence and influence, in the Middle East;

- Iran's methodology of supporting terrorist operations and the roles of Iran's Supreme Leader and his special intelligence apparatus, the Iranian Revolutionary Guard Corps ("IRGC"), and the Ministry of Information and Security ("MOIS"), in providing direct and material support for terrorist organizations, as well as Iran's unlimited usage of the agencies and instrumentalities of the Iranian state and government, including even private entities, to engage in and support terrorism;

- Iran's creation and sponsorship of proxy terrorist organizations as appendages of the Iranian state, most notably, Hizballah, and linkages between Hizballah, particularly through the master terrorist Imad Mughniyah, and al Qaeda;

- Iran's connections to, material support for, and direct support of and partnership with, international terrorist groups, most importantly for the present case, al Qaeda;

- Iran's strategy and actions to move beyond the centuries-old historical split between Sunni and Shi'a Muslims in order to form a cooperative alliance of convenience for the purpose of unifying and expanding Islamic opposition to the West, particularly the U.S. and Israel, and employing terrorism as a means to that end; and

- Iran's strategy of leading the Muslim world's opposition to the leadership of the United States while preserving itself and creating plausible deniability of its role in global terrorism.

Altogether, the expert analyses, considered in the context of the Baer publications, compel the conclusions that Iran provided material support to al Qaeda generally in the years before September 11, 2001, that Iran provided material and direct support to al Qaeda in the preparation for and implementation of the 9/11 plot, and that, after the fact,

33

Iran provided  material and direct support by aiding and abetting al Qaeda members who evaded the American-led military forces that uprooted al Qaeda and overthrew the Taliban regime in Afghanistan in late 2001.  "Few if any noted terrorism experts would dispute that Iran provides material support to al-Qaeda within the meaning of 18 U.S.C. Section 2339A(b)1."  Ex. 8, Clawson Affid. ¶56 (*emphasis omitted*).

       3.     THE FACT WITNESSES

The *Havlish* Plaintiffs also submit, under seal at present, approximately twenty-eight (28) hours of sworn fact witness testimony, via videotaped depositions of four Iranian witnesses.  Three of these witnesses are defectors from the Iranian government who testify to their knowledge of Iranian government complicity in the 9/11 attacks – before, contemporaneously with, and after, the attacks, supported by government letters and memoranda, photographs, and organizational charts.  The factual evidence also includes a sealed affidavit of an American investigative journalist who corroborates certain aspects of the sealed testimony, provides details concerning the *Havlish* field investigation which produced the factual testimony of the four Iranian witnesses, and discloses additional supporting facts and sources.

       a.     <u>Witnesses X, Y, and Z.</u>  Three of the *Havlish* fact witnesses are defectors Iran's secretive Ministry of Information and Security ("MOIS"), roughly the equivalent of the U.S. Central Intelligence Agency, who worked in positions that gave them access to sensitive information regarding Iran's state sponsorship of terrorism.  Very little of the evidence contained in the sealed testimony of Witnesses X, Y, and Z (Ex. S-1, S-2, S-3, S-4, S-5, S-6, and S-7), discussed in Plaintiffs' Second (Sealed) Memorandum, has been brought to light in any public forum, although some of it is apparently known to the U.S.

government and/or some Western intelligence services.  These witnesses also confirm and expand upon the body of knowledge regarding the Iranian regime's pervasive use of terrorism as an instrument of foreign and domestic policy, and provide details of their lives and careers, as well as the reasons for their separate defections from Iran.  All three also state their reasons for coming forward with their "insider" information.

Witness X testifies to his knowledge of, *inter alia*, the following:

- Iran's involvement in the design of the 9/11 attacks and other terrorist operations;

- Iran's foreknowledge of the 9/11 attacks;

- The existence of terrorist training camps and facilities inside Iran, including camps for foreign Sunni terrorist operatives; and

- Iran's use of the entire apparatus of its government, as well as private interests, in the service of terrorist operations.

Witness Y testifies to his knowledge of, *inter alia*, the following:

- Iran's terrorist training camps inside Iran and in Lebanon;

- Imad Mughniyah's involvement in the recruitment and training of the 9/11 hijackers;

- Iran's material support for hundreds of al Qaeda fighters inside Iran after 9/11; and

- Iran's safe harboring of Imad Mughniyah, and key al Qaeda operatives, including Saad bin Laden and Abu Musab Zarqawi, after 9/11.

Witness Z testifies to his knowledge of, *inter alia*, the following:

- Imad Mughniyah's involvement in the design of the 9/11 attacks and other terrorist operations, and his relationship with al Qaeda's number two leader, Ayman al Zawahiri;

- Iran's foreknowledge of the 9/11 attacks, including meetings inside Iran during the months before 9/11, attended by top leaders of al Qaeda, Hizballah, and Iran;

- Iran's anticipation of a retaliatory strike in the event its role in 9/11 were discovered;

- Iran's provision of terrorist training, including airliner hijacking, to foreign Sunni Arab "hardliners" – al Qaeda – inside Iran; and

- The existence nature, and organization of a separate intelligence apparatus in the office of Iran's Supreme Leader.

b.      <u>Abolhassan Banisadr.</u>  A fourth fact witness is the first president of the Islamic Republic of Iran, Abolhassan Banisadr.  A key figure in the Islamic Revolution that brought Ayatollah Ruhollah Khomeini to power, Banisadr became a familiar face to the American public during the 444-day hostage crisis of 1979-1981.  He was ousted by Khomeini during his term as president and has since lived in exile in France.  Banisadr's sworn videotaped testimony in this case, Ex. 11, addresses the nature and motivations of the Iranian government and state, the role of Iran's Supreme Leader, Iran's usage of terrorism as a tool of domestic and foreign policy, and the availability of the entire apparatus of the government, state, and private individuals and entities in the service of Iran's state sponsorship of terror.

c.      <u>Kenneth R. Timmerman.</u>  Additional factual evidence in the form of a sealed affidavit comes from investigative journalist Kenneth R. Timmerman.  Ex. S-10, Timmerman 2nd Affidavit.  Timmerman participated in the *Havlish* investigation, finding and making contact with, and, along with Timothy B. Fleming, a *Havlish* attorney, debriefing the three defectors, Witnesses X, Y, and Z, as well as Mr. Banisadr.  Timmerman's first affidavit addresses his role in the investigation and provides facts corroborating certain aspects of the testimony of the MOIS defector witnesses, including Timmerman's own communications with one of them in the days after September 11, 2001.  Timmerman also discusses key documents discovered during the *Havlish*

36

investigation.

## V.   IRAN IS THE WORLD'S PREEMINENT STATE SPONSOR OF TERRORISM

The Islamic Republic of Iran "stands at the center of the rise of modern terrorism"
as the world's preeminent state sponsor of terrorism.  Ex. 7, Bergman Affid. ¶16; *see also*
Ex. 6, Lopez-Tefft Affid. ¶22; Ex. 3, Byman Affid. ¶15.  Iran's thirty-year record of
engaging in and supporting terrorism began immediately after the Islamic Revolution
brought Ayatollah Khomeini to power in 1979.  *See* Ex. 6, Lopez-Tefft Affid. ¶¶60-61.
Indeed, from its inception, the Islamic Republic of Iran has always considered terrorism a
legitimate tool of foreign policy.  Ex. 3, Byman Affid. ¶¶19-22, 25; Ex. 8, Clawson Affid.
Conclusion, p. 35; Ex. 6, Lopez-Tefft Affid. ¶¶62-63, 67-95; Ex. 13, State Department
*Country Reports on Terrorism*, *Patterns of Global Terrorism* [excerpts regarding Iran];
Ex. 2, Timmerman 2nd Affid. ¶2; *see also* Ex. 11, Banisadr testimony, p. 16.  (*See*
Appendix E regarding Iran's early terrorist connections.)

In a very real sense, Iran has waged an undeclared war against both the United
States and Israel for thirty years.  Baer, The Devil We Know, pp. 1-2, 56, 249, and See
No Evil, p. 264; Ex. 7, Bergman Affid. ¶24; Ex. 6, Lopez-Tefft Affid. ¶60.  Iran wages
this undeclared war through asymmetrical strategies and terrorism, often through proxies
such as Hizballah, HAMAS, al Qaeda, and others.  Baer, The Devil We Know, pp. 1-5, 19,
21-22, 63, 78, 91, 96-111, and See No Evil, p. 264; Ex. 7, Bergman Affid. ¶¶19-21.[21]

The U.S. State Department has designated Iran as a foreign state sponsor of terror

---

[21] The U.S. federal courts "have chronicled the senseless violence and carnage that have dotted the last
three decades of hostile relations between the Islamic Republic of Iran and the United States.  These
terrorism cases are the tragic stories of the many victims – like the more than one thousand victims
represented here today – who have suffered dearly as a result of a campaign of terror that has included
hostage takings, torture, suicide bombings, and assassinations."  *In Re: Islamic Republic of Iran
Terrorism Litigation*, 659 F.Supp.2d at 188 (Lamberth, Ch.J.).

every year since 1984.  Ex. 3, Byman Affid. ¶15; Ex. 8, Clawson Affid. ¶40; *see Estate of Heiser v. Islamic Republic of Iran*, 466 F.Supp.2d 229 (D.D.C. 2006).  Since 1980, each of the State Department's annual reports on terrorism[22] describes the Iranian state's consistent involvement in acts of terror.  Ex. 13, State Department *Country Reports on Terrorism*, *Patterns of Global Terrorism* [excerpts regarding Iran] 1980-2009; Appendix F [selected excerpts]; Ex. 6, Lopez-Tefft Affid. ¶¶66-95.  The State Department's 1992 report puts the overall conclusion most plainly:

> The Iranian regime has practiced state terrorism since it took power in 1979; it is currently the deadliest state sponsor and has achieved a worldwide reach. . . .  Tehran's leaders view terrorism as a valid tool to accomplish the regime's political objectives, and acts of terrorism are approved at the highest level of government in Iran. . . .  Iran is also the world's principal sponsor of extremist Islamic and Palestinian groups, providing them with funds, weapons, and training. . . .  Khartoum [Sudan] has become a key venue for Iranian contact with Palestinian and North African extremists of the Sunni branch of Islam.

*See* Ex. 13; Ex. 6, Lopez-Tefft Affid. ¶79.

In its 1987 report, the U.S. State Department observed that a frequent proxy for implementing Iran's terrorist policy option is Iran's creation, Hizballah (*see also* Appendix G):

> [Hizballah is] known or suspected to have been involved in numerous anti-US terrorist attacks, including the suicidal car bombing in Beirut in October 1983 and the US Embassy annex in September 1984. The group is responsible for the kidnapping and continuing detention of most, if not

---

[22] These State Department reports, thoroughly prepared and with each word being carefully weighed, are highly respected by researchers on terrorism. Ex. 8, Clawson Affid. ¶40.  It is well-settled that the State Department's Country Reports constitute admissible evidence under Rule 803(8)(c) of the Federal Rules of Evidence, and may be relied on "not merely . . . [for] factual determinations in the narrow sense, but also . . . conclusions and opinions that are based upon a factual investigation." *Bridgeway Corp. v. Citibank*, 201 F.3d 134, 143-144 (2nd Cir. 2000)(upholding district court's heavy reliance on State Department country report on Liberia for "facts concerning Liberia's civil war" and "its effect on the judicial system there."); *Flatow v. Iran*, 999 F.Supp. 1, 8-10, 14, 17 (D.D.C. 1998)(relying in part on State Department report concluding that Iran generally provided material support to Islamic Jihad to hold Iran liable for the death of an American citizen killed by members of Islamic Jihad).

all, of the United States and other Western hostages in Lebanon . . . .

Ex. 13, *Patterns of Global Terrorism*, p. 44 (1987).

Former Iranian president Abolhassan Banisadr summed up these observations by simple citation to the Supreme Leader Ayatollah Khamenei's phrase: "Victory by Terror." Ex. 11, Banisadr testimony, p. 22.

**A. The Motives, Strategy, and Tactics Behind Iran's Terrorist Policy**

As the only country in the Middle East that has existed as a state within stable borders for thousands of years, Iran's worldview blends Shiite Islamic ideology and pragmatic nationalism. Baer, The Devil We Know, p. 246. Iranian Shi'a Islam is steeped in the ancient religion of Persia – Zoroastrianism – which centers on a precept of the duality of good and evil. Thus, Iran calls the United States and Israel, which it considers colonial or occupying powers and therefore evil, the "Great Satan"[23] and the "Lesser Satan," while Shi'a Islam is good and must oppose the evil powers. Baer, The Devil We Know, pp. 148, 234-38; Ex. 7, Bergman Affid. ¶24.

Iran today considers itself a global power. Its geopolitical goals include Iranian hegemony over the Middle East and its oil. Central to this quest is a near-term objective of driving out of the region all colonialist and occupying powers, leaving Iran in a position to defeat what it has viewed as the corrupt governments of Sunni states, such as Saudi Arabia, and to establish itself as the leader and protector of all Islam. Baer, The Devil We Know, pp. 198, 238, 242-43, 245. Iran considers itself to be the "*Ommol-ghora*"— "the heart of the Islamic world" and the homeland of Islam. Ex. S-2,

---

[23] On November 5, 1979, the Ayatollah Khomeini first declared the United States to be "the Great Satan." On January 14, 1980, he told visiting Pakistani army officers, "We are at war against the infidels. Take this message with you. I ask all Islamic nation, all Muslims, all Islamic armies and heads of Islamic states to join the Holy War. There are many enemies to be killed or destroyed. Jihad must triumph." Ex. 6, Lopez-Tefft Affid. ¶60.

Testimony of Witness X, February 23, 2008, pp. 20-22.

Furthermore, the "primary mission" of the Islamic Republic of Iran, "enshrined in Iran's Constitution and the works of the Ayatollah Khomeini, is the establishment of an Islamic state worldwide and the conversion of all peoples to its Islamic ideology." *Id.* ¶18.[24]  "In the ideal world as envisioned by the leadership of Iran and al Qaeda, the United States is no longer the powerful leader of the free world." *Id.*, ¶56; *see* ¶¶54-55.

However, understanding it could not defeat its two most reviled – and militarily potent – enemies, the United States and Israel, in a conventional war, Iran does not seek face-to-face confrontation.  Instead, Iran has spent the past three decades modernizing guerilla tactics needed to wage what is sometimes referred to as "asymmetrical" (unconventional) warfare in order to thwart American and Israeli military power in the Persian Gulf.  Further, Iran prefers creating, developing, training, and funding proxy organizations that use such unconventional weapons and tactics, such as suicide bombings, car and truck bombs, shaped charges, and swarming attacks, to battle superior military forces.  Baer, The Devil We Know, pp. 56, 67-69, 96-111.  Thus, Iran uses proxies for bold and risky initiatives, preserving some measure of deniability and avoiding direct confrontations with superior military powers.  Ex. 3, Byman Affid. ¶¶19-22, 44, 67; Ex. 7, Bergman Affid. ¶¶19-21, 33-36, 40-45; Ex. 6, Lopez-Tefft Affid. ¶¶31, 39, 42, 58, 352; Ex. 2, Timmerman 2nd Affid. ¶¶23, 29-46, 84-90; Baer, The Devil We Know, pp. 2, 4, 19, 21-22, 30, 48-50, 54-55, 64, 67, 75, 125, 128, 195, 205, 212-13; *see*

---

[24]  The *Preamble to the Constitution of the Islamic Republic of Iran* instructs that the IRGC has a "responsibility not only for the safeguarding of the frontiers, but also for a religious mission, which is Holy War (JIHAD) along the way of God, and the struggle to extend the supremacy of God's Law in the world," and it cites a passage of the Koran that directs: "Against them make ready your strength to the utmost of your power, including steeds of war, to strike terror into the hearts of the enemies of God and your enemies, and others besides . . . ." Ex. 6, Lopez-Tefft Affid. ¶54.

*also* Appendix G.  The leaders of Hizballah, a creature of Iran, make certain that their cadres lie, cover up, obfuscate – whatever is necessary – to keep Iran's involvement secret.  Baer, <u>The Devil We Know</u>, p. 75.[25]

The development of the cult of the suicide bomber as a religious rite of passage has enabled Iran and its proxies to strike devastating and precise military blows against powerful enemies without great risk or expense to themselves.  Martyrdom was a pillar of the Khomeini's Islamic revolution, but the unconventional tactic of the suicide bomber – the ultimate smart bomb – as perfected by Imad Mughniyah and Hizballah, has turned martyrdom into a virtual state religion and a nationalistic sacrifice for Iran itself.  Baer, <u>The Devil We Know</u>, pp. 2, 13, 38, 72, 212-13, 218-26.

Importantly, the common American conception of Iran as an irrational and dogmatic Islamo-fascist state, which Iran largely was in the 1980s, is no longer accurate.  *Id.*, pp. 71, 77, 197.  Rather, the leadership of Iran is coldly rational, calculating, pragmatic,[26] and strategic.  *Id.*, pp. 26, 125, 197, 249; Ex. 3, Byman Affid. ¶¶41-43.  Thus, Iran's "clerical regime . . . has shown a willingness to ally with groups it considers enemies for short-term advantage."  Ex. 3, Byman Affid. ¶42.  "Iran's leaders are quite capable of supporting a given group one day, then arming its opponents the next as Iran's tactical goals shift."  Ex. 2, Timmerman 2nd Affid. ¶4.  "[I]f there [is] one watermark

---

[25] Maintaining Iran's plausible deniability for the acts of its terrorist proxies is critical for Iran to avoid retaliation by more potent military powers, particularly the U.S. and Israel.  A conventional military conflict would likely be devastating to Iran.  Ex. 6, Lopez-Tefft Affid. ¶58; Ex. 3, Byman Affid. ¶¶40, 44; Ex. 7, Bergman Affid. ¶41; Baer, <u>The Devil We Know</u>, pp. 64-67.  This is important not only as a matter of self-preservation but also for a religious reason: as the "*Ommol-ghora*," meaning "the heart of the Islamic world," Iran is to be preserved at all costs.  Ex. S-2, Testimony of Witness X, February 23, 2008, pp. 20-22.

[26] Shi'a Islam maintains a unique aspect known as "*ijtihad*," or the exercise of independent judgment, which allows for non-literal interpretations of the Koran and has permitted Shi'a Islam to adapt to the 21st century.  *Id.*, p. 196.

41

running through the contemporary Middle East, it [is] political Islam, a current the Iranians long ago learned to turn to their benefit."  Baer, The Devil We Know, p. 22.

**B.     Iran's Political and Revolutionary Structure**

Iran is a police state, and its government one of the most secretive in the world. *Id.*, pp. 10, 16, 65.  Executive power in Iran is held not by the elected head of the government, Iran's president, but rather by the unelected Supreme Leader.  *Id.*, pp. 55, 66; 127; Ex. 6, Lopez-Tefft Affid. ¶19; Ex. 8, Clawson Affid. ¶18.  During his presidency from 1997 to 2005, Mohammad Khatami had little if any voice in Iran's national security decisions.  Baer, The Devil We Know, p. 66.

The Supreme Leader's authority emanates not only from the Iranian Constitution, but also from the Islamic Revolution itself.  Further, the Supreme Leader is the earthly representative of the legendary *twelfth imam*, the "hidden imam" who is believed to return at the end of days.  As such, the Supreme Leader has the authority to make any decision – religious or political.  Ex. 8, Clawson Affid. ¶¶19-20.  "[P]art cleric, part mediator, part dictator, part military commander, and part police chief," he "governs more like a pope than a president."  Baer, The Devil We Know, p. 127; *see also* Ex. 8, Clawson Affid. ¶24.

Importantly, Iran's leaders view the Islamic Republic as the "seed and vanguard of a revolutionary movement."  Ex. 6, Lopez-Tefft Affid. ¶22.  Accordingly, the political structure of Iran is divided conceptually: there is a formal governmental structure and a revolutionary structure.[27]  The Supreme Leader oversees both.  Ex. 8, Clawson Affid. ¶25.  He holds power to dismiss the president, overrule the parliament and the courts, and

---

[27]  Just after the 1979 revolution, a "Revolutionary Council" ran the country; first president Abolhassan Banisadr was a member of the Revolutionary Council.  Ex. 11, Banisadr testimony, p. 8.

42

overturn any secular law.  *Id.*, ¶21.  He "wields sole authority to command, appoint, and dismiss every major leadership figure of any importance in the Iranian government system," all military commanders, the chief of the judicial system, all heads of important foundations, directors of national television and radio, "and even the Friday prayer leaders in major mosques."  Ex. 6, Lopez-Tefft Affid. ¶20.

There have been only two Supreme Leaders during the entirety of the Islamic Republic of Iran: the leader of the Islamic Revolution, Ayatollah Ruhollah Khomeini, and, after his death in 1989, the current Supreme Leader, Ayatollah Ali Khamenei.  *Id.*, ¶19; Ex. 8, Clawson Affid. ¶¶22-23; Baer, <u>The Devil We Know</u>, p. 55.  The Supreme Leader is assisted by an informal politburo, which has no name and no public accountability; indeed, its membership shifts with the secret currents of regime politics. Ex. 11, Banisadr testimony, pp. 13-14; 22; Baer, <u>The Devil We Know</u>, p. 66; *see also* Ex. 6, Lopez-Tefft Affid. ¶21.

Other than the Supreme Leader and a few influential ayatollahs, the most powerful entities in Iran are the elite Iranian Revolutionary Guards ("IRGC"), also known as the *Sepah Pasdaran*, and the Ministry of Intelligence and Security ("MOIS" or "VEVAK" or sometimes "VAJA").  Baer, <u>The Devil We Know</u>, pp. 34-36, 127; Ex. 8, Clawson Affid. ¶¶29-39.

Established in the wake of the 1979 revolution, the IRGC is the key component of the revolutionary political structure of Iran.  As both the guardian and the "striking arm" of the Islamic Revolution, the IRGC is answerable only to the Supreme Leader, not to the president.  Ex. 8, Clawson Affid. ¶¶29-35.  The IRGC is a special entity unto itself, part military force, part paramilitary force, and part business conglomerate.  Baer, <u>The Devil</u>

We Know, p. 127; Ex. 6, Lopez-Tefft Affid. ¶23.  It has its own arms procurement network and its own prisons.  IRGC officers have powers of arrest, and they hold a plurality of seats in the parliament.  It owns and controls Imam Khomeini International Airport in Tehran.[28]  Indeed, the IRGC is a major factor in the Iranian economy: it owns hundreds of companies and commercial interests, particularly in the oil and gas sector, telecommunications and infrastructure, and it holds billions of dollars in assets and government contracts.  For example, one IRGC company has been awarded contracts worth billions of dollars by government agencies and the National Iranian Oil Company.  Baer, The Devil We Know, pp. 34-35; Ex. 8, Clawson Affid. ¶37; Ex. 2, Timmerman 2nd Affid. ¶202; see also Ex. 11, Banisadr testimony, pp. 19-20.

The IRGC also has a special foreign division, known as the Qods (or Quds, meaning "Jerusalem") Force, which "is the arm of the IRGC that works with militant organizations abroad and promotes terrorism overseas . . . ."  Ex. 3, Byman Affid. ¶62; see also Ex. 6, Lopez-Tefft ¶25; Ex. 11, Banisadr testimony, p. 19.  (The sealed testimony of Witnesses X, Y, and Z provide additional information about the activities of the Qods Force in international terrorism.)  The Qods Force has a long history of engaging in coups, insurgencies, assassinations, kidnappings, bombings, and arms dealing.  It has a well-deserved reputation for being the most organized, disciplined, and violent terrorist organization in the world.  Baer, The Devil We Know, pp. 35-36.  The IRGC and its Qods Force are "deeply integrated into the regime's leadership," "[t]he IRGC commander reports directly to Iran's Supreme Leader," and "in some instances the IRGC is the most important voice in determining Iran's foreign policy."  Ex. 3, Byman

---

[28]  The IRGC's nearly arbitrary power was evident by the manner in which it simply seized the new Imam Khomeini International Airport just before its opening and dedication in May 2004.  The IRGC now owns and controls everything there.  Baer, The Devil We Know, p. 72.

Affid. ¶63; *see also* Ex. 8, Clawson Affid. ¶35; Ex. 6, Lopez-Tefft Affid. ¶¶24-25.

The fact that the IRGC has provided funding and training for Hizballah, HAMAS, and al Qaeda terrorist operations targeting American and Israeli citizens has been well documented for more than two decades.  Ex. 8, Clawson Affid. ¶36.  For more than a quarter century since its creation, Iran has provided Hizballah with $100 million to $300 million in direct financial support annually.  Ex. 8, Clawson Affid. ¶66; Ex. 6, Lopez-Tefft Affid. ¶31; Ex. 7, Bergman Affid. ¶26.

