# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------:

IN RE TERRORIST ATTACKS ON                                    Civil Action No.
SEPTEMBER 11, 2001                                            03 MDL 1570 (GBD)
-----------------------------------------------------------:

FIONA HAVLISH, in her own right                               :
and as Executrix of the ESTATE OF                             :
DONALD G. HAVLISH, JR., Deceased, et al.,                     :
                                                              :
            Plaintiffs,                      :
v.                                                            :
                                                              :
USAMA BIN LADEN,                                              :
                                                              : CIVIL ACTION NO. 03-CV-9848 -RCC
AL QAEDA/ISLAMIC ARMY,                                        : Case Transferred from the United
an unincorporated association, *et al*                        : States District Court for the
                                                              : District of Columbia
FOREIGN STATE DEFENDANTS,                                     : Case Number   1:02CV00305
                                                              :
THE ISLAMIC REPUBLIC OF IRAN,                                 :
ALI AKBAR HASHEMI RAFSANJANI                                  :
Previously Identified and Served as                           :
Unidentified Terrorist 1,                                     :
                                                              :
IRANIAN MINISTRY OF                                           :
INFORMATION AND SECURITY,                                     :
                                                              :              **AFFIDAVIT OF**
THE ISLAMIC REVOLUTIONARY                                     :          **JANICE L. KEPHART**
GUARD CORPS,                                                  :
                                        :
HEZBOLLAH,                                                    :
an unincorporated association,                                :
                                                              :
THE IRANIAN MINISTRY OF PETROLEUM,                            :
                                                              :
THE NATIONAL IRANIAN                                          :
TANKER CORPORATION                                            :
Previously identified as Unidentified Terrorist 2, :
                                                              :
THE NATIONAL IRANIAN OIL CORPORATION,                         :
                                                              :

THE NATIONAL IRANIAN  GAS COMPANY        :
Previously Identified as Unidentified Terrorist 4, :
                                         :
IRAN AIRLINES                            :
Previously Identified as Unidentified Terrorist 5, :
                                         :
THE NATIONAL IRANIAN                     :
PETROCHEMICAL COMPANY                    :
Previously Identified as Unidentified Terrorist 6, :
                                         :
IRANIAN MINISTRY OF                      :
ECONOMIC AFFAIRS AND FINANCE             :
IRANIAN MINISTRY OF COMMERCE,            :
                                         :
IRANIAN MINISTRY OF DEFENSE              :
AND ARMED FORCES LOGISTICS,              :
                                         :
THE CENTRAL BANK OF THE                  :
ISLAMIC REPUBLIC OF IRAN, *et al.*       :
Previously Identified as Unidentified Terrorist 7, :
                                         :
                   Defendants.           :

---

## *<u>Affidavit of Janice L. Kephart</u>*

I, **Janice L. Kephart,** being duly sworn, do hereby swear and affirm under penalty of

perjury that the contents of this Affidavit are true and correct to the best of my knowledge,

information, and belief.

1.        I am an adult citizen of the United States and a resident of the State of Virginia.

### <u>Introduction and Summary</u>

2.        Affidavit represents the expert opinion of **Janice L. Kephart**.  Ms. Kephart is a former

counsel to the U.S. Senate Judiciary Subcommittee on Technology, Terrorism and Government

Information; a former immigration counsel to the September 11 Commission; and current

National Security Policy Director at the Center for Immigration Studies.  Ms. Kephart has

extensive knowledge of *terrorist travel* in general and exclusive knowledge of al Qaeda's 9/11 terrorist travel operation and its essential value to the success of its four plane operations.

3.     **This Affidavit concludes that** (1) facilitation of terrorist travel is critical material support to terrorist operations; and (2) Iran's facilitation of al Qaeda operative travel, including at least eight 9/11 hijackers, amounted to essential material support, indeed, direct support that further enabled al Qaeda to perpetrate the 9/11 attacks successfully.  Iran itself, and through its surrogate Hizballah, gave direct support to the 9/11 conspirators by Iran's and Hezbollah's active facilitation of hijackers' travel into and out of Afghanistan and by actions of a "senior Hizballah operative" in traveling to Saudi Arabia "to coordinate activities there" and "to assist individuals in Saudi Arabia in traveling to Iran during November" 2001.  *See* 9/11 COMMISSION REPORT pp. 240-241.  Al Qaeda's complex and well-executed travel plan that, at minimum, required complicity by Iranian government officials, including transit through Iran to Afghanistan and into Iran after acquisition of U.S. visas (likely for next-phase training or meetings), contributed to the success of the 9/11 operations.

4.     More specifically, this Affidavit concludes, Iran supported 9/11 hijacker travel into Iran and placed a "senior Hezbollah operative" on flights with slated 9/11 hijackers *immediately after* they had acquired U.S. visas in Saudi Arabia.  Keeping those passports "clean" of Iranian or Afghani travel stamps was essential now that the critical step in acquiring U.S. visas were achieved.  (Not all tapped 9/11 operatives were able to acquire U.S. visas and those that were not able to do so were not part of the operations).

5.     All of these facts taken together indicate that Iran, at minimum, facilitated the *terrorist travel* of the 9/11 hijackers.

## Qualifications of the Witness

6.       I am an adult citizen of the United States and a resident of the State of Virginia.

7.       From 1982 and 1986, I attended Duke University, majoring in political science and with a minor in history.  I received a liberal arts bachelor's degree in 1982.

8.       From 1989 to 1992, I attended Villanova School of Law, graduating in 1992.  While studying law at Villanova, I also founded the Public Interest Law Society.

9.       I was admitted to the Pennsylvania bar in 1992, and I am currently a member of the Pennsylvania bar, but my status is inactive.

10.       I have testified as an expert witness for the defense in the federal criminal case of *United States v. Stephen Traitz, Jr. et al.*, *see* 871 F.2d 368 (3rd Cir. 1989); 646 F.Supp. 1086 (E.D. Pa. 1986), in the Eastern District of Pennsylvania having reviewed and transcribed 740 hours of surveillance.  I worked for Duane Morris & Hecksher law firm.  I have not testified as an expert witness since 1989.

11.       Between 1992 and 1994, I worked for a Philadelphia law firm, where I represented plaintiffs in product liability and other tort cases.

12.       From 1996 to 1998, I served as an attorney for the U.S. Senate Judiciary Committee's Subcommittee on Technology, Terrorism and Government Information (hereinafter, the "Terrorism Subcommittee").  The Senate Judiciary Committee has legislative jurisdiction over federal criminal laws, terrorism, and immigration law, as well as areas such as human rights, intellectual property rights, antitrust law, and Internet privacy.  The Judiciary Committee considers and holds hearings on the appointment of all federal judges by the President and is also engaged in legislative oversight of Justice Department activities.

13.    A key responsibility while I worked for the Terrorism Subcommittee was oversight of the implementation of the ANTITERRORISM AND EFFECTIVE DEATH PENALTY ACT OF 1996 ("AEDPA"), the passage of which was stimulated in large part by the two most deadly acts of domestic terrorism in the United States up to that point in time: the bombings of the Alfred P. Murrah Federal Building in Oklahoma City in 1995 and the World Trade Center in New York City in 1993.

14.    Specifically, I mostly worked on implementation of the AEDPA's immigration-related requirements.[1] Those provisions established or adjusted mechanisms to bar alien terrorists from the U.S., enabled the removal of alien terrorists from the U.S., narrowed asylum provisions that had allowed terrorists to frustrate efforts to bar or remove them, and expedited deportation of criminal aliens.

15.    I also worked on oversight of counterterrorism programs at the Federal Bureau of Investigation (FBI), the Immigration and Naturalization Service (INS), and U.S. Attorneys' offices, as well as at some other specialty offices at the Department of Justice (DOJ) dealing specifically with terrorism.  In this work, I conducted a great deal of research on terrorist attacks and incidents and engaged in policy discussions regarding the designations of terrorist

---

[1]  The AEDPA also substantially amended federal *habeas corpus* law as applied to both state and federal prisoners, whether on death row or imprisoned for a term of years, by providing a bar on federal *habeas* reconsideration of legal and factual issues ruled upon by state courts in most instances, by creation of a general one-year statute of limitations, creation of a six-month statute of limitation in death penalty cases, and by requiring appellate court approval for repetitious *habeas* petitions.  The AEDPA further recast federal law concerning restitution, expanded the circumstances under which foreign governments that support terrorism may be sued for resulting injuries, and increased the assistance and compensation available to the victims of terrorism.  The AEDPA also was designed to help sever international terrorists from their sources of financial and material support, enlarged the proscriptions against assisting in the commission of various terrorist crimes, authorized the regulation of fundraising by foreign organizations associated with terrorist activities, and adjusted the Foreign Assistance Act to help isolate countries that support terrorists.  Finally, the AEDPA adjusted restrictions on possession and use of materials capable of producing catastrophic damage in the hands of terrorists and implemented a treaty requiring countries to limit plastic explosives to those with pre-explosion detection devices implanted within them.

organizations.  This work included information sharing with DOJ, the Department of State, the Central Intelligence Agency (CIA), and the Senate Select Committee on Intelligence on issues involving the State Department's designation of terrorist organizations and state sponsors of terror.

16.    In February 1998, the Terrorism Subcommittee's hearing on "Foreign Terrorists In America: Five Years After The World Trade Center" broke new ground in revealing the extent of foreign terrorist activity within the United States.  The hearing record contained the first American public release of Osama bin Laden's now infamous February 23, 1998 *fatwa*, which became the ideological basis for the 9/11 attacks.  The hearing record included a 40-page report, which I authored, entitled "Majority Staff Report on The Thwarted Brooklyn Bomb Plot: Identifying, Excluding and Removing Terrorists from the United States."

17.    From 2003 to July 2004, I served as a counsel to the NATIONAL COMMISSION ON TERRORIST ATTACKS ON THE UNITED STATES, otherwise known as the "9/11 Commission."

18.    On the 9/11 Commission Staff, I was assigned to the "border team" with two other attorneys and a former senior immigration enforcement agent.  As such, I was one of the principal authors of 9/11 AND TERRORIST TRAVEL: A STAFF REPORT OF THE NATIONAL COMMISSION ON TERRORIST ATTACKS UPON THE UNITED STATES (hereinafter "9/11 AND TERRORIST TRAVEL STAFF REPORT").

19.    As explained in a Note from the 9/11 Commission's Executive Director, Phillip Zelikow, much of the 9/11 Commission staff's work was organized around specialized studies of particular areas.  These studies then informed the seventeen staff statements delivered in conjunction with the 9/11 Commission's 2004 public hearings and the 9/11 COMMISSION REPORT OF THE 9/11 COMMISSION itself.  "Some of the specialized staff work . . . offered substantial

information or analysis that was not well represented in the Commission's report." The 9/11 AND TERRORIST TRAVEL STAFF REPORT, published one month after the 9/11 COMMISSION REPORT OF THE 9/11 COMMISSION, was one of two 9/11 Commission staff monographs published, and it specifically addressed such "immigration, border security and terrorist travel issues."

20.     From August 2004 to May 2005, after concluding my work with the 9/11 Commission (which was closed by the terms of the statute in August 2004), I worked on a book on the current state of foreign terrorist operations in the United States.

21.     From July 2005 to July 2008, I operated a consulting business for clients interested in government contracts and implementation of 9/11 Commission national security recommendations that had become law in the INTELLIGENCE REFORM AND TERRORISM PREVENTION ACT OF 2004, otherwise known as the "9/11 law". In that capacity, I testified before Congress a total of nine times, spoke at numerous national and international conferences on the subjects of terrorist travel, border security, and identity assurance, and I provided briefings to British intelligence and law enforcement entities. I also interfaced with the Canadian Embassy concerning security policy issues, and I was hired as a contractor to work with the Assistant Secretary for Policy of the Department of Homeland Security on relevant national security implementation programs.

