UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE TERRORIST ATTACKS ON SEPTEMBER 11, 2001 | Civil Action No. 03 MDL 1570 (GBD) |
| FIONA HAVLISH, in her own right and as Executrix of the ESTATE OF DONALD G. HAVLISH, JR., Deceased, et al., | |
| Plaintiffs, v. | |
| USAMA BIN LADEN, | |
| AL QAEDA/ISLAMIC ARMY, an unincorporated association, et al | CIVIL ACTION NO. 03-CV-9848-RCC Case Transferred from the United States District Court to the District of Columbia Case Number 1:02CV00305 |
| FOREIGN STATE DEFENDANTS, | |
| THE ISLAMIC REPUBLIC OF IRAN, ALI AKBAR HASHEMI RAFSANJANI Previously Identified and Served as Unidentified Terrorist 1, | |
| IRANIAN MINISTRY OF INFORMATION AND SECURITY, | |
| THE ISLAMIC REVOLUTIONARY GUARD CORPS, | AFFIDAVIT OF DIETRICH L. SNELL, ESQ. |
| HEZBOLLAH, an unincorporated association, | |
| THE IRANIAN MINISTRY OF PETROLEUM, | |
| THE NATIONAL IRANIAN TANKER CORPORATION Previously Identified as Unidentified Terrorist 2, | |
| THE NATIONAL IRANIAN OIL CORPORATION THE NATIONAL IRANIAN GAS COMPANY Previously Identified as Unidentified Terrorist 4, | |

*Affidavit of Dietrich L. Snell, Esq., Page 1*

| | |
|---|---|
| IRAN AIRLINES<br>Previously Identified as Unidentified Terrorist 5, | : |
| | : |
| THE NATIONAL IRANIAN<br>PETROCHEMICAL COMPANY<br>Previously Identified as Unidentified Terrorist 6, | :<br>:<br>: |
| | : |
| IRANIAN MINISTRY OF DEFENSE<br>ECONOMIC AFFAIRS AND FINANCE<br>IRANIAN MINISTRY OF COMMERCE, | :<br>:<br>: |
| | : |
| IRANIAN MINISTRY OF DEFENSE<br>AND ARMED FORCES LOGISTICS, | :<br>: |
| | : |
| THE CENTRAL BANK OF THE<br>ISLAMIC REPLUBLIC OF IRAN, *et al.*<br>Previously Identified as Unidentified Terrorist 7, | :<br>:<br>: |
| | : |
| Defendants | : |

## *Affidavit of Dietrich L. Snell, Esq.*

I, Dietrich L. Snell, being duly sworn, do hereby swear and affirm under penalty of perjury that the contents of this Affidavit are true and correct to the best of my knowledge, information, and belief.

### Qualifications of the Expert Witness

1. My name is Dietrich L. Snell. I am an adult citizen of the United States and reside in the State New York.

2. Between August 1988 and January 1999, I was an Assistant United States Attorney in the office of the United States Attorney for the Southern District of New York. From about August 1997 until January 1999, I was Deputy Chief Appellate Attorney of the Criminal Division.

*Affidavit of Dietrich L. Snell, Esq., Page 2*

3. As an Assistant United States Attorney, I investigated and prosecuted a wide spectrum of federal criminal offenses and offenders. In addition to personally conducting numerous jury trials in this Court, I briefed and argued numerous criminal appeals before the United States Court of Appeals for the Second Circuit. Further, as Deputy Chief Appellate Attorney, I supervised the briefing and oral argument of dozens of criminal appeals by other Assistant United States Attorneys before the Second Circuit.

4. Of particular relevance to the present proceeding, starting in 1995, I became intensively involved in the investigation and prosecution of terrorism cases in this District. Specifically, in 1995-1996, I investigated and prosecuted the case of *United States v. Ramzi Ahmed Yousef, et al.,* S12 93 Cr. 180 (KTD), which involved the conspiracy of Ramzi Yousef, Abdul Hakim Murad, Wali Khan Amin Shah and others to bomb a dozen United States civil aircraft while those aircraft were flying across the Pacific Ocean, en route to the United States (commonly known as the "Bojinka plot"). The four-month trial I conducted resulted in a jury verdict convicting Yousef, Murad and Shah on all counts in the Indictment.

