

545 F.Supp.2d 122
**(Cite as: 545 F.Supp.2d 122)**

**H**

United States District Court,
District of Columbia.
Robin L. **HIGGINS**, et al., Plaintiffs,
v.
ISLAMIC REPUBLIC OF **IRAN**, et al., Defendants.

Civil Action No. 99-377(CKK).
April 21, 2008.

**Background:** In action against, inter alia, the Islamic Republic of Iran under the state-sponsored terrorism exception to the Foreign Sovereign Immunities Act (FSIA), arising out of the abduction, torture, and killing of a United States serviceman by terrorists in Lebanon, serviceman's widow moved for supplemental relief.

**Holding:** The District Court, Colleen Kollar-Kotelly, J., held that widow was not entitled to supplemental relief on basis of newly-enacted statute providing a private, federal cause of action against foreign states.

Motion denied.

See also 2000 WL 33674311.

West Headnotes

**International Law 221 ⟲10.33**

221 International Law
    221k10.29 Actions Against Sovereign or Instrumentality
        221k10.33 k. Extent and Effect of Immunity.
Most Cited Cases
    (Formerly 221k10.30)

Widow of United States serviceman abducted, tortured, and killed by terrorists in Lebanon, who had previously received final judgment in her action, under the state-sponsored terrorism exception to the Foreign Sovereign Immunities Act (FSIA), against, inter alia, the Islamic Republic of Iran, was not entitled to supplemental relief on basis of newly-enacted statute providing a private, federal cause of action against foreign states; case was not a pending case, in that it was not before the courts in any form as of date of statute's enactment. 28 U.S.C.A. §§ 1605(a)(7), 1605A.

*122 John J. McDermott, Arlington, VA, Joshua M. Ambush, Baltimore, MD, for Plaintiffs.

**MEMORANDUM OPINION**

COLLEEN KOLLAR-KOTELLY, District Judge.

On March 27, 2008, Plaintiffs filed a[20] Motion for Supplemental Relief seeking "supplemental relief of entry of a judgment for punitive damages against defendants." Plaintiffs' Motion essentially seeks to alter this Court's September 21, 2000 Order entering a Final Judgment in this matter. *See* Docket No. [17]. Plaintiffs' Motion is premised upon Section 1083 of the National Defense Authorization Act for Fiscal Year 2008 (the "2008 Defense Authorization Act"), Pub.L. No. 110-181, 122 Stat. 3, which amended the Foreign Sovereign Immunities Act ("FSIA") by adding a new section, § 1605A, in Title 28 of the United States Code. The 2008 Defense Authorization Act was signed by *123 President George W. Bush and enacted into law on January 28, 2008. As amended, 28 U.S.C. § 1605A, *inter alia,* creates a private, federal cause of action against a foreign state that is or was a state sponsor of terrorism, and provides that damages against the foreign state and its agents may include economic damages, solatium, pain and suffering, and punitive damages. 28 U.S.C. § 1605A(c).

Section 1083(c) of the 2008 Defense Authorization Act is entitled "Application to Pending Cases" and provides that, upon motion by the plaintiffs, the amendments to the FSIA shall be given effect with respect to any action that (1) was brought under 28 U.S.C. § 1605(a)(7) before January 28, 2008; (2) relied upon 28 U.S.C. § 1605(a)(7) as creating a cause of action; (3) has been adversely affected on the grounds that 28 U.S.C. § 1605(a)(7) fails to create a cause of action against the foreign state; and (4) "as of [the] date of enactment [*i.e.,* January 28, 2008], is before the courts in any form, including on appeal or motion under rule 60(b) of the Federal Rules of Civil Procedure[.]" Pub.L. No. 110-81, Div. A., Title X, § 1083(c); 28 U.S.C. § 1605A Note. Section 1083(c) thus provides that Section 1605A only applies to cases brought prior to January 28, 2008 if they meet the four requirements set forth above.

