UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (GBD)<br>ECF Case |

*This document relates to: All Cases*

**PLAINTIFFS' RESPONSE TO THE NOTICE OF SUPPLEMENTAL AUTHORITY
FILED BY DEFENDANT SAUDI BINLADIN GROUP**

THE MDL 1570 PLAINTIFFS'
EXECUTIVE COMMITTEES
August 1, 2011

The new cases identified in the Saudi Binladin Group ("SBG") Notice of Supplemental Authority do not fundamentally alter the landscape of the law of personal jurisdiction, and SBG has misstated the actual holdings of these cases. Plaintiffs continue to meet their burden of demonstrating a *prima facie* case of jurisdiction, wholly consistent with the Due Process Clause of the Constitution, and the motion to dismiss should be denied. This response reviews the discrete holdings of these new decisions, and explains why they should have no effect on this Court's resolution of the motion to dismiss.

    A.    <u>Specific Jurisdiction</u>

The law regarding specific jurisdiction remains as it was stated in Plaintiffs' response to the SBG renewed motion to dismiss: (1) it is Plaintiffs' burden to make a *prima facie* showing of jurisdiction, factually supported (Plaintiff's Mem. Law at 3-5); (2) Due Process was satisfied once Plaintiffs demonstrated that SBG purposefully directed its activities at residents of the forum, and the alleged injuries that arose out of or related to those activities led to this litigation (Plaintiffs' Mem. Law at 6-7); and (3) under Second Circuit precedent, the test for whether a cause of action arises out of or relates to a given defendant's conduct directed at the forum is judged on a sliding scale in order to determine whether the exercise of personal jurisdiction in a particular case does or does not offend traditional notions of fair play and substantial justice (Plaintiffs' Mem. Law at 7-9).

This final point requires some elaboration, as SBG contends this "sliding scale" is no longer valid following the Supreme Court's latest decisions. SBG is wrong. Under Second Circuit precedent, if the defendant's several jurisdictional ties to the forum state are more limited "it may be appropriate to say that he will be subject to suit in that state only if the plaintiff's injury was proximately caused by those contacts." *Chew v. Dietrich*, 143 F.3d 24, 29 (2d Cir. 1998), *cert. denied*, 525 U.S. 948 (1998). However, at the same time,

> Where the defendant's contacts with the jurisdiction that relate to the cause of action are more substantial … it is not unreasonable to say that the defendant is subject to personal jurisdiction even though the acts within the state are not the proximate cause of the plaintiff's injury.

*Id.* This test allows for specific jurisdiction if the defendant has substantial contacts with the forum—even if not at a level sufficient to establish general jurisdiction—and in such cases "the court may accept a more attenuated relation between the defendant's contacts with the forum and the plaintiff's cause of action." *Ponte v. Universal City Dev. Partners, LTD.*, 2008 U.S. Dist. LEXIS 3528, *36-37 (S.D.N.Y. Jan. 15, 2008).

The Supreme Court's decision in *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846 (2011), relied upon by SBG, in no way affects the validity of *Chew* and the cases which have adopted its reasoning. It is true, as SBG notes, that *Goodyear* affirms that "ties serving to bolster the exercise of specific jurisdiction do not warrant a determination that, based on those ties, the forum has general jurisdiction over a defendant." *Goodyear*, 131 S. Ct. at 2855. But *Goodyear* is the inverse of the present situation. It is a case about using *specific* jurisdictional ties to bolster a finding of *general* jurisdiction. *Goodyear* does not address the Second Circuit's approach of considering *general* jurisdictional ties as a factor in determining whether *specific* jurisdiction exists. Indeed, the plurality opinion in *J. McIntyre Machinery, Ltd. v. Nicastro*, 131 S. Ct. 2780 (2011), which *does* address specific jurisdiction, suggests that such a sliding scale is wholly appropriate, observing that "foreign corporations will often target or concentrate on particular States, subjecting them to specific jurisdiction in those forums." *McIntyre Machinery*, 131 S. Ct. at 2789-90. Moreover, the *McIntyre Machinery* plurality observes, common law tests like the Second Circuit's *Chew* analysis will continue to be useful in determining whether specific jurisdiction exists: "The defendant's conduct and the economic realities of the market the defendant seeks to serve will differ across cases, and judicial

exposition will, in common-law fashion, clarify the contours of that principle." 131 S. Ct. at 2790.

