# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------x

IN RE TERRORIST ATTACKS ON

SEPTEMBER 11, 2001

CIVIL ACTION NO.

03 MDL 1570 (GBD)

---------------------------------------------------------x

FIONA HAVLISH, in her own right
and as Executrix of the ESTATE OF
DONALD G. HAVLISH, JR., Deceased,

RUSSA STEINER, in her own right
and as Executrix of the ESTATE OF
WILLIAM R. STEINER, Deceased,

CLARA CHIRCHIRILLO, in her own right
and as Executrix of the ESTATE OF
PETER CHIRCHIRILLO, Deceased,

TARA BANE, in her own right
and as Executrix of the ESTATE OF
MICHAEL A. BANE, Deceased,

GRACE M. PARKINSON-GODSHALK, in her
own right and as Executrix of the ESTATE OF
WILLIAM R. GODSHALK, Deceased,

ELLEN L. SARACINI, in her own right
and as Executrix of the ESTATE OF
VICTOR J. SARACINI, Deceased,

THERESANN LOSTRANGIO, in her own right
and as Executrix of the ESTATE OF
JOSEPH LOSTRANGIO, Deceased, *et al.*,

Plaintiffs,

v.

SHEIKH USAMAH BIN-MUHAMMAD
BIN-LADEN, a.k.a. OSAMA BIN-LADEN,

AL-QAEDA/ISLAMIC ARMY,
an unincorporated association, *et al.*,

CIVIL ACTION NO.
03-CV-9848 – GBD

Case Transferred from the
United States District Court
for the District of Columbia
Case Number 1:02CV00305


**PLAINTIFFS'
THIRD
MEMORANDUM
OF LAW
IN SUPPORT OF
MOTION FOR
ENTRY OF
JUDGMENT
BY DEFAULT
AGAINST
SOVEREIGN
DEFENDANTS**

*FOREIGN STATE DEFENDANTS*:                          :

                                                     :

THE ISLAMIC REPUBLIC OF IRAN,                        :

                                                     :

AYATOLLAH ALI-HOSEINI  KHAMENEI,                     :

                                                     :

ALI AKBAR HASHEMI RAFSANJANI,                        :

                                                     :

IRANIAN MINISTRY OF                                  :
INFORMATION AND SECURITY,                            :

                                                     :

THE ISLAMIC REVOLUTIONARY                            :
GUARD CORPS,                                         :

                                                     :

HEZBOLLAH,                                           :
an unincorporated association,                       :

                                                     :

THE IRANIAN MINISTRY                                 :
OF PETROLEUM,                                        :

                                                     :

THE NATIONAL IRANIAN                                 :
TANKER CORPORATION,                                  :

                                                     :

THE NATIONAL IRANIAN                                 :
OIL CORPORATION,                                     :

                                                     :

THE NATIONAL IRANIAN                                 :
GAS COMPANY,                                         :

                                                     :

IRAN AIRLINES,                                       :

                                                     :

THE NATIONAL IRANIAN                                 :
PETROCHEMICAL COMPANY,                               :

                                                     :

IRANIAN MINISTRY OF                                  :
ECONOMIC AFFAIRS AND FINANCE,                        :

                                                     :

IRANIAN MINISTRY OF                                  :
COMMERCE,                                            :

                                                     :

IRANIAN MINISTRY OF DEFENSE                          :
AND ARMED FORCES LOGISTICS,                          :

                                                     :

THE CENTRAL BANK OF THE                              :
ISLAMIC REPUBLIC OF IRAN, *et al.*,                  :

                                                     :

Defendants.                       :

## TABLE OF CONTENTS

I.      INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     THE WITNESSES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

III.    THE DEFENDANTS' RELATIONSHIPS TO THE ISLAMIC REPUBLIC OF IRAN . . . . . . . . 7

        A.      Ayatollah Ali Hoseini Khamenei and Ali Akbar Hashemi Rafsanjani . . . 7

        B.      The Iranian Ministries and Political Subdivisions . . . . . . . . . . . . . . . . . . 9

        C.      The Iranian Agencies and Instrumentalities  . . . . . . . . . . . . . . . . . . . . . . 14

IV.     CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

**PLAINTIFFS' THIRD MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR ENTRY OF JUDGMENT
BY DEFAULT AGAINST SOVEREIGN DEFENDANTS**

**I.      INTRODUCTION**

The Plaintiffs' file this Third Memorandum of Law in Support of Motion for Entry of

Judgment by Default Against Sovereign Defendants in order to address the liability under the

Foreign Sovereign Immunities Act of 1976 ("FSIA"), 28 U.S.C. §1602, *et seq*., as amended, of

certain of the named defendants which are "foreign states or political subdivisions" or "agencies

and instrumentalities" of the defendant Islamic Republic of Iran.  As Plaintiffs indicated they

would do in their First Memorandum of Law in Support of Motion for Entry of Judgment by

Default Against Sovereign Defendants ("Plaintiffs' First Memorandum"), at p. 2, Plaintiffs

submit this Third Memorandum to supplement and complete their argument for entry of a default

judgment against all the defendants pursuant to their two pending motions, Plaintiffs' Motion for

Judgment by Default Against Sovereign Defendants (MDL Docket Document 2124) and

Plaintiffs' Motion for Entry of Default and Judgment by Default Against Non-Sovereign

Defendants (MDL Docket Document No. 2125).  The Plaintiffs also wish to advise the Court of

two recent developments of significance.

