# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------:

IN RE TERRORIST ATTACKS ON
SEPTEMBER 11, 2001

Civil Action No.
03 MDL 1570 (GBD)

-----------------------------------------------------------------:

FIONA HAVLISH, in her own right
and as Executrix of the ESTATE OF
DONALD G. HAVLISH, JR., Deceased, et al.,

                  Plaintiffs,

      v.

USAMA BIN LADEN,

AL QAEDA/ISLAMIC ARMY,
an unincorporated association, *et al*

FOREIGN STATE DEFENDANTS,

THE ISLAMIC REPUBLIC OF IRAN,
ALI AKBAR HASHEMI RAFSANJANI
Previously Identified and Served as
Unidentified Terrorist 1,

IRANIAN MINISTRY OF
INFORMATION AND SECURITY,

THE ISLAMIC REVOLUTIONARY
GUARD CORPS,

HEZBOLLAH,
an unincorporated association,

THE IRANIAN MINISTRY OF PETROLEUM,

THE NATIONAL IRANIAN
TANKER CORPORATION
Previously identified as Unidentified Terrorist 2,

THE NATIONAL IRANIAN OIL CORPORATION,

: CIVIL ACTION NO. 03-CV-9848 -RCC
: Case Transferred from the United
: States District Court for the
: District of Columbia
: Case Number  1:02CV00305

**AFFIDAVIT OF
PATRICK L. CLAWSON, PhD
REGARDING THE RELATIONSHIPS
BETWEEN VARIOUS INDIVIDUALS
AND ENTITIES AND THE
GOVERNMENT OF IRAN**

-1-

THE NATIONAL IRANIAN GAS COMPANY          :
Previously Identified as Unidentified Terrorist 4,   :
                                                     :
IRAN AIRLINES                                        :
Previously Identified as Unidentified Terrorist 5,   :
                                                     :
THE NATIONAL IRANIAN                                 :
PETROCHEMICAL COMPANY                                :
Previously Identified as Unidentified Terrorist 6,   :
                                                     :
IRANIAN MINISTRY OF                                  :
ECONOMIC AFFAIRS AND FINANCE                         :
IRANIAN MINISTRY OF COMMERCE,                        :
                                                     :
IRANIAN MINISTRY OF DEFENSE                          :
AND ARMED FORCES LOGISTICS,                          :
                                                     :
THE CENTRAL BANK OF THE                              :
ISLAMIC REPUBLIC OF IRAN, *et al.*                   :
Previously Identified as Unidentified Terrorist 7,   :
                                                     :
                         Defendants.                 :

---

## *Affidavit of Patrick L. Clawson, PhD, Regarding the Relationships Between Various Individuals and Entities and the Government of Iran*

I, **Patrick L. Clawson, PhD,** being duly sworn, do hereby swear and affirm under

penalty of perjury that the contents of this Affidavit are true and correct to the best of my

knowledge, information, and belief.

### Qualifications of the Witness

1.  I am an adult citizen of the District of Columbia. I have extensively studied and

    researched and am an expert on the Islamic Republic of Iran ("Iran"), its sponsorship of

    terrorism, its economy and its politics. This affidavit is submitted to provide the Court

    with facts and evidence concerning Iran's extensive provision of money, military training

-2-

and other material resources to terrorists.

2.   I am Deputy Director for Research of the Washington Institute for Near East Policy,
     where I have been employed since 1997.  My previous positions include five years as
     senior research professor at the Institute for National Strategic Studies of the National
     Defense University and senior economist for four years each at the Foreign Policy
     Research Institute, the World Bank, and the International Monetary Fund.  I have done
     contract consulting work about Iran for U.S. government agencies over the last twenty-
     five years, including the Central Intelligence Agency, the Defense Department, and the
     State Department Bureau of Intelligence and Research.

3.   As the Deputy Director for Research at the Washington Institute for Near East Policy, a
     think tank focusing on contemporary issues of the Middle East, I supervise a staff of
     about twenty senior researchers who study Middle East politics and terrorism, with
     considerable focus on Iran. I also brief and receive briefings from senior United States
     military officials and senior officials of other governments friendly to the United States,
     about the threats from Iran, Iranian support of terrorism and Iranian strategy regarding
     terrorism.

