09-4958-cv
Doe v. Bin Laden



1  UNITED STATES COURT OF APPEALS
2
3  FOR THE SECOND CIRCUIT
4
5
6
7  August Term, 2010
8
9  (Argued: October 15, 2010        Decided: November 7, 2011)
10
11  Docket No. 09-4958-cv
12  _____
13
14
15  JOHN DOE, in his capacity as the executor of the estate of JANE DOE, in his personal capacity,
16  and as the personal representative of JANE DOE,
17
18  *Plaintiff-Appellee*,
19
20  — v. —
21
22  USAMA BIN LADEN, et al.,
23
24  *Defendants*,
25
26  ISLAMIC EMIRATE OF AFGHANISTAN, ALSO KNOWN AS ISLAMIC STATE OF
27  AFGHANISTAN,
28
29  *Defendant-Appellant*.
30  _____
31
32
33  Before: KEARSE, CALABRESI, WESLEY, *Circuit Judges*.

34      Appeal from an order of the United States District Court for the District of Columbia

35  (Roberts, *J.*), entered on September 30, 2008, denying without prejudice Appellant's motion to

36  vacate entry of default and to dismiss the complaint.  We AFFIRM and REMAND the case to the

37  United States District Court for the Southern District of New York for further proceedings.

38                              PAUL J. ORFANEDES, Judicial Watch, Inc.,
39                                  Washington, D.C., *for Plaintiff-Appellee*

STANLEY McDERMOTT III, DLA Piper LLP (David
S. Wenger, *on the brief*), New York, NY, *for
Defendant-Appellant*

Per Curiam:

Defendant-Appellant Afghanistan appeals from an order of the United States District Court for the District of Columbia denying without prejudice its motion to vacate entry of default and to dismiss the complaint. For the reasons explained below, we agree with the district court that Plaintiff-Appellee John Doe's suit is properly considered under the noncommercial tort exception to foreign sovereign immunity provided by 28 U.S.C. § 1605(a)(5). Because factual issues persist with respect to whether the Taliban's actions in allegedly agreeing to facilitate the attacks of September 11, 2001, are properly considered to be the action of Afghanistan and as to whether any such actions were "discretionary" under § 1605(a)(5)(A), we remand the case for jurisdictional discovery as requested by Afghanistan in the district court.

## Background

In January 2002, Plaintiff-Appellee John Doe[1] filed suit in the United States District Court for the District of Columbia, in his role as executor of the estate and personal representative of his wife Jane Doe, who perished in the terrorist attacks of September 11, 2001, as well as in his individual capacity. His complaint brought claims, arising from the events of that infamous day, of assault and battery, false imprisonment, intentional infliction of emotional distress, conspiracy, wrongful death and violation of the Anti-Terrorism Act, 18 U.S.C. § 2333.

On the conspiracy and wrongful death counts, Doe named among the defendants the nation of Afghanistan. He asserted subject matter jurisdiction under the Foreign Sovereign

---

[1] In December 2001, Doe moved for and was granted leave to file under a pseudonym.

Immunities Act ("FSIA"), 28 U.S.C. §§ 1330, 1602 *et seq.*, which provides subject matter jurisdiction for lawsuits against foreign governments only when one of several enumerated exceptions applies. *See Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 443 (1989) (noting that the FSIA is the "sole basis for obtaining jurisdiction over a foreign state" in U.S. courts). Doe rested his complaint against Afghanistan on § 1605(a)(5), known as the noncommercial tort exception.

Initially, Afghanistan did not respond to the suit, and in January 2003 the clerk of the district court entered a default against it. In February 2004, Afghanistan moved to vacate the entry of default and to dismiss the complaint against it for lack of subject matter jurisdiction. It argued that claims like Doe's, predicated on terrorist acts, can only be brought under the terrorism exception, § 1605A. That exception is not available against Afghanistan, all agree, because the State Department has not designated Afghanistan as a state sponsor of terrorism.[2]

In September 2008, the district court denied without prejudice the motion to vacate and dismiss, concluding that Doe's suit was properly cognizable under the noncommercial tort exception rather than the terrorism exception. The court concluded, however, that a definitive ruling on the existence of subject matter jurisdiction could not yet be made because two factual

---

[2] The terrorism exception provides:
> A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case not otherwise covered by this chapter in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

