16N4TERC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   IN RE:  TERRORIST ATTACKS
    ON SEPTEMBER 11, 2001                03MDL1570(GBD)(FM)
4
    ------------------------------x
5
                                         June 23, 2011
6                                        11:35 a.m.

7   Before:

8                       HON. FRANK MAAS

9                                        Magistrate Judge

10                      APPEARANCES

11  ANDERSON KILL & OLICK
         Attorneys for O'Neill Plaintiffs and PECs
12  JERRY S. GOLDMAN

13  COZEN O'CONNOR
         Attorneys for Federal Insurance Plaintiffs and PECs
14  SEAN P. CARTER
    J. SCOTT TARBUTTON
15
    MOTLEY RICE
16       Attorneys for Burnett Plaintiffs and PECs
    ROBERT T. HAEFELE
17
    CLIFFORD CHANCE
18       Attorneys for Defendant Dubai Islamic Bank
    BY:  RONI BERGOFFEN (via telephone)
19
    McMAHON & ASSOCIATES
20       Attorneys for Defendants IIRO, MWL and Wa'el Jelaidan
    BY:  MARTIN McMAHON (via telephone)
21
    STEVEN BARENTZEN (via telephone)
22       Attorney for Defendant Jamal Barzinji

23

24

25

16N4TERC

1              (Case called)

2              THE COURT:  Good morning.  I have the joint letter

3    that's dated June 20, 2011.  I had suggested that, I think I

4    had suggested that at this conference we would raise the

5    subject of interrogatories or I may have had said it on the

6    April 12 conference.  But I gather both sides have agreed to

7    table that issue.  I also noticed that, I guess we did it by

8    design, the next scheduled conference is July 12, but then

9    there is a conference if it is to be held before Judge Daniels

10   on July 13.  I wonder if that makes sense.  I guess, I don't

11   know, perhaps you have not yet discussed whether there will be

12   a July 13 conference before Judge Daniels.

13             MR. GOLDMAN:  It's the plaintiffs' position that there

14   should be a conference on July 13.  There are certain matters

15   that are ripe for Judge Daniels to act on and we would like to

16   address those.

17             THE COURT:  The thought must have been that if the

18   issues I take up that perhaps he can deal with the following

19   day, was that the thinking or was it just accidental that we

20   ended up with potentially you folks making two trips or staying

21   overnight.

22             MR. CARTER:  Your Honor, I think it was accidental.  I

23   do believe at some point we noticed that we had these

24   consecutive dates and intended to propose that we try to

25   consolidate them on July 13.

      SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

1           THE COURT:  Why don't I just say that we will do what

2      we did perhaps in the first joint conference; I think it was

3      the second that Judge Daniels and I had.  Namely, if he holds a

4      conference, after he is done I will sit down with you to deal

5      with whatever issues remain.  Alternatively, if he cancels his

6      conference and there is a need for one before me, we will just

7      hold it at 10:00, the time he had indicated.  I gather that the

8      disputes with Dr. Barzinji and his clients have been resolved.

9           MR. CARTER:  That's correct, your Honor.  We have

10     provided a signed agreement that concludes all matters to Mr.

11     Barentzen who will then circulate it with his clients.

12          THE COURT:  If the message was whether Mr. Barentzen

13     needs to be on the phone, today if that's the status, I guess

14     the answer is not any longer.

15          MR. BARENTZEN:  I may just listen in anyway; thank

16     you, your Honor.

17          THE COURT:  Sure.

18          MR. BARENTZEN:  I don't know how long it will last; I

19     might listen in anyway just in case.

20          THE COURT:  No problem.

21          MR. BARENTZEN:  Your Honor, pursuant to the agreement,

22     you should be expecting stipulations of dismissal dismissing

23     plaintiffs' claims against not just Dr. Barzinji against but

24     all of our clients within the next few days.

25          THE COURT:  That should go to Judge Daniels unless

 1   there is 636(c) language in the stipulation.

 2            I guess that brings us, Mr. McMahon, to the issues

 3   raised in the letter which I know you take the view are not yet

 4   ripe related to IIRO and the Muslim World League.  Putting

 5   aside the question of ripeness as to some of the detail, one

 6   fairly simple directive was that 8 categories of documents were

 7   to be produced within 30 days.  I take it the plaintiffs take

 8   the view that that didn't happen.

 9            I know at one of the last two conferences, I think it

10   was the April 26 one, I said we are really at the stage where

11   you need to sit down with your clients in Saudi Arabia and hold

12   their hands while they go through those 8 categories.  I guess

13   I am curious whether you have been to the kingdom since that

14   session.

15            MR. McMAHON:  Well, your Honor, just to bring you up

16   to speed, I received a very antagonistic email from Sean Carter

17   concerning his level of frustration.

18            THE COURT:  More antagonistic than his letter of June

19   16; I am just trying to get the scale.

20            MR. McMAHON:  Well, your Honor, I replied, because I

21   am somewhat older, in a very conciliatory manner and said,

22   Sean, I am equally frustrated.  I don't read Arabic.  I

23   wouldn't have sent you four indexes, two of which were

24   duplicative, had I known about it.  I don't understand the

25   erosive indexes because they are in Arabic.  So if you are

1   unsatisfied with the indexes, there not much I can do about it.

