1cfeter1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    IN RE TERRORIST ATTACKS ON
     SEPTEMBER 11, 2001,
4
                                        03 MDL 1570(GBD)
5
     ------------------------------x
6
                                        December 15, 2011
7                                        10:48 a.m.

8
     Before:
9
                         HON. GEORGE B. DANIELS,
10
                                        District Judge
11
                            APPEARANCES
12
     MELLON WEBSTER & SHELLY
13        Attorneys for Havlish Plaintiffs
     BY:  THOMAS MELLON, JR.
14        THOMAS MELLON, III,
          STEPHEN A. CORR
15        DENNIS PANTAZIS

16   WIGGINS CHILDS QUINN & PANTAZIS
          Attorneys for Plaintiffs
17   BY:  TIMOTHY B. FLEMING

18   ANDERSON KILL & OLICK
          Attorneys for O'neill Plaintiffs and Plaintiffs' Executive
19        Committee
     BY:  JERRY GOLDMAN
20
     COZEN O'CONNOR
21        Attorneys for Federal Insurance
     BY:  SEAN CARTER
22
     MOTLEY RICE, LLC
23        Attorneys for Burnett Plaintiffs
     BY:  ROBERT T. HAEFFLE
24
     JD LEE
25        Attorney for Plaintiffs

1cfeter1

1           (In open court)

2           THE COURT:  So that we can use this time efficiently,

3     we can turn, I guess, to Mr. Mellon --

4           MR. MELLON:  Yes, your Honor.  Good morning.

5           THE COURT:  -- and your application to enter a default

6     judgment against Iran.

7           What I'd like to do is I've reviewed substantially a

8     significant amount of materials submitted.  There are both

9     materials submitted under seal and materials not under seal.

10    What I'd like to do is give you an opportunity to summarize

11    that material here on the public record.  I'd like to keep this

12    as a public record, so any reference that you make to sealed

13    documents, just reference that particular file, other than the

14    substance, on the record for those documents.

15          I've also received and reviewed your proposed findings

16    of fact and conclusions of law in support of the application.

17    And I'm going to use that, unless you tell me otherwise, as a

18    guide to follow you today.

19          MR. MELLON:  Yes, your Honor.  Exactly.

20          THE COURT:  And the only other thing that I'm going to

21    ask is if you could give me that on disk.

22          MR. MELLON:  Yes.

23          THE COURT:  So that if you can give me that right away

24    on disk, I can either at the end of this hearing go ahead and

25    adopt it in total or substantially in a form that you've given

1cfeter1

1    to me, and I'll expedite it.

2             MR. MELLON:  Your Honor, you'll have that tomorrow.

3             THE COURT:  Great.  Thank you.

4             Then let me let you go ahead and proceed in the manner

5    in which you believe is appropriate.

6             MR. MELLON:  Thank you, your Honor.

7             Your Honor, we have passed up to the Court and law

8    clerk a copy of a PowerPoint that we will be demonstrating for

9    you in the next hour to perhaps, at tops, two hours.  We have

10   tried to discipline ourselves to be concise and pithy.

11            First let me begin, with the Court's permission, by

12   one or two introductions.

13            My name again is Thomas E. Mellon, Jr., and I have the

14   honor and pleasure of representing the plaintiffs in the

15   Havlish case.  Several of those plaintiffs are here today, your

16   Honor.  And I'd just like to acknowledge them, given the nature

17   of their tragedy and their loss.  Please stand when I call your

18   name:  Ms. Ellen Saracini, Ms. Fiona Havlish, Ms. Tara Bain,

19   and Mikaela, who is the daughter of Fiona Havlish.  Thank you

20   very much.  Oh Grace.  Good Lord.  And Grace Godshalk, which

21   her son, William, was also lost in the towers.  Thank you.

22            Your Honor, we are mindful of the amount of work that

23   we have submitted to the Court on the Havlish claims.  So our

24   goal today was to take those claims and try to make them as

25   centered and as focused as possible.

1cfeter1

1          I'd now like to introduce those lawyers who have been

2    working the case for the last ten years from around the country

3    just, again, to acknowledge them and ask them to please stand.

4          First, working from my left to the right:  Mr. Stephen

5    Corr of Philadelphia; Mr. Ed Rubenstone of Philadelphia;

6    Mr. Evan Yegelwel from Jacksonville, Florida; Ms. Mary Beth

7    Ramey from Indianapolis; Ms. Melinda Goldfarb from Birmingham,

8    Alabama.

9          And working again from my left, your Honor, Mr. Tim

10   Fleming, Thomas Mellon, Rich Hailey from Indianapolis; Dennis

11   Pantazis, also from Birmingham; and Bob Flick from Chicago, Bob

12   from Chicago.  Oh, wait a second.  All right.  We got a whole

13   team here that I better not miss this, your Honor.  I better

14   not.  Dom Winder from Salt Lake City; Mr. JD Lee from

15   Knoxville; and Mr. Jack Corr from Philadelphia; and whoever

16   called that to my attention, thank you very much.

17         Your Honor, just a word about these attorneys.  They

18   have worked tirelessly for ten years, travelling to Europe 22

19   times, reviewing thousands of documents, hundreds and hundreds

20   of hours of interviews.  What we would like today to do is very

21   briefly discuss the law.  And let me explain that.

22         We thought we were going to spend 30 to 40 minutes

23   discussing the law, but the *Owens* opinion came out as we know

24   on November 28th.  And the *Owens* opinion goes right down the

25   line, and it involves Iran, Hezbollah and Al-Qaeda.  So after

1cfeter1

1   ten years of us writing the law, worrying about the law,

2   analyzing the law, a gift was given to us, a holiday gift on

3   November 28th, and that is the law has been really delineated

4   very specifically.

5           So with the Court's permission, we're not going to

6   spend 30, 40 minutes on the law.  We're going to get right to

7   the facts that we think compels your Honor, respectfully, to

8   consider awarding a case against Iran, Hezbollah, and of

9   course, Al-Qaeda.

10          THE COURT:  I do have the *Owens* opinion.  I did

11  receive that recently from you.

12          MR. MELLON:  Thank you, your Honor.  We found that

13  very illuminating, and I might honestly say a great relief.

14          Your Honor, here's how we'd like to proceed, with the

15  Court's permission.  We have a PowerPoint that we'll be using

16  as an outline, but the PowerPoint follows the findings of fact

17  and conclusions of law.  So you will see a parallelism by

18  design.

19          The first presentation will be by Mr. Timothy Fleming,

20  who himself went to Europe 14 times.  He will be discussing the

21  overall thematic scheme, who the principals are, who the

22  defendants are and the like.

23          May I have the first slide, please.

24          We had highlighted the sovereign defendants only.

25  There are 16.  The nine sovereign defendants in our case are

1cfeter1

1    already in default, and we would ask the Court respectfully to

2    provide a default judgment against the nonsovereign defendants.

3    But it is these 16 defendants here today that compels the

4    presentation of testimony.

5            The next slide, please.

6            Your Honor, before we hear from Mr. Fleming, just a

7    word about the law.  We have perfected service in Washington,

8    DC, and then again we perfected service here in the Southern

9    District of New York.  So actually, Iran, Hezbollah, and to the

10   extent Al-Qaeda through publication -- they have default

11   entered twice, once December 23rd, out of the District of

12   Columbia, and again on December 27th, here in the Southern

13   District of New York.

14           Jurisdictionally speaking, besides service and

15   entering the default, Iran is designated a state sponsor of

16   terrorism.  And most of the lawyers in this room know,

17   certainly all we know that's been since 1984.

18           But, your Honor, this first slide is very important

19   with regard to the following words, because today we hope to

20   prove to the Court that Iran provided the following to Al-Qaeda

21   over the course of years.  That material support would be

22   defined as any property, tangible or intangible, and here we

23   go, this is what Iran did:  They provided service, including

24   currency or monetary instruments and financial securities,

25   financial services; they provided lodging; Iran provided

1cfeter1

1    training; they provided expert advice and assistance to

2    Al-Qaeda.  Iran provided safe houses, false documentation and

3    identification.  They provided Al-Qaeda with communications

4    equipment.  They provided Al-Qaeda with facilities, weapons,

5    lethal substances.  They provided Al-Qaeda with explosives,

6    personnel and transportation.  In other words, your Honor, for

7    jurisdictional purposes, we must show some material support.

8    We hope to show the Court in the next hour an abundance of many

9    different types of material support.

10           Finally, for jurisdiction, our plaintiffs are US

11   nationals.  And, of course, we cite as last comment on the law,

12   the *Owens* case.

13           Your Honor, I believe that brings us to the part of

14   our presentation where Mr. Timothy Fleming will be giving us

15   the overview, the general themes of what we investigated.  I

16   will return for purposes of specifically and detailedly

17   defining our expert reports.  They are 1,100 pages.  I know

18   that's way too much, but I think I can break it down to 50

19   paragraphs with a little time.

20           Your Honor, at this time, Mr. Timothy Fleming.

21           MR. FLEMING:  Good morning, your Honor.

22           This morning I'm humbled to present evidence on behalf

23   of the Havlish plaintiffs, who have been appointed by my

24   colleagues to present a substantial portion of the evidence

25   that we've submitted to the Court in this case.

1cfeter1

1          The evidence in this case demonstrates that the

2   Islamic Republic of Iran, the principal defendant, as well as

3   the defendants, agencies and instrumentalities of Iran,

4   including its terrorist proxy organization, Hezbollah,

5   materially and directly supported Al-Qaeda's attacks on the

6   United States on September 11, 2001.

7          Iran's material and direct support for Al-Qaeda

8   included the facilitation of the hijackers' international

9   movements and coordination of activities, to conceal the

10  hijackers' travel to the Al-Qaeda training camps in Afghanistan

11  almost a year before 9/11.  The evidence also shows that Iran

12  had preknowledge that the 9/11 attacks were to occur and that

13  Iranian officials met with Al-Qaeda plotters before and after

14  9/11.  And the evidence shows that the 9/11 attacks themselves

15  were based upon a contingency plan for attacking the United

16  States that was designed by Iran.

17         Finally, after 9/11 occurred, Iran facilitated the

18  escape of Al-Qaeda leaders and operatives from Afghanistan at

19  the time of the United States invasion.  And thereafter, Iran

20  provided years of safe haven and refuge for hundreds of

21  Al-Qaeda operatives and major Al-Qaeda leaders inside Iran,

22  where they continued to engage in terrorism and to direct

23  terrorist activities in the Middle East and throughout the

24  world.

25         Now, to understand the role that Iran and Hezbollah,

1cfeter1

1    as well as the other agencies and instrumentalities played in

2    9/11, we must trace some of the history of the Iran, Hezbollah

3    and Al-Qaeda relationship, which I will try to describe as

4    briefly and as economically at least as possible, but it is

5    rather detailed and it is tremendously important.

6           Now, there are evidentiary references -- excuse me.

7    There are references to the evidentiary record in the

8    voluminous materials that we have already submitted to the

9    Court last May, July and August in our findings of fact, as

10   well as in our lengthy briefs.  So I won't attempt to repeat

11   them here.  However, I will make some -- as your Honor pointed

12   out, I will make some references to the sealed testimony, and I

13   will -- for those items I will try to supply some specific

14   references.  We could do that also in writing, if you would

15   prefer.  They are not in the PowerPoint or in the binders that

16   you have.

17          Now, with respect to that yesterday, we filed a motion

18   to partially unseal evidence.  And the purpose of that was

19   because, as we had previously explained to the Court when we

20   filed the motion to seal the testimony, principally the

21   testimony of the three defector Iranian defector witnesses,

22   there were major concerns about their safety and security,

23   which continue to this day for certain.

24          However, we have been able to at least secure the

25   agreement of the person I formally identified as witness X to

1cfeter1

1   reveal his name and to reveal his evidence with certain limited

2   exceptions.  And that is why I said motion to partially unseal

3   even as to witness X.  It's very limited portions.  We actually

4   have someone still scouring the transcript to make sure that we

5   can eliminate from the public record references to people who

6   would be in great danger, other than witness X, those people

7   being in Iran principally.

8           And so what we propose to do, if your Honor is

9   disposed to grant the motion to partially unseal, would be to

10  refile witness X's testimony both as to the transcript and as

11  to the videotaped testimony that would eliminate various small

12  portions which are designed to try to assure the safety of

13  people.  We could do that very quickly, particularly as to the

14  transcript.  The videotape might be a little bit -- we may have

15  to do some editing, but if your Honor is disposed to grant that

16  motion, that is how we would like to proceed.

17          THE COURT:  I don't think I received a motion.  You

18  just filed it electronically?  I don't think I received a copy

19  in chambers.

20          MR. CORR:  Your Honor, it was filed electronically

21  probably around 3:30 yesterday afternoon.

22          THE COURT:  So I was not notified that -- do you have

23  a courtesy copy that I can review or discuss?  Otherwise, I'll

24  pull it down when we come back to it.

25          MR. FLEMING:  I'm sorry, your Honor.  We don't seem to

1cfeter1

1    have a paper copy of it.  I can say it was fairly general and

2    didn't include even all the details that I've just related.

3            Now, it should be understood that as your Honor may

4    recall, there is also a sealed affidavit of the person known as

5    witness X.  That was always intended to be permanently sealed,

6    and that would not come within the purview of the motion to

7    unseal.  And so that, as well as my affidavit explaining some

8    of those circumstances, would remain under seal.

9            THE COURT:  Do you have with your motion a carefully

10   drafted proposed order in terms of what you think would be

11   consistent with that partial unsealing?

12           MR. FLEMING:  I don't think we filed something that

13   would fit that description.  Yes, your Honor, but we can do so

14   certainly by tomorrow, or we can do it -- I can do it verbally

15   right here.

16           THE COURT:  Well, I would do it in the form that you

17   think will release that much of the material and no more than

18   the material than you intended.  I don't want to inadvertently

19   unseal something that, the way you're describing it now, under

20   certain things, you say still should remain under seal.  So if

21   you could either articulate it clearly on the record or craft

22   it for my signature, which is probably the better thing to do,

23   go ahead and craft it carefully for my signature.  I'll pull

24   the motion up now, start reviewing it now so I can sign it as

25   soon as you submit it, if it conforms with the motion.

1cfeter1

 1          MR. FLEMING:  It was my intention, your Honor, this

 2    morning to discuss the testimony of witness X and reveal his

 3    name as part of my presentation, which, of course, would be

 4    consistent with the parameters that we would be suggesting.  Is

 5    that all right?

 6          THE COURT:  And you're asking, at least to the extent

 7    that you want to discuss it today, that it be unsealed for that

 8    purpose --

 9          MR. FLEMING:  Yes, your Honor.

10          THE COURT:  -- to that extent during this discussion?

11    I will grant that motion, and then I will formally consider and

12    grant the entire motion, as you've laid it out, as soon as we

13    pull the papers and I start looking at it.  And then I will

14    sign an order consistent.

