Exhibit B

# ORIGINAL

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------X

IN RE: TERRORIST ATTACKS ON SEPTEMBER 11, 2001

-----------------------------------------------------------X

03 MDL 1570 (RCC)
ECF Case
**Opinion and**
**Order**

*This document relates to*:

| | |
|---|---|
| Burnett v. Al Baraka Inv. & Dev. Corp. | 02 Civ. 1616 |
| Ashton v. al Qaeda Islamic Army | 02 Civ. 6977 |
| Tremsky v. Osama bin Laden | 02 Civ. 7300 |
| Salvo v. al Qaeda Islamic Army | 03 Civ. 5071 |
| Burnett v. Al Baraka Inv. & Dev. Corp. | 03 Civ. 5738 |
| Federal Insurance v. al Qaida | 03 Civ. 6978 |
| Barrera v. al Qaeda Islamic Army | 03 Civ. 7036 |
| Vigilant Insurance v. Kingdom of Saudi Arabia | 03 Civ. 8591 |

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 1- 18. 05

**Richard Conway Casey, United States District Judge:**

On September 11, 2001, nineteen members of the al Qaeda terrorist network hijacked four United States passenger airplanes and flew them into the twin towers of the World Trade Center in New York City, the Pentagon in Arlington, Virginia, and – due to passengers' efforts to foil the hijackers – an open field in Shanksville, Pennsylvania. Thousands of people on the planes, in the buildings, and on the ground were killed in those attacks, countless others were injured, and billions of dollars of property was destroyed.

Pursuant to 28 U.S.C. § 1407, on December 9, 2003 the Mulitidistrict Litigation Panel centralized six then-pending September 11-related cases before this Court "for coordinated or consolidated pretrial proceedings." Additional actions, that are not the subject of this opinion, have since been filed. Plaintiffs in these consolidated actions are more than three thousand survivors, family members, and representatives of victims, and insurance carriers seeking to hold responsible for the attacks the persons and entities that supported and funded al Qaeda. The complaints allege that over two hundred defendants directly or indirectly provided material support to Osama bin Laden and the al Qaeda terrorists. Generally, these defendants fall into one of several categories: al Qaeda and its members and associates; state sponsors of terrorism; and individuals and entities, including charities, banks, front organizations, terrorist organizations, and financiers who provided financial, logistical, and other support to al Qaeda.[1] See, e.g.,

---

[1] According to Plaintiffs, Osama bin Laden formed al Qaeda, which means "the Base" or "the Vanguard," into an international terrorist organization with the aim of violently opposing non-Islam governments and Islamic states too beholden to the West. See, e.g., Burnett

<u>Ashton</u> Complaint ¶ 5; <u>Burnett</u> Complaint "Introduction"; <u>Federal</u> Complaint ¶¶ 42-66.  The complaints assert subject matter jurisdiction under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 <u>et seq.</u>; and causes of action under the Torture Victim Protection Act ("TVPA"), 28 U.S.C. § 1350 note; the Antiterrorism Act ("ATA"), 18 U.S.C. § 2331 <u>et seq.</u>; the Alien Tort Claims Act ("ATCA"), 28 U.S.C. § 1350; the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 <u>et seq.</u>; theories of aiding and abetting, conspiracy, intentional infliction of emotional distress, negligence, survival, wrongful death, trespass, and assault and battery.

Several motions to dismiss are pending before the Court.  At the suggestion of counsel, the Court scheduled oral arguments in groups organized generally by grounds for dismissal.  On September 14, 2004, the Court heard oral argument on the motions to dismiss for lack of subject matter jurisdiction under the FSIA by HRH Prince Sultan bin Abdulaziz Al-Saud ("Prince Sultan"), HRH Prince Turki Al-Faisal bin Abdulaziz Al-Saud ("Prince Turki"),[2] and the National

------

Complaint at 275.

[2] Before the Multidistrict Panel transferred <u>Burnett v. Al Baraka Inv. & Dev. Corp.</u>, 02 Civ. 1616, to this Court, Judge Robertson of the United States District Court for the District of Columbia dismissed the claims against Prince Sultan relating to acts performed in his official capacity for lack of subject matter jurisdiction.  <u>Burnett v. Al Baraka Inv. & Dev. Corp.</u>, 292 F. Supp. 2d 9, 23 (D.D.C. 2003) (hereinafter "<u>Burnett II</u>").  Finding that the court lacked personal jurisdiction over Prince Sultan, Judge Robertson dismissed without prejudice the allegations concerning acts taken in his personal, as opposed to official, capacity.  <u>Id.</u>  Judge Robertson dismissed the complaint against Prince Turki for lack of subject matter jurisdiction as well.  <u>Id.</u>

Prince Sultan and Prince Turki both move to dismiss the complaints against them in <u>Ashton v. Al Qaeda Islamic Army</u>, 02 Civ. 6977 (S.D.N.Y.); <u>Barrera v. Al Qaeda Islamic Army</u>, 03 Civ. 7036 (S.D.N.Y.); <u>Burnett v. Al Baraka Inv. & Dev. Corp.</u>, 02 Civ. 1616 (D.D.C.); <u>Burnett v. Al Baraka Inv. & Dev. Corp.</u>, 03 Civ. 5738 (S.D.N.Y.); <u>Salvo v. Al Qaeda Islamic Army</u>, 03 Civ. 5071 (S.D.N.Y.); and <u>Tremsky v. Osama bin Laden</u>, 02 Civ. 7300 (S.D.N.Y.).  Plaintiffs in these cases filed consolidated responses to Prince Sultan's and Prince Turki's motions.  In Plaintiffs' words, the New York <u>Burnett</u> action is materially identical to the D.C. <u>Burnett</u> action and was filed as a "prophylactic" measure in the event the D.C. court found that it lacked subject matter jurisdiction.  <u>Burnett</u> Complaint at 265.  Additionally, at Plaintiffs' counsel request, this Court ordered the <u>Barrera</u> action consolidated with the <u>Ashton</u> case on December 6, 2004.

Prince Sultan and Prince Turki have each also filed a separate motion to dismiss in <u>Federal Insurance v. Al Qaida</u>, 03 Civ. 6978 (S.D.N.Y.), both of which are fully submitted and are resolved in this opinion.  The <u>Federal Insurance</u> Plaintiffs are forty-one insurance companies that have paid and reserved claims in excess of $4.5 billion as a result of the September 11 attacks.

2

Commercial Bank ("NCB").[3]  On October 12, 2004 the Court heard oral argument from Defendants who filed motions to dismiss for lack of personal jurisdiction, including Prince Sultan, HRH Prince Mohamed Al-Faisal Al-Saud ("Prince Mohamed"),[4] the estate of Mohammad Abdullah Aljomaih,[5] Sheikh Hamad Al-Husani,[6] NCB, Abdulrahman bin Mahfouz,[7] the Saudi Binladin Group, Tariq Binladin, Omar Binladin, and Bakr Binladin.[8] Although their counsel did not argue on that day, motions to dismiss by the African Muslim Agency, Grove Corporate, Inc., Heritage Education Trust, International Institute of Islamic Thought, Mar-Jac Investments, Inc., Mena Corporation, Reston Investments, Inc., Safa Trust, Sana-Bell Inc., Sterling Charitable Gift Fund, Sterling Management Group, Inc., and York Foundation, (hereinafter collectively referred to as the "SAAR Network"),[9] Prince Turki, and Adel A. J.

---

The Burnett Plaintiffs filed a motion for reconsideration in conjunction with Prince Sultan's and Prince Turki's motions to dismiss certain consolidated complaints. While this Court reviews and gives deference to Judge Robertson's thoughtful opinion, it must evaluate Prince Sultan's and Prince Turki's motions on the merits de novo. See In re Grand Jury Proceedings (Kluger), 827 F.2d 868, 871 n.3 (2d Cir. 1987) ("A transfer under 28 U.S.C. § 1407 'transfers the action lock, stock, and barrel. The transferee district court has the power and the obligation to modify or rescind any orders in effect in the transferred case which it concludes are incorrect.'") (internal citations omitted). The Court bears in mind that it is bound by Second Circuit precedent while Judge Robertson applied D.C. Circuit law. Menowitz v. Brown, 991 F.2d 36, 40-41 (2d Cir. 1993) (explaining transferee court is to apply its interpretation of federal law, not that of the transferor circuit); In re Air Crash at Belle Harbor, New York, No. 02 Civ. 8411 (RWS), 2003 WL 124677, at *3 (S.D.N.Y. Jan. 15, 2003) (applying Second Circuit law after 28 U.S.C. § 1407 transfer from a district court in the Fifth Circuit).

[3] NCB moves to dismiss the complaints against it in Ashton and Burnett.

[4] Prince Mohamed moves to dismiss the complaints against him in Ashton and Federal Insurance.

[5] The estate of Mohammad Abdullah Aljomaih moves to dismiss the complaint in Burnett.

[6] Sheikh Hamad Al-Husani moves dismiss the complaint in Burnett.

[7] Abdulrahman bin Mahfouz moves to dismiss the complaint in Burnett.

[8] The Saudi Binladin Group moves to dismiss the complaints against it in Burnett and Ashton. Tariq Binladin, Omar Binladin, and Bakr Binladin move to dismiss the Burnett complaint.

[9] The SAAR Network moves to dismiss the Federal Insurance complaint.

3

Batterjee,[10] also raised personal jurisdiction defenses.  On October 14, 2004 the Court heard oral argument from certain Defendants arguing Plaintiffs had failed to state a claim, including Al Rajhi Banking & Investment Corporation (hereinafter "Al Rajhi Bank"),[11] the Saudi American Bank,[12] Arab Bank,[13] NCB, the SAAR Network, Prince Mohamed, Al Baraka Investment & Development Corporation and Saleh Abdullah Kamel,[14] Abdulrahman bin Mahfouz, the Saudi Binladin Group, and Adel A. J. Batterjee.  Finally, the last of this group of motions was entertained on November 5, 2004, when the Court heard oral argument from the Kingdom of Saudi Arabia in its motion to dismiss the Federal Insurance complaint.[15]

## I.     Subject Matter Jurisdiction Under the FSIA

Under the FSIA, a foreign state and its instrumentalities are presumed immune from United States courts' jurisdiction.  Saudi Arabia v. Nelson, 507 U.S. 349, 355 (1993); 28 U.S.C. §§ 1602-1607.  The FSIA's exceptions to immunity provide the sole basis for obtaining subject matter jurisdiction over a foreign state and its instrumentalities in federal court.  Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 439 (1989); Robinson v. Gov't of Malaysia, 269 F.3d 133, 138 (2d Cir. 2001).  Federal courts must inquire at the "threshold of every action" against a foreign state whether the exercise of its jurisdiction is appropriate. Verlinden B.V. v. Cent. Bank of Nigeria, 461 U.S. 480, 493 (1983).

### A. Standard of Review

In a Rule 12(b)(1) motion to dismiss challenging subject matter jurisdiction under the FSIA, "the defendant must first 'present a prima facie case that it is a foreign sovereign.'" Virtual Countries v. Republic of South Africa, 300 F.3d 230, 241 (2d Cir. 2002) (quoting Cargill Int'l S.A. v. M/T Pavel Dybenko, 991 F.2d 1012, 1016 (2d Cir. 1993)).  In response, the plaintiff must present evidence that one of the statute's exceptions nullifies the immunity.  Virtual Countries, 300 F.3d at 241 ("Determining whether this burden is met involves a 'review of the

---

[10] Adel A. J. Batterjee moves to dismiss the complaint in Burnett.

[11] Al Rajhi Bank renews its motion to dismiss the Burnett complaint. Judge Robertson denied its original motion and permitted it to serve a Rule 12(e) request on the Burnett Plaintiffs.  Burnett v. Al Baraka Invest. & Dev. Corp., 274 F. Supp. 2d 86, 110 (D.D.C. 2003) (hereinafter "Burnett I").

[12] Saudi American Bank moves to dismiss the Ashton and Burnett complaints.

[13] Arab Bank moves to dismiss the Burnett and Federal Insurance complaints.

[14] Al Baraka Investment & Development Corporation and Saleh Abdullah Kamel move to dismiss the Ashton and Burnett complaints.

[15] The parties have agreed that resolution of this motion will also apply to Vigilant Insurance v. Kingdom of Saudi Arabia, 03 Civ. 8591 (RCC).

4

allegations in the complaint, the undisputed facts, if any, placed before the court by the parties, and – if the plaintiff comes forward with sufficient evidence to carry its burden of production on this issue – resolution of disputed issues of fact.") (citing Robinson, 269 F.3d at 141); Leutwyler v. Office of Her Majesty Queen Rania Al-Abdullah, 184 F. Supp. 2d 277, 287 (S.D.N.Y. 2001) (explaining plaintiff may "rebut the presumption of immunity . . . by proffering evidence of record that the defendant undertook certain activities that fall within the scope" of one of the statutory exceptions) (citing Drexel Burnham Lambert Group Inc. v. Comm. of Receivers for A.W. Galadari, 12 F.3d. 317, 325 (2d Cir. 1993)). In challenging this Court's subject matter jurisdiction, the moving Defendants retain the ultimate burden of persuasion. Virtual Countries, 300 F. 3d at 241 (citing Cargill, 991 F.2d at 1016); Robinson, 269 F.2d at 141 n.8 (noting defendant's burden must be met with a preponderance of the evidence).

Defendants may "challenge either the legal or factual sufficiency of the plaintiff's assertion of jurisdiction, or both." Robinson, 269 F.3d at 140 (citations omitted). "If the defendant challenges only the legal sufficiency of the plaintiff's jurisdictional allegations, the court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of the plaintiff." Id. (internal quotations and citations omitted); Sweet v. Sheanhan, 235 F.3d 80, 83 (2d Cir. 2000). "But where evidence relevant to the jurisdictional question is before the court, 'the district court . . . may refer to that evidence.'" Robinson, 269 F.3d at 140 (quoting Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000)); see also Filatech S.A. v. France Telecom S.A., 157 F.3d 922, 932 (2d Cir. 1998) (explaining, where there are factual disputes regarding the immunity question, the court may not "accept the mere allegations of the complaint as a basis for finding subject matter jurisdiction"). Thus, "on a 'challenge to the district court's subject matter jurisdiction, the court may resolve disputed jurisdictional fact issues by reference to evidence outside the pleadings, such as affidavits.'" Filatech, 157 F.3d at 932 (explaining a court should consider all the submissions of the parties and may, if necessary, hold an evidentiary hearing to resolve the jurisdictional question) (quoting Antares Aircraft, L.P. v. Federal Republic of Nigeria, 948 F.2d 90, 96 (2d Cir. 1991)). The court must consult outside evidence if resolution of a proffered factual issue may result in the dismissal of the complaint for lack of jurisdiction. Robinson, 269 F.3d at 141 n.6. Defendants here challenge both the legal and factual sufficiency of Plaintiffs' claims. The Court will consider the affidavits submitted by the parties as necessary.

Before turning to the allegations against the Defendants claiming immunity, the Court notes it is keenly aware of the "delicate balanc[e] 'between permitting discovery to substantiate exceptions to statutory foreign sovereign immunity and protecting a sovereign's or sovereign's agency's legitimate claim to immunity from discovery.'" First City, Texas-Houston, N.A. v. Rafidain Bank, 150 F.3d 172, 176 (2d Cir. 1998) (ordering full discovery against defendant over whom court already had subject matter jurisdiction because such discovery would provide plaintiff an opportunity to obtain jurisdictional discovery regarding potentially sovereign alter ego co-defendant without further impinging that defendant's immunity) (quoting Arriba Ltd. v. Petroleos Mexicanos, 962 F.2d 528, 534 (5th Cir. 1992) ("At the very least, discovery should be ordered circumspectly and only to verify allegations of specific facts crucial to an immunity determination.")). The Second Circuit has instructed "that generally a plaintiff may be allowed

limited discovery with respect to the jurisdictional issue; but until [plaintiff] has shown a reasonable basis for assuming jurisdiction, she is not entitled to any other discovery." First City, 150 F.3d at 176-77 (quoting Filus v. Lot Polish Airlines, 907 F.2d 1328, 1332 (2d Cir. 1990)). Still, the Plaintiffs must allege sufficient facts to warrant jurisdictional discovery. Robinson, 269 F. 3d at 146 (citing Jazini v. Nissan Motor Co., 148 F. 3d 181, 185 (2d. Cir. 1998) (refusing jurisdictional discovery where plaintiffs' allegations lacked factual specificity to confer jurisdiction)); see also Burnett II, 292 F. Supp. 2d at 15 (denying Plaintiffs' request for discovery from Prince Turki where "suggestions of [his] individual activity are only conclusory").

**B. Allegations Against Defendants Asserting Foreign Sovereign Immunity**
**1. Prince Sultan**

Prince Sultan has been Saudi Arabia's Minister of Defense and Aviation and Inspector General of its Armed Forces since 1962. Ashton Complaint ¶ 265; Burnett Complaint ¶ 352; Federal Complaint ¶ 427; William H. Jeffress, Jr. Decl. ¶ 4 at Notice of HRH Prince Sultan Bin Abdulaziz Al-Saud's Motion to Dismiss Consolidated Complaint (hereinafter "Consolidated Jeffress Decl."); Andrea Bierstein Aff. in Opp. to Prince Sultan's Motion to Dismiss Consolidated Complaints Ex. 1, Sultan Bio, available at http://saudiembassy.net/Country/ Government/SultanBio.asp. In 1982, his brother King Fahd bin Abdulaziz Al-Saud named him Second Deputy President of Saudi Arabia's Council of Ministers, the Kingdom's governing body. Nizar Bin Obaid Nadani Decl. ¶ 2 at Notice of HRH Prince Sultan Bin Abdulaziz al-Saud's Motion to Dismiss Certain Consolidated Complaints Ex. 1 (hereinafter "Nadani Decl."); Consolidated Jeffress Decl. ¶ 4; Federal Complaint ¶ 427; Sultan Bio. As such, he is the third-highest ranking member of the Saudi government.

Especially relevant here, Prince Sultan is the Chairman of the Supreme Council of Islamic Affairs, which was established in 1995 and is responsible for the Kingdom's Islamic policy abroad. Consolidated Jeffress Decl. ¶ 5; Ashton Complaint ¶ 265; Federal Complaint ¶ 427. Prince Sultan disagrees with Plaintiffs' claim that the Supreme Council monitors and approves domestic and foreign charitable giving on behalf of the Kingdom. Prince Sultan prefers the characterization that the Supreme Council "carr[ies] out the foreign policy of Saudi Arabia as determined by the Council of Ministers." Abdulaziz H. Al-Fahad Decl. ¶ 5, at Sara E. Kropf Decl. Ex. 2. Finally, Prince Sultan, as the head of the Special Committee of the Council of Ministers, which is a foreign policy advisory resource for King Saud, exercises authority over disbursements by the Special Committee. Consolidated Jeffress Decl. ¶ 6. In the past, these disbursements, which are government funded, have included grants to Islamic charities. Id. at ¶ 6.

The various complaints make substantially similar accusations against Prince Sultan. See Consolidated Jeffress Decl. Ex. C (summarizing allegations against Prince Sultan in consolidated complaints). Prince Sultan is alleged to have met with Osama bin Laden after Iraq invaded Kuwait in the summer of 1990. Ashton Complaint ¶ 253; Burnett Complaint ¶ 340. At that meeting, which Prince Turki also attended, bin Laden purportedly offered his family's support to Saudi military forces. Ashton Complaint ¶ 253. Plaintiffs allege that, at the time of the Gulf War, Prince Sultan "took radical stands against western countries and publicly supported and

funded several Islamic charities that were sponsoring Osama bin Laden and al Qaeda operations." Ashton Complaint ¶ 266; Burnett Complaint ¶ 353. After the attacks of September 11, Prince Sultan allegedly advocated against granting the United States use of Saudi military bases to stage attacks against Afghanistan. Ashton Complaint ¶ 273; Burnett Complaint ¶ 356.

Prince Sultan allegedly made personal contributions, totaling $6,000,000 since 1994, to various charities that Plaintiffs claim sponsor or support al Qaeda. Ashton Complaint ¶ 269; Burnett Complaint ¶ 359; Federal Complaint ¶ 430. The specific charities that Prince Sultan donated to include Defendants International Islamic Relief Organization ("IIRO"),[16] Al Haramain,[17] Muslim World League ("MWL"),[18] and the World Assembly of Muslim Youth ("WAMY").[19] Ashton Complaint ¶¶ 269-272; Burnett Complaint ¶¶ 354, 359; Federal Complaint ¶ 430. According to Plaintiffs, with respect to his alleged donations, "[a]t best, Prince Sultan was grossly negligent in the oversight and administration of charitable funds, knowing they would be used to sponsor international terrorism, but turning a blind eye. At worse, Prince Sultan directly aided and abetted and materially sponsored al Qaeda and international terrorism." Burnett Complaint ¶ 363; Federal Complaint ¶¶ 429-31 (alleging Prince Sultan knew and intended that the contributions he made to various charities would be used to fund al Qaeda and international terrorism).[20]

---

[16] IIRO is allegedly an al Qaeda front that has been tied to the 1993 World Trade Center attack and the 1998 embassy bombings. See, e.g., Burnett Complaint ¶¶ 156, 240, 242.

[17] Beginning in 2002, certain branches of Al Haramain were designated by the United States as terrorist organizations. See Exec. Order No. 13224, 31 C.F.R. 595, available at http://www.treas.gov/offices/enforcement/ofac/sanctions/t11ter.pdf (hereinafter "Exec. Order No. 13224"). Judge Robertson denied Al Haramain's motion to dismiss the Burnett action. Burnett I, 274 F. Supp. 2d at 107.

[18] MWL is the parent of IIRO. See, e.g., Burnett Complaint ¶ 236.

[19] WAMY is a suspected al Qaeda front, allegedly "preaching good . . . while plotting evil," connected to charity Defendant Benevolence International Foundation ("BIF"). BIF is now a designated terrorist, but it previously concealed its relationship with Osama bin Laden and al Qaeda. See, e.g., Burnett Complaint ¶¶ 160, 205, 229, 362; Exec. Order 13224.

[20] Prince Sultan denies making any grants to Al Haramain and MWL and argues that contributions made to IIRO and WAMY were made strictly in his official capacity on behalf of the Saudi government. Further, he claims the four charities searched their records and confirmed that Prince Sultan did not make any personal contributions. These transmittal letters and government checks were included in Prince Sultan's motion to dismiss the D.C. Burnett action. Judge Robertson found these documents had "limited probative value, [as they] lack[ed] proper foundations to establish that the affiants could have known the actual source of the moneys they received." Burnett II, 292 F. Supp. 2d at 16. This Court has reviewed these affidavits and agrees with Judge Robertson's assessment. For example, one declarant who provided information

## 2. Prince Turki

Prince Turki is currently the Kingdom of Saudi Arabia's ambassador to the United Kingdom.  Ashton Complaint ¶ 263.  From 1977 until August 2001, he was the Director of Saudi Arabia's Department of General Intelligence ("DGI," also known by its Arabic name, Istakhbarat).  Ashton Complaint ¶ 255; Burnett Complaint ¶ 343; Federal Complaint ¶ 445.  As such, Plaintiffs allege he was or should have been aware of the terrorist threat posed by Osama bin Laden, al Qaeda, and the Taliban.  Ashton Complaint ¶ 256; Burnett Complaint ¶ 343. Prince Turki allegedly met with Osama bin Laden five times in the mid-1980s and mid-1990s. Ashton Complaint ¶ 257; Burnett Complaint ¶ 344.  At one of those meetings, which Prince Sultan also attended, bin Laden allegedly offered the Saudis the use of his family's engineering equipment and suggested bolstering Saudi military forces with militants.  Ashton Complaint ¶ 253.  Prince Turki is alleged to have close ties with an al Qaeda financier, Mr. Zouaydi, and is allegedly implicated in Mr. Zouaydi's financial support of al Qaeda.  Ashton Complaint ¶ 241; Burnett Complaint ¶ 345.  Further, Plaintiffs claim Prince Turki met with members of the Taliban and, in 1995, gave the Taliban financial and material support.  Ashton Complaint ¶ 257; Federal Complaint ¶¶ 447-48 (alleging that, at the time Prince Turki provided support, the Taliban maintained a symbiotic relationship with al Qaeda and thus Prince Turki knew al Qaeda would benefit from the Kingdom's support).  In July 1998, Prince Turki is alleged to have met with members of the Taliban and representatives of bin Laden and agreed to not extradite bin Laden or close terrorist camps in exchange for bin Laden's protection of the Saudi Royal family. Ashton Complaint ¶ 261; Burnett Complaint ¶ 348.  Plaintiffs allege Prince Turki facilitated money transfers from wealthy Saudis to the Taliban and al Qaeda.  Ashton Complaint ¶ 259; Federal ¶ 451.  Additionally, the Federal Plaintiffs claim that, while Prince Turki was the head of DGI, Saudi Arabian intelligence officers allegedly trained a member of the al Qaeda Spanish cell in explosives and provided material support to two of the September 11 hijackers.  Federal Complaint ¶ 449.  The Federal complaint also alleges that Prince Turki made personal contributions to Saudi-based charities that he knew were sponsors of al Qaeda, including IIRO, MWL, WAMY, BIF, the Saudi High Commission, Saudi Joint Relief Committee for Kosovo and Chechnya ("SJRC"), and Al Haramain.  Federal Complaint ¶¶ 451-52.

