# Exhibit Q

Law Offices of
# Thomas H. Nelson & Associates
Box 1211
Welches, OR  97067-1211
Telephone: 503.622.3262
Fax: 503.622.3562

**Thomas H. Nelson**　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　**Admitted in:**
E-Mail:  nelson@thnelson.com　　　　　　　　　　　　　　　　　　　　　　　　　　　Oregon, Washington, and
Mobile: 503.709.6397　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　Idaho

*Via Electronic Mail: Samadams@portlandoregon.gov,
amanda@portlandoregon.gov, Nick@portlandoregon.gov,
randy@portlandoregon.gov, dan@portlandoregon.gov*

April 25, 2011

Sam Adams, Mayor, Commissioner of Finance and Administration
Amanda Fritz, Commissioner of Public Utilities, Position Number 1
Nick Fish, Commissioner of Public Works, Position Number 2
Randy Leonard, Commissioner of Public Safety, Position Number 4
Dan Saltzman, Commissioner of Public Affairs, Position Number 3

　　　　**Re:   City of Portland's Participation in Joint Terrorism Task Force**

Dear Commissioners:

　　　I am writing to oppose the City of Portland Police Bureau's participation in the federal Joint Terrorism Task Force.  If the City decides to do so I believe that it will unnecessarily put Muslims in the City as risk by reducing the cooperation between the Police Bureau and the Muslim Community.  Now more than ever the Muslim community of greater Portland needs the protection of the first responders of the Bureau; by the City's aligning itself with the Department of Justice through cooperation with the JTTF that needed cooperation and consequent protection will suffer.

　　　As suggested above, I have been involved as an attorney in the civil-rights consequences of Islamophobia in Oregon.  It has been my experience that, since September 11, 2001, the civil and human rights of Oregon Muslims have come under threat, and that the threat is actually increasing as the events of September 11 recede into history.  In my opinion, the increasing threat is caused in large part by the policies and practices of the United States Department of Justice which, of course, is the federal part of the JTTF which have heightened Islamophobia nationally and in Portland.  Specifically, it is my experience over years of practice since 9/11 that the Department of Justice itself has been responsible for a major portion of the Islamophobia which is driving the increase in threats to Muslims' civil rights.  I would like to cite several examples of past and current Department of Justice conduct that may help explain why the Muslim community in Oregon perceives itself to be under increasing attack.  I am personally familiar with each of the cases described below.

Portland City Commissioners
April 25, 2011
Page 2

<u>Muhammad Kariye.</u>  In September 2002 the leader of the predominant mosque in Portland, Masjid As-Saber, was arrested at the Portland airport while he was leaving with his family to Dubai; the alleged crimes were unlawful use of a Social Security number and using an incorrect birth date in an asylum application. Taking what at most would be allegations of garden-variety fraud, the U.S. Attorney's office then reached for the headlines: The Assistant U.S. Attorney involved in the case announced that "explosive residue" had been found inside two pieces of luggage belonging to Kariye and his family, intimated that Mr. Kariye may have been involved in funding a charity set up by an aide to Osama bin Laden, and urged that Mr. Kariye be kept in prison pending trial because he had "several thousand dollars in cash" when arrested, and that such made him a "flight risk."  These spectacular allegations incited immediate anti-Islamic responses in the Portland community; later, however, when the initial hysteria cooled, the FBI admitted that the allegation about explosive residue was incorrect (this was not the last case of botched federal forensics used to incite Islamophobia; see Mr. Mayfield's case, below).  I have personally attended sermons delivered by Mr. Kariye in the years since in which he urged that his congregants be moderate and report any suspected antisocial activities to authorities.  As you probably know, although Mr. Kariye was prosecuted for only the regulatory infractions, the cloud over the Muslim community at the As-Saber Mosque remains.

<u>Brandon Mayfield.</u>  In May 2004 a local Muslim attorney, Brandon Mayfield, was arrested as a material witness in the matter of the Madrid train bombing that occurred in March of that year.  The Department of Justice's application for a search warrant in that case recited a number of factors designed to incite, e.g., that he had represented in a child custody matter a person who had been charged with terrorism, Mr. Mayfield's attendance at a local mosque, and his having advertised his legal services on a Muslim Web page directory service. The fundamental basis for Mr. Mayfield's arrest was that the FBI asserted that a fingerprint on one of the plastic bags used to carry explosives in the Madrid bombing matched Mr. Mayfield's fingerprints on file.  At the inception of the legal proceedings – when I was representing Mr. Mayfield – Judge Robert Jones of the Federal District Court of Oregon imposed a strict "gag order" on the participants, including the Department of Justice; I was specifically prohibited from discussing the contents of the affidavit in support of the warrant, and the government was likewise cautioned about commenting publicly on the case.  Notwithstanding this gag order, anonymous sources within the Department of Justice provided leaks to the news media to the effect that the fingerprint on the bag was in fact Mr. Mayfield's; specifically, according to the New York times a source, the partial print on a plastic bag used in the bombing was an "absolutely incontrovertible match" to Mr. Mayfield's prints on file.[1]  A second leak to the Los Angeles Times referred to the alleged match as a "bingo match."[2]  These and other leaks by the Department of Justice, which were obvious violations Judge Robert Jones' gag order, created strong public sentiment against Mr. Mayfield and fanned the fires of Islamophobia in the local community.  Again, as in the case of Mr. Kariye, the FBI had to admit that its experts had botched the forensics and

---

1  See http://www.cs.odu.edu/~apalmer/collection/en.wikipedia.org/wiki/Fingerprint.html#Brandon_Mayfield_and_Madrid_bombing.
2  See http://articles.latimes.com/2004/may/08/nation/na-terror8.

that there was no match - which incidentally was a position firmly held by the Spanish authorities from the beginning of the affair.  By this time, of course, the harm had been done, and the cloud over Oregon Muslims remained for some time; indeed, part of it remains today.

