# Exhibit G

1

0287TERC

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x

 3    IN RE:  TERRORIST ATTACKS ON
      SEPTEMBER 11, 2001                    03 MDL 1570
 4
      ------------------------------x
 5
                                            February 8, 2010
 6                                          10:30 a.m.

 7    Before:

 8                        HON. FRANK MAAS

 9                                          Magistrate Judge

10                          APPEARANCES

11    KREINDLER & KREINDLER
           Attorneys for Plaintiffs
12    BY:  JAMES KREINDLER
           ANDREW MALONEY
13
      ANDERSON KILL & OLICK, P.C.
14         Attorneys for Plaintiff O'Neill
      BY:  JERRY S. GOLDMAN
15
      COZEN O'CONNOR
16         Attorneys for Plaintiff Federal Insurance
      BY:  SEAN CARNER
17
      MOTLEY RICE
18         Attorneys for Burnett Plaintiffs
      BY:  ROBERT HAEFELE (via telephone)
19
      ROTTENBERG LIPMAN RICH
20         Attorneys for Defendants Sana Bell, Inc
           and Sanabel Al Kheer
21    BY:  CHRIS MANNING
           EURYDICE KELLEY
22
      BERNABEI & WACHTEL PLLC
23         Attorneys for Defendant Al Haramain
           Islamic Foundation (USA)
24    BY:  ALAN R. KABAT

25
```

0287TERC

1                              APPEARANCE (Continued)

2

LAW OFFICE OF STEVEN BARENTZEN

3        Attorneys for Defendant Dr. Yaqub Mirza
BY:   STEVEN BARENTZEN

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

0287TERC

1    be a substitute.

2         THE COURT:  It could be, but I'm not going to require

3    it.

4         MR. BARENTZEN:  One last point I'll make just for the

5    record here, so it's all on the record:  Whatever delay may

6    have occurred quite frankly is plaintiffs' own fault.

7         Had they in the beginning of this come to Dr. Mirza

8    and asked me do you have documents, where are they, I could

9    have told you five years ago we don't have them.

10        Whatever dispute happened between the plaintiffs and

11   Sanabel, I still can't really wrap my head around it, but we

12   got caught in the crossfire here.  I found out about it and

13   jumped into this case and voluntarily said we don't have

14   documents.  That somehow Dr. Mirza and I are somehow

15   responsible for the delay the plaintiffs are suffering here is

16   just not the case at all.

17        THE COURT:  OK.  Well, I have made my ruling.

18        Should we move on to Al Haramain?

19        MR. HAEFELE:  I imagine that's me, your Honor.

20        THE COURT:  OK.

21        MR. HAEFELE:  May it please the court, first of all,

22   thank you for accepting my appearance by telephone.  I promise

23   I had multiple flights to come up there to be with you but they

24   were all canceled.

25        THE COURT:  A likely story, but that's fine.

23

0287TERC

1      MR. HAEFELE:  You are probably better off anyway.
2  Really, you don't need me coughing in your courtroom.

3      THE COURT:  I can probably hear you better on the
4  phone than if you were in the courtroom.  Go on.

5      MR. HAEFELE:  Well, first, I think your Honor noted
6  one of the first things that I did want to call to your
7  attention, that we're in full blown merits discovery with Al
8  Haramain, so any notion that there's any limitation as to any
9  discovery, other than any limits that the federal rules put on
10  us, they don't apply here.

11      The other point that I wanted to make, your Honor, is
12  the need to avoid discover delay, and I just believe we have
13  emphasized that to your Honor on multiple occasions, the need
14  to avoid delay and obtaining discovery.  And in your Honor's
15  most recent decision regarding discovery, your Honor recognizes
16  the need to avoid discovery delay, and those principles apply
17  no less.  That rationale your Honor provided there regarding
18  avoiding prejudice to the other side doesn't apply here where
19  we are in merits discovery with Al Haramain.

20      THE COURT:  With respect to Al Haramain U.S.

21      MR. HAEFELE:  Well, yes, your Honor, that's correct.
22  I will get into the other aspect of that in a moment, but, yes,
23  with regard to how Al Haramain, what I would call the U.S.
24  branch office of Al Haramain.

25      This court has express policy against allowing

24

0287TERC

1   defendants to shield documents from discovery by moving

2   documents abroad, and that same principle applies concerning

3   what I will call shape shifting corporate entities to avoid

4   ·discovery and accountability.

5          Borrowing from the language from one of the cases I

6   cited in the brief, your Honor, Cooper Industries, 102 F.R.D.

7   918, if a defendant could so easily evade discovery, every U.S.

8   company would do the same thing.  Here in this case it would be

9   keeping documents out of the U.S. at a headquarters or

10   resisting collecting discovery until after dissolving or making

11   other branch offices disappear.

12          That principle of treating commonly controlled

13   entities as singular entities for discovery was also supported

14   in the Alcan International case that we cited, which was 176

15   F.R.D. 75.  Like in Alcan, here the Al Haramain entities are

16   unquestionably all members of a unified worldwide business

17   under common control, using the same corporate logo and with

18   regular contact, particularly given the overlap and leadership

19   of the two entities.

20          As in Alcan, the court -- in Alcan the court said it

21   was inconceivable -- and I would say that's true here -- that

22   the U.S. entity through its actors would not have access to the

23   headquarters' information, particularly through the very same

24   overlapping acts.

