## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| *IN RE* TERRORIST ATTACKS ON SEPTEMBER 11, 2001 | ) No. 03 MDL 1570 (GBD/FM)<br>)     ECF Case<br>) |

This document relates to:

ASHTON, *et al.* v. AL QAEDA ISLAMIC ARMY, *et al.*,
    Case No. 02-CV-6977;
BURNETT, *et al.* v. AL BARAKA INVESTMENT & DEVELOPMENT CORP., *et al.*,
    Case No. 03-CV-5738;
CANTOR FITZGERALD ASSOCIATES, LP, *et al.* v. AKIDA INVESTMENT CO., LTD., *et al.*,
    Case No. 04-CV-7065;
CONTINENTAL CASUALTY CO., *et al.* v. AL QAEDA ISLAMIC ARMY, *et al.*,
    Case No. 04-CV-05970;
EURO BROKERS, INC., *et al.* v. AL BARAKA INVESTMENT AND DEVELOPMENT CORP., *et al.*,
    Case No. 04-CV-07279;
FEDERAL INSURANCE CO., *et al.* v. AL QAIDA, *et al.*,
    Case No. 03-CV-6978; and
ESTATE OF O'NEILL, *et al.* v. AL BARAKA INVESTMENT AND DEVELOPMENT CORP., *et al.*,
    Case No. 04-CV-1923.

### Declaration of Alan R. Kabat in Support of
### Defendant Al Haramain Islamic Foundation, Inc. (USA)'s
### Opposition to Plaintiffs' Motion for Sanctions

I am an attorney licensed to practice in the District of Columbia and am admitted *pro hac vice* in this matter.  I am with the law firm of Bernabei & Wachtel, PLLC, counsel to defendant Al Haramain Islamic Foundation, Inc. (USA).  I submit this declaration to transmit to the Court the following documents submitted in support of Defendant Al Haramain Islamic Foundation, Inc. (USA)'s Opposition to Plaintiffs' Motion for Sanctions (Jan. 31, 2013):

1.    Exhibit 1 is a copy of excerpts from the transcript of the sentencing proceedings, in *United States v. Sedaghaty*, No. 05-cr-60008 (D. Or.) (Sept. 27, 2011).

2.    Exhibit 2 is a copy of the Declarations of Thomas Nelson (Feb. 13, 2009; Dec. 9, 2009; Jan. 30, 2013).

3.      Exhibit 3 is a copy of the Declarations of Soliman Al-Buthe (Feb. 13, 2009; Dec. 9, 2009).

4.      Exhibit 4  is a copy of the Protective Order in *United States v. Sedaghaty*, No. 05-cr-60008 (D. Or.) (ECF No. 77) (Dec. 18, 2007).

5.      Exhibit 5 is a copy of excerpts from the trial transcript, in *United States v. Sedaghaty*, No. 05-cr-60008 (D. Or.) (Sept. 2, 2010).

6.      Exhibit 6 is a copy of excerpts of the "General Ledger" prepared by Thomas Wilcox, dated May 6, 2004, and obtained and produced by plaintiffs in discovery.

7.      Exhibit 7 is a copy of the letter from Steven Wax, Federal Public Defender, to Chief Judge Aiken, in *United States v. Sedaghaty*, No. 05-cr-60008 (D. Or.) (Jan. 29, 2013).

I declare under the penalties of perjury that the foregoing is true and correct to the best of my knowledge and belief.  Executed on January 31, 2013.

_____
ALAN R. KABAT

**Exhibit 1**

Excerpts, transcript of the sentencing proceedings,
*United States v. Sedaghaty*, No. 05-cr-60008 (D. Or.) (Sept. 27, 2011).

1

1           IN THE UNITED STATES DISTRICT COURT

2               FOR THE DISTRICT OF OREGON

3    UNITED STATES OF AMERICA,         )
                                       )
4                    Plaintiff,        ) No. 05-60008-2-HO
                                       )
5         v.                           ) September 27, 2011
                                       )
6    PIROUZ SEDAGHATY, et al.,         ) Eugene, Oregon
                                       )
7                    Defendants.       )

8

9          TRANSCRIPT OF SENTENCING PROCEEDINGS

10       BEFORE THE HONORABLE MICHAEL R. HOGAN

11         UNITED STATES DISTRICT COURT JUDGE

12

13                      -:-

14

15

16

17

18

19

20

21

22

23              Deborah Wilhelm, CSR, RPR
                     Court Reporter
24                   P.O. Box 1504
                  Eugene, OR  97440
25                   (541) 431-4113

```
 1                      APPEARANCES OF COUNSEL

 2

 3    FOR THE PLAINTIFF:        CHRISTOPHER L. CARDANI
                                United States Attorney's Office
 4                              405 E. 8th Avenue, Suite 2400
                                Eugene, OR  97401
 5                              (541) 465-6771
                                chris.cardani@usdoj.gov
 6
                                CHARLES F. GORDER, JR.
 7                              United States Attorney's Office
                                1000 S.W. Third Avenue, Suite 600
 8                              Portland, OR  97204-2902
                                (503) 727-1021
 9

10    FOR THE DEFENDANT:        LAWRENCE H. MATASAR
                                Lawrence Matasar, P.C.
11                              621 S.W. Morrison Street
                                Suite 1025
12                              Portland, OR  97205
                                (503) 222-9830
13                              larry@pdxlaw.com

14                              STEVEN T. WAX
                                MICHELLE SWEET
15                              Federal Public Defender
                                101 S.W. Main Street, Suite 1700
16                              Portland, OR  97204
                                (503) 326-2123
17                              steve_wax@fd.org

18

19

20

21

22

23

24

25
```

1          There is a recommended-by-probation increase

2     for sophisticated or intricate, complex means.  And

3     Mr. Sedaghaty and Mr. al-But'he, I find, engaged in

4     especially complex and intricate conduct when they

5     withdrew the El-Fiki donation from the Bank of America

6     account in Ashland, converted it to 130 traveler's

7     checks, each for $1,000 and one -- and another cashier's

8     check, and transported the checks by plane to a bank in

9     Saudi Arabia, that's Mr. al-But'he, where it would be

10    very difficult for authorities to track and detect the

11    money, and the purpose for which it was used, and,

12    therefore, I impose a two-level increase under specific

13    offense characteristics.

14          Now, the -- I believe the remaining increase

15    sought by the government is for application of a

16    terrorism enhancement.  And there is little doubt in my

17    mind that this money went to Chechnya, and that it went

18    to the mujahideen, but I find there has been a failure

19    to prove the terrorist enhancement because of the --

20    certainly by clear and convincing evidence, which I

21    think is appropriate here under the Ninth Circuit case

22    law, because of the failure to prove a link between the

23    defendant and the money being used for terrorist

24    activities.  There is no doubt the Chechen mujahideen

25    were involved in terrorist activities, but there hasn't

7

```
 1  been that link proved for this defendant.
 2          What other findings do you request for the
 3  underlying sentence?
 4          MR. CARDANI:  Judge, before Mr. Wax speaks on
 5  the tax loss, there is an argument that under the Ninth
 6  Circuit law that because the tax loss increases the
 7  sentence under the guidelines fairly significantly, that
 8  the burden of proof should be clear and convincing
 9  evidence.  Does the court so find?
10          THE COURT:  Yes.
11          MR. CARDANI:  I think those were all of the
12  guideline issues, and the others would relate to the
13  Rule 32 matters.
14          THE COURT:  All right.
15          MR. WAX:  One moment, please, Your Honor.
16          THE COURT:  Excuse me, yes.  Go ahead.
17          (Discussion held off the record between Mr. Wax
18  and Mr. Matasar.)
19          MR. WAX:  Your Honor, your ruling on the
20  terrorism enhancement obviates the need for a number of
21  the other specific objections that we --
22          THE COURT:  I'm aware of that.  That's why I
23  didn't bother to rule on them.
24          MR. WAX:  -- have made.  I believe that there
25  are still three or four issues that we had raised on
```

**Exhibit 2**

Declarations of Thomas Nelson
(Feb. 13, 2009; Dec. 9, 2009; Jan. 30, 2013).

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| Al Haramain Islamic Foundation, Inc., *et al.*, | |
| Plaintiffs, | |
| | Case No. 07-CV-1155-KI |
| v. | **DECLARATION OF THOMAS H. NELSON** |
| United States Department of the Treasury, *et al.*, | |
| Defendants. | |

I, Thomas H. Nelson, Esquire, hereby declare under penalty of perjury that the following is true to the best of my knowledge, information, and belief:

1.     I am an attorney who resides in Oregon and am currently an attorney for, and a board member of, the Al Haramain Islamic Foundation, Inc. ("AHIF-Oregon"). I submit this declaration in support of AHIF-Oregon's challenge to its designation as a specially designated global terrorist ("SDGT").

2.     I commenced my involvement on behalf of AHIF-Oregon as an attorney in the spring or summer of 2004, before AHIF-Oregon or Soliman H. Al-Buthe was "designated" by the United States Department of the Treasury as SDGTs.

3.     I became a board member of AHIF-Oregon in 2005 after it was designated because there were at that time only two active board members and under Oregon law there must be three board members for the organization to remain legally viable. The purpose of my becoming a board member was to facilitate the sale of AHIF-Oregon properties.

4.     As a board member of AHIF-Oregon, I had no involvement with the activities of

the Al-Haramain Islamic Foundation (Saudi Arabia) ("AHF-SA").

5.      Had I known that the involvement of Soliman Al-Buthe with AHIF-Oregon was a potential basis for designating AHIF-Oregon, I would have recommended that he resign and that another person serve as a member of the board in his place. Because I was not informed that his involvement was an issue until it was too late – until AHIF-Oregon had already been redesignated – I was unable to take this action.

6.      Had I been informed in 2004, when AHIF-Oregon's assets were frozen, that OFAC was considering designating AHIF-Oregon for its support of Al Qaeda and other SDGTs through its relationship to AHF-SA, I would likely have been able to obtain substantial records from AHF-SA showing that AHIF-Oregon acted independently of AHF-SA. and was not involved in any decisionmaking regarding AHF-SA's activities in other countries or with any of AHF-SA's affiliated organizations. I might also have asked OFAC to specify which SDGTs it thought AHIF-Oregon had supported so that I could have responded to those specific charges. AHF-SA at that time was not an SDGT, and therefore our understanding under the Department of the Treasury's regulations was that there was no bar on transactions with it, so long as those transactions were not intended to support terrorist activity or an SDGT. However, in June 2004, Saudi Arabia shut down AHF-SA under pressure from the United States to do so, and we were not informed of OFAC's concern until February 2008. Although I have made numerous trips to Saudi Arabia since then and have attempted to obtain documents from AHF-SA, I have been unable to obtain any documents from AHF-SA, an entity that has been closed for four years and is no longer in operation.

7.      Had I known that OFAC sought to designate AHIF-Oregon based on a claim that it supported SDGTs through its activities with AHF-SA, I would have attempted to obtain

records in 2004 of all the financial transactions between AHF-SA and AHIF-Oregon, and believe

that those transactions would have shown that none of them funded any SDGTs.   But because

we did not even learn that this was a basis for designation until AHIF-Oregon was redesignated

in February 2008, we never had an opportunity to develop the record.   And now that AHF-SA

has been closed down at the request of the U.S. government, it is exceedingly difficult to obtain

such evidence.

