## MDL 1570 PLAINTIFFS' EXECUTIVE COMMITTEES
In re: Terrorist Attacks on September 11, 2001 (S.D.N.Y)

| Plaintiffs' Executive Committee for Personal Injury and Death Claims | Plaintiffs' Executive Committee for Commercial Claims |
|---|---|
| Ronald L. Motley, Co-Chair<br>MOTLEY RICE LLC<br>James P. Kreindler, Co-Chair<br>KREINDLER & KREINDLER LLP | Elliot R. Feldman, Co-Chair<br>Sean Carter, Co-Chair<br>COZEN O'CONNOR |
| Andrew J. Maloney III, Co-Liaison Counsel<br>KREINDLER & KREINDLER LLP<br>Paul J. Hanly, Jr., Co-Liaison Counsel<br>HANLY CONROY BIERSTEIN SHERIDAN FISHER & HAYES LLP | J. Scott Tarbutton, Liaison Counsel<br>COZEN O'CONNOR |

**Via ECF and Federal Express**

February 7, 2013

The Honorable Frank Maas
United States District Court for the
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street, Room 740
New York, NY 10007-1312

      Re:    In Re: Terrorist Attacks on September 11, 2001, 03 MDL 1570 (GBD) (FM)

Dear Judge Maas:

      On behalf of all plaintiffs, the Plaintiffs' Executive Committees ("Plaintiffs") reply to Defendant Al Haramain's Opposition to Plaintiffs' Motion for Sanctions [D.E. 2676] ("Opposition"). Al Haramain's Opposition fails to rebut the critical elements of Plaintiffs' Motion for Sanctions [D.E. 2665 and 2666] ("Sanctions Motion"), namely (a) the existence of and breach of an obligation to preserve and produce requested discovery, (b) Plaintiffs' showing that Al Haramain had a culpable state of mind, i.e., willful or grossly negligent conduct, and (c) that the missing evidence is relevant to Plaintiffs' claims.[1] Sanctions Motion at 6; see also Residential

---

[1] Al Haramain's extensive and irrelevant tangential diatribe on Plaintiffs' citation to the Terrorism Monograph and the State Department Cable (Exhibits E and F, respectively, to the Sanctions Motion) warrants only passing attention. Opposition at 2-4.

      First, Plaintiffs are not obligated to present admissible evidence at this stage of proceedings. Consistent with this and other defendants' efforts at each stage of the proceedings thus far, defendant would treat each stage as though it were trial, requiring plaintiffs to prove the entirety of their case at the filing of the complaint.

      Second, Plaintiffs are not obligated to present admissible evidence in order to obligate Al Haramain to adhere to its obligations under Fed. R. Civ. P. 26 and three orders of this Court in order for Plaintiffs to receive relevant and admissible evidence. To permit a party to avoid its discovery obligations simply by refusing to meet its obligations would stand discovery burdens on their head.

      Third, Al Haramain's argument that judicial estoppel applies to prevent admission of the Terrorism Monograph grossly mischaracterizes the "parties" in 03 MDL 1570 and In re September 11, 2001 Litig., 21 MC 101

Funding Corp. v. DeGeorge Fin. Corp., 306 F.3 99, 107 (2d Cir. 2002). Rather than address Plaintiffs' argument directly, Al Haramain attempts to ignore this Court's alter ego ruling, contort facts,[2] and misdirect with inapplicable legal standards.

Reduced to its essence, the Opposition makes three arguments, which neither collectively nor individually rebut Plaintiffs' motion. <u>First</u>, regardless of this Court's finding that Al Haramain constitutes a single, indistinguishable entity, Al Haramain argues that imposition of a default judgment or adverse inferences would violate due process because its failure to produce documents was the result of the documents being located at its Saudi Arabian headquarters, which was reportedly closed down during the pendency of the litigation. <u>Second</u>, similarly, and again ignoring this Court's finding that Al Haramain constitutes a single, indistinguishable entity, Al

---

(AKH). Among the problems with Al Haramain's argument is that (a) the "plaintiffs" in 03 MDL 1570 were not the parties in In re September 11, 2001 Litig. and (b) the cases in In re September 11, 2001 Litig., which included the claims filed against aviation and security companies, were consolidated separately before Judge Hellerstein and were not transferred to 03 MDL 1570 – presumably because they were not "related" as contended by Al Haramain.

And <u>fourth</u>, Plaintiffs do not rely upon these "factual allegations" to meet their burden relating to sanctions for discovery misconduct or spoliation.

[2] One factual contortion from Al Haramain's Preliminary Statement requires specific comment. Al Haramain claims that:

> Since the U.S. government – which has greater prosecutorial resources and has access to classified information that plaintiffs do not have – did not bring any terrorism charges against AHIF-USA, instead dismissing the tax and customs charges against AHIF-USA, and was unable to prove any link with terrorism as to Mr. Sedaghaty, despite having over seven years to investigate him, plaintiffs' allegations as to AHIF-USA must be seen as unsupportable.

Opposition at 4. In addition to being entirely irrelevant in determining whether Al Haramain has met its discovery obligations, or even whether plaintiffs will be able to prove their case at a trial, this claim is misleading for at least two additional reasons, as well. First, the United States government must meet a higher burden of proof to establish a terrorism enhancement in a criminal case (clear and convincing evidence) than in a civil action pursuant to the Anti-Terrorism Act (more likely than not). As such, the failure of the United States government to persuade U.S. District Judge Hogan that it had met its burden to prove, by clear and convincing evidence, that Mr. Sedaghaty, individually, provided material support to Al Qaeda-connected mujahedeen in Chechnya tells us little about the underlying facts. This is particularly true where the two lines immediately before those selected by Al Haramain, but omitted in the selection Al Haramain quotes, state that "there is little doubt in my mind that [money from Al *Haramain's U.S.* branch] went to Chechnya, and that it went to the mujahideen . . . ." United States v. Sedaghaty, No. 6:05-cr-60008 (D. Or.), Transcript, at 6:16-17 (Sept. 27, 2011)(emphasis added), Exhibit 1 to Opposition.

