

778 F.Supp.2d 70
**(Cite as: 778 F.Supp.2d 70)**

H

United States District Court,
District of Columbia.
Elizabeth MURPHY, et al., Plaintiffs,
v.
ISLAMIC REPUBLIC OF IRAN, et al., Defendants.

No. 06–cv–596 (RCL).
April 21, 2011.

**Background:** Following entry of order granting plaintiffs' request to use diplomatic means to execute service of default judgment on foreign states and their instrumentalities, in action alleging the Islamic Republic of Iran, its Ministry of Information and Security (MOIS), and the Iranian Islamic Revolutionary Guard Corps (IRGC), violated Foreign Sovereign Immunities Act (FSIA) by providing material support and assistance to terrorist organization that carried out attacks on United States servicemen, plaintiffs moved to clarify or amend order.

**Holdings:** The District Court, Royce C. Lamberth, Chief Judge, held that:
(1) FSIA's default judgment notice provision was mandatory;
(2) even if MOIS was equivalent to foreign state of Iran, notice of entry of default judgment on Iran alone was insufficient to satisfy FSIA's default judgment notice provision; and
(3) plaintiffs could not circumvent FSIA's default judgment notice requirements by volunteering to seek attachment of property held only by Iran and not its MOIS.

Motion denied.

West Headnotes

**[1] International Law 221** 10.42

221 International Law
    221k10.29 Actions Against Sovereign or Instrumentality
        221k10.42 k. Procedure in actions in general.
Most Cited Cases

Foreign Sovereign Immunities Act (FSIA) provision providing that copy of default judgment entered against foreign state or its political subdivision be sent to that foreign state or subdivision was mandatory, and thus FSIA plaintiffs who obtained default judgment against Islamic Republic of Iran, its Ministry of Information and Security (MOIS), and Iranian Islamic Revolutionary Guard Corps (IRGC), were required to inform all foreign defendants that judgment had been entered against them, rather than just foreign defendant they intended to pursue execution of judgment against, since notice provision was designed both to ensure that foreign defendants remained protected by requirement that FSIA plaintiff substantiate her claim, and to preserve foreign property interests by insisting upon prompt notification of entry of judgment that could put such interests at risk. 28 U.S.C.A. §§ 1605A, 1608(e).

**[2] International Law 221** 10.42

221 International Law
    221k10.29 Actions Against Sovereign or Instrumentality
        221k10.42 k. Procedure in actions in general.
Most Cited Cases

Even if Iran Ministry of Information and Security (MOIS) was, for purposes of Foreign Sovereign Immunities Act (FSIA), equivalent to foreign state of Iran, notice of entry of default judgment on Iran alone was insufficient to satisfy FSIA's requirement that notice of entry of default judgment be sent to all foreign state defendants, since broad understanding of term "foreign state" did not apply in context of providing MOIS copy of default judgment entered against it, and notice requirement ensured that foreign entities, whether the states themselves or their instrumentalities, were treated as separate and distinct for purposes of notice. 28 U.S.C.A. §§ 1603(a), 1605A, 1608(e).

**[3] International Law 221** 10.35

221 International Law
    221k10.29 Actions Against Sovereign or Instru-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

778 F.Supp.2d 70
**(Cite as: 778 F.Supp.2d 70)**

mentality
 221k10.35 k. Property of sovereign. Most Cited Cases

**International Law 221 ⛉10.42**

221 International Law
 221k10.29 Actions Against Sovereign or Instrumentality
  221k10.42 k. Procedure in actions in general. Most Cited Cases

Foreign Sovereign Immunities Act (FSIA) provision governing enforcement of default judgments permitted no attachment or execution until court had determined that reasonable period of time had elapsed following giving of notice of entry of default on foreign state, rather than permitting particular defendant's interests in property to be immune from execution until after that defendant had received notice of judgment, and thus judgment creditors could not circumvent FSIA's notice requirements by volunteering to seek attachment of property held only by Islamic Republic of Iran and not its Ministry of Information and Security (MOIS). 28 U.S.C.A. §§ 1605A, 1608(e), 1610(c).

