## MDL 1570 PLAINTIFFS' EXECUTIVE COMMITTEES
In re: Terrorist Attacks on September 11, 2001 (S.D.N.Y)

| Plaintiffs' Executive Committee for Personal Injury and Death Claims | Plaintiffs' Executive Committee for Commercial Claims |
|---|---|
| Ronald L. Motley, *Co-Chair*<br>MOTLEY RICE LLC<br>James P. Kreindler, *Co-Chair*<br>KREINDLER & KREINDLER LLP | Elliot R. Feldman, *Co-Chair*<br>Sean Carter, *Co-Chair*<br>COZEN O'CONNOR |
| Andrew J. Maloney III, *Co-Liaison Counsel*<br>KREINDLER & KREINDLER LLP<br>Paul J. Hanly, Jr., *Co-Liaison Counsel*<br>HANLY CONROY BIERSTEIN SHERIDAN FISHER & HAYES LLP | J. Scott Tarbutton, *Liaison Counsel*<br>COZEN O'CONNOR |

### VIA HAND DELIVERY

January 30, 2013

The Honorable Frank Maas
United States District Court for the
Southern District of New York
Daniel Patrick Moynihan United States
Courthouse
500 Pearl Street, Room 740
New York, NY 10007-1312

     Re:   *In Re: Terrorist Attacks on September 11, 2001,* 03 MDL 1570 (GBD) (FM)

Dear Judge Maas:

    The Plaintiffs' Executive Committees, on behalf of all plaintiffs, submit this letter and the accompanying exhibits and respectfully request that the Court enter an Order, pursuant to F.R.C.P. 37(a), compelling defendant Wa'el Hamza Jelaidan, a co-founder of al Qaeda and Executive Order 13224 designee, to: (1) immediately produce documentation verifying all efforts the defendant and his counsel have undertaken to request and secure documents responsive to plaintiffs' requests for production of documents, consistent with this Court's November 16, 2011 Order; and (2) immediately produce all documents and materials in his possession, custody, or control responsive to plaintiffs' Supplemental Requests for Production of Documents. If the defendant will not comply with this Court's discovery orders, plaintiffs respectfully submit that severe sanctions are warranted given defendant Jelaidan's ongoing refusal to meaningfully respond to plaintiffs' discovery and failure to comply with this Court's clear orders.

### I.   DEFENDANT JELAIDAN HAS FAILED TO COMPLY WITH THIS COURT'S NOVEMBER 16, 2011 DISCOVERY ORDER

    On October 17, 2011, plaintiffs submitted a letter motion to this Court seeking an order compelling defendant Jelaidan to produce several categories of documents, including but not limited to: (1) banking and financial accounts associated with the al Qaeda financier; (2) the defendant's relationship with other Executive Order 13224 designees, including transfers of

The Honorable Frank Maas
January 30, 2013
Page 2

---

millions of dollars between them; and (3) the imposition of financial and other sanctions upon Jelaidan following his September 2002 designations by the United States, Kingdom of Saudi Arabia, and United Nations. *See* October 17, 2011 letter motion at Exhibit A.[1]

With respect to the bank accounts, plaintiffs' submission identified a number of specific accounts linked to Jelaidan, several of which had been frozen following his designations as a terrorist financier, including an account Jelaidan holds jointly with Osama bin Laden. *See id.* (identifying accounts at Faisal Finance (Switzerland) S.A., Al Rajhi Bank, Habib Bank, and other banks).

In opposition to plaintiffs' motion, Jelaidan primarily asserted that he had made a number of good faith attempts to request and obtain responsive account records from the banks, but that banking officials were unwilling to cooperate with him given his designations. The defendant did not provide any documentary evidence to verify these claims, but merely submitted his own affidavit in support. In response, plaintiffs offered affidavit testimony from Professor Jimmy Gurulé, former Under-Secretary (Enforcement) of the United States Department of the Treasury, which makes clear that the sanctions programs implemented by the United States and United Nations were purposely designed to prevent designees like Jelaidan from gaining access to funds or other assets in frozen bank accounts, *but not from requesting and obtaining basic banking records for the blocked account(s).* As Professor Gurulé states:

> Neither the text of E.O. 13224, nor any regulations promulgated thereunder, nor the text of UN Security Resolution 1267, nor any related Security Council resolutions, preclude a financial institution from providing a designated or listed party with account statements concerning an account that has been frozen or blocked.

> Neither the Treasury Department nor the UN 1267 Committee have ever interpreted either E.O. 13224 or UN Security Resolution 1267, or any related regulations or security resolutions, to preclude a financial institution from providing a designated or listed party with account statements concerning an account that has been frozen or blocked.

> And finally, neither the Treasury Department nor the UN 1267 Committee have ever prohibited or banned or taken action otherwise to preclude a financial institution from providing a designated or listed party with account statements concerning an account that has been frozen or blocked.

*See* Declaration of Professor Jimmy Gurulé, Exhibit 1 to plaintiffs' November 9, 2011 letter reply brief, attached hereto as Exhibit B.

---

[1] Since the commencement of merits discovery with the defendant, Jelaidan has made only a single production of documents to plaintiffs. That production, dating back to August 15, 2006, consisted of a mere 22 documents (104 pages), many of which are unresponsive to plaintiffs' discovery requests and have no relevance to the specific issues articulated in those requests.

The Honorable Frank Maas
January 30, 2013
Page 3

_____

At the November 16, 2011 discovery hearing, after first determining that the account records are in fact within Jelaidan's control given his practical ability to obtain them from the banks, the Court directed the defendant to undertake vigorous and expeditious efforts to obtain the requested banking materials, and to document those good faith efforts:

> I guess, Mr. McMahon, it comes down to the same thing I said with respect to your other two clients, namely, that there has to be a full-court press. And, as Mr. Carter indicated and I've said before, it has to be documented. If you're not sufficiently able to document a vigorous effort to obtain those documents, it may be that sanctions are imposed.

*See* November 16, 2011 Discovery Hearing Transcript, p. 33.

Only a few short weeks following the hearing (19 days), defendant's counsel sent a cursory email to plaintiffs' counsel, advising that further attempts by Jelaidan and his Saudi Arabian attorney (Mr. Bassim Alim) to obtain responsive documentation had been exhausted, claiming once again that certain government and commercial entities were unwilling to cooperate with the defendant and/or his attorney.  *See* December 5, 2011 email from Martin McMahon to plaintiffs' counsel, attached hereto as <u>Exhibit C</u>.

To date, plaintiffs have heard nothing further from the defendant regarding his attempts to obtain and produce responsive discovery materials, nor has the defendant produced any documentary evidence verifying his claims that he and his attorneys have made diligent and exhaustive efforts to contact banking officials and/or other potential custodians of documents responsive to Plaintiffs' First Set of Requests for Production of Documents Directed to Wa'el Hamza Jelaidan.  Indeed, the August 30, 2012 discovery deadline passed without receiving a single document from defendant Jelaidan or any explanation as to the vigorous efforts made to obtain any responsive documents.[2]  Accordingly, plaintiffs respectfully request that this Court enter an order compelling the defendant to immediately produce all documentation supporting any and all attempts undertaken by Jelaidan and his representatives to obtain the requested discovery materials.  Specifically, Jelaidan should be compelled to:

- Identify every source to which requests for responsive documents were made, including without limitation: (a) the date of the request; (b) the name of the individual and/or organization to whom the request was directed, including their title, address, telephone number, and email address; (c) documents sought by the request; and (d) the time period covered by the request;

- Produce all communications (oral and written) sent to and received from each identified source concerning the defendant's requests for documents and information (responsive

_____

[2] Jelaidan's failure to produce any documents in accordance with the August 30 deadline directed by this Court should not serve to benefit the defendant in these proceedings.  In the event that Jelaidan eventually complies with this Court's orders and produces responsive documentation and information, plaintiffs reserve the right to seek extensions of the existing discovery schedule to allow for translation, follow-up discovery, and motion practice.

The Honorable Frank Maas
January 30, 2013
Page 4

---

documents shall include, but are not limited to, correspondence, letters, emails, facsimiles, transcribed voicemails, or otherwise);

• Identify any and all independent efforts undertaken by Jelaidan to request and obtain responsive documents, including documentation verifying those efforts;

• Identify any additional efforts undertaken by Mr. McMahon and his staff at the Law Offices of Martin F. McMahon & Associates, and/or Mr. Alim, to request and obtain responsive documents, including documentation verifying those efforts; and

• Produce the letter received from Mr. Alim identified in Exhibit C.

Plaintiffs respectfully submit that the scope of the proposed order should extend to the defendant's attempts to request and obtain responsive materials both prior to *and* after the November 16, 2011 hearing.[3]

## II.   DEFENDANT JELAIDAN HAS FAILED TO RESPOND TO PLAINTIFFS' SUPPLEMENTAL DOCUMENT REQUESTS

On July 31, 2012, plaintiffs served their consolidated Supplemental Requests for Production of Documents to Wael Jelaidan, attached hereto as Exhibit D.  Those requests seek *inter alia*:  (i) banking and financial documents for additional accounts directly linked to the defendant; (ii) documents relating to Jelaidan's relationship with U.S. aviation schools attended by certain of the 9/11 hijackers; (iii) documents relating to Jelaidan's relationship with the Muwafaq Foundation, a purported charity co-founded by defendants Khalid bin Mahfouz and Yassin al Kadi which merged with al Qaeda prior to the 9/11 attacks; and (iv) documents relating to Jelaidan's relationship with individuals and entities that were a part of the al Qaeda financial network.

To date, the defendant has failed to serve responses to plaintiffs' supplemental discovery requests, and thus waives any objection to those requests.  Accordingly, plaintiffs respectfully request that the Court order Jelaidan to immediately produce all responsive materials in accordance with Rule 34(b)(2)(E).

---

[3] Plaintiffs reserve their right to seek sanctions from defendant Jelaidan for the issues addressed in this letter submission.  *See American Cash Card Corp. v. AT&T Corp.,* 184 F.R.D. 521 (S.D.N.Y. 1999) (granting sanctions and entering default judgment for repeated failures to comply with discovery orders); *Montblanc-Simplo GMBH v. Colibri Corp.,* 692 F. Supp. 2d 245 (E.D.N.Y. 2010) (granting motion for default judgment where defendants willfully refused to participate in the litigation); *Owen v. No Parking Today, Inc.,* 280 F.R.D. 106 (S.D.N.Y. 2011) (imposing sanctions of attorney's fees in response to the defendant's failure to fully respond to discovery requests and multiple orders and directives of the court).  However, largely because Jelaidan has provided virtually no information to date, plaintiffs believe that the issue of sanctions may be more appropriately addressed on the basis of a more complete record.

The Honorable Frank Maas
January 30, 2013
Page 5

Respectfully submitted,

THE MDL 1570 PLAINTIFFS' EXECUTIVE
COMMITTEES

cc:    The Honorable George B. Daniels, U.S.D.J. (Via Hand Delivery)
       Members of Plaintiffs' Executive Committees (Via Email)
       Martin F. McMahon, Esq. (Via Email)
       Alan R. Kabat, Esq. (Via Email)

PHILADELPHIA\6809995\3 117430.000

# Exhibit A

## MDL 1570 PLAINTIFFS' EXECUTIVE COMMITTEES
In re: Terrorist Attacks on September 11, 2001 (S.D.N.Y)

| Plaintiffs' Executive Committee for Personal Injury and Death Claims | Plaintiffs' Executive Committee for Commercial Claims |
|---|---|
| Ronald L. Motley, *Co-Chair*<br>MOTLEY RICE LLC<br>James P. Kreindler, *Co-Chair*<br>KREINDLER & KREINDLER LLP | Elliot R. Feldman, *Co-Chair*<br>Sean Carter, *Co-Chair*<br>COZEN O'CONNOR |
| Andrew J. Maloney III, *Co-Liaison Counsel*<br>KREINDLER & KREINDLER LLP<br>Paul J. Hanly, Jr., *Co-Liaison Counsel*<br>HANLY CONROY BIERSTEIN SHERIDAN FISHER & HAYES LLP | J. Scott Tarbutton, *Liaison Counsel*<br>COZEN O'CONNOR |

### VIA HAND DELIVERY

October 17, 2011

The Honorable Frank Maas
United States District Court for the
Southern District of New York
Daniel Patrick Moynihan United States
Courthouse
500 Pearl Street, Room 740
New York, NY 10007-1312

Re:    *In Re: Terrorist Attacks on September 11, 2001,* 03 MDL 1570 (GBD) (FM)

Dear Judge Maas:

In accordance with the Court's January 21, 2011 Order, Plaintiffs in the above referenced action submit this letter and the accompanying exhibits and respectfully request that Your Honor enter an order, pursuant to F.R.C.P. 37(a), compelling defendant Wa'el Hamza Jelaidan, an Executive Order 13224 terrorist designee, to promptly produce documentation and information relating to certain categories of documents previously requested by the Plaintiffs. Generally speaking, the documents at issue relate to: (1) banking and financial accounts associated with the terror financier, including a frozen account Jelaidan holds jointly with Osama bin Laden; (2) the defendant's relationship with other Executive Order 13224 designees, including transfers of millions of dollars between them; and (3) the imposition of financial and other sanctions upon Jelaidan following his September 2002 designations by the United States, Kingdom of Saudi Arabia, and United Nations.[1]

---

[1] There are a number of other serious deficiencies with the defendant's discovery responses that warrant this Court's attention. Plaintiffs will separately address those remaining issues in subsequent letter submissions.

The Honorable Frank Maas
October 17, 2011
Page 2

## I.   PLAINTIFFS' FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS

On June 13, 2006, Plaintiffs served their consolidated First Set of Requests for Production of Documents Directed to Wa'el Hamza Jelaidan, attached hereto as Exhibit 1. Plaintiffs' document requests were divided into Part A (comprising the first 25 requests) and Part B (the remaining 49 requests).[2]

Those requests seek *inter alia*: (i) relevant banking and financial documents, including documentation relating to an account Jelaidan holds jointly with Osama bin Laden; (ii) documents relating to investigations conducted by the United States and foreign governments into Jelaidan's terror sponsorship activities, including sanctions leveled against the defendant; (iii) documents relating to Jelaidan's employment with, and oversight of, several of the charities that were an integral part of the al Qaeda financial support infrastructure, including but not limited to the Muslim World League ("MWL"), International Islamic Relief Organization ("IIRO"), Rabita Trust, Saudi Joint Relief Committee ("SJRC"), and Al Haramain & Al Masjed Al Aqsa Charity Foundation ("AHAMAA"); and (iv) documents relating to Jelaidan's relationship with fellow Executive Order 13224 designees – Yassin Abdullah al Kadi and Chafiq Ayadi – and other prominent financial supporters of Osama bin Laden and al Qaeda.

On August 15, 2006, Jelaidan provided his responses to the Plaintiffs' Part A requests, and on September 13, 2006, Jelaidan provided his responses to the Plaintiffs' Part B requests. *See* Wael Jelaidan's Responses to the Plaintiffs' First Set of Requests for Production of Documents "Part A," and Wael Jelaidan's Responses to the Plaintiffs' First Set of Requests for Production of Documents "Part B," attached collectively hereto as Exhibit 2.

Following an examination of the defendant's discovery responses and documents, it is readily apparent that there are significant problems. First, the most glaring deficiency is the fact that the defendant has failed to produce a single document in response to sixty-seven (67) of the Plaintiffs' seventy-four (74) document requests. Just as egregious, the defendant has produced a mere 22 documents (104 pages) since the commencement of merits discovery, several of which are unresponsive to the Plaintiffs' discovery requests and have no relevance to the specific issues articulated in those requests.

Second, when responding to Plaintiffs' discovery requests, Jelaidan has in boilerplate fashion asserted conclusory and unsubstantiated objections regarding alleged burdens associated with producing responsive documentation and materials. Although the Federal discovery rules require a party to provide credible evidence to substantiate its objections, the defendant has failed to provide a single affidavit, declaration, or other document in support of those burden objections. *See Arias-Zeballos v. Tan*, 2007 U.S. Dist. Lexis 40245, *4 (S.D.N.Y. 2007) ("In

---

[2] Plaintiffs staggered their discovery requests in this manner, as well as the response times, so as to provide the defendant with sufficient time to search for and gather responsive materials and fully respond to the Plaintiffs' requests.

The Honorable Frank Maas
October 17, 2011
Page 3

order to satisfy its burden, the resisting party must do more than simply inton[e the] familiar litany that the [discovery requests] are burdensome, oppressive or overly broad, and must clarify and explain its objections and provide support thereof.").

Further, not only has Jelaidan blatantly ignored his continuing obligation under Federal Rule 26(e) to supplement his responses to the Plaintiffs' discovery requests, the defendant has failed to supplement his responses pursuant Judge Daniels' Order holding that "the appropriate temporal scope of discovery should reasonably begin in 1992," and further directing Jelaidan to respond to Plaintiffs' discovery requests in accordance with that determination. *See* Order, MDL Docket No. 2059, December 21, 2007. Jelaidan's failure to do so has significantly prejudiced the Plaintiffs' ability to obtain relevant and discoverable information.

Moreover, the defendant attempts to excuse his lack of production by repeatedly asserting that he neither has knowledge of nor possession of responsive documents. Jelaidan particularly relies upon this position when responding to Plaintiffs' requests seeking banking and financial records for accounts under his control. But neither Jelaidan's failure to conduct a diligent search for responsive records nor his bare "not in my possession" disclaimers fulfill his discovery obligations. *See Scott v. Arex, Inc.*, 124 F.R.D. 39, 41 (D. Conn. 1989) (Court holding that a party to a lawsuit cannot escape the obligation to produce documents by incanting .... 'not in my possession.' That a party does not possess documents is simply immaterial if those documents remain in that party's custody or control.").

Plaintiffs have well-founded concerns that Jelaidan does not intend to fulfill his discovery obligations in this important case and is in fact deliberately withholding the production of responsive documentation. Plaintiffs have attempted to contact Jelaidan's counsel, Martin McMahon, on at least three separate occasions to set up a meet and confer to discuss the defendant's discovery deficiencies, but Mr. McMahon's office has not responded to any of Plaintiffs' requests to schedule a conference. *See* Plaintiffs' emails to Martin McMahon dated April 14, 2011, and May 5, 2011 and May 16, 2011, attached hereto as <u>Exhibit 3</u>. Plaintiffs still do not have the requested information and, particularly given the impending deadline for document productions, intervention by this Court is now necessary. Accordingly, Plaintiffs respectfully request that the Court order Jelaidan immediately to produce all responsive materials.

### A.   Jelaidan's Timeframe and Burden Objections Have Previously Been Struck By This Court

Plaintiffs have served the defendant with a number of important discovery requests seeking a variety of relevant information, including without limitation, documents concerning: (i) meetings and conferences Jelaidan attended with other members of al Qaeda; (ii) relationships between members of al Qaeda and certain charities; (iii) Jelaidan's relationship with fellow Executive Order 13224 designees Yassin Abdullah al Kadi, Chafiq Ayadi, Adel Batterjee, and Hassan Cengic; (iv) Jelaidan's relationship with the al Qaeda charities such as the IIRO, AHAMAA, World Assembly of Muslim Youth ("WAMY"), and Third World Relief Agency

The Honorable Frank Maas
October 17, 2011
Page 4

_____

("TWRA"); and (v) bank accounts Jelaidan held jointly with the aforementioned individuals and entities. *See* Plaintiffs' Request Nos. B12-14 and B38-43 at Exhibit 1.

