D4GFTERA

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
3   In re:
                                    03 MDL 1570 (GBD)(FM)

4   TERRORIST ATTACKS ON SEPTEMBER
    11, 2001,
5   ------------------------------x
                                    New York, N.Y.
6                                   April 16, 2013
                                    12:00 p.m.
7   Before:
                        HON. FRANK MAAS,

8
                                    Magistrate Judge
9
                          APPEARANCES
10
    KREINDLER & KREINDLER
11       Attorney for Plaintiff
    JAMES KREINDLER, ESQ.
12
    COZEN O'CONNOR
13       Attorneys for Federal Insurance Plaintiffs
    SEAN P. CARTER, ESQ.
14  J. SCOTT TARBUTTON, ESQ.

15  MOTLEY RICE
         Attorney for Burnett and Eurobroker Plaintiffs
16  ROBERT T. HAEFELE, ESQ.

17  ANDERSON KILL & OLICK, P.C.
         Attorneys for O'Neill and Plaintiffs Executive Committee
18  JERRY S. GOLDMAN, ESQ.

19  BERNABEI AND WACHTEL
         Attorneys for Defendants
20  ALAN KABAT, ESQ.

21  CLIFFORD CHANCE
         Attorneys for Dubai Islamic Bank
22  STEVE COTTREAU, ESQ.
    RONI BERGOFFEN, ESQ.
23
    OMAR T. MOHAMMEDI, ESQ.
24       Attorney for Wamy International

25  MARTIN F. McMAHON, ESQ.
         Attorney for Rabita Trust

D4GFTERA

```
 1              (Case called)

 2              (In open court)

 3              THE COURT:  This is a conference on In Re:  Terrorist

 4    Attacks on September 11, 2001.  Counsel, state your appearances

 5    for the record.

 6              MR. KREINDLER:  Good morning, your Honor.  James

 7    Kreindler from Kreindler & Kreindler.

 8              MR. CARTER:  Good morning, your Honor.  Sean Carter

 9    from Cozen O'Connor.

10              MR. HAEFELE:  Good morning, your Honor.  Robert

11    Haefele from Motley Rice.

12              MR. GOLDMAN:  Good morning.  Jerry Goldman for the

13    O'Neill plaintiffs and plaintiffs executive committee.

14              MR. TARBUTTON:  Good afternoon, your Honor.  Scott

15    Tarbutton, Cozen O'Connor.

16              MR. KABAT:  Good afternoon, your Honor.  Alan Kabat

17    from Bernabei and Wachtel.

18              MR. COTTREAU:  Good afternoon, your Honor.  Steve

19    Cottreau from Clifford Chance on behalf of Dubai Islamic Bank.

20              MS. BERGOFFEN:  Good afternoon, your Honor.  Ronnie

21    Bergoffen on behalf of Dubai Islamic Bank from Clifford Chance.

22              MR. MOHAMMEDI:  Good morning, your Honor.  Omar

23    Mohammedi on behalf of Wamy International.

24              MR. McMAHON:  Good morning, your Honor.  Martin

25    McMahon on behalf of Rabita Trust.
```

D4GFTERA

1          THE COURT:  Good morning.  Hiding in the back.

2          MR. McMAHON:  I'm trying to avoid you, your Honor.

3          THE COURT:  Before we get started on the agenda, Judge

4     Daniels referred to me the case of John Doe v. Bin Laden which

5     is brought by Judicial Watch Incorporated.  It was filed in

6     2009 apparently in the District of Columbia and I guess just

7     recently found its way here.  Is that a case you folks are

8     familiar with?

9          MR. CARTER:  Your Honor, it is it's a suit filed

10    against Afghanistan and Osama bin Laden on behalf of as I

11    understand it a family member of one victim of the attacks.  It

12    went up to the circuit previously and the circuit remanded the

13    case for discovery related to subject matter jurisdiction under

14    the Foreign Sovereign Immunities Act.  The counsel for the

15    plaintiffs in that case, Jim Peterson from Judicial Watch, had

16    contacted us in advance of the timing for the agenda letters

17    for Judge Daniels and asked that we simply request that some

18    discovery schedule be set.  And that is what resulted in being

19    in front of your Honor.  I do not believe that either counsel

20    for the plaintiff or counsel for Afghanistan is present today.

21         THE COURT:  So we'll leave that for another day.  Is

22    that what you propose?

23         MR. CARTER:  I think that's correct your Honor.

24         On a somewhat related note, as several of us were

25    walking here this morning the Second Circuit issued three

D4GFTERA

1    decisions on the appeals that had been argued in December.

2    Frankly, we really haven't had a chance to even survey them

3    yet.  As I understand it 11 or 12 defendants had been remanded

4    to the district court for jurisdictional discovery, so in the

5    hallway outside we spoke to our colleagues on the defense side

6    and suggested that it might make sense for us all to take stock

7    of the decision and come back in May and discuss with your

8    Honor a comprehensive discovery schedule going forward.

9            THE COURT:  That certainly makes sense.  Are there

10   defendants who have been remanded for merits discovery who are

11   potential deep pockets in the case, if I could put it that way?

12           MR. CARTER:  Your Honor, my understanding is that the

13   banking defendants that had been dismissed on 12(b)(6), their

14   dismissals are affirmed.  There's at least one corporate

15   defendant that's been remanded for jurisdictional discovery as

16   well as a relatively insignificant defendant also as well as a

17   number of the other defendants, as I understand it, again, I

18   haven't read the decision, are officials of certain of the

19   charities that are presently before the Court for discovery.

20           MR. KABAT:  I can confirm there is no merit discovery.

21   There is jurisdictional discovery.  The circuit limited

22   jurisdictional discovery, specifically 27 and 28 of their

23   opinion, so we'll be discussing that among ourselves with

24   counsel and proposing a jurisdictional discovery.

