**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (GBD) (FM)<br>ECF Case |

This document relates to:

*Federal Insurance Co., et al. v. Al Qaida, et al.*, Case No. 03-CV-6978.

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT
DR. ABDUL RAHMAN AL SWAILEM'S RENEWED MOTION TO DISMISS**

Stephen A. Cozen, Esq.
Elliott R. Feldman, Esq.
Sean P. Carter, Esq.
COZEN O'CONNOR
1900 Market Street
Philadelphia, PA   19103

Counsel for the *Federal Insurance* Plaintiffs

October 9, 2013

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ........................................................................................................ 1

II.  FACTUAL BACKGROUND ...................................................................................... 2

III. PROCEDURAL HISTORY ........................................................................................ 7

IV.  LEGAL ARGUMENT ............................................................................................... 10

    A.   Al Swailem's Request for Common Law Immunity Is Not Properly Before This Court ............................................................................................... 10

        1.   The Kingdom of Saudi Arabia Failed to Present a Request for Immunity on Al Swailem's Behalf to the Department of State ........... 10

        2.   Consideration of Common Law Immunity Questions is Inappropriate Prior to Completion of Jurisdictional Discovery ........... 13

    B.   Common Law Immunity Does Not Exist For The Claims Against Al Swailem .. 15

        1.   Al Swailem Has No Entitlement to Status-Based Immunity ................ 15

        2.   Al Swailem Has No Entitlement to Conduct-Based Immunity ........... 16

            a)   As An Official of Purported Charities Operating Principally Outside Saudi Arabia, Al Swailem is Not Entitled to Invoke Conduct-Based Immunity ................ 17

            b)   The Claims Against Al Swailem Arise From His "Private" Unauthorized and Illegal Acts .............................. 21

    C.   The Kingdom Of Saudi Arabia Is Not The Real Party In Interest In This Suit As Plaintiffs Seek Money Damages From Al Swailem For His Private Acts ...... 24

V.   CONCLUSION ......................................................................................................... 25

i

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Chuidian v. Philippine National Bank,*
    912 F.2d 1095 (9th Cir. 1990) ...................................................................................25

*Ex parte Peru,*
    63 S. Ct. 793 (1943).........................................................................................10, 11

*Flores v. S. Peru Copper Corp.,*
    414 F.3d 233 (2d Cir. 2003)...................................................................................23

*Heaney v. Government of Spain,*
    445 F.2d 501 (2d Cir. 1971)..............................................................16, 17, 20, 21

*In re Terrorist Attacks on September 11, 2001,* ("*Terrorist Attacks III*")
    538 F.3d 71 (2d Cir. 2008) ......................................................................................3

*Matar v. Dichter,*
    563 F.3d 9 (2d Cir. 2009).........................................................................17, 20, 23

*O'Neill v. Al Rajhi Bank (In re Terrorist Attacks on September 11, 2001 (Al Rajhi Bank)),*
    ("*Terrorist Attacks VII*") 714 F.3d 118 (2d Cir. 2013) .........................................23

*O'Neill v. Asat Trust Reg. (In re Terrorist Attacks on September 11, 2001 (Asat Trust*
    *Reg.)),* ("*Terrorist Attacks VIII*") 714 F.3d 659 (2d Cir. 2013) .................................1, 2, 9, 14

*O'Neill v. Saudi Joint Relief Comm. (In re Terrorist Attacks on September 11, 2001*
    *(Saudi Joint Relief Comm.)),* ("*Terrorist Attacks VI*") 714 F.3d 109 (2d Cir. 2013) .............21

*Republic of Mexico v. Hoffman,*
    65S. Ct. 530 (1945).........................................................................................10, 11

*Samantar v. Yousuf,*
    130 S. Ct. 2278 (2010)................................................................................ passim

*Schooner Exchange v. McFaddon,*
    11 U.S. 116 (1812).................................................................................................10

*Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.,*
    127 S. Ct. 1184 (2007)....................................................................................13, 14

*United States v. Enaam M. Arnaout,*
    Case No. 02-CR-892 (N.D. Ill.), at pp. 17-18.........................................................3

*United States v. Yousef,*
    327 F.3d 56 (2d Cir. 2003)....................................................................23

*Verlinden B. V. v. Central Bank of Nigeria,*
    103 S. Ct. 1962 (1983).............................................................10, 12, 17

*Victory Transport Inc. v. Comisaria General de Abastecimientos y Transportes,*
    336 F.2d 354 (2d Cir. 1964)...........................................................18, 20, 21

*Yousuf v. Samantar,*
    699 F.3d 763 (4th Cir. 2012) .................................................................23

## STATUTES

18 U.S.C §§ 2339A, 2339B, 2339C, and 2332(b) ........................................23

## OTHER AUTHORITIES

*Federal Ins. Co. v. Kingdom of Saudi Arabia, Brief for the United States as Amicus
    Curiae,* No. 08-640, 2009 WL 1539068 (U.S. May 29, 2009)...................................7

Final Report of the National Commission on Terrorist Attacks Upon the United States,
    available at http://govinfo.library.unt.edu/911/report/911Report.pdf.......................4

Harold H. Koh, "Foreign Official Immunity after *Samantar*: A United States Government
    Perspective," 44 Vanderbilt Transnational L., 1141 (2011) .................................. 13-15, 21, 22

*Kensington Int'l Ltd. v. Itoua*, Letter Brief of The U.S., Nos. 06-1763 & 06-2216
    (2d Cir. May 23, 2007) ........................................................................ 18-20

Restatement (Second) of Foreign Relations Law of the United States § 66(f) (1965)............16, 24

*Rosenberg, et al. v. Lashkar-e-Taiba, et al.,* Statement of Interest of the U.S., No. 1:10-
    cv-05448 (DLI) (Doc No. 28) (S.D.N.Y. Dec. 17, 2012)................................. 11-14

Sovereign Immunity Decisions of the Department of State, May 1952 to January 1977
    (Michael Sandler, Detlev F. Vagts, & Bruno A. Ristau eds.), in the Digest of U.S.
    Practice in Int'l Law (1977)...............................................................18, 20

I.    <u>INTRODUCTION</u>

Earlier this year, the Second Circuit Court of Appeals overturned the personal jurisdiction dismissal of Dr. Abdul Rahman Al Swailem ("Al Swailem"), based on its finding that plaintiffs' pleadings sufficiently alleged that Al Swailem used his authority over the Saudi Joint Relief Committee for Kosovo and Chechnya and Saudi Red Crescent Society to deliver material support and resources *directly* to al Qaeda, with specific intent that those resources would be used to attack the United States and its citizens.  *O'Neill v. Asat Trust Reg. (In re Terrorist Attacks on September 11, 2001 (Asat Trust Reg.))*, 714 F.3d 659, 678-679 (2d Cir. 2013) ("*Terrorist Attacks VIII*").  Consistent with that finding, the Second Circuit remanded Al Swailem for personal jurisdiction discovery, a process that is ongoing.  *Id.*

