# Exhibit 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case<br><br>**AMENDED RICO STATEMENT**<br>**applicable to**<br>**SAUDI RED CRESCENT SOCIETY AND**<br>**DR. ABDUL RAHMAN AL SWAILEM** |

*This document relates to:*          *Federal Insurance Co. v. al Qaida*
                                      03 CV 06978 (RCC)

## AMENDED RICO STATEMENT APPLICABLE TO
## SAUDI RED CRESCENT SOCIETY
## AND DR. ABDUL RAHMAN AL SWAILEM

Based on information currently available, and pursuant to the Case Management Order dated June 15, 2004, plaintiffs submit this amended RICO statement for defendants Saudi Red Crescent Society ("SRC") and Dr. Abdul Rahman Al Swailem.

Given the vastly complicated nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, much information is presently unavailable to plaintiffs, absent discovery. Plaintiffs therefore reserve the right to amend this RICO statement as information is learned and verified and after discovery is obtained.

1.  The unlawful conduct is in violation of 18 U.S.C. § 1962(a), (c) and/or (d).

2.  The name of the defendants to whom this RICO statement pertains are the Saudi Red Crescent Society and Dr. Abdul Rahman Al Swailem. The alleged misconduct and basis for liability is set forth in Exhibit "A".

3.  Not applicable. All known wrongdoers are named as defendants in this action. Given the vastly complicated nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, however, much information is unavailable to plaintiffs, and the identities of other wrongdoers may be revealed through discovery. Plaintiffs therefore reserve the right to amend this RICO statement as information is learned and verified and after discovery is obtained.

4.  The name of each victim and the manner in which each was injured is indicated on the chart attached hereto as Exhibit "B".

5.  (a) <u>list of predicate acts and specific statutes violated</u>:

| | |
|---|---|
| conspiracy to commit murder | NY CLS Penal § 105.15; NY CLS Penal § 125.25(xi) |
| conspiracy to commit arson | NY CLS Penal § 105.15; NY CLS Penal § 150.15 |
| fraud with identification documents | 18 U.S.C. § 1028 |
| Travel Act | 18 U.S.C. § 1952 |
| illegal transactions in monetary instruments | 18 U.S.C. § 1956 |
| money laundering | 18 U.S.C. § 1957 |
| financial institutions fraud | 18 U.S.C. § 1344 |
| mail fraud | 18 U.S.C. § 1341 |
| wire fraud | 18 U.S.C. § 1343 |
| Providing material support of Terrorism | 18 U.S.C. § 2332(b)(g)(5)(B) 18 U.S.C. § 2339A 18 U.S.C. § 2339B 18 U.S.C. § 2339C |
| Anti-Terrorism Act | 18 U.S.C. § 2332b |

(b) dates of, the participants in, and a description of the facts surrounding the predicate acts

| DATES | PARTICIPANTS | FACTS |
|---|---|---|
| early 1990s to 9/11/2001 | SRC and Dr. Abdul Rahman Al Swailem | The SRC and Dr. Abdul Rahman Al Swailem conspired to support terrorism and to obfuscate the roles of the various participants and conspirators in the al Qaida movement, which conspiracy culminated in the Attack. |
| early 1990s to 9/11/2001 | SRC and Dr. Abdul Rahman Al Swailem | The SRC and Dr. Abdul Rahman Al Swailem undertook the above-named actions as part of a conspiracy to commit murder and arson, in that they knew that the Enterprise in which they were participating, the al Qaida movement, planned to and would commit acts of deadly aggression against the United States in the near future, using the resources |

2

| | | |
|---|---|---|
| | | and support each supplied. |
| early 1990s to 9/11/2001 | SRC and Dr. Abdul Rahman Al Swailem | The SRC and Dr. Abdul Rahman Al Swailem agreed to form and associate themselves with the Enterprise and each agreed to commit more than two predicate acts, *i.e.*, multiple acts of money laundering, murder and arson, in furtherance of a pattern of racketeering activity in connection with the Enterprise. |

    (c) not applicable

    (d) No.

