# Exhibit 14

# BERNABEI & WACHTEL, PLLC

### ATTORNEYS AT LAW

#### 1775 T STREET, N.W.
##### WASHINGTON, D.C. 20009

LYNNE BERNABEI
DAVID WACHTEL
ALAN R. KABAT

202.745.1942
FAX: 202.745.2627
WWW.BERNABEIPLLC.COM

PETER M. WHELAN
LAUREN R. S. MENDONSA
NADIA E. SAID ■
MATTHEW E. RADLER ▲
■ ADMITTED IN IL ONLY
▲ ADMITTED IN VA ONLY

By Telecopier and Overnight Mail
July 12, 2013

Hon. Frank Maas
United States Magistrate Judge
Southern District of New York
Daniel P. Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007-1312

Re:     *In re Terrorist Attacks on September 11, 2001*, 03 MDL 1570 (GBD/FM)

Dear Judge Maas:

The Plaintiffs' Executive Committees, and counsel for Dr. Abdul Rahman Al-Swailem, respectfully submit their proposals for the briefing schedule for the sovereign immunity defenses, pursuant to this Court's Discovery Order, at ¶ 2 (ECF No. 2733) (June 28, 2013)..

**<u>Defendant's Proposal:</u>**

Consistent with what Defendants stated during the June 28, 2013 status conference, counsel proposes the following briefing schedule, running from July 15, 2013:

| | |
|---|---|
| Motion to Dismiss | Thursday, August 15, 2013 (one month) |
| Opposition | Monday, September 16, 2013 (one month) |
| Reply | Monday, September 30, 2013 (two weeks) |

Only one defendant, Dr. Al-Swailem, who was the head of the Saudi Arabian Red Crescent Society, will be filing a renewed motion to dismiss based on common-law sovereign immunity.  A proposed Order is attached hereto.

Magistrate Judge Maas
July 12, 2013
Page 2 of 15

As set forth below, we do not agree that a request to the State Department for a Statement of Interest is necessary or even appropriate before Dr. Al-Swailem files his motion to dismiss, particularly given how long this matter has been pending against him already.

First, all the allegations against Dr. Al-Swailem concern acts that he allegedly took in his official capacity as head of the Saudi Red Crescent ("SRC"). The Second Circuit has already concluded that the SRC is entitled to official immunity as a government entity. *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 109 (2d Cir. 2013). Thus, Dr. Al-Swailem's official status is not in doubt.

Second, there is no requirement that the State Department's views be requested in every case in which a foreign official asserts immunity. Describing pre-FSIA practice in *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480 (1983), the Supreme Court recognized that "foreign nations did not always make requests to the State Department. In such cases, the responsibility fell to the courts to determine whether sovereign immunity existed, generally by reference to prior State Department decisions." *Id.* at 487. In *Samantar*, the Supreme Court confirmed that a State Department determination of immunity was not mandatory under pre-FSIA practice. *See Samantar v. Yousuf*, 130 S. Ct. 2278, 2284 (2010) (explaining that "the diplomatic representative of the sovereign *could* request a 'suggestion of immunity' from the State Department" and that, "in the absence of recognition of the immunity by the Department of State, a district court had authority to decide for itself whether all the requisites for such immunity existed") (emphasis added; internal quotation marks omitted). As Harold H. Koh, then-Legal Adviser at State, recently explained, "[t]he government need not, and should not, speak in every case, and that is not what *Samantar* envisages, particularly when those cases are brought not by the U.S. Government, but by private litigants with their own motives and goals." H. H. Koh, "Foreign Official Immunity after *Samantar*: A United States Government Perspective," 44 *Vanderbilt J. Transnational L.* 1141, 1161 (2011).

Third, we have consulted with Michael Kellogg, Counsel for the Kingdom of Saudi Arabia, and he indicated that the Kingdom will fully support Dr. Al-Swailem's motion to dismiss, including providing an affidavit describing his official capacity as head of the SRC.

Under these circumstances, an indefinite delay for referral to the State Department is unwarranted and unnecessary. We respectfully submit that briefing on the merits of Dr. Al-Swailem's motion to dismiss should proceed without further delay, pursuant to the schedule proposed herein.

Magistrate Judge Maas
July 12, 2013
Page 3 of 15

**Plaintiffs' Proposal:**

   A.   **Plaintiffs submit that the State Department should be afforded an opportunity to present its views at the outset of any briefing process.**

       Pursuant to longstanding historical practice, the process for presenting any common law immunity defense traditionally begins with a request by the defendant or presiding court for a Statement of Interest from the United States Department of State.  In the wake of *Samantar v. Yousuf,* 130 S. Ct. 2278 (2010),[1] the State Department expressly affirmed the importance of affording the Executive Branch an opportunity to provide its views concerning any request for common law immunity.  As then State Department Legal Advisor Harold Koh explained in 2011, "if courts follow historical practice, they will again request the State Department's 'determinations regarding immunity' to decide whether or not to grant immunity to individuals for actions taken as officials," and "we [at the State Department] consider it a good idea for courts in such cases to seek executive guidance, for the simple reason that institutionally, the State Department is best situated to establish the initial framework for making decisions regarding foreign official immunity, and best-positioned in the long run to consider the remedial, substantive, and prudential concerns raised by suits against foreign officials."  Harold Hongju Koh, Symposium:  *Foreign State Immunity at Home and Abroad:  Foreign Official Immunity After Samantar: A United States Government Perspective,* 44 Vand. J. Transnat'l L. 1141, *1147 (2011) (hereinafter "*Immunity Symposium*"), included as Exhibit A hereto.

       The novel nature of al Swailem's attempt to invoke common law immunity protections renders it all the more important to adhere to historical practice in this case and afford the State Department an opportunity to present its views.  Indeed, the United States previously has expressed doubt as to whether common law immunity protection could extend to officers of state-owned enterprises such as al Swailem's Saudi Joint Relief Committee (as opposed to officers of traditional government ministries).  U.S. Ltr. Br. at 10, *Kensington Int'l Ltd. V. Itoua,* 505 F.3d 147 (2d Cir. 2007) (No. 06-1763).  Further, al Swailem's proposed claim to common law immunity protection arises in the context of terrorism sponsorship claims, placing these claims well beyond the parameters of common law immunity in the modern era.  As State Department Legal Advisor Koh further explained in addressing the import of *Samantar* in 2011, "the State Department remains the agency best suited to keep track of changes in international human rights practices and norms.  In the same way that the law of foreign state immunity eventually took into account the global commercial revolution, official immunity law will need to take into account the human rights revolution…changes in international human rights norms,

---

[1] In *Samantar,* the Supreme Court unanimously held that federal common law principles, and not the Foreign Sovereign Immunities Act, govern immunity claims of foreign officials.  *Id.* at 2292-93.

Magistrate Judge Maas
July 12, 2013
Page 4 of 15

as reflected in treaties ratified by the United States, new U.S. statutes, and U.S. judicial doctrines, have given rise to new views about the boundaries of official action appropriately subject to immunity, and call for review of the standards governing personal accountability for gross human rights abuses." *Immunity Symposium* at *1151.[2]  Here, the conduct at issue violates U.S. laws including the Anti-Terrorism Act, as well as numerous treaties to which the U.S. is a signatory.  *See e.g. International Convention for the Suppression of the Financing of Terrorism,* Dec. 9, 1999, 2178 U.N.T.S. 284.  Thus, it is especially appropriate to follow the longstanding historical process in this case and afford the State Department an opportunity to provide its views concerning the novel immunity theories raised by al Swailem's doubtful bid for common law immunity protection.[3]

In addition to the reasons outlined above, inviting the views of the State Department will promote efficiency in this multi-district litigation proceeding, and avoid the potential for multiple appeals concerning al Swailem's proposed common law immunity defense.  Indeed, given the longstanding practice of inviting the views of the State Department concerning common law immunity defenses, and the rationales underlying that practice, a failure to invite the State Department to offer its views could render the record incomplete for purposes of any necessary appellate proceedings.  This would potentially result in multiple appeals and prolonged pre-trial and discovery proceedings in this Court.  Further, although Plaintiffs believe the unavailability of common law immunity protection to al Swailem is apparent on the present record, there is a potential that the State Department may conclude that discovery is necessary to resolve the question.  Having the State Department identify any areas in which discovery might be necessary

---

[2] Then State Department Legal Advisor Koh identified a host of other individualized and context specific factors that may implicate Executive Branch prerogatives and impact common law immunity determinations in a particular case, and made clear that the parameters of individual official immunity are not identical to those governing foreign state immunity under the FSIA.  *Id.* at *1148.

[3] In July of 2009, the Court declined a request by Plaintiffs to invite the State Department to file a Statement of Interest concerning common law immunity issues.  MDL ECF No. 2180.  However, at the time of that ruling, controlling Second Circuit authority provided that the FSIA, rather than the common law, governed the immunity of individual officials.  *In re: Terrorist Attacks on September 11, 2001,* 583 F.3d 71 (2d Cir. 2008, *abrogated in part, Samantar v. Yousuf,* 130 S. Ct. 2278 (2010), *and overruled in part, Doe v. Bin Laden,* 663 F.3d 64 (2d Cir. 2011).  On that basis, the four defendants then claiming sovereign immunity (all of whom other than defendant al Swailem have now abandoned any immunity defense) argued that common law immunity was not raised at all by their motions to dismiss predicated on the FSIA, rendering the views of the United States irrelevant.  Defendants' Executive Committee July 8, 2009 Agenda Letter at pp. 5-6.  The Court agreed, and later resolved their motions solely on personal jurisdiction grounds.  Given the Supreme Court's decision in *Samantar,* coupled with the State Department's unequivocal statements concerning the importance of requesting its views on common law immunity bids in the post-*Samantar* environment, al Swailem's expressed intent to seek common law immunity protection obviously arises in dramatically different circumstances, and plainly warrants a request for the views of the Executive Branch.

Magistrate Judge Maas
July 12, 2013
Page 5 of 15

up front would promote efficiency in the resolution of al Swailem's proposed common law immunity defense. Accordingly, Plaintiffs respectfully submit that requesting the views of the State Department is not only the appropriate procedural approach to this question, but the most efficient course as well. As this Court already has held that personal jurisdiction discovery will proceed concurrently with proceedings concerning al Swailem's proposed immunity defense, this approach will not delay further proceedings in the case.

