# Exhibit 15

# APPENDIX

## SOVEREIGN IMMUNITY DECISIONS OF THE DEPARTMENT OF STATE

### May 1952 to January 1977

Edited by
Michael Sandler,* Detlev F. Vagts**
and Bruno A. Ristau***

*Member, District of Columbia Bar. Special Assistant to the Legal Adviser, Department of State, 1975–1977.

**Professor of Law, Harvard University. Counselor on International Law, Department of State, 1976–1977.

***Chief, Office of Foreign Litigation, Department of Justice.

(1017)

257-179 O - 79 - 66

HeinOnline -- 1977 Dig. U.S. Prac. Int'l L. 1017 1977

## INTRODUCTION [1]

The following case reports trace the history of Department of State decisions concerning the immunities of foreign states, their agencies and instrumentalities, their property, and their nondiplomatic and nonconsular officials, beginning with the Tate Letter of May 19, 1952, and ending with the entry into force on January 19, 1977, of the Foreign Sovereign Immunities Act of 1976 (Public Law 94–583, 90 Stat. 2891; 28 U.S.C. 1602 *et seq.*).

It was in the Tate Letter of 1952 that the Department announced its adherence to the restrictive doctrine of sovereign immunity—a doctrine under which sovereign immunity is restricted to a foreign state's acts of a public nature (*jure imperii*), and does not extend to acts of a commercial or private nature (*jure gestionis*). Apart from the relatively infrequent occurrence of supervening foreign policy considerations, the Tate Letter provided the basis under which the Department made its decisions with respect to sovereign immunity from May, 1952 onward. The Tate Letter was superseded [2] by the Foreign Sovereign Immunities Act of 1976, which is designed to conform U.S. sovereign immunity procedures to international practice by transferring to the courts the responsibility for deciding claims of immunity.

### *Role of the Department*

The Department of State role in deciding foreign sovereign immunity claims prior to the enactment of legislation was articulated by the Supreme Court in *Ex Parte Peru*, 318 U.S. 578 (1943) and *Mexico v. Hoffman*, 324 U.S. 30 (1945). Without discussing the effect of any future congressional legislation, these decisions essentially held that State Department determinations in individual cases, and, in the absence of such determinations, general State Department policy, would provide the basis for any recognition of immunity by the courts.

Following crystallization of departmental policy in the Tate Letter of 1952, the Department developed a number of procedures to be fol-

---

[1] Appreciation is expressed to Karen Vagts who greatly assisted in researching references cited in these materials.

[2] *See* Notice of Department of State policy with respect to the immunity of foreign states in U.S. courts, in light of the Foreign Sovereign Immunities Act of 1976. 41 *Fed. Reg.* 50883 (1976) ; Dept. of State *Bulletin*, Vol. LXXV, No. 1952, Nov. 22, 1976, pp. 649–650; *Digest of United States Practice in International Law, 1976*, at 323–325.

lowed when requested to resolve questions of immunity. To begin with, the Department generally required a formal diplomatic request, usually in the form of a diplomatic note, from the embassy of the foreign state concerned (or from a third country embassy representing the interests of the foreign state concerned), although in at least one case the Department responded to a request from a court (see Case No. 7). Generally, the foreign state had the option to litigate its immunity claim before the Department or before the court (see Nos. 50, 88, 109).

During the first decade and a half of experience under the Tate Letter, the Department made its immunity decisions based on either representations of the embassy concerned, copies of pleadings filed with the court, or reports from the Department of Justice. Beginning in the late 1960's, it became the Department's practice to invite counsel for the plaintiff and for the foreign state concerned to present to the Department's Office of the Legal Adviser memoranda as well as oral presentations on the immunity questions at issue. When oral presentations were requested by either the parties or the Department, they took place as informal conferences and not as on-the-record administrative proceedings.

If the Department decided to recognize sovereign immunity in a particular case, it would send a letter to the Attorney General requesting that a suggestion of sovereign immunity be filed with the court where the action was pending. It would also advise the embassy concerned by diplomatic note or otherwise. If the Department's decision was *not* to recognize immunity, the Department usually advised the embassy in question of that decision by diplomatic note.

The Department generally restricted itself to deciding questions of immunity, and usually, but not always, avoided collateral issues such as whether property subject to an attachment was indeed owned by the foreign state concerned (compare No. 38 with No. 18), whether an immunity which would otherwise be recognized had been waived (compare No. 65 with No. 11), and the merits of a jurisdictional or substantive claim (see Nos. 12, 60, 61, 67). Also, the Department generally refused to decide immunity claims while jurisdictional defenses remained to be decided by the court (see Nos. 80, 84, 92).

### *Present Legal Significance*

Since the regime under which the Department of State made immunity decisions has been superseded by the Foreign Sovereign Immunities Act of 1976, the cases summarized below may not have the effect of precedent in future court cases arising under the Act. However, apart from any contribution the following materials may

make to the body of customary international law, these cases may prove of some value in elucidating certain problems that may arise under the legislation. In comparing the cases reported here with future situations, the following factors should be taken into account:

*"Nature" Versus "Purpose" Test.* Section 1603(d) of the Foreign Sovereign Immunities Act ("the Act") states that the "commercial character of an activity shall be determined by reference to the *nature* of the course of conduct or particular transaction or act, rather than by reference to its *purpose*." 28 U.S.C. 1603(d). This approach of examining the underlying nature of an activity rather than its avowed purpose was followed in a great many of the Department's decisions under the Tate Letter (see *e.g.*, Nos. 21, 36, 60, 62, 77, 81, 107). However, there were instances where the Department examined the nature of a foreign government entity performing an act, instead of the nature of the act itself (see Nos. 4, 23, 41 and 69), which apparently would not be permitted under the new legislation.

*U.S. Contacts.* The Act (28 U.S.C. 1605) generally requires that there be certain contacts with the United States before an exception to a foreign state's immunity will be recognized. This requirement was included for jurisdictional reasons. House Rep. No. 94–1487, 94th Cong., 2d Sess. 13 (1976). A similar requirement was not usually present in the Department's decisions under the Tate Letter (see Nos. 6, 9, 36, 60, 81; cf. No. 86).

*Expropriation Cases.* The Act denies immunity with respect to expropriation claims which are founded in international law and which have the requisite contacts with the United States. 28 U.S.C. 1605(a) (3). In its earlier decisions under the Tate Letter, the Department took the position that an expropriation was a public act as to which immunity should be accorded (Nos. 25, 32, 40; cf. No. 33).

*Immunity of Officials.* The Department has made a number of decisions concerning the immunity of heads of state (Nos. 49 and 99) and of other nondiplomatic and nonconsular officials (Nos. 19, 96, 97; cf. No. 62). These decisions may be of some future significance, because the Foreign Sovereign Immunities Act does not deal with the immunity of individual officials, but only that of foreign states and their political subdivisions, agencies and instrumentalities.

*Administrative Proceedings.* The Act relates to foreign state immunities "in the courts of the United States and of the States," but not before administrative bodies or from administrative action. Thus, here also, Department decisions with respect to administrative proceedings (No. 10) and in the tax area (Nos. 14, 44, 48, 71) may be of some value.

*Arbitration.* The Act and its legislative history do not expressly mention actions to compel an arbitration or to enforce an arbitral

award. Department decisions suggest at least that actions to compel a commercial arbitration should be deemed to be claims based on a commercial activity (see Nos. 45 and 73).

*Diplomatic Considerations.* As a government agency charged with the day-to-day conduct of foreign relations, the Department was of course cognizant of diplomatic considerations which were raised in connection with individual sovereign immunity claims. For the most part, diplomatic influences were resisted. In those cases where diplomatic concerns appeared to have an effect (*e.g.*, Nos. 32, 41, 69, 86), it is difficult to ascertain the precise role which those concerns played. By transferring to the courts responsibility for deciding claims of immunity, the Act should remove this factor as a hidden influence on future decisions. See House Rep. No. 94–1487, 94th Cong., 2d Sess. 7, 9 (1976).

### Sources and Methods

The cases reported below cover all diplomatic requests for sovereign immunity, and Department decisions in response to those requests, that could be gleaned from a search of Department of State and Department of Justice files.[3] While no assurance can be given that the list is

---

[3] The materials omit the diplomatic requests in the following cases, which were not acted on by the Department either because the request was withdrawn, because it was not pursued by presenting a memorandum or additional facts in support of the request, or because the case was settled:

No. 35. *Olavaria y Cia.* v. *Banca para el Commercio,* Civil Action No. 61–3825 (Sup. Ct., San Juan, P.R. 1962) (Diplomatic request from the Czechoslovak Ambassador on behalf of the Republic of Cuba).

No. 70. *Paterno* v. *Norway,* Civil Action No. 69–H–130 (S.D. Tex. 1969) (Diplomatic request: December 22, 1970).

No. 72. *Heaney* v. *Government of Spain,* 445 F.2d 501 (2d Cir. 1971) (invitation from the court to submit views).

No. 76. *Grofer* v. *Government of Jamaica,* Civil Action No. 38102 (E.D. Mich.) (Diplomatic request: May 16, 1972).

No. 83. *Marine Transport Lines, Inc.* v. *The Turkish Government,* 72 Civ. 3703 RJW (S.D.N.Y.) (Diplomatic request: January 22, 1975).

No. 89. *Manufacturas Sumar, S.A.* v. *M/V William Foster,* Civil Action No. 7910 (D.C.Z.) (Diplomatic request from the Soviet Embassy: October 30, 1973).

No. 90. *Moore* v. *FFV Sport, Inc., Kingdom of Sweden, et al.* (Sup. Ct. .N.J., County of Orange) (Diplomatic request: November 2, 1973).

No. 91. *Alora Compania Naviera S.A.* v. *Embassy of the Philippines* (S.D.N.Y.) (Diplomatic request: November 20, 1973).

No. 98. *Nalvandian, et al.* v. *Her Majesty, The Queen in Right of the Dominion of Canada,* No. 4726–27 (E.D. Mich.) (Diplomatic request: September 5, 1975).

No. 105. *Cross & Brown Company* v. *Republic of Zaire,* Index No. L&T 17774/76 (Ct. City N.Y., County N.Y. 1976) (Diplomatic request: March 17, 1976).

No. 109. *Panama Canal Company* v. *Compania Nacional de Navegacion,* Civil Action No. 76–3111 (E.D. La.) (Diplomatic request from the Embassy of Colombia: October 26, 1976).

**1022**                                    APPENDIX

complete, all diplomatic requests for immunity which were located
have been included.

Virtually all Department determinations with respect to immunity
have been expressed in diplomatic notes or in letters to the Attorney
General. In cases where the Department declined to recognize im-
munity, the portions (if any) of the Department's note indicating the
reasons for the decision, or the facts relied on, are quoted. Other por-
tions of the note are generally not quoted, unless they appear to have
some bearing on the decision.

In cases where the Department recognized immunity, the same
procedure outlined above was followed. However, very often no in-
dication was given as to why immunity was recognized, except for a
customary conclusory statement such as "the Department recognizes
and allows immunity and requests the Attorney General to cause an
appropriate suggestion of immunity to be filed." In such cases, the
letter to the Attorney General is often not quoted.

Beginning in the late 1960's when Department procedures became
more detailed, other materials were developed which, in a few cases,
shed light on the Department decision that was ultimately expressed
in a diplomatic note or in a letter to the Attorney General. Such mate-
rials have been quoted or described where applicable and appropriate.
Although not incorporated into the final document of decision (the
diplomatic note or letter to the Attorney General), such materials
may be of some interest.

Many of the cases referred to have been reported elsewhere, and the
citations are noted. Where cases reported elsewhere fully duplicate
the material that would otherwise be presented here, such material is
not repeated here. However, available material not reported elsewhere
has been included.

The documents which are quoted in the following case reports may be found
in Dept. of State File No. P78 0101–0328.

### The Tate Letter

On May 19, 1952, the U.S. Department of State, in a letter of that
date, signed by the Acting Legal Adviser (Jack B. Tate) and ad-
dressed to the Acting Attorney General (Philip B. Perlman), an-
nounced its policy of adhering to the so-called "restrictive theory"
of sovereign immunity. The letter reads:

"A study of the law of sovereign immunity reveals the exist-
ence of two conflicting concepts of sovereign immunity, each widely
held and firmly established. According to the classical or absolute
theory of sovereign immunity, a sovereign cannot, without his con-
sent, be made a respondent in the courts of another sovereign. Ac-
cording to the newer or restrictive theory of sovereign immunity,
the immunity of the sovereign is recognized with regard to sovereign

or public acts (*jure imperii*) of a state, but not with respect to private acts (*jure gestionis*). There is agreement by proponents of both theories, supported by practice, that sovereign immunity should not be claimed or granted in actions with respect to real property (diplomatic and perhaps consular property excepted) or with respect to the disposition of the property of a deceased person even though a foreign sovereign is the beneficiary.

"The classical or virtually absolute theory of sovereign immunity has generally been followed by the courts of the United States, the British Commonwealth, Czechoslovakia, Estonia, and probably Poland.

"The decisions of the courts of Brazil, Chile, China, Hungary, Japan, Luxembourg, Norway, and Portugal may be deemed to support the classical theory of immunity if one or at most two old decisions anterior to the development of the restrictive theory may be considered sufficient on which to base a conclusion.

"The position of the Netherlands, Sweden, and Argentina is less clear since although immunity has been granted in recent cases coming before the courts of those countries, the facts were such that immunity would have been granted under either the absolute or restrictive theory. However, constant references by the courts of these three countries to the distinction between public and private acts of the state, even though the distinction was not involved in the result of the case, may indicate an intention to leave the way open for a possible application of the restrictive theory of immunity if and when the occasion presents itself.

"A trend to the restrictive theory is already evident in the Netherlands where the lower courts have started to apply that theory following a Supreme Court decision to the effect that immunity would have been applicable in the case under consideration under either theory.

"The German courts, after a period of hesitation at the end of the nineteenth century have held to the classical theory, but it should be noted that the refusal of the Supreme Court in 1921 to yield to pressure by the lower courts for the newer theory was based on the view that that theory had not yet developed sufficiently to justify a change. In view of the growth of the restrictive theory since that time the German courts might take a different view today.

"The newer or restrictive theory of sovereign immunity has always been supported by the courts of Belgium and Italy. It was adopted in turn by the courts of Egypt and of Switzerland. In addition, the courts of France, Austria, and Greece, which were traditionally supporters of the classical theory, reversed their position in the 20's to embrace the restrictive theory. Rumania, Peru, and possibly Denmark also appear to follow this theory.

"Furthermore, it should be observed that in most of the countries still following the classical theory there is a school of influential writers favoring the restrictive theory and the views of writers, at least in civil law countries, are a major factor in the development of the law. Moreover, the leanings of the lower courts in civil law countries are more significant in shaping the law than they are in

common law countries where the rule of precedent prevails and the trend in these lower courts is to the restrictive theory.

"Of related interest to this question is the fact that ten of the thirteen countries which have been classified above as supporters of the classical theory have ratified the Brussels Convention of 1926 under which immunity for government owned merchant vessels is waived. In addition the United States, which is not a party to the Convention, some years ago announced and has since followed, a policy of not claiming immunity for its public owned or operated merchant vessels. Keeping in mind the importance played by cases involving public vessels in the field of sovereign immunity, it is thus noteworthy that these ten countries (Brazil, Chile, Estonia, Germany, Hungary, Netherlands, Norway, Poland, Portugal, Sweden) and the United States have already relinquished by treaty or in practice an important part of the immunity which they claim under the classical theory.

"It is thus evident that with the possible exception of the United Kingdom little support has been found except on the part of the Soviet Union and its satellites for continued full acceptance of the absolute theory of sovereign immunity. There are evidences that British authorities are aware of its deficiencies and ready for a change. The reasons which obviously motivate state trading countries in adhering to the theory with perhaps increasing rigidity are most persuasive that the United States should change its policy. Furthermore, the granting of sovereign immunity to foreign governments in the courts of the United States is most inconsistent with the action of the Government of the United States in subjecting itself to suit in these same courts in both contract and tort and with its long established policy of not claiming immunity in foreign jurisdictions for its merchant vessels. Finally, the Department feels that the widespread and increasing practice on the part of governments of engaging in commercial activities makes necessary a practice which will enable persons doing business with them to have their rights determined in the courts. For these reasons it will hereafter be the Department's policy to follow the restrictive theory of sovereign immunity in the consideration of requests of foreign governments for a grant of sovereign immunity.

"It is realized that a shift in policy by the executive cannot control the courts but it is felt that the courts are less likely to allow a plea of sovereign immunity where the executive has declined to do so. There have been indications that at least some Justices of the Supreme Court feel that in this matter courts should follow the branch of the Government charged with responsibility for the conduct of foreign relations."

XXVI *Bulletin,* Department of State, No. 678, June 23, 1952, pp. 984–985

## DEPARTMENT DECISIONS 1952–1977

No. 1. *Arias* v. *SS. Fletero and Cia. Argentina de Navegacion Dodero,* Adm. No. 7492 (E.D. Va. 1952).

Diplomatic request (from the Ambassador of Argentina) : May 7, 1952.

An action for injuries aboard a commercial vessel of an Argentine state-owned company. The Department, in a note dated May 22, 1952, denied the request of the Embassy of Argentina for immunity from suit, stating in part:

At the time your Excellency's note was received, there had been formulated in the Department for some time an overall policy decision on the question of sovereign immunity which was then in the process of receiving final clearance. Since it was not certain that such clearance would be given prior to May 14, 1952, the Department requested the Attorney General to instruct the United States Attorney for the Eastern District of Virginia to attempt to obtain a continuance of the trial for a reasonable length of time. The Department was in due course informed that the trial had been continued until May 23, 1952.

The policy decision referred to has now been cleared in the Department and communicated to the Attorney General. Under this decision, which is the result of a study over a considerable period of time of the law of sovereign immunity, the Department will no longer recognize and allow claims of sovereign immunity in certain types of cases.

A study of the law of sovereign immunity reveals the existence of two conflicting concepts of sovereign immunity. According to the classical or absolute theory of sovereign immunity, a sovereign cannot, without his consent, be made a respondent in the courts of another sovereign. According to the newer or restrictive theory of sovereign immunity, the immunity of the sovereign is recognized with regard to sovereign or public act (*jure imperii*) of a state, but not with respect to private acts (*jure gestionis*). There is agreement by proponents of both theories, supported by practice, that sovereign immunity should not be claimed or granted in actions with respect to real property (diplomatic and perhaps consular property excepted) or with respect to the disposition of the property of a deceased person even though a foreign sovereign is the beneficiary.

With the possible exception of the United Kingdom little support has been found except on the part of the Soviet Union and its satellites for continued full acceptance of the absolute theory of sovereign immunity. Furthermore, the granting of sovereign immunity to foreign governments in the courts of the United States is most inconsistent with the action of the Government of the United States

(1025)

## 1026 APPENDIX

in subjecting itself to suit in these same courts in both contract and tort and with its long established policy of not claiming immunity in foreign jurisdictions for its merchant vessels. Finally, the Department feels that the widespread and increasing practice on the part of governments of engaging in commercial activities makes necessary a practice which will enable persons doing business with them to have their rights determined in the courts. For these reasons the Department has decided to follow the restrictive theory of sovereign immunity in the consideration of requests of foreign governments for a grant of sovereign immunity.

Consequently since the Fletero and the Compania Argentina de Navegacion Dodero are engaged in commercial activities, I regret to have to inform your Excellency that the Department must decline to recognize and allow the claim of sovereign immunity made in this case.

No. 2. *Di Sandolo* v. *Empresa Nacional Elcano S.A.* (S.D.N.Y. 1952).

Diplomatic request (from the Embassy of Spain) : June 16, 1952.

The Department, in a note dated June 30, 1952, declined to recognize immunity from suit of a company represented to be an agency of the Spanish Government. The note stated in part:

> The Embassy states that the Empresa Nacional Elcano is entitled to immunity as an agency of the Spanish Government engaged in the operation of various merchant vessels.
>
> The Department has given careful consideration to the Embassy's request and has concluded that it cannot recognize and allow the claim of sovereign immunity made on behalf of Empresa Nacional Elcano.
>
> \* \* \*
>
> Since under the restrictive theory of sovereign immunity the operation of merchant vessels is normally considered a private act (*jure gestionis*) and since it appears from the Embassy's note that the Empresa Nacional Elcano is an agency of the Spanish Government engaged in the operation of various merchant vessels, it is the Department's view that it should not be granted immunity from the jurisdiction of the courts of the United States in suits arising out of the operation of such merchant vessels.

