DATCTERC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   In Re: Attacks on September
    11, 2001
4                                        03 MDL 1570 (GBD) (FM)

5

    ------------------------------x
6                                        New York, NY
                                         October 29, 2013
7                                        10:23 a.m.

8   Before:

9                         HON. FRANK MAAS,

10                                       Magistrate Judge

11                        APPEARANCES

12  COZEN O'CONNOR
         Attorneys  for Federal Insurance Company Plaintiffs
13  BY:  SEAN P. CARTER
         J. SCOTT TARBUTTON
14
    MOTLEY RICE
15       Attorneys   for Burnett Plaintiffs
    BY:  ROBERT T. HAEFELE
16
17  ANDERSON, KILL & OLICK
         Attorneys  for Plaintiff O'Neill
18  BY:  JERRY S. GOLDMAN

19  KREINDLER & KREINDLER
         Attorneys  for Ashton Plaintiffs
20  BY:  ANDREW J. MALONEY

21  MANNING SOSSAMON
         Attorneys  for Sana-Bell, Inc. and Sanabel Al Kheer, Inc.
22  Defendants
    BY:  CHRISTOPHER C.S. MANNING
23

24

25

DATCTERC

APPEARANCES


CLIFFORD CHANCE
        Attorneys  for Dubai Islamic Bank Defendant
BY:  RONI E. BERGOFFEN

DOAR RIECK KALEY & MACK
        Attorneys  for Yassin Abdullah Kadi Defendant
BY:  AMY ROTHSTEIN
        PETER C. SALERNO

LEWIS BAACH
        Attorneys  for MWL and IIRO Defendants
BY:  ERIC L. LEWIS
BY:  AISHA HENRY

DATCTERC

```
 1              (Case called)
 2              THE COURT:  Good morning everyone.  Yesterday, later
 3    than I had planned, we filed a combined decision, and report,
 4    and recommendation concerning three of the motions, and no
 5    other counsel got notice of that at a time when they could
 6    still look at it.  Plaintiffs' counsel seen it already.
 7              MR. CARTER:  Your Honor, we did see it late last
 8    night.  I will confess I haven't had a chance to read it
 9    thoroughly.  The one thing that we did note, as I think your
10    Honor had indicated for the fee applications, a deadline had
11    been set for 30 days.
12              THE COURT:  If you want to extend that, and you work
13    it out, I have no problem with that.
14              MR. CARTER:  We will take stock of how much work is
15    involved --
16              THE COURT:  Obviously, if you wish to forego it,
17    that's fine, too.
18              MR. CARTER:  That seems unlikely, your Honor.
19              THE COURT:  If you didn't read it, I spared you two
20    pages, because it started out as a separate memorandum
21    decision, and report and recommendation, but I combined the two
22    when I entered the last two pages, which are a separate report
23    and recommendation that were filed and deleted.
24              For those of you who haven't seen it, basically I
25    concluded that an adverse inference was warranted and also an
```

DATCTERC

```
1    award of attorneys' fees as to Rabita trust, recommended that a

2    default judgment be entered as to Al Kheer, U.S.A.  I concluded

3    that sanctions were not warranted, but for reasons explained in

4    the decision, the costs of the motion were recoverable.  As to

5    Al Khair, Saudi Arabia, I concluded a default judgment was

6    appropriate.  I know on the proposed agenda for this session, I

7    had indicated that I thought the only thing that was right for

8    consideration was the Sana-Bell motion.

9              Is there anything else we will need to take up?

10             MR. LEWIS:  Your Honor, I just have a minor

11   housekeeping motion.  We filed pro hac vice motions for three

12   of my colleagues, my partner, Ms.  Henry and two other

13   attorneys in my firm; and they have been on file for some

14   months; and I just thought I would mention it.

15             THE COURT:  They, obviously, got lost in the shuffle.

16   The last decision I mentioned is document 2789, so there is a

17   lot of forests.  If you just give my law clerk the approximate

18   date it was filed, we will see that it's taken care of.

19             MR. LEWIS:  Thank you, your Honor.

20             THE COURT:  Turning to Sana-Bell, I guess the first

21   question that I have as to the predecessor entity is if it

22   doesn't exist at the moment, who retained you, Mr. Manning?

23   Have you seen the decisions that have been filed?

24             MR. MANNING:  I have not gone through it with the

25   level of detail --
```

DATCTERC

1          THE COURT:  Basically, as to Rabita trust, one of the

2     things I concluded was that Mr. McMahon couldn't actually

3     represent the trust, because he didn't appear to have a client

4     whom he could communicate with.  And it was not only a defunct

5     organization, but one that didn't seem to have somebody who

6     served in a capacity whereby they could retain counsel.  That's

7     why I'm inquiring about Sana-Bell.

8          MR. MANNING:  Understood, your Honor.  There is some

9     question as to that issue in the case.  I currently am retained

10    by Sanabel Al Kheer, Inc.  They assumed certain property, as I

11    understand it, from Sana-Bell, Inc.  There hasn't been a legal

12    determination, I believe, as to the successor rights or

13    obligations of that party, but at this point in order to ensure

14    that all interests are, at least, represented to some extent, I

15    have asserted myself as someone who represents that company.

16         THE COURT:  I'm not sure you can do that.  When you

17    read the decision I just entered, you will see what my concern

18    is.

