DCKFTERT

1   UNITED STATES DISTRICT COURT

2   SOUTHERN DISTRICT OF NEW YORK
    ------------------------------x

3
    In Re: Attacks on September
4   11, 2001
                                        03 MDL 1570 (GBD) (FM)
5

6   ------------------------------x
                                        New York, NY
7                                       December 20, 2013
                                        11:15 a.m.
8
    Before:
9
                        HON. FRANK MAAS,
10
                                        Magistrate Judge
11
                        APPEARANCES
12
    COZEN O'CONNOR
13       Attorneys  for Federal Insurance Company Plaintiffs
    BY:  SEAN P. CARTER
14       J. SCOTT TARBUTTON

15  MOTLEY RICE
         Attorneys  for Burnett Plaintiffs
16  BY:  ROBERT T. HAEFELE (via speakerphone)
         JODY WESTBROOK FLOWERS (via speakerphone)
17
    ANDERSON, KILL & OLICK
18       Attorneys  for Plaintiff O'Neill
    BY:  JERRY S. GOLDMAN
19
    KREINDLER & KREINDLER
20       Attorneys  for Ashton Plaintiffs
    BY:  JAMES P. KREINDLER
21
    MANNING SOSSAMON
22       Attorneys  for Sana-Bell, Inc. and Sanabel Al Kheer, Inc.
    Defendants
23  BY:  CHRISTOPHER C.S. MANNING (via speakerphone)

24

25

DCKFTERT

APPEARANCES


CLIFFORD CHANCE
     Attorneys  for Dubai Islamic Bank Defendant
BY:  RONI E. BERGOFFEN
      JAMES TAYLOR COPELAND

DOAR RIECK KALEY & MACK
     Attorneys  for Yassin Abdullah Kadi Defendant
BY:  AMY ROTHSTEIN
     PETER C. SALERNO


LEWIS BAACH
     Attorneys  for MWL and IIRO Defendants
BY:  ERIC L. LEWIS
      AISHA HENRY (via speakerphone)
      MARK LEIMKUHLER (via speakerphone)

BERNABEI & WACHTEL
     Attorneys for Defendants
ALAN R. KABAT

OMAR MOHAMMEDI LAW FIRM
     Attorneys for Defendant WAMY
OMAR MOHAMMEDI

GOETZ & ECKLAND
     Attorneys for Defendant WAMY
FREDERICK J. GOETZ

DCKFTERT

```
1              (Case called)

2              (In open court)

3              THE DEPUTY CLERK:  This is a conference in the matter

4    of In Re Terrorist Attacks of 9/11.  Counsel, please state your

5    appearances for the record.

6              MR. KREINDLER:  Good morning, your Honor.  James

7    Kreindler from Kreindler and Kreindler.

8              MR. CARTER:  Good morning, your Honor.  Sean Carter

9    from Cozen O'Connor on behalf of the plaintiffs.

10             MR. TARBUTTON:  Good morning.  Scott Tarbutton, Cozen

11   O'Connor on behalf of the Federal Insurance claims.

12             MR. GOLDMAN:  Good morning.  Jerry Goldman, Anderson,

13   Kill & Olick on behalf of the O'Neill plaintiffs and the

14   plaintiff executive committee.

15             MR. KABAT:  Good morning, your Honor.  Alan Kabat on

16   behalf of the defendants.

17             MS. BERGOFFEN:  Good morning.  Ronnie Bergoffen on

18   behalf of Dubai Islamic bank.

19             MR. MOHAMMEDI:  Good morning, your Honor.  Omar

20   Mohammedi on behalf of defendant WAMY.

21             MR. GOETZ:  Good morning, your Honor.  Frederick

22   Goetz, also on behalf of WAMY.

23             MS. ROTHSTEIN:  Good morning, your Honor.  Amy

24   Rothstein on behalf of defendant Kadi.

25             MR. SALERNO:  Peter Salerno, also on behalf of
```

DCKFTERT

1   defendant Kadi.

2           MR. LEWIS:  Good morning, your Honor.  Eric Lewis on

3   behalf of Muslim World League and International Islamic Relief

4   Organization.

5           THE DEPUTY CLERK:  We also have parties on the phone.

6   If you could state your name for the record and spell your last

7   name for the court reporter.

8           MR. HAEFELE:  Robert Haefele, and I have my partner

9   Jody Westbrook Flowers, on behalf of the plaintiffs.

10          MS. HENRY:  Good morning.  This is Aisha Henry from

11  Lewis Baach on behalf of MWL and IIRO and my partner Mark

12  Leimkuhler is also on the phone.  Good morning, your Honor.

13          MR. MANNING:  Good morning, your Honor. This is

14  Christopher Manning for Sana-Bell, Inc. and Sanabel Al Kheer.

15          THE COURT:  Sounds like we have everybody.

16          I guess one of the things you wanted to raise,

17  Mr. Manning, was Sana-Bell's compliance?

18          MR. MANNING:  Yes, your Honor.  Since your Honor's

19  order of November we searched for and obtained approximately

20  4,000 additional pages of documents.  They were electronically

21  produced to the plaintiffs on September 5th.  We believe that

22  these are all of the responsive documents that exist.  However,

23  of course, if in the event that we discover any additional

24  documents they will be immediately produced, but our position

25  now is that we've produced the entire universe of documents

DCKFTERT

1    that are responsive.

2            THE COURT:  And I gather the plaintiffs' position is

3    they were saying there were gaps, you believe, but you haven't

4    finished reviewing the documents?

5            MR. CARTER:  Your Honor, that's correct.  We received

6    them a few weeks ago and it's going to take a little bit of

7    time.  A large piece of the production includes materials like

8    MapQuest directions around Washington, D.C., receipts for

9    refilling gas, ComCast bills, so we're struggling to see how

10   much of the production is really relevant.  We see gaps in

11   time, particularly in the period 2002 forward -- virtually all

12   of this production relates to 2008 to 2012 -- and we do think

13   there are clear indications in the documents that were produced

14   that there are other materials that we haven't received.

15           And then we have the related issue as to whether or

16   not Sana-Bell has undertaken sufficient efforts to obtain

17   documents pertaining to itself that are located in Saudi

18   Arabia.  We do see in these documents that when Sana-Bell

19   needed access to certain of those documents for purposes of the

20   sale of its building, Mr. McMahon went to Saudi Arabia and was

21   provided access to them, so we think at a minimum there is a

22   practical ability to get those documents.  But, again, those

23   issues collectively are I think more appropriately raised after

24   we've completed a review.

25           THE COURT:  Sure.  I saw that the Second Circuit ruled

DCKFTERT

1   on the 60(b) motion appeal yesterday and other than the fact

2   that that means that Mr. Kellogg will be joining the party

3   again, are there other consequences I should be aware of?

4           MR. CARTER:  Your Honor, I don't think that we can

5   tell you sitting here today what the consequences might be to

6   your Honor's management of discovery in particular.  There was

7   also, your Honor, earlier this week the Supreme Court requested

8   the views of the Solicitor General, essentially the views of

9   the United States, concerning the petition for certiorari that

10  was pending.  That relates in essence to the personal

11  jurisdiction and 12(b)(6) rulings the Second Circuit issued

12  earlier this year, so that's lingering out there as well.

13          THE COURT:  Okay.  Thanks for telling me that.  Then

14  we have the -- bear with me a second.  Just before I came up

15  here I received plaintiffs' latest motion, which obviously is

16  not ripe for discussion today.  So why don't we turn to the

17  defendant's motion regarding plaintiff's FOIA production.

18          MS. BERGOFFEN:  Thank you, your Honor.  Your Honor,

19  we're here to address some significant deficiencies in that

20  production of the FOIA correspondence.  The production, your

21  Honor, as you recall you had ordered this production in

22  response to our prior motion to compel and the problem is that

23  the production is largely incomprehensible for several reasons.

