# Exhibit A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------x

IN RE:                                           :

TERRORIST ATTACKS ON                             :
SEPTEMBER 11, 2001

                                                 :

--------------------------------------------------------x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  10/28/13

**MEMORANDUM
DECISION AND REPORT
AND RECOMMENDATION**

03 MDL 1570 (GBD) (FM)

**FRANK MAAS,** United States Magistrate Judge.

I.      Introduction

             The Plaintiffs in this expansive multidistrict litigation seek to recover

damages for personal injury and property damage claims arising out of the September 11

terrorist attacks.  Although more than a decade has passed since the attacks, discovery is

still inching along.  Over the years, many foreign banks and other potentially deep-pocket

defendants have been dismissed, leaving as defendants, mostly, charities and relief

organizations that are alleged to have funneled millions of dollars into al Qaeda and

related terrorist groups.  Securing their compliance in discovery has proven to be a

difficult task.

             Over the past several months, the Plaintiffs have filed letter motions seeking

sanctions against certain of the defendants for discovery infractions that are alleged to

have persisted throughout the pendency of this proceeding.  The Plaintiffs request varying

forms of relief, including the entry of a default judgment or the imposition of adverse

inference jury instructions, depending upon the defendant.  This combined Memorandum

Decision and Report and Recommendation addresses three of the Plaintiffs' motions and

sets forth legal principles that should be applicable to any future similar motions that may

be brought.  For the reasons that follow, the Plaintiffs' motions (ECF Nos. 2654, 2700,

2701) are granted in part and denied in part.

II.     Legal Framework

               Rule 37 of the Federal Rules of Civil Procedure permits a court to impose a

"wide range of sanctions for . . . discovery abuses."  Mali v. Federal Ins. Co., 720 F.3d

387, 392 (2d Cir. 2013).  These include, but are not limited to:  "orders deeming certain

facts established; permitting an adverse inference instruction; striking pleadings;

prohibiting the 'disobedient' party from making specific claims or introducing certain

matters into evidence; dismissing a claim or the entire action or granting default judgment

against the disobedient party; or entering an order of contempt."  Linde v. Arab Bank,

PLC, 269 F.R.D. 186, 195 (E.D.N.Y. 2010) ("Linde I") (citing Residential Funding Corp.

v. DeGeorge Fin. Corp., 306 F.3d 99, 101 (2d Cir. 2002)).

               When sanctions are sought based upon a party's failure to produce

documents, the party moving for sanctions must demonstrate that:  (a) the opposing party

had an obligation to make timely disclosure of the requested materials; (b) the opposing

party acted with a "culpable state of mind;" and (c) the missing evidence is "relevant" to

the moving party's claim or defense.  In re Sept. 11th Liab. Ins. Coverage Cases, 243

F.R.D. 114, 125 (S.D.N.Y. 2007) ("Coverage Cases") (quoting Residential Funding, 306

F.3d at 107).  If sanctions are sought based upon a party's destruction, or "spoliation," of

evidence, an identical legal framework applies, except that the first required showing is that the opposing party had an obligation to "preserve [the missing evidence] at the time it was destroyed." Residential Funding, 306 F.3d at 107.

To satisfy the first element, there must be proof that either the nondisclosing party was obligated by Rule 26 or a court order to produce the materials, Coverage Cases, 243 F.R.D. at 125, or, in cases involving spoliation of evidence, the party was on "notice that the evidence [was] relevant to litigation or . . . should have known that the evidence [might] be relevant to future litigation," Fujitsu Ltd. v. Fed. Exp. Corp., 247 F.3d 423, 436 (2d Cir. 2001). In this Circuit, the second element of culpability may be satisfied if the nondisclosing party is shown to have breached a discovery obligation or destroyed evidence through bad faith, gross negligence, or even ordinary negligence. Coverage Cases, 243 F.R.D. at 125 (quoting Residential Funding, 306 F.3d at 113). Finally, with respect to the third element, the party moving for sanctions must identify at least "some evidence" that suggests that items "relevant to substantiating its claim would have been included among the withheld or destroyed files." Linde I, 269 F.R.D. at 196 (quoting Kronisch v. United States, 150 F.3d 112, 128 (2d Cir. 1998)) (brackets omitted). Evidence that the nondisclosing party acted in bad faith is sufficient to infer that the missing evidence is "relevant," and even a showing of gross negligence is "frequently" enough. Coverage Cases, 243 F.R.D. at 125 (quoting Residential Funding, 306 F.3d at 109). In all other circumstances, however, the party moving for sanctions "must adduce sufficient evidence from which a reasonable trier of fact could infer that the destroyed or unavailable

3

evidence would have been of the nature alleged by the [moving] party." Residential

Funding, 306 F.3d at 109 (internal quotation marks and brackets omitted). Nonetheless, in

that inquiry, "care should be taken not to require too specific a level of proof," because

"holding the prejudiced party to too strict a standard of proof regarding the likely contents

of the destroyed [or absent] evidence would subvert the prophylactic and punitive

purposes of [sanctions]," and allow parties to profit from disobedient conduct. Kronisch,

150 F.3d at 128 (citing 2 Wigmore, Evidence in Trials at Common Law § 291, at 228)

(internal quotations marks omitted). Thus, "[i]n cases involving spoliated or unavailable

evidence, the negligent or willful party bears the risk that the evidence was adverse to it."

Coverage Cases, 243 F.R.D. at 125.

The courts have "broad discretion in fashioning an appropriate sanction" for

the non-production of evidence. Residential Funding, 306 F.3d at 107. In determining the

proper sanction to impose, a court may consider "(a) the willfulness of the non-compliant

party or the reason for noncompliance; (b) the efficacy of lesser sanctions; (c) the duration

of the period of noncompliance[;] and (d) whether the non-compliant party had been

warned of the consequences of noncompliance." Agiwal v. Mid Island Mortg. Corp., 555

F.3d 298, 302 (2d Cir. 2009) (quotation marks and ellipses omitted). "[T]hese factors are

not exclusive, and they need not each be resolved against the party challenging . . .

sanctions." S. New England Tel. Co. v. Global NAPs, Inc., 624 F.3d 123, 144 (2d Cir.

2010). Indeed, Rule 37 merely requires that a sanction be "just." See Fed. R. Civ. P.

37(b)(2)(a). The overriding consideration therefore is whether the "severity of [the]

sanction" is "commensurate with the non-compliance." Shcherbakovskiy v. Da Capo Al
Fine, Ltd., 490 F.3d 130, 140 (2d Cir. 2007). "Ultimately, discovery sanctions should,
'insofar as possible, . . . restore the prejudiced party to the same position it would have
been in absent the wrongful [withholding] of evidence by the opposing party." Linde I,
269 F.R.D. at 195 (quoting Kronisch, 150 F.3d at 126).

III.   Discussion

    A.   Wa'el Jelaidan

        1.   Background

        The first of the Plaintiffs' motions for sanctions concerns defendant Wa'el
Hamza Jelaidan ("Jelaidan").[1]  Jelaidan is widely believed to have shared a close
relationship with Osama bin Laden and to have directed organizations that provided
financial and logistical support to al Qaeda.  In September 2002, the Treasury Department,
jointly with the Kingdom of Saudi Arabia, designated Jelaidan under Executive Order
("EO") 13224 as a "person who supports terror."  See Treasury Department Statement on
the Designation of Wa'el Hamza Julidan, http://www.treasury.gov/press-center/press-
releases/Pages/po3397.aspx.[2]  Jelaidan is similarly designated on the United Nations 1267
Committee's "Al-Qaida Sanctions List."  See Narrative Summaries of Reasons for Listing

---

    [1]    The papers associated with the Jelaidan motion are docketed as follows:  Ltr. to the
Court from the Pls.' Exec. Comms., dated Jan. 30, 2013 (ECF No. 2700) ("Pls.' Jelaidan Mem.");
Jelaidan's Opp. to Pls.' Mot. to Compel/Mot. for Sanctions (ECF No. 2702) ("Jelaidan Opp.
Mem."); Ltr. to the Court and Annexed Exhibit A from the Pls.' Exec. Comms., dated March 12,
2013 (ECF No. 2704) ("Pls.' Jelaidan Reply").

    [2]    All websites in this Memorandum Decision and Report and Recommendation were
last visited on October 29, 2013.

QI.J.79.02. Wa'el Hamza Abd Al-Fatah Julaidan, http://www.un.org/sc/committees/1267/
NSQI07902E.shtml.

