E4OP911M

```
 1    UNITED STATES DISTRICT COURT

 2    SOUTHERN DISTRICT OF NEW YORK
      ------------------------------x
 3
      IN RE:  TERRORIST ATTACKS            CASE NO.
 4            OF SEPTEMBER 11, 2001        03 MD 01570 (GBD)

 5    ------------------------------x

 6                                         New York, N.Y.
                                           April 24, 2014
 7                                         2:09 p.m.

 8    Before:

 9                         HON. FRANK MAAS,

10                                         Magistrate Judge

11                         APPEARANCES

12    COZEN O'CONNOR

13         Attorneys for Plaintiffs Federal Insurance Company and Tig
      Insurance Co.
14    BY:  SEAN P. CARTER, ESQ.
           J. SCOTT TARBUTTON, ESQ.
15

16    MOTLEY RICE
           Attorneys for Plaintiffs
17    BY:  ROBERT T. HAEFELE, ESQ.

18

19    KREINDLER & KREINDLER, LLP
           Attorneys for Plaintiffs
      BY:  JAMES P. KREINDLER, ESQ.
20

21    ANDERSON KILL & OLICK, PC
           Attorneys for O'Neill Plaintiffs and the Plaintiffs'
22    Executive Committee
      BY:  JERRY S. GOLDMAN, ESQ.
23

24    LAW OFFICES OF MELLON, WEBSTER, & SHELLY, PC
           Attorneys for Plaintiffs
25    BY:  THOMAS E. MELLON, III, ESQ.
```

E4OP911M

1                       APPEARANCES (Continued)

2    BERNABEI & WACHTEL, PLLC
          Attorneys for Defendant, Abdul Rahman Al-Swailem
3    BY:  ALAN R. KABAT, ESQ.

4

5    LAW FIRM OF OMAR T. MOHAMMEDI, LLC
          Attorney for Defendant, WAMY
     BY:  OMAR T. MOHAMMEDI, ESQ.

6

7    CLIFFORD CHANCE US LLP
          Attorneys for Dubai Islamic Bank
8    BY:  RONI E. BERGOFFEN, ESQ.

9

10   LEWIS BAACH, PLLC
          Attorneys for Muslim World League (MWL) and International
     Islamic Relief Organization (IIRO)
11   BY:  AISHA E. R. HENRY, ESQ.

12

13   SALERNO & ROTHSTEIN
          Attorneys for Yassin Abdullah Kadi
     BY:  PETER C. SALERNO, ESQ.
14        AMY ROTHSTEIN, ESQ.

15

16   MARTIN F. McMAHON & ASSOCIATES
          Attorneys for Defendants, Jelaidin, etc.
     BY:  MARTIN F. McMAHON, ESQ.  (PRESENT VIA TELEPHONE)
17

18   MANNING SOSSAMON
          Attorney for Defendant, Sanabel Al Kheer
19   BY:  CHRISTOPHER MANNING, ESQ.  (PRESENT VIA TELEPHONE)

20

21   GOETZ & ECKLAND, PA
          Attorneys for Defendants, World Assembly of Islamic Youth
22   and World Assembly of Muslim Youth
     BY:  FREDERICK J. GOETZ, ESQ.

23

24

25

                     SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

E4OP911M

1              (In open court)

2              (Case called)

3              (Appearances noted)

4              THE COURT:  Good afternoon, everyone.  I guess there

5     are two motions that we need to consider today.  First, the

6     motion to compel WAMY to produce its documents here and related

7     relief, and then the motion for sanctions.  I don't have any

8     particular view as to which you should address first.  Any

9     preferences?

10             MR. CARTER:  No preferences from our perspective, your

11    Honor.

12             THE COURT:  Why don't we start with the motion to

13    compel, the WAMY motion.

14             MR. CARTER:  Thank you, your Honor.  I think from the

15    plaintiff's perspective, your Honor, the papers concerning this

16    motion are relatively complete themselves, and there are just a

17    few points that we really would like to emphasize during

18    argument today.

19             THE COURT:  Okay.

20             MR. CARTER:  If we can, we'd like to begin with this

21    ancillary issue concerning the cutoff date for the merits

22    discovery concerning the charity defendants.  We think quite

23    clearly this was an issue the Court previously addressed with

24    global application; albeit, in the context of the dispute

25    involving the International Islamic Relief Organization and

E4OP911M

1   Muslim World League, but both the content of the discussion and

2   the nature of the ruling indicated that it was intended to have

3   broad affect for all of the merits of discovery on defendants.

4           So WAMY's continued resistance to this rule is

5   troubling from our perspective, all the more so insofar as it's

6   tied to this very tenuous argument about the scope of

7   jurisdictional discovery that was permitted as to Saudi Bin

8   Laden group, which as your Honor will recall primarily

9   concerned potential theories of general jurisdiction based on

10  Saudi Bin Laden's presence in the United States.

11          So there's really no analog to the circumstance there.

12  It was jurisdictional discovery and not merits.  On the other

13  hand, WAMY is identically situated to the Muslim World League,

14  IIRO, and all the other defendants, and so for that reason, we

15  think that 2004 was very clearly a rule that was already in

16  place.

17          THE COURT:  Well, I don't disagree with you, and even

18  if it weren't a general rule, I think it would be desirable to

19  have a general rule because there certainly not parties here

20  that individualized findings with respect to each that would

21  result in many different termination dates.

22          And I know you said it in your papers, but you suggest

23  that by asking for 2002 rather than 2004, there were some

24  critical documents that you may be deprived of, or potentially

25  critical documents, and I guess my question is whether those --

E4OP911M

1    what's the concern?

2            MR. CARTER:  Your Honor, I think the concern that we

3    expressed originally with regard to this issue is that a lot of

4    the investigations that occurred following the events of 9/11

5    didn't really kick into full swing until 2003, 2004.  If you

6    take, as an example, the designations of the IIRO offices,

7    those actually came down in 2006.

8            So there's fair evidence in the record that this

9    matter was really a focal point for a larger period of time

10   than we've suggested.  We know, in particular, that pressure

11   mounted on Saudi Arabia to exercise control over its charities

12   in that 2003, 2004 period, and that the Saudis got somewhat

13   serious about the issues following the bombings in Saudi Arabia

14   in 2003.  So those are, sort of, the basic predicates for

15   thinking that a 2004 rule has a little bit more logic to it.

16           THE COURT:  Anything else you wanted to add?

17           MR. CARTER:  Not on that point, your Honor.  With

18   that, I would turn to the issue of the production of documents

19   here in the U.S.

20           THE COURT:  Yes.

21           MR. CARTER:  And the motion implicates the obligations

22   of two entities, here, both WAMY Saudi Arabia, as well as the

23   U.S.-based entity, WAMY International, and that's significant

24   in some respects.  WAMY really cites no authority that would

25   support the proposition that a foreign defendant that is

E4OP911M

1    subject to jurisdiction in the United States for claims arising

2    from events and injuries occurring in the United States can

3    faithfully discharge its discovery obligations by shipping

4    documents from all over the world to a remote, inconvenient and

5    potentially dangerous location and telling the other parties to

6    come there.

7            It certainly cites no authority to support the

8    position that a U.S.-based entity with custody and control over

9    the documents can direct a propounding party to go visit a

10   foreign subsidiary somewhere else in the world and thereby

11   discharge its obligations.

12           And if that were the rule, U.S.-based corporations

13   would systematically house critical documents abroad for the

14   specific purpose of creating a barrier to discovery, which is a

15   practice that the U.S. courts have consistently rejected as

16   inappropriate.

17           And so for those reasons, it seems clear that the

18   production of documents in the U.S. is consistent with both

19   general practice and also critical to the efficient management

20   of this MDL proceeding.

21           The cases that WAMY supports in support of its view

22   that it's not obligated to incur copying costs and simply needs

23   to make the documents available for inspection, are readily

24   distinguishable because they all involve circumstances in which

25   the defendant or other party made the documents available at a

E4OP911M

```
 1    convenient location, either within the jurisdiction where the

 2    litigation was pending or somewhere nearby and convenient

 3    within the United States.  And that's, again, not the

 4    circumstance we have here, and it's also distinguishable --

 5            THE COURT:  Go on.

 6            MR. CARTER:  It's also distinguishable, your Honor,

 7    because many of the documents at issue presently housed in

 8    Saudi Arabia came from other places and were shipped there,

 9    rather than simply being shipped here, which is an additional

10    problem.

11            THE COURT:  And that was what I was about to ask you.

12    I gather it's not the case that WAMY U.S. shipped its

13    documents; is that correct?

14            MR. CARTER:  We don't believe so, your Honor.

15            THE COURT:  It's just simply saying, as you understand

16    it, to the extent there were any documents that we have control

17    over, they are Saudi Arabia?

18            MR. CARTER:  I think, for instance, your Honor, the

19    documents that would have been in WAMY Pakistan, rather than

20    being shipped to U.S. for production, were shipped to WAMY

21    Saudi Arabia.  WAMY Indonesia, the same sort of practice

22    occurred.

23            THE COURT:  Right.

24            MR. CARTER:  In addition to sort of these general

25    principles, your Honor, there are a range of equitable
```

E4OP911M

considerations and practicable realities relating to the

management of this MDL that counsel are in favor of requiring

WAMY, like everyone else, to produce their documents here.  As

we've indicated, every party in the litigation, other than

WAMY, has agreed to produce its documents, almost without

exception, in electronic form here in the United States.  That

includes the Saudi defendants.

        Following the series of decisions that Judge Daniels

issued in 2010, we then had meet and confers with the

defendants' executive committee.  We certainly would like this

agreement to have been more explicit in writing, but there was

a dialogue raised by the defendants expressing a preference for

production of documents in single-page TIFFs.  Every party,

other than WAMY, has since proceeded to produce documents in

that matter, at least reflecting through their course of

conduct and understanding in common agreement, that it should

proceed in that way.

        The difficulty, were WAMY's view to be endorsed, is

that it would lead to a cascade of discovery disputes where

parties sought to, tit for tat, impose significant costs of

tracking down documents and copying them.  On the other, even

if you look at the limited instance of this dispute here, if we

were required to pay WAMY to copy its documents and produce

them to us, the next step would be our filing a motion seeking

to compel WAMY to reimburse us, and for other sanctions for the

E4OP911M

1   costs we incurred to have copied documents that proved to be

2   completely irrelevant or included solely to sort of foster

3   WAMY's own defenses.

4          And the manner in which all other parties have

5   proceeded clearly reflects the understanding by the group, as a

6   whole, that that's not helpful to the efficient process of this

7   litigation and that we're all trying to do it, and it's just an

8   example of WAMY not playing by the same rules that everyone

9   else seemed to agree are appropriate in the litigation.

10         A word or two only, your Honor, about the indices.  I

11  think there are examples in there that pretty clearly

12  demonstrate that the indices are --

13         THE COURT:  I looked at your exhibit compiling some

14  specimen, but I also looked through the indices myself, to the

15  extent I have them.

16         MR. CARTER:  So they're not sufficiently detailed to

17  displace the normal obligation to produce the documents in a

18  reasonable manner.

19         The last thing, your Honor, that we had raised was

20  although the indices are -- well, two related things, your

21  Honor.  Also central to this is that the documents that are

22  being withheld are of core relevancy to the proceedings, at

23  least as near as we can tell; so --

24         THE COURT:  Say that again?

25         MR. CARTER:  These are not fringe issues, but rather,

E4OP911M

1    the core, central, relevant documents in the proceeding.  For

2    instance, the kind of financial records that your Honor already

3    ordered were clearly of central relevance in the context of the

4    Muslim World League and IIRO proceedings.  I think what is more

5    troubling, from our perspective, is that in looking at the

6    indices more closely, we now see there are documents housed in

7    Saudi Arabia relating to WAMY Canada that have never been

8    produced to us here in the United States.

9         And in the connection with the dispute we had with

10   WAMY over the lack of cooperation on the part of WAMY Canada,

11   WAMY made its view known that it had taken every possible step

12   to cure that problem.  But, of course, the first step in curing

13   that problem would have been to send us the documents that are

14   sitting in Saudi Arabia pertaining to WAMY Canada and that had

15   been sent to Saudi Arabia about WAMY Canada.  And that still

16   hasn't happened even after the hearing.

17        THE COURT:  I don't remember an issue as to WAMY

18   Canada's documents.  That was some time ago?

19        MR. CARTER:  No, your Honor, it was at the last

20   hearing.  WAMY Canada, it was the branch that, following the

21   revocation of its registration by the Canada Revenue Agency,

22   had become suddenly uncooperative.

