E4OP911O

```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   IN RE:  TERRORIST ATTACKS              CASE NO.
            OF SEPTEMBER 11, 2001          03 MD 01570 (GBD)
4
    ------------------------------x
5
                                          New York, N.Y.
6                                         April 24, 2014
                                          11:42 a.m.
7
    Before:
8
                       HON. GEORGE B. DANIELS,
9
                                          District Judge
10
                           APPEARANCES
11
    COZEN O'CONNOR
12      Attorneys for Plaintiffs Federal Insurance Company and Tig
    Insurance Co.
13  BY:  SEAN P. CARTER, ESQ.
         J. SCOTT TARBUTTON, ESQ.
14

15  MOTLEY RICE
        Attorneys for Plaintiffs
16  BY:  ROBERT T. HAEFELE, ESQ.

17

18  KREINDLER & KREINDLER, LLP
        Attorneys for Plaintiffs
    BY:  JAMES P. KREINDLER, ESQ.
19

20  ANDERSON KILL & OLICK, PC
        Attorneys for O'Neill Plaintiffs and the Plaintiffs'
21  Executive Committee
    BY:  JERRY S. GOLDMAN, ESQ.
22

23

24  LAW OFFICES OF MELLON, WEBSTER, & SHELLY, PC

25      Attorneys for Plaintiffs
    BY:  THOMAS E. MELLON, III, ESQ.
```

E4OP911O

```
 1                   APPEARANCES (Continued)

 2   BERNABEI & WACHTEL, PLLC
          Attorneys for Defendant, Abdul Rahman Al-Swailem
 3   BY:  ALAN R. KABAT, ESQ.

 4
     LAW FIRM OF OMAR T. MOHAMMEDI, LLC
 5        Attorney for Defendant, WAMY
     BY:  OMAR T. MOHAMMEDI, ESQ.
 6

 7   CLIFFORD CHANCE US LLP
          Attorneys for Dubai Islamic Bank
 8   BY:  RONI E. BERGOFFEN, ESQ.

 9
     LEWIS BAACH, PLLC
10        Attorneys for Muslim World League (MWL) and International
     Islamic Relief Organization (IIRO)
11   BY:  AISHA E. R. HENRY, ESQ.

12
     SALERNO & ROTHSTEIN
13        Attorneys for Yassin Abdullah Kadi
     BY:  PETER C. SALERNO, ESQ.
14        AMY ROTHSTEIN, ESQ.

15
     MARTIN F. McMAHON & ASSOCIATES
16        Attorneys for Defendants, Jelaidin, etc.
     BY:  MARTIN F. McMAHON, ESQ.  (PRESENT VIA TELEPHONE)
17

18   MANNING SOSSAMON
          Attorney for Defendant, Sanabel Al Kheer
19   BY:  CHRISTOPHER MANNING, ESQ.  (PRESENT VIA TELEPHONE)

20

21   GOETZ & ECKLAND, PA
          Attorneys for Defendants, World Assembly of Islamic Youth
22   and World Assembly of Muslim Youth
     BY:  FREDERICK J. GOETZ, ESQ.
23

24

25
```

E4OP911O

1          (In open court)

2          (Case called)

3          THE COURT:  The court reporter has everybody's

4    appearance.  Let me do this first.  Magistrate Judge Maas is

5    not going to join us, but I spoke to him and he's having a

6    conference after to further coordinate moving forward with the

7    discovery.

8          Let me first ask, and I'll start with the plaintiffs,

9    before I address the motion with regard to the immunity,

10   sovereign immunity motion, let me see where we are and see if

11   there are any other issues that we need to address before then.

12   Let me start with the plaintiff, and just identify yourselves

13   for the court reporter when you speak.

14         MR. CARTER:  Good morning, your Honor.  Sean Carter

15   from Cozen, O'Connor, on behalf of the plaintiffs.  I think,

16   from our perspective, Magistrate Judge Maas has been doing a

17   very effective job at trying to move the discovery process

18   forward.  We have presently a date in place for a number of the

19   defendants to complete outstanding productions of documents.

20   At which point, I think we'll evaluate what the schedule

21   dictates going forward.

22         Besides that, as we mentioned in our letter, there are

23   two cert petitions now pending before the Supreme Court.

24   Plaintiffs brought one with regard to the Second Circuit's

25   rulings on personal jurisdiction and the standards of liability

E4OP911O

1   under the Anti-terrorism Act.

2            That petition was then referred by the Court to the

3   Solicitor General for the views of the United States.  We would

4   normally expect the Solicitor General to file its amicus brief

5   somewhere in the mid-May period.  At which point, then, the

6   matter would essentially be ripe for the Court to resolve

7   whether to grant cert or not, and we would expect a decision on

8   that petition in June.

9            Briefing on the Kingdom's -- Kingdom of Saudi Arabia's

10  separate cert petition is going to conclude near the end of May

11  as well, and we would expect that to be considered at a

12  conference of the Supreme Court in June also.

13           And for those reasons, we had suggested that it might

14  make sense to at least put a conference on the calendar for

15  July, in case those results dictate that there's a need for a

16  dialogue between the parties and the Court, just with the

17  understanding that if whatever happens doesn't necessitate a

18  hearing, we can always cancel it, but the number of parties

19  sort of dictates that we try to be thoughtful in advance.

20           THE COURT:  Why don't I go ahead and tentatively

21  schedule a July 15th conference.  Tuesday, July 15th at 11:00.

22           What's the status of the jurisdictional discovery, as

23  a result of the previous Second Circuit briefing?

24           MR. CARTER:  Your Honor, there were a dozen or so

25  defendants remanded for jurisdictional discovery by the

E4OP911O

```
 1    decisions issued in April.  We promptly propounded discovery on
 2    them.  The deadline for completion of their document
 3    productions is aligned in with deadline for the merits
 4    discovery for defendants to complete their document production.
 5    My recollection is that those productions presently are due by
 6    the end of June.
 7            THE COURT:  Okay.  And then so what's the timetable on
 8    that, in terms of further review of jurisdiction.
 9            MR. CARTER:  What we've discussed generally with Judge
10    Maas at this point is that there would probably need to be a
11    window following the completion of document productions for the
12    parties to evaluate the materials produced.
13            There's a need to do a fair number of translations in
14    this setting, and so once we have the complete package of
15    documents, we intended to confer with Judge Maas to set a
16    window for purposes of evaluating it, file any necessary
17    motions to compel dictated by the nature of the productions,
18    and then move forward with everything else and try to set a
19    concluding deadline for all discovery proceedings.
20            THE COURT:  So at this point, you do not have a date
21    for filing of briefs?
22            MR. CARTER:  We do not, your Honor.
23            THE COURT:  And the date for completion of discovery,
24    for the jurisdictional discovery is when?
25            MR. CARTER:  We don't have a date for completion of
```

E4OP911O

```
1    all judicial discovery.  We have a date for completion of
2    document production by all parties, which is the end of June.
3    And we have discussed with Judge Maas that we would meet with
4    him shortly before that to try and set some further dates based
5    on how things had proceeded over the periods of months
6    preceding that deadline.
7              THE COURT:  What would you anticipate that this point?
8              MR. CARTER:  It's difficult for us to predict, your
9    Honor, because some of the defendants suggested that near the
10   deadline, we may be receiving as many as hundreds of thousands
11   of documents.  So we really, sort of, need to see what that
12   embodies, at which point we'll be in a better position.  We're
13   hopeful that we'll be in a position to spend a relatively brief
14   window of time doing the necessary motions to compel at the end
15   of the document production and, in certain cases, maybe be
16   moving forward with depositions on a parallel track.
17             THE COURT:  All right.  So then, are there any other
18   outstanding issues that, from the plaintiffs' perspective, that
19   need to be addressed here as opposed to before Judge Maas?
20             MR. CARTER:  No, your Honor.  I think we intended to
21   address most of these scheduling issued with Judge Maas in his
22   role of managing discovery in the near future.
23             THE COURT:  Let me turn to the defense.  Are there any
24   issues that need to be addressed, other than the motions?  No?
25   All right.
```

1          So I've been, obviously, in close contact with

2    Magistrate Judge Maas and, as you say, he's moving forward

3    efficiently with the discovery.  So what I think we'll -- as I

4    say, I've already scheduled the July 15th date for 11:00, and

5    then you can give me letters before that date as to whether or

6    not we should have that conference, and if we are to have that

7    conference, what issues that should be addressed at that

8    conference.

9          So I guess, then, we can go straight into the motion.

10   Who is going to argue the motion?  Mr. Kabat?  Yes, sir.

11         MR. KABAT:  Good morning, your Honor.  Allen Kabat on

12   behalf of Dr. Al-Swailem.  There are two reasons why this Court

13   should dismiss Dr. Al-Swailem, who is the former head of both

14   the Saudi Red Crescent and the Saudi Joint Relief Committee.

