# AML/CDD/CFT POLICY

## For Prevention of Money Laundering/Terrorist Financing

## HBL

**Owner:**

**GLOBAL COMPLIANCE**

**Revision Date:**

**August, 2011**

Cited in In re Terroist attacks on Sept. 11, 2001
03MDL1570 Decided 10/28/13
Archived on 11/7/43
This document is protected by copyright.
Further reproduction is prohibited without permission.

| **AML/CDD/CFT POLICY** |
|---|
| **APPROVAL SHEET** |
| **Policy Owner: Global Compliance** |
| **Implementation Responsibility:** Chief Compliance Officer |
| **Custodian: Anti Money Laundering Department, Global Compliance** |
| **Operating Jurisdiction: All Domestic and International HBL** Operations |
| **Review Frequency: 3 years or earlier if required** |
| **Review Responsibility: Anti Money Laundering Department, Global Compliance** |
| **Approval Date:** |
| **Effective Date:** |
| **Next Review Date:** |

| **Recommended by:** | **Concurred by:** |
|---|---|
| _____ | _____ |
| **Jamil Iqbal** | **R. Zakir Mehmood** |
| **Chief Compliance Officer** | **President & CEO** |
| **Approved By:** | |
| | |
| _____ | |
| **Board of Directors** | |

Cited in In re Terrorist Attacks on Sept. 11, 2001 03MDL1570 Decided 10/28/13

Archived on 11/7/13

This document is protected by copyright. Further reproduction is prohibited without permission.

# Slogan for HBL

# 'Compliance is My Responsibility'

Cited in In re Terroist Attacks on Sept 11, 2001
03MDL1570 Decided on 10/28/13
Archived on 11/7/13
This document is protected by copyright.
Further reproduction is prohibited without permission.

# TABLE OF CONTENTS

| | | |
|---|---|---|
| | **Introduction** | 6 |
| **1** | **Methodology** | 7 |
| 1.1 | Objectives of AML/CDD/CFT Policy | 8 |
| 1.2 | Scope | 8 |
| 1.3 | Money Laundering | 8 |
| 1.4 | Stages of Money Laundering | 8 |
| 1.5 | Sources of Money Laundering | 11 |
| 1.6 | Terrorist Financing | 12 |
| 1.7 | The need to combat Money Laundering (ML) and Terrorist Financing (TF) | 12 |
| 1.8 | Regulatory Oversight & Compliance Risks | 13 |
| | | |
| **2** | **Legal and Regulatory obligations** | 14 |
| 2.1 | Legal obligations | 15 |
| 2.2 | Regulatory obligations | 15 |
| 2.3 | Offences and penalties | 16 |
| 2.3.1 | AML Act 2010 | 16 |
| 2.3.2 | NAB Ordinance 1999 | 16 |
| 2.3.3 | Control of Narcotic Substances Act 1997 | 17 |
| 2.3.4 | Anti Terrorism Act | 17 |
| | | |
| **3** | **THE BANK'S Policy for AML/CDD/CFT** | 18 |
| 3.1 | AML/CFT | 19 |
| 3.2 | CDD | 20 |
| 3.3 | AML/CDD /CFT associated policies | 21 |
| 3.3.1 | Internal controls and communication | 21 |
| 3.3.2 | Recognition and reporting of suspicion | 21 |
| 3.3.3 | Awareness raising and training | 22 |
| 3.3.4 | Record keeping | 22 |
| 3.3.5 | Bank's' policy on politically exposed persons (PEPs) | 22 |

Cited in In re Terrorist Attacks on Sept 11, 2001 03MDL1570 Decided 10/28/13 Archived on 11/7/13 This document is protected by copyright. Further reproduction is prohibited without permission.

3.3.6      Bank's' policy on Correspondent Relationships/MSBs    23

3.3.7      Use of automated AML solutions    24

**3.4    Non Compliance with Bank's AML/CDD/CFT Policy**    24

3.5    Accountabilities and responsibilities    24

3.5.1      The Board is responsible for    24

3.5.2      Management is responsible for    24

3.5.3      Global Compliance / MLRO are Responsible for    25

3.5.4      All employees are responsible for    25

**Abbreviations used in AML/CDD/CFT Policy**    27

Cited in In re Terrorist Attacks on Sept 11, 2001
03MDL1570 Decided 10/28/13
Archived on 11/7/13
This document is protected by copyright.
Further reproduction is prohibited without permission.

## INTRODUCTION

Habib Bank ('the Bank') is a pioneer financial institution of Pakistan, having largest domestic network of branches, a well-known brand locally with a substantial international presence.

To protect itself from the increasing danger of organized criminal activity and money laundering, it is essential for the Bank to have a clearly laid down "Anti-Money Laundering" (AML)/"Customer Due Diligence" (CDD)/"Counter Financing of Terrorism (CFT) Policy to ensure that the Bank remains protected from the menace of money laundering and is not used by existing &/or prospective customers for any criminal activity.

