# Exhibit A

## MDL 1570 PLAINTIFFS' EXECUTIVE COMMITTEES
In re: Terrorist Attacks on September 11, 2001 (S.D.N.Y)

| Plaintiffs' Executive Committee for Personal Injury and Death Claims | Plaintiffs' Executive Committee for Commercial Claims |
|---|---|
| Ronald L. Motley, *Co-Chair*<br>MOTLEY RICE LLC<br>James P. Kreindler, *Co-Chair*<br>KREINDLER & KREINDLER LLP | Elliot R. Feldman, *Co-Chair*<br>Sean Carter, *Co-Chair*<br>COZEN O'CONNOR |
| Andrew J. Maloney III, *Co-Liaison Counsel*<br>KREINDLER & KREINDLER LLP<br>Paul J. Hanly, Jr., *Co-Liaison Counsel*<br>HANLY CONROY BIERSTEIN SHERIDAN FISHER & HAYES LLP | J. Scott Tarbutton, *Liaison Counsel*<br>COZEN O'CONNOR |

August 25, 2014

The Honorable Frank Maas
United States District Court
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street, Room 740
New York, NY 10007

     Re:    *In Re: Terrorist Attacks on September 11, 2001,* 03 MDL 1570 (GBD) (FM)

Dear Judge Maas:

The Plaintiffs' Executive Committees, on behalf of all plaintiffs, submit this letter and accompanying exhibits in support of their request that the Court enter an order pursuant to Federal Rule of Civil Procedure 37(a), compelling defendant Dallah Avco to promptly produce all documents identified in Dallah Avco's Amended Privilege Log ("privilege log"). The documents identified in the privilege log relate to Dallah Avco's relationship with Omar al Bayoumi, a Saudi intelligence agent who provided direct assistance to several of the September 11th hijackers in support of the 9/11 attacks, while operating under cover of a "ghost job" provided by Dallah Avco.

Dallah Avco acknowledges that each of the documents listed in its privilege log is responsive to plaintiffs' discovery requests and directly relevant to the jurisdictional inquiry commanded by the Second Circuit, but resists production of those documents on two grounds. First, Dallah Avco argues that a confidentiality provision in a contract between Dallah Avco and the Saudi Presidency of Civil Aviation ("PCA") immunizes the responsive documents from the operation of the Federal Rules of discovery. Second, Dallah Avco asserts that the production of the materials listed on the privilege log would be in conflict with Saudi law, and that Dallah Avco may avoid production of the materials on that basis. In support of this position, Dallah Avco invokes a 2011 Saudi Royal Decree prohibiting the dissemination by public employees of information "the disclosure of which [would] prejudice[ ] the State's national security, interests,

The Honorable Frank Maas
August 25, 2014
Page 2

policies or rights." Thus, Dallah Avco is arguing that the production of even the most basic information pertaining to Omar al Bayoumi, including materials as mundane as payroll slips, would prejudice the Kingdom of Saudi Arabia's "national security, interests, policies or rights."

For the reasons discussed below, Dallah Avco's refusal to produce admittedly relevant materials, based on the provisions of its contract with the PCA and alleged conflicts with foreign law, is unsupportable on both factual and legal grounds, and represents an improper attempt to avoid its discovery obligations on a wholesale basis.

Dallah Avco's unfounded resistance to its basic discovery obligations is all the more concerning given that one of the principal arguments upon which it relies – the contention that disclosure of any information concerning al Bayoumi would undermine "the national security, interests, policies, or rights" of the government of Saudi Arabia – implicitly supports plaintiffs' theory that al Bayoumi was in fact an agent of the Saudi government. Indeed, were al Bayoumi a mere middle-management employee performing legitimate work on a project for the Saudi civil aviation authority, it would be unfathomable for Dallah Avco to suggest that disclosing even the most basic information pertaining to al Bayoumi (such as payroll slips), would amount to a breach of a Royal Decree aimed at protecting Saudi state secrets.

1.    **Factual Background**

Plaintiffs allege that Dallah Avco provided a "ghost job" to Omar al Bayoumi, a Saudi government intelligence agent who provided direct assistance to three of the September 11th hijackers – Nawaf al Hazmi, Khalid al Mihdhar, and Hani Hanjour. When al Mihdhar and al Hazmi arrived in Los Angeles, al Bayoumi traveled from San Diego to Los Angeles to meet them. Immediately before doing so, al Bayoumi visited the Saudi consulate in Los Angeles, where he met with Fahad al Thumairy, a representative of the Islamic Affairs Department of the consulate who was later stripped of his diplomatic visa and barred from the United States, based on his ties to terrorism. Following his meeting with al Thumairy, al Bayoumi facilitated the future hijackers' settlement in the San Diego area, rented them an apartment, channeled funds to them, and assisted them in efforts to enroll in flight training classes. Evidence disclosed since the filing of the underlying pleadings also indicates that al Bayoumi facilitated meetings in the United States between the hijackers and Anwar al Awlaqi, the radical cleric and senior al Qaeda figure the United States has described as the hijackers' spiritual leader.[1]

The pleadings further describe that Dallah Avco provided al Bayoumi with a ghost job from 1995 through the tragic events of September 11, 2001. Throughout this time frame, al Bayoumi was stationed in San Diego despite the fact that the project to which he was allegedly

---

[1] The United States designated Awlaqi after the September 11th attacks, based on his involvement "in every aspect of the supply chain of terrorism – fundraising for terrorist groups, recruiting and training operatives, and planning and ordering attacks on innocents." Treasury Department Designation of Anwar al-Aulaqi, available at http://www.treasury.gov/press-center/press-releases/Pages/tg779.aspx. Further underscoring his importance in the global al Qaeda organization, Awlaqi, an American citizen, was targeted and killed by the United States in a drone strike in Yemen in September 2011.

