**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (GBD) (FM)<br>ECF Case |

This document relates to:  *All Actions*

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO THE**
**MOTION TO DISMISS OF THE KINGDOM OF SAUDI ARABIA**
**AND SAUDI HIGH COMMISSION FOR RELIEF OF BOSNIA & HERZEGOVINA**

February 3, 2015

**Table of Contents**

**Page**

I.  Introduction .................................................................................................1

II.  Plaintiffs' Burden is Met by an Averment of Facts Satisfying a FSIA Exception .............7

III.  Defendants' "Entire Tort" Theory Provides No Basis to Dismiss the Complaint .............9

    A.  Tortious Acts By Saudi Agents and Employees Within the United States .............9

        1.  U.S.-Based Support for the Attacks .........................................................10

            a.  Hussayen ...................................................................................11

            b.  Bayoumi and Thumairy ...............................................................11

            c.  Basnan and Unnamed U.S.-Based Officials of the Office of Islamic Affairs ......14

            d.  Acts of U.S.-Based Saudi Officials Working for al Haramain,WAMY, MWL, and IIRO ......15

            e.  Status of U.S.-Based Actors as Saudi Agents ...............................15

        2.  The 9/11 Report and the Allegations' Plausibility .....................................17

    B.  Other Attributable Acts in the U.S. and Acts Abroad Causing Damage Here ......18

IV.  The FSIA Merely Requires Some Reasonable Connection Between a Defendant's Actions and the Plaintiff's Injury ................................................................21

        1.  Plaintiffs' Injuries Were "Caused By" the 9/11 Attacks ..........................22

        2.  Saudi Agents Directly Supported the 9/11 Attacks ..................................22

        3.  Material Support Provided to Al Qaeda by Saudi Arabia's Da'awa Organizations and the Government Employees of Those Organizations ......23

        4.  The  Da'awa Organizations' Torts are Attributable to the Kingdom ......25

            a.  The Kingdom Dominates and Controls the Da'awa Organizations ......26

        b.      The Da'awa Organizations Perform Core Functions of
the State ......................................................................................... 27

V.     Defendants' Direct Support of the 9/11 Hijackers and al Qaeda are not
Discretionary Functions ............................................................................... 28

VI.    Conclusion ...................................................................................................... 30

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Argentine Republic v. Amerada Hess Shipping Corp.*,
    488 U.S. 428 (1989)...................................................................................................21

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)...................................................................................................10

*Cargill Int'l S.A. v. M/T Pavel Dybenko*,
    991 F.2d 1012 (2d Cir. 1993)......................................................................................9

*Doe v. Bin Laden*,
    580 F. Supp. 2d 93 (D.D.C. 2008)............................................................................20

*Doe v. Bin Laden*,
    663 F.3d 64 (2d Cir. 2011)..................................................................19, 20, 22, 30

*Filler v. Hanvit Bank*,
    378 F.3d 213 (2d Cir. 2004)......................................................................................26

*Filus v. Lot Polish Airlines*,
    907 F.2d 1328 (2d Cir. 1990)......................................................................................9

*First City, Texas-Houston, N.A. v. Rafidain Bank*,
    150 F.3d 172 (2d Cir. 1998).....................................................................................8, 9

*First National City Bank v. Banco Para El Comercio Exterior de Cuba*,
    462 U.S. 611 (1983)...................................................................................................26

*Garb v. Republic of Poland*,
    440 F.3d 579 (2d Cir. 2006)......................................................................................27

*Gosain v. State Bank of India*,
    414 Fed. Appx. 311 (2d Cir. 2011).............................................................................8

*Halberstam v. Welch*,
    705 F.2d 472 (D.C. Cir. 1983)..................................................................................20

*Havlish v. Bin Laden*,
    2011 U.S. Dist. LEXIS 155899 (S.D.N.Y. 2011)....................................................22

*Human Rights in China v. Bank of China*,
    2003 U.S. Dist. LEXIS 16436 (S.D.N.Y. 2003)........................................................8

*Kilburn v. Socialist People's Libyan Arab Jamahiriya,*
    376 F.3d 1123 (D.C. Cir. 2004) ................................................................9, 21

*Letelier v. Republic of Chile,*
    488 F. Supp. 665 (D.D.C. 1980) ...................................................................29

*Liu v. Republic of China,*
    892 F.2d 1419 (9th Cir. 1989) .....................................................................29

*Moran v. Saudi Arabia,*
    27 F.3d 169 (5th Cir. 1994) ............................................................................8

*Mukaddan v. Permanent Mission of Saudi Arabia,*
    136 F. Supp. 2d 257 (S.D.N.Y. 2001) ............................................................8

*O'Neill v. Asat Trust Reg.,*
    714 F.3d 659 (2d Cir. 2013)..........................................................................11

*O'Neill v. Saudi Joint Relief Committee,*
    714 F.3d 109 (2d Cir. 2013)........................................................9, 19, 20, 21

*Owens v. Republic of Sudan,*
    412 F. Supp. 2d 99 (D.D.C. 2006) ................................................................21

*Reiss v. Societe Centrale DuGroupe Des Assurances Nationales,*
    235 F.3d 738 (2d Cir. 2000)............................................................................9

*Republic of Argentina v. NML Capital, Ltd.,*
    134 S. Ct. 2250 (2014) ....................................................................................7

*Robinson v. Gov't of Malaysia,*
    269 F.3d 133 (2d Cir. 2001)........................................................................8, 9

*Rux v. Republic of Sudan,*
    461 F.3d 461 (4th Cir. 2006) ........................................................................21

*Saudi Arabia v. Nelson,*
    507 U.S. 349 (1993)......................................................................................7, 8

*SerVaas Inc. v. Republic of Iraq,*
    2011 U.S. App. LEXIS 2709 (2d Cir. 2011) ................................................27

*In re Terrorist Attacks on Sept. 11, 2001,*
    349 F. Supp. 2d 765 (S.D.N.Y. 2005)...........................................................28

*In re Terrorist Attacks on Sept. 11, 2001,*
    538 F.3d 71 (2d Cir. 2008)............................................................................29

*In re Terrorist Attacks on September 11, 2001,*
   392 F. Supp. 2d 539 (S.D.N.Y. 2005)....................................................................25

*In re Terrorist Attacks on September 11, 2001,*
   740 F. Supp. 2d 494 (S.D.N.Y. 2010)....................................................................25

*USAA Casualty Insurance Co. v. Permanent Mission of Republic of Namibia,*
   681 F.3d 103 (2d Cir. 2012)....................................................................................29

**Statutes**

18 U.S.C. 2331 *et seq*.................................................................................................29

28 U.S.C. § 1605(a)(5)........................................................................................ *passim*

28 U.S.C. § 1605A........................................................................................................19

**International Authority**

G.A. Res. 51/210, U.N. GAOR, 51st Sess., Annex 1, U.N. Doc. A/RES/51/210
   (Jan. 16, 1997).......................................................................................................29

I.    **Introduction**

From their earliest pleadings, plaintiffs have asserted that agents and officials of the Saudi government *directly* and *knowingly* assisted the 9/11 hijackers and plotters in support of the 9/11 attacks, *including from within the United States,* and that al Qaeda's development into a sophisticated terrorist organization was fueled principally by the massive financial and operational support it received from Saudi *government* da'awa organizations (often described inaccurately as "charities"), such as the Saudi High Commission for Relief of Bosnia & Herzegovina ("SHC") itself.  The facts and evidence now supporting these allegations are compelling.

Collectively, these facts do not merely underscore the plausibility of plaintiffs' claims that the Saudi government bears culpability for the events of 9/11, but also firmly resolve in plaintiffs' favor the immunity issues now before the Court.

*First,* the so-called "entire tort" rule is plainly satisfied by plaintiffs' allegations and evidence that: (1) agents and alter-egos of the Saudi government committed tortious acts within the U.S. in support of the 9/11 hijackers; (2) the 9/11 attacks were an integral and intended part of the ongoing course of defendants' tortious conduct abroad; and (3) defendants conspired with and abetted the 9/11 attackers, rendering the hijackers' own acts attributable to defendants.

*Second,* plaintiffs' facts and evidence that agents of the Kingdom knowingly and directly supported the 9/11 hijackers in furtherance of the 9/11 plot, and provided the essential funding and support necessary for al Qaeda to acquire the capabilities essential to carry out those attacks (including by funding the training camps where the hijackers were trained), clearly establish a "reasonable connection" between defendants' acts and plaintiffs' injuries, satisfying the minimal jurisdictional causation requirement of the Foreign Sovereign Immunities Act ("FSIA").

*Third,* plaintiffs' claims do not rest in any sense on remote planning-level decisions about the funding of Islamic charities, but rather on the tortious acts of Saudi agents and alter-egos

who, at the operational level, directly supported the 9/11 hijackers and al Qaeda. Those illegal operational level torts are not "discretionary" acts within the meaning of the FSIA.

A summary of key aspects of the facts and evidence now before this Court follows, after which this brief addresses their significance to the FSIA immunity analysis.

