# Exhibit "1"

to the Affirmation of Sean P. Carter Transmitting Evidence in Support of Plaintiffs' Memorandum of Law in Opposition to the Motion to Dismiss of the Kingdom of Saudi Arabia and Saudi High Commission for Relief of Bosnia & Herzegovina

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (GBD) (FM)<br>ECF Case |

*This document relates to:  All Actions*

### PLAINTIFFS' AVERMENT OF FACTS AND EVIDENCE IN SUPPORT OF THEIR CLAIMS AGAINST THE KINGDOM OF SAUDI ARABIA AND THE SAUDI HIGH COMMISSION FOR RELIEF OF BOSNIA & HERZEGOVINA

Plaintiffs in the above-referenced actions submit this Averment of Facts and Evidence in further support of their theories of liability and subject matter jurisdiction under the Foreign Sovereign Immunities Act ("FSIA"), for their claims against the Kingdom of Saudi Arabia and the Saudi High Commission for Relief of Bosnia & Herzegovina.

## I.    PLAINTIFFS

1.    This Averment of Facts and Evidence is submitted on behalf of all plaintiffs in the following actions, including all members of any putative class represented by any such plaintiffs: *Federal Insurance Co., et al. v. al Qaida, et al.*, Case No. 03 Civ. 6978, *Pacific Employers Ins., et al., v. Kingdom of Saudi Arabia, et al.*, Case No. 04 Civ. 7216, *Vigilant Insurance Co., et al., v. Kingdom of Saudi Arabia, et al.*, Case No. 03 Civ. 8591, *Thomas Burnett, Sr., et al. v. Al Baraka Inv. & Dev. Corp., et al.*, Case No. 03 Civ. 9849, *Euro Brokers Inc., et al., v. Al Baraka, et al.*, Case No. 04 Civ. 7279, *Kathleen Ashton, et al. v. Al Qaeda Islamic Army, et al.*, Case No. 02 Civ. 6977, *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.*, Case No. 04 Civ. 1922,  *Continental Casualty Co., et al. v. Al Qaeda, et al.*, Case No. 04 Civ. 5970, and *Cantor Fitzgerald & Co., et al. v. Akida Bank Private Ltd, et al.*, Case No. 04 Civ. 7065.[1] [2]

---

[1]The Kingdom of Saudi Arabia is presently named in the following actions:  *Federal Insurance Co., et al. v. al Qaida, et al.*, Case No. 03 Civ. 6978; *Pacific Employers Ins., et al., v. Kingdom of Saudi Arabia, et al.*, Case No. 04 Civ. 7216; *Vigilant Insurance Co., et al., v. Kingdom of Saudi Arabia, et al.*, Case No. 03 Civ. 8591; and *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.*, Case No. 04 Civ. 1922.  The *O'Neill* suit is a putative class action.

2.      All Plaintiffs adopt and incorporate by reference the following operative complaints and pleadings in their entireties, including all allegations and counts presented therein:  *Federal Insurance* First Amended Complaint with Incorporated More Definite Statements, RICO Statements and Rule 15(d) Supplemental Pleadings, Filed in Accordance with Paragraph 13 of Case Management Order Number 2, Case No. 03 Civ. 6978, ECF No. 772; *Pacific Employers* Complaint, Case No. 04 Civ. 7216, ECF No. 1; *Vigilant Insurance* Complaint, Case No. 03 Civ. 8591, ECF No. 1; *Burnett* Third Amended Complaint, Case No. 02 Civ. 1616 (D.D.C.), ECF No. 29,[3] and *Burnett's* Notice of Consolidation of Pleadings, 03 MDL 1570, ECF No. 1377; *Euro Brokers* Complaint, Case No. 04 Civ. 7279, ECF No. 1, and *Euro Broker's* Notice of Consolidation of Pleadings, 03 MDL 1570, ECF No. 1078; *Ashton* Sixth Amended Complaint, Case No. 02 Civ. 6977, ECF No. 465; *O'Neill* Class Action Complaint, Case No. 04 Civ. 1922, ECF Nos. 1, 21-22, as amended by the *O'Neill* First Consolidated Complaint, Case No. 03 MDL 1570, ECF No. 1569; *Continental Casualty* Second Amended Complaint, Case No. 04 Civ. 5970, ECF No. 195; and *Cantor Fitzgerald* Complaint, Case No. 04 Civ. 7065, ECF No. 5.

3.      In further support of their theories of subject matter jurisdiction and liability as to defendants Kingdom of Saudi Arabia and the Saudi High Commission for Relief of Bosnia & Herzegovina, as presented in the complaints adopted by reference in paragraph 2 above, plaintiffs offer the following additional factual allegations and evidence.

---

[2]The Saudi High Commission for Relief of Bosnia & Herzegovina is presently named in the following actions:  *Federal Insurance Co., et al. v. al Qaida, et al.*, Case No. 03 Civ. 6978; *Thomas Burnett, Sr., et al. v. Al Baraka Inv. & Dev. Corp., et al.*, Case No. 03 Civ. 9849; and *Continental Casualty Co., et al. v. Al Qaeda, et al.*, Case No. 04 Civ. 5970.

[3] The *Burnett* action, originally filed in the United States District Court for the District of Columbia, was transferred to the Southern District of New York by Order of the Judicial Panel on Multidistrict Litigation on December 9, 2003.

## II.   DEFENDANTS KINGDOM OF SAUDI ARABIA AND SAUDI HIGH COMMISSION FOR RELIEF OF BOSNIA & HERZEGOVINA

4.     Defendant Kingdom of Saudi Arabia ("the Kingdom" or "Saudi Arabia") is a foreign state within the meaning of 28 U.S.C. §1603(a).  Saudi Arabia maintains an Embassy within the United States at 601 New Hampshire Avenue, N.W., Washington, D.C. 20037.

5.     Defendant Saudi High Commission for Relief of Bosnia & Herzegovina ("Saudi High Commission" or "SHC") is a controlled agent and alter-ego of the government of Saudi Arabia.  Although the Saudi High Commission has its headquarters in the Kingdom, its operations are conducted primarily outside of Saudi Arabia.  As the SHC has itself acknowledged in affidavit testimony submitted of record in these proceedings, "[a]ctions undertaken by the Saudi High Commission may be viewed as actions of the government of Saudi Arabia."  The acts and conduct of the SHC are thus attributable to the Kingdom for purposes of both subject matter jurisdiction under the FSIA and liability.

## III.   JURISDICTION

6.     The jurisdiction of this Court for the claims against Saudi Arabia and the SHC is invoked pursuant to 28 U.S.C. § 1330, as the claims against those defendants fall within the exception to foreign sovereign immunity set forth at 28 U.S.C. §1605(a)(5), the non-commercial tort exception of the FSIA.

7.     Venue in this district is proper inasmuch as the Judicial Panel on Multidistrict Litigation ("JPML") assigned the cases to this district for purposes of MDL management, and pursuant to 28 U.S.C. §§ 1391(b)(2) and 1391(f)(1), as a substantial part of the events giving rise to the claims asserted herein occurred in this district.

## IV.   FACTUAL BACKGROUND

8.     On September 11, 2001, nineteen members of the al Qaeda terrorist organization, fifteen of whom were citizens of the Kingdom of Saudi Arabia, hijacked four commercial airliners, and used those planes as weapons in a coordinated terrorist attack upon the United States and its citizens (the "September 11th Attacks").

9.      The September 11th Attacks resulted in the tragic loss of several thousand lives, personal injuries to countless other persons, and property damage on a catastrophic scale, including the complete destruction of the World Trade Center Complex.

10.     To al Qaeda and its adherents and supporters, the September 11th Attacks represented a single targeted operational strike, carried out as part of a broader and long ongoing campaign to wage jihad against the United States.

11.     The success of al Qaeda's jihadist campaign, including the September 11th Attacks themselves, was made possible by the lavish sponsorship al Qaeda received from its material sponsors and supporters, including the Kingdom and SHC, over more than a decade leading up to September 11, 2001.

12.     As further detailed below, the Kingdom and the SHC provided material support to al Qaeda with knowledge of al Qaeda's intent to conduct terrorist attacks against the United States, and an awareness that al Qaeda would use the support provided by the Kingdom and SHC to achieve that objective, a goal al Qaeda has tragically realized on numerous occasions, including on September 11, 2001.

13.     As further detailed below, the support provided by the Kingdom and SHC enabled al Qaeda to obtain the global strike capabilities necessary to carry out the September 11th Attacks, and was essential to the success of those attacks.  Indeed, the material support provided by agents of the Kingdom, all of which is attributable to the Kingdom itself, included direct assistance to the September 11th plotters and hijackers.

14.     Absent the support provided by the Kingdom and SHC, al Qaeda would not have possessed the capacity to conceive, plan and execute the September 11th Attacks.

## V.      THE ORIGINS OF AL QAEDA

15.     Al Qaeda has its origins in the jihad against the Soviet occupation of Afghanistan, although the ideological foundation for the al Qaeda movement long pre-dates that conflict.

16.     The Soviet invasion of Afghanistan served as a rallying point for Islamic extremists in the Middle East, who flocked to Afghanistan to wage jihad against the Soviet Union.

17.     Osama bin Laden travelled to Afghanistan in 1980 to participate in the jihad, and gained prominence during this period for his role in establishing the financial and logistical infrastructure that sustained the Arab-Afghan fighters, commonly referred to as the mujahideen. According to the Final Report of the National Commission on Terrorist Attacks Upon the United States (the "9/11 Commission"):

> Bin Ladin understood better than most of the volunteers the extent to which the continuation and eventual success of the jihad in Afghanistan depended on an increasingly complex, almost world-wide organization.  This organization included a financial support network that came to be known as the "the Golden Chain," put together mainly by financiers in Saudi Arabia and Persian Gulf states.  Donations flowed through charities and other non-governmental organizations (NGOs).  Bin Ladin and the "Afghan Arabs" drew largely on funds raised by this network, whose agents roamed world markets to buy arms and supplies for the mujahideen or "holy warriors."

18.     Together with Abdullah Azzam, bin Laden founded the Maktab al Khidmat ("the Office of Services") to facilitate the provision of financial and logistical support to the mujahideen.

19.     Throughout the Afghan jihad, Maktab al Khidmat worked in concert with a network of purported charities and relief organizations (including among others the Muslim World League ("MWL"), International Islamic Relief Organization ("IIRO"), World Assembly of Muslim Youth ("WAMY"), Al Haramain Islamic Foundation ("al Haramain"), Rabita Trust, Saudi Red Crescent Society ("SRC"), and Benevolence International Foundation ("BIF")) to provide travel documents, funds, transportation, training, facilities, arms, physical assets, and other support to the mujahideen.

20.     This network of ostensible charities and relief organizations established a vast financial and logistical infrastructure to support the mujahideen opposition to the Soviet occupation of Afghanistan.

21.     At the conclusion of the Afghan jihad, bin Laden determined that the network that supported the mujahideen in Afghanistan should not be abandoned, but rather adapted to serve as a foundation for waging a global jihad against all of the perceived enemies of Islam, and in particular, the United States.

> April 19, 1988 brought victory for the Afghan jihad.  Moscow declared it would pull its military forces out of Afghanistan within the next nine months.  As the Soviets began its withdraw, the jihad's leaders debated what to do next.
>
> Bin Ladin (and Abdullah Azzam) agreed that the organization successfully created for Afghanistan should not be allowed to dissolve.  They established what they called a base or foundation (al Qaida) as a potential general headquarters for future jihad.

9/11 Report at p. 56

## VI.     AL QAEDA'S OBJECTIVES AND TACTICS

22.     In establishing al Qaeda in 1988, bin Laden sought to create a multi-national Islamic army to challenge the perceived domination of the democratic West, and to engage in armed combat wherever Muslim communities were perceived to be under duress, in furtherance of the ultimate objective of establishing a Pan-Islamic Caliphate.

23.     Al Qaeda employs a range of operational tactics and initiatives in the pursuit of its goals, which complement one another as part of a carefully conceived and coordinated global strategy.

24.     Although high profile terrorist attacks are an important aspect of that campaign, al Qaeda has historically devoted a significant portion of its vast resources to military campaigns in conflict regions, and to supporting and fostering regional jihadist organizations and Islamic separatist movements throughout the World.

25.     In this context, al Qaeda has been deeply involved in regional jihad campaigns, involving both traditional forms of combat and terrorist activities, in Bosnia, Chechnya, Kosovo, Sudan, Kashmir, Pakistan, Afghanistan, Iraq, Turkey, Indonesia, Malaysia, Algeria, the Philippines, Somalia, Palestine, Yemen, Kenya, Tanzania and Egypt.

26.     Al Qaeda's participation in these regional conflicts has taken many forms.  Al Qaeda provides funding and logistical assistance to local extremist and terrorist organizations, in support of their military and terrorist activities.  In addition, al Qaeda deploys its own members to fight in these conflicts, train new volunteers, and assist in the planning and execution of terrorist attacks.

27.     Through its engagement in these regional jihad campaigns, al Qaeda aims to establish and support radical Islamic regimes and extend its sphere of influence, as critical components of its long-term objective to eradicate democratic societies and establish a pan-Islamic Caliphate.

28.     In describing the importance of these regional military campaigns within the overall context of al Qaeda's jihad against the West, a 1998 Department of Defense Intelligence Report states as follows:

> [al Qaeda] seeks to establish a worldwide Islamic state capable of directly challenging the US, China, Russia, and what it views as judeo-Christian and Confucian domination.
>
> The means by which the above goals are to be met are via terror, ethnic cleansing, "latent penetration" (NEI), and control over nuclear and biological weapons (Jikhad).  Further, radical Islamic (predominantly Sunni) regimes are to be established and supported everywhere possible, including Bosnia, Albania, Chechnya, Dagestan, the entire northern Caucasus "from Sea to Sea," central Asian Republics, Tatarstan, Bashkortostan, all of Russia, Afghanistan, Pakistan, Turkey, Indonesia, Malaysia, Algeria, Morocco, Egypt, Tunisia, Sudan, and the states of the Persian Gulf.

29.     In addition to the value its participation in regional military conflicts yields in relation to its long-term strategic objectives, al Qaeda's participation in these regional jihad

campaigns also enabled al Qaeda to acquire the global infrastructure needed to plan and execute sophisticated international terrorist attacks, including the September 11th Attacks themselves.

30.     Al Qaeda's military operations bolster the organization's image among local Muslims, thereby facilitating al Qaeda's ongoing recruiting and fundraising efforts.  These campaigns also afford the organization an efficient vehicle to provide new members with battle experience, in preparation for terrorist operations and the ongoing military conflict with the United States.  In addition, al Qaeda's financial and operational support for local Islamist and separatist movements has allowed al Qaeda to co-opt local conflicts and organizations to its own ends.  As a result, many pre-existing terror and extremist organizations evolved into al Qaeda proxies, thereby extending al Qaeda's operational capabilities, resources, and sphere of influence.

31.     Al Qaeda's participation in such regional conflicts and jihad campaigns fueled al Qaeda's growth and development in the years leading up to the September 11th Attacks.  Indeed, according to the 9/11 Commission, al Qaeda's operational involvement in regional conflicts between 1988 and 1998 served to establish the organization as the vanguard of the global jihadist movement, and directly enhanced al Qaeda's operational capacity to carry out large scale terrorist attacks:

> By the time he issued his February 19, 1998 declaration of war, bin Ladin had nurtured (the al Qaeda) organization for nearly ten (10) years.  He could attract, train, and use recruits for ever more ambitious attacks, rallying new adherents with each demonstration that his was the movement of the future.

9/11 Report at p. 55.

32.     The findings of the 9/11 Commission further confirm that al Qaeda relied heavily on its global infrastructure in planning, coordinating and staging the September 11th Attacks, and that al Qaeda could not have successfully mounted those Attacks absent the impressive resources and assets amassed by the organization over the thirteen years preceding the Attacks.

33.     In this regard, the 9/11 Commission found that the "9/11 attack was a complex international operation, the product of years of planning."  The 9/11 Report confirms that plans for the Attacks were carefully vetted through al Qaeda's most senior leadership over a period of nearly six years, while those leaders were safely ensconced in training camps and safe houses funded by al Qaeda's financial supporters; that the individuals selected to participate in the Attacks were chosen from an enormous pool of potential candidates, all of whom were recruited, trained, and indoctrinated with funds provided by the organization's supporters; and that details of the plans were revised up until the last minute, through a sophisticated global communication network capable of evading the surveillance and intelligence operations of the United States and its allies, the development and existence of which was also dependent on the financial sponsorship of al Qaeda's supporters.

34.     Based on the findings of its investigation concerning the relationship between al Qaeda's global infrastructure and the organization's operational capability to plan, coordinate and mount the September 11th Attacks, the 9/11 Commission reached the following conclusions regarding the basic organizational requirements for staging a sophisticated terrorist attack:

> A complex international terrorist operation aimed at launching a catastrophic attack cannot be mounted by just anyone in any place. Such operations appear to require
>
> Time, space, and ability to perform competent planning and staff work;
>
> A command structure able to make necessary decisions and possessing the authority and contacts to assemble needed people, money, and materials;
>
> Opportunity and space to recruit, train, and select operatives with the needed skills and dedication, providing the time and structure required to socialize them into the terrorist cause, judge their trustworthiness, and hone their skills;
>
> A logistics network able to securely manage the travel of operatives, move money, and transport resources (like explosives) where they need to go;

Access, in the case of certain weapons, to the special materials
needed for a nuclear, chemical, radiological, or biological attack;

Reliable communications between coordinators and operatives;
and

Opportunity to test the workability of the plan.

35.    Consistent with the findings of the 9/11 Commission, U.S. counter-terrorism

officials have repeatedly affirmed the critical importance of al Qaeda's broader infrastructure and

resources to its capacity to conceive, plan, coordinate, and successfully conduct sophisticated

terrorist attacks, including the September 11th Attacks, as reflected by the following statements:

There are some who question the effectiveness of our strategy to
prevent terrorism by attacking the financing that supports it. They
note that terrorist attacks themselves cost very little money to carry
out – the trivial cost of a suicide belt or similar device – and then
leap to the conclusion that our efforts to combat terrorism by
attacking terrorist resources are wasted or futile.

The 9/11 Commission wisely rejected this point of view.  In the
first place, the cost of financing terrorist activity cannot be
measured by the cost of a primitive destructive act.  The
maintenance of those terrorist networks, like al Qaeda, which
threaten our national security, is expensive – even if a particular
attack does not cost much to carry out.  As the 9/11 Commission
explained, groups like al Qaeda must spend money for many
purposes – to recruit, train, plan operations, and bribe corrupt
officials for example.  If we can eliminate or even reduce their
sources and conduits of money, we can degrade their ability to do
all of these things, and thus can make them less dangerous.

Testimony of Stuart A. Levey, Undersecretary of Terrorism and Financial Intelligence, August
23, 2004.

As this Committee knows well, tracking and combating terrorist
financing are critical facets of our overall efforts to protect our
citizens and other innocents around the World from terrorist
attacks…. While any single terrorist attack may be relatively
inexpensive to carry out, terrorist groups continue to need real
money.  They depend on a regular cash flow to pay operatives and
their families, arrange for travel, train new members, forge
documents, pay bribes, acquire weapons and stage attacks.
Disrupting money flows stresses terrorist networks and undermines
their operations.  In recent months, we have seen at least one

> instance of what we look for most – a terrorist organization
> indicating that it could not pursue sophisticated attacks because it
> lacks adequate funding.

Testimony of Stuart Levey, Undersecretary of Terrorism and Financial Intelligence, before the House Financial Services Subcommittee on Oversight and Investigations, July 11, 2006.

> (T)errorist organizations require significant funding.  Although
> individual terrorist attack may be inexpensive, terrorist
> organizations require far more than explosives to sustain
> themselves.  They need money to train, recruit, pay operatives and
> their families, travel, bribe officials, procure cover and false
> documents, as well as purchase arms.  If implemented effectively,
> targeted financial sanctions can put terrorist organizations in a
> financial box, effectively depriving them of the resources they
> need to conduct this range of activity.

Prepared remarks of Daniel L. Glaser, Acting Assistant Secretary for Terrorist Financing and Financial Crimes before the Annual Meetings Program of Seminars: The Importance of Expanding Targeted Financial Transactions Programs Around the Globe: Challenges and Opportunities, September 23, 2005.

> The primary reason why combating the financing of terrorism
> efforts are both necessary and important is that terrorist groups
> need money.  Although mounting an individual terrorist attack is
> relatively inexpensive, the cost to maintain the infrastructure to
> support terrorist activities is high.  Terrorist networks need cash to
> train, equip and pay operatives, to secure materials and to promote
> their cause.  To eliminate or reduce the cell's means of raising and
> transferring funds is to significantly degrade that cell's capabilities.

*The Money Trail: Finding, Following and Freezing Terrorist Finances*, Michael Jacobsen and Matthew Levitt (Deputy Assistant Secretary for Intelligence and Analysis of the Treasury Department from 2005 – 2007), November 2008, at p. 3.

> Although manning a terrorist attack is relatively inexpensive, the
> cost to maintain a terrorist infrastructure is high.  Terrorist
> networks need cash to train, equip and pay operatives and their
> families and to promote their causes.  Recruiting, training,
> traveling, bribing corrupt officials and other such activities also
> cost money.  Limiting their ability to raise funds therefore limits
> their ability to function.

*Follow the Money – The Obama Administration Should Continue to Track How Terrorists get Their Money*, Michael J. Jacobsen and Matthew Levitt, December 23, 2008

36.     Given the financial needs of terrorist organizations, as documented above, Congress has concluded that money is the lifeblood of terrorism, and that any contribution to a terrorist organization furthers acts of terrorism.  The State Department has affirmed in proceedings before the United States Supreme Court that "[t]he experience and analysis of the U.S. government agencies charged with combating terrorism strongly suppor[t]" Congress's findings on those points.

## VII.   THE MEANS THROUGH WHICH AL QAEDA BUILT AND SUSTAINS ITS GLOBAL INFRASTRUCTURE

37.     Given the infrastructural requirements inherent in al Qaeda's mission to wage jihad globally, and its ambitious goal to stage spectacular international terrorist attacks against the United States as a component of that mission, the development and sustainment of the al Qaeda organization required massive funding on an ongoing basis over a period of many years, through secure and reliable channels.

38.     Indeed, in the wake of the September 11th Attacks, U.S. counter-terrorism officials estimated that al Qaeda required $35 million annually to sustain the infrastructure that supported the September 11th Attacks, a view that was endorsed by the 9/11 Commission as well.

39.     To realize these immense fundraising needs, al Qaeda simply and ingeniously adapted the network developed during the Afghan jihad, relying from its inception on Islamic da'awa organizations (frequently described inaccurately as "charities") to fuel its growth and development.

40.     As the United Nations Security Council Committee concerning al Qaeda and the Taliban succinctly explained:

> From its inception, al-Qaida has relied heavily on charities and donations from its sympathizers to finance its activities.  Charities provide al-Qaida with a very useful international channel for soliciting, collecting, transferring and distributing the funds it needs for indoctrination, recruitment, training, and logistical and operational support.  These funds are often merged with and hidden among funds used for other legitimate humanitarian or social programs.  Al-Qaida supporters and financiers have also

established front charity networks whose main purpose is to raise and deliver funds to al-Qaida.  The roots of these charity networks stem from the anti-Soviet Jihad in Afghanistan during the last 1980s.  During that time, al-Qaida could draw on a number of state-assisted charities and other deep pocket donors that supported the anti-Soviet cause.

Today, al-Qaida continues to rely heavily on those charities to facilitate and mask the collection and movement of its funds.

41.     The 9/11 Commission's Staff Monograph on terrorist financing similarly concluded that "al Qaeda was funded, to the tune of approximately $30 million per year, by diversions of money from Islamic charities."

42.     Purported charities provide an attractive mechanism for al Qaeda to raise and launder funds for a variety of reasons.  Unlike for-profit organizations, charitable funds are meant to move in one direction only, meaning that large purported charitable transfers can move without any corresponding return of value.  In addition, charities are often cash intensive, and frequently have considerable access to funds.  Charities with global operations offer an infrastructure for international transactions, often within or near areas that present strategic opportunities for terrorist activity and recruitment.  Further, the legitimate relief work carried out by charities related to terrorist organizations allows terrorists to generate recruitment, financial, and other support for their causes and assists terrorists in propagating violent and extremist ideologies.

43.     Although al Qaeda has in limited instances established its own charities to serve as channels of support for particular initiatives, al Qaeda's development into a sophisticated global terrorist network was fueled primarily by the massive support it received from purported charities acting as agents and alter-egos of the government of the Kingdom of Saudi Arabia, many of which worked with the al Qaeda leadership during the Afghan jihad.  These governmental agents have served as the primary conduits for channeling financial, logistical, operational, and ideological support for al Qaeda's global jihad for more than twenty years.  To this day, many of these arms of the Saudi government remain dedicated to promoting al Qaeda's

goals and operational objectives, and continue to play a singular role in propagating the violent and virulently anti-Western ideology that provides religious legitimacy for al Qaeda's terrorist activities and draws new adherents to al Qaeda's cause.

44.    Although representing themselves to the West as traditional "charities" or "humanitarian organizations," these organizations are more accurately described as Islamic da'awa organizations, created by the government of the Kingdom to propagate a radical strain of Islam throughout the World, commonly referred to as Wahhabism.

45.    Under the direction of the Saudi government, and especially the Kingdom's Ministry of Islamic Affairs, these organizations have aggressively pressed the view that Western society, under the leadership of the United States, is conducting a coordinated "Western Cultural Attack" (Ghazu Fikari in Arabic) on Islam, designed to destroy the fabric of Muslim society as a predicate for Western conquest of Muslim territories.

46.    These organizations fervently believe that this so-called "Western Cultural Attack" (and other perceived or imagined threats to Islam) must be aggressively countered through jihad and worldwide indoctrination into Wahhabi Islam, a strategy the Kingdom has promoted and implemented through government agencies, state controlled media, government sponsored publications, and a variety of other channels.

47.    Consistent with this view, the Saudi government controlled charities have embraced al Qaeda (an organization founded on the same Wahhabi ideology the Kingdom's da'awa organizations were established to propagate) and its affiliates as partners, and actively supported al Qaeda's global jihad at every level, from the organization's inception.

48.    These so-called charities, including among others the MWL, IIRO, SHC, WAMY, BIF, Al Haramain Islamic Foundation ("Al Haramain"), Saudi Red Crescent Society ("SRC"), Saudi Joint Relief Committee ("SJRC"), and Al Haramain al Masjil al Aqsa have provided the vast majority of the funding that allowed al Qaeda to build and sustain its massive global infrastructure over the thirteen years leading up to the September 11th Attacks.  Beyond their massive financial sponsorship of al Qaeda's global jihad, the Saudi government charities

have been intimately involved in all aspects of al Qaeda's operations, and allowed al Qaeda to use their infrastructures and resources as platforms for carrying out jihad.  As further detailed herein, the Saudi government controlled charities have: (1) raised and laundered funds on behalf of Islamic terrorist organizations and associated separatist movements, including al Qaeda; (2) channeled donated funds to Islamic terrorist organizations, fighters and associated separatist movements, including al Qaeda; (3) provided financial and logistical support and physical assets to Islamic fighters and terrorists, including al Qaeda; (4) directly participated in al Qaeda's terrorist activities, including the planning, coordination, funding and execution of terrorist attacks; (5) permitted Islamic fighters and terrorists, including al Qaeda members, to use ostensible employment with their organizations as a vehicle for gaining access to conflict regions, thereby allowing those individuals to carry out militant and terrorist activities in those areas; (6) performed reconnaissance within conflict regions on behalf of Islamic terrorist organizations and separatist movements, including al Qaeda; (7) served as liaisons to localized terrorist organizations on behalf of al Qaeda, thereby assisting al Qaeda in expanding its operational base and sphere of influence; (8) funded and facilitated shipments of arms and supplies to Islamic terrorist organizations and associated separatist movements, including al Qaeda; (9) funded camps used by al Qaeda and associated jihadist organizations to train soldiers and terrorists, including camps used to train the September 11th hijackers; (10) actively recruited new members for Islamic terrorist organizations and associated separatist movements, including al Qaeda; (11) worked throughout the World to spread al Qaeda's jihadist ideology and draw new adherents to its cause; (12) served as channels for distributing information and documentation within Islamic terrorist organizations and associated separatist movements, including al Qaeda, and from Islamic terrorist organizations and separatist movements to the media; (13) disseminated publications designed to advance al Qaeda's radical Islamist ideology throughout the Muslim world and legitimize violent jihad against Christians and Jews on the grounds that they are "infidels" who do not deserve to live; and (14) openly advocated for young Muslims to take up arms against Western and democratic societies, including the United States.

## VIII.   THE HISTORICAL CONTEXT OF SAUDI ARABIA'S SUPPORT FOR AL QAEDA

49.     The emergence of al Qaeda and the global Sunni jihadist movement under the patronage and stewardship of the Saudi government charities is rooted in the origins of the Saudi state itself, and the unique relationship between the House of Saud and Wahhabi Islam.

50.     The modern Saudi state is a product of a pact forged in the 18th century between Muhammad Ibn al Saud, the head of the al Saud tribe in Arabia, and Muhammad Ibn Abd al Wahhab, a Muslim scholar from the Najd region of Arabia.

51.     Ibn Abd al Wahhab's ideas and teachings form the basis of the Islamic school of thought commonly known as Wahhabism, which forms the ideological foundation for the al Qaeda movement.  According to the National Commission on Terrorist Attacks Upon the United States, al Qaeda finds inspiration and religious justification for its actions "in a long tradition of intolerance" that flows "through the founders of Wahhabism."

52.     In the late 1730's, Ibn Abd al Wahhab began a campaign to impose a puritanical Islamic rule in the Najd region, zealously preaching and writing against Shia Islam as well as the "popular" practices of many Sunni Muslims.

53.     In furtherance of his goal to establish broad rule pursuant to Wahhabi doctrine, and to eradicate Islamic practices he deemed deviant or improper, Ibn Abd al Wahhab sought out an alliance with a political and military leader.

54.     In 1744 Ibn Abd al Wahhab achieved that goal, when he swore a traditional Muslim oath with Ibn al Saud, pursuant to which they promised to work together to establish a state run according to Islamic law (Shariah).

55.     The pact with Ibn Abd al Wahhab provided religious legitimacy and justification for Ibn al Saud's political authority, and offered Ibn Abd al Wahhab political and military resources to compel adherence to Wahhabi religious doctrine by force.

56.     In keeping with the pact forged with Ibn Abd al Wahhab, Ibn al Saud began leading his armies in a campaign to eradicate Islamic practices deemed deviant by Ibn Ab Wahhab, and to establish Wahhabi Islamic rule throughout the Najd region of Arabia.

57.     Over the ensuing century, the decedents of Ibn al Saud and Ibn Abd al Wahhab sustained and reinforced their politico-religious alliance, even as the political fortunes of the Saud clan waned.

58.     With the aid of a movement of fervent Wahhabi fundamentalists known as the Ikhwan, the House of Saud mounted a military offensive in the early 20th Century under the leadership of Abd al Aziz, which succeeded in uniting much of the Arabian Peninsula under Saudi rule, culminating in the establishment of the modern Saudi state.

59.     Upon taking control of Mecca and Medina, Abd al Aziz assumed the title Khadim al Haramain (servant of the Two Shrines), thus reaffirming the religious precondition and justification for the House of Saud's political authority.

60.     During the early years of the Saudi state, the Kingdom's affairs were governed pursuant to a generalized power-sharing agreement between the House of Saud and the Wahhabi Ulema (Islamic Religious Leaders), under which the Saudi kings and princes controlled political and financial decisions, while the Ulema governed religious and judicial affairs, including the issuance of fatwas (religious edicts that judged the compatibility of temporal decisions with Islamic law).

61.     In the early period of the Saudi state, the balance of power tipped heavily in favor of the House of Saud, largely because the King appointed the Ulema to their positions, and retained largely unchecked authority to dismiss them from their posts.

62.     However, in the last three decades of the 20th Century, several developments occurred that fundamentally transformed Saudi society, leading to a massive investment by the Kingdom in the promotion of Islamic extremism as an accommodation to the Ulema, and the establishment of new ministries and governmental agencies that afforded the Ulema direct access to government resources and platforms to advance its Islamist and jihadist causes, including through the direct support of al Qaeda and the September 11th Attacks.

63.     First, the oil boom of the 1970s thrust the Kingdom into the modern era, a development that created tension between the regime and Ulema, given the latter's deep animosity and resistance to modernization and technological advancements.

64.     In order to gain the approval of the Ulema for modernization essential to the exploration and development of Saudi Arabia's oil reserves, and thereby maintain the Ulema's endorsement of the legitimacy of the regime's rule, the regime embedded the Ulema in the Kingdom's developing administrative and bureaucratic systems, thereby further integrating the Ulema into the power structure of the Saudi state.

65.     In addition, the regime channeled resources from its new-found oil wealth to support the religious goals and priorities of the Wahhabi Ulema. In this setting, the Kingdom increased the funding of existing organizations like the Muslim World League, and created a host of new da'awa organizations, to promote the propagation of Wahhabi Islam and the establishment of states governed pursuant to Shariah outside of Saudi Arabia.

66.     Although these accommodations succeeded in appeasing certain segments of the Ulema, an emerging group of clerics and scholars, largely influenced by prominent members of the Muslim Brotherhood who fled Egypt and were welcomed by Saudi Arabia and given prominent positions in the Kingdom's state controlled Islamic universities and mosques, became increasingly wary of the modernization of Saudi society.  These religious scholars were especially discontented by the perceived failure of the Saudi state to adequately apply its new-found wealth to the service of Wahhabi Islam, the failure of the Saudi government to support Islamist movements throughout the world, the absence of a banking system adhering to principles of Shariah, and the un-Islamic excesses of the Saudi royals themselves.

67.     In the face of modernization, these Sheikhs increasingly advocated that the Ummah (the Muslim community throughout the globe) were under a sophisticated cultural and intellectual attack organized by the West, the objective of which was to destroy the fabric of Muslim society as a precursor to a Western re-conquest of the Middle East, and the subordination of Muslims to Western faiths and values.  In this context, the Saudi Ulema did not

differentiate between the United States and Communist Russia, advocating that the two "super-powers" were but opposite sides of the same coin, and that both were enemies of Islam.

68.    In 1979, three events occurred that empowered these members of the Ulema, and provided a platform for them to press their worldview.

69.    In January of 1979, the Shah of Iran fled his country in response to popular protests, leading to the establishment shortly thereafter of a Shia'h Islamic regime in Iran, a direct threat to the Saudi state's then perceived hegemony as the preeminent "Islamic" nation in the world.  To the Saudi Ulema, who viewed as heretical the version of Islam espoused by the Iranian clergy, the Iranian Revolution presented a threat to Islam itself, to be countered at all costs.

70.    Shortly thereafter, on November 20, 1979, a group of armed insurgents stormed and took control of the Grand Mosque in Mecca, the holiest site of Islam.  The insurgents were led by Juhaiman ibn Muhhamed ibn Saif al Utaibi, a member of a powerful Saudi family and student of Sheikh Abdel Aziz bin Baz, a revered member of the Ulema who would later become the Grand Mufti of Saudi Arabia, the Kingdom's supreme religious leader.

71.    Broadcasting throughout Mecca over the Grand Mosque's speakers during a siege that lasted for several weeks, the jihadists asserted that the House of Saud had lost its legitimacy through corruption and imitation of the West, and called for a purification of Islam and the absolute repudiation of modernizing influences.

72.    Because any violence within the Grand Mosque is strictly forbidden by Islamic law, the Saudi regime was paralyzed from taking action to oust the jihadists from the Grand Mosque without a formal fatwa from the senior Ulema authorizing force, a reality that underscored the increasing influence and power of the Ulema within the modernizing Kingdom.

73.    After the senior Ulema issued a fatwa authorizing the use of deadly force to retake the Grand Mosque, Saudi forces under the command of senior members of the Royal family mounted several offensives to oust the jihadists, but were repelled and suffered massive casualties in a series of embarrassing clashes.  In the end, the regime had to turn the entire

mission over to the Pakistani military, which then carried out a successful operation to reclaim the Grand Mosque.

74.     The regime's inability to protect and recapture the Grand Mosque on its own further undermined the legitimacy of its rule, requiring greater reliance by the House of Saud on the continuing support of the Ulema, and compelling the regime to find new ways to bolster its Islamic credentials within the Muslim world.

75.     On the heels of the Grand Mosque siege, the Soviet army invaded Afghanistan on December 27, 1979.  For the Ulema who had been cautioning against the Western Cultural Attack, the invasion validated their thesis, and offered a compelling platform for promoting their Islamist agenda.

76.     In response to the invasion, Abdullah Azzam, a Palestinian member of the Muslim Brotherhood who fled to Saudi Arabia and was appointed by the government of the Kingdom to a prominent lecturing position at the King Abdul Aziz University in Jeddah, issued a fatwa entitled *Defense of the Muslim Land*, in which he declared it the personal obligation of all Muslims to wage jihad against the Russians in Afghanistan and the Israelis in Palestine.

77.     Azzam's fatwa was endorsed by Sheikh bin Baz and the senior Saudi Ulema, which endorsement necessarily required the approval of the Saudi regime.

78.     In response to the Ulema's call for jihad, the most radical young Saudis – many of whom were graduates of the Kingdom's new religious universities and had been indoctrinated into Wahhabi jihadist ideology by members of the Ulema who taught at those universities  – flocked to Afghanistan to join the mujahideen.

79.     As discussed above, Osama bin Laden was among the Saudis who went to Afghanistan to wage jihad during this time period, and worked closely with Abdullah Azzam in organizing the infrastructure to support the mujahideen fighters.

