# Exhibit "3"

to the Affirmation of Sean P. Carter Transmitting Evidence in Support of Plaintiffs' Memorandum of Law in Opposition to the Motion to Dismiss of the Kingdom of Saudi Arabia and Saudi High Commission for Relief of Bosnia & Herzegovina

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (GBD) (FM) <br> ECF Case |
|---|---|

*This document relates to: All Actions*

## AFFIRMATION OF JOHN F. LEHMAN

I, John F. Lehman, being duly sworn, declare and state as follows:

1. My name is John F. Lehman. From 1969 through 1974, I served as a staff member to Dr. Henry Kissinger at the National Security Council. In 1981, President Ronald Reagan appointed me to serve as the 65th Secretary of the United States Navy. I served as Secretary of the Navy for six years, from 1981 to 1987, and in that position was responsible for the management of 1.2 million people, and an annual budget of $95 billion. On December 16, 2002, I was appointed to serve as a member of the bi-partisan National Commission on Terrorist Attacks Upon the United States ("9/11 Commission"). I served as a member of the 9/11 Commission from the date of my appointment through the conclusion of the Commission's work, on August 21, 2004. I served as a national security and foreign policy advisor to Senator John McCain during the 2008 presidential race, and for Governor Mitt Romney in his 2012 presidential campaign. I am the author of several books, including *On Seas of Glory*, *Command of the Seas*, *Making War*, and *America the Vulnerable*.

2. I offer this Affirmation based on my experience as a member of the 9/11 Commission, and my work for more than four decades in the national security arena.

3. In briefs filed earlier this year with the Supreme Court of the United States, the Kingdom of Saudi Arabia argued that the 9/11 Commission "concluded that the Kingdom of Saudi Arabia had no role in the attacks of September 11, 2001," and "found that Saudi Arabia

did not provide financial or material assistance to the September 11 terrorists or their al Qaeda organization." The Kingdom further asserted that the allegations offered by the plaintiffs in support of their claims against Saudi Arabia "were considered and rejected years ago as factually untrue by the 9/11 Commission." The Kingdom has offered similar arguments in submissions to this Court, including in its Renewed Motion to Dismiss filed on September 15, 2014.

4. Contrary to the view advocated by the Kingdom, the 9/11 Commission did not exonerate Saudi Arabia of culpability for the events of September 11, 2001, or the financing of al Qaeda in the years leading up to the September 11th attacks. In addition, the Kingdom is fundamentally incorrect in suggesting that our Commission in some way "considered and rejected as factually untrue" the allegations or claims that have been advanced by the 9/11 plaintiffs against Saudi Arabia.

5. As a member of the 9/11 Commission with several decades of experience in national security matters, I was (and remain) deeply troubled by the evidence our Commission developed concerning the support 9/11 hijackers Nawaf al Hazmi and Khalid al Mihdhar received in Southern California upon their arrival in the United States. This evidence centered on the activities of a Saudi citizen who was then living in San Diego, Omar al Bayoumi, and a Saudi religious cleric who served as an official of the Islamic Affairs Department of the Saudi consulate in Los Angeles, Fahad al Thumairy. I was (and remain) equally disturbed by the evidence our Commission developed concerning "charity" payments that issued from an account associated with members of the Saudi Embassy to persons closely associated with al Mihdhar and al Hazmi.

6. At least until September 11, 2001, the Islamic Affairs Departments of Saudi Arabia's diplomatic missions throughout the world were populated and controlled by Wahhabi

imams from the Kingdom's Ministry of Islamic Affairs, like Fahad al Thumairy. Wahhabism is a puritanical, intolerant and virulently anti-American strand of Islam, and the state religion of the Kingdom of Saudi Arabia. The Kingdom has dedicated vast sums over the last several decades to promote the Islamist agenda of Saudi Arabia's Wahhabi clerics. This vast Saudi funding has been deployed to promote Wahhabi teachings throughout the world, fueling the jihadist tide that now confronts the civilized world. Wahhabi teachings form the ideological foundation for al Qaeda and a host of other jihad organizations that threaten our national security, including the so-called Islamic State of Iraq and the Levant (ISIL, a/k/a ISIS).

7. The links between Saudi Arabia's Wahhabi clerics and al Qaeda did not exist solely at the ideological level, but rather also involved collaboration on financial and logistical fronts. Saudi clerics, paid by the government of the Kingdom and preaching at state funded mosques, issued fatwas that provided religious justification for al Qaeda's terrorist actions. By the time our Commission began its work, it was already well known in intelligence circles that the Islamic Affairs Departments of Saudi Arabia's diplomatic missions were deeply involved in supporting Islamic extremists.

8. Especially when viewed within this broader context, it is implausible to suggest that the broad spectrum of evidence developed by the 9/11 Commission concerning the relationships among Omar al Bayoumi, Fahad al Thumairy, the Islamic Affairs Departments of Saudi diplomatic missions, and 9/11 hijackers Nawaf al Hazmi and Khalid al Mihdhar can be explained away as merely coincidental. To the contrary, I believe Nawaf al Hazmi and Khalid al Mihdhar knew who to go to for support, and that their initial encounter with Omar al Bayoumi immediately following al Bayoumi's meeting with Fahad al Thumairy was not at all coincidental. I also believe that Fahad al Thumairy and Omar al Bayoumi knew that al Mihdhar

and al Hazmi were bad actors who intended to do harm to the United States, and that the evidence concerning the activities of these principal actors in the events surrounding the terrorist attacks of September 11, 2001 warrants further examination.

9.  Finally, as a member of the 9/11 Commission, I personally read the 28 classified pages of the report issued by the Congressional Joint Inquiry Into Intelligence Activities Before and After the Terrorist Attacks of September 11, 2001. In my view, the release of those pages would in no way implicate or harm our national security interests. To the contrary, I believe the disclosure of those 28 pages of the Joint Inquiry report would greatly assist policymakers and the public in better understanding many of the threats that we now confront. For those reasons, I fully support the 9/11 plaintiffs in their efforts to secure public disclosure of the 28 pages of the Joint Inquiry report, and of the many records relating to the 9/11 Commission's work that still have not been released, despite our Commission's urging that its records be made available, to the greatest extent possible, by January 2, 2009.

Dated:

John F. Lehman