# Exhibit "4"

to the Affirmation of Sean P. Carter Transmitting Evidence in Support of Plaintiffs'
Memorandum of Law in Opposition to the Motion to Dismiss of the Kingdom of Saudi Arabia
and Saudi High Commission for Relief of Bosnia & Herzegovina

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (GBD)<br>ECF Case |

This document relates to:      *All Actions*

## AFFIRMATION OF JOSEPH ROBERT "BOB" KERREY

I, Bob Kerrey, being duly sworn, declare and state as follows:

1.      My full name is Joseph Robert Kerrey.  Between 1983 and 1987, I served as the
35th Governor of the State of Nebraska.  Between 1989 and 2001, I served as United States
Senator for the State of Nebraska.  From December of 2003 through August 21, 2004, I served as
a Member of the bi-partisan National Commission on Terrorist Attacks Upon the United States
(the "9/11 Commission"), by appointment of then Senate Majority Leader Thomas A. Daschle.

2.      I submit this affirmation on behalf of the Plaintiffs, to address certain statements
in the January 30, 2012 Memorandum of Law of the Kingdom of Saudi Arabia and Saudi High
Commission for Relief of Bosnia & Herzegovina ("SHC") in Opposition to Plaintiffs' Motion
for Relief of Final Judgments (the "Kingdom's Memorandum of Law"), concerning the
investigation and findings of the 9/11 Commission.  The views expressed in this Affirmation are
my own, based on my experience as a Member of the 9/11 Commission.

3.      Congress established the 9/11 Commission through H.R. 4628, the "Intelligence
Authorization Act for Fiscal Year 2003" (the "IAA"), which was signed into law by then
President George W. Bush on November 27, 2003.

4.      Under the IAA, the 9/11 Commission was given broad authority and
responsibility to investigate the facts and circumstances concerning the terrorist attacks of

September 11, 2001, and to make recommendations to the President and Congress for corrective measures that could be taken to prevent future acts of terrorism.

5.      The 9/11 Commission was comprised of ten Members, all of whom were appointed to their positions in accordance with the IAA. The 9/11 Commission carried out its work with the assistance of a staff of approximately eighty (80) full-time employees, contractors, and detailees.

6.      In accordance with the requirements under law concerning the focus and scope of the 9/11 Commission's work, the 9/11 Commission organized work teams to address each of the following eight topics:

- al Qaeda and the organization of the 9/11 Attack:

- intelligence collection, analysis, and management (including oversight and resource allocation);

- international counter-terrorism policy, including states that harbor or harbor terrorists, or offer or offered terrorists safe havens;

- terrorist financing;

- border security and foreign visitors;

- law enforcement and intelligence collection inside the United States;

- commercial aviation and transportation security, including an investigation into the circumstances of the four hijackings;

- the immediate response to the attacks at the national, state and local levels, including issues of continuity of government.

7.      The 9/11 Commission held its first meeting on January 11, 2003, and issued its Final Report on July 22, 2004. The 9/11 Commission formally closed its operations on August 21, 2004, and on that same day released a staff monograph on the subject of terrorist financing.

PHILADELPHIA\6343162\1

8.      The Kingdom's Memorandum of Law contains several misleading statements concerning the investigation and findings of the 9/11 Commission relative to possible Saudi culpability for the sponsorship of al Qaeda and the events of September 11, 2001 that should not go unaddressed.   First, the Kingdom and SHC state "[following an exhaustive and authoritative investigation, the National Commission on Terrorist Attacks Upon the United States (the "9/11 Commission") concluded that the Government of Saudi Arabia had no role in the attacks of September 11, 2001, declaring:  '[W]e have found no evidence that the Saudi government as an institution or senior Saudi officials individually funded' al Qaeda." MDL DKT. #2542 at p.1. Second, the Kingdom and SHC assert that "[even before this Court dismissed them, Plaintiffs' claims against Saudi Arabia had been directly rebutted by facts found by the United States government.  The 9/11 Commission concluded that Saudi Arabia did not assist the September 11 terrorists.  Although it did not rule out the possibility that some independent (non-sovereign) charities may have diverted funds to al Qaeda, the 9/11 Commission 'found no evidence that the Saudi government as an institution or senor Saudi officials individually funded' al Qaeda.  9/11 Report at 171.  The 9/11 Report further concluded that 'we have seen no evidence that any foreign government – or foreign government official – supplied any funding' to the September 11 hijackers." MDL DKT. #2542 at p. 4.

