# Exhibit "9"

to the Affirmation of Sean P. Carter Transmitting Evidence in Support of Plaintiffs'
Memorandum of Law in Opposition to the Motion to Dismiss of the Kingdom of Saudi Arabia
and Saudi High Commission for Relief of Bosnia & Herzegovina

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (GBD)<br>ECF Case |

This document relates to:

*All Actions*

## AFFIRMATION OF EVAN FRANCOIS KOHLMANN

1. I, Evan Francois Kohlmann, being duly sworn, declare and state as follows:

2. My full name is Evan Francois Kohlmann. I am a private International Terrorism Consultant who specializes in tracking Al-Qaida and other contemporary terrorist movements.

3. I hold a degree in International Politics from the Edmund A. Walsh School of Foreign Service (Georgetown University), and a Juris Doctor (professional law degree) from the University of Pennsylvania Law School. I am also the recipient of a certificate in Islamic studies from the Prince Alwaleed bin Talal Center for Muslim-Christian Understanding (CMCU) at Georgetown University. I am a senior partner at Flashpoint Global Partners, a New York-based security consulting firm. I additionally serve as an on-air analyst for NBC News in the United States. I am author of the book Al-Qaida's Jihad in Europe: the Afghan-Bosnian Network (Berg/Oxford International Press, London, 2004) which has been used as a teaching text in graduate-level terrorism courses offered at such educational institutions as Harvard University's Kennedy School of Government, Princeton University, and the Johns Hopkins School of Advanced International Studies (SAIS).

4. As part of my research beginning in approximately 1997, I have traveled overseas to interview known terrorist recruiters and organizers (such as Abu Hamza al-Masri) and to attend underground conferences and rallies; I have reviewed thousands of open source documents; and, I have amassed one of the largest digital collections of terrorist multimedia and propaganda in the world. The open source documents in my collection include sworn legal affidavits, original court exhibits, video and audio recordings, text communiqués, eyewitness testimonies, and archived Internet websites. I have also developed computer software and database applications in PHP/MYSQL format designed to draw out this data and provide statistical trends and models to human analysts.

5. I have testified on twelve occasions as an expert witness in jurisdictions beyond the United States—including the United Kingdom, Denmark, Australia, Switzerland, and Bosnia-Herzegovina.

6. I have been qualified as an expert on terrorism issues in U.S. federal court to testify in three U.S. civil cases and testified three times in U.S. civil cases--<u>Gates v. Syrian Arab Republic</u> and <u>Amduso v. Sudan</u> before the U.S. District Court for the District of Columbia, and <u>Linde et al. v. Arab Bank PLC</u> before the U.S. District Court for the Eastern District of New York.

7. I have additionally testified as an approved expert witness on the subject of terrorism and terrorist organizations for the United States in thirty-one criminal cases; including:

- <u>United States v. Sabri Benkhala</u> (Eastern District of Virginia, 2004)
- <u>United States v. Ali Timimi</u> (Eastern District of Virginia, 2005)
- <u>United States v. Uzair Paracha</u> (Southern District of New York, 2005)
- <u>United States v. Ali Asad Chandia</u> (Eastern District of Virginia, 2006)
- <u>United States v. Yassin Aref</u> (Northern District of New York, 2006.
- <u>United States v. Sabri Benkhala</u> (Eastern District of Virginia, 2007)
- <u>United States v. Rafiq Sabir</u> (Southern District of New York, 2007)
- <u>United States v. Emaddedine Muntasser</u> (District of Massachusetts, 2007)
- <u>United States v. Hassan Abu Jihaad</u> (District of Connecticut, 2008)
- <u>United States v. Mohammed Amawi et al.</u> (Northern District of Ohio, 2008)
- <u>United States v. Salim Hamdan</u> (Guantanamo Bay Military Commissions, 2008)
- <u>United States v. Ali Hamza al-Bahlul</u> (Guantanamo Bay Military Commissions, 2008)
- <u>United States v. Mohamed Shnewer et al.</u> (District of New Jersey, 2008)
- <u>United States v. Oussama Kassir</u> (Southern District of New York, 2009)
- <u>United States v. Syed Haris Ahmed</u> (Northern District of Georgia, 2009)
- <u>United States v. Ehsanul Sadequee</u> (Northern District of Georgia, 2009)
- <u>United States v. Pete Seda et al.</u> (District of Oregon, 2010)
- <u>United States v. Betim Kaziu</u> (Eastern District of New York, 2011)
- <u>United States v. Daniel Boyd et al.</u> (Eastern District of North Carolina, 2011)
- <u>United States v. Barry Walter Bujol Jr.</u> (Southern District of Texas, 2011)
- <u>United States v. Tarek Mehanna et al.</u> (District of Massachussetts, 2011)
- <u>United States v. Patrick Nayyar</u> (Southern District of New York, 2012)
- <u>United States v. Adis Medunjanin</u> (Eastern District of New York, 2012)
- <u>United States v. Anes Subasic</u> (Eastern District of North Carolina, 2012)
- <u>United States v. Mohammed Nisar Khan</u> (Western District of Texas, 2012)
- <u>United States v. Mohamed Mohamud</u> (District of Oregon, 2013)
- <u>United States v. Abdel Hameed Shehadeh</u> (Eastern District of New York, 2013)
- <u>United States v. Sulaiman Abu Ghaith</u> (Southern District of New York, 2014)

- United States v. Mustafa Kamel (Southern District of New York, 2014)
- United States v. Sami Osmakac (Middle District of Florida, 2014)
- United States v. Soheil Kabir et al. (Central District of California, 2014)

8. In United States v. Uzair Paracha, Federal District Judge Sidney Stein held a Daubert hearing on my qualifications as an expert witness and issued a ruling concluding: "Evan Kohlmann has sufficient education, training, and knowledge to be qualified as an expert, and… Kohlmann's methodology—that is, his process of gathering sources, including a variety of original and secondary sources, cross-checking sources against each other, and subjecting his opinions and conclusions to peer review—is sufficiently reliable to meet the standards for admissibility of expert testimony set by the Federal Rules of Evidence."

9. Likewise, in United States v. Hassan Abu Jihaad, Federal District Judge Mark Kravitz held a Daubert hearing on my qualifications as an expert witness and issued a ruling concluding, "Mr. Kohlmann is certainly qualified to provide expert testimony… Mr. Kohlmann is qualified by means of his education, training, background, and experience to testify as an expert on terrorism… Mr. Kohlmann has conducted first-hand interviews of several leaders of terrorist organizations and has reviewed reams of information about al Qaeda… and the other subjects on which he will offer testimony.  Indeed… it is apparent that these subjects are Mr. Kohlmann's life work, and he has, therefore, acquired a considerable amount of information and documentation on these subjects… Mr. Kohlmann's work receives a considerable amount of peer review from academic scholars and others, and by all accounts, Mr. Kohlmann's work is well regarded."

10. Similarly, during United States v. Syed Haris Ahmed, Federal District Judge William S. Duffey Jr. held a Daubert hearing on my qualifications as an expert witness, and noted in his published ruling, "Kohlmann has developed an understanding of terrorist organization structures, operations, and membership, allowing him to speak with authority about Al-Qaeda in Iraq, Lashkar-e-Taiba, and Jaish-e-Mohammed.  His research and experience have provided him a base of understanding far greater, and far more sophisticated, than of the Court or of jurors... A person lacking Kohlmann's advanced knowledge of JeM and LeT essentially would not be able to recognize the information on Khan's hard drive as information that might link a person to JeM or LeT."

11. On February 4, 2011, the U.S. 2nd Circuit Court of Appeals issued a formal ruling regarding the admissibility of my testimony during United States v. Rafiq Sabir (2007): "Kohlmann has, in fact, been qualified as an expert on al Qaeda and terrorism in a number of federal prosecutions… Kohlmann's proposed expert testimony had a considerable factual basis… We conclude that the district court acted well within its discretion in concluding that Kohlmann's testimony satisfied the enumerated requirements of Rule 702… Such testimony was plainly relevant to mens rea."

12. Most recently, on February 4, 2014, the U.S. 4th Circuit Court of Appeals published a ruling addressing the admissibility of my expert testimony in United States v. Hassan, Yaghi, et al (2012):

> "The court heard and considered testimony about Kohlmann's credentials and techniques and was convinced that he possessed 'the requisite knowledge, skill, experience, training, and education to testify on various aspects of the trend of decentralized terrorism and homegrown terrorism.' In so ruling, the court gave particular attention to the Daubert factors, including thorough assessments of whether Kohlmann's methods were subject to peer review, his 'consultation with others in the field,' and 'whether or not his research findings [were] based in a sound methodology'… The court did not err in deciding that Kohlmann's testimony was reliable as well as relevant to the issues to be presented. Notably, we have previously approved of Kohlmann's expertise in terrorism matters, ruling that his testimony would 'assist the trier of fact to understand the evidence or to determine a fact in issue.'"

13. I have been asked by Plaintiffs counsel to provide expert testimony analyzing the degree to which several alleged dawah organizations, or charitable fronts for terrorism—namely, the Al-Haramain Islamic Foundation (Al-Haramain), the International Islamic Relief Organization (IIRO), the Muslim World League (MWL), the World Assembly for Muslim Youth (WAMY), the Saudi Red Crescent (SRC), the Saudi High Commission (SHC), and the Saudi Joint Relief Committee (SJRC)—are under the control and/or guidance of official representatives of the government of the Kingdom of Saudi Arabia. I was also asked to assess the intimacy of the relationship between the Saudi-based headquarters of each of these groups with their branch offices around the world, and whether that relationship demonstrates mutuality and organizational symbiosis. I was further asked to assess the commonality of ownership; the exchange or intermingling of corporate directors and officers; the exchange of documents among the entities in the ordinary course of business; the use of the same offices; the financing of branch offices by the headquarters; the headquarters' use of the branch offices' property as its own; the decision-making by the headquarters for the branch offices; and whether the branches' officers failed to act independently in the interest of the branch but rather for the parent organization.

14. Before addressing the relationship between the Kingdom of Saudi Arabia and the various dawah entities, it is necessary to understand the role of Islam in the Saudi state, and the role of Dawah organizations in fulfilling Islamic obligations of the Saudi state.

15. The Kingdom of Saudi Arabia is an Islamic state, and its Constitution is the Quran and the Sunna (Traditions) of the Prophet Mohammed.[1]

---

[1] See Saudi Basic Law of Governance, Article 1.

16. The Kingdom itself was founded through an alliance between the al-Saud family and conservative Wahhabi clerics who viewed themselves as the true custodians of Islam.  As a result, from its inception, a core function of the Saudi government has been the advancement of a Wahhabi ideology both inside and outside the borders of the Arabian Peninsula.  The  Basic Law of Governance expressly provides that the Propagation of Islam (Dawah) is an essential function and duty of the Saudi government.[2]

17. In his speech on the issuance on the Basic Laws of Governance in 1992, then-King Fahd bin Abdulaziz identified the nine bases for the foundation of the modern Saudi state, including "the undertaking of the Propagation of Islam (Dawah) and its dissemination, since the Propagation of Islam is one of the most important functions of an Islamic state."[3]

18. In an affidavit filed in this litigation, Abdulaziz H. al Fahd, a member of the Saudi Council of Ministers, similarly affirmed that "Saudi Arabia is home to the most holy sites of Islam, and a core policy and function of the Kingdom since its founding in the early twentieth century has been to foster and preserve Islamic faith and Islamic law within the Kingdom and abroad."[4]

19. According to the General Manager for External Relations in the Ministry of Islamic Affairs, Abdul Majid bin Muhammad al-Omari, "The most prominent characteristic of the Kingdom of Saudi Arabia's role in spreading Islamic missionary work is that it has made it one of the goals of the country.  This means that this is a role that has been adopted by the state and is part of its plans. The government provides it with the necessary financial and human resources."[5]

20. The Kingdom has formed several bodies and organizations to carry out its self-described duty to propagate Islam outside of Saudi Arabia.  These include the Supreme Council for Islamic Affairs, the Ministry of Islamic Affairs Endowment, Da'wah and Guidance, and individual dawah organizations such as the Muslim World League (MWL), International Islamic Relief Organization (IIRO), the World Assembly of Muslim Youth (WAMY), the Al-Haramain Islamic Foundation, the Saudi High Commission for Relief of Bosnia & Herzegovina (SHC), the Saudi Joint Relief Committee for Kosovo and Chechnya (SJRC), the Saudi Red Crescent Society (SRC), the Al-Haramain al-Masjid al-Aqsa Foundation, and others.

---

[2] See Saudi Basic Law of Governance, Article 23 ("the State shall protect the Islamic Creed, apply the Sharia, encourage good and discourage evil, and undertake its duty regarding the Propagation of Islam (Da'wah").

[3] King Fahd's Speech on the Issuance of the Basic Law of Governance, at p.2.

[4] Declaration of Abdulaziz H. al Fahad, at pp. 2-3.

[5] Interview with General Manager for External Relations in the Ministry of Islamic Affairs, Abdul Majid bin Muhammad Al Omari.

21. Dr. Saleh bin Hussein al-Ayed, the Secretary General for Islamic Affairs, described the differing functions of those bodies in an interview with al Riyadh daily newspaper, a Saudi government publication. Dr. al-Ayed explained that the Supreme Council for Islamic Affairs "is responsible for the Islamic work by the Kingdom abroad, including providing in-kind and financial assistance to Islamic centers as well as Islamic organizations and associations abroad, and coordinating Saudi activities undertaken by the organizations, whether at the official or individual levels, all of which fall under the responsibility of the Supreme Council." Dr. al-Ayed further explained that the "Supreme Council is not an executive authority, but rather a planning body." In contrast, other authorities "such as the Ministry of Islamic Affairs" serve as the operational bodies that "execute its (the Supreme Council for Islamic Affairs') decisions." Because the Supreme Council for Islamic Affairs is a planning body, and the Ministry of Islamic Affairs is an operational arm of the government, Dr. al-Ayed affirmed that "there is no duplication" between their work.

22. The overview of the Ministry of Islamic Affairs' role in the propagation of Islam outside of the Kingdom, from its own website, reinforces that the dawah activities undertaken by the Kingdom outside of Saudi Arabia are an essential function of the Kingdom as an Islamic state, and affirms the Ministry of Islamic Affairs' role as an operational body tasked with implementing those activities. The website explains that propagating and calling people to Islam "is the essential cornerstone of its [the Kingdom's] system, duties and obligations, to which it pays due attention." The website also notes that dawah is one of the "outstanding pillars and essential parts of the Kingdom," and that the Kingdom has "established, sponsored, supported, and developed large organizations for this purpose." The overview then explains that "this effort was crowned with success when Royal Decree No. 3-A of 20-1-1414 A. H. was issued to establish the Ministry of Islamic Affairs, Endowments, Da'wah, and Guidance to be in charge of matters relating to Islam, endowments, mosques, guidance, and Da'wah."[6]

23. The individual dawah organizations—such as MWL, IIRO, Al-Haramain, WAMY, SHC, SJRC, and SRC—serve as the primary (although not exclusive) governmental arms through which the Ministry of Islamic Affairs implements the Kingdom's dawah activities at the ground level, outside of the Kingdom.

