# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

_____
)
IN RE:  TERRORIST ATTACKS ON            )        **Civil Action No. 03 MDL 1570 (GBD)**
SEPTEMBER 11, 2001                      )        **ECF Case**
_____ )

This document relates to:

*Kathleen Ashton, et al. v. al Qaeda Islamic Army, et al.*, Case No. 02-cv-6977
*Federal Ins. Co., et al. v. al Qaida, et al.*, Case No. 03-cv-6978
*Vigilant Ins. Co., et al. v. Kingdom of Saudi Arabia, et al.*, Case No. 03-cv-8591
*Thomas Burnett, Sr., et al. v. Al Baraka Inv. & Dev. Corp., et al.*, Case No. 03-cv-9849
*Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia*, Case No. 04-cv-1922
*Continental Cas. Co., et al. v. al Qaeda, et al.*, Case No. 04-cv-5970
*Cantor Fitzgerald Assocs. v. Akida Inv. Co.*, Case No. 04-cv-7065
*Pacific Emps. Ins., et al. v. Kingdom of Saudi Arabia, et al.*, Case No. 04-cv-7216
*Euro Brokers Inc., et al. v. Al Baraka, et al.*, Case No. 04-cv-7279

## MEMORANDUM OF LAW IN OPPOSITION TO
## PLAINTIFFS' MOTION TO FILE A CONSOLIDATED AMENDED PLEADING
## OF FACTS AND EVIDENCE AS TO THE KINGDOM OF SAUDI ARABIA AND
## THE SAUDI HIGH COMMISSION FOR RELIEF OF BOSNIA & HERZEGOVINA

Lawrence S. Robbins (LR8917)           Michael K. Kellogg (MK4579)
Roy T. Englert, Jr.                    Mark C. Hansen (MH0359)
ROBBINS, RUSSELL, ENGLERT,             Gregory G. Rapawy
  ORSECK, UNTEREINER                   KELLOGG, HUBER, HANSEN, TODD,
  & SAUBER LLP                           EVANS & FIGEL, P.L.L.C.
1801 K Street, N.W.                    Sumner Square
Suite 411                              1615 M Street, N.W., Suite 400
Washington, D.C. 20009                 Washington, D.C. 20036-3209
(202) 775-4500                         (202) 326-7900
(202) 775-4510 (fax)                   (202) 326-7999 (fax)

*Attorneys for the Saudi High Commission*     *Attorneys for the Kingdom of Saudi Arabia*
*for Relief of Bosnia & Herzegovina*

February 3, 2015

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ....................................................................................................... ii

INTRODUCTION AND SUMMARY ......................................................................................... 1

STANDARD OF REVIEW ........................................................................................................... 4

ARGUMENT ................................................................................................................................... 5

I.  Plaintiffs' Attempt To Replead Their Claims Is Not in the Interests
of Justice ..................................................................................................................... 5

II.  Plaintiffs' Proposed Amended Pleading Is Futile ................................................. 8

A.  The Pleading Is Futile Under the Entire-Tort Rule ..................................... 9

1.  The Allegations About Al Bayoumi Do Not Satisfy
the Entire-Tort Rule ......................................................................... 9

a.  Plaintiffs Fail Properly To Allege that Al
Bayoumi Was an Agent of Saudi Arabia .......................... 10

b.  Plaintiffs Fail To Allege that Al Bayoumi
Committed any Tortious Act in the United
States ....................................................................................... 14

2.  The Allegations About Others Do Not Satisfy the
Entire-Tort Rule ............................................................................. 17

3.  The Charity Allegations Do Not Satisfy the Entire-
Tort Rule ......................................................................................... 19

a.  The SHC, SRC, and SJRC ................................................. 20

b.  The MWL, IIRO, WAMY, and Al Haramain ................. 20

B.  The Pleading Is Futile Under the Discretionary-Function
Exception ...................................................................................................... 25

C.  The Pleading Is Futile Because It Does Not Allege
Causation ...................................................................................................... 27

CONCLUSION ............................................................................................................................. 29

# TABLE OF AUTHORITIES

Page

CASES

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ........................................................................11

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ................................................13

*Bigio v. Coca-Cola Co.*, 675 F.3d 163 (2d Cir. 2012), *cert. denied*, 133 S. Ct. 952
    (2013) ............................................................................................................14

*Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122 (2d Cir. 2008) ...........................4

*Burnett v. Al Baraka Inv. & Dev. Corp.*, 292 F. Supp. 2d 9 (D.D.C. 2003) .................28

*Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.*, 607 F. Supp. 2d 600
    (S.D.N.Y. 2009) ................................................................................................8

*De Letelier v. Republic of Chile*, 748 F.2d 790 (2d Cir. 1984) ...................................21

*Doe v. Bin Laden*, 663 F.3d 64 (2d Cir. 2011) ......................................................4, 5

*Doe v. Holy See*, 557 F.3d 1066 (9th Cir. 2009) ...............................................21, 23

*EM Ltd. v. Republic of Argentina*, 473 F.3d 463 (2d Cir. 2007) .................................21

*First Nat'l City Bank v. Banco Para el Comercio Exterior de Cuba*, 462 U.S. 611
    (1983) .......................................................................................................20, 21

*Grand River Enters. Six Nations, Ltd. v. Pryor*, No. 02 Civ. 5068(JFK),
    2004 WL 1594869 (S.D.N.Y. July 15, 2004) .......................................................8

*IAC/InterActiveCorp Sec. Litig., In re*, 695 F. Supp. 2d 109 (S.D.N.Y. 2010) ............11

*Licci v. American Express Bank Ltd.*, 704 F. Supp. 2d 403 (S.D.N.Y. 2010),
    *aff'd in part sub nom. Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
    672 F.3d 155 (2d Cir. 2012) .............................................................................28

*Lipsky v. Commonwealth United Corp.*, 551 F.2d 887 (2d Cir. 1976) .........................16

*Lucente v. International Bus. Machs. Corp.*, 310 F.3d 243 (2d Cir. 2002) ......................8

*Meisel v. Grunberg*, 651 F. Supp. 2d 98 (S.D.N.Y. 2009) .........................................14

*Paskar v. City of New York*, 3 F. Supp. 3d 129 (S.D.N.Y. 2014) ...........................14-15

*Platinum & Palladium Commodities Litig., In re*, 828 F. Supp. 2d 588
    (S.D.N.Y. 2011) ...............................................................................................16

*Rein v. Socialist People's Libyan Arab Jamahiriya*, 162 F.3d 748 (2d Cir. 1998) .......................8

*Robinson v. Government of Malaysia*, 269 F.3d 133 (2d Cir. 2001).......................4, 7, 27, 28, 29

*Rothman v. Gregor*, 220 F.3d 81 (2d Cir. 2000)...........................................................12

*Saudi Arabia v. Nelson*, 507 U.S. 349 (1993) ..................................................................4

*Seijas v. Republic of Argentina*, 502 F. App'x 19 (2d Cir. 2012)....................................21, 22, 23

*Swarna v. Al-Awadi*, 622 F.3d 123 (2d Cir. 2010) ........................................................25

*Terrorist Attacks on September 11, 2001, In re*:

    349 F. Supp. 2d 765 (S.D.N.Y. 2005), *aff'd*, 538 F.3d 71 (2d Cir. 2008)..........4, 5, 25, 26

    392 F. Supp. 2d 539 (S.D.N.Y. 2005), *aff'd*, 538 F.3d 71 (2d Cir. 2008)...............4, 5, 25

    714 F.3d 109 (2d Cir. 2013)....................................................................2, 4, 5, 9

    741 F.3d 353 (2d Cir. 2013), *cert. denied*, 134 S. Ct. 2875 (2014)....................................5

*Transamerica Leasing, Inc. v. La Republica de Venezuela*, 200 F.3d 843
    (D.C. Cir. 2000) .......................................................................................23

*United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*,
    467 U.S. 797 (1984)...............................................................................25, 26

*Vine v. Beneficial Fin. Co.*, 374 F.2d 627 (2d Cir. 1967) .................................................8

*Virtual Countries, Inc. v. Republic of South Africa*, 300 F.3d 230 (2d Cir. 2002) .........................4

*Zappia Middle E. Constr. Co. v. Emirate of Abu Dhabi*, 215 F.3d 247
    (2d Cir. 2000)..................................................................................21, 22, 23

STATUTES AND RULES

Foreign Sovereign Immunities Act of 1976, 28 U.S.C. § 1602 *et seq.* ................................ *passim*

      28 U.S.C. § 1604 ................................................................................................................ 4

      28 U.S.C. § 1605(a)(5) ........................................................................................3, 9, 27, 28

      28 U.S.C. § 1605(a)(5)(A) .......................................................................................... 3, 25

      28 U.S.C. § 1605A ............................................................................................................5

Fed. R. Civ. P.:

      Rule 8 ............................................................................................................4, 7, 13, 24

      Rule 12(b)(1) ...................................................................................................................7

      Rule 15(a)(2) ...................................................................................................................1

