# Exhibit 1

# UNITED STATES DISTRICT COURT
## DISTRICT OF OREGON

AL-HARAMAIN ISLAMIC FOUNDATION, *et al.*,        CV. 07-1155-KI

      Plaintiffs,

  v.

UNITED STATES DEPARTMENT
OF THE TREASURY, *et al.*,

      Defendants.

# ATTACHMENT 1

**to Defendants' Memorandum in Support of
Defendants' Motion to Dismiss and for Summary Judgment**

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON

| | |
|---|---|
| AL-HARAMAIN ISLAMIC FOUNDATION, *et al.*, | ) ) ) |
| Plaintiffs, | ) ) Case No. 07-CV-1155-KI ) ) |
| v. | ) ) ) |
| UNITED STATES DEPARTMENT OF THE TREASURY, *et al.* | ) ) ) |
| Defendants. | ) ) ) |

## DECLARATION OF ADAM J. SZUBIN

I, Adam J. Szubin, pursuant to 28 U.S.C. § 1746, declare the following under penalty of perjury:

1. I am the Director of the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC") and have held this position since September 3, 2006. Prior to becoming OFAC Director, I served as the Senior Advisor to the Under Secretary of the Treasury, Office of Terrorism and Financial Intelligence, a position I assumed in August 2004. Before joining the Treasury Department, I served as Counsel to the Deputy Attorney General, coordinating the U.S. Department of Justice's efforts to combat terrorism financing. Prior to assuming that position, I was a Trial Attorney in the Civil Division of the Justice Department.

2. I am familiar with the mission and operations of OFAC. I am also familiar with OFAC's designation and redesignation of plaintiff Al Haramain Islamic Foundation, Inc. ("AHIF-Oregon") and AHIF-Oregon's challenges to its designation. I make this declaration

based upon information within my personal knowledge or provided to me in my official capacity.

OFAC's Mission and Authority

3.    OFAC is the office principally responsible for administering U.S. economic sanctions programs.  These programs are primarily directed against foreign states and nationals, including sponsors and supporters of global terrorism, to further U.S. foreign policy and national security goals.  Pursuant to authority delegated by the President to the Secretary of the Treasury, OFAC acts under Presidential national emergency powers, as well as under authority granted by specific legislation, to impose controls on transactions and to freeze, or "block," certain property in which any foreign country or foreign national has any interest that is within the United States or in the possession or control of U.S. persons.

4.    OFAC currently administers over 20 economic sanctions programs against foreign governments, entities, and individuals.  OFAC administers, *inter alia*, sanctions programs relating to Iran, Sudan, Burma, Cuba, and North Korea.  Several of OFAC's other sanctions programs, including those relating to Syria, Lebanon, Iraq, Zimbabwe, the Western Balkans, the former Liberian Regime of Charles Taylor, the Democratic Republic of the Congo, and Cote D'Ivoire, are "list-based" programs, affecting members of government regimes and other individuals and groups whose activities conflict with U.S. national security and foreign policy interests.  OFAC also implements list-based sanctions programs against narcotics traffickers and kingpins; terrorism-related governments, entities, and individuals; and proliferators of weapons of mass destruction and their supporters.

5.   As Director of OFAC, I am responsible for the implementation, administration, and enforcement of such economic sanctions programs.  These responsibilities include enforcement of blocking orders to ensure the segregation and safeguarding of blocked property, as well as enforcement of certain restrictions on trade and financial transactions.

Blockings under IEEPA and UNPA

6.   The International Emergency Economic Powers Act, 50 U.S.C. §§ 1701-1706 ("IEEPA"), grants the President a broad spectrum of powers to deal "with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat."  50 U.S.C. § 1701(a).  The President typically exercises these IEEPA powers through Executive orders that declare a national emergency and impose economic sanctions to address the emergency.

7.   Section 5 of the United Nations Participation Act, 22 U.S.C. § 287c, grants the President the authority to apply certain measures that the United States has been called upon to apply by the United Nations Security Council.  This authority includes the power to "investigate, regulate, or prohibit, in whole or in part, economic relations . . . involving property subject to the jurisdiction of the United States."  22 U.S.C. § 287c(a).  As with IEEPA, the President typically exercises his UNPA powers through Executive orders.  Often, a single Executive order will be based on authority derived from IEEPA and the UNPA, as well as other sources.

8.   In addition to identifying a particular threat in an Executive order, the President may also identify for sanctions specific entities and individuals who pose or contribute to the threat

3

in the Executive order and set forth standards pursuant to which additional entities and individuals may be designated for sanctions. The President typically delegates the task of identifying/designating such additional entities and individuals to a cabinet official, usually the Secretary of the Treasury, in consultation with other cabinet officials such as the Secretary of State and Attorney General. Those who are determined to meet these standards are "designated" and thus made subject to the Executive order's restrictions. Typically, such a designation results in the blocking of any property or interest in property of the designated person that is in the United States or in the possession or control of a U.S. person.

9.   A Presidential Executive order that blocks property constitutes the legal framework of an economic sanctions program. In practice, such orders require holders of blocked property to freeze that property, including bank accounts, in their possession or control at the time of the order, as well as property that later comes into the holders' possession. Blocking actions are not permanent and do not constitute a forfeiture or seizure of assets.

10. The property and property interests blocked by OFAC pursuant to an Executive order may not be transferred, withdrawn, exported, paid, or otherwise dealt in by U.S. persons without OFAC's prior authorization. As noted above, the blocking of a designated person's property encompasses the designated person's property "interests." OFAC interprets the term "interest" to include a property interest of any nature whatsoever, direct or indirect. *See, e.g.,* 31 C.F.R. § 594.306 (Global Terrorism Sanctions Regulations). The term "person" includes both individuals and corporate entities.

11. The prohibition against dealing in property of a designated person serves important objectives, such as depriving the designated person of the benefit of the property, including

4

services, that might otherwise be used to further ends that conflict with U.S. interests. Blocking assets of designated terrorists and their supporters prevents their possible use in the orchestration, assistance, or support of unlawful and dangerous global terrorist plots. Blocking also allows OFAC to guard against the dissipation of assets to preserve assets for possible legal judgments, and to preserve the President's ability to use the blocked assets as a bargaining chip or negotiation tool in resolving the national emergency that gave rise to the blocking. Guarding against the dissipation of assets is important even when the amount of assets is small because terrorist activities often proceed on limited budgets and funding for such activities, in small amounts, can easily escape detection.

12. OFAC typically does not provide prior notice of a pending investigation or impending blocking action and generally considers its target list of prospective designees under E.O. 13224 as classified information. If persons learn that they are the subject of an ongoing sanctions investigation, there is a significant risk that they would transfer, hide, sell, or destroy assets that could be blocked, destroy or alter records relevant to the investigation, or otherwise frustrate or obstruct the investigation before the sanctions investigation, and the potential blocking of assets, can be completed. Such an outcome would frustrate OFAC's law enforcement efforts.

13. Pursuant to IEEPA-based sanctions programs, OFAC asserts jurisdiction over U.S. persons wherever located in the world, including within the territory of the United States. These sanctions programs typically prohibit U.S. persons from dealing in or conducting transactions in blocked property.

14. A person's status as a U.S. person does not exempt it from designation or IEEPA's prohibitions. Any other conclusion would serve to effectively immunize U.S. persons from

designation; to allow such U.S. persons to deal in or transfer blocked assets would undermine the intent and operation of the sanctions programs that OFAC is charged with administering and threaten the U.S. national interests that those programs are meant to protect. As just one example, if U.S. persons were deemed immune from designation, sanctioned countries and persons could then transact their business through "untouchable," complicit U.S. persons and severely undercut the sanctions program.

