# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (GBD) (FM)<br>ECF Case |

This document relates to:

*Federal Insurance Co., et al. v. al Qaida, et al.,* Case No. 03-CV-06978
*Ashton et al. v. al Qaeda Islamic Army, et al.*, Case No. 02-CV-06977

### *FEDERAL INSURANCE* AND *ASHTON* PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR ENTRY OF JUDGMENT BY DEFAULT AS TO LIABILITY AGAINST DEFENDANT, THE ISLAMIC REPUBLIC OF IRAN

Stephen A. Cozen, Esquire
Elliott R. Feldman, Esquire
Sean P. Carter, Esquire
J. Scott Tarbutton, Esquire
**COZEN O'CONNOR**
1650 Market Street
Philadelphia, PA 19103
Tel: (215) 665-2000
*Attorneys for Federal Insurance Plaintiffs*

James P. Kreindler, Esquire
Andrew J. Maloney, III, Esquire
**KREINDLER & KREINDLER, LLP**
750 Third Avenue, 32nd Floor
New York, New York 10017
Tel: (212) 687-8181
*Attorneys for Ashton Plaintiffs*

July 9, 2015

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ...................................................................................................1

II.     FACTUAL BACKGROUND.................................................................................2

    A.  United States' Recognition of Iran as a State Sponsor of Terrorism...................4

    B.  Iran's Training and Support of al Qaeda Operatives .........................................5

    C.  Iran's Support for the September 11, 2001 Attacks...........................................7

III.    JURISDICTIONAL BASIS FOR RELIEF UNDER THE FSIA .........................10

    A.  This Court Has Subject Matter Jurisdiction over Iran Pursuant to the FSIA....10

    B.  This Court's Prior Holding that It Has Subject Matter Jurisdiction Pursuant to 28
        U.S.C. § 1605A is Controlling.........................................................................10

    C.  This Court has Personal Jurisdiction over Iran ................................................13

IV.     STANDARDS FOR FSIA DEFAULT JUDGMENTS AND 1605A LIABILITY...............15

    A.  Legal Standard for FSIA Default Judgment ....................................................15

    B.  Plaintiffs State a Cause of Action Under the Terrorism Exception of the FSIA ...............17

    C.  Material Support ............................................................................................19

        1.  Definition of "Material Support or Resources" ........................................ 19

        2.  Causation................................................................................................. 20

V.      EVIDENCE OF IRAN'S DIRECT AND MATERIAL SUPPORT OF AL QAEDA
        FOR THE SEPTEMBER 11, 2001 ATTACKS ..................................................21

    A.  Iran's Material Support of Al Qaeda Caused the September 11, 2001 Attacks ...............21

VI.     CONCLUSION...................................................................................................22

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bakhtiar v. Islamic Republic of Iran*,
   2012 U.S. App. LEXIS 3117 (D.D.C. Feb. 17, 2012) ...........................................................10

*Blais v. Islamic Republic of Iran*,
   459 F. Supp. 2d 40 (D.D.C. 2006) .......................................................................................20

*Certain Underwriter's at Lloyd's London v. Great Socialist People's Libyan Arab Jamahiriya*,
   811 F. Supp. 2d 53 (D.D.C. 2011) ......................................................................12, 14, 18, 19

*Comm. Bank of Kuwait v. Rafidain Bank*,
   15 F.3d 238 (2d Cir. 1994)....................................................................................................15

*Fain v. Islamic Republic of Iran*,
   856 F. Supp. 2d 109 (D.D.C. 2012) ......................................................................................17

*Federal Insurance Co. v. Kingdom of Saudi Arabia*,
   741 F.3d 353 (2d Cir. 2013)..................................................................................................11

*Flatow v. Islamic Republic of Iran*,
   999 F. Supp. 1 (D.D.C. 1998) ..........................................................................................20, 21

*Frontera Resources Azerbaijan Corp. v. State Oil Company of the Azerbaijan Republic*,
   582 F.3d 393 (2d Cir. 2009)..................................................................................................13

*Gates v. Syrian Arab Republic*,
   580 F. Supp. 2d 53 (D.D.C. 2008) ........................................................................................19

*Haim v. Islamic Republic of Iran*,
   784 F. Supp. 2d 1 (D.D.C. 2011) ..........................................................................................16

*Harrison v. Republic of Sudan*,
   882 F. Supp. 2d 23 (D.D.C. 2012) ........................................................................................16

*Hegna v. Islamic Republic of Iran*,
   2011 U.S. Dist. LEXIS 24394 (S.D.N.Y. Mar. 11, 2011) .....................................................10

*Heiser v. Islamic Republic of Iran*,
   466 F. Supp. 2d 229 (D.D.C. 2006) ....................................................................................6, 17

*Int'l Road Fed'n v. Embassy of the Democratic Republic of the Congo*,
    131 F. Supp. 2d 248 (D.D.C. 2001) ....................................................................16

*In re Islamic Republic of Iran Terrorism Litig.*,
    659 F. Supp. 2d 31 (D.D.C. 2009) ....................................................13, 14, 19, 21

*Leibovitch v. Syrian Arab Republic*,
    2014 U.S. Dist. LEXIS 82487 (N.D. Ill. Mar. 31, 2014) .......................................17

*Murphy v. Islamic Republic of Iran*,
    740 F. Supp. 2d 51, 59 (D.D.C. 2010) ................................................................17

*Owens v. Republic of Sudan*,
    826 F. Supp. 2d 128 (D.D.C. 2011) .........................................................5, 7, 18, 19

*Peterson v. Islamic Republic of Iran*,
    264 F. Supp. 2d 46 (D.D.C. 2003) .....................................................................17

*Reed v. Islamic Republic of Iran*,
    2012 U.S. Dist. LEXIS 24866 (D.D.C. Feb. 28, 2012) ...............................14, 15, 21

*Rimkus v. Islamic Republic of Iran*,
    575 F. Supp. 2d 181 (D.D.C. 2008) ....................................................................15

*Rimkus v. Islamic Republic of Iran*,
    750 F. Supp. 2d 163 (D.D.C. 2010) .................................................................16, 17

*Roeder v. Islamic Republic of Iran*,
    333 F.3d 228 (D.C. Cir. 2003) ...........................................................................15

*Rux v. Republic of Sudan*,
    495 F. Supp. 2d 541 (E.D. Va. 2007) .................................................................20

*Samantar v. Yousef*,
    130 S.Ct. 2278 (2010) ......................................................................................10

*Shapiro v. Republic of Bolivia*,
    930 F.2d 1013 (2d Cir. 1991) .........................................................................13, 14

*Smith v. Islamic Emirate of Afghanistan*,
    262 F. Supp. 2d 217 (S.D.N.Y. 2003) ................................................................15

