## MDL 1570 PLAINTIFFS' EXECUTIVE COMMITTEES
In re: Terrorist Attacks on September 11, 2001 (S.D.N.Y)

| Plaintiffs' Executive Committee for Personal Injury and Death Claims | Plaintiffs' Executive Committee for Commercial Claims |
|---|---|
| Ronald L. Motley, *Co-Chair*<br>MOTLEY RICE LLC<br>James P. Kreindler, *Co-Chair*<br>KREINDLER & KREINDLER LLP | Elliot R. Feldman, *Co-Chair*<br>Sean Carter, *Co-Chair*<br>COZEN O'CONNOR |
| Andrew J. Maloney III, *Co-Liaison Counsel*<br>KREINDLER & KREINDLER LLP<br>Paul J. Hanly, Jr., *Co-Liaison Counsel*<br>HANLY CONROY BIERSTEIN SHERIDAN FISHER & HAYES LLP | J. Scott Tarbutton, *Liaison Counsel*<br>COZEN O'CONNOR |

VIA ECF

July 14, 2015

The Honorable Frank Maas
United States District Court
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street, Room 740
New York, NY 10007

Re: *In Re: Terrorist Attacks on September 11, 2001,* 03 MDL 1570 (GBD) (FM)

Dear Judge Maas:

The Plaintiffs' Executive Committees, on behalf of all plaintiffs, submit this letter and accompanying exhibits in support of their request that the Court enter an order pursuant to Federal Rule of Civil Procedure 37(a), compelling defendant Dubai Islamic Bank ("DIB") to produce documents and information responsive to plaintiffs' document requests. Generally speaking, the documents at issue relate to: (1) DIB accounts held by members of al Qaeda (including those directly linked to the 9/11 plot), financiers of the terror group, and al Qaeda charity fronts; and (2) Taliban accounts at DIB.[1] Plaintiffs also request that this Court compel DIB to provide substantive responses to plaintiffs' supplemental requests for production, served on July 31, 2012. DIB's refusal to produce these relevant materials is unsupportable on both factual and legal grounds, and represents an improper attempt to avoid its discovery obligations. Accordingly, Plaintiffs request that this Court order DIB to search for and produce all such responsive documents.

---

[1] Plaintiffs' proposal concerning a schedule for motions to compel, and the Court's Order endorsing same (ECF No. 2963), contemplates the filing of multiple motions as to any one defendant. Pursuant to that Order, plaintiffs are filing two separate motions today in support of their request for an order compelling defendant Dubai Islamic Bank to produce relevant categories of documents. This motion will be referred to as "Plaintiffs' Letter Brief #1."

The Honorable Frank Maas
July 14, 2015
Page 2

---

I.  **DIB HAS LONG PROVIDED CRITICAL MONEY LAUNDERING AND OTHER FINANCIAL SUPPORT TO AL QAEDA AND ITS AFFILIATES**

Described as the "black hole" of terrorism financing, the United Arab Emirates ("UAE"), has for many years been "vulnerable to abuse by terrorist financiers and facilitation networks." *See* New York Times, *Cash Flow to Terrorists Evades U.S. Efforts*, December 5, 2010 (reporting on U.S. State Department diplomatic cables originating from Secretary of State Clinton's office). "UAE-based donors" have taken advantage of the lack of banking industry safeguards to "provide[] financial support to a variety of terrorist groups, including al-Qa'ida, the Taliban, LeT and other terrorist groups, including Hamas." *Id.* Al Qaeda itself used the UAE's banking and financial system, and DIB in particular, as an entry point into the global financial system, for purposes of funding the September 11th attacks: "It is now apparent that institutions in the United Arab Emirates, the region's most developed and lightly regulated financial centre, played a key role in moving resources to those who planned and carried out the September 11 attacks." *See* NATO Parliamentary Assembly, *The Economic Consequences of September 11, 2001 and the Economic Dimension of Anti-Terrorism*, attached as Ex. A.

