# Exhibit A

NATO PA - General Report. The economic consequences of September 1... Page 1 of 11

Case 1:03-md-01570-GBD-SN   Document 2973-1   Filed 07/14/15   Page 2 of 8



" *Strengthening the transatlantic link* "

**NATO Parliamentary Assembly**
FORMERLY NORTH ATLANTIC ASSEMBLY

> Home > DOCUMENTS > Committee Reports > 2002 Annual Session > AV 187 EC(02)7 - General Report. 'The economic consequences of September 11, 2001 and the economic dimension of anti-terrorism'

## General Report. 'The economic consequences of September 11, 2001 and the economic dimension of anti-terrorism'

General Rapporteur - Rapporteur général : Paul HELMINGER (Luxembourg)

TABLE OF CONTENTS (Page)

I. INTRODUCTION 1

II. MACRO-ECONOMIC EFFECTS 1

III. MACRO-ECONOMIC RESPONSES 5

IV. PROTECTING ECONOMIC INFRASTRUCTURE 6

V. TERRORIST FINANCING 7

VI. DEVELOPMENT AID 12

VII. THE ROLE OF THE EUROPEAN UNION 13

VIII. CONCLUSIONS 14

. . . . . . . I. INTRODUCTION

1. It goes without saying that there is a fundamental correlation between a country's inherent vitality, its capacity to generate wealth and its ability to defend itself. Yet these complex linkages are sometimes under appreciated, although usually not among parliamentarians who ultimately are charged with placing security considerations into a broader framework of national welfare. Doing so is a central task of this Committee.

2. The September 11 attacks on New York and Washington mark a sea change and have graphically illustrated to our societies the complex interaction between national security and developments in the global economy. The attacks have raised a wide range of issues tied to the economic dimension of security including the vulnerability of the global economy to devastating acts of terror, the need to better protect national economies, the financing of terrorism and using economic tools to counter terrorism. Al-Qaeda's horrific acts have also directed attention to the concept of privatised terror and the unique financial networks terrorists rely upon to conduct their grim business. This report will look at all these issues.

II. MACRO-ECONOMIC EFFECTS

3. The attacks on Washington and New York came at a delicate moment. The American economy was already teetering on the edge of an economic downturn. Previously booming equity markets were heading into a tailspin, and there were justifiable concerns that the bursting of the stock bubble would spill over into other markets. It is now evident that the United States entered a recession as early as March 2001 and by the time of the attacks, the US economy had registered 11 months of production decline. (Brian Westbury, "The Economic Costs of Terrorism", International Information Programs Electronic Journal, September 2002.) One could also trace the slowdown to the delayed impact of last year's energy-price hikes. By September 11, signs of a downturn were evident in other indicators. US economic growth had slowed to around 1.2% annually, and there were strong concerns that the economy was entering a decline after years of buoyant growth. This downturn, however, accelerated albeit briefly after September 11. Overall US GDP fell by 1.3% in the 3rd quarter of 2001 but recovered to 1.8% growth in the 4th quarter and then recorded a 5.8% jump in the 1st quarter of 2002. European economic growth too had slowed considerably in the months prior to the attack and fell further in the weeks afterwards. But it too picked up again by the end of the year. In brief, therefore, while the attacks of September 11 were indeed consequential, broader trends in the global economy have been responsible for the general downturn experienced over the last year.

4. It is virtually impossible to state with precision the costs of the September 11 attacks on New York and Washington. We

now know that the terrorist organisation al-Qaeda probably spent no more than US$500,000 to carry out this crime, while the damage inflicted certainly runs into billions of dollars. The most obvious and readily calculable damage was to the infrastructure of New York's financial district and the unprecedented insurance claims, which range between $50 and $60 billion. The US Bureau of Economic Analysis has estimated the damage to New York's infrastructure and to the four aeroplanes involved in the attacks at $15.5 billion - a significant figure for the companies involved, yet only 0.2% of US GNP for the year. (OECD Economic Outlook. Vol. 2001/2, No. 70. December 2001). Rescue and cleanup operations bore an $11 billion price tag while the human toll from those attacks is now thought to be just under 3000 dead and missing (OECD Study: the Economic Consequences of Terrorism, OECD Economic Outlook, No 71, 2002. Not surprisingly, the month of September also saw a dramatic fall in retail sales, durable goods order and a sharp rise in unemployment claims.

