Exhibit J

**E-FILED**

Thursday, 30 April, 2009  04:44:37 PM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

FILED

APR 3 0 2009

PAMELA E. ROBINSON, CLERK
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | NO. 09-CR-10030 |
| | ) | |
| ALI SALEH KAHLAH AL-MARRI, | ) | |
| | ) | |
| Defendant. | ) | |

## PLEA AGREEMENT AND STIPULATION OF FACTS

Pursuant to Rule 11(c) of the Federal Rules of Criminal Procedure, the United States of America, by its attorneys, the United States Attorney for the Central District of Illinois, acting through Assistant United States Attorney David E. Risley, and Michael J. Mullaney, Chief of the Counterterrorism Section of the Department of Justice, acting through Trial Attorney Joanna Baltes, and the defendant, Ali Saleh Kahlah al-Marri, personally and by his lead attorney, Lawrence S. Lustberg, hereby enter into this plea agreement.

1.      This document contains the complete and only plea agreement between the United States Department of Justice and the defendant.  This agreement supersedes and replaces any and all prior formal and informal, written and oral, express and implied, plea agreements between the parties.  No other agreement, understanding, promise, or condition between the United States Department of Justice and the defendant exists, except as set forth in this plea agreement.

2.     This agreement is made pursuant to Federal Rule of Criminal Procedure 11(c)(1)(A) and (B), and therefore if the Court does not accept the recommendations of the parties, the defendant does not have the right to withdraw his plea of guilty.

## CHARGE, ELEMENTS, AND PENALTIES

3.     The defendant will plead guilty to count 1 of the indictment, in which he is charged with conspiracy to provide material support or resources to a foreign terrorist organization, namely al Qaeda, in violation of Title 18, United States Code, Section 2339B(a)(1).

4.     The defendant has read the charge to which he is pleading guilty, and the charge has been explained to him by his attorney.  Furthermore, the defendant acknowledges that he fully understands the nature and elements of the crime to which he is pleading guilty.

5.     The term "terrorist organization" as defined in Title 18, United States Code, Section 2339B(g)(6), means an organization designated as a terrorist organization by the United States Secretary of State pursuant to Section 219 of the Immigration and Nationality Act.  On October 8, 1999, al Qaeda was so designated as a foreign terrorist organization by the Secretary of State, and has remained designated.  A "conspiracy" is defined as an agreement between two or more persons to accomplish an unlawful purpose (in this case, the provision of material support or resources to al Qaeda).

6.     The phrase "material support or resources," as defined in Title 18, United States Code, Section 2339A(b)(1), means, among other things, personnel, which may be or include oneself.

7.     To sustain the charge of conspiracy to provide material support or resources to al-Qaeda in the form of personnel as charged in count 1, the government must prove the following propositions beyond a reasonable doubt:

- First, that al-Qaeda was, at the time of the offense, a designated foreign terrorist organization;

- Second, that the defendant knowingly agreed with at least one other person to provide material support or resources to al Qaeda in the form of personnel, including himself, to work under al Qaeda's direction or control;

- Third, at the time of that agreement, the defendant knew either that al Qaeda was a designated terrorist organization, or that al Qaeda had engaged or was engaging in terrorist activity or terrorism; and

- Fourth, the defendant entered into that agreement with the intent to further the terrorist activity or terrorism objectives of al Qaeda.

8.     The defendant understands and agrees that the potential penalties for the offense to which he will plead guilty are:

- up to 15 years in prison,

- up to a $250,000 fine,

- up to a life term of supervised release, and

- a $100 mandatory special assessment.

9.     The defendant further understands that upon violation of any of the terms of his supervised release, the supervised release may be revoked and he may be imprisoned for all or part of the supervised release period without credit for time previously served.

10.     The defendant understands and agrees that the Court may be required to order him to pay restitution.  The parties to this agreement have not reached a determination on the issue of restitution.  Restitution may include the cost of incarceration and supervision.  The parties acknowledge that the Court may order restitution in whatever amount it deems proper.

