F7uWterC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   In re Terrorist Attacks on
    September 11, 2001
4
                                    03 MD 1570 (GBD)
5   ------------------------------x
                                    New York, N.Y.
6                                   July 30, 2015
                                    11:00 a.m.
7
    Before:
8
                    HON. GEORGE B. DANIELS,
9
                                        District Judge
10
                        APPEARANCES
11

12

13  COZEN O'CONNOR
         Attorneys for Federal Insurance Plaintiffs
14  BY:   SEAN P. CARTER
         SCOTT TARBUTTON
15
    SIMMONS HANLY CONROY, LLC
16       Attorneys for Burnett and Euro Brokers Plaintiffs
         -and-
17  MOTLEY RICE, LLP
    BY:   ROBERT T. HAEFELE
18
    KREINDLER & KREINDLER LLP
19       Attorneys for Ashton Plaintiffs
    BY:   JAMES P. KREINDLER
20       -and-
    BAUMEISTER & SAMUELS P.C.
21  BY:   MICHEL F. BAUMEISTER

22  ANDERSON KILL P.C.
         Attorneys for O'Neill Plaintiffs
23  BY:   JERRY S. GOLDMAN
         ROBERT M. HORKOVICH
24       BRUCE STRONG

25

F7uWterC

1                          APPEARANCES (cont'd)

2    RAMEY & HAILEY
          Attorney for Havlish Plaintiffs
3    BY:  RICHARD D. HAILEY

4    DAVID C. LEE
          Attorney for Hoglan Plaintiffs
5
     KELLOGG, HUBER, HANSEN, TODD EVANS & FIGEL P.L.L.C.
6         Attorneys for Defendant Kingdom of Saudi Arabia
     BY:  MICHAEL K. KELLOGG
7         GREGORY G. RAPAWY

8    BERNABEI & WACHTEL, PLLC
          Attorneys for Defendant Dr. Abdullah M. Al-Turki
9    BY:  ALAN R. KABAT

10   ROBBINS, RUSSELL, ENGLERT, ORSECK UNTEREINER & SAUBER LLP
          Attorneys for Defendant Saudi High Commission
11        for Relief of Bosnia & Herzegovina
     BY:  ROY T. ENGLERT, JR.
12
     LEWIS BAACH PLLC
13        Attorneys for Defendants Muslim World League and
          International Islamic Relief Organization
14   BY:  AISHA E.R. HENRY

15   SALERNO & ROTHSTEIN
          Attorneys for Defendant Yassin Abdullah Kadi
16   BY:  PETER C. SALERNO

17   CLIFFORD CHANCE US LLP
          Attorneys for Defendant Dubai Islamic Bank
18   BY:  STEVEN COTTREAU
          RONI E. BERGOFFEN
19
     MOLO LAMKEN LLP
20        Attorneys for Dallah Avco Trans Arabia Co.
     BY:  ROBERT K. KRY

21

22

23

24

25

1          (Case called)

2          THE COURT:  Good morning, everyone.  I know the court

3    reporter has the appearance sheet and a seating chart.  This is

4    the way I'd like to proceed today.  First of all, I understand

5    from speaking with Magistrate Judge Maas there are no issues

6    for him to address today, so I don't think he's expecting to

7    see you this afternoon.

8          With regard to the motions that are outstanding, this

9    is what I'd like to do.  Let me go to the Hoglan motion for

10   default.  I think it would be useful to go through the same

11   process, the same evidentiary hearing that we went through with

12   the Havlish default motion.  Basically, I have the voluminous

13   papers, evidentiary documents that were submitted in support of

14   the motion, but I think it would be useful to have the

15   plaintiffs come in and summarize for the record the nature of

16   that evidence, so there will be a clear record, and highlight

17   the issues and the facts on which I need to make

18   determinations.  I'd like to do that, if possible, on August

19   17, at 10:30.

20         Mr. Lee?  Who signed in for the Hoglan plaintiffs?  I

21   thought it was David Lee.

22         MR. HAILEY:  Rich Hailey, your Honor, for Havlish.

23         THE COURT:  OK.  I'm sorry.

24         MR. LEE:  I'm David Lee, your Honor.

25         THE COURT:  I assume your firm and your offices are

1   going to be in a position to do that.  Is that date sufficient

2   for your purposes?

3            MR. HAILEY:  Yes.

4            THE COURT:  Let's plan on doing that.  I've already

5   started to review your submission and I'd be prepared to hear

6   you on that date and I'll discuss it further if I have any

7   questions and then immediately move forward to determine that

8   motion.

9            MR. HAILEY:  Your Honor, just for clarification, I

10  assume you're referring to the Hoglan case.

11           THE COURT:  Yes, Hoglan.

12           MR. HAILEY:  Thank you very much.

13           THE COURT:  Let me put that aside.  Also, there is an

14  outstanding motion, al-Swailem.  Who is representing that

15  defendant?

16           MR. KABAT:  I am, your Honor.

17           THE COURT:  I'm working on a draft now of the decision

18  in that case and I'm preparing to issue a decision sometime

19  between now and the August 17 date.  I should get you a

20  decision on that within that time period.

21           What I'd like to do is hear the parties on any other

22  issues that we can address either now or after argument on the

23  latest motion that categorizes the issues of sovereign

24  immunity.  I'd like to hear from the parties on that.  I think

25  it's reasonable to expect that within the next 60 to 90 days, I

1    can go ahead and resolve that, given the nature of what's been

2    submitted.  I know that we can discuss the further averments

3    that have been submitted.  I think there's a 100-page

4    submission, several hundred paragraphs.  We'll discuss that in

5    the context of the motion and then I'll be prepared to resolve

6    that motion in that period of time.

7          Before I hear, and I guess I should hear first from

8    the defendants on that motion, is there anything we should

9    address or raise, any other issue that we can quickly put aside

10   before we go through the motions?

11         MR. KREINDLER:  Good morning, your Honor.  First let

12   me say today a number of the family members of some of the

13   people who were killed on 9/11 are here, including John and

14   Kathy Ashton, whose names you've read thousands of times.

15   They've been here through some of the first conferences with

16   Judge Schwartz and then Judge Casey and then with your Honor,

17   and I just wanted to take not more than a minute to kind of

18   introduce them *en masse* to your Honor.  And I don't want to

19   take any time now, but when oral argument is done, if your

20   Honor would permit three to five minutes on what we're doing

21   with Iran and what we see coming up in the next few months, I

22   think that would be helpful.  But I don't want to delay the

23   main event.  Sean Carter is going to be arguing for us.

24         THE COURT:  Yes.

25         MR. KELLOGG:  Good morning, your Honor.  Michael

1    Kellogg, on behalf of the Kingdom of Saudi Arabia.  Roy Englert

2    is also here on behalf of the Saudi High Commission.  He'll be

3    available if the Court has any specific questions about the

4    Saudi High Commission or if there's rebuttal.  Otherwise, I

5    would like to set aside the Saudi High Commission at the

6    outset.  That agency is in exactly the same posture as the

7    Saudi Joint Relief Commission and the Saudi Red Crescent, both

8    of which instrumentalities of the kingdom were dismissed by

9    this COURT and their dismissals were affirmed by the Second

10   Circuit under the whole tort doctrine under which they have to

11   have committed a tort in the United States.

12          Like the Saudi Joint Relief Commission and the Saudi

13   Red Crescent, the Saudi High Commission operated wholly outside

14   the United States.  They were formed to assist the victims of

15   the Serbian genocide in Bosnia-Herzegovina.  Having completed

16   that mission, the agency no longer exists, but it never

17   operated inside the United States and the plaintiffs have made

18   no attempt to suggest or prove otherwise.  Their only

19   contention is that the Second Circuit is wrong on the whole

20   tort doctrine, which is obviously not a cognizable issue before

21   this Court.  So the Saudi High Commission is clearly out and I

22   want to focus my attention this morning on the allegations

23   against the kingdom and explain why they, too, must be

24   dismissed again as Judge Casey did, I guess it's nine years ago

25   now.

1          The plaintiffs brought this case in 2003.  Their claim

2     is that the Kingdom of Saudi Arabia, a close ally of the United

3     States, launched an unprovoked attack against U.S. citizens on

4     U.S. soil.  That is or would be tantamount to an act of war.

5     It is obviously an incredibly serious allegation and the FSIA

6     rightly requires the plaintiffs to back it up before they're

7     allowed to pursue discovery into their claims and seek

8     discovery from a foreign sovereign.  Foreign sovereigns are

9     presumed immune from suit under the FSIA, and plaintiffs can

10    only overcome that immunity by showing that they fall within

11    one of the specified exemptions.  Yet after 12 years and two

12    trips to the Second Circuit, the plaintiffs still cannot do

13    that.  Indeed, they have not come close.  The 9/11 attacks are

14    among the most closely investigated events of United States

15    history.  There are congressional committees and independent

16    commissions, the FBI, the intelligence agencies and the news

17    media all spent exhaustive efforts investigating this.  The

18    United States Government, of course, does not believe that the

19    Kingdom of Saudi Arabia launched these attacks, nor does the

20    FBI, nor do any of the congressional committees or the

21    independent commissions or any of the other government

22    agencies.

23         Plaintiffs claim repeatedly that all they have to do

24    is allege it and that they are entitled then to discovery on

25    their claims.  They say their allegations have to be accepted

as true, but that is absolutely incorrect under the governing

FSIA law of this circuit.  I'll just quote briefly from the

Second Circuit's decision in 2013 affirming the dismissals of

the Saudi Joint Relief Commission and the Saudi Red Crescent.

The court said there, and this is 714 F.2d at 114, "Once a

defendant presents a *prima facie* case that it is a foreign

sovereign or instrumentality of a foreign sovereign," there is

no question here that we have established that case, "the

plaintiff has the burden of going forward with evidence showing

that under exceptions to the FSIA immunity should not be

granted."

Evidence, they have to present evidence.  Conclusory

allegations, speculation, innuendo and supposition, even if

contained in piles and piles of documents, is not enough.

Plaintiffs have the burden of coming forward with admissible

concrete evidence, competent evidence showing that they fit

within one of the exceptions, and they've utterly failed to do

that.  None of the material that they've submitted enables them

to meet the substantive standards of the FSIA.  They're out

under three different theories:

First, under the entire tort rule, which the Second

Circuit affirmed and is controlling in a decision affirming the

dismissal of the Red Crescent and the Saudi Joint Relief

Commission; second, they're out under the discretionary

function exception, as Judge Casey found in 2005, a ruling

1     that's never been questioned in the Court of Appeals; and,

2     third, express textual causation requirement in the FSIA

3     because they do not come remotely close to showing that Saudi

4     Arabia caused the 9/11 attacks, as Judge Robertson found in the

5     very initial decision in this case in Burnett in 2003.

6          I'd like to walk through each of those three grounds

7     for dismissal.  The entire tort rule is the law of this circuit

8     after the Saudi Red Crescent and the Saudi Joint Relief

9     Commission decisions.  It requires a tortious act by an

10    official or employee of the government in the United States

11    acting within the scope of his employment.  Plaintiffs have

12    zero evidence or even competent allegations of any tortious act

13    by any Saudi official or agent acting within the scope of his

14    employment.  They give us four names:  Omar al-Bayoumi, Fahad

15    al-Thumairy, Osama Basnan and Abdul Rahman Hussayen.

16         I will say at the outset each of those names was

17    investigated in detail by the 9/11 Commission, by the recent

18    review commission, by the FBI, and none of them found any

19    competent evidence to indicate that they were agents of Saudi

20    Arabia, that they acted to assist the hijackers, knowing their

21    plans to hijack the planes and crash them into the twin towers.

22         Let's start with Bayoumi.  First of all, there's no

23    evidence that he was even an intelligence agent.  At the time

24    he was here, he was officially seconded to Dallah Avco, a

25    private company.  His job in Saudi Arabia was to work for the

civil aviation division of the kingdom.  He was seconded to

Dallah Avco as part of a contract.  His salary was paid by

Dallah Avco, although they were reimbursed for that pursuant to

the contract with Dallah Avco.

Now, plaintiffs spent a lot of time arguing that he

was really an employee of the kingdom even though he was

officially working for Dallah Avco.  That's completely

irrelevant.  I'm not sure it's correct or not under Saudi law,

but it's irrelevant because they can't suggest that he did

anything within the scope of his employment, even as a civil

aviation employee, that aided the hijackers or that assisted in

the 9/11 attacks.  The 9/11 Commission and the FBI both found

that there was no evidence -- no evidence, those are the exact

words they used -- that he was a Saudi agent, intelligence

agent, that he materially assisted the hijackers or that he had

any knowledge of the attacks.

The 9/11 review commission, just in March of this

year, looked over everything again and concluded that nothing

had changed in that respect.

THE COURT:  Bayoumi was an employee at the time of the

alleged acts at issue.

MR. KELLOGG:  He was technically an employee of Dallah

Avco, which was a private company, but he was employed pursuant

to a contract with the civil aviation.

