# Exhibit C

## MDL 1570 PLAINTIFFS' EXECUTIVE COMMITTEES
In re: Terrorist Attacks on September 11, 2001 (S.D.N.Y)

| Plaintiffs' Executive Committee for Personal Injury and Death Claims | Plaintiffs' Executive Committee for Commercial Claims |
|---|---|
| Ronald L. Motley, *Co-Chair*<br>MOTLEY RICE LLC<br>James P. Kreindler, *Co-Chair*<br>KREINDLER & KREINDLER LLP | Elliot R. Feldman, *Co-Chair*<br>Sean Carter, *Co-Chair*<br>COZEN O'CONNOR |
| Andrew J. Maloney III, *Co-Liaison Counsel*<br>KREINDLER & KREINDLER LLP<br>Paul J. Hanly, Jr., *Co-Liaison Counsel*<br>HANLY CONROY BIERSTEIN SHERIDAN FISHER & HAYES LLP | J. Scott Tarbutton, *Liaison Counsel*<br>COZEN O'CONNOR |

## VIA HAND DELIVERY

October 17, 2011

The Honorable Frank Maas
United States District Court for the
Southern District of New York
Daniel Patrick Moynihan United States
Courthouse
500 Pearl Street, Room 740
New York, NY 10007-1312

Re:     *In Re: Terrorist Attacks on September 11, 2001,* 03 MDL 1570 (GBD) (FM)

Dear Judge Maas:

In accordance with the Court's January 21, 2011 Order, Plaintiffs in the above referenced action submit this letter and the accompanying exhibits and respectfully request that Your Honor enter an order, pursuant to F.R.C.P. 37(a), compelling defendant Wa'el Hamza Jelaidan, an Executive Order 13224 terrorist designee, to promptly produce documentation and information relating to certain categories of documents previously requested by the Plaintiffs.  Generally speaking, the documents at issue relate to: (1) banking and financial accounts associated with the terror financier, including a frozen account Jelaidan holds jointly with Osama bin Laden; (2) the defendant's relationship with other Executive Order 13224 designees, including transfers of millions of dollars between them; and (3) the imposition of financial and other sanctions upon Jelaidan following his September 2002 designations by the United States, Kingdom of Saudi Arabia, and United Nations.[1]

---

[1] There are a number of other serious deficiencies with the defendant's discovery responses that warrant this Court's attention.  Plaintiffs will separately address those remaining issues in subsequent letter submissions.

The Honorable Frank Maas
October 17, 2011
Page 2

---

## I.   PLAINTIFFS' FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS

On June 13, 2006, Plaintiffs served their consolidated First Set of Requests for Production of Documents Directed to Wa'el Hamza Jelaidan, attached hereto as Exhibit 1. Plaintiffs' document requests were divided into Part A (comprising the first 25 requests) and Part B (the remaining 49 requests).[2]

Those requests seek *inter alia*: (i) relevant banking and financial documents, including documentation relating to an account Jelaidan holds jointly with Osama bin Laden; (ii) documents relating to investigations conducted by the United States and foreign governments into Jelaidan's terror sponsorship activities, including sanctions leveled against the defendant; (iii) documents relating to Jelaidan's employment with, and oversight of, several of the charities that were an integral part of the al Qaeda financial support infrastructure, including but not limited to the Muslim World League ("MWL"), International Islamic Relief Organization ("IIRO"), Rabita Trust, Saudi Joint Relief Committee ("SJRC"), and Al Haramain & Al Masjed Al Aqsa Charity Foundation ("AHAMAA"); and (iv) documents relating to Jelaidan's relationship with fellow Executive Order 13224 designees – Yassin Abdullah al Kadi and Chafiq Ayadi – and other prominent financial supporters of Osama bin Laden and al Qaeda.

On August 15, 2006, Jelaidan provided his responses to the Plaintiffs' Part A requests, and on September 13, 2006, Jelaidan provided his responses to the Plaintiffs' Part B requests. *See* Wael Jelaidan's Responses to the Plaintiffs' First Set of Requests for Production of Documents "Part A," and Wael Jelaidan's Responses to the Plaintiffs' First Set of Requests for Production of Documents "Part B," attached collectively hereto as Exhibit 2.

Following an examination of the defendant's discovery responses and documents, it is readily apparent that there are significant problems. First, the most glaring deficiency is the fact that the defendant has failed to produce a single document in response to sixty-seven (67) of the Plaintiffs' seventy-four (74) document requests. Just as egregious, the defendant has produced a mere 22 documents (104 pages) since the commencement of merits discovery, several of which are unresponsive to the Plaintiffs' discovery requests and have no relevance to the specific issues articulated in those requests.

Second, when responding to Plaintiffs' discovery requests, Jelaidan has in boilerplate fashion asserted conclusory and unsubstantiated objections regarding alleged burdens associated with producing responsive documentation and materials. Although the Federal discovery rules require a party to provide credible evidence to substantiate its objections, the defendant has failed to provide a single affidavit, declaration, or other document in support of those burden objections. *See Arias-Zeballos v. Tan*, 2007 U.S. Dist. Lexis 40245, *4 (S.D.N.Y. 2007) ("In

---

[2] Plaintiffs staggered their discovery requests in this manner, as well as the response times, so as to provide the defendant with sufficient time to search for and gather responsive materials and fully respond to the Plaintiffs' requests.

The Honorable Frank Maas
October 17, 2011
Page 3

_____

order to satisfy its burden, the resisting party must do more than simply inton[e the] familiar litany that the [discovery requests] are burdensome, oppressive or overly broad, and must clarify and explain its objections and provide support thereof.").

Further, not only has Jelaidan blatantly ignored his continuing obligation under Federal Rule 26(e) to supplement his responses to the Plaintiffs' discovery requests, the defendant has failed to supplement his responses pursuant Judge Daniels' Order holding that "the appropriate temporal scope of discovery should reasonably begin in 1992," and further directing Jelaidan to respond to Plaintiffs' discovery requests in accordance with that determination. *See* Order, MDL Docket No. 2059, December 21, 2007. Jelaidan's failure to do so has significantly prejudiced the Plaintiffs' ability to obtain relevant and discoverable information.

Moreover, the defendant attempts to excuse his lack of production by repeatedly asserting that he neither has knowledge of nor possession of responsive documents. Jelaidan particularly relies upon this position when responding to Plaintiffs' requests seeking banking and financial records for accounts under his control. But neither Jelaidan's failure to conduct a diligent search for responsive records nor his bare "not in my possession" disclaimers fulfill his discovery obligations. *See Scott v. Arex, Inc.*, 124 F.R.D. 39, 41 (D. Conn. 1989) (Court holding that a party to a lawsuit cannot escape the obligation to produce documents by incanting .... 'not in my possession.' That a party does not possess documents is simply immaterial if those documents remain in that party's custody or control.").

Plaintiffs have well-founded concerns that Jelaidan does not intend to fulfill his discovery obligations in this important case and is in fact deliberately withholding the production of responsive documentation. Plaintiffs have attempted to contact Jelaidan's counsel, Martin McMahon, on at least three separate occasions to set up a meet and confer to discuss the defendant's discovery deficiencies, but Mr. McMahon's office has not responded to any of Plaintiffs' requests to schedule a conference. *See* Plaintiffs' emails to Martin McMahon dated April 14, 2011, and May 5, 2011 and May 16, 2011, attached hereto as <u>Exhibit 3</u>. Plaintiffs still do not have the requested information and, particularly given the impending deadline for document productions, intervention by this Court is now necessary. Accordingly, Plaintiffs respectfully request that the Court order Jelaidan immediately to produce all responsive materials.

