# Exhibit D

# MARTIN F. McMAHON & ASSOCIATES

1150 CONNECTICUT AVENUE, N.W.
SUITE 900
WASHINGTON, D.C. 20036

—————

Established 1978

TELEPHONE (202) 862-4343
FACSIMILE (202) 828-4130

www.martinmcmahonlaw.com

MARTIN F. McMAHON
  Managing Partner
  Admitted in District of Columbia, New York
  and U.S. District Court of Maryland

CHRISTINE M. HILGEMAN
  Of Counsel
  Admitted in Virginia and the District of
  Columbia

JASON A. DZUBOW
  Of Counsel
  Admitted in District of Columbia and
  Maryland

ROBERT MANCE
  Of Counsel
  Admitted in District of Columbia and
  Maryland

## DEFENDANT WAEL JELAIDAN'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL

October 31, 2011

The Honorable Frank Maas
United States District for the
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street, Room 740
New York, NY 10007

Re:   *In Re: Terrorist Attacks on September 11, 2001, 03 MDL 1570 (GBD) (FM)*

COMES NOW the Defendant, Wael Jelaidan, and hereby files, through undersigned counsel, his opposition to Plaintiffs' motion to compel. The motion should be denied because the Defendant has put forth a good faith effort and produced all documents that are within his possession and control.  As explained *infra* and as detailed in the attached affidavit of Wael Jelaidan, despite Plaintiffs' contentions that the Defendant has maintained control over the referenced accounts, the reality is that due to his designation by the United Nations, he has lost his ability to access documents concerning the referenced bank accounts. These accounts have been seized and the respective governments have frozen their funds. The Defendant has made several attempts to contact such banks, but none of them are willing to cooperate and respond to his requests.

In 2001, the United Nations issued the United Nations Security Council Resolution 1373 which requires UN member states to prohibit their nationals from supporting designated terrorists by "making any funds, financial assets or economic resources or financial or other related services available, directly, or indirectly…" to designated individuals.[1] Exhibit 1. Since the Resolution was passed, UN member states and their respective banks have taken steps to freeze the bank accounts of UN designated terrorists. *See, e.g.,* Royal Embassy of Saudi Arabia, *Initiatives and Actions Taken by the Kingdom of Saudi Arabia to Combat Terrorism* 12 (March

---

[1] Additionally, as made abundantly clear by the Treasury Department's Office of Foreign Assets Control, anyone who wishes to conduct business with Mr. Jelaidan, even if only to transmit banking records, has to secure a specific license to do so; otherwise he is breaking the law.

2004) ("In the summer of 2002, in another successful joint anti-terrorism action, the Kingdom of Saudi Arabia and the United States took steps to freeze the assets of a close bin Laden aide, Wa'el Hamza Julaidan, who is believed to have funneled money to al-Qaeda."). Because of the designation, not only has he lost control over the accounts and the ability to obtain account documents, banks are also not willing to cooperate with the Defendant.

As a result, the Plaintiffs' motion to compel should be denied because: the Defendant does not have access or control over the frozen accounts referenced by the Plaintiffs as a result of his designation; the Defendant has made a good faith effort to comply with the Plaintiffs' document request and as detailed in his affidavit, has attempted to acquire documents from the banks regarding his accounts on several occasions; to this date, the Defendant has provided opposing counsel with all responsive documents within his possession and control; and nothing has precluded the Plaintiffs from subpoenaing the various bank accounts which they reference in their motion to compel if they deem that appropriate.

1. **Mr. Jelaidan does *not* have control over his bank accounts due to his designation by the U.S. government and the United Nations, and therefore, *cannot* produce any documents associated with those accounts**

As the Plaintiffs correctly point out, "control has been defined to include the legal right to obtain the documents requested upon demand…" *See United States v. Stein*, 488 F. Supp. 2d 350, 361 (S.D.N.Y. 2007); *Bank of New York v. Meridien BIAO Bank Tanzania Ltd.*, 171 F.R.D 135 (S.D.N.Y 1997) (stating that, "documents are considered to be under a party's control when that party has the right, authority or practical ability to obtain the documents from a non-party to the action"); *In Re Flag Telecom Holdings*, 236 F.R.D. 177, 180 (S.D.N.Y. 2006) ("If the producing party has the legal right or the practical ability to obtain the documents, then it is deemed to have 'control,' even if the documents are actually in the possession of a non-party.").

