# Exhibit E

## MDL 1570 PLAINTIFFS' EXECUTIVE COMMITTEES
In re: Terrorist Attacks on September 11, 2001 (S.D.N.Y)

| Plaintiffs' Executive Committee for Personal Injury and Death Claims | Plaintiffs' Executive Committee for Commercial Claims |
|---|---|
| Ronald L. Motley, *Co-Chair*<br>MOTLEY RICE LLC<br>James P. Kreindler, *Co-Chair*<br>KREINDLER & KREINDLER LLP | Elliot R. Feldman, *Co-Chair*<br>Sean Carter, *Co-Chair*<br>COZEN O'CONNOR |
| Andrew J. Maloney III, *Co-Liaison Counsel*<br>KREINDLER & KREINDLER LLP<br>Paul J. Hanly, Jr., *Co-Liaison Counsel*<br>HANLY CONROY BIERSTEIN SHERIDAN FISHER & HAYES LLP | J. Scott Tarbutton, *Liaison Counsel*<br>COZEN O'CONNOR |

### VIA HAND DELIVERY

November 9, 2011

The Honorable Frank Maas
United States District Court for the
Southern District of New York
Daniel Patrick Moynihan United States
Courthouse
500 Pearl Street, Room 740
New York, NY 10007-1312

     Re:   *In Re: Terrorist Attacks on September 11, 2001,* 03 MDL 1570 (GBD) (FM)

Dear Judge Maas:

     The Plaintiffs' Executive Committees, on behalf of all of the Plaintiffs, submit this reply to the October 31, 2011 letter brief of defendant Wa'el Hamza Jelaidan, which opposes the Plaintiffs' October 17, 2011 motion to compel the production of all documentation and information relating to the following categories of documents previously requested by the Plaintiffs: (1) banking and financial accounts associated with the terror financier; (2) the defendant's relationship with other Executive Order 13224 designees; and (3) the imposition of financial and other sanctions upon the defendant following his September 2002 designations by the United States, Kingdom of Saudi Arabia, and United Nations. For the reasons set forth below, the defendant's arguments should be rejected and Jelaidan should be compelled to immediately produce the requested materials identified in Plaintiffs' October 17 submission.

### I.    THERE IS NO EVIDENCE TO SUPPORT THE DEFENDANT'S ALLEGED GOOD FAITH EFFORTS TO PRODUCE RESPONSIVE DOCUMENTS

     Defendant Jelaidan would like this Court to believe that he has acted in good faith to fully respond to the Plaintiffs' discovery requests and produce all responsive documents. Unfortunately for the defendant, that position is rather unconvincing when faced with the actual record in these proceedings:

The Honorable Frank Maas
November 9, 2011
Page 2

- Since the commencement of merits discovery in June 2006, the defendant has failed to produce a single document in response to sixty-seven (67) of the Plaintiffs' seventy-four (74) requests.

- The defendant has produced a mere twenty-two (22) documents totaling 104 pages in over five years; the first and only production occurring on August 16, 2006.

- The defendant has failed to supplement his discovery responses in accordance with Judge Daniels' almost four-year old Order holding that the scope of discovery should reasonably begin in 1992.

In his opposition to Plaintiffs' October 17 motion to compel, defendant Jelaidan repeatedly asserts that he has made a number of good faith efforts to produce documents responsive to the Plaintiffs' discovery requests. However, there simply is no evidence that even remotely substantiates these blanket and generic assertions. Rather, Jelaidan (a co-founding member of al Qaeda and former Osama bin Laden associate) would prefer that this Court and the parties just take him at his word that he has exhausted all conceivable methods to locate and obtain responsive materials. In support of this effort, Jelaidan seeks to use his designations as an al Qaeda member and terror sponsor as a shield to immunize him from fulfilling his duties under the Federal discovery rules. Jelaidan's arguments in this regard are without legal or factual merit, and serve only to underscore his failure to make any good faith efforts to fulfill his discovery obligations. For the reasons set forth below, Plaintiffs respectfully request that the Court order the defendant to immediately produce all responsive materials.

**A.      Jelaidan's Alleged Good Faith Attempts To Obtain Responsive Banking Records Are Unfounded**

As set forth in Plaintiffs' Motion to Compel, defendant Jelaidan played an instrumental role in creating and supporting the financial infrastructure used to fund the al Qaeda terrorist network from its inception in 1988 through the September 11, 2001 terrorist attacks. Using his relationships with other prominent terror financiers, including his leadership positions within a number of the Saudi charities, Jelaidan directed massive amounts of monetary and logistical support to Osama bin Laden, al Qaeda, and affiliated terror organizations through a number of banking and financial institutions, some of which have been identified by the Plaintiffs.

In opposition to Plaintiffs' October 17 motion seeking the immediate production of Jelaidan's bank account records, the defendant attempts to excuse his blatant non-production by primarily arguing that he has made attempts to request and obtain documentation and information regarding his frozen bank accounts, but his designations as a terrorist financier by the United States and United Nations have effectively extinguished any and all rights he has as an account holder to communicate with the banks and make such requests. According to Jelaidan, Faisal Finance (Switzerland) S.A., Al Rajhi Banking & Investment Corporation, Habib Bank, Bank of Austria, and other financial institutions are precluded from providing him with the

The Honorable Frank Maas
November 9, 2011
Page 3

_____

most basic account information (such as bank statements or account summaries) by virtue of the designations.

