# Exhibit F

1

1bgr911c

```
 1  UNITED STATES DISTRICT COURT
 1  SOUTHERN DISTRICT OF NEW YORK
 2  ------------------------------x
 2
 3  In Re:  TERRORIST ATTACKS ON
 3          SEPTEMBER 11, 2001            03 MDL 1570 (GBD)
 4
 4  ------------------------------x
 5                                        New York, N.Y.
 5                                        November 16, 2011
 6                                        2:30 p.m.
 6
 7  Before:
 7
 8              HON. FRANK MAAS
 8
 9                                        Magistrate Judge
 9
10
10
11          APPEARANCES
11
12
12  KREINDLER & KREINDLER LLP
13       Attorneys for Ashton Plaintiffs
13  BY:  JAMES KREINDLER
14       ANDREW J. MALONEY, III
14
15
15  COZEN O'CONNOR
16       Attorneys for Plaintiff Federal Insurance
16  BY:  SEAN CARTER
17       J. SCOTT TARBUTTON
17
18
18  MOTLEY RICE LLC
19       Attorneys for Burnett Plaintiffs
19  BY:  ROBERT T. HAEFELE
20
20
21  ANDERSON KILL & OLICK, P.C.
21       Attorneys for O'Neill Plaintiffs
22  BY:  JERRY S. GOLDMAN
22
23
23  BERNABEI & WACHTEL PLLC
24       Attorneys for Defendants Al Haramain Islamic Foundation
24       and Perouz Seda Ghaty
25  BY:  ALAN R. KABAT
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

```
1bgr911c
```

```
 1              APPEARANCES
 2
 2   CLIFFORD CHANCE US LLP
 3        Attorneys for Defendant Dubai Islamic Bank
 3   BY:  RONI E. BERGOFFEN
 4
 4
 5   STEVEN K. BARENTZEN
 5        Attorney for Dr. Jamal Barzinji
 6
 6
 7   OMAR T. MOHAMMEDI
 7        Attorney for defendants WAMY International, Inc.
 8
 8
 9   MARTIN MCMAHON (telephone)
 9        Attorney for Defendant Muslim World League
10
10
11   LUQUE GERAGOS MARINO LLP
11        Attorneys for Defendant African Muslim Agency
12   BY:  NANCY LUQUE (telephone)
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

3

1bgr911c

```
 1              (Case called)
 2              THE COURT:  Good afternoon everyone.  Sorry we are
 3   starting late.  I guess we had some phone issues.
 4              One of the motions that is pending before me relates
 5   to Pete Seda.  I plan to resolve that motion shortly, but I had
 6   some factual questions that I want to make sure I'm accurate in
 7   my understanding in what I recite.
 8              As to the documents that were seized pursuant to a
 9   search warrant, it's not clear to me whether those were seized
10   from Mr. Seda's residence, from AHIF USA, or both.
11              MR. KABAT:  You mean the documents that came from Al
12   Haramain's law firm?
13              THE COURT:  They were documents you say you can't turn
14   over because they were returned to Mr. Seda by the government,
15   and under the Federal Defenders' understanding of the
16   magistrate judge's order in Oregon, those documents can't be
17   produced.  Those documents, as I understand it, were seized
18   pursuant to a search warrant from somewhere.  I just don't know
19   where somewhere is.
20              MR. KABAT:  From where Al Haramain is headquartered,
21   which is also where Mr. Seda lives.
22              THE COURT:  So the office was his house?
23              MR. KABAT:  He lived in the office.  Al Haramain owned
24   the building where he lived.
25              THE COURT:  Fair enough.  That answers one of my
```

