1bgr911c

```
 1  documents that relate to expulsion because nobody was expelled,
 2  that's one thing, but there needs to be a clear response to the
 3  request.
 4          MR. McMAHON:  That was my understanding, your Honor.
 5  I went over that with Mr. al-Radhi.  It was basically the
 6  newspaper clipping, to the extent he had any records pertaining
 7  to that, they should be produced.  We didn't find any records
 8  for that.  We'll verify that or re-verify.
 9          MR. CARTER:  Your Honor, a few points.  We have
10  invested tremendous time and resources over a period of many
11  months to get to the point where the Court is again directing
12  these defendants to do what it told them to do back in April.
13  The only basis we had to try and maintain integrity in the
14  process was the fact that we did have some independent
15  information verifying that they weren't complying with their
16  discovery obligations.
17          It is only now that we have presented it to them that
18  they are acknowledging some of these gaps.  And now that we
19  have made the case, they are going to start to begin this
20  process of producing the documents.  We have lost time,
21  resources that could have been invested in other aspects of the
22  case.
23          This kind of process of discovery only plays into a
24  broader effort to outlast the plaintiffs by using up all of
25  their resources before they can get to a point of having an
```

lbgr911c

1   opportunity to litigate this case on the merits.
2            Where we are now is that we are going to have another
3   meet-and-confer, Mr. McMahon and his clients are going to
4   peruse droves of additional documents, and we are going to go
5   back to the beginning with Arabic translators and consultants
6   and everyone else combing through them in considerable detail
7   to try and demonstrate that stuff has been withheld again.
8            I just don't know, given where we have come thus far,
9   that there is much basis to think that there is going to be
10  true compliance going forward or that there will be a
11  reasonably obtainable methodology for demonstrating
12  noncompliance once we have already sort of showed our hand.
13           MR. McMAHON:  Your Honor my short response to that is
14  Mr. Carter should take a look at the 12 disks, the CD's, the
15  12,000 pages, and maybe comment on that.
16           THE COURT:  I have already directed that he do that.
17  I recognize that the defendants, and perhaps not just these
18  defendants, are a bit of a moving target, but I don't think it
19  is appropriate to say, well, if they didn't give it to us by
20  the date we filed our motion, we're not going to look at it.
21           Part of what I need to consider is prejudice, and it's
22  hard to demonstrate prejudice if Mr. McMahon can say, well, if
23  they'd opened the file or come to my office, all of the records
24  they want are there, admittedly late, but they are there.  I
25  suspect if it's 12,000 documents, it may make a dent in what

1bgr911c

```
 1   you are seeking, but it probably makes a fairly small dent.
 2           MR. CARTER:  Your Honor, part of the prejudice I think
 3   we would identify is that, for instance, the 12,000 documents
 4   can include branch office reporting that in one of the early
 5   filings we were told didn't exist.  We then invested all the
 6   time and resources to have investigators go out and collect
 7   information and comb through documents to prove that they did
 8   exist.  The prejudice we have suffered so far, is the
 9   incredible investment of money, time, and resources simply to
10   get to the point where the defendants acknowledge effectively,
11   yes, there's a whole bunch of stuff that we never looked for.
12           THE COURT:  The alternative, I suppose, is to proceed
13   directly to the 30(b)(6) deposition.  That might put a finer
14   point on what you are telling me and what seems to be correct
15   in terms of what was and wasn't done.  But I'm not sure that at
16   the end of the day I wouldn't have to provide some relief short
17   of throwing out the defendants' answer before taking that step.
18           I guess I understand your frustration.  I'm prepared
19   to move forward on the basis of the motion papers I already
20   have, supplemented as is appropriate so that you are not
21   starting from scratch again.  But I do think we need to take
22   this a step at a time.
23           MR. CARTER:  Your Honor, could we reserve at a minimum
24   that if we get to the end of that process, the Court would
25   entertain an application, if we fall short at the end of an
```

1bgr911c

 1  actual dispositive motion, for a motion for sanctions to
 2  recover some of the costs and expense we have incurred over
 3  nine months of simply proving that these documents exist?
 4          THE COURT:  Oh, sure.  Yes.
 5          MR. McMAHON:  Your Honor, you should be aware that Mr.
 6  al-Radhi has invited these lawyers to come to London at his own
 7  expense or at the charity's expense to go to an overseas office
 8  and actually learn how the office operates.  It would be a
 9  wonderful education for them.  I wrote them and said WML would
10  pay for that trip.
11          It is extraordinary, I think, the affirmative response
12  from these charities to accommodate these attorneys.  Keep in
13  mind, your Honor, we have been sued for a trillion dollars.  I
14  have never been involved in one of these trillion-dollar
15  lawsuits before.  Now, with these 12,000 pages, we are up to
16  35,000 pages of discovery.  But you have heard my speech
17  before.  I'm sorry.
18          THE COURT:  The trillion-dollar ad damnum and the
19  seriousness that you view it with is hard to square with an
20  earlier stage where I think you were having trouble getting
21  advanced sufficient funds to go to Saudi Arabia.
22          Putting that aside, I think there has to be greater
23  focus here.  I've said in the past that if I were the
24  plaintiffs, I'd take you up on the offer to visit these
25  offices.  But if they want to proceed the way they are and on

