# Exhibit K

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------x

IN RE:                                              :

TERRORIST ATTACKS ON                   :
SEPTEMBER 11, 2001

                                                        :

--------------------------------------------------------x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  10/28/13

**MEMORANDUM
DECISION AND REPORT
<u>AND RECOMMENDATION</u>**

03 MDL 1570 (GBD) (FM)

**FRANK MAAS,** United States Magistrate Judge.

I.      <u>Introduction</u>

        The Plaintiffs in this expansive multidistrict litigation seek to recover

damages for personal injury and property damage claims arising out of the September 11

terrorist attacks.  Although more than a decade has passed since the attacks, discovery is

still inching along.  Over the years, many foreign banks and other potentially deep-pocket

defendants have been dismissed, leaving as defendants, mostly, charities and relief

organizations that are alleged to have funneled millions of dollars into al Qaeda and

related terrorist groups.  Securing their compliance in discovery has proven to be a

difficult task.

        Over the past several months, the Plaintiffs have filed letter motions seeking

sanctions against certain of the defendants for discovery infractions that are alleged to

have persisted throughout the pendency of this proceeding.  The Plaintiffs request varying

forms of relief, including the entry of a default judgment or the imposition of adverse

inference jury instructions, depending upon the defendant.  This combined Memorandum

Decision and Report and Recommendation addresses three of the Plaintiffs' motions and

sets forth legal principles that should be applicable to any future similar motions that may

be brought.  For the reasons that follow, the Plaintiffs' motions (ECF Nos. 2654, 2700,

2701) are granted in part and denied in part.

II.        Legal Framework

               Rule 37 of the Federal Rules of Civil Procedure permits a court to impose a

"wide range of sanctions for . . . discovery abuses."  Mali v. Federal Ins. Co., 720 F.3d

387, 392 (2d Cir. 2013).  These include, but are not limited to:  "orders deeming certain

facts established; permitting an adverse inference instruction; striking pleadings;

prohibiting the 'disobedient' party from making specific claims or introducing certain

matters into evidence; dismissing a claim or the entire action or granting default judgment

against the disobedient party; or entering an order of contempt."  Linde v. Arab Bank,

PLC, 269 F.R.D. 186, 195 (E.D.N.Y. 2010) ("Linde I") (citing Residential Funding Corp.

v. DeGeorge Fin. Corp., 306 F.3d 99, 101 (2d Cir. 2002)).

               When sanctions are sought based upon a party's failure to produce

documents, the party moving for sanctions must demonstrate that:  (a) the opposing party

had an obligation to make timely disclosure of the requested materials; (b) the opposing

party acted with a "culpable state of mind;" and (c) the missing evidence is "relevant" to

the moving party's claim or defense.  In re Sept. 11th Liab. Ins. Coverage Cases, 243

F.R.D. 114, 125 (S.D.N.Y. 2007) ("Coverage Cases") (quoting Residential Funding, 306

F.3d at 107).  If sanctions are sought based upon a party's destruction, or "spoliation," of

evidence, an identical legal framework applies, except that the first required showing is

that the opposing party had an obligation to "preserve [the missing evidence] at the time it

was destroyed." Residential Funding, 306 F.3d at 107.

   To satisfy the first element, there must be proof that either the nondisclosing

party was obligated by Rule 26 or a court order to produce the materials, Coverage Cases,

243 F.R.D. at 125, or, in cases involving spoliation of evidence, the party was on "notice

that the evidence [was] relevant to litigation or . . . should have known that the evidence

[might] be relevant to future litigation," Fujitsu Ltd. v. Fed. Exp. Corp., 247 F.3d 423, 436

(2d Cir. 2001). In this Circuit, the second element of culpability may be satisfied if the

nondisclosing party is shown to have breached a discovery obligation or destroyed

evidence through bad faith, gross negligence, or even ordinary negligence. Coverage

Cases, 243 F.R.D. at 125 (quoting Residential Funding, 306 F.3d at 113). Finally, with

respect to the third element, the party moving for sanctions must identify at least "some

evidence" that suggests that items "relevant to substantiating its claim would have been

included among the withheld or destroyed files." Linde I, 269 F.R.D. at 196 (quoting

Kronisch v. United States, 150 F.3d 112, 128 (2d Cir. 1998)) (brackets omitted). Evidence

that the nondisclosing party acted in bad faith is sufficient to infer that the missing

evidence is "relevant," and even a showing of gross negligence is "frequently" enough.

