# Exhibit O

IN THE MATTER OF

YASSIN ABDULLAH KADI

and

THE DEPUTY ATTORNEY GENERAL OF SWITZERLAND
MR CLAUDE NICATI

---

## SUBMISSION OF YASSIN ABDULLAH KADI TO THE DEPUTY ATTORNEY GENERAL OF SWITZERLAND, MR CLAUDE NICATI, FURTHER TO THE MEETING AT THE SWISS EMBASSY IN RIYADH ON 1 JULY 2003

---

Peter Carter-Ruck & Partners
International Press Centre
76 Shoe Lane
London
EC4A 3JB

Tel: 0207 353 5005
Fax: 0207 353 5553

McDermott, Will & Emery
600 - 13th Street, N.W.
Washington, D.C. 20005

Tel: 202 756 8255
Fax: 202 756 8269

22 August 2003

# TABLE OF CONTENTS

| | | |
|---|---|---|
| 1. | Introduction | Page 3 |
| **PART I** | | |
| 2. | Background | Page 5 |
| 2.1 | Mr Kadi's introduction to the Al Eman University Housing Project | Page 5 |
| 2.2 | Description and scale of the University Housing Project | Page 6 |
| 2.3 | The decision to appoint Mr Jeleidan for the University Housing Project | Page 7 |
| 2.4 | Mr Jeleidan's acquisition of Maram | Page 9 |
| 2.5 | Mr Jeleidan executed the University Housing Project through Maram | Page 10 |
| 2.6 | Corporate history of Maram | Page 11 |
| 2.7 | The money transfers into Mr Jeleidan's account | Page 13 |
| 2.8 | Evidence of how the money Mr Kadi transferred was applied solely to the University Housing Project | Page 14 |
| 2.9 | Implementation of the University Housing Project | Page 17 |
| 2.10 | Supervision of the University Housing Project | Page 18 |
| 3. | Response to Allegations of Mr Nicati | Page 19 |
| **PART II** | | |
| | Clarifications and Supplemental Evidence | Page 25 |
| | KA Stan | Page 26 |
| | Commercial Relationship with Bin Mahfouz | Page 27 |
| | Hussam Tayeh | Page 27 |
| | Mohamed Ibrahim Saeed | Page 28 |
| | Prince Bandar Abdelrahman Al Saud | Page 28 |
| | Spoiled Cargo of Rice between Port Said and Albania | Page 29 |
| | Conclusion | Page 29 |

# SUBMISSION OF YASSIN ABDULLAH KADI TO THE DEPUTY ATTORNEY GENERAL OF SWITZERLAND, MR CLAUDE NICATI, FURTHER TO THE MEETING AT THE SWISS EMBASSY IN RIYADH ON 1 JULY 2003

## 1.   INTRODUCTION

At the meeting at the Swiss Embassy in Riyadh, Saudi Arabia, on 1 July 2003, the Deputy Attorney General of Switzerland, Mr Claude Nicati ("Nicati") met Mr Yassin Kadi in the presence of his legal team. Mr Nicati requested Mr Kadi and his legal team to provide a detailed explanation of the issues raised at the meeting. This memorandum sets out the evidence as requested by Mr Nicati:

1.1   PART I of this memorandum relates to certain transfers authorised by Mr Kadi from the account of Caravan Development Group Limited (account 10257) at Faisal Finance, Geneva, for the benefit of Wael Hamza Jeleidan (for convenience referred to as "Mr Jeleidan") between 24 February 1998 and 3 August 1998 in the total sum of US$1.25 million. Mr Kadi testified at the 1 July 2003 meeting that he authorised all these transfers for the sole purpose of giving financial support for prefabricated housing for students and ancillary buildings for the Al Eman University in Sanaa, Yemen.

1.2   PART II of this memorandum contains clarification and supplemental evidence on certain issues raised by Mr Nicati during the 1 July 2003 meeting.

PCR1-192420.1

3

00010448

DOJ AR - 002022

Following the meeting on 1 July 2003, Mr Kadi's legal team and his staff have urgently undertaken substantial investigations in various jurisdictions around the world including in Yemen, Sudan, Saudi Arabia, Jordan, Turkey and Switzerland. During these investigations a significant number of relevant documents have been obtained in various different languages, including Turkish and Arabic. Following that meeting, Mr Kadi's legal team has also met Mr Jeleidan. Mr Jeleidan has co-operated with the legal team including by authorising access to corporate documents for Maram Travel Importation and Exportation Trading Limited Company (for convenience "Maram") as well as banking documents relating both to Mr Jeleidan's personal accounts and the account of Maram. Mr Kadi's legal team has arranged for many of these documents to be translated. All the foregoing work has been undertaken as a matter of urgency as a result of the short deadline imposed at the 1 July 2003 meeting by Mr Nicati.

It must be noted at the outset that these investigations have been impeded, in part, by the very recent removal by the Turkish government authorities of crucial documents relating to Maram, a company that had a central role in the Al Eman University housing project. These documents were removed in late June or early July 2003, at around the same time as the 1 July 2003 meeting with Mr Nicati, when representatives of the Turkish Ministry of Finance visited Ms Semra Sonmez, the accountant in Istanbul who formerly represented Maram. The Turkish government authority that removed these documents is HESAP YZMANLARI KURULU, a division of MALIYE BAKANLIGE (Ministry of Finance) in Karakoy, Istanbul. Due to this, Mr Kadi's legal team has not been able to access all documents relevant to the transfers. This memorandum has, therefore, been prepared, and the evidence collated, despite, and subject to, these constraints.

A paginated file of supporting documentation is provided with this memorandum together with, wherever necessary, translations.

PCR1-192420.1

4

00010449

DOJ AR - 002023

# PART I

## 2.    BACKGROUND

### 2.1    Mr Kadi's Introduction to the Al Eman University Housing Project

Al Eman University (for convenience "the University") is located in Sanaa, in the Republic of Yemen. The University was founded in 1994 by Sheikh Abdel Majid Zindani ("Mr Zindani"). Mr Zindani has a close, and long-standing, association and friendship with Mr Kadi's uncle, Dr Mohammed Omar Zubayr ("Dr Zubayr"). Their association began when Mr Zindani was teaching as a visiting lecturer at the King Abdul Aziz University in Jeddah, Saudi Arabia, when Dr Zubayr was President, and then a consultant, for that university.