> In providing support to these three organizations, the IRGC is acting as an official agency whose activities are tightly and carefully controlled by the Iranian government through the Supreme Leader and his representatives.  The terrorism training provided to Hizbollah, HAMAS, and al Qaeda by the IRGC is part of an official policy of the Iranian government.

*Id. (emphasis omitted).*  Less than two weeks after 9/11, on September 23, 2001, the U.S. Treasury Department designated the IRGC-*Qods* Force as a terrorist organization for "providing material support to the Taliban and other terrorist organizations," and, on June 28, 2005, the U.S. State Department designated the IRGC as a "foreign terrorist organization."  Ex. 6, Lopez-Tefft Affid. ¶65 (*emphasis omitted*).

The MOIS (in Farsi, VEVAK) is Iran's world-class intelligence agency.  With 30,000 employees, it is the largest intelligence agency in the Middle East.  Its annual budget is somewhere between $100 million and $400 million.  Ex. 8, Clawson Affid. ¶38; Ex. 11, Banisadr testimony, p. 12.  Created in 1985 after the ouster of president Abolhassan Banisadr, its predecessor was not the Shah's intelligence agency, SAVAK, which had been dissolved, but rather Supreme Leader Ayatollah Khomeini's own intelligence service, which had no name and was engaged in the business of assassinations.  Ex. 11, Banisadr testimony, pp. 11-12.  Many of the U.S. State

Department reports on global terrorism refer to MOIS as Iran's key facilitator and director of terrorist attacks.  *See* Ex. 8, Clawson Affid. ¶39; Ex. 13.  After the discovery of MOIS' role in a series of assassinations of intellectuals, writers, and dissidents in the late 1990s, known in Iran as the "Chain Murders," *see* Banisadr testimony at 15-16 and *infra* at p. 50, led to so-called "reformists" gaining influence within MOIS, the Supreme Leader, Ayatollah Khamenei, would again form a special, unnamed intelligence service that operated directly under his control.[29]

Further, the entire apparatus of the Iranian state and government, and many parts of the private sector, including corporations (*e.g.*, National Iranian Oil Company, Iran Air, Iran Shipping Lines), banks (*e.g.*, Central Bank, Bank *Sepah*), state-run media (*e.g.*, IRIB television, the Islamic Revolution News Agency ("IRNA"), KAYHAN and other daily newspapers), private individuals, and even charities are at the service of the Supreme Leader, the IRGC, and the MOIS when it comes to support of terrorism.  Ex. 11, Banisadr testimony, pp. 19-20; Ex. 2, Timmerman 2nd Affid. ¶¶91-96, 190-212. (Witness X provides additional evidence concerning the usage of the entire apparatus of the Iranian government in the service of terrorism, as well as the use of private entities as front companies, and the co-opting of other types of private entities and individuals for service in Iran's network of terror.)  And Iran's extended apparatus of terrorism is very well funded:

> You won't find in the budget . . . a line item for that type of activity [terrorism].  It began under Mr. Rafsanjani, where every one of these organs involved in overseas terrorist activities would have its own financial setup to finance its operations.  For instance Vevak, or MOIS, had many companies that supported its operations, and especially the

---

[29]  Witnesses X, Y, and Z all provide significant additional evidence about the roles of MOIS, the president, and the Supreme Leader in the "Chain Murders," and about the existence, organization, and functioning of the intelligence apparatus of the Supreme Leader.

Revolutionary Guards.  First of all, they controlled virtually all the airports, so they had a hand on import and export, and the free ports.  And there are even Customs officers that the official Customs Agency doesn't control. . . .  [T]hey have all the money they need to finance this type of [terrorist] activity. . . .  [F]ront companies had played a very important role in terrorist activities.  So to finance the comings and goings of people, they would use these front companies.

Ex. 11, Banisadr testimony, pp. 19-20.

### C.    Iran's Terrorist Proxy War on the United States

As discussed above at pp. 36-39, Iran has used terrorist proxies to wage asymmetrical warfare against the U.S. and Israel while maintaining plausible deniability. Indeed, Iran has worked with a veritable *Who's Who* of Middle East terrorist organizations over the first three decades of its existence.[30]  While some of Iran's terrorist associates are Shi'a, and others are secular, many of them are Sunni.  Iran's pragmatic leadership is largely indifferent about the religious beliefs of these groups; it is these groups' memberships – the alienated young men ready to fight – that Iran really seeks to influence and control.  Baer, The Devil We Know, pp. 68-71; 170-76; *see also* Ex. 11, Banisadr testimony, p. 23.  Iran's MOIS and IRGC, as well as Hizballah, were instrumental in obtaining relationships with, recruiting, vetting, training, funding, and supporting the Sunni terrorist proxies.[31]  (Witness Y's sealed testimony provides a description of the role of the IRGC and its *Qods* Force in recruiting and investigating

---

[30]  The list of Iran's terrorist partners includes some it created, like Hizballah and the Islamic Jihad Organization (IJO), and others that already existed: Palestinian Islamic Jihad (Islamic wing of the PLO), *al Jamaa al Islamiyya*, the *Abu Nidal* Organization, HAMAS, the Iraqi *Da'wa* Party, the Kurdish Workers' Party (PKK), Islamic *Amal*, the Popular Front for the Liberation of Palestine – the General Command, the *al Aqsa* Martyrs Brigades, the Muslim Brotherhood (progenitor of al Qaeda), and al Qaeda itself. Baer, The Devil We Know, pp. 170-78, 211, and See No Evil, pp. 263-65; Ex. 7, Bergman Affid. ¶21; Ex. 6, Lopez-Tefft Affid. ¶¶32, 69-95.

[31]  Hizballah is particularly useful for connecting to Sunni Arab terrorist groups because, "although Hizballah is a Shi'a organization, it is an Arab group, while Iran is a Persian state.  As such, Hizballah has stature in the Arab nationalist community and can better bridge the Shi'a-Sunni divide because it is not also suspect due to a difference in ethnicity." Ex. 3, Byman Affid.  ¶44.

47

terrorist recruits from a variety of countries, including Saudi Arabia, Lebanon, Syria, Bahrain, Bosnia, and Afghanistan, among others.)

Iran's terrorist agenda, rooted in power politics, led it to use proxies for a long list of terrorist operations against the U.S. and its allies during the 1980s, including bombings, kidnappings and murders, hijackings, and assassinations:

1.    **Bombings.**  The suicide-bombing of the U.S. Embassy in Beirut, Lebanon, on April 18, 1983, killing sixty-three (63) people, including seventeen (17) Americans, was carried out by Iran's proxies.[32]  Imad Mughniyah was personally involved in the planning and the operation, which he carried out on direct orders from Iran.[33]  (*See* Appendix H for information on the terrorist origins and demise of Imad Mughniyah.)

On October 23, 1983, Iran's proxies carried out the simultaneous truck-bombings of the U.S. Marines barracks at the Beirut Airport and, three miles away, an outpost of French parachutists taking part in the Multi-National Force, killing two hundred forty-one (241) American servicemen and fifty-eight (58) French soldiers.[34]  It was the worst

---

[32]  Among the dead was Robert Ames, CIA's National Intelligence Officer for the Near East and South Asia and several other officers.  Ex. 7, Bergman Affid. ¶35; Ex. 6, Lopez-Tefft Affid. ¶70; Ex. 2, Timmerman 2nd Affid. ¶¶15-16, 26; Baer, The Devil We Know, pp. 17, 54, 77-78; Baer, See No Evil, p. 267; Baer, Sleeping With The Devil, p. 117; *see also* Ex. 24, CIA Press Release *re*: Robert C. Ames, https://www.cia.gov/news-information/press-releases-statements/press-release-archive-1997-1/trailblazers.html.

[33]  Baer, See No Evil, p. 269; Baer, Sleeping With The Devil, p. 117; Ex. 7, Bergman Affid. ¶35; Ex. 2, Timmerman 2nd Affid. ¶¶15, 26; *see* Ex. 6, Lopez-Tefft Affid. ¶70, citing *1983 Patterns of International Terrorism*, U.S. State Department; *see* Ex. 13.

[34]  Baer, The Devil We Know, p. 54; Baer, See No Evil, p. 269; Ex. 7, Bergman Affid. ¶¶36-37; Ex. 2, Timmerman 2nd Affid. ¶¶16-26.  Less than a month before, NSA intercepted a message to Hojjat-ol eslam Ali Akbar Mohtashemi, the Iranian ambassador to Syria who coordinated Hizballah operations and finances for Iran, proving that Mohtashemi had been instructed by Tehran to activate the Hizballah network for "a spectacular action against the United States Marines."  Ex. 2, Timmerman 2nd Affid. ¶16; *see also* Ex. 7, Bergman Affid. ¶37.  The NSA also intercepted telephone calls from the IRGC in Baalbek, Lebanon, to the Iranian embassy in Damascus, Syria, requesting a green light for the attacks. Ex. 7, Bergman Affid. ¶37.

terrorist attack against America in history up to that time.  Imad Mughniyah was responsible for the bombings, again acting on direct orders from the Iranian government.[35]  The U.S. District Court for the District of Columbia would later determine that the Marines barracks bombing was carried out by Hizballah operatives acting on the directives of, and with financing by, senior members of the Iranian government.  *See Peterson, et al. v. Islamic Republic of Iran*, 246 F.Supp. 2d 46 (D.D.C. 2003).[36]  From a nearby rooftop, Mughniyah himself videotaped the suicide truck being driven into the Marines barracks.  (Witness X provides additional evidence about Mughniyah's involvement in the 1983 bombings of the U.S. Embassy and the Marines barracks.)

The Marines barracks truck-bombing led to the withdrawal of the American-led Multi-National Force from Lebanon, enabling Hizballah to become the dominant military and political force in Lebanon, which it remains today.  Ex. 7, Bergman Affid. ¶38; Ex. 2, Timmerman 2nd Affid. ¶¶23-25; Baer, Sleeping With The Devil, p. 117.  Even more importantly, the success of the simultaneous suicide bombings validated Iran's belief in the use of terror as a tool of foreign policy, Baer, The Devil We Know, pp. 226-28; Ex. 2, Timmerman 2nd Affid. ¶2, Ex. 13, pp. 55-56 (*Patterns of Global Terrorism, 1987*), because it clearly demonstrated that U.S. foreign policy in the Middle East could be affected – favorably in Tehran's eyes – by terrorist operations.

Many other bombings against the United States and its allies, and many other coordinated acts of terror, would follow in the years after the creation, by Iran, Hizballah,

---

[35]  Baer, The Devil We Know, pp. 17, 77; Baer, Sleeping With The Devil, p. 117; Ex. 2, Timmerman 2nd Affid. ¶¶16-17, 22-23, 25-26; Ex. 7, Bergman Affid. ¶¶33-38.

[36]  Mughniyah set up a secret group within Hizballah, the "Special Research Apparatus," of 200-400 crack special forces, all trained in Iran, for use in many of Hizballah's terrorist and military operations in the 1990s.  Ex. 7, Bergman Affid. ¶39.

and al Qaeda, of the "most formidable terrorist coalition in history." Baer, See No Evil, p. 269. *See infra*.

2.    **Kidnappings and Murders.**  The terrorist strikes of the 1980s were interlaced with a wave of kidnappings of dozens of Americans and Europeans in Lebanon, starting with the kidnapping of American University of Beirut president David Dodge on July 19, 1982. "The Iranian Pasdaran ran the whole operation out of Balabakk." Baer, See No Evil, pp. 74, 100. After the Dodge kidnapping was clearly attributed to it, Iran changed its tactics, employing proxies to kidnap more Americans, in order to give Iran "plausible denial." *Id.*; Baer, The Devil We Know, p. 63. Thereafter, Imad Mughniyah, Hizballah, and the IJO, acting as proxies for Iran and supervised by the IRGC and MOIS, kidnapped dozens more, including the kidnapping, torture and murder of the CIA's station chief in Beirut, William Buckley (kidnapped 1984, died 1985), and U.S. Marines Lt. Col. William Higgins (kidnapped 1988, died 1990).[37] Like the 1983 Marine barracks bombing, the kidnappings played an enormous role in U.S. foreign policy as a key component of the *Iran-Contra* arms-for-hostages scandal. Baer, See No Evil, pp. 72, 96-97. In 1991, two senior IRGC officers, Feridoun Mehdi-Nezhad and Hossein Mosleh (who had recruited Mughniyah), supervised – on direct orders from Iran's Supreme Leader, Ayatollah Khamenei – the release of the last of the American hostages kidnapped in Lebanon during the 1980s. Baer, See No Evil, p. 262; *see also* Baer, The Devil We Know, p. 192 (Iran ordered Hizballah leader Hassan Nasrallah to

---

[37]    Baer, See No Evil, pp. 79-81, 92, 96, 262-63; Baer, The Devil We Know, pp. 54, 63, 127; Baer, Sleeping With The Devil, p. 117; Ex. 2, Timmerman 2nd Affid. ¶¶32-33; *see also* Ex. 11, Banisadr testimony, p. 26; *Surette v. Islamic Republic of Iran*, 231 F. Supp. 2d 260 (D.D.C. 2002); *Jenco v. Islamic Republic of Iran*, 154 F.Supp.2d 27 (D.D.C. 2001); *Higgins v. Islamic Republic of Iran*, No. 1:99CV00377 (D.D.C. 2000)(attached as Ex. 28). Hostage David Jacobsen, who was held in a room with Buckley at the Camp Imam Ali in Lebanon, later testified that Mughniyah was the boss of the hostage operations. Ex. 2, Timmerman 2nd Affid. ¶33.

release the last hostages).

     **3.**      **Hijackings.** During the same time period, Iran's proxies carried out a wave of civilian aircraft hijackings, including the 1984 hijacking of Kuwait Airlines flight 221, during which two USAID officials were murdered and their bodies dumped on an airport tarmac, Ex. 2, Timmerman 2nd Affid. ¶¶29-31, and the 1985 hijacking of TWA Flight 847, during which a U.S. Navy diver, Robert Stethem, was murdered in cold blood on an airport tarmac in full view of rolling television cameras. *Stethem v. Islamic Republic of Iran*, 201 F.Supp.2d 78 (D.D.C. 2002). Authorities later found Mughniyah's fingerprints in TWA 847's lavatory, which led to his indictment. Baer, <u>The Devil We Know</u>, pp. 79-80; Ex. 2, Timmerman 2nd Affid. ¶¶34-37.

     **4.**      **Assassinations.** During the 1980s and 90s, particularly following the end of the Iran-Iraq War, the Islamic regime assassinated scores of Iranian dissidents inside Iran and on foreign soil. *See, e.g.*, *Elahi v. Islamic Republic of Iran*, 124 F.Supp.2d 97 (D.D.C. 2000). The most notorious of these assassinations outside of Iran was the massacre of four Kurdish leaders in Berlin's *Mykonos* restaurant in September 1992, which led to a diplomatic crisis between the European Union countries and Iran. Domestically, the gruesome killings of Dariush Forouhar and his wife Parvaneh Eskandari revealed MOIS' role in the "Chain Murders" of scores of intellectuals and political dissidents inside Iran.[38] Significantly, during this era, "MOIS was granted an extraordinary degree of authority to assassinate, attack, kidnap, and kill Iranian dissidents and exiles but also . . . to forge alliances with like-minded Islamic *jihadist* entities . . . . These *jihadist* foreign policy objectives made Iran's consolidation of ties with al Qaeda a

---

[38] *See* Ex. 32, Timmerman, "Banisadr Fingers Top Leadership in Murders," The Iran Brief, Sept. 7, 1996; Safa Haeri, "Double-wiring of the Forouhar Residence Led to the Murderers," Iran Press Service, February 2, 1999.

predictable occurrence." Ex. 6, Lopez-Tefft Affid. ¶176 (*emphasis omitted*).  (Witnesses X, Y, and Z all provide additional information about the Iranian regime's use of assassination and murder, internationally and domestically, to further its policy goals.)

Importantly, *every attack, car-bombing, kidnapping, hijacking, and assassination carried out by Iran's proxies,* such as Hizballah, the IJO, and the PFLP-GC, *was approved by the IRGC and Iran's Supreme Leader,* Ayatollah Khomeini, or, after his death, his successor, Ayatollah Khamenei.  Baer, <u>The Devil We Know</u>, pp. 64-65, and <u>See No Evil</u>, p. 264; *see* Ex. 8, Clawson Affid. ¶¶36, 58; Ex. 6, Lopez-Tefft Affid. ¶30; Ex. 32.  (Witness X testifies regarding his personal knowledge of the Supreme Leader blessing the perpetrators of such crimes before they carried them out.)

### D.     Bridging the Sunni-Shi'a Divide: The Iran-Hizballah-al Qaeda Terrorist Alliance

Some Western analysts continue to believe in the now-outdated conventional wisdom that the centuries-old historical religious rift between Sunnis (such as al Qaeda) and Shi'a (such as Iran and Hizballah) somehow precludes their working together, even in areas of common interest.[39]  Although common Sunnis and Shi'a may hold such grudges based on religious differences,[40] the public myth that a historical religious-based enmity precludes all cooperation between Shi'a and Sunni terrorists is simply mistaken, an old school analysis that has not kept pace with current knowledge and realities.  Baer, <u>The Devil We Know</u>, pp. 68-71; Ex. 3, Byman Affid. ¶¶41-43; Ex. 6, Lopez-Tefft Affid.

---

[39]   Some members of the U.S. intelligence community are belatedly reassessing the conventional wisdom. As stated by former State Department Counterterrorism official Larry Johnson, "'when you see someone like Mughniyah meeting with bin Laden, and Mughniyah moves freely back and forth between the Bekaa Valley and Iran – and the Bekaa Valley is where the explosives come out . . . , all of a sudden, you need to step back and say, 'okay, maybe this is not quite as we pictured it.'" Ex. 6, Lopez-Tefft Affid. ¶186.

[40]   The existence of the historic rift may be one reason Iran kept its terrorist training camps segregated along sectarian, and even nationality, lines.  *See* Ex. 2, Timmerman 2nd Affid. ¶¶62-66, 112, and n. 37.

¶¶40, 55-60, 110-12, 132-39, 163, 174, 186, 310, 351, 352, 356; Ex. 2, Timmerman 2nd Affid. ¶¶112-13. Indeed, both Iran and al Qaeda "can be ruthlessly pragmatic, cutting deals with potential future adversaries[41] to advance their cause in the short-term." Ex. 3, Byman Affid. ¶¶41-42; *see also* Ex. 2, Timmerman 2nd Affid. ¶4.[42] "Because of this pragmatism, the Sunni-Shi'a split and the *jihadist* hostility toward Iran does not prevent tactical cooperation. . . . Iran has sought to rise above Sunni-Shi'a differences, and several Sunni leaders have also done so." Ex. 3, Byman Affid. ¶43.

Members of the Shiite and Sunni sects – particularly at the leadership level – often work together on terrorist operations. The religious differences, to the extent they retain any vitality at the leadership level,[43] are trumped by the leaders' desire to confront and oppose common enemies, particularly the U.S. and Israel. Ex. 7, Bergman Affid. ¶46;; Ex. 6, Lopez-Tefft Affid. ¶¶57, 186; Ex. 3, Byman Affid. ¶¶41-44; Ex. 2, Timmerman 2nd Affid. ¶¶112-13. Thus, Iran, though Shiite, is willing to use, co-opt, and support Sunnis as proxies to carry out acts of terrorism. Ex. 7, Bergman Affid. ¶46; Ex. 6, Lopez-Tefft Affid. ¶58; Ex. 3 Byman Affid. ¶¶41-44; Ex. 8, Clawson Affid. ¶¶36, 66; Ex. 2, Timmerman 2nd Affid. ¶¶112-13; Baer, <u>The Devil We Know</u>, pp. 168-73.

---

[41] For Osama bin Laden and Ayman al Zawahiri, "'the gravity of the situation requires al Qaeda to pursue its interests by any means available; conventional morality impinges on its political thought only with regard to its utility in manipulating others. . . . [E]ven Ayman al Zawahiri, who is considered more doctrinaire than bin Laden, wanted to delay the conflict with the Shi'a until the short-term goal of defeating the United States is met. For these leaders, the reasons to keep cooperation with Iran at a low profile are primarily driven by a fear of losing recruits, money, and prestige rather than a deep-seated antipathy toward working with a Shi'a power." Ex. 8, Clawson Affid. ¶41, quoting S. Bar and Y. Minzili, *see* n. 21.

[42] Indeed, Iran even worked with Israel and the United States to obtain weapons parts, which led to the Iran-Contra Affair during the 1980s. After the Iran-Iraq War, Iran worked with its nemesis Saddam Hussein to counter United Nations sanctions by helping Saddam smuggle Iraqi oil past UN monitors to world markets. More recently, Iran has provided "opportunistic support" to the Taliban even as it publicly worked with the pro-U.S. Karzai regime in Afghanistan. Ex. 3, Byman Affid. ¶42.

[43] As former Iranian president Banisadr explained, Iran's hard-line leaders "have no real tie to Islam, and they don't care about Islam, they only care about power. . . . [They only use Islam as a rationale] in order to appear more legitimate." Ex. 11, Banisadr testimony, p. 23.

The factual reality – as found by the 9/11 REPORT – is that "[t]he relationship between al Qaeda and Iran demonstrated that Sunni-Shia divisions did not necessarily pose an insurmountable barrier to cooperation in terrorist operations." 9/11 REPORT, p. 61. Indeed, Iran has "coalesced its sympathizers from rigid, exclusionary sectarian factions into a united Islamic front, unlike anything that has been achieved in Islam's history since the Crusades." Baer, The Devil We Know, p. 177. Understanding how such a united Islamic front came about requires some historical perspective.

1.      **1991-92: The Sudanese Connection.** After Osama bin Laden's ascent to prominence during the 1980s war against the Soviet Union in Afghanistan, he returned to Saudi Arabia. But in 1991, bin Laden fled Saudi Arabia,[44] accepting an offer by Sudan's religious and political leader, Hassan al Turabi, to move himself and several hundred of his *mujaheddin* fighters to Sudan. 9/11 REPORT, p. 57; Ex. 6, Lopez-Tefft Affid. ¶¶133-34.[45] Dr. Ayman al Zawahiri, along with many other Egyptian radical Sunni Islamic extremists, had also found refuge in Sudan during this time.[46]

At about the same time bin Laden arrived in Sudan, Hassan al Turabi was hosting the first Popular Arab and Islamic Congress, a conclave of international delegates – Islamists, mullahs, and terrorists – from forty-five (45) countries. Ex. 6, Lopez-Tefft Affid. ¶132. A Sunni Muslim, Turabi "sought to persuade Shiites and Sunnis to put aside

---

[44]   Bin Laden offered to reassemble a *mujaheddin* force to defend Kuwait from Saddam Hussein's invasion in 1990. The Saudi monarchy rebuffed bin Laden, electing instead to allow the U.S. military onto Saudi soil to fight the Iraqis. An incensed Osama bin Laden publicly denounced the arrangement, and the Saudis took away his passport.

[45]   Osama bin Laden subsequently took as his third wife a niece of Hassan al Turabi. Such marriages are significant because Muslim families, clans, and tribes have forged political alliances for centuries in this manner. Ex. 6, Lopez-Tefft Affid. ¶134.

[46]   Ayman al Zawahiri, later to become Osama bin Laden's deputy in al Qaeda, served prison time in Egypt for his part in the Muslim Brotherhood's assassination of Anwar Sadat. Ex. 7, Bergman Affid. ¶50. Iran had applauded Sadat's murder, naming a Tehran street after his assassin, Khalid Eslambouli, Ex. 2, Timmerman 2nd Affid. ¶53, and Iran sheltered Eslambouli's brother inside Iran under the protection of the IRGC for five years. Ex. 7, Bergman Affid. ¶74.

their divisions and join against the common enemy" – the West.  9/11 REPORT, p. 61; *see also* Ex. 6, Lopez-Tefft Affid. ¶¶57, 132.  Osama bin Laden, whose own "vision mirrored that of Sudan's Islamist leader, Turabi," "seemed willing to include in the confederation terrorists from almost every corner of the Muslim world."  9/11 REPORT, pp. 60-61.