22.     Since July 2008 to the present, I have been the National Security Policy Director at the Center for Immigration Studies, a non-partisan research institute devoted to immigration issues. Presently, some of my work can be accessed at cis.org/kephart.

## Foundation for Expert Opinions

23.     The only specific guidance the 9/11 Commission Staff's "border team" received

regarding the scope of our mission was based on the Congress' enabling statute.  Thus, the

Border Team devised our workload accordingly.  The law's stated purposes and functions, in

pertinent part, were as follows:

SEC. 602.  PURPOSES.

   The purposes of the Commission are to--
      (1) **examine and report upon the facts and causes** relating to the terrorist attacks of
September 11, 2001, occurring at the World Trade Center in New York, New York, in
Somerset County, Pennsylvania, and at the Pentagon in Virginia;
      (2) **ascertain, evaluate, and report on the evidence developed by all relevant
governmental agencies** regarding the facts and circumstances surrounding the attacks;
. . . .
      (4) **make a full and complete accounting of the circumstances surrounding the
attacks**, and the extent of the United States' preparedness for, and immediate response to, the
attacks; and
      (5) **investigate and report to the President and Congress on its findings,
conclusions, and recommendations** for corrective measures that can be taken to prevent
acts of terrorism.

SEC. 604.  FUNCTIONS OF COMMISSION.

   (a) In General.--The functions of the Commission are to--
      (1) **conduct an investigation that--**
         (A)  **investigates relevant facts and circumstances relating to the**
terrorist attacks of September 11, 2001 . . . and
         (B)  may **include relevant facts and circumstances relating to--**
            (i)     intelligence agencies;
            (ii)    law enforcement agencies;
            (iii)   diplomacy;
            (iv)   **immigration, nonimmigrant visas, and border control**;
            (v)    the flow of assets to terrorist organizations;
            (vi)   commercial aviation;
            (vii)  the role of congressional oversight and resource allocation; and
            (viii) other areas of the public and private sectors determined relevant
by the Commission for its inquiry;
      (2) **identify, review, and evaluate the lessons learned from the terrorist
attacks of September 11, 2001,** regarding the structure, coordination, management policies,
and procedures of the Federal Government, and, if appropriate, State and local governments

and nongovernmental entities, **relative to detecting, preventing, and responding to such terrorist attacks**; and

        (3) submit to the President and Congress such reports as are required . . . .

P.L. 107-306, Title VI (Nov. 27, 2002), 116 STAT. 2408-2410 (*emphasis added*).

24.     We on the Commission Staff's "border team" interpreted the statute as directing our investigation to "relevant facts and circumstances relating to the terrorist attacks of September 11, 2001" as pertaining to "immigration, nonimmigrant visas, and border control." In essence, we were to assess how and why the 9/11 hijackers were able to enter into, and remain inside, the United States, determine "lessons learned," and submit recommendations regarding how to prevent or detect terrorist entry or presence in the U.S. in the future.

25.     As a first order of business, we had to identify, locate, and extract all of the relevant immigration records from the newly created Department of Homeland Security (DHS) which absorbed numerous agencies, including INS and the Customs Bureau, and the State Department. Ultimately, we had to subpoena some of them. We also had to find the few sources within the U.S. Intelligence Community that had any knowledge of terrorist travel methodologies.

26.     I was specifically responsible for all aspects of the investigation regarding how and when the 9/11 hijackers attained entry into, and were able to stay in, the United States. This work entailed analysis of the entire INS operation as it pertained to the hijackers and why INS failed to detect and exclude the hijackers at the various points of entry. I also supported my border teammates regarding investigations into CIA, FBI, and State Department policies and procedures for tracking terrorists' movements across international borders.

27.     Our border team decided to divide the workload amongst the three of us originally hired in March 2003 as follows: intelligence, visas, and immigration. I took the immigration piece, meaning that I was responsible for all immigration matters pertaining to the hijackers once they

reached U.S. soil, including a complete review of immigration failings at the Immigration and Naturalization Service and a broad review of the pertinent immigration-related policies and practices of the Department of Justice.

28.     However, due to 9/11Commission internal rules of operation, we never conducted any interviews alone.  I thus worked with my colleagues on numerous issues, document reviews and interviews pertaining to investigations into CIA, FBI, and State Department policies and procedures for tracking terrorists' movements across international borders.  Each of us held the highest level of security clearance, thus enabling access to some extremely sensitive information, as well as interviews and briefings at the CIA and a Guantanamo Bay intelligence analytic center at Fort Belvoir, Virginia.

29.     The cross-over of work and sharing of some responsibilities on our border team enabled me, for example, to conduct the investigation that led to the revelation of the "20th hijacker", Mohamed al Kahtani.  Kahtani had attempted entry on August 4, 2001 at Orlando International Airport.  An astute border inspector sent him for further inspection, and he was excluded and sent back to Saudi Arabia.  He was later picked up in a raid by U.S. forces on the Afghan-Pakistani border, and only identified as the 20th hijacker based on fingerprints taken at the Orlando International Airport on August 4, 2001, and subsequent admissions by senior al Qaeda operatives.  A tipoff from a member of the intelligence community with very little information led my investigation to the Orlando airport.  In early 2004, the FBI had never interviewed the inspector, and was still unaware of the work done at Orlando International Airport to exclude the 20th hijacker.  Again, the analytic work I was able to conduct drawing from all source material available to me on the 9/11 Commission allowed me to come to conclusions about terrorist travel that otherwise would have been highly unlikely.

30.     One of my particular projects I did in order to assess and analyze my own work better was to create a definitive timeline of the 9/11 hijackers' immigration activities based on primary travel-related documents.

31.     These documents included the hijackers' passports, of which six survived, State Department visa applications and records, INS and Customs Bureau entry and exit records, customs records, secondary inspection records, INS change-of-status applications and records,[2] state-issued personal identification records, such as drivers' licenses, and those passport records from other countries that we were able to obtain.  Assuring the records belonged to the correct individuals was a significant part of my investigation.

32.     I melded all of this information into one definitive master chart that became a fundamental analytical tool for the Commission's work in connection with tracking the international travel, consular activities, U.S. border entries, and U.S. presence of the 9/11 hijackers.  Attached to this Affidavit as "Exhibit A," this chart has never before been seen by the public, but it is the single best existing document tracking the entry and immigration status of the 9/11 hijackers.[3]

33.     In sum, the border team conducted 14 months of research, reviewing thousands of documents from the Departments of State and Defense, Homeland Security (and its former

---

[2] A visa, generally issued by the State Department at its embassies or consular offices abroad, is not a permission to enter the U.S., but merely an authorization of a lawful immigrant or non-immigrant status enabling the bearer to present oneself at a point of entry or border for inspection and possible entry into the U.S.  The actual decision to admit the person into the U.S., or to exclude the person, was reserved to the INS (now Customs and Border Protection within the Department of Homeland Security (DHS)), as is any decision to extend a stay inside the U.S. or to change one's non-immigrant status from, *e.g.*, tourist to student.  The Customs Bureau (now also merged into Customs and Border Protection with the DHS) was responsible for physical inspection, generally to determine that the individual is not importing any contraband.

[3] Subsequent to my work on the 9/11 Commission, I prepared a similar chart of the entry and immigration status of all known terrorists who had attained entry into the United States.  These work included a substantial analysis of Hizballah's continuing utilization of U.S. immigration system vulnerabilities.  That analysis was published in a 2005 report *Immigration and Terrorism: Moving Beyond the 9/11 Staff Report on Terrorist Travel* that can be found at http://www.cis.org/node/55.

constituent agencies), and Justice, including the FBI, as well as the CIA.  We held approximately 25 briefings on various border security issues and conducted more than 200 interviews.  I conducted a total of 18 hours of interviews of former INS Commissioners, as well as interviews of 26 of 38 inspectors involved in 28 attempted entries. Five of these inspectors had conducted secondary interviews of hijackers, and some remembered hijackers in detail.  The insights gained from these interviews led to discovery of otherwise unknown details about the hijackers, conclusions about the legality of their entries, and numerous border inspection recommendations.

34.     In 9/11 AND TERRORIST TRAVEL, my able colleagues and I discussed in depth the many varieties of terrorist travel tactics.  These include fraudulent manipulations of passports, terrorist "calling card" indicators, abuse of a lax State Department visa adjudication process in Saudi Arabia, and a solid understanding of how to acquire immigration benefits such as a change of status from tourist to student, or a tourist extension of stay.

35.     In 9/11 AND TERRORIST TRAVEL, we provide all the facts and details of how 26 al Qaeda terrorist operatives tasked with the 9/11 planes operation were whittled down to 19 hijackers, mostly due to failure to obtain U.S. visas or, in the case of Kahtani, failure to gain admission into the United States.

36.     In 9/11 AND TERRORIST TRAVEL, we provide all the facts and evidence of the 23 visas applied for and the 22 visas obtained by the 9/11 hijackers, as well as those who were excluded from the operation because they were unsuccessful in obtaining visas.  We also related the stories of the 9/11 hijacker pilots' acquisitions of new passports and U.S. visas in Germany.  We related the details of all 34 hijacker entries into the U.S. over a period of 21 months, of the applications for change of immigration status by some, and we discussed all the U.S. government failures surrounding these entries and changes.

37.     After months of analysis, and based on all the information we had gathered, including intelligence community analytic products, the border team concluded that **the 9/11 terrorists had engaged in a specific terrorist travel operation.**  In other words, **not only did the four nearly simultaneous hijackings of four commercial airplanes constitute a coordinated operation, but so did the hijackers' travel.**  We came to describe this coordinated operation, internally, as *"terrorist travel."*

38.     Certain discoveries linking Iran to the 9/11 hijackers were discovered only in the final days of the Commission prior to publication of the 9/11 COMMISSION REPORT.  Thus, for the 9/11 AND TERRORIST TRAVEL monograph, we were limited to the facts found by other Commission staff teams.  Accordingly, for this Affidavit I have relied upon not only the evidence of which I am directly knowledgeable from my work on the 9/11 Commission Staff, but also the U.S. State Department's annual reports entitled *"Patterns of Global Terrorism* and *Patterns of International Terrorism"* and (beginning with the report for 2004) *"Country Reports on Terrorism,"* as well as various publications, statements, designations, and fact sheets of the U.S. Treasury Department addressing the designation of foreign individuals and organizations as terrorists or terrorist entities and nations as state sponsors of terror, and other publicly available information.  I have also reviewed the portions of the Affidavit of Ronen Bergman and the Second Affidavit of Kenneth Timmerman that address the terrorist record of Imad Mughniyah.

### Successful Travel Was Critical to the 9/11 Operation

39.     For terrorists, success is often dependent on travel.  One of the most oft-used phrases from the 9/11 COMMISSION REPORT is: **"For terrorists, travel documents are as important as**

**weapons."** 9/11 COMMISSION REPORT at p. 384 (*emphasis added*).[4] "Terrorists appeared to exercise particular caution with regard to Western travel ... to eliminate the possibility of being detained on fraudulent documents charges, a goal that became especially important when an operative was traveling to participate in an attack, and to avoid the suspicions raised by indicators of travel to Afghanistan." 9/11 AND TERRORIST TRAVEL at pp. 65-66.

40.     The 9/11 Commission's conclusion about the importance of terrorist travel led to a series of travel, border, and immigration-related recommendations, set forth in the 9/11 COMMISSION REPORT at pages 385-90. The primary purpose of the 9/11 AND TERRORIST TRAVEL STAFF REPORT was to support the 9/11 COMMISSION REPORT recommendations by providing facts, circumstances and lessons learned not included in the 9/11 COMMISSION REPORT. The practical, combined result of the 9/11 COMMISSION REPORT and the 9/11 AND TERRORIST TRAVEL STAFF REPORT was numerous changes to U.S. immigration laws and programs, ID-issuance standards, and even to the priorities set by the Department of Homeland Security, the National Security Council, the Congress and occasionally, the President of the United States.