5. In 1996-1997, I assisted in the preparation of the prosecution's brief in opposition to the appeal of Mohammed Salameh, Nidal Ayyad, Mahmoud Abouhalima and Ahmad Ajaj of their 1994 convictions for the February 26, 1993 bombing of the World Trade Center. *See United States v. Salameh,* 152 F.3d 99 (2d Cir. 1998). I also participated in the oral argument preparation of the Assistant United States Attorneys who argued this appeal and the appeal of Sheik Omar Abel Rahman (the "Blind Sheik") and his co-defendants of their convictions for conspiring to wage a war of urban terrorism against the United States. *See United States v. Abdel Rahman,* 189 F.3d 88 (2d Cir. 2000).

6.     In January 1999, I joined the New York State Department of Law as Deputy Attorney General for Public Advocacy, overseeing the work of approximately 150 attorneys and as many support staff. In particular, I was responsible for supervising the work conducted by the Antitrust, Charities, Civil Rights, Consumer Fraud and Protection, Environmental Protection, Health Care, Internet, Investor Protection, Real Estate Financing, and Telecommunications and Energy Bureaus of the Office of the Attorney General.

7.     Between May 2003 and July 2004, I served as Senior Counsel on the staff of the National Commission on Terrorist Attacks upon the United States (commonly known as the "9/11 Commission"). In particular, I was the Team Leader of the contingent of Commission staff assigned to investigate the plot that culminated in the 9/11 attack. It was my responsibility to design and coordinate the staff's investigation of the 9/11 plot, ensuring that the Commission appropriately considered all relevant evidence gathered from the myriad sources – both classified and public record – that were made available to the Commission. This assignment involved reviewing countless documents and interviewing hundreds of witnesses, including members of the law enforcement and intelligence communities within the United States and overseas. The Commission assignment ultimately required a painstaking assessment of the credibility and reliability of evidence and sources, so that the Commission could fulfill its mandate to present an authoritative history of the 9/11 plot. In this regard, I supervised the preparation the Staff Statement on the plot, which I helped deliver at a hearing held by the Commission on June 16, 2004. My assignment at the Commission culminated in June and July of 2004 with the drafting and editing of those portions of *The 9/11 Commission Report* (the "*Report*") that dealt with the plot. *See Report*, chapters 5 and 7).

8.      Following the completion of my work with the 9/11 Commission, I returned to my position as Deputy Attorney General in the New York State Department of Law, where I remained until April 2007. In March 2005, at the request of the Superior Court in Hamburg, Germany, I testified over a two-day span at the second criminal trial of Mounir el-Motassadeq on charges related to the 9/11 attack. My testimony addressed the findings of the 9/11 Commission with respect to the formation and execution of the 9/11 plot, and the evidence obtained by the Commission with respect to the complicity of Motassadeq in that plot. In its August 2005 decision announcing its guilty verdict against Motassadeq, the German court specifically cited my testimony as having proved helpful to the court in arriving at its decision.

9.      Since May 2007, I have been a member of the law firm of Proskauer Rose, LLP, where I am Deputy Chair of the Corporate Defense and Investigations practice group within the firm's litigation department.

### Opinion as to Iran's Material Support for al Qaeda and the 9/11 Attack

10.     I have reviewed the affidavit of Daniel L. Byman, dated June 8, 2010, and the affidavit of Janice Kephart-Roberts, dated June 7, 2010. I am familiar with the work of both Mr. Byman and Ms. Kephart-Roberts from our time together as colleagues on the 9/11 Commission staff, and recognize and thoroughly respect the expertise of both of them. I also have reviewed the affidavit of Patrick L. Clawson, dated June 25, 2010, and I understand that all three of these affidavits are to be submitted to the Court by plaintiffs in this proceeding.

11.     As set forth in greater detail below, I find the conclusions reached by Mr. Byman, Ms. Kephart-Roberts and Mr. Clawson to be consistent with my own view – based on my experience investigating and prosecuting terrorism cases and my own work with the 9/11

Commission – that there is clear and convincing evidence the government of Iran provided material support to al Qaeda in the planning and execution of the 9/11 attack, within the meaning of 18 U.S.C. § 2339A(b)(1), primarily in the form of facilitating the travel of members of the 9/11 conspiracy to and from Afghanistan and Pakistan, in which countries, in my opinion and as found by the 9/11 Commission, the plot was hatched and developed.