545 F.Supp.2d 122
**(Cite as: 545 F.Supp.2d 122)**


Plaintiffs' Motion glosses over the fourth requirement of Section 1083(c), *see* Pls.' Mot. at 6, by suggesting that this action "is currently pending before the Court as plaintiffs pursue attachment in aid of execution and execution of the September 21, 2002, judgment entered by the Court." A review of that section's plain text reveals that the instant case falls outside of the category of pending cases as to which the FSIA amendments apply. As noted above, the Court's September 21, 2000 Order entered a Final Judgment in this case. Docket No. [17]. That Final Judgment was not appealed, and no motions or other matters were pending before the Court as of January 28, 2008, the date on which the National Defense Authorization Act for Fiscal Year 2008 was enacted. Indeed, no motions were filed at all in this case during the interim between the September 21, 2000 Final Judgment and Plaintiffs' March 27, 2008 filing of their Motion for Reconsideration. Plaintiffs' suggestion-that this case is currently pending because of the open-ended possibility of filing an attachment or executing the judgment in the future-is inconsistent with the statutory language that requires the case to be before the Court as of January 28, 2008. The Court therefore concludes that this case is outside the category of prior actions covered by Section 1083(c) because it was not "before the courts in any form" as of January 28, 2008.


Accordingly, the Court shall deny Plaintiff's [20] Motion for Supplemental Relief. An appropriate Order accompanies this Memorandum Opinion.


D.D.C.,2008.
Higgins v. Islamic Republic of Iran
545 F.Supp.2d 122

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.2d, 2000 WL 33674311 (D.D.C.)
**(Cite as: 2000 WL 33674311 (D.D.C.))**

**H**Only the Westlaw citation is currently available.

United States District Court, District of Columbia.
Robin L. **HIGGINS** Individually and as Administrator of
the Estate of COL. William R. **Higgins**, Deceased, 3026
White Ibis Way Tallahassee, Fla. 32308 Plaintiff,
v.
THE ISLAMIC REPUBLIC OF **IRAN** Ministry of For-
eign Affairs Khomeini Avenue United Nations Street Te-
hran, **Iran**
THE ISLAMIC REVOLUTIONARY GUARD Pasdaran
Avenue Golestan Yekom Tehran, **Iran** Defendants.

No. 1:99CV00377.
Sept. 21, 2000.

*FINDINGS OF FACT AND CONCLUSIONS OF LAW*
KOLLAR-KOTELLY, J.
Introduction
**\*1** This is an action for wrongful death brought by the
spouse of Colonel William "Rich" Higgins arising out of
the 1988 abduction and torture of Colonel Higgins, and his
murder the following year. The Republic of Iran ("Iran")
and The Islamic Revolutionary Guard ("Islamic Guard")
are named as Defendants and stand accused of these state
sponsored acts of terrorism. Jurisdiction for this action lies
in the 1996 amendments, 28 U.S.C. § 1605(a)(7), to the
Foreign Sovereign Immunities Act of 1976 ("FSIA"), 28
U.S.C. § 1602 *et seq.* Pursuant to the Court's order, the
Clerk entered a default on January 11, 2000, following the
Defendants' failure to plead or appear after service of
process. [FN1] On July 10, 2000, the Court conducted a
non-jury trial at which Plaintiff presented the testimony of
eight witnesses, one videotape deposition, and documen-
tary evidence consisting of thirty-three exhibits in support
of her claims.

> FN1. As of August 11, 1999, service of process
> was effectuated in conformance with 28 U.S.C. §
> 1608(a) on The Islamic Republic of Iran and The
> Islamic Revolutionary Guard, and on two indi-
> vidually named Defendants. On December 16,
> 1999, the Court ordered that a default be entered
> by the Clerk's Office against all Defendants.
> Plaintiffs' proposed order for judgment does not
> name the individual Defendants.

Based on the credible evidence presented in this case,
and in the absence of any evidence from the Defendants,
the Court will accept Plaintiff's uncontroverted evidence,
permitting it to make the following findings of fact and
conclusions of law.