The other fact worth noting about the limits of the Court's recent holdings as to specific jurisdiction is that both cases were product liability cases; neither involved an intentional tort, and, accordingly, neither addressed the unique issues and settled law concerning jurisdiction over foreign persons and entities involved in sponsoring terrorist attacks targeted at the United States. Indeed, the *McIntyre Machinery* plurality is explicit in distinguishing its holding regarding purposeful availment from cases such as the instant case:

> *There maybe exceptions, say, for instance, in cases involving an intentional tort.* But the general rule is applicable in this products-liability case, and the so-called "stream-of-commerce" doctrine cannot displace it.

131 S. Ct. at 2785 (emphasis added). The *McIntyre Machinery* plurality reiterates this distinction a few pages later, again separating its holding from intentional tort cases:

> As a general rule, the sovereign's exercise of power requires some act by which the defendant "purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws," *Hanson*, 357 U.S., at 253, though in some cases, as with an intentional tort, the defendant might well fall within the State's authority by reason of his attempt to obstruct its laws. In products-liability cases like this one, it is the defendant's purposeful availment that makes jurisdiction consistent with "traditional notions of fair play and substantial justice."

131 S. Ct. at 2785.

This case, however, involves an intentional tort. With regard to jurisdiction over defendants alleged to have provided material support for terrorism, the United States Government has strongly advanced its view, reflected in the governing case law, that the Due Process Clause requirement for personal jurisdiction is satisfied when plaintiffs have presented allegations sufficient to make plausible the claim that a defendant's contributions of support,

whether direct or indirect, were made with knowledge that those contributions would be used to support terrorism, or with reckless disregard for that potentiality. In its *amicus* brief as to the petition for *certiorari* earlier in this litigation, the United States strongly argued for specific jurisdiction in cases such as this:

> It does not matter … that the individual defendant is not "able to control" the means by which the tortious injury is caused in the foreign jurisdiction, as long as he acted with the "kn[owledge] that the brunt of th[e] injury" from his tortious act "would be felt" in the foreign forum. Where the defendant acted with such knowledge, he "must reasonably anticipate being haled into court there to answer for" his actions.

*See* United States Amicus at 18, quoting *Calder v. Jones*, 465 U.S. 783, 789-90 (1984).[1] Federal courts have consistently upheld the exercise of jurisdiction over foreign terrorists and terror sponsors who target the United States. *See* Plaintiff's Mem. Law at 8-9.

Beyond that, it is significant that there is no majority holding in *McIntyre Machinery*, because no opinion captured the agreement of more than four Justices. At most, there seem to be six Justices in agreement that "stream of commerce" is an inapt metaphor in product liability cases for determining when specific jurisdiction exists, and that some form of purposeful availment is required in those cases.

To the extent that SBG argues that this "holding" replaces "mere foreseeability" as a jurisdictional requirement in this case, it is attacking a strawman. Plaintiffs have not argued that "mere foreseeability" is the jurisdictional test; the word "foreseeability" appears nowhere in the response to SBG's renewed motion to dismiss. Instead, Plaintiffs have argued, and have factually supported as required, that SBG purposefully directed its conduct at the United States and should

---

[1] *See also* Section III-B of Plaintiffs' Memorandum of Law in Opposition to Renewed Motion to Dismiss of Defendant National Commercial Bank for Lack of Personal Jurisdiction, which is incorporated as though fully set forth herein.

have reasonably anticipated being haled into court here to respond to claims arising from the September 11th Attacks.

Plaintiffs allege, and have provided factual support demonstrating that SBG maintained a close and direct relationship with Osama bin Laden well beyond the time when his intent to attack the United States was made clear, and knowingly provided him with material support for al Qaeda to wage jihad against the United States. The factual support for specific jurisdiction is found at pages 10-17 of Plaintiffs' Memorandum of Law in response to the motion to dismiss, and is more than enough to demonstrate a *prima facie* case as required. It includes confirmation that from 1993-2000, Osama bin Laden's shares of SBG were neither monetized nor taken away from him, but instead voluntarily assigned to his brother Ghaleb who, along with Bakr bin Laden invested substantial sums in Bank Al Taqwa, a frequent al Qaida conduit, from November 1993 until March 2000.[2] The next month, a $9.8 million sum reflecting Osama's SBG shares was placed into a trust account at National Commercial Bank. In short, SBG directors and Bin Laden family members kept a financial lifeline open to Osama throughout the decade leading into the September 11 Attack—long after being well aware of his terrorist intent towards America. *See* Summary of Allegations, Facts and Evidence in Support of Plaintiffs' Showing of Specific Jurisdiction as to Saudi Binladin Group at ¶¶ 46-86.