First, on July 28, 2011, the Obama Administration and the U.S. Treasury Department

took actions indicating that Iran has materially assisted al Qaeda by facilitating the transport of

money and terrorist recruits across Iran's territory.  The U.S. Government concluded that there is

"an agreement between al-Qaida and the Iranian government . . . demonstrat[ing] that Iran is a

critical transit point for funding to support al-Qa'ida's activities in Afghanistan and Pakistan."

Ex. 38, U.S. Department of Treasury Press Release (July 28, 2011).  "This network serves as the

1

core pipeline through which al-Qa'ida moves money, facilitators and operatives from across the Middle East to South Asia . . . ." *Id.*

Thus, "[t]he Obama administration said . . . that Iran is helping al-Qaeda funnel cash and recruits into Pakistan for its international operations." Ex. 39, WASHINGTON POST (July 28, 2011). U.S. Treasury Department documents now "accuse Iran of facilitating an al-Qaeda-run support network that transfers large amounts of cash from Middle East donors to al-Qaeda's top leadership in Pakistan's tribal region." *Id.* Further, Obama administration officials stated that senior Iranian officials know about the money transfers and allow the movement of al-Qaeda foot soldiers through Iranian territory. *Id.*

> "By exposing Iran's secret deal with al-Qaeda, allowing it to funnel funds and operatives through its territory, we are illuminating yet another aspect of Iran's unmatched support for terrorism," said David S. Cohen, the Treasury Department's undersecretary for terrorism and financial intelligence.
> . . . . The officials said the sanctions . . . would serve to demonstrate that Iran was working with Al Qaeda.
> Indeed, one senior administration said the Treasury action sought to both "expose a key funding facilitation network for Al Qaeda and a key aspect for Iranian support for international terrorism."
> "Our sense is this network is operating through Iranian territory with the knowledge and at least the acquiescence of Iranian authorities," the official said in a conference call with reporters, adding that he could not be more specific.

Ex. 40. NEW YORK TIMES (July 29, 2011). Plaintiffs note that this U.S. Government conclusion is completely consistent with the *Havlish* investigation, evidence, and arguments.

Second, Plaintiffs would have the Court take note of Chief Judge Royce C. Lamberth's recent ruling in *Estate of Heiser, et al. v. Islamic Republic of Iran*, No. 00-cv-2329 (RCL), Consolidated With No. 01-cv-2104 (RCL) (D.D.C. August 10, 2011). Chief Judge Lamberth

ruled that, pursuant to the FSIA, monies owed by a U.S. corporation to an Iranian corporation must be paid instead to the victims of Iranian sponsored terrorism. This ruling highlights the importance of a finding of liability not only as to the nation-state of Iran itself, but also as to agencies and instrumentalities of the world's preeminent foreign state sponsor of terror.

Pending before the Court is Plaintiffs' Motion for Judgment by Default Against Sovereign Defendants (MDL Docket Document 2124) which seeks entry of judgment by default against The Islamic Republic of Iran ("Iran"), a number of Iranian officials, agencies, and instrumentalities, and other non-Iranian non-sovereign defendants.[1] The following officials, subdivisions, and agencies and instrumentalities of Iran are named as defendants and were duly served:[2] Ayatollah Ali Hoseini Khamenei, Ali Akbar Hashemi Rafsanjani, Iranian Ministry of Information and Security, The Islamic Revolutionary Guard Corps, Hizballah, The Iranian Ministry of Petroleum, The National Iranian Tanker Corporation, The National Iranian Oil Corporation, The National Iranian Gas Company, Iran Airlines, The National Iranian Petrochemical Company, Iranian Ministry of Economic Affairs and Finance, Iranian Ministry of Commerce, the Iranian Ministry of Defense and Armed Forces Logistics, and The Central Bank of the Islamic Republic of Iran.

Under the FSIA, "a 'foreign state' . . . includes a political subdivision of a foreign state or an agency or instrumentality of a foreign state" as defined in the FSIA. 28 U.S.C. §1603(a).

---

[1] As mentioned above, Plaintiffs have also moved for entry of default judgments against the non-sovereign defendants Usama (or Osama) bin Laden, the Taliban, Muhammad Omar, the al Qaeda/Islamic Army, and Hizballah in a separate, and still pending, Plaintiffs' Motion for Entry of Default and Judgment by Default Against Non-Sovereign Defendants (MDL Docket Document No. 2125), filed on August 29, 2008.

[2] Service under the FSIA is governed by 28 U.S.C. §1608. Subsection (a) provides for service on foreign states, while subsection (b) provides for service on an agency or instrumentality of a foreign state. At the Court's request, Plaintiffs' counsel recounted the manner of service on all defendants in a letter to Your Honor dated October 27, 2009.

The FSIA defines the term "agency or instrumentality of a foreign state" as any entity

> (1) which is a separate legal person, corporate or otherwise, and
> (2) which is an organ of a foreign state or political subdivision
> thereof, or a majority of whose shares or other ownership interest
> is owned by a foreign state or political subdivision thereof, and
> (3) which is neither a citizen of . . . the United States . . . nor
> created under the laws of any third country.

28 U.S.C. §1603(b)(1)-(3); *see Estate of Heiser, et al. v. Islamic Republic of Iran*, No. 00-cv-

2329 (RCL), Consolidated With No. 01-cv-2104 (RCL) (D.D.C. August 10, 2011).

Thus, entry of a judgment against all of the Iranian defendants in this case, based on

the evidence submitted to date by Plaintiffs, is proper because, as will be conclusively

demonstrated below, all of these defendants, except the two individuals, are either subdivisions,

or agencies or instrumentalities, of the Iranian state, a "foreign state that is . . . a state sponsor of

terrorism." 28 U.S.C. §1605A(c).