4.   I have previously been designated and qualified by federal courts as an expert witness on
     issues relating to Iran, Iran's support for terrorism, its economy and other issues, and
     have given live or written testimony in various cases brought against Iran for its
     sponsorship of terror, including *Cicippio v. Islamic Republic of Iran*, U.S.D.C., D.C. No.
     96-01805 (1996); *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 8-9 (D.D.C. 1998);
     *Cronin v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 99-02890 (1999); *Higgins v.*

*Islamic Republic of Iran*, U.S.D.C., D.C. No. 99-00377 (1999); *Stethem v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 00-00159 (2000); *Hegna v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 00-00716 (2000); *Anderson v. Islamic Republic of Iran*, 90 F. Supp. 2d 107, 112-113 (D.D.C. 2000); *Eisenfeld v. Islamic Republic of Iran*, 172 F. Supp. 2d 1, 5 (D.D.C. 2000); *Elahi v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 99-02802 (1999); *Wagner v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 00-01799 (2000); *Polhill v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 00-01798 (2000); *Mousa v. Islamic Republic of Iran*, 238 F. Supp. 2d 1, 3-4 (D.D.C. 2001); *Rafii v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 01-850 (2001); *Kerr v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 01-01994 (2001); *Surette v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 01-00570 (2001); *Weinstein v. Islamic Republic of Iran*, 184 F. Supp. 2d 13, 19 (D.D.C. 2002); *Ungar v. Islamic Republic of Iran*, 211 F. Supp. 2d 91, 93 (D.D.C. 2002); *Stern v. Islamic Republic of Iran*, 271 F. Supp. 2d 286, 288 (D.D.C. 2003); *Rieger v. Islamic Republic of Iran*, 281 F. Supp. 2d 87, 90 (D.D.C. 2003); *Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258, 262 (D.D.C. 2003); *Greenbaum v. Islamic Republic of Iran*, No. 02-2148, 2006 WL 2374241 at *3 (D.D.C. Aug. 10, 2006); and *Levin v. Islamic Republic of Iran*, U.S.D.C. No. 05-2494 (2007), among others.

5.  My books and monographs include: *The Perfect Handshake with Iran: Prudent Military Strategy and Pragmatic Engagement Policy* (The Washington Institute, 2010); Much Traction from Measured Steps: The Iranian Opposition, the Nuclear Issue, and the West (The Washington Institute, 2010);  Engaging Iran: Lessons from the Past (The Washington Institute for Near East Policy, 2009, edited); *The Last Resort: Consequences*

-4-

*of Preventive Military Action Against Iran* (The Washington Institute, 2008, with

Michael Eisenstadt); *Eternal Iran: Continuity and Chaos* (Palgrave Press, 2005, with

Michael Rubin); *Getting Ready for a Nuclear-Ready Iran* (U.S. Army War College,

2005, with Henry Sokolski, edited); *Checking Iran's Nuclear Ambitions* (U.S. Army War

College, 2004, with Henry Sokolski, edited); *Iran Under Khatami* (The Washington

Institute for Near East Policy, 1998, with others); *Strategic Assessment*, (the flagship

annual report of the Institute for National Strategic Studies of the National Defense

University, which I inaugurated and edited for three years 1995-1997); *U.S. Sanctions on

Iran* (Emirates Centre for Strategic Studies and Research, 1997); *Business As Usual?

Western Policy Options Towards Iran* (American Jewish Committee, 1995); *Energy

Security in the Twenty-ain First Century* (National Defense University Press, 1995,

edited); *Iran's Strategic Intentions and Capabilities* (National Defense University Press,

1994, edited); and *Iran's Challenge to the West: How, When, and Why* (the Washington

Institute for Near East Policy, 1993).

6.  My Ph.D. in economics is from the New School for Social Research and my B.A. is from

Oberlin College.  I am able to read and/or speak Persian and French as well as some

Hebrew, Spanish, and German.  I read the Iranian press regularly through the internet.  I

also read other publications from Iran, including books in Persian.

7.  My knowledge of Iran's sponsorship of terrorism comes as a result of my routine and in-

depth access to facts concerning Iran, its support of terrorism, its economy and politics,

and my extensive study of Iran as outlined herein, including my professional research and

publishing in this field over the course of many years.  Iran is a relatively open

information country in which the competing political forces frequently reveal information about the country's security apparatus and debate issues relating to terrorism; Iran has many internet sites that publish information on these subjects.  From my years studying Iranian politics and given the competing sources which can be compared, I believe that I am able to determine whether Iranian reports on these subjects are credible.  Indeed, I use this information as a source to brief the United States and other governments. Furthermore, Iran and some of the terrorist groups it sponsors have been openly boastful about their relations, and have described and detailed their connections in print.