28 U.S.C. § 1605A(a)(1). The exception is only available against a nation that has been designated by the United States government as a state sponsor of terrorism at the time of the terrorist act. §1605A(a)(2)(A)(i)(I). Currently, only four states are so designated: Cuba, Iran, Sudan, and Syria. A list of designated states is available at http://www.state.gov/s/ct/c14151.htm (last visited October 11, 2011).

disputes remained: (a) whether the Taliban acted as the nation of Afghanistan when it allegedly entered the conspiracy alleged in the complaint and (b) whether any such action was "discretionary" within the meaning of § 1605(a)(5)(A). *Doe v. Bin Laden*, 580 F. Supp. 2d 93, 99 (D.D.C. 2008). The court therefore directed the parties to prepare for jurisdictional discovery, as Afghanistan had requested if its motion to dismiss were denied.

But rather than proceed with discovery, Afghanistan appealed the denial of its motion to the Court of Appeals for the District of Columbia Circuit. In November 2009, that court transferred the appeal and all pending motions to this Court. *Doe v. Bin-Laden*, No. 08-7117 (D.C. Cir. Nov. 24, 2009) (transferring the case under 28 U.S.C. § 1407, which governs the coordination of multi-district litigation).

## Discussion

"A district court's decision regarding subject matter jurisdiction under the FSIA is reviewed for clear error as to factual findings and *de novo* as to legal conclusions." *Swarna v. Al-Awadi*, 622 F.3d 123, 133 (2d Cir. 2010). The question before us now is purely a legal one: whether the noncommercial tort exception can be a basis for a suit arising from the terrorist acts of September 11, 2001.

As with any question of statutory interpretation, we start with the text. *Dobrova v. Holder*, 607 F.3d 297, 301 (2d Cir. 2010) ("[S]tatutory analysis necessarily begins with the plain meaning of a law's text and, absent ambiguity, will generally end there." (internal quotation marks omitted)). The text of the noncommercial tort exception of the FSIA provides jurisdiction for cases that (1) are noncommercial, (2) seek "money damages," (3) for "personal injury or death, or damage to or loss of property," (4) that "occur[ed] in the United States," and (5) that

was "caused by the tortious act," (6) "of [a defendant] foreign state or [its] employee . . . acting within the scope of his . . . employment," unless (7) the claim is based on a discretionary act or (8) it is for "malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights." 28 U.S.C. § 1605(a)(5).[3] There is no question that the first five requirements are present and that the last exclusion does not apply. *See Doe*, 580 F. Supp. 2d at 99. Specifically, there is no doubt that the terrorist acts giving rise to the harms at issue—aircraft sabotage, extrajudicial killing, and conspiracy to support the same—are all torts. Additionally, the complaint alleged nondiscretionary acts by employees of the foreign state within the scope of their employment. Compl. ¶¶ 21, 60–61. Therefore, at the pleading stage, the claim appears to fit within the noncommercial tort exception.

Afghanistan, however, urges us to shun this "plain language" reading. It argues for a narrow reading of the noncommercial tort exception under which the later-added[4] "terrorism exception" acts not as an *additional* basis of jurisdiction but as an implicit *limitation* on the already-existing jurisdiction conferred by the noncommercial tort exception. Allowing the noncommercial tort exception to govern would, the argument goes, let the plaintiffs "shoehorn a claim properly brought under one exception into another," which would violate the longstanding

---

[3] More fully, the relevant provision reads:
> A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case . . . [not encompassed in the commercial activities exception] in which money damages are sought against a foreign state for personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment; except this paragraph shall not apply to—
> (A) any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function regardless of whether the discretion be abused, or
> (B) any claim arising out of malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights . . . .

[4] Congress added the terrorism exception to the FSIA as part of the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104–132, § 221(a), 110 Stat. 1214, 1241–42 (1996).

judicial tradition in FSIA cases. *In re Terrorist Attacks on September 11, 2001*, 538 F.3d 71, 89 (2d Cir. 2008), *abrogated in part on other grounds by Samantar v. Yousuf*, 130 S. Ct. 2278 (2010).