2            Your Honor, here is the suggestion I make.  He doesn't

3   read Arabic.  I don't.  Why doesn't he have his Arabic guy who

4   feels that we are frustrating the process, I gather, plug into

5   our Arabic guy, Mr. al Rahdi, either through Skype or sit down

6   in London with him for three days and just have an entire

7   agenda the indexes for IIRO-SA, we are claiming this, the

8   indexes don't work, and have Mr. al Rahdi explain what the

9   indexes are and why he believes they do work.

10           I would propose before that happens, that Sean and I

11  prepare an agenda and say these are all the big issues, for

12  example, how come they are dissatisfied with the Arabic

13  indexes, the IIRO-SA warehouse, certainly we can narrow that

14  issue, and lay out everything that they are dissatisfied about,

15  your Honor.

16           THE COURT:  Let me interrupt.  Correct me if I am

17  wrong.  The indices are a separate issue from the 8 categories

18  of documents.

19           MR. McMAHON:  Right.  I am referring to Sean's recent

20  email to me.

21           THE COURT:  But I want to focus first on the 8

22  categories of documents that I think on April 12 I said needed

23  to be produced in 30 days, and wholly apart from issues with

24  the indices, those were intended to be focused requests, and I

25  gather they have been kicking around for a very long time.

    SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

1              MR. McMAHON:  Your Honor, we now have prepared for the

2    MWL and for IIRO-SA specific responses for those 8 categories.

3    I can shoot Sean an email this afternoon.  I want to get back

4    to your earlier question.

5              THE COURT:  When you say responses, I am not clear

6    whether you are talking about a formal response to those 8

7    categories or documents responsive or both.

8              MR. McMAHON:  Both, your Honor.  We want to show

9    Mr. Carter that this is what we sent you for 1 through 8 for

10   the Muslim World League, this is what we sent you 1 through 8

11   for IIRO-SA.

12             THE COURT:  So I understand, you are not producing

13   additional documents.  You are basically saying among the

14   documents we previously produced, X is responsive to request

15   number 1, Y is responsive to request number 2.

16             MR. McMAHON:  No, your Honor, we have been producing

17   and we just got in some more documents, we have had an ongoing

18   production, Mr. Carter is not satisfied with it, but there has

19   been an ongoing production, for example, on orphan records, the

20   52,000 orphans.

21             THE COURT:  Their letter said they don't want orphan

22   records, so why are we talking about producing even 12 orphan

23   records.  They have made it clear they could care less which

24   orphans got $2 a month in exchange for their fingerprints.

25             MR. McMAHON:  I thought they wanted the list of the

     SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

1    orphans and we can't just push a button in the computer and

2    that spits itself out; we have to go in and do the hard copies.

3         THE COURT:  Let's clear that up.  Mr. Carter, whoever

4    wants to chime in, do you want the list of orphans?

5         MR. CARTER:  Your Honor, we don't.  We discussed this

6    very issue at the April 12 hearing.  We had a colloquy with the

7    court during which you said, I take it you don't want the

8    orphan records, and we said, correct, your Honor.  We followed

9    up with emails subsequently making clear that we don't want the

10   orphan records.  So the fact that we are continuing to have

11   this same discussion is a source of frustration.

12        MR. McMAHON:  I just didn't want the record to reflect

13   that we didn't put together these orphan records because at

14   some point I thought they were looking for the beneficiaries of

15   IIRO-SA distributions worldwide.

16        THE COURT:  At some point they were, but since April

17   they haven't been, and I think one of my orders may even have

18   said excluding orphan records or maybe I am not recalling that

19   accurately.  So I don't understand why in late June we are

20   talking about the orphan records.

21        MR. McMAHON:  If it's no longer an issue, that's

22   great.  I want to get back to your question to me.  You don't

23   know this, I put this into the email to Sean, that until some

24   document is signed by the Saudi government with the charities,

25   the charities are unable to send any moneys out even for

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

1   attorney fees, so I am way behind on payment of attorney fees

2   and they can't even send me money for an airplane ticket and I

3   just can't finance that, your Honor.

4          I want to make sure you understand on the record that

5   they are frustrated because the kingdom will not allow them to

6   send out funds until such time a certain document is signed.  I

7   have spoken with or emailed with the kingdom's attorney,

8   Michael Kellogg, and he is trying to help me on that issue.

9   But until such time that that's resolved, I couldn't go over

10  there.

11         We have been on Skype with Mr. al Rahdi a great deal

12  in the interim.  I think we have narrowed our differences.  I

13  also sent a couple of emails to Sean about the fact that we

14  received in these banking records for IIRO-SA, but they are

15  very lightly printed, so I said do you have somebody come down

16  and just go through this and see if you want to take a shot at

17  copying all the banking records for IIRO-SA.