15          MR. FLEMING:  Thank you, your Honor.

16          MR. MELLON:  Your Honor, if I may speak to it, we have

17    just received permission from what has been known as witness X

18    heretofore to release his name to the public and to discuss his

19    testimony today before the Court.  But that permission came

20    only within the last 36, 48, 72 hours.  And that is why there

21    has been a last-minute paper rush.  And I think that explains

22    it.  But we are prepared to tell you about his testimony today.

23          THE COURT:  Okay.  On that basis I will grant that

24    motion to that extent, and then I'll review the complete papers

25    and sign a broader order.

1cfeter1

1             MR. MELLON:  Thank you.

2             MR. FLEMING:  To begin, your Honor, due to the default

3       of all the defendants in this case, the Court may take as

4       true -- the allegations of the complaint as true.  And that

5       would include, of course, the fact that 9/11 occurred and that

6       the decedent, the plaintiffs' decedents, were all victims of

7       those terrorist attacks.  And we will be proceeding on that

8       assumption that that is the case.

9             Additionally, your Honor, I'd like to offer the

10      exhibits that plaintiffs have already submitted to the Court

11      and move their admission into evidence.  Those exhibits are

12      detailed in the list of exhibits that were attached to

13      plaintiff's first memorandum of law; that is, the public --

14      what we refer to generally as the public brief.  And we would

15      move into evidence Exhibits 1 through 20, Exhibit 22 through 25

16      and Exhibits 29 through 37.

17            THE COURT:  Those will be admitted into evidence for

18      purposes of the Court.

19            (Plaintiff's Exhibits 1 through 20, 22 through 25 and

20      29 through 37 received in evidence)

21            MR. FLEMING:  Additionally, with respect to the sealed

22      material, your Honor, I would like to offer and move for

23      admission Exhibits S1 through S7 and -- excuse me.  Actually,

24      I'm going to move into evidence all of the exhibits, S1 through

25      S44.  And to the extent that those include -- and they

1cfeter1

1    particularly do with respect to S1 through S7 -- they include

2    the documents that were offered as exhibits at the time of the

3    videotaped depositions that were taken in this case of

4    witnesses X, Y and Z, and so I would move those to be admitted

5    as well.

6              THE COURT:  And those will be admitted into evidence.

7              (Plaintiff's Exhibit S1 through S44 received in

8    evidence)

9              THE COURT:  Can you designate for the record which one

10   of those are being unsealed at this point?

11             MR. FLEMING:  Yes, your Honor.  Being unsealed is

12   Exhibit S1, S2, S3 and S4, again, with the limited redactions

13   that we would need to make.

14             THE COURT:  So you're not moving to unseal them in

15   their entirety; you're moving to unseal them with redactions?

16             MR. FLEMING:  With redactions, which will be very

17   limited, I believe, your Honor.

18             Therefore, basically it is S5, S6 and S7, as well as

19   the deposition exhibits attached to them which would remain

20   under seal.

21             THE COURT:  That are related to this particular

22   witness?

23             MR. FLEMING:  That's right.  And then actually, I

24   should point out a further detail.  We had filed sealed copies

25   of several of the expert witnesses who discussed the

1cfeter1

1    testimonies of the witnesses.  We would like to unseal those as

2    well, to the extent that they address witness X.  Well, it may

3    not -- and we would like to provide those as well, because they

4    would just remain -- we could keep the redactions as to the

5    other two witnesses for the moment.

6           THE COURT:  I think that probably what would be most

7    efficient, is to file unsealed, redacted copies of the sealed

8    documents so that there won't be any misunderstanding about the

9    availability of the totally sealed docket.

10          MR. FLEMING:  Very good, your Honor.

11          THE COURT:  Those should remain sealed, and you should

12   have permission to file an unsealed redacted copy of those

13   documents to the extent that you move.

14          MR. FLEMING:  Very good.  Thank you, your Honor.

15          Now, your Honor, the defendant, Islamic Republic of

16   Iran, has engaged in and has supported terrorism as an

17   instrument of foreign policy ever since the Islamic Republic

18   was -- began after the Iranian revolution in 1979.  Iran has

19   been waging virtually an undeclared war against the United

20   States and Israel for more than 30 years.  This is not a

21   metaphorical sense of a war or rhetorical use of the term.

22   It's a very real and meaningful war, although quite an

23   unconventional one; one that regularly employed the use of

24   criminal acts and unconventional tactics, namely asymmetrical

25   strategies of warfare and terrorism.

1cfeter1

The victims, the casualties of this particular type of war, criminal war, have included thousands of innocent victims, including the plaintiffs' relatives who died on 9/11 who are the plaintiffs in this case today.

Iran has engaged in this war generally through proxies such as Hezbollah, Hamas, Al-Qaeda and others.  And this is particularly important because it gives Iran plausible deniability, which creates or which allows it to avoid direct confrontation with the United States over these things, over these acts.  This, as we'll see, will be very important when it comes to the planning of the 9/11 terrorist attacks.

Now, the US State Department has designated Iran as a foreign state sponsor of terror every year since 1984, ever since it began to make those designations, every single year. And indeed, since 1980, each and every one -- and the Republic came into being, Islamic Republic came into being 1979.  Every single year since 1980 each of the State Department's annual reports on terrorism describes the Iranian state's consistent involvement in acts of terror.

Now, briefly, your Honor, the two individual defendants in this case, the two individual defendants, the first is the Ayatollah Ali Hoseini Khamenei.  He is the Supreme Leader of Iran, and he is certainly the most important and powerful official in Iran.  He has the authority to make any decision, religious or political, or to appoint and remove

1cfeter1

1     almost virtually any officer in the government.

2              Khamenei is and has been, since the death of Ayatollah

3     Khomeini in 1989, has been the Supreme Leader of the Islamic

4     Republic of Iran, and his term of office is unlimited.  He is

5     the commander in chief of the armed forces.  He appoints the

6     head of the military services.  He declares war and peace.  He

7     can dismiss the elected president of the country, and he has

8     many other powers delineated in the Constitution.

9              The popular media focus on when it comes to all things

10    Iran is to discuss the activities of and words of President

11    Mahmoud Ahmadinejad.  This is a fundamental misunderstanding of

12    the governmental structure.  Khamenei, the Supreme Leader, is

13    the real policy maker in Iran.

14             Secondly, the defendant Ali Akbar Hashemi Rafsanjani,

15    the former president of Iran from 1997, was the Speaker of the

16    Parliament during the 1980s, when Ayatollah Khomeini was the

17    Supreme Leader.  Rafsanjani is also one of the wealthiest

18    individuals in Iran.  And he was certainly, without question,

19    the second most powerful figure in the Iranian government on

20    September 11, 2001; indeed, from 1980 on to at least 2005.  And

21    he continues to hold very important posts to this day.

22             Khamenei and Rafsanjani both have long records of

23    direct involvement in Iran's material support for terrorism.

24    And they have been cited in as key figures in many court cases

25    in the federal courts of the United States and abroad, finding

1cfeter1

Iranian state support for terrorism, and some of which have specifically named them as directing and ordering terrorist attacks, murders, assassinations, bombings and so forth.

One of those cases is known as the Mykonos case, which involved the -- in Europe, in Germany, involved the assassination of several Kurdish dissident leaders in a Greek restaurant in Berlin. The Court in Germany found that Khamenei and Rafsanjani personally ordered the assassinations to occur.

The defendant Iranian Revolutionary Guard Corps, the acronym being the IRGC -- I will generally use that term, also known and discussed in the evidence in this case in some of the testimony as the Sepah Pasdaran, or simply the Sepah, or simply the Pasdaran -- that is an agency, that is an elite military force that is an agency and instrumentality of the Supreme Leader. It is answerable only to the Supreme Leader and to the concept of the Iranian revolution itself. It is parallel to the regular army. It is not subject to parliamentary supervision and it is not part of the formal government structure. It is a force unto itself. As appointed by the Constitution of Iran, it is the guardian of the Islamic revolution. And it is its striking force as well overseas.

It is also, the IRGC is also a major force in the Iranian economy. It holds billions of dollars of assets and government contracts in virtually every sector of the Iranian economy, including oil and gas, engineering,

1cfeter1

1  telecommunications, infrastructure.  It owns and controls the

2  Khomeini Airport in Tehran.

3       The IRGC also engages in widespread criminal activity,

4  including smuggling, drugs and alcohol and other things, and it

5  is also deeply, deeply involved in terrorism.  The IRGC has a

6  special division called the Qods Force.  Qods is Arabic for

7  Jerusalem, which refers to the retaking of Jerusalem some day,

8  the goal of retaking it.  The Qods Force, or Jerusalem force,

9  works with a militant overseas terrorist organization --

10  terrorist organizations abroad promoting it and directing it

11  and training for it.  It has a long history of engaging in

12  coups, assassinations and terrorist activities of every stripe.

13  It is one of the most organized, disciplined and violent

14  terrorist organizations in the world.

15       Witness Y, one of the sealed witnesses, was a former

16  member of the IRGC's Qods Force.  And he testifies at length

17  about it, as do many of our experts.  The United States

18  Treasury Department has designated the Qods Force as a

19  terrorist organization for providing material support to the

20  Taliban of Afghanistan and many other terrorist organizations.

21  The State Department has designated the IRGC itself as a

22  foreign terrorist organization.

23       The defendant MOIS is the Ministry of Information and

24  Security, roughly an analog to our CIA but without the rules.

25  It is a well funded, disciplined and skilled intelligence

1cfeter1

1    agency with an annual budget of somewhere between 100 and 400

2    million dollars.  All three of the Iranian defector witnesses

3    X, Y and Z, are former members of the MOIS.  All testify at

4    great length about it.  Indeed, witness Z testifies in

5    tremendous length about the structure of MOIS and his career in

6    it.

7            And I will have more to say about that in just a

8    moment.  The predecessor of the MOIS was not SAVAK, which is

9    the Shah's intelligence agency, but rather a nameless

10   intelligence agency created by Ayatollah Khomeini in the early

11   days of the republic which was answerable only to him and

12   assassinated people, dissidents or opponents at his command

13   now.  Many of the State Department reports, annual reports on

14   global terrorism over the past 25 years discuss the MOIS as a

15   key facilitator of terrorism throughout the Middle East and the

16   world.

17           Now, in the 1990s there was a series of domestic

18   murders, dozens of murders of intellectuals, writers,

19   journalists and opponents of the regime.  These were known in

20   Iran as the chain murders.  This led -- when it was discovered

21   publicly, and the information did get out that MOIS was deeply

22   involved, was, in fact, doing the murdering, and that this led

23   to some limited reforms in order to protect certain officials

24   in the government, led to certain limited reforms of the MOIS.

25           But Ayatollah Khamenei by that point is the defendant

1cfeter1

1    in this case.  Ayatollah Khamenei was the Supreme Leader by

2    that time.  He then went back to Khomeini's original idea of a

3    nameless special intelligence apparatus answerable only to him,

4    and he formed a new special intelligence apparatus which has no

5    name.  We call it the Supreme Leader's special intelligence

6    apparatus in our papers.  But it reported directly to him and

7    is completely under his control.

8            Witness Z testifies at great length about the creation

9    of the special intelligence apparatus, its structure and

10   function and even presents organizational charts showing how

11   the special intelligence apparatus is structured.  Witness Z's

12   testimony in that regard is in Exhibit S7 at pages 24 through

13   40 and includes Deposition Exhibit 6.

14           Witness X and witness Y also discuss it.  And witness

15   Y's testimony, who also was very knowledgable about the special

16   intelligence apparatus, is in Exhibit S6 at pages 6, 14 to 18

17   and 53 to 54.

18           Witness X discusses it in S3 at 24 to 39, but that

19   will be unsealed.

20           Now, beyond the special intelligence force, beyond the

21   IRGC and beyond the MOIS and the Qods Force, and the IRGC's

22   Qods Force, the entire apparatus, the truth is the entire

23   apparatus of the Iranian government and many parts of Iran's

24   private sector, companies, private individuals, all are at the

25   service of the Supreme Leader, the MOIS and the IRGC in the

1cfeter1

1    service and support of terrorism, if they want them to be.

2    Witness X actually testifies a great deal about that in his

3    testimony, and this will be discussed as well a bit later.

4           Now, the next defendant is an organization Hezbollah.

5    Hezbollah today is the de facto government of Lebanon, but it

6    was created by Iran specifically in the early to mid1980s in a

7    reaction to the Israeli invasion of Lebanon when it sought to

8    drive out the PLO.

9           But Iran sent its -- the IRGC, Qods Force into Lebanon

10   to create a resistance force.  This became Hezbollah.  They did

11   it as an extension of the Iranian revolution itself into

12   Lebanon, with aims of going even beyond.

13          Now, Iran ever since then has been a total sponsor and

14   controller of Hezbollah.  Hezbollah is, in fact, an agency and

15   instrumentality of the Iranian government.  It is funded by the

16   Iranian government to the tune of 100 to 500 million dollars

17   annually, direct financial support, cash, as well as untold

18   amounts of equipment, weapons and training.

19          From the beginning, from the very beginning, Hezbollah

20   has served as a terrorist proxy organization for Iran, and the

21   US State Department has so designated it, Hezbollah, as a

22   foreign terrorist organization ever since 1997.

23          Imad Fayez Mughniyah is a very important player in the

24   facts of this case.  Imad Mughniyah, also known as the Hajj

25   Radwan, was for three decades prior to his assassination in

1cfeter1

Damascus, in Syria.  In February 2008 he was the terrorist

operations chief of Hezbollah.  And all that entire time he was

an agent of Iran, recruited by Iran specifically for this role.

Mughniyah played a critical role in many -- in a long

string of imaginative and high-profile and vicious terrorist

attacks across the globe, including many, many terrorist acts

directly against United States citizens during the '80s and

'90s.

Mughniyah was the central figure what's called the

Lebanon hostage crisis of the 1980s.  All of the university

officials, business people, reporters and CIA agents,

prominently, the Beirut station chief in Beirut, William

Buckley, all kidnapped by Hezbollah, directed and personally

executed in many instances by Imad Mughniyah.  William Buckley

in particular was tortured to death by Mughniyah at his own

hands.  He directed the hijacking of a TWA flight in which the

Navy diver by the name of Robbie Stidham was murdered and his

body dumped on the tarmac of the airport in the 1980s.  That

was a subject of a federal case, *Stidham v. Iran*.

Mughniyah's activities in this regard was in part,

large part to affect United States policy in the Middle East.

The Lebanon hostage crisis, for example, led directly to the

Iran-contra affair.  The goal of Iran through its agent

Hezbollah, the goal was to drive the United States out of the

Middle East and to reduce the American presence and influence

1cfeter1

throughout the Middle East, which Iran seeks to displace, seeks
to take the place of.