Prince Turki denies the allegations against him in a declaration prepared in concert with his motion to dismiss the D.C. Burnett action.  In reviewing this declaration, the Court gives "great weight to any extrinsic submissions made by the foreign defendant[] regarding the scope of [his] official responsibilities."  Leutwyler, 184 F. Supp. 2d at 287 (internal quotation marks omitted).  Prince Turki explains that the DGI "is involved in the collection and analysis of foreign intelligence and in carrying out foreign operations."  Decl. of HRH Prince Turki ¶ 5, at

---

regarding alleged contributions relied on his personal knowledge of a charity's records, yet he had only been in his position for two months.  See Decl. of Saleh Abdullah Al Saykhan ¶ 2, at Decl. of Sara E. Kropf in Support of Prince Sultan's Motion to Dismiss the D.C. Burnett action. As Judge Robertson pointed out, "the value of plaintiffs' showing that Prince Sultan did give money to these organizations in his personal capacity, however, is no greater."  Burnett II, 292 F. Supp. 2d at 16 (referring to Saudi press reports of Prince Sultan's contributions).

HRH Prince Turki's Motion to Dismiss Certain Consolidated Complaints Ex. 1 (hereinafter "Prince Turki Decl."). He was active in Saudi Arabia's efforts to combat terrorism generally and the threat posed by Osama bin Laden and al Qaeda specifically, and served on a joint information-sharing committee with the United States beginning in 1997. Id. ¶¶ 6, 10. He states that all of his interactions with Osama bin Laden and the Taliban were part of his official functions. Id. ¶ 5. In June 1998, King Fahd sent Prince Turki to Kandahar to meet with the Taliban and to relay the official Saudi request that Osama bin Laden be extradited to Saudi Arabia for trial. Id. ¶ 11. The Taliban denied the Saudi request and Saudi Arabia subsequently suspended diplomatic relations with the Taliban in September 1998. Id. ¶ 13. Prince Turki denies facilitating money transfers to Osama bin Laden or al Qaeda, he denies offering material assistance to Osama bin Laden, his representatives, or al Qaeda in return for their not attacking Saudi Arabia, he denies promising or providing oil or financial assistance to the Taliban, and denies ever hearing of the Syrian financier Mr. Zouaydi, with whom he is alleged to have ties. Id. ¶¶ 14, 16, 17.

### 3. Kingdom of Saudi Arabia

The Federal Plaintiffs claim that "[m]ore than any other factor, al Qaida's phenomenal growth and development into a sophisticated global terrorist network were made possible by the massive financial, logistical and other support it received from the Kingdom of Saudi Arabia, members of the Saudi Royal family, and prominent members of Saudi society." Federal Complaint ¶ 398. Further, the Federal Plaintiffs allege September 11 was "a direct, intended and foreseeable product of the Kingdom of Saudi Arabia's participation in al Qaida's jihadist campaign." Id. ¶ 425. Specifically, the Kingdom allegedly maintained and controlled several of the charities within al Qaeda's infrastructure. Id. ¶ 399. The Federal Plaintiffs claim Saudi Arabia knew the threat that these charities posed particularly to the United States, and did nothing to stop it. Id. ¶¶ 400-02. The Kingdom allegedly used its relationship with the Taliban to sustain al Qaeda in the mid-1990s. Id. ¶¶ 403, 407. To the extent the Federal Plaintiffs rely on actions by members of the Saudi Royal family as allegations against the Kingdom, they make no claim that these individuals were acting on behalf of or at the behest of the Kingdom. See, e.g., id. ¶ 420 (claiming that in January 1999 Princess Haifa made payments to Al-Bayoumi, a Defendant alleged to have paid rent on behalf of two of the hijackers). Finally, Plaintiffs allege that members of the Saudi Royal family provided support to al Qaeda in their official capacities as members of the Supreme Council of Islamic Affairs. Federal Complaint ¶¶ 426-464.

### 4. National Commercial Bank

NCB was established in 1950 by Salim bin Mahfouz, the father of Defendant Khalid bin Mahfouz, as the first commercial bank of Saudi Arabia. Ashton Complaint ¶ 563; Burnett Complaint ¶ 88. The Ashton Plaintiffs allege that the bin Mahfouz family controlled NCB until 1999 when the Saudi government bought a majority of its shares. Ashton Complaint ¶ 573.[21]

---

[21] The Ashton Plaintiffs moved to amend this allegation to claim that the Public Investment Fund ("PIF"), not the Saudi government, purchased a majority of NCB shares in 1999. Ashton Docket ## 137, 138.

The Ashton and Burnett Plaintiffs claim that NCB has a wholly-owned subsidiary in New York, SNCB Securities, Ltd., through which it operates an international banking business. Ashton Complaint ¶ 563; Burnett Complaint ¶ 88.

Plaintiffs claim Osama bin Laden and al Qaeda used NCB as "a financial arm, operating as a financial conduit for [their] operations." Ashton Complaint ¶ 564; Burnett Complaint ¶ 89. In 1986, Khalid bin Mahfouz became NCB's President and CEO and remained so until 1999. Ashton Complaint ¶ 563; Burnett Complaint ¶ 88. Also in 1986, Khalid bin Mahfouz became the Chief Operating Officer and a major shareholder of the Bank of Credit and Commerce International ("BCCI"). Ashton Complaint ¶¶ 564, 566; Burnett Complaint ¶¶ 89, 91. He was subsequently indicted in New York state in connection with his involvement in BCCI's fraudulent practices, which also implicated NCB. Ashton Complaint ¶¶ 564, 566; Burnett Complaint ¶¶ 89, 91.

Plaintiffs claim both NCB and BCCI supported international terrorism. Ashton Complaint ¶¶ 564-68; Burnett Complaint ¶¶ 91-93. Specifically, a "1999 United States Senate Report on the BCCI scheme detailed the role of [NCB] in hiding assets, money laundering, the cover-up and obstruction of a Senate investigation, and sponsoring international terrorism." Burnett Complaint ¶ 89. Additionally, a 1998 NCB bank audit revealed irregularities involving direct donations to several charities and that $74 million had been funneled by the bank's Zakat Committee to IIRO.[22] Ashton Complaint ¶¶ 569-71; Burnett ¶¶ 94, 95. NCB also allegedly made loans to charitable organizations without the knowledge of the Zakat Committee. Id. Plaintiffs allege "direct donations were received through NCB facilities to the Red Crescent Committee, [IIRO], and the Muwaffaq Foundation," all Defendants in these actions. Ashton Complaint ¶ 570; Burnett Complaint ¶ 95. Muwaffaq allegedly provided Osama bin Laden with $3 million in 1998. Ashton Complaint ¶ 573. Plaintiffs claim NCB knew or should have known it was materially supporting al Qaeda, Osama bin Laden, and international terrorism. Ashton Complaint ¶ 570; Burnett Complaint ¶ 95.

### C. Defendants' Status as Foreign States for FSIA Purposes

The Court must first determine if the moving Defendants are "foreign states" for purposes of the FSIA. A "foreign state" is statutorily defined:

(a) A "foreign state" . . . includes a political subdivision of a foreign state or an agency or instrumentality of a foreign state as defined in subsection (b).

(b) An "agency or instrumentality of a foreign state" means any entity –

(1) which is a separate legal person, corporate or otherwise, and

(2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and

(3) which is neither a citizen of a State of the United States . . . nor created under

---

[22] Zakat is required almsgiving by all Muslims. See, e.g., Burnett Complaint at 275; id. ¶ 40.

the laws of any third country.
28 U.S.C. § 1603. There is no dispute that the Kingdom of Saudi Arabia is a foreign state. The status of each of the Princes and NCB are discussed below.

### 1. Prince Sultan and Prince Turki

Several courts have recognized that "[i]mmunity under the FSIA extends also to agents of a foreign state acting in their official capacities [since] '[i]t is generally recognized that a suit against an individual acting in his official capacity is the practical equivalent of a suit against the sovereign directly.'"[23] Bryks v. Canadian Broad. Corp., 906 F. Supp. 204, 210 (S.D.N.Y. 1995) (quoting Chuidian v. Philippine Nat'l Bank, 912 F.2d 1095, 1101 (9th Cir. 1990) ("Nowhere in the text or legislative history does Congress state that individuals are not encompassed within 28 U.S.C. § 1603(b).")); see also Velasco v. Gov't of Indonesia, 370 F.3d 392, 398-99 (4th Cir. 2004) (collecting cases extending FSIA immunity to individuals sued in their official capacities); Byrd v. Corporacion Forestal y Industrial de Olancho S.A., 182 F.3d 380, 388 (5th Cir. 1999) (acknowledging the FSIA protects individuals to the extent they act within their official duties); El Fadl v. Cent. Bank of Jordan, 75 F.3d 668, 671 (D.C. Cir. 1996) (dismissing claims against government officials since they were sued in their official capacities); Leutwyler, 184 F. Supp. 2d at 286-87 ("[I]t has been generally recognized that individuals employed by a foreign state's agencies or instrumentalities are deemed 'foreign states' when they are sued for actions undertaken within the scope of their official capacities.") (citing Bryks, 906 F. Supp. at 210); Flatow v. Islamic Republic of Iran, 999 F. Supp. 1, 11 n.3 (D.D.C. 1998) (noting favorable practice of applying FSIA to individuals). Thus, this Court finds that immunity may be available to Prince Sultan, as the third-highest ranking member of the Saudi government, and to Prince Turki, as the Director of Saudi Arabia's Department of General Intelligence, to the extent their alleged actions were performed in their official capacities.

The Federal Plaintiffs argue that the FSIA cannot apply to Prince Turki because, as of September 10, 2003 when the complaint was filed, Prince Turki was the Saudi ambassador to the United Kingdom, a position the Federal Plaintiffs allege is not entitled to immunity under the FSIA. In support of this argument, the Federal Plaintiffs cite Dole Food Co. v. Patrickson, 538 U.S. 468, 480 (2003), in which the Supreme Court held that instrumentality status is determined at the time of the filing of the complaint.

The Court disagrees with this reliance on Dole Food. The Supreme Court resolved two questions in Dole Food. "The first [was] whether a corporate subsidiary can claim instrumentality status where the foreign state does not own a majority of its shares but does own a majority of the shares of a corporate parent one or more tiers above the subsidiary. The second question [was] whether a corporation's instrumentality status is defined as of the time an alleged tort or other actionable wrong occurred or, on the other hand, at the time the suit is filed." Id. at 471. The Supreme Court held that a foreign state's ownership of an entity must be direct for the entity to be considered an instrumentality. Id. at 474. The Supreme Court also ruled that

---

[23] The FSIA is silent on the subject. Neither the Supreme Court nor the Second Circuit has specifically addressed the issue.

11

ownership must be determined as of the date on which the complaint was filed. Id. at 480. Neither of these points of law speaks, however, to the circumstances under which an individual is covered by the FSIA. Indeed, numerous other courts that have addressed this issue have held that the relevant inquiry for individuals is simply whether the acts in question were undertaken at a time when the individual was acting in an official capacity. See, e.g., Velasco, 370 F.3d at 398-99; Byrd, 182 F.3d at 388; Bryks, 906 F. Supp. at 210. This Court considers that precedent to be more consistent with the FSIA and unaltered by the decision in Dole Food. Thus, it deems Prince Turki the equivalent of the foreign state inasmuch as the complaints allege actions taken in his official capacity as the head of the DGI. Accordingly, both Prince Sultan and Prince Turki are immune from suit for their official acts unless an exception under the FSIA applies.

### 2. National Commercial Bank

NCB submits that it is an instrumentality of the Kingdom of Saudi Arabia and therefore immune from suit. · See Decl. of Nizar Bin Obaid Madani, Assistant Minister of Foreign Affairs of Kingdom of Saudi Arabia ¶ 2, at Berger Decl. Ex. 7 ("It is the position of the Ministry of Foreign Affairs that NCB is a government instrumentality of the Kingdom of Saudi Arabia."). To enjoy immunity from suit under the FSIA, NCB must demonstrate that it is an agency or instrumentality, or a political subdivision of the Kingdom. 28 U.S.C. § 1603(a). As explained above, the FSIA defines an "agency or instrumentality" as (1) "a separate legal person, . . .(2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof," and (3) a non-U.S. citizen. 28 U.S.C. § 1603(b). Accordingly, NCB claims that (1) it is a separate legal person, (2) at the time the suit was filed a majority of its shares were owned by an administrative unit of the Saudi Ministry of Finance, the Public Investment Fund ("PIF"),[24] and (3) it is not a citizen of the United States or created under the laws of a third country.

In Dole Food, the Supreme Court held "that only direct ownership of a majority of shares by the foreign state satisfies the statutory requirement" outlined in § 1603(b). 538 U.S. at 474. Accordingly, the Kingdom of Saudi Arabia's ownership of NCB must be direct for NCB to enjoy immunity under the FSIA. That is, NCB will not be deemed an instrumentality of the Kingdom if the PIF, its majority owner, is determined to be an agency, instrumentality, or organ of the Kingdom. See § 1603(b)(2) (stating agency or instrumentality is entity whose majority

---

[24] After the parties submitted their briefs and argued the FSIA issue, the Ashton Plaintiffs filed supplemental affidavits, without leave of the Court, to contest, for the first time, the timing of the PIF's majority ownership. See 03 MD 1570 Docket # 455. The parties agree that the PIF bought 50% of NCB shares in May 1999. See John Fawcett Sept. 23, 2004 Supplemental Affidavit at Ex. 1 ("Fawcett Supp. Aff."). Later in 1999, the PIF sold 10% of its shares to the General Organization for Social Insurance. Fawcett Supp. Aff. at Ex. 2. Late in 2002 the PIF agreed to buy 30% of the remaining shares from the bin Mahfouz family, but Plaintiffs claim the purchase was not completed until January 2003, after the lawsuit was filed on September 4, 2002. See Fawcett Supp. Aff. at Ex. 3 & 4 (news accounts of sale). For the reasons that will be explained below, the Court finds it unnecessary to resolve this dispute at this time.

ownership interest is held by either the foreign state or a political subdivision thereof); Filler v. Hanvitt Bank, 378 F.3d 213 (2d Cir. 2004) (holding an organ's ownership of two banks did not, in turn, make the banks organs or instrumentalities of foreign state); see also In re Ski Train Fire in Kaprun, Austria, 198 F. Supp. 2d 420, 426 (S.D.N.Y. 2002) (holding ski resort owner, which was owned in part by instrumentality of Austrian government, was not instrumentality because it was not owned directly by the state or a subdivision thereof); Hyatt Corp. v. Stanton, 945 F. Supp 675, 688 (S.D.N.Y. 1996) (concluding "that corporations a majority of whose shares are owned by agencies or instrumentalities of foreign states are not themselves agencies or instrumentalities"). Thus, NCB must demonstrate that the PIF is the equivalent of the Kingdom of Saudi Arabia or a political subdivision thereof.

The PIF was established by Royal Decree with the sole function of "financing . . . investments in productive projects of a commercial nature whether they belong to the Government or the industrial lending institutions connected to it or to its public corporations and whether these projects are undertaken independently or in partnership between these administrative parties and private institutions." PIF Charter ¶ 2, at Berger Aff. Ex. 4B ("PIF Charter"); Affidavit of Abdallah Bin Hamad Al-Wohaibi ¶ 3, the Director of the Legal Department of the Ministry of Finance, at Berger Aff. Ex. 4 ("Al-Wohaibi Aff."). Its board of directors are all Saudi officials named in its charter, its employees are civil servants, and the Ministry of Finance is responsible for its costs. Id. ¶¶ 4, 8, 10; see also PIF Charter ¶¶ 4, 7. Its board must submit an annual report to Saudi Arabia's Council of Ministers summarizing its financial position and major operations. Al-Wohaibi Aff. ¶ 10. It has no separate legal status from the Ministry of Finance. Id. ¶ 4. The PIF holds shares of corporations and operational assets, "generally . . . on behalf of the Ministry of Finance." Id. ¶ 9. It may be sued as a department of the Ministry of Finance, and as such, the Ministry of Finance would be named as the defendant. Id. ¶ 12. It funds investments on behalf of the Kingdom and it provides financing terms for projects that commercial lenders do not. Id. ¶ 5; Supplemental Al-Wohaibi Aff. ¶¶ 8-10 (hereinafter "Supp. Al-Wohaibi Aff.").

### a. Status of the PIF

In Filler v. Hanvitt Bank, a case with facts very similar to those presented here, the Second Circuit reiterated Dole Food's requirement of direct ownership for instrumentality status. Two defendants were commercial banks majority-owned by the Korean Deposit Insurance Corporation ("KDIC"), a "governmental institution" run by the Korean Ministry of Finance and the Economy of the Republic of Korea. Filler, 378 F.3d at 215-16. In determining if KDIC was an organ of Korea, the court considered several factors:

> (1) whether the foreign state created the entity for a national purpose; (2) whether the foreign state actively supervises the entity; (3) whether the foreign state requires the hiring of public employees and pays their salaries; (4) whether the entity holds exclusive rights to some right in the [foreign] country; and (5) how the entity is treated under foreign state law.

Id. at 217 (citing Kelly v. Syria Shell Petroleum Dev. B.V., 213 F.3d 841, 846-47 (5th Cir. 2000) (alteration in original)). The Second Circuit held that the KDIC was an organ of Korea because it was formed by statute and presidential decree; it performs the governmental functions of

protecting depositors and promoting financial stability; its directors are appointed by the Ministry of Finance and Economy; its president is appointed by the President of the Republic of Korea; and many of its operations are overseen by the Ministry of Finance and Economy. Id.

The banks argued that once the court determined KDIC was an organ of the foreign state, the banks automatically became instrumentalities or agencies of the state because KDIC owned a majority of their stock. Id. The Second Circuit rejected this argument, finding such a holding would "permit an infinite number of subsidiaries to enjoy sovereign immunity, . . . would be incompatible with the purpose of the FSIA, which is to grant governmental, not private corporate immunity, and . . . would reflect infidelity to the Supreme Court's reasoning in Dole Food." Id. at 218. Accordingly, it reiterated that "'a subsidiary of an instrumentality is not itself entitled to instrumentality status' . . . and that 'only direct ownership of a majority of shares by the foreign state satisfies the statutory requirement.'" Id. (quoting Dole Food, 538 U.S. at 473-74).

The Second Circuit determined the KDIC was an organ of Korea by considering whether it was created and supervised by a foreign state and whether public employees were performing public functions. Id. at 217. Under its reasoning, it would appear the PIF is also an organ. It was created by royal decree, it is supervised by the Kingdom's Council of Ministers and staffed with government employees. See PIF Charter.

Yet, under the "legal characteristics" test, the PIF could qualify as a political subdivision. See Hyatt, 945 F. Supp. at 680. In Hyatt, a court in this district reasoned that a statutory requirement of an agency or instrumentality, as opposed to a political subdivision, is that it is a "separate legal person . . . that can function independent of the state." Id. at 684. If an entity could sue and be sued, own property, and contract in its own name, it would be considered an agency or instrumentality and not a political subdivision. Id. at 685. NCB submits the PIF sues and is sued as, and generally holds property on behalf of, the Ministry of Finance. Al-Wohaibi Aff. ¶¶ 9, 12.

NCB argues the Court should employ the "core functions" test outlined in Transaero, Inc. v. La Fuerza Aerea Bolivian, 30 F.3d 148 (D.C. Cir. 1994), to find that the PIF is the equivalent of the Kingdom. Under this test, if the entity's core functions are governmental, it is considered the state itself. Id. at 153. If its functions are commercial in nature, it is considered an instrumentality. Id. This Court is governed by Second Circuit precedent and finds Filler and Hyatt to be controlling. Even if it were to adopt Transaero, however, the Court finds on the record before it that the PIF's emphasis on commercial projects precludes a finding that its core functions are governmental in nature. See PIF Charter ¶ 2 (noting the PIF's primary function of "financing . . . investments in productive projects of a commercial nature").

NCB also urges that O'Connell Machinery Co. v. M.V. "Americana," 734 F.2d 115 (2d Cir. 1984), mandates the finding that the PIF is a political subdivision of the Kingdom. In O'Connell, the Second Circuit reasoned that the legislative history of the FSIA indicated that "political subdivisions" were intended to include "all governmental units beneath the central government." Id. (quoting H.R. Rep. No. 1487, 94th Cong., 2d Sess. 15, reprinted in, 1976

14

U.S.C.C.A.N. 6604, 6613). Given the PIF's position under the Ministry of Finance, O'Connell could lead to the conclusion that the PIF is a political subdivision of the Kingdom of Saudi Arabia. Id.; but see In re Ski Train Fire, 198 F. Supp. 2d at 425 n.9 (distinguishing O'Connell on grounds that the court based its holding on a finding that the Italian government double-tiered its administrative agencies); Hyatt, 945 F. Supp. at 683-84 (finding definition of "political subdivision" in O'Connell too broad and suggesting the case should be limited to its facts and not applied widely). In the twenty years since O'Connell was decided, however, courts have been inclined to limit the FSIA's grant of immunity. See, e.g., Dole Food, 538 U.S. at 473-47; Filler, 378 F.2d at 218. Accordingly, the Court will not rely on O'Connell here.

### b. Limited Jurisdictional Discovery is Warranted

The Court finds that resolution of the PIF's and thereby NCB's status is not determinable on the current record and, therefore, limited jurisdictional discovery is warranted. As explained above, the PIF could qualify either as an organ or political subdivision of the Kingdom of Saudi Arabia. Additionally, the affidavits on which the parties ask the Court to rely have not been subjected to cross examination and are rather self-serving. The parties should have the opportunity to take discovery of the jurisdictionally relevant facts. First City, 150 F.3d at 177; see also In re Magnetic Audiotape Antitrust Litig., 335 F.3d 204, 208 (2d Cir. 2003) (instructing district court to permit discovery before granting motion to dismiss based on fact-sensitive, multi-factor test). Accordingly, NCB's motion to dismiss for lack of subject matter jurisdiction based on the FSIA is denied without prejudice. Limited jurisdictional discovery will be permitted to explore PIF's function, organizational structure, and place within the Kingdom of Saudi Arabia.

### D. Application of FSIA Exceptions to the Princes and Kingdom of Saudi Arabia

Three exceptions to foreign sovereign immunity are implicated in these motions – the commercial activities exception, 28 U.S.C. § 1605(a)(2), the state sponsor of terrorism exception, 28 U.S.C. § 1605(a)(7), and the torts exception, 28 U.S.C. § 1605(a)(5).

### 1. Commercial Activities Exception

Section 1605(a)(2) states:

A foreign state shall not be immune . . . in any case . . . in which the action is based . . . upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2). The statute defines "commercial activity" as "either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." 28 U.S.C. § 1603(d). The Supreme Court has explained, "when a foreign government acts, not as a regulator of the market, but in the manner of a private player within it, the foreign sovereign's actions are 'commercial' within the meaning of the FSIA." Weltover, 504 U.S. at 614. Courts must inquire whether the foreign state's actions "are the type of actions by which a private party engages in trade and traffic or

commerce." Id. (internal citations omitted).

Judge Robertson determined that the commercial activity exception did not apply to the Burnett Plaintiffs' claims against Prince Sultan and Prince Turki because "the act of contributing to a foundation is not within our ordinary understanding of 'trade and traffic or commerce' nor, apparently was it within the contemplation of . . . Congress." Burnett II, 292 F. Supp. 2d at 18 (citing H.R. Rep. No. 94-1487, at 16, reprinted in 1976 U.S.C.C.A.N. at 6615). Thus, the consolidated Plaintiffs do not assert that the commercial activities exception is applicable to any of the Defendants raising FSIA defenses here. This Court adopts Judge Robertson's reasoning. To the extent any Plaintiffs' claims are based on a Defendant's contributions to charities, those acts cannot be considered commercial.