 The November 2010 "Christmas Tree Bombing" in Portland, Oregon.  The third example is much more recent, having occurred in Portland in November of last year.  In this case the FBI acknowledged that it had worked with a disturbed young man to the point where he allegedly agreed to ignite explosives at the lighting of Portland's Christmas Tree in Pioneer Courthouse Square last November.  In its press release the FBI admitted it controlled the operation from the beginning and firmly stated that at no time was there a danger to the public.  But the FBI went further; instead of quietly arresting the defendant, it made a theatrical spectacle by apprehending the defendant just after he had attempted to ignite the "bomb" that the FBI itself had helped prepare and then issuing a press release claiming that the FBI had saved innocent lives by apprehending the alleged planner.  This unnecessary public spectacle created very severe and immediate danger to local Muslims, and the backlash against the Muslim community was also immediate and severe.  Specifically, there was an arson fire at a Corvallis, Oregon, mosque which the alleged bomber had attended (still no arrests), a Muslim prisoner incarcerated in a Portland jail was severely beaten, there was a bomb threat at Mr. Kariye's mosque in Portland, and other criminal products of Islamophobia have occurred.  Had the FBI and Department of Justice put the protection of local Muslims on an even footing with informing (if not inciting) the public I believe that all of these consequences could have been avoided.

 The 2010 Trial of Pete Seda in Eugene, Oregon.  Pete Seda, a naturalized American citizen of Iranian descent who now lives in Portland, was arrested on charges relating to the filing a false federal tax report in 2000.  Mr. Seda, who for years was a Muslim peace activist in Ashland, Oregon, was brought to trial in Eugene, Oregon, on the eve of the anniversary of September 11.  I attended every day of that trial and witnessed first-hand the Islamophobia that was at the core of the Department of Justice's case.  For example, from the beginning of the trial the Department of Justice displayed to the jury a poster containing pictures of several individuals including Mr. Seda along and a known terrorist whom Mr. Seda had never met or communicated.  In addition, during the prosecution's closing argument one of the prosecutors picked up a Qur'an containing a controversial appendix and threw it on a table in front of the jury while referring to it as "junk" - an action that inflamed the feelings of at least the many Muslims in the courtroom.

 Perhaps the most glaring shortcoming during Mr. Seda's trial involved the testimony of one witness, Barbara Cabral.  Ms. Cabral was the only witness who testified to Mr. Seda's desire to support Islamic fighters ("mujahedeen") who were opposing the Russian occupation of Chechnya during the Second Chechen War.  Specifically, Ms. Cabral, who had performed an Islamic pilgrimage ("hajj") to Mecca in the spring of 1999, testified that at the conclusion of the pilgrimage Mr. Seda suggested that she and her husband who accompanied her donate unused travel funds to support

Portland City Commissioners
April 25, 2011
Page 4

the mujahedeen in Chechnya.  Again, Ms. Cabral's testimony was the *only* testimony during the trial that purported to link Mr. Seda with radical Islamic causes.  It was only after the trial and Mr. Seda's conviction that the Department of Justice admitted for the first time that it had authorized the payment of $14,500 to Ms. Cabral for her testimony and that it had anticipated paying her additional funds after the verdict was returned.

The disclosure of the payments to Ms. Cabral has resulted in a motion for new trial, which is currently pending.  But the story does not end there.  During a recent trip to Saudi Arabia I was able to obtain and inspect some of the unused travel vouchers that were the source of the purported payment to the mujahedeen; I have personally confirmed their amounts and that they are dated March 1999.  During that trip I also learned of other facts that cast serious doubt on the veracity of Ms. Cabral's testimony; those facts have been turned over to the Department of Justice for possible further action.  Whether it was merely prosecutorial negligence or something deeper that led the Department of Justice to sponsor Ms. Cabral's false and highly inflammatory testimony is open to speculation; there can be no doubt, however, of the effect of her testimony on the jury, the press, and the public who were following the trial.

These are not the only examples, but time limits further discussion.  The point is that I have witnessed first-hand Department of Justice's going to unusual steps to create and inflame Islamophobia in Portland, which, of course, is the main cause of the threats to Muslims' safety, not to mention their civil rights.  Today, of course, the Portland Police Bureau is untainted by the Department of Justice's actions, and as a result there has been strong and significant cooperation between the Muslim community and the Bureau in recent years.  Portland's joining the JTTF will, in my opinion, lessen if not eliminate that cooperation: Muslims simply will not feel secure or comfortable in calling Bureau personnel when an emergency arises because they will not know whether the first responders are there "to serve and protect" or to spy.  Ultimately I believe the Muslim community will come to realize that it cannot look to the Bureau for protection, which raises the uncomfortable question of how such necessary protection might be provided.

The City of Portland has put too much effort to build trust with the Muslim community to destroy that trust by joining the JTTF.  No one doubts that the FBI has a legitimate role to serve, but that role - in contradistinction to the role of the Portland Police Bureau - is not as a first responder charged with immediate protection of Portland's Muslim citizens.  In my opinion, the FBI and the Department of Justice have so abused Muslims in Oregon since 9/11 as exemplified by the four examples above that there is no hope of any real cooperation between the Muslim community and federal authorities.  By aligning itself with the federal authorities, the Police Bureau will become every bit as suspect - to the detriment of the overall Portland community, not to mention the Muslim community.

Portland City Commissioners
April 25, 2011
Page 5

    Thank you for your attention and patience in reading this. If you have any questions or desire further information or elaboration please let me know.

                                                Very truly yours,

                                                Thomas H. Nelson