25          Your Honor, in both of our letters we set out a number

0287TERC

```
1    of factors to be considered to treat Al Haramain and the Al
2    Haramain headquarters as alter egos of each other.  And what I
3    would like to do, your Honor, if you have the letter, the
4    January 5 letter that we sent your Honor, I would refer you to
5    page 2 of that letter.  Do you have that?
6              THE COURT:  I'm sure I do.  Bear with me a second.
7              Yes.
8              MR. HAEFELE:  On page 2, I think it's in the second
9    paragraph, we went through and we referenced some case law that
10   sets out a number of factors to be recognized in considering
11   whether to disregard juridical separateness of companies or
12   entities.  And going through them, what I would like to do is
13   walk the court through some of the documents that we submitted
14   and show you evidence supporting treating the U.S. office as
15   the alter ego of the Riyad headquarters, if that's ripe, your
16   Honor.
17             THE COURT:  Sure.
18             MR. HAEFELE:  Well, if we go one through 15, through
19   the factors, the first factor that's referenced there just
20   doesn't apply here because they're talking about common or
21   overlapping stock ownership, and we are talking about entities
22   that don't have stock ownership here.  So, that one wouldn't
23   apply.
24             The second fact does apply, which is common or
25   overlapping directors or officers.  And we have three principal
```

0287TERC

1    officers or directors of the U.S. branch office.  And for those

2    there, Mr. Al Akil, who is in Saudi Arabia, who is the

3    president of the U.S. branch office; the U.S. branch director,

4    GM of the Riyad headquarters.  And those items are identified

5    in Exhibits 14, 15 and 16.

6         Actually 14, 15 and 16 are important for all three of

7    the directors.  Mr. Al Khati, who is also in Saudi Arabia is

8    vice president of the U.S. branch, as shown on Exhibits 15 and

9    16.  He is the U.S. branch director, as shown in Exhibit 14.

10   He is the deputy director of Al Haramain Riyad, as shown in

11   Exhibit 18.  Mr. Al Butay is also in Saudi Arabia.  He is the

12   treasure of the U.S. branch, as shown in Exhibits 15 and 16.

13   He is the U.S. branch director, as shown in Exhibit 14.  He

14   worked from the Riyad office, as shown in Exhibits 19 and 20.

15   He is the lawful representative in the U.S. of Al Haramain

16   headquarters, as shown in Exhibit 10.

17        If we skip down to the next factor, your Honor, the

18   use of the same corporate offices.  And what we see is that in

19   Exhibit 22 we see that the Al Haramain website, which is used

20   jointly by both the Al Haramains, identify the U.S. office as

21   the U.S. branch office of Al Haramain.  The website also

22   identified Riyad as the head office and the U.S. branch office

23   as the Al Haramain Educational Center.  That's in Exhibit 23.

24        Both the headquarters and U.S. branch regularly use

25   the same website, the same letterhead and the same logo without

0287TERC

1      any kind of distinction.  And that's in a variety of exhibits

2      from 24 through 35 and then 50 through 58.

3              I don't actually have the exhibits referenced here,

4      but I think certainly the anticapitalization of the

5      subsidiaries, which is the next factor, there are a variety of

6      documents that show that Al Haramain branch office in the U.S.

7      pretty much lived off of the money, the funding that was coming

8      in from Al Haramain headquarters, and that's through a number

9      of correspondence back and forth between the two where Al

10     Haramain U.S.A. is asking for money to do any kind of repairs

11     to the buildings, and it indicates that the salaries paid to

12     the Al Haramain people in the U.S. came from the funding that

13     came from the headquarters.

14              The next factor, which is an overlapping factor I

15     think, is the financing of the subsidiary by the parent.

16     Exhibit 10 shows that Al Akil appointed Al Butay the power of

17     attorney on headquarters letterhead to pay any property,

18     equipment, materials, people, for the express purpose of

19     support and maintenance of the goals and objectives of Al

20     Haramain activities in the U.S.  Now, that's the way that Al

21     Haramain in the U.S. branch office got open because of the

22     power of attorney given from the general manager in the Riyad

23     headquarters to the U.S. representative -- sorry, the U.S.

24     representative of the headquarters in Riyad.

25              THE COURT:  That was used to acquire the building,

0287TERC

1      among other things, correct?

2              MR. HAEFELE:  It's basically a general power of

3      attorney so that the Riyad office could act in the U.S. through

4      Mr. Al Khati.  So anything that he used to open up and start

5      the U.S. branch office was covered by that power of attorney.

6              Exhibit 7 also shows it switches the OFAC directory,

7      Newcomb's memo about Al Haramain.  He says the Al Haramain

8      Foundation headquarters under Al Akil's leadership provided

9      funding and instructions that governed the activities

10     throughout the world, including U.S. and elsewhere.

11             If we go to factor number seven, the parent's use of

12     subsidiary's property and assets as its own, just a variety of

13     the documents we submitted, including Exhibits 10, 14, 43 and

14     44, all go to this factor.

15             Again, 10 is the power of attorney.  And in 14 we see

16     that Al Butay brought money from the Al Haramain headquarters

17     in Riyad to the U.S. to buy the U.S. branch property for the

18     branch office use.  And he also brought money apparently from

19     the headquarters in Riyad to the U.S. to buy property in

20     Missouri to build a mosque, and the money went through Al

21     Haramain U.S. bank accounts to buy the property in Missouri.

22             Those factors also show the informal intercorporate

23     loan transactions that have -- that's factor number eight --

24     which shows that instead of making formal loan transactions,

25     they were just bringing money into the U.S. from the

0287TERC

1  headquarters to buy the properties both in Missouri and in

2  Oregon.

3        THE COURT:  One way in which to conclude that

4  documents of a foreign entity must be produced pursuant to a

5  document request or subpoena to a domestic entity is

6  practicability in the ordinary course of business to secure

7  such documents.  I guess that would be among others the Cooper

8  Industry case where Judge Edelstein basically ended up saying

9  it's inconceivable that they can't.