Thomas Nelson, Esquire

DATED:   February 13, 2009

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

———————————————————————— )
                                                          )
In Re Terrorist Attacks on September 11, 2001   ) 03 MDL No. 1570 (GBD)(FM)
                                                          )
———————————————————————— )
                                                          )
Thomas E. Burnett, Sr., et al.,                      )
                                                          )
                    Plaintiffs,                           )
                                                          )
            v.                                             ) No. 03 CV 9849 (GBD)(FM)
                                                          )
Al Baraka Investment and Development       )
           Corporation, et al.,                        )
                                                          )
                    Defendants.                          )
———————————————————————— )

**DECLARATION OF THOMAS NELSON**

I, Thomas Nelson, Esquire, hereby declare under penalty of perjury that the following is true to the best of my knowledge, information, and belief:

1.       I am an attorney who resides in Oregon and am currently a board member of the Al Haramain Islamic Foundation, Inc. ("AHIF USA").  I submit this declaration in support of AHIF USA's response to the plaintiffs' motion to compel.

2.       As a board member of AHIF USA, I had no involvement with the activities of the Al-Haramain Islamic Foundation (Saudi Arabia) ("Al Haramain Saudi Arabia").

3.       In June 2004, the government of Saudi Arabia closed Al Haramain Saudi Arabia in response to pressure from the United States.  Although I have made several trips to Saudi Arabia since 2004, and have made several requests for documents, I have been unable to obtain any documents relating to Al Haramain Saudi Arabia, other than a few documents that were

already in the possession of other individuals, who had retained personal copies.

Thomas Nelson, Esquire

DATED:   December 9, 2009

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| *IN RE* TERRORIST ATTACKS ON SEPTEMBER 11, 2001 | ) )  03 MDL No. 1570 (GBD)(FM) ) ) |

This Document relates to: *All cases*

**DECLARATION OF THOMAS NELSON**

I, Thomas Nelson, hereby declare under penalty of perjury that the following is true to the best of my knowledge, information, and belief.

1.      I am an attorney licensed to practice in Oregon. I am the sole board member and director of the Al Haramain Islamic Foundation, Inc. (USA) ("AHIF USA"). I assumed my position as director upon receipt of a license from the Office of Foreign Assets Control in September 2005, after which the two other directors took no formal action on behalf of AHIF USA. I submit this declaration in support of AHIF USA's response to the plaintiffs' motion for a default judgment.

2.      Plaintiffs' motion for a default judgment (on page 14) cites to a letter that I wrote to the Commissioners of the City of Portland, dated April 25, 2011 (attached hereto as Attachment A), to claim that AHIF USA had not produced certain documents that I had examined while traveling to Saudi Arabia.

3.      The documents referenced in my April 25, 2011 letter were "unused travel vouchers," and they were in the possession of Soliman Al-Buthe, who resides in Saudi Arabia. However, I did not take the documents out of the country at that time, and only examined them to determine that they were dated March 1999, which was an issue that I was looking into in relation to the still pending criminal case, *United States v. Sedaghaty* (D. Or.).

4.     As I have previously advised both this Court, and the U.S. District Court for the District of Oregon, despite repeated attempts since 2004, during my visits to Saudi Arabia over the past eight years, I was unable to obtain any documents from the Al Haramain Foundation's office in Saudi Arabia, other than copies of a few documents that were already in the possession of other individuals.

I declare under the penalties of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on January 30, 2013.


_____
Thomas Nelson, Esquire

Law Offices of
# *Thomas H. Nelson & Associates*
Box 1211
Welches, OR 97067-1211
Telephone: 503.622.3262
Fax: 503.622.3562

**Thomas H. Nelson**
E-Mail: nelson@thnelson.com
Mobile: 503.709.6397

**Admitted in:**
Oregon, Washington, and
Idaho

*Via Electronic Mail: Samadams@portlandoregon.gov,*
*amanda@portlandoregon.gov, Nick@portlandoregon.gov,*
*randy@portlandoregon.gov, dan@portlandoregon.gov*

April 25, 2011

Sam Adams, Mayor, Commissioner of Finance and Administration
Amanda Fritz, Commissioner of Public Utilities, Position Number 1
Nick Fish, Commissioner of Public Works, Position Number 2
Randy Leonard, Commissioner of Public Safety, Position Number 4
Dan Saltzman, Commissioner of Public Affairs, Position Number 3

**Re:  City of Portland's Participation in Joint Terrorism Task Force**

Dear Commissioners:

I am writing to oppose the City of Portland Police Bureau's participation in the federal Joint Terrorism Task Force. If the City decides to do so I believe that it will unnecessarily put Muslims in the City as risk by reducing the cooperation between the Police Bureau and the Muslim Community. Now more than ever the Muslim community of greater Portland needs the protection of the first responders of the Bureau; by the City's aligning itself with the Department of Justice through cooperation with the JTTF that needed cooperation and consequent protection will suffer.

As suggested above, I have been involved as an attorney in the civil-rights consequences of Islamophobia in Oregon. It has been my experience that, since September 11, 2001, the civil and human rights of Oregon Muslims have come under threat, and that the threat is actually increasing as the events of September 11 recede into history. In my opinion, the increasing threat is caused in large part by the policies and practices of the United States Department of Justice which, of course, is the federal part of the JTTF which have heightened Islamophobia nationally and in Portland. Specifically, it is my experience over years of practice since 9/11 that the Department of Justice itself has been responsible for a major portion of the Islamophobia which is driving the increase in threats to Muslims' civil rights. I would like to cite several examples of past and current Department of Justice conduct that may help explain why the Muslim community in Oregon perceives itself to be under increasing attack. I am personally familiar with each of the cases described below.

Portland City Commissioners
April 25, 2011
Page 2

<u>Muhammad Kariye.</u>  In September 2002 the leader of the predominant mosque in Portland, Masjid As-Saber, was arrested at the Portland airport while he was leaving with his family to Dubai; the alleged crimes were unlawful use of a Social Security number and using an incorrect birth date in an asylum application. Taking what at most would be allegations of garden-variety fraud, the U.S. Attorney's office then reached for the headlines: The Assistant U.S. Attorney involved in the case announced that "explosive residue" had been found inside two pieces of luggage belonging to Kariye and his family, intimated that Mr. Kariye may have been involved in funding a charity set up by an aide to Osama bin Laden, and urged that Mr. Kariye be kept in prison pending trial because he had "several thousand dollars in cash" when arrested, and that such made him a "flight risk."  These spectacular allegations incited immediate anti-Islamic responses in the Portland community; later, however, when the initial hysteria cooled, the FBI admitted that the allegation about explosive residue was incorrect (this was not the last case of botched federal forensics used to incite Islamophobia; see Mr. Mayfield's case, below).  I have personally attended sermons delivered by Mr. Kariye in the years since in which he urged that his congregants be moderate and report any suspected antisocial activities to authorities.  As you probably know, although Mr. Kariye was prosecuted for only the regulatory infractions, the cloud over the Muslim community at the As-Saber Mosque remains.

<u>Brandon Mayfield.</u>  In May 2004 a local Muslim attorney, Brandon Mayfield, was arrested as a material witness in the matter of the Madrid train bombing that occurred in March of that year.  The Department of Justice's application for a search warrant in that case recited a number of factors designed to incite, e.g., that he had represented in a child custody matter a person who had been charged with terrorism, Mr. Mayfield's attendance at a local mosque, and his having advertised his legal services on a Muslim Web page directory service. The fundamental basis for Mr. Mayfield's arrest was that the FBI asserted that a fingerprint on one of the plastic bags used to carry explosives in the Madrid bombing matched Mr. Mayfield's fingerprints on file.  At the inception of the legal proceedings – when I was representing Mr. Mayfield – Judge Robert Jones of the Federal District Court of Oregon imposed a strict "gag order" on the participants, including the Department of Justice; I was specifically prohibited from discussing the contents of the affidavit in support of the warrant, and the government was likewise cautioned about commenting publicly on the case.  Notwithstanding this gag order, anonymous sources within the Department of Justice provided leaks to the news media to the effect that the fingerprint on the bag was in fact Mr. Mayfield's; specifically, according to the New York times a source, the partial print on a plastic bag used in the bombing was an "absolutely incontrovertible match" to Mr. Mayfield's prints on file.[1]  A second leak to the Los Angeles Times referred to the alleged match as a "bingo match."[2]  These and other leaks by the Department of Justice, which were obvious violations Judge Robert Jones' gag order, created strong public sentiment against Mr. Mayfield and fanned the fires of Islamophobia in the local community.  Again, as in the case of Mr. Kariye, the FBI had to admit that its experts had botched the forensics and

---

1   See http://www.cs.odu.edu/~apalmer/collection/en.wikipedia.org/wiki/Fingerprint.html#Brandon_Mayfield_and_Madrid_bombing.
2   See http://articles.latimes.com/2004/may/08/nation/na-terror8.

Portland City Commissioners
April 25, 2011
Page 3

that there was no match - which incidentally was a position firmly held by the Spanish authorities from the beginning of the affair. By this time, of course, the harm had been done, and the cloud over Oregon Muslims remained for some time; indeed, part of it remains today.

The November 2010 "Christmas Tree Bombing" in Portland, Oregon. The third example is much more recent, having occurred in Portland in November of last year. In this case the FBI acknowledged that it had worked with a disturbed young man to the point where he allegedly agreed to ignite explosives at the lighting of Portland's Christmas Tree in Pioneer Courthouse Square last November. In its press release the FBI admitted it controlled the operation from the beginning and firmly stated that at no time was there a danger to the public. But the FBI went further; instead of quietly arresting the defendant, it made a theatrical spectacle by apprehending the defendant just after he had attempted to ignite the "bomb" that the FBI itself had helped prepare and then issuing a press release claiming that the FBI had saved innocent lives by apprehending the alleged planner. This unnecessary public spectacle created very severe and immediate danger to local Muslims, and the backlash against the Muslim community was also immediate and severe. Specifically, there was an arson fire at a Corvallis, Oregon, mosque which the alleged bomber had attended (still no arrests), a Muslim prisoner incarcerated in a Portland jail was severely beaten, there was a bomb threat at Mr. Kariye's mosque in Portland, and other criminal products of Islamophobia have occurred. Had the FBI and Department of Justice put the protection of local Muslims on an even footing with informing (if not inciting) the public I believe that all of these consequences could have been avoided.

The 2010 Trial of Pete Seda in Eugene, Oregon. Pete Seda, a naturalized American citizen of Iranian descent who now lives in Portland, was arrested on charges relating to the filing a false federal tax report in 2000. Mr. Seda, who for years was a Muslim peace activist in Ashland, Oregon, was brought to trial in Eugene, Oregon, on the eve of the anniversary of September 11. I attended every day of that trial and witnessed first-hand the Islamophobia that was at the core of the Department of Justice's case. For example, from the beginning of the trial the Department of Justice displayed to the jury a poster containing pictures of several individuals including Mr. Seda along and a known terrorist whom Mr. Seda had never met or communicated. In addition, during the prosecution's closing argument one of the prosecutors picked up a Qur'an containing a controversial appendix and threw it on a table in front of the jury while referring to it as "junk" - an action that inflamed the feelings of at least the many Muslims in the courtroom.