Second, the decision by the United States government not to bring criminal charges against the U.S. branch of Al Haramain also tells us little. The United States government must balance many factors, some completely unrelated to the merits of the potential actions, when considering whether and how far to advance criminal charges. Such unrelated considerations include whether any benefit in bringing an action against the dormant shell of a designated entity sufficiently justifies the expenditure of resources. This is particularly relevant where, as here, the government is already pressing criminal suit against an individual responsible for directing that entity. See Exhibit A to the Declaration of Robert T. Haefele, dated February 7, 2013 (Federal Charges Against Islamic Charity Dismissed in Oregon But Investigation Continues, ASSOCIATED PRESS, September 10, 2005 ("Federal prosecutors had asked last month that the charges be dropped, saying the case would be a waste of time because all that remains of [Al Haramain's U.S. branch office] is its corporate shell.")). Each of the exhibits referenced throughout this letter, unless otherwise indicated, are attached to the Declaration of Robert T. Haefele, dated February 7, 2013 ("Haefele 2/7 Decl."), and are hereafter cited simply as "Exhibit __."

Haramain argues that imposition of a default judgment or adverse inferences would be inappropriate because Al Haramain's inability to produce documents from its U.S. branch office was not Al Haramain's fault but the result of the government's seizure of documents from the site, the assertion of Fifth Amendment rights by another defendant (Al Haramain officer, director and the person overseeing day-to-day operation of the U.S. branch office, Perouz Sedaghaty), and because the documents were subject to a protective order precluding their disclosure. Lastly, Al Haramain argues that default judgment and adverse inferences are inappropriate because no relevant evidence was lost or destroyed as it was successfully restored by government forensic specialists.

1. **Al Haramain's "Inability" Arguments Are Predicated On An Indefensible And Overruled Separate-Corporate-Fiction.**

From the very first page of its Opposition, Al Haramain continues its indefensible and overruled separate-corporate-fiction mantra. Opposition at 1 & n. 1 (stating that the opposition is submitted only for the U.S. branch of Al Haramain, that counsel does not have a license from the Office of Foreign Assets Control (OFAC) to represent any other offices of Al Haramain, and that counsel do not have a retainer or other representation agreement with any other Al Haramain branch). See also 5-10 (separating the status of discovery between the U.S. branch and the rest of Al Haramain) and 12-15 (claiming inability to access or produce documents based on lack of access to a foreign branch, a lack of control due to government seizure, and the Fifth Amendment assertion of Sedaghaty). But because the very premise of Al Haramain's arguments – i.e., that it is distinct from all other Al Haramain entities (and most notably, the Saudi Arabian headquarters) – has been rejected, the arguments fall like a house of cards.

It is beyond argument that this Court has determined that Al Haramain is a single, indistinguishable entity and that Al Haramain's branch offices, particularly those in the United States and in Saudi Arabia, are alter egos of one indistinguishable entity. Sanctions Motion at 7-8; Sanctions Motion, Exhibit A (Tr. (Oct. 28, 2010) at 16-18). That is the law of the case.

The strategic decision of the worldwide entity to abandon its U.S. branch office necessarily has consequences. Perhaps the worldwide Al Haramain organization viewed the consequences of the sacrifice as preferable to the consequences of actually litigating. Nonetheless, where Al Haramain began and operated the U.S. branch for years as a closely controlled alter ego of the worldwide entity, the decision to abandon its branch office during discovery, by shielding access to documents, necessarily imperils the sacrificed entity that remains in the litigation. Al Haramain cannot use the worldwide organization's decision to sacrifice one branch office as a defense either to its discovery obligations or to the merits of the suit. Such a manipulation of corporate form is not sustainable, and the abandonment has consequences – Al Haramain remains obligated. In fact, contrary to Al Haramain's assertion that Plaintiffs need discovery sanctions to prevail, the default attributable as to Al Haramain's Saudi headquarters is enforceable against the U.S. alter-ego entity. See International Controls Corp. v. Vesco, 593 F.2d 166, 171 (2d Cir. 1979) (Upholding district court determination that alter ego's assets are available to satisfy default judgment).

Other implications of the law of the case determination that Al Haramain is a single indistinguishable alter ego are also clear:

### Obligation and Failure to Preserve

Al Haramain's obligation to preserve documents began no later than at the filing of the civil action and applied to all its offices. Sanctions Motion at 16; see also Orbit One Communications, Inc. v. Numerex Corp., 271 F.R.D. 429, 436 (S.D.N.Y. 2010) (quoting Kronisch v. United States, 150 F.3d 112, 126 (2d Cir. 1998) ("obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation – most commonly when suit has already been filed..."). That obligation extended equally to all Al Haramain offices because it was a single, indistinguishable entity. At the very least, Al Haramain was obligated to issue a litigation hold to all offices for all relevant discoverable information. Sanctions Motion at 16. And if Al Haramain thought there was a chance that some information was at risk of loss or destruction, part of that obligation was to inform Plaintiffs' counsel of the content and location of that at risk information. Id. at 17.

Al Haramain's Opposition offers no argument that it adequately preserved documents at any of its branches, including the U.S. branch. It makes no assertion, let alone an appropriate showing, that counsel requested a litigation hold for relevant discoverable information. It makes no showing that relevant and discoverable information was in fact preserved in anticipation of litigation. And its only rebuttal to substantial evidence of loss (negligence) or destruction of information (gross negligence, willfulness, or bad faith conduct) is that after efforts were made to destroy evidence at the U.S. branch office, some of the destroyed information was ultimately recovered by government forensic computer specialists after onerous and time-consuming efforts. Opposition at 16-17.

### Obligation and Failure to Produce

Al Haramain also had and has an obligation to produce documents that should have been preserved from all Al Haramain branches. Sanctions Motion at 7-8 (citing discovery obligations under Fed. R. Civ. P. 26 and three orders of this Court); see also Cacace v. Meyer Mktg. (Macau Commer. Offshore) Co., No. 06 Civ. 2938 (KMK) (GAY), 2011 U.S. Dist. LEXIS 50753, at *10 (S.D.N.Y. May 12, 2011) (a corporate party must obtain discovery materials from employees of affiliate companies when there is an alter ego relationship).

Al Haramain's only arguments in response to the failure to produce are that it was unable to do so because, inter alia, the Saudi headquarters was dissolved in June 2004, the United States government seized the documents at the U.S. branch in February 2004, and Perouz Sedaghaty asserted his Fifth Amendment rights – each purportedly creating an inability to produce documents that was outside Al Haramain's control. But each of these arguments fails because all of the failures all entirely of Al Haramain's own making – i.e., if Al Haramain had preserved and / or produced documents when the obligation to do both attached, the purported grounds for inability would have been moot, or at the very least would have been minimized.

### 2. Al Haramain's "Inability" Arguments Fail Because They Are A Consequence Of Al Haramain's Own Actions At The Beginning Of This Civil Action.