**\*71** John W. Karr, Theodore S. Allison, Karr & Allison, P.C., Washington, DC, for Plaintiffs.

Alan Lee Balaran, Law Office of Alan L. Balaran, Washington, DC, for Defendants.

**OPINION AND ORDER**
ROYCE C. LAMBERTH, Chief Judge.
 Plaintiffs hold a default judgment against defendants Islamic Republic of Iran ("Iran") and the Iranian Ministry of Information and Security ("MOIS") under the "state-sponsored terrorism" exception to the Foreign Sovereign Immunities Act ("FSIA"), codified at 28 U.S.C. § 1605A. Order & Judgment, Sep. 24, 2010 [66], 740 F.Supp.2d 51 (D.D.C.2010). Under the FSIA, entry of default judgment against a foreign state or its instrumentalities must be accompanied by service of that judgment. 28 U.S.C. § 1608(e). By Order dated March 8, 2011, the Court granted plaintiffs' request to use diplomatic means to execute such service, and ordered plaintiffs to proceed, absent good cause, within twenty-one days. Order Concerning Service of Final Judgment, Mar. 8, 2011[71]. Nearly a month later and after the deadline had passed, plaintiffs filed a motion with the Court requesting that it clarify or amend its prior Order; specifically, plaintiffs request that they be permitted to serve only defendant Iran, and not defendant MOIS, as they intend to pursue execution of their judgment only against property in which Iran has any interest. Motion for Clarification (or Modification) of Order Authorizing Service Through Diplomatic Channels, Apr. 5, 2011 [72] ("Mtn."). Plaintiffs' request shall be denied for the reasons that follow.

 As a law that codifies sovereign immunity with limited exceptions, the FSIA envisions a process for litigating against foreign powers that respects the independence and dignity of every foreign state as a matter of international law while providing a forum for legitimate grievances. To accomplish this goal, the Act sets forth numerous procedural hurdles imposed on persons suing foreign states to ensure that state and federal courts will not harm foreign interests—or United States foreign relations—by acting hastily or failing to provide the foreign parties an adequate opportunity to respond. See Sealift Bulkers, Inc. v. Republic of Arm., 965 F.Supp. 81, 84 (D.D.C.1997) ("The FSIA provides special protections to foreign states against the swift entry of default judgments."). Several of these hurdles are in play here.

 [1] First, the provision of the FSIA that governs default judgments provides that no entry of default judgment "shall be entered ... unless the claimant establishes his claim or right to relief by evidence **\*72** satisfactory to the court," and also instructs that "[a] copy of any such default judgment shall be sent to the foreign state or political subdivision in the manner prescribed for in this section." 28 U.S.C. § 1608(e). The use of "shall" in each of these clauses indicates that they are mandatory conditions for the entry of a default judgment. Ass'n of Civilian Technicians, Mont. Air Chapter No. 29 v. FLRA, 22 F.3d 1150, 1153 (D.C.Cir.1994). The mandatory nature of these procedures is unsurprising, as this particular provision is designed both to ensure that having been served with an initial complaint and declining to participate in litigation—a foreign state or entity remains protected by the requirement that a plaintiff substantiate her claim, and to preserve foreign property interests by insisting upon prompt notification of any entry of judgment that might put such interests at risk. And nothing in this subsection suggests that plaintiffs in FSIA actions may obtain a default judgment against

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

778 F.Supp.2d 70
**(Cite as: 778 F.Supp.2d 70)**

multiple foreign parties and then selectively choose which of those defendants to inform of that decision.