Jelaidan has failed to produce a single document in response to these document requests, primarily relying on his objection that the timeframe and breadth of the requests is "too expansive and burdensome:"

> Despite the foregoing and preserving all our objections, WJ states that no responsive documents will be produced because both the timeframe and breadth of this request is much too expansive and burdensome. Should Plaintiffs identify a reasonable amount of specific individuals and a reasonable and relevant timeframe, WJ would endeavor to focus a search that may or may not produce documents responsive to this request.

(Emphasis added). *See* Jelaidan's Responses to Plaintiffs' Request Nos. B12-14 and B38-43 at Exhibit 2. As this Court will recall, Judge Daniels previously considered, rejected, and struck the defendant's timeframe and burden objections, holding that the appropriate temporal scope of discovery should reasonably begin in 1992, and further directing Jelaidan to respond to the Plaintiffs' discovery requests in accordance with that determination. *See* December 21, 2007 Order (MDL Docket Entry No. 2059). The defendant has failed to supplement his discovery responses and/or produce a single document since the Court's December 2007 Order. Plaintiffs therefore respectfully request that Your Honor direct Jelaidan to comply with the Court's prior orders and immediately produce all requested documents.

**B.     Jelaidan Should Be Compelled To Produce All Banking And Financial Records**

Plaintiffs have served the defendant with several discovery requests seeking banking and financial records for accounts linked to Jelaidan, including the defendant's personal bank accounts and other accounts over which he has signatory authority and control. Although the defendant responded to Plaintiffs' banking requests by producing a few documents (mostly unresponsive), Jelaidan has largely failed to produce any of the requested information relating to a number of bank accounts the Plaintiffs have discovered through their independent investigations, as well as certain accounts Jelaidan himself has acknowledged in his discovery responses.[3] In support of his non-production, the defendant relies primarily upon his contention that he "neither has knowledge of nor possession" of the requested banking records. As

_____

[3] The discussion which follows focuses on a select number of identified bank accounts held in Jelaidan's name, or over which he held signatory or account authority. Plaintiffs focus on these particular accounts merely as a means of demonstrating Jelaidan's failure to comply with his discovery obligations in responding to Plaintiffs' document requests. However, through the instant application, Plaintiffs seek an Order directing Jelaidan to produce any and all records for *any* bank account held in his name, or relative to which he held signatory or account authority, during the relevant timeframe. For the reasons discussed in Section F below, that timeframe should extend at least back to the formation of al Qaeda in 1988.

The Honorable Frank Maas
October 17, 2011
Page 5

_____

discussed in further detail below, that response fails to meet Jelaidan's most basic obligations under the Federal discovery rules.

> 1.   **Jelaidan has "control" over his bank accounts and must produce documents concerning those accounts in accordance with Rule 34.**

The federal courts have been clear that a party may not forego his duty to produce responsive documents by asserting that they are "not in my possession," and must produce documents where the party has the legal right to obtain such documents on demand. *See Scott v. Arex, Inc.*, 124 F.R.D. 39, 41 (D. Conn. 1989) (Court holding that a party to a lawsuit cannot escape the obligation to produce documents by incanting .... 'not in my possession.' That a party does not possess documents is simply immaterial if those documents remain in that party's custody or control.").

Rule 34(a) of the Federal Rules of Civil Procedure requires production of all responsive, non-privileged documents within a party's "possession, custody or control" that are responsive to another party's document request. *See United States v. Stein*, 488 F. Supp. 2d 350, 361 (S.D.N.Y 2007) ("Legal ownership of the requested documents or things is not determinative, nor is actual possession necessary if the party has control of the items. *Control* has been defined to include the legal right to obtain the documents requested upon demand. The term 'control' is broadly construed."); *Florentia Contracting Corp. v. The Resolution Trust Corp.*, 1993 WL 127187, at *3 (S.D.N.Y. Apr. 22, 1993) ("Control has been defined as the legal right, authority, or ability to obtain upon demand documents in the possession of another."); *The Bank of New York v. Meridien BIAO Bank Tanzania Ltd.*, 171 F.R.D. 135 (S.D.N.Y. 1997) (stating that control does not require that the party have legal ownership or actual physical possession of the documents at issue, but rather, documents are considered to be under a party's control when that party has the right, authority or practical ability to obtain the documents from a non-party to the action); *In Re Flag Telecom Holdings*, 236 F.R.D. 177, 180 (S.D.N.Y. 2006) ("If the producing party has the legal right or the practical ability to obtain the documents, then it is deemed to have 'control,' even if the documents are actually in the possession of a non-party.").

Following that reasoning, the courts have similarly held that a party has control over his or her bank account records and must produce them in accordance with Rule 34. See *Dorocon, Inc. v. Burke*, 2005 U.S. Dist. Lexis 38839, at *52-53 (D.D.C. 2005) (reasoning that control is not defined by actual possession but also includes constructive possession (i.e., the legal right to obtain documents on demand), the court held that Rule 34(a) obligates the party to turn over documents such as bank statements "given that they enjoy constructive possession of such documents."); *Engel v. Town of Roseland*, 2007 U.S. Dist. Lexis 73645 (N.D. Ind. 2007) (holding that when a person has a right to obtain copies of his bank statements, the party is in control of those documents and must produce them in response to a request under Rule 34); *Thomas v. Deloitte Consulting L.P.*, 2004 Dist. Lexis. 29154 (N.D. Tex. 2004) (ordering production of bank statements); *Zervos v. S.S. Sam Houston*, 79 F.R.D. 593, 595-96 (S.D.N.Y. 1978) (where the plaintiff failed to produce the requested banking records by claiming they were not in his possession, the court ordered the plaintiff to request production of the records from the Swiss Bank, holding that "[p]roduction may be ordered when a party has a legal right to obtain

The Honorable Frank Maas
October 17, 2011
Page 6

papers, even though he has no copy, and regardless of whether a paper is beyond the jurisdiction of the Court.").

## 2. Jelaidan's accounts at Faisal Finance (Switzerland) S.A.

Plaintiffs served the following requests seeking banking records for accounts held by the defendant at Faisal Finance (Switzerland) S.A.[4]

- Request No. A-6 – Please provide any and all documents relating to any financial accounts held by You in Faisal Finance and/or any Faisal Finance accounts over which You hold or have held signatory authority, including without limitation, monthly or annual account statements, correspondence, deposits, withdrawals, cleared or canceled checks, wire transfers, or investments, including the source or destination of funds deposited into or withdrawn from any such account.

- Request No. A-7 – Please provide any and all documents relating to Switzerland's investigation and post 9-11 determination to freeze any and all accounts in Your name and/or any accounts over which you hold or held signatory authority, including without limitation, all documents identifying any and all accounts, assets, and/or monies frozen by the Swiss government.

Jelaidan produced a mere two documents in response to Request Nos. A-6 and A-7: (1) a three-page bank statement for Account No. x0409 at Faisal Finance for the month of January 2005 (WJ003); and (2) a September 25, 2002 letter from Faisal Finance notifying Jelaidan that Account No. x0409 has been frozen per the directives of the Swiss Federal Prosecutor (WJ013). The defendant further responds as follows:

WJ neither has knowledge of nor possession of any additional documents other than what has been produced which are responsive to this request.

*See* Exhibit 2, pp. 6-7. As the case law cited above makes clear, Jelaidan's discovery obligations under the Federal Rules require him to do more than simply assert that responsive banking records are not in his possession, particularly when he has the legal right, authority, and/or practical ability to request them from the bank. There is no question that Jelaidan has control over Account No. x0409 and/or any other account associated with him at Faisal Finance. Indeed, the defendant's production of the January 2005 account statement makes clear that Jelaidan has successfully requested and obtained responsive banking records from the Swiss bank despite the freezing of the account three years earlier in 2002.

Jelaidan's document production in response to Plaintiffs' Request Nos. A-6 and A-7 is significantly inadequate and the defendant should be compelled to immediately produce all responsive documents.

---

[4] Executive Order 13224 designee and al Qaeda financier, Yassin al Kadi, also held personal and business accounts at Faisal Finance (Switzerland) S.A. As discussed in Section C(1) herein, Kadi used his accounts at Faisal Finance to transfer millions of dollars to Jelaidan.

The Honorable Frank Maas
October 17, 2011
Page 7

---

        **3.    Jelaidan's accounts at Al Rajhi Banking & Investment Corporation.**

     Plaintiffs also served the following request seeking banking records for all accounts held by the defendant at Al Rajhi Bank:

-     Request No. A-8 – Please provide any and all documents relating to any financial accounts held by You in the al Rajhi Banking & Investment Corporation ("al Rajhi") and/or any al Rajhi accounts over which You hold or have held signatory authority, including without limitation, monthly or annual account statements, correspondence, deposits, withdrawals, cleared or canceled checks, wire transfers, or investments, including the source or destination of funds deposited into or withdrawn from any such account.

     The defendant responded to Plaintiffs' discovery request with the following:

     Despite the foregoing and preserving all our objections, WJ has no statements post dating the freezing of his account.  WJ is currently endeavoring to obtain statements prior to the freezing of his account (but not prior to 1996) and will produce such documents if and when they may be found.

*See* Exhibit 2, p. 7.

     Despite the defendant's assurances in 2006 that he was working to obtain the requested documentation, Jelaidan has yet to produce a single document relating to his accounts at Al Rajhi Bank.  Nor has the defendant advised Plaintiffs of the status of his efforts to obtain the requested banking records.  Accordingly, Jelaidan should be compelled to produce all relevant banking records for any and all accounts associated with the defendant at Al Rajhi Bank, including without limitation, all bank statements for the life of the accounts (both *prior to and after* the date of freezing).

        **4.    Jelaidan's joint account with Osama bin Laden at Habib Bank.**

     In addition to the frozen accounts at Faisal Finance (Switzerland) S.A. and Al Rajhi Bank, a third account linked to Jelaidan has been frozen following the September 11th attacks.  According to media reporting, the government of Pakistan identified and seized an account Jelaidan held jointly with Osama bin Laden at Habib Bank in Peshawar in or around June 2003.  *See* Ikram Hoti, *Accounts of 15 Terrorist Organizations Frozen*, World News Connection (June 21, 2003) (identifying the frozen Jelaidan-bin Laden account as: "Osama Bin-Laden and Wael Jelaidan FC-CD xx051-1 USS 342.04 Habib Bank Limited (HBL) Cantt Br. Peshawar"), attached hereto as Exhibit 4; *see also* November 18, 2002 letter from the State Bank of Pakistan to William C. Murde, Director of the Treasury Department's Task Force on Terrorist Financing, regarding the status of certain frozen accounts, including the Jelaidan-bin Laden account, attached hereto as Exhibit 5.

The Honorable Frank Maas
October 17, 2011
Page 8

_____

   Based on this reporting and other available information, Plaintiffs served the following document requests:

•   Requests No. A-3 – From the period beginning January 1984 through the present, please provide any and all documents relating to any accounts You hold or held jointly with, or on behalf of Osama Bin Laden (including any member of the Bin Laden family), including without limitation, any accounts over which You held or hold signatory authority.  Such documents shall include, but are not limited to, monthly or annual account statements, correspondence, deposits, withdrawals, cleared or canceled checks, wire transfers, or investments, including the source or destination of funds deposited into or withdrawn from any such account.

•   Request No. A-4 – Please provide any and all documents relating to the Islamic Republic of Pakistan's investigation and post 9-11 determination to freeze any and all accounts in Your name and/or any accounts over which you hold or held signatory authority, including without limitation, all documents identifying any and all accounts, assets, and/or monies frozen by the Islamic Republic of Pakistan, including the following: "Osama Bin-Laden and Wael Jelaiden FC-CD xx051-1 USS 342.04 Habib Bank Limited (HBL) Cantt Br. Peshawar."

   Jelaidan responds to Request No. A-3 by merely asserting that "no such documents exist." *See* Exhibit 2, p. 5.  The defendant's contention is simply not true in light of the specifically identified Jelaidan-bin Laden account at Habib Bank in Pakistan.

   In response to Plaintiffs' Request No. A-4, the defendant has produced seven (7) documents, including but not limited to:  (i) a September 25, 2002 letter from Faisal Finance (Switzerland) S.A. to Jelaidan stating that the Swiss Federal Prosecutor has ordered the freezing of Jelaidan's account (WJ013); (ii) a letter from the MWL Secretary General, Dr. Abdullah bin Abdul Mohsin al Turki, to the Ambassador of Pakistan in the Kingdom of Saudi Arabia, Admiral Abdul Aziz Mirza, requesting that the Rabita Trust accounts in Habib Bank be unfrozen by the government of Pakistan (WJ021); (iii) a December 16, 2002 letter from Javed Masud, Government of Pakistan, Cabinet Division, to the MWL Secretary General, Dr. Abdullah bin Abdul Mohsin al Turki, stating that Jelaidan's continued presence on the Board of Rabita Trust acts "as an impediment in defreezing the accounts of the Rabita Trust" (WJ008); and (iv) an October 15, 2001 statement by Jelaidan (unsigned) asserting that neither he nor Rabita Trust were involved or connected to al Qaeda or Osama bin Laden (WJ015).  None of these mostly self-serving documents are remotely responsive to Plaintiffs' request that made specific reference to the Jelaidan-bin Laden account.

   Moreover, Jelaidan once again falls back on his oft-stated position that he is not in possession of responsive documents:

   WJ neither has knowledge of nor possession of any additional documents other than what has been produced which are responsive to this request.

The Honorable Frank Maas
October 17, 2011
Page 9

---

*See* Exhibit 2, p. 5.  As a named account holder and beneficiary of the account at Habib Bank, Jelaidan most certainly has control over the requested documents and thus the legal right, authority, and practical ability to request and obtain all responsive banking records from Habib Bank relating to the account he holds jointly with bin Laden.  Accordingly, this Court should compel the defendant to promptly produce the requested banking documents.[5]

### 5.   Other responsive account records at Habib Bank.

Given the defendant's relationship with Habib Bank (as evidenced by the Jelaidan-bin Laden account), Plaintiffs served Jelaidan with the following request seeking documents for any and all bank accounts at Habib Bank associated with the defendant, including any account over which Jelaidan holds signatory authority:

- Request No. A-2 – Please provide any and all documents relating to any financial accounts held by You in Habib Bank and/or any Habib Bank accounts over which You hold or have held signatory authority, including without limitation, monthly or annual account statements, correspondence, deposits, withdrawals, cleared or canceled checks, wire transfers, or investments, including the source or destination of funds deposited into or withdrawn from any such account.

Although Jelaidan responds that he "neither has knowledge of nor possession of" documents responsive to this request,[6] the defendant does produce an August 21, 2002 letter authored by himself in his capacity as the Secretary General of Rabita Trust, to the State Bank of Pakistan, requesting that six (6) Rabita Trust accounts held at Habib Bank be unfrozen and the funds contained therein released.  *See* Exhibit 6 (identifying Account Nos. xx973-1, x536, xx206-4, x254, x255, and x414).

As the leading official for Rabita Trust, Jelaidan would have signatory authority over the Rabita Trust accounts at Habib Bank and thus the supervisory authority to manage the disposition of the funds in those accounts at the time they were frozen.  Accordingly, responsive banking records in the possession of Habib Bank are within defendant Jelaidan's control by virtue of his signatory authority.  Therefore, Plaintiffs submit that these six Rabita Trust accounts are responsive to Request No. A-2 and the defendant should be compelled to request, obtain, and produce all responsive banking records relating to these accounts.

Similarly, in documents resolving an arbitrated dispute between Jelaidan and another man concerning funds for a project in Afghanistan, Jelaidan indicated that he had control of various accounts at Habib Bank related to that project.  According to representations to which Jelaidan agreed, Jelaidan wrested control of all the components of the project, "pressured the director of the (Habib Bank), Peshawar Kant Branch, and managed to seize control of all the bank accounts

---

[5] To the extent Jelaidan is attempting to make a semantic distinction to avoid production of the requested documents, for instance on the ground that bin Laden is not formally listed by name on the account, his attempts to avoid discovery should be rejected.

[6] *See* Exhibit 2, p. 4.

The Honorable Frank Maas
October 17, 2011
Page 10

---

of the project." *See* Exhibit 7. Given the control over those accounts that Jelaidan was shown to have, he should be compelled to request, obtain, and produce all responsive banking records relating to those accounts as well.

### 6.    Jelaidan's bank accounts associated with the charities.

As this Court will recall from Plaintiffs' prior submissions in this case, Jelaidan is a long-time associate of Osama bin Laden, a founding member of al Qaeda, and an Executive Order 13224 Specially Designated Global Terrorist. The U.S. Treasury Department statement supporting Jelaidan's designation details the defendant's ties to the terror group and its senior members:

> Wa'el Hamza Julaidan, a Saudi citizen, is an associate of Osama bin Laden. Julaidan fought with bin Laden in Afghanistan in the 1980s. Julaidan is also associated with several individuals and entities linked to al Qaida, including bin Laden's lieutenants, Ayman al Zawahri, Abu Zubaida, and Mohammed Atef; and the organizations: Maktab al Khidmat, the Rabita Trust, and al-Gamma al Islamiya. These individuals and entities have been previously designated under President Bush's Executive Order and by the United Nations.

> Bin Laden himself acknowledged close ties to Julaidan during a 1999 interview with al-Jazeera TV. When referring to the assassination of al Qaida co-founder Abdullah Azzam, bin Laden stated that "we were all in one boat, as is known to you, including our brother, Wa'el Julaidan." Julaidan has established contacts with several known Islamic extremists, including bin Laden's principal lieutenant, Ayman al-Zawahri. Another bin Laden lieutenant, Abu Zubaida, claimed that he had accompanied Julaidan from Pakistan to Kandahar, Afghanistan during the summer of 2000. Zubaida said that Julaidan met with bin Laden and senior bin Laden lieutenant Mohammed Atef soon after arriving in Kandahar.

> In February 2000, Julaidan was appointed to the Board of Trustees of the Rabita Trust and served as its director general. The Rabita Trust is an NGO designated under President Bush's Executive Order as an organization that provided logistical and financial support to al-Qa'ida.

> BASIS FOR DESIGNATION

> The United States has credible information that Wa'el Hamza Julaidan is an associate of Osama bin Laden and several of bin Laden's top lieutenants. **Julaidan has directed organizations that have provided financial and logistical support to al-Qa'ida.** Accordingly, the United States is designating Julaidan under Executive Order 13224 as a person who supports terror.

(Emphasis added). *See* U.S. Treasury Department's September 6, 2002 press release discussing the Executive Order 13224 designation of Jelaidan, attached hereto as Exhibit 8. The United

The Honorable Frank Maas
October 17, 2011
Page 11

_____

Nations similarly designated Jelaidan as a member of al Qaeda on September 11, 2002, attached
as Exhibit 9.

      Consistent with the U.S. government's position that the defendant oversaw organizations
that supported al Qaeda, Plaintiffs have submitted compelling evidence in these proceedings in
support of their contention that Jelaidan used his high-ranking leadership positions within several
ostensible charities to deliberately direct material, logistical, ideological, and other forms of
support to Osama bin Laden, al Qaeda, and affiliated terror groups, including massive amounts
of money. See Plaintiff's Chart at Exhibit 10 (summarizing key allegations and evidence relating
to Jelaidan's relationship with the Muslim World League ("MWL"), International Islamic Relief
Organization ("IIRO"), Rabita Trust, Saudi Joint Relief Committee ("SJRC"), Al Haramain & Al
Masjed Al Aqsa Charity Foundation ("AHAMAA"), and Saudi Red Crescent ("SRC")).