25           I just wanted to mention that we think that that

D4GFTERA

1    jurisdictional discovery schedule should be separate from the

2    merits discovery currently underway.  In other words, there's

3    no reason to stop the merit discovery while the jurisdictional

4    discovery is underway, so we would just be on two tracks.

5            THE COURT:  Well, whether it should be one or two is

6    something we will take up in May.  We don't have a date in May.

7    We haven't scheduled out that far.

8            MR. CARTER:  We don't, your Honor.  I know Mr. Kabat

9    has suggested possibly May 13, 14 or 15.

10           MR. KABAT:  We have several dates we'd like to

11   propose; May 13, 14 or 15 or after Memorial Day, May 30th and

12   31.

13           THE COURT:  My criminal duty is the week of May 13 so

14   that doesn't work.

15           MR. CARTER:  The 30th or 31 they had suggested is okay

16   with us as well.

17           THE COURT:  Either of those days is fine at the

18   moment.  Shall we say the 30th?

19           MR. CARTER:  That's fine, your Honor.

20           THE COURT:  At 11, is that when you've been usually

21   doing this?

22           MR. CARTER:  It is, your Honor.

23           THE COURT:  So May 30th at 11.

24           MR. CARTER:  Your Honor, one mild point of

25   clarification based on what Mr. Kabat said.  We were discussing

D4GFTERA

| | |
|---|---|
| 1 | in the hallway adjusting the schedule for merits discovery as |
| 2 | well, so I assume that's an issue we'll take up on May 30. |
| 3 | THE COURT:  I consider all of that on the table. |
| 4 | MR. CARTER:  Thank you, your Honor. |
| 5 | MR. McMAHON:  Your Honor, can you consider pushing |
| 6 | that back to 12:00?  It's quite an inconvenience for me coming |
| 7 | from Washington, D.C. to catch the 8:00 train. |
| 8 | THE COURT:  Sure.  If that's convenient for everybody |
| 9 | else, I have no problem with that.  Noon it is. |
| 10 | I guess that brings us to the application with respect |
| 11 | to the plaintiff's privilege log, a healthy portion of which is |
| 12 | documents that are subjected to the protective order in Linde |
| 13 | v. Arab Bank, which I guess is before Judge Gershon in the |
| 14 | Eastern District, is that correct? |
| 15 | MR. HAEFELE:  That's correct, your Honor. |
| 16 | THE COURT:  And if the only reason why that's part of |
| 17 | the privilege log is that there's a protective order in place. |
| 18 | I guess the first question I have is why the two sides |
| 19 | should not be making a joint application to Judge Gershon to |
| 20 | lift that order to the extent that the materials can be |
| 21 | provided for use in this case. |
| 22 | MR. COTTREAU:  Your Honor, maybe I can just start. |
| 23 | Steve Cottreau for Dubai Islamic Bank and I guess my views are |
| 24 | in the brief for all the moving defendants.  The order, the |
| 25 | confidentiality order itself in paragraph 12 sets forth a very |

D4GFTERA

1    specific procedure for situations like this where the documents

2    subject to the order, and that order is Exhibit 4 to our

3    opening moving papers --

4              THE COURT:  Yes.  I'm turning to it now.

5              MR. COTTREAU:  It's on page 16, paragraph 12.  It sets

6    forth a very specific procedure that the plaintiff should have

7    followed, and that is, within three days of getting the

8    document requests that called for these documents they were

9    supposed to give their bank's counsel notice and then wait

10   until the last day the documents were due to produce them.  I

11   understand that that didn't happen, but they've now given -- I

12   don't want to -- there's no recriminations about it, we want

13   the documents, we're happy to get them now.  We understand that

14   the plaintiffs from their opposition brief reached out to Arab

15   Bank's counsel who didn't raise any objections save one with

16   respect to one of the documents.  It was --

17             THE COURT:  Say that again?  I'm sorry, I missed the

18   last part.

19             MR. COTTREAU:  We understand that plaintiff's counsel

20   from their opposition papers have now reached out to Arab Bank,

21   told them what documents they were withholding.  Arab Bank

22   raised only one objection and only with respect to one document

23   and that objection was that one of the documents was obtained

24   by a letter rogatory process and the government that approved

25   the release of that document did so based on the understanding

D4GFTERA

1     that there was this confidentiality order in place, but also if

2     the government had that understanding it would also have the

3     understanding from paragraph 12 that there was a way to get

4     these documents by process or document request, and so we don't

5     even see that being a bar as to the release of that one

6     document.  So if anybody should be in here objecting it ought

7     to be Arab Bank.  We understand they're not objecting, so we

8     don't see any reason why that document shouldn't be produced to

9     us today.

10          MR. HAEFELE:  Your Honor, Robert Haefele from Motley

11    Rice for the plaintiffs.  I'm standing principally because it's

12    Motley Rice that's sort of in the crosshairs here.

13          THE COURT:  Because you're in the other case?

14          MR. HAEFELE:  We're counsel in the Linde case and

15    we're subject to the protective order and the documents that

16    are at issue here are covered under a protective order based on

17    a designation of confidentiality in the Linde case.  So we

18    couldn't produce them here, but they are nonetheless responsive

19    to discovery requests here.  And we, Motley Rice in particular,

20    feels caught in the crosshairs here between the various

21    obligations here.  On the one hand --

22          THE COURT:  But you're not opposing their production

23    but for the protective order, correct?