On remand, Al Swailem belatedly seeks to pursue a defense predicated upon doctrines of common law immunity, more than eight years after the he filed his initial motion to dismiss.  Al Swailem's renewed motion to dismiss should be rejected on both procedural and substantive grounds.  First, because the Kingdom of Saudi Arabia has not presented a request for immunity on Al Swailem's behalf to the United States Department of State, his renewed motion to dismiss is procedurally improper and the immunity question is not properly before this Court.  Second, it would not be appropriate in any case for this Court to address immunity questions prior to completion of personal jurisdiction discovery, and resolution of the threshold personal jurisdiction inquiry.  Third, in his role as "president" of the SJRC and SRC - entities engaged in activities most commonly performed by private and non-governmental organizations - Al Swailem is not entitled to invoke the common law immunity protections reserved to senior officials of traditional governmental ministries, for actions undertaken in the performance of core governmental functions.  Fourth, even in the absence of the foregoing procedural and status barriers to Al Swailem's common law immunity defense, the activities which form the basis of the claims against him fall well beyond the parameters of conduct-based immunity under the

common law.  Indeed, the terrorist activities which form the basis of the claims against Al Swailem are illegal under U.S., international, and other applicable law, and therefore do not constitute "official" acts for purposes of the common law immunity analysis.  Finally, the SJRC and SRC are not the real parties in interest for purposes of this personal capacity suit against Al Swailem, seeking money damages from his own pockets.  For all of these reasons, defendant Al Swailem's motion to dismiss should be denied.

II.   FACTUAL BACKGROUND

In this action, plaintiffs seek monetary damages against Al Swailem and other alleged sponsors of al Qaeda, for property damage, economic losses, deaths and personal injuries resulting from the September 11th attacks.[1]  Plaintiffs' claims against Al Swailem arise from his roles directing two of al Qaeda's most notorious and critical charity fronts, the Saudi Joint Relief Committee for Kosovo and Chechnya ("SJRC") and the Saudi Red Crescent Society ("SRC").  FAC at ¶¶ 190-207.[2]  As the Second Circuit concluded, plaintiffs' pleadings and extrinsic evidentiary submissions sufficiently establish, for purposes of a pre-discovery motion to dismiss, that Al Swailem "used [his] authority over those organizations to orchestrate their material support and sponsorship of al-Qaeda," "with knowledge that the organizations under [his] control were channeling material support and resources to al-Qaeda, and that [such support] would be used to support al-Qaeda's jihad against the United States."  *Terrorist Attacks VIII*, 714 F.3d at 667.  Although this controlling ruling renders it unnecessary for this Court to again engage in a comprehensive analysis of plaintiffs' pleadings for purposes of the present motion,

---

[1] *See Federal Insurance* Plaintiffs' First Amended Complaint With Incorporated More Definite Statements, RICO Statements and Rule 15(d) Supplemental Pleadings Filed in Accordance With Paragraph 13 of Case Management Order Number 2 (hereinafter "FAC"), Case No. 03-cv-06978, Dkt. No. 772 (filed September 30, 2005).

[2] *See Federal Insurance* Plaintiffs' Amended RICO Statement Applicable to Saudi Red Crescent Society and Dr. Abdul Rahman al Swailem, and RICO Statement Applicable to Saudi Joint Relief Committee for Kosovo and Chechnya, Exhibits 1 and 2 to the Affirmation of J. Scott Tarbutton, Esq. Attaching Exhibits in Support of Plaintiffs' Memorandum of Law in Opposition to Defendant Dr. Abdul Rahman al Swailem's Renewed Motion to Dismiss (hereinafter "Tarbutton Affirm.").

plaintiffs briefly survey some of the more salient allegations and evidence below, to provide context for the arguments that follow.

As a foundation for the claims against Al Swailem, plaintiffs offered extensive factual detail and extrinsic evidence concerning al Qaeda's intimate institutional partnerships with the SRC and SJRC, firmly establishing that those "charities" maintained systematic programs of support for al Qaeda. FAC at ¶¶ 190-207; Exhibits 1 and 2 to Tarbutton Affirm. Reviewing those very allegations in the context of the first appeal in this litigaion, the Second Circuit concluded that plaintiffs' pleadings "include a wealth of detail (conscientiously cited to published and unpublished sources) that, if true, reflects close working arrangements between ostensible charities and terrorist networks, including al Qaeda." *In re Terrorist Attacks on September 11, 2001*, 538 F.3d 71, 76 (2d Cir. 2008) ("*Terrorist Attacks III*"). In the cases of the SRC and SJRC, those "close working arrangements" were facilitated, maintained, and carried out under the direction and supervision of Al Swailem.

The SRC's partnership with Osama bin Laden in the cause of jihad dates to the period of the Afghan conflict with the Soviet Union, during which the SRC operated within a network of ostensible charities to provide travel documents, funds, transportation, training facilities, arms, physical assets, and other support to the mujahedeen. FAC at ¶¶ 76-78; United States Government's Evidentiary Proffer Supporting the Admissibility of Coconspirator Atatements, *United States v. Enaam M. Arnaout*, Case No. 02-CR-892 (N.D. Ill.), at pp. 17-18, Exhibit 3 to Tarbutton Affirm. Following the conclusion of the Afghan jihad, Osama bin Laden determined that the network established to support the mujahedeen should not be abandoned, but instead adapted to serve as a foundation for waging jihad against the United States. FAC at ¶ 77; Final Report of the National Commission on Terrorist Attacks Upon the United States ("9/11

Commission Final Report"), p. 56.[3]  Consistent with this plan, an internal al Qaeda historical record retrieved during a 2002 raid of an al Qaeda front charity identifies the SRC as a member of a committee established at the time of al Qaeda's formation to "receive donations and maintain an account and the spending" for al Qaeda.  FAC at ¶ 121; Exhibits 1, 2 and 4 to Tarbutton Affirm.  With its establishment in 1999, the SJRC joined the network of purported charities that served as the primary conduits for channeling support and resources to al Qaeda.  "Between 1999 and 2001, the SJRC channeled more than $74 million to al Qaida members and loyalists affiliated with the SJRC bureaus."  FAC at ¶ 204; Exhibit 2 to Tarbutton Affirm.