    (e) No.

    (f) The predicate acts form a pattern of racketeering in that they are continuous, and are a part of the Enterprise's regular way of doing business. Other of the defendants consistently, evenly constantly, laundered money, filed false tax returns, and otherwise impeded and impaired the administration of the tax laws as part of their scheme to conduit money to terrorists, and obfuscate their support of the al Qaida movement.

    (g) The predicate acts relate to each other (horizontal relatedness) as part of a common plan because each act of money laundering, technical support and tax evasion allowed certain of the defendants to surreptitiously provide funds to terrorist organizations, including al Qaida, which conspiracy culminated in the Attack.

6.     (a) The enterprise (the "Enterprise" or "the al Qaida movement") is comprised of the defendants named in the First Amended Complaint, and is a collection of persons, organizations, businesses, and nations associated in fact.

    (b) The Enterprise has its origins in the defeat of the Soviets in Afghanistan in the late 1980s, when Osama Bin Laden ("Bin Laden") formed an organization called "The Foundation" or "al Qaida." Al Qaida was intended to serve as a foundation upon which to build a global Islamic army. The structure of the Enterprise is an association in fact with common and complex goals that consist of far more than the mere desire to perpetrate the acts of racketeering outlined herein. Rather, the Enterprise utilizes acts of racketeering to further its overall common purposes of: (i) spreading a particularly virulent brand of radical, conservative Islam; (ii) eliminating Western influences in Islamic countries; and (iii) punishing Israel, and the United States for its perceived support of Israel. The al Qaida movement does not feature a centralized hierarchy, because the lack of a centralized hierarchy is essential to the Enterprise's clandestine nature and its success. Thus, although al Qaida had its own membership roster and a structure of "committees" to guide and oversee such functions as training terrorists, proposing targets, financing operations, and issuing edicts, the committees were not a hierarchical chain of command but were instead a means for coordinating

3

functions and providing material support to operations. The SRC and Dr. Abdul Rahman Al Swailem fit neatly into this framework by raising and providing funds for and otherwise providing material support for al Qaida and the members of the Enterprise who planned, coordinated and carried out the Attack.

(c) No.

(d) The SRC and Dr. Abdul Rahman Al Swailem are associated with the Enterprise.

(e) The SRC and Dr. Abdul Rahman Al Swailem are members of the Enterprise, and are separate and distinct from the Enterprise.

(f) The SRC and Dr. Abdul Rahman Al Swailem intended to further the Attack and adopted the goal of furthering and/or facilitating that criminal endeavor, which criminal activity culminated in the Attack.

7. The pattern of racketeering activity conducted by The SRC and Dr. Abdul Rahman Al Swailem is separate from the existence of the al Qaida movement, but was a necessary component to the Attack.

8. The Enterprise conducts terrorism all over the world; the racketeering activity conducted by the SRC and Dr. Abdul Rahman Al Swailem furthers and facilitates that activity, which activity culminated in the Attack. The usual and daily activities of the Enterprise includes recruitment, indoctrination, and the provisioning and operation of training camps, all of which activities are furthered and facilitated by the racketeering activities described herein.

9. The Enterprise benefits by spreading its ideology, by suppressing other forms of Islam, and through the gratification of destroying its perceived enemies.

10. The Enterprise, and the racketeering activities conducted by the SRC and Dr. Abdul Rahman Al Swailem, relies heavily on the American interstate system of commerce for banking, supplies, communications, and virtually all its essential commercial functions, and in that manner affects interstate commerce. Additionally, the Attack itself affected commerce. See Rasul v. Bush, 124 S. Ct. 2686, No. 03-334, 2004 U.S. LEXIS 4760, * 8 (stating that the Attack "severely damaged the U.S. economy").

11. Not applicable.

12. Not applicable.

13. The al Qaida movement "employs" certain individuals, only a few of whose identities are known, including defendant Osama bin Laden.