For the foregoing reasons, Plaintiffs submit that a deadline should be set for defendant al Swailem to request a Statement of Interest from the State Department concerning his proposed common law immunity defense. In the event defendant al Swailem declines the opportunity to initiate that process himself, the Court should itself submit a request to the State Department to appear and present its views pursuant to 28 U.S.C. § 517. In the post-*Samantar* era, the State Department has developed an internal process for evaluating common law immunity bids by foreign officials, pursuant to which the State Department solicits information from both sides of a *Samantar* dispute. *Immunity Symposium* at *1159-60. In light of that internal process, Plaintiffs would suggest that best course would be to have the parties report back to the Court after their initial contacts with the State Department, to propose appropriate deadlines for the filing of the State Department's Statement of Interest and the parties' briefs. A proposed form of Order is enclosed.

Finally, in connection with the submission of this proposal, Plaintiffs note that they are expressly reserving their rights to argue that al Swailem has waived or failed to preserve any potential common law immunity defense.

**<u>Plaintiffs' Response to Defendant's Proposal:</u>**

Defendant al Swailem offers no plausible justification for his deeply misguided effort to persuade this Court to depart from the longstanding and preferred practice of inviting the Executive Branch to provide its views concerning an application for common law immunity protection.

First, defendant al Swailem's remarkable suggestion that historical practice and post-*Samantar* pronouncements by the State Department somehow counsel against a request for the views of the State Department in this case is patently wrong, as a complete reading of the very authority he relies upon reveals. Specifically, while defendant al Swailem is correct that Legal Advisor Koh acknowledged in 2011 that the State Department "need not..speak in every [*Samantar*] case," the full text of the article makes clear that such a result should attend only after the State Department has been afforded an opportunity to file a Statement of Interest and made a conscious decision to refrain from doing so. As Legal Advisor Koh explained,

Magistrate Judge Maas
July 12, 2013
Page 6 of 15

"[s]ometimes, and notably, the State Department will make *a conscious decision* not to speak *at the end of this process,*" (referring to the revised internal process established by the State Department in the wake of *Samantar* to address common law immunity claims). *Immunity Symposium* at *1160 (emphasis supplied). Legal Advisor Koh further emphasized that the decision to remain silent in a particular case would itself represent an important exercise of Executive Branch discretion, to be arrived upon after balancing the relative equities. *Id.* Legal Advisor Koh also underscored that the State Department would as a general matter "want to be responsive when courts request our views," *id.*, and that the Department's flexibility to remain silent would require further development of post-*Samantar* "official immunity policy over time," *id.* at *1161, something that has not yet occurred and can only be achieved by providing the State Department an opportunity to be heard in cases like this one. See *Samantar,* 130 S. Ct. at 2291, n. 18 (noting that a "study that attempted to gather all of the State Department decisions related to sovereign immunity from the adoption of the restrictive theory in 1952 to the enactment of the FSIA reveals only four decisions related to official immunity, and two related to head of state immunity, out of a total of 110 decisions"). Indeed, as referenced in Plaintiffs' initial proposal, the important national security and counter-terrorism policy issues posed by al Swailem's application for common law immunity uniquely implicate Executive Branch interests and render adherence to the traditional and preferred practice of inviting the State Department's views all the more important.

Second, defendant al Swailem's expressed concerns about the potential "delay" that might result from inviting the State Department to present its views are manufactured, and fail to acknowledge that al Swailem is himself singularly responsible for delaying the proceedings concerning his purported common law immunity defense. In this regard, it was *al Swailem* who failed to raise any common law immunity defense in the motion to dismiss he filed in 2004. And, when Plaintiffs proposed in 2009 that any potential common law immunity defenses should be addressed in connection with al Swailem's original motion to dismiss (even though he had not himself raised that defense), and that the State Department should be invited to file a Statement of Interest on the issue,[4] it was *al Swailem* who opposed consideration of any common law immunity defenses at that time. *See* Defendants' Executive Committee July 8, 2009 Agenda Letter at pp. 5-6. It was only after the Supreme Court's decision in *Samantar* in 2010 that al Swailem suggested that he may wish to invoke common law immunity protection in these proceedings, but even in that context he urged the Court to focus instead on his personal jurisdiction defenses (likely because he recognized that the Court may very well conclude that he had consciously waived any common law immunity defense). *See* June 4, 2010 Letter from Alan Kabat to Judge George B. Daniels. Thus, al Swailem is himself solely responsible for delaying

---

[4] Plaintiffs offered those proposals for the specific purpose of avoiding any potential delays related to common law immunity issues.

Magistrate Judge Maas
July 12, 2013
Page 7 of 15

the proceedings pertaining to his purported common law immunity defense for a period of years, and it is Plaintiffs who have suffered prejudice as a result. Moreover, as the State Department has established an efficient internal process for addressing common law immunity issues in the wake of *Samantar*, al Swailem's concerns about potential delay are purely hypothetical. In fact, for the reasons stated in Plaintiff's initial proposal above, inviting the views of the State Department at this time will promote the efficient resolution of al Swailem's proposed common law immunity defense in this Court, and ensure a proper record for purposes of any necessary appellate proceedings.

Third, the fact that Michael Kellogg has reportedly communicated that the Kingdom of Saudi Arabia will support al Swailem's bid for common law immunity protection is completely irrelevant. Stated simply, whether al Swailem is entitled to common law immunity protection is a matter of U.S. law, and is not determined by the views of a foreign sovereign. The Kingdom will of course have every opportunity to present its views to the State Department as part of the internal review process described by Legal Advisor Koh, in relation to which the State Department will also have the opportunity to request that the Kingdom of Saudi Arabia and al Swailem address relevant factual matters impacting upon the common law immunity analysis.

Fourth, al Swailem's assertion that his "official status is not in doubt" is both inaccurate and irrelevant. As a primary matter, "status immunity" is entirely distinct from "official capacity" immunity, and reserved for a very select group of foreign officials, such as sitting heads of state and diplomats. Immunity Symposium at *1153-58. In his capacities as the head (or potentially former head) of the Saudi Red Crescent (SRC) and Saudi Joint Relief Committee (SJRC), al Swailem has no entitlement to "status immunity" whatsoever. *Id.* Further, al Swailem's right to invoke "official capacity immunity" for the claims at issue in this case is doubtful. Once again, the United States previously has expressed doubt as to whether common law immunity protections extend at all to officials of non-traditional government-controlled entities like the SRC or SJRC. Moreover, it is well established that "a government official's legitimate authority has not generally been thought to encompass a right to commit 'official acts' that violate both international and domestic law," *id.* at *1154, as the acts underlying the claims against al Swailem most certainly do.

In sum, al Swailem offers no plausible rationale for abandoning longstanding historical practice and the process the State Department has unequivocally endorsed in the wake of *Samantar*, pursuant to which the Executive Branch should be afforded an opportunity to present its views concerning al Swailem's proposed common law immunity defense.

Magistrate Judge Maas
July 12, 2013
Page 8 of 15

**Defendant Dr. Al-Swailem's Response to the Plaintiffs' Proposal.**

Dr. Al-Swailem was named as a defendant in this case more than a decade ago.  It is undisputed that all the allegations against him relate to his official capacity as head of the Saudi Red Crescent, an agency of the government of Saudi Arabia that itself has been held to be immune from suit.  As the Second Circuit has recognized, sovereign immunity is immunity not just from liability, but also from "the attendant burdens of litigation."  *Rein v. Socialist People's Libyan Arab Jamahiriya*, 162 F.3d 748, 756 (2d Cir. 1998).  To ensure that litigants benefit from the immunity to which they are entitled, claims of immunity should be completely and finally resolved as early as possible.  *See Robinson v. Gov't of Malaysia*, 269 F.3d 133, 141 (2d Cir. 2001); *Rein*, 162 F.3d at 755-56.

There is no reason why this Court, applying long-settled principles, cannot determine Dr. Al-Swailem's entitlement to common-law immunity without the need for a referral to State, or the antecedent delay caused by such a referral.

1.     **The State Department Does Not Intend To Provide Its Views in Every Case.**

Plaintiffs' extensive discussion of then-Legal Advisor Harold Koh's article omits the key conclusion – which expressly stated that a determination of immunity by the State Department would <u>not</u> necessarily be warranted in private litigation such as this case:

> Following the 1952 Tate Letter, **courts consistently applied the restrictive theory of sovereign immunity articulated by the State Department even in cases where the Department did not make a case-specific determination**.

> The Supreme Court in *Samantar* echoed that directive, noting that under the common law if the Executive Branch chooses not to participate in the litigation, district courts must consider whether a foreign sovereign or foreign official defendant is entitled to immunity under "the established policy of the [State Department]." . . .

> . . . In closing, let me say that in time, we hope that litigants will come to understand, with respect to State Department submissions in these cases, both the "sound of silence" and the notion that government silence is sometimes golden. In domestic litigation, our ultimate goal is, in fact, not more verbiage, but more silence.  **The government need not, and should not, speak in every case, and that is not what *Samantar* envisages, particularly when those cases are**

Magistrate Judge Maas
July 12, 2013
Page 9 of 15

>**brought not by the U.S. Government, but by private litigants with their own**
>**motives and goals**.

H. H. Koh, "Foreign Official Immunity after *Samantar*:  A United States Government
Perspective," 44 *Vanderbilt J. Transnational L.* 1141, 1161 (2011) (emphasis added).

Thus, given that the Department of State does <u>not</u> view its input as required in every case,
particularly those brought by private litigants, there is no basis for the plaintiffs in this litigation
to demand that briefing on Dr. Al-Swailem's motion to dismiss be delayed in order to seek
State's views on his immunity.

### 2.    There Is No Longstanding Practice of Referrals to State for Individuals.

Plaintiffs' assertion that there exists a "longstanding practice of inviting the views of the
State Department concerning common law immunity defenses" ignores the fact that from 1952
through the effective date of FSIA in January 1977, State submitted its views in "only four
decisions related to official immunity, and two related to head of state immunity, out of a total of
110 decisions."  *Samantar*, 130 U.S. at 2291 n.18 (citing "Sovereign Immunity Decisions of the
Dept. of State, May 1952 to Jan. 1977" (M. Sandler, et al., eds.), in *Digests of U.S. Practice in
Int'l Law* 1020 (1977)).  Thus, there is no longstanding practice of involving State in determining
the immunity of individual officers.

Instead, as the *Samantar* Court expressly recognized, the federal courts could determine
immunity without any response from the State Department:

>But "in the absence of recognition of the immunity by the Department of State," a
>district court "had authority to decide for itself whether all the requisites for such
>immunity existed."  *Ex parte Peru*, 318 U.S., at 587, 61 S. Ct. 1113; *see also
>Compania Espanola*, 303 U.S., at 75, 58 S. Ct. 432 (approving judicial inquiry
>into sovereign immunity when the "Department of State ... declined to act");
>*Heaney v. Government of Spain*, 445 F.2d 501, 503, and n.2 (C.A.2 1971)
>(evaluating sovereign immunity when the State Department had not responded to
>a request for its views).  In making that decision, a district court inquired
>"whether the ground of immunity is one which it is the established policy of the
>[State Department] to recognize."  *Hoffman*, 324 U.S., at 36, 65 S. Ct. 530.