No. 3. *O'Brien* v. *Republic of Cuba*, Case Index No. 4651–1952 (Sup. Ct., N.Y. 1952).

Diplomatic request (from the Ambassador of Cuba) : August 12, 1952.

Plaintiffs attached funds of the Republic of Cuba deposited in Manufacturers Trust Company. The attachment was for the purpose of obtaining jurisdiction. The Department, in a letter of August 15, 1952, requested the Attorney General to suggest immunity, stating in part:

> In the United States, in conformity with international law, the property of a foreign sovereign is immune from seizure or attach-

ment. *Hassard* v. *United States of Mexico et al.*, 61 N.Y. Supp. 939 (1899).

In this case, there appears to be no dispute as to the ownership or official character of the deposit which is made the subject of the attachment.

Accordingly, the Department of State recognizes and allows the claim of immunity under international law made by the Ambassador of Cuba on behalf of the Government of the Republic of Cuba.

No 4. *Kempton* v. *Institute de la Ciudad Universitaria* (N.Y. Munic. Ct. 1952).

Diplomatic request (from the Venezuelan Chargé d'Affaires): October 27, 1952.

Plaintiff was engaged by the defendant. Institute in New York to work as a plumber in Venezuela. According to the note of the Venezuelan Chargé d'Affaires, the contract of employment contained a clause which stated, "The employee is duly aware that the activities of the Institute are not of a commercial or speculative nature." The note further stated that Plaintiff's employment was terminated in Caracas, and that in a document confirming the termination, Plaintiff allegedly undertook to reimburse all expenses incurred by the Institute relating to Plaintiff's travel to Venezuela. Plaintiff brought suit for the value of his return ticket to New York and related expenses. According to the note of the Venezuelan Chargé, the Institute was "an annex" of the Ministry of Public Works, and its function was to complete a University City in Caracas. In a letter dated November 10, 1952, the Department requested the Attorney General to suggest immunity from suit, stating in part:

> You are requested to instruct the appropriate United States Attorney to present to the Court a copy of the Embassy's note, with translation, and inform the Court that the Department accepts as true the statements of the Chargé d'Affaires concerning the official character of the *Instituto*, and that, since it considers that the acts out of which the cause of action has arisen were official governmental acts (*jure imperii*), it recognizes and allows the claim of immunity.

[Compare case No. 107, *post.*]

No. 5. *Frazier* v. *Hanover Bank* (Sup. Ct., N.Y. 1953).

Diplomatic request (from the Ambassador of Peru): January 19, 1953.

The Department, in a letter to the Assistant Attorney General of February 1953, recognized the immunity of the Republic of Peru from

jurisdiction with respect to a suit seeking distribution of script obligations of the Government of Peru.

Reported: 119 N.Y.S.2d 319 (1953), *aff'd* 281 App. Div. 861, 119 N.Y.S.2d 918 (1953); 283 App. Div. 44, 125 N.Y.S.2d 900 (1953); 6 Whiteman, *Digest of International Law* 593

No. 6. *New York and Cuba Mail S.S. Co.* v. *Republic of Korea*, Adm. Index No. 179–204 (S.D.N.Y. 1953).

Diplomatic request (from the Ambassador of Korea): October 29, 1953.

A vessel owned by the Republic of Korea collided in a Korean port with a vessel owned by Plaintiff, and sank. The Republic of Korea's vessel was assisting Plaintiff's vessel unload a cargo of rice, when the accident occurred. The note of the Korean Ambassador represented that the cargo of rice had been acquired "not for sale or resale, barter or exchange—but for free distribution to the population and military personnel in Korea." Plaintiff brought suit by securing an attachment against Republic of Korea accounts with New York banks. Relying on the Tate Letter and Brussels Convention of 1926, the Ambassador's Note requested immunity from both suit and attachment, and asserted that "[i]n implementing a program of relief for its inhabitants, nationals and military personnel, the Republic of Korea was not functioning as a government engaged in commerce or profit but as a body-politic. . . ."

Immunity from attachment recognized, but immunity from suit denied, in a letter to the Attorney General dated November 18, 1953, which stated in part:

> It is the view of the Department that under international law property of a foreign government is immune from attachment and seizure and that the principle is not affected by the views expressed in the Department's letter of May 19, 1952, in which the Department indicated its intention to be governed by the restrictive theory of sovereign immunity in disposing of requests from foreign governments that immunity from suit be suggested in individual cases. Accordingly, the Department requests that you present a copy of the Ambassador's note to the Court and inform the Court of the Department's agreement with the contention of the Ambassador that Korean Government property is not subject to attachment in the United States.
>
> The Department has considered the request of the Korean Ambassador that you be asked to instruct the United States Attorney for the Southern District of New York to file with the Court an appropriate suggestion of immunity of the Korean Government from suit in this case, and is not prepared, on the basis of the information furnished, to comply with the Ambassador's request. Inasmuch as the particular acts out of which the cause of action arose are not shown

to be of a purely governmental character, the Department considers that it would not be warranted, on the basis of the showing made and in the light of the policy set forth in its letter of May 19, 1952, in taking the action requested. The Korean Ambassador is being advised accordingly.

Reported : 132 F. Supp. 684 (1955).

No. 7. *Hungarian People's Republic* v. *Cecil Associates* (S.D.N.Y. 1953).

Request from the court : November 25, 1953.

Immunity from suit denied by the Department in a letter to the court dated December 18, 1953.

Reported : 118 F. Supp. 954, 6 Whiteman, *Digest of International Law* 642–43.

No. 8. *Republic of China* v. *Chang* (Sup. Ct., Los Angeles Cty., Calif. 1954).

Diplomatic request (from the Chargé d'Affaires of the Embassy of the Republic of China) : August 12, 1954.

The Department, in a letter of August 12, 1954, requested the Attorney General to transmit to the court a note from the Chinese Chargé d'Affaires asserting immunity to a counterclaim and cross-complaint filed by the defendant in an action brought by the Republic of China for misappropriation of funds. The Department's letter asked that the Court be informed "that this action is taken purely as a matter of comity between the Government of the United States and the Government of the Republic of China in view of the request made by the latter, and that it is not to be construed as an expression of views by the executive branch of the Government concerning the merits of the claim of immunity made by the Republic of China."

No. 9. *Anderson* v. *South African Airways* (S.D.N.Y. 1955).

. Diplomatic request (from the Ambassador of the Union of South Africa) : April 28, 1955.

The Department, in a note dated May 6, 1955, declined to recognize immunity from suit in an action by the legal representative of the estate of Clyde Anderson against South African Airways, BOAC and De Havilland Aircraft Co., arising out of an airplane crash near Naples on April 8, 1954. The South African Ambassador's note asserted that South African Airways was "not an independent legal person nor a statutory corporation, but an integral and organic part of the South African Railways and Harbours Administration, which is a Government Department. . . ." The Department's note stated, "It is the view of the Department that the activity in which South African Airways is engaged is the type of activity, *i.e., jure gestionis,* which the letter referred to [the Tate Letter] contemplated would no

longer give a government while engaged in it immunity from the jurisdiction of the courts of this country."

No. 10. *Matter of Linea Aeropostal Venezolana* (U.S. National Mediation Board, 1955).

Diplomatic request (from the Embassy of Venezuela) : September 15, 1955.

The Department declined to recognize an immunity from an administrative proceeding.

The Embassy requested that the Department use its good offices to terminate an intended Board investigation relating to the formation of a labor union among LAV employees. The Embassy's note stated that LAV "is an official entity under the public administration of Venezuela whose capital has been entirely supplied by the Government of Venezuela from public funds," and that the Department of State had previously stated that LAV "is an agency that is a part of the Government of Venezuela and not an enterprise of a private character." The Department, in a note dated September 23, 1955, stated in part:

> I note that the Embassy does not specifically raise the question of sovereign immunity, although it might be implied from the text of the note. As you may recall, in May 1952 the Department expressed its general position with regard to commercial activities in the United States of publicly owned enterprises. . . . In the light of this policy it is the view of the Department that the Linea Aeropostal Venezolana, although publicly owned, is engaged in a commercial activity in the United States which does not entitle it to immunity from the jurisdiction of the United States. Accordingly, this Department would not consider it appropriate to make a suggestion as to the sovereign immunity of LAV from the jurisdiction of the National Mediation Board.
>
> As to your point that the Railway Labor Act does not apply, the Department is requesting the comments of the National Mediation Board regarding the statutory construction of the Act, as amended, so far as it is applicable to persons working for foreign air lines. Upon receipt of such information the Department will inform you further regarding this question.

No. 11. *National City Bank of New York* v. *Republic of China* (S.D.N.Y. 1955).

Diplomatic requests (from the Ambassador of the Republic of China) : May 23 and September 9, 1955.

The requests for immunity from certain counterclaims were made after the Supreme Court's decision in one of three cases at issue (348 U.S. 356). The Department's note of September 26, 1955, denied immunity, and stated:

I have the honor to refer to your notes of May 23, and September 9, 1955, concerning the case of the *National City Bank of New York* v. *The Republic of China, et al.*, which was decided by the Supreme Court of the United States on March 7, 1955, and two additional actions brought by the Government of the Republic of China against the National City Bank of New York which are now pending in the United States District Court for the Southern District of New York.

The two actions pending in the district court are said to be based upon demand deposits in the respondent bank. It is further stated that in each case the defendant bank has set forth two counterclaims based upon obligations of the Government of China which the City Bank holds. The first counterclaim is based on a Chinese Government Treasury Note given by the Chinese Government as security for a loan made in 1920, by a syndicate of member banks in which the National City Bank participated. The second counterclaim is based on the ownership by the Bank of Chinese Government Treasury notes issued in 1947 and 1948. The obligations of the Chinese Government on which the counterclaims are based are alleged to be due and unpaid.

The Embassy's note states that the Government of China has never consented to be sued on the counterclaims and that it feels that to allow the City Bank to put forward these counterclaims is tantamount to permitting an individual suit to be brought against a friendly foreign state without its consent. The Embassy requests that if the Department considers it appropriate it transmit the views of the Chinese Government to the District Court for the Southern District of New York, together with a suggestion that the Republic of China is entitled to immunity from the counterclaims interposed by the National City Bank in these two actions.

The Department regrets that it is unable to comply with the Embassy's request. The law of sovereign immunity as the Department understands it is that, in certain types of cases at least, a sovereign cannot without its consent be made a respondent in the courts of another sovereign. There has been a growing tendency to restrict the area of immunity and as indicated in the Department's letter of May 19, 1952, to the Acting Attorney General it has been its policy since that date to follow the restrictive theory of sovereign immunity in the consideration of requests of foreign sovereign with respect to its public acts (*jure imperii*) but not with respect to its private acts (*jure gestionis*).

In the two actions with respect to which the Embassy seeks the Department's assistance, the Chinese Government is not the respondent to an action brought against it without its consent but as the Embassy's note indicates the Chinese Government has sought the assistance of a United States court to recover its deposits with the defendant bank. The Chinese Government is, therefore, within the jurisdiction of the court not against its will but on its own initiative. The immunity, if any, which it had in the existing circumstances has thus been waived. Having sought the application to the defendant of American law, it is in no position to contend that any defenses available under that law to the defendant should be denied. And it would

be most inappropriate for the executive branch of the Government to suggest to the courts what defenses are available. The Department is unaware of any principles of international law which would make it inappropriate to apply to a foreign sovereign which has submitted to the jurisdiction of domestic law any provisions of that law which would be applicable to any other litigant.

In the view the Department takes of this case, it is unnecessary for it to decide whether the activities of the Chinese Government which are involved in the counterclaims to the two pending actions are in the nature of public acts concerning which it would be entitled to immunity if made a party respondent in the courts of the United States without its consent.

In accordance with the practice indicated in the Department's letter of May 19, 1952, to the Acting Attorney General referred to above, the Department of Justice is being advised of the Embassy's request and of the Department's action thereon. Inasmuch as the Embassy's appeal to the Department for recognition of its claim to sovereign immunity on the counterclaims has been made known to the district court, the Attorney General is being requested to advise the court of the Department's decision.

Reported : 348 U.S. 356; 6 Whiteman, *Digest of International Law* 681–83.

No. 12. *Miami Jaraqua Hotels Corporation* v. *The Dominican Republic* (S.D.N.Y. 1956).

Diplomatic request (from the Ambassador of the Dominican Republic) : March 1, 1956.

The Department denied immunity from suit, and, in a letter dated April 6, 1956, advised the Attorney General as follows:

An examination of the Ambassador's note and its enclosures indicates that the law suit arises out of a lease by the Dominican Republic of property to private individuals for use as a resort hotel, and that the suit is based upon the cancellation by the Dominican Republic of the lease. The Ambassador is being informed that no steps are being taken to request that a suggestion of immunity be made to the court in this case because the Department does not consider that the lease by a foreign government of real property to private individuals for use as a resort hotel is a sovereign act, *jure imperii*, but a commercial act, *jure gestonis* [sic], which does not, under the restrictive theory of immunity now being followed by the Department, entitle a foreign sovereign to immunity from suit.

Since one of the defendants in this case is the duly accredited Ambassador to the United States from the Dominican Republic, you are requested to instruct the appropriate United States attorney to suggest to the Court the immunity of the Ambassador from suit and service of process under 22 U.S.C. 252–254.

\* \* \*

With respect to the Ambassador's statements concerning the authority of the Consul General of the Dominican Republic in New York City to accept service on behalf of the Dominican Republic,

and the effect to be given the provision in the contract placing all matters arising out of the contract within the jurisdiction of the Dominican courts, the Ambassador is being informed that these are matters within the exclusive competence of the Court.

No. 13. *Maxudian* v. *Standard Oil Co. of New Jersey* (N.J. Sup. Ct., 1956).

Diplomatic request (from Ambassador of Venezuela) : December 10, 1956.

Maxudian alleged that in 1939 he was employed by the Venezuelan Government to ascertain and compute royalties owed to the Government by certain oil companies in Venezuela, and that he was to receive 25 percent of any payments to the Government. Maxudian was also employed to help prepare a new Hydrocarbons Law for Venezuela, eventually enacted in 1943. In 1941, the oil companies concerned paid royalties to the Venezuelan Government of $10 million. Also in 1941, Maxudian was paid about $390,000.

Five years later, in 1946, Maxudian demanded additional sums he claimed were owed under the alleged agreement to pay him 25 percent of any royalties received by the Government. This claim was rejected in a Government resolution and by the Venezuelan courts. In the Venezuelan court action, the Venezuelan Government allegedly asserted (1) that the $390,000 payment to Maxudian related only to expenses incurred in connection with the preparation and passage of a new Hydrocarbons Law; and (2) that the records relating to Maxudian's claim for 25 percent of any royalties paid had disappeared.

In 1956, Maxudian brought suit in New Jersey against the Republic of Venezuela and against U.S. oil companies which were parents of the Venezuelan oil companies involved.

In a letter, dated January 3, 1957, the Department requested the Attorney General to file a suggestion of immunity from suit of the Republic of Venezuela (but not of the private defendants). The letter stated in part:

> The Ambassador states that the subject matter of the suit was previously made the basis for claims by Mr. Maxudian, both in the administrative channels provided by Venezuelan law and in the courts of Venezuela and that these claims were rejected by the Government of Venezuela both administratively and judicially. The Ambassador states further that Mr. Maxudian's suit in the courts of New Jersey constitutes an attempt to attack indirectly in the United States the propriety and validity of the action of the Government of Venezuela in rejecting Mr. Maxudian's claim.
>
> The gravemen of Mr. Maxudian's complaint appears to be an alleged conspiracy on the part of the Venezuelan Government and the other named defendants to deprive him of moneys alleged to be due to him. The Department considers that the disposition by govern-

ments of claims of individuals against them is a sovereign function and that a foreign government is not subject to suit in the courts of the United States for the sole purpose of challenging the disposition made by it of a claim.

Subsequently, the Department of Justice advised the Department of State that the Republic of Venezuela had not been served with a summons or complaint in this case, and that therefore "it would be unnecessary and inadvisable to file a suggestion of immunity on behalf of the Republic of Venezuela or to call the court's attention to the note from the Ambassador of Venezuela and your response with regard thereto of January 3, 1957." The Department then sent a note to the Venezuelan Ambassador dated April 4, 1957, which described this recommendation from the Justice Department. The note then continued:

> Bringing this correspondence to the attention of the court could only alert the plaintiff to the fact that he had not in fact made the Republic of Venezuela a party defendant. If, nevertheless, the Republic of Venezuela or any of its agents or representatives should be made a party or defendant, the Department would be pleased to consider any representation that might be made by your Excellency.

No. 14. *Knocklong Corporation v. Kingdom of Afghanistan* (Cty. Ct. Nassau Cty., N.Y., 1957).

Diplomatic requests (from the Embassy of Afghanistan) : February 12 and 21, 1957.

Immunity from suit recognized by the Department in a letter to the Attorney General dated February 26, 1957. The suit related to claims against property which had been levied upon by the County of Nassau in New York for nonpayment of real estate taxes. The County awarded an interest in the property to Plaintiff. The property had been purchased by Afghanistan and was used as the residence of the Afghanistan representative to the United Nations and as the offices of the Afghanistan mission to the United Nations.

Reported : 6 Misc. 2d 700. 167 N.Y.S. 2d 285.

No. 15. *Martinson v. Government of Israel*, Civ. Index 109-80 (S.D.N.Y. 1957).

Diplomatic request (from Ambassador of Israel) : January 3, 1957. Immunity from suit recognized by the Department in a letter to the Attorney General dated May 21, 1957.

Martinson filed a suit for negligence in connection with an injury that occurred on an Israeli military vessel. Martinson worked as a machinist in the employ of a company that had contracted to make repairs and improvements to the vessel. The vessel had originally

been built for the U.S. Navy, and was in the Marine Basin Shipyard in Brooklyn when the alleged accident occurred. The note of the Israeli Ambassador asserted, *inter alia,* that "the act on which the plaintiff sues is public and governmental viz., the repair of a ship of war," rather than a commercial act. The note also represented that the claim was not made known to the contractor which employed the plaintiff until two years after the accident, and that Israel had not consented to be sued by virtue of the Treaty of Friendship, Commerce and Navigation between the United States and Israel of 1951 (5 UST 550). The Department's letter stated in part:

> On the basis of the information contained in the Ambassador's note, the Department is of the opinion that the Government of Israel is not subject to suit under the circumstances set forth in the Ambassador's note. Accordingly, it requests you to instruct the appropriate United States Attorney to present a certified copy of the the Ambassador's note to the court and inform the court that the Department recognizes and allows the claim of immunity and that the Department agrees with the contention of the Ambassador of Israel that the Treaty of Friendship, Commerce and Navigation between the Government of the United States and the Government of Israel has no applicability to this case.

No. 16. *Airmotive Suppliers Corp.* v. *Republic of Haiti,* Civil Action No. 8098–M (S.D. Fla., Miami Div. 1958).

Diplomatic request (from the Embassy of Haiti): January 31, 1958.

The Department, in a note dated February 19, 1958, declined to suggest immunity from attachment of a military airplane represented to belong to the Haitian Army Air Corps. The note stated in part:

> It appears from the information furnished the Department that the airplane which has been attached was brought to the United States for repairs by the plaintiff company, Airmotive Suppliers Corporation, and that the suit which has been instituted against the Republic of Haiti by the Corporation is based upon the sale of certain supplies for the aircraft in question to the Republic of Haiti by the plaintiff. It further appears that although the aircraft–is said to be owned by the Haitian Air Force, it has been operated under corporate title for profit on regular scheduled commercial air services under the name of "Compagnie Haitienne de Transports Aeriens" and was so engaged during the period when the supplies in question were furnished. In view of these facts, the Department considers that under the restrictive theory of sovereign immunity, it would not be warranted in making to the court a suggestion of immunity of the Haitian Government from suit in this case. . . .
>
> So far as concerns the attachment of a military plane belonging to the Haitian Air Corps, it appears that this attachment was levied for the purpose of obtaining jurisdiction over the Government of Haiti. The Department does not consider that property of a

foreign government is immune from attachment for the purpose of obtaining jurisdiction over the foreign government in a matter where, under the restrictive theory of sovereign immunity, the foreign government is subject to suit.