19         My other major concern is I gained a middle initial

20    that I never had in plaintiffs' papers, Frank B. Maas.  I don't

21    know where the "B" came from.  It was just a minor point.

22         Let me hear from the plaintiffs with respect to the

23    motion, and then I will get back to you.

24         MR. HAEFELE:  Thank you, your Honor.  First off, if I

25    might address the question you just asked, your Honor,

DATCTERC

1    regarding the existence or nonexistence --

2              THE COURT:  I thought you were going to address my

3    middle initial.

4              MR. HAEFELE:  No.  I will leave you to decide that.

5              THE COURT:  The jury is still out on that one.

6              MR. HAEFELE:  I think that's for the Court to decide,

7    your Honor.

8              As you may recall in the very early stages, if you

9    will, early stages at least with regard to Sanabel, there was a

10   decision by Judge Daniels that said there was insufficient data

11   in the record to determine that Sanabel did not exist.  And

12   that's why his Honor entered an order that allowed -- denied

13   the motion to dismiss on behalf of Sanabel.  So to the extent

14   that that order is still in existence, and I believe it still

15   is, there remains no data in the records; they don't exist.

16   And I think we have been moving forward that they either don't

17   exist or if they do exist -- I'm sorry.  Either they don't

18   exist and if they don't exist, Sanabel Al Kheer, the United

19   States entity, is the alter ego and the successor.  I think

20   your Honor --

21             THE COURT:  If Sana-Bell doesn't exist and has no

22   assets, there probably isn't much there for you in any event,

23   correct?

24             MR. HAEFELE:  To the extent there are individuals that

25   have documents related to that entity --

DATCTERC

1              THE COURT:  That's a separate issue.

2              MR. HAEFELE:  That is a separate issue, I agree.

3              THE COURT:  I guess I'm looking at it in terms of the

4    big picture and your ability to recover damages from an entity,

5    if the entity, as a practical matter, no longer exists.  I

6    think if Sanabel is a successor entity does -- and recognized

7    there may be some overlap between the two -- I'm not sure

8    what's gained by pursuing Sanabel.

9              MR. HAEFELE:  I will address that in two stages, your

10   Honor.

11             THE COURT:  Sure.

12             MR. HAEFELE:  First off, I haven't looked at this

13   issue in quite sometime, but my recollection is even where an

14   entity is wrapping up, under New York law, if they -- either if

15   they existed at the time the suit was filed or within a short

16   time period before that, there is still the opportunity to

17   reach back into the entity, if they haven't fully wrapped up by

18   the time the lawsuits --

19             THE COURT:  No question.  Even a defunct entity can

20   continue to both prosecute and defend lawsuits.

21             MR. HAEFELE:  Right.  My recollection is that given

22   the question marks that existed.  The question marks

23   Sana-Bell's -- the first Sana-Bell's existence at the time of

24   the suit -- raised the issue that they clearly had not wrapped

25   up by the time the suit was started; and they may still not be

DATCTERC

wrapped up, I think is what the question is.  But the other

issue that I wanted to address -- and it goes to some other

things in the motion today -- is that it's important to

understand that this litigation was not brought just for

financial recovery.  It was also brought for the -- the 9/11

families, thousands and thousands of people that brought the

suit, much of it has to do with wanting accountability and

wanting to know what happened on 9/11; and part of that story

is Sanabel, both the old Sana-Bell and the new Sanabel, and

frankly, the Sanabel in Saudi Arabia, as well.  So it's both

the financial damages, as well as the accountability that they

can get through the judicial system.

          THE COURT:  Fair enough.

          MR. HAEFELE:  Your Honor, I don't know that -- when we

wrote the papers, I think, your Honor, we laid out quite a bit

of the timeline facts of this.  I resist boring you with that,

unless your Honor has any questions about those.  What I think

we tried to do was lay both the standard -- the willfulness or

bad faith on the part of the noncompliant party, the history of

the noncompliance that dates all the way back to the time that

we first filed.

          THE COURT:  I think you have to parse, at times -- and

at other times I recognize, perhaps, it's fair to view this as

a single entity, but the Sana-Bell record appears to suggest it

dissolved.  Whether it ceased to function is another question;

DATCTERC

1   at least it was formally dissolved before 9/11.  I assume

2   that's not a matter of dispute,  Is it?

3          MR. HAEFELE:  It is.  Your Honor, I'm not sure it's

4   still not -- I know that my colleague, Mr. Manning and his

5   predecessor counsel, Mr. McMahon, have frequently and

6   repeatedly argued what was decided by the Court, that Sana-Bell

7   doesn't exist; the first Sana-Bell doesn't exist.  But there

8   still remains the same questions, that were in the record

9   before Judge Daniels, haven't changed.

10          THE COURT:  Well, Dr. Nirza was at least an officer of

11   the successor entity, correct?

12          MR. HAEFELE:  I believe he was an officer of both.

13          THE COURT:  That was my next question.  I know I

14   permitted you to depose him, and I know I narrowed the topic.

15   I'm not sure whether it was as to Sana-Bell, Sanabel Al Kheer,

16   or both as a practical matter.  He is one of the people who

17   presumably knows what happened to Sana-Bell, correct?