24  In particular, the production is seemingly randomly ordered so

25  what you have is several letters consecutively from different

DCKFTERT

1    agencies or from the plaintiffs' two agencies that are

2    unrelated.

3            THE COURT:  I mean, in a nutshell, you say the

4    production is a complete shambles and whoever speaks for the

5    plaintiffs is going to tell me that there's some minor

6    problems, that they agree with that there are some minor

7    problems but that it's a relatively small percentage and this

8    is much ado about nothing.

9            MS. BERGOFFEN:  It's actually not, your Honor.  I have

10   several specific examples.  The entirety of the first several

11   thousand pages or couple of thousand pages is nothing more than

12   letters that are disjointed, having nothing to do with each

13   other following consecutively and more troubling is that --

14           THE COURT:  These are to and from agencies?

15           MS. BERGOFFEN:  Correct.  So you'll have a letter to

16   the Department of Energy from 2009 followed by a letter from

17   the Department of Defense from 2004 completely unrelated, not

18   the same request.  But more troubling, your Honor, is that

19   countless of these letters reference attachments that don't

20   consecutively follow the production.  I have several examples I

21   can share with you.

22           For example, plaintiffs' production contains a letter

23   from 2009 which bears the Bates stamp PECFOIA0000594 through

24   596.  This letter clearly states within it, as does the

25   enclosure line, that it encloses 1,031 pages of documents.

DCKFTERT

1    However, immediately following that letter there's another

2    letter from the Department to the Drug Enforcement Agency.  So

3    the 2009 letter from Treasury not only doesn't enclose the

4    documents that it says it encloses, it's immediately followed

5    by a 2004 -- sorry, it's immediately preceded by a 2004 letter

6    from the Drug Enforcement Agency and it's immediately followed

7    by a 2007 letter to the Department of State.

8            This is just one example.  I have several more that

9    I've even brought here today.  There's another example --

10           THE COURT:  Do I understand correctly that the entire

11   production is approximately 4,000 pages?

12           MS. BERGOFFEN:  Correct.  So there are several more

13   examples even, your Honor --

14           THE COURT:  But it's essentially people disagree as to

15   what object this describes in one banker's box or ten banker's

16   boxes.

17           MS. BERGOFFEN:  Right.  I have it set up in my office

18   as four boxes.  What it looks like is there's several letters,

19   a good majority of which reference attachments and exhibits

20   that are not actually contained within the production at all

21   that I see and to the extent they are they are certainly not

22   consecutively following.  But it's not an isolated issue.  I've

23   got about ten examples with me today that I could share with

24   you, if you'd like, and that's just the tip of the iceberg.

25           In fact, there are many instances where you have a

DCKFTERT

1     single letter which references an attachment of a couple of

2     hundred pages or 21 files that are supposed to be attached and

3     it's immediately filed by another letter referencing its own

4     attachment that aren't contained in the production either.  So

5     what we have are letters and no attachments.  And it's not just

6     of the correspondence that plaintiffs received from the

7     government, but plaintiffs own letters that they sent to the

8     government are disjointed as well.  So you'll have a letter

9     that references that part of the letter that contains the

10    specific request they're making or an attachment that sets out

11    specific names and that in one instance the attachment isn't

12    immediately following.  We found it a couple of pages later.

13    In another instance we found it several hundred pages later and

14    in other instances it's just not there.

15          THE COURT:  It seems to me there's two issues raised

16    by your papers, one of which is the issue you've just been

17    talking about, which is who has to unscramble the egg.  The

18    other is once you unscramble the egg all of the contents of the

19    egg are actually there or whether because of the way the

20    plaintiffs handled the data that they received they're not in a

21    position to represent that they have a complete -- have turned

22    over a complete set of the FOIA materials.

23          MS. BERGOFFEN:  Precisely, your Honor.  In fact, when

24    we first filed our motion what we were concerned about was a

25    certain level of gamesmanship in the way the production was

DCKFTERT

1   made and now we're actually considerably more concerned that

2   what we have here is a failure to preserve and spoliation.

3           As you see in our briefs, plaintiffs readily admit

4   that they had inherent difficulty in managing the files related

5   to the FOIA request, that's at page 2 of their opposition.  If

6   you look at one of our attachments, they stated in an April 13

7   letter to Mr. Mohammedi they stated that it wasn't that their

8   production isn't necessarily ordered in the way that we're

9   looking for in the files.  So this is very concerning to us.

10  This isn't just some random files that may have been laying

11  around in plaintiffs' office.  These files were expressly

12  contained solely for the purpose of this litigation.

13          If there's a preservation requirement at all in

14  discovery it's for documents such as these, your Honor.  The

15  fact they take it lightly that the files haven't been

16  maintained is quite troubling.  It's not just a minor issue, as

17  I know this is going to raise issues going forward as to the

18  authentication of any of these documents as to whether or not

19  they have any evidentiary value whatsoever.  So, I mean, as we

20  set out in our letter we have a hard time accepting, even if

21  they were to try to unscramble the egg, as you say, that's

22  really not a cure.  I'm not sure how they're going to go about

23  that other than by guesswork.

24          THE COURT:  Let me hear from the plaintiffs.

25          MR. CARTER:  Thank you, your Honor.  If I can take a

DCKFTERT

1   step back --

2             THE COURT:  Let me just state something which I think

3   is obvious which is nobody kept a production set of each set of

4   documents that were received from an agency?

5             MR. CARTER:  I'm sorry, your Honor, I didn't follow.

6             THE COURT:  In other words, if it's in response to

7   FOIA request number 1 after a lot of backing and forthing with

8   the agency 800 documents were produced, nobody, if they weren't

9   Bates numbered, Bates numbered them and kept an original set in

10  that format before you started to do whatever it is the

11  plaintiffs did with them?

12            MR. CARTER:  I think that's true in most cases, your

13  Honor.  In some cases the agencies themselves may have provided

14  Bates stamps or they may have produced through FOIA documents

15  that they, the agencies had produced elsewhere and provided

16  those Bates stamps.  So that's that scenario.

17            If I could take a step back, the way this process

18  worked, as your Honor will recall, is that way back in August

19  of 2012 we, the plaintiffs, made a large production of

20  essentially the evidence that we had, which included the

21  substantive documents received from the agencies.  We produced

22  those at that time.

23            At that time we asserted that we felt the

24  communications with the agencies were privileged and it was

25  relative to those communications that the defendants then moved

DCKFTERT

```
 1   to compel and your Honor issued the order directing us to
 2   produce the correspondence.
 3        THE COURT:  But even the letters apparently are not
 4   kept in an organized way it seems like.
 5        MR. CARTER:  Your Honor, speaking for the Federal
 6   Insurance plaintiffs, in our FOIA request I think that the
 7   segment of the FOIA production that relates to the work that we
 8   did was for the large degree well ordered.  There may be
 9   instances in which some of the correspondence does not directly
10   relate to one another, but the fact of the matter is
11   substantive documents were produced separately because of the
12   way the process unfolded.
13        The correspondence itself, with very limited
14   exceptions, is largely completely irrelevant.  A lot of it is
15   back and forth about, will you please, Mr. Agency, produce some
16   documents to us, will you please get through the process.  So
17   articulating this is a very enormous problem in litigation.
18   That it tends towards spoliation is a bit of hyperbole.  It's
19   not a spoliation problem.  We have all the documents.  What we
20   said in our motion is simply because of the process that you
21   gave the agencies, relative to which they in certain
22   circumstances include a reference numbers but in other
23   circumstances don't provide you with a reference number as to
24   which FOIA request they're dealing with, it's entirely possible
25   that paralegals didn't put things in the exact right order in
```

DCKFTERT

1    the files, but it's all there and it's been produced.