In October 2011, the Plaintiffs sought an order compelling Jelaidan to
produce documents related to (a) his banking and financial accounts, (b) his relationship
with other EO 13224 designees, including the alleged transfer of millions of dollars
among them, and (c) any other sanctions that had been imposed on him after 2002.  (Pls.'
Jelaidan Mem., Ex. A).  Although the Plaintiffs originally served their requests for those
documents in 2006, Jelaidan had made only a single production, consisting of twenty-two
documents (totaling 104 pages), many of which the Plaintiffs consider either unresponsive
or irrelevant.  (Id.).

Jelaidan opposed the Plaintiffs' motion on the basis that he lacked the ability
to obtain responsive documents from his banks because they allegedly were unwilling to
cooperate with him due to his global terrorist designations.  (See Jelaidan Opp. Mem., Ex.
8).  The Plaintiffs disputed that representation and produced, in response, the affidavit of
Jimmy Gurulé, a professor of law at the Notre Dame Law School, who previously had
served as Under Secretary for Enforcement at the Treasury Department.  Gurulé asserted,
in substance, that, contrary to what Jelaidan had suggested, his designations did not legally
"preclude a financial institution from providing [him] with account statements," for
accounts that were frozen or blocked.  (Pls.' Jelaidan Mem., Ex. B).

I first addressed the Plaintiffs' motion at a discovery conference on
November 16, 2011.  (See ECF No. 2493 ("11/16/11 Hr'g Tr.") at 32).  During that

conference, the Plaintiffs complained that Jelaidan had not produced any documentation reflecting the diligent efforts he supposedly had made to obtain his banking records, and they expressed suspicion that Jelaidan was attempting to "use his designation by the United States and the UN as a shield from the discovery process." (Id. at 31-32). I agreed with the Plaintiffs that Jelaidan had not satisfactorily demonstrated that he was incapable of securing the requested documents. I therefore ordered Jelaidan to undertake a vigorous "full-court press" to secure the responsive records. (Id. at 33). I further cautioned him that sanctions would be imposed if he failed to document sufficiently his good faith efforts to comply. (Id.).

Less than one month after the conference, Jelaidan's counsel, Martin McMahon, Esq., again informed the Plaintiffs that Jelaidan was unable to produce additional documents, explaining that both Jelaidan and Bassim A. Alim, Esq., his attorney in Saudi Arabia, had "made a number of attempts to request and obtain responsive documents from governmental and commercial entities[,] but [that] these entities ha[d] not cooperated with them." (Pls.' Jelaidan Mem., Ex. C). Mr. McMahon did not disclose any details regarding Jelaidan's alleged efforts, however, other than to indicate that he had received a letter from Mr. Alim, who stated that he was "sure" that Jelaidan would be unable to procure any further documents. (Id.).

Over the ensuing months, Jelaidan did not did not furnish the Plaintiffs with any additional documents, nor did he provide any information regarding the attempts he allegedly had made to obtain the requested records. Jelaidan also failed to serve any

7

responses to the Plaintiffs' supplemental document requests.  (Pls.' Jelaidan Mem. at 4).

On August 30, 2012, the discovery deadline passed without any further production.

On January 30, 2013, the Plaintiffs filed their present motion, seeking

sanctions against Jelaidan for his failure to respond adequately to their initial and

supplemental document requests or to produce evidence verifying the diligent efforts that

he allegedly undertook to obtain the responsive materials.  Jelaidan opposed the motion,

reasoning that "many of the banking and governmental institutions [to whom requests

have been made] have not been compliant," and that he therefore had exhausted any

avenues that he could pursue to collect responsive documents.  (Jelaidan Opp. Mem. at 2).

As evidence of those efforts, Jelaidan annexed to his opposition papers a number of letters

in which Mr. McMahon requested documents from various banks, the Office of the

Ombudsperson at the United Nations, the Office of Foreign Assets Control ("OFAC") at

the Treasury Department, and the Saudi Arabian Monetary Agency ("SAMA").  (Id., Exs.

1-4).  Jelaidan also submitted his own affidavit, originally proffered in October 2011 in

connection with the Plaintiffs' motion to compel, as well as the more recent joint affidavit

of Mr. Alim and Aftar Altaf, Jelaidan's personal assistant.  (Id., Exs. 5 ("Alim/Ataf Aff.")

& 6 ("Jelaidan Aff.")).[3]  The Plaintiffs contend that those materials are patently

insufficient and simply underscore the "pattern of unacceptable discovery abuses" that has

pervaded their dealings with Jelaidan.  (Pls.' Jelaidan Reply at 1-2).

---

[3]    In addition, Jelaidan submitted a number of purportedly privileged documents –
mainly email communications between Mr. McMahon and Mr. Alim – for in camera review.  (See
Ltr. to the Court from Mr. Martin F. McMahon, Esq., dated April 2, 2013).

2.     Analysis

a.     Discovery Obligations

In determining whether sanctions against Jelaidan are appropriate, it is first necessary to assess his discovery obligations and the extent to which he has complied with them. See Coverage Cases, 243 F.R.D. at 125. In that regard, during the conference on November 16, 2011, I clearly directed Jelaidan to undertake vigorous renewed efforts to obtain and produce documents responsive to the Plaintiffs' requests, or, at the very least, to document his good faith attempts to do so. Having done essentially nothing to pursue any responsive records since then, Jelaidan clearly has failed to comply with my order and, consequently, has not met his discovery obligations.

b.     Culpable State of Mind

Jelaidan's conduct throughout this case evidences a continued unwillingness to participate fairly in discovery and can only be characterized as proceeding in bad faith. In seven years, Jelaidan has produced a mere twenty-two documents. After being directed to remediate his clearly deficient responses, Jelaidan's only attempts to comply with my order began more than one year later, after the Plaintiffs filed their motion for sanctions, which was more than six years after the requests first were made. Jelaidan's failure to meet even his most basic discovery obligations thus has resulted in extreme delay.

Although Jelaidan continues to claim that he cannot obtain any further responsive documents, despite having made good faith attempts to do so, that assertion is not supported by the record. At the outset, the letters that Mr. McMahon sent on

Jelaidan's behalf requesting records from his various banks are woefully insufficient and do not demonstrate good faith.  Indeed, the letters first were mailed in February 2013 – several weeks after the Plaintiffs filed their present motion for sanctions, and sixteen months after the date on which I had ordered Jelaidan to undertake a "full-court press" to obtain the requested records.  This timing alone strongly suggests that the letters simply were sent in an eleventh-hour attempt to manufacture a basis upon which to oppose the Plaintiffs' motion.

Quite apart from their untimeliness, the letters to the banks are so inadequate that they could not reasonably have been expected to generate an effective response.  The letter to Al Rajhi Bank, for example, conveniently omits key information, including the type of records being sought and the relevant account number.  Even more troubling is the fact that the letter was addressed to a branch office in Malaysia, rather than to the bank's headquarters in Saudi Arabia.  It is clear that Jelaidan could not have had any relevant prior dealings with the Malaysia branch since the bank only opened its offices there in 2006.  See Al Rajhi Bank, About Us:  History, http://www.alrajhibank.com.  Moreover, in light of Jelaidan's prior acknowledgment that "all relevant information [concerning his] account [could] only be disseminated by the Saudi Authorities," (Jelaidan Aff. ¶ 8), it should have been obvious that the Malaysia branch lacked the authority to entertain his counsel's request.  Such an approach plainly suggests that the Jelaidan letter requests were intended to fail.  See Linde v. Arab Bank, PLC, 706 F.3d 92, 113 (2d Cir. 2013) ("Linde II") (district court's finding that defendants' letters requesting responsive bank documents

were "calculated to fail" properly supported the conclusion that defendants had not acted

in good faith).

The method by which Jelaidan chose to transmit his requests further

underscores the deficiency of his woefully belated discovery efforts.  Despite the fact that

many of the requests were directed to large foreign banks, each letter was sent in English

to a general mailing address, with no accompanying translation.[4]  As the Plaintiffs point

out, even a brief internet search would have revealed that several of the financial

institutions where Jelaidan has accounts have specific representatives or departments

dedicated to addressing such issues as money laundering, customer due diligence, and

terrorism-related designations by OFAC or the United Nations.  Habib Bank, for instance,

provides information on its website about its money laundering and anti-terrorist financing

policies, and indicates that those and other related issues are overseen by Jamil Iqbal, the

bank's Chief Compliance Officer.  See AML/CDD/CFT Policy,

http://www.hbl.com/downloads/pdf/regulatory-compliance/aml-cdd-cft-policy.pdf.  A

number of other banks where Jelaidan maintains accounts provide similar information on

their websites.  See, e.g., Anti-Money Laundering and Combating the Financing of

Terroristm (AML/CFT) Regulations, http://sbp.org.pk/l_frame/Revised-AML-CFT-

Regulations.pdf (identifying Inayat Hussain as Executive Director of  the State Bank of

Pakistan's Money Laundering and Anti-Terrorism programs); Key People / Management,

---

[4]        Although a request from local counsel might have gained more traction than Mr.
McMahon's form letters, Jelaidan apparently also made no effort to obtain representation in any
of the countries to which the letter requests were sent.

http://www.faisalfinance.com/la_banque/keypeople_en.aspx (listing Jacqueline Consoli Bernasconi as Head of Compliance at Faisal Private Bank).  The apparent failure of Jelaidan to conduct or make use of even this basic research confirms that his discovery efforts never advanced beyond the superficial.