23        THE COURT:  Oh, right.

24        MR. CARTER:  So, you know, what we see here is that

25   there are a host of documents pertaining to WAMY Canada's

E4OP911M

1    operations in relationship to the Saudi headquarters that,

2    throughout that dispute remained sitting, you know, somewhere

3    on a floor in Riad rather than being produced to us.  You know,

4    that was not only inconsistent with WAMY's obligation in

5    dealing with the lack of cooperation by WAMY Canada, it also

6    precluded us from having a complete record in that dispute.

7    One of the issues that WAMY raised is that this has been a

8    historically contentious relationship and that you can't blame

9    WAMY Saudi Arabia for the sudden decision of WAMY Canada not to

10   cooperate.

11          Well, the documents, at least as far as we can tell

12   from the index, suggest a more cooperative historical

13   relationship, and we're left to wonder whether the sudden lack

14   of cooperation by WAMY Canada was the result of some action or

15   sanction by WAMY Saudi Arabia that had the predictable result

16   of driving them to no longer cooperate.  So these are centrally

17   relevant documents.

18          The last point I think, your Honor, is we've also

19   raised a concern, again based on the indices, although it's

20   hard to fully understand them, that WAMY has not undertaken a

21   search consistent with the Court's prior orders concerning the

22   scope of relevancy for purposes of claims against charity

23   defendants in this case.

24          Your Honor, had, in the context of the IRL and Muslim

25   World League, issued a series of orders requiring the

E4OP911M

1    production of organizational documents, banking and auditing

2    records, the materials underlying those banking and auditing

3    records.  And we don't see, from the indices, anything

4    suggesting that that kind of a search has been undertaken.

5            So we were also seeking an admonition to ensure that

6    WAMY fulfills the obligations that have already been

7    articulated by the Court.  Thank you, your Honor.

8            THE COURT:  Thank you.  Mr. Mohammedi?

9            MR. MOHAMMEDI:  Yes, your Honor.  I would like to

10   address the production of documents here in the United States,

11   as well as the scope of discovery and leave Mr. Goetz to

12   address the indices.  Your Honor, I'm not going to address the

13   rhetoric that were submitted in their motion, as well as reply

14   brief.  However, I'm going to concentrate on the law, and

15   that's really the issue that, with respect to the cost of

16   production and copying production.

17           THE COURT:  One of the things you say in your letter,

18   and I'm reading from Page 3:  WAMY is not obligated to do

19   anything beyond permit inspection of its voluminous documents

20   as they are kept in its ordinary course of business.

21           MR. MOHAMMEDI:  Right.

22           THE COURT:  But by virtue of shipping the documents

23   from various locations to Saudi Arabia, they're no longer being

24   kept as they were in the ordinary course of business; isn't

25   that so?

E4OP911M

1              MR. MOHAMMEDI:  Your Honor, I can give the example you

2      gave a while ago about you taking -- you have cases in your

3      chambers and you want to review documents from your chambers.

4      You take them to here.  You can either mix them with

5      everything, or you can take them as folders, you review them,

6      you bring them back.  This is exactly the same thing what was

7      happening with WAMY.

8              THE COURT:  So you're saying that even though some of

9      the indices, as plaintiffs pointed out, do not indicate sources

10     for each document that's part of the production, you can say

11     from whence it came?

12             MR. MOHAMMEDI:  I mean, some of them you know where

13     they came from, yes.  They are -- some of them are -- some of

14     them are duplicates, your Honor.  Some of them are stored in

15     Saudi Arabia because they have communication with the chapters,

16     and when they ask the chapters to send those documents, they

17     will take them to where they are and they keep them.  And

18     that's how they keep them.

19             If there is no source here, it's not relevant exactly

20     what -- I think the source issue is an issue that we take with

21     plaintiff.

22             THE COURT:  I mean, I understand that, undoubtedly,

23     there are duplicates, but let's assume that someplace in this

24     120,000 documents there's a smoking gun.  The smoking gun

25     appears in the files of WAMY Indonesia rather than in the files

E4OP911M

1    of some other subsidiary or WAMY Saudi Arabia, but not WAMY

2    Indonesia.  That potentially has significance, which is why I'm

3    asking whether the documents, except for having been moved to

4    Saudi Arabia, are still in a format where, as to each document,

5    you can say a particular location was the source?

6            MR. MOHAMMEDI:  Yes, there are, your Honor.  There are

7    specific forms.

8            THE COURT:  Okay.  Go on.

9            MR. MOHAMMEDI:  And when the search happened, it

10   identified the document.  It kept them where they should be.

11   They just identified the documents that's what they do, but I'd

12   like to go back to the real issue here about the production of

13   documents.  And I think the indices, I believe that Mr. Goetz

14   is going to address in some more detail.

15           I think plaintiffs are either on purpose confusing

16   between production of documents, or they're not making a

17   difference between them.  And I think Federal Rules of Civil

18   Procedure 34(a)(1), parties only need to make requested

19   documents available for inspection and copying.  It is not

20   required to produce copies of natural document, not obligated

21   to pay for the cost of copying and shipping the documents.  And

22   the cases that we cited are very clear on this, and ever the

23   cases that they cited themselves, they support our proposition.

24   And I can go into detail.  Plaintiffs, for instance, cite

25   Cleverview --

E4OP911M

1          THE COURT:  Just tell me again which part of Rule 34

2     you were just quoting?

3          MR. MOHAMMEDI:  It's 34(a)(1).

4          THE COURT:  Okay.  Go on.

5          MR. MOHAMMEDI:  So I think the plaintiff, in even

6     citing that case law, they mention Cleverview Investment v.

7     Steven Oshatz, in that case specifically, it's discussed the

8     Federal Rules of Civil Procedure 34(a)(1), where it

9     specifically stated, and I can --

10          THE COURT:  Well, let's ignore the law for a moment

11     and --

12          MR. MOHAMMEDI:  But, your Honor, this is very

13     important.

14          THE COURT:  I'll let you get back to it.  I just want

15     to ask --

16          MR. MOHAMMEDI:  Sure.

17          THE COURT:  -- a practical question.  Let me assume

18     for purposes of questioning that Mr. Carter is a frequent

19     traveler to Israel and that he and Mr. Goldman, who -- from his

20     name, I assume is Jewish; I shouldn't make the assumption --

21     together --

22          MR. GOLDMAN:  I'll stipulate.

23          THE COURT:  -- they want to go together and travel to

24     Saudi Arabia to look at the documents.  As I understand it,

25     neither of them may be admitted to the country for that

E4OP911M

1    purpose.

2              MR. MOHAMMEDI:  It doesn't matter -- sorry.

3              THE COURT:  And I suppose you can tell me that, you

4    know, there's lots of plaintiffs' lawyers, and they can find

5    people who qualify.  But why shouldn't that be a concern of

6    mine?

7              MR. MOHAMMEDI:  Your Honor, like you mentioned, there

8    are plenty of lawyers out there, first.

9              Second, Saudi Arabia is not a place where there are no

10   foreigners, there are not a place where there are no Jewish

11   people visiting, there are not a place where investors are

12   going,  there are not a place where business people are going.

13   They make Saudi Arabia as a war zone, where they're so afraid

14   to go.

15             They could not support their claim.  They could not

16   provide any information to support that claim, plus the fact

17   they didn't even try.  Did they apply for a visa to Saudi

18   Arabia?  They didn't even try to do that.  Now, they cannot

19   come to this Court and say we cannot do it without even trying.

20   Here they claim against WAMY --

21             THE COURT:  Let me just understand what you're saying.

22   You're representing that if an attorney on the plaintiffs'

23   side, who has Israel as a stamp in their passport, although I'm

24   not sure the Israelis frequently stamp U.S. passports, but

25   assuming they did, and Mr. Goldman applied for visas, they

E4OP911M

1    would be granted?

2            MR. MOHAMMEDI:  I am not making that representation.

3    What I am saying is that they have not tried.

4            THE COURT:  Okay.

5            MR. MOHAMMEDI:  That's what I'm saying.

6            THE COURT:  Okay.  Go on.  I'm sorry.  I interrupted

7    you when you were about to tell me about the law.

8            MR. MOHAMMEDI:  Sure.  You know, in the same case that

9    I cited -- by the way, that case, it was a split of cost, and

10   issue was one party did not inform the other party that they

11   would charge them for copying costs.  And during that

12   conversation, with the case law which I can give that to you if

13   your Honor wants, it's very clear.  Here, if you go to Page 2,

14   it specifically allowing party to make original documents

15   available for inspection without any copying to be at

16   adversary's expense.

17           The law specified that when the party believes it will

18   be facing enormous production costs, the presumption is that

19   the responding party must bear the expense for complying with

20   the discovery request, but he may involve the District Court

21   discretion in their Rule 26; therefore, protecting him from

22   undue burden of expense in doing so.

23           And many cases cited the difference between having

24   documents available for production, which is the production

25   itself, and the copying costs, which is the reproduction.  So I

E4OP911M

1    think they are mixing the two and making it sound as if WAMY

2    did not comply with the discovery obligation.  WAMY did.

3            They also make the -- they make this argument that

4    they, WAMY, has to show that they are not able to afford the

5    discovery cost.  And they cite Zubulake v. UBS Warburg.  As a

6    matter of fact, this case speaks about the retrieving data,

7    which was very expensive for the party.  WAMY already done

8    that, and they spent 1.5 million in there.  It was not about

9    copying costs.

10           THE COURT:  Well, the cost of the indices could have

11   been spared had a document -- I mean, money that was spent

12   preparing indices could have been spent simply converting them

13   to an electronic form and shipping a handful of disks or a hard

14   drive to the U.S., correct?

15           MR. MOHAMMEDI:  Yeah, but, you know, when you make

16   copies or make scanning the documents, most of the documents

17   were not in electronic version.  They were almost all of them

18   in hard copies.  They were reviewed.  When they were reviewed,

19   they were taking notes, and that's where the indices came from.

20   Obviously, when you review the documents, you are taking notes;

21   so it became part of retrieving the data, which is different

22   from copying costs.  Even though they had the copy, they would

23   still have to go through that.  That's what differentiates

24   between production of documents, which WAMY has done, and

25   copying costs or scanning of documents.

E4OP911M

1          THE COURT:  Well, but how about the fact that we're

2     talking about the difficulty of reviewing them in Saudi Arabia

3     when many of the documents were in countries that may have been

4     more accessible to plaintiffs' counsel, and WAMY simply decided

5     to move them to Saudi Arabia?

6          MR. MOHAMMEDI:  Your Honor, where?  Example, where did

7     they think they would be accessible?  Much of them are

8     hotspots, such as Pakistan.  Do you want to plaintiffs to go to

9     these places to review the documents?  We made it easier for

10    them.  We made it easier for them.

11         THE COURT:  That's why I backed off picking a WAMY

12    country because I recognize that none of these places --

13         MR. MOHAMMEDI:  That's the reason they we are in this

14    lawsuit because WAMY happened to be in this hotspot; so that's

15    why plaintiffs are suing WAMY for that purpose.

16         Now, I think also the hardship issue, I think it's not

17    something that WAMY will have to show because the hardship is

18    what retrieving there, but I will just mention something about

19    the argument that plaintiff made about Kingdom Saudi Arabia

20    offered a grant of $33,000, which is about the equivalent of

21    about 100,000 Saudi riyal.  Isn't that what the not-for-profit

22    organization do?  They get grants.

23         You're not going to have Merck, who is a billion

24    dollar company get a grant for $33,000, but that's beside the

25    point.  I just want to make sure that -- WAMY, it is a

E4OP911M

1   not-for-profit organization, no matter what plaintiff said.

2              Now, as far as them saying that MDL cases, they favor

3   cost sharing, I have no idea where they get that from.  As a

4   matter of fact, in the Merck case, it was not order of the

5   judge.  It was an agreement between the two parties, which was

6   entered into an order, and -- but they forget to just go

7   through other case law that they say we did not support our

8   with any authority, we did.  They did not.  They did not

9   provide any case law that says that a party is obligated to pay

10  for the cost of copying and shipping.

11             THE COURT:  Well, but they also say that this was,

12  although not reduced to writing, the agreement among the

13  various parties, or at least among the two executive

14  committees; is that the representation?

15             MR. CARTER:  That's correct, your Honor.

16             THE COURT:  So that the two executive committees, one

17  of which represents WAMY's interests, among others, they say

18  agreed that this would be the ground rules.

19             MR. MOHAMMEDI:  We were not part of that agreement.

20  Only thing I can tell you is we reach out to plaintiffs for an

21  agreement and they refuse.  We ask them to split the cost, and

22  they refuse.  So in other cases that I mentioned that --

23  actually, in those cases the Cleverview and the other cases,

24  and we have another case actually issued from California, that

25  specifically the issue became there was no agreement to show.