15         First, he's entitled to common law sovereign immunity,

16   as all of the plaintiffs' allegations against him relate solely

17   to his role as an official of the Saudi government.  Plaintiffs

18   have consistently pled that both the Saudi Red Crescent and the

19   Saudi Joint Relief Committee are agencies or instrumentalities

20   of the government; the allegations are solely as to his

21   official acts.  The Saudi government, through its Ambassador,

22   have properly invoked immunity on his behalf.  The scope of

23   common-law sovereign immunity is actually broader than that

24   immunity under the Foreign Sovereign Immunity Act, because the

25   statutory exceptions under the FSIA do not apply to common-law

E4OP911O

1  sovereign immunity.  That's why this Court lacks subject matter

2  jurisdiction under rule 12(b)(1).

3  Secondly, the plaintiffs cannot sue Dr. Al-Swailem

4  because the real parties in interest are the Saudi Red Crescent

5  and the Saudi Joint Relief Committee, and one cannot circumvent

6  their undisputed immunity under the Foreign Sovereign Immunity

7  Act by suing Dr. Al-Swailem for his official acts.

8  Let me turn to the lack of subject matter

9  jurisdiction.  As a threshold matter, plaintiffs have never,

10 never disputed that the Saudi Red Crescent and the Saudi Joint

11 Relief Committee are agencies and instrumentalities of the

12 Saudi government, and they are covered by the FSIA.  Although

13 the plaintiffs did argue that the tort exception to the FSIA

14 applied to those two entities, the Second Circuit held that

15 they were covered by the FSIA and the tort exception did not

16 apply.

17 Although plaintiffs did file cert petitions with the

18 Supreme Court as to the Second Circuit's other two decisions,

19 they did not do a cert petition as to the Saudi Red Crescent

20 and the Saudi Joint Relief Committee; so that decision is

21 final.

22 Plaintiffs' opposition, which now argues that the

23 Saudi Red Crescent and the Joint Relief Committee are, quote,

24 private charities, or quote, non-governmental organizations, is

25 contrary to the Second Circuit's decision which is the law of

E4OP911O

1    the case.  In fact, plaintiffs did not even argue that

2    commercial-activities exception to the FSIA; so plaintiffs

3    cannot now argue that these agencies are private charities.

4         Let me say a few words about why common-law sovereign

5    immunity is actually broader than the immunity under FSIA.  The

6    Supreme Court, in the 2010 decision in *Samantar*, held that FSIA

7    does not cover individual officials through the change in the

8    law.

9         Now, critically, the scope of common-law immunity is

10   broader than the immunity of the agencies like the Saudi Red

11   Crescent, because the commercial exception or the tort

12   exception in the FSAI do not apply at all to common-law

13   sovereign immunity.  The Supreme Court, in its *Samantar*

14   decision, cited a decision from the Southern District case

15   called *Greenspan v. Crosbie*, for the proposition that even if a

16   foreign state could be liable on a contract claim, the

17   individual foreign official would not be liable under

18   common-law sovereign immunity because you don't have the

19   statutory exception.

20        And, indeed, the U.S. government, when it submitted

21   its brief to the Supreme Court in the first appeal of this

22   case, that's the *Federal Insurance v. Saudi Arabia* appeal back

23   in 2009, similarly wrote that the executive branch continued to

24   recognize the immunity of foreign officials for their official

25   acts in circumstances even in which the foreign state would be

E4OP911O

1    liable.  And, again, the U.S. government in that Supreme Court

2    brief cited the *Greenspan* case.

3         And there are two ways that this Court can determine

4    common-law sovereign immunity.  The Court could either rely

5    upon a submission from the Department of State, or if the

6    Department of State shall not decide to submit one, then the

7    Court can simply determine, quote, whether the ground of

8    immunity is one which it is the established policy of the

9    government to recognize.

10        And the Second Circuit, in the *Heaney v. Spain* case,

11   explained that when the State Department didn't submit an

12   affidavit, then you can rely on an affidavit from the

13   Ambassador of the defendant's home country.  That's what we

14   have done as Exhibit 4 to our motion to dismiss, that the

15   Ambassador of the Saudi government to the U.S. government, who

16   explains that Dr. Al-Swailem was a government official, who

17   acts as the head of Saudi Red Crescent and Saudi Joint Relief

18   Committee, for official acts on behalf of the government.

19        THE COURT:  Let me interrupt you there because this is

20   the real critical issue, first, defining what the acts are that

21   are at issue.  It does not appear to me to be an appropriate

22   analysis in the abstract simply based on his position or role

23   or his general governmental function.

24        Isn't the real issue whether or not the acts that they

25   accuse him of, themselves, that those acts provide some

E4OP911O

```
1     immunity because those are the acts of the government?  What

2     conduct do you say he has immunity for?  Because I look at it

3     as a question of what conduct that you say he should have

4     immunity for rather than his status as a government official.

5          He's not being -- currently their position is that

6     he's not being sued in his official capacity.  He is being sued

7     personally and individually for conduct that is not official

8     conduct that would fall under any governmental function.  So

9     what is the conduct that you -- how do you define the conduct

10    that you say is protected by sovereign immunity?

11         MR. KABAT:  That's true, your Honor, but here the

12    plaintiffs specifically pled in their complaint in the initial

13    statements and all the acts of Dr. Al-Swailem were in his

14    official capacity.  Now, in their opposition motion to dismiss,

15    plaintiffs attempted to contradict their own pleadings by

16    saying for the first time that these acts were not in his

17    official capacity, but were in his personal capacity.

18         But for purposes of the motions that we have to look

19    at the allegations in the complaint and the RICO statement,

20    which made clear that the plaintiffs theory indicates that if

21    everything else Swailem did was in his official capacity, and

22    they presented no evidence in their RICO statement of their

23    complaint to overcome that.  And secondly --

24         THE COURT:  Well, do you recognize that distinction?

25    Would you have any argument?
```

E4OP911O

1           MR. KABAT:  Pardon?

2           THE COURT:  Would you have any argument if they had

3    not -- if they're alleging that he's being sued in his personal

4    capacity?

5           MR. KABAT:  Well, the only act the plaintiffs alleged

6    related to Dr. Al-Swailem is that he made the decision to hire

7    someone, a fellow named Wael Jelaidin, as the director of the

8    Saudi Joint Relief Committee.  However, plaintiffs' RICO

9    statement as to Wael Jelaidin makes no mention of either the

10   Saudi Red Crescent or the Saudi Relief Committee.

11          Even that one allegation that he hired Mr. Jelaidin

12   does not help plaintiff on long-settled law.  The Second

13   Circuit, in the *Heaney* decision, held that government officials

14   are covered by sovereign immunity.  In other words, they're

15   immune to individual liability for their hiring or employment

16   decisions, but the plaintiff cannot really circumvent sovereign

17   immunity of a state by suing individual officers for a hiring

18   decision that they made, which is what the U.S. government

19   recognized its brief to the Second Circuit in the *Matar* appeal.

20          THE COURT:  So are you limiting the conduct that they

21   are basing their lawsuit against him individually on -- your

22   limiting it to the hiring?  I mean, I understand your argument

23   that hiring someone on behalf of the government entity can be,

24   and probably is, an official act.  But it seems to me -- and

25   I'll have them articulate it.  It seems to me that the

E4OP911O

1    determinative issue is what you hire him to do, what you allow

2    him to do, and what you participate and knowingly participate

3    in the acts which they say caused them injury.

4           MR. KABAT:  Well, your Honor, while the plaintiff may

5    have a claim against the individual who did cause them injury,

6    they do not have a claim against any sovereign official who

7    simply made a hiring or other employment decision.

8           THE COURT:  Well, but that's true of any -- I mean,

9    that's, as they say, that's a truism in the abstract.  It's

10   clear to me that they're going to have to give me a little bit

11   more than simply saying that it has been determined that the

12   entities are government entities entitled to sovereign

13   immunity.  He, in his capacity as an official of the government

14   entity, decided who to hire; so, therefore, we want to sue him,

15   and he doesn't have sovereign immunity for who he hires.

16          Well, they've got to tell me a little bit more than

17   that.  The case is not about just that.  If it was about just

18   that, it's clear that a hiring decision, in and of itself, by

19   itself, is not an act which would be in any way characterized

20   as an act, other than an official act, on behalf of the

21   sovereign if he is employed by the sovereign and the power to

22   appoint employees is given to him by the sovereign.