Cited in In re Terrorist Attacks on Sept 11, 2001
03MDL1570 Decided 10/28/13
Archived on 11/7/13
This document is protected by copyright.
Further reproduction is prohibited without permission.

# METHODOLOGY

Cited in In re Terroist Attacks on Sept 11, 2001
03MDL1570 Decided 10/28/13
Archived on 11/7/13
This document is protected by copyright.
Further reproduction is prohibited without permission.

# 1  METHODOLOGY

## 1.1 OBJECTIVES OF AML/CDD/CFT POLICY

The objective of this policy is to ensure that the products and services of the Bank are not used to launder the proceeds of crime and that all of the Bank's staff is aware of their obligations and the need to remain vigilant in the fight against money laundering/terrorist financing. The document also provides a framework to comply with applicable laws, Regulatory guidelines specially related with detection and reporting of suspicious activities.

In case of any clarification contact AML Department of Global Compliance at HOK comphelp@hbl.com or MLROs in respective countries.

## 1.2 SCOPE

This policy is applicable to the Bank's local as well as overseas operations including business of other banks routed through HBL.

*In overseas branches/ subsidiaries, the Bank would ensure compliance with the Regulations of the host country on AML/ CDD /CFT or that of the State Bank of Pakistan whichever are more exhaustive.*

**Our coverage will include:**

- Compliance of AML Act 2010.
- Compliance of SBP Prudential Regulations on AML / CDD/CFT.
- Compliance of local country legislations/ regulations on AML/ CDD/CFT & subsequent updates.
- FATF Recommendations (40 plus 8+1).
- International Standards and guidelines, including Basel and Regulatory sanctions as applicable.

## 1.3    MONEY LAUNDERING

### Definition:

Money Laundering is the criminal practice of processing ill-gotten gains or "dirty" money, through a series of transactions, in this way the funds are "cleaned" so that they appear to be the proceeds from legal activities, it is also the process to change the identity of illegally obtained money by using banking channel so that it appears to have originated from a legitimate source.

## 1.4   STAGES OF MONEY LAUNDERING

Money laundering can be a diverse and often complex process.  The first step in the laundering process is for criminals to attempt to get the proceeds of their crimes into a bank or other financial institution, sometimes using a false identity. The funds can further be transferred to other accounts, locally or internationally or use it to buy other goods or services. It eventually appears to be like legally earned

---

money and becomes difficult to trace back to its criminal origin. The criminals can then invest or spend it or, as is often the case, use it to funded more crime.

The laundering process is often described as taking place in three stages:-

1. Placement
2. Layering
3. Integration.

**1.  Placement**

The first stage is referred to as Placement. At this stage Illegal funds or assets are first brought into the financial system. When illegal funds are placed in the financial system, they become more liquid. There are numerous Placement techniques, including the following.

- Smurfing
- Alternative Remittances
- Electronic Transfers
- Asset Conversion
- Bulk Movement
- Securities Dealing

**Smurfing:**  involves the deposit of small amounts of illegal cash into account(s). Typically, smurfing deposits are in small amounts in order to avoid Regulatory requirements of reporting cash transactions '

**Alternative Remittances**: It refers to the transfer of funds through 'alternative' or illegal money transfer system. These systems are unregulated and illegal, but they are used to transfer both legitimate and illegal funds. Alternative Remittances also goes by the names of underground or parallel banking. There are very large networks of these systems in operation around the world.

**Electronic Transfers:** In the money laundering context, an electronic transfer involves the transfer of money through electronic payment systems that do not require sending funds through a bank account. If the amount is below the CTR (Cash Transaction Reporting) limit then it will not be reported as per prevailing regulations.

**Asset Conversion:** Asset Conversion simply involves the purchase of goods. Illegal money is converted into other assets, such as real estate, diamonds, gold and vehicles, which can then be sold and proceeds can be deposited in the account.

**Bulk Movement:** involves the physical transportation and smuggling of cash and monetary instrument such as money orders and checks.

**Securities Dealing:** Illegal funds are placed with securities firms which is used for buying bearer securities and other easily transferable instruments

---

### 2.  Layering

Layering is the second stage of money laundering. In this stage illegal funds or assets are moved, dispersed and disguised to conceal their illegal origin. There are numerous techniques and institutions that facilitate layering, including the following:

- Offshore Banks
- Shell Corporations
- Trusts
- Walking Accounts
- Intermediaries

**Offshore Banks:** Offshore Banks accept deposits from non-resident individuals and corporations. A number of countries have well-developed offshore banking sectors; in some cases, combined with loose anti- money laundering regulations.