The Honorable Frank Maas
August 25, 2014
Page 3

---

assigned was located in Saudi Arabia.  Moreover, al Bayoumi reported for work only once
during this seven year period.  Meanwhile, witnesses who knew al Bayoumi personally testified,
and the 9/11 Joint Inquiry found, that al Bayoumi "had access to seemingly unlimited funding
from Saudi Arabia," despite his alleged status as a mere project manager for Dallah Avco.  In
addition, the Department of Justice determined that al Bayoumi called phone numbers associated
with the Saudi consulate in Los Angeles, the Saudi Cultural Mission in Washington, D.C., and
the Saudi embassy in Washington, D.C. over 100 times, during the two and a half month period
after he met the hijackers in Los Angeles and began assisting them.

Consistent with this and other evidence, plaintiffs alleged in their earliest pleadings that
al Bayoumi was in fact a Saudi intelligence agent, and that his ghost job at Dallah Avco enabled
him to serve as part of a covert support network for the September 11th hijackers, and thereby
directly aided and enabled the September 11th attacks.

A broad array of facts and evidence disclosed since the filing of the underlying pleadings
in this litigation support plaintiffs' theories against Dallah Avco.  Of particular note, plaintiffs'
theories enjoy the support of the affidavit testimony of former Senator Bob Graham, who in his
role as the Chairman of the Senate Select Committee on Intelligence also served as the Co-Chair
of the Congressional Joint Inquiry Into Intelligence Community Activities Before and After the
Terrorist Attacks of September 11, 2001 ("9/11 Joint Inquiry").  In his affidavit, attached hereto
as Exhibit A, Senator Graham testifies as follows:

> Based on my experiences as Co-Chair of the Joint Inquiry, and the evidence
> collected by the Joint Inquiry during the course of its investigation into the events
> of September 11, 2001, the information contained in the Final Report of the 9/11
> Commission, and reports and published materials I have reviewed, I am
> convinced there was direct line between at least some of the terrorists who carried
> out the September 11th attacks and the government of Saudi Arabia, and that a
> Saudi government agent living in the United States, Omar al Bayoumi, provided
> direct assistance to the September 11th hijackers Nawaf al Hazmi and Khalid al
> Mihdhar.  Based on the evidence discovered by the Joint Inquiry, I further believe
> that al Bayoumi was acting at the direction of elements of the Saudi government
> and that an official from the Islamic and Cultural Affairs section of the Saudi
> Consulate in Los Angeles, Fahad al Thumairy, likely played some role in the
> support network for the 9/11 attacks.  In May 2003, the United States revoked al
> Thumairy's diplomatic visa and banned him from the United States.

Senator Graham's testimony is consistent with recent disclosures relating to the
investigation and findings of the National Commission on Terrorist Attacks Upon the United
States ("9/11 Commission"), as well as the views of senior 9/11 Commission members
concerning evidence of the Saudi Ministry of Islamic Affairs' role in supporting al Qaeda's
global operations and the September 11th attacks themselves.  For instance, the definitive account
of the 9/11 Commission's investigation confirms that the staff members responsible for
conducting the inquiry into al Bayoumi's role in the attacks "felt strongly that they had
demonstrated a close Saudi government connection to the two hijackers in San Diego," but that

The Honorable Frank Maas
August 25, 2014
Page 4

_____

political considerations led to the omission of that conclusion from the 9/11 Commission's Final Report. Philip Shenon, *The Commission: The Uncensored History of the 9/11 Investigation*, pp. 398-99 (2008).[2]  Commissioner John Lehman also endorsed this position, reportedly expressing his view that "it was clear early on that there was some sort of Saudi support network in San Diego that had made it possible for the hijackers to hide in plain sight." *Id.* at p. 185.  Further, concerning the evidence implicating elements of the Saudi Ministry of Islamic Affairs embedded in the Kingdom's embassies in the attacks, Commissioner Lehman confirmed that "it was well-known in intelligence circles that the Islamic affairs office" of the Saudi embassies and consulates "functioned as the Saudis' 'fifth column' in support of Muslim extremists."[3]  *Id.*

In April 2013, the Second Circuit Court of Appeals reversed Dallah Avco's dismissal on personal jurisdiction grounds, and remanded Dallah Avco for jurisdictional discovery.  The Second Circuit recognized that plaintiffs' claims against Dallah Avco included theories based on Dallah Avco's own conduct in providing cover employment for al Bayoumi while he was in the United States and providing support to the September 11th hijackers, and concluded that "plaintiffs' allegations suggest that Dallah Avco may have directed its activities, related to Bayoumi's cover employment, towards the United States."  The Second Circuit further concluded that plaintiffs' allegations concerning Dallah Avco "suggest a closer nexus between [Dallah Avco's] alleged support of al Qaeda and the September 11, 2001 attacks," and remanded the cause of action against Dallah Avco for jurisdictional discovery.

## 2.   Plaintiffs' First Set of Jurisdictional Requests for Production of Documents

Pursuant to the Second Circuit's remand, plaintiffs served their First Set of Jurisdictional Requests for Production of Documents Directed to Dallah Avco on August 22, 2013, attached hereto as Exhibit C.  Relevant to the present motion, those requests seek information relating to: (1) Dallah Avco's relationship with al Bayoumi; (2) Dallah Avco's relationship with the PCA; and (3) the PCA project to which al Bayoumi was allegedly assigned.