In part as a result of the release of previously classified materials relating to the 9/11 attacks, but sadly also due to the continuing tide of Wahhabi-inspired jihadist aggression against the civilized world, the spectrum of facts and evidence supporting plaintiffs' claims has grown considerably since Judge Casey first considered them in 2005. This evidence now encompasses an expansive volume of previously-unavailable U.S. and foreign intelligence reports, State Department diplomatic cables, Congressional testimony of U.S. officials and counterterrorism experts, government reports, filings and evidence from court and military tribunal proceedings, studies of respected think tanks and experts, internal documents of the Saudi da'awa organizations and al Qaeda, testimony of al Qaeda members, and a vast array of public reporting. This evidence is canvassed in the Averment of Facts and Evidence ("Averment")[1] submitted in support of the present opposition to defendants' renewed motion to dismiss, and provides compelling factual detail concerning the particular tortious acts of Saudi agents, officials, and alter-egos in support of the 9/11 hijackers and al Qaeda organization.[2]

In further support of their claims, plaintiffs offer sworn testimony of three principals of the U.S. government's two primary investigations into the 9/11 attacks, Bob Graham, the Co-

---

[1] An index of the evidence surveyed in the Averment is included as Exhibit 23 to the Affirmation of Sean P. Carter. The evidence identified in that index is itself being submitted to the Court in support of this Opposition. Thus, plaintiffs are not relying solely on the Averment, but on the actual evidence surveyed in the Averment as well.

[2] Certain key evidence relevant to these claims remains classified to this date, but is likely to be released soon. This includes the 28 pages of the Congressional Joint Inquiry Report detailing evidence of Saudi government involvement in the 9/11 attacks, which the President referred to the Director of National Intelligence for an inter-agency declassification review last Summer, and nearly 80,000 pages of material relating to an FBI investigation of Saudis who provided support to 9/11 hijackers in Florida, which is being reviewed by Judge William J. Zloch for possible release in response to a Freedom of Information Act suit against the FBI.

Chair of the Joint Congressional Inquiry into 9/11, and 9/11 Commissioners John Lehman and

Bob Kerrey.  Plaintiffs also offer testimony of al Qaeda and 9/11 insider Zacarias Moussaoui.

Based on his experiences as a member of the Senate Select Committee on Intelligence

and Co-Chair of the 9/11 Joint Inquiry, Sen. Graham confirms his conclusion "that there was a

direct line between some of the terrorists who carried out the September 11th attacks and the

government of Saudi Arabia, and that a Saudi government agent *living in the United States*,

Omar al Bayoumi, provided direct assistance to September 11th hijackers Nawaf al Hazmi and

Khalid al Mihdhar.  Based on the evidence discovered by the Joint Inquiry, I further believe that

al Bayoumi was acting at the direction of elements of the Saudi government and that an official

from the Islamic and Cultural Affairs section of the Saudi Consulate in Los Angeles, Fahad al

Thumairy, likely played some role in the support network for the 9/11 attacks."  Exh. 2, ¶ 7.[3]

Sec. Lehman echoes Sen. Graham's testimony concerning the involvement of Thumairy

and Bayoumi in supporting the attacks from within the U.S., and also places their tortious

conduct in broader context, by explaining the close historical ties between Saudi Arabia's

Wahhabi Ulema [Government Clerics] and al Qaeda, and how those clerics used government

platforms under their control to support and advance al Qaeda's terrorist agenda.  Sec. Lehman

explains that Wahhabism "is a puritanical, intolerant and virulently anti-American strand of

Islam, and the state religion of the Kingdom of Saudi Arabia," and that its "teachings form the

ideological foundation for al Qaeda and a host of other jihad organizations that threaten our

national security, including the so-called Islamic State of Iraq and the Levant."  Exh. 3, ¶ 6.[4]

Sec. Lehman further testifies that the links between Saudi Arabia's clerics and al Qaeda "involve

---

[3] "Exh." citations refer to the Exhibits to the Affirmation of Sean P. Carter.  "Ind. Exh." citations refer to the exhibits to Plaintiffs' Index of Evidence Supporting Plaintiffs' Averment of Facts and Evidence.  "#" citations refer to the relevant bates pages of the referenced Index exhibit.

[4] *See also* Final Report of the National Commission on Terrorist Attacks Upon the United States  ("9/11 Final Report"), p. 362 (al Qaeda finds inspiration and religious justification for its actions in "a long tradition of extreme intolerance" that flows "through the founders of Wahhabism").

collaboration on financial and logistical fronts" and that by the time the 9/11 Commission began its work "it was already well-known in intelligence circles that the Islamic Affairs Departments of Saudi Arabia's diplomatic missions were deeply involved in supporting Islamic extremists." *Id.* at ¶ 7. Against that backdrop, Sec. Lehman affirms that it is "implausible to suggest that the broad spectrum of evidence developed by the 9/11 Commission concerning the relationships among Omar al Bayoumi, Fahad al Thumairy, the Islamic Affairs Department of Saudi diplomatic missions, and 9/11 hijackers Nawaf al Hazmi and Khalid al Mihdhar can be explained away as merely coincidental. To the contrary, I believe Nawaf al Hazmi and Khalid al Mihdhar knew who to go to for support, … that Fahad al Thumairy and Omar al Bayoumi knew that al Mihdhar and al Hazmi were bad actors who intended to do harm to the United States, and that the evidence concerning the activities of these principal actors in the events surrounding the terrorists' attacks of September 11, 2001 warrants further examination." *Id.* at ¶ 8.

Zacarias Moussaoui, in turn, offers new insights into al Qaeda's close relationship with the Saudi government, based on his experiences as a member of al Qaeda and personal dealings with both al Qaeda leadership *and senior Saudi officials*. Moussaoui attests to the intimate relationship between the Saudi Ulema and al Qaeda, explaining that Osama bin Laden's attitude towards the Ulema was one of "complete reverence and obedience." Exh. 5, p. 13. Moussaoui further testifies that the Ulema demanded that the Kingdom deploy government resources to support bin Laden's jihad, and, based on his personal role in creating a digital database of al Qaeda's donors, that senior Saudi officials made direct financial contributions to al Qaeda to maintain their legitimacy in the eyes of the Ulema. Exh. 5, pp. 11-12; Exh. 6, pp. 10-11. Moussaoui also confirms direct dealings between senior Saudi officials and bin Laden, revealing that he personally traveled to Saudi Arabia on two occasions to deliver handwritten communications between bin Laden and senior Saudi officials, including in particular then-Saudi

intelligence chief Turki al-Faisal, who worked closely with bin Laden during the Afghan jihad.[5]
Exh. 7, pp. 23-26, 30-32.  Equally important, Moussaoui testifies that he met in Afghanistan with
a cleric from the Islamic Affairs office of the Saudi embassy in Washington, D.C., concerning al
Qaeda's efforts to conduct terrorist attacks on U.S. soil, and that he was supposed to meet with
that same embassy official again in Washington to receive assistance in relation to a plot to shoot
down Air Force One.  Exh. 8, pp. 8-13.  Sec. Lehman has separately implicated that same Saudi
embassy office in funneling "charity" payments to the 9/11 hijackers.  Aver. ¶ 202; Exh. 3, ¶ 5.

This and other testimonial evidence before this Court[6] provides support not only for
plaintiffs' allegations concerning the particular tortious actions of Saudi agents and officials in
furtherance of the 9/11 attacks, but also reinforces plaintiffs' claims regarding the central role
Saudi Arabia's government clerics played in the Kingdom's intimate collaboration with al Qaeda
prior to 9/11.  As detailed in the Averment, the Saudi regime's legitimacy has depended at all
times on the continuing endorsement of Saudi Arabia's Wahhabi Ulema, and is conditioned on
the regime's fulfillment of its duty under Saudi law to export Wahhabism beyond the Kingdom's
borders.  To support the religious priorities of the Ulema, the Kingdom created a Ministry of
Islamic Affairs in 1992 (as a central component and operational arm of the state itself under the
control of the Ulema), to implement the Saudi government's vast campaign to propagate
Wahhabism, and embedded members of the Ulema in Saudi embassies to facilitate those efforts.
Aver. ¶¶ 115-120.  Through their government posts in the Ministry of Islamic Affairs and Saudi
embassies, the Ulema exercised control over the Kingdom's da'awa organizations, themselves

---

[5] Prince Turki was suddenly removed from his post as intelligence chief, a post he had held for nearly 24 years,
within two weeks of Moussaoui's arrest in the United States, without explanation, or any advance notice to his
counterparts in allied intelligence agencies.  The unusual circumstances and timing of his sudden removal led one
prominent Saudi expert to ask in the Wall Street Journal whether it signaled that "the Saudi regime [knew] that bin
Laden was planning his attack against the U.S.?"  Exh. 21.

[6] Plaintiffs have also presented sworn testimony from Ali Ahmed ali Hamad, a confessed and convicted al Qaeda
member who was employed by the SHC, attesting to the SHC's extensive sponsorship of al Qaeda's operations.
Exh. 17; *see also* Aver. ¶¶ 519-542 (allegations and evidence relating to SHC's tortious activity).

part of the Saudi state headed by government officials, and the unprecedented financial resources dedicated by the government to spread Wahhabism.  *Id.*

"Al Qaeda represented a natural partner for the Saudi da'awa organizations and radicals within the Ministry of Islamic Affairs and Da'awa, given their shared Wahhabi ideology, past collaboration in the cause of jihad in Afghanistan, common desire to spread Wahhabi rule beyond the Kingdom's borders, and mutual belief in raising the banner of jihad in service of those goals."  Aver. ¶ 127.  In the years leading up to 9/11, the Ulema aggressively used the governmental resources and platforms under their control *as officials of the Saudi government* to support al Qaeda, providing the financing that fueled al Qaeda's growth, and collaborating intimately with al Qaeda at operational levels.  Aver. ¶ 129.  This program of support encompassed both the direct assistance provided by Saudi agents to the 9/11 hijackers, and the massive funding and operational support that flowed to al Qaeda from the Ministry of Islamic Affairs and Saudi "charities," the two central components of plaintiffs' claims here.