80.     For the Saudi government, the Afghan jihad presented an opportunity to restore the Kingdom's Islamic credentials.  By supporting the jihad, the regime could portray itself to the Muslim world as a leading force in the defense of the Ummah against the Western Attack,

without requiring that the Kingdom directly intervene in the conflict.  At the same time, the jihad drew the most radicalized young Saudis away from the Kingdom, thus limiting the ideological and security threat they posed to the regime.

81.     The Kingdom seized on the opportunity, mobilizing and deploying its vast da'awa infrastructure to support the jihad.  Under the guise of performing humanitarian work, Saudi government controlled organizations, including among others the MWL, IIRO, WAMY, SRC, and Rabita Trust established an efficient network to channel support to the mujahideen fighters. Pursuant to fatwas issued by the Saudi Ulema and under the direction of the Saudi government, these organizations recruited new volunteers for the conflict, established safe houses for new recruits arriving in the region, provided false documentation to the fighters and otherwise assisted them in gaining entry to the conflict zone, supported training camps for the fighters, purchased and delivered weapons and equipment to the mujahideen, raised funds to support the jihad, performed reconnaissance for military initiatives, and evacuated wounded jihadists.

82.     In connection with its support of the Afghan jihad, the government of the Kingdom appointed a young Saudi jihadist named Wa'el Jelaidan to serve as Director of the SRC in Pakistan in 1986.  Jelaidan served in that position until the Kingdom appointed him as the Director of the MWL/IIRO offices in Peshawar, Pakistan in 1989.  Prior to those appointments, Jelaidan had served for several years as the Director of the Islamic Center of Tucson, the de facto office of Makhtab al Khidmat in the United States.  Jelaidan developed close ties to bin Laden during the Afghan jihad, and as detailed below would go on to become a founding member of al Qaeda.

83.     Bin Laden and Jelaidan were joined in their organizing efforts by another young Saudi named Mohammed Jamal Khalifa, who would later become bin Laden's brother-in-law. Khalifa and bin Laden had become close friends while studying together at King Abdulaziz University, where they became further radicalized by government-paid religious scholars.  The two joined the Afghan jihad together, and Khalifa excelled at recruiting volunteers to the cause from throughout the world, including over 100 Philippino Muslims, among them Abdulrak

21

Janjalani.  Following the Afghan jihad, Janjalani was selected by Khalifa and al Qaeda to head

Abu Sayyaf Group, a Philippine proxy for al Qaeda established by Khalifa using funds and

resources of the International Islamic Relief Organization.

84.    After nine years of combat, in 1988, the Soviet army began withdrawing from

Afghanistan, delivering the Afghan mujahideen and young jihadists a stunning victory.

85.    To the leaders of the Afghan jihad, the defeat of the Soviets demonstrated the

divine supremacy of their Islamist movement, and reinforced their belief that the United States

could be defeated by guerilla warfare and terrorism.  By virtue of their unwavering belief in the

Western Cultural Attack narrative, this group viewed waging jihad against the United States as

an absolute religious duty and imperative, and established al Qaeda in 1988 for that purpose.

86.    Around this same time, bin Laden returned to Saudi Arabia to fulfill his

responsibilities and duties relative to the bin Laden family construction empire, which through a

reorganization in 1989 became known as Saudi Binladen Group, and began organizing al Qaeda

and planning for the next phase of the global jihad.

87.    From the outset, the Saudi regime was aware of bin Laden's ongoing efforts to

organize a mujahideen army to conduct jihad throughout the world, and in particular bin Laden's

desire to wage jihad against the United States.

88.    Indeed, during a February 13, 2006 speech at the Council on Foreign Relations,

Prince Turki al Faisal al Saud, the Saudi Intelligence Chief from 1977 through September 1,

2001, stated that "we [the Saudi regime] were pretty much aware of bin Laden from the very

beginning, if you like."  Turki confirmed that he personally met with bin Laden after the

conclusion of the Afghan jihad, and that bin Laden presented himself at that time as the leader of

a jihad army, recounting as follows:

> I met Osama bin Laden five times in my life as intelligence
> director.  Mid-'80s to end of 1989 or beginning of 1990 was the
> last time I saw him.  And when the withdrawal of Soviet troops in
> Afghanistan occurred, bin Laden and his supporters within
> Afghanistan—and by the way, that's where al Qaeda was born.  As
> I like to—prefer to say, the al Qaeda was born in the hills of

Afghanistan rather than in the deserts of Saudi Arabia. And they decided that they were going to form a group that will, in their view, protect Muslim interests throughout the world as they identified themselves as being the primary claimants to the credit of driving the Soviets out of Afghanistan.

And so, by 1990 when I last saw him at the beginning of that year, he had come to me with a proposition that he wants to bring his Mujaheddin as he called them, to liberate the then-Marxist regime in south Yemen.

89.     Moreover, bin Laden made no effort to conceal his jihadist ambitions in public speeches within the Kingdom during this period. Upon returning from Afghanistan, bin Laden was greeted as a hero by the Saudi populace, who were astonished that a wealthy member of the Saudi elite had risked his life to carry out jihad. Bin Laden was in great demand to give speeches and interviews, and made clear in his statements his continuing dedication to jihad against the perceived enemies of Islam.

90.     Speaking in 1988, bin Laden expressly affirmed what he believed to be the personal obligation of all Muslims to wage jihad against the enemies of Islam, stating as follows:

the blessing of jihad in the cause of God – the peak of true Islam, which people in this age have forgotten is a religious duty….Praise be to God for allowing us to perform jihad in Afghanistan as he did for the best of men, our Prophet, may God's peace and prayers be upon him…I would like to advise my brother Muslims in all parts of the East and West to take the initiative and leave what they are doing to assist in raising the banner of jihad for the cause of God. This banner is the best banner and the mujahidin are the best people…May God accept our and your prayers and our urging of believers to perform jihad in order to deter the infidel forces and be truthful.

91.     Speaking in 1990 to an audience of hundreds in the Bin Laden family mosque in Jeddah, bin Laden singled out the United States as the primary target of this global jihad, asserting that "[t]he Americans won't stop their support of Jews in Palestine until we give them a lot of blows. They won't stop until we do jihad against them."

92.     In that same year, bin Laden organized and funded the travel of an estimated 4,000 mujahideen fighters to Afghanistan for training, as part of his ongoing efforts to build his jihadist army.

93.     To the regime, neither bin Laden's status as an organizational leader of a jihad movement nor his ambition to target America were at all surprising.  The Saudi government was intimately familiar with bin Laden's role as a logistical, financial and operational organizer of the Afghan jihad, and the Saudi regime knew well that the young radicals who had travelled to Afghanistan to wage jihad had no intention of abandoning the cause.  Through its security apparatus, the government of the Kingdom closely monitored the activities of the returning mujahideen, chief among them bin Laden, to ensure that their jihadist fervor remained focused on targets outside of the Kingdom.  The Kingdom also knew that several of the chief organizers of the Afghan jihad network (including Jelaidan and Khalifa) remained embedded in senior positions within the Saudi government da'awa infrastructure, and therefore had access to that infrastructure in relation to their ongoing jihadist efforts.  More fundamentally, the jihadist worldview bin Laden was promoting was firmly grounded in Wahhabi ideology and the Western Cultural Attack narrative, as promoted by the Saudi Ulema (and Kingdom itself) over a period of many years.  In simple terms, the Saudi regime had unique access to information concerning bin Laden's jihadist agenda and organizational efforts from the earliest date.  Moreover, the House of Saud understood implicitly that the ideological foundation for bin Laden's global jihadist movement was grounded in the teachings of the Saudi Ulema, and that his jihadist agenda and goals enjoyed widespread support among the Ulema.  The Kingdom also was well aware that members of that movement, including broad segments of the Ulema, firmly believed that they owed a religious duty to wage jihad against the United States.

94.     On August 2, 1990, bin Laden's ongoing efforts to build support for the global jihad received a transformative boost, when Iraq invaded Kuwait.  The invasion of Kuwait by the region's most sophisticated army posed an imminent threat to the security of the Kingdom.

95.     At the height of the security crisis, bin Laden again used his prominence and family's close ties to the House of Saud to secure a meeting with a senior member of the Saudi royal family, in this case Prince Sultan, the Saudi Minister of Defense.

96.     Accompanied by several mujahideen commanders and veterans of the Afghan jihad, bin Laden laid out a detailed plan of attack, indicating where trenches and protective measures would be constructed along the border using the Saudi bin Laden Group's earthmoving equipment.  Again making clear his continuing role as an organizer of a jihadist army, bin Laden assured Sultan that he could amass 100,000 mujahideen quickly to defend the Kingdom, drawing primarily on the Arab veterans of the Afghan jihad.

97.     Prince Sultan treated bin Laden with warmth and respect at the meeting, but rejected bin Laden's plan out of hand, as did Prince Turki, with whom bin Laden also met. Instead, the Kingdom invited the United States army to Saudi Arabia to protect the Kingdom.

98.     The presence of an infidel crusader army on Saudi soil reinforced and energized the Western Cultural Attack narrative, and prompted outrage among many prominent Ulema (and bin Laden), who again questioned the legitimacy of the House of Saud's rule given its inability to protect Islam without foreign assistance.

99.     Recognizing the gravity of the threat to its rule, the Saudi regime prevailed upon members of the Senior Ulema to issue a fatwa authorizing the presence of U.S. troops on Saudi soil.

100.     The issuance of that fatwa did not, however, appease the majority of the Ulema or their followers, but rather merely convinced them that some members of the senior religious establishment had been co-opted by the regime, and that decisive action was needed to restore the primacy of Islam within the Kingdom and counter the Western Cultural Attack.

101.     A vibrant movement rapidly spread at mosques and universities within the Kingdom, demanding the removal of the "crusader" U.S. forces from Muslim soil and advocating for extensive reforms in accordance with Shariah.

102.    The leaders of this emerging reformist movement were known as the Awakening Sheiks and included Salman al Awda, a professor of Islamic law at Imam Muhammad bin Saud University in Riyadh, and Safar al-Hawali, the head of the Department of Theology at Umm al-Quarra University in Mecca.  Al Awda and al Hawali were, not coincidentally, spiritual mentors to bin Laden, and many of bin Laden's ideas about jihad were derived directly from the teachings of these Saudi government-paid scholars.

103.    In the view of these members of the Ulema, the Iraqi occupation of Kuwait was itself organized by the United States as a predicate for its occupation of the Muslim world. Hawali in particular theorized that Washington engineered the rift between Iraq and Kuwait, and then encouraged Sadaam Hussein to invade.  At that point, Hawali argued that Washington used the pretext of defending Arab states from Iraqi aggression as a predicate for occupying sacred Muslim soil.  According to Hawali, the United States was motivated to this course of action by its recognition that Islam was the only threat to America's world domination, and that the United States consequently determined that it must subordinate Muslims to its rule.

104.    When the war ended with the defeat of Hussein's armies, many of the Ulema demanded a complete U.S. withdraw from Saudi soil, but the House of Saud declined to accede to that demand, effectively acknowledging that the regime was incapable of defending Saudi Arabia on its own.

105.    The decision to allow American forces to remain on Saudi soil, and the implications that followed from that decision, prompted an even more acute crisis of legitimacy for the Saudi Royal Family.  To many prominent and influential members of the Ulema, the House of Saud's self-evident inability to protect Saudi Arabia was a product of its own corruption under Western influences, and its failure to govern and rule in strict accordance with Shariah.  To the extent the regime would not embrace and fulfill its duty to rule in accordance with the requirements of Islam, these Ulema concluded that they should exercise greater authority relative to the governance of the Kingdom.

106.     In March 1991, a group of prominent Ulema drafted a "Letter of Demands" detailing their principal criticisms with the House of Saud's rule, and reforms they deemed imperative to restoring Saudi Arabia's Islamic character, and by extension, the regime's legitimacy.  Broadly speaking, the document demanded a greater role for the Ulema in the conduct of Saudi domestic and foreign affairs; the abolition of any laws and regulations that did not adhere with Shariah; a ban against the collection of interest by financial institutions; the establishment of a strong and sophisticated military; the repudiation of any alliances which in their view contradicted Shariah, to include Riyadh's alliance with Washington; and a drastic increase in the funding of Saudi Arabia's da'awa institutions, in order to spread Wahhabi Islam and foster the establishment of Shariah-based states outside of the Kingdom.  In particular, the Letter of Demands insisted on the following reforms:

> The formation of a consultative council to decide internal and external issues on the basis of the Shari'a.  Its members must be honest, straightforward and representing all fields of expertise. They must be totally independent and not be subject to any pressure that may affect the authority of the council.

> All laws and regulations of political, economic, administrative or other nature must be reconciled with the principles of the Shari'a. Trusted committees with expertise in Shari'a should be authorized to repeal legislation not conforming to Shari'a principles.

> In addition to possessing specialized expertise, dedication and honesty, government officials and their overseas representatives must be unswervingly moral.  Failing any one of the requirements for any reasons is an abuse of public trust and a fundamental cause of injury to the national interest and reputation.

> Justice must be applied, rights granted and duties assigned in full equality among all citizens, not favoring the nobles or begrudging the weak.  Abuse of authority by anyone whether by shirking obligations or denying people what is their right is a cause for breakup and annihilation of society.

> All government officials, especially those occupying the highest positions, must be diligently scrutinized and must all be made accountable with no exceptions.  Government agencies must be

cleansed of anyone whose corruption or dereliction is proven, regardless of any other consideration.

Public wealth must be distributed fairly among all classes and groups. Taxes must be eliminated and fees that have overburdened citizens must be reduced. Government revenues must be protected from exploitation and abuse; priority in expenditure must be given to the most urgent necessities. All forms of monopoly or illegitimate ownership must be eliminated. Restrictions imposed on Islamic banks must be lifted. Public and private banking institutions must be cleansed of usury, which is an affront to God and His Prophet, and a cause for stunting the growth of wealth.

A strong and fully-integrated army must be built and fully equipped with weapons of all kinds, from any source. Attention must be given to manufacturing and developing arms. The goal of the army must be to protect the country and the Holy Sites.

Information media must be remodeled according to the adopted media policy of the Kingdom. The goals must be to educate, serve Islam and express the morals of society. The media must be purged of anything conflicting with these objectives. Its freedom to spread awareness through truthful reporting and constructive criticism must be safeguarded within the confines of Islam.

Foreign policy must be based on national interest without relying on alliances not sanctioned by the Shari'a. It must also embrace Muslim causes. The Kingdom's embassies must be reformed to enable them to reflect the Islamic nature of the country.

Religious and proselytizing institutions must be developed and strengthened with financial and human resources. All obstacles preventing them from fully carrying out their objectives must be removed.

Judicial institutions must be unified and granted full and effective independence. Juridical authority must apply to all. It is necessary to establish an independent body whose function is to ensure carrying out judicial orders.

The rights of individuals and society must be guaranteed. Every restriction on people's rights and their will must be removed, to ensure the enjoyment of human dignity, within the acceptable religious safeguards.

107.    The Letter of Demands was broadly supported among the Ulema, bearing the

signatures of approximately 400 clerics, judges and scholars, and the endorsement of Sheik bin

Baz.  In addition, thousands of copies of the Letter of Demands were distributed throughout the country, in a rare public denunciation of the practices and policies of the Saudi regime.  The rebuke was especially problematic in that the criticisms and demands set forth therein were grounded in well-established beliefs and principles of Wahabbi Islam, the ultimate source of all law in the Kingdom and of the authority of the Saudi regime.

108.    Approximately one year later, in March 1992, a smaller group of Ulema submitted a second petition to the regime, entitled the Memorandum of Advice, which expanded upon and refined the arguments presented in the Letter of Demands.  In the Memorandum of Advice, the Ulema offered particularly harsh criticisms of the Saudi government's conduct of foreign affairs, and its perceived failure to provide adequate funding to Saudi *da'awa* institutions or support to Islamist separatists and jihad movements outside of the Kingdom.  It also criticized the government's failure to maintain an adequate and competent army "motivated by the spirit of jihad and sacrifice."  The Memorandum of Advice asserted that Islam should be central to Saudi foreign policy, and again attacked Saudi Arabia's relationship with the United States, given "America's general hostile policies towards Muslims."  The Memorandum of Advice further criticized the regime for failing to use Saudi Arabia's embassies throughout the world to promote Wahhabi Islam, and advocated that the Kingdom's embassies be reformed to serve that goal.

109.    Together, the Letter of Demands and Memorandum of Advice presented a withering criticism of the Saudi regime, and a direct challenge to its legitimacy of a far more serious nature than any the House of Saud had previously faced.

110.    In response to the renewed crisis of legitimacy, the regime sought to diminish the Ulema's challenge by positioning itself as a leading force in combating the Western Cultural Attack and in advancing the global Islamist movement, much as it had done in response to the Soviet invasion of Afghanistan.

111.    Rhetorically, the regime enthusiastically embraced the concept of the Western Cultural Attack, promoting through official speeches and the state-run media the idea of a clash of civilizations between the infidel West and a spiritual Muslim civilization led by Saudi Arabia.

The regime fully endorsed the view, advocated by the Ulema, that Saudi Arabia must launch a counter attack against Western civilization, in defense of the Ummah.

112.     To demonstrate its commitment to these ideas, and simultaneously appease the Ulema and their followers, the House of Saud used the Letter of Demands and Memorandum of Advice as a roadmap for its course of action, subject to limitations necessary to protect the regime's own power and self-interest.  Of particular note, the regime acceded to the Ulema's demands that the Ulema be given a more formal and expansive role within the Saudi government, and increased access to government structures and resources to serve the Ulema's Islamist agenda.

113.     As demanded by the Ulema in the Letter of Demands, the regime announced the formation of a Majlis al Shura (Consultative Council) in 1992, to which King Fahd appointed senior members of the Ulema.

114.     A year later, King Fahd issued a Royal Decree appointing Sheikh bin Baz as Grand Mufti of Saudi Arabia, and as the head of both the "Council of Senior Scholars" (Hayat Kibar al-Ulama) and the "The General Presidency of Scholarly Research and Ifta" (Idarat al-Buhuth al-Ilmiyya wal-Ifta), and formally designating bin Baz as a Minister of the Saudi government in those roles.

115.     In the same Royal Decree, King Fahd established a new "Ministry of Islamic Affairs, Endowment (Waqf), Guidance and Da'awa" (the Ministry of Islamic Affairs and Da'awa).  The new Ministry of Islamic Affairs and Da'awa was given authority over all matters of Islamic affairs, other than the Hajj, including Saudi da'awa activities.  The Royal Decree noted that the establishment of the new Ministry of Islamic Affairs and Da'awa was undertaken on recommendation of Sheikh bin Baz, and appointed Abdullah Mohsen al Turki as the first Minister of Islamic Affairs and Da'awa.  The Royal Decree further directed that steps be taken to transfer authority over all matters concerning Islamic affairs and da'awa activities to the newly formed Ministry of Islamic Affairs and Da'awa.

116.     With its formation, the Ministry of Islamic Affairs and Da'awa assumed primary responsibility for supervising and directing the activities of Saudi Arabia's charity alter-egos, including among others the MWL, IIRO, WAMY, and al Haramain, in keeping with the new ministry's authority over all Saudi da'awa activities outside of the Kingdom.  As the 9/11 Commission explained, "international relief organizations, such as the World Assembly of Muslim Youth (WAMY), are [] regulated by the Ministry of Islamic Affairs.  This Ministry uses zakat and government funds to spread Wahhabi beliefs throughout the world."  In many cases, members of the Ulema simultaneously held senior positions within both the Ministry of Islamic Affairs and Da'awa and the charities under its supervision.  In addition, members of the Ulema routinely cycled between positions within the Ministry of Islamic Affairs and Da'awa and leadership posts within the charities.

117.     Consistent with the Ulema's demands that the Kingdom reform its embassies to support the propagation of Wahhabi Islam and the Ulema's agenda outside of Saudi Arabia, the regime also established Islamic Affairs Departments in its embassies throughout the world, populated by Wahhabi religious clerics from the Ministry of Islamic Affairs, many of whom held diplomatic credentials.

118.     The Islamic Affairs Departments in the Saudi embassies carried out a range of functions in service of the Wahhabi Ulema's Islamist agenda.  Among other activities, the Islamic Affairs Departments of the embassies closely supervised and directed the activities of the local offices of the Saudi da'awa organizations, ensuring that the priorities and activities of those offices were directed in furtherance of the strategic goals of the Saudi Ulema and Ministry of Islamic Affairs.  Indeed, internal documents produced by the Saudi da'awa organizations in these proceedings confirm that the Islamic Affairs Departments in the embassies and Ministry of Islamic Affairs officials in Saudi Arabia held authority to dictate the projects and causes to be supported by the local da'awa offices.

119.     The Islamic Affairs Departments within the Saudi embassies and consulates also had authority for monitoring the activities of Saudi citizens living outside of the Kingdom, as a

component of the Ministry of Islamic Affairs and Da'awa's role in protecting the Kingdom's "Islamic" character.

120.     In addition, the Islamic Affairs Departments of the Saudi embassies and consulates were responsible for establishing Wahhabi mosques and Islamic centers throughout the world, and distributing Wahhabi texts and literature in an effort to spread Wahhabi teachings. Texts and literature disseminated by the Ministry of Islamic Affairs and Da'awa through the Islamic Affairs Departments, including in the United States, often advocated intensely anti-American views, condemned democracy as un-Islamic, vilified Christians and Jews as infidels, and glorified jihad against the infidels.

121.     In the years following the establishment of the Ministry of Islamic Affairs, the regime enthusiastically embraced the external religious priorities of the Ulema concerning the propagation of Wahhabi Islam and support for Islamist movements abroad.

122.     Pursuant to this strategy, the regime dramatically increased the budget and resources of the State controlled da'awa institutions, dedicating incomprehensible sums to support the priorities and objectives of the Ulema and the propagation of Wahabbi Islam outside of the Kingdom.  Indeed, according to recent estimates, the Kingdom has expended between $2-3 billion dollars annually to further the priorities of the Ulema outside of Saudi Arabia.

123.     The Kingdom deployed thousands of Wahhabi clerics from the Ministry of Islamic Affairs to teach at Saudi government funded mosques and Islamic centers throughout the globe, many of which were themselves established under the auspices of the Saudi government controlled da'awa organizations.

124.     The reach and authority of the Ministry of Islamic Affairs swelled as a result of these initiatives, affording the Ulema who populated and controlled the Ministry of Islamic Affairs and Saudi da'awa organizations (as officials of the Kingdom) access to a vast governmental platform to pursue their Islamist agenda.

125.     The Ministry of Islamic Affairs and Da'awa soon became "a stronghold of zealots," according to knowledgeable Saudi sources cited by the Washington Post.

126.     It is thus not surprising that, under the supervision of the Ministry of Islamic Affairs and Da'awa, the Saudi da'awa organizations, themselves agents and alter-egos of the Saudi government, aggressively deployed their resources to support Islamic extremist movements throughout the world, including al Qaeda and its affiliates.  Other movements and organizations that benefited from this Islamist largesse included (among others):  Abu Sayyef Group, Moro Islamic Liberation Front, Hamas, Palestine Islamic Jihad, Jemaah Islamiyya, Egyptian Islamic Jihad, Asbat al-Ansar, Salafist group for Call and Combat, Al Gama'a al Islamiyya, Lashkar-Tayyiba, Lashkar I Janghvi, and Algerian Islamic Group.  That many of these organizations used terrorism as a tool to achieve their religious and political goals was not an impediment to the Kingdom's support of their causes.

127.     Al Qaeda represented a natural partner for the Saudi da'awa organization and radicals within the Ministry of Islamic Affairs and Da'awa, given their shared Wahhabi ideology, past collaboration in the cause of jihad in Afghanistan, common desire to spread Wahhabi rule beyond the Kingdom's borders, and mutual belief in raising the banner of jihad in service of those goals.

128.     As referenced above and discussed in further detail below, the support channeled to al Qaeda by Saudi Arabia's charity-alter-egos during the decade preceding the September 11th attacks enabled and fueled al Qaeda's growth and development, and directly enabled bin Laden to build an international terrorist organization capable of mounting a sophisticated international terrorist attack on American soil.  Without the support provided by those agents of the Saudi government, al Qaeda could not have successfully conceived, planned, coordinated, and mounted the September 11th attacks.

129.     In addition to the support that flowed to al Qaeda from the Kingdom's charity agents and alter-egos, investigations by the United States and its allies have confirmed that officials within the Ministry of Islamic Affairs and Da'awa collaborated directly with al Qaeda members, and that agents of the Saudi government, including representatives of the Islamic Affairs Departments in the Saudi embassy in Berlin and the Saudi consulate in Los Angeles,

provided direct assistance to the September 11th plotters and hijackers, which was essential to the success of the attacks.

130.     The claims and theories of jurisdiction advanced as to the Kingdom of Saudi Arabia are predicated on the aforementioned:  (1)  attributable tortious acts of the Saudi government's charity alter-egos, including the SHC itself, involving their provision of myriad forms of material support directly to al Qaeda for more than a decade leading up to the September 11th attacks, which included support provided through offices in the United States; and (2) attributable tortious acts of individual agents and officials of the Kingdom, who provided direct assistance to the September 11th plotters and hijackers.  The hand of the Ministry of Islamic Affairs and Da'awa is evident in both contexts.  The facts and evidence underlying and supporting these theories is surveyed in further detail below.

## IX.    THE ATTRIBUTABLE TORTIOUS ACTS OF INDIVIDUAL SAUDI GOVERNMENT OFFICIALS AND AGENTS IN SUPPORT OF THE SEPTEMBER 11TH ATTACKS

131.     The September 11th plot was planned and developed by al Qaeda over a period of many years, beginning no later than 1996 when Osama bin Laden and his al Qaeda terror group were completing their migration from Sudan to the mountains of Afghanistan.

132.     Khalid Sheikh Mohammed ("KSM"), the mastermind behind the September 11th attacks, initially briefed bin Laden on his proposed operation during a meeting with the al Qaeda leader in Tora Bora, Afghanistan that same year.

133.     The proposal was an adaptation of a component attack of the earlier "Bojinka" plot conceived by KSM and Ramzi Yousef in 1994 while in the Philippines.  Yousef, KSM's nephew, was the mastermind of the 1993 World Trade Center bombing.  KSM divulged to U.S. interrogators after his capture in 2003 that Yousef's successful attack on the World Trade Center inspired him to begin planning attacks against the United States.

134.     The Bojinka plot was a complex collection of planned terrorist attacks, including a plot to bomb twelve U.S. commercial airplanes over the Pacific Ocean as they flew from Asia to the United States, as well as plans to assassinate President Clinton and Pope John Paul II

during planned trips to the Philippines.  The plot was disrupted by the Philippine National Police in January 1995 when a chemical fire erupted in an apartment used by Yousef and Abdul Hakim Ali Hashim Murad to plan for the attacks.

135.    The cell that hatched the Bojinka plot, which included KSM and Yousef, was affiliated with Abu Sayyef Group, an al Qaeda affiliate in the Philippines, and supported by al Qaeda, through the Philippine branch of the IIRO, headed by bin Laden's brother-in-law Mohammed Jamal Khalifa.

136.    Khalifa, appointed to head the IIRO's branch office in the Philippines following his participation in the Afghan jihad, used the IIRO as a platform for al Qaeda's expansion into Southeast Asia and personally orchestrated IIRO's funding and support for the Bojinka plot. Khalifa's appointment was endorsed by the Secretary General of the MWL, Dr. Abdullah Omar Naseef.

137.    According to the 9/11 Commission, Osama bin Laden directed KSM to proceed with the operational planning for the September 11th attacks in late 1998 or early 1999.  Soon thereafter, several individuals were personally selected by bin Laden to serve as suicide operatives, including Saudi nationals Nawaf al Hazmi and Khalid al Mihdhar.

138.    Hazmi and Mihdhar, considered experienced al Qaeda veterans at the time of their selection, were described by Director of Central Intelligence George Tenet as "having trained and fought under al Qa'ida auspices in three different countries."  In 1995, Hazmi and Mihdhar traveled to Bosnia to participate in jihad with other Muslims against the Serbs.  Both men similarly traveled to Chechnya to fight with the Chechen rebels.

139.    Hazmi first traveled to Afghanistan as a teenager in 1993, returning to the country sometime before 1998 to swear allegiance ("bayat") to bin Laden.  Hazmi fought against the Northern Alliance and returned to Saudi Arabia in early 1999.

140.    Mihdhar made his first trip to Afghanistan in early 1996 to attend al Qaeda training camps.  He returned in 1998 and also swore bayat to bin Laden.

141.    In April 1999, Hazmi and Mihdhar obtained visas through the U.S. Consulate in Jeddah, Saudi Arabia.  Soon thereafter, they traveled to Afghanistan to attend an elite training course at al Qaeda's Mes Aynak camp.  Located in an abandoned Russian copper mine near Kabul, the camp offered a full range of vigorous instruction to the future hijackers, including an advanced commando course.

142.    Following completion of their advanced training at Mes Aynak, Hazmi and others traveled to Karachi, Pakistan where they received basic instruction on western culture and travel from KSM.  Mihdhar did not attend the training, instead traveling to Yemen.

143.    In early January 2000, Hazmi and Mihdhar flew to Kuala Lumpur, Malaysia to attend an al Qaeda summit hosted by the leader of the al Qaeda affiliate Jemaah Islamiyah in Asia, Hambali (a/k/a "Riduan Isamuddin").  The meetings took place from January 5-8 in a condominium owned by Yazid Sufaat.  Sufaat is linked to Zacarias Moussaoui and was arrested by Malaysian police in December 2001 based on evidence that he had procured four tons of bomb material, ammonium nitrate, for an Indonesian jihadist cell.

144.    Approximately a dozen individuals attended the meetings, including al Qaeda members KSM, Ramzi Binalshibh, Tawfiq bin Attash (a/k/a "Khallad"), and Abu Bara al Yemeni.  Key operational details of the September 11th attacks were discussed at this summit and Hazmi and Mihdhar were directed to fly to the United States.

145.    Following the meetings, Hazmi and Mihdhar flew to Bangkok, Thailand where they boarded an American Airlines flight to the United States.  On January 15, 2000, they arrived in Los Angeles, establishing themselves as the first of the future September 11th hijackers to set foot on United States soil in preparation for the attacks.

146.    As the 9/11 Commission correctly observed, the two hijackers were "ill prepared for a mission in the United States.  Their only qualifications for this plot were their devotion to Usama Bin Ladin, their veteran service, and their ability to get valid U.S. visas.  Neither had spent any time in the West, and neither spoke much, if any, English."

147.    The Commission concluded it was therefore "unlikely that Hazmi and Mihdhar – neither of whom, in contrast to the Hamburg group, had any prior exposure to life in the West – would have come to the United States without arranging to receive assistance from one or more individuals informed in advance of their arrival."

148.    As discussed below, the support network that received Hazmi and Mihdhar upon their arrival in the United States, and assisted them in settling in the United States and beginning their preparations for the September 11th Attacks, included Saudi officials Fahad al Thumairy, Omar al Bayoumi, and Osama Basnan.

### A.   OMAR AL BAYOUMI, FAHAD AL THUMAIRY, OSAMA BASNAN AND SALEH AL HUSSAYEN

149.    Bayoumi (a/k/a "Omar Ahmad Mustafa Al-Baioomi"), was a long-time employee of the Saudi Arabian government, and according to witnesses who knew him personally, served as a Saudi intelligence agent responsible for monitoring the activities of Saudi citizens in the United States.

150.    As discussed in further detail below, Bayoumi's status as an agent and official of the Saudi government is corroborated and confirmed by:  (1) the findings of the Congressional Joint Inquiry into the September 11th attacks; (2) the affidavit testimony of former Senator Bob Graham, who co-chaired the Congressional Joint Inquiry; (3) the testimony and statements of people who knew Bayoumi personally and interacted with him frequently; (4) the character, extent, and pattern of his contacts with Saudi government agencies and diplomatic missions; (5) the nature of his relationship with Osama Basnan, another agent of the Saudi government; (6) the very status the FBI itself assigned to Bayoumi during an investigation prior to the September 11th attacks; (7) the particular circumstances surrounding his initial meetings with the September 11th hijackers; (8) his access to "seemingly endless" funds, despite his alleged status as a student and mere project manager for Dallah Avco, a contractor to the Presidency of Civil Aviation; (9) the unusual circumstances of his alleged employment with Dallah Avco, including the fact that he performed no actual work for that company; (10) Dallah Avco's specific assertion in ongoing

discovery proceedings that Bayoumi was, at all times, an employee of the Saudi government; (11) Dallah Avco's assertion in ongoing discovery proceedings that virtually all documents in its possession concerning Bayoumi are "classified" materials under a Saudi Royal Decree prohibiting the dissemination by public employees of information "the disclosure of which [would] prejudice[ ] the State's national security, interests, policies or rights;" (12) Fahad al Thumairy's implausible attempts to deny any relationship with Bayoumi when interviewed by U.S. officials; and (13) Osama Basnan's equally implausible attempts to deny any relationship with Bayoumi when interviewed by U.S. officials.

151.     It is undisputed that Bayoumi provided extensive and critical assistance to 9/11 hijackers Hazmi and Mihdhar, which enabled them to establish themselves in the United States despite their lack of preparation for that transition, and to begin their operational preparations for the attacks.  The character of that support, and its criticality to the success of the September 11th plot, is surveyed in further detail below.

152.     As also summarized below, a broad array of evidence, including the testimony of 9/11 Joint Inquiry Co-Chair Bob Graham, indicates that Bayoumi was acting at the direction of elements of the Saudi government, and elements of the Ministry of Islamic Affairs in particular, in providing that support to the hijackers.  Further, a top FBI official has stated that "We [the FBI] firmly believed that he [Bayoumi] had knowledge [of the 9/11 plot], and that his meeting with them [Hazmi and Mihdhar] that day was more than coincidence."

153.     An employee of the Saudi Arabian Presidency of Civil Aviation ("PCA") since the mid-1980's, a branch of the Saudi Ministry of Defense, Bayoumi moved to the United States in August 1994 at the direction of the Saudi government where he enrolled in an ESL program (English as a Second Language) at San Diego State University ("SDSU").

154.     Bayoumi lived in the San Diego suburb of Clairemont Mesa with his wife, Manal Bajadr, and four children.  On his rental application for an apartment, Bayoumi listed his job as student and his income as $2,800 a month, a stipend he claimed came from a family in India.

But U.S. intelligence reports indicate that claim was false.  Instead, Bayoumi's finances were supported by the government of Saudi Arabia itself.

155.    Bayoumi was well known throughout the San Diego Muslim community, spending much of his time interacting with all of the regional mosques, including the Islamic Center of San Diego ("ICSD").  According to various sources, Bayoumi knew everyone and was widely accepted in the local community.  If Bayoumi vouched for certain people, they would be immediately accepted.

156.    During his initial year in San Diego, Bayoumi was granted a secondment by the PCA to work as an employee of Dallah Avco Trans Arabia Company ("Dallah Avco") in Saudi Arabia.  Dallah Avco, an aviation contractor, is a wholly-owned subsidiary of the Dallah al Baraka Group ("DBG") which is owned by wealthy Saudi businessman, Saleh Abdullah Kamel.  DBG and Kamel directed tens of millions of dollars in funding to support al Qaeda and other radical Islamic causes.  Kamel has been publicly identified on the "Golden Chain" as one of al Qaeda's principal financiers.

157.    In or around 1995, Bayoumi began receiving a $3,000 monthly salary from Dallah Avco.  Although the salary was given to Bayoumi as payment for his work on an aviation project commissioned by the Saudi government and taking place in the Kingdom, Bayoumi remained in San Diego and did not report for the job.  Despite his absence, Bayoumi remained in the employment of Dallah Avco for the next seven years.  The Saudi government reimbursed Dallah Avco for Bayoumi's salary.  For its part, Dallah Avco has stated in ongoing discovery proceedings that Bayoumi was, at all time, an employee of the Saudi government.  Further, Dallah Avco has asserted that virtually all documents in its possession concerning Bayoumi are "classified" materials under a Saudi Royal Decree prohibiting the dissemination by public employees of information "the disclosure of which [would] prejudice[ ] the State's national security, interests, policies or rights."

158.    After obtaining his degree from SDSU, Bayoumi continued to seek higher education in the United States and submitted his application for an executive doctorate in the

Management Program at the Weatherhead School of Management at Case Western Reserve University in Cleveland, Ohio.  On his application, Bayoumi stated that he was employed by the Saudi Civil Aviation administration and was the "Assistant to the Director of Finance, Contracts and Finance Control Division, PCA, Airways Engineering" of Dallah Avco.  His application was ultimately rejected.

159.    Thereafter, Bayoumi enrolled in a George Washington University program in Project Management, which he pursued both in San Diego and Washington, D.C.  While attending classes in Washington, Bayoumi resided with an employee of the Saudi Embassy in D.C.

160.    Bayoumi first caught the attention of the FBI in 1995 in connection with other ongoing investigations at the time.  Several years later, on September 8, 1998, the FBI's San Diego Field Office opened a preliminary inquiry into Bayoumi based on allegations raised by the manager in the apartment complex where he was living.  According to the manager, she had been notified by the U.S. Postal Inspection Service in March 1998 that a suspicious package had been sent to Bayoumi from the Middle East.  The package had broken open and a number of wires were protruding from it.  The manager also reported that a maintenance worker for the apartment complex had noticed strange wires protruding beneath the bathroom sink in Bayoumi's master bedroom.  In addition, the manager reported frequent gatherings of young Middle Eastern men at Bayoumi's apartment on weekend nights.  The FBI case agent conducted a limited investigation, but the preliminary inquiry was closed on June 7, 1999 and Bayoumi was no longer actively investigated by the FBI.  However, in connection with its pre-9/11 investigation, the FBI identified Bayoumi as an agent of the Saudi government.