9.      To the extent the Kingdom and SHC offer those statements in support of the proposition that the  9/11 Commission fully exonerated Saudi Arabia and any Saudi government charities for any potential culpability for the financing and emergence of al Qaeda or the events of September 11, 2001, following a comprehensive evaluation of all potentially relevant evidence, the Kingdom and SHC are incorrect.  To the contrary, significant questions remain unanswered concerning the possible involvement of Saudi government institutions and actors in

PHILADELPHIA\6343162\1

the financing and sponsorship of al Qaeda, and evidence relating to the plausible involvement of possible Saudi government agents in the September 11th Attacks has never been fully pursued.

10.     Although the 9/11 Commission conducted an investigation of historic scale into the facts and circumstances surrounding the events of September 11, 2001, our investigation and findings were subject to certain inherent challenges and unavoidable limitations.  The challenges included the sweeping scope of our mandate itself, which required us to conduct inquiries into a broad range of complex and disciplinarily distinct issues relating to intelligence agencies, law enforcement agencies, diplomacy, immigration and border control, the flow of assets to terrorist organizations, commercial aviation, the role of Congressional oversight and resource allocation, and other issues identified by the 9/11 Commission during the course of its work.  And although we were assisted in our work by a singularly dedicated and capable staff, our investigation was subject to the limitations of available resources and time, as well as our access to witnesses and evidence outside of the United States.

11.     The 9/11 Commission noted these limitations in the Preface to our Final Report, stating:

> We want to note what we have done, and not done.  We have endeavored to provide the most complete account we can of the events of September 11[th], what happened and why.  This final report is only a summary of what we have done, citing only a fraction of the sources we have consulted.  But in an event of this scale, touching so many issues and organizations, we are conscience of our limits.  We have not interviewed every knowledgeable person or found every relevant piece of paper.  New information will inevitably come to light.  We present this report as a foundation for a better understanding of a landmark in the history our nation.

9/11 Final Report at xvii.

12.     Given the limits of the investigation conducted by the 9/11 Commission, as acknowledged in the Preface of our Final Report, it is fundamentally inaccurate to characterize our investigation and findings as "exhaustive" with respect to any of the issues within the scope of our mandate, and most certainly incorrect to characterize our investigation into potential Saudi culpability for the sponsorship of al Qaeda and the September 11th Attacks as exhaustive or conclusive.

13.     Stated simply, the 9/11 Commission did not have the time, opportunity or resources to pursue all potentially relevant evidence on that important question, and the American public deserves a more comprehensive inquiry into the issue.

14.     In portraying the 9/11 Commission's findings concerning the government of Saudi Arabia in the Memorandum of Law, the Kingdom overstates not only the comprehensiveness of our inquiry, but the character of our findings as well.

15.     Although the Kingdom accurately quotes a few statements from our Final Report relating to the Kingdom, it presents them out of context and without reference to our finding that there was a "likelihood that charities with significant Saudi government sponsorship diverted funds to al Qaeda." 9/11 Commission Final Report at p. 171.

16.     Importantly, our Final Report did not address in any further detail the character of the Kingdom's relationships to the charities in question, and there is no statement in the 9/11 Final Report identifying those charities as "independent (non-sovereign)" entities as the Kingdom and SHC suggest in their Memorandum of Law.  As a corollary, our Final Report also did not address at all whether the actions of those purported charities would be attributable to the government of Saudi Arabia under governing legal standards, a question that was beyond the scope of the 9/11 Commission's mandate.

17.     Finally, neither our Final Report nor the Staff Monograph on Terrorist Financing contain a single reference to the SHC.

18.     For all of the reasons set forth above, it is fundamentally inaccurate and misleading for the Kingdom and SHC to suggest that the 9/11 Commission's investigation exonerated them for the events of September 11, 2001, or that the 9/11 Commission's investigation directly rebutted Plaintiffs' claims.

Bob Kerrey

Executed on this 24th day of February, 2012.