24. The government of the Kingdom has consistently and repeatedly described the actions of the Saudi dawah organizations outside of the Kingdom as achievements of the State itself.[7] According to a document posted on multiple official Saudi government websites touting their work in the "Service of Islam and Muslims", one of the chief such contributions was cited as the creation of "Saudi Relief Agencies": "Since the era of King Abdulaziz—may Allah be merciful to him—

---

[6] http://www.moia.gov.sa/eng/Menu/Pages/About.aspx

[7] *See, e.g.*, Fahad Declaration at para. 11 (government oversight of dawah organizations is exercised through government officials who head those organizations).

Kingdom of Saudi Arabia gave the top priority to support and help the Muslims all over the world. Kingdom of Saudi Arabia made available of this support through specialized agencies established for this reason as follows: International Islamic Relief Organization, World Assembly for Muslim Youth, Saudi Commission for Fundraising."[8]  An alternative version of this text posted on the official website of the Saudi Embassy in New Zealand also included the "Al-Haramain Foundation" on the list of "specialized agencies" established by the Kingdom to "support Muslims all over the world."[9]  As noted by Saudi Minister of Islamic Affairs Saleh al-Shaykh, "this work was not at an individual level, but rather conducted through institutions and committees and special entities headed by… state officials."[10]

25.  Consistent with its self-described dawah obligation, the evidence as outlined below reflects that the Saudi state apparatus has controlled the dawah organizations, both internally and externally, to fulfill the Kingdom of Saudi Arabia's core function of propagating Islam.

# I.  AL-HARAMAIN ISLAMIC FOUNDATION

26.  The Al-Haramain Islamic Foundation was a Saudi non-profit dawah organization that has engaged in various forms of religious propagation and related work around the world.  At the height of its operations, it had over 40 international branches working in over fifty countries, and in 1999 spent more than $61 million on various projects worldwide.[11]  Al-Haramain also maintained a presence and local offices in the continental United States; primarily, in the states of Missouri and Oregon.

27.  An overwhelming degree of evidence indicates that Al-Haramain was controlled by the Saudi Ministry of Islamic Affairs and funded by the Saudi government and Saudi officials.

28.  According to Al-Haramain's former website www.alharamain.org, the "superintendent of all Foundation activities" is Shaykh Saleh Ibn Abdul-'Azeez Aali Shaykh, the Saudi Minister of Islamic Affairs, Endowments, Call and

---

[8] http://www.mofa.gov.sa/sites/mofaen/EServ/VisitingSaudiArabia/aboutKingDom/Pages/Serving Islam36145.aspx, http://www.mohe.gov.sa/en/studyinside/aboutKSA/Pages/service-of-Islam-and-Muslims.aspx?AspxAutoDetectCookieSupport=1,
http://www.mohe.gov.sa/ar/studyinside/aboutksa/pages/service-of-islam-and-muslims.aspx?aspxautodetectcookiesupport=1

[9] http://embassies.mofa.gov.sa/sites/NewZealand/AR/AboutKingdom/KingdomAchievments/Pages/default.aspx

[10] Lecture of Sheikh Saleh bin Abdel Aziz Al Sheikh, Minister of Religious Affairs

Efforts of the Servant of the Two Holy Mosques in Advocacy and the Service of Islam and Muslims

[11] "Saudi Arabia's top Islamic charity denies any of its assets frozen."  Agence France Presse.  March 13, 2002.

Guidance.[12]  In a sworn affidavit, senior Al-Haramain official Khalid bin Obaid Azzahri confirmed, "Al-Haramain operates under the supervision of the Saudi Minister of Islamic Affairs, who appoints its Board of Directors and senior management personnel."[13]

29. The 9/11 Commission staff assigned to the investigate of the September 11, 2001 terrorist attacks on the United States concluded in their monograph on terrorist financing, "Although both the Saudi government and al Haramain say that it is a private organization, al Haramain has considerable ties to the Saudi government. Two government ministers have supervisory roles (nominal or otherwise) over al Haramain, and there is some evidence that low-level Saudi officials had substantial influence over various [Al-Haramain] offices outside of Saudi Arabia."[14]

30. The former "General Director" of Al-Haramain, Shaykh 'Aqeel Ibn 'Abdul-'Aziz Al-'Aqeel stated on several occasions that Al-Haramain operates only with the explicit permission and the Islamic mandate of the Kingdom of Saudi Arabia. Interviewed in the Washington Post, Al-'Aqeel explained, "We work under the supervision of the Saudi government."[15]   Promotional materials and Al-Haramain's own website offer examples of how the Saudi government has used its influence to assist and guide the charity.

31. In a letter dated May 1, 1999, published under the official letterhead of the Saudi embassy in Albania and addressed to Saudi Minister of Islamic Affairs, Shaykh Saleh Shaykh offers "appreciation and praise for the efforts of Al-Haramain Foundation in the Albanian Republic . . . We thank you for the cooperation of the Foundation in Albania with the Embassy of the Custodian of the Two Holy Mosques, King Fahd Ibn Abdul-Aziz — may Allah preserve him.  If anything, this indicates the deep ties among Saudi society both governmentally and with its people."[16]

32. Likewise, on August 25, 2002, Al-Haramain's website published an article on the charity's activities in East Africa, highlighting the key role played by local Saudi diplomats: "The Africa Committee in Al-Haramain Charity Foundation conducts

---

[12] http://www.alharamain.org/alharamain/eng/inner.asp?order=1&num=1.  See also: http://www.alharamain.org/english/ourobjectives.htm.  January 27, 2002.

[13] Affidavit of Khalid bin Obaid Azzahri.  In Re: Terrorist Attack on September 11, 2001 (Thomas E. Burnett Sr. et al. v. Al Baraka Investment and Development Corporation).  United States District Court for the Southern District of New York.  Case No: 03 CV 9849 (RCC).

[14] Roth, John, Douglas Greenburg, and Serena Wille.  "Monograph on Terrorist Financing: Staff Report to the Commission."  National Commission on Terrorist Attacks upon the United States.

[15] "How Jihad Made Its Way to Chechnya Secular Separatist Movement Transformed by Militant Vanguard."  Washington Post.  April 26, 2003.

[16] "REPORT NO: 12 - A Letter of Commendation."  Report from the Al-Haramain Foundation; Tirana, Albania.  May 1, 1999.  http://kosova.hypermart.net/harameen.html.

numerous urgent relief projects in Kenya . . .  under direct supervision from the Embassy of the Servant of the Land of The Two Holy Mosques in Kenya."[17]

33. Al-Haramain's own lawyer has similarly confirmed that Al-Haramain's activities, including those outside of the Kingdom, were directed by Saudi officials, explaining that funds that Al-Haramain "collected and transferred on behalf of the Chechnya refugees were part of a Saudi government project" approved "at the highest levels" of the Saudi government.[18]

34. Available information also reveals that meetings of senior Al-Haramain officials were conducted at government offices of the Saudi Ministry of Islamic Affairs. For example, in March 2003, Al-Haramain announced on its official website the "establishment of an Administrative Board which held its first meeting on Tuesday 24 of Dhul-Hijjah in the office of his eminence the Minister of Islamic Affairs, Endowments, Call and Guidance and the General Supervisor of the Foundation and under his chairmanship.  This was announced by [Al-Haramain's] Director General, Sh. 'Aqeel Al-'Aqeel."[19]

35. It is also inescapable that Al-Haramain was funded almost entirely through donations from inside the Kingdom of Saudi Arabia, including from government grants and contributions of Saudi officials.  Former Al-Haramain chief Aqeel al-Aqeel openly acknowledged in an interview with Asharq al-Awsat that over 95% of Al-Haramain's funding was coming directly from Saudi Arabia.[20]  Much of this funding ran through senior Saudi officials.  On November 12, 2002, a fundraising event in Riyadh co-sponsored by Al-Haramain was attended by, among others: the Governor of the Riyadh region, the Grand Mufti of Saudi Arabia, the Minister of Islamic Affairs, and Al-Haramain director Shaykh 'Aqeel Ibn 'Abdul-'Aziz Al-'Aqeel.[21]  Less than two weeks later, the Governor of the Mecca Region, pledged a personal contribution of approximately $40,000 during another joint fundraiser organized by Al-Haramain.[22]  During the same month, the Governor of the Eastern region of Saudi Arabia was reportedly a featured guest at yet another joint charitable function organized in November 2002 by Al-Haramain, where he pledged a donation of over $250,000 and delivered a speech to attendees congratulating the assistance "given by the government of the Kingdom of Saudi Arabia under the leadership of…King Fahd Ibn Abdul Aziz,

---

[17] http://www.alharamain.org/AR/Contents.aspx?AID=746&HL=1&Q=.  February 2003.

[18] Letter from Lynne Barnabei (Bernabei & Katz, PLLC) to R. Richard Newcomb (Office of Foreign Assets Control, U.S. Treasury Department).  Dated May 14, 2004.  Subject: "Re: Al-Haramain Islamic Foundation, Inc. SDG #305 (License Request Pending)."

[19] http://www.alharamain.org/alharamain/eng/inner.asp?order=1&num=1.  April 2003.

[20] "Interview with Aqil al-Aqil, general manager of the charitable Al-Haramayn Foundation."  Al-Sharq al-Awsat (London).  March 16, 2002.

[21] "Prince Salman patronizes charity ceremony."  Saudi Press Agency.  November 12, 2002.

[22] Ain Al-Yaqeen.  November 29, 2002.

Crown Prince Abdullah Ibn Abdul Aziz and Prince Sultan Ibn Abdul Aziz, Second Deputy Prime Minister and Commander of the National Guard to charities and charitable deeds."[23]

36. Al-Haramain has posted endorsements from at least two prominent Saudi religious officials on its English-language website. Among these, an "attestation" written by the former supreme religious authority in Saudi Arabia, Shaykh Abdulaziz Bin Baz, dated April 15, 1999: "I attach for you a check in the amount of 10,000 Riyals to assist [Al-Haramain] in its charitable work. May Allah accept your efforts, multiply your reward and bless you in your work for indeed He is Most Generous and Most Kind."[24] Similarly, Shaykh Mohammed Al-Uthaimeen, a lecturer at the Imam Muhammad bin Saud Islamic University and a member of the Council of Senior Scholars of the Kingdom of Saudi Arabia wrote in an endorsement dated October 22, 1998: "I was very pleased with what the Foundation has done both domestically and internationally just as I was pleased with the opening of the breasts of the brothers who accepted Islam. I ask Allah (SWT) to make all of them firm and to provide us with sincerity and correct action."[25]

37. Al-Haramain's own employees have also confirmed their understanding that al Haramain was a governmental arm, and that they were themselves Saudi government employees in their roles working for Al-Haramain.

38. Detainees captured in Afghanistan and transferred to U.S. military custody in Guantanamo Bay, Cuba have repeatedly insisted that, as Al-Haramain employees, they were working in the direct employ of the Kingdom of Saudi Arabia. For example, Guantanamo Bay detainee Yemeni national Jamal Mohammed Alawi Mar'i complained bitterly during a Pentagon Administrative Review Board hearing, "The Al Haramayn organization is a governmental agency. How [can] it [be] classified as non-governmental and the person in charge is the Minister of the Muslim Association [Islamic Affairs]."[26] Another Jordanian national held in Guantanamo was equally indignant when it came to charges that Al-Haramain was involved in supporting terrorist activities: "If you consider al-Haramayn as a terrorist organization you should [be] talking to Saudi Arabia, because Saudi Arabia was the country that established al-Haramayn… This is something you need to take up with Saudi Arabia."[27] Yet another Guantanamo prisoner from Saudi Arabia, Wasm Awaad al-Wasm al-Omar, offered a similar excuse for "cooperating" with Al-Haramain "in my country [Saudi Arabia]."[28] Al-Omar

---

[23] <u>Ain Al-Yaqeen</u>. November 29, 2002.

[24] http://www.alharamain.org/english/ourobjectives.htm. January 27, 2002.

[25] http://www.alharamain.org/english/ourobjectives.htm. January 27, 2002.

[26] http://www.dod.gov/pubs/foi/detainees/csrt_arb/Set_4_0320-0464.pdf. Page 131.

[27] http://www.dod.gov/pubs/foi/detainees/csrt_arb/Set_26_1848-1900.pdf. Pages 21-22.

[28] http://www.dod.gov/pubs/foi/detainees/csrt_arb/Set_49_3298-3380_Revised.pdf. Page 26.

insisted, "Al Haramain is an official governmental organization, registered under the administration of the government in the Kingdom of Saudi Arabia. It is officially registered and included in the Humanitarian Aid Association, and under the Administration of Internal Affairs, led by the Minister of Internal Affairs… so why are they called a non-governmental organization?"[29]

39. In addition to the evidence indicating that the Saudi state funded and controlled Al-Haramain, the evidence also indicates that Al-Haramain's headquarters office in Saudi Arabia controlled the various branch offices worldwide, with Al-Haramain functioning as a single worldwide organization.

40. Al Haramain's headquarters in Saudi Arabia and the various branch offices held themselves out as being a single entity. For example, dozens of different publications produced by Al-Haramain were marked with both the logo and address of the U.S. office of the charity, as well as its Saudi headquarters.

41. In public interviews, Al-Haramain's longtime "General Director" Shaykh Aqeel al-Aqeel has repeatedly insisted that the activities of the charity were "under tight administrative and financial control."[30]

42. According to the U.S. Treasury Department, "activities within the branches" of Al-Haramain "took place under the control of Aqeel Abdulaziz Al-Aqil, the founder and long-time leader of [Al-Haramain]… As [Al-Haramain]'s founder and leader, Al-Aqil controlled [Al-Haramain] and was responsible for all [Al-Haramain] activities."[31]

43. In 2003, an Arabic-language post appeared on Alsaha.fares.net purporting to be a letter from former senior Al-Haramain official Mansour al-Kadi. Al-Kadi's public statement lambasted "the autocratic administration in power" within Al-Haramain's headquarters in Saudi Arabia that has "caused problems and handicaps."[32] According to al-Kadi:

> "The main reason behind [my] resignation was the autocratic and centralist governance of the organization. Despite the growth and spread of the organization, all benefits are centered solely in the hands of one man Sheikh Aqil bin abdul Aziz al-Aqil the General Manager of the foundation and due to this there has been several administrative and financial mistakes. Therefore as result of this centralistic order (and it must be added that the General Manager is the

---

[29] http://www.dod.gov/pubs/foi/detainees/csrt_arb/Set_49_3298-3380_Revised.pdf. Pages 21, 23.

[30] "Noose tightens around Islamic charities in Gulf." Agence France Presse. October 3, 2001.

[31] "Additional Al-Haramain Branches, Former Leader Designated by Treasury as Al Qaida Supporters; Treasury Marks Latest Action in Joint Designation with Saudi Arabia." Office of Public Affairs; U.S. Treasury Department. June 2, 2004.