      Rule 60(b) .......................................................................................................................6

OTHER MATERIALS

Br. for the United States as Amicus Curiae, *Federal Ins. Co. v. Kingdom of Saudi*
      *Arabia*, 557 U.S. 935 (2009) (No. 08-640) (U.S. filed May 29, 2009),
      2009 WL 1539068 ...................................................................................................9, 24

Dan Christensen & Anthony Summers, BrowardBulldog.org, *Graham:  FBI*
      *report raises questions about who helped 9/11 terrorists* (Apr. 18, 2013),
      *available at* 2013 WLNR 9467587 ...................................................................................15

Bob Graham, *Intelligence Matters* (2004) ...............................................................12, 14, 16, 19

National Commission on Terrorist Attacks, *Outline of the 9/11 Plot:*
      *Staff Statement No. 16* (June 16, 2004), *available at*
      http://govinfo.library.unt.edu/911/staff_statements/staff_statement_16.pdf .........14, 15, 19

*Report of the Joint Inquiry into the Terrorist Attacks of September 11, 2001*
      (Dec. 2002), *available at* http://fas.org/irp/congress/2002_rpt/911rept.pdf .......................12

John Roth et al., National Commission on Terrorist Attacks Upon the United
      States, *Monograph on Terrorist Financing:  Staff Report to the*
      *Commission* (2004), *available at* http://govinfo.library.unt.edu/911/
      staff_statements/911_TerrFin_Monograph.pdf .......................................................14, 19

Philip Shenon, *The Commission:  The Uncensored History of the 9/11 Investigation*
(2008) .......................................................................................................................13

*The 9/11 Commission Report:  Final Report of the National Commission on
Terrorist Attacks Upon the United States* (July 2004), *available at*
http://govinfo.library.unt.edu/911/report/911Report.pdf.....................................12, 13, 14,
15, 16, 17, 18, 19

## INTRODUCTION AND SUMMARY

Plaintiffs' proposed "Consolidated Amended Pleading of Facts and Evidence" (the "Pleading") does nothing more than rehash unfounded, previously discredited speculation about the alleged role of Saudi Arabia in the terrorist attacks of September 11, 2001.  Having obtained a reopening of this Court's judgment against them on the ground that their claims should be evaluated under current Circuit precedent, Plaintiffs now ask this Court to consider an extraordinary lengthy rewrite of their claims:  587 paragraphs of purportedly new allegations against the Kingdom of Saudi Arabia (the "Kingdom") and its agency the Saudi High Commission for Relief of Bosnia & Herzegovina ("SHC").  Plaintiffs' attempt to replead their case from scratch after a decade-long lapse should be rejected.

Despite its great length, moreover, the Pleading offers only the same grab-bag of rumor and innuendo that Judge Casey properly dismissed 10 years ago.  It contains no well-pleaded allegations that any official or agent of the Kingdom played any role in the plot that led to the September 11 attacks.  Moreover, Plaintiffs' allegations were pleaded in 2004; could have been pleaded in 2004 had Plaintiffs chosen; or are meaningless filler to give the appearance of heft to empty claims that have been thoroughly investigated and rejected.  Plaintiffs' claim that their belated repleading is justified by "new evidence," Dkt. No. 2890-1, at 11, fails because what they offer is neither new nor evidence.  The newly proffered opinions of two former Senators (the minority view, rejected by the 9/11 Commission and by the FBI) about old facts "cannot," as Plaintiffs have admitted, "be considered 'new' in any meaningful sense."  Dkt. No. 2572, at 10.  And Plaintiffs fail to point to anything relevant, material, or new in the declassified FBI documents relating to Omar Al Bayoumi they cite in their motion.  After 10 years, "justice" hardly "requires," Fed. R. Civ. P. 15(a)(2), this Court to permit Plaintiffs to rewrite their complaint merely to restate their baseless charges at enormous, burdensome length.  *See infra* Part I.

Further, nothing in the Pleading changes the correct result Judge Casey reached in his prior decisions dismissing Plaintiffs' claims against the Kingdom and the SHC under the Foreign Sovereign Immunities Act of 1976 ("FSIA").  The Second Circuit has made clear – in affirming this Court's judgment dismissing two instrumentalities of the Kingdom – that, in order to pierce the Kingdom's foreign sovereign immunity, Plaintiffs must satisfy the entire-tort rule.  *See In re Terrorist Attacks on September 11, 2001*, 714 F.3d 109 (2d Cir. 2013) ("*Terrorist Attacks IV*").  To do so, Plaintiffs must plead (and also present evidence) that the Kingdom or the SHC "committed a tortious act in the United States."  *Id.* at 117.  Plaintiffs have not met, and cannot meet, that burden.

As to the Kingdom, their attempt to do so rests almost entirely on conclusory speculation that a Saudi citizen named Omar Al Bayoumi was (a) an intelligence agent of the Kingdom who (b) knowingly aided the 9/11 hijackers.  As the very sources Plaintiffs cite make clear, those allegations have been rejected by the 9/11 Commission and (despite Plaintiffs' misleading statements to the contrary) the FBI.  Plaintiffs' threadbare assertions that Al Bayoumi and a few other individuals must somehow have been involved in the 9/11 plot are insufficient under Rule 8 and the FSIA.  Plaintiffs also rely on assertions that various nongovernmental charities were "alter egos" of the Kingdom, but do not come close to meeting the demanding standard the law requires to overcome the presumption that those charities are separate juridical entities.  As to the SHC, moreover, the Pleading does not even attempt to allege a tortious act within the United States, and so Plaintiffs' claims against that entity are plainly barred.  *See infra* Part II.A.

The Pleading is also futile because it alleges conduct that falls within the discretionary-function exception to tort liability under the FSIA.  As Judge Casey correctly observed when he originally dismissed the claims against the Kingdom and the SHC, Plaintiffs' theory of this case

at its core is that the Kingdom and the SHC provided funds to various Islamic charities that then diverted those funds to support terrorism rather than the religious and humanitarian purposes to which they should have gone.  The decision to fund those charities was a discretionary one, deeply rooted in the Kingdom's foreign and social policies – and the FSIA does not authorize review of those decisions by the courts of the United States.  Conclusory allegations that the Kingdom knew or should have known about the diversion are legally irrelevant, because the FSIA bars review of discretionary policy decisions "regardless of whether the discretion be abused."  28 U.S.C. § 1605(a)(5)(A).  *See infra* Part II.B.  Finally, for similar reasons, the Pleading fails to meet the FSIA's jurisdictional requirement that Plaintiffs plead and prove that their injuries were "caused by [a] tortious act or omission" of the Kingdom or the SHC.  28 U.S.C. § 1605(a)(5).  *See infra* Part II.C.

In sum, the Pleading is a flailing, prolix, but still futile attempt to escape the consequence of applying current Circuit law to Plaintiffs' existing pleadings:  a swift dismissal followed by the appellate review that they complained they did not get in 2008.  This Court should deny Plaintiffs' motion for leave to amend and grant Defendants' motion to dismiss.

**STANDARD OF REVIEW**

"While Federal Rule of Civil Procedure 15(a) states that leave to amend should be granted 'when justice so requires,' motions to amend should generally be denied in instances of futility, undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, or undue prejudice to the non-moving party." *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 126 (2d Cir. 2008) (per curiam).  Whether amendment would be futile is determined under the FSIA.  That statute provides that "a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter."  28 U.S.C. § 1604.  Saudi Arabia and its instrumentalities are foreign sovereigns.[1]  They are "presumptively immune from the jurisdiction of United States courts[] unless a specified exception applies."  *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993).

On a motion to dismiss under the FSIA, a defendant "may challenge either the legal or factual sufficiency of the plaintiffs' assertion of jurisdiction, or both."  *Robinson v. Government of Malaysia*, 269 F.3d 133, 140 (2d Cir. 2001).  An assertion of jurisdiction is legally insufficient when it rests on key premises that are no more than "bald assertions" and "[c]onclusory allegations," *Virtual Countries, Inc. v. Republic of South Africa*, 300 F.3d 230, 241 (2d Cir. 2002) (internal quotation marks omitted) – the sort that do not suffice in an ordinary civil action under Rule 8.  An assertion is factually insufficient when Plaintiffs cannot meet their "burden of going forward with evidence" to show that "immunity should not be granted."  *Terrorist Attacks IV*, 714 F.3d at 114 (internal quotation marks omitted).

---

[1] *See In re Terrorist Attacks on September 11, 2001*, 349 F. Supp. 2d 765, 802 (S.D.N.Y. 2005) ("*Terrorist Attacks I*"), *aff'd*, 538 F.3d 71 (2d Cir. 2008) ("*Terrorist Attacks III*"), *overruled on other grounds by Doe v. Bin Laden*, 663 F.3d 64 (2d Cir. 2011) (per curiam); *In re Terrorist Attacks on September 11, 2001*, 392 F. Supp. 2d 539, 553 (S.D.N.Y. 2005) ("*Terrorist Attacks II*"), *aff'd*, 538 F.3d 71, *overruled on other grounds by Doe v. Bin Laden*, *supra*.