15. In certain instances, OFAC may use its authority to license certain transactions that otherwise would be prohibited, when doing so would further U.S. policy. OFAC regularly promulgates in its sanctions regulations general licenses authorizing certain categories of otherwise prohibited activity, and it grants specific licenses on a case-by-case basis. 31 C.F.R. § 501.801. In its blocking notices, OFAC explains that it will consider license requests for use of blocked funds to pay costs such as living expenses, attorneys' fees, and corporate operating costs. In addition, OFAC may license blocked parties to access their blocked documents under supervision. Because no two sanctions programs are exactly alike, and because applicants often present unique circumstances, OFAC considers such applications on a case-by-case basis in light of all facts presented, consistent with U.S. national security and foreign policy. OFAC does not guarantee that any particular license request will be granted.

16. OFAC provides a mechanism for a designated party to challenge its designation, the blocking of its property, and its inclusion on the list of Specially Designated Nationals, which OFAC compiles and maintains. Designated parties may submit arguments or evidence to challenge the basis for the blocking, to assert that the circumstances resulting in the designation no longer apply, or to assert mistaken identity. 31 C.F.R. §§ 501.806-807. Any relevant

information submitted by a designated party is considered by OFAC in making a determination

with respect to such a challenge.  OFAC has, in the past, revoked blocking orders based upon

new information provided by a designated party.

Executive Order 13224

17.  After the September 11, 2001 attacks at the New York World Trade Center, in

Pennsylvania, and against the Pentagon, President Bush issued Executive order 13224 of

September 23, 2001 ("E.O. 13224").[1]  E.O. 13224 begins with the President's declaration that

the threat of terrorist attacks constitutes an unusual and extraordinary threat to the national

security, foreign policy, and economy of the United States:

> I, George W. Bush, President of the United States of America, find
> that grave acts of terrorism and threats of terrorism committed by
> foreign terrorists, including the terrorist attacks in New York,
> Pennsylvania, and the Pentagon committed on September 11, 2001
> . . . and the continuing and immediate threat of further attacks on
> United States nationals or the United States constitute an unusual
> and extraordinary threat to the national security, foreign policy,
> and economy of the United States, and . . . hereby declare a
> national emergency to deal with that threat.  I also find that
> because of the pervasiveness and expansiveness of the financial
> foundation of foreign terrorists, financial sanctions may be
> appropriate for those foreign persons that support or otherwise
> associate with these foreign terrorists.

E. O. 13224.

18.  E.O. 13224 blocks all property and interests in property within the United States or in

the possession or control of U.S. persons, including foreign branches, in which there is an

---

[1] E.O. 13224, "Blocking Property and Prohibiting Transactions with Persons who Commit, Threaten to Commit, or Support Terrorism," 66 Fed. Reg. 49079 (Sept. 25, 2001).

interest of any person listed in the Annex to the order or subsequently determined to be subject to the order.

19. E.O. 13224 delegates to the Secretary of State the power to designate "foreign persons" who are found "to have committed, or to pose a significant risk of committing, acts of terrorism that threaten the security of U.S. nationals or the national security, foreign policy, or economy of the United States." E.O. 13224, § 1(b). E.O. 13224 authorizes the Secretary of the Treasury to designate those persons, whether foreign persons or U.S. persons, who are "owned or controlled by," or that "act for or on behalf of," designated persons; those who "assist in, sponsor, or provide financial, material, or technological support for, or financial or other services to or in support of . . . acts of terrorism or" designated persons; and those who are otherwise "associated with" designated persons. E.O. 13224, §§ 1 (c)-(d).

Treasury's Designation Process

20. Treasury's process of designating individuals or entities appropriate for sanctions begins with an extensive investigation. Treasury investigations draw on a broad range of information, which historically has included both publicly available and non-publicly available information (such as privileged or classified information).

21. Once the evidence is collected, Treasury staff draft an evidentiary memorandum summarizing the various exhibits acquired through their investigation. After an evidentiary package has been reviewed within OFAC, it is then reviewed for legal sufficiency by Treasury's attorneys. Based on that legal review, the analyst or investigator may engage in further investigation and revise the package to address any legal concerns. The Department of Justice

also provides legal review of evidentiary packages under E.O. 13224 and certain other programs.

22. In some programs, including the terrorism programs, there is interagency coordination throughout the designation process, and this interagency coordination is a critical part of the designation process. This interagency process helps to ensure that Treasury and State's proposed designations are consistent with the operational and policy interests of other agencies, as well as with the strategic national security and foreign policy goals of the United States. Certain Executive orders, such as E.O. 13224, direct that designations by the Departments of Treasury and State be undertaken in consultation with one another, as well as in consultation with the Department of Justice and other relevant agencies.[2]  Once this interagency process has been completed, the final evidentiary package is presented for my signature pursuant to authority delegated to me from the Secretary of the Treasury.

23. A designated party may seek to have its designation rescinded by filing a petition pursuant to 31 C.F.R. § 501.807 (hereinafter "delisting petition").  A party seeking to challenge a designation may submit to OFAC in writing arguments and evidence showing why an insufficient basis exists for the designation or why the circumstances resulting in the designation no longer apply.  After OFAC has conducted a review of the request for reconsideration, it will provide a written decision to the designated person.

---

[2] E.O. 13224, as amended by Executive Order 13284, requires consultation among the Secretaries of Treasury, State, and Homeland Security, as well as the Attorney General.

<u>U.S. Government Strategy vis-à-vis Terrorist Financing</u>

24. Since September 11, the U.S. Government has launched an intensive campaign to track and target terrorist financing, drawing on a wide range of agencies, authorities, and resources. Studying these asset flows is valuable in its own right, as financial data provides a rich source of information as to the identities, operations, methodologies, and locations of terrorist operatives and networks. In the appropriate circumstances, the U.S. Government draws upon a range of tools to disrupt terrorist financing channels and networks, including diplomatic action, sanctions, law enforcement, and covert activities. Past efforts have yielded concrete gains, straining terrorist organizations, forcing covert cells to adopt riskier methodologies, and, in some instances, rendering terrorists unable to proceed with deadly attack plans.

25. Terrorist groups raise, move, and store their monies using a range of opaque and sometimes complex techniques and methods. One method, relied upon in particular by al Qaida-related groups and Hamas, is the abuse of charities. Charities have proved to be an attractive conduit for terrorist groups for a number of reasons. Among them are the following:

- The guise of international charitable work provides unparalleled cover for the movement of funds, personnel, and even military supplies to and from high-risk or conflict areas in which terrorists operate.

- Charitable donations are the rare money transfers that move without a corresponding return of value; accordingly, large transfers can move in a single direction without arousing suspicion.

- Corrupted charities can attract large numbers of unwitting donors along with the witting, thus increasing the funds available to terrorists.

- To the extent that funds of these charities reach bona fide recipients, the charities benefit from public support and an attendant disinclination by many governments to take enforcement action against them.

- The "legitimate" activities of these charities, such as the operation of schools, religious institutions, and hospitals, can – if abused – create fertile recruitment

10

grounds, allowing terrorists to generate support for their causes and to propagate extremist ideologies.

*See*, Testimony of Stuart Levey, Senate Committee on Banking, Housing, and Urban Affairs, July 13, 2005, available at http://www.treas.gov/press/releases/js2629.htm.

26. The U.S. Government has deployed a number of tools to stem terrorist abuse of charities. We have conducted extensive outreach to the charitable sector and issued best practices and other guidance to raise public awareness of the ongoing threat that terrorist organizations present to the charitable sector and to help both charities and donors protect themselves against terrorist abuse. When confronted with charities that are acting on behalf of or supporting terrorist organizations, the U.S. Government has pursued a range of actions, including domestic designation under E.O. 13224, submission for worldwide designation before the United Nations, and law enforcement action. To date, the United States has publicly designated more than thirty charitable organizations for their support to terrorist organizations, in the service of terrorist groups including al Qaida, Hizballah, Hamas, and Palestinian Islamic Jihad. "Protecting Charitable Organizations," available at

http://www.treas.gov/offices/enforcement/key-issues/protecting/index.shtml.