*Ungar v. Islamic Republic of Iran*,
    211 F. Supp. 2d 91 (D.D.C. 2002) .....................................................................15

*United States v. Quintieri*,
    306 F.3d 1217 (2d Cir. 2002) ...........................................................................11

*Valore v. Islamic Republic of Iran,*
   478 F. Supp. 2d 101 (D.D.C. 2007) ..............................................................15

*Weinstein v. Islamic Republic of Iran,*
   175 F. Supp. 2d 13 (D.D.C. 2001) ...............................................................16

*Weinstein v. Islamic Republic of Iran,*
   184 F. Supp. 2d 13 (D.D.C. 2002) ...............................................................15

*Wultz v. Islamic Republic of Iran,*
   864 F. Supp. 2d 24 (D.D.C. 2012) ...............................................................16

**Statutes**

18 U.S.C. § 2339A ............................................................................. passim

28 U.S.C. § 1083(c)(3) ..............................................................................13

28 U.S.C. § 1605(a)(5) ...................................................................10, 11, 13

28 U.S.C. § 1605(a)(7) .......................................................................10, 14

28 U.S.C. § 1605A ............................................................................. passim

28 U.S.C. § 1608 ..............................................................2, 13, 14, 15

**Other Authorities**

Federal Rule of Civil Procedure 50(a) ......................................................15

Restatement (Second) of Torts....................................................................21

The *Federal Insurance* Plaintiffs, by and through their counsel, Cozen O'Connor, and the *Ashton* Plaintiffs, by and through their counsel, Kreindler & Kreindler, LLP, respectfully submit this Memorandum of Law in Support of Their Joint Motion for Entry of Judgment by Default as to Liability Against Defendant, the Islamic Republic of Iran ("Iran"), pursuant to 28 U.S.C. § 1605A.

## I.    INTRODUCTION

This action arises out of the events of September 11, 2001, during which members of the al Qaeda[1] terrorist network hijacked four commercial airliners and used those planes as weapons in coordinated terrorist attacks on the United States ("the September 11th attacks"). Plaintiffs in the *Ashton* and *Federal Insurance* cases (collectively "Plaintiffs") include representatives for 856 wrongful death victims and approximately 1700 personal injury victims of the September 11th attacks (the "*Ashton* Plaintiffs"), as well as members of the insurance industry who, in accordance with their obligations under applicable policies of insurance, paid several billion dollars to their insureds in compensation for property or other forms of economic damage resulting from the September 11th attacks (the "*Federal Insurance* Plaintiffs"). The *Federal Insurance* Plaintiffs' suit also seeks recovery for several hundred wrongful death and personal injury claims, which were assigned to those plaintiffs pursuant to applicable worker's compensation laws.

Plaintiffs brought claims against, *inter alia*, the Islamic Republic of Iran (hereinafter, "Iran"), based on its direct sponsorship of al Qaeda for nearly a decade leading up to September 11, 2001, which included support that directly assisted and enabled al Qaeda to carry out the September 11th attacks. Throughout the time that Iran sponsored al Qaeda, Iran knew and intended that al Qaeda would use support provided by Iran to carry out terrorist attacks against

---

[1] Arabic words and names are spelled differently in various sources. Plaintiffs have strived for consistency as much as possible, but original spellings are maintained in quoted sources.

the United States and its allies, a goal al Qaeda announced publicly on numerous occasions prior to September 11, 2001.

As a result of Iran's failure to participate in the proceedings, this Court issued a Certificate of Default against Iran in the *Ashton* case on December 22, 2011, as authorized by 28 U.S.C. § 1608(e).  Iran also failed to appear in the *Federal Insurance* action after being properly served, and a request for a Certificate of Default as to Iran in the *Federal Insurance* action is pending before the Clerk of Court.  Plaintiffs now respectfully request entry of judgment by default against Iran on the issue of liability, solely as to Plaintiffs' substantive causes of action established under the Foreign Sovereign Immunities Act's ("FSIA") State Sponsor of Terrorism Exception, codified at 28 U.S.C. §§ 1605A(c) and 1605A(d).[2]  Significantly, this Court already has entered judgment against Iran for identical claims, in a related matter consolidated in this same MDL, based on a full evidentiary record and hearing pursuant to the FSIA.  The extension of that ruling to the *Ashton* and *Federal Insurance* matters is both appropriate and consistent with the specific objectives that prompted the Judicial Panel for Multidistrict Litigation to centralize these proceedings before this Court.

## II.    FACTUAL BACKGROUND

Plaintiffs seek entry of default judgment against Iran as to liability, based on Iran's provision of material support to al Qaeda and direct support for, and sponsorship of, the September 11th attacks.  Iran provided material support and resources to al Qaeda and bin Laden both directly and through its surrogate, Hezbollah.  The support provided by Iran assisted in, and contributed to, the preparation and execution of the plans that culminated in the September 11th

---

[2] As discussed in detail below, the issues presented by this application for default judgment against Iran as to Plaintiffs' claims under the State Sponsor of Terrorism exception have already been addressed by this Court in a related proceeding in this MDL.  Because an application for default judgment as to Plaintiffs' other causes of action would potentially raise issues not previously addressed by the Court, Plaintiffs are not seeking judgment on those other claims through the present motion, but reserve their right to do so in the future, if necessary.

attacks.  Without Iran's active and enthusiastic support, al Qaeda could never have carried out those attacks.

The government of Iran has a long history of providing material support and resources to terrorist organizations targeting the United States and its citizens, including al Qaeda.  In 2011, this Court entered Findings of Fact and Conclusions of Law in the *Havlish* case, part of the *In re Terrorist Attacks on September 11, 2001* MDL, specifically outlining Iran's longstanding role in the development of the al Qaeda network, and direct support for the September 11th attacks themselves.[3]  This Court's findings of fact in the *Havlish* proceeding are supported by an array of government reports, including the Final Report of the National Commission on Terrorist Attacks Upon the United States (the "9/11 Commission").  Among other relevant findings as to Iran, the 9/11 Commission concluded that Iran forged a cooperation agreement with al Qaeda in the early 1990's, pursuant to which Iran provided a range of training and assistance to al Qaeda for nearly a decade leading up to the September 11th attacks; and that Iran facilitated the travel of senior al Qaeda figures and several of the future 9/11 hijackers into Afghanistan, thereby directly assisting al Qaeda in the planning and execution of the September 11th attacks.  *See* 9/11 Final Report at pp. 60-61, 240-241.