From its very establishment in 1975, DIB has been controlled by individuals who openly facilitate and advance a radical Islamic agenda. DIB's Fatwa and Sharia Supervisory Board in particular, has been populated by Islamic clerics notorious for promoting radical Islamic agendas, sanctioning jihad, and offering justification for martyrdom operations.[2] For instance, DIB Sharia Board member Dr. Ajeel Jassem al Nashmi issued a fatwa endorsing the legality of suicide attacks. *See* Ex. B. In another fatwa, Nashmi argues in support of jihad and states that it is permissible to pay *zakat* funds to those Islamic groups that wish to "restore Islamic life, erase Kufr regimes, and replace them with the Sharia'a of Allah." *See* Ex. C. DIB Sharia Board member Dr. Ali Muhssein al Din Qaradaghi has also issued several fatwas justifying jihad, stating that "[j]ihad today is a personal duty imposed on anyone who can carry it out, with his soul, money and body ... with all the means of jihad." *See* Ex. D. This mindset filled the halls of DIB, providing justification for the support provided to Osama bin Laden, al Qaeda, and the charity fronts and other entities operating within the al Qaeda network.

DIB's collaboration with bin Laden in the cause of violent jihad dates to the Afghan jihad. During that time, DIB maintained and serviced a jihad account for Abdallah Azzam, spiritual mentor to Osama bin Laden, co-founder of al Qaeda, and co-leader (with bin Laden) of the mujahideen during the "holy war" against the Soviet occupation of Afghanistan of the 1980s. In his book, "Ayyat al Rahman fee Jihad al-Afghan," ("God's Signs in the Afghan Jihad"),

---

[2] Sheikh Yusuf al Qaradawi, an Egyptian Islamic scholar well known for his radical religious teachings and commentary in support of acts of terrorism, was one of the first DIB Sharia advisors. Qaradawi issued a fatwa in 2003 asserting that Muslims killed fighting United States forces are martyrs: "Those killed fighting the American forces are martyrs given their good intentions since they consider these invading troops an enemy within their territories but without their will." *See* Nur Eddin Al-Uwaydidi, "Those Who Die Fighting U.S. Occupation Forces Are Martyrs: Qaradawi," IslamOnline.net, January 27, 2003.

Azzam directs monetary donations for the Afghan mujahideen be sent to Account No. 1335 at Dubai Islamic Bank. Azzam's book still features prominently on jihadist websites.[3]

DIB's support for bin Laden's jihadist agenda continued when bin Laden located the nascent al Qaeda organization in Sudan. Senior al Qaeda member, Said Madani al Tayyib, who served as al Qaeda's "chief financial officer" during the early 1990s while Osama bin Laden was in Sudan building his Islamic army, held at least two accounts at DIB (Account Nos. xx-xxx-xxx4302 and xx-xxxxxxx-x20-01). Jamal al Fadl, a former al Qaeda official who became a cooperating witness for the United States, provided the FBI with key details regarding Tayyib's tenure as bin Laden's trusted advisor. *See* Ex. E. According to Fadl, Tayyib was "in charge of most of Osama bin Ladin's money, including the money located outside of Sudan." *Id.* at p. 4. "Al-Tayyib basically became the man in charge of most of the finances for the Islamic Army and attended nightly meetings with Osama bin Ladin to discuss monetary issues … no one, except Osama bin Ladin, could make any decisions regarding money without an order coming from al-Tayyib." *Id.* at p. 7.

DIB was directly implicated in the 1998 U.S. Embassy bombings in Kenya and Tanzania as well. According to the NATO report at Ex. A, "Al Qaida had previously used the Dubai Islamic Bank and local Hawala transfer companies to fund the bombings of the American embassies in Kenya and Tanzania." In the wake of the attacks, U.S. officials pressed the UAE to enact more rigorous banking controls and to close certain accounts at DIB that were used to move money intended for the attacks. In connection with those discussions, "the U.S. asked in 1998 that some Taliban accounts be closed at Dubai Islamic Bank."[4]

Mamdouh Mahmud Salim, a founding member of al Qaeda responsible for managing terrorist training camps in Afghanistan and Pakistan and undertaking efforts to obtain nuclear weapons for al Qaeda, was arrested by German authorities on September 16, 1998 for his role in the 1998 Embassy bombings. A German report describing Salim's interrogation by FBI and German officials details the items in Salim's possession at the time of his arrest, including three DIB banking cards under his name: (1) "VISA Card Dubai Islamic Bank fur Mamdoh M S Ahmed, Nr. xxxx xxxx xxxx 1013;" (2) "Bank Card Dubai Islamic Bank fur Mamdoh M. S. Ahmed, Nr. xxxx xxxx xxxx 2362;" and (3) "Card Dubai Islamic Bank Nr. xxx4008." *See* report excerpts at Ex. F.