5. Damage estimates naturally become even more difficult when one begins to consider indirect costs, some of which may be of a long-term nature. These include the very sudden if nonetheless temporary collapse in equity prices last autumn, the steep drop in airline travel, expensive additional security measures and equipment at airports and borders, the rise in insurance premia for coverage against acts of terrorism, and new security measures adopted by the private sector, the sudden rise in defence spending, the Afghanistan campaign, and the costs of a possible expansion of the war on terrorism to Iraq.

6. The airline and insurance sectors suffered serious losses and face new cost constraints that are likely to endure. Insurance against terrorist acts has very likely risen permanently. Insurance claims stemming from the attacks approach $60 billion, and reinsurance costs, many of which have been shouldered by European firms, constitute nearly two thirds of that total. ("Premium Rates", The Economist, February 9, 2002.) It is clear that European insurance firms have been as exposed to this catastrophe as their American counterparts. Many insurance liabilities associated with the attacks were held outside of the US and this could result in a net capital inflow to the United States of approximately $11 billion or 0.1 % of GDP.

7. As suggested above, the September 11 attacks will invariably result in increased insurance rates for business over the long term. The industry has created a premium scale that increases the cost of doing business the closer companies are to centres of political and financial power. This will be a permanent additional cost stemming directly from 9/11 and will raise both production costs and consumer prices. While most analysts believe that industry can manage these costs, the airline sector, in particular, faces a much more serious dilemma. Insurance executives have determined that it simply is not cost effective to cover airliners for accidents linked to terrorist attacks. The industry began to withdraw terrorism and war coverage after September 11 due to the costs and risks. The few insurance companies that reinstated war risk insurance some weeks after the attacks, did so at prohibitive costs and offering inadequate levels of cover (liabilities dropped from between $1 billion and $2 billion per aircraft before the attacks, to a maximum of $50 million). Many reinsurance companies that hedge the risk associated with insurance coverage have also withdrawn terrorist coverage or raised premia to prohibitive levels. Under pressure from the airlines, American and EU governments agreed to become insurers of last resort for airlines' war and terrorist liabilities, for a limited period of time. For the short term, governments have extended their emergency guarantee programmes. Despite the opposition of some groups in the US to the airlines' federal coverage, the US Transportation Department has continued to issue temporary extensions, usually lasting 30 or 60 days, to emergency government funding. The European Commission has extended emergency airline insurance coverage until the end of October 2002. At the same time, governments are anxious to diminish their role in, and ultimately withdraw from the insurance market place; continued government intervention can distort the market and crowd out private sector opportunities. For the medium term, both the US and EU governments have supported plans to develop mutual insurance schemes with government backing.

8. In the US, a risk retention group, known as Equitime, will be financed by the airlines and reinsured by the government through the US Federal Aviation Administration (FAA). A risk retention group is a liability insurance company, owned and funded by its members, and typically formed when standard commercial insurance is unobtainable. Equitime aims to make war-risk insurance available to both passenger and cargo airlines on affordable terms (it is estimated that premiums will cost roughly half of what airlines are currently paying). Equitime would cover the first $300 million for war-related costs, including terrorist activities, and the FAA would provide additional coverage of up to $2 billion (matching the pre-September 2001 liabilities offered by commercial insurers). It is predicted that the government's role should end within two years, as the surplus within Equitime increases and private insurance companies are attracted back into the market.

9. European governments are planning for a mutual insurance fund, Eurotime, along the same lines as Equitime. Airlines, airports and other industry players would subscribe to the fund, with governments to guarantee the excess risk. A member of the Association of European Airlines (AEA) predicted that Eurotime would require government reinsurance for three years, until the mutual fund grows to appropriate levels.

10. European airlines look forward to the future establishment of a global insurance mutual fund, incorporating both Equitime and Eurotime. However the long term vision of governments' looks toward complete withdrawal from the insurance market place. In Europe, some commercial companies, notably AIG and Germany's Allianz have already re-established private coverage for airlines, including terrorist-related risks. Analysts recognise that there is no particular impediment for incorporating terrorist attacks within a risk management model, and that in a few years the insurance industry will have adjusted appropriately. Until then, limited government intervention seems both justified and necessary.