## STATUTORY AND GUIDELINE WAIVERS

### Waiver of Right of Appeal from Conviction

11.     The defendant is aware that federal law, specifically, Title 28, United States Code, Section 1291, affords a defendant a right to appeal a final decision of the district court and that federal law, specifically, Title 18, United States Code, Section 3742, affords a defendant a right to appeal the conviction and/or sentence imposed.  Understanding those rights, and having thoroughly discussed those rights with his attorney, the defendant agrees not to appeal and knowingly and voluntarily waives the right to appeal any and all issues relating to this plea agreement and conviction.  The defendant reserves the right to appeal or collaterally attack the imposed sentence, including any fine or restitution, within the maximum provided in the statutes of conviction, and the manner in which the sentence,

- 4 -

including any fine or restitution, was determined, on any ground whatever.  In particular,

the defendant reserves the right to challenge on appeal or otherwise, any determination as

to whether and to what extent he is given credit toward the service of his term of

imprisonment, pursuant to 18 U.S.C. § 3585(b) or by way of a reduction in sentence, for

the time he has spent in custody since his arrest on December 12, 2001.

<u>**Waiver of Right to Collateral Attack**</u>

12.    The defendant also understands that he has a right to attack the conviction

and/or sentence imposed collaterally on the grounds that it was imposed in violation of the

Constitution or laws of the United States; that he received ineffective assistance from his

attorney; that the Court was without proper jurisdiction;  or that the conviction and/or

sentence was otherwise subject to collateral attack.  The defendant understands such an

attack is usually brought through a motion pursuant to Title 28, United States Code,

Section 2255.  The defendant and his attorney have reviewed Section 2255, and the

defendant understands his rights under the statute. Understanding those rights, and having

thoroughly discussed those rights with his attorney, the defendant knowingly and

voluntarily agrees not to file and waives his right to file a collateral attack on the

conviction and/or sentence except to the extent (a)  he wishes to argue that he was

provided ineffective assistance of counsel or (b) such attack is provided for in paragraph

11 above.  The defendant's attorney has fully discussed and explained the defendant's

right to attack the conviction and/or sentence collaterally with the defendant.

- 5 -

## ADVISORY SENTENCING GUIDELINES

13.    The defendant understands that the Court will calculate the defendant's

offense level and criminal history category under the United States Sentencing Guidelines,

and that the Court will use those calculations to arrive at an advisory sentencing range

under the Guidelines.  The defendant understands that the Court must consider the

advisory Sentencing Guideline range when imposing sentence.  The defendant understands

that the Court shall also consider the other factors listed under Title 18, United States

Code, Section 3553(a) in determining the specific sentence to be imposed.  The defendant

understands that although the Sentencing Guidelines are advisory, the Court may choose to

impose sentence in accordance with the Sentencing Guidelines.

14.    Based on the information currently available, the defendant and the United

States agree on the following points regarding the application of the United States

Sentencing Guidelines to the offense to which the defendant is pleading guilty:

a.    The parties agree, based upon facts currently known by the United States,

that the defendant has clearly demonstrated a recognition and affirmative acceptance of

personal responsibility for his criminal conduct in accordance with Section 3E1.1 of the

Sentencing Guidelines and, therefore, a two-level reduction in the offense level is

appropriate.  Acceptance of personal responsibility shall include cooperating fully and

being truthful with the United States Probation Office in the preparation of a presentence

report.  This agreement does not preclude the United States from changing its position if

- 6 -

new evidence to the contrary is discovered or if the defendant later demonstrates a lack of acceptance of personal responsibility for the defendant's criminal conduct, such as by frivolously contesting his relevant conduct or related sentencing enhancements.

b.      The parties also agree that the defendant qualifies, and the government agrees to move, for an additional one-point reduction in his offense level pursuant to United States Sentencing Guidelines Section 3E1.1(b)(2) because he timely notified the United States of his intention to enter a plea of guilty, thereby permitting the United States to avoid further trial preparation and permitting the Court to allocate its resources efficiently.

c.      The parties agree that the terrorism enhancement of Sentencing Guidelines Section 3A1.4 applies.  The parties further agree that by application of the terrorism enhancement that the defendant is facing the statutory maximum sentence of fifteen years.

d.      The defendant reserves the right to argue that under the sentencing factors set forth in Title 18, United States Code, Section 3553 a sentence below fifteen years is applicable in this matter.  The government reserves the right to oppose any such argument.