THE COURT:  But I thought he was also a government

```
 1   employee.

 2               MR. KELLOGG:  That's what they argue, that because he

 3   was seconded, because his salary was reimbursed, that he was

 4   still an employee of civil aviation.

 5               THE COURT:  I'm asking you.  Was he an employee of

 6   civil aviation?

 7               MR. KELLOGG:  No, he was technically an employee of

 8   Dallah Avco at that time, your Honor.

 9               THE COURT:  How do you define the distinction if he

10   was paid by civil aviation?

11               MR. KELLOGG:  Because his salary was paid by Dallah

12   Avco.

13               THE COURT:  I thought ultimately that salary was

14   reimbursed.

15               MR. KELLOGG:  The salary was reimbursed.

16               THE COURT:  So he was ultimately being paid by civil

17   aviation.

18               MR. KELLOGG:  He was ultimately being paid by Saudi

19   Arabia, but he was being paid to work in civil aviation.  They

20   have not suggested that any of his alleged actions were within

21   the scope of that employment, which is a separate issue.

22               THE COURT:  Those are two different issues.  I

23   understand both those arguments, but I'm trying to figure out

24   whether or not there's a genuine argument to be made that he's

25   not an employee of the Saudi Arabian government.
```

1          MR. KELLOGG:  There's an argument to be made that

2    because his salary was ultimately paid by the Saudi government

3    that you could consider him an employee of civil aviation, but

4    that does not make him a Saudi intelligence agent.  It does not

5    mean that the scope of his employment, if you attribute that

6    employment to civil aviation, had anything to do with assisting

7    the hijackers or knowing of their activities.

8          THE COURT:  How do I determine that?

9          MR. KELLOGG:  I'm sorry?

10          THE COURT:  How do I determine that?  How do I

11   determine whether or not that wasn't within the scope of his

12   employment, that that wasn't what he was employed to do?

13          MR. KELLOGG:  I'm sorry, your Honor.  I didn't catch

14   the question.

15          THE COURT:  That that wasn't part of what he was

16   employed to do.

17          MR. KELLOGG:  His contract was to assist Dallah Avco

18   in projects for the civil aviation division.  There is no

19   suggestion, and the FBI found and the 9/11 Commission found,

20   that there was no evidence that he was either an intelligence

21   agent, that he materially assisted the hijackers or that he

22   knew what the hijackers were up to.

23          THE COURT:  And his contract was with what entity?

24          MR. KELLOGG:  I'm sorry.  His contract?  The

25   plaintiffs have a copy of this contract.  They have full

1    discovery from Dallah Avco.  They have all his employment

2    records through Dallah Avco.  They haven't come up with

3    anything to suggest that.

4            THE COURT:  Is that a Dallah Avco contract, or is that

5    a civil aviation contract, or is that a Saudi Arabian

6    government contract?  What's the nature of the contract?  Who

7    is the contract technically with?

8            MR. KELLOGG:  They have these employment records from

9    Dallah Avco, which include the contract between Dallah Avco and

10   civil aviation.

11           THE COURT:  Right.

12           MR. KELLOGG:  Pursuant to which he was working for

13   Dallah Avco at that time.

14           THE COURT:  But when you say his contract, his

15   contract was with whom?

16           MR. KELLOGG:  His contract at the time of the 9/11

17   attacks, actually, he was out of the United States by then, but

18   his contract, his employment contract, was with Dallah Avco.

19           THE COURT:  And is the Saudi Arabian government or

20   civil aviation a party to that contract?

21           MR. KELLOGG:  There's no question he was only working

22   for Dallah Avco because civil aviation asked Dallah Avco to

23   employ him as part of Dallah Avco's contract with civil

24   aviation.

25           THE COURT:  Again, I'm trying to figure out where

1    you're drawing the distinction that he is not either a civil

2    aviation employee pursuant to a civil aviation contract and/or

3    a Saudi government contract.  As they say, I have four parties.

4    I have Bayoumi, I have civil aviation, I have the Saudi Arabian

5    government, and I forget now the company that you say he was

6    working for.  Why do you say he's only an employee of that one

7    company, to the exclusion of the other two?

8         MR. KELLOGG:  Your Honor, I don't think there's any

9    dispute about the underlying facts.  All the employment

10   contracts have been provided.  He was a long-term employee of

11   civil aviation.  He was seconded to Dallah Avco pursuant to a

12   contract between civil aviation and Dallah Avco.  His salary

13   was paid by Dallah Avco, but it was reimbursed by civil

14   aviation.  Whether that makes him an employee at the time

15   technically of Dallah Avco, which I believe it does, or civil

16   aviation I don't think actually matters for purposes of this

17   argument because the plaintiffs would have to show that he was

18   doing something pursuant to and within the scope of his

19   employment to aid the hijackers, knowing about their planned

20   attack.

21        THE COURT:  Before you go to them, my last question

22   will be how you would characterize the difference in his

23   relationship with civil aviation and the Saudi government

24   before, during and after this contract.

25        MR. KELLOGG:  Before he was definitely an employee of

1   civil aviation.

2          THE COURT:  Right.

3          MR. KELLOGG:  Which is an agency of the Saudi

4   government.

5          THE COURT:  Did that status ever change?

6          MR. KELLOGG:  It did in the sense that there was a

7   period in which he was seconded to Dallah Avco and hence

8   technically became an employee of Dallah Avco during that

9   period.

10          THE COURT:  Is it your argument he's no longer an

11   employee of civil aviation at that period?

12          MR. KELLOGG:  It was clear he was going to go back to

13   the civil aviation at the end of the secondment.

14          THE COURT:  That's my question.  What was his

15   relationship?  Was he an employee of the Saudi Arabian

16   government at that period of time?  You argue that he was an

17   employee of the Saudi Arabian government and civil aviation

18   prior to this contract, and I assume you take the position that

19   he was an employee of civil aviation of the Saudi Arabian

20   government after this contract.

21          MR. KELLOGG:  Yes.

22          THE COURT:  I'm trying to understand what you say his

23   status was *vis-a-vis* civil aviation and the Saudi Arabian

24   government during the period of this contract.  Are you saying

25   that he was an employee before and an employee after but was

1    not an employee during the period of this contract?

2              MR. KELLOGG:  I would say during the period of the

3    contract, he was technically an employee of Dallah Avco.

4              THE COURT:  I know, but that doesn't answer my

5    question.  He could be an employee of Dallah Avco and an

6    employee of the Saudi Arabian government at the same time.

7              MR. KELLOGG:  No, I don't think he was an employee of

8    the Saudi Arabian government at the same time, your Honor.

9              THE COURT:  And you say he was an employee before this

10   contract and an employee after this contract?

11             MR. KELLOGG:  Correct.

12             THE COURT:  And your argument that he wasn't an

13   employee is not because there's anything that says he's no

14   longer an employee, it's because they contracted to have him do

15   work for the other entity.

16             MR. KELLOGG:  Correct.

17             THE COURT:  And that work was different work than he

18   had been doing previously and afterwards for the Saudi Arabian

19   government and civil aviation.

20             MR. KELLOGG:  Yes, he was actually pursuing education,

21   pursuing a higher degree in the United States.

22             THE COURT:  All right.

23             MR. KELLOGG:  But, as I say, my principal argument is

24   that whether you characterize it one way or another doesn't

25   actually matter because they can't show that he was an

1    intelligence agent, which they'd have to do, because clearly

2    sponsoring the 9/11 attacks would not be within the scope of

3    his duties with Dallah Avco or civil aviation.

4            THE COURT:  But it's difficult for me to understand

5    any job that that would be within the scope of his duties.

6            MR. KELLOGG:  That's absolutely correct, unless you

7    were an intelligence agent specifically charged to do that.

8            THE COURT:  He could be a civil aviation agent

9    specifically charged to do that.  I don't think an intelligence

10   agent necessarily means that within the scope of their

11   employment, blowing up the World Trade Center is part of the

12   job.

13           MR. KELLOGG:  There is no evidence whatsoever, as

14   multiple commissions and the FBI found, that he materially

15   assisted the hijackers or that he knew what they were up to,

16   and I think those are the dispositive facts here.  The only

17   evidence that plaintiffs present to the contrary is an exhibit

18   that describes the possibility that Bayoumi could be a Saudi

19   agent is no more than speculation.  Now, they asked Senator

20   Graham to say, Well, I was part of these commissions, I looked

21   at this, and I think he might have been an agent, but he has no

22   personal knowledge.  His affidavit is not admissible in that

23   regard, and his own book notes, and I quote from the book, "The

24   FBI's concluded that al-Bayoumi was not a Saudi intelligence

25   officer."  And even Senator Graham concedes, and I will quote,

1   "There is no evidence that Bayoumi knew what was going on."

2           There was no material assistance given to the

3   hijackers.  The FBI found that, the independent commission

4   found that, the review.  And there's no claim that he knew what

5   was going on, no valid evidence to that effect.  The FBI

6   interviewed him.  They let him go, and they concluded that he

7   was not involved in the 9/11 attacks.

8           The same thing is true of Thumairy, who was an

9   employee of the embassy in the United States.  There is no

10  evidence or even allegation that Thumairy did anything

11  whatsoever to help the hijackers.  Again, the 9/11 report, at

12  217, claims no evidence to support such claim.

13          THE COURT:  My focus is really on not whether there's

14  no evidence but whether the accusations that are made in the

15  complaint about their activity, whether there is a factual

16  basis for those allegations.  Bayoumi is accused of meeting

17  with the hijackers and is accused of offering to assist the

18  hijackers to settle in the United States and find them an

19  apartment and provide them financial support.  I mean, there

20  are specific allegations, which I assume you would agree if

21  there was a factual basis for those allegations, those would be

22  sufficient allegations.

23          MR. KELLOGG:  I would distinguish that, your Honor,

24  because even if you look at the allegations, we said he met

25  them at a restaurant, that he introduced them around.  He

helped them find an apartment, that when they couldn't write a

check, he wrote a check for them and was immediately

reimbursed.  None of that adds up to any indication that he was

assisting them in order to do the 9/11 attacks or that he knew

what was going on.  Their own star witness, even though he has

no personal knowledge, Senator Graham, admits that there's no

indication that Bayoumi knew what was going on.  There would

have to be knowledge, and not only is there no competent,

nonspeculative, nonconclusory allegation that he had knowledge,

there's absolutely no evidence in the huge pile of materials

that they've presented that suggests that.

THE COURT:  OK.

MR. KELLOGG:  And Bayoumi has been so thoroughly

investigated by the FBI and the various congressional reports

and the department of justice and they have all concluded that

there is no evidence.  Now, I don't cite those materials as

conclusive, as an exoneration.  I cite them for two reasons:

one, to make the Court skeptical of mere allegations and

conclusory allegations to the contrary put in by plaintiffs;

and second, to hold them to their obligation under the FSIA to

come forward with concrete admissible evidence that indicates

that an FSIA exception applies, and that would mean that

Bayoumi was knowingly acting to assist the hijackers in

completing the 9/11 attacks, and there is absolutely nothing in

the record to suggest that and, therefore, no basis for going

1  on and allowing these allegations to continue.

2         I'm not sure if the Court is mainly interested in

3  Bayoumi.  I'm happy to talk about Thumairy.

4         THE COURT:  I'm just using that as an example.  You

5  were saying there's no evidence that he was involved at all.

6  There are clearly allegations he was involved.

7         MR. KELLOGG:  Correct, your Honor.

8         THE COURT:  The question for me is not whether there

9  is a lack of allegations, it's whether there is a basis for me

10  to conclude that they've come forth with evidence and that

11  evidence is sufficient to demonstrate the exception here that

12  they say should apply to immunity, so I can't ignore their

13  allegations.  I have to examine whether or not, given what's

14  been put before me, there's a reasonable basis, factual basis,

15  to say that there's either direct evidence or circumstantial

16  evidence that would support the claim that these individuals

17  knew the hijackers, were directly involved with assisting the

18  hijackers, and that direct evidence or logical conclusion,

19  given the nature of the activity that they say they have

20  evidence of, that the nature of that activity one could either

21  directly conclude or infer that their actions were to support

22  the hijackers in committing these acts.

23         MR. KELLOGG:  Understood, your Honor.  I would suggest

24  that plaintiffs' allegations being conclusory and speculative

25  wouldn't even pass muster under Twombly and Iqbal, but they

certainly don't pass muster under the higher standard of the

FSIA, which says they have to come forward with actual

competent admissible evidence.

I'll move on to the other three supposed agents.

There was Thumairy, who was an employee of the Saudi embassy at

the time, but there is absolutely no evidence or allegation,

even, that he did anything whatsoever to help the hijackers.

Plaintiffs only point to one conversation that he had with

Bayoumi before Bayoumi met with the hijackers, but there's no

allegation as to why that conversation took place or what was

discussed or whether he gave any instructions to Bayoumi

whatsoever.  Even former Senator Bob Graham admits that what

the two men talked about is completely unknown, and even if

they could show that he provided any assistance, they can't

show that it was within the scope of his employment and that he

was acting at the behest of the Saudi government.