A.      **Jelaidan's Timeframe and Burden Objections Have Previously Been Struck By This Court**

Plaintiffs have served the defendant with a number of important discovery requests seeking a variety of relevant information, including without limitation, documents concerning: (i) meetings and conferences Jelaidan attended with other members of al Qaeda; (ii) relationships between members of al Qaeda and certain charities; (iii) Jelaidan's relationship with fellow Executive Order 13224 designees Yassin Abdullah al Kadi, Chafiq Ayadi, Adel Batterjee, and Hassan Cengic; (iv) Jelaidan's relationship with the al Qaeda charities such as the IIRO, AHAMAA, World Assembly of Muslim Youth ("WAMY"), and Third World Relief Agency

The Honorable Frank Maas
October 17, 2011
Page 4

---

("TWRA"); and (v) bank accounts Jelaidan held jointly with the aforementioned individuals and entities. *See* Plaintiffs' Request Nos. B12-14 and B38-43 at Exhibit 1.

Jelaidan has failed to produce a single document in response to these document requests, primarily relying on his objection that the timeframe and breadth of the requests is "too expansive and burdensome:"

> Despite the foregoing and preserving all our objections, WJ states that no responsive documents will be produced because both the timeframe and breadth of this request is much too expansive and burdensome. Should Plaintiffs identify a reasonable amount of specific individuals and a reasonable and relevant timeframe, WJ would endeavor to focus a search that may or may not produce documents responsive to this request.

(Emphasis added). *See* Jelaidan's Responses to Plaintiffs' Request Nos. B12-14 and B38-43 at Exhibit 2. As this Court will recall, Judge Daniels previously considered, rejected, and struck the defendant's timeframe and burden objections, holding that the appropriate temporal scope of discovery should reasonably begin in 1992, and further directing Jelaidan to respond to the Plaintiffs' discovery requests in accordance with that determination. *See* December 21, 2007 Order (MDL Docket Entry No. 2059). The defendant has failed to supplement his discovery responses and/or produce a single document since the Court's December 2007 Order. Plaintiffs therefore respectfully request that Your Honor direct Jelaidan to comply with the Court's prior orders and immediately produce all requested documents.

**B.      Jelaidan Should Be Compelled To Produce All Banking And Financial Records**

Plaintiffs have served the defendant with several discovery requests seeking banking and financial records for accounts linked to Jelaidan, including the defendant's personal bank accounts and other accounts over which he has signatory authority and control. Although the defendant responded to Plaintiffs' banking requests by producing a few documents (mostly unresponsive), Jelaidan has largely failed to produce any of the requested information relating to a number of bank accounts the Plaintiffs have discovered through their independent investigations, as well as certain accounts Jelaidan himself has acknowledged in his discovery responses.[3] In support of his non-production, the defendant relies primarily upon his contention that he "neither has knowledge of nor possession" of the requested banking records. As

---

[3] The discussion which follows focuses on a select number of identified bank accounts held in Jelaidan's name, or over which he held signatory or account authority. Plaintiffs focus on these particular accounts merely as a means of demonstrating Jelaidan's failure to comply with his discovery obligations in responding to Plaintiffs' document requests. However, through the instant application, Plaintiffs seek an Order directing Jelaidan to produce any and all records for *any* bank account held in his name, or relative to which he held signatory or account authority, during the relevant timeframe. For the reasons discussed in Section F below, that timeframe should extend at least back to the formation of al Qaeda in 1988.

The Honorable Frank Maas
October 17, 2011
Page 5

_____

discussed in further detail below, that response fails to meet Jelaidan's most basic obligations under the Federal discovery rules.

**1.      Jelaidan has "control" over his bank accounts and must produce documents concerning those accounts in accordance with Rule 34.**

The federal courts have been clear that a party may not forego his duty to produce responsive documents by asserting that they are "not in my possession," and must produce documents where the party has the legal right to obtain such documents on demand. *See Scott v. Arex, Inc.*, 124 F.R.D. 39, 41 (D. Conn. 1989) (Court holding that a party to a lawsuit cannot escape the obligation to produce documents by incanting .... 'not in my possession.' That a party does not possess documents is simply immaterial if those documents remain in that party's custody or control.").

Rule 34(a) of the Federal Rules of Civil Procedure requires production of all responsive, non-privileged documents within a party's "possession, custody or control" that are responsive to another party's document request. *See United States v. Stein*, 488 F. Supp. 2d 350, 361 (S.D.N.Y 2007) ("Legal ownership of the requested documents or things is not determinative, nor is actual possession necessary if the party has control of the items. *Control* has been defined to include the legal right to obtain the documents requested upon demand.  The term 'control' is broadly construed."); *Florentia Contracting Corp. v. The Resolution Trust Corp.*, 1993 WL 127187, at *3 (S.D.N.Y. Apr. 22, 1993) ("Control has been defined as the legal right, authority, or ability to obtain upon demand documents in the possession of another."); *The Bank of New York v. Meridien BIAO Bank Tanzania Ltd.*, 171 F.R.D. 135 (S.D.N.Y. 1997) (stating that control does not require that the party have legal ownership or actual physical possession of the documents at issue, but rather, documents are considered to be under a party's control when that party has the right, authority or practical ability to obtain the documents from a non-party to the action); *In Re Flag Telecom Holdings*, 236 F.R.D. 177, 180 (S.D.N.Y. 2006) ("If the producing party has the legal right or the practical ability to obtain the documents, then it is deemed to have 'control,' even if the documents are actually in the possession of a non-party.").

Following that reasoning, the courts have similarly held that a party has control over his or her bank account records and must produce them in accordance with Rule 34. *See Dorocon, Inc. v. Burke*, 2005 U.S. Dist. Lexis 38839, at *52-53 (D.D.C. 2005) (reasoning that control is not defined by actual possession but also includes constructive possession (i.e., the legal right to obtain documents on demand), the court held that Rule 34(a) obligates the party to turn over documents such as bank statements "given that they enjoy constructive possession of such documents."); *Engel v. Town of Roseland*, 2007 U.S. Dist. Lexis 73645 (N.D. Ind. 2007) (holding that when a person has a right to obtain copies of his bank statements, the party is in control of those documents and must produce them in response to a request under Rule 34); *Thomas v. Deloitte Consulting L.P.*, 2004 Dist. Lexis. 29154 (N.D. Tex. 2004) (ordering production of bank statements); *Zervos v. S.S. Sam Houston*, 79 F.R.D. 593, 595-96 (S.D.N.Y. 1978) (where the plaintiff failed to produce the requested banking records by claiming they were not in his possession, the court ordered the plaintiff to request production of the records from the Swiss Bank, holding that "[p]roduction may be ordered when a party has a legal right to obtain

The Honorable Frank Maas
October 17, 2011
Page 6

---

**2.      Jelaidan's accounts at Faisal Finance (Switzerland) S.A.**

Plaintiffs served the following requests seeking banking records for accounts held by the defendant at Faisal Finance (Switzerland) S.A.[4]

- Request No. A-6 – Please provide any and all documents relating to any financial accounts held by You in Faisal Finance and/or any Faisal Finance accounts over which You hold or have held signatory authority, including without limitation, monthly or annual account statements, correspondence, deposits, withdrawals, cleared or canceled checks, wire transfers, or investments, including the source or destination of funds deposited into or withdrawn from any such account.

- Request No. A-7 – Please provide any and all documents relating to Switzerland's investigation and post 9-11 determination to freeze any and all accounts in Your name and/or any accounts over which you hold or held signatory authority, including without limitation, all documents identifying any and all accounts, assets, and/or monies frozen by the Swiss government.

Jelaidan produced a mere two documents in response to Request Nos. A-6 and A-7:  (1) a three-page bank statement for Account No. x0409 at Faisal Finance for the month of January 2005 (WJ003); and (2) a September 25, 2002 letter from Faisal Finance notifying Jelaidan that Account No. x0409 has been frozen per the directives of the Swiss Federal Prosecutor (WJ013). The defendant further responds as follows:

> WJ neither has knowledge of nor possession of any additional documents other than what has been produced which are responsive to this request.

*See* Exhibit 2, pp. 6-7.  As the case law cited above makes clear, Jelaidan's discovery obligations under the Federal Rules require him to do more than simply assert that responsive banking records are not in his possession, particularly when he has the legal right, authority, and/or practical ability to request them from the bank.  There is no question that Jelaidan has control over Account No. x0409 and/or any other account associated with him at Faisal Finance. Indeed, the defendant's production of the January 2005 account statement makes clear that Jelaidan has successfully requested and obtained responsive banking records from the Swiss bank despite the freezing of the account three years earlier in 2002.