As made clear in Mr. Jelaidan's affidavit, he does not have the authority, legal right, or ability to obtain documents responsive to the Plaintiffs requests from any of the following banking institutions and/or accounts: Faisal Finance Account (Switzerland); Al Rajhi Banking and Investment Corp.; Habib Bank; Rabita Trust accounts; Third World Relief Agency bank accounts (Bank Austria accounts); or bank accounts in Turkey concerning the Maram Company. *See* Wael Hamzah Jelaidan Aff., ¶ 5 – 13, Exhibit 2 (hereinafter "Jelaidan Aff."). Mr. Jelaidan's mistaken designation is essentially an absolute hindrance on his capability to obtain any banking documents. Despite Mr. Jelaidan's past signatory authority over many charity accounts, including the MWL, Rabita Trust, SJRC, AHAMAA, and SRC, he has long ceased to have any working relationship with these entities and ergo, has no authority to obtain or request any documents from these institutions. *See* Jelaidan Aff., ¶ 10. Mr. Jelaidan's connection with these entities was purely for humanitarian and/or business purposes and never for illegal, much less terrorist, endeavors.

Contrary to the Plaintiffs' assertions, Mr. Jelaidan has made a good faith effort to obtain these banking records. On many occasions, Mr. Jelaidan has attempted to obtain documents responsive to the Plaintiffs' requests, but as outlined above, the banking entities in question are not willing to cooperate with him and therefore, he has not been able to obtain any additional

documents not already provided to the Plaintiffs. Mr. Jelaidan also is unable to meet with the bank officials in person because he is barred from traveling abroad as a result of being designated by the UN.  *See* Jelaidan Aff., ¶ 7. Because these banks are not willing to cooperate with the Defendant and because he is unable to meet with them in person, Mr. Jelaidan has exhausted all methods of retrieving any documents concerning his bank accounts and thus has made a good faith effort to comply with the Plaintiffs' document request. Mr. Jelaidan should not be penalized for failing to produce documents he has no control over.

### 2. Mr. Jelaidan has no further documents relating to relationships that he has/had with particular individuals named in the Plaintiffs' motion to compel

Plaintiffs assert that the Defendant has failed to produce documents relating to various individuals including Yassin Kadi and Chafiq Ayadi. Even though it is possible that the Defendant served on a board with Yassan Kadi or Chafiq Ayadi, he has no access to any documents that may be responsive to the Plaintiffs' requests. *See* Jelaidan Aff., ¶ 15.

Mr. Jelaidan also does not have any documents in his possession or control concerning his relationship to Hasan Cengic.  In a chart on page 17 of the Plaintiffs' motion, they point to several significant monetary transfers made to Mr. Cengic in 1993 as evidence that he has maintained a relationship with Mr. Cengic. These monetary transfers which are labeled as "debt repayment[s]" to Hasan Cengic are nothing more than "comfort loans" extended to the Bosnian Government for relief efforts. The Bosnian Government constantly repaid these loans. *See* Jelaidan Aff., ¶ 10.  Mr. Jelaidan does not recall the specifics of the six (6) referenced transfers and does not possess or control documents concerning them. *See* Jelaidan Aff., ¶ 16.

The Plaintiffs also allege that Mr. Jelaidan has a relationship with Adel Batterjee and Mohamed Bayazid (a former co-owner of Maram Company), and that he has failed to produce any documents regarding his relationships with them. Though the Defendant has been acquainted with them in the past, he does not have any documents responsive to the Plaintiffs' requests in his possession or control. *See* Jelaidan Aff., ¶ 17.