The defendant's position is without merit. First, the defendant fails to cite to any supporting regulation or rule established by the Treasury Department's Office of Foreign Assets Control ("OFAC"), the United Nations 1267 Committee, or other relevant government agency or international body that specifically prevents a bank from providing a designee with information regarding his account(s) following its seizure and freezing. Nor has the defendant provided this Court with evidence of any law, regulation, or rule within the Kingdom of Saudi Arabia that would direct a Saudi bank (such as Al Rajhi Bank) or other Saudi financial institution not to cooperate with a designee's simple request for bank statements or other documentation relative to the history of the account.[1]

Second, affidavit testimony obtained from Professor Jimmy Gurulé, former Under-Secretary (Enforcement) of the United States Department of the Treasury, makes clear that the sanctions programs implemented by the United States and United Nations were purposely designed to prevent designees like Jelaidan from gaining access to funds or other assets in frozen bank accounts, but not from requesting and obtaining basic banking records for the blocked account(s). Professor Gurulé, who is intimately familiar with the United States and United Nations sanctions programs, states the following:

> Neither the text of E.O. 13224, nor any regulations promulgated thereunder, nor the text of UN Security Resolution 1267, nor any related Security Council resolutions, preclude a financial institution from providing a designated or listed party with account statements concerning an account that has been frozen or blocked.

> Neither the Treasury Department nor the UN 1267 Committee have ever interpreted either E.O. 13224 or UN Security Resolution 1267, or any related regulations or security resolutions, to preclude a financial institution from providing a designated or listed party with account statements concerning an account that has been frozen or blocked.

> And finally, neither the Treasury Department nor the UN 1267 Committee have ever prohibited or banned or taken action otherwise to preclude a financial institution from providing a designated or listed party with account statements concerning an account that has been frozen or blocked.

_____

[1] The defendant's generic assertion that a bank must secure a specific license "if only to transmit banking records" is similarly unsupported. Contrary to the defendant's statement, a license is typically required in instances where there is a particular request to release funds from a frozen account or wire transfer that has been blocked. *See* License Application for the Release of Blocked Funds which must be submitted to the OFAC Licensing Division, and which can be found at http://www.treasury.gov/resource-center/sanctions/Documents/license.pdf. That is not the case here and the defendant cannot point to a specific regulation or rule that directs a bank to obtain a license from OFAC or the U.N. sanctions committee in order to provide a designee account holder with a simple bank statement or account summary.

The Honorable Frank Maas
November 9, 2011
Page 4

Stated simply, the goals of the E.O. 13224 designation process and the UN
Sec. Res. 1267 designation process would not be undermined by disclosing
to a designated or listed party account statements concerning an account
that has been frozen or blocked. Those programs are designed to prevent
designated parties from obtaining access to the *funds or property* in the
blocked account, not from obtaining a simple statement for the blocked
account.

*See* Declaration of Professor Jimmy Gurulé, ¶¶ 12-15, attached hereto as <u>Exhibit 1</u>.

Professor Gurulé further describes the importance of providing a designee like Jelaidan
with the ability to obtain bank statements so that he may periodically determine whether the bank
is managing the frozen account in accordance with regulations instituted under the U.S. and U.N.
sanctions programs:

In fact, the provision of such statements serves the goals of the respective
programs, by verifying that all account funds have in fact been frozen, and
that the accounts in question are being maintained in accordance with the
requirements of those programs, including requirements established for the
protection of the designated party.

*Id.* at ¶ 15. Indeed, certain OFAC regulations not only require that blocked account funds earn
interest at commercially reasonable rates ("a rate currently offered to other depositors on
deposits or instruments of comparable size and maturity"), but further permit a bank to debit
blocked accounts for normal service charges.[2] Thus, it was intended that designees would be
given access to bank statements and other records upon request as a means to confirm that the
accounts are being properly maintained.

Further, this Court need only look to the few documents produced by the defendant at the
outset of merits discovery five (5) years ago to see that Jelaidan's claim is baseless. As indicated
in Plaintiffs' Motion to Compel at p. 6, Jelaidan produced a January 2005 bank statement for
Account No. x0409 at Faisal Finance. *See* <u>Exhibit 2</u>, (WJ003). That account was seized and
frozen by Swiss authorities and Faisal Finance on or around September 25, 2002, just weeks
after Jelaidan's designation by the United States, Kingdom of Saudi Arabia, and United Nations.
Jelaidan's assertion that his designations preclude him from obtaining responsive account
records is directly contradicted by his own documents.

Finally, Jelaidan repeatedly represents to this Court that he has "exhausted" all available
methods to contact banking authorities and request the production of banking records responsive
to Plaintiffs' document requests. *See* Opposition at pp. 1-3; *see also* Affidavit of Wael Hamzah
Jelaidan at ¶¶ 7, 8, 9, and 14 (stating that he has contacted, or attempted to contact, Faisal

---

[2] *See* http://www.treasury.gov/resource-center/faqs/Sanctions/Pages/answer.aspx#1.

The Honorable Frank Maas
November 9, 2011
Page 5

Finance, Al Rajhi Bank, and Habib Bank).[3]  Despite these generic assertions, the defendant has failed to produce any tangible evidence that even remotely corroborates his position.  Indeed, had Jelaidan in fact undertaken "exhausting" efforts to contact banking authorities, the defendant would be able to provide this Court with documentation supporting those alleged good faith efforts, including but not limited to:  (1) correspondence from Jelaidan to Faisal Finance, Al Rajhi Bank, and Habib Bank requesting relevant documents and information; (2) correspondence from Mr. McMahon, or another attorney acting on Jelaidan's behalf, to Faisal Finance, Al Rajhi Bank, and Habib Bank requesting relevant account records; (3) correspondence from banking officials to Jelaidan or Mr. McMahon acknowledging receipt of said correspondence; (4) correspondence or other documentation from banking officials explaining the bank's position relative to the defendant's request for account records; and/or (5) correspondence from Jelaidan or Mr. McMahon to OFAC or United Nations officials requesting assistance in relation to the defendant's efforts to obtain basic account records from the banks, including any such applications to said entities requesting access to banking records.  No such documentation has been produced to substantiate these alleged good faith efforts.