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

4

1bgr911c

1  questions.  Then were the documents returned to him before
2  trial, do you know?
3          MR. KABAT:  Yes.  They were turned over according to
4  the Rule 16 protective order, that is, after Mr. Seda returned
5  to this country and before the trial.
6          THE COURT:  So once the magistrate judge signed the
7  protective order, then the documents were returned?
8          MR. KABAT:  I believe that's the correct timing.
9          THE COURT:  I should be able to determine this from
10  the docket sheet.  I assume that the charges against AHIF USA
11  were dismissed prior to trial, correct?
12          MR. KABAT:  Correct.
13          THE COURT:  I think that's all I wanted to clear up
14  with regard to Mr. Seda.
15          I have the letters that have been submitted with
16  regard to various sanctions applications.  I also have the
17  binder that the plaintiff sent me relating to their October
18  17th motion regarding Wa'el Jalaidan.  There are a number of
19  other groups of exhibits that relate to the MWL/IIRO and Wa'el
20  Jalaidan motions that have been submitted that I don't have.
21  I'm not quite sure what the explanation for that is.
22          In some instances I think I have a reasonable
23  understanding of what the information is.  For example, in the
24  affidavits of Mr. al-Radhi and Mr. al-Mujeel and others that
25  Mr. McMahon submitted, I don't have the affidavits themselves.

5

1bgr911c

 1   I'm not sure what the explanation is, whether it never got sent
 2   to me, whether it ended up in Judge Daniels' chambers.  They
 3   recarpeted my chambers and moved me in and out, so I may be to
 4   blame.  But I will need copies of the binders other than the
 5   October 17th motion binder of exhibits sent to me in relation
 6   to these motions.
 7          That raises in my mind the related question of
 8   whether, going forward, to the extent that there were motions
 9   similar to these, they should be done on formal motion papers
10   rather than letter motions.
11          MR. CARTER:  Your Honor, we had raised at various
12   times the notion that certain of these motions should probably
13   be docketed just to preserve the record.
14          THE COURT:  Sure, the letters certainly would be
15   docketed or should be docketed.  You're basically saying toss
16   the answer, for example, of MWL/IIRO and put them in a
17   circumstance where a default judgment would be entered
18   eventually.  That's fairly significant relief.  It seems odd to
19   be doing it on a letter application, although the letter
20   application is single space is probably longer than a
21   double-spaced set of motion papers would be.
22          I'm trying to think through, since conceivably there
23   will be a lot more motion practice as we go forward, whether
24   for motions like this it makes sense to proceed by letter or
25   formal motion papers or you don't care.

6

1bgr911c

1          MR. CARTER:  Your Honor, I don't think that we care.
2    It harkens back to one of the original case orders that
3    requires that all original discovery motions be done by letter,
4    if my recollection is correct.  We have just adhered to that
5    practice.
6          THE COURT:  Unless somebody on the defense side has a
7    different view, I'm content to go forward that way.  It just
8    occurred to me that might account for some of the problem I had
9    in terms of some of the exhibits, although I hadn't had that
10   problem in the past.
11         MR. McMAHON:  Your Honor, this is Mr. McMahon.  I
12   would prefer for you to decide.  I want to get clarified in my
13   mind, we owe you copies of all affidavits that we served with
14   our opposition letter for the motion for sanctions, is that it?
15         THE COURT:  Yes, exactly.
16         MR. McMAHON:  On Wa'el Jalaidan we filed a memorandum
17   letter opposition as well as an affidavit.  Do you have that?
18         THE COURT:  Let me tell you what I have.  I have your
19   September 26th letter relating to MWL and IIRO, and it says,
20   "In addition to the exhibits referenced herein, attached are."
21   The "attached are" part I'm missing.
22         On the plaintiffs' side I have the affirmation of
23   Scott Tarbutton dated October 14, 2011, annexing three
24   exhibits.  In relation to your letter about Wa'el Jalaidan, if
25   the only attachment is his affidavit, I have that.  Is it