27

1bgr911c

 1   the record they have, I'm not going to require that they go to
 2   London or the Philippines or anyplace else.
 3            MR. McMAHON:  Your Honor, we should forget about,
 4   then, the vendor proposals that we brought to your attention?
 5            THE COURT:  Yes.  Getting a bid to copy every scrap of
 6   paper, if that's what the offer is, in Saudi Arabia is a
 7   nonstarter.  The duty of identifying responsive documents
 8   really belongs to the defendants.  There are also other issues.
 9   Once you move documents, for example, from Mecca to another
10   city, I don't know that you can say we're producing them as
11   they are maintained in the ordinary course and therefore the
12   plaintiffs have to come inspect them.
13            MR. McMAHON:  I think in United LEXIS, your Honor --
14   I'll have to go back and double-check -- there would be an
15   analysis of all the documents to say these documents are
16   responsive to number 1 or number 4 or number 6 or number 3.
17            THE COURT:  I'm sorry, I didn't get that.
18            MR. McMAHON:  I think in United LEXIS, your Honor,
19   there certainly was, for instance 2 to 6,000 MWL folders.  That
20   would be an attempt to narrow that down in the sense that these
21   are the documents that are necessarily responsive to X, go
22   through the use of classic work, discovery work.
23            THE COURT:  I have directed that the two sides meet
24   and confer with regard to the indices that either will or won't
25   shed light on this process.  Given the track records so far, I

28

1bgr911c

```
 1   understand the plaintiffs' reluctance to write a check for
 2   files that may or may not be responsive.
 3             MR. CARTER:  Your Honor, if I could add one thing to
 4   that.  After having spent all the time and money we have to
 5   prove that the documents exist, I think we are doubly reluctant
 6   to write a check, now that they acknowledge them to exist, for
 7   them to produce them.  It's tripling the investment,
 8   effectively.
 9             THE COURT:  Let's move on, unless somebody wants to
10   add something with respect to MWL and IIRO, to Wa'el Jalaidan.
11             MR. CARTER:  Your Honor, before we move on, I
12   apologize, but we didn't set any time frame for this process.
13             THE COURT:  That's true.  I want to tie it to the
14   discussion of the timetable for fact discovery in this case,
15   which was one of the points you wanted to raise.  In fact,
16   let's do that next rather than moving on to Wa'el Jalaidan.
17             MR. CARTER:  Your Honor, I had some conversations with
18   counsel for Dubai Islamic Bank and some of the other members of
19   the defendants' executive committee about what we contemplated
20   would be a brief extension of the rolling production probably
21   to 60 days.  The process that was just described with regard to
22   the Muslim World League and IIRO gives me some pause to suggest
23   that we can complete everything we are doing and the additional
24   work with those defendants in 60 days.
25             THE COURT:  Is it feasible to have, in terms of
```

```
        1bgr911c
 1   document discovery, two different schedules?
 2              MR. CARTER:  I think that would be fine.  You mean one
 3   as to the Muslim World League and IIRO and one as to other
 4   parties?
 5              THE COURT:  Yes.
 6              MR. CARTER:  That would be acceptable to us, I think.
 7              THE COURT:  For the others you're proposing a 60-day
 8   extension?
 9              MR. CARTER:  Of the rolling production deadline, yes,
10   your Honor.
11              THE COURT:  Which takes us to when?
12              MR. CARTER:  January 30th, if I'm correct.
13              THE COURT:  I don't have a problem with that.
14              MR. KABAT:  Your Honor, we would also request that the
15   summary judgment deadline would be extended correspondingly.
16              THE COURT:  That's obviously going to have to shift
17   other dates.  Candidly, I tried to call Judge Daniels right
18   before this conference to let him know that that was one of the
19   applications and to see whether he had any strong views.
20   Perhaps fortunately for you folks, I wasn't able to reach him.
21   As far as I'm concerned, that necessitates readjusting all of
22   the other dates that we're talking about.
23              What do you suggest as an extension as to MWL and
24   IIRO?
25              MR. CARTER:  Your Honor, in terms of the production of
                        SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```

1bgr911c

1  the actual documents, I'm not really sure that it makes sense
2  to give them more time than other defendants by virtue of their
3  failure to make a diligent search to this point.
4       What I would ask, though, because of the track record
5  we have with these particular defendants, is that we have a
6  pause from our obligation to collect everything potentially
7  responsive to their requests and give us an opportunity to
8  focus on making our productions to the other defendants.  I
9  think we would be in a position to produce our documents to the
10  Muslim World League and IIRO say some 30 days after they had
11  completed their production.
12       THE COURT:  I'm not going to do that.  What I'm going
13  to do is extend the rolling discovery deadline for both sides
14  as to those defendants for the same 60 days.  If I see some
15  good-faith effort to move forward in terms of document
16  production, maybe there will be some additional adjustment.  If
17  I don't, there is not much point in me extending this ad
18  nauseam.
19       MR. CARTER:  Thank you, your Honor.
20       THE COURT:  I guess I will do the same with respect to
21  Wa'el Jalaidan.
22       MR. CARTER:  Thank you, your Honor.
23       THE COURT:  It seemed to me there were issues as to
24  whether banking records were in Mr. Jalaidan's position or a
25  representation that they were not in his possession versus the

31

1bgr911c

1    plaintiffs' view, which I agree with, that if they are in his
2    custody or control, they are also producible, and that if he
3    has the practical ability to get them from his banks, they are
4    within his control.
5           Part of the response that I received from you, Mr.
6    McMahon, was, well, the accounts have all been seized.  I have
7    no doubt that perhaps he couldn't write a check against one or
8    more of these accounts, but that's not the same as saying that
9    he can't obtain records that relate to them.
10          MR. McMAHON:  Your Honor, I have had a lot of
11   experience with designated entities, for good and bad.  Banks
12   are conservative institutions to begin with.  They would
13   hesitate to have any kind of dialogue with respect to alleged
14   designated terrorists because without having procured a
15   license, for example, from OFAC, you can't deal with such
16   people, you're breaking the law.
17          I think they would be very hesitant to do anything.
18   And Jalaidan I guess would have to pay attorney's fees to the
19   bank to hire special counsel to investigate all of this to see
20   whether or not they are even allowed to take a request from him
21   for certain bank records that are no longer in his physical
22   possession but in the bank's control.
23          MR. CARTER:  Your Honor, effectively what Mr. Jalaidan
24   is trying to do is use his designation by the United States and
25   the UN as a shield from the discovery process.  In articulating

32

1bgr911c
1  that position, all he gave us was a very generic affirmation in
2  which he said, for instance, that he has contacted some of his
3  banks but that effectively they won't take his calls.
4          We don't see any sort of documentation establishing
5  the kind of diligent effort to obtain the records that one
6  would expect, particularly from someone who is trying in good
7  faith to obtain records that in his position to the Court would
8  exonerate him from the claims in this litigation.  We don't see
9  letters from counsel or anything of that nature.
10         THE COURT:  Since he is a designated terrorist,
11 apparently, I've indicated how I would expect the record to be
12 made clear with respect to MWL and IIRO.  I would anticipate
13 that there would be some complications whether you're taking
14 his deposition regarding documents or as to the merits of this
15 case.  How do you envision that unfolding if indeed the case
16 goes forward as against him?
17         MR. CARTER:  Your Honor, I think what we had in mind
18 at this point was simply an order for him to undertake all
19 diligent efforts to obtain the bank records and to provide the
20 Court and the plaintiffs with some documentation verifying that
21 he has done that.
22         As your Honor saw, we produced an affidavit from
23 Professor Gerulli, who in large degree was the architect of the
24 executive order 13224 program that liaisoned to the UN relative
25 to its program.  He is quite clear that the programs don't

1bgr911c