Coverage Cases, 243 F.R.D. at 125 (quoting Residential Funding, 306 F.3d at 109). In all

other circumstances, however, the party moving for sanctions "must adduce sufficient

evidence from which a reasonable trier of fact could infer that the destroyed or unavailable

evidence would have been of the nature alleged by the [moving] party." <u>Residential Funding</u>, 306 F.3d at 109 (internal quotation marks and brackets omitted).  Nonetheless, in that inquiry, "care should be taken not to require too specific a level of proof," because "holding the prejudiced party to too strict a standard of proof regarding the likely contents of the destroyed [or absent] evidence would subvert the prophylactic and punitive purposes of [sanctions]," and allow parties to profit from disobedient conduct.  <u>Kronisch</u>, 150 F.3d at 128 (citing 2 Wigmore, <u>Evidence in Trials at Common Law</u> § 291, at 228) (internal quotations marks omitted).  Thus, "[i]n cases involving spoliated or unavailable evidence, the negligent or willful party bears the risk that the evidence was adverse to it." <u>Coverage Cases</u>, 243 F.R.D. at 125.

The courts have "broad discretion in fashioning an appropriate sanction" for the non-production of evidence.  <u>Residential Funding</u>, 306 F.3d at 107.  In determining the proper sanction to impose, a court may consider "(a) the willfulness of the non-compliant party or the reason for noncompliance; (b) the efficacy of lesser sanctions; (c) the duration of the period of noncompliance[;] and (d) whether the non-compliant party had been warned of the consequences of noncompliance." <u>Agiwal v. Mid Island Mortg. Corp.</u>, 555 F.3d 298, 302 (2d Cir. 2009) (quotation marks and ellipses omitted).  "[T]hese factors are not exclusive, and they need not each be resolved against the party challenging . . . sanctions." <u>S. New England Tel. Co. v. Global NAPs, Inc.</u>, 624 F.3d 123, 144 (2d Cir. 2010).  Indeed, Rule 37 merely requires that a sanction be "just." <u>See</u> Fed. R. Civ. P. 37(b)(2)(a).  The overriding consideration therefore is whether the "severity of [the]

4

sanction" is "commensurate with the non-compliance." Shcherbakovskiy v. Da Capo Al Fine, Ltd., 490 F.3d 130, 140 (2d Cir. 2007). "Ultimately, discovery sanctions should, 'insofar as possible, . . . restore the prejudiced party to the same position it would have been in absent the wrongful [withholding] of evidence by the opposing party." Linde I, 269 F.R.D. at 195 (quoting Kronisch, 150 F.3d at 126).

III.   Discussion

A.   Wa'el Jelaidan

1.   Background

The first of the Plaintiffs' motions for sanctions concerns defendant Wa'el Hamza Jelaidan ("Jelaidan").[1]  Jelaidan is widely believed to have shared a close relationship with Osama bin Laden and to have directed organizations that provided financial and logistical support to al Qaeda.  In September 2002, the Treasury Department, jointly with the Kingdom of Saudi Arabia, designated Jelaidan under Executive Order ("EO") 13224 as a "person who supports terror."  See Treasury Department Statement on the Designation of Wa'el Hamza Julidan, http://www.treasury.gov/press-center/press-releases/Pages/po3397.aspx.[2]  Jelaidan is similarly designated on the United Nations 1267 Committee's "Al-Qaida Sanctions List."  See Narrative Summaries of Reasons for Listing

_____

[1]   The papers associated with the Jelaidan motion are docketed as follows:  Ltr. to the Court from the Pls.' Exec. Comms., dated Jan. 30, 2013 (ECF No. 2700) ("Pls.' Jelaidan Mem."); Jelaidan's Opp. to Pls.' Mot. to Compel/Mot. for Sanctions (ECF No. 2702) ("Jelaidan Opp. Mem."); Ltr. to the Court and Annexed Exhibit A from the Pls.' Exec. Comms., dated March 12, 2013 (ECF No. 2704) ("Pls.' Jelaidan Reply").

[2]   All websites in this Memorandum Decision and Report and Recommendation were last visited on October 29, 2013.

QI.J.79.02. Wa'el Hamza Abd Al-Fatah Julaidan, http://www.un.org/sc/committees/1267/
NSQI07902E.shtml.

        In October 2011, the Plaintiffs sought an order compelling Jelaidan to
produce documents related to (a) his banking and financial accounts, (b) his relationship
with other EO 13224 designees, including the alleged transfer of millions of dollars
among them, and (c) any other sanctions that had been imposed on him after 2002.  (Pls.'
Jelaidan Mem., Ex. A).  Although the Plaintiffs originally served their requests for those
documents in 2006, Jelaidan had made only a single production, consisting of twenty-two
documents (totaling 104 pages), many of which the Plaintiffs consider either unresponsive
or irrelevant.  (Id.).

        Jelaidan opposed the Plaintiffs' motion on the basis that he lacked the ability
to obtain responsive documents from his banks because they allegedly were unwilling to
cooperate with him due to his global terrorist designations.  (See Jelaidan Opp. Mem., Ex.
8).  The Plaintiffs disputed that representation and produced, in response, the affidavit of
Jimmy Gurulé, a professor of law at the Notre Dame Law School, who previously had
served as Under Secretary for Enforcement at the Treasury Department.  Gurulé asserted,
in substance, that, contrary to what Jelaidan had suggested, his designations did not legally
"preclude a financial institution from providing [him] with account statements," for
accounts that were frozen or blocked.  (Pls.' Jelaidan Mem., Ex. B).