In 1997 the University was in dire need of housing units for its students. A decision was made to acquire some temporary prefabricated buildings as a short-term solution to the students' housing needs. In order to acquire these buildings, the University required funds. The University made a public appeal to raise funds and issued a fund appeal brochure, a copy of which is at Annex A. The fund appeal brochure included specifically an urgent appeal for help regarding the temporary housing for students, as well as a general appeal for funds for the University. The appeal by the University for funds was totally open and transparent. The funds raised for the student housing project would be used to acquire and provide temporary housing units for married and single students at the University as well as ancillary infrastructure such as a nursery school, clinic, grocery store and administration offices. All of these prefabricated buildings were to be located on a temporary campus at the University. For convenience this project is referred to below as the "University Housing Project".

Mr Kadi's uncle, Dr Zubayr, and Mr Zindani have, as stated above, a close and long-standing association so that when Mr Zindani founded the University in 1994, he asked Dr Zubayr, to become a member of the University's governing board. Subsequently, in 1997, when the University appealed for urgent donations for the University Housing Project, Mr Zindani requested the help of Dr Zubayr.

00010450                                                                                    DOJ AR - 002024

Dr Zubayr agreed to help and enthusiastically supported the appeal. A photograph of Dr Zubayr alongside Mr Zindani appears in the fund appeal brochure at Annex A, page 4.

It was against this background that in late 1997 Mr Kadi was approached by his uncle, Dr Zubayr, who explained the University Housing Project to him and suggested it was worthy of Mr Kadi's support.

In summary, Mr Kadi was introduced to the University Housing Project by his uncle, Dr Zubayr, who has a long-standing association with Mr Zindani, the founder of the University. The University made a public and open appeal for funds for the University Housing Project. Based on this appeal, Mr Kadi agreed to help by providing funds.

## 2.2    Description and scale of the University Housing Project

The scale, composition and layout of the proposed University Housing Project was substantial as will be seen from the drawing in the fund appeal brochure (see Annex A, page 5). The prefabricated buildings were manufactured and supplied by a company based in Istanbul, Turkey, called Vefa Engineering Industry and Trading Limited Company (for convenience "Vefa"). Drawings prepared by Vefa, and a detailed schedule of the completed buildings, are at Annex B. From these it will be seen that the University Housing Project comprised the following:

2.2.1    30 buildings for housing married students of 10 apartments each. Each apartment was of 41 sq metres and comprised 2 bedrooms, bathroom, kitchen and a small living room.

2.2.2    25 housing units for single students, each of 41 sq metres and each housing 8 students, 15 units for male students and 10 for female students.

2.2.3    A building of 114 sq metres, which was a nursery school.

00010451                                                                        DOJ AR - 002025

2.2.4    A building, also of 114 sq metres, which was used as a clinic.

2.2.5    A building for administration offices of 340 sq metres.

2.2.6    Finally, a building, of 114 sq metres, which was used as a grocery store.

A photograph of the University Housing Project appears at Annex N (page 331). Thus, it will be seen that the University Housing Project as executed was very substantial.

## 2.3    The decision to appoint Mr Jeleidan for the University Housing Project

It is common practice in the Middle East, and especially in Saudi Arabia, that transactions are conducted on the basis of personal trust. This is unlike the West where such transactions and dealings often generate a very significant amount of documentation, as well as the conducting of due diligence investigations and the taking of references. This point applies generally to business practices throughout the Middle East, but particularly where the parties are Saudi Arabian. Mr Jeleidan is known in Saudi Arabia to come from a reputable family and also for his trustworthiness. The trust held by Mr Kadi for Mr Jeleidan underpinned all Mr Kadi's dealings concerning the University Housing Project.

Mr Kadi's uncle suggested the University Housing Project to Mr Kadi as a project deserving of support. Mr Kadi is well known for his strong commitment to helping and promoting education for both men and women in society in general, both inside and outside Saudi Arabia.

As an example of Mr Kadi's commitment to supporting education, Mr Kadi's humanitarian work has frequently included educational projects and support to schools in developing countries such as Bosnia, Pakistan and Albania. Moreover, in 1996, Mr Kadi founded and led a planning committee to establish higher educational institutions for women in Saudi Arabia. This ultimately led to the founding of a pioneering women's college in Jeddah, named Dar Al Hekma

00010452                                                        DOJ AR - 002026

College in 1999. Dar Al Hekma College is now one of the first private colleges for women in the Kingdom offering university level degrees. It is also unique as it educates women in an English language setting. The college has won support from the Saudi Royal Family, business people, local and foreign dignitaries all of whom have commended its work. Mr Kadi also had the honour of receiving the former President of the United States, President Jimmy Carter and Mrs Rosalyn Carter during their visit to Saudi Arabia in 2000. They were very pleased with their visit to the college. Rosalyn Carter spoke of the positive impression she had gained at the college.

Consistent with Mr Kadi's commitment to supporting educational projects, he accepted his uncle's suggestion to provide financial support towards the University Housing Project.

Mr Kadi's uncle knew that Mr Kadi was extremely busy managing his international business affairs and did not have the time personally to implement the University Housing Project. Dr Zubayr suggested to Mr Kadi that he should entrust the implementation of the University Housing Project to Mr Jeleidan. Both Dr Zubayr and Mr Kadi knew and trusted Mr Jeleidan who, as stated above, was, and is, well known in Saudi Arabia for his trustworthiness and his humanitarian work helping refugees in Pakistan. In his humanitarian activities Mr Jeleidan had gained extensive experience of construction work. Among the construction projects managed by Mr Jeleidan to help refugees in Pakistan, in 1989/1990 he supervised the construction of an orphanage and in 1993 he was put in charge of a project for the construction of 1,000 housing units. Moreover, Mr Jeleidan was ideally placed to implement the University Housing Project because, with his business partner, he had recently bought Maram, a company incorporated in Turkey to carry on business in, among other areas, the construction field. (See Maram corporate documents at Annex C, pages 64, 76, 78 and 126). Mr Jeleidan could implement the University Housing Project through Maram by arranging for the purchase of the prefabricated buildings from the supplier in Turkey, and arranging for their shipment from Turkey to Yemen.