Iran's thinking was in accord with al Turabi's as well.  "Iran has long tried to bridge the Shi'a-Sunni divide . . . for strategic reasons – . . . Iran seeks influence and stature with [Middle Eastern] peoples – and because Iran sees itself as the leader of the Muslim world and a revolutionary power that transcends sectarian differences."  Ex. 3, Byman Affid. ¶23; *see also* ¶¶18-22, 24-28.[47]

In October 1991, Iran invited al Turabi to speak at its international conference in support of Palestinians.  Ex. 7, Bergman Affid. ¶47.  In 1991-92, Iran founded a new organization, *al Majma' al Alami lil-Taqrib bayna al Madhahib al Islamiyyah* (International Institute for Rapprochement Among the Islamic Legal School) to promote publicly a reconciliation of the rival Sunni and Shiite sects.  Ex. 2, Timmerman 2nd Affid. ¶47.  Casting aside the historic bitterness between the Sunni and Shi'a sects of Islam, al Turabi and Iran's political leadership and intelligence agencies proceeded to establish close ties – the beginnings of a united Sunni-Shiite front against the United States and the West.  *Id.*, ¶48; Ex. 6, Lopez-Tefft Affid. ¶¶132-33.

Hassan al Turabi and Ayman al Zawahiri both became key links between the various radical Islamic terrorists assembled in Sudan and Iran.  Ex. 7, Bergman Affid. ¶54.  In 1991, al Zawahiri paid a clandestine visit to Iran to ask for help in his campaign to overthrow the government of Egypt.  There, and in subsequent visits to Iran, al

---

[47] For many years, a special department within the Supreme Leader's office known as "*Rahman al Rahim*" had been devoted to supporting both Shiite and Sunni *jihadi* organizations.  Ex. 2, Timmerman 2nd Affid. p. 14, n. 12.

Zawahiri met with Imad Mughniyah, who convinced him of the power of suicide

bombing, a significant event because suicide was prohibited by most Islamic clerics, both

Sunni and Shi'a.  Ex. 7, Bergman Affid. ¶51.

In December 1991, Iran's President Ali Akbar Hashemi Rafsanjani, Intelligence

Minister Ali Fallahian, IRGC Commander Mohsen Rezai, and Defense Minister Ali

Akbar Torkan paid an official visit to Sudan where, in meetings also attended by Imad

Mughniyah, they committed to send weapons shipments and as many as 2,000

Revolutionary Guards to Sudan.  Ex. 6, Lopez-Tefft Affid. ¶136.

"In late 1991 or 1992, discussions in Sudan between al Qaeda and Iranian

operatives led to an informal agreement to cooperate in providing support – even if only

training – for actions carried out primarily against Israel and the United States.  Not long

afterward, senior al Qaeda operatives and trainers traveled to Iran to receive training in

explosives."  9/11 REPORT, p. 61.  Ayman al Zawahiri made efforts to connect Osama bin

Laden with Iran, and bin Laden sent some of his senior aides to Iran for training with the

IRGC and to Lebanon for training with Hizballah.  Ex. 7, Bergman Affid. ¶58.

(Witnesses Y and Z provide evidence about this terrorist training.)  *See also* Baer, See No

Evil, p. 250 (regarding IRGC training of Saudi Hizballah terrorist cadres in Lebanon

during this time frame).

  **2.**  **The 1993 Meeting in Khartoum.**  In 1993, in a meeting in Khartoum,

Sudan, arranged by Ali Mohamed (a confessed al Qaeda terrorist and trainer, *see* Ex.

31[48]), Osama bin Laden and Ayman al Zawahiri met directly with Iran's master terrorist

---

[48] Ali Mohamed was convicted for his role in the 1998 bombings of the U.S. Embassies in Tanzania and
Kenya.  As part of his guilty plea, Ali Mohamed attested to his role in setting up the Khartoum
meeting:

Imad Mughniyah and Iranian officials, Ex. 7, Bergman Affid. ¶¶58-61; Ex. 6, Lopez-Tefft Affid. ¶¶137-38; Ex. 8, Clawson Affidavit ¶58, including IRGC Brigadier General Mohammad Baqr Zolqadr, "a multipurpose member of the Iranian terrorist structure." Ex. 11, Banisadr testimony, pp. 17-18, 31; Ex. 2, Timmerman 2nd Affid. ¶¶49-51.[49] These representatives of Iran, Hizballah, and al Qaeda worked out an alliance of joint cooperation and support on terrorism. Ex. 6, Lopez-Tefft Affid. ¶¶135, 137-39; Ex. 7, Bergman Affid. ¶58-61; Ex. 2, Timmerman 2nd Affid. ¶¶48-52. (Witness X testifies to his own discussions with an Iranian representative to this meeting and the creation of the terrorist alliance bridging the Sunni-Shi'a divide.)

As he had previously done with Ayman al Zawahiri, Mughniyah convinced Osama bin Laden of the effectiveness of suicide bombings in driving the U.S. out of Lebanon in the 1980s. Ex. 7, Bergman Affid. ¶58. From 1983 until his death in February 2008, Imad Mughniyah was a major connection point between Iran and al Qaeda. *Id.* ¶59. Indeed, Osama bin Laden had been a guerilla fighter in Afghanistan and it was Mughniyah who made bin Laden into an accomplished terrorist. Ex. 6, Lopez-Tefft Affid. ¶187. (Witness Z provides additional testimony about the Mughniyah-al Zawahiri relationship.)

---

I was aware of certain contacts between al Qaeda and al Jihad organization, on one side, and Iran and Hezbollah on the other side. I arranged security for a meeting in the Sudan between Mughniyah, Hezbollah's chief, and Bin Laden.
Hezbollah provided explosives training for al Qaeda and al Jihad. Iran supplied Egyptian Jihad with weapons. Iran also used Hezbollah to supply explosives that were disguised to look like rocks.

Ex. 31, Plea allocution, *USA v. Ali Mohamed*, S(7) 98 Cr. 1023 (LBS) (S.D.N.Y. Oct. 20, 2000), p. 28.

[49] General Zolqadr is a deputy commander of the IRGC and head of its "Shiraz" group; he works with the "hardliners of the regime." Ex. 11, Banisadr testimony, pp. 17-18. By 1996, General Zolqadr would direct the regime's "Special Operations Committee" that set policy and selected targets for Iranian-backed terror attacks. Ex. 2, Timmerman 2nd Affid. ¶¶49-50 and n. 13. That "committee . . . chose the targets to be assassinated," after which the Supreme Leader would approve the target and give the order to assassinate. Ex. 11, Banisadr testimony, pp. 17-18.

The historic 1993 meeting in Khartoum led to an ongoing series of communications, training arrangements, and operations among Iran and Hizballah and al Qaeda.  Osama bin Laden sent more terrorist operatives, including Saef al Adel (who would become number 3 in al Qaeda and its top "military" commander), to Hizballah training camps operated by Mughniyah and the IRGC in Lebanon and Iran.  Among other tactics, these operatives learned how to bomb large buildings.  Ex. 6, Lopez-Tefft Affid. ¶¶151-52; Ex. 2, Timmerman 2nd Affid. ¶¶56-59.  Another al Qaeda group traveled to the Bekaa Valley in Lebanon to receive training in explosives from Hizballah, as well as training in intelligence and security.  9/11 REPORT, p. 61; *see also* Ex. 6, Lopez-Tefft Affid. ¶151.  Iran's *Charge d'Affaires* in Khartoum, Sudan, Majid Kamal, an IRGC commander, coordinated the training expeditions; Kamal had performed the same function in Beirut, Lebanon, in the early 1980s during the formation of Hizballah.  Ex. 6, Lopez-Tefft Affid. ¶152.[50]  (Appendix I discusses evidence of financial connections between Osama bin Laden's *al Shamal* Bank and Iran during the mid-1990s.  Appendix J discusses evidence of the operation of terrorist training camps by Iran and Hizballah.  Witnesses X, Y, and Z all provide additional evidence regarding these terrorist training camps.)

The terrorist alliance[51] among Iran, Hizballah, and al Qaeda created in 1991-1996

---

[50]  At the same time, the Muslim cause in Kosovo and Bosnia in the 1990s gave Iran and al Qaeda an opportunity to work together in *jihad*.  *See* Ex. 6, Lopez-Tefft Affid. ¶¶153-57; Ex. 7, Bergman Affid. ¶65.  Osama bin Laden and Ayman al Zawahiri both visited the training camps in Albania and Bosnia between 1994 and 1996.  Ex. 6, Lopez-Tefft Affid. ¶156.  Money from al Qaeda arrived through Muslim charities, while the Iranians channeled money via their embassies in Sarajevo and Vienna; the Iranians sent arms shipments through an airfield at Visoko, northwest of Sarajevo.  Thousands of Hizballah and *mujahedin* fighters arrived to fight for the Bosnian Muslims; they were trained by the IRGC, and even today, many *mujahedin* connected to extremist Islamic organizations across the world, and to Iran, remain in Bosnia.  Ex. 7, Bergman Affid. ¶¶65-66; Ex. 6, Lopez-Tefft Affid. ¶¶155-57.

[51]  An "informal agreement to cooperate," *id.*, an "alliance of convenience," Ex. 7, Bergman Affid. ¶54; Ex. 3, Byman Affid. ¶¶39, 41-43; a "quiet cooperation," or a "tactical cooperation," Ex. 3, Byman

bridged the Sunni-Shi'a divide to produce, in Robert Baer's phrase, the "most formidable terrorist coalition in history."  Baer, <u>See No Evil</u>, p. 269.

> **E.**     **<u>A Coordinated Campaign by "History's Most Formidable Terrorist Coalition"</u>**

The creation of the Iran-Hizballah-al Qaeda terror alliance was followed, as detailed below, by a string of terrorist strikes directly against the U.S. and its allies. Meanwhile, Ayman al Zawahiri repeatedly visited Tehran and met with officers of MOIS, including chief Ali Fallahian, and *Qods* Force chief Ahmad Vahidi.  Ex. 7, Bergman Affid. ¶67; Ex. 6, Lopez-Tefft Affid. ¶¶170-71; Ex. 2, Timmerman 2nd Affid. ¶55.[52]  At the same time, the al Qaeda-Iran-Hizballah terrorist training arrangement continued throughout the 1990s and beyond.  Ex. 6, Lopez-Tefft Affid. ¶¶50, 58, 104, 108-11, 135, 138, 151-52, 169, 179, 182-83, 194, 293, 341-42; Ex. 7, Bergman Affid. ¶¶53, 61, 68; Ex. 2, Timmerman 2nd Affid. ¶¶60-67.  Imad Mughniyah himself coordinated the training activities, including the training of al Qaeda personnel, with Iranian government officials in Iran and with IRGC officers working undercover at the Iranian embassy in Beirut, Lebanon.  At all times, the Supreme Leader was aware that Hizballah was training foreign terrorists.  *See* Ex. 11, Banisadr testimony, pp. 32-33. (Witnesses X, Y, and Z all provide additional information about Mughniyah's role in the

---

Affid. ¶¶33-40, 43; a pact of "mutual cooperation," Ex. 8, Clawson Affid. ¶47; a "strategic plan" leading to "extensive cooperation," Ex. 2, Timmerman 2nd Affid. ¶¶48, 52; a "strategic relationship," Baer, <u>See No Evil</u>, p. 251; a "collaborative relationship" of "close coordination," Ex. 6, Lopez-Tefft Affid. ¶¶39, 42; an "alliance dedicated to a complete rearrangement of the world order." *Id.*, ¶56. However, the exact nature of the Iran-al Qaeda relationship "is not relevant to the issue of whether Iran provides material support to al-Qaeda within the meaning of 18 U.S.C. Section 2339A(b)1 before, during and after September 11, 2001."  Ex. 8, Clawson Affid. ¶57.

[52]  A few years later, shortly after September 11, 2001, when Ayman al Zawahiri was by mistake in Iran, it was Fallahian (or his successor as MOIS chief, Ali Younesi) and/or Vahidi, who arranged for Zawahiri's speedy release.  The incident highlights "the close ties that existed between top levels of al Qaeda and Iran, particularly Iran's intelligence community and the IRGC.  Ex. 6, Lopez-Tefft Affid. ¶171.

continuing terrorist training of al Qaeda cadres at camps in Hizballah-controlled Lebanon and Iran.)

1.     **1992: Israeli Embassy in Buenos Aires, Argentina.**  In March 1992, a Hizballah terrorist team operating under Mughniyah's command truck-bombed the Israeli embassy in Buenos Aires, Argentina, killing twenty-nine (29) people and wounding two hundred forty-two (242) others.  Baer, The Devil We Know, p. 228; Ex. 7, Bergman Affid. ¶42; Ex. 2, Timmerman 2nd Affid. ¶¶38-39.  NSA intercepts of communications from the Iranian embassies in Buenos Aires and Brasilia, Brazil, to the Foreign Ministry in Iran were decoded to prove Iranian involvement in the attack; the NSA provided Israel with "unequivocal proof – 'not a smoking gun, but a blazing cannon'" – that Imad Mughniyah and another senior Hizballah member, Talal Hamiaa, executed the terrorist operation.  Ex. 7, Bergman Affid. ¶42.

2.     **1993: New York City.**  On February 26, 1993, the first World Trade Center bombing occurred, killing six persons and injuring more than one thousand (1,000).  A few months later, an al Qaeda conspiracy to bomb several New York City landmarks, including the Lincoln Tunnel and the Holland Tunnel, was disrupted. Egyptian cleric Omar Abdul Rahman, a/k/a the "Blind Sheikh," whose Egyptian radical group is linked to al Zawahiri and al Qaeda, was convicted of masterminding the plot to engage in urban warfare against the United States.[53]  Ex. 6, Lopez-Tefft Affid. ¶150; Ex.

---

[53]  Ramzi Yousef, an al Qaeda operative who stayed at a bin Laden guest house in Pakistan (and is the nephew of 9/11 plotter Khalid Sheikh Mohammad), was the coordinator of the first WTC attack.  Ex. 6, Lopez-Tefft Affid. ¶149.  Ali Mohamed, who arranged the 1993 meeting in Khartoum, Ex. 2, Timmerman 2nd Affid. ¶51, provided guidance and training to extremists at the *Farouq* Mosque in Brooklyn, including some of those who were subsequently convicted of the 1993 WTC bombing.  Ex. 6, Lopez-Tefft Affid. ¶138.  *Havlish* expert Dietrich Snell investigated and prosecuted Yousef and others for the "*Bojinka*" plot to bomb a dozen U.S. civil aircraft over the Pacific Ocean, obtaining convictions of Yousef and his co-defendants on all counts.  Snell also assisted in appellate arguments sustaining the convictions of the "Blind Sheikh" and others for their conspiracy to wage urban warfare

22.

**3.      1994: AMIA, Buenos Aires, Argentina.**  In July 1994, Mughniyah and

his Hizballah cadres followed up the 1992 bombing of the Israeli embassy in Buenos

Aires by again attacking Israeli interests there.  A terrorist sleeper network was activated,

again under Imad Mughniyah's command, and it detonated a truck bomb to destroy the

*Asociación Mutual Israelita Argentina* ("AMIA"), the Jewish cultural center in Buenos

Aires.  It was a devastating explosion that killed eighty-six (86) persons and injured two

hundred fifty-two (252).  "The U.S., Israel, and Argentina all concluded that Iran,

Hizballah, and Imad Mughniyah were responsible for the AMIA bombing."  Ex. 7,

Bergman Affid. ¶43; *see also* Baer, The Devil We Know, p. 228.  Argentine investigators

determined that the decision to bomb the AMIA center was taken at the highest levels of

Iran's government, which directed Mughniyah and Hizballah to perform the operation.

Specifically, the decision was made by Iran's Supreme Leader Khamenei, President

Rafsanjani, Foreign Minister Velayati, and MOIS Minister Fallahian – the "*Omar-e*

*Vijeh"* (or Special Matters Committee) – during an August 14, 1993 meeting in Mashad,

Iran, also attended by Mohzen Rezai, Ahmad Vahidi, Mohsen Rabbani, and Ahmad Reza

Asgari.  "'[T]he preliminary plan to attack our country had its origin in the 'Intelligence

Office' that depends on the Presidential office and [was] headed by Rafsanjani himself,'

and was then handed to the IRGC al Qods force for execution," according to Argentine

prosecutors Alberto Nisman and Marcelo Martinez Burgos.  Ex. 2, Timmerman 2nd

Affid. ¶¶38-46.

The Argentinean investigation revealed that nine Iranians (including the Iranian

agent Mughniyah) were responsible for the AMIA bombing, and the Argentines sought

_____

against the U.S.A.  Ex. 5, Snell Affid. ¶¶4-5.

the issuance of INTERPOL Red Notices on all nine.[54]  However, Iran took extraordinary

measures to try to block the issuance of the Red Notices by INTERPOL, and Iran succeeded

in part, as the General Assembly of INTERPOL upheld a decision by the Executive

Committee to issue only six Red Notices, instead of the nine sought by the Argentines.

The six who were the subjects of Red Notices included Imad Mughniyah (Hizballah chief

of terrorism), Ali Fallahian (MOIS minister), Mohsen Rabbani (Iranian cultural attaché),

Ahmad Reza Asgari (senior MOIS official), Ahmad Vahidi (*Qods* Force commander),

and Mohsen Rezai (IRGC commander).  The three persons who avoided red notices were

all very high Iranian government officials: Ali Akbar Rafsanjani (President of Iran), Ali

Akbar Velayati (Iranian Foreign Minister), and Hadi Soleimanpour (Iran's Ambassador

to Argentina).  Ex. 10, Adamson Affid. ¶¶21-33; Ex. 2, Timmerman 2nd Affid. ¶¶40-45;

Ex. 7, Bergman Affid. ¶¶43-44.

       **4.**       **1994: Eiffel Tower, Paris, France.**  In December 1994, Algerian

terrorists associated with al Qaeda hijacked a French airliner, intending to crash it into the

Eiffel Tower in Paris.  They were foiled by a French SWAT team.  Chief French

terrorism investigator Jean-Louis Bruguière believes the hijacking was a "precursor to

9/11."  Ex. 9, Bruguière Declaration ¶¶18-20; Ex. 2, Timmerman 2nd Affid. ¶¶78-80.

       **5.**       **1995: Ethiopia**.  On July 7, 1995, Ayman al Zawahiri's Egyptian gunmen,

supported, trained, and funded by Iran,[55] attempted to assassinate Egyptian President

Hosni Mubarak near Addis Ababa, Ethiopia.  The attempt failed, and the IRGC extricated

---

54   A "Red Notice" is an INTERPOL alert issued to all member nations that a person is wanted by a national
jurisdiction or an international criminal tribunal and is intended to help police identify or locate such
individuals with a view toward their arrest and extradition.  *See* Ex. 10, Adamson Affid. ¶19.

55   Osama bin Laden was also deeply involved: the commander of the team of assassins was one of his
men and a number of the planning meetings had occurred at bin Laden's own house in Sudan.  Ex. 7,
Bergman Affid. ¶¶62-63; Ex. 2, Timmerman 2nd Affid. ¶¶81-83; *see also* 9/11 REPORT, p. 62.

some of the assassins from Ethiopia and arranged for their protection in Lebanon by Hizballah, and, for the assassins' team leader, Mustafa Hamza, inside Iran itself.  Ex. 7, Bergman Affid. ¶74.[56]

> **6.**     **1996: Osama bin Laden Moves to Afghanistan.**  U.S., Saudi, and Egyptian political pressure on the Sudanese eventually forced them to expel Osama bin Laden in May 1996.  Radical Afghan Sunni warlord Gulbuddin Hekmatyar, a strong Iranian ally, invited bin Laden to join him in Afghanistan (Hekmatyar and bin Laden had known each other during the 1980s Afghan *mujaheddin*-Soviet war), and bin Laden relocated to Afghanistan with the assistance of the Iranian intelligence services.  Ex. 15, U.S. Embassy (Islamabad) Cable, November 12, 1996;[57] Ex. 7, Bergman Affid. ¶64; Ex. 2, Timmerman 2nd Affid. ¶99; *see also* 9/11 REPORT at p. 65.  (*See* Appendix K for more information on the relationships between Hekmatyar, Iran, bin Laden, and the Taliban.) The U.S. obtained information that "[i]n the mid-1990s, Mustafa Hamid [a close associate of bin Laden] reportedly negotiated a secret relationship between Usama bin Laden and Iran, allowing many al Qaida members safe transit through Iran to Afghanistan."  Ex. 30.

> **7.**     **June 1996: Khobar Towers, Dharan, Saudi Arabia.**  On June 25, 1996, terrorists struck the Khobar Towers housing complex in Dhahran, Saudi Arabia, with a powerful truck bomb, killing nineteen (19) U.S. servicemen and wounding some five hundred (500).  Ex. 6, Lopez-Tefft Affid. ¶162; Ex. 2, Timmerman 2nd Affid. ¶84.  FBI

---

[56]   In July 1996, Egyptian authorities arrested forty-four (44) Islamists loyal to al Zawahiri.  Mubarak's top assistant stated publicly that the assassins had been trained in Iran, and Mubarak himself revealed that "'[t]here is information, the source for which is the confessions of the terrorists who were arrested. They confessed that Iran was involved and that it helped Sudan organize this operation."  Ex. 2, Timmerman 2nd Affid. ¶¶81-83.

[57]   Released under the FOIA to the National Security Archive.  *See* http://www.gwu.edu/~nsarchiv/NSAEBB/NSAEBB227/18.pdf.

investigators concluded the operation was undertaken on "'direct orders from senior Iranian government leaders'" and that the bombers had been trained and funded by the IRGC in Lebanon's Bekaa Valley. FBI Director Louis Freeh stated, "'[w]e later learned that senior members of the Iranian government, including Ministry of Defense, Ministry of Intelligence and Security and the Spiritual Leader's office had selected Khobar as their target and commissioned the Saudi Hezbollah to carry out the operation.'" Ex. 6, Lopez-Tefft Affid. ¶162. Based in part on the testimony of Freeh and his deputy Dale Watson that IRGC *Qods* Force commander General Ahmed Vahidi coordinated the Khobar Towers attack (as well as expert testimony of Dr. Patrick Clawson and Dr. Bruce Tefft, both of whom are expert witnesses in this case), a U.S. district court held that Iran was factually and legally responsible for the Khobar Towers bombing. *Heiser v. Islamic Republic of Iran*, 466 F.Supp.2d 229 (D.D.C. 2006). The 9/11 Commission also examined classified CIA documents establishing that Vahidi planned the Khobar Towers attack with Ahmad al Mugassil, a Saudi-born al Qaeda operative. 9/11 REPORT, p. 60, n. 48.[58] *See* Ex. 2, Timmerman 2nd Affid. ¶¶85-86.

Al Qaeda itself was also involved in the planning and preparations for the Khobar Towers bombing. Osama bin Laden tried to facilitate a shipment of explosives to Saudi Arabia, and, on the day of the operation, bin Laden was, according to NSA intercepts,

---

[58] This conclusion was recently corroborated by Reza Khalili, a CIA agent who penetrated the IRGC for nearly a decade. According to Khalili, then IRGC-*Qods* Force General Vahidi was a key operator in Iran's relationship to al Qaeda, and he met regularly with al Qaeda deputy Ayman al Zawahiri. Ex. 2, Timmerman 2nd Affid. ¶¶85-87. Vahidi, now defense minister of Iran, was indicted by Argentina for the AMIA bombings, and was the subject of one of the INTERPOL Red Notices, which have never been honored by Tehran. *See* Ex. 10, Adamson Affid. ¶¶21-33, and pp. 60-61, *supra*. Vahidi would play a major role in facilitating the evacuation of al Qaeda operatives from Afghanistan after the U.S.-led invasion in the wake of the 9/11 attacks. *See infra* at pp. 80, 90.

verbally congratulated.  Ex. 6, Lopez-Tefft Affid. ¶¶163-68; 9/11 REPORT, p. 60.[59]  Two

months later, in August 1996, Osama bin Laden would cite the Khobar Towers bombing

in his first *fatwa*, a "Declaration of War Against the Americans Occupying the Land of

the Two Holy Places": "The crusader army became dust *when we detonated* al Khobar . .

. ."  Ex. 6, Lopez-Tefft Affid. ¶¶52, 166, p. 66, n. 29 (*emphasis added*).  (Witness Z

provides additional evidence of Iranian involvement in the Khobar Towers attack.)

**8.   1998: Osama bin Laden's Second *Fatwa*.**  On February 23, 1998, Osama

bin Laden issued his second public *fatwa* in the name of a "World Islamic Front" against

America, calling for the murder of Americans "as the individual duty for every Muslim

who can do it in any country in which it is possible to do it."  It would not be long before

one of his terrorist cells, trained by Hizballah, struck another direct blow against the U.S.

9/11 REPORT, pp. 47-48, 69.