41.     The lack of appropriate travel documents can delay or interrupt terrorist operational plans.[5] Prominent among the facts derived, and the lessons learned, in the course of the 9/11 Commission's investigation is this: **terrorist attacks against the United States are more likely to be thwarted if a foreign national operative is prevented from entering the United States.**

> Terrorists must travel clandestinely to meet, train, plan, case targets, and gain access to attack. To them, international travel presents great danger,

---

[4] A Google search shows 1,190 uses of the phrase in news articles, books, Congressional testimonies, in speeches by politicians, and statements by officials such as former Secretary of Homeland Security Michael Chertoff and the Secretary General of INTERPOL.

[5] Conversely, the ability of operatives to travel easily to certain countries often determined the location of operational and planning meetings. Malaysia, for example, was viewed by both Osama bin Laden and Khalid Sheikh Mohammed as an "excellent" venue for meetings because Muslims could enter without a visa, including those with Saudi and Gulf passports. 9/11 COMMISSION REPORT at pp. 59-60.

> because they must surface to pass through regulated channels, present themselves to border security officials, or attempt to circumvent inspection points.
>
> In their travels, terrorists use evasive methods, such as altered and counterfeit passports and visas, specific travel methods and routes, liaisons with corrupt government officials, human smuggling networks, supportive travel agencies, and immigration and identity fraud. These can sometimes be detected.

9/11 COMMISSION REPORT at p. 384.

42.     The planners of the 9/11 attacks well understood the importance of successful terrorist travel and the consequences of detection.  Underscoring the high premium placed on travel, two senior al Qaeda operatives, Khalid Sheikh Mohammed ("KSM") and Abu Zubaydah, each played key roles in facilitating travel for the group's terrorist operatives.  In addition, al Qaeda had an office of passports and host country issues under its security committee, located at the Kandahar airport and managed by Muhammed Atef, al Qaeda's chief of military operations and the number two man in the organization. The committee altered papers, including passports, visas, and identification cards.  Mohamed Atta, the pilot on American Airlines Flight 11, was also believed to have been trained in passport alteration techniques.  9/11 COMMISSION REPORT at p. 169.

43.     The nineteen 9/11 hijackers had a mission which required a relatively short time for legal admission into the United States, but also required that none of them be compromised for failure to obey immigration law.  Therefore, they needed to appear "clean" to immigration authorities.

44.     Thus, the hijacking team and their handlers worked hard to make it appear that the hijackers were following the rules. The 9/11 hijackers had been taught, while in training, what to do to attain successful entry into the U.S.

a. All nineteen hijackers had valid passports.  Thirteen of the hijackers acquired new passports within three weeks prior to seeking U.S. visas.

b. All nineteen hijackers had U.S. entry visas (22 or 23 visa applications were approved by U.S. consular officials).

c. All nineteen hijackers sought entry into the United States through regular immigration inspection kiosks at U.S. international airports; they did not enter surreptitiously.  In fact, the hijackers altogether entered, through normal channels, a total of 34 times over 21 months.

d. Five times 9/11 hijackers were pulled into secondary inspections at the port of entry, but only once did a hijacker resist questioning.  Even in that instance, however, he quickly became cooperative once a new inspector was assigned to conduct the questioning.

45.     The 9/11 Commission found that "as many as 15 of the 19 hijackers were potentially vulnerable to interception by border authorities.  Analyzing their characteristic travel documents and travel patterns could have allowed authorities to intercept 4 to 15 hijackers and more effective use of information available in U.S. government databases could have identified up to 3 hijackers."  9/11 COMMISSION REPORT at p. 384.

46.     If 15 of the 19 hijackers, or even a subset of them, had been intercepted, by denial of visas abroad or exclusion or apprehension at the border, 9/11 likely would not have occurred.

47.     The reason is clear.  The 9/11 operation depended on a minimum number of trained hijackers, and four of them had to have the capacity to serve as pilots.  Thus, denial of visas or border exclusions would have disrupted the mission plans, potentially leading to mistakes being

made by the hijackers or, given the care and planning of the operation, a decision to scuttle the mission altogether.

48.    Indeed, as mentioned previously, as 9/11 Commission staff, I determined that Mohamed al Kahtani, the "muscle" hijacker who was supposed to complete the group on United 93 (the plane crashed in Pennsylvania on 9/11), *was* denied entry into the United States on August 4, 2001 at Orlando airport.  The immigration inspector who excluded did so because Kahtani had a one-way ticket and little money, could not speak English, and could not adequately explain what he intended to do in the United States.  9/11 COMMISSION REPORT at p. 248; *see* 9/11 AND TERRORIST TRAVEL at pp. 145-46.  According to the inspector, Kahtani had the look, stare and ever-changing answers that led him to believe he was a "hit man."  Statement of Jose E. Melendez-Perez to the NATIONAL COMMISSION ON TERRORIST ATTACKS UPON THE UNITED STATES (January 26, 2004).  With Kahtani missing, United flight 93 was commandeered by only three "muscle" hijackers, whereas the other planes all had four.

49.    The absence of that one "muscle" hijacker on United flight 93 may have made all the difference.  The heroic passengers of flight 93 fought their way through to a point at least outside the door of the cockpit and thereby foiled the hijackers' attempt to fly the plane all the way to Washington, D.C.  While it is true that the passengers had gained knowledge, by cell phone, of the events of the day and this probably also played a significant role, still, it may have been the absence of the fourth "muscle" hijacker that meant the difference between success and failure, as the passengers' efforts to get to the hijacker pilot, Ziad Jarrah, in the cockpit caused the Jarrah to crash the plane into the ground in rural Pennsylvania rather than into the north portico of the White House or the main rotunda of the United States Capitol.  *See* 9/11 COMMISSION REPORT at pp. 10-14, 248, and n.167.

50.     Further, apprehension of just one hijacker may well have led to detection of the existence

of the plot itself and apprehension of the other hijackers, or, potentially, to cancellation of the

operation.  (To differentiate, Kahtani was excluded and sent back to Saudi Arabia, not

apprehended.)  The 9/11 Commission concluded that Zacarias Moussaoui was probably a

potential substitute pilot for Ziad Jarrah, who had exhibited signs of backing out of the plot.

Moussaoui was arrested in Minnesota on immigration charges in August 2000, but KSM did not

learn of Moussaoui's arrest until after 9/11.  Yet, according to Ramzi Binalshibh, had KSM and

bin Laden learned of the arrest before 9/11, they might have canceled the operation altogether.

9/11 COMMISSION REPORT at p. 247.

51.     One of the potential problems al Qaeda's sophisticated and knowledgeable travel

facilitators surely would have been concerned about was the prospect that consular officials

deciding on a visa application at a U.S. embassy or consulate, or INS inspectors at the ports of

entry, would examine the passports of the hijackers seeking admission into the United States.

The immigration inspector, among other things, is tasked with assuring travel documents are not

fraudulent or the applicant for admission is not a national security risk.  In making such a

determination, one element of fraud detection and risk determination is examination of the travel

document.  Inspectors – according to guidelines often not followed – are to look for photo

substitutions, changes in biographic information, and review of countries of prior travel by

flipping through the travel stamps in the passport.  A stamp indicating travel to a place where

terrorists are known to have trained, along with other derogatory information, could cause further

inspection, or even exclusion.  Al Qaeda's travel planners clearly considered all these potential

outcomes when strategizing their travel operations for the 9/11 plot.  "A review of the entries and

immigration benefits sought by the hijackers paints a picture of conspirators who put **the ability**

**to exploit U.S. border security while not raising suspicion about their terrorist activities**

**high on their operational priorities.**" 9/11 AND TERRORIST TRAVEL STAFF REPORT at p. 130

(*emphasis added*).

52.     Iran and Afghanistan were both on the U.S. State Department's list of foreign state

sponsors of terror and, of course, al Qaeda knew that the Americans were well aware of the

existence of al Qaeda training camps in Afghanistan.  Thus, al Qaeda's travel planners must have

believed that a terrorist operative trying to obtain a visa at an American embassy or consulate, or

trying to enter the United States itself, faced a very serious risk if his passport showed travel to

Afghanistan or Iran.[6]

53.     At the same time, travel to those training camps in Afghanistan by the future 9/11

hijackers was absolutely essential for the success of the operation.  Thus, preventing passport

evidence of entry into Afghanistan at all, and particularly through Iran, was desirable.  *See* 9/11

AND TERRORIST TRAVEL at pp. 65-66.

54.     It was also well-known that if a Saudi traveled to Afghanistan via Pakistan, his passport,

showing a Pakistani stamp, would be confiscated upon his return to Saudi Arabia.  Thus, al Qaeda

operatives either erased Pakistani visas from their passports or traveled through Iran, which did

not stamp visas directly into passports.  9/11 COMMISSION REPORT at p. 169; *see* 9/11 AND

TERRORIST TRAVEL at p. 61.

### Iran's Facilitation of 9/11 Hijacker Terrorist Travel Was Material Support

55.     The better option was to take the route through Iran because, as the 9/11 Commission

determined, **Iran did not stamp the passports of the future 9/11 hijackers as they entered**

---

[6] The IMMIGRATION AND NATURALIZATION ACT provides for the denial of visas and exclusion from entry into the U.S. of any person involved in terrorism, whether acting alone or as a member of a group, or who provides material support to terrorists.  *See* 9/11 AND TERRORIST TRAVEL at pp. 75-76.

**Iran or exited to Afghanistan or vice-versa**.  9/11 COMMISSION REPORT at p. 240 (*emphasis added*).

56.     The 9/11 Commission obtained **"evidence that 8 to 10 of the 14 Saudi 'muscle' operatives traveled into or out of Iran between October 2000 and February 2001."**  9/11 COMMISSION REPORT at p. 240 (*emphasis added*).  Further, the 9/11 Commission stated that both

> KSM and [hijacker coordinator Ramzi] Binalshibh have confirmed that several of the 9/11 hijackers (at least eight, according to Binalshibh) transited Iran on their way to or from Afghanistan, **taking advantage of the Iranian practice of not stamping Saudi passports** . . . .  In sum, there is **strong evidence that Iran facilitated the transit of al Qaeda members into and out of Afghanistan before 9/11, and that some of these were future 9/11 hijackers**.

9/11 COMMISSION REPORT at p. 241 (*emphasis added*).

57.     The 9/11 Commission learned very late in the investigation that Iran facilitated the above-referenced entries into and through Iran and into Afghanistan of at least eight to ten of the 14 Saudi "muscle" 9/11 operatives between October 2000 and February 2001.  (These muscle hijackers also got their U.S. visas from American consular officials in Saudi Arabia during this time frame as well.) Because the discovery of this information occurred so late in the 9/11 Commission's investigation and clearly warranted further exploration that the time remaining in the Commission's statutory authority did not permit, the Commission stated: "We believe this topic requires further investigation by the U.S. government."  9/11 COMMISSION REPORT at p. 241.

58.     For this Affidavit, I conducted further analysis of the facts provided in the 9/11 COMMISSION REPORT in an effort to determine if any terrorist travel patterns emerged between the 9/11 travel operation into the U.S., and the visits to Iran and Beirut described in the 9/11 COMMISSION REPORT.  My primary analytic tool was the master chart described previously and

attached as Exhibit A to this Affidavit.  I compared the nine 9/11 Saudi "muscle" hijackers who

were known to have travelled to or from either Iran or Beirut by plane (according to senior al

Qaeda detainees), and the time frames stated that they conducted such travel, with their

acquisition of new passports, U.S. visas and entry into the United States.

59.     One travel operation similarity is that the "muscle" hijackers, who all entered the U.S. in

pairs or trios, also did the same when travelling by air to Iran or Beirut.