## Discussion

12.   One of the more salient features the various terrorist attacks against the United States that I have investigated and prosecuted during my career is their international character. The participants in the 1993 bombing of the World Trade Center, the Bojinka plot and the 9/11 attack all exploited their ability to cross international boundaries essentially unimpeded by government authorities.

13.   For example, two of the four conspirators convicted of the 1993 World Trade Center bombing – Ramzi Yousef and Ahmad Ajaj – traveled together from Pakistan to the United States in furtherance of their terrorist plot. Upon their arrival in New York on September 1, 1992, Yousef succeeded in entering the country by claiming asylum, while Ajaj sought to use a fraudulent passport and was detained following its discovery by U.S. Immigration authorities. Even though Ajaj remained incarcerated for passport fraud for six months and did not gain until March 1, 1993 – several days *after* the actual February 26, 1993 bombing – he nevertheless was subsequently convicted of complicity in the attack on the World Trade Center, based on large part on the voluminous written materials – including bombmaking manuals and correspondence regarding his participation in a terrorist training program in Afghanistan – that he was carrying in his luggage when he and Yousef arrived in New York.

14. The Bojinka plot placed even greater reliance on the ability of its participants to travel freely from one country to another, especially throughout Southeast Asia. The conspirators hailed from a variety of nations, including Kuwait, Pakistan and Turkmenistan, but the conspiracy's epicenter was in the Philippines, which the conspirators used as a base for their operations. Not surprisingly, the proof at trial included a myriad of physical exhibits relating to international travel – such as passports, flight schedules, airline tickets, flight manifests – that established the frequent conspirators' frequent trips in furtherance of the plot.

15. The 9/11 plot was considerably more complex and logistically challenging than either the 1993 World Trade Center bombing or the Bojinka plot. Not surprisingly, therefore, the 9/11 conspiracy involved international travel on an even greater scale than did either of its predecessors. As detailed in the *Report*, the 9/11 conspirators – including the 19 eventual suicide operatives and the various logistics facilitators – traveled extensively, to and from Pakistan and Afghanistan in order to undergo indoctrination and training, as well as to obtain necessary travel documents in Saudi Arabia and other countries. Moreover, after first arriving in the United States in early 2000, key members of the conspiracy repeatedly left and returned to the United States over an eighteen-month period, each time without incident. Starting in the spring of 2001, the 15 "muscle" hijackers – whose job it would be to subdue the passengers and maintain control of the aircraft – traveled to the United States, no more than three at a time, to participate in the plot's final preparations.

16. Given the formidable complexity of the 9/11 plot, it makes eminent sense to consider the possibility that foreign government assistance of some sort may have played some

role in the plot's execution. The 9/11 Commission certainly recognized this possibility and was sensitive to any evidence pointing in that direction.

17. During my work with the Commission, I became intimately familiar with the FBI's criminal investigation of the 9/11 attack (the "Penttbom investigation"), an investigation of unprecedented scope in the history of the FBI. In particular, I attended detailed briefings held by the Penttbom team for the 9/11 Commission staff. In those briefings, the FBI emphasized its view that a substantial number of the 19 al Qaeda operatives who hijacked the four targeted U.S. airliners likely transited through Iran on their way to and from Pakistan and Afghanistan, during and in furtherance of the conspiracy. According to the Penttbom team, the willingness of Iranian border officials to refrain from stamping the passports of al Qaeda members helped explain the absence of a clear document trail showing the travels of those members to and from Afghanistan, the center of al Qaeda training starting in the late 1990s and leading up to September 11, 2001.

18. The 9/11 Commission obtained evidence that strongly supported the FBI's theory. First, a number of al Qaeda members who were detained following the 9/11 attack – including a senior al Qaeda member named Tawfiq bin Attash, a/k/a "Khallad" (who was captured in Pakistan in April 2003) – confirmed to interrogators their understanding that Iranian immigration inspectors had been directed "not to place telltale stamps in the passports of [al Qaeda] travelers. *See Report* at 240.