*FINDINGS OF FACT*
Since 1948 the United Nations has maintained a
presence in the disputed border areas between Lebanon
and Israel. One such group, the United Nations Interim
Force in Lebanon ("UNIFIL"), consists of armed military
personnel occupying fortified positions in a buffer zone
between Lebanon and Israel. Another group, the United
Nations Truce Supervision Organization ("UNTSO"),
maintains a presence in the same area but, unlike their
UNIFIL counterpart, is unarmed. Colonel Michael Sulli-
van, United States Marine Corps, Retired, aptly describes
UNTSO's mission as a "mission of peace." UNTSO's
primary function is to report the movements of potentially
hostile forces and avert further violence in this troubled
part of the world.

Colonel Higgins was assigned to Observer Group
Lebanon, a division of the UNTSO, in June 1987 as part of
the United States' contribution to this unarmed peace-
keeping force. He assumed command of Observer Group
Lebanon in January 1988, approximately halfway through
his anticipated one-year tour of duty in this assignment.

Prior to this assignment, Colonel Higgins had been
recognized as an exemplary officer whose career to date in
the Marine Corps had been characterized by successive
achievements and promotions. In this regard, Plaintiff
introduced a particularly laudatory personnel evaluation
issued by then-Secretary of Defense Casper Weinberger
shortly before Colonel Higgins' departure to Lebanon. In
describing Colonel Higgins, Secretary of Defense Wein-
berger wrote that "this very gifted and dedicated Marine
Officer towers over his peers and is one of the Marine
Corps' future leaders." Shortly before his kidnaping, he
was promoted to Colonel and was congratulated by the
Commandant of the Marine Corps, General Al Gray, who
indicated in a letter to Colonel Higgins that on his return he
expected him to assume command of a Marine Expedi-
tionary Unit as the next step to joining the general officer
ranks.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 33674311 (D.D.C.)
**(Cite as: 2000 WL 33674311 (D.D.C.))**

**\*2** The Court was particularly impressed with the comments of retired Colonel Sullivan, who served with Colonel Higgins in Lebanon, and who commented with pride that a true "report card on a Marine is written by his subordinates." The report card he gave Colonel Higgins included such statements as "in 28 years of service to my country I have never served for an officer of the high caliber of Rich Higgins." His high regard for Colonel Higgins was evidenced also in his remark that "the most important thing Rich Higgins taught me is that every man and woman can make a difference, and that was the way he led that organization and that was the way he performed his duties as a Marine." The death of Colonel Higgins was a great loss not only for his family and friends, but for his country.

Once in Southern Lebanon, Colonel Higgins worked to acquaint himself with the various factions seeking control of the region. In addition, he worked to overcome the inherent difficulties of commanding a multi-national force in a hostile environment. During this time period, a number of Americans had been kidnaped and were held hostage by an organization known as Hizballah, noted for their terrorist and anti-American activities. Attempts to locate the whereabouts of the hostages and precautions to avoid additional kidnaping became a part of Colonel Higgins' mission.

On February 17, 1988, Colonel Higgins met with a leader of the Amal Militia in the coastal city of Tyre for the purpose, ironically, of discussing procedures that might be implemented between all of the United Nations and local South Lebanese forces, as well as other factions, in the event of a kidnaping. In his radio communications to base after the meeting, he noted the presence of Hizballah gunmen in the vicinity and asked that Observer Group Lebanon carefully monitor his return to base. On the return trip, Colonel Higgins rode alone in the second vehicle of a two-vehicle convoy. The first vehicle maintained periodic radio contact with the communication center. The vehicles became separated around one bend of the road. Upon noticing the absence of the trailing vehicle, the driver of the first vehicle found Colonel Higgins' jeep to be empty. An immediate alert was issued to locate Colonel Higgins and his abductors. Both UNIFIL and UNTSO groups attempted to locate and retrieve Colonel Higgins, but were unsuccessful. All that could be done at the time was done.