B.      General Jurisdiction

Plaintiffs have argued that SBG is subject to general jurisdiction in the United States because of its systematic and continuous activities here, and that these general jurisdiction contacts, separately and in their totality, must be considered in the Court's specific jurisdiction

---

[2]     Shortly after 9/11, Bank al Taqwa was named by the U.S. Treasury Department as a terrorist entity for its activities in support of al Qaeda since the 1980s. According to the Treasury Department, some of Bank al Taqwa's activities were "providing indirect investment services for Al Qa'ida, investing funds for bin Laden, and making cash deliveries on request to the Al Qa'ida organization."

analysis under prevailing Second Circuit law. To satisfy the requirements of "minimum contacts" for the assertion of general jurisdiction, Plaintiffs have acknowledged, a defendant's contacts must be "continuous and systematic." *See* Plaintiffs' Mem. Law at 17-19.

To this, SBG argues that the *Goodyear* decision restricts general jurisdiction only to those cases in which the foreign defendant's contacts are "so 'continuous and systematic' as to render them essentially at home in the forum state." *Goodyear*, slip op. at 2. But this is merely a restatement of *International Shoe*. Otherwise, the *Goodyear* holding simply repeats as to general jurisdiction the finding of *McIntyre Machinery* as to specific jurisdiction—that the "stream of commerce" metaphor alone is insufficient and stronger ties to the forum state must be demonstrated.

In so doing, the *Goodyear* Court harkened back to its 1952 decision in *Perkins* v. *Benguet Consol. Mining Co.*, 342 U.S. 437 (1952), calling it a "textbook case of general jurisdiction appropriately exercised over a foreign corporation that has not consented to suit in the forum," *Goodyear,* 131 S. Ct. at 2856, *quoting Donahue* v. *Far Eastern Air Transport Corp.*, 652 F. 2d 1032, 1037 (D.C. Cir. 1981). In *Perkins*, general jurisdiction was found proper in Ohio over a Philippine mining corporation which had maintained an office in Ohio, kept its company files in that office, and supervised from that office its limited domestic activities. *Id.* at 447-48. Goodyear's foreign subsidiaries, in contrast, were alleged to have no place of business, employees, or bank accounts in the forum state of North Carolina; did not design, manufacture, or advertise its products in North Carolina; and did not solicit business in North Carolina or themselves sell or ship tires to North Carolina customers. *Goodyear,* 131 S. Ct. at 2852.

SBG, by contrast, is far closer to *Perkins* than *Goodyear* on its facts. As verified by Plaintiffs' Factual Averment, for more than 17 years SBG has engaged in business activities in the United States coordinated through its one-person domestic office and through its employee,

-6-

Fuad Rihani, who has worked for SBG in the U.S. from a home-based office established and supported by SBG. From at least 1993 until as late as December 2000, SBG maintained an office in Maryland and coordinated its U.S. activities directly from that office, and when SBG closed that office it continued to coordinate its activities in the U.S. through its single remaining employee physically present in the U.S. SBG's activities in the U.S. in the relevant time period are of three principal types: (1) business activities performed in the U.S. by an individual working for SBG in the U.S., using facilities paid for and supported by SBG; (2) business activities in the U.S. performed by SBG's U.S.-based subsidiary to promote, facilitate, and track SBG business with U.S. business interests; coupled with (3) sundry additional activities of SBG employees within the U.S. Together, the physical presence of SBG employees and their activities represent "systematic and continuous" contacts sufficient to meet the "minimum contacts" threshold of the Fifth Amendment. *See* Plaintiffs' Mem. Law at 19-32 and Factual Averment attached thereto.

    C.    Conclusion

While *Goodyear* and *McIntyre Machinery* may have clarified the jurisdictional inquiry for product liability cases, they have no impact upon the instant motion to dismiss. Plaintiffs have demonstrated a *prima facie* case of jurisdiction, wholly consistent with the Due Process Clause of the Constitution, and accordingly the motion to dismiss should be denied.

Dated:  August 1, 2011                      Respectfully Submitted,

                                                /s/_____
                                                THE MDL 1570 PLAINTIFFS' EXECUTIVE
                                                COMMITTEES

## CERTIFICATE OF SERVICE

      I hereby certify that, on August 1, 2011, I caused an electronic copy of Plaintiffs' Response to the Notice of Supplemental Authority Filed By Defendant Saudi Binladin Group and all accompanying papers to be served electronically in redacted form by the Court's Electronic Case Filing (ECF) System.

                                                   /s/
                                        Adam C. Bonin