As to the two Iranian individuals, defendant Ayatollah Khamenei and Ali Akbar

Rafsanjani, entry of judgment is proper, again based on the evidence submitted to date, because a

cause of action against each such individual as an "official, employee, or agent of that foreign

state while acting with the scope of his or her office, employment, or agency" is authorized to the

same extent as the cause of action against the "foreign state that is or was a state sponsor of

terrorism" itself. *Id.* Moreover, Iran and the other Iranian subdivision and agency or

instrumentality defendants are liable for all of the individual and unincorporated association

defendants' actions because "[i]n any such action, a foreign state shall be vicariously liable for

the acts of its officials, employees, or agents." *Id.* Finally, as noted *supra* at n. 1, judgment

should be entered against all of the non-state individuals and unincorporated associations

pursuant to the pending Plaintiffs' Motion for Judgment by Default Against Non-Sovereign

Defendants (MDL Docket Document No. 2125).

The courts have universally adopted the approach of *Roeder, et al. v. Islamic Republic of Iran*, 333 F.3d 228 (D.C. Cir. 2003), *cert. denied,* 542 U.S. 915 (2004), for the standard for determining the status of a defendant vis-à-vis a sovereign state defendant in a case brought under the FSIA.  "'Any government of reasonable complexity must act through men organized into offices and departments.'" *Id.* at 234, quoting *Transaero, Inc. v. La Fuerza Aerea Boliviana,* 30 F.3d 148, 153 (D.C. Cir. 1994).  Relying on *Transaero*'s holding that a nation's air force is a "foreign state or political subdivision" rather than an "agency or instrumentality" of the nation for purposes of the service-of-process provisions of the FSIA, 30 F.3d at 149-50, *Roeder* held that, because "the conduct of foreign affairs is an important and 'indispensable' governmental function," Iran's Foreign Ministry "must be treated as the state of Iran itself rather than as its agent."  333 F.3d at 234-35.  The court explained:

> We adopted a categorical approach: if the core functions of the entity are governmental, it is considered the foreign state itself; if commercial, the entity is an agency or instrumentality of the foreign state.  A nation's armed forces are clearly on the governmental side.  *Id.*  For similar reasons, the Ministry of Foreign Affairs must be treated as the state of Iran itself rather than as its agent.  The conduct of foreign affairs is an important and "indispensable" governmental function.

333 F.3d at 234-35 (*citation omitted*).

Following *Roeder*, U.S. District Court Judge Royce C. Lamberth held that MOIS must be considered part of the state of Iran itself.  *See, e.g., Haim v. Islamic Republic of Iran*, 425 F. Supp. 2d 56, 71, n.2 (D.D.C. 2006); *see also Valore v. Islamic Republic of Iran*, 478 F.Supp.2d 101, 106,

n.4 (D.D.C. 2007); *see generally, In Re: Islamic Republic of Iran Terrorism Litigation*, 659

F.Supp.2d 31, 48, n. 10 (D.D.C. 2009) (Lamberth, C. J.).

## II.    THE WITNESSES

Dr. Patrick L. Clawson is the Deputy Director for Research at the Washington Institute

for Near East Policy, a think tank focusing on contemporary issues of the Middle East.  The

federal courts have previously designated and qualified Dr. Clawson as an expert witness on Iran

in dozens of cases addressing Iran's state sponsorship of terrorism, Iran's economy, and other

related issues.  As Chief Judge Lamberth of the U.S. District Court for the District of Columbia

recognized again just a few days ago, Dr. Patrick Clawson is "'a widely-renowned expert on

Iranian affairs.'"  *Estate of Heiser, et al. v. Islamic Republic of Iran*, *supra*, at n. 9; *see also*

*Anderson v. Islamic Republic of Iran*, 753 F.Supp. 2d 68, 78 (D.D.C. 2010) (*quoting Peterson v.*

*Islamic Republic of Iran*, 264 F.Supp.2d 46, 51 (D.D.C. 2003).  Perhaps the leading expert on

Iran in the United States, Dr. Clawson has lectured throughout the world on the topic of Iran and

terrorism.  Over the last twenty-five years, Dr. Clawson has served as a consultant to the Central

Intelligence Agency, the Defense Department and various military officials, the State

Department, the National Security Agency, and the Defense Intelligence Agency.  Widely

published, Dr. Clawson has also testified before many U.S. House of Representatives and Senate

committees.  He also briefs, and receives briefings from, senior U.S. military officials and senior

officials of other governments friendly to the United States, about threats from Iran, Iranian

support of terrorism and Iranian strategy regarding terrorism.

Plaintiffs herewith submit Dr. Clawson's second affidavit in this case; he also signed an

affidavit submitted in support of Plaintiffs' First Memorandum (*see* Ex. 8 thereto, and Ex. S-14

6

in unredacted form).  His first affidavit in this case addressed the political, religious, and cultural structure that produces Iran's state sponsorship of terrorism, and his analysis of the economics of Iran's support for terrorism.  He also discussed U.S. governmental and non-governmental findings on Iran and Iran's role as a state sponsor of terrorism, and he explained why the factual and expert evidence in this case compels the conclusion that Iran provided material support to al Qaeda in connection with the 9/11 attacks upon America.  *See* Ex. 8, Clawson Affidavit.