8.  My opinions set forth below are based upon my education, research, and experience, as well as my review and analysis of documents typically relied upon by experts in my field. Such basis includes, but is not limited to: official speeches made by Iranian officials, U.S. officials, and the officials of other countries; my conversations with U.S. officials, former Iranian officials, and officials of other countries; and my review and analysis of relevant documents, including newspaper accounts (in both the English-language press and Persian language press).

**The Relationship of Various Persons to the Iranian Government**

9.  Two of the most important and powerful officials in Iran are Ali Khamenei and Ali Akbar Hashemi Rafsanjani.

10. Since the death of the Islamic Revolution's leader, Ayatollah Ruhollah Khomeini, in 1989, Ali Khamenei has been the Supreme Leader of Iran.

11. The Supreme Leader is commander-in-chief of the armed forces, appoints the head of each military service, declares war and peace, appoints the head of the judiciary, and may

dismiss the elected president of Iran "where the interests of the nation should warrant," among many other powers outlined in Article 110 of the Iranian Constitution. He is, indeed, as his title suggests, supreme. He is the head of state, and it is only a slight overstatement to say that Khamenei *is* the Iranian government. Khamenei is certainly – by far – the most powerful person in the Iranian government. His term of office in unlimited.

12. Ali Akbar Hashemi Rafsanjani is a former president of Iran (from 1989 to 1997) and a former speaker of the Iranian parliament (from 1981 to 1989). He is also one of the wealthiest individuals in Iran. Currently, Rafsanjani heads two important bodies established by the Iranian Constitution:

    a. The Assembly of Experts. This body of clerics, elected by popular vote from among the clerics permitted (by a body appointed by the Supreme Leader) to run, is charged with selecting a new Supreme Leader when the position becomes vacant. The position has only been vacant once, upon the death of Ayatollah Ruhollah Khomeini in 1989.

    b. The Expediency Council. This uniquely Iranian institution, whose members are appointed by the Supreme Leader, is charged with the responsibility of resolving deadlocks between the parliament and the Guardian Council. The Guardian Council is a body charged with vetting legislation to ensure that it is consistent with Islam and with the Iranian Constitution. According to Article 12 of the Iranian Constitution, the Expediency Council is also empowered to look into other issues "forwarded to them by the [Supreme] Leader."

13. Until he lost a bid for a new presidential term in 2005, Rafsanjani was widely considered to be the second most powerful figure in the Iranian government.  Certainly, he was the second most powerful figure from 1989 to 2005.  However, Rafsanjani appears to have had a serious falling-out with the Supreme Leader and with the radical conservative elements which have been consolidating power ever since Mahmoud Ahmadinejad's victory in the 2005 presidential election.  Rafsanjani retains his powerful posts but seems, in recent years, to have lost some of his influence.

14. Both Khamenei and Rafsanjani have long records of involvement in Iran's material support for terrorism.  Both Khamenei and Rafsanjani have been cited as key figures in numerous U.S. court cases finding Iranian state support for terrorism.  Both Khamenei and Rafsanjani were named by a German court in the "Mykonos case" as having been responsible for ordering the assassination of Iranian dissidents in Berlin.[1]

**The Relationship of Various Ministries to the Iranian Government**

15. The ministries in Iran bear much the same relationship to Iran's government as do the cabinet departments in the United States government: they are established by law, their heads are appointed by the president subject to confirmation by the parliament, their budgets are proposed by the president and approved the parliament, and their funding comes almost entirely from general tax revenues.  In short, their core functions are