But this conclusion can only be reached if one concludes that these claims "properly" belong under the terrorism exception and no other. And that conclusion, in turn, relies on the belief that to hold otherwise would leave the terrorism exception impotent because then no case would exist that is both (a) within the ambit of the terrorism exception and (b) not "otherwise covered by [the FSIA]." 28 U.S.C. § 1605A. That is, Afghanistan's argument for the narrow reading of the noncommercial tort exception rests on the factual premise that there exists no set of cases covered by the terrorism exception that fall outside the noncommercial tort exception. This premise is, however, demonstrably false.

To begin with, the very language of the statute undercuts the premise. The noncommercial tort exception applies only to injuries or damages "occurring *in the United States*." 28 U.S.C. § 1605(a)(5) (emphasis added). Accordingly, the noncommercial tort exception does not cover a wrongful death suit brought against a foreign state as the result of a bombing abroad. *E.g., Smith v. Socialist People's Libyan Arab Jamahiriya*, 101 F.3d 239, 246 (2d Cir. 1996) (affirming dismissal of a case against Libya for the bombing of Pan Am flight 103 for lack of subject matter jurisdiction, in part, because the bombing did not occur in the United States but over Scotland and hence could not be subject to the noncommercial tort exception). In contrast, this is precisely the type of wrong the terrorism exception encompasses: under that exception, no geographic limitation applies so long as the victim is a U.S. national, member of the U.S. armed forces, or U.S. government employee. 28 U.S.C. § 1605A(a)(2)(A)(ii).

A bombing abroad killing U.S. nationals is not only a paradigmatic example of terrorism, it is the precise—and only—example Congress cited when it originally added the terrorism exception to the FSIA.[5] The report from the House Committee on the Judiciary describes Section 804 of the Comprehensive Antiterrorism Act of 1995[6]—what would become the terrorism exception to the FSIA—as "*responding* to the tragedy of the Pan Am 103 bombing." H.R. Rep. No. 104-383, at 62 (1995) (emphasis added).[7] Clearly, the bombing of Pan Am 103 over Lockerbie, Scotland by terrorists affiliated with the Libyan government was not actionable under the noncommercial tort exception because neither the bombing nor the injuries "occurr[ed] in the United States." *Smith*, 101 F.3d at 246. But it did kill U.S. nationals. And, as such, it seemed to Congress to be a wrong demanding a remedy.

The history of the Pan Am 103 litigation in this very Court illustrates the work that can be done only by the terrorism exception even accepting a literal reading of the noncommercial tort exception. Applying the pre-amendment version of the FSIA, this Court correctly dismissed a suit brought by the estates of Pan Am 103 victims because the noncommercial tort exception failed to encompass the explosion occurring in Scottish airspace. *Smith*, 101 F.3d at 246. But

---

[5] Later, in 2001, Congress amended the terrorism exception to cover a specific case—the Iran hostage crisis. *See* Pub. L. No. 107-77, § 626(c), 115 Stat. 748, 803 (2001) (codified at 28 U.S.C. § 1605A(a)(2)(B)) (the amendment attempted to abrogate the Algiers Accord, which ended the hostage crisis and prohibited suit against Iran). Again, this is an example of a case to which the terrorism exception would apply and the noncommercial tort exception would not.

[6] The bill was later subsumed in, and became law as part of, the Antiterrorism and Effective Death Penalty Act of 1996. In 2008, Congress reorganized this section, moving the terrorism exception from 28 U.S.C. § 1605(7) to § 1605A with minimal substantive changes. Pub. L. No. 110–181, § 1083(b)(1)(A) (2008).

[7] Though Pan Am 103 was the only example given in the House committee report, Senators heard testimony from a survivor of a Nazi concentration camp, survivors of the 1985 kidnapping of faculty at American University in Beirut, and a civilian contractor who was abducted in Kuwait by Iraq during the first Gulf War, in addition to the Pan Am 103 victims' group. Foreign Sovereign Immunities Act: Hearing on S.825 Before the Subcomm. on Courts and Admin. Practice of the S. Comm. on the Judiciary, 103d Cong. 34–35, 55–57, 67, 77, 92–96 (1994). All of these incidents are examples of cases to which the terrorism exception would apply (if the foreign defendant state were designated as a state sponsor of terrorism) but which were (and continue to be) unactionable under the noncommercial tort exception.