18         We also had another file.  The reason I am not up

19  there today, we have a translator in today.  They can't even

20  afford to pay for a translator, so this is coming out of my

21  pocket again.  I want to spend some time with the translator to

22  see what other documents we just received in.  I think they are

23  very responsive.  And as I say, at the close of business today,

24  I was going to send Sean an email saying these are the new

25  records we got in.

1        THE COURT:  Let me just interrupt.  I understand part

2  of the difficulty is that you have not been to the kingdom.  I

3  am not suggesting that you need to invest your own money in the

4  case.  Quite the opposite; I think that privately retained

5  attorneys are entitled to be paid, and I have never kept in a

6  case an attorney who was not getting paid who wished to exit a

7  case.

8        But whether it's because of Saudi regulations or

9  whatever, documents were not produced on a schedule which is

10  consistent with my order which was that these 8 narrow

11  categories were to be produced within 30 days, I think 30 days

12  of April 12.  I am pretty sure it was as of April 12.  Even it

13  was April 26, we are still more than a month beyond the

14  deadline for the 8 narrow categories.

15        So it seems to me, and you are telling me that after

16  the conference rather than shortly before the conference, you

17  are going to be getting back to Mr. Carter, which basically

18  means there is no way to know what the outcome of that would be

19  today.  So I guess I somewhat share plaintiffs' frustration.

20  One thing that your clients ought to be concerned about is that

21  I can't worry about issues like Saudi approvals for attorney

22  fees.

23        What inevitably may happen in this case is that if

24  responsive documents are not produced, and Mr. Carter and his

25  colleagues are able to show that the documents exist and should

    SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

1   be produced, some of the tenor of what they said in the prior

2   conferences suggests to me that they may have specimens of

3   documents from whatever sources that enable them to show that

4   there are categories of reports that exist, which at least as

5   of now have not been produced.  If they make a sufficiently

6   persuasive showing, your clients may be faced with the prospect

7   that I issue case-dispositive sanctions.

8          So, I will let you finish talking but I just wanted

9   you to understand my concerns and where we collectively may all

10  be headed.  Go on.

11         MR. McMAHON:  I appreciate that, your Honor.  You have

12  always being struck me as being a very level-headed guy and you

13  are trying to satisfy the plaintiffs' needs and you are

14  cognizant of the fact that we are dealing with a foreign

15  country.  What my point is that we have produced everything

16  that was called for in terms of the 8 categories for both MWL

17  and IIRO-SA and we now have that format.  I am going to send

18  that to Mr. Carter in about an hour or so.  I am waiting on our

19  translator to tell me some other things, but we can certainly

20  get that to him.

21         That is our position that we have complied.  I

22  apologize.  It was not timely in terms of if you set this down

23  for 30 days.  Mr. al Rahdi is just super overworked.  He can't

24  get the resources he needs to do all sorts of stuff.  He's been

25  killing himself.  He has produced a ton of things.  I have sent

16N4TERC

1    also an email to Sean asking him about an initial production

2    and he said it just wasn't a good production.  Well, I can't

3    deal with that; what does that mean.

4           Your Honor, I am fully cognizant of where you are

5    heading and I have tried to apprise my clients of that.  In

6    fact, this morning I sent an email to IIRO-SA about the

7    prospects of my having to withdraw.  I don't really want to do

8    that, your Honor.  I know even though Sean may vigorously

9    disagree, I know our guys are not hiding the ball.  That's why

10   I was hoping a meeting between their Arabian guy and my guy can

11   get to that and hopefully Sean's man will tell them that he is

12   not hiding the ball.

13          It may not be the sharpest discovery process in the

14   world, they don't have a legal background, but that's a

15   different issue.  It's our position we produced everything now,

16   albeit late.  I apologize for that.  There are just so many

17   complicated factors dealing with that kingdom over there and

18   Mr. al Rahdi, and it's just been very, very difficult.

19          That's our position.  We produced, albeit we produced

20   late, I apologize, and we are in an ongoing production process.

21   I think we have now sent out 6,000 pages of financial records.

22   We are in an ongoing discovery process.  The last I heard was

23   that he was going to approach the court I guess about issuing

24   some sanctions, but I didn't see a motion, your Honor, and I

25   wasn't sure what was going to be discussed today.

1          THE COURT:  One of the allegations in Mr. Carter's

2     letter is that somebody in effect manufactured documents by

3     cutting and pasting from other documents.  Have you discussed

4     that with Mr. al Rahdi or somebody else on behalf of your

5     clients?

6          MR. McMAHON:  I think I discussed that, your Honor.

7     If he's referring to the Muslim World League committee, I am

8     sorry, the central council, whatever it was --

9          THE COURT:  The constituent council.

10          MR. McMAHON:  Yes.  I think we got those off the MWL

11     website.  There was no cutting and pasting.  We got it off the

12     MWL website as the easiest way to get all this stuff, at least

13     that category.  No, we didn't do that and we didn't create

14     documents as Mr. Carter maintains to show that we produced

15     documents.

16          MR. CARTER:  Your Honor, as an initial matter, I am a

17     little unclear as to Mr. McMahon's position, because at certain

18     points I think he represented that it's the view of the Muslim

19     World League and the IIRO that they have now produced all

20     documents responsive to the 8 categories and then there were

21     references to it being an ongoing production.  One of the

22     reasons we wanted to come here today was to get some

23     clarification on the record as to whether the defendants

24     believe they have produced everything responsive to the 8

25     categories.