Now, Mughniyah himself was on the FBI's Most Wanted
List for 21 years until his death.  He was personally
responsible for two bombings of the United States Embassy in
Beirut, Lebanon, in 1983.  He was personally responsible for --
indeed, took a film of the execution of the truck bombing of
the marine barracks in Beirut in 1983.  Significant about that
is that Mughniyah -- and this was his first, the first time he
had done it -- created and perfected the art, if you will, of
simultaneous terrorist acts.  In that particular case he truck
bombed the marine barracks and the French paratroopers'
quarters outside the Beirut airport simultaneously.

By the way, those facts were found in the case of
*Peterson v. Iran*, and Iran and Hezbollah were held legally
liable for the marine barracks bombing in 1983.

Now, a popular -- sometimes in the media there's
references to the notion that Sunnis and Shias, the two major
sects of Islam, they don't get along.  They don't work
together.  They don't deal with each other.  That might be true
on a street level, but the truth is that that is -- especially
when it comes to matters of terrorism, that is a popular
misconception.  The conventional wisdom is wrong, and the many
experts, as Mr. Mellon will describe later, many of our experts
debunk that conventional wisdom as being absolutely wrong when

1cfeter1

 1    it comes to matters of terrorism.

 2              Indeed, the 9/11 commission report itself stated

 3    clearly that the relationship between Al-Qaeda and Iran

 4    demonstrated that Sunni/Shia divisions did not necessarily pose

 5    an insurmountable barrier to cooperation in terrorist

 6    operations.  Indeed, the fact is that Iran and Al-Qaeda in

 7    particular are ruthlessly pragmatic forces, and they will cut

 8    deals with potential adversaries whenever and wherever it will

 9    advance their own causes.

10              Now, Iran in particular, though it is Shiite

11    generally, a Shiite majority nation, has demonstrated it is

12    quite willing to use, coopt and support Sunni people, Sunnis,

13    as their proxies in order to carry out acts of terrorism.

14              Religious difference, to the extent they even exist at

15    that point on the leadership level, is trumped by the leaders'

16    desire to confront common enemies, particularly the United

17    States and Israel, which are, of course, known as the great

18    Satan and the lesser Satan in Iran and throughout Muslim --

19    Islamic terrorist organizations.

20              One of the witnesses in this case is the first elected

21    president of Iran, Abulhassan Banisadr.  We took his

22    testimony -- and that is unsealed already -- we took his

23    testimony in France in 2005.  Banisadr was a -- as the first

24    elected president, was a fairly moderate person, and he was

25    statesmanlike and wanted to put Iran on a path of a normal

1cfeter1

relationship with nations.  He was ousted by Ayatollah

Khomeini.  He had to be smuggled out before he was

assassinated.  He's lived in exile ever since.  Banisadr

testified in this case.  He said Iran's leaders don't actually

care about Islam.  What they care about is power.

Now, as part of that, the idea of using Sunnis as

proxies, Iran in starting in 1991, 1992, Iran founded a new

organization specifically to promote publicly a reconciliation

of Sunni and Shia sects of Islam.  This dovetailed

simultaneously with the ideas and the preachings of the

Sudanese political and religious leader Hassan al Turabi.

Al Turabi promoted the idea of setting aside the historic

bitterness between Sunni and Shia to create a united front

against the United States and Israel.  He hosted a giant

conclave in 1991 of hundreds of mullahs, clerics and hundreds

of terrorists who all descended upon Sudan to attend this

conclave for this purpose.  He established ties to Iran's

political leadership and intelligence agencies at that time.

Among the people who was resident in Sudan at that

time was Osama bin Laden, as well as Ayman al Zawahiri, who

around that time came together to form what we -- solidified

what we now know as Al-Qaeda.  Bin Laden and Zawahiri accepted

this concept, and the leadership of Iran as we know it was

already on that path.  They all came together during that time

frame, and discussions in Sudan between those parties led to an

1cfeter1

 1  informal agreement to start to cooperate against the United

 2  States and Israel.

 3      Now, when those discussions start, led to the

 4  beginnings of exchanges of training where Al-Qaeda operatives

 5  were sent to Iran to receive training, particularly in

 6  explosives, as well as being sent to Lebanon for training with

 7  Hezbollah.  This all led to a historic meeting in 1993 in

 8  Khartoum, Sudan.  This meeting, as we know, was arranged by a

 9  man named Ali Mohammed, who now resides in the United States

10  federal prison.

11      Ali Mohammed is a confessed terrorist.  He was a

12  bin Laden bodyguard.  He is the fellow who was a member of the

13  United States military for many years but he was exposed,

14  ultimately, and convicted for his part in several terrorist

15  attacks that will be discussed in a few moments.

16      As part of his plea allocution, Ali Mohammed

17  confessed -- or described setting up the meeting, or helped

18  setting up the meeting in 1993 in Khartoum, Sudan.  That

19  meeting was attended by Osama bin Laden and Ayman al Zawahiri

20  on behalf of Al-Qaeda, as well as Iran's and Hezbollah master

21  terrorist Imad Mughniyah and a number of very prominent Iranian

22  officials, including the IRGC brigadier general Mohammad Baqr

23  Zolqadr.

24      This 1993 meeting in Khartoum led to an alliance, an

25  actual alliance between Iran, Al-Qaeda and Hezbollah to jointly

1cfeter1

cooperate, support each other and to carry out terrorist acts

against the United States and Israel.  In particularly

significant was that Imad -- up until that time bin Laden's

history was that he was a guerilla fighter in Afghanistan.  It

was Imad Mughniyah who made him into a terrorist, starting

then, and he convinced him in particularly, in particular about

the effectiveness of suicide bombings in -- that he had

demonstrated in the 1980s in the acts that -- previously

described, which had the effect basically of getting the United

States military out of Lebanon in the mid-'80s.  He convinced

Bin Laden that this was the right tactic; this was the

effective tactic.  And that is what bin Laden and al Zawahiri

embraced.

          This meeting led to ongoing communications, training

arrangements and operations among Iran, Hezbollah and Al-Qaeda

that continued on throughout the '90s.  Bin Laden sent more of

his terrorist operatives to Hezbollah training camps that were

operated by Mughniyah, both in Lebanon and in Iran, inside

Iran.  One of those trained was a man named Saif al-Adel, who's

become the number three person in Al-Qaeda and the chief of the

military operations.  And he becomes a significant player in

these facts as well, which I will mention in a few moments as

well.

          Among the Hezbollah training of the Al-Qaeda

operatives and the IRGC training of Al-Qaeda was training in

1cfeter1

how to bomb large buildings, as well as intelligence and
security.  One of the others who fit by the way, who
coordinated this training, was a man by the name by Majid
Kamal.  He was an IRGC commander who had performed this
training function and this training coordination function at
the creation of Hezbollah.  He returned for repeat performance
then in the '90s assisting in this very same function.

Now, after the terrorist alliance was formed,
al Zawahiri repeatedly visited Tehran during and throughout the
1990s, developed relationships with MOIS and IRGC, including
the MOIS Chief Ali Fallahian and the Qods Force chief Ahmad
Vahidi, both notorious players in many terrorist acts yet to
come throughout the '90s.  Then the training arrangement
continued, coordinated by Imad Mughniyah and the IRGC officers.

The witness Y testified -- witness Y was one of those
trainers.  And he testifies in great detail about his
activities in Lebanon as an IRGC terrorist trainer in his
deposition, Exhibit S5, at pages 42 to 52 and 66 through 73.

Witness Z testifies about training camps inside Iran
for terrorists that he personally was aware of.  Witness Z
testifies about S7 at pages 117 to 118.

Witness X testifies to those as well, but, again, that
will be unsealed.

Terrorist attacks thereafter -- the formation of the
terrorist alliance between these three entities then led to,

1cfeter1

1    directly to a pattern of terrorist strikes directly against the

2    United States and its allies during the 1990s.  In March 1992

3    Hezbollah terrorist team operated directly under Imad

4    Mughniyah, truck bombed the Israeli embassy in Buenos Aires,

5    Argentina.  Many casualties, many killed and wounded.  United

6    States National Security Administration, NSA, intercepts of

7    communications from Iranian embassies in Buenos Aires and

8    Brasilia to the foreign ministry in Iran proved beyond doubt

9    that Iran itself was involved in the 1992 attack on the Israeli

10   embassy in Buenos Aires.

11          Indeed, as our expert, Ronen Bergman, from Israel

12   describes in his affidavit, the proof was unequivocal.  It was

13   not a smoking gun but a blazing cannon of proof that Imad

14   Mughniyah and another senior Hezbollah member, Talal Hamiaa,

15   actually executed this terrorist operation.

16          In July 1994 Mughniyah and a Hezbollah sleeper cell

17   struck again, a follow-up bombing in Buenos Aires, Argentina,

18   when they truck bombed the Asociacion Mutual Israelita

19   Argentina, otherwise known as the AMIA, Jewish cultural center

20   in Buenos Aires.  United States investigation, Israeli

21   investigation and Argentina all concluded that Iran, Hezbollah

22   and Imad Mughniyah were responsible for the AMIA bombing.

23          In fact, the Argentinian investigators determined that

24   the decision was taken at the highest levels of Iran's

25   government.  And they indicted nine major officials of Iran,

1cfeter1

1    including Imad Mughniyah, but also including the Supreme

2    Leader, the defendant Khamenei in this case, and then president

3    Rafsanjani, also a defendant in this case, among others.  The

4    Argentines then sought the issuance of Interpol red notices for

5    all nine.

6           And what followed then was an extraordinary, in fact,

7    unprecedented attempt by Iran to try to block Interpol from

8    issuing red notices for its president and Supreme Leader, as

9    well as the others.  After a long battle at Interpol, notices

10   were -- red notices were issued for six.  They managed to avoid

11   Khamenei, Rafsanjani and the ambassador to Argentina being

12   sought by Interpol, but as affidavit of Edgar Adamson

13   describes, it was an unprecedented activity at Interpol at that

14   time.

15          In July 1995, Ayman al Zawahiri's Egyptian gunmen, who

16   were supported trained and funded by Iran, attempted to

17   assassinate Egyptian president Hosni Mubarak in Addis Ababa,

18   Ethiopia.  That attempt failed.  However, what followed was

19   that the IRGC extricated some of the assassins from Ethiopia

20   and arranged for their protection by Hezbollah in Lebanon and

21   for the team leader of that assassination attempt, they

22   protected him.  They gave him refuge inside Iran itself.

23          In May 1996, after extraordinary pressure from the

24   United States and the Saudis and Egyptians, Sudan actually

25   expelled Bin Laden and he relocated to Afghanistan.  What's not

1cfeter1

 1    generally known about that is that his relocation was

 2    materially assisted and coordinated by a Sunni warlord, an

 3    Afghan named Gulbuddin Hekmatyar, who is a strong ally -- he's

 4    from western Afghanistan.  He's a strong ally of Iran -- and

 5    that Bin Laden's relocation was accomplished with the direct

 6    assistance of the Iranian intelligence services.

 7            Shortly after Bin Laden relocated to Afghanistan was

 8    the 1996 truck bombing of the Khobar Towers in Saudi Arabia.

 9    This is the American servicemen's housing complex.  A

10    devastating truck bomb killing 19 soldiers and wounded more

11    than 500.

12            The FBI had been engaged in an unprecedented overseas

13    investigation.  The FBI investigators concluded that the Khobar

14    Towers operation was on the direct orders of the Iranian senior

15    government leaders.  The bombers were trained and funded by the

16    IRGC in Lebanon.  And indeed, the 9/11 Commission looked at

17    this as part of the pattern of Al-Qaeda violence, terrorism,

18    and the 9/11 Commission itself said that it examined CIA

19    documents that established that it was the -- actually, it was

20    the IRGC Qods Force commander Vahidi who planned the Khobar

21    Towers attack, along with Ahmad al Mugassil, who was an

22    Al-Qaeda operative.

23            A US District Court in Washington, DC, held that Iran

24    was, in fact, factually and legally responsible for the Khobar

25    Towers bombing.  That's the Heiser case, vs. Islamic Republic

1cfeter1

1    of Iran, about 2006.

2              The Al-Qaeda, as you know, was involved in planning,

3    so Iran was as well, but so was Imad Mughniyah.  And witness Z

4    testifies of his personal knowledge of Mughniyah's involvement

5    and Iran's involvement in the Khobar Towers bombing.  His

6    testimony in Exhibit S7 at pages 100 to 101 and 111 to 112 is

7    specifically about their involvement in the Khobar Towers

8    bombing.

9              Now, indeed, you know it's known that Bin Laden

10    facilitated shipment of explosives to Saudi Arabia and was, in

11    fact, congratulated on the day of the Khobar Towers bombing on

12    a satellite phone which was intercepted by the United States

13    NSA.  Now, just two months later, Osama bin Laden issued his

14    first fatwa against the United States, basically a declaration

15    of war against the United States.  And he specifically cites

16    the Khobar Towers bombing as part of his premise for doing

17    that.

18              Now, so Khobar Towers is very, very clear instance in

19    which the involvement of all three, Hezbollah, Iran and

20    Al-Qaeda, were clearly involved together, acting together.

21              At that same time in August of 1996 an Iranian

22    intelligence operative who was directly involved in the Khobar

23    Towers bombing visited Osama bin Laden in Jalalabad,

24    Afghanistan and the subject of a continuing strategic agreement

25    to undertake a joint terrorism campaign against the United

1cfeter1

1    States.  And at that same time one of his associates, most

2    dangerous associates, was in contact with Mughniyah's offices

3    in Beirut.  And the training and transfer of equipment and

4    material and knowledge between Iran and Hezbollah and Al-Qaeda

5    continued.

6          On February 23, 1998, just about a year and a half

7    later, Osama bin Laden issued his second fatwa against the

8    United States, calling for the murder of Americans as the

9    individual duty for every Muslim who can do it in any country

10   in which it is possible to do it.

11         A few months later they struck again.  This time it

12   was the United States Embassies in Nairobi, Kenya, and

13   Dar-es-Salaam, Tanzania.  Hundreds of miles apart, but the

14   truck bombings, which were devastating in nature, were

15   simultaneous, killing hundreds of people and wounding

16   thousands.  This type of attack, the simultaneous spectacular

17   truck bombings by suicide bombers against American symbols of

18   power and influence, is the hallmark of Imad Mughniyah.  That

19   would be -- United States District Court held just recently, as

20   your Honor indicated a little while ago, in the *Owens* case,

21   United States District Court held that Iran, IRGC and the MOIS

22   were factually and legally responsible for the US Embassy, twin

23   embassy bombings in 1998.