The Federal Plaintiffs allege that the Kingdom of Saudi Arabia, Prince Sultan, and Prince Turki financed terrorism by contributing to or supporting charities known to support terrorist activities. In these Plaintiffs' view, this is essentially money laundering and, therefore, a commercial activity. See, e.g., Federal Plaintiffs' Opp. to Motion to Dismiss of Prince Sultan at 18 (citing U.S. v. Goodwin, 141 F.3d 394, 399 (2d Cir. 1997)). The Second Circuit noted in Goodwin that "[m]oney laundering is a quintessential economic activity," 141 F.3d at 399, but that statement has no bearing here. In Goodwin the court was not deciding whether money laundering is a commercial activity for purposes of the FSIA. Id. (analyzing constitutionality of criminal money laundering statute). The Second Circuit has made very clear that, for purposes of the FSIA, a commercial activity must be one in which a private person can engage lawfully. Letelier v. Republic of Chile, 748 F.2d 790, 797-98 (2d Cir. 1984); see also Saudi Arabia v. Nelson, 507 U.S. 349, 360-62 (1993) (holding detaining and torturing plaintiff is not commercial activity since it "is not the sort of action by which private parties can engage in commerce"). Since money laundering is an illegal activity, see 18 U.S.C. § 1956 (criminalizing money laundering), it cannot be the basis for applicability of the commercial activities exception. See Letelier, 748 F.2d at 798 (holding alleged participation in an assassination is not a lawful activity and therefore not a commercial activity for purposes of the FSIA). Accordingly, the Court finds that the commercial activities exception outlined in § 1605(a)(2) is inapplicable to the allegations contained in the Federal complaint against the Kingdom of Saudi Arabia, Prince Sultan, and Prince Turki.

### 2. State Sponsor of Terrorism

Subsection (a)(7) lifts immunity in cases:

in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources . . . for such an act . . . except that the court shall decline to hear a claim under this paragraph

(A) if the foreign state was not designated as a state sponsor of terrorism . . . .

28 U.S.C. § 1605(a)(7) (emphasis added). The parties agree that the Kingdom of Saudi Arabia has not been designated a state sponsor of terrorism. See 28 U.S.C. § 1605(a)(7)(A) (explaining there is no jurisdiction if "the foreign state was not designated as a state sponsor of terrorism under . . . the Export Administration Act of 1979 . . . or . . . the Foreign Assistance Act of 1961").

16

Thus, this exception does not provide an exception to immunity for any of the Defendants raising the FSIA defense here.

### 3. Torts Exception

In relevant part, the torts exception deprives a foreign sovereign of immunity in actions:

> in which money damages are sought against a foreign state for personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment; except this [exception] shall not apply to –
>
>> (A) any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function regardless of whether the discretion be abused.

28 U.S.C. § 1605(a)(5). Second Circuit law instructs that district courts must determine whether the defendant's alleged acts were tortious under the laws of New York and, if so, whether the defendant's acts were discretionary. Robinson, 269 F.3d at 142 ("If those activities could not render the Malaysian government liable for a tort under New York law, then it remained immune under § 1605(a)(5)."). In the event that the act is tortious and the acts were not discretionary, the alleged tortfeasor is subject to suit under the FSIA.

The FSIA's discretionary function exception replicates the discretionary function exception found in the Federal Tort Claims Act. See 28 U.S.C. § 2680(a). Courts have found both exceptions are "intended to preserve immunity for 'decisions grounded in social, economic, and political policy.'" Marchisella v. Gov't of Japan, No. 02 Civ. 10023 (DC), 2004 WL 307248, at *2 (S.D.N.Y. Feb. 17, 2004) (citing United States v. S.A. Empresa De Viacao Aerea Rio Grandense (Varig Airlines), 467 U.S. 787, 814 (1984) (interpreting FTCA)). Generally, acts are discretionary if they are performed at the planning level of government, as opposed to the operational level. Kline v. Kaneko, 685 F. Supp. 386, 392 (S.D.N.Y. 1988) (finding decision to expel plaintiff from Mexico was product of enforcement of immigration laws and therefore a discretionary function); Marchisella, 2004 WL 307248, at *2 (finding decision regarding placement of a water hose on a ship was an operational function and therefore not discretionary and not protected by the FSIA); Napolitano v. Tishman Constr. Corp., No. 96 Civ. 4402 (SJ), 1998 WL 102789, at *4 (E.D.N.Y. Feb. 26, 1998) (finding purchasing consulate buildings and hiring contractor to renovate is a planning function and therefore discretionary).

Defendants argue that the Court should not even consider the torts exception for two reasons. First, they claim that for this exception to apply, the entire tort must have occurred in the United States, which Defendants argue is not the case here. Second, Defendants claim that Plaintiffs impermissibly seek to contort a § 1605(a)(7) state sponsor of terrorism claim into a § 1605(a)(5) tort claim.

With respect to Prince Sultan's and Prince Turki's arguments that the entire tort, meaning both the tortious conduct and the injury, must occur in the United States, Judge Robertson disagreed and stated the FSIA "preserves immunity for tort claims unless injury or death occurs

in the United States." Burnett II, 292 F. Supp. 2d at 19 n.4 (quoting Tel-Oren v. Libyan Arab
Republic, 726 F.2d 774, 775 (D.C. Cir. 1984) (Edwards, J., concurring) (some emphasis
omitted). Courts in the Second Circuit seem to take the opposite approach. "Although cast in
terms that may be read to require that only the injury rather than the tortious acts occur in the
United States, the Supreme Court has held that this exception 'covers only torts occurring within
the territorial jurisdiction of the United States.'" Cabiri v. Gov't of the Republic of Ghana, 165
F.3d 193, 200 n.3 (2d Cir. 1999) (quoting Amerada Hess, 488 U.S. at 441); see also Hirsh v.
State of Israel, 962 F. Supp. 377, 383-84 (S.D.N.Y. 1997) (citing legislative history stating both
the tort and injury must occur within the United States for the exception to apply and dismissing
complaint where plaintiffs failed to allege specific tort or place tort occurred); Kline, 685 F.
Supp. at 391 (finding tort exception inapplicable where victim was abducted in Mexico City and
brought to the United States because "the entire tort must be committed in the United States").

Plaintiffs allege that the Kingdom, Prince Sultan, and Prince Turki tortiously aided and
abetted the September 11 terrorists by supporting charities that, in turn, supported al Qaeda and
international terrorism. Plaintiffs also claim that, in return for protection of the Kingdom, these
Defendants essentially willfully ignored the threat that Osama bin Laden and al Qaeda posed to
the United States. Plaintiffs do not claim that the Kingdom or the Princes undertook any of their
alleged acts in the United States. Yet, in the Plaintiffs' view, the operative torts for the Court's
consideration are the attacks of September 11, which did take place in the United States. See
Burnett II, 292 F. Supp. 2d at 19 n.4 (noting death and injuries occurred in United States).
Further, Plaintiffs claim it would be unjust to allow foreign nations to escape liability for tortious
acts performed in the United States if they could show that some act of planning the tort took
place outside the United States.

Additionally, Defendants submit that, since the allegations are precisely those outlined in
§ 1605 (a)(7) – that is, "personal injury or death that was caused by an act of . . . extrajudicial
killing, aircraft sabotage . . . or the provision of material support or resources . . . for such an act"
– none of the other exceptions should be read to apply in its place.[25] Defendants argue the
Court's adjudication of Plaintiffs' claims would interfere with the executive branch's discretion
to designate state sponsors of terror. See 28 U.S.C. § 1605(a)(7)(A) (listing statutes that give

_____

[25] Judge Robertson recognized the same difficulty. Although he did consider Plaintiffs's
claims under the tort exception, he found that the language of the state sponsor of terrorism
exception buttressed his ultimate conclusion that the tortious acts exception would not provide
subject matter jurisdiction over Prince Sultan and Prince Turki. Unlike (a)(7), the tort exception
"makes no mention of the 'provision of material support.'" Burnett II, 292 F. Supp. 2d at 20 n.5.
After reviewing canons of statutory construction counseling that Congress acts intentionally
when it includes particular language in one section of a statute but omits it from another, Judge
Robertson concluded that Congress's omission of 'provision of material support' from (a)(5)
should be treated as intentional." Id.; see also HCSC Laundry v. United States, 450 U.S. 1, 6
(1980) (per curiam) ("[I]t is a basic principle of statutory construction that a specific statute . . .
controls over a general provision . . ., particularly when the two are interrelated and closely
positioned.").

Secretary of State authority to designate countries as sponsors of terrorism).  Finally, Defendants submit the purpose of (a)(5) was "to eliminate a foreign state's immunity for traffic accidents and other torts committed in the United States, for which liability is imposed under domestic tort law."  Amerada Hess, 488 U.S. at 439-40; Burnett II, 292 F. Supp. 2d at 19 (stating "the legislative history [of the FSIA] counsels that the exception should be narrowly construed so as not to encompass the farthest reaches of common law").

Plaintiffs respond that if Congress intended (a)(5) and (a)(7) to be mutually exclusive or intended that (a)(5) never apply in the terrorism context, Congress would have said so.  Indeed, Congress did so very explicitly with respect to (a)(5) and (a)(2) and between (a)(7) and (a)(2).  See § 1605(a)(5) (explaining exception can only be used in situations "not otherwise encompassed in paragraph (2)"); §1605(a)(7) (same).  To further buttress their argument, Plaintiffs note the two exceptions have been interpreted to encompass different situations.  Subsection (a)(7) covers acts of terrorism committed abroad by a state sponsor of terrorism, while subsection (a)(5) governs tortious acts, including terrorism, performed in the United States.  See Flatow v. Islamic Republic of Iran, 999 F. Supp. 1, 15 (D.D.C. 1998) (finding (a)(7) applied to conduct outside the United States and stating "28 U.S.C. § 1605(a)(5) already provides jurisdiction over state-sponsored terrorist acts in the United States, . . . the state sponsored terrorism exception would be redundant if it were held to apply only within the United States").  Again, Plaintiffs argue that Defendants' argument of exclusivity would lead to absurd results, such that if a foreign sovereign not designated a state sponsor of terror was involved in a car accident stemming from negligence it would not be immune; but if it undertook a deliberate act of violence it would enjoy immunity from suit.

The Court understands Plaintiffs' desire to find a legal remedy for the horrible wrongs committed on September 11, 2001.  If appropriate, however, these Defendants are entitled to immunity from litigating these gravely serious claims in this forum.  Congress made a policy decision that the Executive branch, and not the courts, have the authority to label a foreign nation a terrorist.  See 28 U.S.C. § 1605(a)(7)(A).  But when it drafted the state sponsor of terror exception it did not include mutually exclusive language that would preclude the application of the torts exception here.  It did include such language with respect to the commercial activities exception.  See 28 U.S.C. § 1605(a)(7) ("A foreign state shall not be immune from jurisdiction of courts of the United States or of the States in any case – not otherwise covered by paragraph (2) above."); see also 28 U.S.C. § 1605(a)(5) ("A foreign state shall not be immune from jurisdiction of courts of the United States or of the States in any case – not otherwise encompassed in paragraph (2) above.").  Particularly in a case such as this where interests of sovereignty, comity, international relations, and separation of powers are implicated, the Court must be vigilant to exercise discipline to apply the law only as it is written.  While there are certainly obstacles to (a)(5)'s application – and the Court is not convinced the Plaintiffs have or can overcome them – the Court will not rule as a matter of law that subsections (a)(7) and (a)(5) are mutually exclusive.  Accordingly, the Court will consider Plaintiffs' evidence demonstrating the torts exception outlined in (a)(5) provides a basis for subject matter jurisdiction here.

To fit within the exception outlined in § 1605(a)(5), the Plaintiffs must come forward

19

with evidence demonstrating the Princes' or Kingdom's tortious acts or omissions caused Plaintiffs' injuries.[26] 28 U.S.C. § 1605(a)(5); Virtual Countries, 300 F.3d at 241; Cargill, 991 F.2d at 1016. "Any terrorist act, including the September 11 attacks, might have been the natural and probable consequence of knowingly and intentionally providing financial support to al Qaeda, given [the complaints'] allegations that, prior to September 11, al Qaeda and Osama bin Laden had proclaimed their intentions to commit murderous terrorist activities against the United States and its citizens, . . . and had accompanied these words with actions by implementing, and publicly acknowledging responsibility for, such terrorist schemes as the 1993 bombing of the World Trade Center, the 1998 attack of the U.S. embassies in Kenya and Tanzania, and the 2000 attack of the U.S.S. Cole in Yemen." Burnett I, 274 F. Supp. 2d at 105; see also Ashton Complaint ¶¶ 105-108 (1993 World Trade Center attack), 130-136 (embassy bombings), 152-55 (Cole attack); Federal Complaint ¶ 77 (alleging Osama Bin Laden established al Qaeda to wage war with the United States).

### a. Prince Sultan and Prince Turki

Both Princes are alleged to have tortiously aided and abetted terrorism through their contributions to, and support of, Islamic charities that they knew or should have known were supporting terrorist organizations such as al Qaeda.[27] Additionally, Plaintiffs allege Prince Turki aided and abetted the terrorists by attempting to deflect their activities away from Saudi Arabia and by serving as a "facilitator of Osama bin Laden's network of charities." Ashton Complaint ¶ 261; Burnett Complaint ¶ 350. Plaintiffs allege both Princes must have known that the United States would have been al Qaeda's target, making the attacks on September 11 a foreseeable result of the Princes' actions.

Pursuant to the Second Circuit's instruction, the Court must first determine whether the Princes' acts are tortious under New York law. Robinson, 269 F.3d at 142. In New York, conspiracy and aiding and abetting are varieties of concerted action liability. Pittman v. Grayson, 149 F.3d 111, 122 (2d Cir. 1998). There must be "(1) an express or tacit agreement to 'participate in a common plan or design to commit a tortious act,' (2) tortious conduct by each

---

[26] Plaintiffs argue that Judge Robertson held them to an unnecessarily stringent theory of causation and submit that the D.C. Circuit's subsequent decision in Kilburn v. Socialist People's Libyan Arab Jamahiriya, 376 F.3d 1123 (D.C. Cir. 2004), effectively overrules the holding in Burnett II. See Kilburn, 376 F.3d at 1129 (evaluating a claim under § 1605(a)(7) and holding the requirement for jurisdictional causation was proximate cause). This Court does not read Burnett II as requiring but-for causation and Defendants agreed at oral argument that the proper inquiry at this stage of the litigation is the presence of proximate causation. See Sept. 14, 2004 Tr. at 121.

[27] To the extent that the consolidated Plaintiffs and the Federal Plaintiffs allege that Prince Sultan and Prince Turki made donations in their personal capacities, see, e.g., Ashton Complaint ¶ 269 (Prince Sultan); Federal Complaint ¶¶ 451-52 (Prince Turki), those claims are not subject to the FSIA's protection. The Court will determine whether it has personal jurisdiction over Prince Sultan and Prince Turki in Part II.

defendant, and (3) the commission by one of the defendants, in pursuance of the agreement, of an act that constitutes a tort.'" Id. (quoting Rastelli v. Goodyear Tire & Rubber Co., 79 N.Y.2d 289, 295 (1992)). Conspiracy "requires an agreement to commit a tortious act." Id. at 122-23. Aiding and abetting "requires that the defendant have given substantial assistance or encouragement to the primary wrongdoer." Id. at 123. "[U]nder either theory, the defendant must know the wrongful nature of the primary actor's conduct." Id. (finding no concerted action liability where airline had no knowledge mother was removing daughter from country without father's approval).

### i. Causation

Judge Robertson found his consideration of Prince Sultan's and Prince Turki's FSIA defenses did not present an opportunity for a general discourse on causation since Plaintiffs' theory would stretch causation to "terra incognita." Burnett II, 292 F. Supp. 2d at 20. This Court agrees with Judge Robertson's conclusion, but it undertakes the causation analysis because a similar review will be necessary in its consideration of the Defendants' motions for failure to state a claim. See Part III below.

Plaintiffs place great reliance on Halberstam v. Welch, 705 F.2d 472 (D.C. Cir. 1983) and Boim v. Quranic Literacy Institute. & Holy Land Foundation for Relief & Development, 291 F.3d 1000, 1023 (7th Cir. 2002) ("Boim II"). Neither of these cases concern the tortious activity exception to the FSIA, but they do explain liability under the ATA and for aiding and abetting and conspiracy.[28] In Halberstam, the defendant was found liable as a joint venturer for a killing that occurred during a burglary at which she was not present. Halberstam, 705 F.2d at 488; see also Lumbard v. Maglia, Inc., 621 F. Supp. 1529, 1536 (S.D.N.Y. 1985) ("[T]hose who aid or abet or conspire in tortious conduct are jointly and severally liable with other participants in the tortious conduct, regardless of the degree of their participation or culpability in the overall scheme."). The court found that the defendant's intimate relationship with the burglar and her assistance in his other illegal ventures "defie[d] credulity that [she] did not know that something illegal was afoot." Halberstam, 705 F.2d at 486.

In Boim, the district court had denied a motion to dismiss by U.S.-based charities alleged to have aided and abetted international terrorism. Boim v. Quranic Literacy Inst. & Holy Land Found., 127 F. Supp. 2d 1002, 1018 (N.D.Ill. 2001) ("Boim I"). The Seventh Circuit affirmed

---

[28] The court in Halberstam outlined the elements of aiding and abetting as: "(1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; (3) the defendant must knowingly and substantially assist the principal violation." Halberstam, 705 F.2d at 477. It described the elements of civil conspiracy as: "(1) an agreement between two or more persons; (2) to participate in an unlawful act, or a lawful act in an unlawful manner; (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; (4) which overt act was done pursuant to and in furtherance of the common scheme." Id.

the decision and held that the parents of a yeshiva student killed in 1996 in Israel by members of the military wing of Hamas could prove that the defendants aided and abetted their son's murder under the ATA if they could demonstrate that the charities "knew of Hamas' illegal activities, that they desired to help those activities succeed, and they engaged in some act of helping the illegal activities." Boim II, 291 F.3d at 1023. The court explained that "[f]oreseeability is the cornerstone of proximate cause, and in tort law, a defendant will be held liable only for those injuries that might have reasonably been anticipated as a natural consequence of the defendant's actions." Id. at 1012. Plaintiffs submit the court's decision in Boim – that the ATA was designed "to extend liability to all points along the causal chain of terrorism" – supports the finding that Prince Sultan's and Prince Turki's conduct caused the attacks on September 11, 2001. Id. at 1011.

Plaintiffs exert much effort outlining the connections between al Qaeda and the Defendant charities that Prince Sultan and Prince Turki supported. Plaintiffs argue that the indirect nature of the Princes' contributions to al Qaeda is not fatal to their claims since they allegedly knew that funds they donated to the Defendant charities were being diverted to al Qaeda. See Bierstein Aff. in Opp. to Prince Sultan's Motion to Dismiss, Exs. 1-24. The Court has reviewed the exhibits on which Plaintiffs rely and finds only a handful relate to Plaintiffs' arguments.

Exhibit 11 is a report allegedly prepared for the President of the U.N. Security Council regarding a Saudi connection to terror financing. The report mentions Prince Sultan once in his role as the head of the Supreme Council of Islamic Affairs and does not conclude or suggest that he had any knowledge that charities to which he allegedly donated were funneling money to al Qaeda.

Exhibit 12 is a statement by the former French Minister of the Interior in which he claims to have met with Prince Sultan, Prince Turki, and other members of the Saudi Royal family in November 1994 and to have raised the "question of financial aid furnished by Saudi charitable organizations enjoying state support . . . to Islamist movements or terrorist groups." The only charity he names in his statement is the World Islamic League, not one of the charities to which the Princes allegedly donated.

Exhibits 21-24 are excerpts from The Muslim World regarding Prince Sultan's donations to IIRO and the Joint Saudi Committee for Relief of Kosovar Refugees ("JSCR"). There is no indication in these exhibits that IIRO or JSCR was funneling donations to al Qaeda. Even construing these allegations and exhibits in the light most favorable to Plaintiffs, and drawing all inferences in their favor, none of these exhibits amount to admissible evidence that Prince Sultan or Prince Turki knew the charities they supported were fronts for al Qaeda.

Alternatively, Plaintiffs argue that, since Osama bin Laden and al Qaeda made no effort to hide their hatred for the United States, Prince Sultan and Prince Turki had to have been aware that the United States was a target, making the atrocities of September 11, 2001 a foreseeable result of their actions. See, e.g., Bierstein Aff. in Opp. to Prince Sultan's Motion to Dismiss,

22

Exs. 2-10, 14, 15, 18, 20 (including reports and fatwas summarizing Osama bin Laden's and al Qaeda's repeated public threats to and denouncement of the United States). There is no question that in the years leading up to the September 11 attacks, Osama bin Laden and al Qaeda were increasingly vocal in their hatred of the United States and its interests. The question remains, however, whether Plaintiffs have adequately alleged that Prince Sultan's and Prince Turki's specific acts aided and abetted those terrorists.

Both Prince Sultan and Prince Turki claim Plaintiffs cannot demonstrate their alleged tortious activity caused Plaintiffs' injuries. They argue that Plaintiffs ignore that Osama bin Laden also targeted the Saudi Royal family. See, e.g., Bierstein Aff. in Opp. to Prince Sultan's Motion to Dismiss, Ex. 16 (Prince Turki, "Allied Against Terrorism," September 17, 2002, Washington Post, editorial in which Prince Turki explains the Saudis' practice of sharing information regarding Osama bin Laden and al Qaeda with the CIA and states that al Qaeda also targeted the Kingdom); Exs. 3, 5, 6 (fatwas issued by Osama bin Laden and Sheikh Omar Abdel Rahman targeting Americans and expressing extreme bitterness toward the Saudi Royal family). Prince Sultan argues that Plaintiffs blur the distinction between charities he is on record of supporting, IIRO and WAMY, and those he is not, Al Haramain and MWL. See supra note 20. Both Princes also distinguish the instant case from Boim and other cases cited by the Plaintiffs on the basis that groups that they are alleged to have supported were not designated as terrorist organizations by the United States government. See Boim II, 291 F.3d at 1002 (noting Hamas was designated a terrorist organization by President Clinton in 1995 and by the Secretary of State in 1997); see also Consolidated Plaintiffs' Opp. to Prince Sultan's Motion to Dismiss at 16-17 (citing Flatlow, 999 F. Supp. at 18 (holding Iran, a state sponsor of terrorism, liable as provider of material support to terrorist organization Palestine Islamic Jihad pursuant to 18 U.S.C. § 1605(a)(7)); Smith v. Islamic Emirate of Afghanistan, 262 F. Supp. 2d 217, 232 (S.D.N.Y. 2003) (granting default judgment against Iraq, a designated state sponsor of terror, after plaintiffs demonstrated it provided material support to Osama bin Laden and al Qaeda)); Consolidated Plaintiffs' Opp. to Prince Turki's Motion to Dismiss at 8 (same).

Although they did not involve New York law, the Court agrees that Halberstam and Boim are instructive. In Halberstam, the defendant enjoyed an extravagant lifestyle made entirely possible by her long-term live-in boyfriend's regular burglaries. The court concluded that she had to know of his criminal activities because she acted as a money launderer for her boyfriend's stolen metals business. Halberstam, 705 F.2d at 486-88. The court found the defendant was so close to the illegal activity that she had to be aware of her role in it. Id. at 486. In Boim, the court denied the defendants' motion to dismiss because the complaint contained specific factual allegations tying the defendants to Hamas. For example, one defendant entity allegedly employed an individual designated as a terrorist affiliated with Hamas, another entity admitted providing funds to Hamas, two individual defendants had documented and admitted ties to Hamas, and numerous links existed between the individual terrorist defendants and the entity defendants. Boim I, 127 F. Supp. 2d at 1006-1008. Unlike Hamas in Boim, none of the organizations the Princes are alleged to have supported in an official capacity were designated a sponsor of terrorism at the time of the alleged contributions. In fact, only BIF and certain branches of Al Haramain have since been designated. See Exec. Order No. 13224 (designating

23

BIF (November 19, 2002) and branches of Al Haramain (Bosnia, Somalia on March 11, 2002; Indonesia, Kenya, Pakistan, Tanzania on January 22, 2004; Afghanistan, Albania, Bangladesh, Ethiopia, the Netherlands on June 2, 2004)). Thus, pursuant to Boim, the Plaintiffs would have to allege specific facts showing that the Princes knew or should have known that the charities they supported were actually fronts for al Qaeda. See Burnett I, 274 F. Supp. 2d at 106.

Plaintiffs have pleaded al Qaeda's repeated, public targeting of the United States. They have not, however, pleaded facts to support an inference that the Princes were sufficiently close to the terrorists' illegal activities to satisfy Halberstam or New York law. Similarly, Plaintiffs have not pleaded facts to suggest the Princes knew they were making contributions to terrorist fronts and provided substantial assistance or encouragement to the terrorists to satisfy Boim or New York law. The Court has reviewed the complaints in their entirety and finds no allegations from which it can infer that the Princes knew the charities to which they donated were fronts for al Qaeda. The Court is not ruling as a matter of law that a defendant cannot be liable for contributions to organizations that are not themselves designated terrorists. But in such a case, there must be some facts presented to support the allegation that the defendant knew the receiving organization to be a solicitor, collector, supporter, front or launderer for such an entity. There must be some facts to support an inference that the defendant knowingly provided assistance or encouragement to the wrongdoer. Here, there are no such factual bases presented, there are only conclusions. See Robinson, 269 F.3d at 146 ("[W]e note that the conclusory nature of [plaintiff's] allegations alone would give us pause before we would allow them to sustain jurisdiction.") (citing Zappia Middle East Const. Co. v. Emirate of Abu Dhabi, 215 F.3d 247, 253 (2d Cir. 2000) (finding, in context of FSIA 12(b)(1) motion, conclusory allegations in plaintiff's affidavit insufficient to sustain jurisdiction)). The law does not permit Plaintiffs

> to circumvent the jurisdictional hurdle of the FSIA by inserting vague and conclusory allegations of tortious conduct in their complaints – and then . . . rely on the federal courts to conclude that some conceivable non-discretionary tortious act falls within the purview of these generic allegations under the applicable substantive law. This is at odds with the goal of the FSIA to enable a foreign government to obtain an early dismissal when the substance of the claim against it does not support jurisdiction.