10        When I looked through the exhibits -- and I did --

11  most of them seemed to be the U.S. entity asking for permission

12  to do things, asking for money and the like.  I didn't notice

13  as I went through it -- and I can't say I studied each

14  document -- instances in which in effect the U.S. entity was

15  saying we need particular documents from you and showing a

16  degree of control, if you will, over the Saudi entity.

17        So, correct me if I'm wrong, it seems to me your

18  argument is that applying the factors you are going through,

19  they should be treated as alter egos of one another rather than

20  saying, as some of the cases say, the U.S. entity had

21  practicability to control what occurred in Saudi Arabia.

22        MR. HAEFELE:  Well, your Honor, I think the answer is

23  both really.  I think there is evidence that shows though

24  certainly the headquarters dominated and controlled the branch

25  office.  There is no doubt about that.

0287TERC

1      THE COURT:  No, I am asking whether there is an extent

2   to which and documents to support the conclusion that the U.S.

3   entity had a measure of control, or, forget control, just the

4   practicability to get documents that it wanted from Saudi

5   Arabia.

6      MR. HAEFELE:  I would say the latter, your Honor.

7   Certainly not the former, I don't think, because of the control

8   of the headquarters over the branch.  I think the

9   practicability is present as well because there are instances

10   where they asked for information and they got it.

11      In the normal course of business if the branch office

12   asked for information -- I think there is one instance where

13   they asked for Albanian literature to give out to the Albanian

14   refugees, and they wanted to be able to provide Islamic

15   literature for the Albanians.  They asked for it and got it.

16   And I think just the fact that they asked -- when they asked

17   for money for various things, they were able to get it.  So if

18   they asked for it, they were certainly able to get these

19   things.

20      THE COURT:  OK.  I interrupted you as you with going

21   through the list of factors.

22      MR. HAEFELE:  OK.  But to finish up your thought, your

23   Honor, yes, the other aspect is what I was working on, which is

24   that the evidence shows more than just that there is an ability

25   to get documents; it's that they are the alter ego of each

0287TERC

1    other.  Ands that's the factors I was working on, so your Honor

2    is right on that.

3            THE COURT:  I have had the issue, quite frankly, arise

4    with worldwide accounting firms, where typically there is the

5    U.S. entity, there is entities in a host of countries, and

6    frequently there is a logo but not a worldwide overseer in any

7    particular locality.  And I have had that issue arise at least

8    twice with arguably inconsistent results but based on the way

9    in which particular accounting firms operated and held

10   themselves out.  So, it seems to me that it's a very fact bound

11   inquiry.

12           MR. HAEFELE:  I agree, your Honor, and I think that's

13   what the case law said, which is why I thought it helpful if I

14   went through and walked you through each of the factors, to

15   show you that there was some evidence indicating that at least

16   by my count nine or ten of the factors, if not more, weigh in

17   favor of alter ego relationship.

18           THE COURT:  And I take it you don't dispute that as to

19   this issue the plaintiffs have the burden.

20           MR. HAEFELE:  As to the issue of showing that there is

21   some evidence of this?  Yeah.  Which I think that we have.

22           THE COURT:  Well, what I was referring to is that you

23   have the burden of establishing that there is a basis for

24   saying that the two should be treated as fungible in terms of

25   documents.

0287TERC

1          MR. HAEFELE:  Yes, I agree.

2          THE COURT:  OK.  Go on.  I'm sorry.

3          MR. HAEFELE:  I think we have indicated factor eight,

4     informal intercorporate loan transactions.  We have Exhibits 10

5     and 14.

6          Then we move to incorporation of the subsidiary by the

7     parent.  And the fact of the matter is that the Akil power of

8     attorney to Al Butay indicates that Mr. Al Butay was sent to

9     the U.S. for the purpose of setting up the entity that's the

10    U.S. branch.  And when it was eventually set up the directors

11    became directors that I referenced earlier, which is three of

12    them are headquarters people, and the fourth is Mr. Sayer or

13    Mr. Seragati, who is the local person in Oregon that they used

14    to be the person on the ground.

15         You also have Exhibit 44 which is a visit from a

16    headquarters person reporting on the U.S. office, saying that

17    Al Haramain took on a great responsibility when deciding to

18    open the office in the U.S.

19         Moving to factor eleven, decision making for the

20    subsidiary by the parent and the principals.  And the documents

21    we submitted are just rife with examples of that, including

22    Exhibit 7, 8 and 9.  Exhibit 7 is Director Newcomb's memo

23    regarding the degree of interaction among Al Haramain branches

24    and the headquarters in Riyad, noting that Al Akil had treated

25    the entirety of Al Haramain's one entity absolutely centralized

0287TERC

1    and that Al Haramain's director Al Khati characterized out

2    Akil's governance of Al Haramain as autocratic and centralist,

3    including all of the branch offices.

4         Al Akil was the quote only individual with the full

5    decision making on spending and the one with the authority to

6    hire employees, even if it was just a janitor.  And then if we

7    look at Exhibits 26, 27, 28, 29, 34, 36, 37 and 38, they all

8    show various examples of the U.S. office asking the Al Haramain

9    Riyad headquarters for funding for various things, from

10   electrical repairs, to building repairs, to property repairs,

11   to literature for the Albanians, the funds to shelter a camel

12   they had in the Oregon office.