Perhaps the most glaring shortcoming during Mr. Seda's trial involved the testimony of one witness, Barbara Cabral. Ms. Cabral was the only witness who testified to Mr. Seda's desire to support Islamic fighters ("mujahedeen") who were opposing the Russian occupation of Chechnya during the Second Chechen War. Specifically, Ms. Cabral, who had performed an Islamic pilgrimage ("hajj") to Mecca in the spring of 1999, testified that at the conclusion of the pilgrimage Mr. Seda suggested that she and her husband who accompanied her donate unused travel funds to support

Portland City Commissioners
April 25, 2011
Page 4

the mujahedeen in Chechnya.  Again, Ms. Cabral's testimony was the *only* testimony during the trial that purported to link Mr. Seda with radical Islamic causes.  It was only after the trial and Mr. Seda's conviction that the Department of Justice admitted for the first time that it had authorized the payment of $14,500 to Ms. Cabral for her testimony and that it had anticipated paying her additional funds after the verdict was returned.

The disclosure of the payments to Ms. Cabral has resulted in a motion for new trial, which is currently pending.  But the story does not end there.  During a recent trip to Saudi Arabia I was able to obtain and inspect some of the unused travel vouchers that were the source of the purported payment to the mujahedeen; I have personally confirmed their amounts and that they are dated March 1999.  During that trip I also learned of other facts that cast serious doubt on the veracity of Ms. Cabral's testimony; those facts have been turned over to the Department of Justice for possible further action.  Whether it was merely prosecutorial negligence or something deeper that led the Department of Justice to sponsor Ms. Cabral's false and highly inflammatory testimony is open to speculation; there can be no doubt, however, of the effect of her testimony on the jury, the press, and the public who were following the trial.

These are not the only examples, but time limits further discussion.  The point is that I have witnessed first-hand Department of Justice's going to unusual steps to create and inflame Islamophobia in Portland, which, of course, is the main cause of the threats to Muslims' safety, not to mention their civil rights.  Today, of course, the Portland Police Bureau is untainted by the Department of Justice's actions, and as a result there has been strong and significant cooperation between the Muslim community and the Bureau in recent years.  Portland's joining the JTTF will, in my opinion, lessen if not eliminate that cooperation: Muslims simply will not feel secure or comfortable in calling Bureau personnel when an emergency arises because they will not know whether the first responders are there "to serve and protect" or to spy.  Ultimately I believe the Muslim community will come to realize that it cannot look to the Bureau for protection, which raises the uncomfortable question of how such necessary protection might be provided.

The City of Portland has put too much effort to build trust with the Muslim community to destroy that trust by joining the JTTF.  No one doubts that the FBI has a legitimate role to serve, but that role - in contradistinction to the role of the Portland Police Bureau - is not as a first responder charged with immediate protection of Portland's Muslim citizens.  In my opinion, the FBI and the Department of Justice have so abused Muslims in Oregon since 9/11 as exemplified by the four examples above that there is no hope of any real cooperation between the Muslim community and federal authorities.  By aligning itself with the federal authorities, the Police Bureau will become every bit as suspect - to the detriment of the overall Portland community, not to mention the Muslim community.

Portland City Commissioners
April 25, 2011
Page 5


Thank you for your attention and patience in reading this.  If you have any questions or desire further information or elaboration please let me know.

Very truly yours,

Thomas H. Nelson

Thomas H. Nelson

**Exhibit 3**

Declarations of Soliman Al-Buthe
(Feb. 13, 2009; Dec. 9, 2009).

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF OREGON

Al Haramain Islamic Foundation, Inc., *et al.*,

    Plaintiffs,

    v.

United States Department of the Treasury, *et al.*,

    Defendants.

Case No. 07-CV-1155-KI

**DECLARATION OF
SOLIMAN H. AL-BUTHI**

I, Soliman H. Al-Buthi, hereby declare under penalty of perjury that the following is true to the best of my knowledge, information, and belief:

    1.    I reside in Riyadh, Saudi Arabia, and am currently the Director of Environmental Health for the Capital City of Riyadh, Saudi Arabia. I have held this position since 2006. I submit this declaration in support of Al Haramain Islamic Foundation's (AHIF-Oregon) challenge to its designation as a specially designated global terrorist.

    2.    I attended the King Saud University in Riyadh from 1981 to 1985, and earned a Bachelor's degree in Agricultural Science in 1985. From 1985 to 2006, I was the Landscaping Engineer for the City of Riyadh, General Administration of Gardens and Beautification, and was subsequently promoted to Director of the Environmental Health Department.

    3.    From 1997 to the fall of 2002 I was active in the American and Internet Committee (AIC) of Al-Haramain Islamic Foundation – Saudi Arabia (AHF-SA), which was responsible for providing internet support for Islamic outreach activities and for development of Islamic outreach efforts in the United States. There were eight (8) members of the AIC, and two

Declaration of Soliman H. Al-Buthi

paid secretaries who provided clerical support to the AIC. I was a volunteer and was never paid

for my work on behalf of this charitable organization. During the period I worked on the AIC, I

held a responsible, full-time government position as Landscaping Engineer. I devoted

approximately 6-8 hours per week to my volunteer work for the AIC. I stopped volunteering for

AHF-SA in 2002, due to the death of my son.

4.      I am aware that there were other committees under AHF-SA, but my activities on

behalf of the charity were limited to outreach in America and internet matters only. My internet

activities were carried out primarily in Saudi Arabia.

5.      AHF-SA was governed by a Board of Directors, also known as the Management

Council. See Al Haramain Foundation, Organizational Chart (original and translation attached

hereto as Exhibit 1); Al Haramain Foundation, Constitution (1992) (attached hereto as Exhibit

2). I was not a member of the Board of Directors (Management Council) of AHF-SA As a

volunteer, I had no authority over, involvement in, or input into, any activities of AHF-SA or its

affiliated organizations in countries other than the United States. Even with respect to the

America and Internet Committee, I only made recommendations, which the Management

Council or the General Manager could either accept or reject.

6.      I did occasionally attend Management Council meetings, but only by invitation

when matters relating to the AIC were on the agenda. I attended only that portion of the meeting

dealing with my committee's work and did not attend the portions of the meetings dealing with

other branches or other activities of AHF-SA.

7.      I was not familiar with AHF-SA's financial books and records, and as a part-time

volunteer had no access to or responsibility for these records.

8.      To the best of my knowledge my employer, the Saudi Arabia government, was

aware of my volunteer activities with AHF-SA and did not object to them. The Saudi government officially recognized AHF-SA as a charitable organization, and it was one of the largest charities in Saudi Arabia.

9.      Except as stated below, I had no involvement in, or knowledge of, the work of AHF-SA branches in countries other than the United States, except in general terms. I understood that AHF-SA carried on humanitarian efforts in many other areas of the world, but did not know anything about how these activities in other countries were funded or how they operated. As a volunteer, I did not have the time, nor would it have been appropriate given my limited involvement, to become engaged in the activities of the other branches.

10.     The Al-Haramain Islamic Foundation in Oregon (AHIF-Oregon), of which I have been on the board, has never been involved with the operations of any of the other branches of AHF-SA. Furthermore, AHIF-Oregon has never been involved in any terrorist activities, or in funding any terrorist activities.

11.     Had I known that my involvement in AHIF-Oregon was a potential basis for designating AHIF-Oregon, I would have resigned as a member of the board. Because I was not aware that my involvement was an issue until it was too late – until AHIF-Oregon had already been designated and redesignated, I was unable to take this action. I am willing to resign my position for the future if this Court orders OFAC to vacate its current designation of AHIF-Oregon, and OFAC seeks to designate AHIF-Oregon again.

12.     During the entire tenure of my involvement in AHF-SA, through the fall of 2002, it was not a designated organization on any US or UN terrorism lists. Had I been informed that AHIF-Oregon's relationship to AHF-SA was an issue in the designation process for AHIF-Oregon, I would likely have been able to obtain substantial records from AHF-SA showing that

AHIF-Oregon acted independently of AHF-SA, and was not involved in any decision-making regarding AHF-SA's activities in other countries or with any of AHF-SA's affiliated organizations. However, in June 2004, Saudi Arabia shut down AHF-SA under pressure from the United States to do so. At that time, its offices were closed, and since then it has become extraordinary difficult to obtain any records relating to AHF-SA's activities. I have worked closely with attorney Tom Nelson, who has traveled to Riyadh on several occasions, to try to obtain such records, to little avail. Accordingly, OFAC's failure to notify AHIF-Oregon in early 2004 of the basis for its potential designation has irreparably undermined its ability to defend itself, by making it virtually impossible to obtain evidence regarding the activities of AHF-SA.

13.     Had I known that OFAC sought to designate AHIF-Oregon based on a claim that it supported SDGTs through its activities with AHF-SA, I would have obtained records of all the financial transactions between AHF-SA and AHIF-Oregon, and showed that none of them funded any "specially designated terrorists." In fact, for the most part, AHF-SA funded AHIF-Oregon, not vice versa. On one occasion, I brought a $150,000 donation from AHIF-Oregon to Saudi Arabia, but that was solely intended for humanitarian support to those suffering from violence and poverty among the Chechen population in Russia, through the Saudi Joint Relief Commission, a government relief agency. In no instance did AHIF-Oregon transfer any money to AHF-SA in order to support a SDGT. In no instance did AHIF-Oregon ever approve any funding of an SDGT. And for the entire time that AHIF-Oregon was involved with the activities of AHF-SA, AHF-SA was not a SDGT, and thus as far as we knew, there was no bar on providing funds or engaging in transactions with AHF-SA. Moreover, while AHIF-Oregon was affiliated with AHF-SA, it had absolutely no say in or authority over any decisions regarding AHF-SA's activities in other parts of the world. Had we known that this was an issue, we would

have submitted records and evidence from AHF-SA supporting all of these claims.  But because we did not even learn that this was a basis for designation until AHIF-Oregon was redesignated in February 2008, we never had an opportunity to develop the record.  And now that AHF-SA has been closed down at the request of the U.S. government, it is exceedingly difficult to obtain such evidence.

Soliman H. Al-Buthi

DATED:   February _15_, 2009

Attachment A

Al Haramain Foundation (Saudi Arabia), Organizational Chart

FROM :    FAX NO. :    NOV. 10 2009 07:09AM P1

## Al Haramain Foundation Management Chart



Attachment B

Al Haramain Foundation (Saudi Arabia), Constitution

**AL·HARAMAIN ISLAMIC FDN.**

Head Office - Riyadh

مؤسسة الحرمين الخيرية

المكتب الرئيس – الرياض

*Ref.* : ...................................................

*Date* : ...................................................

الـرقم : ...................................................

التاريخ : ...................................................

# CONSTITUTION OF
# AL-HARAMAIN ISLAMIC FOUNDATION

### Item One

1.      ALHARAMAIN ISLAMIC FOUNDATION has been established by the  Constitution of Council of AL-haramain Islamic Foundation in  Its session In ( 1-7-1412 H) corresponding ( 3-1-1992).

2.      HIF  having its head office at Riyadh  K.S.A may :-

a.      establish offices and branches and appoint its representatives outside the head office.

b.      make use of volunteer in performance of its activities and  establish  from them  ad-hoc committees whenever need arises which will operate within rules and regulation drawn for them.

### Item Two: OBJECTIVES OF HIF

HIF  shall  operate  to realise  the  following objectives:-

1.      To rescue needy people whenever they are at time of distress and crises.

2.      To deal with educational,  economical,  social or health problems of people and uplift their standard, effectiveness and productivity in a bid to avert the catastrophe upon their lives.