#### a. A Dispositive Failure Of Al Haramain's "Inability" Arguments Is That They Are Conditioned On A Finding Of Good Faith In Discovery.

Al Haramain offers Societe Internationale Pour Participations Industrielles Et Commerciales, S.A. v. Rogers, 357 U.S. 197 (1958) and Shcherbakovskiy v. Da Capo Al Fine, Ltd., 490 F.3d 130 (2d Cir. 2007) as support for the contention that default judgment cannot comport with due process protections "when it has been established that failure to comply has been due to inability, and not to willfulness, bad faith, or any fault of [the defendant]." Opposition at 10 (citing Societe Internationale, 357 U.S. at 212).

However, Societe Internationale and Shcherbakovskiy are inapplicable here because the import of those cases is that termination of proceedings was inappropriate where there had been an affirmative finding of "good faith" regarding the opposing party's attempted compliance with discovery. For example, in Societe Internationale,

> The upshot of all this was that the District Court, before finally ruling on petitioners motion for relief from the production order and on the Government's motion to dismiss the complaint, referenced the matter to a Special Master for findings . . . as to petitioner's good faith in seeking to achieve compliance with the court's order. . . . The Report of the Master bears importantly on our disposition of this case.

Societe Internationale, 357 U.S. at 201; see also id. at 209 (indicating that the support of different facts "would have a vital bearing on justification for dismissal of the action . . . ."). Furthermore, the Societe Internationale court went on to state that "[t]he findings below, and what has been *shown as to petitioner's extensive efforts at compliance*, compel the conclusion on this record that petitioner's failure to satisfy fully the requirements of this production order was due to inability fostered neither by its own conduct nor by circumstances within its control." Id. at 211 (emphasis added).[3]

The same standard applies in Shcherbakovskiy. "With no findings or explanation from the district court, we cannot conclude that the sanction of dismissal of the complaint and granting of the counterclaims was appropriate." Shcherbakovskiy, 490 F.3d at 140. Importantly, Shcherbakovskiy cites John B. Hall, Inc. v. Waterbury Petroleum Prods., Inc., 845 F.2d 1172 (2d Cir. 1988) for the proposition that "[d]ismissal under Rule 37 is warranted, however, where a party

---

[3] The Court should also note that, in Societe Internationale, in spite of the fact that the Supreme Court found that default was inappropriate due to a showing of extensive good faith in discovery, the Supreme Court found that adverse inferences at trial may be justified.

> It may be that in a trial on the merits, petitioner's inability to produce specific information will prove a serious handicap in dispelling doubt the Government might be able to inject into the case. It may be that in the absence of complete disclosure by petitioner, the District Court would be justified in drawing inferences unfavorable to petitioner as to particular events.

Societe Internationale, 357 U.S. at 212-213.

---

fails to comply with the court's discovery orders willfully, in bad faith, or through fault." 845 F.2d at 1176. That is the circumstance here.

In this case, Al Haramain cannot find safe haven in a claim of inability in spite of extensive good faith compliance with discovery obligations and discovery orders. To the contrary, Al Haramain's faulty, abusive, and willful non-participation in discovery and flaunting of the Federal Rules of Civil Procedure and multiple orders of this Court render default judgment appropriate and just.

### b. Al Haramain Did Not Preserve Relevant And Discoverable Information When Its Obligation Attached.

The first step in any discovery effort is the preservation, collection, and review of relevant information.[4] *Pension Comm. Of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 685 F. Supp. 2d 456, 464-465 (S.D.N.Y. 2010). Culpable failure at this early hurdle results in liability for any loss or destruction that follows. The culpable mental state depends on the nature of the failure. *Pension Committee* provides a useful – if not definitive – set of guidelines for relating actions (or failures to act) in discovery with culpability:

> A failure to preserve evidence resulting in the loss or destruction of relevant information is surely negligent, and depending on the circumstances, may be grossly negligent or willful. For example, the intentional destruction of relevant records, either paper or electronic, after the duty to preserve has attached, is willful. . . . [T]he failure to issue a written litigation hold constitutes gross negligence because that failure is likely to result in the destruction of relevant information. . . . [T]he failure to collect records – either paper or electronic – from key players constitutes gross negligence or willfulness, as does the destruction of email or certain backup tapes after the duty to preserve has attached. By contrast, the failure to obtain records from all employees (some of whom may have had only a passing encounter with the issues in the litigation), as opposed to key players, likely constitutes negligence as opposed to a higher degree of culpability. Similarly, the failure to take all appropriate measures to preserve [electronically-stored information] likely falls in the negligence category.

---

[4] Related to the question of <u>when</u> the obligation to preserve evidence arises is the question of <u>what</u>. See, e.g., *Orbit One Comm's, Inc. v. Numerex Corp.*, 271 F.R.D. 429, 436-437 (S.D.N.Y. 2010) ("Although some cases have suggested that the definition of what must be preserved should be guided by principles of 'reasonableness and proportionality,' . . . a party is well-advised to 'retain all relevant documents . . . in existence at the time the duty to preserve attaches. In this respect, 'relevance' means relevance for purposes of discovery, which is 'an extremely broad concept.'") (citing *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 218 (S.D.N.Y. 2013)). In this case, Al Haramain has fallen well short of either principle.

Id. (internal citations omitted);[5] see also *Orbit One Comm's*, 271 F.R.D. at 437 (outlining how a litigant meets its preservation burden); id. at 438 (In the Second Circuit, "a 'culpable state of mind' for the purposes of a spoliation inference includes ordinary negligence" and "An adverse inference is imposed to ameliorate any prejudice to the innocent party by filling the evidentiary gap created by the party that destroyed the evidence.").