[2] Second, the Court rejects plaintiffs' contention that because the Court previously held that MOIS was, for FSIA purposes, equivalent to the foreign state of Iran, Memorandum Opinion 13, Sep. 24, 2010[65], service on Iran alone is sufficient to satisfy § 1608(e). Mtn. at 1–2. The Court's prior holding was contingent upon the definition of a foreign state in the FSIA, which "includes a political subdivision ... or an agency or instrumentality" as the foreign state. 28 U.S.C. § 1603(a). This definition, however, explicitly states that it applies "except as used in section 1608 of this title." Id. Section 1608 of the Act concerns service and default, and thus the plain language of the FSIA is clear that the broad understanding of the term "foreign state" does not apply in this context. This exclusion represents another procedural protection which ensures that foreign entities—whether the states themselves or their instrumentalities—are treated as separate and distinct for purposes of notice.

[3] Finally, plaintiffs cannot circumvent the FSIA's procedural hurdles by volunteering to seek attachment of property held only by Iran and not by MOIS. See Mtn. at 2 ("[B]ecause it is not clear that it will be necessary to pursue any attachment or execution against [MOIS], Plaintiffs request the option of serving the judgment ... on Iran only."). Section 1610(c), which governs enforcement of default judgments under the Act, does not provide that a particular defendant's interests in property are immune from execution until *that* defendant has received notice of the judgment and been given an opportunity to respond. Instead, the provision broadly declares that "**[n]o attachment or execution ...** shall be permitted until the court has ... determined that a reasonable period of time has elapsed following ... the giving of notice required under section 1608(e) of this chapter." 28 U.S.C. § 1610(c) (emphasis added). Had Congress wished to permit plaintiffs to selectively choose those defendants upon which they would serve and then seek enforcement, it would have provided such a mechanism. It did not. Simply put, the limitation on enforcement of default judgments is clear, and its reference to § 1608(e) forecloses plaintiffs' proposed approach of selective service and enforcement. Thus, no Order permitting the execution of plaintiffs' judgment will be entered in this case until all defendants have been served with the final judgment and given an opportunity to respond.

\* \* \*

**\*73** The Court pauses to emphasize that the above conclusion should not be read as a lack of sympathy for plaintiffs' position. The U.S. Department of State recently imposed a substantial fee-hike for victims of terrorism—such as plaintiffs here—who must use the State Department to serve Iran with FSIA-related papers. See Schedule of Fees for Consular Services, 75 Fed.Reg. 36532, 36534 (June 28, 2010) (setting $2,275 fee for processing FSIA judicial assistance cases). This sudden jump in charges represents a nearly three-fold increase in costs to plaintiffs—a cost they must bear at least twice. [FN1] And in a context where successful enforcement of judgments is notoriously difficult and the prospects for recovering damages are rather bleak, see In re Islamic Republic of Iran Terrorism Litig., 659 F.Supp.2d 31, 49 (D.D.C.2009) ("[A] number of practical, legal and political obstacles have made it all but impossible for plaintiffs in these FSIA terrorism cases to enforce their default judgments against Iran.") (" In re Terrorism Litig."), the imposition of these substantial fees imposes a significant burden upon victims of terrorism.

> FN1. FSIA plaintiffs are also required by statute to serve their initial complaint and summons upon defendants, 28 U.S.C. § 1608(a), and because defendants in these cases often cannot be served by traditional methods, plaintiffs must rely on—and pay—the State Department for such service. Id. at § 1608(a)(4).

The Court is also troubled by the purported necessity of such a large fee for what is a simple ministerial task. The process of serving documents through diplomatic channels requires the State Department to send the papers from Washington to its Embassy in Switzerland, deliver—through the Swiss—those documents to the Iranian Embassy, and then send a letter to the Court confirming that service was completed. How some paperwork and a few postage stamps are capable of generating over $2000 in expenses is a product of creative accounting that is simply beyond the financial wherewithal of this Court.[FN2]

> FN2. Indeed, service procedures have be-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

778 F.Supp.2d 70
**(Cite as: 778 F.Supp.2d 70)**

come so routine that the State Department has developed form-letters and form-documents to aid in the undertaking.