      Importantly, as a principal official of those organizations, Jelaidan would have had
signatory authority over the charities' bank accounts and thus the requisite control to direct the
movement of funds in and out of those accounts in support of terror activities. For example,
Jelaidan opened three bank accounts on behalf of the designated AHAMAA "between 1997 and
2001 and continued to have the authorization to handle two of their accounts as a signatory on
two [of] the NGO's Bosnian accounts." Id. Additionally, as discussed in the previous section,
Plaintiffs are aware of at least six (6) accounts at Habib Bank which were seized from Rabita
Trust and frozen following the September 11, 2001 attacks (Account Nos. xx973-1, x536,
xx206-4, x254, x255, and x414). As the Secretary General of Rabita Trust, Jelaidan would have
had signatory authority and control over these accounts. In light of the evidence of Jelaidan's
prominent role in funding the al Qaeda network via the charities, Plaintiffs served the defendant
with the following requests seeking relevant bank account records:

-     Request No. B-19 – From the period beginning January 1984 through the present, please
  provide all documents relating to any accounts in any banking or financial institution You
  hold or held jointly with, or on behalf of the Charities, and/or any Charity accounts over
  which You hold or have held signatory authority. [The term "Charities" refers to the
  Muslim World League ("MWL"), Rabita Trust, Saudi Joint Relief Committee ("SJRC"),
  and Saudi Red Crescent ("SRC").]

-     Request No. B-43 – Please provide all documents relating to any accounts in any banking
  or financial institution You hold or held jointly with, or on behalf of the entities identified
  in Exhibit C, and/or any accounts over which You hold or have held signatory authority.
  [Entities identified in Exhibit C include, but are not limited to: International Islamic
  Relief Organization ("IIRO"), Al Haramain & Al Masjed Al Aqsa Charity Foundation
  ("AHAMAA"), Third World Relief Agency ("TWRA"), Al Haramain Islamic
  Foundation, and World Assembly of Muslim Youth ("WAMY").]

      Jelaidan fails to produce documents in response to Request No. B-19, again chiefly
relying upon his assertion that he has no documents in his possession. See Exhibit 2, pp. 11-12.
Further, the defendant once again asserts that both the timeframe and breadth of the requests are
"much too expansive and burdensome" to produce relevant documentation in response to

The Honorable Frank Maas
October 17, 2011
Page 12

Request No. B-43.  *Id.* at p. 24.  As discussed in Section I(A) supra, this Court previously struck the defendant's timeframe and burden objections and directed Jelaidan to respond to the Plaintiffs' discovery requests in accordance with that determination.  To date, the defendant has failed to act in accordance with the Court's December 2007 Order and Plaintiffs respectfully submit that the defendant should be compelled to produce all responsive bank records.

> 7.    **Jelaidan's bank account associated with the Third World Relief Agency.**

        In addition to his use of the above mentioned charities to fulfill the terror group's fundraising needs, Jelaidan was determined to find and use other opportunities to direct financial and material support to the al Qaeda network.  Jelaidan successfully did so by virtue of his relationship with the leaders of the Sudan-based Third World Relief Agency ("TWRA"), a purported charitable organization that provided the people of Bosnia-Herzegovina with humanitarian assistance during the war in the former Yugoslavia.  According to CIA intelligence, the TWRA was in fact aiding Islamic terrorist groups in the region.[7]  The 9/11 Commission similarly concluded that bin Laden "made use of the already-established Third World Relief Agency" to provide financial and other support for al Qaeda's terrorist activities. *See Final Report of the National Commission on Terrorist Attacks Upon the United States*, available at http://govinfo.library.unt.edu/911/report/911Report.pdf, at p. 58. German authorities, providing judicial assistance to the Office of the Prosecutor of the International Court of Criminal Justice for the former Yugoslavia, conducted an investigation of TWRA bank accounts and discovered large monetary transfers to those accounts from the Islamic world, including six (6) suspicious transactions directly linked to Jelaidan himself at Bank Austria (Acct. No. xxxxx1587), totaling more than $11 million.  *See German Intelligence Report regarding the TWRA*, attached as Exhibit 11, pp. 13-15.  Consequently, Plaintiffs served the following request:

- Request No. A-9 – Please provide any and all documents relating to any financial accounts held by You in the Bank Austria and/or any Bank Austria accounts over which You hold or have held signatory authority, including without limitation, monthly or annual account statements, correspondence, deposits, withdrawals, cleared or canceled checks, wire transfers, or investments, including the source or destination of funds deposited into or withdrawn from any such account.

        Not surprisingly, the defendant fails to produce a single document in response to the Plaintiffs' request and continues to assert the following:

> No documents will be produced as WJ neither has knowledge of nor possession of any such documents.

*See* Exhibit 2, pp. 7-8.

---

[7] According to a 1996 CIA report, the TWRA was one of several charitable organizations facilitating the activities of terrorist groups operating in Bosnia-Herzegovina region.  Employees of the TWRA have conducted suicide bombings and engaged in massive weapons smuggling operations. *See* Exhibit 27.

The Honorable Frank Maas
October 17, 2011
Page 13

_____

      Given the defendant's ongoing resistance to produce relevant bank account records under his control, which he has the legal right to request and obtain directly from the bank, this Court should compel Jelaidan to immediately produce all documents responsive to Request No. A-9.

    **8.    Jelaidan's bank accounts in Turkey.**

      Maram Company, located in Istanbul, Turkey, is a Jelaidan-owned travel and trading firm that has significant ties to al Qaeda. Maram was founded by Mamdouh Mahmud Salim, a former al Qaeda financial officer who is now serving time in a U.S. prison for his involvement in the bombing of the U.S. embassies in Kenya and Tanzania in August 1998. In 1997, Jelaidan and his partner Mohamed Bayazid became owners of Maram when Salim transferred his shares in the company to them.[8]

      In 1998, Yassin al Kadi, an Executive Order 13224 designee and al Qaeda financier, transferred $1.25 million to Jelaidan. *See* March 23, 2007 letter from the Office of the Swiss Federal Examining Magistrates office to U.S. authorities at Exhibit 12; *see also* Memorandum in Support of Defendants' Motion to Dismiss or, in the Alternative, For Summary Judgment (*Yassin Abdullah Kadi v. Timothy Geithner, et al.*, Case No. 09-0108), attached hereto as Exhibit 13, pp. 11 and 21. Although Kadi told U.S. authorities that the $1.25 million was intended for the Al Imam University in Yemen,[9] the money was suspiciously transferred to Jelaidan through a Turkish account connected to Maram.[10] *See* Exhibit 14 (Swiss prosecutors investigating Kadi's links to Jelaidan and al Qaeda stated that "the Turkish account Juleidan used in Turkey to receive al Qadi's money might be linked to the Maram Company, a ***ucture connected (according to your intel services) to al Qa'eda.").

      As the owner of Maram, Jelaidan has the legal right, authority, and practical ability to request and obtain responsive banking records relating to any and all bank accounts associated with that company. Accordingly, this Court should compel the defendant to produce all banking records for Maram, including any other accounts associated with Jelaidan in Turkey.

_____

[8] Bayazid (a/k/a Abu Rida) is an al Qaeda founding member (like Jelaidan) who participated in obtaining weapons and communications equipment for the terror organization. Bayazid also sought to obtain uranium for a nuclear weapon for Osama bin Laden.

[9] Al Imam is not the ordinary university one would expect. Founded by Sheikh Abd al Majid al Zindani, a bin Laden associate and al Qaeda recruiter who was designated by the U.S. Department of the Treasury, "Al Imam students are suspected of being responsible, and were arrested, for recent terrorist attacks, including the assassination of three American missionaries and the assassination of the number two leader for the Yemeni Socialist party, Jarallah Omar. Notably, John Walker Lindh was also a student at Al Iman University before he joined the Taliban." *See* February 24, 2004 OFAC press release regarding the designation of Abd al Majid al Zindani which can be found at http://www.treasury.gov/press-center/press-releases/Pages/js1190.aspx.

[10] The $1.25 million came from the account of Kadi's company, Karavan Development Group. Karavan's account was held at Faisal Finance (Switzerland) S.A.

The Honorable Frank Maas
October 17, 2011
Page 14

---

9.      **Jelaidan should be ordered to produce affidavit testimony and other supporting documentation detailing his efforts to request and obtain responsive banking records.**

As demonstrated by the foregoing, including Plaintiffs' Chart at Exhibit 10, the breadth of Jelaidan's involvement in the financial support infrastructure used to fund the al Qaeda terrorist network is staggering. Using his leadership positions within multiple charitable organizations, including his relationships with other prominent financiers of the al Qaeda network, the al Qaeda co-founder was able to direct massive amounts of material, financial, and other forms of support to Osama bin Laden and his terror organization. Consequently, any and all banking accounts linked to Jelaidan, one of the premier al Qaeda financiers over the past 20+ years, should be fair game in these discovery proceedings.

Jelaidan contends in his discovery responses that he does not physically possess the requested banking documents. As a central figure in a global terror organization responsible for the murder of nearly 3,000 innocent individuals on September 11, 2001, it is feasible that Jelaidan would choose not to personally retain copies of sensitive banking records that could be easily seized from him by investigating authorities. However, the Federal discovery rules and the courts are clear that the defendant must do more than merely assert that he does not have possession of responsive banking documents which are under his control. Rather, Jelaidan is required to request the production of those records directly from the bank and produce those immediately to the Plaintiffs upon receipt. To date, Plaintiffs have yet to see any evidence that Jelaidan has made any such effort to request, obtain, and produce the relevant documents.

Plaintiffs therefore respectfully request that Your Honor compel Jelaidan to immediately request and produce *all* bank account records requested by the Plaintiffs. In the event that the defendant is unable to obtain the banking records after a formal request, Plaintiffs respectfully submit that Jelaidan should be ordered to submit an affidavit and all supporting documentation detailing his efforts to obtain the requested materials, including without limitation: (1) identification of all bank representatives that were contacted relative to the defendant's request to produce all banking records, attaching all written communications exchanged in requesting the information; (2) a description of the specific subject matters that were discussed with the bank representatives; (3) a description of the search conducted by the bank, including locations searched; (4) a detailed description as to why the defendant was unable to obtain the requested records; and (5) any other detail that demonstrates the defendant made a reasonable, good faith attempt to obtain the requested documents.

C.      **Jelaidan Should Be Compelled to Produce Documentation Relating To His Relationships with Other Executive Order 13224 Designees**

Plaintiffs served the defendant with discovery requests seeking documents relating to his relationship with fellow Executive Order 13224 designees Yassin Abdullah al Kadi, Chafiq Ayadi, Hasan Cengic, and Adel Batterjee, including documents relating to the transfers of funds between Jelaidan and those individuals and any banking or financial accounts Jelaidan held jointly with those individuals:

The Honorable Frank Maas
October 17, 2011
Page 15

---

- Request No. B-38 – Please provide any and all documents governing, describing, detailing, or otherwise relating to the relationship between You and the persons identified in Exhibit B.  [Persons identified in Exhibit B include, but are not limited to:  Yassin Abdullah al Kadi, Chafiq Ayadi, Hasan Cengic, Adel Batterjee, and Mohamed Bayazid.]

- Request No. B-39 – Please provide any and all documents sent to, and/or received from the persons identified in Exhibit B, including without limitation, all documents relating to the transfer of funds between You and those persons.

- Request No. B-40 – Please provide all documents relating to any accounts in any banking or financial institution You hold or held jointly with, or on behalf of the persons identified in Exhibit B, and/or any accounts over which You hold or have held signatory authority.

*See* Plaintiffs' Request Nos. B38-40 at <u>Exhibit 1</u>.

Once again, Jelaidan objects to each of these discovery requests by asserting that both the timeframe and breadth of the requests are "much too expansive and burdensome:"

> Despite the foregoing and preserving all our objections, <u>WJ states that no</u>
> <u>responsive documents will be produced because both the timeframe and breadth</u>
> <u>of this request is much too expansive and burdensome</u>.  Should Plaintiffs identify
> a reasonable amount of specific individuals and a reasonable and relevant
> timeframe, WJ would endeavor to focus a search that may or may not produce
> documents responsive to this request.

(Emphasis added).  *See* Jelaidan's Responses to Plaintiffs' Request Nos. B38-40 at <u>Exhibit 2</u>.

Despite this Court's December 2007 Order (MDL Docket Entry No. 2059) rejecting and striking Jelaidan's timeframe and burden objections, the defendant has yet to produce a single document in response to Plaintiffs' discovery requests and should be compelled to immediately produce the requested materials.

### 1. Jelaidan has failed to produce any documents relating to his relationships with Yassin Abdullah al Kadi and Chafiq Ayadi.

Jelaidan has failed to produce documents relating to fellow Executive Order 13224 designees Yassin Abdullah al Kadi and Chafiq Ayadi despite well-documented personal and business relationships between and among the three men.  *See* October 12, 2001 U.S. Department of the Treasury designations for Kadi and Ayadi, attached hereto as <u>Exhibit 15</u>.

Family friends since the 1980's, Jelaidan and Kadi are known to have held seats on various boards together, invested in several businesses together, and have generally supported each other's business and/or purported charitable endeavors.  For instance, the two men were board members of the Executive Order 13224 designated Al Haramain & Al Masjed Al Aqsa

The Honorable Frank Maas
October 17, 2011
Page 16

Charity Foundation ("AHAMAA").  *See* Statement of Yassin Abdullah Kadi to the U.S. Foreign
Assets Control at Exhibit 16, pp. 42 and 55; *see also* Plaintiff's Chart at Exhibit 10 (discussing
the Treasury Department's designation of the AHAMAA).  In addition, Jelaidan and Kadi sat on
the board of the Dar al Walidain School in Sarajevo, Bosnia, which operated under the patronage
of the AHAMAA.  *See* Exhibit 16, pp. 54-55.

Jelaidan and Kadi were also shareholders in Abrar of Saudi Arabia, a travel company
established to provide services to Muslim pilgrims, as well as a Bosnian investment company
called Euroinvest which had originally been created by E.O. 13224 designee Ayadi.  *See* Exhibit
16, pp. 54-56, 67, and 77.

Moreover, when Jelaidan was appointed as Executive Director of the Saudi Joint Relief
Committee ("SJRC") in Albania and Kosovo in 1999, Kadi's companies in Albania provided the
SJRC with considerable support and resources.  *See* Exhibit 16, pp. 54 and 56 (stating that
Kadi's companies provided the SJRC with apartments and office space, among other things).

Kadi is also known to have transferred significant sums of money directly to Jelaidan.
According to Swiss authorities, Kadi transferred approximately $23 million to the accounts of
Jelaidan.  *See* Exhibit 17.  In addition, Kadi transferred $1.25 million to Jelaidan in 1998 through
the defendant's Maram Company in Turkey.  *See* Section B(8) supra.

Importantly, Jelaidan was instrumental in introducing Kadi to Chafiq Ayadi.[11]  While
working with Kadi to establish an advanced teacher's college in Zagreb, Croatia, Jelaidan
recommended that Kadi hire Ayadi to manage the college.  *See* Exhibit 16, pp. 34 and 54; *see
also* Exhibit 19, OFAC Designation Memorandum for Yassin al Kadi, p. 8.  That same year,
Kadi hired Ayadi to head Muwafaq's European operations, again based upon the
recommendation from Jelaidan.  *See* Exhibit 13, pp. 10 and 21-22; Exhibit 19 at p. 28 (stating
that there is "substantial and credible evidence that both Muwafaq as an entity, and many of the
individuals charged with operating it and distributing its funds, were engaged in a longstanding
pattern of supporting terrorist and extremist causes.").  Notably, all three men were shareholders
in KA Stan, a construction company set up in 1996.  *See* Exhibit 16, p. 79.

Having failed to produce any documents in response to Request Nos. B-38-B-40,
Plaintiffs respectfully request that Your Honor compel the defendant to produce all responsive
documentation and information requested by the Plaintiffs.

---

[11] Ayadi has been identified as one of the heads of the Tunisian Islamic Front ("TIF"), which is the armed branch of
Ennahdha, a Tunisian terrorist organization.  *See* INTERPOL Fusion Taskforce, Financing of Terrorism, March
2003, attached hereto as Exhibit 18, pp. 26-29.  In the 1990's, Ayadi went to Afghanistan where he became the TIF
representative to al Qaeda and attended military training camps.  *Id.*  During the Bosnian War, Ayadi acted under the
cover of a humanitarian organization to buy weapons and false documentation for terrorist activities.  *Id.*

The Honorable Frank Maas
October 17, 2011
Page 17

---

      **2.**      **Jelaidan has failed to produce any documents relating to his relationship with Hasan Cengic.**

      Hasan Cengic is the former Deputy Prime Minister and Defense Minister of the Federation of Bosnia and Herzegovina and a radical, militant Muslim cleric who provided significant financial, material, and logistical support to Osama bin Laden and the al Qaeda network.  The Imam of an important mosque in Zagreb, Croatia, Cengic served as the local "primary organizer" of arriving foreign mujihadeen during the Bosnian War and turned his mosque into the central point of entry for Arab militants loyal to al Qaeda traveling to Bosnia via Croatia.[12]  Moreover, as a member of the Third World Relief Agency ("TWRA") supervisory board, Cengic aided Islamic terrorists, including bin Laden, with the financing and shipment of massive amounts of weapons to Bosnia.[13]  On May 29, 2003, the U.S. Department of the Treasury designated Cengic as a Specially Designated Global Terrorist.  *See* Exhibit 20.

      As set forth above in Section I(B)(7), an investigation of TWRA bank accounts by German authorities revealed six (6) large monetary transfers linked to Jelaidan himself, totaling more than $11 million.  Four (4) of those transactions attributed to Jelaidan, totaling $7,058,973.20, are linked directly to Cengic.

| Ser. no. | Date posted | Recipient/ Sender | Accounting-holding bank | Account | Posting text | Amount in USD |
|---|---|---|---|---|---|---|
| 256 | 4/7/93 | Wael Jelaidan Acct. no. xxxxx1587 | Bank Austria (Former Z), Vienna | xxxxx1587 | Debt repayment Hasan Cengic | *-960,000.000 USD* |
| 261 | 4/9/93 | Wall Jelaidan [sic] Acct. no. xxxxx1587 | Bank Austria (Former Z), Vienna | xxxxx1587 | Debt repayment Hasan Cengic | *-98,973.20 USD* |
| 294 | 5/11/93 | Wael Jelaidan Acct. no. xxxxx1587 Account with: Bank Austria | Bank Austria (Former Z), Vienna | xxxxx1587 | Debt repayment Hasan Cengic | *-2,000,000.00 USD* |
| 356 | 6/30/93 | Wael Jelaidan Acct. no. xxxxx1587 | Bank Austria (Former Oelb), Vienna | xxxxx1587 | USD 4,000,000.- Less bank charges Debt repayment Hasan Cengic | *-4,000,000.00 USD* |

*See* Exhibit 11, pp. 13-14.

---

[12] *See* Agence France Presse, "*Hostage Drama After Five Killed in Police Raids*," March 29, 1996; Agence France Presse, "*Police Arrest Gunman, Hostages Released in Belgium*," March 29, 1996.

[13] *See* Washington Post, "*Bosnian Officials Involved In Arms Trade Tied To Radical States,*" September 22, 1996, p. A26.  Sheikh Omar Abdel Rahman (a/k/a "The Blind Sheikh"), the radical Egyptian cleric who was convicted for his role in the 1993 World Trade Center bombing, has been linked to Cengic and the leadership of the TWRA.

The Honorable Frank Maas
October 17, 2011
Page 18

---

To date, the defendant has failed to produce any documentation relating to his relationship with Executive Order 13224 designee Cengic and/or the transfers of funds identified above by German authorities. Accordingly, Jelaidan should be compelled to immediately produce all requested materials identified in Request Nos. B-38-B-40.