24          MR. HAEFELE:  Yes.  We made it very clear to counsel

25    in this case as well as to the Arab Bank counsel that our

D4GFTERA

purpose for, quote-unquote, opposing the production here is
because we need to maintain the confidentiality order and we're
not in a position to violate it, the Court's confidentiality
order.  Arab Bank has the interest in maintaining the
document's confidentiality.  The plaintiffs have an interest
and Motley Rice has an interest in maintaining the integrity of
the confidentiality order of the Eastern District of New York.
I have in fact, your Honor, provided notice to Arab Bank's
counsel and they have -- just to clarify one thing and I'm not
in a position where I really want to make Arab Bank's
arguments, but I want to clarify one thing that Mr. Cottreau
said.  I don't think from my discussions with Arab Bank they
have made it clear that it's not just that one document that
they have a problem with that was not produced, it's the whole
set they have, but they were giving that one document that was
an example as a particular example that stuck out to them.

            THE COURT:  Is there any reason why -- let me go back
a second.  You made a determination that among the set of
documents that you reviewed in the Linde v. Arab Bank case, the
ones that are on the privilege log are relevant ones which are
covered by the protective order, correct?

            MR. HAEFELE:  Correct, your Honor.

            THE COURT:  You have no objection to their release.
Arab Bank hasn't come in, the defendants, the moving defendants
want the documents just to be on the safe side, why shouldn't

D4GFTERA

 1    you -- to make it more generic, why shouldn't the plaintiffs

 2    and the moving defendants be moving from Judge Gershon to lift

 3    the protective order to the extent of allowing the use of the

 4    documents in this case, if she sees fit and in that context

 5    where Arab Bank is a party it could come in before Judge

 6    Gershon and articulate whatever arguments it has as to why the

 7    document should not be produced.  I understand there's a

 8    procedure set forth in the protective order, but just as a belt

 9    and suspenders approach, what's wrong with that?

10         MR. HAEFELE:  The only concern I have there, your

11    Honor, is I would need to consult with my colleagues in Motley

12    Rice who are closer to that case to determine what our

13    obligations are to our clients and what the concerns would be

14    of doing that relevant to those clients.

15         THE COURT:  That's an open case?

16         MR. HAEFELE:  It is an open case, your Honor, yes.

17         THE COURT:  And what does that case involve?

18         MR. HAEFELE:  It involves allegations that Arab Bank,

19    among other things, allegations that Arab Bank had procedures

20    in the Middle East related to helping the families of

21    terrorists and engaging in conduct that encouraged terrorist

22    conduct.  That's a very broad description.

23         THE COURT:  Your situation in that case is not

24    dissimilar from where you're positioned in this case.  I

25    understand your desire to proceed cautiously.  Why don't I say

D4GFTERA

1    that within one week you'll send me a letter telling me whether

2    there's from your perspective some problem with the procedure I

3    proposed?

4              MR. HAEFELE:  Your Honor, could we get a little bit

5    longer, like ten days?  I'm going to be away from my office.  I

6    need to discuss it with them.

7              THE COURT:  We'll make it two weeks.  Okay.  So we've

8    dealt with a healthy portion of the privilege log.  What are

9    the other complaints about it?  Mr. Cottreau?

10             MR. COTTREAU:  Your Honor, the other chief complaint

11   that we have about the privilege log is how the plaintiffs have

12   approached the FOIA documents that they've sought and the

13   correspondence that they've had in seeking those documents.

14   There are really three categories of FOIA documents at issue.

15   First, it's the documents, the underlying documents that were

16   produced by the government to plaintiffs.  Second, it's the

17   plaintiffs' requests and followup correspondence to the

18   government, and, third, it's the government's correspondence

19   back to plaintiffs.

20             What plaintiffs have done is they've taken sort of a

21   half-waiver approach here if you bought the idea that there was

22   some kind of protection.  They've produced the documents -- as

23   we understand it they've produced all the documents they've

24   received from the government that are responsive to any of the

25   document requests.

D4GFTERA

1          THE COURT:  Let me pause for a second.  That's my

2    understanding, but that's correct, is that right?

3          MR. CARTER:  Your Honor one caveat to that.  The FOIA

4    productions from government agencies continue.  It's sort of

5    like a surprise that arrives on your desk from 2009 and you

6    receive something.  I think we may have received a package last

7    week that we have not produced, but with that exception I think

8    that's correct.

9          MR. COTTREAU:  We wanted to confirm there is some

10   confusion about it, because they referred in their opposition

11   to all of the responsive evidentiary documents and just wanted

12   to be certain there wasn't anything hidden in the term

13   "evidentiary," it's all the documents you received from the

14   government.

15         MR. CARTER:  That's correct, your Honor.

16         MR. COTTREAU:  So that leaves us with the remaining

17   two categories of documents.  The reason why we're seeking this

18   correspondence between plaintiffs and the government is really

19   six principal reasons, your Honor.  One is we don't know where

20   these documents came from.  We couldn't authenticate them, we

21   couldn't get originals under the best evidence rule, we

22   couldn't cast doubt on their authenticity without knowing where

23   the plaintiffs got them.  By stripping away the cover letter

24   correspondence they now have sort of hidden who the custodian

25   of these documents really is.

D4GFTERA

1            Second, the documents, and you can see this in Exhibit

2     1 to our reply, were produced with portions redacted often, and

3     so what we'll receive is a portion of the documents redacted,

4     but we've obtained from the plaintiffs because they've produced

5     some of their correspondence with the government, when they

6     correspond with the government the government will explain to

7     the plaintiffs exactly why something was redacted in one of the

8     documents that we have.  It will say the name of the officer

9     was omitted pursuant to a privacy protection and they'll cite

10    the rule in 5 U.S.C. 552 that they're relying upon, the FOIA

11    exemption for that information.

12            THE COURT:  This is in reply Exhibit 1?

13            MR. COTTREAU:  Exhibit 1.

14            THE COURT:  Right, I see.

15            MR. COTTREAU:  They produced selected correspondence

16    with the government.  I'm not sure why they produced this

17    versus other, but we have it, and you can see the important

18    kind of information that's in it, which is the explanation

19    about the redactions and often you can tell whether a redaction

20    is substantive or non-substantive from that correspondence.