The SRC and SJRC did not only serve as fronts for channeling financial resources to al Qaeda, but rather maintained intimate partnerships with al Qaeda in relation to every aspect of that terrorist organizations' operations.  To facilitate these broad partnerships, both the SRC and SJRC embedded al Qaeda personnel throughout their organizations.  For instance, al Qaeda founding member and Executive Order 13224 terrorist designee Wa'el Julaidan served as an official of both the SRC and SJRC.  FAC at ¶¶ 193, 205; Exhibit 5 to Tarbutton Affirm.  At the time of Jelaidan's terrorist designation in 2002, the United States explained that Jelaidan served as an officer of numerous "organizations providing financial and logistical support to the al-Qa'ida network."   Exhibit 6 to Tarbutton Affirm.  Al Qaeda's present leader, Ayman al-Zawahiri, also held a position with the SRC, and used cover of employment with the SRC to raise funds for terrorist activities.  FAC at ¶ 193.  Numerous other al Qaeda members were embedded in SRC and SJRC offices throughout the world, and also used their positions to facilitate al Qaeda's terrorist aggression against the United States.  In fact, in the years preceding the September 11th Attacks, employees of the SRC and SJRC were repeatedly and publicly implicated in terrorist plots targeting U.S. interests.  FAC at ¶¶ 197-200.  The allegations

---

[3] The 9/11 Commission Final Report is available at http://govinfo.library.unt.edu/911/report/911Report.pdf.

concerning the direct participation of the SRC and SJRC in al Qaeda operations and terrorist plots enjoy additional support in plaintiffs' extrinsic evidentiary submissions, which include relevant declarations of the United States government. For instance, plaintiffs included in the record an April 3, 2000 BBC article entitled *U.S. Fears Terrorist Attack in Kosovo*, discussing a raid conducted by K-For military police of an SJRC facility in Kosovo. Exhibit 7 to Tarbutton Affirm. The raid was prompted by the alert from U.S. officials, issued amid "fears of a possible terrorist attack on the U.S. office in the province" after members of the SJRC were seen "taking photos near the U.S. office and K-For headquarters in Pristina." As the article recounts:

> In 2000, U.S. officials sent a written alert to the U.N. Peace Keeping Force in Pristina, asserting that SJRC officials Adel Kazem and Julaidan were "associates of Osama bin Laden" and that Julaidan was actively involved in helping bin Laden "move money and men" to and from the Balkans.

Several additional evidentiary submissions further corroborate plaintiffs' factual allegations concerning the SJRC's deep links to al Qaeda, and offer additional insights of significance here. These materials include an Interpol Task Force Report on terrorist financing affirming that "the SJRC has been connected to OSAMA BIN LADEN and two of his top operatives: WA'EL HAMZA JALAIDAN – ADEL MUHAMMAD SADIQ BIN KAZEM," and that "*though well-known for his extremist views,* he *(*Jelaidan), has also made a career as a Saudi functionary." Exhibit 8 to Tarbutton Affirm., at p. 15.

A separate report of the U.N. Monitoring Committee on al Qai'da and the Taliban states, in turn:

> Wa'el Hamza Julaidan (also spelled Jalaidan) was designated at the request of the United States and Saudi Arabia on 6 September 2002. There nevertheless are reports that Julaidan remains actively engaged "in charitable activities" and financial transactions. Julaidan currently lives in Saudi Arabia and is repeatedly still working with the Saudi Joint Relief Committee for Kosovo and Chechnya…"

Exhibit 9 to Tarbutton Affirm., at p. 17.

The pleadings expressly allege that Al Swailem actively used his leadership positions with the SRC and SJRC to promote, facilitate and extend those organizations' intimate partnerships with al Qaeda.  These express allegations are corroborated by the very nature and scope of the support flowing from the SJRC and SRC to al Qaeda under Al Swailem's leadership, which extended to several branch offices throughout the world over a period of many years.  These programs of support continued unabated under Al Swailem's leadership of the SJRC and SRC, in the face of repeated public reporting and government investigations implicating those organizations in al Qaeda's terrorist activities, making Al Swailem's personal support for those activities more than apparent (as the Second Circuit already has found).

Plaintiffs further allege that Al Swailem was personally responsible "for the decision to appoint [Wa'el] as a Director of the SRC, thus placing a prominent and known al Qaida figure in a position of authority within his charity."  Exhibit 1 to Tarbutton Affirm.  The appointment of Jelaidan to that position itself constituted a critical act of material support of al Qaeda by Al Swailem, and effectively afforded al Qaeda with unfettered access to SRC and SJRC funds and resources.  Plaintiffs' pleadings and extrinsic evidence make clear that Jelaidan's ties to bin Laden and al Qaeda were well known to Al Swailem at the time he appointed Jelaidan a director of the SJRC.  In this regard, the pleadings and extrinsic evidentiary submissions document that bin Laden publicly acknowledged his affiliation with Jelaidan in a 1999 interview that was widely disseminated in the Arab world.  Exhibit 6 to Tarbutton Affirm.  Further, the aforementioned Interpol report confirms that Jelaidan's ties to bin Laden were well known within the Kingdom, noting that "*though well-known for his extremist views*, Jelaidan has also made a career as a Saudi functionary."  (emphasis supplied).  Even more remarkable, the Second Report of the U.N. Monitoring Group on Al Qa'ida and the Taliban reveals that Al Swailem still had not removed Jelaidan from his position with the SJRC as of 2003, despite: (1) the 1999

interview in which bin Laden publicly identified Jelaidan as a close associate; (2) the April 2000 raid of the offices of the SJRC in Kosovo, and related publication of the BBC article asserting that Jelaidan was using the SJRC to support bin Laden; and (3) Jelaidan's formal designation as a terrorist in the aftermath and as a result of the 9/11 attacks.  Exhibit 9 to Tarbutton Affirm., p. 17.

In light of these and other facts of record, it is not at all surprising that the Second Circuit concluded that the record sufficiently demonstrated, for purposes of pre-discovery motion practice, that Al Swailem directly supported al Qaeda, with the specific intent that the resources he provided would be used to attack the United States.

III.     PROCEDURAL HISTORY

Following service upon him of plaintiff's complaint, Al Swailem moved to dismiss the claims against him in 2005, arguing that U.S. Courts lacked personal jurisdiction over him for the claims at issue, that plaintiffs' pleadings failed to state a claim upon which relief could be granted, and that he was a Saudi governmental official entitled to immunity from suit under the FSIA.[4]  Al Swailem's motion to dismiss did not assert any defense based on doctrines of common law immunity.

Al Swailem's motion to dismiss remained pending in 2009, when the United States filed an amicus brief in Supreme Court proceedings arising out of this litigation, affirming the United States' view that foreign officials named as defendants in the 9/11 litigation could not rely on the FSIA as a basis for a sovereign immunity defense.  *Federal Ins. Co. v. Kingdom of Saudi Arabia, Brief for the United States as Amicus Curiae,* No. 08-640, 2009 WL 1539068 (U.S. May 29, 2009).  In light of the United States' long-held views concerning the inapplicability of the FSIA to individual foreign officials, including its most recent pronouncement on the issue in the Supreme Court proceedings in this case, plaintiffs proposed in 2009 that Al Swailem be compelled to present any potential common law immunity defense in connection with his then

---

[4] MDL Dkt. Nos. 1174-1176.

pending motion to dismiss, and that the State Department should be invited to file a Statement of Interest concerning Al Swailem's entitlement to immunity. Exhibit 10 to Tarbutton Affirm., pp. 3-4. In response to that proposal, al Swailem expressly opposed consideration of any common law immunity defense or the participation of the State Department in relation to any immunity proceedings pertaining to Al Swailem, again adhering to the strategic decision he made at the outset of the litigation to predicate any immunity defense solely on the FSIA. Exhibit 11 to Tarbutton Affirm., pp. 5-6.