14. The history of the conspiracy behind the al Qaida movement could, and has, filled many books, but for purposes of the present RICO Statement, the following is offered. From its inception, al Qaida has relied on well-placed financial facilitators and logistical sponsors, including the SRC and Dr. Abdul Rahman Al Swailem, to raise, manage and distribute

4

money and resources for the Enterprise under the guise of legitimate banking business activity. Al Qaida also relied heavily on certain imams at mosques who were willing to divert the *zakat*, the mandatory charitable contributions required of all Muslims.

The funds thus raised were used to, among other things, operate terrorist training camps in the Sudan, Afghanistan and elsewhere, where some recruits were trained in conventional warfare but where the best and most zealous recruits received terrorist training. The curriculum in the camps placed great emphasis on ideological and religious indoctrination. All trainees and other personnel were encouraged to think creatively about ways to commit mass murder.

The camps were able to operate only because of the worldwide network of fundraisers, recruiters, travel facilitators, and document forgers who vetted recruits and helped them get in and out of Afghanistan and the other countries where al Qaida maintained an operational presence. From the ranks of these recruits the nineteen perpetrators of the Attack were selected. None of this would have been possible without the funds and other support supplied by participants and conspirators like the SRC and Dr. Abdul Rahman Al Swailem. Indeed, the Enterprise would not have been successful without the enthusiastic participation of all of the conspirators, including the SRC and Dr. Abdul Rahman Al Swailem. In order to identify nineteen individuals willing, able and competent to carry out the Attack, al Qaida needed to select from a vast pool of recruits and trainees, which pool would not have been available to it without the assistance provided by the SRC and Dr. Abdul Rahman Al Swailem. These participants, with knowledge and intent, agreed to the overall objectives of the conspiracy, and agreed to commit at least two predicate acts and agreed to participate in the conspiracy, either expressly or impliedly. The SRC and Dr. Abdul Rahman Al Swailem also, with knowledge and intent, agreed to and did aid and abet all of the above illegal activities, RICO predicate acts, and RICO violations.

15. As the subrogees of both individual and property claimants, plaintiffs have been harmed in their business and property through the claims that they have paid out or for which they have reserved.

16. Plaintiffs' damages -- injuries, the loss of life and property damage that resulted from defendants' actions -- are direct in that they are not derivative of damage to a third party. Rather the plaintiffs' insureds' assignees were the "reasonably foreseeable victims of a RICO violation" and the "intended victims of the racketeering enterprise," *i.e.*, terrorism, the culmination of which was the Attack.

17. Each defendant is jointly and severally liable for the damages suffered by each plaintiff, as set forth in Exhibit "C".

18.

| VI | Torture Victim Protection Act, 28 U.S.C. § 1350 |
|---|---|
| VIII | RICO, 18 U.S.C. § 1962(c), 1962(d) |
| X | Anti-Terrorism Act, |

5

|   | 18 U.S.C. § 2333 |

19. pendent state claims:

| I | Trespass |
|---|---|
| II | Wrongful Death |
| III | Survival |
| IV | Assault & Battery |
| V | Intentional and Negligent Infliction of Emotional Distress |
| VII | Conspiracy |
| IX | Aiding and Abetting |
| XI | Negligence |
| XII | Punitive Damages |