*Samantar*, 130 S. Ct. at 2284.  Thus, for example, in *Heaney*, the Second Circuit decided the
sovereign immunity issue without any determination from the State Department.  *Heaney v.*

Magistrate Judge Maas
July 12, 2013
Page 10 of 15

*Government of Spain*, 445 F.2d 501, 503 n.2 (2d Cir. 1971) (Friendly, J.) ("In a letter … we invited the State Department to submit its views on the questions presented by this case.  The Department has not even acknowledged our letter.").

      **3.**      **Dr. Al-Swailem Is Not an Officer of a "State-Owned Enterprise" and His Entitlement To Immunity Does Not Yield to Plaintiffs' General Claims of Support for Terrorism.**

Plaintiffs' assertion that the Saudi Joint Relief Committee (SJRC) is a "state-owned enterprise," and their reliance on the U.S. government's brief in *Kensington Int'l, Inc. v. Itoua*, 505 F.3d 147 (2d Cir. 2007), is baseless.  This Court and the Second Circuit have held that the SJRC and the Saudi Red Crescent (SRC) are agencies or instrumentalities of the Kingdom of Saudi Arabia and are entitled to sovereign immunity under the FSIA.  *See Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 109 (2d Cir. 2013).  Before the Second Circuit, Plaintiffs did not even argue that their claims against those entities fit the FSIA's "commercial activity" exception to immunity.  Because the SJRC and the SRC are not commercial enterprises, Dr. Al-Swailem cannot be compared to the officer of the state-owned oil company in *Kensington International*.

Plaintiffs' suggestion that Dr. Al-Swailem's immunity defense is "well beyond the parameters of common law immunity in the modern era" because it "arises in the context of terrorism sponsorship claims" is equally meritless.  The United States has explained in submissions to this Court and the Second Circuit that, under prevailing domestic and international law, a plaintiff's allegation that a foreign official acted unlawfully – or even violated settled international norms of conduct – does not deprive that official of immunity from suit in U.S. courts.  *See* Statement of Interest of the United States of America at 23, *Matar v. Dichter*, No. 05 Civ. 10270 (S.D.N.Y. filed Nov. 17, 2006); Br. for the United States of America as Amicus Curiae in Support of Affirmance at 21, *Matar v. Dichter*, No. 07-2579-cv (2d Cir. filed Dec. 19, 2007) (case decision reported at 563 F.3d 9 (2d Cir. 2009)).

      **4.**      **Dr. Al-Swailem Has the Right to Assert Common Law Immunity.**

Finally, plaintiffs' assertion that in 2009, the individual sovereign defendants "argued that common law immunity was not raised at all by their motions to dismiss" (*supra* at 4 n.3), mischaracterizes their prior submissions to this Court.  In July 2009, when the parties submitted their agenda letters to this Court, the Supreme Court had not even decided whether to grant certiorari in *Samantar* (which did not happen until September 30, 2009), so the defendants' agenda letter was based on then-controlling Second Circuit precedent, under which individuals were covered by the FSIA.  That is why counsel wrote that:  "Furthermore, because the FSIA

Magistrate Judge Maas
July 12, 2013
Page 11 of 15

applies to the remaining individual defendants raising this defense and because no exception to immunity applies, whether these defendants would also be entitled to immunity under the common law is irrelevant." *See* M. Kellogg letter to J. Daniels, at 5-6 (July 8, 2009).

However, after the Supreme Court decided *Samantar* – on June 1, 2010 – the parties then submitted status reports to Judge Daniels regarding the import of that decision. Defendants' submissions made clear that under *Samantar*, individuals remained entitled to assert common law immunity. *See* A. Kabat letter to Judge Daniels, at 2 (June 4, 2010); A. Kabat letter to Judge Daniels, at 1-2 (June 16, 2010). Indeed, the Supreme Court, in *Samantar*, itself specifically recognized that Mr. Samantar remained free to assert common law immunity upon remand to the district court. *Samantar*, 131 S. Ct. at 2292-93.

Thus, Judge Daniels, in his June 17, 2010 decision, recognized that Dr. Al-Swailem and several other defendants could assert common-law immunity in light of *Samantar*, but concluded that the Court did not need to address this defense: "Although this Court has thoroughly examined that issue, the issue of immunity need not, however, be resolved." *In re Terrorist Attacks on Sept. 11, 2001*, 718 F. Supp. 2d 456, 467 (S.D.N.Y. 2010), *aff'd in part, rev'd in part*, 714 F.3d 659 (2d Cir. 2013).

There is thus no basis for plaintiffs to assert that Dr. Al-Swailem has waived his right to renew his motion to dismiss based on common-law immunity.

Sincerely,

*Alan R. Kabat*

Lynne Bernabei
Alan R. Kabat
*Counsel for Dr. Al-Swailem*

*Sean Carter* /AIL

Sean Carter
*Plaintiffs' Executive Committee*

Enc.

cc:     Judge George B. Daniels
        MDL-1570 counsel

**Attachment A**

**Defendant's Proposed Order**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

IN RE:

                                    :      **DISCOVERY ORDER**

       TERRORIST ATTACKS ON
       SEPTEMBER 11, 2001          :      03 MDL 1570 (GBD) (FM)

-------------------------------------------------------------x

**FRANK MAAS,** United States Magistrate Judge.

        Pursuant to this Court's Discovery Order, at ¶ 2 (ECF No. 2733) (June 28, 2013), and the parties' submissions thereto, it is hereby ORDERED that:

        1.  The briefing schedule for the motion to dismiss on common law sovereign immunity shall proceed as follows:

| | | |
|---|---|---|
| a. | Motion to Dismiss | Thursday, August 15, 2013; |
| b. | Opposition | Monday, September 16, 2013; and |
| c. | Reply | Monday, September 30, 2013. |

        SO ORDERED.

Dated:      New York, New York
            July ___, 2013


                                   _____
                                    FRANK MAAS
                           United States Magistrate Judge


Copies to:

Hon. George B. Daniels
United States District Judge

All counsel (via ECF)

**Attachment B**

**Plaintiffs' Proposed Order**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
IN RE:                                                                          **<u>DISCOVERY ORDER</u>**

                                                                        :

        TERRORIST ATTACKS ON
        SEPTEMBER 11, 2001                            :           03 MDL 1570 (GBD) (FM)


-------------------------------------------------------------x

**FRANK MAAS,** United States Magistrate Judge.

        Pursuant to this Court's Discovery Order, at ¶ 2 (ECF No. 2733) (June 28, 2013), and the
parties' submissions thereto, it is hereby ORDERED that:

   1.    Defendant al Swailem shall advise the Court by seven days after the date of the
         entry of this order whether he intends to seek a Statement of Interest from the
         United States Department of State concerning his proposed common law
         immunity defense.  In the event defendant al Swailem elects to exercise his option
         to initiate that process, he shall submit his request to the State Department on or
         before August 15, 2013.

   2.    In the event defendant al Swailem declines to exercise his option to initiate the
         request for the views of the State Department, Plaintiffs shall provide the Court
         with a proposed draft of a request from the Court to the State Department
         requesting the State Department's views on or before seven days after the date on
         which al Swailem advises the Court that he declines to exercise this option.

         SO ORDERED.

Dated:        New York, New York
              July ___, 2013


                                             _____
                                                    FRANK MAAS
                                             United States Magistrate Judge


Copies to:
Hon. George B. Daniels, U.S.D.J.
All counsel (via ECF)

VANDERBILT JOURNAL
*of* TRANSNATIONAL LAW



VOLUME 44           NOVEMBER 2011           NUMBER 5

# Foreign Official Immunity After *Samantar*: A United States Government Perspective

*Harold Hongju Koh**

## TABLE OF CONTENTS

I.    THE WORLD BEFORE *SAMANTAR* .................................... 1142
II.   *SAMANTAR* AND ITS IMPLICATIONS ................................ 1146
III.  THE EMERGING POST-*SAMANTAR* PROCESS ................. 1149
      A.    *Five Tenets of Official Immunity Practice* ......... 1152
      B.    *Non*-Samantar *Status Issues* ............................ 1155
      C.    *Non*-Samantar *Procedural Issues* ..................... 1158
      D.    *The Sound of Silence* ......................................... 1159

I am delighted to speak here at Vanderbilt regarding the U.S. Government's perspective on Foreign Official Immunity after *Samantar v. Yousuf*.[1] In the *Samantar* case, the U.S. Supreme Court unanimously held that the immunity of foreign government officials

---

* Legal Adviser, United States Department of State; Martin R. Flug '55 Professor of International Law, Yale Law School (on leave). This is a lightly edited and footnoted version of a keynote speech delivered on February 4, 2011 at the *Vanderbilt Journal of Transnational Law* Symposium on the *Samantar* case. I am grateful to Professors Ingrid Wuerth and Michael Newton and the *Journal's* editors for their kind hospitality during my visit to Nashville, and to my Counselors on International Law Professors Sarah Cleveland and Bill Dodge and to my colleagues at the Legal Adviser's Office—Kimberly Gahan, Mary Catherine Malin, David Pozen, Jonathan Schwartz, Aaron Zelinsky, David Zionts, and especially Paige Chabora—for their outstanding support.

1.      130 S. Ct. 2278 (2010).

sued in their personal capacity in U.S. courts, including for alleged human rights violations, is not controlled by the Foreign Sovereign Immunities Act of 1976,[2] but rather, by immunity determinations made by the Executive Branch. Let me break my topic today into three parts: first, the world of foreign official immunity as it existed before the *Samantar* case; second, the Supreme Court's decision in *Samantar* and its implications; and third, the State Department's "New *Samantar* Process," which has been emerging since the Supreme Court's decision—focusing, in particular, on distinguishing what we call *Samantar* issues from non-*Samantar* issues, the effect of a State Department suggestion of immunity, and the effect of State Department silence with respect to a foreign official's claim of immunity.