No. 17. *Weilamann* v. *Chase Manhattan Bank* (Sup. Ct., N.Y. Cty. 1957).

Diplomatic requests (from Embassy of the Union of Soviet Socialist Republics) : July 18, September 17, November 22, 1955, November 22, 1957, and March 2, 1959.

Immunity from execution recognized by Department in a letter to the Attorney General dated March 9, 1959. The initial requests from the Soviet Embassy, prior to 1959, claimed immunity from suit and attachment, and were responded to in notes from the Department dated April 2, 1956, and December 9, 1957. These notes stated that since the court had not as of that time entered final judgment, the Department could not take action unless plaintiff should attempt to levy upon assets of the Soviet Government to satisfy a judgment.

Reported: 21 Misc. 2d 1086, 192 N.Y.S.2d 469; 54 Am. J. Int'l. L. 643; 6 Whiteman, *Digest of International Law* 709–15.

No. 18. *Stephen* v. *Živnostenska Banka* (Sup. Ct., N.Y. Cty. 1959).

Diplomatic requests (from the Embassy of Czechoslovakia) : January 1959 and June 16, 1959.

Plaintiff was a depositor of the defendant bank, which was nationalized by the Czechoslovak Government in 1945. Plaintiff brought suit in New York, and obtained (1) an order of receivership against defendant's assets on deposit with New York banks since before the date of nationalization, and (2) subsequently, a final judgment.

Immunity from execution was recognized by the Department in a letter to the Attorney General dated June 22, 1959. This letter also requested the Justice Department "to inform the court that the Department of State accepts as true the statements of fact of the Czechoslovak Government . . . that the attached securities . . . constitute the property of the State of Czechoslovakia." Another letter from the Department, dated December 15, 1959, stated that the Department's prior position was not intended to determine any controversy between claimants and the Czechoslovak Government as to actual ownership of the attached assets, and that the Department was not suggesting "that any property not owned by the Government of Czechoslovakia was immune from execution." However, a further letter from the Department dated May 12, 1960, stated that the Department recognized the attached assets to "constitute the property of the State of Czechoslovakia," unless claimants could show that they owned these assets "as a matter of Czechoslovakia [sic] law." The court rejected this latter sug-

gestion as "an intrusion upon the judicial function," and its rejection was twice affirmed on appeal.

Reported: 31 Misc.2d 45, 140 N.Y.S.2d 323 (Sup. Ct. 1955) (order finding plaintiff to be a creditor of Zivnostenska Banka and setting trial on nationalization issues), *aff'd mem.* 286 App. Div. 999, 145 N.Y.S.2d 310 (1955); 31 Misc.2d 10, 155 N.Y.S.2d 340 (1956) (entering judgment for plaintiff), *aff'd mem.* 2 A.D.2d 958, 157 N.Y.S. 903 (1956), *aff'd mem.* 3 N.Y.2d 868, 166 N.Y.S.2d 309, 149 N.E.2d (1957), *appeal dismissed,* 356 U.S. 22 (1958).

For subsequent history, see 23 Misc.2d 855, 199 N.Y.S.2d 797 (1960) (leave granted to Government of Czechoslovakia to prove ownership of any defendant's assets placed under receivership); 213 N.Y.S. 2d 396 (1961) (holding that State Department suggestion of Czechoslovak Government ownership of assets in question exceeded the executive branch's competence to suggest immunity and was "an intrusion upon the judicial function"), *aff'd* 15 A.D.2d 111, 222 N.Y.S.2d 128 (1961), *aff'd* 12 N.Y.2d 781, 186 N.E.2d 676 (1962).

For a companion case, see *Wolchok v. Statni Banka Ceskoslovenska,* 15 A.D. 2d 103, 222 N.Y.S.2d 140 (1960), *aff'd* 12 N.Y.2d 784, 186 N.E.2d 678 (1962), cert. denied, 374 U.S. 828 (1962).

No. 19. *Waltier* v. *Thomson,* Civil Action No. 150–362 (S.D.N.Y. 1960).

Diplomatic request (from the Embassy of Canada): March 17, 1960.

Immunity of a foreign government official from suit recognized by the Department in a letter to the Attorney General dated May 27, 1960. The letter requested that the court be informed, in part, as follows:

1. That it is a matter of record in the Department of State that Mr. Hubert W. P. Thomson is "Settlement Officer-Department of Citizenship and Immigration" of the Canadian Government on duty at the Canadian Consulate General in New York City, that he held that position on and continuously subsequent to March 6, 1957, and that Mr. Thomson's official duties include interviewing and advising prospective immigrants to Canada.

2. That, in the view of the Department of State, acts done by Mr. Thomson in the course of, or in connection with, his official duties described above constitute sovereign or public acts (*jure imperii*) of the Government of Canada, and for such acts the Dominion of Canada is entitled to enjoy sovereign immunity in courts in the United States.

Reported: 189 F. Supp. 319, 6 Whiteman, *Digest of International Law* 655.

No. 20. *Siegl* v. *Sea Bird Linens, Inc.,* Index No. 15747 (Sup. Ct. N.Y. Cty 1959).

Diplomatic request (from the Czechoslovak Embassy): March 31, 1960.

In a letter of June 29, 1960, the Department requested the Department of Justice to transmit "without suggestion or comment" a note from the Czechoslovak Embassy claiming immunity.

No. 21. *Degan* v. *Olmos* (S.D. Tex. 1960).

Diplomatic requests (from the Embassy of Venezuela) : June 1 and August 18, 1960.

Plaintiff brought suit for payment under a contract with the Venezuelan Ministry of Agriculture and Animal Husbandry, under which plaintiff undertook to sell breeding bulls for the purpose of improving cattle breeds in Venezuela. In a note dated June 15, 1960, the Department declined to recognize immunity from suit, stating that "it appears to the Department that the lawsuit arises from a commercial transaction concerning the purchase of cattle in the United States."

Following a second request from the Venezuelan Embassy the Department sent a note dated September 11, 1960, which stated in part:

> The Department of State accepts the statement of the Venezuelan Government that the instant transaction was entered into for the purpose of benefiting the Venezuelan economy. However, the Department of State cannot share the view of your Government that the purpose of a governmental act is necessarily the controlling or dominant factor in determining whether such act constitutes *acta imperii* or *acta gestionis*. The difficulty with purpose as a test is that all governmental activity is presumably for the purpose of benefiting the state. This is so whenever a government acts in a commercial transaction.
>
> In applying the doctrine of sovereign immunity from jurisdiction, contracts with private persons for the purchase and sale of goods are examined with great care to ascertain whether the object of the contract is *acta imperii*, *i.e.*, one that is peculiar to the conduct of government, and not *acta gestionis*, *i.e.*, one that can properly be performed by private persons. Viewed in this light, the Department must conclude that the acts for which immunity is sought in the instant case are *acta gestionis* and do not afford the basis for a suggestion of immunity.

No. 22. *In re Grand Jury Investigation of the Shipping Industry* (D.D.C. 1960).

Diplomatic request (from the Philippine Chargé d'Affaires) : January 18, 1960.

Immunity of the Philippine National Lines from a subpoena duces tecum to appear before a grand jury with certain documents relating to shipping freight rates and other shipping practices, denied by the Department in a note dated January 25, 1960, which stated in part:

> Your note requests the Department to inform the United States District Court for the District of Columbia that the Philippine National Lines is owned and operated by the Government of the Republic of the Philippines, that the subpoena is therefore in fact directed to your Government and that your Government does not wish to waive its sovereign immunity from suit in, or any process issued by, a court of a friendly government. The Department of State interprets your note to be a request that the Department in-

form the Court that the Department recognizes and allows your Government's foregoing claim of immunity.

In considering requests of a foreign government for a grant of foreign sovereign immunity from the jurisdiction of courts in the United States, the Department of State follows the so-called restrictive theory of sovereign immunity. Under this theory a foreign government (including its instrumentalities) is entitled to immunity from the jursdiction of the courts of the territorial sovereign only with regard to governmental acts (*jure imperii*) as distinguished from private or commercial activities (*jure gestionis*).

Since it appears to the Department that the Philippine National Lines is engaged in commercial activities, the Department of State regrets that it cannot take the action requested in your note.

Reported: 186 F. Supp. 298; 6 Whiteman, *Digest of International Law* 572.

No. 23. *Sawchuck v. Netherlands Ministry of Traffic* (Sup. Ct., N.Y. Cty 1960).

Diplomatic request (from the Ambassador of the Netherlands): January 3, 1961.

In a letter of January 13, 1961, the Department requested the Attorney General to file a suggestion of immunity from suit. The case arose from an accident in which a venetian blind fell upon plaintiff as he was cleaning windows in the New York offices of defendant. The note of the Netherlands Ambassador asserted, "The Traffic Bureau of the Netherlands Ministry of Defense is the shipping agency of the Netherlands Government in the United States in charge of the organization of all sea and air transport to the Netherlands . . . of materials and commodities acquired by the Netherlands Ministry of Defense in the United States for the use of the Netherlands Armed Forces."

No. 24. *American Trading and Production Corporation v. Banco do Brasil* (S.D.N.Y., 1960).

Diplomatic requests (from the Embassy of Brazil): October 26 and December 28, 1960.

The Embassy of Brazil requested immunity from a jurisdictional attachment of funds of the Banco do Brasil on deposit in New York banks. The libellant secured the attachment in connection with a demurrage claim arising from the chartering of libellant's vessel. The charter party was executed by an agent on behalf of Banco do Brasil. The Brazilian Embassy represented that the underlying transaction involved the carriage of U.S. surplus wheat purchased pursuant to an intergovernmental agreement between the United States and Brazil under the P.L. 480 program. The Department denied immunity in a note dated January 31, 1961, which stated in part:

After careful consideration of the Embassy's note the Department of State believes that the transaction underlying the present case is a commercial one (*jure gestionis*). Therefore, even if Banco do

## 1040                                   APPENDIX

Brasil, or its Foreign Trade Department ("CACEK"), or its Exchange Department, are agencies of the Brazilian Government, they are not, in the view of the Department, entitled to sovereign immunity from the jurisdiction of the Court.

Unless a government engaging in *jure gestionis* activities will accept *in personam* jurisdiction, the only alternative is the *in rem* or *quasi in rem* jurisdiction obtainable by attachment in accordance with the law of the forum. Therefore, even if the funds attached in the present case are the property of the Brazilian Government, it is the Department's view that such funds are not immune from attachment for that purpose. However, if steps are taken to enforce against property of the Brazilian Government any judgment which might be obtained, and if the Department's intervention is requested, the Department will be pleased to consider what action, if any, it might appropriately take.

No. 25. *Dixie Paint & Varnish Co.* v. *Republic of Cuba* (City Ct. of Savannah, Ga., 1961).

Diplomatic request (from the Czechoslovak Ambassador on behalf of the Republic of Cuba) : April 6, 1961.

Immunity from attachment was recognized in a letter to the Attorney General dated April 25, 1961, which stated in part :

In this case the plaintiff, by means of attaching a relatively small Cuban Government bank account, seeks to obtain partial compensation for its assets allegedly confiscated by act of the Cuban Government within its own territory. In other words, the cause of action being based upon a sovereign act *(jure imperri)* [sic], the Department of State has no choice under existing international law and Departmental policy but to recognize and allow the requested immunity from jurisdiction in this case. However, the foregoing is, of course, without prejudice to any future decision which may be taken regarding vesting of Cuban assets in the United States.

Reported : 104 Ga. App. 854, 123 S.E.2d 198.

No. 26. *Arcade Bldg. of Savannah* v. *Republic of Cuba* (City Ct. of Savannah, Ga., 1961).

Diplomatic requests (from the Czechoslovak Ambassador on behalf of the Republic of Cuba) : March 20 and 29, and April 4, 1961.

In a letter dated June 19, 1961, to the Attorney General, the Department recognized immunity of a local bank account of the Cuban Consulate from execution, on a judgment in a suit for unpaid rent. The letter stated in part :

The Department is of the view that where under international law a foreign government is not immune from suit, as in this case, attachment of its property to obtain jurisdiction is not prohibited. In many cases jurisdiction could probably not be obtained otherwise.

However, the Department has long recognized that under international law there is a distinction between "immunity from jurisdic-

tion" whether *in personam* or *in rem* and "immunity from execution." And the Department is also of the further view that foreign government property although properly attached to obtain jurisdiction *in rem* cannot be retained to satisfy a judgment ensuing from the suit because in accordance with international law the property of a foreign sovereign is immune from execution even in a case such as this where the foreign sovereign is not immune from suit.

Reported: 104 Ga. App. 848, 123 S.E.2d 453; 6 Whiteman, *Digest of International Law* 718–19.

No. 27. *Kane* v. *National Institute of Agrarian Reform*, and *State of Florida ex rel. National Institute of Agrarian Reform* v. *Dekle*, No. 61L–730 (Cir. Ct., 11th Jud. Cir. Fla. 1961).

Immunity from execution was recognized by the Department in a letter to the Attorney General dated December 13, 1961, which stated in part:

> Since the ownership of the two pieces of property in question by the Cuban Government does not appear to be disputed, the Department recognizes and allows the sovereign immunity of the property from execution, and you are requested to issue appropriate instructions to the United States Attorney in the jurisdiction indicated to file a suggestion of immunity with the court.

Reported: 137 So.2d 581; 153 So.2d 40; 6 Whiteman, *Digest of International Law* 718.

No. 28. *Harris & Company Advertising, Inc.* v. *Republic of Cuba*, Civil No. 60–L–2257 (Cir. Ct., 11th Jud. Circuit, Fla. 1961).

First diplomatic request (from the Cuban Ministry of Foreign Relations through the Embassy of Switzerland) : September 14, 1961. The Department, in a letter to the Attorney General dated October 25, 1961, recognized immunity from execution of two crop dusting planes of the Cuban National Institute of Agrarian Reform, and of the proceeds from any execution sale of those planes.

Second diplomatic request (from the Czechoslovak Ambassador on behalf of the Republic of Cuba) : October 26, 1961.

Third diplomatic request (from the Czechoslovak Ambassador on behalf of the Republic of Cuba) : November 7, 1961. The Department, in a letter to the Attorney General dated November 22, 1961, recognized immunity from execution of an airplane, described as a "Super Cub," represented to be property of the Government of the Republic of Cuba.

Fourth diplomatic request (from the Czechoslovak Chargé d'Affaires on behalf of the Republic of Cuba) : July 23, 1960. The Department, in a letter to the Attorney General dated July 24, 1962, recognized immunity from execution of an airplane, described as an

Antonov AN–2 aircraft, hijacked from Cuba to Miami where it was attached by Plaintiff.

Reported: 127 So.2d 687; 149 So.2d 384.

No. 29. *Berlanti Construction Co.* v. *Republic of Cuba,* No. 621795 (Cir. Ct., 11th Jud. Cir., Fla. 1962).

First diplomatic request (from the Czechoslovak Ambassador on behalf of the Republic of Cuba) : March 19, 1962.

In a note dated March 22, 1962, the Department declined to recognize immunity from suit, stating in part:

> It appears from information previously furnished by counsel for the Government of Cuba that this suit like previous suits between the same parties arises out of a contract between the plaintiff and the National Housing Commission said to be an agency of the Cuban Government for the construction of low cost housing in Cuba.
>
> It is the Department's view that under the restrictive theory of sovereign immunity activities of the kind under consideration must be regarded as of a private nature, *jure gestionis,* for which sovereign immunity from suit cannot be recognized. In these circumstances, the Department regrets that it cannot comply with the request of the Ambassador of the Czechoslovak Socialist Republic for recognition of sovereign immunity from suit of the defendant Republic of Cuba in this case.

Second diplomatic request: December 12, 1961.

This second note from the Czechoslovak Ambassador requested immunity from execution as to a Cessna twin-engine airplane that had been attached to satisfy a final judgment in the case. The Department made no decision, having been advised that the judgment had been vacated and the attachment removed. The same airplane was also attached in *Bergstresser* v. *Cuban Air Force* (No. 31).

No. 30. *Gonzalez* v. *Industrial Bank of Cuba* (Sup. Ct. N.Y. Cty., 1961).

First diplomatic request (by Czechoslovak Ambassador on behalf of the Republic of Cuba) : December 1, 1961.

This was a request for immunity from execution with respect to funds of the Industrial Bank of Cuba that had been attached at the commencement of the lawsuit on May 21. 1959. By a note dated December 8, 1961, the Department stated that the request was "premature" because "there has been no judgment against the Government of Cuba or any of its agencies in this case and, therefore, no attempt to levy on any property of the Government of Cuba to satisfy such judgment. . . ."

Second diplomatic request: January 3, 1962.

Request for immunity from execution was denied by the Department in a note dated February 6, 1962, which stated in part:

As the Ambassador's note indicates, a final judgment in this case was handed down by the Supreme Court of New York County on December 27, 1961. It is clear that the property which is the subject of the judgment had been attached by the plaintiff a year prior to the dissolution of the defendant Industrial Bank of Cuba by Cuban Decree Law No. 891 and was in the custody of the sheriff of New York County at the time the decree purported to transfer title thereto. In its judgment, the Court held that the *ex post facto* dissolution of the Industrial Bank of Cuba by the Decree was "ineffectual to reprive plaintiff of her property," and that no recognition would be given to such expropriation decree relative to assets located in New York. In these circumstances, the Department considers that no proper basis exists for recognition of the assets in question as the property of the Cuban Government immune from disposition by the Court. The Department has reached this conclusion after careful consideration of written and oral presentations by counsel for both sides.

Reported: 227 N.Y.S.2d 456; 6 Whiteman, *Digest of International Law* 702.

No. 31. *Bergstresser* v. *Cuban Air Force F.A.R..* Civil No. 61I48 (11th Jud. Cir. Fla. 1961).

Diplomatic request (from the Czechoslovak Ambassador on behalf of the Republic of Cuba): December 27, 1961.

Immunity from execution was requested as to a Cessna twin-engine airplane that had been attached in Florida. The airplane was the same one that had been the subject of a levy in *Berlanti Construction Co.* v. *Republic of Cuba* (No. 29). The note from the Czechoslovak Ambassador stated that the Government of the Republic of Cuba claimed ownership of the airplane.

The Department recognized immunity in a letter to the Attorney General dated December 28, 1961, which stated in part:

According to the legal documents attached to the [Czechoslovak Ambassador's] note the plaintiff. Bergstresser. has obtained a judgment dated January 10, 1961, against the Cuban Air Force for the sum of $24,516.00, and the plane in question has been attached and will be sold in execution of that judgment. The Department has been subsequently informed that there is an outstanding Short Order of Sale ordering the plane to be sold on Friday, December 29, 1961.

It does not appear to be contested that the plane in question was the property of the Cuban Government when it arrived in Florida. As has been previously indicated. it is the Department's view that under international law property of a foreign sovereign is immune from execution. . . .

Before a suggestion of immunity was filed with the court, however, the plane was sold for $9,500. The Florida District Court of Appeals and a Florida Circuit Court judge had refused to stay the sale despite oral representations by an Assistant United States Attorney that the State Department had recognized immunity from execution and that the papers regarding the suggestion of immunity were en route from Washington. No action was apparently taken by the defendant to recover the funds obtained from the sale.

Reported: 135 So.2d 752.

No. 32. *Rich* v. *Naviera Vacuba* (E.D. Va. 1961).

Diplomatic request (from the Republic of Cuba through the Embassy of Switzerland) : August 19, 1961.

The case involved several attachments of the vessel *Bahia de Nipe* and its cargo in connection with claims of expropriation in violation of international law against the Republic of Cuba. The vessel was diverted to the United States by the vessel's crew which was fleeing Cuba. In a letter dated August 19, 1961, the Secretary of State advised the Attorney General that it had been determined "that the release of this vessel would avoid further disturbance of our foreign relations in the premises." In a letter dated August 20, 1961, the Secretary of State stated that the U.S. had given assurances that the vessel would be released if Cuba "declared the vessel to be its property, requested its return, and provided sufficient, properly identified personnel to replace those electing to remain in the United States"—and that these conditions had been fulfilled. The letter concluded that the vessel's prompt release was "necessary to secure observance of the rights and obligations of the United States."