18   Sana-Bell -- when I say "Sana-Bell" without a further verbiage,

19   I'm talking about the first entity.

20          MR. HAEFELE:  He would be someone that would have, at

21   least, familiarity with that, but I don't know -- I mean, I

22   don't know that he knows the legal aspect of whether or not it

23   completed the wrap-up.  In other words, as far as I know, he

24   wasn't the lawyer, or the person, that filled out the papers

25   that concluded everything that was necessary to wrap up the

DATCTERC

1    first Sana-Bell.

2            THE COURT:  Well, there's two possibilities here as to

3    the first Sana-Bell, one of which is it was dissolved before

4    9/11, presumably but not reasonably, they hadn't anticipated

5    litigation at that point; and, therefore, probably sanctions

6    are inappropriate.

7            The other is that it had some continuing existence,

8    either by itself or in combination with Sanabel Al Kheer, in

9    which then there could be discussion about sanctions.  Don't I

10   need to know which side of the line the first entity falls on

11   before I can decide sanction motions?

12           Another way of asking that is:  Is the motion

13   premature?

14           MR. HAEFELE:  Well, I think, your Honor, it's one of

15   the two things.  It is either that the two Sanabels are alter

16   egos of one another, or the two Sanabels -- or the second

17   Sanabel is the successor and the first Sana-Bell does not

18   exist.  But in either instance, I think what's important is

19   through all of this, whether it's one Sanabel or two Sanabels

20   currently in existence, through the entire time that's

21   significant here, the strings were being pulled in Saudi Arabia

22   from the parent entity of the two Sanabels, which would be

23   Sanabel Al Khair, the Saudi entity --

24           THE COURT:  K-h-a-i-r?

25           MR. HAEFELE:  Sanabel Al Khair.

DATCTERC

1          MR. HAEFELE:  I know.  And the parent, essentially,

2     the effective parent of Sanabel Al Khair, Saudi Arabia would be

3     IIRO and Muslim World League.  So essentially, we still have

4     one close-knit happy family that is running the show in Saudi

5     Arabia for the Sanabel entities.

6          THE COURT:  Well, in relation to the motion that's

7     before me now, how do I know that strings are being pulled by

8     the Saudi entity or its parents, IIRO/MWL?

9          MR. HAEFELE:  What I would suggest, your Honor, is

10    that if that becomes the string that holds things together for

11    the opinion the Court is coming to, we would be happy to brief

12    that issue.  Much of the facts of that have been developed

13    through or have gotten, both -- some of what we got from

14    Sanabel, but also what we've received from IIRO and Muslim

15    World League, what -- we are doing a rolling production from

16    Sanabel -- or from IIRO, Muslim World League now.

17          In going through that, we are finding out more

18    information about the relationship between Sanabel Al Kheer,

19    Muslim World League and Sanabel Al Khair, Inc., Saudi Arabia,

20    and the connection between them and the U.S. entities.

21          THE COURT:  If the first Sana-Bell entity ceased to

22    exist before 9/11, then I'm not sure you can make out a

23    spoliation claim for its records, assuming that they were

24    destroyed or handed off to somebody else before litigation was

25    reasonably anticipated.

DATCTERC

1          One thing that concerns me is I'm not sure there is an

2    adequate record as to that.  I mean, Sanabel Al Kheer --

3    K-h-e-e-r -- the U.S. successor entity, the analysis may be

4    much different, but as to the first entity, I'm not sure there

5    is an adequate record to award sanctions at the present.  Maybe

6    ultimately.  I'm just not sure you have gotten there yet.

7          MR. HAEFELE:  I would have to think through that.  I

8    think I understand where you are coming from.  Clearly, there

9    was an obligation just under corporation law to turn over the

10   documents to -- separate and apart from what their

11   obligations -- to preserve evidence for the litigation, because

12   obviously the litigation hadn't started, if they didn't exist

13   pre-9/11/11.

14          THE COURT:  Do you have records that related to the

15   real estate transaction?  I know there are records that show

16   that Mr. McMahon did okay as a result of the real estate

17   transaction, so there was some records.

18          MR. HAEFELE:  Right.  There are a few.

19          THE COURT:  It doesn't sound like you have a whole

20   closing binder.

21          MR. HAEFELE:  That's correct.  That closing happened

22   in 2008, I believe.  So clearly, it was long after the

23   litigation started and deep into the obligation to exchange

24   documents, let alone preserve documents.

25          THE COURT:  And the seller was the first Sana-Bell

DATCTERC

1    entity selling property to the second?

2              MR. HAEFELE:  No.  I don't know who -- I don't recall

3    who the purchaser was.  But it was the -- the sale was --

4    again, it was orchestrated and there is evidence -- there is

5    documentation within -- I think what we showed your Honor, but

6    certainly within what we have -- that shows that there was

7    permission to sell the property given in an exchange between

8    IIRO and Sanabel, U.S.A.  Interestingly, your Honor, the

9    permission comes from Samir Al Rhadi.  I don't know if you

10   remember Samir Al Rhadi, but he was the gentleman, the supposed

11   kindly volunteer that was helping IIRO and Muslim World League

12   to go through the documents with Mr. McMahon, and we were

13   supposed to have a telephone conference call with him, and he

14   was a nice, older gentleman that was just sort of, quote,

15   unquote, helping out.