2            All of the problems that the defendants are

3    complaining about with regard to our production are present in

4    their FOIA productions.  They're talking about letters that

5    don't include the attachments sequentially.  The FOIA

6    production we've received from the WAMY defendants is rife with

7    those problems.  There's a March 4, 2013 letter which

8    identifies three attachments; June 23, 2011, November 14, 2012

9    and February 22, 2013.  Those attachments are not provided in

10   order.  One of them is 300 pages later and one of them is not

11   included at all.  So, your Honor, one of the points we made,

12   this isn't just a problem with the defendants' FOIA production

13   but when we have broader discovery with the defendants it's

14   completely disorganized.

15           When we went and copied documents that were at that

16   time in Mr. McMahon's office relating to a raid of one of the

17   Muslim World League offices embedded in there were apparently

18   documents that had been collected in Saudi Arabia and sent to

19   him and then dropped in a box that was from the raid.  This is

20   pretty pervasive problem with production.  So before we go down

21   the road with our FOIA productions and do everything in

22   sequence we want to make sure that defendants are making a

23   commitment that their production includes all of the

24   attachments and are properly sequenced in order.

25           THE COURT:  Your letter, and it may be the subject of

DCKFTERT

1    the letter I received this morning, but your letter opposing

2    their motion said also that it appears that at the same time

3    they're complaining about your withholding of FOIA documents

4    WAMY itself was withholding documents it had received pursuant

5    to FOIA requests.

6           MR. CARTER:  Subsequent to that letter, your Honor,

7    WAMY produced unredacted versions of certain of the redacted

8    documents.  We're still not clear as to whether WAMY produced

9    all substantive responsive documents provided by the agencies.

10   There's some suggestion that there have been substantive

11   productions that we don't appear to have.

12          We also know, your Honor, from our efforts to obtain

13   documents from agencies relating to Dubai Islamic Bank, is

14   correspondence from Dubai Islamic Bank to the agencies opposing

15   release of the information.  We don't have that production from

16   Dubai Islamic Bank.  So we do have a more fundamental problem

17   with the completeness of their production, not just the

18   ordering of it.

19          THE COURT:  So there are a number of things I could

20   do, I suppose.  One of which is require you as best you are

21   able to unscramble the egg.  It's one bankers box.  It doesn't

22   sound like an enormously difficult task.  Another is to

23   require, either require plaintiffs to file further FOIA

24   requests to get the documents previously produced or to tell

25   the defendants that they can file such FOIA requests for those

DCKFTERT

1    documents and shift the costs but burdens the agencies which

2    have complied with that and as a taxpayer seems somewhat

3    offensive.  A third option is for me or some special master to

4    go through the production and see whether the problems are

5    minor as you say or major as your adversary suggests and

6    frankly I'm not sure which way to proceed.

7         MS. BERGOFFEN:  Your Honor, if I may, I think what

8    Mr. Carter just stated to you is what is clear now that the

9    production, at least the first couple of thousand pages are

10   just the letters that are clearly disjointed from the

11   underlying attachments.  So it clearly is a pervasive problem

12   throughout the entirety and there's no way to link up to that

13   prior production what they're in response to.  This isn't a

14   minor issue where the correspondence is irrelevant, your Honor.

15   We need to answer the questions where did the document come

16   from, was it from the government --

17        THE COURT:  A lot of the documents at the end of the

18   day are going to be garbage and there's only going to be a

19   relatively small portion of the documents I would think that

20   would be used at deposition, much less at trial, if there is a

21   trial.  So to go through the exercise of linking previously

22   produced substantive documents to letters back and forth

23   relating to them may be a massive make-work exercise if at the

24   end of the day you come down to let's say a dozen documents,

25   let's say it's more, that really are important and then have to

DCKFTERT

1    trace back where it came in.

2              MS. BERGOFFEN:  Two points, your Honor.  That's

3    something that plaintiff would have to do to -- number one,

4    defendants don't want any surprises in the summary judgment or

5    the trial case with regard to where these documents came from

6    or for what purpose they're going to be able to be used and to

7    that point further, for the plaintiffs to use these they have

8    to be able to authenticate them in some way, which means that

9    presumably they have in their files and know where they got

10   these documents, so the question for the plaintiffs is do they

11   actually have a set of these documents that they know where

12   they came from in the first place, do they know what letter

13   they link up to so they can authenticate it and say these came

14   from the DOJ, these could have been inter agency transfer

15   documents that the DOJ was holding that they might have taken

16   from State.  We just don't know where these documents came from

17   if they're disjointed.

18              My suspicion is to the extent plaintiffs plan to

19   actually use any of the documents certainly they should have

20   planned in their files to know where they used it for them to

21   have any evidentiary value.

22              THE COURT:  Why isn't that an issue we should worry

23   about down the road?  If the plaintiff can't authenticate any

24   document that's pretty much their problem, not yours.

25              MS. BERGOFFEN:  For a few reasons.  That is going to

DCKFTERT

1   be their problem, correct, but from a substantive standpoint

2   where the documents comes from alter in many respects what

3   their relevance is, doesn't it?  So to the extent you receive

4   documents from the State Department, they hold in their files,

5   it could have potentially some meaning to the case.  Just the

6   simple fact of what the agency has and doesn't have could

7   impact the claims and defenses in the case by the nature of

8   these documents.  So it's very difficult not having any of the

9   underlying documents linked up with where they came from for us

10  to know even how or if they have any value in the case.  So

11  taking your point that many of them may not have relevance, it

12  depends where they came from and who had them in their files

13  within the government whether or not they have relevance, so

14  that's going to be very difficult for us to determine, not

15  having them linked up to the letters.

16       THE COURT:  Give me an example of how that's relevant.

17  Let's assume that there was some document, let's take a

18  far-fetched example that shows that there was something that

19  related to the 9/11 bombing dated prior to 9/11 and let's

20  assume it was in somebody's file at the Department of State but

21  they didn't realize the import of it.  What difference does it

22  make?

23       MS. BERGOFFEN:  A lot of these documents are, you

24  don't know where they came from.  They could be a statement

25  that a potential witness gave, didn't know what agency it was,

DCKFTERT

1    it could be a bank record that they've collected, so you don't

2    know for what purpose.  If they're coming from Treasury if

3    they're bank records how were they looking into it, were they

4    looking into it for the purposes of seeing whether they

5    complied with various different statutes?

6           THE COURT:  I'm not sure why that matters.  It's

7    objectively a banking record.  It either can or can't be

8    authenticated and it either is relevant to this case or not.

9    Whether it came from Treasury, whether it came from WAMY or

10   some other defendant it seems to me is largely irrelevant.

11          MS. BERGOFFEN:  To that point, your Honor, there's no

12   way for defendants to tell whether it came from the government

13   or whether it came from some other third party or just

14   something that was contained in the files.  That's an issue in

15   and of itself.  For example, there are claims against the Dubai

16   Islamic Bank over what the government knew and what the

17   government may or may not have disclosed in discussions they

18   had with officials within the UAE.

19          THE COURT:  Say that again, I'm sorry.

20          MS. BERGOFFEN:  For example there were certain

21   meetings between U.S. officials and UAE officials that

22   defendants have alleged in their complaint.  To the extent you

23   have files that potentially talk about meetings between the

24   U.S. government and UAE officials, it wouldn't matter where

25   these came from.  If it's coming from the State Department who

DCKFTERT

```
 1 │ is allegedly at this meeting versus from some third party that
 2 │ doesn't prove it actually came from the government at all would
 3 │ have very, very different potential ramifications depending
 4 │ where that letter came from or whether it's from some third
 5 │ agency who discusses whether there was a meeting or wasn't a
 6 │ meeting and that agency wasn't actually present.  So there is
 7 │ evidentiary -- there's different evidentiary value or potential
 8 │ value depending on where these attachments came from.  I mean,
 9 │ especially with hearsay considerations, your Honor, who is
10 │ speaking and whether or not it's a business record versus just
11 │ double and triple layers of hearsay within the documents will
12 │ matter as well.
13 │           THE COURT:  Mr. Carter?
14 │           MR. CARTER:  Your Honor, almost without exception the
15 │ substantive documents produced bear some stamp from the agency
16 │ that produced them from us which itself tells you where they
17 │ came from.  When we made the production of the substantive
18 │ documents, FOIA documents, at least in the case of Federal I
19 │ think without exception the transmittal letter from the agency
20 │ was within that production.  The back and forth that may have
21 │ occurred between us and the government about trying to get them
22 │ to that point of production was not included within that
23 │ document because we had claimed it was privileged.  So there
24 │ are pretty easy ways to tell within this production what came
25 │ from the government and what came from which agencies and
```

DCKFTERT

1    transmittal levels that demonstrate that and we don't have any

2    concerns to authenticate what we got from the government.  If

3    using the transmittal letters and relating them to the

4    productions is all that's necessary I think it's largely been

5    done, but we can work to that goal.