In addition, the contents of Jelaidan's letter requests cast significant doubt on his claim that he had made prior good faith attempts to contact his banks.  Although the letters allude to Jelaidan having, in some cases, received prior rejections of his requests for records, they oddly provide no details regarding the dates or substance of those communications, nor do they identify the bank personnel who had processed his requests. Moreover, given the references to prior correspondence, it is puzzling that Jelaidan would choose to address subsequent letters to no one in particular, rather than to individuals from whom he had received communications in the past.[5]

Like the letter requests, the two affidavits that Jelaidan submitted in opposition to the Plaintiffs' motion do not support his claim that he has acted in good faith.  Indeed, neither affidavit is even remotely probative of any efforts that Jelaidan may have made to comply with my instructions during the November 2011 discovery conference.  The first affidavit, by Messrs. Alim and Altaf, cites only two terse – and wholly irrelevant – examples of Jelaidan's past communications with his banks.  The first

---

[5]     Jelaidan's belated document requests to the United Nations, OFAC, and SAMA contain deficiencies similar to those in his letters to the banks.  Even if those submissions ultimately result in the production of some responsive documents, Jelaidan's failure to make any attempt to contact these entities prior to the Plaintiffs' filing of their motion for sanctions is inexcusable, especially in light of the fact that those records first were requested in 2006.

is a letter dated August 21, 2001, sent by Jelaidan to the Governor of the State Bank of
Pakistan, in which he allegedly seeks to remove the "ban" on six accounts held by Rabita
Trust, which is a separate defendant in this case.  (Jelaidan Opp. Mem., Ex. 5).  Although
the affidavit indicates that this letter is attached, it does not appear to have been included
among the exhibits submitted with Jelaidan's opposition papers.  Regardless, the letter
predates this litigation, and there is no indication that it sought any documents germane to
the Plaintiffs' requests directed to Jelaidan.  Moreover, although Jelaidan may have had
significant connections to Rabita Trust, his request to lift a ban on the Trust's accounts
proves nothing about any steps that Jelaidan may have taken to obtain information relating
to his own personal accounts after he was instructed to do so.  The second example cited
in the joint affidavit is a letter, dated April 28, 2012, that Jelaidan sent to the Istanbul
office of the Turkish Company for Financing and Joint-Stock Partnership in response to a
message concerning the automatic transfer of his account proceeds into an insurance fund.
That letter, too, appears to be unrelated to the Plaintiffs' discovery demands and to be
nothing more than a self-serving request that his account be "return[ed] to [his] disposal"
or converted into an "Islamic saving[s] account."  (Id. at 4).

   Jelaidan's own affidavit, previously submitted in response to the Plaintiffs'
original motion to compel, has not become any more convincing with the passage of time.
Furthermore, because the affidavit was prepared in October 2011, it sheds no light on
Jelaidan's efforts to comply with my "full-court press" directive the following month.

The remaining material proffered in opposition to the Plaintiffs' motion confirms that Jelaidan has not made good faith efforts to satisfy his discovery obligations. Indeed, some of the material submitted for in camera review actually suggests that certain relevant bank records are available to Jelaidan, despite his claims to the contrary. Moreover, although Jelaidan continues to take the position that he has been blocked from obtaining any relevant bank records since being designated in 2002, he apparently was able to produce a 2005 account statement from Faisal Finance. (See 11/16/11 Hr'g Tr. at 34). These inconsistencies show that Jelaidan has been less than forthcoming about the documents that he is capable of obtaining and producing.

In addition, although Jelaidan has resided for many years in Saudi Arabia, there is no evidence that he ever has sent letter requests to any banks within the Kingdom, even though the Plaintiffs have asked for documents relating to numerous personal and business accounts that he maintained there, including a number of accounts for charities or organizations for which Jelaidan allegedly had signatory authority. There also is no indication that Jelaidan made any efforts to contact any bank there in person after he was ordered to renew his efforts to obtain responsive documents in November 2011.

Finally, Jelaidan has provided no explanation for why he continues to ignore the Plaintiffs' supplemental discovery requests, which have now been outstanding for more than one year. Although Jelaidan seeks to justify his noncompliance on the grounds that the supplemental requests are "largely duplicative" of the Plaintiffs' initial demands, (Jelaidan Opp. Mem. at 4-5), the supplemental requests seek many new categories of

documents, including records from recently-identified bank accounts and materials concerning Jelaidan's relationship with certain of the 9/11 hijackers and the Muwafaq Foundation. Jelaidan's refusal to make so much as an attempt to respond to these requests simply underscores the deficient manner in which he has approached his discovery obligations throughout this case.

For these and other reasons, I find that Jelaidan has willfully disregarded his discovery obligations and acted in bad faith.

c.   Relevance

Jelaidan's bad faith alone is sufficient to support an inference that the evidence he has failed to produce would be relevant. Residential Funding, 306 F.3d at 109. Moreover, "[e]ven conduct characterized as 'purposeful sluggishness,' or intentional delay, can support a finding of relevance." Short v. Manhattan Apartments, Inc., 286 F.R.D. 248, 254 (S.D.N.Y. 2012) (quoting Residential Funding, 306 F.3d at 110). Here, Jelaidan's failure to undertake any efforts to retrieve responsive documents for nearly one and one-half years after he was ordered to do so is clear evidence of his intentionally obstructive conduct.

Even in the absence of a showing of bad faith, there can be no question that Jelaidan's bank records, if produced, would have significant evidentiary value. Since those records likely would confirm whether Jelaidan provided funding to al Qaeda or its affiliates, they would help prove the Plaintiffs' central allegations in this case. Therefore,

15

by all measures, the missing documents must be considered relevant. Sanctions

consequently are appropriate.

      3.    <u>Sanctions</u>

      The remaining question relates to the penalty to be imposed. In determining

the proper sanction for a party's failure to produce evidence, a court should "weigh,

among other factors, the harshness of the sanctions, the extent to which the sanctions are

necessary to restore the evidentiary balance upset by incomplete production, and the non-

disclosing party's degree of fault." <u>Linde II</u>, 706 F.3d at 115. Where, as here, "the failure

to comply with a court order is due to willfulness or bad faith," severe sanctions are

justified. <u>Daval Steel Prods. v. M/V Fakredine</u>, 951 F.2d 1357, 1367 (2d Cir. 1991).

      Jelaidan's failure to produce responsive documents undoubtedly has

deprived the Plaintiffs of critical information concerning their case. Without banking

records, for example, it will be very difficult, if not impossible, for the Plaintiffs to prove

that Jelaidan financed terrorism-related activities. The only means of restoring the

evidentiary imbalance caused by Jelaidan's incomplete production is the imposition of an

adverse inference instruction. I have considered other sanctions, but it is clear that there is

no lesser sanction that effectively could remedy the prejudice caused by Jelaidan's failure

to produce vital documents. Moreover, sanctions serve a punitive as well as a remedial

purpose, <u>Shamis v. Ambassador Factors Corp.</u>, 34 F. Supp. 2d 879, 890 (S.D.N.Y. 1999),

and the imposition of an adverse inference sanction is an appropriate punishment given

Jelaidan's continued willful behavior in this case. Indeed, his misconduct spans a history of seven years and persists to this day.

I note that the Plaintiffs warned Jelaidan many times of the potential consequences of his failure to comply with his discovery obligations. I also cautioned Jelaidan myself during the November 2011 conference that sanctions could be imposed if he did not remedy his deficient responses. (11/16/11 Hr'g Tr. at 33). Since Jelaidan disregarded those warnings, there is no reason to impose a lesser sanction. See Agiwal, 555 F.3d at 302. I am not the trial judge, however. Accordingly, Judge Daniels should be the one to craft the specific language of that instruction, should the case against Jelaidan reach the stage of a trial.