E4OP911M

1        And even in those cases, the Court they split,

2   sometimes the Court, they did not say -- even with Merck, they

3   say we have a specific number of documents that we have -- the

4   requesting party will have to pay.  And so that's what we tied

5   to do with plaintiff.  We have been trying to do this with them

6   for a long time, and they just basically refusing to do so.

7        So that's why we are here, trying to find a way to

8   explain our position that reproduction of document, it is not

9   obligation of the party producing the documents.  And we cannot

10  be forced to do so while we did everything we could to search

11  for those documents and produce those document then make them

12  available.  We gave them two options, and even though their

13  admission they cannot proceed, we say okay, then that's fine.

14  We can ship those documents to you at your cost.  I think that

15  was a fair proposition, and plaintiffs just ignored it and

16  didn't want to respond to it.

17        THE COURT:  What's the cost of shipping the documents?

18        MR. MOHAMMEDI:  I think -- We don't know.  We don't

19  know the cost.  I mean, the issue here is either shipping the

20  documents or scanning them, and that's really what's going to

21  be.  We can scan those documents for them, and it would be the

22  cost of scanning them.  And there has been an electronic -- so

23  far, most of the documents have been produced in electronic

24  version.  They have not been produced most of the time.

25        THE COURT:  What percentage of your documents are

E4OP911M

1    electronic?

2            MR. MOHAMMEDI:  What we have in electronic, we have

3    produced to them so far.  Your Honor, we produced 25,000

4    documents.  They make it sound like we have not produced

5    anything.  We have produced 25,000 documents to them.

6            And I'd like to go to the point where they said about

7    WAMY International and WAMY Saudi Arabia.  I think Mr. Carter,

8    he misconstrued the letters to him about getting the documents.

9    The documents that we asked them to take them.  These were

10   documents that us, as counsel, brought from Saudi Arabia, not

11   WAMY International get those documents from Saudi Arabia.

12   So -- and we said, remember, your Honor, it was following the

13   hearing that we had, and I stood up and I said, in good faith,

14   we are going to bring some documents for plaintiff to -- for

15   plaintiff production.  I think it was about two or three

16   thousand documents, and that's what happened.  We asked them to

17   come and get them.

18           So let me see if there's anything else I forgot to

19   mention.

20           THE COURT:  Sure.  One thing you haven't talked about

21   is the cutoff date.

22           MR. MOHAMMEDI:  Yes, that's what I'm going to mention

23   now.  The cutoff date.  We do believe that the MWL and IRO

24   hearing did not apply to us.  First, we never briefed this

25   issue before, and second, we believe that the transcript showed

E4OP911M

1    that it was specifically addressed to the IRO and MWL.

2            Now, as far as their argument that this should be

3    general rule, I do believe, actually, plaintiff, that there are

4    some defendants here that can attest to that.  They entered

5    into an agreement with some other defendants to designate

6    specific scope of discovery.  If they do believe this is a

7    general, apply to everyone, why would they do that?

8            So it is not a general rule.  It was applied to IRO

9    and Mr. Mordley.  And as far as their trying to establish the

10   relevance why these documents are responsive to them, I think

11   they made an example of Jelaidin being invited by WAMY.

12   Therefore, WAMY should participate, and they said speak of one

13   of the conference in no way establish that WAMY is a Saudi

14   charity that has served as a fully integrated component of

15   Al-Qaeda organization structure by inviting Jelaidin in 2008.

16   In fact, we were in a hearing with Judge Daniels, just in the

17   motion that was held before this Court -- I mean, before we had

18   this sitting with your Honor.

19           The conduct of WAMY to invite Jelaidin does not raise

20   to a claim.  If that's the case, then Jimmy Carter, where he

21   met with Meshal, then Jimmy Carter -- then people would have a

22   claim against Jimmy Carter when he met with Meshal, who was

23   head of Hamas.  So I don't think that -- I think it's not an

24   argument for them to use, because of that the extension of

25   discovery should be 2004.

E4OP911M

1          As far as the investigation that they're talking

2     about, you know, we have no issue producing those documents

3     related to investigation, but they have to be specific to

4     investigation.  We cannot make a general rule that everything

5     from 1992 to 2004, that everything that we're asking should be

6     produced to us.  If that's what they're requesting, that's

7     fine.  We can provide that to them.  If we have them, we'll

8     produce them, but they cannot be spread to all other requests.

9     I think they need to be specific to the 2002 request.

10          I think that's all.  Thank you, your Honor.

11          MR. GOETZ:  May I stand?  I've been sitting for a

12     while.

13          THE COURT:  Yes.

14          MR. GOETZ:  Your Honor, as I understand, the purpose

15     of the indices, they are to facilitate plaintiffs' inspection

16     and copying of the records that are in WAMY's file room.  From

17     my reading of the transcript of the February 15, 2012, hearing,

18     the Court really had two broad requirements for these indices.

19     They have to be intelligible and workable.  So with those broad

20     concepts in mind, we've produced the 155 indexes.

21          They are not meant, as I understand it, to replace the

22     documents themselves or the evidence themselves.  It's

23     basically a tool to say, all right, these are some documents

24     we're interested in, we want to inspect and copy these

25     documents.  These other ones, they don't pertain to our claims.

E4OP911M

1    We're not interested in them.  And that's what these indices

2    do.

3          The Court's reviewed them and, ultimately, your Honor

4    is the one that matters.  But you note that they correlate to

5    specific document requests.  So by definition, if we're talking

6    about a document request for reports and we give an index

7    that's responsive to that, well, these are all reports, they're

8    within that category.  So by tieing the documents in the

9    indices to the requests, specific requests, that's a

10   definitional exercise or definitional statement that makes them

11   intelligible and workable.

12         Beyond that, and the Court has reviewed Exhibits E

13   through H in plaintiffs' motion, the documents -- the indices,

14   most of them they give a description of the subject, they state

15   who the document is to, who the document is from, and they give

16   the date.  And all I think plaintiffs' argument is really

17   putting form over substance.  Well, we don't have it, whether

18   it's an annual report or a quarterly report.

19         THE COURT:  Refresh my recollection.  How did we get

20   to indices in the first place as opposed to the documents?  I

21   know my recollection is that WAMY was not the only defendant to

22   resort to indices.  Do I have that right?

23         MR. CARTER:  That's correct, your Honor.

24         THE COURT:  But refresh my recollection as to how the

25   indices came about.

E4OP911M

1          MR. GOETZ:  Well, my understanding is that, I think,

2    MWL had the first indices, and they were problematic because,

3    as I understand it, they were not specific document-by-document

4    breakdowns.  They were broad descriptions that were not tied to

5    specific requests.

6          But as I understand, as I said the purpose and how we

7    got here, is basically when you're talking about a file room

8    full of hard copies, documents, the purpose of the indices are

9    to facilitate -- production having been made to facilitate the

10   inspection and the copying.  That's what I understood the

11   purposes.  They're not to replace the documents themselves, but

12   to help plaintiffs exercise and fulfill the discovery they want

13   to do.  So I think that's the ultimate test.  The Court gave

14   the standard, are they intelligible and are they workable?  And

15   they are.

16         Plaintiffs arguments, as I said, they really put form

17   over substance.  They talk about lack of uniformity.  They are

18   in different formats.  They had different teams working on

19   them.  They gave different products.  But, again, does that

20   mean index A is not intelligible and workable because it's in a

21   different format from index B?  No, it doesn't, not at all.

22         There are, for example, the complaint or the issue was

23   made, well, as to correspondence.  It doesn't matter -- well,

24   it's not described as an e-mail or a letter or a memorandum.

25   Well, it's the substance, the subject of the document that

E4OP911M

1    should be important because I can't believe if you have a

2    correspondence confirming wire transfer to Osama Bin Laden,

3    it's going to matter whether or not that's a letter or an

4    e-mail.  They're going to want to get it.

5         THE COURT:  I thought Mr. Mohammedi was telling me if

6    it was an e-mail, it was already produced, unless perhaps it

7    exists in paper form also.  I thought he said everything

8    electronic had been produced.  Did I misunderstand that?

9         MR. MOHAMMEDI:  Your Honor, the electronic format we

10   produced them, most of them were produced, and those indices

11   were made two years ago.  Right?  And now, WAMY Canada, when --

12   Mr. Carter mentioned WAMY Canada, doesn't mean that all the

13   documents in the indices are not produced.  There are some

14   documents, many of them, that have already been produced.  They

15   were used as an example.

16        THE COURT:  So the answer to my question is, if

17   there's something in the indices, that's in electronic form, it

18   has been produced?

19        MR. MOHAMMEDI:  In good faith, for what we think,

20   that's been produced.  For what we believe, that -- I mean, I

21   cannot page a representation a hundred percent, but most of

22   them, we believe were produced.

23        MR. GOETZ:  And most of the records that I've seen,

24   your Honor, are not electronic communications.  Those are the

25   letters, memo, but my point, setting aside e-mails for this

E4OP911M

1    example, it doesn't matter whether it's a memo, a

2    correspondence or a card, again, I think that's form over

3    substance.

4          Plaintiffs make the argument that, well, the

5    description are insufficient but, yet, on the other hand,

6    they're arguing that there's a number of these documents that

7    are just not relevant.  So I think, to some extent, there must

8    be some intelligible aspects to these that they're able to make

9    that differentiation.

10         WAMY has identified the particular documents that it

11   believes are within the scope of discovery, and to some extent,

12   your Honor, what we have here is the pot calling the kettle

13   black.  Because, if you recall, this came up at the

14   February 15, 2012, hearings when, at that time, WAMY was

15   chastising or complaining about the plaintiffs producing all

16   these newspaper clippings that really had nothing to do.

17         And the Court said, well, that doesn't really control.

18   If the producing party feels that they're responsive, they

19   produce whatever responded.  And I think the Court said whether

20   they're garbage or not, in the receiving parties' view, is not

21   controlling.

22         Just because these document in some instances may not

23   support the plaintiffs' claims does not mean that they're not

24   within the scope of discovery that might be responsive to that

25   particular request.

E4OP911M

1          And one point for clarification, your Honor, in

2     reviewing these indices, I want to make clear that Exhibit D is

3     a different type of index.  Exhibit D -- and this was some

4     confusion, I think, from the February 15, 2012, hearing.

5     Exhibit D is an index of documents that have been produced.  So

6     the other exhibits, G, E through H, are the index of the

7     documents that are in the file room in Riad.

8          And one unfortunate thing, your Honor, speaking about

9     the February 15 of 2012, is that that is the last time that

10    this issue, the sufficiency or insufficiency of these indexes,

11    came up.  I mean, all of these issues and complaints that we're

12    hearing today, the first time we heard about those was on

13    March 14 of 2014, over two years later.

14         And there have been absolutely no indications from the

15    plaintiffs between February 15, 2012, and February -- or

16    March 14 of 2014, that there was any insufficiency.  And I

17    would note to the Court your comments on February 15th when

18    this issue of the indexes came up.  You said, well, until the

19    two sides have a more focused discussion about that with

20    respect to the WAMY documents, I'm not going to address it any

21    further.  And, unfortunately, that focused discussion has never

22    come up.  Many of these issues about details about "to,"

23    "from," "subject," those things could have been worked out.

24         And, your Honor, I would note that in terms of

25    supplementing, last night we did finally receive from the

E4OP911M

1    plaintiffs, at 9:00-something p.m., the supplemental answers

2    that were the subject of the December 26th hearing, or

3    December 26th order that we brought up again on February 15,

4    20 -- I'm sorry, February 19th of 2014 was the last time we

5    were together.  And we did just get those finally last night.

6              One other point, your Honor, that was brought up by

7    Mr. Carter.  The WAMY Canada documents that are referenced on

8    the index, copies being in Saudi Arabia.  We believe copies

9    have been produced, and if they have any questions about a

10   specific document, well, where's this report or where's this

11   letter, we'd be happy to caucus with them about that.  And if

12   there's something they think they're missing, then we'll

13   produce that because we certainly stood before the Court

14   before, and we continue to maintain, that we believe we've

15   produced every WAMY Saudi Arabia document that pertains to WAMY

16   Canada.

17             THE COURT:  Thank you.

18             MR. GOETZ:  That's all I have.

19             THE COURT:  Anything further?

20             MR. CARTER:  Yes, your Honor, if you don't mind, a few

21   things that I'll try and address.  The legal rationale WAMY is

22   relying upon is that the party need simply make available for

23   inspection the documents that are responsive.  But the

24   discovery rules have a reasonableness requirement embedded in

25   them.  And as an example of that, the courts have consistently

E4OP911M

1   held that a parties that has a woefully disorganized filing

2   system can't simply tell the party seeking discovery to go into

3   that woefully disorganized file room and try and find the stuff

4   that's responsive.