23          The difficulty that I'm having is that it seems to me

24   that your argument is too narrow and their argument is too

25   expansive.  It's not just limited to who he hired, and that

E4OP911O

```
1    doesn't cover everything he did as a government official.  So
2    there's got to be something in between.  As I say, I'm trying
3    to -- the way the case is being articulated now, and I think
4    appropriately because given the developments in the law just in
5    these cases, is that in order to sue him, they have to sue him
6    in his individual capacity, not in his official capacity.  And
7    they have to sue him for acts which are not considered to be
8    acts of the sovereign.  Would you agree with that?
9         Now, they may or may not agree with that.  I'll see if
10   they agree with it, but that's where I'm starting.  Okay?  So
11   that somebody has to clearly define for me on this record what
12   other activities that we say it's limited to, it excludes, it
13   includes.
14        MR. KABAT:  That's a correct way of looking at the
15   law, but the problem here is that the plaintiffs did not sue
16   him in his individual capacity for things that he took outside
17   the scope of his official duties.  Instead, if you look back at
18   the complaint and official statement, they made clear that they
19   were suing him in his official capacity as the head of the
20   Saudi Red Crescent and the Saudi Joint Relief Committee, and so
21   that's why the common-law sovereign immunity applies in this
22   context.  Plaintiffs did not allege that he took acts that were
23   contrary but outside the scope of his duties, and in fact, the
24   affidavit from the Saudi ambassador makes that clear, too, that
25   what Dr. Al-Swailem did was in his official capacity.
```

E4OP911O

```
 1          Now, plaintiffs, in their opposition, claimed the
 2    guidance from the State Department is required.  However, the
 3    Supreme Court in the Second Circuit has held that sovereign
 4    immunity can be decided without the U.S. government's views.
 5    That goes way back to 1945, the Mexico v. Hoffman case; 1983,
 6    the Verlinden v. Nigeria case; 1969, the Heaney v. Spain case.
 7          And, in fact, counsel for the Ashton plaintiffs in
 8    this court represented plaintiffs in other terrorist financing
 9    litigation in the Eastern District of New York, Rosenberg v.
10    Lashkar.  And in that case, the Ashton plaintiffs' law firm
11    demanded that the Eastern District judge, Judge Irizarry, get
12    the views of the Department of State.  Well, she made that
13    request.  It took the State one year to respond, and then State
14    explained in their brief that the individual defendants were
15    entitled to common-law immunity.  That's Exhibit 1 in our reply
16    brief.  But the Kreindler firm repudiated the State submission.
17          THE COURT:  Well, they didn't get the answer that they
18    wanted.  I understand that, but -- and I understand what
19    happened -- I mean, I understand the record in that case, but
20    doesn't that -- I mean, look, I'll tell you exactly what my
21    rationale is.  You've made a tactical decision.  That's what
22    you decided.  You decided you didn't want to ask the State
23    Department what they thought.
24          So whether they repudiated it in Judge Irizarry's case
25    in the decision by the State Department, you're not even taking
```

E4OP911O

1    a chance that you're going to get an adverse decision by the

2    State Department.  You want to avoid them altogether.  So you

3    don't have the benefit of saying to me that you went to the

4    State Department, they say that your guy is entitled to

5    immunity; so therefore, that should decide the issue.

6         You don't want to know what they think.  You want to

7    know what I think they think.  I understand that, but that puts

8    you in the situation that what I must determine, and I'll take

9    it right out of Hobby.  What I must determine is whether or not

10   the ground of immunity that you are urging is one which is the

11   established policy of the Department to recognize.  Isn't that

12   the standard that I'm supposed to use?

13        MR. KABAT:  That's correct.

14        THE COURT:  Okay.  So where do I look?  Give me a

15   similar circumstance that demonstrates the established policy

16   is to grant immunity in this type of situation.

17        MR. KABAT:  Well, probably the best example is the

18   case I just mentioned out of the Eastern District of New York,

19   where the State Department submitted its view in the terrorist

20   financing case, where it involved much closer allegations

21   between the individual defendants and the alleged terrorism.

22   And in that case, the State Department explained -- it's

23   Exhibit 1 in our reply brief -- that the individual defendants

24   were entitled to common-law immunity.  Let me check that in the

25   brief.  Starting on Page 7 of Exhibit 1 to our reply brief,

E4OP911O

```
 1    where it says:  The State Department discussed it at great

 2    length here.  The position of common-law sovereign immunity of

 3    the two individual defendants, and recognizing that in some

 4    cases -- this is on Page 9 -- in some cases, the Department of

 5    State may conclude that the conduct was not in the official

 6    capacity such as purely private acts.  However, the State

 7    Department goes on to explain that while they're expressing no

 8    views as to the merits of these plaintiffs' claims, the

 9    plaintiff allegations were based on the official acts of those

10    two individual defendants.  So that's based on this submission

11    is one example of what the Court can look to.

12            In our motion to dismiss, we also cite the State

13    Department's submission to the Second Circuit in several other

14    cases, including the *Matar v. Dichter* from 2009, the *Kensington*

15    *v. Itoua*, which I think was in 2007.  Those are in our motion

16    to dismiss, but those are the source of where the State

17    Department has said, repeatedly explained, that the common-law

18    sovereign immunity, not only broader immunity under FSIA, but

19    it also covers the official acts of the individual sovereign

20    official.

21            THE COURT:  I understand your argument that it is

22    broader, but I'm not sure what you mean by that.  In what way

23    do you want me to make it easier for you?  Broader, you give me

24    almost synonymous with easier.  In what way are you saying that

25    a broader interpretation of sovereign immunity is relevant
```

E4OP911O

1    here?

2          MR. KABAT:  The reason that's important is because if

3    the plaintiffs had alleged that Dr. Al-Swailem engaged in

4    tortious conduct, then if we were under the FSIA, that we might

5    be talking about the tort activity exception.  And, of course,

6    here, both this Court and the Second Circuit, found that that

7    tort exception didn't even apply.

8          THE COURT:  Right.  So I don't know why there would be

9    any comparison at all.  I mean, it's not -- there's not a more

10   limited analysis.  That analysis doesn't apply to individuals.

11   That's what the Court said.  It didn't say that there's a

12   broader analysis that applies.  It says that Congress did not

13   intend for that statutory scheme to cover individuals.  That's

14   what they determined.

15         So I see it being inapplicable, but I don't see why --

16   in what sense you're saying that that is a relevant broader

17   interpretation that somehow makes it easier for me to rule in

18   your favor.

19         MR. KABAT:  Because there are no exceptions to

20   common-law sovereign immunity for official acts.  None.

21         THE COURT:  All right.  Okay.  I understand that.  I

22   mean, there's never been, and I don't think anybody's arguing

23   that there's such an exception.  The question is whether or not

24   the acts that are at issue are acts of the sovereign.  Isn't

25   that really still where we come back to?  I mean, I see that as

E4OP911O

```
 1    a different analysis.  I don't see that as a broader analysis.

 2    I'm not sure in what way that's a broader analysis.

 3            I mean, I have to remind myself of Judge Irizarry's

 4    case.  Again, what I was focused on, what was the activity that

 5    the Pakistani officials were involved in that the State

 6    Department said that that was official state action entitled to

 7    immunity.  That's the real comparison that I'm looking for.  I

 8    don't get, just because they said in that case, it's, quote, a

 9    terrorist case, and we say that these officials have immunity.

10    That's not really the policy that I'm looking for.

11            I'm looking for, well, why did they say?  What is the

12    nature of the conduct that they say puts that in the area of

13    sovereign immunity, and is that what we are comparably dealing

14    with here in terms of the activity?  What is -- How is what the

15    Pakistani -- remind me of what the Pakistani officials were,

16    what conduct was at issue.  Because my recollection was that I

17    tried to compare what the State Department said about their

18    activities and compare it to what the plaintiffs are arguing

19    about the activity here.  I don't necessarily think that

20    they're equal or the same, that it's the same acts.

21            MR. KABAT:  We think the conduct that was alleged in

22    that Pakistani case was far more egregious as to those two

23    individual defendants in the Pakistani case than what

24    plaintiffs allege here, which is that Dr. Al-Swailem made a

25    hiring decision and hired someone to be the director for the
```

E4OP911O

1    Saudi Joint Relief Committee.

2          Plaintiffs allegations in that Eastern District case

3    go far beyond, far more detail than what we have here with

4    Dr. Al-Swailem.  So the fact that the Department of State would

5    recognize common-law sovereign immunity as to those two

6    Pakistani defendants, who did far great worse things in much

7    greater detail than we have here.  If this Court were to wait

8    one year for the State to come into this case, the result would

9    be the same.

10          THE COURT:  All right.

11          MR. KABAT:  And let me just wrap up in a minute or

12   two.  I want to alert this Court to a recent decision by Judge

13   Schofield in a case called *Smith Rocke v. Venezuela* in the

14   Southern District of New York, January 27, 2014.

15          THE COURT:  I'm sorry, I didn't hear you.  Who's

16   decision did you say it was?

17          MR. KABAT:  Pardon?

18          THE COURT:  Whose decision did you say?

19          MR. KABAT:  Schofield.

20          THE COURT:  Oh, Judge Schofield.

21          MR. KABAT:  She recently held the individual

22   defendants, who are officials of the country of Venezuela, had

23   to be dismissed from that case, since the real party in

24   interest was the country of Venezuela, which was immune under

25   the FSIA.  She explained that under *Samantar*, plaintiff could

E4OP911O

1   not avoid or circumvent the Foreign Sovereign Immunity Act

2   through, quote, artful pleadings by trying to name the state

3   official, in his official capacity, when the action was clearly

4   against the foreign government -- the foreign agency, as the

5   real party in interest.

6          THE COURT:  Well, that argument seems to me to be

7   somewhat certain because it seems to me that -- I don't know

8   how to analyze whether or not the sovereign is the real party

9   in interest without first concluding that the individual was

10  acting in his official capacity involved in purely official

11  acts.  So, I mean, it's sort of a circular argument.  I don't

12  know how one can go without the other.

13         I don't know a scenario that you could give me that

14  they could not be the real party in interest if I accept the

15  argument that he was taking an official act in his official

16  capacity.  Well, if he was taking an official act in his

17  official capacity, I don't need to worry about who's the real

18  party in interest.  He's got an interest.  If he's not, then

19  he's sued for official acts in his official capacity, and if

20  they're seeking individual damages against him for his

21  individual conduct, then they're not the real party in

22  interest.