**Shell Corporations:** A Shell Corporation is a company that is formally established under applicable corporate laws, but does not actually conduct a business. Instead, it is used to engage in fictitious transactions or hold accounts and assets to disguise their actual ownership

**Trusts:** Trusts are legal arrangements for holding specified funds or assets for a specified purpose. These funds or assets are managed by a trustee for the benefit of a specified beneficiary or beneficiaries. Trusts can act as layering tools as they enable creation of false paper trails and transactions. The private nature of trusts makes them attractive to money launderers.

**Walking Accounts:** A Walking Account is an account for which the account holder has provided standing instructions that upon receipt all funds should be immediately transferred into one or more  accounts. By setting up a series of walking accounts, criminals can automatically create several layers as soon as any fund transfer occurred.

**Intermediaries**: Lawyers, accountants and other professionals may be used as Intermediaries or middlemen between the illegal funds and the criminal. Professionals engage in transactions on behalf of a criminal client who remains anonymous. These transactions may include use of shell corporations, fictitious records and complex paper trails.

### 3.  Integration

Integration is the third stage of money laundering process. In this stage, illegal funds are successfully legitimized by mixing with legitimate funds in the financial system.

There are various Integration techniques, including the following:

- Import /Export Transactions

Citation in re Terrorist Attacks on Sept 11, 2001 3MDL1570 Decided on 11/7/13
Archival document – not protected by copyright.
This document is not protected by copyright.
Further reproduction is prohibited without permission.

- Business Recycling
- Asset Sales & Purchases
- Consultants
- Credit & Debit Cards
- Corporate Financings

**Import /Export Transactions** to bring illegal money into the criminal's country of residence, the domestic trading company will export goods to the foreign trading company on an over-invoiced basis. The illegal funds are remitted and reported as export earnings. The transaction can work in the reverse direction as well.

**Business Recycling** Legitimate businesses also serve as conduits for money laundering. Cash-intensive retail businesses, real estate, jewelers, and restaurants are some of the most traditional methods of laundering money. This technique combines the different stages of the money laundering process.

**Asset Sales & Purchases** This technique can be used directly by the criminal or in combination with shell corporations, corporate financings and other sophisticated means. The end result is that the criminal can treat the earnings from the transaction as legitimate profits from the sale of the real estate or other assets.

**Consultants** The use of consultants in money laundering schemes is quite common. The consultant could be fake. For example, the criminal could himself be the consultant. In this case, the criminal is channeling money back to himself. This money is declared as income from services performed and can be used as legitimate funds.

**Credit & Debit Cards:**

<u>**Credit cards**</u> are an efficient way for launderers to integrate illegal money into the financial system. By maintaining an account in an offshore jurisdiction through which payments are made, the criminal ensures there is a limited financial trail that leads to his country of residence.

<u>**Debit Cards**</u> Individuals first transfer illegal funds into an offshore account and also signs up for a debit card from the bank to utilize the funds.

**Corporate Financings** Corporate financings are typically combined with a number of other techniques, including use of offshore banks, electronic funds transfers and shell corporations.

The three basic stages may occur as separate and distinct phases. They may also occur simultaneously or, more commonly, may overlap.

## 1.5 SOURCES OF MONEY LAUNDERING:

Money laundering may not just involve wealth related to Drug Trafficking / Terrorism financing. List of crimes identified by Financial Action Task Force (FATF) as generators of criminal wealth also included:

---------------------------------------------------------------------------------------------------------------------------------

Cited in Re Terrorist Attacks on Sept 11, 2001 & MDL 1570 Decl 10/28/13
Archived 1/7/13
This document is protected by copyright. Further reproduction is prohibited without permission.

1. Illegal arms sales.
2. Gun running
3. Organized crime including drug trafficking and prostitution
4. Embezzlement
5. Smuggling (including movement of nuclear materials)
6. Counterfeiting (including making of imitation and copies of original products/goods)
7. Fraud, especially computer-supported fraud
8. Benefiting from insider trading.
9. Bribery and kickbacks
10. Tax evasion
11. Under and over-invoicing of trade transactions.
12. Bogus trade transactions to launder money through round-tripping
13. Facilitating illegal immigration
14. Real Estate Transactions

## 1.6 TERRORIST FINANCING

Terrorist Financing can be defined as the financial support, in any form, to terrorism or of those who encourage, plan, or engage in terrorism. A terrorist group, like any other criminal organization, builds and maintains an infrastructure to develop sources of funds and channel them to those who provide materials and or services to the terrorist organization.

## 1.7 THE NEED TO COMBAT MONEY LAUNDERING (ML) AND TERRORIST FINANCING (TF)

The prevention of ML and TF from the point of view of the Bank has three dimensions:

- **Ethical** - taking part in the prevention of crime.

- **Professional** - ensuring that the Bank is not involved in recycling the proceeds of crime that would call into question its reputation, integrity and, if fraud is involved, its solvency.

- **Legal** - complying with Laws and Regulations that impose a series of specific obligations on financial institutions and their employees.