Dallah Avco served its responses to Plaintiffs' discovery requests on November 11, 2013. Those responses were accompanied by Defendant Dallah Avco's privilege log, which Dallah Avco thereafter amended on several occasions.  Dallah Avco's most recent Amended Privilege

_____

[2] Relevant excerpts from *The Commission* are attached hereto as Exhibit B.
[3] As discussed *supra*, al Thumairy was himself a Ministry of Islamic Affairs representative, embedded in the Saudi consulate in Los Angeles.  Investigations following the September 11th attacks similarly revealed that Muhammed Fakihi, the head of the Islamic Affairs Department of the Saudi Embassy in Berlin, assisted members of the Hamburg al Qaeda cell that planned and coordinated the September 11th attacks.  Further, Commissioner Lehman "was convinced" that "radicals who worked in the [Saudi] embassy's Islamic affairs office in Washington" were responsible for initiating transfers from accounts associated with Princess Haifa, the Saudi Ambassador's wife, that benefited persons who were supporting al Midhar and al Hazmi.  Thus, the evidence directly implicates officials of the Islamic Affairs departments of three separate Saudi diplomatic missions in the September 11th attacks.  In addition, the Ministry of Islamic Affairs also principally controlled and directed the Saudi da'wah organizations that, according to the U.S. government, served as the primary sources of financial and logistical support for al Qaeda's global operations during the decade leading up to the September 11th attacks.

The Honorable Frank Maas
August 25, 2014
Page 5

_____

Log is attached hereto as <u>Exhibit D</u>.  In explaining its grounds for withholding the documents identified in the privilege log, Dallah Avco stated as follows:

> The following documents [listed on the privilege log] are privileged under Article 3 of the PCA-Dallah Avco contract.  Saudi Arabian law imposes an obligation to abide by contract terms.  Saudi law also imposes criminal penalties against disclosure of confidential governmental information.  *See Penal Law on Dissemination and Disclosure of Classified Information and Documents*, Royal Decree No. (M/35) Art. 1, 5 (08-05-1432 Hijri).

A copy of Royal Decree No. (M/35) is attached hereto as <u>Exhibit E</u>.

As a review of the identifying information provided in the privilege log confirms, Dallah Avco has invoked its objections based on its contract with the PCA and the Saudi Royal Decree governing dissemination of "classified information" to justify the wholesale withholding of virtually all information in its possession pertaining to al Bayoumi.  Indeed, Dallah Avco has produced relatively few documents to date, which consist of:  (1) three pages from Dallah Avco's November 29, 2001 contract with the PCA (consisting of the two page Table of Contents and a single, partially redacted page containing that contract's confidentiality provision);[4] (2) letters between Dallah Avco and Saudi government agencies pertaining to Dallah Avco's withholding of documents responsive to plaintiffs' discovery requests; (3) a two paragraph note sent to a Wall Street Journal reporter concerning al Bayoumi (which Dallah Avco had initially included on the privilege log); and (4) a copy of the affidavit Dallah Avco previously filed in support of its original motions to dismiss in these proceedings.  Copies of these documents are attached hereto as <u>Exhibit F</u>.

The parties conferred telephonically on February 14, 2014 concerning Dallah Avco's responses to plaintiffs' discovery requests.  Before and during the call, Dallah Avco confirmed that the contractual confidentiality provision and Royal Decree relating to classified information were being invoked as distinct and independent grounds for withholding all documents on the privilege log.  In response, plaintiffs expressed their view that Dallah Avco's contract with the PCA could not possibly serve as a basis for withholding responsive documents from production.  Plaintiffs indicated that Dallah Avco's reliance on the confidentiality provision in that contract was especially inappropriate given that:  (1) Dallah Avco had not produced the entire contract for review; and (2) the few pages Dallah Avco had produced were from a November 29, 2001 contract, which post-dated most of the documents being withheld.  Plaintiffs also questioned the predicate for Dallah Avco's claim that the documents on the privilege log constituted "classified information" within the meaning of the Royal Decree, noting that plaintiffs had not received any indication that any Saudi government agency had issued any determination to that effect, and that many of the documents on the log had been generated internally by Dallah Avco or by third parties (and not by a Saudi agency).  Plaintiffs also raised concerns regarding the scope of the

_____

[4] Dallah Avco's privilege log references the November 29, 2001 contract twice, but does not reference any other iterations of the contract, making it unclear whether different versions of the same contract exist.  Plaintiffs are unable to determine if they are different.

The Honorable Frank Maas
August 25, 2014
Page 6

_____

searches conducted by Dallah Avco, explaining the Dallah Avco's broad objections to every
request rendered it impossible to discern which of the requests were included in the scope of
Dallah Avco's searches, if any.

Although the meet and confer was scheduled well in advance of the date on which it
occurred, and plaintiffs specifically advised in their request for the call that they wished to
discuss Dallah Avco's privilege objections and the scope of Dallah Avco's searches for
responsive documents, counsel for Dallah Avco was largely unable or unwilling to provide
substantive responses to plaintiffs' questions and concerns during the call, indicating repeatedly
that they would need to check with their client and get back to plaintiffs on even the most basic
issues. For instance, Dallah Avco's counsel declined to say whether searches were conducted in
response to any particular request or to provide any explanation as to the manner in which
searches for responsive documents were carried out, repeatedly stating only that Dallah Avco
had searched for documents "relating to Omar al Bayoumi" and that they would need to confer
with their client in order to provide any additional detail.