In recent years, a consensus has emerged among senior policymakers concerning the relationship described in plaintiffs' pleadings between Saudi Arabia's campaign to propagate Wahhabi Islam and the emergence and financing of al Qaeda and other jihad organizations. Interviewed recently in the wake of the Charlie Hebdo attack, Senate Intelligence Committee Chairman Richard Burr bluntly stated that Saudi Arabia has been "a contributor since al Qaeda was created" and that "there ought to be some kind of ramifications from it."  Exh. 20.  Senator Chris Murphy of the Senate Foreign Relations Committee concurred with Burr's assessment.  *Id.* These senior U.S. officials are but two members of a vast chorus of government officials, experts and thought leaders who have recognized Saudi Arabia's primary role in providing the ideological foundation and funding for terrorist organizations, from al Qaeda to ISIS.  Aver. ¶

316 (collecting testimony and statements of U.S. officials and experts concerning intersection of Wahhabi-ideology, Saudi-government propagation activities, and al Qaeda).

The Kingdom's own actions prove this point as well.  Between 2003-2007, the Kingdom removed over 2,000 Wahhabi clerics from the Saudi government payroll, and sent over 2,000 additional government clerics to "reeducation" programs.  Aver. ¶ 285.  In addition, the Kingdom instituted broad reforms targeted at stemming the flow of funds and other support from its government da'awa organizations, publicly acknowledging (in very careful language) that "we may have been naïve in our giving and did not have adequate control over all of our donations.  As a consequence, some may have taken advantage of our charity and generosity." Exh. 22.  Of course, this case is not about the reforms the Kingdom has put in place more recently, but rather about the tortious activities of its government actors up to and including 9/11.

## II.  Plaintiffs' Burden is Met by an Averment of Facts Satisfying a FSIA Exception

The Supreme Court recently confirmed that foreign states are not entitled to any special protections from the normal operation of the Federal procedural rules, and must be treated as any other litigant would, except where the FSIA explicitly provides otherwise.  *Republic of Argentina v. NML Capital, Ltd.,* 134 S. Ct. 2250, 2256-57 (2014).  Here, this dispute comes before the Court on a preliminary motion to dismiss for lack of jurisdiction,[7] and the traditional rules governing such motions apply.  *Id.*

As with motions challenging personal jurisdiction, the burdens applicable in deciding a motion to dismiss under the FSIA depend on the procedural setting of the dispute.  Where the defendant does not present competent evidence challenging the allegations underlying plaintiffs' theories of non-immunity, as here, the district court must accept all of those allegations as true, and draw all reasonable inferences in favor of the plaintiff.  *Saudi Arabia v. Nelson*, 507 U.S.

---

[7] Plaintiffs' related brief in support of their motion for leave to file a consolidated amended pleading contains a discussion of the procedural history of these disputes, which plaintiffs incorporate by reference.  *See* ECF No. 2892.

349, 351 (1993); *Robinson v. Gov't of Malaysia,* 269 F.3d 133, 140 (2d Cir. 2001).[8]  Where a defendant does proffer competent evidence directly challenging a particular key allegation, the burden of production shifts to the plaintiff to proffer facts or evidence which, if proven, would satisfy the elements of one of the FSIA's immunity exceptions.  *Robinson,* 269 F.3d at 141-43; *Moran v. Saudi Arabia,* 27 F.3d 169, 172 (5th Cir. 1994) ("once a *prima facie* showing of immunity has been made, the plaintiff seeking to litigate in the district court bears the burden of coming forward with facts showing that an exception applies"); *Human Rights in China v. Bank of China,* 2003 U.S. Dist. LEXIS 16436, at *4 (S.D.N.Y. 2003) ("plaintiff bears the burden of producing supporting *facts* showing the applicability of an FSIA exception") (emphasis supplied).[9]  As a court in this district has observed, this burden of production is consistent with that applicable in a personal jurisdiction contest.  *Mukaddan v. Permanent Mission of Saudi Arabia,* 136 F. Supp. 2d 257, 260 (S.D.N.Y. 2001).  As there, a plaintiff may make the required "showing through his own affidavits and supporting materials containing an averment of facts that, if credited, would suffice to establish jurisdiction over the defendant."  *Gosain v. State Bank of India,* 414 Fed. Appx. 311 (2d Cir. 2011) (internal citations omitted).

If the court determines that resolution of any fact in dispute is necessary to determine the availability of jurisdiction under the FSIA, the plaintiff must be afforded an opportunity to conduct discovery relative to that disputed factual contention.  *First City, Texas-Houston, N.A. v.*

---

[8] In addition, a plaintiff responding to a motion to dismiss under the FSIA may supplement the allegations of its pleadings, through submission of extrinsic materials containing facts and evidence relevant to the FSIA analysis. *Robinson,* 269 F.3d at 140-41.

[9] Defendants' brief contains scant reference to the applicable burden regime, and no discussion as to how the procedural posture of the case affects it, but they appear to acknowledge (correctly) that plaintiffs may satisfy their burden through factual allegations.  *See, e.g.,* MTD, at 13 ("Plaintiffs cannot satisfy the torts exception because they have not properly alleged – and certainly cannot provide any evidence – that any of the supposed actions by Saudi Arabia and its instrumentalities to support al Qaeda occurred within the United States"); MTD, at 14 ("Plaintiffs have not alleged that Saudi Arabia or its instrumentalities committed any act, much less a tortious one, in the United States . . . ); MTD, at 16 ("Plaintiffs have not properly alleged that any charities were agents of Saudi Arabia  . . ."); MTD, at 18 ("even if the Al Bayoumi allegations were facially sufficient to state a claim (which they are not), they are factually unsupported"); MTD, at 20 ("Plaintiffs have not adequately alleged causation.").

*Rafidain Bank,* 150 F.3d 172, 177 (2d Cir. 1998); *Filus v. Lot Polish Airlines,* 907 F.2d 1328, 1332 (2d Cir. 1990).[10]  Upon completion of discovery, the court should normally "afford the parties the opportunity to present evidentiary material at a hearing."  *Reiss v. Societe Centrale DuGroupe Des Assurances Nationales,* 235 F.3d 738, 748 (2d Cir. 2000).  The defendant bears the ultimate burden of persuasion to demonstrate, by a preponderance of the evidence, that an exception to immunity does not apply.  *Robinson,* 269 F.3d at 141; *Cargill Int'l S.A. v. M/T Pavel Dybenko,* 991 F.2d 1012, 1016 (2d Cir. 1993).

Here, defendants have not offered any competent evidence challenging *any* of plaintiffs' allegations,[11] and plaintiffs have in any case presented facts and evidence demonstrating the applicability of the FSIA's tort exception to their claims.

## III.     Defendants' "Entire Tort" Theory Provides No Basis to Dismiss the Complaint

### A.     Tortious Acts By Saudi Agents and Employees Within the United States

The FSIA provides that U.S. courts have jurisdiction "in any case" against a foreign state "for personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state" or of its employees and other agents. 28 U.S.C. § 1605(a)(5).  Even under the narrowest construction of § 1605(a)(5), whereby the foreign state's agents must have committed some tortious act in the United States, the allegations and evidence in this case readily satisfy the jurisdictional requirement.  *Cf. O'Neill v. Saudi Joint Relief Committee*, 714 F.3d 109, 117 (2d Cir. 2013) (§ 1605(a)(5) bars claim because defendants

---

[10] Pursuant to these authorities, plaintiffs request an opportunity to conduct discovery as to any fact the Court deems to be in dispute and material to the FSIA analysis.  Plaintiffs made an identical request during the proceedings before Judge Casey, and thus most clearly did not waive their right to discovery.  Indeed, in keeping with the authorities that discovery should be limited to disputed facts the Court deems material to the FSIA analysis, it is appropriate for plaintiffs in FSIA cases to wait until the Court has defined such areas of relevant dispute, before serving discovery.

[11] Merely pointing to alleged "'contradictions' between the plaintiff's claims and some passages of [U.S. government] documents" does not meet a foreign state's burden of production to raise a factual dispute, much less its burden of persuasion to establish that an exception to immunity does not apply.  *Kilburn v. Socialist People's Libyan Arab Jamahiriya,* 376 F.3d 1123, 1132 (D.C. Cir. 2004).

are not alleged to have "committed a single tortious act in the United States" and "*all of the tortious conduct*" allegedly "occurred abroad") (emphasis in original).

Plaintiffs' initial pleadings alleged and described the tortious acts of individual employees of the Saudi government who, acting in the U.S. and elsewhere, directly and knowingly assisted and supported the 9/11 hijackers and plotters.  In particular, the allegations described how two Saudi government employees in the U.S., Omar al Bayoumi and Fahad al Thumairy, "provided direct assistance to Kalid al-Mihdhar and Nawaf Al Hazmi, two of the September 11th hijackers."  *See* Federal Insurance First Amended Complaint with Incorporated More Definite Statements and RICO Statements, Case No. 03-cv-06978, ECF No. 772, ¶ 411 (hereinafter "Compl.").  More generally, they alleged that Saudi officials and agents knowingly supported al Qaeda and its targeting of the United States, and intended and foresaw that those actions caused damage in the United States.  *Id.* at ¶¶ 79-83, 398-499.