161.    On February 1, 2000, Bayoumi and Caysan bin Don (a/k/a "Isamu Dyson") got into Bayoumi's car and drove nearly two hours from San Diego to the Saudi Arabian Royal Consulate in Los Angeles.  Bayoumi had previously disclosed to friends at the ICSD that he had friends at the Saudi Consulate.  Although the stated purpose of the trip was to resolve a visa issue

and obtain Islamic religious materials and Korans, Bayoumi had told at least one other person prior to the trip that he was going to Los Angeles to pick up visitors.

162.    Upon arriving at the Saudi Consulate, Bayoumi met for an hour with an official from the Consulate's Ministry of Islamic Affairs office, Fahad al Thumairy.  U.S. officials have concluded that Thumairy and Bayoumi discussed the recent arrival of future 9/11 hijackers Nawaf al Hazmi and Khalid al Mihdhar in the United States, and Bayoumi was tasked with getting them welcomed and assimilated into the San Diego Muslim community.

163.    Thumairy, who was twenty-nine years old at the time of the meeting with Bayoumi, graduated with a degree in Islamic studies from the Imam Muhammad Bin Saudi Islamic University in the Kingdom and immediately joined the Saudi Ministry of Islamic Affairs. The Ministry directed Thumairy to serve in the United States and he was sent to the Saudi Embassy in Washington, D.C.  The Embassy then assigned Thumairy to the Saudi Consulate in Los Angeles.  Thumairy does not recall the name of the individual that sent him to Los Angeles, but noted it was the person in charge of the Islamic Affairs office at the Embassy.

164.    Thumairy was an accredited diplomat at the Saudi Consulate from 1996 to 2003, and further served as a religious leader at the King Fahd Mosque in Culver City, CA, a mosque that had been built with financial assistance from the government of Saudi Arabia.  As of January 2000, Thumairy acted as the Saudi Consulate's liaison to the King Fahd Mosque, per the request of his superiors at the Ministry of Islamic Affairs.

165.    After arriving in the United States on January 15, Hazmi and Mihdhar reportedly spent time at the King Fahd Mosque until their move to San Diego a few short weeks later.

166.    Thumairy was well known at the King Fahd Mosque and within the Los Angeles Muslim community.  However, he was reputed to be an Islamic fundamentalist who believed in strict adherence to the orthodox Wahhabi doctrine.  According to the 9-11 Commission, some Muslims from the mosque expressed concerns regarding Thumairy's religious teachings, stating that he "injected non-Islamic themes into his guidance/prayers at the [King Fahd] Mosque" and further had followers "supportive of the events of September 11, 2001."  The Commission

41

further stated that "Thumairy appears to have associated with a particularly radical faction within the community of local worshippers, and had a network of contacts in other cities in the United States."

167.     In an interview with 9/11 Commission members in 2003, Bayoumi identified Thumairy as the imam at the King Fahd Mosque and described him as his religious advisor, conceding that he had telephone conversations with Thumairy to discuss religious matters. Despite having personally met with Thumairy at the Saudi Consulate on the same day he met the hijackers, Bayoumi implausibly professed surprise during the interview that Thumairy might have also held a position at the Saudi Consulate.

168.     On February 23, 2004, 9/11 Commission members Dietrich Snell and Raj De interviewed Thumairy in Saudi Arabia under the watchful eye of Major Khalid, a Saudi official with the Mabahith (the secret police agency of the Ministry of Interior).  To their astonishment, when Thumairy was asked about his relationship with Bayoumi, he denied knowing Bayoumi:

> Al-Thumairy stated that he did not recognize the name Omar al-Bayoumi.  When shown a photo of al-Bayoumi, al-Thumairy first denied recognizing him.  At this time, Major Khalid whispered something to him in Arabic, and Thumairy said in English, "Oh Bayoumi."  Al-Thumairy then acknowledged that he recognized al-Bayoumi because he had seen him on television, but denied ever seeing him in Los Angeles.

169.     9/11 Commission members Snell and De interviewed Thumairy again the next day and received similar stone-walling from him:

> At this point, al-Thumairy was asked again about Omar al-Bayoumi.  Al-Thumairy was reminded that at his interview the previous night, he had initially denied recognizing al-Bayoumi until Major Khalid said something to him, which was when he acknowledged recognizing al-Bayoumi from the media.  Al-Thumairy was also informed that we have information that shows numerous phone calls between him and al-Bayoumi over a short period in December 1999, from both al-Thumairy's cell and landline phones.  Finally, al-Thumairy was told that since speaking with him the prior night, we were told by another witness [i.e. Khalil al-Khalil] that he had been seen meeting with al-Bayoumi on several occasions at the [King Fahd Mosque].

Despite being confronted with these facts, al-Thumairy continued
to deny knowing al-Bayoumi.

170.     Despite Thumairy's apparent resistance to their investigators' questioning, the

Commission uncovered evidence confirming that "Bayoumi and Thumairy had numerous

telephone contacts between December 1998 and December 2000.  Specifically, Bayoumi called

Thumairy's home telephone 10 times during this period, and Thumairy called Bayoumi's cellular

and home phone 11 times between December 3 and December 20, 2000."

171.     Given his apparent terrorist ties, the United States revoked Thumairy's diplomatic

visa in May 2003, banning him from entering the United States again.

172.     Immediately following their stop at the Saudi Consulate, Bayoumi and bin Don

drove to the King Fahd Mosque.  After prayers, the men traveled to a nearby Middle Eastern

restaurant known as the Mediterranean Café, where they met with Hazmi and Mihdhar over

lunch.  Hazmi and Mihdhar explained to Bayoumi in Arabic that they had just arrived in the

United States and were living in a nearby apartment.  Bayoumi exchanged his telephone number

with Hazmi and invited the men to relocate to San Diego.  Following their meeting, Bayoumi

and bin Don returned to the King Fahd Mosque for the evening prayer.  Soon thereafter, Hazmi

called Bayoumi to arrange for his and Mihdhar's relocation to san Diego, with Bayoumi's

assistance.

173.     Hamzi and Mihdhar arrived in San Diego on February 4, 2000 and Bayoumi

began undertaking extraordinary efforts to get the future hijackers assimilated into the local

Muslim community.  This same day, four telephone were placed from Bayoumi's cell phone to

Anwar Aulaqi, a senior al Qaeda recruiter who was involved in planning terrorist operations for

al Qaeda and was killed by a United States drone attack on September 30, 2011 in Yemen.

Additional calls from Bayoumi's cell phone to Aulaqi took place on February 10, 16, and 18.

174.     In an interview with 9/11 Commission members, Bayoumi admitted to having a

relationship with Aulaqi, describing him as someone "with whom he discussed religious matters

and ideas similar to those he would discuss with other imams."

175.    The two hijackers initially moved in with Bayoumi and his family at their residence at the Parkwood Apartment complex (6333 Mount Ada Road, Apt. #152, San Diego, CA 92111) until Bayoumi was able to secure similar housing for them at the same apartment building (Apt. #150) a few days later.

176.    Public records indicate that Suleiman al Ali, a member of the Saudi Ulema who served as an official of the IIRO's branch office in the United States and its financial arm Sana-Bell, Inc., maintained a shared address with Bayoumi from October 1999-Janaury 2000, just prior to the arrival of Hazmi and Mihdhar.  According to U.S. intelligence documents, Ali maintained longstanding relationships with Islamic radicals and terror groups, and was implicated in the diversion of IIRO funds for the 1998 U.S. Embassy bombings.

177.    Bayoumi recommended Hazmi and Mihdhar to the property manager of the Parkwood Apartments and appears as co-signer and guarantor for them on their rental application.  Bayoumi is further listed as the co-signor and guarantor on their lease agreement because they did not have established credit.  When the real estate agent refused to take cash for a deposit on the apartment, Bayoumi helped Hazmi and Mihdhar open a bank account with a $9,000 deposit.  According to the manager at the Parkwood Apartments, Bayoumi would occasionally pay the hijackers' rent.

178.    Future 9/11 hijacker Hani Hanjour was also seen in Bayoumi's apartment at least twice in early 2000 according to witnesses.

179.    After Hazmi and Mihdhar moved into their own apartment at the Parkwood Apartments,  Bayoumi organized a party to welcome the two men to San Diego.  The party was attended by approximately 20 men from the local Muslim community, including members of the ICSD.  Cayson bin Don attended the party and used Bayoumi's video camera to videotape the party.  According to bin Don, Hamzi and Mihdhar mingled with the attendees, explaining that they were students.

180.    By all accounts, the party was successful in welcoming and introducing Hazmi and Mihdhar to the San Diego Muslim community, and the 9/11 hijackers would soon form trusted relationships with other key Muslims in the area as a result of Bayoumi's efforts.

181.    Despite Bayoumi's modest income and student status, witnesses reported that Bayoumi had access to "seemingly endless" funds while in the United States, serving as a conduit for large sums of money from Saudi Arabia to the United States.  In 1998, a FBI source identified Bayoumi as the individual who delivered approximately $400,000 from Saudi philanthropist Saed al Habib (a/k/a Mohamed Barak) for the construction of a Kurdish mosque in in El Cajon, CA, approximately 15 miles northeast of San Diego.

182.    The substantial donation was made on the condition that the Al Medina Al Munawara Mosque hire Bayoumi as the building manager and provide him with a private office. Following completion of the mosque, however, the mosque's leadership became unhappy with Bayoumi due to his failure to show up for work and the discovery of financial irregularities relating to his collection and distribution of funds.  They neither liked nor trusted him and eventually asked him to leave the premises.

183.    The Report of the Joint Inquiry into the Terrorist Attacks of September 11, 2001 ("9/11 Joint Inquiry Report"), authored by the United States House Permanent Select Committee on Intelligence and the Senate Select Committee on Intelligence, similarly concluded that Bayoumi "had access to seemingly unlimited funding from Saudi Arabia."

184.    Bayoumi's primary source of income originating from Saudi Arabia came from his employment with Dallah Avco.  Although the project for which Bayoumi was allegedly hired was based in the Kingdom, Bayoumi showed up for work only once during the seven years he was receiving a salary from Dallah Avco.  Bayoumi's chronic absence led employees at the company to describe him as a "ghost employee," one of many Saudis on the payroll who were not required to work.  According to U.S. intelligence, there were approximately fifty (50) individuals who were being carried on the books at Dallah Avco who were being paid for doing nothing.

185.     Dallah Avco records indicate that, in or around April 1999, Dallah Avco sought to terminate Bayoumi's annual employment contract.  To that end, a Dallah Avco official wrote to the PCA advising that "the company is not willing to renew the period for another year and we wish this to be known."  A PCA official immediately responded with an "extremely urgent" letter informing Dallah Avco that the Saudi government wanted Bayoumi's contract renewed "as quickly as possible."  According to FBI documentation, Bayoumi "was a representative that PCA personnel wished to keep in America."  From his "ghost job," Bayoumi was receiving a monthly salary of about $3,000 with allowances of $465 per month.

186.     In or around March 2000, a month after he had invited Hazmi and Mihdhar to relocate to San Diego, found them an apartment, opened a bank account for them with his own money, and introduced them to the local Muslim community, Dallah Avco awarded Bayoumi with a promotion, raised his salary, and further increased his "other allowances" stipend from approximately $465 to $3,925 a month, remaining at that level until December 2000.In January 2001, the stipend was reduced to $3,427.

187.     According to the Joint Inquiry Report, "one of the FBI's best sources in San Diego informed the FBI that he thought that al-Bayoumi must be an intelligence officer for Saudi Arabia or another foreign power."

188.     A number of witnesses in San Diego also believed that Bayoumi was closely connected to the Saudi government and likely working as an intelligence agent.  One witness, noting that Bayoumi did not work while in the United States, stated that he "had more money than he knew what to do with."  Another witness told the FBI that Bayoumi "always had a significant source or supply of money and observed him driving a new Toyota."

189.     A U.S. intelligence document titled "Connections of San Diego PENTTBOMB Subjects to the Government of Saudi Arabia," details a prevailing feeling within the San Diego Muslim community that Bayoumi was more than he seemed:

> 4. Witness Reports: Various SD witnesses have described Al-Bayoumi as "associated with the Saudi government"

[REDACTED]; "a frequent traveler to Saudi Arabia"
[REDACTED]; "member of the Aviation Board for Saudi Arabia"
[REDACTED]; "having regular contact with the Saudi Arabian
Consulate in LA" [REDACTED]; "making frequent trips to the
Saudi Consulate during the six years he was known to live in San
Diego" [REDACTED]; "working for the Saudi government to
watch the actions of Saudis in the U.S." [REDACTED]; inquiring
about the welfare of Saudi students in San Diego [REDACTED];
"on a scholarship and financially supported by the Saudi
government" [REDACTED]; "having friends at the Saudi
Consulate in LA" [REDACTED]; "a spy for the Saudi
government" (hijacker Al-Hazmi as reported by Shaikh);
"receiving support from the Saudi Arabian Government or Saudi
Airlines" [REDACTED]; a reputed "Saudi Arabian intelligence
officer" due to his prolific videotaping of services at the mosque
(Abukar); "an engineer for the Saudi Arabian government"
[REDACTED]; "providing a $500 check to the SD Kurdish
Community Islamic Center drawn on the account of the Royal
Embassy of Saudi Arabia [REDACTED]; considered by some in
the community as "some type of intelligence agent for the Saudi
Arabian government [REDACTED] "frequently traveling to the
Los Angeles airport to drop off or pick up Saudis visiting southern
California" [REDACTED] traveling to WDC every one to two
months" to visit the civil aviation office of the Saudi Consulate on
Wyoming Street in WDC [REDACTED] "disclosing to others at
the Islamic Center that he has friends/contacts in the Saudi
Consulate in LA" [REDACTED], a "ghost employee" of
Dallah/Avco and one of "approximately 50 individuals carried on
the books of Dallah and being paid for doing nothing"
[REDACTED] "working for the Saudi Intelligence Service to
report on dissident Saudis" [REDACTED].

190.  Former Senator Bob Graham, who in his role as the Chairman of the Senate

Select Committee on Intelligence, and who also served as the Co-Chair of the Congressional

Joint Inquiry Into Intelligence Community Activities Before and After the Terrorist Attacks of

September 11, 2001 ("9/11 Joint Inquiry"), similarly concluded in affidavit testimony that

Bayoumi was an agent of the Saudi government, and that Bayoumi was acting at the direction of

elements of the Saudi government in providing support to the September 11th hijackers.  Senator

Graham testified as follows:

Based on my experiences as Co-Chair of the Joint Inquiry, and the
evidence collected by the Joint Inquiry during the course of its

investigation into the events of September 11, 2001, the information contained in the Final Report of the 9/11 Commission, and reports and published materials I have reviewed, I am convinced there was a direct line between at least some of the terrorists who carried out the September 11th attacks and the government of Saudi Arabia, and that a Saudi government agent living in the United States, Omar al Bayoumi, provided direct assistance to the September 11th hijackers Nawaf al Hazmi and Khalid al Mihdhar.  Based on the evidence discovered by the Joint Inquiry, I further believe that al Bayoumi was acting at the direction of elements of the Saudi government and that an official from the Islamic and Cultural Affairs section of the Saudi Consulate in Los Angeles, Fahad al Thumairy, likely played some role in the support network for the 9/11 attacks.  In May 2003, the United States revoked al Thumairy's diplomatic visa and banned him from the United States.

191.     Senator Graham's testimony is consistent with recent disclosures relating to the investigation and findings of the 9/11 Commission, as well as the views of senior 9/11 Commission members concerning evidence of the Saudi Ministry of Islamic Affairs' role in supporting al Qaeda's global operations and the September 11th attacks themselves.  For instance, the definitive account of the 9/11 Commission's investigation confirms that the staff members responsible for conducting the inquiry into Bayoumi's role in the attacks "felt strongly that they had demonstrated a close Saudi government connection to the two hijackers in San Diego," but that political considerations led to the omission of that conclusion from the 9/11 Commission's Final Report.  Philip Shenon, *The Commission: The Uncensored History of the 9/11 Investigation*, pp. 398-99 (2008).

192.     9/11 Commissioner John Lehman also endorsed this position, expressing his view that "it was clear early on that there was some sort of Saudi support network in San Diego that had made it possible for the hijackers to hide in plain sight."  *Id.* at p. 185.

193.     Intelligence collected by the FBI also demonstrates a deeply rooted relationship between the Saudi government and Bayoumi.  According to an April 5, 2002 FBI report titled "Omar Al Bayoumi, Employed by Dallah Al Baraka," the FBI obtained and analyzed Bayoumi's telephone records revealing extensive contacts between Bayoumi and Saudi officials in

Washington D.C. and Los Angeles, CA, particularly during the January-March 2000 timeframe when 9/11 hijackers Hazmi and Mihdhar arrived in Los Angeles and subsequently settled in San Diego with Bayoumi's assistance.  Telephone records indicate that Bayoumi made approximately 141 calls to Saudi officials in Washington D.C. at the Saudi Arabian Royal Embassy, the Saudi Islamic Affairs Department, the Saudi Arabian Cultural Mission, the Saudi Arabian Education Mission, and the Saudi National Guard.  Bayoumi also made approximately 34 calls to the Saudi Arabian Royal Consulate in Los Angeles.

194.    The extent and pattern of these contacts are consistent with witness statements identifying Bayoumi as an agent of the Saudi government responsible for monitoring the activities of Saudi citizens living in the United States, a role in which he would have reported to the Islamic Affairs departments in the Kingdom's embassies and consulates.

195.    Moreover, the U.S. Postal Service advised the FBI that on January 18, 2001, Bayoumi received a package at his San Diego apartment from the Saudi Arabian Royal Embassy, 601 New Hampshire Ave., N.W., Washington, D.C.

196.    Evidence further indicates that an additional source of Saudi government funding used to support the activities of Hazmi and Mihdhar while in the United States came by way of Bayoumi's relationship with Osama Yousef Basnan, another agent of the Saudi government who was being groomed to replace Bayoumi in San Diego.

197.    Basnan, known as a vocal al Qaeda sympathizer and further described by U.S. intelligence as an "ardent UBL [Osama bin Laden] supporter" who "has been in contact with UBL family members," was a target of FBI investigations as early as 1992.  In May of that year, the State Department provided the FBI with a box of documents recovered from a parked car that was abandoned on Wisconsin Avenue near the residence of then Secretary of State, James A. Baker.  The car, belonging to Basnan's used car business in Alexandria, VA, had been parked there by Basnan while allegedly visiting a friend's nearby clothing business.  The documents, consisting of jihadist literature, included a "Confidential" newsletter written in Arabic to supporters of the Eritrean Islamic Jihad (EIJ) Movement, providing updates on the EIJ's council.

A high level EIJ member reportedly sat on al Qaeda's Shura Council. The documents also included a number of letters addressed to Basnan outlining plans to import used cars to the United States.

198. That same year, on October 17, 1992, Basnan hosted a party in Washington D.C. for Omar Abdul Rahman (a/k/a the "Blind Sheikh") who is currently serving a life sentence following his conviction for his role in supporting the 1993 World Trade Center bombing and for plotting a "day of terror" in which he planned to attack the United Nations in New York City, bomb the Holland and Lincoln tunnels, and assassinate then-Senator Alfonse D'Amato.

199. FBI sources further report that in September 2000, Basnan was in phone and e-mail contact with senior al Qaeda member and key facilitator for the September 11th attacks, Ramzi Binalshibh. Binalshibh himself confirmed his relationship with Basnan during interrogations by U.S. officials following his capture in Karachi, Pakistan on September 11, 2002.

200. According to U.S. intelligence reports, Basnan's wife, Majeda Ibrahin Dweikat, reportedly required thyroid surgery in April 1998. Basnan contacted the health attaché at the Saudi Embassy in Washington D.C., requesting financial assistance for the surgery on his wife's behalf. Soon thereafter, Basnan received a $15,000 check from the Saudi Embassy to pay for the surgery. That amount was apparently insufficient to cover the cost of her treatments and Basnan's wife submitted her own request to Princess Haifa al Faisal, the wife of Prince Bandar bin Sultan bin Abdul Aziz al Saud, the Saudi Ambassador to the United States.

201. Basnan's wife was placed on Princess Haifa's charity list in January 1999, and began receiving cashier's checks totaling between $2,000 and $3,000 a month. At the same time that Hazmi and Mihdhar arrived in the United States in January 2000, Basnan's wife began signing her checks over to Bayoumi's wife, Manal Bajadr. According to Senator Graham: "Beginning in 2000, Basnan's wife began signing her checks over to a woman named Manal Bajadr – the wife of Omar al Bayoumi. It looked suspiciously like another backdoor way of channeling money to al-Hazmi and al-Mihdhar. This would also justify Bassan's boast to the

FBI that he had done more for the two future hijackers than had al-Bayoumi." Senator Bob Graham, *Intelligence Matters*, p. 168 (2004). The payments, drawn from Princess Haifa's account at Riggs Bank in Washington D.C., total nearly $150,000.

202.    9/11 Commissioner John Lehman believed that Princess Haifa had no knowledge that the money would end up in the hands of the hijackers, but was simply signing checks that had been placed in front of her by Wahhabi radicals who worked out of the Ministry of Islamic Affairs office in the Saudi Embassy. According to Lehman, "it was well-known in intelligence circles that the Islamic Affairs office functioned as the Saudis' 'fifth column' in support of Muslim extremists." Philip Shenon, *The Commission: The Uncensored History of the 9/11 Investigation*, p. 185 (2008).

203.    Basnan remained in San Diego through the September 11th attacks and "celebrated the heroes of September 11" and talked about "what a wonderful, glorious day it had been" at a party shortly thereafter. In August 2002, Basnan and his wife were arrested for visa fraud, ultimately admitting they used false immigration documents to remain in the United States. Basnan was deported to Saudi Arabia on November 17, 2002. His wife was deported to Jordan the same day.

204.    Interviewed by the FBI and members of the 9/11 Commission following the September 11th attacks, both Bayoumi and Basnan rejected claims that the two men had a close relationship. Bayoumi denied having any relationship at all with Basnan, asserting that he did not like Basnan, but volunteered that their wives were close. Basnan, in turn, incredibly claimed not to know Bayoumi at all.

205.    But those statements are directly contradicted by FBI witness testimony describing the two men as "the closest of friends." Both Bayoumi and Basnan were well known at the ICSD and their families both lived at the Parkwood Apartments at the same time Hazmi and Mihdhar resided there in 2000. Additionally, their wives were arrested together in April 2001 for shoplifting at a J.C. Penney. Moreover, a FBI agent assigned to a counter-terrorism squad investigating Basnan confirmed the friendship between Bayoumi and Basnan, noting that

"phone records reveal roughly 700 calls between various phones subscribed to by Bayoumi and Basnan over a one year period."

206.    Witness testimony further confirms that Basnan had close ties to other persons connected to the hijackers, and made a number of in-person visits to the Saudi Consulate in Los Angeles.  According to an October 3, 2001 FBI report titled "PENTTBOMB; MAJOR CASE 192," Basnan also had telephone contact with Anwar Aulaqi.

207.    9/11 Commission member Dietrich L. Snell, who conducted the October 2003 interview of Basnan in Riyadh, Saudi Arabia with representatives of the Mabahith in attendance, noted the deceitful and misleading nature of Basnan's testimony:

> The interview failed to yield any new information of note.  Instead, in the writer's opinion, it established beyond cavil the witness' utter lack of credibility on virtually every material subject.  This assessment is based on:  the witness' demeanor, which engendered a combination of confrontation, evasiveness, and speechmaking, presumably for the benefit of his Mabahith audience; his repudiation of statements made by him on prior occasions; and the inherent incredibility of many of his assertions when viewed in light of the totality of the available evidence.

208.    In addition to being the point person to facilitate the future hijackers' preparations in the United States, Bayoumi was responsible for introducing Hazmi and Mihdhar to certain members of the San Diego Muslim community that not only shared their extremist beliefs and hatred for the United States, but would also provide significant logistical and ideological support to the hijackers as they plotted the attacks.

209.    One such individual was Anwar Aulaqi.  Aulaqi, who was covertly acting as a senior recruiter for al Qaeda and affiliated terrorist organizations and advocating jihad against the United States, had spent nearly five years in the public eye as the imam of the Al Ribat Al Islami Mosque  (or "Rabat") in La Mesa, CA, northeast of San Diego.  Aulaqi had a following of approximately 200-300 people and would become an important religious leader to Hazmi and Mihdhar.

210.     Aulaqi has been linked to Fort Hood shooter Nidal Malik Hasan, as well as Christmas Day bomber Umar Farouk Abdulmutallab.  According to U.S. intelligence, Aulaqi was one of Abdulmutallab's al Qaeda trainers who assisted in planning the attack and providing religious justification for it.  Moreover, Faisal Shahzad, the individual responsible for the failed New York Times Square car bombing attempt on May 1, 2010, told U.S. investigators that he was inspired by Aulaqi.

211.     Aulaqi was also the subject of  FBI investigations in 1999 and 2000 after learning that he may have been contacted by a "possible procurement agent" for Osama bin Laden.  During the investigation, the FBI learned that Aulaqi knew individuals with the Holy Land Foundation and others involved in raising money for Hamas.

212.     Aulaqi had other extremist connections.  U.S. intelligence reports link Aulaqi to other FBI counter-terrorism investigations, including the activities of "the Palestinian Islamic Jihad (PIJ) in the United Sates."  Moreover, according to the Joint Inquiry Report, Aulaqi was visited in early 2000 "by a subject of a Los Angeles investigation closely associated with Blind Sheikh [Omar Abdel] al-Rahman."  The FBI closed its inquiry into Aulaqi's activities in March 2000, two months after Hazmi and Mihdhar arrived in San Diego, claiming that the evidence collected by the agency was not considered strong enough to support a criminal prosecution at the time.

213.     Aulaqi, Hazmi, and Mihdhar developed a very close relationship and FBI sources reported that "Aulaqi met consistently and privately with Alhazmi and Almidhir for prayers."  Another witness recalled meeting Hazmi through Aulaqi and Mohdar Abdullah, and later meeting Mihdhar at Aulaqi's mosque.  The witness also remembered seeing Hazmi and Mihdhar in the guest room on the second floor of the mosque and, on one occasion, leaving the room just after Aulaqi, at the conclusion of a meeting. Other witnesses "informed the FBI after September 11 that [Aulaqi] had closed-door meetings in San Diego with al-Mihdhar, al-Hazmi, and another individual, whom al-Bayoumi had asked to help the hijackers."

214.    These contacts have led investigators, including Senator Graham, to conclude that Aulaqi was not only Hazmi's and Mihdhar's spiritual leader but also a trusted confidant who was fully aware of the planned 9/11 attacks.

215.    Aulaqi eventually left San Diego in mid-2000, and by January 2001 had relocated to Virginia where he took a position at the Dar al Hijra Mosque at 3159 Row Street, Falls Church, VA 22044.  He resided at 3331 Kaywood Drive, Falls Church, VA 22041.

216.    Hamzi and 9/11 hijacker Hani Hanjour arrived at Dar al Hijra in early April 2001. Upon their arrival, Aulaqi tasked a Jordanian named Eyad al Rababah to assist the hijackers get settled and find an apartment.  They eventually moved into Rababah's friend's apartment in Alexandria, VA.  On May 8, 2001, Rababah went back to the apartment to pick up Hazmi and Hanjour for a trip to Connecticut.  When Rababah arrived at the apartment, he found they had new roommates – muscle hijackers Ahmed al Ghamdi (United Airlines Flight 175) and Majed Moqed (American Airlines Flight 77).

217.    Following the September 11th attacks, Aulaqi submitted to four FBI interviews between September 15 and 19, 2001.  During an interview on September 17, the FBI showed Aulaqi a picture of the American Airlines Flight 77 hijackers.  Aulaqi stated that he knew Hazmi from the Al Ribat Al Islami Mosque in San Diego, provided a physical description of him, and further described some of his personality traits, explaining that Hazmi was "a loner who did not have a large circle of friends," "was slow to enter into personal relationships," and "was always very soft spoken, a very calm and extremely nice person."  Although Aulaqi admitted meeting with Hazmi several times, he claimed not to remember any specifics of what they discussed.

218.    Aulaqi told the FBI that he did not recognize Mihdhar, but did admit to knowing Hani Hanjour.  According to the FBI, information in their possession at the time of the interviews suggested "a more pervasive connection" between Aulaqi and the 9/11 hijackers than he was willing to admit.

219.    Bayoumi was also responsible for introducing Hazmi and Mihdhar to Mohdhar Mohamed Abdullah (a/k/a "Mihdar Mohammad al Mihdar Zaid").  Abdullah, who was a friend

to both Bayoumi and Aulaqi, lived in an apartment complex around the corner from Aulaqi's mosque.  According to the 9/11 Commission, in a post-9/11 interview with law enforcement, Abdullah claimed that Bayoumi specifically asked him "to be the individual to acclimate the hijackers to the United States, particularly San Diego, CA."

220.    Per Bayoumi's instructions, Abdullah helped Hazmi and Mihdhar locate and apply to language and flight schools, and assisted them in translating between English and Arabic.  Abdullah also helped Hazmi and Mihdhar obtain fake driver's licenses with false names from an unknown individual in Los Angeles.  Abdullah drove the hijackers from San Diego to an area in Los Angeles, near McArthur Park, and a second location near Huntington Park, where the unknown individual was selling the fake cards.  Abdullah purchased approximately four or five fraudulent California Department of Motor Vehicle identification cards and gave them to Hazmi and Mihdhar.

221.    Abdullah further helped Hazmi conduct surveillance of the Los Angeles International Airport in June 2000.  On June 9, the day before Mihdhar left the United States and returned to Yemen to visit his family, Abdullah traveled with Hamzi and Mihdhar to Los Angeles where they visited the King Fahd Mosque.  Abdullah was surprised that the hijackers already knew several people at the mosque, including an individual named Khallam.  FBI investigators believe the individual is Khallad bin Attash, an al Qaeda operative and trusted member of Osama bin Laden's inner circle who is linked to the 1998 U.S. Embassy bombings and the purported mastermind behind the U.S.S. Cole bombing.  Their belief is based on witness reporting that Khallad was in the United States that same month and was seen in the company of Fahad al Thumairy.  On June 10, Los Angeles International Airport security tapes show Abdullah, Hazmi and an unidentified man (potentially Khallad) using a video camera to scout out the airport.

222.    During a number of interviews with the FBI following the 9/11 attacks, Abdullah reportedly admitted knowing of Mihdhar's and Hazmi's extremist leanings and Mihdhar's involvement with the Islamic Army of Aden, an Islamic extremist group in Yemen with ties to al

Qaeda.  According to the 9/11 Commission, Abdullah was clearly sympathetic to those extremist views and expressed hatred for the U.S. government.

223.     Although Abdullah denied having advance knowledge of the 9/11 attacks when interviewed by the FBI, Abdullah bragged to fellow inmates in September-October 2003 (during his incarceration for immigration charges), that he knew that Hazmi and Mihdhar intended to carry out a terrorist attack in the United States.  Abdullah told the inmates that he first learned of the terrorist plot from Hazmi and Mihdhar themselves during a dinner at a restaurant in San Diego after praying together at a nearby mosque.  Hazmi and Mihdhar invited Abdullah to join them on the airplane and participate in the attack.  Abdullah knew that the attack would consist of an airplane flying into a building, but Abdullah reportedly did not know any further details.

224.     Abdullah further boasted that he was responsible for driving Hazmi and Mihdhar from Los Angeles to San Diego after meeting Bayoumi in the Mediterranean Café with Cayson bin Don.

225.     After spending nearly 3 years in U.S. prisons, and multiple challenges to deportation proceedings arising from immigration violations, Abdullah was deported to Yemen on May 21, 2004.

226.     While residing in San Diego in 2000, Mihdhar and Hazmi drew little attention to themselves.  They enrolled in English language classes at the Language Instruction Centrum, took flying lessons at the National Air College and Sorbi Flying School in San Diego, opened a new bank account at Bank of America with a $4,900 deposit, bought a 1988 Toyota Corolla for $2,300 and purchased automotive insurance, and obtained local phone service that included Hazmi's listing in the local telephone directory.

227.     On March 20, 2000, a long distance telephone call was placed from Mihdhar and Hazmi's apartment to a suspected terrorist facility in the Middle East linked to al Qaeda activities.

228.     In May 2000, disappointed with their housing arrangements at the Parkwood Apartments, Hazmi and Mihdhar vacated their apartment and moved to a home at 8451 Mount

Vernon Avenue, Lemon Grove, CA, which they had found through an advertisement at the ICSD.

229.     Mihdhar stayed at the Lemon Grove residence until June 10, 2000, when he left the United States for Yemen.  Hazmi continued to reside at the house and remained in the San Diego area until he moved to Phoenix, Arizona with fellow hijacker Hani Hanjour on December 10, 2000, and then eventually the east coast.

230.     According to the records at the Parkwood Apartments, Bayoumi and his family moved out of their apartment just prior to the attacks on June 23, 2001.  Bayoumi advised he was leaving the United States, but left no forwarding address with the property management company.

231.     In their final hours before boarding American Airlines Flight 77, overtaking the crew, and crashing the plane into the Pentagon, September 11th hijackers Hazmi, Mihdhar, and Hanjour, again found themselves in close proximity to a senior member of the Kingdom's Ulema, Saleh Ibn Abdul Rahman Hussayen.

232.     Hussayen, a member of the Saudi Ulema, had maintained a long career as a government official for the Kingdom, holding positions with the Ministry of Finance and National Economy, the Council of Prime Ministers, the MWL Constituent Council, and other appointed positions within the Saudi government.

233.     Hussayen also spent five years as a member of Al Rajhi Bank's Sharia Board, the committee at the bank charged with ensuring compliance with Islamic law, and ultimately responsible for approving Al Rajhi Bank's own zakat contributions, including those Al Rajhi Bank channeled to al Qaeda through the IIRO.

234.     In the weeks prior to the attacks, Hussayen was in the United States on a fundraising mission with members of the Islamic Association of North America ("IANA"), a radical Islamic organization in Ypsilanti, Michigan which receives money from the Saudi government and other Saudi donors.  The IANA has promoted teachings and fatwas issued by radical Saudi clerics Safar Hawali and Salman Ouda, which advocate violence against the United

States.  Hawali and Ouda were identified in the 1993 World Trade Center bombing trial as spiritual advisors to Osama bin Laden.

235.    Hussayen's nephew, Sami Omar al Hussayen, was employed by the IANA to create and maintain websites and other internet media which were used to recruit personnel and raise funds for violent jihad.  From March 1995 until February 2002, the IANA received $3 million from Sami's resources, including two checks from his uncle totaling $100,000.  In March 2004, Sami was charged with conspiracy to provide material support to Hamas and other violent jihadists through his work at the IANA and the Al Haramain Islamic Foundation.

236.    During this fundraising trip, Hussayen was scheduled to visit officials at the offices of the MWL and WAMY in the Washington, D.C. area.  The WAMY office was headed at that time by Abdullah bin Laden.

237.    On September 6, 2001, Hussayen arrived in Herndon, VA.  Then, just days before the September 11th attacks, Hussayen abruptly moved from his original hotel to the Marriott Residence Inn just a few miles away.  The Marriott Residence Inn is the same hotel where September 11th hijackers Hazmi, Mihdhar, and Hanjour were staying before they woke up on the morning of September 11th, hijacked American Airlines Flight 77 and crashed it into the Pentagon killing approximately 125 military personnel and civilians, and injuring countless others.

238.    The United States Second Circuit Court of Appeals has concluded that Hussayen's "travels to the United States shortly before the September 11, 2001 attacks, *as well as his decision to switch hotels to stay in the same hotel as at least three of the hijackers* … not only suggest the possibility that he may have provided direct aid to members of al Qaeda, but they also raise a plausible inference that he may have intended his alleged indirect support of al Qaeda to cause injury in the United States."  *O'Neill v. Asat Trust Reg.* (*In Re: Terrorist Attacks on September 11, 2001* (Asat Trust Reg.)), 714 F.3d 659, 679 (2d Cir. 2013).  (Emphasis original).

239.     Directly after the attacks, FBI agents attempted to interview Hussayen in his hotel room.  However, according to the FBI, Hussayen "feigned a seizure, prompting the agents to take him to a hospital, where the attending physicians found nothing wrong with him."  The FBI returned to his hotel room the next day, but found Hussayen unwilling to cooperate.

240.     In March 2002, just months after the September 11th attacks, King Fahd bin Adbul Aziz al Saud appointed Hussayen as the President of the Committee of the Two Holy Mosques in Mecca and Medina, the two most sacred sites in Islam.  Hussayen has since died.

241.     From the moment they first set foot in the United States on January 15, 2000, to the end of their journey almost two years later in a hotel with a senior member of the Saudi Ulema, Hazmi, Mihdhar and Hanjour were the benefactors of a broad support network orchestrated by agents of the Kingdom of Saudi Arabia, who helped provide them with the necessary tools to plot, prepare for, and ultimately conduct the September 11, 2001 terrorist attacks.

242.     Absent the critical financial, logistical, ideological and other support provided to them by Omar al Bayoumi, Fahad al Thumairy, Osama Basnan, Anwar Aulaqi, Mohdhar Abdullah, and others, the hijackers would have been incapable of successfully carrying out the single worst enemy attack on United States soil this country had seen in 60 years.

243.     The Kingdom of Saudi Arabia has asserted during the course of this litigation that Plaintiffs' claims relating to the activities of Bayoumi, Thumairy and other Saudi agents have been "directly rebutted by facts found by the United States government," and that the 9/11 Commission "concluded that the government of Saudi Arabia had no role in the attacks of September 11, 2001."  These statements are incorrect, and directly rebutted by evidence of record.