[32] http://alsaha.fares.net. June 25, 2003. As cited in U.S. Treasury public document recovered on March 24, 2004 (PUBLIC-AR0258 to PUBLIC-AR0269).

only individual with final decision making on spending)… I myself headed the African committee for six years, then the Asian Committee for about two years, and we used to always be warned in meetings of the committee (usually attended by 8-12 members) to format the requests in a way to the liking of the General Manager so they would not be denied!!  The General Manager has repeatedly withheld the release of funds as he pleased."[33]

44. Al-Kadi grumbled, "It got to a point where I had to write to the General Manager to convince him to allow the Asian committee to hire only one employee for 150,000 riyal!!"[34]  He repeated, "I again state that the General Manager bears the sole responsibility in this lack as he is the one with the authority to hire employees, even if it is just a janitor."[35]  One of the reasons cited for al-Aqeel being eventually dismissed from his position as head of Al-Haramain in 2004 was his "absolute centralization" of Al-Haramain.[36]

45. Evidence of the Saudi headquarter's control over the U.S. branch office of Al-Haramain is demonstrative.  In October 1997, Al-Haramain "General Director" Aqeel al-Aqeel signed a Power of Attorney writ on behalf of Al-Haramain's Saudi headquarters appointing al-Buthe as the "true and lawful attorney for and in Alharamain Foundation's name, place and stead, to purchase, lease, or procure any and all property (real estate, rental etc.), equipment, materials, personnel, assistance or otherwise as deemed necessary by him for the express purpose of support and maintenance of the goals and objectives of Alharamain Foundation activities in the United States of America."[37]

46. Later in the same month, Al-Haramain established a branch inside the U.S. "when Pete SEDA and Soliman ALBUTHE registered it with the Oregon Secretary of State."[38]  Officers of the branch entity included Aqeel al-Aqeel, Mansour al-Kadi, and Soliman al-Buthe—all either officers or otherwise answerable to the Saudi headquarters.  A letter to the IRS from the accountant of Al-Haramain's new office in Ashland, Oregon confirmed that "the founders or leaders have a background in religious matters.  Copies of certificates (King Saud University)

---

[33] http://alsaha.fares.net.  June 25, 2003.  As cited in U.S. Treasury public document recovered on March 24, 2004 (PUBLIC-AR0258 to PUBLIC-AR0269).

[34] http://alsaha.fares.net.  June 25, 2003.  As cited in U.S. Treasury public document recovered on March 24, 2004 (PUBLIC-AR0258 to PUBLIC-AR0269).

[35] http://alsaha.fares.net.  June 25, 2003.  As cited in U.S. Treasury public document recovered on March 24, 2004 (PUBLIC-AR0258 to PUBLIC-AR0269).

[36] "Head of Al-Haramayn Charity Foundation Dismissed."  Al-Hayat.  January 8, 2004.

[37] "Power of Attorney" document signed by Aqeel Bin Abdel-Aziz Al-Aqeel on behalf of "Al-Haramain Islamic Foundation; Head Office – Riyadh" dated October 22, 1997 (AHIF 000914).

[38] Affidavit by I.R.S. Special Agent Colleen Anderson in support of search warrant application for 3800 S. Highway 99, Ashland, Oregon dated February 23, 2004.  United States District Court; District of Oregon (AHIF 001537).

are attached.  Copies of the world wide foundation's web page are attached.  The United States foundation is part of the world wide foundation."[39]

47. Mr. al-Buthe and other representatives of Al-Haramain's operations in the Kingdom of Saudi Arabia repeatedly visited Oregon to oversee plans for the charity in the United States.  Al-Buthe himself visited Ashland on eight separate occasions, including December 30, 1997; August 13, 1998; February 7-14, 1999; March 7, 2000; April 5-6, 2000; May 17-21, 2000; November 10-17, 2000; and April 24-29, 2001.[40]  "General Director" Aqeel al-Aqeel and the onetime head of Al-Haramain's Africa and Asia sub-committees Mansour al-Kadi both visited Ashland at least once each, in April 2000 and August 1998 respectively.[41]

48. The administrator for the Al-Haramain branch office in Oregon reported monthly to the Saudi headquarters.  In an August 1999 monthly report signed by branch office administrator Pete Seda-Ghaty, on a letterhead that read "Al-Haramain Islamic Foundation – Head Office – Riyadh", offered thanks to those in the Riyadh headquarters "for your support of the Ashland [Oregon] Office… We were blessed to have Brother Abdul-Qaadir Abdul-Khaaliq with us for part of this month… In addition to Brother Abdul-Qaadir, Brother Ahmed Ezzat and Brother Abdullah Al-Najashi flew to Oregon to help."  According to Seda-Ghaty, the three men sent to Oregon from Saudi Arabia assisted in delivering religious sermons and producing media projects with an independent camera crew.  Seda-Ghaty noted in the report, "We previously sent you the contract that we signed with them to give you an idea of the services they provided.  If you would like us to send it again, please let us know… Brother Abdullah will do the post-production in Saudi Arabia… Alhamdulillah, all of our Brothers in Saudi Arabia were very supportive of the project."[42]

49. Evidence suggests that a similar pattern existed in other Al-Haramain branch offices outside Saudi Arabia and the United States.  Information unearthed by the Dutch government indicated that Shaykh Aqeel al-Aqeel and "his deputy" Mansour al-Kadi were both listed as "board members of [Al-Haramain] in The Netherlands."[43]  Al-Haramain's headquarters in Riyadh also provided explicit

---

[39] Letter from Thomas J. Wilcox, CPA to Jennifer Nicolin #95152, Internal Revenue Service, re: "Al-Haramain Islamic Foundation Inc. #93-1231083." Dated August 17, 2000.

[40] "Defendant Al-Haramain Islamic Foundation, Inc.'s Responses to Plaintiffs' Interrogatories." Thomas Burnett et al. v. Al Baraka Investment and Development Corporation et al.  United States District Court for the District of Columbia.  Civil Action No. 1:03CV9849 (RCC).

[41] "Defendant Al-Haramain Islamic Foundation, Inc.'s Responses to Plaintiffs' Interrogatories." Thomas Burnett et al. v. Al Baraka Investment and Development Corporation et al.  United States District Court for the District of Columbia.  Civil Action No. 1:03CV9849 (RCC).

[42] Al-Haramain Islamic Foundation (Ashland, Oregon).  "Monthly Report: August 1999."  Signed by "Abu Yunus, Director, Ashland Office of Al-Haramain Islamic Foundation, U.S.A."

[43] Al-Haramain Islamic Foundation (Ashland, Oregon).  "Monthly Report: August 1999."  Signed by "Abu Yunus, Director, Ashland Office of Al-Haramain Islamic Foundation, U.S.A."

instructions to the local office in Bosnia-Herzegovina in 2003 "for the disposition of [Al-Haramain] assets."[44]  Indeed, according to an internal memo from the U.S. Treasury Department, "the [Al-Haramain] headquarters, under Al-Aqil's leadership, provided funding and instructions that governed the activities of [Al-Haramain] throughout the world including in Bosnia, Albania, Iraq, the United States, and elsewhere."[45]   Moreover, U.S. government investigators have concluded "resources regularly flow from the head office to the branches."[46]

50. A study of the financial relationship between Al-Haramain's Saudi headquarters and the Ashland, Oregon branch reveal a complex web of transactions involving senior officials from both offices.   These transactions began with the establishment of the Ashland office in late 1997, when Soliman al-Buthe "brought into the U.S. from Saudi Arabia over $206,000 in Visa Travelers checks issued by the Al Rajhi Bank in Saudi Arabia, which he used to purchase 3800 S. Highway 99 in Ashland, Oregon."  Information provided by an accountant for the U.S. branch office shows that 380 S. Highway 99 appears to be "the main facility" in the U.S. in which Al-Haramain "conducts its business activities."[47]  Almost three years later, in March 2000, after a wealthy Egyptian donor wired several hundred thousand dollars to the bank account of Al-Haramain's branch office in Ashland, Oregon, al-Buthe traveled from Riyadh to Oregon in order to withdraw $130,000 from the same account in American Express traveler's checks.  During his time at the bank, al-Buthe was accompanied by the son of Al-Haramain local branch administrator Pete Seda-Ghaty.  As noted by an IRS-CI agent in a sworn affidavit, "soon after obtaining the travelers checks, ALBUTHE departed the United States with those traveler's checks."[48]  Federal investigators have since recovered a legal agreement indicating that al-Buthe "received $186,644.70… and contains the notation 'I deposit the amanet in Alharamain head office for Chechnya Refugees', and appears to have been signed a second time by ALBUTHE."[49]

---

[44] "Additional Al-Haramain Branches, Former Leader Designated by Treasury as Al Qaida Supporters; Treasury Marks Latest Action in Joint Designation with Saudi Arabia."  Office of Public Affairs; U.S. Treasury Department.  June 2, 2004.

[45] "Designation of AL-HARAMAIN FOUNDATION (AHF) branches in Afghanistan, Albania, Bangladesh, Ethiopia, and The Netherlands, and AHF's leader AL-AQIL pursuant to the authorities of E.O. 13224."  Memorandum for R. Richard Newcomb, Director, Office of Foreign Assets Control (U.S. Treasury Department).  Dated: June 2, 2004.

[46] Roth, John, Douglas Greenburg, and Serena Wille.  "Monograph on Terrorist Financing: Staff Report to the Commission."  National Commission on Terrorist Attacks upon the United States.

[47] Affidavit by I.R.S. Special Agent Colleen Anderson in support of search warrant application for 3800 S. Highway 99, Ashland, Oregon dated February 23, 2004.  United States District Court; District of Oregon (AHIF 001537).

[48] Affidavit by I.R.S. Special Agent Colleen Anderson in support of search warrant application for 3800 S. Highway 99, Ashland, Oregon dated February 23, 2004.  United States District Court; District of Oregon (AHIF 001537).

[49] Affidavit by I.R.S. Special Agent Colleen Anderson in support of search warrant application for 3800 S. Highway 99, Ashland, Oregon dated February 23, 2004.  United States District Court; District of Oregon (AHIF 001537).

51. Soliman al-Buthe was also personally responsible for bringing funds into the United States from Saudi Arabia in order to purchase a mosque property in Springfield, Missouri on behalf of the Ashland, Oregon branch run by Pete Seda-Ghaty.[50]   In other words, Al-Haramain's head office was closely intermingling funds with the branch office in the United States.

52. The reports that the U.S. branch administrator Mr. Seda-Ghaty sent to Al-Haramain's headquarters in Saudi Arabia reinforce the close financial relationship with the office in Ashland.   On May 5, 1999, Seda-Ghaty wrote to his colleagues in Riyadh:

> "Dear Brothers at Alharamain Islamic Foundation, Your brothers in Islam at your Ashland Office hope this proposal finds you in the best of health and Iman, InshaAllah.   Dear Brothers, the purpose of this proposal is to update you on the cost of repairing the electrical system in the Masala at the Ashland Office, InshaAllah… Photos regarding the matter were provided to Brother Soliman [al-Buthe]."[51]

On July 23, 1999, Seda-Ghaty wrote a new letter addressed to al-Buthe directly: "Dear Brother Soliman… InshaAllah, we hope that you are pleased with the efforts of the Ashland Office, and we pray that all of our Brothers in Saudi Arabia feel that their money was well spent."[52]

53. Shortly after U.S. military operations began in Afghanistan in October 2001, Seda-Ghaty wrote a new letter addressed to Al-Haramain's "General Director" in Saudi Arabia, Aqeel al-Aqeel.

> "I am writing you with an urgent request and proposal regarding the dire situation of famine and war in Afghanistan with the approaching harsh winter.   I am asking for your financial approval to supply a convoy of approximately 100 trucks… I will adjust my proposed purchase according to the need I find and consult with you regarding the findings… I will take full responsibility to Allah and to Al-Haramain Islamic Foundation for the Muslim's money, make a detailed report to you, and keep you informed throughout the journey… InshaAllah, if I can I will be transmitting live footage for uploading to your website and fundraising using a laptop computer, camera, and a satellite phone.   Your immediate response to my request is much needed and appreciated."[53]

---

[50] Affidavit by I.R.S. Special Agent Colleen Anderson in support of search warrant application for 3800 S. Highway 99, Ashland, Oregon dated February 23, 2004.   United States District Court; District of Oregon (AHIF 001537).

[51] Al-Haramain Islamic Foundation (Ashland, Oregon).   "Emergency Proposal Regarding Repairs to the Electrical System in the Ashland Office's Masjid."   Dated: May 5, 1999.

[52] Letter from Pete Seda-Ghaty (a.k.a. "Abu Yunus") to Soliman Albuthe (a.k.a. "Brother Soliman"). "Distribution of literature."   Dated: July 23, 1999.

[53] Letter from Pete Seda-Ghaty (a.k.a. "Abu Yunus Sedaghaty") to Shaykh Aqeel al-Aqeel.   "Urgent relief for Afghani refugees."   Dated: October 21, 2001.

Days later, Seda-Ghaty sent another plea addressed to "the USA Committee in Riyadh", praising "you brothers and sheikhs" for "approv[ing] many great projects": "You approved half a million dollars to be taken to Afghani refugees on the Iranian side of the border with Afghanistan… You also approved half a million dollars to be taken to the refugees in Palestine… You have spent hundreds of thousands of dollars in the U.S. for purchasing buildings, salaries for da'ees, shipping books, food for Ramadhan and many other projects."[54]  Not only were large sums of money being regularly transferred by Al-Haramain's headquarters to its branch offices, but moreover, Seda-Ghaty's messages suggest that administrators in the Kingdom of Saudi Arabia were intimately aware of exactly how those funds were being spent.

54. As demonstrated above, Al-Haramain's Oregon branch office was overseen by the most senior administrators at the charity's headquarters in Saudi Arabia. Large sums of money were regularly transferred back and forth between Riyadh and Ashland, wired or couriered personally by senior Saudi Al-Haramain officials.  Projects undertaken by Al-Haramain branches, such as in Oregon, were typically approved directly by the "autocratic" al-Aqeel back in Riyadh.  In light of this overwhelming evidence, the sworn affidavit of "General Director" Aqeel al-Aqeel dated December 21, 2003—in which Mr. Aqeel asserted that Al-Haramain's Saudi headquarters "has neither financial dealings with nor exerts control over any group in the US"—is not the least bit accurate or credible.[55]  This affidavit is also quite ironic in light of separate comments that al-Aqeel made in 2002 to Arabic-language media, where he contended that Al-Haramain has, in fact, retained "tight control" over its affiliates and flatly denied that any branch office of the charity could be operating independently of the Saudi central headquarters.  Al-Aqeel contended:

> "The offices' directors are employees who follow the directions of the main office with regards to hiring workers at the offices and making any decisions on cooperation with any party.  In the main office, there are 19 auditors.  Each of the foundation's specialized committees has an auditor.  There are monthly, quarterly, and yearly reports on the foundation's revenue and expenditure."[56]

## II.   MUSLIM WORLD LEAGUE (MWL)

55. The multi-million dollar Muslim World League (MWL), founded in 1962 to "promote Islamic unity," is one of the largest of the Saudi Islamic dawah

---

[54] Letter from Pete Seda-Ghaty (a.k.a. "Abu Yunus") to "the USA Committee in Riyadh."  "Expanding Da'wa Efforts."  Dated: October 27, 2002.

[55] Affidavit of Al-Haramain Islamic Foundation "General Manager" Aqeel al-Aqeel.  Dated: December 31, 2003.