**ARGUMENT**

**I.     Plaintiffs' Attempt To Replead Their Claims Is Not in the Interests of Justice**

Plaintiffs persuaded the Second Circuit to reopen this Court's judgment against them based on two extraordinary circumstances.  *First*, the court of appeals accepted Plaintiffs' argument that they should have their claims evaluated under the legal rule adopted in *Doe v. Bin Laden*, 663 F.3d 64.  *See In re Terrorist Attacks on September 11, 2001*, 741 F.3d 353, 358 (2d Cir. 2013) ("*Terrorist Attacks V*"), *cert. denied*, 134 S. Ct. 2875 (2014).[2]  *Second*, the court of appeals agreed it was unjust that Plaintiffs had never received appellate review of Judge Casey's original rulings in 2005, which held that their claims were insufficient under the FSIA's discretionary-function exception.  *Id.* at 359.  Both circumstances would be addressed by a ruling from this Court applying current law – including not only the discretionary-function exception as originally applied by Judge Casey in *Terrorist Attacks I* and *II*, but also the entire-tort rule adopted in *Terrorist Attacks IV* – to the First Amended Complaint filed by the *Federal Insurance* Plaintiffs.[3]  For the reasons set forth in support of the Kingdom's motion to dismiss, Dkt. No. 2894, that ruling should be a swift dismissal, followed by the appellate review Plaintiffs previously claimed to want.

Plaintiffs now ask for something entirely different:  an opportunity to replead their allegations against the Kingdom and the SHC at much greater length based on a "universe of new evidence" that has purportedly "grown exponentially."  Dkt. No. 2890-1, at 11.  The only

---

[2] That is, Plaintiffs should not be barred from bringing suit against the Kingdom and the SHC *solely* because the alleged torts for which they seek to recover were also terrorist offenses that could potentially fit within § 1605A.  *See Doe*, 663 F.3d at 66-70 & n.10.

[3] By stipulation, the allegations and evidence in the other cases against the Kingdom and the SHC are not materially different from those in the *Federal Insurance* case.  *See* Dkt. No. 2894, at 8 & nn.8-9 (citing stipulations and decisions relying on them).

thing that has grown exponentially, however, is the length of Plaintiffs' papers.  A large majority of the allegations in the Pleading were available to Plaintiffs from publicly available sources when this case was litigated before Judge Casey.  Exhibit A to this Opposition contains a table that sets forth in detail how 416 out of the 587 paragraphs in the Pleading (70.9%) contain either no factual information at all or information from sources publicly available in 2004 or earlier.[4]  The remainder, as shown in Part II, is immaterial to the legal points in contention.

Plaintiffs point to two "newly discovered" sources of information that they assert were not previously available to them.  One source consists of affirmations from two former Senators (Robert Graham and Robert Kerrey), which Plaintiffs first submitted with their reply in support of their Rule 60(b) motion.  Dkt. No. 2890-1, at 5; Dkt. No. 2557, at 1-2 & Exhs. 1-2.  Plaintiffs, however, previously conceded – in successfully contending that this Court should not strike those affirmations from the record – that the Graham and Kerrey affirmations "cannot be considered 'new' in any meaningful sense," Dkt. No. 2572, at 10 (Kerrey); *see id.* at 8-9 (same for Graham), because they merely summarized Plaintiffs' previous contentions.[5]  Plaintiffs' previous position was correct – the affirmations add nothing of substance – and cannot be reconciled with their current contention that the affirmations are "new evidence."

The other purportedly "new" source of information consists of a set of "documents relating to the investigation of Omar al Bayoumi" that the "FBI has declassified."  Dkt. No. 2890-1, at 5.  Neither in their memorandum nor in their Pleading do Plaintiffs identify which

---

[4] Judge Casey issued his opinion dismissing the claims against the Kingdom on January 18, 2005.  Accordingly, at least through the end of 2004, Plaintiffs should have moved to amend based on any important new facts that reasonable diligence would have brought to their attention.

[5] By contrast, the Kingdom and the SHC argued at the time *both* that the Graham and Kerrey affirmations "are not competent evidence of anything" *and* that anything in them was available to Plaintiffs years earlier.  Dkt. No. 2561, at 4.  They maintain both positions now.

documents those were; when they were declassified; or which allegations in the Pleading are based on the unspecified documents. Instead, they leave the Court and Defendants to reconstruct how much is new and how much is recycled – and, from what Defendants can tell, almost everything is recycled. Only 11 substantive paragraphs of the massive Pleading refer both to the FBI and to Al Bayoumi.[6] Of those, seven can be matched to information in government reports, books, and newspaper articles that were available to Plaintiffs in 2004.[7] The remaining four, assuming they are indeed newly discovered, are of little significance. *See infra* pp. 13, 18 n.25 (discussing the futility of Pleading ¶¶ 195, 204-205, and 213, among other allegations).

Plaintiffs further contend (at 13) that they have the "right" to "augment their operative complaints through the filing of averments of fact and extrinsic evidence." But there is no "evidence" in the Pleading; it is simply an endless series of "vague and conclusory" allegations – especially as to the legally material points – that are and always have been insufficient to defeat Saudi Arabia's right "to obtain an early dismissal when the substance of the claim against it does not support jurisdiction." *Robinson*, 269 F.3d at 146. As set forth in detail in Part II, the Pleading relies on hearsay, speculation, and bare conclusions to support its statements about dispositive issues. It is therefore insufficient either under Rule 8 or under the heightened standard that applies in a Rule 12(b)(1) motion under the FSIA. *See id.* at 144-45 (holding that, "*even if* [a complaint's] broad allegations c[an] be read sufficiently to allege a non-discretionary tort," the plaintiff must still "m[eet] his 'burden of going forward with evidence' ") (emphasis added).

Given Plaintiffs' failure to point to any material allegation in the Pleading that could not have been made in 2004 before Judge Casey ruled on their initial motion, this Court can and

---

[6] *See* Pleading ¶¶ 152, 160, 181, 185, 187-188, 193, 195, 204-205, 213. This list excludes paragraphs that merely summarize other allegations.

[7] *See* Exh. A at 5-6 (sources matching Pleading ¶¶ 152, 160, 181, 185, 187-188, 193).

should find that they unduly delayed in seeking leave to file their 587-paragraph tome. *See Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.*, 607 F. Supp. 2d 600, 603 (S.D.N.Y. 2009) ("[A] party cannot wait to 'see how he would fare on [a] prior motion to dismiss' before seeking leave to amend based on facts that were available before the motion was decided.") (quoting *Vine v. Beneficial Fin. Co.*, 374 F.2d 627, 637 (2d Cir. 1967)) (second alteration in original).

The Kingdom and the SHC (which has wrapped up operations) also would suffer prejudice. The prejudice with which they are primarily concerned is further delay in their right to a prompt adjudication of their foreign sovereign immunity – which is, or should be, immunity not just from liability, but also from "the attendant burdens of litigation." *Rein v. Socialist People's Libyan Arab Jamahiriya*, 162 F.3d 748, 756 (2d Cir. 1998) (internal quotation marks omitted); *see also Grand River Enters. Six Nations, Ltd. v. Pryor*, No. 02 Civ. 5068(JFK), 2004 WL 1594869, at *4 (S.D.N.Y. July 15, 2004) (finding "prejudice . . . stem[ming] from the fact that [an] action [was] two-years old" and had already been "the subject of motions to dismiss that took more than six months to brief and submit").

## II.     Plaintiffs' Proposed Amended Pleading Is Futile

Plaintiffs' proposed amendment should be denied because it is futile. *See Lucente v. International Bus. Machs. Corp.*, 310 F.3d 243, 258 (2d Cir. 2002) ("An amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6)."). Despite the great length of the Pleading, Plaintiffs have failed to cure the fatal jurisdictional defects identified in Defendants' motion to dismiss: their claims do not satisfy the entire-tort rule, *see infra* Part I.A; are barred by the discretionary-function exception, *see infra* Part I.B; and in any event do not adequately allege causation, *see infra* Part I.C.

8

## A.      The Pleading Is Futile Under the Entire-Tort Rule

As explained in support of Defendants' motion to dismiss, *see* Dkt. No. 2894, at 13-15, the

entire-tort rule is now the law of this Circuit under the April 2013 decision in *Terrorist Attacks IV*.

Under that rule, Plaintiffs must properly allege "that the 'torts' allegedly committed by

[Defendants] occurred in the United States"; allegations "that the injuries and damage caused by

the September 11, 2001 attacks in the United States were related to, and a result of, the actions

taken by [Defendants] abroad" do not suffice.  714 F.3d at 116.  Accordingly, Plaintiffs must

allege a " 'tortious act or omission of [the Kingdom or the SHC] or of any official or employee of

[the Kingdom or the SHC] while acting within the scope of his office or employment' " on U.S.

soil.  *Id.* at 115 (quoting 28 U.S.C. § 1605(a)(5)).  They have failed to do that (and, with respect

to the SHC, have not even tried).