27. In the case of charities operating abroad, the U.S. Government will frequently approach its international partners to develop a joint action plan with respect to the entity of concern. Securing the cooperation of relevant host governments is of tremendous importance – both diplomatically and operationally – in taking successful action against a terrorist financing threat.

28. Charities based out of the Arabian Peninsula have presented a particular source of concern. As Under Secretary Levey testified in July 2005:

> Another regional focus of ours in addressing charities and terrorism has
> been the Gulf, and Saudi Arabia in particular. For too long, wealthy
> donors and multinational charities in Saudi Arabia were underwriting
> terrorism of all kinds, without any meaningful controls. Since 9/11, our
> government has worked aggressively to press the Saudis to take action
> against these financiers and to clean up their charitable sector.

Levey Testimony, Senate Committee on Banking, Housing, and Urban Affairs, July 13, 2005,

available at http://www.treas.gov/press/releases/js2629.htm.

The Al Haramain Foundation and the U.S. Government's Response

29. In the U.S. Government's efforts to combat terrorist abuse of charities, the Al Haramain

Islamic Foundation ("AHIF") loomed as a major concern. AHIF was a Saudi Arabia-based

charity that, at its peak, was said to have operated in over 50 countries and had an annual budget

estimated at between $30-$80 million. A.R. Exhibit 200, pp. 114-115. The Administrative

Record demonstrates that the charity used its worldwide geographical reach and deep funding

base to support al Qaida's activities. As the Treasury Department noted in June 2004 when

designating Aqeel Abdulaziz Al-Aqil, the former leader of AHIF, "When viewed as a single

entity, [AHIF] is one of the principal Islamic NGOs providing support for the al Qaida network

and promoting militant Islamic doctrine worldwide.... Terrorist organizations designated by the

United States including [Jemaa Islamiyah (JI)], Al-Ittihad Al-Islamiya (AIAI), Egyptian Islamic

Jihad (EIJ), HAMAS and Lashkar E-Taibah received funding from [AHIF] and used [AHIF] as

a front for fundraising and operational activities."[3]

30. A few instances, presented here in unclassified form, of AHIF's global support for, and

ties to, terrorist organizations illustrate the grounds for the U.S. Government's concern.

12

31. As early as 1997, U.S. and other friendly authorities were informed that the Kenyan branch of AHIF was involved in plotting terrorist attacks against Americans. As a result, a number of individuals connected to AHIF in Kenya were arrested and later deported by Kenyan authorities. A.R. Exhibit 99.

32. In August 1997, an AHIF employee indicated that the planned attack against the U.S. Embassy in Nairobi would be a suicide bombing carried out by crashing a vehicle into the gate at the Embassy. A wealthy AHIF official outside East Africa agreed to provide the necessary funds. A.R. Exhibit 99.

33. A former Tanzanian AHIF Director, believed to be associated with Usama bin Ladin (UBL), was responsible for making preparations for the advance party that planned the August 7, 1998, bombings of the U.S. Embassies in Dar Es Salaam, Tanzania, and Nairobi, Kenya, according to information available to the United States Government. A.R. Exhibit 99.

34. Shortly before the dual Embassy bombing attacks in Kenya and Tanzania, a former AHIF official in Tanzania met with another conspirator to the attacks and cautioned the individual against disclosing knowledge of preparations for the attacks. Around the same time, four individuals led by an AHIF official were arrested in Europe. At that time, they admitted maintaining close ties with the designated terrorist groups EIJ and Gama'a al-Islamiyya. A.R. Exhibit 99.

35. Wadih el-Hage, a leader of the East African al Qaida cell and personal secretary to UBL, visited the Kenya offices of AHIF before the 1998 dual embassy attacks. Searches conducted by authorities revealed that el-Hage possessed contact information for a senior AHIF official

---

[3] A.R. Exhibit 137.

who was head of AHIF's Africa Committee, the overseeing authority for AHIF's offices in Kenya and Tanzania.  A.R. Exhibit 99.

36. As a result of the dual Embassy attacks, 224 people were killed, including 12 American U.S. government employees and family members and 40 Kenyan and Tanzanian U.S. government employees.  A.R. Exhibit 99.

37. Using a variety of means, AHIF provided financial support to al Qaida operatives in Indonesia and to its Southeast Asia affiliate, JI.  JI committed a series of terrorist attacks, including the bombing of a nightclub in Bali on October 12, 2002, that killed 202 and wounded over 300.  A.R. Exhibit 99.

38. Information available to the United States shows that a senior AHIF official deployed a Bangladeshi national to conduct surveillance on U.S. consulates in India for potential terrorist attacks. The Bangladeshi national was arrested in early 1999 in India, reportedly carrying four pounds of explosives and five detonators. The terrorist suspect told police that he intended to attack U.S. diplomatic missions in India. The suspect reportedly confessed to training in al Qaida terrorist camps in Afghanistan, where he met personally with Usama bin Laden in 1994. The suspect first heard of plans for these attacks at the AHIF office in Bangladesh.  A.R. Exhibit 137.

39. Before the removal of the Taliban from power in Afghanistan, the AHIF in Pakistan supported the Taliban and other groups.  It was linked to the UBL-financed and designated terrorist organization, Makhtab al-Khidemat (MK).  In one instance, sometime in 2000, the MK director instructed funds to be deposited in AHIF accounts in Pakistan and from there transferred to other accounts.  A.R. Exhibits 99, 137.

40. The United States has information that indicates UBL may have financed the establishment of AHIF in Albania, which has been used as cover for terrorist activity in Albania and in Europe.  A.R. Exhibit 137.

41. AHIF in Ethiopia has provided support to AIAI, a terrorist group designated both by the U.S. Government and by the United Nations Security Council Committee established pursuant to Resolution 1267 concerning Al-Qaida and the Taliban and Associated Individuals and Entities ("U.N. al Qaida/Taliban Committee").  A.R. Exhibit 137.

42. These and other ties to terrorist acts and organizations – attested to in both classified and unclassified materials – prompted the U.S. Government to take action with respect to AHIF. The U.S. Government recognized that cooperation with Saudi authorities would allow for the most effective action against the global AHIF network, which was headquartered in Saudi Arabia.  Over a period of approximately two years, U.S. and Saudi government officials discussed and coordinated their response to the threat posed by AHIF.  The two governments' activities included joint U.S.-Saudi actions, as well as unilateral actions by each government.

43.   On March 11, 2002, the U.S. and Saudi governments jointly announced the U.S. designation of the AHIF branches in Somalia and Bosnia and proposed their names for designation by the U.N. al Qaida/Taliban Committee.  Treasury Secretary O'Neill called the joint action a "new level of coordination in the international cooperation" to fight terrorism. A.R. Exhibit 24.  The U.N. al Qaida/Taliban Committee designated the Somalia and Bosnia branches of al Haramain on March 13, 2002.  Such a designation requires the consensus (or lack of objection) of all 15 members of the Security Council.

44. In 2003, the Government of Saudi Arabia ordered AHIF to close all of its overseas branches. A.R. Exhibit 137.

45. AHIF stated that it had in fact closed several branches, but continued monitoring by the United States and Saudi Arabia indicated that some branches, and/or former officials associated with these branches, were either continuing to operate or maintaining other plans to avoid these measures. A.R. Exhibit 137.

46. In December 2003, the U.S. Government announced the joint Saudi-U.S. submission of an entity known as Vazir to the U.N. al Qaida/Taliban Committee for designation. Vazir was determined to be operating as a successor organization to the AHIF Bosnia branch. A.R. Exhibit 98. In 2003, the AHIF headquarters in Saudi Arabia had provided instructions to AHIF in Bosnia for the disposition of AHIF assets, including actions contravening local and international counter-terrorism laws and regulations. A.R. Exhibit 137. The U.N. al Qaida/Taliban Committee designated Vazir on December 26, 2003.