Although the 9/11 Commission's findings as to the nature and scope of Iran's sponsorship of al Qaeda are themselves sufficient to support entry of judgment by default in these proceedings, those findings were further corroborated by affidavits of terrorism experts Dietrich L. Snell, Dr. Daniel L. Byman, Janice L. Kephart, Dr. Patrick Clawson, Claire M. Lopez, Dr. Bruce D. Tefft, Dr. Ronen Bergman, and Kenneth Timmerman, submitted of record in the *Havlish* default proceedings.  Citing both the government reports of record and the corroborating affidavits, this Court recognized Iran's critical role in enabling and facilitating al

---

[3] *See Havlish v. Bin Laden,* Docket No. 03-CV-9848-GBD, ECF No. 294 (S.D.N.Y. Dec. 22, 2011).  The Court's Findings of Fact and Conclusions of Law in the *Havlish* case are attached hereto as Exhibit A, and hereinafter referred to as "*Havlish* Findings, Exh. A."

Qaeda's terrorist activities, concluding, for example, that "there is clear and convincing evidence pointing to the involvement on the part of Hezbollah and Iran in the 9/11 attack, especially as it pertains to travel facilitation and safe haven." *See Havlish* Findings, Exh. A at p. 35 ¶ 213 (citing Ex. 5, Snell Affid. ¶ 23). "Iran's facilitation of the hijackers' terrorist travel operation constituted material support – indeed direct support – for al Qaeda 9/11 attacks," *Havlish* Findings, Exh. A at p. 39 ¶ 234 (citing Ex.4, Kephart Affid. ¶ 66), and that evidence of record "leaves no doubt that al Qaeda and the official Iranian Regime at the highest levels have been acting in concert to plot and execute attacks against the United States since early 1990s." *Havlish* Findings, Exh. A at p. 41 ¶ 247 (citing Ex. 6, Lopez-Tefft Affid. ¶ 352).

    A.    <u>United States' Recognition of Iran as a State Sponsor of Terrorism</u>

    The United States Government has recognized and condemned Iran's support of terrorist attacks for over 30 years. Since January 19, 1984, Iran has been designated by the United States Secretary of State as a State Sponsor of Terrorism on the basis that it "repeatedly provided support for acts of international terrorism."[4] As a designated State Sponsor of Terrorism, Iran is subject to restrictions on exports and imports, prohibitions on economic assistance and financial and other restrictions. On March 16, 1995, in response to Iranian support of international terrorism, President Clinton issued Executive Order 12957, which prohibited United States involvement with petroleum development in Iran. On May 6, 1995, President Clinton strengthened these sanctions by signing Executive Order 12959, pursuant to the International Emergency Economic Powers Act. President Clinton imposed additional restrictions on Iran pursuant to Executive Order 13059 on August 19, 1997. This Order reflected the Executive Branch's intent to prohibit virtually all trade and investment activities with Iran by United States persons.

---

[4] U.S. Department of State, *State Sponsors of Terrorism*, www.state.gov/j/ct/list/c14151.htm, accessed 8/1/2014.

B.       Iran's Training and Support of al Qaeda Operatives

This Court's prior findings of fact affirm that Iran "has engaged in, and supported, terrorism as an instrument of foreign policy, virtually from the inception of its existence after the Iranian Revolution in 1979."  Ex. A at p. 6 ¶ 1.  Beginning in the mid-to-late 1980s, Iran began formulating contingency plans for anti-United States terrorist operations.  *Id.* at p. 15 ¶ 70.  As this Court already has found:

> In the early 1990s, casting aside the historic bitterness between the Sunni and Shi'a sects of Islam, Sudanese religious-political leader Hassan al Turabi and Iran's political leadership and intelligence agencies established close ties, including paramilitary and intelligence connections, beginning a united Sunni-Shiite front against the United States and the West. . . .
>
> While Osama bin Laden and al Qaeda were headquartered in Sudan in the early 1990s, Hassan al Turabi fostered the creation of a foundation and alliance for combined Sunni and Shi'a opposition to the United States and the West, an effort that was agreed to and joined by Osama bin Laden and Ayman al Zawahiri, leaders of al Qaeda, and by the leadership of Iran. . . .

*Havlish* Findings, Exh. A at p. 16 ¶¶ 72-73.  Though Iran and Hezbollah are largely Shite and al Qaeda is Sunni, according to the 9/11 Final Report, "[t]he relationship between al Qaeda and Iran demonstrated that Sunni-Shia divisions did not necessarily pose an insurmountable barrier to cooperation in terrorist operations."  *Id.* at p. 15 ¶ 69 (citing 9/11 Report p. 61).

In 1991, bin Laden relocated his terrorist operation from Afghanistan and Pakistan to Sudan.  According to the testimony of terrorism expert Dr. Matthew Levitt in a separate proceeding, the Iranian government played a "very active" role in Sudan when bin Laden operated from Khartoum.  *See Owens v. Republic of Sudan,* 826 F. Supp. 2d 128, 136 (D.D.C. 2011).  In 1991 or 1992, al Qaeda and Iranian operatives met in Sudan and "reached an informal agreement to cooperate in providing support for actions carried out primarily against Israel and the United States."  *Havlish* Findings, Exh. A at p. 16 ¶ 77 (citing 9/11 Report p. 61).  After

5

these meetings, senior al Qaeda operatives traveled to Iran to receive explosives training. *Id.* ¶ 78 (citing 9/11 Report p. 61). In 1993, bin Laden and Ayman al Zawahiri met in Sudan to develop an "alliance of joint cooperation and support on terrorism" with Iran's master terrorist Imad Mughniyah and Iranian officials. *Havlish* Findings, Exh. A. at pp. 16-17, ¶¶ 79-80.

> The 1993 meeting in Khartoum led to an ongoing series of communications, training arrangements, and operations among Iran, Hezbollah and al Qaeda. Osama bin Laden sent more terrorist operatives, including Saef al Adel (who would become number 3 in al Qaeda and its top 'military' commander), to Hezbollah training camps operated by Mughniyah and the IRGC [Islamic Revolutionary Guard Corps] in Lebanon and Iran. Among other tactics, Hezbollah taught bin Laden's al Qaeda operatives how to bomb large buildings, and Hezbollah also gave the al Qaeda operatives training in intelligence and security.

*Id.* at p. 17 ¶ 83. The al Qaeda-Iran-Hezbollah terrorist training continued throughout the 1990s. "At all times, Iran's Supreme Leader [Ayatollah Ali Hoseini Khamenei] was fully aware that Hezbollah was training such foreign terrorists." *Id.* at p. 18 ¶ 88.

In the years that followed, this terrorist alliance orchestrated and claimed responsibility for various terrorist attacks against the United States and its allies. *See, e.g., id.* at pp. 18-22, ¶¶ 90-115. Consistent with the evidence also endorsed by this Court, the United States District Court for the District of Columbia held that Iran was factually and legally responsible for the June 25, 1996 bombing of the Khobar Towers housing complex in Dhahran, Saudi Arabia. *See Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229 (D.D.C. 2006). Al Qaeda was involved in the planning of and preparation for the bombing. *See Havlish* Findings, Exh. A at p. 20 ¶ 104. Shortly thereafter, in August 1996, an Iranian intelligence operative involved in the Khobar Towers attack met with bin Laden in Jalalabad, Afghanistan to continue developing their joint terrorism campaign against the United States. *Id.* at pp. 20-21 ¶ 106 .