By 1999, al Qaeda's use of DIB to launder and move money was so pervasive that officials from the Departments of State and Treasury, and the National Security Council, traveled to Dubai to demand that the UAE government take steps to end DIB's relationship with Osama bin Laden. According to a July 8, 1999 State Department press conference, DIB's involvement

---

[3] Azzam also issued a fatwa, *"Defense of the Muslim Lands,"* considered to be one of the most important Islamic publications declaring jihad as a personal obligation for all Muslims. In the introduction, Azzam states that he submitted the fatwa to several prominent Islamic scholars for their approval, prior to publication. Dr. Hussain Hamid Hassan, a long-time member of GDB's Fatwa and Sharia Supervisory Board and its current Chairman, reviewed Azzam's book and provided his personal endorsement.

[4] *See* Stephen Braun, *Emirates Looked Other Way While Al Qaeda Funds Flowed*, LA Times, January 20, 2002.

The Honorable Frank Maas
July 14, 2015
Page 4

___

with "terrorist money laundering" was the key concern. *See* State Department Briefing of July 8, 1999 at Ex. G. The same day as the briefing, it was reported that the "Central Intelligence Agency has obtained evidence that Mr. bin Laden has been allowed to funnel money through the Dubai Islamic Bank in Dubai." *See* James Risen with Benjamin Weiser, *"U.S. Officials Say Aid for Terrorists Came Through Two Persian Gulf Nations,"* New York Times, July 8, 1999, at Ex. H. According to the Times, "United States intelligence officials said they had evidence that Mr. bin Laden had a relationship with the bank, which they believed had been arranged with the approval of the officials who control the bank." *Id.* Among other things, U.S. officials were concerned with a single wire transfer of $50 million to bin Laden through DIB, originating from wealthy Saudis in the Kingdom, and raised the issue with the ruling Maktoum[5] family of Dubai.[6]

Despite U.S. government warnings, DIB continued to maintain relationships with, and provide critical financial support to, members of al Qaeda. Consequently, the UAE and DIB became an important logistical and financial base of operations for al Qaeda in advance of the September 11th attacks. In fact, Khalid Sheikh Mohammed ("KSM"), the mastermind of the attacks, chose DIB as a point of access into the global financial system for funding the 9/11 plot. KSM ordered the hijackers to travel "through the UAE en route to the United States," where "they were primarily assisted by al Qaeda operatives Ali Abdul Aziz Ali and Mustafa al Hawsawi." *See* 9/11 Commission Report at p. 236.[7] Upon their arrival in the U.S., the hijackers were wired significant sums of money from Ali and Hawsawi,[8] via their accounts at DIB.

September 11th hijacker Faiz Rashid Ahmad Hassan al Qadi (a/k/a Fayez Banihammad) held an account at DIB (Account No. xx-xxxxxxx-x20-06), as did al Qaeda member Ali Salah Muhammad Kahlah al Marri (Account No. xx-xxxxxxx-580-7). Al Marri attended al Qaeda terrorist training camps and was instructed by KSM "to enter the United States no later than September 10, 2001."[9] *See* Ex. J, p. 11.

Shortly after the September 11th attacks, the Central Bank of the UAE ("Central Bank") ordered the freezing of accounts and investments of approximately 26 individuals and organizations suspected of ties to the al Qaeda network, including accounts at DIB. The actions of the Central Bank mirrored the regulatory alert issued days earlier by Luxembourg's financial supervisory commission identifying DIB's connection to Osama bin Laden.

___

[5] Sheikh Mohammed bin Rashid al Maktoum, Vice President and Prime Minister of the UAE, and Ruler of Dubai, was at all relevant times a majority shareholder of DIB.

[6] *See* Jonathan C. Randal, *Osama: The Making of a Terrorist*, Vintage Books (2004), pp. 211-212.

[7] Available at http://www.9-11commission.gov/report/911Report.pdf.

[8] Hawsawi provided the hijackers with money to finance their travel to the U.S., and further wired money to them in the U.S. for flight training. *See* Substitution for the Testimony of Khalid Sheikh Mohammed, ¶¶ 42, 68, and 73, at Ex. I.

[9] Prior to traveling to the U.S., al Marri went to Dubai to meet with Mustafa Hawsawi, per KSM's instruction. Hawsawi provided al Marri with $10,000 for his mission. *See* Ex. J, p. 14.