11. Nevertheless, higher insurance rates, lower ticket sales (more pronounced in the US than in Europe), and burdensome new security requirements have dealt a blow to the air travel business. The sudden collapse in demand quickly drove several weakened European firms into receivership while hundreds of thousands of airline workers both in Europe and the

United States subsequently lost their jobs. The airline industry is highly dependent upon a steady cash inflow, and the dramatic decline in ticket sales induced a sudden reversal of fortune for large full-service airlines. Swissair spun into a prolonged crisis that ultimately required a state bailout, while the Belgian airline Sabena simply folded.

12. Cross-border transport of goods could also prove more difficult and costly after September 11. The US government recently introduced a container control system and is negotiating with several European ports including Le Havre and Rotterdam. The Americans want to create an express lane for containers inspected at non-US commercial ports. EU Commissioners Pascal Lamy, Loyola de Palacio and Frits Bolkestein contend the measures undercut EU efforts to simplify customs procedures, harm smaller ports lacking the means to implement the American programme, and, in effect, shift EU customs sovereignty to the US. The Commission wants the US to deal directly with the EU on this issue rather than confer separately with each port. (Bulletin Quotidien Europe, No. 8257, July 18, 2002.) The OECD has also expressed concerns about these types of measures because they invariably add cost to trade and can have an effect not dissimilar to that of a tariff regime. Because trade is highly responsive even to minute shifts in cost, numerous security requirements could ultimately depress trade. ("OECD Study: the Economic Consequences of Terrorism", OECD Economic Outlook, No 71, 2002).

13. Most large corporations will have to reconsider their own security strategies, and this too has begun to introduce unanticipated costs to corporate balance sheets. These costs involve everything from new security guards and metal detectors to efforts to make critical network systems more robust and adopt new facility location strategies. Companies are henceforward also likely to hold more inventory as a hedge against possible breakdowns in global supply chains. These measures ultimately have the same effect as new taxes; they will no doubt weigh on long-term economic growth but in ways that are presently very difficult to measure.

14. The attacks have important implications for "business" geography - that is, the urban concentration of vital financial and commercial assets and even the architecture of buildings that house critical industries. Highly concentrated financial centres are doubtless inviting targets for terrorists dedicated to inflicting as much damage as they can, given limited military means. Decentralising these centres will be costly in the short-term. Despite phenomenal advances in information and telecommunications technology, decentralisation will result in permanent losses associated with foregoing scale economies and all the advantages that banks, brokerages, and insurance companies derive from operating in close proximity to each other. A number of New York's financial firms have already set up shop outside of Manhattan. At the end of the day, one must chalk this up as a permanent cost of the September 11 attacks.

15. Energy utilities, information companies and communications firms infrastructures are likely to face new costs because they are working with potential infrastructural targets and are now compelled to redouble their own security efforts to defend them, make those systems more robust, and insure against the possibility of attack. US officials have let it be known that they feel that industry has a responsibility to take these measures, particularly as public budgets are insufficient to underwrite such broad measures. Indeed, the fact that firms were able to activate existing emergency plans, which, for example, allowed global firms to switch trading to other financial centres like London and Zurich and relocate offices away from "ground zero" suggest that the market had already built in a degree of flexibility and security that hampered the terrorist goal of paralysing the system. As suggested above, the insurance industry also faces new and burdensome expenses, particularly in insuring against acts of terrorism. The industry must now devise new risk models that factor in the terrorist threat and the possible costs of future attacks -this is an enormously complex task and will take some time to complete.

16. There are already signs, particularly in the United States, that government spending could shift significantly to cope with emerging threats. Most obvious has been the marked upswing in American defence spending. In 2002 US defence outlays of $379 billion are more than twice those of Europe. (Gopal Ratnam, "How Europe can close the gap", Defence News, August 5-11, 2002) Europe defence spending growth is lagging far behind partly because it escaped physical attacks on September 11 and because the American view on the role and purpose of military power seems to be diverging in profound ways from that of its European partners. (Robert Kagan, "Power and Weakness, Policy Review, No 113.) European defence outlays generally increased in 2002, though hardly on the scale of recent US spending hikes. ("Europe's evolving strategic role", IISS Strategic Survey, 2001-2002, p.135.) It is nonetheless apparent that the post-Cold-War peace dividend has effectively been exhausted in Europe, if not because of the terrorist threat, than because of the commitments European governments have made to build a more coherent defence identity. The most likely direction for European defence spending is upwards, and most governments are moving in that direction. This will put pressure on national budgets, already constrained by the requirements of the monetary Stability Pact, pledges by several governments to reduce taxes and now the multi-billion euro clean-up costs stemming from the recent floods in Central Europe. In fact, officials from Germany, the Czech Republic and Slovakia have recently suggested that some public expenditure may have to be switched from defence budgets to funding repairs for infrastructure. (Judy Dempsey "Defence takes second place as clean-up battle absorbs funds", August 29, 2002.)