15.     The defendant and the United States agree that the above statements regarding Sentencing Guidelines calculations are not binding on the Court, and relate only to the positions the parties take regarding the applicable advisory sentencing guideline range based upon the information of which they are currently aware.  The Court will

remain free to make its own independent determination of the applicable advisory sentencing guideline range and to impose whatever sentence it deems appropriate.

16.      The defendant understands and agrees that at the time of sentencing, the Court will not be bound by any recommendation made by any party and that the Court will be free to impose whatever sentence it deems appropriate up to the statutory maximum. The defendant understands and agrees that he will not be allowed to withdraw his guilty plea because of an objection to the calculation of the sentencing guidelines or to the Court's sentencing findings or rulings.

## DEFENDANT'S FURTHER OBLIGATIONS

17.      In addition to pleading guilty to count 1 of the indictment, the defendant agrees to pay the mandatory $100 special assessment for that count at or before the time of sentencing by delivering a check or money order made payable to the United States District Court, and agrees that he will be required to do so as a condition of this plea agreement.

18.      Defendant agrees not to oppose his removal from the United States to Qatar or Saudi Arabia, by prisoner transfer, deportation or otherwise, and specifically agrees to stipulate to deportation before an immigration judge should he not be transferred before the conclusion of his sentence.  Defendant understands that he will not be deported until he has served any criminal sentence imposed upon him and he waives any right to appeal, reopen or challenge a deportation order properly entered against him.

## THE UNITED STATES ATTORNEY'S OBLIGATIONS

19.    The government agrees that at the time of sentencing it will move to dismiss count 2 of the indictment.   The defendant acknowledges that the count the United States agrees to dismiss was brought in good faith and not for any vexatious or frivolous reason on the part of the United States.

The government further agrees that it will not bring any further criminal charges or seek to detain the defendant as an enemy combatant (or any similar designation reflecting military or non-criminal detention) based upon the defendant's admitted involvement with al-Qaeda through his arrest on December 12, 2001 as set forth in paragraph 20 below or based on any material facts known to the government at the time of his plea.

## FACTUAL BASIS

20.    The defendant will plead guilty because he is in fact guilty.  In pleading guilty the defendant admits that he knowingly conspired and agreed with Khalid Sheikh Mohammed and others to provide material support and resources to al Qaeda in the form of personnel, including himself, to work under al Qaeda's direction and control; that at the time of this agreement, the defendant knew that al Qaeda had engaged and was engaging in terrorist activity as that term is defined under United States law; and that he entered into the agreement with the intent to further the terrorist activity and terrorism objectives of al Qaeda.  The defendant further agrees that on October 8, 1999, al Qaeda was designated as a foreign terrorist organization by the United States Secretary of State, pursuant to

Section 219 of the Immigration and Nationality Act, and has remained designated ever since. The defendant admits to the following facts.

Between 1998 and 2001, the defendant attended various terrorist training camps because he wished to engage in jihad. While at these terrorist training camps, the defendant participated in a number of courses where he learned, among other things: 1) basic military training, including the use of various weapons and basic operational security tradecraft that al Qaeda associates employed which allowed those engaged in terrorist operations to avoid detection, conceal the true nature of their communications, and generally protect their operations.  These methods included the use of prearranged codes and various other techniques to protect communications, counter-surveillance techniques, and the protection of information on computers.

During these trips to the training camps, the defendant stayed in safehouses in Pakistan which the defendant agrees the government would prove were run by and for the benefit of al Qaeda.  While in the terrorist training camps and in the safehouses, the defendant used the nickname Abdul-Rahman al-Qatari.  In addition, the defendant provided contact information to the al Qaeda operators of the safehouses.  This information included his camp nickname, Abdul Rahman al-Qatari, the name of his father, Saleh al Marri, and telephone numbers for his house, his father, and his brother in Qatar. The defendant agrees that the government would establish at trial that such information was generally provided by al Qaeda members so that al Qaeda could inform their families

should they be killed or "martyred" during an al Qaeda mission.