Then there's Mr. Basnan.  Again, the 9/11 report, at

516, note 24, says there's no evidence that he worked for the

Saudi government or that he did anything whatsoever to help the

hijackers.  He was interviewed by the FBI and he was cleared.

The only theory they have, which is unsupported by any

competent evidence, is that money was channeled from Basnan to

Bayoumi through checks written to assist Basnan's wife, who was

suffering from thyroid cancer.  But there's no evidence and not

even an allegation that that money went from Bayoumi to the

1   hijackers.

2          As for Abdul Hussayen, who is deceased, there's no

3   evidence that he was an official of the Kingdom of Saudi Arabia

4   at the relevant time period.  In fact, his declaration says

5   exactly the opposite, that he was retired and working in

6   various private charitable organizations.  There's no

7   allegation or evidence that he did anything to help the

8   hijackers.  He was interviewed and cleared by the FBI, and the

9   big allegation that plaintiffs made in the Second Circuit,

10  which is that he changed hotels in order to stay with the

11  hijackers, which the Second Circuit said might be suspicious,

12  there's no evidence of that either.  All they cite is a

13  newspaper article which indicates that he stayed at this hotel,

14  but there's no evidence whatsoever about him switching hotels

15  to stay with the hijackers.

16          In none of those four cases is there anything to

17  suggest that these were agents of Saudi Arabia, directed by the

18  government of Saudi Arabia, to provide material assistance to

19  make the 9/11 attacks possible.  That's the whole tort rule.

20  They have to have committed a tort in the United States, and

21  they cannot satisfy that allegation.

22          The discretionary function, this mainly applies to the

23  allegations of support to charitable organizations which then

24  in turn supposedly gave money to al-Qaeda.  Judge Casey already

25  dismissed on discretionary function grounds that deciding what

1    charitable organizations to support or not support is a

2    governmental activity.  That ruling has never been questioned

3    by the Court of Appeals, so it's still a valid ruling.  And

4    their only other argument in this case is that, Well, there are

5    various charities that did operate, like al-Haramain, in the

6    United States, and those charities were alter egos of the

7    kingdom, but there's absolutely no allegation or evidence that

8    any of the day-to-day operations of any of these charities,

9    which were not even governmental agencies, these are private

10   charities.  These are NGOs.  If they'd been governmental

11   charities, Muslim World League, IIRO, WAMY, al-Haramain, they

12   would have been dismissed by now under the FSIA.  They're not

13   even governmental instrumentalities, and there's no allegation

14   that the government of Saudi Arabia plays any role in the

15   day-to-day operations, which is what's required under Supreme

16   Court and Second Circuit precedent in order to pierce the veil

17   and hold that they're an alter ego of the kingdom.  So the two

18   big prongs that they have, the agents and the charities, both

19   fail on the record before this Court.

20           Finally, there is the causation issue.  The standard

21   of causation under the FSIA, which requires that the injuries

22   and deaths be caused by the tortious act of that foreign state,

23   it has to be some sort of fairly direct but-for causation, as

24   Judge Robertson held initially in this case in the Burnett

25   ruling in 2003.

1          The question before this Court is whether there's any

2     evidence to suggest that but for the kingdom or the Saudi High

3     Commission's actions the twin towers would still be standing

4     today, that these attacks would not have taken place, and the

5     answer is clearly no.  Plaintiffs have no evidence of any

6     misconduct whatsoever, and looking at the causation issue makes

7     it clear just how irrelevant the bulk of materials that the

8     plaintiffs have presented to this Court are.  There are dozens

9     of paragraphs about what happened in Afghanistan in the 1990s.

10    They have dozens of paragraphs criticizing the kingdom's

11    religious officials and religious beliefs.  They have dozens of

12    paragraphs about things that happened in the Philippines or in

13    Bosnia.  They have testimony of Moussaoui.

14          The Court may recall that they received three

15    extensions of time to file their briefs in this case because

16    they wanted to get the testimony of Moussaoui before this Court

17    which was going to blow the case wide open.  They put the

18    testimony and there's absolutely nothing in there that links

19    Saudi Arabia to the 9/11 attacks, any sort of causation between

20    the two.  It's all about things that were happening in

21    Afghanistan.  It's all about donations to al-Qaeda.  Actually,

22    it wasn't even called al-Qaeda then in the 1990s, and it's

23    about a rather bizarre plot to blow up Air Force One that they

24    draw no connection with to the 9/11 attacks, not the slightest

25    attempt to tie any of this vast, colorful filler to the 9/11

1    attacks.

2           Finally, your Honor, and I'll be brief on this, I just

3    wanted to talk about jurisdictional discovery and why the Court

4    should not order jurisdictional discovery.  First of all, I'm

5    going to give four reasons:

6           First, the plaintiffs have not satisfied the FSIA

7    threshold for obtaining discovery from a foreign sovereign,

8    which is to present enough evidence to create a factual issue

9    that one or more exceptions to the FSIA applies.  There's a

10   huge danger in subjecting a foreign sovereign to discovery in

11   U.S. courts based on conclusory allegations, and the Second

12   Circuit in this case, in Virtual Countries, Judge Robertson has

13   made it very clear that the plaintiffs' allegations are

14   insufficient.  They have to have concrete evidence that one of

15   the exceptions applies.

16          Second, jurisdictional discovery, if it takes place,

17   has to be limited, and I'll quote here from the EM Limited

18   case, a Second Circuit decision, it has to be limited to

19   "specific facts crucial to an immunity determination."

20   Plaintiffs have waived any effort to seek such discovery by

21   failing to identify any such material facts, either back in

22   2005 or now.  Even today, all they have is a footnote, a

23   footnote which is incapable of preserving an issue, saying if

24   the Court decides that any issues are important, we would like

25   discovery.  In other words, they're going for all or nothing.

1   They don't want jurisdictional discovery, they want complete

2   merits discovery.  In the 587 paragraphs of their allegations,

3   they have not focused their attack on any specific issues of

4   material fact that they've been able to call into question.

5   Essentially, their approach is an admission that they have no

6   such evidence sufficient to get out of the gateway threshold

7   for FSIA discovery.

8       The third point I'd like to make is discovery would be

9   futile in this case because the case has already been

10  thoroughly investigated.  The four alleged agents that they

11  discussed, Bayoumi, Basnan, Thumairy and al-Hussayen, were all

12  interviewed by the FBI.  We all know what they would say.

13  Plaintiffs have had the benefit, too, of discovery of the

14  nongovernmental charities, and it's still clear that they

15  haven't come close to anything that would prove their alter ego

16  theory or their agency theory.

17      The fourth reason is all that's left to the plaintiffs

18  at this point is a general fishing expedition of the Saudi

19  government files and in particular its intelligence files

20  because they will want us to try to prove a negative, that none

21  of these people are agents, intelligence agents, of Saudi

22  Arabia.  Now, nothing of the kind has ever been permitted in a

23  U.S. court, nothing that would open up such files and enable

24  broad-ranging discovery of a foreign sovereign.  It would

25  trench on the comity that's afforded to foreign sovereigns as

1   another judge in this district in the <u>Freund</u> case indicated in

2   refusing to open up sealed records of the French government

3   concerning the Holocaust and World War II.  The United States

4   obviously would never permit such discovery of its own files.

5   Suppose, for example, that in Russia people were to claim that

6   attacks by Chechnyan separatists in Russia were somehow caused

7   or sponsored or aided and abetted by the United States and

8   therefore they should have access to CIA files to find out

9   whether certain people were or were not agents, certain people

10  did or did not aid and abet those attacks.  The United States

11  would never allow that, your Honor, and we should not be in a

12  position as a matter of comity of saying that a foreign

13  government should open up its files to the plaintiffs in this

14  case, not, certainly not, when their allegations are conclusory

15  and when they have failed after 12 years to overcome the

16  findings of independent commissions, the FBI, etc., that Saudi

17  Arabia was not responsible for these attacks.

18          THE COURT:  Thank you.

19          MR. CARTER:  Good morning, your Honor.  Sean Carter,

20  on behalf of the plaintiffs.

21          I'd like to just begin by clarifying what this case is

22  actually about, your Honor.  The case is about whether or not

23  operational-level agents of the Saudi government in the United

24  States provided direct aid and assistance to the September 11th

25  hijackers, in particular two of them named Nawaz al-Hazmi and

1    Khalid al-Midhar, in furtherance of the September 11 plot, and

2    whether or not charity alter egos of the government provided

3    the overwhelming resources that enabled al-Qaeda to acquire the

4    global strike capabilities it employed to deadly effect on

5    September 11.  And on both of those points, your Honor, the

6    record presently before this Court contains extensive,

7    thorough, detailed, well documented, well supported and

8    compelling support in form of both facts and evidence in

9    support of both of those propositions.  The kingdom's effort to

10   obtain dismissal at this point amounts to no more than a plea

11   that the Court simply ignore wholesale all of the facts and

12   evidence of record.  It rests on a rather remarkable suggestion

13   that plaintiffs, in a prediscovery jurisdictional context, are

14   required to come forward and prove their claims conclusively

15   through direct and admissible evidence, without the benefit of

16   discovery and in an environment where the foreign state

17   defendant has not even bothered to come forward with competent

18   evidence to challenge a single one of the factual allegations,

19   and that simply is not how it works, your Honor.

20        There are a myriad of problems with the procedural

21   construct they've intended to invent here, the most fatal of

22   which is that the Second Circuit Court of Appeals has already

23   considered it in the context of both the appeals it decided in

24   2008 and 2013, rejected their formulation of the burdens and

25   standard of review, and specifically held that plaintiffs are

1    entitled to have their factual allegations accepted as true and

2    to have all inferences drawn in their favor in deciding motions

3    to dismiss in this case by the Saudi government and its

4    instrumentalities.

5         Now, the issue was first presented to the Second

6    Circuit, your Honor, in the context of appeals decided in 2008,

7    which as your Honor will recall concerned the Saudi High

8    Commission and kingdom specifically.  In the context of that

9    appeal, plaintiffs identified four issues for which they sought

10   resolution from the Second Circuit, one of which was whether or

11   not plaintiffs were required to come forward with

12   particularized proofs or evidence in support of their

13   allegations at the motion-to-dismiss phase, as the kingdom and

14   as HSC had argued, or instead entitled to have the allegations

15   in their complaint accepted as true.

16        In issuing its decision, the Second Circuit very

17   clearly resolved the issue in plaintiffs' favor citing its own

18   decision in Garb v. Poland and holding specifically that "the

19   complaints, which we accept as true at the pleading stage,

20   allege the facts set forth below."  It then proceeded to credit

21   the factual allegations of plaintiffs' pleadings, including

22   those concerning the activities of the government's charity

23   alter egos.  It acknowledged and credited the allegations that

24   the acts of those charities were attributable to the

25   government, and it complemented the allegations concerning

1    their involvement in supporting al-Qaeda by saying that they

2    included a wealth of detail conscientiously cited to published

3    and unpublished sources.

4         The Second Circuit again rejected the formulation that

5    the kingdom is attempting to relitigate today in its 2013

6    decision concerning the Saudi Joint Relief Committee and the

7    Saudi Red Crescent in which it indicated in its statement of

8    the standard of review that its "review of the district court

9    decision proceeded by accepting all material facts alleged in

10   the complaint as true and drawing all reasonable inferences in

11   the plaintiffs' favor."

12        Now, your Honor, there is a host of other problems

13   with the kingdom's articulation of the burden and standard of

14   review.

15        THE COURT:  Remind me.  I don't remember it being in

16   the specific context of sovereign immunity.

17        MR. CARTER:  Your Honor, both of those decisions, the

18   Saudi Joint Relief Committee and the Saudi Red Crescent

19   decision, were foreign sovereign immunity decisions.  The 2008

20   decision relating to the kingdom and Saudi High Commission was

21   a motion to dismiss under the Foreign Sovereign Immunities Act.

22   In fact, your Honor, the motion to dismiss that was decided by

23   the Second Circuit in 2008 went up to the Second Circuit on a

24   procedural posture that is identical to the one that is

25   presently before this Court.  As is the case now, the kingdom

1   did not present any affirmative affidavits of its own to

2   challenge any of plaintiffs' material factual allegations.  All

3   it did was urge that plaintiffs' allegations were in some way

4   incompatible with the findings of the 9/11 Commission, which it

5   claimed had fully exonerated Saudi Arabia and directly refuted

6   plaintiffs' allegations.  This issue has already been clearly

7   resolved.

8           The other problem, your Honor, is that the kingdom

9   simply fails to understand the nature of the burden-shifting

10  regime under the FSIA.  Any obligation to come forward with

11  facts or evidence in support of the allegations, the well-pled

12  allegations of the plaintiff's pleading, can potentially arise

13  only after the foreign state defendant makes a competent

14  challenge to a fact that is material to the resolution of the

15  immunity issue, and now the courts have addressed how a foreign

16  state must do that, and in particular the D.C. Circuit

17  addressed this in its Kilburn decision and it said quite

18  clearly "a foreign state defendant does not carry that burden

19  simply by pointing to alleged inconsistencies between the

20  plaintiffs' pleadings and the content of government reports,"

21  which is at best what the Saudi government is trying to do

22  here.  Instead, the defendant has to come forward with a

23  specific affidavit making a concrete and particularized

24  challenge to an allegation that is essential to the

25  jurisdictional theory, and they simply haven't done that.