Jelaidan's document production in response to Plaintiffs' Request Nos. A-6 and A-7 is significantly inadequate and the defendant should be compelled to immediately produce all responsive documents.

---

[4] Executive Order 13224 designee and al Qaeda financier, Yassin al Kadi, also held personal and business accounts at Faisal Finance (Switzerland) S.A.  As discussed in Section C(1) herein, Kadi used his accounts at Faisal Finance to transfer millions of dollars to Jelaidan.

The Honorable Frank Maas
October 17, 2011
Page 7

---

      **3.**      **Jelaidan's accounts at Al Rajhi Banking & Investment Corporation.**

Plaintiffs also served the following request seeking banking records for all accounts held by the defendant at Al Rajhi Bank:

- Request No. A-8 – Please provide any and all documents relating to any financial accounts held by You in the al Rajhi Banking & Investment Corporation ("al Rajhi") and/or any al Rajhi accounts over which You hold or have held signatory authority, including without limitation, monthly or annual account statements, correspondence, deposits, withdrawals, cleared or canceled checks, wire transfers, or investments, including the source or destination of funds deposited into or withdrawn from any such account.

The defendant responded to Plaintiffs' discovery request with the following:

Despite the foregoing and preserving all our objections, WJ has no statements post dating the freezing of his account.  WJ is currently endeavoring to obtain statements prior to the freezing of his account (but not prior to 1996) and will produce such documents if and when they may be found.

*See* Exhibit 2, p. 7.

Despite the defendant's assurances in 2006 that he was working to obtain the requested documentation, Jelaidan has yet to produce a single document relating to his accounts at Al Rajhi Bank.  Nor has the defendant advised Plaintiffs of the status of his efforts to obtain the requested banking records.  Accordingly, Jelaidan should be compelled to produce all relevant banking records for any and all accounts associated with the defendant at Al Rajhi Bank, including without limitation, all bank statements for the life of the accounts (both *prior to and after* the date of freezing).

      **4.**      **Jelaidan's joint account with Osama bin Laden at Habib Bank.**

In addition to the frozen accounts at Faisal Finance (Switzerland) S.A. and Al Rajhi Bank, a third account linked to Jelaidan has been frozen following the September 11th attacks.  According to media reporting, the government of Pakistan identified and seized an account Jelaidan held jointly with Osama bin Laden at Habib Bank in Peshawar in or around June 2003.  *See* Ikram Hoti, *Accounts of 15 Terrorist Organizations Frozen*, World News Connection (June 21, 2003) (identifying the frozen Jelaidan-bin Laden account as:  "Osama Bin-Laden and Wael Jelaidan FC-CD xx051-1 USS 342.04 Habib Bank Limited (HBL) Cantt Br. Peshawar"), attached hereto as Exhibit 4; *see also* November 18, 2002 letter from the State Bank of Pakistan to William C. Murde, Director of the Treasury Department's Task Force on Terrorist Financing, regarding the status of certain frozen accounts, including the Jelaidan-bin Laden account, attached hereto as Exhibit 5.

The Honorable Frank Maas
October 17, 2011
Page 8

_____

Based on this reporting and other available information, Plaintiffs served the following document requests:

- Requests No. A-3 – From the period beginning January 1984 through the present, please provide any and all documents relating to any accounts You hold or held jointly with, or on behalf of Osama Bin Laden (including any member of the Bin Laden family), including without limitation, any accounts over which You held or hold signatory authority.  Such documents shall include, but are not limited to, monthly or annual account statements, correspondence, deposits, withdrawals, cleared or canceled checks, wire transfers, or investments, including the source or destination of funds deposited into or withdrawn from any such account.

- Request No. A-4 – Please provide any and all documents relating to the Islamic Republic of Pakistan's investigation and post 9-11 determination to freeze any and all accounts in Your name and/or any accounts over which you hold or held signatory authority, including without limitation, all documents identifying any and all accounts, assets, and/or monies frozen by the Islamic Republic of Pakistan, including the following: "Osama Bin-Laden and Wael Jelaiden FC-CD xx051-1 USS 342.04 Habib Bank Limited (HBL) Cantt Br. Peshawar."

Jelaidan responds to Request No. A-3 by merely asserting that "no such documents exist." *See* Exhibit 2, p. 5.  The defendant's contention is simply not true in light of the specifically identified Jelaidan-bin Laden account at Habib Bank in Pakistan.

In response to Plaintiffs' Request No. A-4, the defendant has produced seven (7) documents, including but not limited to:  (i) a September 25, 2002 letter from Faisal Finance (Switzerland) S.A. to Jelaidan stating that the Swiss Federal Prosecutor has ordered the freezing of Jelaidan's account (WJ013); (ii) a letter from the MWL Secretary General, Dr. Abdullah bin Abdul Mohsin al Turki, to the Ambassador of Pakistan in the Kingdom of Saudi Arabia, Admiral Abdul Aziz Mirza, requesting that the Rabita Trust accounts in Habib Bank be unfrozen by the government of Pakistan (WJ021); (iii) a December 16, 2002 letter from Javed Masud, Government of Pakistan, Cabinet Division, to the MWL Secretary General, Dr. Abdullah bin Abdul Mohsin al Turki, stating that Jelaidan's continued presence on the Board of Rabita Trust acts "as an impediment in defreezing the accounts of the Rabita Trust" (WJ008); and (iv) an October 15, 2001 statement by Jelaidan (unsigned) asserting that neither he nor Rabita Trust were involved or connected to al Qaeda or Osama bin Laden (WJ015).  None of these mostly self-serving documents are remotely responsive to Plaintiffs' request that made specific reference to the Jelaidan-bin Laden account.

Moreover, Jelaidan once again falls back on his oft-stated position that he is not in possession of responsive documents:

WJ neither has knowledge of nor possession of any additional documents other than what has been produced which are responsive to this request.

The Honorable Frank Maas
October 17, 2011
Page 9

---

*See* Exhibit 2, p. 5.  As a named account holder and beneficiary of the account at Habib Bank, Jelaidan most certainly has control over the requested documents and thus the legal right, authority, and practical ability to request and obtain all responsive banking records from Habib Bank relating to the account he holds jointly with bin Laden.  Accordingly, this Court should compel the defendant to promptly produce the requested banking documents.[5]

### 5.    Other responsive account records at Habib Bank.

Given the defendant's relationship with Habib Bank (as evidenced by the Jelaidan-bin Laden account), Plaintiffs served Jelaidan with the following request seeking documents for any and all bank accounts at Habib Bank associated with the defendant, including any account over which Jelaidan holds signatory authority:

• Request No. A-2 – Please provide any and all documents relating to any financial accounts held by You in Habib Bank and/or any Habib Bank accounts over which You hold or have held signatory authority, including without limitation, monthly or annual account statements, correspondence, deposits, withdrawals, cleared or canceled checks, wire transfers, or investments, including the source or destination of funds deposited into or withdrawn from any such account.

Although Jelaidan responds that he "neither has knowledge of nor possession of" documents responsive to this request,[6] the defendant does produce an August 21, 2002 letter authored by himself in his capacity as the Secretary General of Rabita Trust, to the State Bank of Pakistan, requesting that six (6) Rabita Trust accounts held at Habib Bank be unfrozen and the funds contained therein released.  *See* Exhibit 6 (identifying Account Nos. xx973-1, x536, xx206-4, x254, x255, and x414).

As the leading official for Rabita Trust, Jelaidan would have signatory authority over the Rabita Trust accounts at Habib Bank and thus the supervisory authority to manage the disposition of the funds in those accounts at the time they were frozen.  Accordingly, responsive banking records in the possession of Habib Bank are within defendant Jelaidan's control by virtue of his signatory authority.  Therefore, Plaintiffs submit that these six Rabita Trust accounts are responsive to Request No. A-2 and the defendant should be compelled to request, obtain, and produce all responsive banking records relating to these accounts.