### 3. Mr. Jelaidan has previously submitted to the Plaintiffs any and all documents he is aware of concerning the sanctions that have been levied against him

Plaintiffs assert that the Defendant has failed to turn over all documents relating to the sanctions imposed upon him.  As mentioned in the Defendant's Production of Documents response, Mr. Jelaidan does not have any additional documents, nor does he have access to any additional documents concerning the sanctions or investigations that have been rendered or conducted against him by the United Nations, the United States Government, or the Saudi Arabian Government. As described above, Mr. Jelaidan's designation is a plenary roadblock to his ability to request or obtain any documents that may be responsive to the Plaintiffs' requests.

**4. Defendant cannot recall any documents that have been lost, discarded, or destroyed**

Plaintiffs assert that Mr. Jelaidan has failed to identify all documents that were in his possession, custody or control that have now been lost, discarded or destroyed. This assertion stems from the Plaintiffs' opinion that Mr. Jelaidan has intentionally discarded documents. This opinion is false. Mr. Jelaidan has acted in good faith and has produced all documents that are within his possession or control. The Defendant cannot readily recall any documents that may have been lost or discarded within the relevant time period.

**5. The Court need only take a cursory look at the Plaintiffs' motion to compel to decipher the flagrantly weak case that the Plaintiffs have constructed against Mr. Jelaidan—thus, Mr. Jelaidan objects to an earlier discovery date of 1988**

Defendant objects to an earlier discovery date of 1988. Judge Daniels ordered a discovery date of 1992—nine (9) years before the terrorist attacks of September 11, 2001. Plaintiffs' request for an even earlier date is unnecessary and inappropriate as being well beyond the scope of relevance in this case. It is clear that the Plaintiffs' recent recognition of the weakness of their case against Mr. Jelaidan has prompted the instant request of an earlier discovery date. Any humanitarian efforts that Mr. Jelaidan engaged in during the 1980s, or distant relationships he had then, is wholly irrelevant to whether he assisted in the financing of terrorist attacks that occurred thirteen (13) years later. Mr. Jelaidan has dedicated his life to humanitarian efforts and his name on a questionable document (i.e., the Golden Chain document—which has been rejected by a number of courts so this Court should not entertain it as a reliable document either), or his name passively mentioned in an interview in 1998, is hardly reliable evidence to base an entire case on.

**6. Conclusion**

In conclusion, the Plaintiffs have offered no evidence to prove that an entity or individual can deal with an international designated global terrorist without proceeding through regulatory agencies within the countries where the bank accounts are located. And they have not proffered any rationale as to why they cannot subpoena records from the various banks. The Plaintiffs have to concede that Mr. Jelaidan is basically under house arrest and is confined to the Kingdom—thus he cannot travel across the globe and meet with these banks to resolve issues concerning records. Banks will not go out of their way to accommodate alleged international terrorists. Thus, there is no basis for entry of an order compelling further production of documents by Defendant Jelaidan.

Respectfully Submitted,

Martin F. McMahon, Esq.

4

United Nations

S/RES/1373 (2001)

 **Security Council**

Distr.: General

28 September 2001

---

## Resolution 1373 (2001)

### Adopted by the Security Council at its 4385th meeting, on 28 September 2001

*The Security Council,*

*Reaffirming* its resolutions 1269 (1999) of 19 October 1999 and 1368 (2001) of 12 September 2001,

*Reaffirming also* its unequivocal condemnation of the terrorist attacks which took place in New York, Washington, D.C. and Pennsylvania on 11 September 2001, and expressing its determination to prevent all such acts,

*Reaffirming further* that such acts, like any act of international terrorism, constitute a threat to international peace and security,

*Reaffirming* the inherent right of individual or collective self-defence as recognized by the Charter of the United Nations as reiterated in resolution 1368 (2001),

*Reaffirming* the need to combat by all means, in accordance with the Charter of the United Nations, threats to international peace and security caused by terrorist acts,

*Deeply concerned* by the increase, in various regions of the world, of acts of terrorism motivated by intolerance or extremism,

*Calling* on States to work together urgently to prevent and suppress terrorist acts, including through increased cooperation and full implementation of the relevant international conventions relating to terrorism,

*Recognizing* the need for States to complement international cooperation by taking additional measures to prevent and suppress, in their territories through all lawful means, the financing and preparation of any acts of terrorism,