In the absence of any evidence that would support the defendant's blanket assertions of compliance, Jelaidan's arguments that he has undertaken meaningful and good faith efforts to obtain responsive documents within his custody and control should be rejected out of hand, and Jelaidan should be compelled to immediately produce all responsive banking records.

**B.      Jelaidan Has Additionally Failed To Provide Evidence Of Any Good Faith Attempts To Establish A Dialogue With Officials From OFAC And The United Nations Regarding His Designations And Sanctions**

Jelaidan similarly asserts that his designation as a prominent global terror financier has further prevented him from requesting and obtaining responsive documentation relating to his designations and any and all sanctions imposed upon him by the United States, Kingdom of Saudi Arabia, or the United Nations.  *See* Opposition at p. 3.  However, the defendant is once again unable to cite to any law, regulation, rule, or otherwise to substantiate this position.  Nor has the defendant provided any convincing evidence to this Court demonstrating that he and/or his counsel have made the good faith efforts to formally request and obtain the relevant information.

More importantly, any suggestion by the defendant and his counsel that his designations prevent him from establishing a dialogue with the appropriate authorities at OFAC or the United Nations 1267 Committee is utterly baseless.  In fact, it is well known that both OFAC and the United Nations have established certain procedures that effectively promote dialogue between a designee and those entities, particularly where the designee believes that he has been wrongly included on the designated terrorism list.

---

[3] Jelaidan's affidavit provides no indication that he has initiated any efforts to contact Bank of Austria or the other banks in Turkey where he concedes he holds accounts.

The Honorable Frank Maas
November 9, 2011
Page 6

As defense counsel is certainly aware, the IIRO (his client) used those same procedures to establish direct communication with OFAC officials following Treasury's August 3, 2006 designations of the IIRO branch offices in the Philippines and Indonesia and the Executive Director of the IIRO Eastern Province Branch, Abd al Hamid Sulaiman al Mujil. Thereafter, Mr. McMahon used those same channels to submit an application on behalf of the IIRO seeking to have the designations withdrawn. Defendant Yassin al Kadi similarly used those same mechanisms to enter into a robust dialogue with Treasury officials in relation to his designation and sanctions. *See* Plaintiffs' Motion to Compel, Exhibit 16 (Statement of Yassin Abdullah Kadi to OFAC). The United Nations 1267 Committee also has explicit procedures in place for the submission of formal requests to be "de-listed" from the list of designated individuals and entities.[4]

To represent to this Court that the defendant is prohibited from contacting the appropriate officials because of his designation is baseless, and the defendant should be compelled to undertake all efforts to obtain all documentation relating to his designations and any and all sanctions in accordance with the rights conferred upon him as a designee.

As a final note, Jelaidan indicates in his opposition that some of the sanctions imposed upon him as a result of the September 2002 designations include an absolute bar to traveling abroad, as well as house arrest. Plaintiffs submit that the defendant's contention that he is under house arrest is more than a bit misleading, particularly in light of statements made by defense counsel early in these proceedings. During an early meet and confer concerning Jelaidan's discovery responses, Plaintiffs asked Jelaidan's counsel to explain how Jelaidan could credibly maintain that he never received any notification concerning any of his designations, given the fact that Jelaidan is a Saudi citizen living within the Kingdom, who had been designated by Saudi Arabia itself. In response, counsel expressed his understanding that Jelaidan is a successful and respected businessman in good standing, who was carrying out business activities within the Kingdom on an ongoing basis. Jelaidan's counsel also indicated at one point that Jelaidan's efforts to collect responsive discovery materials had been delayed because he was busy traveling to several weddings within the Kingdom. These statements undermine the credibility of many of Jelaidan's arguments, and his status as an active and respected businessman suggest that Jelaidan has continuing access to banking resources within Saudi Arabia (which is perhaps the very reason he is attempting to hide behind his designations to avoid turning over responsive documents).

Plaintiffs' independent investigations corroborate the characterization of Jelaidan's present status provided by his counsel, and indicate that Jelaidan has relationships with senior officials of Saudi Arabia that he could use to facilitate the release by his banks in the Kingdom of relevant financial documents. Specifically, Arabic news articles report that Jelaidan was featured as a "major speaker" at an April 2008 conference hosted by the World Assembly of Muslim Youth ("WAMY"), which was sponsored by Prince Khaled al Faisal, Governor of the Mecca District, and further attended by representatives of the Saudi government from the Office of Islamic Affairs and the Office of Social Affairs. *See* Arab News, "WAMY Organizing Forum on

---

[4] *See* http://www.un.org/sc/committees/1267/fact_sheet_delisting.shtml.

The Honorable Frank Maas
November 9, 2011
Page 7

Integration of Charity Work," April 18, 2008, attached hereto as <u>Exhibit 3</u>. The defendant's participation in this conference similarly belies any representation that he has been under house arrest since his 2002 designations.

## II.   JELAIDAN MUST DO MORE THAN SIMPLY CLAIM HE DOES NOT HAVE POSSESSION OF RESPONSIVE DISCOVERY MATERIALS

In the face of extensive and compelling evidence supporting Plaintiffs' claims that Jelaidan had close personal and business relationships with Executive Order 13224 designees Yassin Abdullah al Kadi, Chafiq Ayadi, Hasan Cengic, and Adel Batterjee, as well as al Qaeda co-founder Mohamed Bayazid, the defendant continues to make blanket assertions that he does not personally have, or have access to, documents that may be responsive to Plaintiffs' requests. *See* Opposition, p. 3.