7

1bgr911c

1     correct, Mr. McMahon, that that is the only affidavit?
2               MR. McMAHON:  I believe that's the case, your Honor.
3               THE COURT:  I missed that.  I guess all I'm missing is
4     the affidavits that relate to your opposition relating to MWL
5     and IIRO.
6               MR. McMAHON:  The 9/26 letter exhibits, yes.
7               THE COURT:  Yes.
8               MR. McMAHON:  What is the best way, your Honor, to get
9     you physical possession of those?  FedEx them to your chambers?
10              THE COURT:  Exactly.
11              MR. CARTER:  Your Honor, for clarification on our end,
12    these are the exhibits that were submitted in support of the
13    motion for sanctions as to the Muslim World and IIRO.  Does the
14    Court have something approximating this?
15              THE COURT:  Yes.  Because of its impressive girth, I
16    didn't bring it upstairs today.
17              MR. CARTER:  That's why I made Mr. Tarbutton carry it.
18              THE COURT:  Turning to MWL and IIRO, one of the things
19    Mr. McMahon says in his papers is that he has 12,000 pages of
20    exhibits, possibly more, kicking around his office that you and
21    your colleagues have declined to come look at.
22              MR. CARTER:  Your Honor, we received notification of
23    the existence of those documents on the very day we were filing
24    the motion for sanctions.  We were very reluctant to continue
25    to embrace a moving target relative to what had been produced

8

1bgr911c

```
1    and what had not been produced.
2              We simply asked Mr. McMahon to brief the dispute on
3    the record that existed as of the deadline that the Court had
4    set and hold those documents to the extent the Court declined
5    to place his clients in default.  Obviously, our papers take
6    the position that that universe of documents still doesn't
7    represent anything nearly close to compliance with the Court's
8    orders.
9              THE COURT:  Just so I'm clear, and I know I've asked
10   this question before, from the plaintiffs' perspective what is
11   the relationship between MWL and IIRO?
12             MR. CARTER:  The Muslim World League is, for lack of a
13   better term, the parent of the IIRO.  The Muslim World League
14   established the IIRO in, if I remember correctly, 1978
15   primarily to serve as an operational arm so that the Muslim
16   World would set broad policies and the IIRO would carry out
17   operational activities that served those general policy
18   interests.  Although, we have seen in many instances that the
19   Muslim World League also maintains operational presences and
20   carries out operations on its own.
21             THE COURT:  Mr. McMahon, I'm not wholly clear on what
22   your present position is as to the extent to which the parent
23   organization or organizations, in the plural, control the
24   branches.  I saw some reference to certain branches being
25   within the control of the central agency, but I thought I saw
```

9

1bgr911c

1  another one that essentially conceded that all of the branches
2  are under the control of the parent organizations.  Let me get
3  from you what your position is to that.
4          MR. McMAHON:  Yes, your Honor.  I want to get back to
5  the 12,000 pages.  For your information, your Honor, we took
6  the time to put those on CD's, and they are ready to go if Mr.
7  Carter wants those.
8          With respect to your pertinent question here, they are
9  separate entities.  There may be certain parts of the globe
10 where there is an MWL office and an IIRO office, but they are
11 separate entities, have separate charters.  We don't deem IIRO
12 to be a subsidiary of the MWL.
13         THE COURT:  I'm asking a slightly different question.
14 For IIRO, for example, to the extent that the plaintiffs are
15 seeking documents from branch offices, what is your position as
16 to the IIRO's ability to secure documents from the Indonesian
17 branch, the London branch, etc.?  Is it branch-specific or do
18 you concede that all of the branches, in terms of document
19 flow, are within the control of the parent?
20         MR. McMAHON:  No, your Honor, we don't concede that.
21 We would look to IIRO for the different office records in terms
22 of a particular branch, like the Philippines, which the
23 plaintiffs are very interested in.  At one point I think the
24 MWL had presence there, but IIRO has whatever records IIRO it
25 has.

1bgr911c

1          If the Court orders, I don't know what MWL records
2  exist for the Philippines, because if there was an operational
3  arm there at some juncture, I thought it was IIRO.  I would
4  think, your Honor, that you look to the IIRO branch.  Your
5  Honor, I only did due diligence in the sense that I did it at
6  six or seven of the offices.  I don't want you to think that I
7  traveled the globe and visited every one of those offices.  I
8  haven't.
9          MR. CARTER:  Your Honor, I think there is a fair
10 degree of specificity within the actual filings concerning the
11 relationship between the headquarters of the IIRO and various
12 branch offices.
13         THE COURT:  When you say the filings, do you mean the
14 letter briefing that I have?
15         MR. CARTER:  Yes, for the sanctions.  They make clear
16 that it is a highly centralized organization, that none of the
17 branch offices engage in any activity from the hiring of an
18 employee, to the opening of a bank account, to the issuance of
19 a check to a potential payee without authorization of the
20 headquarters.  There are controls in place requiring those
21 branch offices to turn documents back to the headquarters on a
22 routine basis.
23         We even see as a practical matter in the course of
24 this litigation Mr. al-Radhi mentions that, among other things,
25 he went to Indonesia at one point and the Indonesian office was