```
 1   prohibit the banks from sharing this information.  And the
 2   record seems to establish that in that one of the banks Mr.
 3   Jalaidan says he can't get records from is Faisal Finance,
 4   which gave him records three years after his designation.
 5              What we are really looking for is some record to
 6   establish that he has undertaken those efforts.
 7              THE COURT:  He's produced records.  Does that
 8   necessarily mean that he obtained them from the bank rather
 9   than from his own files?
10              MR. CARTER:  He is producing a 2005 account statement
11   from a bank that froze his account in 2002.
12              THE COURT:  If he had that in his back pocket, then he
13   didn't need to go to the bank.
14              MR. CARTER:  What I'm saying is he is taking the
15   position that from the date of the freezing of his accounts,
16   all of his banks have uniformly refused to deal with him and to
17   provide him bank statements, yet he has a bank statement from
18   three years after that point in time.
19              THE COURT:  I see your point.  I guess, Mr. McMahon,
20   it comes down to the same thing I said with respect to your
21   other two clients, namely, that there has to be a full-court
22   press.  And, as Mr. Carter indicated and I've said before, it
23   has to be documented.  If you're not sufficiently able to
24   document a vigorous effort to obtain those documents, it may be
25   that sanctions are imposed.
```

34

1bgr911c

```
 1              MR. McMAHON:  Your Honor, if I could ask Mr. Carter
 2    this.  What precludes the plaintiffs' lawyers from issuing
 3    subpoenas to these banks and demanding the Jalaidan records?
 4    Then they might have an excuse to produce the records, that
 5    they are not dealing with global terrorists, they are producing
 6    records pursuant to a valid subpoena.
 7              THE COURT:  I'll let Mr. Carter answer that, but my
 8    answer to it is they have the right to ask the defendant
 9    produce that which is in his control.  You're saying it's not
10    within his control, but I'm not sure this has adequately been
11    established.
12              MR. McMAHON:  They have a track record, your Honor, of
13    seeking extrajudicial assistance throughout the course of the
14    litigation.  I'm just curious if they even tried one of these
15    things to see what the response was.
16              MR. CARTER:  Your Honor, they are beyond the subpoena
17    power, so it's not a simple matter of issuing a subpoena.  I
18    think what we are running into here is a problem that we have
19    run into consistently, which is an effort to reformulate the
20    discovery process in a manner that deserves the defendants'
21    interests but bears no relationship to the rules.  We have seen
22    it with the Muslim World League and the IIRO, and we are seeing
23    it with Mr. Jalaidan.
24              If there is a record that he has undertaken good faith
25    and diligent efforts to obtain these records and has been
```

                                                                    35
        1bgr911c
 1   unable to, a joint application to this court for letters
 2   rogatory to a foreign tribunal may make sense.  But that is a
 3   time-consuming process and we are trying to adhere to a
 4   schedule.  Until he has undertaken his direct efforts, I don't
 5   see a point of going down that road.
 6              THE COURT:  I agree.  Can we move on from Mr.
 7   Jalaidan?
 8              MR. CARTER:  Your Honor, there was one issue in that,
 9   and also a request, that the time frame as to Mr. Jalaidan,
10   particularly with respect to bank records, go back to 1988.
11              THE COURT:  I'm going to deny that request without
12   prejudice.
13              MR. CARTER:  Thank you, your Honor.
14              THE COURT:  That brings us to the agenda letter and
15   the remaining points on it.  I appreciate the report that I
16   received as to other defendants.  I know that there was a
17   request regarding the deposition transcripts of Dr. Mirza, Dr.
18   Barzinji, and a third deponent.  What else is there to discuss
19   today?
20              MR. CARTER:  Your Honor, there was the scheduling
21   issue, which I think the Court has addressed.
22              THE COURT:  Right.
23              MR. CARTER:  We have one issue that wasn't on the
24   agenda letter simply because it came up on Monday of this week
25   and has no bearing on any of the defendants here, if I could

36

1bgr911c
 1  take a moment.
 2            THE COURT:  Sure.
 3            MR. CARTER:  It deals with your Honor's report and
 4  recommendation on the al~Qaeda default judgment, the monetary
 5  award on behalf of certain of the Federal Insurance plans.
 6            THE COURT:  You haven't collected the full amount yet?
 7            MR. CARTER:  We have not.  There is, however, an
 8  ongoing forfeiture proceeding in the Northern District of
 9  Illinois through which the government is seeking to seize
10  approximately $6.6 million in al~Qaeda assets.  We have
11  appeared in that proceeding.
12            THE COURT:  I thought you sent a letter to Judge
13  Daniels.