        I first addressed the Plaintiffs' motion at a discovery conference on
November 16, 2011.  (See ECF No. 2493 ("11/16/11 Hr'g Tr.") at 32).  During that

conference, the Plaintiffs complained that Jelaidan had not produced any documentation reflecting the diligent efforts he supposedly had made to obtain his banking records, and they expressed suspicion that Jelaidan was attempting to "use his designation by the United States and the UN as a shield from the discovery process." (Id. at 31-32). I agreed with the Plaintiffs that Jelaidan had not satisfactorily demonstrated that he was incapable of securing the requested documents. I therefore ordered Jelaidan to undertake a vigorous "full-court press" to secure the responsive records. (Id. at 33). I further cautioned him that sanctions would be imposed if he failed to document sufficiently his good faith efforts to comply. (Id.).

Less than one month after the conference, Jelaidan's counsel, Martin McMahon, Esq., again informed the Plaintiffs that Jelaidan was unable to produce additional documents, explaining that both Jelaidan and Bassim A. Alim, Esq., his attorney in Saudi Arabia, had "made a number of attempts to request and obtain responsive documents from governmental and commercial entities[,] but [that] these entities ha[d] not cooperated with them." (Pls.' Jelaidan Mem., Ex. C). Mr. McMahon did not disclose any details regarding Jelaidan's alleged efforts, however, other than to indicate that he had received a letter from Mr. Alim, who stated that he was "sure" that Jelaidan would be unable to procure any further documents. (Id.).

Over the ensuing months, Jelaidan did not did not furnish the Plaintiffs with any additional documents, nor did he provide any information regarding the attempts he allegedly had made to obtain the requested records. Jelaidan also failed to serve any

responses to the Plaintiffs' supplemental document requests.  (Pls.' Jelaidan Mem. at 4).

On August 30, 2012, the discovery deadline passed without any further production.

On January 30, 2013, the Plaintiffs filed their present motion, seeking sanctions against Jelaidan for his failure to respond adequately to their initial and supplemental document requests or to produce evidence verifying the diligent efforts that he allegedly undertook to obtain the responsive materials.  Jelaidan opposed the motion, reasoning that "many of the banking and governmental institutions [to whom requests have been made] have not been compliant," and that he therefore had exhausted any avenues that he could pursue to collect responsive documents.  (Jelaidan Opp. Mem. at 2). As evidence of those efforts, Jelaidan annexed to his opposition papers a number of letters in which Mr. McMahon requested documents from various banks, the Office of the Ombudsperson at the United Nations, the Office of Foreign Assets Control ("OFAC") at the Treasury Department, and the Saudi Arabian Monetary Agency ("SAMA").  (Id., Exs. 1-4).  Jelaidan also submitted his own affidavit, originally proffered in October 2011 in connection with the Plaintiffs' motion to compel, as well as the more recent joint affidavit of Mr. Alim and Aftar Altaf, Jelaidan's personal assistant.  (Id., Exs. 5 ("Alim/Ataf Aff.") & 6 ("Jelaidan Aff.")).[3]  The Plaintiffs contend that those materials are patently insufficient and simply underscore the "pattern of unacceptable discovery abuses" that has pervaded their dealings with Jelaidan.  (Pls.' Jelaidan Reply at 1-2).

_____

[3]    In addition, Jelaidan submitted a number of purportedly privileged documents – mainly email communications between Mr. McMahon and Mr. Alim – for in camera review.  (See Ltr. to the Court from Mr. Martin F. McMahon, Esq., dated April 2, 2013).

2.    Analysis

    a.    Discovery Obligations

       In determining whether sanctions against Jelaidan are appropriate, it is first necessary to assess his discovery obligations and the extent to which he has complied with them. See Coverage Cases, 243 F.R.D. at 125. In that regard, during the conference on November 16, 2011, I clearly directed Jelaidan to undertake vigorous renewed efforts to obtain and produce documents responsive to the Plaintiffs' requests, or, at the very least, to document his good faith attempts to do so. Having done essentially nothing to pursue any responsive records since then, Jelaidan clearly has failed to comply with my order and, consequently, has not met his discovery obligations.

    b.    Culpable State of Mind

       Jelaidan's conduct throughout this case evidences a continued unwillingness to participate fairly in discovery and can only be characterized as proceeding in bad faith. In seven years, Jelaidan has produced a mere twenty-two documents. After being directed to remediate his clearly deficient responses, Jelaidan's only attempts to comply with my order began more than one year later, after the Plaintiffs filed their motion for sanctions, which was more than six years after the requests first were made. Jelaidan's failure to meet even his most basic discovery obligations thus has resulted in extreme delay.