PCR1-192420.1                                    8

Due to the above, Mr Kadi believed that Mr Jeleidan was well qualified to implement the University Housing Project and Mr Kadi had full confidence in Mr Jeleidan's ability to do this. Mr Kadi therefore accepted his uncle, Dr Zubayr's, suggestion to entrust the implementation of the University Housing Project specifically to Mr Jeleidan.

At that time, in 1998, Mr Kadi was totally unaware of any allegation, either public or private, that Mr Jeleidan was connected with any terrorist group or individual and Mr Kadi had no evidence or reason to suspect Mr Jeleidan of any continued association with Usama bin Laden. It was at the time widely believed in Saudi Arabia that Mr Jeleidan had parted company with Usama bin Laden following the war when the Soviet forces were driven out of Afghanistan.

### 2.4    Mr Jeleidan's acquisition of Maram with his business partner on 14 July 1997

In 1997, Mr Jeleidan wished to commence a travel business in Turkey, including arranging for Muslims in Turkey to undertake pilgrimages (Hajj) and minor pilgrimages (Omrah). Maram had already been incorporated in Turkey in January 1997 for purposes which included the travel and tourism business (see Annex C, pages 64, 76, 78 and 126), but it needed 5 years of trading history before it could get a licence from the Turkish authorities to arrange pilgrimages. It was convenient for Mr Jeleidan to acquire an already existing company, which included the travel business in its corporate objectives, instead of incorporating a new company.

Therefore, Mr Jeleidan acquired the entire ownership of Maram with his business partner in Turkey, Mohammed Louy Bayazied ("Mr Bayazied").

As will be seen from Annex C, Maram was a highly regulated company. Maram was in good standing, visibly doing business and operating in Turkey until it was formally liquidated in November 2002. During the period of its existence, Maram made numerous regulatory, corporate and tax filings with the Turkish authorities.

00010454                                                                    DOJ AR - 002028

**2.5     Mr Jeleidan executed the University Housing Project through Maram**

Mr Jeleidan executed the University Housing Project through Maram.  Maram searched the market in Turkey and found a manufacturer, Vefa, which was prepared, and had the capacity, to supply the prefabricated buildings and take responsibility for the transportation of the buildings to the port in Turkey, and the installation of the buildings upon their arrival at the University in Yemen.  It was accordingly Maram, which entered into a contract with Vefa. Mr Kadi refers to the contract, receipts, demands and other business documents, between Maram and Vefa at Annex E.

At Annex E (page 193-194) is a demand issued by Vefa and addressed to Maram dated 18 April 1998. It will be noted from this demand that the total value of the contract between Maram and Vefa was US$ 850,000. Of this sum Vefa had already received, by 18 April 1998, the sum of US$ 740,000. Vefa demanded from Maram payment of the balance due of US$110,000.

It will also be noted from the contract between Maram and Vefa dated 5 February 1998 (at Annex E page 185-188) that Vefa was responsible for domestic freight within Turkey.  Thus, Maram was responsible, and therefore undertook liability for, transporting the buildings by ship from the port in Turkey to Yemen and then onward transportation to the University.

In addition to this, Maram was, by the terms of the contract, responsible for:

1.      Equipment and labour needed for concreting of the ground.

2.      Equipment and labour needed for coating of the ground.

3.      Equipment and labour needed for installation of central heating

4.      Equipment and labour needed for installation of appliances.

00010455                                                                    DOJ AR - 002029

5.     Equipment and labour needed for interior and exterior painting of the buildings.

6.     Meeting the travel, feeding, flights and visa costs of the 5 person engineering team from Vefa who were sent to supervise the assembly of the buildings.

7.     The provision of 4 assistants to each member of Vefa's supervisory team.

8.     Personnel to assist the off loading of the received equipment.

9.     Electrical equipment and installation were also the responsibility of Maram.

It will be seen, therefore, that Maram was a highly regulated company in good standing in Turkey, and that Maram entered into a detailed contract with another Turkish company, Vefa for the manufacture, supply and installation in Yemen of the prefabricated buildings. The transaction was entirely genuine and legitimate and it was evidenced by extensive documentation.

**2.6    Corporate history of Maram: Mamduh Salim completed the sale of shares in July 1997 and had no connection with Maram when Mr Kadi authorised the transfers**

Investigations conducted by Mr Kadi's legal team and documents obtained in Turkey show the following facts:

1.     Mamduh Mahmoud Salim Ahmed ("Mr Salim") and Thikra Muh Gawhar Mubarak (who it is believed is the wife of Mr Salim) sold the entire ownership of shares in Maram on 14 July 1997 to Mr Jeleidan and Mr Bayazied, each of them acquiring 50% of the ownership of Maram. After that date, Mr Salim held no shares or other interest in Maram. This can be seen from the assignments of shares by Mr Salim and Thikra Mubarak at Annex C (pages 103-110). It will be noted that each of them assigned their "entire share" of the ownership of Maram. These assignments were

00010456          DOJ AR - 002030

officially notified to the authorities in Turkey on 1 August 1997 (Annex C, page 89-90) and were officially announced in the Official Turkish Trade Gazette on 10 October 1997 (Issue No. 4395) - (see Annex C pages 179-181), which confirmed that each of Mr Salim and Ms Mubarak "has transferred all of [their] company shares".

2.  On 20 August 1997, Mr Jeleidan and Mr Bayazied resolved to appoint Mr Bayazied for a period of 5 years as director to represent and operate Maram.  This decision was reached in a formal company resolution complying with all relevant formalities under Turkish law (see Annex C pages 91-92).  The decision to appoint Mr Bayazied as director was officially announced in the Official Turkish Trade Gazette (page 1104 of Issue 4398) on 15 October 1997 - see Annex C pages 79-82).

3.  Upon the appointment of Mr Bayazied as a director to represent Maram, and its official announcement in the Official Turkish Trade Gazette, Mr Salim's directorship lapsed and all Mr Salim's connection with Maram terminated as he had completely disposed of all his shares on 14 July 1997.  Therefore, after the official announcement of the appointment of Mr Bayazied as director in the Official Turkish Trade Gazette on 15 October 1997, Mr Salim no longer had any connection with Maram. Mr Yavuz Subasi, the accountant who incorporated Maram and transferred the shares to Mr Jeleidan and Mr Beyazied, has confirmed this. See Mr Subasi's statement at Annex D pages 183-184).