**9.   1998: U.S. Embassies in Kenya and Tanzania.**  On August 7, 1998, two

nearly simultaneous truck bombings destroyed the U.S. Embassies in Nairobi, Kenya,

and Dar-es-Salaam, Tanzania, killing more than three hundred (300) persons and

wounding more than five thousand (5,000).  Although known to have been committed by

al Qaeda operatives (due to the confession of Ali Mohamed, who led the team that

studied the embassy in Nairobi, beginning as early as December 1993, shortly after the

Khartoum meeting, 9/11 REPORT, p. 68, Ex. 6, Lopez-Tefft Affid. ¶180), the twin East

Africa U.S. Embassy bombings also bore the unmistakable *modus operandi* of Imad

Mughniyah: multiple, simultaneous, spectacular suicide bombings against American

---

[59] Former CIA analyst and 9/11 Commission staff member Douglas MacEachin subsequently testified that ". . . intelligence . . . showed a far greater potential for collaboration between Hezbollah and al Qaeda than many had previously thought."  "In sum, . . . we have seen now strong but indirect evidence that bin Laden's organization did in fact play some as yet unknown role in the Khobar attack."  Ex. 6, Lopez-Tefft Affid. ¶163; *see also* ¶168 (*citations omitted*).

symbols.  Ex. 6, Lopez-Tefft Affid. ¶¶178-83.  Further, the al Qaeda operatives who carried out the attacks were trained by Hizballah in handling the sophisticated explosives used in the East Africa bombings.  *See* 9/11 REPORT, p. 68; Ex. 6, Lopez-Tefft Affid. ¶¶179; 182-83.  One of the specific types of training Hizballah provided was in blowing up large buildings.  Among those who trained at the Hizballah camps was Saef al Adel, the al Qaeda chief of terrorist operations, who was convicted *in absentia* in the U.S. for his role in the twin embassy bombings, and who would spend the years after 9/11 in safe haven inside Iran.  Ex. 6, Lopez-Tefft Affid. ¶¶194-95; Ex. 2, Timmerman 2nd Affid. ¶¶57-59 and Ex. B-4 thereto.[60]

10.    **2000: the *U.S.S. Cole*.**  On October 12, 2000, al Qaeda suicide bombers attacked the *U.S.S. Cole* in the harbor of Aden, Yemen, killing seventeen sailors and injuring thirty-nine.  At just that time, a U.S. Defense Intelligence Agency analyst was alerting his superiors to a web of connections he was finding between and among al Qaeda, the Iranian intelligence agencies controlled by Iran's Supreme Leader, Hizballah, and other active terrorist groups.  *See* Ex. 6, Lopez-Tefft Affid. ¶¶188-192.[61]  As later analysis would reveal, the explosives used to damage the *Cole* were a trademark Hizballah "shaped charge" similar to what was used in the Marine barracks bombings.  According to a U.S. government official who spoke to the press, "'It's a trademark of bombs made by Hizballah and raises the question of the involvement of Iran.'"  *Id.*

---

[60]  Telephone records obtained by American prosecutors investigating the East Africa embassy bombings revealed that ten percent (10%) of the calls made from the satellite phone used by Osama bin Laden were to Iran.  Ex. 6, Lopez-Tefft Affid. ¶185.

[61]  One such connection was a secret meeting in Kuala Lumpur in January 2000 attended by a Malaysian army captain affiliated with al Qaeda who would later be linked to the *U.S.S. Cole* bombing (and who would help Zacharias Moussaoui obtain a U.S. visa), and two of the eventual 9/11 hijackers.  The two future hijackers were observed to have spent the night at the Iranian embassy.  Ex. 6, Lopez-Tefft Affid. ¶191.

¶¶196-97.

The 9/11 REPORT specifically concluded that, "Iran made a concerted effort to strengthen relations with al Qaeda after the October 2000 attack on the *USS Cole*. . . ." 9/11 REPORT, p. 240; Ex. 6, Lopez-Tefft Affid. ¶264.  Although the 9/11 REPORT notes that an al Qaeda detainee ("Khallad", *see* 9/11 REPORT Ch. 7, n. 120, and p. 19, *supra*) told American interrogators that Osama bin Laden rebuffed this overture "because Bin Ladin did not want to alienate his supporters in Saudi Arabia," this assertion means only that bin Laden, always concerned about recruiting, sought to downplay the relationship publicly and deflect unwanted attention from an "alliance of convenience."  Ex. 3, Byman Affid. ¶39.[62]  Indeed, as the 9/11 REPORT finds, Iran, Hizballah, and al Qaeda would have extremely important and sensitive dealings over the next few months.

**F.      Iran's Contingency Plans for Terrorist Operations Against the U.S.**

Witnesses X, Y, and Z, taken together, provide significant evidence concerning Iran's contingency plans for asymmetrical warfare, with specific evidence concerning Iran's development, in the late 1980s, of contingency plans employing many of the same tactics as those of the 9/11 hijackers.  Further, the defector witnesses testify to Iran's foreknowledge of the means and time of the 9/11 attacks.  According to the U.S. State Department's *1987 Patterns of Global Terrorism* report, "during the summer of 1987 Iran began to formulate contingency plans for anti-US terrorist operations."  Ex. 13 at p. 56; *see* Ex. 6, Lopez-Tefft Affid. ¶74. Thus, the State Department's 1987 terrorism report provides corroboration for significant parts of the sealed evidence submitted in this case. As Dr. Patrick Clawson explains, the U.S. State Department's annual report on

---

[62]   Nor is the meaning of Khallad's statement to interrogators especially clear, although it does confirm the existence of prior relations between Iran and al Qaeda.  Ex. 6, Lopez-Tefft Affid. ¶112.

worldwide terrorism is "a report into which much effort is put, with each word being carefully weighed, and which is highly respected by researchers on terrorism." Ex. 8, Clawson Affid. ¶40.

## VI.   ANALYSIS OF THE EVIDENCE OF IRAN'S DIRECT AND MATERIAL SUPPORT OF al QAEDA FOR THE 9/11 ATTACKS

### A.   Terrorist Travel

The 9/11 REPORT clearly implicates Iran and Hizballah in the preparations for the 9/11 attacks.  In particular, the 9/11 REPORT documents the willingness of Iranian officials in the months prior to September 11, 2001, to facilitate the travel of al Qaeda members through Iran on their way to and from Afghanistan, where the hijackers trained at al Qaeda's terrorist training camps.  9/11 REPORT, pp. 233-36; 240-41.  The 9/11 Commission obtained "evidence that 8 to 10 of the 14 Saudi 'muscle' operatives traveled into or out of Iran between October 2000 and February 2001."  9/11 REPORT, p. 240.

Indeed, the 9/11 Commission's staff "border team" determined that the 9/11 terrorists had engaged in a specific terrorist travel operation.  In other words, not only did the four nearly simultaneous hijackings of four commercial airplanes constitute a coordinated operation, but so did the hijackers' travel.  Ex. 4, Kephart Affid. ¶37.  The importance of terrorists' travel cannot be overstated[63] because, "[f]or terrorists, success is often dependent on travel. . . . 'For terrorists, travel documents are as important as

---

[63]   The al Qaeda planners of the 9/11 attacks understood the importance of successful terrorist travel and the consequences of detection.  "A review of the entries and immigration benefits sought by the hijackers paints a picture of conspirators who put the ability to exploit U.S. border security while not raising suspicion about their terrorist activities high on their operational priorities."  Ex. 4, Kephart Affid. ¶51, citing Ex. 25, 9/11 AND TERRORIST TRAVEL, p. 130.  Two senior al Qaeda operatives, Khalid Sheikh Mohammed and Abu Zubaydah, each played key roles in facilitating travel for the group's terrorist operatives, and al Qaeda even had an office of passports, managed by then al Qaeda number 2 official Muhammed Atef, its chief of military operations, for altering passports, visas, and identification cards.  Ex. 4, Kephart Affid. ¶¶42, 51; 9/11 REPORT, p. 169.

weapons.'"  *Id.,* ¶39 (*emphasis omitted*), *quoting* 9/11 REPORT, p. 384.[64]  "The lack of appropriate travel documents can delay or interrupt terrorist operational plans."[65]  Ex. 4, Kephart Affid. ¶41.  As stated by the 9/11 Commission:

> Terrorists must travel clandestinely to meet, train, plan, case targets, and gain access to attack.  To them, international travel presents great danger, because they must surface to pass through regulated channels, present themselves to border security officials, or attempt to circumvent inspection points.

9/11 REPORT, p. 384; Ex. 4, Kephart Affid. ¶43; *see also* Ex. 4 ¶¶72-78.

It was in the arena of international movement of the operatives that the 9/11 hijackers' "terrorist travel" operation was facilitated, in a most critical way, by the Iranian government.  The al Qaeda travel planners knew that a terrorist operative trying to obtain a visa at an American embassy or consulate, or trying to enter the United States itself, faced serious risk if his passport showed travel to Afghanistan or Iran, which were both on the State Department's list of state sponsors of terrorism.  Yet, the hijackers' travel to the al Qaeda training camps in Afghanistan was essential for success of the 9/11 operation.  Thus, eliminating passport evidence of entry into Afghanistan at all, and particularly through Iran, was necessary.  Ex. 4, Kephart Affid. ¶¶51-53; *see* Ex. 25, 9/11

---

[64] "It should now be apparent how significant travel was in the planning undertaken by a terrorist organization as far-flung as al Qaeda.  The story of the plot includes references to dozens of international trips."  9/11 REPORT, p. 168.

[65] The 9/11 operation depended on a minimum number of trained hijackers, with four required to have the capacity to serve as pilots.  Thus, denial of visas or border exclusions could have disrupted the mission plans, led to mistakes by the hijackers, detection, or, even a decision to scuttle the mission altogether.  Indeed, one 9/11 hijacker *was* intercepted: Mohamed al Kahtani, who was to be the fourth "muscle" hijacker on United Flight 93, was denied entry into the United States on August 4, 2001 at the Orlando airport.  With Kahtani missing, United 93 was commandeered by only three "muscle" hijackers; all the other planes had four.  The absence of one "muscle" hijacker on United 93 may have made all the difference, as the heroic passengers of Flight 93 fought their way through to a point at least outside the door of the cockpit and foiled the hijackers' attempt to fly the plane all the way to Washington, D.C.  Thus, the hijackers crashed the plane into the ground in rural Pennsylvania rather than into the White House or the United States Capitol.  Further, according to Ramzi Binalshibh, had Osama bin Laden and KSM learned of Khatani's arrest, the operation might have been canceled altogether.  Ex. 4, Kephart Affid. ¶¶41-50; *see* 9/11 REPORT, pp. 10-14, 248, and n. 167; Ex. 25, 9/11 AND TERRORIST TRAVEL, pp. 145-46.

AND TERRORIST TRAVEL, pp. 65-66.  Moreover, al Qaeda travel planners knew that a

Saudi's passport showing a stamp indicating travel to or through Pakistan would be

confiscated upon his return to Saudi Arabia.  Ex. 4, Kephart Affid. ¶54; 9/11 REPORT, p.

169; Ex. 25, 9/11 AND TERRORIST TRAVEL pp. 61, 65-66.[66]

Thus, in the mid-1990s, al Qaeda operative Mustafa Hamid "negotiated a secret

relationship with Iran that allowed safe transit via Iran to Afghanistan."  Ex. 3, Byman

Affid. ¶47; Ex. 2, Timmerman 2nd Affid. ¶216 and Ex. B-15 thereto (U.S. Department of

Treasury report, January 16, 2009).  The existence of this secret network of travel routes

and safe houses was confirmed by al Qaeda military chief Saef al Adel in an interview

with *Al Quds al Arabi* on May 21, 2005.  Ex. 3, Byman Affid. ¶47.  Further, numerous

admissions from lower level al Qaeda members who were interrogated at the detention

facility at Guantanamo Bay confirm the existence of the clandestine Iran-Afghanistan

passageway, managed by MOIS.  *See* Ex. 2, Timmerman 2nd Affid. ¶¶115-19.[67]  One al

Qaeda travel facilitator told a detainee that al Qaeda had "'total collaboration with the

Iranians,' and had its own organization in Iran 'that takes care of helping the mujahedin

brothers cross the border.'"  *Id.*, ¶119.  (Witness Y's sealed testimony reveals specific

information about the extent of IRGC and MOIS control over immigration and the

airports regarding the arrivals of al Qaeda members.)

---

[66]  "The al-Qa'ida-linked Saudi dissident al-Faqih noted that 'before 9/11 many Saudi used Iran to access Afghanistan' because 'the Iranians kept a blind eye to this.'"  Ex. 3, Byman Affid. ¶47.

[67]  Judge Jean-Louis Bruguière's investigations of a series of 1995 GIA terrorist attacks in France, including the bombing of the St. Michel metro train station in Paris, led him to discover the existence of the clandestine passage network to and from the al Qaeda camps in Afghanistan.  He confirmed the existence of the secret passage system during his investigation of Djamel Beghal for an attempt to blow up the U.S. Embassy in Paris in 2001.  Ex. 9, Bruguière Declaration ¶¶22-28; *see also* Ex. 2, Timmerman 2nd Affid. ¶¶180-85.

Part of the factual basis for the 9/11 Commission's conclusion that Iran facilitated the 9/11 hijackers' travel into Afghanistan comes from clear admissions, in response to questions drafted by Dietrich Snell, an expert in this case, by two of the most knowledgeable of the 9/11 conspirators – KSM and hijacker coordinator Ramzi Binalshibh:

> . . . several of the 9/11 hijackers (at least eight, according to Binalshibh) transited Iran on their way to or from Afghanistan, taking advantage of the Iranian practice of not stamping Saudi passports. . . . In sum, there is strong evidence that Iran facilitated the transit of al Qaeda members into and out of Afghanistan before 9/11, and that some of these were future 9/11 hijackers.

9/11 REPORT, p. 241; *see* Ex. 5, Snell Affid. ¶¶20-21; *see* pp. 16-19, *supra*.[68]

1.    **January 2001: Ramzi Binalshibh.**  The 9/11 hijackers were not the only conspirators to travel to Iran prior to the attack.  Ramzi Binalshibh, unable to obtain a U.S. visa needed to participate in the attack, instead served as a coordinator for the operation, particularly with regard to the members of the Hamburg, Germany-based cell of Mohammed Atta.  9/11 REPORT, pp. 161, 167-68, 225, 243-46, Ch. 5, n. 46; *see also* Ch. 7, n. 52 and Ex. 4, Kephart Affid. ¶¶73-74.[69]  According to documents *Havlish* attorneys obtained from German federal prosecutors, Binalshibh stopped in Tehran eight months before 9/11 *en route* to meetings with al Qaeda leaders in Afghanistan.[70]  Ex. 18;

---

[68]    The fact that KSM and Binalshibh denied any relationship between the hijackers and Hizballah, *id.*, is unsurprising, transparent, and not at all credible.  "[W]hile al Qaeda did not hesitate to take credit for 9/11, the supporting hands of Iran and Hizballah were alays [*sic*: always] supposed to remain hidden."  Ex. 6, Lopez-Tefft Affid. ¶119.

[69]    According to Israeli *Mossad* sources, the IRGC provided financial and logistical assistance to an al Qaeda terror cell active in Hamburg, Germany.  Ex. 7, Bergman Affid. ¶70.   Binalshibh was Atta's roommate in Hamburg, and later he met with Atta at various cities in Europe in late 2000 and early 2001, and he relayed instructions and messages between KSM and Atta.  9/11 REPORT, pp. 167-68; 225, 243-46.

[70]    The 9/11 Commission report does not mention Binalshibh's travel to Iran, although it references intelligence reports on Binalshibh's activities in Germany that the BKA provided to the Commission.  One of those reports, which *Havlish* attorneys and investigator Ken Timmerman obtained in Germany,

*see* Ex. 2, Timmerman 2nd Affid. ¶¶148-54 and Ex. B-13 thereto.  From the Iranian

embassy in Berlin, Binalshibh obtained a four-week tourist visa to Iran on December 20,

2000.  He flew to Iran on January 31, 2001, via Amsterdam on January 27-28, but Iran

was not, contrary to his visa application, his final destination.[71]  From Iran, Binalshibh

traveled on to Afghanistan, where he delivered a progress report from the operations team

to Osama bin Laden and Ayman al Zawahiri.[72]

     **2.**       **Oct.-Nov. 2000:  A "Senior Operative of Hezbollah."**  Intelligence

reports, including NSA-intercepts reports, obtained at the eleventh hour of the 9/11

Commission's investigation, *see* pp. 16-19, *supra*, led to inclusion of the section entitled

"Assistance from Hezbollah and Iran to al Qaeda" in Chapter 7.  Ex. 2, Timmerman 2nd

Affid., ¶¶120-29; *see* Shenon, Phillip, The Commission, pp. 155-57; 371-73.  Noting "the

persistence of contacts between Iranian security officials and senior al Qaeda figures after

Bin Ladin's return to Afghanistan," the Commission cited, without ambiguity, "the

willingness of Iranian officials to facilitate the travel of al Qaeda members through Iran,

on their way to and from Afghanistan" and the fact that "Iranian border inspectors would

be told not to place telltale stamps in the passports of these travelers.  Such arrangements

were particularly useful to Saudi members of al Qaeda."  9/11 REPORT, p. 240.  Thus, as

---

        shows that Binalshibh traveled to Iran on his own passport after obtaining a visa from the Iranian
        embassy in Berlin.

[71]   The sealed testimony of Witness Z permits the reasonable inference that Binalshibh probably met with
        an al Qaeda operational liaison team then inside Iran.  Witness Z testimony, Ex. 7-S, pp. 82-83; Ex. 2,
        Timmerman 2nd Affid. ¶153.

[72]   The Germans next picked up Binalhshibh's trace on February 28, 2001, when he returned to Germany
        to clear out the Hamburg cell's apartment.  Ex. 18; Ex. 2, Timmerman 2nd Affid. ¶¶148-54 and Ex. B-
        13 thereto; Ex. 6, Lopez-Tefft Affid. ¶¶272-75.  Binalshibh was eventually arrested in Pakistan,
        apparently in September 2002.  Ex. 2, Timmerman 2nd Affid. ¶152; *see* 9/11 REPORT, p. 476, n. 58 to
        Ch. 3, p. 494, n. 65 to Ch. 5, and p. 522, n. 67 to Ch. 7; Ex. 23; *see*
        http://www.odni.gov/announcements/content/DetaineeBiographies.pdf.

noted, "8 to 10 of the 14 Saudi 'muscle' operatives traveled into or out of Iran between October 2000 and February 2001" without their passports having been stamped.  *Id.*

The 9/11 Commission also found that "[i]n October 2000, a senior operative of Hezbollah visited Saudi Arabia to coordinate activities there.  He also planned to assist individuals in Saudi Arabia in traveling to Iran during November.  A top Hezbollah commander and Saudi Hezbollah contacts were involved."  9/11 REPORT, p. 240. Unnamed in the 9/11 REPORT, the "senior operative of Hezbollah" is now known, as stated above, to be the master terrorist of Hizballah and Iran, Imad Mughniyah himself. Ex. 2, Timmerman 2nd Affid. ¶¶126-27; Ex. 6, Lopez-Tefft Affid. ¶114-17.  The "activities" that Mughniyah went to coordinate clearly revolved around the hijackers' travel, their obtaining new Saudi passports and/or U.S. visas for the 9/11 operation, as several of them did, as well as the hijackers' security, and the operation's security.  Ex. 6, Lopez-Tefft Affid. ¶114; Ex. 4, Kephart Affid. ¶¶60-64 and Ex. A thereto.[73]  By itself, the extraordinary fact that the world's most dangerous, notorious, and even ingenious terrorist, a known commander of Hizballah – and agent of Iran – coordinated 9/11 hijacker preparations inside Saudi Arabia is significant evidence of Iranian and Hizballah material aid and assistance to the 9/11 conspirators.  Mughniyah was far too important an asset to Iran and Hizballah for his involvement to be tangential or insignificant.  *See* Ex. 6, Lopez-Tefft Affid. ¶114.

The 9/11 Commission also determined that, in November 2000, "muscle" hijacker Ahmed al Ghamdi "flew to Beirut – perhaps by coincidence – on the same flight as a senior Hezbollah operative."  9/11 REPORT, p. 240.  Again, further investigation revealed

---

[73] Witness Y provides specific corroborating testimony regarding MOIS' surveillance of terrorist trainees after they left Iran to make sure that they did not talk to journalists or engage in suspicious activity.

that the "senior Hezbollah operative" was Imad Mughniyah.  The *Havlish* experts'

analysis of all the evidence now available demonstrates that there was no realistic

possibility of a coincidence:

> . . . if a (1) "senior operative of Hizballah (2) planned (3) to assist
> individuals (4) in Saudi Arabia (5) in traveling (6) to Iran (7) in November
> 2000," we find no coincidence that Almed [*sic*: Ahmed] al Ghamdi (1) "in
> November" (2) "flew from Saudi Arabia" (3) "to Beirut" (4) "on the same
> flight" (5) "as a senior Hizballah operative."  These travel arrangements
> were by design, not coincidence.

Ex. 6, Lopez-Tefft Affid. ¶114.  Rather, the confluence of events, together with the fact

that al Qaeda did use travel facilitators and was extremely careful about all aspects of the

terrorist travel operation, makes a coincidence of such magnitude in this situation

prohibitively unlikely.  *Id.*, ¶¶115, 117, 120.

Then, as stated above, in mid-November 2000, three muscle hijackers, having

obtained U.S. visas, "traveled in a group from Saudi Arabia to Beirut and then onward to

Iran.  An associate of a senior Hezbollah operative was on the same flight that took the

future hijackers to Iran."  9/11 REPORT, p. 240 ("a particularly nasty Hizballah operative

with close ties to Iran," Baer, Blow The House Down, p. 296 [author's note]).  Again, the

"senior operative of Hezbollah" was Imad Mughniyah; therefore, it was one of

Mughniyah's associates, and thus, another known agent of Hizballah and Iran, who

accompanied a group of three future 9/11 hijackers to Iran.  The October and November

trips were, thus, mirror images of each other: al Qaeda was adhering to a proven

methodology.  Ex. 6, Lopez-Tefft Affid. ¶116.

The Commission further found that "Hezbollah officials in Beirut and Iran were

expecting the arrival of a group during the same time period.  The travel of this group

was important enough to merit the attention of senior figures of Hezbollah."  9/11

REPORT, p. 240. The *Havlish* experts reject the existence of a "remarkable coincidence," *id.*, p. 241 – actually, a string of remarkable coincidences. Unless Hizballah officials were in fact expecting some other unknown group of travelers at the same time and place for some unknown reason,[74] the conclusion is inescapable that Hizballah officials in Lebanon and in Iran, including Imad Mughniyah, had actual foreknowledge of the 9/11 attacks.

> It makes no sense … for senior figures of Hizballah to be carefully monitoring the travels of three otherwise nondescript Saudi citizens unless, of course, they were engaged in preparatory acts of terrorism. The expectation of the young Saudis' arrival and the attention of senior Hizballah figures in both Iran and Beirut eliminate[] any element of chance. Terror operations are, and must be, highly disciplined and highly organized. It would be totally shocking if the young hijackers were not escorted and monitored; travel facilitators are a common, indeed necessary, factor of terrorist travel. The extraordinary planning of the 9/11 attack, years in the planning, affirms our conviction. Therefore, if the Hizballah operatives were responsible to coordinate and assist "individuals" in their travel to Beirut/Iran, we can rule out coincidence altogether.

Ex. 6, Lopez-Tefft Affid. ¶117; *see* ¶¶114-120 (*emphasis omitted*). Notably, these al Qaeda entries and exits through Iran's borders, clearly controlled by the IRGC and MOIS, were occurring precisely during the time period after the bombing of the *U.S.S. Cole* when, as found by the 9/11 Commission, Iran was making a concerted effort to "strengthen relations with al Qaeda." Ex. 6, Lopez-Tefft Affid. ¶264; 9/11 REPORT, p. 240.

Although the 9/11 Commission "found no evidence" that Iran or Hizballah had

---

[74] Although the Commission could not rule out the possibility of a "remarkable coincidence," 9/11 REPORT, p. 241, further well-considered analysis by intelligence professionals does exactly that. *See* Ex. 6, Lopez-Tefft Affid. ¶¶117, 120. Moreover, a coincidence would be all the more unlikely where, after the October 2000 *U.S.S. Cole* attack, Iran actively sought to strengthen contacts with al Qaeda and given the "strong evidence that Iran facilitated the transit of al Qaeda members into and out of Afghanistan before 9/11, and that some of these were future 9/11 hijackers." 9/11 REPORT, pp. 240-41.

actual foreknowledge of the planning of the 9/11 attacks, *see* 9/11 REPORT, p. 241, that

finding is unsurprising because the Commission also found that "[a]fter 9/11, Iran and

Hezbollah wished to conceal any past evidence of cooperation with Sunni terrorists

associated with al Qaeda."  *Id.*  That "[a] senior Hezbollah official disclaimed any

Hezbollah involvement in 9/11," *id.*, *citing* intelligence reports dated less than two weeks

after September 11, 2001, is, similarly, unsurprising.[75]

Finding no evidence, however, "does not mean that there was no evidence to be

found."  The further investigation conducted by *Havlish* attorneys uncovered specific

evidence, in the form of the expert affidavits cited above and of sworn testimony by

Witnesses X, Y, and Z, that Iran and Hizballah did have prior knowledge of planning for

the 9/11 attacks.