60.     While looking for potential travel patterns, I determined that acquisition of a U.S. visa

seemed to trigger travel to Iran and Beirut.   The travel operation during this phase was a two-

step process:  secure acquisition of a U.S. visa and then get to Iran or Beirut.  Based solely on my

terrorist travel analysis, Iran, with Hezbollah, was providing much more than travel facilitation to

these slated 9/11 hijackers. Shielding Saudi passports from Iranian travel was thus not only

absolutely essential to prevent confiscation of passports by Saudi authorities, but also to hide

complicity of Iran in supporting al Qaeda, and possibly even Iran's actual knowledge and

support of 9/11 as well.

61.     The 9/11 COMMISSION FINAL REPORT states that Waleed al Shehri, Wail al Shehri, and

Ahmed al Nami flew in November 2000 from Saudi Arabia to Beirut and onward to Iran.  The al

Shehri brothers were both on American Airlines flight 11, the first plane to crash into the World

Trade Center buildings.  Ahmed al Nami was on United flight 93 that crashed in Pennsylvania.

U.S. immigration records corroborate that the November 2000 travel was possible.  Waleed al

Shehri received his U.S. visa on October 3, 2000.  Wail al Shehri received his U.S. visa on

November 12, 2000.  Ahmed al Nami had a U.S. visa from April 2000, but applied for, and

received, a new one on October 28, 2000.  *See* Ex. B, Visa Application of Ahmed al Nami

(October 28, 2000).  Assuring that these operatives had their U.S. visas prior to flying to Beirut

and Iran (which not all slated hijackers were able to do) assured that they were likely able to

enter the U.S. "cleanly" for the operation. Thus, whatever other support the hijackers were

afforded in Beirut and Iran (perhaps training), would be less likely a wasted allocation of

resources in cultivating these operatives as hijackers, as the U.S. visas were near assurance that

the hijackers could enter the U.S. undetected. *See* Ex. A.

62.     The 9/11 COMMISSION FINAL REPORT states that Satam al Suqami and Mojed Moqed flew

from Iran to Bahrain in late November 2000. Satam al Suqami applied for a U.S. visa on

November 21, 2000, and he received it. *See* Ex. C, Visa Application of Satam al Suqami

(November 21, 2000). *See also* Ex. D, Biographic and U.S. Immigration Entry Stamp pages of

the passport of Satam al Suqami (recovered at the World Trade Center site by a passerby on

September 11, 2001). Mojed Moqed had applied for his U.S. visa the prior day, on November

20, 2000. *See* Ex. E, Visa Application of Mojed Moqed (November 20, 2000); *see also* Ex. A. It

is possible that once Moqed and Suqami had their visas, a trip to Iran was planned. The Report

is definitive that Suqami's and Moqed's *return* from Iran was in late November. Still,

immigration records do not contradict, but rather support that a travel operation was possible,

even likely, between November 21, 2000 and "late November" 2000, as the 9/11 COMMISSION

FINAL REPORT states, once both Suqami and Moqed had obtained their U.S. visas. In fact, it is

also likely that neither Suqami nor Moqed would have traveled to Iran unless each had

successfully obtained a U.S. visa.

63.     The FINAL REPORT states that Mohand al Shahri and Hamza al Ghamdi travelled from

Iran to Kuwait in October 2000. Mohand al Shahri had applied for a U.S. visa and received it on

October 23, 2000. *See* Ex. F, Visa Application of Mohand al Shahri (October 22, 2000). Hamza

al Ghamdi had received his visa on October 17, 2000. Both 9/11 operatives were on the same

plane when they entered the U.S., and both hijackers were on United flight 175, the plane that hit the South Tower. *See* Ex. A.

64.     The FINAL REPORT states Ahmed al Ghamdi travelled to Beirut with a "senior Hezbollah operative" in November 2000. He had received his U.S. visa on September 3, 2000, using a 13-day old newly issued Saudi passport. *See* Ex. G, NIV Applicant Detail for Ahmed al Ghamdi; *see also* Ex. A. New passports were often acquired to hide prior travel. *See generally* 9/11 AND TERRORIST TRAVEL. Based on the Second Affidavit of Kenneth Timmerman, I understand that the "senior Hezbollah operative" has been identified as Imad Mughniyah. *See* Timmerman 2nd Affid. ¶¶120-29.

65.     The 9/11 COMMISSION REPORT states that it is possible that Khalid al Mihdhar, a more senior al Qaeda operative, flew from Syria to Iran and traveled to the Afghan border in February 2001. 9/11 COMMISSION REPORT at p. 241. This "possibility" is based on intelligence reports. However, immigration records show he was in the U.S. in February 2001. He had first entered the U.S. on January 15, 2000 and did not leave until June 10, 2001 and returned again on July 4, 2001. *See* Ex. A.

66.     In my expert opinion, the actions of Iranian border authorities, in refraining from stamping the passports of the Saudi hijackers, vastly increased the likelihood of the operational success of the 9/11 plot. Shielding the Saudis' passports from indicia of travel to Iran and Afghanistan was perceived as essential to prevent potential confiscation of passports by Saudi authorities, and also to hide complicity of Iran in supporting al Qaeda.

67.      According to the 9/11 COMMISSION REPORT, Hezbollah provided "advice and training" to al Qaeda members and also participated in the travel facilitation activities. In addition to the "senior Hezbollah operative" on the flight with Ahmed al Ghamdi from Beirut to Iran, and the

"associate of a senior Hezbollah operative" on the same flight with the al Shehri brothers and

Ahmed al Nami, we also know that Hezbollah officials in Beirut and Iran were expecting the

arrival of a group during the same time period.  The travel of this group was important enough to

merit the attention of senior figures in Hezbollah."[7]  9/11 COMMISSION REPORT at p. 240.  In 9/11

AND TERRORIST TRAVEL, we discussed the three Saudi hijackers who were carrying passports

with possible indicators of extremism that dated back to the 1993 World Trade Center attack, and

we know that at least one of these hijackers went to Iran.  It is probable that such an indicator

was an al Qaeda "calling card" used by the broad *jihadi*-terrorist community in general to

identify themselves covertly, and that the Iranian border authorities were aware of this covert

calling card and, thus, knew when not to stamp Iranian travel stamps into al Qaeda passports.

*See* 9/11 AND TERRORIST TRAVEL at pp. 12, 132, 140.

68.    KSM and Khallad bin Attash, both of whom helped conduct travel facilitation for the

9/11 hijackers (and who played key roles in the 1998 East Africa bombings and the attack on the

USS Cole in 2000), "described the willingness of Iranian officials to facilitate travel of al Qaeda

members through Iran, on their way to and from Afghanistan.  For example, Iranian border

inspectors would be told not to place telltale stamps in the passports of these travelers.  Such

arrangements were particularly beneficial to Saudi members of al Qaeda." 9/11 COMMISSION

REPORT at p. 240.

69.    Iran's willingness to permit the undocumented admission and passage of al Qaeda

operatives and 9/11 hijackers provided key material support to al Qaeda.  By not stamping the

hijackers' passports, by providing safe passage through Iran and into Afghanistan, and by

---

[7] There was also some information suggesting that 9/11 pilot Ziad Jarrah (United flight 93), who was Lebanese, had been trained by Hezbollah, but that information was not sufficiently corroborated to be included in the findings of the 9/11 COMMISSION REPORT.

permitting Hezbollah to receive the traveling group and, apparently, to actively support the human trafficking of the 9/11 hijackers, **Iran, in essence, acted as a state sponsor of terrorist travel.**

70.     Based on my review of the aforementioned affidavits of Ronen Bergman and Kenneth Timmerman, and my own professional knowledge regarding Imad Mughniyah, it is my opinion that the revelation that Mughniyah was the "senior Hezbollah operative," referenced in the 9/11 Report at pp. 240-41, compels the conclusion that Iran had actual foreknowledge of a major terrorist strike against the United States that was, in fact, the 9/11 attacks.  This conclusion flows from the fact that Mughniyah was a known terrorist agent of Iran, and, moreover, was a top-level Hezbollah terrorist commander who had attacked, kidnapped, and killed more Americans than any other terrorist in multiple terrorist attacks over the past three decades, at least some of which were at the direction of Iran.  For example, the 1984 Marine-French paratrooper barracks truck bombings were executed by Mughniyah upon direct orders from Tehran.  *See* Timmerman 2nd Affid. ¶¶17-26; Bergman Affid. ¶¶36-38.  Mughniyah's personal role in the hijackers' travel into Beirut and Iran after they had obtained U.S. visas in Saudi Arabia, and his coordination of hijackers' activities in Saudi Arabia, means that Iran must have had actual advance knowledge of an impending terrorist attack against United States interests, most likely on U.S. territory, involving more than one al Qaeda operative.  That attack turned out to be 9/11.

71.     Thus, **Iran's facilitation of the hijackers' "terrorist travel" operation, involving Imad Mughniyah, constituted material support – indeed, direct support – for al Qaeda's 9/11 attacks.**

### Additional Information Regarding the Importance of
### Successful Travel to al Qaeda's Operational Success

72.     The 9/11 COMMISSION REPORT sets forth a number of examples demonstrating that

successful international travel was integral to al Qaeda's operational planning and success.  (For

an in-depth discussion of this subject matter, *see generally* the TERRORIST TRAVEL monograph.)

> Bin Ladin appeared to have in Afghanistan a freedom of movement that he
> had lacked in Sudan.  Al Qaeda members could travel freely within the
> country, enter and exit it without visas or any immigration procedures,
> purchase and import vehicles and weapons, and enjoy the use of official
> Afghan Ministry of Defense license plates.  Al Qaeda also used the
> Afghan state-owned Ariana Airlines to courier money into the country.

9/11 COMMISSION REPORT at pp. 155-56.

> When Khallad applied for a U.S. visa, however, his application was
> denied. . . . .  Giving up on acquiring a U.S. visa and concerned that the
> United States might learn of his ties to al Qaeda, Khallad returned to
> Afghanistan.
>
> . . . .
>
> Travel issues thus played a part in al Qaeda's operational planning from
> the very start.  During the spring and summer of 1999, KSM realized that
> Khallad and Abu Bara, both of whom were Yemenis, would not be able to
> obtain U.S. visas as easily as Saudi operatives like Mihdhar and Hazmi.
> Although Khallad had been unable to acquire a U.S. visa, KSM still
> wanted him and Abu Bara, as well as another Yemeni operative from Bin
> Ladin's security detail, to participate in the planes operation. Yet because
> individuals with Saudi passports could travel much more easily than
> Yemeni, particularly to the United States, there were fewer martyrdom
> opportunities for Yemenis.  To overcome this problem, KSM decided to
> split the planes operation into two components.

9/11 COMMISSION REPORT at p. 155-56.

73.     Ramzi Binalshibh was unable to be a direct participant in the 9/11 attacks because

he could not travel to the U.S.  ". . . Ramzi Binalshibh, another Yemeni slated early on to

participate in the 9/11 attacks, likewise would prove unable to acquire a U.S. visa the

following year." 9/11 COMMISSION REPORT, Ch.5, note 46; *see also* Ch. 7, note 52.

74.     The 9/11 COMMISSION REPORT contains an expansive passage specifically addressing some of

the key terrorist travel considerations at the heart of the 9/11 conspiracy:

> Before seeking visas to enter the United States, Atta, Shehhi, and Jarrah
> obtained new passports, each claiming that his old passport had been lost.
> Presumably they were concerned that the Pakistani visas in their old
> passports would raise suspicions about possible travel to Afghanistan.
> Shehhi obtained his visa on January 18, 2000; Atta, on May 18; and Jarrah,
> on May 25. Binalshibh's visa request was rejected, however, as were his
> three subsequent applications.  Binalshibh proved unable to obtain a visa, a
> victim of the generalized suspicion that visa applicants from Yemen –
> especially young men applying in another country (Binalshibh first applied in
> Berlin) – might join the ranks of undocumented aliens seeking work in the
> United States.  Before 9/11, security concerns were not a major factor in visa
> issuance unless the applicant already was on a terrorist watchlist, and none of
> these four men was.  Concerns that Binalshibh intended to immigrate to the
> United States doomed his chances to participate firsthand in the 9/11 attacks.
> Although Binalshibh had to remain behind, he would provide critical
> assistance from abroad to his co-conspirators.