19. Second, at virtually the last moment of the Commission's existence and only a week before publication of the *Report* – at a time when the staff and commissioners alike were engaged in final preparation of the *Report* – we obtained intelligence reports providing clear evidence that as many as ten of the 14 Saudi muscle hijackers involved in the 9/11 attack

traveled into or out of Iran between October 2000 and February 2001, a critical period in the life of the conspiracy when those operatives had to interrupt their training in Afghanistan to obtain U.S. visas in Saudi Arabia before returning for the final training in Afghanistan and Pakistan that would precede their eventual journey to the United States. Moreover, as described on pages 240-241 of the *Report*, the last minute evidence examined by the Commission staff – including members of my team – established a series of links between travel apparently conducted by various muscle hijackers during this stage of the plot and facilitation activities of senior members of Hezbollah, the Iranian-supported international terrorist organization.

20.  Given the inconclusive nature of this last-minute evidence apparently linking certain travel in furtherance of the 9/11 plot with Iran and Hezbollah, the Commission staff recognized the importance of obtaining some measure of corroboration before including the evidence in the *Report*. Such corroboration was obtained. Under the protocol established for Commission staff inquiries regarding information obtained from captured al Qaeda members being subjected to interrogation, we were entitled first to submit questions for particular detainees and then to review reports of interrogation sessions that, quite plainly, involved some effort on the part of the actual interrogators to incorporate our questions into their work. *See Report* at 146 (textbox). Immediately upon receiving the evidence indicating Hezbollah's and Iran's travel support for the 9/11 plot, I drafted pertinent questions for senior alleged 9/11 conspirators Ramzi Binalshibh and Khalid Sheikh Mohammed ("KSM"), and submitted those questions to our U.S. intelligence community contact for detainee interrogations. Responses to those questions promptly were reported back to us on July 16, 2004, just in time to be included in the *Report*. *See Report* at 241 & ch. 7 nn. 121, 126.

21.     As noted in the *Report*, both Binalshibh and KSM "confirmed that several of the 9/11 hijackers (at least eight, according to Binalshibh") transited Iran on their way to or from Afghanistan, taking advantage of the Iranian practice of not stamping Saudi passports." *Report* at 241. Thus, both key detainees provided information tending to corroborate the evidentiary support that already existed for the Penttbom team's theory regarding the important role played by Iran in facilitating the 9/11 attack. Although both Binalshibh and KSM denied "any relationship between the hijackers and Hezbollah" *id.*, based on my experience in reading hundreds of interrogation reports and based on documented instances in which both detainees withheld information and even on occasion engaged in outright prevarication, I do not particularly credit those denials any more than I credit the denials of both Iran and Hezbollah of any complicity in the 9/11 attack.

22.     To be sure, the 9/11 Commission did not uncover evidence that Iran or Hezbollah *actually knew* of the planning for what would become the 9/11 attack. *See id.* This fact, however, does not at all, in my view, undercut the conclusion that both contributed materially to the attack. First, when the muscle hijackers passed through Iran, they "themselves probably were not aware of the specific details of their future operation" *id.*, an altogether unremarkable likelihood, given the security measures employed by al Qaeda's leadership to keep the plot under wraps to avoid detection. Second, as the Commission starkly acknowledged in the *Report*, additional facts plainly remained to be uncovered and the extent of involvement on the part of Iran and Hezbollah clearly warranted "further investigation by the U.S. government." *Id.* Third, the law is clear that a co-conspirator can be unaware of all of the specifics of conspiracy and still incur *criminal* liability; here, of course, the substantially lower evidentiary threshold associated with *civil* liability applies. Finally, and perhaps most significantly for present purposes, to my

knowledge neither Iran nor Hezbollah has ever provided any specific refutation of the compelling array of evidence pointing to their involvement in facilitating the 9/11 attack, despite having received specific invitation, in the form of both the *Report* and this lawsuit, to do so. Their silence in the face of such damning evidence is telling and ought to give rise to a powerful inference against them.

## Conclusion

23. In sum, based on my experience as an investigator, prosecutor and senior staff member of the 9/11 Commission staff, I believe Mr. Byman, Ms. Kephart-Roberts and Mr. Clawson are correct in their analysis that there is clear and convincing evidence pointing to involvement on the part of Hezbollah and Iran in the 9/11 attack, especially as it pertains to travel facilitation and safe haven.

DIETRICH L. SNELL

Sworn to before me this 29th day of July, 2010.

Notary Public

ELISE A. YABLONSKI
Notary Public, State of New York
No. 02YA5038741
Qualified in New York County
Commission Expires Feb. 6, 2011

*Affidavit of Dietrich L. Snell, Esq., Page 11*