Five days later, a group which identified itself as the Organization of the Oppressed On Earth, a name used by Hizballah, claimed responsibility for his abduction, and released a videotape of Colonel Higgins reading a statement. Thus began an 18-month period during which Colonel Higgins was held hostage under what the evidence indicates were cruel and primitive conditions.[FN2] In the ensuing months, the Organization of the Oppressed On Earth issued various statements regarding Colonel Higgins, typically threatening to try him on charges of espionage, or noting that he was to be or had been executed. On April 21, 1988, they released to the news media a photograph of Colonel Higgins (Pl. Exhibit 20). There is a stark contrast between the emaciated and listless figure of Colonel Higgins in that photograph, and photographs of him prior to the kidnaping in which he appears as a vital, robust, and healthy man (Pl. Exhibits 2, 3, and 4). The autopsy report revealed that he had not been fed for some time prior to his death. There were no other communications between Colonel Higgins, his family, or the United States government. In 1988, the Nobel Peace Prize was awarded to the United Nations' Peacekeeping Forces. When accepting the award, the Secretary General pleaded for Colonel Higgins' release. All efforts to learn of his whereabouts and secure his release through intelligence sources and political contacts were unavailing.

> FN2. At the time, the conflict among the various factions in Lebanon had left that country with an ineffective central government unable to provide even the most basic services such as electric power, water supply and sewage. The population lived in abject poverty, often underground or in buildings damaged by weaponry from many years of combat. These were the conditions under which Colonel Higgins must have been held.

**\*3** By the end of July 1989, Colonel Higgins had been held for approximately 18 months. At that time, Israeli forces kidnaped Sheik Obeid, a leader of Hizballah. Two days later, Hizballah issued a statement demanding the return of Sheik Obeid with a threat to hang Colonel Higgins if their demand was not met. When Sheik Obeid was not returned, the Organization of the Oppressed On Earth released on July 31, 1989, a gruesome videotape of the body of Colonel Higgins hanging from the neck. CNN received the tape, which was replayed on televisions throughout the world. Both his wife, Robin Higgins, and his daughter, Christine, saw this grisly videotape. This last image of Colonel Higgins will be replayed in their minds for the rest of their lives. The videotape prompted an international outcry, and caused the United States to prepare a potential military retaliation to deter the threatened ex-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 33674311 (D.D.C.)
**(Cite as: 2000 WL 33674311 (D.D.C.))**

ecution of other hostages.

Over two years later, Colonel Higgins' body was re-
leased in Lebanon and flown to the United States. An
autopsy was conducted on December 24, 1991, by physi-
cians associated with the Armed Forces Medical Examin-
er. Despite the fact that the remains had become partially
mummified, the Chief Medical Examiner, Dr. Richard C.
Froede, a forensic pathologist, was able to positively
identify the remains as those of Colonel Higgins and rule
that the death was a homicide. Because of the condition of
the body it was not possible to determine whether the lethal
injuries occurred perimortem or postmortem. However,
any one of the lethal injuries could have caused his death,
and he could have bled to death from any of those injuries.
It was Dr. Froede's expert opinion and that of his col-
leagues that Colonel Higgins had already been killed when
he was shown hanging by the neck on the videotape.

The autopsy examination revealed also that skin had
been removed in the facial area from mid-point of the top
of the head all the way down to the chin, and on both sides
of the neck. It was clear that the floor of the mouth and the
tongue had been removed. There was also evidence of a
potentially lethal wound approximately 3 inches deep on
the right shoulder. The penis and testicles had been re-
moved by sharp force.[FN3] There were no indications that
medical or surgical treatment had been provided. In sum,
the kidnapers had inflicted grievous injuries, and had mu-
tilated barbarically Colonel Higgins' body while he was
their captive.

> [FN3]. None of the injuries to the body can be as-
> cribed to coffin wear, or animal activity.

Back in the United States, the Higgins family endured
the agony of the abduction, the constant and repeated
threats that he would be executed, the uncertainty of his
ultimate fate, the cruelty of the videotape of his hanging
body, and finally the results of the autopsy report which
only confirmed what had been feared. Robin Higgins, his
wife of ten years, was also a Marine Officer. His daughter
from a prior marriage, Christine Higgins, was a high
school senior living with them. Both women testified mo-
vingly about how the Colonel's captivity and death had
affected them.