"Witness X" is one of the three MOIS defector witnesses whose testimony was filed under seal on July 13, 2011, and was discussed in Plaintiffs' Second (Sealed) Memorandum of Law in Support of Motion for Entry of Judgment by Default Against Sovereign Defendants.  As a career MOIS operative with connections at the highest levels of the Iranian intelligence apparatus and integral involvement in sensitive MOIS activities throughout the 1980's and into the 1990's, Witness X was in a position to know, firsthand, about the myriad ways in which the Iranian government uses its subdivisions, agencies, and instrumentalities in the service of the state and its policy of conducting, planning, and directing international terrorism.  *See* Plaintiffs' Second (Sealed) Memorandum at pp. 3-11, and exhibits cited therein.

### III.    THE DEFENDANTS' RELATIONSHIPS TO THE ISLAMIC REPUBLIC OF IRAN

### A.  Ayatollah Ali Hoseini Khamenei and Ali Akbar Hashemi Rafsanjani

Defendants Khamenei and Rafsanjani are "[t]wo of the most important and powerful officials in Iran . . . .  Ex. 41, Affidavit of Patrick L. Clawson, PhD, Regarding the Relationships Between Various Individuals and Entities and the Government of Iran, ¶9 (hereinafter "Clawson 2nd Affidavit").

Ayatollah Ali Hoseini Khamenei is, and has been since 1989, the Supreme Leader of the Islamic Republic of Iran. *Id.*, ¶10.  Dr. Clawson states:

> [Khamenei] is the commander-in-chief of the armed forces, appoints the head of each military service, declares war and peace, appoints the head of the judiciary, and may dismiss the elected president of Iran "where the interests of the nation should warrant," among many other powers outlined in Article 110 of the Iranian Constitution.  He is, indeed, as his title suggests, supreme.  He is the head of state, and it is only a slight overstatement to say that Khamenei *is* the Iranian government.  Khamenei is certainly – by far – the most powerful person in the Iranian government.  His term of office is unlimited.

*Id.*, ¶¶11.

Defendant Ali Akbar Hashemi Rafsanjani, one of the wealthiest individuals in Iran, has held a number of top positions in Iran's government: from 1989 to 1997, he was the president of Iran; from 1981 to 1989, he was the speaker of the Iranian parliament.  Currently, Rafsanjani heads two important bodies established by the Iranian Constitution: the Assembly of Experts and the Expediency Council.  *Id.*, ¶12.  The Assembly of Experts selects a new Supreme Leader when that position becomes vacant.  The Expediency Council, a uniquely Iranian institution, with members appointed by the Supreme Leader, is charged with responsibility for resolving deadlocks between the parliament and the Guardian Council, a body charged with vetting legislation to ensure that it is consistent with Islam and the Iranian Constitution, and which deals with other issues "'forwarded to them by the [Supreme] Leader.'"  *Id.*  "Until he lost a bid for a new presidential term in 2005, Rafsanjani was widely considered to be the second most powerful figure in the Iranian government.  Certainly, he was the second most powerful figure from 1989 to 2005."  *Id.*, ¶13.

Because both Khamenei and Rafsanjani occupy positions at the very highest echelon of the Iranian government, they are persons who, in the performance of their official duties, are indistinguishable from the state itself.  Indeed, in this case, the evidence demonstrates that both Khamenei and Rafsanjani have been directly involved in Iran's acts of terror, and in Iran's material support for acts of terrorism committed through Iran's proxies.  *See* Plaintiffs' First Memorandum and Plaintiffs' Second (Sealed) Memorandum, *passim*.  For example, "[b]oth Khamenei and Rafsanjani were named by a German court in the "Mykonos case" as having been responsible for ordering the assassination of Iranian dissidents in Berlin."  Ex. 41, Clawson 2nd Affidavit, ¶14.  Indeed, Dr. Clawson explains that Khamenei and Rafsanjani both "have long records of involvement in Iran's material support for terrorism," and both "have been cited as key figures in numerous U.S. court cases finding Iranian state support for terrorism."  *Id.*

### B.  The Iranian Ministries and Political Subdivisions

Of the above-referenced defendants, the following are political or military subdivisions of the nation-state the Islamic Republic of Iran: the Iranian Ministry of Information and Security ("MOIS), the Islamic Revolutionary Guard Corps ("IRGC"), the Iranian Ministry of Petroleum, the Iranian Ministry of Economic Affairs and Finance, the Iranian Ministry of Commerce, and the Iranian Ministry of Defense and Armed Forces Logistics.  As detailed below, each of these agencies has core functions which are governmental, not commercial, in nature.  *See id.*, ¶¶15-17, 23-28.  As explained by Dr. Clawson, except for the IRGC, these governmental

> . . . ministries in Iran bear much the same relationship to Iran's government as do the cabinet departments in the United States government: they are established by law, their heads are appointed by the president subject to confirmation by the parliament, their budgets are proposed by the president and approved by the parliament, and their funding comes almost entirely from general tax revenues.  In

short, their core functions are governmental, and they are agencies within the government.

*Id.*, ¶15.

As to the IRGC, Dr. Clawson attests that it is "a military force parallel to the regular [Iranian] military."  *Id.* ¶16.  With its responsibilities and powers described in the Iranian Constitution, the IRGC reports directly to Iran's Supreme Leader rather than to its president. Moreover, "[t]he IRGC strongly asserts its constitutional role as defender of the Islamic Revolution, which it interprets as meaning that it is not subject to parliamentary supervision in the same manner as are ministries.  Be that as it may, the IRGC is clearly a governmental agency whose core functions are governmental."  *Id.*; *see also* Plaintiffs' First Memorandum at pp. 43-45 and Ex. 8, Clawson Affid. ¶¶29-35.