---

[1] On September 17, 1992, three leaders of the Iranian Kurdish Democratic Party (KDP), Sadegh Sharafkandi, Fattah Abdoli, Homayoun Ardalan, and their translator, Nouri Dehkord, were assassinated in a restaurant called "Mykonos" in Berlin. On April 10, 1997, a German court found Kazem Darabi, an Iranian who worked as a grocer in Berlin, and a Lebanese man, Abbas Rhayel, guilty of the murders and sentenced them to life in prison.  Two other Lebanese, Youssef Amin and Mohamed Atris, were convicted of being accessories to the murders.  Amin was sentenced to 11 years imprisonment and Atris to five years and three months imprisonment.  The German court found that the order for the Mykonos killings came from top Iranian leaders, without identifying them by name.  Prosecutors had earlier implicated Iran's supreme leader, Ayatollah Ali Khamenei, and President Hashemi Rafsanjani.  The prosecution was met with protests by pro-Iranian nationalists.  The decision also caused European Union countries to withdraw their ambassadors from Tehran for several weeks.

governmental, and they are agencies within the government.  This description applies to, among others, the Ministry of Petroleum, the Ministry of Economic Affairs and Finance, the Ministry of Commerce, the Ministry of Information and Security ("MOIS"), and the Ministry of Defense and Armed Forces Logistics.

16. A closely related situation is that of the Islamic Revolutionary Guard Corps ("IRGC"), a military force parallel to the regular military.  The responsibilities and powers of the IRGC are described in the Iranian Constitution rather than in statutory law.  The IRGC reports directly to the Supreme Leader rather than to the president.  The IRGC strongly asserts its constitutional role as defender of the Islamic Revolution, which it interprets as meaning that it is not subject to parliamentary supervision in the same manner as are ministries.  Be that as it may, the IRGC is clearly a governmental agency whose core functions are governmental.

17. The Iranian government ministries are responsible for carrying out the policies of the Iranian government.  The Iranian government's policies include state support for terrorism.  Much of that state support is done through clandestine means.  While I am not aware of specific information about a role played by the Ministry of Petroleum, the Ministry of Commerce, or the Ministry of Economic Affairs and Finance in Iran's state support for terrorism, it is my opinion that it is quite likely that these ministries were involved in some ways in state support for terrorism generally and in support for al Qaeda and Hezbollah in particular.  The role of the Ministry of Economic Affairs and Finance in administering the state budget would mean that it has a key role in transferring state funds to many organizations and in verifying that state funds were properly used.  It

is my opinion that the Ministry had to have been involved in Iran's extensive financial support for terrorists generally and in support for al Qaeda and Hezbollah, in particular. Similarly, the Ministry of Commerce and the Ministry of Petroleum are closely involved in Iran's export/import trade and the shipping used for such trade.  On numerous occasions, what has purported to be normal commerce from Iran has been found instead to include shipments of weapons bound for terrorist groups.  In my opinion, the Ministries of Commerce and Petroleum must have been aware of the planning and logistics for such disguised shipments.

18. A separate but related case is Iran's Central Bank, whose name in the Persian language is Bank Merkazi Iran ("BMI").  Its core functions are quasi-governmental, but it is a corporation rather than an agency within the government.  The relationship between BMI and the Iranian government can be examined from the point of view of the legal framework, from actual practice, and from the perspective of economists:

19. In law, BMI is owned by and is tightly linked to the Iranian government.  Iran's 1972 Monetary and Banking Law ("MBL"), which is still in force, provides that BMI is a joint-stock company whose capital is "wholly owned by the Government," to quote the MBL's Article 10(e).

20. In practice, the Iranian government exercises tight control over BMI and ignores the law by issuing direct orders to the BMI.  That has been particularly true under the current Iranian government headed by President Mahmoud Ahmadinejad.  For instance, in practice, the BMI governor serves at the pleasure of the president, rather than for the five-year term specified in the MBL.  In 2008, BMI chief Tahmasb Mazaheri was dismissed

by presidential decree when he refused to resign.  Second, the government cabinet regularly votes at its meetings to order BMI to extend loans for specific purposes, which is contrary to the procedures set out in the MBL.

21. From the perspective of economists, BMI has less independence from the Iranian government than do the central banks in most developed countries.

22. Officials of terrorist groups, such as the Palestinian group Hamas, have described carrying tens of millions of dollars of cash notes in suitcases from Iran.  It is my opinion that it is quite likely that this money was assembled with a key role being played by BMI. Since BMI is the government's banker, the cash probably had to come from BMI.  In the developing countries I visited as an IMF official, it was a universal practice that politically delicate transactions were carried out directly by the Central Banks.  Even in the unlikely case that, in the case of HAMAS, the money came from a government account in a commercial bank, still, the BMI closely monitors foreign exchange dealings and would have almost certainly been well informed about a large shipment of cash. Furthermore, it is quite likely that BMI had other involvements in Iran's material support for terrorism generally and in support for al Qaeda and Hezbollah in particular, such as transferring funds via the banking system to Lebanon's Hezbollah.