after the addition of the terrorism exception—and in the first circuit court case to apply the new exception—a different panel allowed the refiled suit to go forward. It found that the terrorism exception supplied a new, sufficient, and constitutional source of jurisdiction over plaintiffs' wrongful death claims based on aircraft sabotage. *Rein v. Socialist People's Libyan Arab Jamahiriya*, 162 F.3d 748, 762–63 (2d Cir. 1998).[8]

All this is to say, Afghanistan's proposed narrow reading of the noncommercial tort exception would not so much be a reading of the statue as it would be a decision that the terrorism exception amounts to a partial repeal by implication of the noncommercial tort exception. Prior to the terrorism exception's enactment, several courts had allowed suits against foreign governments under the noncommercial tort exception for tortious—and arguably "terrorist"—acts occurring in the United States. For example, in *Liu v. Republic of China*, 892 F.2d 1419, 1425 (9th Cir. 1989), the Ninth Circuit allowed the widow of a man killed by Taiwanese intelligence forces in California to maintain a wrongful death action against the Taiwanese government. Similarly, in *Letelier v. Republic of Chile*, 488 F. Supp. 665, 674 (D.D.C. 1980), the district court permitted a wrongful death suit against the Chilean government for its alleged role in a car bombing in the District of Columbia. Under the narrow reading of the noncommercial tort exception urged by Afghanistan, both these cases would now be barred (unless Taiwan and Chile were designated state sponsors of terrorism) because the alleged acts constitute extrajudicial killings, i.e., acts specifically listed in the terrorism exception.[9] Were the

---

[8] The Iran hostage crisis had a similar history in the D.C. Circuit, where the case was initially dismissed for want of subject matter jurisdiction and then later revived after the addition of the terrorism exception. *See Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 230 (D.C. Cir. 2003) (recounting the history of the Iran hostage crisis litigation).

[9] "[T]he term 'extrajudicial killing' means a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples. Such term, however, does not include any such killing that, under

narrow reading correct, the enactment of the terrorism exception would therefore have constituted a repudiation of the then-prevailing interpretation of the noncommercial tort exception.

But such an implicit repudiation runs against all canons of interpretation. "Congress is presumed to be aware of a judicial interpretation of a statut[ory section]" and partial amendment of a statute without touching the previously interpreted section "constitutes an implicit adoption of [the prior] interpretation," absent a clear indication to the contrary. *Elkimya v. Dep't of Homeland Sec.*, 484 F.3d 151, 154 (2d Cir. 2007); *cf. Handberry v. Thompson*, 446 F.3d 335, 345 (2d Cir. 2006) ("'Absent a clearly established congressional intention, repeals by implication are not favored. An implied repeal will only be found where provisions in two statutes are in irreconcilable conflict, or where the latter Act covers the whole subject of the earlier one and is clearly intended as a substitute.'" (quoting *Lockhart v. United States*, 546 U.S. 142, 149 (2005) (internal alteration omitted))).

In the debate surrounding the adoption of the terrorism exception, these prior cases were explicitly discussed, so Congress was actually, and not just presumptively, aware of their existence, yet no one even suggested—let alone argued—either that they were incorrectly decided or that the proposed amendment would overturn their reasoning. *See Foreign Sovereign Immunities Act: Hearing on S.825 Before the Subcomm. on Courts and Admin. Practice of the S. Comm. on the Judiciary* ("Senate Hearing"), 103d Cong. 82 (1994) (discussing these cases).

In this same vein, were Afghanistan's proposed narrow reading correct, the enactment of the terrorism exception would represent a contraction rather than an expansion of jurisdiction

---

international law, is lawfully carried out under the authority of a foreign nation." 28 U.S.C. § 1350 note (incorporated by reference in 28 U.S.C. § 1605A(h)(7)).

over foreign states. The legislative history of the terrorism exception, however, suggests just the opposite. When the basic structure of the terrorism exception was first debated in Congress in 1992 and again in 1994, the House Committee Report explained that the provision was "necessary to clarify and *expand* the circumstances in which an American . . . can bring suit in U.S. courts against a foreign government under the FSIA." H.R. Rep. No. 103-702, at 3 (1994) (emphasis added); *accord* H.R. Rep. No. 102-900, at 3–4 (1992). Similarly, the report on the provision that would go on to become the terrorism exception twice explained that it would amend the FSIA to "grant" jurisdiction. H.R. Rep. No. 104-383, at 41, 62 (1995). Both supporters and opponents of the bill thought it would "expand the [then-]present jurisdiction of [the] courts" to cover claims arising outside the United States. Senate Hearing at 2 (statement of Sen. Heflin, supporting the bill); *see also id.* at 86–87 (statement of Sen. Thurmond, opposing the bill).