 1              THE COURT:  Mr. McMahon.

 2              MR. McMAHON:  Yes, your Honor.  To reiterate, we

 3    believe we have produced everything we have that is responsive

 4    to 1 to 8 for MWL and IIRO-SA, but there are other documents

 5    out there that they have been requesting like banking records.

 6    We are still working on that.  We will be getting them up to

 7    Mr. Carter as soon as the translator finishes up with the

 8    latest package.

 9              MR. CARTER:  The banking records were part of the 8

10    categories.

11              THE COURT:  I was just about to say that myself.

12              MR. McMAHON:  Well, we now have, your Honor, I don't

13    know what's officially under banking records definition, but we

14    now have a complete printout on IIRO-SA's bank accounts,

15    although that's the document I made reference to that's kind of

16    light in ink, so I suggest he send his man down here and look

17    at that document.  But the problem is, your Honor, there is one

18    guy, Mr. al Rahdi, who has been dumped upon to do all this

19    massive work.

20              That's why I made the suggestion, come to Jeddah, send

21    your man to London.  I told Mr. Carter, you are so concerned

22    about how an MWL office operates, visit the one in London.  I

23    am frustrated.  I think it's all there.  It's a matter of

24    collating everything.  He is just swamped with this enormous

25    request.  He doesn't read English as he should; he is OK but

1    not that proficient.

2              THE COURT:  You know, they may have to assign other

3    folks to help on the project of producing documents.  I assume

4    at this stage that plaintiffs' counsel are interested in the

5    documents, but if we are not at this stage yet, my sense is

6    certainly we are going to get there shortly, where they will

7    forgo the documents in exchange for a judgment, based either on

8    the fact that these entities don't have counsel, should it come

9    to that stage, or that the entities have been shown not to have

10   produced all of the documents that are responsive to the

11   requests.  The fact that they have one guy trying to produce

12   everything is interesting but not exculpatory in relation to

13   that.

14             MR. CARTER:  Your Honor, I think I should probably

15   address what is a pattern of behavior that's manifesting itself

16   again in the lead-up to this conference.  Mr. McMahon mentioned

17   to you that he would be sending to me later today a chart

18   reflecting what they thought they had produced.  He in fact

19   sent me something to that effect yesterday.  It references

20   wholesale categories of documents that are just being mailed.

21             What we encounter every time we run into a problem

22   with the IIRO and the Muslim World League is that as soon as we

23   go to the step of moving the court to compel, we have a

24   hearing, we get a flood or trickle of some responsive documents

25   but not a complete production.  The ball keeps moving.  We keep

          SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

1    talking about this conversation with Mr. al Rahdi.  We have

2    been through that territory before.

3           With regard to the constituent council records, they

4    were not produced as pulled from a website as Mr. McMahon

5    suggested.  They have been copied over into some kind of Word

6    document.  In that process, these documents, the Arabic records

7    words have been transposed so they no longer are legible.  That

8    was what clued us into the fact that they had been created.

9    There is no way for us to tell in this format whether they are

10   authentic, whether they are original.

11          We do know from our independent investigations about

12   these constituent council meetings that a handful of press

13   releases and meeting minutes do not represent anything close to

14   a complete production of the documents that are created for

15   purposes of these meetings.

16          We just keep running into the same problems and that

17   is what motivated us in the first place to move to compel some

18   very specific categories of documents and to try to set a

19   timeline so we would have some way to crystallize this issue

20   which I think is becoming crystallized.

21          There is a concern that your Honor acknowledged with

22   Mr. al Rahdi being the only person searching for responsive

23   records.  That's a double concern because you are dealing not

24   only with two organizations but with two organizations with

25   offices not only throughout Saudi Arabia but throughout the

1    world.  So I am not really sure how it would be feasibly

2    possible for Mr. al Rahdi to single-handedly conduct a search

3    for responsive documents.  It seems impossible.

4            MR. McMAHON:  Your Honor, in his affidavit Mr. al

5    Rahdi had pointed out that he had I believe two or three

6    individuals who were assisting him.  I don't want to have this

7    come across as he's the only individual; he is overseeing the

8    process.

9            THE COURT:  I thought that was in relation to

10   generating the index rather than necessarily harvesting

11   documents; do I recall that incorrectly?

12           MR. McMAHON:  I am sorry, your Honor?

13           THE COURT:  I thought that the reference to two or

14   three other people was that there was a team that was

15   generating this large master index of files.  I don't remember

16   there being a reference to the team harvesting documents.

17           MR. McMAHON:  You may be right, your Honor.  I think

18   what we were making reference to is that Mr. al Rahdi had

19   discovered 6,000 folders that were responsive on the Muslim

20   World League side to the document requests, 6,000 folders, your

21   Honor.  It's going to cost a fortune to do that.  I think

22   that's what he's making reference to.  So perhaps you are

23   right, your Honor.