24         But there's no doubt that it was all three of these

25   entities, Iran, Hezbollah and Al-Qaeda, who carried it out.  It

1cfeter1

was, in fact, Al-Qaeda operatives who actually carried out the

bombings, were the -- provided the suicide bombers, but they

were trained by Hezbollah, as found in the *Owens* case, trained

in handling sophisticated explosives.  And the *Owens* court

found that Iran's leaders were aware of and authorized that

training and assistance.

          Again, one of those who had been trained in the

Hezbollah camps was Al-Qaeda operative Saif al-Adel.  Saif

al-Adel was convicted in absentia in the United States for his

personal role in the twin embassy bombings, and significantly,

Saif al-Adel, as we'll see, spent years after 9/11 in safe

refuge inside Iran.

          Now, the next attack was October 12, 2000.  The USS

Cole was struck in the harbor of Aden, Yemen, killing 17

sailors and injuring many more.  Around just that time a US

defense intelligence agency analyst by the name of Kie Fallis

was actively alerting his superiors that he had found a web of

connections among Al-Qaeda, Iranian intelligence agencies

controlled by the Supreme Leader and by Hezbollah, as well as

other groups, terrorist groups.  Indeed, the 9/11 Commission

report states at page 240, it says, quote, that Iran made a

concerted effort to strengthen relations with Al-Qaeda after

the October 2000 attack on the USS Cole.

          But significantly, the same passage of the 9/11 report

also states that during this time frame Iranian officials

1cfeter1

1  facilitated the travel of Al-Qaeda members, including some of

2  the 9/11 attackers, hijackers, through Iran on their way to and

3  from Afghanistan, where they trained at the Al-Qaeda's training

4  camps.  Additionally, the types of charges that were used in

5  the USS Cole attack were sophisticated, shaped charges, which

6  is the specialty of Hezbollah as taught to them by the MOIS and

7  IRGC.

8          That leads me to the specific instances of Iran's

9  active involvement in the 9/11 attacks.  First, the concept of

10  Iran and terrorist travel.  There are two separate but related

11  ways in which Iran furnished material and direct support for

12  the 9/11 terrorist specific travel operation, just the part of

13  the operation that involved getting the 19 hijackers to the

14  United States.  But first they had to go to Afghanistan, where

15  they trained for the mission; in fact, had to meet with

16  Bin Laden himself.

17          Now, what happened, the first way in which Iran

18  specifically materially supported this travel operation was

19  that Iran facilitated the transit of Al-Qaeda members into and

20  out of Afghanistan in the year prior to 9/11 by ordering its

21  border inspectors not to stamp the passports of the future

22  hijackers as they crossed the international boundary either way

23  into and out of Iran.  That enabled the Al-Qaeda hijackers to

24  enter Iran without any record in their passport that they had

25  done so, to enter Afghanistan.  They could only do that by

1cfeter1

1    transiting through Iran and not having their passport stamped.

2         Here was the problem they were addressing.  9/11

3    Commission, of course, if you take what this says on 240, is it

4    contained evidence 8 to 10 out of the 14 Saudi muscle

5    operatives -- excuse me, of the muscle operatives traveled into

6    or out of Iran between October 2000 and February 2001.  The

7    problem was this:  That the travel to the training camps in

8    Afghanistan was absolutely essential for the hijackers, because

9    they had to train there and meet with Bin Laden and others.

10   Absolutely essential for the success of the operation.

11        But Al-Qaeda knew that the Americans were well aware

12   of the existence of the Al-Qaeda training camps in Afghanistan.

13   During the Clinton years our military had fired cruise missiles

14   into those training camps already trying to get Bin Laden.

15   They knew that we knew where they were.

16        They also knew that a terrorist operative who was

17   trying to obtain a visa in the United States Embassy or

18   consulate abroad or who was presenting himself for entry,

19   admission at a port of entry into the United States, could be

20   not only discovered and denied entry or denied a visa, but

21   rather, he could be arrested and interrogated and perhaps the

22   entire plot be unraveled if it became known that they had

23   traveled to Afghanistan.  Because Afghanistan was already a

24   terrorist state, that alone would have prevented them from

25   getting a passport or being able to enter.  And the entire plot

1cfeter1

could have come unraveled.  Therefore, they needed to be able
to enter Afghanistan without any documentary evidence in their
passports.

NSA intercepts themselves, which were made available
to the 9/11 Commission but were discovered only a few days
prior to the report's publication, showed that Iranian border
inspectors had been ordered not to tell -- put those stamps in
the operatives' passports, and that the Iranians were well
aware that they knew that -- were well aware that they were
helping operatives who were part of an organization that was
preparing attacks against the United States.

And this could not happen, this could not possibly
happen in Iran without senior leadership knowing about it.  It
is a police state.  They control their borders.  The MOIS and
IRGC control the borders.  There are no rogues who are stamping
passports.  This was unquestionably -- and the NSA intercepts
proved it.  The 9/11 Commission knew and concluded that that's
what happened.  They simply ran out of time.  But when they had
to publish, because the commission was going out of existence,
they didn't have time to follow up on all of this information,
which is why the 9/11 Commission concluded on page 241 that a
further investigation is needed.  That investigation is the
investigation that we have done.

But to return to the travel problem, what is known
from the 9/11 Commission investigation was that three

1cfeter1

hijackers, at least three, were known -- we had enough of the

passports recovered.  They were known to be carrying an

indicator inside the passport of what the commission reports as

Islamic extremism.  It was basically some kind -- apparently

was some kind of counterfeit stamp or indicator that they were

who they were, they were terrorists.  These were the guys

you're supposed to not stamp their passports.  The commission

figured that out.  They were probably Al-Qaeda calling cards to

identify themselves covertly to the border inspectors in Iran.

          Therefore, the commission concluded that the actions

of the border authorities in Iran, by refraining from stamping

the passports of the Saudi hijackers, vastly increased the

likelihood of the operational success of the 9/11 plot.  That

conclusion appears at page 240.

          Now, interestingly, it's also known that in the

mid-1990s the groundwork for this had been laid by an Al-Qaeda

operative Mustafa Hamid, who had negotiated a secret

relationship with Iran that had already contemplated this type

of safe transit to Afghanistan via Iran, and that passageway

was managed by -- was to be managed by the MOIS.  This is also

a conclusion of the United States government that comes from a

United States Treasury Department designation in January 2009.

So it was known that they made this arrangement.

          This entire arrangement is confirmed by numerous

admissions from Al-Qaeda prisoners at Guantanamo who confirmed

1cfeter1

the existence of the clandestine Iran/Afghanistan passageway
that was managed by MOIS.  As Mr. Mellon will describe for you
later, many of our experts also contribute valuable insights
into this arrangement.

It leads to the second way which Iran actively and
materially directed and supported the hijackers' international
movements.  The commission report specifically finds that in
October 2000, a senior operative of Hezbollah visited Iran to
coordinate activities there.  Excuse me, I misread that.
Quote, in October 2000 a senior operative of Hezbollah visited
Saudi Arabia to coordinate activities there.  He also planned
to assist individuals in Saudi Arabia travelling to Iran during
November.  A top Hezbollah commander and Saudi Hezbollah
contacts were involved.

Further, the 9/11 report says that in November of
2000, a muscle hijacker, one of the muscle hijackers,
specifically, Ahmed al Ghamdi, flew to Beirut on the same
flight as a, quote/unquote, senior Hezbollah operative.

Further, the report states, in mid-November 2000,
three of the muscle hijackers, having obtained US visas,
traveled in a group from Saudi Arabia to Beirut and then onward
to Iran.  An associate of a senior Hezbollah operative was on
the same flight that took the future hijackers to Iran.

Finally, the report also states that Hezbollah
officials in Beirut and Iran were expecting the arrival of a

1cfeter1

group during this exact same time period.  The travel of this
group was important enough to merit the attention of senior
figures of Hezbollah.

        The 9/11 hijackers were -- not a single one of them
was an important individual.  They were all pretty much nobody
before 9/11.  They were young men who were recruited to engage
in this operation.  There is no way that their travel would be
important enough to merit the attention of senior Hezbollah
figures if they weren't, in fact, people who had been recruited
for a major terrorist operation.

        But most significantly of all, the senior operative of
Hezbollah that is referenced on pages 240 and 241 of the 9/11
report, we know, is the master terrorist of Hezbollah and the
agent of Iran, Imad Mughniyah.  We have presented to the Court
evidence that it was, in fact, Imad Mughniyah.  The 9/11
Commission report, remember, they wrote these -- they had to
write these two pages in the last few days before publication,
the last few days of the commission's existence, when these NSA
intercepts that proved all of this information was discovered.
To put Imad Mughniyah's name would have been basically to turn
the table over, because he is, without question, he was,
without question, the most dangerous terrorist in the world.
But it is known that the senior Hezbollah operative was Imad
Mughniyah.

        Now, because that is true, that means that it's an

1cfeter1

agent, a direct and long-time agent of Iran, as well as other
Hezbollah officials, senior Hezbollah officials in Lebanon and
in Iran had actual foreknowledge of the 9/11 conspiracy.  And
that much is clear just from pages 240 and 241 of the report.

        Our three defector witnesses in this case testify
repeatedly about the involvement of Imad Mughniyah in the 9/11
plot.  Witness Y testifies at Exhibit S6 at pages 36 to 45.
Witness Z testifies in Exhibit S7, pages 43 to 52 and 62 to 90
and 103, as well as 91 to 98.  Additionally, important to that
is our Exhibits 7 through 10 to witness Z's testimony, which is
S7.

        Once again, the 9/11 Commission after reviewing this
evidence concluded that further investigation of these matters
was warranted.  Again, this group of lawyers conducted that
further investigation, and among the first things that we found
was it was important information about the individual Ramzi
Binalshibh.  Ramzi Binalshibh is -- this is in the 9/11
conclusion of the 9/11 report.

        Ramzi Binalshibh was a well placed Al-Qaeda operative
who was supposed to be one of the pilots on one of the planes,
but he was unable to get a United States visa, which he needed
to participate directly as a hijacker.  So the 9/11 Commission
concluded that that's why he wasn't part of it, but instead he
became the coordinator, the overseas coordinator for the entire
9/11 operation and a liaison between the Al-Qaeda camps and

1cfeter1

1    Bin Laden and al-Zawahiri in Afghanistan, and in particular,

2    the Hamburg cell of the Mohammed Atta in Germany.  So he lived

3    in that apartment with Mohammed Atta, and he was instrumental

4    in the coordination of the entire operation.

5             Now, what we found in our investigation was that eight

6    months before 9/11 occurred Ramzi Binalshibh went to

7    Afghanistan.  This was known.  But what was not in the 9/11

8    report was that Ramzi Binalshibh stopped in Tehran en route to

9    meetings with the Al-Qaeda leaders in Afghanistan in January,

10   February of 2001.  This is Exhibit 18.  And we received these

11   documents directly from the German federal prosecutors in

12   Karlsruhe, Germany.  Those documents show that the stop along

13   the way for Ramzi Binalshibh between Germany via Amsterdam to

14   Afghanistan, he stopped in Tehran in January.

15            Now, during the time frame that Binalshibh was in Iran

16   or was making that trip, our evidence shows that Iran was

17   hosting a four-day secret meeting of Al-Qaeda terrorists,

18   including Ayman al Zawahiri specifically and Saif al-Adel

19   specifically and many others, as well as the Hezbollah terror

20   chief Imad Mughniyah and many senior Iranian officials, some of

21   whom are named.  This is important testimony from Exhibit S7,

22   the testimony of witness Z, pages 73 to 84 of Exhibit S7.  So

23   this places Ramzi Binalshibh in Iran at the same time that

24   these meetings occur.

25            Our investigation also turned up a memorandum of

1cfeter1

1     May 14, 2001.  And this is in our proof several times.  It is

2     an exhibit to the testimony of witness Z, who testifies to the

3     origin and significance of this document.  So also available on

4     the Internet now, and it is the attachment B to the affidavit

5     of Ronen Bergman, which is Exhibit 7.

6          The May 14, 2001, memorandum was authored by Ali Akbar

7     Nateq-Nouri.  Nateq-Nouri was the overseer, the head guy in

8     charge of its Supreme Leader's special intelligence apparatus.

9     And in that memorandum he says that he is speaking through the

10    Supreme Leader.  And he shows, he demonstrates quite clearly

11    Iran's and Hezbollah's full awareness of and involvement in

12    Al-Qaeda's plans for an impending terrorist strike against the

13    United States.  Needless to say, this is just a few months

14    before 9/11 occurred.  That document -- which, again, is

15    publicly available, but if your Honor would review the

16    testimony of witness Z, it is specifically in his testimony.

17    And it's in the exhibits and testified to in detail.

18         This document has been reviewed and found authentic by

19    the United States and Israeli intelligence, as indicated in

20    Ronen Bergman's affidavit.  It was addressed to the head of

21    Iran's intelligence operations, Section 43 of MOIS, Mustafa

22    Pourkanad.  It shows Iran's awareness of an upcoming major

23    attack in the United States, and it directly connects Iran and

24    Imad Mughniyah to Al-Qaeda and to the planned attack.  It

25    references Iran's, quote/unquote, support for Al-Qaeda's future

1cfeter1

plans and cautions to be alert for the possible negative future

consequences of this cooperation between Iran and Al-Qaeda.  It

says, while expanding the collaboration of the fighters of

Al-Qaeda and Hezbollah, the Supreme Leader was emphasizing with

regard to cooperation with Al-Qaeda that no traces be left that

might have negative and irreversible consequences.  And that

contact should be limited to those already existing with Imad

Mughniyah and Ayman al-Zawahiri.  A very, very important

indication that Iran knew all about and was preparing for

potential retaliation from the United States, should Iran's

involvement in 9/11 be discovered.  At that time it was not,

and that's why there was the caution to limit contacts only to

Mughniyah, who was the most secretive and skilled of

terrorists, and Al-Qaeda's number two, Ayman al-Zawahiri.

          Now, as part of the Havlish investigation, your Honor,

as we've indicated, we had the testimony of the three former

MOIS, and in one case, IRGC Qods Force members X, Y and Z;

elaborate testimony covering about 28, 29 hours that was taken

in 2005 and 2008 overseas.  And your Honor has the videotapes

as well as the transcripts and exhibits.

          Witness X has authorized us to reveal his identity,

and I want to do so today.

          Now, this might however, if the Court pleases, this

might be a good place for a break before, because I know I've

been going a long time.  And I sense that this could be a good

1cfeter1

1    time for a break?

2            THE COURT:  Sure.  Let me give the court reporter,

3    which I'm most concerned about, let's take a five to ten-minute

4    break.