Robinson, 269 F.3d at 146.

### ii. Discretionary Function
Plaintiffs argue that there is no discretion to conduct illegal activities and the so-called discretionary function exception to the tortious act exception should not apply to Prince Sultan or Prince Turki. See, e.g., Liu v. Republic of China, 892 F.2d 1419, 1421, 1431 (9th Cir. 1989) (finding no discretion to violate Chinese law prohibiting murder where gunmen acting on direction of China's Director of Defense Intelligence Bureau killed plaintiff's husband); Birnbaum v. United States, 588 F.2d 319, 329-30 (2d Cir. 1978) (finding in FTCA case that the CIA had no authority and therefore no discretion to open U.S. first class mail departing for and arriving from the Soviet Union); Glickman v. United States, 626 F. Supp. 171, 175 (S.D.N.Y. 1985) (finding in FTCA case that CIA agent's secret administration of LSD to plaintiff was not discretionary function); Letelier v. Republic of Chile, 488 F. Supp. 665, 673 (D.D.C. 1980)

24

(holding no discretion to order or aid assassination of former Chilean ambassador and foreign minister).  Prince Sultan insists that any recommendation of government grants to Islamic charities was a discretionary function.  Prince Turki makes a similar argument regarding his actions as the head of DGI and urges the Court to find that all of his alleged actions should be subsumed by the discretionary function exception.

        The Court finds the discretionary function exception independently bars Plaintiffs' claims against Prince Sultan and Prince Turki.  Both Princes are accused of donating money or recommending government grants to charities that allegedly supported al Qaeda.  As the head of DGI, Prince Turki is also alleged to have attempted to protect Saudi Arabia from terrorism and to have implemented the Kingdom's foreign relations with the Taliban and Osama bin Laden.  In determining whether these were discretionary functions, the Court must decide whether the actions involved an element of choice or judgment based on considerations of public policy.  See Callahan v. United States, 329 F. Supp. 2d 404, 408 (S.D.N.Y. 2004) (interpreting FTCA); Berkovitz v. United States, 486 U.S. 531, 536 (1988) (construing FTCA).

        There can be little doubt that, as the chairman of the Supreme Council of Islamic Affairs, charged with making recommendations to the Council of Ministers regarding requests for aid from Islamic organizations located abroad, and as the head of the Special Committee of the Council of Ministers, charged with deciding which grants should be made to Islamic charities, Prince Sultan's decisions were made at the planning level of government, Kline, 685 F. Supp. at 392, and "grounded in social, economic, and political policy," Varig Airlines, 467 U.S. at 814. Similarly, as the head of DGI, Prince Turki's decisions regarding the treatment of the Taliban and Osama bin Laden were judgments based on considerations of public policy.  See Callahan v. United States, 329 F. Supp. 2d at 408; see also Burnett II, 292 F. Supp. at 20-21 ("[T]his conclusion would be nearly self-evident: Prince Turki, as director of intelligence, taking acts to protect Saudi Arabia from terrorism, and Prince Sultan, as chairman of the Supreme Council, making recommendations to the Council of Ministers about requests for assistance from Islamic organizations outside Saudi Arabia or, as head of the Special Committee, deciding what disbursements should be made to Islamic charitable organizations, were clearly making 'decisions grounded in social, economic, and political policy.'") (quoting Varig Airlines, 467 U.S. at 814).

        Accordingly, to the extent that Plaintiffs allege acts Prince Sultan and Prince Turki performed in their official capacities, Prince Sultan's and Prince Turki's motions to dismiss the certain consolidated complaints[29] and the Federal complaint are granted.  The Court denies Plaintiffs' request for jurisdictional discovery because Plaintiffs have not presented any factual basis for believing that discovery might reasonably be expected to result in evidence that would overcome the discretionary function exception.  See 28 U.S.C. § 1605(a)(5)(A) (exception not applicable to "any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function regardless of whether the discretion be abused.")  The Court

_____

[29] The consolidated complaints are Ashton, Barrera, Burnett, Salvo, and Tremksy.

will consider the appropriateness of exercising personal jurisdiction over Prince Sultan's and Prince Turki's personal acts in Part II below.

### b. Kingdom of Saudi Arabia

There is no dispute that the Kingdom of Saudi Arabia is a foreign state within the meaning of the FSIA. Federal Complaint ¶ 63. The Federal Plaintiffs have the "burden of going forward with evidence that, under exceptions to the FSIA, immunity should not be granted." Virtual Countries, 300 F.3d at 241 (internal quotations omitted). As explained above, the only possible applicable exception is the torts exception under 28 U.S.C. § 1605(a)(5).

The Federal Plaintiffs' allegations arise "predominantly from misconduct of ostensible charities under the Kingdom's control." Federal Opp. to Motion to Dismiss of the Kingdom of Saudi Arabia at 1.[30] Thus, the Federal Plaintiffs claim the Kingdom of Saudi Arabia aided and abetted the terrorists through these charities. In attempting to overcome the presumption of the Kingdom's sovereign immunity, the Federal Plaintiffs argue the merits of their claims against the charities.[31] Based on news accounts that the Kingdom has dissolved its international charities and terrorist financing reports that implicate certain charities, the Federal Plaintiffs urge the Court to find that the Kingdom had previously willfully ignored the charities' support for terrorism. See, e.g., Federal.Opp. to Kingdom of Saudi Arabia Motion to Dismiss Ex. 2 ("Terrorist Financing, Report of an Independent Task Force Sponsored by the Council on Foreign Relations"), Ex. 3 (CNN.com June 2, 2004 "Saudis reform charities as antiterror measure" (mentioning only Al Haramain Islamic Foundation)), Ex. 5 (Senate Subcommittee Testimony, July 31, 2003 by Steven Emerson with Jonathan Levin, "Terrorism Financing: Origination, Organization, and Prevention: Saudi Arabia, Terrorist Financing and the War on Terror").

In response, the Kingdom argues that Plaintiffs ignore Osama bin Laden's public

---

[30] The Federal Plaintiffs allege that each of the following charities, which are all named as Defendants and represented by counsel in these actions, are agencies, instrumentalities, arms or organs of the Kingdom: MWL, IIRO, WAMY, Al Haramain Islamic Foundation, Saudi High Commission for Relief to Bosnia and Herzegovina, SJRC, Rabita Trust, Saudi Red Crescent, and BIF. The Kingdom disputes the instrumentality status of MWL, IIRO, WAMY, Al Haramain Islamic Foundation, Rabita Trust, and BIF. These Plaintiffs request discovery as to the instrumentality status of these charities. The request is denied at this time and may be more appropriate when the Court considers each of the charities' motions to dismiss.

[31] Rather than pleading specific facts showing that the Kingdom caused Plaintiffs' injuries, the Federal Plaintiffs focus predominantly on the charities' actions. For example, these Plaintiffs argue that the Kingdom has waived the defense of sovereign immunity because certain charities, which have not been designated as instrumentalities of the Kingdom and which are represented by separate counsel, did not raise the FSIA defense in their motions to dismiss. The Court is not convinced by this argument because the waiver of FSIA immunity must be explicit. See Banco de Seguros del Estado v. Mutual Marine Office, Inc., 344 F.3d 255, 261 (2d Cir. 2003).

targeting of the Kingdom. See, e.g., Bierstein Aff. in Opp. to Prince Sultan's Motion to Dismiss, Ex. 3 & 4; The 9/11 Commission Report: Final Report of the National Commission on Terrorist Attacks Upon the United States, 48, 373 (July 2004) (hereinafter "9/11 Report"). The Kingdom also submits it has worked with the United States to share information in the fight against terrorism. 9/11 Report, at 115-22; Prince Turki Decl. ¶¶ 7, 8, 10. The U.S. State Department has not designated the Kingdom a state sponsor of terrorism. Additionally, the presidentially-appointed September 11 commission found no evidence of the Kingdom's funding or support for the September 11 terrorists. 9/11 Report, at 171 ("[W]e have found no evidence that the Saudi government as an institution or senior Saudi officials individually funded the organization.").

The Court finds the Plaintiffs' allegations cannot overcome the discretionary function exception to the tortious acts exception. Marchisella v. Gov't of Japan, 2004 WL 307248, at *2 (explaining acts performed at the planning, as opposed to operational, level of government are protected by immunity); Robinson, 269 F.3d at 146 (noting conclusory nature of allegations would not sustain jurisdiction). Saudi Arabia's treatment of and decisions to support Islamic charities are purely planning level "decisions grounded in social, economic, and political policy." Varig Airlines, 467 U.S. at 814; see also Kline, 685 F. Supp. at 392. The Federal Plaintiffs have not met their burden of demonstrating an exception to the FSIA applies to negate the Kingdom's immunity. "[S]overeign immunity under the FSIA is immunity from suit, not just from liability." Moran v. Kingdom of Saudi Arabia, 27 F.3d 169, 172 (5th Cir. 1994). Because there were no factual disputes raised in the Court's resolution of this motion, no jurisdictional discovery is necessary. See Filatech S.A. v. France Telecom S.A., 304 F.3d 180, 183 (2d Cir. 2002). The Kingdom of Saudi Arabia's motion to dismiss the Federal complaint for lack of subject matter jurisdiction is granted.

## II. Personal Jurisdiction

To avoid dismissal for lack of personal jurisdiction under Rule 12(b)(2), Plaintiffs must establish personal jurisdiction over each Defendant. Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez, 171 F.3d 779, 784 (2d Cir. 1999). Because these motions are brought before discovery and decided without an evidentiary hearing, Plaintiffs need only make a prima facie showing that personal jurisdiction exists. PDK Labs, Inc. v. Friedlander, 103 F.3d 1105, 1108 (2d Cir. 1997); A.I. Trade Finance, Inc. v. Petra Bank, 989 F.2d 76, 79 (2d Cir. 1993). Plaintiffs may rely entirely on factual allegations, Jazini v. Nissan Motor Co., 148 F.3d 181, 184 (2d Cir. 1998), and they will prevail even if Defendants make contrary arguments, A.I Trade, 989 F.2d at 79. In resolving the motions, the Court will read the complaints and affidavits in a light most favorable to Plaintiffs. PDK Labs, 103 F.3d at 1108. It will not, however, accept legally conclusory assertions or draw "argumentative inferences." Mende v. Milestone Tech., Inc., 269 F. Supp. 2d 246, 251 (S.D.N.Y. 2003) (citing Robinson v. Overseas Military Sales Corp., 21 F.3d 502, 507 (2d Cir. 1994)).

### A. Bases for Personal Jurisdiction
### 1. New York Long-Arm Statute
"In a federal question case where a defendant resides outside the forum state, a federal

court applies the forum state's personal jurisdiction rules if the federal statute does not specifically provide for national service of process." PDK Labs, 103 F.3d at 1108. Similarly, a federal court sitting in diversity exercises personal jurisdiction over a foreign defendant to the same extent as courts of general jurisdiction of the state in which it sits pursuant to Federal Rule of Civil Procedure 4(k)(1)(A). Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez, 305 F.3d 120, 124 (2d Cir. 2002). In such cases, courts must determine if New York law would confer jurisdiction through its long-arm statute, and then decide if the exercise of such jurisdiction comports with the requisites of due process under the Fourteenth Amendment. Id. (citing Bank Brussels, 171 F.3d at 784); Bensusan Rest. Corp. v. King, 126 F.3d 25, 27 (2d Cir. 1997).

### a. Conspiracy Theory

Plaintiffs claim that New York's long-arm statute provides a basis for personal jurisdiction. Rule 302(a)(2) of New York's Civil Practice Law & Rules states in part: "(a) As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary, or his executor or administrator, who in person or through an agent . . . (2) commits a tortious act within the state . . . ." N.Y. C.P.L.R. § 302(a)(2) (McKinney 2002). Courts have defined "agent" to include a defendant's co-conspirators "under certain circumstances." Chrysler Capital Corp. v. Century Power Corp., 778 F. Supp. 1260, 1266 (S.D.N.Y. 1991) (citing Lehigh Valley Indus., Inc. v. Birenbaum, 389 F. Supp. 798, 806-07 (S.D.N.Y. 1975), aff'd, 527 F.2d 87 (2d Cir. 1975)). Thus, "acts committed in New York by the co-conspirator of an out-of-state defendant pursuant to a conspiracy may subject the out-of-state defendant to jurisdiction under C.P.L.R. 302(a)(2)." Chrysler Capital Corp. 778 F. Supp. at 1266.

Plaintiffs are not required to establish the existence of a "formal agency relationship" between the Defendants and their putative co-conspirators. Daventree Ltd. v. Republic of Azerbaijan, No. 02 Civ. 6356 (SHS), 2004 WL 2997881, at *18 (S.D.N.Y. Dec. 28, 2004). Yet, "the bland assertion of conspiracy . . . is insufficient to establish jurisdiction for the purposes of section 302(a)(2)." Lehigh Valley Indus. Inc., 527 F.2d at 93-94; Lamarr v. Klein, 315 N.Y.S.2d 695, 697-98 (App. Div. 1970) (holding that conclusory statements about defendant's role in conspiracy were insufficient to establish jurisdiction under the co-conspirator doctrine). To establish personal jurisdiction on a conspiracy theory, Plaintiffs must make a prima facie showing of conspiracy, allege specific facts warranting the inference that the defendant was a member of the conspiracy, and show that the defendant's co-conspirator committed a tort in New York. Chrysler Capital Corp., 778 F. Supp. at 1266 (citing Singer v. Bell, 585 F. Supp. 300, 302 (S.D.N.Y. 1984)).

"To plead a valid cause of action for conspiracy under New York law, a plaintiff must allege the primary tort and four elements: '(a) a corrupt agreement between two or more persons, (b) an overt act in furtherance of the agreement, (c) the parties' intentional participation in the furtherance of a plan or purpose, and (d) the resulting damage or injury.'" Chrysler Capital Corp. 778 F. Supp. at 1267 (quoting Kashi v. Gratsos, 790 F.2d 1050, 1055 (2d Cir. 1986)). To warrant the inference that a defendant was a member of the conspiracy, Plaintiffs must show that "(a) the defendant had an awareness of the effects in New York of its activity; (b) the activity of

28

the co-conspirators in New York was to the benefit of the out-of-state conspirators; and (c) the co-conspirators acting in New York acted 'at the direction or under the control' or 'at the request of or on behalf of' the out-of-state defendant." Chrysler Capital Corp., 778 F. Supp. at 1268-69 (quoting Dixon v. Mack, 507 F. Supp. 345, 350 (S.D.N.Y. 1980)).

"Whether an alleged conspiracy . . . existed is 'a mixed question of law and fact.'" Daventree, 2004 WL 2997881, at *19 (quoting Mario Valente Collezioni, Ltd. v. Confezioni Semeraro Paolo, S.R.L., 264 F.3d. 32, 36 (2d Cir. 2001)). Accordingly, the Court cannot accept "conclusory assertions on those issues; instead it must resolve such questions based upon an independent examination of the factual allegations while mindful of its duty to draw all factual inferences in plaintiffs' favor." Id. (rejecting conspiracy theory of personal jurisdiction without permitting jurisdictional discovery).

Plaintiffs claim that all Defendants in these actions conspired with the al Qaeda terrorists to perpetrate the attacks of September 11. See, e.g., Ashton Complaint ¶ 296; Federal Complaint ¶¶ 66, 72-74. Without supporting factual allegations, such a statement is insufficient to establish an agency relationship. Lehigh Valley Indus. Inc., 527 F.2d at 93-94; Daventree, 2004 WL 2997881, at *22 (citing First Capital Asset Mgmt. v. Brickellbush, Inc. 218 F. Supp. 2d 369, 395 (S.D.N.Y. 2002)). As will be highlighted below, the complaints do not allege any specific facts from which the Court could infer that Prince Sultan, Prince Turki, Mohammed Abdullah Aljomaih, Sheikh Hamad Al-Husani, or Abdulrahman bin Mahfouz directed, controlled, or requested al Qaeda to undertake its terrorist activities. Nor are there any specific allegations of their knowledge of, or consent to those activities. See Daventree, 2004 WL 2997881, at *22 (finding no personal jurisdiction under a conspiracy theory because there was no basis from which the court could impute to defendants the conduct of their putative co-conspirators); Chrysler Capital Corp., 778 F. Supp. at 1266 (requiring specific facts warranting the inference that the defendant was a member of the conspiracy). Accordingly, for Prince Sultan, Prince Turki, Mohammed Abdullah Aljomaih, Sheik Hamad Al-Husani, and Abdulrahman bin Mahfouz, personal jurisdiction cannot be based on a New York long-arm conspiracy theory. The Court will examine the possibility of exercising conspiracy theory personal jurisdiction over the remaining moving Defendants when it examines the specific claims against each of them below.

### 2. Federal Rule of Civil Procedure 4(k)

Under Federal Rule of Civil Procedure 4(k)(1)(D), service of process will establish personal jurisdiction over a defendant when so authorized by a federal statute.[32] Here, the ATA contains a nationwide service of process provision, such that proper service will confer personal

---

[32] Although the Court does not have subject matter jurisdiction over any of the moving Defendants pursuant to the FSIA, that statute also provides for personal jurisdiction if service is proper and subject matter jurisdiction has been established. 28 U.S.C. § 1330(b) ("[P]ersonal jurisdiction over a foreign defendant shall exist as to every claim for relief of which the district courts have jurisdiction . . . where service has been made under section 1608 of this title."); Rein v. Socialist People's Libyan Arab Jamahiriya, 995 F. Supp. 325, 329-330 (E.D.N.Y. 1998).

jurisdiction.[33]  18 U.S.C. § 2334(a) (providing for nationwide service of process and venue);
Burnett I, 274 F. Supp. 2d at 95-96.  Courts asked to analyze personal jurisdiction under the
ATA's national service of process provision have concluded that a plaintiff "must demonstrate
that the defendant has sufficient minimum contacts to satisfy a traditional due process analysis."
Estate of Ungar v. Palestinian Auth., 153 F. Supp. 2d 76, 95 (D.R.I. 2001); see also Biton v.
Palestinian Interim Self-Gov't Auth., 310 F. Supp. 2d 172, 179 (D.D.C. 2004) (dismissing
complaint pursuant to 18 U.S.C. § 2333 because individual defendants lacked contacts with the
United States).  "The relevant inquiry under such circumstances is whether the defendant has
minimum contacts with the United States as a whole [to satisfy Fifth Amendment due process
requirements], rather than . . . with the particular state in which the federal court sits."  Ungar,
153 F. Supp. 2d at 87.  Many of the moving Defendants either dispute the manner in which they
were served or were not served in the United States.  Accordingly, the Court must consider an
alternative basis for personal jurisdiction.

   If the New York long-arm statute or the ATA does not establish personal jurisdiction, the
Court will engage in a Rule 4(k)(2) analysis.  Rule 4(k)(2) states:

> If the exercise of jurisdiction is consistent with the Constitution and laws of the
> United States, serving a summons or filing a waiver of service is also effective,
> with respect to claims arising under federal law, to establish personal jurisdiction
> over the person of any defendant who is not subject to the jurisdiction of the
> courts of general jurisdiction of any state.

Fed.R.Civ.P. 4(k)(2).  Rule 4(k)(2) "fill[s] a gap in the enforcement of federal law" for courts to
exercise personal jurisdiction over defendants with sufficient contacts with the United States
generally, but insufficient contacts with any one state in particular.  Fed.R.Civ.P. 4(k)(2) advisory
committee's note; United States v. Int'l Bhd. of Teamsters, 945 F. Supp. 609, 616-17 (S.D.N.Y.
1996).  For jurisdiction under Rule 4(k)(2), there must be a federal claim, personal jurisdiction
must not exist over the defendant in New York or any other state, and the defendant must have
sufficient contacts with the United States as a whole such that the exercise of jurisdiction does
not violate Fifth Amendment due process.  Int'l Bhd. of Teamsters, 945 F. Supp. at 617.

### a. Purposefully Directed Activities Theory

   Personal jurisdiction based on Rule 4(k) requires minimum contacts with the United
States to satisfy Fifth Amendment due process requirements.  Plaintiffs claim these requirements
are met because Defendants purposefully directed their activities at the United States.  Burger

---

  [33] The Federal Plaintiffs pursue claims under RICO, which some courts outside the
Second Circuit have held also provides for nationwide service of process and jurisdiction.  See
18 U.S.C. § 1965; Republic of Panama v. BCCI Holdings (Luxembourg) S.A., 119 F.3d 935, 942
(11th Cir. 1997) (finding 18 U.S.C. § 1965(d) provides for nationwide jurisdiction); cf. PT
United Can Co. Ltd. v. Crown Cork & Seal Co., Inc., 138 F.3d 65, 71  (2d Cir. 1998) (finding "§
1965 does not provide for nationwide personal jurisdiction over every defendant in every civil
RICO case, no matter where the defendant is found").  The Federal Plaintiffs do not use their
RICO claims as a basis for personal jurisdiction and the Court focuses on the ATA.

King v. Rudzewicz, 471 U.S. 462, 472, 479 (1985) (explaining jurisdiction is appropriate if defendant "purposefully directed his activities at residents of the forum and the litigation results from alleged injuries that arise out of or relate to those activities" and finding minimum contacts existed since dispute arose from a contract with substantial contacts with the forum) (internal quotations and citations omitted); Calder v. Jones, 465 U.S. 783, 789 (1984) (finding personal jurisdiction appropriate over non-resident defendants who "expressly aimed" intentionally tortious conduct at residents of forum state, even where defendants were never physically present in forum); see also Daventree, 2004 WL 2997881, at *22 (finding exercise of personal jurisdiction under Rule 4(k)(2) is appropriate if defendants "purposefully directed their activities at residents of the forum, and the litigation results from alleged injuries that arise out of or related to those activities").  Pursuant to the holdings in Burger King, Calder, and three recent terrorism cases – Rein v. Socialist People's Libyan Arab Jamahiriya, 995. F. Supp. 325 (E.D.N.Y. 1998), Daliberti v. Republic of Iraq, 97 F. Supp. 2d 38 (D.D.C. 2000), and Pugh v. Socialist People's Libyan Arab Jamahiriya, 290 F. Supp. 2d 54 (D.D.C. 2003) – Plaintiffs submit that the moving Defendants knew that the primary target of Osama bin Laden's and al Qaeda's campaign of terror was the United States and that by providing assistance to these terrorists, who Plaintiffs claim were Defendants' co-conspirators, Defendants aimed their conduct at the United States.

In Rein, the court denied defendants' motions to dismiss for lack of subject matter and personal jurisdiction in a case arising from the bombing of Pan Am Flight 103 over Lockerbie, Scotland.  The court found it had subject matter jurisdiction over defendant Libya, a designated state sponsor of terror, pursuant to § 1605(a)(7) of the FSIA.  Rein, 995 F. Supp. at 329-30.  Noting that the FSIA provides for personal jurisdiction as long as subject matter jurisdiction exists and proper service was effected, the court turned to Libya's contacts with the United States.  Id. at 330 (citing Burger King, 471 U.S. at 472).  It found that Libya's contacts with the United States were sufficient because its allegedly "intentional, tortious actions [were] . . . 'expressly aimed at' the United States," and included "destruction of a United States flag aircraft . . . while en route to the United States . . . with 189 United States nationals on board."  Id. (citing Calder, 465 U.S. at 789).  The court concluded that its exercise of personal jurisdiction was appropriate since "[a]ny foreign state would know that the United States has substantial interests in protecting its flag carriers and its nationals from terrorist activities and should reasonably expect that if these interests were harmed, it would be subject to a variety of potential responses, including civil actions in the United States."  Id.

Similarly, in Daliberti the court found it had subject matter jurisdiction over defendant Iraq, a designated state sponsor of terror, in a case stemming from the alleged torture of several United States citizens who were working in Kuwait.  Daliberti, 97 F. Supp. 2d at 46.  Iraq argued that exercising personal jurisdiction over it would offend constitutional due process since the FSIA "abrogates the minimum contacts requirement."  Id. at 52.  The court disagreed and explained that "Congress expressly addressed the minimum contacts requirement in enacting the FSIA by providing that '[p]ersonal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction.'"  Id. (citing 28 U.S.C. § 1330(b); Shapiro v. Republic of Bolivia, 930 F. 2d 1013, 1020 (2d Cir. 1991)).  The court acknowledged that the foreign state's contacts with the United States might be more attenuated in the context of

the state sponsor of terrorism exception than in the FSIA's other exceptions, but concluded "in the context of this statute, the purpose for which it was enacted, and the nature of the activity toward which it is directed, . . . it is reasonable that foreign states be held accountable in the courts of the United States for terrorist actions perpetrated against U.S. citizens anywhere." Id. at 54. Finally, it noted that the "detention of these three plaintiffs had a direct effect in the United States and was consciously designed to affect United States policy . . . Iraq cannot now claim surprise at the assertion of jurisdiction by this Court." Id.