13        And then one Exhibit, 29, the U.S. office is asking

14   Riyad for approval, advice and immediate support on these goals

15   and ambitions, and to give them future backing.

16        All of these documents show that the decision making

17   for the subsidiary came from the parent.

18        Factor Twelve is the subsidiary's directors do not act

19   independently in the interest of the subsidiary but in the

20   interest of the parent.  And this is important because I think

21   part of the evidence for this is that three of the four

22   individuals that run Al Haramain in the U.S. are Saudi

23   individuals that work with the headquarters.  Exhibits 7, 8 and

24   9 support the factors, especially because Al Akil was the

25   director of both the U.S. branch and the Riyad headquarters.

0287TERC

1   And Exhibit 43, which is the letter from an attorney at

2   Bernabei to OFAC recognizes that $150,000 in donations to the

3   U.S. office were sent to the Riyad office.

4        Fact Fourteen is the nonobservance of formal legal

5   requirements.  And two instances of that that are evidenced are

6   in Exhibit 14 which indicated in two instances Mr. Al Butay

7   bringing substantial sums of money into the U.S. to buy

8   property for the branch office, the property in Oregon and

9   property again in Missouri.

10       And just some other factors that aren't in the 1

11   through 15 but I think that are important are the overlapping

12   identification of the two offices.  Exhibit 5 shows

13   alphabetical listing of SBNs and block persons, and it lists

14   the alternate name of Al Haramain Islamic Foundation as Al

15   Haramain United States Branch.

16       THE COURT:  I understand that aspect of it.  I'm not

17   sure how somebody from the Saudi entity bringing money to the

18   U.S. falls under the category of nonobservance of formal legal

19   requirements.

20       MR. HAEFELE:  Well, instead of doing the formal loan

21   transactions that ought to have been performed if they were

22   considered to be separate entities, instead of making a loan or

23   instead of putting on paper formal transactions, what they did

24   is they just slipped money into the U.S. and put it into bank

25   accounts for the U.S. entity and ran with it.

0287TERC

1          If they were separate entities, your Honor, then there

2   should have been loan documents that indicated that there were

3   separate entities that were involved, and I don't see any

4   indication of that.

5          THE COURT:  OK.

6          MR. HAEFELE:  So, running through the documents that

7   we submitted, your Honor, by my count there is one, two, three,

8   four, five, six, seven, eight, nine, ten of them, plus another

9   one of the overlapping identifications, 11 of 16.  And, you

10  know, I'm not going to say we need to weigh and if I get over

11  half of them we're good.  But, as a whole, if you look at it

12  not only do 11 of the 16 match, but out of the ones that are

13  left they just don't apply under the circumstances because they

14  can't apply.  For example, there is no stock here.  The parent

15  exists solely as a holding company of the subsidiary, that sort

16  of applies.  It's really just a holding entity for all the

17  others, but it's that plus more.

18          The parent and subsidiary file consolidated income tax

19  returns is another factor but that doesn't apply here because

20  they don't file income tax in this country.

21          So, I think if you weigh all of the factors, your

22  Honor, what we get is a very strong indication that Al Haramain

23  U.S.A. is the alter ego of the headquarters.  And that seems to

24  be exactly what the U.S. government has indicated when it has

25  identified the headquarters as being the branch office of the

0287TERC

1    headquarters.

2            THE COURT:  Go on.

3            MR. HAEFELE:  There are just some other problems that

4    we would ask the court to take into account as well, and some

5    of these I think were highlighted earlier in the argument that

6    we heard a few moments ago regarding Sana Bell, and it has also

7    been the subject of other discussion before your Honor, and

8    that's what I would call -- well, I think Mr. Kriendler earlier

9    referred to it as a shell game, but I would call it the

10   problems with the mystery of the disappearing corporations and

11   the mystery of corporate assets.

12           The one problem is the shell game with the corporate

13   entities being either dissolved or mysteriously disappearing,

14   and it's become a theme in the litigation.  And that's one of

15   the problems that I think Mr. Kabat has indicated in his

16   response and said, well, the headquarters doesn't exist

17   anymore, so what are we to do?  Well, the answer is that we are

18   to try and get -- first of all, they were supposed to get all

19   of the documents responsive to discovery from the get-go, and

20   if they didn't do that then that's a problem we need to face as

21   well.

22           The other problem is the problem of ignoring -- what I

23   will call the mystery of the corporate actions.  And the

24   defendants seem to keep pointing to these corporate entities as

25   though they act mysteriously on their own.  They don't.  They

0287TERC

1    act through the individuals that are the corporations.  And so

2    if there are individuals that are involved here, those

3    individuals are the individuals that we need to look to to get

4    the documents from.  Al Haramain acts through the individuals,

5    and yet they ask the court to ignore that fact.

6           Some of the people -- in this instance represented by

7    the very same counsel -- have filed what clearly contain Al

8    Haramain documents.  One of the affidavits that came back to us

9    in the reply indicates that Mr. Al Butay has a file that has at

10   least some Al Haramain documents in it.  We didn't get those.