Contd/p2

**AL-HARAMAIN ISLAMIC FDN.**

Head Office - Riyadh

مؤسسة الحرمـين الخـيرية

المكتب الرئيس – الرياض

Ref. : .................................................

Date : .................................................

الـرقم : .................................................

التاريخ : .................................................

=2=

3.    To help refugees and assist them in returning to their homes.

4.    To take care of orphans or other persons of their like.

Item Three : MEANS OF OPERATION

For realisation of the above prescribed objectives, HIF will utilise every possible means that are consistant with the law, and particularly it shall-

1.    Seek help from Ullamas, scholars, businessmen and others who prove to be willing to help effectively.

2.    Encourage Muslims to volunteer their services either in person or by donating money to HIF.

3.    Carry our Scientific studies in order to identify problems facing human beings and thus find most appropriate solutions for them.

4.    Make action plans in the light of priorities that are decided upon HIF.

5.    Co-operate with Islamic organisations and international welfare societies and also strengthen the relationship with Muslim individuals , societies or groups.

6.    Utilise press media to reach Muslims i.e radio , television, newspaper, books publications and others.

contd/3

**AL-HARAMAIN ISLAMIC FDN.**

Head Office - Riyadh

مؤسسة الحرمـــين الخـيرية

المكتب الرئيس – الرياض

Ref. : ........................................

Date : ........................................

الـرقم : ........................................

التاريخ : ........................................

=3=

7.   Establish training  centres  or   other health , social, or   economic establishments  otherwise support,  promote or administer the   said establishments.

Item Four : FINANCIAL RESOURCES.

Finance of HIF shall depend upon the following resources:-

1.   Subscriptions  or  donations  from  Muslim  individuals,  groups establishments, states and  whether  the contributions  are  in  form of money , estate, property or otherwise.

2.   Zakat  collected  from   individuals   or   Islamic  Organizations  or establishments.

3.   Bequests to HIF made by Muslims from their heritage.

4.   Income from endowments  in  favour of HIF and   the  profits    from investments of HIF.

5.   Unconditional subscriptions from international establishments    and no right shall accrue  in  favour  of the subscriber  against    HIF.

6.   Turnover of the donation campaigns arranged by HIF.

Contd/p4

**AL-HARAMAIN ISLAMIC FDN.**

Head Office - Riyadh

مؤسسة الحرمـين الخيرية

المكتب الرئيس – الرياض

Ref. : ..........................................

Date : ..........................................

الـرقم : ..........................................

التاريخ : ..........................................

=4=

Item Five: SESSION OF THE COUNCIL

1.   The council meets after every four months but it may meet at any time in the case of emergency necessitating meeting.

2.   The Council reaches its resolution by simple majority of votes of members present . In case where votes are equal, the Chairman shall have casting vote.

3.   The meeting of the council will be lawful when it is attended by more than a half of it's members. In the case where there is no quorum, the council meets after twenty four hours for the members present.

4.   The Council may invite to meetings any person whom it considers useful as honorary member of observer.

5.   The membership of the Council ceases in any of the following cases:-

Expire of membership term unless renewed.

Resignation

Death.

Contd/ P5

**AL-HARAMÁIN ISLAMIC FDN.**

Head Office - Riyadh



مؤسسة الحرمـين الخيرية

المكتب الرئيس – الرياض

*Ref.* : ...........................

*Date* : ...........................

الـرقم : ...........................

التاريخ : ...........................

=5=

Absence without excuse at three consecutive meetings after having been warned.

Conviction of a member by the majority members of the Council of the acts he committed that are detrimental to the reputation of the said member.

<u>Item Six: POWER OF THE COUNCIL</u>

The Council is empowered to endorse:-

1.  Plans and policies capable of realising HIF objectives.

2.  Rules and regulations of HIF.

3.  Plans for holding Conferences or seminars relating to HIF activities.

4.  Budget of HIF and its final accounts.

5.  Action plan for HIF working program

6.  Plan for collecting donations, grants, legacies, or endowments from individuals, establishments or governments.

7.  Organizational structure of HIF or its amendments.

8.  Renewal of term of services for Director General, Assistant Director General or Responsible for Finance or termination of their services and make replacement thereof.

Contd/p6



**AL-HARAMAIN ISLAMIC FDN.**

Head Office - Riyadh

مؤسسة الحرمين الخيرية

المكتب الرئيس – الرياض

Ref. : ........................................

Date : ........................................

الرقم : ........................................

التاريخ : ........................................

=6=

9.  Appointment of new members to the Council otherwise renewal of membership of those whose term has expired.

Item seven : CHAIRMAN OF THE COUNCIL AND HIS FUNCTIONS.

1.  Supervision in general of activities of HIF.

2.  Addressing Head of States and Governments, signing   agreements that have been entered into with states in order to   implement   HIF programs therein.  However the Chairman may delegate to whom he deems fit to sign  these agreements on his behalf.

3.  Appointing  lawful auditor to audit HIF's  accounts and its  budget.

4.  Submission of  annual report on  activities of  HIF to the Council of HIF.

5.  Delegation of Chairman's functions, at the Chairman's discretion to the Director General.

Item Eight.   DIRECTOR  GENERAL AND HIS FUNCTIONS.

The Director General is appointed by a resolution of the Council to  hold the office for five years term which is renewable. His services are  honorary excepted if he is full-time working for HIF. The Director General shall also act on behalf of the Chairman during  the latter's absence.

Contd/ p7

**AL·HARAMAIN ISLAMIC FDN.**

Head Office - Riyadh

مؤسسة الحرمـين الخـيرية

المكتب الرئيس – الرياض

*Ref.* : .................................................

*Date* : ..............................................

الـرقم : ..........................................

التاريخ : ........................................

=7=

The functions of Director General are:-

1.   Supervision of HIF in its head office, subsidiary offices and branches, representatives, projects and programs operated under its auscipecious in all over the world.

2.   Issuing of administrative or financial directives and recruitment of staff in HIF and its affiliated in accordance with the general policies of HIF and further delegation of powers to others.

3.   Submission of an annual report on HIF operation to the Council.

4.   Submission of yearly draft budget to the Council.

5.   Delegation of power, at his discretion to whom he deems fit.

6.   Signing of cheques initially. .

7.   .Coordination of HIF operations with those of the like .organizations round the world.

8.   Conclusion of agreements for and on behalf of HIF in line with what is decided by the Council.

Contd/p8

**AL-HARAMAIN ISLAMIC FDN.**

**Head Office - Riyadh**

مـؤسسة الحـرمـين الخـيـرية

المكتب الرئيس – الرياض

Ref. : ...........................................

الرقم : ...........................................

Date : ...........................................

التاريخ : ...........................................

=8=

Item Nine: ASSISTANT DIRECTOR GENERAL AND HIS FUNCTIONS.

The Assistant Director General is appointed by a resolution of the Council to hold the office for five years term which is automatically renewable unless the Council decides otherwise. He acts on behalf of Director General during the latter's absence. The Assistant Director General shall have the following functions:-

1.   Assisting the Director General of HIF in supervision and follow-up over different departments and offices.

2.   Discharging all duties assigned to him or exercising powers conferred upon him by the Director General.

Item Ten: THE FINANCE OFFICER AND HIS FUNCTIONS.

The Finance Officer is appointed by a resolution for the Council for five years term which is automatically renewable unless the Council decides otherwise. His functions are:-

1.   Supervision of the income and expenditure of HIF.

2.   Signing of cheques as the second signature.

3.   Preparation of yearly draft budget for HIF.

4.   Preparation of HIF estimates under the instructions of the Director General.

5.   Performance of any duties assigned to him by the Director General.

Contd/p9

**AL-HARAMAIN ISLAMIC FDN.**

Head Office - Riyadh



مؤسسة الحرمـين الخـيرية

المكتب الرئيس – الرياض

Ref. : ........................................

Date : ........................................

المرقم : ........................................

التاريخ : ........................................

=9=

Item Eleven: <u>DATE OF COMMENCEMENT</u>

This   constitution  shall  come into force on the date of  its  issue   which  is
( 3-1-1992)  and  the  Chairman  of  the  Council  shall  perform functions of the
Council until its first session is held.

= = = =

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *IN RE* TERRORIST ATTACKS ON SEPTEMBER 11, 2001 | ) 03 MDL No. 1570 (GBD)(FM) |
| | ) |
| THOMAS E. BURNETT, SR., *et al.*, | ) |
| Plaintiffs, | ) |
| v. | ) C.A. No. 03 CV 9849 (GBD)(FM) |
| AL BARAKA INVESTMENT AND DEVELOPMENT CORPORATION, *et al.*, | ) |
| Defendants. | ) |

**DECLARATION OF SOLIMAN H. AL-BUTHE**

I, Soliman H. Al-Buthi, hereby declare under penalty of perjury that the following is true to the best of my knowledge, information, and belief:

1.      I reside in Riyadh, Saudi Arabia, and am currently the General Director of Environmental Health for the Capital City of Riyadh, Saudi Arabia. I have held this position since 2006. I submit this declaration in support of Al Haramain Islamic Foundation's (AHIF USA) response to the plaintiffs' motion to compel.

2.      I attended the King Saud University in Riyadh from 1981 to 1985, and earned a Bachelor's degree in Agricultural Science in 1985. From 1985 to 2006, I was the Landscaping Engineer for the City of Riyadh, General Administration of Gardens and Beautification, and was subsequently promoted to General Director of the Environmental Health Department.

3.      I have reviewed the plaintiffs' motion to compel. On pages 12 and 13 of the motion to compel, reference is made to certain documents relating to the Al Haramain Islamic

Declaration of Soliman H. Al-Buthi

Foundation (Saudi Arabia) ("Al Haramain Saudi Arabia"), as listed in plaintiffs' Exhibits 58, 59, and 60. These receipts and letters were documents that I provided in early 2004 to the attorneys for AHIF-USA, since I had kept copies in my personal files. I did not have to request those documents from Al Haramain Saudi Arabia in 2004, since I already had them in my possession. The motion to compel, Exhibit 58, also refers to an affidavit from Mr. Khalid Bin Obaid Azzahri, which is a document that AHIF USA's attorneys were able to obtain in early May 2004, at a time when Al Haramain Saudi Arabia was legally operating in Saudi Arabia.

    4.    However, in June 2004, the Saudi Arabia government shut down Al Haramain Saudi Arabia under pressure from the United States. At that time, its offices were closed, and since then it has become impossible to obtain any records relating to Al Haramain Saudi Arabia's activities from Al Haramain Saudi Arabia. I have worked closely with attorney Tom Nelson, who has traveled to Riyadh on several occasions, to try to obtain such records, but we were not able to obtain any documents from Al Haramain Saudi Arabia.

Soliman H. Al-Buthi

DATED:  December 9, 2009

Page 2 of 2 B Declaration of Soliman H. Al-Buthi

**Exhibit 4**

Protective Order, *United States v. Sedaghaty*,
No. 05-cr-60008 (D. Or.) (ECF No. 77) (Dec. 18, 2007).

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. CR 05-60008 |
| v. | ) | |
| | ) | |
| PIROUZ SEDAGHATY, | ) | **PROTECTIVE ORDER** |
| | ) | |
| Defendant. | ) | |

Upon motion of the United States, the Court being advised as to the nature of this case, and there being no objection by the parties, it is hereby

ORDERED that pursuant to Rule 16(d)(1), Federal Rules of Criminal Procedure, defense counsel will not reproduce any discovery material provided by the government for dissemination to the defendant or to any third party (specifically including co-defendant Soliman Hamd Al-Buthe, his attorneys, and the Al Haramain Islamic Foundation, Inc., and its attorneys), or allow the defendant to have unsupervised access to the material, except as provided below.