In this case, even in Al Haramain's own recitation of "the status of AHIF-USA Discovery," Opposition at 5-10, it is clear that Al Haramain failed to adequately preserve, collect, and review relevant and discoverable information. There is no indication that Al Haramain issued a written litigation hold (gross negligence); there is no indication that Al Haramain attempted to collect records from "key players," including – to varying degrees Perouz Sedaghaty, Aqeel Al-Aqeel, Mansour Al-Kadi, and Soliman Al-Buthe (gross negligence); and there is no indication that appropriate measures to preserve electronically-stored information were put in place (at least negligence).[6] In the Sanctions Motion, Plaintiffs have explained how evidence from the criminal trial in United States v. Sedaghaty indicates that large amounts of electronically-stored information, including twenty to twenty-five thousand emails, were intentionally deleted at Al Haramain's U.S. branch office long after the obligation to preserve had already attached. Sanctions Motion at 11-12.[7] Moreover, Plaintiffs argue that it is reasonable to infer that the inaccessibility of and non-participation in discovery by "key players" in both the U.S. branch office and Saudi headquarters, namely Aqeel Al-Aqeel, Mansour Al-Kadi, and Soliman Al-Buthe, was willful. This inference is supported by the fact that Aqeel Al-Aqeel and Soliman Al-Buthe are designated Specially Designated Global Terrorists by the United States government pursuant to Executive Order 13224 and, in the case of Aqeel, he has essentially ceased defending himself in the litigation.[8] Additionally, the timing and consequence of Perouz Sedaghaty's departure also indicates willful subversion of Al Haramain's discovery obligations from the officer of the branch office who performed the day-to-day operations of that office.[9] At the very least, Al Haramain should not be

---

[5] See also Apple Inc. v. Samsung Electronics Co., Ltd., No. C 11-1846, 2012 WL 3042943 (N.D. Cal. July 25, 2012) (the institution of a preservation hold was not sufficient to shield the party from sanctions; the institution of a system to secure relevant information in anticipation of litigation and to follow-up and ensure that the system was being enacted properly was of equal importance).

[6] There is no indication that Al Haramain had any sort of regular policies and procedures with respect to electronically-stored information – or any type of information, let alone separate information retention procedures to ensure that relevant and discoverable information was secured.

[7] For the purposes of determining Al Haramain's culpable mental state relating to its discovery malfeasances and the totality of lost or destroyed information, the fact that many of the tens of thousands of emails that were deleted were ultimately recovered by government forensic specialists is immaterial. As will be discussed later, the recovery of intentionally destroyed information is immaterial to the separate prejudice inquiry – though the record testimony of Jeremy William Christiansen indicates that electronically-stored information beyond the recovered email was likely overwritten and thereby destroyed. See, e.g., Sanctions Motion, Exhibit N (Sedaghaty Trial Tr.), at 46:16-47:12

[8] Aqeel was dismissed from this litigation based on this Court's determination that it lacked personal jurisdiction over him. When that determination was appealed to the Second Circuit, Aqeel declined to file any opposition to the plaintiff-petitioner's memoranda on appeal.

[9] Al Haramain distorts the facts about Sedaghaty's flight from the jurisdiction of the United States courts. It tries to deflect the timing and import of Sedaghaty's departure by claiming that he "moved to the United Arab Emirates to pursue job opportunities after his work as a self-employed arborist in Ashland had dried up, and he closed AHIF-USA's operations later [in 2003]." Opposition at 5. This statement is, at best, incomplete, and more likely false.

able to benefit from the consequences of the departure from the jurisdiction (justifiable or otherwise) of the director and day-to-day manager of its U.S. branch office. Upon consideration of the totality of facts relating to the conduct of this civil action vis-à-vis Al Haramain, it is clear that, on the spectrum of culpability, there is ample support for a finding that Al Haramain's culpable mental state was and is willful or grossly negligent.

### c. Al Haramain Had Twenty-Two Months To Preserve, Collect, And Review Relevant And Discoverable Information From Saudi Arabia (And Other Branches) Before The Saudi Headquarters Was Purportedly Dissolved.

The purported closure of Al Haramain's Saudi headquarters in June 2004 does not absolve Al Haramain for its preservation and production failures in the twenty-two months between filing of the complaint and dissolution.[10] Those twenty-two months were more than adequate time for Al Haramain to issue a litigation hold, gather relevant and discoverable information from those branch offices and the headquarters implicated by the civil complaint, and contact and collect documents from "key players" within Al Haramain. Nothing in the record indicates that any efforts – let alone adequate efforts – were undertaken in accord with these discovery obligations between August 15, 2002 and June 2004.

The declarations of Thomas H. Nelson, proffered by Al Haramain as exhibits to its Opposition, support the conclusion that if Al Haramain had undertaken to meet its discovery obligations between August 15, 2002 and June 2004 it would have been able to preserve and produce relevant and discoverable information. For example, Mr. Nelson states that, had he been informed in 2004 of the need to obtain documents from the Saudi headquarters, he "likely would have been able to obtain substantial records from [the Saudi headquarters]." Opposition Exhibit 2 (Declaration of Thomas H. Nelson, Feb. 13, 2009), at ¶ 6 (emphasis added); see also id. at ¶ 7 ("Had I known that OFAC sought to designate AHIF-Oregon based on a claim that it supported

---

Correspondence from Lawrence Matasar to Lisa Brown indicates that, upon his departure from the United States, Sedaghaty first spent six months in Saudi Arabia, then eighteen months in the United Arab Emirates, eighteen months in Iran, and then about one year in Syria before returning to the United States to surrender himself to United States authorities to face criminal prosecution. Exhibit B (Aug. 13, 2007 e-mail from Lawrence Matasar to Lisa Brown; Sept. 7, 2007 letter from Lawrence Matasar to Lisa Brown).

Equally unclear from the record in United States v. Sedaghaty is the reasons for Sedaghaty's departure from the United States. In an August 4, 2004 letter from Lynne Bernabei (counsel for Sedaghaty in this case) to R. Richard Newcomb, Bernabei stated that "Perouz Sedaghaty, the director of AHIF went to Saudi Arabia to obtain the resignations of the two outside board members of AHIF – Aqeel al-Aqeel and Mansour Al-Kadi – who were also officers of al-Haramain (SA). . . ." Exhibit C (Aug. 4, 2004 letter from Lynne Bernabei to R. Richard Newcomb) at 2. This conflicts with reports from other sources, including one that reported that Mr. Sedaghaty told his son that he was going to the Hajj and would see him in a few weeks. Exhibit D (Ted Katauskas, The $150,000 Question, Portland Monthly (Feb. 2008)), at 6. There is, at least, reasonable suspicion regarding Mr. Sedaghaty's mental state given these disparate reports and the timing of his departure. But the fact that he left the United States facing imminent criminal indictment and remained overseas for years in multiple jurisdictions that had no extradition treaties is at least indicative that his motives were other than what has been characterized by Al Haramain.

[10] The purported shuttering of Al Haramain's Saudi headquarters was undertaken pursuant to joint designation of Al Haramain as a terrorist entity by the Kingdom of Saudi Arabia and the United States. See, e.g., Exhibit E (U.S. Dep't of Treasury, Additional Background Information on Charities Designated Under E.O. 13224), at 2-5. Subsequently, Al Haramain was placed on the United Nations designation list as well. See, e.g., Id.