Even more troublesome is the State Department's decision to charge multiple fees where multiple defendants are involved in a case. While on the surface such a determination appears logical, a close examination of the processes involved reveals that it is not. Where service in FSIA cases is made through diplomatic channels, individual agencies or instrumentalities that may be co-defendants with Iran are not served separately—there is but one Iranian Embassy in Switzerland, and that Embassy receives service of FSIA papers whether they are directed to Iran itself or to one of its political subdivisions (such as MOIS.) The only adjustment made in such cases is that additional copies of the relevant papers are provided for each defendant. In other words, no matter how many defendants are parties to a particular case, for purposes of service the State Department receives *one* package, makes *one* delivery to the Embassy in Switzerland, and returns *one* confirmation of service to the Court. Even if it were somehow accurate that the cost of service in this manner exceeds $2000, it strains the bounds of credibility to maintain that the presence of multiple defendants—which adds no extra steps to the process—necessitates multiple fees.[FN3] Put simply, the only plausible explanation**74** for the charging of multiple fees is the desire to generate revenue through the collection of multiple fees.

> FN3. The *only* effect that the number of defendants should have on the process of serving FSIA papers is the thickness of the package provided to the State Department, as plaintiffs must provide a copy of the relevant legal papers for each defendant. The Court certainly understands the need to charge a slightly higher fee for additional thickness to cover the additional costs in shipping. $2,275, however, seems excessive.

Sadly, this is not the first time that the government has stationed itself in a position to undermine the interests of victims of terrorism in FSIA litigation. Indeed, "plaintiffs efforts to enforce judgments under the FSIA have often pitted victims of terrorism against the Executive Branch." *In re Terrorism Litig.,* 659 F.Supp.2d at 53. Much of this conflict is driven by the oldest of motivations: money. The Executive Branch, in the often-legitimate pursuit of foreign policy goals, has frequently and zealously protected many of the assets it has, over time, seized from Iran and its instrumentalities. And in defending these assets from attachment by FSIA plaintiffs, the government has, "in the absence of Iran, which never shows to defend itself in these actions, ... turned out to be the number one adversary of these victims in litigation before this Court." *Id.* at 126. The fact that the situation has now worsened with the imposition of excessive fees, however, is no surprise. The Executive Branch has a history of publicly expressing support for victims of terrorism while repeatedly fighting against their efforts for justice, and the State Department's recent decision to quietly triple fees for process in FSIA cases is merely a symptom of a more fundamental illness.

Putting the entire picture together, the result is quite striking: the federal government has promised victims of terrorism a forum and opportunity to seek compensation for their devastating losses, exploited this glimmer of hope to extract exorbitant fees from those victims, and then actively undermined those victims' efforts to obtain satisfaction of legal and valid judgments in order to protect its own coffers. Two years ago, this Court observed that "the great travesty in all this is that our political branches have essentially told victims of terrorism to continue their long march to justice down a path that leads to nowhere." *Id.* at 125. Now, the government wishes to tax those victims for their travails, as well. A sad state indeed, but one the Court is unable to remedy.

\* \* \*

Despite the significant injustices described above and the fact that the costs imposed on plaintiffs are not insignificant, the Court simply cannot ignore the important procedural protections for foreign states and their instrumentalities that are inherent to the FSIA and closely connected to the core purposes of the Act. In light of the increased cost-burden on plaintiffs, however, the Court will grant their request for an extension of time to collect the necessary funds to pay for service of the final judgment. Accordingly, it is hereby

ORDERED that plaintiffs' Motion for Clarification (or Modification) of Order Authorizing Service through Diplomatic Channels, Apr. 5, 2011[72] is

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

778 F.Supp.2d 70
**(Cite as: 778 F.Supp.2d 70)**

DENIED; it is furthermore

ORDERED that, absent good cause shown, plaintiffs have an additional twenty-one (21) days to comply with this Court's prior Order Concerning Service of Final Judgment, Mar. 8, 2011[71].

SO ORDERED.

D.D.C.,2011.
Murphy v. Islamic Republic of Iran
778 F.Supp.2d 70

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.