### 3. Jelaidan has failed to produce any documents relating to his relationship with Adel Batterjee.

On December 21, 2004, the U.S. Department of the Treasury designated Adel Batterjee "for providing financial and material support to al Qaida and Usama bin Laden." *See* Treasury Designation at Exhibit 21. Batterjee served as the Executive Director and a member of the Board of Directors of the Benevolence International Foundation ("BIF"), another purported charitable organization designated in November 2002 for the organization's longstanding support to al Qaeda and bin Laden. *Id.* According to Treasury, Batterjee "has ranked as one of the word's foremost terrorist financiers, who employed his private wealth and a network of charitable fronts to bankroll the murderous agenda of al Qaida." *Id.*

In support of that designation, Treasury identified Batterjee ("Baterji") as one of the wealthy financiers of the al Qaeda network listed on the "Golden Chain."[14] Jelaidan is also identified on the Golden Chain document. U.S. intelligence and enforcement agencies have concluded that the Golden Chain is an authentic al Qaeda document identifying al Qaeda's most important financial benefactors and the individuals responsible for coordinating their contributions to al Qaeda. Indeed, the 9-11 Commission's Final Report refers to the Golden Chain as the al Qaeda organization's "financial supply network" put together mainly by financiers in Saudi Arabia and the Persian Gulf states.[15]

Jelaidan's long-standing relationship with Batterjee (which dates back to the formation of al Qaeda in the late 1980's) has been confirmed by additional documentation uncovered during the same raid of the Benevolence International Foundation's ("BIF") offices in Bosnia which led to the discovery of the Golden Chain. As set forth in the seized documents, a 1988 dispute between two purported charitable organizations was submitted to secret arbitration overseen by members of al Qaeda's fatwa committee. One of the relief organizations involved in the

---

[14] The Golden Chain document was discovered during the March 2002 raid of the Bosnian offices of the Benevolence International Foundation, conducted jointly by the FBI and Bosnian Police. During the course of that raid, the authorities seized several computer hard drives, one of which included a file named "Tareekh Osama" ("Osama's History"), containing scanned images of documents chronicling the formation of al Qaida. The "Golden Chain" document was among several hundred documents contained in this computer file. Based on their analysis of all the documents within that file, and intelligence gathered from other sources during the war on terror, officials of the U.S. government concluded that the document is "a list of people referred to within al Qaeda" as wealthy donors to the movement. *See* Government's Evidentiary Proffer supporting the Admissibility of Co-Conspirator Statements, *United States of America v. Enaam M. Arnaout*, No. 02-CR-892 (N.D. Ill. filed January 6, 2003); http://fl1.findlaw.com/news.findlaw.com/wsj/docs/bif/usarnaout10603prof.pdf.

[15] *See* Final Report of the National Commission on Terrorist Attacks Upon the United States, p. 55, http://www.9-11commission.gov/report/911Report.pdf.

The Honorable Frank Maas
October 17, 2011
Page 19

_____

controversy was the Saudi Red Crescent Society which Jelaidan headed at that time. According to the United States government, Batterjee sided with Jelaidan in the dispute.[16]

Notably, this Court denied defendant Batterjee's motion to dismiss on January 18, 2005, finding that the Plaintiffs' allegations regarding the terror financier's activities were sufficient to support a finding of personal jurisdiction. *See* Judge Richard Casey's Opinion at 349 F. Supp. 2d 765, 823-825. Although Batterjee remains a defendant in this litigation, he is technically in default for his failure to respond to Plaintiffs' discovery requests. In fact, both he and his attorney of record have refused to participate in this litigation following Judge Casey's denial of his motion. In any event, the discovery of relevant communications and transactions between the two co-defendants should not be unreasonable.

Jelaidan has failed to produce any documents regarding his relationship with Batterjee and should be compelled to produce all responsive information set forth in Request Nos. B-38-B-40.

> **4.    Jelaidan has failed to produce any documents relating to his relationship with Mohamed Bayazid.**

As discussed in Section I(B)(8) above, Jelaidan owned the Maram Company with Mohamed Bayazid (a/k/a Abu Rida). Although not an Executive Order 13224 designee, Bayazid is a co-founding member of al Qaeda and a key figure in the terror group's efforts to obtain large caches of weapons, including materials for a nuclear bomb.[17]

Documents uncovered during the 2002 raid of the BIF's offices in Bosnia reveal the two men were close associates to bin Laden in the early days of al Qaeda. In a letter to Bayazid ("Abu al Ridha") on Saudi Red Crescent letterhead, bin Laden requests that all weapons be inventoried. At the bottom of the letter is a note from bin Laden to Jelaidan ("Abu al Hasan") stating that "we have an extreme need for weapons so I urge that you not provide them with more than 25% of the existing weapons." *See* Exhibit 22. In a second letter to Bayazid, bin Laden concludes the letter by asking him to "communicate my greeting to Abu Al-Hasan Al-Madani [Jelaidan]." *See* Exhibit 23.

Jelaidan has yet to produce any documentation relating to his relationship with Bayazid. Accordingly, the defendant should be compelled to immediately produce all materials identified in Request Nos. B-38-B-40.

_____

[16] *See* Government's Evidentiary Proffer supporting the Admissibility of Co-Conspirator Statements, *United States of America v. Enaam M. Arnaout*, No. 02-CR-892 (N.D. Ill. filed January 6, 2003), p. 31, n. 18.
[17] *See* Government's Evidentiary Proffer supporting the Admissibility of Co-Conspirator Statements, *United States of America v. Enaam M. Arnaout*, No. 02-CR-892 (N.D. Ill. filed January 6, 2003), pp. 20-24, 30-32, 38, 46, and 49.

The Honorable Frank Maas
October 17, 2011
Page 20

---

**D.    Jelaidan Should Be Compelled To Produce Documentation Relating To Any And All Sanctions Imposed Upon Him**

On September 6, 2002, the United States and the Kingdom of Saudi Arabia jointly designated Jelaidan as "an associate of Usama bin Laden and a supporter of al-Qa'ida terror." *See* Exhibit 8. A week later on September 11, 2002, the United Nations Security Council Committee (a/k/a the "1267 Committee") similarly designated Jelaidan for his connections to al Qaeda. *See* Exhibit 9.

Plaintiffs served the defendant with the following document requests:

- Request No. A-13 – Please provide any and all documents relating to any sanctions imposed upon you by the United States, United Nations, or any other nation or international body.

- Request No. A-18 – Please provide any and all documents relating to the joint United States-Saudi Arabian investigation and September 6, 2002 designation of You as a Specially Designated Global Terrorist and "an associate of Usama bin Laden and a supporter of al-Qa'ida terror," including without limitation, any and all documents identifying all of Your accounts, assets, and monies that were frozen by the United States and Saudi Arabia per the September 6, 2002 designation.

- Request No. A-19 – Please provide any and all documents relating to any sanctions imposed upon you by the Kingdom of Saudi Arabia.

Yet again, the defendant responds to each of the Plaintiffs' requests by claiming that he does not have possession of relevant documents:

WJ neither has knowledge of nor possession of any documents responsive to this request.

*See* Exhibit 2, p. 9 and 11. Jelaidan's contention is questionable.

As this Court is well aware, a principal method by which the United States government and other foreign states seek to deny financial resources to terrorist organizations, including those who sponsor them or act on their behalf, has been the imposition of asset-blocking orders and related economic sanctions. *See* Exhibit 8 (stating that the U.S. and Saudi Arabia are taking joint action "to publicly identify and freeze the assets of terrorists and their supporters"). Indeed, by Jelaidan's own acknowledgement in his discovery responses, at least three financial institutions have blocked assets linked to him following his 2002 designations – Faisal Finance, Al Rajhi Bank, and Habib Bank.

In conjunction with their determination to freeze problematic accounts, participating banks routinely provide official notification of their actions to named account holders, beneficiaries, and persons with signatory authority. For example, Faisal Finance notified Jelaidan of the bank's decision to freeze Account No. x0409 in a September 2002 letter to the

The Honorable Frank Maas
October 17, 2011
Page 21

_____

defendant, attached hereto as <u>Exhibit 24</u>. Habib Bank also advised Jelaidan of the freezing of six
Rabita Trust accounts identified in Section B(5), leading to him ask the bank to reconsider its
decision. *See* <u>Exhibit 6</u>. Moreover, other designated defendants in this litigation have received
documented notice that their bank accounts were frozen as a result of U.S. and U.N.
designations. In a December 14, 2006 letter to the IIRO, the Bank of Philippines Islands notified
the Saudi charity that its account at the bank was ordered frozen. *See* <u>Exhibit 25</u>.

   In response to Plaintiffs' Request No. 8 seeking documents relating to accounts at Al
Rajhi Bank, the defendant fully acknowledges that his account at the bank was frozen, but
produces no documentation to that effect. *See* <u>Exhibit 2</u>, p. 7. Surely he received some form of
official notification from Al Rajhi Bank, the Saudi Arabian Monetary Authority ("SAMA"),
and/or the Kingdom itself advising him of the bank's actions and the reasons for doing so. *See*
<u>Exhibit 26</u> (July 25, 2003 article from the Saudi newspaper, Ain Al Yaqeen, reporting that the
Kingdom of Saudi Arabia took steps to freeze the assets of Jelaidan, a close aid to Osama bin
Laden who funneled money to al Qaeda). Similarly, Habib Bank and/or the State Bank of
Pakistan must have sent official notice to Jelaidan that it was freezing the six Rabita Trust
accounts and the account he holds jointly with Osama bin Laden. The defendant has failed to
produce any such documentation and this Court should compel Jelaidan to produce all
responsive materials relating to *all* accounts, assets, and/or monies that were seized and frozen
by the United States, Saudi Arabia, other foreign states, and financial institutions following his
September 2002 designations.

   In addition to the freezing of assets, other types of sanctions have been effectively
imposed upon terror financiers such as Jelaidan. Sanctions such as travel restrictions, seizure of
passports, and home detention are known to have been used by the host government where the
designee resides and/or does business. In the instant case, it is implausible to believe that the
Saudi government and other governments and institutions implementing the U.N. mandated
sanctions as to Jelaidan failed to provide any form of official notification and/or explanation to
Jelaidan (a Saudi citizen and long-time official to several of the Kingdom's global charities) in
relation to his September 2002 designations. Plaintiffs have yet to receive any such
documentation. Accordingly, Jelaidan should be compelled to produce all documents relating to
any and all types of sanctions imposed upon him by the Kingdom of Saudi Arabia or any other
foreign state.

   **E.      Jelaidan Should Be Compelled To Specifically Identify Any Documents
         Responsive To Plaintiffs' Requests That Have Been Lost, Discarded Or
         Destroyed (Or Seized)**

   Jelaidan's boilerplate objection to the production of documents that are no longer in his
physical "possession" also fails to meet his obligation to identify any responsive documents that
have been lost, discarded or destroyed, and describe the circumstances under which those
responsive documents were lost, discarded, or destroyed. In this regard, Plaintiffs' Requests for
Production of Documents directed to defendant Jelaidan included the following specific
instruction:

The Honorable Frank Maas
October 17, 2011
Page 22

---

> If any documents requested herein have been lost, discarded, destroyed or
> otherwise no longer in Defendant's possession, custody or control, they shall be
> identified as completely as possible including, without limitations, the following
> information: date of disposal, manner of disposal, reason for disposal, person
> authorizing disposal and person disposing of the document.

*See* Exhibit 1, p. 3.

The Definitions section of Plaintiffs' document requests to defendant Jelaidan, fully consistent with Local Rule 26.3(c)(4), go on to state as follows:

> The term "identify" when used with reference to a document shall mean to give,
> to the extent known, the (i) type of document; (ii) general subject matter; (iii) date
> of the document; (iv) author(s), addressee(s) and recipient(s).

*Id.*, p. 5.

Although Jelaidan has generically denied that responsive materials are currently in his "possession," he has failed to indicate in his responses whether responsive documents were at one time within his care, custody, or control, but were at some point lost, destroyed, or discarded. That information, as well as information sufficient to identify the nature of the documents, its disposition, and perhaps its current custodian, is absolutely necessary to determine whether Jelaidan has engaged in any spoliation of evidence, and to determine whether responsive documents may be available from another source. Accordingly, Plaintiffs' respectfully request the Court direct Jelaidan to comply with the instructions in Plaintiffs' documents requests, and identify any responsive documents that were at any point within his care, custody, or control, and to describe the circumstances under which any such documents were lost, destroyed, discarded, or seized.

### F.   The Temporal Scope Of Discovery Concerning Defendant Jelaidan Should Extend To Periods Prior To 1992

As discussed in Section I(A) above, Judge Daniels previously issued an Order setting 1992 as the presumptive starting point for discovery in this litigation. However, in issuing that Order, Judge Daniels made clear that discovery concerning information and activities relating to earlier periods may be appropriate upon a "showing of relevance as to a particular issue or defendant." *See* Order, MDL Docket No. 2059, December 21, 2007. With regard to defendant Jelaidan, the extension of discovery to earlier periods is singularly appropriate.

As the United States government's public declarations concerning Jelaidan make clear, he is a founding member of al Qaeda, and a close and long-term associate of Osama bin Laden. Defendant Jelaidan's own counsel has confirmed that his client's relationship with Osama bin Laden predates 1992, acknowledging during a prior hearing in these proceedings that "Wael Jelaidan, your Honor, was very important in Afghanistan. He headed up the refugee mission,

The Honorable Frank Maas
October 17, 2011
Page 23

---

and he got to know, among other things, Osama bin Laden very well." *See* April 12, 2011
Discovery Hearing Transcript, pp. 40-41.

Significantly, the U.S. government has asserted, and Plaintiffs have alleged, that Jelaidan
was instrumental in assisting bin Laden adapt the support network established to support the
Afghan jihad into a global infrastructure to support al Qaeda's jihad against the United States.
To that end, Jelaidan is alleged to have used bank accounts under his control, and the charities
for which he worked, as tools to channel financial and other forms of support to al Qaeda from
that organization's inception.

Given his status as a founding member of al Qaeda, and his role in adapting the Afghan
support network into a global infrastructure to support al Qaeda's jihad against the West,
Plaintiffs respectfully submit that discovery as to Jelaidan should presumptively extend to 1988,
the year in which al Qaeda was founded. In addition, at least with respect to certain facts and
issues, such as Jelaidan's relationship with bin Laden, the extension of discovery to periods prior
to 1988 would be appropriate. However, for purposes of the documents at issue in the present
Motion, Plaintiffs at this time merely request an Order directing Jelaidan to provide
documentation from the period between 1988 and 2004. Plaintiffs reserve their right to request
documents and information pertaining to the subject matter of this motion for earlier and later
periods, after they have reviewed the responsive materials from defendant Jelaidan.

## III.    CONCLUSION

As the foregoing demonstrates, Plaintiffs have legitimate concerns that defendant
Jelaidan is deliberately withholding the production of responsive documents and information.
Accordingly, intervention by this Court is now necessary and Plaintiffs respectfully request that
the Court order the defendant to immediately to produce all responsive materials.

Respectfully submitted,

*MDL Plaintiffs' Executive Committees*

THE MDL 1570 PLAINTIFFS' EXECUTIVE
COMMITTEES

The Honorable Frank Maas
October 17, 2011
Page 24

cc:     Sean P. Carter, Esq.
        J. Scott Tarbutton, Esq.
        Robert T. Haefele, Esq.
        Jodi Westbrook Flowers, Esq.
        John M. Eubanks, Esq.
        James P. Kreindler, Esq.
        Andrew J. Maloney, Esq.
        Jerry S. Goldman, Esq.
        Martin F. McMahon, Esq.
        Alan Kabat, Esq.

PHILADELPHIA\6053428\1  117430.000

# Exhibit B

## MDL 1570 PLAINTIFFS' EXECUTIVE COMMITTEES
In re: Terrorist Attacks on September 11, 2001 (S.D.N.Y)

| Plaintiffs' Executive Committee for Personal Injury and Death Claims | Plaintiffs' Executive Committee for Commercial Claims |
|---|---|
| Ronald L. Motley, *Co-Chair*<br>MOTLEY RICE LLC<br>James P. Kreindler, *Co-Chair*<br>KREINDLER & KREINDLER LLP | Elliot R. Feldman, *Co-Chair*<br>Sean Carter, *Co-Chair*<br>COZEN O'CONNOR |
| Andrew J. Maloney III, *Co-Liaison Counsel*<br>KREINDLER & KREINDLER LLP<br>Paul J. Hanly, Jr., *Co-Liaison Counsel*<br>HANLY CONROY BIERSTEIN SHERIDAN FISHER & HAYES LLP | J. Scott Tarbutton, *Liaison Counsel*<br>COZEN O'CONNOR |

### VIA HAND DELIVERY

November 9, 2011

The Honorable Frank Maas
United States District Court for the
Southern District of New York
Daniel Patrick Moynihan United States
Courthouse
500 Pearl Street, Room 740
New York, NY 10007-1312

Re:   *In Re: Terrorist Attacks on September 11, 2001*, 03 MDL 1570 (GBD) (FM)

Dear Judge Maas:

The Plaintiffs' Executive Committees, on behalf of all of the Plaintiffs, submit this reply to the October 31, 2011 letter brief of defendant Wa'el Hamza Jelaidan, which opposes the Plaintiffs' October 17, 2011 motion to compel the production of all documentation and information relating to the following categories of documents previously requested by the Plaintiffs: (1) banking and financial accounts associated with the terror financier; (2) the defendant's relationship with other Executive Order 13224 designees; and (3) the imposition of financial and other sanctions upon the defendant following his September 2002 designations by the United States, Kingdom of Saudi Arabia, and United Nations. For the reasons set forth below, the defendant's arguments should be rejected and Jelaidan should be compelled to immediately produce the requested materials identified in Plaintiffs' October 17 submission.

## I.   THERE IS NO EVIDENCE TO SUPPORT THE DEFENDANT'S ALLEGED GOOD FAITH EFFORTS TO PRODUCE RESPONSIVE DOCUMENTS

Defendant Jelaidan would like this Court to believe that he has acted in good faith to fully respond to the Plaintiffs' discovery requests and produce all responsive documents. Unfortunately for the defendant, that position is rather unconvincing when faced with the actual record in these proceedings:

The Honorable Frank Maas
November 9, 2011
Page 2

- Since the commencement of merits discovery in June 2006, the defendant has failed to produce a single document in response to sixty-seven (67) of the Plaintiffs' seventy-four (74) requests.

- The defendant has produced a mere twenty-two (22) documents totaling 104 pages in over five years; the first and only production occurring on August 16, 2006.

- The defendant has failed to supplement his discovery responses in accordance with Judge Daniels' almost four-year old Order holding that the scope of discovery should reasonably begin in 1992.

In his opposition to Plaintiffs' October 17 motion to compel, defendant Jelaidan repeatedly asserts that he has made a number of good faith efforts to produce documents responsive to the Plaintiffs' discovery requests. However, there simply is no evidence that even remotely substantiates these blanket and generic assertions. Rather, Jelaidan (a co-founding member of al Qaeda and former Osama bin Laden associate) would prefer that this Court and the parties just take him at his word that he has exhausted all conceivable methods to locate and obtain responsive materials. In support of this effort, Jelaidan seeks to use his designations as an al Qaeda member and terror sponsor as a shield to immunize him from fulfilling his duties under the Federal discovery rules. Jelaidan's arguments in this regard are without legal or factual merit, and serve only to underscore his failure to make any good faith efforts to fulfill his discovery obligations. For the reasons set forth below, Plaintiffs respectfully request that the Court order the defendant to immediately produce all responsive materials.