21            THE COURT:  Well, they don't tell you -- well, I

22    forget whether the documents themselves will have a

23    specification exemption.  I assume they don't, right?

24            MR. COTTREAU:  I believe some do and some don't, your

25    Honor.

D4GFTERA

1                THE COURT:  Okay.

2                MR. COTTREAU:  It's mixed.  In my experience sometimes

3       those stamps might not be exhaustive.

4                The third reason why we're seeking this information is

5       because there are documents that are withheld, categories of

6       documents withheld, the correspondence with the government,

7       some of the sample correspondence in Exhibit 1 explains that,

8       explains what documents are being withheld.  It helps put the

9       documents that we do have from plaintiffs and that they have in

10      context, what's missing, what portions have been omitted of a

11      set of documents.

12               Fourth, the fact that the documents themselves exist

13      or don't exist within a certain agency may aid certain

14      defendants in rebutting some of the allegations by plaintiffs.

15      There are allegations of government meetings, allegations of

16      government communications and the fact that those don't exist,

17      which are revealed in these letters from the government are

18      very relevant to the defense of some of the defendants.

19               Fifth, there are communications and again, Exhibit 1

20      in this selected communications from the government reveals

21      this, there are communications with plaintiffs' fact witnesses.

22      In Exhibit 1 there's references to e-mails that we previously

23      sent to you regarding Richard Newcomb who is the director of

24      OFAC at the time.  So we understand omitted from this

25      correspondence from the government to the plaintiffs are

D4GFTERA

1    correspondence itself with witnesses in this case.  And so we

2    want, obviously, the documents from the government that would

3    reveal that.

4         And then last, sixth, the whole notion that we would

5    have to go to these government agencies ourselves, make our

6    identical requests, would be a burden on those agencies

7    themselves.  There are subdivisions, including subdivisions --

8         THE COURT:  Wholly apart from making the same

9    requests, why couldn't you make a FOIA request for their FOIA

10   requests?

11        MR. COTTREAU:  We believe we can, your Honor.  There

12   is no exemption that applies in 5 U.S.C. 552(b).  We believe

13   we're entitled to that.  That's the next step obviously and we

14   don't believe the plaintiffs could restrict the government from

15   revealing both the communications they received from plaintiffs

16   and the communications that they made to plaintiffs.  In fact,

17   what's fundamentally wrong with their work product argument is

18   work product applies to the documents themselves.  Plaintiffs

19   can't restrict the government from releasing them, we don't

20   believe and if they could, that would be an extraordinary

21   proposition.

22        THE COURT:  Well, if this weren't in the FOIA context,

23   the selection of documents or categories of documents that the

24   plaintiffs sought to seek arguably it seems to me could be work

25   product.  There's a Third Circuit case some of you may be

D4GFTERA

familiar with, Sporck v. Peil which I guess is the first in the
line of cases taking that view, but here there's been a
disclosure to a third party, namely, the United States.

          MR. COTTREAU:  Yes, and a couple of relevant points.
Sporck is documents that the government specifically arranged
and showed to a witness in a deposition.  We're not asking for
all documents that you think are relevant or that you believe
you're going to use in your case that you received from the
government or some way that involves attorney selection.  The
better analogy is to Rule 34 and to Rule 45.  Rule 45 in
subsection B specifically requires service on other parties of
your subpoena to third parties and indeed if they would have
provided instead of by FOIA by Rule 45 indeed we would have had
these requests.  There should be no different outcome under
FOIA than by Rule 45.

          THE COURT:  Okay.  Mr. Haefele?

          MR. HAEFELE:  Thank you, your Honor.  First I think
there's an asymmetry here that begs to be called to your
Honor's attention.  The defendants that are principally arguing
on behalf of this motion they're defendants who haven't
themselves produced most of the basic documents that they're
obligated to produce in the course of discovery, even when the
Court's issued orders and even when the documents have been
shown to exist, and now they come to us and they complain about
the margins of discovery here where we have given, plaintiffs

1    have given the defendants the substance of the discovery, the

2    essence of the substantive documents, the actual substantive

3    documents that would be admitted at trial.  And all of that --

4             THE COURT:  I guess I perhaps feel your pain but I'm

5    not sure that's at all relevant to the issue here.

6             MR. HAEFELE:  What we're seeking to prevent, your

7    Honor, is the disclosure of plaintiffs' counsel's core work

8    product.  The essence of not just Rule 26 which my colleague on

9    the other side has focused on but what is protected under

10   Hickman which is broader than just Rule 26.  We think we're

11   protected under Rule 26 because by the terms of Rule 26 what

12   we're seeking to protect here are documents that were prepared

13   by the plaintiffs' counsel or for the plaintiffs' counsel and

14   there are documents that fall directly under Rule 26.  But even

15   if they're not directly under Rule 26 what we're seeking to

16   prevent disclosure of is at the core of what's protected in the

17   Hickman case which is the thought processes, the paring down of

18   the documents that are being sought.

19            If you look at the documents that we're seeking to

20   protect, your Honor, the information that's in them that's at

21   the core of the Hickman case is the documents that talk about

22   the dialogue back and forth as to what the plaintiffs' counsel

23   would prioritize in the discovery process.  If you can't give

24   us this, then, you know, we would accept this, and no, for

25   instance, another example would be you've told us that you

D4GFTERA

1    don't have these documents but we know XYZ so therefore we're

2    positive that there are documents that fall within this

3    category.

4           THE COURT:  Well, let me interrupt you for a second.

5    There are the, I assume the kitchen sink initial requests which

6    are included among the documents in your privilege log, is that

7    correct?

8           MR. HAEFELE:  I think they are, yes, your Honor.

9           THE COURT:  It seems to me as to those, the theory

10   you're advancing to me now doesn't apply because they are very

11   broad requests without prioritization and presumably without

12   discussion of why you want them.