Thereafter, the Supreme Court issued its decision in *Samantar v. Yousuf*, 130 S. Ct. 2278 (2010), through which the Court unanimously held that the FSIA does not provide any basis of immunity for individual foreign officials, and that the limited immunities potentially available to such officials would be restricted to those recognized under common law doctrines. *Id.* at 2292-93. In issuing its unanimous ruling, the Supreme Court emphasized that "[w]e have been given no reason to believe that Congress saw as a problem, or wanted to eliminate, the State Department's role in determinations regarding individual official immunity." *Id.* at 2291.

In the wake of *Samantar*, Al Swailem sought to reverse course and, along with three other senior officials of Saudi "charities,"[5] submitted a letter to this Court purporting to raise for the first time defenses under common law immunity doctrines. Exhibit 12 to Tarbutton Affirm. In a related sur-reply letter, Al Swailem and the other Saudi charity officials argued that their entitlement to common law immunity was so apparent that briefing the question was not even unnecessary. Exhibit 13 to Tarbutton Affirm. Notably, three of the Saudi charity officials who joined Al Swailem in advocating that view have now abandoned any common law immunity defenses altogether, thereby acknowledging that they never had a credible grounds to invoke

---

[5] The three Saudi charity officials who joined in the application are Saleh Al-Hussayen, Abdullah bin Saleh al Obaid, and Dr. Abdullah Muhsen al Turki.

such defenses in the first place, and that their own government would not support them in pursuing such defenses.  Only Al Swailem now persists in seeking common law immunity.

Subsequent to the submission of Al Swailem's letter advocating that he was entitled to invoke common law immunity defenses, this Court granted his motion to dismiss for lack of personal jurisdiction, without addressing on procedural or substantive grounds any immunity issues.  *See* Memorandum Decision and Order, MDL Dkt. No. 2252.  Thereafter, the Court entered Rule 54(b) final judgments in favor of Al Swailem and other defendants, and plaintiffs appealed Al Swailem's dismissal to the Second Circuit.  The Second Circuit reversed Al Swailem's dismissal on personal jurisdiction grounds, concluding that plaintiffs' pleadings and evidence presented facts sufficient to demonstrate in a pre-discovery context that Al Swailem provided material support and resources directly to al Qaeda, with the specific intent that those resources would be used by al Qaeda to attack the United States.  *Terrorist Attacks VIII*, 714 F.3d at 678-679.  Reasoning that such factual allegations were uniquely sufficient to meet its demanding due process standard in cases involving claims against foreign sponsors of terrorism, the Second Circuit remanded Al Swailem for immediate commencement of judicially supervised discovery.  *Id.*  Notably, the Second Circuit was expressly aware from the parties' briefs that Al Swailem intended to raise a common law immunity defense in the event of remand, but did not in any way qualify its directive that personal jurisdiction discovery commence immediately.

On remand, Al Swailem announced his intent to file a renewed motion to dismiss on common law immunity grounds.  In response, plaintiffs recommended that the State Department be invited to participate in any immunity proceedings.  Exhibit 14 to Tarbutton Affirm., at pp. 3-5.  Al Swailem opposed that proposal, arguing that the Department's participation was not "necessary or even appropriate" and that the Court could "determine Al-Swailem's entitlement to common-law immunity without the need for a referral to State."  *Id.* at pp. 2, 8.  The Court

9

thereafter entered a briefing schedule, without indicating whether it had made any final determination whether to invite the State Department to file a Statement of Interest concerning Al Swailem's request for common law immunity.  *See* Order, MDL Dkt. No. 2743.

IV.    LEGAL ARGUMENT

    A.    Al Swailem's Request For Common Law Immunity Is Not Properly Before This Court

    This Court need not, and indeed should not, consider the substantive merits of Al Swailem's common law immunity defense, because:  (1) the Kingdom of Saudi Arabia failed to present a request for immunity in the first instance to the State Department; and (2) it would in any case be improper to consider the implications of common law immunity doctrines prior to completion of the ongoing personal jurisdiction discovery directed by the Second Circuit.

    1.    The Kingdom of Saudi Arabia Failed to Present a Request for Immunity on Al Swailem's Behalf to the Department of State

    Given the potential foreign policy implications arising from the mere presentment of a request for foreign official immunity, courts should not even consider such an application unless it has been first presented by the foreign state to the State Department, a prerequisite Al Swailem and the Kingdom have failed to fulfill here.

    Common law doctrines of foreign sovereign immunity have their historical origins in the Supreme Court's decision in *Schooner Exchange v. McFaddon,* 11 U.S. 116, (1812), which afforded foreign sovereigns immunity for certain of their activities "as a matter of grace and comity."  *Verlinden B. V. v. Central Bank of Nigeria,* 103 S. Ct. 1962, 1967 (1983).  Given the inherent foreign relations implications posed by requests for such immunity, a two-step procedure developed for resolving a foreign state's claim of sovereign immunity.  *Samantar*, 130 S. Ct. at 2284; *see also Republic of Mexico v. Hoffman,* 65 S. Ct. 530, 532-33 (1945); *Ex parte Peru,* 63 S. Ct. 793, 799-800 (1943).  Under that long-recognized procedure, a request for immunity would first be raised by the diplomatic representative of the sovereign to the State

Department, and the courts would become involved only after the State Department completed its review. *Ex parte Peru,* 63 S. Ct. at 799.  "Although cases involving individual foreign officials as defendants were rare, the same two-step procedure was typically followed when a foreign official asserted immunity."  *Samantar,* 130 S. Ct. at 2284-85.

In the wake of *Samantar,* the United States has emphasized the importance of adhering to this two-step procedure, and that the presentation of a request for immunity by the foreign sovereign to the State Department should be treated as a precondition to raising any such defense with the court.  As the United States recently explained:

> [B]ecause a foreign state's request for immunity on behalf of an official itself has foreign relations implications, courts should ensure that the Executive Branch has been notified and had an opportunity to consider such a request before ruling on the immunity issue. Indeed, *for that reason, a foreign state's request for an official's immunity should first be presented to the Department of State, not to the court.*

*Rosenberg, et al. v. Lashkar-e-Taiba, et al.,* Statement of Interest of the U.S., No. 1:10-cv-05448 (DLI) (Doc No. 28) (S.D.N.Y. Dec. 17, 2012), at pp. 9-10, n. 5 (emphasis supplied) (hereinafter *Rosenberg* Statement of Interest).