20. Not applicable

6

# EXHIBIT "A"

# RICO STATEMENT

# QUESTION # 2

| DEFENDANT | MISCONDUCT | BASIS OF LIABILITY |
|---|---|---|
| Saudi Red Crescent and Dr. Abdul Rahman Al Swailem | The SRC's close ties to al Qaida's leadership date to the 1980s, when Osama bin Laden was deeply involved in financing and supporting the *mujihadeen* in Afghanistan. During that conflict, bin Laden and other future al Qaida leaders established a complex network of front "charities" and "relief organizations" to support to the *mujihadeen* forces: | 1962(a), 1962(c), 1962(d) |
| | Bin Ladin understood better than most of the volunteers the extent to which the continuation and eventual success of the jihad in Afghanistan depended on an increasingly complex, almost worldwide organization. | |
| | By all accounts, the SRC played a prominent role within that network. Indeed, in 1986, Dr. Abu Hazifa, a Director of the SRC, openly acknowledged the organization's direct ties to the *mujihadeen*, and that many of those fighters in fact worked for the SRC. | |
| | When the Soviets withdrew from Afghanistan in 1988, bin Laden concluded that the organization created to wage the *jihad* in Afghanistan should not be dissolved, but instead transformed into a multi-national Islamic army. The transformed organization, to be known as al Qaida, would wage war with America through terrorist activities, and engage in armed combat in regional conflicts throughout the world in the hopes of rallying Muslim communities to join its campaign to establish a Pan-Islamic Caliphate. | |
| | During this time, the Saudi Arabian Red Crescent was populated and run by Islamic militants who would become the future founders of al Qaida. Following the | |

withdrawal of Soviet forces from Afghanistan, the SRC continued to sponsor mujhadeen elements which joined Osama bin Laden's al Qaida, and the Saudi Arabian Red Crescent redirected its efforts towards the fulfillment of the objectives of the newly established al Qaida movement.

The SRC's integral role in the growth and development of the nascent al Qaida movement has been confirmed by documents seized in Bosnia and Herzegovina, during the searches of the Benevolent International Foundation's offices. During those searches, investigators recovered a list of orders from Osama bin Laden regarding the management of Islamic charities. On point 10 of his list, bin Laden urges the creation of a committee to receive and distribute donations to al Qaida, and suggests the participation of the Saudi Arabian Red Crescent, among others. During that same search, investigators found a letter on Saudi Arabian Red Crescent stationary to Abu Rida, another founding member of al Qaida, requesting that "weapons be inventoried." At the bottom of the letter is a note from Osama bin Laden to Wa'el Julaidan stating that al Qaida has an extreme need for weapons.

Bin Laden relied heavily on the network of charities established to support the Afghan *jihad*, including the SRC, in building this global terrorist network:

> "From its inception, Al-Qaida has relied heavily on charities and donations from its sympathizers to finance its activities…The roots of these charity networks stem from the anti-Soviet Jihad in Afghanistan during the late 1980s."

*Second Report of the U.N. Monitoring Group on Al Qaida,* December 2003, pp. 13-14.

The SRC's support for bin Laden's terrorist organization was orchestrated largely by Wa'el Julaidan, a Specially Designated Global

8

Terrorist. In the 1980's, Julaidan headed the SRC's office in Peshawar, Pakistan, the coordinating point for supporting the *mujihadeen*. Historical documents regarding al Qaida's formation, uncovered in a raid of Benevolence International's office in Bosnia, confirm that Julaidan remained dedicated to bin Laden's vision after the Afghan conflict, and continued to funnel support to bin Laden through the charity organizations he headed.

For example, one internal al Qaida document states that the SRC could no longer be relied on to function as an "umbrella" for al Qaida members, because Julaidan was being recalled to Saudi Arabia. See Government's Evidentiary Proffer Supporting the Admissibility of Co-Conspirator Statements, *United States v. Enaam Arnaout*, 02-CR-892 (N.D. IL).

The import of this statement is clear – under Julaidan's direction the SRC was serving as a front for al Qaida. Authorities also discovered a message on the letterhead of the SRC bureau in Peshawar requesting that 'weapons' be inventoried. That letter contains a note from bin Laden to Julaidan, the SRC's then-director, stating "we have an extreme need for weapons."

Years later, Julaidan facilitated the SRC's sponsorship of al Qaida activities in Kosovo and Chechnya. In 1999, Saudi Arabia formed the Saudi Joint Relief Committee for Kosovo and Chechnya (SJRC) to coordinate the relief efforts of the SRC and other Saudi charities in Kosovo and Chechnya. The Kingdom designated the SRC to exclusively serve as the operational arm for SJRC-coordinated relief efforts.