## I. THE WORLD BEFORE *SAMANTAR*

As almost every American international lawyer knows, the world before the Foreign Sovereign Immunities Act was one in which the U.S. Executive Branch was long considered the appropriate body to determine official immunity by providing courts with so-called suggestions of immunity. The State Department's practice regarding foreign official immunity grew out of its historical practice regarding foreign sovereign immunity. The 1812 decision in *The Schooner Exchange v. McFaddon* set out the early framework for foreign sovereign immunity, whereby wrongs perpetrated by foreign sovereigns were recognized as appropriate "for diplomatic, rather than legal," resolution.[3] Due to the potentially significant foreign policy consequences of subjecting another sovereign state to suit in our courts, the courts looked to the "political branch of the government charged with the conduct of foreign affairs" to decide whether immunity should be recognized.[4]

Traditionally, the State Department provided the judiciary with suggestions of immunity, based upon the Department's judgments regarding customary international law and reciprocal practice.[5] Before 1952, the State Department followed a theory of absolute foreign sovereign immunity for friendly sovereigns. Under that doctrine, "a sovereign cannot, without [its] consent, be made a respondent in the courts of another sovereign" regardless of the nature of the acts alleged to have been committed.[6] The Department

---

2. 28 U.S.C. §§ 1330, 1602–1611 (2006).
3. 11 U.S. (7 Cranch) 116, 137, 146 (1812).
4. Republic of Mexico v. Hoffman, 324 U.S. 30, 34 (1945).
5. *See* Verlinden B.V. v. Cent. Bank of Nigeria, 461 U.S. 480, 487 (1983).
6. Permanent Mission of India to the United Nations v. City of New York, 551 U.S. 193, 199 (2007) (quoting Letter from Jack B. Tate, Acting Legal Adviser, Dep't of

would file "suggestions of immunity" with the court, invoking considerations of international law and international comity to request sovereign immunity in particular cases, and the U.S. courts generally gave absolute deference to those suggestions.[7] As the State Department's practice with regard to suggestions of immunity evolved over time, courts came to adopt a two-track process, under either track looking to State Department policy to see whether official immunity was appropriate. Under one track—which I will call the "suggestion" track—if the State Department offered a suggestion of immunity, the court would allow that immunity and dismiss the case. Under the second track—which I will call the "silence" track—if the State Department stayed silent in a case where a foreign official's immunity was at issue, the court would decide on its own "whether all the requisites for such immunity existed," considering "whether the ground of immunity is one which it is the established policy of [the State Department] to recognize."[8]

In 1952, Acting Legal Adviser of the State Department, Jack Tate,[9] sent a famous letter to the Acting Attorney General that became known as the "Tate Letter."[10] The Tate Letter announced the United States' adherence to the "restrictive theory" of sovereign immunity, which extended immunity to a foreign state for its public acts, but not for its commercial acts. Tate pointed out that the "widespread and increasing practice on the part of governments of engaging in commercial activities makes necessary a practice which will enable persons doing business with them to have their rights determined in the courts" and that this shift away from absolute immunity was consistent with the practices of other countries.[11] The Tate Letter marked a tectonic shift in immunity theory, inasmuch as it recognized that the commercial revolution, in which virtually all foreign states had become involved, had caused their entry into the global marketplace in a way that required a move away from an

---

State, to Philip B. Perlman, Acting Att'y Gen. (May 19, 1952) [hereinafter Tate Letter], *reprinted in* 26 DEP'T ST. BULL. 984 (1952)).

7.    Samantar v. Yousuf, 130 S. Ct. 2278, 2285 (2010); RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES ch. 5, intro. note (1987).

8.    *Samantar*, 130 S. Ct. at 2284 (quoting *Hoffman*, 324 U.S. at 36 and *Ex parte* Republic of Peru 318 U.S. 578, 587 (1943)).

9.    For the historical record, let me note with pride my own passing connection with the great Jack Tate, and the opposite paths that we took to arrive here in Tennessee. I was lucky enough to serve as Dean of Yale Law School, to become the Legal Adviser in 2009, and to come here to Tennessee for this keynote lecture. Jack Tate took the inverse path. Born in Bolivar, Tennessee, in 1902, he graduated from the University of Tennessee at Knoxville in 1924. After his historic service as Acting Legal Adviser, he moved to New Haven, Connecticut, where he served for many years as the beloved Deputy Dean of Yale Law School. There, he showed great kindness to my whole family, and his wonderful wife Elizabeth became my older sister's revered high school English teacher!

10.    Tate Letter, *supra* note 6, at 984–85.

11.    *Id.* at 985.

unyielding doctrine of absolute foreign sovereign immunity toward a more nuanced doctrine of restrictive foreign sovereign immunity by executive suggestion.

After 1952, the State Department relied upon the restrictive theory to inform any suggestions of immunity it provided to courts, whether with respect to foreign sovereigns, agencies or instrumentalities, or foreign officials, and courts largely continued to defer to the Department's case-by-case suggestions.[12] During the next quarter century, the State Department rendered only four reported determinations with respect to immunity, in the absence of an applicable treaty or statute, in suits against individual foreign officials who were not heads of state.[13]

In several respects, the practice of executive suggestions of immunity with respect to foreign states was flawed. First, as several Legal Advisers acknowledged, the informality of the State Department's internal procedures did not provide the sort of process that sovereign states believed was due.[14] Second, critics charged that

---

12.    *See* Curtis A. Bradley & Laurence R. Helfer, *International Law and the U.S. Common Law of Foreign Official Immunity*, 2010 SUP. CT. REV. 213, 219–20.

13.    *See generally* Sovereign Immunity Decisions of the Department of State, May 1952 to January 1977, 1977 DIGEST, at 1017 [hereinafter Sovereign Immunity Decisions]. In 1960, after the State Department recognized immunity, the court dismissed a suit against a Canadian consular officer who was sued for making statements to induce the plaintiff to move to Canada, on the ground that "[a] consular official is immune from suit when the acts complained of were performed in the course of his official duties." Waltier v. Thomson, 189 F. Supp. 319, 320 (S.D.N.Y. 1960). In an unpublished 1968 civil rights suit against a Jamaican labor organization and its liaison officer, Cole v. Heidtman (S.D.N.Y. 1968), the State Department denied immunity for the labor organization and the officer on the ground that the activities were of a private nature, under the Tate Letter. *See* Sovereign Immunity Decisions, *supra*, at 1062–63. In two other cases—*Semonian v. Crosbie*, Civil Action No. 74-4893-T (D. Mass. 1974), and *Greenspan v. Crosbie*, No. 74 Civ. 4734 (GLG), 1976 WL 841 (S.D.N.Y. Nov. 23, 1976)—the State Department suggested immunity for officials of the Province of Newfoundland sued by shareholders of a Canadian corporation regarding a timber sales agreement, noting that "although it is alleged that the defendant officials . . . acted in excess of their authority, it is not alleged that these officials acted other than in their official capacities and on behalf of the Province . . . ." Sovereign Immunity Decisions, *supra*, at 1076.

14.    Critics charged that rules of evidence were not observed; that there was no full presentation of competing arguments, no particular time period within which the Department had to make a decision, and no right to review State Department documents which provided the basis or the reasons for its final determination; and that plaintiffs were not always notified of the Department's decision whether or not to file. *See, e.g., Hearings on H.R. 11315 Before the Subcomm. on Admin. Law and Governmental Relations of the H. Comm. on the Judiciary*, 94th Cong. 94 (1976) [hereinafter *Hearings on H.R. 11315*] (testimony of Michael Cardozo). In 1973, then-Acting Legal Adviser Charles Brower described the process as a "reasonably informal" "internal procedure which permits the litigants and the interested parties involved to have a hearing within the Department and they present written statements, sometimes come in and present oral statements . . . heard in the Department. Once the decision is made on the basis of the hearing . . . there is no judicial recourse from it." *Immunities of Foreign States: Hearing on H.R. 3493 Before the Subcomm. on Claims*

the State Department did not always follow the Tate Letter criteria, leading to inconsistent results under the State Department process.[15] Third, the process arguably brought too much political pressure to bear on the State Department, which was incessantly lobbied by foreign states to support immunity requests.[16] Yet despite these criticisms, the Department found it useful to retain flexibility to take foreign relations concerns into account on a case-by-case basis.

Partly in response to these critiques, in 1976, with State Department support, Congress passed the Foreign Sovereign Immunities Act (FSIA), which codified the standards for foreign state immunity and "transferred primary responsibility for immunity determinations to the Judicial Branch."[17] From the beginning, the Executive Branch saw the FSIA, by its terms, as applying only to foreign states, not to foreign officials,[18] and continued to assert that State Department immunity determinations were required in cases involving foreign officials. The courts divided on this issue.[19] In 1992, Congress legislated in the area of human rights litigation by enacting the Torture Victim Protection Act (TVPA), which does not expressly

---

and Governmental Relations of the H. Comm. on the Judiciary, 93d Cong. 27 (1973) (statement of Charles Brower, Legal Adviser, Dep't of State). In 1976, Legal Adviser Monroe Leigh acknowledged: "We in the Department of State and Legal Adviser's office do not have the means of really conducting a quasi-judicial hearing to determine whether, as a matter of international law, immunity should be granted in a given case. Among other things, we don't have the power to compel testimony or to take testimony under oath or any of the normal indicia of a true judicial hearing. So we are not in a position really to conduct the kind of inquiry that ought to be conducted to determine whether it's a proper case for allowing sovereign immunity to be applied." Hearings on H.R. 11315, supra, at 34 (testimony of Monroe Leigh, Legal Adviser, Dep't of State).

15.   See, e.g., Hearings on H.R. 11315, supra note 14, at 58 (testimony of Peter Trooboff, Att'y) ("The current practice has caused inequitable results for private litigants as a result of departmental suggestions of immunity in commercial cases."); see also Bradley & Helfer, supra note 12, at 220 ("[I]n some cases a foreign state would seek an immunity determination from the State Department and in other cases the state would ask the court to make its own determination. The result was that 'sovereign immunity determinations were made in two different branches, subject to a variety of factors, sometimes including diplomatic considerations.' Perhaps not surprisingly, this regime did not always produce consistent decisions." (footnotes omitted)).

16.   See, e.g., Andreas F. Lowenfeld, Litigating a Sovereign Immunity Claim—The Haiti Case, 49 N.Y.U. L. Rev. 377, 390 (1974).