In a letter to the Attorney General dated August 21, 1961, the Department recognized "the claim of the Government of Cuba for immunity of said vessel and its cargo from the jurisdiction of the United States courts." The Department did not address an assertion made by one of the claimants before the court that the Republic of Cuba had waived its immunity in a written agreement.

Reported: 197 F. Supp. 710, *aff'd* 295 F. 2d 24 (4th Cir.) ; 6 Whiteman, *Digest of International Law* 704.

No. 33. *Ritter* v. *Republic of Cuba*, Case No. 60–L 2357–A (Cir. Ct., 11th Jud. Cir., Fla. 1960).

Diplomatic request (from the Czechoslovak Ambassador on behalf of the Republic of Cuba) : January 26, 1962.

In a note dated February 14, 1962, the Department declined to suggest immunity from execution, stating in part :

On January 17, 1962, the trial court entered a final judgment in favor of Ritter. In its judgment the court found that at the time of the filing of the complaint by Ritter, Banco Nacional de Cuba was a private Cuban corporation but that subsequently the Bank had been nationalized by the Republic of Cuba and that, therefore, the Republic of Cuba was liable for the obligations of the defendant Banco Nacional. From this judgment, it appears that under Florida law the effect of the decree of October 13, 1960, nationalizing Banco Nacional de Cuba was not to transfer to the Government of Cuba encumbered assets of Banco Nacional in Florida. The court apparently decided that the Cuban Government acquired the liabilities of Banco Nacional when that private corporation was nationalized. This seems to conform to the provisions of the decree and to representations of counsel for the Government of Cuba in another case to the effect that under the decree of nationalization of October 13, 1960, the Government of Cuba took over the assets and the liabilities of the nationalized private banks.

In the above circumstances, and since the judgment of the court does not appear to be contrary to any principle of international law, there does not seem to be adequate basis for recognition of immunity from execution of the funds of Banco Nacional de Cuba in the custody of the court in the case under consideration.

No. 34. *Benton* v. *Cuban Air Force, F.A.R.*, No. 61–L–949 (Cir. Ct., 11th Jud. Cir., Fla. 1962).

Diplomatic request (from the Czechoslovak Ambassador on behalf of the Republic of Cuba) : January 23, 1962.

The complaint in this case alleged that on or about August 16, 1960, Mr. Benton was detained at Havana Airport while preparing to travel to the State of Florida. An armed guard, apparently from the Cuban Air Force, seized from him a suitcase containing his life savings, \$48,000 in U.S. currency. In a separate letter from defendant's counsel, it was asserted that removal of the money from Cuba would have violated Cuban currency laws.

In a note dated February 23, 1962, the Department stated that it recognized an immunity from suit in this case :

It appears from the allegations in the complaint filed by the plaintiff, Sam Benton, that on or about August 16, 1960, when he was leaving Cuba for Florida, a suitcase containing some \$48,000 was taken from him at Havana Airport by an armed guard of the Cuban Air Force, that he was interrogated, and that he was told that the money would be held in the Banco Nacional de Cuba. He has further alleged that attempts to recover the money have been unsuccessful.

Since it appears that the acts complained of by the plaintiff, Sam Benton, in the above case were governmental acts, *jure imperii*, as distinguished from acts of a private nature, *jure gestionis*, the Department recognizes and allows the sovereign immunity of the defendants as agents of the Cuban Government from suit, and the

## 1046                                   APPENDIX

Department of Justice is being requested to instruct the appropriate United States Attorney to file with the court a suggestion of immunity.

No. 36. *Mirabella* v. *Banco Industrial de la Republica Argentina* (Sup. Ct., N.Y. Cty. 1962).

Diplomatic request (from the Embassy of the Argentine Republic) : March 7, 1962.

In a note dated April 9, 1962, the Department declined to recognize immunity from suit in an action based on defendant's alleged improper revocation of letters of credit given to one Franco Gronda, an Italian national. According to written statements furnished to the Department by counsel, the letters of credit were issued in connection with a contract between Gronda and an Argentine Government agency for the construction of an aluminum producing complex (to be owned by Gronda) and a hydroelectric plant (to be owned by Argentina). Gronda assigned the letters of credit to plaintiff. The defendants alleged various claims of fraud and infirmities in the assignment of Gronda's rights to plaintiff. The Department's note stated in part:

[I]t is the Department's view that the activities of the defendant Bank in extending credits to private persons for the purpose of inducing them to invest in the economy of Argentina by bringing and operating their industrial plants there, importing raw materials for use therein, and constructing a plant to furnish hydroelectric power for such plants, even though the power plant was to be owned by the Government of Argentina, are all acts of a private nature (*jure gestionis*) for which the Bank is not entitled to claim sovereign immunity regardless of its relationship with the Government of Argentina. It may be assumed that all acts of a government whether of a public (*jure imperii*) or private nature (*jure gestionis*) are done for some public purpose. It is obvious, however, that this cannot be the criterion else the restrictive theory of sovereign immunity would be meaningless. It is the nature of the activity engaged in by the Government which is controlling and not whether it serves some public policy.

Reported : 38 Misc. 2d 128, 237 N.Y.S. 2d 499, 501, 507.

Second diplomatic request : June 18 and July 10, 1974. No Department decision was made as to this request, and, in 1977, the Department advised counsel that no decision would be made in light of the Foreign Sovereign Immunities Act of 1976.

No. 37. *Johansen* v. *Insua*, Chancery No. 62C–13817 (Cir. Ct., 11th Jud. Cir., Fla. 1962)

Diplomatic request (from the Embassy of the Dominican Republic) : May 10, 1963.

In a note dated August 3, 1963, the Department declined to suggest immunity from suit in litigation involving title to an airplane. According to a report prepared by the Bureau of Customs at the request of the Department, the airplane had been purchased by plaintiff and used to transport to the Dominican Republic persons fleeing from Cuba. The airplane was subsequently impounded by the Dominican Government and then brought to Miami to be sold. Plaintiff brought suit for replevin. The Department's note stated that "it is contrary to the Department's practice to intervene in judicial proceedings brought for the purpose of determining title to property, ownership of which is claimed by a foreign government, since it is the Department's position that questions of title are for the courts."

No. 38. *Flota Maritima Browning de Cuba* v. *Motor Vessel Ciudad de la Habana*, Admiralty No. 4056 (D.Md. 1962).

Diplomatic request (from the Czechoslovak Ambassador on behalf of the Republic of Cuba) : June 19, 1962.

The Department declined to recognize immunity of the vessel in question from suit and attachment, in a note dated June 26, 1962, which stated in part:

> It appears from the pleadings in this case, copies of which have been furnished by counsel for the parties, that the ownership of the vessel is directly in issue. It further appears from the pleadings that maritime liens against the vessel are asserted and contested. In such circumstances, it is contrary to the practice of the Department to recognize sovereign immunity because the basic fact on which such immunity would rest, in this case Cuban Government ownership of the vessel, is in dispute. Furthermore, the Cuban Government itself has voluntarily accepted the jurisdiction of the court and requested a determination of its ownership of the vessel and its release. The Department does not consider it would be appropriate to prejudge that issue by suggesting the vessel's immunity.

In response to a subsequent request from the Czechoslovak Ambassador dated April 11, 1963, the Department, in a note dated April 17, 1963, reaffirmed its earlier position.

In response to a third request from the Czechoslovak Ambassador dated November 25, 1966, relating to a pending court-ordered sale of the vessel, the Department, in a note dated November 28, 1966, stated in part:

> Although the Ambassador's note does not specifically so indicate, the Department understands that the sale referred to has been ordered to conserve the asset and that it is not a sale in execution of a judgment of the Court. In these circumstances, the Department considers that a request for recognition of sovereign immunity from

execution is premature and must decline to intervene with respect
to the proposed sale.

Reported: 181 F. Supp. 938 (1960) (jurisdictional motions denied) ; 218 F.
Supp. 938 (1963) (claim of sovereign immunity denied), *aff'd* 335 F.2d 619 (4th
Cir. 1964), petition for writ of prohibition denied *sub nom. Duda* v. *United States
District Court*, 380 U.S. 970 (1965). For subsequent proceedings involving sale
of the vessel, see 245 F. Supp. 205 (1965), *aff'd* 363 F.2d 733 (4th Cir. 1966),
*cert. denied sub nom. Cuba* v. *Floto Maritima Browning de Cuba S.A.*, 385 U.S.
837 (1966).

No. 39. *Harty* v. *Corporacion Venezolana de Guayana*, Civ. Action No.
63-325 (W.D. Pa. 1963).

Diplomatic request (from the Ambassador of Venezuela) : August
29, 1963.

In a note dated October 23, 1963, the Department declined to sug-
gest immunity in a suit against an entity created by the Govern-
ment of Venezuela "to advance the industrial development of the
Guayana region in the private as well as the public sector." The en-
tity was empowered to carry on normal business activities, in-
cluding the production of steel products and sale of such products
abroad. The Department's note stated in part:

> In all of the circumstances, it seems evident to the Department
> of State that the corporation is engaged in activities of a private
> nature (*jure gestionis*) rather than of a public nature (*jure im-
> perii*) and that in such circumstances it would not be entitled to an
> immunity from suit in the country of the United States under the
> policy set forth in the Department letter of May 19, 1952, to the De-
> partment of Justice (the so-called Tate Letter) even though it
> should be regarded as a governmental entity. Furthermore, it ap-
> pears that the services of the plaintiff in the case under consideration
> were procured for the purpose of furthering such activities.

No. 40. *Chemical Natural Resources, Inc.* v. *Republic of Venezuela*,
Case No. 2048 (Ct. Common Pleas, Phila. Cty., Pa. 1964).

Diplomatic request (from the Ambassador of Venezuela) : Novem-
ber 16, 1963.

Immunity from jurisdiction recognized by the Department in a
letter to the Attorney General dated January 18, 1964. The lower court
refused to honor the suggestion of immunity filed by the U.S. Attor-
ney, but was reversed by the Pennsylvania Supreme Court.

Reported: 38 Pa. D.&C.2d 47 (1965), *writ of prohibition issued*, 420 Pa. 134, 215
A.2d 864 (1966), *cert. denied*, 385 U.S. 822 (1966) ; 6 Whiteman, *Digest of Inter-
national Law* 705.

No. 41. *Melone* v. *Republic of Chad*, Index No. 1287/64 (City Ct. N.Y. 1964).

Diplomatic request (from the Chargé d'Affaires of the Embassy of Chad) : May 7, 1964.

Suits were filed against the Republic of Chad and the Counselor of its U.N. Mission because of a three-car collision in the City of New York. Immunity of the Republic of Chad from suit, and diplomatic immunity of the Counselor, were recognized in a letter to the Attorney General dated May 20, 1964. A Department note of the same date stated in part:

Affidavits furnished by the attorney for the plaintiffs and by attorneys for the Government of Chad are conflicting as to whether the dinner at the house of the Ambassador of Gabon (who was in Gabon) was an official dinner or a private party. In such circumstances, the Department feels that it must accept the version of the Chargé d'Affaires of the Permanent Mission of the Republic of Gabon to the United Nations that it was an official dinner. Consequently, the Department recognizes and allows the claim of the Republic of Chad of sovereign immunity from suit in the three suits in question. The Attorney General of the United States is being requested to instruct the appropriate United States Attorney to file a suggestion of immunity with the courts in which the suits are pending.

\* \* \*

Although the Department of State recognizes the sovereign immunity from suit of the Republic of Chad in the cases referred to. and also recognizes the diplomatic immunity of Mr. . . . . it strongly urges the Government of Chad to waive both immunities in order that the cases may be heard on their merits and justice not be frustrated. It is noted that the Government of Chad has protected itself against eventualities of this kind by obtaining insurance and it is suggested that it should avail itself of that protection.

[Cf. Nos. 6 and 81.]

No. 42. *Better* v. *Government of Burundi*, Index No. 51853 (Civ. Ct., City of N.Y. 1964).

Diplomatic request (from the Permanent Mission of Burundi to the United Nations) : June 19, 1964.

In a letter of June 24, 1964, the Department requested the Attorney General to file a suggestion of immunity "from execution or attachment for the purpose of execution" as to funds on deposit in the Belgian American Bank and Trust Company in New York in the name of the Permanent Mission of Burundi to the United Nations.

**1050**                                    **APPENDIX**

No. 43. *Cargo and Tankship Management Corp.* v. *India Supply Mission*, 62 A.D. 1043 (S.D.N.Y.).

Diplomatic request (from the Ambassador of India) : December 15, 1964.

The Department, in a letter of December 16, 1964, advised the Attorney General that it recognized the immunity from execution of funds of the India Supply Mission which were on deposit in various New York banks and which were attached following the Second Circuit decision cited below.

Reported : 221 F. Supp. 680 (1963), *rev'd in part*, 336 F.2d 416 (2d Cir. 1964).

No. 44. *City of New Rochelle* v. *Republic of Ghana, Republic of Indonesia,* and *Republic of Liberia* (Cty. Ct., Westchester County, N.Y. 1964).

Diplomatic requests: May 11, 1964 (by Ambassador of the Republic of Ghana), May 5, 1964 (by Ambassador of the Republic of Indonesia), and April 24, 1964 (by Ambassador of the Republic of Liberia).

Immunity of property from foreclosure proceedings to satisfy real estate tax liens was recognized in three parallel Department notes dated June 8, 1964, which stated in part :

It is the position of the Department of State that as the property in question is being used as the residence of the Permanent Representative of Ghana to the United Nations, it is not subject to the jurisdiction of the County Court of the County of Westchester, State of New York. The Department, therefore, recognizes and allows the claim of the Government of Ghana that the property is immune from suit. The Department of Justice is being requested to instruct the appropriate United States Attorney to appear and file a suggestion of immunity with the Court.

With respect to the request for action to have the claim for taxes on the property in question withdrawn, the Ambassador is informed that in the Department's view such property is not immune from real property taxation under customary international law. Furthermore, the Department of State has construed Section 15 of the Headquarters Agreement [signed by the United States and United Nations on June 26, 1947, and entered into force Nov. 21, 1947 ; TIAS 1676 ; 61 Stat. 3416] with the United Nations as not extending immunity from real estate taxes to Missions to the United Nations. This position to which the Department has adhered since 1955 was first stated in a note to the Secretary-General of the United Nations dated November 23, 1955. In the light of these views, the Department of State is not in a position to take the further action requested by the Ambassador of causing the underlying tax claims to be withdrawn.

Reported : 44 Misc.2d 773, 255 N.Y.S.2d 178.

No. 45. *Petrol Shipping Corp.* v. *Kingdom of Greece* (S.D.N.Y. 1964).

Diplomatic request (from the Ambassador of Greece) : September 30, 1964.

The Department declined to recognize immunity from suit in a note dated October 16, 1964, stating in part :

> The basic facts appear to be : that the respondent chartered the petitioner's tanker "Atlantis" to carry grain from Houston, Texas, to Piraeus, Greece, the grain having been financed by the United States Government under Title I, Public Law 480; that the berth in the port of Piraeus, Greece, designated by the respondent was not one at which the vessel could properly and safely lie afloat and as a result thereof the vessel suffered damage; and that the charter party contained an arbitration clause and petitioner seeks an order directing the respondent to proceed to arbitration in accordance therewith. The district court pursuant to an application of the respondent granted an adjournment of the case to permit respondent to present a claim of foreign sovereign immunity to the Department of State. The Memorandum makes several requests, the net effect of which is for recognition of sovereign immunity from suit for the respondent.
>
> As the Embassy is probably aware, it is the practice of the Department of State when considering requests for recognition of sovereign immunity from suit by foreign governments to follow the policy set forth in its letter of May 19, 1952, to the Acting Attorney General, the so-called Tate Letter, a copy of which is enclosed. Applying that policy to the facts in the case under consideration, the Department sees no basis for any conclusion other than that the acts on which the suit is based are private acts (*jure gestionis*). In these circumstances, the Department regrets that it is unable to comply with the request of the Ambassador of the Kingdom of Greece for recognition of sovereign immunity from suit in the instant case.

Prior to the request to the Department for immunity, the Ambassador of Greece had appeared specially by counsel before the trial court to "suggest" immunity. The trial court dismissed the complaint on grounds of sovereign immunity. The court of appeals affirmed *per curiam*, but then ordered a rehearing en banc and requested a brief from the United States. The Justice Department brief for the United States took the position that the trial court should not have accepted without question the claim of immunity by the Greek Ambassador, but, on remand, should examine the facts underlying the claim. Relying upon *Compania Espanola* v. *Naremar*, 303 U.S. 68, 74–75, the brief stated that where the executive branch suggests immunity—

> This is conclusive and the Court should dismiss the action against the foreign government. On the other hand, where the executive branch does not indicate to the Court that it recognizes the claimed immunity, the Court should examine the claim itself and decide

whether, under the circumstances of the case and the appropriate standards, the claim is entitled to recognition.

After this brief was filed, the court of appeals remanded the case to the trial court to examine the facts underlying the claim of immunity. Thereafter, the Greek Ambassador made the request to the Department of State discussed above.

Reported : 360 F. 2d 103 (2d Cir. 1966) ; *cert. denied*, 385 U.S. 931 (1966).

No. 45A. *Victory Transport, Inc.* v. *Comisaria General* (S.D.N.Y. 1963).

Invitation by the Supreme Court to the Solicitor General to express the views of the United States on a petition for certiorari in this case.

The case was an action to compel arbitration of a dispute under a charter party, entered into by a Spanish Government agency and a private U.S. shipping company, to transport surplus wheat to Spain. The brief of the United States, prepared by the Departments of Justice and State, recommended the granting of certiorari and stated in part:

Sovereign immunity has. of course, never been absolute in the literal sense, and immunity has been withheld under certain circumstances. The decision below, however, in declining to recognize a claim of sovereign immunity because of the commercial character of the transaction seems to be the first clear-cut departure by an American Federal court from the so-called absolute theory of sovereign immunity upheld in *Berizzi Bros. Co.* v. *S. S. Pesaro*, [271 U.S. 562 (1926)]. Moreover, as petitioner indicates, the Second Circuit's decision here is apparently the only federal case to uphold an *in personam* action against an objecting foreign sovereign or its unincorporated agency or department.

Whether the court of appeals decided this issue correctly is a substantial question worthy of certiorari. Since the decision below will govern all similar contracts in the New York area—a center of international commercial activity—it has great importance.

Reported : 232 F. Supp. 295. 336 F. 2d 354 (2d Cir. 1964), *cert. denied* 381 U.S. 934 (1965).

No. 46. *Mayan Lines* v. *Republic of Cuba* (the SS *Araecelio Iglesias*), Adm. Action Nos. 2712, 2713 (D. Canal Z. 1965).

Diplomatic request (by the Czechoslovak Chargé d'Affaires on behalf of the Republic of Cuba) : July 9, 1965.

In a letter dated July 28, 1965, the Department requested the Attorney General to suggest the immunity of a vessel, represented to be the property of the Government of Cuba, from attachment and sale in aid of execution.

No. 47. *Dorest* v. *S.S. Narwik, Polskie Linie Oceaniczne and The Polish People's Republic* (E.D. La. 1965).

Diplomatic request (from the Ambassador of the Polish People's Republic) : January 5, 1965.

Immunity from suit was denied by the Department in a note dated January 24, 1966, which stated in part :

> In the answer filed in the above case by Polskie Linie Oceaniczne, it is admitted that the *SS Narwik* was owned, operated and controlled by Polskie Linie Oceaniczne and the Polish People's Republic at the time the libellant Sidney Dorest alleges he was injured. It further appears that the vessel then was engaged in carriage of cargo for hire. In these circumstances, there does not appear to be any basis on which the Department of State under its present practice could recognize sovereign immunity from suit or the Polish People's Republic in the action referred to. However, if the Ambassador feels that his Government is entitled to immunity from suit in the case referred to under the restrictive theory of sovereign immunity, the Secretary of State will be glad to receive his further view in the matter.

No. 48. *Republic of Argentina* v. *City of New York* (Sup. Ct.. N.Y. City 1966).

Action by the Republic of Argentina to recover taxes assessed against its Consulate. The Department of Justice. for the United States as *amicus curiae*, brought to the court of appeals' attention a letter from the Department of State to the Comptroller of the City of New York dated September 2, 1965, which stated in part :

> The Department of State is of the opinion that under recognized principles of international law and comity the several States of the United States, as well as their political subdivisions, should not assess taxes against foreign government-owned property used for public noncommercial purposes.