16             THE COURT:  I vaguely recall that.

17             MR. HAEFELE:  Well, it turns out he must have a little

18   bit more of a position than a kindly volunteer helping out on

19   his own, because he is the one that was -- gave the power of

20   attorney that allowed them to sell the property here in the

21   U.S. and pretty much he is the one that the Sanabel Al Kheer

22   people here in the U.S. were reporting to at the IIRO.  So

23   that's some indicator of how IIRO and Muslim World League were

24   pulling the strings.

25             THE COURT:  Let me hear from Mr. Manning a bit, and

DATCTERC

 1     then I will get back to you.  One of the problems I have with

 2     your side of the equation, Mr. Manning, is what we were just

 3     talking about.  Even if I assumed that this is the equivalent

 4     of some benign entity, a stamp club that existed in one format,

 5     Dr. Nirza was a member of a club and an officer.  He resigned

 6     from the first entity and when the second one started up, he

 7     was an officer of that.  The position is that the two were

 8     unrelated.  The stamp club, nonetheless, had engaged in

 9     transactions for which it didn't, evidently, retain paperwork

10     long after litigation was contemplated, and the flow of funds

11     clearly was an issue.

12            So why isn't the mere fact that things one would

13     expect to be held either by the successor stamp club, or here

14     Sanabel Al Kheer, related to the real estate transaction,

15     documents that should have either been preserved by Sanabel Al

16     Kheer, the U.S. entity, or its counsel as its agent.  And why

17     shouldn't I be troubled that documents like that are not

18     available.

19            MR. MANNING:  Your Honor, I think, first of all, it's

20     important to clarify what these entities are.  There's Sanabel

21     Al Kheer, K-h-e-e-r, which is a Virginia corporation.

22            THE COURT:  Right.

23            MR. MANNING:  There is a Sana-Bell, D.C, which is a

24     D.C. corporation.  That's the entity that is now defunct.

25            THE COURT:  That's the one that's B-e-l-l?

DATCTERC

1          MR. MANNING:  S-a-n-a, hyphen, B-e-l-l.  Then there is

2     this other entity that I don't represent and that was alluded

3     to as being a sally company.  So the two companies that we're

4     talking about here, as far as the relationship, is Sana-Bell,

5     D.C., I'll call it, and Sanabel of Virginia -- Sanabel Al

6     Kheer, Virginia.

7          THE COURT:  I agree.  That's why I was saying to

8     counsel that I think that the record as to the Saudi entity and

9     the supposed parents or folks pulling the strings on behalf of

10    the Saudi entity, I don't think there is a record in relation

11    to this motion.

12         MR. MANNING:  So, you know, I think what we have is,

13    for a very brief timeline, as you mentioned, Dr. Nirza was --

14    did have a relationship with Sana-Bell of D.C.  Then he had a

15    relationship also with Sanabel Al Kheer, Virginia.  In 2004 --

16         THE COURT:  Does he continue to be affiliated with the

17    Virginia entity?

18         MR. MANNING:  With neither entity.  In 2004, the

19    current president of Sanabel of Virginia, and their two people

20    on the board currently, the current president was essentially

21    given a box of documents that related to Sanabel Al Kheer.  We

22    produced all of that documentation to include, as was

23    mentioned, some documents as related to the transaction.

24    Whatever documents that related to Sana-Bell, D.C. have,

25    likewise, been produced.  And then in a series of, I think it's

DATCTERC

 1   now four supplements to that production, we have produced bank

 2   records up to 2011.

 3         THE COURT:  Well, one troublesome thing, and I

 4   apologize for jumping around is that a large part of the

 5   production occurred on July 17th of this year, two days before

 6   your response was due as to this motion.

 7         MR. MANNING:  Right, your Honor.  There is one thing

 8   that I personally have to apologize for.  To get -- to step

 9   back just for a moment, there were, starting in 2011,

10   settlement conversations that began.  And part of the delay in

11   those settlement negotiations was that my client, not being as

12   completely conversant in American law as others, didn't

13   completely understand what a settlement fully meant.  And so

14   the reason for that delay was from my client asking for some

15   sort of an averment that if this documentation that they were

16   requesting was produced, that he would, in fact, be released.

17   Because we weren't able to get that assurance, the settlement

18   negotiations broke down -- and I'm getting to your timing

19   issue.

20         They broke down early 2013, I believe, or late 2012.

21   And my personal apology is, as I referenced in the briefs,

22   during early 2013, I was dealing with a personal family issue

23   that resolved itself in early June.  It's not an excuse.  I did

24   certainly create a delay in the production, but once we

25   received this motion, I, as quickly as possible, turned that

DATCTERC

```
 1    around.  So that's the reason for the lack of timeliness of the
 2    most recent production, or the most recent supplementation.
 3              THE COURT:  Let's take, as an example, the real estate
 4    transaction.  Was Sanabel Al Kheer, the Virginia entity, a
 5    party to that transaction?
 6              MR. MANNING:  It was.
 7              THE COURT:  So shouldn't there be a fuller record than
 8    the documents that you turned over, such as a complete closing
 9    binder?
10              MR. MANNING:  Again, your Honor, what's been produced
11    is what my client is in possession, custody and control of.
12    There hasn't been any spoliation --
13              THE COURT:  Possession and custody, perhaps, but I
14    assume there was some real estate lawyer in the loop
15    representing Sanabel Al Kheer.  Did anybody reach out to that
16    lawyer and say, We need your documents?
17              MR. MANNING:  I'm trying to figure out the extent to
18    which I can discuss my conversations with my client.  But there
19    were -- there was outreach to that -- to the lawyer that had
20    handled the transaction.  And if you would like, we can
21    certainly make that outreach again, but I think everyone knows
22    the result of the transaction --
23              THE COURT:  I think your client has the obligation to
24    produce that which is in his control, and that which is held by
25    agents is clearly within his control.  I presume the lawyers
```

DATCTERC

1    were paid their fees and, therefore, have no lien as part of

2    the real estate transaction, and I can't imagine why every

3    record that's responsive to the plaintiffs' requests is held by

4    counsel that represented the Virginia corporation in relation

5    to the closing hasn't already been produced.