6         THE COURT:  I was about to say, I mean, your letter

7    represents that these problems are minor.  If they're minor

8    that also suggests that fixing them is not that burdensome.  So

9    amongst a number of relatively unsatisfactory solutions I think

10   I'm going to put it to you to try and reorder the production as

11   best you are able.

12        It does sound like from your letter there was also an

13   issue as to the completeness of the FOIA production in that I

14   have the sense -- maybe I was reading too much into what was

15   written, that there was no assurance that everything that had

16   been produced pursuant to a FOIA request and that was

17   responsive to defendant's request had in fact been produced.

18        MR. CARTER:  That's correct, your Honor.  There is a

19   concern on our part that there have been FOIA requests

20   submitted by defendants relative --

21        THE COURT:  No, I'm talking about your FOIA requests.

22   I thought I read in your letter that there was some lawful

23   language that suggested that there may, because of the number

24   of firms that were involved in this endeavor that you weren't

25   completely certain that everything that had been produced

DCKFTERT

1    pursuant to a plaintiffs' FOIA request that was produced by an

2    agency and that was responsive to a request had in fact been

3    produced.

4           MR. CARTER:  Well, in part, your Honor, we just had a

5    dozen defendants remanded and so the production deadline

6    relative to those defendants at present runs to January 15th

7    and that was merely an indication that people needed to check

8    relative to certain of those new defendants to make sure that

9    their productions relative to FOIA were complete relative to

10   those defendants.  I can say for Federal we've given everything

11   that we've received pursuant to FOIA requests with the

12   exception of some very recently received materials within the

13   last few weeks which we're fully intending to produce within

14   the deadline.  So I don't think it's a problem of people

15   failing to in due course produce documents to the defendants.

16   It's just a matter of certain defendants having been remanded.

17          MS. BERGOFFEN:  Your Honor, if I may.  Mr. Carter has

18   made several representations with regard to FOIA requests

19   served by the Federal Insurance plaintiffs but has not spoken

20   to what the majority of the letters that I've seen that we're

21   complaining about seem to have come from the Motley Rice firm

22   and the problem that we're suggesting and you picked up quite

23   correctly is we don't have any assurances that all the pages

24   have been produced.  Frankly, based on the representations I

25   don't even know if they know.  They haven't kept this in order.

DCKFTERT

1    We have a serious preservation issue.

2            THE COURT:  Let me -- Mr. Haefele, you're lurking on

3    the phone?

4            MR. HAEFELE:  I don't know if I would call it lurking,

5    but I am here, your Honor.  As I listen to Mr. Carter I

6    understand why he's limiting his comments to Federal only

7    because that's the documents that he's been in charge of.  I

8    can't disagree with anything that he said.  It's all the same

9    for Burnett as well.  What he's done and what he's said about

10   the Federal documents are the same thing we've done.  In fact,

11   we were coordinating when we were producing so we did the same

12   thing.

13           THE COURT:  So you're confident that there are no

14   documents responsive to a discovery -- let me start over.

15   There are no FOIA documents that were received by the

16   plaintiffs pursuant -- by you on behalf of your clients in

17   response to FOIA requests that are responsive to any of the

18   current defendants' requests that have not been produced?

19           MR. HAEFELE:  That is correct, your Honor.  And I

20   would say, I would agree with that, with the caveat that

21   Mr. Carter added about the remanded defendants and I think

22   we're going back to make sure that they get produced as well,

23   if they haven't already.  I suspect they probably have been

24   produced, but, yes, your Honor, I can tell you that there's

25   been no spoliation.

DCKFTERT

1          THE COURT:  Well, given the breadth of this litigation

2     it seems unlikely that a remanded defendant coming back in is

3     going to have a request that is so uniquely different that

4     suddenly there's more documentation to produce.  I assume that

5     with the number of defendants who are in the case that pretty

6     much the field has been covered in terms of requests, but given

7     those representations I think the only thing I'm going to do at

8     this point in response to the motion is to require that to the

9     extent that the box of documents can be better ordered, that be

10    undertaken and I guess you will probably reproduce the whole

11    box under new Bates numbers if that's not adding more

12    confusion.

13         MR. CARTER:  That's fine, your Honor.  Just to

14    clarify, I did mention we have some recently received FOIA

15    stuff that we are producing within the next few weeks but we

16    didn't have it at any point prior.

17         MS. BERGOFFEN:  To be clear, your Honor, with regard

18    to this order I would hope that includes linking up the

19    substantive documents that are to be attached to these

20    documents to be reproduced consecutively with the documents so

21    you can see where they came from.  Because from our review,

22    1300 pages and a thousand couldn't possibly be included there.

23         THE COURT:  I found that there was no basis for

24    withholding the FOIA documents, the transmittal letters and the

25    like, so to the extent they haven't been make sure they've been

DCKFTERT

1    produced as part of the initial production.  So if they were,

2    if they should have been in a file which was initial request

3    letter, 13 letters back and forth and the ultimate transmittal

4    letter from the agency followed by a box of documents, that

5    should be done.  Obviously, if you have already produced

6    documents that are extensive I think you can simply indicate

7    what the Bates numbers are.

8                MR. CARTER:  That's what I was going to ask, your

9    Honor.

10                MR. HAEFELE:  Can I just clarify?  I want to be sure I

11   understand.  What you're ordering I think comes down to what

12   was on the privilege log has to be reproduced to include the

13   substantive documents that came from the agency?

14                THE COURT:  Yes, or with an indication of what those

15   substantive documents were.

16                MR. CARTER:  Your Honor, what I was going to ask, in

17   some cases the production from agencies were voluminous and in

18   that case we would, as your Honor indicated, just refer to the

19   Bates range.

20                THE COURT:  You put a place holder in your

21   reproduction that says Bates numbers 12 million to 13 million

22   instead of copying them again.

23                MR. CARTER:  That's fine, your Honor.

24                MS. BERGOFFEN:  Your Honor, and I appreciate that, and

25   I think that goes a long way towards correcting the deficiency

DCKFTERT

1    with regard to those documents that were actually preserved and

2    they could be put back together.  However, based on the

3    representations within the opposition that they didn't always

4    keep these documents in order, I think it's going to be very

5    difficult in some cases for them to be put back together and

6    what I ask is that plaintiffs provide some documentation as to

7    which documents were actually maintained in a certain set so

8    that they have certainty as to the order and number of pages

9    and the contents of the documents versus those documents that

10   they've simply kept out of order that they're making guesswork

11   of.  Because, your Honor, it's not quite as simple as

12   Mr. Carter said.  There are Bates numbers, but not the

13   traditional Bates numbers that we use in many cases.  I've

14   looked extensively at these documents. there will be a

15   reference number of a single Bates number that single Bates

16   number repeats on every page in the document.  That doesn't

17   give any assurance as to whether or not there are missing

18   pages, it's the end or the middle.  Then there are some many

19   that don't have any indicator that ties them to a letter.