Rule 37(b)(2)(C) of the Federal Rules of Civil Procedure requires a court to award a successful party the expenses reasonably incurred in making a motion "unless the noncompliant party['s] . . . failure [to cooperate in discovery] was substantially justified or . . . an award of expenses would be unjust." Oleg Cassini, Inc. v. Electrolux Home Prods., Inc., No. 11 Civ. 1237 (LGS) (JCF), 2013 WL 3056805, at *3 (S.D.N.Y. June 19, 2013) (quoting Fed. R. Civ. P. 37(b)(2(C)). For this reason, I will require that Jelaidan reimburse the Plaintiffs for the fees and costs that they reasonably have incurred in connection with their filing of the present motion. See Fed. R. Civ. P. 37(b)(2)(C). The Plaintiffs therefore are directed to submit, within thirty days, affidavits and contemporaneous time records itemizing the number of hours expended on the motion, the nature of the work done, and the reasonableness of the timekeepers' rates. See Lewis v. Coughlin, 801 F.2d 570, 577

(2d Cir. 1986); <u>N.Y. State Ass'n for Retarded Children, Inc. v. Carey</u>, 711 F.2d 1136, 1148

(2d Cir. 1983); <u>Puglisi v. Underhill Park Taxpayer Ass'n</u>, 964 F. Supp. 811, 817 (S.D.N.Y.

1997).  Any opposition papers must be submitted within twenty-one days thereafter.

    B.     <u>Rabita Trust</u>

        1.     <u>Background</u>

       The Plaintiffs also seek sanctions against defendant Rabita Trust.[6]  Rabita

Trust is a relief organization founded in 1988 for the purported purpose of repatriating

Pakistanis stranded in Bangladesh after the Liberation War in 1971.  In 2001, both the

Treasury Department and the United Nations 1267 Committee designated Rabita Trust as

a terrorist organization based upon evidence that it had supplied logistical and financial

support to al Qaeda.  <u>See</u> Treasury Department Releases List of 39 Additional Specially

Designated Global Terrorists, http://www.treasury.gov/press-center/press-

releases/Pages/po689.aspx; Narrative Summaries of Reasons for Listing, QE.R.21.01.

Rabita Trust, http://www.un.org/sc/committees/1267/NSQE02101E/shtml.  Specifically,

Rabita Trust was found to have had close ties with several al Qaeda affiliates, including

Jelaidan, who had served on the Board of the Trust and as its Director General.  (<u>Id.</u>).

       In 2006, the Plaintiffs served Rabita Trust with a set of jurisdictional

discovery requests seeking, among other things:  (a) documents concerning any

---

[6]     The papers associated with the Rabita Trust motion are docketed as follows:  Ltr. to the Court from the Pls.' Exec. Committee, dated Jan. 30, 2013 (ECF No. 2701) ("Pls.' Rabita Mem."); Rabita Trust's Opp. to Pls.' Mot. to Compel/Mot. for Sanctions (ECF No. 2703) ("Rabita Opp. Mem."); Ltr. to the Court from the Pls.' Exec. Committee, dated Mar. 12, 2013 (ECF No. 2705) ("Pls.' Rabita Reply").

investigations by the United States or foreign governments into the Trust's activities in

support of terrorism; (b) information relating to the Trust's terrorist designations and any

sanctions arising out of those designations; (c) relevant banking and financial records; (d)

documents concerning the appointment of Jelaidan as Rabita Trust's Secretary General;

(e) information about Rabita Trust's relationship to certain other purported charitable

organizations alleged to have operated within the al Qaeda network; and (f) documents

concerning the Trust's relationship with the government of Saudi Arabia, including the

Islamic Affairs Division of any Saudi embassy or consulate.  (See Pls.' Rabita Mem., Ex.

A).  Rabita Trust's total production to date in response to those requests has consisted of

the twenty-two documents produced by Jelaidan, many of which, the Plaintiffs contend,

are "not even remotely relevant to the specific issues articulated in [their] discovery

requests."  (Pls.' Rabita Mem. at 2).

   Mr. McMahon, who serves as counsel for both Jelaidan and Rabita Trust,

takes the position that Rabita Trust has been "dormant" since 1994 and, consequently, has

no further documents to produce.  (See id., Ex. B, Part B at 3; ECF No. 2711 ("3/19/2013

Hr'g Tr.") at 37).  Mr. McMahon's representations appear to be at odds, however, with

other evidence that suggests that Rabita Trust was active well beyond 1994.  For example,

a prior declaration executed by Jelaidan indicates that he was appointed as the Trust's

Secretary General in 1999.  (Pls.' Rabita Mem., Ex. C ¶ 2).  Similarly, several of the scant

documents that Rabita Trust did produce indicate that the Trust's Board of Directors was

conducting operations as late as the fall of 2001.  (See id., Exs. E ("Summary of Events"

describing the initiation of an audit of the Rabita Trust fund and the closure of an office in

Lahore, Pakistan, following the September 11 attacks), F (press release dated Oct. 15,

2001, issued by Jelaidan on behalf of Rabita Trust, denying involvement with or

connection to al Qaeda or Osama bin Laden), G (letter dated Jan. 5, 2002, from Rabita

Trust's "Project Director," requesting assistance from the Pakistani government in

removing its terrorist designations), H (letter dated Aug. 21, 2002, from Jelaidan in his

capacity as Secretary General of the Trust, requesting removal of a ban imposed on

several of its accounts at Habib Bank), I (circular dated Mar. 14, 2000, listing the

composition of the Trust's current Board of Directors)).

   In light of these conflicting documents, the Plaintiffs understandably sought

clarification from Mr. McMahon regarding the Trust's alleged dormancy.  By letter dated

September 29, 2011, the Plaintiffs asked Mr. McMahon to provide information concerning

the current location of Rabita Trust's documents and any offices, employees, or

administrative functions that the Trust maintained after 1994.  (See Pls.' Rabita Mem., Ex.

J).  The Plaintiffs further requested an update regarding the efforts of a Pakistani lawyer

who allegedly was retained in 2006 to assist in the location and collection of responsive

documents.  (Id. at 2).

   Thereafter, the parties held a telephone conference in an effort to resolve

some of these issues.  (Pls.' Rabita Mem. at 5).  Given Rabita Trust's alleged dormancy,

the Plaintiffs voiced concern as to whether there presently was an officer or representative

with the authority to retain counsel or direct litigation on behalf of the Trust.  (Id.).  In

response, by email dated November 4, 2011, Mr. McMahon agreed that he would attempt

to discern "if there [was] anyone currently with authority to direct the Trust," and to

"figure out the current organizational status of the entity and the officers, if any, that

occupy positions in the entity." (Id., Ex. K; Rabita Opp. Mem., Ex. 5). Mr. McMahon

further promised that he would try to obtain more information about the Trust's

documents, but noted that any documents contained in Rabita Trust's office when it

became dormant "would likely have either been destroyed or transferred to storage,

probably by Pakistan's Office of the Cabinet Secretary." (Id.).

More than eight months passed without the production of any further

documents or any response from Mr. McMahon regarding the issues that had been raised

during the telephone conference. Accordingly, on July 30, 2012, the Plaintiffs wrote to

Mr. McMahon to follow up on the results of his inquiries into Rabita Trust's current status.

(See Pls.' Rabita Mem., Ex. L). That letter apparently went unanswered. Thereafter, on

August 30, 2012, the discovery deadline expired without Rabita Trust having produced so

much as a single additional document.

On January 30, 2013, the Plaintiffs filed their present motion, which seeks

an order compelling Rabita Trust to: (a) provide information about its current

organizational status and leadership; (b) identify any individuals who presently or

previously were authorized to direct litigation on the Trust's behalf or ensure compliance

with its discovery obligations; (c) identify the efforts undertaken by Rabita Trust to obtain

and produce documents responsive to the Plaintiffs' requests; and (d) produce all materials

21

responsive to the Plaintiffs' supplemental document requests, which were served on August 1, 2012. (Pls.' Rabita Mem. at 1). Mr. McMahon opposed the motion on behalf of Rabita Trust on the basis that the Trust did not have access to its own files. (Rabita Opp. Mem. at 3). The Plaintiffs believe that Rabita Trust's opposition papers simply confirm their allegations regarding the Trust's continuing discovery violations and have requested that sanctions be imposed. (Pls.' Rabita Reply at 1).