5        And as the analogy, the decision to try and make

6   documents from a variety of locations available for inspection

7   in a location where the State Department has said it is ill

8   advised for U.S. people to travel, whether they can get a visa

9   or not, doesn't comply with that baseline reasonableness

10  standard.  And at the end of the day, WAMY International here

11  in the U.S. has care, custody and control over these documents.

12  It's a U.S.-based party.  It has an obligation to produce the

13  documents here, where it resides and where the plaintiffs in

14  the litigation also reside.  So all of those things --

15        THE COURT:  What's the basis for saying that WAMY

16  International in the U.S. can cause WAMY Saudi Arabia to

17  produce documents?

18        MR. CARTER:  Your Honor, we see within the discovery

19  materials very free flow of information back and forth, when

20  even they have acknowledged, when WAMY Saudi Arabia wanted

21  something to happen to WAMY Canada, it sent the request to U.S.

22  entity to facilitate that role and back and forth.  The

23  correspondence all indicate that it is able to go and get

24  documents from WAMY Saudi Arabia.  So those are all sort of

25  evident in the documents that they've produced themselves.

E4OP911M

1          With regard to the feasibility of going to Saudi

2     Arabia, you know, Mr. --

3          THE COURT:  One of the things -- before you get to

4     that, what Mr. Mohammedi said was the other locations are

5     equally bad, if not worse.  Do you agree with that?

6          MR. CARTER:  You know, I don't know that WAMY's office

7     in the U.S. was particularly disturbing to us.  I think it may

8     have maintained an office in London for several years.  It

9     maintained an office in Canada.  So, you know, not all of its

10    offices are in so-called hotspots.  There were plenty of WAMY

11    locations where the documents could have been shipped without

12    presenting this security risk, and it's not just a security

13    risk, as informed by the State Department warning.

14         As your Honor indicated, there's a potential that the

15    attorneys have Israeli visa stamps or Jewish religious

16    affiliation.  There's also the matter of the consultants that

17    one would need to meaningfully review these, and I can say with

18    a level of confidence that they would not be allowed into Saudi

19    Arabia, period.  The nature of this case, the kind of

20    consultants you need to deal with counter-terrorism expertise

21    are not going to be allowed into Saudi Arabia for the purposes

22    of doing this kind of inspection.

23         WAMY, throughout the process, based on the agreements

24    between the defendants' executive committee and the plaintiffs

25    executive committee, has benefited substantially from

E4OP911M

1    plaintiffs' adherence to produce documents in single page TIFF

2    format.  Literally, tens and tens and thousands of documents

3    have been collected by plaintiffs in hard copy format.

4        Everything that came back to us from FOIA was produced

5    in hard copy format.  Documents we got from foreign governments

6    were produced in hard copy format.  We converted all of those

7    to electronic format and produced them to the defendants, and

8    WAMY's gained that benefit.

9        The only thing that allowing WAMY to impose costs on

10   us does is trigger a request by us for a corresponding

11   reimbursement for all of the costs we incurred to collect our

12   documents and produce them to WAMY.  And that kind of back and

13   forth really doesn't make any sense from a management

14   perspective.  Obviously, your Honor has the discretion in

15   managing discovery in an MDL proceeding, to set rules that will

16   ensure that we don't mire ourselves down in certain pointless

17   disputes for many, many years.  And this is a circumstance

18   where it seems that the parties' course of conduct, other than

19   WAMY, supports the view that such a rule should exist.

20       There was an indication that all of the electronic

21   documents, including e-mails, have been produced.  We don't

22   recall seeing any e-mails.  I raise it only because there was a

23   suggestion that e-mails existing in electronic form had been

24   produced, but we really don't recall seeing e-mails.  So that's

25   one consideration.

E4OP911M

1          Again, Mr. Mohammedi said that the discussion about

2     single-page TIFF productions didn't apply to WAMY, but he was a

3     participant in the videoconference; so it's hard for us to

4     understand how a silence during the course of a discussion

5     between the executive committees, can later absolve you of the

6     agreement that everyone else understands to have been reached.

7          THE COURT:  Let me interrupt you for a second.  Were

8     you part of that videoconference?

9          MR. MOHAMMEDI:  Your Honor, I cannot recall.  I really

10    cannot recall.

11         THE COURT:  Anything else, Mr. Carter?

12         MR. CARTER:  No, your Honor.  I think that's it.

13         MR. MOHAMMEDI:  Your Honor, can I just say a few

14    things?

15         THE COURT:  Sure.

16         MR. MOHAMMEDI:  We tried to reach an agreement with

17    plaintiffs.  We talked to them.  We asked them to split the

18    cost.  They refused.  We didn't ask them to go to Saudi Arabia

19    if they didn't want to go.  So I think the issue here is the

20    cost.  It's not about traveling anywhere else.

21         As far as the e-mails, I'd like to make very clear

22    that I was not referring to e-mails.  I was referring to

23    electronic documents, whether they had them, whether they were

24    scanned or whatever.  I can't make this representation that all

25    e-mails have been produced because I'm not sure, but I want to

E4OP911M

1    make sure, it was an example that Mr. Goetz made to this Court.

2              So we were willing, and we are still willing, to work

3    with plaintiffs.  If only plaintiff can reach out, we can go

4    into -- we can reach an agreement to do it.  We tried.  We did

5    our best.  However, this does not mean we violated our

6    obligations to search for documents and have them available for

7    production, which is contradictory to what plaintiffs are being

8    said all along against WAMY.  Thank you.

9              THE COURT:  As to the situs of production, I wasn't

10   being inattentive when counsel were speaking.  If you saw me

11   looking at the laptop computer on my bench, I was pulling up

12   again the State Department web page that talks about travel to

13   Saudi Arabia, which contains numerous cautions.  Although, it

14   acknowledges that the climate in recent years has been getting

15   better, but it makes it perfectly reasonable to believe that,

16   assuming all of the attorneys who might wish to review the

17   documents could get into Saudi Arabia would be granted visas,

18   that there's legitimate reasons why they might not wish to be

19   in Saudi Arabia, and assuming that many of the consultants and

20   interpreters, who might be required to assist in the review of

21   the documents, would be viewed as turncoats, I do not view it

22   as practical to turn to plaintiffs' counsel and say, go to

23   Saudi Arabia to review the documents, particularly when, for

24   many of the documents, Saudi Arabia is a location that WAMY

25   chose, for whatever reason, they chose to consolidate the

E4OP911M

1    documents there, any more than I would consider it reasonable

2    if the plaintiffs said, well, we have the documents spread out

3    among law offices in numerous locations.  Some of the documents

4    are at Mr. Haefele's office in South Carolina; so start with

5    Mr. Kreindler's offices in New York, then tour South Carolina

6    and the location where Mr. Carter's office is.

7              It seems to me, in a litigation of this scope, an MDL

8    litigation in particular, the only practical solution is to

9    have each side produce its documents to the other side, rather

10   than having plaintiffs, by way of example, have to go to Saudi

11   Arabia.  So for those two reasons, I do not view viewing the

12   documents in Saudi Arabia as a practical solution.

13             With respect to the indices, the indices clearly are

14   better than some of the indices in the past in this case.  As

15   counsel said, they are document specific it appears, but this

16   was, obviously, a significant undertaking and many of the

17   indices really don't tell you much of anything.  I'm looking at

18   the first page of -- well, it's not the first page, but a page

19   of one of the exhibits, copy, and the subject is copy of a news

20   published in one of the Pakistani newspapers and replied with,

21   which tells you virtually nothing.  And there were other

22   equally uninformative descriptions attached.  "Copy of

23   transfer" is another one that I noted.

24             I spent more time than I care to, at times, looking at

25   privilege logs, which are equally unenlightening.  And I'm not

E4OP911M

1    a fan of privilege logs, the way they're currently done, nor of

2    these indices.  But I don't think the indices really move the

3    matter forward, nor do I think it's practical at this stage to

4    talk about redoing the indices as a way to specify a subset of

5    documents to be produced to the plaintiffs.

6            In terms of the cutoff date, I'm of two minds, I

7    suppose.  I acknowledge that we were having a specific

8    discussion at the time that we discussed a 2004 rather than a

9    2002 cutoff date, and it was in the context of setting the

10   other parameter for what was a generic start date that, I

11   guess, Judge Daniels or Judge Casey, I think it was Judge

12   Daniels, had set.  But I'm going to reserve decision with

13   respect to the cutoff date and try to move things along by

14   ensuring that at least through 2002, presumably, the documents

15   are produced in relatively short order.

16           As to the cost, I understand that WAMY is a charity.

17   As I said, I never have viewed the indices of any of the

18   parties -- except for, obviously, the need to produce privilege

19   logs -- I haven't viewed the indices as a particularly

20   practical way to proceed for anybody.  I think it was

21   unrealistic to think that the indices would somehow focus the

22   discussion or review and, therefore, lead to less burden.

23           And taking what WAMY says at face value, obviously, a

24   large sum of money has been spent preparing the indices.  But

25   if I were to say that WAMY and the plaintiffs don't have a deal

E4OP911M

1    as to costs or that the deal that, evidently, was struck by the

2    two executive committees didn't bind WAMY, as Mr. Carter said,

3    then by all rights, plaintiffs will be entitled to bill back

4    for the documents that they produced and the cost of some

5    allocable share of producing those in TIFF format, and then we

6    get into battles about the extent to which the documents were

7    responsive to the requests or garbage, on both sides.

8         So I am going to require that WAMY produce the

9    documents at its cost, and notwithstanding the agreement that

10   documents should be produced in TIFF form, I will leave it to

11   the WAMY defendants to decide whether they wish to ship the

12   documents here, so long as they can be made available in a

13   location where the plaintiffs can practically review them and

14   indicate that which they have to have or wish to have copied,

15   or whether it's produced in TIFF form, whichever better suits

16   defendants, I will permit them to pursue.

17        But either TIFFs have to be made available with

18   reasonable dispatch or the hard copy documents.  And certainly,

19   any electronic documents that have not been produced, if

20   e-mails have not been produced, there's no longer any reason

21   why e-mails should not have been produced, and those should be

22   produced forthwith.

23        So I think that I've addressed the issues as to the

24   cutoff date.  Again, I want to see where we end up with the

25   production through 2002, and I said I am reserving decision on

E4OP911M

1    that.  I'm not reserving it for a week or two.  I'm going to

2    wait to see what happens with production through 2002, and then

3    we'll worry about 2002 through 2004.  Although, I do think

4    there's some merit.

5         If it's really, Mr. Carter, particular types of

6    documents that plaintiffs are looking for, I'd encourage you to

7    have discussions with WAMY's counsel and see whether production

8    for that area can be narrowed.

9         MS. BERGOFFEN:  Your Honor, if I may.  With regard to

10   the cutoff date, and as it applies to any other party or the

11   defendants in general, a couple of points there.  I think I

12   speak on behalf of the other defendants as well.  Our

13   understanding is that this would just apply to WAMY.  I know

14   that in the case we generally try to have universal things like

15   this apply, but this is not a case in which it should for a few

16   reasons.

17        If I may use my client, the Dubai Islamic Bank, as an

18   example.  Mr. Mohammedi alluded to before to an agreement.  We

19   actually have an express agreement with plaintiffs, which was

20   on a document-request-by-document-request basis as to what that

21   particular cutoff should be.  In some cases the agreement was

22   that it would be serving documents through 2001 and in others

23   it was through present.

24        So I mean, to the minimum, I believe this would apply

25   to other defendants as well, and I encourage anybody else to

E4OP911M

1    speak up, but with regard to the Dubai Islamic Bank, we would

2    certainly urge that you not make that ruling apply to us

3    because we have an express agreement already in place with

4    regard to specific dates.

5             THE COURT:  Well, anybody who has an express

6    agreement, I'm certainly not going to meddle with those

7    agreements.

8             MS. BERGOFFEN:  Very good.  Thank you, your Honor.

9             THE COURT:  Unless somebody tells me there's

10   disagreement as to what the agreement is.  That will read oddly

11   in the transcript, but go on.

12            MR. CARTER:  Your Honor.

13            MR. MOHAMMEDI:  May I -- Go ahead.

14            MR. CARTER:  Your Honor, just a couple of minor

15   points.

16            THE COURT:  Yes.

17            MR. CARTER:  I think it's implicit in your Honor's

18   order that you're reserving judgment as to the 2002 to 2004

19   period for WAMY, that there's a continuing obligation to

20   preserve documents from that period that are responsive.