23         So I'm not quite sure how that's a separate analysis

24  that takes us anywhere.  Because we have to resolve those

25  issues before we even get there, and resolving those issues,

E4OP911O

1    that defines whether or not he gets sovereign immunity

2    independently, seems to me.

3         MR. KABAT:  Let me respond.  First of all, plaintiffs

4    did not sue Dr. Al-Swailem in his individual capacity; so

5    they're not going to get any damages from him personally.

6    Instead, by suing him in his official capacity, the only way

7    they can get damages is from the agencies, the Saudi Red

8    Crescent and Saudi Joint Relief Committee, both of which this

9    Court and the Second Circuit have held they're immune.

10        Now, the Supreme Court in the *Samantar* case, as well

11   as the earlier case, called *Philippines v. Pimentel*, back in

12   2008, held that a case could not go forward against an

13   individual if the foreign state or its agency -- here the Saudi

14   Red Crescent and the Saudi Joint Relief Committee -- were

15   required parties.

16        Yet, plaintiffs have conceded that they cannot go

17   forward against the Red Crescent and the Saudi Joint Relief

18   Committee.  We know that because they didn't file a circuit

19   petition as to those two agencies.  That alone requires

20   dismissal on the claims against Dr. Al-Swailem.

21        And, finally, both the Supreme Court and the Second

22   Circuit have made clear that sovereign immunity, whether we're

23   talking about common-law sovereign immunity or immunity under

24   the FSIA, is immunity from suite, not just immunity from

25   liability.  Subjecting Dr. Al-Swailem to extensive discovery

E4OP911O

1   into the operations of the Saudi Red Crescent and the Saudi

2   Joint Relief Committee violates that well-settled principle.

3          Exhibit 5 to our motion to dismiss is the plaintiffs'

4   document request to Dr. Al-Swailem.  They submitted 113

5   document requests.  Just over a hundred of them were about the

6   operations of the Saudi Red Crescent and the Saudi Joint Relief

7   Committee, particularly, communications that those agencies had

8   with other Saudi government agencies.  Fewer than ten of those

9   document requests are actually deemed what might be

10  Dr. Al-Swailem's personal documents.  That is contrary to what

11  the Second Circuit in *Robinson v. Malaysia* case that held you

12  do not subject individual sovereign defendants to that kind of

13  discovery.

14         And, finally, plaintiffs' argument --

15         THE COURT:  Why are they being subject to that kind of

16  discovery?  Either he has those documents personally or he does

17  not.  They can't force him to produce the documents, nor can

18  they force the sovereign to produce the document as a party in

19  this case because they're not a party in this case.  I'm not

20  even sure I would venture to guess that they may not have any

21  other avenue to force the sovereign to give them the documents.

22         So what is the burden you say is being placed on the

23  sovereign by asking him personally for documents that he would

24  personally, in a lawsuit, have an obligation to turn over if

25  they are accessible to him?

E4OP911O

1          MR. KABAT:  Well, first of all, we're faced with a

2   potential motion to compel if plaintiff decides to go after

3   Dr. Al-Swailem for the fact that he did not produce documents

4   that belonged --

5          THE COURT:  That would be a legitimate motion if he

6   was perfectly capable of producing those documents, and he was

7   not taking steps to produce those documents.

8          MR. KABAT:  And, secondly, Dr. Al-Swailem is now

9   retired from both the Saudi Red Crescent and the Saudi Joint

10  Relief Committee I think about five or six years ago.  He's

11  not -- he may be retired from the Parliament too.  So it's not

12  as if he can go back to his former agency and say you need to

13  give me all these documents.

14         THE COURT:  But those are issues that could come up in

15  any litigation.  If you're suing a person who ran over you with

16  their car and you want documents from their employer when they

17  were driving the truck for the employer, if they don't work

18  there anymore, you're faced with the same situation that you're

19  faced with every day about whether or not that person has those

20  documents available to them, whether they're refusing to

21  produce those documents or whether they have an inability to

22  produce, personally to produce those documents.  How is that

23  unique to this -- to a Sovereign Immunity Act?

24         MR. KABAT:  Well, if plaintiff had withdrawn all those

25  document requests, I wouldn't be making this argument, but

E4OP911O

1    those documents requests are still out there.

2            THE COURT:  Well, I'm not sure what is the

3    inappropriateness of making that request to the party

4    defendant.  The response is always, as I always say in every

5    case, I have it, I will give it to you; I have it, I won't give

6    it to you; I don't have it.  Those are the three responses.

7    How does that affect the sovereign?

8            MR. KABAT:  Well, the entire problem with the

9    plaintiffs' argument throughout this case is that they sued

10   Dr. Al-Swailem in his official capacity as the head of these

11   two agencies, and yet, both in their discovery requests and

12   their opposition to motions to dismiss, they've completely

13   backtracked on that by claiming, well, we're suing him for

14   personal acts.  Whatever he did wasn't in his official

15   capacity.

16           So the discovery requests are just another example of

17   how the plaintiffs, in their motions and their opposition and

18   their discovery requests, are completely contradicting what

19   they are claiming of Dr. Al-Swailem.

20           And my very last point is that plaintiffs, in their

21   opposition, argue that this Court should resolve personal

22   jurisdiction before subject matter immunity.  Well, that's

23   directly contrary to Second Circuit precedent, which makes

24   clear that sovereign immunity is immunity from suit, not just

25   liability.  Second Circuit says that in the *Rein v. Libya*,

E4OP911O

1998; and *Robinson v. Malaysia* 2001.  And, likewise, the

Supreme Court has made it clear there are no mandatory

sequencing of jurisdictional defenses in the *Sinochem v.*

*Malaysia* in 2007.

　　　　　So in conclusion, your Honor --

　　　　　THE COURT:  Well, let me just quickly ask you about

that.  Even you, in your submission, rely upon -- or at least

attach as an exhibit, and I believe it is the -- it may be in

the statement of interest a suggestion of immunity that you

relied upon out of Judge Irizarry's case.

　　　　　Even the State Department, in citing *Sinochem*, said in

their footnote 3:  In a case involving a claim of immunity, the

Court need not address the immunity question until they have

first reached determinations on threshold issues, including

whether a foreign official defendant has been properly served

and whether the Court has personal jurisdiction.

　　　　　MR. KABAT:  Well --

　　　　　THE COURT:  And I'm not sure that I know of a case

that said, on threshold issues, that somehow immunity is the

issue that should be determined prior to whether or not you

have jurisdiction, personal jurisdiction or subject matter

jurisdiction.

　　　　　And I should say that your argument isn't particularly

compelling on this issue since that's not the motion that you

first made.  That's a motion you made years later, after the

E4OP911O

```
1    case has been remanded back for jurisdictional discovery on

2    your jurisdictional motion.

3            It's not a particularly compelling argument that

4    there's some urgency with regard to assigning sovereign

5    immunity prior to jurisdiction when you never raised sovereign

6    immunity for years.  And you raised jurisdiction, and the

7    Court, even the Circuit addressed personal jurisdiction before

8    you raised sovereign immunity.

9            What's the compelling -- How did sovereign immunity

10   get now ahead of that?

11           MR. KABAT:  Your Honor, what happened in this case is

12   that we did, in fact, bring both sovereign immunity, 12(b)(2),

13   personal jurisdiction and 12(b)(6).  And your Honor, back in

14   2010, declined to address the sovereign immunity, and you

15   dismissed Dr. Al-Swailem for lack of personal jurisdiction.

16   Part of the reason was that the Supreme Court had just came out

17   with its *Samantar* decision, which somewhat complicated the

18   decision because the parties had proceeded.  *Samantar* said, no,

19   you have to go under common law sovereign immunity.

20           Well, in 2010, your Honor appropriately decided not to

21   weigh into that at that time, when Dr. Al-Swailem had been

22   fully briefed personal jurisdiction defense, and that went up

23   on appeal.  The Second Circuit refused to look at the personal

24   jurisdiction defense of Dr. Al-Swailem and the others.  We did

25   brief the sovereign immunity and common law, but the Second
```

E4OP911O

1   Circuit decided not to go there.

2              THE COURT:  All right.  Thank you.  I hadn't

3   remembered.  Well, let me hear from the other side.

4              MR. KABAT:  Thank you.

5              MR. CARTER:  Thank you, your Honor.  Dr. Al-Swailem's

6   motion to dismiss pursuant to doctrines of common-law immunity

7   fails for at least three reasons.  The first is the procedural

8   defect that your Honor was just discussing with Mr. Kabat.  The

9   State Department has made very clear its policy that sovereign

10  immunity determinations under the common law should be

11  undertaken only after threshold questions such as service of

12  process and personal jurisdiction have been resolved.  That's

13  not the case here.