The need also arises due to the severe nature of consequences of ML and TF. Following are some examples:

- Unexplained changes in supply and demand for money,
- Volatility of capital flows and exchange rates due to un-anticipated cross border asset transfers,
- Contamination of legal financial transactions,
- Threat to the functioning of economy's financial system,
- Systemic risk,
- Unlawful enrichment by perpetrator of crime,
- Dampening effect on foreign direct investment,
- Weakening of the social, collective ethical standards,
- Drug trafficking, Human trafficking,
- Political corruption,
- Terrorism crimes cause a great deal of human misery.
- Prudential risks to bank soundness arising from these developments.

Cited in the Terrorist Attacks on Sept 11, 2001
03MDL1570 Decided on 1/7/15
Archived on 10/28/13
This document is protected by copyright.
Further reproduction is prohibited without permission.

## 1.8 REGULATORY OVERSIGHT & COMPLIANCE RISKS

HBL has used SBP/FMU guidelines and International Regulatory guidelines/standards as applicable to formulate its own AML/CDD/CFT Policy. The consequence of contravening the Regulations or failing to comply can be significant and include disciplinary measures, imprisonment or fine or both under local laws as well as the loss of reputation for the bank.

Notwithstanding the statutory and regulatory penalties, increased vigilance by Management and staff will protect the Bank from the following risks:

- Reputational
- Operational
- Legal
- Financial

**Reputational risk:** The reputation of a business is usually at the core of its success. The ability to attract good employees, customers, funding and business is dependent on reputation. Even if a business is otherwise doing all the right things, if customers are permitted to undertake illegal transactions through that business, its reputation could be irreparably damaged. A strong AML/CDD/CFT policy helps to prevent a business from being used as a vehicle for illegal activities.

**Operational risk:** This is the risk of direct or indirect loss from faulty or failed internal processes, management and systems. In today's competitive environment, operational excellence is critical for competitive advantage. If AML/CDD/CFT policy is faulty or poorly implemented, then operational resources are wasted, there is an increased chance of being used by criminals for illegal purposes, time and money is then spent on legal and investigative actions and the business can be viewed as operationally unsound.

**Legal risk:** If a business is used as a vehicle for illegal activity by customers, it faces the risk of fines, penalties, injunctions and even forced discontinuance of operations.

**Financial risk:** If a business does not adequately identify and verify customers, it may run the risk of unwittingly allowing a customer to pose as someone they are not. The consequences of this may be far reaching. If a business does not know the true identity of its customers, it will also be difficult to retrieve money that the customer owes.

# LEGAL AND REGULATORY OBLIGATIONS

Cited in In re Terroist Attacks on Sept 11, 2001
03MDL1570 Decided 10/28/13
Archived on 11/7/13
This document is protected by copyright.
Further reproduction is prohibited without permission.

## 2   LEGAL/ REGULATORY OBLIGATIONS

### 2.1 LEGAL OBLIGATIONS

The bank is obligated to comply with the requirements of the AML Law and with the relevant provisions of the Banking Act as and when they are promulgated.  In addition, the bank under NAB Ordinance 1999, Anti Terrorism Act 1997 and Control of Narcotics Substance Act 1997 is obligated to take prompt and immediate notice of all unusual or large transactions in customer account, which have no apparently genuine economic or lawful purpose.

Overseas branches should follow regulatory requirement of the host country under relevant legislations.

### 2.2   REGULATORY OBLIGATIONS

Under State Bank of Pakistan/ Financial Monitoring Unit (FMU) and international Regulations there are personal obligations on every member of the management and staff to report suspicious activities

If a person is aware or suspects that a transaction or instruction is related to any crime, he/ she must report the transaction to Global Compliance /MLRO even if he/ she is not handling the transaction, instruction or funds in question.

### The Bank itself has similar obligations.

It is a regulatory requirement for an institution to have in place policy and procedures to combat money laundering/terrorist financing. These procedures as a minimum must include:

- Setup a compliance unit with a full time head
- The verification of new client identification, CDD (Know Your Customer) profiling, update customer's information and record at reasonable interval.
- Risk-based controls
- Awareness raising and training of staff members.
- Recognition and reporting suspicions of money laundering/terrorist financing.
- Retention of records.
- Independent testing (internal/external Audits);

Overseas branches/ subsidiaries should follow host country regulatory requirements or that of the State Bank whichever are more exhaustive.

It is a criminal offence if management or staff:

1. Acquire proceeds of a crime or assist anyone whom they know or suspect has committed, or benefited from any criminal conduct. **(Acquire, Possess & Assist)**

---

Cited in the Terrorist Attacks on Sept 11, 2001
03-MDL-1570 Decided 10/28/13
Admitted on 11/7/13
This document is protected by copyright.
Further reproduction is prohibited without permission.