Two weeks after the meet and confer, counsel for Dallah Avco sent a following email to
plaintiffs' counsel about certain of the issues discussed during the February 14th call, a copy of
which is attached as Exhibit G hereto. In that email, counsel for Dallah Avco acknowledged that
the few pages from its 2001 contract with the PCA that had been produced post-dated many of
the documents identified on the privilege log, but assured plaintiffs that "our client reports that
the particular contract excerpt we produced is one of a series of contracts between the PCA and
Dallah Avco with similar confidentiality language. Our client has not yet been able to locate the
earlier contracts, but if we find them, we will produce those confidentiality clauses as well." As
to plaintiffs' request that Dallah Avco produce the entirety of any contract it intended to rely
upon to withhold documents, counsel for Dallah Avco advised that "[o]ur client's position is that
the remainder of the contract is itself covered by the confidentiality clause," but offered plaintiffs
the comfort of knowing that "[w]e can report, however, that we have reviewed the remaining
provisions and that none of them provides any exceptions or limitations to the confidentiality
obligation imposed by Article 3." The February 26, 2014 correspondence further indicated that
Dallah Avco was awaiting word from the Saudi government as to whether disclosure of the
documents on the privilege log would be permitted, and that counsel was still awaiting details
from Dallah Avco concerning the scope of the searches undertaken for documents responsive to
plaintiffs' requests. To date, plaintiffs have heard no further word on these latter issues, or other
issues left outstanding in Dallah Avco's February 26 correspondence.

3.      **Dallah Avco Should Be Compelled to Produce the Documents Identified on its
        Privilege Log**

One of the specific purposes for which the Second Circuit remanded Dallah Avco to this
Court for jurisdictional discovery was to allow plaintiffs to develop evidence concerning their
contention that Dallah Avco provided a ghost job to Omar al Bayoumi. The documents
identified on Dallah Avco's privilege log are of central relevance to this inquiry, as they relate in
the most direct and specific sense to Dallah Avco's relationship with al Bayoumi. In fact, even
Dallah Avco, which has evidently defined the concept of relevance in the narrowest of ways in

The Honorable Frank Maas
August 25, 2014
Page 7

_____

its search for documents responsive to plaintiffs' document requests, admits that the documents
in question are relevant and responsive. Its efforts to resist production of these materials
wholesale are legally and factually unsupportable, and represent a transparent attempt to frustrate
the operation of the Federal Rules of discovery and negate the Second Circuit's ruling and
mandate.

> **A.** **Dallah Avco's Contract With the PCA Cannot Serve as a Basis to Withhold
> the Relevant Information Identified in the Privilege Log**

Dallah Avco's contention that the provisions of its private contract with the PCA can
justify the withholding of documents of central relevance to the Second Circuit's remand is
contrary to the law of this Circuit and the Federal Rules of Civil Procedure. As courts in this
Circuit and elsewhere consistently have held, parties may not shield relevant information from
discovery through confidentiality provisions in private contracts. See Griffin v. Mashariki, No.
96-cv-6400, 1997 U.S. Dist. LEXIS 19325, *2 (S.D.N.Y. Dec. 8, 1997) ("the mere fact that
settling parties agreed to maintain the confidentiality of part of the settlement...cannot serve to
shield that statement from discovery"); Tribune Co. v. Purcigliotti, No. 93-cv-7222, 1996 U.S.
Dist. LEXIS 8433, *9 (S.D.N.Y. June 19, 1996) (same); Magnaleasing, Inc. v. Staten Island
Mall, 76 F.R.D. 559, 562 (S.D.N.Y. 1977) (confidentiality clause does not bar discovery of
relevant portions of a settlement agreement); In re Continental Ins. Co., 994 S.W.2d 423, 425
(Tex. App. – Waco 1999, no writ) (parties to litigation "cannot protect relevant information from
discovery by confidentiality provisions in contracts, even settlement agreements. The private
agreement between two individuals does not override the discovery rules.").

Consistent with the well-settled view that confidentiality provisions of private contracts
may not serve to shield a party from its discovery obligations under the Federal Rules, Dallah
Avco's reliance on the confidentiality provision of its contract with the PCA, as a basis to
withhold documents of central relevance to the inquiry into its responsibility for one of the most
significant events in the history of the United States, is unsupportable as a matter of law.

> **B.** **Dallah Avco Has Failed to Provide Competent Support That Any
> Contractual Confidentiality Provision Applies to the Documents Identified
> on the Privilege Log**

Although Dallah Avco's reliance on the provisions of an alleged contract with the PCA to
resist discovery is legally unjustifiable, its reliance is uniquely baseless, given its failure to
provide any competent support that the documents listed on the privilege log even fall within the
ambit of a confidentiality provision of any relevant contract. As discussed previously, the sole
document Dallah Avco has offered to support its claim that confidentiality provisions of
contracts with the PCA apply to the documents on the privilege log is a single, partially redacted,
page from an alleged November 29, 2001 contract. The defects in Dallah Avco's reliance on that
document hardly require elaboration, but include the following:

- *The majority of the documents listed on the privilege log pre-date the alleged contract in
which the proffered confidentiality provision appears.* For obvious reasons, Dallah Avco

The Honorable Frank Maas
August 25, 2014
Page 8

---

cannot reasonably rely on a confidentiality provision (allegedly) included in a November 29, 2001 contract to justify withholding documents created and in Dallah Avco's possession before that date. Dallah Avco's effort to avoid this obvious truth based on its own unilateral and undocumented assurance that earlier contracts with the PCA (which Dallah Avco can no longer find) contain "similar confidentiality language," *see* Exhibit G, is incompatible with the most basic foundational principles of the American (adversarial) system of justice.