Defendants err in claiming that these allegations and further details provided in later filings are "conclusory" and otherwise insufficient, and their mistake is especially clear in light of the allegations and other evidence set forth in the Averment and evidence now submitted to this Court.  *See supra* pp. 7-9.  As described below regarding (i) the existence of U.S.-based tortious actions, (ii) the status of the actors as Saudi agents, and (iii) confirmation of the plausibility of the link of Saudi action to the attacks, these allegations and supporting materials readily state facts and support inferences that require denial of defendants' motion.  Indeed, they clearly "provide 'enough fact[s] to raise a reasonable expectation that discovery will reveal evidence,'" the standard endorsed by defendants.  *See* MTD, at 17 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).

1.      <u>U.S.-Based Support for the Attacks</u>.  The allegations of Saudi agent and employee support for the 9/11 attacks, provided in the United States, extend to a range of different Saudi

agents and detail their very direct and knowing support of certain of the 9/11 hijackers in the months preceding the attacks, in addition to other agents' broader contributions in the United States to the Kingdom's support for al Qaeda and its efforts to target the United States.

a.     Hussayen.  The Second Circuit has effectively settled the issue of U.S.-based support in its findings as to one Saudi official acting in the U.S., Abdul Rahman Hussayen, holding that the allegations concerning Hussayen's "travels to the United States shortly before the September 11, 2001 attacks, as well as his decision to switch hotels to stay in the same hotel as at least three of the hijackers … not only suggests the possibility that he may have provided direct aid to members of al Qaeda, but they also raise the plausible inference that he may have intended his alleged indirect support of al Qaeda to cause injury in the United States."  *O'Neill v. Asat Trust Reg.*, 714 F.3d 659, 679 (2d Cir. 2013) (emphasis omitted).  This conclusion establishes the U.S.-based action necessary to satisfy the "entire tort" exception, at least for purposes of defeating a motion to dismiss.  In addition, in drawing the obvious inferences from a basic description of a limited set of "coincidences" and contacts between a Saudi agent and the 9/11 hijackers and violent jihad supporters, the Court illustrated the appropriate level of factual assertion required at this stage of the litigation to link alleged U.S.-based support to the 9/11 attacks.  The Court's conclusion shows that the far more detailed allegations associated with the following Saudi agents even more clearly make the requisite showing.

b.     Bayoumi and Thumairy.  Plaintiffs' initial allegations regarding the direct and knowing assistance that Bayoumi and Thumairy provided in California to two 9/11 hijackers are far more detailed, and allege far more proximate support to the hijackers, than were the allegations found compelling by the Second Circuit as to Hussayen.  That conclusion alone suffices to defeat defendants' mistaken claims that plaintiffs' original pleadings did not sufficiently allege that Bayoumi knew or should have known of the hijackers' identity or

mission.  *See* MTD, at 17.  Even apart from the Second Circuit's conclusion, defendants' claims are also erroneous because those points were either alleged directly with supporting detail or are readily inferred from the facts provided in the pleadings regarding the depth, importance, proximity, and directness of the support provided to crucial participants in the attacks.[12]

Plaintiffs' Averment removes any doubt regarding the import and sufficiency of those allegations by providing even more details regarding the support Bayoumi and Thumairy provided to the hijackers in the U.S. shortly before the attacks.  Over 24 pages, the proffered facts and evidence detail how Bayoumi traveled from San Diego to Los Angeles to meet with the hijackers after meeting at the Saudi consulate with Thumairy, a Saudi official and ultraconservative Wahhabi religious cleric with documented ties to terrorists.  Aver. ¶¶ 149-251.  U.S. officials have concluded that Thumairy and Bayoumi "discussed the recent arrival of the future 9/11 hijackers in the United States," leading to Bayoumi's being "tasked with getting them welcomed and assimilated into the San Diego Muslim community."  Aver. ¶ 162; Ind. Exh. 35, #397-399.  Bayoumi then traveled to a restaurant where he met with al Hazmi and al Mihdhar, who had just arrived in the U.S., spoke virtually no English, and were otherwise ill-prepared to carry out their terrorist mission in this country.  Aver. ¶ 162.  Bayoumi promptly offered to assist the future hijackers settle in the U.S. and immediately thereafter began providing a range of support and assistance[13] "which enabled them to establish themselves in the United States despite their lack of preparation for that transition, and to begin their operational preparations for

---

[12] *See, e.g.*, Compl. ¶ 411 ("direct assistance" to hijackers, credited by U.S. officials); *id.* ¶ 412 (Bayoumi "traveled to Los Angeles to meet [the hijackers]" upon their arrival in the United States shortly before the attacks); *id.* ¶ 413 ("Following their meeting, Al-Bayoumi facilitated the future hijackers' settlement in the San Diego community, and paid two months' rent for an apartment on their behalf."); *id.* ¶ 420 ("Some of the money Al-Bayoumi received … ended up in the hands of the two September 11th hijackers."); *id.* ¶ 66 (Bayoumi listed among defendants who conspired with and supported al Qaeda).

[13] Among other support, Bayoumi gave the hijackers significant funds, housed them for a period in his own apartment, assisted them in finding an apartment of their own, co-signed and guaranteed their lease, paid the rent for that apartment, and helped them open a bank account with approximately $9,000 of his own money.  Aver. ¶ 177.

the attacks." Aver. ¶ 151; Ind. Exh. 49, #628-630. As a top FBI official stated in drawing the obvious inference from these dealings, "We [at the FBI] firmly believe that [Bayoumi] had knowledge [of the 9/11 plot], and that his meeting with [the hijackers] that day was more than coincidence." Aver. ¶ 152; Ind. Exh. 25, #309.

Bayoumi also is alleged to have worked on a continuing basis to ensure that the hijackers and their mission would receive significant support from "members of the San Diego Muslim community that not only shared their extremist beliefs and hatred for the United States, but would also provide significant logistical and ideological support to the hijackers as they plotted the attacks." Aver. ¶ 208; Ind. Exh. 61, #691. These included Anwar al Aulaqi, a Wahhabi cleric and terrorist leader who maintained an ongoing relationship with Bayoumi (Aulaqi left the U.S. after 9/11 and assumed a leadership role in al Qaeda, and was eventually targeted and killed in a U.S. drone strike in 2011). Bayoumi introduced the hijackers to Aulaqi, and from that point forward, Aulaqi "met consistently and privately" with the two hijackers behind closed doors as their spiritual mentor. Ind. Exh. 60, #687. The evidence pertaining to Aulaqi's terrorist activities and his dealings with the hijackers have led U.S. investigators to conclude that Aulaqi "was fully aware of the planned 9/11 attacks." Aver. ¶ 214; Ind. Exh. 26, #317-318.

Bayoumi also tasked Modhar Abdallah, a member of Aulaqi's San Diego mosque, over whom Bayoumi exercised considerable influence, with assisting the hijackers. Ind. Exh. 45, #610. According to the 9/11 Commission, Abdallah confirmed in an interview with law enforcement that Bayoumi specifically tasked him "to be the individual to acclimate the hijackers to the United States, particularly San Diego, CA." Aver. ¶ 219; Ind. Exh. 63, #698. As instructed, Abdallah helped al Mihdhar and al Hazmi "locate and apply to language and flight schools" and "obtain fake driver's licenses with false names," and he participated with them in conducting "surveillance of the Los Angeles International Airport." Aver. ¶¶ 220-221; Ind. Exh.

13

46, #616.  During detention after the 9/11 attacks, Abdallah reportedly told fellow inmates that he had advance knowledge of the attacks.  Aver. ¶ 223; Ind. Exh. 35, #614, 615, 617.