244.     Former United States Senator and 9/11 Commission member, Bob Kerrey, has testified in an affidavit submitted in support of Plaintiffs that "it is fundamentally inaccurate and misleading for the Kingdom and SHC to suggest that the 9/11 Commission's investigation exonerated them for the events of September 11, 2001, or that the 9/11 Commission's

investigation directly rebutted Plaintiffs' claims." Kerrey further affirms in his affidavit that "significant questions remain unanswered concerning the possible involvement of Saudi government institutions and actors in the financing and sponsorship of al Qaeda, and evidence relating to the plausible involvement of possible Saudi government agents in the September 11th Attacks has never been fully pursued." *See* the Affirmation of Joseph Robert "Bob" Kerrey, *In Re: Terrorist Attacks on September 11, 2001*, MDL Case No. 1:03-md-01570, ECF No. 2557-3, which is incorporated herein in its entirety by reference.

245. Former United States Senator and 9/11 Joint Inquiry Co-Chair Bob Graham has similarly affirmed in affidavit testimony submitted of record that the "Kingdom is mistaken" in arguing that it "has been fully exonerated of any culpability for the events of September 11, 2001, whether through the investigation and findings of the 9/11 Commission or any other investigation of the United States government." To the contrary, and as mentioned previously, Senator Graham has testified that he is "convinced that there was a direct line between at least some of the terrorists who carried out the September 11th attacks and the government of Saudi Arabia." *See* the Affirmation of Daniel Robert "Bob" Graham, *In Re: Terrorist Attacks on September 11, 2001*, MDL Case No. 1:03-md-01570, ECF No. 2558, which is incorporated herein in its entirety by reference.

246. The testimony from Senators Kerrey and Graham is consistent with the views of the 9/11 Commission staff members who led the investigation into the involvement of Bayoumi and Thumairy in the attacks. As detailed in the definitive account of the 9/11 Commission's investigation, those staff members "felt strongly that they had demonstrated a close Saudi government connection to the two hijackers in San Diego," but that political considerations led to the omission of that conclusion from the 9/11 Commission's Final Report. Philip Shenon, *The Commission: The Uncensored History of the 9/11 Investigation*, pp. 398-99 (2008).

247. Commissioner John Lehman also endorsed this position, expressing his view that "it was clear early on that there was some sort of Saudi support network in San Diego that had made it possible for the hijackers to hide in plain sight." *Id.* at p. 185.

248.     Further undermining the Kingdom's efforts to characterize the 9/11 Commission investigation as "exhaustive," recent disclosures make clear that both the 9/11 Commission and 9/11 Joint Inquiry were deprived of critical investigative information by the FBI.

249.     For example, a Freedom of Information Act ("FOIA") lawsuit brought against the FBI by BrowardBulldog.org has revealed that the FBI never disclosed to the 9/11 Commission or 9/11 Joint Inquiry the existence of a massive investigation into an apparent Saudi support network for the 9/11 hijackers in Florida.  The investigation concerns the extensive links between 9/11 hijackers Mohammed Atta, Marwan al Shehhi, and Ziad Jarrah, and a Saudi family residing in Florida with ties to the Saudi Royal Family.

250.     U.S. District Judge William J. Zloch, who currently presides over BrowardBulldog.org's FOIA suit, is currently reviewing more than 80,000 pages of records recently turned over by the FBI concerning the FBI's Florida investigation.  The FBI initially responded to the lawsuit by claiming that it had no responsive documents.

251.     Senator Graham insists the FBI never disclosed the existence of the Sarasota investigation to either the Congressional Joint Inquiry or the 9/11 Commission, nor provided them with a single document relating to the investigation.  According to Graham, the FBI's Florida probe "opens the door to a new chapter of investigation as to the depth of the Saudi role in 9/11."

### B.     MOHAMMED JABER HASSAN FAKIHI AND THE HAMBURG CELL

252.     The Saudi Ministry of Islamic Affairs is further implicated in the September 11th terrorist attacks by virtue of the relationship between the 9/11 plot's "Hamburg cell" and the head of the Ministry of Islamic Affairs office in the Saudi Arabian Embassy in Berlin, Germany, Muhammad Jaber Hassan Fahiki.

253.     The "Hamburg cell" consisted of key operatives in the September 11th attacks, including Mohammad Atta (the ringleader of the 19 hijackers who piloted American Airlines Flight 11), Marwan al Shehhi (piloted United Airlines Flight 175), Ziad Jarrah (piloted United

Airlines Flight 93), Ramzi Binalshibh, Mounir el Motassadeq, Said Bahaji, Zakariya Essabar, Abdelghani Mzoudi, and others.

254.    Fakihi, who worked for the Ministry of Islamic Affairs in Riyadh following his graduation from the King Saud University in 1995, was assigned to head the Islamic Affairs office at the Saudi Embassy in Berlin in or around June 2000.  Fakihi answered directly to the Saudi Minister of Islamic Affairs in Riyadh, Saleh bin Abdulaziz al Ashaikh.

255.    As a representative of the Saudi Embassy and Ministry of Islamic Affairs, Fakihi frequently attended the Al Nur Mosque in Berlin.  The mosque was a notorious haven for Islamic extremists, often hosting Muslim clerics that preached intolerance of non-Muslims and justified violence in the name of defending Islam.  Dr. Salem Rafei, a Lebanese cleric who ran the mosque, openly supported Palestinian suicide attacks and called Muslims to kill all unbelievers standing in the way of Islam.  Documents containing the mosque's address were seized from individuals detained by Pakistani authorities who are alleged to have received military training at al Qaeda camps in Afghanistan in 2001.

256.    Fakihi, himself an adherent to the most extreme teachings of Wahhabi ideology, advocated for the development of mosques across Europe and told his superiors in the Kingdom that his ultimate goal was to turn Berlin into an Islamic proselytizing center for Eastern Europe. In June 2000, Fakihi wrote a letter to the Saudi Minister of Islamic Affairs, Saleh bin Abdulaziz al Ashaikh, proposing to turn the Al Nur Mosque into a center for Islamic missionary activity aimed at "ethnic European" populations in Eastern Europe.  Fakihi, who planned to move his office to the Al Nur Mosque, proposed to carry the word of Islam to Poland, the Czech Republic and Hungary, the last of "which once belonged to the Islamic Caliphate under Ottoman Empire rule."

257.    Fakihi arranged for Saudi charities to fund the expansion of the Al Nur Mosque consistent with his vision.  In particular, the Saudi-based Al Haramain Islamic Foundation, a purported charity that was itself headed by the Saudi Minister of Islamic Affairs, donated $1.2 million to help the mosque purchase a newer, larger building outfitted with prayer rugs,

classrooms, kitchens, shops, and an Internet server.  According to municipal records in Berlin, Aqeel al Aqeel, Al Haramain's Director-General, was one of the building's owners.  Aqeel was designated by the U.S. Treasury Department as a Specially Designated Global Terrorist ("SDGT") on June 2, 2004.  According to the Treasury Department, the Al Haramain Islamic Foundation provided "financial and material support to the al Qaida network" while under Aqeel's leadership.

258.    Mohammad Atta and other members of the Hamburg cell, including Mounir el Motassadeq, were seen visiting the mosque and meeting with Fakihi.  Fakihi's business card was found in the apartment of Motassadeq, who was later arrested and convicted in a German court for being an accessory to murder relative to the September 11th attacks, given his membership in the Hamburg cell and his knowledge and involvement in the preparation of the plans to hijack the planes.

259.    Fakihi further used the Al Nur Mosque to meet with other al Qaeda members and Islamic extremists.  In March 2003, German police raided a suspected terrorist cell in Berlin and arrested a half-dozen men who were planning a large scale terrorist attack in Germany.  Bomb-making equipment, forged passports, flight-simulator software, chemicals and a handbook for brewing poisons were seized during the raid.  German police said Fakihi met frequently at the Al Nur Mosque with the terror cell's leader, Ihsan Garnaoui, a Tunisian al Qaeda member.

260.    Two days after the arrests, on March 22, 2003, the German Foreign Ministry, following a recommendation from the country's domestic-intelligence service, told the Saudi Embassy that Fakihi's diplomatic accreditation would be withdrawn unless he left the country.  Four days later, Fakihi flew back to Saudi Arabia.

261.    Amid concerns that Fakihi may have funneled hundreds of thousands of dollars out of official Saudi Embassy accounts to al Qaeda operatives in Europe, Saudi investigators interrogated him upon his return to the Kingdom.  According to testimony presented during a September 10, 2003 hearing before the Senate Judiciary Subcommittee on Terrorism, Technology, and Homeland Security by Matthew Levitt (a former counterterrorism intelligence

analyst for the FBI who would later be appointed to serve as deputy assistant secretary for intelligence and analysis at the U.S. Department of the Treasury from 2005-2007), Fakihi confessed to his interrogators that he in fact transferred Saudi Embassy funds to certain charities, mosques and other recipients per the instructions he received from al Qaeda loyalists and "close friends" of Osama bin Laden.  U.S. officials familiar with the Saudi investigation claim that Fakihi was "more than just a sympathizer of bin Laden" and was "organizationally involved" with bin Laden's al Qaeda network.  Saudi investigators reportedly reviewed some $800,000 in funds that were doled out by the Saudi Embassy's Ministry of Islamic Affairs office while under Fakihi's leadership.

262.    Saudi authorities nevertheless obstructed the German government's investigation into links between Fakihi and the members of the Hamburg cell.  The Saudi Embassy in Berlin never responded to a formal request from German prosecutors to explain the presence of Fakihi's business card in Motassadeq's apartment or an alleged meeting between Fakihi and Motassadeq in Berlin shortly before the al Qaeda member's arrest in November 2001.  In an interview with the Wall Street Journal in 2003, a German police official stated that the Saudi Embassy failed to cooperate in the probe.

263.    9/11 Commission member Dietrich L. Snell conducted an interview with Fakihi in October 2003 in Riyadh relative to his duties with the Ministry of Islamic Affairs, his association with the Al Nur Mosque, and his relationships with Motassadeq and Garnaoui.  The interview was conducted under the watchful eye of the Saudi secret police, the Mabahith.  According to Snell, Fakihi's testimony "did not appear credible."

## C.    POST 9/11 COUNTER-TERRORISM INITIATIVES TARGETING THE MINISTRY OF ISLAMIC AFFAIRS

264.    As further evidence of the depth of the Ministry of Islamic Affairs' ties to terrorist movements, including al Qaeda, came to light in the wake of the September 11th Attacks,  the United States and other governments directly targeted the Ministry and officials of the Ministry in a series of counter-terrorism initiatives.

265.    In December 2003, the State Department deported and revoked the visas of approximately sixteen (16) individuals who were using their diplomatic status as representatives of the Saudi Embassy in Washington D.C. to promote and spread the radical and extremist Wahhabi ideology in the United States.

266.    The group included Jaafar Idris, an influential cleric who worked out of the Ministry of Islamic Affairs office in the Saudi Embassy, who from his position at the Embassy worked extensively with Fairfax, VA-based Institute for Islamic and Arabic Sciences in America ("IIAS"), to promote extremist Wahhabi propaganda via student lectures and textbooks.

267.    IIAS, fully funded by the Saudi government, was operating as a satellite campus of the Al Imam Muhammad Ibn Saud Islamic University in Riyadh.  Saudi Ambassador Prince Bandar bin Sultan bin Abdul Aziz al Saud acted as the Chairman of IIAS's Board of Trustees.

268.    Idris, who was well-known in Islamic radical circles, was president of American Open University in Alexandria, VA, and further founded the Islamic Foundation of America in Springfield, VA, which operated a school, a mosque, and a prison-outreach program.  According to U.S. government sources, the Foundation's office was regularly visited by celebrated Islamic extremists, including Siraj Wahhaj, a New York imam who was identified as an unindicted conspirator in the 1993 World Trade Center bombing.

269.    The State Department's actions coincided with investigations conducted by the Internal Revenue Service and Senate Finance Committee into IIAS and its links to terrorist groups, forcing the Saudi government to end its sponsorship of the school.

270.    In a January 29, 2004 letter to then Secretary of State Colin L. Powell, Senator Charles Schumer urged the State Department to follow up its decision to revoke the visas of the Saudi officials and increase pressure on the Saudi government "to shut down the Islamic Affairs sections at their American diplomatic posts and to cease funding the Institute for Islamic and Arabic Sciences (IIAS)."  According to Senator Schumer, "the Saudis continue to sponsor and promote the spread of religious extremism in the U.S.," particularly the Islamic Affairs offices

which "supply textbooks to Muslim schools in the U.S. that promote an intolerant Wahhabi line."

271.    In late June 2004, dozens of federal agents connected to the FBI, Bureau of Immigration and Customs, and the IRS raided and searched IIAS as part of the U.S. government's on-going investigation into the school's links to radical Islam.

272.    On July 22, 2004, Senator Schumer introduced a resolution, co-sponsored by Senator Susan B. Collins, urging the State Department to add the Kingdom of Saudi Arabia to the U.S. list of religiously intolerant nations. Citing "Saudi efforts to export militant ideology" and "Saudi-funded schools and mosques [that] continue to teach hatred and preach violence around the world," the Schumer-Collins resolution called on Saudi Arabia to cease its support of religious ideologies that promoted hatred, intolerance, violence, and other abuses of international recognized human rights. Moreover, the resolution called on Saudi Arabia to cease providing undeserved diplomatic status to Islamic clerics and educators teaching outside of Saudi Arabia, and further demanded that the Kingdom close any Ministry of Islamic Affairs office in any Saudi Embassy that has been responsible for propagating intolerance.

273.    Authorities in the Netherlands took similar action as well. Based on evidence that Saudi-educated clerics and Saudi-funded mosques and other missionary organizations were propagating an intolerant Wahhabi ideology within Muslim communities in the Netherlands, and encouraging young Muslim men to engage in jihad, the Dutch Intelligence and Security Service ("AIVD") conducted surveillance of six Saudi-funded mosques that government officials maintain were consciously contributing to the radicalization of Muslims in the Netherlands.

274.    The mosques included the El Tawheed Mosque (Amsterdam), Al Fourqaan Mosque (Eindhoven), Sjeikh Al Islam Ibn Taymia (Hague), Al Mouahidine Mosque (Helmond), Society of Islamic Youth (Breda), and the Islamic Society for Education and Knowledge Transfer (Tilburg).

275.    Beginning in December 2001, the AIVD began closely monitoring the El Tawheed Mosque due to growing concerns of radical Egyptian and Saudi influences. The Saudi-

based Al Haramain Islamic Foundation, designated by the U.S. Treasury Department as a Specially Designated Global Terrorist ("SDGT") entity, was responsible for establishing and financing the mosque.  In 2002, the AIVD identified a group of Muslim youth affiliated with the El Tawheed Mosque known as the "Hofstad Group."  This group, an indigenous Islamist terrorist cell of approximately twenty young Dutch Muslims of mainly North African descent, met often at the mosque where they received inspiration to develop their skills as jihadists and were urged to travel abroad to wage jihad.

276.     In the summer of 2004, several members of the Hofstad Group were arrested for planning to launch terrorist attacks against Amsterdam International Airport Schipol, a nuclear reactor, and other targets.  In November 2004, the group attracted international attention when a member, Mohammed Bouyeri, murdered Dutch filmmaker Theo van Gogh on an Amsterdam sidewalk in broad daylight.

277.     The Saudi-funded Al Fourqaan Mosque itself has a history of Islamic extremism and has been widely considered the most radical mosque in the Netherlands.  For instance, the Al Fourqaan Mosque is closely affiliated with the Saudi-based Al Waqf Foundation, a Muslim cultural organization which opened its doors in Eindhoven in 1989 and operates from the Al Fourqaan Mosque itself.  According to the AIVD, Al Waqf promotes the radical teachings of Wahhabi Islam and serves as a recruiting ground for jihad.  Ahmad al Hussaini, the head of Al Waqf in Eindhoven and a member of its Board of Directors since June 1991, is a known financier of the al Qaeda network.  Hussaini transferred funds to Muhammad Galeb Zouaydi, al Qaeda's principal financier in Europe.

278.     Al Waqf, which maintained close ties with Islamic primary schools in the Netherlands, frequently hosted educational courses and seminars as part of its effort to propagate the Wahhabi strain of Islam and promote anti-Western sentiment.  Attendance at the seminars became a critical credential for young Muslim men aspiring to join jihad.

279.     In early 1999, Hamburg cell members and future 9/11 hijackers Mohammad Atta and Marwan al Shehhi attended a religious training seminar hosted by Al Waqf at the Al

Fourqaan Mosque.  Following the seminar, Atta and Shehhi traveled to al Qaeda camps in Afghanistan for training.

280.    Later that same year, Hamburg cell members Mounir el Motassadeq and Zakariya Essabar attended Al Waqf's Ramadan seminar at the Al Fourqaan Mosque.  The five-day event was organized by the Saudi Ministry of Islamic Affairs.  Not long after attending the seminar, Motassadeq also traveled to Afghanistan to train at an al Qaeda-run camp.

281.    In June 2005, concerned that foreign-born and trained imams were becoming a threat to public order and national security, Dutch Immigration and Integration Minister Rita Verdonk announced the deportation of three radical imams from the Al Fourqan Mosque, accusing the men of radicalizing Muslims, recruiting men for jihad, and inciting violence within the mosque.  The imams were also accused of using their sermons to urge Muslims to "isolate" themselves from the rest of Dutch society,

282.    Charged with "contributing to the radicalization of Muslims in the Netherlands" and "advocating violence through their militant, anti-Western sermons," the Dutch government deported Galal Osman Ahmed Kehil (a Saudi national), Eisha Eltayeb Bersham (a/k/a "Abu Tareq;" a Bosnian national), and Mohamud Mohamed Mohamud (a Kenyan national who studied at the University of Medina in Saudi Arabia).

283.    A fourth imam, from the Iskender Pasa Camil Mosque in Rotterdam, was also deported by Dutch authorities that same year for provoking hatred and inciting people to jihad.

284.    Under pressure from the United States, the Saudis themselves ultimately acknowledged the depth of the problem regarding the radical and extremist teachings of the Saudi-educated clerics connected to the Ministry of Islamic Affairs, albeit only after al Qaeda carried out attacks within the Kingdom itself in 2003.

285.    Beginning in 2003, the Saudi government began to remove the most radical clerics within its ranks and sent others to rehabilitation programs for training and monitoring.  According to a February 1, 2007 diplomat cable originating from the U.S. Embassy in Riyadh,

approximately 2,000 extremist clerics were terminated by the government, while another 2,160 clerics were sent to reeducation training programs.

## X. THE ATTRIBUTABLE TORTIOUS ACTS OF SAUDI ARABIA'S CHARITY AGENTS AND ALTER-EGOS IN PROVIDING MATERIAL SUPPORT AND RESOURCES TO AL QAEDA

286.   As discussed previously, da'awa organizations established and controlled as arms and alter-egos of the Saudi government collaborated intimately with al Qaeda from that terrorist organization's establishment through September 11, 2001, serving as the most important sources of financial and logistical support necessary to build and sustain the al Qaeda organization, and essential to obtaining the global strike capabilities necessary to carry out the September 11th attacks.

287.   The Saudi-government da'awa organizations that worked most closely with al Qaeda in the years preceding the September 11th attacks, and whose support was most critical in the success of those attacks, include the IIRO, MWL, SHC, SJRC, SRC, WAMY, al Haramain Islamic Foundation (al Haramain), al Haramain al Masjil al Aqsa, and Rabita Trust.

288.   The collaboration between the Saudi da'awa organizations and al Qaeda dated to the Afghan jihad, when several of those da'awa organizations worked with the future al Qaeda leadership to support the jihad against the Soviet occupation of Afghanistan.

289.   Their partnerships with al Qaeda were continuously reinforced and expanded during the years before the September 11th attacks, through their intimate collaborations in a range of conflicts where they joined in conducting jihad, as in Bosnia-Herzegovina, where a war broke out in 1992, primarily between Bosnian Muslims and Bosnian Serbs, just as the Saudi regime campaign to restore its legitimacy by supporting the Islamist agenda of the Ulema outside of Saudi Arabia was unfolding.

290.   For the Saudi regime, the outbreak of the Bosnian war presented a timely opportunity for the House of Saud to demonstrate its dedication to the defense of the Ummah, one of the duties the Ulema had called on the Kingdom to fulfill in the Letter of Demands and Memorandum of Advice.

291.    The Bosnian war presented a timely opportunity for al Qaeda as well.  As discussed above, al Qaeda was formed to carry out jihad throughout the globe, and participation in military conflicts involving Muslim communities (as the mujahideen had done in Afghanistan) was a central pillar of its strategy to establish Islamic regimes throughout the World.  Waging jihad in Bosnia also offered al Qaeda an opportunity to establish a base of operations in Europe, from which it could launch future terrorist attacks against the West.  At the same time, the Arab veterans of the Afghan jihad were being expelled from Pakistan.  For many of these jihadists, return to their home countries was impossible, as they were viewed as extremists and faced potential imprisonment.  Finding a new jihad front for these fighters was therefore essential to maintaining the nascent al Qaeda army.  Beyond these strategic considerations, as an Islamist organization deriving its ideological foundation from the teachings of Wahhabi Islam and the Western Cultural Attack theory, al Qaeda believed Muslims owed a personal obligation to carry out jihad in defense of the Bosnian Muslims, a view that was shared by the Saudi Ulema.

292.    In 1992, bin Laden, who was by then residing in Sudan under the protection of the National Islamic Front, sent a delegation of senior al Qaeda members to Bosnia to assess the situation and evaluate the logistical needs for waging jihad in the region.  The delegation was led by Abu Abdel Aziz, a Saudi veteran of the Afghan jihad and senior al Qaeda member.  Abu Adbel Aziz, also known by the aliases Barabarossa (Red Beard), Abdelrahman al-Dosari, and Hown (for his proficiency during the Afghan jihad with Russian made "Hound" artillery), succinctly explained in an interview the circumstances under which al Qaeda sent him to Bosnia following the conclusion of the Afghan jihad, as part of al Qaeda's broader efforts to find new regions for waging jihad:

> Then the conquest of Kabul came, and we thanked Allah, praised be He. The joy of Jihad overwhelmed our hearts. The Prophet, peace be upon him, said, "The highest peak of Islam is Jihad."  We were looking for Jihad (after Afghanistan). We found it in the Philippines, and in Kashmir. Only fifteen days lapsed (after the conquest of Kabul) and the crisis of Bosnia begun. This confirmed the saying of the Prophet (of Islam), peace and blessings be upon

him, who said, "Indeed Jihad will continue till the day of
Judgment." A new Jihad started in Bosnia, (we moved there), and
we are with it, if Allah wills.

[W]hen Jihad in Afghanistan was over, with the conquest of Kabul,
I went with four of those who participated in Afghanistan to
Bosnia to check out the landscape.

293.    In that same interview Abu Abdel Aziz confirmed the convergence of interests

between al Qaeda and the Saudi Ulema in relation to the Bosnian War, and the importance as a

religious matter of the latter's specific authorization for al Qaeda's proposed jihad in Bosnia:

Interviewer:  We heard, and many brothers heard, that you met
with prominent Ulema and scholars in the Muslim World and
discussed with them the question of Jihad in Bosnia. Can you tell
us some of their views and the issues you discussed?

Abu Abdel Aziz:  First, we consider our scholars the light and
guidance of Islam. They are the heirs of prophets (as the Hadith
says, "warathat al-Anbiya"). Our duty is to seek knowledge from
them and guidance from their scholarly light (sic). I -
alhamdulillah - met several prominent Ulema. Among them Sheikh
Nasir ad-Din al-Albani, Sheikh Abdel Aziz Bin Baz and Sheikh
Muhammad Bin Otheimin and others in the Gulf area.
Alhamdulillah, all grace be to Allah, they all support the religious
dictum that "the fighting in Bosnia is a fight to make the word of
Allah supreme and protect the chastity of Muslims."  It is because
Allah said (in his holy book), "Yet, if they ask you for succor
against religious persecution, it is your duty to give [them] this
succor." (Lit. "to succor them in religion", Qur'an, al-Anfal, 8:72).
It is then our (religious) duty to defend our Muslim brethren
wherever they are, as long as they are persecuted because they are
Muslims and not for any other reason.

294.    At the time he endorsed al Qaeda's jihad in Bosnia, Sheikh bin Baz was both

Saudi Arabia's Grand Mufti and a senior Saudi official with the rank of Minister.  Thus, Abu

Abdel Aziz's statements confirm that al Qaeda's jihad in Bosnia was formally sanctioned by the

Saudi government.

295.    Bin Baz used his governmental post as the Kingdom's highest religious authority

to encourage public support for al Qaeda's Bosnian jihad as well, issuing a fatwa calling on

Muslims to support that jihad by any means available to them, including by way of "money, arms and prayers."

296.    In accordance with the fatwas issued by its senior religious leaders, the Kingdom aggressively deployed its da'awa infrastructure to support the Bosnian jihad.  Existing Saudi da'awa organizations such as the IIRO, WAMY, al Haramain Islamic Foundation, and al Haramain al Masjil al Aqsa Foundation promptly established physical operations in Bosnia and the surrounding region to support the jihad.  In addition, the Kingdom established a new da'awa organization under the leadership of Prince Salman bin Abdul Aziz al Saud, called the Saudi High Commission for Relief to Bosnia and Herzegovina (SHC), to steward and centralize the Kingdom's Bosnian efforts.

297.    From the inception of the conflict, these organizations sponsored the entry into the region of hundreds of jihadists eager to join the fighting.  Many of these jihadists were Saudi veterans of the Afghan jihad, known to the Kingdom by virtue of its intimate participation in that earlier conflict and subsequent monitoring of their activities to be associates of bin Laden, and members of his nascent jihad organization.

298.    Throughout the course of the Bosnian war, the Saudi government controlled da'awa organizations, including the SHC, al Haramain, IIRO and WAMY, provided money, food, shelter and supplies to al Qaeda fighters.  In many cases, this support was coordinated by senior al Qaeda members who were embedded in the da'awa organizations themselves as directors, managers and officials.  These organizations also transported al Qaeda members throughout the region in their vehicles bearing UNHCR plates, thereby allowing al Qaeda to circumvent UN checkpoints.  After the conclusion of the war, the Saudi da'awa organizations provided ostensible employment to many al Qaeda members, so that they could remain in Bosnia in furtherance of al Qaeda's operational goals.  Several of those al Qaeda members planned and carried out terrorist attacks from offices of the SHC, while ostensibly employed by that organization.

299.     The methodology employed by the Kingdom to support the Bosnian jihad was implemented in regions throughout the world to advance al Qaeda's global agenda, but ably adapted to suit the particular objectives and conditions presented by the local context.

300.     For example, at the time of its founding, al Qaeda identified the Philippines as a potential fertile ground for jihad.  Muslims in the southern Philippines had been engaged in a long-running but unsuccessful campaign to establish an independent Muslim state, which had taken on an increasingly militant and Islamist character under the banner of the Moro Islamic Liberation Front, following a failed peace agreement in 1976.  Al Qaeda had strong relationships with members of MILF and Philippine jihadists, as a result of Mohammed Jamal Khalifa's successful campaign to recruit Philippine Muslims to join the Afghan jihad.  The opportunity presented by these circumstances fit perfectly into al Qaeda's global strategy, and in particular its plans to exploit regional conflicts to expand its global reach and promote the establishment of Shariah based states.

301.     The Saudi Ulema had likewise long identified with the Philippine Islamic movement, and advocated that the Saudi state support the effort of Philippine Islamists to establish an independent Shariah state.  From at least the 1980's, the Muslim World League was actively engaged in da'awa and political activities aimed at supporting the Philippine Islamist independence movement.

302.     To both al Qaeda and the Saudi Ulema, the inability of Muslims in the Philippines to achieve their goal of establishing an independent state was largely attributable to a lack of understanding and application of the true (Wahhabi) Islam.  In addition, based on their joint activities in Afghanistan, the al Qaeda leadership and Saudi da'awa organizations believed that the goals of the Philippine Islamist movement could be achieved only through jihad by trained, indoctrinated, dedicated, highly ideologized, and organized mujahid.

303.     Based on this understanding of the circumstances and challenges facing the Philippine Islamist movement, al Qaeda implemented a comprehensive strategic plan for

promoting the jihadist movement in the Philippines, to be carried out under the cover of humanitarian activities of the MWL, IIRO and AHIF.

304.    In furtherance of that plan, the MWL and IIRO established offices in the Philippines and Indonesia in approximately 1989.  The Kingdom appointed Mohammed Jamal Khalifa to serve as Director of those offices.  At the time of his appointment, the Kingdom was aware that Khalifa was a prominent veteran of the Afghan jihad and close associate of bin Laden.  Khalifa has affirmed that all of his activities as Director of the IIRO in the Philippines and Indonesia were carried out under the supervision and direction of the Saudi Embassy in the Philippines.

305.    Using IIRO funds and resources, Khalifa established an Islamic "school" called Dar al Imam al Sahfi'e, and personally selected and invited the most promising young Philippine jihadists to become students.  The curriculum of Dar al Imaam al Shafi'e was designed to indoctrinate the students in the most intolerant conceptualization of Wahhabi Islam, and prepare them to carry out jihad and terrorist activities as members of a covert organization.

306.    Simultaneously, Khalifa entered into negotiations with Abdurajik Janjalani, a local Islamist leader whom Khalifa had recruited to the Afghan jihad, regarding the establishment of an al Qaeda proxy in the Far East.  In basic terms, Khalifa offered to provide funding through the IIRO for a jihad organization to be headed by Janjalani, subject to Janjalani's agreement that the organization would take direction from al Qaeda.  The negotiations ultimately led to the establishment of Abu Sayyaf Group.  Khalifa filled the ranks of Abu Sayyaf with graduates of Dar ul Imaam al Sahfi'e, and using IIRO funds arranged for them to be trained in terrorist techniques at camps operated by MILF.  Khalifa gave certain Abu Sayyaf members ghost positions with the IIRO, typically as "da'awa instructors," to provide an income to support them while they carried out jihad.

307.    Since its formation through the patronage of the MWL/IIRO, the Abu Sayyaf Group has systematically targeted U.S. citizens in a series of kidnappings, bombings and brutal killings.  These include the beheading of an American citizen in 2001, the 2002 bombing of a bar

across the street from a United States military camp, and a 2009 bombing which killed two U.S. soldiers on a humanitarian mission.

308.     Beyond its role in establishing and supporting Abu Sayyaf, the IIRO used its Philippine and Indonesian offices to support the terrorist activities of 1993 World Trade Center Bomber Ramzi Youssef and 9/11 mastermind Khalid Sheikh Mohammed.  The plots developed by Youssef and Mohammed in conjunction with Khalifa and the IIRO included a plan to assassinate of Pope John Paul II during a January 1995 trip to the Philippines and a plot to simultaneously bomb multiple U.S. airliners as they flew from Asia to the United States, dubbed Operation Bojinka.  The Operation Bojinka plot served as inspiration for the September 11th Attacks.

309.     In Kosovo and Albania, the partnership between al Qaeda and the Saudi da'awa organizations more closely tracked the program implemented in Bosnia, owing to the similarity of the of the conflicts that drew al Qaeda to those regions.

310.     The conflict in Kosovo erupted in 1998, when ethnic Albanians in Kosovo demanded their independence from Serbia and the Kosovo Liberation Army came out in open rebellion against Serbian rule.

311.     As was the case in Bosnia, al Qaeda saw in the Kosovo conflict an opportunity to extend the global jihad and advance its strategic interests.

312.     Consistent with the model which had been applied in Afghanistan and Bosnia, the Saudi da'awa institutions quickly established physical operations in the region to support al Qaeda's intervention in the Kosovo conflict.  The Kingdom again established an umbrella organization, called the Saudi Joint Relief Committee for Kosovo and Albania, to coordinate Saudi Arabia's activities in the region.  In a move that plainly demonstrated the SJRC's true mission in the region, the Kingdom appointed Wa'el Jelaidan to serve as Director of the Pristina offices of the SJRC, thereby embedding a founding al Qaeda member in a powerful and pivotal role in the organization.  Contemporaneous to Jelaidan's appointment to his position in the SJRC by the government of the Kingdom, bin Laden described Jelaidan as a close associate in a widely

disseminated interview with al Jazeera.  Not surprisingly, Jelaidan promptly began using the
SJRC as a front for planning terrorist attacks against Western interests and moving men and
weapons into the region for bin Laden, according to the U.S. government.

313.    Within Africa, al Qaeda's charity partners worked closely with bin Laden to build
al Qaeda's infrastructure, and directly supported al Qaeda's military and terrorist operations
throughout the continent.  In this context, the SHC facilitated arms shipments to General
Mohammad Farah Hassan Aideed, the al Qaeda affiliated Somali warlord responsible for the
massacre of American troops during the Battle of Mogadishu, according to a Defense
Intelligence Agency Report.  The IIRO and al Haramain were, in turn, directly implicated in the
1998 African embassy bombings.

314.    In Europe and the United States, the Saudi da'awa organizations have focused
primarily on spreading al Qaeda's jihadist ideology, encouraging Muslim communities to reject
Western culture and values, recruiting Western Muslims to al Qaeda's cause, raising funds to
support al Qaeda's global jihad, and providing cover for the planning and execution of terrorist
attacks.  In explaining the role of the da'awa organizations in promoting the jihadist agenda in
Europe, the Dutch Intelligence Service explained as follows:

> The groups focusing on Dawa follow a long-term strategy of
> continuous influencing based on extreme puritanical, intolerant and
> anti-Western ideas.  They want Muslims in the West to reject
> Western values and standards, propagating extreme isolation from
> western society and often intolerance towards other groups in
> society.  They also encourage these Muslims to (covertly) develop
> parallel structures in society and to take the law into their own
> hands.

315.    As a complement to their financial, ideological and operational support for these
regional objectives and activities, the Saudi da'awa organizations provided a robust, secure and
consistent source of funding for al Qaeda's global infrastructure.  For example, a 1996 CIA
Report concerning the involvement of purported charities in the sponsorship of terrorism
indicates that the IIRO provided the funding for six al Qaeda training camps in Afghanistan.  Al

Haramain has separately been described by the U.S. government as a "principal" source of funding for al Qaeda.

316.    U.S. officials and knowledgeable experts have repeatedly confirmed the intersection among Wahhabi ideology, the activities of Saudi Arabia's government-controlled charities, and al Qaeda, in both sworn testimony and public statements:

> The Committee is also well aware that the challenges posed by terrorist financing from within Saudi Arabia are among the most daunting we have faced.  Wealthy Saudi financiers and charities have funded terrorist organizations and causes that support terrorism and the ideology that fuels the terrorists' agenda.  Even today, we believe that Saudi donors may still be a significant source of terrorist financing, including for the insurgency in Iraq.
>
> Saudi Arabia-based and funded organizations remain a key source for the promotion of ideologies used by terrorists and violent extremists around the world to justify their hate-filled agenda.
>
> Saudi Arabian charities, particularly the International Islamic Relief Organization (IIRO), the World Association of Muslim Youth (WAMY), and the Muslim World League (MWL) continue to cause us concern.

*Money Laundering and Terror Financing Issues in the Middle East*, Hearing Before the U.S. Senate Committee on Banking, Housing, and Urban Affairs (July 13, 2005), Testimony of Treasury Department Undersecretary for Terrorism and Financial Intelligence Stuart Levey.

> Saudi Arabia has been one of the most significant funding mechanisms for terrorist organizations, especially Al Qaeda.

*Money Laundering and Terror Financing Issues in the Middle East*, Hearing Before the U.S. Senate Committee on Banking, Housing, and Urban Affairs (July 13, 2005), Testimony of Dennis M. Lormel.

> It is widely known that the Saudi government has permitted and even encouraged fundraising by charitable Islamic groups and foundations that have been linked to known terrorist organizations.

*Saudi Arabia: Friend or Foe in the War on Terror*, Hearing Before the U.S. Senate Committee on the Judiciary (November 8, 2005), Statement of Senator Patrick J. Leahy.

> Troubling reports continue to question Saudi Arabia's efforts to curb terrorist financing.  Saudi officials have yet to clearly separate themselves from radical Islamic charities that seek to manipulate

> misperceptions of the US and its relations with Israel and to
> promote violence.

*Saudi Arabia: Friend or Foe in the War on Terror*, Hearing Before the U.S. Senate Committee on the Judiciary (November 8, 2005), Statement of Senator Russell D. Feingold.

> On May 23 of this year, just a few months ago, the Under
> Secretary of the Department of the Treasury, Stuart Levey, made
> this statement, quote, "In addition to the export of terrorist funds,
> we are extremely concerned about the export of terror ideologies.
> These teachings are as indispensable to terrorists as money and
> possibly even more dangerous.  We must do all we can to ensure
> that extremists' violent ideologies are not disseminated under the
> cover of religious organizations, charities, or schools."

*Saudi Arabia: Friend or Foe in the War on Terror*, Hearing Before the U.S. Senate Committee on the Judiciary (November 8, 2005), Statement of Senator Arlen Specter.

> Last month, the General Counsel of the Treasury Department
> testified before the Terrorism Subcommittee of the Judiciary
> Committee that in many cases Saudi Arabia is the "epicenter" of
> terrorist financing.  The Council on Foreign Relations report found
> that for years individuals and charities based in Saudi Arabia have
> been the most important source of funds for al-Qaeda and that for
> years Saudi officials have turned a blind eye to this problem.
>
> As our witnesses Ambassador Dore Gold and Steven Emerson will
> describe in some detail, there is evidence that enormous sums of
> money flow from Saudi individuals and charitable organizations to
> al-Qaeda, to Hamas, and other terrorist organizations.

*Terrorism Financing: Origination, Organization, and Prevention*, Hearing Before the U.S. Senate Committee on Governmental Affairs (July 31, 2003), Statement of Senator Susan M. Collins.

> Saudi government officials and prominent Saudi citizens have
> routinely contributed millions of dollars to Muslim charities which
> support terrorism, including supporting families of terrorists killed
> in bombings or other terrorist attacks.

*Terrorism Financing: Origination, Organization, and Prevention*, Hearing Before the U.S. Senate Committee on Governmental Affairs (July 31, 2003), Opening Statement of U.S. Senator Carl M. Levin.