[56] "Interview with Aqil al-Aqil, general manager of the charitable Al-Haramayn Foundation."  Al-Sharq al-Awsat.  March 16, 2002.

organizations.[57]   In May 1962, in an effort to strengthen Saudi presence in regional affairs and dilute Egypt's influence, King Faysal of Saudi Arabia sponsored a pan-Islamic conference in Mecca.  The objectives of the conference were to (1) promote cooperation among Muslim states, (2) counter Soviet and communist threats in the Arab world, and (3) mobilize the Muslim world to oppose the state of Israel.  The Mecca meeting resulted in the creation of the Muslim World League (*rabitat al-'alam al-Islami*).[58]

56. Since its inception, the MWL has operated as an arm of the Saudi government through which the Kingdom's dawah activities are implemented.  In fact, in their own court papers, MWL's lawyers have asserted that the organization "is an instrumentality of the government of the Kingdom of Saudi Arabia."[59]

57. According to former Secretary General of MWL, Dr. Abdullah Naseef: "The establishment [of MWL] came in a decision approved by the first General Islamic Conference held under the auspices of Saudi Arabia in Makkah in Dhul-Hijjah, 1381/1962. The conference was attended by a large number of Islamic leaders, Ulema [clerics], and intellectuals from various countries and continents."[60] Naseef explained in a media interview, "There was no one who wanted to do something for the Muslims as One Ummah . . . . To fill this vacuum, the Kingdom, being the seat of two Holy Harams, took the initiative and founded the League."[61]

58. On its own Internet website, MWL has listed its main objectives as "to disseminate Islamic Dawah and expound the teachings of Islam.  To defend Islamic causes in a manner that safeguards the interests and aspirations of Muslims, solves their problems, refutes false allegations against Islam, and repels inimical trends and dogma which the enemies of Islam seek to exploit in order to destroy the unity of Muslims and to sow seeds of doubt in our Muslim brethren."[62]

59. Since its founding, the MWL has functioned as a religious missionary and propaganda arm of the Saudi Kingdom.  In 1997, the Governor of Mecca province, attended a meeting of the MWL Constituent Council in Saudi Arabia and delivered a speech on behalf of the King:

---

[57] "Saudi Arabian Information Resources: Muslim World League." http://www.saudinf.com/main/k312.htm.  March 1, 2003.

[58] Al-Rasheed, Madawi.  A History of Saudi Arabia.  Cambridge University Press; © 2002.  Page 132.

[59] Defendant Muslim World League's Answer to Plaintiffs First Amended Complaint.  In Re: Terrorist Attack on September 11, 2001 (Federal Insurance Company et al. v. Al-Qaida et al.).  United States District Court for the Southern District of New York.  Case No: 02 CV 6978 (RCC).

[60] http://www.wamy.org/english/conferences/speech3.htm.  July 1, 2003.

[61] "More Dynamic Role for MWL: Dr. Abdullah Omar Nasseef."  The Muslim World League Journal. Vol. 11; Nos. 5 and 6.  Jumada I&II 1404 (February-March 1984).  Mecca, Saudi Arabia.  Page 65.

[62] "About the Muslim World League."  http://www.arab.net/mwl/about.htm.

> "Since its unification under King Abdel Aziz, may God grant him mercy, the kingdom of Saudi Arabia has devoted its concern to Muslim affairs, and proffered its hand to assist Muslims wherever they may be….the kingdom has sponsored many such conferences and meetings.  Foremost amongst them, is the Muslim World League which today we regard—thanks be to God—as an outstanding Muslim body devoted to the spreading of the Islamic call."[63]

The Chairman of the Saudi Shura Council, Muhammad Ibn Ibrahim Ibn Uthman Ibn Jubair[64], was also a member of the MWL Jurisprudence Council until he died in January 2002.[65]   The Deputy Chairman of the Saudi Shura Council, Dr. Abdullah Naseef, is a former Secretary General of the MWL.[66]

60. According to Ali Muhammad al-Kamal, Manager of the MWL Financial Affairs Administration: "The MWL's policies are established by its Constitutive Council, which is chaired by the Grand Mufti of Saudi Arabia.  The MWL's daily operations are conducted and supervised by its General Secretariat, which is headed by a Secretary General appointed by the Constitutive Council based on a nomination by the Saudi Government."[67]

61. The closely intertwined relationship between MWL and the Saudi regime—and particularly the Ministry of Islamic Affairs—is well-illustrated by a sworn statement filed by former MWL Secretary General Abdullah al-Obaid:

> "I was the Secretary-General of the Muslim World League from 1995 until 2000. The Muslim World League is a charity that is sponsored and financially supported by the Saudi government.  As Secretary-General, I was also one of eight members fo the Supreme Council for Islamic Affairs, established by King Fahd by Royal Decree No. 296/8 (1994).   The Supreme Council has responsibility for Saudi Arabia's Islamic policies in other countries… In 2001, I was appointed by Royal Decree to the Saudi Majlis-ash-Shura, which is the legislative body of the Saudi government."[68]

62. A similar understanding of the relationship between MWL and the Saudi Kingdom was also offered in a sworn deposition by Arafat el-Asahi, a full-time

---

[63] "At the Opening of the Muslim World League Meeting: The Custodian of the Two Holy Places Calls for Islamic Solidarity to Overcome Obstacles."  Ain al-Yaqeen.  December 15, 1997.

[64] http://www.saudiembassy.net/gov_profile/consult.html.

[65] http://www.saudiembassy.net/gov_profile/consult.html.

[66] http://www.saudia-online.com/Shura%20Council.htm.

[67] Declaration of Ali Muhammad al-Kamal, Manager for Financial Affairs Administration of the Muslim World League.  Thomas Burnett et al. v. Al Baraka Investment and Development Corporation et al.  United States District Court for the District of Columbia.  Civil Action No. 1:02CV01616.

[68] Declaration of Abdullah Bin Saleh al-Obaid.  Thomas Burnett et al. v. Al Baraka Investment and Development Corporation et al.  United States District Court for the District of New York.  03 CV 9849 (RCC).

MWL organizer based in the group's regional branch in Canada. According to el-Asahi, "The Muslim World League… is a fully government funded organization. In other words, I work for the Government of Saudi Arabia. I am an employee of that government."[69]

63. Senior MWL officials have also routinely acknowledged that the organization is the recipient of large donations and financial allocations by the Saudi government. In fact, Article 11 of the MWL organizational bylaws states explicitly, "part of the MWL's income comes from the Saudi government."[70]   In a February 1984 interview, former MWL Secretary General Dr. Abdullah Omar Naseef explained that his group was the beneficiary of "an annual budget of SR 130 million allocated by the Government of Saudi Arabia."[71]   In March 1997, Secretary General Abdullah Al-Obaid thanked the King for his continued support, noting that the Saudi government had officially provided more than $1.33 billion in financial aid to MWL since 1962.[72]   More recently, in a sworn declaration, MWL financial manager Ali Muhammad al-Kamal has indicated, "the MWL's annual budget is 80 million Saudi Riyals, which is funded by an annual grant from the Saudi Government."[73]

64. These funds appear to be allocated to MWL by the "Special Committee of the Council of Ministers": "Disbursements of funds by the Special Committee have included grants to Islamic charitable organizations, which are directed by Prince Sultan in furtherance of the national policy of Saudi Arabia as determined by the Council of Ministers… Grants by the special committee… are paid from government bank accounts with government funds."[74]

65. The bylaws of MWL, as enunciated in April 2002, make clear the degree to which senior MWL officials in the Kingdom of Saudi Arabia retain tight administrative and financial control over MWL branch offices and affiliates around the world.

66. The bylaws provide for the headquarter's strict administrative control of all aspects of the branch offices.  Article 17 of the bylaws enunciates the principle

---

[69] "Reasons for Order." The Minister of Citizenship and Immigration and Mahmoud Jaballah.  Docket: DES-6-99.  Federal Court of Canada.  November 2, 1999.  Pages 81-88.

[70] MWL regulations as published by the MWL Constituent Council (April 10-11, 2002).

[71] "More Dynamic Role for MWL: Dr. Abdullah Omar Nasseef." The Muslim World League Journal. Vol. 11; Nos. 5 and 6.  Jumada I&II 1404 (February-March 1984).  Mecca, Saudi Arabia.  Page 65.

[72] Monthly Newsletter of the Royal Saudi Embassy in Washington D.C.  March 1997. http://www.saudiembassy.net/publications/news_letter/NL_97/nl_97_03.html.

[73] Declaration of Ali Muhammad al-Kamal, Manager for Financial Affairs Administration of the Muslim World League.  Thomas Burnett et al. v. Al Baraka Investment and Development Corporation et al.  United States District Court for the District of Columbia.  Civil Action No. 1:02CV01616.

[74] Declaration of Abdulaziz H. Al-Fahad.  Thomas Burnett et al. v. Al Baraka Investment and Development Corporation et al.  United States District Court for the District of Columbia.  Civil Action No. 1:02CV01616.

that the MWL Secretary General is responsible for supervising the work of the branch offices and is responsible for approving the League's General Secretariat structure and that of its offices. Article 20 states that it is the General Secretariat in Saudi Arabia that is responsible for the opening of offices overseas, in accordance with the interests and the budget.[75] The Secretary General is also vested with the authority to appoint employees at overseas offices and that the employees need to report to the Secretary General on their work. MWL overseas offices are required to submit a report on their activity every three months to the Secretary General.[76] Furthermore, Article 19 of the MWL Employee Regulations mandates that an annual evaluation report on every employee will be filed annually with MWL's leadership in Saudi Arabia.[77]

67. The bylaws are even more specific—and strict—as applied to financial obligations and responsibilities.

- Article 14 requires that the MWL Secretary General publish an annual memorandum containing the principles and goals that should be taken into account when the various mechanisms, including the overseas offices, are planning the annual budget.[78]

- Article 18 requires the Secretary General to publish a register at the start of each fiscal year containing the allocations to all of the MWL overseas offices and Islamic centers it is running.[79]

- Article 125 requires MWL external supervisors at various branch offices to submit reports every quarter to the Secretary General in Saudi Arabia on the MWL's accounts. Article 131 further states that no overseas office may take upon itself financial undertakings without approval.[80]

- Article 11 mandates that funds transferred from MWL headquarters in Saudi Arabia to overseas branch offices cannot be used for anything other than the objectives for which they were allocated. In order to ensure that the correct sums of money are being received and disbursed overseas, Article 13 also requires branch offices to send copies of their bank statements each month to the General Secretary so they can be reviewed. Article 18 further requires each overseas office to send a monthly detailing of its expenses to the General Secretary. This responsibility extends to

---

[75] MWL regulations as published by the MWL Constituent Council (April 10-11, 2002).

[76] MWL regulations as published by the MWL Constituent Council (April 10-11, 2002).

[77] MWL regulations as published by the MWL Constituent Council (April 10-11, 2002).

[78] MWL regulations as published by the MWL Constituent Council (April 10-11, 2002).

[79] MWL regulations as published by the MWL Constituent Council (April 10-11, 2002).

[80] MWL regulations as published by the MWL Constituent Council (April 10-11, 2002).

forwarding original receipts to MWL headquarters in Saudi Arabia for any local financial disbursements on a monthly basis. [81]

- Article 19 explicitly forbids overseas branch offices of MWL from spending even their own independently-raised donations on any project unless based on the instructions provided by the authorized entity within the General Secretariat. [82]

68. The bylaws are clear and specific in stating that the overseas office manager cannot make a decision entailing a financial undertaking, not stated in the annual budget, without written consent from the authorized entity within the General Secretariat.  Funds beyond the scope determined in the annual budget cannot be spent without written consent from the authorized entity within the General Secretariat. [83]  In other words, all significant financial decisions or undertakings by MWL overseas branch offices are typically reviewed and approved at the highest levels of the organization inside the Kingdom of Saudi Arabia.

## III.  INTERNATIONAL ISLAMIC RELIEF ORGANIZATION (IIRO)

69. Though the Muslim World League conducts a variety of Islamic missionary and similar activities worldwide, according to former MWL Secretary General Dr. Ahmed Mohammed Ali, the MWL provides "humanitarian assistance" through the arms of a sub-branch of the group known as the International Islamic Relief Organization (IIRO) (a.k.a. Hayat al-Ighatha al-Islamiya, Islamic Relief Organization, IGASA). [84]  The IIRO was established in 1978 and is headquartered in Jeddah, Saudi Arabia. [85]  According to senior IIRO officials, the group operates more than 100 branch offices worldwide. [86]

70. The closely intertwined relationship between MWL and IIRO is a matter of extensive public record.  MWL Secretary General Abdullah al-Obaid describes IIRO in his own sworn statement as "a subsidiary of the Muslim World League." [87]  MWL employee and director of IIRO operations in Canada Arafat el-

---

[81] MWL regulations as published by the MWL Constituent Council (April 10-11, 2002).

[82] MWL regulations as published by the MWL Constituent Council (April 10-11, 2002).

[83] MWL regulations as published by the MWL Constituent Council (April 10-11, 2002).

[84] Ahmed, Iftikhar.  "Counter anti-Islam propaganda, says MWL sec-general."  Moneyclips.  May 6, 1995.

[85] "IIRO – Welcome."  http://www.arab.net/iiro.

[86] Declaration of Saleh Abdullah Al Saykhan, Manager of Financial Administration of the International Islamic Relief Organization.  Thomas Burnett et al. v. Al Baraka Investment and Development Corporation et al.  United States District Court for the District of Columbia.  Civil Action No. 1:02CV01616.

[87] Declaration of Abdullah Bin Saleh al-Obaid.  Thomas Burnett et al. v. Al Baraka Investment and Development Corporation et al.  United States District Court for the District of New York.  03 CV 9849 (RCC).

Asahi explained to Canadian investigators that MWL "is the mother organization of what is called IIRO, the Relief branch of the Muslim World League."[88] According to el-Asahi, "What happens is that sometimes the IIRO and the Muslim World League office is one, but sometimes they have two different offices, although the umbrella organization is the same, which is the Muslim World League."[89]

71. Similarly, the IIRO "annual report" for 2001-2002 notes, "the Board of Directors of IIROSA is headed by… [the] Secretary General of the Muslim World League. The IIROSA serves as the [MWL's] arm in matters relating to humanitarian activities such as relief, development, health care, education, and social welfare throughout the Muslim world . . . .   The Secretariat General of IIROSA . . . submits periodical progress reports to the Constituent Council of the Muslim World League."[90]

72. IIRO is governed over by a board of directors chaired by the Secretary General of MWL — who himself, according to IIRO financial manager Saleh al-Saykhan, "is nominated by the Saudi Arabian government."[91]   In March 1999, IIRO Secretary General Adnan Basha specifically issued a directive to IIRO branch office managers in foreign countries that "close ties, cooperation, and collaboration should be kept with the Saudi embassy."[92]

73. In court papers, IIRO's lawyers have asserted that — exactly like its MWL corporate parent — the organization "is an instrumentality of the government of the Kingdom of Saudi Arabia."[93]   When pressed on the issue of IIRO's precise relationship with the Kingdom of Saudi Arabia, Arafat el-Asahi repeatedly insisted:

> "The IIRO is the relief branch of that organization [MWL] which means that we are controlled in all our activities and plans by the Government of Saudi Arabia. Keep that in mind, please… I am paid by my organization which is funded by the [Saudi] government.   Let me tell you one little thing.   Whenever the Saudi

---

[88] "Reasons for Order."  The Minister of Citizenship and Immigration and Mahmoud Jaballah.  Docket: DES-6-99.  Federal Court of Canada.  November 2, 1999.  Pages 81-88.