### 1.      The Allegations About Al Bayoumi Do Not Satisfy the Entire-Tort Rule

Plaintiffs' proposed amended pleading relies heavily on a debunked theory that a Saudi

citizen named Omar Al Bayoumi was a Saudi intelligence agent who aided two individuals who

were later among the September 11 hijackers (Nawaf Al Hazmi and Khalid Al Mihdhar).  The

9/11 Commission investigated and rejected this theory, and the United States advised the

Supreme Court in 2009 that Plaintiffs' original allegations concerning Al Bayoumi – which

apply only to the claims against the Kingdom, not the SHC – were insufficient to state a claim.

*See* Br. for the United States as Amicus Curiae at 16 n.4, *Federal Ins. Co. v. Kingdom of Saudi

Arabia*, 557 U.S. 935 (2009) (No. 08-640) (U.S. filed May 29, 2009) ("U.S. Amicus Br."), 2009

WL 1539068.  The Pleading suffers from the same fatal flaw.

### a.   Plaintiffs Fail Properly To Allege that Al Bayoumi Was an Agent of Saudi Arabia

Plaintiffs rely on three general types of allegations in the Pleading to support their assertion that Al Bayoumi was an intelligence agent of Saudi Arabia:  (1) allegations relating to Al Bayoumi's employment relationship with Dallah Avco Trans Arabia Company ("Dallah Avco") and alleged receipt of funds from the Kingdom; (2) witness reports to the FBI (and FBI phone records); and (3) conclusions expressed by former Senators and by former 9/11 Commission members and staffers.  None is sufficient.

**Dallah Avco.**  The Pleading alleges that Al Bayoumi was originally an employee of the "Saudi Arabian Presidency of Civil Aviation ('PCA')," who was seconded to the aviation contractor Dallah Avco.  Pleading ¶¶ 153, 156, 157.  It further alleges that the Kingdom reimbursed Dallah Avco for Al Bayoumi's salary, *id.* ¶ 157; that Al Bayoumi continued to receive that salary while a student in the United States, *id.* ¶¶ 157-158; that Dallah Avco has stated that Al Bayoumi was an "employee of the Saudi government," *id.* ¶ 157;[8] and that, when applying to graduate school on an unspecified date, Al Bayoumi identified himself as an employee of the PCA, *id.* ¶¶ 157-158.  The Pleading further alleges that Al Bayoumi was "chronic[ally] absen[t]" from work, yet Dallah Avco continued to pay him "for doing nothing,"

---

[8] The Pleading also states (at ¶ 157) that Dallah Avco withheld documents concerning Al Bayoumi on the basis that they were confidential under Saudi law.  Dallah Avco later produced the documents.  *See* Dkt. No. 2889.  As the letter from the PCA authorizing the production states, the confidentiality objections were based on a nondisclosure clause in Dallah Avco's contract with the PCA.  *See* Dkt. No. 2889-1.  The Pleading's suggestion that there is anything unusual about Dallah Avco's concern that it comply with its confidentiality obligations under Saudi law is an attempt to make a mountain out of a molehill.

and that in or around April 1999 the PCA requested that his contract be renewed "'as quickly as possible.'" *Id.* ¶¶ 184-185.[9]

All of this is consistent with Al Bayoumi's being a PCA employee who had been seconded to Dallah Avco while he pursued his education in the United States, and whose education the Kingdom was subsidizing. To draw the conclusion from these allegations that he was a Saudi intelligence agent, as the Pleading suggests, would be speculation. To draw the further conclusion that he was acting within the scope of any alleged employment for the Kingdom when he allegedly met two of the hijackers – even though Plaintiffs admit that he was being paid "for . . . work on an aviation project commissioned by the Saudi government and taking place in the Kingdom," *id.* ¶ 157 – would pile one speculative inference on another.

**FBI Investigations.** Plaintiffs also rely heavily on conclusions and witness statements released by the FBI, which they claim support their position that Al Bayoumi was a Saudi agent. Many of these statements are bare conclusions about Al Bayoumi coupled with assertions that the FBI said so;[10] or, less persuasive still, the FBI said an unidentified source said so.[11] Those statements are "not entitled to the assumption of truth," *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009), and the court should give them no weight. *See In re IAC/InterActiveCorp Sec. Litig.*, 695 F. Supp. 2d 109, 119 (S.D.N.Y. 2010) (finding allegations insufficient to state a claim under

---

[9] The Pleading also alleges (at ¶ 186) that Al Bayoumi received an increase in his stipend from Dallah Avco at around the time he allegedly met Al Hazmi and Al Mihdhar. Because, however, there is no plausible allegation that Al Bayoumi provided the two men with any financial assistance, *see infra* pp. 14-17, the fact that he happened to be receiving more money at around that time does not help Plaintiffs.

[10] *E.g.*, Pleading ¶ 160 ("[I]n connection with [a] pre-9/11 investigation, the FBI identified Bayoumi as an agent of the Saudi government.").

[11] *E.g.*, Pleading ¶ 187 ("According to the Joint Inquiry Report, 'one of the FBI's best sources in San Diego informed the FBI that he thought that al-Bayoumi must be an intelligence agent for Saudi Arabia or another foreign power.'").

*Twombly* where complaint relied on "confidential informants"; the allegations were "[s]ketchy at best" and lacked "any facts that might corroborate the statements of unidentified former employees") (internal quotation marks omitted).[12]

Further, the FBI's *actual* conclusions cut against Plaintiffs. The sources cited in the Pleading identify two FBI investigations of Al Bayoumi. The first, described in ¶ 160, took place in 1998 and 1999, and the "responsible FBI agent" for the investigation later told Congress that the inquiry was "closed . . . because the original complaint . . . turned out to be false and she had developed no other information of such significance as to justify continuing the investigation";[13] the 9/11 Report[14] likewise found (at 516 n.19) that the allegations that "prompted" the investigation "appear to have been groundless." The second investigation took place after the September 11 attacks and resulted in the "conclu[sion] that [Al] Bayoumi was not a Saudi intelligence officer."[15] Plaintiffs are free to disagree; but it is misleading for them to rely

---

[12] The same applies to the statements of "various . . . witnesses" collected in something that Plaintiffs describe generically as a "U.S. intelligence document." Pleading ¶ 188.

[13] *Report of the Joint Inquiry into the Terrorist Attacks of September 11, 2001*, at 174 (Dec. 2002) ("Joint Inquiry Report"), *available at* http://fas.org/irp/congress/2002_rpt/911rept.pdf. Plaintiffs cite the Joint Inquiry Report in the Pleading (at ¶ 183) and appear to rely on it for other allegations. This Court may therefore properly take it into account. *See Rothman v. Gregor*, 220 F.3d 81, 88-89 (2d Cir. 2000) (complaint includes "any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference" and documents "plaintiffs either possessed or knew about and upon which they relied in bringing the suit").

[14] *The 9/11 Commission Report: Final Report of the National Commission on Terrorist Attacks Upon the United States* (July 2004), *available at* http://govinfo.library.unt.edu/911/report/911Report.pdf.

[15] Bob Graham, *Intelligence Matters* 11 n.* (2004); *see also id.* at 224 (describing the FBI's conclusion that Al Bayoumi and Osama Basnan (spelled "Bassnan") "were not intelligence agents for their country" and did not "aid[] the terrorist plot"). To be clear, Senator Graham himself continued to believe that Al Bayoumi was an intelligence agent, *see id.* at 11, but at least he (unlike Plaintiffs) candidly admits that the FBI disagreed. Plaintiffs cite *Intelligence Matters* in the Pleading (at ¶ 201) and appear to rely on it for other allegations, so this Court may take it into account in assessing their motion. *See supra* note 13.

on the mere fact of FBI investigations into Al Bayoumi's status without telling the Court how those investigations turned out.

The nonconclusory facts that Plaintiffs glean from FBI reports about Al Bayoumi will not bear the weight that Plaintiffs seek to place on them.  He received money from Saudi Arabia, some of which was used to fund the construction of a mosque, Pleading ¶¶ 181, 185, 188, 189; the PCA wished to keep him in America, *id.* ¶ 185; and he made a large number of phone calls to the Saudi Embassy in Washington, DC, and with the Saudi Consulate in Los Angeles, and received an otherwise undescribed package from the Saudi embassy, *id.* ¶¶ 193-195.  Those allegations fail to "nudge[]" Plaintiffs' contention that Al Bayoumi was an agent of the government of Saudi Arabia "across the line from conceivable to plausible," *Twombly*, 550 U.S. at 570, and so they do not save Plaintiffs' claims from futility.