47.   In January 2004, the U.S. and Saudi governments announced the joint submission of four additional branches of AHIF – Indonesia, Kenya, Tanzania, and Pakistan – to the U.N. al Qaida/Taliban Committee for designation.   A.R. Exhibit 99. In announcing the designation, Treasury Secretary John Snow stated that, "These branches have provided financial, material and logistical support to the al-Qaida network and other terrorist organizations…. The branches of al Haramain that we have singled out today not only assist in the pursuit of death and destruction; they deceive countless people around the world who believe that they have helped spread good will and good works. By working together to take action today and calling on the United Nations to do the same, our two countries send a clear message: those who hide

intensions of terror behind a veil of benevolence and charity will not escape justice from the international community." A.R. Exhibit 99. The U.N. al Qaida/Taliban Committee designated the Indonesia, Kenya, Tanzania, and Pakistan branches of al Haramain on January 26, 2004.

48. Action with respect to the U.S. branch of AHIF was closely coordinated within the U.S. Government to ensure that separate law enforcement and designation efforts would not interfere with one another.

49. On February 18, 2004, agents from the Federal Bureau of Investigation ("FBI"), Internal Revenue Service, Immigrations and Customs Enforcement, and local police executed a search warrant issued as part of a criminal matter at property in Ashland, Oregon, that was being used by AHIF-Oregon ("the Ashland property").

50. On February 19, 2004, OFAC issued an order blocking the AHIF location in Oregon ("AHIF-Oregon"), including its funds, accounts and business records, pending further investigation into AHIF-Oregon's support of, and ties to, terrorists. *See* Exhibit A. This action was taken pursuant to Treasury's authorities under IEEPA, UNPA, and E.O. 13224, and after consultation with the Departments of State and Justice. OFAC considered both classified and unclassified information in reaching its decision to issue the blocking order.

51. In June 2004, the U.S. and Saudi governments announced a final joint action against the worldwide network of AHIF. First, the governments jointly announced the designation of five additional branches of AHIF (Afghanistan, Albania, Bangladesh, Ethiopia, and the Netherlands) and stated that they would be submitting these branches to the U.N. al Qaida/Taliban Committee for international designation. The U.S. Government also announced the designation of Aqeel al-Aqil, the former Chairman of AHIF and President of AHIF-Oregon. A.R. Exhibit

135, pp. 7-8. Finally, the Saudi Government announced that it was "dissolving the Riyadh-based Al-Haramain Islamic Foundation," and that its assets would be folded into the "Saudi National Commission for Relief and Charity Work Abroad." Foreign Affairs Advisor to the Crown Prince Adel Al-Jubeir announced that these actions were taken in furtherance of the Kingdom of Saudi Arabia's objective "to identify and shut down the financial sources that support terrorism." A.R. Exhibit 135. The U.N. al Qaida/Taliban Committee designated the Afghanistan, Albania, Bangladesh, Ethiopia, and the Netherlands branches of al Haramain on July 6, 2004.

52. On September 28, 2004, the fifteen-member U.N. al Qaida/Taliban Committee designated AHIF-Oregon, AHIF-Oregon Director Soliman al-Buthe ("al-Buthe"), and AHIF-Comoros Islands because of their links to, among others, al Qaida.

OFAC's Designation and Redesignation of AHIF-Oregon

53. Following the February 2004 blocking during the pendency of the investigation, OFAC and other agencies within the United States Government continued to review (1) additional unclassified material; (2) additional classified information; and (3) correspondence between OFAC and AHIF-Oregon, in determining whether to designate AHIF-Oregon as an SDGT pursuant to E.O. 13224 and IEEPA.

54. Prior notice of OFAC's determination whether to designate an entity is not typically provided at the time of an initial blocking action because of the risk of asset flight. In the case of AHIF-Oregon, where the blocking had been announced and financial assets and business records were blocked pending investigation on February 19, 2004, OFAC provided AHIF-

18

Oregon several months' notice that it was considering designating AHIF-Oregon and blocking all of AHIF-Oregon's property and interests in property. OFAC provided such notice on April 23, 2004, at which time OFAC also shared with AHIF-Oregon the unclassified, non-privileged information upon which it had relied in blocking AHIF-Oregon during the pendency of its investigation. The notice requested that, within 21 days, AHIF-Oregon provide any material to OFAC that it wished OFAC to consider in making its determination as to whether to designate AHIF-Oregon.

55. Over the course of the next several months, OFAC continued to share with AHIF-Oregon additional unclassified, non-privileged documents that it was considering.

56. Throughout the course of the investigation, AHIF-Oregon counsel provided a series of responses to OFAC's notice of possible designation, including documents for OFAC's consideration in deciding whether to designate AHIF-Oregon, all of which OFAC considered and included in the Administrative Record for the designation. AHIF-Oregon also continued to request additional time in order to provide further responses and additional documents. On May 18, 2004, OFAC granted an extension until May 28, 2004, to AHIF-Oregon to provide a response. AHIF-Oregon provided responses and, on some occasions, additional documents on May 14, 2004; May 27, 2004; May 28, 2004; and June 7, 2004.

57. On July 23, 2004, OFAC shared with AHIF-Oregon some additional materials that had been identified and were being considered by OFAC in making its final designation determination. OFAC requested that AHIF-Oregon respond by July 30, 2004. On July 29, 2004, OFAC granted AHIF-Oregon an extension until August 4, 2004, to respond. On August 4, 2004, AHIF-Oregon produced further arguments and documents in support of its position that

AHIF-Oregon should not be designated.  This material consisted of documents elaborating on the board structures of AHIF-Oregon and its Saudi headquarters.  AHIF-Oregon also raised perceived deficiencies in the documents produced by OFAC, principally arguing that the material produced did not specifically relate to the AHIF-Oregon branch but, rather, concerned the larger organization.  Finally, AHIF-Oregon provided additional material related to the nature of its prior operations and activities.  In its August 4 submission, AHIF-Oregon also indicated that it intended to produce further documents.

58.  On August 20, 2004, OFAC produced to AHIF-Oregon additional documentation that was being considered by OFAC in making its final determination and gave AHIF-Oregon until August 23, 2004, to respond.  OFAC denied a request for a further extension on August 24, 2004.[4]  In its August 20 production to AHIF-Oregon, OFAC inadvertently disclosed a classified document.

59. After considering AHIF-Oregon's submissions; the unclassified, non-privileged material previously provided to AHIF-Oregon; privileged and classified material not provided to AHIF-Oregon; and correspondence between OFAC and AHIF-Oregon, OFAC made the decision to designate AHIF-Oregon.  On September 9, 2004, after consulting with the Secretaries of State and Homeland Security and the Attorney General, OFAC designated AHIF-Oregon as a Specially Designated Global Terrorist ("SDGT"), the term used to denote those persons designated pursuant to the Global Terrorism Sanctions Regulations, the criteria for which are set forth in E.O. 13224.  In the same action, OFAC designated Mr. al-Buthe and the al Haramain branch in the Comoros Islands ("AHIF-Comoros").  The Blocking Notice provided to AHIF-

Oregon counsel informed AHIF-Oregon that, as of that date, all property and interests in property of AHIF-Oregon, including but not limited to all accounts in which AHIF-Oregon has any interest, were blocked, and could not be transferred, paid, exported, withdrawn, or otherwise dealt in, and all transactions involving AHIF-Oregon and U.S. persons, wherever located, or from the United States, were prohibited, unless licensed by OFAC. *See* Exhibit B.

60. All of the unclassified and non-privileged material that OFAC considered for designation was provided to AHIF-Oregon or was already within AHIF-Oregon's possession at the time of designation.

61. On February 14, 2005, AHIF-Oregon filed a request to supplement the Administrative Record and for reconsideration of the designation with OFAC. This request was based on its previous arguments made during the pendency of the investigation and included in AHIF-Oregon's previous submissions, including a description of AHIF-Oregon's understanding of the use to which its funds were put in Chechnya; AHIF-Oregon's assertion that no assistance had been provided to al Qaida or the AHIF headquarters for the purpose of supporting terrorism; and AHIF-Oregon's assertion that the U.S. branch had no control over what types of activities the Saudi headquarters pursued. The AHIF request followed submission of a similar request for delisting filed by counsel for Mr. al-Buthe with OFAC on January, 19, 2005. Both submissions have been considered thoroughly and included in the Administrative Record.