> At this time, Iranian and Hezbollah trainers traveled between Iran and Afghanistan, transferring to al Qaeda operatives such material as blueprints and drawings of bombs, manuals for wireless

6

> equipment, and instruction booklets for avoiding detection by
> unmanned aircraft.

*Id.* at p. 21 ¶ 107 (citing Ex. 7, Bergman Affid. ¶ 68).

The United States District Court for the District of Columbia also recognized Iran's involvement in and responsibility for al Qaeda's August 7, 1998 bombings of the United States embassies in Kenya and Tanzania. *See Owens,* 826 F. Supp. 2d at 135. That court relied on testimony of Dr. Matthew Levitt to support its conclusion regarding Iran's direct assistance to al Qaeda operatives and its provision of explosives training to Bin Laden and al Qaeda, recognizing that the "government of Iran was aware of and authorized this training and assistance." *Id.* at 139. The *Owens* Court further found that "Iran regarded al Qaeda as a useful tool to destabilize U.S. interests. . . . [T]he government of Iran aided, abetted, and conspired with Hezbollah, Osama Bin Laden and al Qaeda to launch large-scale bombing attacks against the United States by utilizing the sophisticated delivery mechanism of powerful suicide truck bombs." *Id.* at 135. Moreover, the court in *Owens* recognized that "Hezbollah's assistance to al Qaeda would not have been possible without the authorization of the Iranian government." *Id.* at 138.

This Court's findings of fact further recognize that, in or around October 2000, a United States Defense Intelligence Agency analyst was in the process of identifying connections among al Qaeda, Iranian intelligence agencies controlled by Iran's Supreme Leader, Hezbollah, and other terrorist groups. *Havlish* Findings, *Ex.* A at p. 22 ¶ 114. On October 12, 2000, al Qaeda suicide bombers attacked the *U.S.S. Cole* in Yemen. According to the 9/11 Report, "Iran made a concerted effort to strengthen relations with al Qaeda after the October 2000 attack on the *USS Cole.*" *Id.* at ¶ 115 (citing 9/11 Report, p. 240).

     C.     <u>Iran's Support for the September 11, 2001 Attacks</u>

In the *Havlish* proceeding, this Court held that "Iran furnished material and direct support for the 9/11 terrorists' specific terrorist travel operation" and the facilitation of al Qaeda's operatives' travel to training camps in Afghanistan was "essential for the success of the 9/11 operation." *Havlish* Findings, Exh. A at p. 22 ¶¶ 116, 118-119. This finding is consistent with the statement in the 9/11 Report that "[f]or terrorists, success is often dependent on travel . . . For terrorists, travel documents are as important as weapons." *Id.* at ¶ 117 (citing 9/11 Report, p. 384).

This Court's findings of fact confirm two separate, but related, ways in which Iran directly facilitated and supported al Qaeda relative to the September 11, 2001 attacks:

> The first way in which the Iranian government materially and directly supported the 9/11 terrorist travel operation was by ordering its border inspectors not to place telltale stamps in the passports of these future hijackers traveling to and from Afghanistan via Iran. Several of the 9/11 hijackers transited Iran on their way to or from Afghanistan, taking advantage of the Iranian practice of not stamping Saudi passports. Thus, Iran facilitated the transit of al Qaeda members into and out of Afghanistan before 9/11. Some of these were future 9/11 hijackers.
> *   *   *
>
> Iran's willingness to permit the undocumented admission and passage of al Qaeda operatives and 9/11 hijackers provided key material support to al Qaeda. By not stamping the hijackers' passports, by providing safe passage through Iran and into Afghanistan, and by permitting Hezbollah to receive the traveling group . . . Iran, in essence, acted as a state sponsor of terrorist travel.

*Id.* at pp. 22, 24, ¶¶ 122, 132. This Court's findings on this point are corroborated by National Security Administration intercepts made available to the 9/11 Commission shortly before the publication of the 9/11 Report. *See id.* at p. 123. Moreover, "[n]umerous admissions from lower level al Qaeda members who were interrogated at the detention facility at Guantanamo Bay

confirm the existence of the clandestine Iran-Afghanistan passageway." *Id.* at p. 23 ¶ 128 (citing

Ex. 2, Timmerman 2nd Affid. ¶¶ 115-19).

> The second way in which Iran furnished material and direct
> support for the 9/11 attacks was that a terrorist agent of Iran and
> Hezbollah helped coordinate travel by future Saudi hijackers.  As
> found by the 9/11 Commission, "[i]n October 2000, a senior
> operative of Hezbollah [Imad Mughniyah] visited Saudi Arabia to
> coordinate activities there.  He also planned to assist individuals in
> Saudi Arabia in traveling to Iran during November. . . ."
>
> *   *   *
>
> The "activities" that Mughniyah went to Saudi Arabia to
> "coordinate" revolved around the hijackers' travel, their obtaining
> new Saudi passports, and/or U.S. visas for the 9/11 operation, the
> hijackers' security, and the operation's security.

*Havlish* Findings, Exh. A at pp. 24-25, ¶¶ 134, 140.  This Court found that those activities also

"constituted direct and material support for the 9/11 conspiracy."  *Id.* at p. 25 ¶ 144.

Additionally, Iran's provision of material support to al Qaeda continued after the

September 11, 2001 attacks, "most significantly by providing safe haven to al Qaeda leaders and

operatives, keeping them safe from retaliation from U.S. forces, which invaded Afghanistan."

*Id*. at p. 33 ¶ 198.  Indeed, the Department of State's *Patterns of Global Terrorism* report for

calendar year 2002, released in April 2003 by the Secretary of State and Coordinator for

Counterterrorism, recognized that "al-Qaida members have found virtual safehaven there [in

Iran] and may even be receiving protection from elements of the Iranian Government."[5]

In sum, it is by now well established that Iran provided al Qaeda with critical training

and support, from the earliest stages of al Qaeda's formation through September 11, 2001, and

even thereafter.  Iran's assistance provided al Qaeda with the expertise necessary to carry out

large scale international terrorist attacks, and directly enabled al Qaeda to plan and carry out the

September 11th attacks.  As this Court already has held, Iran's provision of material support and

---

[5] *See* http://www.state.gov/documents/organization/20117.pdf, at p. 77.

resources was instrumental in ultimately causing the deaths of thousands of United States nationals and billions of dollars in property damage, and subjects Iran to liability for those injuries.