DIB has also provided financial services to Executive Order 13224 designees, including the al Qaeda charity front International Islamic Relief Organization ("IIRO"). IIRO had at least one account at DIB (Account No. xxx0287).[10]

Al Qaeda financier Ahmed Nur Ali Jumale, designated by the Treasury Department on November 7, 2001 for his links to Osama bin Laden, including a number of his designated businesses that make up the Al Barakaat financial and telecommunications conglomerate, also held accounts at DIB. According to the Treasury officials, Jumale used the Al Barakaat group of companies "to transmit funds, intelligence and instructions" to al Qaeda and other terrorist organizations. *See* Ex. K. Several of those DIB accounts were seized pursuant to the instructions of the Central Bank, including Jumale's personal and VISA accounts (Account Nos. xxx1192 and xxx-xxx-xxx-960 respectively), and accounts for Al Barakah Exchange (Account Nos. xxx7440 and xxx7483), and Al Barakaat Bank of Somalia (Account Nos. xxx339 and xx-xxx-xx-x13-01).

As the foregoing clearly demonstrates, DIB provided essential financial services and other forms of material support to al Qaeda for many years, while disregarding U.S. warnings about the bank's support of Osama bin Laden.

## II.    PLAINTIFFS' FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS

On October 15, 2010, plaintiffs served their consolidated First Set of Requests for Production of Documents Directed to DIB, attached hereto as Ex. L. Those requests seek *inter alia*: (i) banking and financial records for DIB accounts linked to Osama bin Laden and other members of al Qaeda; (ii) banking and financial records for Taliban accounts at DIB; (iii) documents relating to DIB's involvement in the funding of the 1998 U.S. Embassy bombings; (iv) documents relating to the 1998 and 1999 meetings between U.S. officials and representatives of DIB and the UAE government concerning al Qaeda's use of the bank to launder and move money; (v) documents detailing the Fatwa and Sharia Supervisory Board, including the board's oversight and control over DIB's operations; and (vi) documents detailing and describing DIB's policies, programs and procedures for anti-money laundering, combatting the financing of terrorism, and reporting suspicious activities or transactions.

DIB served its Responses and Objections to Plaintiffs' First Set of Requests for Production of Documents on January 21, 2011, at Ex. M, and thereafter produced its first production of documents on July 7, 2011 (DIB00001-2363). Those materials consist primarily of open source documents, including the entirety of the 9/11 Commission Report (585 pages),

---

[10] DIB manages financial accounts for, and makes donations to, the designated terrorist organization Hamas and its affiliated organizations, including but not limited to, International Islamic Charity Organization (Account No. xxx2845), Nablus Zakat Committee (Account No. xxx5/939), Fujairah Charity Organization (Account Nos. xxxxxxxxxx5801 and xxxxxxxxx2006), Emirates Red Crescent (Account No. xxx6754), Human Appeal International, and the Union of Good. Plaintiffs request that the Court order DIB to produce records for these accounts as well, as they reflect DIB's institutional support for terrorist entities.

complete copies of terrorism related books (e.g., *Holy War, Inc.*, Peter Bergen, 318 pages), media reports, U.S. congressional hearings, and U.N. Security Council resolutions.

DIB produced its second production of documents on January 24, 2012 (DIB02364-3034). This production, consisting of 670 pages (approximately 73 pages are duplicates), appear to originate from a single notebook containing basic corporate records, such as organizational charts, documents identifying various departments within the bank, employee guidelines, 1993 training procedures, regulations relating to bank loans and insurance policies, and IT Department procedures for electronic data archiving.

DIB produced its third and final production on August 22, 2012 (DIB03035-3521), consisting of internal DIB correspondence regarding administrative and managerial issues, DIB internal auditing reports, a handful of communications regarding the New York Times July 1999 article linking DIB to Osama bin Laden,[11] communications between the Central Bank and DIB regarding the freezing of al Qaeda related accounts, and a handful of actual account records.

In sum, 2,237 pages (64% of DIB's entire production) consist of open source materials, approximately 970 pages are DIB generated business records as described above, and another 226 pages are Central Bank notices and directives distributed to the country's banks and financial institutions advising of various banking rules and regulations.

As discussed in more detail below, DIB refuses to produce basic account and other financial records, or not at all, for many of the al Qaeda related accounts described above. For instance, DIB has only produced roughly 159 pages of DIB generated account records (i.e., opening account forms, customer information summaries, copies of customer passports and licenses, communications between DIB and the customer, etc.), and even fewer actual account statements (77 pages, but many are duplicates). Moreover, DIB refuses to produce any documents relating to the Taliban accounts.

Plaintiffs simply do not have the information they have requested and intervention by this Court is now necessary. Accordingly, plaintiffs respectfully request that the Court order DIB to promptly produce all responsive materials, including but not limited to the following categories of documents.