17. One thing is certain: reducing defence outlays will no longer provide a short cut to a blissful state of fiscal rectitude. Mounting defence spending can adversely affect national economies over the long-term by diverting investment from more productive government spending. According to the IMF, some of the costs to the US economy of the September 11 have been partly offset by the $33 billion increase in the defence budget and other spending projects that will bolster the government demand component of GNP. Yet, over the long-term, these new government outlays could swell both the budget and balance-of-payments deficits, thereby raising interest rates and crowding out private investment. Such may be the price of greater security.

18. While on the subject of defence outlays, one is compelled also to consider the possibility of war in Iraq. The Bush Administration has made regime change a leitmotiv of its post-9/11 foreign policy, and there are conspicuous signs that an attack on Iraq may be forthcoming. The costs of waging such a campaign should probably be understood as yet another economic consequence of last autumn's terrorist strikes, even though many in Europe question the correlation made by the US administration. It is nonetheless worth recalling that the conduct of the Persian Gulf War cost $61,1 billion of which US coalition partners underwrote $48,3 billion. That campaign helped push oil prices from $15 to $40 per barrel and this, in turn, was instrumental in precipitating a prolonged economic recession. (Patrick E. Tyler, Richard Stevenson, "Profound Effect on U.S. Economy Seen in a War on Iraq", New York Times, July 30, 2002.) A war in Iraq, therefore, would likely have significant costs for both the United States and Europe. The distribution of this burden would partly hinge on the degree of European participation. Finally it would be disingenuous not to consider the potential long-term economic benefits of a successful effort including an increased flow of Iraq oil to international markets.

## III. MACRO-ECONOMIC RESPONSES

19. Central bankers on both sides of the Atlantic immediately recognized the grave economic dangers precipitated by the September 11 attacks and responded with remarkable alacrity and coordination. They confronted potential immediate liquidity problems stemming from panic and damage to New York's financial and trading infrastructure. The world's central bankers dealt with this by pumping money into the system, slashing interest rates and thereby ensuring the availability of funds for carrying out critical economic operations. The US Federal Reserve Bank, for example, cut interest rates three times in the weeks after September 11 even though it had reduced rates eight times in the eight months preceding September 2001. The existence of parallel financial networks meanwhile helped reroute the pathways of global finance and commerce - this was facilitated by the unprecedented four-day shutdown of US trading floors which gave banks breathing room to make these adjustments.

20. Expansionary monetary operations in the US, Europe and Japan provide a relatively quick stimulus to ailing economies. The extra liquidity pumped into Western economies in the days following the attacks altered expectations of key economic actors and allowed the financial system to continue operating without rash capital withdrawals. The absence of inflation reinforced by low oil prices, moreover, diminished the risk that monetary expansion would induce an inflationary spiral. By November 2001, the Fed had cut interest rates by 450 basis points (150 basis points after the attacks) while the European Central Bank lowered rates by 100 basis points. (OECD Economic Outlook, Vol. 2001/2, No. 70, December 2001.) The prompt response of the Fed and the ECB proved instrumental in containing the immediate shock of the attacks. Markets were as reassured as they could have been. Within a few months, shaky equity markets, stung by the attacks, the bursting of the technology bubble, and declining corporate earnings, had returned to early September levels. Of course, those markets have subsequently taken a second tumble, but this is due to broader- trends in the business cycle.

21. The impact of the September 11 attacks in Europe was less apparent than in the United States. Yet, because of its myriad financial and commercial links to the United States, Europe cannot escape the economic consequences of a sudden and precipitous shock to the US economy. Events since September have only reinforced recognition of the interdependency of the two economies.

22. Changes in tax and public-spending policies normally take longer than interest rate and money surplus adjustments to stimulate growth in a weakened economy. Fiscal policy change can also have a more distorting and localised impact depending upon the form it takes. Public spending has only a delayed impact on GNP, and large government spending initiatives invariably alter relative prices. In Europe, moreover, several countries were already encountering difficulties in meeting tough budgetary targets so there was no leeway for massive fiscal stimulus. Such restraint has not been evident in the U.S.