During this same time period, the defendant met Khalid Sheikh Mohammed and other members and associates of al Qaeda. The defendant offered his services to al Qaeda. In 2001, the defendant was approached by Khalid Sheikh Mohammed, who was then the external operations chief for al-Qaeda, about assisting al Qaeda operations in the United States. The defendant agreed to do so and knew at the time that he entered into the agreement with Khalid Sheikh Mohammed to assist al Qaeda operations in the United States that he was providing himself to al Qaeda to further al Qaeda's terrorist objectives. The defendant was instructed by Khalid Sheikh Mohammed to enter the United States no later than September 10, 2001, with an understanding that he was to remain in the United States for an undetermined length of time.

When the defendant agreed to the operation, he was aware that al-Qaeda was responsible for attacks against the United States, including the 1998 bombings of two United States embassies in East Africa, and the 2000 attack on the USS Cole. In addition, the defendant was aware of the 1996 and 1998 "fatwas" issued by Usama bin Laden against the United States.

Khalid Sheikh Mohammed also directed the defendant to meet with an associate of Khalid Sheikh Mohammed who was a member of al Qaeda. The defendant agrees that the government would prove at trial that this was Mustafa al Hawsawi. (hereinafter al-Hawsawi). Khalid Sheikh Mohammed gave the defendant contact information for

- 11 -

al-Hawsawi in Dubai, UAE, and told the defendant that al-Hawsawi would provide him with money for his mission.  The defendant knew that al-Hawsawi was associated with al Qaeda and agrees that the government would prove at trial that al-Hawsawi was a primary financier of the September 11th attacks.

Khalid Sheikh Mohammed and the defendant set up a communications code through which the defendant and Khalid Sheikh Mohammed communicated.  The defendant was instructed to conceal telephone numbers and other numbers to be used in email addresses by using a numeric code (hereinafter "10-code").  The defendant agrees that the government would prove at trial that this code was used by al Qaeda members, including al-Hawsawi and some of the September 11th hijackers to conceal telephone numbers so as to avoid detection.   The defendant was also provided contact information, including telephone numbers, for several al Qaeda associates which he stored in his personal PDA (Personal Digital Assistant) using the 10-code.

Khalid Sheikh Mohammed and the defendant also used a pre-arranged code to disguise their email communications.  The prearranged communication method referred to Khalid Sheikh Mohammed as "Muk."  The defendant was to communicate with Khalid Sheikh Mohammed by sending emails to an email account used by Khalid Sheikh Mohammed.  The account was *HOR70@hotmail.com*.  In the email communications, the defendant was to refer to himself as "Abdo."  Through these emails, the defendant was to keep Khalid Sheikh Mohammed apprised of information related to his efforts to enter the

United States, his contact information, and his efforts to advance al Qaeda's mission in the United States. Khalid Sheikh Mohammed was also going to use these email communications to pass on instructions to the defendant. The defendant agrees that the government would prove at trial that the details of the prearranged code were stored in an address book which was found in an al Qaeda safehouse in Pakistan. The book contained the email address to be used by the defendant which was listed as *farwaa@yahoo.com* along with the identification number for the defendant of "038." Using the 10-code to decipher "038," the defendant, consistent with the code, used the email address of *farwaa72@hotmail.com*. The book also listed Khalid Sheikh Mohammed's email address as *HOR70@hot*[mail.com].

From approximately June 2001 through August 2001, the defendant communicated via email with Khalid Sheikh Mohammed, as directed and agreed upon, regarding the defendant's attempts to gain entry into the United States via a student visa from Bradley University in Peoria, Illinois. Initially, the defendant tried to communicate with Khalid Sheikh Mohammed using the *farwaa@yahoo.com* account. He received no reply. On July 15, 2001, the defendant created the *farwaa72@hotmail.com* account using the name "Abdo Abdo." He then contacted Khalid Sheikh Mohammed at the *hor70@hotmail.com* account with an email sent from the correct email address and using the correct coded language, including addressing the email to "Muk" and signing it "Abdo." Khalid Sheikh Mohammed responded to the email, and criticized the defendant for his failure in the

earlier email to follow the prearranged code.  Khalid Sheikh Mohammed then directed the defendant to contact him once he was settled in the United States.