1          Your Honor, what we're left with is that this motion

2     proceeds as other jurisdictional contests based on the factual

3     allegations and other material of record and involves a

4     straightforward application of the text of the Foreign

5     Sovereign Immunities Act to those facts, and on that basis,

6     there can be no question that plaintiffs have carried their

7     burden at this stage of the litigation to present factual

8     allegations demonstrating jurisdiction under the Foreign

9     Sovereign Immunities Act tort exception, and I think in that

10    regard, your Honor, a summary of the particular allegations and

11    evidence of record relating to the activities of Saudi

12    government officials, Omar al-Bayoumi and Fahad al-Thumairy,

13    and the support that they provided to Nawaz al-Hazmi and Khalid

14    al-Midhar is helpful to the Court's analysis, so I'll turn to

15    that for a moment.

16         Al-Hazmi and al-Midhar were personally selected for

17    the September 11 plot by Usama Bin Laden.  Both had fought

18    under al-Qaeda auspices in three countries, including Bosnia

19    and Chechnya.  Bin Laden thought that their battle experience

20    would serve useful in the heat of the September 11 plot, but

21    both Bin Laden and Khalid Shaikh Mohammed had serious

22    reservations about their ability to carry out the mission

23    assigned to them, most especially because neither spoke any

24    English and neither had spent any time in the West, and so the

25    likelihood that they could assimilate into the West and begin

to carry out their plot without detection by law enforcement

presented a huge risk to the al-Qaeda plot.

They arrived in the United States in Los Angeles on

January 13, 2000, and as the 9/11 Commission concluded in its

report, they were ill-prepared for a mission in the United

States.  Their only qualifications for this plot were devotion

to Usama Bin Laden, their veteran service and their ability to

get valid U.S. visas.  Neither had spent any time in the West

and neither spoke much, if any, English.  For all of those

reasons, the 9/11 Commission expressly concluded that it was

unlikely that Hazmi and Midhar would have come to the United

States without arranging to receive assistance from one or more

individuals informed in advance of their arrival.

Now, during the critical first two-week period they're

in the United States, the 9/11 Commission confirms that they

spend time at the King Fahad Mosque in Los Angeles.  The imam

at that mosque at that time is Fahad al-Thumairy, the Saudi

government cleric working under the auspices of the Ministry of

Islamic affairs office in the Los Angeles consulate.  For his

part, the 9/11 Commission confirms that Thumairy is an Islamic

extremist and strict adherent to wahabbi ideology.  They

further indicated that Thumairy associated with a particularly

radical faction within the local community, which included

people supportive of the events of September 11, 2001, and even

more to the point, that Thumairy maintained extensive ties to

 1    terrorists which ultimately caused the State Department to ban

 2    him from the United States in 2003.

 3            Now, on this point, the 9/11 Commission specifically

 4    acknowledges that the circumstantial evidence makes Thumairy a

 5    logical person to consider as a possible point of contact for

 6    Hazmi and Midhar at the time of their arrival in the United

 7    States.  Thumairy then proceeds on February 1, 2000, just two

 8    weeks after the hijackers' arrival, to meet for an hour at the

 9    Saudi consulate with Omar al-Bayoumi, who is beyond dispute an

10    agent of the Saudi government.  Your Honor had an extensive

11    exchange with Mr. Kellogg about this issue, and I'll turn to it

12    in more detail in a moment, but there is at this point

13    absolutely no dispute that Bayoumi is an agent of the Saudi

14    government.

15            As Mr. Kellogg mentioned, we've been engaged in

16    discovery with Dallah Avco, the government contractor that

17    nominally employed Bayoumi.  For its part, Dallah Avco has

18    affirmatively told us in discovery that he was an employee at

19    all time of the Saudi government and they merely served as a

20    paymaster for him.  They have indicated that they have no

21    records pertaining to any work he performed because he wasn't

22    performing any work for them.  The full range of facts

23    documented not only in the amended pleading but in the FBI

24    reports revealed that Bayoumi didn't perform any work for

25    Dallah Avco or anyone else to that effect, and that everyone

who had occasion to observe him felt he was an agent of the
Saudi government of some type, that his role involved watching
dissident Saudis in the United States and reporting on their
activities to the Saudi embassy.  His range of contacts
document systematic contacts with the Saudi embassy and in
particular the Islamic Affairs departments of the embassy in
Washington and the consulate in Los Angeles, consistent with
the views of the people who observed him that he was an agent
working under the auspices working under the Ministry of
Islamic Affairs and reporting to the Ministry of Islamic
Affairs on his activities.

          Following the meeting with Thumairy that morning,
Bayoumi proceeds immediately to a restaurant in the Los Angeles
area where he promptly meets the two hijackers who have just
arrived in the United States, Hazmi and Midhar.

          THE COURT:  Before you go beyond that, what are you
specifically alleging that Thumairy did to assist the
hijackers?

          MR. CARTER:  Your Honor, the allegation is very clear
that Thumairy was the point of contact in the United States for
the hijackers who needed a support network here and that he
employed Bayoumi who was effectively reporting to his office in
the Los Angeles consulate to help the two hijackers assimilate
into the United States, to help them find lodging, to help them
enroll in flight courses.

1          THE COURT:  That's a general conclusory statement.

2     What specific role do you say Thumairy played?  What he did do?

3     I mean, give me an example of something he did that would

4     support that conclusion.

5          MR. CARTER:  Your Honor, the circumstances that follow

6     demonstrate, and the affidavits from the principal

7     investigators, Senator Graham and Secretary Lehman, bear this

8     out, they specifically affirm that Bayoumi was acting at the

9     direction of the Saudi government.

10          THE COURT:  I'm talking about Thumairy first.  You

11     said Thumairy was at the mosque and that he met with Bayoumi,

12     but you don't tell me what you say he did to further the

13     attack.  What specific assistance are you alleging that he

14     provided to the 9/11 attack?

15          MR. CARTER:  Yes, your Honor.  His specific assistance

16     is to deploy Bayoumi to give them lodging, to help them find an

17     apartment.

18          THE COURT:  When you say deploy Bayoumi, again, those

19     are conclusory statements.  You are saying he did specifically

20     what that assisted the hijackers, in what way?

21          MR. CARTER:  Your Honor, we're saying that he was

22     effectively in charge of Bayoumi as the representative of the

23     Ministry of Islamic Affairs consulate and that in that capacity

24     he had the authority to direct Bayoumi to engage in these

25     activities.

1          THE COURT:  You're accusing him of directing Bayoumi

2     to do what?

3          MR. CARTER:  To help the hijackers assimilate in the

4     United States, to help them relocate to San Diego, which, as it

5     happens, is the city where Khalid Shaikh wanted them to end up,

6     even though they were arriving in Los Angeles, to ensure that

7     they found lodging, to ensure that they were able to sign up

8     for flight lessons.

9          THE COURT:  All right, but that conclusion that these

10    are the things that he directed Bayoumi to do, the factual

11    basis on which you base that is the fact that he was at the

12    mosque, that he met with Bayoumi.  You don't have any evidence

13    as to what conversations he might have had with Bayoumi or any

14    contacts that he might have had with the hijackers.

15         MR. CARTER:  Your Honor, as with any case involving a

16    covert conspiracy involving criminal wrongdoing, the

17    motivations of the actors have to be, and their state of mind

18    has to be, inferred from the full spectrum of circumstantial

19    evidence.

20         THE COURT:  Sure.

21         MR. CARTER:  Associated with their activities.

22         THE COURT:  Yes, but, as I say, you would agree that

23    it would be an unreasonable inference for me to draw that if

24    you say based on what you know he went to Bayoumi and gave

25    Bayoumi a bomb.  I would say to you, That's interesting, but

what's the factual basis that you allege that when he met with
Bayoumi he handed him a bomb.  I'm asking it in that same
context.  What's the factual basis for you to allege that when
he met with Bayoumi he said, Give lodging to the hijackers,
assist them and give financial support to the hijackers so that
they can carry out the 9/11 attacks?  It suggests the inference
that because of his role at the mosque and because he met with
Bayoumi, one should conclude that these are the conversations
that he must have had with Bayoumi?

MR. CARTER:  Your Honor, it arises from the fact that
the 9/11 Commission concluded he was the logical point of
contact based on the circumstantial evidence upon their
arrival.

THE COURT:  I know, but the 9/11 report didn't have a
factual conclusion that you're asking me to draw.  They didn't
specifically say that he met with Bayoumi and directed Bayoumi
to provide assistance to the hijackers.  You're not getting
that from them.  I'm trying to figure out whether or not
there's any basis other than the things that I laid out in
terms of his role at the mosque and relationship and meeting
with Bayoumi.  What's the factual basis that we can conclude
that these are likely the conversations, directions, assistance
that he was providing to the hijackers?

MR. CARTER:  Yes, your Honor.  We have affidavits from
two principals of the investigations, Senator Bob Graham, who

has viewed all of the intelligence and offered that conclusion, as well as from Secretary Lehman, who has specifically said that none of this can possibly be explained away as coincidental, that when you look at the full range of facts and evidence developed by the 9/11 Commission, the conclusion follows that al-Hazmi and Midhar knew who to go to.

THE COURT:  What are they basing that on factually? Because that's not the conclusion of the majority of the commission.

MR. CARTER:  No, your Honor.  With regard to the conclusion of the commission, your Honor, the historical accounts make clear that the staff investigators who handled this aspect of the investigation felt that they had documented a direct link between the Saudi government and the September 11 plot based on the explosive material they had uncovered concerning the activities of Fahad al-Thumairy and Omar al-Bayoumi.  They included affirmative allegations of that effect in a draft of their report, but they were removed at the 11th hour by the senior staff.  Now, the senior staff of the commission removed them because they determined that as a political matter the commission should not include an allegation, an affirmative allegation, of foreign government involvement in the September 11 attacks unless it could prove it with 100 percent certainty.  Now, that is a far different standard than applies in a preliminary pleading posture in a

1    civil proceeding.

2            THE COURT:  I'm trying to understand.  What are you

3    implying that they had factually that we don't have before us?

4            MR. CARTER:  Your Honor, I think factually what they

5    had is, first of all, the fact that the hijackers went to the

6    mosque to visit the imam; second of all, that he has documented

7    terrorist connections; third of all, that he has the meeting

8    with Bayoumi in the morning and Bayoumi improbably travels to

9    the exact location where the hijackers are and proceeds to then

10   provide them with the exact forms of support the al-Qaeda

11   leadership thought they so desperately needed in order to carry

12   out their assignment; that Bayoumi then proceeds to also

13   connect them with Anwar al-Aulaqi, another radical cleric who

14   would rise to become a senior member of the al-Qaeda

15   leadership, and that throughout this entire period, Bayoumi is

16   receiving checks from Osama Basnan, another Saudi agent, who

17   according to the FBI, is an ardent Usama Bin Laden supporter,

18   and that collectively what all of this evidence shows places

19   Fahad al-Thumairy and Omar al-Bayoumi at the very center of a

20   network of radical extremists with documented terrorist ties

21   who come immediately to the aid of the 9/11 hijackers upon

22   their arrival in the United States; that they do that under

23   circumstances where the 9/11 Commission says that those

24   hijackers were ill-prepared for a mission in the United States

25   and unlikely to have come here without arranging for a network

1    of assistance in advance and proceed to provide the exact forms

2    of support that they need in order to carry out their mission.

3              THE COURT:  Let me put it in the context of the three

4    things that you have to demonstrate.  Define for me what you

5    say is the tort.

6              MR. CARTER:  Your Honor, the tortious act is the

7    assistance that they arranged and provided through Bayoumi to

8    the hijackers to help them get settled in the United States.

9              THE COURT:  Wouldn't Bayoumi have to have provided

10   that assistance rather than asking someone else to provide that

11   assistance to qualify as being someone who had provided a

12   government official who was provided assistance and was himself

13   involved in the tortious act?

14             MR. CARTER:  Your Honor, the theories that are the

15   predicate to the claims encompass secondary theories of

16   liablity, like conspiracy theory and aiding and abetting.

17   Certainly if Thumairy agreed to participate by agreeing to help

18   the hijackers find someone to help them relocate, he would have

19   committed a tortious act.