Similarly, in documents resolving an arbitrated dispute between Jelaidan and another man concerning funds for a project in Afghanistan, Jelaidan indicated that he had control of various accounts at Habib Bank related to that project.  According to representations to which Jelaidan agreed, Jelaidan wrested control of all the components of the project, "pressured the director of the (Habib Bank), Peshawar Kant Branch, and managed to seize control of all the bank accounts

---

[5] To the extent Jelaidan is attempting to make a semantic distinction to avoid production of the requested documents, for instance on the ground that bin Laden is not formally listed by name on the account, his attempts to avoid discovery should be rejected.

[6] *See* Exhibit 2, p. 4.

The Honorable Frank Maas
October 17, 2011
Page 10

of the project." *See* Exhibit 7. Given the control over those accounts that Jelaidan was shown to have, he should be compelled to request, obtain, and produce all responsive banking records relating to those accounts as well.

### 6.   Jelaidan's bank accounts associated with the charities.

As this Court will recall from Plaintiffs' prior submissions in this case, Jelaidan is a long-time associate of Osama bin Laden, a founding member of al Qaeda, and an Executive Order 13224 Specially Designated Global Terrorist. The U.S. Treasury Department statement supporting Jelaidan's designation details the defendant's ties to the terror group and its senior members:

> Wa'el Hamza Julaidan, a Saudi citizen, is an associate of Osama bin Laden. Julaidan fought with bin Laden in Afghanistan in the 1980s. Julaidan is also associated with several individuals and entities linked to al Qaida, including bin Laden's lieutenants, Ayman al Zawawri, Abu Zubaida, and Mohammed Atef; and the organizations: Maktab al Khidmat, the Rabita Trust, and al-Gamma al Islamiya. These individuals and entities have been previously designated under President Bush's Executive Order and by the United Nations.

> Bin Laden himself acknowledged close ties to Julaidan during a 1999 interview with al-Jazeera TV. When referring to the assassination of al Qaida co-founder Abdullah Azzam, bin Laden stated that "we were all in one boat, as is known to you, including our brother, Wa'el Julaidan." Julaidan has established contacts with several known Islamic extremists, including bin Laden's principal lieutenant, Ayman al-Zawahri. Another bin Laden lieutenant, Abu Zubaida, claimed that he had accompanied Julaidan from Pakistan to Kandahar, Afghanistan during the summer of 2000. Zubaida said that Julaidan met with bin Laden and senior bin Laden lieutenant Mohammed Atef soon after arriving in Kandahar.

> In February 2000, Julaidan was appointed to the Board of Trustees of the Rabita Trust and served as its director general. The Rabita Trust is an NGO designated under President Bush's Executive Order as an organization that provided logistical and financial support to al-Qa'ida.

> BASIS FOR DESIGNATION

> The United States has credible information that Wa'el Hamza Julaidan is an associate of Osama bin Laden and several of bin Laden's top lieutenants. **Julaidan has directed organizations that have provided financial and logistical support to al-Qa'ida.** Accordingly, the United States is designating Julaidan under Executive Order 13224 as a person who supports terror.

(Emphasis added). *See* U.S. Treasury Department's September 6, 2002 press release discussing the Executive Order 13224 designation of Jelaidan, attached hereto as Exhibit 8. The United

The Honorable Frank Maas
October 17, 2011
Page 11

---

Nations similarly designated Jelaidan as a member of al Qaeda on September 11, 2002, attached as <u>Exhibit 9</u>.

Consistent with the U.S. government's position that the defendant oversaw organizations that supported al Qaeda, Plaintiffs have submitted compelling evidence in these proceedings in support of their contention that Jelaidan used his high-ranking leadership positions within several ostensible charities to deliberately direct material, logistical, ideological, and other forms of support to Osama bin Laden, al Qaeda, and affiliated terror groups, including massive amounts of money. *See* Plaintiff's Chart at <u>Exhibit 10</u> (summarizing key allegations and evidence relating to Jelaidan's relationship with the Muslim World League ("MWL"), International Islamic Relief Organization ("IIRO"), Rabita Trust, Saudi Joint Relief Committee ("SJRC"), Al Haramain & Al Masjed Al Aqsa Charity Foundation ("AHAMAA"), and Saudi Red Crescent ("SRC")).

Importantly, as a principal official of those organizations, Jelaidan would have had signatory authority over the charities' bank accounts and thus the requisite control to direct the movement of funds in and out of those accounts in support of terror activities. For example, Jelaidan opened three bank accounts on behalf of the designated AHAMAA "between 1997 and 2001 and continued to have the authorization to handle two of their accounts as a signatory on two [of] the NGO's Bosnian accounts." *Id.* Additionally, as discussed in the previous section, Plaintiffs are aware of at least six (6) accounts at Habib Bank which were seized from Rabita Trust and frozen following the September 11, 2001 attacks (Account Nos. xx973-1, x536, xx206-4, x254, x255, and x414). As the Secretary General of Rabita Trust, Jelaidan would have had signatory authority and control over these accounts. In light of the evidence of Jelaidan's prominent role in funding the al Qaeda network via the charities, Plaintiffs served the defendant with the following requests seeking relevant bank account records:

- Request No. B-19 – From the period beginning January 1984 through the present, please provide all documents relating to any accounts in any banking or financial institution You hold or held jointly with, or on behalf of the Charities, and/or any Charity accounts over which You hold or have held signatory authority. [The term "Charities" refers to the Muslim World League ("MWL"), Rabita Trust, Saudi Joint Relief Committee ("SJRC"), and Saudi Red Crescent ("SRC").]

- Request No. B-43 – Please provide all documents relating to any accounts in any banking or financial institution You hold or held jointly with, or on behalf of the entities identified in Exhibit C, and/or any accounts over which You hold or have held signatory authority. [Entities identified in Exhibit C include, but are not limited to: International Islamic Relief Organization ("IIRO"), Al Haramain & Al Masjed Al Aqsa Charity Foundation ("AHAMAA"), Third World Relief Agency ("TWRA"), Al Haramain Islamic Foundation, and World Assembly of Muslim Youth ("WAMY").]

Jelaidan fails to produce documents in response to Request No. B-19, again chiefly relying upon his assertion that he has no documents in his possession. *See* <u>Exhibit 2</u>, pp. 11-12. Further, the defendant once again asserts that both the timeframe and breadth of the requests are "much too expansive and burdensome" to produce relevant documentation in response to

The Honorable Frank Maas
October 17, 2011
Page 12

---

Request No. B-43. *Id.* at p. 24. As discussed in Section I(A) supra, this Court previously struck the defendant's timeframe and burden objections and directed Jelaidan to respond to the Plaintiffs' discovery requests in accordance with that determination. To date, the defendant has failed to act in accordance with the Court's December 2007 Order and Plaintiffs respectfully submit that the defendant should be compelled to produce all responsive bank records.

### 7.      Jelaidan's bank account associated with the Third World Relief Agency.

In addition to his use of the above mentioned charities to fulfill the terror group's fundraising needs, Jelaidan was determined to find and use other opportunities to direct financial and material support to the al Qaeda network. Jelaidan successfully did so by virtue of his relationship with the leaders of the Sudan-based Third World Relief Agency ("TWRA"), a purported charitable organization that provided the people of Bosnia-Herzegovina with humanitarian assistance during the war in the former Yugoslavia. According to CIA intelligence, the TWRA was in fact aiding Islamic terrorist groups in the region.[7] The 9/11 Commission similarly concluded that bin Laden "made use of the already-established Third World Relief Agency" to provide financial and other support for al Qaeda's terrorist activities. *See Final Report of the National Commission on Terrorist Attacks Upon the United States*, available at http://govinfo.library.unt.edu/911/report/911Report.pdf, at p. 58. German authorities, providing judicial assistance to the Office of the Prosecutor of the International Court of Criminal Justice for the former Yugoslavia, conducted an investigation of TWRA bank accounts and discovered large monetary transfers to those accounts from the Islamic world, including six (6) suspicious transactions directly linked to Jelaidan himself at Bank Austria (Acct. No. xxxxx1587), totaling more than $11 million. *See* German Intelligence Report regarding the TWRA, attached as Exhibit 11, pp. 13-15. Consequently, Plaintiffs served the following request:

- Request No. A-9 – Please provide any and all documents relating to any financial accounts held by You in the Bank Austria and/or any Bank Austria accounts over which You hold or have held signatory authority, including without limitation, monthly or annual account statements, correspondence, deposits, withdrawals, cleared or canceled checks, wire transfers, or investments, including the source or destination of funds deposited into or withdrawn from any such account.