*Reaffirming* the principle established by the General Assembly in its declaration of October 1970 (resolution 2625 (XXV)) and reiterated by the Security Council in its resolution 1189 (1998) of 13 August 1998, namely that every State has the duty to refrain from organizing, instigating, assisting or participating in terrorist acts in another State or acquiescing in organized activities within its territory directed towards the commission of such acts,

*Acting* under Chapter VII of the Charter of the United Nations,

01-55743 (E)

1.    *Decides* that all States shall:

(a)    Prevent and suppress the financing of terrorist acts;

(b)    Criminalize the wilful provision or collection, by any means, directly or indirectly, of funds by their nationals or in their territories with the intention that the funds should be used, or in the knowledge that they are to be used, in order to carry out terrorist acts;

(c)    Freeze without delay funds and other financial assets or economic resources of persons who commit, or attempt to commit, terrorist acts or participate in or facilitate the commission of terrorist acts; of entities owned or controlled directly or indirectly by such persons; and of persons and entities acting on behalf of, or at the direction of such persons and entities, including funds derived or generated from property owned or controlled directly or indirectly by such persons and associated persons and entities;

(d)    Prohibit their nationals or any persons and entities within their territories from making any funds, financial assets or economic resources or financial or other related services available, directly or indirectly, for the benefit of persons who commit or attempt to commit or facilitate or participate in the commission of terrorist acts, of entities owned or controlled, directly or indirectly, by such persons and of persons and entities acting on behalf of or at the direction of such persons;

2.    *Decides also* that all States shall:

(a)    Refrain from providing any form of support, active or passive, to entities or persons involved in terrorist acts, including by suppressing recruitment of members of terrorist groups and eliminating the supply of weapons to terrorists;

(b)    Take the necessary steps to prevent the commission of terrorist acts, including by provision of early warning to other States by exchange of information;

(c)    Deny safe haven to those who finance, plan, support, or commit terrorist acts, or provide safe havens;

(d)    Prevent those who finance, plan, facilitate or commit terrorist acts from using their respective territories for those purposes against other States or their citizens;

(e)    Ensure that any person who participates in the financing, planning, preparation or perpetration of terrorist acts or in supporting terrorist acts is brought to justice and ensure that, in addition to any other measures against them, such terrorist acts are established as serious criminal offences in domestic laws and regulations and that the punishment duly reflects the seriousness of such terrorist acts;

(f)    Afford one another the greatest measure of assistance in connection with criminal investigations or criminal proceedings relating to the financing or support of terrorist acts, including assistance in obtaining evidence in their possession necessary for the proceedings;

(g)    Prevent the movement of terrorists or terrorist groups by effective border controls and controls on issuance of identity papers and travel documents, and through measures for preventing counterfeiting, forgery or fraudulent use of identity papers and travel documents;

3.    *Calls* upon all States to:

(a)    Find ways of intensifying and accelerating the exchange of operational information, especially regarding actions or movements of terrorist persons or networks; forged or falsified travel documents; traffic in arms, explosives or sensitive materials; use of communications technologies by terrorist groups; and the threat posed by the possession of weapons of mass destruction by terrorist groups;

(b)    Exchange information in accordance with international and domestic law and cooperate on administrative and judicial matters to prevent the commission of terrorist acts;

(c)    Cooperate, particularly through bilateral and multilateral arrangements and agreements, to prevent and suppress terrorist attacks and take action against perpetrators of such acts;

(d)    Become parties as soon as possible to the relevant international conventions and protocols relating to terrorism, including the International Convention for the Suppression of the Financing of Terrorism of 9 December 1999;

(e)    Increase cooperation and fully implement the relevant international conventions and protocols relating to terrorism and Security Council resolutions 1269 (1999) and 1368 (2001);

(f)    Take appropriate measures in conformity with the relevant provisions of national and international law, including international standards of human rights, before granting refugee status, for the purpose of ensuring that the asylum-seeker has not planned, facilitated or participated in the commission of terrorist acts;