As one of the premier al Qaeda financiers over the past two decades, it is conceivable that Jelaidan would elect not to retain documentation and information connecting him to other prominent supporters and financiers of global terrorism. Nevertheless, it does not relieve the defendant of his duty to identify any and all responsive documents that have been lost, discarded, destroyed, or seized, and further describe the circumstances under which those responsive documents were lost, discarded, destroyed, or seized. *See* Plaintiffs' Motion to Compel, pp. 21-22. Therefore, with respect to all of the Plaintiffs' document requests, Plaintiffs' respectfully request that this Court direct the defendant to comply with the instructions set forth in Plaintiffs' documents requests and identify any and all responsive documents that were at any point within his care, custody, or control, and to describe the circumstances under which any such documents were lost, discarded, destroyed, or seized.

## III.   THE TIMEFRAME FOR DISCOVERY AS TO JELAIDAN SHOULD EXTEND TO 1988

Finally, Jelaidan objects to Plaintiffs' request for an Order from this Court directing that the temporal scope of discovery should extend to 1988 (the year al Qaeda was established by Osama bin Laden with the assistance of Jelaidan and others), arguing that any such activities and/or relationships during that timeframe are wholly irrelevant.

As demonstrated in Plaintiffs' October 17 motion, Jelaidan was an instrumental player in the formation of al Qaeda, a close associate to bin Laden at that time (a fact confirmed by Jelaidan's counsel), and an important fundraiser for the terror organization. *See* Plaintiffs' Motion to Compel, Exhibits 8, 22, and 23; *see also* <u>Exhibit 4</u> attached hereto (identifying Jelaidan as a member of the initial committee to handle financial matters for al Qaeda as the terror group was forming).[5] By all credible accounts, Jelaidan was a critical member of al Qaeda's inner circle during those early formative years. Thus, his role in supporting the Afghan

---

[5] Exhibits 4, 5, and 6 were discovered during the March 2002 raid of the Bosnian offices of the Benevolence International Foundation, conducted jointly by the FBI and Bosnian police, and produced by the U.S. government in *United States of America v. Enaam M. Arnaout*, No. 02-CR-892 (N.D. Ill.).

The Honorable Frank Maas
November 9, 2011
Page 8

fighters and foreign mujihadeen during this timeframe, the continuation of those relationships following the end of the Soviet-Afghan conflict, and his efforts with those same people to create a terrorist organization that was ultimately responsible for the deaths of nearly 3,000 innocent lives on September 11, 2001, are absolutely relevant to the Plaintiffs' claims in this historic case, just as this Court observed during the April 26, 2011 discovery hearing. *See* Transcript, p. 18 ("I'm not saying its inappropriate to go back to 1987 ... if a request that's more narrowly focused that basically deals with, how did these folks get together and what were their basic roles ... I would probably look somewhat favorably upon it.").

Moreover, although defense counsel argues that Jelaidan's humanitarian activities with the MWL, IIRO, and other purported charitable groups during this period are irrelevant, it is important to remember that it was these very same organizations that bin Laden and other founding members of al Qaeda intended to use, and did use, as centers for terrorist fundraising and launching attacks. *See* Exhibit 5 (identifying the Saudi Red Crescent, MWL, and IIRO ("Hayaat al Igatha") to be part of the committee to receive donations, maintain accounts, and oversee spending); Exhibit 6 (stating that attacks will be launched from MWL offices). Indeed, the United States government has specifically asserted that Jelaidan used charitable organizations under his direction in the 1980's to provide financial and logistical support to al Qaeda and the Arab mujihadeen. *See* Plaintiffs' Motion to Compel, Exhibits 8 and 10.

Based on the foregoing, extending the timeframe for discovery to relevant periods prior to 1992 is warranted in this case.

Accordingly, for the reasons explained herein and in Plaintiffs' letter motion of October 17, 2011, Plaintiffs respectfully request that Your Honor direct defendant Jelaidan to produce any and all responsive documents requested by the Plaintiffs.

Respectfully submitted,

*The MDL 1570 Plaintiffs' Executive Committees*

THE MDL 1570 PLAINTIFFS' EXECUTIVE
COMMITTEES

The Honorable Frank Maas
November 9, 2011
Page 9

_____

cc:     The Honorable George B. Daniels
        Sean P. Carter, Esq.
        J. Scott Tarbutton, Esq.
        Robert T. Haefele, Esq.
        Jodi Westbrook Flowers, Esq.
        John M. Eubanks, Esq.
        James P. Kreindler, Esq.
        Andrew J. Maloney, Esq.
        Jerry S. Goldman, Esq.
        Martin F. McMahon, Esq.
        Alan Kabat, Esq.

PHILADELPHIA\6242779\1 117430.000

# EXHIBIT 1

UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
| --- | --- |
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (GBD)(FM)<br><br>DECLARATION OF PROFESSOR<br>JIMMY GURULÉ |

I, Professor Jimmy Gurulé, under penalties as provided by law, declare that the statements set forth in this Declaration are true and correct. I am over the age of 21 and have personal knowledge of the facts as set forth herein.