1bgr911c

 1   directed to give him anything he wanted.  The same is true for
 2   the Muslim World League, and we think that the papers lay that
 3   out.  It's their own documents.
 4           THE COURT:  I understand your position.  I just wanted
 5   to understand Mr. McMahon's.  I'm not sure I fully understand
 6   it now.  I think perhaps the better way to approach this is to
 7   look at some specific requests.
 8           The April 12th order, for the moment focusing on the
 9   first request, asked for annual, semiannual, and other periodic
10   financial reports of the two organizations, including branch
11   offices, including a number of specified documents.  Let's
12   focus on financial reports.
13           I understand that your position, Mr. McMahon, is
14   periodic reports would be submitted, they'd be consolidated
15   into an annual report, and then the periodic reports would not
16   be retained.  Do I have that right?
17           MR. McMAHON:  Yes, your Honor.
18           THE COURT:  I assume what you are telling me when you
19   say that is that IIRO central, for example, in Saudi Arabia,
20   would not keep the periodic reports once it had an annual
21   report.
22           MR. McMAHON:  Right, your Honor.  I think I addressed
23   that on page 13 of our letter opposition response, branch
24   office reporting, number 5.
25           THE COURT:  It's a little hard to understand, if some

12

1bgr911c

1  of these organizations have a thousand or thousands of
2  employees, how 12,000 pages, even if it's all financial
3  records, would be all the financial records, quarterly, etc.,
4  that relate to all of these branches for a multiyear period.
5  Are you representing that in response to this first category
6  somebody, Mr. al-Radhi or somebody else, on behalf of IIRO
7  queried every branch office to secure the documents that
8  plaintiffs have requested?
9           MR. McMAHON:  Your Honor, I believe that's the case.
10  I will have to go back and check his affidavit.  As I said at
11  page 13 paragraph 5, these documents were apparently sent to
12  counsel's office.
13           THE COURT:  Just to avoid the game of chicken, I'm
14  going to direct that you provide that CD to plaintiffs' counsel
15  and also that plaintiffs' counsel review it.
16           MR. McMAHON:  There are 12 CD's.
17           THE COURT:  Like I said, the 12 CD's.  I don't want to
18  leave anybody in suspense.  It's not my intent at the end of
19  today to grant or recommend -- I think it would be a grant,
20  since this is a discovery issue -- dispositive relief in terms
21  of something like striking the answer of any of these
22  defendants.  But I do think, unless I'm convinced otherwise, we
23  may be heading in that direction.
24           MR. McMAHON:  Does your Honor have a viewpoint on the
25  bank documents we have, which are difficult to read?  I asked