14            MR. CARTER:  We did, and a proposed order.  One of the
15  things that we would like to have very much in a somewhat
16  urgent time frame is a ruling on that so that we can present
17  that to the Court in Chicago.
18            THE COURT:  Yes.  I work for him, not the other way
19  around, but I was going to urge him to turn to the Al Haramain
20  objections as well.  I'll try to take up both those issues with
21  him this week.
22            MR. CARTER:  Thank you, your Honor.
23            THE COURT:  Anything else?
24            MR. KREINDLER:  Yes, your Honor.  This is for the next
25  conference.
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

.

37

1bgr911c

```
 1                THE COURT:  Do we have a date by the way?
 2                MR. KREINDLER:  It's the December conference.
 3                THE COURT:  There is a date scheduled?
 4                MR. KREINDLER:  Yes.  This is the defendants' request
 5      from us for information on standing and the plaintiffs'
 6      damages.  If I spend two, three minutes on it, I think we can
 7      save hours of future brief writing and discussion.
 8                THE COURT:  Sure.
 9                MR. KREINDLER:  First of all, I think it is important
10      to keep in mind where we are trying to go on this case.  This
11      is not the regular case where there is going to be varying
12      individual damages.  Speaking personally, my goal is a uniform
13      recovery on each death case and each injury case and an
14      allocation to the economic and property damage plaintiffs.  So,
15      any information about whether a victim was married or had
16      children or who is the executor or how many people are involved
17      really isn't going to be relevant here.
18                Second, as a practical matter, the only way this case
19      is going to work --
20                THE COURT:  Wait.  Let me stop you at point one.  I'm
21      probably not the judge who should be asking this question, it's
22      probably Judge Daniels, but let's say that every victim was
23      single and childless or, conversely, every victim was married
24      and had 12 children.  Wouldn't that affect the equation?
25                MR. KREINDLER:  As a practical it's not going to here,
```

38

1bgr911c

1 your Honor.  The precedent is the numbers used now by the
2 foreign claims commission for all terrorist claims against
3 Libya, which is 10 million a death, 3 million an injury.  That
4 is our goal.  People receive damages from the VCF, some
5 received damages from the insurers for American and United.
6 Some didn't sue at all.
7          The common element here is driven by and of the
8 intentional tort punitive damages type of case.  The way we are
9 handling the case is on that uniform basis.
10          Now, if any one of these defendants or any group of
11 defendants got to the point where they wanted to talk about
12 settlement, it would not be making 25,000 offers on each injury
13 and death case.  As a practical matter, a defendant would come
14 forward and say, we want out of this case, we can put up a
15 hundred million dollars, what can we do?  Then, with the
16 Court's assistance, we would find a mechanism with your Honor
17 or special master to create a fund following the proportions
18 that we have recommended to our clients.
19          THE COURT:  I guess some of this must have been
20 followed in the Libya case?
21          MR. KREINDLER:  Exactly.  It's a paradigm that the
22 state department and the justice department and the
23 administration are using with Libya, and it's the model we're
24 following in other cases, the Mumbai case, etc.
25          Right here I want to say that apart from wasting

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

39

1bgr911c

1  thousands and thousands of hours of going to all these families
2  and saying who was appointed -- it's a colossal waste of time
3  and it doesn't advance the litigation.
4         One specific thing came up, and really this is my
5  request that the defendants withdraw a demand.  What is coming
6  up ahead is an ostensible standing issue under the VCF.  The
7  defendants have focused on the language of the VCF to advance
8  an argument that some plaintiffs may be eligible against some
9  defendants.  It just isn't the case.  Let me lay it out right
10 now.  Here is the legislative history of how the VCF came
11 about.
12        Senator Schumer passed the first version.  Five
13 minutes after it came out, my father and I called him up -- my
14 dad had known him for 30 years -- and said, Chuck, you screwed
15 it up, you forgot to leave the exemption for the suit we're
16 working on against the backers of al~Qaeda.  He said, oops,
17 we'll fix it up.  The fix three or four days later was to
18 permit these very suits that we have been litigating for ten
19 years.  Now, if there is any doubt about what I'm saying, I can
20 have Senator Schumer verify it.  Ken Feinberg will verify it.
21        I would like now to take all these nonissues that will
22 waste hundreds and thousands of hours out of the case so we can
23 be at a point in the very near future where we're not doing
24 exactly what we are doing with you and pulling teeth to get
25 liability documents.