       Although Jelaidan continues to claim that he cannot obtain any further responsive documents, despite having made good faith attempts to do so, that assertion is not supported by the record. At the outset, the letters that Mr. McMahon sent on

Jelaidan's behalf requesting records from his various banks are woefully insufficient and do not demonstrate good faith. Indeed, the letters first were mailed in February 2013 – several weeks after the Plaintiffs filed their present motion for sanctions, and sixteen months after the date on which I had ordered Jelaidan to undertake a "full-court press" to obtain the requested records. This timing alone strongly suggests that the letters simply were sent in an eleventh-hour attempt to manufacture a basis upon which to oppose the Plaintiffs' motion.

Quite apart from their untimeliness, the letters to the banks are so inadequate that they could not reasonably have been expected to generate an effective response. The letter to Al Rajhi Bank, for example, conveniently omits key information, including the type of records being sought and the relevant account number. Even more troubling is the fact that the letter was addressed to a branch office in Malaysia, rather than to the bank's headquarters in Saudi Arabia. It is clear that Jelaidan could not have had any relevant prior dealings with the Malaysia branch since the bank only opened its offices there in 2006. See Al Rajhi Bank, About Us: History, http://www.alrajhibank.com. Moreover, in light of Jelaidan's prior acknowledgment that "all relevant information [concerning his] account [could] only be disseminated by the Saudi Authorities," (Jelaidan Aff. ¶ 8), it should have been obvious that the Malaysia branch lacked the authority to entertain his counsel's request. Such an approach plainly suggests that the Jelaidan letter requests were intended to fail. See Linde v. Arab Bank, PLC, 706 F.3d 92, 113 (2d Cir. 2013) ("Linde II") (district court's finding that defendants' letters requesting responsive bank documents

10

were "calculated to fail" properly supported the conclusion that defendants had not acted in good faith).

The method by which Jelaidan chose to transmit his requests further underscores the deficiency of his woefully belated discovery efforts.  Despite the fact that many of the requests were directed to large foreign banks, each letter was sent in English to a general mailing address, with no accompanying translation.[4]  As the Plaintiffs point out, even a brief internet search would have revealed that several of the financial institutions where Jelaidan has accounts have specific representatives or departments dedicated to addressing such issues as money laundering, customer due diligence, and terrorism-related designations by OFAC or the United Nations.  Habib Bank, for instance, provides information on its website about its money laundering and anti-terrorist financing policies, and indicates that those and other related issues are overseen by Jamil Iqbal, the bank's Chief Compliance Officer.  See AML/CDD/CFT Policy, http://www.hbl.com/downloads/pdf/regulatory-compliance/aml-cdd-cft-policy.pdf.  A number of other banks where Jelaidan maintains accounts provide similar information on their websites.  See, e.g., Anti-Money Laundering and Combating the Financing of Terroristm (AML/CFT) Regulations, http://sbp.org.pk/l_frame/Revised-AML-CFT-Regulations.pdf (identifying Inayat Hussain as Executive Director of  the State Bank of Pakistan's Money Laundering and Anti-Terrorism programs); Key People / Management,

_____

[4]        Although a request from local counsel might have gained more traction than Mr. McMahon's form letters, Jelaidan apparently also made no effort to obtain representation in any of the countries to which the letter requests were sent.

http://www.faisalfinance.com/la_banque/keypeople_en.aspx (listing Jacqueline Consoli Bernasconi as Head of Compliance at Faisal Private Bank).  The apparent failure of Jelaidan to conduct or make use of even this basic research confirms that his discovery efforts never advanced beyond the superficial.

In addition, the contents of Jelaidan's letter requests cast significant doubt on his claim that he had made prior good faith attempts to contact his banks.  Although the letters allude to Jelaidan having, in some cases, received prior rejections of his requests for records, they oddly provide no details regarding the dates or substance of those communications, nor do they identify the bank personnel who had processed his requests.  Moreover, given the references to prior correspondence, it is puzzling that Jelaidan would choose to address subsequent letters to no one in particular, rather than to individuals from whom he had received communications in the past.[5]

Like the letter requests, the two affidavits that Jelaidan submitted in opposition to the Plaintiffs' motion do not support his claim that he has acted in good faith.  Indeed, neither affidavit is even remotely probative of any efforts that Jelaidan may have made to comply with my instructions during the November 2011 discovery conference.  The first affidavit, by Messrs. Alim and Altaf, cites only two terse – and wholly irrelevant – examples of Jelaidan's past communications with his banks.  The first

---

[5]     Jelaidan's belated document requests to the United Nations, OFAC, and SAMA contain deficiencies similar to those in his letters to the banks.  Even if those submissions ultimately result in the production of some responsive documents, Jelaidan's failure to make any attempt to contact these entities prior to the Plaintiffs' filing of their motion for sanctions is inexcusable, especially in light of the fact that those records first were requested in 2006.