4.  Mr Jeleidan made transfers from his account number 10409 at Faisal Finance, Geneva to Maram's account number 160377 at Faisal Finance in Istanbul. Since 1998 ownership of Faisal Finance in Istanbul has changed and the bank has changed its name to Family Finance. The only person authorised to make withdrawals from Maram's account number 160377 was Mr Bayazied. The present manager of Family Finance, Mr Gursel, has confirmed this.  Mr Salim therefore had no authority or mandate at any time regarding the bank account of Maram into which Mr

00010457                                                                      DOJ AR - 002031

Jeleidan remitted funds given to him by Mr Kadi for the University Housing Project.

5.   On 23 May 2001 Mr Jeleidan and Mr Bayazied resolved to liquidate Maram (see Annex C pages 171-172) because it had ceased operations. Announcements of the liquidation proceedings were made for the consideration of debtors and creditors of Maram in the Official Turkish Trade Gazette on 1 June 2001, 8 June 2001 and 15 June 2001 (see Annex C pages 171-172). Maram was eventually liquidated by resolution dated 5 November 2002, notice of which appeared in the Official Turkish Trade Gazette on 25 November 2002 (Annex C pages 171-172).

6.   From the documents at Annex C, it would appear that Maram was in good standing and was openly and visibly doing business and operating in Turkey and throughout the period of its existence made numerous regulatory, corporate and tax filings with the Turkish authorities.

In summary, at no time during the period Mr Kadi authorised the transfers to the account of Mr Jeleidan, between February and August 1998, did Mr Salim have any connection whatsoever with Maram. Moreover, Mr Salim at no time had any authority regarding the bank account of Maram into which Mr Jeleidan remitted funds given to him by Mr Kadi for the University Housing Project.

**2.7   The money transfers into Mr Jeleidan's account from 24 February 1998 to 3 August 1998 coincided with the implementation of the University Housing Project**

Mr Kadi authorised the transfers into the account of Mr Jeleidan's personal, account number 10409 at Faisal Finance in Geneva (No. 10409), and not to Maram, or anyone else. This was for the following reasons:

1.   Mr Kadi and his uncle trusted Mr Jeleidan and had complete confidence in him that he would apply the funds to the satisfactory implementation of the University Housing Project.

00010458                                                          DOJ AR - 002032

2.  Mr Kadi did not transfer funds directly to the account of Maram because Mr Kadi had entrusted the University Housing Project to Mr Jeleidan, and Mr Jeleidan alone.

3.  Mr Kadi did not transfer the funds to any personal account of Mr Jeleidan in Istanbul because, as at the date of the transfers from 24 February 1998 to 3 August 1998, Mr Jeleidan had no personal account in Istanbul denominated in US dollars. The only account denominated in US dollars held by Mr Jeleidan personally was account 950905 which Mr Jeleidan did not open until 5 August 1998, after the last of the transfers from Mr Kadi. This can be seen from the bank statement of Mr Jeleidan at Annex F (page 208).

After the meeting on 1 July 2003, Mr Jeleidan made himself fully available to Mr Kadi's legal team including authorising full access to all relevant banking and corporate documents. Banking documents obtained show that Mr Jeleidan was involved in other transactions, totally unrelated to Mr Kadi.

### 2.8  Evidence of how the money Mr Kadi transferred was applied solely to the University Housing Project

Mr Kadi authorised the transfers into the account of Mr Jeleidan at Faisal Finance in Geneva solely and exclusively for the purpose of supporting the University Housing Project, and not for any other purpose. Mr Jeleidan then made transfers from his account at Faisal Finance in Geneva to the account held by Maram at Faisal Finance in Istanbul (account number 160377). The funds were used for this purpose and no other purpose: Mr Jeleidan transferred funds to Maram as and when the funds were needed for the University Housing Project. These transfers coincided with the manufacture and shipment of the prefabricated units, under the contract dated 5 February 1998 between Maram and Vefa (see Annex pages 185-188), and the payment of associated expenses for such items as shipping costs (Annex G pages 213-216) and equipment installed at the University Housing Project (see Annex H pages 217-237). This can best be demonstrated by analysing the dates of the respective transfers and comparing them with the dates of:

00010459                                                        DOJ AR - 002033

1.    The demand from Vefa to Maram (Annex E pages 193-194).

2.    The shipping invoices issued by Pasifik International Transport and Foreign Trade Co. Limited ("Pasifik"); a substantial and well established shipping company in Turkey with offices in Istanbul, Izmir and Ankara, for shipping the prefabricated units from Turkey to Yemen. These were broadly contemporaneous with the dates of the actual shipments of the prefabricated units.   Copies of the shipping invoices will be found at Annex G pages 213-216.

3.    The invoice from a company named Egemak Machinery Food and Agricultural Products and Foreign Trade Company Limited ("Egemak"), which entered into a contract with Maram dated 11 March 1998 for the supply of bread and dough making equipment for use in a bakery at the University Housing Project (see Annex H pages 217-225).

4.    The quotation from a company named Inoksan Kitchen Industry and Trade Inc. ("Inoksan"), which Maram asked to quote for supplying kitchen equipment in connection with the University Housing Project (see Annex H page 237.  Mr Kadi believes that this kitchen equipment was then purchased by Maram from Inoksan.