Importantly, the discovery of the NSA intercepts occurred only days before

publication of the Report and there was insufficient time to review the files thoroughly."

Ex. 6, Lopez-Tefft Affid. ¶121; *see* Ex. 5, Snell Affid. ¶¶19-22.  Dietrich Snell, Team

Leader of the 9/11 Commission's staff team investigating the 9/11 conspiracy, states in

his affidavit:

> This fact [that the 9/11 Commission "found no evidence" that Iran or
> Hizballah had actual foreknowledge of the planning of the 9/11 attacks],
> however, does not at all, in my view, undercut the conclusion that both
> [Iran and Hezbollah] contributed materially to the attack.  First, when the
> muscle hijackers passed through Iran, they "themselves probably were not
> aware of the specific details of their future operation . . . , an altogether
> unremarkable likelihood, given the security measures employed by al
> Qaeda's leadership to keep the plot under wraps to avoid detection.

---

[75]  For good reasons, Snell also does not credit Binalshibh's and KSM's disavowal of any relationship
between the hijackers and Hizballah: ". . . based on my experience in reading hundreds of interrogation
reports and based on documented instances in which both detainees withheld information and even on
occasion engaged in outright prevarication, I do not particularly credit those denials any more than I
credit the denials of both Iran and Hezbollah of any complicity in the 9/11 attack."  Ex. 5, Snell Affid.,
¶21.

> Second, as the Commission starkly acknowledged in the *Report*, additional facts plainly remained to be uncovered . . . .

Ex. 5, Snell Affid. ¶22; *see also* Ex. 6, Lopez-Tefft Affid. ¶121.

Still, according to an interview of a 9/11 Commission staff member who reviewed the NSA material, the documents showed that the Iranian border inspectors had been *ordered* not to put telltale stamps in the operatives' passports and that the Iranians were *fully aware* they were helping operatives who were part of an organization preparing attacks against the United States.  Ex. 2, Timmerman 2nd Affid. ¶¶123-24.  Indeed, the 9/11 Commission's investigation found that the conspiracy involved "a specific terrorist travel operation," Ex. 4, Kephart Affid. ¶37, including movement of the hijackers around the globe and into the United States without their travel to al Qaeda's training camps in Afghanistan being discoverable.  One key feature of this "terrorist travel operation" was "passports with possible indicators of extremism that dated back to the 1993 World Trade Center attack" carried by at least three[76] of the hijackers:

> It is probable that such an indicator was an al Qaeda "calling card" used by the broad *jihadi*-terrorist community in general to identify themselves covertly, and that Iranian border authorities were aware of this covert calling card and thus, knew when not to stamp Iranian travel stamps into al Qaeda passports.

*Id.*, ¶67.

As concluded by former 9/11 Commission staffer Janice Kephart:

> . . . the actions of Iranian border authorities, in refraining from stamping the passports of the Saudi hijackers, vastly increased the likelihood of the operational success of the 9/11 plot.  Shielding the Saudis' passports from indicia of travel to Iran and Afghanistan was perceived as essential to prevent potential confiscation of passports by Saudi authorities, and also to hide complicity of Iran in supporting al Qaeda.
> . . . .

---

[76]  Only six of the nineteen hijackers' passports were found after the attack.  *Id.*, ¶31.

> Thus, Iran's facilitation of the hijackers' "terrorist travel"
> operation, involving Imad Mughniyah, constituted material support –
> indeed, direct support – for al Qaeda's 9/11 attacks.

*Id.*, ¶¶66, 71 (*emphasis omitted*).

The fact that Iranian border inspectors were directed not to place telltale stamps in the passports of these future hijackers traveling to and from Afghanistan constituted vital direct and material support for the 9/11 operation.  The actions of the "senior Hizballah operative," Imad Mughniyah, and his "associate" and a "top commander" of Hizballah, in escorting 9/11 hijackers on flights to and from Iran and coordinating passport and visa acquisition activities in Saudi Arabia also constituted direct and material support for the 9/11 conspiracy.  9/11 REPORT, pp. 240-41; Ex. 4, Kephart Affid. *passim* and ¶¶3-5, 66, 71, 79; Ex. 6, Lopez-Tefft Affid. ¶¶104-07; 112-20; 264; Ex. 3, Byman Affid. ¶¶32; 46-47, 49-50; Ex. 2, Timmerman 2nd Affid. ¶¶120-24; Ex. 7, Bergman Affid. ¶17; Ex. 8, Clawson Affid. ¶¶48-49; 59.

Indeed, the participation of Imad Mughniyah, a known agent of Iran and a top terrorist commander of Iran's proxy, Hizballah, as well as Mughniyah's associate, in the facilitation of the travel of 9/11 hijackers, and in coordinating their activities in Saudi Arabia, during the critical period in late 2000 when the hijackers were completing their training and obtaining clean Saudi passports and U.S. visas, compels the conclusion that Iran had actual foreknowledge of the 9/11 plot.  Ex. 4, Kephart Affid. ¶70.

> Mughniyah's personal role in the hijackers' travel into Beirut and Iran
> after they had obtained U.S. visas in Saudi Arabia, and his coordination of
> hijackers' activities in Saudi Arabia, means that Iran must have had actual
> advance knowledge of an impending terrorist attack against United States
> interests, most likely on U.S. territory, involving more than one al Qaeda
> operative.  That attack turned out to be 9/11.

*Id*.  A terrorist of Mughniyah's importance could not be acting as travel facilitator

through Lebanon and Iran, as well as activities coordinator in Saudi Arabia, without

Iran's full knowledge and authorization.  The importance of the direct and material

support of Iran and Hizballah to al Qaeda in the preparation for the 9/11 attacks cannot be

overstated:

> As experts, we conclude the travel and passage assistance provided by
> Iran/Hizballah to al Qaeda through a "*senior Hizballah operative*" and
> "*top commander*" was an indispensable part of the September 11 plot
> which enabled two essential aspects of September 11, 2001 to succeed: (a)
> training in Afghanistan and (b) entry access to the United States after the
> acquisition of their visas in Saudi Arabia.
> . . . .
> The success of the September 11 conspiracy depended on the ability of the
> hijackers to obtain U.S. visas and pass U.S. immigration and customs
> inspection in order to enter the United States.  . . . Iran aided and abetted al
> Qaeda's successful acquisition of passports . . . and visas . . . and entry
> into U.S. territory
> . . . .
> [I]f the Iranians had stamped the Saudi passports, the hijackers' entry into
> the United States would have become virtually impossible.  With no
> Iranian or Afghanistan passport stamp, the terrorists appeared to be young
> Saudi citizens interested in travel, vacation or academic pursuits.
> . . . .
> [T]he "senior Hizballah operative" is Mughniyah. . . .  [T]he senior
> Hizballah operative was engaged in a vital role: travel facilitator.
> . . . .
> In our expert opinion, we find a design, a plan involving high level
> cooperation on an important aspect of the September 11, 2001 plot.

Ex. 6, Lopez-Tefft Affid. ¶¶107, 112, 113, 115, 120 (*emphasis omitted*).[77]

Iranian material support for al Qaeda in the form of travel facilitation continues to

---

[77] "Al-Qa'ida's haven in Afghanistan before 9/11 . . . [made] it difficult for it to bring fighters and other personnel to and from its base to the broader Muslim and Western world where it seeks to be active. Having the ability to transit via Iran is thus exceptionally useful." Ex. 3, Byman Affid. ¶32. "Such travel assistance is invaluable for groups like al-Qa'ida." *Id.*, ¶50. Iran had "a deliberate policy of neglect" but when neglect was not enough, such as at the border, "instructions were made more explicit." *Id.*, ¶49. There is no chance that the border officials were somehow rogue elements operating independently from government.  Iran is a police state and a closed society; the IRGC has ingress and egress through the country's borders tightly under control.  *Id.*, ¶65; Baer, The Devil We Know, pp. 4, 10, 16.  Rather, as confirmed by Guantanamo detainees, a secure "'very smooth'" and "'well-organized'" travel facilitation system was set up, utilizing Iranian embassies abroad such in London, past Iranian border officials, through Iran and "'all the way to the training camps.'" Ex. 2, Timmerman 2nd Affid. ¶¶118-19; Ex. 6, Lopez-Tefft Affid. ¶277.

the present day.  Testifying before the U.S. Senate Armed Services Committee on March

16, 2010, General David H. Petraeus, Commander, U.S. Central Command, stated:

"'Additionally, al-Qaeda continues to use Iran as a key facilitation hub, where facilitators

connect al-Qaeda's senior leadership to regional affiliates.'"  Ex. 3, Byman Affid. ¶48.

**B.      Iran's Material Support of al Qaeda After September 11, 2001**

After discovery of al Qaeda's perpetration of the 9/11 attacks from its base in

Afghanistan, the United States led a multi-national coalition attack, including support for

the Afghan Northern Alliance, on the Taliban regime.  Immediately, Iran facilitated the

exit of numerous al Qaeda leaders, operatives, and their families from Afghanistan into

Iran.  Ex. 13, p. 115; *see* Ex. 6, Lopez-Tefft Affid. ¶90.  The transit route that Iran had

established earlier to get al Qaeda recruits into and out of the training camps in

Afghanistan now was utilized to evacuate al Qaeda fighters from Afghanistan before the

oncoming invasion.  Ex. 6, Lopez-Tefft Affid. ¶278; Ex. 2, Timmerman 2nd Affid. ¶171;

*see also* Ex. 9, Bruguière Declaration ¶32; Ex. 6, Lopez-Tefft Affid. ¶¶295.  Following

the battle of Tora Bora, "'smugglers helped about 400 fighters in Taftan, Pakistan, to

escape to Iran.'"  Ex. 6, Lopez-Tefft Affid. ¶278, citing Ex. 25, 9/11 AND TERRORIST

TRAVEL, p. 67 (*emphasis omitted*).[78]  Further, in November 2001, 250 senior Taliban and

al Qaeda members were smuggled across the Iranian border near Herat in a convoy of 50

off-road vehicles.  Ex. 6, Lopez-Tefft Affid. ¶279.

An advisor to Ismail Khan, the warlord of Herat, Afghanistan (near the Iran

border), told TIME magazine that in October 2001, a high-ranking Iranian official

connected to Iran's Supreme Leader had been dispatched to Kabul to offer secret

---

[78]  "Taftan is Pakistan's only legal crossing into Iran as well as being a famous smuggling route.
Collusion by officials on both sides of the border would be necessary for such a large number of
terrorists being moved."  Ex. 6, Lopez-Tefft Affid. ¶278.

sanctuary to Taliban and al Qaeda fighters, an offer that was accepted.  Ex. 6, Lopez-

Tefft Affid. ¶278.  Osama bin Laden's old friend, Gulbuddin Hekmatyar, still in exile in

Iran near the Afghan border, was particularly instrumental, "using his relationship with

the Iranian regime to facilitate the passage of hundreds of al Qaeda terrorists into Iranian

territory . . . ."  Ex. 6, Lopez-Tefft Affid. ¶129 (*emphasis omitted*).  Also important to the

evacuation were Imad Mughniyah, Ex. 6, Lopez-Tefft Affid. ¶290, and Iran's *Qods* Force

commander Ahmad Vahidi,[79] who maintained a close relationship with Ayman al

Zawahiri.  Ex. 6, Lopez-Tefft Affid. ¶280.  A Western diplomat in Afghanistan said,

"[t]he Iranian Revolutionary Guard has an eye on everything that happens along the

border.  Of course they know that Taliban and al Qaeda fighters are getting across."  Ex.

6, Lopez-Tefft Affid. ¶279 (*emphasis omitted*); *see also* Ex. 2, Timmerman 2nd Affid.

¶¶172-73.  According to Havlish expert Dr. Patrick Clawson, a U.S. government official

confirmed that, in 2001-02, Iranian officials had acknowledged they had permitted these

al Qaeda members into Iran.   Ex. 8, Clawson Affid. ¶60.  The Iranian exile "Bahram"

and his *Fedaii* Guerillas organization identified safe houses outside of Tehran where

nearly 800 al Qaeda fighters and their families were housed.  Ex. 2, Timmerman 2nd

Affid. ¶173.  (Witness Y provides additional evidence regarding Iran's safe harboring of

hundreds of al Qaeda operatives and their families after the U.S.-led invasion of

Afghanistan.)

      **1.**      **Abu Musab al Zarqawi.**  Among the high-level al Qaeda officials who

arrived through the protected transit route were Saad bin Laden and the man who would

soon lead al Qaeda in Iraq, Abu Musab al Zarqawi.  Ex. 30, U.S. Treasury Designation,

---

[79]  Vahidi was promoted to Iran's Minister of Defense in August 2009, despite the fact that he was still
the subject of an INTERPOL Red Notice for his involvement in the 1994 AMIA bombing and is known
to have been deeply involved in the Khobar Towers bombing.  *See* pp. 64-65, 70, *supra*.

January 16, 2009; Ex. 2, Timmerman 2nd Affid. ¶171.  Zarqawi, along with al Qaeda

commander Saef al Adel, escaped to Iran, staying in the houses of Gulbuddin

Hekmatyar's followers, with the tacit permission of Iranian intelligence.  He then "moved

. . . across the entire width of Iran . . . [and] began setting up terrorist training camps

conveniently near the Iranian border, which he crossed over on a regular basis,

maintaining an easy relationship with Iranian security forces on the other side." Ex. 6,

Lopez-Tefft Affid. ¶281-82 (*emphasis omitted*).  Later, Zarqawi "was living in Tehran . .

. under the protection of Iranian security services.  Zarqawi was . . . back in Iran as of

October 2003, where he continued to operate with the full knowledge of the regime in

Tehran . . . ." *Id.*, ¶283 (*emphasis omitted*).  "'Zarqawi spent more time in Iran than

anywhere else after September 11 . . . .'" Ex. 8, Clawson Affid. ¶51 (quoting noted al

Qaeda expert Peter Bergen)(*emphasis omitted*).

     French Judge Jean-Louis Bruguière's investigations established that Zarqawi's

"group traveled through Iranian territory on a regular basis and used Iran for clandestine

meetings, activities that implied the complicity of the intelligence services of the Islamic

Republic of Iran." Ex. 9, Bruguière Declaration ¶33.  "It was clear to me that Zarkawi

had direct ties to the Iranian regime for his terrorist operations." *Id.*, ¶41.  Indeed, one of

Zarqawi's "top deputies" arranged transport of deadly poisons from Zarqawi's enclave

"through Iran where they had excellent contacts" with "the full knowledge of the

Iranians" to destinations overseas for use in terrorist attacks.  *Id.*, ¶¶34, 37-41.

     **2.     January 16, 2009:  U.S. Treasury Department Designation.**  A U.S.

Treasury Department designation of Saad bin Laden as an "international terrorist" under

Executive Order 13224 (targeting terrorists and terrorist supporters) said of the eldest son

of Osama bin Laden: "in late 2001**,** Sa'ad bin Laden facilitated the travel of Usama bin Laden's family members from Afghanistan to Iran.  Sa'ad made key decisions for al Qaida and was part of a small group of al Qaida members that was involved in managing the terrorist organization from Iran."  Ex. 30; *see also* Ex. 8, Clawson Affid ¶¶54, 62.

The January 16, 2009 Treasury report further states that Mustafa Hamid, a senior al Qaeda member and the father-in-law of top-level al Qaeda commander Saef al Adel, "served as a primary interlocutor between al Qaida and the Government of Iran. . . . While living in Iran, Hamid was harbored by the Islamic Revolutionary Guards Corps (IRGC), which served as Hamid's point of contact for communications between al Qaida and Iran."  Ex. 30.[80]  Further, in the late 1990s, Mustafa Hamid passed communications between Osama bin Laden and the Government of Iran and, in late 2001, while in Tehran, Hamid negotiated with the Iranians, on behalf of al Qaeda, "to relocate al Qaida families to Iran" after the 9/11 attacks.  *Id; see also* Ex, 8, Clawson Affid. ¶53.

---

[80]   According to the U.S. Treasury Department designation:

> In the mid-1990s, Mustafa Hamid reportedly negotiated a secret relationship between Usama Bin Laden and Iran, allowing many al Qaida members safe transit through Iran to Afghanistan.

> In the late 1990s, Mustafa Hamid passed communications between Usama bin Laden and the Government of Iran.  When tensions were high between Iran and Afghanistan, Mustafa Hamid traveled multiple times from Kandahar to Tehran as an intermediary for the Taliban.

> In late 2001, Mustafa Hamid was in Tehran delivering messages from the Taliban to the Government of Iran. Hamid also negotiated on behalf of al Qaida in an attempt to relocate al Qaida families to Iran.  As part of this effort, senior al Qaida member Abu Hafs the Mauritanian traveled with Hamid and two IRGC members to Tehran for meetings.

Ex. 30.

The January 16, 2009, Treasury designation also states that Ali Saleh Husain, a/k/a Abu Dahhak, a Yemeni al Qaeda operative with "close relations" to Osama bin Laden himself, was a chief al Qaeda contact in Iran for acquiring fresh travel documents for al Qaeda operatives.  "In 2001 after the fall of the Taliban, Husain facilitated the movement of al Qaida associated fighters, including an al Qaida military commander, from Afghanistan to Iran.  After leaving Afghanistan, Husain was responsible for smuggling al Qaida members and associates via networks in Zahedan, Iran."  Ex. 30.

Al Qaeda deputy Ayman al Zawahiri made particular arrangements for his own family's safe haven in Iran after 9/11.[81]  The January 16, 2009 Treasury designation states the following as to the son-in-law of Ayman al Zawahiri, Muhammad Rab'a al Sayid al Bahtiyti**,** an al Qaeda operative:

> After September 11, 2001, Ayman al Zawahiri instructed Bahtiyti to take al Zawahiri's family to Iran.  Bahtiyti reportedly traveled to Iran with al Zawahiri's daughters, where he was subsequently responsible for them. In January 2003, while working from Iran, Bahtiyti arranged housing on behalf of al Qaida.

Ex. 30; *see also* Ex. 8, Clawson Affid. ¶53.

**3.**     **Al Qaeda's Safe Haven in Iran.**  For eighteen months the Islamic regime denied that any al Qaeda operatives were present in Iran, but American officials knew otherwise.  On March 13, 2002, U.S. Special Presidential Envoy to Afghanistan Zalmay Khalilzad (also a Senior Director on the National Security Council) said publicly that the Iranian regime had facilitated the movement of al Qaeda terrorists escaping from Afghanistan into Iran.  Ex. 29.  In April 2002, Secretary of Defense Donald Rumsfeld

---

[81] There was earlier precedent for this, too.  KSM had also secured his family in Iran "back when he was wanted by the United States for trying to assassinate President Clinton and blow up twelve U.S. airliners over the Pacific" (the "*Bojinka*" plot).  Blow The House Down, p. 296 [author's note].

said, "'there is no question but that al Qaeda has moved into Iran, out of Iran to the south and dispersed to some other countries.'" In September 2002, Rumsfeld told the Senate Armed Services Committee that Iran "'is currently harboring reasonably large numbers of al Qaeda,'" and CIA Director George Tenet confirmed this in testimony before the Senate the following February, saying "'we see disturbing signs that al Qaeda has established a presence in both Iran and Iraq.'" Ex. 6, Lopez-Tefft Affid. ¶294 (*emphasis omitted*). Further, Western intelligence services reported that al Qaeda fugitives being pursued by European security services repeatedly escaped to Iran. *Id.*, ¶298. Meanwhile, al Qaeda and Hizballah were actively collaborating in Iran as well as at Hizballah's sanctuary in Lebanon's Bekaa Valley. *Id.*, ¶¶292-94; *see also* ¶¶287-291.

Iran eventually changed its official story on February 16, 2003, when Foreign Minister Kamal Kharrazi stated that Iranian authorities had "'arrested'" or "'deported'" more than 500 al Qaeda members. Ex. 2, Timmerman 2nd Affid. ¶174. Still, that was not true. "Iran has not cracked down fully on al-Qa'ida operatives in the country, either bringing them to justice in Iran or extraditing them to the United States or their home countries." Ex. 3, Byman Affid. ¶57. By all accounts, "[t]he al-Qaeda members in Iran do not seem to have been that closely monitored or controlled . . . ." Ex. 8, Clawson Affid. ¶61. None of the high-level al Qaeda operatives or their families was ever arrested by the regime, but rather, had been transferred from "'blown'" safe houses to more secure quarters at *Boostaneh Bostan*, a guesthouse run by the IRGC. Ex. 2, Timmerman 2nd Affid. ¶175. There are no reports of any deportations or extraditions. *Id*., ¶176; Ex. 35, Congressional Research Service, "Iran: Concerns and Policy Responses" (March 4, 2011), p. 48.

85

Indeed, Iran permitted al Qaeda to use its safe haven inside Iran to plan and direct further terrorist attacks.  According to the U.S. government and other Western intelligence services, there have been numerous instances of al Qaeda and other terrorist organizations meeting, planning, and directing international terrorist operations from the safety of Iranian territory.  Ex. 6, Lopez-Tefft Affid. ¶¶281-86, 292-94, 297-300, 305; Ex. 3, Byman Affid. ¶55; Ex. 2, Timmerman 2nd Affid. ¶¶179; Ex. 8, Clawson Affid. ¶61. In 2001-02, al Qaeda operative Ali Saleh Husain, a/k/a Abu Dahhak, while living in Iran, was given "responsibility for operation meetings for attacks against Israel . . . ."  Ex. 30, January 16, 2009 U.S. Treasury Designation.  The U.S. intercepted communications from senior al Qaeda commander Saef al Adel, then in Mashad, Iran, to al Qaeda assassination teams in Saudi Arabia just before their May 12, 2003 assault on three housing compounds in Riyadh.  Dozens, including several Americans, were killed during the Riyadh bombings and gun battles.  Ex. 6, Lopez-Tefft Affid. ¶¶97, 99, 329-330; Ex. 8, Clawson Affid. ¶61; Ex. 2, Timmerman 2nd Affid. ¶¶177, 219.  "The general, clear and convincing view is that the al-Qaeda leaders in Iran planned and ordered the [Riyadh] bombing, and they may well have provided the funds for it."  Ex. 8, Clawson Affid. ¶61 (*emphasis omitted*).[82]

Meanwhile, Iran's implausible public denial that it was providing safe haven to al Qaeda continued.  In response to a U.S. accusation that Iran was harboring al Qaeda operatives, in August 2003, MOIS minister Ali Younesi admitted they were present in Iran, but claimed that his services were detaining "'large numbers'" of al Qaeda

---

[82]  As with the evidence of Iran's pre-9/11 involvement in, and sponsorship of, terrorism, evidence of post-9/11 terrorist acts conducted or directed by al Qaeda members from safe haven inside Iran is admissible under Rule 404(b), Fed.R.Evid., and may form part of the bases for experts' opinions under Rule 703, Fed.R.Evid.

terrorists, purportedly under house arrest.  Ex. 2, Timmerman 2nd Affid. ¶178.  However, in July 2004, upon release of the 9/11 REPORT, President George W. Bush stated publicly that Iran was still "'harboring al Qaeda leadership.'"  *Id.*, p. 47, n. 56; *see also* Ex. 29. Further, U.S. Secretary of Defense Donald Rumsfeld said, "We know Iran is actively sending terrorists down through Damascus into the Bekka Valley where they train terrorists, then engage in acts against countries in the region and elsewhere."  Ex. 6, Lopez-Tefft Affid. ¶288 (*emphasis omitted*).  Recently, Britain's former prime minister, Tony Blair, confirmed the continuing critical alliance between al Qaeda and Iran.  In a January 2011 interview, Blair confirmed that Iran is supportive of terrorist groups and stated that the West cannot deal with al Qaeda unless it deals with Iran.  Ex. 37.