> Once again, the need for travel documents dictated al Qaeda's plans.

> **Travel**

> It should by now be apparent how significant travel was in the planning
> undertaken by a terrorist organization as far-flung as al Qaeda. The story of
> the plot includes references to dozens of international trips. Operations
> required travel, as did basic communications and the movement of money.
> Where electronic communications were regarded as insecure, al Qaeda relied
> even more heavily on couriers.

> KSM and Abu Zubaydah each played key roles in facilitating travel for al
> Qaeda operatives. In addition, al Qaeda had an office of passports and host
> country issues under its security committee. The office was located at the
> Kandahar airport and was managed by Atef. The committee altered papers,
> including passports, visas, and identification cards.

> Moreover, certain al Qaeda members were charged with organizing passport
> collection schemes to keep the pipeline of fraudulent documents flowing. To
> this end, al Qaeda required jihadists to turn in their passports before going to
> the front lines in Afghanistan. If they were killed, their passports were
> recycled for use. The operational mission training course taught operatives

how to forge documents. Certain passport alteration methods, which included substituting photos and erasing and adding travel cachets, were also taught. Manuals demonstrating the technique for cleaning visas were reportedly circulated among operatives. Mohamed Atta and Zakariya Essabar were reported to have been trained in passport alteration.

The purpose of all this training was twofold: to develop an institutional capacity for document forgery and to enable operatives to make necessary adjustments in the field. It was well-known, for example, that if a Saudi traveled to Afghanistan via Pakistan, then on his return to Saudi Arabia his passport, bearing a Pakistani stamp, would be confiscated. So operatives either erased the Pakistani visas from their passports or traveled through Iran, which did not stamp visas directly into passports.

9/11 COMMISSION REPORT at pp. 168-69 (endnotes omitted); *see also* p. 225 *and* Ch. 7, note 52 *re:*

Binalshibh's inability to obtain a U.S. visa.

Charities were a source of money and also provided significant cover, which enabled operatives to travel undetected under the guise of working for a humanitarian organization.

9/11 COMMISSION REPORT at p. 171.

While Jarrah took his personal trips, Atta traveled to Germany in early January 2001 for a progress meeting with Ramzi Binalshibh. . . . . Binalshibh proceeded to Afghanistan, made his report, and spent the next several months there and in Pakistan."

9/11 COMMISSION REPORT at p. 227.

75.    Potential hijackers' ability to travel, or lack thereof, played a significant role in their selection to be part of the 9/11 operational team.

Khallad claims it did not matter whether the hijackers had fought in jihad previously, since he believes that U.S. authorities were not looking for such operatives before 9/11. But KSM asserts that young mujahideen with clean records were chosen to avoid raising alerts during travel. The al Qaeda training camp head mentioned above adds that operatives with no prior involvement in activities likely to be known to international security agencies were purposefully selected for the 9/11 attacks.
. . . .

KSM told potential hijackers to acquire new clean passports in their home countries before applying for a U.S. visa. This was to avoid raising suspicion about

previous travel to countries where al Qaeda operated. Fourteen of the 19 hijackers, including nine Saudi muscle hijackers, obtained new passports. Some of these passports were then likely doctored by the al Qaeda passport division in Kandahar, which would add or erase entry and exit stamps to create "false trails" in the passports.

In addition to the operatives who eventually participated in the 9/11 attacks as muscle hijackers, Bin Ladin apparently selected at least nine other Saudis who, for various reasons, did not end up taking part in the operation: Mohamed Mani Ahmad al Kahtani . . . . These candidate hijackers either backed out, had trouble obtaining needed travel documents, or were removed from the operation by the al Qaeda leadership. Khallad believes KSM wanted between four and six operatives per plane. KSM states that al Qaeda had originally planned to use 25 or 26 hijackers but ended up with only the 19.

9/11 COMMISSION REPORT at pp. 234-35.

Only the passports of Satam al Suqami and Abdul Aziz al Omari were recovered after 9/11. Both had been doctored. According to KSM, two hijacker passports were damaged in the doctoring process. These may have belonged to Saeed al Ghamdi and Ahmed al Nami, as both acquired new passports and new U.S. visas, although the old visas were still valid. Wail and Waleed al Shehri had a family member in the Saudi passport office who provided them with new passports for their trip to the United States.

9/11 COMMISSION REPORT at Ch. 7, n. 106.  *See also* ¶¶67-68, *supra, re*: Ramzi Binalshibh's

exclusion from the hijacker group due to his inability to obtain a U.S. visa.

76.     Osama bin Laden also selected nine or ten candidates for the 9/11 operation who turned

out to be unable to participate in the 9/11 hijackings, half of them because of difficulties with

their ability to travel successfully:

**Muhammad Mani Ahmad al Kahtani.** Currently in custody, he is the last known Saudi muscle candidate to be sent to the United States, in early August 2001, to round out the number of hijackers. He was refused entry by an alert border inspector at Orlando Airport.

**Khalid Saeed Ahmad al Zahrani**. He traveled to Afghanistan illegally after being prohibited by Saudi authorities from leaving Saudi Arabia. After being assigned to a mission in the U.S., he secretly reentered the Kingdom but failed in an attempt to have his name removed from the list of prohibited travelers so that he could obtain a U.S. visa.

**Saeed al Baluchi and Qutaybah al Najdi.** Both sent to Saudi Arabia via Bahrain, where Najdi was stopped and briefly questioned by airport security officials. Both were so frightened by the experience that they withdrew from the operation. KSM urged Baluchi to obtain a U.S. visa, but Baluchi refused, fearing that he might be watchlisted at the U.S. embassy.

**Saeed Abdullah Saeed ("Jihad") al Ghamdi.** He arranged to travel to Afghanistan in March 2000, swore allegiance to Bin Ladin (agreeing to serve as a suicide operative), and was sent to Saudi Arabia by KSM with 9/11 hijacker Ahmad al Haznawi to obtain a U.S. visa, but his visa application was denied because he appeared to be intending to immigrate.

9/11 COMMISSION REPORT at Ch. 7, n. 107.

77.     Conversely, some preparations were handled in countries like Malaysia, specifically "because its government did not require citizens of Saudi Arabia or other Gulf states to have a visa. Malaysian security was reputed to be lax when it came to Islamist jihadists." 9/11 COMMISSION REPORT at p. 158; *see also* 9/11 AND TERRORIST TRAVEL at p. 60.

78.     The hijackers took some trips to other places in order to "enhance their cover as tourists to have passport stamps from a popular tourist destination such as Thailand." 9/11 COMMISSION REPORT at p. 159.

79.     In sum, it is my expert opinion that there is clear and convincing evidence that Iran and Hezbollah provided material support to al Qaeda by actively facilitating the travel of eight to ten of the 9/11 hijackers to Iran or Beirut immediately after their acquisitions of their U.S. visas, and into and out of Afghanistan, and that these U.S. visas were garnered specifically for the purpose of terrorist travel into the United States to carry out the 9/11 attacks.

**_Further the Affiant Sayeth Not._**

This Affidavit is comprised of 79 separately numbered paragraphs.

I, **JANICE L. KEPHART,** being duly sworn, do hereby swear and affirm under penalty of perjury that the contents of this Affidavit are true and correct to the best of my knowledge, information, and belief.

Janice L. Kephart

Sworn to before me this the 17th day of ~~June, 2010~~ May, 2011, in Washington, D.C.

Notary ARTURO ALDE
Notary Public, District of Columbia
My Commission Expires November 14, 2014

## September 11 Hijackers
### Team 5 Work Product- Janice Kephart-Roberts
### (Draft April 5, 2004)

| Name[1] | Alias | DOB | Resident Country | Citizenship Country | Passport Country, Passport Number; Prior Issuances | Visa Type Issued, Place, Date, Number (Expiration Date); Prior Issuances; | Admission Status, Date, Referral to Secondary Inspection | Port of Entry, (Date Admitted To) Departure Date; Prior Entries | Type of Change of Status Filed, Date Filed, Approval Date, (Extension Date) | U.S. Issued Identification, Card Driver's Licenses (DL) (no Social Security Numbers issued) |
|---|---|---|---|---|---|---|---|---|---|---|
| Mohamed Mohamed Elamir Awad Elsayad ATTA (AA#11-pilot) (WTC-N) | NA (this may change) | 9-1-68 | GER | Egypt | GER, 1617066* | B1/B2, Berlin, 5-18-00, 34137932 (5-16-05) | B1, 7-19-01, no; B2, 1-10-01, yes[2]; B2, 6-3-00, no | Atlanta, GA from Madrid, (11-12-01); 1/4/2-00 Miami, FL from Madrid, (7-9-01 or 9-8-01), 7-7-01 Newark, NJ from Czech, (12-2-00), 1-4-01 | I-539 from B2 to M1, 9-19-00, July 17, 2001 | USA ID card DL, FL 5-2-01 |
| Abdul Aziz AL OMARI (AA#11) | NA | 5-28-79 | SA | SA | SA, C165015* | B1/B2, Jeddah, 6-18-01, 42563737 (6-17-03) | B2, 6-29-01, no | New York, NY (12-28-01)[3] | none | USA and VA ID cards 8-2-01 |
| Waleed Ahmed AL SHEHRI (AA#11) | NA | 12-20-78 | SA | SA | SA, C348871 | B1/B2, Jeddah, 10-3-00, 39731318 (10-23-02) | B2, 4-23-01, yes[4] | Orlando, FL (10-22-01) | none | DL, FL 5-4-01 |
| Satam Muhammad Al Rahman AL SUQAMI (AA#11) | NA | 6-28-76 | SA | SA | SA, B559583*[5] | B1/B2, Riyadh, 8-11-98[6], 40240382, (11-20-02) | B1, 4-23-01, no[7] | Orlando, FL (5-20-01) | none | none |
| Wail M. AL SHEHRI (AA#11) | NA | 7-31-73 | SA | SA | SA, C348870 | B1/B2, Jeddah, 11-12-00, 39731319 (10-23-02) | B2, 6-8-01, no[8] | Miami, FL (12-7-01) | none | FL ID card 7-3-01 |
| Hani Saleh Hassan HANJOUR (AA #77-pilot) (Pentagon) | Hani Hanjour, Hani Saleh Hassan | 8-30-72 | SA | SA | SA, C241922 SA, A669998 | F1, Jeddah, 9-25-00, 39730222 (9-24-01)[9]; F1, Jeddah, 11-2-97, 14729687 (11-2-98); B2, Jeddah, 3-19-96; B2, Jeddah, 9-21-91 | F1, 12-8-00, no; F1, 11-16-97, no; B2, 4-2-96, no; B2, 10-3-91, no | Cincinnati, OH, (unknown)[10]; Atlanta, GA, (12-31-99)[11]; New York, NY from SA, (10-1-96)[12]; 11-26-96 New York, NY from SA (4-2-92); unknown | I-539 from F1 to M1, 6-16-98, 1-16-01, (7-30-98 to 7-29-99); I-539 from B2 to F1, 6-7-96[13], 6-27-96, ("D/S") | VA ID card 8-2-01 DLs, FL and AZ (used SSN 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) |
| Khalid Bin Muhammad AL MIHDHAR (AA #77)[14] | Khalid Almodhar, Khalid Almihoha, Khalid Almidher | 5-16-75 | SA | SA | SA, C551754* SA, B721156 | B1/B2, Jeddah, 6-13-01, 43144581 (6-12-03); B1/B2, Jeddah, 4-7-99, 14436479 (4-7-99) | B/2, 7-4-01, no; B1/B2, 1-15-00, no[15] | New York, NY, (10-3-01); Los Angeles, CA, (7-14-00); 6-10-01 | none | USA and VA ID cards DL, CA |
| Majed Mashaan MOQED (#77) | none | 6-18-77 | SA | SA | SA, C390833 | B1/B2, Riyadh, 11-19-00, 40240220 (11-19-02) | B2, 5-2-01, no[16] | Washington, D.C. (11-2-01) | none | USA and VA ID cards 8-2-01 (reissued 9/7/01) (used SSN 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 and SSN 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) |