**\*4** Christine Higgins described the close and caring
relationship she had with her father prior to his captivity.
She related that "he was very involved in every activity I
did." Although posted overseas, he stayed in constant

contact with her, sending her articles on colleges, and
advising her on her choices. She had been accepted at both
the University of Miami and Boston University. With his
kidnaping, his involvement in her life ceased abruptly,
leaving her without his support at a vulnerable time. All of
her plans for college changed. She did not want to leave the
area while he was a captive. She enrolled locally at James
Madison University but was forced to withdraw due to
poor academic performance. This stood in sharp contrast to
her otherwise strong academic record in high school prior
to her father's abduction. She described the shock of
learning through the news media about her father's abduc-
tion and subsequent events. She testified about the "tu-
multuous time" and uncertainty regarding her father's
welfare during months of captivity, and about ultimately
learning his fate by watching a videotape on television.
Emotionally overwrought by these events and the diffi-
culties of coping during her father's absence, her relation-
ship with her stepmother, which had been amicable, also
deteriorated, causing her to move out of the house.

Although Robin Higgins reacted in a more controlled
manner, she was described as "a person in great agony."
She continued to work in the public affairs office of the
Pentagon despite the fact that, in the testimony of former
Assistant Secretary for Public Affairs Dan Howard, the
enormous emotional strain of the events brought her close
to a breakdown. He observed that she was "a responsible
stalwart Marine, but underneath that stalwart, ascetic ex-
terior, very much a human being who was in turmoil." She
suffered periods of deep depression and despair as she
coped with the needs of her stepdaughter, and the ever
present threat that her husband would be executed.

As she recounted her married life with Colonel Hig-
gins, a picture emerged of a loving couple who shared
everything, spending all of their free time together, sharing
interests and activities. When separated by assignments,
they corresponded daily and telephoned each other as often
as feasible. She and Christine spent Christmas of 1987 in
Lebanon visiting with Colonel Higgins, celebrating as well
their tenth wedding anniversary. Shortly after the kidnap-
ing, she wrote letters to her husband on an almost daily
basis, which she has kept in eight binders, despite the fact
that she could not send them. She described her daily ac-
tivities and the raw emotions she was experiencing. At the
trial, Mrs. Higgins read from this correspondence, which
depicted the pain and anguish she suffered during this time
period. These letters also revealed, probably more than her
testimony, the nature of their relationship and their passion
for life and each other. Hoping to share this with her hus-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 33674311 (D.D.C.)
**(Cite as: 2000 WL 33674311 (D.D.C.))**

band on his release, she collected in three oversized scrapbooks every bit of information reported concerning the condition of her husband during his captivity.

**\*5** In addition to her official duties, she worked tirelessly to effect the release of her husband. As she stated, "my mission was to bring my husband home and bring my husband home alive and as quickly as possible." She began to meet with a number of officials at the highest levels of the government to express her concerns for her husband's fate, and to garner any information about his captivity. These included the Secretary of Defense, the National Security Advisor and various representatives of the Department of State. She also met with the Secretary General of the United Nations, since Colonel Higgins was serving under the auspices of that organization when he was kidnaped.

Following the news of her husband's death, Robin Higgins worked to persuade officials to return his remains to this country. These efforts concluded in a Memorial Ceremony on December 30, 1991, at Andrews Air Force Base and the National Cemetery at Quantico Virginia.

For Mrs. Higgins, "this chapter will never be closed." She testified that "I still don't know when Rich died or how he died or why he died, and nobody has ever been brought to justice for his kidnaping and his murder." She concluded simply by stating that "I still miss him every day."

### THE ROLE OF IRAN

The United States Department of State has recognized Iran as a state sponsor of terrorism since 1984. Published reports, including Patterns of Global Terrorism and various declassified documents obtained through Freedom of Information Act requests, depicted the now universally held view of the intelligence community that Iran was responsible for the formation, funding, training, and management of Hizballah, and its various pseudonyms such as the Organization of the Oppressed on Earth, during the relevant time period. This documentary evidence was placed in context by the testimony of Ambassador Robert Oakley, Dr. Patrick Clawson and Colonel David Hurley.