Because all of the Iranian governmental subdivision, agency and instrumentality defendants have defaulted in this case, it is not necessary to prove, individually, their specific involvement in either the terrorist attacks on the United States, or even involvement in Iran's state sponsorship of terrorism generally.  Nevertheless, Dr. Clawson and Witness X do provide such evidence with respect to many of them.  Dr. Clawson attests to the fact that

> important roles in Iran's state support for terrorism were . . . played by MOIS, the IRGC, and the Ministry of Defense and Armed Forces Logistics ("MODAFL").  These are the main organizations through which Iran's material support for terrorism is conducted.  The first two are the main organizations through which Iran's material support for terrorism is conducted; MODAFL appears also to have a supporting role.

*Id.*. ¶23.

Dr. Clawson references the many cases in which U.S. federal courts have "cited MOIS as a key instrument of the government of Iran for its material support of terrorist groups like

10

Hizbollah . . . and as a terrorist agency of the Iranian government . . . ." *Id.* ¶24.  For example, in *Dammarell v. Islamic Republic of Iran*, 404 F. Supp. 2d 261, 271-72 (D.D.C. 2005), the court held that "through MOIS, Iran materially supported Hizbollah by providing assistance such as money, military arms, training, and recruitment." *Id.  See also Flatow v. Islamic Republic of Iran,* 999 F.Supp. 1 (D.D.C.1998); *Anderson v. Islamic Republic of Iran,* 90 F.Supp.2d 107, 112-13 (D.D.C.2000); *Peterson v. Islamic Republic of Iran*, 264 F. Supp.2d 46 (D.D.C. 2002); *Salazar v. Islamic Republic of Iran*, 370 F.Supp.2d 105 (D.D.C. 2005); *Haim v. Islamic Republic of Iran*, 425 F.Supp.2d 56 (D.D.C. 2006); *Blais v. Islamic Republic of Iran*, 459 F.Supp.2d 40 (D.D.C. 2006); *Valore v. Islamic Republic of Iran*, 478 F.Supp.2d 101 (D.D.C. 2007); *see also* Plaintiffs' First Memorandum at pp. 45-46.  Furthermore, Witnesses X, Y, and Z all testify to MOIS' role in conducting and directing acts of international terrorism.  *See generally* Plaintiffs' Second (Sealed) Memorandum.

On September 23, 2001, the U.S. Treasury Department designated the IRGC and its *Qods* Force as a terrorist organization for "providing material support to the Taliban and other terrorist organizations."  On June 28, 2005, the State Department designated the IRGC as a "foreign terrorist organization."  *See* Plaintiffs' First Memorandum at pp. 43; Ex. 6, Lopez-Tefft Affid. ¶65 (*emphasis omitted*).  U.S. Government officials regularly state that the IRGC is considered an active supporter of terrorism.  Ex. 41, Clawson 2nd Affid. ¶26.  In *Rimkus v. Islamic Republic of Iran*, 575 F. Supp. 2d 181, 198–200 (D.D.C. 2008) (Lamberth, C.J.), the court again followed *Roeder's* categorical approach and held that the IRGC, like MOIS, is part of the Iranian state itself; *see also Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40, 60–61 (D.D.C. 2006) (Lamberth, J.) (concluding that both MOIS and IRGC must be treated as the state of Iran itself

for purposes of liability); *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 115–16 (D.D.C. 2005) (Bates, J.) (same).

Dr. Clawson also observes that "the Iranian government ministries are responsible for carrying out the policies of the Iranian government[, and t]he Iranian government's policies include state support for terrorism."  Ex. 41, Clawson 2nd Affid. ¶17.  Although "[m]uch of that state support is done through clandestine means," it is Dr. Clawson's expert opinion that "it is quite likely that these ministries were involved in some ways in state support for terrorism generally and in support for al Qaeda and Hezbollah in particular."  *Id.*

For example, Dr. Clawson's expert opinion is that because "the role of the Ministry of Economic Affairs and Finance in administering the state budget would mean that it has a key role in transferring state funds to many organizations and in verifying that state funds were properly used," that Ministry "had to have been involved in Iran's extensive financial support for terrorists generally and in support for al Qaeda and Hezbollah, in particular."  *Id.*

Dr. Clawson also concludes that Iran's Ministry of Commerce and Ministry of Petroleum "must have been aware of the planning and logistics for . . . disguised shipments" of weapons bound for terrorist groups:

> . . . [T]he Ministry of Commerce and Ministry of Petroleum are closely involved in Iran's export/import trade and the shipping used for such trade.  On numerous occasions, what has purported to be normal commerce from Iran has been found instead to include shipments of weapons bound for terrorist groups.  In my opinion, the Ministries of Commerce and Petroleum must have been aware of the planning and logistics for such disguised shipments.

*Id.*

12

Because each of these defendants is a division of the Iranian government, part and parcel of the state under 28 U.S.C. §1603(a) and *Roeder, et al. v. Islamic Republic of Iran*, 333 F.3d 228, 232 (D.C. Cir. 2003), each of these defendant entities is in the same legal status as the state of Iran itself.  Thus, the liability of each of these agencies under the FSIA is established by a combination of its default and the Plaintiffs' submission of proof of the Iranian state's complicity in the September 11, 2001 terrorist attacks and Iran's material support for al Qaeda and Hizballah before and after those attacks.  Indeed, as the evidence demonstrates (and as discussed in both Plaintiff's First Memorandum and Plaintiffs' Second (Sealed) Memorandum), both MOIS and the IRGC were active participants in such material support.