23. Important roles in Iran's state support for terrorism were also played by MOIS, the IRGC, and the Ministry of Defense and Armed Forces Logistics ("MODAFL").  These are the main organizations through which Iran's material support for terrorism is conducted.  The first two are the main organizations through which Iran's material support for terrorism is conducted; MODAFL appears also to have a supporting role.

-11-

24. The United States courts have, many times, cited MOIS as a key instrument of the government of Iran for its material support of terrorist groups like Hizbollah.  In *Dammarell v. Islamic Republic of Iran*, 404 F. Supp. 261, 271-72 (D.D.C. 2005), the court found that through MOIS, Iran materially supported Hizbollah by providing assistance such as money, military arms, training, and recruitment.  In numerous cases, the federal courts have held that MOIS is a terrorist agency of the Iranian government; the following are only a few of many such cases: *Anderson v. Islamic Republic of Iran,* 90 F.Supp.2d 107, 112-13 (D.D.C.2000); *Jenco v. Islamic Republic of Iran,* 154 F.Supp.2d 27 (D.D.C. 2001); *Cronin v. Islamic Republic of Iran*, 238 F.Supp.2d 222 (D.D.C. 2002); *Peterson v. Islamic Republic of Iran*, 264 F. Supp.2d 46 (D.D.C. 2002); *Stern v. Islamic Republic of Iran*, 271 F. Supp. 2d 286 (D.D.C. 2003*); Salazar v. Islamic Republic of Iran,* 370 F.Supp.2d 105 (D.D.C. 2005); *Blais v. Islamic Republic of Iran*, 459 F.Supp.2d 40 (D.D.C. 2006).

25. In August 2007, the Washington Post reported that "The United States has decided to designate Iran's Revolutionary Guard Corps, the country's 125,000-strong elite military branch, as a "specially designated global terrorist," according to U.S. officials, a move that allows Washington to target the group's business operations and finances."[2]  In the end, only the Qods Force of the IRGC has been designated by the Treasury as a supporter of terrorism. "The Treasury Department also designated the IRGC-Qods Force (IRGC-QF) under E.O. 13224 for providing material support to the Taliban and other terrorist organizations."[3]

26. However, U.S. government officials frequently refer to the IRGC as involved in

---

[2] *See* http://www.washingtonpost.com/wp-dyn/content/article/2007/08/14/AR2007081401662.html
[3] *See* http://www.treasury.gov/press-center/press-releases/Pages/hp644.aspx

terrorism. For instance, in a speech in September, 2010, Stuart Levey (then Undersecretary of the Treasury for Terrorism and Financial Intelligence) said, "We have sanctioned the IRGC since 2007 because it actively supports terrorism and has long been involved in Iran's proliferation activities."[4] The Kyl-Lieberman Agreement (passed in the Senate September 29, 2007) states, "that the United States should designate the Islamic Revolutionary Guards Corps as a foreign terrorist organization under section 219 of the Immigration and Nationality Act and place the Islamic Revolutionary Guards Corps on the list of Specially Designated Global Terrorists, as established under the International Emergency Economic Powers Act and initiated under Executive Order 13224."[5] Current U.S. government sanctions against the entire IRGC are tied specifically to its proliferation-related activities, and not to support of terrorism.[6]

27. Like Iran's MOIS, the IRGC has been cited by U.S. courts for its role in materially supporting terrorism. *See e.g., Salazar v. Islamic Republic of Iran*, 370 F.Supp.2d 105 (D.D.C. 2005); *Prevatt v. Islamic Republic of Iran*, 421 F.Supp.2d (D.D.C. 2006); *Blais v. Islamic Republic of Iran*, 459 F.Supp.2d 40 (D.D.C. 2006).