Additionally, and even apart from the noncommercial tort exception's plain text and this legislative history, application of the familiar canon of construction *expressio unius est exclusio alterius* to the noncommercial tort exception supports the broad reading. *See Greene v. United States*, 79 F.3d 1348, 1355 (2d Cir. 1996) ("The ancient maxim *expressio unius est exclusio alterius* (mention of one impliedly excludes others) cautions us against engrafting an additional exception to what is an already complex [statute]."). The noncommercial tort exception excludes from its scope "any claim arising out of malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights." 28 U.S.C. § 1605(a)(5)(B). Noticeably absent from this list are the torts listed in the terrorism exception—"an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act." 28 U.S.C. § 1605A(a)(1). But, Afghanistan would have us, in effect,

narrow the noncommercial tort exception precisely by adding these additional torts to the § 1605(a)(5)(B) list of excluded torts. Had Congress wished the § 1605(a)(5)(B) list to include those torts, it could easily have added them to that list itself.

The text, history, and purpose of the statute make clear that the statute does not counsel a narrow reading. All this makes clear that there is a set of cases outside the scope of the noncommercial tort exception to which the terrorism exception can apply. But are there not also cases that seemingly are covered by both exceptions, and does not their existence lend some support to the narrow reading? Why would Congress create two exceptions covering the same wrong? One exception usually should take precedence over the other.

There are, of course, just such overlaps. But, Congress has expressly provided in the statute for how to determine which exception dominates. It did so by *limiting* the terrorism exception to "any case not otherwise covered by [the FSIA]." 28 U.S.C. § 1605A(a)(1). In other words, Congress expressly stated that the terrorism exception should only apply when the preexisting exceptions failed to cover a case. That means that while a plaintiff may not "shoehorn a claim properly brought under one exception into another," *In re Terrorist Attacks*, 538 F.3d at 89, an explicit statutory command as to which exception rules in cases of overlap resolves the issue. The existence of the "not otherwise covered" language in § 1605A(a)(1) makes pellucid beyond doubt that the terrorism exception, far from limiting the preexisting noncommercial tort exception, is there to cover some injuries that the noncommercial tort exception does not reach. Accordingly, we hold that the statutory text does not support Afghanistan's proposed narrow reading of the noncommercial tort exception, and that the

terrorism exception, rather than limiting the jurisdiction conferred by the noncommercial tort exception, provides an additional basis for jurisdiction.[10]

\* \* \*

Let us be clear: we make no judgment as to whether the allegations in the complaint are sufficient to state a claim or even to provide jurisdiction. Indeed, the district court had ordered further discovery to provide for fact finding with regard to whether the alleged acts were attributable to Afghanistan and whether they were discretionary. *Cf. In re Terrorist Attacks on September 11, 2001*, 392 F. Supp. 2d 539, 555 (S.D.N.Y. 2005) (dismissing similar claims against Saudi Arabia after finding the alleged acts encompassed in the discretionary-acts exception to the noncommercial tort exception once jurisdictional discovery produced documents supporting that exception). What we decide today is simply that limited discovery to determine whether jurisdiction exists should proceed.

## Conclusion

We AFFIRM the ruling of the district court and REMAND the case to the United States District Court for the Southern District of New York for further proceedings consistent with this opinion.

---

[10] We recognize that this holding is inconsistent with that reached by a different panel of our Court in *In re Terrorist Attacks on September 11, 2001*, 538 F.3d 71, 89 (2d Cir. 2008), *abrogated in part on other grounds by Samantar v. Yousuf*, 130 S. Ct. 2278 (2010). That panel, however, was presented with sparse and one-sided argument on this point in the context of a very large and complex case that focused on other aspects of the FSIA. This opinion has been circulated to the members of that panel as well as all active judges on our Court, and we have received no objection to our issuing this opinion. *See Shipping Corp. of India v. Jaldhi Overseas Pte*, 585 F.3d 58, 67 & n.9 (2d Cir. 2009) (explaining this "*mini-en banc*" procedure).