24           MR. CARTER:  Your Honor, one issue that shouldn't be

25   lost in the conversation about the 8 categories is that the

      SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

1    court issued a subsequent order on April 27, directing the IIRO

2    to produce documents relating to other unrelated issues,

3    distinct from the 8 categories.  Those included records

4    relating to Mohammed Jamal Khalifa, another individual named

5    Wa'el Jelaidan, and the director named al Mujil.

6         Since the April 27 order was issued there has been

7    absolutely no production relative to any of those issues.  So

8    there has been a focus on a few discrete aspects of the 8

9    categories.  We don't think that that is complete.  There has

10   been nothing as to the other order.

11        Adding to the problems, Mr. McMahon suggested there

12   was a conciliatory tone.  What there wasn't was any outreach to

13   us in advance of any of the expirations of these deadlines at

14   all to let us know that there was going to be a problem, to let

15   us know that they were not going to be able to comply with the

16   court's order.  It's all after the fact and only after we

17   invest the time and effort to come before the court again on an

18   issue that really should have been put to bed.

19        THE COURT:  What I am inclined to do is to put this

20   over to the July 12 or 13 conference.  I think I have made my

21   position clear which is that if a persuasive showing can be

22   made that MWL and IIRO have not fully complied with the rulings

23   that I made on April 12 and April 26, those organizations may

24   be facing a more formal motion that I would entertain which if

25   my recommendation were to be accepted by Judge Daniels might

1   lead to the entry of default judgments against those

2   organizations.  By the same token, if you are not getting paid

3   and move to withdraw on another route, they could end up in the

4   same position.

5           So I am inclined to put this off because there is not

6   much point in my simply saying you really have to comply with

7   orders that I last time and the time before said you really

8   have to comply with.  But really the burden is it seems to me

9   on your clients, Mr. McMahon, to establish that they have

10   complied, putting aside questions of timeliness of the

11   compliance.

12           I don't think I said it before, but as far as I am

13   concerned anything that is produced by anybody needs to be

14   Bates-stamped because it's difficult enough that we are dealing

15   with documents in Arabic and there may be translations down the

16   road, if we have piles of documents that are not Bates-stamped,

17   this is rapidly going to spin even more out of control than it

18   may be now.

19           MR. CARTER:  Your Honor, we have a double problem with

20   regard to Bates-stamping as far as the IIRO is concerned.

21   There were documents produced without Bates stamps.  Then there

22   was another production which repeated Bates stamps that were

23   used in an earlier production with regard to different

24   documents.  So for instance, I directed Mr. Haefele to a

25   particular Bates stamp the other day and he was looking at a

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

1   document from a 2008 production and I was looking at a document

2   from 2011.  So we have this very difficult problem.

3        THE COURT:  Was there an order originally from Judge

4   Casey or whoever that said everything was to be Bates-stamped;

5   was that part of one of the case management orders?

6        MR. CARTER:  I don't recall it being part of the case

7   management orders; I know that it has been our practice on the

8   plaintiffs' side.

9        THE COURT:  What I am going to do is issue an order

10  that says that all productions to the extent feasible, and by

11  that I mean technologically feasible not in terms of manpower,

12  will be Bates-stamped with non-repetitive numbers.  Mr.

13  McMahon, if your clients have produced un-Bates-stamped

14  documents or documents which bear numbers that have previously

15  been used, they are going to have to reproduce those documents

16  with a new set of Bates numbers that don't use the same Bates

17  numbers for two discrete documents.

18        And I will expect that that also will have been

19  accomplished by July 12 or 13.  So we are clear on that, before

20  July 12 or 13, not around or a day or two after whenever we

21  hold that conference.

22        MR. CARTER:  With regard to holding us over to that

23  July 13 date.

24        THE COURT:  I keep saying July 12 or 13; I guess we

25  have agreed it will be the 13th.

1            MR. CARTER:  Correct, your Honor.  With regard to

2    holding this issue over until that date, in the event there is

3    a supplemental production that is received only a few days

4    before, it will be impossible for us to address whether or not

5    it's complete.  That said, it may be self-evident, I am not

6    inclined to completely delay the issue to a later date, but

7    would just want to clarify that we may not be in a position to

8    fully address whether the production has been complete by that

9    date.

10           THE COURT:  It may not give you sufficient time, but I

11   will say that any additional documents that are going to be

12   produced in an effort to convince you or me that the production

13   is complete ought to be produced by July 8.

14           MR. CARTER:  Thank you, your Honor.

15           THE COURT:  From the plaintiffs' perspective is there

16   anything else we should take up today?

17           MR. GOLDMAN:  As a follow-up to this one, we are

18   requesting that Mr. Carter's letter of June 16, we have leave

19   to have docketed.

20           THE COURT:  Sure.  Anything else?

21           MR. McMAHON:  I am sorry, can you repeat that.

22           THE COURT:  Mr. Goldman was requesting that

23   Mr. Carter's letter of June 16 be docketed.  But I think what I

24   am going to do is direct that the letter to me of June 20 be

25   docketed and the letter to you as an exhibit to that.  Mr.