5            (Recess)

6            THE COURT:  You can continue.

7            MR. FLEMING:  Thank you.

8            Your Honor, witness X is Abolghasem Mesbahi.

9    Abolghasem Mesbahi was an Iranian regime insider from the very

10   beginnings of the Islamic republic, was personally familiar

11   with many of the top regime leaders in the '80s, 1980s and

12   early '90s, was a personal friend from a very early age of

13   Ayatollah Khomeini, was part of his circle, even though Mesbahi

14   was very young.

15           He was born into a well educated family.  His mother

16   was a judge during the reign of the Shah.  And he was very well

17   educated, something of a child prodigy, finished school at a

18   very early age, got advanced education in Paris at the

19   Sorbonne, speaks five languages.  A very, very, very

20   intelligent person who I think that comes across in his

21   testimony, which your Honor has seen.

22           He also knew the defendant Ali Akbar Hashemi

23   Rafsanjani very well, former president of Iran and former

24   speaker of the Parliament and a key player in the Iran/Iraq

25   war.  And he tells some stories, he relates some stories of his

1cfeter1

exposure to Rafsanjani during that time period.  Abolghasem
Mesbahi was also a close associate of Saeed Emami, who was the
top -- a very top official, the number two official in the
MOIS.

Mesbahi himself held a number of prominent positions
in the diplomatic and intelligence organizations of the Iranian
regime, even as a very young man, including a position at the
Iranian embassy in France shortly after the Islamic republic
came into being.  But there he was not really a diplomat.  He
was a spy, and was in charge of espionage for Iran in France
until December 1983, when he was expelled by the French
government as persona non grata had he been discovered.

He returned to Iran but shortly after returned to
western Europe, where he was based in Belgium.  And he ran
Iran's espionage operations throughout western Europe under a
variety of assumed names.  Subsequently, Mesbahi played a role
in the negotiations on behalf of Iran during the Lebanon
hostage crisis of the 1980s.  In particular, he was deeply
involved in the negotiations surrounding a German hostage named
Rudolf Cortés, as he testifies.  Mesbahi returned to Iran in
the mid-'80s, 1984, '85, to work on the creation of the new
intelligence service, MOIS.

Now, during the mid1980s Iran's government believed
that its best hope in case of a war with the United States,
which was always possible -- remember that the four-day Iran

1cfeter1

1    hostage crisis had only ended a few years before.  And there

2    were so many -- including the bombings in Lebanon and so forth

3    that we've already discussed.  The possibility of the war with

4    the United States was ever present.

5            But Iran knew that it could not win a conventional,

6    head-to-head military confrontation with the United States.

7    Therefore, Iran concluded that its best hope to defeat the

8    United States in case of some kind of a military confrontation

9    was to engage in unconventional or asymmetrical warfare

10   strategies.  Therefore, it formed a task force of MOIS agents

11   and IRGC officers that was tasked with creating contingency

12   plans for asymmetrical warfare against the United States.

13           Indeed, the State Department, the State Department

14   itself became aware of this.  And in one of the US State

15   Department reports we point out in our brief, the State

16   Department observed that Iran began formulating contingency

17   plans for anti-US terrorist operations in the mid to late

18   1980s.

19           In 1985/1986 timeframe Abolghasem Mesbahi worked with

20   the MOIS/IRGC task force that was creating contingency plans

21   for asymmetrical warfare against the United States.  That task

22   force, as Mesbahi testifies in this case, devised contingency

23   plans which were aimed at breaking the backbone of the United

24   States economy, crippling or disheartening its will to fight,

25   breaking the resistance of the United States government and its

1cfeter1

people or their appetite for war with Iran and disrupting the
American economic social, military and political order, all, if
it could risk a head-to-head military confrontation.  Mesbahi
described it as a breaking plan.

The contingency plan's code name was Shaitan dar
Atash, which in Farsi means Satan in fire or Satan in hell.
Now, among the other things, the Shaitan dar Atash plan, it had
many components, but first, some of the tactics that were
conceived of and designed were tactics such as chemical weapons
and radioactive dirty bombs, to be deployed in American cities,
bombing electrical power plants, as many as possible, bombing
gas stations, which have, of course, you know, lots of fuel,
explosive fuel right on site, bombing oil -- attacking, bombing
oil tankers by the hundreds, even the trucks that go along the
highways, destroying the railroads.

But it also involved, among all those other things,
the planning group devised a scheme to crash hijacked Boeing
747 aircraft into major American cities.  Specifically and
principally and always first among the targets were the cities
of New York and Washington, DC, as well as Chicago.  In fact,
as Mesbahi testified, the contingency plan to hijack Boeing 747
aircraft were actually, was targeted -- specifically, among
other potential targets, were the World Trade Center in
New York, the White House in Washington and Pentagon, the
Pentagon in Virginia, just across the river from Washington.

1cfeter1

1          Now, the Shaitan dar Atash plan specifically was

2     focused on Boeing 747 aircraft for a reason:  They're the

3     largest major airplanes being used at the time.  They were the

4     focus of the IRGC and MOIS task force for aircraft hijackings

5     precisely because their large fuel tanks made them suitable for

6     crashing them into high value targets, such as the World Trade

7     Center or the Empire State Building in New York or the White

8     House or the Pentagon.

9          Mesbahi himself was part of the group that devised

10    these contingency plans which existed in Iran, in the military

11    intelligence circles of Iran since the mid to late 1980s;

12    again, contingency plans not necessarily to be used at that

13    time, were not used at the time, but they were planned and

14    ready.

15         Now, Mesbahi himself fell into disfavor with certain

16    hard line elements of the Islamic regime.  And as is often

17    happens in Iran, when you fall out of favor with hard line

18    elements in the regime, Mesbahi was arrested and imprisoned

19    several times.  And after his release the last time he was

20    banned from government, official government positions.

21         So he started a private business, but he still

22    became -- because as I noted previously, individuals and

23    private corporations are always at the beck and call of the

24    intelligence service when it comes to matters of terrorism.

25    Mesbahi continued to be called upon by MOIS to perform duties

1cfeter1

related to intelligence and terrorism support.  So he was

called upon to use his private business as a cover for those

activities.

He describes in his testimony working with MOIS front

companies involved in transactions such as Iraqi oil sales

using reflagged oil tankers.  He describes working on the

importation of supercomputers and on weapons procurement deals

and all kinds of other transactions.

Now, in 1996 Mesbahi was told by his colleague and

friend, Saeed Emami, who was then the number two official at

MOIS, he was told that he had been targeted -- he had been put

on a death list, that he was targeted for imminent

assassination by his enemies within the regime, the people who

didn't like him or like his attitude particularly with regard

to his somewhat moderate stance on relations with the West.

So Mesbahi fled Iran, based on the tip from Saeed

Emami.  And he describes how Emami came to his house in the

middle of the night to tell him he was going to be killed.  So

he left everything he had behind and he fled.  And he made his

way -- got outside of Iran, where he obtained a United Nations

refugee card, and ultimately made his way to Germany.

Mesbahi has been living in hiding in Europe ever

since.  But in Germany, he became an informant for the German

Bundeskriminalamt, roughly the German equivalent of the FBI.

And he was placed in a German witness protection program.  He

1cfeter1

1      became a very important informant and witness for the Germans.

2      And at that time he testified anonymously as witness C in the

3      German prosecution of the Iranian-backed assassins of the

4      Kurdish leaders at the Mykonos restaurant in Berlin in

5      September 1992, which I referred to earlier.  That German court

6      relied heavily on Mesbahi's testimony in convicting all of the

7      defendants, including the Iranian coordinator, and specifically

8      finding defendant Rafsanjani and defendant Khamenei as having

9      ordered the assassination of those Kurdish dissidents.

10             Mesbahi was witness C.  He was the critical witness in

11     the Mykonos prosecution.  He was introduced to the Court, in

12     fact, by another witness in that case, and a witness who's also

13     a witness in this case, and that is Abolhassan Banisadr, the

14     first president of Iran who testified in this case as well.

15             The Mykonos trial, as I said, resulted in the

16     convictions of all the defendants.  And it led to the German

17     arrest warrant being issued for the MOIS chief Ali Fallahian.

18     The trial exposed the inner workings of the MOIS and the role

19     of the Supreme Leader and the president in matters of

20     terrorism.  It also led to an international incident in which

21     the nations of Western Europe withdrew their ambassadors from

22     Iran and suspended what was at that time called the critical

23     dialogue, which was an attempt to gain some kind of

24     international dialogue with Iran.  It was all suspended and the

25     ambassadors were withdrawn for a period of time.

1cfeter1

            But the Mykonos trial also led other European and

ultimately South American investigators to try to work with

Mesbahi to help them in their prosecutions of terrorists for

terrorist attacks that occurred in their countries.  And

Mesbahi became one of the most important witnesses for western

prosecutors who were attempting to prosecute Iranian-backed

terrorists.

            Among those prosecutions was the AMIA bombing in

Buenos Aires in 1994, which I described a little while ago.  It

resulted in indictments of nine top Iranian officials and

Interpol red notices for six of them, including the master

terrorist of Hezbollah, Imad Mughniyah.

            This also, the AMIA bombing, the AMIA prosecution

heavily relied on the assistance of Abolghasem Mesbahi.

Parenthetically, another person who was involved was another

witness in this case, Kenneth Timmerman, who's in the courtroom

here today and was an instrumental part of the Havlish

investigation team.

            What's important about that, it will become apparent

in a moment, because what happened to Mesbahi was this:  Before

he left Iran, being well versed in code methodology as a top

Iranian spy, the head of espionage in all western Europe,

before he left Iran, he established code methodologies with

some of his trusted friends.  Principally among us, he knew

that -- he knew a lot of state secrets.  And he knew they

1cfeter1

wanted to kill him, so he was very concerned that if a death

squad went overseas, that his friends be able to alert him.

Remember that in the 1980s some 200 Iranian dissidents were

assassinated in western Europe.  Mesbahi knew this, so he

established a set of codes to which he could communicate with

trusted friends inside the Iranian government thereafter.

That led to the summer of 2001.  And on July 23, 2001,

as he was accustomed, Mesbahi checked the places in which he

received coded messages.  He describes a number of ways in

which he did receive coded messages from inside Iran, but one

of them was through the newspapers, Iranian newspapers, where a

code -- where he could -- where he could look -- read a

published newspaper and find a coded message embedded therein.

On July 23, 2001, Mesbahi received just such a coded

message from one of his trusted friends.  When he decoded the

message, he saw that the message was three words:  Shaitan dar

Atash, Satan in hell, Satan in fire.  But more importantly, it

was the name of the contingency plan for asymmetrical warfare

against the United States that he was a part of the creation.

Mesbahi knew that this coded message meant what it

meant, because he was -- of his work on that task force.  And

he knew that it must have meant that the Shaitan dar Atash plan

was being activated somehow, but he still didn't know which

aspect of it was.  Was it the airliners or was it the oil

tankers; the electrical power plants, the railroads?  He didn't

1cfeter1

1    know.

2            But he knew it was serious, so he contacted his former

3    handlers when he was in the witness protection program.  He met

4    them and told them that he had received this message.  He said

5    a big event is going to happen in the United States, a huge

6    terrorist operation, and he asked them to convey the

7    information to higher authorities.  The officers said they

8    would convey the information, and they'd let him know what

9    would happen next.

10           But three weeks later, on August 13, 2001, Mesbahi

11   received another coded message from his source in Iran,

12   clarifying that the Shaitan dar Atash contingency plan that was

13   being activated was the plan to crash hijacked civilian

14   airliners into American cities.  Again, Mesbahi contacted the

15   German police officers that he knew or the LKA,

16   Landeskriminalamt, which is more of a local police, cut in,

17   told them about the message, pleaded with them for action.

18   Again, they conveyed the message to higher authorities and said

19   they would get back to him if there were further developments.

20   And Mesbahi emphasized that lives were at risk.

21           They didn't get back to him, and two weeks

22   additionally passed.  And Mesbahi received a third coded

23   message on August 27, 2001.  That third message confirmed the

24   activation of the Shaitan dar Atash plan but added important

25   information that somehow Germany was involved in the facts; not

1cfeter1

that Germany was part of it, but, rather, that something, the
name of Germany was in the reports that his friend and contact
in Iran knew.  So he knew that somehow there was something
going on in Germany that was related to the Shaitan dar Atash
plan.

It is now known in the 9/11 Commission report quite
clearly that Mohammed Atta, Ramzi Binalshibh, Al-Qaeda
terrorist cell that headed the 9/11 attacks was, in fact, based
in Hamburg, Germany.

Now, on September 11, 2001, Mesbahi saw with the rest
of the world that the attacks had taken place.  He desperately
tried to reach the LKA officers that he knew, and he tried to
contact people he knew in the Bundeskriminalamt, but in
Germany, just like in the United States, chaos rang.  He wasn't
able to get through to anybody.

A couple of days later he was able to and to reach
them and was able to speak with some people, but his
information -- it's not clear what happened to his information
at that point.  But after 9/11, as is set forth in great detail
in his testimony, he made repeated efforts to try to convey his
inside information to German and American governmental
authorities, German authorities in the law enforcement area in
Germany and American government authorities at the embassy.  He
was generally unsuccessful.

However, one person that he was able to contact was a

1cfeter1

1    Dr. Akbar Ganji.  He was an Iranian dissident in the United

2    States, and Dr. Ganji put Mesbahi in touch with Kenneth

3    Timmerman, who is an Iran expert and investigative journalist,

4    a well known authority in the United States and a person who

5    has actively tried to help the Iranians shake off the yolk of

6    the repressive regime of the mullahs for the last 20 years, an

7    author of many books on the subject and many, many articles in

8    the press, well known to the Iranian exile regime -- excuse me,

9    Iranian exile community in the United States and abroad.

10         Mesbahi succeeded in calling Kenneth Timmerman in

11   September 2001.  He told Ken Timmerman about the coded

12   messages.  And what is significant about that in particular is

13   that the way Mesbahi related his information about the coded

14   messages was exactly the same as he testified years later in

15   2008.

16         Now, another subject in had which Mesbahi had received

17   information from his sources inside Iran was that he learned

18   that Iran had purchased in 2000, Iran had purchased an aircraft

19   flight simulator through a Chinese company called Fuktad which

20   is based in Taiwan with which MOIS had relations.  And Mesbahi

21   knew about that.  Fuktad had obtained a simulator from AVIC,

22   the Aviation Industries Corporation of China, which is a

23   state-owned entity.  Then the simulator was transported to Iran

24   in 2000 by an IRGC front company called Safiran.  Safiran was a

25   company that was frequently used for clandestine procurement

1cfeter1

1    and transportation operations by the MOIS and the IRGC, and

2    Mesbahi knew about that, too.

3           Now, finally, that simulator was set up with computer

4    software to program the module to simulate Boeing 757, 767 and

5    777 aircraft, and that software was purchased through, as

6    Mesbahi testified, purchased by MOIS through East China

7    Airlines.  And the flight simulator for Boeing 757, 767, 777

8    aircraft was set up in a secure, secret facility at Doshen

9    Tappeh air base near Tehran.

10           Each of the four airliners that was hijacked on

11   September 11, 2001, and used in the 9/11 attacks were either

12   Boeing 757 or Boeing 767 model aircraft.  But Iran has never

13   owned a single Boeing 757, 767 or 777 aircraft, and that's due

14   to American trade sanctions against Iran that prohibit it from

15   buying aircraft from Boeing or from any company selling Boeing

16   aircraft.  They've never had a single Boeing aircraft, and yet

17   they had the flight simulator for that aircraft.  Those are the

18   aircraft that were, in fact, used, were hijacked on 9/11.