Most recently, in Pugh, representatives of passengers killed in the bombing of a French airliner in Africa survived a motion to dismiss by the individual defendants. The court found it had subject matter jurisdiction over seven Libyan officials, including Muammar Qadhafi, pursuant to the state sponsor of terrorism exception of the FSIA outlined in § 1605(a)(7). Pugh, 290 F. Supp. 2d at 58. In its personal jurisdiction analysis, the court concluded that the individuals had sufficient contacts with the United States to satisfy due process since they had "conspired to sabotage" a flight, which was scheduled to "stop in several nations," thus making it foreseeable that "passengers of many nationalities would be on board." Id. at 59. From their actions, the defendants could have expected to be haled into "the courts of those nations whose citizens would die." Id. Given the number of passengers on the plane, it was also foreseeable that Americans would be on board. Id. Finally, the court reasoned that the "interest of the United States in preventing and punishing international terrorism has been a matter of worldwide common knowledge for years." Id. (citing statutes criminalizing terrorist acts). "It logically follows that if federal courts may constitutionally exercise criminal jurisdiction over such individuals, the Constitution should be no bar to those same federal courts, in a civil action . . . exercising civil in personam jurisdiction over those same individuals for the same acts." Id.

The courts in Rein, Daliberti, and Pugh properly exercised personal jurisdiction over each of the defendants in those cases pursuant to the FSIA, which specifically provides that personal jurisdiction exists where proper service and subject matter jurisdiction have been established. 28 U.S.C. § 1330(b); Rein, 995 F. Supp. at 329-30; Daliberti, 97 F. Supp. 2d at 52; Pugh, 290 F. Supp. 2d at 58. While the FSIA is not the basis for personal jurisdiction here, jurisdiction based on the ATA or Rule 4(k)(2) also requires minimum contacts with the United States. Accordingly, Plaintiffs may rely on their "purposefully directed" theory to establish these minimum contacts. But as existed in Burger King, Calder, and the three terrorism cases, Plaintiffs must allege some personal or direct involvement by the Defendants in the conduct giving rise to their claims. See, e.g., Daliberi, 97 F. Supp. 2d at 41 (explaining that defendant Iraq had held and tortured plaintiffs and that three of four plaintiffs were released only after U.S. officials' explicit negotiations with their Iraqi counterparts); Pugh, 290 F. Supp. 2d at 56 (noting that seven individual Libyan defendants were sued in the United States after extensive official French investigation and that these defendants were deemed to be responsible for the bombings in both civil and criminal proceedings); see also In re Magnetic Audiotape, 334 F.3d at 208 (2d (stating a "court may exercise personal jurisdiction over defendant consistent with due process when defendant is primary participant in intentional wrongdoing – albeit extraterritorially – expressly directed at forum" (citing Calder v. Jones, 465 U.S. at 789-90)); Time, Inc. v. Simpson, No. 02 Civ. 4917 (MBM), 2003 WL 23018890, at *5 (S.D.N.Y. Dec. 22, 2003) (finding Calder

32

turned on "personal involvement of the individual defendants in the particular conduct that gave rise to the plaintiff's claim" and granting motion to dismiss because plaintiff had not demonstrated that defendant had had any personal involvement in the events giving rise to the lawsuit). Accordingly, regardless of whether personal jurisdiction is based on the ATA's nationwide service of process provision or Rule 4(k)(2), to satisfy the Fifth Amendment's due process requirements, Plaintiffs must make a prima facie showing of each Defendant's personal or direct participation in the conduct giving rise to Plaintiffs' injuries.

### 3. Mass Torts Theory

In addition to the arguments articulated above, the <u>Federal</u> Plaintiffs submit that the Court should utilize a modified due process standard appropriate for mass torts. <u>See, e.g.</u>, Federal Prince Turki Opp. at 23; Federal Prince Mohammed Opp. at 12;  SAAR Network Opp. at 12-13. Courts in the Eastern District of New York have outlined the modified standard in products liability cases as follows: the state's interests in the litigation replace contacts with the forum as the constitutional touchstone and the "reasonableness" inquiry is replaced with a hardship analysis. <u>Smith v. Philip Morris</u>, 86 F. Supp. 2d 95, 129 (E.D.N.Y. 2000); <u>In re DES Cases</u>, 789 F. Supp. 552, 587 (E.D.N.Y. 1992). The Court declines to adopt this standard. There was no question that, at a minimum, the defendants in these products liability actions had substantial contacts with the forum, in these cases being New York, and were involved in the sale or production of the products at issue. <u>In re DES Cases</u>, 789 F. Supp. at 559; <u>Smith</u>, 86 F. Supp. 2d at 99-100. Here, however, there are questions as to the Defendants' contacts with the forum, whether it be the United States generally or New York specifically, and the Defendants' alleged involvement with al Qaeda is much more attenuated.

### B. Due Process Requirements

Any exercise of personal jurisdiction must comport with the requirements of due process. "The due process test for personal jurisdiction has two related components: the 'minimum contacts' inquiry and the 'reasonableness' inquiry." <u>Metro. Life Ins. Co. v. Robertson-Ceco Corp.</u>, 84 F.3d 560, 567 (2d Cir. 1996). Depending on the basis for personal jurisdiction, due process under either the Fifth or Fourteenth Amendment applies. "[T]he due process analysis is basically the same under both the Fifth and Fourteenth Amendments. The principal difference is that under the Fifth Amendment the court can consider the defendant's contacts throughout the United States, while under the Fourteenth Amendment only the contacts with the forum state may be considered." <u>Chew v. Dietrich</u>, 143 F.3d 24, 28 n.4 (2d. Cir. 1998). Here, personal jurisdiction under the New York long-arm statute requires minimum contacts with New York pursuant to the Fourteenth Amendment. The exercise of personal jurisdiction under Rule 4(k) requires contacts with the United States as a whole pursuant to the Fifth Amendment.

### 1. Minimum Contacts

Minimum contacts are required so "that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." <u>Int'l Shoe Co. v. Washington</u>, 326 U.S. 310, 316 (1945); <u>see also</u> <u>World-Wide Volkswagon Corp. v. Woodson</u>, 444 U.S. 286, 292 (1980). The minimum contacts requirement is also known as "fair warning," such that the defendant's contacts with the forum should be sufficient to make it reasonable to be haled into

court there. Burger King, 471 U.S. at 474. The "'fair warning' requirement is satisfied if the defendant has 'purposefully directed' his activities at the residents of the forum . . . and the litigation results from alleged injuries that 'arise out of or relate to' those activities." Id. (internal citations omitted); see also World-Wide Volkswagen, 444 U.S. at 297-98 (finding purposefully directed activities where defendant delivered products into stream of commerce with expectation they would be purchased by residents of forum); Caldor, 465 U.S. at 789-90 (finding publishing activities outside of forum were calculated to cause injury to plaintiff in forum where she lived and which also had the highest subscription rate). "Although it has been argued that foreseeability of causing injury in another State should be sufficient to establish such contacts there when policy considerations so require, the Court has consistently held that this kind of foreseeability is not a 'sufficient benchmark' for exercising personal jurisdiction." Burger King, 471 U.S. at 474 (quoting World-Wide Volkswagon, 444 U.S. at 295). In every case, there must be "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." Id. (quoting Hanson v. Denckla, 357 U.S. 235, 253 (1958)).

For purposes of the minimum contacts inquiry, a distinction is made between specific and general jurisdiction. Specific jurisdiction exists when the forum exercises jurisdiction over the defendant in a suit arising out of the defendant's contacts with that forum. Metro. Life Ins. 84 F.3d at 567-68. General jurisdiction is based on the defendant's general business contacts with the forum; because the defendant's contacts are not related to the suit, a considerably higher level of contacts is generally required.[34] Id. at 568.

### 2. Reasonableness

In determining whether the exercise of personal jurisdiction is reasonable, a court is to consider:

> (1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests in the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies.

Metro. Life, 84 F.3d at 568 (citing Asahi Metal Indus. Co. v. Superior Court, 480 U.S. 102, 113-16 (1987)). "These considerations sometimes serve to establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required." Burger King, 471 U.S. at 477.

There obviously are competing policy considerations at play here. In general, "'great care and reserve should be exercised when extending our notions of personal jurisdiction into the international field.'" Asahi Metal Indus., 480 U.S. at 115 (quoting United States v. First Nat'l

---

[34] At oral argument, Plaintiffs focused on specific jurisdiction, see Oct. 12, 2004 Transcript at 44, but Plaintiffs include general jurisdiction arguments in many of their opposition briefs, see, e.g., Ashton Opp. to Prince Mohamed at 22-24; Burnett Opp. to Aljomaih at 11. The Court considers all arguments.

City Bank, 379 U.S. 378, 404 (1965) (Harlan, J., dissenting)). "[T]he unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders." Id. at 114. On the other hand, "[t]here is some merit . . . to the plaintiffs' argument that no foreign terrorist today can fairly assert a lack of 'fair warning' that it could be 'haled into court' in [this forum.]" Biton v. Palestinian Interim Self-Government, 310 F. Supp. 2d 172, 178 (D.D.C. 2004).

### C. Jurisdictional Discovery

Plaintiffs urge the Court to deny Defendants' motions and order jurisdictional discovery. In evaluating jurisdictional motions, district courts enjoy broad discretion in deciding whether to order discovery. See, e.g., APWU v. Potter, 343 F.3d 619, 627 (2d Cir. 2003) (noting a court may "devis[e] the procedures [to] ferret out the facts pertinent to jurisdiction"); Marine Midland Bank, N.A. v. Miller, 664 F. 2d 899, 904 (2d Cir. 1981) (noting a court has considerable procedural leeway in deciding whether discovery would assist resolution of motion to dismiss for lack of personal jurisdiction); Lehigh Valley Indus. v. Birenbaum, 527 F.2d 87, 93-94 (2d Cir. 1975) (finding no abuse of discretion in denying discovery where the complaint failed to plead sufficient facts to establish jurisdiction). "If a plaintiff has identified a genuine issue of jurisdictional fact, jurisdictional discovery is appropriate even in the absence of a prima facie showing as to the existence of jurisdiction." Daventree, 2004 WL 2997881, at *20 (citing In re Magnetic Audiotape, 334 F.3d at 207-08). Courts are not obligated to subject a foreign defendant to discovery, however, where the allegations of jurisdictional facts, construed in plaintiffs' favor, fail to state a basis for the exercise of jurisdiction or where discovery would not uncover sufficient facts to sustain jurisdiction. Id. (citing Jazini, 148 F.3d at 183-85 (granting motion to dismiss and denying jurisdictional discovery where complaint was described as "sparse" and "conclusory")); see also Cornell v. Assicurazioni Generali S.p.A., Consolidated, Nos. 97 Civ. 2262, 98 Civ. 9186 (MBM), 2000 WL 284222, at *2 (S.D.N.Y. Mar. 16, 2000) (granting motion to dismiss and denying request for jurisdictional discovery where the complaint stated, without any supporting facts, that the defendant "participates in a 'multinational insurance arrangement' present in the State of New York"); In re Ski Train Fire in Kaprun, Austria, 230 F. Supp. 2d at 410-413 (granting motion to dismiss and denying jurisdictional discovery where complaint only contained conclusory allegations).

### D. Application of Plaintiffs' Theories to Moving Defendants
#### 1. Prince Sultan

The Court outlined the allegations against Prince Sultan in Part I.B.1. With respect to Prince Sultan's contacts with the United States, Plaintiffs allege that "Saudi Royal family members own substantial assets in the United States of America, and do substantial business in the United States of America, the profits of which in part, are used to fund international terrorist acts, including those which led to the murderous attacks of September 11, 2001." See Ashton Complaint ¶ 296. There is no indication of whether these unspecified members of the Royal family include Prince Sultan. Most Plaintiffs also claim Prince Sultan is the ex-officio Chairman of the Board of Saudi Arabia Airlines, "which does business in the United States and internationally." Burnett Complaint ¶ 340; Ashton Complaint ¶ 253; Barrera Complaint ¶ 255;

35

Salvo Complaint ¶ 245; Tremsky Complaint ¶ 180.  The Federal Plaintiffs do not make a similar allegation.

To the extent these allegations are an attempt to establish general jurisdiction over Prince Sultan, they are insufficient.  See In re Baan Co. Sec. Litig., 245 F. Supp. 2d 117, 130 (D.D.C. 2003) (refusing to hold that control status in foreign corporation with United States office is sufficient for personal jurisdiction over individual); Cornell, 2002 WL 284222, at * 2 (granting motion to dismiss where complaint contained one conclusory statement regarding jurisdiction); Family Internet, Inc. v. Cybernex, Inc., No. 98 Civ. 0637 (RWS), 1999 WL 796177, at *4 (S.D.N.Y. Oct. 6, 1999) (holding that personal jurisdiction must be individually established over corporate officers even when the court has personal jurisdiction over the corporation itself).

Proceeding under the purposefully directed activities theory of personal jurisdiction, Plaintiffs argue that Prince Sultan knew or should have known the organizations to which he donated were funneling money to al Qaeda and that al Qaeda's primary target was the United States.  Consol. Plaintiffs' Opp. at 23.  Prince Sultan argues that his alleged actions cannot satisfy the minimum contacts requirement since the Second Circuit's recent description of Calder requires "primary participa[tion] in intentional wrongdoing." See In re Magnetic Audiotape, 334 F.3d at 208.

Judge Robertson dismissed without prejudice the claims against Prince Sultan in his personal capacity for lack of personal jurisdiction. Burnett II, 292 F. Supp. 2d at 21-22. He rejected Plaintiffs' argument that Prince Sultan had purposefully directed his alleged activities at the United States. Id. at 22-23. Judge Robertson found that the complaint's claims that Prince Sultan donated money to foundations that allegedly funded al Qaeda "stop[] well short of alleging Prince Sultan's actions were 'expressly aimed' or 'purposefully directed' at the United States." Id. at 23 (citing Burger King and Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 774-75 (1984)).  Judge Robertson also denied Plaintiffs' request for discovery because they did not provide an "outline of how their showing of minimum contacts might be enhanced by jurisdictional discovery." Id. at 22.

This Court's record, which Plaintiffs claim is more extensive than that before Judge Robertson, contains many examples of Osama bin Laden's and al Qaeda's public targeting of the United States.  See Bierstein Aff. in Opp. to Prince Sultan's Motion to Dismiss, Exs. 1-24.  The complaints also contain conclusory allegations that Prince Sultan aided and abetted terrorism. See, e.g., Burnett Complaint ¶ 363; Federal Complaint ¶¶ 429-31. But Plaintiffs do not offer any facts to lend support to their allegation that Prince Sultan purposefully directed his activities at this forum by donating to charities that he knew at the time supported international terrorism. See Exec. Order 13244 (designating certain branches of Al Haramain in 2002 and later). "[L]egal conclusions done up as factual allegations are not facts and cannot substitute for facts." Cornell, 2000 WL 284222, at *2 (citing Papasan v. Allain, 478 U.S. 265, 286 (1986)).  Plaintiffs have note provided an "outline of how their showing of minimum contacts might be enhanced by jurisdictional discovery." Burnett II 292 F. Supp. 2d at 22.  Accordingly, Prince Sultan's motions to dismiss the certain consolidated and Federal complaints for lack of personal

jurisdiction over the claims concerning his personal acts are granted. Plaintiffs' request for jurisdictional discovery with respect to Prince Sultan is denied. Daventree, 2004 WL 2997881, at *20 (finding jurisdictional discovery is not necessary where the allegation of jurisdictional facts fails to state a basis for the exercise of personal jurisdiction).

### 2. Prince Turki

The allegations against Prince Turki are outlined in Part I.B.2. Because the consolidated Plaintiffs do not allege any acts taken by Prince Turki in his personal capacity, the Court only considers the Federal Plaintiffs' claim that Prince Turki made personal donations to certain Saudi charities. See Federal Complaint ¶ 452. The Federal complaint does not make any specific jurisdictional allegations against Prince Turki. Rather, these Plaintiffs rely on Calder, Rein, Daliberti, Pugh, and the modified due process standard for mass torts to argue that the September 11 attacks were a foreseeable result of Prince Turki's alleged support of certain Saudi charities. See Federal Opp. to Prince Turki's Motion to Dismiss at 22-23.

The Federal Plaintiffs have not presented any specific facts from which this Court could infer Prince Turki's primary and personal involvement in, or support of, international terrorism and al Qaeda. Conclusory allegations that he donated money to charities, without specific factual allegations that he knew they were funneling money to terrorists, do not suffice. See Burnett II, 292 F. Supp. 2d at 23 (citing Burger King and Keeton v. Hustler Magazine, Inc., 465 U.S. at 774-75); see also Exec. Order 13244 (designating certain branches of Al Haramain and BIF in 2002). Accordingly, Prince Turki's motion to dismiss the Federal complaint for lack of personal jurisdiction is granted. Jurisdictional discovery is not appropriate with respect to Prince Turki because Plaintiffs have not identified any genuine issue of jurisdictional fact. Daventree, 2004 WL 2997881, at *20.

### 3. Prince Mohamed

The Ashton and Federal Plaintiffs allege that Prince Mohamed is or was the chairman or chief executive officer of three financial institutions in Saudi Arabia: Dar al Maal al Islami ("DMI"), Islamic Investment Company of the Gulf-Bahrain EC ("IICG"), and Faisal Islamic Bank-Sudan ("FIBS"), which are all shareholders of Defendant Al Shamal Islamic Bank.[35] Ashton Complaint ¶¶ 51, 54; Federal Complaint ¶¶ 307, 309, 473. They claim that Prince Mohamed knew or should have known that each of these financial institutions "acted as an aider and abettor and material sponsor of al Qaeda, Bin Laden, and international terrorism." Ashton Complaint ¶ 276; Federal Complaint ¶ 472 (alleging Prince Mohamed "has long provided material support and resources to al Qaeda"). The Ashton Plaintiffs claim that Prince Mohamed is "heavily involved in the sponsorship of terror through Faisal Islamic Bank-Sudan," since at some point al Qaeda allegedly had an account there. Ashton Complaint ¶¶ 65, 66, 255, 274; see also Ashton Opp. to Prince Mohamed's Motion to Dismiss at 25 (arguing that al Qaeda operative Jamal Ahmed Al Fadl used an account at Al Shamal Islamic Bank to transfer $250,000 for

---

[35] Osama bin Laden allegedly capitalized Al Shamal Islamic Bank with $50 million. Burnett Complaint ¶ 70. Several al Qaeda operatives, including Osama bin Laden, held accounts there. Id. ¶ 79.

Osama bin Laden).  These Plaintiffs also claim that Prince Mohamed has financial ties with alleged al Qaeda financier Muhammed Zouaydi.  Ashton Complaint ¶ 258.  The Federal Plaintiffs claim that Prince Mohamed made personal contributions to Saudi-based charities that he knew or should have known sponsored the terrorist activities of al Qaeda.  These charities include IIRO, MWL, WAMY, BIF, the Saudi High Commission, SJRC, and Al Haramain. Federal Complaint ¶¶ 475-76

The Ashton complaint contains an unspecific allegation regarding the Saudi Royal family's ownership of property in the United States.  Ashton Complaint ¶ 296.  The Ashton Plaintiffs argue that general jurisdiction is appropriate because Prince Mohamed attended college and business school in the United States, gave two interviews in a New York apartment in 1978, gave a speech at Harvard in 1999, and made investments in American businesses through the banks he chairs in 2001.  Ashton Opp. to Prince Mohamed Motion to Dismiss at 22-23. Plaintiffs assert jurisdictional discovery is likely to expose further contacts between Prince Mohamed and the United States.

If general jurisdiction is not established through Prince Mohamed's contacts with the United States, the Ashton and Federal Plaintiffs claim that jurisdiction exists under either the New York long-arm conspiracy theory or the purposefully directed activities theory.  Ashton Opp. to Prince Mohamed Motion to Dismiss at 17-22; Federal Opp. to Prince Mohamed Motion to Dismiss at 6-12.  Specifically, the Ashton Plaintiffs bolster their arguments for personal jurisdiction by citing to paragraphs in the complaint in support of each of the requirements for conspiracy.  See Chrysler Capital Corp., 778 F. Supp. at 1268-69 (outlining cause of action for conspiracy).

Plaintiffs claim that Prince Mohamed and al Qaeda agreed to injure the United States through acts of international terrorism.  Ashton Complaint ¶¶ 5, 23 (all defendants are co-conspirators), 51, 105-08 (February 1993 World Trade Center bombing), 120 (February 1998 fatwa), 130-36 (1998 embassy bombings), 152-55 (U.S.S. Cole attack), 188, 255, 274-76, 580 (September 11, 2001 attacks); see also Federal Complaint ¶¶ 66, 72-74 (listing defendants who have "aided and abetted, conspired with, and provided material support and resources to, defendant al Qaeda and/or affiliated FTOs, associations, organizations or persons.").  Next they claim the September 11 attacks were perpetrated in furtherance of that common scheme.  Ashton Complaint ¶¶ 23, 188, 610.  According to Plaintiffs, Prince Mohamed participated in the conspiracy by providing funding, financial support, and banking services through FIBS.  Id. ¶¶ 48-54, 63-66, 255, 274-276, 387, 580, 582.  Specifically, Plaintiffs claim:
- On October 17, 1983, Prince Mohamed became CEO of DMI.  Under Prince Mohamed's chairmanship, DMI developed banking, investment and insurance activities in approximately twenty offices across the world.  DMI was founded in 1981 to foster the spread of Islamic banking across the Muslim world and its Board of Directors included Haydar Mohamed bin Laden, a half-brother of Osama bin Laden.  Id. ¶ 274.
- Faisal Islamic Bank Sudan was one of the five main founders of Al Shamal Islamic Bank . . . . Al Shamal Islamic Bank is an instrumental bank in bin Laden's

financial support network. Bin Laden used Al Shamal Bank for the funding of his al Qaeda network leading up to the 1998 United States embassy bombings in Africa. Defendant Faisal Islamic Bank was implicated during Al Fadl's May 2001 United States trial testimony regarding the bombings as holding and managing bank accounts for al Qaeda operatives. Id. ¶¶ 274-75.

- As the head of DMI, Prince Mohamed knew or should have known of these and other activities and acted as an aider and abettor and material sponsor of al Qaeda, bin Laden, and international terrorism. Id. ¶ 276.

- U.S. designated terrorists Wa'el Julaidan and Yassin Kadi had accounts in a DMI subsidiary. Ashton Opp. at 25.

Finally, Plaintiffs allege the that attacks in question caused many deaths, a fact that no one disputes. Ashton Complaint ¶¶ 23, 610.

In response, Prince Mohamed argues that Plaintiffs have failed to demonstrate that he is "present" in the United States for general personal jurisdiction purposes. See Helicopteros Nacionales de Columbia, S.A. v. Hall, 466 U.S. 408, 411-12, 416-18 (1984); Bersch v. Drexel Firestone, Inc., 519 F.2d 974, 998 (2d Cir. 1975) (buying and selling American securities is insufficient to establish that defendant was "doing business" in the United States). Prince Mohamed submits that some of the contacts on which Plaintiffs rely are too far removed in time from September 2001 to be considered by the Court. See Metro. Life, 84 F.3d at 569 (holding courts should examine a defendant's contacts with the forum for a reasonable period prior to the date on which the lawsuit was filed, and finding that six years was reasonable). Prince Mohamed correctly submits that his position as an officer of DMI, IICG, and FIBS would not be a basis for jurisdiction over him even if the Court had personal jurisdiction over these entities. See Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 781 n.13 (1984) ("Each defendant's contacts with the forum State must be assessed individually."). Finally, Prince Mohamed argues that the conclusory allegation that he participated in a terrorist conspiracy, without specific facts, is insufficient to create personal jurisdiction over him.

The Court agrees that Plaintiffs have not presented a prima facie case of general jurisdiction over Prince Mohamed. In the ten years before the attacks, Prince Mohamed's contacts with the United States consist of one speech and a handful of investments in the United States through the banks with which he is affiliated. These contacts are not sufficiently "systematic and continuous" to maintain general jurisdiction over a defendant in this action.[36] See Helicopteros, 464 U.S. at 416 (holding that purchasing in forum, sending personnel for training in forum, and negotiating a contract in forum were not sufficient to establish general jurisdiction).