11   They came to us.  We didn't get them from Al Haramain directly

12   as a result of the various requests; they came because they

13   happened to be in an OFAC file.  They were provided by Al

14   Haramain to OFAC when they wanted to make their own arguments.

15          THE COURT:  Mr. Al Butay submitted an affidavit

16   though, as did Mr. Nelson, both of which you say are

17   insufficiently specific, at least one of which seemed fairly

18   specific.  So, I'm not sure what your gripe was there.

19          MR. HAEFELE:  Well, I would have to look back, your

20   Honor, but there is a curious problem with the affidavits.  The

21   affidavits that were submitted with the motion or the

22   opposition regarding the efforts employed to get responsive

23   documents came from someone who at the time that's pertinent

24   here had little to do with Al Haramain until fairly recently.

25   He was not a director at the time.  He is not listed in the

0287TERC

1    document as being a director until fairly recently.

2              THE COURT:  That's Mr. Nelson.

3              MR. HAEFELE:  That's Mr. Nelson, yes, your Honor.  And

4    we get nothing about those efforts on the three or four primary

5    actors for Al Haramain at the time, at least two who are also

6    represented by the same counsel.  And those people, I think

7    Mr. Seda and Mr. Al Butay, are both I believe represented by

8    the same counsel as Al Haramain U.S.A. branch.  And I don't

9    recall as to Mr. Al Akil.  But it raises the issue of Al

10   Haramain's efforts to actively collect responsive documents in

11   a timely and complete manner, when none of the documents that

12   were submitted back to us -- including the one that came from

13   Mr. Al Butay himself -- indicates what efforts were actually

14   done to try and collect documents in a timely manner and in a

15   complete manner.  We don't know.  We know very little, if

16   anything, on the efforts that have been made by Al Haramain to

17   get documents from Mr. Al Akil, from Mr. Seragati or from

18   Mr. Al Butay.  You know, he could have said something in his

19   declaration, but he didn't.

20             And none of these players at Al Haramain ever say

21   anything about any efforts to obtain documents, despite the

22   fact that they have been in Saudi Arabia for years following

23   9/11.  And instead we get a single affidavit from a relative

24   outsider to Al Haramain, saying very little about any of the

25   efforts made to get the information.

0287TERC

1        And on that issue, your Honor, that is pretty much

2   what I had to say.  I think there is several other issues that

3   were raised, including the counting interrogatories or whether

4   we should use interrogatories more or less.  And in that

5   instance I think your Honor I would rely on what we wrote in

6   our letters.

7        And the other issue, your Honor, the problem is the

8   definition of material support for requests 15 and 16, and we

9   just have a problem where we were specific in terms of what we

10  were requesting, and they come back and they try to define it

11  as saying, well, because the word "material support" showed up

12  in the request we take the liberty of saying unilaterally our

13  stuff wasn't material support.  That not what the request was,

14  your Honor.

15       THE COURT:  Well, at so that one it seemed to me the

16  problem may be where the comma is or isn't placed.  But we will

17  get to that as we go forward.

18       Mr. Kabat?  Is that the way you pronounce it?

19       MR. KABAT:  Yes.

20       THE COURT:  OK.

21       MR. KABAT:  Good morning, your Honor.  Let me just say

22  we're here more than five years after producing more than

23  50,000 pages of documents and publications and the CD-ROMs with

24  all the financial records from the Oregon group.  Now, we

25  exchanged a lot correspondence with plaintiffs counsel way back

1    in '03, '04 and '05.  Plaintiffs did not then respond to most

2    of the issues we raised in our correspondence, and plaintiff

3    waited over five years to really raise the discovery issue with

4    the court.

5           Now, the fundamental problem that I have with their

6    motion to compel, is it's not a motion to compel about the

7    activities and operations of the Oregon Group.  Instead,

8    plaintiff, they are trying to use the Oregon Group as a method

9    for obtaining information about the activities and operations

10   of the Saudi Group, which is another defendant.

11          And I submit that you should deny the Burnett

12   plaintiff's motion to compel because essentially the plaintiffs

13   are seeking discovery from the Oregon defendant of documents

14   and information that's in the possession, custody and control

15   of other defendants, principally the Saudi defendants, Saudi Al

16   Haramain Group.

17          THE COURT:  I thought your position is -- maybe I

18   misunderstood it -- that the Saudi Foundation at least couldn't

19   produce documents because the Saudi government shut it down.

20   Are you talking about documents in the possession of the

21   individuals who were the officers, or in the possession of the

22   Saudi Foundation, or both?

23          MR. KABAT:  Well, plaintiff is trying to seek both

24   through --

25          THE COURT:  No, I understand plaintiffs want

0287TERC

1    everything.  But what you were saying was, well, don't give

2    them the documents held by the -- I think you used the phrase

3    Saudi defendants, one of whom is the Foundation itself, and in

4    your papers there were representations that the Saudi

5    Foundation was shut down by the Saudi government, which sounded

6    like, you know, put a padlock on the front door.

7            Is that what you're saying?  Or does the Saudi

8    Foundation in fact have access to documents?

9            MR. KABAT:  It is my understanding they do not.  Since

10   the government closed it down both Mr. Albans and Mr. Nelson

11   have made repeated attempts while in Saudi Arabia to obtain any

12   documents, because, after all, they could be exculpatory

13   documents for us as well.  We would like to get that

14   information too, but we can't.