IT IS FURTHER ORDERED that defense counsel may provide copies to those persons directly employed by the attorneys of record for defendant Sedaghaty who are necessary to assist counsel of record in preparation for trial or other proceedings in the case.

IT IS FURTHER ORDERED that defense counsel may also provide copies to those persons who are physically located within the territory of the United States of America when doing so is necessary to further legitimate defense investigation and preparation of this case.

**Page 1 - PROTECTIVE ORDER**

IT IS FURTHER ORDERED that no person who receives a copy of any document subject to this protective order from defense counsel shall use such document in any way except to assist counsel for defendant Sedaghaty in the investigation or preparation of this case, and shall not reproduce or disseminate any such document in any way to any other person or entity, and shall not remove any such document from the territory of the United States of America.

IT IS FURTHER ORDERED that counsel for defendant Sedaghaty shall provide a copy of this protective order to any person to whom they provide a copy of any document subject to this order and secure that person's written agreement to abide by the terms of this order. In the event of a possible violation of this order, defense counsel shall provide a copy of such written agreement to the government upon further order of the Court. Before copies of any document subject to this order are provided to any attorney for defendant Soliman Hamd Al-Buthe such attorney shall personally appear before the Court and acknowledge agreement to this order.

Nothing in this protective order shall in any manner limit the right of counsel for defendant Sedaghaty to show any document subject to this order to any person for legitimate defense investigation and preparation in this case. Nothing in this protective order shall in any manner limit the right of counsel for defendant Sedaghaty to reproduce and disseminate any document that they obtain from independent sources other than the government even if it is within the material provided to the defense by the government in the discovery process.

IT IS FURTHER ORDERED that pursuant to Rule 6(e)(3)(E)(I), Federal Rules of Criminal Procedure, the government is authorized to disclose to attorneys of record, records and documents received by the federal grand jury during the investigation of this matter.

IT IS FURTHER ORDERED that the United States is permitted to disclose return and return

**Page 2 - PROTECTIVE ORDER**

information it has obtained pursuant to Title 26 U.S.C. § 6103, pertaining to the defendant or any other party to counsel of record.  The defendant and his respective counsel shall use the returns and return information disclosed solely in connection with the criminal proceeding herein and any disclosure shall be made to any other person in accordance with Title 26 U.S.C. § 6103.

DATED this ____ day of December, 2007.

_____
THOMAS M. COFFIN
United States Magistrate Judge


Presented by:                                         Agreed to by:

KARIN J. IMMERGUT
United States Attorney
District of Oregon

_____        _____
CHARLES F. GORDER, JR.                          STEVEN T. WAX
CHRISTOPHER L. CARDANI                        LARRY MATASAR
Assistant United States Attorneys                   Attorneys for Defendant


**Page 3 - PROTECTIVE ORDER**

**Exhibit 5**

Excerpts, trial transcript,
*United States v. Sedaghaty*, No. 05-cr-60008 (D. Or.) (Sept. 2, 2010).

1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF OREGON

 3    UNITED STATES OF AMERICA,        )
                                       )
 4                   Plaintiff,        ) No. 05-60008-2-HO
                                       )
 5       v.                            ) September 2, 2010
                                       )
 6    PIROUZ SEDAGHATY, et al.,        ) Eugene, Oregon
                                       )
 7                   Defendants.       )


 8


 9        PARTIAL TRANSCRIPT OF TRIAL PROCEEDINGS

10       BEFORE THE HONORABLE MICHAEL R. HOGAN

11   UNITED STATES DISTRICT COURT JUDGE, AND A JURY

12        DAY 4 A.M. SESSION - PAGES 1 - 128

13


14                        -:-

15

16

17

18

19

20

21

22

23           Deborah Wilhelm, CSR, RPR
                  Court Reporter
24               P.O. Box 1504
               Eugene, OR  97440
25               (541) 431-4113
```

2

```
 1                       APPEARANCES OF COUNSEL

 2

 3     FOR THE PLAINTIFF:      CHRISTOPHER L. CARDANI
                               United States Attorney's Office
 4                             405 E. 8th Avenue, Suite 2400
                               Eugene, OR  97401
 5                             (541) 465-6771
                               chris.cardani@usdoj.gov
 6
                               CHARLES F. GORDER, JR.
 7                             United States Attorney's Office
                               1000 S.W. Third Avenue, Suite 600
 8                             Portland, OR  97204-2902
                               (503) 727-1021
 9

10     FOR THE DEFENDANT:      LAWRENCE H. MATASAR
                               Lawrence Matasar, P.C.
11                             621 S.W. Morrison Street
                               Suite 1025
12                             Portland, OR  97205
                               (503) 222-9830
13                             larry@pdxlaw.com

14                             STEVEN T. WAX
                               BERNARD J. CASEY
15                             MICHELLE SWEET
                               Federal Public Defender
16                             101 S.W. Main Street, Suite 1700
                               Portland, OR  97204
17                             (503) 326-2123
                               steve_wax@fd.org
18

19

20

21

22

23

24

25
```

3

```
 1                    INDEX OF EXAMINATIONS

 2   FOR THE PLAINTIFF:    Direct   Cross    ReD      ReX

 3   Thomas Wilcox    (See Day 3)      4   79, 100    97

 4   Gregory Wooten          102    (See p.m. session)

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    A.    Yes, sir.

2    Q.    And at one point she asked you if you had a

3  lawyer?

4    A.    I don't remember that.

5    Q.    You don't remember telling her on February that

6  you were not represented by a lawyer at that time?

7    A.    No, I don't -- I never really used a lawyer too

8  often.

9    Q.    I'm asking about this matter.  Maybe you don't

10 use one too often.  I'm asking if, when she came to talk

11 to you about this case, if you told her you didn't have

12 a lawyer?

13   A.    Oh, okay.  I consulted with Mike Guy who was a

14 lawyer in town who actually was the lawyer that referred

15 Mr. Seda to me.  And I did have some questions about my

16 exposure, my liability, in meeting with IRS and

17 questions along that line.

18   Q.    So you met with me and Mr. Wax and Mr. Strupp

19 in May of 2009, right?

20   A.    Yes, sir.

21   Q.    That was eight years after this thing was

22 printed?

23   A.    Yes, sir.

24   Q.    And at that time you told us -- and, by the

25 way, Colleen Anderson was present at that meeting,

Wilcox - X by Mr. Matasar                          59

1   right?

2       A.      That's correct.

3       Q.      You asked that she be present.  We said no

4   problem.  And so we all spoke together in -- was it your

5   office or was it the IRS office?

6       A.      Her office.

7       Q.      And you told us again, did you not, that

8   al-Haramain coded all the checks, and that you didn't

9   enter anything yourself into QuickBooks?

10      A.      Yes, I did tell you that.

11      Q.      In fact, you told us you didn't enter any

12  financial transactions at all into QuickBooks, that

13  al-Haramain did them all, all you did was some bank

14  reconciliation?

15      A.      Yeah.  What I was going through -- well, I was

16  doing it by memory.  That's the process that we have in

17  place for our clients is where -- for them to do all the

18  detail entry.  And then after we get the QuickBooks file

19  from them, after they reconcile the bank statement, then

20  we take it from there.  And I do the -- whatever

21  adjusting to entries need to be made.  So that's the

22  normal process.  And I was quoting to you my normal

23  process from memory.

24      Q.      So it's fair to say your memory is not very

25  good?

**Exhibit 6**

Excerpt of the "General Ledger" prepared by Thomas Wilcox,
dated May 6, 2004, and obtained and produced by plaintiffs in discovery.

## Al Haramain Foundation
## General Ledger
### All Transactions

| | Type | Date | Num | Name | Memo | Split | Amount | Balance |
|---|---|---|---|---|---|---|---|---|
| **Bank Of America** | | | | | | | | |
| | Check | 12/06/2000 | 9791 | Al Jumuah Magazine | | Advertisement | -1,600.00 | -1,600.00 |
| | Check | 12/22/2000 | 9799 | Gene's Pump Service | | Repairs | -325.00 | -1,925.00 |
| | Check | 12/22/2000 | 9802 | AT & T Wireless Services | | Telephone | -196.94 | -2,121.94 |
| | Check | 12/28/2000 | 9803 | Pacific Power | | Utilities | -147.51 | -2,269.45 |
| | Check | 01/02/2001 | 9804 | Roto Rooter | | Repairs | -94.50 | -2,363.95 |
| | Check | 01/02/2001 | 9805 | CDS Internet | | Utilities | -55.00 | -2,418.95 |
| | Deposit | 01/03/2001 | | | | Donations | 680.00 | -1,738.95 |
| | Check | 01/08/2001 | 9806 | Ashland Sanitary | | Utilities | -29.20 | -1,768.15 |
| | Check | 01/08/2001 | 9807 | Grange Co-op | | Supplies | -314.31 | -2,082.46 |
| | Check | 01/08/2001 | 9808 | State of Oregon, Corporation Division | | Duties and Subscripti | -10.00 | -2,092.46 |
| | Deposit | 01/12/2001 | | | | Donations | 10.00 | -2,082.46 |
| | Deposit | 01/16/2001 | | | | Donations | 36.00 | -2,046.46 |
| | Check | 01/17/2001 | 9893 | US Post Office | | Postage | -420.00 | -2,466.46 |
| | Deposit | 01/19/2001 | | | | Donations | 20.00 | -2,446.46 |
| | Transfer | 01/20/2001 | | | //////////////////////// | Opening Bal Equity | 4,051.51 | 1,605.05 |
| | Deposit | 01/23/2001 | | | | Soliman Albuthe | 5,985.00 | 7,590.05 |
| | Check | 01/25/2001 | 9810 | Pacific Power | | Utilities | -207.01 | 7,383.04 |
| | Check | 01/26/2001 | 9841 | Qwest | | Telephone | -124.80 | 7,258.24 |
| | Check | 01/26/2001 | | Bank Debit | | Credit Card Account | -5,018.62 | 2,239.62 |
| | Check | 01/28/2001 | 9842 | Qwest | | Telephone | -133.56 | 2,106.06 |
| | Check | 01/28/2001 | 9843 | AT & T Wireless Services | | Telephone | -78.54 | 2,027.52 |
| | Check | 01/28/2001 | 9844 | Jackson County Payment Center | | Taxes | -877.48 | 1,150.04 |
| | Deposit | 01/29/2001 | | | | Postage | 6.00 | 1,156.04 |
| | Check | 01/31/2001 | 9845 | US Treasury | | Taxes | -56.00 | 1,100.04 |
| | Check | 01/31/2001 | 9895 | GAP | Tent | Meals | -110.00 | 990.04 |
| | Check | 01/31/2001 | | Bank Debit | | Bank Service Fee | -308.45 | 681.59 |
| | General Jour | 01/31/2001 | | | Balance Adjustment | Opening Bal Equity | -320.25 | 361.34 |
| | Check | 01/31/2001 | | | Service Charge | Bank Service Fee | -9.00 | 352.34 |
| | Deposit | 02/05/2001 | | | | Donations | 188.40 | 540.74 |
| | Check | 02/06/2001 | 9846 | Ashland Sanitary | | Utilities | -29.20 | 511.54 |

**56030**

BUR-PEC-047102

**Exhibit 7**

Letter from Steven Wax, Federal Public Defender, to Chief Judge Aiken,
*United States v. Sedaghaty*, No. 05-cr-60008 (D. Or.) (Jan. 29, 2013).