SDGTs through its activities with AHF-SA, I would have attempted to obtain records in 2004 of all the financial transactions between AHF-SA and AHIF-Oregon . . ..") (emphasis added); Opposition Exhibit 2 (Declaration of Thomas H. Nelson, Dec. 9, 2009), at ¶ 3 ("Although I have made several trips to Saudi Arabia since 2004, and have made several requests for documents, I have been unable to obtain any documents relating to Al Haramain Saudi Arabia, other than a few documents that were already in the possession of other individuals, who had retained copies."); Opposition Exhibit 2 (Declaration of Thomas H. Nelson, Jan. 30, 2013), at ¶¶ 3-4 (referencing documents that were in the possession of Soliman Al-Buthe, a "key player" in Al Haramain from whom no documents have been produced and who likely had possession of relevant information and reiterating attempts to access information after 2004);[11] Opposition Exhibit 3 (Declaration of Soliman H. Al-Buthi, Feb. 15, 2009), at ¶ 12 ("During the tenure of my involvement in AHF-SA, through the fall of 2002, . . . I would likely have been able to obtain substantial records from AHF-SA . . . .") (emphasis added), ¶ 13 ("Had I known . . . I would have obtained records of all the financial transactions between AHF-SA and AHIF-Oregon, . . . .") (emphasis added).[12] The fact is that Al Haramain was on notice, and had discovery obligations, since the filing of this civil action on August 15, 2002 that those were precisely the types of documents that it should have been preserving in anticipation of production in the on-going litigation.

It is clear that Al Haramain has not adequately complied with its discovery obligations under Fed. R. Civ. P. 26 or multiple orders of this Court. Al Haramain must bear the consequences for its discovery failures that resulted in the loss or destruction of relevant and discoverable information. And subsequent and avoidable events cannot and should not allow Al Haramain to evade responsibility and culpability for the loss or destruction of relevant and discoverable information that followed.

### d. Al Haramain Had Eighteen Months To Preserve, Collect, And Review Relevant And Discoverable Information Before The United States Executed Its Search Warrant And Seized Al Haramain's Property In Ashland, Oregon.

Similarly, setting aside for the moment Al Haramain's utter failure to attempt to gain access to its own documents seized by the government from its U.S. branch office February 18, 2004, to produce them in discovery here, that seizure does not absolve Al Haramain for its preservation and production failures in the eighteen months between the time the first complaint

---

[11] Footnote 9 on page 14 of Al Haramain's Opposition illustrates a continuing confusion on the part of Al Haramain as to the extent and duration of its discovery obligations. Relevant and responsive documents relating to this civil action are not limited to being "in the Saudi headquarters of Al Haramain (Saudi Arabia);" rather any relevant and responsive documents in the possession, control, or custody of Al Haramain and its officers, directors, employees, and agents, including its "key players" like Soliman Al-Buthe, should have been preserved, collected, searched, and reviewed. And they should have been produced if responsive to Plaintiffs' document requests. Similarly, in footnote 6 on page 6 of the Opposition, Al Haramain states that Aqeel Al-Aqeel and Al-Buthe were not subject to discovery because they were dismissed in their individual capacity for lack of personal jurisdiction. This overlooks the fact that as officers and directors of Al Haramain they had an obligation to preserve and produce in that capacity. That obligation began upon the filing of the complaint and persisted, at least, until they resigned.

[12] It bears emphasizing that, while these declarations state that efforts were made to get documents from Al Haramain's Saudi headquarters, each of them is rote and conclusory. Despite invitation from Plaintiffs and the Court to provide additional detail, subsequent declarations have been similarly wont of any details as to what efforts were taken, when, and by whom.

was filed and the seizure happened. Those eighteen months were more than adequate time for Al Haramain to issue a litigation hold, gather relevant and discoverable information from Al Haramain's U.S. branch office, and contact and collect documents from "key players" within Al Haramain. Nothing in the record indicates that any efforts – let alone adequate efforts – were undertaken in accord with its discovery obligations between August 15, 2002 and February 18, 2004. During that year and a half there is no mention of a litigation hold or any attempts to secure information at any branch, including the office in the United States or in Saudi Arabia. There is no mention of any attempts to secure information from officers, directors, or employees.[13] Rather, it is clear that Al Haramain did not engage those obligations in parallel to its attempts to dismiss the complaint as it was obligated to do.

Al Haramain must bear the consequences for its discovery failures that resulted in the loss or destruction of relevant and discoverable information. Moreover, subsequent events cannot and should not allow Al Haramain to evade responsibility and culpability for the loss or destruction of relevant and discoverable information that followed.

    e. **Al Haramain Has Previously Represented To This Court That It IS In Possession Of The Documents Seized From The U.S. Branch Office; Accordingly, Al Haramain Had An Obligation To Produce The Documents.**

Al Haramain's assertion that it is unable to produce the documents seized from its U.S. branch office is contradicted by an on-the-record representation to this Court by its own counsel that counsel did, in fact, receive the documents that the government had seized. During the February 8, 2010 hearing in front of Magistrate Judge Maas, when asked whether more Al Haramain documents might be produced to Plaintiffs if Plaintiffs were to request additional documents directly from Mr. Sedaghaty, Al Haramain's counsel represented as follows: "The government . . . seized all the documents that were in the Ashland office, and then turned them over to [Sedaghaty's] defense attorney in Portland . . . . They in turn gave us a copy, and we produced those to the plaintiffs." Sanctions Motion, Exhibit G (Tr. (Feb. 8, 2010)) at 51. Although it is certainly clear that none of the seized documents that were turned over to Al Haramain's counsel were produced to Plaintiffs, it can hardly be an innocent slip for counsel to represent both that Al Haramain received the seized documents and also produced them to Plaintiffs.

---

[13] The Opposition does note in passing that Perouz Sedaghaty, the person responsible for the day-to-day operation of Al Haramain's U.S. branch, provided copies of some relevant documents to counsel, which were produced to Plaintiffs in December 2002, before the government seizure and his departure for Saudi, Iran, the United Arab Emirates, and Syria. Opposition at 6. Of course, this beckons the question of why the rest of the information at the U.S. branch and other Al Haramain information in the possession of Perouz Sedaghaty was not preserved and available for production between October 29, 2003 (service of initial discovery on Al Haramain's U.S. branch) and February 18, 2004 (United States government seizure). Likewise, there is no mention of any attempt to secure information from other members of the Board of Directors and other key representative, notably Aqeel Al-Aqeel and Mansour Al-Kadi, and Soliman Al-Buthe.