### A.    Jelaidan's Alleged Good Faith Attempts To Obtain Responsive Banking Records Are Unfounded

As set forth in Plaintiffs' Motion to Compel, defendant Jelaidan played an instrumental role in creating and supporting the financial infrastructure used to fund the al Qaeda terrorist network from its inception in 1988 through the September 11, 2001 terrorist attacks. Using his relationships with other prominent terror financiers, including his leadership positions within a number of the Saudi charities, Jelaidan directed massive amounts of monetary and logistical support to Osama bin Laden, al Qaeda, and affiliated terror organizations through a number of banking and financial institutions, some of which have been identified by the Plaintiffs.

In opposition to Plaintiffs' October 17 motion seeking the immediate production of Jelaidan's bank account records, the defendant attempts to excuse his blatant non-production by primarily arguing that he has made attempts to request and obtain documentation and information regarding his frozen bank accounts, but his designations as a terrorist financier by the United States and United Nations have effectively extinguished any and all rights he has as an account holder to communicate with the banks and make such requests. According to Jelaidan, Faisal Finance (Switzerland) S.A., Al Rajhi Banking & Investment Corporation, Habib Bank, Bank of Austria, and other financial institutions are precluded from providing him with the

The Honorable Frank Maas
November 9, 2011
Page 3

most basic account information (such as bank statements or account summaries) by virtue of the
designations.

The defendant's position is without merit. First, the defendant fails to cite to any
supporting regulation or rule established by the Treasury Department's Office of Foreign Assets
Control ("OFAC"), the United Nations 1267 Committee, or other relevant government agency or
international body that specifically prevents a bank from providing a designee with information
regarding his account(s) following its seizure and freezing. Nor has the defendant provided this
Court with evidence of any law, regulation, or rule within the Kingdom of Saudi Arabia that
would direct a Saudi bank (such as Al Rajhi Bank) or other Saudi financial institution not to
cooperate with a designee's simple request for bank statements or other documentation relative
to the history of the account.[1]

Second, affidavit testimony obtained from Professor Jimmy Gurulé, former Under-
Secretary (Enforcement) of the United States Department of the Treasury, makes clear that the
sanctions programs implemented by the United States and United Nations were purposely
designed to prevent designees like Jelaidan from gaining access to funds or other assets in frozen
bank accounts, but not from requesting and obtaining basic banking records for the blocked
account(s). Professor Gurulé, who is intimately familiar with the United States and United
Nations sanctions programs, states the following:

> Neither the text of E.O. 13224, nor any regulations promulgated thereunder,
> nor the text of UN Security Resolution 1267, nor any related Security
> Council resolutions, preclude a financial institution from providing a
> designated or listed party with account statements concerning an account
> that has been frozen or blocked.

> Neither the Treasury Department nor the UN 1267 Committee have ever
> interpreted either E.O. 13224 or UN Security Resolution 1267, or any
> related regulations or security resolutions, to preclude a financial institution
> from providing a designated or listed party with account statements
> concerning an account that has been frozen or blocked.

> And finally, neither the Treasury Department nor the UN 1267 Committee
> have ever prohibited or banned or taken action otherwise to preclude a
> financial institution from providing a designated or listed party with account
> statements concerning an account that has been frozen or blocked.

---

[1] The defendant's generic assertion that a bank must secure a specific license "if only to transmit banking records" is
similarly unsupported. Contrary to the defendant's statement, a license is typically required in instances where there
is a particular request to release funds from a frozen account or wire transfer that has been blocked. *See* License
Application for the Release of Blocked Funds which must be submitted to the OFAC Licensing Division, and which
can be found at http://www.treasury.gov/resource-center/sanctions/Documents/license.pdf. That is not the case here
and the defendant cannot point to a specific regulation or rule that directs a bank to obtain a license from OFAC or
the U.N. sanctions committee in order to provide a designee account holder with a simple bank statement or account
summary.

The Honorable Frank Maas
November 9, 2011
Page 4

_____

> Stated simply, the goals of the E.O. 13224 designation process and the UN
> Sec. Res. 1267 designation process would not be undermined by disclosing
> to a designated or listed party account statements concerning an account
> that has been frozen or blocked.  Those programs are designed to prevent
> designated parties from obtaining access to the *funds or property* in the
> blocked account, not from obtaining a simple statement for the blocked
> account.

*See* Declaration of Professor Jimmy Gurulé, ¶¶ 12-15, attached hereto as Exhibit 1.

Professor Gurulé further describes the importance of providing a designee like Jelaidan
with the ability to obtain bank statements so that he may periodically determine whether the bank
is managing the frozen account in accordance with regulations instituted under the U.S. and U.N.
sanctions programs:

> In fact, the provision of such statements serves the goals of the respective
> programs, by verifying that all account funds have in fact been frozen, and
> that the accounts in question are being maintained in accordance with the
> requirements of those programs, including requirements established for the
> protection of the designated party.

*Id.* at ¶ 15.  Indeed, certain OFAC regulations not only require that blocked account funds earn
interest at commercially reasonable rates ("a rate currently offered to other depositors on
deposits or instruments of comparable size and maturity"), but further permit a bank to debit
blocked accounts for normal service charges.[2]  Thus, it was intended that designees would be
given access to bank statements and other records upon request as a means to confirm that the
accounts are being properly maintained.

Further, this Court need only look to the few documents produced by the defendant at the
outset of merits discovery five (5) years ago to see that Jelaidan's claim is baseless.  As indicated
in Plaintiffs' Motion to Compel at p. 6, Jelaidan produced a January 2005 bank statement for
Account No. x0409 at Faisal Finance.  *See* Exhibit 2, (WJ003).  That account was seized and
frozen by Swiss authorities and Faisal Finance on or around September 25, 2002, just weeks
after Jelaidan's designation by the United States, Kingdom of Saudi Arabia, and United Nations.
Jelaidan's assertion that his designations preclude him from obtaining responsive account
records is directly contradicted by his own documents.

Finally, Jelaidan repeatedly represents to this Court that he has "exhausted" all available
methods to contact banking authorities and request the production of banking records responsive
to Plaintiffs' document requests.  *See* Opposition at pp. 1-3; *see also* Affidavit of Wael Hamzah
Jelaidan at ¶¶ 7, 8, 9, and 14 (stating that he has contacted, or attempted to contact, Faisal

_____

[2] *See* http://www.treasury.gov/resource-center/faqs/Sanctions/Pages/answer.aspx#1.

The Honorable Frank Maas
November 9, 2011
Page 5

Finance, Al Rajhi Bank, and Habib Bank).[3] Despite these generic assertions, the defendant has failed to produce any tangible evidence that even remotely corroborates his position. Indeed, had Jelaidan in fact undertaken "exhausting" efforts to contact banking authorities, the defendant would be able to provide this Court with documentation supporting those alleged good faith efforts, including but not limited to: (1) correspondence from Jelaidan to Faisal Finance, Al Rajhi Bank, and Habib Bank requesting relevant documents and information; (2) correspondence from Mr. McMahon, or another attorney acting on Jelaidan's behalf, to Faisal Finance, Al Rajhi Bank, and Habib Bank requesting relevant account records; (3) correspondence from banking officials to Jelaidan or Mr. McMahon acknowledging receipt of said correspondence; (4) correspondence or other documentation from banking officials explaining the bank's position relative to the defendant's request for account records; and/or (5) correspondence from Jelaidan or Mr. McMahon to OFAC or United Nations officials requesting assistance in relation to the defendant's efforts to obtain basic account records from the banks, including any such applications to said entities requesting access to banking records. No such documentation has been produced to substantiate these alleged good faith efforts.

In the absence of any evidence that would support the defendant's blanket assertions of compliance, Jelaidan's arguments that he has undertaken meaningful and good faith efforts to obtain responsive documents within his custody and control should be rejected out of hand, and Jelaidan should be compelled to immediately produce all responsive banking records.

**B.      Jelaidan Has Additionally Failed To Provide Evidence Of Any Good Faith Attempts To Establish A Dialogue With Officials From OFAC And The United Nations Regarding His Designations And Sanctions**

Jelaidan similarly asserts that his designation as a prominent global terror financier has further prevented him from requesting and obtaining responsive documentation relating to his designations and any and all sanctions imposed upon him by the United States, Kingdom of Saudi Arabia, or the United Nations. *See* Opposition at p. 3. However, the defendant is once again unable to cite to any law, regulation, rule, or otherwise to substantiate this position. Nor has the defendant provided any convincing evidence to this Court demonstrating that he and/or his counsel have made the good faith efforts to formally request and obtain the relevant information.

More importantly, any suggestion by the defendant and his counsel that his designations prevent him from establishing a dialogue with the appropriate authorities at OFAC or the United Nations 1267 Committee is utterly baseless. In fact, it is well known that both OFAC and the United Nations have established certain procedures that effectively promote dialogue between a designee and those entities, particularly where the designee believes that he has been wrongly included on the designated terrorism list.

---

[3] Jelaidan's affidavit provides no indication that he has initiated any efforts to contact Bank of Austria or the other banks in Turkey where he concedes he holds accounts.

The Honorable Frank Maas
November 9, 2011
Page 6

---

As defense counsel is certainly aware, the IIRO (his client) used those same procedures to establish direct communication with OFAC officials following Treasury's August 3, 2006 designations of the IIRO branch offices in the Philippines and Indonesia and the Executive Director of the IIRO Eastern Province Branch, Abd al Hamid Sulaiman al Mujil. Thereafter, Mr. McMahon used those same channels to submit an application on behalf of the IIRO seeking to have the designations withdrawn. Defendant Yassin al Kadi similarly used those same mechanisms to enter into a robust dialogue with Treasury officials in relation to his designation and sanctions. *See* Plaintiffs' Motion to Compel, Exhibit 16 (Statement of Yassin Abdullah Kadi to OFAC). The United Nations 1267 Committee also has explicit procedures in place for the submission of formal requests to be "de-listed" from the list of designated individuals and entities.[4]

To represent to this Court that the defendant is prohibited from contacting the appropriate officials because of his designation is baseless, and the defendant should be compelled to undertake efforts to obtain all documentation relating to his designations and any and all sanctions in accordance with the rights conferred upon him as a designee.

As a final note, Jelaidan indicates in his opposition that some of the sanctions imposed upon him as a result of the September 2002 designations include an absolute bar to traveling abroad, as well as house arrest. Plaintiffs submit that the defendant's contention that he is under house arrest is more than a bit misleading, particularly in light of statements made by defense counsel early in these proceedings. During an early meet and confer concerning Jelaidan's discovery responses, Plaintiffs asked Jelaidan's counsel to explain how Jelaidan could credibly maintain that he never received any notification concerning any of his designations, given the fact that Jelaidan is a Saudi citizen living within the Kingdom, who had been designated by Saudi Arabia itself. In response, counsel expressed his understanding that Jelaidan is a successful and respected businessman in good standing, who was carrying out business activities within the Kingdom on an ongoing basis. Jelaidan's counsel also indicated at one point that Jelaidan's efforts to collect responsive discovery materials had been delayed because he was busy traveling to several weddings within the Kingdom. These statements undermine the credibility of many of Jelaidan's arguments, and his status as an active and respected businessman suggest that Jelaidan has continuing access to banking resources within Saudi Arabia (which is perhaps the very reason he is attempting to hide behind his designations to avoid turning over responsive documents).

Plaintiffs' independent investigations corroborate the characterization of Jelaidan's present status provided by his counsel, and indicate that Jelaidan has relationships with senior officials of Saudi Arabia that he could use to facilitate the release by his banks in the Kingdom of relevant financial documents. Specifically, Arabic news articles report that Jelaidan was featured as a "major speaker" at an April 2008 conference hosted by the World Assembly of Muslim Youth ("WAMY"), which was sponsored by Prince Khaled al Faisal, Governor of the Mecca District, and further attended by representatives of the Saudi government from the Office of Islamic Affairs and the Office of Social Affairs. *See* Arab News, "WAMY Organizing Forum on

---

[4] *See* http://www.un.org/sc/committees/1267/fact_sheet_delisting.shtml.

The Honorable Frank Maas
November 9, 2011
Page 7

Integration of Charity Work," April 18, 2008, attached hereto as <u>Exhibit 3</u>. The defendant's participation in this conference similarly belies any representation that he has been under house arrest since his 2002 designations.

## II.   JELAIDAN MUST DO MORE THAN SIMPLY CLAIM HE DOES NOT HAVE POSSESSION OF RESPONSIVE DISCOVERY MATERIALS

In the face of extensive and compelling evidence supporting Plaintiffs' claims that Jelaidan had close personal and business relationships with Executive Order 13224 designees Yassin Abdullah al Kadi, Chafiq Ayadi, Hasan Cengic, and Adel Batterjee, as well as al Qaeda co-founder Mohamed Bayazid, the defendant continues to make blanket assertions that he does not personally have, or have access to, documents that may be responsive to Plaintiffs' requests. *See* Opposition, p. 3.

As one of the premier al Qaeda financiers over the past two decades, it is conceivable that Jelaidan would elect not to retain documentation and information connecting him to other prominent supporters and financiers of global terrorism. Nevertheless, it does not relieve the defendant of his duty to identify any and all responsive documents that have been lost, discarded, destroyed, or seized, and further describe the circumstances under which those responsive documents were lost, discarded, destroyed, or seized. *See* Plaintiffs' Motion to Compel, pp. 21-22. Therefore, with respect to all of the Plaintiffs' document requests, Plaintiffs' respectfully request that this Court direct the defendant to comply with the instructions set forth in Plaintiffs' documents requests and identify any and all responsive documents that were at any point within his care, custody, or control, and to describe the circumstances under which any such documents were lost, discarded, destroyed, or seized.

## III.   THE TIMEFRAME FOR DISCOVERY AS TO JELAIDAN SHOULD EXTEND TO 1988

Finally, Jelaidan objects to Plaintiffs' request for an Order from this Court directing that the temporal scope of discovery should extend to 1988 (the year al Qaeda was established by Osama bin Laden with the assistance of Jelaidan and others), arguing that any such activities and/or relationships during that timeframe are wholly irrelevant.

As demonstrated in Plaintiffs' October 17 motion, Jelaidan was an instrumental player in the formation of al Qaeda, a close associate to bin Laden at that time (a fact confirmed by Jelaidan's counsel), and an important fundraiser for the terror organization. *See* Plaintiffs' Motion to Compel, Exhibits 8, 22, and 23; *see also* <u>Exhibit 4</u> attached hereto (identifying Jelaidan as a member of the initial committee to handle financial matters for al Qaeda as the terror group was forming).[5]  By all credible accounts, Jelaidan was a critical member of al Qaeda's inner circle during those early formative years. Thus, his role in supporting the Afghan

---

[5] Exhibits 4, 5, and 6 were discovered during the March 2002 raid of the Bosnian offices of the Benevolence International Foundation, conducted jointly by the FBI and Bosnian police, and produced by the U.S. government in *United States of America v. Enaam M. Arnaout*, No. 02-CR-892 (N.D. Ill.).

The Honorable Frank Maas
November 9, 2011
Page 8

---

fighters and foreign mujihadeen during this timeframe, the continuation of those relationships following the end of the Soviet-Afghan conflict, and his efforts with those same people to create a terrorist organization that was ultimately responsible for the deaths of nearly 3,000 innocent lives on September 11, 2001, are absolutely relevant to the Plaintiffs' claims in this historic case, just as this Court observed during the April 26, 2011 discovery hearing. *See* Transcript, p. 18 ("I'm not saying its inappropriate to go back to 1987 ... if a request that's more narrowly focused that basically deals with, how did these folks get together and what were their basic roles ... I would probably look somewhat favorably upon it.").

Moreover, although defense counsel argues that Jelaidan's humanitarian activities with the MWL, IIRO, and other purported charitable groups during this period are irrelevant, it is important to remember that it was these very same organizations that bin Laden and other founding members of al Qaeda intended to use, and did use, as centers for terrorist fundraising and launching attacks. *See* Exhibit 5 (identifying the Saudi Red Crescent, MWL, and IIRO ("Hayaat al Igatha") to be part of the committee to receive donations, maintain accounts, and oversee spending); Exhibit 6 (stating that attacks will be launched from MWL offices). Indeed, the United States government has specifically asserted that Jelaidan used charitable organizations under his direction in the 1980's to provide financial and logistical support to al Qaeda and the Arab mujihadeen. *See* Plaintiffs' Motion to Compel, Exhibits 8 and 10.

Based on the foregoing, extending the timeframe for discovery to relevant periods prior to 1992 is warranted in this case.

Accordingly, for the reasons explained herein and in Plaintiffs' letter motion of October 17, 2011, Plaintiffs respectfully request that Your Honor direct defendant Jelaidan to produce any and all responsive documents requested by the Plaintiffs.

Respectfully submitted,

*The MDL 1570 Plaintiffs' Executive Committees*

THE MDL 1570 PLAINTIFFS' EXECUTIVE COMMITTEES

The Honorable Frank Maas
November 9, 2011
Page 9

_____

cc:    The Honorable George B. Daniels
       Sean P. Carter, Esq.
       J. Scott Tarbutton, Esq.
       Robert T. Haefele, Esq.
       Jodi Westbrook Flowers, Esq.
       John M. Eubanks, Esq.
       James P. Kreindler, Esq.
       Andrew J. Maloney, Esq.
       Jerry S. Goldman, Esq.
       Martin F. McMahon, Esq.
       Alan Kabat, Esq.

# EXHIBIT 1

UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK

In re Terrorist Attacks on September 11, 2001

03 MDL 1570 (GBD)(FM)

DECLARATION OF PROFESSOR
JIMMY GURULÉ

I, Professor Jimmy Gurulé, under penalties as provided by law, declare that the statements set forth in this Declaration are true and correct. I am over the age of 21 and have personal knowledge of the facts as set forth herein.

## I. Background

1.      My expertise is described more completely in paragraphs 2 – 8 below and in my *curriculum vitae*, which is attached hereto as Exhibit A. In summary, I am a former Under Secretary (Enforcement) of the U.S. Department of Treasury, where I was the Treasury Department's official responsible for overseeing its Office of Foreign Asset Control ("OFAC") in administering and enforcing the United States' economic sanctions policies and programs. Presently I am a full professor of law at Notre Dame Law School, where I have taught courses in Criminal Law, White Collar Crime, International Criminal Law, and the Law of Terrorism. As a law professor since 1989, I have taught courses, conducted research, published scholarly articles and books, and lectured domestically and internationally on the subjects of anti-money laundering and countering the financing of terrorism.

2.      In my capacity as Under Secretary for Enforcement, U.S. Department of the Treasury, from 2001-2003, I had oversight responsibility for several major federal law enforcement agencies, including the U.S. Secret Service; U.S. Customs Service; Bureau of Alcohol, Tobacco and

Firearms; Executive Office of Asset Forfeiture; Financial Crimes Enforcement Network (FinCEN); and the Office of Foreign Assets Control (OFAC). The U.S. Customs Service (now part of the Department of Homeland Security and known as Immigration and Customs Enforcement) conducts complex money laundering investigations. FinCEN is the federal agency responsible for enforcing the Bank Secrecy Act (31 U.S.C. § 5311 et seq), and OFAC administers and enforces the United States' economic sanctions policies and programs, including those imposed under Executive Order No. 13224 ("E.O. 13224"), blocking property and prohibiting transactions with persons who commit, threaten to commit, or support terrorism.