13          MR. HAEFELE:  No, I don't think that's true, your

14   Honor.  I think there were very specific requests made within

15   those requests.  And so I don't know that the broad category

16   that you're talking about -- I mean, what we may have done is

17   we may have gone through certain documents and culled out what

18   we thought were the most important documents.  For example,

19   going through the 9/11 Commission report and focusing on what

20   we thought were the core documents that we would need from the

21   9/11 Commission report in making requests from the various

22   agencies that created those documents for those sorts of

23   things.  So that is plaintiffs' lawyers looking at something

24   and using their minds to determine what is important.

25          THE COURT:  Let's assume that the day before you

D4GFTERA

1    mailed that letter when it was still sitting on your desk, you

2    or one of your colleagues, it was work product.  One of the

3    things that you have to show in order to rely on the work

4    product doctrine is that you didn't make disclosure to somebody

5    in circumstances that rendered it more likely that those

6    documents would be disclosed.  And here, unless I'm missing

7    something, if Mr. Cottreau were to submit a FOIA request to the

8    various government agencies saying we want anything that

9    Mr. Haefele sent to you requesting information about 9/11, that

10   probably would be turned over.

11        MR. HAEFELE:  Your Honor, I'm not sure that it's that

12   easy.  As we ourselves have found, and I propose that others in

13   this room who are lawyers who have made FOIA requests have

14   found, what you get from the discovery process in FOIA is not

15   necessarily a clean document that demonstrates exactly what

16   happened.  There are going to be redactions, more likely than

17   not there are going to be redactions, sometimes wholesale

18   redactions, and as I'm sure counsel for DIB knows for certain,

19   there are also processes in place by which the agency that's

20   having the documents sought from will go to the party who has

21   an interest in the documents, presumably in that case to the

22   plaintiffs' lawyers and ask whether or not there is any reason

23   why those documents should not be produced and in this case our

24   argument would be exactly what we're proposing here today, that

25   the core work product of the plaintiffs' lawyers is contained

D4GFTERA

1    within the documents.  If there's any production, that has to

2    be redacted out.

3         THE COURT:  Is there on either side any case law

4    that's applicable that has not been presented to me in these

5    letters?

6         MR. HAEFELE:  I can tell you, your Honor, that there

7    are some cases that were cited in the defense counsel's

8    opposition, or reply brief.  At first instance I would say that

9    some of those cases are not exactly as proposed and they're not

10   as on point as we would like them to be or that defense would

11   like them to be, I suppose, and that's the, I think it's the --

12        THE COURT:  The Grand Jury?  I assume it's not

13   Klamath, which is one the basic cases In Re: Steinhart?

14        MR. HAEFELE:  No, I think it was the Egiazaryam case,

15   I have a case that was cited along with that.

16        THE COURT:  Well, in any event you're telling me you

17   want to respond to what they've said.

18        MR. HAEFELE:  Well, I think one of the things that I

19   wanted to call to the Court's attention and I wish I could find

20   it in my notes, but in the Egiazaryam case, I think it is.  I'm

21   probably butchering the name of the case.

22        THE COURT:  The second name is Zalmayev, and madam

23   reporter, the first name which may or may not have been

24   pronounced correctly, is spelled E-g-i-a-z-a-r-y-a-m.

25        MR. HAEFELE:  And I would suggest also in the Skanska

D4GFTERA

case which was cited along with that.  The factual

underpinnings of those cases are very different than the cases

we have here because the parties that were involved in that,

the documents that were related to those parties were third

parties that have nothing to do with the litigation.  In this

instance, the documents being sought are documents to and from

the plaintiffs' lawyers which is different from, that's as if

you're asking for the substantive documents that we've already

agreed to produce.  That's what those cases are really more

aligned to deal with.  I think if you look at those cases

what's interesting is that one or more of those cases actually

site the Ricoh versus I think it's the Aeroflex case.  Within

that case --

          THE COURT:  How do you spell Ricoh?

          MR. HAEFELE:  R-i-c-o-h, v. A-e-r-o-f-l-e-x, 219 FRD

66 at 70, which the defendants admit in their brief which

discusses three e-mails an attorney sent to a third party

seeking information to develop the client's case.  The Court

found that the e-mails were work product because work product,

is, quote, intended to preserve a zone of privacy in which a

lawyer can prepare and develop lead strategies with an eye

towards litigation free from unnecessary intrusions by

adversaries.  I think that's quoting U.S. v. Adelman, and goes

on to say that to the extent that the e-mails reflect counsel's

strategy for establishing a claim or defense, they would

D4GFTERA

constitute protected attorney work product and that's pretty

much what we're arguing here.  To the extent that the documents

they're seeking to and from the plaintiffs' lawyers reveal the

plaintiffs' lawyers' thought processes, they would constitute

protected attorney work product.

Responding to a few things that Mr. Cottreau did say.

Your Honor, I think he articulated the fact or his argument

that the documents that he's asking for go to the

authentication, without them it's impossible to determine the

authentication of the documents, the substantive documents.

The problem with that argument is I think in most instances on

the very face of the documents it's indicated what the

redactions were as well as the reasons for the redactions and

they're consistent across all FOIA redactions.  And I think

they also indicate who it is that was the entity from which the

document was generated, so that the document itself indicates

who it comes from and it also indicates ordinarily who did the

redactions.

More so, as Mr. Cottreau has indicated, we have

already offered to give them the cover letters and that's the

examples he has provided, the cover letters without any thought

processes, if there's anything of the thought processes in a

document we would redact that.  In our negotiations, your

Honor, we told them we would give them the substantive

documents and we agreed to give them cover letters to the

D4GFTERA

1    extent that they did not reveal attorney work product, that

2    that's something that they did not want.  However, some of

3    those documents were in fact produced.