The requirement that the foreign sovereign first present a request for individual official immunity to the State Department is necessary to ensure that "the political branch of the government charged with the conduct of foreign affairs" retains a primary and effective role in managing the foreign relations impact of a request for foreign official immunity.  *Hoffman,* 65 S. Ct. at 532; *see also Samantar,* 130 S. Ct. at 2291.  Because the very act of submitting such a request "itself has foreign relations implications," it is imperative that the foreign state present any such request directly to the State Department in the first instance, to ensure that the Executive has the practical opportunity to manage the impact of the request itself.  *Rosenberg* Statement of Interest at pp. 9-10, n. 5.  As a corollary, in requesting immunity on behalf of one of

its officials, a foreign state is by definition seeking to invoke the "grace and comity" of the United States, *Verlinden,* 103 S. Ct. at 1967, and should not be permitted to avoid the diplomatic implications of soliciting the favor of our Nation's goodwill by bypassing the State Department and presenting the request solely to the courts.

Here, there is no indication that Saudi Arabia has presented a request for immunity for Al Swailem to the State Department, as contemplated under the longstanding two-step process governing common law immunity requests, and now mandated in the post-*Samantar* era.  To the contrary, Al Swailem has actively opposed any participation in this process by the State Department, arguing in response to Plaintiffs' request that the State Department be invited to file a Statement of Interest that the Department's participation was not "necessary or even appropriate" and that the Court could "determine Al-Swailem's entitlement to common-law immunity without the need for a referral to State."  Exhibit 14, at pp. 2, 8.  As the United States has made clear in its post-*Samantar* filings, however, presentation of a request for immunity to the State Department in the first instance is now properly regarded as a precondition to presenting such a defense to the court.[6]  *Rosenberg* Statement of Interest at pp. 9-10, n.5. Because Al Swailem and his government have failed to comply with that requirement, this Court should not entertain Al Swailem's renewed motion to dismiss.  *Id.*

Although strict adherence to the two-step process for raising immunity defenses should be required in all cases, it would be especially inappropriate to allow Al Swailem to bypass the State Department in relation to his immunity bid, given the content of the very arguments he advances in support of his motion.  In particular, Al Swailem relies extensively in his brief on State Department filings from other cases (which he misreads), implicitly advocating that the

---

[6] Plaintiffs anticipate that Al Swailem will argue in reply that the Court necessarily rejected such a requirement in entering a briefing schedule in response to the proposals submitted by the parties in July.  However, plaintiffs' proposals in that context were not informed by, and did not include, the views presented on this point by the U.S. in the *Rosenberg* Statement of Interest, which only came to the attention of these plaintiffs when the district court issued its ruling in that case on September 30, 2013.

views of the State Department are critical and entitled to great deference in resolving his

immunity defense.  These efforts to invoke the views and positions of the State Department from

separate cases stand at odds with Al Swailem's conspicuous resistance to having the State

Department play any role in examining and opining on his own request for immunity.  This

tension gives rise to a strong inference that Al Swailem has resisted State Department

participation for the express purpose of avoiding the Department's unique expertise in this arena,

a strategy that should not be tolerated.

2.    Consideration of Common Law Immunity Questions is Inappropriate Prior to Completion of Jurisdictional Discovery

Even if Al Swailem had complied with the requirement that his government first raise his

request for immunity with the State Department, it would be inappropriate to consider the merits

of his common law immunity defense prior to completion of the personal jurisdiction discovery

directed by the Second Circuit.

By their very nature, foreign official immunity determinations have potentially far

reaching ramifications on the conduct of our nation's foreign affairs, and even in the most

mundane cases involve complex questions of reciprocity, international law and state practice,

and domestic precedents.  *See* Harold H. Koh, "Foreign Official Immunity after *Samantar*:  A

United States Government Perspective," 44 Vanderbilt Transnational L., 1141, 1148-51 (2011)

(hereinafter "Koh Article").  Given the implications and complexities of such determinations,

common law immunity defenses should not be addressed at all until other threshold issues, such

as personal jurisdiction, have been resolved.  *Rosenberg* Statement of Interest at p.8, n.3;

*Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.,* 127 S. Ct. 1184, 1191 (2007).

Consistent with this standard, it would be inappropriate to address Al Swailem's common

law immunity defense at this time, even were his motion to dismiss not otherwise defective.  As

discussed previously, the Second Circuit remanded Al Swailem to this Court for the conduct of

judicially-supervised personal jurisdiction discovery to resolve "factual issues" relevant to whether Al Swailem's direct support of al Qaeda was "expressly aimed at the United States." *Terrorist Attacks VIII*, 714 F.3d at 678. Until final resolution of those factual issues bearing on the threshold question of personal jurisdiction, it would be premature in any case for this Court to consider the merits of Al Swailem's immunity defense. *Rosenberg* Statement of Interest at p.8, n.3; *Sinochem Int'l,* 127 S. Ct. at 1191; Koh Article at 1158-59.

Plaintiffs anticipate that Al Swailem will seek to avoid this result by intoning the familiar refrain that "sovereign immunity" is "immunity from suit, not just liability." Al Swailem Br. at p. 17. Any such argument is without merit, and simply reflects disagreement with the rule requiring resolution of threshold questions such as personal jurisdiction, prior to consideration of immunity issues. Indeed, that rule itself embodies a recognition that any modest burdens that may be imposed on a foreign official in resolving threshold questions of personal jurisdiction are insignificant in comparison to the adverse implications to our foreign relations that may flow from unnecessary resolution of an immunity defense. Koh Article at 1158-59. Thus, the prospect that resolution of the threshold personal jurisdiction question may impose modest discovery obligations on Al Swailem does not provide a basis to proceed now to a premature determination of his immunity defense.

The procedural posture of the claims against Al Swailem further undercuts any argument he may advance predicated on the alleged "burdens" that would result from deferring consideration of his immunity defense until resolution of the threshold personal jurisdiction inquiry. Most notably, the personal jurisdiction discovery directed by the Second Circuit is already ongoing under the supervision of this Court, which already rejected a request by Al Swailem to stay that discovery during the pendency of the instant motion. Transcript, June 28, 2013 Hearing, pp. 29-30. Plaintiffs served their jurisdictional discovery requests directed to Al

Swailem in August, and the deadline for Al Swailem to respond is October 21, 2013, less than two weeks from the filing of this opposition.[7]  *See* Endorsed Letter, MDL Dkt. No. 2780.  Given the advanced status of the personal jurisdiction discovery as to Al Swailem, the efforts necessary to complete that discovery will be especially modest.

B.       Common Law Immunity Does Not Exist For The Claims Against Al Swailem

While consideration of the merits of Al Swailem's common law immunity defense is both unnecessary and inappropriate under the circumstances presented, his substantive arguments are plainly misplaced.  Relying principally on superficial readings of authorities that are readily distinguishable or in fact contrary to his position, Al Swailem advocates that the immunity protections afforded to foreign "officials" are essentially limitless and absolute, so long as their own governments generically affirm that the claims arise from activities associated with their roles as governmental officials.  Al Swailem is incorrect, both as to the scope of immunity under the common law, and the availability of common law immunity to him for the claims arising from the illegal and unauthorized conduct at issue.