Although bin Laden had publicly confirmed that Julaidan was one of al Qaida's founding members in a 1999 interview, the SJRC and SRC appointed Julaidan Director of SJRC and SRC operations in Pristina. In 2000, U.S. officials sent a written alert to the U.N. Peace Keeping Force in Pristina, asserting that SJRC

9

officials Adel Kazam and Julaidan were "associates of Osama bin Laden" and that Julaidan was actively involved in helping bin Laden "move money and men" to and from the Balkans.

Separate incidents revealed that members of the SRC staff working under the supervision of the SJRC actively participated in the development and planning of terrorist attacks against American interests. Employees of the SRC were similarly implicated in the 1996 al Qaida bombing attack on the Egyptian Embassy in Islamabad. Following that attack, investigators arrested Muhammed Ali Sayed and Bashir Barbar Qadim, two Sudanese employees of the SRC. The investigation which led to the arrests revealed evidence that Sayed had indirectly funded the attack by channeling SRC funds to Egyptian al Jihad, the terrorist organization run by Ayman al Zawahiri which formally merged with al Qaida several years before the September 11th Attack. Egyptian authorities alleged that Zawahiri personally masterminded the Embassy attack.

Zawahiri's relationship with the SRC was established long before the attack on the Egyptian Embassy. Zawahiri, who is universally regarded to be bin Laden's top lieutenant, joined the SRC in 1985. By that time, he was already a prominent figure within the Muslim Brotherhood, and had been jailed by the Egyptian government. Zawahiri continued to serve as an SRC official until at least 1995, when he made a fundraising trip to the United States, raising $500,000 in the San Francisco area. . According to members of the terrorist cell who arranged the trip, the funds raised by Zawahiri were channeled to al Qaida's sister organization, the Egyptian Islamic Jihad.

The SRC continued to serve as a front for al Qaida through the date of the September 11th Attack. In fact, just weeks after the September 11th Attack, the Pakistani government deported

employees of the SRC, based on evidence that they were involved in al Qaida related terrorist activities. In 2002, NATO and Bosnian authorities arrested six Algerian al Qaida members who were plotting attacks on the U.S. and British embassies in Sarajevo. Two of those men were employees of the SRC.

Stated simply, the SRC has extensively and knowingly supported al Qaida, assisting it in raising money, concealing documents, giving shelter to operatives, and maintaining and transporting weapons. In other words, the SRC's role in al Qaida's global *jihad* is identical to the role it played in supporting the *mujihadeen* in Afghanistan.

The claims against al Swailem arise from his participation in the SRC's sponsorship of al Qaida. Al Swailem was appointed to head the SRC in 1998, and held that position until 2005. As head of the SRC, al Swailem used his authority to foster the organization's continued role in al Qaida's global *jihad*. For example, as head of the SRC, al Swailem was responsible for the decision to appoint Julaidan as a Director of the SJRC, thus placing a prominent and known al Qaida figure in a position of authority within his charity.

The SRC and al Swailem were well aware of the SRC's pervasive sponsorship of al Qaida during the relevant period. To begin with, it was well known that the SRC formed close ties with the al Qaida leadership during the conflict with the Soviet Union in Afghanistan, and that the fighters and charities who participated in that conflict formed the foundation of the al Qaida terrorist organization.

In addition, media reports prior to September 11, 2001 directly implicated the SRC in terrorist activities. The SRC leadership undoubtedly knew of those reports. Indeed, in many instances, high level officials of the SRC participated directly in that misconduct, a fact which in and of itself confirms the SRC's

11

|  | knowledge. Moreover, given the close ties between the SRC and the Kingdom, it is also reasonable to infer that the SRC's leaders received warnings regarding their organization's illegal activities through official governmental channels. |  |
|---|---|---|
|  | (The Saudi government received such warnings from the United States, France, Russia, Pakistan, Egypt, India, the United Nations and other sources, as detailed in Exhibit A to the Federal Plaintiffs' RICO Statement Applicable to World Assembly of Muslim Youth, incorporated herein by reference. As the SRC's involvement in terrorist activities was well known to intelligence officials since the early 1990's, it is reasonable to infer that it was identified specifically during many of those discussions. On this point, Plaintiffs respectfully refer the Court to the documents submitted as Exhibits to the June 1, 2005 Affirmation of Sean P. Carter Transmitting Supplemental Evidence in Opposition to All Motions to Dismiss Under the Foreign Sovereign Immunities Act.) |  |
|  | Absent the material support and sponsorship provided by Saudi Red Crescent and Dr. Abdul Rahman Al Swailem, al Qaida would have remained a regional extremist organization incapable of conducting large scale terrorist attacks on a global level. |  |