17.   Republic of Austria v. Altmann, 541 U.S. 677, 691 (2004).

18.   See Chuidian v. Philippine Nat'l Bank, 912 F.2d 1095, 1100–01 (9th Cir 1990) (discussing the U.S. position).

19.   Compare Samantar v. Yousuf, 552 F.3d 371, 381 (4th Cir. 2009) (holding the FSIA does not govern the immunity of individual foreign officials), aff'd, 130 S. Ct. 2278 (2010), and Enahoro v. Abubakar, 408 F.3d 877, 881–82 (7th Cir. 2005) (same), with In re Terrorist Attacks on Sept. 11, 2001, 538 F.3d 71, 81 (2d Cir. 2009) (holding that the FSIA governs individual official immunity), and Keller v. Cent. Bank of Nigeria, 277 F.3d 811, 815–16 (6th Cir. 2002) (same), and Byrd v. Corporación Forestal y Industrial de Olancho, S.A., 182 F.3d 380, 388–89 (5th Cir. 1999) (same), and El-Fadl v. Cent. Bank of Jordan, 75 F.3d 668, 671 (D.C. Cir. 1996) (same), and Chuidian, 912 F.2d 1095 (9th Cir. 1990) (same).

speak to immunity, but creates a cause of action for damages against individuals who, "under actual or apparent authority, or color of law, of any foreign nation," commit acts of torture or "extrajudicial killing."[20]

## II. SAMANTAR AND ITS IMPLICATIONS

In 2010, in *Samantar v. Yousuf*, the Supreme Court accepted the U.S. Government's position that the FSIA does not govern immunity for foreign officials sued in their personal capacity. Defendant Mohamed Ali Samantar had served as First Vice President, Prime Minister, and Minister of Defense of Somalia under the Siad Barre regime in the 1980s, before fleeing to the United States. Somali plaintiffs, who included naturalized U.S. citizens, brought suit against Samantar under the TVPA and the Alien Tort Claims Act (ATCA) in federal court in Virginia, alleging his command responsibility for terrorizing the civilian population of Somalia with widespread and systematic use of torture, arbitrary detention, and extrajudicial killing. Although the United States had recognized the Barre regime, the United States has not recognized any government since its fall. The U.S. Government declined to participate in the litigation before either the district court or the Fourth Circuit.

After the district court dismissed, the U.S. Court of Appeals for the Fourth Circuit reversed, concluding—consistent with the U.S. Government's longstanding view—that the FSIA applies only to foreign states and not to foreign officials, and remanded the case to the district court for consideration of what immunity, if any, should apply in these circumstances. The Supreme Court unanimously affirmed, clarifying that, as we had said, the Foreign Sovereign Immunities Act does not govern the immunity of foreign officials. The Court held that the FSIA applies only to states, not individual officials. The decision turned on statutory construction; the Court held that the clear language of the statute, coupled with its legislative history, indicated that Congress did not intend to include foreign officials.[21] The Court emphasized that the trial court could consider on remand whether Samantar might be entitled to common

---

20. Torture Victim Protection Act of 1991, Pub. L. No. 102-256, 106 Stat. 73 (1992) (codified at U.S.C. § 1350(a) note (2006)).

21. "Reading the FSIA as a whole," Justice Stevens wrote for the Court, "there is nothing to suggest we should read 'foreign state' in [the statute] to include an official acting on behalf of the foreign state, and much to indicate that this meaning was not what Congress enacted." Samantar v. Yousuf, 130 S. Ct. 2278, 2289 (2010). Nor, the Court concluded, did the background, purposes, and legislative history of the FSIA indicate that Congress had attempted to codify the common law doctrine of foreign official immunity in a statute designed to codify the common law governing foreign *state* sovereign immunity. *See id.* at 2289–90.

law immunities, but declined to offer guidance as to the scope of these immunities.

What are the implications of the *Samantar* decision? Obviously, we in the U.S. Government believe that *Samantar* was correctly decided. The decision was consistent with the longstanding executive branch view that the text, structure, and legislative history of the FSIA demonstrate that Congress did not intend the FSIA to govern individual officials' immunity. As a practical matter, based on historical experience, unless Congress passes legislation to govern official immunity, as it did with respect to foreign state immunity in the FSIA, we expect courts will again look to the State Department for authoritative guidance as to whether a foreign official enjoys immunity.

Before the enactment of the FSIA, courts recognized foreign official immunity in a variety of contexts. As in suits against foreign states, the courts traditionally deferred to the State Department's judgment whether an official should be accorded immunity in a given case,[22] and in cases where the State Department was silent, courts applied the principles articulated by the Department.[23] Thus, if courts follow historical practice, they will again request the State Department's "determinations regarding immunity" to decide whether or not to grant immunity to individuals for actions taken as foreign officials. When the Department is silent, courts may apply State Department principles to determine whether or not immunity is warranted.

Some commentators have already suggested that *Samantar*'s deference to State Department immunity determinations marks an unfortunate return to the "bad old days" of executive suggestion.[24] But we at the State Department are more optimistic. In general, we consider it a good idea for courts in such cases to seek executive guidance, for the simple reason that institutionally, the State Department is best situated to establish the initial framework for making decisions regarding foreign official immunity, and best-positioned in the long run to consider the remedial, substantive, and prudential concerns raised by suits against foreign officials.

After all, there is nothing new about the State Department making recommendations to courts regarding the immunity of individuals. To the contrary, the Department has been making such recommendations all along in numerous other litigation contexts. Even after the enactment of the FSIA in 1976, the Department's

---

22.  *See, e.g.*, Greenspan v. Crosbie, No. 74 Civ. 4734 (GLG), 1976 WL 841, at *1–2 (S.D.N.Y. Nov. 23, 1976); Waltier v. Thomson, 189 F. Supp. 319, 320–21 (S.D.N.Y. 1960).

23.  *See* Heaney v. Gov't of Spain, 445 F.2d 501, 504, 506 (2d Cir. 1971).

24.  *See, e.g.*, Ingrid Wuerth, *Foreign Official Immunity Determinations in U.S. Courts: The Case Against the State Department*, 51 Va. J. Int'l. 915, 917 (2011).

practice of suggesting *rationae personae* (or status-based) immunities continued undisturbed. For example, we have regularly provided guidance in cases regarding the immunity of heads of state,[25] the immunity of foreign officials on "special missions" for their governments,[26] and the immunity of diplomats in cases brought against them by their former domestic servants.[27] It is precisely because these determinations of individual immunity involve such a complex set of factors that courts have long trusted the State Department to play the lead role. Indeed, the U.S. Government's Supreme Court amicus brief in *Samantar*—signed, *inter alia*, by then-Solicitor General Elena Kagan and myself—argued that:

> The conclusion that the FSIA does not govern foreign official immunity is reinforced by the number of complexities that could attend the immunity determination in this and other cases—complexities that could not be accommodated under the rigid and ill-fitting statutory regime of the FSIA. Even in an ordinary case, in considering whether to recognize immunity of a foreign official under the generally applicable principles of immunity discussed above, the Executive might find it appropriate to take into account issues of reciprocity, customary international law and state practice, the immunity of the state itself, and, when appropriate, domestic precedents. But in this case, the Executive may also find the nature of the acts alleged—and whether they should properly be regarded as actions in an official capacity—to be relevant to the immunity determination.[28]

We argued, in effect, that determinations of official immunity are derivative of, but not identical to, determinations of state immunity. Even within foreign governments, individuals may change roles, and the immunity to which they are entitled may change as they do.

---

25.    *See, e.g.*, Wei Ye v. Jiang Zemin, 383 F.3d 620 (7th Cir. 2004).
26.    *See, e.g.*, Li Weixum v. Bo Xilai, 568 F. Supp. 2d 35 (D.D.C. 2008).
27.    *See, e.g.*, Baoanan v. Baja, 627 F. Supp. 2d 155 (S.D.N.Y. 2009).
28.    Brief for the United States as Amicus Curiae Supporting Affirmance at 24–25, Samantar v. Yousuf, 130 S. Ct. 2278 (2010) (No. 08-1555) [hereinafter United States Samantar Brief]. Elsewhere, the U.S. brief similarly noted:

> Th[e conclusion that] foreign officials' immunity continues to be governed by the generally applicable principles of immunity articulated by the Executive Branch . . . derives additional support from the complexity of certain official immunity determinations, which could not be accommodated under the rigid statutory framework of the FSIA. In this case, for example, the Executive reasonably could find it appropriate to take into account petitioner's residence in the United States rather than Somalia, the nature of the acts alleged, respondents' invocation of the statutory right of action in the TVPA against torture and extrajudicial killing, and the lack of any recognized government of Somalia that could opine on whether petitioner's alleged actions were taken in an official capacity or that could decide whether to waive any immunity that petitioner otherwise might enjoy. It is unlikely that Congress, in enacting the FSIA, intended to divest the Executive of the ability to evaluate complex considerations like these in deciding whether to recognize a foreign official's immunity.

*Id.* at 7–8.

Determining the degree of individual immunity to which current and former foreign officials may be entitled for their various acts while in office is a complex legal determination that entails a careful weighing of factors that the State Department is in the best position to perform.

In sum, the Court's *Samantar* decision clarified a number of issues, while leaving others to be determined. First, *Samantar* makes clear that the immunity of individual foreign officials derives from federal common law standards, not from the statutory standards of the FSIA. Accordingly, Samantar's own case was remanded so that the trial court could consider what common law immunities might be available to that former official.[29] Second, historically, and now once again, courts must look to the State Department to suggest principles governing the immunities of foreign officials. Third, as our amicus brief in *Samantar* indicated, in making this determination, application of a highly rigid framework is not appropriate, given the flexibility we need to consider complex case-specific issues relying on a non-exhaustive range of factors.

## III. The Emerging Post-*Samantar* Process

After the Supreme Court's ruling, we in the State Department's Legal Adviser's Office have begun establishing a new process for making determinations regarding the immunity of foreign officials after *Samantar*. This "New *Samantar* Process," we believe, will be an improvement over the pre-FSIA process, which we have carefully analyzed in an effort to avoid repeating old mistakes. Although some question whether the State Department should be making these decisions,[30] we believe that the Department is better equipped today than it was when it lacked the necessary resources to appropriately evaluate such immunity issues in all cases. The *Samantar* Court

---

29. On remand, the State Department determined that Samantar was not entitled to immunity, and the district court accepted that determination. At this writing, the case is on appeal to the Fourth Circuit, where the United States has filed an amicus brief. For further discussion of these subsequent developments, see *infra* notes 39–40 and accompanying text.

30. *See, e.g.*, Wuerth, *supra* note 24. In his submission to this Symposium and elsewhere, my predecessor John Bellinger suggests that we should consider ourselves "the dog who caught the car," because of the "enormous burden" he fears will be visited on the Legal Adviser's Office by the task of making *Samantar* determinations. *See, e.g.*, John Bellinger III, *Ruling Burdens State Dept.*, 32 Nat'l L.J., June 28, 2010, at 47 ("The Obama administration will now be buffeted by competing demands from foreign governments for protection for their officials and from human rights advocates for accountability for human rights abusers."); John Bellinger III, *The Dog that Caught the Car: Observations on the Past, Present, and Future Approaches of the Office of the Legal Adviser to Official Acts Immunities*, 44 Vand. J. Transnat'l L. 819 (2011). But up to this point, although there has been an uptick in immunity requests after *Samantar*, we have found this workload entirely manageable.

made clear that it found "no reason to believe that Congress saw as a problem, or wanted to eliminate, the State Department's role in determinations regarding individual official immunity."[31] As the Court observed, before the FSIA was enacted, when the State Department suggested that a foreign sovereign defendant was immune from suit, courts surrendered jurisdiction over a case.[32] Or, as the Second Circuit put it, "once the State Department has ruled in a matter of this nature, the judiciary will not interfere."[33] These judicial rulings recognize that the State Department, in consultation with others in the Executive Branch, remains best positioned to consider the policy, remedial, substantive, and prudential concerns raised by suits against officials, for at least four reasons.