Reported : 54 Misc. 2d 796, 283 N.Y.S. 2d 389 (1967) (held : in the absence of a treaty to the contrary, a foreign state's property is not exempt from taxation and Argentina was not entitled to recover real estate taxes on consular property), *aff'd per curiam* 29 A.D. 2d 1052, 290 N.Y.S. 2d 706 (1968) ; *mod.*, 25 N.Y. 2d 252, 303 N.Y.S. 2d 644 (1969) (held : foreign state property devoted to public governmental uses is immune under customary international law from local real estate taxes, but Argentina's claim for a refund was not timely).

No. 49. *Kendall* v. *Kingdom of Saudi Arabia*, 65 Adm. 885 (S.D.N.Y. 1965).

Diplomatic requests (from the Ambassador of Saudi Arabia) : August 30 and September 10, 1965.

Kendall and others filed suit against the Kingdom of Saudi Arabia. King Faisal and certain Saudi officials. The complaint alleged that,

## 1054 **APPENDIX**

while on a trip from Egypt to Jordan in a converted PBY amphibious aircraft, plaintiffs made an emergency landing in the Gulf of Aqaba. The following day, while repairing the aircraft, plaintiffs allegedly were fired upon in the water by Saudi militiamen. Two of the plaintiffs were wounded and the airplane was sunk. Damages with respect to the plane, other property and for personal injuries were claimed. Plaintiffs caused New York bank accounts of the Saudi Government and of King Faisal to be attached. In a letter to the Attorney General of September 3, 1965, the Department recognized immunity from suit of the Saudi Arabian Government. In a letter of September 14, 1965, the Department recognized an immunity from suit of King Faisal, and stated in part:

> King Faisal Bin Adull Aziz Al-Saud is the Head of State of The Kingdom of Saudi Arabia and as Head of State is not subject to the jurisdiction of any foreign Court without his consent.

No. 50. *B.N.S. International Sales* v. *Embassy of United Arab Republic Purchasing Bureau,* 65 Civil 57 (S.D.N.Y. 1965).

Diplomatic request (from the Embassy of the United Arab Republic) : February 17, 1965.

In a note dated April 5, 1965, the Department declined to suggest immunity from suit in an action on a contract between the parties. In connection with the contract, the United Arab Republic had obtained a letter of credit entitling the U.A.R. to draw the amount stated in the letter upon presentation to the Chase Manhattan Bank of a certified statement that B.N.S. had failed to perform its obligations under the contract. B.N.S. brought suit and obtained an attachment order enjoining payment under the letter of credit. Prior to making a diplomatic request to the Department, the Ambassador from Egypt filed a "suggestion of sovereign immunity" directly with the court, and began to litigate its claim of immunity. The Department's note stated in part:

> In the above circumstances, it is not clear how the Department of State can be of assistance to the Embassy. If the Embassy's note is to be regarded as a request for recognition of sovereign immunity from suit, such request is not made timely since it appears that the United Arab Republic has already submitted to the jurisdiction of the court and has made a plea of sovereign immunity from suit directly to the court as a part of its defense. Had a request for recognition of immunity from suit been made timely, the Department would have been guided in its consideration of such request by the policy set forth in its letter of May 19, 1952, to the Attorney General, a copy of which is enclosed. In the light of the facts now known, it seems unlikely that such a request would have been granted.

No. 51. *French* v. *Banco Nacional de Cuba* (Sup. Ct., N.Y. Cty 1966).

First diplomatic request (from the Czechoslovak Ambassador on behalf of the Republic of Cuba) : October 4, 1961.

Immunity from suit was denied by the Department in a note dated October 25, 1961, which stated in part:

From information furnished by the Ambassador, it appears that the suit is for damages because of the alleged nonpayment of obligations of the defendant bank evidenced by written instruments agreeing to deliver to plaintiff's assignor, one Alexander S. Ritter, dollar checks on New York in stated amounts upon tender by Ritter of like sums in Cuban pesos before a stated date. It further appears that at the time these written instruments were issued Banco Nacional de Cuba was a private bank incorporated under the laws of Cuba with the right to sue and be sued, to discount and rediscount, and to carry on other private banking activities. Slightly more than fifty percent of its stock was owned by the Government of Cuba and the rest by private banks doing business in Cuba. The shares owned by the private banks were entitled to receive dividends but not those owned by the Government. The bank has since apparently been nationalized by the present Government of Cuba.

It should be added that the written instruments on which the plaintiff's suit is based were apparently issued in accordance with provisions of Cuban law intended to induce persons to invest dollars in certain types of Cuban industry by guaranteeing them the right to withdraw their dollars at will and free of any exportation tax.

In view of the foregoing facts, the Department considers that the activities out of which the suit of Hazel W. French against Banco Nacional arises were of a *jure gestionis* rather than a *jure imperii* nature and, consequently, under the restrictive theory of sovereign immunity which this Government follows no immunity exists. The Department must, therefore, decline the request for recognition of such immunity.

Second diplomatic request: April 20, 1966.

Request for immunity from suit and execution was denied by the Department in a note dated June 2, 1966, which stated in part:

The Ambassador's note of October 4, 1961, requested recognition of sovereign immunity from suit in the above case. This request was declined by the Secretary of State's note of October 25. 1961, on the ground that the activities out of which the suit of *Hazel W. French* against the *Bank* arose were of a *jure gestionis* nature and consequently that under the restrictive theory of sovereign immunity which this Government follows no immunity existed. The Ambassador's note of April 20, 1966, is, therefore, in effect, a request for reconsideration of the Secretary's previous decision.

Pursuant to the Ambassador's request the case has been reviewed and no reason is seen for changing the decision of October 25, 1961. It is noted that this position is consistent with the recommendation in the report, after hearing, of the Special Referee in the case that the motion of the defendant *Bank* to dismiss the complaint and

vacate the attachment on the ground of sovereign immunity be denied. This report was confirmed by court order. It is also consistent with representations made by the Bank in another case that it had no right of sovereign immunity from suit.

With respect to the Ambassador's request for recognition of immunity of the Bank's property from execution to satisfy the judgment entered on June 17, 1965, this request is considered premature since the judgment in question has not become final.

Reported: 27 A.D.2d 530, 275 N.Y.S.2d 567 (1966), *rev'd*, 23 N.Y.2d 46, 242 N.E.2d 704 (1968).

No. 52. *Hellenic Lines, Limited* v. *Embassy of South Vietnam,* 67 Civ. 860 (S.D.N.Y. 1967).

Diplomatic request (from the Ambassador of the Republic of Vietnam) : May 31, 1967.

Immunity from attachment of bank accounts in New York of the Banque Nationale du Viet Nam was recognized by the Department in a letter to the Attorney General dated July 29, 1967, which stated in part:

> The accounts of the Banque Nationale du Viet Nam in the First National City Bank of New York are foreign exchange reserves of the Republic of Viet Nam, which are used for public rather than commercial purposes. Accordingly, the Department of State has recognized and allowed the claim of the Republic of Viet Nam for immunity of the funds of the Banque Nationale du Viet Nam in the First National City Bank from attachment, seizure, or any other judicial process.

Reported : 275 F. Supp. 860.

No. 53. *Brown International* v. *Republic of the Sudan,* 67 Civ. 2941 (S.D.N.Y. 1967).

Diplomatic requests (by the Embassy of the Somali Republic on behalf of the Republic of the Sudan) : September 1 and 5, 1967.

This was an action to enforce in the United States an arbitral award and court decree entered in the Republic of the Sudan. The award and decree in the Sudan arose from a claim by plaintiff for damages under a contract with the Sudan Railways, a branch of the Sudan Ministry of Communications, for construction of shipping berths and railway facilities at a port in the Sudan. The note of the Somali Embassy stated that the Government of the Sudan had instituted an appellate review proceeding in the Sudan concerning the arbitral award and court decree and that, therefore, there was no final decree or award to be enforced.

In a note of October 27, 1967, the Department denied immunity from suit and attachment of the Republic of the Sudan, stating that the

claim relating to a contract for port construction was a private and not a sovereign activity.

In an order of November 20, 1967, the court dismissed the case on the ground of lack of diversity jurisdiction, since plaintiff was a foreign citizen organized under the laws of Liberia.

No. 54. *Caribbean Mercantile Export Co.* v. *Dominican State* and *Compania Dominicana de Aviacion*, Civil Action No. 67–10228 (Cir. Ct., 11th Jud. Cir. Fla. 1967).

Diplomatic requests (from the Ambassador and Embassy of the Dominican Republic) : August 14, 1967, and November 22, 1968.

Shortly after the initial request for immunity was made, the Department was advised that a default judgment had been entered and that property occupied by the Dominican Consulate in Miami had been levied upon and was to be sold to satisfy the default judgment. Immunity from execution of the property in question was recognized by the Department in a letter to the Attorney General of October 2, 1967.

In December 1967, plaintiff commenced a supplementary proceeding to obtain a declaration that Compania Dominicana de Aviacion was "property" of the Dominican State and to obtain execution against Compania Dominicana de Aviacion. In April 1968, the Florida Circuit Court entered an order holding that assets in Florida of Compania Dominicana de Aviacion were subject to execution to satisfy the default judgment against the Dominican State.

This order was appealed to the Florida District Court of Appeal, and the Dominican Embassy then submitted a second request for immunity.

In letters dated November 27 and 29, 1968, the Department recognized an immunity from execution of assets of Compania Dominicana de Aviacion and requested that a suggestion of immunity be filed by the District Court of Appeal of Florida. The latter court subsequently held that this suggestion of immunity was not properly before it since it had not been ruled on by the trial court.

Reported : 218 So.2d 523 (1969).

No. 55. *Ocean Transport Co., Inc.* v. *Government of the Republic of the Ivory Coast*, Docket No. 67–99–E (E.D. La. 1967).

Diplomatic requests (from the Ambassador of the Republic of the Ivory Coast) : February 16 and March 7, 1967.

Immunity from suit was denied in a Department note dated April 4, 1967, which stated in part:

It appears from the complaint, a copy of which was furnished by the Ivory Coast Embassy, that this is a suit for alleged breach of a

contract between the parties under which the complainant was to
furnish a master and crew for the fishing vessel *President Kennedy*
in addition to other services and to deliver the vessel to the de-
fendant in the Port of Abidjan, Republic of the Ivory Coast. Dam-
ages in the amount of $35,000 are claimed. It further appears that
the account of the defendant in The Hibernia National Bank of New
Orleans, New Orleans, Louisiana, has been attached. There is no
indication that court process has been issued against the vessel.

As both parties to the suit have been advised, the Department of
State follows the restrictive theory of sovereign immunity set forth
in its letter of May 19, 1952, to the Acting Attorney General, copies
of which were furnished. It is the Department's view that the con-
tract out of which the present action against the Government of the
Republic of the Ivory Coast arises and in which the defendant Gov-
ernment contracted for the services of a private company for the
transportation of a vessel and its delivery in Abidjan is of a private
nature (*jure gestionis*). In these circumstances, the Department of
State regrets that it is unable to comply with the request of the
Embassy of the Ivory Coast for recognition of sovereign immunity
from suit.

Reported : 269 F. Supp. 703.

No. 56. *Carpets by Certified, Inc.* v. *Permanent Mission of Ghana to
the United Nations,* Index No. 50301–65 (Civ. Ct., Kings Cty, N.Y.
1968).

Diplomatic request (from the Permanent Mission of Ghana to the
United Nations).

In a letter of January 10, 1969, the Department advised the At-
torney General that it recognized immunity from execution of New
York bank accounts of the Permanent Mission of Ghana to the United
Nations, and requested that a suggestion of immunity be filed.

No. 57. *Orcor Transportation Co.* v. *Embassy of Pakistan,* 67 Civ. 4094
(S.D.N.Y. 1967).

Diplomatic requests (from the Embassy of Pakistan) : November
16 and December 5 and 11, 1967.

In a note of January 5, 1968, the Department declined to suggest
the immunity from attachment of funds of the Embassy of Pakistan,
stating in part:

In its consideration of this request, the Department has studied
the information furnished to it by the Embassy of Pakistan con-
cerning the uses to which the funds in question are put. On the
face of the above-referenced notes and aide-memoire. it appears that
the subject funds are used ". . . in support of acquisition and
shipment of commodities provided by the Government of the United
States to the Government of Pakistan in accordance with agree-
ments between the two countries under U.S. Public Law No. 480."
The Embassy of Pakistan has not submitted to the Department any

additional data concerning use of the funds that might indicate that the bank accounts in question are used for other purposes. Moreover, in its note of December 5, 1967, the Embassy has informed the Department that the Embassy does not wish to make any additional submissions nor ". . . enter into a controversy with the complainants in the course of the suggested hearing in the Department of State."

In prior cases, the Department has concluded that activities conducted in the United States by a foreign government in support of P.L. 480 programs are commercial in nature. The courts of the United States have reached the same conclusion. Consequently, the funds in question are, according to the information supplied by the Embassy, used for commercial purposes. Therefore, the Department regrets that it cannot comply with the Embassy's request to suggest the immunity of the funds from attachment in the referenced case.

No. 58. *New York World's Fair 1964–1965 Corporation* v. *Republic of Guinea*, Index No. 477/1967 (Sup. Ct., Queens Cty. 1967).

Diplomatic request (from the Ambassador of the Republic of Guinea) : October 24, 1967.

Action to recover unpaid rent on space in a pavilion rented by the Republic of Guinea during the New York World's Fair of 1964–1965. The Republic of Guinea had paid half the rental upon signing a rental agreement with plaintiff, but allegedly ignored repeated requests to pay the balance. Plaintiff commenced suit in January 1967 and secured an attachment of a New York bank account of the Republic of Guinea allegedly used as the operating account for the Republic's pavilion during the Fair.

Immunity from suit was denied by the Department in a note dated January 31, 1968, which stated in part :

In this case, the Republic of Guinea requests a suggestion of sovereign immunity from a suit arising out of its participation in the 1964–65 New York World's Fair, more particularly, from a contract it entered into with the World's Fair Corporation for the rental by the Republic of Guinea of exhibition space at the Fair grounds. In considering this application, the Department has been particularly impressed by the fact that the Fair was privately organized, that entities other than foreign governments, including a number of business corporations, participated in the Fair, and that in at least one case a pavilion in the international section was sponsored by a group of business firms resident in the country concerned. Considering these facts and the character of the New York World's Fair, the actions of the Republic of Guinea giving rise to this suit do not qualify as sovereign or public acts under the standards established in the Tate Letter. The Department of State finds it necessary, therefore, to decline the request for a suggestion of sovereign immunity.

Reported : 159 N.Y.L.J. 15, 63 Am.J.Int'l L. 343 (1969).

No. 59. *Worldwide Carriers* v. *National Bank of Egypt, et al.*, Civ. 4009 (S.D.N.Y. 1967).

Diplomatic request (from the Embassy of India on behalf of the United Arab Republic) : December 9, 1968.

Action for payment and damages under a bill of lading relating to the shipment of 16 street cars to Egypt. Immunity from suit and attachment was denied by the Department in a note dated October 31, 1968, which stated in part :

> This is a suit in Admiralty against the National Bank of Egypt as consignee under a bill of lading covering this shipment of sixteen tram cars to Alexandria, United Arab Republic. The complaint seeks a balance due under the bill of lading and damages. For jurisdictional purposes the funds of the defendant National Bank of Egypt on deposit in the First National City Bank of New York have been attached.
>
> As both parties to the suit have been advised, the Department of State follows the restrictive theory of sovereign immunity in accordance with the policy set forth in its letter of May 19, 1952 (the so-called Tate Letter), to the Acting Attorney General, copies of which were furnished to the parties. It should be added that it is also the practice of the United States Government to recognize the validity of attachment of foreign government property for the purpose of obtaining jurisdiction unless such property is exclusively used for public purposes.
>
> It is the Department's view that the transaction out of which the present action against the National Bank of Egypt arose was of a commercial and therefore private nature under the theory adopted by the Tate Letter. It further appears that the defendant National Bank of Egypt has not shown that its funds deposited with the First National City Bank were government funds used solely for public rather than commercial purposes. In these circumstances, the Department of State regrets that it is unable to comply with the request of the Ministry of Foreign Affairs of the United Arab Republic to suggest the sovereign immunity of the funds from attachment. The Department wishes to emphasize that this decision is in no way intended to reflect upon the arguments of the defendants on the merits of this case, or upon other legal issues apart from the question of sovereign immunity.

No. 60. *Pruitt* v. *M/V Patignies* (E.D. Mich. 1968).

Diplomatic request (from the Ambassador of Canada) : March 13, 1968.

In a note of July 18, 1968, the Department declined to recognize the immunity of the Government of Canada from suit. The case involved a collision on the Great Lakes alleged to be due to the negligence of the pilot of the *Patignies*, who was an employee of the Canadian Department of Transport. The Department's note stated in part:

In the instant case, representatives of the Government of Canada contended that pilotage on the Great Lakes was "governmental" activity and therefore sovereign immunity should attach. The Department of State notes that pilotage on the Great Lakes is provided by private independent contractors working through pilot associations as well as by employees of the Canadian Department of Transport. Therefore, the Government of Canada, by directly furnishing pilotage service, is participating in an operation open to and in fact carried on by private enterprise. Consequently, the furnishing of this service does not qualify as a governmental act under the standards established in the Tate letter.

The representatives of the Government of Canada also suggested that the activity in question was performed in furtherance of a public service and in fulfillment of Canada's obligations under an international agreement. The Department of State believes that these factors are not determinative of the question whether pilotage is a governmental or commercial act, especially where, as here, the activity in question is largely carried on by private individuals as a commercial venture. In fact, the United States Government has chosen to meet its obligations under the relevant international agreements by relying on private pilots.

The representatives of the Government of Canada contended that the responsibility of the Government of Canada for pilots employed by the Department of Transport ceases when these pilots take command of a vessel. The Department of State believes that this question is a matter for the courts to determine. While a foreign sovereign, like any other employer, is not responsible for the acts of persons who are not its agents or employees, this conclusion is founded on ordinary rules of agency and not on principles of sovereign immunity.

Finally, the representatives of the Government of Canada contended that the collision had occurred in Canadian waters and that, accordingly, an action arising therefrom involving the Canadian government would not fall within the purview of a United States court. The Department of State does not, of course, have any means of determining the factual issue in question and must leave it and its legal effect on other issues of jurisdiction and choice of law to the court in this case. However, in the circumstances of this case, where the activities of Canadian pilots are carried out both in United States and Canadian territorial waters, the Department of State does not believe that the question of sovereign immunity should turn on the fortuity that the accident may have occurred in Canada.

For these reasons, the Department of State finds it necessary to decline the request of the Government of Canada that a suggestion of sovereign immunity be made in this case.

No. 61. *Amkor Corp.* v. *Bank of Korea,* 61 Civ. 444 (S.D.N.Y. 1969).

Diplomatic requests (from the Ambassador of Korea) : September 1968 and December 30, 1968.

## 1062                                  APPENDIX

Immunity from suit was denied by the Department in a letter of September 27, 1968 (quoted at 298 F. Supp. at 144), and in a note of February 6, 1969. The latter note stated in part:

The Ambassador's request for reconsideration is based upon the Department of State's unwillingness to consider evidence that no contract existed between the Bank of Korea and Amkor Corporation. The Ambassador's note contends that in making its decision the Department assumed that the transaction in question was "a simple contract for the purchase of commercial articles on behalf of a commercial enterprise."

In considering a request for a suggestion of sovereign immunity, the Department must review the acts of the governmental agency for which immunity is claimed. Under the restrictive theory applied by the Department, these acts must be characterized as "governmental" or "commercial," and the decision on sovereign immunity is based on that determination. Whether or not these acts would also constitute the elements of a contractual relationship are matters for the court and not the Department of State.

Accordingly, in this case, the Department made no legal or factual determination on the existence of a contract, or any other basis of liability. The Department did determine that the activities of the Bank of Korea relating to the acquisition of machinery, equipment and services in connection with construction of a caustic soda plant in Korea were commercial in nature. This finding would apply whether or not the activities also gave rise to a contractual relationship between the Bank and the Amkor Corporation. While the existence or nonexistence of a contract may affect the rights and liabilities of the parties, that issue is one for the court to resolve.

For these reasons, the Department of State is unable to modify its decision in this case not to suggest the sovereign immunity of the Bank of Korea.

Reported: 298 F. Supp. 143.