6            MR. MANNING:  Your Honor, we can --

7            THE COURT:  There's also the issue of a producing

8    party's obligation to reach out to former employees.  And in

9    one of his letters, Mr. Haefele -- I guess it's probably his

10   reply -- cites a series of cases -- Footnote 4 on Page 2 of the

11   reply letter brief says that there is no indication that

12   Sanabel Al Kheer has taken any steps over the last several

13   years to secure missing corporate records from Sana-Bell

14   officers and employees, something it was obligated to do;

15   citing a series of cases that suggest that that obligation

16   exists, including at least one in the Southern District of New

17   York.

18            I haven't actually read those cases, but it makes

19   sense to me that there was at least an obligation to reach out

20   and have the sense that that didn't occur here either.

21            MR. MANNING:  Well, your Honor, I wasn't a party to

22   the litigation.  At that point, Mr. McMahon was and he also

23   represented the company from a corporate context.  So I think

24   that when it gets back -- to kind of step back, I think your

25   Honor is right.  We might be premature to some degree, because

DATCTERC

1    we have factual issues that we're essentially trying to try in

2    the context of this motion for sanctions.  But also, to your

3    point, I think that there could be, perhaps, the involvement of

4    my predecessor to clarify a few of those issues, although it's

5    certainly my obligation to know all of that, but he -- it's

6    sometimes difficult to engage that person.

7            THE COURT:  One of the points that you make is that

8    Sanabel entities, if you give me a second.

9            Off the record.

10           (Off the record)

11           THE COURT:  It's not jumping out at me, but I thought

12   within your letter you made the point that the Court had never,

13   perhaps, previously directed or warned Sanabel that -- here, it

14   is here.

15           Cited on Page 3 to American Cash Card saying, "One of

16   the factors to be considered is (d) whether the noncompliant

17   party has been warned about the possibility of sanctions.  And

18   specifically with respect to Sanabel Al Kheer, although there's

19   been a lot of backing and forthing between them among counsel,

20   I don't know that I have ever specifically done that.

21           So what I'm inclined to do at the interim measure is

22   to make such a directive and say that Sanabel Al Kheer, the

23   Virginia entity, has to boil the ocean and produce any

24   additional documents that it has within four weeks and then

25   revisit this question.

DATCTERC

```
 1              I know I'm kicking the can down a little, Mr. Haefele,
 2      but any reaction to that?
 3              MR. HAEFELE:  Pardon me, your Honor?
 4              THE COURT:  I said I know I'm kicking the can down the
 5      road a bit, but any reaction to that?
 6              MR. HAEFELE:  I do have a reaction to a number of
 7      items.  First off, the one thing I wanted to address quickly is
 8      that, as I think it was in our motion papers -- if not the
 9      original one, but the reply letter -- there were never any
10      settlement discussions.  I know repeatedly Mr. Manning has
11      articulated a dialogue of settlement discussions, but I think
12      you made the point that there has never been any settlement
13      discussions.
14              THE COURT:  Whether there were or weren't -- let me
15      assume for the sake of argument that there were -- is utterly
16      irrelevant in terms of the duty to produce documents.
17              MR. HAEFELE:  I agree, your Honor.  I agree.
18              THE COURT:  I think that's really not terribly
19      informative with respect to the motion that's before me.  On
20      the other hand, when Mr. Manning tells me that there were
21      personal issues that delayed the last production, that's
22      something I am certain of.
23              MR. HAEFELE:  As were we, your Honor.  I'm not sure --
24      we had some dialogue on it, I'm not sure when his personal
25      issues started.  I'm aware of what they are and I think we've
```

DATCTERC

1   been happy, I suppose -- I don't know if that's the right word

2   -- to provide him with extensions that were needed to address

3   the motion.  So absolutely, your Honor, we agree with you on

4   that.  But I think we have been chasing basic discovery since

5   2007, and certainly I know for a fact that the issues don't go

6   back that far.

7           Going back to one of the things we said earlier --

8           THE COURT:  Nor does his representation of this

9   client.

10          MR. HAEFELE:  I know that his representation also

11  significantly precedes the issues --

12          THE COURT:  Fair enough.

13          MR. HAEFELE:  I will gladly defer, let him tell you

14  more if that's the case.

15          Going back to one of the issues that you raised

16  earlier, your Honor, it has been called to my attention that

17  Sana-Bell existed, at least, as of September 9, 2002, because

18  it was on that day that Sana-Bell -- I'm sorry.  September 9,

19  2002, certificate from the government of the District of

20  Columbia Department of Consumer and Regulatory Affairs

21  certified that on that day Sana-Bell's articles of

22  incorporation were revoked.  So I think that calls, at least

23  clarifies, that as of at least that day Sana-Bell existed, the

24  first Sana-Bell existed.