20          THE COURT:  I thought I heard Mr. Carter and

21   Mr. Haefele both say that they're confident that the

22   substantive productions were complete.  And they produced the

23   substantive materials originally.  With hindsight, they

24   mistakenly withheld the FOIA documents although Mr. Carter says

25   the ultimate transmittal letter was produced with the documents

DCKFTERT

1   and I think to grant the last request you made would add a

2   layer of complexity which would just make this even worse so

3   I'm not going to require that.

4           MR. CARTER:  Your Honor, could we simply ask that this

5   be reciprocal and apply as well to the defendants?

6           THE COURT:  I was going to say that one of the things

7   that struck me, and I think I said it already, at the same time

8   that defendants are complaining about non-production of FOIA

9   requests it sounds like FOIA request items were not fully

10  produced before the date of the defendants' motion to compel

11  plaintiffs to produce their FOIA requests and related

12  correspondence or were produced in redacted form.  I understand

13  that there's been some negotiation and that unredacted copies

14  of some of those documents have been produced, but it's at

15  least odd to make a motion to compel with respect to an issue

16  where defendant is doing the exact same thing they're

17  complaining about.

18          MS. BERGOFFEN:  Your Honor, if I could speak with

19  regard to that.  There's simply no -- yesterday you received a

20  motion that was concerning a single defendant.  I'm going to

21  let Mr. Mohammedi speak to that in one moment, but with regard

22  to the rest of the defendants there's simply no basis for that

23  allegation, number one, and there's no details regarding what

24  potential disorganization they're complaining about.  But in

25  any event the proper forum for is that not in a footnote to a

DCKFTERT

1    motion in opposition to our motion.

2              THE COURT:  The footnote has been expanded.

3              MS. BERGOFFEN:  And I'll let Mr. Mohammedi speak to

4    that, but to make a universal order for defendants, to -- I

5    don't know what it is, to begin or what they would want

6    reordered in the defendants' production.

7              THE COURT:  No, I'm not requiring the defendants --

8              MS. BERGOFFEN:  And I'll let Mr. Mohammedi speak to

9    the WAMY point.

10             THE COURT:  Any ruling I make which is generic

11   obviously applies to both sides, so FOIA productions either

12   retrospective or prospective should be produced with all the

13   backing and forthing letters that relate to them and then the

14   documents that are produced by the agency, if there are such

15   documents, and to the extent that hasn't been done I'm

16   requiring that that be done by both sides.  If it's been done

17   by every defendant it's not an issue.  If it's been done by

18   every defendant other than WAMY, then it's only an issue for

19   WAMY.  And I noted it, I don't know if it was in the footnote

20   or just a small aside in the correspondence related to the

21   issue that's before me today, to the extent that it relates

22   specifically to WAMY it's probably not fully ripe because I

23   just have the papers and Mr. Mohammedi can respond.  If you

24   want to say something today, feel free.

25             MR. MOHAMMEDI:  Yes, your Honor.  I think we briefly

DCKFTERT

| | |
|---|---|
| 1 | reviewed the motion and we challenge some of the dispute they |
| 2 | have there about our production.  As you may know, when you |
| 3 | have -- I'm not going to speak in detail because I don't think |
| 4 | it's fair that I would have to respond to plaintiffs in this. |
| 5 | As you might know, when we apply for a FOIA request to agencies |
| 6 | I know they refer to some assessment about $800 that we might |
| 7 | have to pay, does not mean they produce that document, it might |
| 8 | be they have not produced those documents and I'm not going to |
| 9 | go into very much detail on that, but we know we have produced |
| 10 | everything that we have that we received from those agencies |
| 11 | and we're going to review the motion and we have to respond, |
| 12 | but I don't think it would be fair to address the WAMY issue |
| 13 | now, something that we didn't have a chance to respond to. |
| 14 | THE COURT:  We'll save that for a future conference. |
| 15 | MR. MOHAMMEDI:  Thank you.  And I guess that brings us |
| 16 | to WAMY's motion to compel. |
| 17 | MR. HAEFELE:  Your Honor, this is Robert Haefele. |
| 18 | THE COURT:  Yes.  I'm sorry, Mr. Haefele. |
| 19 | MR. HAEFELE:  The point I was going to make is what |
| 20 | Mr. Carter said, but I just want to make sure that in the |
| 21 | reciprocal language it includes not only communications |
| 22 | regarding one's own FOIA request, but, for example, Mr. Carter |
| 23 | indicated there was some concern that Dubai Islamic Bank had |
| 24 | communications relative to the plaintiffs' requests and those I |
| 25 | want to be sure those will be included. |

DCKFTERT

1          MS. BERGOFFEN:  Your Honor, it's very unclear to me

2     what Mr. Carter is even speaking about, so it's very difficult

3     to even respond to that.

4          THE COURT:  I think he's asking about FOIA requests

5     that you may have made for all of the communications that

6     plaintiffs had.

7          MS. BERGOFFEN:  That amounts to seeking discovery in

8     open court from DIB.  If they have a concern they should more

9     appropriately address that through the normal context of meet

10    and confer and sending letters.

11         THE COURT:  Well, I don't know what the requests were,

12    but I've ruled that FOIA requests are not in any fashion

13    privileged and although they may be work product, simply by

14    making the request the work product production is waived.  So

15    to the extent that anybody's FOIA request, whether they relate

16    to a defendant's own efforts to secure documents to support its

17    defense or if the defendants have filed FOIA requests to

18    unearth what the plaintiffs' requests were before I ruled,

19    that's fair game.  That's all I'm saying.

20         MR. HAEFELE:  Your Honor, if I could explain a little

21    bit.  I was giving the example of DIB to be specific but I

22    think it should be phrased generically and ought to be phrased

23    generically to the extent that any party has communication with

24    an agency relative to another party's request.  So, for

25    example, where plaintiffs make the request and then a defendant

DCKFTERT

```
 1   communicates with the agency saying we don't want you to
 2   produce that for the plaintiffs, that's the communication that
 3   I'm talking about.
 4            THE COURT:  Well, and assuming that that is -- thanks
 5   for the amplification but assuming that that is responsive to a
 6   request the plaintiffs made that's fair game, absolutely, and
 7   should be produced.
 8            MR. HAEFELE:  Thank you.
 9            MR. CARTER:  Thank you, your Honor.
10            THE COURT:  Are we finished with that?  Okay.  That
11   brings us to WAMY's motion to compel.
12            MR. GOETZ:  Your Honor, good morning again.  Frederick
13   Goetz.  I'll be addressing that.  The motion is very narrow and
14   we're seeking specific relief just as to WAMY.  In essence,
15   your Honor, we're asking for two things.  First, as to the
16   document requests, and there's about ten of them, to which
17   plaintiffs have not indicated one way or the other whether they
18   had responsive documents we'd like clarity on that, and,
19   second, as to the many requests as to which plaintiffs
20   apparently continue to maintain specific objections based upon
21   claims of privilege and other grounds, we'd like clarity on
22   that as well.  If they're going to maintain those objections,
23   tell us if they're withholding documents under those other
24   objections or if not please withdraw it so we can know what
25   universe we're dealing with.
```

DCKFTERT

1          THE COURT:  Let me read you proposed rule 34(b)(2)(c)

2     of the Federal Rules.  Quote:  "An objection must state whether

3     any responsive materials are being withheld on the basis of

4     that objection.  An objection to part of a request must specify

5     the part and permit inspection of the rest."  And before that,

6     (b)(2)(b) says that objections must be stated with specificity,

7     which is basically the Mancia holding that I'm sure I've talked

8     about in the past.  Does that satisfy your concern if I in

9     effect move up the effective date of that amendment and say

10    that will be the rule in this case?