During a discovery conference on March 19, 2013, I asked Mr. McMahon to address the issue of Rabita Trust's current leadership. (3/19/13 Hr'g Tr. at 33). Mr. McMahon explained that he had been retained by Jelaidan to represent Rabita Trust approximately nine years ago, at a time when Jelaidan was serving as the Trust's Secretary General. (Id. at 34). He acknowledged, however, that Jelaidan no longer occupied a position in Rabita Trust's leadership and has not for at least several years. (Id. at 36). Although the only communications that Mr. McMahon continued to have with regard to Rabita Trust were with Jelaidan and his Saudi counsel, he admitted that Jelaidan did not have authority to speak for the Trust. (Id. at 36-37). When asked who presently was running the organization, Mr. McMahon indicated that he did not know and suggested that, because the Trust was "inactive," there likely was no one in command. (Id. at 33, 36-37). He further conceded that the Trust had not paid his legal fees for many years. (Id. at 42).

2.     Analysis

Although the Plaintiffs' motion seeks sanctions on the basis of Rabita Trust's
continuing failure to meet its discovery obligations, there is a more fundamental concern
regarding the Trust's participation in this case.  As a matter of basic agency law, an
attorney's authority to represent a client terminates, in the case of a corporation or similar
organization, when the client loses its capacity to function.  Restatement (Third) of the
Law Governing Lawyers § 31 (2000).  Thus, if Mr. McMahon is correct that Rabita Trust
is a defunct organization which lacks any leadership or person authorized to retain counsel
and direct the organization's litigation efforts, neither he nor anyone else can continue as
its representative in this action.  See N.Y.  Rules of Prof'l Conduct R. 1.2(a), 1.4.

Although Mr. McMahon apparently "believe[s]" that he is able to represent
the Trust notwithstanding its dormant status, his affidavit in support of that position
contains a number of puzzling contradictions.  (Rabita Opp. Mem., Ex. 4 (Aff. of Martin
F. McMahon, Esq., sworn to on Mar. 1, 2013 ("McMahon Aff."), ¶ 6)).  First, the affidavit
asserts that Jelaidan continues to act as the Trust's Secretary General, (id.), even though
Mr. McMahon has admitted on the record that Jelaidan has not served as Secretary
General for many years.  (3/19/13 Hr'g Tr. at 36).  Second, the affidavit indicates that
Jelaidan is responsible for coordinating legal strategy on the Trust's behalf, (McMahon
Aff. ¶¶ 3, 6), but at the same time suggests that the Pakistani government currently has the
sole authority to make decisions regarding the Trust's legal representation, including
whether to retain or terminate counsel.  (Id. ¶ 8).  Finally, despite the suggestion that the

23

Pakistani government may ultimately be in control of Rabita Trust, there is no indication that Mr. McMahon has ever had communications with any Pakistani official regarding the Trust's legal representation in this suit. (Id. ¶ 3 (stating that coordination of Rabita Trust's legal strategy has "at all times" been conducted through communications with Jelaidan or Jelaidan's Saudi counsel)).

      Mr. McMahon states that he is "not opposed" to investigating further Rabita Trust's current status and leadership, (Rabita Opp. Mem. at 5), but it is clear that any such efforts would be futile. In fact, Mr. McMahon says that he already has sent multiple requests for information to the Trust's current Secretary General, which have been met with no response. (Id.). It is unclear to whom those requests would have been addressed since Mr. McMahon has indicated that he does not know the names of anyone who currently is part of the Trust's leadership. The fact that Jelaidan did not respond obviously cuts against Mr. McMahon's claim that Jelaidan is still acting as Secretary General. Tellingly, in the two years since the Plaintiffs first raised the issue, Mr. McMahon has been unable to obtain any information about the Trust's current organizational status, its officers, or the identity of any individual who is responsible for directing its representation in this action. That Mr. McMahon is incapable of obtaining such basic information from his "client" confirms that Rabita Trust is no longer actively participating in this suit.

      Despite the Trust's unresponsiveness, Mr. McMahon has expressed reluctance to withdraw from representation because "no one knows" the circumstances under which a lawyer may be terminated under Pakistani law. (3/19/13 Hr'g Tr. at 34). It

surely does not require resort to Pakistani law, however, to observe that there is no semblance of any attorney-client relationship between Mr. McMahon and Rabita Trust. Indeed, the Trust ceased paying Mr. McMahon's legal fees long ago, (id. at 42), and, for many years, he has had no contact with anyone who has the power to authorize or direct the Trust's legal representation in these proceedings, (id. at 37). In light of the representation that Rabita Trust is defunct, it is questionable whether such an individual even exists.

It is axiomatic that a lawyer cannot act on a client's behalf without its "consent and cooperation." Kent v. First Inter-County Bank of N.Y., No. 88 Civ. 820 (DNE), 1990 WL 204193, at *2 (S.D.N.Y. Dec. 6, 1990) (quoting R-T Leasing v. Ethyl Corp., 484 F. Supp. 950, 952 (S.D.N.Y. 1979)). Given the present circumstances, Rabita Trust plainly lacks the capacity to assent to Mr. McMahon's or anyone else's continued representation of the Trust in this litigation. Moreover, the lack of an authorized representative spells an end to the Trust's ability to proceed here, since it has long been held that artificial entities are not permitted to appear in federal court without counsel. Rowland v. Cal. Men's Colony, 506 U.S. 194, 201-02 (1993) ("It has been the law for the better part of two centuries . . . that a corporation may appear in federal courts only through licensed counsel. As the courts have recognized, the rationale for that rule applies equally to all artificial entities.") (citations omitted); see also Lattanzio v. COMTA, 481 F.3d 137, 140 (2d Cir. 2007) (per curiam) (limited liability companies may not proceed pro se); Jones v. Niagara Frontier Transp. Auth., 722 F.2d 20, 22 (2d Cir. 1983) ("[I]t is

established that a corporation, which is an artificial entity that can only act through agents,

cannot proceed pro se.")  Therefore, in the present circumstances, it appears that the only

viable course of action is to enter a default judgment against the Trust.[7]

---

[7]    Even if Mr. McMahon were able to continue serving as Rabita Trust's counsel, the Court would be obliged to recommend sanctions for its nonproduction of documents.

As Mr. McMahon concedes, there seem to be only two possibilities as to who is in charge of Rabita Trust today – either Jelaidan or the Pakistani government.  Jelaidan denies having any continuing access to the Rabita Trust documents, stating that "the Pakistani authorities froze all of Rabita Trust's bank accounts and confiscated any and all of its documents" in 2001. (Jelaidan Opp. Mem., Ex. 7, ¶ 6).  Mr. McMahon, however, states that "when the Trust entered into dormancy, any documents in the office would likely have been destroyed or transferred to storage, probably by Pakistan's Office of the Cabinet Secretary."  (Rabita Opp. Mem. at 3; see also id. Ex. 4, ¶ 7 (McMahon Aff.) ("Apparently, the records have been sent to storage, and to procure documents, if they exist, one must go through the Pakistani government.")).  Neither Jelaidan nor Mr. McMahon make any effort to reconcile their dueling representations that the records became unavailable either in 1994 when the Trust allegedly became dormant, or in 2001 when Rabita Trust's assets were seized, nor have they attempted to determine whether the records were destroyed or placed in storage.  Indeed, except for their one-sentence explanations, neither Jelaidan nor Mr. McMahon provides any details concerning the disposition of Rabita Trust's records or their efforts to determine the records' present whereabouts.

If the Pakistani government is, in effect, Mr. McMahon's client because it has assumed operational control of the Rabita Trust, the lack of a detailed proffer is even more egregious.  Mr. McMahon explains that he "personally met with officials at the Pakistani Embassy and participated in efforts to procure documentation to which [the Plaintiffs] are entitled."  (Id. ¶ 5).  Mr. McMahon further avers that he has exhausted his "efforts to obtain documents through correspondence and/or the meeting I attended at the Pakistani Embassy."  (Id. ¶ 9.)  Apart from these two conclusory statements, however, Mr. McMahon has provided no details from which the Court could reasonably conclude that Rabita Trust has made a good faith effort to locate and produce its own records.  Nor have Mr. McMahon or Rabita Trust shown that those records no longer exist.