21            THE COURT:  Clearly.

22            MR. CARTER:  Is the Court inclined to set a deadline

23   for this production to occur?

24            THE COURT:  I had thought about that, and I'd like the

25   two sides to confer.  If you can't reach agreement on that,

E4OP911M

1    then submit a joint letter to me setting forth the two

2    positions.

3            MR. CARTER:  And the last thing, your Honor, was we

4    had already asked in our motion --

5            THE COURT:  Let me just interrupt you for a second and

6    say, I recognize also that Mr. Mohammedi may file objections to

7    this.  Although, I think I'm correct that every single

8    objection to a discovery ruling of mine has been denied, at

9    least since Judge Daniels has been the district judge, but I

10   recognize that that possible exists.

11           MR. CARTER:  You are, in fact, batting a thousand,

12   your Honor.  The one last issue, your Honor, was that we had

13   asked in the motion --

14           THE COURT:  Although, defendants, or whoever objected

15   this time got a longer decision than some of the other ones.

16           MR. CARTER:  That's correct.  We had asked just that

17   there be a clarification that the rulings concerning the sort

18   of central relevance of, for instance, the auditing reports and

19   the supporting documents for the auditing reports for charity

20   defendants, be made clear so that when we get this production,

21   we're sure it encompasses everything that the Court has already

22   acknowledged to be relevant and quoted the claims in the

23   litigation.

24           THE COURT:  Let me try it this way and see whether it

25   deals with your concern.  Obviously, anything that's responsive

E4OP911M

1    to your request, except to the extent that I've sustained an

2    objection, needs to be produced.

3              MR. CARTER:  That's fine.  Thank you, your Honor.

4              THE COURT:  Anything else as to this?

5              MR. MOHAMMEDI:  I think Mr. Carter already addressed

6    some of the questions we were going to ask.

7              THE COURT:  Okay.  Let's move on then to the

8    application for fees and costs.

9              MR. HAEFELE:  Good afternoon, your Honor.  Robert

10   Haefele from Motley Rice.  We're here for the -- what I think

11   you had identified as the sanctions motions.  The sanctions

12   motion is, thankfully, behind us.  This is the fee petition

13   related to the sanction motion as a result of that, which as I

14   understand, was upheld in one of the decisions that --

15             THE COURT:  Right.

16             MR. HAEFELE:  -- Judge Daniels issued yesterday, or

17   three of the decisions, I guess.  The two that are before your

18   Honor today is one petition that was done jointly related to Al

19   Haramain and to Wael Jelaidin.  And, you know, we went through

20   most of what we need to say, I think, in the papers, just like

21   we said -- Mr. Carter said about the WAMY motion.  I think most

22   of what we had to say was laid out in the papers, and then the

23   reply papers.

24             There is a lingering issue, I suppose, as to whether

25   or not the motion for the surreply granted -- allows the

E4OP911M

1     opportunity for the surreply, but I'm not sure that really

2     matters because the arguments in the surreply were essentially

3     the arguments that had been made earlier.

4             THE COURT:  I, obviously, ignored the motion to strike

5     the surreply.  And when I was reading it today, I'm not sure it

6     adds much or it's cause for concern; so....

7             MR. HAEFELE:  I think that our whole point was not a

8     motion to strike.  It was the opposition to their motion to

9     file a surreply, but regardless, I think it all comes to the

10    same point.  Our objection was their surreply made the same

11    arguments.

12            THE COURT:  And I suppose, to the extent it did, I

13    should file an objection also, but --

14            MR. HAEFELE:  At any rate --

15            THE COURT:  At the end of the day, I think the issues

16    have been fully briefed at this point.  One thing that concerns

17    me is, obviously, the longer you're on the bench, the more out

18    of date your views of going rates become.  But looking at the

19    billing rates and noting, for example, that your firm is in

20    South Carolina, although I know it has a somewhat unique

21    practice, 750 bucks an hour for you, just to pick on you as an

22    example, seemed like a pretty high rate.

23            MR. HAEFELE:  I do feel sort of targeted, your Honor.

24    It's interesting that you should raise me --

25            THE COURT:  Would you rather I pick on Mr. Flowers?

E4OP911M

1          MR. HAEFELE:  No, but it is interesting that you would

2     choose me because none of my practice is in South Carolina.

3     Honestly, the ironic thing, and I've had this discussion with a

4     number of folks, is that I moved to South Carolina to work in

5     New York.

6          THE COURT:  And I saw you're not admitted in South

7     Carolina.

8          MR. HAEFELE:  No, no, no.  I am admitted in South

9     Carolina because I must be, but because I hold an office in

10     South Carolina, I have to be.  So I am admitted in South

11     Carolina, but my point in the brief, your Honor, was that I am

12     not admitted in the District Court in South Carolina, the

13     Federal Court in South Carolina, I am not admitted.

14          And that was the suggestion, that why should he get

15     the billing rate that a lawyer practicing in a Federal District

16     Court in South Carolina.  The truth of the matter is, most of

17     my practice is in the Southern District of New York, and I am

18     admitted in the Southern District of New York, I am admitted in

19     New York, and I think that's pretty much what the rule says.

20     And a number of cases that were cited is -- the question is

21     what venue do you apply the billing rates.  It's the --

22          THE COURT:  Before you get to that, then let me pick

23     on Mr. Flowers, unless you're going to tell me that he's

24     similarly situated.  The representation is that, for South

25     Carolina clients, he's billing 800 bucks an hour?

E4OP911M

1          MR. HAEFELE:  First off, the only reason I'll first

2     start out picking on you about it is it's Miss Flowers.

3          THE COURT:  Oh, Miss, I'm sorry.  Yes.

4          MR. HAEFELE:  And Ms. Flowers' situation is similar;

5     although she is admitted in South Carolina.  Again, it goes

6     back to the particular nature of the practice of Motley Rice.

7     Our practice is all over the country, and we go all over the

8     country to litigate, usually mass tort cases all over the

9     country.  I don't know if you had an opportunity to look at the

10    brochure about the firm that was in the profiles section of our

11    submission, but, I mean, we're talking about the tobacco

12    litigation all over the country.  We represented -- the firm's

13    predecessor firm that Ms. Flowers was at, which was Ness Motley

14    at the time, represented the attorneys general all over the

15    country in the tobacco litigation.

16         Similarly related all over the country in asbestos

17    litigation, and much of Miss Flowers' practice, too, is in

18    New York, Washington, D.C. and elsewhere throughout the

19    country.  So, yes, she is admitted in South Carolina, but her

20    practice is all over the country.  And I think in that

21    circumstance, to be honest, I can't remember, but I think a lot

22    of it was by pro hac vice admission.  But it is a uniquely

23    national practice as opposed to a local one.

24         THE COURT:  But I guess also a lot of it is

25    contingency fee work, right?

E4OP911M

1          MR. HAEFELE:  Excuse me?

2          THE COURT:  A lot of it is contingency fee work?

3          MR. HAEFELE:  A lot of it would be contingency fee

4    work, that's correct, your Honor.  I don't -- Well, yeah, the

5    tobacco litigation, it was uniquely -- it was a unique

6    contingency fee work, but it was still contingent.

7          THE COURT:  So then I guess that leads to the

8    question, and certainly your firm's not unique in this respect,

9    but the billing rate per hour, therefore, to a certain extent,

10   it is a contrived number because if you're getting a percentage

11   of a recovery, what rate you deem yourself to be billing at may

12   not be an accurate rate.

13         MR. HAEFELE:  I would say this, actually, your Honor.

14   I maybe spoke too quickly.  The firm also has a very large

15   portion of the firm, relatively speaking, within the firm, that

16   does securities litigation, and we do have billing rates for

17   that.  We have assigned billing rates that are assigned for

18   that purpose.

19         THE COURT:  And do they -- it may be different lawyers

20   but for matters that are billed on an hourly basis, do the

21   rates correspond to the rates that are represented in your

22   application to me?

23         MR. HAEFELE:  I actually think the rates here are --

24   they generally correspond, but I think for the folks that were

25   in the leadership position here, they might be a little bit

E4OP911M

1   higher.  For the folks that are, for example, in a piece of

2   litigation where you were one of many lawyers and you were not

3   necessarily the decision maker, the billing rate might be

4   different.

5        In this litigation, where the folks that are on that

6   list, particularly Jodi and myself, Ms. Flowers and myself, are

7   on the plaintiffs' executive committee, have different

8   responsibilities, broader responsibilities, representing more

9   than just the Burnett plaintiffs.  We come here and we are

10   going to have -- this is a particularly good example, where I'm

11   arguing on behalf of all the different plaintiffs in the case,

12   I think the billing rate was a little higher.

13        THE COURT:  Okay.  One infirmity that was raised in

14   opposition is that there's only an affidavit, I guess, from

15   you.  You're not in a position to know the billing rates of

16   other law firms firsthand; so at a minimum, one thing I'm going

17   to want is an affidavit from each of the applicant firms with

18   respect to its billing rates.

19        And I understand that there's some case law.  I guess

20   it was Judge Fox, most recently, who may have said it, saying

21   that that should not be provided in reply, but I think that's

22   wholly within my discretion, and the view is dotting I's and

23   crossing T's; so I am going to ask that that be submitted to

24   me, say, within two weeks.

25        Bear with me a second.  Well, there's also the matter

E4OP911M

1  of -- and Motley Rice may be the wrong firm to use as an

2  example.  But there is Judge Peck's decision which interprets

3  *Arbor Hill* as requiring that billing be at the rate of the

4  forum jurisdiction or the rate in the locality where the

5  attorney's office is, if that's lower or whichever is lower.

6  I'm not sure whether that actually effects any of the firms.  I

7  guess, Mr. Carter, you're from out of town.

8           MR. CARTER:  Philadelphia, your Honor.

9           MR. HAEFELE:  Well, your Honor, I think there's a

10  couple of responses I have to that, as I'm reading -- I mean, I

11  know that's language from one case, but there's multiple other

12  Second Circuit cases and Southern District cases that are

13  pretty particular to the relevant community.  And this is --

14  actually, this is the language I'm reading from *Arbor Hill*.

15           THE COURT:  And the irony is *Arbor Hill* was using it,

16  I forget which law firm he was at, but I remember it was, I

17  think --

18           MR. HAEFELE:  I believe it was the Western District of

19  New York, wasn't it?

20           THE COURT:  No, but the law firm was a New York law

21  firm.  I think the lawyer was Mitchell Carlin, if memory

22  serves.  But by saying the forum jurisdiction, they were

23  picking -- Judge Walker, I think it was who wrote the decision,

24  was in effect picking the lower number.  Here, potentially, you

25  could have the reverse, which I guess is where --

E4OP911M

1          MR. HAEFELE:  I'm looking not just at Arbor Hill, but

2     I'm also looking at a case called *AR v. New York City*

3     *Department of Education*, which the language in that case is the

4     community is typically measured by the geographic area where

5     the action was commenced and litigated, and then in Puglisi --

6          THE COURT:  There's no question that that's what the

7     Second Circuit said, and I'm sure you can find decisions where

8     I've done that, or quoted *Arbor Hill* and not considered whether

9     there should be the lower rate.  And I understand your position

10    that, at least for some of the plaintiffs, New York may not

11    have been their first forum, and there's a debate about who, at

12    the MDL stage, urged that the cases be cited here.

13         MR. HAEFELE:  I think that was the explanation that I

14    provided in the brief, was that that leads to a whole host of

15    disputes within the decision itself.  I mean, all the firms

16    that are here on the plaintiffs' side, they all have New York

17    offices, every single one of them.  And among the plaintiffs'

18    lawyers that were represented in there, for example, one of the

19    Motley Rice lawyers that worked on them is in the billing

20    records, though she's a Motley Rice lawyer, her office was, at

21    one point in Manhattan but at another point was in DC.  But,

22    yet, she was working on this case and doing the briefing

23    related to the case in the Southern District of New York.

24         It runs a -- and then you have the example of me, not

25    admitted in the South Carolina District Court but practicing,

E4OP911M

1    for the most part, in the Southern District of New York and

2    admitted in Southern District of New York.  It runs -- the rule

3    that the Second Circuit generally applies is a much cleaner

4    rule that provides, you know, with much clearer guidance than

5    having to have ad hoc determinations based on each of the

6    individual lawyers.

7            THE COURT:  Okay.  There was one other question I

8    wanted to ask.

9            MR. HAEFELE:  And while you're looking --

10           THE COURT:  There was one firm as to which, and I'm

11   not sure whether it was your firm or Kreindler and Kreindler.