14              There are also two substantive --

15              THE COURT:  Well, I mean, that's not the law.

16              MR. CARTER:  Your Honor, it's the stated policy of the

17  State Department and it reflects --

18              THE COURT:  I know, but that's a stated policy on a

19  legal procedural issue, a court issue.  I'm not sure --

20              MR. CARTER:  Your Honor, I think it's a protocol that

21  reflects the study judgment of the State Department that

22  individual immunity determinations necessarily have

23  far-reaching implications to U.S. national foreign policy

24  interests and involve a range of complex questions.  And it

25  would be the preference of the United States to avoid those

E4OP911O

1    determinations unless they are absolutely necessary.

2           And so, in this context, the answer that Mr. Kabat

3    offered that sovereign immunity is immunity from suit, not just

4    from liability, is really no answer at all because, at base, a

5    request for a grant of individual official immunity is, in

6    effect, a request for the favor of the United States' grace and

7    comity.  And in that setting, it follows necessarily that the

8    U.S. government's national interests, in avoiding unnecessary

9    sovereign immunity determinations, trump the individual

10   official's interest in avoiding modest discovery burdens

11   associated with resolving threshold issues such as service of

12   process and personal jurisdiction.  And as your Honor

13   indicated --

14          THE COURT:  Well, I can't use the word modest in this

15   instance.

16          MR. CARTER:  Well, your Honor, again --

17          THE COURT:  It just doesn't apply.

18          MR. CARTER:  Well, your Honor, in practical reality,

19   it is relatively modest because Mr. Kabat --

20          THE COURT:  Not relatively with regard to sovereign

21   immunity.  The issue of sovereign immunity is before me.

22   You're arguing the issue of personal jurisdiction.  You haven't

23   even completed discovery and haven't even begun to brief.

24          MR. KABAT:  Your Honor, but with regard to Mr. Kabat's

25   client, Dr. Al-Swailem, he identified a number of document

E4OP911O

requests, and your Honor has very acutely pointed out that to
the extent the documents aren't in his possession, custody or
control, he doesn't have to produce anything.

        And as a reality, he has completed what we understand
to be his full production.  It consisted of an online biography
of Dr. Al-Swailem and a series of affidavits that had already
been filed in this litigation in support of his motion to
dismiss and the motions to dismiss of the Saudi Joint Relief
Committee and Saudi Red Crescent.

        So in other words, he told us, I don't have any
documents.  I've produced these five or six things, and that's
the total universe of documents I'm burdened to produce in this
litigation, and that's already occurred.

        So in this setting, it is relatively modest and,
again, as your Honor pointed out, the reason that the personal
jurisdiction question has been tee'd up this way is because of
very conscious choices that Dr. Al-Swailem made along the way,
and I think the record needs to be clarified on this point
because Dr. Al-Swailem made the strategic decision initially to
proceed only under the FSIA.

        When the Solicitor General filed its brief in the
prior Supreme Court proceedings in this litigation, we urged
that defendants claiming individual immunity should proceed to
brief it under the common law and invoke the views of the State
Department.  They declined at that time.  When the Supreme

E4OP911O

1    Court decided *Samantar*, we suggested that briefing should

2    proceed on a full record relative to the common-law immunity

3    question.  They declined to do that.

4            Those choices had the necessary effect of prioritizing

5    the personal jurisdiction question.  It was really the only

6    issue that was fully before your Honor to decide at that point,

7    because they declined to brief it at various invitations from

8    the plaintiffs.  And as a consequence of that, it went up to

9    the Second Circuit.  The only issue before the Second Circuit

10   with regard to Dr. Al-Swailem was personal jurisdiction.

11           He noted in a two-line paragraph that he and other

12   Saudi defendants intended to raise common-law immunity defense

13   in the event of remand, but it wasn't briefed in any

14   substantive respect in the proceedings before the Second

15   Circuit, and that's a very fundamental procedure defect with

16   this.

17           But there are, in addition, your Honor, two critical

18   substantive defects.  They both are impacted by the strategic

19   decisions that Dr. Al-Swailem made to not seek the views of the

20   State Department in this litigation.  As the Second Circuit

21   made clear in its decision in *Victory Transport* and then

22   reiterated in its decision in *Heaney*, the extension of

23   common-law immunity is a derivation of the Court's

24   jurisdiction, and for that reason, the Second Circuit explained

25   in *Victory Transport*, that it should be accorded only in cases

E4OP911O

1  where it is absolutely clear, unless the State Department has

2  provided its express views supporting immunity.

3          So in other words, in the absence of a formal

4  submission from the State Department supporting immunity, the

5  Court considering the issue, in isolation, should limit common

6  immunity defenses to five categories of conduct, which involve

7  historically public acts for which nations were especially

8  sensitive.

9          THE COURT:  Well, they argue that that was an

10  illustrative but not exclusive list.  What are you relying on

11  that says that those are the only circumstances in which

12  sovereign community applies?

13          MR. CARTER:  Your Honor, the specific language of the

14  decision is that the sovereign immunity will not be extended

15  unless it is plain that the activity in question falls within

16  one of the categories of strictly political or public acts

17  about which sovereigns have traditionally been quite sensitive.

18          THE COURT:  Okay.

19          MR. CARTER:  And then the Court went on to explain

20  that those categories are limited to internal administrative

21  acts --

22          THE COURT:  I'm sorry.  I want you to quote that part

23  of it, that the Court went on to explain that those categories

24  or venue.  Are you quoting that?

25          MR. CARTER:  I am, your Honor, from *Victory Transport*,

E4OP911O

1    and it's quoted again in *Heaney*, which is one of the cases the

2    defendants rely upon.

3             THE COURT:  Okay.  All right.  Go ahead, I'm sorry.

4             MR. CARTER:  Now, your Honor, the Second Circuit did

5    allow in *Victory Transport* that an extension of those

6    categories may be appropriate upon recommendation of the State

7    Department in a particular case, but the effect of the decision

8    by Dr. Al-Swailem to refrain from requesting the support of the

9    State Department has the impact of caveating him into the

10   structure announced in Victory Transport.  And his activities

11   here, whether official or private or not, don't fall anywhere

12   near within the scope of the five categories, which is --

13            THE COURT:  Well, I'm sorry.  I didn't mean to

14   interrupt you, but let me just focus myself.  In what capacity

15   does your complaint sue him?

16            MR. CARTER:  Well, he's sued individually, seeking

17   money damages in his own name, your Honor.  That's quite clear

18   from the complaint.  Now, with regard to this area of the law,

19   there is a distinction drawn, a legal distinction between what

20   are called official acts and what are called private acts.

21            The term "private" in this legal setting does not

22   connote acts undertaken for personal advantage or gain.

23   Rather, the traditional rule is that acts that are illegal or

24   exceed an official's authority, even if undertaken in

25   connection with the governmental role, are characterized as

E4OP911O

1    private and not acts of the State.

2            THE COURT:  Well, I think there's an exception to

3    that, and I think you probably accepted that exception until

4    they got sovereign immunity.  That doesn't apply with the

5    sovereign -- if those acts are being done at the sovereign's

6    behest.

7            MR. CARTER:  Your Honor, the limitation on illegality

8    or legality doesn't fall on whether it's being done at the

9    sovereign's behest.  It's a traditional rule of international

10   law.  So it's not a matter of whether or not this was

11   undertaken for personal motive; although, there is, obviously,

12   evidence in the record that he exceeded his authority, which

13   gives rise to an inference, clearly, that he was acting in

14   pursuit of a personal objective.

15           THE COURT:  Well, that, I guess you're right.  I'll

16   take that back.  I think you're correct.  But I still have not

17   fully comprehended the scope of the activity that you say that

18   he is being sued for.  Now, I assume you're not saying -- I

19   think part of the problem is that you're talking about not --

20   it doesn't sound to me that the two of you are talking about

21   the same case.

22           MR. CARTER:  I think that's a fair assessment, your

23   Honor.

24           THE COURT:  They're talking about you specifically

25   suing him only in an official capacity for the hiring decision

E4OP911O

1    that he made.  I assume that that's not your theory.

2              MR. CARTER:  That's not the theory and it's also not

3    what the Second Circuit understood the theory to be in

4    connection with the personal jurisdiction assessment.

5              The dispute we're having right now about the nature of

6    the claims was a central feature of the personal jurisdiction

7    appeal as well.  In that setting, Defendant Al-Swailem argued:

8    I'm merely being sued for a decision to hire this one person to

9    work within the Saudi Joint Relief Committee.

10             And that clearly does not meet the Second Circuit's

11   due process test for requiring that I have direct and tortious

12   conduct with the United States.  And that certainly would

13   almost clearly be the case under the Second Circuit's decision,

14   and so the remand itself is a reflection that the Second

15   Circuit rejected that view.

16             The full spectrum of the allegations in forming the

17   claims against Dr. Al-Swailem reveal that the Saudi Joint

18   Relief Committee and Saudi Red Crescent were longstanding

19   intimate collaborators with Al-Qaeda on a variety of fronts.

20             THE COURT:  Well, what are you suing him for?

21             MR. KABAT:  We sued him for, and that the Second

22   Circuit indicated we had sued him for, his role as the director

23   of that in orchestrating the overarching programs to support --

24             THE COURT:  Well, again, when you say "role," I can't

25   accept that he's being sued because of his position.  You have

E4OP911O

to do a better job articulating to me what conduct he's being

sued for.  What do you claim that he did, that you say that you

get the umbrella of illegal activity that cannot be acts of the

sovereign?  What is the illegal activity that you are suing him

for?