2. Prejudice an investigation by informing the subject of a suspicion, or any third party that a disclosure has been made either internally or externally, or that the authorities may act or propose to act or investigate. **(Tip Off)**

3. Acquire knowledge or a suspicion, or has reasonable grounds to know or suspect, that benefit has been gained from criminal conduct or that the proceeds of crime have been laundered, and have not reported the same as soon as possible.  Bank staff negligent in this respect would liable for prosecution. **(Failure to Report)**

4. Have not implemented effective systems, controls and procedures to guard against money laundering. **(Systems & Controls)**

## 2.3   OFFENCES AND PENALTIES (KEY ELEMENTS)

The AML Act 2010 and other local Laws deal with AML/CDD/CFT related violations which include imprisonments or fine or both.

### 2.3.1   AML ACT 2010

**Offences (Section 3)**

A person shall be guilty of offence or money laundering, if the person;

a. Acquires, converts, possesses, uses or transfers property, knowing or having reason to believe that such property is proceeds of crime conceals or disguises the true nature, origin, location, disposition, movement or ownership of property, knowing or having reason to believe that such property is proceeds of crime.

b. Holds or possesses on behalf of any other person any property knowing or having reason to believe. that such property is proceeds of crime

c. Participates in, associates, conspires to commit, attempts to commit, aids, abets, facilitates or counsel the commission of the acts specified in the above clauses.

**Penalties (Section 4)**

Whoever commits the offence of money laundering shall be punishable with rigorous imprisonment for a term which shall not be less than one year but may extend to ten years and shall also be liable to fine which may extend to one million rupees and shall also be liable to forfeiture of property involved in the money laundering, the aforesaid fine may extend to five million rupees in case of a company and every director, officer or employee of the company found guilty shall also be punishable under this law.

### 2.3.2   NAB ORDINANCE 1999

**Offences (Section 9)**

Corruption and corrupt practices: Committed by holder of public office or any other person is cognizable offence under NAB Ordinance

---

## Penalties (Section 10)

A person who commits the offence of corruption and corrupt practices shall be punishable with imprisonment for a term which may extend to 14 years and with fine, assets and property of such person which are found to be disproportionate to the known sources of his/her income or which is acquired by money obtained through corruption and corrupt practices whether in his/her name or in the name of any of his/her dependents, or benamidars shall be liable to be forfeited.

### 2.3.3   CONTROL OF NARCOTIC SUBSTANCES ACT 1997

### Offences (Section 67)

Reporting of Suspicious financial transactions: Notwithstanding anything contained in any for the time being in force, all banks and financial institutions shall pay special attention to all unusual patterns of transactions, which have o apparent economic or lawful purpose and upon suspicion that such transactions could constitute or be related to illicit narcotics activities , the manager or director of such financial institution shall report the suspicious transactions to the Director General of ANF.

## Penalties (Section 67)

Whoever fails to supply the information in accordance with the above shall be punishable with rigorous imprisonment which may extend to three years.

### 2.3.4   ANTI TERRORISM ACT 1997

### Offences (Section 11-K)

A Person commits an offence if  he/she enters into or becomes concerned in any arrangement which facilitates the retention or control, by or on behalf of another person of terrorist property.

(a)   by concealment,
(b)   By removal from the jurisdiction.
(c)   By transfer of nominees, or
(d)   In any other way.

## Penalties (Section 11-N)

Any person who commits an offence shall be punishable on conviction with imprisonment for a term no less than six months and not exceeding five years and with fine.

Similarly, in the overseas network where the bank operates, respective Regulators also have stringent laws to deal with AML/CDD/CFT related violations and violators.

---

Cited in In re Terrorist Attacks on Sept 11, 2001 03MDL1570 Decided 11/18/2013
Archived on 11/7/13
This document is protected by copyright. Further reproduction is prohibited without permission.

# THE BANK'S POLICY FOR AML/CDD/CFT

Cited in In re Terroist Attacks on Sept 11, 2001 03MDL1570 Decided on 9/28/13

Archived on 11/7/13

This document is protected by copyright. Further reproduction is prohibited without permission.

## 3   THE BANK'S POLICY FOR AML/CDD/CFT

Keeping in view of Global threat, the bank has taken various steps to counter the menace of money laundering and terrorist financing. The bank is stringently focusing on core Compliance functions and has adopted a robust Policy across HBL network to remain complied with AML/CFT regimes in all jurisdictions.

### 3.1 AML/CFT

**It is the Policy of HBL that:**

- Statutory, regulatory & legal obligations to prevent ML and TF are fully complied with.

- Systems and controls are implemented and reviewed on set frequency in order to minimize the risk of the Bank's services being abused for the purposes of ML and TF.

- A money laundering risk assessment of the Bank's services and customer base including correspondent banks and MSBs (Money Service Businesses) are undertaken and appropriate policies, procedures and due diligence controls are applied proportionate to that risk.