- *It is impossible to assess the significance, relevance, or import of an excerpted provision of a contract without reading the entire contract.* There is perhaps no rule of contract interpretation more fundamental than the principle that a contract must be read as a whole. As the Second Circuit has explained, "[t]he rules of contract interpretation…do not contemplate considering any provision of the contract in isolation 'but in light of the obligation as a whole and the intention of the parties manifested thereby.'" U.S. ex rel. Anti-Discriminatory Ctr. of Metro N.Y., Inc. v. Westchester Cnty., 712 F.3d 761, 767 (2d Cir. 2013) (quoting JA Apparel Corp. v. Abboud, 568 F.3d 390, 397 (2d Cir. 2009)). It is impossible to glean the meaning of the confidentiality provision in the purported contract between Dallah Avco and the PCA, or the parties' intent concerning the operation of that provision with respect to the particular documents identified on the privilege log, by reading that (partially redacted) provision in isolation. Even more unsustainable is Dallah Avco's suggestion that the excerpted and partially redacted provision of the 2001 contract provides sufficient support to assess the scope and applicability of "similar" provisions from earlier contracts that have not been produced at all. And, for the reasons discussed previously, plaintiffs' are not required under the American justice system to accept counsel for Dallah Avco's assurance that they have "reviewed the remaining provisions" of the contract and that "none of them provides any exceptions or limitations to the confidentiality obligation." *See* Exhibit G.

- *Dallah Avco cannot use its alleged contract with the PCA as both a sword and a shield, selectively producing the provisions that support its objections to discovery, but withholding the provisions that likely support plaintiffs' theories of jurisdiction.* In connection with its assertion of privilege based on the provisions of its alleged contract with the PCA, Dallah Avco has made a conscious and intentional decision to produce selected pages of the alleged contract that support its position, while simultaneously claiming that all of the remaining pages of the contract (which may undermine Dallah Avco's privilege argument and also provide substantive evidence supporting plaintiffs' theories) are themselves subject to the confidentiality provision and therefore privileged. This constitutes the classic "sword and shield" approach to the handling of allegedly privileged materials in the discovery process that the Federal Rules and courts have long rejected as improper. Indeed, Dallah Avco's production of the confidentiality provision of its alleged contract with the PCA constitutes a waiver of any potential privilege applicable to the remaining provisions of the contract. *See* F.R.E. 502(a). Accordingly, Dallah Avco should be required to produce all remaining pages of the contract on this additional basis as well.

The Honorable Frank Maas
August 25, 2014
Page 9

---

- *Certain documents on the privilege log were authored by, or disclosed to, third-parties, and/or relate to the investigations into al Bayoumi's involvement in the September 11th attacks, and not the ANSS project for the PCA.* Dallah Avco has withheld on the basis of the confidentiality provision all of al Bayoumi's employment records. However, the Notes to the 9/11 Commission's Final Report confirm that the PCA voluntarily produced all of al Bayoumi's employment records to the FBI, which in turn provided those materials to the 9/11 Commission. In addition, Dallah Avco separately disclosed information pertaining to its relationship with al Bayoumi to the Wall Street Journal. Individually and collectively, these voluntary disclosures of al Bayoumi's employment records and information undermine any attempt by Dallah Avco to now argue that the production of documents relating to al Bayoumi is prohibited by any alleged contract with the PCA.[5] Further still, the withheld employment records include payroll slips, which by definition include information that would have been disclosed to third-party banks involved in the relevant transactions, and for which no expectation for confidentiality can possibly exist. Dallah Avco also has withheld documents sent from Michael Snowden, the U.S. Consul in Jeddah, on January 21, 2002, relating to the investigation into al Bayoumi's possible role in the September 11th attacks. As in the case of the employment records the PCA voluntarily released to third parties, or necessarily expected to be disclosed to third parties, it is implausible to suggest that the confidentiality provision of any alleged contract with the PCA applies to records generated by third parties who are not themselves bound by that provision. This is especially true in the case of letters from Consul Snowden, which came into Dallah Avco's possession as a result of investigations of the September 11th attacks, rather than Dallah Avco's performance of services under the PCA contract.[6]

- *Dallah Avco has provided no support for the proposition that al Bayoumi worked on any PCA project.* Dallah Avco's failure to provide any substantive information pertaining to al Bayoumi renders it impossible to determine whether al Bayoumi actually performed any work in relation to any PCA project. This failure presents a further foundational defect in its efforts to rely on any PCA contract to shield itself from discovery.

For all of the foregoing reasons, plaintiffs submit that Dallah Avco's privilege objections based on the purported confidentiality provisions of its alleged contracts with the PCA are wholly unsupported and defective as a matter of law.

---

[5] Contemporaneous with the issuance of its Final Report, the 9/11 Commission released a formal statement urging that all of its records be made public by the earliest possible date, further confirming that the PCA had no expectation of confidentiality with respect to the production of the documents when it released them to the FBI.
[6] All of these points apply with equal, and perhaps greater, force to Dallah Avco's contention that the records in issue are classified materials under the Royal Decree.