These and other facts and evidence surveyed in the Averment amply support Sen. Graham's conclusion that Bayoumi "was acting at the direction of elements of the Saudi government" in supporting the hijackers, Exh. 2, ¶ 7, and Sec. Lehman's testimony that "Fahad al Thumairy and Omar al Bayoumi knew that al Mihdhar and al Hazmi were bad actors who intended to do harm to the United States."  Exh. 3, ¶ 8.

c.   <u>Basnan and Unnamed U.S.-Based Officials of the Office of Islamic Affairs</u>.   The Averment also sets forth Saudi agent Basnan's role as a supporter of the hijackers through his close coordination with Bayoumi and separate facilitation of the network supporting the hijackers.  Ind. Exh. 49, #632.  Like Bayoumi, Basnan and his family resided at the same California apartment complex as the two hijackers, and Basnan's relationship with Bayoumi directly and through family members is reflected in common acts, joint arrests, and more than 700 phone calls over a relevant one-year period.  Aver. ¶ 205; Ind. Exh. 33, #387.  In particular, he is alleged, along with Washington, D.C.-based Saudi officials of the Ministry of Islamic Affairs, to have funneled approximately $150,000 from a Washington, D.C. bank account of the wife of the Saudi Ambassador to the U.S., through Bayoumi and his family, to be used in support of the hijackers.  Aver. ¶ 201; Ind. Exh. 26, #323-324.  Basnan is reported to have boasted to the FBI that he had supported the 9/11 hijackers even more than Bayoumi had.  *Id*. at #324.  The involvement of these officials of the Office of Islamic Affairs is consistent with the claim by Sec. Lehman that the payments were initiated by "radicals who worked in the embassy's Islamic Affairs office in Washington," Aver. ¶ 202; Ind. Exh. 44, #607, and reinforced by Moussaoui's

testimony implicating officials of that same office in operational aspects of al Qaeda's efforts to conduct attacks within the U.S.  Exh. 8, pp. 9-13.[14]

       d.     <u>Acts of U.S.-Based Saudi Officials Working for al Haramain, WAMY, MWL, and IIRO</u>.  The complaint and Averment also set forth the factual bases for concluding that U.S.-based Saudi officials working in four government affiliated organizations – al Haramain, WAMY, MWL, and the IIRO – undertook fundraising and related activities in the U.S. designed to support and having the effect of supporting al Qaeda's terrorism directed against the United States, as part of the support efforts undertaken by those organizations globally.  Aver. ¶¶ 333-518; *see also infra* pp. 18-21 (discussing charities' status as alter-egos of Kingdom).  These activities led the U.S. government to designate the U.S. branch of al Haramain as a supporter of terrorism, in part based on investigations "show[ing] direct links between the U.S. branch and Usama bin Laden."  Ind. Exh. 206, #3035.  State Department officials similarly concluded that "Usama bin Ladin used the entire IIRO network for his terrorist activities."  Aver. ¶ 399; Ind. Exh. 156, #2321.  Indeed, the IIRO is alleged to have operated on a global basis to use all its fundraising capabilities, including those undertaken by officials in the U.S., to function "as the principal sponsor of terrorist training camps in Afghanistan," Aver. ¶ 330, Ind. Exh. 116, #1465, including camps where the 9/11 hijackers received training for the attacks.  Aver. ¶ 48; Ind. Exh. 95, #972.

       e.     <u>Status of U.S.-Based Actors as Saudi Agents</u>.  The allegations that each of these persons acted in the U.S. as agents of the Kingdom are direct, detailed, and well-supported. For example, Hussayen sought to be dismissed from this case on sovereign immunity grounds.

---

[14] The FBI undertook a massive investigation of the support provided to the Florida-based hijackers (Mohammed Atta, Marwan al Shehhi, and Ziad Jarrah) by a Saudi family with alleged ties to the Saudi royal family.  Aver. ¶¶ 248-250. Sen. Graham claims this investigation was never revealed to the 9/11 Commission and that omission "opens the door to a new chapter of investigation as to the depth of the Saudi role in 9/11."  Aver. ¶ 251.  While these allegations would not independently support the conclusion that Saudi government agents acted in the U.S. in support of the attacks, they do provide additional bases to conclude that discovery on this general issue is warranted.

Supported by a personal affidavit, his motion argued that he "was a government official during the entire period in question," that "the allegations against him concern matters within his capacity as an official of the Saudi Government," and that his 2001 "visit [to the United States] to Islamic charities was related to his governmental work."  *See In re Terrorist Attacks of September 11, 2001,* ECF No. 83, Memorandum of Law in Support of Motion to Dismiss, pp. 6, 10 (Apr. 8, 2004, S.D.N.Y.); *see also* Aver. ¶¶ 232, 236.

Similarly, the pleadings assert, and there is apparently no dispute, that Thumairy was during the relevant period an official of the Islamic Affairs Department of the Saudi Consulate in Los Angeles, acting within the scope of his employment.  Aver. ¶¶ 162-164; Ind. Exh. 35, #399-400.  So, too, with the Saudi officials based in Washington, who acted in coordination with him and Bayoumi.  *Id.*, Ind. Exh. 36.

Defendants argue that the initial allegations relating to Bayoumi's status as a Kingdom agent are conclusory, but plaintiffs' initial pleadings made clear and the Averment provides further details confirming that Bayoumi was a low level Saudi intelligence agent operating in the U.S. under cover of a "ghost job" with a Saudi government aviation contractor, Dallah Avco.  Aver. ¶¶ 184, 185, 189; Ind. Exh. 35, #398; Ind. Exh. 36, #433; Ind. Exh. 51, #646.  Although Bayoumi's *precise* role in working for the Saudi government may be disputed, his status as an agent and employee of the Kingdom is amply "corroborated and confirmed" by at least 13 separate categories of evidence cited and detailed in the Averment.  Aver. ¶ 150.  Indeed, Dallah Avco has asserted in ongoing discovery that Bayoumi was a Saudi government employee, acting within the scope of his government position.  *Id.*

Basnan's status as a Saudi agent is supported by various FBI documents reflecting the Bureau's conclusion to that effect, as well as Sen. Graham's similar conclusion based on his familiarity with relevant intelligence.  Aver. ¶ 196 ; Ind. Exh. 26, #320 (Basnan was "another

Saudi spy who was suspected of being groomed to replace al-Bayoumi"); Ind. Exh. 49, #632 (FBI report addressing Basnan as "*affiliated with the Saudi Arabian Government or the Saudi Arabian Intelligence Service*" and possibly "*succeeded Omar Al-Bayoumi and may be undertaking activities on behalf of the Government of Saudi Arabia*").  In addition, the persons alleged to be working with him to divert funds from the Washington, D.C. bank account are officials of the Ministry of Islamic Affairs, and thus employees of the Saudi government.

As for the U.S.-based officials of al Haramain, IIRO, MWL, and WAMY, their status as agents or officials of the Kingdom is based on the close relationship between the Kingdom and the global charities, whereby the global charities function as alter-egos of the Kingdom, and the alleged lack of corporate independence of the U.S. branches within each of the globally active charities.  *See infra* pp. 18-21.  Because the Kingdom's alter-egos are components of the state, U.S.-based officials of those entities act as officials of the Kingdom.

2.     The 9/11 Report and the Allegations' Plausibility.  Defendants claim that open-ended passages of the 9/11 Final Report in some manner exculpate the Kingdom and all its agents and officials acting in the U.S., and amount to "evidence" requiring plaintiffs to respond with "evidence" of their own.  *See* MTD, at 18.  Those passages provide no support for a motion to dismiss and do not require the production of evidence, *see supra* pp. 7-9, but even if that were wrong, the Report is not exculpatory and the Averment and evidence discussed above and in the paragraphs that follow would readily meet any such burden.  Indeed, affidavits of the former 9/11 Commissioners alone provide powerful confirmation that plaintiffs' allegations are non-conclusory and wholly plausible.

Initially, the affidavits of Sec. Lehman and Senators Graham and Kerrey directly refute the Kingdom's claims that the Report exonerated the Kingdom or fully addressed the issue.  According to Sen. Kerrey, such claims "are incorrect."  Exh. 4, ¶ 9.  "To the contrary, significant

17

questions remain unanswered concerning the possible involvement of Saudi government institutions and actors in the financing and sponsorship of al Qaeda, and evidence relating to the plausible involvement of possible Saudi government agents in the September 11th attacks has never been fully pursued."  *Id.*  Sec. Lehman similarly affirms that "the 9/11 Commission did not exonerate Saudi Arabia of culpability for the events of September 11, 2001 … In addition, the Kingdom is fundamentally incorrect in suggesting that our Commission in some way 'considered and rejected as factually untrue' the allegations or claims that have been advanced by the 9/11 plaintiffs against Saudi Arabia."  Exh. 3, ¶ 4.  Sen. Graham concurs and points to various evidence not presented to the Commission, including the potential Saudi government role in the support provided to 9/11 hijackers in Florida, that bear further examination.  Exh. 2, ¶¶ 10-12.[15]

Further, Sec. Lehman and Sen. Graham are familiar with plaintiffs' evidence (and other, classified corroborating evidence) and have expressly confirmed that plaintiffs' allegations concerning the direct and knowing involvement of Saudi officials Bayoumi and Thumairy in supporting the attacks are well supported and entirely plausible.  Exh. 3, ¶ 8; Exh. 2, ¶¶ 7-9.  At the least, "the evidence concerning the activities of these principal actors in the events surrounding the terrorists' attacks of September 11, 2001 warrants further examination."  Exh. 3, ¶ 8.  It is hard to imagine a clearer statement of how the evidence and allegations readily meets *Twombly*'s standard even as construed by defendants.

### B.  Other Attributable Acts in the U.S. and Acts Abroad Causing Damage Here

Even had plaintiffs not adequately alleged tortious acts by Saudi agents in the U.S., other aspects of their complaint and related allegations and evidence would satisfy § 1605(a)(5) in three separate respects.

---

[15] The Report's own summaries of how the staff found Bayoumi and Thumairy to lack all credibility and to have withheld information further confirms the gaps in the information before the Commission.  Aver. ¶¶ 167-169, 170.