> Using an elaborate network of mosques, schools, "charitable" and
> "humanitarian" organizations, and even official diplomatic
> facilities, Saudi Arabia has for years fostered the growth and
> spread of a militant doctrinal interpretation of Islam.  The ideology

of Wahhabism has been exported not only throughout the Middle East but throughout the world resulting in the indoctrination of anti-American, anti-Christian, anti-Semitic and anti-western hatred among new generations of militant Islamic youth.

Coupled with its virtually unlimited financial resources, the Wahhabi dawah invariably leads to acts of terror against non-Muslims and moderate Muslims alike.

For years, components of Saudi charities have been used to funnel money or divert resources to terrorist organizations.

*Terrorism Financing: Origination, Organization, and Prevention*, Hearing Before the U.S. Senate Committee on Governmental Affairs (July 31, 2003), Prepared Testimony of Steven Emerson and Jonathan Levin.

Today's hearing is the second in a series of hearings to investigate the roots of terrorist ideology, terrorist support networks, and state sponsorship – especially the continued financial support from Saudi Arabia – estimated at billions of dollars per year for nearly 40 years – and what the U.S. government can do to counter these terrorists and their supporters.

Saudi Arabia has a deep historical and symbiotic relationship with the radical Islamic ideology of Wahhabism.  The Saudis continue aggressively to export this intolerant and violent form of Islam to Muslims across the globe, and to inculcate it in the major institutions of Islam worldwide.

*Terrorism: Two Years After 9/11, Connecting the Dots*, Hearing Before the U.S. Senate Judiciary Subcommittee on Terrorism, Technology and Homeland Security (September 10, 2003), Statement of Senator Jon Kyl.

In order to maintain its leadership in the Islamic world, Saudi Arabia sends aid and builds mosques that spread its Wahhabi variant of Islam around the world.  Some of this money goes via official Saudi channels, some goes via what are claimed to be non-official channels, and some goes via Islamic charities linked to the Saudi government.  Each of these has been linked to al-Qaeda and Islamic terrorism.

The Saudi Foreign Ministry and its network of embassies provides a crucial structure for the propagation of Wahhabism and distributing state funds to support the growth of Wahhabism across the world.  Until 9/11 it was not widely realized that Saudi embassies had Islamic affairs departments charged with this role. Saudi Arabia depicts this role of their embassies in innocent terms. But here in Washington, funds from the ambassador's wife were

79

reaching Saudi individuals in California linked to 9/11.  And
several countries, including the US, have withdrawn diplomatic
credentials from Saudis working in Islamic affairs departments
because of links with terrorism.

*Terrorism: Two Years After 9/11, Connecting the Dots*, Hearing Before the U.S. Senate Judiciary
Subcommittee on Terrorism, Technology and Homeland Security (September 10, 2003),
Testimony of Simon Henderson.

> [M]ilitant Islamists command a disproportionate share of media
> and political attention as a result of substantial funding received
> from wealthy benefactors, led by the Saudis and their Wahhabi
> brand of Islam.  With deep pocketbooks and religious conviction,
> the Saudi Wahhabists have bankrolled a series of Islamic
> institutions in the United States that actively seek to undermine
> U.S. counterterrorism policy at home and abroad.  In the United
> States, the Saudi Wahhabis regularly subsidize the organizations
> and individuals adhering to the militant ideology espoused by the
> Muslim Brotherhood and its murderous offshoots Hamas,
> Palestinian Islamic Jihad and al-Qaeda, all three of which are
> designated terrorist organizations.

> Several of these U.S. based organizations drawing Saudi support
> have recently been shuttered and many of their leaders indicted.

*Terrorism: Two Years After 9/11, Connecting the Dots*, Hearing Before the U.S. Senate Judiciary
Subcommittee on Terrorism, Technology and Homeland Security (September 10, 2003),
Testimony of Matthew Epstein.

> I have testified before that Saudi Arabia has been an "epicenter" of
> terrorist financing.

*Efforts to Combat Terrorism Financing*, Hearing Before the U.S. Senate Committee on Banking,
Housing and Urban Affairs (September 25, 2003), Testimony of former Treasury Department
General Counsel David D. Aufhauser.

> I want to focus for a moment one of the primary topics examined
> in the report and that is the role of Saudi Arabia.  Right now, Saudi
> Arabia has two primary exports to the rest of the world: oil and an
> extreme form of Islam that advocates hatred and violence to
> achieve its ends.

> The report before us today does not shy away from this reality.  It
> describes "the fundamental centrality persons and institutions
> based in Saudi Arabia have had in financing militant Islamist
> groups on a global basis."  It repeats a statement made in its earlier
> report:  "It is worth stating clearly and unambiguously what
> official U.S. government spokespersons have not:  For years,

individuals and charities based in Saudi Arabia have been the most important source of funds for al-Qaeda; and for years, Saudi officials have turned a blind eye to this problem."

*An Assessment of Current Events to Combat Terrorism Financing*, Hearing Before the U.S. Senate Committee on Governmental Affairs (June 15, 2004), Statement of Senator Carl M. Levin.

As a core tenet of its foreign policy, Saudi Arabia funds the global propagation of Wahabism, a brand of Islam that, in some instances, supports militancy by encouraging divisiveness and violent acts against Muslims and non-Muslims alike.  We are concerned that this massive spending is helping to create the next generation of terrorists and therefore constitutes a paramount strategic threat to the United States.  Through the support for madrassas, mosques, cultural centers, hospitals, and other institutions, and the training and export of radical clerics to populate these outposts, Saudi Arabia has spent what could amount to hundreds of millions of dollars around the world financing extremism.  Such Saudi financing is contributing significantly to the radicalization of millions of Muslims in places ranging from Pakistan to Indonesia to Nigeria to the United States.

*An Assessment of Current Events to Combat Terrorism Financing*, Hearing Before the U.S. Senate Committee on Governmental Affairs (June 15, 2004), Statement of Lee S. Wolosky.

317.    Diplomatic cables authored by senior U.S. officials in the years following the September 11th attacks have reported on the continuing problem of Saudi charities engaging in illicit and criminal activities to fund and support terror organizations such as al Qaeda, Abu Sayyaf Group, Jemaah Islamiya, Hamas and others.

318.    A February 12, 2010 cable from the U.S. Embassy in Riyadh advises that "[t]errorist funding emanating from Saudi Arabia remains a serious concern."

319.    According to a December 30, 2009 diplomatic cable originating from Secretary of State Hillary Clinton's office, titled *Terrorist Finance: Action Request for Senior Level Engagement on Terrorism Finance*, "it has been an on-going challenge to persuade Saudi officials to treat terrorism financing emanating for Saudi Arabia as a strategic priority." Secretary Clinton adds that "donors in Saudi Arabia constitute the most significant source of funding to Sunni terrorist groups worldwide,"  and further warns that "organizations such as the

International Islamic Relief Organization (IIRO), Muslim World League (MWL) and the World Assembly of Muslim Youth (WAMY) … continue to send money overseas and, at times, fund extremism overseas."

320.    An April 1, 2009 diplomatic cable from the U.S. Embassy in Sudan to the office of Secretary Clinton identifies "the World Assembly of Muslim Youth" and "Al-Haramayn" as organizations in that country with links to terrorist groups, including al Qaeda, Hamas, Hezbollah, and Palestinian Islamic Jihad.

321.    A March 25, 2009 cable from the U.S. Embassy in Riyadh titled *Saudi Ministry of the Interior on Terrorist Financing Issues*, advises that because of "concerns about Saudi-based non-governmental organizations (NGOs) financing terrorist networks," the United States government continues "to look strategically at entities such as the International Islamic Relief Organization, the World Assembly of Muslim Youth, and Hamas as organizations of concern."

322.    A March 12, 2009 cable from the U.S. Embassy in Uganda advises that organizations operating in that country, such as the MWL and IIRO, have connections to transnational terrorism and have relationships with al Qaeda.

323.    A March 2, 2009 cable from the U.S. Embassy in Sana'a to the office of Secretary Clinton identifies the IIRO, WAMY and Al Haramain as Saudi organizations in Yemen that have a relationship with terrorist groups in that country, including al Qaeda, Egyptian Islamic Jihad, Hamas and Palestinian Islamic Jihad.

324.    An August 21, 2008 cable from the U.S. embassy in Indonesia identifies Muhammad Thalib, "a commission member of the Muslim World League since 1989," as the new leader of the Majelia Mujahiddin Council.  The Council operates as the political wing of the terrorist organization Jemaah Islamiya.

325.    A March 24, 2008 cable from Secretary of State Condoleezza Rice's office identifies "the World Assembly of Muslim Youth and the Muslim World League" as organizations with ties to terrorist organizations.

326.    A February 13, 2007 cable originating from the U.S. Embassy in Khartoum, Sudan, identifies the IIRO as "one of the major Saudi Arabian humanitarian organizations suspected of maintaining links with al-Qaeda."  According to the U.S. government, "Usama bin Ladin used the entire IIRO network for his terrorist activities."

327.    A June 16, 2006 cable from the office of Secretary Rice, titled *Terrorism Financing: International Islamic Relief Organization (IIRO)*, states that "the United States is also aware of IIRO's significant illegitimate and illegal activities that fund terrorist activity.  We have been concerned about IIRO for many years now and have shared our concerns with the Government of Saudi Arabia on a regular basis."

328.    An October 11, 2005 diplomatic cable titled *Islam and Islamic Extremism in Bulgaria*, states that "the Bulgarian branch of the Saudi-based International Islamic Relief Organization (IIRO)" is linked to "the Muslim Brotherhood, Al Qa'ida, and other extremist groups."

329.    A May 23, 2005 cable titled, *Islamic NGOs in the Philippines*, details the IIRO's illicit activities:  "Operated by Usama Bin Laden's brother-in-law, Saudi businessman Mohammed Jamal Khalifa, and with links to captured al-Qaeda lieutenant Khalid Shaikh Mohammed, the IIRO served as a legal front to conceal the transfer of al-Qaeda funding and material to the Abu Sayyaf Group and possibly other insurgents or terrorists operating in the Philippines."

330.    A June 2004 cable originating from Secretary of State Colin Powell's office similarly describes the IIRO's support for al Qaeda and the Abu Sayyaf terrorist group. According to the cable:  "The USG believes that some elements of the International Islamic Relief Organization (IIRO) have been exploited by terrorists and their financiers as a means of transferring assets, providing organizational cover, or otherwise supporting extremist, violent operations."  The cable further states the "IIRO has been cited as the principal sponsor of terrorist training camps in Afghanistan during the Taliban regime.  IIRO has also been cited as the conduit for funds from Usama Bin Laden to terrorist organizations, specifically that the Abu

Sayyaf cell in Manila was founded with money sent by Bin Laden to Mohamed Jamal Khalifa through IIRO."

331.    An April 2004 cable from Secretary Powell's office states that the IIRO is "tied to al-Qaida and other terrorist organizations.  For example, IIRO has been cited as the principal sponsor of terrorist training camps in Afghanistan during the Taliban regime.  IIRO has also been cited as the conduit for funds from Usama Bin Laden to terrorist organizations, specifically that the Abu Sayyaf cell in Manila was founded with money sent by Bin Laden to Mohamed Jamal Khalifa through IIRO."

332.    The pervasive involvement of the government of Saudi Arabia in sponsoring al Qaeda's global jihad through its state controlled da'awa organizations is further demonstrated by the facts and evidence set forth below as to each of those organizations.  By virtue of their status as agents and alter-egos of the Saudi government, the terror sponsorship activities of these organizations, as described herein, are properly viewed as activities of the Saudi government itself, and attributable to the Kingdom for purposes of both subject matter jurisdiction under the FSIA, and substantive liability.  As discussed previously and below, the support provided by the Kingdom's charity agents and alter-egos was singularly important to al Qaeda's growth and sustainment in the years leading up to the September 11th Attacks, and essential to al Qaeda's development of the global strike capabilities employed to carry out the September 11th Attacks.

## THE MUSLIM WORLD LEAGUE

333.    Founded in 1962 by the Kingdom of Saudi Arabia, the Muslim World League ("MWL") is among the world's largest Islamic charitable organizations, with offices in more than thirty (30) countries.  The MWL serves as an umbrella organization for a number of other Islamic charities, commonly referred to as bodies or members of the League, including the International Islamic Relief Organization ("IIRO"), World Assembly of Muslim Youth ("WAMY"), Al Haramain Islamic Foundation, Al Haramain Al Masjed Al Aqsa Foundation, and Rabita Trust, among others.

334.    The MWL is a controlled agent and alter-ego of the Kingdom of Saudi Arabia.
The Kingdom controls and directs MWL operations, appoints and terminates MWL personnel,
provides the MWL with virtually all of its funding, determines how funds will be distributed
throughout the world, and otherwise stringently controls the MWL's operations.  In many
countries, MWL conducts operations from the local Saudi embassy, under the supervision of the
embassy's Islamic Affairs Division.

335.    Senior officials of the MWL have expressly acknowledged that the MWL and its
subsidiary bodies are agents and alter-egos of the Saudi government.

336.    According to the affidavit testimony of Ali Mohammed al Kamal, Manager for
Financial Affairs of the MWL, "the MWL's policies are established by its Constitutive Council,
which is chaired by the Grand Mufti of Saudi Arabia.  The MWL's daily operations are
conducted and supervised by its General Secretariat, which is headed by a Secretary General
appointed by the Constitutive Council based on a nomination by the Saudi Government.  The
MWL's annual budget is $80 million Saudi Riyals, which is funded by an annual grant from the
Saudi Government."

337.    Abdulaziz H. al Fahd, a member of the Saudi Council of Ministers, confirmed in a
separate affidavit that organizations such as the MWL and World Assembly of Muslim Youth
are headed by Saudi officials, and that the Saudi government uses its da'awa organizations as
tools to spread Wahabbi Islam outside of Saudi Arabia.

338.    Abdullah bin Saleh al Obaid, Secretary-General of the Muslim World League
from 1995 through 2000, has similarly affirmed the intimate relationship between the
government of Saudi Arabia and MWL, explaining in an affidavit that the MWL is "sponsored
and financially supported by the Saudi Government," and that he was appointed to his position as
the Secretary General of the MWL by Royal Decree.

339.    In a 1984 edition of the *Muslim World League Journal*, then MWL Secretary
General, Dr. Abdullah Omar Nasseef, briefly discussed the relationship between the MWL and
Government of Saudi Arabia, noting that the Kingdom founded the League "in order to serve"

the Ummah throughout the World and that the MWL receives an annual budget from the
Kingdom.

340.     Arafat El Asahi, the Director of IIRO in Canada and a full-time employee of the
Muslim World League, was even more explicit concerning the Kingdom's absolute domination
of the MWL and IIRO during testimony in a Canadian immigration proceeding captioned
*Minister of Citizenship and Immigration v. Mahmoud Jaballah*, Federal Court of Canada, Docket
DES-6-99, stating under oath as follows:

> Q:  During those eight years that you have been with the IIRO here
> in Canada, have you ever heard anything to the effect that the
> Canadian government has any concern whatsoever with respect to
> your office?
>
> A:  Let me tell you one thing, the Muslim World League, which is
> the mother of IIRO, is a fully government funded organization.  In
> other words, I work for the government of Saudi Arabia.  I am an
> employee of that government.  Second, the IIRO is the relief
> branch of that organization which means that we are controlled in
> all of our activities and plans by the government of Saudi
> Arabia.  Keep that in mind, please. . .I am paid by my organization
> which is funded by the [Saudi] government . . . The [IIRO] office,
> like any other office in the world, here or in the Muslim World
> League, has to abide by the policy of the Government of Saudi
> Arabia.  If anybody deviates from that, he would be fired; he
> would not work at all with IIRO or with the Muslim World
> League.

341.     Consistent with the statements of its senior officials, the MWL has asserted in
pleadings filed in American court proceedings that it is an "instrumentality" of the government
of Saudi Arabia.

342.     The MWL's close affiliation with Osama bin Laden and other high ranking al
Qaeda officials dates to the 1980's.  During the war against the Soviet occupation of
Afghanistan, Abdullah Azzam, bin Laden's spiritual mentor and partner in Makhtab al Kidhmat,
headed the office of the MWL in Peshawar, Pakistan, which served as the rear base for
mujihadeen operations.  That office was thereafter led by Wa'el Jelaidan, who also served as
Director General and a member of the Board of Trustees of Rabita Trust, a financial arm of the

MWL.  Wa'el Julaidan is a founding member of al Qaeda.  On September 6, 2002, the United States Department of Treasury designated Jelaidan as a Specially Designated Global Terrorist pursuant to Executive Order 13224.  The Treasury Department statement regarding the designation provided as follows:

> Wa'el Hamza Julaidan, a Saudi citizen, is an associate of Osama bin Laden.  Julaidan fought with bin Laden in Afghanistan in the 1980s.  Julaidan is also associated with several individuals and entities linked to al Qaida, including bin Laden's lieutenants, Ayman al Zawahri, Abu Zubaida, and Mohammed Atef; and the organizations: Maktab al Khidmat, the Rabita Trust, and al-Gamma al Islamiya.  These individuals and entities have been previously designated under President Bush's Executive Order and by the United Nations.

> Bin Laden himself acknowledged close ties to Julaidan during a 1999 interview with al-Jazeera TV.  When referring to the assassination of al Qaida co-founder Abdullah Azzam, bin Laden stated that  "we were all in one boat, as is known to you, including our brother, Wa'el Julaidan."  Julaidan has established contacts with several known Islamic extremists, including bin Laden's principal lieutenant, Ayman al-Zawahri.  Another bin Laden lieutenant, Abu Zubaida, claimed that he had accompanied Julaidan from Pakistan to Kandahar, Afghanistan during the summer of 2000.  Zubaida said that Julaidan met with bin Laden and senior bin Laden lieutenant Mohammed Atef soon after arriving in Kandahar.

> In February 2000, Julaidan was appointed to the Board of Trustees of the Rabita Trust and served as its director general. The Rabita Trust is an NGO designated under President Bush's Executive Order as an organization that provided logistical and financial support to al-Qa'ida.

> ## BASIS FOR DESIGNATION

> The United States has credible information that Wa'el Hamza Julaidan is an associate of Osama bin Laden and several of bin Laden's top lieutenants.  Julaidan has directed organizations that have provided financial and logistical support to al-Qa'ida.  Accordingly, the United States is designating Julaidan under Executive Order 13224 as a person who supports terror.

343.     Consistent with bin Laden's plan to adapt the network established for the Afghan resistance to support al Qaeda's global jihad, al Qaeda has from its establishment used the MWL as a front to conceal the terrorist organization's existence and true purpose, as confirmed by documents seized throughout the world in conjunction with investigations into al Qaeda's global support infrastructure.

344.     Internal al Qaeda documents chronicling the formation of the organization, seized during a 2002 raid of the Sarajevo office of an al Qaeda front, the Benevolence International Foundation ("BIF"), confirm that al Qaeda planned from its inception to use the MWL and its subsidiary bodies, to include the IIRO, to provide support and cover for al Qaeda's operations. A BIF computer file named "Tareekh Osama" (or "Osama's History") contained numerous documents regarding al Qaeda's formation and the participation of purported Islamic charities in al Qaeda's support infrastructure, including the MWL and IIRO.

345.     For instance, the files include a document on MWL/IIRO letterhead detailing a meeting between Abu Abdullah (a/k/a "Osama bin Laden"), Dr. Abdullah Omar Naseef, in his capacity as the Secretary General of the MWL, and others where it was agreed that al Qaeda attacks would be launched from MWL offices:  "And if he is being subjected to any pressures, let it be a secret (*agreement*), in a way that [Muslim World] League offices will be opened as (*illegible*) for the Pakistanis, and the attacks will be launched from the (*these offices*) …").

346.     As the senior most official of the MWL and as a member of the Saudi government's Majlis al Shura, the advisory body to the Saudi King, Naseef had systematic interaction and dealings with the Kingdom's most senior officials, including senior members of the Saudi Royal Family.

347.     Dr. Naseef was also a member of the Board of Directors of Faisal Islamic Bank-Sudan ("FIBS"), which has long provided financial services and other forms of material support to terrorist organizations, including al Qaeda.  FIBS was implicated as an al Qaeda bank during the 2001 U.S. trial relating to the 1998 U.S. Embassy bombings in Kenya and Tanzania.  FIBS

was also one of the main founders of the Al Shamal Islamic Bank, the Sudanese bank Osama bin Laden helped establish in 1991 by providing $50 million in capital.

348.     During the 2002 searches of BIF's offices, investigators also recovered a list of orders from Osama bin Laden regarding the management of Islamic charities.  On point 10 of his list, bin Laden urges the creation of a committee to receive and distribute donations to al Qaeda, and suggests the participation of the MWL, SRC and IIRO.

349.     Another al Qaeda document seized during the March 2002 raids, written on the joint letterhead of the MWL and IIRO, suggests using the name of the "League" as "an umbrella which you can stay under."

350.     Consistent with this plan, as head of the MWL, Dr. Naseef approved the appointment of Mohammed Jamal Khalifa, a founding al Qaeda member and Osama bin Laden's brother-in-law, to open a joint MWL/IIRO branch office in the Philippines contemporaneous with the formation of al Qaeda.  As a result of that appointment, Khalifa was able to use the MWL/IIRO office as a platform for al Qaeda's expansion into Southeast Asia, and provide funds and other support for the 1993 World trade Center bombing and the 1995 "Bojinka" plot to simultaneously bomb multiple airlines while in transit to the United States.  The Bojinka plot was conceived by September 11th mastermind Khalid Sheikh Mohammed, and was a precursor to the September 11th attacks.

351.     Khalifa was tried in absentia by a Jordanian court for his involvement in a 1994 attack on a movie theater in Amman, Jordan by a local terrorist cell.  One of Khalifa's co-defendants in that case, Abdul al Hasheikeh, testified at length concerning the impressive terrorist platform Khalifa established in the Far East through the MWL and IIRO.  Al Hasheikh explained that he traveled from Jordan to the Philippines in July 1993 to meet with Khalifa and request his support for the Jordanian terrorist cell.  According to al Hasheikeh:  "The principal of the League's office in the Philippines is the named Mohammed Gamal Khalifa, a Saudi citizen, who is the in-law of Osama Ben Laden, a wealthy Saudi, who supports extremist Islamic organizations around the world and has training camps in Yemen."

352.    Al Hasheikeh testified that Khalifa established a terrorist training academy in the Philippines under the auspices of the IIRO called Dar ul Imam al Shafi'e, and that Khalifa recruited al Hasheikh to work as a teacher at the school.

353.    Khalifa was detained by U.S. law enforcement officials on December 16, 1994 by U.S. law enforcement officials as he was returning to the Philippines from San Francisco, California.  Documents found in Khalifa's possession at the time of his arrest confirm al Hasheikheh's testimony, detailing that students at the Dar al Imam al Shafi'e received training in assassination, kidnapping, bombing churches, martyrdom operations, methods of torture, explosives and weapons.

354.    As al Qaeda developed and expanded its operations into new geographical regions over the years, the MWL extended its infrastructural support accordingly.  In Bosnia, for instance, the MWL was instrumental in transferring hundreds of millions of dollars to al Qaeda and the Arab mujihadeen in that region, including military equipment and weapons.

355.    As a "beacon" of Wahhabi ideology and propagation, the MWL took a leading role in rallying Muslims throughout the World to support al Qaeda's Bosnian jihad as well.  In the April 20, 1992 edition of the *Al Alam Al Islami*, the Arabic edition of the MWL Journal, the MWL published an article by Isma'il Fath Alh Salamah calling for the Islamic world to prepare an army for jihad for Allah.  In the article, Salamah incites readers to fight all infidels, calls on them to gather weapons, and quotes militant verses praising jihad and terrorizing the enemies of Islam.  In the August 10, 1992 edition of the *Al Alam Al Islami*, the MWL published a fatwa issued by Sheikh Muhmmad al Ghazali in reference to Bosnia.  Al Ghazali's fatwa warns that any Muslim ignoring the plight of the Muslims in Bosnia is an infidel, and further asserts that the duty to help Muslims in Bosnia is a religious one akin to jihad.  An article in the April 19, 1993 edition of *Al Alam Al Islami* similarly advocates that the first step to saving Bosnia is to equip the jihad fighters in Bosnia with everything necessary for jihad for Allah.

356.    MWL officials, including then Secretary General of the MWL, Dr. Abdullah Omar Naseef, have similarly issued statements calling for Muslims to support jihad in Bosnia

and other regions of strategic importance to al Qaeda.  For instance, in the April 17, 1992 edition of *Al Alam Al Islami*, Secretary General Naseef issued an announcement relating to the state of Muslim affairs in countries such as Bosnia-Herzegovina, the Philippines, Kashmir, Somalia, and Burma, stating that Muslims can have a role in caring for their Muslim brothers in these countries by carrying out jihad with their money and lives.  At the time of that statement, al Qaeda was engaged in ongoing efforts to promote jihad in each of those countries.

357.    Intent on spreading the message that Muslims have a duty to carry out jihad in support of their Muslim brothers, Dr. Naseef sent a letter to the Saudi Arabian Minister of Religious Affairs in October 1992 advising of the recent recommendation from the "Conference of the Mosque's Message" that Friday sermons in the mosques should be used to spread belief in Allah and the study of the Islamic religion.  Dr. Naseef recommended in his letters that Friday sermons should be used to revive the spirit of jihad.

358.    At an April 1993 press conference in Cairo, Dr. Naseef again stressed the importance of providing money and weapons to Muslims in Bosnia.  According to Naseef:  "We cannot solve the problem of Bosnia with talks and not with action.  We must act in all manners possible to equip the Muslims in Bosnia with financial support and military equipment."

359.    In May 1993, Dr. Naseef released a statement thanking Saudi Arabia's King Fahd for his contribution of $20 million which would be used for immediate relief of Muslims in Bosnia so that they may continue their jihad against the Serbs.

360.    Dr. Naseef similarly called on Muslims to support the Palestinian Intifada against Israel.  In the March 23, 1992 edition of the *Al Alam Al Islami*, the MWL published a manifesto issued by Dr. Naseef urging Muslims to support jihad and the Palestinian Intifada, and further directing donations be deposited into a MWL bank account to support the Intifada.  The bank account was identified as being at the National Commercial Bank, Account No. 01/14807000107.

361.    Ahmad Muhammad Ali, the MWL's Secretary General following Dr. Nassef, also called on Muslims to help the Bosnian people with funds and weapons.

362.   The MWL also played a role in supporting the 1998 U.S. Embassy bombings in Kenya and Tanzania.  While working for the MWL in Kenya, Ihab Ali relayed messages between Osama bin Laden and Wadi El Hage in connection with the coordination of the bombings of the U.S. embassies.  El Hage, who was convicted for his role in the embassy bombings, was himself at one time an employee of the MWL.

363.   The MWL also provided direct financial assistance to al Qaeda members involved in the attempted assassination of Egyptian President Hasni Mubarak in 1995.

364.   The MWL was further implicated in a terrorism finance investigation conducted jointly by the U.S. Department of Justice and the government of Spain.  According to diplomatic cables authored by the State Department in June 2005, money was transferred by the Saudi Embassy in Madrid to the MWL, which in turn transferred the funds to the Islamic Cultural Center ("ICC"), a prominent Islamic institution located in Madrid.  Several million dollars that flowed through three accounts managed by the ICC between 1998 and 2003 were suspected of being "diverted to persons suspected of supporting international jihadist activities."

365.   The MWL further sponsored al Qaeda through its participation in the Saudi Joint Relief Committee for Kosovo and Chechnya ("SJRC"), a body established by the Kingdom of Saudi Arabia to coordinate ostensible relief efforts among several charitable organizations under its control and direction in Kosovo and Chechnya.  The other purported charities compromising the SJRC include the International Islamic Relief Organization, Saudi Red Crescent Society, World Assembly of Muslim Youth, al Haramain Foundation, Islamic Endowments and Makk Establishment, among others.

366.   The United Nations' mission in Kosovo declared that the SJRC in Pristina, Kosovo served as a cover for several al Qaeda operatives, including Adel Muhammad Sadi bin Kazam and Wa'el Hamza Julaidan, both of whom served as directors of the SJRC.

367.   Between 1998 and 2000, the Kingdom of Saudi Arabia, through the SJRC, diverted more than $74 million to al Qaeda members and loyalists affiliated with SJRC bureaus.

Throughout this time, the Committee was under the supervision and control of Saudi Interior Minister Prince Naif bin Abdul Aziz.

368.     MWL officials have publicly acknowledged the organization's funds were being funneled to terrorist organizations.  In an interview with Dr. Abdullah bin Saleh al Obaid, Secretary General of the MWL, published in *The Muslim World* magazine on July 21-27, 1997, al Obaid was asked about reports that the MWL's funds were being funneled to extremist groups. Al Obaid responded:  "This is a closed chapter ….  It has already been proven that there were people who exploited the situation and misused some funds …."

369.     Despite Dr. Obaid's public admission, the State Department has made clear that "it has been an on-going challenge to persuade Saudi officials to treat terrorism financing emanating for Saudi Arabia as a strategic priority."  According to a December 30, 2009 diplomatic cable originating from Secretary of State Hillary Clinton's office, titled *Terrorist Finance:  Action Request for Senior Level Engagement on Terrorism Finance*, "donors in Saudi Arabia constitute the most significant source of funding to Sunni terrorist groups worldwide." Secretary Clinton further warned that "organizations such as the International Islamic Relief Organization (IIRO), Muslim World League (MWL) and the World Assembly of Muslim Youth (WAMY) … continue to send money overseas and, at times, fund extremism overseas."

370.     As further detailed herein, the MWL has also provided substantial material support and resources to al Qaeda through its subsidiary bodies, including the IIRO, WAMY, and Rabita Trust.

### INTERNATIONAL ISLAMIC RELIEF ORGANIZATION

371.     The International Islamic Relief Organization ("IIRO") is a subsidiary body of the Muslim World League ("MWL"), with offices throughout the globe.

372.     Like the MWL, the IIRO is a controlled agent and alter-ego of the Kingdom of Saudi Arabia.  The Kingdom controls and directs IIRO operations, appoints and terminates IIRO personnel, provides the IIRO with virtually all of its funding, determines how funds will be

distributed throughout the world, and otherwise stringently controls the IIRO's operations.  In many countries, IIRO conducts operations from the local Saudi embassy, under the supervision of the embassy's Islamic Affairs Division.

373.    Senior officials of the IIRO have expressly acknowledged that the IIRO and the other subsidiary bodies of the MWL are agencies, instrumentalities and organs of the Kingdom of Saudi Arabia.  According to the affidavit testimony of the Manager of Financial Administration of the IIRO, Saleh Abdullah al Saykan, himself a Saudi government official, the IIRO was "established by the Muslim World League in 1978," and "is governed by a 15-member Board of Directors chaired by the Secretary General of the Muslim World League, who is nominated by the Saudi Arabia Government."

374.    The IIRO's Annual Reports further document the direct involvement of senior Saudi Government officials in the "supervision," and "direction" of the IIRO offices within Saudi Arabia, which in turn supervise and direct the activities of the IIRO branch offices abroad.

375.    As referenced above, IIRO's relationship with al Qaeda also grew out of IIRO's participation in the Afghan jihad in the 1980s, during which the IIRO worked within the network of ostensible charities to support the mujihadeen.  During the conflict Wa'el Hamza Jelaidan ran the IIRO offices in Peshawar, Pakistan, and was a leading supporter of jihad through the relief organization network.  As a member of al Qaeda, Jelaidan remained in the Saudi da'awa infrastructure, serving as the director of the IIRO's Peshawar, Pakistan offices, an officer of the MWL, and later as a director of the SJRC.

376.    With the formation of al Qaeda, Jelaidan and the al Qaeda leadership continued to draw on the IIRO to support al Qaeda's global jihad, as documented by the previously discussed documents chronicling al Qaeda's formation.

377.    According to Jamal al Fadl, a former al Qaeda official who became a cooperating witness for the United States and testified at length in the African Embassy bombing trials, the IIRO provided false identification cards to al Qaeda members to enable them to cross the Pakistan-Afghanistan border for training at al Qaeda camps.  Additionally, a June 2, 2004 FBI

report summarizing an interview with al Fadl states that the IIRO office in Peshawar, under Jelaidan's leadership, facilitated the purchase of weapons for al Qaeda.  According to the FBI report, "Julidan was one of Bin Laden's closest friends at the time."

378.     Other representatives of the IIRO in Pakistan provided funds for salary, travel and health benefits for al Qaeda members.  For instance, the IIRO's branch office in Pakistan was managed by Abu Hamam al Saudi, who was also Osama bin Laden's cousin.  Al Saudi would transfer IIRO funds to Madani al Tayyib, who would then distribute the amounts to individuals who were in charge of salary, travel, and health benefits for al Qaeda.

379.     The IIRO also played a critical role in supporting al Qaeda's expansion into the Far East, as discussed previously.

380.     Using IIRO funds and resources, Mohammed Jamal Khalifa established a network of charities, businesses, and Islamic institutions in the Philippines to support international terrorism.  To assist Khalifa, Ramzi Yousef, a bomber of the World Trade Center in 1993, and Wali Khan Amin Shaw, also an IIRO employee in Pakistan, came to the Philippines.  Yousef began training Philippine terrorist groups in bomb-making, while also conducting further research and refining his bomb-making technique.

381.     While working as the Director of the IIRO's Philippines branch, Khalifa maintained close connections with al Qaeda and employed members of the Abu Sayyaf Group, the al Qaeda proxy organization established by Khalifa using IIRO funds.  According to a U.S. Department of the Treasury memorandum detailing the designation of the IIRO's Philippine and Indonesian branch offices and a senior IIRO official in Saudi Arabia: "The Abu Sayyaf Group [ASG] is the most violent of the separatist groups operating in the Southern Philippines and was designated as an SDGT pursuant to E.O. 13224 on September 24, 2001.  It was formed in the early 1990's and received support and seed money from al Qaida."

382.     According to the U.S. government, one of the plots devised by Ramzi Yousef in conjunction with Khalifa and the IIRO office was to assassinate Pope John Paul II during a planned January 1995 visit to the Philippines and to simultaneously attack multiple U.S. airliners

95

as they flew over the Pacific Ocean from Asia to the United States (the "Operation Bojinka" plot).  According to a 1996 Central Intelligence Agency report regarding the involvement of Islamic charities in the sponsorship of terrorism, the "former head of the IIRO office in the Philippines, Mohammed Jamal Khalifa, has been linked to Manila-based plots to target the Pope and U.S. airlines; his brother-in-law is Usama Bin Ladin."  The CIA report further states that another high-ranking IIRO official in the Philippines leads Hamas meetings and that the majority of Hamas members in the Philippines are employed by the IIRO.  Moreover, the "IIRO helps fund six militant training camps in Afghanistan," including camps from which al Qaeda planned, approved and coordinated the September 11th Attacks, and at which some or all of the September 11 hijackers received indoctrination and training.

383.    As mentioned above, American law enforcement officials detained Khalifa on December 16, 1994, as he was returning to the Philippines from San Francisco, California.  FBI documentation relating to his arrest identifies Khalifa as a "Known Terrorist."  Traveling with Khalifa at the time of his detention was Mohamed Loay Bayazid, an al Qaeda founding member and top official who had tried to purchase uranium on behalf of al Qaeda.

384.    At the time of his arrest, the FBI discovered a trove of information in Khalifa's possession including documents referring to the plot to kill Pope John Paul II, as well as documentation identifying the curriculum for the Dar al Imam al Shafi'e in the Philippines. These documents confirmed that students at the school received training in assassination, kidnapping, bombing churches, martyrdom operations, methods of torture, explosives and weapons.

385.    Jamal al Fadl identified Khalifa as a close associate to Osama bin Laden.  During testimony as a cooperating witness for the United States, al Fadl stated that he knew Khalifa by his alias ("Abu Bara"), "who was close to bin Laden."  According to al Fadl:  "Hammam [IIRO's branch manager in Pakistan], Bara, and bin Laden are part of the group that has been around a long time."

386.    In connection with immigration proceedings following Khalifa's arrest, Philip C. Wilcox, Jr., the Department of State's Coordinator for Counterterrorism, submitted several letters to the immigration judge urging for Khalifa's continued detention.  In a December 16, 1994 letter, Wilcox advised the Court that Khalifa financed a 1994 attack on a Jordanian movie theater, and that "the United Stated Government has evidence that Muhammad Jamal Khalifa, who has lived in the Philippines for a number of years, has provided financial support to the Philippine terrorist group Abu Sayyaf.  We also have information that while in the Philippines he has been involved in organizations closely linked to Hamas…."

387.    In a December 20, 1994 letter the Court, Wilcox asserted that (i) Khalifa has provided support to terrorist groups in the Philippines; (ii) Khalifa has helped organize efforts by former fighters in Afghanistan to provide training and assistance to terrorists in the Philippines; (iii) Khalifa has extensive ties to Hamas; and (iv) Khalifa has ties to the terrorist organization Gama't Islamiya.

388.    Department of State cables following Khalifa's detention in the United States further detail Khalifa's and the IIRO's support for terrorist organizations and their activities in the Philippines and Afghanistan.  For instance, a July 1994 cable from the American Embassy in Amman, Jordan concerning the Jordanian cinema bombing trial states that one of the defendants in the case worked "in the Imam al-Shafi center led by Muhammad Jamal Khalifa, another defendant who is an in-law of Saudi financier Usama Bin-Ladin."

389.    A December 1994 cable from the Secretary of State Warren Christopher's office states: "Khalifa is an officer of an Islamic NGO in the Philippines that is a known Hamas front and has financed terrorist operations.  Khalifa is reported to be the brother in law of Usama Bin Laden, the Sudan-based financier of Islamic extremists.  Khalifa is believed to have provided support to the Philippine terrorist group Abu Sayyaf."  An additional December 1994 cable from the Secretary of State's office states that Khalifa is a "known financier of terrorist operations and an officer of an Islamic NGO in the Philippines that is a known Hamas front."