[89] "Reasons for Order."  The Minister of Citizenship and Immigration and Mahmoud Jaballah.  Docket: DES-6-99.  Federal Court of Canada.  November 2, 1999.  Pages 81-88.

[90] "Annual Report: 2001-2002."  International Islamic Relief Organzation (Muslim World League).  The Kingdom of Saudi Arabia.

[91] Declaration of Saleh Abdullah Al Saykhan, Manager of Financial Administration of the International Islamic Relief Organization.  Thomas Burnett et al. v. Al Baraka Investment and Development Corporation et al.  United States District Court for the District of Columbia.  Civil Action No. 1:02CV01616.

[92] "Memo to the External Offices Managers."  March 16, 1999.  IIRO in the Saudi Arabian Kingdom; the Secretary General's Office.  Department: 1729.

[93] Defendant International Islamic Relief Organization's Amended Answer to Plaintiffs First Amended Complaint.  In Re: Terrorist Attack on September 11, 2001 (Federal Insurance Company et al. v. Al-Qaida et al.).  United States District Court for the Southern District of New York.  Case No: 02 CV 6978 (RCC).

Embassy in Ottawa required anything, to ask about any Muslim project all over Canada, they come to us.  They ask us about the people who are doing this project.  Whatever we say is acceptable, fully acceptable, by the Saudi Embassy and by the government of Saudi Arabia… The Government of Saudi Arabia, I am stating, is our government.  We work for it.  Whatever the government does and its attitude toward Ossama Bin Laden and other people, that is our attitude, too."[94]

74. Several Guantanamo Bay detainees have also testified before the Pentagon's Administrative Review Board that they had worked as a "government employee of a charitable organization . . ., the IIRO, International Islam Relief Organization."[95]   In the summer of 2001, Saudi Guantanamo detainee Ghanim Abdul Rahman al-Harbi reportedly worked in IIRO's finance department in the city of Dammam.  According to al-Harbi, "I worked as an official worker there . . . .  We can call it [a] financial department, not a problem but it was like accounting.  I was employed by the [Saudi] government under training there."[96]  Likewise, when questioned about his knowledge of charitable organizations, Somali Guantanamo detainee Mohammed Hussein Abdallah acknowledged working on behalf of "Haiat Al-Ighata [a/k/a IIRO], which is another organization that belongs to the Saudi government."[97]

75. Guantanamo detainee Abdullah Ibrahim al-Rushaydan told Pentagon officials during his own ARB hearing:

> "I was an employee of the International Aid Organization (Al Hayaa Al Ighathiya)… under the [Saudi] Ministry of the Interior… it is a government organization managed by Dr. Adnan Basha who holds the rank of Minister.  And Al Hayaat Al Ighatha Al Islamiya Al Aalamiya [IIRO] is a government organization under the Islamic World League [MWL] and all charity organizations are under the Senior Director for charity organizations… who is the Saudi Minister of Interior… it is official and governmental."[98]

76. There is a groundswell of evidence available to document exactly how dependent IIRO is on financial donations from the Saudi government and senior members of the Saudi royal family.  According to IIRO financial manager Saleh al-Saykhan, "since 1987 . . . the IIRO has received an annual grant of 1 million Saudi Riyals (in two semi-annual installments of SR 500,000) from the Special Committee of the Council of Ministers, which I understand to be a department of the Saudi

---

[94] "Reasons for Order."  The Minister of Citizenship and Immigration and Mahmoud Jaballah.  Docket: DES-6-99.  Federal Court of Canada.  November 2, 1999.  Pages 81-88.

[95] http://www.dod.gov/pubs/foi/operation_and_plans/Detainee/csrt_arb/Set_44_2922-3064.pdf.  Pages 103-104.

[96] http://www.dod.mil/pubs/foi/operation_and_plans/Detainee/csrt_arb/ARB_Transcript_Set_7_20497-20750.pdf.  Pages 46-47.

[97] http://www.dod.gov/pubs/foi/operation_and_plans/Detainee/csrt_arb/Set_15_1318-1362.pdf.  Pages 4-5.

[98] http://www.defenselink.mil/pubs/foi/detainees/csrt/ARB_Transcript_Set_2_585-768.pdf.  Page 85.

Arabian government chaired by Prince Sultan . . . .   The Special Committee extended three additional grants to the IIRO in 1998, totaling 5 million Saudi Riyals . . . .   These three grants were directed to the IIRO through the Office of the Western Command of the Saudi military."[99]

77. Indeed, according to IIRO Canada branch office director Arafat el-Asahi, as of 1999, IIRO reportedly received 70% of its charitable funding directly from the Saudi government.[100]  In the words of former MWL Secretary General Dr. Ahmad Muhammad Ali as published in a 1995 media interview, "[M]uch of [IIRO's] funding has been made possible by financial assistance from the Saudi government."[101]  The 2001-2002 IIRO annual report trumpets the "wholehearted support and encouragement" the charity has received "from the people of Saudi Arabia, above all, King Fahd, the Custodian of the Two Holy Mosques, HRH Crown Prince, Prince Abdullah, the Deputy Premier and Commander of the National Guard, HRH Prince Sultan, the Second Deputy Premier and Minister of Defense and Aviation, the entire royal family."[102]

78. Between 1992 and 1998, IIRO held numerous high profile fundraising events in Saudi Arabia, along with IIRO's own internal investment arm Sanabel al-Kheer. As suggested above, many of the largest donations to the two charities reportedly came directly from the Saudi royal family:

- In July 1992, IIRO sponsored a fundraising drive in Jeddah for the Muslims of Bosnia.  The conference was inaugurated by the acting Governor of Mecca, who was also the acting chairman of Sanabel al-Kheer.  Over SR19 million was collected in one day.  The largest single donors reportedly included the governor himself and Bakr Bin Laden. Several months later, Sanabel al-Kheer reported that it had transferred SR12 million collected on July 5 directly to IIRO to underwrite its "charitable operations" in the Balkans.[103]

- In December 1993, IIRO held another yearly fundraising drive inside Saudi Arabia to help support embattled Bosnian Muslims.  IIRO collected an additional SR15 million, which put the organization on a base capital level of nearly SR82 million.  The Governor of Mecca spoke again as an

---

[99] Declaration of Saleh Abdullah Al Saykhan, Manager of Financial Administration of the International Islamic Relief Organization.  Thomas Burnett et al. v. Al Baraka Investment and Development Corporation et al.  United States District Court for the District of Columbia.  Civil Action No. 1:02CV01616.

[100] "Reasons for Order."  The Minister of Citizenship and Immigration and Mahmoud Jaballah.  Docket: DES-6-99.  Federal Court of Canada.  November 2, 1999.  Page 13.

[101] "Prince Salman Opens Fundraising Campaign for IIRO."  Info-Prod Research (Middle East) Ltd. – Middle East News Items.  February 28, 1995.

[102] "Annual Report: 2001-2002."  International Islamic Relief Orgnanization (Muslim World League).  The Kingdom of Saudi Arabia.

[103] "Islamic Intn'l Relief Organisation receives SR12m for Bosnia fund."  The Saudi Gazette.  February 11, 1993.

honorary trustee and noted "the continuous support and encouragement of the Custodian of the Two Holy Mosques King Fahd" in promoting IIRO operations.[104]

- In February 1994, IIRO organized another annual Sanabel Al-Kheer fundraising convention in Riyadh. During the traditional opening speech, the Governor of Riyadh told of how he had personally solicited "donations from a number of benevolent Saudi people" for Sanabel and IIRO totalling SR6,979,462.[105] Over SR3.7 million was raised in the Saudi Cultural Festival Palace for IIRO/Sanabel. The royal function was attended by Shaykh Abdulaziz bin Baz (General Mufti of Saudi Arabia).[106] A few months later, IIRO officials stated that in the year 1994, the charity had raised more than SR90 million from wealthy benefactors in Saudi Arabia.[107]

- On February 23, 1995, IIRO held its eighth annual charity festival in Riyadh in conjunction with Sanabel al-Kheer. Donations totaling SR8 million ($2.13 million) included SR1 million from the Governor of Riyadh and at least another SR1 million from other senior Saudi officials.[108]

- On February 5, 1996, the IIRO and Sanabel Al-Kheer annual fundraising drive raised more than SR6 million at the Cultural Palace in Riyadh. Large donations included: SR1 million from the Governor of Riyadh; SR1 million from the Deputy Governor of Riyadh; and, SR10,000 from Shaykh Abdulaziz Bin Baz.[109]

- In December 1998, at the 12th annual Sanabel al-Kheer/IIRO charity drive, IIRO netted over SR6 million, including: SR5 million from the Saudi Second Deputy Premier and Saudi Defense Minister; SR1 million from the Governor of Riyadh; and, SR10,000 from Shaykh Abdulaziz bin Baz.[110]

79. Responding years later to allegations that his donations had gone to support extremist or terrorist activity, the Governor of Riyadh insisted, "I have . . . chaired several (charity) groups and I know that (the funds) are used in good deeds."[111]

---

[104] Bashir, Abdul Wahab. "IIRO raises SR15m in-funds." Arab News. December 22, 1993.

[105] "Saudis back fund-raising for Bosnian Muslims." The Saudi Gazette. February 26, 1994.

[106] Hassan, Javid. "Riyadh Governor Prince Salman donates SR1m to IIRO." Arab News. February 23, 1994.

[107] "IIRO marks eight anniversary." Riyadh Daily. January 12, 1995.

[108] Saberi, Mahmood. "SR8 million raised for IIRO at Sanabel Al-Khair drive." Saudi Gazette. February 23, 1995.

[109] Awkasho, Rashad. "SR6m raised in three hours at Sanabel Al-Khair drive." Saudi Gazette. February 5, 1996.

[110] Khan, M. Ghazanfar Ali. "SR6m collected at Sanabel Al-Khair." Arab News. December 24, 1998.

[111] "Saudi Tycoon Defends Muslim Charity." Associated Press. November 2, 2002.

80. Nor did Saudi government patronage of IIRO slacken in the immediate wake of the September 11, 2001 terrorist attack and allegations that the charity had helped support Al-Qaida's operations globally.  The 2001-2002 IIRO annual report includes a wealth of donations and coordinating work conducted on behalf of the charity by all levels of the Saudi royal family:

- "Under the supervision and directives of… Governor of Al-Baha region and the patronage of his Deputy… the Al-Baha branch office… was able to raise the sum of SR 4,655,308.80 in the year 2001-2002."[112]

- "Through the constant instructions of… Governor of the Gizan region, IIROSA offices in Gizan, Sabia, Abu Arish, Daarb, and Beish… collected SR 6,600,000 during the fiscal year 2001-2002." [113]

- "Under the supervision and patronage of… Governor of Al-Jouf region, the IIROSA office [in Al-Jouf] raised SR 1,374,644 during the fiscal year 2001-2002." [114]

- "Under the generous patronage of… Governor of Riyadh region and his Deputy… the Riyadh office of the IIROSA… raised SR 27,456,663" in 2001-2002. [115]

- "Under the patronage of… Governor of the Eastern region, and his Deputy… the IIROSA offices in the Eastern region collected SR 4,382,000 in the year 2001-2002." [116]

- "Thanks to continuous advices of… Governor of the Asir region… the twelve IIROSA offices in the Asir region collected SR 16,293,386 in 2001-2002." [117]

---

[112] "Annual Report: 2001-2002."  International Islamic Relief Organization (Muslim World League).  The Kingdom of Saudi Arabia.

[113] "Annual Report: 2001-2002."  International Islamic Relief Organization (Muslim World League).  The Kingdom of Saudi Arabia.

[114] "Annual Report: 2001-2002."  International Islamic Relief Organization (Muslim World League).  The Kingdom of Saudi Arabia.

[115] "Annual Report: 2001-2002."  International Islamic Relief Organization (Muslim World League).  The Kingdom of Saudi Arabia.

[116] "Annual Report: 2001-2002."  International Islamic Relief Organization (Muslim World League).  The Kingdom of Saudi Arabia.

[117] "Annual Report: 2001-2002."  International Islamic Relief Organization (Muslim World League).  The Kingdom of Saudi Arabia.

- "Continued patronage by… Governor of Al-Qasim region helped IIROSA offices in the area to collect SR 4,230,222 during the fiscal year 2001-2002."[118]

- "IIROSA office in Unaiza enjoys wholehearted support of… Governor of Al-Qasim region."[119]

- "Through the guidance of… Governor of Madinah region, the IIROSA office… collected SR 12,654,191 during the fiscal year 2001-2002.  The patronage of… Governor of Madinah region, extends to the Yanbu office of the IIROSA."[120]

- "Under the constant supervision of… Governor of Makkah region, IIROSA office in Makkah… collected SR 110,077,378 during the fiscal year 2001-2002."[121]

- "Governor of Makkah region extends his kind patronage to the IIROSA in Jeddah.  Indeed, through the keen interest of… Governor of Jeddah… IIROSA's Jeddah office collected SR 29,708,981" in 2001-2002.[122]

- "IIROSA's office in Taif also enjoys the support of both… Governor of Makkah, and Honorable Mayor of Taif, Mr. Ahad A. A. Moamar."[123]

- "Thanks to the kind patronage of… Governor of Najran region… the IIROSA office collected SR 1,652,114 during the fiscal year 2001-2002."[124]

81. Akin to Al-Haramain, IIRO officials in both Saudi Arabia and elsewhere have gone out of their way to insist that their charity is highly centralized and that branch offices are rendered incapable of independent action, especially if it

---

[118] "Annual Report: 2001-2002."  International Islamic Relief Organization (Muslim World League).  The Kingdom of Saudi Arabia.

[119] "Annual Report: 2001-2002."  International Islamic Relief Organization (Muslim World League).  The Kingdom of Saudi Arabia.

[120] "Annual Report: 2001-2002."  International Islamic Relief Organization (Muslim World League).  The Kingdom of Saudi Arabia.

[121] "Annual Report: 2001-2002."  International Islamic Relief Organization (Muslim World League).  The Kingdom of Saudi Arabia.

[122] "Annual Report: 2001-2002."  International Islamic Relief Organization (Muslim World League).  The Kingdom of Saudi Arabia.

[123] "Annual Report: 2001-2002."  International Islamic Relief Organization (Muslim World League).  The Kingdom of Saudi Arabia.