**Former Senators and Commission Staff.**  Plaintiffs also rely prominently on an affidavit from former Senator Bob Graham, who opines that Al Bayoumi was an agent of the Kingdom or was acting at its direction; and on broadly similar statements by former members of the 9/11 Commission and from various unnamed staff members of the commission.  Pleading ¶¶ 190-191, 245-246.[16]  These statements are contrary to the 9/11 Commission's emphatic, considered finding of "no evidence that the Saudi government as an institution or senior Saudi officials individually funded" al Qaeda,  9/11 Report 171; leaving that aside, the affidavits state conclusions, not facts, and so are irrelevant to this Court's analysis under Rule 8 and the FSIA.

---

[16] The allegations are inaccurate even as compared to the hearsay sources Plaintiffs cite.  For example, Plaintiffs cite a popular history to support their claim that certain allegations against the Kingdom came out of a draft of the 9/11 Report because of "political considerations." Pleading ¶ 246.  The source really says that Dietrich Snell, the career prosecutor who led the Commission's investigative team, believed that those allegations "could not be backed up conclusively" and that "allegations based on partial evidence should not be made at all."  Philip Shenon, *The Commission:  The Uncensored History of the 9/11 Investigation* 398 (2008).

b.     **Plaintiffs Fail To Allege that Al Bayoumi Committed any Tortious Act in the United States**

Even if Al Bayoumi's actions in the United States were attributable to the Kingdom, they could not satisfy the entire-tort rule unless they were tortious – which means that Al Bayoumi must not only have provided assistance to Al Hazmi and Al Mihdhar, but also have *known* that they were planning to commit an act of terrorist violence and *intended* to assist them in doing so.[17]   To pass that hurdle, Plaintiffs must plausibly allege that the 9/11 Commission was wrong when it found "no credible evidence that [Al Bayoumi] believed in violent extremism or knowingly aided extremist groups," 9/11 Report 218; that the FBI was wrong when it "concluded" that Al Bayoumi did not "aid[] the terrorist plot," *Intelligence Matters* 224; that the Commission's staff was wrong in stating that a "thorough investigation . . . has determined that [Al] Bayoumi did not pay rent or provide any funding to the hijackers"[18] and that, when he "helped them settle in San Diego," there is no "evidence that he did so knowing that they were terrorists";[19] and that their

_____

[17] Plaintiffs must prove intent and knowledge because they seek to hold the Kingdom liable on theories of civil conspiracy, which requires among other elements "intentional participation in the furtherance of a plan or purpose," *Meisel v. Grunberg*, 651 F. Supp. 2d 98, 119 (S.D.N.Y. 2009); and aiding-and-abetting, which requires "knowledge of [an] [underlying tort] . . .  and . . .  substantial assistance to advance the [underlying tort's] commission," *Bigio v. Coca-Cola Co.*, 675 F.3d 163, 172 (2d Cir. 2012) (internal quotation marks omitted; second and fifth alterations in original), *cert. denied*, 133 S. Ct. 952 (2013).  *See* First Am. Compl. ¶¶ 614-617, 621-624, *Federal Ins. Co. v. al Qaida*, No. 03-cv-6978 (S.D.N.Y. filed Sept. 30, 2005) ("Fed. Ins. Compl.").  There is no allegation that the Kingdom committed any tort against Plaintiffs other than through these types of vicarious liability.

[18] John Roth et al., National Commission on Terrorist Attacks Upon the United States, *Monograph on Terrorist Financing:  Staff Report to the Commission*, App. A at 138 (2004) ("*Financing Monograph*"), *available at* http://govinfo.library.unt.edu/911/staff_statements/ 911_TerrFin_Monograph.pdf.  Plaintiffs cite the *Financing Monograph* in the Pleading (at ¶¶ 41, 479).

[19] National Commission on Terrorist Attacks, *Outline of the 9/11 Plot:  Staff Statement No. 16*, at 5 (June 16, 2004), *available at* http://govinfo.library.unt.edu/911/staff_statements/ staff_statement_16.pdf.  The Pleading does not cite *Staff Statement No. 16*; nevertheless, it is a government report of which the Court may take notice, *see*, *e.g.*, *Paskar v. City of New York*, 3 F.

own declarant, Senator Graham, was wrong when he stated publicly in 2013 that there "is no evidence that [Al] Bayoumi knew what was going on."[20]   None of Plaintiffs' allegations is sufficient to that task.

**Finding an Apartment.**  The Pleading alleges (at ¶¶ 172, 175, 177, 179) that Al Bayoumi met Al Hazmi and Al Mihdhar at a restaurant in Los Angeles, and then helped them find an apartment near his home in San Diego; the assistance allegedly included cosigning their application, assisting them with the initial rental deposit, and occasionally paying rent.[21] Plaintiffs do not mention that Al Hazmi and Al Mihdhar "reimbursed [Al Bayoumi] on the spot for the deposit" or that they "immediately started looking for a different place to stay," giving notice to the landlord "[j]ust over a week after moving in."  9/11 Report 219.  Those facts undermine any inference that any assistance they received from Al Bayoumi was meaningful, substantial, or part of a plot to support them in the United States.

**Making Introductions.**  The Pleading further alleges (at ¶¶ 179, 219) that Al Bayoumi held a "party" to "welcome" Al Hazmi and Al Mihdhar to San Diego, and "introduc[ed]" them to other individuals including Mohdhar Mohamed Abdullah, who later helped them apply to flight

---

Supp. 3d 129, 134 (S.D.N.Y. 2014), and it is proper for the Court to do so here given Plaintiffs' misleading attempts to suggest that the views of the Commission's staff support their allegations against the Kingdom.  *See* Pleading ¶¶ 191, 246.

[20] Dan Christensen & Anthony Summers, BrowardBulldog.org, *Graham:  FBI report raises questions about who helped 9/11 terrorists* (Apr. 18, 2013), *available at* 2013 WLNR 9467587.  Senator Graham's theory appears to be that Al Bayoumi was "told to take care of" Al Hazmi and Al Mihdhar, *id.*, by some other, unspecified person or people.  The Pleading does not cite the specific article quoted above, but does rely (at ¶¶ 249-251) on other public comments by Senator Graham about the BrowardBulldog.org lawsuit against the FBI.

[21] The date or amount of any such rent payments is unspecified, and the allegation is inconsistent with the Commission staff's finding of "[n]o credible evidence . . . that the operatives received substantial funding from any person in the United States," and "[s]pecifically . . . no evidence" that they "received funding" from Al Bayoumi.  *Staff Statement No. 16*, at 12.

school.[22]  None of these allegations goes beyond "'compliance with [a] Muslim custom of being kind to strangers,'" which the FBI concluded was Al Bayoumi's motive for "'help[ing] Saudi visitors settle into the United States'" when it dropped its investigation of him in 2004. *Intelligence Matters* 224 (quoting statements by FBI "officials" to the Associated Press).

**Knowledge or Intent.**  The Pleading is particularly bare (and fatally so) as to any reason to think that Al Bayoumi knew anything about what Al Hazmi and Al Mihdhar were planning or had any intent to help them commit acts of violence.  There is a conclusory allegation that an unnamed "top FBI official" said he "believed" that Al Bayoumi "had knowledge" of the plot, Pleading ¶ 152 – apparently taken from a 2003 Newsweek article, *see* Exh. A at 5 – but a conclusory statement of this kind is both legally insufficient, *see supra* pp. 11-12, and also contrary to the 9/11 Commission's and the FBI's own later findings, *see supra* pp. 12-13, as well as to the views of Plaintiffs' own declarant, Senator Graham, *see supra* pp. 14-15 & n.20.

In this Circuit, "references to preliminary steps in litigations and administrative proceedings that did not result in an adjudication on the merits or legal or permissible findings of fact are, as a matter of law, immaterial." *In re Platinum & Palladium Commodities Litig.*, 828 F. Supp. 2d 588, 593 (S.D.N.Y. 2011) (internal quotation marks omitted) (collecting authorities including *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887 (2d Cir. 1976)).  Here, Plaintiffs attempt to rely not even on preliminary proceedings, but on statements attributed to anonymous agency officials that are directly contrary to the agencies' own conclusions.  The Court should

---

[22] The Pleading also discusses (at ¶¶ 173-174, 209-215) Anwar Aulaqi, an alleged recruiter for al Qaeda, and notes that Al Bayoumi discussed "religious matters" with him.  It does not allege that Al Bayoumi knew that Aulaqi was associated with al Qaeda at that time, or that this was generally known; at around the same time, the FBI had closed an investigation into Aulaqi because it found insufficient evidence of his involvement in terrorism to support charges. *See* 9/11 Report 517 n.33.

reject that improper attempt and conclude that the Pleading contains no cognizable allegation about Al Bayoumi's knowledge or state of mind.

### 2. The Allegations About Others Do Not Satisfy the Entire-Tort Rule

Plaintiffs name two other individuals in the United States who they allege were "Saudi officials" who "assisted" Al Hazmi and Al Mihdhar: Fahad Al Thumairy and Osama Basnan. They also allege that some of the hijackers were close to Saleh Ibn Abdul Rahman Hussayen shortly before the attacks, though they do not allege that he provided them any assistance. Those allegations are also clearly futile when measured against the entire-tort rule.