62. Since the designation, OFAC has continued to work on a range of matters related to actions taken against AHIF and AHIF-Oregon. On May 11, 2005, former AHIF Director al-Aqil, himself designated as a Specially Designated Global Terrorist pursuant to E.O. 13224,

---

[4] Despite OFAC's denial of AHIF-Oregon's request for additional time to respond beyond August 20, AHIF-Oregon

filed a lawsuit in U.S. District Court for the District of Columbia alleging that his designation violated his due process rights. This litigation remains pending.

63. On July 28, 2005, OFAC met with counsel for Mr. al-Buthe regarding a range of concerns related to his designation and the blocking of AHIF-Oregon property. As explained more fully below, OFAC worked with counsel throughout 2005 and 2006 on a number of licensing issues, as well as on another lawsuit, stemming from the blocking of AHIF-Oregon property.

64. On September 21, 2005, AHIF-Oregon requested that the Administrative Record be supplemented with all of AHIF-Oregon's filings submitted prior to the designation (which OFAC had already done), as well as supplemented with the February 2005 delisting petition. In the September 21 letter, AHIF repeated its past arguments regarding funds supplied directly from AHIF-Oregon to AHIF for subsequent use in Chechnya.

65. In February 2006, AHIF-Oregon filed a lawsuit against OFAC and other agencies and officials alleging that an inadvertently disclosed classified document indicated that Mr. al-Buthe and AHIF-Oregon counsel had been improperly subjected to surveillance.

66. On November 14, 2007, OFAC notified AHIF-Oregon that it was considering redesignating AHIF-Oregon as an SDGT. OFAC provided AHIF-Oregon with the additional unclassified information that OFAC was considering in determining whether to its redesignate.[5] OFAC provided AHIF-Oregon until November 30, 2007, to submit to OFAC any additional

---

provided additional material to OFAC on August 31, 2004, and September 4, 2004, all of which OFAC considered and included in the Administrative Record.

[5] A redesignation is, in essence, a process whereby OFAC updates and supersedes its original designation on the basis of a revised administrative record. OFAC undertakes the redesignation process pursuant to the same standards as apply to any designation action under E.O. 13224. In the end, a redesignation provides more process for the

information for consideration. AHIF-Oregon requested, and was granted, an extension of this deadline to January 4, 2008. Additional documents being considered by OFAC were produced by OFAC to AHIF-Oregon counsel on November 30, 2007, and December 28, 2007. On January 4, 2008, AHIF-Oregon responded to OFAC's November 14 notice and provided additional arguments and documentation in response to the material produced by OFAC. As with all of its previous submissions, the January 4 submission by AHIF-Oregon has been incorporated into the Administrative Record.

67. As with the original designation record, OFAC considered classified, privileged, and unclassified information in reaching its decision to redesignate. The decision to redesignate AHIF-Oregon was based upon, *inter alia*, OFAC's desire to incorporate all of AHIF-Oregon's submissions into the Administrative Record; to update the record with information developed over the intervening period; and to remove certain documents from the record. I have not considered or relied upon the documents that have been removed from the record in reaching my determination to redesignate AHIF-Oregon as a SDGT.

68. With respect to all classified documents in the Administrative Record for the redesignation, OFAC requested the originating agency to review each document to determine whether it continued to be appropriately classified. To date, OFAC has not received final approval to release any documents as a result of declassification. In the event that any documents in the administrative record are determined to no longer be properly classified, OFAC will provide AHIF-Oregon with the declassified version of such documents. In light of

---

benefit of the designated party than they would receive were OFAC simply to amend the record administratively, as the regulations provide for. *See, e.g.,* 31 C.F.R. § 501.803.

the above, OFAC requested authorization to provide all classified documents in the
Administrative Record to the court in an *ex parte*, *in camera* manner, as provided by IEEPA.

69. OFAC received responses from relevant agencies for all materials. OFAC received
authorization to submit the overwhelming majority of the classified materials to the court *ex
parte* and *in camera*. OFAC did not obtain authorization to submit a number of classified
documents to the court. Additional information concerning these records is set forth in the
Classified Addendum to this Declaration that is being submitted separately. These records were
not considered or relied upon as a basis for redesignation and are not included in OFAC's
Administrative Record.

70. AHIF-Oregon alleges in its Complaint that, in the original designation process, OFAC
relied on a document that AHIF-Oregon claims relates to privileged communications between
Mr. al-Buthe and several AHIF-Oregon attorneys in Washington, D.C., that were allegedly
intercepted by the National Security Agency under a warrantless wiretapping program. *See*
Compl. ¶¶ 45, 51, 55-57. As mentioned above, this document has been the subject of separate
litigation brought by AHIF-Oregon against U.S. officials and agencies, including OFAC, in a
lawsuit that was commenced in this Court (Civ. No. 06-275-KI, D. Oregon) and is currently
pending in proceedings before the Northern District of California. *See Al-Haramain Islamic
Foundation et al. v. Bush et al.,* (Civ. No. 07-109, N.D. Cal.) and (MDL No. 06-1791, N.D.
Cal.). The Court of Appeals for the Ninth Circuit recently upheld the United States' assertion of
the state secrets privilege with respect to the contents of this document as well as with respect to
whether or not AHIF-Oregon was subject to alleged surveillance by the NSA. *See Al-Haramain
Islamic Foundation et al. v. Bush et al.,* 507 F.3d 1190, 1201-1204 (9th Cir. 2007). Consistent

24

with the Ninth Circuit's decision to protect the document from disclosure in litigation, and

without confirming or denying any allegations with respect to the information in the document,

OFAC has *not* considered the document as a basis for the redesignation of AHIF-Oregon, and

the document is not a part of the Administrative Record in this case.

71. I have reviewed the record, including materials submitted by AHIF-Oregon, and on

February 6, 2008, I signed an order redesignating AHIF-Oregon for being (1) owned or

controlled by SDGTs al-Aqil and al-Buthe, (2) acting for or on behalf of SDGTs al-Aqil and al-

Buthe, and (3) providing financial, material, and other support to SDGTs through its role as a

branch office and integral part of the worldwide organization AHIF.  Among the information

relating to AHIF-Oregon supporting the redesignation is the fact that two of the founding

directors of AHIF-Oregon were and remain Specially Designated Global Terrorists, namely Mr.

al-Buthe, who was the Treasurer, and Mr. al-Aqil, who was the founding President of both

AHIF-Oregon[6] and AHIF in Saudi Arabia.  A.R. Exhibit 39.  Documents provided confirm that

the AHIF headquarters in Saudi Arabia, and Mr. al-Aqil personally, oversaw and controlled the

activities of the AHIF branches.  In one press report, Mr. al-Aqil's leadership of the

organization was described as "absolute centralization."  A.R. Exhibits 104, 106.  Mr. al-Aqil

himself confirmed in a 2002 press interview that the AHIF headquarters in Saudi Arabia

maintained "tight control" over affiliates.  A.R. Exhibit 153.

72. Based on the totality of the classified and unclassified evidence in the Administrative

Record, and in order to insure that AHIF's efforts to support terrorism around the world do not

---

[6] As set forth in correspondence from AHIF-Oregon counsel on August 4, 2004, Mr. al-Aqil and another senior al Haramain official, Mansur al-Kadi, purportedly submitted formal resignations from the AHIF-Oregon board in 2003.  Nevertheless, classified and unclassified information indicates that Mr. al-Aqil retained effective control over

have a U.S. outlet, I determined that AHIF-Oregon met the criteria set forth in E.O. 13224 and,

as a result, OFAC redesignated AHIF-Oregon.