## III.     JURISDICTIONAL BASIS FOR RELIEF UNDER THE FSIA

### A.     This Court Has Subject Matter Jurisdiction over Iran Pursuant to the FSIA

The FSIA provides the "sole basis for obtaining jurisdiction over a foreign state in the courts of this country." *Samantar v. Yousef*, 130 S.Ct. 2278, 2286 (2010) (citing *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989)).  Under the architecture of the FSIA, foreign states are presumed to be immune from suit in the courts of the United States unless one of the FSIA's enumerated exceptions to immunity apples.  *See* 28 U.S.C. §§ 1605-1605A; *Samantar*, 130 S.Ct. at 2277-78.  As discussed below, this Court already has held that subject matter jurisdiction exists for claims against Iran for injuries resulting from the September 11th attacks under two separate, independent provisions of the FSIA: the State Sponsor of Terrorism exception (28 U.S.C. § 1605A) and the noncommercial tort exception (28 U.S.C. § 1605(a)(5)).  *Havlish* Findings, Exh. A at p. 46 ¶ 4.  Those rulings control in relation to the present application, although this motion focuses solely on the jurisdictional grant and substantive remedies provided under § 1605A.[6]

### B.     This Court's Prior Holding that It Has Subject Matter Jurisdiction Pursuant to 28 U.S.C. § 1605A is Controlling

In its findings of fact and conclusions of law issued in the *Havlish* case, this Court held that it had subject matter jurisdiction for claims against Iran for injuries resulting from the

---

[6] Plaintiffs initially filed this action in 2003 under the terrorism exception of §1605(a)(7).  In 2008, Congress amended the FSIA and replaced §1605(a)(7) with the more expansive §1605A.  *See* National Defense Authorization Act for Fiscal Year 2008, Pub. L. No. 110-181, § 1083, 122 Stat. 3, 338-341.  Section 1083 allowed plaintiffs to convert actions under § 1605(a)(7) into actions under § 1605A.  *See Hegna v. Islamic Republic of Iran*, No. 11 MC. 5 (JSR), 2011 U.S. Dist. LEXIS 24394, at *7 (S.D.N.Y. Mar. 11, 2011); *Bakhtiar v. Islamic Republic of Iran*, No. 10-7030, 2012 U.S. App. LEXIS 3117, at *3 (D.D.C. Feb. 17, 2012).  Contemporaneous with the filing of the present motion for entry of default judgment, Plaintiffs have filed a motion to amend and convert their claims under § 1605(a)(7) to § 1605A claims.

September 11th attacks pursuant to both §§ 1605A and 1605(a)(5) of the FSIA, explaining as follows:

> Subject matter jurisdiction exists if the defendant's conduct falls within one of the specific statutory exceptions to immunity. *See* 28 U.S.C. § § 1330(a) and 1604. *Owens v. Republic of Sudan*, 2011 WL 5966900 (D.D.C. Nov. 28, 2011). Here, this Court has jurisdiction because service was proper and defendants' conduct falls within both the "state sponsor of terrorism" exception set forth in 28 U.S.C. § 1605A and the "noncommercial tort" exception of § 1605(a)(5).

*See Havlish* Findings, Ex. A at p. 46 ¶ 4.

Through the present motion, Plaintiffs seek entry of default judgments as to liability solely in relation to their substantive causes of action arising under § 1605A, and thus only the exception to immunity provided under that section is implicated by the instant proceedings.[7] With respect to that issue, this Court's prior holding that § 1605A provides a proper basis for subject matter jurisdiction for claims against Iran for injuries resulting from the September 11th attacks is controlling, and the issue need not, and indeed should not, be re-litigated in the context of the present default judgment proceedings. *Federal Insurance Co. v. Kingdom of Saudi Arabia,* 741 F.3d 353, 358 (2d Cir. 2013) (explaining that the present "September 11 cases were centralized in part to 'prevent inconsistent pretrial rulings'"); *see also United States v. Quintieri*, 306 F.3d 1217, 1225 (2d Cir. 2002) (internal quotations omitted) ("when a court has ruled on an issue that decision should generally be adhered to by that court in subsequent stages in the same case.").

As in the *Havlish* case, the *Ashton* and *Federal Insurance* actions both assert claims against Iran for wrongful deaths and personal injuries resulting from the September 11th attacks, based on Iran's extensive sponsorship of al Qaeda during the decade leading up to the attacks,

---

[7] As indicated previously, Plaintiffs reserve their right to pursue judgments against Iran on their additional common law and statutory theories of liability, and to invoke jurisdiction pursuant to § 1605(a)(5) in that context.

and direct support for critical aspects of the 9/11 operation itself.  The evidentiary and factual record supporting the present claims is identical to the record this Court considered in issuing judgment against Iran in the *Havlish* proceeding.  Given the complete identity of the present claims to those present in *Havlish*, there can be no dispute that this Court's ruling that § 1605A provided a proper basis for jurisdiction for the claims against Iran in the *Havlish* also controls as to the wrongful death and personal injury claims asserted in the *Ashton* and *Federal Insurance* cases.

Pursuant to the plain text of § 1605A(d), it is likewise clear that this Court's endorsement of 1605A as a proper basis for jurisdiction for claims against Iran in these proceedings applies with equal force to the property and economic loss claims asserted in the *Federal Insurance* action.  Specifically, that provision expressly provides that: "After an action has been brought [for personal injury or death] under subsection (c), actions may also be brought for reasonably foreseeable property loss, whether insured or uninsured, third party liability, and loss claims under life and property insurance policies, by reason of the same acts on which the action under subsection (c) is based."  Consistent with the plain language of this section, the Court's prior endorsement of § 1605A as a valid basis for jurisdiction for the personal death and injury claims asserted in *Havlish* necessarily applies to the related claims asserted in the *Federal Insurance* case pursuant to § 1605A(d), for property damage and economic losses resulting from the September 11th attacks.  *See Certain Underwriter's at Lloyd's London v. Great Socialist People's Libyan Arab Jamahiriya,* 811 F. Supp. 2d 53, 71-74 (D.D.C. 2011) (finding that 1605A(d) provided clear basis for jurisdiction and liability for insurers' claims against Syria for property damages to Egypt Air aircraft destroyed in 1984 terrorist attack, where court had found jurisdiction and liability for death and injury claims brought under 1605A(c) for same incident).

For all the foregoing reasons, this Court's prior ruling concerning the applicability of Section 1605(A) to claims against Iran for injuries resulting from the September 11th attacks applies with full force to the claims asserted against Iran in the *Ashton* and *Federal Insurance* matters.