### A. DIB Is Withholding Critical Bank Account And Related Financial Records For Key Members Of Al Qaeda And The Terror Group's Financiers

#### 1. Said Madani Al Tayyib

As al Qaeda's "chief financial officer," Said Madani al Tayyib was responsible for controlling much of the money sent to Osama bin Laden "from wealthy individuals in the Gulf

---

[11] These documents consist almost entirely of communications discussing possible action against the New York Times for the article. They do not include any documents that discuss in any meaningful sense any investigation by DIB into the substance of the very serious and very public allegations in the article.

The Honorable Frank Maas
July 14, 2015
Page 7

_____

area. *See* Ex. E, p. 10. "Al-Tayyib controlled and monitored Osama bin Ladin's money and kept portions of the money in banks under his (Al-Tayyib) own name and in other names such as Abu Amjed, Abu Mahdi, and Abu Khallifah al Omani." *Id.*, at p. 5.

      Plaintiffs' Request No. 10 seeks documents relating to all DIB accounts and financial transactions involving Tayyib, including but not limited to, records detailing the opening and closing of account(s), customer due diligence reports, account statements, communications between DIB and Tayyib, deposit records, wire transfer records, and account auditing reports. In response, DIB produced a mere 13 pages of documents which consist primarily of copies of Tayyib's passport and driver's license and post-9/11 correspondence between DIB and the Central Bank in which the defendant informs the Central Bank that DIB "do[es] not have any accounts, deposits or investments" for Tayyib.

      Notwithstanding that representation, the documents identify two DIB accounts belonging to Tayyib (Account Nos. xx-xxx-xxx4302 and xx-xxxxxxx-x20-01). Nevertheless, DIB has shown no interest in producing the entire spectrum of banking records that would logically be associated with each of those accounts, including but not limited to, communications between DIB and Tayyib, internal DIB communications regarding same, customer due diligence reports, monthly and annual account statements, account transaction reports, audit reports, wire transfer reports, and papers documenting the opening and closing of the accounts.

      Plaintiffs have only received 4 pages of statements for Account No. xx-xxxxxxx-x20-01 (for years 1993-1996), copies of customer information cards identifying Tayyib, and a February 1993 "Current Account Opening Form" for Tayyib and Account No. xx-xxx-xxx4302. Importantly, the existence of those accounts coincides with the time period that Tayyib was in control of bin Laden's and al Qaeda's financial affairs. DIB should be directed to produce <u>all</u> records relating to any account associated with Tayyib, including any accounts under his aliases.

      Plaintiffs' Request Nos. 16-19 additionally seek documents in DIB's possession relating to any investigations conducted relative to Tayyib and his accounts, any auditing of those accounts, and any communications with the UAE government regarding same. DIB has not produced any such documents.

      Finally, U.S. intelligence affirms that Osama bin Laden and other members of al Qaeda maintained ties with senior members of DIB. *See supra*, p. 4. Indeed, former al Qaeda member Jamal al Fadl testified that "al-Tayyib had a relationship with Ahmed Lootah from the United Arab Emirates." *See* Ex. E, p. 6. Saeed Ahmed Lootah is the founder of DIB, a shareholder, and a former board member. Plaintiffs' Request Nos. 12-15 specifically seek documents relating to any DIB accounts held by Lootah or his companies, any communications between Tayyib and Lootah, any financial transactions involving Tayyib and Lootah including transfers of funds between their accounts, and any transactions involving Lootah and the various Sudan-based businesses associated with bin Laden identified in Attachment C of the Requests. DIB should be directed to produce all of the foregoing documents.

The Honorable Frank Maas
July 14, 2015
Page 8

_____

### 2.     Ali Abdul Aziz Ali (a/k/a Ammar al Baluchi)

Ali Abdul Aziz Ali, a member of al Qaeda and KSM's nephew, was instrumental in providing financial and logistical assistance to the 9/11 hijackers.  As the 9/11 Commission found, "the hijackers received assistance in financing their activities from two facilitators based in the United Arab Emirates: Ali Abdul Aziz Ali … and Mustafa al Hawsawi." *See* 9/11 Commission, Monograph on Terrorist Financing, p. 131.[12]

At the direction of KSM, Ali was responsible for transferring significant sums of money from his post in the UAE to the hijackers in the United States, including a $20,000 wire from Dubai to a Florida SunTrust bank account held by hijackers Mohammed Atta and Marwan al Shehhi on August 29, 2000.  *See* Indictment, *U.S. v. Khalid Sheikh Mohammed, et al.*, Case No. (S14) 93 Cr. 180 (KTD) (S.D.N.Y., April 4, 2011).  On September 17, 2000, Ali transferred $70,000 to the same Florida SunTrust account.  *Id.*  According to the U.S. government, Ali "opened a bank account at the Dubai Islamic Bank" during the same period that he was carrying out KSM's orders.  *See* DOD Unclassified Summary of Evidence at Ex. N.