23. The US Congress appropriated significant emergency funding which would not only dole out immediate relief but also stimulate short-term GDP growth. Legislators passed a stimulus package of $40 billion, which included aid packages for the city of New York, funds for victims' families, and increased military and security outlays. Congress also appropriated an additional $15 billion in relief for the stricken airline industry, $5 billion in the form of direct cash grants and $10 billion in loan guarantees.

24. One complication in opening the fiscal spigot because of a national emergency is that a range of industries are likely to suddenly "discover" a need for special supports and concessions. If the government yields to the claims, the resulting subsidies, tax breaks and other grants can strongly distort the national economy with adverse long-term effects on productivity. Moreover, a subsidy once extended is difficult to withdraw and has the additional drawback of supplanting more productive forms of government spending, for example, in education or in infrastructure development. Moreover, there is a risk that such subsidies will foment a degree of international tension because trade partners tend to believe that concessions confer unfair advantages to national companies. This is precisely the European view of the large grants the US government has extended to American airline industries.

## IV. PROTECTING ECONOMIC INFRASTRUCTURE

25. The very technology that is so rapidly accelerating economic change, raising productivity and vastly expanding communications capacity is also a potential security Achilles heel. Western society is reliant on global supply and communication chains that are highly efficient but vulnerable to disruption by even small groups with the will to wreak havoc. Encryption technology, so important to providing a secure environment for e-commerce, is now widely available and can be put to destructive uses. As Thomas Homer Dixon recently noted: " A laptop today is comparable to computational power available to the entire US DOD in the 1960s. (Thomas Homer-Dixon, "The Rise of Complex Terrorism", Foreign Policy, January/February 2002, pp.52-62.). The state has simply lost its monopoly on fast computing, and this potentially allows terrorist organisations an edge they never previously enjoyed. Technological advances grant terrorists access to weapons of mass destructive power, highly advanced communications systems, and opportunities to divert other non-weapons technologies to malignant ends. Economic and technological interdependencies also offer a terrorist group an array of new and vital targets, many of which stand utterly undefended. The destruction of certain assets would have catastrophic economic and human consequences. The challenge to the terrorist is to identify which targets, if destroyed, will exact the highest toll from the society they intend to strike. Our challenge is to identify and defend these very same assets.

26. It is often assumed that the terrorists who attacked New York could not have chosen a better target. The towers obviously had enormous human, economic, and symbolic value, and the global reaction to those attacks was one of overriding shock and dismay. Yet, given the rapid recovery of the American economy, the damage inflicted, at least in economic and strategic terms, proved to be manageable. It turns out that while the World Trade Centre was an important symbol of American capitalism and housed a multitude of important companies and talented individuals, they were not, in themselves indispensable national or international communications or financial nodes. The national and global economic systems were not significantly set back by their loss even amid the tragic loss of the World Trade Centre. That seems small compensation for horror of September 11, but it nonetheless raises a highly important point: Governments and private actors alike must identify the targets that, if destroyed, could unleash a catastrophic chain reaction throughout society, and they must make critical systems more robust to prevent such a scenario from unfolding.

27. Indeed, the attacks have renewed interest in the entire concept of building more robust networks ; transportation, communications, energy and financial nodes must be replaceable in the event of an attack. The question is particularly compelling because of the global economy's increased reliance on such networks to deliver goods, information, and power. Highly concentrated business centres like Manhattan's Wall Street district now seem more vulnerable than ever, but the real challenge may lie not only in protecting those centres but also in defending the network of less visible but equally essential hubs upon which Western economies now rely. These include internet servers, phone switching systems, electrical grids, chemical plants, fibre optic cables, power sub-stations, and food and water distribution networks to name but a few.

28. Economic actors and political leaders now recognize that national economies are not immune to terrorist threats. Technological advances have not only generated enormous wealth, they have made it easier for individuals to wreak catastrophic destruction. The means to do so are no longer restricted to state actors, and when well-chosen targets like vital power generators and relay systems are struck, the economic damage could be massive. Obviously, if one considers the possibility of an attack on a nuclear power generator then the likely consequences are indeed dire. This suggests, of course, that Western societies need to appraise the probability of these kinds of attacks, identify potential targets, find ways to secure these vital nodes, and failing that, ensure that defensive systems are in place so that one attack cannot shut down a critical network. This will be a highly complex and very expensive undertaking.