The defendant applied online to Bradley University using the same email address that he used to communicate with Khalid Sheikh Mohammed. In order to expedite his admission into the United States, the defendant applied for a second bachelor's degree instead of a master's degree as recommended by the University Registrar.   Once the defendant was advised that he had been re-enrolled in Bradley University, he traveled to Dubai, UAE to meet with al-Hawsawi.  In Dubai, the defendant received $10,000 from al-Hawsawi to purchase material in support of al-Qaeda, including a laptop computer. Subsequently, the defendant traveled to Pakistan to meet Khalid Sheikh Mohammed.  In Pakistan, the defendant provided Khalid Sheikh Mohammed with items that Khalid Sheikh Mohammed had requested, including electronic devices.  Upon his return to Qatar, the defendant applied for a new Qatari passport.

The defendant also obtained his student visa at that time.  The defendant did not admit a trip the defendant had taken to the United States in 2000 on this visa application. During the trip in 2000, the defendant had used his Saudi Arabian passport to enter the United States.  He had also established a fictitious business using a false name and stolen Social Security number, fraudulently obtaining a number of credit cards and opening several business accounts.  The defendant admitted none of this on his visa application.

- 14 -

The defendant and his family arrived in the United States on September 10, 2001, over three weeks after the beginning of the fall semester at Bradley University.  On his first day at Bradley University, although understanding that international students were expected to take 12 credit hours, the defendant requested that he be allowed to take 6 credit hours.  Officials at Bradley University agreed that the defendant could take 9 credit hours to allow him and his family time to adjust to their entry into the United States.  The defendant rarely attended classes and was in a failing status by the end of his first semester.

On September 21, 2001, the defendant traveled to another university in the central Illinois area and created five new email accounts under different aliases.  By this time, the defendant knew that al Qaeda was responsible for the September 11, 2001 attacks on the United States and fully understood why Khalid Sheikh Mohammed had directed him to be in the United States before that date.  Pursuant to Khalid Sheikh Mohammed's prior directions, the defendant used these accounts to inform Khalid Sheikh Mohammed that he had arrived safely in the United States, that he had been forced to enroll for a total of nine credits, and that he had been attempting to reach Khalid Sheikh Mohammed on a different email account. The defendant also provided Khalid Sheikh Mohammed with his Peoria cellular telephone number, concealed in 10-code format.

From September 23, 2001 through November 4, 2001, the defendant made a number of attempts to contact al-Hawsawi and other individuals he knew were al Qaeda

operatives using the telephone numbers that he had been provided in Pakistan, and which were disguised in 10-code in his PDA. These calls were unsuccessful. In order to conceal his communication with al Qaeda figures, the defendant used prepaid calling cards at various public pay phones in and around central and northern Illinois to place the calls. Although the initial calls were made from payphones in the Peoria area, after the defendant was interviewed by the FBI on October 2, 2001, he expanded the calling area, sometimes traveling over 160 miles away from his home in Peoria, Illinois, to place the calls.

The defendant researched online information related to various cyanide compounds. The defendant's focus was on various cyanide substances, including hydrogen cyanide, potassium cyanide, and sodium cyanide. The defendant reviewed toxicity levels, the locations where these items could be purchased, and specific pricing of the compounds. The defendant also studied various commercial uses for cyanide compounds. The defendant also explored obtaining sulfuric acid. The defendant agrees that the government would prove at trial that sulfuric acid is a well known binary agent which is used in a hydrogen cyanide binary device to create cyanide gas, and that this is the method taught by al Qaeda for manufacturing cyanide gas. The defendant further agrees that the government would prove at trial that his research into various cyanide compounds is consistent with the type of research conducted by persons trained in camps teaching advanced poisons courses to terrorist organizations, including al Qaeda. The defendant also agrees that the government would prove at trial that an almanac recovered

in the defendant's residence was bookmarked at pages showing dams, waterways and tunnels in the United States, which is also consistent with al Qaeda attack planning regarding the use of cyanide gases.