20             THE COURT:  Hasn't the court already said that

21   secondary liablity is not sufficient, that it can't be that

22   they helped someone else commit the tortious act; they have to

23   have committed the tortious act as a government employee in the

24   United States?

25             MR. CARTER:  Your Honor, that's not the holding of the

1     Second Circuit in this case, and I think its ruling with regard

2     to Dallah Avco more than demonstrates that principle and also

3     the sufficiency of everything that's alleged here as to the

4     Saudi government.   The Second Circuit reinstated the claims

5     against Dallah Avco, which were predicated on the argument that

6     they engaged in tortious conduct directed at the United States

7     by providing a ghost job to Omar al-Bayoumi, which he then used

8     to conceal his activity and thus enabled him to provide support

9     to the September 11 hijackers, and the Second Circuit endorsed

10    those as providing a sufficient nexus to the September 11

11    attacks to go forward.

12          Now, Dallah Avco is further removed from the

13    assistance to the hijacker than either Thumairy or Bayoumi, for

14    certain.   Their tortious act involves only providing a cover

15    job to him.   These individuals are alleged to have directly

16    assisted them in helping the hijackers get settled.

17          THE COURT:   Also, didn't the U.S. government, the

18    justice department, in opposition to the request for certiorari

19    in the United States Supreme Court, specifically take that

20    opposite position?

21          MR. CARTER:   No, your Honor.   The position the

22    government took in what amounted to a footnote is that there

23    were allegations that there were agents in the United States

24    assisting the hijackers, but perhaps they were insufficient

25    under the Twombly/Iqbal pleading rule.

1          THE COURT:  Didn't they specifically urge the court

2     not to take it because there was no third-party agent, there's

3     no third-party agent liablity?

4          MR. CARTER:  No, your Honor.  They urged the court not

5     to take it on the basis that although they acknowledged that

6     the Second Circuit had committed error in the basis of its

7     original ruling, they thought that there were other potential

8     bases on the record that existed at that time to affirm the

9     dismissals below.  Now, part of that turned on their view of

10    the sufficiency of the allegations relating to Bayoumi.  The

11    difference, your Honor, is, first of all, with respect to the

12    department of justice, it was an amicus brief and they raised

13    the issue in a footnote.  It's unclear exactly what record they

14    were looking at, but they certainly weren't looking at the

15    record that's presently before the Court.  They did not have

16    the benefit of the affidavits of the 9/11 Commission members,

17    who have affirmatively endorsed plaintiffs' theories on the

18    basis of the evidence that they've seen.

19          They don't have the benefit of Senator Graham in his

20    capacity as chair of the 9/11 Commission, which specifically

21    endorsed plaintiffs' theories on the basis of the evidence and

22    intelligence he has seen.  They don't have the benefit of

23    knowing that the historical account of the 9/11 Commission

24    confirms that the individual staff members who conducted this

25    investigation felt that they had documented a strong and direct

1    connection between the Saudi government and the September 11

2    plot, all of which adds additional support and certainly is

3    sufficient to sustain the plausibility of the allegations.

4            THE COURT:  I'm not sure that it's sufficient for me

5    to simply rely on their opinions.  I have to rely on the facts

6    which would support such a thing.  Senator Graham can't just

7    say I reviewed all the evidence and I think that they were

8    involved.  I have to know what it is logically that would make

9    him, you or I lead to that conclusion.

10           MR. CARTER:  Your Honor, there is ample support for

11   that in the averment, which identifies all of the range of

12   interactions between these principals, the Saudi government

13   agents in southern California and the hijackers, as well as all

14   of the FBI reports, the original FBI reports which documented

15   these connections as well and provide the specific factual

16   detail showing the sequence of the meetings, the timings of the

17   interactions, the details concerning the terrorist activities

18   of the Saudi government agents and their connections.  All of

19   that material is in the record, and it is that kind of evidence

20   that those principals of the investigations were relying upon.

21           Now, their views of the evidence, your Honor, you may

22   not have to accept them as gospel at this stage.

23           THE COURT:  I need to know on what basis they have

24   that view because if somebody else left the room and said I

25   have the opposite view, I can't give that any evidentiary

1    weight.

2              MR. CARTER:  Again, your Honor, and that's the issue,

3    we're not required to come forward with affirmative and

4    admissible evidence at this stage.

5              THE COURT:  That's not evidence at all.  It's not even

6    inadmissible evidence, simply because someone in this room

7    thinks that.  I have to know why they think that, not just

8    because they say, Well, I saw some stuff that you haven't seen

9    and it's my opinion that this is what happened, particularly

10   when it's not the view taken by the commission.

11             MR. CARTER:  Your Honor, again, this idea that the

12   9/11 Commission didn't endorse this and that they refuted this

13   is incorrect.  They actually go out of their way to make clear

14   that they weren't making any pronouncement on this issue.  They

15   specifically say we can't say affirmatively whether or not the

16   meeting between Bayoumi and the hijackers happened by

17   coincidence or by design.  Again, they also acknowledge that

18   the circumstantial evidence supports the conclusion that

19   Thumairy was the logical point of contact, but based on the

20   standard that they assigned to themselves requiring 100 percent

21   certainty on the basis of direct evidence, they declined to

22   make any affirmative findings on these points.

23             THE COURT:  The findings aren't what's critical.  It's

24   what evidence leads to those conclusions.  As I say, it's not

25   as compelling even if the commission said it's our opinion that

1    they were involved.  I would still have to say what do you base

2    that opinion on.  Is it on some evidence that I can review in

3    your analysis, or is it based on some secret information that

4    you have that I don't get a chance to see?  It can't be simply

5    because member A believes this because they were on the

6    commission.  It's got to be, OK, what was before the commission

7    that would lead a reasonable person to come to that conclusion.

8              MR. CARTER:  Correct, your Honor, and those materials

9    are in the record.  The memoranda for the record, for instance,

10   of the interviews of Bayoumi, Thumairy and Osama Basnan are in

11   the record.  They detail the specific factual allegations about

12   the series of interactions between these parties.  In addition,

13   they make absolutely and abundantly clear that the 9/11

14   Commission concluded that Thumairy lied systematically

15   throughout his interview, as did Basnan, and that Bayoumi also

16   lied on key points.  And while the 9/11 Commission may have

17   declined to draw any inferences from that, as an evidentiary

18   matter even at trial a fact finder in a civil proceeding would

19   be able to infer from the witnesses lying about a material fact

20   evidence of guilt, affirmative evidence of guilt, and so the

21   fact that they lied about these details in an effort to conceal

22   their activity is itself affirmative evidence that is also in

23   the record, your Honor.

24             THE COURT:  All right.  Let's assume that I give

25   weight to all of the factual allegations and reasonable

1    inferences.  My assessment, and you can tell me whether you

2    disagree with it, is that I have to determine whether or not

3    there are employees or officials of the Saudi Arabian

4    government in the United States who were involved in tortious

5    acts, those acts are entirely within the United States and that

6    those tortious acts were not discretionary acts and those

7    tortious acts caused the injuries that are at issue here.  Is

8    that a mischaracterization of what I'm assessing, or how would

9    you differ with that?

10          MR. CARTER:  Your Honor, I would differ only on two

11   relatively modest points.  The Second Circuit's entire tort

12   rule does not require that every aspect of the tortious

13   activity occur in the United States.

14          THE COURT:  Then why do they call it an entire tort?

15          MR. CARTER:  Look, your Honor, I think it evolved in

16   other places.

17          THE COURT:  They don't say substantially tort rule,

18   they say the entire tort rule.

19          MR. CARTER:  Your Honor, the specific language of

20   their decision is rather conspicuous on this when they issued

21   the Saudi Joint Relief Committee and the Saudi Red Crescent.

22   They made clear that the decisions turned on the fact that none

23   of the tortious acts of those defendants were alleged to have

24   occurred in the United States, and they specifically

25   highlighted with italics that their decision was issuing only

1    because every aspect of the tortious activity had occurred

2    abroad.

3              THE COURT:  I know, but you're not arguing that the

4    rule is that as long as some of the tortious acts were

5    committed in the United States that's sufficient to meet the

6    entire tort rule.

7              MR. CARTER:  Your Honor, if we demonstrate that an

8    agent of the Saudi government committed a tortious act in the

9    United States, that is sufficient for purposes of the

10   territorial requirement of the tort exception as identified by

11   the Second Circuit.

12             THE COURT:  It depends on what you define as the

13   tortious act.  It can't be "a" tortious act.  It has to be

14   "the" tortious act, doesn't it?

15             MR. CARTER:  There could be multiple tortious acts,

16   your Honor.  Let me give you an example.

17             THE COURT:  The tortious act that you're suing on.

18             MR. CARTER:  Correct, your Honor.

19             THE COURT:  What's the tortious act that is involved

20   here?  I assume that you mean the tortious act is that they

21   provided financial support to the terrorists who were involved

22   in the 9/11 attacks.  I'm sorry.  Let me restate that.  They

23   provided material support to the individuals who perpetrated

24   the terrorist attacks on 9/11.  That means that that entire

25   act, under the entire tort doctrine, must have occurred in the

United States.  So as part of your tort, one would argue that it can't be that they provided material support to the 9/11 attackers in the United States and outside the United States. That can't be the tort.  The tort has got to be limited to that they provided material support, they directly provided material support in the United States to the 9/11 attackers, and they did so while they were employees or officials of the Saudi government.  Would that be an incorrect statement?

MR. CARTER:  Your Honor, the entire tort rule requires an entire tort in the United States.  It doesn't require every tort committed by the foreign state in furtherance of the act to have occurred here, and there's a reason why.  To hold otherwise would encourage bad actors of this nature simply to slip across the border to Canada, engage in one act of support of the terrorist attack and come back and then claim immunity because they also drove over the border.

THE COURT:  I understand what you're saying, but it seems to me that it does require that the claim on which you're suing can't be the claim that they provided material support outside the United States.  Now, that may be evidence of the material support that you're saying that they provided in the United States.  It doesn't make it irrelevant.  If you say I have significant evidence that they provided material support outside the United States to the hijackers, sure, that could further a determination that they did provide material support

1    for the tort that you're suing on in the United States, but it

2    can't constitute the tort you're suing on in the United States.

3    What the court has said is that the tort that you're suing on

4    in the United States has got to be wholly, irrespective of

5    whether they did or didn't provide other support also outside

6    the United States, the claim has to be one in which they were

7    involved in a tortious act in the United States.  Your claim

8    has got to be, now, your evidence can be more, but your claim

9    has got to be that they provided material support in the United

10   States to these hijackers, and it can't be that, Well, even if

11   I can't prove that they provided support in the United States,

12   if I prove that they provided support outside the United

13   States, then I have a claim; or if your claim necessarily has

14   to be that they provided material support in and outside the

15   United States, that's not a sufficient claim.  That's not an

16   actual claim.  The claim has got to be that they provided

17   material support in the United States.  Would you agree with

18   that or disagree?

19            MR. CARTER:  Your Honor, I think the issue is that for

20   purposes of the present motion, the question is whether or not

21   the government of Saudi Arabia has carried its burden to

22   demonstrate that we have not adequately alleged that a

23   government agent committed a tort in the United States.

24            THE COURT:  And the tort that's at issue has to be the

25   tort that their acts were entirely in the United States.

1          MR. CARTER:  It has to form a basis of the claim that

2     we are pursuing.  The question that your Honor is getting to is

3     in the event that the Court does conclude that there is an

4     adequate allegation that they committed a tort in the United

5     States, what scope of claims then proceed.  Is the claim that

6     proceeds limited only to those tortious acts that were

7     committed here, or would the plaintiffs be able to pursue

8     claims related to a broader spectrum of support both within and

9     without the United States?  And, your Honor, I would say that

10     it's unnecessary to reach that conclusion at this juncture.

11          THE COURT:  I agree with you, but that isn't the

12     issue.  The issue is whether or not it is trying to establish

13     whether the exception to immunity exists, you have to

14     demonstrate a tortious act that it took place entirely in the

15     United States.  For that purpose, that's where you have to

16     focus.  You can't demonstrate that exception relying on

17     tortious acts that happened outside the United States, so you

18     have to say I'm relying on this tortious act, I'm accusing this

19     person, acting on behalf of the government, of doing this

20     tortious act in the United States.  That's the basis on which I

21     say there's an exception.  The tortious act that you rely upon

22     to meet the exception cannot be a tortious act that happened

23     outside the United States.  It has to be a tortious act that

24     you say occurred entirely in the United States.  If you say to

25     me in the United States one of these individuals provided

1    dollars to a hijacker so that the hijacker could carry out the

2    attack, I would say that that qualifies as a tortious act that

3    was committed in the United States.  If you say to me a charity

4    gave money to someone that was going to funnel money to the

5    hijackers, but the charity gave this money outside the United

6    States, that does not help you in meeting the exception.

7            MR. CARTER:  The external acts would not help in

8    meeting the exception, I think, only for purposes of pleading,

9    your Honor.  They may inform the plausibility of the

10   allegations relating to the domestic torts, the U.S. torts.

11           THE COURT:  They may make it more or less likely.

12           MR. CARTER:  Correct, your Honor.

13           THE COURT:  And one could consider that, if that's

14   consistent with the kind of activities happening within the

15   United States.  But the tortious activity you have to rely upon

16   is in the United States.  I'm not sure how you allege that

17   Basnan and Hussayen are employees or officials of the Saudi

18   government.  I understand your argument about Bayoumi and

19   Thumairy being employed by the Saudi government, but I don't

20   understand that there is any fact that would indicate the other

21   two at the time of their activities were employees of the Saudi

22   government.