Not surprisingly, the defendant fails to produce a single document in response to the Plaintiffs' request and continues to assert the following:

No documents will be produced as WJ neither has knowledge of nor possession of any such documents.

*See* Exhibit 2, pp. 7-8.

---

[7] According to a 1996 CIA report, the TWRA was one of several charitable organizations facilitating the activities of terrorist groups operating in Bosnia-Herzegovina region. Employees of the TWRA have conducted suicide bombings and engaged in massive weapons smuggling operations. *See* Exhibit 27.

The Honorable Frank Maas
October 17, 2011
Page 13

Given the defendant's ongoing resistance to produce relevant bank account records under his control, which he has the legal right to request and obtain directly from the bank, this Court should compel Jelaidan to immediately produce all documents responsive to Request No. A-9.

**8.      Jelaidan's bank accounts in Turkey.**

Maram Company, located in Istanbul, Turkey, is a Jelaidan-owned travel and trading firm that has significant ties to al Qaeda. Maram was founded by Mamdouh Mahmud Salim, a former al Qaeda financial officer who is now serving time in a U.S. prison for his involvement in the bombing of the U.S. embassies in Kenya and Tanzania in August 1998. In 1997, Jelaidan and his partner Mohamed Bayazid became owners of Maram when Salim transferred his shares in the company to them.[8]

In 1998, Yassin al Kadi, an Executive Order 13224 designee and al Qaeda financier, transferred $1.25 million to Jelaidan. *See* March 23, 2007 letter from the Office of the Swiss Federal Examining Magistrates office to U.S. authorities at Exhibit 12; *see also* Memorandum in Support of Defendants' Motion to Dismiss or, in the Alternative, For Summary Judgment (*Yassin Abdullah Kadi v. Timothy Geithner, et al.*, Case No. 09-0108), attached hereto as Exhibit 13, pp. 11 and 21. Although Kadi told U.S. authorities that the $1.25 million was intended for the Al Imam University in Yemen,[9] the money was suspiciously transferred to Jelaidan through a Turkish account connected to Maram.[10] *See* Exhibit 14 (Swiss prosecutors investigating Kadi's links to Jelaidan and al Qaeda stated that "the Turkish account Juleidan used in Turkey to receive al Qadi's money might be linked to the Maram Company, a ***ucture connected (according to your intel services) to al Qa'eda.").

As the owner of Maram, Jelaidan has the legal right, authority, and practical ability to request and obtain responsive banking records relating to any and all bank accounts associated with that company. Accordingly, this Court should compel the defendant to produce all banking records for Maram, including any other accounts associated with Jelaidan in Turkey.

---

[8] Bayazid (a/k/a Abu Rida) is an al Qaeda founding member (like Jelaidan) who participated in obtaining weapons and communications equipment for the terror organization. Bayazid also sought to obtain uranium for a nuclear weapon for Osama bin Laden.

[9] Al Imam is not the ordinary university one would expect. Founded by Sheikh Abd al Majid al Zindani, a bin Laden associate and al Qaeda recruiter who was designated by the U.S. Department of the Treasury, "Al Imam students are suspected of being responsible, and were arrested, for recent terrorist attacks, including the assassination of three American missionaries and the assassination of the number two leader for the Yemeni Socialist party, Jarallah Omar. Notably, John Walker Lindh was also a student at Al Iman University before he joined the Taliban." *See* February 24, 2004 OFAC press release regarding the designation of Abd al Majid al Zindani which can be found at http://www.treasury.gov/press-center/press-releases/Pages/js1190.aspx.

[10] The $1.25 million came from the account of Kadi's company, Karavan Development Group. Karavan's account was held at Faisal Finance (Switzerland) S.A.

The Honorable Frank Maas
October 17, 2011
Page 14

---

9.   **Jelaidan should be ordered to produce affidavit testimony and other supporting documentation detailing his efforts to request and obtain responsive banking records.**

As demonstrated by the foregoing, including Plaintiffs' Chart at Exhibit 10, the breadth of Jelaidan's involvement in the financial support infrastructure used to fund the al Qaeda terrorist network is staggering.  Using his leadership positions within multiple charitable organizations, including his relationships with other prominent financiers of the al Qaeda network, the al Qaeda co-founder was able to direct massive amounts of material, financial, and other forms of support to Osama bin Laden and his terror organization.  Consequently, any and all banking accounts linked to Jelaidan, one of the premier al Qaeda financiers over the past 20+ years, should be fair game in these discovery proceedings.

Jelaidan contends in his discovery responses that he does not physically possess the requested banking documents.  As a central figure in a global terror organization responsible for the murder of nearly 3,000 innocent individuals on September 11, 2001, it is feasible that Jelaidan would choose not to personally retain copies of sensitive banking records that could be easily seized from him by investigating authorities.  However, the Federal discovery rules and the courts are clear that the defendant must do more than merely assert that he does not have possession of responsive banking documents which are under his control.  Rather, Jelaidan is required to request the production of those records directly from the bank and produce those immediately to the Plaintiffs upon receipt.  To date, Plaintiffs have yet to see any evidence that Jelaidan has made any such effort to request, obtain, and produce the relevant documents.

Plaintiffs therefore respectfully request that Your Honor compel Jelaidan to immediately request and produce *all* bank account records requested by the Plaintiffs.  In the event that the defendant is unable to obtain the banking records after a formal request, Plaintiffs respectfully submit that Jelaidan should be ordered to submit an affidavit and all supporting documentation detailing his efforts to obtain the requested materials, including without limitation:  (1) identification of all bank representatives that were contacted relative to the defendant's request to produce all banking records, attaching all written communications exchanged in requesting the information; (2) a description of the specific subject matters that were discussed with the bank representatives; (3) a description of the search conducted by the bank, including locations searched; (4) a detailed description as to why the defendant was unable to obtain the requested records; and (5) any other detail that demonstrates the defendant made a reasonable, good faith attempt to obtain the requested documents.

C.   **Jelaidan Should Be Compelled to Produce Documentation Relating To His Relationships with Other Executive Order 13224 Designees**

Plaintiffs served the defendant with discovery requests seeking documents relating to his relationship with fellow Executive Order 13224 designees Yassin Abdullah al Kadi, Chafiq Ayadi, Hasan Cengic, and Adel Batterjee, including documents relating to the transfers of funds between Jelaidan and those individuals and any banking or financial accounts Jelaidan held jointly with those individuals:

The Honorable Frank Maas
October 17, 2011
Page 15

---

- Request No. B-38 – Please provide any and all documents governing, describing, detailing, or otherwise relating to the relationship between You and the persons identified in Exhibit B. [Persons identified in Exhibit B include, but are not limited to: Yassin Abdullah al Kadi, Chafiq Ayadi, Hasan Cengic, Adel Batterjee, and Mohamed Bayazid.]

- Request No. B-39 – Please provide any and all documents sent to, and/or received from the persons identified in Exhibit B, including without limitation, all documents relating to the transfer of funds between You and those persons.

- Request No. B-40 – Please provide all documents relating to any accounts in any banking or financial institution You hold or held jointly with, or on behalf of the persons identified in Exhibit B, and/or any accounts over which You hold or have held signatory authority.

*See* Plaintiffs' Request Nos. B38-40 at <u>Exhibit 1</u>.