(g)    Ensure, in conformity with international law, that refugee status is not abused by the perpetrators, organizers or facilitators of terrorist acts, and that claims of political motivation are not recognized as grounds for refusing requests for the extradition of alleged terrorists;

4.    *Notes* with concern the close connection between international terrorism and transnational organized crime, illicit drugs, money-laundering, illegal arms-trafficking, and illegal movement of nuclear, chemical, biological and other potentially deadly materials, and in this regard *emphasizes* the need to enhance coordination of efforts on national, subregional, regional and international levels in order to strengthen a global response to this serious challenge and threat to international security;

5.    *Declares* that acts, methods, and practices of terrorism are contrary to the purposes and principles of the United Nations and that knowingly financing, planning and inciting terrorist acts are also contrary to the purposes and principles of the United Nations;

6.    *Decides* to establish, in accordance with rule 28 of its provisional rules of procedure, a Committee of the Security Council, consisting of all the members of the Council, to monitor implementation of this resolution, with the assistance of appropriate expertise, and *calls upon* all States to report to the Committee, no later than 90 days from the date of adoption of this resolution and thereafter according to a timetable to be proposed by the Committee, on the steps they have taken to implement this resolution;

7.    *Directs* the Committee to delineate its tasks, submit a work programme within 30 days of the adoption of this resolution, and to consider the support it requires, in consultation with the Secretary-General;

**S/RES/1373 (2001)**

8.    *Expresses* its determination to take all necessary steps in order to ensure the full implementation of this resolution, in accordance with its responsibilities under the Charter;

9.    *Decides* to remain seized of this matter.

_____

4

Affidavit of Wael Hamzah Jelaidan

IN THE NAME OF GOD, THE MERCIFUL, THE COMPASSIONATE

I Wael Hamzah Jelaidan, state as follows:

1.  I give this affidavit in support of our memorandum in opposition to the plaintiffs' motion to compel.

2.  I do not now and have never supported international terrorism of any kind, and the only relationship I had with Osama bin-Laden was in connection with my supporting humanitarian efforts in Afghanistan in the late 1980's. There was a tremendous number of Afghani refugees who fled into Pakistan during that time due to the Russian invasion and occupation. I would like to add that during my limited interaction with Osama Binladen, he was an acceptable figure locally and internationally.  Further, I would mention that I ran my Offices in complete transparency to the extent that Local and International envoys systematically visited our offices and project sites including the US Embassy officials and His Excellency President Jimmy Carter and Mrs. Carter.

3.  My humanitarian career began with the Saudi Red Crescent during 1986 – 88, and then I directed the Muslim World League office in Pakistan from 1989-1994 in addition to being the Director of the Muslim World League office in Pakistan, I was also given the added responsibility of overseeing the repatriation of the Stranded Pakistanis in Bangladesh as the Manager of the said Project (AKA Rabita Trust) since 1992 onwards till 1994.  I want the court to know specifically that, in connection with Pakistani activities, there was a complete separation between the MWL and IIRO organizations—separate offices, bank accounts, etc.

4.  I have been the Secretary-General of the Rabita Trust since 1999 till this date.   It is worth noting that although, I submitted my resignation, it was never ratified nor accepted.  Rabita Trust was a humanitarian organization that engaged in the construction of housing units for the repatriation and rehabilitation of Pakistanis displaced in Bangladesh by the 1970 Indo-Pakistan War.

5.  On 11/09/2002, I was designated by the UN as a " individual associated with Al-Qaida".  Since then, as mentioned below, all of my bank accounts have been frozen by the respective governments of which the accounts were located.  I do not possess any documents, such as notifications, concerning these accounts being frozen. With several of these accounts, I was made aware that they were frozen via a phone call or verbal answer to my inquiries.

6.  On or about 2001, the Pakistani Authorities froze all of Rabita Trust's bank accounts and confiscated any and all of its documents. The bank accounts referred

to by the Plaintiffs were mainly for the "Stranded Pakistanis in Bangladesh" Repatriation Program. I was the signatory for these accounts. Ever since the Pakistani Authorities seized these accounts, I have been unable to access them nor obtain documents. Any documents that are in my control have been handed over to the Plaintiffs.