## I.  Background

1.     My expertise is described more completely in paragraphs 2 – 8 below and in my *curriculum vitae*, which is attached hereto as Exhibit A.  In summary, I am a former Under Secretary (Enforcement) of the U.S. Department of Treasury, where I was the Treasury Department's official responsible for overseeing its Office of Foreign Asset Control ("OFAC") in administering and enforcing the United States' economic sanctions policies and programs.  Presently I am a full professor of law at Notre Dame Law School, where I have taught courses in Criminal Law, White Collar Crime, International Criminal Law, and the Law of Terrorism.  As a law professor since 1989, I have taught courses, conducted research, published scholarly articles and books, and lectured domestically and internationally on the subjects of anti-money laundering and countering the financing of terrorism.

2.     In my capacity as Under Secretary for Enforcement, U.S. Department of the Treasury, from 2001-2003, I had oversight responsibility for several major federal law enforcement agencies, including the U.S. Secret Service; U.S. Customs Service; Bureau of Alcohol, Tobacco and

Firearms; Executive Office of Asset Forfeiture; Financial Crimes Enforcement Network (FinCEN); and the Office of Foreign Assets Control (OFAC). The U.S. Customs Service (now part of the Department of Homeland Security and known as Immigration and Customs Enforcement) conducts complex money laundering investigations. FinCEN is the federal agency responsible for enforcing the Bank Secrecy Act (31 U.S.C. § 5311 et seq), and OFAC administers and enforces the United States' economic sanctions policies and programs, including those imposed under Executive Order No. 13224 ("E.O. 13224"), blocking property and prohibiting transactions with persons who commit, threaten to commit, or support terrorism.

3.      While Under Secretary of the Treasury, I played a central role in developing and implementing the U.S. Government's anti-terrorist financing strategy. Among other things, I was responsible for drafting the 2001 and 2002 National Money Laundering Strategy (NMLS). The NMLS is intended to prioritize, focus, and coordinate the U.S. Government's resources used to combat money laundering and terrorist financing. Several federal agencies, bureaus and offices are involved in developing and implementing the NMLS, including: the U.S. Department of the Treasury; U.S. Department of Justice; U.S. Department of State; Federal Bureau of Investigation; Drug Enforcement Administration; Federal Deposit Insurance Corporation; Federal Reserve Board; FinCEN; OFAC; Internal Revenue Service; Office of the Comptroller of the Currency; Office of Thrift Supervision; Immigration and Custom Enforcement; U.S. Postal Inspection Service; U.S. Secret Service; Office of National Drug Control Policy; U.S. Securities and Exchange Commission; and Treasury Department Executive Office of Asset Forfeiture.

4.      As a component of my role in developing and implementing the U.S. Government's anti-terrorist financing strategy, I had responsibility as Under Secretary for coordinating America's anti-terrorist financing programs, to include the E.O. 13224 designation program, with the complementary programs of our international partners, to include the designation and sanctions

2

programs administered by the United Nations Security Council Committee established pursuant to Resolution 1267 (the UN 1267 Committee). Among other duties, the UN 1267 Committee oversees the implementation by UN Member States of the three sanctions measures (assets freeze, travel ban and arms embargo) imposed by the Security Council on individuals and entities associated with the al Qaeda terrorist organization.

5.     While Under Secretary, I also supervised the promulgation of the Treasury Department regulations implementing the anti-money laundering and counter-terrorist financing provisions of the USA PATRIOT Act (P.L. 107-56, 115 Stat. 272 (2001)).

6.     As an expert in anti-money laundering and countering terrorist financing, I have given lectures at conferences, universities, before international bankers associations, and other venues located domestically and abroad, including: Milan, Rome, and Naples, Italy; London, England; Vienna, Austria; Brussels, Belgium; Madrid and Barcelona, Spain; Davos, Switzerland (World Economic Forum); Luxembourg, Luxembourg; Mumbai, New Delhi, Pune, and Calcutta, India; Asuncion, Paraguay; Tirana, Albania; New York City, New York (International Organization of Securities Commissioners and Institute of International Bankers); Miami, Florida (Florida International Bankers Association); and Las Vegas, Nevada (Association of Certified Anti-Money Laundering Specialists).

7.     As Under Secretary, I gave two presentations to the UN 1267 Committee on the Treasury Department designation process. In late 2001, I gave a presentation discussing the process employed by the U.S. Government for placing the names of individuals and entities on the Treasury Department list. Further, in early 2002, I explained the delisting process for removing names from the Treasury list.

8.     I am the author and co-author of numerous books, law review articles, and other publications on money laundering and terrorist financing, including: PRINCIPLES OF

COUNTERTERRORISM LAW (West Publ. 2011 ) (co-authored with Prof. Geoffrey Corn); UNFUNDING TERROR: THE LEGAL RESPONSE TO THE FINANCING OF GLOBAL TERRORISM (Edward Elgar 2008); COMPLEX CRIMINAL LITIGATION: PROSECUTING DRUG ENTERPRISES AND ORGANIZED CRIME (LEXIS 2d ed., 2001); INTERNATIONAL CRIMINAL LAW: CASES AND MATERIALS (Carolina Academic Press 3d ed., 2007) (co-authored with Jordan Paust, Cherif Bassiouni, Michael Scharf, Leila Sadat and Bruce Zagaris); THE LAW OF ASSET FORFEITURE (LexisNexis 2d ed., 2004) (coauthored with Sandra Guerra Thompson and Michael O'Hear); How To COMBAT MONEY LAUNDERING AND TERRORIST FINANCING (Chapter 13) (Central Banking Publ. Ltd. 2005); *The Demise of the UN. Economic Sanctions Regime to Deprive Terrorists of Funding*, 41 CASE W.RES. J. INT'L. L. 19 (2009); *Does "Proceeds" Really Mean 'Net Profits"?: The Supreme Court's Efforts to Diminish the Utility of the Federal Money Laundering Statute*, 7 AVE MARIA L. REV. 339 (2009); *Who Is Winning the War on Terrorist Financing?*, THE FINANCIAL REGULATOR 25 *(2005); The Global Efforts to Stop Terrorist Financing*, AM. INT'L. ELECT. 1., U.S. Dep't of State(Aug. 2003); and *The Money Laundering Control Act of 1986: Creating a New Federal Offense or Merely Affording Federal Prosecutors an Alternative Means of Punishing Specified Unlawful Activity?*, 32 AM.CRIM.L.REV. 823 (1996).