13

1bgr911c

```
 1   Mr. Cater to send somebody down here to look at these.  We
 2   inquired of the bank about a digital format, but that may be
 3   months away.  I simply suggest to send somebody down to look at
 4   the bank records.
 5          THE COURT:  I didn't go back through prior
 6   transcripts, but I thought that there was a representation at
 7   some prior session that there was no digital version of this.
 8   Maybe the representation was just that there was no digital
 9   file at these defendants' offices.
10          MR. McMAHON:  I think at that time, your Honor, we
11   didn't have total definition on this issue.  But subsequently,
12   in conference with the bank of Mr. al-Radhi, we discovered that
13   there is a hardcopy, and if they are to have access to the
14   digital records, that would take an enormous amount of time.  I
15   know I referenced that somewhere that that is something that is
16   still --
17          THE COURT:  You say it would take I guess it was at
18   least six months.  One of the things that plaintiffs pointed
19   out was the letter request seeking these documents, I guess
20   from just one bank, was dated August 15th, which hardly
21   suggests that the defendants are proceeding with dispatch.
22          MR. McMAHON:  Your Honor, I addressed this in point 4
23   on page 13, right before 5.  I just want to know what to do
24   with these records, because we do have them.  I want you to
25   know that I made the offer to come and visit and see if they
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

14

1bgr911c

1   can read these banking records if they so terribly want them.
2   I can't be more definite on what is in here regarding any
3   digital version.

4          MR. CARTER:  Your Honor, my recollection of this is
5   that we were initially told that this was an old dot matrix
6   printout of some banking records and that there were no digital
7   files that could ever be identified.  When we interviewed Mr.
8   al-Radhi at Mr. McMahon's request, what he told us is that
9   these were banking records that were printed out by their banks
10   during the course of this litigation.  That prompted an inquiry
11   from us.

12          If that is the case, then digital files have existed
13   during the course of this litigation.  Has anyone gone and
14   asked them to print it again so that we can have a legible copy
15   or to give us the digital files?  Mr. al-Radhi said we've never
16   asked them.

17          So, the first representation was that we've had
18   checked, it doesn't exist.  The second representation is no one
19   ever asked.  It's just difficult for us to figure out what the
20   actual playing field is.

21          THE COURT:  It seems to me that there is an obligation
22   to produce records not just in the possession of a party but
23   those that are in their custody or control.  To the extent that
24   there are electronic records or files that are available from
25   the banks, those have to be requested in a timely fashion and

15

1bgr911c
```
 1  produced.
 2              It also seems to me that the request, unless Mr.
 3  Carter tells me otherwise, extends to each branch of the
 4  organization.  And to the extent that there are nonduplicative
 5  files in the branches, those have to be produced, whether it's
 6  burdensome or not.
 7              This whole case is about money being diverted toward
 8  terrorist goals.  As I understand it, the lion's share of the
 9  effort is to see where money went.  So the notion that this is
10  a lot of paper or bytes of information and therefore
11  burdensome, Mr. McMahon, doesn't really resonate to be me.
12              MR. McMAHON:  OK, your Honor.  I went back and tried
13  to find the reference to the banking records.  That's in
14  paragraph 22, I guess, of Mr. al-Radhi's affidavit.  My team
15  has also inquired of the al-Radhi bank if they have a digital
16  record of financial banking transactions, and they have stated
17  such inquiries should be requested to the head office and it
18  might take six months, and we are in the process of doing that
19  accordingly.
20              THE COURT:  I assume if you had a large number of
21  branches, there is also a fairly large number of banks.  What
22  is required here is not one request to one bank but, to the
23  extent that records don't exist in the branches themselves,
24  many requests to many banks.
25              While I said that I'm certainly at this stage not
```

1bgr911c

1    going to grant dispositive sanctions, at some point Mr.
2    al-Radhi or somebody else, as a 30(b)(6) witness, is going to
3    testify as to the efforts that these defendants made in
4    response to these requests.
5             Except to the extent that the two sides can agree that
6    some branch office is not relevant, if each branch office is
7    not queried and the documents from that branch produced, as far
8    as I'm concerned that will have been an inadequate search and
9    may lead to dispositive sanctions.
10            MR. McMAHON:  I hear and appreciate that, your Honor.
11            MR. CARTER:  Your Honor, we focused a lot during the
12   discussion today on the financial records and bank statements,
13   but there were a number of other categories.
14            THE COURT:  I had written down, just on the April 12th
15   order, I was going to focus on 1, 3, 4, 6, and 8.  We don't
16   have time to go through each one.  I know 2 is important to
17   you, but you seemed to get a list of orphans, so I skipped that
18   one.
19            3 relates to the annual constituent council meetings
20   where it would appear that there should be centrally located
21   files.  To the extent that there is something from the
22   Philippines' office, as an example, that the main office
23   doesn't have, if the Philippines office has it, it needs to be
24   produced from that office.
25            I guess 4 is similar, although I would imagine Mr.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

17

1bgr911c