```
                                                              40
      1bgr911c
 1              I think the case can move forward.  If the defendants
 2    need Ken Feinberg or Senator Schumer to verify what I'm saying
 3    here on the record, we can do that.  But I'm representing that
 4    that's the fact.  I'd request that they withdraw those demands.
 5              THE COURT:  Let's assume that everything you said, I
 6    have no reason not to, is a hundred percent accurate.  If the
 7    legislation is unambiguous and reads the other way, aren't the
 8    plaintiffs entitled perhaps to discovery but at least to make
 9    the argument that the statute unambiguously requires something
10    other than what you just said?
11              (Pause)
12              THE COURT:  Off the record.
13              (Discussion off the record)
14              THE COURT:  Now we are on the record.
15              MR. KREINDLER:  I wanted to bring it up now.  I think
16    it is unambiguous.  I wanted to say what I just said because I
17    think we can save a lot of time.  Defendants can call me about
18    it tomorrow or next week to discuss it further.  But I would
19    like to focus on the work that must be done and not be diverted
20    by things that are going to wind up being irrelevant.
21              THE COURT:  I guess ultimately, absent some agreement,
22    it becomes a discovery issue as to whether that discovery is or
23    is not appropriate.
24              MR. KREINDLER:  Yes.  Our position is that we are
25    doing liability discovery, which is the defendants' conduct,
```

41

1bgr911c

1  whether it's called standing or damages, and it's premature to
2  waste any time on it until we get to the point of the
3  possibility of the defendants paying money to some of the
4  victims.
5          THE COURT:  It may be that discovery gets staged and
6  that this is stage 2 if it's at any point relevant.
7          MR. KREINDLER:  Right.
8          THE COURT:  But I will duck the issue rather than
9  resolving the issue, which in a sense solves your problem.  I
10  think it is appropriate for the parties, as you said, to talk
11  first, and then we'll talk some more about it in December.
12          MR. KREINDLER:  OK.
13          MS. BERGOFFEN:  Your Honor, if I may respond with
14  regard to the motion on the consolidated requests?
15          THE COURT:  Sure.
16          MS. BERGOFFEN:  As your Honor put it, this is an issue
17  for a discovery brief.  We have submitted to the plaintiffs a
18  brief and given them an extension on a response.  I think, with
19  all due respect, Mr. Kreindler's response oversimplifies the
20  position that we have taken in that brief, and it does need to
21  be fully briefed on the papers to address the legal issues.
22          If I may for a moment, there are many issues with
23  regard to standing.  As you know, standing is an issue as to
24  liability rather than damages.  With regard to the VCF point,
25  as I state in our papers, it's not simply a matter of whether

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

42

1bgr911c

1 or not the VCF allows suits to go forward, it's what the
2 standard would be once you're under the VCF and once a
3 potential plaintiff has actually become under the victims
4 compensation fund.
5           All of this is borne out in our papers and, with
6 respect, needs to be fully briefed before the Court.  It isn't
7 something that can just be summarily dismissed based on Mr.
8 Kreindler's statements.
9                THE COURT:  Let's talk about it more next month.
10               MS. BERGOFFEN:  Very good.  Thank you.
11               THE COURT:  Why shouldn't I direct that plaintiffs
12 turn over the three deposition transcripts?
13               MR. BARENTZEN:  Your Honor, Steven Barentzen on behalf
14 of Dr. Jamal Barzinji.  Should I walk over that that podium to
15 speak?
16               THE DEFENDANT:  Ms. Luque, can you hear?
17               THE COURT:  You're good where you are.
18               MR. BARENTZEN:  I prefer to go to the podium if I'm
19 allowed to, because I've got a place to put my stuff.
20               THE COURT:  Be my guest.  However, make sure that that
21 microphone is plugged in, because it may not help you.
22               MR. BARENTZEN:  I have a pretty loud voice.  I'm not
23 sure the microphone is going to be necessary.
24               The short story is we do not and never have had any
25 objection to any of the current parties to this case ordering

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

43

lbgr911c