is a letter dated August 21, 2001, sent by Jelaidan to the Governor of the State Bank of
Pakistan, in which he allegedly seeks to remove the "ban" on six accounts held by Rabita
Trust, which is a separate defendant in this case.  (Jelaidan Opp. Mem., Ex. 5).  Although
the affidavit indicates that this letter is attached, it does not appear to have been included
among the exhibits submitted with Jelaidan's opposition papers.  Regardless, the letter
predates this litigation, and there is no indication that it sought any documents germane to
the Plaintiffs' requests directed to Jelaidan.  Moreover, although Jelaidan may have had
significant connections to Rabita Trust, his request to lift a ban on the Trust's accounts
proves nothing about any steps that Jelaidan may have taken to obtain information relating
to his own personal accounts after he was instructed to do so.  The second example cited
in the joint affidavit is a letter, dated April 28, 2012, that Jelaidan sent to the Istanbul
office of the Turkish Company for Financing and Joint-Stock Partnership in response to a
message concerning the automatic transfer of his account proceeds into an insurance fund.
That letter, too, appears to be unrelated to the Plaintiffs' discovery demands and to be
nothing more than a self-serving request that his account be "return[ed] to [his] disposal"
or converted into an "Islamic saving[s] account."  (Id. at 4).

       Jelaidan's own affidavit, previously submitted in response to the Plaintiffs'
original motion to compel, has not become any more convincing with the passage of time.
Furthermore, because the affidavit was prepared in October 2011, it sheds no light on
Jelaidan's efforts to comply with my "full-court press" directive the following month.

The remaining material proffered in opposition to the Plaintiffs' motion confirms that Jelaidan has not made good faith efforts to satisfy his discovery obligations. Indeed, some of the material submitted for in camera review actually suggests that certain relevant bank records are available to Jelaidan, despite his claims to the contrary. Moreover, although Jelaidan continues to take the position that he has been blocked from obtaining any relevant bank records since being designated in 2002, he apparently was able to produce a 2005 account statement from Faisal Finance. (See 11/16/11 Hr'g Tr. at 34). These inconsistencies show that Jelaidan has been less than forthcoming about the documents that he is capable of obtaining and producing.

In addition, although Jelaidan has resided for many years in Saudi Arabia, there is no evidence that he ever has sent letter requests to any banks within the Kingdom, even though the Plaintiffs have asked for documents relating to numerous personal and business accounts that he maintained there, including a number of accounts for charities or organizations for which Jelaidan allegedly had signatory authority. There also is no indication that Jelaidan made any efforts to contact any bank there in person after he was ordered to renew his efforts to obtain responsive documents in November 2011.

Finally, Jelaidan has provided no explanation for why he continues to ignore the Plaintiffs' supplemental discovery requests, which have now been outstanding for more than one year. Although Jelaidan seeks to justify his noncompliance on the grounds that the supplemental requests are "largely duplicative" of the Plaintiffs' initial demands, (Jelaidan Opp. Mem. at 4-5), the supplemental requests seek many new categories of

documents, including records from recently-identified bank accounts and materials

concerning Jelaidan's relationship with certain of the 9/11 hijackers and the Muwafaq

Foundation.  Jelaidan's refusal to make so much as an attempt to respond to these requests

simply underscores the deficient manner in which he has approached his discovery

obligations throughout this case.

       For these and other reasons, I find that Jelaidan has willfully disregarded his

discovery obligations and acted in bad faith.

       c.     <u>Relevance</u>

       Jelaidan's bad faith alone is sufficient to support an inference that the

evidence he has failed to produce would be relevant.  <u>Residential Funding</u>, 306 F.3d at

109.  Moreover, "[e]ven conduct characterized as 'purposeful sluggishness,' or intentional

delay, can support a finding of relevance." <u>Short v. Manhattan Apartments, Inc.</u>, 286

F.R.D. 248, 254 (S.D.N.Y. 2012) (quoting <u>Residential Funding</u>, 306 F.3d at 110).  Here,

Jelaidan's failure to undertake any efforts to retrieve responsive documents for nearly one

and one-half years after he was ordered to do so is clear evidence of his intentionally

obstructive conduct.

       Even in the absence of a showing of bad faith, there can be no question that

Jelaidan's bank records, if produced, would have significant evidentiary value.  Since

those records likely would confirm whether Jelaidan provided funding to al Qaeda or its

affiliates, they would help prove the Plaintiffs' central allegations in this case.  Therefore,

by all measures, the missing documents must be considered relevant.  Sanctions consequently are appropriate.