Mr Kadi's team has prepared the following table to show the application of the funds transferred, coinciding with the transfers by Mr Kadi:

00010460                                                                      DOJ AR - 002034

| Date | US$ from Caravan 10257 to Jeleidan 10409 | UD$ from Jeleidan 10409 to Maram 160377 or Jeleidan 950905 | Invoices/demands to Maram for University Campus Project | US $ |
|---|---|---|---|---|
| 24.02.98 | $350,000 | | | |
| 03.03.98 | | $150,000 to Maram | | |
| 10.03.98 | | | Pasifik invoice Port waiting fee | $ 31,080 $  2,732 |
| 12.03.98 | | | Egemak invoice for bakery equipment | $ 23,500 |
| 31.03.98 | | | Pasifik invoice | $ 37,956 |
| 03.04.98 | | $199,985 to Maram | | |
| 14.04.98 | $300,000 | | | |
| 18.04.98 | | | Vefa demand for the balance of $110,000. From this, Vefa had already received the sum of $740,000 | $110,000 $740,000 |
| 20.04.98 | | | Pasifik invoice | $ 25,900 |
| 22.04.98 | | $250,000 to Maram | | |
| 05.05.98 | | | Pasifik invoice | $ 12,880 |
| 05.05.98 | | | Inoksan invoice | $ 35,321 |
| 26.05.98 | | $50,000 (1) | | |
| 26.05.98 | $250,000 | | | |
| 26.05.98 | | $200,000 to Maram | | |
| 29.06.98 | | $300,000 (2) | | |
| 03.07.98 | $150,000 | | | |
| 03.08.98 | $200,000 | | | |
| 04.08.98 | | $300,000 to Jeleidan account 950905 | | |
| 1998 | | | Excavation and ground preparation | $  125,000 |
| Dec 1998 | | | Sum retained by Mr Jeleidan as per balance on account 10409 at Faisal Finance | $  105,000 |
| Totals | $1,250,000 | $1,150,000 | | $1,249,369 |

1       To Maram account number 160377 not B77191 as alleged by Mr Nicati at page 4, lines 19-20 of the minutes of the meeting on 1 July 2003

2.      According to bank statements of Maram's account 160377 this sum was never received in Maram's account although it appears it was withdrawn from Faisal Finance account 10409 but never transferred to Maram  (See Annex F page 209).

00010461                                                      DOJ AR - 002035

2.9    Implementation of the Project

It will be noted from the contract between Maram and Vefa (Annex E pages 185-188) that Maram was responsible for all ground preparation work, cement foundations and all other preparatory work in order to prepare the site for installation of the prefabricated units. This work was carried out by a company called "Yaman for General Contracting Co." (for convenience "Yaman"). It appears that Yaman certainly did some work because they wrote to Maram on 29 October 1998 (see copy letter at Annex J page 238) expressing their desire to invite 5 named engineers to visit Yemen for the University Housing Project. It is assumed that these engineers were employed by Vefa, and provided by Vefa in accordance with Maram's contract with Vefa dated 5 February 1998 (see Annex E page 186). Investigations have shown that these costs would have been of the order of $125,000.

Also at Annex J (pages 239-253) is a quote from Yemen Business Centre Limited, which was asked to quote for furnishing some of the apartments.

Also at Annex J (page 254) is a Memorandum Of Understanding dated 10 December 1997 between Maram and Technovision Engineering Consulting, a company that Maram also engaged to provide services in connection with the University Housing Project.

From the above, and the documents annexed, it would appear that Maram applied at least the sum of US$1,144,369 towards the University Housing Project, this being made up as follows:

00010462                                                                        DOJ AR - 002036

|  | US $ |
|---|---|
| Vefa contract value as per demand letter dated 18.4.98 at Annex E (pages 193-194) | 850,000 |
| Shipping costs with Pasifik as per Pasifik invoices at Annex G | 110,548 |
| Cost of bakery and associated equipment paid to Egemak at Annex H | 23,500 |
| Kitchen equipment which Mr Kadi believes was supplied by Inoksan as per invoice at Annex H | 35,321 |
| Cost of ground preparation work in Yemen (estimate) | 125,000 |
| **Total** | **1,144,369** |

Mr Kadi fully expected Mr Jeleidan to retain out of the monies transferred a commission for his handling of the project in the sum of 10% equating to roughly $100,000 in round figures. It will be noted from Annex F (page 201) that at the end of 1998, the balance in Mr Jeleidan's account at Faisal Finance in Geneva was $106,730.44, the majority of which Mr Kadi infers is the commission retained by Mr Jeleidan. This sum accounts for the difference between the total sum transferred of US$1,250,000 and the amount accounted for above, namely UD$1,144,369.

### 2.10   Supervision of implementation of the University Housing Project and the application of funds transferred

As to supervision of the project, Mr Kadi reaffirms, once again, that the entire arrangement was based on the trust that existed between him and Mr Jeleidan, and Mr Kadi's full confidence in Mr Jeleidan's ability and qualifications to implement the University Housing Project. Mr Kadi would add the following:

1.     Mr Kadi personally supervised, at the port in Turkey, the loading of the first two shipments of prefabricated buildings.

00010463                                                                                                   DOJ AR - 002037

2.   Mr Kadi's uncle, Dr Zubayr, was fully involved in overseeing the University Housing Project. He liaised with Mr Jeleidan and with the Yemen university staff and reported from time to time to Mr Kadi about the project. Dr Zubayr accordingly visited the University Housing Project several times during the project. Documents obtained show that Dr Zubayr also attended at least one meeting of the design team: see the report prepared in September 1998 of Professor Zen, a supervising academic consultant from the International Islamic University, Malaysia (see Annex K pages 258-262). Mr Kadi and Dr Zubayr kept in close contact with regard to the implementation of the project to ensure its proper realisation.

## 3.   RESPONSE TO ALLEGATIONS OF MR NICATI

During Mr Nicati's questioning of Mr Kadi, Mr Nicati made the following allegations, all of which Mr Kadi denies. In this section, reference will be made to the minutes of the meeting held at the Swiss Embassy on 1 July 2003:

Allegation (Page 4 of the minutes):

"3.   **The list of all transfers for the benefit of Wael Hamza JELEIDAN ordered by you shows that the sums on his account were debited shortly afterwards, divided into several different sums and transferred to the account of Wael Hamza JELEIDAN at the Faisal Finance Institution Inc. in Istanbul (Turkey). All these transfers took place within a period of 5 months".**

Response:

All the transfers Mr Kadi authorised for the account of Mr Jeleidan were made for the entirely legitimate purpose of providing funds for the University Housing Project. The funds transferred were transferred to the account of Maram (account number 160377). This was an account in the name of Maram and not

PCR1-192420.1                                      19

an account of Mr Jeleidan as alleged by Mr Nicati (see Annex F page 209). The transfers took place within a period of 5 months, this being the exact period when Maram expended the funds on the University Housing Project.