 Meanwhile, Iran has persistently refused "to publicly identify senior members [of al Qaeda allegedly being held] in Iranian custody on the grounds of 'security . . .'" and "Iran has resisted calls to transfer custody of its al-Qaida detainees to their countries of origin or third countries for further interrogation and trial."  Ex. 13, *2003 Patterns of Global Terrorism*, U.S. State Department (released April 29, 2004);[83] *see* Ex. 6, Lopez-Tefft Affid. ¶90.  On the contrary, Iran appears to have permitted top al Qaeda leaders, such as Saef al Adel, Sa'ad bin Laden, and Suleiman Abu Ghaith to "travel freely in departing from Iran" when they wanted to do so, an option "that would constitute an important material support to al-Qaeda."  Ex. 8, Clawson Affid. ¶63; Ex. 6, Lopez-Tefft Affid. ¶¶318, 320; Ex. 35, Congressional Research Service, "Iran: Concerns and Policy Responses (March 4, 2011), p. 48.  The *status quo* has persisted in the years since.[84]

---

[83] Ex. 13; *see* http://www.state.gov/s/ct/rls/crt/2003/31644.htm.

[84] *See* Ex. 13, *Patterns of Global Terrorism, U.S. State Department* 2007 edition (released April 30, 2008), http://www.state.gov/s/ct/rls/crt/2007/103711.htm; 2008 edition (released April 29, 2009), http://www.state.gov/s/ct/rls/crt/2008/122438.htm; and 2009 edition (released August 2010),

The fact is that many important "core al Qaeda leaders" and operatives are known to have lived in Iran since September 11, 2001, including the aforementioned, as well as Abu Hafs, Abu Mohammed al Masri (a/k/a Mustafa Hamid, Ex. 30), Abu Khayr, Abu Musab Zarqawi, members of al Qaeda's *Shura* Council, and others. Ex. 6, Lopez-Tefft Affid. ¶¶281-83; 297; 302-04; 306-14 (*emphasis omitted*); Ex. 2, Timmerman 2nd Affid. ¶¶186-89, 213-219; Ex. 8, Clawson Affid. ¶63.

In the opinion of experts, the provision of safe haven to al Qaeda members who fled the U.S. invasion of Afghanistan, and later conducted terrorist operations from their safe haven in Iran, was done with the knowledge, approval, and assistance of the highest levels of the Iranian government. The provision of such safe haven comprised material support for al Qaeda after the fact of the 9/11 attacks. Ex. 3, Byman Affid. ¶¶51-59; Ex. 8, Clawson Affid. ¶¶52-55, 60-63; Ex. 2, Timmerman 2nd Affid. ¶179; Ex. 6, Lopez-Tefft Affid. ¶¶277-310.

**C.      September 11, 2001:  Al Qaeda Did Not Act Alone**

The September 11, 2001 attacks on the World Trade Center, the Pentagon, and Washington, D.C. (the latter foiled by the passengers), bore all the hallmarks of an Imad Mughniyah/Hizballah terrorist operation: multiple, simultaneous, spectacular suicide bombings against American symbols of power. Ex. 6, Lopez-Tefft Affid. ¶¶178-83. The attacks also fit the profile of Iran's sponsorship of terrorism: acts that affect U.S. foreign policy, performed by a proxy organization (with demonstrable pre-existing relations and agreements to conduct joint terrorist operations), while preserving Iran's plausible public

---

http://www.state.gov/s/ct/rls/crt/2009/140889.htm.

deniability.

Iran assisted al Qaeda in another critical way just before 9/11. Two days before September 11, 2001, the leader of the Afghan Northern Alliance, Ahmed Shah Massoud – the "Lion of Panshir," a U.S. ally, and the chief opponent of the Taliban – was assassinated by al Qaeda members posing as journalists, and a Taliban offensive against the Northern Alliance commenced the next day. 9/11 Report, pp. 214, 252. Iran assisted in the assassination. "Specifically, the Iranian Embassy in Brussels, Belgium, helped two Tunisian al Qaeda assassins obtain counterfeit Belgian passports . . . which they used to enter northern Afghanistan in the guise of journalists to interview Massoud." In addition, Iran sent two men to procure the camera, which was stolen from a French journalist, in which the explosives used in the assassination were concealed. Ex. 6, Lopez-Tefft Affid. ¶276; Ex. 7, Bergman Affid. ¶71. Massoud's assassination was highly significant because he was the Taliban's opposition's greatest hope – and he would have become America's most important military ally in Afghanistan after 9/11. (Witness Y provides evidence of Iran's duplicity in dealing with both Massoud and the Taliban, and a possible motive for the Iranians' assistance to the Taliban-al Qaeda assassination of Massoud.)

Significantly, the confession of KSM as being the sole mastermind of the 9/11 attacks, "responsible for the 9/11 Operation, from A to Z," Ex. 19 – thereby suggesting that al Qaeda needed no help from any state sponsor such as Iran – is unsupported and not at all credible. Ex. 20, Baer, "Why KSM's Confession Rings False," TIME (March 15, 2007).[85] The conclusion that KSM was the sole "mastermind" of 9/11 is based on

---

[85] After being water-boarded numerous times, KSM confessed to scores of terrorist operations, few of which actually occurred, some of which seem outlandish. He may have been boasting, or even mentally unstable, but either way, "[i]t's also clear he is making things up." *Id.* Perhaps KSM, in custody and doubtless knowing he was never getting out, was taking credit in order to deflect the truth

little other than KSM's own self-aggrandizing descriptions.  And, of course, it is not true

at all, for KSM himself identified Osama bin Laden and Mohammed Atef as involved in

the development of the plan, selection of targets, and selection of the hijackers.  9/11

REPORT, pp. 155-56, and p. 492, n. 40; *see also* Ex. 4, Kephart Affid. ¶¶75-76 and

citations therein.[86]

Moreover, the notion that KSM was the principal planner of 9/11 is also

undermined by one of the *Havlish* experts, who, based on Israeli intelligence sources,

states that "Ayman al Zawahiri, who has been marked as the successor to Osama bin

Laden, was responsible for planning the attacks on 9/11."  Ex. 7, Bergman Affid. ¶69.

Although Dr. Bergman was constrained from citing his source(s), his information is

noteworthy because Zawahiri is known to have been a key link between al Qaeda, Iran,

and Hizballah since the early 1990s, particularly with Iran's intelligence service, MOIS.

Ex. 7, Bergman Affid. ¶¶51, 54, 58-59, 62-63, 67; Ex. 6, Lopez-Tefft Affid. ¶¶170-71,

280; Ex. 2, Timmerman 2nd Affid. ¶¶55, 81-83, 84-87, 217; Ex. 30.  "The significance of

the personal relationship here forged between al Qaeda's number two [Zawahiri] and the

top leadership of the Iranian intelligence service [Ahmad Vahidi, head of MOIS] . . .

cannot be overstated."  Ex. 6, Lopez-Tefft Affid. ¶170; *see also id.* ¶171 (MOIS chief

arranged for Zawahiri's release in Iran after mistaken arrest), ¶280 (Vahidi and Zawahiri

arranged for safe harbor of al Qaeda inside Iran).  (Witness Z provides additional

---

from reaching others, including perhaps, a state sponsor.  Baer notes that KSM "has also not offered evidence of state support to al Qaeda, though there is good evidence there was, even at a low level. . . . KSM provides no details that would suggest we are getting the full story from him."  *Id.*

[86]  Indeed, KSM's own al Qaeda colleagues cast doubt on his ability to conceive a masterful plan like 9/11.  "Al Qaeda associate Abu Zubaydah has expressed more qualified admiration for KSM's innate creativity, emphasizing instead his ability to incorporate the improvements suggested by others. Nashiri [al Qaeda member and/or full name] has been similarly measured, observing that although KSM floated many general ideas for attacks, he rarely conceived a specific operation himself."  9/11 REPORT, p. 150.

evidence regarding the relationship between Zawahiri and Imad Mughniyah, the

Hizballah terrorist commander.)

Another reason for not crediting KSM's A-to-Z confession is that he actually

supplied very few details about the development of the 9/11 plot to his interrogators. *See*

9/11 Report at pp. 149, 154-55.[87]  Moreover, Abu Zubaydah, "who worked closely with

the al Qaeda leadership, has stated that KSM originally presented Bin Ladin with a

scaled-down version of the 9/11 plan, and that Bin Ladin urged KSM to expand the

operation with the comment, 'Why do you use an axe when you can use a bulldozer?'"

9/11 REPORT, p. 491, Ch. 5, n. 35.  Another al Qaeda detainee, Khallad, also told U.S.

interrogators that bin Laden may have expanded KSM's original idea for an attack using

planes. *Id.*[88]  Notably, all of the planning meetings KSM revealed occurred after Osama

bin Laden's meeting with Iranian intelligence in Jalalabad in August 1996 regarding joint

---

[87]  Although KSM should have been able to provide intricate detail, he apparently was quite vague about the development of the 9/11 plot:

> [I]n mid-1996, . . . KSM arranged a meeting with Bin Ladin in Tora Bora . . . .  At the meeting KSM presented the al Qaeda leader with a menu of ideas for terrorist operations.  . . . .  KSM also presented a proposal for an operation that would involve training pilots who would crash planes into buildings in the United States.  This proposal eventually would become the 9/11 operation.
> . . . .
> Bin Ladin summoned KSM to Kandahar in March or April 1999 to tell him that al Qaeda would support his proposal.  The plot was now referred to within al Qaeda as the "planes operation."
> . . . .
> Bin Ladin reportedly discussed the planes operation with KSM and Atef in a series of meetings in the spring of 1999 at the al Matar complex near Kandahar.  . . . .  Bin Laden, Atef, and KSM developed an initial list of targets.

9/11 REPORT, pp. 149, 154-55.

[88]  Further, the 9/11 REPORT itself finds KSM to have been not credible in his confession regarding the role played by another participant in the "Bojinka" plot: "This aspect of KSM's account is not credible, as it conflicts not just with Murad's confession but also with physical evidence tying Murad to the very core of the plot, and with KSM's own statements elsewhere that Murad was involved in planning and executing the operation."  9/11 REPORT, Ch. 5, n. 8.  Finally, U.S. interrogators' deduction that KSM lied about not knowing the pseudonym of a trusted courier was an important clue in the intelligence that ultimately led to the discovery of Osama bin Laden's hideout, resulting in bin Laden being killed by U.S. Navy SEALs on May 1, 2011.  *See* Ex. 33.

91

terrorism operations against the U.S.  *See* pp. 92-93, *infra*.  Thus, Iran's "contingency

plans for anti-US terrorist operations," which the State Department said were developed

around 1987, some of which were strikingly similar to the 9/11 operation, *see* pp. 67-68,

*supra*, became the "bulldozer" that was the operative plan for 9/11.

      Besides Iran's involvement in facilitating the 9/11 hijackers' travel before

September 11, 2001, and Iran's provision of safe haven for al Qaeda after the post-9/11

invasion of Afghanistan, there is additional evidence that Iran was involved in the

planning for 9/11 itself.  Documentary evidence demonstrates Iran's and Hizballah's

awareness of, and involvement in, al Qaeda's plans for an impending terrorist strike

against the U.S.  A memorandum, dated May 14, 2001, from Ali Akbar Nateq-Nouri

(overseer of the Supreme Leader's intelligence apparatus), speaking for the Supreme

Leader, to the head of intelligence operations Mustapha Pourkanad, clearly demonstrates

Iran's awareness of an upcoming major attack on the United States and directly connects

Iran and Imad Mughniyah to al Qaeda and to the planned attack.  This "tasking

memorandum" (which Dr. Bergman states has been reviewed and found to be authentic

by U.S. and Israeli intelligence, Ex. 7, Bergman Affid. ¶¶75-76, and Ex. B thereto)

clearly anticipates an attack "damaging [American] economic systems," "discrediting . . .

other institutions," and undermining [U.S.] "security and stability."  *Id*.  Written "in order

to remove the existing lack of clarity regarding support for al-Qaeda's future plans," the

memo cautions "to be alert to the [possible] negative future consequences of this

cooperation [between Iran and al-Qaeda]."  *Id*.  The memo also says that, while

"expanding the collaboration with the fighters of al-Qaeda and Hizballah [Lebanon]," the

Supreme Leader "emphasizes that, with regard to cooperation with al-Qaeda, no traces

must be left [] that might have negative and irreversible consequences, and that [the

activity] must be limited to the existing contacts with [Hizballah Operations Officer

Imad] Mughniyeh and [bin Laden's deputy Ayman] al-Zawahiri." *Id*.

Thus, in the words of the very experienced former CIA case officer Robert Baer:

Were the attacks of September 11 conceived in the fertile
imagination of Osama bin Laden?  . . . . I am absolutely sure that it's in
Osama bin Laden's best interests for us to believe that it is so. . . .
Did Osama bin Laden act alone, through his own al Qaeda
network, in launching the 9/11 attacks?  About that I'm far more certain
and emphatic: no.  Even before I left the CIA in late 1997, we had learned
that bin Laden had suggested to the Iranians that they drop their efforts to
undermine central Asian governments and instead join him in a campaign
against the United States.  We knew, too, that in July 1996 bin Laden's
allies, the Egyptian Gama'at, had been in touch with 'Imad Mughniyah,
whom my own research had shown to be behind the 1983 bombing of the
American embassy in Beirut.

Baer, See No Evil, p. 269.

In August 1996 – the same month bin Laden issued his first *fatwa* declaring war

against the United States, Ex. 6, Lopez-Tefft Affid. ¶52 – one of the Iranian intelligence

operatives involved in the Khobar Towers attack (in June 1996) traveled to Jalalabad,

Afghanistan, to meet with Osama bin Laden.  The subject was continuing the secret

strategic agreement to undertake a joint terrorism campaign against the U.S.  Baer, See

No Evil, pp. 165-66, 250-51, and Blow The House Down, pp. 294-95 [author's note]; *see*

*also* Ex. 6, Lopez-Tefft Affid. ¶172 (regarding NSA electronic intercepts establishing

Nuri's communications to facilitate a meeting between Osama bin Laden and Iranian

intelligence).[89]

At the same time, "one of bin Laden's most dangerous associates was calling one

---

[89]  The meeting was brokered by Tajikistan's Islamic chieftain Abdallah Nuri, who Osama bin Laden and
al Qaeda senior official Mustafa Hamid had recruited to join al Qaeda at a meeting in Iran in December
1995.  Baer, See No Evil, pp. 166; Ex. 6, Lopez-Tefft Affid. ¶¶172-73.

of Mughniyah's offices in Beirut." Baer, See No Evil, p. 266. Indeed, "senior al-Qaeda and Iranian officials met repeatedly during this time" [after bin Laden's return to Afghanistan in 1996]," and "continued to collaborate in pursuit of their common anti-American agenda." Ex. 8, Clawson Affid. ¶59. At this time, Iranian and Hizballah trainers traveled between Iran and Afghanistan, transferring to al Qaeda operatives such material as blueprints and drawings of bombs, manuals for wireless equipment, and instruction booklets for avoiding detection by unmanned aircraft. Ex. 7, Bergman Affid. ¶68. (Witness Y testifies about Iran's training of al Qaeda cadres in Afghanistan.)

As will be discussed in Plaintiffs' Second (Sealed) Memorandum of Law, the Iranian defector witnesses X, Y, and Z all reveal that Iran did have foreknowledge of the 9/11 attacks, that Iran was involved in the design of the 9/11 operation, and that Iran played a role in training and preparing for execution of the 9/11 attacks.

## VII. PLAINTIFFS' EVIDENCE IS CLEAR AND CONVINCING PROOF OF IRAN'S MATERIAL AND DIRECT SUPPORT FOR AL QAEDA

Plaintiffs' expert evidence in this case demonstrates clearly and convincingly that Iran and its officials, acting on behalf of the Iranian government and within the scope of their offices, provided material support to al Qaeda.[90] In cases regarding the state-sponsored terrorism exception to the FSIA, such as this one, courts rely extensively on such expert testimony. *E.g.*, *Valore v. Islamic Republic of Iran*, 478 F.Supp.2d 101, 105 (D.D.C. 2007)(finding Dr. Clawson is a "renowned expert on Iranian affairs" to find that "Hezbollah was a creature of the Iranian government, acting almost entirely under the

---

[90] As noted by Chief Judge Lamberth in *In Re Islamic Republic of Iran Terrorism Litigation, supra*, a plaintiff need not establish that the material support or resources provided by a foreign state for a terrorist act contributed directly to the act from which his claim arises. Nevertheless, much of the evidence presented by the Plaintiffs here establishes that Iran provided material and direct support to al Qaeda for the specific purpose of facilitating the 9/11 attacks.

order of the Iranians and being financed almost entirely by the Iranians" and "the [1983] attack [on the Marines barracks in Beirut] itself would have been impossible without the express approval of Iranian government leaders at the highest level." *Valore v. Islamic Republic of Iran,* 478 F.Supp.2d 101, 105 (D.D.C. 2007); *see also Valore v. Islamic Republic of Iran*, 700 F.Supp.2d 52 (D.D.C. 2010)(citing Dr. Patrick Clawson as "an expert on Iranian terrorism activities"); *Peterson v. Islamic Republic of Iran*, 515 F.Supp.2d 25, 51 (D.D.C. 2007)(citing Dr. Clawson as "a widely-renowned expert on Iranian affairs over the past 25 years"); *Estate of Heiser v. Islamic Republic of Iran*, 466 F.Supp.2d 229 (D.D.C. 2006)(citing both Dr. Bruce Tefft and Dr. Patrick Clawson as experts in the field of terrorism); *Campuzano v. Islamic Republic of Iran*, 282 F.Supp.2d 258 (D.D.C. 2003)(same). Indeed, the courts have relied on expert testimony to award punitive damages against Iran in at least eleven terrorism cases where the plaintiffs met the "clear and convincing evidence" standard. *See* Appendix A.

Plaintiffs' experts are some of the most knowledgeable persons in the world on the subject of Iran's terrorist activities: former members of the 9/11 Commission staff, former CIA case officers, a former chief of the U.S. National Central Bureau of INTERPOL, noted academics, an accomplished investigative journalist from the United States, as well as a noted intelligence analyst from Israel, and a highly-regarded former French investigative magistrate judge specialized in terrorism cases. Their opinions, supported by the 9/11 REPORT, U.S. State Department terrorism reports, U.S. Treasury Department reports, court records, FBI and INTERPOL notices, declassified intelligence agency materials, other governmental documents, open source information, and information from intelligence sources, demonstrate clearly and convincingly that Iran

provided material support to al Qaeda before, contemporaneously with, and after the 9/11 attacks.

  *Havlish* experts specifically conclude that the evidence is clear and convincing that Iran materially supported al Qaeda.  *See* Ex. 8, Clawson Affid. ¶43; Ex. 3, Byman Affid. ¶14; Ex. 4, Kephart Affid. ¶79; Ex. 5, Snell Affid. ¶23.  Although each of the *Havlish* experts' affidavits speaks for itself, two passages fairly summarize their views: "It is our expert opinion to a reasonable degree of professional certainty that the Iranian Regime's use of terror and, specifically, its material support of al Qaeda in multiple terrorist attacks, including 9/11, is beyond question."  Ex. 6, Lopez-Tefft Affid. ¶50 (*emphasis omitted*); *see also id.*, ¶¶31-49, 352.  "Iran [has] provide[d] material support to al-Qaeda within the meaning of 18 U.S.C. Section 2339A(b)1."  Ex. 8, Clawson Affid. ¶56 (*emphasis omitted*).

  While the 9/11 Commission pointedly recommended that the assistance to al Qaeda by Iran and Hizballah was a "topic [that] requires further investigation by the U.S. government," 9/11 REPORT, p. 241 – and obviously it still is, Ex. 3, Byman Affid. ¶68; Baer, <u>Blow The House Down</u>, pp. 296-97 [author's note] – Plaintiffs here submit that their own "further investigation" in this case has conclusively demonstrated, by clear and convincing evidence, the fact of Iran's material support, and direct support, for al Qaeda and the 9/11 attacks.

## VIII. CONCLUSION

  The evidence submitted by the Plaintiffs in this case, even without considering the evidence being filed under seal, is well beyond the evidence required to establish the civil liability of the Islamic Republic of Iran for the September 11, 2001 terrorist attack upon the United States.  The Plaintiffs' substantial evidence is clear and convincing, and

therefore, exceeds the FSIA standard of "evidence satisfactory to the court." 28 U.S.C. §1608(e); *Roeder v. Islamic Republic of Iran,* 333 F.3d 228, 232-33 (D.C. Cir. 2003), *cert. denied,* 542 U.S. 915 (2004).

When combined with the sealed evidence, filed separately, and reviewed by experts Dr. Bruce Tefft and Clare Lopez, who found the witnesses credible, and which has been corroborated, in part, by Plaintiffs' other experts, the Plaintiffs submit that their proof substantially exceeds the "clear and convincing" standard.  Accordingly, this Court should find that  Iran has provided material support to al Qaeda, and that Iran provided direct support for the 9/11 attacks.

WHEREFORE, for the reasons stated herein, and in the Plaintiffs' Second (Sealed) Memorandum of Law in Support of Motion for Entry of Judgment (to be filed separately under seal), and based on all the evidence submitted in support of such Motion, Plaintiffs respectfully request that this Honorable Court grant Plaintiffs' Motion for Entry of Default Judgment Against Sovereign Defendants, enter an Order directing the Clerk of the Court to enter judgment by default against the Islamic Republic of Iran and its agencies and instrumentalities, and set this matter for further proceedings on the amounts of damages to be awarded to the Plaintiffs.

Respectfully Submitted this 19th day of May, 2011,

  /s/ Thomas E. Mellon, Jr.
Thomas E. Mellon, Jr. (PA Bar No. 16767)
John A. Corr (PA Bar No. 52820)
Stephen A. Corr (PA Bar No. 65266)
MELLON WEBSTER & SHELLY
87 North Broad Street
Doylestown, PA  18901
(215) 348-7700

Walter S. Batty, Jr. (PA Bar No. 02530)
c/o MELLON WEBSTER & SHELLY
87 North Broad Street
Doylestown, PA  18901
(215) 348-7700

Timothy B. Fleming (DC Bar No. 351114)
WIGGINS CHILDS QUINN
   & PANTAZIS, PLLC
1850 M Street, NW, Suite 720
Washington, DC  20009
(202) 467-4123

Dennis G. Pantazis (AL Bar No. ASB-2216-A59D)
Melina Goldfarb (AL Bar No. ASB- 3739-R71M)
WIGGINS CHILDS QUINN
   & PANTAZIS, LLC
The Kress Building
301 19th Street North
Birmingham, AL  35203
(205) 314-0500

Richard D. Hailey (IN Bar No. 7375-49)
Mary Beth Ramey (IN Bar No. 5876-49)
RAMEY & HAILEY
9333 North Meridian Street, Suite 105
Indianapolis, IN  46260
(317) 582-0000

J.D. Lee (TN Bar No. 2030)
David C. Lee (TN Bar No. 015217)
LAW OFFICE OF J.D. LEE
422 South Gay Street, 3rd Floor
Knoxville, TN  37902
(865) 544-0101

Evan J. Yegelwel (FL Bar No. 319554)
TERRELL HOGAN ELLIS
   YEGELWEL. P.A.
233 East Bay Street
Blackstone Building, 8th Floor
Jacksonville, FL  32202
(904) 632-2424

Edward H. Rubenstone (PA Bar No. 16542)
LAMM RUBENSTONE LLC
3600 Horizon Boulevard, Suite 200
Trevose, PA  19053
(215) 638-9330

Donald J. Winder (UT Bar No. 3519)
Jerald V. Hale (UT Bar No. 8466)
WINDER & COUNSEL, PC
175 West 200 South, Suite 4000
P.O. BOX 2668
Salt Lake City, UT  84110-2668
(801) 322-2222

Robert M. Foote (IL Bar No. 03124325)
Craig S. Meilke (IL Bar No. 03127485)
FOOTE, MEYERS, MIELKE
   & FLOWERS, LLC
3 North Second Street, Suite 300
St. Charles, IL  60174
(630) 232-6333
(630) 845-8982

***Attorneys for the Havlish Plaintiffs***

99

APPENDICES
**PLAINTIFFS' FIRST MEMORANDUM OF LAW IN SUPPORT OF MOTION
FOR ENTRY OF JUDGMENT BY DEFAULT AGAINST SOVEREIGN DEFENDANTS**

**APPENDIX A**

**Cases where the district courts have entered default judgments against Iran for materially supporting terrorist acts by proxies and where the plaintiffs' expert evidence was sufficient, under the clear and convincing evidence standard, to support an award of punitive damages against Iran**

*Flatow v. Islamic Republic of Iran,* 999 F.Supp. 1 (D.D.C. 1998).   Compensatory damages and $225 million punitive damages awarded to plaintiffs who demonstrated that Iran was a source of funding for the *Shaqaqi* faction of Palestine Islamic *Jihad,* a small terrorist cell that claimed responsibility for and in fact perpetrated the suicide bombing that mortally wounded Alisa Flatow on April 9, 1995.