Exhibit A

# September 11 Hijackers
## Team 5 Work Product- Janice Kephart-Roberts
### (Draft April 5, 2004)

| Name[1] | Alias | DOB | Resident Country | Citizenship Country | Passport Country, Passport Number; Prior Issuances | Visa Type Issued, Place, Date, Number (Expiration Date); Prior Issuances; | Admission Status, Date, Referral to Secondary Inspection | Port of Entry, (Date Admitted To), Departure Date; Prior Entries | Type of Change of Status Filed, Date Filed, Approval Date, (Extension Date) | U.S. Issued Identification, Card Driver's Licenses (DL) (no Social Security Numbers issued) |
|---|---|---|---|---|---|---|---|---|---|---|
| Nawaf Mohamed Salem AL HAZMI (AA# 77) | NA | 8-9-76 | SA | SA | SA, B673987* | B1/B2, Jeddah, 4-3-99, 14436338 (4-2-00) | B2, 1-15-00, no | Los Angeles, CA (7-14-00) | I-539, extension of status, 7-12-00[17] | USA ID card DLs, FL 6-25-01 and CA 4-19-00 (used SSN 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) |
| Salem AL HAZMI (AA #77) | Nawaf Moqed | 2-2-81 | SA | SA | SA, C582647 or SA, C562647 | B1/B2, Jeddah, 6-20-01, 42562994 (6-19-03) | B2, 6-29-01, ? | New York, NY (12-28-01) | none | USA and VA ID cards 8-2-01 (requested reissue 9/7/01) (used SSN 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) |
| Ziad Samir JARRAH (UA #93-pilot) (Pennsylvania) | NA | 5-11-75 | GER | LEB | GER, 1619505 | B1/B2, Berlin, 5-25-00, 34138882 (5-24-05) | B2, 8-5-01, no; B1, 4-13-01, no; B1, 2-25-01, no; B2, 1-5-01, no; B2, 11-25-00, no; B2, 10-29-00, no; B2, 6-27-00, no[18] | Newark, NJ from Dusseldorf (2-4-02); Atlanta, GA from Amsterdam (7-30-01); 7-25-01 Newark, NJ from Dusseldorf (8-24-01); 3-30-01 Newark, NJ from Dusseldorf (7-04-01); 1-26-01 Miami, FL from Nassau (5-21-01);[19] 12-26-00 Tampa, FL from Frankfurt (4-28-01); Atlanta, GA from Munich (12-26-00); | none | VA ID card DL, FL 5-2-01 |
| Saeed AL GHAMDI (UA #93) | NA | 11-21-79 | SA | SA | SA, C573895 SA, B516922 | B1/B2, Jeddah, 6-12-01[20], 43146043, (6-11-03) B1/B2, Jeddah, 9-4-00, 39737298, (9-3-02) | B2, 6-27-01, yes[21] | Orlando, FL (12-26-01) | none | FL ID card 7-10-01 |

## September 11 Hijackers
### Team 5 Work Product- Janice Kephart-Roberts
### (Draft April 5, 2004)

| Name[1] | Alias | DOB | Resident Country | Citizenship Country | Passport Country, Passport Number; Prior Issuances | Visa Type Issued, Place, Date, Number (Expiration Date); Prior Issuances; | Admission Status, Date, Referral to Secondary Inspection | Port of Entry, (Date Admitted To), Departure Date; Prior Entries | Type of Change of Status Filed, Date Filed, Approval Date; (Extension Date) | U.S. Issued Identification, Card Driver's Licenses (DL) (no Social Security Numbers issued) |
|---|---|---|---|---|---|---|---|---|---|---|
| Ahmed A. A. AL NAMI (UA #93) | none | 12-7-77 | SA | SA | SA, C505363 SA, C115007 | B1/B2, Jeddah, 4-23-00, 43139969 (4-22-03) B1/B2, Jeddah, 10-28-00, 39731764 (10-27-02) | B2, 5-28-01[22], no | Miami, FL (11-27-01) | none | FL ID card 6-29-01 |
| Ahmad Ibrahim A. AL HAZNAWI (UA#93) | NA | 10-11-80 | SA | SA | SA, B991866 | B1/B2, Jeddah, 11-12-00, 39731493 (11-11-02) | B2, 6-8-01, no | Miami, FL (12-07-01) | none | DL, FL 7-10-01 |
| Marwan Yousef Mohamed Rashid Lakrab ALSEHHI (UA #175-pilot) (WTC S) | NA | 5-9-78 | GER | UAE | UAE, A0460773 | B1, Dubai, 1-18-00, 27334344 (1-17-?) | B2, 5-2-01, no; B1, 1-18-01, yes[23]  B2, 5-29-00, yes[24] | Miami, FL (11-2-01); New York, NY on Royal Morrocan Air (5-18-01); 4-18-01 Newark, NJ (11-28-00); 1-11-01 | I-539 from B2 to M1, 9-22-00[25] | DL, FL 4-12-01 |
| Mohand AL SHAHRI (UA-#175) | Mohammed Alshehri | 5-7-79 | Unk | Unk | SA, B982062 | B1/B2, Riyadh, 10-23-00, 40238473 (10-22-02) | B2, 5-28-01, no | Miami, FL (11-27-01) | none | FL ID card |
| Hamza Saleh A. AL GHAMDI (UA #175) | NA | 11-18-80 | SA | SA | SA, B991893 | B1/B2, Riyadh, 10-17-00, 40237957 (10-16-02) | B2, 5-28-01, no | Miami, FL (11-27-01) | none | Driver's License, FL 6-27-01 FL ID card |
| Fayez Rashid Ahmed Hassan Al Qadi BANIHAMMAD (UA #175) | Fayez Ahmad, Fayez Rashid, Banihammad Fayez Abu-Dhadi Banihammad | 3-19-77 | UAE | UAE | UAE, A0929256 | B1/B2, Abu Dhabi, 6-18-01, 45915108 (6-17-?) | B2, 6-27-01, no | Orlando, FL (12-26-01) | none | FL ID card |
| Ahmed Salah ALGHAMDI | Algamdi | 7-2-79 | SA | SA | SA, C317968 | B1/B2, Jeddah, 9-3-00, 40237957 (9-2-02) | B2, 5-2-01, no[26] | Washington, D.C. (11-1-01) | none | USA and VA ID cards 8-2-01 (reissued 9/7/01) (used SSN 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) |

[1] Same color indicates hijackers arriving on same flight from abroad on their final entry into the US prior to September 11. Information contained herein is derived from "Texas Service Center Enforcement Operations Division, 911 Terrorist Review" (Limited Official Use); DOJ summaries provided to the Joint Inquiry; computer records of entries; I-539 and I-20 forms, and inspection and interview reports. THE CHART IS STILL A WORK IN PROGRESS (4-05-04).

**September 11 Hijackers**
*Team 5 Work Product- Janice Kephart-Roberts*
*(Draft April 5, 2004)*

---

[2] Atta first entered in June 2000 as a B-2 visitor via Newark, NJ. Atta began training at Huffman Aviation on July 7, 2000 and passed his commercial pilot test on December 19, 2000. On Sept. 19, 2000, Atta filed an I-539 to change his status to an M-1 student at Huffman Aviation in Venice Florida. Pursuant to 8 CFR 248.1©, an alien who wants to attend school as a B2 can apply for a change of status any time during his permitted length of stay. The I-539 was not approved by the INS until July 17, 2001. When Atta departed January 4, 2001 and then returned again to Miami International Airport on January 10 as a B-2, he was pulled into secondary inspection upon arrival. NIIS primary inspection report reads: "PAX (passenger) turned in [an I-20 form] but has had a response, meanwhile he's attending flight training school. Already was in school for 5/6 months, please verify." Secondary Inspection results read: SUBJ applied for M-1. I.S. Adjusted status. No overstay/No removal grounds found." At the time, nonimmigrants with pending change of status applications were permitted to attend class while awaiting adjudication of their application. The I-539 was not approved by INS until July 17, 2001. Atta had, in fact, already obtained his commercial pilot license on Dec. 16, 2000.

[3] A.A. Al Omari and S. Al Hazmi arrived together, went to the same inspection line and were inspected by the same inspector.

[4] On the April 23, 2001 entry, Al Shehri's Customs Declaration claimed no money and stated length of stay was 20 days. He received 6 months length of stay. There is circumstantial evidence that Atta may have picked up Suqami and al Shehri, as Penttbomb has parking garage tickets of Atta from 3:07 – 4:07 pm. Suqam and al Shehri arrived at 3:25 pm. On May 16, 2001, M. Al Shehri, along with Satam M. A. Al Suqami, departed Ft. Lauderdale, Florida but were refused entry into the Bahamas. Customs pre-clearance in the Bahamas pulled Al Shehri into secondary inspection, checked the two names in IBIS, then returned both to Ft. Lauderdale. U.S. Customs records also indicate the U.S. Customs pre-clearance conducted a secondary inspection that lasted one minute. Under immigrationlaw, since neither was admitted into the Bahamas, technically neither had departed the U.S., therefore no new arrival record was created in NIIS. The Penttbomb investigation says these two had reservations at the Bahamas Princess Resort May 16-19, 2001.

[5] Suqami had the oldest visa issuance date of 1998. Only N. al-Hazmi, al Mihdhar, and M. al Shahri had visas issued in 1999. All others were issued in 2000 or after.

[6] This date is drawn from the I-94 completed by Suqami and is also recorded in NIIS. The visa application, however, notes an issuance of Nov. 21, 2000.

[7] See footnote 4. Suqami's April 23, 2001 customs declaration did check any box to declare money, and requested 20 days. He received 30 days.

[8] Wail Al Shehri's customs declaration neither checks off a money or length of stay declaration.

[9] Hanjour had applied for a visa as an previous F-1 applicant on Sept 10, but it was denied. In a handwritten note on the side of the application, underlined and circling is the phrase, "like to stay three years or more!", and below that, "going to flight training school wants to change status when he finds a school. He also states on this application, and the one approved 15 days later, that he'd only been in the US in 1998 for a year.

[10] INS records indicate that the date Hanjour was admitted to in December of 2000 is unknown. INS experts state that the typical time period of admission for a Saudi F1 visa in 2000 was six months.

[11] The Non-Immigrant Visa System record for Hanjour's Nov. 16, 1997 admission states admitted to "Dec 31, 9999"; this is most likely a typo meaning Dec 31, 1999.

[12] Hanjour was admitted by INS inspectors at NYC until October 1, 1996, but his date of departure is November 11, 1996, indicating Hanjour an overstay.

[13] Hanjour's March 1996 B2 visa was issued with a notation "prospective student school not yet selected. The June 7, 1996 I-539 application to change status from B2 to F1student was approved June 27, 1996. In Nov. 1996, Hanjour left the US again, and acquired an F-1 visa valid for one year to attend ELS Language Centers in Florida one year later, in Nov. 1997. He re-entered on the F1 visa also in Nov. 1997. On June 16, 1998, Hanjour filed a second I-539, this time seeking a change of status from an F-1 student to an M-1 student to attend the Cockpit Resource Management Airline Training Center in Scottsdale, Arizona. Eight months later, the INS requested supporting evidence. By April 1999, having already attended the flight school and received a commercial pilot license from FAA without ever acquiring INS approval to change his status to an M-1, Hanjour departed again. One and a half years later, in Sept. 2000, Hanjour got a new F-1visa. On his last entry in December 2000, the I-94 lists his intended address as English Language School in Oakland, California. Hanjour's M-1 status requested November 2, 1998 was finally approved January 16, 2001 for a validity from July 30, 1998 to July 29, 1999.