Dr. Clawson, a recognized expert on Iranian sponsorship of terrorism, described Iran's aim to export terrorism operations as a means of building a client organization within the Lebanese Shia population. Its chosen instrument was the Islamic Guard, a distinct entity from the Iranian Armed Forces. Its mission was to export the Islamic Revolution to other countries. The Islamic Guard provided

support to Hizballah in southern Lebanon in the form of armaments, training in military operations, and cash payments. In articles in the Iranian press, and in press interviews and speeches by Iranian and Hizballah leaders, they not only acknowledge the role of Iran in the founding of Hizballah, but describe in great detail the various types of support provided to the Islamic Guard and Hizballah. Later information released in the 1990's demonstrated that Iran was much more intimately involved in directly commanding the kidnapings than originally thought. Dr. Clawson opined that "with the Colonel Higgins case the military precision with which the kidnaping was carried out, the immediate crowing about what a great coup this was," there was every indication of "having been something that the Revolutionary Guard Corps was intimately involved in and it bore every indication of being like the kidnaping of CIA officials, Mr. Buckley, some years earlier." He concluded that it was quite clear that Iran was involved in supporting the kidnaping of Colonel Higgins.

**\*6** The use of the Islamic Guard and Hizballah allowed Iran to pursue its aims to discredit and oppose American policies in the Middle East, without accepting responsibilities for the actions of its surrogate. Although Hizballah gradually grew more independent of Iran in the ensuing years, Dr. Clawson testified that in 1988 and 1989 it was totally controlled by the Iranian government, which provided annual funding of between $50 and $200 million, solely devoted to terrorist activity.

Colonel Hurley described the operational difficulties of locating or rescuing any of the American hostages during their captivity, despite efforts through a variety of intelligence sources. In particular, he noted that the communications and operations security practices of Hizballah reflected a degree of sophistication that could not have existed without the training and support provided by the Islamic Guard.

Ambassador Robert Oakley became an authority on state-sponsored terrorism through a distinguished career in the Foreign Service. At one time he served as the Director of the State Department's Office for Counter-Terrorism. At the time of Colonel Higgins' kidnaping, Ambassador Oakley worked with the National Security Council on issues relating to the American hostages. Ambassador Oakley recounted the emergence of Hizballah as an extension of Iranian foreign policy, a relationship which was less clear at its inception but clarified by later events. For example, it became apparent that Hizballah acted in response to directions from Iran in negotiations with the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 33674311 (D.D.C.)
**(Cite as: 2000 WL 33674311 (D.D.C.))**

United States concerning the release and treatment of the hostages. These discussions, which became known as the Iran Contra Affair, resulted in the provision of arms to Iran as the *quid pro quo* for the release of a Hizballah-held hostage in Beirut.

The Ambassador reiterated that the various organizations that claimed credit for terrorist activities, including Organization of the Oppressed of the Earth, were pseudonyms of Hizballah. The Iranian sponsorship of Hizballah resulted in other terrorists acts against the United States, including the U.S. Embassy in Beirut on two occasions, the explosion of the Marine barracks in detonating explosives in Beirut, in which 241 Marines lost their lives, and the captivity of American hostages including Colonel Higgins. He pointed out that Hizballah had intended to execute more hostages after Colonel Higgins' death, but was prevented from doing so by the Iranians because of the international outcry. It was an example of the control exhibited by Iran as a state sponsor of terrorist activity.

To support the claim for economic damages, plaintiff introduced the testimony of Dr. Herman Miller, an expert economist. Dr. Miller used an accepted methodology to calculate lost net income considering, among other things, work-life and life expectancies, pay as an active military officer and retirement pay, civilian pay, deductions for taxes and maintenance of their household, adjusting those calculations to present value. The Court accepts the calculations of $1,431,937 as reasonable economic damages in this case.