Dr. Clawson's opinion is consistent with the testimony of Witness X, who, in his sworn testimony, described numerous ways in which the various ministries and offices of the Iranian government were used for the purpose of aiding MOIS' terrorist activity, including its direction and material support of terrorist acts by proxies.  *See* Ex. S-1, Testimony of Witness X (February 22, 2008); Ex. S-2, Testimony of Witness X (February 23, 2008); Ex. S-3, Testimony of Witness X (March 1, 2008); Ex. S-4, Testimony of Witness X (March 2, 2008).  Witness X explained that the ministries must cooperate with MOIS by following its dictates, for example, in the areas of procurement, and that this policy was put in place by defendants Khamenei and Rafsanjani.  If the Ministry of Agriculture needs to purchase pesticide, MOIS may require it to obtain pesticide that has a dual use for the production of chemical bombs for terrorist activities.  Ex. S-3, Testimony of Witness X (March 1, 2008), pp. 61-64.  Similarly, if the Ministry of Heavy Industries was to procure truck engines or parts, it may be required by MOIS to purchase engines or parts that could also be used to manufacture military equipment.  *Id.*, pp. 64-65.  In another

13

example, MOIS required the Telecommunications Ministry to procure equipment for espionage. *Id.*, p. 65.  Even the Minister of Education received orders of this nature from MOIS.  *Id.*

Witness X also detailed other ways in which the Iranian government, MOIS, and individual defendants Rafsanjani and Khamenei in particular, used Iranian ministries, for example, the defendant Ministry of Petroleum, to funnel money to terrorist proxy groups through the procurement process, phony banking, and the use of shell companies registered in Nigeria and Cyprus that were really fronts for terrorist organizations.  *Id.*, pp. 67-81.

C.      The Iranian Agencies and Instrumentalities

The following are agencies and instrumentalities of the state of Iran: the National Iranian Tanker Corporation, the National Iranian Oil Corporation, the National Iranian Gas Company, Iran Airlines, the National Iranian Petrochemical Company, and the Central Bank of the Islamic Republic of Iran.  *See* Ex. 41, Clawson 2nd Affidavit, ¶¶18-22; 29-36.  Each of these corporate defendants, though having a legal corporate existence outside the government, is tightly connected to the government of Iran, is an organ of the government, and/or has been owned, directed, and controlled by the Iranian state.   However, they each have core functions which are commercial, not governmental, in nature.  *Id.*, ¶29.

As Dr. Clawson explains, prior to 2004, each of these agencies/instrumentalities of Iran was "wholly owned and controlled by the government of Iran."  *Id.*, ¶30.  Iran indicated in 2004 that it would "privatize" many corporations that had been started, operated, and controlled, by the Iranian government, including all of the above-mentioned corporate "agency and instrumentality" defendants.  *Id.*  For the most part, such privatization has not, in fact, occurred, indeed, "in every case about which information is available, the privatization has been a sham . .

14

. . ." *Id.*, ¶31.  Shares in the companies have been sold to other companies, such as pension plans of state-controlled firms and state-controlled banks, which themselves are tightly controlled by the government or sold to politically well-connected people.  *Id.*  Furthermore, "key decisions about operations of the firm continued to be made by Iranian government officials."  *Id.*  "[T]he record of such transfers to date has been that they do not change the reality of Iranian government control."  *Id.*  Thus, the nation-state of Iran continues to own, operate, and control most of these corporate entities.

Specifically, as detailed by Dr. Clawson, each of the Iranian corporate defendants in this case was, as of the time of the September 11, 2001 terrorist attacks, and are still today, agencies and instrumentalities of Iran.  Dr. Clawson states his opinion that each of these instrumentalities of the Iranian regime did, or must have, aided the Iranian regime in its material support of terrorism."  *Id.*, ¶¶18-22; 29-36.  Furthermore, Witness X testified to his firsthand knowledge, based on his own observations and experience, that each of these instrumentalities in fact assisted the Tehran regime in Iran's material support of terrorism.  Ex. S-4, Testimony of Witness X (March 2, 2008), pp. 4-5.

National Iranian Tanker Corporation.  "It is common knowledge among experts in international banking and commerce, and it is my expert opinion, that the National Iranian Tanker Corporation is, and has been since 1974, controlled by the Islamic Republic of Iran."  Ex. 41, Clawson 2nd Affidavit, ¶32.

National Iranian Oil Company ("NIOC").  Dr. Clawson cites the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC"), for the fact that the National Iranian Oil Company is an "'entity owned or controlled by the Government of Iran.'"  *Id.*, ¶33.  Witness X

15

corroborates Dr. Clawson and OFAC by testifying that NIOC is "managed by the Ministry of Oil."  Ex. S-3, Testimony of Witness X (March 1, 2008), p. 75.  Further, Witness X testified that a large cash flow of money was funneled to terrorist organizations through the NIOC.  Ex. S-4, Testimony of Witness X (March 2, 2008), pp. 6-7.

Moreover, "[b]ecause of NIOC's role in material support of terrorism, OFAC has placed NIOC on its List of Specially Designated National and Blocked Persons ('OFAC SDN List')."'  Further, at the time of the September 11, 2001 terrorist attacks, "the National Iranian Oil Corporation was wholly owned or controlled by the government of Iran."  Ex. 41, Clawson 2nd Affidavit, ¶33.

The National Iranian Gas Company ("NIGC").  The Iranian Ministry of Petroleum, itself a defendant in this case, established the National Iranian Gas Company in 1965, initially capitalizing it with Iranian government money.  In 2010, Iran's Oil Minister appointed a new managing director of the National Iranian Gas Company, which clearly equates to a continuing ownership and/or controlling interest by the state.  *Id.*, ¶34.  Witness X testified that terrorists received commissions for operating as go-betweens for arrangements involving long-term payments.  Ex. S-4, Testimony of Witness X (March 2, 2008), p. 7.