28. Iran's MODAFL has been designated by the Treasury for proliferation-related activities, but the U.S. government does not have any sanctions in place related to MODAFL's ties to terrorist groups.[7] Iran's MODAFL is responsible for directing the regular armed forces, but regarding the IRGC, it has the more limited role of providing logistical support on items used both by the IRGC and the regular military, such as transport and

---

[4] *See* http://www.treasury.gov/press-center/press-releases/Pages/tg862.aspx
[5] *See* http://www.fincen.gov/statutes_regs/guidance/pdf/guidance_fi_increasing_mlt_iranian.pdf
[6] *See* http://www.treasury.gov/press-center/press-releases/Pages/hp644.aspx
[7] *See* http://www.treasury.gov/press-center/press-releases/Pages/hp644.aspx

communications equipment.  The IRGC fiercely guards its independence from control by

the executive branch, reporting instead directly to the Supreme Leader, and so the IRGC

as such does not come under MODAFL.  MODAFL has been designated by the Treasury

for proliferation-related activities, but the U.S. Government does not have any sanctions

in place related to MODAFL's ties to terrorist groups.

**The Relationship of Various Entities to the Iranian Government**

29. The Iranian government owns, directs, and/or controls many entities that have legal status

separate from the government and core functions that are not governmental.  Therefore,

such entities must be considered to be instrumentalities of the Iranian government.  Such

entities include: the National Iranian Tanker Corporation, the National Iranian Oil

Corporation, the National Iranian Gas Company, Iran Airlines, and the National Iranian

Petrochemical Company, all of which are sometimes referred to by slight variations on

the names given here.

30. Prior to 2004, all of the entities discussed here were wholly owned and controlled by the

government of Iran.  In 2004, article 44 of the Iranian Constitution was reinterpreted by

the government to permit privatization.  A law was passed that allowed 80 percent of

assets in state firms to be privatized. As authorized by that law, the Iranian government

announced plans to "privatize" most government-owned shipping companies,

petrochemical companies, and refineries.  For instance, on August 4, 2009, *Bloomberg*

*Business Week* reported:[8]

> The government of Iran has announced the privatization of
> 14 state-owned, giant companies, [state-owned] Press TV
> reported.  In compliance with the implementation of Article
> 44 of the Iranian constitution, the government has

---

[8] *See* http://investing.businessweek.com/research/stocks/private/snapshot.asp?privcapId=38329762.

announced the sale of 40% of government shares in 14
state-owned companies, including the National Iranian Gas
Company, National Petrochemical Company, Iran Air,
Iranian Oil Terminals Company, Iranian Tobacco
Company, National Iranian Oil Products Distribution
Company, and 10% of its shares in a number of oil
refineries, the Dolat reported. [The Dolat is a government
run, Persian-language news website. (Dolat.ir)]

31. The privatization process is not transparent; it is difficult to get information about which

firms have been or will be affected.  It would appear that many announced plans for

privatization were not put into effect.  In every case about which information is available,

the privatization has been a sham, with the shares being purchased by other companies –

such as pension plans of state-controlled firms and state-controlled banks – which

themselves are tightly controlled by the government.  In other cases, shares were sold to

politically well-connected people, and, in any event, key decisions about operations of

the firm continued to be made by Iranian government officials.  It is possible that the

Iranian government has transferred or sold some or the entire share in some of the firms

referred to here.  However, the record of such transfers to date has been that they do not

change the reality of Iranian government control.

32. *The National Iranian Tanker Corporation ("NITC").*  It is common knowledge among

experts in international banking and commerce, and it is my expert opinion, that the

National Iranian Tanker Corporation is, and has been since 1974, controlled by the

Islamic Republic of Iran.

33. *The National Iranian Oil Corporation ("NIOC").*  A November 26, 2008 press release,

entitled *OFAC Identifies Entities Owned or Controlled by the Government of Iran,*[9]

stated, "The U.S. Department of the Treasury's Office of Foreign Assets Control (OFAC)

---

[9] *See* http://www.treasury.gov/press-center/press-releases/Pages/hp1299.aspx.

has identified the National Iranian Oil Company . . . as [an] entity owned or controlled by the Government of Iran." That information is also available from analysts of Iran, such as Iran Watch, http://www.iranwatch.org/. Because of NIOC's role in material support of terrorism, OFAC has placed NIOC on its List of Specially Designated National and Blocked Persons ("OFAC SDN List").[10] As of 2001, The National Iranian Oil Corporation was wholly owned or controlled by the government of Iran.