16N4TERC

1   McMahon, anything else you wanted to bring up today.

2           MR. McMAHON:  Your Honor, there will be an ongoing

3   problem with respect to producing documents for Wa'el Jelaidan.

4   If you recall, maybe not, he was the humanitarian director

5   during the Soviet occupation of Afghanistan.  I believe there

6   were some records and we produced; we just don't have anything.

7   With respect to the Mr. Khalifa, we have given them everything

8   we have.  That's the guy who was in the Philippines who was

9   totally exonerated.  So we are going to have some situations

10  where they have whatever we have and if they don't like it.

11  And of course, with Wa'el Jelaidan, you are going back to 1989,

12  your Honor.

13          THE COURT:  Slow down; you can't see it but the court

14  reporter may keel over.

15          MR. McMAHON:  If you really want to order us in

16  connection with Wa'el Jelaidan, he was the humanitarian

17  director during the Soviet occupation of Afghanistan.  My

18  understanding is he didn't work for IIRO-SA; he helped refugees

19  of course.  We don't have any records for him and we don't have

20  any records for Mr. Khalifa other than those we have produced.

21  They may not like that but that's what our ultimate position is

22  going to be on those people.

23          MR. CARTER:  Your Honor, with regard to Mr. Khalifa in

24  particular, I think we probably need some clarification from

25  the IIRO as to where the documents went, because what we know

        SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300

1    is that he was the director of several offices of the IIRO for

2    a number of years, was responsible for making disbursements,

3    for initiating and managing projects.

4            All we have with regard to Mr. Khalifa are a series of

5    letters and newspaper articles in which he claims his

6    innocence.  So, we are receiving everything that the IIRO has

7    that would present its view that he was not a central figure in

8    using the IIRO to promote Al Qaeda, but we don't have any of

9    the operational documents relating to his tenure as an

10   official.

11           The same thing for Mr. al Mujil.  With regard to

12   Mr. Jelaidan, there are references in the indexes that were

13   provided to Mr. Jelaidan's name, so I suspect that there are

14   records.  So I think it would probably be in Mr. McMahon's best

15   interest to check back.

16           THE COURT:  One would think.  Yes.

17           MR. CARTER:  I suppose we will cross that bridge when

18   we get to it.

19           MR. McMAHON:  Your Honor, you should know that that

20   Khalifa individual, he goes back to 1992.  He is certainly not

21   current.  He was arrested in 1993 by the U.S. authorities and

22   then tried in absentia in Jordan.  As of 1992, that's the end

23   of Khalifa's working days in the Philippines with IIRO-SA.

24           MR. CARTER:  The few documents we have actually say

25   something different from that; they say he was there for some

1    period after 1992.

2              MR. McMAHON:  How can it be?  He was in jail; he was

3    under arrest.

4              MR. CARTER:  He was briefly detained in the United

5    States; he was not in jail throughout that period of time.

6              THE COURT:  One thing that Mr. McMahon had suggested

7    was that the person you are relying on to review the documents,

8    or I guess the indices, have a discussion with the person who

9    the defendants are using for the same purpose and I guess I

10   don't see much harm in that.  Why should that not occur?

11             MR. CARTER:  There's a whole group of people who need

12   to be used to analyze this information.  The analysis of

13   information in this case requires a rather unique set of

14   skills.  It's not really translating; it's having substantive

15   knowledge regarding particular activities, particular

16   individuals, networks.

17             THE COURT:  I am really focusing, maybe I didn't make

18   it clear, on the indices, the two indices, and how they were

19   generated, what you perceive as the shortcomings, why they

20   perceive them as adequate, and perhaps dealing with some of the

21   issues where you say just the file organization suggests that

22   there must be must be other indices.  I guess what I am

23   proposing is that whoever is generating that belief on your

24   side communicate with whoever thinks they have done an adequate

25   job on their side as part of an informal meet and confer to see

1  whether the two sides can get closer together on that, whether

2  one side has a fundamental misunderstanding, or perhaps just

3  confirm that each side thinks its position is correct and there

4  is no meeting of the minds.

5       MR. CARTER:  The difficulty from our perspective is

6  that there is this constant effort to shift to the plaintiffs

7  the burden of explaining to the Muslim World League and IIRO

8  the nature of their discovery obligations and why they are not

9  fulfilling them.  We have already invested thousands and

10  thousands of dollars to needlessly translate documents that are

11  not responsive or are duplicative.  Mr. McMahon's answer to

12  that is to spend thousands more dollars to fly people around

13  the world talk to his guy.

14       THE COURT:  I am not suggesting a face-to-face

15  discussion.  This can be done by telephone; this can be done by

16  Skype.

17       MR. CARTER:  There is an additional issue that we have

18  been reluctant for a variety of reasons to disclose the

19  identities of our non-testifying consultants who are working.

20  Some of them may have a concern about, a personal concern about

21  identifying their participation and involvement.  That's

22  another layer of the problem.