19           And when Mesbahi called Ken Timmerman in Washington in

20   September 2001, he also told that story, relayed that exact

21   information to Ken Timmerman in September 2001.  It didn't

22   change.  His testimony did not change.  It's beyond belief.

23   And Ken Timmerman is a personal witness to that.  He could not

24   have hatched any such story unless he actually had the

25   information that he was saying.  It would have been a

1cfeter1

preposterous thing to do.  So he didn't make it up.  He didn't

tell the story the first time in 2008, when we took his

testimony.  He told it to Ken Timmerman in September 2001.

Now, additionally, Mesbahi learned from his sources

one other important fact about the 9/11 hijackers, and that was

that at least one of them he knew by name, Majid Moqed, was a

muscle hijacker on American Flight 77 that hit the North tower

of the World Trade Center, had been identified and was being

housed in the months before 9/11, had stayed at a IRGC/MOIS

safe house called the Hotel Sepid in Tehran, where Mesbahi

himself had used, Mesbahi himself had used as an MOIS safe

house.  That is some of the more important testimony, some of

the most important testimony from Abolghasem Mesbahi.

Now, I want to address also what occurred after 9/11,

and that is that Iran provided safe haven to Al-Qaeda after the

9/11 attacks in several significant ways.  Most importantly, it

provided safe haven to Al-Qaeda leaders and operatives by the

hundreds, keeping them safe from retaliation of the United

States forces which had invaded Afghanistan in the fall of

2001.  Hundreds of Al-Qaeda operatives and leaders and their

families somehow managed to escape US invasion by entering

Iran.  That can't happen by accident.

In fact, it is known that the IRGC facilitated their

exit into Iran, and they then provided them safe quarters and

everything from financial services, food, medical services,

1cfeter1

everything they needed to live safely.  It is known that the
Gulbuddin Hekmatyar, the same person who helped Bin Laden
relocate with the assistance of the IRGC, relocate from Iran to
Afghanistan, now had helped the Al-Qaeda cadres fleeing
Afghanistan, helped them get into Iran, as did Imad Mughniyah,
as did the Iranian Qods Force commander Ahmad Vahidi.

        Among the high level Al-Qaeda officials who arrived in
Iran from Afghanistan at that time were Sa'ad bin Laden and the
man who would soon lead Al-Qaeda in Iraq, Abu Mussab Zarqawi.
This is particularly important because these are very, very
important people in Al-Qaeda.  And they were allowed to come
into Iran to escape the Americans, and they were allowed to
stay there.  In fact, Sa'ad Bin Laden had directed Al-Qaeda
terrorist activities thereafter for many years.

        Two of the witnesses in this case, the sealed
witnesses, Z and Y, both were involved in that evacuation and
provision of safe haven.  Witness Z testifies -- well, excuse
me.  Witness Z testifies to assistance to Sa'ad bin Laden prior
to 9/11 -- excuse me, I misspoke -- at S7, 84 to 90, pages 84
to 90.  Witness Y testifies in detail, because he was very much
involved in the support for the escaping Al-Qaeda operatives at
S6, Exhibit S6, pages 29 to 31, 35 to 45, or excuse me, 35 to
52.

        This does not all come from their testimony, though.
The United States Treasury designations and State Department

1cfeter1

1    words show very clearly that the United States knows beyond any

2    doubt that Iran helped the Al-Qaeda cadres escape into Iran and

3    that they were provided safe haven thereafter.  This is an

4    established conclusion of the United States government.

5    Indeed, the treasury designations report that Ayman al Zawahiri

6    himself made particularized arrangements for his own family for

7    safe haven in Iran after 9/11 through his son-in-law, who was

8    an Al-Qaeda operative, and that Sa'ad Bin Laden facilitated the

9    travel of Osama bin Laden by Bin Laden's own family members

10   from Afghanistan to Iran.

11           Now, finally, there have been -- as I mentioned, there

12   has been many instances of those Al-Qaeda operatives in Iran

13   living in safe haven, actually conducting terrorist activities

14   throughout the Middle East and directing them from their refuge

15   in Iran.

16           Most recently, your Honor, in July of this year, the

17   Obama administration and the US treasury department took

18   actions indicating that even to this day Iran has been

19   materially assisting Al-Qaeda by facilitating the transport of

20   money and terrorist recruits across Iran's territory.  The

21   government, our government, concluded that there is an

22   agreement between Al-Qaeda and the Iranian government

23   demonstrating that Iran is a critical transit point for funding

24   of Al-Qaeda activities currently going on in Afghanistan and

25   Pakistan.  It's the core pipeline that they move money and

1cfeter1

1    operatives across the Middle East to South Asia.  And the Obama

2    administration was very clear in announcing this, that senior

3    Iranian officials know all about these money transfers and that

4    they allow the movement of these Al-Qaeda foot soldiers through

5    Iran's territory.

6            That concludes my presentation of the evidence.  Thank

7    you, your Honor, for giving me the time to do that and being so

8    attentive.  I know it took quite a while, but thank you.

9            And I want to turn it back over to Thomas Mellon for

10   additional presentation.

11           THE COURT:  Thank you.

12           Mr. Mellon?

13           MR. MELLON:  Thank you.

14           Your Honor, I'd just like to add a footnote to what

15   Mr. Fleming said with regard to Mesbahi.  In the 9/11

16   Commission report, which was released in July of 2004, the

17   testimony of Mesbahi may be put in better context because the

18   9/11 report chapter 8 is entitled, The System was Blinking Red.

19           On page 256 it states that the CIA notified all the

20   stations in the summer of 2001 about intelligence suggesting a

21   possible Al-Qaeda attack on US targets over the next few days.

22   The point there being, your Honor, chapter 8 talks just not

23   about Mesbahi, which it doesn't mention at all, but apparently

24   there was an onslaught of information, frequent but fragmentary

25   reports from around the world about a possible attack on

1cfeter1

America.

The context I'm trying to place Mr. Mesbahi in is he's not a gadfly or one in a million or one in ten million. Mr. Mesbahi was very well placed, very knowledgable, but he was one of, apparently, many, many, many Al-Qaeda leaks in the world, from Malaysia and other places around the world, suggesting something was happening.  Something was big.  It's going to happen in the summer.  And the details were never as specific, of course, as we would like, or we would have prevented it.  But, again, Mesbahi is one of many individuals, according to the 9/11 Commission report, that had some fragmentary knowledge of what it is that was going to happen.

Your Honor, it is my responsibility on behalf of the Havlish plaintiffs to discuss the experts.  I believe I can do so in 30 minutes.  I will do my best by now identifying them and stating that which is the most important part of some of their very lengthy depositions.

By way of introduction, the plaintiff's experts are Dietrich Snell, a 9/11 Commission staff member, more to come; Dr. Daniel L. Byman, also of the 9/11 Commission, more to come; Ms. Janice Kephart, also of the 9/11 Commission; Dr. Patrick Clawson, who is no stranger to our federal courts here in the Southern District of New York or in Washington; Dr. Ronen Bergman, an Israeli national security analyst.  We also have the testimony of two CIA street operatives who became, in fact,

1cfeter1

1    supervisors, Clare Lopez and Dr. Bruce Tefft.  We have the

2    testimony and the affidavit of Mr. Ken Timmerman, who's been

3    identified in the courtroom already.  Then we have Interpol in

4    charge of the United States, Mr. Edgar Adamson.  And then

5    finally, a French jurist by the name of Jean-Louis Bruguiere,

6    who has sat on more terrorism trials in Europe than any other,

7    for example -- Judge, I believe it's more than all the French

8    judges combined, a man very knowledgable about terrorism for

9    the last 30 years.

10        Your Honor, I'd like to begin, then, with the

11   affidavit, which can be found at the lower right-hand corner of

12   your PowerPoint, 159 to 160, specifies these proposed findings

13   of fact, findings of fact that, indeed, are more elaborate as

14   to the affidavit.

15        But first what I'd like to advise the Court is that

16   Dietrich Snell was the team leader.  He was in charge for the

17   United States of America for the 9/11 Commission.  He was the

18   team leader of the plot investigation.  I doubt that there's

19   anyone more knowledgable in the country than Dietrich Snell as

20   to the entire conspiracy.

21        In his affidavit, your Honor, he states that he looked

22   at classified and unclassified information in the performance

23   of his responsibility to understand the entire plot.  And not

24   only was he in charge of it, but he drafted and edited the 9/11

25   Commission report on the entire conspiracy, with special

1cfeter1

emphasis, on page 240 and 241, Iran, Hezbollah and Al-Qaeda.

             And what he tells us is that the FBI had its largest

investigation in its history.  And it was called the PENTTBOM

investigation:  "pen" as in Pentagon; "TT", Twin Towers; "bom",

bombing.  He worked very closely with the FBI in the entirety

of the 9/11 Commission report.

             And here is what they determined:  The FBI view was

that the hijackers transited Iran to and from Pakistan and to

and from Afghanistan.  And this is most important, your Honor:

Just not vacation travel; the FBI determined the hijackers were

not there as students or tourists; they were there in

furtherance of the conspiracy, according to our FBI.  And this

explains the absence of travel documents.

             When you have the largest collection of FBI agents on

one case in the world, we all wonder why documents are absent.

Well, they're absent, as we heard earlier, and we'll hear a

little bit later, it was by design.  The documents were not

absent by lack of intent.  They were intended not to be

utilized.

             However, Dietrich Snell is a very experienced, highly

regarded prosecutor.  And he didn't want to write that without

further corroboration.  So he went to the FBI and the CIA and

said, I have to have some questions answered.  I want to know

what Ramzi Binalshibh in Guantanamo and I want to know what

Khalid Sheikh Mohammed in Guantanamo say about this.  We're not

1cfeter1

| | |
|---|---|
| 1 | going to show our cards.  We're just going to ask them some |
| 2 | questions.  And lo and behold, the answers came back from |
| 3 | Binalshibh and Mohammed that Iran was corroborating travel |
| 4 | facilitation into and out of and through Iran.  And again, |
| 5 | these points are found in our proposed findings of fact 160, |
| 6 | 161, but of course in those findings of fact we cite |
| 7 | extensively the other information in the brief in its entirety. |
| 8 | Next slide please. |
| 9 | This, your Honor, we believe carries the day.  As the |
| 10 | Court may know, there have been other cases against Iran.  In |
| 11 | fact, there's been 45 cases against Iran in this country in the |
| 12 | last 15 years for terrorism, 45 in federal courts, and some of |
| 13 | them just have one expert or some have two.  We have ten, and |
| 14 | we did that because of the seriousness of the charges. |
| 15 | But this statement from the person who wrote the book |
| 16 | on the 9/11 conspiracy, I believe, establishes our legal |
| 17 | burden.  And here are his words, your Honor:  There is clear |
| 18 | and convincing evidence pointing to the involvement on the part |
| 19 | of Hezbollah and Iran in the 9/11 attack, especially as it |
| 20 | pertains to travel facilitation and safe haven. |
| 21 | (Continued on next page) |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

1cfQhavC2

1          MR. MELLON:  Your Honor, I believe we have already

2     moved the affidavit in its entirety for Dietrich Snell into

3     evidence, but to the extent it hasn't been, I want to do it

4     again for insurance purposes.

5          THE COURT:  Sure.

6          MR. MELLON:  The next person, your Honor, we believe

7     is equally compelling in this is Dr. Daniel L. Byman.

8     Dr. Byman was again a member of the 9/11 Commission.  Who

9     better to think about these important issues and the

10     interrelationships between Iran, al~Qaeda and Hezbollah.

11          Dr. Byman is a professor at Georgetown University

12     specializing in terrorism.  His résumé is so impressive, your

13     Honor, which is why I put it here in terms of his credibility.

14          He's a member of the Brookings Institute.  He's a

15     regular consultant to the United States Government on terrorism

16     and national security matters.  He spent years in the CIA

17     before his Georgetown days.  He was the research director of

18     the RAM Center for the Middle East public policy.  This is

19     interesting, your Honor, respectfully, he was on both the House

20     and Senate Intelligence Committees investigation into the

21     attack, which was called "The 9/11 Inquiry" and then, of

22     course, "The 9/11 Commission."  Dr. Byman has seen it all.  In

23     fact, his specialty is al Qaeda.  Next one, please.

24          Your Honor, here is what Dr. Byman says:  He too says

25     there is clear and convincing evidence that Iran has provided

1cfQhavC2

material support for al Qaeda.  The support included assistance

with travel, unlimited safe haven and training, at the very

least.  Next, please.

Dr. Byman explained to us that the main reason for the

cooperation between Iran and al Qaeda is that both see -- Iran

and al Qaeda -- both see the United States as its enemy.  Both

believe the United States is an imperialistic power bent on

subjugating Muslims and want to weaken the United States'

influence.

Here is a very powerful statement:  Dr. Byman says,

"The use of violence and the threat of force have been part of

Iran's foreign policy," leaving no doubt.

He also mentions that al Qaeda leader Ayman

al-Zawahiri has admitted publicly in Middle Eastern newspapers

that before 9/11, Iran and al Qaeda cooperated together.  As

part of their cooperation, Iran used Hezbollah as a facilitator

and, of course, the number one facilitator for terrorism in the

world is Imad Mughniyah.

In fact, Dr. Byman writes that the relationship

between Hezbollah and Iran has one of the closest relationships

in history between a terrorist group and its sponsors.  He

said, however, there's another reason for this Iranian-al Qaeda

connection:  That reason is that Hezbollah offers Iran

deniability, deniability.  Next, please.

Dr. Byman notes that keeping passports clean was

1cfQhavC2

1    vital -- and that is his word, your Honor -- vital to reducing

2    the risk of discovery and arrest.

3           One of al Qaeda's key military commanders, Seif

4    al-Adl, acknowledged transit through Iran has been publicly

5    stated again in Middle Eastern newspapers.  The source of this

6    information again goes back to the actual affidavit, which in

7    turn actually notes specific publications and the source.