Plaintiffs have alleged that DMI and FIBS might have been involved in the financing of terrorism. See, e.g., Ashton Complaint ¶¶ 274-75; Ashton Opp. at 25. Even assuming that the Court has personal jurisdiction over these entities, "[t]he mere fact that a corporation is subject to

---

[36] There is no allegation that Prince Mohamed's investments in the United States are related to any alleged conspiracy or to al Qaeda's activities.

jurisdiction . . . does not mean that individual officer may be hauled before New York courts without any showing that the individuals themselves maintained a presence or conducted business in New York." Family Internet, 1999 WL 796177, at *4. Plaintiffs have not alleged that Prince Mohamed had any knowledge or involvement in any al Qaeda accounts at any of the banks he chaired. FIBS' relationship with Al Shamal Islamic Bank, which purportedly knowingly opened accounts for al Qaeda operatives, including Osama bin Laden, is too remote in time and proximity to implicate Prince Mohamed. To make a prima facie case of personal jurisdiction, Plaintiffs must either allege personal acts by Prince Mohamed by which he purposefully directed his activities at the United States by supporting Osama bin Laden, al Qaeda, or their terrorist agenda, or demonstrate that the acts of the banks he chaired can be imputed to him. Plaintiffs have not met their burden. Thus, Prince Mohamed's motions to dismiss the Ashton and Federal complaints as against him for lack of personal jurisdiction are granted.

### 4. Estate of Mohammad Abdullah Aljomaih

On May 2, 2003 by Second Addition and Removal of Defendants Pursuant to Case Management Order No. 1 imposed by Judge Robertson, the Burnett Plaintiffs added a defendant "Mohammed Bin Abdullah Al-Jomaith." To date, no specific allegations have been added to the complaint with respect to Mr. Aljomaih.

In anticipation of what the claims against him might be, before his death Mr. Aljomaih prepared a declaration in support of his motion to dismiss. He was born in Saudi Arabia in 1915 and lived in Riyadh for most of his life. Aljomaih Decl. ¶ 3. He and his family began a company in the 1940s that now supplies automobiles, soft drinks, construction equipment, and other goods and services to large portions of Saudi Arabia. Id. ¶ 4. In the past ten years he visited the United States three times for medical reasons. Id. ¶¶ 5-6. Prior to these medical visits, he took a short trip to New York City in 1964. Id. ¶ 7. He owned no property, held no bank accounts, and conducted no business in this country. Id. ¶ 10.

Mr. Aljomaih's estate argues that there were problems with his service. He was served pursuant to Judge Robertson's March 25, 2003 approving service by publication. Under that order, Plaintiffs published a list of defendants in two publications, The International Herald Tribune and Al Quds Al Arabia. The notice in The International Herald Tribune contained Mr. Aljomaih's name in English, a language he could not read. Id. ¶ 11. Al Quds Al Arabi is published in Arabic, but is not circulated in Saudi Arabia and the list did not include Mr. Aljomaih's name. Even if service was proper, however, the estate of Mr. Aljomaih claims the Court does not have personal jurisdiction over it.

Plaintiffs submit that Mr. Aljomaih is implicated by the "Golden Chain." Plaintiffs' Opp. at 9. The "Golden Chain" is a group of documents that was discovered by Bosnian authorities searching the offices of charity Defendant BIF in March 2002. Plaintiffs claim the "Golden Chain" contains a list of early direct donors to al Qaeda. Plaintiffs' Opp. at 9; see also Bierstein Aff. in Opp. to Al-Husani Motion to Dismiss, Ex. 2 ("Golden Chain" document). It includes the entry "Al-Jumaih. Jeddah (S.A.)." Plaintiffs do not dispute that "for more than sixty years [Mr.

40

Aljomaih] lived in Rihadh," not Jeddah, Aljomaih Decl. ¶ 3, yet they insist the document
identifies him as a direct donor to al Qaeda. Additionally, Plaintiffs claim that Mr. Aljomaih's
company donated money to charity Defendant IIRO. Plaintiffs assert there are sufficient
allegations against Mr. Aljomaih in the form of general allegations against all Defendants to put
him on notice of the claims against him. They claim that jurisdiction over Mr. Aljomaih's estate
is proper because he "purposefully directed" his activities at the United States by supporting al
Qaeda. Plaintiffs also submit that Mr. Aljomaih's company does business with General Motors
and Shell Corporation and that, therefore, he must have had contacts with the United States. See
Opp. at 11; Statement of Jamie L. Paye attached to Plaintiffs' Opp.

The Court finds the Plaintiffs have not established a prima facie case of jurisdiction over
Mr. Aljomaih to defeat his motion or warrant jurisdictional discovery. Their theory of
jurisdiction rests almost entirely on a document with serious foundational flaws. Even assuming,
as the Court must, that the "Golden Chain" refers to Mr. Aljomaih, with no indication of who
wrote the list, when it was written, or for what purpose, the Court cannot make the logical leap
that the document is a list of early al Qaeda supporters. Mr. Aljomaih's motion to dismiss the
Burnett complaint for lack of personal jurisdiction is accordingly granted.

### 5. Sheikh Hamad Al-Husani

The posture of the Burnett Plaintiffs' case against Sheikh Hamad Al-Husani is similar to
that against Mr. Aljomaih. Mr. Al-Husani was also added to a list of defendants to be served by
publication and the complaint contains no specific allegations against him. Al-Husani Decl. ¶
10. He is a watch retailer residing in Saudi Arabia. Id. ¶¶ 3-4, 7. Mr. Al-Husani has never
visited the United States, owns no real property here, holds no bank accounts or investments in
the United States, and does not engage in transactions with any businesses in the United States.
Id. ¶¶ 3, 5-7. He has never supported any person or organization that he has known to participate
in any terrorist attacks. Id. ¶ 9. Mr. Al-Husani submits that Plaintiffs cannot cure the lack of
allegations in the complaint in its motion papers. Wright v. Ernst & Young, LLP, 152 F.3d 169,
178 (2d Cir. 1998) (explaining a party is not permitted to amend its complaint through
allegations made in motion papers).

Mr. Al-Husani also claims that he was not properly served because The International
Herald Tribune has a circulation of only 199 in Saudi Arabia and is published in English, and Al
Quds Al Arabia is a London-based paper banned in the Kingdom. Even if service was proper,
however, Mr. Al-Husani submits this Court does not have personal jurisdiction over him.

The Burnett Plaintiffs claim that Mr. Al-Husani is also implicated by the "Golden Chain,"
and thus an early supporter of al Qaeda. Plaintiffs' Opp. to Al-Husani Motion to Dismiss at 10;
Bierstein Aff at Ex. 2 (document listing "Hamad Al Husaini," without indicating when list was
written, by whom, or for what purpose). The Plaintiffs place great weight on the United States'
inclusion of the "Golden Chain" in its proffer of evidence in United States v. Arnaout, the
government's case against an executive of Defendant charity BIF. See Bierstein Aff. at Ex. 1
(proffer). The court presiding over that case, however, ruled that the document was inadmissible
hearsay. United States v. Arnaout, No. 02 Cr. 892, 2003 WL 255226, at *1-2 (N.D.Ill. Feb. 4,

2003). Nevertheless, by supporting al Qaeda, Plaintiffs assert Mr. Al-Husani purposefully directed his activities toward the United States, making the exercise of personal jurisdiction appropriate. See, e.g. Bierstein Aff. Exs. 9-15 (detailing al Qaeda's hatred for and actions against the United States). Additionally, Plaintiffs claim that one of Mr. Al-Husani's companies is a supporter of Al-Waqf al-Islami Foundation, a Dutch entity whose seminars "have drilled extremist messages into the heads of thousands of young Muslims." "Radical Foundation: In 'Law' Seminars, A Saudi Group Spreads Extremism," Wall St. J., Apr. 15, 2003, at Bierstein Aff. Ex. 6.

Plaintiffs have not established a prima facie showing of jurisdiction over Mr. Al-Husani to survive his motion to dismiss or warrant jurisdictional discovery. The "Golden Chain" does not say what the Plaintiffs argue it says. It is only a list of names found in a charity's office. It does not establish Mr. Aljomaih's involvement in a terrorist conspiracy culminating in the September 11 attacks and it does not demonstrate that he purposefully directed his activities at the United States. Accordingly, Mr. Al-Husani's motion to dismiss the Burnett complaint against him is granted.

### 6. NCB

The Court outlined the Ashton and Burnett Plaintiffs' claims against NCB in Part I.B.4. For purposes of the personal jurisdiction analysis, the Court will assume at this point that the FSIA does not provide for subject matter and personal jurisdiction over NCB. Accordingly, the Plaintiffs will have to make a prima facie showing to survive NCB's motion to dismiss. In that vein, Plaintiffs argue that NCB purposefully directed its activities at the United States and participated in a conspiracy that culminated in the attacks of September 11.

Plaintiffs submit NCB has many contacts with the United States, including a wholly-owned subsidiary in New York City through which it operates an international banking business. See, e.g., Aff. of John Fawcett in Support of Ashton Plaintiffs' Opp. to NCB's Motion to Dismiss (hereinafter "Fawcett Aff.") ¶ 3, Exs. 2 & 3. NCB has been a party to lawsuits in the Southern District of New York, both as a plaintiff and defendant. Fawcett Aff. ¶ 7. The Muslim World League Journal, a monthly publication distributed in American mosques, ran solicitations from 1998 to 2001 for the Islamic Solidarity Fund & Waqf for the Organization of the Islamic Conference and the Khair Funds of the Muslim World League that provided NCB account numbers to which donors could contribute directly. Id. ¶ 8, Ex. 5. Plaintiffs request jurisdictional discovery to explore further contacts.

NCB argues that none of Plaintiffs' submissions satisfy the constitutionally required showing of minimum contacts. NCB closed its New York City branch office in 1992. Decl. of Jorge Juco ("Juco Decl.") ¶ 5, at Berger Aff. in Support of NCB's Motion to Dismiss Ashton and Burnett, Ex. 5. NCB's second-tier subsidiary, SNCB Securities Inc., dissolved in February 2001. Id. (citing Ex. A of Juco Decl., the certified copy of the Certificate of Dissolution); see also Schenker v. Assicurazioni Generali, S.P.A., No. 98 Civ. 9186 (MBM), 2002 WL 1560788, at * 4 (S.D.N.Y. July 15, 2002) (finding no personal jurisdiction over parent corporation where New York subsidiary was sold two months prior to commencement of action). NCB submits its

involvement in lawsuits is equally unavailing because both were terminated prior to the filing of this action. See docket Logan Feed v. Nat'l Commercial Bank, No. 92 Civ. 7653 (S.D.N.Y.) (NCB terminated July 24, 1995); docket Nat'l Commercial Bank v. Morgan Stanley Asset Mgmt., Inc., No. 94 Civ. 3167 (S.D.N.Y.) (closed Feb. 17, 1998). It contends that its consent to personal jurisdiction in one case does not open the door to personal jurisdiction in future cases. See Klinghoffer v. S.N.C. Achille Lauro, 937 F.2d 44, 50 n.5 (2d Cir. 1991); Andros Compania Maritima, S.A. v. Intertanker Ltd., 714 F. Supp. 669, 675 (S.D.N.Y. 1989) (holding lawsuits in the forum do not establish general personal jurisdiction). NCB argues that there is no indication it placed the advertisements in The Muslim World League Journal, or that any donations were deposited into NCB accounts.

In arguing its absence of contacts with the United States, NCB reiterates that it is not domiciled, organized, or maintaining an office in New York. Juco Decl. ¶ 3. It is not registered or licensed to do business in the United States and has no property in the United States. Id. ¶ 8. Shares of NCB stock are not sold in the United States, there are no NCB employees or telephone numbers in the United States, and the company does not advertise or solicit business in the United States. Id. ¶ 11. Its website is accessible from United States, but only NCB account holders may access the inter-active services. Id. The Saudi Arabian Monetary Agency requires that NCB's account holders be Saudi citizens or residents, Saudi government entities, or business or charity entities with lawful status in Saudi Arabia. Juco Decl. ¶ 10.

NCB claims the rare contacts it does have with the United States do not satisfy the requirements of due process. Although it maintains correspondent banking relationships with U.S. commercial banks, Juco Decl. ¶ 12, NCB argues such relationships are insufficient to establish personal jurisdiction over NCB. Semi Conductor Material, Inc. v. Citibank Int'l PLC, 969 F. Supp. 243, 244 (S.D.N.Y. 1997) (holding foreign bank's correspondent banking relationship with New York bank is not sufficient for personal jurisdiction); Casio Computer Co. v. Sayo, No. 98 Civ. 3772 (WK), 2000 WL 1877516, at *26 (S.D.N.Y. Oct. 13, 2000) (holding defendant bank's wire transfers to U.S. bank accounts does not create minimum contacts); Leema Enters. Inc. v. Willi, 575 F. Supp. 1533, 1537 (S.D.N.Y. 1983) (holding correspondent banking relationships insufficient to create general personal jurisdiction). NCB offers its customers the opportunity to open accounts directly with United States-based securities broker-dealers, but NCB does not act as a broker-dealer for securities sold in the United States and is not so licensed. Juco Decl. ¶ 14; Bersch v. Drexel Firestone, Inc., 519 F.2d 974, 998 (2d Cir. 1975) (finding Canadian securities broker not "doing business" in New York when it arranges for its Canadian customers to buy and sell U.S. securities through U.S. broker). In 2002, less than 2% of the securities NCB traded for its own account were issued by U.S. entities. Juco Decl. ¶ 15; Schenckler, 2002 WL 1560788, at *3-5 (finding that a single bank account in the United States, constituting small fraction of defendant's total assets, is insufficient to form the basis for personal jurisdiction).

Taken individually, NCB's contacts with the United States would not satisfy due process requirements. However, when they are examined as a whole – the presence of a branch office until 1992, a subsidiary until 2001, taking advantage of the privilege of its presence in New York

43

by instigating a lawsuit in this forum, advertisements in U.S. publications – the Court finds that they may, with the help of limited jurisdictional discovery, comport with due process. NCB's motion to dismiss is therefore denied without prejudice.

### 7. Abdulrahman bin Mahfouz

Abdulrahman bin Mahfouz is a Defendant in the <u>Burnett</u> action. He is the son of Defendant Khalid bin Mahfouz and a director of the Defendant charity Blessed Relief Society, also known as Muwaffaq. <u>Burnett</u> Complaint ¶¶ 331; 445. Blessed Relief is a branch of the Human Concern International Society, which Osama bin Laden identified as a supporter in 1995. <u>Id.</u> ¶ 333. He is a shareholder and the CEO of former Defendant Nimir, LLC, also known as Nimir Petroleum Ltd. <u>Id.</u> ¶ 443.[37] Finally, Plaintiffs claim that Mr. bin Mahfouz was a member of the board and Vice Chairman of the Executive Management Committee of Defendant National Commercial Bank. <u>Id.</u> ¶ 445.

Plaintiffs base their personal jurisdiction arguments on their claim that Mr. bin Mahfouz was a participant in the conspiracy of terror that purposefully directed its conduct at the United States and included the September 11 hijackers. Plaintiffs also claim that he has business interests in the United States. Specifically he is a shareholder in U.S.-based companies, and his company, Al Murjan, allegedly has dealings with the American phone company Hughes Technologies, Inc.

Mr. bin Mahfouz disputes the manner in which he was served. His name appeared in Plaintiffs' notice by publication in <u>The International Herald</u>, which only has circulation of 199 in the entire Kingdom of Saudi Arabia, and <u>Al Quds al-Arabia</u>, which is banned in the Kingdom. He submits that he has no personal contacts with the United States and there is no basis for exercising personal jurisdiction over him.

The <u>Burnett</u> complaint does not contain any specific actions by Mr. bin Mahfouz from which the Court could infer that he purposefully directed his activities at the United States. His affiliations with entities that are alleged to have U.S. contacts will not sustain jurisdiction. <u>Family Internet</u>, 1999 WL 796177, at *4. Finally, being a shareholder in a United States company is not sufficient to establish general personal jurisdiction over Mr. bin Mahfouz. <u>Bersch</u>, 519 F.2d at 998; <u>see also Schenckler</u>, 2002 WL 1560788, at *3-5 (finding single bank account in United States constituting small fraction of defendant's total assets is not a sufficient basis for personal jurisdiction). Mr. bin Mahfouz's motion to dismiss the <u>Burnett</u> complaint as against him for lack of personal jurisdiction is accordingly granted.

### 8. Saudi Binladin Group, Tariq Binladin, Omar Binladin, and Bakr Binladin

The <u>Ashton</u> and <u>Burnett</u> complaints name the Saudi Binladin Group ("SBG") as a Defendant. The <u>Burnett</u> complaint also names Tariq Binladin, Omar Binladin, and Bakr

---

[37] The <u>Burnett</u> Plaintiffs voluntarily dismissed their claims against Nimir LLC. <u>See</u> Mem. in Supp. of Motion to Dismiss Ex. 1.

Binladin, Osama's half-brothers, as Defendants. In both actions, these Defendants move to dismiss the complaint or for a more definite statement.

Based in Jeddah, Saudi Arabia, SBG is the successor to a construction company founded by Mohammed Binladin, the father of Osama bin Laden. Ashton Complaint ¶ 543; Burnett Complaint ¶ 311. It is now one of the largest engineering and construction companies in the Arab world and is managed by Osama bin Laden's half brothers, including defendants Bakr Binladin, who runs SBG, and Tariq Binladin, who holds a position on the board. Ashton Complaint ¶ 545; Burnett Complaint ¶ 313. Tariq Binladin allegedly had a prominent role at IIRO in 1990. Ashton Complaint ¶ 557; Burnett Complaint ¶ 326. Osama bin Laden purportedly used SBG to build an infrastructure in Afghanistan. Ashton Complaint ¶¶ 546, 547; Burnett Complaint ¶¶ 314-316. After the Soviets withdrew from Afghanistan in 1989, Osama bin Laden returned to work with SBG in Jeddah. Ashton Complaint ¶ 548; Burnett Complaint ¶ 317. SBG allegedly continued to support Osama bin Laden after he relocated to Sudan in 1991. Ashton Complaint ¶ 548; Burnett Complaint ¶ 317. For example, SBG, through two subsidiaries allegedly supported Osama bin Laden's participation in the construction of the Tahaddi road and Port Sudan Airport. Ashton Complaint ¶¶ 550; 552, 553; Burnett Complaint ¶¶ 319-322. Plaintiffs claim Osama bin Laden's name is still listed on SBG corporate records. Ashton Complaint ¶ 558; Burnett Complaint ¶ 329. Defendants dispute this and argue he was formally removed from SBG's ownership documents in June 1993. SBG's Mem. in Supp. of Motion to Dismiss Ashton Complaint at 2. Plaintiffs also claim that Osama bin Laden never "broke" with his family after he was exiled to Sudan and that SBG continued to provide him financial assistance and engineering support. Ashton Complaint ¶ 549; Burnett Complaint ¶ 318. Defendants also dispute this statement and argue that Bakr formally ostracized Osama from the family and the company in a February 1994 statement. SBG's Mem. in Supp. of Motion to Dismiss Ashton Complaint at 2.

SBG "sheltered and directly supported operatives of the al Qaeda terrorist organization." Ashton Complaint ¶ 555; Burnett Complaint ¶ 324. Mohammad Jamal Khalifa, allegedly a key al Qaeda operative, was taken in by a branch of SBG, the Mohammed Bin Laden Organization. Ashton Complaint ¶ 555; Burnett Complaint ¶ 324. The Mohammed Bin Laden Organization is allegedly a wholly-owned subsidiary of SBG and its board members include defendants Bakr, Tariq, and Omar Binladin. Ashton Complaint ¶ 556; Burnett Complaint ¶ 325. Khalifa listed the Mohammed Bin Laden Organization address on his visa application. Ashton Complaint ¶ 555; Burnett Complaint ¶ 324. Additionally, U.S.-designated terrorist Yassin Abdullah al-Kadi was allegedly introduced to the Global Diamond Resource's Chairman by an executive of SBG. Ashton Complaint ¶ 459; Burnett Complaint ¶ 328.

Plaintiffs claim that SBG had an address in Rockville, Maryland until very recently. Ashton Complaint ¶ 545; Burnett Complaint ¶ 313. SBG claims the Rockville address was the headquarters of a separately incorporated company, SBG USA, which was formally dissolved in December 1999. See SBG Memorandum in Support of Motion to Dismiss Ashton Complaint at 7 & Ex. 2 (articles of dissolution); see also Klinghoffer v. S.N.C. Achille Lauro, 937 F.2d 44, 52 (2d Cir. 1991) (personal jurisdiction contacts determined at time complaint is filed); but see

Metro. Life, 84 F.3d at 569 (holding courts should examine a defendant's contacts with the forum for a reasonable period prior to year of lawsuit and finding six years was reasonable).

The Burnett complaint does not contain any factual allegations against Tariq, Omar, or Bakr Binladin from which the Court could infer that they purposefully directed their activities at the United States, that they were members of a conspiracy pursuant to the New York long-arm statute, or that they have any general business contacts with the United States. Accordingly, the Burnett complaint against these three individuals is dismissed.

Rather than permitting a 12(e) statement, the Court finds jurisdictional discovery is warranted to determine if SBG purposefully directed its activities at the United States. See Asip v. Nielsen Media Research, No. 03 Civ. 5866 (SAS), 2004 WL 315269, at *2 (S.D.N.Y. Feb. 18, 2004) (noting the purpose of Rule 12(e) is to "strike at unintelligibility rather than want of detail and . . . allegations that are unclear due to lack of specificity are more appropriately clarified by discovery"). Specifically, although the complaints are not specific about when, at the very least, SBG provided construction support to Osama bin Laden. Ashton Complaint ¶¶ 550, 552-53; Burnett Complaint ¶¶ 319-22. A branch of SBG allegedly look in an al Qaeda operative who listed the SBG branch address on his visa application. Ashton Complaint ¶ 555; Burnett Complaint ¶ 324. It is alleged to have ties to U.S.-designated terrorist Yassin Abdullah Al-Kadi. Ashton Complaint ¶ 459; Burnett Complaint ¶ 328. At this stage, the Court must accept as true Plaintiffs' contentions that SBG still contains Osama bin Laden's name in its corporate documents. Ashton Complaint ¶ 558; Burnett Complaint ¶ 329. Additionally, although it would not satisfy the due process requisites on its own, SBG's presence in Maryland three years before the complaints were filed, also warrants some discovery. Accordingly, SBG's motion to dismiss the Ashton and Burnett complaints are denied without prejudice.

### 9. SAAR Network

The Federal Plaintiffs claim the SAAR Network is a network of "interrelated ostensible charities" that was established in the 1980s "to generate and surreptitiously transfer funds to terrorist organizations, including al-Qaeda." Federal Complaint ¶ 222. Several organizations within the SAAR Network, including SAAR Foundation, SAAR International, Safa Group, Mar-Jac Poultry, Mar-Jac Holdings, Inc., Safa Trust, Inc. and Aradi, Inc., were established, funded or closely affiliated with Defendant Suleiman Abdul Aziz al Rajhi. Id. at ¶ 223. By September 11, 2001, there were allegedly over one hundred entities in this network, "including the U.S. branches of MWL, IIRO and WAMY, [and the SAAR Network Defendants moving to dismiss here,] African Muslim Agency, Grove Corporate, Inc., Heritage Education Trust, International Institute of Islamic Thought, Mar-Jac Investment, Inc., Mena Corporation, Reston Investment, Inc., Sterling Charitable Gift Fund, Sterling Management Group, Inc., Success Foundation, and York Foundation." Id. ¶ 224. Allegedly, many of the entities are related by common management, few of them maintained a physical presence at their purported place of business, and they all "have long acted as fully integrated components of al Qaeda's logistical and financial support infrastructure." Id. ¶¶ 225, 226.

Plaintiffs argue the Court has personal jurisdiction over the SAAR Network because it

46

participated in the conspiracy that resulted in catastrophic effects in this district.  After an ongoing investigation in the Eastern District of Virginia, federal authorities raided the offices of several of these Defendants in Herndon, Virginia in March 2002.  Id. ¶ 227.  The investigation has allegedly revealed that SAAR Network funds have been transferred to designated terrorists and al Qaeda operatives Youssef Nada and Ahmed Idris Nasreddin.  Id. ¶ 228; see Exec. Order No. 13224 (designating individuals as terrorists).  Additionally, Plaintiffs claim that the investigation has revealed that SAAR Network entities have engaged in transactions with Bait Ul-mal, Inc. (BMI), which has transferred funds to terrorist organizations including al Qaeda, and materially supported the 1998 embassy bombings in Africa.  Federal Complaint ¶¶ 229- 230.

At this stage, the Court must accept as true Plaintiffs' allegations concerning the relationships of the SAAR Network.  Id. ¶¶ 222, 226.  Defendants correctly argue, however, that Defendants have provided scant basis for linking these entities under the SAAR Network title.  Certain of these groups may be subject to personal jurisdiction in light of Plaintiffs' allegation that they purposefully directing its activities at the United States by transferring money to designated terrorists Youssef Nada and Ahmed Idris Nasreddin, particularly if they intended the money to support terrorism.  Id. ¶ 228.  Additionally, general jurisdiction could be appropriate for the SAAR Network entities having offices in Virginia.  Id. ¶ 227.  Accordingly, the SAAR Network's motion to dismiss is denied without prejudice.  The parties are to engage in jurisdictional discovery to determine which of the Network's entities have a presence in Virginia and which entities transferred money to Nada and Nasreddin.