15           THE COURT:  Well, one of the things -- and I

16   understand the points you have made about delay, and certainly

17   I don't disagree with you there were long gaps between when you

18   write back to the plaintiffs and when they respond at times --

19   but one thing they want to focus on, which the affidavits that

20   you submitted don't seem to address, is what happened in the

21   period after either it was apparent that litigation was

22   imminent or certainly when the earliest of these lawsuits was

23   filed between then and when the Saudi government shut down the

24   Saudi Foundation, in terms of preserving documents?  I mean

25   that, it seems to me, is one of the issues that Mr. Haefele and

0287TERC

1   others are trying to focus on undoubtedly as the precursor to

2   an exfoliation motion.

3           MR. KABAT:  Well, your Honor, I can't speak to what

4   the Saudi defendants have done with respect to its documents,

5   but I can only say for ourselves, our positions.  The case

6   originated with Judge Robertson.  In fact one of the very first

7   motions involved that we are independent, a separate corporate

8   entity from the Saudi defendant, and our position in fact

9   during the initial discovery conference we had back in August

10  of '03, almost seven years ago, was we only have possession,

11  custody and control of the Oregon Group documents.  We produced

12  those documents in '04.  So, our position has always been it's

13  a separate corporate defendant, we don't have custody and

14  control of the Saudi defendant documents.

15          I don't see where that puts an obligation on us to

16  tell another defendant, represented by another counsel, oh, by

17  the way, you need to preserve your documents just in case the

18  plaintiffs come after us in order to get your documents.

19          I mean there are numerous defendants in this case.

20  It's not my responsibility to issue document preservation

21  letters to codefendants.

22          THE COURT:  Well, but that really is the issue.

23  Mr. Haefele says going through these 15 factors that 11 weigh

24  in his favor and most of the others are simply inapplicable.

25  If you use those factors or some other factors and he's right

0287TERC

1    that I guess both as a matter of law and fact the Saudi and

2    U.S. entities should be viewed as a single organization, then

3    what you just said in terms of it not being your obligation may

4    be wrong.  Right?

5              MR. KABAT:  Well, that sort of begs the question of

6    why the plaintiff named the Oregon Group as a separate

7    defendant.  We were served separately with a subpoena out in

8    Ashland.  Plaintiff from the outset recognized that the Oregon

9    defendant was a separate one.  They did not try to name it as

10   one defendant.  They had a different subpoena.  We were served

11   out in Oregon.  They were served -- Saudi Group I believe was

12   served by publication -- I'm not sure now -- but the plaintiff

13   recognized at the outset these were different defendants, they

14   had to be sued and served separately.

15             THE COURT:  OK.

16             MR. KABAT:  I'd like to add to some of the other

17   points that Mr. Haefele mentioned.

18             THE COURT:  Sure.

19             MR. KABAT:  First of all, Mr. Haefele made reference

20   to the fact that the Oregon Group requested publication from

21   the Saudi Group.  We point out, first of all, those were

22   primarily various Islamic type publications which we have

23   produced in discovery, but Islamic publications, religious

24   publications, are not the same as corporate operational

25   documents.  As your Honor recognized, we did not see anything

0287TERC

1    in the document where the Oregon Group was requesting these

2    sort of corporate operational documents from the Saudi Group.

3    I would just like to mention two cases that I think are

4    dispositive of the plaintiff's discovery request.  The first

5    case is the Securities and Exchange Commission --

6              THE COURT:  Which one?

7              MR. KABAT:  Securities and Exchange Commission v.

8    Credit Bancorp, a case from 2000, Judge Sweet of this court.

9    Judge Sweet said that the burden is on the party seeking

10   discovery to make a showing that the other party "has control

11   over the materials sought".

12             We simply do not have control over the Saudi Group

13   documents.

14             The other case I want to emphasize is the Second

15   Circuit's opinion, and it's a hard name to spell, the

16   Shcherbakovskiy case, Second Circuit 2007.  It held that it was

17   reversible error to impose sanctions on the party for failing

18   to produce documents from a related overseas corporate entity,

19   since, as the Second Circuit said, a party is not obligated to

20   produce documents that it does not possess or cannot obtain.

21   The Shcherbakovskiy holding I submit applies with equal force

22   here.

23             And there is a third decision by Judge Chin of this

24   court called M'Baye v. New Jersey Sports.  And Judge Chin found

25   that if the party made an effort to get documents from an

0287TERC

1    overseas agent but was unsuccessful in getting those documents,

2    that showed that the party lacked the requisite control over

3    the documents.

4         THE COURT:  Well, that's why I was asking Mr. Haefele

5    those questions.  He being a good lawyer wouldn't concede that

6    that was not a theory that the plaintiffs could prevail on, and

7    he pointed, when I asked about the U.S. entity's ability to

8    compel the Saudi entity to do something, he pointed to

9    requesting literature and getting it, which frankly it seems to

10   me isn't the most persuasive evidence that the U.S. entity

11   might have practical control such that it could in effect at

12   the stage when both of these foundations were going concerns so

13   that it could say we don't care what you think, Saudi Arabia,

14   send us money or send us literature, I suppose.

15        And I think that the evidence that the U.S. entity

16   could compel anything from the other entity is slim at best and

17   perhaps nonexistent.  I haven't studied, as I think I said

18   before, all of the exhibits, although I have looked at them

19   all.  But as I read the case law, they don't have to make that

20   showing if they can show that as a matter of law and fact the

21   two entities should be treated as one entity.  And certainly

22   they were separately sued, but I'm not sure that's dispositive.