# FEDERAL PUBLIC DEFENDER
## DISTRICT OF OREGON

**101 SW Main Street, Suite 1700**
**Portland OR 97204**
**503-326-2123 / Fax 503-326-5524**

STEVEN T. WAX
  Federal Public Defender
STEPHEN R. SADY
  Chief Deputy Defender
Bryan E. Lessley ▲
Christopher J. Schatz
Ellen C. Pitcher
Craig Weinerman ▲
Mark Bennett Weintraub ▲
Gerald M. Needham
Thomas J. Hester
Ruben L. Iñiguez
Anthony D. Bornstein
Lisa Hay
Tonia L. Moro +
Susan Russell
Patrick Ehlers
Francesca Freccero

C. Renée Manes
Nell Brown
Kristina Hellman
Harold DuCloux III
Alison M. Clark
Brian Butler+
Thomas E. Price
Michelle Sweet ★
Banu Ramachandran ★
Mark Ahlemeyer ★

*In memoriam*
Nancy Bergeson
1951 - 2009

▲ Eugene Office
+ Medford Office
★ Research/Writing Attorney

Branch Offices:

859 Willamette Street
Suite 200
Eugene, OR 97401
541-465-6937
Fax 541-465-6975

15 Newtown Street
Medford, OR 97501
541-776-3630
Fax 541-776-3624

January 29, 2013

Honorable Ann Aiken, Chief Judge
United States District Court
Wayne L. Morse U.S. Courthouse
405 East Eighth Avenue, Room 2100
Eugene, OR 97401

> Re:    *United States v. Pirouz Sedaghaty*
>           No. 6:05-cr-60008-AA

Dear Chief Judge Aiken:

Please find enclosed a letter from Alan Kabat.  He is a civil attorney whose law firm represents the charity Al Haramain USA and Mr. Sedaghaty in a civil case pending in the U.S. District Court for the Southern District of New York.   At present, Mr. Kabat must respond to a discovery order in that case.

As you may be aware, Mr. Sedaghaty was an officer of Al Haramain USA. Due to events surrounding the filing of tax returns on behalf of the charity, charges were brought against Mr. Sedaghaty and Al Haramain USA.  In September 2010, Mr. Sedaghaty was convicted on tax and conspiracy charges before Judge Hogan.  His appeal is currently pending before the Ninth Circuit under case no. CA 11-30342.

During the investigation leading up to the charges, the government received many documents pursuant to a grand jury subpoena and during the execution of the search warrant.  These documents were then provided to defense counsel for Mr. Sedaghaty as discovery in his criminal case.  Defense counsel also received many other documents from the government in discovery

January 29, 2013
Page 2

during and after the case concluded.  Early on in the case, Magistrate Judge
Coffin entered a protective order.  CR 77 (copy attached).  The protective order
prevents defense counsel from disseminating the government discovery to
anyone, including Mr. Sedaghaty, except under very limited circumstances.  It
is our understanding that this protective order remains in effect.

Through the discovery litigation in the civil case, Al Haramain USA has
taken the position that much of the information sought through discovery was
unavailable due to the protective order put in place by Magistrate Judge Coffin
and as relied upon by Judge Hogan.  In addition, Mr. Kabat asserted on Mr.
Sedaghaty's behalf and at our request that he has a Fifth Amendment right
that needs to be protected while his criminal conviction is pending.  However,
the Magistrate Judge in the civil case disagreed and has ordered that discovery
be provided despite the Fifth Amendment concerns and the existence of the
protective order.  It is our understanding that the Magistrate Judge contacted
Magistrate Judge Coffin, who stated that the protective order does not prevent
dissemination of government discovery that was obtained through the
execution of the search warrant.  *See* enclosed letter and Order.

As you can see from Mr. Kabat's letter, he is specifically seeking access
to the documents that were provided by Mr. Matasar to the government prior to
the search warrant, the documents and other material seized during the
execution of the search warrant, and the investigative reports that were
subsequently turned over in discovery.   In addition, Mr. Kabat seeks access to
the seized hard drives that were also provided to us during discovery.  As
defense counsel for Mr. Sedaghaty, we continue to believe that Mr. Sedaghaty
has a Fifth Amendment right that needs to be protected.  However, we
understand that in this instance, it is on behalf of Al Haramain USA that Mr.
Kabat seeks access to the government discovery provided in Mr. Sedaghaty's
case.

We also understand that Al Haramain USA is unable to provide discovery
in the civil case because it is in the possession of the government and defense
counsel.  We understand that the protective order in the criminal case
continues to preclude our providing discovery to civil counsel.  Therefore, we
seek guidance and an order regarding the intent of the protective order entered

January 29, 2013
Page 3

this case.  I have copied the attorneys for the government in this case in order
for them to provide a position to the Court regarding the protective order.

Sincerely,

Steven T. Wax
Federal Public Defender

STW/sls
cc:    Hon. Thomas M. Coffin
       Larry Matasar
       AUSA Kelly Zusman
       AUSA Charles Gorder
       AUSA Christopher Cardani
       AUSA Frank Papagni
       Alan Kabat
       Lynne Bernabei
       Pirouz Sedaghaty

O:\Client\Sedaghaty_Pirouz_PD201200314_STW\Correspondence\Outgoing\aiken.01.wpd

BERNABEI & WACHTEL, PLLC

ATTORNEYS AT LAW

1775 T STREET, N.W.

WASHINGTON, D.C. 20009

202.745.1942

FAX: 202.745.2627

WWW.BERNABEIPLLC.COM

LYNNE BERNABEI

DAVID WACHTEL

ALAN R. KABAT

PETER M. WHELAN

ELIZA BRINK DERMODY

LAUREN R. S. MENDONSA ▲

NADIA E. SAID ■

▲ ADMITTED IN VA ONLY

■ ADMITTED IN IL ONLY

By Electronic Mail

January 28, 2013

Steve Wax, Esquire

William Teesdale, Esquire

Michelle Sweet, Esquire

Federal Public Defenders Office

101 S.W. Main Street

Suite 1700

Portland, OR 97204-3225

Re:   Al Haramain Islamic Foundation, Inc. (USA).

Dear Counsel:

I am writing to you in your capacity as defense counsel for Perouz Sedaghaty in *United States v. Perouz Sedaghaty*, No. 6:05-cr-60008 (D. Oregon), a tax and customs prosecution initiated on February 17, 2005, and currently on appeal. The Al Haramain Islamic Foundation, Inc. (USA) was also named as a co-defendant in that proceeding, but was voluntarily dismissed by the government on September 8, 2005.

On or around February 18, 2004, the U.S. government used a search warrant to seize documents and computer hard drives at the corporate office of the Al Haramain Islamic Foundation, Inc. (USA), located in Ashland, Oregon. It is my understanding that several years later, after your office entered an appearance on behalf of Mr. Sedaghaty, the government provided your office with access to those materials for purposes of defending Mr. Sedaghaty. According to the court's docket, U.S. Magistrate Judge Coffin entered a protective order that precluded your office from sharing those materials, or other discovery subsequently provided by the government, with anyone not in the case, which included our office. U.S. District Judge Hogan maintained that protective order during the pendency of the litigation. As a result, the Al Haramain Islamic Foundation, Inc. (USA) was unable to access these documents during the course of this trial or subsequently.

Steve Wax, Esquire
William Teesdale, Esquire
Michelle Sweet, Esquire
Federal Public Defenders Office
January 28, 2013
Page 2 of 3

As you know, our firm represents the Al Haramain Islamic Foundation, Inc. (USA) in civil litigation pending in the U.S. District Court for the Southern District of New York. In that litigation, the plaintiffs have sought, through discovery, the documents that the U.S. government seized in February of 2004 and other records. On November 22, 2011, U.S. Magistrate Judge Maas (S.D.N.Y.) entered an order regarding plaintiffs' request for documents. *See* Order, No. 03-MD-1570, at 12-13 (ECF No. 2491) (Nov. 22, 2011) (enclosed). Magistrate Judge Maas recognized that a "literal reading" of the Order precluded any dissemination of those documents, but concluded that the "intent" of the Order did not require that interpretation. *Id.* In that Order, Magistrate Judge Maas stated that he had conferred with Magistrate Judge Coffin, who advised him that the protective order in the *Sedaghaty* prosecution did not apply (or no longer applied) to documents that the U.S. government had obtained through the search warrant. *Id.* at 13 & n.3.

Since the Al Haramain Islamic Foundation, Inc. (USA) does not have custody or control of the documents that were seized in February 2004, I am requesting that your office obtain confirmation from both the U.S. District Court and the government that the following categories of documents may be made available to our law firm:

1. Documents provided by Lawrence Matasar, Esquire, to the U.S. government;

2. The "3800 single pages of itemized discovery, including investigative reports" and the "43,000 pages of bank and Al Haramain corporate records" as identified by the government in a post-trial filing (ECF No. 536) (Feb. 18, 2011).

3. The government's exhibits and the defendant's exhibits from the criminal case;

4. The video prepared by your office as a potential trial exhibit, which was made part of the public record through the sentencing litigation;

5. The CD-ROMs and videos in the possession of the government, which came from the search of the office of the Al Haramain Islamic Foundation, Inc. (USA); and

6. Access to the seized hard drives that were examined by the government and determined to have files or emails relevant to the operations and activities of the Al Haramain Islamic Foundation.

With respect to the CD-ROMs and the hard drives, we will review them to identify the relevant and responsive, non-privileged documents for production in the New York case that have not already been produced, or are not already encompassed by the first, second and third categories listed herein.

Steve Wax, Esquire
William Teesdale, Esquire
Michelle Sweet, Esquire
Federal Public Defenders Office
January 28, 2013
Page 3 of 3

To the extent that some of the trial exhibits and potential exhibits are already in the public record, either through post-trial filings, or filings with the U.S. Court of Appeals for the Ninth Circuit, we also request access to those trial exhibits.

Also, any confidential documents can be designated as confidential and subject to the discovery protective order that governs the civil case.  *See In re Terrorist Attacks*, 454 F. Supp. 2d 220 (S.D.N.Y. 2006).

Thank you for your assistance with this request.

Sincerely,

/s/ *Alan R. Kabat*

Alan R. Kabat

Enc.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 11/22/11

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

In Re:                                                    :

      TERRORIST ATTACKS ON
      SEPTEMBER 11, 2001                           :

------------------------------------------------------------x

**MEMORANDUM
DECISION AND ORDER**

03 MDL 1570 (GBD) (FM)

This Document Relates to
Ashton v. al Qaeda Islamic Army,
 02 Civ. 6977 (GBD) (FM),
Burnett v. al Baraka Invest. & Dev. Corp.,
03 Civ. 5738 (GBD) (FM),
Continental Casualty Co. v. al Qaeda Islamic Army,
04 Civ. 5970 (GBD) (FM),
Federal Insurance Co. v. al Qaeda,
03 Civ. 6978 (GBD) (FM)
Euro Brokers, Inc. v. al Baraka Invest. & Dev. Corp.,
04 Civ. 7279 (GBD) (FM), and
World Trade Center Prop. LLC v. al Baraka Invest. & Dev. Corp.,
04 Civ. 7280 (GBD) (FM)

**FRANK MAAS,** United States Magistrate Judge.

        Defendant Perouz Sedaghaty ("Sedaghaty") seeks to stay discovery in this

multi-district civil litigation pending his appeal of his recent criminal conviction in the

District of Oregon. The plaintiffs in the above cases (collectively, "Plaintiffs") oppose

Sedaghaty's motion and seek to compel him to respond to document requests they served

in December 2010. Sedaghaty contends that the production of those documents would

infringe upon his Fifth Amendment privilege against self-incrimination. Sedaghaty

further contends that he is barred from disclosing certain of the requested documents

because of a protective order entered in his criminal case.