### f. There Is No Evidence In The Record That Al Haramain Made Any Effort To Obtain Its Own Records From The United States Government After February 18, 2004.

Amidst Al Haramain's failure to preserve and produce documents before the so-called events-beyond-its-control, it is notable that there is no information in the record indicating that Al Haramain made any effort to obtain its own records from the United States government to respond to discovery requests. It appears that the first effort to obtain the documents seized by the United States government is Magistrate Judge Maas' communication with Magistrate Judge Coffin in the United States District Court for the District of Oregon. Memorandum Decision and Order, Nov. 22, 2011 [D.E. 2491] at 13 & n.3. The result of that communication was that Magistrate Judge Coffin agreed that the documents could be produced in 03 MDL 1570. Id. at 12-13. The very first effort indicated in the record of Al Haramain attempting to obtain its own relevant and responsive documents from the United States government are the letters dated January 28, 2013 (Letter from Alan R. Kabat to Steven T. Wax, Federal Public Defender for Perouz Sedaghaty) and January 29, 2013 (Letter from Steven T. Wax to Chief Judge Aiken in United States v. Sedaghaty, No. 6:05-cr-60008-AA (D. Or.). Opposition Exhibit 7. These belated attempts – obviously done only in conjunction with Al Haramain's simultaneous preparation of its opposition to Plaintiffs' Sanctions Motion – hardly constitute a good-faith attempt to respond to duly proffered discovery in this multi-district litigation.

### g. Perouz Sedaghaty's Legally Unsupportable Blanket Assertion Of His Fifth Amendment Rights Cannot Shield Al Haramain From Its Discovery Obligations Or Create Justifiable Inability To Produce.

While the issue of defendant Perouz Sedaghaty's blanket assertion of his Fifth Amendment rights has already been the subject of a previous motion [see D.E. 2486, 2489] that resulted in the Court ordering Mr. Sedaghaty to produce responsive documents [D.E. 2491, 2501], and is anticipated to be the subject of additional motion practice in light of Mr. Sedaghaty's failure to abide by this Court's orders to produce, Sedaghaty's blanket assertion of his Fifth Amendment rights in 03 MDL 1570 is legally unsupportable.[14] The Fifth Amendment privilege against self-incrimination is a narrow privilege. It "applies only when the accused is compelled to make a testimonial communication that is incriminating." Memorandum Decision and Order, Nov. 22, 2011 [D.E. 2491] at 6 (quoting Fisher v. United States, 425 U.S. 391, 408 (1975). As such, generally, "[d]ocuments prepared 'wholly voluntarily . . . cannot be said to contain compelled testimonial evidence.'" Id. The exceptions where the production of voluntarily prepared documents may require incriminating testimony are limited: (1) if the existence and location of requested documents are unknown to the government, (2) where production would implicitly authenticate documents, and (3) "if those documents are 'the first step in a chain of evidence that [leads] to . . . prosecution." Id. (citing United States v. Fox, 721 F.2d 32, 36 (2d Cir. 1983) and quoting United States v. Hubbell, 530 U.S. 27, 42 (2000).

---

[14] Initially Mr. Sedaghaty moved to stay all discovery in this action pending resolution of his criminal trial based on potential invasion of his right against self-incrimination. Upon denial by this Court of his motion for a stay of discovery and two orders compelling him to produce responsive documents, Mr. Sedaghaty has continued to assert his Fifth Amendment right and refused to produce anything in discovery.

In short, the Fifth Amendment privilege simply does not apply to the production of business or personal records. See In re Grand Jury Subpoena Duces Tecum Dated October 29, 1 F.3d 87, 93 (2d Cir. 1993) (holding that the Fifth Amendment does not protect the contents of voluntarily prepared documents, either business or personal); Braswell v. United States, 487 U.S. 99, 104 (1988) (holding that the Fifth Amendment privilege may not be asserted on the basis of corporate books and records); Panaro v. U.S. Securities and Exchange Comm., CV-86-4122, 1987 U.S. Dist. LEXIS 16810, at *7 (E.D.N.Y. Aug. 5, 1987) (holding that bank records are not considered to be compelled testimonial evidence because they are voluntarily prepared by the bank).

And lastly, the privilege cannot shield Al Haramain from its discovery obligations because Al Haramain cannot offensively use Mr. Sedaghaty's personal privilege. Al Haramain claims that it "was only able to [request that the U.S. District Court for the District of Oregon allow the seized documents and other government discovery to be released to it so that the relevant documents can be produced to the plaintiffs in this litigation] after Mr. Sedaghaty's criminal defense counsel agreed [in January 2013] to request clarification from the U.S. District Court." Opposition at 15. Such a nonsensical position implies that, somehow, Mr. Sedaghaty's criminal defense attorney held veto power over Al Haramain's ability to request its own seized documents from the government.[15] Moreover, Mr. Sedaghaty's apparent endeavor to obstruct Al Haramain from producing in discovery Al Haramain's own documents places Al Haramain's counsel in the paradoxical position of representing one client that is placing another client at risk.

### 3. Plaintiffs Have Met Their Burden To Show That The Lost Or Destroyed Evidence Is Relevant To Their Claims.

#### a. Legal Standards

Though purporting to highlight a difference, the Sanctions Motion and Opposition rely on exactly the same legal standard and citations. Compare Sanctions Motion at 6-7 (standard for sanctions under Rule 37 citing Residential Funding, 306 F.3d 99 (2d Cir. 2002)) and 11-13 (standard for spoliation sanctions citing Pirello v. Gateway Marina, No. CV 2008-1798 (KAM) (MDG), 2011 U.S. Dist. LEXIS 113632 (E.D.N.Y. Sept. 30, 2011) and Residential Funding) with Opposition at 11 (standard for sanctions under Rule 37 and standard for spoliation sanctions citing Residential Funding).

Importantly, Al Haramain's citation to GenOn Mid-Atlantic, LLC v. Stone & Webster, Inc., 282 F.R.D. 346 (S.D.N.Y. 2012) (Maas, M.J.) does not negatively impact Plaintiffs' argument.