3.     While Under Secretary of the Treasury, I played a central role in developing and implementing the U.S. Government's anti-terrorist financing strategy. Among other things, I was responsible for drafting the 2001 and 2002 National Money Laundering Strategy (NMLS). The NMLS is intended to prioritize, focus, and coordinate the U.S. Government's resources used to combat money laundering and terrorist financing. Several federal agencies, bureaus and offices are involved in developing and implementing the NMLS, including: the U.S. Department of the Treasury; U.S. Department of Justice; U.S. Department of State; Federal Bureau of Investigation; Drug Enforcement Administration; Federal Deposit Insurance Corporation; Federal Reserve Board; FinCEN; OFAC; Internal Revenue Service; Office of the Comptroller of the Currency; Office of Thrift Supervision; Immigration and Custom Enforcement; U.S. Postal Inspection Service; U.S. Secret Service; Office of National Drug Control Policy; U.S. Securities and Exchange Commission; and Treasury Department Executive Office of Asset Forfeiture.

4.     As a component of my role in developing and implementing the U.S. Government's anti-terrorist financing strategy, I had responsibility as Under Secretary for coordinating America's anti-terrorist financing programs, to include the E.O. 13224 designation program, with the complementary programs of our international partners, to include the designation and sanctions

2

programs administered by the United Nations Security Council Committee established pursuant to Resolution 1267 (the UN 1267 Committee). Among other duties, the UN 1267 Committee oversees the implementation by UN Member States of the three sanctions measures (assets freeze, travel ban and arms embargo) imposed by the Security Council on individuals and entities associated with the al Qaeda terrorist organization.

5.      While Under Secretary, I also supervised the promulgation of the Treasury Department regulations implementing the anti-money laundering and counter-terrorist financing provisions of the USA PATRIOT Act (P.L. 107-56, 115 Stat. 272 (2001)).

6.      As an expert in anti-money laundering and countering terrorist financing, I have given lectures at conferences, universities, before international bankers associations, and other venues located domestically and abroad, including: Milan, Rome, and Naples, Italy; London, England; Vienna, Austria; Brussels, Belgium; Madrid and Barcelona, Spain; Davos, Switzerland (World Economic Forum); Luxembourg, Luxembourg; Mumbai, New Delhi, Pune, and Calcutta, India; Asuncion, Paraguay; Tirana, Albania; New York City, New York (International Organization of Securities Commissioners and Institute of International Bankers); Miami, Florida (Florida International Bankers Association); and Las Vegas, Nevada (Association of Certified Anti-Money Laundering Specialists).

7.      As Under Secretary, I gave two presentations to the UN 1267 Committee on the Treasury Department designation process. In late 2001, I gave a presentation discussing the process employed by the U.S. Government for placing the names of individuals and entities on the Treasury Department list. Further, in early 2002, I explained the delisting process for removing names from the Treasury list.

8.      I am the author and co-author of numerous books, law review articles, and other publications on money laundering and terrorist financing, including: PRINCIPLES OF

3

COUNTERTERRORISM LAW (West Publ. 2011 ) (co-authored with Prof. Geoffrey Corn); UNFUNDING TERROR: THE LEGAL RESPONSE TO THE FINANCING OF GLOBAL TERRORISM (Edward Elgar 2008); COMPLEX CRIMINAL LITIGATION: PROSECUTING DRUG ENTERPRISES AND ORGANIZED CRIME (LEXIS 2d ed., 2001); INTERNATIONAL CRIMINAL LAW: CASES AND MATERIALS (Carolina Academic Press 3d ed., 2007) (co-authored with Jordan Paust, Cherif Bassiouni, Michael Scharf, Leila Sadat and Bruce Zagaris); THE LAW OF ASSET FORFEITURE (LexisNexis 2d ed., 2004) (coauthored with Sandra Guerra Thompson and Michael O'Hear); How To COMBAT MONEY LAUNDERING AND TERRORIST FINANCING (Chapter 13) (Central Banking Publ. Ltd. 2005); *The Demise of the UN. Economic Sanctions Regime to Deprive Terrorists of Funding*, 41 CASE W.RES. J. INT'L L. 19 (2009); *Does "Proceeds" Really Mean 'Net Profits'?: The Supreme Court's Efforts to Diminish the Utility of the Federal Money Laundering Statute*, 7 AVE MARIA L. REV. 339 (2009); *Who Is Winning the War on Terrorist Financing?*, THE FINANCIAL REGULATOR 25 (2005); *The Global Efforts to Stop Terrorist Financing*, AM. INT'L ELECT. 1., U.S. Dep't of State(Aug. 2003); and *The Money Laundering Control Act of 1986: Creating a New Federal Offense or Merely Affording Federal Prosecutors an Alternative Means of Punishing Specified Unlawful Activity?*, 32 AM.CRIM.L.REV. 823 (1996).

9.      By virtue of my experience serving as Under Secretary and academic work, as described more fully above, I am intimately familiar with the requirements and objectives of the E.O. 13224 sanctions program, as well as the requirements and objectives of the UN 1267 sanctions regime.

10.      Broadly speaking, E.O. 13224 imposes economic sanctions on persons who have been determined to have committed or pose a significant risk of committing acts of terrorism, as well as on persons determined to be owned or controlled by such persons or to provide support to such persons or acts of terrorism.  It prohibits any transaction or dealing *in property or interests in*

4

*property* of any person (i.e., an individual or entity) designated under its authority, including the donation of funds, goods, or services, and it blocks all property in the United States or within the possession or control of a U.S. person in which there is an interest of any designated person. The overarching objective of this program is to deprive designated parties of access to funds and resources, as a means of undermining their ability to promote acts of terrorism.

11. The sanctions programs overseen by the UN 1267 Committee serve these same goals, by requiring UN Member States to undertake the following steps with respect to any individual or organization included on the UN 1267 Committee Consolidated List:

- freeze without delay the funds and other financial assets or economic resources of designated individuals and entities [**assets freeze**],

- prevent the entry into or transit through their territories by designated individuals [**travel ban**], and

- prevent the direct or indirect supply, sale and transfer from their territories or by their nationals outside their territories, or using their flag vessels or aircraft, of arms and related materiel of all types, spare parts, and technical advice, assistance, or training related to military activities, to designated individuals and entities [**arms embargo**].

12. Neither the text of E.O. 13224, nor any regulations promulgated thereunder, nor the text of UN Security Resolution 1267, nor any related Security Council resolutions, preclude a financial institution from providing a designated or listed party with account statements concerning an account that has been frozen or blocked.

13. Neither the Treasury Department nor the UN 1267 Committee have ever interpreted either E.O. 13224 or UN Security Resolution 1267, or any related regulations or security resolutions, to preclude a financial institution from providing a designated or listed party with account statements concerning an account that has been frozen or blocked.

14. And finally, neither the Treasury Department nor the UN 1267 Committee have ever prohibited or banned or taken action otherwise to preclude a financial institution from providing a

5

designated or listed party with account statements concerning an account that has been frozen or blocked.

15.     Stated simply, the goals of the E.O. 13224 designation process and the UN Sec. Res. 1267 designation process would not be undermined by disclosing to a designated or listed party account statements concerning an account that has been frozen or blocked. Those programs are designed to prevent designated parties from obtaining access to the *funds or property* in the blocked account, not from obtaining a simple statement for the blocked account. In fact, the provision of such statements serves the goals of the respective programs, by verifying that all account funds have in fact been frozen, and that the accounts in question are being maintained in accordance with the requirements of those programs, including requirements established for the protection of the designated party.


Jimmy Gurulé
Professor of Law University of Notre Dame
Notre Dame, Indiana

11/9/11
Date

6

# **EXHIBIT A**

## QUALIFICATIONS OF EXPERT WITNESS

### JIMMY GURULÉ

**EDUCATION:**

University of Utah College of Law, J.D. 1980;

University of Utah, B.A. English 1974

**EXPERT WITNESS AND CONSULTING:**

Retained as an expert witness or expert consultant in ten major money laundering and terrorist financing cases, including: El Camino Resources, Ltd., et al. v. Huntington National Bank, No. 1:07-cv-598 (W.D. Mich.) (deposed); Richardson v. Huntington National Bank, No. 06-80989-jrh (Bkrtcy. W.D. Mich.) (deposed and testified); Dale, et al. v. Dreyfus Service Corp., et al., No. 3:00 CV 359LN (S.D. Miss. Jackson Div.) (deposed); BDP International Finance Corp., Ltd., et al. v. 6-F Corporation, Pedro Castillo, No. 06-02544-CA 21 (11th Dist. Miami-Dade County) (deposed). Serves as a Senior Advisor on AML, Booz Allen Hamilton (2007).

**EXPERIENCE:**

PROFESSOR OF LAW, NOTRE DAME LAW SCHOOL (1989 to present) – Tenured, full Professor of Law, teaching courses in Criminal Law, White Collar Crime (money laundering, RICO), International Criminal Law, and The Law of Terrorism.  Served as Associate Dean from 1999-2000.

UNDER SECRETARY (ENFORCEMENT), U.S. DEPARTMENT OF THE TREASURY (2001-2003) - Nominated by President George W. Bush and unanimously confirmed by the United States Senate.

Served as the top Treasury law enforcement official, providing oversight and policy guidance to and coordinating the activities of the United States Customs Service, United States Secret Service, Bureau of Alcohol, Tobacco and Firearms, Financial Crimes Enforcement Network (FinCEN), Federal Law Enforcement Training Center (FLETC), Office of Foreign Assets Control (OFAC), and Executive Office of Asset Forfeiture, and coordinated the enforcement activities of the Internal Revenue Service – Criminal Investigation Division (IRS-CID).

The Treasury Enforcement Bureaus comprised approximately 33,000 employees with a proposed fiscal year 2003 budget of over $5 billion.

Played a pivotal role in developing and coordinating the Treasury Department's global

strategy to combat terrorist financing and freeze terrorist-related assets, meeting regularly with foreign cabinet and sub-cabinet ministers and foreign bank officials. Supervised Treasury's participation in the Financial Action Task Force (FATF), and was responsible for developing the 2001 and 2002 National Money Laundering Strategy, and overseeing publication of the regulations implementing Title III (anti-money laundering provisions) of USA PATRIOT Act.

Responsible for establishing the U.S. Customs-led terrorist financing task force – "Operation Green Quest."

As Under Secretary (Enforcement), was featured in *Newsweek (*Oct. 29, 2001); *U.S. News & World Report* (Dec. 31, 2001); *The Washington Diplomat* (March 2003); *The Government Executive* (July 2002); *Bank Systems & Technology* (May 2002); *Luxembourg Business* (Sept. 2002); and *Notre Dame Magazine* (Autumn 2002).

As Under Secretary was awarded the prestigious U.S. Department of Treasury Medal (2003).

**ASSISTANT ATTORNEY GENERAL, U.S. DEPARTMENT OF JUSTICE (1990-1992)** – Nominated by former President George H.W. Bush and sworn in as Assistant Attorney General by U.S. Attorney General Dick Thornburg. Unanimously confirmed by the United States Senate.

Provided oversight, policy guidance to, and coordinated the activities of the Bureau of Justice Assistance (BJA), Bureau of Justice Statistics (BJS), National Institute of Justice (NIJ), Office of Juvenile Justice and Delinquency Prevention (OJJDP), and Office of Victims of Crime (OVC).

Responsible for administering an office with a combined fiscal year budget of over three-quarters of a billion dollars. Testified before various congressional committees on a wide range of criminal justice issues.

For services as Assistant Attorney General, was awarded the Edmund J. Randolph Award and the Excellence in Administration Award.

**ASSISTANT UNITED STATES ATTORNEY, U.S. ATTORNEY'S OFFICE, CENTRAL DISTRICT OF CALIFORNIA (1985-1989)** – Served as the Deputy Chief of the Major Narcotics Section, prosecuting high profile international narcotics, money laundering, and tax fraud cases, and conducting complex grand jury investigations. Supervised the three year investigation and prosecution of defendants responsible for the kidnapping and murder of a DEA Special Agent.

For services as Assistant United States Attorney, received the Attorney General's Distinguished Service Award, and Drug Enforcement Administration Administrator's Award (the highest award conferred by DEA).

**DEPUTY COUNTY ATTORNEY, SALT LAKE COUNTY ATTORNEY'S OFFICE (1982-1985)**
– Served as Section Chief of Major Drug Section, where he prosecuted major felony cases.

**TRIAL ATTORNEY, U.S. DEPARTMENT OF JUSTICE, CRIMINAL DIVISION (1980-1982)** –
Hired through the DOJ Honors Program (one of eleven attorneys hired from over 1,000 applicants).  Prosecuted major narcotics cases and investigated money laundering cases.

## PUBLICATIONS

### Books

PRINCIPLES OF COUNTER-TERRORISM LAW (West Publ. 2011) (with Prof. Geoffrey Corn);

UNFUNDING TERROR: THE LEGAL RESPONSE TO THE FINANCING OF GLOBAL TERRORISM (Edward Elgar Publ. 2008);

HOW TO COMBAT MONEY LAUNDERING AND TERRORIST FINANCING (Chapter 13) (Central Bank Publ.) (2005);

COMPLEX CRIMINAL LITIGATION: PROSECUTING DRUG ENTERPRISES AND ORGANIZED CRIME (Lexis Publ., 2d ed. 2000);

INTERNATIONAL CRIMINAL LAW, CASES AND MATERIALS (with Prof. Jordan Paust, Cherif Bassiouni, Michael Scharf, Lelia Sadat, and Bruce Zagaris) (Carolina Academic Press, 3d ed. 2007);

INTERNATIONAL CRIMINAL LAW DOCUMENTS SUPPLEMENT (with Prof. Jordan Paust, Cherif Bassiouni, Michael Scharf, Lelia Sadat, and Bruce Zagaris) (Carolina Academic Press 2007); and

THE LAW OF ASSET FORFEITURE (with Sandra GuerraThompson & Michael O'Hear) (Lexis Publ., 2d ed. 2004).

## LAW REVIEW and OTHER LEGAL ARTICLES

*The Demise of the U.N. Economic Sanctions Regime to Deprive Terrorists of Funding*, CASE W. RES. J. INT'L L., 41 CASE W. RES. J. INT'L L. 19 (2009);

*Does "Proceeds" Really Mean "Net Profits"? The Supreme Court's Efforts to Diminish the Utility of the Federal Money Laundering Statute*, 7 AVE MARIA L. REV. 339 (2009);

*Who Is Winning the War on Terror Financing?*, 10 THE FINANCIAL REGULATOR 25

3

(Sept. 2005);

*Unfunding Terror, The U.S. and International Response to 9/11*, 17 TRANSNAT'L. LAW. 113 (2004);

*The Global Effort to Stop Terrorist Financing*, AM. INT'L ELECT. J., U.S. State Department (August 2003);

*The 1988 U.N. Convention Against Illicit Traffic in Narcotic Drugs and Psychotropic Substances – A Ten Year Perspective: Is International Cooperation Merely Illusory?*, 22 FORDHAM INT'L. L.J. 74 (1998);

*The Money Laundering Control Act of 1986: Creating a New Federal Offense or Merely Affording Federal Prosecutors an Alternative Means of Punishing Specified Unlawful Activity?* 32 AM. CRIM. L. REV. 823 (1996);

*The Ancient Roots of Modern Forfeiture*, 21 NOTRE DAME J. LEGIS. 155 (1995).

## OTHER PUBLICATIONS IN THE PRECEDING TEN YEARS

CRIMINAL AND FORENSIC EVIDENCE – CASES, MATERIALS, PROBLEMS ( with Robert Goodwin) (LexisNexis, 3d ed. 2009);

HUMAN RIGHTS MODULE ON CRIMES AGAINST HUMANITY, GENOCIDE, OTHER CRIMES AGAINST HUMANITY, AND WAR CRIMES (with Prof. Jordan Paust, Cherif Bassiouni, Michael Scharf, Lelia Sadat, and Bruce Zagaris) (Carolina Academic Press) (2006); and

*U.S. Opposition to the 1998 Rome Statute Establishing an International Criminal Court: Is the Court's Jurisdiction Truly Complementary to National Criminal Jurisdictions?*, 35 Cornell Int'l Law Journal 1 (2002).

## CONGRESSIONAL TESTIMONY

As Under Secretary (Enforcement), testified before the following Congressional committees:

Senate Judiciary Committee (11/20/02);
House Committee on Ways and Means (6/26/02);
U.S. Commission on Security and Cooperation in Europe (OSCE) (5/8/02);
Senate Appropriations Subcommittee on Treasury and General Government (4/17-18/02);
House Appropriations Subcommittee on Treasury, Postal Service and General Government (3/06/02, 2/27-28/02);
Senate Select Committee on Intelligence (2/04/02);

4

House Committee on Financial Services (10/03/01);
Senate Committee on Banking, Housing, and Urban Affairs (9/26/01);
House Permanent Select Committee on Intelligence (9/18/01); and
Senate Committee on Finance (5/16/01).

## AWARDS AND RECOGNITION

U.S. Department of the Treasury -- Treasury Medal (conferred by Secretary of the
Treasury John Snow) (2003);

U.S. Department of Justice, Edmund J. Randolph Award (conferred by U.S. Attorney
General Dick Thornburg) (1991);

Attorney General's Distinguished Service Award (one of the highest awards conferred by
the U.S. Department of Justice) (1990);

Excellence in Management Award (conferred by U.S. Attorney General William P. Barr)
(1992);

Drug Enforcement Administration Administrator's Award (highest award conferred by
the DEA) (1989); and

Drug Enforcement Administration Certificate of Appreciation (April 1987 and July
1987).

## LECTURES

An internationally recognized expert in the field of anti-terrorist financing and anti-
money laundering, delivering lectures on these subjects in Tirana, Albania (2008);
Mumbai (ICICI Bank, Nehru Center), Pune (MIT School of Government, National
Defense Academy, National Institute of Bank Management, Indira School of
Management Studies), New Delhi (Institute for Defense Studies and Analysis, Central
Economic Intelligence Bureau, Standard Chartered Bank), and Calcutta (India Bankers
Seminar), India (2006); Asuncion, Paraguay (Vice-President Luis Castiglioni,
SEPRELAD, Comandancia de la Policia Nacional, Senators of Finance Committee,
Paraguay Bankers' Association) (2005); Amerika Haus, Vienna, Austria (2006, 2005 &
2004); Milan (Banca Intesa, Guardia di Finanza), Rome (Italian Bankers' Association,
Military Center for Strategic Studies (War College), members of Italian Senate) and
Naples (Treasury Police Regional Headquarters), Italy (2005); American Center Forum
Series, U.S. Embassy, Brussels, Belgium (2005); Copenhagen, Denmark (2006); Judicial
Conference for Iraqi Judges and the Rule of Law; The Hague, Netherlands (2004);
International Organization of Securities Commissions, New York City (2004); Institute
of International Bankers, New York City (2003); Florida International Bakers
Association, Miami, Florida (2003); EuroForum, Madrid, Spain (2003); British Institute
of International & Comparative Law, London, England (2003); Centre for the Study of

Financial Innovation (CFSI), London, England (2003); World Economic Forum, Davos, Switzerland (2003); American-Luxembourg Chamber of Commerce, Luxembourg (2002); Heritage Foundation (2002); McGeorge School of Law (2003); S.J. Quinney School of Law, University of Utah (2003); Columbus School of Law, Catholic University of America (2002), University of Mississippi (2002); Notre Dame Law School (2003); Florida State University School of Law (2000); Institute of Advanced Legal Studies, London, England (2000); University of Mendoza School of Law, Mendoza, Argentina (1999); Harvard Law School (1993); and University of Kentucky Law School (1997).

Delivered the law school commencement address at the S.J. Quinney School of Law, University of Utah (2002).