4           In a sense, the key question here is whether

5    respecting the claim of work product privilege is supportive of

6    the adversarial system and the purpose of the work product

7    doctrine as it's enunciated in the Hickman case.  That includes

8    both under federal civil procedure Rule 26 as well as the

9    purposes of Hickman which are pretty much to protect that zone

10   of privacy that the lawyers are preparing their case in and

11   preventing the adversary from freeloading or interfering with

12   opposing's counsel preparation of ongoing litigation.  That's

13   what we're seeking to protect, your Honor.

14          THE COURT:  I understand you view this as consistent

15   with the spirit of work product.  I think that the key question

16   and neither side has cases directly on point as to it, is

17   whether disclosure of that thought process to the United States

18   government does or does not render it more likely that third

19   parties such as Mr. Cottreau will learn the contents of the

20   documents.  It's an interesting question.  It's one I want to

21   spend some time thinking about.  I had asked you earlier if you

22   want to submit a further letter discussing the cases raised in

23   the reply brief.  You've discussed them orally.  I certainly

24   will look at them, but I want to give you the opportunity to

25   submit a further letter if you want to.  You shouldn't feel

D4GFTERA

1    obligated to.

2            MR. HAEFELE:  We will take that opportunity, your

3    Honor, but I also wanted to, in terms of a case that's more on

4    point.  I do think that the In Re: Student Finance Corporation

5    case that we did cite in our brief which among the items that

6    are identified as being within the work product category for

7    the FOIA requests --

8            THE COURT:  Okay.

9            MR. HAEFELE:  I think that's 2006 U.S. District Lexis

10   86603, November 29, 2006.

11           THE COURT:  If I say your letter will be submitted

12   within two weeks also, is that okay?

13           MR. HAEFELE:  That's fine, your Honor.

14           MR. COTTREAU:  Your Honor, just because I don't want

15   to be deceived in any way, plaintiffs cite two different cases

16   in their brief in support of the notion that FOIA is work

17   product protected.  In Re: Student Finance is one.  The second

18   is Ron Pallon (ph).  I believe both of these cases are out of

19   the Eastern District.  Ron Pallon v. Home Indemnity Company.

20   The discussion of the issue is extremely cursory in both cases.

21   Neither one, for example, considers the Rule 34, Rule 45 kind

22   of analogy.  Neither one gets much into the language of what

23   type of relationship you need to have with the party that

24   you're disclosing to, or indeed with respect to these documents

25   it's government correspondence in many cases.  The notion that

D4GFTERA

plaintiffs can convert the government into their work product

producing machine, that they can then tell the government and

us they can't produce the correspondence is an extraordinary

proposition.  And I don't think either one of those cases ever

comes to grip with that notion.  It also doesn't come to grips

with the notion that we have in this case which is reflected in

these communications, our communications with material fact

witnesses that plaintiffs themselves have put on their witness

list against us.  The notion that plaintiffs can write a

letter, send it to a third party witness discussing either that

witness's documents or testimony and then put that witness on

at trial and have us shielded from that communication with a

third party that it has no relationship with --

          THE COURT:  Give me a concrete example of what you're

talking about.

          MR. COTTREAU:  Sure.  If I was representing an

accounting firm and there were bank records and there was going

to be a bank that were at issue in a securities fraud case and

the bank's a third party to the case, like the U.S. government

is here, a third party to this case, and I sent a letter saying

hey, here's the kind of documents we're looking for, and they

write back and say here's the e-mail to the witness you're

going to call at trial, which is exactly what is shown in

Exhibit 1 to our reply.  Oh, it says we sent an e-mail to

Richard Newcomb.  You have it, here it is on the topic of the

D4GFTERA

documents.  They're having communications with third party

witnesses in this case that are reflected in some of these

communications.  We don't have them all because there are over

200 documents on their privilege log, but they're having

communications with potential witnesses at trial.  That also

has no work product protection.  You need to have some

relationship with the party who is generating work product for

you or that you're disclosing your work product to in order to,

one, qualify for the protection and two, to maintain the

protection.  These weren't prepared by the governments for

plaintiffs as litigants.  These were prepared by the government

because it was required to under statute, and that's not work

product.

          And disclosure to the government, with all due respect

to my colleague that they qualify for some 552(b) exception to

the disclosure, they do not.  If you take a look at 5 U.S.C.

552 and the exceptions in subsection B, they don't qualify for

any of them.  These would have to be disclosed.  We know who

the 42 subdivisions of the government are that they sent these

to.  We could certainly obtain it by FOIA.  This is a much more

efficient way of doing it.  It doesn't reveal much more than

what we get through a FOIA request itself.  Like the Arab Bank

case the approach seems to be here to make us jump through

additional hoops when this should have already been taken care

of.  They want to produce the cover letters because they don't

D4GFTERA

think the cover letters qualify for work product protection.

Produce the cover letters.  I don't understand why you go

through the business of putting them on a log and now you'll

say they'll produce them.  Excuse my frustration but both of

these seem to be issues that could have been headed off.

THE COURT:  Well, there are cover letters that you're

willing to produce, which you said Mr. Cottreau didn't want

because he wanted all of them.

MR. COTTREAU:  I didn't want them redacted your Honor,

they were going to redact them for things they thought the

government was saying that was their work product.

THE COURT:  But there are cover letters that you're

not proposing to redact, is that correct?

MR. CARTER:  Your Honor, there are cover letters that

we would be willing to produce.  The essential breakdown in

regard to the production of those documents is that we

approached the meet and confer as an effort to reach a

compromise and when they expressed the concern about the

inability to authenticate and the other issues we offered them

the cover letters to address that concern in the hopes we could

meet in the middle.  Ultimately that was rejected and we were

told that they wanted everything.