1.       Al Swailem Has No Entitlement to Status-Based Immunity

Under the common law, two distinct immunity doctrines are potentially implicated by a suit against an individual foreign official:  (1) "head of state" or status-based immunity; and (2) official act or conduct-based immunity.  Koh Article at 1153-54.  Status-based immunity is a narrow common law doctrine, under which a small class of *sitting* foreign officials are immune from suit for actions taken while in power.  *Id.*  The only foreign officials who may invoke status-based immunity are sitting heads of state, diplomats, and members of certain qualifying

---

[7] Significantly, in seeking an extension to October 21, 2013 to respond to plaintiffs' discovery requests, Al Swailem represented that it would be more efficient to complete his search for documents prior to providing written responses to plaintiffs' discovery.  Thus, he should by now have concluded all necessary efforts to search for and identify responsive documents.

special missions.  *Id.*  Even those officials generally lose the protections of status-based

immunity when they leave office.  *Id.*

In the present case, Al Swailem's own submissions make clear that he has no entitlement

to claim status-based immunity.  Al Swailem is not presently (nor has he ever been) a head of the

Saudi state, a diplomat, or a member of a qualifying special mission.  *See* Al Swailem Br., at pp.

1-2 (identifying government positions).  Accordingly, he has absolutely no right to status-based

immunity under the common law.[8]

### 2.    Al Swailem Has No Entitlement to Conduct-Based Immunity

Al Swailem fairs no better in his application for conduct-based or "official-act"

immunity, a distinct doctrine which affords immunity to a broader (but not limitless) class of

foreign officials for actions undertaken in their "official capacities," where "the effect of

exercising jurisdiction would be to enforce a rule of law against the state."  Restatement

(Second) of Foreign Relations Law of the United States § 66(f) (1965); *Heaney v. Government of

Spain,* 445 F.2d 501, 504 (2d Cir. 1971); *see also Samantar,* 130 S. Ct. at 2290 (citing

Restatement).  As discussed below, this immunity doctrine also is inapplicable to the claims

against Al Swailem, both because the SJRC and SRC were established to engage in activities

commonly performed by private entities, and because the terrorist sponsorship activities Al

Swailem committed as the head of those organizations were illegal.

---

[8] Al Swailem goes to pains to identify every position he has held in the Saudi government apparatus, including positions that have no relevance to the claims at issue in this proceeding, and therefore have no bearing on the conduct-based immunity inquiry.  It appears that the references to these additional positions unrelated to the SRC and SJRC are simply offered to provide artificial weight to Al Swailem's motion.  In any case, as those additional positions would not remotely qualify for status-based immunity, and also are irrelevant to any conduct-based immunity inquiry, they are properly disregarded entirely.

a)    As An Official of Purported Charities Operating Principally
Outside Saudi Arabia, Al Swailem is Not Entitled to Invoke
Conduct-Based Immunity

As the very cases and State Department filings Al Swailem relies upon make clear, official-act immunity has traditionally been extended only to senior officials of traditional government ministries, for authorized actions undertaken in performance of core governmental functions. *See e.g. Matar v. Dichter,* 563 F.3d 9, 14 (2d Cir. 2009) (involving claims against the former head of the Israeli Defense Agency for military actions); *Heaney,* 445 F.2d at 503-04 (diplomatic activities of Spain's consular representative). These limitations are consistent with the restrictive view of sovereign immunity embraced by the United States more than sixty years ago through the "Tate Letter," which extended immunity to foreign sovereigns for their uniquely public or governmental acts, but not for activities commonly carried out by private actors. *Verlinden,* 461 U.S. at 486-87. Applying this distinction in the context of a common law immunity determination, the Second Circuit insightfully explained as follows:

> [W]e are disposed to deny a claim of sovereign immunity that has not been 'recognized and allowed' by the State Department unless it is plain that the activity in question falls within one of the categories of strictly political or public acts about which sovereigns have traditionally been quite sensitive. Such acts are generally limited to the following categories:
>
> (1) internal administrative acts, such as expulsion of an alien.
>
> (2) legislative acts, such as nationalization.
>
> (3) acts concerning the armed forces.
>
> (4) acts concerning diplomatic activity.
>
> (5) public loans.
>
> We do not think that the restrictive theory adopted by the State Department requires sacrificing the interests of private litigants to international comity in other than these limited categories. Should diplomacy require enlargement of these categories, the State Department can file a suggestion of immunity with the court.

17

> Should diplomacy require contraction of these categories, the State
> Department can issue a new or clarifying policy pronouncement.

*Victory Transport Inc. v. Comisaria General de Abastecimientos y Transportes,* 336 F.2d 354,

360 (2d Cir. 1964).

Consistent with this framework, the State Department has likewise restricted immunity

under the common law to quintessentially governmental acts, and declined to extend immunity to

activities of a "private" nature.  For instance, applying the restrictive theory of common law

immunity prior to the FSIA's enactment, the State Department declined to extend immunity to

Trinidad and Tobego for claims brought in New York state court alleging mistreatment at a

government hospital in Trinidad and Tobego.  *See* Sovereign Immunity Decisions of the

Department of State, May 1952 to January 1977 (Michael Sandler, Detlev F. Vagts, & Bruno A.

Ristau eds.), in the Digest of U.S. Practice in Int'l Law 1977, at 1072 (1977) (hereinafter "State

Report").[9]  In reaching that determination, the State Department specifically rejected Trinidad

and Tobego's argument that, because the provision of hospital services was not a "commercial

activity," the provision of such services constituted immunized governmental activity under the

Tate Letter.  *Id.*  Succinctly explaining its rationale, the Department offered as follows:

> After weighing all aspects of this matter, the Department of State
> has concluded that under United States practice and jurisprudence
> the activities in question were essentially of a private nature for
> purposes of the Tate Letter and that the restrictive theory of
> immunity described in the Tate Letter must be applied in this case.

*Id.*  More recently, the United States again emphasized these limitations on conduct-based

immunity imposed by the restrictive theory in its Statement of Interest in *Kensington v. Itoua,*

explaining "while common law immunity clearly extends to the official acts of traditional

government ministers…it is not clear whether (and if so, to what extent) this immunity applies to

officers of a state owned commercial enterprise."  *Kensington Int'l Ltd. v. Itoua,* et al., Letter

---

[9] For the Court's convenience, a copy of the State Report is included as Exhibit 15 to the Tarbutton Affirmation.

Brief of the U.S., Nos. 06-1763 & 06-2216 (2d Cir. May 23, 2007) (hereinafter *Kensington* Statement of Interest).