EXHIBIT "B"
RICO STATEMENT

*Federal Insurance Company, et al. v. al Qaida et al.,* 03cv6978

| Plaintiffs | Total Paid Loss |
|---|---|
| ACE AMERICAN INSURANCE COMPANY | $47,868,598.56 |
| ACE BERMUDA INSURANCE LTD | $298,000,000.00 |
| ACE CAPITAL V LTD | $118,454,289.00 |
| ACE INA INSURANCE COMPANY OF CANADA | $15,431,185.61 |
| ACE INDEMNITY INSURANCE COMPANY | $11,853.55 |
| ACE INSURANCE SA-NV | $17,990,692.00 |
| ACE PROPERTY & CASUALTY INSURANCE COMPANY | $34,637.00 |
| AIU INSURANCE COMPANY | $2,240.00 |
| ALLSTATE INSURANCE COMPANY | $13,307,542.13 |
| AMERICAN ALTERNATIVE INSURANCE CORPORATION | $3,384,383.56 |
| AMERICAN EMPLOYERS' INSURANCE COMPANY | $325,421.23 |
| AMERICAN GLOBAL INSURANCE COMPANY | $0.00 |
| AMERICAN GUARANTEE AND LIABILITY INSURANCE COMPANY | $42,208,222.23 |
| AMERICAN HOME ASSURANCE COMPANY | $155,607,722.68 |
| AMERICAN INTERNATIONAL SPECIALTY LINES INSURANCE COMPANY | $15,183,595.31 |
| AMERICAN ZURICH INSURANCE COMPANY | $2,213,018.97 |
| AMLIN UNDERWRITING, LTD. | $203,040,909.68 |
| ASSURANCE COMPANY OF AMERICA | $2,074,058.61 |
| ATLANTIC EMPLOYERS INSURANCE COMPANY | $0.00 |
| AXA ART INSURANCE CORPORATION | $14,287,543.00 |
| AXA CORPORATE SOLUTIONS ASSURANCE UK BRANCH | $64,609,064.00 |
| AXA CORPORATE SOLUTIONS INSURANCE COMPANY | $112,330,452.00 |
| AXA CORPORATE SOLUTIONS REINSURANCE COMPANY | $83,531,796.00 |
| AXA GLOBAL RISKS UK, LTD. | $10,986,624.00 |
| AXA RE | $102,482,949.00 |
| AXA RE CANADIAN BRANCH | $23,898,103.33 |
| AXA REINSURANCE UK PLC | $17,159,504.00 |
| AXA VERSICHERUNG AG | $2,030,867.09 |
| BANKERS STANDARD INSURANCE COMPANY | $23,250,000.00 |
| BIRMINGHAM FIRE INSURANCE COMPANY OF PENNSYLVANIA | $0.00 |
| BOSTON OLD COLONY INSURANCE COMPANY | $5,100.00 |
| CHINA AMERICA INSURANCE COMPANY LIMITED | $3,590,140.08 |
| CHUBB CUSTOM INSURANCE COMPANY | $545,025.00 |
| CHUBB INDEMNITY INSURANCE COMPANY | $4,046,308.90 |
| CHUBB INSURANCE COMPANY OF CANADA | $44,923,071.95 |
| CHUBB INSURANCE COMPANY OF NEW JERSEY | $412,681.71 |
| CNA CASUALTY OF CALIFORNIA | $25,771.00 |
| COLONIAL AMERICAN CASUALTY AND SURETY INS. COMPANY | $20,000.00 |
| COMMERCE AND INDUSTRY INSURANCE COMPANY | $2,678,408.05 |
| COMMERCE AND INDUSTRY INSURANCE COMPANY OF CANADA | $17,068.80 |
| COMMERCIAL INSURANCE COMPANY OF NEWARK, NJ | $141,343.00 |
| CONTINENTAL INSURANCE COMPANY | $542,627.00 |
| CONTINENTAL INSURANCE COMPANY OF NEW JERSEY | $39,073.00 |
| CRUM & FORSTER INDEMNITY COMPANY | $44,300.08 |
| FEDERAL INSURANCE COMPANY | $1,515,713,272.41 |
| FIDELITY AND CASUALTY COMPANY OF NEW YORK | $79,856.00 |