First, the Department remains the Executive Branch's acknowledged expert on international law and the immunities that flow from it.[34] There are roughly 180 lawyers in my office whose specialty is the interpretation, application, and development of international law. The Legal Adviser's Office has unrivaled knowledge of treaties, conventions, and international instruments of all stripes. We participate in the negotiating process at every level on every multilateral agreement, and we are likewise intimately involved with the study, interpretation, and formation of customary international law. We also follow closely what other countries do with respect to their domestic law, and how they evaluate international law. Given our expertise in this area, we are best situated to offer guidance on the content of evolving international law principles relevant to determining whether our federal common law of official immunity provides immunity in any given case.

Second, the State Department has longstanding, special expertise in this precise area. For decades, the Department has played the lead role in formulating and applying the relevant executive branch principles—informed by customary international law and practice—which recognize that both current and former officials of a foreign state usually enjoy common law immunity for acts undertaken in their official capacity.[35] The scope of immunity that individual foreign officials enjoy under traditional principles can be either broader or narrower than the immunity of the state itself.[36]

---

31.  *Samantar*, 130 S. Ct. at 2291.

32.  *Id.* at 2285.

33.  Isbrandtsen Tankers, Inc. v. President of India, 446 F.2d 1198, 1201 (1971).

34.  *See* Verlinden B.V. v. Cent. Bank of Nigeria, 461 U.S. 480, 487 (1983).

35.  *See, e.g.*, Underhill v. Hernandez, 65 F. 577, 579–80 (2d Cir. 1895), *aff'd*, 168 U.S. 250 (1897).

36.  In some circumstances, the individual immunity will be narrower than state immunity. For example, a foreign state may be immune for any acts unless one of the FSIA's exceptions applies, whereas individual officials are usually immune only for acts taken in official capacity. Conversely, in other circumstances, individual immunity can be broader than foreign state immunity. The Executive Branch has on occasion suggested immunity for an individual official even when the state would lack immunity

Third, as the home of the Bureau of Democracy, Human Rights, and Labor (which I was honored to head during the Clinton Administration) and the author of the annual Country Reports on Human Rights Practices, the State Department remains the agency best situated to keep track of changes in international human rights practice and norms. In the same way that the law of foreign state immunity eventually took into account the global commercial revolution, official immunity law will need to take into account the human rights revolution. Just as the Tate Letter acknowledged an important watershed in state practice—the increasing entry of governments into international commercial markets—changes in international human rights norms, as reflected in treaties ratified by the United States, new U.S. statutes, and U.S. judicial doctrines, have given rise to new views about the boundaries of official action appropriately subject to immunity, and call for review of the standards governing personal accountability for gross human rights abuses.[37]

Fourth, the State Department is best situated to evaluate the foreign policy and reciprocal consequences of subjecting a foreign official to suit in U.S. courts.[38] In some settings, personal damage actions against foreign officials may unduly chill their performance of duties, trigger reciprocity concerns about the treatment of U.S. officials sued in foreign courts, and potentially interfere with the Executive Branch's conduct of foreign affairs. The Department daily grapples with the impact of litigation on foreign states, and is best positioned to distinguish "genuine" *Samantar* issues, which involve complex questions of official conduct, from distinct legal issues, such as pure status questions and procedural issues including personal jurisdiction, service of process, *forum non conveniens*, indispensible parties, and real parties in interest.

In our filing before the Eastern District of Virginia, we determined that Samantar was not immune from suit based on a number of factors, including the facts of the case in conjunction with "the applicable principles of customary international law."[39] We noted, among other things, that the defendant was a U.S. resident sued *inter alia* by a U.S. citizen, that he was a former official who

---

for the same conduct. *See* Greenspan v. Crosbie, No. 74 Civ. 4734 (GLG), 1976 WL 841, at *2 (S.D.N.Y Nov. 23, 1976) (official immunity for commercial activities).

37.   Current common law doctrine, statutes, treaties, and customary international law may impose obligations to hold accountable those who commit gross violations of human rights that did not exist when the Executive Branch and courts first addressed the immunity of foreign government officials.

38.   *See, e.g.*, Spacil v. Crowe, 489 F.2d 614, 619 (5th Cir. 1974) ("[T]he degree to which granting or denying a claim of immunity may be important to foreign policy is a question on which the judiciary is particularly ill-equipped to second-guess the executive. The executive's institutional resources and expertise in foreign affairs far outstrip those of the judiciary.").

39.   United States Samantar Brief, *supra* note 28, at 7.

would enjoy only residual immunity for acts taken in an official capacity, and that Somalia has no currently recognized government that could either assert or waive its immunity or assert that the relevant acts were taken in an official capacity. We also considered "the overall impact of this matter on the foreign policy of the United States," and ultimately determined that Samantar was not immune from suit. Soon thereafter, based on our determination of non-immunity, the district court rejected Samantar's motion to dismiss, and at this writing, the matter is on appeal before the Fourth Circuit.[40]

## A. *Five Tenets of Official Immunity Practice*

While it may be some time before the Executive Branch develops a full-fledged U.S. Government statement of official immunity principles—a definitive "Koh Letter," if you will, parallel to those principles found in the 1952 Tate Letter—it is not too early to discern at least five basic tenets that we will apply in our official immunity practice.

The first, as acknowledged by the Supreme Court in *Samantar* itself, is that when State Department determinations of immunity and non-immunity are made in particular cases, the courts should defer to those State Department determinations.[41] Such deference is due both to State Department determinations with respect to the

---

40. The United States has filed a brief as amicus curiae in the appeal, arguing that the district court correctly relied on the State Department's determination in denying the motion to dismiss. *See* Brief for the United States as Amicus Curiae Supporting Appellees, Yousuf v. Samantar, No. 11-1479 (4th Cir. Oct. 24, 2011).

In the related case of *Ahmed v. Magan*, at the request of District Judge Smith, the State Department recently determined that defendant Abdi Aden Magan was not entitled to immunity in a suit brought by a Somali plaintiff in the U.S. District Court for the Southern District of Ohio under the TVPA and ATCA for alleged responsibility for torture, cruel, inhuman or degrading treatment, and arbitrary detention. *See* Order, *Ahmed*, No. 2:10-cv-34 (S.D. Ohio Dec. 6, 2010); Statement of Interest of the United States at 1–2, 7, *Ahmed*, No. 2:10-cv-34 (S.D. Ohio Mar. 15, 2011) [hereinafter Magan Statement of Interest]. The U.S. Government's filing noted, *inter alia*, that: (1) Magan is a former, not sitting, official of a state with no current government formally recognized by the United States who generally would enjoy only residual immunity, unless waived, and even then only for acts that may properly be considered authorized by the foreign state; (2) plaintiff had alleged that while in office, Magan "directed and participated in the interrogation and torture of Plaintiff and other civilians perceived as opponents of the Barre regime"; and (3) Magan resides in the United States, and basic principles of sovereignty provide that a state generally has a right to exercise jurisdiction over its residents. *See* Magan Statement of Interest, *supra*.

41. *See* Samantar v. Yousuf, 130 S. Ct. 2278, 2291 (2010) ("[There is] no reason to believe that Congress [in passing the FSIA] saw as a problem, or wanted to eliminate, the State Department's role in determinations regarding individual official immunity."); *see also* Republic of Mexico v. Hoffman, 324 U.S. 30, 35 (1945) ("It is therefore not for the courts to deny an immunity which our government has seen fit to allow, or to allow an immunity on new grounds which the government has not seen fit to recognize." (footnote omitted)).

status of foreign officials and with respect to the character of the acts.[42]

A second conclusion that can be drawn from *Samantar* is that, absent a treaty or statute, general principles regarding immunity articulated by the State Department will govern foreign official immunity as a matter of federal common law.[43] Again, this is nothing new. For more than seventy years, both before and after the Tate Letter and enactment of the FSIA, the federal common law of immunity has given force not just to case-specific immunity determinations but also to principles of immunity articulated by the State Department.[44]

A third tenet is that the immunities of foreign officials belong to the foreign state—not to the officials personally—and thus, it has been historically recognized that those immunities may be waived by the foreign state.[45] States recognize special protections for officials where the balance of public interests requires even deserving claimants to find remedies outside of court systems. But it is also important to remember that official immunity does not extinguish liability; states and their officials may still bear responsibility for the underlying conduct, and the individuals themselves may be subject to suit, including criminal prosecution.[46] Just because an official may not be sued in a foreign court for an official act does not mean that the liability of the individual cannot be established elsewhere. Nor does it mean that the state's own responsibility cannot be addressed through some other mechanism, such as claims settlement or some other form of international remedy. Moreover, as a policy matter, because the U.S. Government is pressing for advancement of the rule of law internationally, this approach should lead in the longer term to reduced need for recourse to U.S. courts for injuries abroad, as more effective domestic remedies become available.

Fourth, in making official immunity determinations, the State Department will distinguish carefully between those immunities that

---

42.   *See, e.g.,* Isbrandtsen Tankers, Inc. v. President of India, 446 F.2d 1198, 1200 (2d Cir. 1971) (deferring to State Department determination that alleged conduct was "of a public, as opposed to a private/commercial nature").

43.   *See Samantar,* 130 S. Ct. at 2292–93. As an academic, I discussed federal common law rules governing foreign affairs in Harold Hongju Koh, *Is International Law Really State Law?,* 111 HARV. L. REV. 1824 (1998).

44.   *See, e.g., Hoffman,* 324 U.S. at 34–36; *Ex parte* Republic of Peru, 318 U.S. 578, 588–89 (1943); The Navemar, 303 U.S. 68, 74–75 (1938).

45.   *See* Statement of Interest of the United States ¶ 10, Yousuf v. Samantar, No. 1:04 CV 1360 (LMB) (E.D. Va. Feb. 14, 2011); Arrest Warrant of 11 April 2000 (Dem. Rep. Congo v. Belg.), 2002 I.C.J. 3, ¶ 61 (Feb. 14) (foreign officials "will cease to enjoy immunity from foreign jurisdiction if the State which they represent or have represented decides to waive that immunity").