No. 62. *Cole* v. *Heidtman* (S.D.N.Y. 1968).

Diplomatic request (from the Ambassador of Jamaica) : June 18, 1968.

In a note of November 29, 1968, the Department declined to suggest the immunity of the British West Indies Central Labour Organization and its liaison officer. Plaintiffs, Jamaican nationals "in the United States under a program providing agricultural labor for Florida growers," alleged a conspiracy among defendants to deprive plaintiffs of civil rights, to have them falsely arrested, imprisoned and blacklisted, and to deprive them of wages and other employee rights. The Department's note stated in part:

The Government of Jamaica has urged that the British West Indies Central Labour Organization is an official agency and arm of the Government acting without profit to itself in the conduct of public acts (arranging for the employment of the workers in the United States and representing the workers in various ways while

HeinOnline -- 1977 Dig. U.S. Prac. Int'l L. 1062 1977

they are in the United States) and is, therefore, entitled to immunity from suit. By the same reasoning it is claimed that [a named person], acting as an agent of the British West Indies Central Labour Organization, is entitled to immunity.

The Department of State regrets that it cannot agree with these conclusions. In the opinion of the Department of State, the activities under consideration are of a private nature under the standards set forth in the Tate Letter. The Department of State is impressed by the fact that the activities of the British West Indies Central Labour Organization with regard to this program are very much akin to those that might be conducted by a labor union or by a private employment agency—arranging and servicing an agreement between private employers and employees. Although it may be argued that some of the acts performed by the British West Indies Central Labour Organization in this case are consular in nature, the Department believes that they arise from the involvement of the British West Indies Central Labour Organization in the private employer-employee contractual relationship rather than from a consular responsibility, and cannot be separated therefrom. It is not determinative that the British West Indies Central Labour Organization is a non-profit organization funded by the Caribbean Governments. The policy expressed in the Tate Letter focuses upon the nature of the activities of the government agency involved and not upon its character as a governmental agency or its purposes. That the functions performed by the British West Indies Central Labour Organization are inspired by an important governmental purpose, the Department of State does not question. However, when such a purpose is furthered by actions of a private nature and these actions are questioned in court, the restrictive theory prevents the Department of State from shielding them from judicial examination through a suggestion of sovereign immunity. The Department of State, therefore, finds it necessary to decline the request of the Government of Jamaica that a suggestion of sovereign immunity be made.

No. 63. *Morrison, Inc.* v. *Servicio Autonomo Nacional de Acueductos y Alcantarillados*, Civil No. 5092 (N.D. Ind. 1969).

Diplomatic request (from the Ambassador of Honduras) : November 15, 1968.

Plaintiff, an American construction firm, commenced an action seeking damages of \$20,500 for the failure of defendant, SANAA, to pay for work done by plaintiff on an aqueduct in Honduras. For the purpose of obtaining jurisdiction, equipment purchased by SANAA from another firm was attached.

Immunity from suit and attachment was denied by the Department in a note dated May 2, 1969, which stated in part :

> The Government of Honduras urges that SANAA "was not engaged in a commercial enterprise, but in the construction and erection of the aqueduct project was engaged in a public act and said public act is entitled to protection under the doctrine of sovereign

## 1064 APPENDIX

immunity." The Department of State regrets that it cannot agree with these contentions. While supply of water is often carried out by governmental agencies, this is not universally the case. In the United States, for example, a great many private companies are engaged in this enterprise. Moreover, the nature of the enterprise is essentially one of offering a product for sale to the public. For these reasons, it is the opinion of the Department of State that the activities that are the subject of this suit are of a private nature under the standards set forth in the Tate Letter. SANAA therefore cannot be regarded as enjoying sovereign immunity from the present suit.

The goods attached in Indiana are valves and other equipment commercially purchased by SANAA from a third party for use in this construction. It is, therefore, also the opinion of the Department of State that the goods in question are not immune from attachment for jurisdictional purposes.

The Department does not consider that the use of United States Foreign Assistance funds affect the issue of sovereign immunity. Foreign Assistance programs frequently involve activities of a foreign government that are of a private nature under the standards set forth in the Tate Letter.

On the basis of these conclusions, the Department of State finds it necessary to decline the request of the Government of Honduras that the Department suggest the immunity from suit of SANAA and the immunity from attachment for jurisdictional purposes of the valves and equipment purchased from RMC Specialties, Inc.

No. 64. *Pan American Tankers Corp.* v. *Republic of Vietnam*, 68 Civil 3079 (S.D.N.Y. 1968).

First diplomatic request (from the Ambassador of the Republic of Vietnam) : January 3, 1969.

Action in admiralty to recover unpaid freight and demurrage. Plaintiff had entered into a contract of affreightment with the Republic of Vietnam and a Vietnamese company for the transport of cement from Taiwan to South Vietnam. The transaction was financed through the Agency for International Development (AID), which provided U.S. dollars to the account of the Republic of Vietnam to pay plaintiff for any freight or demurrage earned under the contract. After six shipments were made, the defendants gave notice that they were suspending indefinitely further shipments under the contract. Defendants also allegedly ceased providing letters of credit for the cement suppliers in Taiwan.

Immunity from suit was denied in a Department note dated March 13, 1969, which stated in part :

In the instant case, the Republic of Viet-Nam has been made a party to an action arising out of the purchase and shipment of cement for use in Viet-Nam. In support of the request for a suggestion of sovereign immunity, attorneys for the Republic of Viet-Nam have suggested that the connection of Government officials

with the transaction in question was of a purely governmental nature, *i.e.*, supervision of foreign exchange controls. In this regard, the Department has examined the documents submitted to it and has considered the written and oral arguments relating to this issue. On the basis of this review, the Department is unable to conclude that the Republic of Viet-Nam has demonstrated that its relation to this commercial transaction was limited to the performance of governmental acts. Consequently, the Department is unable to support the request of the Ambassador for a suggestion of sovereign immunity from suit in this case.

Second diplomatic request: September 18, 1969. The Department took no action on this request for immunity from execution, having been subsequently advised that the judgment had been satisfied.

Reported: 291 F. Supp. 49 (1968), 296 F. Supp. 361 (1969).

No. 65. *Caribbean Maritime Company, Ltd.* v. *Directorate General of Commerce, Saigon*, 68 Civil 801 (S.D.N.Y. 1968).

Diplomatic request (from the Ambassador of the Republic of Vietnam) : October 23, 1969.

In a letter of February 27, 1970, the Department requested the Attorney General to suggest immunity from execution upon accounts of the Banque Nationale du Viet Nam with certain New York banks, consisting of foreign exchange reserves; and also upon accounts of Credit Commerciale unless the court should find that immunity had been waived with respect to these accounts. The Department's letter stated in part:

> The Department of State continues to adhere to the view that, absent a waiver of immunity, funds held by a foreign government in a bank in the United States are immune from execution.
> Plaintiff has argued that the arbitration clause in the charter party entered into by the Directorate General of Commerce, Saigon, constitutes a waiver of immunity from execution with respect to its property used for commercial purposes and has asked that the Department of State find that the Republic of Viet-Nam has waived immunity in this respect. The Department of State accepts the principle set forth in Section 70 of *Restatement, Second, Foreign Relations Law of the United States* which provides, in part, that a state may waive the immunity to which it is entitled, "by international agreement or by agreement with a private party, including an agreement made before the institution of proceedings. . . . A waiver of immunity from suit or from a counterclaim does not, in the absence of clear indication to the contrary, imply waiver of immunity from execution." Since this case only involves an alleged waiver in respect of commercial assets, the question of the degree of specificity and clarity required to find a waiver with respect to funds held for public purposes does not arise and the Department expresses no opinion in this regard.

In the present case the Department considers the questions of whether immunity has been waived with respect to the Republic of Viet-Nam's assets used for commercial purposes and, if so, to what specific commercial assets such a waiver was intended to apply to involve principally matters of contract interpretation, upon which it is inappropriate for the Department to express an opinion, and which the district court is in the best position to determine.

It is the Department of State's view, as previously set forth in respect of the case of *Hellenic Lines, Ltd.* v. *Republic of South Viet-Nam, et al.*, that the accounts of the Banque Nationale du Viet-Nam in the garnishee banks are foreign exchange reserves of the Republic of Viet-Nam used for public rather than commercial purposes. The nature of accounts of Credit Commerciale was not an issue in the *Hellenic Lines* case, and the Department expresses no opinion in the present case concerning whether funds of Credit Commerciale are used for commercial or for public purposes, in whole or in part.

Accordingly, the Department of State recognizes and allows the Republic of Viet-Nam's claim of immunity from execution for funds of the Banque Nationale du Viet-Nam in the garnishee banks. In addition, the Department recognizes and allows the claim of immunity from execution for funds of Credit Commerciale in the garnishee banks, unless the court should find that immunity has been waived in the present case with respect to such funds.

No. 66. *Isbrandtsen Tankers, Inc.* v. *President of India*, 68 Civ. 407 (S.D.N.Y. 1968).

Diplomatic request (from the Ambassador of India) : February 2, 1970.

Immunity from suit was recognized as to one cause of action only, in a letter to the Attorney General dated September 16, 1970, which stated in part:

The Department has been informed by the Government of India that it accepts the jurisdiction of the district court with respect to the claims set forth in the complaint for demurrage and freight under the charter party. However, it considers the claim for detention damages to involve governmental acts by officials of the Government of India and has claimed immunity from jurisdiction of the court with respect to the detention claim stated in the complaint.

The Department of State considers that plaintiff's claim for damages for detention set forth in the second cause of action draws into issue acts of Indian Government officials which were governmental rather than commercial in nature. In consequence, the Department recognizes and allows the Indian Government's immunity from suit with respect to plaintiff's claim for detention damages. The Department of State's determination concerns only the issue of immunity of the Government of India from suit on the second cause of action and is without prejudice to the merits of the claims or other defenses asserted in this case.

Under the second cause of action. plaintiff claimed that Indian port officials had acted unreasonably in delaying the discharge of cargo from plaintiff's vessels during a backup in the port of Calcutta. The remaining causes of action, as to which immunity was not recognized, were based on alleged breach of the charter party.

Reported: 446 F. 2d 1198 (2d Cir. 1971), *cert. denied*, 404 U.S. 985.

No. 67. *Venore Transportation Co.* v. *President of India*, 67 Civ. 2578, 68 Civ. 1134–1139 (S.D.N.Y. 1967 and 1968).

Diplomatic request (from the Ambassador of India) : November 2, 1970.

In a note of June 22, 1971, the Department declined to suggest immunity in a series of charter party suits parallel to the *Isbrandtsen Tankers* case (No. 66, *ante*). The Department's note stated in part:

> According to Your Excellency's communication and subsequent memoranda submitted on behalf of the Government of India. the cause of action stated in each complaint relates to contract demurrage based upon a charter party entered into between the plaintiff shipping firm and the President of India, represented by the Director General of the Indian Supply Mission. Each of the charter parties upon which the demurrage claims are based contains a clause providing that any and all differences and disputes arising under the charter party are to be determined by the United States Courts for the Southern District of New York. The Department of State understands that the Government of India generally accepts the jurisdiction of the district court with respect to demurrage claims based upon the provisions of the charter parties. However, Your Excellency's communication refers to the possibility that certain theories of liability might be pursued under the demurrage cause of action that could involve examination of governmental activities of the Government of India and asserts immunity from such examination.
>
> In considering requests for suggestions of sovereign immunity, the Department of State applies the restrictive theory of sovereign immunity as announced in the "Tate Letter" of May 19. 1952. (26 Department of State *Bulletin* 984–85). Under this theory, the immunity of the sovereign is recognized with regard to sovereign or public acts of a commercial nature. In view of the fact that plaintiff's claim in each of the present cases is based on a commercial contract, as well as the fact that the President of India has consented in the charter parties to jurisdiction of the District Court for the Southern District of New York for all disputes arising under the charter party, the Department of State has concluded that no basis exists for recognition of immunity with respect to the contract demurrage cause of action stated in the present cases. The Department considers that questions concerning the scope of the claims that may be made as a matter of law within the provisions of the charter parties are for the courts to resolve.

The Department wishes to emphasize that its determination concerns only the issue of immunity of the Government of India from suit on the contract demurrage cause of action set forth in the aforementioned cases and is without prejudice to the merits of the claims or of defenses, including the act of state doctrine, that might be asserted in these cases.

Your Excellency's communication of November 2, 1970, also makes reference to the suggestion of sovereign immunity submitted by the United States Attorney to the District Court for the Southern District of New York with respect to the detention cause of action in the case of *Isbrandtsen Tankers, Inc.* v. *President of India*, Index No. 68 Civil 407. The Department confirms that nothing in the determination contained in the present note is intended to limit the suggestion of sovereign immunity submitted in that case.

No. 68. *The S.S. Tumbes* (S.D. Ala.).

Diplomatic request (from the Chargé d'Affaires of the Embassy of Peru) : March 13, 1970.

The note of the Peruvian Chargé d'Affaires requested that the Department cause a suggestion of immunity to be filed in an action in which the vessel *Tumbes* had been attached and seized in the port of Mobile, Alabama. It stated that there was danger that the vessel would be sold by default and that time was of the essence. The Department advised counsel for the Peruvian Government that it could not suggest immunity without giving the plaintiff an opportunity to present its views according to established procedures. The Department made no decision, having been advised that counsel for the Peruvian Government would post a guaranty bond to obtain release of the ship.

No. 69. *Townsley* v. *American Airlines, Inc. and Mexican National Tourist Council*, No. 69–L–2170 (Cir. Ct., Cook County, Ill. 1969).

Diplomatic request (from the Ambassador of Mexico) : March 18, 1970.

Immunity from suit was recognized in a letter to the Attorney General dated December 9, 1970.

This was a suit for personal injuries allegedly incurred from a fall during a tour of Mexico sponsored by the defendants. In its request, the Embassy of Mexico stated that "the activities for the promotion of tourism by offices and agents of a foreign government are recognized as a governmental function, and that the acts of such offices and agents are sovereign or public acts *(jure imperii)* . . . . " It was also asserted that the National Tourist Council had merely advised American Airlines, lent its name to promotional material, and furnished a tourist guide in one of the Mexican cities visited. The Department, in a note dated December 9, 1970, stated that it had recognized immunity on

the ground that "the sponsorship of the Travel Agents Familiarization Tour involved acts of a governmental rather than commercial nature."

[This decision may not have fully comported with the Tate Letter, in that the defendants had participated in the sale and provision of commercial travel services and the claimed tort had allegedly taken place in the course of providing those services. Under the Foreign Sovereign Immunities Act, one would have had to consider whether this tort claim had sufficient contacts with the United States. 28 U.S.C. 1605(a) (2) and (5).]

No. 71. *United States* v. *City of Glen Cove*, No. 70C–1188 (E.D.N.Y.).

Suit by the United States to enjoin a tax foreclosure sale by the City of Glen Cove against a residence of the Soviet Permanent Representative to the United Nations. The Department, in a letter to the Attorney General of October 16, 1970, stated that it "accepts as true the diplomatic representations" of the Soviet Government that the property "is used as a residence of its Permanent Representative to the United Nations and his deputies having the rank of Ambassador or Minister. . . ."

Reported : 322 F. Supp. 149. *aff'd*, 450 F.2d 884 (2d Cir. 1971).

No. 73. *Premier Steamship Co.* v. *Embassy of Algeria*, No. 71 Civ. 2674 (S.D.N.Y. 1971).

A petition to compel arbitration. In a letter to petitioner's counsel of August 11, 1971, the Department stated that Algeria had closed its Embassy in the United States and that "an Embassy and its diplomatic agents are entitled to immunity from United States jurisdiction." The court held this letter not to constitute a binding suggestion of immuniy.

Reported :336 F. Supp. 507.

No. 74. *Maher, et al.* v. *United Arab Republic, et al.,* No. 635–732 (Sup. Ct. Calif., Cty. San Francisco).

Diplomatic request (from the Embassy of India, Egyptian Interests Section) : September 14, 1971.

Immunity denied by the Department in a note dated September 17, 1971. The suit for quiet enjoyment of rented property and for damages, was brought by tenants of a building owned by the United Arab Republic. It had been leased from real estate agents representing the Egyptian Interests Section of the Embassy of India. The building had served as the Egyptian Consulate in San Francisco prior to the suspension of diplomatic relations between the United States and Egypt in

the aftermath of the 1967 Middle East War. The Egyptian Interests Section claimed that the real estate agents had leased the building without authority and, in light of article 27 of the Vienna Convention on Consular Relations, asserted that the Department should both recognize immunity and assist in the recovery of the premises. The Department's note stated in part:

> According to the restrictive theory of sovereign immunity as followed in the United States, the immunity of a sovereign is recognized with regard to sovereign or public acts of a state, but not with respect to commercial acts. In view of the circumstances involved in this matter, including the fact that the property in question was made available for lease through agents selected by the Egyptian Interests Section, the Department of State does not believe this to be an appropriate case for a suggestion of sovereign immunity from the court's jurisdiction.

No. 75. *Laszlo* v. *Republic of Cyprus*, Index 1542/72 (Sup. Ct., N.Y., Cty. N.Y. 1972).

Diplomatic requests (from the Embassy of the Republic of Cyprus) : February 4, 8, and 23, 1972.

Plaintiff was the assignee of a Liberian corporation that became a dredging subcontractor on a project to renovate and expand the harbor facilities at Limassol, Cyprus. Plaintiff attached two New York bank accounts of the Republic of Cyprus used to fund its Permanent Mission to the United Nations and other governmental activities. One account was in the name of the Permanent Mission, and the other in the name of the Central Bank of Cyprus. With respect to the first account, the Department, in a letter of January 27, 1972, advised the Attorney General that "the Permanent Mission states the account in question is the official account of the Permanent Mission and that the moneys in the account are used for the official purposes of the Mission," and that the Department recognized the immunity of this bank account from attachment (but that it took no position on an account of the Central Bank of Cyprus). In a second letter, dated February 24, 1972, the Department advised the Attorney General that it recognized the immunity of the account of the Central Bank from attachment, noting that the Embassy of the Republic of Cyprus had represented that this account "is used primarily to fund accounts of the Permanent Mission of Cyprus to the United Nations and the Embassy of the Republic of Cyprus, and that the only other use of the account is for activities of other government agencies, none of which is commercial in nature."

In an opinion of March 17, 1972, the court vacated the attachments based on the suggestions of immunity filed by the U.S. Attorney.

No. 77. *Republic International Corporation* v. *AMCO Engineers, Inc., Uruguay Ministry of Public Works, Republic of Uruguay, et al.*, Civil Action No. 72–1222–RJK (C.D. Calif.).

Diplomatic request (from the Embassy of Uruguay) : July 5, 1972.

Immunity from suit denied by the Department, in a note of October 1972.

AMCO Engineers, Inc. and the Uruguay Ministry of Public Works entered into contract under which AMCO agreed to provide engineering services in connection with the construction of highways in Uruguay financed by the Inter-American Development Bank and the International Bank for Reconstruction and Development. AMCO assigned its interest in the contract to the plaintiff, allegedly without the consent of the Republic of Uruguay. The Ministry of Public Works terminated all payments under the contract, and plaintiff brought suit for breach of contract. The Department's note stated in part :

> The Department is of the opinion that the contract for engineering services which is the subject of the pending litigation is essentially a commercial transaction. The affiliation of the Ministry of Public Works with the Government of Uruguay does not alter the commercial nature of the transaction. The Department, therefore, finds it necessary to decline the request of the Government of Uruguay that a suggestion of sovereign immunity be made.

No. 78. *Damion* v. *Gevens and Kingdom of Belgium*, No. 72L–7777 (Cir. Ct. Cook County, Ill.).

Diplomatic request (from the Ambassador of Belgium) : August 8, 1972.

No Department decision. The Department declined to take action until an outstanding issue relating to insufficient service of process had been resolved by the court. The Department had been advised that service was attempted on the Consulate General of Belgium at Chicago, and that the service was being challenged.

No. 79. *Battery Steamship Corp.* v. *Republic of South Vietnam*, No. C–72–1440 RFP (N.D. Calif.).

Diplomatic request (from the Ambassador of the Republic of Vietnam) : September 8, 1972.

Immunity from attachment was recognized by the Department, in a letter to the Attorney General dated November 6, 1972. The letter stated, "The funds in question are public funds of the Government of Vietnam deposited to the account of the National Bank of Vietnam."