25          And in addition, in this litigation, Sana-Bell filed

DATCTERC

1   motions, made appearances, twice hired lawyers, and it was only

2   to the extent -- I mean, they represented that they existed

3   through their counsel in motions and in appearances at least

4   until it was to their benefit to begin arguing that they didn't

5   exist.

6          THE COURT:  But so did Rabita trust.  When you sit

7   down with my decision, you will see I concluded really

8   Mr. McMahon was not in a position to represent Rabita trust.

9          MR. HAEFELE:  Right.  I understand.

10          THE COURT:  It may be the same circumstance here that

11  he abrogated onto himself the ability to represent the D.C.

12  corporation, because somebody on behalf of the Virginia

13  corporation decided to retain him.

14          MR. HAEFELE:  Going to Mr. McMahon for a moment, you

15  may recall, your Honor, that at the time, Mr. Manning came on

16  board, I think shortly after or right around the time period,

17  Mr. McMahon filed a motion to withdraw as counsel as well.

18          THE COURT:  When was that?

19          MR. HAEFELE:  I don't actually recall --

20          THE COURT:  Mr. Manning.

21          MR. MANNING:  I don't remember the exact date.  2010.

22          THE COURT:  Approximately.

23          MR. MANNING:  2010.

24          MR. HAEFELE:  And right around that time, when

25  Mr. McMahon filed his motion to withdraw as counsel, plaintiffs

DATCTERC

1    actually opposed that, because there was some issues that we

2    felt Mr. McMahon needed to continue to be at least in the

3    litigation related to Sana-Bell, because he had involvement

4    with certain facts.

5         Well, one of the things that he had involvement in was

6    the 2008 closing.  I believe -- I'm not certain -- but I

7    believe he was the lawyer that did the closing.  If he wasn't,

8    he was at least involved in it, and we believe that he would

9    have all of the records from that 2008 closing.  We find it

10   very odd if he was involved with the closing, why those

11   documents were not available to be produced to the plaintiffs.

12        THE COURT:  You have refreshed my recollection that

13   there is something in your letter that suggests that his firm

14   at least was involved.  And if that's correct, it boggles the

15   mind that you don't have those records.  And certainly

16   Mr. Manning, that's one of the things you need to look at.

17        MR. HAEFELE:  I think one of the issues --

18        THE COURT:  In the 30-day window.

19        MR. MANNING:  To clarify, your Honor, I mean, we have

20   requested from Mr. McMahon all documents relating to both

21   entities, to the extent they existed.  So we will be following

22   up with him as well.

23        MR. HAEFELE:  Other than the 2008 closing documents,

24   there are a host of other things that we have requested that

25   are basic discovery things -- things that are particular that

DATCTERC

1      ought to exist -- and we don't have any of them.  And I know --

2      the problem that comes is that Mr. McMahon and Mr. Manning have

3      repeated a number of times, Sorry folks, that's all there is.

4      And then, you know, later on, when we start honing in on what

5      it really is, or what ought to exist, suddenly we get a dribble

6      drabble.

7               THE COURT:  I'm not sure you made the record even to

8      Sanabel Al Kheer.  I mean, the closing binder is a no-brainer.

9      Someplace that should exist.  But let's take minutes of

10     meetings of the Virginia entity from its formation until now, I

11     agree with you, those should exist and if you haven't gotten

12     them, I'm not saying that's a potential problem, but saying

13     they should exist is different than saying they ever did exist.

14     If there were no minutes of meetings, then you can't produce

15     that which didn't exist.  It seems to me that what I said

16     earlier that the motion may be premature.  What may be missing,

17     in part, is a deposition of a 30(b)(6) witness who says, Yes, we

18     did take minutes; we took minutes after 9/11; after the suit

19     was filed; and we don't have them now.  Then you would have a

20     failure to preserve, or spoliation, and a much stronger motion;

21     but the mere fact that it's logical that there should be

22     minutes is not the same as saying there were minutes, and now

23     they no longer exist.

24               MR. HAEFELE:  I understand your point, your Honor.  I

25     think that overriding point, though, is that from the time of

DATCTERC

```
1    discovery –– from the time discovery started in 2007, we have
2    been fighting tooth and nail to get any document.  We have been
3    chasing them from 2007 until 2013 to get anything that we have
4    gotten, and it's only when we continually hound them that we
5    get anything.  And I will be honest, I haven't had the
6    opportunity to read your decision from last night, but it's
7    pretty clear that that is not particular, unfortunately, to the
8    Sanabel defendants.  It's, unfortunately, from most of the
9    defendants or all of the defendants in this litigation, where
10   there is this unfortunate notion that they aren't obligated to
11   produce discovery unless plaintiffs' hound them and then come
12   to the Court to ask the Court for assistance.  And during that
13   process they let out a few documents to make the argument that,
14   Oh, we are making our efforts.
15        The fact is there is –– plaintiffs' view is there is
16   an orchestrated process in the defendants' part to delay,
17   obfuscate and drain the plaintiffs of their resources until the
18   clock runs out on the litigation, and that is something that
19   needs to be stopped.
20        THE COURT:  Assuming your assumption is correct, I
21   don't disagree with you certainly, I think the ground rules and
22   the ability to find excuses will decline as some of the earlier
23   decisions related to this move forward, but I think for the
24   time being what I'm going to do is reserve decision as to the
25   Sana-Bell motion.  I direct that Mr. Manning go back to the
```