11         MR. GOETZ:  The forward-thinking individuals on that

12    committee, your Honor, I think would satisfy our concern.  We

13    just want clarity to know if they're maintaining these

14    objections or not.  We can assume from their privilege log

15    since they just served work product documents that's the only

16    privilege they're asserting, but that this privilege is still

17    in existence, or still claimed.  As I understand the Court's

18    ruling or proposed ruling that would satisfy the concerns as

19    long as we also have then as to the ones where they haven't

20    said one way or the other whether they have responsive

21    documents.

22         THE COURT:  Well, as I've indicated previously, all of

23    the garbage about the requests being overbroad, irrelevant,

24    whatever, basically becomes surplusage and not a basis for

25    withholding documents.  The objections have to be specific and

DCKFTERT

1    you have to say whether there are documents that are being

2    produced or withheld pursuant to various portions of a request

3    and I think there seems to be a consensus that at the close of

4    document discovery, although that itself seems to be a moving

5    target, there will be amended responses to these requests that

6    presumably would comply with that, and be updated within the

7    field of play as of that date.

8            MR. CARTER:  Your Honor, that's correct.  As indicated

9    in our papers, one of the concerns we have about WAMY's motion

10   and that we expressed during the dialogue one day before a

11   hearing here in court was that this is the kind of issue that

12   shouldn't be dealt with on a collateral basis between

13   plaintiffs and one defendant but globally.

14           THE COURT:  That was the point I was going to make

15   because I agree wholeheartedly with that.  There are committees

16   on both sides and to the extent that there are generic issues

17   they should be raised by plaintiffs as a group or defendants as

18   a group unless there's really something unique.  The fact that

19   one defendant or one plaintiff finds an issue to be more

20   pressing than perhaps their colleagues doesn't mean it

21   shouldn't filter up through the committee process and be part

22   of the further dialogue.

23           MR. CARTER:  To add one thing, your Honor, sort of

24   more substantive in nature, at least as it was originally

25   presented, the WAMY motion appeared to really be raising

DCKFTERT

1    concerns as to whether or not documents were being withheld on

2    privilege grounds based on a generic assertion of privilege,

3    and we had of course produced privilege logs.  The difficulty

4    that we're facing now is that the parties negotiated terms of a

5    privilege log and under the terms of that order there are

6    certain documents that can be withheld by the parties on the

7    basis of privilege without any requirement that they be

8    included on a privilege log.  And so, for instance, we all have

9    correspondence with our clients and we mutually agreed we

10   weren't going to require the other side to do that.  So to the

11   extent the privilege log order required us to include documents

12   that were withheld on privilege grounds they've been identified

13   and, frankly, with the exception of the narrow set of documents

14   your Honor deemed appropriately withheld on privilege grounds

15   they've now been produced because your Honor directed us to

16   produce all the FOIA correspondence.

17           So I think that we have to maintain some respect for

18   the order we negotiated about privilege logs and not go down a

19   road of requiring people to say have you withheld

20   correspondence with your clients because of course we have.

21           THE COURT:  I don't think that's what the concern was.

22   I think it was that in its present state your response to

23   request number 7, perhaps, in addition to all of the

24   boilerplate that I view as surplusage may say "and we're also

25   withholding any privileged documents" and they don't know

DCKFTERT

1   whether there are any documents that have been produced.  So

2   this would, my proposed amendment, or moving up the effective

3   date of the amendment, would require you to say whether there

4   are documents that are being withheld that are responsive to

5   that particular request on the basis of privilege, but I guess

6   it would be which either are on the privilege log or by

7   agreement are exempt from the privilege log.

8        MR. CARTER:  That's fine, your Honor.  I think it's

9   self evident that that's the state of affairs right now.

10        THE COURT:  Well, but WAMY's complaint is that as to

11   some requests, and it didn't seem like it was all that many,

12   they didn't know whether you had any documents that were

13   responsive to the request.

14        MR. CARTER:  Well, your Honor, to the extent, when we

15   made the productions to each of the defendants, the bulk

16   productions really in August we provided an index and for each

17   of the requests it identified the Bates numbers of the

18   documents that were produced as being responsive to that.  If

19   there aren't documents identified as responsive to a request at

20   present we didn't have anything to produce.  But as the

21   defendants made the point when we sought certification of the

22   completeness of their discovery the rules allow you to

23   supplement, the discovery deadline hadn't run and we were still

24   waiting for FOIA requests from dozens of agencies.

25        MR. GOETZ:  All we're asking, your Honor, is that they

DCKFTERT

1    go a step further and just because -- then I can give counsel

2    the specific numbers, but there were specific requests they did

3    not include, there's no indication on the indexes that there

4    are any responsive documents but yet the answer or the response

5    says, well, we'll produce documents as on a rolling basis.

6    Well, we don't know do they have documents or not.  So we're

7    not asking for certification, we just want to know as the

8    universe stands now do you have documents or not.  If they

9    don't have any just say so.

10            THE COURT:  Well, the answer was except for the

11   rolling FOIA productions that they don't as to those.  Is that

12   correct?

13            MR. CARTER:  Right, your Honor.  This is true of all

14   the defendants.  We don't know whether they've produced

15   everything they have or whether they have documents and we

16   won't know until the document discovery deadline comes and they

17   fail to produce anything else and that's their representation

18   that they don't have it.

19            THE COURT:  So I'm not sure whether there's anything

20   further for me to do as to that.

21            MR. GOETZ:  If counsel is indicating today that as to

22   these requests they don't have any documents I'll take him at

23   his word.

24            THE COURT:  Okay.  It does seem like we spent a lot of

25   time and both sides have spent a lot of effort writing letters

DCKFTERT

1   back and forth about what is essentially a non-issue.

2          The current discovery schedule says all documents are

3   to be produced by January 14th, is that correct?

4          MR. CARTER:  I thought it was the 15th, your Honor,

5   but it's in that ballpark, correct.

6          THE COURT:  Close enough for government work.  And

7   there was an indication, I guess it may have been in your

8   letter, Mr. Carter, that the parties were talking about whether

9   that is realistic and what changes need to be made and now we

10  have additional defendants.  That's something I guess we'll

11  take up the next time we meet.

12         MR. CARTER:  That's fine, your Honor.  We were

13  conscious of wanting to raise this issue before the deadline

14  actually expired to be ahead of it.  We made a proposal to the

15  defendants that may be sort of a stopgap.  We would extend the

16  document production by 45 days and then in the weeks leading up

17  to that confer amongst ourselves as to whether or not that was

18  still realistic.  I understand from speaking with Mr. Cabot

19  that various of the defendants have varying views on what the

20  deadline should be.

21         MR. KABAT:  Let me make a global response and then

22  perhaps my colleagues can speak in further detail.  First of

23  all there are three defendants, the two WAMY defendants and

24  DIB, Dubai Islamic Bank, who are ready to move forward with

25  deposition and see no reason then for the extension of the

DCKFTERT

1    document production deadline other than with respect to the

2    FOIA documents which we talked about separately.  There are

3    three other defendants, who as your Honor knows have recently

4    changed counsel and are in the middle of a huge document

5    productions, mainly the Muslim World League, the IIRO and

6    Yassin Kadi, those three defendants who are, who counsel are

7    also here today, do require additional time, simply given the

8    quite enormous volume of documents they have to deal with, and

9    so defendants propose that instead of trying to shoehorn all

10   the defendants into a single deadline for document production

11   when some of the defendants have completed their production no

12   issue has been raised, they've been waiting for over a year and

13   a half while other defendants are in the middle of admittedly

14   quite huge productions it might make sense to allow those

15   defendants who are ready to move forward simply to start the

16   deposition process as to them and then allow the other

17   defendants, namely Muslim World League, the IIRO and Yassin

18   Kadi the additional time that they need to complete the review

19   and production of tens of thousands of documents and I'll be

20   happy to let my colleague give you more specifics if you are

21   interested.

22           THE COURT:  But then we run the risk of doing

23   depositions twice as to some of these witnesses.