In sum, even if Mr. McMahon continues to represent Rabita Trust, his client has not shown that it made reasonable efforts to produce the documents sought by the Plaintiffs, the relevance of which can scarcely be contested.  Nor has Rabita Trust shown that those records no longer exist.  In these circumstances, assuming that Rabita Trust is entitled to continue defending this action, its failure to establish that it took reasonable steps to attempt to produce its documents would warrant a finding that Rabita Trust proceeded in bad faith.  This, in turn, would entitle the Plaintiffs, at a minimum, to an adverse inference instruction at trial.  The Plaintiffs would also be (Continued…)

C.    Al Haramain Defendants

1.    Background

The Plaintiffs' third sanctions motion relates to two entities that the Plaintiffs refer to collectively as Al Haramain Islamic Foundation ("Al Haramain").[8]  Al Haramain is a purported Islamic charity based in Saudi Arabia with branch offices located throughout the world.  Between 2002 and 2004, the Treasury Department designated thirteen Al Haramain field offices as terrorist organizations, including branches in the United States, based upon evidence that Al Haramain had provided financial and logistical support to al Qaeda and other affiliated terrorist organizations.  See Treasury Designates Al Haramain Islamic Foundation, http://www.treasury.gov/press-center/press-releases/Pages/hp1043.aspx.  Al Haramain's branch in the United States ("Al Haramain (USA)") was further alleged to have engaged in tax fraud and money laundering offenses in connection with the channeling of funds to mujahideen and Chechen jihadists affiliated with al Qaeda.  Id.  Several of Al Haramain's directors, including Aqeel Al-Aqeel ("Al-

_____

(…continued)

entitled to recover the expenses incurred in connection with their motion.  Fed. R. Civ. P. 37(b)(2)(C).

[8]        The papers associated with the Al Haramain motion are docketed as follows:  Ltr. to the Court from the Pls.' Exec. Comm., dated Jan. 9, 2013 (ECF No. 2654) ("Pls.' Al Haramain Mem."); Decl. of Robert T. Haefele, Esq., in Supp. of Pls.' Mot. for Sanctions, sworn to Jan. 9, 2013 (ECF No. 2655) ("Haefele Decl."); Al Haramain Opp. to Pls.' Mot. for Sanctions (ECF No. 2676) ("Al Haramain Opp. Mem."); Ltr. to the Court from the Pls.' Exec. Comm., dated Feb. 7, 2013 (ECF No. 2679) ("Pl.'s' Al Haramain Reply"); Decl. of Mr. Robert T. Haefele, Esq., in Further Supp. of Pls.' Mot. for Sanctions (ECF No. 2680) ("Haefele Decl. II"); Al Haramain's Notice of Filing (ECF No. 2683) ("Al Haramain Notice"); Al-Haramain's Second Notice of Filing (ECF No. 2691) ("Al Haramain Second Notice"); Pls.' Resp. to Al Haramain's Notice of Filing (ECF No. 2694) ("Pls.' Resp.").

Aqeel") and Soliman Al-Buthe ("Al-Buthe"), who are themselves defendants in this litigation, also were designated for similar reasons.  Id.

The Plaintiffs' present motion regarding Al Haramain caps a procedural history that spans more than nine years.  That history began in August 2002, when the Plaintiffs filed the first complaint in this action, naming as defendants both Al Haramain (USA) and Al Haramain's head office in Saudi Arabia ("Al Haramain (SA)").  Subsequently, in January 2003, Al Haramain (USA) entered an appearance and filed a motion to dismiss, which later was granted in part and denied in part.  In February 2003, one month after Al Harmain (USA) appeared, Perouz Sedaghaty ("Sedaghaty"), one of Al Haramain (USA)'s directors and himself a defendant in this case, moved to the United Arab Emirates, allegedly to pursue job opportunities because his work in the United States as a self-employed arborist had "dried up."  Sedaghaty apparently closed down Al Haramain (USA)'s operations later that year.

On October 29, 2003, following the partial denial of Al Haramain (USA)'s motion to dismiss, the Plaintiffs served a set of initial discovery requests on Al Haramain (USA).  No requests were served on Al Haramain (SA), however, because it did not enter an appearance in the case until April 2004.  Counsel initially agreed that Al Haramain (USA)'s discovery responses would be due by February 13, 2004, but Judge Richard Casey, to whom the case then was assigned, approved an extension of that deadline to April 26, 2004.

In the interim, on February 18, 2004, United States government officials executed a search warrant and seized all the documents and computers at Al Haramain (USA)'s office in Ashland, Oregon. According to Al Haramain (USA), that seizure made it impossible to produce any documents in response to the Plaintiffs' discovery requests, with the exception of certain materials that Sedaghaty had supplied to Al Haramain (USA)'s lawyers prior to his departure from the United States. Al Haramain (USA) also raised objections to the Plaintiffs' requests on the basis that they were overbroad and unduly burdensome, and that it could not be required to produce documents in the possession of Al Haramain (SA), which it contended was a separate entity. Moreover, Al Haramain (USA) asserted that it was unable to obtain responsive documents from Al Haramain (SA) because the Saudi government had announced, on June 2, 2004, that it would be dissolving Al Haramain (SA) as part of an effort to "choke off additional channels of terrorist funding." (See Haefele Decl., Ex. T at 4; Al Haramain Opp. Mem. at 6).

On December 2, 2009, the Plaintiffs wrote to the Court, requesting an order compelling Al Haramain to provide "complete and non-evasive" responses to their discovery requests or "risk institution of sanctions." (ECF No. 2206). Al Haramain (USA) responded as it had before, arguing that it lacked the ability to produce documents in the possession of Al Haramain (SA) because that entity's offices had been shut down, and it did not have the requisite custody or control over Al Haramain (SA)'s documents because the two entities were separate. (ECF No. 2384-2).

At a discovery conference on October 28, 2010, I overruled Al Haramain (USA)'s objections and granted the Plaintiffs' motion to compel.  At the outset, I concluded that Al Haramain (USA) and Al Haramain (SA) were not separate entities for discovery purposes, and that Al Haramain (USA) consequently was required to produce documents in Al Haramain (SA)'s possession, custody, and control, since "the Saudi entity controlled . . . the U.S. entity and . . . the two were indistinguishable."[9]  (Haefele Decl., Ex. A ("10/28/10 Hr'g Tr.") at 17).  Second, I overruled Al Haramain (USA)'s boilerplate objections that the Plaintiffs' requests were unduly burdensome.  (Id.).  Third, I found that Al Haramain (USA) had not made an adequate showing that it was incapable of obtaining any documents from Al Haramain (SA) simply because the Saudi branch had been closed.  (Id. at 18).  Finally, I recognized that my directives to the Al Haramain defendants might not open the documentary floodgates, but left "for another day what the consequences of any nonproduction . . . w[ould] be."  (Id.).

On November 12, 2010, Al Haramain (USA) filed objections to my ruling pursuant to Rule 72(a) of the Federal Rules of Civil Procedure.  (ECF No. 2384).  During a subsequent telephone conference on December 2, 2010, I cautioned Al Haramain (USA)

---

[9]     The following year, in ruling on a challenge to the Treasury Department's designation of Al Haramain (USA), the Ninth Circuit similarly rejected Al Haramain (USA)'s argument that it was a distinct organization.  See Al Haramain Islamic Found., Inc. v. U.S. Dep't of Treasury, 660 F.3d 1019, 1031 (9th Cir. 2011) ("We have no trouble concluding that substantial evidence supports OFAC's determination that [Al Haramain (USA)] is a branch office of [Al Haramain (SA)] and of the worldwide network of the Al Haramain Islamic Foundation . . . . Additionally, three out of four founding members of [Al Haramain (USA), including Al-Aqeel and Al-Buthe,] were senior officials of [Al Haramain (SA)].").

that its objections did not stay my order and directed the Al Haramain defendants to

produce all responsive documents by January 7, 2011. (Haefele Decl., Ex. B). I further

issued a written order to that effect on December 10, 2010. (ECF No. 2393). Judge

Daniels subsequently rejected Al Haramain (USA)'s objections to my ruling in their

entirety. (ECF No. 2536).

By 2012, both Al Haramain entities still had yet to produce any additional

documents. On July 31, 2012, in a final attempt to obtain at least partial responses, the

Plaintiffs served supplemental document requests on the Al Haramain defendants, seeking

a narrowly-tailored subset of the documents that they originally had requested. (Haefele

Decl., Ex. D). On September 4, 2012, Al Haramain (USA) once again objected to those

requests on grounds that they were overbroad or unduly burdensome and that Al Haramain

did not have possession, custody, or control of any documents located at "the headquarters

of Al Haramain in Saudi Arabia" or "any other branch office of Al Haramain worldwide."

(Id., Ex. H at 2).