12   Oh, no.  I'm sorry.  It was your firm, Judge Forester noted --

13   and I'm obviously reading from Mr. Kabat's papers, that Motley

14   Rice did not keep time sheets.  I take it with respect to this

15   MDL matter, Motley Rice has kept time sheets?

16           MR. HAEFELE:  Your Honor, yes.  It's a word that I

17   consistently forget, and I complained to one of my colleagues

18   that I can't remember, but I know I used it three times when I

19   referred to that particular example, but it's just an anecdote.

20   He went -- Mr. Kabat went through and he found one situation

21   where some lawyers from Motley Rice, for a different team

22   within my firm, practicing in a different court on a different

23   matter, didn't keep time.  And they went back and they

24   recreated it.

25           But yes, in the circumstance -- I mean, like I said to

E4OP911M

1    you, we have other teams within our firm, practice groups is

2    what we call them, that keep time.  And this circumstance, you

3    know, the -- and it says so in our declaration, that the time

4    records were contemporaneously kept time records; so it's not a

5    situation that's analogous exactly to the circumstance that you

6    had in the anecdote quotation or the circumstance that

7    Mr. Kabat gave.

8              THE COURT:  Assuming it's accurate, I will want the

9    affidavit from somebody knowledgeable at each firm to say

10   what's implicit in the application, which is that summaries are

11   based on contemporaneous time records.

12             MR. HAEFELE:  And I'm assuming that from Motley Rice,

13   the one you received already is okay?

14             THE COURT:  Yes.

15             MR. HAEFELE:  Since it's signed by Motley Rice.

16             THE COURT:  Unless there's something that I conclude,

17   based on the defendant's argument, that should be supplemented,

18   that's accurate.  Anything else?

19             MR. HAEFELE:  Not unless your Honor has any -- I mean,

20   I had planned to go through each of the things, but they're

21   pretty much mostly what we said.  I would add one thing, your

22   Honor, just to give you a notion of the reasonableness of the

23   fees, or the reasonableness of the billing hours -- I'm sorry,

24   the billing rates.

25             When I went through and looked at the billing rates, I

E4OP911M

1    took the average of the billing rates that were there, and came

2    up with, I think the average billing rate was $650.

3               THE COURT:  Blended rate amongst all the firms?

4               MR. HAEFELE:  Blended rates amongst all the lawyers.

5               THE COURT:  That's what I meant, but among the four

6    applicant firms?

7               MR. HAEFELE:  I took, yes, all of the lawyers that

8    were listed on there, added them up and calculated the median,

9    and it was $650 an hour.

10              THE COURT:  Right.

11              MR. HAEFELE:  And then I went to the --

12              THE COURT:  The median or the mean?

13              MR. HAEFELE:  First off, let me say at least in the

14   sources that we cited, the median billing rate in New York

15   cited by one of the sources it was $650 an hour, $656 an hour,

16   and with some rates over a thousand, some rates tipping in at

17   almost $2,000 an hour.  Obviously, we're not there.

18              THE COURT:  Yet.

19              MR. HAEFELE:  But the median rate identified in the

20   fee petition was just slightly under $650 an hour.  But also,

21   if you added up the median number of years of experience, was

22   18.  And if you look at the Laffey rate adjusted for New York,

23   that $750 for an 18-year-experienced lawyer.

24              THE COURT:  I have the Laffey rate in that one

25   decision.  I don't consider it particularly significant.  I had

E4OP911M

1    to deal with DC rates in that case; otherwise, I would have

2    gone for my career never citing the Laffey cases.

3              MR. HAEFELE:  I understand what your Honor is saying,

4    but it happened to be something that was available to provide a

5    resource to compare different years in the different locations.

6    But I think the other sources that we cited were fairly

7    consistent with that as well.  So I think, all things

8    considered, what we provided to your Honor was a good

9    indication as to the reasonableness of the fees of the hourly

10   rates.

11             THE COURT:  Okay.  Thank you.

12             MR. HAEFELE:  Thank you, your Honor.

13             MR. KABAT:  Thank you, your Honor.  There are some

14   fundamental flaws with plaintiffs' $1 million fee petition,

15   which requires either striking it entirely or drastically

16   reducing it.  I'm going to argue with respect to Al Haramain

17   and Mr. McMahon can respond to his client.

18             First of all, we need to look at the context of this.

19   Plaintiffs are seeking $636,000 for one discovery motion as to

20   one defendant, Al Haramain.  Plaintiff had three discrete,

21   independent discovery issues that they raised.  They only

22   prevailed on one issue, arguably the least important issue, the

23   delay in producing documents.

24             Plaintiffs also sought either a default judgment or an

25   adverse inference as to Al Haramain.  Your Honor denied either

E4OP911M

1    sanction, and that's the framework we need to look at.

2              As Judge Hellerstein, handling the aviation

3    litigation, had some very appropriate words that I do want to

4    note.  He recognized that the wounds of September 11 will not

5    be easily assuaged, but neither should they be exacerbated by

6    rich rewards of fees and benign indifference to unreasonably

7    large rewards.  That's the situation we have here, and we cited

8    a number of cases where the courts have not hesitated to strike

9    entirely fee petitions that were, quote, outrageous and

10   excessive, and unsupported by adequate documentation.

11             Now, the first issue that your Honor raised was the

12   excessive rates.  You know, we cited extensive Second Circuit

13   precedent, which makes clear that in New York City there are

14   multiple legal markets.  There's the, quote, Wall Street rate

15   for corporate and securities work, the lower rates for

16   intellectual property work, and there's even lower rates for

17   the rest of us.  And that's the rate we should be looking at

18   now.

19             Plaintiff relies on newspaper articles and surveys,

20   should be entitled little weight because those surveys were

21   looking at the top 350 or top 250 law firms in the country,

22   particularly those with over a thousand attorneys.  I mean,

23   this court --

24             THE COURT:  Sorry, I -- you don't have to spend a lot

25   of time convincing me that what Cravath charges its clients is

E4OP911M

1    simply not relevant in terms of deciding what these firms

2    should be charging.  But Mr. Carter is at Cozen and O'Connor,

3    right?

4              MR. CARTER:  That's correct, your Honor.

5              THE COURT:  Which is not a small firm, by any stretch;

6    so, you know, all of the information, I suppose, potentially

7    enters into the mix in deciding what the reasonable --

8              MR. KABAT:  Well, let me move on.

9              THE COURT:  -- rate is, but I think that's probably

10   less of an issue than the reasonableness of the hours billed,

11   from your perspective.

12             MR. KABAT:  Well, Judge Peck of this court, in the

13   *Ryan* case, had it exactly right when he said that the rates

14   were created solely for the purpose of charging defendants.

15   These are not rates that the plaintiffs charged their own

16   paying clients, which is yet another reason to strike the fee

17   petition.

18             The plaintiffs in their reply brief raised the

19   argument, which is why we did a surreply, that the reason this

20   case when transferred here was, quote, largely at the

21   defendants' insistence.  Well, that was really strange because

22   I've been in this case for twelve years now, and the record of

23   the judicial panel on both sides of this litigation made clear

24   that all of the plaintiffs here today wanted the case to stay

25   with Judge Robertson in the District of Columbia, and it was

E4OP911M

1    only a few days after Judge Robertson dismissed two of the

2    deep-pocket defendants, Prince Sultan and Prince Turki, that

3    the plaintiffs suddenly switched sides at the hearing before

4    the JPML, scrambling somehow to claim that the case should be

5    consolidated in New York.  In fact, they admitted on the record

6    because of Judge Robertson's decision, that they switched

7    sides.

8              So let me turn back --

9              THE COURT:  If that's correct, assuming it is, do you

10   want me to use prevailing DC rates?

11             MR. KABAT:  Pardon?

12             THE COURT:  You're saying that, but for the

13   plaintiff's trying to get away from Judge Robertson after one

14   of his initial decisions, somebody in Washington, D.C. would be

15   having this discussion with you.  And I'm asking whether,

16   therefore, you're saying I should be applying reasonable

17   Washington, D.C. rates?

18             MR. KABAT:  No.  Actually, I'm making a slightly

19   broader point, that the plaintiffs, in their reply, chose to

20   completely misrepresent their own representation to the

21   Judicial Panel on Multi-district Litigation, which does concern

22   me.

23             The second issue I'd like to raise is that despite our

24   repeated requests, and clearly Second Circuit decisions in this

25   court, plaintiffs still have not produced their contemporaneous

E4OP911M

1    time records.  Now, Mr. Haefele claims that in his firm, well,

2    there's some practice groups that don't keep time records, but

3    we do.  I find that very hard to believe.  I've never heard of

4    a law firm where some attorneys were able to make up time as

5    they go along and other attorneys are keeping contemporaneous

6    time records.

7            THE COURT:  Well, one of the problems with producing

8    all of the time records in their original form is they then

9    have to be heavily redacted, and that's a cumbersome exercise.

10   But if you want to test the waters, I will permit you, for each

11   firm, to request the originals, appropriately redacted, for two

12   months.

13           MR. KABAT:  Well, your Honor, the redactions would not

14   need to be that great because if you notice in their

15   spreadsheet, they do give some level of detail.  So,

16   presumably, if there really are contemporaneous records, that

17   same level of detail is in those time records and --

18           THE COURT:  Well, they've represented, and I have no

19   reason to believe that they haven't verbatim copied

20   electronically entries from time sheets or that their

21   timekeeping system.  You've suggested that the summaries are

22   suspect.  The rules of evidence, if this were a trial matter,

23   say that when summaries are used rather than the originals, the

24   originals should be made available to the adverse party.

25           I'm saying if you doubt the accuracy of the summary

E4OP911M

1    charts, feel free to ask for each of the four applicant law

2    firms for two random months' worth of the original records.  I

3    mean, all of us nowadays is electronics; so original is a

4    misnomer.  But if you want to see it as it's spit out from the

5    system for particular months, for a maximum of two months, feel

6    free to do that.  And if you discover that the summaries are

7    inventions rather than accurate reproductions of the relevant

8    entries, I'm sure you'll let me know.

9            MR. KABAT:  Yes, we certainly would request the time

10   records and --

11           THE COURT:  Okay.  Well, I partly granted that request

12   and --

13           MR. KABAT:  Right.

14           THE COURT:  And I'll give you two weeks to -- well,

15   I'll give you one week to make that request, and one week for

16   the firms to respond, and a third week for you to send me a

17   further letter if you have concerns about the accuracy of the

18   tables I've been given.

19           MR. KABAT:  That's fine.  And I should mention part of

20   the reason why --

21           THE COURT:  Hang on just a minute.

22           MR. KREINDLER:  Your Honor, I have a 4:00 doctor's

23   appointment, which I thought would give me plenty of time, but

24   I'm going to have to run to that.

25           THE COURT:  No problem.

E4OP911M

1           MR. KREINDLER:  Thank you, your Honor.

2           THE COURT:  I thought you were protesting something

3      about the billing records.

4           MR. KREINDLER:  No, your Honor.  I thought I'd go back

5      and get our numbers up to a thousand, 2,000 an hour.  We're way

6      behind the times.  Thank you, your Honor.

7           MR. HAEFELE:  Can I clarify one thing on what your

8      order is?

9           THE COURT:  Sure.

10           MR. HAEFELE:  And it will be quick, I promise.  You're

11      talking about -- I just want to get a sense of what redactions

12      would be involved.  You're talking about getting billing --

13      basically the spit-outs of the records that were used to

14      generate that spreadsheets?

15           THE COURT:  For two random months that they will tell

16      you.

17           MR. HAEFELE:  Okay.

18           THE COURT:  So they can tell your firm X month and Y

19      month, and Goldman's firm, A and B months.

20           MR. HAEFELE:  I just wanted to make sure that we

21      weren't talking about us having to produce information about

22      other aspects of the case that we've already worked on.

23           THE COURT:  Well, what you would be doing for those

24      two months is producing the printout as if you were rendering a

25      bill for that month, but you would redact the subject matter on

E4OP911M

1   the entries that don't relate to the application.

2          MR. HAEFELE:  Okay.  All right.  I'm not sure how that

3   works, but okay.  There will be a lot of redaction then.  I can

4   tell you that with regard to these entries, I think the only

5   thing that might be redacted would be like names of, you know,

6   certain people that I may have met with that I didn't want to

7   provide them with the information about.

8          THE COURT:  I'm not telling you how to redact it.  It

9   may be within these entries there would also be redactions, but

10  I think it more likely would relate to other aspects of what

11  you're doing in these cases.

12         MR. CARTER:  Your Honor, could I just raise one

13  practical consideration?  There are days where I have many,

14  many time entries on a time sheet, and I think I'd want to be

15  careful about the redaction process.