MR. CARTER:  I understand, your Honor.  The illegal

activity is the allegation that he used his position to direct

resources of the Saudi Joint Relief Committee and Saudi Red

Crescent Society directly to Al-Qaeda and that he put Al-Qaeda

members in positions of authority within the organization so

that they could use those entities and their assets as

platforms for advancing Al-Qaeda's goals.

And these allegations include statements by former

U.S. officials that more than $74 million had been diverted

from the Saudi Joint Relief Committee during Dr. Al-Swailem's

stewardship to Al-Qaeda and its affiliates.

THE COURT:  I want to put this part to rest.  I assume

you would agree and concede that you would not be able to sue

him in his official capacity for the act of hiring?

MR. CARTER:  If it were a simple personnel decision

made in good faith, no, your Honor, but the act of --

THE COURT:  Well, even if he knew who he was hiring,

that, in and of itself, that act of hiring that person isn't

your claim.

MR. CARTER:  It's not our sole claim, your Honor, but

E4OP911O

1    I do think --

2             THE COURT:  Well, is it a claim?

3             MR. CARTER:  It is a claim, and it would be illegal

4    under various UN security resolutions that prohibited parties

5    from allowing terrorist organizations to have access to

6    humanitarian organizations, in particular.  There were, in

7    addition, UN security resolutions prohibiting any act that

8    would serve to deliver sources to the terrorist --

9             THE COURT:  I know, but that doesn't necessarily

10   follow.  I mean, if I hire you as my law clerk and it turns out

11   that you're a notorious bank robber, you can't sue me for that.

12   I mean -- well, I shouldn't say you can't sue me for that, but

13   that is not determinative that no sovereign immunity would

14   apply.  I mean, you're clearly not suing him simply for hiring

15   an individual that you don't like.

16            MR. CARTER:  No, your Honor.

17            THE COURT:  So you're suing him for giving access to

18   financial resources to Al-Qaeda.  That's the only thing I

19   could -- if I'm incorrectly articulating it, tell me.

20            MR. CARTER:  No.

21            THE COURT:  But that's, as I say, I'm focused on the

22   conduct.  What are you suing him for?  You're clearly not suing

23   him because he hired somebody who you say is an international

24   terrorist criminal.  That's not the basis of whether or not he

25   is entitled to immunity or not entitled to immunity.  If he

E4OP911O

1    took an official act, they say you hire somebody who's really

2    smart and can really do the job, and he said I know a guy.  I

3    know he's a terrorist, you know, a murdering terrorist, or

4    whatever you want to -- any way you want to characterize it.  I

5    would characterize it as terrible as you want to characterize

6    it.

7           If he says I know all these terrible things about him,

8    he's a bank robber, he's a murderer, all these other things,

9    but I think he's a real good computer programmer.  I'm going to

10   hire him because the sovereign says you need somebody to run

11   the computer.  You wouldn't say that that's a claim, would you?

12          MR. CARTER:  Your Honor, again --

13          THE COURT:  By itself.

14          MR. CARTER:  I would say it's a claim.  It's not our

15   sole claim, as you indicated.

16          THE COURT:  How is that a claim?  How is that, in and

17   of -- and if the person goes, does the computer stuff and

18   doesn't do anything else in the charity that affects Al-Qaeda

19   or your client, how is that independently a claim against him

20   for hiring that person?

21          There's no international law that says you can't hire

22   a person because they are a part of -- they are a member of

23   Al-Qaeda or that they have sympathies with Al-Qaeda.  That's

24   not the rule.  The rule is that you can't give them access to

25   financial resources and other resources, and you can't provide

E4OP911O

1    material support.

2            So that's where I'm focused.  I'm not focused on

3    whether or not he comes in and, you know, he, as they say,

4    comes in and fixes the computers every day.  And you say, well,

5    I'm suing you because you hired a person in Al-Qaeda to come

6    fix your computers.  That's not your claim, I assume.

7            MR. CARTER:  Your Honor, as I've said, the claim is

8    that he used the position to direct financial resources to

9    provide access to facilities where Al-Qaeda members were

10   planning attacks.  The reason that --

11           THE COURT:  I understand that.  I understand that.

12   And I don't need to sort of go through, well, in what way do

13   you say he did that?  Because I think that that argument is to

14   be made.  That's for another day.  I mean, you know, what is

15   the actual conduct that you say constitutes that and, you know.

16           But it's clear to me that that's where I start.  I

17   don't start with he hired some guy who has an affiliation or

18   sympathy or is a member of Al-Qaeda.  That's not actionable, in

19   and of itself.  If he hired the guy and he never let him come

20   into the room where he could get access to any of the financial

21   resources to support Al-Qaeda, you wouldn't have a claim.

22           MR. CARTER:  Your Honor, the only reason I'm -- again,

23   it doesn't affect this analysis, but under the Anti-Terrorism

24   Act, for instance, it would be a violation of U.S. law for

25   someone to hire a known Al-Qaeda member and give them a salary.

E4OP911O

```
1    That would be material support, regardless of what they were

2    doing while on the job.  That would be material support.  It

3    would be a violation of the Anti-Terrorism Act to hire an

4    Al-Qaeda member and give them the cover of employment with your

5    organization so that they could travel and carry out Al-Qaeda

6    business.

7              THE COURT:  Well, that's different.  You just loaded

8    the example.  Of course, that's in violation.  You know, you

9    can't do that.  But that's not simply the act of hiring

10   somebody.  If I say, well, you need a job, and we need somebody

11   to sweep the floors every night before we go home, I'll hire

12   you.  And then you say, well, thanks, but let me just -- I want

13   to let you know that I'm a member of Al-Qaeda, you know, I'm

14   not sure that you have a cause of action against the guy who

15   hired him to sweep the floor, if that's the only relationship

16   he has with this person.

17             MR. CARTER:  Your Honor, I think that in that

18   setting --

19             THE COURT:  You may be right, but I wouldn't --

20             MR. CARTER:  The issue is that the definition of

21   material support in the Anti-Terrorism Act is very broad.

22             THE COURT:  Right.  But you're suing him for providing

23   material support.

24             MR. CARTER:  That's correct, your Honor.

25             THE COURT:  So you're not suing him for just a hiring
```

E4OP911O

1    decision.  If that hiring decision did not provide Al-Qaeda

2    material support, then it is not actionable.

3              MR. CARTER:  That's correct.

4              THE COURT:  It's not even -- not only would he be

5    covered, that act itself would be covered by sovereign

6    immunity.  It probably wouldn't be even actionable under the

7    Act.  The act requires -- you must be standing here telling me

8    that you're suing him in his individual, personal capacity

9    because he personally provided material support to Al-Qaeda,

10   right?  That's got to be your claim, right?

11             MR. CARTER:  Your Honor, it is the claim.

12             THE COURT:  Okay.

13             MR. CARTER:  Because the illegality of the conduct

14   causes it to be personal within the model of international law

15   that refuses to acknowledge illegal acts as official acts, and

16   therefore, yes, the result is that it's private conduct.

17   Again, as I said, when you look at *Victory Transport* --

18             THE COURT:  When you say it is private conduct, it's

19   the "it" that is a little --

20             MR. CARTER:  The provision of material --

21             THE COURT:  -- that you guys don't agree with and

22   don't give me the same definition.

23             MR. CARTER:  It's the provision of material support,

24   your Honor.  Again, the Second Circuit was clear --

25             THE COURT:  What are the details of how you say he

E4OP911O

1    provided material support?

2            MR. CARTER:  Your Honor, the way that the Second

3    Circuit properly understood the allegations, was that the

4    allegations themselves provided a wealth of detail,

5    conscientiously cited to, published and unpublished, reports

6    citing close-working relationships between these charities and

7    Al-Qaeda, and that the systematic and programmatic nature of

8    the support programs --

9            THE COURT:  That wasn't my question.  I mean, I really

10   wanted a simple answer, not a complicated answer.  What do you

11   say he did to provide material support to Al-Qaeda?  Because I

12   just want that.  I want to be able to start with that.  Give me

13   a good, clean definition of that.  That's the one I'm going to

14   use.

15           MR. CARTER:  He was in control of the organization

16   during the periods in which the organizations channeled

17   millions and millions of dollars to Al-Qaeda, allowed Al-Qaeda

18   members to use their facilities to plan attacks, moved men and

19   resources on behalf of Al-Qaeda into conflict regions.  It's a

20   broad range of conduct, and it's reflected in the extrinsic

21   evidentiary submissions as well.  And, again, your Honor --

22           THE COURT:  Well, although it's still a little

23   awkward, and maybe you purposely are characterizing it that way

24   or articulating it that way, but to simply say -- I was hoping

25   that I would hear you say you're accusing him of providing

E4OP911O

1    material support to Al-Qaeda, but you said you were accusing

2    him of being in control of the organization when the

3    organization provided material support to Al-Qaeda.

4            MR. CARTER:  I'm sorry.

5            THE COURT:  You got more lawyerly complicated than we

6    needed to be, if you're trying to tell me that that's supposed

7    to be a statement that you're accusing him of providing

8    material support.

9            MR. CARTER:  No, your Honor.  I'm sorry.  I was trying

10   to explain the record.