- The bank would not do business with

    o   Individuals / entities subject to UN sanctions
    o   Individuals / entities under OFAC or local country sanctions as applicable
    o   Unauthorized money changers/prize bond dealers
    o   Anonymous customers
    o   Customers hiding beneficial ownership of the account
    o   Client or business segment black listed by the Bank or by the Regulators.
    o   Shell Banks & off shore corporate clients
    o   Government officials willing to open government's accounts in their personal names.

- To carry out enhanced due diligence before establishing relationships with the following High risks customers

    o   Trusts ,NGOs, NPOs, Foundations, Welfare Association, Religious Entities, Club, Societies, Financial Institution, Authorized Money Exchange Cos., Controversial entity, Jewelers,  Arms Dealers.
    o   Politically Exposed Persons (PEPs)
    o   Correspondent Relationships
    o   Customers using their personal accounts for business transactions
    o   Private Banking Customers
    o   Institutions / Individuals whose association with HBL could be considered controversial
    o   Any individual or entity that has caused or has been related to a credit,  operational or reputational loss to HBL
    o   Banking facilities refused by other banks
    o   Customers belonging to countries where AML/CDD/CFT rules are lax
    o   Non-face to face / on-line customers,
    o   Accounts of foreign nationals belonging to sanctioned countries
    o   Walk in customers
    o   Non- resident customers

---

- o  Customers in cash based business
- o  High risk geographies
- o  Customers reportedly having previous unsatisfactory / suspicious social status

- Any customer relationship where the customer's conduct gives the Bank reasonable cause to believe or suspect involvement with illegal activities is required to be reported to the Regulators or relevant authorities.

- In countries where local regulators call for a money laundering compliance reports, respective country MLROs are responsible for preparation and submission of these reports. CCO would submit a quarterly compliance report (including significant AML/CFT issues) to Board Audit Committee

## 3.2   CDD

CDD is closely associated with the fight against money-laundering. Supervisors around the world are increasingly recognizing the importance of ensuring that their banks have adequate controls and procedures in place so that they know the customers with whom they are dealing. Adequate due diligence on new and existing customers is a key part of these controls. Without this due diligence, banks can be exposed to reputational, operational, legal and financial risks

**It is a Policy of the Bank that:**

- Prior to establishing a relationship with a new customer, basic background information about the customer should be obtained, in particular,  information related with  customer's business and source/utilization of funds, the expected level of activity  and the reasons for opening the account.

- Prior to establishing relationships with correspondent banks or agents, appropriate steps must be taken to confirm the identity, integrity and due diligence procedures of those representatives or agents and, where necessary, the identities of underlying clients.

- The underlying beneficial ownership of all companies and other legal entities with whom  the bank conduct business must be established, including the beneficial ownership of all funds or other properties that are handled by the Bank.

- Customer's profile   must be updated periodically based on risk profiling of the customer. Customer activity must be monitored against a pre-determined profile, paying special attention to higher risk customers or activities.

- All new relationships should be filtered through automated solution for possible name matching with individuals / entities appearing on various negative lists maintained by the bank. In case of exact match, relationship should be discontinued.

---

## 3.3   AML/ CDD/CFT ASSOCIATED POLICIES

Following associated policies form an integral part of the AML/CDD/CFT Policy and have been developed specifically to achieve the objectives outlined in the Bank's Policy and the regulatory requirements of the State Bank of Pakistan/Financial Monitoring Unit.

### 3.3.1   Internal controls and communication

**It is a Policy of the Bank:**

- To design and implement processes, systems, and controls to comply with all applicable AML/CFT laws and regulations.

- To conduct risk assessment and develop risk profiles of the Bank's customers, products & services and to apply appropriate policies and procedures to manage such risks.

- To undertake enhanced due diligence for 'High Risk' customers.

- To communicate Bank's policies to management and staff and provide them with written procedures and control requirements to ensure ongoing compliance with AML/CFT laws and regulatory requirements.

### 3.3.2   Recognition and reporting of suspicion

**It is a Policy of the Bank:**

- To establish and follow procedures that requires employees to refer promptly any suspicious activity to Global Compliance or respective country MLRO for further review and to determine whether STR should be filed with the Regulators.

- To report all cash transactions exceeding Rs. 2.5 M to the Financial Monitoring Unit (FMU) in a manner as prescribed by the Regulator. For overseas locations, the limit may be set as per the requirement set by local regulators.

- To remain vigilant on unusual or suspicious transactions or other activities that appear not to make good business or economic sense, or activities that appear to be inconsistent with the given profile of the customer, including activities that may be indicative of criminal conduct, terrorism or corruption.

- To act competently and honestly when assessing information and circumstances that might give reasonable grounds to suspect ML or TF.