The Honorable Frank Maas
August 25, 2014
Page 10

---

**C.   Dallah Avco Should Be Required to Produce the Requested Documents Because International Comity Does Not Compel a Different Result**

Equally unavailing are Dallah Avco's efforts to avoid discovery by arguing that virtually every document in its possession that mentions al Bayoumi is a confidential state secret, the disclosure of which would prejudice the government of Saudi Arabia's "national security, interests, policies, or rights." Here again, Dallah Avco's position lacks competent foundation in either law or fact.

"A state having jurisdiction to prescribe or enforce a rule of law is not precluded from exercising its jurisdiction *solely* because such exercise requires a person to engage in conduct subjecting him to liability under the law of another state having jurisdiction with respect to that conduct." United States v. First Nat'l City Bank, 396 F. 2d 897, 901 (2d Cir. 1968) (emphasis in original) (quoting RESTATEMENT (2D), FOREIGN RELATIONS LAW OF THE UNITED STATES, § 39(1) (1965)). Where, as here, a party invokes foreign law in an effort to avoid discovery, the party resisting discovery must demonstrate that the balance of comity factors weigh in favor of non-disclosure. Strauss v. Credit Lyonnais, S.A., 249 F.R.D. 429, 438-39 (E.D.N.Y. 2008) (citing RESTATEMENT (3D) OF FOREIGN LAW RELATIONS LAW OF THE UNITED STATES § 442(1)(c)).

Where a conflict with foreign law exists, courts apply a balancing test taken from the Restatement of the Foreign Relations Law of the United States and Supreme Court's decision in Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Ct. for the S. Dist. of Iowa, 482 U.S. 522, 539-40 (1987) to determine whether to order compliance or excuse it. See In re: Grand Jury Subpoena Dated August 9, 2000, 218 F. Supp. 2d 544, 554 (S.D.N.Y. 2002); see also Wultz v. Bank of China Ltd., 298 F.R.D. 91 (S.D.N.Y. 2014). In Wultz, the court cited to Aerospatiale to identify factors to consider in evaluating the propriety of an order directing the production of documents or testimony in contravention of foreign law:

> (1) the importance to the investigation or litigation of the documents or other information requested; (2) the degree of specificity of the request; (3) whether the information originated in the United States; (4) the availability of alternative means of securing information; and (5) the extent to which noncompliance with the request would undermine important interest of the United States, or compliance with the request would undermine the important interests of the state where the information is located.

Wultz, 298 F.R.D. at 96 (internal citations omitted). Wultz identified two additional factors considered in this analysis by courts within the Second Circuit:

> (6) the hardship of compliance on the party or witness from whom discovery is sought; and (7) the good faith of the party resisting discovery.

Id. (internal citations omitted).

The Honorable Frank Maas
August 25, 2014
Page 11

_____

Here, Dallah Avco has failed to make a competent showing that a conflict with foreign law exists, a defect that is itself fatal to its effort to avoid discovery. Further, even assuming it could provide support for the existence of such a conflict, the relevant factors overwhelmingly support an order directing production of the privilege log documents.

1.      **Dallah Avco Has Offered No Support for its Unilateral Claim That the Documents are "Classified"**

To demonstrate that this Court should engage in an <u>Aeropastiale</u> analysis at all, Dallah Avco must first provide competent support for its claim that disclosure of the documents at issue would trigger a conflict with foreign law and subject it to meaningful sanction by the foreign state, a preliminary showing not satisfied here despite ample opportunity. During the parties' meet and confer and in later communications, Dallah Avco (a private entity) acknowledged that it had unilaterally decided that the documents on the privilege log were classified under the Saudi Royal Decree, relying on an alleged confidentiality clause of a purported contract with the PCA. The PCA has, in turn, purportedly sought guidance from the Saudi Ministry of Foreign Affairs, which apparently still has not responded, despite the fact that the requests were served a year ago and Dallah Avco served its objections invoking the Saudi Royal Decree in November 2013. Stated simply, nearly a year after the discovery requests were served, no statement or ruling from a competent Saudi government authority has been provided to support the claim that the documents fall within the scope of the Saudi Royal Decree.[7] Further, despite having ample opportunity to do so, Dallah Avco has never even attempted to explain how disclosure of each of the documents on the log would prejudice the "national security, interests, policies, or rights" of the Saudi state. In the absence of such factual support, Dallah Avco has failed to identify any actual conflict with foreign law.

This failure is all the more damning given the nature of the documents at issue, and the Saudi government's own treatment of those materials in dealings with third parties. Again, Dallah Avco has included virtually every document referencing al Bayoumi in the privilege log, including simple administrative records and items such as payroll slips. By definition, the information contained on payroll slips would be disclosed in normal course to third-party banks. Moreover, the 9/11 Commission's Final Report indicates that the PCA freely released al Bayoumi's employment records to the FBI, which then provided those records to the 9/11 Commission. These facts undermine Dallah Avco's efforts to argue that virtually any document that even mentions al Bayoumi is a classified state secret.

2.      **The <u>Aeropastiale</u> Factors Overwhelmingly Support an Order Compelling Production**

Even if Dallah Avco could make a competent showing that disclosure of each of the documents on the privilege log would conflict with the Royal Decree, the <u>Aeropastiale</u> factors overwhelmingly favor an order requiring production of those documents.

_____

[7] This is true even though Saudi Arabia was itself reinstated as a defendant on December 19, 2003.