*First*, the 9/11 attacks were themselves an entire tort committed in the U.S., and an integral and intended part of the ongoing course of conduct of defendants abroad.  The Second Circuit addressed a similar argument in *O'Neill v. SJRC*, but rejected it based on distinct facts that differ from those presented here.  *See O'Neill v. SJRC*, 714 F.3d at 117 n.10.  The Court acknowledged that the 9/11 attacks constituted a complete "tort" in the U.S. within the scope of § 1605(a)(5), but held that no jurisdiction existed because the only "torts" allegedly committed by defendants "involved giving money and aid to purported charities that supported al Qaeda," making the tort of the 9/11 attacks "distinct and separate from the 'torts' allegedly committed by [defendants]."  *Id.*  Thus, the Court resolved the issue on the factual basis that defendants were not alleged to have participated in the "tort" occurring in the United States.  Here, however, the allegations are different and directly tie even the acts of defendants undertaken abroad to the 9/11 attacks themselves.  Through the Kingdom's and the SHC's acts that directly supported the camps used to train the 9/11 attackers and other material and funds necessary to al Qaeda's achieving the particular capabilities used to plan and execute the 9/11 attacks, the Kingdom and SHC are here alleged to have played an integral role in the attacks themselves, and thus in the "entire tort" committed in the U.S.  *See infra* at pp. 21-28.  And, they are alleged to have done so directly, not just through separate "charitable" officials.  *See id.*  The allegations are equivalent to those made against Afghanistan in *Doe v. Bin Laden*, 663 F.3d 64 (2d Cir. 2011) ("*Doe II*") where the Court's conclusion that FSIA § 1605A did not displace Section 1605(a)(5) rested on § 1605(a)(5)'s otherwise being satisfied – subject to confirmation following discovery that the acts alleged could be attributed to Afghanistan and were not discretionary.  *See id.* at *Doe II,* 663 F.3d at 66-67.  This conclusion makes sense: defendants' acts are akin to those that initiate a foreign-launched missile that strikes the U.S. or a viral attack started across U.S. borders that sets in train

further transmissions causing death here.  Nothing in the "entire tort" doctrine bars jurisdiction over such claims.

*Second*, that the 9/11 attacks constitute an "entire tort" in the U.S. also establishes defendants' responsibility for U.S.-based acts through the operation of state law doctrines of secondary liability.  Plaintiffs allege that defendants' agents and officials conspired with and aided and abetted the 9/11 attackers.  *See supra* pp. 2-7; *infra* pp. 21-28.  As a result, basic state law tort principles attribute the attackers' U.S.-based actions to defendants.  *See, e.g.*, *Halberstam v. Welch,* 705 F.2d 472, 479-86 (D.C. Cir. 1983); *see Doe v. Bin Laden*, 580 F. Supp. 2d 93, 98-99 (D.D.C. 2008) ("*Doe I*"), *aff'd*, 663 F.3d 64 (2d Cir. 2011).  The complaint and averment set out detailed allegations that satisfy state law conspiracy and aiding and abetting liability, including the underlying agreement to undertake terrorist activities against U.S. targets and acts taken by Saudi officials in furtherance of that agreed course.  The Second Circuit did not address this basis of liability in *O'Neill v. SJRC*.  *See O'Neill,* 714 F.3d at 177 n. 10.  The only court that has addressed the issue concluded that even though the "entire tort" doctrine limits the scope of § 1605(a)(5), that doctrine is satisfied when foreign state officials are alleged to have conspired with others acting within the U.S. – and found specifically that, under this theory, § 1605(a)(5) could support a claim based on allegations that Afghanistan conspired with the 9/11 attackers, including (as for Saudi officials) through the provision of training camps.  *See Doe I,* 580 F. Supp. 2d at 98 n. 5*; see also Doe II,* 663 F.3d at 66-67 (analysis based on conclusions that allegations satisfied § 1605(a)(5)).  Indeed, as the Second Circuit in *Doe II* was reviewing and affirming the district court's decision upholding discovery and dismissing a motion to dismiss on this basis, the predicate for the Second Circuit's analysis, that § 1605(a)(5) applies, apparently rested on its approval of this attribution of U.S. actions by operation of state conspiracy law.

*Third*, even if the "entire tort" doctrine could apply to the facts of this case, the doctrine reflects a misconstruction of § 1605(a)(5).  The provision's plain text addresses only claims for "personal injury or death, or damage to or loss of property, occurring in the United States," and the provision's exclusions related to "malicious prosecution [and] abuse of process" are inconsistent with any Congressional endorsement of the doctrine.  28 U.S.C. § 1605(a)(5).  *Argentine Republic v. Amerada Hess Shipping Corp*., 488 U.S. 428 (1989), does not establish such a limitation and instead points to the need for a tort that causes damage in the U.S.  *Id.* at 440 (addressing a tort committed on the high seas).  Even so, the Second Circuit has adopted the doctrine and construed *Amerada Hess* more broadly, *see O'Neill v. SJRC*, 714 F.3d at 115-16, a determination plaintiffs would seek to have reconsidered in further proceedings if necessary.

## IV.    The FSIA Merely Requires Some Reasonable Connection Between a Defendant's Actions and the Plaintiff's Injury

Federal courts, including this Court, have consistently held that the "caused by" language of the FSIA immunity exceptions does not impose a restrictive causation standard for purposes of establishing jurisdiction over a foreign state.  To the contrary, the FSIA is merely a jurisdictional statute, and "[j]urisdictional causation under [the FSIA] is distinct from the substantive causation of a claim."  *Rux v. Republic of Sudan,* 461 F.3d 461, 472 (4th Cir. 2006).  The causal link necessary to establish jurisdiction under the FSIA requires only that plaintiffs allege "'some reasonable connection between the act or omission of the defendant and the damages which the plaintiff has suffered.'"  *Kilburn,* 376 F.3d at 1128; *see Rux,* 461 F.3d at 474.  Consistent with this standard, the FSIA's "caused by" requirement "does *not* limit jurisdiction only to situations where the defendant's conduct was either the nearest cause or a non-remote factual cause of the ultimate injury," *Owens v. Republic of Sudan,* 412 F. Supp. 2d 99, 112 (D.D.C. 2006) (emphasis in original), and does not rise to the level of "but for" or "substantial factor" causation.  *Id.* at 110-11.  This Court adopted and applied these very standards in entering

judgment against Iran in *Havlish v. Bin Laden,* one of the cases comprising this MDL, holding that the "caused  by" requirement of the tort exception "may be established by a showing of a 'reasonable connection' between the material support provided and the ultimate act of terrorism." *Havlish v. Bin Laden,* 2011 U.S. Dist. LEXIS 155899, at *202 (S.D.N.Y. 2011).

Plaintiffs' Averment and evidence readily meet this modest causation standard for the claims here, whether the Court views those claims through the lens of plaintiffs' theories of secondary liability, or considers the relationship between the particular tortious acts of the Kingdom's agents and alter-egos and plaintiffs' resulting injuries on an individualized basis.

1.    Plaintiffs' Injuries Were "Caused By" the 9/11 Attacks.  Again, plaintiffs have offered facts and evidence satisfying applicable common law conspiracy and aiding and abetting requirements, as to both the Kingdom and SHC.  *See supra* at p. 20.  Pursuant to those common law tort principles and the Second Circuit's ruling in *Doe II,* the actions of the 9/11 attackers are themselves attributable to defendants for purposes of the FSIA analysis.  *Id.*  Thus, because there is no dispute that plaintiffs' injuries were "caused by" the 9/11 attacks in the most direct sense, jurisdictional causation under the FSIA is easily satisfied.

2.    Saudi Agents Directly Supported the 9/11 Attacks.  Separate and apart from these secondary liability principles, plaintiffs' facts and evidence detail the extensive support provided by Saudi officials *directly* to the 9/11 hijackers and plotters, *in furtherance of the 9/11 plot itself.* This evidence demonstrates that 9/11 hijackers al Mihdhar and al Hazmi were ill prepared for their mission in the U.S., and that the assistance provided by (among others) Saudi officials Bayoumi, Thumairy, and Basnan was *essential* to the success of the 9/11 plot.  *See supra* at pp. 11-15.  This direct and essential support for the 9/11 attacks more than establishes "some reasonable connection" between the tortious conduct at issue and resulting harm to plaintiffs.

3.      Material Support Provided to Al Qaeda by Saudi Arabia's Da'awa Organizations and the Government Employees of Those Organizations.  Plaintiffs' claims based on the support provided by the Kingdom's da'awa organizations, under the direction of the Ministry of Islamic Affairs and attributable to the Kingdom, *see infra* at pp. 25-28, also readily satisfy the minimal causation requirement of the tort exception.  Plaintiffs' Averment details how the Saudi da'awa organizations (including among others the MWL, IIRO, al Haramain, WAMY, SJRC, SRC and SHC itself) "provided the vast majority of the funding that allowed al Qaeda to build and sustain" the global infrastructure required to plan and execute the 9/11 attacks.  Aver. ¶ 48.  In fact, the financial contributions of these entities funded the very al Qaeda camps where the 9/11 hijackers received their training for the attacks, and the safe haven and facilities in Afghanistan where senior officials of al Qaeda, including Osama bin Laden and Khalid Sheikh Mohammed, planned and coordinated the attacks.  Aver. ¶¶ 48, 81, 315, 330, 331, 382, 393, 394, 422; Exh. 5, pp. 25-26; Exh. 6, pp. 9-10, 12-13.  Plaintiffs' Averment and evidence thus draws a very direct causal link between the da'awa organizations' overwhelming financial support for al Qaeda, and the planning and execution of the 9/11 attacks themselves.