390.    An April 1995 cable from the American Embassy in Amman, Jordan to Secretary of State Warren Christopher discusses an attack by Abu Sayyaf Group, with possible assistance from Moro Islamic Liberation Front and Moro National Liberation Front, which left 53 people dead.  According to the cable:  "President Ramos said that Prime Minister Bhutto had disclosed to him the existence of training camps in Afghanistan where international terrorists, including ASG, are being trained …. Mohammed Jamal Khalifa, the former head of the International Islamic Relief Organization in Manila, [i]s a principal financier of Abu Sayyaf."

391.    In an August 1993 interview concerning the Moro Islamic Liberation Front's call for jihad against the Philippine government, Sheikh Savila Salih, who was in charge of MILF's religious rulings, confirmed that MILF also received support from the IIRO:  "The IIRO and other Islamic bodies who deal with the da'awa and aid, are the leaders of those who give the Front considerable support and are deserving of their gratitude."

392.    An October 2001 cable from the Secretary of State Colin Powell's office states that "Philippine authorities reported that Saudi national Muhammad Jamal Khalifa who ran two Islamic nongovernmental organizations in Manila was the major financier of the terrorists arrested there.  Khalifa who has also been implicated in terrorist activities in Jordan is Bin Ladin's brother-in-law."

393.    An April 2004 cable from Secretary of State Colin Powell states that the IIRO is "tied to al-Qaida and other terrorist organizations.  For example, IIRO has been cited as the principal sponsor of terrorist training camps in Afghanistan during the Taliban regime.  IIRO has also been cited as the conduit for funds from Usama Bin Laden to terrorist organizations, specifically that the Abu Sayyaf cell in Manila was founded with money sent by Bin Laden to Mohamed Jamal Khalifa through IIRO."

394.    A June 2004 cable from the Secretary of State's office similarly details the IIRO's support for al Qaeda and the Abu Sayyaf terrorist group.  According to the cable:  "The USG believes that some elements of the International Islamic Relief Organization (IIRO) have been exploited by terrorists and their financiers as a means of transferring assets, providing

98

organizational cover, or otherwise supporting extremist, violent operations." The cable further states the "IIRO has been cited as the principal sponsor of terrorist training camps in Afghanistan during the Taliban regime. IIRO has also been cited as the conduit for funds from Usama Bin Laden to terrorist organizations, specifically that the Abu Sayyaf cell in Manila was founded with money sent by Bin Laden to Mohamed Jamal Khalifa through IIRO."

395.   A May 23, 2005 State Department cable titled, *Islamic NGOs in the Philippines*, also discusses the IIRO's illicit activities: "Operated by Usama Bin Laden's brother-in-law, Saudi businessman Mohammed Jamal Khalifa, and with links to captured al-Qaeda lieutenant Khalid Shaikh Mohammed, the IIRO served as a legal front to conceal the transfer of al-Qaeda funding and material to the Abu Sayyaf Group and possibly other insurgents or terrorists operating in the Philippines."

396.   Prior to his death in January 2007, Khalifa confirmed in writing that all of his activities as Director of the IIRO in the Philippines were conducted under the direct supervision of the Saudi embassy.

397.   Other U.S. diplomatic cables have described the IIRO's illicit activities. For instance, an October 3, 2005 cable concerning OFAC Director Robert Werner's meetings a month earlier in Bahrain with the government's Minister of Finance, Minister of Social Affairs, and the Governor of the Bahrain Monetary Agency, details the closing of an IIRO bank account with Shamil Bank of Bahrain. According to information presented by Director Werner, the IIRO headquarters transferred over $7 million from the IIRO account at Shamil Bank to 18 different IIRO satellite offices. Among those transactions, the IIRO transferred funds from the Bahrain account to three Saudi Embassies. According to Director Werner, the second largest recipient of those funds was the IIRO's Djibouti branch office. Director Werner pointed out that the IIRO transactions represented a violation of the Kingdom's ban imposed on Saudi charities preventing them from engaging in extraterritorial financial activities. In a follow-up meeting with the Governor of the Bahrain Monetary Agency on January 23, 2006, Treasury Undersecretary Stuart

Levey thanked the Governor for closing the IIRO account which had been used to circumvent Saudi restrictions on sending money abroad.

398.    In an October 9, 2006 cable from the American Consulate in Jeddah, titled *IIRO Secretary-General Talks of Saudi Programs and Expansions*, IIRO Secretary-General Dr. Adnan Basha conceded that Islamic extremists have lectured at IIRO summer youth camps.  Dr. Basha explained that the Ministry of Islamic Affairs is responsible for vetting both the programs and lecturers for all of IIRO's summer camps within the Kingdom, but that no such process was available to prevent radicals from passing their extremist ideologies on to young men and women at summer camps outside of Saudi Arabia.

399.    A February 13, 2007 cable originating from the U.S. Embassy in Khartoum, Sudan, identified the IIRO as "one of the major Saudi Arabian humanitarian organizations suspected of maintaining links with al-Qaeda."  According to the U.S. government, "Usama bin Ladin used the entire IIRO network for his terrorist activities."

400.    A February 24, 2007 cable details a meeting between Assistant to the President for Homeland Security and Counterterrorism Francis Fragos Townsend with the Saudi Foreign Minister Prince Saud al Faisal at his home in Jeddah on February 6.  Townsend raised concerns of the U.S. government regarding the involvement of the Saudi Ambassador to the Philippines Muhammad Amin Waly in terrorism facilitation and his intervention to get two members of the IIRO released from prison.

401.    An August 22, 2007 diplomatic cable reported that the IIRO's branch office in Macedonia was closed and its members were expelled from the country in March 1995 amid concerns of terrorism financing.

402.    Finally, a November 3, 2008 cable authored by the U.S. Embassy in Dhaka, Bangladesh describes the freezing of IIRO accounts at Islami Bank Bangladesh as a result of terrorism financing investigations.

403.    On August 3, 2006, the U.S. Department of the Treasury designated the IIRO's Philippine and Indonesian branch offices and a senior IIRO official in Saudi Arabia, Abd al

Hamid Sulaiman al Mujil, "for facilitating fundraising for al Qaida and affiliated terrorist groups." According to U.S. Treasury officials, "Abd Al Hamid Sulaiman Al-Mujil, a high-ranking IIRO official in Saudi Arabia, has used his position to bankroll the al Qaida network in Southeast Asia. Al Mujil has a long record of supporting Islamic militant groups, and he has maintained a cell of regular financial donors in the Middle East who support extremist causes." Often referred to as the "Million Dollar Man" for supporting Islamic militant groups, al Mujil provided donor funds directly to al Qaeda and is identified as a major fundraiser for the Abu Sayyaf Group and Jemaah Islamiyah.

404.    The August 3rd designation details al Mujil's long record of supporting terrorist organizations such as al Qaeda, Abu Sayyaf and Jemaah Islamiyah through the IIRO:

> Abd Al Hamid Sulaiman Al-Mujil (Al-Mujil) is the Executive Director of the IIRO Eastern Province (IIRO-EP) branch office in the Kingdom of Saudi Arabia. Al-Mujil has been called the "million dollar man" for supporting Islamic militant groups.
>
> Al-Mujil provided donor funds directly to al Qaida and is identified as a major fundraiser for the Abu Sayyaf Group (ASG) and Jemaah Islamiyah (JI). Both ASG and JI are al Qaida-associated terrorist groups in Southeast Asia designated pursuant to the authorities of E.O. 13224. These terrorist groups are also on the United Nations 1267 Committee's consolidated list of individuals and entities associated with the Taliban, al Qaida and/or Usama Bin Ladin.
>
> In 2004, Al-Mujil invited a Philippines-based JI supporter to Saudi Arabia under the cover of traveling for the hajj (the Muslim pilgrimage), and planned to provide him with cash to carry back to the Philippines to support organizations including JI.
>
> Al-Mujil was also present in Afghanistan in the late 1990s and personally knew Usama Bin Ladin and deceased al Qaida co-founder Abdallah Azzam. Al-Mujil traveled continuously to meet with members of Bin Ladin's organization in Arab countries. In the 1990s, Al-Mujil established a relationship with senior al Qaida operational planner Khalid Shaykh Muhammad.
>
> Al-Mujil has a long history of providing support to terrorist organizations. He has contributed direct financial assistance to ASG leaders, including Abdurajak Janjalani (deceased).

The Indonesian and Philippines branches of IIRO have received support from IIRO-EP, which in turn is controlled by Al-Mujil. Indeed, he is often responsible for authorizing payment transfers for IIRO Philippines (IIRO-PHL) and IIRO Indonesia (IIRO-IDN).

The Treasury Department's findings regarding the IIRO's branch offices in the Philippines and Indonesia are just as damaging. According to the August 3rd designation:

The IIRO-PHL is a source of funding for the al Qaida-affiliated ASG. IIRO-PHL has served as a liaison for the ASG with other Islamic extremist groups. A former ASG member in the Philippines familiar with IIRO operations in the country reported that a limited amount of foreign IIRO funding goes to legitimate projects and the rest is directed to terrorist operations.

***

The IIRO Indonesia director has channeled money to two Indonesia-based, JI-affiliated foundations. Information from 2006 shows that IIRO-IDN supports JI by providing assistance with recruitment, transportation, logistics, and safe-havens. As of late 2002, IIRO-IDN allegedly financed the establishment of training facilities for use by al Qaida associates.

405.    In conjunction with the designations, the Saudi government imposed a travel ban on al Mujil, barring him from traveling outside of the Kingdom. The Saudis further froze his bank accounts, including an account at Al Rajhi Bank.

406.    However, despite assurances from Saudi officials that it had "shut down" the IIRO's Eastern Province Branch where al Mujil maintained his office and facilitated fundraising in direct support of al Qaeda, a March 2, 2009 State Department cable warned "that money continued to be funneled overseas from the Eastern Province Branch."

407.    The IIRO was also instrumental in supporting al Qaeda's operations in Bosnia, as one of the first da'awa organizations to enter the Balkans following the outbreak of the war. According to Dr. Farid Qurashi, former Secretary General of the IIRO: "From the very beginning of the Bosnia war, we were there to help."

408.    Former American mujahideen recruit Randall Todd Royer (a/k/a Ismail Royer), who participated in the Bosnian jihad, acknowledged that the IIRO's reputation as a front for

jihad was well known in the Balkans:  "It was well known that they helped get 'people' into Bosnia."  Royer explained that another mujahideen fighter in Zenica had openly discussed his efforts to use the IIRO in order to obtain identity cards for fellow jihadists.

409.    In September 1992, Balkan press agencies published photos depicting the severed heads of Serb soldiers killed by foreign mujahideen collected in boxes.  The photos were seized from the belongings of fallen Saudi Arabian jihadists, which also included an IIRO humanitarian worker identification card.  The recovered card was labeled with the name and photo of "Khalil Abdel Aziz," a teacher from Saudi Arabia, and indicated that it had been printed by the Peshawar, Pakistan office of the IIRO.

410.    By mid-1993, the operations of the IIRO in Bosnia-Herzegovina were under the primary oversight of a Palestinian national known as Abdelaziz Zaher (a/k/a Abu Anas; Abu Enes) and his deputy, an Algerian national, Djamel Lamrani (a/k/a Abu Musab al Djazairi).  Zaher was expelled from his former residence in Belgrade in early 1993 after Serbian officials tied him to various organizations suspected of aiding armed fundamentalist militant groups, including the IIRO.  .

411.    Zaher's top lieutenant at the IIRO, Jamal Al-Jibouri, was personally responsible for oversight of a massive logistical operation to provide al Qaeda and al Qaeda affiliated Islamic militants in the Balkans with weapons and ammunition.

412.    While working for the IIRO, Zaher participated in the 1994 murder of British aid worker Paul Goodall near Zenica.  Two days following the murder, Bosnian police arrested Saudi national Abdul Hadi al Qahtani, Abdu Khulud al Yemeni and Abu Enes (a/k/a IIRO chief Abdelaziz Zaher).  At the time of his arrest, al Qahtani was carrying an identification card issued by the Zenica office of the Saudi High Commission.

413.    Following the arrest of the three men, Dr. Abdul Harith al Liby, deputy commander of the mujahideen, sent a letter to "authorized individuals" in the Bosnia-Herzegovina Military Police and security services requesting the release of the two "mujahideen" arrested alongside al Qahtani.  Al Liby's letter identified both "Abu Enes" (Zaher) and al

Qahtani interchangeably as "mujahideen" and as "employees" of "IGASE" (IIRO), who were detained by authorities while traveling in an IIRO employee-owned vehicle.

414.    Following the end of the war in Bosnia-Herzegovina in late 1995, Zaher and the IIRO continued their operations in the Balkans.  The same year, "with the financial help of Selim Ben Mafuz, the executive director of 'Igasa' in Vienna," Zaher and other local IIRO organizers founded two commercial enterprises, "Sahara" and "Isra-Trade" which allegedly were the recipient of suspicious financial transfers from "residential accounts of the H.O. 'Igasa.'"

415.    International law enforcement and intelligence investigations targeted the IIRO's mission in the Balkans as well.  According to a guidebook on Islamic charitable organizations printed by NATO in April 1995, "the regional financial accountant for the IIRO, an Egyptian named Hossam Meawad Mohammad Ali, was detained by Croatian authorities in a raid in Zagreb" for his involvement in alleged criminal activity.

416.    In 1993, officials linked members of the Zagreb office of the IIRO to an Islamic extremist group headed by Muhammad Sa'd Darwish al Shazy, which was planning to conduct anti-Jewish bombings in Croatia.  In addition to representatives of IIRO, al Shazy's organization included the heads of the Zagreb offices of the Saudi High Commission and the Kuwaiti Joint Relief Committee, representatives of the Human Relief International, and members of the Qatar Charitable Society.

417.    The IIRO's branch office in Vienna, Austria is linked to the Third World Relief Agency ("TWRA"), a purported charitable organization that became an integral component of al Qaeda's support infrastructure.  Founded in 1987 in Vienna by Dr. El Fatih Ali Hassanein, a well-connected leader of the Sudanese National Islamic Front ("NIF") and fervent supporter of Osama bin Laden, the TWRA was a primary conduit for channeling financial, logistical, and operational support for al Qaeda's global jihad.  Together with his brother, Sukarno Ali Hassanein, the Hassanein brothers simultaneously managed the IIRO's Vienna branch office, which shared office space with the TWRA.

418.     In September 1995, German authorities and members of the Austrian anti-terrorism task force raided the TWRA's Vienna headquarters, as well as the IIRO's office, uncovering a trove of records detailing the transfer of approximately $220 million from radical Islamic organizations and Islamic countries in the Middle East to the Bosnian region.  According to Western intelligence officials, at least half of the $220 million was used primarily to purchase and transport illegal weapons on behalf of the Bosnian government and foreign Arab fighters associated with Osama bin Laden's Islamic Army.  The 9/11 Commission concluded that Osama bin Laden used the TWRA to covertly provide support for terrorist activities.

419.     Through its offices in Kenya, the IIRO provided direct financial and logistical support to al Qaeda terrorists involved in the 1998 bombings of the United States Embassies in Dar Es Salam, Tanzania and Nairobi, Kenya.  As a result of an investigation into the involvement of the IIRO in the bombings, Kenyan officials deregistered the IIRO's Nairobi office.

420.     In October 2001, Pakistani officials identified and expelled some two dozen al Qaeda members who had been working for the IIRO in Pakistan.

421.     According to the Indian government, IIRO officials were behind the 1999 al Qaeda plot to attack the U.S. consulates in Madras and Calcutta, in response to the American military retaliation for the 1998 bombings of the United States Embassies in Dar Es Salaam, Tanzania and Nairobi, Kenya.  The operational cell designated to carry out the planned attacks on the U.S. consulates was led by Sayed Abu Nesir, a Bangladeshi national who was directed to launch the attacks by Shaykh Ahmed al-Gamdin, Director of IIRO operations in Asia.

422.     During his subsequent interrogation, Abu Nesir declared that 40 to 50% of IIRO's charitable funds were being diverted to finance terrorist training camps in Afghanistan and Kashmir.  Among other duties, Abu Nesir visited the training camps on behalf of IIRO to assess their funding needs.  At the direction of al-Gamdin, Nesir himself attended one of the al Qaeda camps to receive training, where he met Osama bin Laden.

423.    Mahmoud Jaballah, head of IIRO's Canadian office, was arrested and jailed by Canadian officials based on his links to al Qaeda and Egyptian al Jihad.  Jaballah was accused of having contact with al Qaeda operatives and had spent three years working for the IIRO in Pakistan.

424.    In 1991, the IIRO established a U.S. branch in Virginia, under the name International Relief Organization, Inc. ("IRO").  The IRO operated from offices at 360 South Washington Street, Washington, D.C., where it shared office space with the MWL.  The Washington, D.C. offices of the IIRO and MWL were part of a complicated web of for-profit and ostensible charitable organizations within the United States, referred to by the U.S. government as the Safa Group or SAAR Network, the majority of which maintained offices at 555 Gross Street, Herndon, VA.  The SAAR Network of businesses and charities was created to provide funding, money laundering and other material support to terrorist organizations, including al Qaeda.  In March of 2003, federal authorities executed search warrants at the offices of IIRO in Washington, DC, in connection with an ongoing federal investigation of the illegal activities of the Northern Virginia and Washington based charities and for-profit enterprises within the SAAR Network.  Through that investigation, federal authorities determined that the IIRO and MWL offices in Washington, DC provided funding and material support to al Qaeda and Hamas.

425.    The IIRO further sponsored al Qaeda through its participation in the Saudi Joint Relief Committee for Kosovo and Chechnya ("SJRC").  As set forth herein, the SJRC offices in Pristine, Kosovo served as a cover for al Qaeda operatives.  Furthermore, between 1998 and 2000, the Kingdom of Saudi Arabia, through SJRC, diverted more than $74 million to al Qaeda members and loyalists affiliated with SJRC bureaus.

426.    Not surprisingly, given the breadth of the IIRO's ties to al Qaeda, the United States has detained several IIRO officials and employees as "enemy combatants."  In support of the continued detention of those individuals, the U.S. government has cited their affiliations with

IIRO as a "primary factor" favoring detention, and expressly labeled the IIRO as an al Qaeda front.

427.    The U.S. government has identified the IIRO (a/k/a "Hay'at al-Igatha al-Islamiyya al-Alamiyah") as a Tier 1 Terrorist Non-Government Organization and a National Intelligence Priority Framework (NIPF) Counter-Terrorism (CT) Priority 2 Terrorist Support Entity (TSE).  According to the United States, "Priority 2 TSEs have demonstrated sustained and active financial support for terrorist organizations willing to attack U.S. persons or interests, or provide witting operational support to Priority 2 terrorist groups."

428.    Detainee Samir N. Al Hasan (ISN No. 043) traveled to Afghanistan from Yemen in 1999 or 2000, attended the training camp at al Farouq, and became a bodyguard in August 2001.  Al Hasan told U.S. authorities that he was in Afghanistan as a relief worker for the IIRO and that he received the position from the head of the IIRO.  The United States government's unclassified evidentiary summaries relating to al Hasan assert:  "The International Islamic Relief Organization was identified as an Islamic humanitarian organization with headquarters in Mecca, Saudi Arabia, and is financed by Usama bin Laden."

429.    Detainee Rashed Awad Khalaf Balkhair (ISN No. 186) traveled from Saudi Arabia to Pakistan and Afghanistan in early 2001 and worked for "Al-Ighatha Al-Islamiya, International Islamic Relief Organization (IIRO)."  Balkhair was associated with the Taliban and al Qaeda, and stayed approximately 3 months in a Taliban guesthouse in Jalalabad, Afghanistan. Moreover, Balkhair's name was listed on a computer hard drive associated with a known terrorist and was further discovered on a list of al Qaeda mujahedin who were in Afghanistan. The unclassified evidentiary summaries filed in support of Balkhair's continued detention at Guantanamo Bay state that "the International Islamic Relief Organization is a non-governmental organization, which has ties to Usama Bin Laden and the Abu Sayyaf Group."

430.    Detainee Said Muhammad Husayn Qahtani (Detainee No. 200) traveled multiple times from Saudi Arabia to Afghanistan between 2000 and 2001.  In May 2000, Qahtani met and stayed with Abu Zubaydah in a safehouse while waiting to travel to Afghanistan.  Moreover,

during a trip in June 2000, Qahtani joined the Taliban against the Northern Alliance and spent a considerable amount of time on the front lines.  Qahtani joined al Qaeda after giving an oath of allegiance ("al bay'ah") to Osama bin Laden, and further met 2 of the 9-11 hijackers – Saeed al Ghamdi and Ahmed Alnami.  According to Department of Defense documentation, Qahtani contacted relief organizations such as the IIRO and al Haramain with the intention "to join a relief organization because those entities would offer him a way to get into Chechnya, whose borders were closed at that time.  Once there, the detainee would be free to leave the relief organization and join the fighting."

431.    Detainee Abdallah Ibrahim al Rushaydan (ISN No. 343) was captured on December 10, 2001 on the border of Pakistan and Afghanistan.  According to the U.S. government:  "The International Islamic Relief Organization (IIRO) is also known as Al Hayat Al Igatha Al Islamiya Al Aalamiya.  According to the media in Asia, the Islamic Non-government Organization known as the International Islamic Relief Organization (IIRO), which is managed by Osama Bin Laden's brother-in-law, has maintained links with the Abu Sayyaf group (ASG) in the Philippines.  Executive Order 13224, which blocks property and prohibits transactions with persons who commit, threaten to commit, or support terrorism, designates the Abu Sayyaf Group as a global terrorist entity."

432.    Significantly, in response to the U.S. government's assertion that the IIRO is a front for terrorism, al Rushaydan testified that the IIRO "is a government organization managed by Dr. Adnan Basha who holds the rank of Minister.  [IIRO] is a government organization under the Islamic World League and all charity organizations are under the Senior Director for charity organizations, Ameer Nayef (King Nayef), who is the Saudi Minister of Interior."

433.    Detainee Rashid Abd al Muslih Qaid al Qaid (ISN No. 344) traveled from his home in Saudi Arabia to Afghanistan in October 2001 with an individual who was identified as a member of the al Qaeda mujahideen.  Al Qaid himself was also designated by the Saudi government as a high priority target.  The United States government's unclassified evidentiary summaries relating to al Qaid state:  "The detainee and both of his traveling companions, Al Nur

and Wasim, traveled to carry out charity work in conjunction with a Saudi charity, al-ighatha al-khairia."  "Al Ighatha is a large Saudi NGO with field offices worldwide, many of which are staffed by or support terrorists or mujahidin.  The NGO is linked to al Qaida and other extremist NGOs."

434.  Detainee Ghanim Abd al Rahman Ghanim al Huwaymadi al Harbi (ISN No. 516) was working in the IIRO finance department in Jeddah during the summer of 2000.  Al Harbi responded to a fatwa that requires all Muslims to train and be prepared to defend Islam at any time.  Although he was prohibited from traveling outside of Saudi Arabia, al Harbi traveled to Afghanistan during the summer of 2001 via Bahrain and Pakistan.  Al Harbi testified that he was a "governmental employee of a charitable organization" known as the International Islamic Relief Organization.  In addition, al Harbi acknowledged during his testimony that he received training at the al Farouq camp in Afghanistan, a known al Qaeda facility, which he understood to be a "charity funded camp."

435.  Detainee Tariq Mahmoud Ahmed al Sawah (ISN No. 535) is a former relief worker for the IIRO in Bosnia and Croatia.  Al Sawah testified that he chose to go to the Balkans region after watching videos depicting the atrocities committed by Serbs against Bosnians, and eventually joined the Bosnian Third Army, whose members were predominantly Arab Mujahideen fighters.  Al Sawah admitted to being a member of the mujihadeen since 1992.  According to the U.S. government:  "The International Islamic Relief Organization, also known as the World Islamic Relief Organization, is the largest Islamic charity organization in Saudi Arabia.  International investigations have disclosed the organization has connections to terrorist financing activities and its field offices throughout the world have supported terrorist activity."

436.  Al Sawah was expelled from Bosnia in 2000 and traveled to Afghanistan where he attended the al Farouq training camp and further served as an advanced explosives trainer at the Tarnak Farm training camp.  In 2002, he met Ayman al Zawahiri and also attended a banquet dinner with Osama bin Laden and a senior al Qaeda lieutenant.  Moreover, al Sawah authored a 400 page manuscript containing bomb-making techniques and provided it to al Qaeda members.

His design for a shoe bomb technically matched the design of the failed explosive device used by shoe bomber Richard Reid.

437.    Detainee Ahmed Hassan Jamil Suleyman (ISN No. 662), who performed volunteer work for the IIRO, was identified as a senior al Qaeda commander and trainer with contacts to Osama bin Laden, Sheikh al Liby and Abu Zubayda. Suleyman was also a member of Makthab al Khidmat and associated with Makhtab al Khidmat (the "Office of Services"). According to Department of Defense documentation: "The detainee occasionally would perform volunteer work with the International Islamic Relief Organization (IIRO). The IIRO has connections to terrorist organizations and has channeled funds to Islamic extremists from Afghanistan."

438.    Detainee Abdul Latif Elbanna (ISN No. 905) worked for the IIRO. The unclassified evidentiary summaries filed in support of Elbanna's continued detention at Guantanamo Bay state: "In 1990 the detainee worked at an Islamic Relief organization (IRO) called Haiat Ali Ghatha Al Islami Al Alamia. He lived for free at a guesthouse owned by the charity in the Hayat Abad district of Peshawar. Fighters from Afghanistan stayed at the guesthouse. The International Islamic Relief Organization/Hay-at al-Igathat al-Islamiyya al-Alamiyah of Saudi Arabia is designated a Tier 1 Non-Governmental Organization having demonstrated sustained and active support for terrorist organizations willing to attack U.S. persons or interests."

## WORLD ASSEMBLY OF MUSLIM YOUTH

439.    The World Assembly of Muslim Youth ("WAMY") is also a subsidiary of the MWL. Founded in 1972 and headquartered in Riyadh, Saudi Arabia, WAMY has a physical and operational presence in at least 56 countries worldwide. In addition, WAMY conducts activities in many countries in which it does not maintain a formal physical presence, through its association and membership in other Islamic organizations and committees, including its membership in the Saudi Joint Relief Committee for Kosovo and Chechnya ("SJRC").

440.     Like the MWL and IIRO, WAMY is a controlled agent and alter-ego of the Kingdom of Saudi Arabia.  WAMY was established by MWL, itself an alter-ego of the Kingdom, with the formal approval of high ranking officials of the Kingdom.  The vast majority of WAMY's funding is provided by the Kingdom.  In addition, WAMY's leadership is dominated by high ranking officials of the Kingdom.  For example, Dr. Maneh el Johani simultaneously served as both the Secretary General of WAMY and a member of the Kingdom's Shura Council.  While head of the Ministry of Islamic Affairs, Saleh bin Abdul Aziz al Sheikh also served as a chairman of WAMY and al Haramain Islamic Foundation.

441.     Mutaz Saleh Abu Unuq, Financial Director of WAMY, has confirmed in affidavit testimony that WAMY was established by Royal Decree in 1972, and that "WAMY is governed principally by its General Assembly and President who was appointed by the Saudi Government. The current President of WAMY is the Minister of Islamic Affairs in Saudi Arabia.  The daily operations of WAMY are supervised by its Secretary General. The Government of Saudi Arabia funds a large portion of WAMY's budget."

442.     Outside of Saudi Arabia, the operations of WAMY's branch offices are directed and closely supervised by local Saudi embassies.  According to Dr. Abdullah Wahab Noorwali, Assistant Secretary General of WAMY, the Kingdom "provides us with protection abroad through Saudi embassies and consulates, in addition to financial support."  As Arafat el Asahi's previously cited Canadian court testimony confirms, the Saudi embassies do not tolerate any deviation by the Saudi da'awa organizations under their supervision from Saudi government policy.

443.     The operations of WAMY's branch offices are closely supervised and directed by WAMY's central leadership in Saudi Arabia as well, and functionally operate as agents of the central organization.  WAMY's central authority in Saudi Arabia uses a variety of mechanisms to rigidly control the branch offices.  WAMY's General Assembly and Board of Trustees in Saudi Arabia set policies and procedures for all WAMY branch offices, and hand-pick the officials who run those branch offices.  WAMY headquarters also selects the projects and causes

for which funds are to be raised by the WAMY offices throughout the world. Funds raised by the branch offices are transferred back to the organization's headquarters, which then redistributes those funds to the regional offices, to be applied to projects and causes selected by WAMY's central leadership. WAMY's branch offices are required to submit detailed reports of their activities and finances to the central leadership in Saudi Arabia, for review and approval. High ranking WAMY officials from Saudi Arabia also conduct periodic inspections of the branch offices. In addition, by virtue of its close relationship with the Kingdom's government, WAMY is able to use the Kingdom's governmental apparatus throughout the world, including the embassies, to monitor the day to day activities of the branches.

444.    For more than a decade, WAMY has knowingly and intentionally used its international infrastructure as a tool for supporting the al Qaeda movement, on both the ideological and military fronts. As a result of the Kingdom of Saudi Arabia's extensive patronage, WAMY possesses a multi-million dollar annual budget. WAMY dedicates a significant portion of that budget to the publication and worldwide dissemination of literature calculated to promote the global jihadist agenda, convince young Muslims to reject the United States and democratic ideas as evil and non-Muslim, demonize Christians, Jews and non-Wahhabi Muslims, and convince young Muslims to engage in violent jihad against the West and Israel.

445.    Virulently anti-American, anti-Semitic and pro-jihadist propaganda pervade WAMY's "educational" publications. For example, under the heading "The Prophet asks for Jihad," the WAMY book *Islamic Views* says, "The Prophet Mohammad fought against the infidels and the Jews till he triumphed over them and conducted himself about twenty invasions and he sent tens of regiments led by his companions for Jihad…Damn from Allah to the Jews who made graves of their prophets as Masjid." Later, *Islamic Views* says Islam "is a religion of Jihad*"* and that jihad "was an answer for the Jews, the liars." "[T]each our children to love taking revenge on the Jews and the oppressors, and teach them that our youngsters will liberate Palestine and al-Quds when they go back to Islam and make Jihad for the sake of Allah."

*Islamic Views* further exhorts Muslims to wage "Jihad against the Satan," and that "You should not back the Jews and the Christians and the Communists against the Muslims; the Communists, the Infidels, the Jews, and the Christians, those who do not believe in Mohammed.  You should say they are infidels."

446.    The jihad WAMY advocates in its publications is intensely violent.  According to a WAMY policy statement, "[a] Christian should be asked to repent.  If he does not he must be killed." *See Written Statement of James B. Jacobsen, President of Christian Solidarity International,* submitted to the Sub-Committee of International Relations and Human Rights, Hearing on Persecution of Christians Worldwide, February 15, 1996.  The book *Islamic Camps: Objectives, Program Outlines and Preparatory Steps*, prepared by WAMY's Camps and Conferences Unit and intended to serve as a manual for Islamic youth camps, suggests that youths attending WAMY camps be led in the following refrain:

> Hail! Hail! O Sacrificing Soldiers! To Us! To Us!
>
> So we may defend the flag on this Day of Jihad, are you miserly
> with your blood?!
>
> And has life become dearer to you? And staying behind sweeter?
>
> Is staying in this world of torment more pleasing to us?
>
> You are amongst those called upon by Destiny.
>
> Come! So we may revive the times of our predecessors!

447.    Through these and other WAMY publications, as well as the madrassas, camps, Islamic Centers, mosques, conferences and other events it sponsors,  WAMY has provided the ideological foundation for the al Qaeda movement, and actively advocated young Muslims to take up arms and engage in violent jihad against the United States.  In this regard, WAMY has played a critical role in al Qaeda's cultural assault on the United States and democratic institutions throughout the world.

448.     Consistent with the extremist agenda it advocates, WAMY has immersed itself deeply in the militant endeavors of the global jihadist movement as well, actively supporting the militant and terrorist activities of al Qaeda and associated organizations in Bosnia, Chechnya, Kosovo, Kashmir, Pakistan, South East Asia, the United States and elsewhere.

449.     WAMY's pervasive involvement in supporting al Qaeda fighters and associated local jihadist groups in regional conflicts was well documented prior to September 11, 2001.  On December 5, 1992, the *New York Times* identified WAMY as a front for armed Islamic jihad in Bosnia.  According to the article, *Muslims From Afar Joining "Holy War" in Bosnia*:

> The conflict between Serbs and Muslims in Bosnia and Herzegovina… has been adopted by Islamic fundamentalists as the newest holy war against Christian infidels bent on the destruction of Islam.
>
> In the last few weeks, the conflict has lured several hundred militants, many of them veterans of the war in Afghanistan, to volunteer for the Bosnian forces….
>
> The volunteers are sponsored by a variety of militant religious organizations and often have their expenses and plane fare covered….  Despite formal denials from the relief organizations, Saudi officials say an increasing amount of the charity on behalf of the Bosnians is now used to provide arms and logistical support for Arab volunteers.
>
> "Since August, most of the money raised for relief has been turned over to the Bosnians for weapons," a Saudi official…. The World Assembly of Muslim Youth, which organized relief operations in Afghanistan and is now deeply involved in the conflict in the Balkans, flies back wounded Saudi fighters and provides free medical care in the Saudi German hospital.

450.     Within the same article, Adel Batterjee, the then chairman of WAMY, acknowledged the organization's role in supporting armed Islamic jihad in Bosnia: "if a relief worker decides that he wants to join the fighting forces, we would not stop him…." Following the September 11, 2001 attack, Adel Batterjee was formally designated as a terrorist sponsor and supporter pursuant to Executive Order 13224.

451.     In May of 2000, Russian officials similarly accused the SJRC, the committee through which WAMY conducted activities in Chechnya, of financing and otherwise supporting Islamic terrorists and separatists in that region.  According to a May 19, 2000 article in the Russian newspaper *ITAR-TASS*, *Chechen Separatists Said Funded by Several Foreign Sources*:

> The aid to Chechens fighting against Russia, is delivered from the organization of humanitarian assistance to Muslims of Kosovo and Chechnya (the SJRC)….
>
> Officially, the money is sent to Chechnya to be used for religious events and Islamic feasts, but is actually used to finance rebel troops [a representative of the Russian Federal Security Service (FSB)].
>
> According to available information, part of the money is transferred to banking accounts of some warlords, including Shamil Basayev and Khattab…
>
> Russia's security services are aware that these people are financing rebel forces, overseeing arms, food and medicine deliveries, as well as arranging treatment for the wounded and paying allowances to guerillas.

452.     Significantly, Amir Khattab, one of the individuals who received financing directly from WAMY and the SJRC, is a senior al Qaeda member who was deployed to Chechnya by Osama bin Laden to organize al Qaeda's operations in that area.  According to the 1998 Department of Defense Intelligence Report:

> In 1995, Khattab appeared in Chechnya to carry out a special mission assigned to him by Usama ben Laden to organize training camps for international terrorists….  He was a colonel, fought as a field commander, and was wounded in the hand.  Khattab organized three training camps in the Vedeno and Nojai-Urt areas of the forested mountain zone.  Graduation is held at the three camps every two months.  They are very equipped, with firing range facilities and capabilities to create models of "sites of diversion," as well as classes for sappers and snipers.

453.     By no later than 1999, the details of bin Laden's direct links to Khattab and the Chechen mujihadeen were the subject of widespread reporting in the mainstream media.  For instance, in August of 1999, NBC News published a report, *U.S. Links bin Laden to Chechnya*,

stating that "Osama bin Laden is financing the Chechen operation in Dagestan…"  The article, which was based on information provided by senior U.S. intelligence officials, explained that the "key bin Laden connection" to the Chechen jihadists was Amir Khattab, and that their relationship was so close that bin Laden was considering relocating from Afghanistan to areas of Chechnya under Khattab's control.

454.    Prior to the September 11th Attack,  WAMY officials made little effort to conceal their involvement in sponsoring armed jihad in Chechnya.  To the contrary, at least within the Arabic press, WAMY officials openly acknowledged that the organization was deeply involved in sponsoring militant activities in Chechnya.  For example, in a January 15, 2000 article published in *Al Jazeera* newspaper, *The Chechen Tragedy – The Reality and the Required Role*, Dr. Maneh al Johani, the Secretary General of WAMY, wrote as follows:

> [I] want to stress that these heroic Moslems, the Mujihadeen who are standing strong, deserve to receive our support and we must invest all of our energy in aiding them when they are being fed the taste of defeat once again.  … It should be pointed out that WAMY has doubled its efforts and has placed all of its branches inside and outside of the Kingdom on alert to serve the Chechen issue and to implement the aid program for the Chechen refugees.
>
> 1.      The question that must be asked is: What do the Chechen Muslims need from us today?
>
> 2.      ***They need money to buy arms and ammunition. (emphasis supplied)***
>
> The Islamic awakening, which is growing, praise be to Allah, is that which worries the Communist East and Heretic West, and they are afraid they will awaken one day and the Muslims will demand payment of a poll tax.
>
> Triumph is coming and Islam will remain and Allah will rise and be victorious.  I request Allah for our brothers Mujihadeen in Chechnya and Dagestan, stability, reinforcements and victory.

455.    Significantly, al Jahari published his call for Muslims to donate funds to WAMY to buy "arms and ammunition" for the "mujihadeen" in Chechnya and Dagestan well after the

116

direct and close relationship between those militants and al Qaeda had been widely detailed in the media and elsewhere.