[124] "Annual Report: 2001-2002."  International Islamic Relief Organization (Muslim World League).  The Kingdom of Saudi Arabia.

appears to violate the Saudi government's agendas.  The 2001-2002 annual report characterizes IIRO globally as "an indivisible entity and its secretariat general, domestic and external branch offices are guided by the designated mission, policies, aims, regulations, and rules."[125]

82.  The close coordination between IIRO's headquarters in Saudi Arabia and its various branches is demonstrated by the history of its regional office in the U.S., founded in July 1991 in Falls Church, Virginia.  The branch was officially established by Dr. Sulaiman bin Ali al-Ali, a member of IIRO's Executive Committee in Saudi Arabia and a member of the ruling Shura (Consultative) Council of the Kingdom of Saudi Arabia.[126]

83.  According to associates of al-Ali later interviewed by U.S. Immigration and Customs Enforcement (ICE) agents, when al-Ali arrived in the United States, he "was working for the Saudi Arabian government."[127]   The application for tax exemption filed by IIRO's American branch with the IRS explains that al-Ali was employed by IIRO in Saudi Arabia as a "fulltime fundraiser" starting in June 1990.   According to the application, "We are very fortunate to have as our Executive Director Mr. Suliman Al-Ali . . . .   Mr. Al-Ali's most recent pledge program for International Islamic Relief Organization (IIRO) netted about $500,000."[128]   The application also specifies the previous program spearheaded by al-Ali was "supported in part by the Saudi government."[129]

84.  Anyone seeking to fund an IIRO project in the United States was required to "submit proposals for assistance or cooperation.   Proposals are reviewed to determine eligibility and validity.  Once approved, IRO's administration decides on the size and amount of help."[130]

85.  As with other IIRO offices, the Falls Church branch received significant funding from official Saudi sources: on January 18, 1996, Sulaiman al-Ali reported to Arab journalists that Prince Bandar ibn Sultan, Saudi Ambassador in Washington,

[125] "Annual Report: 2001-2002."  International Islamic Relief Orgnanization (Muslim World League).  The Kingdom of Saudi Arabia.

[126] IIRO was originally organized as International Relief Organization in the U.S on July 22, 1991. On February 18, 1992, International Islamic Relief Organization was formed. The two organizations are one-and-the-same, and therefore will be referred to as IIRO herein.  Virginia Secretary of State, Corporate Record, International Relief Organization and International Islamic Relief Organization.  See also: http://www.saudiembassy.net/gov_profile/shura00.html.  November 6, 2002.

[127] ICE interview of Soliman Biheiri by S.A. David Kane.  June 15, 2003.

[128] Application for Recognition of Exemption under Section 501(c)(3) of Internal Revenue Code. International Relief Organization, Inc. October 25, 1991.

[129] Application for Recognition of Exemption under Section 501(c)(3) of Internal Revenue Code. International Relief Organization, Inc. October 25, 1991.

[130] IRS 990 form for the "International Relief Organization" for Fiscal Year 1992.

had donated SR500,000 worth of computer equipment directly to IIRO's operations in northern Virginia.[131]

86.  In mid-1998, allegations emerged within top levels of IIRO that Sulaiman al-Ali had misappropriated charitable funds to cover personal expenses.  A meeting was convened in August 1998 at an office in Herndon, Virginia attended by, among others, al-Ali, the Secretary General of IIRO's corporate parent MWL Abdullah al-Obaid, the director of MWL in New York Dr. Abdulrahim al-Saati, and the head of IIRO's investment arm in Saudi Arabia Sanabel al-Khayr.[132]  Upon its tumultuous conclusion, MWL chief al-Obaid reportedly complained "that the meeting had not gone the way he would have liked."[133]  When al-Ali was eventually removed from his post soon thereafter in 1999, it was under the explicit authority of "instructions from the Secretary General of the Muslim World League, the Chairman of the Board of IIRO and Chairman of the Investments Committee."[134]

87.  During the period of its existence, the "North American Committee of IIRO" produced at least one English-language publication titled Al-Mubeen.  Though the masthead repeatedly states that Al-Mubeen was created specifically for IIRO's operations in North America, it also specifies for readers that "all correspondence should be addressed to" Al-Mubeen at a post office box in the Saudi city of Jeddah.[135]  Likewise, the magazine included full-page advertisements for IIRO's investment wing, Sanabel al-Khayr, and exclusively listed contact and bank information for Sanabel's offices in Jeddah.[136]

88.  IIRO's regional director in Canada Arafat el-Asahi grew adamant after being asked whether all of the charity's offices subscribed to the same tenets and governance: "I know about the general policy and the rules and objectives of the organization which nobody is allowed to go beyond.  Everybody has to abide by the rules and the principles of Islam and is contrary to the principles of Islam… The [IIRO] office, like any other office in the world, here or in the Muslim World League, has to abide by the policy of the Government of Saudi Arabia.  If anybody deviates from that, he would be fired; he would not work at all with IIRO or with the Muslim World League."[137]

---

[131] "Bandar donates computers."  Moneyclips.  January 19, 1996.

[132] ICE interview of Soliman Biheiri by S.A. David Kane.  June 15, 2003.

[133] ICE interview of Soliman Biheiri by S.A. David Kane.  June 15, 2003.

[134] Deposition of Soliman S. Biheiri.  In the Matter of The Sana-Bell, Inc. v. BMI Real Estate Development, Inc. et al.  October 27, 1999.  Exhibit Mirza #16, 10/25/1999.

[135] Al-Mubeen.  The North American Committee; International Islamic Relief Org.; Muslim World League. Vol. 1; No. 4.  November 1993.

[136] Al-Mubeen.  The North American Committee; International Islamic Relief Org.; Muslim World League. Vol. 1; No. 4.  November 1993.

[137] "Reasons for Order."  The Minister of Citizenship and Immigration and Mahmoud Jaballah.  Docket: DES-6-99.  Federal Court of Canada.  November 2, 1999.  Pages 81-88.

89. El-Asahi's understanding of the tightly-knit relationship between IIRO's headquarters in Saudi Arabia and its various worldwide branch offices is also reflected in a March 1999 50-point memo to "External Offices Managers" from then-IIRO Secretary General Adnan Basha.  On the administrative side, Basha's memo instructs branch managers to file "monthly reports on the office's performance, plans, projects, and employees" with the General Secretary in Riyadh.[138]  IIRO employees are flatly forbidden from attending "any convention, course, or activity without receiving prior written permission from the Secretary General, and one must undertake to submit a written report when receiving permission to attend."[139]  The Secretary General insisted that even IIRO branch office contracts limited merely to "moral obligations" must nonetheless be authorized "with the prior written consent of the Secretary General."[140]

90. As with the Muslim World League, the rules laid down by IIRO's senior leadership in Saudi Arabia for overseas branch office managers are even more explicit and strict in issues of finance and fund disbursements.  Any written requests for financial aid received by branch offices must be sent along to the General Secretary, along with any recommendations from the branch manager.[141]  Branch offices are also forbidden from opening any bank account or withdrawing any office funds or capital "for any reason, without prior written consent from the IIRO Secretary General."[142]  Like MWL, these rules apply equally to funds dispatched from IIRO headquarters in Saudi Arabia, as well as any "income funds from projects that finance themselves" or "local donations" contributed directly to the branch office.[143]

## IV.   WORLD ASSEMBLY FOR MUSLIM YOUTH (WAMY)

91. The Riyadh-based World Assembly of Muslim Youth (WAMY) advertises itself as the world's largest Muslim youth organization.  It was first established by a

---

[138] "Memo to the External Offices Managers."  March 16, 1999.  IIRO in the Saudi Arabian Kingdom; the Secretary General's Office.  Department: 1729.

[139] "Memo to the External Offices Managers."  March 16, 1999.  IIRO in the Saudi Arabian Kingdom; the Secretary General's Office.  Department: 1729.

[140] "Memo to the External Offices Managers."  March 16, 1999.  IIRO in the Saudi Arabian Kingdom; the Secretary General's Office.  Department: 1729.

[141] "Memo to the External Offices Managers."  March 16, 1999.  IIRO in the Saudi Arabian Kingdom; the Secretary General's Office.  Department: 1729.

[142] "Memo to the External Offices Managers."  March 16, 1999.  IIRO in the Saudi Arabian Kingdom; the Secretary General's Office.  Department: 1729.

[143] "Memo to the External Offices Managers."  March 16, 1999.  IIRO in the Saudi Arabian Kingdom; the Secretary General's Office.  Department: 1729.

royal decree issued by King Fahd in 1972.[144]  WAMY's goal, according to its own outreach materials, is to "arm the Muslim youth with full confidence in the supremacy of the Islamic system over other systems."[145]

92. WAMY claims on its website to run "66 regional, local offices and representatives in the five continents," including offices in London, Washington DC, Kuala Lampur, Auckland, Dhaka, Nairobi, Dakar, Moscow, and Cordoba (Argentina).[146]

93. According to WAMY financial director Mutaz Abu Unuq, "WAMY is governed principally by its General Assembly and President, who is appointed by the Saudi Government.  The current President of WAMY is the Minister of Islamic Affairs in Saudi Arabia.  The daily operations of WAMY are supervised by its Secretary General."[147]  The fact that WAMY's Board of Trustees is headed by the Saudi Minister of Islamic Affairs has been repeatedly advertised by the group's leaders in Saudi media[148] and on the group's Arabic-language website.[149]

94. In media interviews, Dr Abdul Wahab Noorwali, Assistant Secretary General of WAMY, characterized "Saudi Arabia's support" as "enormous since the establishment of WAMY in 1963.  The Kingdom provides us with a supportive environment that allows us to work openly within the society to collect funds and spread activities.  It also provides us with protection abroad through Saudi embassies and consulates, in addition to financial support."[150]

95. Major media publications—including the Wall Street Journal—have characterized WAMY as "a Saudi government-backed group."[151]

96. Until his death in August 2002, Saudi national Maneh ibn Hammad al-Johani served as WAMY's Secretary General.  Al-Johani was also a member of the ruling Saudi Shura Council, and an "active member of the 120-member consultative body."[152]  According to other senior WAMY officials, al-Johani

---

[144] Declaration of Mutaz Saleh Abu Unuq, Financial Director of the World Assembly of Muslim Youth. Thomas Burnett et al. v. Al Baraka Investment and Development Corporation et al.  United States District Court for the District of Columbia.  Civil Action No. 1:02CV01616.

[145] http://www.wamyusa.org/publications/islaam_at_glance.htm.

[146] http://www.wamyusa.org/about.about%20wamy.htm.

[147] Declaration of Mutaz Saleh Abu Unuq, Financial Director of the World Assembly of Muslim Youth. Thomas Burnett et al. v. Al Baraka Investment and Development Corporation et al.  United States District Court for the District of Columbia.  Civil Action No. 1:02CV01616.

[148] Al-Jazirah (Riyadh).  March 10, 2001.

[149] http://www.wamy.org/index.cfm?method=home.conPrint&contentid=17&fa=Content&simple=0.

[150] "WAMY Team in Afghanistan Risks Life to Deliver Aid."  Middle East Newsfile.  November 20, 2001.

[151] "Reports Link Charity to an Al-Qaeda Front."  Wall Street Journal.  September 20, 2003.

[152] "WAMY chief Johani dies in car crash."  Arab News.  August 5, 2002.

"contributed immensely to the activities of WAMY over the years."[153]   In an interview following al-Johani's death, WAMY's Assistant Secretary General Saleh al-Wohaibi noted that he intended "to brief" the Crown Prince "on the organization's activities.   He was going to update the regent on WAMY's upcoming ninth international."[154]   Shura council Vice Chairman Abdullah al-Naseef has also served as the Vice Chairman of WAMY.   Al-Naseef has even publicly praised "the kings of of [sic] Saudi Arabia" for supporting the establishment of WAMY.[155]

97.   Likewise, senior representatives from the Saudi government and royal family have regularly attended conferences and seminars organized by WAMY.   In October 1998, "His Royal Highness" Prince Ghazi addressed the Eighth International Conference of the World Assembly of Muslim Youth in October 1998.[156]   The following year, the Saudi Crown Prince "received guests of the ninth international conference of the World Assembly of Muslim Youth and its officials who came to greet him on the occasion of the end of the conference, which was held here under the auspices of the crown prince."[157]   The Saudi Premier told his visitors, "Not only Saudi Arabia, Iraq, the Sudan or any other country . . . But rather Islam is the target."[158]

98.   Internal documents produced by WAMY in discovery further reflect the involvement of Saudi government officials in the day-to-day administrative aspects of WAMY's operations.[159]



---

[153] "Dr. Maneh Al-Johani – WAMY Chief Dies in Car Mishap."  Riyadh Daily.  August 5, 2002.

[154] "WAMY chief Johani dies in car crash."  Arab News.  August 5, 2002.

[155] http://www.iiasa.org/researchcenter/symposium.htm.

[156] "Jordan's Prince Ghazi Addresses Muslim Youth Conference."  Amman Times.  October 21, 1998.

[157] "Saudi Crown Prince Receives Dignitaries, says Islam Targeted."  BBS.  November 2, 2002.

[158] "Saudi Crown Prince Receives Dignitaries, says Islam Targeted."  BBS.  November 2, 2002.

[159] See WAMYSA2444, WAMYSA2683, WAMYSA2884-2885, WAMYSA2894, WAMYSA2973, WAMYSA3305, WAMYSA3592-3593.

[160] February 11, 2000 WAMY "Offices Regulations" approved by WAMY Board of Trustees in Riyadh. WAMY Control Docs.pdf

[161] February 11, 2000 WAMY "Offices Regulations" approved by WAMY Board of Trustees in Riyadh. WAMY Control Docs.pdf



99.

100. In January 2001, during an interview with a Saudi news journal, Maneh al-Johani acknowledged to reporters that WAMY's main source of financing for its activities is the annual budget of the Saudi government.[167]  WAMY's financial director Mutaz Abu Unuq has likewise conceded in a sworn statement, "the Government of Saudi Arabia funds a large portion of WAMY's budget."[168] Between 1994 and 2001, according to Abu Unuq, WAMY received at least "two grants of 100,000 Saudi Riyals each from the Saudi Ministry of Finance upon the

---

[162] February 11, 2000 WAMY "Offices Regulations" approved by WAMY Board of Trustees in Riyadh. WAMY Control Docs.pdf

[163] February 11, 2000 WAMY "Offices Regulations" approved by WAMY Board of Trustees in Riyadh. WAMY Control Docs.pdf

[164] February 11, 2000 WAMY "Offices Regulations" approved by WAMY Board of Trustees in Riyadh. WAMY Control Docs.pdf

[165] February 11, 2000 WAMY "Offices Regulations" approved by WAMY Board of Trustees in Riyadh. WAMY Control Docs.pdf

[166] February 11, 2000 WAMY "Offices Regulations" approved by WAMY Board of Trustees in Riyadh. WAMY Control Docs.pdf

[167] Al-Jazirah (Riyadh).  January 12, 2001.

[168] Declaration of Mutaz Saleh Abu Unuq, Financial Director of the World Assembly of Muslim Youth. Thomas Burnett et al. v. Al Baraka Investment and Development Corporation et al.  United States District Court for the District of Columbia.  Civil Action No. 1:02CV01616.

recommendation of the Supreme Council for Islamic Affairs, which I understand to be a department of the Saudi Arabian government headed by Prince Sultan."[169]

101. Media reports from Saudi journalists suggest that the aggregate funds provided by the Kingdom and the royal family to WAMY are far greater than even the numbers cited by Abu Unuq.