**Al Thumairy.** The Pleading alleges (at ¶¶ 162-164, 166-171) that Al Thumairy was an employee of the Saudi Consulate in Los Angeles and of the Ministry of Islamic Affairs; that Al Thumairy and Al Bayoumi met shortly before Al Bayoumi encountered Al Hazmi and Al Mihdhar;[23] that Al Thumairy was considered by some a "fundamentalist" and a "radical"; that Al Thumairy and Al Bayoumi knew each other and spoke on the phone; and that the United States revoked Al Thumairy's visa in 2003 because (Plaintiffs say) of asserted "apparent terrorist ties." It further alleges (at ¶¶ 168-169) that the Commission interviewed Al Thumairy and that he (implausibly, they say) denied knowing Al Bayoumi at all.

Despite repeatedly quoting (at ¶¶ 166, 170) what the 9/11 Report has to say about Al Thumairy, and attempting to rely on his interview by Commission staff, Plaintiffs fail to note that the 9/11 Report specifically addressed (at 216-17) allegations that Al Thumairy assisted Al

---

[23] The Pleading also asserts (at ¶ 162) that unnamed "U.S. officials have concluded that [Fahad Al] Thumairy and [Al] Bayoumi discussed the recent arrival of [Al Hazmi and Al Mihdhar] in the United States" and that Al Bayoumi "was tasked with getting them welcomed and assimilated." This attempt to rely on alleged conclusory statements by unnamed "U.S. officials" is just as defective as Plaintiffs' attempt to rely on the alleged beliefs of unnamed FBI officials. *See supra* pp. 11-12. Further, although ¶ 162 describes Al Hazmi and Al Mihdhar as "hijackers," it tellingly stops short of alleging that either Al Thumairy or Al Bayoumi *knew* that the two men were involved in a terrorist plot, and is thus insufficient for that reason as well.

Hazmi and Al Mihdhar, described them as "speculat[ion]," and concluded that, "after exploring the available leads," the Commission had "not found evidence that [Al] Thumairy provided assistance to the two operatives."  Consistent with that finding, the Pleading contains only conclusory allegations that Al Thumairy did anything to help the two men and no allegations at all that he knew they were terrorists or planning an attack on the United States.

**Basnan.**  The Pleading alleges (at ¶ 196) that Basnan was an "agent of the Saudi government."  It offers no facts whatsoever to support this assertion about his status; so far as this motion is concerned, Plaintiffs' allegations concerning Basnan can be disregarded for that reason alone.  The Pleading also alleges no act of Basnan's that helped Al Hazmi or Al Mihdhar in any way, and does not allege that he ever met them or knew who they were.  Instead, it dwells (at ¶¶ 197-199, 203) on colorful but irrelevant allegations that Basnan was personally sympathetic to terrorist causes and (at ¶¶ 200-202) that his wife received personal charity from a princess of the Kingdom,[24] some of which she transferred to Al Bayoumi's wife.[25]  Other than speculation, Plaintiffs offer no allegation that any of the money made its way any further.

Again, both the Commission and the FBI rejected the claims that Plaintiffs now assert with regard to Basnan.  The Commission found that, "[c]ontrary to highly publicized allegations," there was "no evidence that [Al] Hazmi or [Al] Mihdhar received money from"

---

[24] Basnan's wife's benefactor, Princess Haifa al Faisal, is not alleged personally to have had any improper intent in making the alleged payments – Plaintiffs' theory appears to be that she was given the checks to sign by unnamed "radicals."  *See* Pleading ¶ 202.  The 9/11 Commission "found no evidence that" Princess Haifa "provided any funds to the conspiracy, either directly or indirectly."  9/11 Report 498 n.122.

[25] The Pleading also alleges that Al Bayoumi and Basnan were friends and spoke often on the phone, but that Al Bayoumi minimized and Basnan denied their relationship when interviewed by the 9/11 Commission and the FBI.  *See* Pleading ¶¶ 204-205.  It is not a reasonable inference from those facts that either of the two was a spy or a terrorist.

Basnan.  9/11 Report 516 n.24.[26]  The FBI concluded that Basnan, like Al Bayoumi, was "not [an] intelligence agent[]" and did not "aid[] the terrorist plot."  *Intelligence Matters* 224.  Given that Plaintiffs can offer nothing but innuendo to suggest that Basnan is relevant to this case, they are in no position to ask this Court to disagree.

**Hussayen.**  The Pleading also mentions (at ¶¶ 231-240) Hussayen, whom it describes as a "senior member of the Kingdom's Ulema" who was allegedly in "close proximity" to three of the hijackers shortly before the September 11 attacks.  It does not allege any assistance that Hussayen provided to the hijackers, and it also does not allege that he was acting in any official capacity for the Kingdom at the time that he was in "proximity" to them.  Also, if Plaintiffs intend to rely on any alleged actions by Hussayen, the Kingdom will be severely prejudiced by Plaintiffs' failure to raise those allegations earlier, in light of his relatively recent death in 2013.

### 3.  The Charity Allegations Do Not Satisfy the Entire-Tort Rule

Plaintiffs' Pleading dwells at great length on the alleged actions of a group of Islamic charities that received funding, directly or indirectly, from the Kingdom or its officials.[27]  The theory is that these charities were "alter-egos" of the "Saudi government[]," Pleading ¶ 130, so that the allegedly tortious actions of their employees can be attributed to the Kingdom.  The vast majority of the allegations in this category relate to overseas actions that are irrelevant to the entire-tort rule.  The handful of allegations that do relate to actions in the United States are insufficient because the individuals involved were not officials or employees of the Kingdom,

---

[26] *See also Financing Monograph*, App. A at 138 ("[d]espite persistent public speculation, there is no evidence that . . . [Al] Mihdhar and [Al] Hazmi[] received funding from . . . Bassnan."); *Statement No. 16*, at 12 (similar).

[27] *See* Pleading *id.* ¶¶ 333-370 (Muslim World League ("MWL")); *id.* ¶¶ 371-438 (International Islamic Relief Organization ("IIRO")); *id.* ¶¶ 439-475 (World Assembly of Muslim Youth ("WAMY")); *id.* ¶¶ 476-518 (Al Haramain Islamic Foundation ("al Haramain")); *id.* ¶¶ 519-542 (SHC); *id.* ¶¶ 543-558 (Saudi Red Crescent ("SRC")); *id.* ¶¶ 559-574 (Saudi Joint Relief Committee ("SJRC")); *id.* ¶¶ 575-580 (Rabita Trust).

and because the allegations that the charities were "alter egos" do not meet the demanding standard that the courts apply to such claims.

### a.      The SHC, SRC, and SJRC

For most of the charities, the Pleading does not even attempt to allege any tortious action within the United States.  In particular, it makes no such attempt as to the three named charities that are actually instrumentalities of the Kingdom:  the SHC, *see* Pleading ¶¶ 519-542; the SRC, *see id.* ¶¶ 543-558; and the SJRC, *see id.* ¶¶ 559-574.[28]  The Second Circuit's holding in *Terrorist Attacks* compels the conclusion that the allegations about those entities do not satisfy the entire-tort rule.  Indeed, because that case affirmed this Court's final judgment dismissing Plaintiffs' claims against the SRC and the SJRC on the grounds of foreign sovereign immunity, Plaintiffs are barred by both stare decisis and issue preclusion from asserting claims against the Kingdom based on the conduct of those entities.

### b.      The MWL, IIRO, WAMY, and Al Haramain

Four charities are alleged to have had offices in the United States – the MWL, IIRO, WAMY, and Al Haramain, *see* Pleading ¶¶ 424, 462, 494 – but any allegedly tortious actions taken from those offices do not suffice to satisfy the entire-tort rule, because they are not actions of the Kingdom.  None of these entities is an instrumentality of the government of Saudi Arabia; they are private non-governmental organizations.  Further, even if the four charities were government instrumentalities, the Pleading still does not show that they are alter egos of Saudi Arabia.  The test for alter-ego status comes from *First National City Bank v. Banco Para el Comercio Exterior de Cuba*, 462 U.S. 611 (1983) ("*Bancec*"), and its progeny.  The Pleading does not meet that stringent test.

---

[28] Plaintiffs also make no attempt to allege any tortious action within the United States by the Rabita Trust.  *See* Pleading ¶¶ 575-580.