Post-Blocking Licensing Activity

73.  The blocking notice provided to AHIF-Oregon on February 19, 2004, explained that,

pursuant to E.O. 13224 and IEEPA, any transfer, withdrawal, export, payment or other dealing

in AHIF-Oregon's blocked assets was prohibited without OFAC's prior authorization.  The

notice also explained that OFAC would consider requests for licenses "to help ameliorate the

effects of the blocking of [AHIF-Oregon] funds" to allow for, among other activities, the

payment from blocked funds or accounts of outstanding financial obligations owed by the

organization, such as salary, rent, and utility payments, as well as for attorneys' fees and

expenses related to legal representation of AHIF-Oregon.

74.  The February 2004 blocking did not result in OFAC taking physical possession of any

funds, accounts, or business records.  In addition to the blocking notice described above, OFAC

also filed blocking notices with the County Clerk of Jackson County, OR (located in Medford,

OR) and the Recorder of Deeds of Greene County, MO (located in Springfield, MO) with

respect to properties owned by AHIF-Oregon.  *See* Exhibit C.

75.  OFAC has responded to several licensing requests related to sale and removal of

blocked property in this case.  At the time of the February 2004 blocking order and September

2004 designation, OFAC did not take physical control of any real or tangible property.

Pursuant to a license request from Gessler Hughes Socol Piers Resnick & Dym Ltd. ("the

---

the activities of all branches until his departure from AHIF in 2004, and according to some reports, even following

Hughes firm"), OFAC issued license SDGT-416 on February 7, 2005 to the Hughes firm and to

OFAC's contractor EG&G Technical Services, Inc. ("EG&G"), related to the disposition of

certain property on the blocked physical premises, as well as to the sale of such premises.

License SDGT-416 required that all proceeds from the sale of such property, other than

EG&G's fees, be deposited in a blocked account.  OFAC issued license SDGT-526 on

September 20, 2005, to enable AHIF-Oregon to appoint Thomas Nelson to its Board of

Directors for the purpose of carrying out transactions authorized by license SDGT-416.  OFAC

was informed that the house was eventually sold at auction in May 2006.

76.  Prior to the sale of the Ashland property, and following receipt of reports from various

sources that the Ashland property was unsecured, OFAC personnel traveled to Oregon in

October 2005 in order to meet with Mr. Nelson and members of the Seda family to segregate

personal property from that of AHIF-Oregon and survey the status of the property.  Personal

property was permitted to be removed from the house (most of which was then stored in a

trailer on the premises, secured by a lock provided by the Seda family), and the house was then

secured with a new lock.  OFAC changed the locks for the sole purpose of securing and

preserving the property.  OFAC has never received a licensing request seeking authorization to

use the Missouri property or its contents.

77.  In response to concerns raised by Mr. al-Buthe through Mr. Nelson, license SDGT-416

was amended on February 1, 2006 by license SDGT-416a to add certain provisions related to

the disposition of Islamic literature located on the premises.  Subsequent to the issuance of this

license, and as OFAC and Mr. Nelson continued to negotiate the status and disposition of the

---

his purported departure from the Saudi headquarters.

literature, EG&G removed numerous boxes of Islamic literature from the premises and placed them into storage.

78.  Although negotiations continued, following the initiation of a lawsuit on July 21, 2006, by Mr. Nelson against OFAC for failure to address the concerns raised with respect to the religious literature, amended license SDGT-416b was issued to authorize the transfer of such literature to Mr. Nelson.

79.  On August 2, 2006, OFAC issued license SDGT-603 to the Hughes firm authorizing payment for fees incurred in disposing of AHIF-Oregon property, provided that payments are received from unblocked funds originating outside of the United States.

80.  At this time, OFAC is not aware of any AHIF-Oregon tangible assets, records, or property in its possession.  Approximately $20,310 in blocked funds related to AHIF-Oregon has been reported to OFAC.

81.  OFAC has also granted numerous requests for licensing concerning the payment of attorneys' fees related to representation of AHIF-Oregon.[7]  On March 10, 2004, OFAC received the first such request from plaintiff's counsel Lynne Bernabei, who requested authorization to represent AHIF-Oregon with respect to the OFAC blocking and investigation, as well as in other litigation matters.  This request was supplemented on May 5, June 14, June 23, and July 8, and ultimately license SDGT-343 was granted on July 16, 2004.  OFAC denied, pursuant to then-applicable OFAC policy, AHIF-Oregon's request to use blocked funds to pay attorneys' fees and expenses incurred in the course of such representation.  License SDGT-343 did,

---

[7] OFAC has also received numerous licensing requests concerning payment for representation of former AHIF-Oregon Director al-Buthe.  Although related, these are separate matters, and as Mr. al-Buthe is not a plaintiff in the present action, those licenses are not discussed herein.

however, authorize the receipt of as yet unblocked funds originating outside of the United States as a means of receiving payment for such expenses.[8]

82.  OFAC issued license SDGT-343a on July 20, 2005, to extend the expiration date of license SDGT-343 through July 31, 2006.  License SDGT-343b was issued on April 14, 2006, to amend the name of the licensee's law name as well as to add a reporting requirement related to the source of funds used to pay for legal expenses.  License SDGT-343c was issued on July 31, 2006, to extend the license through July 31, 2007; license SDGT-343d was issued on August 14, 2007, to extend the license through August 31, 2008.

83.  On March 14, 2006, OFAC issued license SDGT-573 to attorney Thomas H. Nelson related to his representation of AHIF-Oregon in other litigation matters.  Pursuant to Mr. Nelson's requests, license SDGT-573 was amended on April 9, 2007, by license SDGT-573a to include representation of AHIF-Oregon concerning challenges to its designation, as well as additional litigation unrelated to the original request or the designation.

84.  At the time OFAC made its decision regarding plaintiff AHIF-Oregon's request to use blocked funds to pay attorneys' fees, it was OFAC policy not to permit the payment of attorneys' fees from blocked funds.  That policy has recently been amended to provide for the payment of attorneys' fees from blocked accounts in limited amounts under specific circumstances.

85.  On February 5, OFAC advised AHIF-Oregon counsel of this policy and requested the provision of several items to OFAC in order to assist with the licensing determination. Specifically, OFAC requested:

---

[8] OFAC has also issued licenses to Ransom Blackman LLP (License No. SDGT-478, Apr. 7, 2005) and Professor

- The hourly rate and number of hours billed per attorney for legal services directly related to the request for administrative reconsideration of the designation and the legal challenge thereto, divided by each phase of the case (i.e., administrative filings to OFAC and proceedings at the district court);
- An itemized statement and description of costs incurred in seeking administrative reconsideration or judicial review of AHIF-Oregon's designation;
- A certification, signed under penalty of perjury, that AHIF-Oregon has no assets, property, or economic resources of any type outside the United States, and does not have access to any AHIF funds worldwide; and
- A certification that to the best of your knowledge the blocked funds do not represent the property interest of another or serve as security for other obligations of AHIF-Oregon.

OFAC will act on the request for use of blocked funds upon receipt of the requested information.

U.S. Persons' Compliance

86. OFAC employs a number of methods to educate and inform the public about the sanctions programs that it administers. The OFAC website, which has over 15,000 e-mail subscribers, offers answers to questions frequently asked by the public about OFAC and its programs, as well as guidelines designed for different industries and explanations of specific sanctions. OFAC has a telephone hotline that provides specific guidance on in-process transactions. OFAC also offers sanctions workshops around the country that are aimed at encouraging companies to enhance their own sanctions compliance programs, including through the use of software to scan and interdict transactions involving sanctions targets.

87. If U.S. persons have questions about whether an intended activity, such as the provision of consultation services to a designated person, constitutes a sanctions violation, they have a number of ways of seeking advice from OFAC. They can call OFAC's compliance hotline and speak to an operations officer, send an e-mail to OFAC's e-hotline mailbox, call

---

David Cole (SDGT-588, May 17, 2006) for provision of legal services to AHIF-Oregon.