> C.   This Court has Personal Jurisdiction over Iran

"Under the FSIA, . . . personal jurisdiction equals subject matter jurisdiction plus valid service of process." *Shapiro v. Republic of Bolivia,* 930 F.2d 1013, 1020 (2d Cir. 1991).[8] Service under the FSIA is governed by 28 U.S.C. § 1608(a)(4), which provides, in relevant part, that Plaintiffs send two copies of the summons and complaint and notice of suit, together with a translation in the official language of the foreign state, to the Secretary of State in the District of Columbia, who will transmit one copy of the papers through diplomatic channels to the foreign state and send the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted.  Plaintiffs met all of those requirements in this case.

The *Federal Insurance* Plaintiffs initiated their suit against Iran, and others, on September 10, 2003, through the filing of a Summons and Complaint.  The *Federal Insurance* Plaintiffs thereafter filed a First Amended Complaint on March 10, 2004, which was served on Iran through diplomatic channels by the United States Department of State on December 7, 2004. Proof of service was transmitted to the Southern District of New York Chief Deputy Clerk Joseph LaMura by the U.S. Department of State on January 13, 2005, and was filed by Plaintiffs on September 8, 2005.  True and correct copies of the Return of Service and supporting U.S. Department of State documents are attached hereto as Exhibit B.  Iran did not answer or respond to the Amended Complaint, nor did it enter an appearance in the litigation.[9]  On September 8,

---

[8] The Second Circuit has ruled that foreign states are not persons within the meaning of the Due Process Clause. *Frontera Resources Azerbaijan Corp. v. State Oil Company of the Azerbaijan Republic*, 582 F.3d 393, 399-401 (2d Cir. 2009).  Thus, the personal jurisdiction analysis as to Iran does not include a due process component.

[9] Service of the Amended Complaint converting Plaintiffs' 1605(a)(5) claims to 1605A claims is not required, consistent with the procedures for related actions under § 1083(c)(3).  *See In re Islamic Republic of Iran Terrorism*

2005, the *Federal Insurance* Plaintiffs' filed an Affidavit of Service as to Iran.  *See id.*  A request for a Certificate of Default as to Iran in the *Federal Insurance* action is pending before the Clerk of Court.

The *Ashton* suit was commenced on September 4, 2002, by the filing of a Complaint.  *See* 02-CV-6977 Docket No. 1.  A Consolidated Master Complaint was filed on March 6, 2003.  *See* 02-CV-6977 Docket No. 11.  Service of the Consolidated Master Complaint was effectuated on Iran through diplomatic channels by the United States Department of State on April 30, 2003. True and correct copies of the Return of Service and supporting U.S. Department of State documents are attached as Exhibit C.  Those supporting documents show that proof of such service on the Iranian Defendants was transmitted to J. Michael McMahon, Clerk of the United States District Court for the District of New York, by the U.S. Department of State on July 7, 2003.

Iran failed to answer or otherwise respond to timely respond to the *Ashton* Consolidated Master Complaint, and on December 22, 2011, the *Ashton* Plaintiffs requested a Clerk's Certificate of Default, which was issued the same day by the Clerk of the Court and is attached as Exhibit D.

Because service upon Iran was proper, and § 1605A of the FSIA provides subject matter jurisdiction for Plaintiffs claims against Iran, this Court may exercise personal jurisdiction over Iran.  *Shapiro,* 930 F.2d at 1020; *see also Reed v. Islamic Republic of Iran,* No. 03-2657 (RMU), 2012 U.S. Dist. LEXIS 24866, at *7 (D.D.C. Feb. 28, 2012).

---

*Litig.,* 659 F. Supp. 2d 31, 105 (D.D.C. 2009) (finding service of amended complaint not required under § 1608 where "the defendant foreign state has failed to appear, and is therefore in default, and where the amendment does not add any claims but instead clarifies existing claims") (internal citations omitted).  The court explained that though claims asserted under § 1605A are "new claims" insofar as they arise under substantive federal law, they are not "new claims" in regard to the applicable pleading requirements because the foreign state has already been provided with notice of the suit, as required under § 1608.  *Id.* at 105.  *See also Great Socialist People's Libyan Arab Jamahiriya,* 811 F. Supp. 2d 53 (explaining that no new service of process is required for claim that has been converted from § 1605(a)(7) to § 1605A).

**IV.**     **STANDARDS FOR FSIA DEFAULT JUDGMENTS AND 1605A LIABILITY**

    A.     <u>Legal Standard for FSIA Default Judgment</u>

    Under the FSIA, "[n]o judgment by default shall be entered by a court of the United

States or of a state against a foreign state . . . unless the claimant established his claim or right to

relief by evidence satisfactory to the court."  28 U.S.C. § 1608(e); *see also Reed*, 2012 U.S. Dist.

LEXIS 24866, at \*14 (considering evidence presented by plaintiffs after satisfaction of

jurisdictional requirements); *Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 232 (D.C. Cir.

2003) ("The court still has an obligation to satisfy itself that plaintiffs have established a right to

relief.").  To prevail in a FSIA default proceeding, a plaintiff must present a "legally sufficient

evidentiary basis for a reasonable jury to find for plaintiff."  *Ungar v. Islamic Republic of Iran*,

211 F. Supp. 2d 91, 98 (D.D.C. 2002).  This standard is the same standard used for granting

judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(a).  *See, e.g., Smith*

*v. Islamic Emirate of Afghanistan*, 262 F. Supp. 2d 217, 223 (S.D.N.Y. 2003) (adopting standard

used in *Ungar* and finding Iraq liable for September 11, 2001 terrorist acts).

    Courts within the Second Circuit have noted that the proper standard for establishing

liability under the FSIA should be "less than normally required," *id.* at 223, and that a plaintiff

need merely demonstrate a *prima facie* case to obtain a judgment of liability in a FSIA case.  *See*

*Ungar*, 211 F. Supp. 2d at 98.  A plaintiff meets its burden of proof by affidavit or similar

evidence, *Weinstein v. Islamic Republic of Iran*, 184 F. Supp. 2d 13, 19 (D.D.C. 2002), and a

court considering entry of default judgment may "accept plaintiffs' uncontroverted evidence as

true." *Rimkus v. Islamic Republic of Iran*, 575 F. Supp. 2d 181, 193 (D.D.C. 2008); *Valore v.*

*Islamic Republic of Iran*, 478 F. Supp. 2d 101, 106 (D.D.C. 2007).