Plaintiffs' Request Nos. 5 and 6 seek documents relating to all DIB accounts and financial transactions involving Ali.  In response, DIB produced only a handful of records for an account linked to Ali (Account No. xx-xxx-xxxxx63-01), including account opening forms, a mere 3 pages of account statements, and copies of Ali's passport (all produced in multiple duplicates).  Again, DIB has shirked its duty to produce all relevant account information.

The documents also reveal that DIB responded to the Central Bank's directive to freeze all accounts linked to Ali.  DIB produced two letters to the Central Bank, dated August and September 2002, advising that DIB located an account in Ali's name.  But that is the extent of the production.  There are no follow-up communications between the banks regarding same, and there is no documentary evidence of any internal DIB deliberations regarding the Central Bank's request, the existence of the Ali account, or the subsequent actions taken by DIB.  Nor are there any documents detailing the ultimate disposition of the account and its funds.  DIB should be ordered to produce all such documents.

Finally, DIB is withholding documents responsive to plaintiffs' Request Nos. 16-19 seeking documents in DIB's possession relating to any investigations conducted relative to Ali and his accounts, any auditing of those accounts, and any communications with the UAE government regarding same.  In a March 22, 2005 letter from the Central Bank to DIB's Chief Executive, Butti Khalifa bin Darwiah al Falasi, the Central Bank advises that a U.S. Embassy official will visit DIB to obtain a "Certification of Business Records" for "documents relating to one of your clients and/or transactions conducted via your bank on behalf of one of your clients previously provided to us."  *See* DIB03444-3446.  The letter adds that the "certificate will be used by the concerned US authorities in an upcoming trial in the Eastern District of Virginia – United States of America."  *Id.*

_____

[12] Available at http://www.9-11commission.gov/staff_statements/911_TerrFin_Monograph.pdf.

_____

By letter dated April 26, 2005, the head of DIB's Anti-Money Laundering Division, Zohair Said al Rabii, responds to the March 22 letter, informing the Central Bank that DIB is attaching a "Certification of Business Records" for Account No. xx-xxx-xxxxx63-01 held in the name of Ali Abdul Aziz Ali. *See* DIB03464. The certification attached to the letter makes clear that "records [are] attached hereto," but no such records were produced by the defendant. *See* DIB03465-3466. Accordingly, plaintiffs respectfully request the Court order DIB to produce all documents relating to the U.S. government's request for Ali's account and transaction records, including without limitation, all communications between and among the U.S. government, the Central Bank and/or DIB regarding same, copies of all account and transaction records DIB provided to the Central Bank and the U.S. government, and all documents that were attached to the "Certification of Business Records."

### 3. Mustafa Ahmed Al Hawsawi

Mustafa Ahmed al Hawsawi also "held an account at the Dubai Islamic Bank" which he used to facilitate the movement of significant sums of money to the hijackers for travel, flight training, and other expenses.[13] *See supra*, p. 4. Plaintiffs' Request Nos. 3 and 4 seek documents relating to all DIB accounts and financial transactions involving Hawsawi. Request Nos. 16-19 further seek documentation relating to any investigations concerning Hawsawi and/or accounts linked to him, any internal audits conducted by DIB concerning same, and any communications between DIB and the UAE government relating to Hawsawi.

DIB responds by producing two directives from the Central Bank, dated August 25, 2002 and September 4, 2002, ordering all banks and financial institutions operating in the UAE to search for and freeze any accounts linked to Hawsawi, but nothing more. It would logically follow that documentation exists detailing DIB's efforts to fully respond to the Central Bank orders, including conducting searches for accounts and transactions linked to Hawsawi, internal DIB communications regarding same, as well as subsequent communications between DIB and the Central Bank regarding the results of DIB's efforts. DIB should be compelled to produce all responsive documents relating to Hawsawi.