V. TERRORIST FINANCING

29. The former chief economist of the World Bank, Joseph Stiglitz recently noted that, "The borderless world through which goods and services flow is also a borderless world through which other things can flow that are less positive." ("Globalisation's Last Hurrah?", Foreign Policy, January/February 2002.) Many of the tools that the business community has used to internationalise their operations are freely available to terrorists and criminals, and both groups have begun to use these tools in costly and deadly ways. Terrorist organisations often develop infrastructure some distance from where their attacks are to take place, and dispersed cells need funds to survive and conduct their operations. Sometimes these cells are self-financing, but often they are dependent on money transfers. It is now known, for example, that al-Qaeda moved funds through the banks of at least 41 countries including many considered to have strong banking regulations. US and European intelligence reports suggest that even today al-Qaeda is shipping large quantities of gold out of Pakistan to Sudan through the United Arab Emirates and Iran. They also suggest that Khartoum has emerged as a hub for al-Qaeda business transactions. (Douglas Farah, "al-Qaeda gold moved to Sudan", Washington Post, September 3, 2002.)

30. Although Osama bin Laden has helped bank roll the activities of al-Qaeda, the organisation has also garnered funds from donors and engaged in self-financing operations through legal and illegal activities. To take but one of many examples several "Mujahedin" terrorist organisations set up shop in Bosnia after the Dayton Peace accords. According to intelligence sources, certain charities claimed to be raising relief when, in fact, they were funnelling money to radical fundamentalist groups. (Kurt Eichenwald, "How Bin Laden used money to privatise terrorism", International Herald Tribune, December 11, 2001.) There is evidence that bin Laden's financial agents may have also "shorted" airline and insurance stocks and then made millions of dollars when those shares plunged after the attacks. Extortion is another source of income and al-Qaeda has demanded payments from Middle Eastern businessmen who, failing to make payments, are threatened with having their businesses destroyed. Opium smuggling through Central Asia has also pumped millions of dollars into al-Qaeda coffers as have a range of other criminal activities. (Jonathan M. Winer and Trifin J. Roule, "Fighting Terrorist Finance," Survival, Vol.

44 no. 3, August 2002.)

31. It is now apparent that institutions in United Arab Emirates, the region's most developed and lightly regulated financial centre, played a key role in moving resources to those who planned and carried out the September 11 attacks. There has subsequently been much discussion about the "hawala", a trust based transaction system, which allows clients to transfer funds internationally without leaving any traces. The al Barakaat hawala operating out of Somalia and the UAE reportedly helped move funds to those who carried out the assault on New York and Washington. That particular network, which was also operating in the United States, has been shut down. Al-Qaeda had previously used the Dubai Islamic Bank and local hawala transfer companies to fund the bombings of the American embassies in Kenya and Tanzania. Russian criminal organisations involved in drug trafficking have used many of these same institutions to launder money. (John Willman, "Trail of terrorist dollars that span the world", Financial Times, November 29, 2001.) The hawala system is not, in itself, illegal, and can be enormously helpful to immigrants who want to remit funds to their families. But better regulation of the system is clearly needed. Until the September 11 attacks, however, the United States had not been able to enlist the support of the UAE in its efforts to target terrorist financial networks. UAE officials are now working more closely with the Americans, particularly on ways to better control the hawalas. This is no easy task; some hawalas are nothing more than grocery store owners with a GSM and a back door.

32. These problems reflect a broader problem in securing the full cooperation of a number of Middle Eastern states broadly in building greater transparency into the financial system and specifically in tracking al-Qaeda funds despite formal pledges to do so. There has been no link found yet to any bank accounts related to terrorist finance schemes that Saudi officials have frozen and no convictions for financial crimes in the United Arab Emirates. This seems strange on the face of it. A similar problem has emerged in Central Asia where financial regulations as well as legal and law enforcement systems suffer serious deficiencies. (Jonathan M. Winer and Trifin J. Roule, "Fighting Terrorist Finance," Survival, vol. 44, no. 3, August 2002.)