The defendant employed an "anonymizer" program on his laptop computer when surfing the internet. The defendant agrees that the government would prove at trial that these types of programs are designed to allow individuals to anonymously search internet websites and programs, and that the program on his computer also erased all historical internet searches on a regular basis.

## WAIVER OF CONSTITUTIONAL RIGHTS

21.     The defendant understands that by pleading guilty he surrenders the following rights, among others:

b.      The right to plead not guilty or persist in the plea of not guilty if already made.  If the defendant persisted in a plea of not guilty to the charges the defendant would have the right to a public and speedy trial.

c.      The right to a trial by jury.  The defendant has an absolute right to a jury trial.  The jury would be composed of twelve persons selected at random.  The jury would have to agree unanimously before it could return a verdict of either guilty or not guilty.  The jury would be instructed that the defendant is presumed innocent, and that it could not convict the defendant unless, after hearing all the evidence, it was persuaded that the United States had met its burden of proving the defendant guilty beyond a reasonable

doubt.  The defendant could also ask for a trial by the Judge instead of a trial by a jury.

       d.     The right to the assistance of counsel.  The defendant has the right to be represented by an attorney at every stage of the proceedings and, if the court finds the defendant is unable to afford an attorney, one will be appointed to represent the defendant at no cost to the defendant.

       e.     The right to confront and cross-examine adverse witnesses.  At a trial, the United States would be required to present its witnesses and other evidence against the defendant.  The defendant would be able to see and hear those government witnesses and  the defendant's attorney would be able to cross-examine them.  In turn, the defendant's counsel could present witnesses and other evidence on the defendant's behalf. If the witnesses for the defendant refused to appear voluntarily, their attendance could be required through the subpoena power of the court.

       f.     The right against compelled self-incrimination.  At a trial, the defendant would have a privilege against self-incrimination so that the defendant could decline to testify, and no inference of guilt could be drawn from the defendant's refusal to testify.  If the defendant desired to do so, the defendant could testify on the defendant's own behalf.

       22.     The defendant understands that by pleading guilty the defendant is waiving all the rights set forth in the prior paragraphs.  The defendant's attorney has explained those rights to  the defendant and the consequences of the waiver of those rights.

**AGREED:**

**Defendant's Attorney:**

        I have discussed this plea agreement fully with my client, and I am satisfied that he fully understands its contents and terms.  No threats, promises, or representations have been made, nor agreements reached, express or implied, to induce my client to plead guilty other than those stated in this written Plea Agreement.  I have reviewed with my client United States Sentencing Guidelines Sections 1B1.3 and 1B1.4 (relevant conduct).

s/ Lawrence Lustberg

Date: 4/30/09

Lawrence S. Lustberg
Attorney for Ali Saleh al-Marri

**Defendant:**

        I have read this entire Plea Agreement carefully and have discussed it fully with my attorney.  I fully understand this Agreement, and I agree to it voluntarily and of my own free will.  I am pleading guilty because I am in fact guilty, and I agree that the facts stated in this agreement about my criminal conduct are true.  No threats, promises, or commitments have been made to me or to anyone else, and no agreements have been reached, expressed or implied, to influence me to plead guilty other than those stated in this written Plea Agreement.  I am satisfied with the legal services provided by my

attorney.  I understand that by signing below I am stating I agree with everything stated in this paragraph, and I am accepting and entering into this Plea Agreement.

s/ Ali Saleh Al-Marri

Date: 30-4-2009

Ali Saleh Al-Marri
Defendant

**United States:**

On behalf of the United States of America, we accept and agree to this Plea Agreement.

MICHAEL J. MULLANEY, CHIEF
COUNTERTERRORISM SECTION

s/ Joanna Baltes

Date: 04/30/09

UNITED STATES ATTORNEY

s/ David E. Risley

Date: 04/30/09

David E. Risley, Assistant United States Attorney

- 20 -