23           MR. CARTER:  Sure, your Honor.  In the case of Basnan,

24   the FBI reports that included in plaintiffs' appendix indicated

25   that they have concluded that he was an agent of the Saudi

1    government in all likelihood being trained to take over

2    Bayoumi's role.

3            THE COURT:  But doesn't he have to be an employee or

4    an official of the Saudi government?

5            MR. CARTER:  Your Honor, I'm using the term "agent"

6    interchangeably.

7            THE COURT:  I'm not, because you can be an agent for

8    someone under strict agency law and not be an employee.  The

9    statute says they have to be an employee or an official.

10   That's why I asked.  There may have been someone who was a

11   nonemployee or nonofficial that they solicited to do an act,

12   but that's not what the statute allows.  They may be an agent

13   in that sense, but if they're not an employee or official, is

14   it your position that they qualify as meeting the exception,

15   their conduct qualifies as meeting the exception to immunity?

16           MR. CARTER:  Your Honor, I think agents in the legal

17   sense do bind their principals.

18           THE COURT:  I know, but the statute doesn't say agent.

19   It says official or employee.  It says the requirement is that

20   the action be taken by an official or employee.  You don't

21   agree that that's what's required?

22           MR. CARTER:  I'm just suggesting, your Honor, that it

23   may not be that narrow.  For instance, clearly a foreign state

24   can be held accountable for the actions of its alter ego, even

25   though they don't mention the term "alter ego" in the tort

1    exception.

2            THE COURT:  Because alter ego, even if that is

3    appropriate, means you are the same as the government.  That's

4    what alter ego means.  It means in any context.  If you're an

5    alter ego of the corporation, that means you are the

6    corporation.  This is not what the statute is suggesting.

7    These individuals aren't alter egos.  These individuals are

8    individuals that you say that you want to attribute their

9    conduct to the government such that the government is

10   responsible in a way that it loses its immunity.  Doesn't the

11   statute say to do that, you have to attribute it to agents who

12   are employees or officials of that government?  Is that not

13   correct?

14           MR. CARTER:  Your Honor, I'm candidly not sure whether

15   or not there's any holding denying the applicability of an

16   exception where an agent acts, but I think it's relatively

17   unimportant here because the allegation is that Thumairy is an

18   employee and official, that Bayoumi is an employee official,

19   that Basnan was being groomed to take over Bayoumi's job, and

20   al-Hussayen filed a motion to dismiss in the early part of

21   these proceedings where he said I was an official of the Saudi

22   government at all material times and I'm seeking immunity

23   because the claims arise from activities that I was carrying

24   out in my role as an official.  So that's the basis for arguing

25   that all four meet that textual requirement your Honor has

1   raised.

2          Your Honor, if I may briefly turn to the kingdom.

3   First of all, your Honor, once the very well documented and

4   credited allegations concerning the activities of Bayoumi,

5   Thumairy and others are credited, the entire tort rule falls

6   away and the kingdom effectively acknowledges as much in their

7   brief because they don't argue that they're not, the entire

8   argument proceeds on the basis that the Court disregard those

9   allegations.  The same thing is true for their discretionary

10  function argument.  They don't try to defend the acts of

11  Thumairy and Bayoumi in supporting the hijackers as

12  discretionary activities protected under the discretionary

13  function exclusion.  They simply say the Court should disregard

14  them entirely, and that's for good reason.  Neither Bayoumi or

15  Thumairy are imbued with the kind of high-level policy-making

16  decision and authority that the discretionary function

17  exception was designed to shield.  They're operational level

18  employees and so the discretionary function exclusion isn't

19  implicated by their conduct here.

20          Additionally, the nature of their conduct, providing

21  direct aid and support to terrorists, simply can't be

22  encompassed within the scope of the kinds of policy-making

23  functions the discretionary function clause was designed to

24  protect.  So the allegations relating to Bayoumi and Thumairy

25  cause the discretionary function argument to fall away as well.

1            THE COURT:  I read that in your papers and I assume

2       you're alluding to it because they're crimes.  I'm not sure I

3       follow, nor do I see in the cases that you've cited a specific

4       holding that simply because you commit a crime it falls outside

5       of a discretionary act analysis.  If I give you $10 and tell

6       you I need a car for tomorrow and I'm your boss and you take

7       the $10 and you put it in your pocket and you go steal a car

8       and you bring it to me, how is that somehow outside the

9       discretionary act simply because your stealing the car was a

10      crime when it was clearly an act of discretion?  You made the

11      decision.  I didn't tell you to steal a car.  You went out and

12      stole the car and you brought it to me and now I'm driving

13      around in a stolen car without knowing it.  I'm not even sure

14      why that would even policywise make sense, but I don't see

15      anywhere where the court either says specifically or implies

16      that a person can't exercise discretionary acts because they

17      are illegal, so therefore, because the discretionary-level

18      employee has such discretion about how to do it, if they choose

19      an illegal way to do it, that somehow strips me of my immunity.

20      I wasn't able to follow that, either the logic or see where the

21      law says that that's the case.

22            MR. CARTER:  Your Honor, that is the case, where

23      employees of a government engage in acts that are illegal,

24      they're acting beyond the scope of the discretionary function.

25            THE COURT:  Why?

1          MR. CARTER:  Your Honor, the Supreme Court held as

2     much in the context of the Federal Tort Claims Act.

3          THE COURT:  The Supreme Court did not say it strips an

4     organization from immunity.

5          MR. CARTER:  Your Honor, they've declined to grant

6     immunity under the discretionary function exclusion where the

7     acts committed by the employee are illegal, malevolent or

8     against fundamental precepts of humanity.  That's the language

9     from the cases.  The discretionary function exclusion operates

10    to restore immunity for a narrow subset of otherwise tortious

11    acts that involve a government employee's valid exercise of

12    discretion in high-level policy-making related to economic or

13    foreign policy.  That's not at all what's engaged here.

14         THE COURT:  All right.  Again, I don't know.  I didn't

15    see in your cases, nor am I aware of any case that address the

16    issue of immunity and the issue of whether or not the tort

17    exception would apply that says that you do not have an

18    obligation to demonstrate that it is a nondiscretionary

19    decision, you're relieved of that burden because the act that

20    the employee took that was within their discretion to take, the

21    act that they took was an illegal act.

22         MR. CARTER:  Your Honor, the issue is that implicit,

23    and one of the requirements of the discretionary function

24    exception, is that the act has to be of a type the exception

25    was designed to protect.  That's an implicit requirement.

```
 1              THE COURT:  No, no.  But it's not designed to protect.
 2    That's why I'm not sure I follow that.  It's not designed to
 3    protect the act.  It's designed to protect the sovereign.  If
 4    you want to sue the guy who took the act, that's a different
 5    question, but the question is is it appropriate.  The rationale
 6    for the discretionary requirement is that it's not appropriate
 7    to strip the government of its sovereign immunity simply
 8    because one of its employees took a discretionary act which was
 9    not the policy or the direction of the sovereign, and so even
10    an illegal act, if not more so, is not the policy or direction
11    of the sovereign when that individual has the discretion.  The
12    fact that they exercise that discretion to do an illegal act,
13    the question is how does that strip the sovereign of sovereign
14    immunity.  What's the logic behind that?  And again, I'm trying
15    to understand the logic behind it because I understand that
16    part of your argument, but I would be the first judge to ever
17    say that, that sovereign immunity doesn't apply because you're
18    relieved of your burden to demonstrate that this was a
19    nondiscretionary act simply because you just say that it is a
20    criminal act.  I would be the first judge to ever say that.
21              MR. CARTER:  Your Honor, you would not be the first
22    judge to ever say that.
23              THE COURT:  Give me a case.
24              MR. CARTER:  Berkowitz.
25              THE COURT:  Where they said that in the context of
```

1    sovereign immunity, that sovereign immunity does not require an

2    examination of whether the act was discretionary or

3    nondiscretionary if it is a criminal act.  None of the cases

4    say that, do they?

5              MR. CARTER:  Liu certainly says that.

6              THE COURT:  In the context of sovereign immunity?

7              MR. CARTER:  Foreign sovereign immunity decisions,

8    Letelier and Liu, two of the decisions that have been cited at

9    length, both turn on the principle where they involved

10   extrajudicial killings, participation in extrajudicial

11   killings.

12             THE COURT:  Read me the language that would say that

13   that is an exception to sovereign immunity rather than the

14   examination of the discretionary function.

15             MR. CARTER:  Your Honor, I don't have the Liu and

16   Letelier decisions highlighted with that language in front of

17   me.  We can certainly provide it and we can provide a statement

18   on this issue if your Honor would like.  I think it's very

19   telling, your Honor, that there's no effort on the kingdom's

20   part in their briefs to defend, and carry their burden as the

21   party seeking dismissal to defend the actions of al-Bayoumi and

22   al-Thumairy on the basis of the discretionary function

23   exclusion.  They simply tell your Honor they don't matter and

24   disregard them, but there's no argument that even if you credit

25   them, they're discretionary.  They don't go and even make that

1    argument because they're cognizant of these authorities.

2            THE COURT:  Let's put aside whether or not the acts

3    that they committed were legal or illegal.  Do you agree that

4    they were discretionary?

5            MR. CARTER:  The acts that Thumairy and Bayoumi

6    committed were not discretionary within the meaning of the

7    Foreign Sovereign Immunities Act at all.

8            THE COURT:  I'm not sure what you tagged on to the end

9    of it.  Why?  Because they were illegal?  Put aside their being

10   illegal.

11           MR. CARTER:  It also has to involve some valid

12   policy-making decision grounded in economic, social or similar

13   policy.  There's no suggestion that they were engaging in these

14   acts on the basis of furthering the kingdom's social policy.

15   They don't have authority to do those things.  The question,

16   the separate question, your Honor, is whether or not their acts

17   are attributable to the state.

18           THE COURT:  So if the kingdom had someone to run its

19   charity and that person was told it is your authority to decide

20   who the appropriate individuals are to give money to, you would

21   agree if they gave money to an entity and that was not an

22   illegal act, that that would not overcome sovereign immunity to

23   be able to sue the sovereign?

24           MR. CARTER:  I'm just trying to think through the

25   hypothetical, your Honor, for a moment.

1          THE COURT:  Sure.

2          MR. CARTER:  Again, if they're giving to an entity

3     they perceive to be legitimate and they have no reason to

4     know --

5          THE COURT:  They who?

6          MR. CARTER:  The charity is giving to an entity that

7     they perceive to be legitimate and have no reason and they're

8     not trying to further a criminal enterprise, I don't think

9     there would be a basis to suggest that that conduct is in any

10    way tortious or that it necessarily runs afoul of the

11    discretionary function in terms of making those decisions.

12         THE COURT:  The conduct might be tortious.  I'm

13    assuming that the conduct is tortious.

14         MR. CARTER:  It might.

15         THE COURT:   I'm assuming that the conduct is

16    tortious but not illegal.  If I gave money to a drunk driver to

17    drive home, would that be criminal conduct or not criminal

18    conduct?  And I'm just not sure, when you say, oh, because it's

19    criminal, it changes the analysis.  I'm not sure how you get

20    there.

21         MR. CARTER:  Your Honor, the decisions again Letelier

22    and Liu --

23         THE COURT:  I'll look at them up here.

24         MR. CARTER:  -- which have said that foreign countries

25    have no discretion to commit unlawful acts.

1            THE COURT:  Is that in the context of stripping them

2    of sovereign immunity?

3            MR. CARTER:  That's in the context of determining that

4    they were not entitled to sovereign immunity under the Foreign

5    Sovereign Immunities Act, as well as the USAA Casualty

6    decision.

7            THE COURT:  With regard to a discussion of whether or

8    not it qualifies as a discretionary or nondiscretionary act?

9            MR. CARTER:  Correct, your Honor.  USAA Casualty v.

10   Permanent Republic of Namibia, Liu v. Republic of China and

11   Letelier v. Republic of Chile all include discussions of this

12   issue in the context of determining whether or not the

13   discretionary function exclusion bars jurisdiction.

14           THE COURT:  Just give me one second because I thought

15   I had the cases.  Where are you quoting from?

16           MR. CARTER:  Your Honor, the exact cite, in the USAA

17   Casualty case, is 681 F.3d at 113.

18           THE COURT:  113?

19           MR. CARTER:  Liu.

20           THE COURT:  Just a second.  What language did you

21   quote?

22           MR. CARTER:  Your Honor, the decision in USAA Casualty

23   case involved a finding --

24           THE COURT:  Just tell me what language.  I have the

25   decision in front of me.

1          MR. CARTER:  It's the language of the decision that

2     speaks to, where there's an affirmative duty imposed by law for

3     a party to have behaved in a certain way, a foreign state does

4     not have discretion to deviate from that.