Once again, Jelaidan objects to each of these discovery requests by asserting that both the timeframe and breadth of the requests are "much too expansive and burdensome:"

Despite the foregoing and preserving all our objections, <u>WJ states that no responsive documents will be produced because both the timeframe and breadth of this request is much too expansive and burdensome</u>. Should Plaintiffs identify a reasonable amount of specific individuals and a reasonable and relevant timeframe, WJ would endeavor to focus a search that may or may not produce documents responsive to this request.

(Emphasis added). *See* Jelaidan's Responses to Plaintiffs' Request Nos. B38-40 at <u>Exhibit 2</u>.

Despite this Court's December 2007 Order (MDL Docket Entry No. 2059) rejecting and striking Jelaidan's timeframe and burden objections, the defendant has yet to produce a single document in response to Plaintiffs' discovery requests and should be compelled to immediately produce the requested materials.

## 1.    Jelaidan has failed to produce any documents relating to his relationships with Yassin Abdullah al Kadi and Chafiq Ayadi.

Jelaidan has failed to produce documents relating to fellow Executive Order 13224 designees Yassin Abdullah al Kadi and Chafiq Ayadi despite well-documented personal and business relationships between and among the three men. *See* October 12, 2001 U.S. Department of the Treasury designations for Kadi and Ayadi, attached hereto as <u>Exhibit 15</u>.

Family friends since the 1980's, Jelaidan and Kadi are known to have held seats on various boards together, invested in several businesses together, and have generally supported each other's business and/or purported charitable endeavors. For instance, the two men were board members of the Executive Order 13224 designated Al Haramain & Al Masjed Al Aqsa

The Honorable Frank Maas
October 17, 2011
Page 16

Charity Foundation ("AHAMAA").  *See* Statement of Yassin Abdullah Kadi to the U.S. Foreign
Assets Control at Exhibit 16, pp. 42 and 55; *see also* Plaintiff's Chart at Exhibit 10 (discussing
the Treasury Department's designation of the AHAMAA).  In addition, Jelaidan and Kadi sat on
the board of the Dar al Walidain School in Sarajevo, Bosnia, which operated under the patronage
of the AHAMAA.  *See* Exhibit 16, pp. 54-55.

Jelaidan and Kadi were also shareholders in Abrar of Saudi Arabia, a travel company
established to provide services to Muslim pilgrims, as well as a Bosnian investment company
called Euroinvest which had originally been created by E.O. 13224 designee Ayadi.  *See* Exhibit
16, pp. 54-56, 67, and 77.

Moreover, when Jelaidan was appointed as Executive Director of the Saudi Joint Relief
Committee ("SJRC") in Albania and Kosovo in 1999, Kadi's companies in Albania provided the
SJRC with considerable support and resources.  *See* Exhibit 16, pp. 54 and 56 (stating that
Kadi's companies provided the SJRC with apartments and office space, among other things).

Kadi is also known to have transferred significant sums of money directly to Jelaidan.
According to Swiss authorities, Kadi transferred approximately $23 million to the accounts of
Jelaidan.  *See* Exhibit 17.  In addition, Kadi transferred $1.25 million to Jelaidan in 1998 through
the defendant's Maram Company in Turkey.  *See* Section B(8) supra.

Importantly, Jelaidan was instrumental in introducing Kadi to Chafiq Ayadi.[11]  While
working with Kadi to establish an advanced teacher's college in Zagreb, Croatia, Jelaidan
recommended that Kadi hire Ayadi to manage the college.  *See* Exhibit 16, pp. 34 and 54; *see
also* Exhibit 19, OFAC Designation Memorandum for Yassin al Kadi, p. 8.  That same year,
Kadi hired Ayadi to head Muwafaq's European operations, again based upon the
recommendation from Jelaidan.  *See* Exhibit 13, pp. 10 and 21-22; Exhibit 19 at p. 28 (stating
that there is "substantial and credible evidence that both Muwafaq as an entity, and many of the
individuals charged with operating it and distributing its funds, were engaged in a longstanding
pattern of supporting terrorist and extremist causes.").  Notably, all three men were shareholders
in KA Stan, a construction company set up in 1996.  *See* Exhibit 16, p. 79.

Having failed to produce any documents in response to Request Nos. B-38-B-40,
Plaintiffs respectfully request that Your Honor compel the defendant to produce all responsive
documentation and information requested by the Plaintiffs.

---

[11] Ayadi has been identified as one of the heads of the Tunisian Islamic Front ("TIF"), which is the armed branch of
Ennahdha, a Tunisian terrorist organization.  *See* INTERPOL Fusion Taskforce, Financing of Terrorism, March
2003, attached hereto as Exhibit 18, pp. 26-29.  In the 1990's, Ayadi went to Afghanistan where he became the TIF
representative to al Qaeda and attended military training camps.  *Id.*  During the Bosnian War, Ayadi acted under the
cover of a humanitarian organization to buy weapons and false documentation for terrorist activities.  *Id.*

The Honorable Frank Maas
October 17, 2011
Page 17

2.      **Jelaidan has failed to produce any documents relating to his relationship with Hasan Cengic.**

Hasan Cengic is the former Deputy Prime Minister and Defense Minister of the Federation of Bosnia and Herzegovina and a radical, militant Muslim cleric who provided significant financial, material, and logistical support to Osama bin Laden and the al Qaeda network. The Imam of an important mosque in Zagreb, Croatia, Cengic served as the local "primary organizer" of arriving foreign mujihadeen during the Bosnian War and turned his mosque into the central point of entry for Arab militants loyal to al Qaeda traveling to Bosnia via Croatia.[12] Moreover, as a member of the Third World Relief Agency ("TWRA") supervisory board, Cengic aided Islamic terrorists, including bin Laden, with the financing and shipment of massive amounts of weapons to Bosnia.[13] On May 29, 2003, the U.S. Department of the Treasury designated Cengic as a Specially Designated Global Terrorist. *See* Exhibit 20.

As set forth above in Section I(B)(7), an investigation of TWRA bank accounts by German authorities revealed six (6) large monetary transfers linked to Jelaidan himself, totaling more than $11 million. Four (4) of those transactions attributed to Jelaidan, totaling $7,058,973.20, are linked directly to Cengic.

| Ser. no. | Date posted | Recipient/ Sender | Accounting-holding bank | Account | Posting text | Amount in USD |
|---|---|---|---|---|---|---|
| 256 | 4/7/93 | Wael Jelaidan Acct. no. xxxxx1587 | Bank Austria (Former Z), Vienna | xxxxx1587 | Debt repayment Hasan Cengic | -960,000.000 USD |
| 261 | 4/9/93 | Wall Jelaidan [sic] Acct. no. xxxxx1587 | Bank Austria (Former Z), Vienna | xxxxx1587 | Debt repayment Hasan Cengic | -98,973.20 USD |
| 294 | 5/11/93 | Wael Jelaidan Acct. no. xxxxx1587 Account with: Bank Austria | Bank Austria (Former Z), Vienna | xxxxx1587 | Debt repayment Hasan Cengic | -2,000,000.00 USD |
| 356 | 6/30/93 | Wael Jelaidan Acct. no. xxxxx1587 | Bank Austria (Former Oelb), Vienna | xxxxx1587 | USD 4,000,000.- Less bank charges Debt repayment Hasan Cengic | -4,000,000.00 USD |

*See* Exhibit 11, pp. 13-14.

---

[12] *See* Agence France Presse, "*Hostage Drama After Five Killed in Police Raids,*" March 29, 1996; Agence France Presse, "*Police Arrest Gunman, Hostages Released in Belgium,*" March 29, 1996.
[13] *See* Washington Post, "*Bosnian Officials Involved In Arms Trade Tied To Radical States,*" September 22, 1996, p. A26. Sheikh Omar Abdel Rahman (a/k/a "The Blind Sheikh"), the radical Egyptian cleric who was convicted for his role in the 1993 World Trade Center bombing, has been linked to Cengic and the leadership of the TWRA.

The Honorable Frank Maas
October 17, 2011
Page 18

---

To date, the defendant has failed to produce any documentation relating to his relationship with Executive Order 13224 designee Cengic and/or the transfers of funds identified above by German authorities. Accordingly, Jelaidan should be compelled to immediately produce all requested materials identified in Request Nos. B-38-B-40.