7. I did have a personal bank account with Faisal Finance S.A. in Switzerland. However, after the said UN Designation, the account was frozen by the Swiss Authorities per the UN directive. Since then, I do not have the legal authority to access the account nor request any documentation. On several occasions, I have initiated contact with the bank but they have not been responsive. It is very important to understand that because of my designation by the UN, I have been barred from traveling abroad to contact the Banks in person, which has made the requisite effort extremely difficult and in many cases unattainable.

8. I did maintain a bank account with Al Rajhi Bank to facilitate my personal finances. However, that accounts have been frozen and is controlled by the Saudi Authorities. Since the Kingdom has confiscated my account, I neither have authority to access the account nor request any documentation. I have contacted the bank on several occasions and was informed that all relevant information in regards to the account can only be disseminated by the Saudi Authorities.

9. To the best of my recollection, the joint account with Usama bin Laden at Habib Bank was opened in 1985 during the height of the Soviet invasion and occupation of Afghanistan. The account was solely used to receive governmental aid and donations allotted to the Afghan refugees. This account has also been frozen. I have attempted to acquire responsive documents from the bank, but they are not willing to cooperate with me.

10. Over the years, I have had signatory authority over charity accounts with the MWL, Rabita Trust, SJRC, AHAMAA, and SRC. I have never had signatory authority over any account associated with IIRO. I was the principal officer for SRC in Pakistan, MWL in Pakistan, Rabita Trust in Pakistan and SJRC in Albania and Kosovo. Though I used to have signatory authority, I no longer work for these organizations and have been currently out of touch with all of them. As a result, I do not have access or control over any of these said accounts and cannot obtain documents concerning these accounts.

11. Maram Company did maintain bank accounts in Turkey. However, Maram Co. has long ceased operations. I do not have authority to access any of these accounts and cannot request any documentation.

12. I did have an account at the Bank of Austria but cannot recall the account number. If the account number mentioned by the Plaintiffs is that of the Third World Relief Agency, then I had no privity at all to it. If the account number was that of my personal account, then I do not have any control or access to the said account at this time. That personal account was used to receive donations for the purpose of humanitarian aid as part of the international humanitarian effort for the Bosnia Herzegovina Refugee's plight during the Serbian Ethnic Cleansing.

13. I also had a personal account in Turkey, but like every other account, it has been frozen due to my UN designation. Therefore, I neither have access to nor legal authority to oversee the account and secure documentation pertaining to the account.

14. As stated previously, I have tried on several occasions to initiate contact with some of the Banks mentioned above; however, to this date, my efforts have been fruitless. Because of my designation I am barred from traveling and cannot contact the banks in person. When I attempt to contact them, they are not willing to cooperate because of my designation.

15. I do know Yassin Kadi and Chafiq Ayadi but do not possess any records documenting any money transfers nor any documents relating to any business relationship with them. I may have sat on a board with them but do not recall the exact board, date or organization.

16. The Plaintiffs refer to debt repayment transfers made by H.E. the representative and Humanitarian Envoy of the President of Bosnia Herzegovina Mr. Hasan Cengic. I do not recall wether any payment were indeed made by Mr. Cengic. However, to be precise, all debt repayment transactions were repayment of comfort loans (banking overdraft) extended to the Bosnian Government to help their relief efforts. This loan was continuously repaid via monies received by the Bosnian Government from international Governmental & Non Governmental Organizations and was subsequently utilized when necessary because the funds were in short supply and not always available when needed. In other words, these transfers were very much like a revolving credit mechanism. As to the six money transfers specifically mentioned by the Plaintiffs, I do not recall the specifics of them.

17. The Plaintiffs mentioned my relationships with Adel Batterjee and Mohamed Bayazid. I do not have any documents in my possession concerning these individuals.



Wael Jelaidan                                            Date      29 - 10 - 2011

The Law Firm ................................ciates
Certifies that the above signing person was presented
before me and the signature which appears on this
document is his/her correct signature, without assuming
any responsibility to the contents of the document
Bassim A. Alim, Esq.
Attorney at Law
Ministry of Justice License No. 98/23
Kingdom ................................