9.       By virtue of my experience serving as Under Secretary and academic work, as described more fully above, I am intimately familiar with the requirements and objectives of the E.O. 13224 sanctions program, as well as the requirements and objectives of the UN 1267 sanctions regime.

10.       Broadly speaking, E.O. 13224 imposes economic sanctions on persons who have been determined to have committed or pose a significant risk of committing acts of terrorism, as well as on persons determined to be owned or controlled by such persons or to provide support to such persons or acts of terrorism. It prohibits any transaction or dealing *in property or interests in*

4

*property* of any person (i.e., an individual or entity) designated under its authority, including the donation of funds, goods, or services, and it blocks all property in the United States or within the possession or control of a U.S. person in which there is an interest of any designated person. The overarching objective of this program is to deprive designated parties of access to funds and resources, as a means of undermining their ability to promote acts of terrorism.

11.    The sanctions programs overseen by the UN 1267 Committee serve these same goals, by requiring UN Member States to undertake the following steps with respect to any individual or organization included on the UN 1267 Committee Consolidated List:

- freeze without delay the funds and other financial assets or economic resources of designated individuals and entities [**assets freeze**],

- prevent the entry into or transit through their territories by designated individuals [**travel ban**], and

- prevent the direct or indirect supply, sale and transfer from their territories or by their nationals outside their territories, or using their flag vessels or aircraft, of arms and related materiel of all types, spare parts, and technical advice, assistance, or training related to military activities, to designated individuals and entities [**arms embargo**].

12.    Neither the text of E.O. 13224, nor any regulations promulgated thereunder, nor the text of UN Security Resolution 1267, nor any related Security Council resolutions, preclude a financial institution from providing a designated or listed party with account statements concerning an account that has been frozen or blocked.

13.    Neither the Treasury Department nor the UN 1267 Committee have ever interpreted either E.O. 13224 or UN Security Resolution 1267, or any related regulations or security resolutions, to preclude a financial institution from providing a designated or listed party with account statements concerning an account that has been frozen or blocked.

14.    And finally, neither the Treasury Department nor the UN 1267 Committee have ever prohibited or banned or taken action otherwise to preclude a financial institution from providing a

designated or listed party with account statements concerning an account that has been frozen or blocked.

15.    Stated simply, the goals of the E.O. 13224 designation process and the UN Sec. Res. 1267 designation process would not be undermined by disclosing to a designated or listed party account statements concerning an account that has been frozen or blocked. Those programs are designed to prevent designated parties from obtaining access to the *funds or property* in the blocked account, not from obtaining a simple statement for the blocked account. In fact, the provision of such statements serves the goals of the respective programs, by verifying that all account funds have in fact been frozen, and that the accounts in question are being maintained in accordance with the requirements of those programs, including requirements established for the protection of the designated party.

Jimmy Gurulé
Professor of Law University of Notre Dame
Notre Dame, Indiana

11/9/11
Date

6

# EXHIBIT A

<u>QUALIFICATIONS OF EXPERT WITNESS</u>

**JIMMY GURULÉ**

**EDUCATION:**

University of Utah College of Law, J.D. 1980;

University of Utah, B.A. English 1974

**EXPERT WITNESS AND CONSULTING:**

Retained as an expert witness or expert consultant in ten major money laundering and terrorist financing cases, including: El Camino Resources, Ltd., et al. v. Huntington National Bank, No. 1:07-cv-598 (W.D. Mich.) (deposed); Richardson v. Huntington National Bank, No. 06-80989-jrh (Bkrtcy. W.D. Mich.) (deposed and testified); Dale, et al. v. Dreyfus Service Corp., et al., No. 3:00 CV 359LN (S.D. Miss. Jackson Div.) (deposed); BDP International Finance Corp., Ltd., et al. v. 6-F Corporation, Pedro Castillo, No. 06-02544-CA 21 (11th Dist. Miami-Dade County) (deposed). Serves as a Senior Advisor on AML, Booz Allen Hamilton (2007).

**EXPERIENCE:**

**PROFESSOR OF LAW, NOTRE DAME LAW SCHOOL** (1989 to present) – Tenured, full Professor of Law, teaching courses in Criminal Law, White Collar Crime (money laundering, RICO), International Criminal Law, and The Law of Terrorism. Served as Associate Dean from 1999-2000.

**UNDER SECRETARY (ENFORCEMENT), U.S. DEPARTMENT OF THE TREASURY (2001-2003)** - Nominated by President George W. Bush and unanimously confirmed by the United States Senate.

Served as the top Treasury law enforcement official, providing oversight and policy guidance to and coordinating the activities of the United States Customs Service, United States Secret Service, Bureau of Alcohol, Tobacco and Firearms, Financial Crimes Enforcement Network (FinCEN), Federal Law Enforcement Training Center (FLETC), Office of Foreign Assets Control (OFAC), and Executive Office of Asset Forfeiture, and coordinated the enforcement activities of the Internal Revenue Service – Criminal Investigation Division (IRS-CID).

The Treasury Enforcement Bureaus comprised approximately 33,000 employees with a proposed fiscal year 2003 budget of over $5 billion.