```
 1   McMahon is going to tell me that some of this is among the
 2   12,000 documents that he has for your review.
 3              MR. McMAHON:  Yes, your Honor.
 4              MR. CARTER:  Your Honor, with regard to category 2,
 5   for instance, I know that it's been the defendants' response to
 6   that to produce orphan records.
 7              THE COURT:  I thought we had agreed that it's
 8   everything but orphans.
 9              MR. KREINDLER:  It is everything but orphans.  One of
10   the reasons that we want clarification on this issue is because
11   it is about the identity of the parties to whom they
12   transferred money.  The orphans aren't of interest, but some of
13   the organizations that received money are.
14              MR. McMAHON:  As I'm sure you read, your Honor, 50
15   percent of IIRO's annual expenses go to these orphans.
16              THE COURT:  You don't have to segregate out orphans.
17   That's the plaintiffs' problem.  But telling me about widows
18   and orphans doesn't really resolve the problem of producing
19   complete records that relate to who received aid during the
20   years we're talking about from either of the two defendants.
21              MR. McMAHON:  Every entity that receives any kind of
22   aid has to be identified?
23              THE COURT:  Correct.
24              Talk for a moment about audits.  It seems to me the
25   defendants will not have done their job as to audits unless
```

18

1bgr911c

1   they have searched their own records to make sure that if they
2   have retained copies of audit reports and the documents that
3   underlie the audit reports -- I guess the first of those is
4   more likely than the second -- that that be produced.  Saying,
5   well, we'll contact the auditor and see whether they will give
6   it to us if a copy of the audit report is sitting in IIRO's
7   office doesn't cut it, as far as I'm concerned.
8           MR. McMAHON:  I hear your Honor.  You want any and all
9   records produced that are still in the possession or control of
10  the charities that in any way supported the audit.
11          THE COURT:  Or that are the audit, yes.
12          MR. McMAHON:  OK.
13          THE COURT:  Whether that is found in Saudi Arabia or
14  in the Philippines office doesn't much matter.  Somebody, Mr.
15  al-Radhi or somebody else, in an organized way has to query all
16  of these offices and be in a position to say what was done to
17  follow up, and you really need to document the process.
18          As an example, in the April 26th order there was a
19  requirement that records that relate to Mr. al-Mujeel be
20  produced.  There is a representation that the Indonesian office
21  was checked, but I gather he worked in the eastern province
22  office.  It would be a little like reviewing the files of the
23  Southern District for an Eastern District of New York case.
24  That doesn't seem to be terribly helpful or likely to adduce
25  responsive documents.

1bgr911c

```
 1              MR. McMAHON:  I understand, your Honor.  Thank you.
 2              THE COURT:  I know you understand.  I thought I was
 3    reasonably clear about this in our prior conferences.  We don't
 4    seem to be moving forward.  Perhaps it is that we never will
 5    and that the plaintiffs' motion ultimately will be granted.
 6    Even though you have been to Saudi Arabia, it sounds like folks
 7    don't understand what their duties are.
 8              For example, saying that somebody has contracted to
 9    have a further audit of records to my mind is somewhat
10    inexplicable in that the plaintiffs don't want audit documents
11    created now, they want preexisting financial records and
12    audits.  It's interesting, I suppose, that perhaps as part of
13    your defense somebody is doing an audit, but it really doesn't
14    relate at all, as far as I'm concerned, to document discovery
15    in this case.
16              Let me jump ahead a little.  At some point Mr. McMahon
17    will tell me that these organizations have produced all of the
18    records they have and I have indicated that I think it is going
19    to be appropriate to test that through a deposition of one or
20    more 30(b)(6) witnesses.  Where will a deposition like that
21    take place?
22              MR. McMAHON:  Your Honor, perhaps we can answer that.
23    We can very easily arrange to have that done in London.
24              THE COURT:  That may be the answer.
25              MR. McMAHON:  I think they even have a London office,
```