```
 1  from the court reporter a copy of the transcripts provided they
 2  are willing to be bound by the confidentiality provisions that
 3  we agreed to in our resolution agreement with the plaintiffs.
 4  I think we shouldn't have to give them over, I think you have
 5  to buy them, but that's besides the point.
 6          I think this letter application that you got is a
 7  classic example of why they have meet-and-confer rules in the
 8  place in the first place.  Had nobody anybody to call us, they
 9  would have known that and maybe I wouldn't have had to come up
10  here.
11          I look at the letter that you are looking at right
12  now.  Four attorneys signed it.  When I got it and looked at
13  it, I said, what is this thing?  I emailed the court reporter
14  and I said, which of those four have actually asked for a copy
15  of the transcript?  Three of them had not.  Only one had, had
16  only asked for one transcript, and that was WAMY's counsel, Mr.
17  Mohammedi.  I'm going to back up a little bit and explain how
18  that happened.
19          I do want to say that there is a legitimate issue as
20  to former defendants who have been dismissed and who are now on
21  appeal at the Second Circuit getting copies of those deposition
22  transcripts.  As to those people, we have objected to them
23  getting them because that was not part of our bargain with the
24  plaintiffs.  We would like an order from the Court to that
25  effect, because I know that at least one of those defendants
```

44

1bgr911c
```
 1   has been trying to get those things.
 2            THE COURT:  Who was dismissed and is seeking the
 3   transcript?
 4            MR. BARENTZEN:  The lawyers for Yousef Jameel.  I
 5   think it is at the Bancroft firm.  A couple of different
 6   lawyers I have been dealing with.  They are not part of the
 7   this application at all.
 8            THE COURT:  I don't see them in the letter
 9   application.
10            MR. BARENTZEN:  They are not part of the application.
11   Four lawyers signed it:  Mr. Mohammedi; Mr. Kabat, who was at
12   the depositions who the day before he signed this letter, I
13   exchanged emails with him about what we are going do at these
14   depositions.  The other two lawyers who signed it were Chris
15   Manning, who I haven't spoken to about this case in two years,
16   and Martin McMahon, who is on the phone, has never been at any
17   of these depositions, I have never heard from.
18            To back up briefly, I think this issue started at the
19   time of the depositions in the first place.  If you remember,
20   they had been noticed on a very short notice by the plaintiffs.
21   We had negotiated confidentiality and finality with our
22   resolution agreement.  That's what we were trying to protect.
23            THE COURT:  Right.  I had forgotten the context.  This
24   was your way out.
25            MR. BARENTZEN:  Exactly.  Due to no fault of our own,
```

1bgr911c

```
 1    the plaintiffs noticed these depositions on very short notice.
 2    Some of the defendants objected, they wanted them moved.  We
 3    said no, we want to hold the plaintiffs' feet to the fire.
 4    That's what we negotiated and that's what we ended up doing,
 5    and I absolutely think it was the right thing to do.
 6             The other defendants counsel, like WAMY's counsel Mr.
 7    Mohammedi, rather than call us, rather than talk to us, they
 8    told you that we were trying to block them from getting into
 9    the depositions.  It was never the case at all.  I think your
10    order actually said something to the effect like it was absurd
11    for us to try to block them from going to the depositions.
12             THE COURT:  I don't remember that.  I just remember
13    saying that it would be without prejudice to anybody's right to
14    say we want a further deposition.
15             MR. BARENTZEN:  There was one part of the order which
16    we interpreted as suggesting that you thought maybe we were
17    trying to block people.  Never the case at all.  We went
18    forward.  Numerous of the defense counsel showed up.
19             THE COURT:  I don't think I suggested that you were
20    trying to block people but were, as you just told me, desirous
21    of standing on your rights to have it done within the
22    particular time period pursuant to the stipulation, which at
23    least as to one lawyer I thought made it impractical or
24    impossible for him to attend.
25             MR. BARENTZEN:  Ms. Luque will get to that lawyer, who
```

46

1bgr911c

1   is Mr. Mohammedi, because we now know what he is doing and why
2   he couldn't get there, which I think you might find
3   interesting.   The point is we did the depositions, took them.
4   Several defendants showed up.   Dubai Islamic Bank's lawyer
5   showed up.   They got the transcripts, no problem.
6           What actually happened was, because these are
7   confidential transcripts, I said to the court reporter at the
8   completion of the three depositions, listen, I don't know who's
9   going to try to get these, it might be some nonparties, it
10  might be some people outside the case.   They are confidential.
11  If somebody asks for them, I'll be the lightning rod.   I don't
12  want you to be in the middle of it.   Just say, listen, call Mr.
13  Barentzen, talk to him.
14          I had absolutely no intention, never have said to
15  anybody, that you can't have these things.   It was never the
16  case other than the nonparties, who I did say that to.
17          As to the actual party that tried to call, the WAMY
18  lawyers, Ms. Luque, they have actually been actively avoiding
19  us.   Instead of talking to us, instead of doing the meet-and-
20  confer, they have actively avoided us and filed this motion.
21          I think maybe now Ms. Luque can explain to you the
22  background as to what has gone on with the WAMY lawyers.
23          MR. McMAHON:   Your Honor, this is Mr. McMahon.   Can I
24  be excused?
25          THE COURT:   Fine by me.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

lbgr911c