3.    <u>Sanctions</u>

The remaining question relates to the penalty to be imposed.  In determining the proper sanction for a party's failure to produce evidence, a court should "weigh, among other factors, the harshness of the sanctions, the extent to which the sanctions are necessary to restore the evidentiary balance upset by incomplete production, and the non-disclosing party's degree of fault."  <u>Linde II</u>, 706 F.3d at 115.  Where, as here, "the failure to comply with a court order is due to willfulness or bad faith," severe sanctions are justified.  <u>Daval Steel Prods. v. M/V Fakredine</u>, 951 F.2d 1357, 1367 (2d Cir. 1991).

Jelaidan's failure to produce responsive documents undoubtedly has deprived the Plaintiffs of critical information concerning their case.  Without banking records, for example, it will be very difficult, if not impossible, for the Plaintiffs to prove that Jelaidan financed terrorism-related activities.  The only means of restoring the evidentiary imbalance caused by Jelaidan's incomplete production is the imposition of an adverse inference instruction.  I have considered other sanctions, but it is clear that there is no lesser sanction that effectively could remedy the prejudice caused by Jelaidan's failure to produce vital documents.  Moreover, sanctions serve a punitive as well as a remedial purpose, <u>Shamis v. Ambassador Factors Corp.</u>, 34 F. Supp. 2d 879, 890 (S.D.N.Y. 1999), and the imposition of an adverse inference sanction is an appropriate punishment given

Jelaidan's continued willful behavior in this case.  Indeed, his misconduct spans a history
of seven years and persists to this day.

I note that the Plaintiffs warned Jelaidan many times of the potential
consequences of his failure to comply with his discovery obligations.  I also cautioned
Jelaidan myself during the November 2011 conference that sanctions could be imposed if
he did not remedy his deficient responses.  (11/16/11 Hr'g Tr. at 33).  Since Jelaidan
disregarded those warnings, there is no reason to impose a lesser sanction.  See Agiwal,
555 F.3d at 302.  I am not the trial judge, however.  Accordingly, Judge Daniels should be
the one to craft the specific language of that instruction, should the case against Jelaidan
reach the stage of a trial.

Rule 37(b)(2)(C) of the Federal Rules of Civil Procedure requires a court to
award a successful party the expenses reasonably incurred in making a motion "unless the
noncompliant party['s] . . . failure [to cooperate in discovery] was substantially justified or
. . . an award of expenses would be unjust."  Oleg Cassini, Inc. v. Electrolux Home Prods.,
Inc., No. 11 Civ. 1237 (LGS) (JCF), 2013 WL 3056805, at *3 (S.D.N.Y. June 19, 2013)
(quoting Fed. R. Civ. P. 37(b)(2(C)).  For this reason, I will require that Jelaidan reimburse
the Plaintiffs for the fees and costs that they reasonably have incurred in connection with
their filing of the present motion.  See Fed. R. Civ. P. 37(b)(2)(C).  The Plaintiffs therefore
are directed to submit, within thirty days, affidavits and contemporaneous time records
itemizing the number of hours expended on the motion, the nature of the work done, and
the reasonableness of the timekeepers' rates.  See Lewis v. Coughlin, 801 F.2d 570, 577

17

(2d Cir. 1986); N.Y. State Ass'n for Retarded Children, Inc. v. Carey, 711 F.2d 1136, 1148

(2d Cir. 1983); Puglisi v. Underhill Park Taxpayer Ass'n, 964 F. Supp. 811, 817 (S.D.N.Y.

1997).  Any opposition papers must be submitted within twenty-one days thereafter.

      B.     Rabita Trust

          1.     Background

      The Plaintiffs also seek sanctions against defendant Rabita Trust.[6]  Rabita

Trust is a relief organization founded in 1988 for the purported purpose of repatriating

Pakistanis stranded in Bangladesh after the Liberation War in 1971.  In 2001, both the

Treasury Department and the United Nations 1267 Committee designated Rabita Trust as

a terrorist organization based upon evidence that it had supplied logistical and financial

support to al Qaeda.  See Treasury Department Releases List of 39 Additional Specially

Designated Global Terrorists, http://www.treasury.gov/press-center/press-

releases/Pages/po689.aspx; Narrative Summaries of Reasons for Listing, QE.R.21.01.

Rabita Trust, http://www.un.org/sc/committees/1267/NSQE02101E/shtml.  Specifically,

Rabita Trust was found to have had close ties with several al Qaeda affiliates, including

Jelaidan, who had served on the Board of the Trust and as its Director General.  (Id.).