**Allegation (Page 4, lines 19-20)**

"May 26th, 1998 debit of 50'000 USD from the account JELEIDAN and transfer to the account JELEIDAN at Faisal Bank Istanbul (account no. 877191)"

**Response:**

It is untrue that on 26 May 1998, US$50,000 was debited from the account of Mr Jeleidan and transferred to the account of Mr Jeleidan at Faisal Finance, Istanbul (account number 877191). Investigations carried out by Mr Kadi's legal team show that this sum was probably transferred to the account of Maram (account number 160377). See Annex F (pages 202-203 and 209). It was transferred for the purpose of the University Housing Project.

**Allegation (Page 4, lines 26-27)**

"June 29th, 1998 debit of 300'000 USD from the account JELEIDAN and transfer to the account JELEIDAN at Faisal Bank Istanbul (account no. 160377)"

**Response:**

It is untrue that on 29 June 1998, US$300,000 was transferred to the account of Mr Jeleidan at Faisal Finance, Istanbul (account number 160377). Account number 160377 was in the name of Maram and not Mr Jeleidan as alleged by Mr Nicati. From investigations by Mr Kadi's legal team, and a review of the relevant bank statements, Mr Jeleidan gave instructions for this sum to be transferred to account 160377 (see Annex F pages 205-207, 199 and 209), the sum was

00010465                                                                DOJ AR - 002039

withdrawn from account number 10409 but never credited to Maram's account 160377. See Maram bank statement at Annex F (page 209).

Allegation (Page 5):

"4.   **Summary You are accused of having transferred, in the name of Caravan Development Group Ltd., a total sum of USD 1'250'000 to the account no. 10409 in the name of Wael Hamza JELEIDAN at Faisal Finance Geneva in the period from** <u>**February to August 1998**</u>**, in the knowledge that these assets would be transferred to the account of Wael Hamza JELEIDAN at Faisal Finance Institution Inc. in Istanbul (account no. 160377) shortly after. At that specific time, both Usama BIN LADEN and his organization were already known as terrorist leader and criminal organization. At the same time there were serious reasons to believe that Wael Hamza JELEIDAN was one of the financiers of BIN LADEN's organization".**

**Response:**

It is **completely untrue** that in 1998 there were "serious reasons to believe that Wael Hamza Jeleidan was one of the financiers of bin Laden's organisation". In 1998, there was no evidence or allegation of which Mr Kadi was aware for suspecting Mr Jeleidan of any connection with al Qaeda or any terrorist group or individual. In 1998, Mr Kadi had no reason or indication whatever to suspect Mr Jeleidan of any connection with terrorism or any continuing association with Usama bin Laden. It was at the time widely believed in Saudi Arabia that Mr Jeleidan had parted company with Usama bin Laden following war when the Soviet forces were driven out of Afghanistan.

Moreover account 160377 at Faisal Finance in Istanbul is in the name of Maram and not Mr Jeleidan as alleged by Mr Nicati. See Maram bank statement at Annex F (page 209).

00010466                                                                    DOJ AR - 002040

Allegation (Page 6):

"5.    You are accused of having had knowledge of the fact that the account of Wael Hamza JELEIDAN in Geneva was only a transit account and of having intentionally obscured the final destination of the money".

Response:

This allegation is **completely untrue** as will be apparent from the following:

(a)    There was never any intention or reason to obscure any aspect of the arrangements, which were for the entirely genuine and legitimate purpose of supporting the University Housing Project. Nothing was obscured. The arrangements for the University Housing Project were conducted openly and transparently as is evidenced by the various contracts and substantial documentation surrounding the project. Mr Kadi had no intention to obscure the final destination of the money or any other element of the arrangements for the project.

(b)    Mr Kadi and his uncle trusted Mr Jeleidan and had complete confidence in him that he would apply the funds to the satisfactory implementation of the University Housing Project. Mr Kadi did not transfer funds directly to the account of Maram because Mr Kadi had entrusted the University Housing Project to Mr Jeleidan, and Mr Jeleidan alone. Mr Jeleidan transferred the funds to Maram as and when they were required for the implementation of that project.

(c)    Investigations by Mr Kadi's legal team have shown that at the time of the transfers from 24 February 1998 to 3 August 1998, Mr Jeleidan had no personal account in Istanbul denominated in US dollars. The only account denominated in US dollars held by Mr Jeleidan personally was account 950905 which Mr Jeleidan did not open until 5 August 1998, after

00010467                                                      DOJ AR - 002041

the last of the transfers from Mr Kadi. This can be seen from the bank statement of Mr Jeleidan at Annex F (page 208).

**Allegation (Page 6):**

"6.   You are accused of having had knowledge of the fact that the account of Wael JELEIDAN at Faisal Finance Institution Inc. in Istanbul (account no. 160377) was closely connected with MARAM Company, Istanbul."

**Response:**

See above.

**Allegation (Page 6):**

"5.1.   Did you know that by that time (1998) Mr Wail Hamza Jeleidan had an account in Turkey, Istanbul?"

**Response:**

From Mr Kadi's investigations to date it is **totally untrue** that at the time of the transfers authorised by Mr Kadi, Mr Jeleidan had any account denominated in US dollars in Istanbul. In any event Mr Kadi trusted Mr Jeleidan and based on this was happy to accept his instructions as to the destination account into which the funds were to be transferred. This is entirely normal practice.

**Allegation (Pages 6 and 7):**

"7   You are accused of having knowledge of the fact that the money transferred via the account JELEIDAN in Geneva would eventually be transferred to the accounts of the MARAM Company in Istanbul, which is closely connected with Mahmud Mamduh SALIM (who was director of the

00010468                                                 DOJ AR - 002042

company prior to his arrest) one of the highest ranking members of Al Qaeda".

**Response:**

This allegation is **totally untrue** as will be apparent from the following:

(a)  When Mr Kadi authorised the transfers he had no knowledge whatsoever that the money would go to Mr Salim: until the meeting on 1 July 2003, Mr Kadi had never heard the name of Mahmud Mamduh Salim. Mr Kadi has never had any dealings or connection or transactions with Mr Salim, directly or indirectly.

(b)  At the time of the transfers authorised by Mr Kadi, Mr Salim was no longer connected with Maram, following the sale of Maram to Mr Jeleidan and Mr Bayazied on 14 July 1997, and having ceased to be a director of the company following the appointment of Mr Bayazied as director, as announced in the Official Turkish Trade Gazette dated 15 October 1997 (see Annex C page 79-82). This has been confirmed by Mr Yavuz Subasi in his statement at Annex D (pages183-184).