*Higgins v. Islamic Republic of Iran*, No. 1:99CV00377 (D.D.C. 2000).  $55.4 million in compensatory damages and $300 million in punitive damages awarded to the wife of a Marine colonel who was kidnapped while serving as part of the United Nations Truce Supervision Organization in Lebanon and subsequently hanged by Hezbollah, a terrorist organization that courts repeatedly recognize was organized, funded, trained, and controlled by Iran.

*Sutherland v. Islamic Republic of Iran*, 151 F.Supp.2d 27 (D.D.C. 2001).  $46.5 million in compensatory damages and $300 million in punitive damages awarded to a professor (and his family) who was kidnapped while teaching at the American University in Beirut and subsequently imprisoned in "horrific and inhumane conditions" for six and a half years by Hezbollah.

*Jenco v. Islamic Republic of Iran*, 154 F.Supp.2d 27 (D.D.C. 2001).  $14.6 million in compensatory damages and $300 million in punitive damages awarded to the estate and family of a priest who was kidnapped while working in Beirut as the Director of Catholic Relief Services and imprisoned in terrible conditions for a year and a half by Hezbollah.

*Wagner v. Islamic Republic of Iran*, 172 F.Supp.2d 128 (D.D.C. 2001).  $16.3 million in compensatory damages and $300 million in punitive damages awarded to the estate and family of a petty officer in the U.S. Navy who was killed by a car bomb driven by a Hezbollah suicide bomber.

*Stethem v. Islamic Republic of Iran*, 201 F.Supp.2d 78 (D.D.C. 2002).  $21.2 million in compensatory damages awarded to the family of a serviceman who was tortured and killed during the hijacking of a TWA plane in 1985, $8 million awarded in compensatory damages to six servicemen and their families for their torture and detention during and after the same hijacking, and $300 million in punitive damages awarded against Iran for

APPENDICES
**PLAINTIFFS' FIRST MEMORANDUM OF LAW IN SUPPORT OF MOTION
FOR ENTRY OF JUDGMENT BY DEFAULT AGAINST SOVEREIGN DEFENDANTS**

its recruitment, training, and financing of Hezbollah, the terrorist group the court found to be responsible for the hijacking.

*Elahi v. Islamic Republic of Iran*, 124 F.Supp.2d 97 (D.D.C. 2000).  $11.7 million in compensatory damages and $300 million in punitive damages awarded to the administrator of the estate of an Iranian dissident and naturalized U.S. citizen killed by gunshot in Paris by the Iranian Ministry of Information and Security (MOIS).

*Mousa v. Islamic Republic of Iran*, 238 F.Supp.2d 1 (D.D.C. 2001).  $12 million in compensatory damages and $120 million in punitive damages awarded to woman who suffered severe and long-lasting injuries from a suicide bombing of a bus in Jerusalem carried out at the instigation of HAMAS, an entity the court found to be supported by Iran.

*Weinstein v. Islamic Republic of Iran,* 184 F.Supp.2d 13 (D.D.C. 2002).  $33 million in compensatory damages and $150 million in punitive damages awarded to the family and estate of a person who was severely injured in a bus bombing in Jerusalem carried out by HAMAS, which the court found to be funded by Iran, and who subsequently died from those injuries.

*Cronin v. Islamic Republic of Iran*, 238 F.Supp.2d 222 (D.D.C. 2002).  $1.2 million in compensatory damages and $300 million in punitive damages awarded to an individual who, while he was a graduate student in Lebanon in 1984, was kidnapped and tortured for four days by Hezbollah and two other paramilitary groups which the court found to have been organized, funded, trained, and controlled by Iran.

*Surette v. Islamic Republic of Iran*, 231 F.Supp.2d 260 (D.D.C. 2002).  $18.96 million in compensatory damages and $300 million in punitive damages awarded to the widow and sister of CIA agent William Buckley who was kidnapped in Beirut and tortured for 14 months by the Islamic *Jihad* Organization, an entity the court found to be organized and funded by Iran, and who ultimately died while in captivity.

*Source*: Ex. 36, CONGRESSIONAL RESEARCH SERVICE REPORT, "Suits Against Terrorist States by Victims of Terrorism," August 8, 2008.

# APPENDICES
## PLAINTIFFS' FIRST MEMORANDUM OF LAW IN SUPPORT OF MOTION
## FOR ENTRY OF JUDGMENT BY DEFAULT AGAINST SOVEREIGN DEFENDANTS

## APPENDIX B

### 28 U.S.C. §1605A provides in pertinent part:

(a) In general.—

**(1) No immunity**.--A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case not otherwise covered by this chapter in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

**(2) Claim heard**.--The court shall hear a claim under this section if –

(A)(i)(I) the foreign state was designated as a state sponsor of terrorism at the time the act described in paragraph (1) occurred, or was so designated as a result of such act, and, subject to subclause (II), either remains so designated when the claim is filed under this section or was so designated within the 6-month period before the claim is filed under this section; or (II) in the case of an action that is refiled under this section by reason of section 1083(c)(2)(A) of the National Defense Authorization Act for Fiscal Year 2008 or is filed under this section by reason of section 1083(c)(3) of that Act, the foreign state was designated as a state sponsor of terrorism when the original action or the related action under section 1605(a)(7) (as in effect before the enactment of this section) . . . ;

(ii) the claimant or the victim was, at the time the act described in paragraph (1) occurred (I) a national of the United States; (II) a member of the armed forces; or (III) otherwise an employee of the Government of the United States, or of an individual performing a contract awarded by the United States Government, acting within the scope of the employee's employment;

* * *

**(c) Private right of action.**--A foreign state that is or was a state sponsor of terrorism as described in subsection(a)(2)(A)(i), and any official,

iii

APPENDICES
**PLAINTIFFS' FIRST MEMORANDUM OF LAW IN SUPPORT OF MOTION
FOR ENTRY OF JUDGMENT BY DEFAULT AGAINST SOVEREIGN DEFENDANTS**

employee, or agent of that foreign state while acting within the scope of his or her office, employment, or agency, shall be liable to –

**(1)** a national of the United States,

**(2)** a member of the armed forces,

**(3)** an employee of the Government of the United States, or of an individual performing a contract awarded by the United States Government, acting within the scope of the employee's employment, or

**(4)** the legal representative of a person described in paragraph (1), (2), or (3),

for personal injury or death caused by acts described in subsection (a)(1) of that foreign state, or of an official, employee, or agent of that foreign state, for which the courts of the United States may maintain jurisdiction under this section for money damages. In any such action, damages may include economic damages, solatium, pain and suffering, and punitive damages. In any such action, a foreign state shall be vicariously liable for the acts of its officials, employees, or agents.

## APPENDIX C

### The Flatow Amendment and the Enactment of §1605A

When the FSIA's terrorism exception was first enacted in April 1996, it was not clear whether the statute established an independent federal cause of action against foreign state sponsors of terrorism.  In an attempt to clarify matters, Congress passed the "Flatow Amendment," enacted as part of the Omnibus Consolidated Appropriations Act, 1997.  *See* Pub.L. 104-208, §589, 110 (1996), 110 Stat. 3009-1, 3009-172 (codified at 28 U.S.C. §1605 note).  In pertinent part, the Flatow Amendment provides:

(a) An official, employee, or agent of a foreign state designated as a state sponsor of terrorism designated under section 6(j) of the Export

iv

## APPENDICES
### PLAINTIFFS' FIRST MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR ENTRY OF JUDGMENT BY DEFAULT AGAINST SOVEREIGN DEFENDANTS

Administration Act of 1979 [section 2405(j) of the Appendix to Title 50, War and National Defense] while acting within the scope of his or her office, employment, or agency shall be liable to a United States national or the national's legal representative for personal injury or death caused by acts of that official, employee, or agent for which the courts of the United States may maintain jurisdiction under section 1605(a)(7) of title 28, United States Code [subsec. (a)(7) of this section] for money damages which may include economic damages, solatium, pain, and suffering, and punitive damages if the acts were among those described in section 1605(a)(7) [subsec. (a)(7) of this section].

The Flatow Amendment permits U.S. nationals injured in terrorist attacks to pursue a private right of action against officials, employees, and agents of designated foreign states acting in their official capacities.  However, in 2004, two years after the present action was filed, the United States Court of Appeals for the District of Columbia Circuit ruled that §1605(a)(7) conferred jurisdiction on the district court, but did not create a substantive cause of action against the foreign state itself.  *Cicippio-Puleo v. Islamic Republic of Iran*, 353 F.3d 1024, 1032 (D.C. Cir. 2004).  The *Cicippio-Puleo* court also held that there is no federal private right of action against foreign governments – as opposed to individuals – under the Flatow Amendment.  *Id.* at 1027.  The D.C. Circuit concluded that FSIA plaintiffs cannot state a claim under the "generic common law" but must "identify a particular cause of action arising out of a specific source of law." *Id.* at 1037.  *See also Acree v. Republic of Iraq,* 370 F.3d 41, 59 (D.C. Cir. 2004).  As a result, plaintiffs seeking to recover damages caused by state-sponsored acts of terrorism could assert jurisdiction under the FSIA, but were then required to establish liability under the various personal injury laws of U.S. states.

**APPENDICES**
**PLAINTIFFS' FIRST MEMORANDUM OF LAW IN SUPPORT OF MOTION**
**FOR ENTRY OF JUDGMENT BY DEFAULT AGAINST SOVEREIGN DEFENDANTS**

This construct no longer applies.  Congress abrogated the *Cicippio-Puleo* holding in 2008 when it enacted §1083 of the National Defense Authorization Act for Fiscal Year 2008 (the "NDAA").  *See* P.L. 110-181, §1083, 122 Stat. 3, 338-44.  NDAA §1083 amended the FSIA by repealing §1605(a)(7) and replacing it with a new §1605A (28 U.S.C. §1605A).  The new §1605A settles the issue by unequivocally creating a federal private right of action against foreign state sponsors of terrorism.  In a very thorough opinion,[*] the District Court for the District of Columbia analyzed the significance of the new FSIA provisions as follows:

> The new law now expressly provides that designated state sponsors of terrorism may be subject to a federal cause of action for money damages if those terrorist states cause or otherwise provide material support for an act of terrorism that results in the death or injury of a United States citizen or national.  *See* §1605A(c).  This new federal right of action for money damages abrogates *Cicippio-Puleo,* 353 F.3d 1024, and is a crucial change in the law for hundreds of FSIA terrorism plaintiffs who were not able to rely on state tort law to create a cause of action against Iran previously.
>
> Thanks to the enactment of §1605A, the inconsistent and varied result that was reached in *Peterson* and in similar cases under §1605(a)(7) will be avoided in actions going forward under the new law.  Courts can now work from a single federal cause of action that will ensure a greater degree of fairness to FSIA terrorism plaintiffs while furnishing a level of consistency and uniformity that is critical in matters of foreign relations.

*In re Islamic Republic of Iran Terrorism Litigation,* 659 F.Supp.2d 31, 59 (D.D.C. 2009).

---

[*]   Royce C. Lamberth, Chief Judge of the United States District Court for the District of Columbia, provides extensive analysis of new §1605A and its retroactive application under NDAA §1083 in *In re Islamic Republic of Iran Terrorism Litigation*, *supra*, and *Heiser, et al. v. Islamic Republic of Iran*, 605 F.Supp.2d 248 (D.D.C. 2009).

**APPENDICES**
**PLAINTIFFS' FIRST MEMORANDUM OF LAW IN SUPPORT OF MOTION**
**FOR ENTRY OF JUDGMENT BY DEFAULT AGAINST SOVEREIGN DEFENDANTS**

While the jurisdictional exception to foreign sovereign immunity under the new provision is identical to that which was contained in the former §1605(a)(7), the new law eliminates the need for terrorism plaintiffs to rely on a myriad of state tort laws as the bases of liability. Nor does state law control the nature of the liability or the damages that may be sought in an action against a foreign government.

**APPENDIX D**

### *Havlish* **Third Amended Complaint Allegations of "Material Support"**

Plaintiffs' Third Amended Complaint contains specific allegations regarding Iran's provision of "material support" to the al Qaeda terrorist organization that carried out the 9/11 attack. Evidentiary support for these allegations, along with proof of far more extensive and pervasive material support, is contained in affidavits and sworn testimony discussed below. Some of the relevant allegations of "material support" are as follows:

219. Defendant, the Islamic Republic of Iran (hereinafter referred to as "Iran"), is a foreign state within the meaning of 28 U.S.C. §1391(f). Iran maintains an Interest Section within the United States at the Embassy of Pakistan at 2204 Wisconsin Avenue, N.W., Washington, D.C. 20007.

220. Iran has for many years been designated as a foreign state that sponsors terrorism within the meaning of the Export Administration Act of 1979, 50 U.S.C. App. §2405(j), and the Foreign Assistance Act of 1961, 22 U.S.C. §2371(b). Iran has also been found to be liable as a state sponsor of international terrorism under 28 U.S.C. §1605(a)(7), especially in connection with acts perpetrated by its state sponsored paramilitary terrorist organization known as "Hizballah" or "Hezbollah," in various cases before this court, including *Anderson v.*

vii

## APPENDICES
### PLAINTIFFS' FIRST MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR ENTRY OF JUDGMENT BY DEFAULT AGAINST SOVEREIGN DEFENDANTS

*the Islamic Republic of Iran*, 90 F.Supp.2d 107 (D.D.C. 2000), and *Cicippio v. The Islamic Republic of Iran*, 18 F.Supp. 2d 62 (D.D.C. 1998).

221. Since the time Iran was designated by the Department of State as a state sponsor of terrorism, a large body of evidence has been collected and analyzed which shows conclusively that Iran views terrorism as an instrument of state policy, like diplomacy or military power - a tool to be used to further political objectives. The evidence shows that Iran has, over the years, directly carried out assassinations, bombings and other terrorist acts against its enemies. It has also provided direct and indirect support to international terrorist groups in the form of money, training, sanctuary, documentation, intelligence, weapons and other types of assistance, including to defendant Al Qaeda.

222. To carry out its policy of terrorism and support for terrorist groups, Iran has created and used government organizations including intelligence ministries, the military, special groups and various types of covert entities which are part of the government and are directly answerable to, and receive instructions from, the regime in power.

223. As described above, Iran acted through its officials, officers, agents, employees, agencies and instrumentalities in providing material support and resources to defendants Al Qaeda, Bin Laden and other defendants. The support provided by Iran to Bin Laden and Al Qaeda assisted in and contributed to the preparation and execution of the plans that culminated in the Terrorist Hijacked Flights and the extrajudicial killing of the Decedents.

224. The following defendants, collectively referred to as the "Iranian Instrumentalities," were among the officials, officers, agents, employees, agencies and instrumentalities through which Iran caused, supported and contributed to the terrorist acts that resulted in the death of the Decedents: (*the list of Instrumentalities includes Hezbollah, Al Qaeda, and Osama Bin Laden*).

252. In the second half of November 1997, Ayatollah Ali Khamenei convened a meeting with General Rahim Safavi and Ahmad Vahidi, the former commander of al-Quds Forces, to discuss the establishment of a new elite terrorist force to carry out spectacular, but deniable, terrorist strikes against the United States and the West.

APPENDICES
**PLAINTIFFS' FIRST MEMORANDUM OF LAW IN SUPPORT OF MOTION
FOR ENTRY OF JUDGMENT BY DEFAULT AGAINST SOVEREIGN DEFENDANTS**

253. Al Qaeda telephone bills of international calls between 1996 and 1998 were analyzed by United States investigators, showing that nearly 10% of the outgoing calls from Afghanistan went to Iran.

254. According to the State Department's Patterns of Global Terrorism 2000, Iran remained the most active state sponsor of terrorism in 2000. It provided increasing support to numerous terrorist groups, including the Lebanese Hezbollah, HAMAS, and the Palestine Islamic Jihad (PIJ), which seek to undermine the Middle East peace negotiations through the use of terrorism.

255. The State Department's Patterns of Global Terrorism 2000 also stated that Iran's "Revolutionary Guard Corps (IRGC) and Ministry of Intelligence and Security (MOIS) continued to be involved in the planning and execution of terrorist acts and continued to support a variety of groups that use terrorism to pursue their goals."

256. In January 2001, Dr. Ayman al-Zawahri and other Al Qaeda leaders met with Iranian intelligence officials at a mountain guesthouse near the town of Varamin, just south of Tehran. The Iranian delegation was headed by Hojjat-ol eslam Ali Akbar Nateq-Nouri and included Imad Fayez Mugniyeh, a Labanese operative and leader of Hezzbollah who is credited with numerous terrorist attacks on Americans. The purpose of the meeting was to plan and coordinate Iranian support for an upcoming Al Qaeda operation against the United States.

257. On May 4, 2001, a second planning meeting between Al Qaeda and Iranian intelligence officials was held in Iran. Attendees at this planning meeting included Khamenei, Rafsanjani, and Bin Laden's son, Saad Bin Laden. Iranian intelligence memos written in the weeks following the meeting advise Iranian operatives to be prepared for U.S. retaliation for an attack planned for September 2001.

## APPENDIX E

## The Islamic Republic of Iran's Early Terrorist Connections

Even before taking power in 1979, Ayatollah Ruhollah Khomeini, a Shiite Muslim, had

**APPENDICES**
**PLAINTIFFS' FIRST MEMORANDUM OF LAW IN SUPPORT OF MOTION**
**FOR ENTRY OF JUDGMENT BY DEFAULT AGAINST SOVEREIGN DEFENDANTS**

started to forge connections to Sunni terrorists.  Early on, he had a close personal relationship

with Yasser Arafat, the Sunni leader of the Palestinian Liberation Organization (PLO).  Ex. 2,

Timmerman 2nd Affid. ¶5.  In 1972, Khomeini signed an accord with Arafat to train Khomeini's

Islamic fighters at Arafat's camps in Lebanon.  Almost every leader of the Iranian Revolution

passed through those PLO training camps, including Khomeini's own son, Ahmad Khomeini,

and Mustafa Chamran, the first commander of the IRGC.  Baer, See No Evil, p. 130; Ex. 2,

Timmerman 2nd Affid. ¶¶5-7.  Khomeini's eventual successor, today the Supreme Leader of

Iran, Ayatollah Khamenei, served as the liaison between the exiled Khomeini and his Islamic

revolutionaries being trained at the PLO camps in Lebanon.  Ex. 2, Timmerman 2nd Affid. ¶7.

Once Khomeini seized power, the very first telephone call he received was from Arafat,

and Arafat was the very first foreign "leader" to visit Khomeini, on October 19, 1979, two weeks

before the seizure of the U.S. Embassy.  Id. at ¶5; Baer, See No Evil, p. 130.  On November 4,

1979, a student group, acting at the behest of Ayatollah Khomeini, seized the U.S. Embassy in

Tehran and took fifty-two (52) diplomatic hostages, Ex. 2, Timmerman 2nd Affid. ¶9, a terrorist

act without precedent in modern times.  In 1979, The CIA's report, *International Terrorism*,

stated:

> *"Anti-US sentiment in Iran reached a peak in 1979 with the second takeover of the US*
> *Embassy in Tehran. . . .  After the takeover, security forces, acting in concert with the*
> *terrorists, guarded the hostages and restricted communications.  Rather than actively*
> *negotiating for the release of the hostages, [Iran] government authorities reinforced the*
> *demands of the terrorist."*

Ex. 6, Lopez-Tefft Affid. ¶61 (*emphasis omitted*).  The 444-day Iranian hostage crisis set the

x

**APPENDICES**
**PLAINTIFFS' FIRST MEMORANDUM OF LAW IN SUPPORT OF MOTION**
**FOR ENTRY OF JUDGMENT BY DEFAULT AGAINST SOVEREIGN DEFENDANTS**

stage for three decades of hostility and "unspeakable acts of terrorist violence," *In Re: Islamic Republic of Iran Terrorism Litigation*, 659 F.Supp.2d 31, 36 (D.D.C. 2009)(Lamberth, Ch.J.), that continues to the present day.

Moreover, early on, Ayatollah Khomeini knew that expansion of the Islamic revolution required Iran to universalize its appeal, to encompass Arabs and to make common cause with them against their enemy, Israel. Baer, The Devil We Know, pp. 69.

## APPENDIX F

### State Department Country Reports on Terrorism – Excerpts *re*: Iran 1989-2008

Since 1976, U.S. law has required the Secretary of State to provide Congress with a report on terrorism. These reports have been entitled "*Patterns of Global Terrorism*," "*Patterns of International Terrorism*," and, more recently, "*Country Reports on Terrorism*." *See* Ex. 13 and Ex. 6, Lopez-Tefft Affid. ¶¶66-95. The following are some of the references in these reports to Iran's involvement in international terrorism:

1980   "[T]he Iranian Government itself initiated numerous acts of international terrorism. . . . [A]t least half . . . were directly carried out by Iranian Government officials." "Most prominently, the taking of the U.S. hostages in Tehran was a clear act of international terrorism, violating all norms of diplomatic behavior; this incident clearly was approved by the Iranian Government."

1981   "[A]ssassination attempts have increased dramatically . . . attributable to the fact that several countries – . . . Iran among them – have increasingly used their military and intelligence services to carry out terrorist attacks against foreign diplomats or their own exiles."

1983   "Iran's use of terrorism to promote Islamic fundamentalist revolutions throughout the

xi

**APPENDICES**
**PLAINTIFFS' FIRST MEMORANDUM OF LAW IN SUPPORT OF MOTION**
**FOR ENTRY OF JUDGMENT BY DEFAULT AGAINST SOVEREIGN DEFENDANTS**

Middle East is inimical to US policies and profoundly threatens Western interests. . . .
Iran also trained Shia dissidents from most of the Arab nations in the Persian Gulf region
in terrorist tactics. . . . . Iranian patronage was a major factor in terrorism elsewhere in the
Middle East during 1983."

1984    "Currently the world's leading supporter of terrorism, Iran . . . still intends to punish the
United States for its support of the late Shah . . . [and] hopes to drive US and Western
influence from the Islamic world . . . .  Tehran's long-term goal is to spread its revolution
by using terrorism . . . . .  To that end, Iran continues to train Shia dissidents and to
establish a terrorist infrastructure in the region."

1985    "Groups with established ties to Iran carried out some 30 attacks last year."  "Iran has
used its network of diplomatic and cultural missions to support terrorist operations, and
many elements of the Iranian Government, including several senior officials, have been
directly involved in terrorist activity."

1986    "Iran in 1986 continued to view terrorism as an important instrument in its campaign to
drive US and Western influence out of the Middle East. . . ."  "Tehran continues to
provide significant support to the radical Shia Hizballah movement that has kidnapped
foreigners and is conducting terrorist operations against Western – and particularly US . .
. interests."

1987    "Iranian-sponsored terrorism [involved] 44 incidents, representing a 30-percent jump
over 1986."  ". . . [M]ost Iranian leaders agree: that terrorism is an acceptable policy
option."  ". . . Iran undoubtedly views terrorism as a potential major weapon in its
confrontation with the United States . . . ."  ". . . [D]uring the summer of 1987, Iran began
to formulate contingency plans for anti-US terrorist operations."

1988    "Iran was linked to 32 [terrorist] incidents in 1988. . . . ."  "Hizballah terrorists, probably
directed by Imad Mughniyah, a Hizballah security chief, hijacked a Kuwaiti airliner . . . .
The terrorists – in suspected complicity with Iran – showed themselves to be skilled
professionals . . . ."

1989    "Iran was the most active state sponsor in 1989, backing 28 attacks . . . Iran continues to
use terrorist tactics to advance its revolutionary goals."  ". . . Iran's extensive support for
terrorism continued after the death of Ayatollah Khomeini in June.  The events of 1989
indicate Tehran continued to view the selective use of terrorism as a legitimate tool to
achieve specific foreign policy goals.  Iranian intelligence has been used to facilitate and
in some cases conduct terrorist attacks."  "Iran continues to provide Hizballah with
money, weapons and training. . . ."

xii

**APPENDICES**
**PLAINTIFFS' FIRST MEMORANDUM OF LAW IN SUPPORT OF MOTION
FOR ENTRY OF JUDGMENT BY DEFAULT AGAINST SOVEREIGN DEFENDANTS**

1990    "Iran's extensive support for terrorism continued during 1990 . . . Iran has used its
        intelligence services extensively to facilitate and conduct terrorist attacks. . . ." "Iran
        continued to strengthen its relationship with Muslim extremists throughout the world,
        often providing them with advice and financial assistance."