[14] Both Al Mihdhar and N. Al Hazmi were videotaped meeting with bin Ladin operatives in January 2000. In May 2000, both took flight lessons at Sorbi's Flying School in San Diego. 2001.

[15] An August 23, 2001 a CIA classified cable to multiple agencies , including INS, requested that K. al Mihdhar and N. al Hazmi be placed on three lookout watch lists (VISA/VIPER, TIPOFF and TECS). TIPOFF and TECS records were created on August 24. Al Hazmi was placed in TECS also on August 24. The TIPOFF record was placed in NAILS on August 30, 2001. On Sept. 4, 2001, another NAILS record is placed by the NY FBI upon the request of the NY FBI. Another NAILS lookout was placed by INS headquarters on Sept. 5, 2001 based on a State Department nonimmigrant visa revocation. TECS was also updated on the same day with the State Department cable which revoked Al Mihdhar's visa. Technically, the revocation could not take place until Al Mihdhar departed the country. TECS and NAILS data is available to INS inspectors through IBIS.

[16] Moqed was on an APIS list transited to INS/Customs prior to reaching US soil, along with A. Al Ghamdi.

[17] *N. al Hazmi's extension of stay*: N. al Hazmi first came into the US on Jan. 15, 2000. His US visa expired on April 2, 2000. His INS length of stay granted by an immigration inspector upon entry into the US expired on July 14, 2000. On July 12, al Hazmi filed for an immigration benefit (I-539) to extend his B2 nonimmigrant status to extend his stay until Jan. 15, 2001. On June 18, 2001, the INS grants the extension of stay for the time requested: from July 15, 2001 to Jan. 15, 2001. It was returned undeliverable on March 25, 2002. *Analysis:* (1) the fact that al Hazmi's visa expired prior to filing for an extension of stay is irrelevant. The Visa is only permission to apply for admission at a US border port of entry. Once an individual is within the US, only INS rules on stay apply. Therefore, since al Hazmi submitted his application prior to his six month length of stay expiring, the INS did not commit an error under their own rules for granting the extension. (2) In terms of al Hazmi's immigration status while he was waiting for the adjudication of the extension from July 2000 to June 2001, he was legally within the U.S., as the pending application stays the expired length of stay until the time it is adjudicated. (3) Once the stay was approved in June 2001 only for a time period to Jan. 2001, he was retroactively illegal in the U.S. Therefore, the reality is that although al Hazmi was illegally in the US at the time of the Sept. 11 hijackings, immigration authorities would only have had a base to remove him from the U.S. after June 18, 2001. As of Sept. 11, al Hazmi was illegal.

[18] On the first day Jarrah entered the US, he immediately enrolled in the Florida Flight Training Center in Venice, FL, from June 27, 2000 to January 31, 2001.

[19] This arrival from Nassau, Bahamas to Miami was via a private aircraft piloted by Jarrah. He both departed and arrived back in the US on Nov. 25, 2000, departing at 2000 hours and returning at 2200. Both Jarrah's pilot license and pilot medical certificates were verified by the inspector. There were one male and one female passenger on this flight on its return. Record indicates that the plane was leased or borrowed from its owner to a flight training school in South Florida. The customs declaration was destroyed prior to Sept. 11, 2001, as it was over six months old.

[20] There is an I-20 record for a Saeed Al Ghamdi, DOB 4-14-83 to attend Bourland Flight Academy in Ft. Worth, Texas for an approved time period of 4-25-01 to 10-25-01. The document states that "student has the required English proficiency". *Further verification required.*

[21] Records reflect that S. Al Ghamdi was sent to secondary inspection because he listed no address on his I-94, spoke little English and only had a one-way ticket. Secondary inspectors determined he was a tourist with sufficient funds for his period of stay (six months). He was then admitted into US by secondary inspector.

[22] The Penttbomb investigation believes that A. al Nami, M. al Shahri, and H. al Ghamdi, who all arrived together in Orlando on this date, were picked up by Atta, who rented an SUV hours prior to these operatives arrival, and returned it the following day.

[23] On January 18, 2001, M. Alshehhi was referred to secondary inspection. The primary inspection report in NIIS reads "SUBJ left one week ago after entry in May [2000]. Has extension and now returning for a few more months." Secondary inspection reads "Was in US gaining flight hours to become a pilot. Admitted for four months." Alshehhi had, in fact, already obtained his commercial pilot license on December 16, 2000.

[24] M. Al Shehhi was pulled into Customs secondary inspection by a rover, an agent trained to look for profiles of persons who may be carrying drugs prior to entering the inspection line. The secondary inspection report states only "secondary inspection complete".

[25] M. Alsehhi submitted on I-539 application to change status of B2 to M1 September 22, 2000, within three days of Atta's application. Alsehhi was enrolled at Huffman Aviation from July 2000 to December 2000. The application was approved August 10, 2001. He did perform check flights on 1/13/01 and 2/6/01 in Georgia while his benefit application was pending.

[26] Al. Al Ghamdi was on an APIS list transited to INS/Customs prior to reaching US soil, along with Moqed.

NOTE: Billy at ICE did afteraction report on the 19 at 307-1206.

3. OTHER NAMES (Maiden, Religious, Professional, Aliases)

MULTOR
Number Applications

| 4. DATE OF BIRTH (Day, Month, Year) | | 8. PASSPORT NUMBER |
|---|---|---|
| 7.12.77 | | (11 5 007 |

MONTHS _____
Validity

| 5. PLACE OF BIRTH | | DATE PASSPORT ISSUED (Day, Month, Year) |
|---|---|---|
| City Province | Country | |
| ABHA | | 24.4.2cc. |

L.O. CHECKED _____

ISSUED/REFUSED

ON _____ . BY ____

| 6. NATIONALITY | 7. SEX | DATE PASSPORT EXPIRES (Day, Month, Year) |
|---|---|---|
| K.S. A | ☑ MALE ☐ FEMALE | 27.7.7co5 |

UNDER SEC. _____ IN/

REFUSAL REVIEWED BY 296/-

9. HOME ADDRESS (include apartment no., street, city, province, and postal zone)

KSA- JEDDH - SAFA-

10. NAME AND STREET ADDRESS OF PRESENT EMPLOYER OR SCHOOL (Postal box number unacceptable)

ALSAFA - AL NIMY

| 11. HOME TELEPHONE NO. | 12. BUSINESS TELEPHONE NO. |
|---|---|
| 6743848 | |

Exhibit B

| 13. COLOR OF HAIR | 14. COLOR OF EYES | 15. COMPLEXION |
|---|---|---|
| BLACK | BROWN | |

| 16. HEIGHT | 17. MARKS OF IDENTIFICATION |
|---|---|
| 165c. | v.1 |

18. MARITAL STATUS
☐ Married  ☑ Single  ☐ Widowed  ☐ Divorced  ☐ Separated
If married, give name and nationality of spouse.

19. NAMES AND RELATIONSHIPS OF PERSONS TRAVELING WITH YOU (NOTE: A separate application must be made for a visa for each traveler, regardless of age.)

my frined MoSt'A BAB

20. HAVE YOU EVER APPLIED FOR A U.S. VISA BEFORE, WHETHER IMMIGRANT OR NONIMMIGRANT?

☐ No
☐ Yes   Where? _____

When? _____ Type of visa? _____
☐ Visa was issued   ☐ Visa was refused

21. HAS YOUR U.S. VISA EVER BEEN CANCELED?
☐ No
☐ Yes   Where? _____

When? _____ By whom? _____

22. Bearers of visitors visas may generally not work or study in the U.S.
DO YOU INTEND TO WORK IN THE U.S.?   ☐ No   ☐ Yes
If YES, explain.

23. DO YOU INTEND TO STUDY IN THE U.S.?   ☑ No   ☐ Yes

24. PRESENT OCCUPATION (If retired, state past occupation)

Student

25. WHO WILL FURNISH FINANCIAL SUPPORT, INCLUDING TICKETS?

My FATHER

26. AT WHAT ADDRESS WILL YOU STAY IN THE U.S.A?

in LecS ANGLc

27. WHAT IS THE PURPOSE OF YOUR TRIP?

tourist

28. WHEN DO YOU INTEND TO ARRIVE IN THE U.S.A?

toomcnth

29. HOW LONG DO YOU PLAN TO STAY IN THE U.S.A?

3 month

30. HAVE YOU EVER BEEN IN THE U.S.A?

33. PLEASE US... ...E PAST 5 YEARS. BEGIN WITH YOUR PRESENT RESIDENCE.

| Countries | Cities | Approximate Dates |
|-----------|--------|-------------------|
|           |        |                   |

34. IMPORTANT ALL APPLICANTS MUST READ AND CHECK THE APPROPRIATE BOX FOR EACH ITEM:

A visa may not be issued to persons who are within specific categories defined by law as inadmissible to the United State (except when a waiver is obtained in advance). Are any of the following applicable to you?

- Have you ever been afflicted with a communicable disease of public health significance, a dangerous physical or mental disorder, or been a drug abuser or addict? . . . . . . . . . ☐ Yes ☒ No

- Have you ever been arrested or convicted for any offense or crime, even though subject of a pardon, amnesty, or other such legal action? . . . . . . . . . ☐ Yes ☒ No

- Have you ever been a controlled substance (drug) trafficker, or a prostitute or procurer? . . . . ☐ Yes ☐ No

- Have you ever sought to obtain or assist others to obtain a visa, entry into the U.S., or any U.S. immigration benefit by fraud or wilful misrepresentation? . . . . . . . . . ☐ Yes ☐ No

- Were you deported from the U.S.A. within the last 5 years? . . . . . . . . . ☐ Yes ☒ No

- Do you seek to enter the United States to engage in export control violations, subversive or terrorist activities, or any unlawful purpose? . . . . . . . . . ☐ Yes ☒ No

- Have you ever ordered, incited, assisted, or otherwise participated in the persecution of any person because of race, religion, national origin, or political opinion under the control, direct or indirect, of the Nazi Government of Germany, or of the government of any area occupied by, or allied with, the Nazi Government of Germany; or have you ever participated in genocide? . . . . . . ☐ Yes ☐ No

A YES answer does not automatically signify ineligibility for a visa, but if you answered YES to any of the above, or if you have any question in this regard, personal appearance at this office is recommended. If appearance is not possible at this time attach a statement of facts in your case to this application.

35. I certify that I have read and understood all the questions set forth in this application and the answers I have furnished o this form are true and correct to the best of my knowledge and belief. I understand that any false or misleading statement ma result in the permanent refusal of a visa or denial of entry into the United States. I understand that possession of a visa does n entitle the bearer to enter the United States of America upon arrival at port of entry if he or she is found inadmissible.

DATE OF APPLICATION 28 - 10 - 2000

APPLICANT'S SIGNATURE _____

If this application has been prepared by a travel agency or another person on your behalf, the agent should indicate name an address of agency or person with appropriate signature of individual preparing form.

SIGNATURE OF PERSON PREPARING FORM
(if other than applicant) _____

DO NOT WRITE IN THIS SPACE



2 FIRST NAME AND MIDDLE NAME (Exactly as in Passport)

EATAM

3 OTHER NAMES (Maiden, Religious, Professional, Aliases)

M. A.

| 4 DATE OF BIRTH (Day, Month, Year) | 8. PASSPORT NUMBER |
|---|---|
| 28, 5, 76 | B559583 |

| 5. PLACE OF BIRTH | | DATE PASSPORT ISSUED (Day, Month, Year) |
|---|---|---|
| City, Province | Country | |
| Riyadh | Saudia | 11, 8, 98 |

| 6 NATIONALITY | 7. SEX | DATE PASSPORT EXPIRES (Day, Month, Year) |
|---|---|---|
| Saudi | ☑ MALE ☐ FEMALE | 9, 8, 2003 |

9 HOME ADDRESS (Include apartment no., street, city, province, and postal zone)

Riyadh AL SHEFA

10. NAME AND STREET ADDRESS OF PRESENT EMPLOYER OR SCHOOL (Postal box number unacceptable)

| 11 HOME TELEPHONE NO | 12. BUSINESS TELEPHONE NO. |
|---|---|
| 22-2152 | — |

| 13. COLOR OF HAIR | 14. COLOR OF EYES | 15. COMPLEXION |
|---|---|---|
| Black | Black | |

| 16 HEIGHT | 17. MARKS OF IDENTIFICATION |
|---|---|
| 76 | |

18 MARITAL STATUS
☐ Married  ☑ Single  ☐ Widowed  ☐ Divorced  ☐ Separated
If married, give name and nationality of spouse

19 NAMES AND RELATIONSHIPS OF PERSONS TRAVELING WITH YOU (NOTE: A separate application must be made for a visa for each traveler, regardless of age.)