CONCLUSIONS OF LAW

**\*7** The Foreign Sovereign Immunities Act, 28 U.S.C. § 1602 *et seq.* ("FSIA") provides that federal courts lack subject matter jurisdiction to entertain claims against foreign states unless those claims fall into the exceptions provided in the Act:

... in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources ... for such an act or provision of material support is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment or agency. 28 U.S.C. § 1605(a)(7)

The record at trial amply demonstrated that these requirements were met. Colonel Higgins was kidnaped, tortured, and ultimately murdered. To conclude that Iran

lent material support to Hizballah would be an understatement. Iran founded Hizballah initially as a terrorist organization. Through its Islamic Guard, it provided funds, training, and equipment. During the relevant time period it virtually directed the terms and conditions under which hostages would be held or released.

The FSIA imposes additional requirements for potential claimants: (1) the United States must have designated the defendant country as a state sponsor of terrorism pursuant to section 6(j) of the Export Administration Act of 1979, *see* 61 Fed.Reg. 12,927 (1996); (2) the act must have occurred outside the foreign state; and (3) the claimants or the victims must be United States citizens. *See* 284 U.S.C. § 1605(a)(7)(A)(B). These conditions are also met insofar as Colonel Higgins, his daughter, and his wife are U.S. citizens and the offenses occurred in Lebanon. In 1988 and 1989 Iran was a designated state sponsor of terrorism. Indeed, it has been so identified in each and every year since the United States began publishing its annual reports, Patterns of Global Terrorism.

DAMAGES

The FSIA allows claims for money damages, which may include economic damages, solatium, pain and suffering, and punitive damages. The latter category may not be assessed against the Islamic Republic of Iran, but may be awarded against the Islamic Guard as its agent or instrumentality. *See Anderson v. Islamic Republic of Iran, 90 F.Supp.2d 107, 114 (D.D.C.2000); Alejandre v. Republic of Cuba, 996 F.Supp. 1239, 1253 (S.D.Fla.1997).*

In *Flatow v. Islamic Republic of Iran, 999 F.Supp. 1 (D.D.C.1998),* the court held that a claim for solatium refers to a claim for the mental anguish, bereavement, and grief that those with a close relationship to the decedent experience as a result of the decedent's death. Besides considering the nature of the relationship, the *Flatow* court held that death as a result of terrorism, with its attendant horrific surrounding circumstances, prevents the anguish from subsiding. *See id.* at 30.

In support of her claim for solatium, Robin Higgins described a loving marriage in which she and her husband were inseparable, both in recreation and work-related activities. When career dictated occasional separations, they went to extraordinary lengths to stay in constant communication, the most poignant reminder of which are the volumes of letters written by Robin Higgins during her husband's captivity. The court has briefly described her grueling ordeal and its emotional toll on her and the family

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 33674311 (D.D.C.)
**(Cite as: 2000 WL 33674311 (D.D.C.))**

relationships. Although a strong woman who has moved forward with her life, Robin Higgins's grief at the loss of her husband and the knowledge she has concerning his treatment and killing by his captors will always be with her.

**\*8** In support of Christine Higgins's claim for solatium, Christine Higgins described her caring relationship with her father, and his pivotal role in her life as parent and advisor. His permanent absence from her life has disrupted her family relationships, and her educational plans. She has been bereft of the guidance he would have provided throughout her life. The emotional damage to her, and the last memories of her father as a captive will have a lasting impact. Therefore, the record at trial supports an award of damages for their pain, mental anguish, and suffering.

The evidence also supports a conclusion that Colonel Higgins was held for 529 days [FN4] in primitive conditions. Photographs in evidence depicted his deteriorating physical condition. The forensic testimony of Dr. Richard Froede confirmed the barbaric treatment Higgins received from his captors. The Court is aware of the pain and suffering described by other former hostages who brought FSIA claims. Terry Anderson, Joseph Cicippio, David Jacobsen, and Frank Reed all returned to recount the inhumane treatment they received. *See Anderson, 90 F.Supp.2d at 107-110; Cicippio v. Islamic Republic of Iran, 18 F.Supp. 62 (D.D.C.1998).* Sadly, the pain and suffering inflicted upon Colonel Higgins appears to have surpassed even their grim testimony. This case combines Colonel Higgins's long suffering as a hostage with his brutal homicide. Therefore, compensatory damages are awarded as follows:

> FN4. This figure represents the time between February 17, 1988 through July 31, 1989. Although the medical examiner was unable to determine the date of death, July 31 was the date on which Hizballah claimed to have killed Colonel Higgins.

| | |
|---|---|
| Loss of Future Income | $ 1,431,937.00 |
| Solatium Robin Higgins | $12,000,000.00 |
| Christine Higgins | $12,000,000.00 |
| Pain and Suffering | $30,000,000.00 |
| Total | $55,431,937.00 |

Plaintiff also seeks punitive damages against the Islamic Guard for its role in this terrorist activity. The calculated cruelty of these actions were condemned at the time by every civilized nation. The fact that Colonel Higgins, an American officer, was abducted from an unarmed United Nations group was clearly designed to undermine the many years of effort to bring a semblance of peace to Lebanon, and as a deliberate act against the United States, the United Nations, and the peace process in the Middle East. Although an act of cruel savagery, the mutilation of the Colonel's body was apparently consistent with the Islamic Guard's fulfillment of Iranian foreign policy.

The Court will rely upon the testimony of Dr. Patrick Clawson regarding the amount of Iranian support provided to Hizballah through the Islamic Guard. Although the amount would vary over time, Dr. Clawson testified that a conservative estimate of terrorist support would range from $50-$200 million annually in 1988 and 1989. A multiple of the amount of these expenditures was used to assess punitive damages in the *Anderson* case against the Iranian Ministry of Information and Security. In *Alejandre v. Cuba, 996 F.Supp. at 1251,* the court described the particular suitability of punitive damages in FSIA cases or under the Alien Tort Claims Act. Quoting *Filartiga v. Pena-Irala, 577 F.Supp. 860 (E.D.N.Y.1984),* the court noted:

**\*9** [P]unitive damages are designed not merely to teach a defendant not to repeat his conduct but to deter others from following his example. To accomplish that purpose the court must make clear the depth of international revulsion against torture and measure the award in accordance with the enormity of the offense.

*Alejandre, 996 F.Supp. at 1251.*

Dr. Clawson testified that the Iranian government has paid attention to the court judgments, and that it would be consistent with their behavior in other circumstances to respond to these court judgments by shifting their activities to advance their goals through other means than abducting and killing Americans.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 33674311 (D.D.C.)
**(Cite as: 2000 WL 33674311 (D.D.C.))**

This Court concludes that an award of punitive damages in the amount of $300,000,000.00 against the Islamic Revolutionary Guard Corps is both appropriate and necessary to achieve these ends.

The Clerk of the Court shall enter judgment accordingly. An Order accompanies these Findings of Fact and Conclusions of Law.

### ORDER

Pursuant to the accompanying Findings of Fact and Conclusions of Law, it is this *21* day of September, 2000,

ORDERED, that the Court finds *in favor of* the Plaintiff, Robin L. Higgins, Individually and as Administrator of the Estate of Colonel William R. Higgins (deceased), and *against* the Defendants, The Islamic Republic of Iran and The Islamic Revolutionary Guard; it is

FURTHER ORDERED, that the Clerk of this Court forthwith enter judgments against The Islamic Republic of Iran and The Islamic Revolutionary Guard in the following amounts:

| *Compensatory Damages:* | |
|---|---|
| Loss of Future Income | $ 1,431,937.00 |
| Solatium Robin Higgins | $12,000,000.00 |
| Christine Higgins | $12,000,000.00 |
| Pain and Suffering | $30,000,000.00 |
| *Total Amount of Compensatory Damages:* | *$55,431,937.00;* and it is |

FURTHER ORDERED, that the Clerk of this Court forthwith enter judgment against The Islamic Revolutionary Guard in the following amount:

| | |
|---|---|
| *Total Amount of Punitive Damages:* | $300,000,000.00. |

SO ORDERED.

D.D.C.,2000.
Higgins v. The Islamic Republic of Iran
Not Reported in F.Supp.2d, 2000 WL 33674311 (D.D.C.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.