The National Iranian Petrochemical Company ("NPC").  Dr. Clawson states that, according to the U.S. Government, "'The National Petrochemical Company (NPC) is a subsidiary of the Iranian Petroleum Ministry and is wholly-owned by the Government of Iran."  Ex. 41, Clawson 2nd Affidavit, ¶35.  Further, because of NPC's material support of terrorism, the OFAC placed NPC on the U.S. Treasury Department's "List of Specially Designated National and Blocked Persons" ("OFAC SDN List").  As of September, 2001, the National Iranian Petrochemical

Company was wholly owned or controlled by the government of Iran.  *Id.*  Witness X testified that, similar to arrangements involving NIGC, terrorists acted as go-betweens for arrangements involving long-term payment promises – that are never kept – and receive monetary commissions for the bogus transactions.  Ex. S-4, Testimony of Witness X (March 2, 2008), pp. 10-11.

Iran Airlines.   Dr. Clawson states that Iran Airlines was, for many years, wholly owned by the government of Iran, and there is no information indicating that the government of Iran has sold its shares in the airline company, and, "[i]n any case, those firms privatized have remained under *de facto* government control."  Ex. 41, Clawson 2nd Affidavit, ¶36.  Although the U.S. Treasury Department has not designated Iran Air on the OFAC SDN List, Dr. Clawson cites the occurrence of "episodes in which Iranian agents who carried out acts of terrorism . . . left the country in which the act was perpetrated on Iran Air flights which were specially held on the ground until the alleged perpetrator(s) could board the flight."  Dr. Clawson also references the existence of a regular Iran Air flight between Caracas, Venezuela, and Tehran for which the airline does not sell tickets to the general public, indicating that "this flight may provide transport for terrorists."  Dr. Clawson notes that the State Department's latest country report on terrorism (for 2009) states, "President [Hugo] Chavez continued to strengthen Venezuela's relationship with state sponsor of terrorism Iran.  Iran and Venezuela continued weekly Iran Airlines flights connecting Tehran and Damascus with Caracas."  Dr. Clawson also credits a former deputy assistant defense secretary who has said that passengers on the flight from Iran and Syria could include "'people who probably . . . are intelligence agents, probably Islamic Revolutionary Guards forces, Quds force, [and] even Hezbollah terrorists.'"  *Id.*

17

Witness X testified that Iran Air also acted as a facilitator for the transfer of cash to terrorists on terrorist missions abroad, describing a specific incident in which he himself was involved.  The head of MOIS instructed him, Witness X, to tell the head of Iran Air in a particular European country to transfer cash to a member of a Pakistani Shia terrorist organization, who was at that time in that European country on a terrorist operation and was in need of funds.  Ex. S-4, Testimony of Witness X (March 2, 2008), pp. 7-9.

Central Bank of Iran.  Iran's Central Bank (in Farsi, Bank Merkazi Iran or "BMI"), has "core functions [that] are quasi-governmental, but it is a corporation rather than an agency within the government.  Ex. 41, Clawson 2nd Affidavit, ¶18.  Dr. Clawson explains that, under Iranian law, BMI is owned by, and is tightly linked to, the Iranian government.  Iran's Monetary and Banking Law ("MBL") provides that BMI is a joint-stock company whose capital is "'wholly owned by the Government.'"  *Id*., ¶19.  Moreover, "in practice, the Iranian government exercises tight control over BMI and ignores the law by issuing direct orders to the BMI."  *Id*., ¶20.  Dr. Clawson provides two clear examples.  Although the BMI's governor has a five-year term specified in the MBL, in fact, he serves at the pleasure of Iran's president; in 2008, the BMI chief was dismissed by presidential decree when he refused to resign.  Second, contrary to procedures set out in the MBL, the government cabinet regularly votes to order BMI to extend loans for specific purposes.  *Id*.  Dr. Clawson also states, that, from an economic perspective, "BMI has less independence from the Iranian government than do the central banks in most developed countries."  *Id*., ¶21.

Dr. Clawson further states his expert opinion that transfers of huge sums of Iranian money to terrorist organizations such as HAMAS and Hizballah, often millions of dollars of cash

carried in suitcases, must be accomplished with the complicity and/or knowledge and acquiescence of BMI.  The same must be true in the case of banking transactions between Iranian agencies and instrumentalities and terrorist organizations.  *Id*., ¶22.  Witness X provides general corroborating testimony that the Central Bank of Iran does indeed facilitate the transfer of money to terrorist groups.  Ex. S-4, Testimony of Witness X (March 2, 2008), p. 12.

Dr. Clawson also addresses the relationship between Iran and Hizballah and Iran's funding of Hizballah, which is beyond dispute.  Ex. 41, Clawson 2nd Affidavit, ¶¶37-41.  However, because Hizballah is a non-sovereign organization, it is entitled to no possible FSIA immunity whatsoever, and it has defaulted in this case.  Although no further presentation is required, Plaintiffs' evidence, and both of Plaintiffs' memoranda, address in depth the involvement of Hizballah in the September 11, 2001, terrorist attacks.

### IV.  CONCLUSION

Defendants Iranian Ministry of Information and Security ("MOIS"), the Islamic Revolutionary Guard Corps ("IRGC"), the Iranian Ministry of Petroleum, the Iranian Ministry of Economic Affairs and Finance, the Iranian Ministry of Commerce, and the Iranian Ministry of Defense and Armed Forces Logistics, are political or military subdivisions of the nation-state of Iran, and, accordingly, are equal in legal status to the state itself.  28 U.S.C. §1603(a).  Furthermore, Plaintiffs have submitted evidence demonstrating that each of these subdivisions of the Iranian state are in fact used by Iran in the furtherance of Iran's material support of terrorism.