34. *The National Iranian Gas Company ("NIGC")*. The National Iranian Gas Company was established in 1965 as one of the four principal companies affiliated with the Ministry of Petroleum of the Islamic Republic of Iran. It was initially capitalized with 25,000 million Rials of Iranian government money. Potential privatization information is not available. However, in 2010, Iran's Oil Minister, Masoud Mir-Kazemi, appointed a new managing director of the National Iranian Gas Company. *See* Fars News Agency, October 31, 2010; http://english.farsnews.net/newstext.php?nn=8808090642. Because the Ministry of Oil was able to appoint a new managing director for NIGC, this can only mean that the state continues to own, or at least control, the gas company. Moreover, the NIGC was placed on Great Britain's "Proliferation Concerns List" in February 2009, and it has been observed that revenues from an energy deal involving NIGC's export subsidiary, the National Iranian Gas Export Company, "will not only feed Iran's nuclear weapons program but help fund its terror proxies, Hamas and Hezbollah." *See* The Weekly Standard Blog, September 17, 2010; http://www.weeklystandard.com/blogs/why-switzerland-doing-irans-dirty-work-europe.

35. *The National Iranian Petrochemical Company ("NPC")*. A June 16, 2010 press release

---

[10] *See* http://www.treas.gov/offices/enforcement/ofac/sdn/t11sdn.pdf.

entitled *U.S. Treasury Department Targets Iran's Nuclear and Missile Programs*,[11]

states, "The National Petrochemical Company (NPC) is a subsidiary of the Iranian

Petroleum Ministry and is wholly-owned by the Government of Iran." Iran analysts

agree; *see* Iran Watch, http://www.iranwatch.org/. Because of NPC's role in material

support of terrorism, OFAC has placed NPC on its List of Specially Designated National

and Blocked Persons ("OFAC SDN List").[12]   As of September, 2001, The National

Iranian Petrochemical Company was wholly owned or controlled by the government of

Iran.

36. *Iran Airlines* was, for many years, wholly owned by the government of Iran.  I am not

aware of any information that the government of Iran has yet sold its shares in the

company, however, as noted earlier, the privatization program is not transparent.  In any

case, those firms privatized have remained under *de facto* government control.  Iran Air

has not been designated on the OFAC SDN List by the U.S. Government.  However,

there have been episodes in which Iranian agents who carried out acts of terrorism were

said to have left the country in which the act was perpetrated on Iran Air flights which

were specially held on the ground until the alleged perpetrator(s) could board the flight.

In addition, Iran Air runs a flight between Caracas and Tehran that does not sell tickets to

the general public.  It has been hypothesized that this flight may provide transport for

terrorists.  "According to the State Department's latest country report on terrorism, which

covers 2009, "President [Hugo] Chavez continued to strengthen Venezuela's relationship

with state sponsor of terrorism Iran.  Iran and Venezuela continued weekly Iran Airlines

flights connecting Tehran and Damascus with Caracas."  According to CNN, "Peter

---

[11] *See* http://www.treasury.gov/press-center/press-releases/Pages/tg747.aspx.
[12] *See* http://www.treas.gov/offices/enforcement/ofac/sdn/t11sdn.pdf.

Brookes, a former deputy assistant defense secretary, now with the conservative

thinktank Heritage Foundation, said passengers on the flight from Iran and Syria could

include "people who probably . . . are intelligence agents, probably Islamic Revolutionary

Guards forces, Quds force, even Hezbollah terrorists."[13]

**Hezbollah**

37. The most recent U.S. State Department Country Report on Terrorism, covering 2009,

describes Hezbollah, whose name it spells Hizballah, as follows:[14]