23       (Pause)

24       THE COURT:  At the stage where you are making a

25  motion, if it comes to that, aren't you going to have to

1    disclose somebody who is in a position to testify or affirm or

2    declare in a way that reflects personal knowledge what the

3    inadequacies are.  Maybe it can be done by saying what your

4    letter alludes to, that there are attributes of the documents

5    that show that documents ought to be easier to find than

6    through this after-the-fact index that was constructed.  But it

7    seems to me that, and I understand your concern, if you are not

8    willing to disclose at least some of these people, it may be

9    difficult for you to make your case in relation to the motion.

10            MR. CARTER:  We appreciate that at some point for that

11   purpose we may have to disclose someone who can file an

12   affidavit.  Frankly, your Honor, we have not exactly determined

13   as a practical matter how we are going to approach that problem

14   which is something that we are considering.  I think the

15   broader problem with the indexes is that they are not going to

16   move the ball at all.  They are literally that fundamentally

17   deficient of any value, that having a meeting won't help us at

18   all.  What will help is getting the documents that were subject

19   to the two orders.  The indexes were this separate initiative

20   of the IIRO to presumably demonstrate some good faith.

21            With regard to how they were manufactured and created,

22   it seems to me that this is something that the attorneys should

23   be able to discuss in a meaningfully intelligent way between

24   one another.  Mr. McMahon has made it clear that he Skypes with

25   Mr. al Rahdi regularly.  They can have a conversation about how

16N4TERC

1   he approached putting this index together.  Then we can sit

2   down meet and confer as counsel to try to move forward.  It's

3   not so much that they are in Arabic, your Honor.  We can see

4   translations; we can find ways.

5        THE COURT:  How about an informal meet and confer,

6   again whether it's on Skype or just a conference call, that

7   involves you or whoever the designee is on your side, and I am

8   suggesting an attorney, Mr. McMahon, Mr. al Rahdi, who I gather

9   speaks English, and if need be, an Arabic translator so that if

10  there are problems you can get past them without the consultant

11  or consultants who you don't want to disclose, just to convey

12  what your concerns are and see whether there are some

13  explanations that perhaps you are missing.

14        MR. CARTER:  I don't have an objection to doing that.

15  I don't want to displace the focus on the documents.

16        THE COURT:  It seems to me the focus would be on the 8

17  categories of documents and the additional documents in the

18  April 26 or 27 order.  If we get to the stage of motion

19  practice, but just because we seem to spend a lot of time

20  talking about the indices, I think what I will do is direct

21  that such a meet and confer occur in advance of the July 13

22  conference.  So that said is there anything else either side

23  believes ought to be taken up today?

24        MR. McMAHON:  Yes, your Honor.  With respect to this

25  issue of perhaps a refusal to identify who are these

1    individuals who are saying this is not a good faith production,

2    I would like to know what their qualifications are if they are

3    not going to provide me with their names, what are their

4    qualifications, because we are relying on Mr. Carter's

5    observations that this has not been produced, that has not been

6    produced.  I would like to know what the qualifications of

7    those individuals are.  I don't understand, is it a personal

8    safety issue, that is, if you identify somebody by the name of

9    Bill Smith someone is going harm him.  I don't understand that.

10   I would like some clarification on that.

11           MR. CARTER:  With regard to the qualifications, you

12   don't really need any particularized qualifications to stand in

13   front of the court and say we don't really have a document that

14   says the name al Mujil.  That was one of the categories of

15   documents that were to have been produced.  So, some of these

16   things are more fundamental than requiring some internalized

17   personal knowledge of the operations of these organizations.

18   So, once we get the supplemental production, we will have to

19   reanalyze whether or not there is a need to have someone with

20   personalized knowledge or some expertise serve as the affiant.

21           THE COURT:  I gather you are using two types of

22   people, one as to whom you have security concerns who have

23   knowledge of the operation of these organizations, I am not

24   asking you to say yes or no, but also, and it may be the same

25   people, folks who simply speak Arabic and are looking through

     SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

16N4TERC

1     the index or other documents and telling you what they say.

2          MR. CARTER:  I think you are correct in the first

3     part.  With respect to the analysis of the Arabic, you still

4     need someone with a background in counterterrorism issues to

5     make any legitimate headway of documents in this area.

6          THE COURT:  I stand by my directive that there be a

7     meet and confer without those folks on your side; maybe it

8     won't move the ball, maybe it will.  But in relation to the

9     total expenditure that both sides are making in this case,

10    having a conference call should not be unduly expensive.  Maybe

11    it will shed some light on these issues.

12         MR. CARTER:  One thing I mentioned earlier is that we

13    would appreciate an explanation regarding documents that no

14    longer exist but did at one time exist and when they were

15    destroyed.  That's part of the instructions in the document

16    requests.  Can we get clarification on the record that to the

17    extent it's the position of the Muslim World League and IIRO

18    that a category of documents relating to a particular category

19    no longer exists, we receive some explanation as to where they

20    went.

21         MR. McMAHON:  Your Honor, I know we produced the

22    document retention policy for the organizations; that was a

23    while ago.  But I can certainly try to get to the bottom of

24    that, to the extent there are no Wa'el Jelaidan documents, when

25    was the last time there were such documents and were they

        SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

16N4TERC

1   disposed of.

2            THE COURT:  Hopefully that can be part of the

3   discussion I just directed.  Anything else on plaintiffs' side?