8           Dr. Byman notes that travel assistance is invaluable,

9    his words, and here is why:  With travel assistance, al Qaeda

10   is able to make recruits and acquire easier training, and, most

11   importantly, al Qaeda is enabled to have better communication

12   and coordination among its ranks.

13          So, Dr. Byman is a 9/11 expert who recognizes that

14   travel assistance is indispensable and indeed invaluable.

15          Al Qaeda received training in explosives in Iran

16   leaving little question open on that point.  Next one, please.

17          Iran's standard modus operandi is outsourcing to its

18   close ally Hezbollah.  I believe Mr. Fleming has certainly

19   touched upon that and made that clear.  The training that Iran

20   has provided Hezbollah -- think Imad Mughniyah -- involves

21   explosives on methods pertaining to the collection of

22   intelligence and operational security.  It's just not a matter

23   of travel facilitation and it's just not a matter of safe

24   haven.

25          He concludes that there is strong support for the

1cfQhavC2

1   claim that Iran has provided important material support for

2   al Qaeda, and that support comes from a range of sources;

3   again, including U.S. Government documents and even statements

4   by al Qaeda themselves.

5           Your Honor, our third expert -- and I will try to

6   speed this up, but I think this is another terribly important

7   expert because she worked for the 9/11 Commission.  This is our

8   third person who worked for the 9/11 Commission.

9           Janice Kephart was their border control expert.  She

10  was the person who was responsible for understanding the

11  ingress and egress of the hijackers.  Previously, she was

12  counsel to the U.S. Senate Judiciary Committee.  She served on

13  the 9/11 Commission.

14          Here is a fact that most of the American public

15  doesn't even know exists.  There is a companion book -- it's

16  pretty thick -- to the 9/11 Commission, and it's called "9/11

17  and Terrorist Travel."  It's a staff report of the National

18  Commission on Terrorist Attacks.  It's a companion to the 9/11

19  Report and it's all about travel, in and out, and as we will

20  see, there are some really revealing facts.

21          First of all, Janice Kephart teaches us, instructs us

22  that the 9/11 travel was an operation.  It was like a military

23  operation.  It was similar to the coordination of going to the

24  four planes, having them take off at the same time, having

25  their targets identified and executing it.

1cfQhavC2

         Janice Kephart's affidavit says:  The travel

operation -- the planning, the execution, the timing, the

manner and means -- was just as important as driving the

airplanes, and that it takes an enormous amount of work.

         In fact, she tells us that in her job she interviewed

many folks, including thousands of travel documents, but,

please, your Honor, listen to this one, rather unbelievably,

she actually has six of the hijacker passports.  It's hard to

believe that of the inferno that was 9/11 that six passports

could survive, but among the thousands of documents that she

examined in writing her companion terrorist travel book, she

found -- not she, but our country found -- six of the

hijackers' actual passports.  Go back for a second, please.

         She interviewed in detail each one of the 26 U.S.

border inspectors who were involved in the ingress and egress

of the travel of the hijackers.

         Her conclusion is as an expert:  The facilitation of

terrorist travel is crucial, crucial material support to

terrorist operations.

         And second conclusion:  Iran's facilitation of

al Qaeda operative travel, including at least eight of the

hijackers, amounted to essential material support, indeed,

direct support, your Honor, direct support, that removes all

doubt, direct support that further enabled al Qaeda to

perpetuate the 9/11 attack successfully.  Next slide, please.

1cfQhavC2

1          Your Honor, slide 58, the 9/11 terrorists had engaged

2     in a specific terrorist travel operation, which I discussed

3     before, and, again, it was not only the seizure of the airlines

4     but the execution.  For terrorists' travel, success is often

5     dependent on preparation.  In fact, look what the 9/11

6     Commission said -- not just Janice Kephart -- the 9/11

7     Commission said, "For terrorists, travel documents are as

8     important as weapons."  Again, that's not just Janice; that's

9     the 9/11 Commission.  Next one, please.

10          Janice's affidavit notes that 26 of the al Qaeda

11    terrorist operatives were whittled down to 19.  In her

12    investigation, along with other members of the border team, 23

13    visas were applied for resulting in 22 visas being obtained for

14    34 separate entries into and out of the United States.  I

15    shouldn't say out of.  I should say into.  34 separate entries

16    into the United States.  Over a period of 21 months.  In other

17    words, the hijackers didn't have much of a problem getting into

18    our country.

19          Now, why is that important?  Well, Ms. Kephart tells

20    us why.  They must travel clandestinely to meet, to train, to

21    plan, to case targets and to gain access for the actual attack

22    itself.  To terrorists, international travel presents a great

23    danger because of passing through regulated channels.

24    Although, again, as noted, they were successful many, many,

25    many times before 9/11.

 1            This is Janice's conclusion on PowerPoint 60.  Again,

 2     the words are used:  "There is clear and convincing evidence

 3     that Iran and Hezbollah provided material support to al Qaeda

 4     by actively facilitating the travel of eight to ten of the 9/11

 5     hijackers to Iran or Beirut" -- importantly -- "immediately

 6     after their acquisition of their U.S. visas."  They got to

 7     Saudi Arabia, they got their visas, and back they went, and

 8     then into Afghanistan, "and that these U.S. visas" -- this we

 9     believe is very important, your Honor -- were specifically

10     acquired, "garnered specifically for the purpose of terrorist

11     travel into the United States to carry out the 9/11 attacks."

12            So we have, once again, Imad Mughniyah rendering

13     assistance to these hijackers, these young men, Imad Mughniyah

14     takes them from Iran to Saudi Arabia, when they get clean visas

15     and their clean passports, back to Iran, then back to

16     Afghanistan.  Next slide, please.

17            Your Honor, Dr. Patrick Clawson, certainly one of the

18     foremost experts on Iranian terrorism.  He's a constant

19     consultant to the CIA, the DIA, the National Security Agency,

20     the Defense Department.  He has lectured worldwide on the

21     subject matter of Iran.

22            However, perhaps of interest to this Court, Patrick

23     Clawson has been an expert witness 25 times in our federal

24     courts on the subject of Iran and terrorism, many times in

25     Washington, but I believe a few times here in New York.

1cfQhavC2

1          Patrick Clawson chose to draft his affidavit in a

2     fashion that he thought would be most compelling to the Court.

3     He believed the fact that the U.S. State Department annual

4     reports are the most telling documents.

5          Here is why:  Those reports are not issued unless

6     every facet of the U.S. Government edits and agrees to the

7     exact wording and content.  So it's just not the State

8     Department putting together a report for one or two bureaucrats

9     to keep themselves busy; this is heavily vetted by our whole

10    intelligence community.

11         Dr. Clawson said, Iran is consistently from the early

12    Eighties, '81, cited as the primary state sponsor of terrorism

13    throughout the world.  There's no second place.  It's all about

14    Iran.  That's been true now for all those many years.

15         He states that the U.S. Government sources have issued

16    repeated and detailed descriptions of Iranian material support

17    to al Qaeda before, during, and after 9/11.

18         Now, we know that the State Department is not the only

19    one that issues reports.  The U.S. Treasury often issues

20    reports involving terrorism.  U.S. Justice Department.  There

21    are many departments of our government that issue reports.  His

22    statement is that U.S. Government sources have issued repeated

23    and detailed descriptions of Iranian material support.

24         He states, "Noting the evidence is clear and

25    convincing, there is simply no ambiguity or unclarity in U.S.

1cfQhavC2

1    government statements about this matter.

2            Of recent vintage, Dr. Patrick Clawson thought it was

3    important for this Court to know that Sa'ad bin Laden went

4    directly to Iran after the 9/11 attacks, and as we'll see

5    coming up in a moment, managed al Qaeda from inside Iran.  Next

6    please.

7            We are at slide 64, I believe.  In fact, Dr. Clawson

8    really became emphatic.  I was going to say strident, but that

9    would be unkind.  He became emphatic when he said, "Few, if

10   any, noted terrorism experts would dispute that Iran provides

11   material support to al Qaeda within the meaning of 18 U.S.C.,

12   which is the definition of material support I read in the very

13   beginning today.

14           Iran supported al Qaeda through its instrumentalities,

15   the Revolutionary Guard and MOIS, is consistent with its

16   foreign policy of supporting terrorism against the United

17   States.  Yes, it's their foreign policy to support terrorism

18   against us.  Next.

19           That concludes Dr. Clawson, and we are better than

20   halfway done, your Honor.

21           Your Honor, Claire M. Lopez and Dr. Bruce Tefft are

22   very interesting experts because they earned their spurs on the

23   streets around the world including the Middle East, Europe,

24   Russia, South America, on-the-street CIA people.  Then they

25   graduated in their senior year, so to speak, as supervisors

1cfQhavC2

1   running the other agents around the world.  Today they are

2   privately retained by various federal contractors, and, of

3   course, that would be in the area of intelligence and security,

4   and their actual bio in the affidavit is quite extensive;

5   quite, quite extensive.

6          But I thought of note to this Court, Dr. Tefft has

7   been certified as an expert in our courts, in the United States

8   District Courts, in Washington in eight different cases

9   involving Iran.

10          Now, your Honor, you may recognize this from my

11   introductory comment about material support.  In my

12   introductory comment, I mentioned that all of these things, and

13   to a significant degree, have been contributed by Iran via

14   Hezbollah to al Qaeda.

15          Dr. Tefft and Claire Lopez write:  Their material

16   support involves planning, recruitment, training, financial

17   services, expert advice and assistance.  Iran provided al Qaeda

18   lodging and safe houses.  Iran and Hezbollah provided false

19   documents and identification.  Iran and Hezbollah provided

20   communication equipment, facilities, weapons, lethal

21   substances, explosives.  And, finally, Iran and al Qaeda, or, I

22   should say, Iran and Hezbollah provided al Qaeda with personnel

23   and travel facilitation.

24          On slide 67, We have seen this by way of Mr. Fleming's

25   prior presentation.  I hope it is now clear that 8 to 14 muscle

1cfQhavC2

hijackers acquired their needed Saudi passports and their
needed U.S. visas thus ensuring two things:  If you have a
clean Saudi passport and a clean U.S. visa, that guarantees
your continued training in Afghanistan but access to the United
States.

Slide 68, your Honor.  I believe Mr. Fleming made a
very clear statement, but I feel compelled to do it again.  The
Iranian and al Qaeda joint terror attacks against the United
States on September 11, 2001 were preceded by the Khobar Towers
in Saudi Arabia, by the two embassy bombings in Africa in 1998,
and the suicide bombing on the Destroyer Cole in 2000.

I respectfully submit, I respectfully submit that the
history demonstrates that something else was going to happen in
2000, or 2001 or 2002.  This conspiratorial relationship had
not ended but had just started, and to our great sadness, the
next thing was September 11.

Slide 69, your Honor.  "We are convinced that the
overwhelming evidence assembled in our affidavit, which is
several hundred paragraphs, leaves no doubt that al Qaeda and
the official Iranian regime at the highest levels have been
acting in concert to plot and execute attacks against the
United States since the early 1990s."

Slide 70, your Honor.  They concluded upon that which
I commented upon a moment ago; that is, al Qaeda and Iran, and
every time we see Iran, we think Hezbollah.  Hezbollah is Iran;

1cfQhavC2

1    Iran is Hezbollah.  Alliance was responsible for all of the

2    most significant terrorist attacks against the U.S. national

3    interests from 1990s up to and including September 11.

4          Your Honor, these are brand new slides.  We just got

5    permission from Mr. Mesbahi to mention his name and to tell the

6    Court what he knew.  So these slides are less than a day old.

7    These slides suggest that Ayatollah Khomeini initiated

8    contingency plans in the mid 1980s for an operation against the

9    United States in the American cities called Shaitan dar Atash.

10         Here is why that is important.  In their affidavits,

11   in their full affidavits, you will see that Lopez and Tefft

12   were mandated by all the Havlish lawyers to take Mesbahi's full

13   testimony and to break it down.  Frankly, your Honor, we don't

14   know whether to believe him or not.  What do we know.  So, we

15   gave him the testimony and the videos.  They took six months to

16   study the videos and the testimony, and in their full

17   affidavit -- and this is a shorthand of it -- they say, from

18   our point of view as CIA, it's all credible.  It's real.  If we

19   were in the CIA today and he came and talked to us, we would

20   sit him down and work with him.  We, of course, know the

21   Germans did.  The important thing is Mesbahi's credibility is

22   bound to be tagged for here are two professionals who have

23   studied it over six months, and they say he's credible with

24   regard to Shaitan dar Atash, and which relates to the

25   operational contingency plans in the mid 90s.

1cfQhavC2

1    They also took a look in great detail about the coded

2    messages coming in newspapers and other ways from Iran to him

3    in Europe.  Of course we said to Lopez and Tefft, how do we

4    know he's telling the truth?  They studied the coded messages.

5    They analyzed the coded messages.  And here is what they said.

6    They studied his communication sources inside of Iran, the

7    encoded and encrypted messages, and the manner and method of

8    such communication is credible.  Mesbahi's testimony that he

9    received from high-level sources in Tehran advance notice of a

10   major attack is credible.

11   This is the conclusion, your Honor.  It is their

12   expert opinion to a reasonable degree of professional certainty

13   that the Iranian regime's use of terror and specifically its

14   material support of al Qaeda and terrorist attacks, including

15   9/11, is beyond question.  And that is slide 73.

16   Your Honor, in the interest of brevity, I believe I

17   will make this my last one.  This will be our last one, your

18   Honor.  We are going to cut a couple of the others short.

19   Your Honor, Dr. Ronen Bergman is an Israel expert on

20   international intelligence, especially the Mossad and

21   terrorism.  I think it's generally considered well-known that

22   Mossad is a very excellent intelligence agency, and, very

23   frankly, we went and tried to learn as much as we could in

24   Israel, and several of the men and women in this room made

25   several trips to Israel with that purpose in mind.

1cfQhavC2

1    On the record the Mossad could not speak to us, on the

2    record the Mossad could not give us anything, but on the record

3    Mossad helped us with Dr. Ronen Bergman, and you will see that.

4        Again, he's an expert on international intelligence

5    and on Mossad and terrorism.  He conducted extensive interviews

6    with many former -- and I found this powerful your Honor --

7    Iranian intelligence and military personnel.  So he's talking

8    to them directly.  Again, his affidavit goes into great detail

9    about that.  He is considered one of the principal experts on

10   the Israeli intelligence community's assessment or analysis of

11   Iran.  And this we found powerful, your Honor:  He has reviewed

12   the intelligence material from not only Israel, but the United

13   States, France, United Kingdom, Egypt, Jordan and Germany.

14       This is a new slide, your Honor.  Dr. Bergman has

15   researched and published material about Witness X, Mr. Mesbahi.