### 10. Adel A. J. Batterjee

The Burnett Plaintiffs claim that Defendant Adel A. J. Batterjee is an associate of Osama bin Laden.  Burnett Complaint ¶ 181.  On December 21, 2004, the U.S. Department of Treasury designated Mr. Batterjee as a Specially Designated Global Terrorist.  See Dec. 23, 2004 Bierstein letter to Court; Exec. Order No. 13224.  Mr. Batterjee is the chairman of Al Shamal Islamic Bank, "an instrumental bank in Osama bin Laden's financial support network."  Burnett Complaint ¶ 365.  Mr. Batterjee is also chairman of al-Bir Saudi Organization, whose United States branch, Defendant BIF, is allegedly a "front for al Qaeda sponsorship."  Burnett Complaint ¶¶ 75, 196, 199.  BIF is also a designated terrorist organization.  See Exec. Order No. 13224. The Saudi government closed Al-Bir in 1993 "at the same time it was closing other organizations for ties to terrorism."  Burnett Complaint ¶ 183.  Mr. Batterjee then allegedly moved the charity's headquarters to Chicago in the name of BIF.  Id. ¶ 183.  Mr. Batterjee is listed as one of BIF's three founders in its articles of incorporation filed in Illinois.  Id. ¶ 183.  Through an alias, Mr. Batterjee allegedly sent money to BIF's branches.  Id. ¶ 184; see also Decl. of Jodi Westbrook Flowers in Opp. to Batterjee Motion to Dismiss ("Flowers Decl.") Att. 5, p. 7 (BIF record showing $48,464 contribution by Abdel Abdul Jalil Batterjee).  Mr. Batterjee allegedly transferred control of BIF to Defendant Enaam M. Arnaout, on September 15, 1997.[38]  Burnett

---

[38] Mr. Arnaout was "criminally indicted for his role in the September 11, 2001 attacks."  Burnett Complaint ¶ 199.  But in its "written plea agreement, the government agreed to dismiss sensational and highly publicized charges of providing material support to terrorists and terrorist organizations."  United States v. Arnaout, 282 F. Supp. 2d 838, 843 (N.D.Ill. 2003).  The Burnett

Complaint ¶ 183. In October 2001, Arnaout allegedly told Batterjee he was worried about being under scrutiny of the U.S. government and in January 2002, Batterjee requested that Aranout relocate his family to Saudi Arabia. Id. ¶¶ 217-218. Plaintiffs also claim that Mr. Batterjee's name is on a BIF list of wealthy Saudi Arabian sponsors of al Qaeda and Osama bin Laden. Id. ¶ 219.

Plaintiffs also claim that Defendant charity WAMY and BIF are closely connected and that Mr. Batterjee was the Secretary General of WAMY when he founded BIF in the United States. Id. ¶ 229; see also Flowers Decl. Att. 4, p.3 (December 5, 1992 New York Times article quoting Adel A. Batterjee as the chairman of WAMY). In his capacity as Secretary General of WAMY, Mr. Batterjee allegedly commissioned a biography of Osama bin Laden and the origins of al Qaeda, which was jointly published by WAMY and BIF in 1991. Burnett Complaint ¶ 230.

With respect to his contacts with the United States, Plaintiffs claim that the documents filed in 1992 in conjunction with the establishment of BIF in Chicago state that Mr. Batterjee is a founder of BIF and that BIF's founders travel to the United States on a regular basis. See Flowers Decl. Att. 2, pp. 2-3. In 1993 BIF filed an application to conduct business in Florida and listed Mr. Batterjee as a director with an address in Florida. See id. at Att. 3, p. 4. BIF's authorization to do business in Florida was revoked on August 26, 1994. Id. at p. 1.

Mr. Batterjee disputes the claims against him in a declaration filed in conjunction with his motion to dismiss. Batterjee Decl. ¶ 8. He states he was born in Saudi Arabia, attended college in the United States in the 1960s, and returned to Saudi Arabia. Id. ¶¶ 3, 5. He claims he was last in the United States in June 2000 for personal reasons. Id. ¶ 5. He denies owning any real property, bank accounts, or investments in the United States. Id. ¶ 6. With respect to the allegations contained in the complaint, Mr. Batterjee claims BIF was never a branch of Al Bir or vice versa. Id. ¶ 9. He claims he never sent money to BIF in all of its history. Id. He states he transferred away all control of BIF in 1993. Id. He claims he never served as an executive of WAMY, never wrote a biography of Osama bin Laden, and denies having any knowledge of Osama bin Laden's or al Qaeda's activities other than what is widely published in the press. Id. ¶¶ 9, 10.

Mr. Batterjee also disputes the manner in which he was served. Plaintiffs reasoned that Al-Quds Al-Arabia had published Osama bin Laden's fatwas in the past and could, therefore, reach his supporters regardless of their location. Further, The International Herald Tribune is available to the world community. Additionally, Plaintiffs submit that these cases have been widely reported in the Arabic media and the complaints have been available on numerous websites for over two years. In light of these considerations and Judge Robertson's March 23, 2003 order approving service by publication for Defendants including Mr. Batterjee, the Court

---

Plaintiffs allege Mr. Arnaout and Osama bin Laden have ties. For example, law enforcement officials in Bosnia-Herzegovina raided BIF's offices in March 2002 and allegedly recovered documents establishing direct communications between Mr. Arnaout and Osama bin Laden in the late 1980s and early 1990s. Burnett Complaint ¶¶ 188, 196, 199.

denies Mr. Batterjee's motion to quash service.

The Court finds the <u>Burnett</u> Plaintiffs made a prima facie showing of personal jurisdiction over Mr. Batterjee. While perhaps not dispositive on its own, Mr. Batterjee's designation as a terrorist lends substantial weight to Plaintiffs' claims that he purposefully directed his activities at the United States and that the exercise of personal jurisdiction over him comports with due process. See <u>Biton</u>, 310 F. Supp. 2d at 178. Mr. Batterjee purportedly commissioned a book about al Qaeda and Osama bin Laden. He is the chairman of Al Shamal Islamic Bank, a bank with admitted and substantial ties to Osama bin Laden. <u>Burnett</u> Complaint ¶¶ 70, 79. Additionally, he is involved in the United States operations of designated terrorist, BIF. In the ten years leading up to the commencement of this action, Mr. Batterjee has had contacts with the United States that could be related to the terrorist attacks inasmuch as BIF participated in those attacks. Specifically, Mr. Batterjee traveled to Chicago for BIF and had an address in Florida for BIF. Accordingly, Mr. Batterjee's motion to dismiss the <u>Burnett</u> complaint for lack of personal jurisdiction is denied.

## III. Failure to State a Claim

In considering Defendants' motions to dismiss for failure to state a claim under Rule 12(b)(6), the Court must "accept all of Plaintiffs' factual allegations in the complaint as true and draw inferences from those allegations in the light most favorable to the Plaintiffs." <u>Desiderio v. Nat'l Ass'n of Sec. Dealers, Inc.</u>, 191 F.3d 198, 202 (2d Cir. 1999). Dismissal is not appropriate unless it appears beyond doubt, "even when the complaint is liberally construed, that the plaintiff can prove no set of facts which would entitle him to relief." <u>Id.</u>; <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46 (1957). Federal Rule of Civil Procedure 8(a) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). The Supreme Court reinforced these liberal pleading standards in <u>Swierkiewicz v. Sorema N.A.</u>, 534 U.S. 506, 512 (2002) (observing the "short and plain statement" required by Rule 8 "must simply 'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests'") (quoting <u>Conley</u>, 355 U.S. at 47). When presented with a 12(b)(6) motion, the district court may not consider matters outside of the pleadings without converting the motion into a motion for summary judgment. <u>Courtenay Communications Corp. v. Hall</u>, 334 F.3d 210, 213 (2d Cir. 2003); <u>Friedl v. City of New York</u>, 210 F.3d 79, 83-84 (2d Cir. 2000).

### A. Elements of Claims

Plaintiffs' claim that each Defendant provided material support to the al Qaeda terrorists who perpetrated the attacks on September 11, 2001. Under the ATA, material support includes money, financial services, lodging, training, safehouses, and false documentation or identification. 18 U.S.C. §§ 2339A(b), 2339B(g). Assuming such support is alleged, Plaintiffs will have to present a sufficient causal connection between that support and the injuries suffered by Plaintiffs. See <u>Burnett I</u>, 274 F. Supp. 2d at 104. Proximate cause will support this connection. See <u>First Nationwide Bank v. Gelt Funding Corp.</u>, 27 F.3d 763, 769 (2d Cir. 1994) ("Central to the notion of proximate cause is the idea that a person is not liable to all those who may have been injured by his conduct, but only to those with respect to whom his acts were a

substantial factor in the sequence of responsible causation, and whose injury was reasonably foreseeable or anticipated as a natural consequence."). In light of al Qaeda's public acknowledgments of its war against the United States, the September 11 attacks may be the natural and probable consequence of knowingly and intentionally providing material support to al Qaeda. Burnett I, 274 F. Supp. 2d at 104.

Plaintiffs rely on theories of concerted action liability – conspiracy and aiding and abetting – in support of this causal link. "Concerted action liability under New York law is based on the principle that '[a]ll those who, in pursuance of a common plan or design to commit a tortious act, actively take part in it, or further it by cooperation or request, or who lend aid or encouragement to the wrongdoer . . . are equally liable with him.'" Pittman, 149 F.3d at 122 (quoting Bichler v. Eli Lilly & Co., 55 N.Y.2d 571, 580 (1982)). To be liable under either conspiracy or aiding and abetting, however, the defendant "must know the wrongful nature of the primary actor's conduct," id. at 123, and the conduct must be tied to a substantive cause of action, Chrysler Capital Corp., 778 F. Supp. at 1267. In this regard, Plaintiffs rely on the ATCA, RICO, the TVPA, the ATA, and various state laws, including wrongful death, survival, intentional infliction of emotional distress, trespass, assault and battery, negligence, and negligent infliction of emotional distress.

### 1. ATCA

The Alien Tort Claims Act provides that "[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. "This statute confers subject matter jurisdiction when the following three conditions are satisfied: (1) an alien sues (2) for a tort (3) committed in violation of the law of nations (i.e., international law)." Kadic v. Karadzic, 70 F.3d 232, 238 (2d Cir. 1995); see also Flores v. Southern Peru Corp., 343 F.3d 140, 143 & n.2 (2d Cir. 2003). Certain Plaintiffs in these actions are aliens and the complaints all allege common law torts. The Court finds that "aircraft hijacking is generally recognized as a violation of international law." Burnett I, 274 F. Supp. 2d at 100 (citing Kadic, 70 F.3d at 240; Bigio v. Coca-Cola Co., 239 F.3d 440, 447-49 (2d Cir. 2000)). Further, "courts, including the Second Circuit, have almost unanimously permitted actions premised on a theory of aiding and abetting and conspiracy." Presbyterian Church of Sudan v. Talisman Energy, Inc., 244 F. Supp. 2d 289, 311 (S.D.N.Y. 2003). Accordingly, the ATCA may provide a basis for a concerted action claim of material support by alien-Plaintiffs here. See Burnett I, 274 F. Supp. 2d at 100.

### 2. RICO

"To state a claim under civil RICO, a plaintiff must plead seven elements: '(1) that the defendant (2) through the commission of two or more acts (3) constituting a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly invests in, maintains an interest in, or participates in (6) an 'enterprise' (7) the activities of which affect interstate or foreign commerce.'" Berk v. Tradewell, Inc., Nos. 01 Civ. 9035, 01 Civ. 10068 (MBM), 2003 WL 21664679, at *11 (S.D.N.Y. July 16, 2003) (quoting Moss v. Morgan Stanley, Inc., 719 F.2d 5, 17 (2d Cir. 1983)); see also 18 U.S.C. § 1962. "Civil RICO is an unusually potent weapon . . . 'courts should strive to flush out frivolous RICO allegations at an early stage of the litigation.'" Katzman v.

Victoria's Secret, 167 F.R.D. 649, 655 (S.D.N.Y. 1996).

    The Federal complaint asserts a RICO claim under § 1962(a), which states in part: "It
shall be unlawful for any person who has received any income derived, directly or indirectly,
from a pattern of racketeering activity or through collection of an unlawful debt in which such
person has participated a principal within the meaning of 18 U.S.C. § 2, to use or invest, directly
or indirectly, any part of such income, or the proceeds of such income, in acquisition of any
interest in, or the establishment or operation of, any enterprise which is engaged in, or the
activities of which affect, interstate or foreign commerce." 18 U.S.C. § 1962(a). "Because the
conduct constituting a violation of § 1962(a) is investment of racketeering income, a plaintiff
must allege injury from the defendant's investment of the racketeering income to recover under §
1962(a)." Quaknine v. MacFarlane, 897 F.2d 75, 83 (2d Cir. 1990). The Federal Plaintiffs have
not done that here and seem to abandon the § 1962(a) claim in their RICO statements.
Accordingly, the Federal Plaintiffs have not stated a claim under 18 U.S.C. § 1962(a).

    The Federal Plaintiffs' RICO statements against Arab Bank and the SAAR Network
assert claims under § 1962(c) and § 1962(d). See 03 MDL 1570 Docket ## 307, 309.
Subsection (c) states, in part: "It shall be unlawful for any person employed by or associated with
any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to
conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a
pattern of racketeering activity." 18 U.S.C. § 1962(c). "The four elements of Section 1962(c)
are '(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'" U.S. Fire
Ins. Co. v. United Limousine Serv., Inc., 303 F. Supp. 2d 432, 451 (S.D.N.Y. 2004). "The
elements of section 1962(c) must be established as to each individual defendant." Id.   Paragraph
(d) states that it "shall be unlawful for any person to conspire to violate any provision of" §
1962(a)-(c).  18 U.S.C. § 1962(d).  "The Second Circuit has held in the context of a motion to
dismiss that to state a claim under [§] 1962(d), the 'complaint must allege some factual basis for
a finding of a conscious agreement among the defendants.'" Am. Arbitration Ass'n, Inc. v.
DeFonseca, No. 93 Civ. 2424 (CSH), 1996 WL 363128, at *7 (S.D.N.Y. June 28, 1996) (quoting
Hecht v. Commerce Clearing House, 897 F.2d 21, 26 n.4 (2d Cir. 1990)); see also Schmidt v.
Fleet Bank, 16 F. Supp. 2d 340, 354 (S.D.N.Y. 1998) ("Bare and conclusory allegations are
insufficient to withstand a motion to dismiss and a plaintiff must plead facts sufficient to show
that each defendant knowingly agreed to participate in the [RICO] conspiracy.").

    Assuming for now that the Plaintiffs have pleaded an enterprise, "[u]nder Reeves v. Ernst
& Young, 507 U.S. 170, 179 (1993), an alleged RICO defendant must have had 'some part in
directing' the 'operation or management' of the enterprise itself to be liable." Dubai Islamic
Bank v. Citibank, N.A., 256 F. Supp. 2d 158, 164 (S.D.N.Y. 2003). The complaints allege the
moving Defendants may have assisted al Qaeda, but they do not allege "anything approaching
active 'management or operation.'" Id.   Accordingly, the Court finds Plaintiffs have failed to
state a RICO claim against the moving Defendants. See id.; Redtail Leasing, Inc. v. Belleza, 95
Civ. 5191 (JFK), 1997 WL 603496, at *5 (S.D.N.Y. 1997) ("A defendant does not 'direct' an

enterprise's affairs under § 1962(c) merely by engaging in wrongful conduct that assists the enterprise."); Dep't of Econ. Dev. v. Arthur Andersen & Co., 924 F. Supp. 449, 466-67 (S.D.N.Y. 1996) (providing services to racketeering enterprise is not directing the enterprise); LaSalle Nat'l Bank v. Duff & Phelps Credit Rating Co., 951 F. Supp. 1071, 1090 (S.D.N.Y. 1996) (same). Plaintiffs' RICO claim under § 1962(d) fails for the same reason. Plaintiffs have not alleged that the moving Defendants were central figures in the underlying schemes or for conspiracy liability under § 1962(d). The RICO claims against the moving Defendants are dismissed.

### 3. TVPA

"The TVPA establishes a cause of action in federal court against an individual who, under actual or apparent authority, or color of law, of any foreign nation subjects an individual to torture or extrajudicial killing." Arndt v. UBS AG, 342 F. Supp. 2d 132, 141 (E.D.N.Y. 2004) (citing Flores, 343 F.3d at 153); 28 U.S.C. § 1350 note. Only individuals may be sued under the TVPA. Arndt, 342 F. Supp. 2d at 141 (citing Friedman v. Bayer Corp., No. 99 Civ. 3675, 1999 WL 33457825, at *2 (E.D.N.Y. Dec. 15, 1999)). Accordingly, to the extent Plaintiffs have not already withdrawn these claims, the TVPA claims are dismissed against Al Rajhi Bank, Saudi American Bank, Arab Bank, Al Baraka Investment & Development Corp., NCB, Saudi Binladin Group, and the SAAR Network. Similarly, there have been no allegations that Saleh Abdullah Kamel or Adel Batterjee acted under color of law and, therefore, the TVPA claims against these individuals are dismissed as well.

### 4. ATA

The ATA provides a civil remedy for "[a]ny national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs." 18 U.S.C. § 2333(a).[39] To adequately plead the provision of material support under this section, a plaintiff would have to allege that the defendant knew about the terrorists' illegal activities, the defendant desired to help those activities succeed, and the

---

[39] The ATA defines international terrorism as:

activities that – (A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State; (B) appear to be intended – to intimidate or coerce a civilian population; (ii) to influence the policy of a government by intimidation or coercion; or (iii) to affect the conduct of a government by assassination or kidnapping; and (C) occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum. 18 U.S.C. § 2331(1). For now, the Court assumes the attacks of September 11 were an act of international terrorism.

defendant engaged in some act of helping those activities. Boim II, 291 F.3d at 1023; see also
Boim v. Quranic Literacy Inst., 340 F. Supp. 2d 885, 906-913 (N.D. Ill. 2004) ("Boim III")
(granting summary judgment against two entity defendants where record evidence demonstrated
the charities' concession that Hamas used terrorism in pursuit of its goals, the organizations'
repeated desire to help Hamas by recruiting donations to the Holy Land Foundation, a known
supporter of Hamas, distributing pro-Hamas literature, and featuring pro-Hamas speakers at their
meetings); see also Burnett I, 274 F. Supp. 2d at 107 (noting the complaint in Boim was quite
specific in its allegation of a causal link). Under a conspiracy theory, the Plaintiffs have to allege
that the Defendants were involved in an agreement to accomplish an unlawful act and that the
attacks of September 11 were a reasonably foreseeable consequence of that conspiracy. See
Boim III, 340 F. Supp. 2d at 895 (framing analysis as what plaintiffs have to prove to succeed on
summary judgment). Plaintiffs do not have to allege that Defendants knew specifically about the
September 11 attacks or that they committed any specific act in furtherance of that attack. Id.

### 5. Wrongful Death and Survival

New York Estates, Powers and Trusts Law governs Plaintiffs' claims of wrongful death
and survival. "The personal representative . . . of a decedent who is survived by distributees may
maintain an action to recover damages for a wrongful act, neglect or default which caused the
decedent's death against a person who would have been liable to the decedent by reason of such
wrongful conduct if death had not ensued." N.Y. Est. Powers & Trusts § 5-4.1 (McKinney
2002); see also N.Y. Est. Powers & Trusts § 11-3.2(b) (McKinney 2002) (outlining survival
claim: "No cause of action for injury to person or property is lost because of the death of the
person in whose favor the cause of action existed. For any injury an action may be brought or
continued by the personal representative of the decedent."). Accordingly, the Court finds that if
Plaintiffs are personal representatives and their allegations sufficiently allege that Defendants
supported, aided and abetted, or conspired with the September 11 terrorists, they will have also
stated claims for wrongful death and survival.

### 6. Assault and Battery and Intentional Infliction of Emotional Distress

The Federal Plaintiffs bring claims of assault and battery and intentional infliction of
emotional distress. The Burnett and Ashton Plaintiffs also allege claims of intentional infliction
of emotional distress. The statute of limitations for assault and battery and intentional infliction
of emotional distress is one year. Holmes v. Lorch, 329 F. Supp. 2d 516, 523 (S.D.N.Y. 2004);
N.Y. C.P.L.R. 215(3) (McKinney 2002). The Federal Plaintiffs filed their complaint on
September 10, 2003, nearly two years after September 11, 2001. Accordingly, their assault and
battery and intentional infliction of emotional distress claims are dismissed against the SAAR
Network and Arab Bank.

"Under New York law, a claim for intentional infliction of emotional distress requires a
showing of (1) extreme and outrageous conduct; (2) intent to cause, or reckless disregard of a
substantial probability of causing, severe emotional distress; (3) a causal connection between the

conduct and the injury; and (4) severe emotional distress." Stuto v. Fleishman, 164 F.3d 820, 827 (2d Cir. 1999) (citing Howell v. New York Post Co., 81 N.Y.2d 115, 121 (1993)). "'Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society.'" Id. (quoting Howell, 81 N.Y.2d at 122). Courts are to determine whether the alleged conduct is sufficiently extreme and outrageous enough to permit recovery. Stuto, at 827. The attacks on September 11, 2001 were undoubtedly extreme and outrageous. The Court finds that if the Ashton and Burnett Plaintiffs's allegations sufficiently allege that Defendants supported, aided and abetted, or conspired with the September 11 terrorists, they will have also stated a claim for intentional infliction of emotional distress. See Burnett I, 274 F. Supp. 2d at 107-08 (analyzing claims under New York law).

### 7. Trespass

The Federal Plaintiffs bring a claim for trespass on the theory that Defendants assisted and encouraged those who intentionally entered the World Trade Center property. New York courts describe this cause of action as "the interference with a person's right to possession of real property either by an unlawful act or a lawful act performed in an unlawful manner." N.Y. State Nat'l Org. for Women v. Terry, 886 F. 2d 1339, 1361 (2d Cir. 1990) (citing Ivancic v. Olmstead, 66 N.Y.2d 349, 352 (1986)). To the extent that the Federal Plaintiffs sufficiently plead that Defendants acted in concert with the September 11 hijackers, they may proceed with this claim. Wantanabe Realty Corp. v. City of New York, 01 Civ. 10137 (LAK), 2003 WL 22862646, at *4 (S.D.N.Y. Dec. 3., 2003) (citing Pittman, 149 F.3d at 122-23).

### 8. Negligence

In New York, a plaintiff may establish negligent infliction of emotional distress under the bystander or direct duty theory. Baker v. Dorfman, 239 F.3d 415, 421 (2d Cir. 2000). Under the bystander theory, "a defendant's conduct is negligent as creating an unreasonable risk of bodily harm to a plaintiff and such conduct is a substantial factor in bringing about injuries to the plaintiff in consequence of shock or fright resulting from his or her contemporaneous observation of serious physical injury or death inflicted by the defendant's conduct on a member of the plaintiff's immediate family in his or her presence." Bovsun v. Sanperi, 61 N.Y.2d 219, 223-24 (1984). Under the direct duty theory, a plaintiff suffers emotional distress caused by "defendant's breach of a duty which unreasonably endangered [plaintiff's] own physical safety." Mortise v. United States, 102 F.3d 693, 696 (2d Cir. 1996).

To establish a claim for negligence under New York law, "a plaintiff must show that the defendant owed the plaintiff a cognizable duty of care, that the defendant breached that duty, and that the plaintiff suffered damages as a proximate cause of that breach." King v. Crossland Savings Bank, 111 F. 3d 251, 259 (2d Cir. 1997). The most basic element of a negligence claim is the existence of a duty owed to plaintiffs by defendants. Palsgraf v. Long Island R.R. Co., 248 N.Y. 338, 342 (1928); see also Burnett I, 274 F.2d at 108 (dismissing negligence claims against Defendant Al Haramain Islamic Foundation because complaint failed to allege or identify any duty owed to Plaintiffs). Banks do not owe non-customers a duty to protect them from the intentional torts of their customers. Renner v. Chase Manhattan Bank, No. 98 Civ. 926 (CSH),

1999 WL 47239, at *13 (S.D.N.Y. Feb. 3, 1999) (citing cases); Burnett I, 274 F. Supp. 2d at 109
("Plaintiffs offer no support, and we have found none, for the proposition that a bank is liable for
injuries done with money that passes through its hands in the form of deposits, withdrawals,
check clearing services, or any other routine banking service."). The complaints presently before
the Court do not allege or identify a duty owed to Plaintiffs by moving Defendants. See Burnett
I, 274 F. Supp. 2d at 108-09. Accordingly, the negligence and negligent infliction of emotional
distress claims are dismissed for failure to state a claim.