23        If the interrelationship between the two is so great

24   that they should be viewed as one, then it seems to me it's

25   appropriate to say that discovery addressed to the U.S. entity

1    calls for documents in the possession, custody or control of

2    the Saudi entity as well.  And I think the operative time

3    period, I think we're dealing with a window period here which

4    is:  What was the case that the date that the suit was filed or

5    reasonably anticipated, up until the point that the discovery

6    requests first were served?

7              So, you know, if I had to take a snapshot, I guess it

8    would be that I need to focus on that period of I guess two

9    years or so.

10             MR. HAEFELE:  Your Honor, can I make two additional

11   points?

12             THE COURT:  Well, why don't you let Mr. Kabat finish.

13             MR. HAEFELE:  Absolutely.  I thought he was done.  My

14   apologies.

15             THE COURT:  You couldn't see he was working down at

16   his papers for his next point.

17             MR. KABAT:  Yeah.  During that brief time period in

18   which the lawsuit was filed, which I believe was in August 2002

19   roughly, when the discovery requests were served, which I

20   believe was in October or November of '03, during that time

21   period in fact when the two groups were moving apart, the

22   Oregon Group got the resignation of two of the directors.  Two

23   of the three Saudi directors resigned from the board of the

24   Oregon Group.  What was also happening during that time period

25   is back in February of '04, while we were still discussing the

0287TERC

1    discovery issues, the Department of Treasury initiated an

2    investigation of the Oregon Group, which consequently limited

3    the ability of the Oregon Group to do anything other than

4    retain counsel and litigate.  So, we were not then in a

5    position to escalate our -- the Oregon Group was not in a

6    position to escalate its involvement with the Saudi Group

7    because the director of the Saudi Group was himself also under

8    investigation by Treasury at that same time period.  So, during

9    that period that your Honor identified, the two groups were

10   moving apart partly because of the ongoing Treasury

11   investigation.

12          So, as a practical matter, thinking back to that time

13   period I don't see how we could have easily gotten the Saudi

14   Group documents given that the Saudi government was starting

15   his own move against Al Haramain, Saudi Arabia.

16          And I will defer to Mr. Haefele.

17          THE COURT:  Your turn, Mr. Haefele.

18          MR. HAEFELE:  Thank you.  I'm having trouble hearing

19   Mr. Kabat.

20          Well, the one point I would like to make to your

21   Honor -- and I think it goes to something that your Honor was

22   saying, as well as the overall picture -- is that there is this

23   fiction that there is no connection.

24          In addition to everything that I have already said,

25   your Honor, something that's very important to keep in mind

0287TERC

1    here is that the head of the Saudi office and the vice head of

2    the Saudi office, numbers one and two in the Saudi

3    headquarters, were also numbers one and two in the U.S. branch

4    office.  So, to say that there was no control, no ability, no

5    say, is a fiction.

6            And, in addition to that, since three of the officers,

7    those two plus Mr. Al Butay, are also at the Saudi office, much

8    of the information about the Saudi office or that's available

9    in the Saudi office goes very importantly to what was known or

10   knowable to the Oregon office.  So, what's known or knowable at

11   headquarters, what's known or knowable throughout the Al

12   Haramain network is all pertinent.

13           One important issue in the case is what the Oregon

14   Group's activities were with the main office, so information

15   about the communications between the offices is important, but

16   it also includes the knowledge in the main office about the

17   activities of Al Haramain overall.  They were a part of that

18   network, and to the extent that Al Haramain was doing things

19   that were inappropriate, improper under the law, that go to

20   terrorist support, terrorist financing, and the Oregon office

21   continued in that network with that knowledge, that's all very

22   important with regard to the plaintiffs' claims.

23           So, what the U.S. branch office knew about Al Haramain

24   worldwide is important, and that's discoverable, your Honor.

25           THE COURT:  One thing I haven't heard any mention of

0287TERC

1    in this discussion, although the papers speak to it, is the

2    Quran Foundation.

3          MR. HAEFELE:  I can speak to that briefly, your Honor.

4    The Quran Foundation is basically Mr. Seda.  Mr. Seda set it

5    up.  Mr. Seda pretty much did the same thing.

6          The Al Haramain entity basically came on the scene to

7    supplement and to enlarge the size, enlarge the scope of, to

8    enlarge the financial capabilities of what the Quran Foundation

9    is doing.  The Quran Foundation was Mr. Seda.  Everything that

10   he did under the Quran Foundation he eventually did that and

11   more under Al Haramain's name.  They had the same office, they

12   were run by the same guy, they had the same staff, they shared

13   offices, phone numbers, computer networks.  Everything that was

14   the Quran Foundation was what Mr. Seda was doing with Al

15   Haramain.  There is really no distinction.

16         THE COURT:  But for purposes of the present motion,

17   what is the relief you want?  Is it a ruling that the two Al

18   Haramain foundations should be viewed as a single entity?

19   Well, clearly it's that, that they should be viewed as a single

20   entity such that the Saudi Arabian entity should be producing

21   documents or should have preserved documents at an earlier

22   time.  But beyond that what is it you are seeking presently?

23         MR. HAEFELE:  You know, our position is since they are

24   alter egos, to the extent we have requested information from Al

25   Haramain the U.S. branch, that requires them to produce

0287TERC

1    anything that the U.S. branch or that can be gotten related to

2    the greater Al Haramain knowledge of what was going on in Al

3    Haramain worldwide.

4         As to the Quran Foundation, since it really is the

5    same, and since they shared information, and since a number of

6    the documents that have been produced indicate that there was

7    really little distinction between things going on at the Quran

8    Foundation, things going on at the Al Haramain foundation the

9    U.S. branch, there is a problem that there may be substantial

10   documents in Mr. Seda's possession that relate to work that was

11   done for either or.  And since that distinction is dissolved

12   for the most part, we want to see the documents from the Quran

13   Foundation that relate to Al Haramain, and I think that's the

14   way the request was made.