For the reasons set forth below, Sedaghaty's motion to stay discovery is denied, and the Plaintiffs' application to compel Sedaghaty to comply with their First Set of Requests for Production of Documents is granted.

I.      Factual and Procedural History

In 2005, a grand jury in the District of Oregon returned an indictment against Sedaghaty, one other individual, and the Al Haramain Islamic Foundation, Inc. (USA) ("AHIF-USA").  In the indictment, Sedaghaty was charged, in two counts, with conspiring to defraud the United States, in violation of Title 18, United States Code, Section 371, and having aided and abetted the filing of a false tax return, in violation of Title 26, United States Code, Section 7206(1), and Title 18, United States Code, Section 2. See United States v. Al Haramain Islamic Found., No. CR 05-60008-HO (D. Or.) (DO ECF No. 1 ("Indictment")).[1]  Sedaghaty was alleged to be a founder of AHIF-USA and one of its corporate officers.  (Id.).

The indictment further alleged that Sedaghaty had participated in a scheme to transport nearly $200,000 in traveler's checks from the United States to Saudi Arabia without filing the required Currency Transaction Reports ("CTRs").  The ultimate goal of the scheme allegedly was to transfer this money to mujahedeen (warriors) in Chechnya who were resisting a Russian occupying force.  According to the indictment, in furtherance of that goal, Sedaghaty mischaracterized an AHIF-USA check that had been

---

[1]      Citations to "DO ECF" refer to the electronic docket in the Oregon criminal case. Citations to "SDNY ECF" refer to the electronic docket of the multidistrict case pending in this Court.

used to purchase the traveler's checks, falsely claiming that it had been used by AHIF-USA to purchase a building in Springfield, Missouri. This, in turn, caused AHIF-USA's accountant to understate its charitable contributions and overstate its basis in its real estate holdings on its tax-exempt organization federal tax return for calendar year 2000. (Id.).

At trial, the government introduced against Sedaghaty certain evidence that had been seized in 2004 from the offices of AHIF-USA pursuant to a search warrant. (See SDNY ECF No. 2448 (Tr. of conf. on July 13, 2011) at 14). It appears that the government returned other materials seized from AHIF-USA to Sedaghaty prior to trial. Before that material was returned, Magistrate Judge Thomas M. Coffin of the District of Oregon entered a protective order restricting Sedaghaty's use of "discovery material" furnished to him by the government. That order, dated December 18, 2007, states in relevant part:

> [I]t is hereby ORDERED that . . . defense counsel will not reproduce any <u>discovery material provided by the government</u> for dissemination to the defendant or to any third party . . . or allow the defendant to have unsupervised access to the material, except as provided below. . . .
>
> . . . Nothing in this protective order shall in any manner limit the right of counsel for defendant Sedaghaty to reproduce and disseminate <u>any document that they obtain from independent sources other than the government</u> even if it is within the material provided to the defense by the government in the discovery process.

(DO ECF No. 77 ("Protective Order") at 1-2 (emphasis added)).

On September 9, 2010, the jury returned a guilty verdict against Sedaghaty on both counts. (DO ECF No. 466).[2] After denying Sedaghaty's post-trial motions, see United States v. Sedaghaty, No. CR 05–60008–HO, 2011 WL 3563145 (D. Or. Aug. 10, 2011), District Judge Michael Hogan, before whom the case had been tried, sentenced Sedaghaty to a thirty-three month prison term. (DO ECF No. 583).   Judge Hogan nevertheless permitted Sedaghaty to remain enlarged on bail pending the outcome of his appeal. (Id.). Although Sedaghaty has declared his intention to file such an appeal, (see SDNY ECF No. 2404 ("Def.'s Mem."), at 3), judgment has yet to be entered because an issue concerning the compensation of his appointed counsel remains pending before the Oregon district court. (See DO ECF No. 593).

In December 2010, the Plaintiffs served Sedaghaty with their First Set of Requests for the Production of Documents ("Document Demands"). (See SDNY ECF No. 2404-1 ("Kabat Decl."), Ex. 1). The subject matter of some of the documents that the Plaintiffs sought overlaps with what was at issue in the Oregon case. Those documents include all documents in Sedaghaty's care, custody, or control relating to:

- Sedaghaty's involvement with the Quran Foundation, a charity located at the same address as AHIF-USA (id. ¶¶ 1-5);

- Sedaghaty's interactions with AHIF-USA and its related entities (id. ¶¶ 6-10, 59-67);

---

[2]    At the government's request, the charges against AHIF-USA were dismissed prior to trial. (DO ECF Nos. 1, 19). The third defendant, Soliman Hamd Al- Buthe, was outside the United States when the charges were returned and remains a fugitive. (DO ECF No. 5; Mark Freeman, Pete Seda Sentenced to Nearly Three Years, Mail Tribune (Medford, Or.), Sept. 28, 2011).

- The financial activities of Sedaghaty, AHIF-USA, and other individuals and entities (id. ¶¶ 11-23);

- United States and foreign government investigations of AHIF-USA and related entities (id. ¶¶ 24-33);

- Communications between Sedaghaty and certain individuals associated with AHIF-USA (id. ¶¶ 34-40, 43);

- Sedaghaty's criminal prosecution, including information concerning his international travel after September 11, 2001 (id. ¶¶ 41-42);

- The structure, organization, activities, and financing of AHIF-USA and any related entities (id. ¶¶ 44-58, 68-69); and

- The ownership of the Missouri property (id. ¶¶ 70-76).

Pursuant to Court order, Sedaghaty's responses to the Document Demands were due on January 21, 2011. (SDNY ECF Nos. 2381, 2487). That day, Sedaghaty filed a motion to stay discovery as against him pending the disposition of the post-trial motions in his criminal case. (SDNY ECF No. 2403). Although his post-trial motions have since been denied, Sedaghaty still seeks a stay pending his appeal. (Def.'s Mem. at 2).

On June 17, 2011, while Sedaghaty's motion to stay was pending, the Plaintiffs submitted a letter application for an order, pursuant to Rule 37(a)(3)(B)(iv) of the Federal Rules of Civil Procedure, compelling Sedaghaty to produce the information responsive to their Document Demands. (SDNY ECF No. 2486). After Sedaghaty responded by letter dated June 29, 2011 (SDNY ECF No. 2488), the Plaintiffs submitted a reply letter dated July 6, 2011 (SDNY ECF No. 2489). The Court then heard oral

argument concerning the Plaintiffs' motion on July 13, 2011. (See SDNY ECF No. 2448).

II.    Applicable Law

    A.    Fifth Amendment

        The Fifth Amendment privilege against self-incrimination "applies only when the accused is compelled to make a testimonial communication that is incriminating." Fisher v. United States, 425 U.S. 391, 408 (1975). Documents prepared "wholly voluntarily . . . cannot be said to contain compelled testimonial evidence." Id. at 409-10. Therefore, "[s]elf-incrimination analysis . . . focuses on whether the creation of the thing demanded was compelled and, if not, whether the act of producing it would constitute compelled testimonial communication." In re Grand Jury Subpoena Duces Tecum Dated Oct. 29, 1992, 1 F.3d 87, 93 (2d Cir. 1993).

        The production of voluntarily prepared documents in response to a subpoena may require incriminating testimony in two situations: "(1) 'if the existence and location of the subpoenaed papers are unknown to the government'; or (2) where production would 'implicitly authenticate' the documents." Id. (quoting United States v. Fox, 721 F.2d 32, 36 (2d Cir. 1983)). Additionally, as Sedaghaty correctly observes, the Fifth Amendment protects a criminal defendant against compelled disclosure of non-testimonial documents if those documents are "the first step in a chain of evidence that [leads] to . . . prosecution." (SDNY ECF No. 2407 (Sedaghaty Reply Mem.) at 2 (quoting United States v. Hubbell, 530 U.S. 27, 42 (2000)).

B.    Stay

In a criminal case, the defendant's assertion of his Fifth Amendment privilege against self-incrimination may not be used against him. See 18 U.S.C. § 3481; Baxter v. Palmigiano, 425 U.S. 308, 317 (1976). On the other hand, an adverse inference may be drawn "against parties to civil actions when they refuse to testify in response to probative evidence against them." Baxter, 425 U.S. at 318. A defendant engaged in parallel civil and criminal litigation simultaneously faces numerous difficult choices, not the least of which is whether to assert his Fifth Amendment privilege against self-incrimination in the civil action, thereby compromising his "interest in testifying and obtaining whatever benefits such testimony might provide." United States v. 4003–4005 5th Ave., 55 F.3d 78, 83 (2d Cir. 1995); see also In re 650 Fifth Ave., No. 08 Civ. 10934 (RJH), 2011 WL 3586169, at *2 (S.D.N.Y. Aug. 12, 2011) ("There is no question that parties who face both civil litigation and criminal investigation face difficult choices.") (quoting Sterling Nat'l Bank v. A-1 Hotels Int'l, Inc., 175 F. Supp. 2d 573, 575 (S.D.N.Y. 2001) (Lynch, D.J.)). Nevertheless, "[t]his Hobson's choice is not so acute that the Constitution prevents the courts from forcing a litigant to make it." In re 650 Fifth Ave., 2011 WL 3586169, at *2.

While a defendant may be required to make this decision, courts also have the "discretion to stay civil proceedings . . . when the interests of justice seem to require such action." Kashi v. Gratsos, 790 F.2d 1050, 1057 (2d Cir. 1986) (internal quotation marks and ellipses omitted). "Courts are afforded this discretion because the denial of a

stay could impair a party's Fifth Amendment privilege against self-incrimination, extend criminal discovery beyond the limits set forth in Federal Rule of Criminal Procedure 16(b), expose the defense's theory to the prosecution in advance of trial, or otherwise prejudice the criminal case." Trustees of the Plumbers and Pipefitters Nat'l Pension Fund v. Transworld Mech., Inc., 886 F. Supp. 1134, 1138 (S.D.N.Y. 1995) (Chin, D.J.). "In other words, the [c]ourt in a civil case may exercise its discretion so that a defendant need not find himself in the position in which the [Supreme Court] ha[s] said he may constitutionally be put." Brock v. Tolkow, 109 F.R.D. 116, 119 (E.D.N.Y. 1985).

There is consensus within the Second Circuit as to the principles that district judges should apply "in determining motions to stay civil actions while criminal litigation is conducted." Sterling Nat'l Bank, 175 F. Supp. 2d at 575. Thus, "courts in this Circuit assessing requests to stay civil proceedings consider '1) the extent to which the issues in the criminal case overlap with those presented in the civil case; 2) the status of the case, including whether the defendants have been indicted; 3) the private interests of the plaintiffs in proceeding expeditiously weighed against the prejudice to plaintiffs caused by the delay; 4) the private interests of and burden on the defendants; 5) the interests of the courts; and 6) the public interest.'" In re 650 Fifth Ave., 2011 WL 3586169, at *3 (quoting Trustees, 886 F. Supp. at 1139). In weighing these factors, however, a court must recognize that "[a] stay of the civil case . . . is an extraordinary remedy." Id. (internal quotation marks omitted).