In fact, GenOn actually supports Plaintiffs' analysis. As an initial matter, GenOn is distinguishable on its facts. GenOn involves a motion for sanctions arising out of the spoliation of electronically-stored information by a third-party consulting firm that assisted GenOn in connection with audits pursuant to an arms-length contract for services. The court found that while the third-party consultant had destroyed (and attempted to restore) information lost when transitioning from active files to backup tapes, only a de minimus amount of documents had not

---

[15] This position also indicates a potential conflict of interest. Al Haramain and Perouz Sedaghaty have retained the same counsel for their defense in this civil action. Counsel is in a position where requesting access to documents for Al Haramain will create a potentially disadvantageous circumstance for Perouz Sedaghaty.

been produced. "Of the 46 emails that existed solely on the backup tapes, only ten had not been produced . . . ." GenOn, 282 F.R.D. at 351. Furthermore, the party seeking sanctions was "forced to admit . . . [that emails going to the] heart of this case were produced by the [defendant separate from the third-party consultant] during discovery." Id. at 359. This could not be more different than the instant case. Here, spoliation was affected by a single, indistinguishable entity acting as alter egos; the amount of documents that was lost or destroyed was extensive; the vast multitude of lost or destroyed evidence is not accessible through other parties or other means, and in fact, the only other party that could produce the documents separately (Sedaghaty) has outright refused to do so.

And the legal standards expressed in GenOn are also the same as those espoused by Plaintiffs in their Sanctions Motion. Compare GenOn, 282 F.R.D. at 354-358 with Sanctions Motion at 16-17. The standards for the duty to preserve, duty to produce, degree of culpability, and relevance of destroyed documents are substantially the same and rely on substantially the same legal support. So, while Al Haramain is correct to suggest that it would be inappropriate to reflexively find sanctions for all failures to preserve electronically-stored information, Opposition at 11, the factual differences between GenOn and this case mandate different results.

    b. **Al Haramain's Willfulness Or Gross Negligence Is Sufficient To Establish The Relevance Of Untimely Or Destroyed Evidence.**

Although Al Haramain relies on the same general legal standard, it fails to understand and rebut the thrust of Plaintiffs' argument. The case law is clear that bad faith, willfulness, or gross negligence are sufficient for a finding, without a showing of "assistive relevance," that untimely produced, lost, or destroyed evidence is relevant as a matter of law. Sanctions Motion at 6 (citing In re Sept. 11th Liab. Ins. Coverage Cases, 243 F.R.D. 114, 125 (S.D.N.Y. 2007), Residential Funding, 306 F.3d at 113, and Design Strategy, Inc. v. Davis, 469 F.3d 284, 296 (2d Cir. 2006). After having shown that Al Haramain had an obligation to preserve relevant and responsive information, and had and has an obligation to timely produce information responsive to discovery requests under Fed. R. Civ. P. 26 and multiple orders of this court, see, e.g., Sanctions Motion at 7-8, Plaintiffs made an extensive showing that, viewed in totality, Al Haramain's discovery failures were committed with willfulness or gross negligence. See, e.g., id. at 10-14; supra at 4-5. Al Haramain's Opposition does not rebut Plaintiffs' showing of willfulness or gross negligence.

    c. **Spoliation Is Just One Example Of Al Haramain's Willfulness; And The Recovery Of Some Documents By Forensic Specialists Does Not Abrogate Al Haramain's Culpable Mental State Or The Loss Or Destruction Of Non-Recovered Information.**

Two points are relevant with regard to Al Haramain's arguments pertaining to spoliation. First, Plaintiffs' spoliation argument is one example of Al Haramain's willfulness and gross negligence in the context of Al Haramain's discovery abuse. Sanctions Motion at 10-14. As such, Plaintiffs' showing, which was largely unrebutted,[16] that remediation of the hard drives led to the

---

[16] Al Haramain offers two facially unlikely, if not frivolous, arguments – unsupported by anything but its bare supposition – that attempt to explain away the "significant" deletion of "the whole system of emails." See, e.g., Sanctions Motion Exhibit N (Sedaghaty Trial Tr.) at 93. Al Haramain argues that the span of over four years from the time of last use by Al Haramain and recovery by the government's computer examiner could explain the

conclusion that multiple entire hard drives, including multiple entire Microsoft Outlook email mailboxes, were intentionally deleted prior to seizure. Sanctions Motion at 11-12. Whether or not the forensic examiner was ultimately able to recover some or most of the information that was intentionally deleted does not abrogate the reasonable conclusion that Al Haramain deleted information willfully and in bad faith as part of widespread discovery abuses.

Second, Al Haramain overstates the relevance of the fact that the government examiner was able to recover twenty to twenty-five thousand emails. As noted above, that recovery does not abrogate or mitigate Al Haramain's culpable state of mind in vast volume of information that was intentionally deleted in the first place. In a sense, Al Haramain is seeking leniency for not being more effective in its intentional spoliation efforts. Moreover, the partial recovery does not erase the fact that other information was lost, overwritten, or destroyed – and that is considering the lost documents only from Al Haramain's U.S. branch office. Sanctions Motion at 12 (citing Sanctions Motion, Exhibit N (Sedaghaty Trial Tr.) at 47:6-12). The recovery of some information from deleted hard drives at the U.S. branch office does not absolve Al Haramain for the loss or destruction of information from the Saudi headquarters.

### d. Al Haramain Also Fails To Understand The Nature Of Plaintiffs' "Assistive Relevance" Showing.

Labeling them as nothing more than "inchoate speculations," Opposition at 16-17, Al Haramain argues that Plaintiffs have failed to make a "showing – inferential or otherwise – that [Plaintiffs have] suffered prejudice" because Plaintiffs have not shown that the missing information is not affirmatively relevant to their claims. Al Haramain attempts to reach this conclusion by narrowly projecting that (a) the seized documents are the whole universe of lost or destroyed information (predicated, again, on its overruled separate-corporate-fiction mantra); (b) Plaintiffs have not specifically identified any relevant documents that were lost, destroyed, or significantly altered; or (c) the seized information could still be produced to Plaintiffs if Al Haramain is given the time to do so. Each of these premises is faulty.

---

degradation or loss of information. Opposition at 8. This argument is implausible for many reasons. First, the hard drives from which the forensic examiner attempted to recover information was mirrored at the time it was seized. If loss was caused by degradation over time, one would expect to see on the record a showing that there was a similar type of degradation on both the original and the mirror. No such showing was made. Second, the United States government had a strong interest in ensuring the integrity of the information contained on the seized hard drives. If there was any risk of degradation, the government would have taken steps to ameliorate that risk. Third, as a matter of proportionality, it is unlikely that degradation can explain evidence of large-scale overwriting of information.