Addressed a nationwide meeting of high-ranking Russian federal prosecutors at a conference on money laundering and organized crime sponsored by the U.S. Embassy in Moscow, Russia (1997), and participated in a conference on money laundering and organized crime held in Yerevan, Armenia, sponsored by the ABA Central and East Europe Law Initiative (CEELI) (1998).

Addressed the United Nations Security Counsel Al Qaida/Taliban Sanctions Committee on freezing terrorist assets (February and September 2002).

## BAR AND COMMUNITY ACTIVITIES

Fulbright Scholar – Santiago, Chile (2011);

American Bar Association Rule of Law Initiative – Drafting Prosecutorial Reform Index for Belize;

National Academy of Public Administration (NAPA) – Elected Fellow (2009);

American Law Institute (ALI) – Member (since 2003);

American Society of International Law (ASIL) – Member (since 2005);

Seventh Circuit Court of Appeals Committee on Pattern Criminal Jury Instructions – Member (2008);

International Penal Law Association – Member (2008); and

Utah State Bar – Member (since 1980).

**EXHIBIT B**

**EXPERT WITNESS TESTIMONY**

*El Camino Resources, Ltd., et al. v. Huntington National Bank,* No. 1:07-cv-598 (W.D. Mich.) (deposed);

*Richardson v. Huntington National Bank,* No. 06-80989-Jrh (Bkrtcy. W.D. Mich.) (deposed and testified at trial);

*Dale, et al. v. Dreyfus Service Corp., et al.,* No. 3:00 CV 359LN (S.D. Miss. Jackson Div.) (deposed); and

*BDP International Finance Corp., Ltd., et.al. v. 6-F Corporation, Pedro Castillo,* No. 06-02544-CA 21 (11th Dist. Miami-Dade Cty) (deposed)

EXHIBIT C

## PUBLICATIONS

### BOOKS

PRINCIPLES OF COUNTER-TERRORISM LAW (West Publ. 2011) (with Prof. Geoffrey Corn);

UNFUNDING TERROR: THE LEGAL RESPONSE TO THE FINANCING OF GLOBAL TERRORISM (Edward Elgar Publ. 2008);

COMPLEX CRIMINAL LITIGATION: PROSECUTING DRUG ENTERPRISES AND ORGANIZED CRIME (Lexis Publ., 2d ed. 2000);

INTERNATIONAL CRIMINAL LAW, CASES AND MATERIALS (with Prof. Jordan Paust, Cherif Bassiouni, Michael Scharf, Leila Sadat, and Bruce Zagaris (Carolina Academic Press, 3d ed. 2007);

INTERNATIONAL CRIMINAL LAW DOCUMENTS SUPPLEMENT (with Prof. Jordan Paust, Cherif Bassiouni, Michael Scharf, Leila Sadat, and Bruce Zagaris (Carolina Academic Press 2007);

THE LAW OF ASSET FORFEITURE (with Prof. Sandra Guerra Thompson and Michael O'Hear) (Lexis Publ., 2d ed. 2004); and

HOW TO COMBAT MONEY LAUNDERING AND TERRORIST FINANCING (Chapter 13) (Central Bank Publ.) (2005).

### LAW REVIEW and OTHER LEGAL ARTICLES

*The Demise of the U.N. Economic Sanctions Regime to Deprive Terrorists of Funding*, CASE W. RES. J. INT'L L., 41 CASE W. RES. J. INT'L L. 19 (2009);

*Does "Proceeds" Really Mean "Net Profits"? The Supreme Court's Efforts to Diminish the Utility of the Federal Money Laundering Statute*, 7 AVE MARIA L. REV. 339 (2009);

*Who Is Winning the War on Terror Financing?*, 10 THE FINANCIAL REGULATOR 25 (Sept. 2005);

*Unfunding Terror, U.S. and International Response to 9/11*, 17 TRANSNAT'L. LAWYER 113 (2004); and

*The Global Efforts to Stop Terrorist Financing*, AM. INT'L ELECT. J., U.S. State Department (August 2003).

## OTHER PUBLICATION IN THE PRECEDING TEN YEARS

CRIMINAL AND FORENSIC EVIDENCE — CASES, MATERIALS, PROBLEMS (with Prof. Robert Goodwin) (LexisNexis, 3d ed. 2009);

HUMAN RIGHTS MODULE ON CRIMES AGAINST HUMANITY, GENOCIDE, OTHER CRIMES AGAINST HUMANITY, AND WAR CRIMES (with Prof. Jordan Paust, Cherif Bassiouni, Michael Scharf, Leila Sadat, and Bruce Zagaris) (Carolina Academic Press) (2006); and

*U.S. Opposition to the 1998 Rome Statute Establishing an International Criminal Court: Is the Court's Jurisdiction Truly Complementary to National Criminal Jurisdictions?*, 35 Cornell Int'l Law Journal 1 (2002)

# EXHIBIT 2

# FAISAL FINANCE (SWITZERLAND) SA
## DETAILED OVERALL PORTFOLIO POSITION AS AT 31/01/05

MR. WAEL HAMZA JULAIDAN

910409.01

| CATEGORY CURRENCY | DESCRIPTION | HOLDINGS | BOOK VALUE | MKT PRICE | MARKET VALUE CCY | YIELD % | MARKET VALUE USD | USD UNREALIZED GAIN/LOSS Market | Transl. | Total |
|---|---|---|---|---|---|---|---|---|---|---|

CASH ACCOUNTS

| DEM | CASH WITH CITIBANK | | 0.00 | | 0.00 | | | | | |
| USD | CASH WITH CITIBANK | | 366.58 | | 366.58 | | | | | |
| EUR | CASH WITH CITIBANK | | 4,188.00 | | 4,188.00 | | | | | |

PARALLEL PURCHASE & SALE OF CURRENCIES (*)

| USD | INVESTMENT 76927 01/02/05 | | 105,000.00 | | 105,037.98 | 2.17 | 105,037.98 | 37 | | 37 |

GRAND TOTALS

110,405.56   37   0   37

(*) Grd With Banque Int. Luxembourg, Societe generale, Chase Manhattan bk N.A, Citibank Bahrain, Arab Inv. Company
    Chf With Banque Int. Luxembourg, Societe generale
    Gbp With Banque Int. Luxembourg
    Eur With Banque Int. Luxembourg, Societe generale
    Sar With Citibank Bahrain

PAGE 1

002

IN THE NAME OF ALLAH, THE BENEFICENT, THE MERCIFUL

**FAISAL FINANCE (Switzerland) S.A.**



مؤسسة فيصل المالية (سويسرا) ش.م.

3, Quai du Mont-Blanc - P.O. Box 1494 - 1211 GENEVA 1,
SWITZERLAND - PHONE: +41 022 908 53 00 - TELEX: 415 354 FFS-CH
FAX: +41 022 908 53 99

٣ كي دي مون – بلان – ص. ب ١٤٩٤ – ١٢١١ جنيف ١
سويسرا – هاتف: ٠٠ ٥٣ ٩٠٨ ٠٢٢ ٤١+ – تلكس: ٣٥٤ ٤١٥ FFS-CH
تلیفاكس: ٩٩ ٥٣ ٩٠٨ ٠٢٢ ٤١+

MR. WAEL HAMZAH JELAIDAN

POBOX : 1436
JEDDAH 21431
SAUDI ARABIA

| EXTRACT OF ACCOUNT | | USD   IFA | | 010409.01.00.840 |

FROM  01/01/2005 TO 31/01/2005     *** CASH BALANCE WITH CITIBANK ***

| DATE | DESCRIPTION | DEBIT | CREDIT | VALUE | USD BALANCE |
|------|-------------|-------|--------|-------|-------------|
| 01/01 | CARRIED FORWARD | | | | 179.70 |
| 14/01 | PPSC/C REIMBURSEMENT | | 105,000.00 | 18/01/05 | 105,179.70 |
| 14/01 | PPSC/C GROSS INCOME | | 187.83 | 18/01/05 | 105,367.53 |
| 14/01 | PROFIT PARTICIPATION | 18.78 | | 18/01/05 | 105,348.75 |
| 18/01 | PPSC/C INVESTMENT | 105,000.00 | | 18/01/05 | 348.75 |
| 21/01 | PPSC/C REIMBURSEMENT | | 105,000.00 | 25/01/05 | 105,348.75 |
| 21/01 | PPSC/C GROSS INCOME | | 44.92 | 25/01/05 | 105,393.67 |
| 21/01 | PROFIT PARTICIPATION | 4.49 | | 25/01/05 | 105,389.18 |
| 25/01 | PPSC/C INVESTMENT | 105,000.00 | | 25/01/05 | 389.18 |
| 31/01 | MANAGEMENT FEES | 22.60 | | 31/01/05 | 366.58 |

This document is considered approved unless
we are notified in writing of any objection
within one month.

| BALANCE | 366.58 |

ACNT620/FFS/FFS 04/02/05

IN THE NAME OF ALLAH, THE BENEFICENT, THE MERCIFUL

**FAISAL FINANCE (Switzerland) S.A.**

3, Quai du Mont-Blanc - P.O. Box 1494 - 1211 GENEVA 1,
SWITZERLAND - PHONE: +41 022 908 53 00 - TELEX: 415 354 FFS-CH
FAX: +41 022 908 53 99



مؤسسة فيصل المالية (سويسرا) ش.م.

٣ كي دي مون – بلان – ص. ب ١٤٩٤ – ١٢١١ جنيف ١
سويسرا – هاتف: ٠٠ ٥٣ ٩٠٨ ٠٢٢+ – تلكس: ٣٥٤ ٤١٥ FFS-CH
تلفاكس: ٩٩ ٥٣ ٩٠٨ ٠٢٢+


MR. WAEL HAMZAH JELAIDAN

POBOX : 1436
JEDDAH 21431
SAUDI ARABIA


| EXTRACT OF ACCOUNT | | EUR    IFA | | | 010409.01.00.978 |

FROM  01/01/2005 TO 31/01/2005          *** CASH BALANCE WITH CITIBANK ***

| DATE | DESCRIPTION | DEBIT | CREDIT | VALUE | EUR BALANCE |
|------|-------------|-------|--------|-------|-------------|
| 01/01 | CARRIED FORWARD | | | | 4,188.08 |

This document is considered approved unless
we are notified in writing of any objection
within one month.

| | BALANCE | 4,188.08 |

MONT520/PPS/PR3 04/02/05

IN THE NAME OF ALLAH, THE BENEFICENT, THE MERCIFUL

**FAISAL FINANCE (Switzerland) S.A.**



مؤسسة فيصل المالية (سويسرا) ش.م.

3, Quai du Mont-Blanc – P.O. Box 1494 – 1211 GENEVA 1,
SWITZERLAND – PHONE: +41 022 908 53 00 - TELEX: 415 354 FFS-CH
FAX: +41 022 908 53 99

٣ كي دي مون – بلان – ص. ب ١٤٩٤ – ١٢١١ جنيف ١
سويسرا – هاتف: ٠٠ ٥٣ ٩٠٨ ٢٢ ٤١٠+ – تلكس: ٣٥٤ ٤١٥ FFS-CH
تلفناكس: ٩٩ ٥٣ ٩٠٨ ٢٢ ٤١٠+

Mr.Wael Hamzah Jelaidan
P.O. Box: 1436
Jeddah 21431
Saudi Arabia

10, February 2005

Dear Sir

We are pleased to enclose herewith your Statement of Accounts for the month of January 2005 comprising, an extract of accounts and a detailed overall portfolio position as at 31.01.2005.

The beginning of the New Year has been marked by a strong pace of activities within Faisal Finance (Switzerland) SA, including a heavy travel schedule both from the Wealth Management and Investment teams.

Our Real Estate portfolio and particularly the USA program are currently attracting tremendous interest from institutional partners, comprising large and reputed European but also Middle Eastern banks. This is mainly due to the fact that such investments have very little correlation to corporate performance which, albeit hedged or diluted, nevertheless constitutes the main underlying risk in most investment solutions – including real estate funds - offered by both conventional and Islamic institutions. In this respect we are currently coordinating efforts, particularly in terms of structuring and compliance with Swiss and international legislations in order to cater to our partners' respective needs.

Our strategic partnership with financial institutions has also been geared towards developing best in class investment solutions in order to diversify our overall portfolio. In this respect we now have the capacity to offer excellent solutions for those interested in capital protection, global equities, or in capturing the opportunities offered by the Asian markets, Japan and recently China.

We of-course continue to be at the entire disposal of our clients not only in terms of providing tailor made wealth management, but also by, extending our in-house capacities and strategic partners in view of acting as your one-stop-shop advisers. In this respect, please do not hesitate to contact us.

Yours sincerely,

Marco Rochat
Chief Executive

Alexander Theocharides
Director, Wealth Management

# EXHIBIT 3



The Middle East's Leading English Language Daily

Friday 18 April 2008 (11 Rabi' al-Thani 1429)



**WAMY Organizing Forum on Integration of Charity Work**
P.K. Abdul Ghafour, Arab News —

JEDDAH, 18 April 2008 — "Specialization and Integration of Charitable Organizations" is the theme of a major seminar to be organized by the World Assembly of Muslim Youth (WAMY) at the Inter.Continental Hotel here on April 27-28.

Dr. Muhammad Badahdah, assistant secretary-general of WAMY, said several nongovernmental organizations in the Kingdom and abroad would take part in the seminar, which will be opened by Makkah Gov. Prince Khaled Al-Faisal. "We hope the seminar will contribute to improving the activities of charitable organizations in terms of quality and quantity," Badahdah told Arab News.

Prominent researchers and experts in developmental and voluntary work will present papers at the event, Badahdah said, and he thanked the ministries of Islamic affairs and social affairs for their support.

A meeting of the directors of WAMY's overseas offices in 20 countries will be held on the sidelines of the seminar, he said, adding that Dr. Saleh Al-Wohaiby, secretary-general the Riyadh-based organization, would attend the function.

Wohaiby, Dr. Abdul Hameed Mazroue and Dr. Ihsan Tayeb will speak at the first session that will focus on the role of private and public organizations in promoting specialization and integration among charitable societies.

Dr. Ahmed Muhammad Ali, president of the Islamic Development Bank, will address the second session on "The Role of Donor Agencies in the Development of Charitable Organizations." Dr. Hani Al-Banna will also speak at the session, which will be presided over by Dr. Muhammad Al-Najaifi.

The third session will focus on the topic: "Civil Society Organizations: Present and Future" with professor Khaled Habbani and Dr. Ali Al-Henaki presenting papers. During the same session, Badahdah will lead a discussion on the importance of specialization in charitable work.

Dr. Abdul Wahab Noorwali, Dr. Samir Fakhru, Dr. Humaid Al-Shaiji, Dr. Owaish Al-Harbi, Dr. Yuslim Al-Shaiba, Dr. Ali Badahdah, professor Wael Julaidan and Dr. Adnan Al-Bar are other major speakers.

Meanwhile, Badahdah said he had received a message from charitable organizations in Gaza, requesting emergency assistance for Palestinians in the strip. The message highlighted the difficult situation of Palestinians in Gaza as a result of the unjust Israeli siege.

"No public facilities in the area including health and educational institutions are working," said the message. "Hunger has hit about 90 percent of the population while 80 percent are unemployed."

Badahdah urged Saudis and expatriate to respond favorably to the call and stand by their Palestinian brethren at this time of need by extending them the necessary financial and material assistance.

# EXHIBIT 4

*(Parenthetical remarks in Italic are the translator's)*

*(Document name: **Tareekh Osama/30/Tareekh Osama 93**)*

In the name of God

1- Advisory council.

2- Cooperating with Sheikh Saleh.

3- Security Officer.

5- Reducing the number of workers.

6- Forming a committee to take care of the brothers' problems, and of the financial matters.

1A- Sheikh Abdallah.

1B- Sheikh Tameem.

1G- Brother Wael Jleidan.

1D- Brother Abu Hajer.

1H- Brother Adel Farhat.

*(Illegible)*- Abu Abdallah     President

?- Abu Khalid.

?- Abu Ubaidah.

1- The mobilization committee, Sheikh Abdallah, Sheikh Tameem, Abu Abdallah, and Abu Hasan.

BOS000093

بسم الله

١- ابـ مجلس شورتن
٢- التعاون مع المشير ضناح
٣- صنايـل أمين

د- تقديص مدد العا لمن
هـ- تشكـل لجنة للدستام مجتلكارالدعو ة ر ضل حدا ما يه

١ يك الشيخي عبد الله
ب . الشيخي نجم
جـ . الحاج وائل جليبد ات
د. الحاج أبو صا حب
هـ. الحاج عاد ل نرضا ست
رك. ٢ يعبد الله   رمبـا
زم ٠ أبر طبا لد
ح . أبو عبيد ة
ط. لجنة الاستنفار الشيخي عبد الله والشيخ نجم سا بطا فا

# EXHIBIT 5

*(Parenthetical remarks in Italic are the translator's)*

*(Document name: TAREEKHOSAMA/29/Tareekh Osama.91)*

In the name of God, the most Compassionate, the most Merciful

1. The families stay as they are.

2. The camps remain as they are.

3. Urging the brethren to benefit from the training.

4. Urging the leaders to go inside. Media

5. Identifying the brethren, among everyone, who are ready to go inside.

6. Holding a mass-media event to collect in-kind and financial donations.

7. Clarifying the Mujahideen's situation to the world and keeping the spirit of Jihad alive.

8. Sending brethren during this month to prepare bases for the Arab brethren.

9. Forming an advisory council for the Arab brethren and using it as the leadership.

10. Forming a committee to receive donations and maintain an account and the spending

__ the Crescent *(most likely, the Saudi Red Crescent)*, the Rabita *(the Muslim World League)*, Sheikh Abdallah, the Relief Agency *(Hayaat Al-Ighata)*, and Abu Mazin.

11. Urging the Islamic agencies to bring in all of what they have.

12. Halting expansion.

13. Unifying the administration (presenting strong leadership for Peshawar, Suda, Warsak, and Al-Maasada.

14. Consulting with a lawyer regarding financial accounts and affairs.

15. Discussing with the Suda group their capability to provide provisions for the inside, and researching the ways which will lead to that. Abu Al-Jood, Sheikh Abdallah, and Abu Abdallah *(the names were written in green ink, and it is*

BOS000067

*unclear which paragraph they were intended for)*

16.  Reducing the number of the working brethren, except for those who are needed urgently.

17.  Discussing the present situation with the Al-Jamaa Al-Islamiyya *(the Islamic Group)*, and the possibility of cooperation (Abu el-Jood).

*(Text continues in TAREEKHOSAMA/29/Tareekh Osama.92)*

BOS000068

بسم الله الرحمن الرحيم

١- تبقى العوائل كما هي
٢- = المعسكرات كما هي ... ...
٣- تحريض الله فرصة على الاستفادة من التدريب ...
٤- تحريض القادة على الدخول الداخل المدني
٥- معرفة آلة شدة المستعدين الذين هم الجميع
٦- القيام بعمل إداري دراسته لجميع الشريعات ... ...
٧- ...منشور بموقف المجاهدين للعالم ... كذا وكذا ... كتاب
٨- إرسال أفراد في هذا الشهر لتصيبه قواعد لوقود العرب
٩- تشكيل مجلس شورى للدعوة العربية ... ... ...
١٠- تشكيل لجنة لجمع ... استقبال التبرعات ... ...
... السلمي والمراجعة والشيخ عبد الله وصية أبنائه
١١- ... ... ... ... فإن ما ... ...
١٢- إيقاف في التوسع
١٣- ... ... ... ... ...
١٤- ... ... ... ... ...
١٥- ... ... ... ... ...
١٦- ... ... ... ... ...
١٧- ... ... ... ... ...