THE COURT:  Well, if there are ones for which you

would not propose to redact on the work product theory that

you're espousing, I think those should be turned over.  In

D4GFTERA

addition to the letter which I've asked Mr. Haefele for, I

would like to be provided in camera with a representative

sample of the types of letters that we're talking about.  If

there's an extensive list of them, I certainly don't want all

of them but I guess they may fall into some broad categories

and I'd like specimens of those so that I have some sense of

what you're talking about and I suppose it would be helpful

also to have indicated what you would propose to redact from

those various sample specimen letters.

          MR. CARTER:  That's fine, your Honor.  That proposal

actually addresses an issue I was going to raise.  Mr. Cottreau

made an example that there were communications with Richard

Newcomb who was the head of the Treasury Department, received

communications by virtue of being the head of the Treasury

department.  That was referred.  It's not as if there were

material conversations about witness testimony, but that would

be evident, I think.

          MR. COTTREAU:  Your Honor, one other just quick point

because I don't like to be lost, which is that Cozen O'Connor

was an adversary of the U.S. government in this process.  They

sued the U.S. government.  The case is cited in our reply

brief, but also at Exhibit 4 to our reply brief they filed much

of this correspondence publicly and we have a real issue here

with selective waiver.  They're going to give us the

attachments to the correspondence but they're not going to give

D4GFTERA

| 1 | us the correspondence their self.  Under Exhibit 1 to our reply

| 2 | brief they're going to give us the favorable, presumably that's

| 3 | why they produced it to us, the favorable correspondence they

| 4 | want to rely on it, but they're not giving correspondence that

| 5 | could put it in context, rebut it.  We have a real selective

| 6 | waiver issue here as well.

| 7 | THE COURT:  I think the first question is does the

| 8 | work product protection apply.  If it doesn't, then I don't

| 9 | have to worry about issues like selective waiver and the like,

| 10 | so I think I need to take this in steps.

| 11 | MR. COTTREAU:  Sure.

| 12 | THE COURT:  And I understand the concern.  I'm not

| 13 | unsympathetic to what Mr. Haefele said with respect to the

| 14 | spirit of work product, I guess it just comes down to whether

| 15 | it meets the requirements of a legitimate work product claim

| 16 | and it's an interesting question that I don't claim to know the

| 17 | answer to at this point.

| 18 | MR. HAEFELE:  Your Honor, one final point, though.

| 19 | THE COURT:  Yes.

| 20 | MR. HAEFELE:  And I don't know that we're at this

| 21 | juncture yet because it sounds like your Honor wants to see

| 22 | more before your Honor makes a decision, but we did want to

| 23 | make it clear that to the extent that, whatever the Court's

| 24 | ruling about production of the FOIA communications or FOIA like

| 25 | communications, plaintiffs ask that they be reciprocal in that

D4GFTERA

1    whatever the plaintiffs were obligated to produce or the

2    categories that plaintiffs are obligated to produce the

3    defendants will be obligated to produce as well.

4            THE COURT:  That would follow logically.

5            MR. HAEFELE:  Specifically on that, your Honor, we

6    would like to make sure that it is not only the communications

7    relative to each parties' own FOIA or FOIA like request but for

8    example in somebody from DIB interposed one of those objections

9    I talked about earlier with regard to FOIA requests that the

10   plaintiffs have made we would like those revealed as well.

11   They haven't been revealed on a privilege log but we understand

12   those exist.  For example plaintiffs make a request for

13   documents to DIB to an agency.  The agency then goes to DIB and

14   says these requests have been made.  DIB says no, no, no, don't

15   produce those and then we get a response back saying we have

16   nothing to produce.  We would like those communications as

17   well.

18           THE COURT:  You wouldn't get a response saying we have

19   nothing to produce, you would get a response saying we have

20   concluded that there are responsive documents but that they

21   fall within one of the following exemptions and an explanation

22   of why.

23           MR. HAEFELE:  Regardless of the response, your Honor,

24   we would want the communications that DIB or whatever other

25   defendant.  I'm just using them as an example.

D4GFTERA

1      THE COURT:  Let me deal with the work product issue

2  first.  If I determine that the materials have to be turned

3  over, then we'll talk about reciprocity.  If I determine that

4  you're correct, I don't have to worry about that, it seems to

5  me.  Correct?

6      MR. HAEFELE:  I think that's right.  I just want to

7  make sure that it's raised, your Honor, that whatever you order

8  is reciprocal.

9      THE COURT:  Okay.  Well, if I don't treat it in my

10  decision, we'll talk about it after I issue my decision.  Okay?

11      MR. COTTREAU:  Your Honor, just one last thing on the

12  case law set while you're considering, they cite and rely very

13  Haefele on the Plew case, and that case is indicative of a lot

14  of the work product cases that you see.  When you have a third

15  party that's producing work product there's some relationship

16  here.  The Plew case was a patent infringement case.  The suit

17  was against the infringer, which was The Limited or Victoria's

18  Secret in this case.  The work product was generated with the

19  supplier or manufacturer of the allegedly infringing article.

20  There's a contractural relationship, they also have a common

21  interest in having the product to be found not to have

22  infringed.  That's the typical third party relationship you see

23  in work product space.

24      MR. HAEFELE:  Your Honor, if we could respond to that.

25  In this instance, in that instance, first of all, in the Plew

D4GFTERA

1    case, the fact that there was a contractual relationship was

2    mentioned at the very beginning of the case and the rationale

3    of the case it was not even mentioned.  I can't tell whether

4    it's part of the rationale or not.

5         THE COURT:  As I guess I've made abundantly clear I

6    haven't read any of the cases.  I haven't said that expressly

7    but my ignorant questions should have revealed it, except to

8    the extent that I dealt with them in prior FOIA cases, all of

9    this is tabula rasa.

10        MR. HAEFELE:  Thank you.

11        MR. COTTREAU:  Your Honor, just with a pin cite on

12   that discussion from Plew.  We cite the Lexis version, it's at

13   star page 9.  When they say the interests are aligned they say

14   the interests of DBA as the supplier to Victoria's Secret the

15   targeted bras are aligned with those of the defendants.  That's

16   directly from the Court.