In the present case, Al Swailem's roles and relevant activities as an official of the SJRC and SRC do not remotely qualify him for the limited conduct-based immunities extended to traditional ministers engaged in core government functions. As Al Swailem's own brief and supporting documents reflect, the SRC and SJRC are (purportedly) humanitarian organizations, principally involved in "charitable initiatives" outside of Saudi Arabia. Al Swailem Br. at pp. 2-3. Such "humanitarian" and "charitable" activities are of course routinely, and in fact most commonly, performed by non-governmental entities. Consistent with this fact, Al Swailem acknowledges that the SRC "is member No. 91 of the International Federation of Red Cross and Red Crescent Societies," a body that includes many private organizations and whose code of conduct requires member organizations "not to act as instruments of foreign government policy." *See "The Code of Conduct for The International Red Cross and Red Crescent Movement and NGOs in Disaster Relief,"* available at http://www.ifrc.org/en/publications-and-reports/code-of-conduct/. Similarly reflecting the private nature of its activities, the SJRC was established to centralize the humanitarian activities of several "*private*" Saudi charities, including the International Islamic Relief Organization and Al Haramain Islamic Foundation.[10] High Order No. 7/B/1863 (the "Albanian High Order"), Exhibit 3 to the Declaration of Alan Kabat, MDL Dkt. 2775-1. The Albanian High Order further reflects that representatives of at least four such "private" charities were appointed to leadership positions in the SJRC. *Id.* These facts, and basic logic, make clear that the core functions of the SRC and SJRC that Al Swailem was appointed to direct are of a type commonly carried out by private entities, and do not at all qualify as public acts under the restrictive theory of sovereign immunity.

---

[10] The Kingdom of Saudi Arabia asserted in previous filings in this litigation that each of these entities was a "private" organization and not an agency, instrumentality, or organ of the Kingdom. *See* Reply in Support of Motion to Dismiss of the Kingdom of Saudi Arabia, MDL Dkt. No. 501, at p. 2.

Al Swailem plainly is wrong in asserting that the restrictive theory only excludes from official-act immunity activities of a "commercial" nature.   Al Swailem Br. at p. 3.  To the contrary, both the Second Circuit and State Department have made clear that the critical distinction in applying the restrictive theory is between the limited functions essential and reserved to governments on the one hand, and activities in which private actors may participate on the other, whether performed for profit or not.  *Victory Transport*, 336 F.2d at 360; State Report at 1072.  Indeed, Al Swailem's arguments on this point are identical to those squarely rejected by the State Department in denying immunity to Trinidad and Tobego, for claims arising from its provision of medical services.  State Report at 1072.  Critically, the activities at issue in that dispute are essentially identical to those performed by the SRC and SJRC.  *See* Al Swailem Br. at p. 2 (describing SRC's humanitarian activities as including medical services). Accordingly, the State Department's  determination in that case is properly viewed as controlling here.

This result is entirely consistent with, and in fact demanded by, the very authorities Al Swailem cites in his own brief.  In particular, Al Swailem principally relies on the Second Circuit's decisions in *Heaney* and *Matar*, and the United States Statement of Interest in *Matar*, in support of his claim that he is entitled to official-act immunity.  Al Swailem Br. at pp. 11-14. However, as referenced previously, each of those disputes involved activities of senior officials of traditional government ministries, for acts undertaken in the performance of core governmental functions, features of those cases that were determinative of the result reached. *See Kensington* Statement of Interest, at p. 10 (explaining rationale for *Matar* Statement of Interest).

Al Swailem's reliance on the Second Circuit's decision  in *Heaney* is especially misplaced, as that decision is in fact directly fatal to Al Swailem's request for official conduct

immunity.  Specifically, the Second Circuit in *Heaney* expressly affirmed and applied, in the context of deciding the immunity of an individual foreign official, the analytical framework for immunity determinations it had previously announced in *Victory Transport*.  *Heaney,* 445 F.2d at 503.  *Heaney* thus confirms that official-act immunity extends only to the five specified categories of traditional government functions identified by the Second Circuit in *Victory Transport*, none of which is remotely implicated by Al Swailem's actions in directing charity programs as an official of the SJRC and SRC.  *Victory Transport*, 336 F.2d at 360.

The fact that the SJRC and SRC have been deemed immune under the FSIA does not affect this conclusion, or in any way render the denial of common law immunity protections to Al Swailem inappropriate or illogical.  As the Supreme Court observed in *Samantar*, the immunities of foreign states under the FSIA and those afforded foreign officials under the common law are not "coextensive." *Samantar,* 130 S. Ct. 2281.  Thus, the "scope of immunity that individual foreign officials enjoy under traditional principles can be either broader or narrower than the immunity of the state itself," depending on the facts of a particular case.  Koh Article at 1158.  That is the plain result compelled by application of the differing analytical regimes here, where the dismissals of the foreign state agencies were predicated upon a statutory requirement unique to the FSIA.  *See O'Neill v. Saudi Joint Relief Comm. (In re Terrorist Attacks on September 11, 2001 (Saudi Joint Relief Comm.))*, 714 F.3d 109 (2d Cir. 2013) ("*Terrorist Attacks VI*") (upholding dismissals of SJRC and SRC pursuant to "entire tort" requirement of the FSIA's non-commercial torts exception)

b)    The Claims Against Al Swailem Arise From His "Private" Unauthorized and Illegal Acts

The illegal nature of the acts giving rise to the claims against Al Swailem, involving his provision of material support and resources directly to al Qaeda with the specific intent that those resources would be used to attack the United States, presents an additional obstacle to his

21

application for common law immunity in this case.  In particular, conduct-based immunity extends only to a qualifying foreign official's "official acts," and is unavailable to "a foreign official who acts beyond the scope of his authority."  *Samantar,* 130 S. Ct. 2291, n. 17; Koh Article at 1154.  In applying this distinction, "[a] government official's legitimate authority has not generally been thought to encompass a right to commit 'official' acts that violate both international and domestic law."  Koh Article at 1154.

Critically, several U.N. Security Council Resolutions expressly prohibited the precise forms of conduct Al Swailem is alleged to have committed as an official of the SJRC and SRC. For example, Resolution 1333, adopted by the Security Council in 2000, required all U.N. member states to ensure that no "funds or financial resources are made available, by their nationals or by any persons within their territory, directly or indirectly for the benefit of Usama bin Laden, his associates or any entities owned or controlled, directly or indirectly, by Usama bin Laden or individuals and entities associated with him including the Al-Qaida organization."  S.C. Res. 1333, U.N. Doc. S/RES/1333 (Dec. 19, 2000).  Similarly, numerous Security Council Resolutions issued in relation to the conflicts in Kosovo and Chechnya, the focal point of the SJRC's mission and activities, prohibited the provision of resources to terrorists operating in those regions.  *See* S.C. Res. 1160, U.N. Doc. S/RES/1160 (Mar. 31, 1998) (condemning "all external support for terrorist activity in Kosovo, including finance, arms and training" and requiring all states to "prevent arming and training for terrorist activities there"); S.C. Res. 1199, U.N. Doc. S/RES/1199 (Sept. 23, 1998) (condemning any "supply of arms and training for terrorist activities in Kosovo); S.C. Res. 1203, U.N. Doc. S/RES/1203 (Oct. 24, 1998) (same).