9/22/2005

EXHIBIT "B"
RICO STATEMENT

*Federal Insurance Company, et al. v. al Qaida et al.,* 03cv6978

| Plaintiffs | Total Paid Loss |
|---|---|
| FIDELITY AND DEPOSIT COMPANY OF MARYLAND | $1,559,298.07 |
| GLENS FALLS INSURANCE COMPANY | $36,239.00 |
| GRANITE STATE INSURANCE COMPANY | $348,071.05 |
| GREAT LAKES REINSURANCE U.K. PLC | $98,999,865.52 |
| GREAT NORTHERN INSURANCE COMPANY | $601,712,247.63 |
| HISCOX DEDICATED CORPORATE MEMBER, LTD. | $231,521,055.00 |
| HOMELAND INSURANCE COMPANY OF NEW YORK | $210,670.75 |
| ILLINOIS NATIONAL INSURANCE COMPANY | $2,229,043.97 |
| INDEMNITY INSURANCE COMPANY OF NORTH AMERICA | $7,465,987.17 |
| INSURANCE COMPANY OF NORTH AMERICA | $78,692.00 |
| LEXINGTON INSURANCE COMPANY | $158,317,791.42 |
| MARYLAND CASUALTY COMPANY | $420,000.00 |
| NATIONAL BEN FRANKLIN INSURANCE COMPANY OF ILLINOIS | $6,442.00 |
| NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH | $26,515,149.78 |
| NEW HAMPSHIRE INSURANCE COMPANY | $2,260,134.91 |
| NORTH RIVER INSURANCE COMPANY | $3,405,966.77 |
| NORTHERN INSURANCE COMPANY OF NEW YORK | $1,043,292.05 |
| ONE BEACON AMERICA INSURANCE COMPANY | $85,101.50 |
| ONE BEACON INSURANCE COMPANY | $185,924,621.93 |
| PACIFIC EMPLOYERS | $4,868,748.19 |
| PACIFIC INDEMNITY COMPANY | $24,230,820.77 |
| SENECA INSURANCE COMPANY, INC. | $4,213,659.07 |
| SPS REASSURANCE | $79,888,622.00 |
| STEADFAST INSURANCE COMPANY | $1,828,050.13 |
| THE CAMDEN FIRE INSURANCE ASSOCIATION | $76,620.00 |
| THE INSURANCE COMPANY STATE OF PENNSYLVANIA | $114,621.84 |
| THE PRINCETON EXCESS & SURPLUS LINES INSURANCE COMPANY | $3,796,292.50 |
| TIG INSURANCE COMPANY | $76,211,229.00 |
| TRANSATLANTIC REINSURANCE COMPANY | $107,194,221.65 |
| UNITED STATES FIRE INSURANCE COMPANY | $77,629,442.37 |
| VALIANT INSURANCE COMPANY | $0.00 |
| VIGILANT INSURANCE COMPANY | $45,622,168.99 |
| WESTCHESTER FIRE INSURANCE COMPANY | $14,079,230.00 |
| WESTCHESTER SURPLUS LINES INSURANCE CO. | $12,705,000.00 |
| WOBURN INSURANCE LTD | $8,750,000.00 |
| ZURICH AMERICAN INSURANCE COMPANY | $835,958,551.83 |

9/22/2005