46.   *See Arrest Warrant of 11 April 2000,* 2002 I.C.J. ¶ 61 ("[S]uch persons enjoy no criminal immunity under international law in their own countries, and may thus be tried by those countries' courts in accordance with the relevant rules of domestic law.").

are based on a person's *status* and those immunities that are based on a person's *claimed official acts*. As a number of articles in this Symposium have discussed,[47] there is a historical distinction between status immunities (immunities *ratione personae*)—i.e., immunities that apply to individual officials because of their current status, which are designed to protect their ability to carry out current functions (diplomatic, head of state, special missions)—and conduct immunities (immunities *ratione materiae)*, which derive from the nature of those individuals' conduct and protect centrally against inappropriate judicial oversight of foreign government conduct. Thus, certain foreign officials—such as sitting heads of state, diplomats, and members of qualifying special missions—are entitled to immunities by virtue of their status, during the time they hold that status. Thereafter, as former officials, they are entitled only to those conduct immunities that attach to challenged acts that can be deemed official in nature, which may depend upon the nature of their former office.[48] Obviously, whether an act may be considered "official" for conduct immunity purposes also depends upon on the nature of the act alleged.[49] A government official's legitimate authority has not generally been thought to encompass a right to commit "official acts" that violate both international and domestic law.[50]

---

47.     *See* David P. Stewart, *The Immunity of State Officials Under the UN Convention on Jurisdictional Immunities of States and Their Property*, 44 VAND. J. TRANAT'L L. 1047, 1056 (2011); *see also* Chimène I. Keitner, *Foreign Official Immunity After* Samantar, 44 VAND. J. TRANSNAT'L L. 837, 838 (2011); Lewis S. Yelin, *Head of State Immunity as Sole Executive Lawmaking*, 44 VAND. J. TRANSNAT'L L. 911, 921 (2011).

48.     A similar distinction between status and conduct immunities is found in the Vienna Convention on Diplomatic Relations (VCDR), Apr. 18, 1961, 23 U.S.T. 3227, 500 U.N.T.S. 95, and the Vienna Convention on Consular Relations, Apr. 18, 1961, 23 U.S.T 3227, 1 U.N.T.S. 16.

49.     The *Samantar* decision notes, for example, a difference "as a matter of common law principles" between immunity "for acts committed in official capacity" and acts "beyond the scope of official authority." *Samantar*, 130 S. Ct. at 2291 n.17; *see also* United States Samantar Brief*, supra* note 28, at 11 ("[T]he immunity of foreign officials arises from the official character of their acts."). Whether or not an act is "official" does not turn on whether the act is attributable to the state. Under international law, attribution to a state for purposes of state responsibility is a question distinct from the question of an individual's responsibility for that act. *Compare* Responsibility of States for Internationally Wrongful Acts, G.A. Res. 56/83, art. 7, U.N. Doc. A/RES/56/83 (Dec. 12, 2001) ("The conduct of an organ of a State or of a person or entity empowered to exercise elements of the governmental authority shall be considered an act of the State under international law if the organ, person or entity acts in that capacity, even if it exceeds its authority or contravenes instructions."), *with id.* art. 58 ("These articles are without prejudice to any question of the individual responsibility under international law of any person acting on behalf of a State.").

50.     Pre-*Samantar* case law treated acts in violation of international and domestic law as falling outside the scope of "official acts." *See, e.g.*, Enaharo v. Abubakar, 408 F.3d 877, 893 (7th Cir. 2005) (noting that "officials receive no immunity for acts that violate international *jus cogens* human rights norms (which by definition are not legally authorized acts)"); Hilao v. Estate of Marcos, 25 F.3d 1467, 1472 (9th

Fifth, and crucially, not every issue involving a foreign official will raise a *Samantar* issue that goes to the defendant's *substantive immunity* from suit. Even after *Samantar*, we expect that many cases can be disposed of, instead, based upon what we call "non-*Samantar* issues," which broadly depend upon the defendant's status immunities or various procedural considerations.

### B. Non-Samantar Status Issues

As already noted, State Department determinations of status immunity are nothing new—we have been making such recommendations throughout the FSIA era, and they will continue as before. These include, for example, cases involving claims of head of state immunity, immunity for diplomatic agents, and special missions immunity. Technically speaking, these are not pure "*Samantar*" cases, which require a fuller assessment of a foreign official's conduct as well as his or her status.

Cases disposed of purely on status grounds fall into four broad categories. First, with respect to *sitting heads of state*, over the past several decades, the Executive Branch has retained its traditional pre-FSIA authority to suggest immunity from suit. A number of courts have held that a suggestion of immunity by the Executive Branch on behalf of a sitting head of state is binding upon the federal courts and must be accepted as conclusive.[51] Those same immunities have not been routinely extended to former heads of state,[52] although some courts have acknowledged that former heads of state enjoy certain immunities based on a combination of their past status and conduct.[53]

---

Cir.1994) (noting that Marcos's "acts of torture, execution, and disappearance were clearly acts outside of his authority as President"); *see also* Torture Victim Protection Act of 1991, S. Rep. No. 102-249, at 8 (1991) ("[B]ecause no state officially condones torture or extrajudicial killings, few such acts, if any, would fall under the rubric of 'official actions' taken in the course of an official's duties.").

51.     *See, e.g.*, Wei Ye v. Jiang Zemin, 383 F.3d 620, 628 (7th Cir. 2004).

52.     *See* Arrest Warrant of 11 April 2000 (Dem. Rep. Congo v. Belg.), 2002 I.C.J. 3, ¶ 61 (Feb. 14) ("[A]fter a person ceases to hold the office of [head of state], he or she will no longer enjoy all of the immunities accorded by international law in other States.").

53.     Recently, for example, Judge Bates of the U.S. District Court for the District of Columbia ruled that former Colombian President Alvaro Uribe enjoys residual immunity from being forced to testify as a witness in a TVPA/ATCA suit against Drummond Company. Balcero Giraldo v. Drummond Co., No. 1:10-mc-00764 (JDB), 2011 WL 3926372, at *4 (D.D.C. Sept. 8, 2011). Uribe had been served with a subpoena by a Georgetown University law student while teaching at Georgetown. In response to a request from Judge Bates, we filed a pleading stating that the former President "enjoys residual immunity from this Court's jurisdiction insofar as Plaintiffs seek information (i) relating to acts taken in his official capacity as a government official; or (ii) obtained in his official capacity as a government official." Statement of Interest and Suggestion of Immunity of and by the United States at 1, Balcero Giraldo v. Drummond Co., No. 1:10-mc-00764 (JDB) (D.D.C. Sept. 8, 2011).

Second, in cases brought against sitting *diplomats and consular officials*, the Executive Branch has filed indications of diplomatic and consular immunity where appropriate under the relevant Vienna Conventions.[54]

Third, the U.S. Government has also expressed its view as a host country regarding *residual diplomatic immunity* in several lawsuits brought by domestic servants against their diplomatic employers following the completion of the diplomat's official service.[55] Under the Vienna Convention on Diplomatic Relations, during the period of a diplomatic agent's accreditation the agent enjoys near absolute immunity from civil jurisdiction.[56] Because the purpose of such diplomatic immunity is not to benefit individuals, but to ensure the efficient performance of diplomatic missions in representing States, once an individual ceases to be a diplomatic agent in a receiving state, the scope of that individual's immunity is limited to that set forth in Article 39(2), which provides:

> When the functions of a person enjoying privileges and immunities have come to an end, such privileges and immunity shall normally cease at the moment when he leaves the country, or on expiry of a reasonable period of time in which to do so, but shall subsist until that time, even in case of armed conflict. However, with respect to acts performed by such a person in the exercise of his functions as a member of the mission, immunity shall continue to subsist.[57]

---

54.     *See, e.g.*, Sabbithi v. Al Saleh, 605 F. Supp. 2d 122 (D.D.C. 2009); *see also* Montuya v. Chedid, 779 F. Supp. 2d 60 (D.D.C. 2011).

55.     In *Baoanan v. Baja*, 627 F. Supp. 2d 155 (S.D.N.Y. 2009), for example, a former domestic servant sued her former employers, including the former Permanent Representative of the Philippines to the United Nations, for alleged violations of various laws against forced labor, human trafficking, and involuntary servitude. The State Department advised the court to consider whether the former diplomat's employment of the plaintiff was an "official act" carried out as a member of the mission such that he might enjoy residual immunity under Article 39(2) of the Vienna Convention on Diplomatic Relations, *supra* note 48. *See* Statement of Interest of the United States at 4–10, *Baoanan*, 627 F. Supp. 2d 155 (S.D.N.Y. 2009) (No. 08 Civ. 5692 (VM)) [hereinafter Baoanan Statement of Interest]. The court adopted our proposed approach and determined that the employment of the plaintiff was a private act, and therefore the former diplomat had no residual immunity under the VCDR. *Baoanan*, 627 F. Supp. 2d at 169–70. Similarly, in *Swarna v. Al-Awadi*, 622 F.3d 123 (2d Cir. 2010), a former domestic servant filed suit against a Kuwaiti diplomat, his wife, and the State of Kuwait, claiming violations of the ATCA and New York state labor law based on alleged slavery and slavery-like practices. The district court determined that the acts alleged by the former domestic servant in her case were private and non-official in nature, such that the former diplomats were not shielded by residual immunity. In our statement of interest filed on appeal to the Second Circuit, we reiterated our longstanding position that a former diplomat enjoys residual immunity under the VCDR, customary international law, and state practice only for those acts performed in exercise of his or her diplomatic functions. Statement of Interest of the United States at 14–15, Swarna v. Al-Awadi, 622 F.3d 123 (2d Cir. 2010) (No. 9-2525-cv (L)).

56.     *See* Vienna Convention on Diplomatic Relations, *supra* note 48, art. 31.

57.     *Id.* art. 39(2).

A former diplomat thus enjoys residual immunity only for those official acts that were performed in the exercise of his or her functions as a member of the mission.[58]

Fourth, at appropriate times we have acknowledged *special missions immunity*.[59] This is a durationally limited status immunity established in international law that applies to diplomatic missions that are temporary and transient, rather than permanent, in nature. It would, for example, extend limited immunity to a sitting high-level foreign official who visits the United States on diplomatic business at the invitation of the U.S. Government, but only for such time as the person is present in the United States on the official visit, and for the limited function of facilitating high-level contacts between governments. The United States has recognized special missions immunity several times to provide foreign officials with immunity from personal service of process while on the diplomatic mission.[60] This form of immunity does not address the official's underlying immunity from suit based on the nature of his or her conduct, and the State Department's role in ascertaining and asserting it rests upon the President's constitutional authority over foreign affairs, including the enumerated power to receive ambassadors and public ministers.