In a subsequent letter to the Attorney General, dated July 24, 1973,

the Department conveyed its views concerning plaintiff's position that the court should exercise *in personam* jurisdiction in this case. This letter is quoted in *Digest of United States Practice in International Law, 1973*, at 227–230.

No. 80. *Pacheo Ruiz* v. *Air France, Republic of France*, Civil Action No. 609–72 (D.P.R.); *Cruz Candelaria* v. *Air France, Republic of France*, Civil Action No. 754–72 (D. P. R.); and related actions.

Diplomatic requests: September 8 and 11, 1972.

No Department decision. The Department declined action pending resolution by the court of a question of sufficiency of service. These actions involved claims of negligence against Air France in connection with the terrorist attack at Lod Airport in Tel Aviv in 1972.

No. 81. *Vincente, et al.* v. *State of Trinidad and Tobago, et al.*, Index No. 7917/70 (Sup. Ct. N.Y., N.Y. County).

Diplomatic request (from the Ambassador of Trinidad and Tobago): October 6, 1972.

Request for immunity from suit was denied by the Department, by a note dated January 11, 1974.

The plaintiff, Vincente, suffered a fall while visiting Trinidad and Tobago, and was treated in a government hospital there. The complaint alleged that Vincente suffered injuries as a result of improper treatment in the hospital. Counsel for Trinidad and Tobago argued, *inter alia*, that the provision of hospital services in question was not a commercial activity, was a governmental function, and had occurred entirely outside the jurisdiction of the United States. The Department's note stated in part:

> After weighing all aspects of this matter, the Department of State has concluded that under United States practice and jurisprudence the activities in question were essentially of a private nature for purposes of the Tate Letter and that the restrictive theory of immunity described in the Tate Letter must be applied in this case. While sympathetic to the position of the Government of Trinidad and Tobago in this case, the Department of State cannot, consistent with its practice in these cases, make a suggestion of immunity based on considerations in the nature of the convenience of the forum or service of process.

No. 82. *Renchard* v. *Humphreys & Harding, et al.*, Civil Action No. 2128–72 (D.D.C.).

First diplomatic request from the Brazilian Embassy): December 6, 1972.

Suit by an owner of the property adjoining the Embassy of Brazil in Washington, for property damage allegedly caused by construc-

tion of the Embassy. Request for immunity from suit was denied by the Department, in a note dated January 30, 1974.

Second diplomatic request : April 4, 1975.

This second request arose under an amended complaint. By a Department note dated July 7, 1975, immunity from suit was again denied, except to the extent that punitive damages were sought.

Reported : *Digest of United States Practice in International Law, 1974,* at 263–264 ; *Digest of United States Practice in International Law, 1975,* at 342–344 ; 59 F.R.D. 530 (D.D.C.).

No. 84. *Soobitsky* v. *German Federal Railroad,* 1972 Civ. 213 (S.D.N.Y.).

Diplomatic request (from Embassy of the Federal Republic of Germany) : June 25, 1973.

The action was for injuries arising from a train derailment in Germany. The Department declined to make a decision pending resolution of a defense of insufficient service of process.

No. 85. *Deep, Deep Ocean Products, Inc.* v. *Union of Soviet Socialist Republics, and Sovrybflot,* Civil Action No. 73–3052–F (D. Mass. 1973).

Diplomatic request and protest (from the Soviet Embassy) : September 7, 1973.

Immunity from attachment was recognized by the Department in a letter to the Attorney General dated September 14, 1973, on grounds that the attached vessel in question was engaged in a public function, a joint U.S.–U.S.S.R. scientific mission.

Reported : *Digest of United States Practice in International Law. 1973,* at 224–225 ; and 493 F.2d 1223 (1st Cir. 1974).

No. 86. *Industria Azucarera Nacional, S.A., et al.* v. *Empresa Navegacion Mambisa* (as owner of the M/V *Imias*), Civil Action No. 7902 (D.C.Z.) ; reported as *Spacil* v. *Crowe.*

Diplomatic request (by Embassy of the Czechoslovak Socialist Republic on behalf of the Republic of Cuba) : October 3, 1973.

Immunity from attachment of a Cuban vessel was recognized by the Department, in a letter to the Attorney General dated October 25, 1973.

Reported : *Digest of United States Practice in International Law, 1973,* at 225–227 ; *Digest of United States Practice in International Law. 1974,* at 268–271 ; 13 Int'l Legal Materials 120 (1974) ; and 489 F.2d 614 (5th Cir. 1974). See Leigh, *Sovereign Immunity—The Case of the "Imias,"* 68 Am. J. Int'l L. 280 (1974).

**1074**                              APPENDIX

No. 87. *Holden* v. *United States, Commonwealth of Australia, et al.,* No. C-73 1313 ACW (N.D. Calif.).

Diplomatic request (from the Embassy of Australia) : October 5, 1973.

No Department decision. The case against the Commonwealth of Australia was dismissed by the court on grounds of insufficient service. The court said that service on the Consul General for Australia was ineffective, because "a consul is not an agent . . . for the purpose of receiving service of process."

No. 88. *Aerotrade Inc.* v. *Republic of Haiti,* 73 Civ. 3587 (S.D.N.Y.).

Diplomatic request (from the Embassy of the Republic of Haiti) : October 29, 1973.

No Department decision. The Department was advised by counsel for defendant that his client was withdrawing its request for a Department decision.

Reported: 376 F. Supp. 1281 (S.D.N.Y. 1974) ; 416 F. Supp. 1114 (S.D.N.Y. 1976). See, Lowenfeld, *Litigating A Sovereign Immunity Claim—The Haiti Case,* 49 N.Y.U.L. Rev. 377 (1974).

No. 92. *Granados, et al.* v. *Linea Aeropostal Venezolana, et al.,* Nos. 73-20665 *et seq.* (Cir. Ct. Dade County, Fla. 1973).

Diplomatic request (from the Embassy of Venezuela) : December 27, 1973.

No Department decision. The Department declined action pending the resolution of certain outstanding jurisdictional issues by the court.

No. 93. *North East Shipping Corp.* v. *Government of Pakistan,* Civil Action No. 72-Civ-4750 CMM (S.D.N.Y. 1972).

Diplomatic request (from the Embassy of Pakistan) : February 15, 1974.

Request for immunity from suit denied by the Department, in a note dated December 31, 1974, quoted in *Digest of United States Practice in International Law, 1974,* at 266.

No. 94. *Walnut Equipment Leasing Co.* v. *Central African Delegation,* Index No. 9932-74 (Civ. Ct., City of N.Y. 1974).

Diplomatic request (from the Embassy of the Central African Republic) : March 20, 1974.

Immunity from execution to satisfy a default judgment was recognized by the Department, in a letter to the Attorney General dated

April 8, 1974. The Department was subsequently advised that the case was settled.

Reported: *Digest of United States Practice in International Law, 1974*, at 267.

No. 95. *Sea Transport Corp. as owner of the S/T Eagle Voyager* v. *The S/T Manhattan*, 74 Civ. 2096 (WCC) (S.D.N.Y. 1974).

Diplomatic request (from the Embassy of the People's Republic of Bangladesh) : November 8, 1974.

No Department decision. Department declined action until outstanding jurisdictional issues were resolved by the court.

Reported: *Digest of United States Practice in International Law, 1974*, at 273 ; and 405 F. Supp. 1244 (S.D.N.Y. 1975).

No. 96. *Semonian* v. *Crosbie, Government of the Province of Newfoundland, et al.*, Civil Action No. 74–4893–T (D. Mass. 1974).

Diplomatic request (from the Embassy of Canada) : November 13, 1974.

Immunity from suit was recognized in part by the Department, in a letter to the Attorney General dated February 20, 1976.

The lawsuit involved two written agreements between the Province of Newfoundland and a Canadian corporation ("Canadian Javelin") concerning the exploitation of timber resources on public lands of the Province. Under the first agreement (the "original agreement"), Canadian Javelin was to construct a mill, a plant and other facilities; to help obtain financing, the Province agreed to guarantee loan obligations of Canadian Javelin.

Following a change of administration in the Province of Newfoundland, a dispute arose between the newly-elected government and Canadian Javelin, involving in part Canadian Javelin's alleged insufficient performance under the original agreement and its ability to pay loans guaranteed by the Province. To resolve the dispute, the parties entered into a second agreement (a settlement agreement) under which Canadian Javelin relinquished its interests in the timber projects and the Province agreed to pay $5 million and to indemnify Canadian Javelin for certain contingent obligations.

The partial recognition of immunity in this case ( a shareholder's derivative suit) related to three counts in the complaint claiming fraud and misrepresentation against the Province of Newfoundland and its officials, in inducing Canadian Javelin to enter into the original agreement and the settlement agreement. It should be noted that section 1605(a)(5) of the Foreign Sovereign Immunities Act of 1976 (P.L. 94–583; 28 U.S.C. 1605(a)(5))—which was pending before the Congress when this case was before the Department—accords im-

## 1076 APPENDIX

munity with respect to noncommercial torts of fraud and misrepresentation. Immunity was denied, in a Department note dated March 16, 1976, as to a claim that the Province breached the indemnification provisions of the settlement agreement.

In addition to the partial immunity of the Province of Newfoundland, a full immunity from this suit was recognized for individual officials of the Province. The Department's February 20, 1976, letter noted that there was "no allegation that the officials . . . acted other than in their official capacities and on behalf of the Province."

Reported: *Digest of United States Practice in International Law, 1976,* at 328–329.

No. 97. *Greenspan, et al.* v. *Crosbie, et al.,* No. 74 Civ. 4734 (JCM) (S.D.N.Y.).

Diplomatic request: November 20, 1974.

Immunity from suit was recognized in part by the Department, in a letter to the Attorney General dated February 20, 1976.

This case has a background similar to that of the preceding case. As part of its overall plan to develop timber and other resources on publicly owned lands, the Province of Newfoundland created a crown development corporation which it sold to a Canadian company, Canadian Javelin, in return for about 80,000 shares of Canadian Javelin stock. Following a change of administration in the Province, the newly-elected government directed the sale of this stock through a Canadian brokerage firm. The Canadian brokerage firm, in turn, sold some of the stock through its U.S. affiliate. The plaintiffs alleged that they were purchasers of Canadian Javelin stock in the United States who were injured, *inter alia,* by various failures by the Province and its officials to disclose material information about the stock and about the Province's plans to preclude Canadian Javelin's future participation in government projects—in alleged violation of section 10b of the Securities Exchange Act and Securities and Exchange Commission Rule 10b–5.

The Department recognized a full immunity from suit of individual officials of the Province of Newfoundland, noting that "although it is alleged that the defendant officials of the Province of Newfoundland acted in excess of their authority, it is not alleged that these officials acted other than in their official capacities and on behalf of the Province." Other portions of the Department's letter to the Attorney General, recognizing a partial immunity of the Province itself, are quoted in *Digest of United States Practice in International Law, 1976,* at 330.

In a memorandum opinion, the district court dismissed the action against both the Province and its officials, on the basis of both the

Department's suggestion of immunity and a holding that a foreign government province was not a "person" within the meaning of the Securities Exchange Act, at least not prior to the 1975 amendments to that Act.

No. 99. *Psinakis* v. *Marcos*, Civil Action No. C-75-1725-RHS (N.D. Calif. 1975).

Diplomatic request (from the Embassy of the Republic of the Philippines) : September 1975.

Head of State immunity was recognized by the Department in a letter to the Attorney General dated September 26, 1975. The Department, however, did not decide that portion of the request seeking recognition of immunity of other Philippine officials named as defendants.

Reported: *Digest of United States Practice in International Law, 1975.* 344-345.

No. 100. *State ex rel. Haddock* v. *Chubu Electric Power Co., Inc.,* No. 9370 (Roane County Ch. Ct., Tenn., Dec. 1, 1975) ; and *In re Chubu Electric Power Co., Inc.* (Assessment App. Comm'n, Tenn. Bd. Tax Equal., May 28, 1976).

Diplomatic request (from the Embassy of Japan) : October 24, 1975.

Actions relating to an attempted taxation by local authorities of uranium which was stored for Japanese utility companies in Oak Ridge, Tennessee, and which was purchased pursuant to undertakings between the Governments of Japan and of the United States. No Department decision. The request was formally withdrawn on May 25, 1976, on the basis of a settlement. See, Brower, *Litigation of Sovereign Immunity Before a State Administrative Body and the Department of State: The Japanese Uranium Tax Case,* 71 Am. J. Int'l L. 438 (1977).

No. 101. *Rovin Sales Company* v. *Socialist Republic of Romania,* Civil Action No. 73-C-1550 (N.D. Ill., E. Div. 1973).

Diplomatic request (from the Embassy of the Socialist Republic of Romania) : November 30, 1975.

No Department decision. The Department learned that the issue of sovereign immunity in this case had been previously decided by the court. The Department's letter to counsel describing the posture of the case stated in part:

In this regard, however, counsel for the Romanian Government defendants has represented to the Department that the defense of sovereign immunity has not been specifically briefed and argued before the Court—at least insofar as it pertains to defendants Socialist Republic of Romania, Octavian Ichim and Teodor Muteanu.

HeinOnline -- 1977 Dig. U.S. Prac. Int'l L. 1077 1977

## 1078 APPENDIX

As a matter of policy the Department, representing one of the political branches, is generally reluctant to take a position in matters pending before the judicial branch—unless the posture of the proceedings so requires. We have consistently followed this policy in the sovereign immunity area where, in the conduct of foreign relations, we are asked by diplomatic request to make a determination of sovereign immunity from *jurisdiction*. By way of background, the Department does not wait for a clarification of the procedural posture of litigation where the case involves sovereign immunity from *attachment*. But in that situation, an attachment of foreign government property is a direct and complete exercise of jurisdiction by a court, making appropriate an immediate determination of immunity by the Department.

In the present case, the Department is concerned about the orderly administration of litigation before a coequal branch of government, and about duplicating an inquiry which may possibly have been fully reviewed, litigated and determined with finality by the Court. Consequently, the Department is adopting the following position:

Unless the Court determines that the defense of sovereign immunity either is still pending or should be reconsidered, the Department will not proceed itself to make a determination with respect to sovereign immunity.

Reported: 403 F. Supp. 1298 (N.D. Ill. 1975).

No. 102. *Logan, et al.* v. *Secretary of State, et al.*, Civil Action No. 75-1519 (D.D.C. 1975).

Diplomatic request by the Embassy of France: December 8, 1975; by the British Embassy: December 8, 1975.

The Department recognized immunity from attachment, suit and other legal process, of certain gold held jointly by the United States, the United Kingdom and France under the Paris Reparation Agreement of 1946.

Reported: *Digest of United States Practice in International Law, 1975,* at 345–346; 553 F. 2d 107 (D.C. Cir. 1976).

No. 103. *Seabulk Carriers, Inc.* v. *Central Bank of Nigeria, et al.,* and *The Kaiser Trading Company* v. *Central Bank of Nigeria, et al.,* Index Nos. 18970/75 and 19329/75 (Sup. Ct. N.Y., County of N.Y.).

Diplomatic request (from the Embassy of the Federal Republic of Nigeria): December 24, 1975.

No Department decision.

For related cases, see *National American Corporation* v. *Federal Republic of Nigeria,* 420 F. Supp. 954 (S.D.N.Y. 1976), 425 F. Supp. 1365 (S.D.N.Y. 1977) ; *Trendex Trading Corporation Ltd.* v. *Central Bank of Nigeria,* [1977] 2 W.L.R. 356 (C.A.), 16 I.L.M. 471.

No. 104. *D'Angelo* v. *Petroleos Mexicanos*, Civil Action No. 74–17 (D. Del. 1974).

Diplomatic request (from the Embassy of Mexico) : February 20, 1976.

No Department decision. In December 1976, the Department advised counsel that inasmuch as the Foreign Sovereign Immunities Act of 1976 was about to take effect and since the issue of sovereign immunity was not ripe for decision (a court decision on an Act of State issue was in the process of being appealed), the Department would not make a determination of sovereign immunity in this case.

Reported : 378 F. Supp. 1034 (D. Del. 1974) ; 398 F. Supp. 72 (D. Del. 1975) ; 422 F. Supp. 1280 (D. Del. 1976).

No. 106. *Citizens Utilities Company* v. *Compania Servicios Publicos de Nogales, S.A., Comision Federal de Electricidad, and the Republic of Mexico*, No. Civ. 75–268 TUC–JAW (D. Ariz. 1975).

Diplomatic request (from the Embassy of Mexico) : March 26, 1976.

No Department decision. The Department was advised by defendants' counsel that the request was being withdrawn and that the claim of immunity would be litigated before the court.

No. 107. *Gittler* v. *German Information Center, et al.*, Index No. 02815/76 (Sup. Ct. N.Y., County of N.Y. 1976).

Diplomatic request (from the Embassy of the Federal Republic of Germany) : May 26, 1976.

Request for immunity from suit was denied by the Department on January 13, 1977.

This suit was brought by the executrix of the estate seeking payment for services allegedly rendered to the German Information Center. The note of the Department to the Embassy stated in part:

The Department of State has carefully considered the written memoranda and accompanying documents submitted on behalf of both the plaintiff and the German Information Center, as well as the oral presentation made on behalf of the German Information Center. (Plaintiff relied solely on her written submissions.) Based on this review, it appears that the litigation in question concerns a claim that an individual was employed by the German Information Center to perform public relations and related services for which he was not paid. In particular, the individual assisted in the production of motion pictures which promoted the image of the Federal Republic of Germany. Although this alleged employment may have involved the exercise of artistic or technical expertise, it did not involve the formulation of government policies. Moreover, the Department notes that the employment or engagement of persons to perform public relations services is a transaction that is common, both

## 1080 APPENDIX

in the public and private sectors. The Department has concluded that such employment is not, in these circumstances, a uniquely governmental activity, but is rather essentially of a commercial or private law nature. In light of international law as applied by the United States, the Department has determined that it would not be appropriate to recognize sovereign immunity in this case.

It should be emphasized that this conclusion does not, in any respect, reflect upon the underlying merits of the lawsuit, or on procedural issues such as whether the proper party has been sued.

The Embassy may be assured that the Department of State has given the most careful consideration to the request of the Embassy. In view of the Embassy's request, the Department has endeavored to reach a decision before the Foreign Sovereign Immunities Act of 1976 (P.L. 94-583) takes effect, and, in so doing, has studied in detail the considerations advanced by the parties and their counsel. The Department regrets that a more favorable determination was not possible.

No. 108. *Ungureanu* v. *Socialist Republic of Romania*, Index No. 09793/1976 (Sup. Ct. N.Y., County of N.Y. 1976).

First diplomatic request (from the Embassy of the Socialist Republic of Romania) : August 18, 1976.

Immunity from attachment of the offices of the Permanent Mission of the Socialist Republic of Romania to the United Nations was recognized by the Department, in a letter to the Attorney General dated August 20, 1976.

Second diplomatic request : September 30, 1976.

Immunity from attachment of the residence of the Permanent Representative of the Socialist Republic of Romania was recognized by the Department, in a letter to the Attorney General dated October 12, 1976.

Reported: *Digest of United States Practice in International Law, 1976,* at 830-331.

No. 110. *India Towing Co., Inc.* v. *French Republic,* No. 76 Civ. 5266 (S.D.N.Y. 1976).

Diplomatic request (from the Embassy of France) : January 4, 1977.

Immunity from attachment was recognized by the Department, in a letter to the Attorney General dated January 13, 1977. The letter stated in part:

The Republic of France, through its Embassy, has sent a diplomatic note requesting that the Department of State determine that certain property is immune from attachment. The property in question is a deposit account held in the name of Banque de France, the central bank of the Republic of France, at the branch of Credit Lyonnias located at 95 Wall Street, New York, New York. This account was attached on or about December 7, 1976, apparently in order to commence the above-entitled lawsuit.

The Embassy's note represents that the funds in this bank account "consist solely of funds maintained on deposit in the United States as dollar reserves of the Republic of France," that "the attached funds are used solely for dollar reserves of the Republic of France deposited in the United States," and that the funds are not "devoted to a commercial or private use." The Department has not received from counsel for plaintiff any information inconsistent with the foregoing representations.

The Department recognizes and allows the immunity of the bank account in question from attachment. The Department would be grateful if you would cause an appropriate suggestion of sovereign immunity to be filed with the United States District Court for the Southern District of New York, on or before January 18, 1977.