DATCTERC

```
 1    well to produce the documents that should have been produced,

 2    to the extent they exist, within four weeks, but I also think

 3    there's a burden on the plaintiffs to show that, not that the

 4    documents should have existed, but that the documents did, in

 5    fact, exist.  So I think really what plaintiffs need to do is

 6    take a 30(b)(6) deposition and connect those dots, and I

 7    probably will award sanctions, or recommend a default judgment,

 8    or whatever the appropriate remedy is.

 9              MR. HAEFELE:  Your Honor, in regard to what they are

10    obligated to produce, we would like for it to be the universe

11    of documents for Sanabel Al Kheer, and any entity that they

12    have the ability, the practical ability, to get documents from;

13    and we believe that that would include their Saudi alter ego,

14    the Sanabel Al Khair entity.  They are essentially -- again,

15    like we said earlier, the strings get pulled from Saudi Arabia.

16              THE COURT:  Well, I think I said that in relation to

17    this case -- if not, I have certainly said it in relation to

18    other cases -- if there's either the practical ability, as a

19    matter of business, routine to get documents from a parent

20    company, or if there is an adequate showing that they are alter

21    egos -- I guess as to Al Khair, that's what I was thinking

22    of -- I made that finding, then I don't disagree with you.  If

23    documents are available from the parent entity on either of

24    those two bases, they would have to be produced.

25              MR. LEWIS:  Your Honor, we were not -- I represent
```

DATCTERC

```
 1    IIRO and the Muslim World League.  I am also part of the

 2    post-McMahon era, so I don't go back and have all of the

 3    factual background.  But there have been --

 4              THE COURT:  Just so I understand, did Mr. McMahon, in

 5    the era before your arrival, represent MWL and IIRO by himself?

 6              MR. LEWIS:  He did, your Honor, and there have just

 7    been a number of statements made that pertain to my client, and

 8    unless silence implies assent, I just want to make clear on the

 9    record we do not accept that IIRO or MWL are pulling any

10    strings for anybody.  Sanabel is a separate entity.  There may

11    have been a debt, but again, I don't want to make a

12    representation on the record money that they may have been

13    owed, but we don't accept that one was controlling the other.

14              There was also a comment made about chasing after

15    documents.  Your Honor, I think they will find that they will

16    have finally caught the bus.  We have a team that your Honor

17    will have seen in our report of September 20th, that's going

18    around the world to these offices, and are reviewing documents;

19    there are Arabic speakers.  So there are documents that have

20    been produced in a large volume that are in the process of

21    being produced.

22              And finally with respect to Mr. Al Rhadi, there was a

23    suggestion made that somehow he is not the kindly older

24    gentleman that he seems, or not a volunteer.  It is not unusual

25    in Saudi charities for there to be many volunteers.  Nor is
```

DATCTERC

1    there any reason to suspect that Mr. Rhadi is other than as he

2    represents, a concerned person who works at the charity as a

3    volunteer and does a great deal of work and continues to do a

4    great deal of work to help with our compliance.  So I just

5    wanted to let your Honor know that the suggestion that Mr. Al

6    Rhadi is playing some nefarious identity game just has no

7    basis.  Thank you.

8         THE COURT:  And I preceded my last remark by saying if

9    there is a showing of impracticality or that MWL and/or IIRO

10   are alter egos of Sanabel Al Kheer, the U.S. entity, then

11   consequences would flow from that, but the first word in the

12   sentence was "if."  And to date, there hasn't been such a

13   showing, at least in relation to this motion.

14        MR. LEWIS:  Nor has it even been alleged in the

15   motion, at least as I...

16        THE COURT:  I think it is sort of alluded to in the

17   motion or the reply, but certainly there's discussion of MWL

18   and IIRO, probably in relation to the real estate closing.

19        MR. HAEFELE:  Your Honor, very quickly.  First off, I

20   meant -- I have no knowledge of whether or not Mr. Rhadi is

21   either kindly or elderly.  It certainly seems as though he has

22   authority with relation to IIRO, and Muslim World League, and

23   also with regard to the Sanabel entities.  And if that becomes

24   something, your Honor, we would be happy to brief that further

25   and provide the additional information for your Honor with

DATCTERC

1    regard to the relationship.

2              And with regard to the "pulling the strings" issue, I

3    call your Honor's attention to the fact that the original

4    Sana-Bell board -- I'm not sure about the later board of the

5    new Sanabel -- but the original board consisted of six Muslim

6    World League and IIRO representatives, officers on the board,

7    so I think there is some indication that at least at that

8    point, at the inception -- and there seems to be no indication

9    that that ever changed, given the kind of interactions that

10   happened with regard to things that were in the briefing.

11             MR. LEWIS:  Your Honor, if that motion is ever tee'd

12   up, we're happy to respond.  I live in the District, around the

13   District of Columbia.  I suspect if 2002 they got around to

14   revoking the articles for nonpayment, I suspect Sana-Bell was

15   not doing its corporate work for some years, but -- well before

16   that.  Again, that's premature and we can address that in due

17   course.  Thank you.

18             MR. MANNING:  Exactly, your Honor.  My understanding

19   of the cause of that document being sent was very likely that

20   the entity didn't, in fact, exist.  So, in fact, if anything,

21   it might be evidence that it wasn't there.