24           MR. KABAT:  Well, here's the point I would make there,

25   your Honor.  First of all, the defendants who are ready to move

DCKFTERT

1    forward are essentially what I'll call unrelated to the other

2    defendants.  In other words, the plaintiffs do not need Yassin

3    Kadi documents in order to depose the Dubai Islamic Bank or

4    WAMY to take those depositions because as a result of the

5    Second Circuit decision we're left with a pretty large group of

6    defendants who are not necessarily related to each other and

7    the three defendants who want to move forward, DIB and WAMY,

8    the plaintiffs don't need Yassin Kadi documents, they don't

9    need the IIRO documents to take those depositions.

10             MS. BERGOFFEN:  If I may just add to that, your

11   Honor --

12             THE COURT:  Well, then, if Mr. Carter or one of his

13   colleagues comes back to me after IIRO, to pick one as an

14   example, or a defendant who is coming back into the case

15   potentially in the next few weeks has some smoking gun document

16   then when Mr. Carter comes back and says, well, I want to

17   continue the deposition of the DIB witnesses because I want to

18   ask them about this document, you will oppose that.

19             MR. KABAT:  A deposition can always be held open, it

20   could always be reopened upon showing of good cause.  If

21   there's a smoking gun that shows up in 2014 we're amenable to

22   that.

23             MS. BERGOFFEN:  Your Honor, two points.  Number one,

24   with regard to the depositions, you previously ordered that any

25   party can move forward at this point with depositions should

DCKFTERT

1    they wish to and that's obviously subject to recognizing that

2    you might not get another bite at the apple.  But if I could

3    step back I have a more fundamental issue with the ongoing

4    repeated extensions of document deadline and that is aside from

5    depositions and wanting to prepare for the next case of trial,

6    my client DIB, and I'll let Mr. Mohammedi speak to WAMY,

7    deserves some certainty with regard to that documents are

8    complete.  They spent considerable time and money collecting

9    documents throughout the UAE.  We produced documents in August

10   of 2012 and to have it over this potential threat of more

11   document requests or the like there's simply no reason with

12   regard to the Dubai Islamic Bank that there should be any

13   further extension for documents and the January 15th deadline

14   with regard to documents for DIB should hold.

15           I know Mr. Carter today is suggesting that there might

16   be some issues that they have with DIB and the like.  They've

17   not in the year and a half since we completed our production

18   filed a motion to compel, which to me suggests they're pretty

19   happy with our production.  To the extent they aren't, this

20   continuing ongoing extension of deadlines for them to file that

21   motion is simply unfair to my client, your Honor.  There should

22   be a date certain in the near term by which any sort of

23   document discovery with regard to the DIB is cut off.

24           THE COURT:  Mr. Carter?

25           MR. CARTER:  Your Honor, a couple of things.  I just

DCKFTERT

1   think as a practical matter having differing production

2   deadlines as to the defendants injects a layer of complexity

3   into the entire proceeding on several levels.  They want to

4   tell you that there's no relationship between the defendants

5   who want to proceed and any of the defendants who have asked

6   for an extension of the deadline.  That's not true.  The

7   allegations and our pleadings suggest it's very clear there is

8   a connection, for example, between WAMY and Muslim World

9   League.  We don't have the documents yet.  We think there's a

10   relationship between certain defendants who asked for

11   extensions and DIB as well.  So we are simply asking for the

12   opportunity to get the collective documents from the defendants

13   and see whether or not we have legitimate followup discovery

14   with some of these other folks.

15          We went down this road before and your Honor agreed

16   that was the right approach but if people wanted to take

17   depositions they could do it and if there were objections we

18   could address it individually and that makes the most sense.

19   Counsel for DIB suggested that since we haven't filed a motion

20   to compel as to DIB we must be happy with the production and

21   that's not the case.  The reality is, as your Honor is aware,

22   we have filed motions to compel on a systematic basis for a

23   very long period of time.  We had to chase certain of the

24   defendants relentlessly and we're in the process of filing some

25   other motions.  WAMY is a prime example.  As we understand it

DCKFTERT

1    you have the motion relating to two issues before your Honor

2    already, but as we understand it just as an example one of the

3    things that WAMY did was to collect documents from all of its

4    various field offices around the world and send them to Saudi

5    Arabia instead of New York.

6            THE COURT:  That's part of your current motion,

7    correct?

8            MR. CARTER:  No, your Honor.

9            THE COURT:  I mean, the one I just got.

10           MR. CARTER:  No, the motion you just got relates to

11   production of documents from WAMY Canada, one of the branch

12   offices.  They haven't been sent to Saudi Arabia.

13           THE COURT:  I think it was in relation to one of your

14   letters to WAMY today that was that issue.

15           MR. CARTER:  That's correct.  So there are motions to

16   compel that another round for WAMY, for instance, and as we

17   have always talked about the document production deadline, all

18   the earlier orders contemplated that there would be a period

19   post completion of productions to do motions to compel, because

20   until we have the documents we won't know what we need to

21   compel.  So we've picked off what we can based on the current

22   state of affairs, but we can't do everything in advance.

23           THE COURT:  But the problem is unless at some point we

24   have a drop dead deadline applicable to every defendant and

25   every plaintiff in the case we keep kicking the can down the

DCKFTERT

```
1    road.  I recognize it's a case with considerable complexity but
2    we will never get to that period where I'll have all the
3    motions to compel, I can rule, presumably there will then be
4    another short period of discovery and then people can move to
5    depositions.
6              MR. CARTER:  That's correct, your Honor, but again, in
7    certain cases we likely need documents from other of the
8    defendants to fully move to compel.
9              MS. BERGOFFEN:  Your Honor, I would --
10             THE COURT:  Wait.  I'm not sure I understand that.
11             MR. CARTER:  I think in certain cases what we're going
12   to see in the productions of other defendants is gaps in the
13   productions that were made by others and inaccuracy of the
14   representations they've made.  So, for example, your Honor,
15   defendant al Kadi's recent production includes a copy of a
16   witness statement from an interview of defendant Jelaidain that
17   was taken in Saudi Arabia and that the defendant Jelaidain
18   signed and was taken during the course of this litigation and
19   that he didn't produce and there are certainly other documents
20   relating to this exchange and we've only become aware of this
21   because we've received documents from other parties.  So we're
22   fine setting a deadline that's reasonable and even aggressive,
23   but we just want the full collection of documents which is why
24   we said 45 days.
25             THE COURT:  But you said 45 days as an interim
```

DCKFTERT

1   deadline, not the ultimate deadline.

2           MR. CARTER:  We said 45 days for production of

3   documents that if someone came and made a showing that they

4   needed more time we would address it at that time.  We were

5   trying to do this without having to reinvent the wheel in its

6   totality right now.

7           MS. BERGOFFEN:  Your Honor, I note with regard to DIB

8   Mr. Carter made several representations about something from

9   one party that might be used against the other.  Those don't

10  apply to DIB, to reference without any examples and to the

11  extent they're looking for a potential hypothetical needle in a

12  haystack that could show up several months down the road that

13  can be addressed then.  But with regard to the productions that

14  have already been made, the potential threat for further

15  requests that may or may not be acceptable to your Honor there

16  should be a deadline, there should be the January 15th deadline

17  that's set for DIB.  There's simply no basis and Mr. Carter has

18  not articulated any need standing here today why documents

19  should remain open as to DIB.

20          MR. MOHAMMEDI:  If I can speak on behalf of WAMY on

21  this issue.  Our client obviously wants to move ahead with this

22  case.  We produced documents, over 22,000 documents to

23  plaintiffs and we gave them 155 indexes and we said to them

24  give us what you need from here and then we will have them

25  produced to you if you do not want o come.  We have been

DCKFTERT

1   waiting for a year, we have not heard from them in that time

2   whatsoever.  They wait a year and they file a motion to compel.