On January 9, 2013, the Plaintiffs filed their present motion, which seeks

sanctions against the Al Haramain defendants for their "abject failure to produce

responsive documents" throughout this case. (Pls.' Al Haramain Mem. at 1). The

Plaintiffs contend that the Al Haramain defendants have been willfully delinquent in

meeting their discovery obligations and, therefore, that the entry of a default judgment is

"the most appropriate remedial course of action." (Id. at 19). As an alternative sanction,

31

the Plaintiffs have requested that the Court instruct the jury that it may draw an adverse

inference from the Al Haramain defendants' repeated failures to produce.  (Id. at 1, 20).

### 2.   Analysis

Since the Court previously found that Al Haramain (USA) was the alter ego

of Al Haramain (SA) for purposes of document production, both entities necessarily have

the same discovery responsibilities.  (10/28/10 Hr'g Tr. at 17-18).  Nevertheless, because

my ruling was limited to the discovery context and left unresolved the question of whether

Al Haramain (USA) ultimately could be deemed liable for Al Haramain (SA)'s actions, I

will consider each entity's conduct separately.  (Id.; ECF No. 2536).

### a.   Al Haramain (USA)

### i.   Failure to Produce Oregon Documents

The Plaintiffs first contend that sanctions are warranted based upon Al

Haramain (USA)'s failure to produce relevant documents from its office in Ashland.  In

response to the Plaintiffs' motion, Al Haramain (USA) initially took the position that it

was unable to obtain the requested documents due to "factors beyond its control" –

namely, the Government's seizure of all of its documents from its office in February 2004.

Al Haramain (USA) further maintained that those documents were subject to a protective

order that had been entered in a criminal tax fraud prosecution pending against Sedaghaty

in the District of Oregon.  (Al Haramain Opp. Mem. at 13).  Since then, however, Al

Haramain (USA) and Sedaghaty's defense counsel jointly petitioned Chief Judge Aiken,

the Judge assigned to Sedaghaty's criminal case, to modify the protective order so as to

permit Al Haramain (USA) to obtain any materials that the Government had seized
through the execution of the search warrant at its Ashland office.  (See Al Haramain
Notice).  After Judge Aiken entered the requested order on February 14, 2013, (D. Or.
ECF No. 629), Al Haramain (USA) produced all non-privileged documents responsive to
the Plaintiffs' requests.  (See ECF No. 2740 ("6/28/13 Hr'g Tr.") at 34-35).

   The Plaintiffs complain that Al Haramain (USA) unreasonably waited years
before making its ultimately successful effort to procure the records.  (Pls.' Al Haramain
Reply at 11; Pls.' Resp. at 1-2).  It is true that it has taken Al Haramain (USA) a great deal
of time to obtain and produce the requested documents.  It is particularly troubling that,
even after I specifically ruled that the original Oregon protective order did not restrict the
dissemination of any materials the Government had seized, In re Terrorist Attacks on
September 11, 2001, No. 03 MDL 1570 (GBD) (FM), 2011 WL 5913526, *6 (S.D.N.Y.
Nov. 22, 2011),[10] Al Haramain (USA) continued to claim that it would be precluded from
obtaining any responsive records.  Although I sympathize with the Plaintiffs' frustration
with Al Haramain (USA)'s failure to take timely steps to obtain the requested documents
earlier, it is difficult to see how the delay has resulted in any harm to the Plaintiffs' case.

   In determining whether to impose severe sanctions, such as the entry of a
default judgment or an adverse inference instruction, the Court must "assess whether the
requesting party suffered prejudice as a result of the loss or withholding of evidence."

---

[10]  Prior to issuing that decision, I confirmed with the magistrate judge who had
entered the protective order that my interpretation of its scope was correct.

Nycomed U.S. Inc. v. Glenmark Generics Ltd., No. 08 Civ. 5023 (CBA) (RLM), 2010 WL
3173785, at *3 (E.D.N.Y. Aug. 11, 2010) (citing Pension Comm. of Univ. of Montreal
Pension Plan v. Bank of Am. Secs., LLC, 685 F. Supp. 2d 456, 467 (S.D.N.Y. 2010)).
Here, although there is no question that Al Haramain (USA) could have pursued the
requested documents earlier, their belated production has not resulted in any demonstrable
prejudice or otherwise deprived the Plaintiffs of a fair opportunity to litigate their case. To
the extent that what now has been produced makes reference to additional categories of
relevant documents, I will of course permit the Plaintiffs to serve follow-up requests.
Since they have the documents and will have that opportunity, however, I find it
inappropriate to impose an adverse inference instruction or to recommend the entry of a
default judgment.

   Although Al Haramain (USA)'s belated production of the Oregon
documents may not have resulted in prejudice, the Plaintiffs nevertheless are entitled to
recover the reasonable attorneys' fees and costs that they incurred in bringing this motion.
See Fed. R. Civ. P. 37(b)(2)(C) (requiring an award of expenses unless a discovery failure
"was substantially justified or other circumstances make an award . . . unjust"); Richard
Green (Fine Paintings) v. McClendon, 262 F.R.D. 284, 291-92 (S.D.N.Y. 2009) (denying
adverse inference sanction but awarding attorneys' fees and costs). Indeed, it is clear that
the Plaintiffs would not have had to file their motion, but for Al Haramain (USA)'s
unreasonable refusal to make efforts to obtain the Oregon documents after I ruled that the
protective order in Sedaghaty's criminal case did not preclude their production in this

action.  Moreover, Al Haramain (USA) has made no showing that its failure to pursue those documents in a timely manner was substantially justified or that the awarding of expenses to the Plaintiffs would be unjust.  The Plaintiffs shall therefore make their motion and Al Haramain (USA) shall respond on the schedule previously fixed for the Plaintiffs' fee application regarding Jelaidan.

ii.     Failure to Produce Saudi Arabia Documents

The Plaintiffs also seek sanctions against Al Haramain (USA) for its failure to produce documents from Al Haramain (SA)'s headquarters in Saudi Arabia.  Al Haramain (USA) asserts in its defense that it is incapable of obtaining any such documents because Al Haramain (SA)'s office was closed by Saudi authorities in 2004 and, as a result, "repeated attempts" to secure responsive materials have been unsuccessful.  (Al Haramain Opp. Mem. at 13-14 & Ex. 2).  The Plaintiffs counter that Al Haramain (USA) nevertheless defaulted on its discovery obligations because it had nearly twenty-two months between the filing of the complaint in this action and Al Haramain (SA)'s forced dissolution during which it should have collected and preserved relevant documents from the charity's Saudi headquarters.  (Pl.'s' Al Haramain Reply at 8).

Although it is true that a party has an obligation to preserve any materials it "knows, or reasonably should know, [are] relevant to the action," Zubulake v. UBS Warburg LLC, 220 F.R.D. 212, 217 (S.D.N.Y. 2003) ("Zubulake IV"), there has been no showing that Al Haramain (USA) failed to meet this obligation.  Rather, Al Haramain (USA)'s present inability to produce the relevant materials was caused by unforeseen

external circumstances – the shutting of Al Haramain (SA)'s offices by the Saudi government.  There may be cases where the duty to preserve would require a custodian to remove relevant documents from their existing location.  For example, such a need might arise if the custodian has reason to believe that the documents would become inaccessible in their current location, or that they have been stored in a manner that makes their destruction likely.  Here, however, there simply is no indication that Al Haramain (USA) had any advance notice that the Saudi government intended to dissolve Al Haramain (SA) or that it would no longer have access to responsive documents as a result of the closure.  Absent a showing that Al Haramain (USA) had a duty to collect or remove relevant documents from the Saudi Arabia office before its closure, there is no basis for imposing sanctions, notwithstanding the Plaintiffs' present inability to secure compliance with their document requests.

### iii.  Spoliation of Evidence

The Plaintiffs also seek sanctions against Al Haramain (USA) for allegedly destroying certain electronic documents located at the Oregon branch office, including several Microsoft Outlook mailboxes which contained approximately 25,000 emails and other records.  (Pls.' Al Haramain Mem. at 11).  The evidence of Al Haramain (USA)'s spoliation originally came to light in connection with Sedaghaty's criminal case in the District of Oregon.  During the trial, there was evidence that the Government's search of Al Haramain (USA)'s office had yielded, among other things, eight computer hard drives containing financial data files, QuickBooks entries, emails, and other documents.

(Haefele Decl., Ex. N ("Sedaghaty Tr.") at 37-39). A subsequent forensic examination

established, however, that a large amount of data, including entire Microsoft Outlook

mailboxes, had been deleted or at least "partially overwritten." (<u>Id.</u> at 39-40, 45-47). The

Plaintiffs contend that Al Haramain (USA) therefore intentionally destroyed relevant

information during a period of time when it had a duty to preserve potential evidence.