16         THE COURT:  Are you talking about block billing

17  entries?

18         MR. CARTER:  No, no.  When I enter time, you know,

19  there are individual entries for as little as one-tenth of an

20  hour and two-tenths an hour.  As a consequence, the number

21  of entries in an individual day can grow quite large, and so

22  the process of vetting those to make sure that we're only

23  providing the material relevant to this dispute could take a

24  little bit more time than a week.

25         THE COURT:  Fine.  I'll modify that to two weeks.

E4OP911M

1          MR. CARTER:  That's fine, your Honor.  Thank you.

2          THE COURT:  Okay.  Go on, Mr. Kabat.

3          MR. KABAT:  Thank you.  The third issue I'd like to

4    address is the limited success.  Namely, both the Supreme Court

5    and the Second Circuit have required that the fee award be

6    proportionate to the results obtained, and the degree of

7    success is the most critical factor.  The Supreme Court has

8    said that in the case *Farrar v. Hobby*, 1992, and *Hensley v.*

9    *Eckerhart*, 1983.

10          And here, as I mentioned at the outset, plaintiff only

11    prevailed on one of three discrete discovery issues as to Al

12    Haramain.  That, alone, requires a reduction of the fee

13    petition by two-thirds, as the issues were discrete, not

14    intertwined.  Moreover, plaintiffs didn't even obtain either a

15    default judgment or an adverse inference, which requires a

16    further substantial reduction.

17          Plaintiffs completely ignored the law in their brief

18    and, instead, they relied upon a 1980 decision in their reply

19    brief.  Well, that 1980 decision is no longer good law, in

20    light of the subsequent Supreme Court decisions in Farrar and

21    Hensley.  And, I mean, they're inconsistent with views not only

22    on this issue but on every issue, to acknowledge controlling

23    Supreme Court and Second Circuit precedent is deeply troubling.

24          And the fourth factor I want to look at that

25    Mr. Haefele, perhaps wisely, skipped was their request for a

E4OP911M

1  50 percent Lodestar enhancement.  While the Supreme Court --

2           THE COURT:  I'm sorry, I missed the last thing you

3  said.  The Supreme Court?

4           MR. KABAT:  That their request for a 50 percent

5  Lodestar enhancement, but they ignored the Supreme Court.

6           THE COURT:  Let me save you some time.  There's not

7  going to be a Lodestar.

8           MR. KABAT:  Thank you.  And the last issue I want to

9  address is that, you know, neither the Court nor the other side

10 should have to put on their eye shades and spend hours going

11 through the fee petitions to identify excessive hours,

12 overstaffing, double billing, redundant work.  I spent more

13 time than I care to remember going through color coding and

14 cross-referencing of fee petitions, the fee affidavits.

15          Probably the most egregious example is routinely

16 billing five or six attorneys to attend status conferences,

17 even though only Mr. Haefele argued as to Al Haramain.  Judge

18 Hellerstein in the aviation litigation held that time sending

19 multiple attorneys to a status conference is not compensable.

20          And even then, plaintiffs billed wildly inconsistent

21 time for attending status conferences.  I mean, in one case, we

22 have the Kreindler firm billed two attorneys for one hour each

23 for a status conference only one-and-a-half page of the

24 transcript is devoted to Al Haramain.  The other firm didn't

25 even bill Al Haramain for that conference.

E4OP911M

1          The other discovery conferences have wildly divergent

2     time estimates between the firms, but all of those time

3     estimates exceed the actual time devoted to Al Haramain.  Judge

4     Patterson in this court some time ago said overbilling or

5     double billing was sufficient ground to strike a fee petition.

6     Judge Ellis also reduced fee petition for duplicative billing.

7          THE COURT:  And one thing I can assure both sides is,

8     if I conclude that there should be reductions in the bill,

9     although from time to time in fee decisions I have gone line by

10    line, here, the amounts sought and the number of time entries

11    is sufficiently large that there is no possibility that I will

12    do that.

13         If there's a haircut, it will be a percentage haircut,

14    putting aside the billing rate issue.  Certainly, that will be

15    based on my review of the time entries, but I appreciate,

16    having done it in other cases, how time consuming it is to go

17    through entries line by line, and I am highly unlikely to

18    resort to that technique in terms of deciding what, if any, the

19    appropriate number here is.  Go on.

20         MR. KABAT:  Well, your Honor, in the *Romeo and Juliet*

21    case very recently you held that a 75 percent reduction was

22    appropriate in a Rule 37 fee petition.  Judge Fox similarly

23    held a 75 percent reduction in the *Bravia Capital* case.  Judge

24    Francis, 80 percent reduction in the *Antonmarchi* case.

25         So that kind of drastic reduction, given the limited

E4OP911M

1    success, the overbilling, overstaffing, double billing, and we

2    think that a similar substantial reduction in any fee petition,

3    if any award should be made, is warranted here.  I mean, what

4    plaintiffs have done is exactly what the courts have warned

5    about.  They submitted excessive fee petitions in the hope that

6    the Court will merely reduce their fees to some slightly lower

7    amount, and the courts have decided, on Pages 4 and 5 of our

8    opposition, have not hesitated to strike fee petitions

9    entirely.  They are so outrageously excessive, as here, where

10   plaintiffs are not only seeking $636,000 for a discovery

11   motion, but throughout their fee petition and their reply

12   brief, they consistently refuse to acknowledge Supreme Court

13   and Second Circuit precedent that is directly contrary to all

14   of their argument.

15          I mean this Court would commit reversible error if it

16   grants plaintiffs what they improperly seek, which is why you

17   would be justified in striking the fee petition entirely for

18   misrepresentations of the history of this case and for its,

19   quote, outrageous and excessive demand.  Thank you.

20          THE COURT:  Before I get back to you, Mr. Haefele,

21   Mr. McMahon?

22          MR. MC MAHON:  Yes, your Honor.  Good afternoon.  How

23   are you?

24          THE COURT:  I'm well.  Thank you.

25          MR. MC MAHON:  I will be brief.  I think the fee

E4OP911M

application is excessive, and I do think case law allows you to
make a substantial cut in the application.  One of the
departure points that we have with plaintiffs counsel, and it's
obviously going to be your call, as a matter of discretion, is
I think they view this as a matter of deterrence.  And at least
the Southern District case law we saw, *Romeo and Juliet*, Page 2
of our memo, doesn't really get into that.  Maybe you can read
something like that into the award, but I think that is a
difference that we have.

        No. 2, there are, obviously, no contemporaneous time
records.  And I'm not sure if you decided this, but I think
Mr. Carter references the fact that he does have the time
sheets but never produced them.  Am I right on that?

        THE COURT:  Well, no.  Let me extrapolate from what
has been said.  I think my understanding is that each of the
firms has the electronic billing records and can spit out a
complete set of entries in chronological order to demonstrate
that the records are contemporaneous but would have to redact
from what may be many months, if not years, of time entries
those which do not relate to their present application.

        And I indicated to Mr. Kabat, and certainly the offer
is available to you as well, if you don't believe that
representation, you can ask to have two random months' worth of
entries produced such that you can see that the system is
generating something that applies to these cases as a whole,

E4OP911M

1    rather than being some artificial construct that was created

2    after the fact, which apparently was the case in the matter

3    that was before Judge Forester in another Motley Rice matter.

4          But if you or -- if you and Mr. Kabat are going to

5    make that request, I'd ask that you confer and ask for the same

6    two random months; so that you're not asking each firm to

7    collectively give you four months' worth of redacted billing

8    records.  So does that clarify where we're at?

9          MR. MC MAHON:  Yes, your Honor, and I'll accept that

10   proposal.  There is, obviously, overbilling in the application.

11   Three attorneys would show up, and Sean Carter was the only one

12   who was there to argue the case.  I'm not sure that we have any

13   basis in the record to say, oh, those other attorneys were

14   essential to bring forth the form that Mr. Carter was arguing.

15   I don't see that.

16         Travel time, I think you should knock that down at

17   least 50 percent, now that there are telephone conferences,

18   among other things that we can utilize.  Although, I know that,

19   given the nature of the proceedings, they wanted to appear in

20   front of you personally, but I think you need to knock that

21   down.

22         Hearings involving other parties, your Honor, I tried

23   to give you some examples of some excessive fee applications on

24   7 and 8 of our memorandum and various cases, including *Unlucky*

25   *Trucking* and *Romeo and Juliet*.  I think *Romeo and Juliet* had

E4OP911M

1    75 percent reduction, and then in the *Unlucky Trucking*, I think

2    they concluded, the Court concluded that 33 hours was a bit

3    much.  And in one of the cases, extraordinary, 437 hours on a

4    single rule 37 motion, that was ridiculous, and I think we

5    cited something on Page 7 to that proposition.

6            In the Leviathan case, which we stated on 8, I think

7    36 hours was held to be unreasonable.  My simple point, your

8    Honor, you know this, you've been around the track, you have

9    authority to knock the fee application down for various good

10   reasons.

11           The other departure for one of the plaintiffs, I

12   think, is I don't see how a 50 percent enhancement is available

13   to them --

14           THE COURT:  Well, you missed that part, where I

15   assured Mr. Kabat that there's not going to be a 50 percent

16   enhancement here.

17           MR. MC MAHON:  Okay, your Honor.  Well, as I get

18   older, I seem to miss more points.  So I will conclude with

19   that, and I wanted to thank you for making it available by

20   telephone conference because I couldn't get up to New York, as

21   much as I love to appear in front of you and say hello.

22           But, anyway, I think that's it, and I think, as you

23   pointed out, your Honor, we briefed this case thoroughly.  I

24   don't think there's any issue we really didn't brief for you.

25   You may disagree with our interpretation of some Southern

E4OP911M

1    District New York case law, but anyway, that concludes my

2    presentation, your Honor.  And nice chatting with you again.

3            THE COURT:  Let me just also note that some of the

4    materials I have I looked at online.  I printed out some of the

5    materials, and although I'm confident that everybody probably

6    sent me hard copy, today, I didn't see hard copies of some of

7    the documents.  And so you may receive a call from my chambers

8    asking you to send duplicate courtesy copies of one or more of

9    the submissions.

10           MR. HAEFELE:  Okay.

11           THE COURT:  Anything else we should take up today?

12           MR. KABAT:  Your Honor?

13           MR. MC MAHON:  Your Honor, just a suggestion.  I was

14   on pins and needles since 11:00 -- not pins and needles, but I

15   thought since Judge Daniels had entered his orders, we'd just

16   start with you.  I realize that my colleagues don't have their

17   cell phones; so there's no way to say, hey, Martin, we're going

18   to get together at 2:00.  It's just a housekeeping matter.  I

19   think Mr. Manning and I just decided, well, we'll wait and

20   eventually somebody will contact us.

21           MR. HAEFELE:  Your Honor, I'm not shocked that the

22   defendants think that the submission was excessive, since it's

23   their clients who presumably have to pay it.  So it doesn't

24   surprise me that they would think it was excessive.

25           THE COURT:  And I've actually never had somebody whose

E4OP911M

response was, yup, that seems reasonable.  Who do I make the
check payable to?

MR. HAEFELE:  Right.  But, you know, Mr. Kabat
indicates that we threw out these numbers in sort of a
negotiation phase.  Of course, I would respond and say they
throughout their laundry list of objections in an effort to
negotiate it down to zero.  But when push comes to shove, this
is a sanctions motion, your Honor.

This was a result of a sanctions motion, and they come
and they want it back to zero, which would make the sanction
that your Honor imposed a paper tiger.  The defendants have
done something wrong.  Mr. McMahon thinks that this is not
about deterrence, but quite frankly, that is much of what Rule
37 is about.  It's preventing the defendants from doing
obstreperous -- or preventing the parties from doing
obstreperous behavior in the course of discovery and imposing
sanctions to deter those defendants and other defendants from
doing it again.

THE COURT:  But I do think, even if that's correct --
and I'm not quarreling with you -- that, ultimately, I have to
decide what is reasonable in the circumstances.

MR. HAEFELE:  I don't disagree with that, your Honor.
I would agree with that, but in terms of -- and I understand
the way we presented it was giving your Honor the discretion
whether or not to impose a lodestar, and I understand your

E4OP911M

1   Honor's decision not to impose a lodestar, which does

2   significantly deflate the numbers that Mr. Kabat kept putting

3   out about over a million dollars.

4           And to put it in perspective, your Honor, the numbers

5   that we're looking at here, are $263,592 for Mr. Jelaidin and

6   $387,474 for Al Haramain, which are significantly lower.  Then,

7   on top of that, your Honor, is the $65,000 and some change for

8   the various briefings that went into this.