11           THE COURT:  I'm not asking you to explain the record.

12   I know the record.  I'm trying to figure out, on this issue,

13   the relevant analysis on this issue, what is the conduct that

14   you say is the conduct by this individual that is not protected

15   by sovereign immunity because it is not conduct in his official

16   capacity by the State.

17           MR. CARTER:  It's the provision of material support to

18   Al-Qaeda, your Honor, and the Second Circuit --

19           THE COURT:  By doing what?

20           MR. CARTER:  The Second Circuit --

21           THE COURT:  No.  By doing what?  In what way did he --

22           MR. CARTER:  By delivering financial resources under

23   his control to Al-Qaeda.

24           THE COURT:  Okay.

25           MR. CARTER:  And by delivering physical resources

E4OP911O

1    under his control directly to Al-Qaeda.

2              THE COURT:  Knowingly and intentionally?

3              MR. CARTER:  Knowingly and intentionally.

4              THE COURT:  That's what I want to understand.  This is

5    not a trick question.  I'm just trying to clearly, cleanly

6    articulate what it is that you say that this case is about with

7    regard to him personally.  And, you know, in order to get in

8    your direction, I first have to get past their argument that

9    you're not suing him in his personal capacity.  You simply

10   always allege and were always suing him in his official

11   capacity, and in suing him in his official capacity because he

12   hired this one individual.

13             I assume, and I'll go back to the record and my

14   recollection is that you at least -- I don't remember the

15   details of the what the complaint says about that, but at least

16   in the numerous papers on these issues and other context, you

17   articulated it in a different way.

18             Now, I don't want to say you're changing your story

19   from what was in the complaint.  I'll look at the complaint and

20   see whether that's what the complaint says, but that's what

21   I -- I mean, if you tell me that there's a sufficient record

22   here to indicate that you are suing him in his personal

23   capacity, individually, for conduct which is not conduct,

24   official conduct on behalf of the sovereign, where the

25   sovereign would have sovereign immunity, then I can understand

E4OP911O

1    your argument.  But if it's not that, then you have to focus me

2    on what else you say that this claim is about.

3              MR. CARTER:  Your Honor, you're understanding what the

4    claim is about.  The point I think that requires emphasis is

5    that the distinction between private and official conduct

6    within the law of common-law immunity has a specific

7    connotation.  And personal conduct is used to describe conduct

8    which is illegal or in violation of international law and,

9    therefore, was viewed historically as not to be properly

10   characterized as official.

11             And so our arguments regarding the immunity question

12   focus on the precise legal standard that governs, and we

13   clearly indicated that the conduct in providing material

14   support directly to Al-Qaeda is illegal and, therefore, can't

15   entitle him to common-law immunity.

16             There is an additional reason which is that the

17   common-law immunity, even for official acts, was traditionally

18   said to run only to the activities of traditional governmental

19   ministers in the performance of core governmental governments,

20   and would not extend to activities in which private parties

21   typically engage.  Now, by their own description of

22   Dr. Al-Swailem's role, he was there to manage a purported

23   humanitarian relief organization that was organizing the

24   activities of other private relief organizations in Kosovo and

25   Chechnya.

E4OP911O

```
 1              So the nature of his official position is also
 2    condemning to his application for sovereign immunity.  Now,
 3    that's under the Victory Transport standard.  The Victory
 4    Transport court made clear that there could be an expansion of
 5    common-law immunity to other categories of official conduct if
 6    supported by a statement of interest by the State Department,
 7    and the State Department has done that in certain cases.  But
 8    there is none here and, therefore, the rubric announced in
 9    Victory Transport is controlling.
10              THE COURT:  Well, the one thing you don't reconcile
11    is, you don't reconcile the activity qualifying -- being
12    sovereign immunity for the sovereign, but not being sovereign
13    immunity for the official.
14              MR. CARTER:  Your Honor, I --
15              THE COURT:  And I'm not sure where you draw the
16    distinction.  I mean, the analysis that you gave me is not an
17    analysis that simply applies to individuals.  It's an analysis
18    that applies to the sovereign.  So your analysis is
19    inconsistent with a determination that the activity that the
20    sovereign was involved in, through these agencies, is entitled
21    to sovereign immunity.  That issue has already been determined.
22              MR. CARTER:  Your Honor, what the Supreme Court has
23    said about that, what the State Department has said about that
24    is that immunity under the common law for officials and
25    immunity under the statutory framework under the Foreign
```

E4OP911O

1   Sovereign Immunity Act are not co-extensive.

2           Now, Mr. Kabat suggested that common-law immunity is

3   broader.  That's not what the cases say.  The cases say it's

4   not co-extensive.  So there may very well be circumstances in

5   which the statutory requirements of the FSIA confer immunity on

6   an agency, but the traditional standards of common-law immunity

7   do not confer immunity on one of its officials for the actions

8   he undertook.

9           THE COURT:  I know, but I just don't understand -- I

10  understand that argument in the abstract, but I don't

11  understand what definition of sovereign immunity that's being

12  applied in the statute that is different than the definition

13  that would be applied outside of the statute as it applies to

14  the sovereign.

15          MR. CARTER:  The statute would govern as to the

16  sovereign solely, your Honor.  The common-law immunity

17  framework would not govern at all.

18          THE COURT:  Well, yes, but I mean, are you saying that

19  there is a nongovernmental function exception in the common

20  law, but not such an exception to be applied under the statute?

21          MR. CARTER:  That's correct, your Honor.  In the

22  common law framework announced in *Victory Transport* there are

23  limitations of common-law sovereign immunity to certain

24  specified activities.  In the FSIA, that is not the regime that

25  governs with regard to agencies.

E4OP911O

1          Now, agencies, if they qualify under the definition of

2    foreign state, are entitled to invoke the immunity.  They are

3    presumed immune unless one of the statutory exceptions to

4    immunity applies, and so you go through the test of the

5    statutory exceptions.  The test is simply different in the

6    common-law immunity domain and the disparity produces a

7    different result for Dr. Al-Swailem.

8          THE COURT:  I understand.

9          MR. CARTER:  Your Honor, I'm just looking through my

10   notes of Mr. Kabat's discussions with you.

11         THE COURT:  Sure.

12         MR. CARTER:  Your Honor, if I can, I'll just take a

13   moment.  Some issues came up about the Mumbai case and the

14   statement of interest in that case.  Just for very briefly, the

15   one point I would make about that is that the Mumbai case is

16   different in two respects.  The first is that a statement of

17   interest was provided supporting immunity, which removed that

18   case from the limitations imposed by the Second Circuit under

19   *Victory Transport*.  And defendants in that case were officials

20   of a foreign government intelligence service.  One of the

21   categories of conduct that even *Victory Transport*, at least in

22   theory, would recognize.  Although, I'm sure there are

23   arguments of the illegality of their conduct, as well.  But I

24   think Mr. Kreindler has a few comments about that, since he was

25   involved.

E4OP911O

1          THE COURT:  All right.

2          MR. KREINDLER:  Thank you, Judge.  All roads lead to

3     Rome, and terrorism cases, from the Libya case to 9/11 to the

4     Mumbai attack, all were related; so I just want to take a

5     couple of minutes and address some of the things involving our

6     Mumbai terror attack.

7          First of all, we're going to have oral argument in the

8     Second Circuit on this issue sometime the week of May 19th.  We

9     don't have the date yet, and we want you to know that that's

10    coming, and presumably there will be a decision from the Second

11    Circuit soon after that.

12         Let me say something about the government's statement

13    of interest, because the situation in Mumbai is highly unique.

14    The government took a long time before it filed a statement of

15    interest there.  No question the government was bothered by the

16    fact that a week after we sued the ISI, Pakistan's intelligence

17    agency, for directing the terrorists to kill Americans,

18    Israelis and other people at the hotels in India, a suit was

19    started in Pakistan against the CIA, naming the CIA officials

20    and saying the CIA is using drones to, you know, murder

21    innocent civilians.

22         And there's no question at all that when the State

23    Department filed its statement of interest there, they were

24    very concerned about the precedence saying an intelligence

25    agency can be sued and the heads of an agency could be sued

E4OP911O

1   because they were afraid of having that thrown in their face by

2   the suit in Pakistan.

3   THE COURT:  I mean, that makes an interesting surmise,

4   but I don't think there's anything in the record that indicates

5   it.

6   MR. KREINDLER:  You know, I'm up for a minute to talk

7   about some other aspects.  Some things are in the record.

8   Still in the case, with no suggestion of immunity, are

9   government officials in the Mumbai case.  At the criminal trial

10  in Chicago, where the government brought forward the testimony

11  of David Headly, he identified individuals in the ISI,

12  government officials, who he met with to plan the attack on

13  Mumbai.  And afterwards, officials said, I was directing the

14  terrorists who to kill.

15  The problem we have, we sued the two directors of the

16  ISI, Pasha, Asad, and the government in its little paragraph

17  addressing the individuals said there's nothing specific, and

18  that's true.  We said that they're the head of the

19  organization.  We did have the detail, we did, about the other

20  government officials, their direct role.  For one of them, we

21  knew that he visited the terrorists in jail.  But that which is

22  in the statement of interest is something for you to know about

23  and put in context.