- To provide Global Compliance or respective country MLRO at his/her request with access to all customer, correspondent or counterparty information that are within the possession of the bank.

- To co-operate with law enforcement authorities in investigations concerning possible ML or TF within the confines of applicable laws, and in consultation with Global Compliance or respective country MLRO.

- Not to alert or provide any information to any person regarding suspicion or inquiry on his or her account or transactional activities or any indication of being reported to the Regulators.

Cited in In re Terrorist Attacks on Sept 11, 2001 (03-md-1570 Decided 10/28/13 on 11/7/13)

This document is protected by copyright.
Further reproduction is prohibited without permission.

---------------------------------------------------------------------------------------------------------------------------------------------------

### 3.3.3    Awareness raising and training

**It is a Policy of the Bank:**

- To make all management and staff aware of what is expected of them to prevent money laundering or terrorist financing and to advise them of the consequences for them and for the Bank if they fall short of that expectation.

- To provide comprehensive training through L& D on AML/CDD/CFT to all  staff members on regular basis

- That Management and staff are required to sign a memorandum confirming they have read and understood the Bank's AML/CDD/CFT policy and relevant procedures. Changes made on set frequencies or on adhoc basis to this policy should also be communicated to the staff

### 3.3.4    Record keeping

**It is a Policy of the Bank:**

- To retain identification and transaction documentation for the minimum period as required by applicable Laws and Regulations.

- To retain records of all reports made by staff to Global Compliance  or respective country MLRO and all suspicious activity reports made by AML Department /MLROs to Regulators for an indefinite period unless advised by the Regulator otherwise.

- To be in a position to retrieve, in a timely fashion, records that are required by law enforcement agencies as part of their investigations.

- To keep records of AML /CDD/CFT training provided to the employees, nature of the training and the names of staff who received such training.

## 3.3.5   Bank's' policy on politically exposed persons (PEPs)

### Definition

PEPs are individuals who are or have been entrusted with prominent public functions in a foreign country, for example Heads of State or of Government, senior politicians, senior government, judicial or military officials. Senior executives of state owned corporations, important political party officials, business relationships with family members or close associates of PEPs involve reputation risks similar to those with PEPs themselves. The definition is not intended to cover middle ranking or more junior individuals in the foregoing categories. PEPs include the following:

- Prominent public functions
- Government ministers,
- Senior civil servants,
- Senior judicial & Military officials,
- Senior executives of state owned corporations,
- Senior political party officials
- Close family members include:

- Spouses, children, parents, siblings and may also include other blood relatives and relatives by marriage.
- Closely associated persons include:
- Close business colleagues and personal advisors/ consultants to the politically exposed person as well as persons who are expected to benefit significantly by being close to such a person.

Branches are required to conduct enhanced due diligence of close family members / closely associated persons of politically exposed persons in line with the afore-mentioned policy references.

## Policy Rationale

PEPs and related individuals can pose unique reputation and other risks, in particular:

- Some corrupt PEPs around the globe have used traditional banking products and services as safe havens for misuse of funds, illegal activities and associated practices, including money laundering;

- PEPs enjoy prominence and are therefore under continuous public spotlight.  Their financial affairs are highly magnified and could easily trigger adverse publicity and franchise risks for the Bank;

- There is a growing attention worldwide to the misuse of public funds and increased reaction against corruption at high government levels;

- There is increasing responsibility and liability for banks and bank personnel to undertake due diligence for establishing source of wealth and investigate fund flows of PEPs.

**It is a Policy of the Bank:**

- That relationships with PEPs should be established with the prior approval of respective business Heads & Global Compliance/MLRO

- All such relationships should be classified under High Risk category for effective monitoring through automated AML solutions used by the bank

### 3.3.6  Bank's' policy on Correspondent Relationships / MSBs

**It is a Policy of the Bank:**

- To obtain sufficient information about correspondent banks/MSBs  to understand the nature of their business & activities

- All FIs relationships are subject to prior approval from FID/ Global Compliance/MLRO

### 3.3.7   Use of automated AML solutions

**It is a Policy of the Bank:**

---

- To make maximum use of technology and upgrade the systems and procedures in accordance with the upcoming challenges ML/TF

- To implement /use automated AML solutions across its network for effective transaction monitoring /real time filtering of payment instructions in line with the best industry practices.

## 3.4   NON COMPLIANCE WITH BANK'S AML/CDD/CFT POLICY

Failure to abide by the Policy set by the Bank to prevent money laundering and terrorist financing will be treated as a disciplinary issue.  Any deliberate breach will be viewed as gross misconduct.  Such cases will be referred to HR for onward initiation of disciplinary action that could lead to termination of employment and could also result in criminal prosecution and imprisonment for the concerned staff member.

## 3.5   ACCOUNTABILITIES AND RESPONSIBILITIES

### 3.5.1     The Board is Responsible for:

- Ensuring that adequate systems and controls are in place to deter and recognize criminal activity, money laundering and terrorist financing.