The Honorable Frank Maas
August 25, 2014
Page 12

_____

a)    **Noncompliance with Discovery Undermines the United States'**
**Important Interests in Combating Terrorism**

In the context of the litigation surrounding the terrorist attacks of September 11th, the fifth factor, namely whether noncompliance with discovery would undermine the interests of the United States, is paramount. Strauss v. Credit Lyonnais, S.A., 242 F.R.D. 199, 214 (E.D.N.Y. 2007). The "United States has a substantial interest in fully and fairly adjudicating matters before its courts. When that interest is combined with the United States's [sic] goal of combating terrorism, it is elevated to nearly its highest point." Wultz, 298 F.R.D. at 102 (quoting Weiss v. Nat'l Westminster Bank, PLC, 242 F.R.D. 33, 45 (E.D.N.Y. 2007) (quotations omitted)) (holding that while Israel's laws demonstrate its interest in confidentiality, that interest, while significant, can be mitigated by factors such as counter-terrorism).

The United States' compelling interest in ensuring that its courts have the information necessary to fully adjudicate claims arising from the alleged material sponsorship of terrorism is embodied in the civil remedy of the ATA itself, which reflects Congress' determination that private enforcement actions by victims of terrorism should serve as a critical tool in combatting the sponsorship of terrorism, and promoting our national security. As one of the ATA's sponsors explained, the ATA was intended to ensure that "justice [is] sought against terrorists even if not by [foreign governments or] the United States." 137 Cong. Rec. S. 1771 (Daily Ed. Feb 7, 1991 Senator Grassley). Consistent with these statements and the ATA's obvious purpose, the Second Circuit Court recently "recognized the important U.S. interest at stake in arming private litigants with the 'weapons available in civil litigation' to deter and punish the sponsorship of terrorism." Linde v. Arab Bank, PLC, 706 F.3d 92, 112 (2d Cir. 2013).

That the present claims against Dallah Avco involve its direct role in supporting the September 11th attacks renders the United States' interest in ensuring a full and fair adjudication of the claims all the more compelling. As this Court need not be reminded, those attacks claimed the lives of literally thousands of individuals on U.S. soil, wrought economic devastation of an unprecedented scale, and fundamentally altered the trajectory of history. The attacks catapulted the United States into multiple military confrontations, and have required the United States to spend several trillion dollars to protect its national security interests. On the fifth anniversary of the attacks, then President Bush described the global battle triggered by the attacks as the "decisive ideological struggle of the 21[st] Century," and noted that "for America, 9/11 was more than a tragedy – it changed the way we look at the world." *See* President's Address to the Nation on the Fifth Anniversary of 9-11, available at http://uspolitics.about.com/od/speeches/a/9_11_bush.htm. President Obama echoed those sentiments on the tenth anniversary of the attacks, stating that "9/11 was not only an attack on the United States, it was an attack on the World and on the humanity and hopes that we share." *See* Statement of President Obama on the 10th Anniversary of the Attacks of 9-11, available at http://egypt.usembassy.gov/pr091011_1.html.

Given the transformative impact the September 11th attacks have had on our nation's security, interests and policies, it is impossible to conceive of a case in which the interests of the

The Honorable Frank Maas
August 25, 2014
Page 13

_____

United States in obtaining a full adjudication of the responsibility of a defendant (for events occurring on U.S. soil) could be more compelling.

   **b)**    **The Discovery Requests Are Important to This Litigation**

   In addition to the compelling U.S. interests in combating terrorism, there can be no dispute that the documents in issue are of critical importance to the present litigation. When evaluating the importance of the information requested for the purposes of international comity, courts "examine the role that the desired information plays in the action." <u>CE Int'l Resources Holdings, LLC v. S.A. Minerals Ltd. P'ship</u>, 12-cv-08087, 2013 U.S. Dist. LEXIS 85650, *23 (S.D.N.Y. June 12, 2013). Here, Dallah Avco itself has acknowledged that the documents at issue are directly and centrally relevant to the inquiry commanded by the Second Circuit. Thus, this factor also weighs heavily in favor of production.

   **c)**    **The Discovery Requests Are Sufficiently Specific to Permit Dallah Avco to Produce Relevant Materials**

   The second factor, namely the degree of specificity of the requests, also favors production. The dispute concerns specific documents that Dallah Avco has already retrieved and identified on its privilege log.

   **d)**    **The Documents Relate to Activities in the United States of a U.S.-Based Employee**

   Although it appears that many of the documents listed in the privilege log originated outside of the United States, this factor does not support Dallah Avco's efforts to avoid discovery, in the unique circumstances of this case. In particular, the documents in question are employment and work records relating to an employee who was, at all relevant times, stationed in the United States. Dallah Avco cannot credibly argue it ever held any reasonable expectation that records relating to activities carried out in the United States by an employee stationed here would be immune from U.S. discovery rules. In fact, al Bayoumi would have received communications and employment records relating to his work here, and certain of the records, such as his payroll slips, would have been disclosed to banks in the United States. These circumstances are far different from cases in which the records bear little, if any, relation to persons or activities within the United States. For these reasons, the fact that certain of the documents[8] originated outside of the United States is of little significance, and all of the other comity factors clearly favor an order requiring disclosure of the records in any case.

,

_____

[8] The letter from Consul Snowden was issued from the U.S. consulate, and is thus properly viewed as originating in the United States.