In this context, the SHC's contributions were especially important to al Qaeda acquiring the strike capabilities used to carry out the 9/11 attacks, and the evidence very directly links the SHC's support to al Qaeda's efforts to launch attacks in the U.S.  For example, international investigations revealed that more than $120 million issued from SHC accounts under the control of then-Prince Salman to an al Qaeda proxy, over a period of just three years, making the SHC one of al Qaeda's most important financial supporters.  Aver. ¶ 530.  Further, materials discovered in a raid of the SHC's facilities and other evidence confirm that its support extended to direct involvement in al Qaeda plots to carry out attacks in the U.S.  *Id.* at 533.  The subject matter of those materials, recovered just months after 9/11, mirrors several of the specific plots

Moussaoui testifies he was sent to the U.S. to pursue in early 2001.  From this and other evidence, a reasonable connection between SHC's support and the 9/11 attacks is evident.

Although a "reasonable connection" between the da'awa organizations' tortious conduct and plaintiffs' injuries is readily apparent from the scope, character, and application of the support alleged, plaintiffs have proffered statements and empirical findings of U.S. counterterrorism officials that further demonstrate the direct link between the support provided by the charities and the 9/11 attacks.  As the 9/11 Commission concluded, a "complex international terrorist operation aimed at launching a catastrophic attack cannot be mounted by just anyone in any place," but rather requires sufficient resources to sustain a command infrastructure; facilities and opportunity to recruit, train and indoctrinate operatives with needed skills and dedication; and sophisticated logistics and communications networks.  Aver. ¶ 34.  For organizations like al Qaeda, the maintenance of these essential resources and infrastructures "is expensive" and requires a steady stream of funding "to pay operatives and their families, arrange for travel, train new members, forge documents, pay bribes, acquire weapons and stage attacks."[16]  Aver. ¶ 35.  For these reasons, the U.S. made the disruption of al Qaeda's financial support infrastructure a centerpiece of our nation's post-9/11 counterterrorism strategy, concluding that disrupting these essential money flows would degrade its ability to carry out sophisticated attacks like 9/11.[17]  The empirical findings and policies of U.S. counterterrorism officials thus affirm plaintiffs' express claim that al Qaeda "could not have successfully mounted" the 9/11 attacks absent the lavish funding and support provided by the Saudi da'awa

---

[16] Plaintiffs' Averment and evidence confirm that the "charities" not only provided the bulk of the funds needed to sustain al Qaeda's critical infrastructures, but also assisted al Qaeda in each of the functions U.S. officials have identified as essential to a sophisticated terrorist organization's operations:  recruitment of new members; facilitation of travel and communications; the acquisition and shipment of weapons; and provision of false identification documents.  Aver. ¶¶ 286-332.  These facts underscore that al Qaeda simply could not have functioned, much less carried out a sophisticated plot like 9/11, without the charities' support.

[17] It was to that end that the U.S. designated IIRO and al Haramain.  Aver. ¶ 403-404, 483-492, 502-503.

organizations, Aver. ¶ 32, and plainly confirm a "reasonable connection" between their tortious acts and plaintiffs' injuries.

Zacarias Moussaoui's testimony affirms these conclusions, succinctly explaining that "without the money of the - - of the Saudi you [al Qaeda] will have nothing." Exh. 5, p. 26. Moussaoui describes in detail in his testimony the scope of the operations and facilities al Qaeda needed to maintain in order to sustain its terrorist operations, and that the funds provided by al Qaeda's Saudi donors were used to fund al Qaeda's training camps, pay salaries of al Qaeda members, build al Qaeda's facilities in Afghanistan, purchase weapons, finance travel, and support other essential terrorist functions. Exh. 5, pp. 25-27; Exh. 6, pp. 9-10, 12-13.

Finally, this Court's own prior decisions denying the motions to dismiss of several of the very charities at issue further resolve the jurisdictional causation question in plaintiffs' favor. In seeking dismissal, the IIRO, WAMY, and al Haramain argued that plaintiffs' initial pleadings failed to present allegations sufficient to satisfy applicable causation standards. Even though this Court's analysis of those defenses was governed by more stringent substantive causation standards, encompassed only the allegations of plaintiffs' earliest pleadings, and considered each defendant's conduct separately, this Court had no trouble rejecting each of those defendant's causation defenses. *In re Terrorist Attacks on September 11, 2001,* 392 F. Supp. 2d 539, 569 (S.D.N.Y. 2005) (IIRO); *In re Terrorist Attacks on September 11, 2001,* 740 F. Supp. 2d 494, 519-20 (S.D.N.Y. 2010) (WAMY and al Haramain).[18] Those rulings thus confirm that plaintiffs have met the jurisdictional causation requirement of the FSIA, for their claims against here.

4.    The Da'awa Organizations' Torts are Attributable to the Kingdom. The Kingdom seeks to avoid attribution of the charities' tortious acts to it, based on the principle that

---

[18] Here, the Court's review is subject to the more modest jurisdictional causation standard of the FSIA, is informed by a far more extensive factual and evidentiary record detailing additional and more expansive material support activities by the charities at issue, and, in the case of the Kingdom, properly considers all of the attributable tortious conduct of the Kingdom's agents and alter-egos *collectively*.

"agencies" of a foreign state are normally to be accorded a presumption of independence.  MTD, at 16.  However, plaintiffs have never quarreled with this general proposition, but have instead asserted that it does not apply to the Kingdom's "charities" because:  (1) plaintiffs specifically allege and have offered evidence that the charities are *alter-egos* of the Saudi government; and (2) the charities perform a core function of the Saudi state.   Each of these considerations provides independent grounds for imputing the charities' acts to the Kingdom.

       a.    <u>The Kingdom Dominates and Controls the Da'awa Organizations.</u>  The Supreme Court has held that, where an instrumentality is so controlled by the state as to create a principal-agent relationship, the acts of that entity are attributable to the state.   *First National City Bank v. Banco Para El Comercio Exterior de Cuba,* ("*Bancec*") 462 U.S. 611, 629 (1983).  Such is the nature of the Kingdom's relationships with its da'awah organizations, as alleged.

       As reflected by the evidence reviewed in the Kohlmann affirmation, the Kingdom thoroughly dominates and controls each of the charities in issue, through a range of financial, administrative, and other mechanisms.  Of note:  (1) the charities are financially dependent on the Saudi government, which funds their operations through state grants and donations; (2) the officials who head the charities are themselves senior Saudi officials, appointed in most cases by the King; (3) the charities' offices outside of Saudi Arabia work hand in glove with, and take direction from, the Saudi embassies; (4) employees of the charities have testified that the charities are controlled by the Saudi government, and as employees of the charities they view themselves to be employees of the government itself; (5) the charities have variously asserted in this litigation that they are "arms" or "instrumentalities" of the Kingdom;[19] (6) the government regularly subordinates the charities to the state, as it did in establishing the SHC and SJRC; (7)

---

[19] These claims are significant, as the charities cannot qualify as "agencies," because they do not issue stock.  Thus, these claims apparently rest on the contention that they are "organs" of the Kingdom.  Organ status turns on factors reflecting state control over the entity and its purpose.  *See Filler v. Hanvit Bank,* 378 F.3d 213, 217 (2d Cir. 2004).

the charities perform a core function of the state; and (8) the Kingdom regularly takes credit for the work of the charities.  *See* Exh. 9.  This evidence more than meets any burden to present facts making plausible their claim that the charities are alter-egos of the state.  At the very least, these facts are sufficient to entitle plaintiffs to discovery on the alter-ego question.

> b.    The Da'awa Organizations Perform Core Functions of the State.  Even where an agency or instrumentality of a foreign state maintains administrative and financial independence from its government, the Second Circuit has held that it will be treated as the state itself, and not as a separate legal person, where it performs "core functions" of the state.  *Garb v. Republic of Poland,* 440 F.3d 579, 590-94 (2d Cir. 2006).  In determining whether an entity engages in such core functions, the Second Circuit has traditionally looked to, and taken judicial notice of, the foreign state's own laws and constitution.  *Id.* at 594-95 (taking judicial notice of Poland's Constitution for finding that Poland's Ministry of Treasury performed core functions); *SerVaas Inc. v. Republic of Iraq,* 2011 U.S. App. LEXIS 2709, at *6 (2d Cir. 2011) (citing Iraqi Law of Executive Authority for finding that Ministry of Industry was part of state itself).

Here, the Kingdom's own laws and filings confirm that the da'awa organizations perform core functions and obligations of the Saudi state, under the direction of the Ministry of Islamic Affairs and government officials who head those individual da'awa organizations.  Indeed, the Kingdom's Basic Law of Governance expressly provides that "[t]he State shall…undertake its duty regarding the propagation of Islam (Da'wa)," Exh. 10, p. 3, and senior Saudi officials have affirmed in this litigation that such da'awa activities have been a "*core policy and function* of the Kingdom since its founding."  Exh. 9, p. 5.  The Ministry of Islamic Affairs is the *operational* body responsible for executing the Kingdom's da'awa activities outside of the Kingdom, and the individual da'awa organizations serve as the tools for implementing those core functions on the ground.  *Id.*, p. 6, Exh. 16.  The Kingdom oversees the activities of those da'awa organizations

"through the government officials who head those organizations," and cites the work of those organizations as achievements of the state.  Exh. 9.  These and other facts surveyed in further detail in the affirmation of expert Evan Kohlmann, drawn from the Kingdom's own laws and official statements, demonstrate that the Ministry of Islamic Affairs and Saudi da'awa organizations are operational arms of the Saudi government engaged in a core function of the state – the propagation of Wahhabism outside of the Kingdom.  Accordingly, the Ministry of Islamic Affairs and individual da'awa organizations are part of the Saudi state itself.