456.     Philippine officials also publicly implicated WAMY in the financing of terrorist activities in Southeast Asia in the years prior to the September 11th Attacks.  According to a January 15, 1999 article in the *Australian General News*, *Philippines Suspect Australian Group of Helping Rebels*, the government of the Philippines accused WAMY's Australian branch of financing the Moro Islamic Liberation Front ("MILF").  MILF was responsible for several bombings and attacks on remote villages in the Philippines that forced 400 civilians to flee in January of 1999.  In February of 1999, MILF Chief Hashim Salamat publicly confirmed that MILF had received funds from Osama bin Laden.

457.     Statements by government officials and press reports in the years preceding the September 11th attack also reveal WAMY's extensive role in supporting al Qaeda activities in Kashmir.  According to a December 8, 1995 article in the periodical *Money Clips*, *Kashmiri Leader Thanks WAMY for Help*, a Kashmiri leader publicly thanked WAMY during a press conference for "helping the Mujihadeen in their struggle for independence from India."  Separate articles published prior to September 11, 2001 reveal that WAMY funneled support to the Students' Islamic Movement of India (SIMI), Lashkar-e-Taibah and Hizb ul Mujahideen, three violent jihadist groups operating under the broader al Qaeda umbrella.  *See SIMI:  Nursery of Hate, India Today*, April 2, 2001; *ISI Twin Plan – Attack Christians, Defame Hindu Outfits, The Economic Times of India*, July 15, 2000; *Kashmir: Hizb-Ul-Mojahedin Chief Explains Reasons Behind Cease Fire, BBC Worldwide Monitoring*, August 23, 2000; *Pakistani Behind Church Blast Say Police, The Statesmen (India)*, July 14, 2000.  In an interview contained in one of the articles, SIMI head Safdar Nagori publicly confirmed his organization's allegiance to al Qaeda:

> Q:     In your conferences, you have openly eulogized Osama bin Laden.
>
> A:     Not once, but dozens of times.  We believe he has shown great character in standing up the Americans, the biggest terrorists in the World.

458.    In March of 2003, al Qaeda military chief Abu Zubaydah was arrested at a Lahkar-e-Taibah safehouse in Islamabad, confirming the depth of collaboration and reciprocal support between those two terrorist organizations.

459.    WAMY Secretary General, Dr. Maneh al Johani, said that Muslims should come forward to wage jihad to liberate Kashmir.  Speaking at a Muslim World League auditorium in 1991, al Johani stated that jihad could be performed in many forms, asserting that  Muslims can go to the battlefield to wage a war against the enemies of Islam or they can give their moral, physical and financial support to the cause of jihad.

460.    WAMY's sponsorship of jihadist activity in Kashmir was channeled through its offices in Pakistan, which sponsored al Qaeda activity in that country as well.  In connection with a crackdown on terrorist activity prompted by the September 11th Attack, Pakistani authorities deported 89 employees of ostensible NGOs in October of 2001, based on their suspected ties to terrorism.  WAMY was among the organizations whose "employees" were specifically targeted by the measure.  Pakistani intelligence officials, operating in conjunction with agents of the Federal Bureau of Investigations of the United States, raided WAMY's Pakistani offices approximately one year later, as part of ongoing counter-terrorism efforts. WAMY's close ties to senior al Qaeda cells in Afghanistan and Pakistan were revealed just one week after the raid, when an employee of WAMY hand delivered a recorded message from Osama bin Laden to an Arab television network in Islamabad.

461.    That incident did not represent the first occasion on which WAMY was involved in transferring information on behalf of al Qaeda.  During the investigation into the 1993 World Trade Center bombing, U.S. officials discovered an al Qaeda  training manual in the possession of Ahmed Ajaj, who was later convicted for his role in that attack.  The manual, entitled "*Military Lessons In The Jihad Against The Tyrants,*" was distributed to Ajaj by WAMY and detailed how to establish and maintain clandestine operational sales.  The same manual was subsequently recovered from the London apartment of African embassy bomber Khalid al-Fawwaz in 1998.

462.     Until shortly after the September 11th Attack, WAMY also maintained a physical presence in the United States, from which the organization channeled material support and resources to al Qaeda.  WAMY's U.S. offices were established in Falls Church, VA in 1992 by Abdullah bin Laden and Omar bin Laden, blood nephews of al Qaeda leader Osama bin Laden. Under Abdullah bin Laden's leadership, WAMY's U.S. branch was deeply involved in the terrorist activities of the SAAR Network of businesses and charities.  Federal authorities raided WAMY's U.S. offices in 2004, in connection with an ongoing investigation of the SAAR Network's role in sponsoring al Qaeda.  Abdullah bin Laden was specifically selected by the Saudi Ministry of Islamic Affairs to head WAMY's branch office in the United States and maintained an office at the Saudi Embassy in Washington, D.C.

463.     Despite the increased scrutiny of WAMY's operations following the September 11th Attack,  the organization continues to sponsor al Qaeda and associated terrorist organizations and separatist movements to this day, demonstrating the organization's deep and longstanding commitment to al Qaeda's global jihad.

464.     In June of 2002, Indian authorities arrested two men under the Prevention of Terrorism Act, after determining that they had transferred funds to Sayed Ali Shah Geelani, the leader of the Fundamentalist Jamaat-e-Islami party.  According to sources within India's government, the two men, Farooq Ahmed and Mohammed Maqbool, were given funds by Nazir Qureshi, a senior WAMY official, to be covertly delivered to Geelani.  Geelani previously had been arrested under the Prevention of Terrorism Act based on his involvement in transferring money to militant organizations in Kashmir.

465.     In September of 2003, Romanian intelligence officials implicated WAMY in an al Qaeda plot to hijack a plane departing from Romania and crash it into Heathrow Airport in London.  According to an article published by the *Global New Wire* on September 5, 2003, *Intelligence Service "Alert" Watches Egypt's "Muslim Brothers" in Romania*, the plot was being coordinated by al Qaeda affiliated members of the Muslim Brotherhood in Romania. Quoting information obtained from Romanian intelligence officials, the article asserts that the

Romanian wing of the Muslim Brotherhood acts under the cover of various humanitarian organizations, and receives most of its funds from WAMY.

466.     As recently as March 2012, the Canadian government concluded an investigation revealing that WAMY's Canadian branch office "maintained close relationships with and provided funding to organizations that were engaged in providing resources to entities engaged in terrorist activities."

467.     The Canada Revenue Agency ("CRA"), the government agency responsible for administering provincial and territorial tax programs, promoting compliance with Canada's tax legislation and regulations, and ensuring the administration and enforcement of the country's tax laws, undertook an extensive investigation into the operations and activities of WAMY's Canadian branch office, located at 3024 Cedarglen Gate, Unit 70, Mississauga, Ontario, arising from concerns that the branch office was failing to comply with certain reporting requirements expected of charitable organizations that wish to maintain their tax exempt status under Canadian law.

468.     As part of that investigation, the CRA conducted an audit of the WAMY branch office's financial and operations records, including a review of the office's Registered Charity Information Returns (T3010).  Upon completion of the audit, the CRA determined that the WAMY branch office was in serious non-compliance with the core requirements of the Canadian Income Tax Act, including: (1) failure to comply with Section 230 of the Act requiring WAMY to maintain proper financial books and records; (2) ceasing to comply with certain provisions of the Act requiring WAMY to devote all of its resources to charitable purposes and activities; and (3) failing to file Registered Charity Information Returns as and when required under the Act.

469.     More importantly, the investigation conducted by the CRA uncovered documentation and information linking the WAMY Canadian branch office, and the WAMY headquarters in Saudi Arabia, to terrorism.  For instance, the CRA uncovered evidence that the WAMY branch office shared common officers, office space, contact information, and bank accounts with Executive Order 13224 Specially Designated Global Terrorist ("SDGT") entity

Benevolence International Fund-Canada ("BIF-Canada").  In addition, the CRA's investigation discovered that the WAMY branch office was funding Executive Order 13224 SDGT entity Benevolence International Foundation ("BIF") in the United States.

470.    On November 19, 2002, the U.S. Department of the Treasury designated Benevolence International Foundation and Benevolence International Fund-Canada as "financiers of terrorism."  According to Treasury, the organization's leadership, including BIF's Chief Executive Officer, Enaam Arnaout, were closely associated with Osama bin Laden and "worked with others – including members of al Qaida – to purchase rockets, mortars, rifles, and offensive and defensive bombs, and to distribute them to various mujahideen camps, including camps operated by al Qaida."

471.    As a result of those findings, the CRA revoked WAMY's designation as a tax exempt registered charitable organization.

472.    Statements by Treasury Department officials, testifying before Congress, further confirm that WAMY continues to serve as a front for al Qaeda and other terrorist organizations. During a July 13, 2005 Hearing on Money Laundering and Terror Financing Issues in the Middle East before the U.S. Senate Committee on Banking, Housing, and Urban Affairs, Treasury Under Secretary Stuart Levey asserted that "wealthy Saudi financiers and charities have funded terrorist organizations and causes that support terrorism and the ideology that fuels the terrorists' agenda…  Even today, we believe that Saudi donors may still be a significant source of terrorist financing, including for the insurgency in Iraq."  Levey expressed particular concern about the continued involvement of WAMY, the IIRO and MWL in the financing of terrorist activities throughout the globe.

473.    As is the case with the MWL and IIRO, the United States has detained a number of WAMY employees as enemy combatants, and the unclassified evidentiary summaries prepared by the Department of Defense for those detainees specifically detail WAMY's support for al Qaeda and other terrorist organizations.

474.    For instance, the United States government's unclassified evidentiary summaries relating to detainee Mammar Ameur (ISN No. 939) state the following regarding WAMY:  "In 1996, the detainee resigned from the EHRO [Egyptian Human Relief Organization] and remained unemployed afterward.  The detainee was arrested with an individual, who worked for several years for a Saudi organization called WAMY.  The World Assembly of Muslim Youth (WAMY) is an NGO operating in Afghanistan and may be associated with Usama Bin Laden and/or al Qaeda."

475.    Detainee Adel Hassan Hamed (ISN No. 940) was employed by Lajnat al Daawa al Islamiya ("LDI") in Afghanistan and Pakistan from 1986-1999.  LDI is a non-governmental organization that operates in Afghanistan and is affiliated with Osama bin Laden and al Qaeda operations.  When Hamed was laid off from the LDI in 1999, he was hired as the Director of the WAMY hospital in Afghanistan.  "WAMY is a non-government organization operating in Afghanistan that may be affiliated with Usama Bin Ladin and al Qaeda operations.  According to top WAMY officials, both the United States and Israel must be destroyed.  WAMY provides financial support to the Palestinians fighting against Israel.  In addition, WAMY has put forward a proposal that the Palestinians should declare open war on Israel."

## AL HARAMAIN ISLAMIC FOUNDATION

476.    Defendant al Haramain Islamic Foundation ("al Haramain") is a Saudi Arabia-based ostensible charity, with branch offices in approximately 50 countries.

477.    Al Haramain is an agent and alter-ego of the Kingdom of Saudi Arabia.  The Kingdom controls and directs al Haramain operations, appoints and terminates al Haramain personnel, provides al Haramain with virtually all of its funding, determines how funds will be distributed throughout the world, and otherwise stringently controls al Haramain's operations.  In many countries, al Haramain conducts operations from the local Saudi embassy, under the supervision of the embassy's Islamic Affairs Division.

478.     Al Haramain officials have acknowledged that their operations are under the control and direction of the Kingdom of Saudi Arabia.  According to the affidavit testimony of the Financial and Administrative Manager of al Haramain, Khalid bin Obaid Azzahri, "al Haramain operates under the supervision of the Saudi Minister of Islamic Affairs, who appoints its Board of Directors and senior management personnel."  Moreover, al Haramain's general director, Sheik Aqeel Abdulaziz al Aqil, stated that "we work under the supervision of Saudi government."  Al Aqil has also acknowledged that more than 95% of al Haramain's funding comes directly from the Kingdom of Saudi Arabia.  In an August 25, 2002 report posted on al Haramain's website, the Chairman of the Africa Committee of al Haramain, al Sheikh Muhmad al Tujri, declared that al Haramain's activities in Kenya were under the "direct supervision" of the Saudi embassy in that country.  A separate report on al Haramain's website that month indicated that the Saudi Interior Minister had directed the organization to provide assistance to Afghani refugees.

479.     The 9-11 Commission Staff Monograph on terrorism financing further indicates that at least two government ministers held supervisory roles over al Haramain.

480.     International investigations have confirmed al Haramain's direct and pervasive complicity in al Qaeda's operations and attacks throughout the world.

481.     In 2002, an intelligence report from the Bosnian Intelligence Services (Agency for Investigation and Documentation or "AID") revealed the active role of Vakufska Banka D.D. in terrorism funding.  Indeed, AID described Vakufska Banka D.D. and the merged Depozitna Banka D.D., as a financial platform assisting al Haramain Islamic Foundation and al Qaeda activities:

> The HO (al Haramain) spent around 13 KM ($7,647,000) between its foundation in 1997 and the end of last year 2000. Financial transactions were through accounts at the Depozit[na] Bank, now the Vakufska Bank, whose major shareholders have been linked with PIS operating illegal money laundering.

The Bosnian Intelligence memo regarding the activities of al Haramain states the following:

> Given all the above security factors, we believe that the clear lack of any concrete humanitarian projects indicates that the existence of this HO [Humanitarian Organization] was a fictitious cover (…)

The report establishes al Haramain's role in financing and assisting Osama bin Laden operations:

> Saudi HO [Humanitarian Organization] Al Haramain, (…) has acted as a channel for financing the activities of terrorist organizations. (…) According to available intelligence, the Sarajevo office assisted the terrorist organization Gama Al Islamija, while members of Bin Laden's El Itihad al Islamija (AIAI) terrorist groups were employed at the Somalia offices, which also financed their operations.

482.    The charity allegedly wired $1 million to Chechen rebels in 1999 and arranged to buy 500 heavy weapons for them from Taliban units.  The Russian security service, FSB, has publicly alleged that Al Baraka Bank was used by al Haramain to funnel money to Islamic resistance fighters in Chechnya.

483.    On March 11, 2002, the United States designated the Bosnia-Herzegovina and Somalia branches of al Haramain, based on their extensive and pervasive involvement in the funding of al Qaeda's activities in those two countries.  According to the designation:

> The Bosnia office of Al Haramain is linked to Al-Gama'at al-Islamiyya, an Egyptian terrorist group (designated under Executive Order 13224 on October 31, 2001) that was a signatory to UBL's February 23, 1998 fatwa against the United States.

U.S. Treasury Department officials further noted the Somalia branch's support for the al Qaeda network and a Somali terrorist organization:

> The Somalia office … is linked to Usama bin Laden's al Qaida network and Al-Itihaad al-Islamiyya (AIAI), a Somali terrorist group (designated under Executive Order 13224 on September 23, 2001). Al Haramain Somalia employed AIAI members and provided them with salaries through al Barakaat Bank (designated under Executive Order 13224 on November 7, 2001), which was a primary source of terrorist funding. Al Haramain Somalia continued to provide material and financial support for AIAI even after the group's designation under E.O. 13224 and UNSCR 1333.

Money was funneled to AIAI by disguising funds as if they were intended for orphanage projects or Islamic schools.

484.    On January 22, 2004, the United States designated the al Haramain branches in Indonesia, Kenya, Tanzania and Pakistan for providing "financial, material and logistical support to Usama bin Laden's (UBL's) al-Qaida network and other terrorist organizations."

485.    The Indonesian Office of al Haramain had diverted funds to al Qaeda affiliated terrorists for weapons procurement, and directly funded the deadly October 12, 2002 Bali nightclub bombing.  In addition to providing financial support to al Qaeda operatives in the country and to the Jemaah Islamiyah terrorist group, a senior al Qaeda official apprehended in Southeast Asia, Omar al Faruq, told authorities that al Haramain served as a primary source of al Qaeda funding throughout Southeast Asia.

486.    In the press release issued in conjunction with the designation of the Kenyan and Tanzanian offices of al Haramain, the U.S. Treasury Department described al Haramain's extensive involvement in terrorist activity within Africa as follows:

> As early as 1997, U.S. and other friendly authorities were informed that the Kenyan branch of AHF was involved in plotting terrorist attacks against Americans.  As a result, a number of individuals connected to AHF in Kenya were arrested and later deported by Kenyan authorities.
>
> In August 1997, an AHF employee indicated that the planned attack against the U.S. Embassy in Nairobi would be a suicide bombing carried out by crashing a vehicle into the gate of the Embassy.  A wealthy AHF official outside East Africa agreed to provide the necessary funds.  Information available to the U.S. shows that AHF was used as a cover for another organization whose priorities include dislike for the U.S. government's alleged anti-Muslim stance and purposed [sic] U.S. support for Christian movements fighting Islamic countries.
>
> Also in 1997, AHF senior activities in Nairobi decided to alter their (then) previous plans to bomb the U.S. Embassy in Nairobi and instead sought to attempt the assassination of U.S. citizens.  During this time period, an AHF official indicated he had obtained five hand grenades and seven "bazookas" from a source in Somalia.  According to the information available to the U.S., these

weapons were to be used in a possible assassination attempt against a U.S. official.

Information available to the U.S. shows that a former Tanzania AHF director was believed to be associated with UBL [Usama Bin Laden] and was responsible for making preparations for the advance party that planned the August 7, 1998 bombings of the U.S. Embassies in Dar Es Salaam, Tanzania, and Nairobi, Kenya. As a result of these attacks, 224 people were killed.

Shortly before the dual-Embassy bombing attacks in Kenya and Tanzania, a former AHF official in Tanzania met with another conspirator to the attacks and cautioned the individual against disclosing knowledge of preparations for the attacks. Around the same time, four individuals led by an AHF official were arrested in Europe. At that time, they admitted maintaining close ties with EIJ and Gamma Islamiyah.

Wadih-El-Hage, a leader of the East African al Qaida cell and personal secretary to UBL [Osama Bin Laden], visited the Kenya offices of AHF before the 1998 dual Embassy attacks. Searches conducted by authorities revealed that El-Hage possessed contact information for a senior AHF official who was head of AHF's Africa Committee, then overseeing authority for AHF's offices in Kenya and Tanzania.

In early 2003, individuals affiliated with AHF in Tanzania discussed the status of plans for an attack against several hotels in Zanzibar. The scheduled attacks did not take place due to increased security by local authorities, but planning for the attacks remained active.

Information made available to the U.S. shows that AHF offices in Kenya and Tanzania provided support, or act for or on behalf of al Qaida and AIM.

487.    The Pakistan office of al Haramain provided funding and logistical support for the

acquisition and delivery of Zenit missiles, Sting anti-aircraft missiles, and hand-held anti-tank

weapons to al Qaeda and al Qaeda affiliated militants. In addition:

Before the removal of the Taliban from power in Afghanistan, the AHF in Pakistan supported the Taliban and other groups. It was linked to the UBL-financed and designated terrorist organization, Makhtab al-Khidemat (MK). In one instance, sometime in 2000, the MK director instructed funds to be deposited in AHF accounts in Pakistan and from there transferred to other accounts.

At least two former AHF employees who worked in Pakistan are suspected of having al-Qaida ties. One AHF employee in Pakistan is detained at Guantanamo Bay on suspicion of financing al-Qaida operations. Another former AHF employee in Islamabad was identified as an alleged al-Qaida member who reportedly planned to carry out several devastating terrorist operations in the United States. In January 2001, extremists with ties to individuals associated with a fugitive UBL lieutenant were indirectly involved with a Pakistani branch of the AHF.

As of late 2002, a senior member of AHF in Pakistan, who has also been identified as a "bin Laden facilitator," reportedly operated a human smuggling ring to facilitate travel of al-Qaida members and their families out of Afghanistan to various other countries.

AHF in Pakistan also supports the designated terrorist organization, Lashkar E-Taibah (LET).

488. On June 2, 2004, the United States designated the al Haramain branches in Afghanistan, Albania, Bangladesh, Ethiopia and the Netherlands "for the financial, material and logistical support they provided to the al-Qaida network and other terrorist organizations." The designation stated the following regarding the al Haramain branch in Afghanistan:

In Afghanistan, prior to the removal of the Taliban from power, AHF supported the cause of Jihad and was linked to the UBL financed Makhtab al-Khidemat (MK), a pre-cursor organization of al Qaida and a Specially Designated Global Terrorist pursuant to the authorities of E.O. 13224.

Following the September 11, 2001 terrorist attacks, activities supporting terrorism in Afghanistan continued. In 2002, activities included involvement with a group of persons trained to attack foreigners in Afghanistan. A journalist suspected of meeting with al Qaida and Taliban members in Afghanistan was reportedly transferring funds on behalf of the al Qaida-affiliated AHF and forwarding videotapes from al Qaida leaders to an Arabic language TV network for broadcast.

The Albanian branch of al Haramain was closely linked to Osama bin Laden according to U.S. Treasury officials:

The U.S. has information that indicates UBL may have financed the establishment of AHF in Albania, which has been used as cover for terrorist activity in Albania and in Europe. In late 2000, a close associate of a UBL operative moved to Albania and was

> running an unnamed AHF subsidiary. In 1998, the head of Egyptian Islamic Jihad in Albania was reportedly also a financial official for AHF in Albania. This individual, Ahmed Ibrahim al-Nagar, was reportedly extradited from Albania to Egypt in 1998. At his trial in Egypt, al-Nager reportedly voiced his support for UBL and al Qaida's August 1998 terrorist attacks against the U.S. embassies in Kenya and Tanzania.

The al Haramain office in Bangladesh conducted surveillance for potential al Qaida attacks on U.S. targets in India:

> Information available to the U.S. shows that a senior AHF official deployed a Bangladeshi national to conduct surveillance on U.S. consulates in India for potential terrorist attacks. The Bangladeshi national was arrested in early 1999 in India, reportedly carrying four pounds of explosives and five detonators. The terrorist suspect told police that he intended to attack U.S. diplomatic missions in India. The suspect reportedly confessed to training in al Qaida terrorist camps in Afghanistan, where he met personally with Usama bin Laden in 1994. The suspect first heard of plans for these attacks at the AHF office in Bangladesh.

489.    In Ethiopia, the al Haramain branch provided support to Al Itihaad al Islamiyya ("AIAI"). AIAI has engaged in attacks against Ethiopian defense forces and has been designated both by the United States and the U.N. 1267 Sanctions Committee. Dutch officials confirmed that the al Haramain Humanitarian Aid Foundation located in Amsterdam is part of the larger al Haramain network which has supported terrorism.

490.    Additionally, on June 2, 2004, the United States designated, "the founder and long-time leader of AHF [al Haramain Islamic Foundation] and a suspected al Qaida supporter," Aqeel Abdulaziz al Aqil. Al Aqil has been identified as al Haramain's Chairman, Director General and President. As al Haramain's founder and leader, al Aqil controlled the organization and was responsible for all of its activities, including its support for al Qaeda and other terrorist organizations. According to U.S. Treasury officials:

> When viewed as a single entity, AHF is one of the principal Islamic NGOs providing support for the al Qaida network and promoting militant Islamic doctrine worldwide. Under Al Aqil's leadership of AHF, numerous AHF field offices and representatives operating throughout Africa, Asia, Europe and North America appeared to be providing financial and material

support to the al Qaida network.  Terrorist organizations designated by the U.S. including Jemmah Islammiya, Al-Ittihad Al-Islamiya, Egyptian Islamic Jihad, HAMAS and Lashkar E-Taibah received funding from AHF and used AHF as a front for fundraising and operational activities.

Under Al-Aqil's leadership, AHF implemented its tasks through its offices and representatives, which span more than 50 countries around the world.  AHF maintained nine general committees and several other "active committees" that included the "Continuous Charity Committee, African Committee, Asian Committee, Da'wah and Sponsorship Committee, Masjid Committee, Seasonal Projects Committee, Doctor's Committee, European Committee, Internet and the American Committee, the Domestic Committee, Zakaat Committee and the Worldwide Revenue Promotion Committee."

491.    According to the U.S. Treasury Department evidentiary memorandum detailing al Aqil's designation pursuant to Executive Order 13224, Mansour Al-Kadi, a Saudi and deputy director general of the al Haramain headquartered in Saudi Arabia, issued an Internet posting which identified al Aqil as the "only individual with final decision making on spending … and the one with authority to hire employees, even if it is just a janitor …."  Al Kadi is also "head" of al Haramain's Africa Committee, and vice president of the United States al Haramain branch.

492.    On September 9, 2004, the United States designated the United States branch of al Haramain, along with one of its directors, Soliman al Buthe.  In support of the designation, Stuart Levey, U.S. Treasury's Under-Secretary for Terrorism and Financial Intelligence, said this:  "We continue to use all relevant powers of the U.S. government to pursue and identify the channels of terrorist financing, such as corrupted charities, at home and abroad.  Al Haramain has been used around the world to underwrite terror, therefore we have taken this action to excommunicate these two branches and Suliman Al-Buthe from the worldwide financial community."

493.    The United States branch of al Haramain was formally established in 1997.  On the United States branch's tax Form 990 for 2001 filed with the Internal Revenue Service ("IRS"), al Aqil is identified as the President, al Kadi as the Vice-President, al Buthe as the Treasurer, and Perouz Sedaghaty as the Secretary.  The U.S. branch's Article of Incorporation

and application to the IRS for tax-exempt status also list al Aqil and al Kadi as members of the board of directors.  Additional documents naming al Buthe as the organization's attorney and providing him with broad legal authority were signed by al Aqil.

494.    The assets of the al Haramain branch, which is headquartered in Ashland, Oregon, were blocked as a result of an investigation involving agents from the Internal Revenue Service – Criminal Investigations ("IRS-CI"), the Federal Bureau of Investigation ("FBI"), and the Department of Homeland Security's Immigration and Customs Enforcement ("ICE").

495.    In February 2004, the United States Attorney's Office for the District of Oregon announced the execution of a federal search warrant against the Ashland, Oregon property which has been purchased on behalf of the Al Haramain Islamic Foundation, Inc.  The search was conducted pursuant to a criminal investigation into violations of the Internal Revenue Code, Money Laundering Control Act and Bank Secrecy Act.  The accompanying affidavit by IRS Special Agent Colleen Anderson alleges al Haramain and its officers attempted to conceal the transfer of $130,000 in American Express traveler's checks and a $21,000 cashier's check intended for aid to Muslims in Chechnya in mid-March of 2000.  The affidavit also states that on several occasions from 1997 to 2001, Soliman H. al Buthe, co-founder of the U.S. branch of Al Haramain, brought significant sums of traveler's checks into the United States, according to declarations he made when entering the country.  In 13 trips, he reported bringing in $777,845, of which $206,000 was used to buy the Ashland headquarters in 1997.  But there is no explanation for the balance, Anderson wrote.

496.    In early 2000, an Egyptian doctor wired a $150,000 donation from his London bank account to al Haramain's Ashland bank, according to the affidavit.  An e-mail from the doctor said the money was meant "to participate in your noble support to our Muslim brothers in Chechnya."  At the time, Russian forces were battling Chechen rebels for control of the region. The fight was considered a jihad, or holy war, by some Muslim factions.

497.    The affidavit said that eleven (11) days after the doctor's donation showed up in Oregon, al Buthe traveled to Ashland from Saudi Arabia.  He joined Perouz Sedaghaty (a/k/a

"Pete Seda"), co-founder of the U.S. branch of al Haramain, at an Ashland bank and the two took out $130,000 – buying 130 traveler's checks in $1,000 denominations, the affidavit said.  A bank clerk suggested it would be easier to issue a cashier's check, the affidavit said.

498.    "Seda said he could not take a cashier's check because the money was to help people and a lot of times these people may not be able to negotiate a cashier's check," the affidavit said Seda took an additional $21,000 in a cashier's check, giving that to al Buthe, the affidavit said.  The check had the notation: "Donations for Chichania [sic] Refugees," the affidavit said.  The affidavit said Seda – using the name Abu Yunus – signed an agreement with al Buthe saying he was relinquishing the money for "brothers and sisters in Chechnya."

499.    Within days, al Buthe returned to Saudi Arabia, failing to declare to Customs, as required, that he was taking the traveler's checks out of the United States, the affidavit said.  Once back in Saudi Arabia, al Buthe cashed the traveler's checks in for Saudi riyals at the Al Rajhi Bank.  The money then disappeared, presumably to be smuggled into Chechnya.  Al Buthe deposited the remainder into his bank account.

500.    Al Haramain's 2000 tax return underreported income by $21,000, underreported grants by $150,000, and overstated the price of a second prayer house that al Haramain bought in Missouri.  The tax return shows that Sedaghaty, or one of his associates, improperly listed the $131,300 disbursement to al Buthe as funds used to purchase the Springfield prayer house.

501.    On September 9, 2010, a grand jury in Eugene, Oregon convicted Sedaghaty of two felonies related to the organization's efforts to send nearly $150,000 to support religious extremist militants in Chechnya.  He was convicted of all charges, which included a charge that he filed a false tax return and conspired to file a false tax return as part of al Haramain's efforts to hide the trail of money.

502.    The United States also further designated the al Haramain branch located in the Union of the Comoros on September 9, 2004 based on information that two associates of that branch were linked to al Qaeda.  According to the transcript from *U.S. v. Usama Bin Laden*, the Union of the Comoros was used as a staging area and exfiltration route for the perpetrators of the

1998 bombings of the U.S. embassies in Kenya and Tanzania.  The al Haramain branches in Kenya and Tanzania were previously designated for providing financial and other operational support to these terrorist attacks.

503.    Finally, on June 19, 2008, the U.S. Treasury Department designated the Saudi-based headquarters of the al Haramain Islamic Foundation "for having provided financial and material support to al Qaida, as well as a wide range of designated terrorists and terrorist organizations."  According to the designation:

> Today's action targets the entirety of the AHF organization, including its headquarters in Saudi Arabia.  Evidence demonstrates that the AHF organization was involved in providing financial and logistical support to the al Qaida network and other terrorist organizations designated by the United States and the United Nations.

504.    Al Haramain has also sponsored al Qaeda activity within Europe, through the al Nur Mosque.  According to German officials, the al Nur Mosque served as a meeting place, recruitment center and base of operations for al Qaeda within Germany.  At the direction of the Kingdom of Saudi Arabia, al Haramain contributed in excess of $1 million dollars to the Mosque, funding the purchase of the land for the Mosque as well as its construction.

505.    Al Haramain also sponsored al Qaeda operations in Chechnya and Kosovo through its participation in the Saudi Joint Relief Committee for Kosovo and Chechnya ("SJRC").  As set forth previously, the SJRC offices in Pristine, Kosovo served as a cover for al Qaeda operatives.  Furthermore, between 1998 and 2000, the Kingdom of Saudi Arabia, through the SJRC, diverted more than $74 million to al Qaeda members and loyalists affiliated with SJRC bureaus.

506.    Al Haramain has advertised its connection to al Qaeda.  Al Haramain's website used to have a direct link to the al Qaeda site about the Chechen operations (qoqaz.com).  The website is part of the al Qaeda propaganda organization, Azzam Publications group of websites, including qoqaz.com, qoqaz.net, and azzam.com (among others).

507.     According to the 1996 Central Intelligence Agency Report, al Haramain directly funded and supported a mujahideen battalion in Zenica, was involved in illegal smuggling activities, and has further been linked to illegal funding through drugs and prostitution.

508.     Predictably, al Haramain employees and associates feature prominently among the persons detained as enemy combatants at Guantanamo Bay, Cuba following the September 11, 2001 attacks.

509.     Detainee Zaid Muhamamd Sa'ad al Husayn (ISN No. 050) left Saudi Arabia for Afghanistan in July 2001 after being inspired by flyers posted by al Haramain.  According to the U.S. government:  "The al Haramayn Foundation (aka Al Haramayn Islamic Foundation (HIF)) is designated as a Tier 1 Non-Governmental Organization (NGO).  Tier 1 targets are defined as terrorist groups, especially those with state support, that have demonstrated the intention and the capability to attack United States Persons or interests."

510.     Detainee Abdel Hadi Mohammed Badan al Sebaii Sebaii (ISN No. 064) worked as a volunteer for al Haramain.  Department of Defense documentation states that al Haramain "is an NGO with known ties to al Qaida and Usama Bin Laden" and further asserts: "Al Haramain has been connected with violent Islamic groups and possible financial support of militant groups.  They're known to support Islamic extremist elements in 17 countries or regions."

511.     Detainee Abdul Rahman Owaid Mohammad al Juaid (Detainee No. 179) provided monetary support to al Haramain, traveled from Saudi Arabia to Afghanistan in 2001, and was identified on a jihadist website on a list of mujahideen captured by the U.S. military in Afghanistan.  According to the unclassified evidentiary summaries submitted in support of his continued detention:  "The Al Haramain Islamic Foundation is on a terrorism blacklist because of 'financial, material and logistical support' they provided to the al Qaida network and other terrorist organization."  "Foreign Government Services officials believe that Al Haramain might be a cover organization for Osama Bin Laden's al Qaida network.  Saudi mujahedin are known to work in Al Haramain regional offices around the world."

512.     Detainee Said Muhammad Husayn Qahtani (Detainee No. 200) traveled multiple times from Saudi Arabia to Afghanistan between 2000 and 2001.  In May 2000, Qahtani met and stayed with Abu Zubaydah in a safehouse while waiting to travel to Afghanistan.  Moreover, during a trip in June 2000, Qahtani joined the Taliban against the Northern Alliance and spent a considerable amount of time on the front lines.  Qahtani joined al Qaeda after giving an oath of allegiance ("al bay'ah") to Osama bin Laden, and further met 2 of the 9-11 hijackers – Saeed al Ghamdi and Ahmed Alnami.  According to Department of Defense documentation, Qahtani contacted relief organizations such as the IIRO and al Haramain with the intention "to join a relief organization because those entities would offer him a way to get into Chechnya, whose borders were closed at that time.  Once there, the detainee would be free to leave the relief organization and join the fighting."

513.     Detainee Fahd Muhammed Abdullah al Fouzan (Detainee No. 218), an al Haramain employee, traveled to Afghanistan after September 11, 2001 and was identified as having attended the Abu Nasir military camp in Afghanistan.  Al Fouzan fought in Tora Bora and was a fundraiser and recruiter for both al Qaeda and the Taliban in Saudi Arabia.  According to the U.S. government:  "The detainee was identified as an employee of the al Haramayn Charitable Institute.  Al Haramayn was added on 11 March 2002 to the list of organizations identified under Executive Order 13224 blocking property and prohibiting transactions with persons who commit, threaten to commit, or support terrorism."

514.     Detainee Wasm Awwad Umar Wasim (Detainee No. 338), traveled from Saudi Arabia to Afghanistan in late 2001 with another member of al Qaeda.  According to the unclassified evidentiary summaries submitted in support of his continued detention:  "The detainee volunteered to work with the Al Haramain charity/non-governmental organization (NGO) from time to time.  Executive Order 13224, which blocks property and prohibits transactions with persons who commit, threaten to commit, or support terrorism, designated Al-Haramain as a global terrorist entity.  The detainee stated he was a colleague of the Al-Haramain Director."  In response to allegations concerning his association with al Haramain, Wasim

testified that "al Haramain is an official governmental organization, registered under the administration of the government and the Kingdom of Saudi Arabia. It is officially registered and included in the Humanitarian Aid Association, and under the administration of Internal Affairs, led by the Minister of Internal Affairs." Wasim further stated that al Haramain is "not a secret organization; it's a governmental organization."

515.    Detainee Sami al Haj (Detainee No. 345), a senior al Qaeda operative and logistics expert, traveled to Azerbaijan at least 8 times to courier money to al Haramain, particularly between 1997-1999. The United States government's unclassified evidentiary summaries relating to al Haj assert: "A source stated the al Haramain Saudi Arabian Foundation's main mission is to implement and teach true Wahhabism religious doctrine worldwide. Al Haramain has connections with al Qaida. A former head of the al Haramain has been accused of controlling the financial, material and logistical support to al Qaida and other terrorist organizations. Al Haramain is suspected of involvement in weapons smuggling to Algeria and the transfer of radical fundamentalists to Bosnia during the war in the former Yugoslavia."

516.    Detainee Jamal Muhammad Alawi Mari (Detainee No. 577), began working with al Haramain as a student in 1995 and was later hired in 1997 to work at the al Haramain office in Baku, Azerbaijan. In August 1998, Mari was appointed as director of the al Haramain office in Baku. A foreign government agency has stated that Mari took part in high-level illegal activity, and further reported that the al Haramain office disseminated propaganda of an extremist and separatist nature in the guise of providing humanitarian assistance.

517.    The unclassified evidentiary summaries filed in support of Mari's continued detention at Guantanamo Bay detail al Haramain's long-standing support for Islamic extremist groups, families of Islamic suicide attackers, the al Qaeda network, and mujahideen fighters in Chechnya:

> Al Haramayn was founded in 1992 to disseminate the Saudi
> Arabian version of the Sunni Islamic religion with Wahabistic

influences/teachings. In addition to providing legitimate humanitarian aid to promote Islamic teachings, this organization has provided support to families of Islamic suicide attackers, freed activists from prisons, procured fraudulent travel documents, provided medical care for wounded Mujahedin, smuggled weapons into Algeria and transferred radical fundamentalists into Bosnia.

Al Haramayn has provided logistical support to the Mujahedin fighting in Afghanistan since the 1980's. Their annual budget was between 50 to 60 million United States Dollars. Al Haramayn provides support to Islamic extremist elements in seventeen countries or regions that includes freeing of activists from prisons, procurement of fraudulent travel documents and weapons smuggling to Algeria. Forty bank accounts connect to terrorist activities have been linked to offices and sub-departments of al Haramayn.

A source stated al Haramayn worked closely with members of al Wafa. A former al Qaida member stated organizations such as al Haramayn and al Wafa allowed easier access to funds which financed al Qaida. These organizations provided a legitimate cover for al Qaida members to travel world-wide under the guise of humanitarian operations. These groups would build mosques for the purpose of recruiting future al Qaida members.