- During a 1999 joint fundraiser for WAMY, IIRO, and Al-Haramain, the Governor of Riyadh reportedly donated SR1.5 million.[170]

- Two years later, during another joint fundraising drive in November 2001, the Governor of Riyadh allegedly contributed SR 1.5 million, "while his deputy… donated SR 1 million."[171]

- On November 12, 2002, a charitable event in Riyadh co-sponsored by WAMY and two other charities was attended by, among others: the Governor of Riyadh, the Grand Mufti of Saudi Arabia, and the Minister of Islamic Affairs.[172]

- Less than two weeks later, the Governor of Mecca pledged a personal contribution of approximately $40,000 during a joint ceremony organized by Al-Haramain and WAMY.[173]

- Elsewhere, the Governor of the Eastern region of Saudi Arabia, was a featured guest at yet another joint charitable function organized in November 2002 by IIRO, WAMY, and Al-Haramain.[174] After pledging a donation of over $250,000, the governor delivered a speech to attendees congratulating the assistance "given by the government of the Kingdom of Saudi Arabia… to charities and charitable deeds."[175]

- In July 2003, the King of Saudi Arabia was reported in Saudi media to be funding Muslim pilgrims on Hajj trips organized and "supervised" by WAMY.[176]

---

[169] Declaration of Mutaz Saleh Abu Unuq, Financial Director of the World Assembly of Muslim Youth. Thomas Burnett et al. v. Al Baraka Investment and Development Corporation et al. United States District Court for the District of Columbia. Civil Action No. 1:02CV01616.

[170] "Salman donates SR1.5m in a Major Fund-Raising Event." Middle East Newsfile. December 16, 2001.

[171] "Fund Raising Event Generates SR6.5 million." Middle East Newsfile. November 29, 2001.

[172] "Prince Salman patronizes charity ceremony." Saudi Press Agency. November 12, 2002.

[173] Ain Al-Yaqeen. November 29, 2002.

[174] Ain Al-Yaqeen. November 29, 2002.

[175] Ain Al-Yaqeen. November 29, 2002.

[176] "European and Canadian pilgrims arrive in Jiddah." Saudi Press Agency. June 2, 2003.

102. The Saudi government, and particularly the Ministry of Islamic Affairs, has also used other means to provide in-kind support to WAMY.  According to Saudi media, Saudi Minister of Islamic Affairs Shaykh Saleh al-Shaykh announced in March 2001 that "Custodian of the Two Holy Mosques King Fahd bin Abdul Aziz has issued directives to provide some of the governmental authorities and Saudi embassies and a number of Islamic organizations inside and outside the Kingdom of Saudi Arabia with 1.6 million copies of the Holy Quran and its meanings in various languages.  Minister al-Shaykh specified, "in line with monarch's directives… the World Assembly for Muslim Youth . . . will be provided with copies of the Holy Quran and its translations."[177]

103. The Saudi government's Armed Forces Printing Press has also published at least one controversial Arabic-language booklet on behalf of WAMY, "Islamic Views."  Under the heading "The Prophet asks for Jihad," the WAMY booklet explains, "The Prophet Mohammad fought against the infidels and the Jews till he triumphed over them and conducted himself about twenty invasions and he sent tens of regiments led by his companions for Jihad . . . .  Damn from Allah to the Jews who made graves of their prophets as Masjid."[178]  Later, further on in the booklet, Islam is trumpeted as "a religion of Jihad" and violent jihad is endorsed as "an answer for the Jews, the liars": "[T]each our children to love taking revenge on the Jews and the oppressors, and teach them that our youngsters will liberate Palestine and al-Quds when they go back to Islam and make Jihad for the sake of Allah."[179]

104. As with the other dawah organizations, WAMY's branch offices maintain a closely intertwined, coordinated relationship with the charity's headquarters in Saudi Arabia.  The website for WAMY's chapter in the United States explains (in English), "Whether you are an organization, a society, a youth circle, or an individual we are here to help you. For further information or inquiries please contact: Head Office. PO Box 10845, Riyadh 11443, Saudi Arabia."[180]  The website also notes:

> "The Projects Committee of WAMY receives dozens of requests every month from all over the world seeking financial assistance to implement various religious, educational, social, vocational and economic projects.  All such requests are carefully studied, evaluated and authenticated by the Projects Committee. These projects are later forwarded to various philanthropists with WAMY 's letters of recommendation.  Funds received for various projects are

---

[177] "Copies of the Holy Quran to be distributed."  <u>Saudi Press Agency</u>.  March 31, 2001.

[178] <u>Islamic Views</u>.  Saudi Armed Forces Printing Press.

[179] <u>Islamic Views</u>.  Saudi Armed Forces Printing Press.

[180] http://www.wamyusa.org/About/serverd_by_wamy.htm.

passed on to the concerned projects.  The Committee also ensures that the projects are executed satisfactorily and honestly."[181]

105. Likewise, WAMY's website for its branch office in the United Kingdom lists contact information for the U.S. bureau described above, the "WAMY Western Europe Office" in London, the WAMY office in Jeddah, and the "WAMY Head Office" in Riyadh.[182]

106. According to former WAMY Secretary General Maneh al-Johani, WAMY's worldwide activities are "decided upon" by a Board of Trustees in Saudi Arabia: "The Board of Trustees, comprised of 23 members, supervises [WAMY activity overseas].  Everyone on the board of Trustees supervises a region around the world, divided into several sectors . . . .  These arrangements are made through the active system tied to the General Secretariat in Riyadh."[183]  When asked by Saudi journalists to explain how WAMY's head office was tracking the activities of its overseas branch offices, al-Johani replied, "Through several conducts—here, at the General Secretariat, there is an assistant to the Secretary General for Office Affairs, whose role is to supervise, administer, and be in contact with the offices.  Furthermore, there are field visits on the part of senior members, whether by the assistant to the Secretary General or other senior members of the board of trustees."[184]

107. Several of the members of the Board of Trustees are also simultaneously listed by WAMY as chiefs of various overseas WAMY offices—such as the head of the "Arab world" office Dr. Awish bin Harbi al-Ghamidi, the head of the North America office Dr. Anwar al-Hajjaj, and the head of the South America office Ali Muhammad al-Abduni.[185]

108. An internal document produced by WAMY in discovery and marked "confidential" further evidences the control and supervision over WAMY's overseas branch offices by WAMY headquarters in Riyadh.



---

[181] http://www.wamyusa.org/About/social_economic_uplift.htm.

[182] http://www.wamy.co.uk/bd_contact.htm.

[183] Al-Jazirah (Riyadh).  March 10, 2001.

[184] Al-Jazirah (Riyadh).  March 10, 2001.

[185] http://www.buraydahcity.net/vb/showpost.php?s=837f02cf3010abbe8aab392e113ea14c&p=893992&postcount=6.



109. In 2011, the Canada Revenue Authority (CRA) conducted an audit of WAMY's branch office in Canada in order to determine whether it reasonably qualified for tax-exempt charitable status.  The CRA concluded in a letter sent to WAMY officials, "the audit findings did not reveal any apparent separation between the acitivties of WAMY (Saudi Arabia) and WAMY [Canada], with all related financial and operating positions being made by WAMY (Saudi Arabia).  This leads to a reasonable inference that WAMY has little or no independent function."[189]  According to the CRA:

> "It is logical and reasonable to assume that WAMY was established to support the goals and operations of the parent organization WAMY (Saudi Arabia), and as a result, the objects and activities of WAMY cannot be viewed in isolation from those of WAMY (Saudi Arabia)… WAMY (Saudi Arabia) maintains substantial control over WAMY's finances, and uses this control to carry out its own objectives in Canada… WAMY (Saudi Arabia) provides substantially all of WAMY's operational funds; WAMY representatives advised the CRA during the audit that WAMY (Saudi Arabia) exercised a significant amount of control over their expenses; WAMY provides annual reports to WAMY (Saudi Arabia) regarding the organizations that it funds and the amounts that it disburses to these organizations.  The reason provided to our auditor was that the WAMY (Saudi Arabia) wanted to know what it was responsible for supporting… WAMY [in Canada] has made no attempt to distinguish itself from WAMY (Saudi Arabia)."[190]

# V.    SAUDI ARABIAN RED CRESCENT SOCIETY (SARCS)

---

[186] February 11, 2000 WAMY "Offices Regulations" approved by WAMY Board of Trustees in Riyadh. WAMY Control Docs.pdf

[187] February 11, 2000 WAMY "Offices Regulations" approved by WAMY Board of Trustees in Riyadh. WAMY Control Docs.pdf

[188] February 11, 2000 WAMY "Offices Regulations" approved by WAMY Board of Trustees in Riyadh. WAMY Control Docs.pdf

[189] "Audit of the World Assembly of Muslim Youth."  Letter to World Assembly of Muslim Youth, 70-3024 Cedarglen Gate, Mississauga ON L5C 4S3.  Canada Revenue Agency (CRA).  Dated August 23, 2011.

[190] "Audit of the World Assembly of Muslim Youth."  Letter to World Assembly of Muslim Youth, 70-3024 Cedarglen Gate, Mississauga ON L5C 4S3.  Canada Revenue Agency (CRA).  Dated August 23, 2011.

110. The Saudi Red Crescent Society was first established in June 1963 by a royal decree issued by the King of Saudi Arabia.[191] According to the official website of SARCS, the establishment of the charity was "based on the Geneva Conventions and the principles adopted by the Conference of the International Red Cross and Crescent."[192] During the same year, SARCS was formally recognized by the International Red Cross and Red Crescent Movement. The charity advertises its purpose as "to mitigate disasters and human suffering, without discrimination or segregation", including supporting "victims of war, both civilian and military personnel, under the conditions set forth in the Geneva Conventions."[193] At present, SARCS maintains at least 14 offices inside the Kingdom of Saudi Arabia alone and a work force of nearly 3,000.[194]

111. According to the President of the Saudi Red Crescent, Dr. Abdulrahman al-Swailem, "the government of the Kingdom of Saudi Arabia sponsors and supervises the Saudi Red Crescent, and appoints its directors . . . . Thus, the Saudi Red Crescent performs essential core governmental functions and is a Saudi Government instrumentality."[195] In a separate, second sworn declaration, al-Suwailem once again insisted, "The Kingdom of Saudi Arabia sponsors and supervises the Saudi Arabian Red Crescent Society, and the Saudi government appoints all of its directors."[196]

112. During one meeting alone of the Red Crescent's management committee in 1999 included appearances by the Saudi Minister of Health Dr. Osama Shobokshi, Secretary-General of the Riyadh Chamber of Commerce and Industry Dr. Fahd Al-Harithy, Ministry of Labor and Finance delegate Muhammad al-Thumaiji, and Saudi Shura Council member Dr. Abdulaziz Al-Mulhem.[197]

113. Red Crescent President Dr. al-Suwailem has also affirmed that much of the Red Crescent's operations "are funded by the Saudi government."[198] Even Arab mujahideen commanders fighting in Afghanistan during the 1980s recognized the

---

[191] http://www.srca.org.sa/OurServices.aspx.

[192] http://www.srca.org.sa/OurServices.aspx.

[193] http://www.srca.org.sa/OurServices.aspx.

[194] http://www.ifrc.org/docs/profiles/saprofile.pdf.

[195] Affidavit of Abdul Rahman Al Swailem.  In Re: Terrorist Attack on September 11, 2001 (Thomas E. Burnett Sr. et al. v. Al Baraka Investment and Development Corporation).  United States District Court for the Southern District of New York.  Case No: 03 CV 9849 (RCC).

[196] Second Affidavit of Abdul Rahman Al Swailem.  In Re: Terrorist Attack on September 11, 2001 (Thomas E. Burnett Sr. et al. v. Al Baraka Investment and Development Corporation).  United States District Court for the Southern District of New York.  Case No: 03 CV 9849 (RCC).

[197] Hassan, Javid.  "10,000 volunteers trained by SRCS: Al Suwailem."  Arab News.  June 16, 1999.

[198] Affidavit of Abdul Rahman Al Swailem.  In Re: Terrorist Attack on September 11, 2001 (Thomas E. Burnett Sr. et al. v. Al Baraka Investment and Development Corporation).  United States District Court for the Southern District of New York.  Case No: 03 CV 9849 (RCC).

contributions of the Saudi Kingdom to the cause had come, at least in part, through its agency the Red Crescent.

114. When asked in a 1989 interview "Who donates to the mujahideen?", Shaykh Abdullah Azzam replied:

> "Saudi Arabia is in truth the only country that has stood beside the Afghan Jihad as a government and as a people… The Saudi Red Crescent and the Saudi Relief Agency headed by [Prince] Salman Abdel 'Aziz, has a budget of 100 million riyal per year. These two Saudi organizations are under one headed [by] Wael Jalaidan, who happens to be head of the Red Crescent as well. He was a representative of the University of King Abdel Aziz in Saudi Arabia in the United States, and left it to become the head of the Red Crescent . . . . There is the [Saudi] government support and this support is many times and many times higher than these amounts and it is given to the government of Pakistan to support the mujahideen and the people."[199]

115. The annual budget statement from the Saudi Ministry of Finance details the revenues and expenditures of public corporations whose budgets are annexed to the Saudi national budget—including the Saudi Red Crescent. According to the budget statement for 1998, the revenues and expenditures of the Saudi Red Crescent Society totaled SR 206,840,000;[200] for the year 2000 the total was SR 238,346,000;[201] for the year 2002 the total was SR 249,055,000.[202]

## VI.   SAUDI HIGH COMMISSION FOR RELIEF (SHC)

116. In 1993, the Saudi government established the Saudi High Commission for Relief in Bosnia-Herzegovina, which claims to have provided more than $400 million in assistance to the Muslim community in the Balkans.[203] The SHC was founded by Saudi Prince Salman bin Abdul-Aziz, mayor of Riyadh and son of Abdul Aziz ibn Saud, the founder of Saudi Arabia.[204] According to the Director of the Executive Office of the SHC Saud bin Mohammad al-Roshood:

> "The Saudi High Commission was formed in 1993 by Decision No. 17419 of the President of the Council of Ministers of Saudi Arabia, dated 2/12/1412 (1993) . . . . The Saudi High Commission is currently, and has been since its inception,

---

[199] Videotaped interview of Shaykh Abdullah Azzam. 1989.

[200] "Budget Statement from Ministry Of Finance." Ministry of Finance of the Kingdom of Saudi Arabia. December 29, 1998.

[201] "Budget for Fiscal Year 2000." Ministry of Finance and National Economy of the Kingdom of Saudi Arabia. December 20, 1999.

[202] "Budget for Fiscal Year 2002." Ministry of Finance and National Economy of the Kingdom of Saudi Arabia. December 8, 2001.

[203] "Islamic Organizations in the Balkans." A Joint Research Project by the Governments of the United States and the United Kingdom. August 2003.