*Bancec* "recognized a presumption of 'separate juridical [status]' for the instrumentalities of foreign states." *Doe v. Holy See*, 557 F.3d 1066, 1077 (9th Cir. 2009) (per curiam) (quoting *Bancec*, 462 U.S. at 624-28) (alteration in original); *see EM Ltd. v. Republic of Argentina*, 473 F.3d 463, 478 (2d Cir. 2007) (explaining the "strong aversion" of the courts of this Circuit "to overriding the presumption of independent status") (internal quotation marks omitted). Accordingly, Plaintiffs bear the burden of proving that "the corporate entity should not be presumed distinct from a sovereign or sovereign entity." *Zappia Middle E. Constr. Co. v. Emirate of Abu Dhabi*, 215 F.3d 247, 252 (2d Cir. 2000). To "overcome the presumption of separate juridical status," simply alleging that the instrumentality is an "agent" is not enough; a plaintiff must allege "day-to-day control." *Doe v. Holy See*, 557 F.3d at 1080.[29]

Applying these principles, the Second Circuit has held it insufficient that a foreign sovereign "appoint[s] and remove[s]" the "directors" of an entity; that the entity uses its resources to serve the sovereign's "political interests"; that the sovereign causes the entity to "violat[e] . . . its governing charter"; or that the entity's "financial records were not transparent." *Seijas v. Republic of Argentina*, 502 F. App'x 19, 21 (2d Cir. 2012) (summary order). Instead, there must be "extensive control of" the entity's "day-to-day activities" or "abuse of corporate form." *Id.* at 22 (internal quotation marks omitted); *see also Zappia*, 215 F.3d at 252 (declining to overcome presumption where private entity "supports a government" but the government "has not authorized the private entity to act on its behalf").

---

[29] *Zappia* also states that the presumption may be overcome "if recognizing the corporate entity as independent would work a fraud or injustice." 215 F.3d at 252. The type of fraud or injustice that permits a court to disregard juridical separateness requires pleading and proof that "separate status was established to shield its owners from liability for their torts or that [the foreign sovereign] ignored ordinary corporate formalities." *De Letelier v. Republic of Chile*, 748 F.2d 790, 794 (2d Cir. 1984). Neither circumstance is alleged here.

**MWL.**  The Pleading alleges in boilerplate fashion (the same as in the Initial Complaint, *see* Fed. Ins. Compl. ¶ 114) that the MWL is a "controlled agent and alter-ego of the Kingdom," because "[t]he Kingdom controls and directs MWL operations, appoints and terminates MWL personnel, provides the MWL with virtually all of its funding, determines how funds will be distributed throughout the world, and otherwise stringently controls the MWL's operations," and that in many countries "MWL conducts operations from the local Saudi embassy, under the supervision of the embassy's Islamic Affairs Division."  Pleading ¶ 334.[30]  These boilerplate allegations of control are plainly insufficient to meet Plaintiffs' burden of overcoming the presumption of separateness.  *See*, *e.g.*, *Zappia*, 215 F.3d at 252.

The only specific allegations added by the Pleading are that the MWL's operations are supervised by a "General Secretariat," the head of which is appointed by a council based on a "nomination by the Saudi Government," that the organization was founded by Saudi Arabia and is "headed by Saudi officials," and that the MWL's annual budget is funded by a grant from Saudi Arabia.  Pleading ¶¶ 336-337, 339; *see also id.* ¶ 338 (Secretary-General of MWL explained that MWL is "'sponsored and financially supported by the Saudi Government'" and that he was appointed by Royal Decree).  Finally, Plaintiffs' proposed amended pleading cites testimony from a MWL and IIRO[31] employee in Canada that the MWL is government-funded, that he considers himself to "work for the government of Saudi Arabia," and that the Kingdom controls the "activities and plans" and sets "policy" for the MWL and IIRO.  *Id.* ¶ 340.

---

[30] The amended pleading also alleges without citation that the MWL has asserted in court that it is an "instrumentality" of Saudi Arabia; assuming that is true, instrumentalities of sovereigns are presumed to be separate from the sovereign itself.  *See supra* pp. 20-22.

[31] The IIRO is alleged to be a subsidiary of the MWL.  *See* Pleading ¶ 371.

Funding an entity and appointing its officials are not enough to overcome the presumption of separate juridical status. *See Seijas*, 502 F. App'x at 21; *see also Transamerica Leasing, Inc. v. La Republica de Venezuela*, 200 F.3d 843, 849 (D.C. Cir. 2000) ("making appointments to the subsidiary's Board of Directors" insufficient); *Seijas*, 502 F. App'x at 21 (appointing and removing directors not enough). Similarly, vague testimony by one employee that Saudi Arabia generally controls the MWL's and IIRO's activities and plans is not enough to allege the *day-to-day* control or abuse of the corporate form required to overcome the presumption of separateness. *See Zappia*, 215 F.3d at 252; *Doe v. Holy See*, 557 F.3d at 1079-80.

**IIRO.** As to the IIRO, the Pleading contains the same boilerplate paragraph that it alleges as to the MWL (and that was alleged in the Initial Complaint, *see* Fed. Ins. Compl. ¶ 131) claiming that the IIRO is a "controlled agent and alter-ego of the Kingdom." Pleading ¶ 372; *see also id.* ¶ 374 (citing annual reports that "further document . . . 'supervision,' and 'direction' of the IIRO offices within Saudi Arabia" by the Saudi government). As with the MWL, these boilerplate allegations of control are plainly insufficient to meet Plaintiffs' burden. The only specific allegation Plaintiffs make as to the IIRO is that a Saudi official testified that the chairman of the IIRO's board of directors is nominated by the Saudi Arabia government. *See id.* ¶ 373. But, as discussed above, simply nominating the head of a board of directors falls well short of the requisite control that is required to overcome the presumption of separateness. *See Transamerica*, 200 F.3d at 852; *Seijas*, 502 F. App'x at 21.

**WAMY.** As to WAMY, the allegations of agency or alter-ego status are similarly insufficient boilerplate. *See* Pleading ¶ 440 (alleging that WAMY is a "controlled agent and alter-ego of the Kingdom," and was established by MWL with "approval" of Saudi officials, and that the "vast majority of funding" is provided by Saudi Arabia). The few more specific

23

allegations merely allege overlap in personnel, appointment of directors, and government funding, *see id.* ¶¶ 440-442, which as already shown are not enough.

**Al Haramain.**  As to Al Haramain, the Pleading contains a boilerplate paragraph alleging agency and alter-ego status that is similar to the paragraphs for the other charities, and similarly insufficient.  *See* Pleading ¶ 477.  Other allegations include Saudi government "supervision" and funding, and that the Kingdom had directed Al Haramain to assist certain refugees.  *See id.* ¶¶ 478-479.  These are insufficient for the reasons already given.

Finally, even if the charities could be treated as alter egos of Saudi Arabia, the Pleading fails to allege with sufficient specificity any tortious activity within the United States.  In comparison to the voluminous (but legally irrelevant) paragraphs describing alleged actions by charity employees outside the United States, only three paragraphs (¶¶ 424, 462, and 492) describe alleged actions *within* the United States.  These allegations are rhetoric, not substance, and do not meet the pleading requirements of Rule 8.[32]  There are no specific actions of support for terrorism mentioned; no names of individuals who allegedly provided or received support; no dates on which support was allegedly provided.  As the United States has explained, the entire-tort rule is not satisfied unless Plaintiffs' allegations "support[ ] a conclusion that Saudi Arabia directed acts by the charities in the United States *that assisted the September 11 attacks*."  U.S. Amicus Brief 16 n.4 (emphasis added).  Nothing in the Pleading meets that standard.

---

[32] *See* Pleading ¶ 424 (conclusory assertion that "federal authorities determined that the IIRO and MWL offices in Washington, DC provided funding and material support to al Qaeda and Hamas"); *id.* ¶ 462 (conclusory assertion that WAMY's "U.S. Branch was deeply involved in the terrorist activities of the SAAR Network of businesses and charities"); *id.* ¶ 492 (quoting statement by the U.S. Treasury that "Al Haramain has been used around the world to underwrite terror").  Paragraphs 495 to 501 allege actions in the United States by employees of Al Haramain who allegedly sent money for "aid to Muslims in Chechnya," *id.* ¶ 495, whom Plaintiffs describe as "religious extremist militants," *id.* ¶ 501, but lack any allegation that the money went to al Qaeda or was used against the United States.

### B.  The Pleading Is Futile Under the Discretionary-Function Exception

Because the entire-tort rule is now unambiguously the law of this Circuit under the April 2013 *Terrorist Attacks* decision, and because that rule renders Plaintiffs' proposed Pleading futile as to both the Kingdom and the SHC, it is unnecessary for this Court to consider whether the Pleading is also futile under the discretionary-function exception – the ground originally, and correctly, adopted by Judge Casey in 2005.  Should the court do so, however, it should conclude that the Pleading is also futile because the only actions that the Kingdom's or the SHC's officials are properly alleged to have taken involve the exercise of policy discretion.  *See Terrorist Attacks I*, 349 F. Supp. 2d at 803-04; *Terrorist Attacks II*, 392 F. Supp. 2d at 555.