OFAC's licensing division to inquire whether a proposed transaction requires OFAC authorization, speak with an attorney in the Chief Counsel's Office (Foreign Assets Control), or submit a written request to OFAC for a written interpretation addressing whether the activity in which they wish to engage would constitute a violation.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  February 6, 2008.

ADAM J. SZUBIN
Director
Office of Foreign Assets Control
Department of the Treasury

A



**DEPARTMENT OF THE TREASURY**
WASHINGTON, D.C. 20220

FEB 19 2004

**BLOCKING NOTICE**

FAC No. SDG-221943

Al-Haramain Foundation
2151 E Division Street
Springfield, MO 65803-4520

Gentlemen:

The United States Government has reason to believe that Al-
Haramain Foundation ("AHF") may be engaged in activities that
violate the International Emergency Economic Powers Act, 50
U.S.C. §§ 1701-06 ("IEEPA"). You are hereby notified that
pursuant to the authorities granted by IEEPA, the U.S.
Department of the Treasury is blocking all funds and accounts
and real property in which AHF has any interest, pending further
investigation and resolution of this matter. All funds and
accounts of AHF include, but are not limited to bank, charge,
investment, and other financial accounts, and securities and
safe deposit boxes at any financial institution located in the
United States or organized under the laws of the United States,
including their overseas branches. Blocked property may not be
transferred, withdrawn, exported, paid, or otherwise dealt in
without prior authorization from the U.S. Department of the
Treasury's Office of Foreign Assets Control ("OFAC"). Any and
all transactions involving the sale and conveyance of title or
deed of blocked real property are prohibited unless licensed by
OFAC.

If AHF believes this blocking action is taken in error and
wishes to challenge it, a letter setting forth the views of AHF
should be sent to the attention of the undersigned at U.S.
Department of the Treasury, Office of Foreign Assets Control,
1500 Pennsylvania Avenue, N.W. (Annex), Washington, D.C. 20220.
In order to expedite OFAC's handling of any such challenge, the
letter may be sent via facsimile to (202)622-1657, with the
original to follow by mail.

Please be further advised that OFAC has licensing authority to
help ameliorate the effects of the blocking of AHF funds and
accounts. OFAC will consider requests for specific licenses to
allow for, among other activities, the payment from blocked
funds or accounts of outstanding financial obligations owed by
the organization, such as salary, rent, and utility payments, as
well as the payment of attorneys' fees and expenses related to

2

legal representation of the organization in this matter.  Should
AHF wish to seek a license to engage in any transaction
involving blocked property, please refer to the licensing
procedures set forth in §§ 501.801-802 of the Reporting and
Procedures Regulations, 31 C.F.R. Part 501.  Requests for
specific licenses must be made in writing to the address set
forth above.  License applications and related correspondence
may be sent via facsimile to (202)622-1657, with the original
document to follow by mail.

**You should be aware that willful violations of IEEPA and of
licenses and orders issued thereunder, including this Blocking
Notice, are punishable by criminal penalties ranging up to 10
years in prison and/or fines up to $500,000 for corporations and
up to $250,000 for individuals.  See 50 U.S.C. § 1705, 18 U.S.C.
§ 3571.  Civil penalties of up to $11,000 per count may also be
imposed by OFAC.**

If you have any questions concerning this notification and
requirement for information, please contact OFAC's Chief of
Enforcement at (202) 622-2430.

Sincerely,

R. Richard Newcomb
Director
Office of Foreign Assets Control





DEPARTMENT OF THE TREASURY
WASHINGTON, D.C. 20220

**SEP  8 2004**

FAC No. SDG - 232587

## OFFICE OF FOREIGN ASSETS CONTROL

### SPECIAL DESIGNATION AND BLOCKING MEMORANDUM

The Office of Foreign Assets Control, pursuant to Executive Order 13224 of September 23, 2001, as amended ("Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten To Commit, or Support Terrorism"), section 203 of the International Emergency Economic Powers Act, as amended (50 U.S.C. 1701 et seq.), section 5 of the United Nations Participation Act of 1945, as amended (22 U.S.C. 287c), and section 201 of the Global Terrorism Sanctions Regulations (31 C.F.R. 594.201) determines, in consultation with the Secretary of State, the Secretary of Homeland Security, and the Attorney General, that there is reason to believe that  the entities named below and in the attached evidentiary memorandum FAC No. SDG-232587 meet the criteria for designation set forth in section(s) 1(c) and/or (d) of Executive Order 13224 and therefore are designated as persons whose property and interests in property are blocked pursuant to Executive Order 13224, as amended.

AL-HARAMAIN FOUNDATION United States locations:

1257 Siskiyou Boulevard, Ashland, OR 97520, U.S.A.

3800 Highway 99 S, Ashland, OR 97520-8718, U.S.A.

2151 E Division Street, Springfield, MO 65803, U.S.A.

Accordingly, except to the extent otherwise provided by law or unless licensed or otherwise authorized by the Office of Foreign Assets Control, (1) all real, personal, and any other property and interests in property of the entity and individual named above, including but not limited to all accounts, that are or hereafter come within the United States, or that are or hereafter come within the possession or control of any U.S. person, are blocked and may not be transferred, paid, exported, withdrawn, or otherwise dealt in, and (2) any transaction or dealing by a U.S. person or within the United States in property or interests in property of the entity and individual named above is prohibited, including but not limited to the making or receiving of any contribution of funds, goods, or services to or for the benefit of those persons listed in the Annex to Executive Order 13224, as amended, or determined to be subject to that order.  Except as otherwise authorized, any transaction by a U.S. person or within the United States that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in Executive Order 13224, as amended, or the regulations, is prohibited, and any

2

conspiracy formed for the purpose of engaging in a transaction prohibited by the order or the regulations is prohibited.

_9 / 8 / 04_ / Date

R. Richard Newcomb
Director
Office of Foreign Assets Control

2





**DEPARTMENT OF THE TREASURY**
WASHINGTON, D.C. 20220

FEB 19 2004

**Blocking Notice**

FAC No.SDG-221825

Kathy Beckett
County Clerk
Jackson County Courthouse, Room 216
10 South Oakdale
Medford, OR 97501

Dear Ms. Beckett:

The Jackson County Recorder of Deeds is hereby notified that the real estate property located at **3800 Highway 99 S, Ashland, Oregon, (Parcel Number: 0010102931); (Legal Information: D/S/T/R/M: 01E39S24, 12/30/1997); (Property is recorded in the State of Oregon, Jackson County Public Records in document 000000049085)** owned by Al-Haramain Islamic Foundation, with a mailing address of 1257 Siskiyou Blvd., Ashland, OR 97520, is blocked pending investigation by the order of the United States Treasury Department, effective February 18, 2004, pursuant to § 203 of the International Emergency Economic Powers Act, as amended, 50 U.S.C. §§ 1701-06 (``IEEPA'').

Any and all transactions concerning this blocked property, to include the sale and conveyance of title or deed, are prohibited unless specifically licensed by the Office of Foreign Assets Control (``OFAC''). Such unlicensed transactions would be deemed a violation of IEEPA and may be punishable by criminal penalties up to 10 years in prison and/or fines up to $500,000 for corporations and up to $250,000 for individuals. Civil penalties of up to $11,000 per count may be imposed by OFAC.

Questions concerning this notice should be directed to OFAC's Chief of Enforcement at (202) 622-2430.