    Section 1608(e) does not require a new evidentiary hearing to establish liability when a

foreign sovereign is in default.  *See Comm. Bank of Kuwait v. Rafidain Bank*, 15 F.3d 238, 242

(2d Cir. 1994) (finding evidence in form of affidavits and exhibits sufficient to satisfy §1608(e));

15

*Int'l Road Fed'n v. Embassy of the Democratic Republic of the Congo*, 131 F. Supp. 2d 248, 262 (D.D.C. 2001) (accepting as true plaintiffs' uncontroverted factual allegations supported by documentary and affidavit evidence without evidentiary hearing). Instead, a plaintiff seeking a default judgment under the FSIA may meet its burden by entering into evidence certified transcripts of relevant testimony presented in a previous proceeding. *See Weinstein v. Islamic Republic of Iran*, 175 F. Supp. 2d 13, 22 (D.D.C. 2001) (adopting findings by relying on affidavit testimony and certified transcript from another proceeding are sufficient to establish Iran's provision of material support and resources to al Qaeda). In lieu of filing affidavits from witnesses that testified in a previous case, plaintiffs may submit certified copies of the witnesses' transcript from the previous case to establish particular facts. *See Weinstein*, 175 F. Supp. 2d at 22; *see also Harrison v. Republic of Sudan*, 882 F. Supp. 2d 23, 31 (D.D.C. 2012) ("when a court has found facts relevant to a FSIA case involving material support to terrorist groups, courts in subsequent, related cases may 'rely upon the evidence presented in earlier litigation . . . without necessitating the formality of having that evidence reproduced.'" (citing *Taylor v. Islamic Republic of Iran*, 811 F. Supp. 2d 1, 6-7 (D.D.C. 2011)); *see also Haim v. Islamic Republic of Iran*, 784 F. Supp. 2d 1, 10 (D.D.C. 2011) (taking judicial notice of sworn testimony and documentary evidence presented in prior proceedings which arose out of 1995 Gaza strip bombing at issue in *Haim* litigation).

Additionally, taking into account the "multiplicity of FSIA-related litigation," *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 172 (D.D.C. 2010), courts acknowledge that "a FSIA court may take judicial notice of related proceedings and records in cases before the same court." *Wultz v. Islamic Republic of Iran,* 864 F. Supp. 2d 24, 29 (D.D.C. 2012).

Although the taking of judicial notice of findings of fact does not itself establish the truth of such facts under the Federal Rules of Evidence, "'the FSIA does not require this Court to re-

litigate issues that have already been settled' in previous decisions. . . . Instead, the Court may review evidence considered in an opinion that is judicially noticed, without necessitating the re-presentment of such evidence." *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 59 (D.D.C. 2010) (taking judicial notice of findings of fact and conclusions of law made in *Peterson v. Islamic Republic of Iran*, 264 F. Supp. 2d 46 (D.D.C. 2003), which also arose out of 1983 Beirut bombing); *Fain v. Islamic Republic of Iran*, 856 F. Supp. 2d 109 (D.D.C. 2012) (same); *Heiser*, 466 F. Supp. 2d at 263 (taking judicial notice of facts findings made in case brought against same defendants for damages arising from same 1996 attack on Khobar Towers); *see also Leibovitch v. Syrian Arab Republic,* No. 08 C 01939, 2014 U.S. Dist. LEXIS 82487 (N.D. Ill. Mar. 31, 2014) (taking judicial notice  of findings of fact in related proceedings arising out of terrorist attack where defendants failed to appear or otherwise plead).

> [T]he statutory obligation found in § 1608(e) was not designed to impose the onerous burden of re-litigating key facts in related cases arising out of the same terrorist attack. . . . Rather, the requirement was intended to ensure that the courts give proper deference to the political branches' predominant role in foreign affairs by pausing to ensure the validity of their actions before undertaking the substantial step of piercing sovereign immunity and entering judgment against a foreign state. Mindful of these interests, courts in FSIA litigation have adopted a middle-ground approach that permits courts in subsequent related cases to rely upon the evidence presented in earlier litigation—without necessitating the formality of having that evidence reproduced—to reach their own, independent findings of fact in the cases before them.

*Rimkus*, 750 F. Supp. 2d at 172.

As set forth below, this Court's prior findings of fact, and the affidavits and documentary evidence already of record, provide a detailed record of Iran's involvement with and sponsorship of al Qaeda and the September 11, 2001 attacks, and are more than sufficient to support entry of default judgments against Iran as to liability in the *Ashton* and *Federal Insurance* actions, pursuant to the substantial liability standards governing their §§ 1605A(c) and 1605A(d) claims.

B.   <u>Plaintiffs State a Cause of Action Under the Terrorism Exception of the FSIA</u>

17

In addition to establishing a basis for subject matter jurisdiction for Plaintiffs' claims against Iran, §1605A also provides a substantive cause of action imposing liability against Iran for Plaintiffs' injuries.  Pursuant to § 1605A(c), a country designated as a State Sponsor of Terrorism shall be liable to a national of the United States for personal injury or death caused by that country's provision of material support or resources.  *See* § 1605A(a)(1); (c).  As the District Court for the District of Columbia explained in 2011:

> A straightforward reading of § 1605A(c) is that it creates a federal cause of action for four categories of individuals: a national of the United States, a member of the U.S. armed forces, a U.S. Government employee or contractor, or a legal representative of such a person . . . The cause of action is further described as "for personal injury or death caused by acts described in subsection (a)(1) of that foreign state, or of an official employee or agent of that foreign state, for which the courts of the United States may maintained jurisdiction under this section for money damages."

*See Owens,* 826 F. Supp. 2d at 153 ("liability under section 1605A(c) will exist whenever the jurisdictional requirements of section 1605A are met") (citing *Calderon-Cardona v. Democratic People's Republic of Korea*, 723 F. Supp. 2d 441, 460 (D.P.R. 2010)).

Section 1605A(c) authorizes the recovery of economic damages, solatium, pain and suffering and punitive damages.  In addition, where, as here, a private right of action has been brought pursuant to subsection (c), actions may also be "brought for reasonably foreseeable property loss, whether insured or uninsured, third party liability, and loss claims under life and property insurance policies, by reason of the same acts on which the action under subsection (c) is based."  *See* § 1605A(d).  Section 1605A(d) permits victims to "pursu[e] claims for collateral property damage sustained in terrorist attacks directed against U.S. Citizens.  [This provision] creat[es] an explicit cause of action for these kinds of property owners, or their insurers, against state sponsors of terrorism."  *Great Socialist People's Libyan Arab Jamahiriya,* 811 F. Supp. 2d

18

at 71 (citing 154 Cong. Rec. S 54,55 (Jan. 22, 2008)).  Because "standing under §1605A(c)" "it is unnecessary for a party filing suit under §1605A(d) to establish standing separately." *Id.*  Thus, Plaintiffs here clearly meet the basic standards for bringing claims under §§1605A(c) and 1605A(d).

    C.    <u>Material Support</u>

        1.    Definition of "Material Support or Resources"

The basis of Iran's liability is its provision of material support and resources to al Qaeda which caused the September 11, 2001 attacks and resulted in the death and injuries of thousands of United States citizens and significant property damage.  *See, e.g., In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d at 59 (explaining Iran's material support to Hamas in the form of funding, safe haven, training and weapons was responsible for suicide attacks).  In order to demonstrate that Plaintiffs have a cause of action under §1605A, Plaintiffs must satisfy the elements of § 1605A(a)(1).  *See Owens*, 826 F. Supp. 2d at 153.