### 4. Mamdouh Mahmoud Ahmed Salim (a/k/a Abu Hajer al Iraqi)

Mamdouh Mahmud Salim, a founding member of al Qaeda, a key figure in the 1998 U.S. Embassy bombings in Kenya and Tanzania, responsible for al Qaeda procurement and instrumental in establishing and operating al Qaeda's international business fronts, held several accounts at DIB. *See supra* p. 3. Plaintiffs' Request No. 10 seeks documents relating to all DIB accounts and financial transactions involving Salim. To date, DIB has failed to produce a single document relating to those specific accounts belonging to Salim and should be ordered to do so promptly.

_____

[13] Rachel Ehrenfeld, *Funding Evil: How Terrorism is Financed – And How to Stop It*, Bonus Books, Inc. (2005), p. 20.

### 5.     Abdallah Azzam

Abdallah Azzam, spiritual mentor to Osama bin Laden and co-founder of al Qaeda, directed monetary support for the Afghan mujahideen to be deposited into Account No. 1335 at DIB. *See* supra, pp. 2-3. Plaintiffs' Request Nos. 31 and 32 seek all documents relating to Account No. 1335, including but not limited to, records detailing the opening and closing of the account, customer due diligence reports, account statements, communications between DIB and Azzam, deposit records, wire transfer records, and audit reports.

DIB flatly refuses to provide any documents and objects on the basis that the request is vague and ambiguous in its reference to "all documents relating to DIB Account No. 1335." Quite clearly, there is nothing ambiguous about the request for records pertaining to a specifically identified account. Accordingly, DIB should be compelled to produce all relevant banking records associated with the account as identified in Request Nos. 31 and 32.

### 6.     Faiz Rashid Ahmad Hassan al Qadi (a/k/a Fayez Banihammad)

Plaintiffs' Request Nos. 7 and 8 seek all DIB accounts and financial transactions linked to the 9/11 hijackers, including muscle hijacker "Fayez Banihammad." *See* supra p. 4. DIB responds with approximately 13 pages of account statements for Qadi's DIB account (Account No. xx-xxxxxxx-x20-06). Clearly, this production does not come remotely close to representing the entire universe of documents that should logically belong to this account. Plaintiffs respectfully ask this Court to order DIB to locate all responsive banking records, including those documents responsive to Request Nos. 16-19, and immediately produce them to plaintiffs.

### 7.     Ali Salah Muhammad Kahlah al Marri

DIB has similarly produced a mere 13 pages of documents for al Qaeda member Ali Salah Muhammad Kahlah al Marri's DIB account (Account No. xx-xxxxxxx-580-7). *See* supra p. 4. Consisting of an account opening form and a few account statements, the production is clearly deficient and warrants an order from this Court directing DIB to produce all responsive banking records and other documents relating to al Marri.

### 8.     Ahmed Nur Ali Jumale

DIB has also provided little documentation relating to the Jumale and Al Barakaat accounts at DIB that were seized per the orders of the Central Bank. *See* supra, p. 5. Aside from some basic account documents – correspondence regarding Jumale's initial request to open accounts at DIB, account opening forms, internal DIB communications regarding same, and duplicative account statements – the defendant is withholding the universe of responsive records associated with those accounts.

Moreover, DIB is clearly withholding documents regarding the freezing of the Jumale and Al Barakaat accounts following the September 11th attacks. Although DIB has produced two pieces of correspondence to the Central Bank advising of the existence of the accounts, clearly

missing are the communications from the Central Bank in response to DIB's letters, further communications with the Central Bank regarding the disposition of the accounts and their funds, internal DIB communications regarding the accounts, and any communications between DIB and Jumale in response to the seizure of the accounts. DIB should be ordered to produce all relevant documents relating to Jumale and the Al Barakaat companies.

      **B.    DIB Should Be Compelled To Produce Documents Relating To Taliban-Related Accounts At DIB**

Plaintiffs' Request Nos. 29-30 seek the production of documents relating to Taliban and/or al Qaeda related accounts at DIB. *See* supra, p. 3. Rather than produce the requested documents, DIB sets forth an extensive list of objections claiming that the requests are vague, ambiguous, unduly burdensome, overly broad, uncertain, and that the requests seek information not relevant to a claim or defense of any party in this litigation.

DIB's responses demonstrate its intent to reformulate plaintiffs' request to suit its own prerogatives. Subject to its objections, DIB agrees to produce documents, if any exist, concerning accounts held in the names of specific persons, including "Osama bin Laden," "Mustafa Ahmed al Hisawi," "Shaykh Sa'id," "Mustafa Muhammed Ahmed," "Ali Abdul Aziz Ali," and "Ammar al Baluchi." DIB applies a rigid approach to searching which is neither calculated to find responsive documents nor in accord with basic principles of reference search methodologies.