33. Those who planned 9/11 also used the established international banking system to move resources "below the radar screens" of regulators. Al-Qaeda financed the attacks, in part, though wire transfers from Dubai to automatic teller machines located in Florida and Maine; exactly who sent those funds is still unknown. Al-Qaeda has employed other innovative methods for transferring money anonymously across borders and has even used the Antwerp diamond market to conduct both arms-trafficking and money-laundering operations. (Jonathan M. Winer, "How to clean up dirty money", Financial Times, March 23-24, 2002.)

34. Al-Qaeda's methods have provided an extraordinarily strong impetus to review current banking regulation both at a national and international level. It is increasingly evident that the international financial system is providing critical tools not only for terrorists but also drug-traffickers, corrupt politicians, tax evaders and illegal arms merchants.

35. One thing is already clear. Even in the new regulatory environment, it remains very difficult to trace illegal transactions and to freeze assets quickly. This confers an enormous advantage to terrorists and money launderers alike. In a 1999 study, the IMF reported that global offshore assets, the ownership of which is nearly impossible to trace, had grown 6% annually during the mid-1990s to roughly $4.8 trillion. The report noted that fragmented regulation and the absence of transparency had increased the potential for all manner of illegal operations. (Jonathan M. Winer, "Illicit Finance and Global Conflict, Programme for International Co-operation and Conflict Resolution" Fafo-report.) The control of illegal finance has been hindered by a lack of co-ordination among national and sectoral regulators, widely varied legislation, erratic imposition of "know your customer" rules and due diligence practices, and the proliferation of off-shore businesses and finance companies that exist only to move illegally obtained funds. The fact that many of these companies operate in relatively undeveloped countries ensures that even local officials will find it difficult to clean up their financial centres. Again, the problem is not restricted to offshore centres and the Middle East; there are long lists of major Western banks in Europe and the United States that have been involved, in some cases wittingly, in illegal capital movements.

36. Generally, many of the measures needed to counter money laundering and criminal finance, can be effective as anti-terrorist measures. However, terrorists often deal with smaller amounts of money that may have been legally obtained, two features that make it exceedingly difficult to trace their financial transactions. (Remarks by Christina Schnicke to the OECD Forum, Paris, 2002.) The UN, the EU, the Council of Europe, the Organisation of American States, the OECD, and the Financial Action Task Force (FATF), the IMF and the World Bank are all working to promote greater financial transparency and implement measures to build new defences against money laundering.

37. Within days of the attacks, the American government froze the assets of a number of organisations operating in the United States that were suspected of redirecting funds raised for charity and other legitimate causes to terrorists. US officials also successfully appealed to allies to do the same. This was only the beginning of an ever-more intense scrutiny of the vulnerability of the international financial system to criminal penetration.

38. Leaders from the Group of 7 (G-7) in October 2001 laid out an Action Plan to Combat the Financing of Terrorism and established clear priorities for the fight. These included vigorous application of international sanctions such as freezing of terrorist assets, rapid development and implementation of international standards, increased information sharing among countries and enhanced efforts by financial supervisors to counter the abuse of financial sectors by terrorists. Member governments also moved to bolster Financial Intelligence Units to facilitate information sharing on money laundering and terrorist financing. These agencies are responsible for receiving, analysing and disseminating financial information concerning suspected proceeds of crime. They were created to fight money laundering and first met in 1995 at the Egmont

Palace in Brussels to compare money laundering trends and law enforcement strategies. Now known as the Egmont Group, these FIUs meet annually to find ways to cooperate on money laundering issues, especially in the areas of information exchange, training, and the sharing of expertise.

39. By mid February, more than 200 countries and jurisdictions had expressed support for the G-7 programme and 150 countries and jurisdictions have issued orders to freeze terrorist assets. Over $115 million has been frozen worldwide. (Jonathan M. Winer and Trifin J. Roule, "Fighting Terrorist Finance," Survival, vol. 44, no. 3, August 2002.)