5          THE COURT:  I still don't know what language you're

6     saying that says that if a person has the authority and is

7     involved in discretionary acts, sovereign immunity does not

8     apply if that employee commits, in exercising that discretion,

9     an illegal act.

10          MR. CARTER:  Your Honor, the issue is that the

11     structure of the tort exception provides there's no immunity

12     for tort claims arising from the acts of foreign states or

13     their officials and employees.

14          THE COURT:  Right.

15          MR. CARTER:  The discretionary function exclusion then

16     says, but we will restore that immunity.

17          THE COURT:  Right.

18          MR. CARTER:  In cases in which the employee is engaged

19     in the performance of an discretionary function.

20          THE COURT:  No.  You said it incorrectly.  Not that we

21     will restore that immunity.  That immunity continues to exist

22     unless you demonstrate that it's a nondiscretionary act.

23          MR. CARTER:  No, your Honor.

24          THE COURT:  That's why they call it exception to

25     sovereign immunity.  They presumptively have the sovereign

1   immunity.

2          MR. CARTER:  Your Honor, it is their burden to come

3   forward and demonstrate that the exclusion applies, their

4   burden to demonstrate that the tort complained of involves the

5   performance of a discretionary act.  So it's their burden to

6   restore their immunity on that issue.  The allegations

7   demonstrating that law prohibited these persons, these

8   employees of the government from engaging in the activities

9   that they performed, affirmatively establishes for the purposes

10  of the plaintiffs' pleadings that the discretionary function

11  exclusion does not apply.

12         THE COURT:  I'll look at that.

13         MR. CARTER:  Your Honor, the language that someone's

14  just handed me from the Liu decision holds that the

15  "discretionary function exception is inapplicable when an

16  employee of a foreign government violates its own internal law

17  and commits murder."  The Letelier decision is "whatever policy

18  options may exist for a foreign country, it has no discretion

19  to perpetrate conduct designed to result in the assassination

20  of an individual or individuals --"

21         THE COURT:  Slow down.

22         MR. CARTER:  "-- action that is clearly contrary to

23  the precepts of humanity as recognized in both international

24  and national law."

25         THE COURT:  Could you tell me what page you're quoting

1    from.

2              MR. CARTER:  The Letelier quote is from 488 F.Supp. at

3    673, and the Liu quote is from 892 F.2d at 1431, your Honor.

4              THE COURT:  And you began where?

5              MR. CARTER:  In Liu, it was the language holding that

6    the discretionary function exception is inapplicable when an

7    employee of a foreign government violates its own internal law.

8              THE COURT:  I'm sorry.  What page?

9              MR. CARTER:  I'm sorry, your Honor.  I have one of our

10   briefs.

11             THE COURT:  Oh, I see.

12             MR. CARTER:  My apologies.

13             THE COURT:  I'll just flag the page.  I'll go back to

14   it.

15             MR. CARTER:  Your Honor, briefly, with regard to the

16   defendants' jurisdictional causation argument, here again we

17   have a problem of the Saudi government simply not engaging

18   under the applicable standard.  Courts, including this court in

19   its Havlish decision, have recognized that the caused-by

20   language of the tort exception merely requires a plaintiff for

21   purposes of establishing jurisdiction to plead some reasonable

22   connection between the defendants' wrongful conduct and the

23   resulting injury.

24             Now, the defendants resist that standard citing to a

25   more recent Supreme Court decision that does not involve the

1  FSIA.  It involves a criminal statute, and it did not involve

2  an interpretation of the exact phrase "caused by."  But the

3  defendants argue that the Supreme Court in that decision

4  reviewed phrases that they think are similar to the phrase

5  "caused by" and concluded that they normally require but-for

6  causation.  And the problems here, your Honor, are first, none

7  of these decisions involve the interpretation of the caused-by

8  language of the Foreign Sovereign Immunities Act.

9       The additional problem, your Honor, is that those

10  decisions all involved the interpretation of causation language

11  in substantive statutes.  Burrage was a criminal statute.  The

12  other decisions involved RICO claims and others.  The Foreign

13  Sovereign Immunities Act is a jurisdictional statute, and it is

14  that principle that lies at the heart of the decisions of the

15  federal courts that the caused-by language merely requires some

16  reasonable connection between the act complained of and the

17  resulting injury.  And so plaintiffs more than meet that

18  requirement here, and this is not based on some unadorned

19  allegation that the defendants' conduct was a cause of the

20  September 11 attack; it's rather based on the specific

21  allegations that describe the importance of the support

22  provided by the defendants to the success of the September 11

23  attacks, as, for example, the allegations documenting that

24  Hazmi and Midhar were ill-prepared for their mission in the

25  United States and would need assistance in order to get settled

1    and begin carrying out their activities.

2            Now, to quarrel with this is simply to disagree with

3    the empirical findings of the 9/11 Commission on the point.

4    It's to disagree with the conclusions of Congress in this very

5    arena about what kinds of supports are material.  They

6    specifically identify in the Antiterrorism Act, for example,

7    that providing lodging, transportation, financial services are

8    forms of material support when given to a terrorist.  And so

9    plaintiffs' allegations more than adequately meet those

10   standards.

11           Finally, your Honor, I'd just like to briefly address

12   the claims arising from the activities of the charity alter

13   egos of the government, and there's a few problems here again,

14   your Honor.  The kingdom has not filed any affidavit or

15   otherwise raised any competent challenge to any of the

16   allegations that are offered about the status of the charities

17   as alter egos and their conduct in supporting al-Qaeda.

18           THE COURT:  Doesn't the same rule apply, that that

19   conduct has to be conduct that took place in the United States?

20           MR. CARTER:  Yes, your Honor, and they argue that the

21   allegations that the charity offices in the United States are

22   insufficient, but the problem with that, your Honor, is this

23   Court and the Second Circuit have already concluded otherwise.

24   The individual U.S. branches of these charities appeared and

25   filed motions to dismiss.  The al-Haramain branch filed a

motion to dismiss, the U.S. branch of the International Islamic

Relief Organization filed a motion to dismiss, the World

Assembly of Muslim Youths filed a motion to dismiss, arguing

all of the same things, that the allegations were conclusory,

that there was no allegation to support a causal connection to

the September 11 attacks, and the Court denied those motions

and we've been proceeding with discovery against them since.

       The Second Circuit likewise reinstated claims against

officials of the U.S. offices of those charities in its 2013

decisions.  It reinstated claims against Suliman al-Buthe, who

was an official of the U.S. branch of al-Haramain, and it

reinstated claims of Soulieman al-Ali, who was an official of

the U.S. branch of the IIRO.  And they indicated that the

allegations pertaining to their conduct in directing the

terrorist activities of those offices were sufficient to

satisfy the pleading standard they were imposing for purposes

of the personal jurisdiction analysis, which as your Honor

knows, requires a very strong nexus to the September 11 attacks

under the standard the Second Circuit has announced in this

case.  And so those factors are all satisfactory.

       Again, your Honor, the kingdom tries to avoid these

results by arguing that we haven't proven that the charities

are alter egos as a primary matter.  The problem with that is

that there's ample evidence in the record, including the

testimony of the plaintiffs' expert, documenting the precise

kinds of control activities that are relevant in determining

whether or not an entity is an alter ego of a foreign state,

and this ranges from the fact that they appoint their

directors, provide virtually all of their funding, specific

allegation that the embassies direct the activities of the

charities in the countries outside of Saudi Arabia where they

operate, the specific testimony of employees of the charities,

they viewed themselves to be employees of the government, and a

range of other very highly specific allegations that certainly

give rise to a reasonable expectation that discovery might lead

to relevant evidence, which is the Twombly standard the

defendants themselves cite.

        THE COURT:  It's not clear to me what discovery you

think is going to uncover.

        MR. CARTER:  Your Honor, again, this is a bit of the

issue.  If the kingdom had come forward and raised a specific

factual challenge to one of our allegations, we would have come

to the Court and said we want discovery as to that issue that

they're attempting to contest.  Now, the question is as the

case proceeds, and counsel for the kingdom is alarmist about

what the discovery might look like with regard to the question

of jurisdiction, if your Honor were to find that a particular

fact that is vital to the resolution of the jurisdictional

dispute was insufficiently developed in the record, let's say,

for example, your Honor concluded that Bayoumi's status as an

agent and employee of the government was a critical factor that

seemed undeveloped in the record, and again, we disagree

because it's clear from the record that he is.  But even

assuming your Honor thought that was undeveloped, the Court

would then say I want discovery as to that issue, which is why

we framed our request in that way.  We don't want pervasive

discovery of every issue pertaining to this for the purposes of

jurisdictional.

THE COURT:  The Court doesn't want discovery, it's the

party that wants discovery.  You present to me what you say is

a significant factual averment from the averment of facts that

you say meets your burden.  Either it does or it doesn't.  You

don't say to me there's something that you don't know or that

you can't demonstrate because they have the information and you

don't.  That's not to say, Well, if you disagree with us, then

just open the door to discovery.  That's not particularly

useful for me because I see no basis for further discovery, nor

do you.  You say that you have what is sufficient and pretty

much whatever you're going to get.  You don't articulate

anything on any issue that you would anticipate that you and

the Court are going to be more knowledgeable about if I end up

disagreeing with you that your 100-page additional averment of

facts, plus the original complaint and what developed over the

last decade, somehow I should think of something that I would

say at this point, well, I think maybe you can find some more

1    information about this or I'll give you jurisdictional

2    discovery.  It seems to me that you haven't even taken that

3    position.  You've taken a fallback decision, that's it.  You

4    say if I lose, give me discovery.  That's all you're saying.

5          MR. CARTER:  No, your Honor.  I think the position

6    we're taking is that because the kingdom has failed to raise

7    any competent factual challenge under the standards applicable

8    in FSIA disputes, our allegations are to be accepted as true

9    and we think that they are more than sufficient to carry our

10   burden on every point, and so the appropriate result is for the

11   Court to deny the motion to dismiss outright on the basis of

12   the record, and that's a product of their decision not to raise

13   a competent factual challenge, your Honor.

14         THE COURT:  If I say that you are deficient in any

15   way, I should rather than dismiss just give you discovery on

16   that issue?  That's basically your argument.

17         MR. CARTER:  I think that the approach the Second

18   Circuit undertook with regard to the personal jurisdiction

19   appeals is instructive on this point.  There were a number of

20   places in which they said that essentially the allegations gave

21   rise to an inference, for instance, that Dallah Avco had

22   engaged in tortious activity giving rise to the September 11

23   attacks and they said we think that discovery as to the nature

24   of their relationship to Bayoumi might push this over the edge

25   and establish jurisdiction, they're very close and this might

1    push it over the edge, and so that's the circumstance in which

2    we'd be seeking discovery, your Honor.

3         THE COURT:  If that was my determination, I might give

4    more serious consideration to giving discovery, but unless you

5    can articulate for me, either now or then if I decide that it's

6    insufficient, in what way you think that discovery would be

7    revealing and determinative and reverse the decision on that

8    issue, I don't think that you've made a sufficient record now

9    to simply say that if I lose give me discovery.

10        MR. CARTER:  Your Honor, I apologize.  I understand

11   now.  Let me give you concrete examples of how discovery might

12   further inform the record.  We know from the 9/11 Commission

13   report that they had the opportunity to interview Fahad

14   al-Thumairy, Omar Bayoumi and Osama Basnan and that the

15   productiveness of that interview was significantly impaired by

16   the conclusion that those principals in this investigation had

17   lied to them throughout.  There was an additional problem that

18   Thumairy was sitting next to a representative of Saudi

19   intelligence who was whispering in his ear throughout the

20   interview.  And so were there any concern in the Court's mind

21   about whether Bayoumi and Thumairy knew one another and were

22   working in concert with one another to support the hijackers,

23   the depositions of those individuals would clearly further

24   inform the record on this point.

25        THE COURT:  Because you think they're going to give

1   you different answers than they gave before?

2             MR. CARTER:  I think that they're not going to have

3   the benefit of having a Saudi intelligence officer whisper in

4   their ear while they're testifying.  I think we're going to

5   have the benefit of being able to proceed pursuant to the

6   Federal Rules of Civil Procedure and the protection it affords,

7   which the commission did not.

8             THE COURT:  What is your wishful thinking in terms of

9   what they would say?

10            MR. CARTER:  Your Honor, I think our wishful thinking

11  is simply to document the denials, for instance, Thumairy's

12  denials of knowing Bayoumi are demonstrably false based on a

13  huge spectrum of evidence, which is the conclusion the 9/11

14  Commission reached as well.

15            THE COURT:  How would I anticipate that you're going

16  to demonstrate that by a deposition of them?  They're not going

17  to break down and confess to you that fact.

18            MR. CARTER:  Your Honor, again, the fact finder's

19  conclusion that they systematically lied on material aspects in

20  dispute may itself prove to be affirmative evidence

21  demonstrating their guilt.

22            THE COURT:  We already have that.  We already know

23  that.

24            MR. CARTER:  Your Honor, I agree with you that the

25  record establishes that point.  I do.