**3.      Jelaidan has failed to produce any documents relating to his relationship with Adel Batterjee.**

On December 21, 2004, the U.S. Department of the Treasury designated Adel Batterjee "for providing financial and material support to al Qaida and Usama bin Laden." *See* Treasury Designation at <u>Exhibit 21</u>. Batterjee served as the Executive Director and a member of the Board of Directors of the Benevolence International Foundation ("BIF"), another purported charitable organization designated in November 2002 for the organization's longstanding support to al Qaeda and bin Laden. *Id.* According to Treasury, Batterjee "has ranked as one of the word's foremost terrorist financiers, who employed his private wealth and a network of charitable fronts to bankroll the murderous agenda of al Qaida." *Id.*

In support of that designation, Treasury identified Batterjee ("Baterji") as one of the wealthy financiers of the al Qaeda network listed on the "Golden Chain."[14] Jelaidan is also identified on the Golden Chain document. U.S. intelligence and enforcement agencies have concluded that the Golden Chain is an authentic al Qaeda document identifying al Qaeda's most important financial benefactors and the individuals responsible for coordinating their contributions to al Qaeda. Indeed, the 9-11 Commission's Final Report refers to the Golden Chain as the al Qaeda organization's "financial supply network" put together mainly by financiers in Saudi Arabia and the Persian Gulf states.[15]

Jelaidan's long-standing relationship with Batterjee (which dates back to the formation of al Qaeda in the late 1980's) has been confirmed by additional documentation uncovered during the same raid of the Benevolence International Foundation's ("BIF") offices in Bosnia which led to the discovery of the Golden Chain. As set forth in the seized documents, a 1988 dispute between two purported charitable organizations was submitted to secret arbitration overseen by members of al Qaeda's fatwa committee. One of the relief organizations involved in the

---

[14] The Golden Chain document was discovered during the March 2002 raid of the Bosnian offices of the Benevolence International Foundation, conducted jointly by the FBI and Bosnian Police. During the course of that raid, the authorities seized several computer hard drives, one of which included a file named "Tareekh Osama" ("Osama's History"), containing scanned images of documents chronicling the formation of al Qaida. The "Golden Chain" document was among several hundred documents contained in this computer file. Based on their analysis of all the documents within that file, and intelligence gathered from other sources during the war on terror, officials of the U.S. government concluded that the document is "a list of people referred to within al Qaeda" as wealthy donors to the movement. *See* Government's Evidentiary Proffer supporting the Admissibility of Co-Conspirator Statements, *United States of America v. Enaam M. Arnaout*, No. 02-CR-892 (N.D. Ill. filed January 6, 2003); http://fl1.findlaw.com/news.findlaw.com/wsj/docs/bif/usarnaout10603prof.pdf.

[15] *See* Final Report of the National Commission on Terrorist Attacks Upon the United States, p. 55, http://www.9-11commission.gov/report/911Report.pdf.

The Honorable Frank Maas
October 17, 2011
Page 19

controversy was the Saudi Red Crescent Society which Jelaidan headed at that time. According to the United States government, Batterjee sided with Jelaidan in the dispute.[16]

Notably, this Court denied defendant Batterjee's motion to dismiss on January 18, 2005, finding that the Plaintiffs' allegations regarding the terror financier's activities were sufficient to support a finding of personal jurisdiction. *See* Judge Richard Casey's Opinion at 349 F. Supp. 2d 765, 823-825. Although Batterjee remains a defendant in this litigation, he is technically in default for his failure to respond to Plaintiffs' discovery requests. In fact, both he and his attorney of record have refused to participate in this litigation following Judge Casey's denial of his motion. In any event, the discovery of relevant communications and transactions between the two co-defendants should not be unreasonable.

Jelaidan has failed to produce any documents regarding his relationship with Batterjee and should be compelled to produce all responsive information set forth in Request Nos. B-38-B-40.

### 4.    Jelaidan has failed to produce any documents relating to his relationship with Mohamed Bayazid.

As discussed in Section I(B)(8) above, Jelaidan owned the Maram Company with Mohamed Bayazid (a/k/a Abu Rida). Although not an Executive Order 13224 designee, Bayazid is a co-founding member of al Qaeda and a key figure in the terror group's efforts to obtain large caches of weapons, including materials for a nuclear bomb.[17]

Documents uncovered during the 2002 raid of the BIF's offices in Bosnia reveal the two men were close associates to bin Laden in the early days of al Qaeda. In a letter to Bayazid ("Abu al Ridha") on Saudi Red Crescent letterhead, bin Laden requests that all weapons be inventoried. At the bottom of the letter is a note from bin Laden to Jelaidan ("Abu al Hasan") stating that "we have an extreme need for weapons so I urge that you not provide them with more than 25% of the existing weapons." *See* Exhibit 22. In a second letter to Bayazid, bin Laden concludes the letter by asking him to "communicate my greeting to Abu Al-Hasan Al-Madani [Jelaidan]." *See* Exhibit 23.

Jelaidan has yet to produce any documentation relating to his relationship with Bayazid. Accordingly, the defendant should be compelled to immediately produce all materials identified in Request Nos. B-38-B-40.

---

[16] *See* Government's Evidentiary Proffer supporting the Admissibility of Co-Conspirator Statements, *United States of America v. Enaam M. Arnaout*, No. 02-CR-892 (N.D. Ill. filed January 6, 2003), p. 31, n. 18.

[17] *See* Government's Evidentiary Proffer supporting the Admissibility of Co-Conspirator Statements, *United States of America v. Enaam M. Arnaout*, No. 02-CR-892 (N.D. Ill. filed January 6, 2003), pp. 20-24, 30-32, 38, 46, and 49.

The Honorable Frank Maas
October 17, 2011
Page 20

---

D.    **Jelaidan Should Be Compelled To Produce Documentation Relating To Any And All Sanctions Imposed Upon Him**

On September 6, 2002, the United States and the Kingdom of Saudi Arabia jointly designated Jelaidan as "an associate of Usama bin Laden and a supporter of al-Qa'ida terror." *See* Exhibit 8. A week later on September 11, 2002, the United Nations Security Council Committee (a/k/a the "1267 Committee") similarly designated Jelaidan for his connections to al Qaeda. *See* Exhibit 9.

Plaintiffs served the defendant with the following document requests:

- Request No. A-13 – Please provide any and all documents relating to any sanctions imposed upon you by the United States, United Nations, or any other nation or international body.

- Request No. A-18 – Please provide any and all documents relating to the joint United States-Saudi Arabian investigation and September 6, 2002 designation of You as a Specially Designated Global Terrorist and "an associate of Usama bin Laden and a supporter of al-Qa'ida terror," including without limitation, any and all documents identifying all of Your accounts, assets, and monies that were frozen by the United States and Saudi Arabia per the September 6, 2002 designation.

- Request No. A-19 – Please provide any and all documents relating to any sanctions imposed upon you by the Kingdom of Saudi Arabia.

Yet again, the defendant responds to each of the Plaintiffs' requests by claiming that he does not have possession of relevant documents:

WJ neither has knowledge of nor possession of any documents responsive to this request.

*See* Exhibit 2, p. 9 and 11. Jelaidan's contention is questionable.

As this Court is well aware, a principal method by which the United States government and other foreign states seek to deny financial resources to terrorist organizations, including those who sponsor them or act on their behalf, has been the imposition of asset-blocking orders and related economic sanctions. *See* Exhibit 8 (stating that the U.S. and Saudi Arabia are taking joint action "to publicly identify and freeze the assets of terrorists and their supporters"). Indeed, by Jelaidan's own acknowledgement in his discovery responses, at least three financial institutions have blocked assets linked to him following his 2002 designations – Faisal Finance, Al Rajhi Bank, and Habib Bank.