Played a pivotal role in developing and coordinating the Treasury Department's global

strategy to combat terrorist financing and freeze terrorist-related assets, meeting regularly with foreign cabinet and sub-cabinet ministers and foreign bank officials.  Supervised Treasury's participation in the Financial Action Task Force (FATF), and was responsible for developing the 2001 and 2002 National Money Laundering Strategy, and overseeing publication of the regulations implementing Title III (anti-money laundering provisions) of USA PATRIOT Act.

Responsible for establishing the U.S. Customs-led terrorist financing task force – "Operation Green Quest."

As Under Secretary (Enforcement), was featured in *Newsweek (*Oct. 29, 2001); *U.S. News & World Report* (Dec. 31, 2001); *The Washington Diplomat* (March 2003); *The Government Executive* (July 2002)*; Bank Systems & Technology* (May 2002); *Luxembourg Business* (Sept. 2002); and *Notre Dame Magazine* (Autumn 2002).

As Under Secretary was awarded the prestigious U.S. Department of Treasury Medal (2003).

ASSISTANT ATTORNEY GENERAL, U.S. DEPARTMENT OF JUSTICE (1990-1992) – Nominated by former President George H.W. Bush and sworn in as Assistant Attorney General by U.S. Attorney General Dick Thornburg.  Unanimously confirmed by the United States Senate.

Provided oversight, policy guidance to, and coordinated the activities of the Bureau of Justice Assistance (BJA), Bureau of Justice Statistics (BJS), National Institute of Justice (NIJ), Office of Juvenile Justice and Delinquency Prevention (OJJDP), and Office of Victims of Crime (OVC).

Responsible for administering an office with a combined fiscal year budget of over three-quarters of a billion dollars.  Testified before various congressional committees on a wide range of criminal justice issues.

For services as Assistant Attorney General, was awarded the Edmund J. Randolph Award and the Excellence in Administration Award.

ASSISTANT UNITED STATES ATTORNEY, U.S. ATTORNEY'S OFFICE, CENTRAL DISTRICT OF CALIFORNIA (1985-1989) – Served as the Deputy Chief of the Major Narcotics Section, prosecuting high profile international narcotics, money laundering, and tax fraud cases, and conducting complex grand jury investigations.  Supervised the three year investigation and prosecution of defendants responsible for the kidnapping and murder of a DEA Special Agent.

For services as Assistant United States Attorney, received the Attorney General's Distinguished Service Award, and Drug Enforcement Administration Administrator's Award (the highest award conferred by DEA).

2

**DEPUTY COUNTY ATTORNEY, SALT LAKE COUNTY ATTORNEY'S OFFICE (1982-1985)** – Served as Section Chief of Major Drug Section, where he prosecuted major felony cases.

**TRIAL ATTORNEY, U.S. DEPARTMENT OF JUSTICE, CRIMINAL DIVISION (1980-1982)** – Hired through the DOJ Honors Program (one of eleven attorneys hired from over 1,000 applicants). Prosecuted major narcotics cases and investigated money laundering cases.

## PUBLICATIONS

### Books

PRINCIPLES OF COUNTER-TERRORISM LAW (West Publ. 2011) (with Prof. Geoffrey Corn);

UNFUNDING TERROR: THE LEGAL RESPONSE TO THE FINANCING OF GLOBAL TERRORISM (Edward Elgar Publ. 2008);

HOW TO COMBAT MONEY LAUNDERING AND TERRORIST FINANCING (Chapter 13) (Central Bank Publ.) (2005);

COMPLEX CRIMINAL LITIGATION: PROSECUTING DRUG ENTERPRISES AND ORGANIZED CRIME (Lexis Publ., 2d ed. 2000);

INTERNATIONAL CRIMINAL LAW, CASES AND MATERIALS (with Prof. Jordan Paust, Cherif Bassiouni, Michael Scharf, Lelia Sadat, and Bruce Zagaris) (Carolina Academic Press, 3d ed. 2007);

INTERNATIONAL CRIMINAL LAW DOCUMENTS SUPPLEMENT (with Prof. Jordan Paust, Cherif Bassiouni, Michael Scharf, Lelia Sadat, and Bruce Zagaris) (Carolina Academic Press 2007); and

THE LAW OF ASSET FORFEITURE (with Sandra GuerraThompson & Michael O'Hear) (Lexis Publ., 2d ed. 2004).

## LAW REVIEW and OTHER LEGAL ARTICLES

*The Demise of the U.N. Economic Sanctions Regime to Deprive Terrorists of Funding*, CASE W. RES. J. INT'L L., 41 CASE W. RES. J. INT'L L. 19 (2009);

*Does "Proceeds" Really Mean "Net Profits"? The Supreme Court's Efforts to Diminish the Utility of the Federal Money Laundering Statute*, 7 AVE MARIA L. REV. 339 (2009);

*Who Is Winning the War on Terror Financing?*, 10 THE FINANCIAL REGULATOR 25

(Sept. 2005);

*Unfunding Terror, The U.S. and International Response to 9/11,* 17 TRANSNAT'L. LAW. 113 (2004);

*The Global Effort to Stop Terrorist Financing,* AM. INT'L ELECT. J., U.S. State Department (August 2003);

*The 1988 U.N. Convention Against Illicit Traffic in Narcotic Drugs and Psychotropic Substances – A Ten Year Perspective: Is International Cooperation Merely Illusory?,* 22 FORDHAM INT'L. L.J. 74 (1998);

*The Money Laundering Control Act of 1986: Creating a New Federal Offense or Merely Affording Federal Prosecutors an Alternative Means of Punishing Specified Unlawful Activity?* 32 AM. CRIM. L. REV. 823 (1996);

*The Ancient Roots of Modern Forfeiture,* 21 NOTRE DAME J. LEGIS. 155 (1995).