```
         1bgr911c
 1   one of these law firms.
 2               THE COURT:  Looking at the number of people in the
 3   courtroom, I'm sure one of these law firms has a London office
 4   or can find a room at Heathrow.
 5               In terms of the indices, I agree that the
 6   responsibility of producing documents can't be shifted from the
 7   defendants to the plaintiffs, but I'm not sure that the
 8   plaintiffs have really looked through the indices to see
 9   whether there are categories of documents that can be excluded
10   or focused on or prioritized or whatever.
11               MR. CARTER:  Your Honor, as I've said, we have had
12   people go through the hundred or so thousand cells within the
13   spreadsheet.  There really is not enough in a descriptive sense
14   to allow us to use them.  So, they have limited value.
15               MR. McMAHON:  Maybe Mr. Carter can send me a brief
16   email on one of those categories, your Honor, to point out why
17   that particular characterization is too limited to afford the
18   9/11 lawyers to say that's the document I want.
19               THE COURT:  I'll go further than that.  You said that
20   there was an attempted meet-and-confer but that plaintiffs'
21   counsel, it appeared to you, didn't have the indices with them.
22               MR. McMAHON:  Right.
23               THE COURT:  I'm going to direct that there be a
24   meet-and-confer where both sides have the indices and you can
25   have a discussion about what they do or don't shed light on.
```

1bgr911c

```
 1                MR. McMAHON:  OK.  That would be before our 30(b)(6)?
 2           THE COURT:  Presumably.
 3           MR. McMAHON:  Yes.
 4           THE COURT:  I view the 30(b)(6) as at a very late
 5  stage of this process.  Conceivably, if the defendants produced
 6  all the documents they had and convinced the plaintiffs that
 7  that were so, there would be no need for a 30(b)(6) witness as
 8  to the document search.  But if we are headed in the direction
 9  of dispositive sanctions, I want there to be a clear record.
10           MR. McMAHON:  I understand, your Honor.
11           THE COURT:  I'm picking at random parts of the papers.
12  There is a request for records that relate to the expulsion of
13  some folks from which office?
14           MR. McMAHON:  The expulsion of offices allegedly from
15  Pakistan.  It's based on a newspaper clipping, your Honor.  It
16  refers to Arab charities.
17           THE COURT:  But the response is (a) nobody has been
18  arrested and (b) the conviction was thrown out.  There is a lot
19  of argument on both sides about the merits of this case, which
20  in terms of discovery is largely irrelevant.
21           MR. McMAHON:  There was no conviction, your Honor.
22           THE COURT:  That's fine.  But the request is not for
23  records related to the conviction or the arrest of folks in
24  Pakistan.  It's as to the expulsion of one or more people from
25  Pakistan.  It may be that nobody was expelled, but the response
```

22

1bgr911c

```
 1   doesn't say that.  It talks about the convictions were thrown
 2   out.  It talks about nobody was arrested.  The response, it
 3   seems to me, is not responsive.  There either are or are not
 4   records that relate to the expulsion of officers or employees
 5   from Pakistan.
 6          MR. McMAHON:  The reference to Arab charities, your
 7   Honor, that's kind of broad.  That's what it says.  That's the
 8   problem.  There could be a ton of Arab charities involved, and
 9   maybe some of them were expelled for whatever reason.
10          THE COURT:  Let me get back to that portion of the
11   letter of plaintiffs.  It's page 15 of plaintiffs' letter.
12          MR. McMAHON:  It's actually page 9, your Honor.
13          THE COURT:  Page 15 of, I'm sorry, your letter says,
14   and you're quoting from the request, that you haven't produced
15   any documents related to the expulsion of IIRO personnel from
16   the Islamic Republic of Pakistan.  I suffer because I haven't
17   read that al-Radhi affirmation, but you're saying that the fact
18   that that didn't occur is confirmed by the director general's
19   office stating in a letter that "no employee has so far been
20   arrested having a link with al~Qaeda, the government of
21   Pakistan, or any other investigating agency.  The office is
22   running smoothly," etc.
23          The office could be running smoothly, nobody could
24   have been arrested or had a conviction that was affirmed, and
25   yet a dozen people could have been expelled.  If there were no
```