```
 1                 MR. McMAHON:  Thank you.
 2                 THE COURT:  Ms. Luque?
 3                 MS. LUQUE:  Your Honor, I appreciate your going
 4    through the extra efforts to get me on the line.  I wish that
 5    Mr. McMahon hadn't gotten off.  I was very troubled by his
 6    refusal to get me back on the line, particularly since in my
 7    view I was somewhat adverse to him, at least in the position
 8    that Mr. Barentzen is articulating.
 9                 I think Mr. Barentzen and I felt that the Court may
10    have been somewhat disappointed in thinking that we were trying
11    to avoid our obligations.  I think that is maybe what we got a
12    sense out of your order.
13                 THE COURT:  I guess maybe I had the sense that you
14    were playing hardball but well within your rights.  I may have
15    conveyed that thought.  Maybe I was more subtle, but probably
16    not, I think I might have said this problem would go away when
17    the depositions were adjourned.
18                 MS. LUQUE:  Yes.  I appreciate what the Court is
19    saying today.  However, I think what's happened is we have
20    become a bit of a political football here with the defendants.
21    One of the reasons I wanted to speak to the Court is to try and
22    get the Court's help in reminding them of their obligations to
23    talk to us before they write letters which contain what I think
24    are gross inaccuracies.
25                 THE COURT:  Wait.  Let me ask, as to folks who are
```

48

lbgr911c

1  currently defendants, is there any objection to producing the
2  transcripts subject to the confidentiality that I gather was
3  designated at the outset of the deposition?
4        MS. LUQUE:  No, your Honor.  The inquiry I got from
5  Mr. Mohammedi was that I provide him with a copy of the
6  transcript, which I don't believe is appropriate.  I think that
7  court reporters everywhere don't like that.
8        THE COURT:  That's true.  Maybe there is no track
9  record here, but I was about to ask what has happened thus far
10 to the extent there have been depositions?  Maybe there haven't
11 been depositions except for NCB a long time ago and things like
12 that.
13       MS. LUQUE:  I believe maybe one of the plaintiffs
14 ordered the transcript directly from the court reporter.  Is
15 that true, Mr. Barentzen?
16       MR. BARENTZEN:  Yes.
17       THE COURT:  I would assume so.  They have to produce a
18 copy to the deponent.
19       MS. LUQUE:  That's true, your Honor.  I you assumed
20 everyone knew that they should order the transcript from the
21 reporter.  It never occurred to me that people would look to us
22 to give them copies.
23       Having said that, I'd like to talk about Mr. Mohammedi
24 just a bit.  If the Court will recall, I think the Court did
25 recall --

1bgr911c

```
 1              THE COURT:  Wait.  Maybe I can short circuit this.  If
 2    somebody other than Mr. Mohammedi or the other applicants is
 3    going to pay for the transcript, it seems to me it would be the
 4    plaintiff, not the deponent's counsel.  But I'm not sure that
 5    it's appropriate for plaintiffs' counsel to pay for it either.
 6    Either way, I think I get to where Mr. Barentzen was a minute
 7    ago, which is this hasn't been discussed amongst the attorneys,
 8    so it seems to me it's something that ought to be discussed and
 9    brought to me next month.
10              MS. LUQUE:  With one exception, your Honor.  I want to
11    put this on the record because I find it extremely troubling.
12    The Court will recall and recalled a moment ago that Mr.
13    Mohammedi apparently couldn't attend these depositions because
14    he was traveling in Saudi Arabia.  It turned out that he was
15    contacting one of my clients, former clients, in this very
16    matter directly to obtain an interview.
17              When I found out about this, I told Mr. Mohammedi that
18    I wished to be present at least telephonically and then he
19    could proceed with an interview.
20              THE COURT:  You're talking about one of the deponents?
21              MS. LUQUE:  Yes, someone who was overseas.
22              THE COURT:  OK.
23              MS. LUQUE:  What happened, however, was that instead
24    of arranging the interview at a time when I could be present,
25    Mr. Mohammedi arranged for that interview to occur
```

50

1bgr911c

1   simultaneously with one of the depositions he knew would be
2   occurring in the States and went ahead talking to my client
3   without my presence.
4           It is with some distress that I wanted to be in front
5   of the Court today.  I don't understand why our former
6   co-defendants are approaching this matter this way.  Your
7   Honor, it is somewhat troubling to me that somebody before the
8   Court would take the position they couldn't attend noticed
9   depositions because they were busy contacting a represented
10  party and then particularly scheduling that interview to
11  coincide with the deposition that that lawyer knew that I had
12  to attend, and then on top of that to object to the Court that
13  it was I that was keeping him from the deposition transcript
14  and somehow impeding him.
15          MR. MOHAMMEDI:  Can I answer this, have an opportunity
16  to answer this?
17          THE COURT:  Yes.
18          MR. MOHAMMEDI:  I think the first time that we were
19  aware of this deposition was when we saw a notice of the
20  deposition that was forwarded to us a few days before we were
21  traveling to Saudi Arabia.  At that time we were not even
22  intending to interview anyone.
23          When we saw that, my associate, who is here in this
24  court, reached out to Ms. Luque and asked her if she could
25  postpone this deposition.  She said to her, no, I will not be

51

1bgr911c

 1   able to do that, because there is a confidentiality agreement
 2   here and there is no way I can do this.  Afterwards, when we
 3   heard that, obviously we had to check.  We did reach out to Ms.
 4   Luque and we spoke with her.
 5              THE COURT:  Did you interview one of Ms. Luque's
 6   clients?
 7              MR. MOHAMMEDI:  That's where I'm going to.  First I'd
 8   like to address this issue about the deposition.
 9              THE COURT:  Do it in the order I'd like.  Did you
10   interview Ms. Luque's client?
11              MR. MOHAMMEDI:  I did know that Ms. Luque was
12   representing her client, who was actually working for WAMY.
13              THE COURT:  Who was working for?
14              MR. MOHAMMEDI:  That was a witness.  We were going to
15   interview some of the witnesses.  I sat down with him and I
16   asked him who is representing him.  He said Ms. Luque.  I said
17   to him, now we need to stop this interview, I'd like you to
18   call Ms. Luque and ask her if it's OK to sit down with you in
19   her presence to interview you.
20              For the record, I sent her an email and I mentioned
21   this to her.  Afterwards I called her and spoke to her on the
22   phone, she cannot deny that, for almost an hour where she was
23   arguing why I made this application to the Court to make sure I
24   will not appear in that deposition.  We could not resolve that
25   issue.

52

1bgr911c