      In 2006, the Plaintiffs served Rabita Trust with a set of jurisdictional

discovery requests seeking, among other things:  (a) documents concerning any

---

[6]     The papers associated with the Rabita Trust motion are docketed as follows:  Ltr. to the Court from the Pls.' Exec. Committee, dated Jan. 30, 2013 (ECF No. 2701) ("Pls.' Rabita Mem."); Rabita Trust's Opp. to Pls.' Mot. to Compel/Mot. for Sanctions (ECF No. 2703) ("Rabita Opp. Mem."); Ltr. to the Court from the Pls.' Exec. Committee, dated Mar. 12, 2013 (ECF No. 2705) ("Pls.' Rabita Reply").

investigations by the United States or foreign governments into the Trust's activities in

support of terrorism; (b) information relating to the Trust's terrorist designations and any

sanctions arising out of those designations; (c) relevant banking and financial records; (d)

documents concerning the appointment of Jelaidan as Rabita Trust's Secretary General;

(e) information about Rabita Trust's relationship to certain other purported charitable

organizations alleged to have operated within the al Qaeda network; and (f) documents

concerning the Trust's relationship with the government of Saudi Arabia, including the

Islamic Affairs Division of any Saudi embassy or consulate.  (See Pls.' Rabita Mem., Ex.

A).  Rabita Trust's total production to date in response to those requests has consisted of

the twenty-two documents produced by Jelaidan, many of which, the Plaintiffs contend,

are "not even remotely relevant to the specific issues articulated in [their] discovery

requests."  (Pls.' Rabita Mem. at 2).

   Mr. McMahon, who serves as counsel for both Jelaidan and Rabita Trust,

takes the position that Rabita Trust has been "dormant" since 1994 and, consequently, has

no further documents to produce.  (See id., Ex. B, Part B at 3; ECF No. 2711 ("3/19/2013

Hr'g Tr.") at 37).  Mr. McMahon's representations appear to be at odds, however, with

other evidence that suggests that Rabita Trust was active well beyond 1994.  For example,

a prior declaration executed by Jelaidan indicates that he was appointed as the Trust's

Secretary General in 1999.  (Pls.' Rabita Mem., Ex. C ¶ 2).  Similarly, several of the scant

documents that Rabita Trust did produce indicate that the Trust's Board of Directors was

conducting operations as late as the fall of 2001.  (See id., Exs. E ("Summary of Events"

describing the initiation of an audit of the Rabita Trust fund and the closure of an office in

Lahore, Pakistan, following the September 11 attacks), F (press release dated Oct. 15,

2001, issued by Jelaidan on behalf of Rabita Trust, denying involvement with or

connection to al Qaeda or Osama bin Laden), G (letter dated Jan. 5, 2002, from Rabita

Trust's "Project Director," requesting assistance from the Pakistani government in

removing its terrorist designations), H (letter dated Aug. 21, 2002, from Jelaidan in his

capacity as Secretary General of the Trust, requesting removal of a ban imposed on

several of its accounts at Habib Bank), I (circular dated Mar. 14, 2000, listing the

composition of the Trust's current Board of Directors)).

In light of these conflicting documents, the Plaintiffs understandably sought

clarification from Mr. McMahon regarding the Trust's alleged dormancy.  By letter dated

September 29, 2011, the Plaintiffs asked Mr. McMahon to provide information concerning

the current location of Rabita Trust's documents and any offices, employees, or

administrative functions that the Trust maintained after 1994.  (See Pls.' Rabita Mem., Ex.

J).  The Plaintiffs further requested an update regarding the efforts of a Pakistani lawyer

who allegedly was retained in 2006 to assist in the location and collection of responsive

documents.  (Id. at 2).

Thereafter, the parties held a telephone conference in an effort to resolve

some of these issues.  (Pls.' Rabita Mem. at 5).  Given Rabita Trust's alleged dormancy,

the Plaintiffs voiced concern as to whether there presently was an officer or representative

with the authority to retain counsel or direct litigation on behalf of the Trust.  (Id.).  In

response, by email dated November 4, 2011, Mr. McMahon agreed that he would attempt to discern "if there [was] anyone currently with authority to direct the Trust," and to "figure out the current organizational status of the entity and the officers, if any, that occupy positions in the entity." (Id., Ex. K; Rabita Opp. Mem., Ex. 5). Mr. McMahon further promised that he would try to obtain more information about the Trust's documents, but noted that any documents contained in Rabita Trust's office when it became dormant "would likely have either been destroyed or transferred to storage, probably by Pakistan's Office of the Cabinet Secretary." (Id.).

More than eight months passed without the production of any further documents or any response from Mr. McMahon regarding the issues that had been raised during the telephone conference. Accordingly, on July 30, 2012, the Plaintiffs wrote to Mr. McMahon to follow up on the results of his inquiries into Rabita Trust's current status. (See Pls.' Rabita Mem., Ex. L). That letter apparently went unanswered. Thereafter, on August 30, 2012, the discovery deadline expired without Rabita Trust having produced so much as a single additional document.