(c)  The account of Maram (No. 160377) at Faisal Finance in Istanbul, to which Mr Jeleidan transferred funds from his account at Faisal Finance in Geneva, had only one signatory, Mr Bayazied. The present manager of Family Finance, Mr Gursel, has confirmed this. At no time was Mr Salim a signatory authorised to sign on this account.

**Allegation (Page 7):**

"8.   Therefore you are accused of having financially supported the organization Al Qaeda with more than 1.2 million USD from February 1998 until August 1998."

00010469                                                                    DOJ AR - 002043

**Response:**

This allegation is **totally untrue** for the reasons explained above. The true position is as follows.

Mr Kadi provided US$1.25 million as a donation to cover the costs of the University Housing Project. It was Mr Kadi's intention and belief and he continues to believe that all the sums he provided to Mr Jeleldan were applied exclusively towards that purpose. The University Housing Project was a very substantial project as is clear from all the evidence, including the promotional brochure of Vefa extracts of which, including photographs, are at Annex N (page 331). The University Housing Project remains in existence in Yemen and itself is evidence of the payments and the link between the money paid by Mr Kadi and its application. Not one piece of evidence has been provided that the money transferred by Mr Kadi went, or was intended, to support terrorism or any terrorist group or individual.

In all Mr Kadi's individual, business and charitable activities, he has never supported nor has he ever intended to support in any manner whatsoever Usama bin Laden or Al Qaeda. Mr Kadi is totally innocent of the allegations against him. Mr Kadi condemns terrorism and is strongly opposed to terrorist activity in all forms. Mr Kadi considers those that support or participate in terrorism to be offensive to the Muslim faith deserving of the most severe condemnation. He believes those who commit terrorist acts have no place in the Muslim faith.

# PART II

## Clarifications and supplemental evidence

In this part all page and line references are to the minutes of 1 July 2003 meeting, following the order of the minutes.

**Page 13, Line 21-22:**

00010470                                                                    DOJ AR - 002044

"... We also had KA STAN in Bosnia, we also had a minority share.
This is what I can remember.  I do have the majority share in KA
STAN ...".

**Clarification:**

Mr Kadi was the majority shareholder in KA Stan until its dissolution by means of
a Court decision dated 24 January 2001.

**Page 14, Lines 2-9:**

"Did you have project in Albania?
No I don't remember having anything in common with Jeleidan in
Albania.  I don't remember any businesses with him in Albania ...".

**Clarification:**

Mr Jeleidan was appointed as the executive director of the Saudi government
backed Saudi Joint Relief Committee ("SJRC") in Albania and Kosovo in 1999.
When the SJRC arrived in Albania they sought Mr Kadi's help, as he was a fellow
Saudi Arabian national with a substantial presence and infrastructure in Albania.
Mr Kadi agreed to help by arranging for Albanian companies associated with him
to provide to the SJRC facilities to help the SJRC's humanitarian efforts assisting
refugees.

The facilities provided to the SJRC by Albanian companies associated with Mr
Kadi included help in establishing a temporary hospital for refugees, stores for
medicines and relief supplies and apartments and office space.  All these
transactions were carried out on normal commercial terms.

**Page 16, Lines 22-26**

"Concerning my commercial relationship with Bin Mahfouz, I have
something to add, we have shares into a Canadian Company called

00010471                                                              DOJ AR - 002045

MIT Ventures (the lawyers are not sure about Venture) which we think a company called Murjan invested in MIT and in which the Bin Mahfouz family are investors. If it is Khaled or his sons, I am not sure".

**Clarification:**

Mr Kadi invested in a Vancouver registered diamond prospecting company called MIT Ventures Corp. in June 1999. Mr Kadi has recently learned that a year before, Abdul Rahman bin Mahfouz and his brother Sultan Khalid bin Mahfouz invested in MIT Ventures in 1998 through their private company Al Murjan Minerals. Mr Kadi's interest in MIT Ventures was held through New Diamond Holdings Limited, a British Virgin Islands company.

**Page 19, Lines 11 to 13:**

"Do you know Hussam Tayeh ?
The name doesn't sound Arabic. I don't remember this name".

**Clarification:**

Mr Kadi did not understand the name because of the way it was pronounced and transliterated. The word "Tayeh" as stated by Mr Nicati has several different possible transliterations into Arabic. If Mr Nicati intended to refer to التايه, then Mr Tayeh was in fact the first person to start working for Muwafaq Foundation in Albania. He was dismissed from his employment with Muwafaq Foundation due to his poor performance.

**Page 19, Lines 15-20:**

"Do you know Mohamed Ibrahim Saeed?
He might have worked for Muwafaq sometimes. But if I remember well, after Muwafaq closed in 1997, I think he worked in a foundation

00010472                                                        DOJ AR - 002046

in Bosnia, related to the al Haramayn and the Al Aqsa mosque. They had school for children and a place for orphans."

**Clarification:**

Mr Kadi confirms that Mr Saaed still works at the al Haramayn and Al Aqsa mosque charity, a foundation which has no connection whatsoever with Al Haramain, which has been designated by US Treasury.

**Page 21, Lines 26- 29:**

"Who is Prince Bandar Abdelrahman al Saud ?
I know of Prince Bandar Abdelaziz al Saud who is the Saudi Ambassador in the United States. I know no Bandar Abdelrahman."

**Clarification:**

Mr Kadi transferred the total sum of US$450,000, in two tranches of US$225,000, on 30 June and 9 July 1998 to HRH Prince Bandar Bin Abdelrahman Al Saud. This sum represented the purchase price of equity participation certificates in Dar Al Maal Al-Islami Trust which certificates were transferred to Caravan Development Group Limited. Documents relevant to this are at Annex L (pages 263-271).

As the documents at Annex L (page 265) show, Mr Kadi gave instructions to Faisal Finance Geneva in relation to this transaction . Because Faisal Finance Geneva executed the transaction Mr Kadi was not aware of the identity of the seller until he asked his staff to investigate the matter following the meeting on 1 July 2003.

**Page 22, Lines 22-27:**

"Were you involved in rice trading?
It might be. We did sugar definitely.   About rice I am not sure.