1991    "Iran has used conferences . . . held in Iran during the period 19-22 October . . . to
        maintain contact with numerous terrorist groups."  "Iran also continued its practice of
        assassinating dissidents."  "Iranian intelligence services continue to facilitate and conduct
        terrorist attacks, particularly against regime opponents living abroad.  This policy is
        undertaken with the approval of the highest levels of the regime, although the
        government routinely denies involvement in assassination of dissidents or in terrorist
        attacks carried out by pro-Iranian groups."

1992    "The Iranian Regime has practiced state terrorism since it took power in 1979; it is
        currently the deadliest state sponsor and has achieved a worldwide reach."  "Iranian
        agents or surrogate groups conducted over 20 attacks in 1992."  ". . . Tehran's leaders
        view terrorism as a valid tool to accomplish the regime's political objectives, and acts of
        terrorism are approved at the highest level of government in Iran."

1993    "Iran remains the world's most active and most dangerous state sponsor of terrorism,
        through its own state agents and the radical groups it supports."

1994    "Iran continues to use terrorism as ruthlessly as it did under Khomeini and supports
        groups, such as Hizballah, that pose a threat to Americans."  "Iran is still the most active
        state sponsor of international terrorism and continues to be directly involved in planning
        and executing terrorist acts. . . .  Iran is also the world's preeminent state sponsor of
        extremist Islamic and Palestinian groups, providing funds, weapons, and training."

1995    "Although Tehran tried to project a moderate image in the West, it continued to
        assassinate dissidents abroad and maintained its support and financing of groups that pose
        a threat to US citizens."  "Iran remains the premier state sponsor of international
        terrorism and is deeply involved in the planning and execution of terrorist acts both by its
        own agents and by surrogate groups."

1996    "Iran remained the premier state sponsor of terrorism in 1996.  It continued to be
        involved in the planning and execution of terrorist acts by its own agents and by
        surrogates . . . ." "Iran continued to provide support – including money, weapons, and
        training to a variety of terrorist groups . . . ." "German prosecutors charged Iranian
        Supreme Leader Khamenei and Iranian President Rafsanjani with approving the

xiii

**APPENDICES**
**PLAINTIFFS' FIRST MEMORANDUM OF LAW IN SUPPORT OF MOTION**
**FOR ENTRY OF JUDGMENT BY DEFAULT AGAINST SOVEREIGN DEFENDANTS**

[Mykonos] operation [killing Kurdish dissidents]."

1997  "Tehran conducted at least 13 assassinations in 1997."  "The [German] judge further stated that the Mykonos [dissident] murders had been approved at the most senior levels of the Iranian Government by an extra-legal committee whose members included the Minister of Intelligence and Security, the Foreign Minister, the President, and the Supreme Leader."  "In the fall of 1997, Tehran hosted numerous representatives of terrorist groups . . . at a conference . . . .  Participants reportedly discussed the jihad, establishing greater coordination between certain groups, and an increase in support for some groups."

1998  "Iran in 1998 continued to be involved in the planning and execution of terrorist acts . . . [and] Tehran continued . . . to support a variety of groups that use terrorism to pursue their goals . . . .  Iran supports these groups with varying amounts of training, money and/or weapons."

1999  ". . . [Iran's] state institutions, notably the Revolutionary Guard Corps and the Ministry of Intelligence and Security, continued to be involved in the planning and execution of terrorist acts and continued to support a variety of groups that use terrorism to pursue their goals."  "A variety of public reports indicate Iran's security forces conducted several bombings against Iranian dissidents abroad."  "Iran also provided support to terrorist groups in North Africa and South and Central Asia, including financial assistance and training."

2000  "Iran remained the most active state sponsor of terrorism in 2000.  Its Revolutionary Guard Corps (IRGC) and Ministry of Intelligence and Security (MOIS) continued to be involved in the planning and the execution of terrorist acts and continued to support a variety of groups that use terrorism to pursue their goals." "Iran also provide a lower level of support – including funding, training, and logistics assistance – to extremist groups in . . . Central Asia."

2001  "Iran remained the most active state sponsor of terrorism in 2001."  "There are . . . reports that Arab Afghans, including al Qaeda members, used Iran as a transit route to enter and leave Afghanistan."

2002  "Iran remained the most active state sponsor of terrorism.  Its Islamic Revolutionary Guard Corps and Ministry of Intelligence and Security were involved in the planning of and support for terrorist acts and continued to exhort a variety of groups that used terrorism to pursue their goals."  "Al-Qaeda members have found virtual safehaven there

xiv

**APPENDICES**
**PLAINTIFFS' FIRST MEMORANDUM OF LAW IN SUPPORT OF MOTION**
**FOR ENTRY OF JUDGMENT BY DEFAULT AGAINST SOVEREIGN DEFENDANTS**

[Iran] and may even be receiving protection from elements of the Iranian Government."
"Iran also provided support to extremist groups in Central Asia, Afghanistan, and Iraq
with ties to al Qaeda."

2003    "After the fall of the Taliban regime in Afghanistan, some al Qaeda members fled to Iran
where they had found virtual safehaven."

2004    "Iran also continued to fail to control the activities of some al Qaeda members who fled
to Iran following the fall of the Taliban regime in Afghanistan."

2005    "The IRGC was increasingly involved in supplying lethal assistance to Iraqi militant
groups, which destabilizes Iraq."

2006    "Iran remained the most active state sponsor of terrorism, its . . .  IRGC and . . . MOIS
were directly involved in the planning and support of terrorist acts and continued to
exhort a variety of groups . . . to use terrorism . . . ."  "Iran also continued to fail to
control the activities of some al Qaeda members who fled to Iran following the fall of the
Taliban regime in Afghanistan."

2007    "Iran's IRGC-Qods Force continued to provide weapons and financial aid to the Taliban
to support anti-U.S. and anti-Coalition activity in Afghanistan."  "Iran remained
unwilling to bring to justice senior al Qaeda members . . . and has refused to publicly
identify those senior members in its custody."  "Iran also continued to fail to control the
activities of some al Qaeda members who fled to Iran following the fall of the Taliban
regime in Afghanistan."

2008    "The Qods Force, an elite branch of the . . . IRGC, is the regime's primary mechanism for
cultivating and supporting terrorists abroad.  The Qods Force provided aid in the form of
weapons, training, and funding to HAMAS and other Palestinian terrorist groups,
Lebanese Hizballah, Iraq-based militants, and Taliban fighters in Afghanistan."  "Iran's
IRGC Qods Force provided assistance to the Taliban in Afghanistan.  The Qods Force
provided training to the Taliban on small unit tactics, small arms, explosives, and indirect
fire weapons."  "Iran also continued to fail to control the activities of some al Qaeda
members who fled to Iran following the fall of the Taliban regime in Afghanistan."
"Senior IRGC and Qods Force officials were indicted by the Government of Argentina
for their alleged roles in the 1994 terrorist bombing of the Argentine Israel Mutual
Association which, according to the Argentine State Prosecutor's Report, was initially
proposed by the Qods force."

2009    "Iran remained the most active state sponsor of terrorism.  Iran's financial, material, and

**APPENDICES**
**PLAINTIFFS' FIRST MEMORANDUM OF LAW IN SUPPORT OF MOTION
FOR ENTRY OF JUDGMENT BY DEFAULT AGAINST SOVEREIGN DEFENDANTS**

logistic support for terrorist and militant groups throughout the Middle East and Central Asia had a direct impact on international efforts to promote peace, threatened economic stability in the Gulf and undermined the growth of democracy." "The Qods Force, the external operations branch of the Islamic Revolutionary Guard Corps (IRGC), is the regime's primary mechanism for cultivating and supporting terrorists abroad. . . . Iran has provided hundreds of millions of dollars in support to Lebanese Hizballah and has trained thousands of Hizballah fighters at camps in Iran." "Iran's Qods Force provided training to the Taliban in Afghanistan on small unit tactics, small arms, explosives, and indirect fire weapons." "Iran remained unwilling to bring to justice senior al-Qa'ida (AQ) members it continued to detain, and refused to publicly identify those senior members in its custody."

## APPENDIX G

### Iran's Creation of Hizballah as a Terrorist Proxy

When Israel invaded Lebanon on June 6, 1982, Iran dispatched a force of its IRGC and MOIS to create and train a force to assist the PLO's resistance to the Israelis. Thus, Iran created Hizballah (the "Party of God") as an extension of the Iranian Revolution into Lebanon. Ex. 7, Bergman Affid. ¶25; Ex. 6, Lopez-Tefft Affid. ¶28; Ex. 2, Timmerman 2nd Affid. ¶¶12-14; Ex. 8, Clawson Affid. ¶36. In November 1982, the IRGC, using the Lebanese militant group Islamic *Amal* as a proxy, seized the Sheikh Abdallah army barracks from the Lebanese government's police force at Balabakk in the Bekaa Valley, renaming it "Camp Imam Ali." This camp became the headquarters of Hizballah and the IRGC in Lebanon (and would be the place where many kidnapped hostages were imprisoned, including CIA station chief William Buckley).[†] Ex. 7, Bergman Affid. ¶28; Baer, See No Evil, pp. 73, 100-02; Baer, The Devil We Know, p. 67.

---

[†] Hizballah today is the ruling *de facto* government of much of Lebanon. Ex. 7, Bergman Affid. ¶23; The Devil We Know, pp. 191-94.

**APPENDICES**
**PLAINTIFFS' FIRST MEMORANDUM OF LAW IN SUPPORT OF MOTION**
**FOR ENTRY OF JUDGMENT BY DEFAULT AGAINST SOVEREIGN DEFENDANTS**

From the beginning, Hizballah served as a terrorist proxy organization for Iran, with a special wing, the Islamic Jihad Organization (IJO), created specifically for the purpose of serving as a front for Iranian terrorism, in effect, a cover name for terrorist operations run by Iran's IRGC around the world.  Baer, The Devil We Know, pp. 63-66; Baer, See No Evil, pp. 262-64, 274; Ex. 3, Byman Affid. ¶20; Ex. 7, Bergman Affid. ¶25.‡  The U.S. State Department designated Hizballah a "foreign terrorist organization" in 1997.  Ex. 6, Lopez-Tefft Affid. ¶63; Ex. 7, Bergman Affid. ¶22.

"Iran's involvement in Hizballah's creation, large-scale funding, constant provision of training, and role in Hizballah's leadership councils has given Iran an important role in the Lebanese organization.  Iran trusts Hizballah and Hizballah trusts Iran – one of the closest relationships in history between a terrorist group and its sponsor."  Ex. 3, Byman Affid. ¶44.  The IRGC's relationship with Hizballah is extremely close, funneling money and weapons from Iran to Hizballah since the 1980s.  Ex. 8, Clawson Affid. ¶36; Ex. 7, Bergman Affid. ¶27.  For more than a quarter century since its creation, Hizballah has received from Iran $100-300 million in direct financial support – annually – which funding was controlled, originally, by Ayatollah Khomeini's close associate (and Iran's former ambassador to Syria and Sudan) Hojat al Islam Ali Akbar Mohtashemi-Pour.  Ex. 8, Clawson Affid. ¶66; Ex. 6, Lopez-Tefft Affid. ¶31; Ex. 7, Bergman Affid. ¶26; Ex. 11, Banisadr testimony, p. 31.  (Iran's financial support for terrorism

---

‡     Iran would found a similar terrorist organization, for a similar purpose, some twenty-five (25) years later when it created, in league with Osama bin Laden, al Qaeda-in-Iraq, headed by Abu Musab Zarqawi, which fueled the insurgency that created some much chaos in Iraq during the latter half of the 2000s.  *See* Ex. 6, Lopez-Tefft Affid. ¶¶228, 281-86; 302, 308, 310.

APPENDICES
**PLAINTIFFS' FIRST MEMORANDUM OF LAW IN SUPPORT OF MOTION
FOR ENTRY OF JUDGMENT BY DEFAULT AGAINST SOVEREIGN DEFENDANTS**

overall has been estimated to range between $300 and 500 million annually.  Ex. 8, Clawson

Affid. ¶¶66-67.)

## <u>APPENDIX H</u>

### <u>Imad Mughniyah</u>

When Yasser Arafat and his PLO fled to Tunisia, he left behind some of his operatives.

One of Arafat's "Force 17" bodyguards, Imad Fayez Mughniyah, was recruited by senior IRGC

officer Hossein Mosleh (a/k/a "Sheikh Hossein").  Baer, <u>The Devil We Know</u>, pp. 62-65; Ex. 2,

Timmerman 2nd Affid. ¶14.  Mughniyah went to work in Hizballah's IJO.  Baer, <u>The Devil We
Know</u>, pp. 64-65.  An especially talented and ruthless terrorist operative, director, and

coordinator, Mughniyah would rise to become Hizballah's chief of terrorist operations, a position

he would hold, with notorious success, until his assassination in Damascus, Syria, in February

2008.  Ex. 2, Timmerman 2nd Affid. ¶14; Ex. 6, Lopez-Tefft Affid. ¶204; Ex. 7, Bergman Affid.

¶¶29-32; Baer, <u>The Devil We Know</u>, pp. 78-86, 229.  Mughniyah was on the FBI's "Most

Wanted" list for 21 years, and for good reason: his terrorist record includes a string of heinous

crimes against American citizens, including bombings, hijackings, kidnappings, torture, and cold-

blooded murder.  Ex. 7, Bergman Affid. ¶¶29-32; Ex. 2, Timmerman 2nd Affid. ¶¶14-46.

Throughout his notorious terrorist career, Imad Mughniyah was an agent of the Iranian

regime.§  He lived in Iran for many years.  Ex. 7, Bergman Affid. ¶¶31, 40-41.  At the time of his

---

§    Imad Mughniyah had a direct reporting relationship to Iranian intelligence and a direct role in Iran's

APPENDICES
**PLAINTIFFS' FIRST MEMORANDUM OF LAW IN SUPPORT OF MOTION
FOR ENTRY OF JUDGMENT BY DEFAULT AGAINST SOVEREIGN DEFENDANTS**

assassination by, ironically, car bomb, in February 2008, the Iranian government heaped praise

upon him.  In a message of condolence to Hizballah leader Hassan Nasrallah, Iran's Supreme

Leader said, "the lives and deaths of such people [as Mughniyah] is a heroic story inspiring all

nations, giving the youths a role-model, a clear prospect, and the way to realize it."  Ex. 6, Lopez-

Tefft Affid. ¶363.  Thus, it was a man who conceived, designed, planned, commanded, and

carried out terrorist operations that killed hundreds of people, more than any other single figure in

the world, who Iran's Supreme Leader's invoked as a role model for children.**


## APPENDIX I


### Osama bin Laden's *al Shamal* Bank

While in Sudan, Osama bin Laden set up financial supports, connected to Iran and

Hizballah, for al Qaeda in Sudan.  He founded *al Shamal* Islamic Bank and funded it with some

$50 million.  Ex. 6, Lopez-Tefft Affid. ¶¶140-42; Ex. 2, Timmerman 2nd Affid. ¶94; Ex. 14,

U.S. Department of State Fact Sheet: "Usama Bin Ladin: Islamic Extremist Financier," August

---

sponsorship of terrorist activities.  Israeli intelligence, which tracked Mughniyah with even greater intensity than did the U.S., termed Mughniyah "a triple Hizballah-Iran-al Qaeda agent and terrorist 'executive.'"  Ex. 6, Lopez-Tefft Affid. ¶205.  (The sealed testimony of Witnesses X, Y, and Z provide additional significant information about Imad Mughniyah and his subordinate relationship to the Iranian government.)

** According to the numerous American and Israeli media outlets, an indictment filed on January 17, 2011 by the prosecutor for the UN Special Tribunal for Lebanon names the Supreme Leader Ayatollah Khamenei as giving the order to assassinate Lebanese Prime Minister Rafik Hariri in 2005, Iran's Qods Force as conveying to order to Hizballah, and Hizballah military leader Imad Mughniyah as carrying out the assassination with a Hizballah team.  Just days earlier, Hizballah walked out on the Lebanese government, causing its collapse, because the acting prime minister, Saad Hariri, son of the slain leader, would not renounce the UN Special Tribunal.  When the indictment was filed, Hizballah leader Hassan Nasrallah threatened to "cut the hands off" of anyone attempting to arrest Hizballah members for the crime.  *See* Ex. 34.

xix

**APPENDICES**
**PLAINTIFFS' FIRST MEMORANDUM OF LAW IN SUPPORT OF MOTION**
**FOR ENTRY OF JUDGMENT BY DEFAULT AGAINST SOVEREIGN DEFENDANTS**

14, 1996.[††]  The *al Shamal* Bank and another al Qaeda front company, Taba Investments,

establish direct connections between bin Laden and attacks against U.S. targets carried out by al

Qaeda and Hizballah with funding from the bank's accounts, and also financial connections

between bin Laden and Iran.  Ex. 6, Lopez-Tefft Affid. ¶¶140-46; Ex. S-10, Timmerman 1st

Affid. ¶¶102-110; Ex. 2, Timmerman 2nd Affid. ¶¶91-96.

One of these direct connections, seemingly incongruous but actually demonstrating the

Iranian capacity for pragmatic action in its own interests, as well as its sponsorship of terrorism,

involved Iran's hated enemy, Saddam Hussein, with whom Iran had recently fought a savage

eight-year war.  An Iranian opposition group, the Iranian People's *Fedaii* Guerillas of Iran, first

reported, on February 16, 1996, that senior IRGC officers were profiting by helping Saddam

Hussein evade U.N. oil sanctions.  At that time, the group's spokesman, who used the *nom de

guerre* "Bahram," submitted thirty-three (33) pages of documents to U.N. Secretary General

Boutros Boutros-Ghali, including contracts, invoices, shipping documents, and bank telexes,

relating to a 1994 contract for the sale by Iraq, at deeply discounted prices, of refined petroleum

products to Iran.  The contract was negotiated by top aides to the IRGC commander, Major

General Mohsen Rezai, with Iraqi intermediaries in Paris, France.

Under the scheme, Iraqi oil tanker trucks monthly brought 30,000 metric tons of diesel

fuel and 50,000 metric tons of gasoline to an Iranian border post controlled by the IRGC.  The

IRGC then took possession of the oil products and sold them at a profit on the international

---

[††]  Available online on the website of the U.S. Embassy in Tel Aviv, Israel, *see*
http://usembassy-israel.org.il/publish/press/state/archive/august/sd4_8-15.htm.

**APPENDICES**
**PLAINTIFFS' FIRST MEMORANDUM OF LAW IN SUPPORT OF MOTION**
**FOR ENTRY OF JUDGMENT BY DEFAULT AGAINST SOVEREIGN DEFENDANTS**

market.  Among the documents "Bahram" presented was a performance bond issued by the

seller's bank, dated April 6, 1994, in favor of the *al Shamal* Islamic Bank in Khartoum, Sudan,

the ultimate buyer of the diesel fuel.  By selling oil through Osama bin Laden's own bank, the *al*

*Shamal* Islamic Bank, and facilitating the clandestine oil shipments in violation of the United

Nations embargo on Saddam Hussein's regime in Iraq, Iran contributed to bin Laden's financial

profit.  Ex. 2, Timmerman 2nd Affid. ¶¶91-96.

## APPENDIX J

### 1999-2000: Terrorist Training Camps

A *Havlish* attorney, Timothy Fleming, along with investigator Kenneth Timmerman,

debriefed a career IRGC officer, "Colonel B," who served as the superintendent of a Sunni

terrorist training camp at *Sahel-e rouh*, about forty (40) kilometers west of Rasht, Iran, on the

Caspian Sea.  From 1999 to 2000, "Colonel B" ran the *Shahid Mohammad Beglou* camp, which

specialized in training the cadres of a variety of terrorist groups loosely affiliated with al Qaeda.

Syrians, Lebanese, Azeris, Libyans, Iraqi Arabs, and Iraqi Kurds – all Sunnis – came to the

Beglou camp for 60-day training sessions.  Ex. 2, Timmerman 2nd Affid. ¶¶61-67.  Colonel B's

information is consistent with an announcement by Turkish authorities in November 1999 of

arrests of a number of al Qaeda terrorists, including Kurds and Algerians, who had entered

Turkey from Iran in June 1999 intending to carry out terrorist attacks aimed at disrupting the

upcoming summit of the Conference on European Cooperation and Security.  Under

**APPENDICES**
**PLAINTIFFS' FIRST MEMORANDUM OF LAW IN SUPPORT OF MOTION
FOR ENTRY OF JUDGMENT BY DEFAULT AGAINST SOVEREIGN DEFENDANTS**

interrogation, the detainees admitted they had been trained at camps in Iran.  Ex. 2, Timmerman 2nd Affid. ¶60.

Colonel B also told Fleming and Timmerman that the IRGC maintained another separate camp especially for Saudi nationals because of their distinct cultural habits and religious practices.  This training camp was located in Iraqi Kurdistan and controlled first by Iranian intelligence and later by Abu Musab Zarqawi, *id.*, ¶64, later to be the notorious head of "al Qaeda in Iraq."  Yet another camp located in the desert east of Tehran, according to Colonel B, was run by Imad Mughniyah for special recruits Mughniyah spotted during his trips to Afghanistan. *Id.*, ¶65.  Former president Abolhassan Banisadr confirmed the existence inside Iran of terrorist training camps for foreign fighters.  Ex. 11, Banisadr testimony, pp. 26, 29.  (Witnesses X, Y, and Z all provide additional evidence concerning the existence of training camps inside Iran, and in Lebanon, run by the IRGC, MOIS, or Imad Mughniyah, for Arab terrorists arriving from various countries.)  These terrorist training camps, all sponsored by Iran, were a continuation of the terrorist training relationship that was established between Iran and al Qaeda in the Sudan and Lebanon in the early 1990s.  Ex. 2, Timmerman 2nd Affid. ¶67.


**APPENDIX K**

**1996-98: Hekmatyar, Iran, bin Laden, and the Taliban**

Shortly after Osama bin Laden moved to Afghanistan at the invitation of Afghan Sunni warlord – and strong Iran ally – Gulbuddin Hekmatyar,  relations soured between Hekmatyar and

**APPENDICES**
**PLAINTIFFS' FIRST MEMORANDUM OF LAW IN SUPPORT OF MOTION
FOR ENTRY OF JUDGMENT BY DEFAULT AGAINST SOVEREIGN DEFENDANTS**

the Taliban, for whom Hekmatyar twice served as Prime Minister.  In 1996, Iran welcomed

Hekmatyar to take up residence in exile in Iran due to his longstanding links with the Islamic

regime.  Ex. 6, Lopez-Tefft Affid. ¶128.‡‡  The following summer, U.S. diplomats reported to

the State Department on meetings between Hekmatyar and Iranian foreign minister Velayati.

Ex. 16, U.S. Embassy (Islamabad), Cable, July 7, 1997; Ex. 2, Timmerman 2nd Affid. ¶100.§§

Taliban officials at the time believed Iran was also dealing with Osama bin Laden.  When

asked by the Clinton Administration, at a meeting on December 8, 1997 in Washington, D.C., to

expel bin Laden, three Taliban government ministers argued that, if they agreed to the U.S.

request, bin Laden would "go to Iran and cause more trouble."  However, the Taliban claimed to

have "frustrated Iranian . . . attempts to get in touch" with bin Laden and also said they would

keep their commitment not to allow Afghanistan to be used as a base for terrorism.  Ex. 6,

Lopez-Tefft Affid. ¶177; Ex. 17, Department of State, Cable, December 11, 1997, at 9; Ex. 2,

Timmerman 2nd Affid. ¶101.***  Neither claim was true: as to the former, the August 1996

meeting in Jalalabad had already occurred, *see* pp. 92-93, *supra*; as to the latter, history would

soon show otherwise.

---

‡‡ Osama bin Laden tried to repair Hekmatyar's relationship with the Taliban but was unsuccessful, and
Hekmatyar remained in exile in Iran for six years, until 2002. Ex. 6, Lopez-Tefft Affid., p. 54, n. 25.

§§ In 1999, the U.N. included Hekmatyar on its consolidated list of entities and individuals associated with Osama
bin Laden, al Qaeda, and the Taliban, which obligates all member states to impose sanctions on him. Ex. 6,
Lopez-Tefft Affid. ¶130.  Yet Iran refused to take any action against Hekmatyar and instead continued to
provide him a safe refuge.  In February 2003, the State Department designated Hekmatyar a "Specially
Designated Global Terrorist" for his support of terrorist acts by al Qaeda and the Taliban, and the United
Nations added him to its list of entities and individuals associated with Osama bin Laden, al Qaeda, and the
Taliban.  *Id.*

*** Released under the FOIA to the National Security Archive.  Also available online at
www.gwu.edu/~nsarchiv/NSAEBB/NSAEBB97/tal24.pdf.