—

20 HAVE YOU EVER APPLIED FOR A U.S. VISA BEFORE, WHETHER IMMIGRANT OR NONIMMIGRANT?
☑ No
☐ Yes  Where? ____
When? ____  Type of visa? ____
☐ Visa was issued  ☐ Visa was refused

21 HAS YOUR U.S. VISA EVER BEEN CANCELED?
☑ No
☐ Yes  Where? ____
When? ____  By whom? ____

22 Bearers of visitors visas may generally not work or study in the U.S.
DO YOU INTEND TO WORK IN THE U.S.?  ☑ No  ☐ Yes
If YES, explain:

23 DO YOU INTEND TO STUDY IN THE U.S.?  ☑ No  ☐ Yes
If YES, write name and address of school as it appears on form I-20

24 PRESENT OCCUPATION (If retired, state past occupation)
DEALER

25 WHO WILL FURNISH FINANCIAL SUPPORT, INCLUDING TICKET?
My Father

26. AT WHAT ADDRESS WILL YOU STAY IN THE U.S.A?
NEW York

27. WHAT IS THE PURPOSE OF YOUR TRIP?
Tours

28 WHEN DO YOU INTEND TO ARRIVE IN THE U.S.A?
IN Two week

29 HOW LONG DO YOU PLAN TO STAY IN THE U.S.A?
one Month

30 HAVE YOU EVER BEEN IN THE U.S.A?
☑ No
☐ Yes  When? ____
For how long? ____

**NONIMMIGRANT VISA APPLICATION**

COMPLETE ALL QUESTIONS ON

---

(right margin — visa stamp/notation area)

OTHER ____  Visa Classification ____
MULT OR ____  Number Applications ____
MONTHS ____  Validity ____
☐ CHECKED
ISSUED/REFUSED
ON ____  BY ____
UNDER SEC  2 1 NOV 2000  NA
REFUSAL REVIEWED BY
00326 - 708-4
40240372

Exhibit C

| Countries | Cities | Approximate Dates |
|-----------|--------|-------------------|

34. IMPORTANT: ALL APPLICANTS MUST READ AND CHECK THE APPROPRIATE BOX FOR EACH ITEM:

A visa may not be issued to persons who are within specific categories defined by law as inadmissible to the United States (except when a waiver is obtained in advance). Are any of the following applicable to you?

- Have you ever been afflicted with a communicable disease of public health significance, a dangerous physical or mental disorder, or been a drug abuser or addict? . . . . . . . . . . . . ☐ Yes  ☑ No

- Have you ever been arrested or convicted for any offense or crime, even though subject of a pardon, amnesty, or other such legal action? . . . . . . . . . . . . . . . . . . . . . . ☐ Yes  ☑ No

- Have you ever been a controlled substance (drug) trafficker, or a prostitute or procurer? . . . . . ☐ Yes  ☐ No

- Have you ever sought to obtain or assist others to obtain a visa, entry into the U.S., or any U.S. immigration benefit by fraud or willful misrepresentation? . . . . . . . . . . . . . . . . . ☐ Yes  ☐ No

- Were you deported from the U.S.A. within the last 5 years? . . . . . . . . . . . . . . . . . ☐ Yes  ☐ No

- Do you seek to enter the United States to engage in export control violations, subversive or terrorist activities, or any unlawful purpose? . . . . . . . . . . . . . . . . . . . . . . . ☐ Yes  ☑ No

- Have you ever ordered, incited, assisted, or otherwise participated in the persecution of any person because of race, religion, national origin, or political opinion under the control, direct or indirect, of the Nazi Government of Germany, or of the government of any area occupied by, or allied with, the Nazi Government of Germany, or have you ever participated in genocide? . . . . . . ☐ Yes  ☑ No

A YES answer does not automatically signify ineligibility for a visa, but if you answered YES to any of the above, or if you have any question in this regard, personal appearance at this office is recommended. If appearance is not possible at this time, attach a statement of facts in your case to this application.

35. I certify that I have read and understood all the questions set forth in this application and the answers I have furnished on this form are true and correct to the best of my knowledge and belief. I understand that any false or misleading statement may result in the permanent refusal of a visa or denial of entry into the United States. I understand that possession of a visa does not entitle the bearer to enter the United States of America upon arrival at port of entry if he or she is found inadmissible.

DATE OF APPLICATION _____

APPLICANT'S SIGNATURE _____

If this application has been prepared by a travel agency or another person on your behalf, the agent should indicate name and address of agency or person with appropriate signature of individual preparing form.

SIGNATURE OF PERSON PREPARING FORM
(if other than applicant) _____

DO NOT WRITE IN THIS SPACE

Exhibit D



U.S. IMMIGRATION
CPL #10
APR 2 3 2001
ADMITTED CLASS
UNTIL

U.S. IMMIGRATION
FIIA
ADMITTED
MAY 1 6 2001

CLASS
UNTIL

**UNITED STATES OF AMERICA VISA**

Issuing Post Name
RIYADH

Surname
AL SUQAMI

Given Name
SATAM M A

Passport Number
B559583

Sex
M

Birth Date
28JUN1976

Control Number
2000326708D004

Visa Type /Class
R    B1/B2

Nationality
SARB

Issue Date
21NOV2000

Expiration Date
20NOV2002

1001

40240372

VNSAUAL<SUQAMI<<SATAM<M<A<<<<<<<<<<<<<<<<<<<<
B559583<<4SAU7606283M0011215R31n2n9AnaAzi2nn

3. OTHER
NIL

4. DATE OF BIRTH *(Day, Month, Year)*
18 · 6 · 1977

8. PASSPORT NUMBER
C390833

5. PLACE OF BIRTH
City, Province _____ Country _____
AL-NAHEEL

DATE PASSPORT ISSUED
*(Day, Month, Year)*
19 - 11 - 2000

6. NATIONALITY
SAUDI

7. SEX
☒ MALE
☐ FEMALE

DATE PASSPORT EXPIRES
*(Day, Month, Year)*
26 - 9 - 2005

9. HOME ADDRESS *(include apartment no., street, city, province, and postal zone)*
Riadh

10. NAME AND STREET ADDRESS OF PRESENT EMPLOYER OR SCHOOL
*(Postal box number unacceptable)*

11. HOME TELEPHONE NO.
2269160

12. BUSINESS TELEPHONE NO.

13. COLOR OF HAIR
BLACK

14. COLOR OF EYES
BLACK

15. COMPLEXION
WHITE

16. HEIGHT
160CM

17. MARKS OF IDENTIFICATION

18. MARITAL STATUS
☐ Married   ☒ Single   ☐ Widowed   ☐ Divorced   ☐ Separated
If married, give name and nationality of spouse

19. NAMES AND RELATIONSHIPS OF PERSONS TRAVELING WITH YOU *(NOTE: arate application must be made for a visa for each traveler, regardless of age.)*
NiL

20. HAVE YOU EVER APPLIED FOR A U.S VISA BEFORE, WHETHER IMMI-
GRANT OR NONIMMIGRANT?
☒ No
☐ Yes     Where? _____

When? _____ Type of visa? _____
☐ Visa was issued     ☐ Visa was refused

21. HAS YOUR U.S VISA EVER BEEN CANCELED?
☒ No
☐ Yes     Where? _____

When? _____ By whom? _____

22. Bearers of visitors visas may generally not work or study in the U.S.
DO YOU INTEND TO WORK IN THE U.S?     ☒ No   ☐ Yes
If YES, explain.

Exhibit E

23. DO YOU INTEND TO STUDY IN THE U.S?     ☒ No   ☐ Yes
If YES, write name and address of school as it appears on form I-20.

SON/DAUGHTER

E COUNTRIES WHERE YOU HAVE LIVED FOR MORE THAN 6 MONTHS DURING THE PAST 5 YEARS
OUR PRESENT RESIDENCE

Cities.                                                 Approximate Dates.

2

APPLICANTS MUST READ AND CHECK THE APPROPRIATE BOX FOR EACH ITEM

Issued to persons who are within specific categories defined by law as inadmissible to the United States
aiver is obtained in advance)   Are any of the following applicable to you?

|  | Yes | No |
|---|---|---|
| been afflicted with a communicable disease of public health significance, a cal or mental disorder, or been a drug abuser or addict? | ☐ | ☑ |
| been arrested or convicted for any offense or crime, even though subject of a ty or other such legal action? | ☐ | ☑ |
| been a controlled substance (drug) trafficker, or a prostitute or procurer? | ☐ | ☑ |
| sought to obtain or assist others to obtain a visa, entry into the U.S. or any on benefit by fraud or wilful misrepresentation? | ☐ | ☑ |
| rted from the U.S.A. within the last 5 years? | ☐ | ☑ |
| enter the United States to engage in export control violations, subversive or s, or any unlawful purpose? | ☐ | ☑ |
| ordered, incited, assisted, or otherwise participated in the persecution of any per cial, religion, national origin, or political opinion under the control, direct or indi Government of Germany, or of the government of any area occupied by or allied Government of Germany, or have you ever participated in genocide? | ☐ | ☑ |

rs not automatically signify the ineligibility for a visa, but if you answered YES to any of the above, or if you have
s regard, personal appearance at this office is recommended.  If appearance is not possible at this time
nt of facts in your case to this application.

r read and understood all the questions set forth in this application and the answers I have furnished on
s correct to the best of my knowledge and belief.  I understand that any false or misleading statement may
nt issuance of a visa or denial of entry into the United States.  I understand that possession of a visa does not
enter the United States of America upon arrival at port of entry.  I further that the final administration

ATION          20/11/2000.

NATURE        _(signature)_

was been prepared by a travel agency or another person on your behalf, the alien should provide name and
by or person with appropriate signature of individual preparing form.

PERSON PREPARING FORM   _(signature)_

DO NOT WRITE IN THIS SPACE



MOHAND M. F. AL SHEHRI   United Airlines Flight 175

▪October 22, 2000 Visa Application

Source: Department of State

Exhibit F



NIV Applicant Detail

QUIGLEYPR on November 08, 2001 10:57 ET

Sensitive But Unclassified (SBU) - Information Protected under INA 222(f) and 9 FAM 40.4



**Issuing Post Name**

JEDDAH

**Control Number**

2000247 243 0010

**Surname**

AL GHAMDI

**Given Name**

AHMED SALEH S

| Passport Number | Gender | Date of Birth | Nationality |
|---|---|---|---|
| C317968, Regular | Male | 02JUL1979 | SARB |

**Place of Birth**

Saudi Arabia (SARB)

| Class | Entries | Issue Date | Expiration Date | Foil Number |
|---|---|---|---|---|
| B1/B2 | M | 03-SEP-2000 | 02-SEP-2002 | 39737182 |

## Adjudication History

| Adjud Date | Status |
|---|---|
| 03-SEP-2000 | Issued |

## Foil History

| Foil Number | Class | Date Printed | Foil Status |
|---|---|---|---|
| 39737182 | B1/B2 | 03-SEP-2000 | Printed and passed QA |

## Namecheck(s)