The evidence establishes that the National Iranian Tanker Corporation, the National Iranian Oil Corporation, the National Iranian Gas Company, Iran Airlines, the National Iranian Petrochemical Company, and the Central Bank of the Islamic Republic of Iran, are all agencies

or instrumentalities of the defendant Islamic Republic of Iran.  They have separate corporate existences from the state, with non-governmental core functions, yet all are organs of the state and/or are owned and controlled by Iran.  The FSIA includes these "agencies or instrumentalities" within the definition of a "foreign state."  28 U.S.C. §1603(a); (b).  Thus, their liability is co-extensive with that of the foreign state itself, and default judgments may be entered as to each of them without any separate assessment of the evidence.  Nevertheless, Plaintiffs have submitted evidence demonstrating that each of these agencies and instrumentalities of Iran are in fact used by Iran in the furtherance of Iran's material support of terrorism.

Individual defendants Ayatollah Ali Hoseini Khamenei, who is, and was on September 11, 2001, the Supreme Leader of Iran, and Ali Akbar Hashemi Rafsanjani, who has held several top leadership positions and was the president of Iran on September 11, 2001, are both individuals who were, at all material times, acting within the scope of their leadership offices on behalf of the nation-state of Iran.  Therefore, those defendants are subject to the same proofs of liability in this case as the defendant Islamic Republic of Iran, and moreover, Iran is vicariously liable for their conduct.  28 U.S.C. §1603A(c).

Because the Plaintiffs' proofs are sufficient to establish liability of the Islamic Republic of Iran in this case, they also establish liability of the subdivision defendants, the agency or instrumentality defendants, and the individual Iranian defendants, and a default judgment should be entered as to all of those defendants.

WHEREFORE, for the reasons stated herein, and in the Plaintiffs' First Memorandum of Law in Support of Motion for Entry of Judgment, Plaintiffs' Second (Sealed) Memorandum of Law in Support of Motion for Entry of Judgment, and based on all the supporting evidence

submitted by Plaintiffs in this case, Plaintiffs respectfully request that this Honorable Court grant

both Plaintiffs' Motion for Judgment by Default Against Sovereign Defendants and Plaintiffs'

Motion for Entry of Default and Judgment by Default Against Non-Sovereign Defendants.

Further, Plaintiffs respectfully request that the Court enter an Order directing the Clerk of the

Court to enter judgment by default against the Islamic Republic of Iran, the political subdivision

defendants, the agencies or instrumentalities defendants, the individual defendants, as well as

Hizballah, al Qaeda, the Taliban, and all other defendants, and to set this matter for further

proceedings on the amounts of damages to be awarded to the Plaintiffs.

Respectfully Submitted this 19th day of August, 2011,


 /s/ Thomas E. Mellon, Jr.
Thomas E. Mellon, Jr. (PA Bar No. 16767)
John A. Corr (PA Bar No. 52820)
Stephen A. Corr (PA Bar No. 65266)
MELLON WEBSTER & SHELLY
87 North Broad Street
Doylestown, PA  18901
(215) 348-7700

Walter S. Batty, Jr. (PA Bar No. 02530)
c/o MELLON WEBSTER & SHELLY
87 North Broad Street
Doylestown, PA  18901
(215) 348-7700

Timothy B. Fleming (DC Bar No. 351114)
WIGGINS CHILDS QUINN
   & PANTAZIS, PLLC
1850 M Street, NW, Suite 720
Washington, DC  20009
(202) 467-4123

Dennis G. Pantazis (AL Bar No. ASB-2216-A59D)
Melina Goldfarb (AL Bar No. ASB- 3739-R71M)

WIGGINS CHILDS QUINN
   & PANTAZIS, LLC
The Kress Building
301 19th Street North
Birmingham, AL  35203
(205) 314-0500

Richard D. Hailey (IN Bar No. 7375-49)
Mary Beth Ramey (IN Bar No. 5876-49)
RAMEY & HAILEY
9333 North Meridian Street, Suite 105
Indianapolis, IN  46260
(317) 582-0000

J.D. Lee (TN Bar No. 2030)
David C. Lee (TN Bar No. 015217)
LAW OFFICE OF J.D. LEE
422 South Gay Street, 3rd Floor
Knoxville, TN  37902
(865) 544-0101

Evan J. Yegelwel (FL Bar No. 319554)
TERRELL HOGAN ELLIS
   YEGELWEL. P.A.
233 East Bay Street
Blackstone Building, 8th Floor
Jacksonville, FL  32202
(904) 632-2424

Edward H. Rubenstone (PA Bar No. 16542)
LAMM RUBENSTONE LLC
3600 Horizon Boulevard, Suite 200
Trevose, PA  19053
(215) 638-9330

Donald J. Winder (UT Bar No. 3519)
Jerald V. Hale (UT Bar No. 8466)
WINDER & COUNSEL, PC
175 West 200 South, Suite 4000
P.O. BOX 2668
Salt Lake City, UT  84110-2668
(801) 322-2222

22

Robert M. Foote (IL Bar No. 03124325)
Craig S. Meilke (IL Bar No. 03127485)
FOOTE, MEYERS, MIELKE
   & FLOWERS, LLC
3 North Second Street, Suite 300
St. Charles, IL  60174
(630) 232-6333
(630) 845-8982

***Attorneys for the Havlish Plaintiffs***