> HIZBALLAH: Hizballah was designated as a Foreign
> Terrorist Organization on October 8, 1997.  Formed in
> 1982, in response to the Israeli invasion of Lebanon, the
> Lebanese-based radical Shia group takes its ideological
> inspiration from the Iranian revolution and the teachings of
> the late Ayatollah Khomeini.  The group generally follows
> the religious guidance of Khomeini's successor, Iranian
> Supreme Leader Ali Khamenei.  Hizballah is closely allied
> with Iran and often acts at its behest, though it also acts
> independently.  Although Hizballah does not share the
> Syrian regime's secular orientation, the group has helped
> Syria advance its political objectives in the region.
> Hizballah remains the most technically-capable terrorist
> group in the world.  It has strong influence in Lebanon's
> Shia community.  The Lebanese government and the
> majority of the Arab world still recognize Hizballah as a
> legitimate "resistance group" and political party.  Hizballah
> provides support to several Palestinian terrorist
> organizations, as well as a number of local Christian and
> Muslim militias in Lebanon.  This support includes the
> covert provision of weapons, explosives, training, funding,
> and guidance, as well as overt political support.
> Activities: Hizballah's terrorist attacks have included the
> suicide truck bombings of the U.S. Embassy and U.S.
> Marine barracks in Beirut in 1983; the U.S. Embassy annex
> in Beirut in 1984; and the 1985 hijacking of TWA flight
> 847, during which a U.S. Navy diver was murdered.

---

[13] *See* http://articles.cnn.com/2010-08-21/world/venezuela.flights.iran_1_flights-islamic-revolutionary-guards-
syria/2?_s=PM:WORLD
[14] *See* http://www.state.gov/s/ct/rls/crt/2009/140900.htm.

> Elements of the group were responsible for the kidnapping,
> detention, and murder of Americans and other Westerners
> in Lebanon in the 1980s. Hizballah also was implicated in
> the attacks on the Israeli Embassy in Argentina in 1992 and
> on the Argentine-Israeli Mutual Association in Buenos
> Aires in 1994. In 2000, Hizballah operatives captured three
> Israeli soldiers in the Sheba'a Farms area and kidnapped an
> Israeli non-combatant . . . .

38. As that State Department report indicates, Iran has long had a close relationship with

Hezbollah. The U.S. Treasury Department's August 3, 2010 designations targeting the

IRGC Qods Force (IRGC-QF) stated, "Iran is the primary funder of Hizballah and has

long been recognized as the most active state sponsor of terrorism. . . . Hizballah is the

largest recipient of Iranian financial aid, training, and weaponry; and Iran's senior

leadership has cited Hizballah as a model for other militant groups."

39. Scholars friendly to Hezbollah have provided detailed accounts of Iran's preeminent role

in the creation of Hezbollah. In the early 1980's Iran encouraged – if not directed – those

most sympathetic to the Iranian revolution to form a radical faction within a broad

Lebanese Shiite movement known as Amal. At the direction of the Iranian government,

that faction then formally split off from Amal and became the separate organization

which adopted the name Hezbollah. Iran then provided Hezbollah with political,

material, and financial assistance, including funding that was well in excess of $25

million a year – by credible accounts reaching $100 million in some years during the

period 1985-2005.

40. Substantial Iranian support for Hezbollah continues to the present day. The State

Department Country Reports for 2008 on Terrorism stated, "In 2008, Iran provided more

than $200 million in funding to Lebanese Hizballah and trained over 3,000 Hizballah

fighters at camps in Iran."  In the 2007 State Department Country Report, the estimate of

Iran's annual expenditures estimated on Hizballah was a range of $100 million to $200

million, and the Report further stated:

> The Qods Force has a long history of supporting Hizballah,
> providing it with guidance, funding, weapons, intelligence,
> and logistical support.  The Qods Force operates training
> camps for Hizballah in Lebanon's Bekaa Valley and has
> reportedly trained more than 3,000 Hizballah fighters at
> IRGC training facilities in Iran.  The Qods Force provides
> roughly $100 to $200 million in funding a year to Hizballah
> and has assisted Hizballah in rearming in violation of UN
> Security Council Resolution 1701.  Through Qods Force
> material support to the Taliban, Iran is seeking to inflict
> casualties on U.S. and NATO forces.

41. As the above-quoted passage makes clear, the $100 million to $200 million figure is only

for direct support for Hizballah, not for Iran's total spending in support of terrorist

groups.

*Further the Affiant Sayeth Not.*

This Affidavit is comprised of 41 separately numbered paragraphs.

I, **PATRICK L. CLAWSON, PHD,** being duly sworn, do hereby swear and affirm under penalty of perjury that the contents of this Affidavit are true and correct to the best of my knowledge, information, and belief.

_____
            Patrick L. Clawson, PhD

Sworn to before me this the 5th day of August, 2011, in Washington, D.C.

_____
     *Notary Public*

G. Ron Sessoms
Notary Public, District of Columbia
My Commission Expires 11/14/2015

-21-