4            MR. CARTER:  Your Honor, Mr. McMahon and I had an

5   exchange at one point.  We noticed in one of Mr. al Rahdi's

6   affidavits that he took the position that I believe it was the

7   IIRO had two gather categories of documents, public documents,

8   and documents that were essentially documents of the government

9   and the kingdom and therefore immune from production as a

10  result of the kingdom's sovereign immunity.

11           We have asked Mr. McMahon to clarify for us as to

12  whether there is an entire class of documents that are not

13  being searched so that we can determine whether or not we need

14  to file a motion on that issue and I have not heard back.  So

15  I'd simply ask that we a receive response to that as well.

16           MR. McMAHON:  Your Honor, we have been in dialogue

17  with the kingdom's attorneys on that issue to determine what

18  the nature of the documents is.

19           THE COURT:  When you say the kingdom's attorneys,

20  that's Kellogg Huber.

21           MR. McMAHON:  Yes, your Honor.  He's been very busy

22  but we have been trying to go back and forth on that just to

23  narrow the scope of the issues here.  If this is just some

24  mundane correspondence, go at it, but if there is some, as I am

25  told, sensitive attorney-client issues, then I think we just

            SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

1    have to log them in a privilege log and explain to Mr. Carter

2    why those won't be produced.  I am a little lost until there is

3    a further dialogue, but I am working on that issue.

4           THE COURT:  But you should convey to Mr. Kellogg,

5    although he has been lurking in the shadows, that he and his

6    firm or his client kingdom may have to come to court to clarify

7    this issue also.

8           MR. McMAHON:  The charities are very concerned that

9    they would do anything to violate the kingdom's rulings on

10   something.  I got to the bottom of that.  They are quite

11   fearful that the kingdom will take the view that they did

12   something wrong.  That's what I am trying to get into as an

13   issue, your Honor.

14          MR. CARTER:  One issue I would mention that may

15   expedite the conversations between Mr. McMahon and Mr. Kellogg

16   is that when Mr. Kellogg was representing the kingdom, he did

17   file a brief of record in which the kingdom disclaimed that

18   either the Muslim World League or IIRO were agencies,

19   instrumentalities, or organs of the kingdom.  So I can't

20   conceive how they would have governmental documents if that's

21   the kingdom's position.

22          MR. McMAHON:  I have one final question.  Are we

23   briefing you on these issues before the 13th; are they going to

24   file a motion; where are we?

25          THE COURT:  I will entertain letters.  I would like

1   them three days before.  Let me be more clear about that. if I

2   get them Monday by 5:00, that's fine as far as I am concerned,

3   but formal briefing, no, but what I have been trying to

4   indicate is that we may be headed towards formal briefing to

5   the extent that plaintiffs seek sanctions.

6       MR. CARTER:  I am confused about what application the

7   Monday-by-5:00 deadline would apply to, whether or not that is

8   in reference to this question of the documents being subject to

9   sovereign immunity or rather to the question of whether or not

10  the Muslim World League and IIRO have made complete production.

11      MR. McMAHON:  I think it's the latter.  I want to be

12  able to show the judge that we have made complete production on

13  1 to 8 for both MWL and IIRO-SA; I want the judge to see that.

14      THE COURT:  I guess what I am saying is any issues

15  that you want to take up on the 13th, I want letters on by

16  close of business on the 11th.  I recognize that because of the

17  schedule we have been talking about, it may be difficult if not

18  impossible for there to be a joint letter, so individual

19  letters are fine.

20      MR. CARTER:  I have to express some concern.

21      THE COURT:  The two letters or however many letters I

22  get may be addressing different issues without opportunity to

23  respond, I understand that, but we have been muddling our way

24  through this thus far and I guess we will continue to do that.

25      MR. CARTER:  The one concern I have about the

    SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

16N4TERC

1   sovereign immunity issue is that, without having received a

2   response, it would put us in a difficult position where the

3   kingdom can now jump in and file some extensive letter

4   asserting immunity as to documents in the possession of the

5   IIRO and Muslim World League.

6         THE COURT:  But it also might explain why there are

7   enormous gaps from your perspective in what you are getting

8   because the MWL and IIRO are taking the position that many of

9   the documents are subject to the kingdom's sovereign immunity.

10  So I would worry less about getting sandbagged and more about

11  hopefully about getting some information that we can deal with

12  on the 13th.

13        MR. CARTER:  OK.  Thank you, your Honor.

14        THE COURT:  Anything else, Mr. McMahon?

15        MR. McMAHON:  I hope you have a wonderful day.  I am

16  exhausted.  Have a wonderful day.

17        THE COURT:  Don't hang up just yet.

18        MR. HAEFELE:  I want to make one clarification.  The

19  invitation for the letters three days before was relative to

20  Muslim World League and IIRO issues, correct; it wasn't an

21  invitation for letters on the multiple other things.

22        THE COURT:  No.  Any other issues that concern other

23  parties, the usual briefing schedule should apply.

24        MR. HAEFELE:  That's all I need, your Honor.

25        THE COURT:  Thank you all.