16   Here is what he tells us in his affidavit.  Mesbahi is known to

17   be an excellent intelligence operative.  He tells us, which we

18   know, the Germans recruited Mesbahi as a source of information

19   and evidence.  An important asset in the investigation of many

20   assassinations and acts of terror by the Iranian regime and its

21   proxies, Hezbollah, in several countries.

22       Mesbahi's testimony has been received with high

23   reliability by courts and law enforcement and intelligence

24   agencies worldwide.  So, once again, we really don't have to

25   take Mesbahi's word for it.  We can rely upon Lopez.  We can

1cfQhavC2

1    rely upon Tefft.  And, more important, we can rely upon his

2    access to information involving Mesbahi; that is, Dr. Bergman.

3            Slide 76.  He notes from his intelligence sources that

4    Iran was involved in 133 terrorist operations in just nine

5    years.  That's between '87 and '95.  He tells us that many

6    other acts of terrorism involving hundreds of fatalities

7    preceded and followed this eight-year period.  Of course, that

8    is not including the 2,977 deaths we had on September 11.

9            Hezbollah, of course, was an Iranian organization from

10   its inception, and of course we now know from Mr. Fleming's

11   presentation that Mughniyah was its leader.

12           Israeli and American intelligence sources believe that

13   Hezbollah's Mughniyah conceived, designed, planned, commanded

14   and carried out terrorist operations involving hundreds of

15   deaths, more than any other single figure in the world before

16   his own assassination in Damascus, Syria in February '08.

17   Mughniyah and his top lieutenants all trained in Iran.

18           Slide 78, your Honor.  This is, I believe, telling and

19   its a very lengthy affidavit.  We wanted to highlight that

20   Dr. Bergman had access to two top-secret highly classified

21   Israeli documents.  I asked him is it OK for us to say that?

22   Are we allowed to say that?  He said, yes, you can put it in.

23   And he did, as you'll see, in his affidavit.  That's finding of

24   fact 210.  He had access to two top-secret highly classified

25   Israeli documents which disclosed:  Iran is aided by

1cfQhavC2

 1    Hezbollah's operational infrastructure abroad, through Imad
 2    Mughniyah for the purpose of attacks.
 3            Hezbollah terrorists train in Iran, which now we know,
 4    and Iran usually refrains from carrying out attacks directly,
 5    and its involvement usually follows an indirect course, Imad
 6    Mughniyah.
 7            I am going to go a little faster because I think
 8    Mr. Fleming has talked about Khartoum.  One of the most amazing
 9    photographs of all time would have been Imad Mughniyah meeting
10    Osama bin Laden in Khartoum 1993.  I presume that photograph
11    doesn't exist or it certainly hasn't surfaced yet.  It's at
12    that meeting where the tactic of suicide attacks became the
13    topic of conversation between Mughniyah and bin Laden.  Of
14    course, Mughniyah had been by '93 and continued to remain a
15    major connection point between Iran and al Qaeda.
16            By this time we know, your Honor, that much of
17    al Qaeda's training was carried out in camps in Iran by MOIS
18    and IRGC.
19            We are on slide 80, finding of fact 213 to 215.
20    Mr. Fleming I believe already mentioned that in 1996 when bin
21    Laden and al Qaeda were made to leave Sudan, it was the Iranian
22    intelligence services that assisted them in moving their
23    operation and members, assisted them.
24            Iran and Lebanese Hezbollah trainers traveled between
25    Iran and Afghanistan transferring to al Qaeda fighters such

1cfQhavC2

material as blueprints, drawings of bombs, manuals for wireless

equipment, instruction booklets and information regarding the

avoidance of unmanned aircraft.

After al Zawahiri's return to Afghanistan with Osama

bin Laden, Iran authorities helped him on many occasions to

pass weaponry and reinforcements to al Qaeda across the border

from Iran to Afghanistan.

Your Honor, we are on slide 82, and I think I am down

to my last three or thereabouts.  Last one.

Your Honor, the Israeli and American intelligence

agents have examined the document Mr. Fleming made reference to

dated May 14, 2001, and they found it to be authentic.  It

reveals both high-level links between Iran's supreme leader and

the al Qaeda leadership involving knowledge and support of a

major upcoming event.  Of course, the major upcoming event was

September 11.

That document states finding of fact 218, that it was

the Iranian government's goal to damage America and Israel's

economic systems discrediting their institutions.

In conclusion, and finally, your Honor, thank you for

your patience, Dr. Ronen Bergman writes:  The Islamic Republic

of Iran was, and is, a benefactor of, and provided material

aid, resources and support to Osama bin Laden and al Qaeda both

before and after the attacks of September 11 against the United

States.

1cfQhavC2

1          Is there anything you'd like to say, Tim?  Your Honor

2     if Mr. Fleming may --

3          THE COURT:  Yes, Mr. Fleming.

4          MR. FLEMING:  Your Honor, thank you.  During my

5     presentation, there was one point that I -- a set of cites that

6     I wanted to give to the sealed documents regarding the issue of

7     the fact of Iran's preknowledge of 9/11.  Therefore, it was

8     obviously very important testimony which occurs in the Exhibit

9     S7, testimony of witness Z, pages 43 to 52, and 55 all the way

10    to 90, page 103.  And then exhibits 7, 8, 9 and 10 addressing

11    that subject.

12         Then the only other thing I wanted to point out, your

13    Honor, also was that with respect to all three of the

14    witnesses, I would also like to point out that the sealed

15    affidavit of Kenneth Timmerman addresses many significant

16    aspects of the investigation and how we came to be able to

17    obtain the testimony of the three defective witnesses.  Since

18    that's sealed, I wanted to point it out in its entirety to the

19    Court that Mr. Timmerman was there for the entire investigation

20    and for all testimony, so it is a good affidavit on that

21    subject.

22         MR. MELLON:  If I may have one more minute, your

23    Honor.  I failed to move in all the affidavits of all the

24    experts we submitted on May 19 and respectfully request your

25    Honor to accept those.  Likewise, we had a supplemental

1cfQhavC2

1    affidavit of Patrick Clawson filed in August involving

2    instrumentalities and agencies.

3         Finally, your Honor, we have asked Mr. Stephen Corr to

4    address the Court for just a minute involving some housekeeping

5    administrative and ministerial matters.

6         Mr. Corr?

7         MR. CORR:  Your Honor, the third amended complaint

8    which is the current complaint in this matter raises causes of

9    action under both the Foreign Sovereign Immunities Act and the

10   Alien Tort Claims Act.  This morning we filed the declaration

11   of Melina Goldfarb who is one of our attorneys here.  In the

12   declaration, she states that she and her team have determined

13   that each and every one of the plaintiffs in the

14   above-captioned lawsuit is either a United States citizen or is

15   asserting a claim that derives from the death of a United

16   States citizen in the 9/11 terrorist attacks.

17        When we started this morning, your Honor asked about

18   the findings of fact and conclusions of law.  Based on the

19   findings and the discussions with all of the clients and their

20   citizenship, we are going to provide you with a revised

21   findings of fact and conclusions of law that will exclude the

22   Alien Tort Claims Act because everybody is a U.S. citizen.

23        THE COURT:  There was specific in there for

24   non-citizens is my recollection.

25        MR. CORR:  Your Honor, if I would, I would hand up the

1cfQhavC2

1    declaration here and move that into evidence as well.

2                THE COURT:  That will be received.

3                MR. CORR:  Your Honor asked for an electronic copy.

4    We will get that to you tomorrow.

5                The last point I think is that there are actually two

6    motions pending before your Honor.  There is a motion for

7    judgment by default against the sovereign defendants; that's

8    what we've been discussing here today.  Of course, you have

9    heard about the affidavits and you've read that they talk about

10   clear and convincing evidence, but we know from 1605(a) of the

11   Foreign Sovereign Immunities Act that the burden is evidence

12   satisfactory to the Court.  I think you can see from the pile

13   of evidence that has been moved before you that we far exceed

14   that very limited burden under the Foreign Sovereign Immunities

15   Act.

16               The second motion is a motion for judgment by default

17   against the non-sovereign defendants.  That, of course, did not

18   require a hearing.  That is pending before your Honor as well,

19   and we want to bring that to your attention.

20               Your Honor, ten years ago, Fiona Havlish started this

21   case.  Today she and her co-plaintiffs would respectfully

22   request that you enter judgment against both the sovereign

23   defendants and the non-sovereign defendants, judgment in their

24   favor against all of those defendants, and then provide us with

25   an opportunity for a hearing either with yourself or with Judge

1cfQhavC2

1    Maas to begin the process -- to come up and formulate a process

2    for establishing the damages for each of the individual

3    plaintiffs in this case.

4              MR. MELLON:  Your Honor, if I may, are there any other

5    Havlish lawyers that wish to address the Court?

6              THE COURT:  Let me make this --

7              MR. FLEMING:  Your Honor, I'm sorry.  I just think

8    that -- I'm glad Mr. Mellon mentioned Dr. Clawson's extra

9    affidavit because I didn't ask to move into admission Exhibits

10   38 through 41.

11             THE COURT:  They will be admitted.

12             Let me make this determination at this point.  There

13   has been an extensive record submitted to the Court.  That

14   extensive record which includes sealed and unsealed submissions

15   including fact and expert testimony by affidavit as outlined

16   here at this hearing establishes plaintiffs' claims by credible

17   evidence satisfactory to this Court pursuant to 28 U.S.C.

18   Section 1608(e).  I accept as true the plaintiffs'

19   uncontroverted evidence.

20             This Court will issue an order consistent with the

21   plaintiffs' proposed findings of fact and conclusions of law.

22   The evidence in this case supports a finding that consistent

23   with its designation as a state sponsor of terrorism, Iran and

24   the sovereign defendants were indeed responsible for providing

25   material aid and support for terrorist acts against the United

1cfQhavC2

1    States, its citizens and interests and others including the

2    terrorist attacks on 9/11, and it provided such material aid

3    and support before, during and after 9/11.  This Court will

4    issue default judgment against all defendants based upon the

5    record that exists before this Court.

6              What I am going to ask you to do is several things:

7              I'd like to see three separate documents.  One with

8    regard to a proposed judgment for the non-sovereign defendants.

9    If you will work with the clerk's office in terms of form and

10   procedure as to what they would require as sufficient, it would

11   facilitate the filing of the judgment, but run it by the

12   clerk's office first in terms of whether that is satisfactory

13   if my signature is upon it for filing.

14             I would ask you to give me the order with findings of

15   facts and conclusions of law as you propose it as amended on

16   disc and in hard copy, if you can change it on the hard copy,

17   and submit that to me, separate out the judgment from the order

18   which has the findings of fact and conclusions of law.

19             Propose to me again a separate judgment with regard to

20   the sovereign defendants approved by the clerk's office for

21   filing.

22             So when I receive those from you, I will execute those

23   or modify them as needed and file them immediately.

24             There was some reference earlier to possibly

25   supplementing some of the presentation or references to the

1cfQhavC2

1    evidence given the unsealing by letter.  If you wish to do

2    that, just submit that by letter with a request in the letter

3    to have it filed, and I will order that filed as part of the

4    record if you think there is something further that you want to

5    specifically reference that was not referenced today and that

6    is warranted in light of the motion for unsealing.

7        While we were here, I reviewed the application to

8    unseal certain documents.  I have granted that application.

9    You should have a copy of that order that was proposed to me.

10   I signed that general order, and that should already be filed

11   on ECF.  It was scanned during the break after I signed it.  So

12   that order is issued.

13       As I indicated, I think following up on that order

14   rather than trying to get involved with the clerk's office as

15   to what should be unsealed and what should remain sealed, I am

16   going to leave it up to you to file an unsealed redacted copy

17   of the material in the form that you wish to have it unsealed

18   consistent with the order.

19       The clerk's office should accept those redacted

20   unsealed documents for filing.  If they indicate to you that

21   they need a subsequent further order to accept those further

22   documents for filing -- they should not, but if they do --

23   indicate that to me and then send to me a proposed order which

24   I will sign right away.

25       At this point, unless it warrants a different way to

1cfQhavC2

proceed, I think I am going to go ahead and make a referral

right away to Magistrate Judge Maas.  He has been doing an

excellent job in moving things along in the last few months.

We've been in constant communication.  I think that unless he

tells me or you tell me it is more complicated than what

further burdens I should put upon him, I am going to make a

referral to Magistrate Judge Maas for request on damages so you

can immediately submit that to Magistrate Judge Maas, he can

perform the inquest, and we can move forward with a further

supplement to the judgment of default itself laying out and

delineating what the damages are that flow from that.

        I think that is the way that we should proceed.  We

will await in the next few days or whenever you can get to me

those items.  As soon as I receive those items, I will execute

them and file them as appropriate.

        I will immediately today tell Magistrate Judge Maas

that he should anticipate hearing from the parties with regard

to an inquest on damages and what you can accomplish through

that.

        MR. CORR:  Your Honor, if I may, I do have a revised

findings of fact and conclusions of law.  We took out the word

proposed.  I did separate out an order of judgment that I know

your Honor just mentioned that we should talk to the clerk's

office about.  I can tell you that we took the order of

judgment, I believe it's word for word, from the Owens judgment

1cfQhavC2

1    that was entered in D.C.  Essentially it just says that default

2    judgment is granted and final judgment on liability is entered

3    in favor of the plaintiffs against the defendants.  It is

4    ordered that the parties shall appear for a status conference

5    with a special master.  That may be something that you want to

6    take out.  It does leave room for a date and time for a

7    hearing.

8             THE COURT:  I will discuss that with Magistrate Judge

9    Maas.

10             MR. CORR:  If I could hand this up and I could speak

11    with your clerk.

12             THE COURT:  Yes.  I still need to look at it because

13    you, for example, did you take out the reference to non U.S.

14    citizens?

15             MR. CORR:  Yes, your Honor, we took out everything

16    that referenced the Alien Tort Claims Act.  So all of those

17    things that we wanted to remove once we confirmed that

18    everybody was a U.S. citizen, we edited that.

19             THE COURT:  So that's already made as suggested here.

20             MR. CORR:  Right.  That is what will be coming to you

21    electronically.

22             THE COURT:  All right.  Then just give me the disk.  I

23    think that should be sufficient.  I am going to need some

24    signature lines on the orders and some line changes on the

25    order as opposed to the judgment.  Also, you are going to give

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1cfQhavC2

1   me a similar judgment on the non-sovereign.

2          MR. CORR:  Your Honor, I have the non-sovereign one

3   that was drafted with the original motion, and I will check

4   that and make sure it is OK.

5          THE COURT:  As soon as we get that, I this we can

6   execute that and move forward on the issue of damages.  All

7   right.

8          MR. MELLON:  Your Honor, thank you for the opportunity

9   before you today.  Thank you.

10         THE COURT:  You're welcome.

11         (Adjourned)

12

13

14

15

16

17

18

19

20

21

22

23

24

25