> **B. Analysis of Claims Against the Moving Defendants**
> While applying the liberal notice pleading requirements of Rule 8, the Court notes that in
light of "the extreme nature of the charge of terrorism, fairness requires extra-careful scrutiny of
Plaintiffs' allegations as to any particular defendant, to ensure that he–or it–does indeed have fair
notice of [the claims]." Id. at 103-04.

> **1. Al Rajhi Bank**
> Al Rajhi Bank was founded in 1987 and now has a network of nearly 400 branch offices
throughout Saudi Arabia and seventeen worldwide subsidiaries. Burnett Complaint ¶ 84. All the
banking Defendants are alleged to have "provided essential support to the al Qaeda organization
and operations. The banking Defendants in this lawsuit have acted as instruments of terror, in
raising, facilitating and transferring money to terrorist organizations." Burnett Complaint ¶ 46.
Plaintiffs claim that Al Rajhi Bank is "the primary bank for a number of charities that serve as al
Qaeda front groups," including Al Haramain, MWL, WAMY, SJRC, and IIRO. Burnett
Complaint ¶ 85; Rule 12(e) Statement ¶ 31. "Al Rajhi continues to maintain Al Haramain's
accounts despite Al Haramain's designation on March 11, 2002 as terrorist organizations by both
the United States and Saudi Arabian authorities." Rule 12(e) Statement ¶ 44. The Burnett
Plaintiffs claim Al Rajhi Bank knew or had to know that its depositors, Defendant charities
WAMY, MWL, IIRC, and SJRC were material supporters of terrorism. Rule 12(e) Statement ¶¶
44-60.

The Burnett Plaintiffs claim that Saudi Arabia has "ineffective and/or rudimentary bank
supervisory, anti-money laundering laws and anti-terrorist financing in place." Rule 12(e)
Statement ¶¶ 72-78. In 1999, William Weschler of the National Security Council and Richard
Newcomb of the Office of Foreign Assets Control traveled to Saudi Arabia to warn Al Rajhi
Bank and its regulator, the Saudi Arabian Monetary Agency ("SAMA"), "that their financial
systems were being manipulated or utilized to fund terrorist organizations such as Al Qaeda." Id.
¶ 75. The United States encouraged SAMA to adopt "know your customer" rules. Id. "Despite
these warnings, Al Rajhi failed to adopt even the most minimal standards, [which] resulted in the
use of Al Rajhi as an instrument of terror and a material supporter, aider and abettor of al Qaeda
and international terrorist activities." Id. ¶¶ 76-77.

One of the hijackers on board American Airlines Flight 11, Abdulaziz al-Omari, held an
account at Al Rajhi Bank. Burnett Complaint ¶ 85; Rule 12(e) Statement ¶ 43. Another hijacker,
Mohammed Atta, made a transfer to this account at some time. Rule 12(e) Statement ¶ 43.
Plaintiffs claim al Qaeda financier Zouaydi asked Abdullah bin Abdul Muhsen al Turki, a

.counselor to the government of Saudi Arabia, to send money through Al Rajhi.  Burnett
Complaint ¶¶ 388, 538.

The Burnett Plaintiffs also claim that Al Rajhi Bank has relationships with Hamas and
other terrorists.  Rule 12(e) Statement ¶¶ 61-69.  Al Rajhi Bank chose Texas-based Infocom to
host its website.  Id. ¶¶ 65, 66.  Infocom has provided funding to Hamas and is owned and
operated by Hamas leader and designated terrorist, Mousa Marzook.  Id.  There have been
transfers made to Marzook and Infocom from Al Rajhi accounts.  Id.  In "December 1999, Al
Rajhi directly funded Tulkarm Charity Committee, a known front for Hamas."  Id. ¶ 71.

Members of the Al Rajhi family, which owns and controls Al Rajhi Bank, are alleged to
have ties to Osama bin Laden's personal secretary.  Id. ¶ 79.  The Al Rajhi family is purportedly
a major donor to the SAAR Network, a Defendant here, being investigated by federal authorities
in Virginia.  Id. ¶¶ 80-84.  Finally, Al Rajhi family members are allegedly closely associated with
wealthy donors to Osama bin Laden.  Id. ¶ 85 (alleging ties with the Golden Chain).

Judge Robertson found that the only allegation in the Third Amended Burnett Complaint
that stated a claim upon which relief could be granted was that Al Rajhi Bank acted as an
instrument "of terror, in raising, facilitating and transferring money to terrorist organizations."
Burnett I, 274 F. Supp. 2d at 109 (quoting Burnett Complaint ¶ 46).  Judge Robertson noted that
there was no support "for the proposition that a bank is liable for injuries done with money that
passes through its hands in the form of deposits, withdrawals, check clearing services, or any
other routine banking service."  Id.  In light of the liberal pleading standards, however, Judge
Robertson denied Al Rajhi Bank's motion to dismiss and permitted it to request a more definitive
statement under Rule 12(e).  Id. at 110.  The Burnett Plaintiffs provided an 89-paragraph
response on August 27, 2003.  Thereafter, Al Rajhi Bank renewed its motion to dismiss pursuant
to Rule 12(b)(6).

Al Rajhi Bank argues that Plaintiffs offer no factual allegations in support of their
conclusion that Al Rajhi Bank had to know that the charities it supported through Zakat and
Hararm[40] payments were really fronts for al Qaeda.  Al Rajhi Bank contends it had a legal and
religious duty to make its charitable donations and any terrorist activity by the recipient charities
was unknown to Al Rajhi Bank.  See Rule 12(e) Statement ¶¶ 26, 29.  Contrary to Plaintiffs'
arguments, Al Rajhi Bank submits it did not have a duty, or a right, to inspect the Defendant
charities' financial transactions to ascertain the ultimate destination of its donations.  But see

---

[40] Under Islamic banking laws, Hararm is forbidden income that must be given away.
The disposal of Hararm cannot be considered charitable giving.  Rule 12(e) Statement ¶ 9.
In the 12(e) statement, the Burnett Plaintiffs explain that al Qaeda takes advantage of the under-
regulated Islamic banking system to move and launder money.  12(e) Statement ¶ 1.  Plaintiffs
allege that al Qaeda has perverted the Zakat and Hararm principles in Islamic banking to collect
and distribute money to individuals and cells throughout the world.  Id. ¶¶ 4-9; see also Burnett
Complaint ¶ 43.

Rule 12(e) Statement ¶ 32 ("Al Rajhi is required to determine that the ultimate recipients of these contributions fall within one of the categories prescribed in the Quran for recipients of Zakat."). Al Rajhi Bank submits that SAMA did not implement any duty to investigate Zakat payments after its meeting with representatives of the National Security Council and Office of Foreign Assets Control.

Plaintiffs do not allege that Al Rajhi Bank provided direct material support to al Qaeda. Rather, Plaintiffs claim Al Rajhi Bank aided and abetted the September 11 terrorists by donating to certain Defendant charities and acting as the bank for these Defendants. New York law and the courts interpreting the ATA in Boim make very clear that concerted action liability requires general knowledge of the primary actor's conduct. See Pittman, 149 F.3d at 123; Boim II, 291 F.3d at 1023; Boim III, 340 F. Supp. 2d at 906. Even with the opportunity to clarify their claims against Al Rajhi Bank, the Burnett Plaintiffs do not offer facts to support their conclusions that Al Rajhi Bank had to know that Defendant charities WAMY, MWL, IIRC, and SJRC were supporting terrorism. See Rule 12(e) Statement ¶¶ 44-60. "[A] complaint which consists of conclusory allegations unsupported by factual assertions fails even on the liberal standard of Rule 12(b)(6)." De Jesus v. Sears, Roebuck & Co., 87 F.3d 65, 70 (2d Cir. 1996)).

This Court, like Judge Robertson before it, has found no basis for a bank's liability for injuries funded by money passing through it on routine banking business. See Burnett I, 274 F. Supp. 2d at 109. Similarly, allegations concerning the Al Rajhi family cannot support a claim against Al Rajhi Bank because there is no allegation that the family members were acting in furtherance of Al Rajhi Bank business. Tasso v. Platinum Guild Int'l, 94 Civ. 8288 (LAP), 1997 WL 16066, at *6 (S.D.N.Y. Jan. 16, 1997). Plaintiffs attach to their opposition brief a September 2002 SAMA report summarizing the initiatives and actions taken by the Kingdom of Saudi Arabia to combat money laundering and terrorist financing. See Burnett Plaintiffs' Opp. to Al Rajhi Motion to Dismiss, Ex. 2. Neither this document, nor the complaint, alleges that SAMA or Al Rajhi Bank implemented "know your customer" rules that Al Rajhi failed to follow with respect to accounts held by the Defendant charities. Finally, Plaintiffs' allegations that Al Rajhi Bank has connections to Hamas supporters fails to state a claim because Plaintiffs have not alleged any relationship between Hamas and al Qaeda or the terrorist attacks of September 11. Even accepting all the allegations against Al Rajhi Bank as true, Plaintiffs have failed to state a claim that would entitle them to relief. Accordingly, Al Rajhi Bank's motion to dismiss the Burnett complaint is granted in its entirety.

### 2. Saudi American Bank

Saudi American Bank is based in Rihadh, Saudi Arabia and was formed in 1980 pursuant to a royal decree to take over the then-existing branches of Citibank in Riyadh and Jeddah. Ashton Complaint ¶ 603; Burnett Complaint ¶ 140. It is the second largest bank in Saudi Arabia and has offices in the United States, based in New York. Ashton Complaint ¶ 604; Burnett Complaint ¶¶ 141-42. Its chairman, Abdullahziz Bin Hamad Al Gosaibi is also the Chairman of the Saudi Cement Company in Damman, Saudi Arabia. Ashton Complaint ¶ 605; Burnett

Complaint ¶ 142.[41]  Ahmed Ali Jumale, purportedly a close associate of Osama bin Laden and responsible for helping Defendant Al Baraka penetrate the United States banking system, allegedly worked for Saudi American Bank as a senior employee from 1979 to 1986. <u>Ashton</u> Complaint ¶ 602; <u>Burnett</u> Complaint ¶ 148.[42]

Plaintiffs claim that Saudi American Bank is the official correspondent of the al Baraka Bank Lebanon; the Riyadh correspondent of Defendant Al Faisal Islamic Bank, which is managed by Defendant Prince Mohamed; and the Riyadh correspondent bank for a branch of Defendant Al Shamal Islamic Bank, which is involved in the financing of al Qaeda. <u>Ashton</u> Complaint ¶¶ 606, 608; <u>Burnett</u> Complaint ¶¶ 143, 146. It is also the bank for Defendant Dallah Al Baraka Group, which is chaired by Defendant Saleh Abdullah Kamel. Saudi American Bank is close to the Saudi Bin Laden family, . . . appears on its financial transactions" and provides banking services to its Sudanese operations. <u>Ashton</u> Complaint ¶¶ 607-8; <u>Burnett</u> Complaint ¶¶ 144, 146.

"In the year 2000, the Saudi American Bank participated in the fundraising campaign in Saudi Arabia for collecting donations to the 'heroes of the Al Quds uprising' (Intifada) by providing a bank account and facilities to receive donations for a committee of charity organizations including Defendants WAMY, IIRO and Al Haramain Foundation." <u>Ashton</u> Complaint ¶ 609; <u>Burnett</u> Complaint ¶ 147.

The essence of Plaintiffs' claim is that through its relationships with other banks and support of the Saudi Binladin group's work in Sudan, Saudi American Bank provided material support to al Qaeda. It is not alleged to have done anything to directly support al Qaeda, Osama bin Laden, or their terrorist agenda. As the Court has stated before, there can be no bank liability for injuries caused by money routinely passing through the bank. Saudi American Bank is not alleged to have known that anything relating to terrorism was occurring through the services it provided. The <u>Ashton</u> Plaintiffs have dismissed their claims against Ahmed Nur Ali Jumale, allegedly an associate of Osama bin Laden. To the extent the <u>Burnett</u> Plaintiffs continue their claims against him, his employment at Saudi American Bank from 1979 to 1986 cannot be grounds for relief. Osama bin Laden did not organize al Qaeda until the late 1980s, Saudi American Bank is not alleged to have provided Jumale with a veil of legitimacy or shelter. <u>Cf.</u> <u>Burnett I</u>, 274 F. Supp. 2d at 104 (finding Al Haramain's employment of al Qaeda operative during height of al Qaeda activity a sufficient allegation of providing material support). The complaints have provided Saudi American Bank with no notice of Plaintiffs' claims or grounds for relief. Accordingly, Saudi American Bank's motions to dismiss the <u>Ashton</u> and <u>Burnett</u> complaints are granted in their entirety.

---

[41] The <u>Ashton</u> Plaintiffs voluntarily dismissed its claims against the Saudi Cement Company and the Arabian Cement Company on June 10, 2004. <u>See</u> 03 MD 1570 Docket # 230.

[42] The <u>Ashton</u> Plaintiffs voluntarily dismissed their claims against Ahmed Nur Ali Jumale on June 10, 2004. <u>See</u> 03 MD 1570 Docket # 230.

### 3. Arab Bank

The <u>Federal</u> Plaintiffs claim Arab Bank is a financial institution headquartered in Egypt with branch offices throughout the world, including New York. <u>Federal</u> Complaint ¶ 357. Arab Bank claims it is actually a Jordanian bank headquartered in Amman, Jordan. Arab Bank allegedly has "long provided financial services and other forms of material support to terrorist organizations, including al Qaeda." <u>Federal</u> Complaint ¶ 358. Further, these Plaintiffs allege that the September 11 attacks were a "direct, intended and foreseeable product of Arab Bank's participation in al Qaeda's jihadist campaign." <u>Id.</u> ¶¶ 364, 363. These claims are based on the allegation that Arab Bank has "long known that accounts it maintained were being used to solicit and transfer funds to terrorist organizations [and despite this knowledge] Arab Bank has continued to maintain those accounts." <u>Id.</u> ¶ 362. Specifically, the <u>Federal</u> Plaintiffs claim Arab Bank accounts have been used for al Qaeda money transfers throughout the world and that Arab Bank maintains accounts for Defendant charities including IIRO, MWL, WAMY, BIF, Blessed Relief (Muwaffaq) Foundation, and Al Haramain. <u>Id.</u> ¶¶ 359, 360. Israeli officials allegedly have seized funds associated with several Arab Bank accounts maintained on behalf of known fronts for Hamas and identified by Arab Bank employees, "confirming the bank's specific knowledge that accounts it maintained were being used to sponsor terrorist activity." <u>Id.</u> ¶ 361.

The <u>Burnett</u> Plaintiffs claim that members of the Spanish al Qaeda cell used Arab Bank to make wire transfers. <u>Burnett</u> Complaint ¶ 138 (alleging Arab Bank is "used regularly by al Qaeda's Spanish cell for transfers of cash to members of al Qaeda operating in Germany, Pakistan, Afghanistan, Lebanon, Yemen, Bosnia, and elsewhere"); <u>id.</u> ¶¶ 139, 528 (alleging $6,400 wire transfer through Arab Bank from member of Spanish al Qaeda cell to an extremist associated with Chej Salah in Spain). These Plaintiffs conclude that "Arab Bank PLC has materially supported, aided, and abetted and financed al Qaeda." <u>Id.</u> ¶ 138.

The <u>Federal</u> and <u>Burnett</u> complaints do not include any facts to support the inference that Arab Bank knew or had to know that it was providing material support to terrorists by providing financial services to the charity Defendants or by processing wire transfers in Spain. The paragraphs do not allege any involvement by, knowledge of, or participation in any wrongful conduct by Arab Bank. These Plaintiffs do not claim that Arab Bank ignored any regulations regarding their customer accounts. Providing routine banking services, without having knowledge of the terrorist activities, cannot subject Arab Bank to liability. While claiming Arab Bank has ties with known Hamas fronts, the <u>Federal</u> complaint does not contain any allegation of a connection between Hamas and Osama bin Laden, al Qaeda, or the September 11 attacks. A complaint alleging conclusions without supporting facts will not survive a Rule 12(b)(6) motion. <u>In re Cross Media Mktg. Corp. Sec. Litig.</u>, 314 F. Supp. 2d 256, 261 (S.D.N.Y. 2004). The <u>Federal</u> Plaintiffs asked for leave to amend their complaint with respect to Arab Bank, but they have not offered any facts to support an amendment. Therefore, Arab Bank's motions to dismiss the <u>Federal</u> and <u>Burnett</u> complaints are granted in their entirety.

### 4. Al Baraka Investment & Development Corporation and Saleh Abdullah Kamel

The <u>Ashton</u> and <u>Burnett</u> complaints detail nearly identical claims against Al Baraka Investment & Development Corp. ("Al Baraka") and Saleh Abdullah Kamel. <u>Ashton</u> Complaint

¶¶ 583-601; Burnett Complaint ¶¶ 47-66. Saleh Abdullah Kamel was born in Saudi Arabia in 1941 and founded Dallah Albaraka Group LLC in 1969. Ashton Complaint ¶ 587; Burnett Complaint ¶ 51. Dallah Albaraka is a diversified conglomerate based in Jeddah and includes twenty-three banks in Arab and Islamic countries. Ashton Complaint ¶ 588; Burnett Complaint ¶ 52. Dallah Albaraka is a shareholder of Aqsa Islamic Bank, a bank that Israel has refused to approve, "citing its obvious ties with known terrorists." Ashton Complaint ¶¶ 596, 597; Burnett Complaint ¶¶ 60, 61. One of Dallah Albaraka's subsidiaries is Dallah Avco Trans-Arabia Co., based in Jeddah. Ashton Complaint ¶ 589; Burnett Complaint ¶ 53. Omar al Bayoumi, a suspect wanted by the FBI in connection with the September 11 attacks, was the Assistant to the Director of Finance for Dallah Avco and paid rent in San Diego for the house occupied by two September 11 hijackers of American Airlines Flight 77. Ashton Complaint ¶¶ 590, 592; Burnett Complaint ¶¶ 55, 54. Mr. Kamel is also one of three founders of Defendant Al Shamal Islamic Bank. Ashton Complaint ¶ 594; Burnett Complaint ¶ 58.

Dallah Albaraka's financial arm is Al Baraka Investment & Development Corp., a wholly owned subsidiary based in Jeddah. Ashton Complaint ¶ 593; Burnett Complaint ¶ 57. Al Baraka is a holding company with 43 subsidiaries, which are mainly banks in Arab and Islamic countries. Ashton Complaint ¶ 583; Burnett Complaint ¶ 47. It also has banks in Chicago, Illinois and Houston, Texas. Burnett Complaint ¶ 47. Al Baraka allegedly provided financial infrastructures in Sudan to Osama bin Laden through Defendant charity Al Haramain. Ashton Complaint ¶¶ 584, 585, 598; Burnett Complaint ¶¶ 48, 49, 62.

Plaintiffs do not offer any factual allegations against Al Baraka or Mr. Kamel to withstand their motions to dismiss. The majority of the complaints' allegations regarding Al Baraka actually concern Dallah Albaraka. The specific allegations against Al Baraka are that through Al Haramain it provided financial infrastructures in Sudan, it provided support to Al Haramain, and it is present in the Sudan banking business through banks it holds. The complaints do not allege that Al Baraka knew or had any reason to know that Al Haramain was supporting terrorism, nor do they allege facts from which such an inference could be drawn.

The allegation that an employee of a Dallah Albaraka subsidiary financially supported two of the hijackers in San Diego does not translate into an allegation that Mr. Kamel provided material support to terrorism or aided and abetted those that provided material support. An employee's actions cannot be a basis for employer liability unless the employee was acting in furtherance of the employer's business. Tasso, 1997 WL 16066, at *6. There is no allegation that Mr. Kamel knew Mr. al Bayoumi or directed anyone at the Della Albaraka subsidiary to support al Qaeda or the hijackers. Similarly, the allegation that Mr. Kamel was one of three founders of Al Shamal Islamic Bank in 1983, without additional allegations, does not state a claim for relief. Thus, the Ashton and Burnett claims against Al Baraka and Mr. Kamel are dismissed in their entirety.

**5. NCB**
The Ashton and Burnett Plaintiffs' allegations against NCB are outlined in Part I.B.4. The Court finds it would be premature to analyze Plaintiffs' largely conclusory claims against

NCB under Rule 12(b)(6) at this time.  NCB may be immune from suit and further discovery if it
is found to be an instrumentality of the Kingdom of Saudi Arabia and its actions do not fit within
the FSIA's exceptions to immunity.  Additionally, the Court is not yet convinced that it would be
proper to exercise personal jurisdiction over NCB.  Accordingly, NCB's motion to dismiss for
failure to state a claim is denied without prejudice.  NCB may renew its motion upon completion
of the limited jurisdictional discovery – first with respect to its instrumentality status – outlined
by the Court above.

### 6. Saudi Binladin Group
The Ashton and Burnett allegations against the SBG are outlined in Part II.C.8.  The same
allegations that warrant limited jurisdictional discovery to investigate whether SBG purposefully
directed its activities at the United States and its contacts with the United States preclude
dismissal under 12(b)(6) at this time.  SBG provided construction support to Osama bin Laden.
Ashton Complaint ¶¶ 550, 552-53; Burnett Complaint ¶¶ 319-22.  A branch of SBG purportedly
provided shelter to an al Qaeda operative.  Ashton Complaint ¶ 555; Burnett Complaint ¶ 324.
SBG has, at some point, had a close relationship with Osama bin Laden, but the complaints do
not specify when or whether the relationship continues.  While these allegations are certainly not
sufficient to reach a jury, if Plaintiffs demonstrate that this Court has personal jurisdiction over
SBG they are entitled the opportunity to develop these claims.  SBG's motions to dismiss the
Ashton and Burnett complaints for failure to state a claim are therefore denied without prejudice.

### 7. SAAR Network
The Federal Plaintiffs' allegations against the SAAR Network are outlined in Part II.C.9.
The Court's analysis of the SAAR Network's arguments in favor of 12(b)(6) dismissal depend on
a predicate finding of which entities are subject to this Court's personal jurisdiction and which
entities – and under what circumstances – transferred money to terror fronts.  Accordingly, the
SAAR Network's motion to dismiss is denied without prejudice.  It may be renewed upon
completion of personal jurisdiction discovery.

### 8. Adel A. J. Batterjee
The Burnett Plaintiffs' allegations against Mr. Batterjee are outlined in Part II.C.10.  For
substantially the same reasons the Court found it had personal jurisdiction over Mr. Batterjee, it
denies his motion to dismiss for failure to state a claim.  The allegations against him and his
designation as a terrorist are sufficient to permit the inference that he provided support to al Qaeda
directly or through Al Shamal Islamic Bank, BIF, or WAMY.  Burnett Complaint ¶¶ 75-76, 183-
84, 196, 199, 230; Exec. Order 13224.

## IV. Conclusion and Order

For the reasons explained above, Prince Sultan's motions to dismiss the Burnett, Ashton,
Tremsky, Salvo, Barrera, and Federal Insurance complaints for lack of subject matter and personal
jurisdiction are granted.  Prince Turki's motions to dismiss the Burnett, Ashton, Tremsky, Salvo,
Barrera, and Federal Insurance complaints for lack of subject matter and personal jurisdiction are
granted.  The Kingdom of Saudi Arabia's motion to dismiss the Federal Insurance and Vigilant

Insurance complaints for lack of subject matter jurisdiction are granted. Prince Mohamed's motions to dismiss the Ashton and Federal Insurance complaints for lack of personal jurisdiction are granted. Mohammad Abdullah Aljomaih's motion to dismiss the Burnett complaint for lack of personal jurisdiction is granted. Sheikh Hamad al Husani's motion to dismiss the Burnett complaint for lack of personal jurisdiction is granted. Abdulrahman bin Mahfouz's motion to dismiss the Burnett complaint for lack of personal jurisdiction is granted. Tariq, Omar, and Bakr Binladin's motion to dismiss the Burnett complaint for lack of personal jurisdiction is granted. Al Rajhi Bank's motion to dismiss the Burnett complaint for failure to state a claim is granted. Saudi ·American Bank's motions to dismiss the Burnett and Ashton complaints for failure to state a claim are granted. Arab Bank's motions to dismiss the Burnett and Federal Insurance complaints for failure to state a claim are granted. Al Baraka and Saleh Abdullah Kamel's motions to dismiss the Burnett and Ashton complaints for failure to state a claim are granted. NCB's motions to dismiss the Burnett and Ashton complaints for lack of subject matter and personal jurisdiction are denied without prejudice. The Burnett and Ashton negligence claims against NCB are dismissed for failure to state a claim. The Saudi Binladin Group's motions to dismiss the Burnett and Ashton complaints for lack of personal jurisdiction and failure to state a claim are denied without prejudice, but the TVPA and negligence claims against SBG are dismissed. The SAAR Network's motion to dismiss the Federal complaint for lack of personal jurisdiction and failure to state a claim is denied without prejudice. T he RICO, TVPA, assault and battery, intentional infliction of emotional distress, and negligence claims against the SAAR Network are dismissed. Adel Batterjee's motion to dismiss the Burnett complaint is denied.

So ordered.

Richard Conway Casey, U.S.D.J.

Dated:
January 18, 2005
New York, New York