15        THE COURT:  Is Mr. Seda a defendant in the suit?

16        MR. HAEFELE:  Yes, he is.  I believe the discovery is

17   open to him as well.  I think his motion to dismiss was also

18   denied.

19        THE COURT:  OK.  Well, I guess one question would be

20   has he been subpoenaed -- not subpoenaed -- has he been given a

21   request for production of documents?

22        MR. HAEFELE:  He has not, because we understood that

23   the request to the Al Haramain Foundation was sufficient.  And

24   he was the U.S. officer.  I mean we could do it, but it would

25   be redundant.

0287TERC

1          THE COURT:  Well, it might be, but it might not be.

2     Who represents him, by the way, do you know?

3          MR. HAEFELE:  The same lawyers, your Honor, Mr.

4     Kabat's office.

5          MR. KABAT:  Yes.

6          THE COURT:  I'll ask him the question:  If he were

7     served with a request for production of documents individually,

8     would it yield any more documents?

9          MR. KABAT:  I don't think so, your Honor, because what

10    happened is that when Mr. Seda was overseas, the government,

11    you know, seized all the documents that were in the Ashland

12    office, and then they turned them over to his defense attorney

13    in Portland.  He is represented by the public defender.  They

14    in turn gave us a copy, and we produced those to the

15    plaintiffs.  So, that seems to be the totality of what was in

16    the Ashland office.

17         THE COURT:  There was also a discussion in the various

18    papers I received about the extent to which various requests

19    or, more particularly, interrogatories were overbroad or the

20    objections to those interrogatories were boilerplate.  Should

21    we discuss that today, or is it more appropriate for me to

22    first decide the issue we have been talking about thus far and

23    then see where that take us?

24         MR. HAEFELE:  Your Honor, I would go whichever way

25    your Honor would prefer.

0287TERC

1          MR. KABAT:  Your Honor, I would agree you should

2     decide the first issue.  And I would also note that the

3     plaintiffs' reply brief, the January 5 brief, did not address

4     any of our response on the overbroad and so forth issues, so

5     they're fully submitted on the papers.

6          THE COURT:  OK.  Well, then I will focus first on the

7     issue of whether the -- well, I guess it's one and a half

8     issues -- whether the Saudi entity and the U.S. entity should

9     be viewed as one in the same, and if the Saudi entity comes

10    into the loop, whether that implicates all of the worldwide

11    activities of the Foundation, since I gather there were what

12    Mr. Haefele would call and I guess at times what the Foundation

13    called branch offices in other countries.

14         MR. HAEFELE:  Your Honor?

15         THE COURT:  Yes.

16         MR. HAEFELE:  Two points that I would like to make to

17    your Honor, fairly simplistic I hope.

18         THE COURT:  Sure.

19         MR. HAEFELE:  We didn't respond to the additional

20    issue related to the scope or the burden or the breadth of the

21    discovery requests in our later letter because we thought we

22    did cover it substantially in our December 2 letter on pages 14

23    and 15.  But the other issue is if you look at our December 2

24    letter, on the bottom of page 15 there is a really important

25    typo that I would like to correct for your Honor.

0287TERC

1        THE COURT:  Is that the one where you left out the

2   word "not"?

3        MR. HAEFELE:  Yes, it is.

4        THE COURT:  I caught that.  I read it twice because it

5   did seem to be a change in your position.

6        MR. HAEFELE:  I read it a lot over the weekend and

7   tried to figure out where that word "not" was.

8        THE COURT:  I had already taken the liberty of

9   correcting that in my copy.

10       MR. HAEFELE:  Thank you, your Honor.

11       THE COURT:  OK.  As to this issue I'm going to reserve

12   decision.

13       The next conference before Judge Daniels is scheduled

14   for April 15.  I haven't a clue whether he will hold that

15   conference or not, but I wanted to alert everyone and let

16   whoever is not here who needs to know know that I have asked

17   him if it is held on April 15 to move it to the afternoon

18   because I have a conflict in the morning.  So if it occurs, and

19   assuming it occurs on April 15, it's likely to be the

20   afternoon, not the morning.

21       Anything else anybody wants to bring up today?

22       MR. CARNER:  A minor thing we mentioned earlier.  As I

23   mentioned, we are in this difficult situation where discovery

24   is ongoing as to Al Haramain in one case but its motion remains

25   pending in the rest of the cases.  And we very much would like

0287TERC

1    to try to harmonize the situation.  So, to the extent that

2    we're going to make an application, would you prefer that go to

3    you or to Judge Daniels?

4            THE COURT:  No, I think that one should -- basically

5    to say that everybody ought to be involved in whatever

6    discovery is permitted as to Al Haramain U.S. and/or Saudi

7    Arabia?

8            MR. CARNER:  That's correct, your Honor.

9            THE COURT:  No, I think that should come to me.

10           MR. CARNER:  OK.  Thank you, your Honor.

11           THE COURT:  OK.  Thank you, all.

12           MR. HAEFELE:  Thank you, your Honor.

13                         - - -

14

15

16

17

18

19

20

21

22

23

24

25