8

III.   <u>Application of Law to Facts</u>

   A.   <u>Need for a Stay</u>

      Sedaghaty relies on cases holding that "the existence of an indictment generally favors the granting of a stay in a related civil proceeding." (<u>See</u> Def.'s Mem. at 7 (quoting <u>Johnson v. N.Y. City Police Dep't</u>, No. 01 Civ. 6570 (RCC) (JCF), 2003 WL 21664882, at *2 (S.D.N.Y. July 16, 2003)); <u>see also</u> <u>Volmar Distribs., Inc. v. N.Y. Post Co.</u>, 152 F.R.D. 36, 39 (S.D.N.Y. 1993) ("The strongest case for granting a stay is where a party under criminal indictment is required to defend a civil proceeding involving the same matter.").  The rationale behind granting a stay in these post-indictment, pre-conviction cases is that the plaintiff in the civil action is protected against undue delay because resolution of the criminal matter is imminent.  Here, however, Sedaghaty has already been tried, convicted and sentenced, and his post-trial motions have been denied.  Moreover, although Sedaghaty has indicated that he plans to file an appeal, it is far from certain that the Ninth Circuit will reverse his conviction; if so, that the government will decide to retry him; and, should that occur, when the retrial will take place.

      Tellingly, Sedaghaty has not cited any cases — nor have I found any — in which a stay of civil discovery was granted after the related criminal trial had concluded, based on the mere possibility that a successful appeal might lead to a new trial.  At least one district judge has held, to the contrary, that "the status of [a d]efendant's criminal case weighs strongly <u>against</u> granting a stay [when the d]efendant has already been tried,

convicted, and sentenced." Sparkman v. Thompson, No. 08-01-KKC, 2009 WL 1941907,

at *2 (E.D. Ky., July 6, 2009) (emphasis added). As that judge explained,

> because [the d]efendant has already challenged the
> government's case in trial, he knows exactly how the
> government intends to prove his guilt and he is exceedingly
> able to avoid making incriminating statements that might be
> used against him if retried. Also, absent a waiver of his Fifth
> Amendment privilege, he has only a minimal concern that
> civil discovery will aid the criminal prosecution because the
> government has already assembled all the evidence needed for
> a conviction.

Id.

Even if Sedaghaty were to assert his Fifth Amendment privilege in response

to any of the Plaintiffs' document requests, it seems unlikely that he would therefore

"effectively forfeit[] [his] civil case." See Trustees, 886 F. Supp. at 1140. Although there

concededly is some overlap of legal and factual issues in the criminal and civil actions,

the overlap is far from complete. In his criminal case, Sedaghaty was convicted of

conspiring together with others to defraud the United States by evading the filing of CTRs

and causing AHIF-USA to mischaracterize funds as a charitable contribution on its

federal nonprofit organization tax return. Neither of these misdeeds, however, is

inextricably interrelated to the events that gave rise to the terrorist attacks of September

11, 2001. (See joint letter to the Court, dated November 11, 2011, at 8 (Defs.' Response

to Pls.' Proposal) (noting Judge Hogan's observation at sentencing that the government

had failed to "prove the terrorism [sentencing] enhancement . . . by clear and convincing

evidence . . . because of [its] failure to prove a link between [Sedaghaty] and the money

10

being used for terrorist activities"). Therefore, even if Sedaghaty were to assert his Fifth

Amendment privilege in this case insofar as the Plaintiffs sought to inquire about his links

to money laundering or AHIF-USA's filing of false tax returns, it by no means follows

that the Plaintiffs would necessarily prevail on their claims that Sedaghaty provided

material support to the perpetrators of the September 11th attacks.  (See, e.g., SDNY ECF

No. 111 (Fed. Ins. Am. Compl.) ¶¶ 776-79).

   The theories on which Sedaghaty has challenged his conviction further

support the Court's conclusion that discovery in this case is unlikely to implicate

Sedaghaty's Fifth Amendment rights.  For example, Sedaghaty argued in his motion for a

new trial (and likely will argue on appeal) that the district court improperly admitted

evidence of Sedaghaty's alleged ties to terrorism, leading to a "prejudicial . . . focus on

Islam, terrorism, and anti-Semitism in a case that is charged as essentially a tax case."

(DO ECF No. 477 (Def.'s Mot. for New Trial) at 1).  If the Court of Appeals for the

Ninth Circuit agrees with this proposition and reverses his conviction, any extraneous

evidence of Sedaghaty's ostensible links to terrorism would presumably be barred at a

new trial.  Consequently, even if Sedaghaty were to authenticate documents or make

admissions relevant to his alleged terrorist ties in the course of discovery in this case, that

evidence could not be used to incriminate him at a second criminal trial.

   Conversely, if the Ninth Circuit eventually holds that the evidence received

at Sedaghaty's trial was proper, his conviction presumably would be upheld without any

need for a new trial.  In that circumstance as well, any additional evidence that the

Plaintiffs may be able to authenticate through civil discovery in this case could not be used to his prejudice in the criminal case, which would effectively be at an end.

Finally, the Plaintiffs have a strong interest in proceeding with this multidistrict litigation, which has been pending for over seven years, but in which merits discovery as to AHIF-USA, Sedaghaty, and other defendants has only recently begun. Any further delay on the speculative ground that proceeding with civil discovery might prejudice Sedaghaty is not warranted. Indeed, the grant of a stay as to Sedaghaty would likely impede the Plaintiffs' ability to pursue discovery relating to other defendants. For example, Sedaghaty was a principal officer of AHIF-USA, which is also a defendant in this case. If discovery against him were to be stayed, the Plaintiffs would also be stymied in their efforts to proceed against AHIF-USA since many of its documents are apparently in Sedaghaty's possession, custody, or control. (See SDNY ECF No. 2405 (Pls.' Mem.) at 7).

The Court therefore declines to issue the stay of discovery that Sedaghaty seeks in this case.

B.    Protective Order

Sedaghaty further contends that the Protective Order entered by Magistrate Judge Thomas M. Coffin in the criminal case makes it impossible for him to comply with the Plaintiffs' Document Demands. (See SDNY ECF No. 2488 at 1, 7-8). Sedaghaty bases that claim on his attorney's discussions with the Federal Public Defender in Oregon who represented Sedaghaty in connection with the criminal case. (Id.). A literal reading might, in fact, support the Federal Public Defender's alleged interpretation of the

Protective Order. However, it seems clear that the intent of the Protective Order was to restrict Sedaghaty's further dissemination of information that the government had provided to his counsel that was not available to Sedaghaty from another source. Any information contained in materials that the government obtained through the execution of the search warrant at AHIF-USA plainly does not fit this description. Sedaghaty therefore may produce to the Plaintiffs any documents that were in his possession, custody, or control, or that of AHIF-USA, prior to the execution of the search warrant.[3]

IV.   <u>Conclusion</u>

For the foregoing reasons, Sedaghaty's motion to stay discovery is denied, and the Plaintiffs' application to compel Sedaghaty to respond to their Document Demands is granted.

SO ORDERED.

Dated:      New York, New York
            November 21, 2011

_____
FRANK MAAS
United States Magistrate Judge

---

[3]      In an effort to stem any further debate about the scope of the Protective Order or its applicability to this case, I have shared this section of this Memorandum Decision and Order with Magistrate Judge Coffin prior to its issuance. Magistrate Judge Coffin confirms that my interpretation of the Protective Order is correct.

Copies to:

Honorable George B. Daniels
United States District Judge

All counsel via ECF

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | No. CR 05-60008 |
| | ) | |
| v. | ) | |
| | ) | |
| PIROUZ SEDAGHATY, | ) | **PROTECTIVE ORDER** |
| | ) | |
| Defendant. | ) | |

Upon motion of the United States, the Court being advised as to the nature of this case, and there being no objection by the parties, it is hereby

ORDERED that pursuant to Rule 16(d)(1), Federal Rules of Criminal Procedure, defense counsel will not reproduce any discovery material provided by the government for dissemination to the defendant or to any third party (specifically including co-defendant Soliman Hamd Al-Buthe, his attorneys, and the Al Haramain Islamic Foundation, Inc., and its attorneys), or allow the defendant to have unsupervised access to the material, except as provided below.

IT IS FURTHER ORDERED that defense counsel may provide copies to those persons directly employed by the attorneys of record for defendant Sedaghaty who are necessary to assist counsel of record in preparation for trial or other proceedings in the case.

IT IS FURTHER ORDERED that defense counsel may also provide copies to those persons who are physically located within the territory of the United States of America when doing so is necessary to further legitimate defense investigation and preparation of this case.

**Page 1 - PROTECTIVE ORDER**

Case 6:05-cr-60008-AA   Document 77   Filed 12/18/07   Page 2 of 3   Page ID#: 533

IT IS FURTHER ORDERED that no person who receives a copy of any document subject to this protective order from defense counsel shall use such document in any way except to assist counsel for defendant Sedaghaty in the investigation or preparation of this case, and shall not reproduce or disseminate any such document in any way to any other person or entity, and shall not remove any such document from the territory of the United States of America.

IT IS FURTHER ORDERED that counsel for defendant Sedaghaty shall provide a copy of this protective order to any person to whom they provide a copy of any document subject to this order and secure that person's written agreement to abide by the terms of this order. In the event of a possible violation of this order, defense counsel shall provide a copy of such written agreement to the government upon further order of the Court. Before copies of any document subject to this order are provided to any attorney for defendant Soliman Hamd Al-Buthe such attorney shall personally appear before the Court and acknowledge agreement to this order.

Nothing in this protective order shall in any manner limit the right of counsel for defendant Sedaghaty to show any document subject to this order to any person for legitimate defense investigation and preparation in this case. Nothing in this protective order shall in any manner limit the right of counsel for defendant Sedaghaty to reproduce and disseminate any document that they obtain from independent sources other than the government even if it is within the material provided to the defense by the government in the discovery process.

IT IS FURTHER ORDERED that pursuant to Rule 6(e)(3)(E)(I), Federal Rules of Criminal Procedure, the government is authorized to disclose to attorneys of record, records and documents received by the federal grand jury during the investigation of this matter.

IT IS FURTHER ORDERED that the United States is permitted to disclose return and return

**Page 2 - PROTECTIVE ORDER**

information it has obtained pursuant to Title 26 U.S.C. § 6103, pertaining to the defendant or any

other party to counsel of record. The defendant and his respective counsel shall use the returns and

return information disclosed solely in connection with the criminal proceeding herein and any

disclosure shall be made to any other person in accordance with Title 26 U.S.C. § 6103.

DATED this _____ day of December, 2007.

THOMAS M. COFFIN
United States Magistrate Judge

Presented by:                                          Agreed to by:

KARIN J. IMMERGUT
United States Attorney
District of Oregon

CHARLES F. GORDER, JR.                                 STEVEN T. WAX
CHRISTOPHER L. CARDANI                                 LARRY MATASAR
Assistant United States Attorneys                      Attorneys for Defendant

**Page 3 - PROTECTIVE ORDER**