The other argument made by Al Haramain is that the government forensic examiner was never provided with backup disks that were also seized. Opposition at 8. Mr. Christiansen did acknowledge that he was never provided those backup disks – and therefore did not review them to see if any of the deleted information was contained on those backup disks. Id. Al Haramain tries to spin this as evidence that Al Haramain did maintain their information. The problems with this argument are obvious – the information on those backup disks was in the possession of Al Haramain from August 2002 until February 2004 and was never collected, reviewed, and produced; if there was information on those backup disks that augured against the government examiner's testimony, it would have been used by criminal defense counsel, and lastly, it is unlikely that backup disks would have been able to hold the volume of information that was deleted or overwritten (entire hard drives and email mailboxes of information require backup to servers or tape systems, not disks).

First, the seized documents are only part of the universe of lost or destroyed information that has not been preserved or produced to Plaintiffs. Al Haramain was an international organization and Plaintiffs' allegations and discovery requests relate to the operation of the entire organization, not only the U.S. branch office. As such, the universe of information that Al Haramain was obligated to preserve, review, and produce goes far beyond that information seized by the United States government.

Second, while some showing of assistive relevance is needed, Al Haramain is mistaken that the burden is heightened or severe. In the Second Circuit, "the burden placed on the moving party to show that the lost evidence would have been favorable to it ought not be too onerous, lest the spoliator be permitted to profit from its destruction." *Orbit One Comm's v. Numerex Corp.*, 271 F.R.D. 429 (S.D.N.Y. 2010) (citing Heng Chan v. Triple 8 Palace, Inc., No. 03 Civ. 6048, 2005 U.S. Dist. LEXIS 16520, at *7 (S.D.N.Y. Aug. 11, 2005); Residential Funding, 306 F.3d at 109; Kronisch v. United States, 150 F.3d 112, 128 (2d Cir. 1998). Moreover, "to hold[] the prejudiced party to too strict a standard of proof regarding the likely contents of the destroyed evidence would subvert the prophylactic and punitive purposes of the [sanction], and would allow parties who have intentionally destroyed evidence to profit from that destruction." Id. (quoting Kronisch, 150 F.3d at 128). "Thus, 'it is not incumbent upon the plaintiff to show that specific documents were lost.'" Id. (quoting Treppel v. Biovail Corp., 233 F.R.D. 363, 372 (S.D.N.Y. 2006)).

Here, Plaintiffs have made an adequate showing that the lost or destroyed information – from Al Haramain as a single, indistinguishable entity, including both the U.S. branch office and the Saudi headquarters – would likely have been favorable to Plaintiffs' claims. Plaintiffs made that showing through both general and specific information. As an initial matter, Al Haramain and multiple branches were designated by the United States, the Kingdom of Saudi Arabia, and the United Nations based on evidence that various branches of Al Haramain were involved in financing terrorism and destructive terrorist plots. Sanctions Motion at 13. It is a reasonable inference that lost or destroyed information would have proven supportive of those public representations and the absence of any production has been prejudicial to Plaintiffs. More specifically, Plaintiffs cite to information made public in United States v. Sedaghaty as illustrative of the types of information that discovery would have revealed. Sanctions Motion at 18-19. This included extensive emails and photographs between directors and employees of Al Haramain and other relevant entities. As noted by Internal Revenue Service Special Agent Colleen Anderson, who was responsible for investigating Mr. Sedaghaty, the number of government exhibits used at trial "were culled [] in order to scale back the number of documents exhibited by the government during trial. For instance, while there was still several hundred e-group correspondence e-mails about the Chechen Mujahideen within this time period, the government only exhibited a very small portion of these Sheeshan emails." Exhibit F (Declaration of Colleen Anderson, Oct. 25, 2010 [D.E. 485-1] in United States v. Sedaghaty, No. 6:05-cr-60008-HO) at ¶7. Furthermore, Special Agent Anderson also stated on the record that "the prosecution team did not exhibit any electronic documents found in defendant Sedaghaty's computers pertaining to assisting the Taliban even though some of the documents fell within the general time frame." Id. The combination of these general and specific examples leaves little doubt that a finding or inference is appropriate that lost or destroyed information would have been favorable to Plaintiffs' claims.

Third, even if the seized information is ultimately produced to Plaintiffs, the existence of that information does not eliminate the appropriateness of sanctions for that portion of information that was still destroyed through overwriting, destruction, or otherwise. Of equal, if not greater, importance, the existence of the seized information does not eliminate the prejudice to Plaintiffs for the lost or destroyed evidence from other Al Haramain offices. Contrary to that assertion, the existence of more examples, like electronic documents pertaining to assisting the Taliban, actually provides further "assistive relevance" regarding the larger set of information from Al Haramain that was not preserved or produced.

## 4. Conclusion

For the reasons set forth above and in Plaintiffs' letter application dated January 9, 2013, sanctions should be granted, default judgment ordered, and expenses and attorneys fees directed. Plaintiffs have met their burden of showing that Al Haramain had (and has) an obligation to preserve and produce requested discovery, that it repeatedly breached its obligations with a culpable state of mind, i.e., willful and grossly negligent discovery abuses, and that the missing evidence is relevant to Plaintiffs' claims. Al Haramain's Opposition fails to rebut Plaintiffs' arguments. Accordingly, the requested sanctions should be imposed.

Dated: February 7, 2013

Respectfully submitted,

THE MDL 1570 PLAINTIFFS' EXECUTIVE COMMITTEES

cc: Alan Kabat, Esq. (Via Electronic Mail)
The Honorable George B. Daniels, U.S.D.J. (Via Overnight Mail)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 1/10/13

-----------------------------------------------------------x

In Re:

TERRORIST ATTACKS ON
SEPTEMBER 11, 2001

**ORDER** (proposed)

03 MDL 1570 (GBD) (FM)

-----------------------------------------------------------x

FRANK MAAS, United States Magistrate Judge.

It is hereby ORDERED that:

1. At the request of the counsel for the Plaintiffs, the Court directs that the following items be separately docketed as of record by the Clerk of the Court with the Court's ECF system: (1) the Letter Memorandum of the Plaintiffs, dated January 9, 2013, seeking imposition of sanctions against defendant Al Haramain, and (2) the attorney declaration of Robert T. Haefele, with accompanying Exhibits A-Y, in support of the Plaintiffs' request, and it is FURTHER ORDERED that

2. Defendant Al Haramain and the plaintiffs may file their respective opposition and reply papers concerning the above-referenced motion via the Court's ECF system, and a copy of this order shall accompany those filings.

SO ORDERED.

Dated: New York, New York
       January 10, 2013

FRANK MAAS
United States Magistrate Judge

Copies to:

Honorable George B. Daniels
United States District Judge

All Counsel via ECF