# EXHIBIT 6

*(Parenthetical remarks in Italic are the translator's)*

*(Document name: TAREEKHOSAMA/49/Tareekh Osama.121)*

Number 1, خ:ش *(The Arabic characters Khaa and Sheen)*

In the name of God, the most Compassionate, the most Merciful

Muslim World League

International Islamic Relief Organization

No: *(left blank)*

Date: *(left blank)*

1.      A meeting between Abu Abdallah/Dr. Abdallah Naseef/Sheikh Abdel Majeed Zindani

and Dhiaul Haq

|————————————————— The situation was explained to him, and he was made aware of his responsibility in front of God, and his continued support, and permitting the support, meaning - giving us an open license fr the borders, and if he is being subjected to any pressures, let it be a secret *(agreement)*, in a way that League offices will be opened as *(illegible)* for the Pakistanis, and the attacks will be launched from them *(these offices)*, and that there are no gatherings inside the cities which will attract attention, or ay other suitable method which you *(plural)* will agree upon and of which you *(singular)* are convinced without any concessions, and what is meant by concessions, is that you will not be ashamed of anything

2.      The removal of all of the brothers from Peshaw *(most likely, Peshawar)* as soon as possible, and the houses will be ready for the arrivals and for any emergency which may occur.

3.      The brothers will be transported directly to Miran Shah (Khost) because it is the only open point at the present time.

4.      The brothers who are at Warsak *(phonetic)* will also be sent to Khost and its surroundings.

5.   All of the brothers' passports are to be kept with the strong organizations, in order to avoid any search action due to pressuring from the embassies, or *(due to)* anything else which may occur.

6.   That the passports should not be kept with the Saudi *(Red)* Crescent in anticipation of the recall of Abu Al-Hasan by Saudi Arabia, and the changing of the director.

7.   In Khost, the absence of the brothers in Miran Shah *(meaning unclear)*. Everyone is at the front at several centers, in Miran Shah only the person in charge and whomever he wants as an assistant.

8.   Assigning a car to secure what the brothers need at the front.

9.   After these *(follow)* the steps that are mentioned in Adel's paper which you have

(text continues in document *TAREEKHOSANA/49/Tareekh Osama.121a)*

BOS000023



*(Parenthetical remarks in Italic are the translator's)*

*(Document name: TAREEKHOSAMA/49/Tareekh Osama.121a, continuation of document TAREEKHOSAMA/49/Tareekh Osama.121)*

10.    I ask all of those who are in charge of people, to be good-natured, kind, compassionate, patient, and not too demanding of the brothers because the situation is not comforting for some individuals; more correctly the new ones, therefore the brothers need someone who will support them and be as a father and as a mother, and be a refuge for their sorrows so that he can assist them.

11.    To examine the brothers' situation, meaning that not everyone who gets close to you is what is desired, because individuals differ when idle, and when tasked with a responsibility.



*(illegible)* in the selection.

12.    I ask you to be good towards Sheikh Sayyaf, for he is known by all with agreement, and specifically you and the extent of his cooperation, and specifically you, and he is your brother *(meaning of this paragraph is unclear).*

After this, *(continue)* in accordance
with Adel's paper, and if anything            .18952410
new comes up I will inform you

Saleh Khan says that his tribe's land is close to Jaji Maidan and that it is in your hands, and the government can not interfere with this.

You must pursue finding an umbrella which you can stay under, other than the Crescent *(most likely, the Saudi Red Crescent)* because I expect that Abu Al-Hasan will be replaced, because he is known by them especially after Abu Mazin left the arena, and I prefer the name of the League *(most likely, Muslim World League)* because Dr. Naseef is one of the brothers, and the government knows who Abu Al-Hasan is and who the ones in the arena are, and this is not a decision, and the change may not happen now, and it may not be the intention, however precaution *(precaution dictates that we do this).*



Your brother

BOS000024



**Abu Anees**

*(signature)*

BOS000025

MUSLIM WORLD LEAGUE

INTERNATIONAL ISLAMIC RELIEF
ORGANIZATION

No

Date

رابطة العالم الإسلامي

هيئة الإغاثة الإسلامية العالمية

BOS000026

BOS000027

Exhibit C

**Tarbutton, J. Scott**

| | |
|---|---|
| **From:** | Martin McMahon <mm@martinmcmahonlaw.com> |
| **Sent:** | Monday, December 05, 2011 2:56 PM |
| **To:** | Carter, Sean; Tarbutton, J. Scott |
| **Subject:** | re: Wael Jelaidan |

Dear Sean and Scott,

Hope you guys are doing well. We recently received a letter from Bassim Alim, counsel to Wael Jelaidan in Jeddah, Saudi Arabia. Mr. Alim explains that Mr. Jelaidan and himself have made a number of attempts to request and obtain responsive documents from governmental and commercial entities but these entities have not cooperated with them.

Mr. Alim states that he is sure that Mr. Jelaidan, on his own, cannot procure any additional documents. Mr. Alim is available to help in any way that the Plaintiffs or the Court feels is appropriate.

Regards,
Martin

# Exhibit D

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (GBD) (FM)<br>ECF Case |

*This document relates to:*

*Kathleen Ashton, et al. v. Al Qaeda Islamic Army, et al.*, Case No. 02 Civ. 6977
*Thomas Burnett, Sr., et al. v. Al Baraka Inv. & Dev. Corp., et al.*, No. 03 Civ. 9849
*Federal Insurance Co., et al. v. Al Qaida, et al.*, No. 03 Civ. 6978
*Estate of John P. O'Neill, Sr., et al. v. Al Baraka., et al.*, No. 04 Civ. 1923
*Continental Casualty Co., et al. v. Al Qaeda, et al.*, No. 04 Civ. 5970
*Cantor Fitzgerald & Co., et al. v. Akida Bank Private Ltd, et al.*, No. 04 Civ. 7065
*Euro Brokers Inc., et al., v. Al Baraka, et al.*, No. 04 Civ. 7279


**PLAINTIFFS' SUPPLEMENTAL REQUESTS**
**FOR PRODUCTION OF DOCUMENTS TO WAEL JELAIDAN**


THE MDL 1570 PLAINTIFFS'
EXECUTIVE COMMITTEES
July 31, 2012

## PLAINTIFFS' SUPPLEMENTAL REQUESTS
## FOR PRODUCTION OF DOCUMENTS TO WAEL JELAIDAN

Plaintiffs in *Kathleen Ashton, et al. v. Al Qaeda Islamic Army, et al.*, Case No. 02 Civ. 6977, *Thomas Burnett, Sr., et al. v. Al Baraka Inv. & Dev. Corp., et al.*, Case No. 03 Civ. 9849, *Federal Insurance Co., et al. v. al Qaida, et al.*, Case No. 03 Civ. 6978, *Estate of John P. O'Neill, Sr., et al. v. Al Baraka., et al.*, Case No. 04 Civ. 1923, *Continental Casualty Co., et al. v. Al Qaeda, et al.*, Case No. 04 Civ. 5970, *Cantor Fitzgerald & Co., et al. v. Akida Bank Private Ltd, et al.*, Case No. 04 Civ. 7065, and *Euro Brokers Inc., et al., v. Al Baraka, et al.*, Case No. 04 Civ. 7279, propound and serve on Wael Jelaidan the following supplemental Requests for Production of Documents to be answered fully and under oath, pursuant to Rule 34 of the Federal Rules of Civil Procedure, within 30 days of their receipt.

The "Instructions" and "Definitions" set forth in the Plaintiffs' First Set of Requests for Production of Documents Part A and Part B Directed to Wael Jelaidan are incorporated herein by reference, except the following definition shall also apply:

1.     The terms "Defendant," "You," and "Your" shall refer to Wael Jelaidan (a/k/a Wa'il Jlaydan, Wa'il Hamza Julaydan, Wa'el Hamza Juliadan, Wa'el Hamza Jalaidin, Wael Hamzah Jelaidan, Wa'il Hamza Julaidan, Wa'el Hamza Julaydan, Wa'il Hamza Jaladin, Abu al Hassan, Abu al Hasan al Madani, Wael Hamzah Jaleedan) and his trustee, employee, attorney, consultant, accountant, agent, alter ego, volunteer, or other legal representative acting on Wael Jelaidan's behalf.

2.     The time frame for the requested documents, unless otherwise noted or agreed, is 1988 to present.

### PLAINTIFFS' SUPPLEMENTAL REQUESTS
### FOR PRODUCTION OF DOCUMENTS TO WAEL JELAIDAN

### SUPPLEMENTAL DISCOVERY REQUESTS

1.      Please provide all documents relating to Bank Austria including but not limited to account #573301587 at Bank Austria in Vienna established or held in the name of, on behalf of and/or for the benefit of Wael Jelaidan.  Responsive documents shall include, but are not limited to, correspondence, letters, memoranda, notes, and/or e-mails, that refer to, relate to, or reflect communications between or among Wael Jelaidan and Bank Austria in Vienna documents detailing the establishment of and/or closing of the account, suspicious activity and/or transaction reports, account numbers, monthly account statements, annual account statements, account notices, deposits, withdrawals, deposit slips, check stubs, cleared or canceled checks, cashier checks, money orders, debit/credit memos, financial ledgers, journals, investment records, real estate records, records of assets, loan records, audit work papers, audit reports, wire transfers, and any documentation showing the source(s) and/or destination(s) of any funds deposited into or withdrawn from that account.

**ANSWER:**


2.      Please provide all documents Wael Jelaidan sent to and/or received from the Third World Relief Agency (or "TWRA"), including without limitation, all documents relating to the transfer of funds between Wael Jelaidan and the TWRA.

**ANSWER:**

3.      Please provide all documents relating to all accounts in any banking or financial institution that Wael Jelaidan currently holds, or has held, jointly with or on behalf of the TWRA.

**ANSWER:**


4.      Please provide all documents relating to the proposal to remove Wael Julaidan from his position within Rabita on or about the year 2003, including but not limited to any documents exchanged with or provided by/to the Muslim World League, the Government of Pakistan, the Kingdom of Saudi Arabia, or any of their instrumentalities.

**ANSWER:**


5.      Please provide all documents, correspondence, letters, memoranda, notes, reports, and/or emails relating to any relationship between Wael Jelaidan and Abdullah bin Abdul Muhsin Al Turki.

**ANSWER:**


6.      Please provide all documents referring or related to Muwafaq Foundation (a/k/a Blessed Relief, Muwafaq Al-Khayriyya Benevolent Foundation, Muwafaq Society).

**ANSWER:**

7.      Please provide all documents referring or related to Depozitna Bank, Bosnia.

**ANSWER:**


8.      Please provide all documents referring or related to Amer Mahdi Saleh.

**ANSWER:**


9.      Please provide all documents referring or related to Adel Muhammad Sadiq bin Kazem.

**ANSWER:**


10.     Please provide all documents referring or related to Maram Import Export Company or Maram Company (Turkey).

**ANSWER:**


11.     Please provide all documents referring or related to Al-Iman University or Al-Eman University (Yemen).

**ANSWER:**


12.     Please provide all documents referring or related to Plan Bojinka or Project Bojinka.

**ANSWER:**

13.    Please provide all documents referring or related to Hani Hanjour.

**ANSWER:**


14.    Please provide all documents referring or related to CRM Airline Training Center (Scottsdale, Arizona).

**ANSWER:**


15.    Please provide all documents referring or related to Arizona Aviation Flight School (Phoenix, Arizona).

**ANSWER:**


16.    Please provide all documents referring or related to Sawyer School of Aviation (Phoenix, Arizona).

**ANSWER:**


17.    Please provide all documents referring or related to the Saudi Joint Relief Committee.

**ANSWER:**

18.     Please provide all documents referring or related to Salman bin Abdulaziz Al Saud.

**ANSWER:**


19.     Please provide all documents referring or related to Ramazi Ahmed Yousuf (a/k/a Ramzi Ahmed Yousef, Abdul Basit, Abdul Karim, Abdul Basit Mahmoud Abdul Karim, Adam Sali, Adam Ali Balauch, Adam Ali Qasim, Arnaldo Forlani, Azan Mohammed, Naji Owaidah Haddad, Najy Awaita Haddad, Rashid, Yonis).

**ANSWER:**


20.     Please provide all documents referring or related to Hassan al-Turabi.

**ANSWER:**


21.     Please provide all documents referring or related to the Saudi Red Crescent.

**ANSWER:**


22.     Please provide all documents referring or related to Abdul Hakim Murad (a/k/a Abdul Hakim, Abdul Hakim Al Hashim Murad, Ahmed Saeed, Saeed Ahmed, Saeed Akman).

**ANSWER:**

23.     Please provide all documents referring or related to Wael Jelaidan's firm Meram Seyahat.

**ANSWER:**

24.     Please provide all documents referring or related to Privredna Banka Zagreb, including but not limited to, account #24116815430-71961, in the name Wael Hamzah A. Jelaidan.

**ANSWER:**

25.     Please provide all documents referring or related to Ghassan Dahduli.

**ANSWER:**

26.     Please provide all documents referring or related to Abdullah Ahmed Abdullah (a/k/a Abu Mohmaed al Masry).

**ANSWER:**

27.     Please provide all documents referring or related to Al Gama'a al Islamiyya (a/k/a "The Islamic Group").

**ANSWER:**

28.     Please provide all documents referring or related to Ali Mohamed.

**ANSWER:**


29.     Please provide all documents referring or related to Bait-ul-Ansar (a/k/a the "Mujahadeen Services Bureau" or "House of Helpers").

**ANSWER:**


30.     Please provide all documents referring or related to Dr. Ayman Al Zawahiri.

**ANSWER:**


31.     Please provide all documents referring or related to Mamdouth Mahmud Salim (a/k/a Abu Hajer, Abu Hajer al Iraqi, Mandouh Salim).

**ANSWER:**


32.     Please provide all documents referring or related to Mohammed Suleiman al Nalfi.

**ANSWER:**


33.     Please provide all documents referring or related to Muhsin Musa Matwalli Atwah (a/k/a Abdel Rahman al Muhajer).

**ANSWER:**

34.     Please provide all documents referring or related to Osama Bin Laden.

**ANSWER:**


35.     Please provide all documents referring or related to Abdel Hadi Taher.

**ANSWER:**


36.     Please provide all documents referring or related to Abu Mohamed al Maqdisi (a/k/a Mohamed Taher al Barqawi).

**ANSWER:**


37.     Please provide all documents referring or related to Abu Rida al Suri (a/k/a Mohammed Loay Bayazid).

**ANSWER:**


38.     Please provide all documents referring or related to Mohamed al Zawahiri.

**ANSWER:**


39.     Please provide all documents referring or related to Salehuddin Abdel Jawad.

**ANSWER:**

40.     Please provide all documents referring or related to Seik Ajadi.

**ANSWER:**


41.     Please provide all documents referring or related to Sheikh Abdel Majid Zindani.

**ANSWER:**


42.     Please provide all documents referring or related to Suleiman al Rashid.

**ANSWER:**


43.     Please provide all documents referring or related to Al Haramain & Al Masjed Al Aqsa Charity Foundation.

**ANSWER:**


44.     Please provide all documents referring or related to Al Haramain Islamic Foundation.

**ANSWER:**


45.     Please provide all documents referring or related to Al Kifah Refugee Center.

**ANSWER:**

46.     Please provide all documents referring or related to International Islamic Relief Organization.

**ANSWER:**


47.     Please provide all documents referring or related to Lajnat al Dawa al Islamiyah Kuwait.

**ANSWER:**


48.     Please provide all documents referring or related to World Assembly of Muslim Youth.

**ANSWER:**


49.     Please provide all documents referring or related to Abdullah bin Abdul Mohsin Al Turki.

**ANSWER:**


Defendant Wael Jelaidan has objected to Plaintiffs first set of production of documents Part B, requests B12-B14, B38-B43, on grounds "that it is a multiple document request ostensibly portrayed as a single document request."   In an attempt to accommodate Defendant's objection, without conceding the validity of this objection and preserving all rights to compel full

answers to same, Plaintiffs reiterate those requests herein, to further specify, focus and break down these prior requests for production to Defendant for the sake of clarity.  *See* Wael Jelaidan's Responses to the Plaintiffs' First Set of Requests for Production of Documents "Part B," dated September 13, 2006.

50.     Please provide all documents referring or related to Hasan Cengic.

**ANSWER:**

51.     Please provide all documents referring or related to Karavan Development Group Ltd., Caravan Development Group Ltd., or Karavan Construction and Development.

**ANSWER:**

52.     Please provide all documents referring or related to Ayadi Chafiq bin Muhammad (a/k/a Ayadi Chafik, ben Muhammad, Chafiq Ayadi, Ben Muhammad Ayadi Shafiq, Ayadi Shafiq).

**ANSWER:**

53.     Please provide all documents referring or related to Eurovest.

**ANSWER:**

54.     Please provide all documents referring or related to Yassin al Kadi (a/k/a Yassin al Qadi, Yassin Abdullah Kadi, Yasin Abdullah al Qadi, Yasin Kahdi, Yassin Quadi).

**ANSWER:**

55.     Please provide all documents referring or related to Mohammed Jamal Khalifa (a/k/a Abdallah Khalifahm Abu Bara, Abu al Bara, Abdul Barashid, Abi Bara, Abu Barra, Abu Barashid, Abu El Bara'a, Abu Salah, Chej Salah, Jamal Khalifa).

**ANSWER:**

56.     Please provide all documents referring or related to Abu Zubaydah (a/k/a Abu Zubaida, Abu Zubayah, Abu Zubayda, Abu Zubeida, Zain Al-Abidin Muhahhad Husain, Zayn Al-Abidin Mohammed Husayn, Zayn Al-Abidin Muhammad Husayn, Zein Abedein Mohammad Hassan, Abd Al-Hadi Al-Wahab, Hani, Tariq).

**ANSWER:**

57.     Please provide all documents referring or related to Mohammed Atef (a/k/a Abu Hafs, Abu Hafs Al Masri, Abu Hafs Al-Masri).

**ANSWER:**

58.     Please provide all documents referring or related to Tucson Islamic Center (a/k/a Islamic Center of Tucson, Arizona).

**ANSWER:**

59.    Please provide all documents referring or related to Wadih El-Hage (a/k/a Abu Abullah, Abu Abdullah Al-Lubnani, Abu al-Sabbour).

**ANSWER:**

60.    Please provide all documents referring or related to Sheik Abdullah Azzam.

**ANSWER:**

61.    Please provide all documents referring or related to Mektab al Khidmat (a/k/a Maktab al Khidmat, Al-Kifah, Human Services Organization).

**ANSWER:**

62.    Please provide all documents referring or related to Enaam Arnaout (a/k/a Enaam Mahmoud Arnaout, Abdel Samia, Abu Mahmoud, Abu Mahmoud al Hamawi, Abu Mahmoud al-Hamnawi).

**ANSWER:**

Dated: July 31, 2012                          Respectfully submitted,

_____

THE MDL 1570 PLAINTIFFS'
EXECUTIVE COMMITTEES

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the Plaintiffs' Supplemental Requests for Production of Documents Directed to Wael Jelaidan was served via electronic mail this 31st day of July 2012, upon:

Martin F. McMahon, Esquire
MARTIN F. MCMAHON & ASSOCIATES
1150 Connecticut Avenue, NW, Suite 900
Washington, DC 20036

Alan R. Kabat, Esquire
BERNABEI & WACHTEL, PLLC
1775 T Street, NW
Washington, DC 20009-7124
(Defendants' Executive Committee's appointed representative to receive discovery requests and responses in 03-MDL-1570)

_____
Robert T. Haefele, Esquire