17        THE COURT:  I will read the cases as well as Mr.

18   Haefele's additional letter and I will look at the documents

19   and rule as quickly as I can.

20        Anything else we should take up today?

21        MR. HAEFELE:  Yes, your Honor.  There are some other

22   items that were on the agenda letter.  In particular I think

23   items two and three.  I think we've covered item one and we've

24   covered item four, but there are items two and three that we

25   would ask your Honor to address.

D4GFTERA

<table>
<tbody>
<tr><td>1</td><td>THE COURT:  For some reach it's not jumping out at me</td></tr>
<tr><td>2</td><td>here in your letter.  What page are we on?</td></tr>
</tbody>
</table>

1    THE COURT:  For some reach it's not jumping out at me

2 here in your letter.  What page are we on?

3    MR. HAEFELE:  Your Honor, do you need a copy of the

4 letter?

5    THE COURT:  No, I have it.  Your March 29 -- maybe I'm

6 looking at the wrong letter.  No, that's the wrong letter.  Oh,

7 I'm sorry, yes, it's the April 10 letter.

8    Yes.  As to Mr. McMahon's documents, it seems clear to

9 me, and I'm only halfway through the stack, that many of them

10 plainly are attorney-client communications.  However, the first

11 letter in the pile is a November 27, 2007 letter.  Mr. McMahon?

12    MR. McMAHON:  Yes, your Honor.

13    THE COURT:  And I can't for the life of me determine

14 any reason why that would be considered either attorney-client

15 or work product.

16    MR. McMAHON:  Well, your Honor, I think part of the

17 problem was that we had sought an extension with Mr. Carter

18 because we had to collect these documents from different parts

19 of the office, and at the last minute we incorporated certain

20 items and that's one that shouldn't have been in there, and I

21 apologize to the Court.

22    THE COURT:  It raises the question of whether it's

23 responsive to any of the myriad requests that the plaintiffs

24 have made over time.

25    MR. McMAHON:  I think, your Honor, we went back, my

D4GFTERA

1    associate and I, Oliver Dorell, and I think there is one

2    document that has not been given to the plaintiff and it was a

3    letter that went to the Habib Bank which I'm certain I can

4    provide Mr. Haefele with and provide him with a letter.

5        THE COURT:  That's the one I was referring to.  I'm

6    only about halfway through the pile but there's a November 27,

7    2007 letter, that's what I've been referring to.  So if there's

8    an additional document you're going to send to Mr. Carter, send

9    it to him with a copy of the letter to me so I understand

10   whether it's this document or some other document.

11       MR. McMAHON:  Will do, your Honor.  Will do.

12       THE COURT:  And once I get through the rest of the

13   materials then we can have a further discussion about all of

14   that next month.

15       MR. McMAHON:  Will that be a part of the May dialogue,

16   your Honor?

17       THE COURT:  Yes.

18       MR. McMAHON:  Or is that premature?

19       THE COURT:  And then I guess there's a progress report

20   as to it is Al Haramain Oregon documents.  Where do we stand on

21   that?  Mr. Kabat?

22       MR. KABAT:  Yes.  We produced over 31,000 pages of

23   documents already which comprise the scans and the materials

24   that were received during the 2004 search and additional

25   documents that were produced to the Grand Jury.  I can also

D4GFTERA

1    impart that we received from the federal public defender

2    another 8,790 pages that were produced by another attorney to

3    the Grand Jury, and we plan to produce those on Friday of this

4    week after completing a privilege review.  We have also last

5    week received over 26,000 e-mails that were recovered from the

6    Outlook account in PST format.  We've completed our privilege

7    review of those e-mails, segregated out the privileged e-mails.

8    Now, we hope to get those produced on Friday, although we may

9    have to do a second production with the Bates stamping as

10   opposed to the PST format.  PST format does have the advantage

11   of being more readily searchable than a Bates stamp format, but

12   we would also need the Bates stamp format for depositions and

13   so forth.

14         And finally we have also received the trial exhibit

15   from the prosecution in Oregon of Mr. Sayed on the tax charge

16   and I think there are several hundred exhibits on each side and

17   while we are not authenticating the exhibits by producing them,

18   we will be producing those exhibits and I will note that many

19   of those exhibits were not used at trial and in fact many of

20   them were excluded and inadmissible through the pretrial made

21   in Oregon but we will be producing them nonetheless.

22         So that's where we stand in terms of the production,

23   and I believe I've answered the questions that Mr. Haefele

24   propounded, although I have not yet done the privilege review

25   of the 8,790 pages that we got last Friday.

D4GFTERA

1          THE COURT:  Well, just so I'm clear, every document

2     will either be produced or be on the privilege log, correct?

3          MR. KABAT:  Yes.

4          MR. HAEFELE:  Your Honor, I think that answers the nub

5     of the questions that we had to make sure that every document

6     was covered under the order that came out of the Oregon

7     district court would be represented somewhere either on a log

8     or being produced.  As I understand, that's what was just

9     confirmed as a yes.

10          THE COURT:  Correct.

11          MR. HAEFELE:  The other question we had, your Honor,

12    was whether or not we could get some delineation as to which of

13    the documents were among the seized documents, which were among

14    the Grand Jury documents and there's a third category I think

15    of which documents came from the accountant as well, which

16    presumably would be a smaller set of documents but I think

17    those were sort of the three categories that were referenced in

18    the Oregon's Court's order, which came from the seizure, which

19    from the Grand Jury documents and which came from the

20    accountant.

21          MR. KABAT:  I will do a cover letter on the production

22    itemizing the production by sorts.

23          MR. HAEFELE:  Thank you, your Honor.

24          THE COURT:  So I'll see all of you folks in May.

25          (Adjourned)