Consistent with the clear prohibitions of these and other Security Council Resolutions, Al Swailem simply had not authority to use the SRC and SJRC as vehicles to help Osama bin Laden "move money and men" into the Balkans, or to provide any other forms of support to al Qaeda.

As the Second Circuit has held, Security Council Resolutions are binding on all member states pursuant to the U.N. Charter, *Flores v. S. Peru Copper Corp.,* 414 F.3d 233, 261 (2d Cir. 2003). Accordingly, the referenced Security Council Resolutions were directly binding on Al Swailem in his capacity as an official of the SJRC and SRC.[11]  As the actions underlying the claims against Al Swailem violated these express and binding international law provisions, those activities cannot be regarded as official acts for purposes of the common law immunity inquiry.

The activities at issue also violate U.S. domestic law, a fact that further removes the claims against Al Swailem from the ambit of official-act immunity.  Most notably, the Anti-Terrorism Act, prohibited as a matter of U.S. criminal law the provision of material support and resources to Osama bin Laden and al Qaeda, at all times material hereto.  *See* 18 U.S.C §§ 2339A, 2339B, 2339C, and 2332(b).  Plaintiffs specifically allege that Al Swailem violated the criminal prohibitions of the ATA through his activities as the head of the SJRC and SRC, and that those violations contributed to injuries suffered as a result of the 9/11 attacks on U.S. soil. For obvious reasons, it would be illogical to extend immunity to Al Swailem as a matter of "grace and comity" for acts that violated U.S. law, and resulted in harm to U.S. citizens on U.S. soil.  Not surprisingly, the common law does not contemplate such a result.[12]

---

[11] In light of these and other Resolutions, plaintiffs maintain that Al Swailem's sponsorship of al Qaeda violated *jus cogens* norms, a fact that provides an additional basis to deny him the benefits of common law immunity protections.  *See Yousuf v. Samantar,* 699 F.3d 763, 777 (4th Cir. 2012) (common law immunity unavailable for alleged *jus cogens* violations); *but cf, Matar,* 563 F.3d at 15-16 (no *jus cogens* exception under FSIA).  Indeed, whatever debate may exist as to the legitimacy of alleged terrorist movements grounded in claims for independence or self-determination, *United States v. Yousef,* 327 F.3d 56, 106-08 (2d Cir. 2003), there can be no dispute that the particular activities of al Qaeda (however labeled) were universally condemned and prohibited by the international community prior to September 11, 2001.  However, because Al Swailem's actions were directly prohibited by express provisions of binding Security Council Resolutions, it is unnecessary for this Court to engage in this more complex analysis, which plaintiffs was not directly addressed by the Second Circuit in *O'Neill v. Al Rajhi Bank (In re Terrorist Attacks on September 11, 2001 (Al Rajhi Bank)),* 714 F.3d 118, 125 (2d Cir. 2013) ("*Terrorist Attacks VII*") (addressing only whether a general international norm against terrorism existed prior to September 11, 2001, and not as to the activities of al Qaeda in particular).

[12] As mentioned previously, the United States designated SJRC and SRC official Wa'el Jelaidan for the same activities that form the basis of the claims against Al Swailem.  It would be more than illogical to conclude that the United States would endorse the view that Al Swailem should be afforded immunity as a matter of "grace and comity" for activities that prompted the United States to designate one of his collaborators.

Although the clear illegality of the conduct at issue under international and domestic law itself precludes recognition of Al Swailem's actions as "official acts," it should be noted that Al Swailem has failed to present any competent support for his claim that the activities at issue were authorized by the government of Saudi Arabia.  The only statements in the Affidavit of Ambassador Al-Jubeir that at all touch upon that issue appear at paragraph 8, which states (in relevant part) as follows:

> I have been advised that the claims against Dr. Al-Swailem in this litigation are based on his roles as head of the Saudi Red Crescent and the SJRC.  In those capacities, Dr. Al-Swailem acted at all relevant times as an official of the Saudi government.

Al-Jubeir Affidavit, Exhibit 4 to the Affirmation of Alan Kabat, at ¶ 8.

This generic statement that Al Swailem "acted at all times as an official of the Saudi government" fails entirely to address whether Al Swailem was authorized to engage in the particular activities underlying the claims against him, or whether the Kingdom of Saudi Arabia ratified those actions.   The Kingdom's efforts to evade those questions are not surprising, as it could not possibly endorse Al Swailem's terrorist actions as valid and authorized sovereign acts. This court should not do so either.

C.   The Kingdom Of Saudi Arabia Is Not the Real Party In Interest In This Suit As Plaintiffs Seek Money Damages From Al Swailem For His Private Acts

Finally, neither the SJRC nor the SRC are the real parties in interest for purposes of plaintiffs' personal capacity claims against Al Swailem, seeking money damages from Al Swailem's own pockets.  At base, a suit against a foreign official is properly viewed as a suit against the state itself only where it seeks to "enforce a rule of law against the state." Restatement (Second) of Foreign Relations Law of the United States § 66(f).  Similarly, actions which violate governing law, such as those here, constitute personal acts for which the responsible official is subject to personal liability, even where allegedly performed under color

of law.  *Samantar,* 130 S. Ct. at 2281.  As such, suits arising from such activities are not properly viewed as actions against the foreign state.  *Chuidian v. Philippine National Bank,* 912 F.2d 1095, 1105 (9th Cir. 1990) ("Where the officer's powers are limited by statute, his actions beyond those limitations are considered individual and not sovereign actions"), *abrogated on other grounds by Samantar,* 130 S. Ct. at 2289.

Here, plaintiffs have sued Al Swailem in his personal capacity for actions in violation of international, domestic and applicable law.  Plaintiffs do not seek to bind the SJRC or SRC in any way, and any judgment against Al Swailem would be enforceable only against his own personal assets.  Under such circumstances, the SJRC and SRC are not real parties in interest for purposes of this suit.  Indeed, the Supreme Court reached this very conclusion in relation to the analogous claims at issue in *Samantar,* explaining that "this case, in which respondents have sued petitioner in his personal capacity and seek damages from his own pocket, is … not a claim against a state."  *Samantar,* 130 S. Ct. at 2281.  The present case is on all fours with that holding.

V.    CONCLUSION

For all the foregoing reasons, plaintiffs respectfully submit that defendant Al Swailem's Renewed Motion to Dismiss should be denied in its entirety.

Respectfully submitted,

COZEN O'CONNOR

By:    /s/_____
        STEPHEN A. COZEN
        ELLIOTT R. FELDMAN
        SEAN P. CARTER
        1900 Market Street
        Philadelphia, PA 19103
        Tel: (215) 665-2000
        Attorneys for the *Federal Insurance*
        Plaintiffs