---

58.     *See* Baoanan Statement of Interest, *supra* note 55, at 5. As explained by a leading diplomatic law expert, residual immunity is limited to official acts because such acts "are in law the acts of the sending State. It has therefore always been the case that the diplomat cannot be sued in respect of such acts since this would be indirectly to implead the sending State." Eileen Denza, Diplomatic Law: Commentary on the Vienna Convention on Diplomatic Relations 439 (3d ed. 2008).

59.     In the Minister Bo case, practitioners of the Falun Gong spiritual movement sued the sitting Chinese Minister of Commerce for actions he allegedly took in a prior governmental post, and purported to serve Minister Bo while he was in Washington, D.C. on a special diplomatic mission. Li Weixum v. Bo Xilai, 568 F. Supp. 2d 35, 36 (D.D.C. 2008). After the federal district court solicited the views of the State Department, we filed a suggestion of immunity and statement of interest, asking the court to find that Minister Bo, as a member of a special diplomatic mission, was immune from service of process and therefore not subject to the court's jurisdiction. Suggestion of Immunity and Statement of Interest at 4, *Li Weixum*, 568 F. Supp. 2d 35 (D.D.C. 2008) (Civ. No. 04-0649 (RJL)). The district court agreed, and noted that the Executive's authority to assert such immunity (for senior ministers who are part of a special diplomatic mission) derives from customary international law and the President's powers to conduct foreign affairs and receive foreign ministers. *See Li Weixum*, 568 F. Supp. 2d at 37–38 (quoting Restatement (Third) of the Foreign Relations Law of the United States § 464, cmt. i ("High officials of a foreign state and their staffs on an official visit or in transit . . . enjoy immunities like those of diplomatic agents when the effect of exercising jurisdiction against the individual would be to violate the immunity of the foreign state.")).

60.     *See, e.g., Baoanan*, 627 F. Supp. 2d 155.

### C. *Non-*Samantar *Procedural Issues*

The foregoing "non-*Samantar* status cases" should not be confused with what I call "non-*Samantar* procedural cases," in which the issue of foreign official immunity is not squarely presented because of a threshold flaw such as lack of personal jurisdiction, improper service of process, *forum non conveniens*, the absence of necessary parties, or because the official is not the real party in interest (i.e., in reality is being sued in her official capacity). The *Samantar* Court took care to say that where the foreign state is the *real party in interest*, the case should be treated as one against the state itself, with the result that it would be governed by the FSIA and the common law issue of foreign official immunity would not arise.[61] In *Samantar*, by contrast, Somalia was neither a necessary party nor a real party in interest, and the Court noted that the suit against Samantar was being brought against a former foreign official in his personal capacity.[62]

Relatedly, where the foreign state is a *necessary* party, the case may not be able to proceed in its absence. In *Republic of the Philippines v. Pimentel*,[63] for example, the Supreme Court recently indicated that a civil lawsuit should generally be dismissed under Federal Rule of Civil Procedure 19 when it may prejudice an absent sovereign, observing that "where sovereign immunity is asserted, and the claims of the sovereign are not frivolous, dismissal of the action must be ordered where there is a potential for injury to the interests of the absent sovereign."

Some cases may be dismissed even before reaching the merits under other sections of the Federal Rules, such as Rule 12(b)(3) and its requirement of proper venue. In making immunity determinations, it is well-recognized that the State Department may consider such factors as the connections of the parties and the case to the United States and the availability of other fora.[64] And the Supreme Court has held, in *Sinochem International Co. v. Malaysia*

---

61.     Samantar v. Yousuf, 130 S. Ct. 2278, 2292 (2010).
62.     *Id.*
63.     553 U.S. 851, 867 (2008).
64.     Basic principles of sovereignty provide that a state has the right to exercise jurisdiction over persons in its own territory and its permanent inhabitants. *See* The Schooner Exchange v. McFaddon, 11 U.S. (7 Cranch) 116, 136 (1812) ("The jurisdiction of the nation within its own territory is necessarily exclusive and absolute."). Thus, foreign sovereign immunity is not a principle of universal immunity, but rather a principle that, when it applies, reserves for the official's own state the authority to establish jurisdiction and seek accountability for official misconduct. *See* Arrest Warrant of 11 April 2000 (Dem. Rep. Congo v. Belg.), 2002 I.C.J. 3, ¶ 61 (Feb. 14) (foreign officials "enjoy no criminal immunity under international law in their own countries, and may thus be tried by those countries' courts in accordance with the relevant rules of domestic law").

*International Shipping Corp.*,[65] that although a federal court generally may not rule on the merits of a case without first determining that it has jurisdiction over the matter (subject-matter jurisdiction) and the parties (personal jurisdiction), a federal court can presume, rather than dispositively decide, its jurisdiction before dismissing under the doctrine of *forum non conveniens*. Thus, even if uncertainty exists about the ultimate scope of a defendant's immunity, a federal court may independently review the availability of other fora and dismiss a case at the outset under the doctrine of *forum non conveniens*.[66]

Alternatively, a case that involves inappropriate service against a foreign official or his or her diplomatic mission may be dismissed under Rule 12(b)(5), for insufficient service of process. Thus, for example, if a plaintiff attempts to serve an individual who enjoys personal inviolability and cannot be effectively served in the United States, the court should dismiss even before reaching the issue of the defendant's immunity because the process itself has not yet properly reached the defendant.[67]

### D. *The Sound of Silence*

At this writing, we are in the early days of the New *Samantar* Process. As noted above, some of the overarching criticisms of the pre-FSIA executive suggestions of immunity were a perception of insufficient process, inconsistent results, and concern about too much political pressure being brought to bear on the State Department. We hope our new post-*Samantar* process will cure those problems and represent a more modern, reliable approach.

To accomplish the complex task of separating *Samantar* from non-*Samantar* issues and unraveling fact-based questions involving procedural issues and the status of parties, the Office of the Legal Adviser, at the Secretary of State's request, has developed a process whereby, after careful initial review of the matter, we solicit information from attorneys on both sides of a *Samantar* case. While we do not invite litigants to participate in a formal adversarial process with rigid administrative procedures, we do offer to meet with counsel on both sides, ask them to provide factual information and make their arguments as to whether or not official immunity should apply, and invite counsel to contribute written materials. If we believe a true *Samantar* issue is at stake, we will ask both sides to answer a standard list of questions regarding the various factual issues that might be relevant to such a determination. We have applied this flexible approach because cases differ considerably in

---

    65.    549 U.S. 422 (2007).
    66.    *See id.* at 429–35; Piper Aircraft Co. v. Reyno, 454 U.S. 235, 247 (1981).
    67.    *See* Tachiona v. United States, 386 F.3d 205, 221–24 (2d Cir. 2004).

complexity, in the degree to which Department officials are already familiar with the issues and the legal doctrines, and in the resources of the parties. The lawyers in my office who handle these issues, particularly from the Office of Diplomatic Law and Litigation, have extensive familiarity with the international practice and domestic law precedents, often more than a private counsel taking his or her first case involving international law.

Sometimes, and notably, the State Department will make a conscious decision *not* to speak at the end of this process. We have long noted that the U.S. Government need not and should not speak in every case. As Justice Harlan observed in the *Sabbatino* case, "Often the State Department will wish to refrain from taking an official position, particularly at a moment that would be dictated by the development of private litigation but might be inopportune diplomatically."[68] In deciding whether and when to speak in official immunity cases, we will also balance the potential benefits of participation against the notion that it is better to file in situations where our pleadings will have the most impact. Obviously the State Department has a greater interest in participating when a case reaches an appellate level than when it is at the earliest pre-trial stages, and could be dismissed on other grounds and for other reasons that have nothing to do with foreign policy. Generally speaking, we want to be responsive when courts request our views, and if we do not file, we often note that no inference should be drawn from our decision not to participate in the case.

What if the State Department chooses to stay silent? *Samantar* suggests that absent a case-specific State Department determination, U.S. courts should, as in the pre-FSIA period, decide questions of immunity in conformity with principles articulated by the State Department. As one Supreme Court case put it:

> [i]n the absence of recognition of the claimed immunity by the political branch of the government, the courts may decide for themselves whether all the requisites of immunity exist. That is to say, it is for them to decide whether the vessel when seized was that of a foreign government and was of a character and operated under *conditions entitling it to the immunity in conformity to the principles accepted by the department of the government charged with the conduct of our foreign relations.*[69]

Following the 1952 Tate Letter, courts consistently applied the restrictive theory of sovereign immunity articulated by the State Department even in cases where the Department did not make a case-specific determination.

---

68.    *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 436 (1964).
69.    *Republic of Mexico v. Hoffman*, 324 U.S. 30, 34–35 (1945) (emphasis added).

The Supreme Court in *Samantar* echoed that directive, noting that under the common law if the Executive Branch chooses not to participate in the litigation, district courts must consider whether a foreign sovereign or foreign official defendant is entitled to immunity under "the established policy of the [State Department]."[70] The clear import is that the more the State Department establishes an official immunity policy over time, the more silent we can afford to be in most cases.[71]

At this conference, some have asked whether the courts should give absolute deference, substantial deference, reasonable deference, or some other measure of deference to State Department suggestions. Yet depending upon our practice, this may well turn out to be a non-issue. For so long as our own determinations of immunity are reasonable, soundly rooted in a close examination of the facts, a diligent sorting of *Samantar* from non-*Samantar* issues, and careful considerations of precedents from both common law and customary international law, the courts will likely defer to them. Only if our suggestions of immunity became unreasonable, it seems to me, would courts be tempted to explore the delicate and uncharted zone between "substantial deference" and "absolute deference" to executive branch immunity determinations.

In closing, let me say that in time, we hope that litigants will come to understand, with respect to State Department submissions in these cases, both the "sound of silence" and the notion that government silence is sometimes golden. In domestic litigation, our ultimate goal is, in fact, not more verbiage, but more silence. The government need not, and should not, speak in every case, and that is not what *Samantar* envisages, particularly when those cases are brought not by the U.S. Government, but by private litigants with their own motives and goals.

Sometimes, less is more. If the State Department says less but speaks clearly when it does speak, litigants and courts should be able to use our broader pronouncements to sort out government perspectives and revise their own positions accordingly. At the end of the day, a careful sorting of *Samantar* from non-*Samantar* issues and these nuances regarding the sound of silence may mark the most fundamental differences between the old process of executive suggestion and the New *Samantar* Process.

---

70.    Samantar v. Yousuf, 130 S. Ct. 2278, 2284 (2010) (internal quotation marks omitted).

71.    This, I submit, is the ultimate antidote to the claimed workload burden that some have suggested *Samantar* will place upon the State Department. *See, e.g.*, *supra* note 30. If the U.S. Government does not feel compelled to file in every case brought against a foreign official, the burden may prove to be far less than many fear.