It should be noted that the Foreign Sovereign Immunities Act of 1976 (P.L. 94–583) takes effect on January 19, 1977. As indicated in my letter to you of November 2, 1976 (which has been published at 41 *Fed. Reg.* 50883), the Department of State will not make any further determinations of sovereign immunity on or after January 19, 1977. The Act requires that, as of that date, all sovereign immunity determinations in the United States will be made by the courts in accordance with P.L. 94–583.

In this regard, it appears that if the issue of immunity from attachment in the above-entitled litigation had been determined on or after January 19, 1977, the outcome would not have been different. By virtue of section 1609 of P.L. 94–583, foreign governments would be entitled to an immunity from attachments levied for the purpose of obtaining jurisdiction.

A suggestion of immunity was filed by the U.S. Attorney on January 17, 1977, two days prior to the entry into force of the Foreign Sovereign Immunities Act of 1976. The court vacated the attachment, and in an opinion dated March 3, 1977, stated:

The State Department has recognized the immunity of the funds in question from attachment and has caused a Suggestion of Immunity to be filed with the Court. This suggestion is binding upon the Court, which has no power to inquire into the validity of the Department's determination. *Republic of Mexico* v. *Hoffman*, 324 U.S. 30, 34 (1945) ; *Ex parte Republic of Peru*, 318 U.S. 578, 588–89 (1943) ; *Spacil* v. *Crowe*, 489 F.2d 614 (5th Cir. 1974) ; *Isbrandtsen Tankers, Inc.* v. *President of India*, 446 F.2d 1198 (2d Cir.), *cert. denied*, 404 U.S. 985 (1971) ; *New York and Cuba Mail S.S. Co.* v. *Republic of Korea*, 132 F. Supp. 684 (S.D.N.Y. 1955).

Even if the new Foreign Sovereign Immunities Act, P.L. 94–583, 90 Stat. 2891 (Oct. 21, 1976), governed this case, the funds in question would be immune from attachment, since it is undisputed that they are funds of a foreign central bank. 28 U.S.C. 1611(b) (1). *See also* 28 U.S.C. 1609, 1610(d).

Accordingly, the motion to vacate the attachment is granted. Since plaintiff's counsel conceded at argument that the attachment was the only basis for jurisdiction over the defendant, the motion to dismiss for lack of jurisdiction is also granted.

HeinOnline -- 1977 Dig. U.S. Prac. Int'l L. 1082 1977

# TABLE OF CASES FOR APPENDIX

*Aerotrade Inc.* v. *Republic of Haiti* (1976), case no. *88*, 1074

Afghanistan. *See* case no. *14*

*Airmotive Suppliers Corp.* v. *Republic of Haiti* (1958), case no. *16*, 1035

Algeria. *See* case no. *73*

*Alora Compania Naviera S.A.* v. *Embassy of the Philippines* (1973), case no. *91*, 1021

*American Trading and Production Corporation* v. *Banco de Brasil* (1960), case no. *24*, 1039

*Amkor Corp.* v. *Bank of Korea* (1969), case no. *61*, 1061

*Anderson* v. *South African Airways* (1955), case no. *9*, 1029

Arbitration. *See* case nos. *45, 73*

*Arcade Bldg. of Savannah* v. *Republic of Cuba* (1961), case no. *26*, 1040

Argentina. *See* case nos. *1, 36, 48*

*Arias* v. *SS Fletero and Cia. Argentina de Navegacion Dodero* (1952), case no. *1*, 1025

Attachment, immunity from. *See* case nos. *3, 6, 16, 24, 25, 32, 38, 42, 46, 52, 53, 57, 59, 63, 68, 75, 79, 85, 86, 102, 108, 110*

Australia. *See* case no. *87*

Administrative proceedings, immunity from. *See* case nos. *10, 20, 100*

Bangladesh, People's Republic of. *See* case no. *95*

*Battery Steamship Corp.* v. *Republic of South Vietnam* (1973), case no. *79*, 1071

Belgium. *See* case no. *78*

*Benton* v. *Cuban Air Force, F.A.R.* (1962), case no. *34*, 1045

*Bergstresser* v. *Cuban Air Force, F.A.R.* (1961), case no. *31*, 1043

*Berizzi Bros. Co.* v. *S.S. Pesaro* (1926), 1052

*Berlanti Construction Co.* v. *Republic of Cuba* (1962), case no. *29*, 1042

*Better* v. *Government of Burundi* (1964), case no. *42*, 1049

*B.N.S. International Sales* v. *Embassy of United Arab Republic Purchasing Bureau* (1965), case no. *50*, 1054

Brazil. *See* case nos. *24, 82*

*Brown International* v. *Republic of the Sudan* (1967), case no. *53*, 1056

(1083)

Burundi. *See* case no. *42*

Canada. *See* case nos. *19, 60, 96, 97*

*Cargo and Tankship Management Corp.* v. *India Supply Mission* (1964), case no. *43*, 1050

*Caribbean Maritime Company, Ltd.* v. *Directorate General of Commerce* (1968), case no. *65*, 1065

*Caribbean Mercantile Export Co.* v. *Compania Dominicana de Aviacion* (1967), case no. *54*, 1057

*Carpets by Certified, Inc.* v. *Permanent Mission of Ghana to the United States* (1968), case no. *56*, 1058

Central African Republic. *See* case no. *94*

Chad. *See* case no. *41*

*Chemical Natural Resources, Inc.* v. *Republic of Venezuela* (1964), case no. *40*, 1048

China, Republic of. *See* case nos. *8, 11*

*Chuba Electric Power Co., Inc., In re* (1976), case no. *100*, 1077

*Citizens Utilities Company* v. *Compania Servicios Publicos de Nogales, S.A., Comision Federal de Electricidad, and the Republic of Mexico* (1975), case no. *106*, 1079

*City of New Rochelle* v. *Republic of Ghana* (1964), case no. *44*, 1050

*Cole* v. *Heidtman* (1968), case no. *62*, 1062

*Compania Espanola* v. *Navemar* (1966), 1051

Counterclaim and cross-complaint, immunity from. *See* case nos. *8, 11*

Court determination of immunity. *See* case nos. *7, 45A, 50, 88, 101, 106*

*Cross & Brown Co.* v. *Republic of Zaire* (1976), case no. *105*, 1021

Cross-complaint and counterclaim, immunity from. *See* case nos. *8, 11*

*Cruz Candelaria* v. *Air France, Republic of France* (1972), case no. *80*, 1072

Cuba. *See* case nos. *3, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 38, 46, 51, 86*

*Cuba* v. *Flota Maritima Browning de Cuba S.A.* (1966), case no. *38*, 1047

Cyprus. *See* case no. *75*

Czechoslovakia. *See* case nos. *18, 20*

*Damion* v. *Gevens and Kingdom of Belgium* (1972), case no. *78*, 1071

*D'Angelo* v. *Petroleos Mexicanos* (1974), case no. *104*, 1079

*Deep, Deep Ocean Products, Inc.* v. *Union of Soviet Socialist Republics, and Sovrybflot* (1973), case no. *85*, 1073

*Degan* v. *Olmos* (1960), case no. *21*, 1037

Diplomatic considerations. *See* case nos. *32, 41, 69, 86*

*Di Sandolo* v. *Empresa Nacional Elcano S.A.* (1952), case no. *2*, 1026

*Dixie Paint & Varnish Co.* v. *Republic of Cuba* (1961), case no. *25*, 1040

Dominican Republic. *See* case nos. *12, 37, 54*

HeinOnline -- 1977 Dig. U.S. Prac. Int'l L. 1084 1977

*Dorest* v. *S.S. Narwik* (1965), case no. *47*, 1053

*Duda* v. *United States District Court* (1965), 1047

Egypt. *See* case nos. *50, 59, 74*

Employee claims. *See* case nos. *4, 107*

Execution, immunity from. *See* case nos. *17, 18, 26, 27, 28, 30, 31, 33, 42, 51, 54, 56, 64, 65, 94*

*Ex Parte Peru* (1943), 1018, 1081

Expropriation. *See* case nos. *25, 32, 33, 40*

France. *See* case nos. *80, 102, 110*

*Frazier* v. *Hanover Bank* (1953), case no. *5*, 1027

*Flota Maritima Browning S.A. de Cuba* v. *Motor Vessel Ciudad de la Habana* (1962), case no. *38*, 1047

*French* v. *Banco Nacional de Cuba* (1966), case no. *51*, 1055

Germany, Federal Republic of. *See* case nos. *84, 107*

Ghana. *See* case nos. *44, 56*

*Gittler* v. *German Information Center, et al.* (1976), case no. *107*, 1079

*Gonzalez* v. *Industrial Bank of Cuba* (1961), case no. *30*, 1042

*Granados, et al.* v. *Linea Aeropostal Venezolana, et al.* (1973), case no. *92*, 1074

*Grand Jury Investigation of the Shipping Industry, In re* (1960), case no. *22*, 1038

Grand jury subpoena, immunity from. *See* case no. *22*

Greece. *See* case no. *45*

*Greenspan, et al.* v. *Crosbie, et al.* (1976), case no. *97*, 1076

*Grofer* v. *Government of Jamaica* (1972), case no. *76*, 1021

Guinea. *See* case no. *58*

Haiti. *See* case nos. *16, 88*

*Harris & Company Advertising, Inc.* v. *Republic of Cuba* (1961), case no. *28*, 1041

*Harty* v. *Corporacion Venezolana de Guayana* (1963), case no. *39*, 1048

*Hassard* v. *United States of Mexico et al.* (1899), 1027

Heads of state, immunity of. *See* case nos. *49, 99*

*Heaney* v. *Government of Spain* (1971), case no. *72*, 1021

*Hellenic Lines, Limited* v. *Embassy of South Vietnam* (1967), case no. *52*, 1056

*Holden* v. *United States, Commonwealth of Australia, et al.* (1973), case no. *87*, 1074

Honduras. *See* case no. *63*

*Hungarian People's Republic* v. *Cecil Associates* (1953), case no. *7*, 1029

Hungary. *See* case no. *7*

Immunity. *See* Administrative proceedings, Arbitration, Attachment, Execution, Heads of state, Officials, Suit, and Taxation

India. *See* case nos. *43, 66, 67*

*India Towing Co., Inc.* v. *French Republic* (1976), case no. *110*, 1080

*Industria Azucarera Nacional, S.A., et al.* v. *Empresa Navegacion Mambisa* (1973), case no. *86*, 1073

*In re Chuba Electric Power Co., Inc.* (1976), case no. *100*, 1077

*In re Grand Jury Investigation of the Shipping Industry* (1960), case no. *22*, 1038

*Isbrandtsen Tankers, Inc.* v. *President of India* (1971), case no. *66*, 1066–1068, 1081

Israel. *See* case no. *15*

Ivory Coast. *See* case no. *55*

Jamaica. *See* case no. *62*

Japan. *See* case no. *100*

*Johansen* v. *Insua* (1962), case no. *37*, 1046

Jurisdictional contacts. *See* case nos. *6, 9, 36, 60, 81, 86*

Jurisdictional immunity. *See* Suit, immunity from

Jurisdiction issues preliminary to immunity decisions. *See* case nos. *78, 80, 84, 87, 92, 95*

*Kaiser Trading Company* v. *Central Bank of Nigeria, et al.* (1975), case no. *103*, 1078

*Kane* v. *National Institute of Agrarian Reform* (1961), case no. *27*, 1041

*Kempton* v. *Institute de la Ciudad Universitaria* (1952), case no. *4*, 1027

*Kendall* v. *Kingdom of Saudi Arabia* (1965), case no. *49*, 1053

*Knocklong Corporation* v. *Kingdom of Afghanistan* (1957), case no. *14*, 1034

Korea. *See* case nos. *6, 61*

*Laszlo* v. *Republic of Cyprus* (1972), case no. *75*, 1070

*Logan, et al.* v. *Secretary of State, et al.* (1975), case no. *102*, 1078

*Maher, et al.* v. *United Arab Republic, et al.* (1971), case no. *74*, 1069

*Manufacturas Sumar, S.A.* v. *M/V William Foster* (1973), case no. *89*, 1021

*Marine Transport Lines, Inc.* v. *The Turkish Government* (1975), case no. *83*, 1021

*Martinson* v. *Government of Israel* (1957), case no. *15*, 1034

*Matter of Linea Aeropostal Venezolana* (1955), case no. *10*, 1030

*Maxudian* v. *Standard Oil Co. of New Jersey* (1956), case no. *13*, 1033

*Mayan Lines* v. *Republic of Cuba* (1965), case no. *46*, 1052

*Melone* v. *Republic of Chad* (1964), case no. *41*, 1049

Merits of jurisdictional or substantive claims. *See* case nos. *12, 18, 38, 60, 61, 67*

Mexico. *See* case nos. *69, 104, 106*

HeinOnline -- 1977 Dig. U.S. Prac. Int'l L. 1086 1977

*Mexico* v. *Hoffman* (1945), 1018

*Miami Jaragua Hotels Corporation* v. *The Dominican Republic* (1956), case no. *12*, 1032

*Mirabella* v. *Banco Industrial de la Republica Argentina* (1962), case no. *36*, 1046

*Moore* v. *FFV Sport, Inc., Kingdom of Sweden et al.* (1973), case no. *90*, 1021

*Morrison, Inc.* v. *Servicio Autonomo Nacional de Acueductos y Alcantarillados* (1969), case no. *63*, 1063

*Nalvandian, et al.* v. *Her Majesty The Queen in Right of the Dominion of Canada* (1975), case no. *98*, 1021

*National American Corp.* v. *Federal Republic of Nigeria* (1976), 1078

*National City Bank of New York* v. *Republic of China* (1955), case no. *11*, 1030

"Nature" versus "purpose" test

  examining nature of activity. *See* case nos. *21, 36, 60, 62, 77, 81, 107*

  examining nature of foreign government agency performing activity. *See* case nos. *4, 23, 41, 60*

Netherlands. *See* case no. *23*

*New York and Cuba Mail S.S. Co.* v. *Republic of Korea* (1955), case no. *6*, 1028

*New York's World's Fair* v. *Republic of Guinea* (1967), case no. *58*, 1059

Nigeria. *See* case no. *103*

*North East Shipping Corp.* v. *Government of Pakistan* (1972), case no. *93*, 1074

*O'Brien* v. *Republic of Cuba* (1952), case no. *3*, 1026

*Ocean Transport Co., Inc.* v. *Government of the Republic of the Ivory Coast* (1967), case no. *55*, 1057

Officials, immunity of. *See* case nos. *19, 62, 96, 97*

*Olavaria y Cia.* v. *Banca para el Commercio* (1962), case no. *35*, 1021

*Orcor Transportation Co.* v. *Embassy of Pakistan* (1967), case no. *57*, 1058

*Pacheo Ruiz* v. *Air France, Republic of France* (1972), case no. *80*, 1072

Pakistan. *See* case nos. *57, 93*

*Pan American Tankers Corp.* v. *Republic of Vietnam* (1968), case no. *64*, 1064

Pan American Union. *See* case no. *40*

*Panama Canal Co.* v. *Compania Nacional de Navegacion* (1976), case no. *109*, 1021

Peru. *See* case nos. *5, 68*

*Petrol Shipping Corp.* v. *Kingdom of Greece* (1964), case no. *45*, 1051

Philippines. *See* case nos. *22, 99*

Poland. *See* case no. *47*

*Premier Steamship Co.* v. *Embassy of Algeria* (1971), case no. *73*, 1069

Property, ownership of. *See* case nos. *18, 38*

*Pruitt* v. *M/V Patignies* (1968), case no. *60*, 1060

*Psinakis* v. *Marcos* (1975), case no. *99*, 1077

*Renchard* v. *Humphreys & Harding, et al.* (1974), case no. *82*, 1072

*Republic International Corporation* v. *AMCO Engineers, Inc., Uruguay Ministry of Public Works, Republic of Uruguay, et al.* (1972), case no. *77*, 1071

*Republic of Argentina* v. *City of New York* (1966), case no. *48*, 1053

*Republic of China* v. *Chang* (1954), case no. *8*, 1029

*Rich* v. *Naviera Vacuba* (1961), case no. *32*, 1044

*Ritter* v. *Republic of Cuba* (1960), case no. *33*, 1044

Romania, Socialist Republic of. *See* case nos. *101, 108*

*Rovin Sales Company* v. *Socialist Republic of Romania* (1973), case no. *101*, 1077

Saudi Arabia. *See* case no. *49*

*Sawchuck* v. *Netherlands Ministry of Traffic* (1960), case no. *23*, 1039

*Sea Transport Corp. as owner of the S/T Eagle Voyager* v. *The S/T Manhattan* (1974), case no. *95*, 1075

*Seabulk Carriers, Inc.* v. *Central Bank of Nigeria, et al.* (1975), case no. *103*, 1078

*Semonian* v. *Crosbie, Government of the Province of Newfoundland, et al.* (1974), case no. *96*, 1075

*Siegl* v. *Sea Bird Linens, Inc.* (1959), case no. *20*, 1037

*Soobitsky* v. *German Federal Railroad* (1972), case no. *84*, 1073

South Africa. *See* case no. *9*

Sovereign immunity. *See* Administrative proceedings, Arbitration, Attachment, Execution, Heads of state, Officials, Suit, and Taxation

Soviet Union. *See* case nos. *17, 71, 85*

*Spacil* v. *Crowe* (1974), 1081.

Spain. *See* case nos. *2, 45A*

*State el rel. Haddock* v. *Chuba Electric Power Co., Inc.* (1975), case no. *100*, 1077

State immunity. *See* Administrative proceedings, Arbitration, Attachment, Execution, Heads of state, Officials, Suit, and Taxation

*State of Florida ex rel. National Institute of Agrarian Reform* v. *Dekle* (1961), case no. *27*, 1041

*Stephen* v. *Zivnostenska Banks* (1959), case no. *18*, 1036

Sudan. *See* case no. *53*

HeinOnline -- 1977 Dig. U.S. Prac. Int'l L. 1088 1977

Suit, immunity from. *See* case nos. *1, 2, 4, 5, 6, 7, 9, 12, 13, 14, 15, 19, 21, 23, 29, 34, 36, 37, 38, 39, 40, 41, 45, 47, 49, 50, 51, 53, 55, 58, 59, 60, 61, 63, 64, 66, 67, 69, 74, 77, 81, 82, 93, 96, 97, 102, 107*

Taxation, immunity from. *See* case nos. *14, 44, 48, 71, 100*

Torts. *See* case nos. *6, 23, 69, 81, 96*

*Townsley* v. *American Airlines, Inc. and Mexican National Tourist Council* (1969), case no. *69,* 1068

*Trendex Trading Corp. Ltd.* v. *Central Bank of Nigeria* (1977), 1078

Trinidad and Tobago. *See* case no. *81*

*Tumbes, The S.S.* (1970), case no. *68,* 1068

*Ungureanu* v. *Socialist Republic of Romania* (1976), case no. *108,* 1080

United Arab Republic. *See* case nos. *50, 59, 74*

*United States* v. *City of Glen Cove* (1971), case no. *71,* 1069

*Uruguay. See* case no. *77*

Venezuela. *See* case nos. *4, 10, 13, 21, 39, 40, 92*

*Venore Transportation Co.* v. *President of India* (1968), case no. *67,* 1067

*Victory Transport, Inc.* v. *Comisaria General* (1963), case no. *45A,* 1052

Vietnam, Republic of. *See* case nos. *52, 64, 65, 79*

*Vincente, et al.* v. *State of Trinidad and Tobago, et al.* (1974), case no. *81,* 1072

Waivers. *See* case nos. *11, 32, 65*

*Walnut Equipment Leasing Co.* v. *Central African Delegation* (1974), case no. *94,* 1074

*Walticr* v. *Thomson* (1960), case no. *19,* 1037

*Weilamann* v. *Chase Manhattan Bank* (1957), case no. *17,* 1036

*Wolchok* v. *Statni Banka Ceskoslovenska* (1962), 1037

*Worldwide Carriers* v. *National Bank of Egypt, et al.* (1967), case no. *59,* 1060

HeinOnline -- 1977 Dig. U.S. Prac. Int'l L. 1089 1977

HeinOnline -- 1977 Dig. U.S. Prac. Int'l L. 1090 1977