22             THE COURT:  Well, it hadn't paid whatever fees were

23   required, I would assume.

24             MR. MANNING:  Understood.

25             And just to clarify, I'm certainly interested in

DATCTERC

1    working with the plaintiffs to, as you said, boil the ocean,

2    but I want to clarify that the showing that you just alluded to

3    as to strings being pulled from Sanabel, Saudi Arabia, et

4    cetera, has not been made at this point.  So as a result, the

5    universe of what we need to be boiling the ocean for is that

6    which relates to Sana-Bell, D.C. and Sanabel Al Kheer,

7    Virginia.

8            THE COURT:  I'm not sure I wholly agree with that.  At

9    some point down the road, I may have to make a determination as

10   to whether, either MWL or IIRO -- let me rephrase it.

11           I may have to make a determination down the road as to

12   whether Sanabel, the Virginia entity, had either the practical

13   ability to obtain documents from the Saudi Arabian entity; or

14   the two were so intricately intertwined, that they are one in

15   the same.  If I make that determination down the road, and if

16   prior to that determination, the Virginia entity had not

17   obtained documents responsive to the plaintiffs' requests that

18   it could have obtained or should have obtained, consequences

19   will flow from that.

20           So I think that's a determination that you and your

21   client need to make.  If you believe that neither of those is

22   correct, then presumably you won't produce and wouldn't be able

23   to produce documents held by the Saudi Arabian entity.

24           On the other hand, if, in your discussions with your

25   client, you can prove either of those is correct, I think you

DATCTERC

```
1    do have the obligation to produce documents from Saudi Arabia.

2              MR. MANNING:  Understood.

3              MR. HAEFELE:  Your Honor, only one last thing.

4              THE COURT:  Sure.

5              MR. HAEFELE:  I hope.

6         The only concern that we have, I think, your Honor,

7    one of the major concerns we have really is the timeline in the

8    litigation.  If we keep a proposed endline for ending discovery

9    and we keep drawing out when we're going to get things from the

10   defendants, we're putting our back to the wall -- we are

11   putting plaintiffs' back to the wall in terms of how we

12   proceed -- and we have been doing this since 2007, or actually

13   in the litigation earlier than that.  I just wanted to make

14   sure we put that on the record, and call your Honor's attention

15   to that.  You know, none of us wants this to go on forever.  We

16   want a time period where we can actually get to a trial, or

17   some kind of resolution.

18        Our purpose here, our request here was for dispositive

19   sanctions, because, quite frankly, if they are saying they are

20   not going to give us any more, and, you know, we don't want to

21   waste the time chasing our tails to get nothing.

22             THE COURT:  I'm mindful of that, but I don't think

23   there is an adequate record at the moment.  Certainly, let me

24   take the default judgment that you asked for.  I don't think

25   there is an adequate record to grab a default judgment
```

DATCTERC

1    certainly with respect to the Virginia entity.

2             So if I were to decide the motion today, I would

3    probably deny that.  So I think I'm benefiting the plaintiffs

4    by reserving decision and proceeding down the road.  I am, even

5    though it subtracts from it somewhat.  I understand in terms of

6    the big picture, that -- believe me.  I share your desire to

7    see, you know, the end of this litigation.  Whether I will in

8    my lifetime remains to be seen, but as an aspirational goal, I

9    certainly share that.

10            MR. HAEFELE:  I just don't want your Honor surprised

11   when somewhere down the road, we say, We still need more time

12   to get more from the defendants.

13            THE COURT:  I will not be flabbergasted to hear that.

14            We also should set up a time for the next conference.

15            MR. CARTER:  Your Honor, there is one thing and I will

16   raise it with the defendants separately.  There are sort of two

17   orders floating around concerning briefing.  There was a

18   briefing system that was in place set by your Honor's order

19   back in 2011, January of 2011, which is -- if I can read the

20   ECF document 2401  --

21            THE COURT:  What did I say then?

22            MR. CARTER:  -- which is the old procedure where you

23   file a letter brief three weeks in advance of the hearing, and

24   the response would come in two weeks, and the reply five days,

25   everything will be delivered at that time to your Honor in a

DATCTERC

```
 1    package.
 2             And then in 2013 your Honor issued a briefing schedule
 3    for motions to compel.  Document 2649, which essentially
 4    provides a three-week response period, and then a one-week
 5    period for replies.
 6             The two schedules are not harmonious, and in certain
 7    cases we have had instances where motions are raised as being
 8    motions other than motions to compel, and there is some
 9    confusion.  So I think we're going to request that we be under
10    a single briefing motion.
11             THE COURT:  That certainly makes sense.  And why don't
12    you confer with the other side and tell me what schedule will
13    makes sense.  As long as it gives me sufficient time before any
14    of our conferences, it's fine with me.
15             MR. CARTER:  Thank you, your Honor.
16             THE COURT:  When should we set our next conference
17    for?  We are coming up against the holidays. I've got two
18    back-to-back trials in early December.  Is December 13th too
19    soon?
20             MR. CARTER:  No, your Honor.
21             THE COURT:  That's a Friday.  Could we say, then, 10
22    o'clock on Friday the 13th?
23             MR. MANNING:  Your Honor, is it possible to do 11:00?
24             THE COURT:  That day it's absolutely possible.  Thank
25    you all.
```