3   This could be resolved, but the deadline keeps extending and

4   extending, and we think the defendants have already produced

5   what they have in this case.

6        MR. LEWIS:  Your Honor, if I may be heard.  I just

7   want to address the document issue in a concrete context rather

8   than an abstract one.  We, my colleague, Mr. Nassar has led a

9   team of Arabic-speaking attorneys who have visited Muslim World

10  League and IIRO offices in -- and I have it written down -- the

11  Philippines, Indonesia, Bosnia, Albania, Kosovo, Macedonia,

12  Pakistan, both Jetta and Mecca and Islamabad, and they've spent

13  months on the road doing that.  They've identified

14  approximately 200,000 documents to be brought to the United

15  States.  Pakistan is not an easy place to get documents

16  scanned, so those are being shipped.  They will then be

17  uploaded to a database so they're easily accessible, with

18  respect to where we have approximately 80,000 documents already

19  in Washington that are being processed and are being produced

20  on a rolling basis.

21       The one issue outstanding is getting access to the

22  eastern province of Saudi Arabia former office which is shut

23  down under the control of the Saudi government and we have been

24  in active discussions with representatives of the Saudi

25  government.  We have given Mr. Carter this report.  We've asked

DCKFTERT

1    for 90 days.  That is our best estimate, you know, with a fair

2    wind from the Pakistan cargo shipping and getting some scanning

3    done in places where it's not that easy to get done, and so

4    we've asked for 90 days to produce what are going to be

5    hundreds of thousands of documents.  We've been on it and

6    pushing hard.  So I know everyone has their own particular

7    issues and their desire to get on with things.

8            What we would ask, and Mr. Carter, we'd ask for 90

9    days.  The 45 is fine, we're quite confident that we'll make a

10   lot of progress in 45 days, but we'll probably need the second

11   45 days.  I don't think Mr. Carter has any problem with that.

12   I just think we need to understand different defendants are in

13   different places and face very different logistical challenges.

14           Thank you, your Honor.

15           MR. CARTER:  Your Honor, we in part proposed the 45

16   because we received Mr. Lewis' letter for 90 and understood

17   that other defendants would likely suggest zero, so we did what

18   we thought was the reasonable thing and split the difference

19   for now.  But again, everyone has a bit of a different agenda.

20           THE COURT:  Well, I am going to extend discovery for,

21   document discovery for 45 days to a date certain and propose to

22   hold a conference shortly before then if I can on my schedule.

23   I would hope to hear from both committees in advance of that

24   conference where you folks are and what you propose.  I

25   understand that that's not wholly satisfactory to Dubai Islamic

DCKFTERT

1    Bank and probably Mr. Salerno's client.  But go ahead

2    Mr. Salerno.

3         MR. SALERNO:  Thank you, your Honor.  Peter Salerno

4    for Mr. Kadi.  Just get to the conclusion first we will

5    probably need until June 30 to complete our production.  The

6    universe of documents that need to be reviewed is over 200,000.

7    We have already produced almost 3,000 documents consisting of

8    13,590 pages.  By next week we will produce another almost

9    5,000 consisting of another 13,000 pages, a total of 27,000

10   pages.  We've reviewed obviously more than that.  Most of these

11   documents are housed at a London law firm, most of them are

12   paper.  We, too, are doing a process of scanning in London and

13   uploading to a database and reviewing the documents, but

14   Mr. Kadi at the time relevant to discovery in this case had a

15   pretty widespread business and philanthropic interests.  Many

16   government investigations were directed at him over the course

17   of the years after 9/11 other than in the U.S. and which

18   involved secret evidence, which were all resolved favorably to

19   Mr. Kadi, but the bottom line is there's a vast amount of

20   documentation, a lot of it is sensitive.  We are obviously not

21   withholding stuff merely because it is sensitive but pursuant

22   to an order entered into in this action we are legending those

23   documents with a confidentiality legend as appropriate.  They

24   could require a review to protect Mr. Kadi's documents.  We are

25   moving as fast as we can, and I felt it was fair to advise the

DCKFTERT

1    Court that we obviously will be making every effort to beat a

2    June 30 deadline, but we anticipate we might need it.

3            THE COURT:  Mr. Kadi is a pretty seminal figure it

4    seems in this case and I guess my question is what's he been

5    doing for the last year or two?

6            MR. SALERNO:  Up until April he was out of the case,

7    your Honor.

8            THE COURT:  I guess that's fair.  Mr. Carter?

9            MR. CARTER:  Your Honor, it seems to me it's one of

10   the complexities of a big MDL when people get remanded and

11   that's one of the realities.  I think we can approach this as a

12   reasonable matter at the 45-day extension and have

13   conversations with everybody and try to get to the bottom of

14   this with a mutually agreeable solution.

15           THE COURT:  I think you, Mr. Salerno and Mr. Carter,

16   need to have some discussions.  Let me put it this way.  I'm

17   unlikely to grant an additional six months, so you need to have

18   discussions about what you can do to rachet up the production.

19   I understand you're making best efforts but maybe you need to

20   make better efforts.

21           MR. SALERNO:  We really are running as fast as we can,

22   your Honor, and we'll continue to do so and we will do the very

23   best we can.

24           THE COURT:  So I guess we should have another

25   conference early February.  Friday, February 14th?

DCKFTERT

1          MR. KABAT:  Valentine's day.

2          THE COURT:  Yes, it is.  That's the first available

3    day in February that I have.

4          MR. KABAT:  The defendants have pretty much every day

5    open the week of February 17 and 21 if you have that available.

6          THE COURT:  The 17th is a holiday.  11:00 a.m. on the

7    19th?

8          MR. CARTER:  That sounds fine, your Honor.

9          MR. LEWIS:  Your Honor, if I might trouble the Court

10   with a housekeeping matter.  Your Honor was kind enough to

11   grant the pro hac vice motions of two of my colleagues.

12   Ms. Henry, Aisha Henry, who is on the phone filed her motion on

13   May 29 and I'm hoping your Honor hasn't found any impediment

14   but it's merely an administrative issue.  It's document 2720

15   filed on May 29th and I would ask your Honor to please address

16   that.

17         THE COURT:  Obviously it's an oversight and we will

18   attempt to secure that today.

19         MR. LEWIS:  Thank you, your Honor.

20         MS. HENRY:  Thank you, your Honor.

21         MR. GOETZ:  Your Honor, one other housekeeping matter

22   on scheduling.  Given the March 19 date that we're going to

23   reconvene, the Court has the motion that was filed yesterday --

24         THE COURT:  You mean February 19.

25         MR. GOETZ:  Oh, I'm sorry, February 19.  The Court has

DCKFTERT

1  the motion that was filed yesterday.  Perhaps we could put that

2  on for the agenda on that hearing and then we would also ask

3  given that it was filed yesterday, we have the holidays coming

4  up, we'd ask on behalf of WAMY for an additional two weeks to

5  respond to plaintiffs' motion.

6          THE COURT:  Well, as long as I have a fully submitted

7  motion, say, a week from, I don't care what you folks work out.

8          MR. CARTER:  That's what I'm trying --

9          THE COURT:  It seems to me ample time.

10          MR. CARTER:  I'm just trying to back out how much time

11  we would have for our reply, but I'm sure that's fine.

12          THE COURT:  All right.  Anything else?

13          MR. KABAT:  Just to bring to your attention we do have

14  a conference with Judge Daniels on January 16 and I believe

15  there will be several motions that will be ripe then and

16  Mr. Carter and I agree that there will probably not be a

17  discovery motion ripe for January so we're not asking for a

18  conference before Judge Daniels.

19          THE COURT:  When is the conference before Judge

20  Daniels?

21          MR. KABAT:  January 16, at 9:30 in the morning.

22          THE COURT:  It is not on my calendar, so I'm glad you

23  called that to my attention.  Okay.  Thank you.

24          (Adjourned)

25