   Although it appears undisputed that a great deal of evidence was deleted

from the hard drives, there has been no showing as to how or when the documents were

lost. Thus, they may well have been erased at a time prior to when the duty to preserve

arose. In any event, even if the Court were to assume that the alleged spoliation occurred

at a time when Al Haramain (USA) had an obligation to preserve the emails from its

Oregon office, to secure sanctions, the Plaintiffs still would have to establish that the

missing evidence was relevant and that they suffered prejudice as a result of its

nonproduction. <u>Orbit One Commc'ns, Inc. v. Numerex Corp.</u>, 271 F.R.D. 429, 438-40

(S.D.N.Y. 2010). Such prejudice may be presumed in cases where evidence is destroyed

willfully or through gross negligence, but when "the destruction of evidence is merely

negligent, the burden falls on the innocent party to prove prejudice." <u>Sekisui Am. Corp. v.</u>

<u>Hart</u>, ___ F. Supp. 2d ___, No. 12 Civ. 3479, 2013 WL 4116322, at *5 (S.D.N.Y. Aug. 15,

2013) (citing <u>Byrnie v. Town of Cromwell, Bd. Of Educ.</u>, 243 F.3d 93, 108 (2d Cir.

2001)).

   Here, there simply is insufficient evidence upon which to evaluate Al

Haramain (USA)'s culpability. Although the Plaintiffs posit that, in the "absence of any

other proposed plausible explanation," the "sheer scale of the [alleged] deletion" suggests

an intentional erasure, (Pl.'s' Al Haramain Reply at 13), that amounts to speculation since

the forensic examiner who testified at Sedaghaty's criminal trial never opined as to the

circumstances under which the information was deleted. In fact, on cross-examination,

the examiner admitted that there could have been several innocent explanations. (See

Sedaghaty Tr. at 78-83). Thus, there is no basis upon which the Court may conclude that

Al Haramain (USA) intentionally destroyed evidence, nor is there any evidence to

establish that Al Haramain (USA)'s failure to preserve its email data constituted gross

negligence. Even under the liberal standards of the Second Circuit, see Residential

Funding, 306 F.3d at 113, the Plaintiffs therefore are not entitled to a presumption of

prejudice and must make an affirmative showing that they have been harmed. Sekisui,

2013 WL 4116322, at *5.

       The available evidence in that regard fails to demonstrate that Al Haramain

(USA)'s alleged spoliation has caused the Plaintiffs prejudice. Indeed, a substantial

portion of Al Haramain (USA)'s emails – approximately 20,000 to 25,000 – were

recovered by the Government's forensic expert from "unallocated space" on the hard

drives. (Sedaghaty Tr. at 43, 45). These recovered emails presumably were among the

files turned over to the Plaintiffs after Judge Aiken modified the protective order in the

Sedaghaty criminal case. The Plaintiffs have also failed to show that any materials that

could not be recovered were relevant to their case. For these reasons, it plainly would be

inappropriate to impose sanctions. The Plaintiffs may renew their application, however,

should they obtain more evidence concerning the circumstances under which erasures

occurred or the contents of any missing files.

b.      Al Haramain (SA)

Since entering an appearance in this case more than eight years ago, Al

Haramain (SA) has been conspicuously absent from discovery.  Its counsel has failed to

attend any of the Court's regularly-scheduled discovery conferences and there is no

indication that it has any intention of participating in such proceedings in the future.

Moreover, Al Haramain (SA) has made absolutely no effort to respond to the Plaintiffs'

document requests or to comply with my order that it engage in efforts to obtain and

produce responsive materials.  (See 10/28/10 Hr'g Tr. at 18).

Al Haramain (SA)'s total lack of involvement in this case strongly suggests

that it no longer has any interest in pursuing a defense.  Indeed, it did not even respond to

the Plaintiffs' motion for sanctions.[11]  Having flouted its discovery obligations and this

Court's orders for many years, Al Haramain (SA) plainly has demonstrated that its

noncompliance has been both willful and in bad faith.  The entry of a default judgment

against Al Haramain (SA) is therefore appropriate.  See Lantigua v. Bonao Meats &

Produce, Inc., No. 11 Civ. 2147 (DAB) (KNF), 2012 WL 2553472, at *3 (S.D.N.Y. July 3,

2012) (default judgment appropriate for defendants' willful refusal to comply with court

---

[11]      Al Haramain (USA) has made clear that its opposition papers were submitted
solely on its own behalf.  Moreover, Al Haramain (USA)'s counsel have confirmed that they do
not represent Al Haramain (SA), and are not permitted to represent any Al Haramain entity other
than Al Haramain (USA) under the terms of their OFAC license.  (Al Haramain Opp. Mem. at 1
n.1).

order and failure to respond to motion for sanctions); <u>Pennacchio v. Powers</u>, No. 05 Civ.

985 (RRM) (RML), 2010 WL 3767141, at *7 (E.D.N.Y. Aug. 9, 2010) ("Perillo's total

lack of participation in this case and his failure to oppose plaintiff's motion warrant the

entry of a default judgment against him."); <u>Trs. of Tapers' Ins., Annuity and Pension

Funds v. Albee Drywall Partitions Corp.</u>, No. 91 Civ. 1014 (DLC), 1996 WL 294306, at *4

(S.D.N.Y. June 3, 1996) (failure to attend conferences, brief motions, or otherwise

participate in case warrants entry of default judgment).

IV.    <u>Conclusion</u>

       For the foregoing reasons, the Plaintiffs' motions (ECF Nos. 2654, 2700,

2701) are granted in part and denied in part.

       To summarize, my rulings and recommendations are as follows:

1.    With respect to Jelaidan, adverse inference sanctions are warranted, and the Plaintiffs are entitled to recover the reasonable fees and costs they incurred in bringing the motion.

2.    With respect to Rabita Trust, a default judgment should be entered.

3.    With respect to Al Haramain (USA), sanctions are not warranted at this time, but the Plaintiffs may recover the expenses they reasonably incurred in bringing their motion.

4.    With respect to Al Haramain (SA), a default judgment should be entered.

V.    <u>Notice of Procedure for Filing of Objections to this Report and Recommendation</u>

       To the extent I have recommended entry of a default judgment, the parties

shall have fourteen days from the service of this Report and Recommendation to file

written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules

of Civil Procedure. <u>See</u> <u>also</u> Fed. R. Civ. P. 6(a) and (d). Any such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable George B. Daniels, and to the chambers of the undersigned at the United States Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties. <u>See</u> 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b). Any requests for an extension of time for filing objections must be directed to Judge Daniels. The failure to file these timely objections will result in a waiver of those objections for purposes of appeal. <u>See</u> 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b); <u>Thomas v. Arn</u>, 474 U.S. 140 (1985).

SO ORDERED.

Dated:    New York, New York
           October 28, 2013

FRANK MAAS
United States Magistrate Judge

Copies to:

Hon. George B. Daniels
United States District Judge

All counsel via ECF

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x

IN RE:                                    :        **REPORT AND**
                                                   **RECOMMENDATION TO**
TERRORIST ATTACKS ON                      :        **THE HONORABLE**
SEPTEMBER 11, 2001                                 **GEORGE B. DANIELS**
                                          :
                                                   03 MDL 1570 (GBD) (FM)
-----------------------------------------------------------x

**FRANK MAAS,** United States Magistrate Judge.

      I issued a Memorandum Decision and Order today granting in part and denying in part three motions for sanctions. For reasons explained in that Decision and Order, some relief I found to be appropriate is dispositive and therefore requires that I issue a Report and Recommendation. Accordingly, for the reasons explained in my Decision and Order, I recommend the following:

      1.    Imposition of an adverse inference jury instruction against Jelaidan.

      2.    Entry of a default judgment against Rabita Trust.

      3.    Entry of a default judgment against Al Haramain (SA).

      <u>Notice of Procedure for Filing of Objections to this Report and Recommendation</u>

      The parties shall have fourteen days from the service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. <u>See also</u> Fed. R. Civ. P. 6(a) and (d). Any such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable George B. Daniels and to the chambers of the

undersigned at the United States Courthouse, 500 Pearl Street, New York, New York

10007, and to any opposing parties.  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d),

72(b).  Any requests for an extension of time for filing objections must be directed to

Judge Daniels.  The failure to file these timely objections will result in a waiver of those

objections for purposes of appeal.  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d),

72(b); Thomas v. Arn, 474 U.S. 140 (1985).

Dated:     New York, New York
           October 28, 2013

FRANK MAAS
United States Magistrate Judge

Copies to:

Honorable George B. Daniels
United States District Judge

All counsel via ECF

43