9           And, your Honor, for those, what we would propose is

10  that, to the extent you grant those, and those are hard costs,

11  I think, for the time that went into this, those should be much

12  less debatable.  But at any rate, that they be imposed joint

13  and severally.  To the extent -- What we are concerned about is

14  that there may be one defendant that may default and not pay.

15          To the extent that these briefs were done jointly for

16  both, I would have done essentially the same brief for one with

17  maybe a section of it cut out, maybe Mr. Jelaidin's section

18  wouldn't be appearing in the brief, but essentially most of the

19  law applied to both defendants.  And one defendant shouldn't

20  get the benefit of the other's default.

21          THE COURT:  That is something I will look at.

22          MR. HAEFELE:  All right.  But in terms of the

23  reduction that they've requested for the, quote, lack of

24  success.  Our goal, your Honor, the plaintiffs' goal was to

25  obtain sanctions against the defendants to deter the defendants

E4OP911M

1  from the kind of behavior.  And, quite frankly, you know, we

2  believe that we will have done that depending much on how harsh

3  the fee petition sanctions result and what the result of those

4  are.  So in a sense, whether or not we've achieved our goal

5  really depends on the message that your Honor sends in imposing

6  it.

7          In terms of the allegations of excessive hours, I

8  think there were two allegations, the overstaffing, too many

9  lawyers at conferences and the redundant work, too much

10  conferencing among the lawyers.  You know, in this case, as we

11  indicated in the briefing, your Honor, it's a hotly contested

12  case, as your Honor knows.  We're in front of you periodically,

13  probably more than you would like us to be here.  As much as I

14  know you love us, I'm sure you'd rather not see us as much.

15          THE COURT:  I don't recall ever saying I love you.

16          MR. HAEFELE:  But you love us --

17          THE COURT:  And just for the record -- Go on.

18          MR. HAEFELE:  You love us and hate us equally.  I'm

19  sorry.  But there is this need for vigorous preparation when

20  it's as hotly contested as it is, where the lawyers do need to

21  confer.  Even though we are -- even though I'm standing here

22  today, it is not just me.  I have conferred with my colleagues

23  behind the scenes.

24          The fact that one lawyer, based primarily on a CMO

25  that was entered in this case creating the plaintiffs'

E4OP911M

1    executive committees, we're obligated to, behind the scenes,

2    work together so that when we come to the court and come to the

3    defendants, we put forth, as much as we can, one voice.

4           Sometimes it can't be done, but quite frankly, all of

5    us have benefited by the almost universal aspect of, we have

6    come and either Mr. Carter or I or somebody else, presents one

7    argument primarily for the whole group.  But that doesn't mean

8    that Mr. Carter is the only one that's ever worked on it.

9           And, you know, based on what the folks on the other

10   side of the aisle have said, it seems very nice that some of

11   the other folks on the aisle are apparently showing up here and

12   not billing their clients.  I'm pretty sure that's not the

13   case.  The lawyers that come to the litigation, even though

14   they're not arguing, when they're sitting in the courtroom,

15   they are working.  And I think that the fact that they would

16   imply that these lawyers come here and shouldn't be billing for

17   their time is sort of an odd goose and gander sort of thing

18   from the other side because I'm pretty sure they're all billing

19   for their time.

20          MR. KABAT:  Your Honor, if I may to respond for one

21   minute?

22          THE COURT:  Well, let me just see whether Mr. Haefele

23   is done.

24          MR. HAEFELE:  Your Honor, the biggest -- I think there

25   were two, maybe three reductions, two that I can think of off

E4OP911M

the top of my head, that we've already done.  We've already
gone through and we've cut out -- we had, it was called to our
attention by the defendants, that we had billed full time for
travel time, regardless of whether or not work was done.

We went through and we did reduce the travel time
billing by 50 percent to the extent that work wasn't performed.
I think there was one or two instances where there were no
indication in the billing records that work -- I'm sorry, there
were one or two instances where there was indication that work
was performed.

I can candidly tell you that I know, myself, when I'm
traveling to the hearing, I'm working, because I'm preparing
for the hearing, particularly when I'm the one that's going to
be arguing.  And almost all the instances, I'm working.  But if
it wasn't represented in the billing record, we didn't bill for
it.  And maybe, this might not be the case going home, but in
all instances that's actually where the defense got a windfall.

Other circumstances, as Mr. Kabat indicated, where
there are some disputes, they don't represent instances where
the time should be cut.  They represent instances where the
defendants got the windfall, where one lawyer didn't pick up
the billing instance and put it in the submission.  I mean,
these submissions aren't all the billing records of the firms.
They are the billing records for the instances that we
identified as being related to this.  If the lawyer didn't do

E4OP911M

 1    it, didn't identify it, that's an instance where they got a

 2    windfall where the lawyer didn't ask them to pay.

 3            THE COURT:  I have never pad a circumstance where the

 4    records are pristine.  You have five people at a conference,

 5    there were different time indicators, frequently, for each of

 6    them, which can be explained by people being present for

 7    different portions of the conference or people not being

 8    completely accurate in their billing one way or another.

 9            MR. HAEFELE:  Instances where real life gets in the

10    way?

11            THE COURT:  Exactly.  So I'm mindful of all of that,

12    and all of those are factors that I will consider in deciding.

13            MR. HAEFELE:  And I just want to make sure that your

14    Honor was aware that I think there was an allegation that we

15    had charged time for -- or I'm sorry, charged expenses for

16    meals.  I don't know -- honestly, I never really figured out

17    whether that was allowed or not, but we made a conscious

18    decision to strike all the meals from that.  So the expenses

19    don't reflect meals.

20            And other instances -- there were other potentials for

21    adding billing time.  There were a number of staff members

22    that, you know, I know in a number of litigations we worked on,

23    where we have submitted billing, in securities litigation for

24    example, the paralegal work time and the staff time is

25    included.  Other than there's only one instance where one of

E4OP911M

1    the staff members was included, but by and large, I know I had

2    at least four other folks that time could have gone on, but we

3    consciously made the decision to exclude that.

4          So there has been some, if you will, some haircutting

5    done already, in addition to the haircutting where we went and

6    we cut off about $20,000 when we did the re-revision.  We cut

7    down some of it by 50 percent on the travel time and some other

8    things.  But in terms of having multiple lawyers here, again,

9    you know, we're representing multiple plaintiffs on a multiple

10   PEC's and having multiple lawyers here, the same way the

11   defendants have -- Randy has two lawyers here today.  It's not

12   unheard of and it's not a particularly deciding issue.

13         THE COURT:  Thank you.

14         MR. KABAT:  I'll be very brief.  Mr. Haefele, for the

15   first time, did suggest that there might be joint and several

16   liability, which I think he means that somehow Al Haramain

17   might be liable for Mr. Jelaidin.  Is that what you meant?

18         MR. HAEFELE:  I'm not sure I understood the question.

19         MR. KABAT:  You made the issue of joint and several

20   liability.

21         MR. HAEFELE:  Oh, I was purely speaking responsibility

22   for payment of that portion, not joint and several liability

23   for the litigation.  I think he's referencing --

24         THE COURT:  Well, let's assume that -- and I have not

25   looked through the billings.  I have no preconceived notion,

E4OP911M

1    but let's —— I'll take a very low number.  Let's assume that I

2    conclude that one defendant should pay 50,000 and the other

3    should pay 40,000.  You're saying that if one of them defaults,

4    the other should pay 90?

5                MR. HAEFELE:  No.

6                THE COURT:  That was, I think, what Mr. Kabat's

7    understanding ——

8                MR. HAEFELE:  Maybe I was unclear and, hopefully, the

9    transcript bears out what I said, but let me reiterate what I

10   meant.  There's really, as I see it, three portions of the

11   award, if you will.  There's one portion of the award that is

12   for Al Haramain for the time and expense of the Al Haramain

13   sanction proceedings.  There's the time and expense for the

14   Wael Jelaidin sanctions proceedings, and then there is the time

15   to prepare the briefs related to what we're here for today.

16   And that was done —— I mean, it was related equally to both of

17   them, for the most part.

18               THE COURT:  So you're saying for that last piece of

19   it, you're seeking joint and several ——

20               MR. HAEFELE:  Responsibility, if you will.

21               THE COURT:  It's really you're just saying —— Well,

22   yes.  What you're seeking is joint and several liability such

23   as if Al Haramain doesn't pay, Jelaidin would or vice versa.

24               MR. HAEFELE:  That's correct, your Honor.

25               THE COURT:  As to that piece?

E4OP911M

1          MR. HAEFELE:  As to that piece alone, yes.

2          MR. KABAT:  I appreciate that clarification.  Since

3     according to their spreadsheet, the time for the fee petition

4     is only five percent, roughly, of the total fee; so we're

5     talking about a microscopic amount.

6          Now, Mr. Haefele claimed that between the original fee

7     petition and the reply brief, they made some reduction.  Your

8     Honor, that was a microscopic reduction.  It was under five

9     percent, which in the context of a million dollar fee petition,

10    isn't much, unfortunately.

11         Mr. Haefele mentioned the issue of conferencing and

12    the different time involved.  What I don't understand is how

13    one firm can claim several hours for a plaintiffs' executive

14    committee conference that no other firm even recorded.  So that

15    clearly calls into question the nature of what was billed, how

16    it was billed, and which is why we're looking forward to seeing

17    the contemporaneous time records from all four firms.

18         THE COURT:  Okay.  I've given you those.

19         MR. KABAT:  That's why we're looking forward to seeing

20    them.

21         THE COURT:  Is there anything new you wish to add?

22         MR. KABAT:  Thank you.

23         THE COURT:  Okay.

24         MR. KABAT:  One issue, your Honor.  Judge Daniels set

25    a status conference on July 15 at 11:00; so we would suggest

E4OP911M

1     that the next discovery status conference be on the same day

2     following the conference with Judge Daniels, however long that

3     takes, if your Honor is free on that day, July 15th at

4     11:00 a.m.

5          THE COURT:  I'm in California that day; so that

6     doesn't work for me.

7          MR. CARTER:  Your Honor, I was just going to mention

8     that we may have a need or reason for a conference before that.

9     I don't know specifically right now.  My suggestion would be

10    that if that need arises, we'll just write to the defendants

11    and try to reach an agreement.

12         THE COURT:  Okay.  But it probably would be useful

13    to -- I know the summer it's not an easy time.  I'm going to,

14    just so that we have some time reserved, set July 21, which is

15    a Monday, at 2:00 p.m.  I'll be glad to cancel that if there

16    are no issues.

17         MR. HAEFELE:  What time, your Honor?

18         THE COURT:  2:00.  That way, people don't have to

19    travel on a Sunday if they're coming.  And I don't know whether

20    everybody had their calendars, I suspect not.

21         MS. BERGOFFEN:  Actually, I have a conflict that day,

22    your Honor, but if it's possible, to move it.  If not, I could

23    see if somebody else can cover it.

24         MS. HENRY:  Likewise, your Honor.  There are two

25    different attorneys that have conflicts in our office on that

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

E4OP911M

```
 1   day.  If it could be moved, that would be great.

 2             THE COURT:  Let's see.  I have a trial starting the

 3   22nd.  July 10th at 2:00 p.m.  That's a Thursday.

 4             MR. KABAT:  At what time?

 5             THE COURT:  2:00 p.m.  And what I may do is confer

 6   with Judge Daniels and see whether he has availability that

 7   morning, so that it's all on the same day, but I just can't

 8   rearrange my schedule to be available on the 15th.

 9             MR. MOHAMMEDI:  Your Honor, I don't have my calendar

10   here; so I won't be able to confirm if I have conflict or not.

11             THE COURT:  Okay.  We're probably not going to have

12   complete unanimity, in any event.  Okay.  Thank you all.

13             MR. HAEFELE:  Your Honor, one last thing.

14             THE COURT:  Yes.

15             MR. HAEFELE:  It's just short.  Hopefully this might

16   help.  I'm not sure.  But a variety of numbers were bandied

17   about.  I would like to give you the number that the plaintiffs

18   are looking for, without -- I understood you said no

19   enhancement, if I can just give you those numbers and you,

20   obviously, can do as your Honor --

21             THE COURT:  Sure.  Why don't you do that -- in fact,

22   rather than spreading it on the record, when you make the

23   other -- You're not making a submission to me, but why don't

24   you send me a letter that has the numbers.

25             MR. HAEFELE:   Okay.  All right.
```

E4OP911M

1          THE COURT:  Okay?  Thank you.

2          MR. HAEFELE:  Thank you, your Honor.

3          (Adjourned)