24  Now, just a personal observation.  The way I look at

25  this defendant and some of these other cases, and maybe my

E4OP911O

1  personal observation will be of no value, but we've all seen

2  those movies where the bad guys can't get into a castle and

3  there's a spy in the castle who opens a little door, letting

4  one of the bad guys in and the bad guy torches the facility and

5  opens all the other doors and bad guys come in and overrun the

6  castle.

7       When you hire a terrorist and give them access and put

8  them inside the castle, access to money, access to

9  communication, that's the image I have in my mind that applies

10  to this defendant and is, frankly, the image I have with a lot

11  of the defendants in the case who have, in essence, taken an

12  Al-Qaeda bad guy, lowered the door and put him in an

13  environment where he can do damage.  That's how I've always

14  seen this defendant and others, and I thought I'd mention it

15  for what it's worth.

16       THE COURT:  Thank you.  Yes, sir?

17       MR. KABAT:  Your Honor, I'll be very brief.  I'd just

18  like to address four points that Mr. Carter made.  First of

19  all, Judge Casey and Judge Robertson before him were able to

20  decide the sovereign immunity defenses of at least four of

21  them, the cabinet ministers the agency had, Prince Sultam and

22  Prince Turki, without a State Department submission.  Your

23  Honor can do the same here by looking to what the government

24  has submitted in other cases, and more importantly, the careful

25  consideration of the common-law sovereign immunity.

E4OP911O

1          And the Second Circuit had made clear, particularly in

2     the Heeding case, *Heeding v. Mexico*, also the *Hoffman* case and

3     for Linden, that the State Department submission is not

4     required.  The District Court can go ahead and decide sovereign

5     immunity without that submission.

6          Secondly, I'm hearing two quite different conflicting

7     theories of the case.  One is that Dr. Al-Swailem, according to

8     Mr. Carter, diverted resources to Al-Qaeda, but you have to

9     remember that the plaintiffs sued the Saudi Red Crescent and

10    the Saudi Joint Relief Committee for officially supporting

11    Al-Qaeda.  So it's not clear to me how the plaintiff, having

12    lost on the theory that the agencies directly supported

13    Al-Qaeda, can turn around and say, oh, no, it wasn't that at

14    all, the agencies are diverting resources.  He's entirely

15    inconsistent claiming.

16          Mr. Carter also referred to the control of the

17    organization.  Well, again not inconsistent with the fact that

18    both this court and the Second Circuit held that those agencies

19    were immune under the FSIA.  They made the same allegations of

20    material support with respect to the Saudi Red Crescent and the

21    Saudi Joint Relief Committee.  They lost under the FSIA.  They

22    did not seek Supreme Court relief.  Now they're here in court

23    today telling us that Dr. Al-Swailem diverted resources, which

24    is inconsistent with their having sued him in his official

25    capacity.

E4OP911O

1          THE COURT:  Well, you know --

2          MR. KABAT:  There are other concerns.

3          THE COURT:  Just as I've asked them whether they would

4    have to concede that they were just suing him in his official

5    capacity for officials acts in the sovereign for hiring, that

6    that would not be a claim.  I assumed that you would have to

7    concede that if they are suing him for knowingly and

8    intentionally providing access to financial resources to

9    Al-Qaeda, you would have to concede that that would not -- he

10   would not be provided sovereign immunity for that purpose and

11   for that activity.

12         MR. KABAT:  Well, your Honor, the claim just made, to

13   say that each of those agencies, the Saudi Red Crescent and the

14   Saudi Joint Relief Committee, each gave resources to Al-Qaeda,

15   that is not enough to waive their sovereign immunity under

16   FSIA; so it is here with Dr. Al-Swailem.

17         The plaintiff did not plead any specific facts showing

18   that he diverted resources, let alone directly provided

19   material support, to Al-Qaeda.  We look at the claims in their

20   complaint and with those statements, and they're based on

21   allegations in their opposition motion to dismiss, but that is

22   not a ground to amend their complaint.

23         For perfect sovereign immunity, you really have to

24   look at what they pled, not in the contradictory allegations in

25   their motion to dismiss.  And Mr. Carter also tried to claim,

E4OP911O

1    again, something that these agencies were like private parties

2    providing humanitarian militia.  While the law remains, the

3    Second Circuit made clear that Red Crescent and the Joint

4    Relief Committee are not private parties.  They're agencies in

5    the Saudi government --

6         THE COURT:  Well, they didn't review that in the

7    context of common-law sovereign immunity.

8         MR. KABAT:  Pardon?

9         THE COURT:  They didn't view that in the context of

10   common-law sovereign immunity.

11        MR. KABAT:  Right, but --

12        THE COURT:  You candidly said, that's a different

13   standard.  They were looking at the statutory standard of

14   sovereign immunity, not the common-law standard sovereign

15   immunity.

16        MR. KABAT:  Your Honor, the plaintiff in the Second

17   Circuit brief specifically said that both of those were

18   agencies or instrumentalities of the Saudi government.  They

19   did not plead to the Second Circuit that these were private

20   entities, as they are now claiming.  And, in fact, the best

21   analogy is the U.S. Agency for International Development, which

22   is a part of the U.S. government, it does humanitarian work

23   overseas like in hurricanes, earthquakes, what have you, and

24   the courts in the District of Columbia, where the U.S. Agency

25   is located, have held that the U.S.A.I.D. is covered by

E4OP911O

1    sovereign immunity because of its humanitarian work.

2              THE COURT:  But none of that was in the discussion of

3    common-law sovereign immunity.

4              MR. KABAT:  True, which is even broader in the FSIA.

5              THE COURT:  At this point, I'd have to say different.

6    You know, it is different.  It is a different analysis.  As I

7    said, it can't be broader for your purposes, but then be more

8    restrictive, you know, for your other purposes.  I mean, either

9    it is a different analysis.  I can't use the analysis under the

10   statute of whether or not the entities qualified for sovereign

11   immunity to say that any court in their mind was thinking about

12   whether or not it was commercial, non-governmental or any other

13   issue beyond whether or not they met the language of the

14   statute.

15             I don't think that there's a case that says that that

16   was a relevant consideration of the court, and I'd like you to

17   point my attention to it.  But no court had that in mind.  I

18   can't look to any decision in this area that gives me guidance

19   on that, I don't think.  On that specifically.

20             MR. KABAT:  Well, no.  Mr. Carter said that the two

21   immunities were co-extensive.  What he did not say is the

22   Supreme Court in the *Samantar* case explained, that even in

23   those circumstances where a foreign agency or foreign state

24   might be liable, the individual foreign official involved with

25   the same decision, the plotting against the State, would not be

E4OP911O

1   personally liable.  And that goes back to the 1976 decision

2   from the Southern District called *Greenspan v. Crosbie*.  That

3   case was cited by the Supreme Court, and it was also cited by

4   the State Department in its amicus brief in the *Federal*

5   *Insurance v. Saudi Arabia* cert petition back in 2009 for the

6   proposition that, quote, the executive branch continues to

7   recognize the immunity of foreign officials for their official

8   acts in circumstances in which the state itself would not

9   itself be immune.

10          Now, here, of course, the state is immune.  We know

11   that because the Saudi Red Crescent and the Saudi Joint Relief

12   Committee were held by this court, in the Second Circuit to be

13   covered by FSIA.  Plaintiffs have not sought further review of

14   this, so here we're even further within that safe harbor.

15   Thank you.

16          MR. CARTER:  Your Honor, may I just raise two very

17   brief points?  And I apologize for not having this at my

18   fingertips when we were discussing the nature of the

19   allegations, but again, I think that the way that the Second

20   Circuit characterized them is, in fact, the law of the case.

21   It makes clear what the claims at issue are, and in this

22   section of the decision, it was referred to Dr. Al-Swailem as

23   among a group that it referred to as the "charity official

24   defendants."

25          And what the Second Circuit said specifically was:

E4OP911O

1    The charity official defendants allegedly controlled and

2    managed some of those charitable organizations, and through

3    their positions of control, they allegedly sent financial and

4    other material support directly to Al-Qaeda when Al-Qaeda

5    allegedly was known to be targeting the United States.

6    Construing all reasonable inferences in favor of the

7    plaintiffs, these allegations suggested the charity official

8    defendants provided financial and other resources to Al-Qaeda

9    knowing that Al-Qaeda was engaged in a global campaign of

10   terror directed at the United States.

11           And that is the basis of the claim as described by the

12   Second Circuit, and the one that dictates that sovereign

13   immunity not attend to the claims here.  Thank you, your Honor.

14           THE COURT:  Thank you.  All right.  I'm going to let

15   you get to -- I don't know how -- Is Judge Maas' clerk here?

16           THE DEPUTY CLERK:  We're going to resume at 2:00.

17           THE COURT:  Okay.  I'm going to let her give you

18   directions.  I'm going to move forward with this, and I'll talk

19   to Judge Maas and see whether or not we can get this done

20   before we see each other next time, and then I'll see if there

21   are other issues that we need to address surrounding it.  Thank

22   you.

23           MR. CARTER:  Thank you, your Honor.

24           MR. KABAT:  Thank you.

25           (Adjourned)