- Seeking  compliance reports through BAC from the CCO (including coverage of AML/CFT issues) on quarterly basis and taking necessary decisions required to protect the bank from use by criminals for ML & TF activities.

- The Oversight of the adequacy of systems and controls that are in place to deter and recognize criminal activity, money laundering and terrorist financing

### 3.5.2     Management is Responsible for:

- Ensuring that AML/CDD/CFT policy is implemented in letter and spirit.

- Ensuring that Global Compliance and respective country MLROs are promptly advised where there are reasonable grounds to know or suspect that transactions or instructions are linked to criminal conduct, money laundering or terrorist financing.

- Ensuring that Global Compliance and respective country MLROs are provided with all relevant information to carry out complete assessment of underlying transaction.

- Ensuring that CDD is being carried out and following minimum steps are taken by the branches:

    (a) At the time of establishing business relationship;

    (b) conducting occasional transactions above rupees one million whether carried out in a single operation or in multiple operations that appear to be linked;

    (c) carrying out occasional wire transfers (domestic / cross border) regardless of any threshold;

    (d) there is suspicion of money laundering / terrorist financing; and

    (e) there is a doubt about the veracity or adequacy of available identification data on the customer

- Ensuring that EDD is being carried out for high risk relationships and  following minimum steps are taken:

Cited in In re Terrorist Attacks on September 11, 2001, 03-MDL01570 Decided on 11/7/13 Archived on 11/28/13 This document is protected by copyright. Further reproduction is prohibited without permission.

a) Approval of all high risk relationships are obtained as required

b) Names of prospective customers are filtered through automated solution for possible name matching with individuals / entities appearing on various negative lists maintained by the bank. In case of an exact match, relationship should be discontinued.

c) Additional documentations as appropriate besides the minimum required documents

- Ensuring that Global Compliance and respective country MLROs are provided with adequate resources to carry out their duties effectively.

### 3.5.3    Global Compliance / MLRO are Responsible for:

- Developing and maintaining policy in line with evolving statutory and regulatory obligations.

- Making use of technology and upgrading Bank's systems and procedures in accordance with the changing compliance risks.

- Undertaking the required money laundering /terrorist financing risk assessment for customers, products or services.

- Developing and ensuring that the internal procedures remain up-dated at all times.

- Monitoring and Identifying transactions of suspicious nature and report to the Regulators in a timely manner.

- Ensuring that staff is aware of their personal obligations and adequately trained in prevention of ML/TF.

- Representing the Bank to all external agencies and any other third party enquiries in relation to money laundering prevention, investigation or compliance.

- Preparing quarterly reports on AML compliance for onward submission to the Board Audit Committee.

- Ensuring that all employees sign off an undertaking confirming having read and understood Bank's policy on AML/CDD/CFT.

- Responding promptly to any request for information made by the Regulators or law enforcement agencies.

- Take appropriate action against the staff found involve in any of such activities that comes under the domain of AML / CFT

### 3.5.4    All Employees are Responsible for:

- Remaining vigilant to the possibility of money laundering / terrorist financing through use of bank's products and services.

- Complying with all AML/CFT policies and procedures in respect of customer identification, account monitoring, record keeping and reporting.

- Promptly reporting to Global Compliance or respective country MLRO where they have knowledge or grounds to suspect a criminal activity or where they have suspicion of money laundering or terrorist financing whether or not they are engaged in AML / CFT monitoring activities.

- Ensuring that the customer is not disclosed any information related to inquiry or filing of a suspicious activity report (STRs) or Cash Transactions Report (CTRs)

- Understanding Bank's Policy and Procedures on AML/CDD/CFT and to sign-off on the required Form.

Employees who violate any of the Regulations or the Bank's AML/CDD/CFT policies and procedures will be subject to disciplinary action.

Cited in In re Terroist Attacks on Sept 11, 2001, 03MDL1570 Decided 10/28/13

Archived on 11/7/13

This document is protected by copyright. Further reproduction is prohibited without permission.

## Abbreviations used in AML/CDD/CFT Policy

| | |
|---|---|
| **CFT** | Counter Financing of Terrorism |
| **TF** | Terrorist Financing |
| **CCO** | Chief Compliance Officer |
| **MLRO** | Money Laundering Reporting Officer |
| **ML** | Money Laundering |
| **PEPs** | Politically Exposed Person |
| **BOD** | Board of Directors |
| **OFAC** | Office of Foreign Assets Control |
| **MSB** | Money Service Business |
| **CDD** | Customer Due Diligence |
| **EDD** | Enhanced Due Diligence |

Cited in In re Terroist Attacks on Sept 11, 2001 03MDL1570 Decided 10/28/13

Archived on 11/7/13

This document is protected by copyright. Further reproduction is prohibited without permission.