The Honorable Frank Maas
August 25, 2014
Page 14

---

   e)  **The Information Plaintiffs Seek Is Not Available By
Alternative Means**

  Plaintiffs are unable to obtain the information they seek from Dallah Avco, a party to the
litigation, from an alternative source.  The documents sought originated with or are in the
custody of Dallah Avco, and are not in the public domain or otherwise available to Plaintiffs
through traditional litigation channels.

   f)  **Dallah Avco Has Not Shown That it Will Experience Any
Hardships By Producing the Information**

  Courts considering whether compliance with a discovery order will impose a hardship on
the party from whom compliance is sought analyze the likelihood that the enforcement of the
foreign law will be successful.  Strauss, 242 F.R.D. at 224.  When the chances of penalties are
"slight" or "speculative," or where defenses exist, courts will compel responses from the party
resisting discovery.  United States v. First Nat'l City Bank, 396 F.2d 897, 905 (2d Cir. 1968).
Further, "any potential hardship faced by a primary defendant in litigation may be weighed less
heavily by the court."  Alfadda v. Fenn, 149 F.R.D. 28, 39 (S.D.N.Y. 1993).

  As the party objecting to discovery, Dallah Avco bears the burden to demonstrate, in
specific and precise terms, why its objections to each request are proper.  Cox v. McClellan, 174
F.R.D. 32, 34 (W.D.N.Y. 1997).  To carry that burden, Dallah Avco must substantiate its
objections with an affidavit or other evidence which supports its objections.  See Arias-Zeballos
v. Tan, No. 06 Civ. 1268, 2007 U.S. Dist. LEXIS 40245, *4 (S.D.N.Y. June 1, 2007).

  As discussed above, Dallah Avco has failed to substantiate its objections based on the
Saudi Royal Decree in any way.  It has not offered any statement from a competent Saudi agency
to support its claim that the privilege log documents are classified, instead relying solely on its
own unilateral designation, and has presented no affidavit to support its resistance to discovery
on the basis of either of its objections.  Further, it has asserted the claim of privilege on a
sweeping basis as to all of the documents, including documents previously released to third-
parties, without even attempting to explain as to each how the disclosure would prejudice the
Kingdom's "national security, interests, policies, or rights."  Stated simply, its assertions of a
potential conflict with Saudi law and possible sanction are entirely speculative.  First Nat'l City
Bank, 396 F.2d at 905.  The fact that Dallah Avco is a primary defendant in this litigation
undercuts its speculative claims of hardship further still.  Alfadda, 149 F.R.D. at 38-39.  The fact
that the Kingdom is also a defendant undercuts those claims even more so.

   g)  **Dallah Avco's Attempts At Compliance With Plaintiffs'
Requests Are Not In Good Faith**

  Finally, the breadth of Dallah Avco's objections, and its approach to presenting those
objections, also indicate a lack of good faith by Dallah Avco in relation to the discovery process.
Once again, Dallah Avco has invoked its privilege objections on a sweeping basis and without
any competent factual support, in a broad attempt to avoid discovery wholesale, and negate the

The Honorable Frank Maas
August 25, 2014
Page 15

---

force of the Second Circuit's remand. Further, Dallah Avco has made no effort to reconcile its broad assertions of privilege with the fact that many (if not all) of the documents previously were released to third parties. Dallah Avco has refused to produce copies of the contracts upon which it relies, and has never produced a document from a competent governmental authority to support its claim that each of the privilege log documents is "classified." In short, Dallah Avco's response to the discovery requests has amounted to nothing less than a total failure to comply with its discovery obligations.

Dallah Avco's efforts to create the appearance of good faith, through letters to the PCA inquiring as to whether the PCA will authorize release of the documents, are entirely unconvincing. As a primary matter, Dallah Avco dedicated much of its initial letter to the PCA to advocating its view that al Bayoumi was technically an employee of the PCA itself, rather than Dallah Avco. *See* Exhibit F (DA000019-22). The obvious import of those statements was to encourage concern that release of records relating to al Bayoumi would potentially implicate the PCA itself in the September 11th attacks, an approach that has the necessary (and likely intended) effect of making the PCA's cooperation less likely. Further, Dallah Avco makes no effort in its letter to the PCA to convince the PCA that cooperation is critical, by explaining the potential adverse consequences of failing to produce the records. More fundamentally, Dallah Avco's letter to the PCA focuses solely on Dallah Avco's claim that the documents are privileged under the confidentiality provision of its alleged contracts with the PCA, and does not at all disclose Dallah Avco's unilateral assertion that the documents are also classified under the Saudi Royal Decree, or seek the PCA's opinion on that matter. Thus, the record is devoid of any indication that Dallah Avco has made any meaningful attempt to resolve the alleged conflict with Saudi law, which itself rests solely on Dallah Avco's unilateral assertion that the documents are classified. See Linde v. Arab Bank PLC, 269 F.R.D. 186, 199 (E.D.N.Y. 2010) (finding that defendant's efforts to obtain permission to disclose documents were "calculated to fail.").

For all of the foregoing reasons, plaintiffs respectfully request that the Court issue an order directing Dallah Avco to produce all of the documents listed on its privilege log.

Respectfully submitted,

Sean P. Carter
THE MDL 1570 PLAINTIFFS' EXECUTIVE
COMMITTEES

SPC/bdw
cc:    The Honorable George B. Daniels, U.S.D.J.
       Members of Plaintiffs' Executive Committees (via email)
       Martin F. McMahon, Esq. (via email)
       Robert K. Kry, Esq. (via email)
       Alan R. Kabat, Esq. (via email)

LEGAL\20167259\1 00000.0000.000/117430.000