## V.   Defendants' Direct Support of the 9/11 Hijackers and al Qaeda are not Discretionary Functions

For several reasons, defendants err in claiming that the FSIA's discretionary function exception bars this Court's jurisdiction over this case.

*First,* defendants' discretionary function argument fails entirely to address the actual torts at issue.  In particular, defendants' discretionary function argument rests entirely on their contention that plaintiffs' claims are "based primarily on contributions and other support [the Kingdom and SHC] are alleged to have provided to Islamic charities that in turn were alleged to have funded al Qaeda."  MTD, at 19.  This characterization is manifestly inaccurate.  Rather, the torts that form the basis for plaintiffs' claims involve:  (1) the acts of Saudi agents and officials (including Bayoumi, Thumairy, Basnan and others) in knowingly and directly providing assistance to the 9/11 hijackers and plotters in furtherance of the 9/11 attacks; (2) the acts of the Kingdom's alter-ego "charities" (including the SHC) in directly providing funds and support to al Qaeda (including funding for training camps and facilities used for the attacks), and in collaborating directly with al Qaeda in relation to its terrorist operations; and (3) the torts of the hijackers themselves.[20]  Defendants have offered no basis to conclude that the imputable torts of

---

[20] The district court's 2005 decision dismissing the Kingdom on discretionary function grounds failed to address the claims based on attribution of these acts to the Kingdom.  *See In re Terrorist Attacks on Sept. 11, 2001,* 349 F. Supp. 2d 765, 803-04 (S.D.N.Y. 2005).  Indeed, it contains no mention of Bayoumi or Thumairy.  *Id.*  However, the Second Circuit confirmed in *Terrorist Attacks III* (where it notably did not apply the district court's discretionary

these *operational level* agents and alter-egos in directly supporting the 9/11 hijackers and al

Qaeda involved any element of policy judgment.

     *Second,* the discretionary function exception does not apply to actions that violate

domestic or international law, even if they involve some element of policy judgment.[21]

Defendants seek to avoid these governing precedents, citing the statutory text indicating that the

exception applies to "any claim" grounded in a discretionary function, "regardless of whether the

discretion be abused."  28 U.S.C. § 1605(a)(5)(A).  But this argument ignores that in order for

discretion to be abused, it must exist in the first place.  The reasoning of *USAA Casualty*

*Insurance Co. v. Permanent Mission of Republic of Namibia,* 681 F.3d 103, 113 (2d Cir. 2012),

*Liu v. Republic of China,* 892 F.2d 1419 (9th Cir. 1989), and other cases is that foreign countries

have "no discretion" to commit unlawful acts.  *Liu,* 892 F.2d at 1431; *Letelier v. Republic of*

*Chile,* 488 F. Supp. 665, 673 (D.D.C. 1980) (same).  Because foreign states have no authority to

engage in acts that violate law, declining to extend the discretionary function exception to such

acts is consistent with the statutory language.  Application of that limitation is especially

appropriate here, given that the illegal torts in issue were committed by operational level actors,

not planning or policy level officials.  *See* MTD, at 19 (noting distinction between acts

performed at planning, as opposed to operational, level in discretionary function analysis).

---

function ruling as a basis for its decision) that plaintiffs' claims rested on such theories, noting for example that
plaintiffs alleged that "the Kingdom exercises complete oversight and control over the charities, making the charities
alter-egos and agents whose deeds can be imputed to the Kingdom."  *In re Terrorist Attacks on Sept. 11, 2001,* 538
F.3d 71, 77 (2d Cir. 2008) (overruled in part).  The district court's failure to consider such theories thus further
undermines defendants' reliance on that decision.

[21] The tortious acts at issue are illegal under a range of U.S. laws, including the Anti-Terrorism Act.  *See* 18 U.S.C.
2331 *et seq.*  And they violate international law as reflected and embodied by binding UN Security Council
Resolutions.  *See G.A. Res. 51/210, U.N. GAOR, 51st Sess., Annex 1, U.N. Doc. A/RES/51/210, at 6 (Jan. 16, 1997)*
("knowingly financing, planning and inciting terrorist attacks are also contrary to the purposes and principles of the
United Nations."); *id.,* Art. I, ¶ 3(f) (member states to take measures to prevent the financing of terrorists and
terrorist organizations, "whether such financing is direct or indirect through organizations which also have or claim
to have charitable, social or cultural goals").  It is therefore entirely illogical to conclude that Congress intended
such acts to be treated and immunized as legitimate and valid discretionary functions.

*Third,* the Second Circuit's decision in *Doe II* confirms that Congress did not intend for unlawful acts such as support for terrorism to fall within the discretionary function exception and that the exception is not a basis for dismissing, at the pleading stage, a claim that a defendant provided material support to al Qaeda.  Specifically, *Doe II* involved allegations that Afghanistan had provided material support to and conspired with al Qaeda in furtherance of the 9/11 attacks, including by allowing al Qaeda to maintain training camps used to support the attacks, and the Court found that the complaint adequately "alleged nondiscretionary acts by employees of the foreign state within the scope of their employment," and thus held that "at the pleading stage, the claim appears to fit within the noncommercial tort exception." *Doe II,* 663 F.3d at 67.  Here, the claims encompass allegations of far more direct support for the 9/11 hijackers and attacks than those at issue in *Doe II*, and additional claims that defendants funded the training camps where the hijackers received their training, which closely parallel the claims in *Doe II*.

Significantly, the question before the Court in *Doe II* – as here – was whether the complaint was legally sufficient to avoid dismissal: i.e., whether the factual allegations in the complaint "fit within the noncommercial tort exception."  The Court found that the acts of material support alleged in the *Doe II* complaint did "fit" within the tort exception – necessarily meaning that these acts did not fit within the discretionary function exception.  As a result, the Court found that the complaint could not be dismissed and that the *Doe II* plaintiffs were entitled to discovery concerning the discretionary function exception. *Doe II,* 663 F.3d at 66-67, 71.  This holding confirms that plaintiffs are at the least entitled to discovery on the discretionary function question, although plaintiffs submit that the record supports denial of that defense outright.

## VI.   Conclusion

For all of the foregoing reasons, plaintiffs respectfully submit that the renewed motion to dismiss of the Kingdom of Saudi Arabia and SHC should be denied.

Dated:  February 3, 2015                    Respectfully submitted,


/s/ Stephen A. Cozen
Stephen A. Cozen, Esq.
Elliott R. Feldman, Esq.
Sean P. Carter, Esq.
Scott Tarbutton, Esq.
COZEN O'CONNOR
1900 Market Street
Philadelphia, PA  19103
(215) 665-2000

Attorneys for *Federal Insurance* Plaintiffs

Jodi W. Flowers, Esq.
Robert T. Haefele, Esq.
MOTLEY RICE LLC
28 Bridgeside Boulevard
P. O. Box 1792
Mount Pleasant, SC  29465
(843) 216-9000

-and-

Andrea Bierstein, Esq.
SIMMONS HANLY CONROY, LLC
112 Madison Avenue
7th Floor
New York, NY  10016
(212) 784-6400

Attorneys for *Burnett* Plaintiffs and *Euro Brokers*
Plaintiffs

James P. Kreindler, Esq.
Justin T. Green, Esq.
Andrew J. Maloney III, Esq.
KREINDLER & KREINDLER LLP
750 Third Avenue
32nd Floor
New York, NY 10017
(212) 687-8181

Attorneys for *Ashton* Plaintiffs

Jerry S. Goldman, Esq.
ANDERSON KILL, P.C.
1251 Avenue of the Americas
New York, NY  10020
(212) 278-1000

Attorneys for *O'Neill* Plaintiffs

Chris Leonardo, Esq.
ADAMS HOLCOMB LLP
1875 Eye Street, NW
Suite 810
Washington, DC  20006
(202) 580-8803

-and-

Howard N. Feldman
Dickstein Shapiro LLP
1825 I Street NW
Washington, DC  20006
(202) 420-2200

Attorneys for *Cantor Fitzgerald*
Plaintiffs

Robert M. Kaplan, Esq.
FERBER CHAN ESSNER &
COLLER, LLP
530 Fifth Avenue, 23rd Floor
New York, NY 10036-5101
(212) 944-2200

Attorneys for *Continental Casualty*
Plaintiffs

32

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the Plaintiffs' Memorandum of Law in Opposition to the Motion to Dismiss of the Kingdom of Saudi Arabia and Saudi High Commission for Relief of Bosnia & Herzegovina was filed electronically this 3rd day of February 2015.  Notice of this filing will be sent to all parties in 03 MDL 1570 by operation of the Southern District of New York's Electronic Case Filing ("ECF") system.  Parties may access this filing through the Court's ECF system.  Copies of Plaintiffs' exhibits (PEC-KSA000001-4650) filed in support of the Memorandum of Law are simultaneously being served in both hard copy and electronic version upon counsel for the Kingdom of Saudi Arabia and Saudi High Commission.

/s/_____
J. Scott Tarbutton

LEGAL\22106507\1

33