Al Haramayn established an office in Azerbaijan to provide a legitimate organization, which was also providing money and materials to Mujahedin, military leaders throughout Chechnya. Authorities accused Al Haramayn of supporting activities not in alignment with the humanitarian aims of the organization in January 2000 and the office was subsequently closed.

518. Detainee Khalid Mahomoud Abdul Wahab al Asmr (Detainee No. 589), identified as an Afghan jihad veteran who had connections with Islamic extremists worldwide, told U.S. military investigators that he had been providing aid to al Qaeda and other extremists since 1996. According to the U.S. government, Al Asmr met with Muhamed Krimi, the director of the al Haramain office in Zenica, Bosnia in July 1999 to discuss a plan to attack the British and American embassies: "HIF [al Haramain] has been sanctioned under Executive Order 13224 for supporting terrorism. HIF has been linked to the Mujahedin Brigade in Bosnia and the Islamic Cultural Institute (ICI) in Milan. HIF uses links to the ICI to remain active in support of the

former mujahideen in Bosnia."  In response to the Tribunal's contention that al Haramain is associated with al Qaeda, Al Asmr stated:  "If you consider al Haramayn as a terrorist organization, you should [be] talking to Saudi Arabia, because Saudi Arabia was the country that established al-Haramayn.  Its president is the Royal Prince there.  Why don't you go over there and ask him."

## SAUDI HIGH COMMISSION

519.    The Saudi High Commission for Relief of Bosnia and Herzegovina ("SHC") is a Saudi Arabia-based da'awa organization, established by the government of Saudi Arabia and headed by Prince Salman bin Abdul Aziz al Saud, who actively directed the SHC's operations.

520.    The SHC is a controlled agent and alter-ego of the Kingdom of Saudi Arabia. The Kingdom controls and directs SHC operations, appoints and terminates SHC personnel, provides the SHC with virtually all of its funding, determines how funds will be distributed throughout the world, and otherwise stringently controls the SHC's operations.

521.    According to the affidavit testimony of the Minister of State of the Council of Ministers of Saudi Arabia, Dr. Mutlib bin Abdullah al Nafissa, the SHC "is an arm of the Saudi Arabian government.  Actions taken by the SHC properly are viewed as actions of the Government of Saudi Arabia."

522.    Saud bin Mohammad al Roshood, Director of the Executive Office of the SHC, has likewise affirmed in affidavit testimony that the SHC was created by decision of the President of the Council of Ministers of Saudi Arabia, has been continuously headed by Prince Salman bin Abdulaziz al Saud, and that the Executive Committee and Supreme Commission of the SHC include a number of other Saudi Government officials.

523.    As detailed previously, the SHC was established to coordinate the Kingdom of Saudi Arabia's response to the Bosnian War, and served as a primary conduit for the Kingdom's massive sponsorship of al Qaeda's jihad in the Balkans.

524.     According to Bosnian officials, al Qaeda mujahideen fighters began entering Bosnia-Herzegovina in 1992, frequently disguised as relief workers for the SHC.

525.     Throughout the course of the war, the SHC served as a primary front for channeling financial and logistical support for al Qaeda's jihad in Bosnia, as confirmed by the testimony of former al Qaeda member Ali Ahmed Ali Hamad.

526.     Ali Hamad was sent to Bosnia in 1992 to help coordinate al Qaeda's military operations.  Following the war, Ali Hamad was employed by the SHC's Mostar office as the Department Chief for "dawa."  In 1997, Ali Hamad was arrested and convicted for participation in a car bombing in the city of Mostar.  At the time, Ali Hamad was ostensibly employed by the SHC.

527.     Among other things, Ali Hamad has affirmed in sworn testimony that:

> The SHC provided Ali Hamad and other al Qaeda members with false employment papers to allow them to move freely throughout the Balkans in furtherance of al Qaeda's objectives.
>
> Representatives of the SHC provided extensive financial support and food to the mujahideen forces, and also permitted the mujahideen and al Qaeda members in Bosnia to use the SHC's offices and rented houses.  Al Qaeda members planned terrorist plots and attacks from SHC facilities.
>
> The SHC frequently transported mujahideen and al Qaeda members throughout Bosnia-Herzegovina in SHC vehicles bearing the mark of the United Nations High Commission for Refugees ("UNHCR"), thereby allowing those mujahideen and al Qaeda members to pass military and police checkpoints.  The SHC also provided the mujahideen with money for other travel expenses.
>
> The SHC appointed a number of former mujahideen fighters to serve as officers or directors of its branch offices in Bosnia-Herzegovina.  In 1993 the director of the Sarajevo office of the SHC was a Saudi named Abu al-Miqdad al Dusari.  Al Dusari was among the first mujahideen to arrive in Bosnia-Herzegovina at the beginning of the Bosnian War.
>
> At the request of the mujahideen in 1994, the Chief Director of the SHC in Zagreb appointed a man named Hasam al Din to serve as the director of the Zenica office.  Al Din was also one of the first

mujahideen to arrive in Bosnia-Herzegovina at the beginning of
the Bosnian War, and he engaged in significant military activities
as a member of the mujahideen forces placed in Tesanj, in the
middle of Bosnia.  Al Din was wounded during the course of the
war, and after recovering from his wounds, returned to Bosnia-
Herzegovina as a representative of the Zenica office of the SHC.

SHC directors routinely delivered truckloads of supplies to al
Qaeda members.

After the conclusion of the Bosnian War, the SHC provided
ostensible employment to a number of foreign fighters and al
Qaeda members who had fought in the War, knowing full well that
they were members of al Qaeda.  Moreover, the SHC continued to
provide foreign fighters and al Qaeda members with access to
vehicles with diplomatic car registrations, and vehicles registered
to the UNHCR, which enabled them to move freely throughout
Bosnia-Herzegovina.

528.    Ali Hamad's sworn testimony is independently corroborated by numerous U.S.,
U.N. and NATO investigations.

529.    For instance, wiretap summaries obtained from the International Criminal
Tribunal for the Former Yugoslavia reveal that members of the al Qaeda mujahedeen in Bosnia
were directed to pick up funds for the purchase of weapons from the SHC.  In this regard, a May
25, 1994 entry in from a report of the Republic of Bosnia and Herzegovina's Ministry of the
Interior, detailing intercepted telephone conversations between mujahideen fighters during 1994,
identifies the SHC as having provided money to mujahideen fighters to purchase weapons ("In
the talk between Abu Talib and Abu Meali, Talib asked for money to purchase weapons and said
that he bought an American rifle, three Kalashnikovs and three sniper rifles, and asked Meali for
permission for DEM.  He picked up the money for the purchase of the weapons at the Saudi
High Committee in Visoko.").

530.    A U.N. sponsored investigation further determined that Prince Salman bin Abdul
Aziz al Saud, the head of the SHC, transferred in excess of $120 million from his personal
accounts and SHC accounts under his control to the Third World Relief Agency ("TWRA"),
between July of 1992 and July of 1995.  According to the 9/11 Commission, the TWRA was an

al Qaeda front and the primary pipeline for illegal arms shipments to al Qaeda fighters in the Balkans. The U.N. sponsored audit of the TWRA's records suggested that the SHC's lavish funding of TWRA commenced shortly after a personal meeting between Prince Salman and the head of the TWRA. As the SHC had a robust operational presence of its own in Bosnia, there was no legitimate "humanitarian" reason for it to send any funds to the TWRA.

531.    In 1994, Abdul Hadi al Gahtani, a Saudi who was the Director of the SHC's office in Zenica, was arrested for the murder of the British aid worker, Paul Goodall. Al Gahtani admitted the gun used in the murder belonged to him, but escaped police custody under mysterious circumstances and a Bosnian court later convicted him in absentia of Goodall's murder. Al Gahtani was reportedly "martyred" on November 19, 2001, when a U.S. rocket hit a building where he was staying.

532.    The U.S. government has also concluded that an al Qaeda member associated with the SHC murdered U.S. citizen William Jefferson in Bosnia on November 18, 1995. In a Federal Bureau of Investigation ("FBI") memorandum summarizing an interview of Ali Ahmed Ali Hamad on June 16, 2003 regarding the murder Mr. Jefferson, Ali Hamad discusses his relationship with fellow mujahideen and al Qaeda member, Ahmed Zuhair Handala (who "had a good relationship with Usama Bin Laden"). The FBI memo states that Handala attempted to recruit Ali Hamad to join his unit to kill American and British citizens, but he refused. The memo further states that Handala had been arrested in Mostar but had been later released from prison because of a payoff by the SHC ("The Saudi Arabia High Commission gave the Croatians $70,000 or more for his release.").

533.    In October 2001, officials of the U.S. government and NATO raided the Sarajevo offices of the SHC. During the raid, investigators found computer hard drives with photographs of the World Trade Center before and after its collapse, as well as photographs of the United States embassies in Kenya and Tanzania and the U.S.S. Cole. Investigators also discovered files on deploying chemical agents with crop dusters, information about how to make fake State

Department badges, and photographs and maps of Washington, marking prominent government buildings.

534. Following the raid, the Financial Police of the Federation of Bosnia Herzegovina Ministry of Finance described the SHC as a front for radical and terrorism-related activities, stating:

> Members of the SFOR (stabilization forces) have on premises on the Saudi high commission relief for Bosnia and Herzegovina confiscated some documentation for which it can be claimed with certainty that it does not belong in the scope of work of a humanitarian organization …

535. During that same month, officials in Bosnia also arrested six members of the al Qaeda network (known as the "Algerian Six" or "Bosnian Six") who were plotting to conduct terrorist strikes on U.S. targets in Bosnia, including an attack on the U.S. Embassy in Sarajevo: Bensayah Belkacem, Saber Lahmar, Mustafa Ait Idir, Hadj Boudella, Lakhdar Boumediene, and Mohamed Nechle. All members of the group were on the SHC's payroll. According to media reporting on their arrest, intercepted phone conversations between the men spoke of the need to retaliate for U.S. attacks in Afghanistan. It was reported that one of them said, "Tomorrow, we will start."

536. The six men were turned over to the U.S. in January 2002 and were incarcerated at Guantanamo Bay Naval Base in Guantanamo Bay, Cuba. Unclassified evidentiary summaries prepared by the Department of Defense for the Combatant Status Review Tribunal ("CSRT") confirm that the men were closely connected to Osama bin Laden and al Qaeda, were on the SHC's payroll, and that the SHC was providing financial support to mujahideen fighters in Bosnia.

537. Department of Defense documentation identifies Bensayah Belkacem as a primary al Qaeda facilitator in Bosnia. According to the unclassified evidentiary summaries: Belkacem possessed numerous phone numbers that linked him to bin Laden's operational network in Afghanistan and the global Sunni extremist group; Belkacem was known for his ties

to the Chechen movement during 1999 and reportedly had a connection to a bin Laden operative; and Belkacem planned to join jihadist elements in Afghanistan in September 2001 in anticipation of the U.S. invasion.

538.    The DOD materials relating to Belkacem specifically link the SHC to the members of the Algerian Six:

> An open source reported that the detainee, also known to be the leader of a group in Algeria, had 3.5 million Marks of Bosnian currency deposited in a bank in Sarajevo, Bosnia, and several other members of the group had millions also deposited in banks.  The open source reported that an investigation revealed the High Saudi Committee had on its payroll almost all of the members of the group from Algeria, which had links to international terrorism.

539.    Bosnian investigators determined that Belkacem was in charge of screening recruits for al Qaeda training camps in Bosnia and that his cell phone contained the telephone number for senior al Qaeda official Abu Zubaydah.  Belkacem worked closely with Zubaydah regarding the procurement of passports.

540.    Saber Lahmar, a member of the al Qaeda network, was also an employee of the SHC for several years.  According to DOD documentation presented in support of Lahmar's continued detention at Guantanamo Bay:  Lahmar is a former Bosnian/Afghan Mujahedin; Lahmar supported the fatwa issued by bin Laden against the U.S.; Lahmar expressed a desire to blow up U.S. soldiers, proposed attacking U.S. troops in Bosnia, and made threats against the international community in Bosnia; Lahmar attempted to assume leadership of the Armed Islamic Group in Bosnia; and finally was known to be a close associate of an al Qaeda member in Bosnia.  DOD unclassified evidentiary summaries further stated:

- The detainee worked for the Saudi High Commission for Relief from 1993 to 1994 and again from 1996 until 2002.

- The Saudi High Commission for Relief and al Haramayn has provided financial support to former Arab Mujahedin in Bosnia.  The types of financial support included family stipends or travel to Chechnya and Afghanistan.

- The detainee worked for El Haramain in Zenica and Sarejevo, Bosnia. He had close leadership ties to the leadership of El Haramain in Zenica.

- The head organizer for placing a car bomb in Mostar in 1997, who was also close to the Saudi High Commission and El Haramein, frequently visited the detainee.

- Al Haramayn is directly tied to terrorist activities in the Bosnia-Herzegovina area. They provide shelter and support to persons known to have committed terrorist activities.

541. DOD materials presented to the CSRT in support of the remaining Algerian Six members' further detention at Guantanamo Bay detail their ties to al Qaeda and the Bosnian mujahideen. Mustafa Ait Idir is identified as a member of the Armed Islamic Group and a former Bosnian Mujahideen and chief martial arts instructor for the Bosnian Muj Brigade who made threats against Stabilization Forces in Bosnia and reportedly exhorted Bosnian mujahideen to kill Stabilization Forces. Hadj Boudella is a suspected member of the Bosnian Mujahideen and was associated with known al Qaeda elements in the Balkans. Boudella was in the Tora Bora region with several al Qaeda fighters and operatives, and received training on the Kalashnikov rifle and grenades from an al Qaeda member. Lakhdar Boumediene was also a former member of the Bosnian Mujahideen, a member of the Algerian Armed Islamic Group, and was one of the closest associates of an al Qaeda member in Bosnia. Finally, Mohamed Nechle is a member of the Armed Islamic Group with links to bin Laden's al Qaeda terrorist network. Nechla is further identified as a supporter of terrorist groups in Africa.

542. Governmental investigations also indicate that the SHC has played a direct role in arms trafficking for al Qaeda. Of particular note, a Defense Intelligence Agency report indicates that General Mohammad Farah Hassan Aideed, the al Qaeda affiliated Somali warlord responsible for the Black Hawn down massacre, received "weapons' shipment from the Saudi Arabian High Commission for Relief." The weapons were "usually hidden in false bottom containers."

## SAUDI RED CRESCENT SOCIETY

543.    The Saudi Red Crescent Society ("SRC") is a Saudi Arabia-based da'awa organization, which conducts operations throughout the world.

544.    The SRC is a controlled agent and alter-ego of the Kingdom of Saudi Arabia.  The Kingdom controls and directs SRC operations, appoints and terminates SRC personnel, provides the SRC with virtually all of its funding, determines how funds will be distributed throughout the world, and otherwise stringently controls the SRC's operation.  In many countries, the SRC conducts operations from the local Saudi embassy, under the supervision of the embassy's Islamic Affairs Division.

545.    Senior officials of the SRC have expressly acknowledged that the SRC is an alter-ego of the Saudi Arabia government.  According to the affidavit testimony of Abdulrahman al Swailem, President of the Saudi Arabian Red Crescent Society, al Swailem was appointed by "royal order issued by King Fahd bin Abdulaziz, to serve as president of the Saudi Arabian Red Crescent Society," a position that holds Excellency level status within the Saudi Arabian Government.  The affidavit further asserts that the Government of the Kingdom "sponsors and supervises the Saudi Arabian Red Crescent Society, and the Saudi Government appoints all of its directors."

546.    The SRC's ties to al Qaeda's leadership also date to the 1980s, when it operated within the network established to support the Afghan jihad.

547.    By all accounts, the SRC played a prominent role within that network, providing extensive financial and logistical support to the mujihadeen in Afghanistan.  Indeed, in 1986, Dr. Abu Hazifa, a Director of the SRC, openly acknowledged the organization's direct ties to the *mujihadeen*, and that many of those fighters in fact worked for the Saudi Red Crescent.

548.    The SRC's support for bin Laden's terrorist organization was orchestrated largely by Wa'el Hamza Jelaidan, who in addition to his positions within the MWL, IIRO and SJRC headed the SRC's office in Peshawar, Pakistan during the 1980s.

549.     As discussed previously, documents recovered from the Tareekh Osama file document al Qaeda's intent to rely on the SRC to support its global jihad.  A later internal al Qaeda document cautioned that the SRC may no longer represent a safe "umbrella" for al Qaeda members, because Jelaidan was being recalled to Saudi Arabia.  The import of this statement is clear – under Jelaidan's direction the SRC was serving as a front for al Qaeda.

550.     During that same search, investigators found a letter on SRC stationary to Abu Rida, another founding member of al Qaeda, requesting that "weapons be inventoried."  At the bottom of the letter is a note from bin Laden to Jelaidan, then the SRC's director, stating "we have an extreme need for weapons."

551.     Years later, Jelaidan facilitated the SRC's sponsorship of al Qaeda activities in Kosovo and Chechnya.  In 1999, Saudi Arabia formed the Saudi Joint Relief Committee for Kosovo and Chechnya to coordinate the relief efforts of the SRC and other Saudi charities in Kosovo and Chechnya.  The Kingdom designated the SRC to serve as the operational arm for SJRC-coordinated relief efforts.  Although bin Laden had publicly confirmed that Jelaidan was one of al Qaeda's founding members in a 1999 interview, the Kingdom appointed Jelaidan Director of SJRC and SRC operations in Pristina.  In 2000, U.S. officials sent a written alert to the U.N. Peace Keeping Force in Pristina, asserting that SJRC officials Adel Kazam and Jelaidan were "associates of Osama bin Laden" and that Jelaidan was actively involved in helping bin Laden "move money and men" to and from the Balkans.

552.     Separate incidents revealed that members of the SRC staff working under the supervision of the SJRC actively participated in the development and planning of terrorist attacks against American interests.

553.     Employees of the SRC were also implicated in the 1995 al Qaeda bombing attack on the Egyptian Embassy in Islamabad.  Following that attack, investigators arrested Muhammed Ali Sayed and Bashir Barbar Qadim, two Sudanese employees of the SRC.  The investigation which led to the arrests revealed evidence that Sayed had indirectly funded the attack by channeling SRC funds to Egyptian al Jihad, the terrorist organization run by Ayman al Zawahiri

which formally merged with al Qaeda several years before the September 11th Attack.  Egyptian authorities alleged that Zawahiri personally masterminded the Embassy attack.

554.    The SRC continued to serve as a front for al Qaeda through the date of the September 11th Attack.  In fact, just weeks after the September 11th Attack, the Pakistani government deported employees of the SRC, based on evidence that they were involved in al Qaeda related terrorist activities.  In 2002, NATO and Bosnian authorities arrested six Algerian al Qaeda members who were plotting attacks on the U.S. and British embassies in Sarajevo. Two of those men, Boumediene Lakhdar and Nechle Mohammed, were employees of the SRC.

555.    Based in part of the U.S. government's assertion that the SRC is a front for al Qaeda, several persons associated with the SRC were incarcerated at the Guantanamo Bay Naval Base in Guantanamo Bay, Cuba as enemy combatants

556.    Detainee Mohamed Atiq Awayd al Harbi (ISN No. 333) was a member of the mujahideen in Kandahar, Afghanistan and was further identified as being a fighter in the Tora Bora Mountains.  When al Harbi was arrested by Pakistani police, he was in possession of $8,000 U.S. dollars and 12,000 Saudi Riyals which he was planning to deliver to the SRC. Representatives from the Saudi Embassy and from the SRC visited him and provided him with lawyers.  Al Harbi was eventually handed over to the United States and transported to Guantanamo Bay, but was subsequently transferred to Saudi Arabia on November 9, 2007 to participate in the Kingdom's terrorist rehabilitation program.  Less than 6 months after returning to Saudi Arabia, al Harbi fled to Yemen with other Saudi al Qaeda members.  On January 23, 2009, the al Fajr Media Center – the official online logistical network responsible for disseminating messages from various al Qaeda military factions – released new video footage of joint sermons delivered by a group of Saudi and Yemeni al Qaeda leaders.  Al Harbi appeared in the video with the official title of "Field Commander of the al Qaeda Organization in the Arabian Peninsula."

557.    Detainee Said Ali al Shihri (ISN No. 372) traveled from Saudi Arabia to Afghanistan following the September 11th attacks with $1,900 U.S. dollars to distribute to the

SRC.  Al Shihri trained in urban warfare at the Libyan Camp north of Kabul, and one of his aliases was among 100 names taken from Afghanistan-based military training camp applications. Following his capture, al Shihri was handed over to the United States and transported to Guantanamo Bay, but was subsequently transferred to Saudi Arabia on November 9, 2007 to participate in the Kingdom's terrorist rehabilitation program.  Al Shihri eventually escaped from Saudi security forces and fled with other high profile al Qaeda operatives to Yemen.  On January 23, 2009, the al Fajr Media Center released new video footage of joint sermons delivered by a group of Saudi and Yemeni al Qaeda leaders.  Al Shihri was featured in the video with the official title of "Secretary General of the al Qaeda Organization in Saudi Arabia."

558.    Detainee Muhamed Hussein Abdallah (ISN No. 704) was employed as an Arabic language instructor by the SRC.  According to the unclassified evidentiary summaries submitted in support of Abdallah's continued detention:  "Senior officials of the SRCS [Saudi Red Crescent Society] were involved in money laundering operations aimed at assisting Pakistani-based extremist organizations."  Concerning the allegations lodged by the United States regarding his association with various "humanitarian organizations," Abdallah stated "the only one I was working for the last two years was the Saudi Red Crescent.  If these organizations were terrorist organizations, its contrary to what I knew about them.  They were official government organizations, recognized as I said, by official governments.  So why don't you bring the officials, the Saudi government…?"

### SAUDI JOINT RELIEF COMMITTEE FOR KOSOVO AND CHECHNYA

559.    The Kingdom of Saudi Arabia established the Saudi Joint Relief Committee ("SJRC") on May 19, 1999 pursuant to High Order 7/B/1863 (the "Albanian High Order").  In accordance with the Albanian High Order, the SJRC was endowed with responsibility for coordinating and carrying out the operations of five constituent charities in Kosovo and Chechnya:  Al Haramain al Masjed al Aqsa; IIRO, WAMY, MWL and SRC.  Subsequent to the

establishment of the SJRC, those constituent charities continued to solicit funds to support activities in Kosovo and Chechnya throughout the World, including from the United States.

560.     Senior officials of the SJRC have expressly acknowledged that the SJRC is a controlled agent and alter-ego of the Kingdom of Saudi Arabia.  According to the affidavit testimony of Dr. Abdulrahmann al Swailem, President of the SJRC, the SJRC has "always functioned as a political subdivision, agency, or instrumentality of the Kingdom of Saudi Arabia. The SJRC was established on May 19, 1999 pursuant to High Order… issued by King Fahd upon the recommendation of the Council of Ministers of the Kingdom of Saudi Arabia."  The affidavit further reflects that the governing Albanian High Order specified that the SJRC would be supervised by the Minister of Interior of the Kingdom of Saudi Arabia, and that the SJRC would include a number of other high-ranking representatives from agencies of the Kingdom and other "charity" organizations.  Of particular interest, the Order establishing the SJRC required that its leadership include "the Presidency of General Intelligence."

561.     Between 1998 and 2000, the Kingdom of Saudi Arabia, through SJRC, diverted more than $74 million dollars to al Qaeda members and loyalists affiliated with SJRC bureaus. Throughout this time, the committee was under the supervision and control of Saudi Interior Minister Prince Naif Bin Abdul Aziz.

562.     Each of the constituent charities operating under the SJRC has longstanding ties to al Qaeda.  For instance, al Haramain al Masjed al Aqsa was designated by the Treasury Department on May 6, 2004 pursuant to Executive Order 13224.  According to U.S. officials:

> The Al-Haramain & Al Masjed Al-Aqsa Charity Foundation
> (AHAMAA) has significant financial ties to the Bosnia-based
> NGO Al Furqan, and al Qaida financier Wa'el Hamza Julaidan,
> who was designated by the Treasury Department on September 6,
> 2002.  Wa'el Hamza Julaidan, a Saudi citizen, is a close associate
> of Usama bin Laden. Julaidan fought with bin Laden in
> Afghanistan in the 1980s. Bin Laden himself acknowledged his
> close ties to Julaidan during a 1999 interview with al-Jazeera TV.
> As a member of the Board of Directors for AHAMAA, Julaidan
> opened three bank accounts on behalf of the NGO between 1997

and 2001 and continued to have authorization to handle two of their accounts as a signatory on two the NGO's Bosnian accounts.

563.     As described above, the MWL, IIRO, WAMY and SRC have similar pervasive ties to al Qaeda, and like its constituent entities, the SJRC provided critical resources to support al Qaeda's jihad against the United States.

564.     As al Qaeda was establishing its operations in Kosovo and Chechnya, Wa'el Jelaidan assumed a position as Director of the SJRC's office in Pristina.  As referenced above, Jelaidan is a founding member of al Qaeda and was designated by the United States government on September 6, 2002 pursuant to Executive Order 13224.  The Treasury Department press release issued in conjunction with the designation set forth the following basis for the action:

> The United States' has credible information that Wa'el Julaidan is an associate of Osama bin Laden and several of bin Laden's top lieutenants.  Julaidan has directed organizations that have provided financial and logistical support to al Qaida.  Accordingly, the United States is designating Julaidan under Executive Order 13224 as a person who supports terror.

565.     The United Nation's mission in Kosovo has declared that the SJRC office in Pristina, Kosovo, served as a cover for several al Qaeda operatives, including Adel Muhammad Sadi Bin Kazam and Wa'el Hamza Julaidan, both of whom served as Directors of SJRC.

566.     More than a year before the September 11th Attacks, U.S. officials sent a written request to the U.N. Peace Keeping Force in Pristina, requesting that U.N. police undertake surveillance of the SJRC.  In that document, Marked "Secret: U.S. Office Only – Release to UNMIK," the U.S. government asserted that SJRC officials Adel Muhammad Sadi Bin Kazam and Julaidan were "associates of Osama bin Laden" and that Julaidan was actively involved in helping bin Laden "move money and men to and from the Balkans."

567.     Acting on that information, the United Nations Mission in Kosovo ("UNMIK") raided a house rented by the SJRC in Pristina, and declared that the organization served as a cover for several Usama bin Laden operatives, including Kazem and Jelaidan.

568.     A year earlier, in June 1998, the CIA and Albanian authorities raided several houses and offices of members of an associate of the SJRC in Tirana.  In July 1998, its Director Muhamed Hasan Mahmud, an Egyptian national, was arrested on charges of making false documents and arms possession.  He was connected to a 1992 terrorist attack against the Egyptian Parliament.  Several of its members and directors were later arrested in connection with the U.S. Embassy bombings in Kenya and Tanzania of August 1998.

569.     Prominent media outlets have also documented the SJRC's role in facilitating the movement of "money and men to and from the Balkans" for Osama bin Laden.

570.     Despite his joint designation by the United States and Saudi Arabia on September 6, 2002 for being "an associate of Usama bin Laden and a supporter of al-Qa'ida terror," Jelaidan continued to work on behalf of the SJRC as late as December 2003.  According to the United Nations Security Council Committee's December 2, 2003 *Second Report of the Monitoring Group on Al-Qaida*:

> The Rabita Trust was added to the list in October 2001. Its Saudi Chairman, Wa'el Hamza Julaidan (also spelled Jalaidan) was designated at the request of the United States and Saudi Arabia on 6 September 2002. There are nevertheless reports that Julaidan remains actively engaged in "charitable activities" and financial transactions. Julaidan currently lives in Saudi Arabia and is reportedly still working with the Saudi Joint Relief Committee for Kosovo and Chechnya, and serves as one of the directors of the Al-Haramain al-Masjid al-Aqsa Foundation in Bosnia and Herzegovina.

571.     SJRC's Saudi bank accounts at National Commercial Bank ("NCB") were managed by Suleiman Abdel Aziz al Rajhi, Chairman, Managing Director and the largest shareholder of Al Rajhi Banking & Investment Corporation.  Historically, Suleiman al Rajhi himself has been an active sponsor of al Qaeda frequently through his own banks.  Al Rajhi Bank has been used by the MWL, IIRO and al Haramain to funnel funds to support terrorism.  According to a 2003 CIA report:

> Al-Rajhi Bank: Conduit for Extremist Finance (S//NF)

> Islamic extremists have used Al-Rajhi Banking & Investment
> Corporation (ARABIC) since at least the mid-1990s as a conduit
> for terrorist transactions, probably because they find the bank's
> vast network and adherence to Islamic principles both convenient
> and ideologically sound.  Senior al-Rajhi family members have
> long supported Islamic extremists and probably know that
> terrorists use their bank.  Reporting indicates that senior al-Rajhi
> family members control the bank's most important decisions and
> that ARABIC's principle [sic] managers answer directly to
> Suleiman.  The al-Rajhis know they are under scrutiny and have
> moved to conceal their activities from financial regulatory
> authorities.

572.    NCB actively sponsored al Qaeda through Muwafaq, IIRO and SJRC.  SJRC also received valuable financial services from NCB which allowed the organization to provide direct financial and logistical support to al Qaeda for several years leading up to the 9/11 attack.

573.    In addition to maintaining the SJRC's bank accounts, NCB actively promoted those accounts on behalf of the organization.  Advertisements running in multiple issues of the MWL Journal in 2000 and 2001 openly solicited funds and directed donors to SJRC accounts managed by the National Commercial Bank and Al Rajhi Banking & Investment Corporation.

574.    NCB opened two "shared accounts" with Al Rajhi Banking & Investment Corporation (Special Joint account #22 and #33) for the IIRO as a member of the SJRC, thereby allowing the SJRC to serve as a conduit for funneling donations to al Qaeda fighters in Kosovo and Chechnya.

**RABITA TRUST**

575.    Rabita Trust is a subsidiary body of the Muslim World League ("MWL"), with headquarters in Lahore, Pakistan and offices throughout the world.

576.    Rabita Trust is an agency, instrumentality and organ of the Kingdom of Saudi Arabia. The Kingdom controls and directs Rabita Trust operations, appoints and terminates Rabita Trust personnel, provides Rabita Trust with virtual all of its funding, determines how funds will be distributed throughout the world, and otherwise stringently controls Rabita Trust operations.  In many countries, Rabita Trust conducts operations from the local Saudi embassy, under the supervision of the embassy's Islamic Affairs Division.

577.    As set forth previously, senior officials of the MWL have expressly acknowledged that the MWL and its subsidiary bodies are agencies, instrumentalities and organs of the Kingdom of Saudi Arabia.

578.    Rabita Trust's material sponsorship of al Qaeda has been facilitated by the direct participation of senior at Qaeda officials in the management and operation of Rabita Trust.  In fact, Rabita Trust was, for several years prior to September 11, 2001, headed by al Qaeda founding member Wa'el Hamza Jelaidan.

579.    In addition, Rabita Trust has shared common officers and directors with several other charities operating within al Qaeda's infrastructure, including the MWL and the SAAR Network of charities and businesses.  Abdullah Omar Naseef served as a Chairman of Rabita Trust and as Secretary General of the MWL.  Naseef is also an officer of Makkahl-Mukarramah, Inc., a Virginia based charity operating within the SAAR network.  The Co-Chairman of the Board of Trustees of Rabita Trust, Abdullah al Obaid, also served as an officer of the MWL and Sanabel al Kheer organizations within the SAAR network. Al Obaid also serves as a senior executive of al Watania Poultry in Saudi Arabia, one of the many businesses owned by Suleiman Abdel Aziz al Rajhi, the founder of the SAAR Network, member of the Board of Directors of the IIRO, and CEO of al Rajhi Banking and Investment.  Adnan Basha, a member of the Rabita Trust Board of Directors, is also the Secretary General of the International Islamic Relief Organization ("IIRO").

580.    Given its pervasive and ongoing involvement in al Qaeda's operations, and the direct participation of senior al Qaeda officials in its management, the United States government designated Rabita Trust as a Specially Designated Global Terrorist on October 12, 2001 pursuant to Executive Order 13224.  According to the U.S. Treasury Department:

> Rabita Trust is a Pakistani non-governmental organization (NGO) designated for its close ties to senior al Qaida leadership and for providing logistical and financial support to al Qaida.  In February 2000, Wa'el Hamza Julaidan was appointed to the Board of Trustees of the Rabita Trust and served as its Director General.

Julaidan was jointly designated on September 6th, 2002 by Saudi
Arabia and by the United States under Executive Order 13224.

## XI.   THE HOUSE OF SAUD'S KNOWLEDGE CONCERNING ITS CHARITIES' TERRORIST ACTIVITIES PRIOR TO 9/11

581.   Because the Saudi da'awa organizations were themselves alter-egos of the Saudi government, their states of mind in knowingly and intentionally sponsoring al Qaeda is itself attributable to the government of the Kingdom.  However, the facts and evidence fully establish that the pervasive sponsorship of al Qaeda's global jihad by the Saudi government controlled da'awa organizations, as reflected by the facts and evidenced set forth above, was carried out with the full knowledge of the Saudi regime.

582.   As discussed previously, the House of Saud made a conscious decision to deploy the Saudi da'awa infrastructure to support Islamist movements throughout the World in response to the demands of the Saudi Ulema, and was expressly aware when it did so of the longstanding ties between those organizations and the al Qaeda leadership.  The Kingdom also knew, from the earliest date, of bin Laden's organizational activities as the head of a global jihad organization, and the continuing involvement of bin Laden associates as officials of Saudi da'awa organizations.  Moreover, by virtue of its own promotion of the Western Cultural Attack paradigm, the regime also understood that members of the Ulema appointed to direct the activities of the Saudi da'awa organizations shared al Qaeda's belief that conducting jihad against the United States was a religious obligation.

583.   Although these facts render any claim that the Saudi government was unaware of the terrorist activities of its da'awa organizations implausible, it is worth noting that the Kingdom received continuous warnings concerning their pervasive ties to al Qaeda, through media reports and engagements with other governments, as well as its own monitoring of those organizations.

584.   Indeed, from the early 1990's through September 11, 2001, the involvement of the Saudi da'awa organizations in terrorist plots and operations was the subject of intense media scrutiny and reporting. As the regime closely monitors all media reporting referencing its state

controlled da'awa organizations, both through its embassies and via a media surveying program carried out by the Saudi Ministry of Foreign Affairs, this reporting was well known to the House of Saud.

585.     Furthermore, the international community repeatedly cautioned Saudi Arabia about the imminent threat posed by the activities of its da'awa organizations during the years preceding the September 11th Attacks.  For instance, during a 1994 meeting with senior officials of the Kingdom, French Interior Minister Charles Pasqua expressed the French government's deep concerns regarding the pervasive involvement of the Saudi charities in the sponsorship and funding of terrorist organizations.  Pasqua specifically mentioned the MWL during that meeting. At a conference of  Arab interior ministers in 1998, the Egyptian Minister of Interior similarly expressed specific concerns about the involvement of  Saudi charities in the sponsorship of terrorist activities to Saudi Prince Naif.  In 1999 and 2000, senior delegations from the U.S. government met with senior officials of the Kingdom, to address the U.S. government's concerns regarding the extensive involvement of Saudi charities in the sponsorship of terrorism.  As the U.S. and Saudi governments had an intelligence sharing program concerning terrorism in place beginning in 1997, these concerns had no doubt been conveyed to the Saudis earlier.

586.     Despite these repeated warnings about the terrorist agenda being pursued by its da'awa organizations in partnership with al Qaeda, the Kingdom continued to channel massive support to those organizations, in the hopes of directing the jihadist fervor of Saudi Arabia's most radical elements at targets other than the House of Saud.  This calculated decision by the Saudi regime fueled al Qaeda's growth and development, culminating in the September 11th Attacks.

587.     Nearly a decade since those Attacks, the Saudi da'awa apparatus continues to channel material support to al Qaeda and affiliated terrorists, and State Department officials have recently lamented that the United States has had little success in convincing the Saudi regime to treat the matter as a priority.

Dated:  February 3, 2015            Respectfully submitted,

/s/ Stephen A. Cozen
Stephen A. Cozen, Esq.
Elliott R. Feldman, Esq.
Sean P. Carter, Esq.
Scott Tarbutton, Esq.
COZEN O'CONNOR
1900 Market Street
Philadelphia, PA  19103
(215) 665-2000

Attorneys for *Federal Insurance* Plaintiffs

Jodi W. Flowers, Esq.
Robert T. Haefele, Esq.
MOTLEY RICE LLC
28 Bridgeside Boulevard
P. O. Box 1792
Mount Pleasant, SC  29465
(843) 216-9000

-and-

Andrea Bierstein, Esq.
HANLY CONROY BIERSTEIN SHERIDAN
FISHER & HAYES, LLP
112 Madison Avenue
7th Floor
New York, NY  10016
(212) 784-6400

Attorneys for *Burnett* Plaintiffs and *Euro Brokers*
Plaintiffs

James P. Kreindler, Esq.
Justin T. Green, Esq.
Andrew J. Maloney III, Esq.
KREINDLER & KREINDLER LLP
750 Third Avenue
32nd Floor
New York, NY 10017
(212) 687-8181

Attorneys for *Ashton* Plaintiffs

Jerry S. Goldman, Esq.
ANDERSON KILL, P.C.
1251 Avenue of the Americas
New York, NY  10020
(212) 278-1000

Attorneys for *O'Neill* Plaintiffs

Chris Leonardo, Esq.
ADAMS HOLCOMB LLP
1875 Eye Street, NW
Suite 810
Washington, DC  20006
(202) 580-8803

Attorneys for *Cantor Fitzgerald*
Plaintiffs

Robert M. Kaplan, Esq.
FERBER CHAN ESSNER &
COLLER, LLP
530 Fifth Avenue, 23rd Floor
New York, NY 10036-5101
(212) 944-2200

Attorneys for *Continental Casualty*
Plaintiffs

LEGAL\20631489\1 00000.0000.000/117430.000