[204] "US, Saudis Plan to Shut Down Charity's Branches." USA Today. March 11, 2002.

headed by His Royal Highness Prince Salman bin Abdulaziz Al Saud, who is the Governor of the Riyadh Province and a member of the Saudi Royal Family.  In Decision No. 17419, the President of the Council of Ministers appointed Prince Salman bin Abdulaziz President of the Saudi High Commission.  As President, Prince Salman bin Abdulaziz is the head of both the Executive Committee and the Supreme Commission. Prince Salman bin Abdulaziz has filled all of the above-listed roles continuously over the approximately eleven years since the Saudi High Commission was formed."[205]

117. Within a short period of time, the SHC "evolved into the primary instrument of Saudi foreign policy towards Bosnia-Herzegovina, due largely to the leadership of Prince Salman bin Abdulaziz."[206]  SHC Executive Office director al-Roshood explained, "The Saudi High Commission engages in specific, government-sanctioned fundraising activities, including a campaign promoted as the 'Campaign of the Custodian of the Two Holy Mosques,' referring to the King of Saudi Arabia."[207]  A separate legal declaration submitted by Dr. Mutlib al-Nafissa, a member of the Council of Ministers of the Kingdom of Saudi Arabia confirms, "the Saudi High Commission is an arm of the Saudi Arabian government."[208]

118. Indeed, no credible source has ever disputed the existential nature of the relationship between the SHC to the Kingdom of Saudi Arabia.  In his capacity as Saudi Minister of State, al-Nafissa describes SHC as a "government agency" and a "government entity":

"The Saudi High Commission is an arm of the Saudi Arabian government. Actions taken by the Saudi High Commission properly are viewed as actions of the government of Saudi Arabia. Actions taken by the Saudi High Commission necessarily are in keeping with the foreign and domestic governmental policies of the Kingdom of Saudi Arabia . . . .  A government commission, such as the Saudi High Commission, always is chaired or presided over by a government official and conducts its affairs in accordance with the domestic or foreign policy objectives of the Kingdom of Saudi Arabia . . . .  Prince Salman bin Abdulaziz was appointed President of the Saudi High Commission by Decision No. 17419, the same Decision of the President of the Council of Ministers that formed the

---

[205] "Declaration of Saud bin Mohammad al-Roshood."  In re: "Terrorist Attacks on September 11, 2001." United States District Court for the Southern District of New York; Case No. 03-MDL-1570.  Dated: February 17, 2004.

[206] "Declaration of Saud bin Mohammad al-Roshood."  In re: "Terrorist Attacks on September 11, 2001." United States District Court for the Southern District of New York; Case No. 03-MDL-1570.  Dated: February 17, 2004.

[207] "Declaration of Saud bin Mohammad al-Roshood."  In re: "Terrorist Attacks on September 11, 2001." United States District Court for the Southern District of New York; Case No. 03-MDL-1570.  Dated: February 17, 2004.

[208] "Declaration of Dr. Mutlib bin Abdullah al Nafissa."  In re: "Terrorist Attacks on September 11, 2001." United States District Court for the Southern District of New York; Case No. 03-MDL-1570.  Dated: January 31, 2004.

Saudi High Commission. Prince Salman bin Abdulaziz is a high-ranking government official of the Kingdom of Saudi Arabia."[209]

119. According to SHC official Saud al-Roshood, "the largest source of funding for the Saudi High Commission is the treasury of the Kingdom of Saudi Arabia, which has provided approximately 30% of the total funds used and distributed by the Saudi High Commission."[210]

120. Aside from direct funding, the Saudi government also provides in-kind financial support to SHC by loaning out free services provided by "civil servant employees of the Kingdom of Saudi Arabia."[211]  Al-Roshood described how "many Saudi High Commission staffers are detailed from other government ministries and other administrative organs of the Kingdom of Saudi Arabia. Staffers on detail from other government offices are paid by their respective ministries and administrative organs, rather than by the Saudi High Commission."[212]

121. As for the question of how closely SHC's activities outside of Saudi Arabia were being managed by administrators and members of the royal family back in the Kingdom, Dr. Mutlib al-Nafissa has insisted:

> "Decisions regarding causes to support and recipients for Saudi High Commission funds are within the discretion of the Executive Committee, the Supreme Commission, and Prince Salman bin Abdulaziz . . . .  The decisions of the Executive Committee, the Supreme Committee, and Prince Salman bin Abdulaziz, by virtue of the Prince's status as a high-ranking government official, reflect the foreign policy of the Kingdom of Saudi Arabia toward the country where the relief effort or foreign aid is directed – in most instances, Bosnia-Herzegovina."[213]

# VII.   SAUDI JOINT RELIEF COMMITTEE (SJRC)

---

[209] "Declaration of Dr. Mutlib bin Abdullah al Nafissa."  In re: "Terrorist Attacks on September 11, 2001." United States District Court for the Southern District of New York; Case No. 03-MDL-1570.  Dated: January 31, 2004.

[210] "Declaration of Saud bin Mohammad al-Roshood."  In re: "Terrorist Attacks on September 11, 2001." United States District Court for the Southern District of New York; Case No. 03-MDL-1570.  Dated: February 17, 2004.

[211] "Declaration of Saud bin Mohammad al-Roshood."  In re: "Terrorist Attacks on September 11, 2001." United States District Court for the Southern District of New York; Case No. 03-MDL-1570.  Dated: February 17, 2004.

[212] "Declaration of Saud bin Mohammad al-Roshood."  In re: "Terrorist Attacks on September 11, 2001." United States District Court for the Southern District of New York; Case No. 03-MDL-1570.  Dated: February 17, 2004.

[213] "Declaration of Dr. Mutlib bin Abdullah al Nafissa."  In re: "Terrorist Attacks on September 11, 2001." United States District Court for the Southern District of New York; Case No. 03-MDL-1570.  Dated: January 31, 2004.

122. Much as the Saudi High Commission was formed by the Kingdom in connection with events in Bosnia-Herzegovina, the Saudi royal family adopted a similar approach when confronted with a parallel crisis in 1999 concerning Serbs and Muslims in the tiny province of Kosovo.  Under the chairmanship of the Saudi Interior Minister, the Kingdom formed the "Saudi Joint Relief Committee for Kosovo and Chechnya" in order to better "coordinate Saudi charitable work abroad."[214]  A key function of the Saudi Joint Committee was to coordinate the efforts of other Wahhabi-style missionary groups with loose ties to the Saudi government.[215]  The founders of the SJRC were also intent on using the new charity entity "to document the assistance that is provided by the Kingdom with International Organizations and Commissions."[216]

123. The royal order that created the SJRC on May 18, 1999 is signed by King Fahd (on behalf of the President of the Saudi Council of Ministers) and is copied to the Saudi Interior Minister, Defense Minister, Deputy President of the National Guard, the Minister of Foreign Affairs, the President of General Intelligence, the Minister of Islamic Affairs, the Minister of Health, the Minister of Information, the Minister of Labor, the Minister of Finance, and the Secretary General of the Muslim World League.[217]

124. The "Albanian High Order" was issued in response to a Saudi Ministerial Committee meeting, during which the King was advised by his cabinet to centralize the Kingdom's efforts to support Muslims in Kosovo by forming "a Committee under the chairmanship of his Excellency the President of the Society and a membership of representatives of high rank from the Presidency of the National Guard, the Ministry of Defense and Aviation, the Ministry of Interior, the Presidency of General Intelligence, the Ministry of Finance and National Economy, the Ministry of Information, the Ministry of Labor and Social Affairs and a representatives from each Saudi society or charitable foundation that participates in relief work, namely: International Islamic Relief Organization, World Assembly of Muslim Youth, Al-Haramain Charitable Foundation, Islamic Endowment Foundation."[218]  Though the "Albanian High Order" explicitly names the Saudi Interior Minister as the SJRC's chairman, Saudi media also reported that another member of the royal family had also served as a chair of the group, "His Highness Prince Turki Bin Fahd Bin Jalawi", due to "his experience in

---

[214] "Islamic Organizations in the Balkans."  A Joint Research Project by the Governments of the United States and the United Kingdom.  August 2003.

[215] "Islamic Organizations in the Balkans."  A Joint Research Project by the Governments of the United States and the United Kingdom.  August 2003.

[216] Telegram No. 7/B/1863 from Fahad bin Abdul Aziz, President of Council of Ministers Kingdom of Saudi Arabia.  Dated: 3/2/1420 (May 18, 1999).

[217] Telegram No. 7/B/1863 from Fahad bin Abdul Aziz, President of Council of Ministers Kingdom of Saudi Arabia.  Dated: 3/2/1420 (May 18, 1999).

[218] Telegram No. 7/B/1863 from Fahad bin Abdul Aziz, President of Council of Ministers Kingdom of Saudi Arabia.  Dated: 3/2/1420 (May 18, 1999).

charity work. He oversees the offices of the International Islamic Relief Commission in the Eastern Region and chairs the Emergency Relief Committee."[219]   It appears that "International Islamic Relief Commission" is merely an alternative translation for the previously-discussed Saudi charity IIRO.

125. Saudi government officials made no secret of its close relationship with, and its endorsement of, the activities of the Saudi Joint Relief Committee.  In February 2003, the Saudi Interior Minister publicly "expressed his thanks for the efforts exerted by members of the [SJRC] . . . .  For his part Dr Al-Suwailam expressed his gratitude to . . .  the Minister of the Interior and Supervisor of the Saudi Joint Committee for the Relief of Kosovo and Chechnya and stressed that his support is always behind the success of the members of the committee in their mission."[220]  Similarly, in June 2003, the head of Saudi Arabia's General Intelligence Directorate openly applauded "the Saudi relief aid provided to the people of Kosovo and Chechen refugees . . . .  In a cable addressed to the Head of the Saudi Red Crescent and Head of the Saudi Joint Committee Dr Abdul Rahman Ibn Abdul Aziz Al Suwailam, Prince Nawaf lauded the efforts of the Saudi Relief Committee to both people and wished the Committee success in the future."[221]

126. According to Dr. al-Suwailem, president of the SJRC and a former Deputy Minister for Executive Affairs for the Kingdom of Saudi Arabia, "Beginning with its formation in 1999, the Saudi Joint Relief Committee (the 'SJRC') has always functioned as a political subdivision, agency, or instrumentality of the Kingdom of Saudi Arabia."[222]   In a sworn statement, al-Suwailem emphasized that King Fahd's "Albanian High Order" in May 1999 "specified that… the SJRC must include high-ranking representatives from agencies of the Kingdom."[223]

127. Dr. al-Suwailem has also acknowledged in a sworn statement that "the SJRC's mission was largely subsidized by the Kingdom of Saudi Arabia."[224]   According to al-Suwailem, "On March 9, 2000, HRM King Fahd bin Abdulaziz issued a Royal Decree donating 5,000,000 Saudi Riyals to support the SJRC's relief work . . . .  Through the end of 2003, the SJRC received 3,000,000 Saudi Riyals from the Kingdom's initial donation through the Ministry of Finance. In addition, the

---

[219] "Relief aid committee set up for Chechen Muslims."  Al-Madinah (Jeddah).  December 4, 1999.

[220] "In Brief."  Ain al-Yaqeen.  February 28, 2003.

[221] "In Brief."  Ain al-Yaqeen.  June 6, 2003.

[222] Declaration of Dr. Abdulrahman A. Al-Suwailem.  In Re: Terrorist Attack on September 11, 2001 (Federal Insurance Company et al. v. Al-Qaida et al.).  United States District Court for the Southern District of New York.  Case No: 02 CV 6978 (RCC).

[223] Declaration of Dr. Abdulrahman A. Al-Suwailem.  In Re: Terrorist Attack on September 11, 2001 (Federal Insurance Company et al. v. Al-Qaida et al.).  United States District Court for the Southern District of New York.  Case No: 02 CV 6978 (RCC).

[224] Declaration of Dr. Abdulrahman A. Al-Suwailem.  In Re: Terrorist Attack on September 11, 2001 (Federal Insurance Company et al. v. Al-Qaida et al.).  United States District Court for the Southern District of New York.  Case No: 02 CV 6978 (RCC).

Kingdom of Saudi Arabia routinely provided critical logistical support for the SJRC's humanitarian efforts in Kosovo and Chechnya."[225]

128. As with the SHC, the Saudi government has provided additional support to the SJRC by loaning out free services performed by employees of the state.  Dr. al-Suwailem confirmed, "the Kingdom of Saudi Arabia paid the salaries and expenses for most of the civil servants seconded to work for the SJRC. The Organizational Charter adopted by the SJRC expressly provided that employees seconded from the government would be subject to the laws applicable to government civil servants. Accordingly, seconded government employees of the SJRC are treated as civil servants, rather than private hires, under Saudi law."[226]

129. Also akin to the SHC, given the limited purpose for which it was created, the SJRC retained far fewer branch offices outside Saudi Arabia than other charitable organizations described in this report.  It remains a fairly centralized organization. Nonetheless, SJRC President Dr. Abdulrahman al-Suwailem has insisted that operations were still kept under tight control by the Saudi government and "the SJRC submitted regular financial and performance reports to the Minister of the Interior, HRH Prince Nayef Bin Abdulaziz Al-Saud."[227]

## VIII.  CONCLUSIONS

130. As demonstrated by the above analysis, Al-Haramain, the Muslim World League, the International Islamic Relief Organization, the World Assembly for Muslim Youth, the Saudi High Commission for Relief, the Saudi Joint Relief Committee, and the Saudi Red Crescent Society are all subject to stringent control by the government of the Kingdom of Saudi Arabia, and specifically in most cases, by the Ministry of Islamic Affairs.

131. All of the above organizations have operated under significant administrative guidance and regulation from senior members of the Saudi government and royal family, and have collected millions of dollars in donations from the same sources. In fact, in virtually all of the above cases, Saudi government funds constituted a large cross-section (if not the majority) of total funds supporting each organization.  Various case studies have shown the degree to which the Minister

---

[225] Declaration of Dr. Abdulrahman A. Al-Suwailem.  In Re: Terrorist Attack on September 11, 2001 (Federal Insurance Company et al. v. Al-Qaida et al.).  United States District Court for the Southern District of New York.  Case No: 02 CV 6978 (RCC).

[226] Declaration of Dr. Abdulrahman A. Al-Suwailem.  In Re: Terrorist Attack on September 11, 2001 (Federal Insurance Company et al. v. Al-Qaida et al.).  United States District Court for the Southern District of New York.  Case No: 02 CV 6978 (RCC).

[227] Declaration of Dr. Abdulrahman A. Al-Suwailem.  In Re: Terrorist Attack on September 11, 2001 (Federal Insurance Company et al. v. Al-Qaida et al.).  United States District Court for the Southern District of New York.  Case No: 02 CV 6978 (RCC).

of Islamic Affairs and other senior Saudi officials have assisted in the micro-managing of these charities remotely from Saudi Arabia.

132. There is also an overwhelming degree of evidence proving that branch offices of these charities were kept on a tight rein by central offices in Riyadh and Jeddah, Saudi Arabia, and that these overseas offices were incapable of making even relatively minor administrative or financial decisions without input and approval from charity officials back in the Kingdom of Saudi Arabia.

133. Indeed, the "history, association, assignments, and transactions" of these charities convincingly demonstrate "mutuality", a commonality of ownership, an exchange or intermingling of corporate directors and officers at the regional and headquarters level, the regular exchange of documents between offices in Riyadh and around the world in the ordinary course of business, the use of the same corporate office and address, the direct financing of subsidiary offices by a parent charity, the parent charity's demonstrated use of a subsidiary entity's property as its own, decision-making for a subsidiary by a parent and its principals, and that the subsidiary directors of these charities frequently do not act independently in the interest of their local chapter but rather the parent organization.

Evan Francois Kohlmann,

Executed on the 2 day of February, 2015.