The FSIA excludes from the scope of the torts exception "any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function regardless of whether the discretion be abused."  28 U.S.C. § 1605(a)(5)(A).  The purpose of discretionary-function immunity is "to prevent 'judicial "second-guessing" of . . . decisions grounded in social, economic, and political policy through the medium of an action in tort.' "  *Swarna v. Al-Awadi*, 622 F.3d 123, 146 (2d Cir. 2010) (quoting *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 814 (1984)) (alteration in *Swarna*).  "Generally, acts are discretionary if they are performed at the planning level of government, as opposed to the operational level."  *Terrorist Attacks I*, 349 F. Supp. 2d at 794.  Plaintiffs' claims that Saudi Arabia or the SHC purportedly abused their discretion by funding organizations they allegedly knew or should have known had terrorist links are legally irrelevant, because the discretionary-function limitation applies to "*any* claim" challenging a discretionary function "*regardless of whether the discretion be abused*."  28 U.S.C. § 1605(a)(5)(A) (emphases added).

Here, Plaintiffs' claims against Saudi Arabia and the SHC rely primarily on contributions and other support provided to Islamic charities that in turn allegedly funded al Qaeda.  *See, e.g.,*

Pleading ¶¶ 12, 48, 128.  Those "decisions to support Islamic charities are purely planning level 'decisions grounded in social, economic, and political policy,'" *Terrorist Attacks I*, 349 F. Supp. 2d at 804 (quoting *Varig Airlines*, 467 U.S. at 814), and this Court lacks jurisdiction to review them.  To the extent employees of particular charities who were not officials or employees of the Kingdom or of the SHC allegedly transferred funds to terrorists or were allegedly involved in terrorist acts, Plaintiffs have failed to allege any proper basis for treating those actions as actions of Defendants.  *See supra* pp. 20-24 (explaining why Plaintiffs' "alter ego" allegations fail as a matter of law).

Although Plaintiffs devote hundreds of superfluous paragraphs to describing the largely overseas activity[33] of charity employees who are *not* alleged to be officials or employees of the Kingdom or the SHC themselves, they allege only a handful of specific actions by such officials or employees that relate to the charities.  As for officers or employees of the Kingdom, Plaintiffs' limited allegations include transfers of funds to charities allegedly suggested by unnamed "al Qaeda loyalists"[34] and promotion of "extremist . . . propaganda."[35]  Those allegations involve claims that discretion given to the individual officers or employees was abused, and therefore are not subject to this Court's jurisdiction.

---

[33] Plaintiffs' allegations concerning actions in the United States fail to overcome foreign sovereign immunity for the same reasons already given in Part II.A.

[34] Pleading ¶ 261 (allegations concerning Mohammed Jaber Hassan Fakihi).  Although Fakihi is alleged to have associated with individuals linked to the September 11 plot, *see id.* ¶ 258, there is no allegation that he provided those individuals with any funds or assistance.  There is also no allegation of any link between the alleged fund transfers and the September 11 plot; given that Fakihi was in Berlin from December 2000 to May 2003, they may well have occurred *after* September 11, 2001.  Certainly Plaintiffs do not allege otherwise.

[35] Pleading ¶ 266 (allegations concerning Jaafar Idris).  The decision whether to support particular "textbooks" or "lectures," *id.*, is obviously a discretionary one.

As for employees of the SHC, Plaintiffs allege primarily (at ¶¶ 524-529) that in the early 1990s the SHC's Bosnian offices served as a "front for channeling financial and logistical support for al Qaeda's jihad in Bosnia," including because al Qaeda members were purportedly "disguised as relief workers for the SHC"; that (at ¶ 530), again in the early 1990s, the SHC transferred $120 million to the "Third World Relief Agency," an alleged "al Qaeda front"; and that (at ¶¶ 531-541) select individuals on the SHC's payroll engaged in various other terrorist acts abroad.  The allegations concerning financial support in Bosnia and the $120 million fund transfer are precisely the sort of discretionary-function decisions that Judge Casey correctly found cannot support liability under the FSIA's torts exemption.  The other allegations suggest – at best – that select SHC employees and associates independently engaged in terrorist activity abroad and that some used SHC employment as a cover when they were really acting on behalf of terrorist groups.  None of Plaintiffs' allegations gives rise to a reasonable inference that the SHC authorized or knew about the alleged conduct.  And, in any event, not only do the allegations all involve conduct concededly outside the United States, but the Pleading also makes no attempt whatsoever to connect the alleged incidents to the September 11 attacks, making them wholly irrelevant to this case.

### C.   The Pleading Is Futile Because It Does Not Allege Causation

Jurisdiction under the FSIA also is lacking because Plaintiffs' proposed amended pleading does not adequately allege causation for purposes of the FSIA's torts exception.  By its terms, that exception applies only to claims for injuries "*caused by* the tortious act or omission" of a foreign sovereign.  28 U.S.C. § 1605(a)(5) (emphasis added).  The words "caused by" in § 1605(a)(5) incorporate common-law principles of tort causation.  *See Robinson*, 269 F.3d at 142 (to determine whether torts exception applies, court must "decide whether [the defendant's alleged] acts were tortious under the law" that "would apply to the merits of the claim").

27

Further, in light of the purpose of the torts exception – which, initially, Congress intended to focus on traffic accidents – courts have held that § 1605(a)(5) "should be narrowly construed so as not to encompass the farthest reaches of common law." *Burnett v. Al Baraka Inv. & Dev. Corp.*, 292 F. Supp. 2d 9, 19 (D.D.C. 2003) (internal quotation marks and italics omitted).

Here, Plaintiffs' allegations of causation are based on boilerplate, conclusory assertions that, "[a]bsent the support provided by the Kingdom and SHC, al Qaeda would not have possessed the capacity to conceive, plan and execute the September 11th Attacks." Pleading ¶¶ 12, 14. As the D.C. district court recognized in dismissing claims against several Saudi officials, Plaintiffs' theory is that "(i) [the Kingdom and its instrumentalities] funded (ii) those who funded (iii) those who carried out the September 11th attacks." *Burnett*, 292 F. Supp. 2d at 20. Accepting that layered theory of causation "would stretch the causation requirement of the noncommercial tort exception not only to 'the farthest reaches of the common law,' but perhaps beyond, to terra incognita." *Id.*; *cf. Licci v. American Express Bank Ltd.*, 704 F. Supp. 2d 403, 410-11 (S.D.N.Y. 2010) (allegations that bank facilitated wire transfers to terrorist groups, which enabled terrorist acts resulting in plaintiffs' injuries, insufficient to establish proximate causation under New York law), *aff'd in part sub nom. Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 672 F.3d 155 (2d Cir. 2012) (per curiam).

In *Robinson*, the Second Circuit elaborated on the dangers of allowing "conclusory . . . allegations . . . to sustain jurisdiction" under the FSIA. 269 F.3d at 146. Basing federal jurisdiction on "generic allegations of [misconduct]," the court of appeals warned, "would invite plaintiffs to circumvent the jurisdictional hurdle of the FSIA by inserting vague and conclusory allegations of tortious conduct in their complaints – and then to rely on the federal courts to conclude that some conceivable non-discretionary tortious act falls within the purview of these generic allegations under the applicable substantive law." *Id.* Refusing to dismiss such claims

28

would be "at odds with the goal of the FSIA to enable a foreign government to obtain an early dismissal when the substance of the claim against it does not support jurisdiction." *Id.*

Those concerns apply with far greater force here. *Robinson* involved a routine slip-and-fall claim. *See id.* at 135. The claims in these cases, by contrast, accuse a foreign sovereign of complicity in a horrific terrorist attack, based on novel and unsupported theories of tort liability and causation. It is therefore all the more important here to require proper allegations of "a 'tortious act or omission' caused by the [Saudi] government," *id.* at 145, before permitting these actions to persist any longer. Because Plaintiffs have not properly alleged that any act of Saudi Arabia or its instrumentalities caused their damages, their claims are subject to dismissal, and – for this and all the other reasons given above – their proposed amended Pleading is futile.

## CONCLUSION

The Court should deny Plaintiffs' motion for leave to amend.

29

Respectfully submitted,

/s/ *Michael K. Kellogg*
Michael K. Kellogg (MK4579)
Mark C. Hansen (MH0359)
Gregory G. Rapawy
KELLOGG, HUBER, HANSEN, TODD,
  EVANS & FIGEL, P.L.L.C.
Sumner Square
1615 M Street, N.W., Suite 400
Washington, D.C. 20036-3209
(202) 326-7900
(202) 326-7999 (fax)
*Attorneys for the Kingdom of Saudi Arabia*

Lawrence S. Robbins (LR8917)
Roy T. Englert, Jr.
ROBBINS, RUSSELL, ENGLERT, ORSECK,
  UNTEREINER & SAUBER LLP
1801 K Street, N.W.
Suite 411
Washington, D.C. 20009
(202) 775-4500
(202) 775-4510 (fax)
*Attorneys for the Saudi High Commission*
*for Relief of Bosnia & Herzegovina*

February 3, 2015

**CERTIFICATE OF SERVICE**

I hereby certify that, on this 3rd day of February 2015, I caused copies of the foregoing document to be served electronically pursuant to the Court's ECF system and by United States first-class mail on any parties not participating with the Court's ECF system as thereafter advised by the Court.

/s/ *Michael K. Kellogg*
_____
Michael K. Kellogg