Sincerely,

R. Richard Newcomb
Director
Office of Foreign Assets Control



DEPARTMENT OF THE TREASURY
WASHINGTON, D.C. 20220

FEB 9 2004

**Blocking Notice**

FAC No.SDG-221828

Linda Montgomery
Greene County Recorder of Deeds
940 Boonville
Springfield, MO 65802

Dear Ms. Montgomery:

The Greene County Recorder of Deeds is hereby notified that the real estate property located at **2151 Division St. Springfield, MO (Parcel ID: 1208307038) (Legal Description: 3A S 5A E 10A SE ¼ SW ¼ (EX W¦200 FT S 435.6 FT) 8/29/21)**, owned by Haramain Al Islamic Foundation, with a mailing address of 1257 Siskiyou Blvd., Ashland, OR 97520, is blocked pending investigation by the order of the United States Treasury Department, effective February 18, 2004, pursuant to § 203 of the International Emergency Economic Powers Act, as amended, 50 U.S.C. §§ 1701-06 (``IEEPA'').

Any and all transactions concerning this blocked property, to include the sale and conveyance of title or deed, are prohibited unless specifically licensed by the Office of Foreign Assets Control (``OFAC''). Such unlicensed transactions would be deemed a violation of IEEPA and may be punishable by criminal penalties up to 10 years in prison and/or fines up to $500,000 for corporations and up to $250,000 for individuals. Civil penalties of up to $11,000 per count may be imposed by OFAC.

Questions concerning this notice should be directed to OFAC's Chief of Enforcement at (202) 622-2430.

Sincerely,

R. Richard Newcomb
Director
Office of Foreign Assets Control

**D**



**DEPARTMENT OF THE TREASURY**
WASHINGTON, D.C. 20220

Case No. SDG-305
FAC No. SDG-222819

MAY 1 8 2004

Lynne Bernabei, Esq.
Bernabei & Katz
1773 T Street, N.W.
Washington, D.C. 20009-7139

Dear Ms. Bernabei:

This responds to your letter of March 10, 2004, on behalf of the Al
Haramain Islamic Foundation, Inc. ("AHIF"), seeking authorization
to debit a blocked account for the payment of legal fees and
expenses: 1) to your firm for legal services rendered to AHIF,
including, as referenced in your letter, legal services in
connection with the multidistrict consolidated action located in
the Southern District of New York, and related cases; and 2) to any
attorney retained by AHIF in connection with several United States
Government investigations and the Treasury Department's
determination to block the assets of AHIF pending investigation as
a Specially Designated Global Terrorist pursuant to the Global
Terrorism Sanctions Regulations, 31 CFR Part 594 (the
"Regulations"). In addition, you seek authorization for the sale
of properties of AHIF, with the proceeds used for the purposes
stated above.

Section 594.506(a) of the Regulations generally authorizes the
provision of certain legal services to persons whose property or
property interests have been blocked pursuant to the Regulations.
Such legal services could therefore be provided pro bono. However,
a specific license is required to receive payment of fees or
reimbursement of expenses for providing such legal services,
whether such fees and expenses are to be paid from blocked funds or
otherwise. It is a basic tenet of OFAC sanctions policy that
blocked funds are not licensed for release except under limited and
compelling circumstances consistent with national security, foreign
policy, and economic interests of the United States.

Accordingly, OFAC has determined that it will consider a request on
behalf of your firm for payment of attorney fees from blocked
property solely with regard to legal representation involving the
blocking action taken by OFAC on February 19, 2004. However, since
your request regarding a license for this representation is not
fully formed, we will require additional information.
Specifically, a license application seeking to debit a blocked
account for such legal representation must include an invoice for

incurred fees and expenses, describing the invoiced services and identifying the attorney and staff working on the matter, redacted if necessary only to protect attorney-client privilege; the bank name, branch address, and account number to be debited; and authorization for the debit from the account party.

With respect to all other generally licensed legal services, OFAC will not issue a license for payment from blocked funds. However, the blocked entity may apply for a license to pay for generally licensed legal services using funds or assets not in the United States or within the possession or control of a U.S. person, or for the establishment of a legal defense fund.

With regard to your request to sell property of AHIF, this Office will consider an application for the sale of property only on the condition that the proceeds of any sale are placed in a blocked account in a U.S. financial institution in the United States. An application for such a license must include a detailed description of the property to be sold, the method of sale, and the institution name, branch address and account number of the account into which the blocked sales proceeds will be deposited. Any further requests regarding disposition of such property would be considered independently.

In response to your request of May 3, 2004, OFAC is granting AHIF an extension until May 28, 2004 to respond to OFAC's notice of intent to designate AHIF as a Specially Designated Global Terrorist. As a result, any material that AHIF may wish to submit to OFAC in response to this letter or the April 23 letter must be received by May 28 so that the agency has an opportunity to evaluate that information prior to making the designation determination.

The response to this notice should be directed to R. Richard Newcomb, Director, Office of Foreign Assets Control, U.S. Department of the Treasury, 1500 Pennsylvania Avenue, N.W., Annex, Washington, D.C. 20220. A copy of your response also should be provided to Ms. Cari Stinebower in Chief Counsel's Office (Foreign Assets Control). If you have any questions, please contact Cari Stinebower at (202) 622-2410.

Sincerely,

R. Richard Newcomb
Director
Office of Foreign Assets Control

**E**



**DEPARTMENT OF THE TREASURY**
WASHINGTON, D.C. 20220

FAC No. SDG-392566

## OFFICE OF FOREIGN ASSETS CONTROL

### SUPERSEDING REDESIGNATION AND BLOCKING MEMORANDUM

Executive Order 13224 of September 23, 2001 ("Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism") (the "Order"), and the Global Terrorism Sanctions Regulations, 31 C.F.R. Part 594 (the "Regulations"), authorize the designation as Specially Designated Global Terrorists ("SDGT") of persons determined: (a) to be owned or controlled by, or to act for or on behalf of those persons listed in the Annex to the Order or those persons determined to be subject to subsection 1(b), 1(c), or 1(d)(i) of the Order; or (b) to assist in, sponsor, or provide financial, material, or technological support for, or financial or other services to or in support of, specified acts of terrorism or those persons listed in the Annex to the Order or determined to be subject to the Order; or (c) to be otherwise associated with those persons listed in the Annex to the Order or those persons determined to be subject to subsection 1(b), 1(c), or 1 (d)(i) of the Order.

I hereby determine, pursuant to the Order, section 203 of the International Emergency Economic Powers Act (50 U.S.C. §§ 1701-1706), section 5 of the United Nations Participation Act of 1945, as amended (22 U.S.C. § 287c), and the Regulations, that there is reason to believe that the individual and entity identified below and in the attached redesignation evidentiary memorandum, FAC No. SDG-392566, continue to meet one or more criteria for designation set forth in the Order:

ENTITY
**AL-HARAMAIN ISLAMIC FOUNDATION**
United States locations:

1257 Siskiyou Blvd.
Ashland, OR  97520

3800 Highway 99 S, Ashland, OR  97520-8718

2151 E Division St.
Springfield, MO  65803

INDIVIDUAL
**Soliman AL-BUTHE**
a.k.a. **Soliman AL-BATAHAI** a.k.a. **Soliman AL-BATHI**
DOB: 12/8/1961
POB: Egypt
Nationality: Saudi Arabia
Saudi Arabia Passport #: B049614
Saudi Arabia Passport #: C536660

Accordingly, except to the extent otherwise provided by law or unless licensed or otherwise authorized by the Office of Foreign Assets Control, (1) all real, personal, and any other property and interests in property of the individual and entity named above that are in the United States, that hereafter come within the United States, or that are or hereafter come within the possession or control of U.S. persons, including their overseas branches, remain blocked and may not be transferred, paid, exported, withdrawn or otherwise dealt in, and (2) any transaction or dealing by a U.S. person or within the United States in property or interests in property of the individual or entity named above is prohibited.

Additionally, the following are prohibited: (1) any transaction for the purpose of, or which has the effect of, evading or avoiding, or which facilitates the evasion or avoidance of, any of the prohibitions contained in the Order or the Regulations; (2) any attempt to violate the prohibitions of the Order or the Regulations; and (3) any conspiracy formed for the purpose of engaging in a transaction prohibited by the Order or the Regulations.

February 6, 2008
Date

Adam J. Szubin
Director
Office of Foreign Assets Control

2