In FSIA cases involving terrorist attacks caused by a foreign state's provision of material support or resources, a court must "determine whether a defendant country has provided material support to terrorism . . . consider[ing] first, whether a particular terrorist group committed the terrorist act[10] and second, whether the defendant foreign state generally provided material support or resources to the terrorist organization which contributed to its ability to carry out the terrorist act."  *Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53, 67 (D.D.C. 2008).

Section 1605A(h) adopts the definition of "material support or resources" set forth in 18 U.S.C. § 2339A:

> [T]he term "material support or resources" means any property,
> tangible or intangible, or service, including currency or monetary
> instruments or financial securities, financial services, lodging,

---

[10] Obviously, al Qaeda's responsibility for committing the September 11th attacks is undisputed, and a matter plainly subject to judicial notice.

> training, expert advice or assistance, safehouses, false
> documentation or identification, communications equipment,
> facilities, weapons, lethal substances, explosives, personnel (1 or
> more individuals who may be or include oneself), and
> transportation, except medicine or religious materials[.]

18 U.S.C. § 2339A(b)(1).

The record evidence concerning Iran's support of al Qaeda easily satisfies this definition of "material support."  Indeed, this Court already has entered a conclusion of law recognizing that Iran "provided material support and resources to al Qaeda for acts of terrorism" including the September 11, 2001 attacks.  *Havlish* Findings of Fact, Exh. A at p. 50 ¶ 17.  This conclusion clearly is correct, as the definition of material support prohibits the provision of any form of property or service to a terrorist organization, making specific reference to "expert advice or assistance" and "transportation" services, both of which are forms of support Iran provided to al Qaeda.  And, the definition plainly recognizes the critical benefits terrorists obtain through any support that assists them in traveling, by expressly including "safehaven," "lodging," "false documentation or identification" and "transportation" as forms of prohibited support.   18 U.S.C. § 2339A(b)(1); *see also Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40, 55 (D.D.C. 2006) (recognizing provision of training and travel documents to facilitate acts constitutes material support); *Rux v. Republic of Sudan*, 495 F. Supp. 2d 541, 549-54 (E.D. Va. 2007) (safehaven); *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 18 (D.D.C. 1998) (superseded by enactment of §1605A) ("routine provision of financial assistance to a terrorist group in support of its terrorist activities constitutes 'providing material support or resources' for a terrorist act within the meaning of the [terrorism exception of the FSIA]").

2.      Causation

The applicable standard of causation is liberally construed in § 1605A material-support cases— namely, in such cases, Plaintiffs do not need to demonstrate any direct nexus between

20

the material support and the eventual terrorist act.[11]  It has been established that a "plaintiff need

not establish that the material support or resources provided by a foreign state for a terrorist act

contributed directly to the act for which his claim arises in order to satisfy [the terrorism

exception of the FSIA]."  *Flatow*, 999 F. Supp. at 18; *see also, e.g., In re Islamic Republic of

Iran Terrorism Litig.*, 659 F. Supp. 2d at 44 (holding that there is no but-for causation

requirement).  Once again, this Court already has determined that the record evidence concerning

the material support Iran provided to al Qaeda is more than efficient to satisfy the modest

causation requirement of 1605A(c).  Indeed, this Court concluded that Iran's assistance

"constituted direct support and material support for al Qaeda's 9/11 attacks.  Exh. "A" at p. 24 ¶

133 (citing 9/11 Final Report).

## V.  EVIDENCE OF IRAN'S DIRECT AND MATERIAL SUPPORT OF AL QAEDA FOR THE SEPTEMBER 11, 2001 ATTACKS

### A.  Iran's Material Support of Al Qaeda Caused the September 11, 2001 Attacks

This Court already has analyzed the evidentiary record submitted in the *Havlish*

proceeding, and issued findings of fact and law on the basis of that evidence.  Although

additional materials could be offered to augment that record, the Court's holdings in *Havlish*

render any such supplementation unnecessary.  Under the circumstances, the submission of

additional or repetitive evidence would merely impose an unnecessary burden on the resources

of the Court.  To avoid that result, Plaintiffs respectfully request that the Court enter default

judgment against Iran as to liability on the basis of the evidence the Court previously received

and analyzed, and which already forms part of the record in this MDL proceeding.  As to the

content and import of that evidence, Plaintiffs respectfully refer the Court to its own findings of

---

[11] Courts addressing liability under the FSIA generally are guided by the principles of the Restatement (Second) of Torts.  *Reed*, 2012 U.S. Dist. LEXIS 24866, at *15-*16 (granting motion for default judgment pursuant to §1605A).

fact and law, which comprehensively review the Court's findings upon review of that evidence, attached hereto as Exhibit A.

## VI.    CONCLUSION

For over a decade prior to the September 11, 2001 attacks, Iran conspired with al Qaeda and other terrorist organizations in an effort to wage a *jihad* against the West.  By providing material support and resources to al Qaeda, Iran facilitated the September 11, 2001 attacks on the United States, and caused catastrophic loss of life and property.

Plaintiffs respectfully request that the Court grant Plaintiffs' motion for entry of judgment by default as to liability against Defendant Iran, as to their claims under §1605A(c) and §1605A(d) of the FSIA.[12]

> Respectfully submitted,
>
> COZEN O'CONNOR
>
> BY:  /s/ _____
>      Stephen A. Cozen, Esquire
>      Elliott R. Feldman, Esquire
>      Sean P. Carter, Esquire
>      J. Scott Tarbutton, Esquire
>      1650 Market Street
>      Philadelphia, PA 19103
>      Tel: (215) 665-2000
>
> *Attorneys for Federal Insurance Plaintiffs*
>
> KREINDLER & KREINDLER, LLP
>
> BY:  /s/ _____
>      James P. Kreindler, Esquire
>      Andrew J. Maloney, III, Esquire
>      750 Third Avenue, 32nd Floor
>      New York, New York 10017
>      Tel: (212) 687-8181
>
> *Attorneys for Ashton Plaintiffs*

---

[12] A proposed form of Order is attached as Exhibit E.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true copy of Plaintiffs' Memorandum of Law in Support of Their Motion for Entry of Judgment by Default as to Liability Against Defendant, the Islamic Republic of Iran, was filed electronically this 9th day of July 2015.  Notice of this filing will be served upon all parties in 03 MDL 1570 by operation of the Southern District of New York's Electronic Case Filing ("ECF") system, which all parties may access.


      /s/ _____
      J. Scott Tarbutton, Esq.


LEGAL\19507367\1

23