Moreover, DIB's objections to well-defined, unambiguous terms used in the requests, such as "account notices", "financial ledgers", "deposits", withdrawals", "debit/credit memos", "cleared or canceled checks", "cashier checks", "money orders", further demonstrates its intent to avoid compliance with its obligations under the federal rules.[14]

During a March 29, 2011 meet and confer, plaintiffs challenged DIB's objection to these requests and DIB agreed to revisit the relevance of these requests at a later date. Nonetheless, to date, DIB has not provided any responsive documents. *See* Ex. O (July 7, 2011 correspondence). The broad scope of discovery is thwarted by DIB's unilateral attempt to define the relevance of

---

[14] During the meet and confer process, counsel for DIB has suggested that DIB does not maintain transaction and other records in a manner that makes them readily searchable by account number or account holder. To date, DIB has not provided an affidavit or any corporate records describing its recordkeeping system, and plaintiffs therefore have no ability to assess the efforts DIB would be required to undertake to retrieve relevant records, or whether DIB's recordkeeping procedures align with relevant standards. In any case, DIB cannot rely on the (allegedly) unwieldy nature of its own recordkeeping system to avoid its discovery obligations wholesale. *Chemtex, LLC v. St. Anthony Enters., Inc.*, 2004 U.S. Dist. LEXIS 6031 (S.D.N.Y. 2004) (holding that a party is not permitted to avoid its discovery obligations simply because it has failed to maintain its records in a manner that makes them easily retrievable); *Wagner v. Dryvit Systems, Inc.*, 208 F.R.D. 606, 610 (D. Neb. 2001) ("The fact that a corporation has an unwieldy record keeping system which requires it to incur heavy expenditures of time and effort to produce requested documents is an insufficient reason to prevent disclosure of otherwise discoverable information"). For obvious reasons, in this action relating to DIB's financing of al Qaeda, transaction records are of singular relevance and importance.

The Honorable Frank Maas
July 14, 2015
Page 12

---

the information sought by Plaintiffs. As the party objecting to discovery, DIB bears the burden to demonstrate, in specific and precise terms, why its objections to each request are proper. *See Cox v. McClellan*, 174 F.R.D. 32, 34 (W.D.N.Y. 1997). DIB is unable to satisfy that burden. For these reasons, this Court should require DIB to produce documents responsive to Request Nos. 29-32.

### III. PLAINTIFFS' SUPPLEMENTAL REQUESTS FOR PRODUCTION OF DOCUMENTS

Plaintiffs served supplemental discovery requests on DIB on July 31, 2012, attached hereto as Ex. P. In response, DIB set forth a series of objections focused mainly on the contention that the plaintiffs' requests were untimely. *See* Ex. Q. DIB's objections do not provide any basis for relieving DIB of its obligation to produce responsive documents.

DIB's timeliness objection to Plaintiffs' supplemental requests is absurd. To this date, discovery is ongoing as against both DIB and other defendants. Accordingly, DIB's claim that plaintiffs' requests serve as "merely an end-run around the Court requirement that Plaintiffs serve document requests by December 10, 2010" is unfounded. Ex. Q, p. 2. As in any complex litigation matter, the parties contemplated that supplemental discovery requests may be necessary. DIB fails to cite to any case law to support its argument that it has only a one-time obligation to search its files, or that plaintiffs are required to ask for all potentially relevant materials at the outset of the discovery process.

DIB's response, or lack thereof, to plaintiffs' supplemental discovery requests is yet another example of DIB's efforts to intentionally obstruct the production of meaningful and responsive documentation in these proceedings. DIB's response serves only to highlight and lend credence to plaintiffs' position that DIB has been cavalier not only in conducting their investigation in connection with this litigation, but also in regulating terrorist financing generally. Plaintiffs are entitled to discovery relating to all of the topics sought and respectfully request that this Court compel DIB to produce all requested documents.

Respectfully submitted,

/s/ Sean P. Carter
Sean P. Carter, Esq.
THE MDL 1570 PLAINTIFFS' EXECUTIVE COMMITTEES

SPC

cc:  The Honorable George B. Daniels (via overnight UPS delivery)
     MDL-1570 Counsel of Record (via ECF)

LEGAL\23841594\1 00000.0000.000/117430.000