40. Yet there have been problems. According to a recent UN Report, since January only $10 million in terrorist funds have been frozen. Al-Qaeda continues to draw from the inheritance of Osama bin Laden as well as from charitable funds, investments, private donations (approaching $16 million a year), and illegal activities including drug trafficking, smuggling and fraud. Al-Qaeda is suspected of having bank accounts under the names of unidentified intermediaries in Dubai, Hong Kong, London, Malaysia and Vienna. It continues to move assets through hawalas and the precious metal and gem trade. The UN warns that greater scrutiny and control is essential. One problem is that many wealthy individuals linked to bin Laden have not been placed on the UN list of suspected terrorists and this has made it difficult to freeze suspect assets. High standards of legal proof in certain European countries have made it difficult to forge a consistent policy across the EU and beyond. Several European governments have also suggested that freezing assets makes it difficult for suspects to meet their basic living needs. The Bush Administration recently responded to this by proposing a Security Council resolution that would allow suspected supporters of terrorist organisations to withdraw funds to meet those basic needs. The UN also contends that the US and other governments are not providing full information about suspected al-Qaeda members making it difficult to achieve agreement on the lists". (Colum Lynch, "War on al-Qaeda Funds Stalled", Washington Post, August 29, 2002.)

41. The UN had begun to address the problem well before last autumn's attack. On 9 December 1999 the UN unanimously adopted the International Convention on the Suppression of Terrorist Financing, which criminalized terrorist fundraising and the financing of terrorist activities. Yet, as of September 11, only four countries had ratified that convention. The UK was the only NATO country of the four (the others being Botswana, Sri Lanka and Uzbekistan). G-7 Finance Ministers meeting in October 2001, however, pledged to ratify the convention. After the attacks the UN passed Resolution 1373 which obliges all UN member government to criminalize the use or collections of terrorist funds, to freeze funds of those who are involved in planning terrorist attacks, to cooperate in international investigations, and to deny safe haven to those carrying out, planning or abetting acts of terrorism. (Press Release by US Assistant Treasury Secretary for Enforcement Jimmy Gurule, May 31, 2002.) Member governments must also submit progress reports updating the UN of their efforts to implement the resolution. UN Resolution 1390 requires all member states to block the assets of the Taliban, Osama bin Ladin, the al-Qaeda organization and those linked to it. Names of those who assets are to be blocked are forwarded to the U.N. Sanctions Committee that then has 48 hours to raise objections. If there are no such objections, the names are placed on U.N. Security Council list and all states must then freeze those assets and prevent their assets from being made available.

42. For its part the EU last year issued the Second Money Laundering Directive which has extended rules on client identification, record keeping and reporting requirements for suspicious transactions undertaken by accountants, auditors, real estate agents, notaries, casino owners and fund transporting companies. It also established an anti-terrorist unit within Europol and expanded contacts between this unit and non-EU states including the US.

43. The American PATRIOT Act of October 2001 reinforced "know your customer" rules and the US government has banned its banks from having any contact with so called "shell banks" that often are little more than an email address. The Act requires all financial institutions including hedge funds and commercial loan institutions to develop comprehensive and stringent anti-money laundering programs. It introduced new customer identification requirements and demands the exercise of due diligence on numerous transactions which were once subject to light regulation. It has proven very difficult, however, for the Treasury Department to come up with a uniform code within the six months called for in the bill. But inevitably the Patriot Act is introducing a near revolutionary change in the reporting requirements of a wide range of American businesses, and there is strong pressure on other countries to adopt similar standards in order to conduct business seamlessly with American partners.

44. The Financial Action Task Force (FATF) was established by the G-7 in 1989 to assess the transparency of international financial centres. The FATF has employed a so-called "name and shame" strategy to encourage offshore centres to improve transparency by publishing lists of centres that do not meet minimal standards. The OECD has employed a similar strategy to combat unfair tax competition in which international financial centres offer non-residents unregulated financial services not available to local citizens-services which act as a magnet for illegal activity. In recent years, the FATF, which is located at the OECD's Paris Secretariat, has also developed a code of conduct based on eight recommendations adopted at an extraordinary meeting in Washington in October 2001 designed to make it far more difficult to launder money through the global banking system. These include criminalizing money-laundering operations, obligatory identification of clients, reporting requirements for suspicious transactions, adequate control and supervision of financial institutions, efforts to foster international cooperation and implementation of relevant UN Resolutions. (http:www.oecd.org/fatf)

45. The FATF's system of mutual evaluation has strongly encouraged authorities in member nations to infuse their banking systems with greater transparency. The FATF's list of Non-Cooperating Countries and Territories has worked well in encouraging compliance. A number of countries and territories remain on this list,* and this "name and shame" approach ultimately puts pressure on wayward financial centres to amend their practices. (André Rouvière, "Convention internationale pour la répression du financement du terrorisme," Report to the French Senate, No 355, 2000-2001.) But a number of