1          THE COURT:  Again, you would have to articulate to me

2     what would be the usefulness of further discovery on this issue

3     in terms of what you anticipate you hope to find and how that

4     would supply any missing relevant fact if I were to determine

5     that this record did not support that assertion.

6          MR. CARTER:  Your Honor, let me give you another

7     example.  Again, we've alleged and provide very specific facts

8     in support of our claim that the charities are alter egos.  If

9     your Honor feels that there is any discrepancy in the record on

10    that point, discovery concerning the nature of the relationship

11    of the charities to the government, how money flowed between

12    them, the role of the government in appointing employees to the

13    charities, the role of the government in directing how they

14    carry out their activities would certainly fill up any

15    potential gaps in that question.  It is an issue we've been

16    attempting to pursue in the discovery as to the charities

17    themselves, but as Judge Maas could say the discovery as to the

18    charity has been punctuated by a number of problems.

19          There has been defaults entered, for instance, against

20    the al-Haramain Saudi headquarters based on discovery

21    violations.  There have been a number of motions to compel

22    filed by plaintiffs granted as to other of the charities, so it

23    may very well be that the direct discovery as to the kingdom

24    would shed light on those issues.  But again, your Honor, we

25    think it more than documented in the record that we carry our

```
 1    burden on that at this stage.

 2              Thank you, your Honor.

 3              THE COURT:  Let me try to figure out how much longer

 4    we're going to go and whether I should give my court reporter a

 5    break.

 6              MR. KREINDLER:  Your Honor, I just need a couple

 7    minutes.  Listening to the dialogue between you and counsel,

 8    there are three points I want to make that will take not more

 9    than five minutes and then five minutes on Iran.

10              THE COURT:  I want to give them an opportunity to

11    reply if they have anything.

12              MR. KREINDLER:  Sure.  I can sit down now or just say

13    what I want to say in three minutes on this topic following

14    some of the comments made by my partner.

15              There are really three points I want to make, your

16    Honor.  There is maybe a dance or a distinction that we've

17    heard today between the Kingdom of Saudi Arabia and high Saudi

18    officials and Saudi officials, and the point I want to make is

19    this, your Honor:  35 years ago, the whole world changed.  In

20    Saudi Arabia, radical fundamentalists took over the mosques,

21    scaring the Saudi government.  There's a revolution in Iran,

22    the Shah is deposed, radical fundamentalists are in control.

23    When the Soviet Union invades Afghanistan, radical

24    fundamentalists eventually defeat the Soviet Union.  Ever since

25    then, in Saudi Arabia, two things have been happening at the
```

1    same time.  The Kingdom of Saudi Arabia depends on us.  When

2    Saddam Hussein invaded, we saved them.  We supplied billions of

3    aid to the Kingdom of Saudi Arabia.  At the same time, to

4    remain in power and for individuals in Saudi Arabia to get

5    higher positions and higher power, you have to have the support

6    of the fundamental Islamic mullahs.  So at the same time the

7    country is depending upon us, Saudi officials are pleasing the

8    mullahs by helping al-Qaeda.  That's just a basic fact that

9    pervades our whole policy.

10        THE COURT:  But that's not the record before me on

11   this motion, nor is that a determinative factor in terms of my

12   legal assessment.

13        MR. KREINDLER:  The point I want to make, your Honor,

14   is we're here dealing with the motion and the law.  In the

15   political process, while sometimes the government will call the

16   Kingdom of Saudi Arabia and other times make a distinction

17   between the kingdom and Saudi officials, that's for political

18   reasons.  Here, as Sean laid out, we've met our burden, I

19   believe.

20        The second point I want to make is this, very briefly.

21   Al-Qaeda could not do the 9/11 attack alone.  You have these

22   Saudi terrorists who don't know how to fly, don't speak

23   English, would stick out like sore thumbs and probably get

24   arrested long before the attack, unless they had an

25   intelligence organization, a state supplying support, and Sean

has detailed what Saudi Arabia did to supply that cover, that

secret support that let them learn English, live and not be

detected until the support was done.

The third point, which bears upon this since we talked

about the entire tort and what's in the United States, I'm kind

of simple about this, Judge.  Most of the time when we deal

with entire torts, it's an embassy driver who gets drunk and

hits a pedestrian at an intersection.  That's the typical case.

In a case like that, say it was Great Britain's driver who hit

a pedestrian who was drunk, if the plaintiff introduced

evidence that the driver purchased single malt scotch in the

London airport or a year before coming over was arrested for

drunk driving and had all these other instances, the things

that happened outside the United States go to the proof of what

was happening inside the United States, and we've given you a

long record on the support that Saudi Arabia funneled to

al-Qaeda through charities all around the world so that you can

be certain that the entire tort done in the United States that

caused 9/11 was done intentionally, deliberately, as part of

the plot.  That's why we've presented all the things outside

the United States.

That's all I have to say on this topic.  You might

want to hear from Mr. Kellogg and then I just need five minutes

on Iran.

THE COURT:  Yes, sir.

1          MR. KELLOGG:  Your Honor, I'm going to be extremely

2     brief.  I'm not going to respond to Mr. Kreindler's attack on

3     the kingdom.  As your Honor noted, this is a legal issue based

4     on legal principles, not a political seminar.  And I think the

5     attack on the kingdom, an ally of the United States, is really

6     quite inappropriate.  I want to make only three points:

7          As I predicted, Mr. Carter did not mention the Saudi

8     High Commission.  As I said at the outset, I think it's

9     absolutely clear that they're not in this case.

10          The second point I wanted to make, Mr. Carter

11     repeatedly says the Court has to take the allegations as true,

12     and it is correct that in the In Re Terrorist Attack 2013

13     decision, the court started out with the general principles

14     that you look at the allegations in the complaint and you

15     assume they're true and you take the allegations, but then it

16     went on to say in the specific FSIA context, where a sovereign

17     nation denies the allegations and claims immunity, that, and

18     I'll quote again, "the plaintiff has the burden of going

19     forward with evidence showing that under the exceptions to the

20     FSIA immunity should not be granted."

21          Evidence, competent admissible evidence.  If

22     Mr. Carter had any competent admissible evidence, he would have

23     been waving it around this courtroom.  Instead, he has hearsay

24     statements by people without direct knowledge.  He has

25     anonymous sources contradicted by the findings of the 9/11

1      Commission, the department of justice, the 9/11 staff and the

2      FBI and the most recent review of the 9/11 report that took

3      place just in March here and still confirmed that there is no

4      evidence to support any of these allegations.

5           The third point I'll make, the charities Mr. Carter

6      mentions that are still before this Court, the IIRO, the Muslim

7      World League, etc., those are all NGOs.  Those are

8      nongovernment organizations.  They did not plead FSIA immunity,

9      so the fact that the Second Circuit kept them in the case based

10     on the allegations there is irrelevant to the issue of whether

11     you can somehow penetrate through these nongovernmental

12     organizations to try to hold the kingdom accountable for the

13     9/11 attacks.  There are so many tenuous steps in that analysis

14     that it can't possibly satisfy the FSIA.  And the law is quite

15     clear, you have to show, to establish alter ego status, that

16     the kingdom is directing the day-to-day operations.  There are

17     no allegations of that.  There is no evidence of that

18     whatsoever.

19          In short, we would ask the Court to finally dismiss

20     this.  Mr. Carter has again made it clear they're not asking

21     for any particular jurisdictional discovery.  They want full

22     merits discovery.  They have not met the burden of going

23     forward with that.

24          THE COURT:  Thank you.

25          MR. KRY:  Your Honor, Robert Kry, counsel for Dallah

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Avco.  We weren't expecting to enter an appearance here on this

motion today, but there were a couple statements made during

argument that were prejudicial to my client's interest.  I was

wondering if you could indulge us.

THE COURT:  I'm not sure how it prejudices your client

since your client doesn't have an outstanding motion.

MR. KRY:  The issue is statements were made suggesting

that Dallah Avco employed Omar al-Bayoumi.  He was a technical

or nominal employee, and the only point we wanted to make is

that there hasn't been any briefing on Saudi labor law.  We are

working with the Saudi labor expert who we expect to be able to

convince your Honor that there is no employment relationship

there at all.  The test under Saudi law is supervision and

direction.  There is no conceivable sense in which Dallah Avco

supervised Omar al-Bayoumi's activities or directed his

activities.  It was a payroll processing entity and so it paid

the salary and then got reimbursed for it.  We expect to be

able to prove that through factual evidence, through expert

testimony.  Right now our client is still in discovery, so it

will be a little while before that's teed up, but we would ask

that as the Court considers this motion, we're not weighing in

on any of the issues that Mr. Kellogg raises, but bear in mind

that that is a disputed issue, a vehemently disputed issue,

from Dallah Avco's point of view and we expect to be able to

prove that to the Court.

1            THE COURT:  I think that came through.

2            Did you have one last point?

3            MR. KREINDLER:  Your Honor, yes.  Not on this, on

4       Iran.

5            THE COURT:  Yes.

6            MR. KREINDLER:  I just thought I'd take a couple

7       minutes to spend a little time with the Court on what we're

8       going to do and why and so you can see our thinking behind

9       what's coming up with Iran.

10           As your Honor will remember, I think now three years

11      ago, you entered judgment in the Havlish action against Iran.

12      You heard evidence that Iran's intelligence organization and

13      Hezbollah cooperated with al-Qaeda and then Iran provided

14      assistance to al-Qaeda members transiting Iran before and after

15      the 9/11 attack.  So you entered a liablity finding on the 47

16      death cases in Havlish.  You also received damages information

17      on those cases and awarded amounts between 32 million and 335

18      million for an aggregate of $6 billion.  There have been

19      hundreds of other default judgments against Iran, for the

20      Khobar Towers, the marine barracks bombing.  I'm sure your

21      Honor is aware that in Ashton and in Federal, we moved for a

22      default judgment on liablity only at this point in time, and

23      I'd like to tell you why we did that and what we hope to do

24      next.

25           The reason, quite simply, is this.  Reading the

1    newspaper, a lot's going to happen between the U.S. and Iran

2    over the coming months, and our approach to the case all along,

3    for everything we've been doing for 14 years, and really going

4    back 27 years to PanAm 103, it's been our approach that we in

5    court have to act in accordance with the Administration and the

6    State Department and Congress when it comes to Libya, Iran or

7    any other country.  Just like with PanAm 103, a good result,

8    which took 20 years, it could only occur when we were on the

9    same page with Congress and the Administration.

10            What we foresee happening with Iran is this, in now

11   less than 60 days, Congress is going to vote on the deal, and

12   most people believe that it will go through.  If it goes

13   through, sanctions will be lifted and money will be flowing to

14   Iran on oil company deals and others, and you have all these

15   judgments that could attach those funds to satisfy the

16   judgments.  Because of that, personally, I, my colleagues and

17   the other lawyers who are involved with Iran all think that

18   there may be an effort in the future to resolve cases against

19   Iran so that you don't have judgment creditors seeking to

20   interfere in oil contracts and other things.  The reason we've

21   moved for liablity only at this point in time is twofold.  If

22   we sought large damage awards, in Ashton, we have 857 deaths,

23   1,750 injuries, and if we do the Havlish sort of math, that

24   could result in $150 billion in judgments against Iran, and

25   we're cautious because we don't want to do something at this

1   point in time that might interfere with diplomacy with Iran and

2   what the Administration and State Department want to do.  So

3   that's why we're doing it in two phases, for liablity only, and

4   we're hoping that when your Honor has the time you'll be able

5   to enter that default on liablity only because it's the exact

6   evidence you've already heard on Havlish.

7          Now, the other component of what we're doing is this.

8   In Havlish, you dealt with 47 deaths.  In Ashton, it's 850, 20

9   times the amount, and almost 2,000 injury cases and we don't

10  want to overwhelm the Court and ourselves with huge damages

11  information, particularly when we expect that all the terror

12  cases will eventually be resolved on an equal per-decedent

13  basis, like the $10 million in PanAm 103.  So you have the

14  default on liablity and we hope that when that's entered, we

15  will be before you with the default on damages, but our present

16  thinking, both to accord with what we see diplomatically and,

17  frankly, what's most effective, is to present something where

18  we ask for a default on a common number, if you take the lowest

19  consortium award in Havlish and pain and suffering and interest

20  and do something like that across the board.  So while we're

21  here together, I thought I'd take these five minutes just to

22  lay out what we've done, what our present thinking is and what

23  we anticipate doing over the coming months.

24         THE COURT:  Thank you.  What I'm going to do is let's

25  go ahead and schedule our next conference, say, for January 14.

1    We'll see where we are.  Continue to work with Magistrate Judge

2    Maas in moving forward.  We'll move these motions out of the

3    way and then we'll see where we are.  In that time if we need

4    to meet before then, just send me a letter and quick response

5    and we can convene before then.  But otherwise, we'll

6    anticipate a January 14 conference at 10:30, unless there are

7    no issues to address at that time.

8            Thank you, everybody.

9            (Adjourned)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25