In conjunction with their determination to freeze problematic accounts, participating banks routinely provide official notification of their actions to named account holders, beneficiaries, and persons with signatory authority. For example, Faisal Finance notified Jelaidan of the bank's decision to freeze Account No. x0409 in a September 2002 letter to the

The Honorable Frank Maas
October 17, 2011
Page 21

_____

defendant, attached hereto as Exhibit 24. Habib Bank also advised Jelaidan of the freezing of six
Rabita Trust accounts identified in Section B(5), leading to him ask the bank to reconsider its
decision. *See* Exhibit 6. Moreover, other designated defendants in this litigation have received
documented notice that their bank accounts were frozen as a result of U.S. and U.N.
designations. In a December 14, 2006 letter to the IIRO, the Bank of Philippines Islands notified
the Saudi charity that its account at the bank was ordered frozen. *See* Exhibit 25.

        In response to Plaintiffs' Request No. 8 seeking documents relating to accounts at Al
Rajhi Bank, the defendant fully acknowledges that his account at the bank was frozen, but
produces no documentation to that effect. *See* Exhibit 2, p. 7. Surely he received some form of
official notification from Al Rajhi Bank, the Saudi Arabian Monetary Authority ("SAMA"),
and/or the Kingdom itself advising him of the bank's actions and the reasons for doing so. *See*
Exhibit 26 (July 25, 2003 article from the Saudi newspaper, Ain Al Yaqeen, reporting that the
Kingdom of Saudi Arabia took steps to freeze the assets of Jelaidan, a close aid to Osama bin
Laden who funneled money to al Qaeda). Similarly, Habib Bank and/or the State Bank of
Pakistan must have sent official notice to Jelaidan that it was freezing the six Rabita Trust
accounts and the account he holds jointly with Osama bin Laden. The defendant has failed to
produce any such documentation and this Court should compel Jelaidan to produce all
responsive materials relating to *all* accounts, assets, and/or monies that were seized and frozen
by the United States, Saudi Arabia, other foreign states, and financial institutions following his
September 2002 designations.

        In addition to the freezing of assets, other types of sanctions have been effectively
imposed upon terror financiers such as Jelaidan. Sanctions such as travel restrictions, seizure of
passports, and home detention are known to have been used by the host government where the
designee resides and/or does business. In the instant case, it is implausible to believe that the
Saudi government and other governments and institutions implementing the U.N. mandated
sanctions as to Jelaidan failed to provide any form of official notification and/or explanation to
Jelaidan (a Saudi citizen and long-time official to several of the Kingdom's global charities) in
relation to his September 2002 designations. Plaintiffs have yet to receive any such
documentation. Accordingly, Jelaidan should be compelled to produce all documents relating to
any and all types of sanctions imposed upon him by the Kingdom of Saudi Arabia or any other
foreign state.

**E.     Jelaidan Should Be Compelled To Specifically Identify Any Documents
        Responsive To Plaintiffs' Requests That Have Been Lost, Discarded Or
        Destroyed (Or Seized)**

        Jelaidan's boilerplate objection to the production of documents that are no longer in his
physical "possession" also fails to meet his obligation to identify any responsive documents that
have been lost, discarded or destroyed, and describe the circumstances under which those
responsive documents were lost, discarded, or destroyed. In this regard, Plaintiffs' Requests for
Production of Documents directed to defendant Jelaidan included the following specific
instruction:

The Honorable Frank Maas
October 17, 2011
Page 22

_____

> If any documents requested herein have been lost, discarded, destroyed or
> otherwise no longer in Defendant's possession, custody or control, they shall be
> identified as completely as possible including, without limitations, the following
> information:  date of disposal, manner of disposal, reason for disposal, person
> authorizing disposal and person disposing of the document.

*See* Exhibit 1, p. 3.

The Definitions section of Plaintiffs' document requests to defendant Jelaidan, fully
consistent with Local Rule 26.3(c)(4), go on to state as follows:

> The term "identify" when used with reference to a document shall mean to give,
> to the extent known, the (i) type of document; (ii) general subject matter; (iii) date
> of the document; (iv) author(s), addressee(s) and recipient(s).

*Id.*, p. 5.

Although Jelaidan has generically denied that responsive materials are currently in his
"possession," he has failed to indicate in his responses whether responsive documents were at
one time within his care, custody, or control, but were at some point lost, destroyed, or discarded.
That information, as well as information sufficient to identify the nature of the documents, its
disposition, and perhaps its current custodian, is absolutely necessary to determine whether
Jelaidan has engaged in any spoliation of evidence, and to determine whether responsive
documents may be available from another source.  Accordingly, Plaintiffs' respectfully request
the Court direct Jelaidan to comply with the instructions in Plaintiffs' documents requests, and
identify any responsive documents that were at any point within his care, custody, or control, and
to describe the circumstances under which any such documents were lost, destroyed, discarded,
or seized.

**F.     The Temporal Scope Of Discovery Concerning Defendant Jelaidan Should
         Extend To Periods Prior To 1992**

As discussed in Section I(A) above, Judge Daniels previously issued an Order setting
1992 as the presumptive starting point for discovery in this litigation.  However, in issuing that
Order, Judge Daniels made clear that discovery concerning information and activities relating to
earlier periods may be appropriate upon a "showing of relevance as to a particular issue or
defendant." *See* Order, MDL Docket No. 2059, December 21, 2007.  With regard to defendant
Jelaidan, the extension of discovery to earlier periods is singularly appropriate.

As the United States government's public declarations concerning Jelaidan make clear,
he is a founding member of al Qaeda, and a close and long-term associate of Osama bin Laden.
Defendant Jelaidan's own counsel has confirmed that his client's relationship with Osama bin
Laden predates 1992, acknowledging during a prior hearing in these proceedings that "Wael
Jelaidan, your Honor, was very important in Afghanistan.  He headed up the refugee mission,

The Honorable Frank Maas
October 17, 2011
Page 23

and he got to know, among other things, Osama bin Laden very well." *See* April 12, 2011
Discovery Hearing Transcript, pp. 40-41.

Significantly, the U.S. government has asserted, and Plaintiffs have alleged, that Jelaidan
was instrumental in assisting bin Laden adapt the support network established to support the
Afghan jihad into a global infrastructure to support al Qaeda's jihad against the United States.
To that end, Jelaidan is alleged to have used bank accounts under his control, and the charities
for which he worked, as tools to channel financial and other forms of support to al Qaeda from
that organization's inception.

Given his status as a founding member of al Qaeda, and his role in adapting the Afghan
support network into a global infrastructure to support al Qaeda's jihad against the West,
Plaintiffs respectfully submit that discovery as to Jelaidan should presumptively extend to 1988,
the year in which al Qaeda was founded. In addition, at least with respect to certain facts and
issues, such as Jelaidan's relationship with bin Laden, the extension of discovery to periods prior
to 1988 would be appropriate. However, for purposes of the documents at issue in the present
Motion, Plaintiffs at this time merely request an Order directing Jelaidan to provide
documentation from the period between 1988 and 2004. Plaintiffs reserve their right to request
documents and information pertaining to the subject matter of this motion for earlier and later
periods, after they have reviewed the responsive materials from defendant Jelaidan.

## III.    CONCLUSION

As the foregoing demonstrates, Plaintiffs have legitimate concerns that defendant
Jelaidan is deliberately withholding the production of responsive documents and information.
Accordingly, intervention by this Court is now necessary and Plaintiffs respectfully request that
the Court order the defendant to immediately to produce all responsive materials.

Respectfully submitted,

*MDL Plaintiffs' Executive Committees*

THE MDL 1570 PLAINTIFFS' EXECUTIVE
COMMITTEES

The Honorable Frank Maas
October 17, 2011
Page 24

_____

cc:    Sean P. Carter, Esq.
       J. Scott Tarbutton, Esq.
       Robert T. Haefele, Esq.
       Jodi Westbrook Flowers, Esq.
       John M. Eubanks, Esq.
       James P. Kreindler, Esq.
       Andrew J. Maloney, Esq.
       Jerry S. Goldman, Esq.
       Martin F. McMahon, Esq.
       Alan Kabat, Esq.

PHILADELPHIA\6053428\1  117430.000