**OTHER PUBLICATIONS IN THE PRECEDING TEN YEARS**

CRIMINAL AND FORENSIC EVIDENCE – CASES, MATERIALS, PROBLEMS ( with Robert Goodwin) (LexisNexis, 3d ed. 2009);

HUMAN RIGHTS MODULE ON CRIMES AGAINST HUMANITY, GENOCIDE, OTHER CRIMES AGAINST HUMANITY, AND WAR CRIMES (with Prof. Jordan Paust, Cherif Bassiouni, Michael Scharf, Lelia Sadat, and Bruce Zagaris) (Carolina Academic Press) (2006); and

*U.S. Opposition to the 1998 Rome Statute Establishing an International Criminal Court: Is the Court's Jurisdiction Truly Complementary to National Criminal Jurisdictions?,* 35 Cornell Int'l Law Journal 1 (2002).

**CONGRESSIONAL TESTIMONY**

As Under Secretary (Enforcement), testified before the following Congressional committees:

Senate Judiciary Committee (11/20/02);
House Committee on Ways and Means (6/26/02);
U.S. Commission on Security and Cooperation in Europe (OSCE) (5/8/02);
Senate Appropriations Subcommittee on Treasury and General Government (4/17-18/02);
House Appropriations Subcommittee on Treasury, Postal Service and General Government (3/06/02, 2/27-28/02);
Senate Select Committee on Intelligence (2/04/02);

4

House Committee on Financial Services (10/03/01);
Senate Committee on Banking, Housing, and Urban Affairs (9/26/01);
House Permanent Select Committee on Intelligence (9/18/01); and
Senate Committee on Finance (5/16/01).

## AWARDS AND RECOGNITION

U.S. Department of the Treasury -- Treasury Medal (conferred by Secretary of the Treasury John Snow) (2003);

U.S. Department of Justice, Edmund J. Randolph Award (conferred by U.S. Attorney General Dick Thornburg) (1991);

Attorney General's Distinguished Service Award (one of the highest awards conferred by the U.S. Department of Justice) (1990);

Excellence in Management Award (conferred by U.S. Attorney General William P. Barr) (1992);

Drug Enforcement Administration Administrator's Award (highest award conferred by the DEA) (1989); and

Drug Enforcement Administration Certificate of Appreciation (April 1987 and July 1987).

## LECTURES

An internationally recognized expert in the field of anti-terrorist financing and anti-money laundering, delivering lectures on these subjects in Tirana, Albania (2008); Mumbai (ICICI Bank, Nehru Center), Pune (MIT School of Government, National Defense Academy, National Institute of Bank Management, Indira School of Management Studies), New Delhi (Institute for Defense Studies and Analysis, Central Economic Intelligence Bureau, Standard Chartered Bank), and Calcutta (India Bankers Seminar), India (2006); Asuncion, Paraguay (Vice-President Luis Castiglioni, SEPRELAD, Comandancia de la Policia Nacional, Senators of Finance Committee, Paraguay Bankers' Association) (2005); Amerika Haus, Vienna, Austria (2006, 2005 & 2004); Milan (Banca Intesa, Guardia di Finanza), Rome (Italian Bankers' Association, Military Center for Strategic Studies (War College), members of Italian Senate) and Naples (Treasury Police Regional Headquarters), Italy (2005); American Center Forum Series, U.S. Embassy, Brussels, Belgium (2005); Copenhagen, Denmark (2006); Judicial Conference for Iraqi Judges and the Rule of Law; The Hague, Netherlands (2004); International Organization of Securities Commissions, New York City (2004); Institute of International Bankers, New York City (2003); Florida International Bakers Association, Miami, Florida (2003); EuroForum, Madrid, Spain (2003); British Institute of International & Comparative Law, London, England (2003); Centre for the Study of

5

Financial Innovation (CFSI), London, England (2003); World Economic Forum, Davos, Switzerland (2003); American-Luxembourg Chamber of Commerce, Luxembourg (2002); Heritage Foundation (2002); McGeorge School of Law (2003); S.J. Quinney School of Law, University of Utah (2003); Columbus School of Law, Catholic University of America (2002), University of Mississippi (2002); Notre Dame Law School (2003); Florida State University School of Law (2000); Institute of Advanced Legal Studies, London, England (2000); University of Mendoza School of Law, Mendoza, Argentina (1999); Harvard Law School (1993); and University of Kentucky Law School (1997).

Delivered the law school commencement address at the S.J. Quinney School of Law, University of Utah (2002).

Addressed a nationwide meeting of high-ranking Russian federal prosecutors at a conference on money laundering and organized crime sponsored by the U.S. Embassy in Moscow, Russia (1997), and participated in a conference on money laundering and organized crime held in Yerevan, Armenia, sponsored by the ABA Central and East Europe Law Initiative (CEELI) (1998).

Addressed the United Nations Security Counsel Al Qaida/Taliban Sanctions Committe on freezing terrorist assets (February and September 2002).

## BAR AND COMMUNITY ACTIVITIES

Fulbright Scholar – Santiago, Chile (2011);

American Bar Association Rule of Law Initiative – Drafting Prosecutorial Reform Index for Belize;

National Academy of Public Administration (NAPA) – Elected Fellow (2009);

American Law Institute (ALI) – Member (since 2003);

American Society of International Law (ASIL) – Member (since 2005);

Seventh Circuit Court of Appeals Committee on Pattern Criminal Jury Instructions – Member (2008);

International Penal Law Association – Member (2008); and

Utah State Bar – Member (since 1980).

6