```
 1              I asked her about --
 2              THE COURT:  Wait.  If you were able to in that time
 3    slot interview this individual, why couldn't you attend the
 4    deposition by telephone?
 5              MR. MOHAMMEDI:  I was in Saudi Arabia, your Honor.  I
 6    was not here.  The witness was in Saudi Arabia, was not in the
 7    United States.  The deposition was held in the United States.
 8    I could not be in two places.
 9              THE COURT:  Was the deposition by telephone?  How was
10    this done?
11              MR. MALONEY:  It was done in Virginia, your Honor, in
12    Herndon, Virginia, as noticed.  That's where they lived, the
13    three witnesses.  There was a fourth witness, who was not
14    deposed, who I believe resides in Saudi Arabia.
15              THE COURT:  The person we are talking about, Ms.
16    Luque, was not one of the deponents?
17              MS. LUQUE:  No, your Honor.  But, your Honor, just for
18    the record, he was a defendant in this case until the dismissal
19    which just occurred.  Everyone should have known I represented
20    him.
21              MR. MOHAMMEDI:  Your Honor, I made sure --
22              THE COURT:  Wait.  If he was a defendant and if Ms.
23    Luque entered a notice of appearance on his behalf, how could
24    you not know that she was representing him?
25              MR. MOHAMMEDI:  I did not know it when I sat with him.
```

53

1bgr911c

1    Your Honor should note the fact that I stopped the interview
2    right away when he mentioned.  I asked him who was representing
3    him, and he said Ms. Luque, and I said we have to stop this
4    deposition -- I mean this interview.
5              Afterwards, I reached out to her and she said to me, I
6    need to be present, if I can, at least in the beginning of that
7    interview.  I said that's fine.  I sent her an email, which I
8    have, and asked her if she could do it at this time.  I can't
9    remember if she replied to me, she said to me yes, it's fine.
10   I can't remember.  Something like that.
11             MS. LUQUE:  Ha.
12             MR. MOHAMMEDI:  What happened was that afterwards I
13   got a confirmation from her client telling me that Ms. Luque
14   had spoke with her, and she said it was fine, she would not be
15   there, it would be fine if I could sit down and talk to him.
16             MS. LUQUE:  Your Honor, that is not true.
17             MR. BARENTZEN:  I have the emails in my hand, your
18   Honor, which say the opposite.
19             THE COURT:  We are not going to go down this path at
20   4:15 today, because I have another conference.  You may have
21   seen folks gathering in the back.
22             Ms. Luque, if you want to pursue this, that's fine.
23   Send me a letter setting forth what you believe occurred.  I'll
24   let Mr. Mohammedi respond.  What I may end up doing is
25   referring it to the grievance committee of the Southern

54

1bgr911c

```
 1   District, which unfortunately I also sit on but would recuse
 2   myself from this one.  That is likely what I would do, which
 3   may be consistent with what you are seeking.  You haven't told
 4   me your bottom line.
 5            MS. LUQUE:  Your Honor, I will be brief.  My bottom
 6   line -- I will consider doing that although I'm loathe to do
 7   it.  What I am more interested in is causing the lawyers in
 8   this case to proceed with civility and to contact us about the
 9   issues before troubling the Court and causing my clients to
10   incur additional expenses.
11            MR. MOHAMMEDI:  Your Honor, we reached out to Ms.
12   Luque.  If you read the transcript, we called the transcript
13   committee.  We have the email that said that they were directed
14   not to provide the transcript.  We have an email from the court
15   reporter they cannot deny.
16            MR. BARENTZEN:  I have the email I sent her.  I know
17   exactly what I said.
18            THE COURT:  Mr. Barentzen agrees that he said that he
19   instructed the court reporter not to produce it to any
20   requesters, I gather, other than the plaintiff unless he
21   cleared it.  I'm not troubled by that.  But in terms of (a) Mr.
22   Mohammedi and the other signers of the letter, your entitlement
23   to the transcript, who pays for it if you're entitled to it, I
24   want you folks to talk and we'll talk about it next month.
25            MR. BARENTZEN:  The one thing I would ask your Honor,
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

55

1bgr911c

```
 1   and maybe you can rule on it now or not, do you agree with me,
 2   and I have spoken at least informally with Mr. Carter and other
 3   people, that if you are dismissed as a defendant, you went and
 4   asked this Court to get out of this case, this Court has no
 5   jurisdiction on it, you're on appeal, that you are not going to
 6   be entitled to these confidential documents?  If you lose the
 7   appeal and you come back in, different story.  But at least
 8   while you're on appeal, and that's what we negotiated.
 9             THE COURT:  Yes is the short answer.
10             MR. BARENTZEN:  Good.
11             THE COURT:  If you're not a party to the litigation,
12   you're not a party to the litigation.  That may change down the
13   road, but you're the same as somebody passing by the
14   courthouse.
15             MR. BARENTZEN:  Thank you, your Honor.
16             THE COURT:  When is our conference Mr. December?
17             MR. CARTER:  The 14th, your Honor, at 2:00.
18             THE COURT:  How far out have we scheduled conferences?
19             MR. CARTER:  To February 15th, your Honor.
20             THE COURT:  Have we been doing these in the afternoon
21   or you folks don't care?
22             MR. CARTER:  We have been doing them at 2:00.
23             THE COURT:  Why don't I say March 15th and April 12th,
24   just to block out some dates, and May 17th.  Thank you all.
25             (Adjourned)
```