On January 30, 2013, the Plaintiffs filed their present motion, which seeks an order compelling Rabita Trust to: (a) provide information about its current organizational status and leadership; (b) identify any individuals who presently or previously were authorized to direct litigation on the Trust's behalf or ensure compliance with its discovery obligations; (c) identify the efforts undertaken by Rabita Trust to obtain and produce documents responsive to the Plaintiffs' requests; and (d) produce all materials

21

responsive to the Plaintiffs' supplemental document requests, which were served on August 1, 2012.  (Pls.' Rabita Mem. at 1).  Mr. McMahon opposed the motion on behalf of Rabita Trust on the basis that the Trust did not have access to its own files.  (Rabita Opp. Mem. at 3).  The Plaintiffs believe that Rabita Trust's opposition papers simply confirm their allegations regarding the Trust's continuing discovery violations and have requested that sanctions be imposed.  (Pls.' Rabita Reply at 1).

During a discovery conference on March 19, 2013, I asked Mr. McMahon to address the issue of Rabita Trust's current leadership.  (3/19/13 Hr'g Tr. at 33).  Mr. McMahon explained that he had been retained by Jelaidan to represent Rabita Trust approximately nine years ago, at a time when Jelaidan was serving as the Trust's Secretary General.  (Id. at 34).  He acknowledged, however, that Jelaidan no longer occupied a position in Rabita Trust's leadership and has not for at least several years.  (Id. at 36). Although the only communications that Mr. McMahon continued to have with regard to Rabita Trust were with Jelaidan and his Saudi counsel, he admitted that Jelaidan did not have authority to speak for the Trust.  (Id. at 36-37).  When asked who presently was running the organization, Mr. McMahon indicated that he did not know and suggested that, because the Trust was "inactive," there likely was no one in command.  (Id. at 33, 36-37).  He further conceded that the Trust had not paid his legal fees for many years.  (Id. at 42).

2.     <u>Analysis</u>

Although the Plaintiffs' motion seeks sanctions on the basis of Rabita Trust's continuing failure to meet its discovery obligations, there is a more fundamental concern regarding the Trust's participation in this case.  As a matter of basic agency law, an attorney's authority to represent a client terminates, in the case of a corporation or similar organization, when the client loses its capacity to function.  Restatement (Third) of the Law Governing Lawyers § 31 (2000).  Thus, if Mr. McMahon is correct that Rabita Trust is a defunct organization which lacks any leadership or person authorized to retain counsel and direct the organization's litigation efforts, neither he nor anyone else can continue as its representative in this action.  <u>See</u> N.Y.  Rules of Prof'l Conduct R. 1.2(a), 1.4.

Although Mr. McMahon apparently "believe[s]" that he is able to represent the Trust notwithstanding its dormant status, his affidavit in support of that position contains a number of puzzling contradictions.  (Rabita Opp. Mem., Ex. 4 (Aff. of Martin F. McMahon, Esq., sworn to on Mar. 1, 2013 ("McMahon Aff."), ¶ 6)).  First, the affidavit asserts that Jelaidan continues to act as the Trust's Secretary General, (<u>id.</u>), even though Mr. McMahon has admitted on the record that Jelaidan has not served as Secretary General for many years.  (3/19/13 Hr'g Tr. at 36).  Second, the affidavit indicates that Jelaidan is responsible for coordinating legal strategy on the Trust's behalf, (McMahon Aff. ¶¶ 3, 6), but at the same time suggests that the Pakistani government currently has the sole authority to make decisions regarding the Trust's legal representation, including whether to retain or terminate counsel.  (<u>Id.</u> ¶ 8).  Finally, despite the suggestion that the

Pakistani government may ultimately be in control of Rabita Trust, there is no indication

that Mr. McMahon has ever had communications with any Pakistani official regarding the

Trust's legal representation in this suit.  (Id. ¶ 3 (stating that coordination of Rabita Trust's

legal strategy has "at all times" been conducted through communications with Jelaidan or

Jelaidan's Saudi counsel)).

Mr. McMahon states that he is "not opposed" to investigating further Rabita

Trust's current status and leadership, (Rabita Opp. Mem. at 5), but it is clear that any such

efforts would be futile.  In fact, Mr. McMahon says that he already has sent multiple

requests for information to the Trust's current Secretary General, which have been met

with no response.  (Id.).  It is unclear to whom those requests would have been addressed

since Mr. McMahon has indicated that he does not know the names of anyone who

currently is part of the Trust's leadership.  The fact that Jelaidan did not respond obviously

cuts against Mr. McMahon's claim that Jelaidan is still acting as Secretary General.

Tellingly, in the two years since the Plaintiffs first raised the issue, Mr. McMahon has been

unable to obtain any information about the Trust's current organizational status, its

officers, or the identity of any individual who is responsible for directing its representation

in this action.  That Mr. McMahon is incapable of obtaining such basic information from

his "client" confirms that Rabita Trust is no longer actively participating in this suit.

Despite the Trust's unresponsiveness, Mr. McMahon has expressed

reluctance to withdraw from representation because "no one knows" the circumstances

under which a lawyer may be terminated under Pakistani law.  (3/19/13 Hr'g Tr. at 34).  It