00010473                                                    DOJ AR - 002047

In December 1998, 500 tons of rice sailing between Port Said and Albania were lost or stolen. What do you know about it?"

**Clarification:**

Mr Kadi refers to the survey report and the various Court judgments in his favour relating to the lost rice shipment at Annex M (pages 272-328). From these, it is clear that on 23 December 1998 some 10,000 50 kg bags of rice were loaded into the holds of M/V "Nawara" at Port Said. En route from Port Said to Durres in Albania a series of events occurred which finally led to the grounding of the M/V "Nawara" at Kastelli on the Island of Crete. The greater part of the cargo was under water and the rice became swollen and rendered unusable. A claim was made against the insurers in the Courts in Jordan, which eventually led to a final judgment being entered against the defendant insurers, the Islamic Insurance Company, in the total sum of 148,438 Jordanian Dinars.

# CONCLUSION

Mr Kadi's legal team has fully investigated all the concerns raised by Mr Nicati and the questions asked by him. Mr Kadi's lawyers have spent substantial time reviewing documents and interviewing witnesses and have found no evidence or grounds whatsoever for believing that Mr Kadi was linked in any manner to Mr Salim or any terrorist group or individual. The payments made by Mr Kadi to Mr Jeleidan were for the totally legitimate charitable purpose of supporting the University Housing Project, a project which Mr Jeleidan accomplished successfully as is apparent from the photograph at page 331 and which, since its installation at the University, has benefited many hundreds of students each year. As to this, philanthropy is a central tenet of religious practice for devout Muslims, especially the wealthy among them. The monies were transferred to Mr Jeleidan in good faith and on the basis of the exceptional degree of trust which existed between Mr Kadi and Mr Jeleidan.

PCR1-192420.1                    29

In all Mr Kadi's individual, business and charitable activities, he has never supported nor has he ever intended to support in any manner Usama bin Laden or Al Qaeda.  Mr Kadi is totally innocent of the allegations against him both in Switzerland and elsewhere.  He has not broken any provisions of the Swiss Penal Code nor has he breached any laws of any other country.  Mr Nicati is requested to close his file forthwith and release Mr Kadi's funds.

PCR1-192420.1

30

00010475

DOJ AR - 002049

**SUBMISSION OF YASSIN ABDULLAH KADI TO THE DEPUTY ATTORNEY GENERAL OF SWITZERLAND, MR CLAUDE NICATI, FURTHER TO THE MEETING AT THE SWISS EMBASSY IN RIYADH ON 1 JULY 2003**

# INDEX TO ANNEXURES

| ANNEXURE | DOCUMENT | DATE | PAGE |
|---|---|---|---|
| ANNEX A | Fund Appeal Brochure | 1997 | 1-7 |
| ANNEX B | Documents showing the University Housing Project: | | |
| B1 | Schedule of completed buildings | 1998 | 8-13 |
| B2 | Drawings prepared by Vefa Engineering Industry and Trading Limited Company ("Vefa") | 1998 | 14-50 |
| ANNEX C | Maram Travel Importation and Exportation Trading Limited Company ("Maram") corporate regulatory and tax documents | 1996-1997 | 51-182 |
| ANNEX D | Witness Statement of Yavuz Subasi | 19.08.03 | 183-184 |
| ANNEX E | Documents between Maram and Vefa: | | |
| E1 | Contract between Maram and Vefa | 05.02.98 | 185-188 |
| E2 | Receipts, demands and other business documents between Maram and Vefa | Various | 189-194 |
| ANNEX F | Banking documents for accounts of Mr Wael Hamza Jeleidan ("Mr Jeleidan") and Maram: | 1997-1998 | |
| F1 | Mr Jeleidan account No. 10409 | | 195-207 |
| F2 | Mr Jeleidan account No. 950905 | | 208 |
| F3 | Maram account No. 160377 | | 209-212 |

PCR1-193210.1

| ANNEXURE | DOCUMENT | DATE | PAGE |
|---|---|---|---|
| ANNEX G | Shipping Invoices issued by Pasifik International Transport and Foreign Trade Co. Limited | 10.03.98 - 05.05.98 | 213-216 |
| ANNEX H | Documents relating to equipment purchased by Maram | | |
| H1 | Contract between Egemak Machinery Food and Agricultural Products and Foreign Trade Company Limited and Maram for the supply of bakery equipment at the University Housing Project | 11.03.98 | 217-225 |
| H2 | Letters between Inoksan Industry and Trade Inc ("Inoksan") and Maram | April-June 1998 | 226-236 |
| H3 | Invoice from Inoksan to Maram | 05.05.98 | 237 |
| ANNEX J | Documents relating to further goods and services bought by Maram for the University Housing Project: | | |
| J1 | Letter from Yaman for General Contracting Co. to Maram | 29.10.98 | 238 |
| J2 | Quotation from Yemen Business Centre Limited for furniture | 23.02.98 | 239-253 |
| J3 | Memorandum of Understanding between Maram and Technovision Engineering Consulting | 10.12.97 | 254 |
| ANNEX K | Documents relating to supervising academic consultant, Professor Zen | | |
| K1 | Letter from Professor Zen, a supervising academic consultant from the International Islamic University, Malaysia to Maram | 14.08.98 | 255-257 |
| K2 | Report of Professor Zen | Sept 98 | 258-262 |
| ANNEX L | Documents relating to transaction with Prince Bandar Abdelrahman Al Saud for the purchase of equity participation certificates in Dar Al Maal Al-Islami | 29.05.98 - 09.07.98 | 263-271 |

PCR1-193210.1

| ANNEXURE | DOCUMENT | DATE | PAGE |
|---|---|---|---|
| ANNEX M | Documents relating to grounded cargo of rice shipment from Port Said to Albania: | | |
| M1 | Survey Report prepared by Macrymichalos Brothers Limited regarding bags of spoiled rice on grounded vessel M/V "Nawara" | 02.02.99 | 272-301 |
| M2 | Notice issued by Jordanian Court of Appeal | 17.02.03 | 302-317 |
| M3 | Decision of Jordanian Court of Cassation | 29.06.03 | 318-328 |
| ANNEX N | Extracts from Vefa Promotional Brochure showing the University Housing Project | Undated | 329-331 |

PCR1-193210.1

00010478

DOJ AR - 002052