# EXHIBIT HH



0003

IN THE MATTER OF

YASSIN ABDULLAH KADI

and

THE OFFICE OF FOREIGN ASSETS CONTROL,
US DEPARTMENT OF THE TREASURY

**INDEX TO
STATEMENT OF YASSIN ABDULLAH KADI**

| *Heading* | *Page No.* |
|---|---|
| Personal background | 2 |
| Father's background | 5 |
| Mr Khalid bin Mahfouz | 6 |
| National Commercial Bank | 7 |
| Charitable and Commercial Activities | 9 |
| Muwafaq Charitable Foundation ("the Foundation") | 10 |
|    The Foundation's purposes | 10 |
|    The Foundation's Trustees and Constitution | 12 |
|    The Foundation's mode of operation | 14 |
|    Holland and Belgium | 15 |
|    USA | 16 |
|    The Foundation's offices in Africa | 16 |

PCR1-180199.1

1

CONFIDENTIAL: This document is subject to a Protective Order
regarding confidential information in 03 MDL 1570 (GBD),
United States District Court for the Southern District of New York.

KADI0039556

| | |
|---|---|
| Chad | 17 |
| Closure of the Foundation in other countries where it was operating | 17 |
| The Foundation's programs | 17 |
| Article in USA Today – October 29, 1999 | 18 |
| **Charitable activities in other countries, both through the Foundation and other charitable activities** | 21 |
| Sudan | 21 |
| Pakistan | 27 |
| Amir Mehdi | 27 |
| Shifa International Hospitals Limited Islamabad | 29 |
| The arrest of Amir Mehdi | 31 |
| Afghanistan | 32 |
| Bosnia and Croatia | 33 |
| Chafiq Ayadi | 34 |
| FBIS Article dated July 31, 1995 | 36 |
| The Foundation's activities in Bosnia and Croatia | 38 |
| Introduction and first visit to Albania | 43 |
| Dr Abdul Latif Saleh | 44 |
| Albania | 47 |
| Building and running community centers and mosques in Kukes, Krome and Tirana | 48 |
| Classes and seminars | 49 |
| School | 50 |
| Kosovo | 52 |
| Waa'el Julaidan | 54 |
| Assistance provided to the SJRC | 56 |
| Ethiopia | 59 |
| Somalia | 60 |
| Germany | 62 |
| Austria | 62 |
| UK | 62 |
| Women's college and other humanitarian activities in Saudi Arabia | 63 |

CONFIDENTIAL: This document is subject to a Protective Order
regarding confidential information in 03 MDL 1570 (GBD),
United States District Court for the Southern District of New York.

KADI0039557

0005

| | |
|---|---|
| **Commercial activities** | 66 |
| Saudi Arabia | 66 |
| Sudan | 68 |
| Albania | 73 |
| Kazakhstan | 75 |
| Bosnia | 76 |
| Depozitna Bank | 76 |
| Other investments in Bosnia | 78 |
| **Saudi Arabian Financiers** | 80 |
| Al Barakah Bank | 80 |
| Dar Al – Maal Al Islami Trust | 81 |
| Bin Laden Group | 81 |
| Mr Yahya bin Laden | 82 |
| Mr Zuhair H Fayez | 82 |
| Mr Qays Julaidan | 82 |
| Mr Hussain Shobokshi | 82 |
| Mr Saleh Kamel | 82 |
| Dr Mohamed Abdu Yamani | 83 |
| Mr Khalid bin Mahfouz | 83 |
| Mr Abdul Rahman bin Mahfouz | 83 |
| Mr Sultan Khalid bin Mahfouz | 83 |
| Mr Rais bin Mahfouz | 83 |
| Mr Talal Badkook | 84 |
| Dr Mohamed El Gheiri | 84 |
| Abdul Gani El Khereiji | 84 |
| Mr Saleh Al-Turki | 84 |
| **Article in the Wall Street Journal dated November 26, 2002 by Glenn Simpson** | 85 |
| Quranic Literary Institute of Chicago, Illinois (QLI) | 86 |
| BMI, Inc. | 90 |
| Abrar Investments Inc. | 93 |

CONFIDENTIAL: This document is subject to a Protective Order
regarding confidential information in 03 MDL 1570 (GBD),
United States District Court for the Southern District of New York.

KADI0039558

0006

| Summary | 94 |
|---|---|
| QLI | 95 |
| The Foundation | 95 |
| Chafiq Ayadi | 96 |
| FBIS Article | 96 |
| USA Today Article | 97 |
| Global Diamond Resources | 97 |
| Shifa International Hospitals | 98 |
| MM Badkook Co. for Catering & Trading | 98 |
| Al-Abrar Group International | 98 |
| Abrar Investments Inc. (Abrar USA) | 98 |
| So-called brother "Omar Al-Qadi" and Mercy International | 98 |
| Conclusion | 99 |

CONFIDENTIAL: This document is subject to a Protective Order
regarding confidential information in 03 MDL 1570 (GBD),
United States District Court for the Southern District of New York.

KADI0039559

0007

IN THE MATTER OF

### YASSIN ABDULLAH KADI

**and**

### THE OFFICE OF FOREIGN ASSETS CONTROL,
### US DEPARTMENT OF THE TREASURY

---

### STATEMENT OF YASSIN ABDULLAH KADI

---

I, **YASSIN ABDULLAH KADI** of Farsi Center, West Tower, 11th Floor, Suite 1103, Waly
Al-Ahd Street, Ruwais District, Jeddah 21411, Saudi Arabia, **SAY AS FOLLOWS:-**

1.     I make this statement further to the meeting held at the Office of Foreign Assets
       Control (OFAC), US Department of the Treasury, in Washington DC on August 1
       2002 attended by Mr R Richard Newcomb, Director of OFAC, and several of his
       colleagues together with my legal representatives.  Although I was not personally
       present at that meeting, and without in any way waiving legal privilege, I am
       informed by my lawyers that Mr Newcomb asked additional questions about my
       commercial and charitable activities in various locations.  I am informed by my
       lawyers that in this context Mr Newcomb requested details of my commercial

CONFIDENTIAL: This document is subject to a Protective Order
regarding confidential information in 03 MDL 1570 (GBD),
United States District Court for the Southern District of New York.

KADI0039560

0008

and/or charitable activities (if any) in Bosnia, Kosovo, Albania and in countries which were formerly Soviet Republics such as Kazakhstan. I set out in this witness statement this information, as requested by Mr Newcomb, and additionally information he requested as to my relationships with other wealthy Saudi Arabian persons including, in particular, members of the Bin Mahfouz family. Furthermore, I have included additional information, to assist in removing any apparent ambiguities concerning my business and charitable activities. Page references in this statement are to the documents exhibited as **"YAK7"** to which I refer.

2.    As a general comment, I have found it very difficult to put this statement together for 3 reasons: firstly, I am apparently required to respond to allegations against me which OFAC has never specifically articulated other than by reference to the affidavit of FBI Agent Robert Wright sworn on June 9, 1998 ("the Robert Wright Affidavit"). I believe that my legal representatives refuted comprehensively the allegations relating to me in the Robert Wright Affidavit in their last presentation to OFAC on August 1, 2002. Secondly in order to investigate and respond to Mr Newcomb's questions my lawyers have had to review documents and interview witnesses concerning events which took place in numerous different jurisdictions. Thirdly those events occurred in some cases more than a decade ago. My assets have now remained frozen for over 14 months and the effect on my business and personal life has been devastating.

## My personal background

3.    First, I believe it is useful to outline my personal and family background. I was born on February 23 1955 in Cairo, Egypt. I am of Saudi Arabian nationality. I

CONFIDENTIAL: This document is subject to a Protective Order
regarding confidential information in 03 MDL 1570 (GBD),
United States District Court for the Southern District of New York.

KADI0039561

0009

lived in Cairo until I was 12, when I returned, with my family, to Saudi Arabia. During the 1960s until about 1969, my father worked for the Bank of America in Jeddah. My father was an important influence on me and from the outset he instilled in me an interest in, and affection for, Britain and America. My father introduced me to British sports, particularly soccer, which I have followed until now. Except for Egypt, my first visit abroad was to London. Throughout my childhood my father was concerned that I should learn to speak good English. Due to this, while I lived in Cairo, I was educated at a school where English was the main language spoken. I was brought back to Saudi Arabia in 1967 where I continued my studies at the Royal School in Jeddah. At this school, I continued studying both English and French, among other subjects.

4.     When I finished school in Jeddah, I decided that I wanted to be an architect. I then attended, from 1972 – 1977, the Faculty of Architecture, Alexandria University, a leading architectural college in Alexandria, Egypt, from where I graduated in 1977.

5.     In 1977, I returned to Jeddah where I started my own business, Jamjoom International, later renamed Jamjoom Hospital Supplies, ("Jamjoom") which was appointed sole agent in Saudi Arabia for American Hospital Supplies. In addition to this, Jamjoom, at that time, was also involved in the computer and construction businesses. I started this business with my brother-in-law, **Kamal Jamjoom.**

6.     After about a year of working for Jamjoom, I wanted to branch out and enhance my experience and knowledge. The opportunity arose for me to work as a trainee at the leading architectural firm of Skidmore, Owings & Merrill LLP in

CONFIDENTIAL: This document is subject to a Protective Order
regarding confidential information in 03 MDL 1570 (GBD),
United States District Court for the Southern District of New York.

KADI0039562

0010

Chicago, USA. At that time my maternal uncle was president of King Abdulaziz University, which was then the only university in Jeddah. Skidmore, Owings & Merrill were then working on a project for the university. My father visited Dr Khan, one of the senior partners in Skidmore Owings & Merrill, and nominated Man of the Year by Time Magazine. Dr Khan arranged for me to be given a traineeship at Skidmore, Owings & Merrill's offices in Chicago where I started work at around the end of 1978/ beginning of 1979. I continued working there for almost 2 ½ years. I enjoyed the atmosphere in the USA and liked living and working there. During this period, I was married in Saudi Arabia, and took my wife to live with me in Chicago. My first son Muaz was born in Chicago in December 1980 and is a US citizen.

7.     In 1981, I returned to Saudi Arabia and rejoined Jamjoom as Vice-President. I began to develop the computer side of the business, purchasing IBM systems. IBM arranged for me to visit their US headquarters, and their manufacturing facilities in Florida and Ohio, where they manufactured, respectively, PCs and mainframes.

8.     During this time, Jamjoom continued its role as the sole agent of American Hospital Supplies the headquarters of which were in Chicago, where I also made frequent visits during the first half of the 1980's. I continued working for Jamjoom until March 1988.

9.     In April 1988 I was appointed Administration Manager of my father's company Saudi Orient Maritime Company Limited ("SOMCOL"), a position I held until October 1988 when I took up a position as Vice-President of MM Badkook Co.

CONFIDENTIAL: This document is subject to a Protective Order regarding confidential information in 03 MDL 1570 (GBD), United States District Court for the Southern District of New York.

KADI0039563

0011

for catering and trading. MM Badkook Co. was then, and is now, one of the largest catering companies in Saudi Arabia with restaurants throughout Saudi Arabia.  As Vice-President, I was responsible for overall management of the business and developing strategy to increase sales.  Talal Badkook is a major shareholder in MM Badkook Co.

10.    Talal Badkook has been named as a Defendant in a civil law suit brought by Burnett & others in the US District Court for the District of Columbia, in which there is a reference to the "Al-Mustaqbal Group".  The background to this group is as follows: some years ago during the elections for the Saudi Arabian Chamber of Commerce a number of Saudi businessmen set up a group in a bid to be elected to the Saudi Arabian Chamber of Commerce. This group was called the Al-Mustaqbal Group.  I confirm I have never had any connection whatsoever with the Al-Mustaqbal Group.   To the best of my knowledge, at no time has Talal Badkook had any connection whatever with terrorism or similar activities.

11.    I worked as Vice-President of M M Badkook Co. until 1990, when I started business investing on my own account. This included trading in textiles and investing in a restaurant business.  It lasted a short period, of about a year.

My father's background

12.    It is appropriate that I should mention specifically some facts concerning my father. He was employed until about 1969 by the Bank of America, as I have mentioned above. He went on to set up his own business in conjunction with international partners in the fields of shipping, construction, medicine, commodity trading and other businesses.  He was a successful businessman from Jeddah,

CONFIDENTIAL: This document is subject to a Protective Order
regarding confidential information in 03 MDL 1570 (GBD),
United States District Court for the Southern District of New York.

KADI0039564

0012

Saudi Arabia. In addition to his employment by Bank of America, he had other strong connections with the United States; ships chartered by his company SOMCOL used to carry oil for Saudi Aramco, a substantial oil company with interests in the US which is now part of a large US refining and marketing joint venture. I stress that I am the only son of my father, and have 6 sisters. Due to this, after my father died in November 1988 I inherited the majority of my father's wealth, which, at the time, amounted to several million dollars.

13.     In regard to my family, I would also mention that the US Treasury Department have alleged in a 2 page fax they supplied to UK Treasury (pages 1 to 2) that :

> "[My] brother Omar Al-Qadi is the director of Mercy International – USA"

This is totally untrue. I do not have any brother. As is well-known in Saudi Arabia, I have 6 sisters.

**Mr Khalid bin Mahfouz**

14.     I now describe my relationship with Mr Khalid bin Mahfouz, whom I will refer to for convenience as "KBM". I was first introduced to KBM socially in about 1989 and have known him since then. KBM and his family were at that time the leading bankers in Saudi Arabia. In 1990, I developed a professional relationship with KBM concerning the introduction of Islamic banking products at the National Commercial Bank ("NCB"), the largest and oldest bank in Saudi Arabia. In addition to our business relationship, I have carried out extensive humanitarian

CONFIDENTIAL: This document is subject to a Protective Order regarding confidential information in 03 MDL 1570 (GBD), United States District Court for the Southern District of New York.

KADI0039565

0013

activities in conjunction with KBM through the Muwafaq Charitable Foundation ("the Foundation") which I established at his request in 1992.

**NCB**

15.   In about 1990, I suggested to KBM introducing Islamic banking products into NCB.   KBM was at that time the most senior person with executive responsibilities within NCB.

16.   By way of background, during the 1980's, there had been an unprecedented growth in banking activity in Saudi Arabia and the Gulf.  In Saudi Arabia the first licensed Islamic bank, that is to say a bank licensed by the Saudi Arabian Government to carry on business according to Islamic investment principles, was Al-Rajhi Banking and Investment Corporation ("Al-Rajhi"). For Al-Rajhi to offer banking services which complied strictly with the tenets of Islam (in particular the prohibition on usury) necessitated the introduction of specific financial instruments and investment products tailored to satisfy the requirements of Islamic precepts. Al-Rajhi grew to become the third biggest bank in Saudi Arabia. These developments reflected a strong trend and preference in Saudi Arabia, and elsewhere, for example in London and other financial centers, for interest free banking (or "Islamic banking" as it is commonly called).

17.   Considering Al-Rajhi is listed as a Defendant in the Burnett civil law suit, I should mention for the sake of completeness that I have maintained various accounts at Al-Rajhi. At Al-Rajhi I have maintained normal bank accounts and an investment fund account. My dealings with Al-Rajhi have at all times been solely and exclusively for the purpose of banking. I have never known the identity of any of

CONFIDENTIAL: This document is subject to a Protective Order regarding confidential information in 03 MDL 1570 (GBD), United States District Court for the Southern District of New York.

KADI0039566

0014

Al-Rajhi's other investors or clients. I have invested funds with Al-Rajhi for solely commercial reasons. I stress that at no time have I ever held any equity share or management role in Al-Rajhi nor have I ever had any business relationship with any of the individuals or entities behind Al-Rajhi.

18.    KBM was aware of Al-Rajhi's successful introduction of Islamic banking services and knew that eventually every bank in Saudi Arabia would have to offer such services, or else lose market share to those institutions which did offer such services. He was determined to convert NCB from a bank which offered purely conventional banking services to one that could also offer Islamic banking products.

19.    Due to the above, KBM turned to me to help him in realising this ambition. To do this, we established a new department within NCB called the Islamic banking department or "IBD"; and, secondly, we sought advice from an outside consultancy company on aspects of Islamic banking product development. I arranged for these consultancy services to be provided through the National Management Consultancy Center ("NMCC"), a company registered in Saudi Arabia, which had a licence from the Saudi Arabian Government to provide consultancy services in Saudi Arabia. NMCC advised and assisted NCB in developing Islamic banking products and designing and implementing training programs for NCB employees. Through this means, NCB established the Islamic Banking Department. These arrangements required a re-organisation of the NMCC, during which I took the position of chairman, a position I held from 1991 to 2001. NMCC ceased operations at the end of 2001 since when it has been dormant.

PCR1-180007.1                                  8

CONFIDENTIAL: This document is subject to a Protective Order
regarding confidential information in 03 MDL 1570 (GBD),
United States District Court for the Southern District of New York.

KADI0039567

C015

20. The introduction of Islamic banking services within NCB was extremely successful. Other banks, both inside and outside Saudi Arabia, soon approached NMCC for consultancy services. NMCC has, since then, established consultancy relationships with many other banks both within Saudi Arabia and elsewhere, such as the Saudi British Bank (an affiliate of HSBC in Saudi Arabia) and the Saudi Hollandi Bank (an affiliate of ABN-Amro).



**Charitable and Commercial Activities**

21. I now describe, in response to Mr Newcomb's request at the meeting on August 1, my charitable and commercial activities (if any) in the locations and countries mentioned by him. I should preface my remarks by highlighting some common threads of my activities in many of the various countries. It will be seen that in some cases I have conducted in parallel both charitable and commercial activities in those countries. The reason for this is that war-torn countries are often emerging markets that can offer good investment returns for outside foreign investors albeit at relatively high risk. This is of course in addition to the humanitarian work, which is in many cases required there.

22. In the case of Bosnia and Croatia, my first involvement in these countries was of a charitable nature in Croatia in 1992. This was motivated by my concern at the humanitarian needs that existed there. Subsequently, following the Dayton Peace Accord in late 1995, I saw the opportunity for making good investment returns, and invested in business enterprises in these countries. In other cases, namely Sudan and Albania, I was part of delegations of leading Arab and Muslim businessmen visiting these countries at the invitation of the host government. In

CONFIDENTIAL: This document is subject to a Protective Order
regarding confidential information in 03 MDL 1570 (GBD),
United States District Court for the Southern District of New York.

KADI0039568

0016

the case of both Sudan and Albania. I initially became active in these countries due to their status as emerging markets and the investment opportunities that existed there. This reason for my initial introduction to Sudan and Albania was followed, in each case, by my making charitable donations and setting up charitable activities to meet what I perceived to be clear and pressing humanitarian needs in those countries.

23.   To the best of my knowledge, I have never, whether through commercial investment or charitable activities or in any other manner whatsoever, anywhere in the world, supported, or intended to support the activities of any terrorist group or individual including Osama bin Laden or Al-Qaeda.

**Muwafaq Charitable Foundation ("the Foundation")**

24.   During 1990/91, while I was working with KBM for NCB, we developed a relationship of mutual trust and respect. KBM told me that he wanted to set up a charitable foundation in memory of his parents. He suggested a name for this foundation, Muwafaq, an Arabic word which means, in essence, "Blessed Success" or "Holy Success". In this regard, I would like to point out that, like most other faiths, philanthropy is a central tenet of religious practice for all Muslims, especially the wealthy among them.

**The Foundation's purposes**

25.   The Foundation was founded as a charitable trust in Jersey by means of a Constitution and Declaration of Trust dated May 31 1992, a copy of which is at pages 3 to 15. The principal objectives and purposes of the Foundation were set out in the Constitution and Declaration of Trust. In summary the objectives and

CONFIDENTIAL: This document is subject to a Protective Order regarding confidential information in 03 MDL 1570 (GBD), United States District Court for the Southern District of New York.

KADI0039569

0017

purposes were to provide relief to and for any individual suffering as a result of natural disaster, wars, revolutions, civil unrest of any description and famine; to provide financial assistance to organisations, institutions, hospitals, research centers to improve the standards of education of health of the needy; to provide guidance and education by compiling, printing and distributing books, tapes, video tapes, newspapers, magazines and other publications and other charitable purposes. I stress that the Foundation's objectives and purposes were not in any way limited to assisting Muslims.

26.   After KBM decided to endow a charitable cause in memory of his parents, he and I identified the famine-struck people of Sudan as the first beneficiaries deserving of support. KBM and I were both deeply concerned by the famine in large parts of Sudan during the two years following the 1989 coup. Sudan is a very close neighbour of Saudi Arabia but the quality of life enjoyed by its people was so dramatically different. Both KBM and I found the sufferings of the Sudanese people particularly distressing. More generally we were also concerned at famine, poverty, lack of education and under-development amongst Muslims in the world. We determined to give some effect to our concerns by providing relief, education and the means to acquire basic skills to foster economic development. In relation to this, the Foundation was similar to many other major international charity organisations. It was our wish to make the Foundation a significant charity of international standing equivalent to many major western charity organisations in terms of scope, management and efficiency.

CONFIDENTIAL: This document is subject to a Protective Order regarding confidential information in 03 MDL 1570 (GBD), United States District Court for the Southern District of New York.

KADI0039570

0018

**The Foundation's Trustees and Constitution**

27.     There were a total of 6 trustees of the Foundation as follows:

- Myself

- Abdul Rahman bin Mahfouz (nominated and appointed by KBM), who is KBM's son and was, at the time of the formation of the Foundation, a student at University aged around 20

- Rais bin Mahfouz (also nominated by KBM), who is a distant relative of KBM, and is a medical doctor who headed the leading Al Salama Hospital in Jeddah, now named King Faisal Specialist Hospital

and the following 3 trustees nominated by me:

- Talal Badkook with whom, as explained above, I had worked closely in the late 1980's

- Dr Mohamed Ali El-Gari Bin Eid, who has a doctorate degree in Islamic Economics, and was the General Manager of NMCC who I had worked with closely in developing Islamic investment products for NCB

- Abdul Gani Al-Khariji, who is a friend and business associate of mine. I describe in more detail on page 84 below my relationship with Abdul Gani Al-Khariji.

28.     I have mentioned that KBM appointed his son, Abdul Rahman bin Mahfouz to be trustee of the Foundation. The background to this deserves explanation. Abdul Rahman bin Mahfouz was still a young man at the time, and so in appointing him

CONFIDENTIAL: This document is subject to a Protective Order regarding confidential information in 03 MDL 1570 (GBD), United States District Court for the Southern District of New York.

KADI0039571

0019

as a trustee his father acted on his behalf. I believe that KBM respected me and the way I conducted my business and charitable affairs, so much so that he repeatedly asked his son Abdul Rahman, to meet with me and see what I did and how I conducted my working life. I believe KBM had a degree of paternal respect towards me such that he felt I was somebody whom his son Abdul Rahman should emulate.



29.    It is appropriate that I explain two further points about the constitution and establishment of the Foundation. I have already mentioned that the Foundation was founded as a charitable trust in Jersey by means of a Constitution and Declaration of Trust dated May 31 1992, (see pages 3 to 15). There was no secrecy in establishing the Foundation: it was established as a charitable trust in Jersey solely as a result of advice obtained from UK accountants and a UK solicitor that the setting up and maintenance of a trust in Jersey is relatively simple and free of formality. The trustees also wished the Foundation to be based outside Saudi Arabia, and considered that if it were based in Jersey it would have an international status. It was for these reasons **alone** that the Foundation was established as a charitable trust in Jersey, and **not** for any sinister or improper motive.

30.    For the avoidance of any doubt, I should also make clear that quite separately to the Foundation, I caused in the previous year, 1991, **a** company to be incorporated in the Isle of Man under the name **Muwaffaq Limited**. This company was formed for the sole purpose of holding my interest in Shifa International Hospitals Limited a public limited company in Pakistan whose shares are traded on the Karachi stock exchange in Pakistan. Shifa International

CONFIDENTIAL: This document is subject to a Protective Order
regarding confidential information in 03 MDL 1570 (GBD),
United States District Court for the Southern District of New York.

KADI0039572

0020

Hospitals Limited is a leading hospital in Islamabad with state-of-the-art medical equipment. The name **Muwaffaq Limited** was not selected because of any connection with the Foundation. The reason I picked the same name was that I liked the name and believed it would bring me good luck. Thus, Muwaffaq Limited of the Isle of Man, has never had any connection, financial or otherwise, with the Foundation (established in Jersey) and vice versa. I believe this may be a potential source of confusion and I have set the position out in some detail in order to clear this matter up once and for all.

## The Foundation's mode of operation

31.   Although Sudan was the first country in which the Foundation was active, it subsequently operated in Pakistan, Afghanistan, Ethiopia, Somalia, Bosnia/Herzegovina, Albania, Austria and Germany. In some of the aforementioned countries, the Foundation was also registered. In addition to this the Foundation was also formally registered in the USA, and I have recently been told in Holland and Belgium, although it never operated in any of these countries. It is appropriate that I should now explain something about how the Foundation came to be registered in, and/or operated in, these countries.

32.   It was impossible for me personally to supervise either the registration formalities of the Foundation in the countries where it was registered or – in respect of the countries where the Foundation actually operated - to be involved in its day-to-day activities. For my part, I was involved in strategic decisions concerning the Foundation, for example which countries to operate in, decisions on how best to apply the Foundation's funds consistent with its charitable objects and purposes and decisions to close the Foundation in various countries. From time to time I

CONFIDENTIAL: This document is subject to a Protective Order
regarding confidential information in 03 MDL 1570 (GBD),
United States District Court for the Southern District of New York.

KADI0039573

0021

visited the countries and locations where the Foundation operated and discussed projects with local directors. I decided on budgets and received reports from local directors. It was the Foundation's policy wherever possible to recruit a local director who was, if possible, a citizen of the country concerned (or was otherwise very familiar with humanitarian work in that country) and had close ties and/or experience of working with Saudis.

### Holland and Belgium

33. I understand that the Foundation's former European director Chafiq Ayadi registered the Foundation in Holland and Belgium. Generally, the local directors closed the Foundation's offices and/or de-registered it as appropriate in response to my instructions. Until recently I was not aware that the Foundation was registered in Holland or Belgium. This is perhaps because the Foundation had no presence or operation in these countries, other than being formally registered there. My lawyers have recently discovered and had translated documents relating to the registration of the Foundation there. I note from these that the Foundation was registered in Holland and Belgium in each case for an "indefinite" period. Copies of these documents, with translations, are at pages 16 to 45.

34. I have instructed my lawyers to investigate whether the Foundation continues formally to be registered in Holland, Belgium or in any other jurisdiction and as soon as practicable to effect the de-registration of the Foundation in any jurisdictions where the Foundation's registration may, inadvertently, have been left in existence.

CONFIDENTIAL: This document is subject to a Protective Order
regarding confidential information in 03 MDL 1570 (GBD),
United States District Court for the Southern District of New York.

KADI0039574

0022

**USA**

35.    I should also explain, because confusion has arisen on this issue, that I decided
in early 1992, on the verbal advice of my ex senior business employee Osama
Halawani, to set up an office for the Foundation in Delaware, USA. At the time of
its incorporation in January 1992 I thought there might be a requirement at some
stage for humanitarian work in the USA but after registering there it became clear
to me that the focus of the Foundation's activities should be in the other
countries.    Nevertheless, Muwafaq Foundation was formally registered in
Delaware on January 14 1992.  A copy of the certificate of incorporation is at
pages 46 to 47.  Muwafaq Foundation in Delaware, USA has always remained
dormant.  No office was ever set up in the USA and the Foundation at no stage
conducted any activities there save only for the formal registration of Muwafaq
Foundation in Delaware. The present status of the Delaware company is that as
a technical matter it remains dormant.



**The Foundation's offices in Africa**

36.    The Foundation had its principal office in Sudan.  I explain below how the
Foundation in Sudan had the support and recognition of local regulatory
authorities and international funding bodies. The Foundation also had offices in
Ethiopia and, for a very limited period only, Uganda and Somalia. The
Foundation never had any operation in Eritrea, Tanzania or, as mentioned below,
in Chad. The Foundation applied to the Muslim Higher Council in Kenya for
authority to open an office there but in the event it did not open any office in
Kenya or operate there.

CONFIDENTIAL: This document is subject to a Protective Order
regarding confidential information in 03 MDL 1570 (GBD),
United States District Court for the Southern District of New York.

KADI0039575

0023

## Chad

37. On the subject of the countries in which the Foundation was registered, I am aware of allegations in the Wall Street Journal that a retired colonel in the Sudanese army, Kamal Mahgoub Al-Rasheed, claimed that the Chadian authorities suspected the local director of the Foundation of active support and funding of extremists. The allegation is completely untrue; I should say straight away that the Foundation has never had any local director in Chad, it has never operated or existed in any manner in Chad.

## Closure of the Foundation in other countries where it was operating

38. By way of further explanation of this, I would refer to pages 16 to 113 of **"YAK7"** which are the available documents relating to the registration and, where applicable, the closure of the Foundation in Holland, Belgium, USA, Pakistan, Afghanistan, Croatia, Bosnia, Albania, Germany, and Sudan.

## The Foundation's programs

39. To achieve its goals, the Foundation developed numerous programs, which I describe below specifically in relation to the countries referred to by Mr Newcomb at the meeting on August 1 2002. It will be seen however that in each case, health and education for adults and children of both sexes, Muslims and non Muslims alike were key elements of the Foundation's activities in the various countries where it operated. The Foundation's educational projects were focused to give priority to modern education following internationally accepted standards for girls and boys, women and men, Muslims and non Muslims alike. The Foundation also promoted self help programs for the poor and destitute; by way of example, in Sudan, the Foundation had numerous activities directed to helping

PCR1-180007.1

17

CONFIDENTIAL: This document is subject to a Protective Order regarding confidential information in 03 MDL 1570 (GBD), United States District Court for the Southern District of New York.

KADI0039576

0024

women whose husbands were either dead or had disappeared to enable them to earn money to provide for their families. In addition, in Sudan, the Foundation funded clinics to help women, as well as children and men, in areas struck by war. I mention this because quite clearly education for women and self help programs for women are wholly inconsistent with any religious fanaticism or extremism of any kind.

**Article in USA Today October 29 1999**

40.   I am aware of false claims published in an article in USA Today dated October 29 1999 to the effect that:-

> "... prominent businessmen in Saudi Arabia continued to transfer tens of millions of dollars to bank accounts linked to indicted terrorist Osama bin Laden, senior US intelligence officials told USA TODAY.
>
> The money transfers, which began more than five years ago have been used to finance several terrorist acts by bin Laden, including the attempted assassination of Egyptian President Hosni Mubarak in Ethiopia, the officials said.
>
> ...
>
> According to a Saudi government audit acquired by US intelligence, five of Saudi Arabia's top businessmen ordered the National Commercial Bank (NCB), the Kingdom's largest, to transfer personal funds, along with $3 million diverted from a Saudi pension fund, to New York and London banks.

CONFIDENTIAL: This document is subject to a Protective Order regarding confidential information in 03 MDL 1570 (GBD), United States District Court for the Southern District of New York.

KADI0039577

0025

> The money was deposited into the accounts of Islamic charities, including Islamic Relief and Blessed Relief, that serve as fronts for bin Laden.
>
> The businessmen, who are worth more than $5 billion, are paying bin Laden "protection money" to stave off attacks on their businesses in Saudi Arabia, intelligence officials said.
>
> ... The money transfers were discovered in April after the Royal Family ordered an audit of NCB and its founder and former chairman Khalid bin Mahfouz, US officials say."

Insofar as these allegations concern me and/or the Foundation, they are totally untrue. As I have made clear in some detail in my December 2001 submission to OFAC, contrary to the allegations in the USA Today article, the true position is as follows:

41.     The Foundation has never had any account with the National Commercial Bank (NCB). In any event, as appears from articles published in the UK and US press (the Guardian dated September 26 2001 and the Chicago Tribune dated October 28 2001 pages 114 to 121) NCB management have vehemently denied the existence of any Saudi government audit and described the allegations as "incorrect, false and frivolous".

42.     At no time have either I or, to the best of my knowledge, the Foundation ever contributed any funds or otherwise supported bin Laden or Al-Qaeda. At no time

PCR1-180007.1                           19

CONFIDENTIAL: This document is subject to a Protective Order regarding confidential information in 03 MDL 1570 (GBD), United States District Court for the Southern District of New York.

KADI0039578

0026

have either I or, to the best of my knowledge, the Foundation ever acted as a conduit or channel for funds being passed to bin Laden or Al-Qaeda. I repeat that I am an honest and law-abiding citizen of Saudi Arabia and am personally strongly opposed to terrorist activity in all forms. I consider those that support or participate in terrorism to be offensive to the Muslim faith and deserving of the most severe condemnation.



43.     It is totally untrue that the Foundation was involved in the attempt to assassinate President Mubarak of Egypt. In this regard the USA Today article repeats allegations made in 1995 in the London-based magazine Africa Confidential linking the Foundation to the attempted assassination in 1995 of President Mubarak of Egypt. I and my fellow Trustees of the Foundation were completely vindicated of these allegations in proceedings for libel which we commenced in 1995 in the High Court in London against the editor and publisher of Africa Confidential. I have already provided OFAC with details of the settlement of those libel proceedings which included Africa Confidential's agreement to pay a substantial sum to me and my fellow Trustees, their undertaking never to repeat the allegations complained of and their agreement to participate in an agreed Statement read out in Open Court before a High Court Judge in London retracting the allegation concerning the attempted assassination of President Mubarak of Egypt and apologising to me and my fellow Trustees. To reinforce how totally baseless this allegation is, I would add that earlier in the libel proceedings, Mr Justice Moses by Order dated June 30 1997 struck out that part of Africa Confidential's Defence which sought to contend that the Foundation was linked to the 1995 assassination attempt upon President Mubarak. Moreover in

CONFIDENTIAL: This document is subject to a Protective Order regarding confidential information in 03 MDL 1570 (GBD), United States District Court for the Southern District of New York.

KADI0039579

0027

striking out this part of the Defence Mr Justice Moses refused Africa Confidential permission to appeal.

**My charitable activities in other countries, both through the Foundation and other charitable activities**



**Sudan**

44.    As stated above, after KBM decided to endow a charitable cause in memory of his parents, he and I identified the neighbouring people of Sudan, many of whom were suffering from famine, as the first beneficiaries deserving of support. KBM and I were both deeply concerned by the famine in large parts of Sudan during the two years following the 1989 coup. We decided to try to give some practical effects to our concerns during the first half of 1991.



45.    The Foundation was an international, non-governmental organisation that gave priority in its activities to comprehensive development in areas struck by natural or human-made disasters, i.e. in the South, West and East of Sudan.    The Foundation's activities in Sudan were accepted and recognised by both local regulatory authorities and international funding bodies as is evident from the following documents at pages  122 to 159 to which I refer:

       45.1    A copy of an Agreement with the Government of Sudan signed by the Commissioner General for Voluntary Agencies dated April 22, 1993.

CONFIDENTIAL: This document is subject to a Protective Order
regarding confidential information in 03 MDL 1570 (GBD),
United States District Court for the Southern District of New York.

KADI0039580

0028

45.2    Various World Food Programme (WFP) documents which authorise the release of emergency food stuffs to the Foundation for delivery.

45.3    A contract between the World Health Organization (WHO) and the Foundation dated October 20,1993

45.4    A letter from the UN to the Foundation dated November 15,1994 inviting the Foundation to participate in the Country Strategy Note for Sudan concerning employment creation.

45.5    A basic agreement between UNICEF and the Foundation dated August 8, 1996.

45.6    A letter of appreciation to the Foundation from UNHCR dated August 28, 1996.

45.7    A letter from the General Commissioner of the Humanitarian Aid Commission ("HAC"), the official Sudanese Government department in charge of voluntary organisations in Sudan, to the Foundation dated October 3 1996.

46.    To achieve its goals, the Foundation developed the following programs in Sudan:

46.1    **Education:** This included formal elementary education, kindergartens, literacy education and adult education

CONFIDENTIAL: This document is subject to a Protective Order regarding confidential information in 03 MDL 1570 (GBD), United States District Court for the Southern District of New York.

KADI0039581

0029

46.2   **Health:**  This was one of the major achievements of the Foundation in Sudan.  By way of example, the Foundation's clinic at Mayo Farms in Sudan was visited and indeed commended by the Head of the Church of England, the then Archbishop of Canterbury, Dr Carey, in 1995.  In addition to a health clinic, the Foundation provided at Mayo Farms educational and social services for displaced people from southern Sudan.  Generally, the Foundation's activities in the health area included :

- curative and primary health care
- immunizations and health education
- mother and child care
- environmental health
- making available drugs in pharmacies at cost price
- co-operation with international organisations and UN agencies in the combat of indigenous diseases, for example, guinea worm and tuberculosis.

46.3   **Social Welfare Programs:**  The Foundation supported the poor and destitute by giving them training in the field of soap making, tailoring, handicrafts, leatherworks and other income generating projects.  Many of these were directed to women whose husbands were either dead or had disappeared to enable them to provide for their families.

46.4   **Agriculture:**  The Foundation supported farmers by providing them with agricultural equipment, for example tractors, discs, irrigation pumps and seeds.

CONFIDENTIAL: This document is subject to a Protective Order regarding confidential information in 03 MDL 1570 (GBD), United States District Court for the Southern District of New York.

KADI0039582

0030

46.5 **Small scale industries:** The Foundation established rural sugar cane production plants and conducted research to produce charcoal from agricultural by-products and cotton, so as to save forests from deforestation.

46.6 **Supply of drinking water:** The Foundation had an efficient well drilling machine that was established in the East of Sudan to supply drinking water for both humans and animals. This project was called the Al Raian Project which began in 1994 in the Red Sea Province of Sudan, drilling 33 fresh water wells in the south of Tokar and Port Sudan, as well as in the areas of Assaloum and Dolabyay.

I emphasise that all the aforementioned activities were directed to benefit adults and children of both sexes, Muslims and non-Muslims alike. Pupils of both sexes attended the Foundation's schools and the health clinics it funded benefited adults and children of both sexes. The Foundation's work in Sudan has been commended by many foreign visitors, dignitaries and diplomats, international relief agencies and the UN. As a mark of the esteem with which the Foundation was regarded by the international humanitarian relief community the Foundation received substantial material support from UNICEF, the World Food Programme (WFP) and other UN agencies, as well as from other international non-governmental organizations ("NGOs").

47. In 1996 I made the decision to close the Foundation in Sudan. I along with the Foundation's other trustees were fighting a major libel action in respect of the

PCR1-180007.1                                24                                    

KADI0039583

CONFIDENTIAL: This document is subject to a Protective Order regarding confidential information in 03 MDL 1570 (GBD), United States District Court for the Southern District of New York.

0031

very seriously defamatory allegations published in Africa Confidential and considering this we wished to focus our resources and time on fighting the libel action and clearing our names of the false allegations which had been published about us in Africa Confidential. Accordingly in August 1996 I instructed the Foundation's Sudanese director, Siraj El Din Bari, to close down the activities of the Foundation in Sudan. Copy documents relevant to the Foundation's closure in Sudan are at pages 112 to 113. The Foundation eventually ceased its activities completely in Sudan at the end of 1996.

48.     I now understand that under the regulations laid down by the relevant Sudanese authorities, when a charity organisation like the Foundation ceased to operate in Sudan its assets and services would be transferred to other relief agencies operating in the country. In the case of the Foundation, its assets and services were transferred with the approval of the relevant Sudanese authorities to various charitable organizations including Sub-Saharan International Development Organization ("SIDO") a totally separate organization which had been registered and operating in Sudan since 1992. Documents relating to the transfer of some of the Foundation's activities are at pages 156 to 159. I am aware that there have been false claims that since 1996 the Foundation has continued to exist under the name of this separate organisation, SIDO. These claims are completely untrue. In view of the apparent confusion concerning this issue, I shall explain the background in some detail.

49.     When the Foundation finally ceased its activities in Sudan in late 1996, its local director, Siraj El Din Abdul Bari, commenced employment, as Director General,

CDNFIDENTIAL: This document is subject to a Protective Order regarding confidential information in 03 MDL 1570 (GBD), United States District Court for the Southern District of New York.

KADI0039584

0032

of SIDO, a totally separate organization which, as mentioned above, had already been operating in Sudan for some years since February 1992.

50.   I have recently learned that Siraj El Din Abdul Bari found himself obliged to write to correct many inaccurate and misleading statements contained in the Directory of Voluntary Organisations in Sudan published by the Humanitarian Co-ordination Unit of the UN in Khartoum.   The most significant of these errors, which Siraj was obliged to correct was that SIDO was the "former Muwafaq foundation." Copies of the relevant correspondence, together with translations, are at pages 160 to 164. To clear up the confusion, Siraj clearly pointed out that the SIDO was a separate organisation and registered with the Humanitarian Aid Commission ("HAC") (the official Sudanese Government department in charge of voluntary organisations in Sudan).   For the avoidance of any doubt, the Foundation never had any part in the establishment, operation or financing of SIDO and while the Foundation existed in Sudan the 2 organizations  were entirely separate.

51.   I should stress that the source of these false claims, or alternatively the person who has mainly promoted and amplified them, is Mr Patrick Smith, the Editor in Chief of Africa Confidential. The false claims which I believe Mr Smith has been responsible for promoting are to the effect that the Foundation has continued its activities in Sudan and elsewhere after closure at the end of 1996. These claims are totally untrue.   I have already referred to similar false claims made in the press that the Foundation existed in Chad.   Once again, this is totally untrue because the Foundation has never existed, operated, registered or worked in any manner in Chad.

PCR1-180007.1                                    26

CONFIDENTIAL: This document is subject to a Protective Order
regarding confidential information in 03 MDL 1570 (GBD),
United States District Court for the Southern District of New York.

KADI0039585

C033

## Pakistan

52.    I first visited Pakistan with my maternal uncle, Dr Mohammed Omar Zubir, in
       about 1988. Between 1988 and 1990 we visited Pakistan 3 or 4 times. At that
       time there were, as a result of the Soviet occupation of Afghanistan, a great
       many Muslim refugees entering Pakistan from Afghanistan, in particular in the
       area near the city of Peshawar in the North West Frontier Province (NWFP) of
       Pakistan.

## Amir Mehdi

53.    As a result of this in 1992, I established a regional office of the Foundation in
       Islamabad, Pakistan with the approval of the Government of Pakistan. The local
       director of the Foundation in Pakistan was Amir Mehdi. I first met Amir Mehdi in
       the following circumstances. From his own contacts Amir Mehdi ascertained that
       I was staying in Islamabad and was looking to appoint a local director to
       supervise and manage the Foundation's charitable activities in Pakistan and
       Afghanistan. He telephoned me asking for an appointment to see me stating his
       objective to gain work and employment in the charitable sector. I interviewed him
       and found he had Pakistani nationality, a good knowledge of the area and
       knowledge of Arabic language. He provided the name of his brother Saleh
       Hassan Mehdi as a reference who was then living in Saudi Arabia and whom I
       knew. My office contacted Saleh Hassan Mehdi and obtained a good reference
       for Amir Mehdi. Accordingly I hired Amir Mehdi for the job. Subsequently the
       Foundation was registered in the City of Peshawar on August 13 1995 as
       appears from page 52.



CONFIDENTIAL: This document is subject to a Protective Order
regarding confidential information in 03 MDL 1570 (GBD),
United States District Court for the Southern District of New York.

KADI0039586

0034

54.   Through the Foundation's offices in Peshawar and Islamabad it implemented
various projects including:

- Tajik Relief Project for the provision of food aid and other relief to Tajik
  refugees following the civil unrest in Tajikistan

- Qurbani Project for the distribution of food aid to the poor and needy in
  Pakistan and Afghanistan on the occasion of Eidu Al Adha (the great feast
  for Muslims)

- Iftaar Saim (breaking of fast at sunset during the month of Ramadan) for
  the distribution of food to poor Afghan refugees in Pakistan and local poor
  Pakistanis for them to break their fast during the 30 days of the month of
  Ramadan.

- Muwafaq International School which provided English education to the
  poor children in Peshawar as supervised by the education department of
  the Government of North West Frontier Province (NWFP) and under their
  registration

- High Institute of Islamic Education which imparted education to the poor
  for classes 13 and 14 in accordance with the syllabus and curriculum
  approved by the University of Peshawar in the NWFP

- Pesh Imam courses and teacher training institute for the training of
  teachers in modern educational techniques

- Samarra Farm, an income generation project for rearing buffaloes for milk
  and distributing milk to the households in the City of Peshawar to
  generate a source of income

CONFIDENTIAL: This document is subject to a Protective Order
regarding confidential information in 03 MDL 1570 (GBD).
United States District Court for the Southern District of New York.

KADI0039587

0035

- Medical clinic in Peshawar, Tajabad Nasir-Bagh area, out patient medical facility for non-critical, and short-term ailments, immunization programs of Government of NWFP and first aid

- Muwafaq Computer Training Centre for software applications training, database programs and secretarial training.

**Shifa International Hospitals Limited Islamabad ("Shifa")**

55.    Shifa is a public limited company, shares in which are traded on the Karachi stock exchange. Shifa was incorporated in Islamabad, Pakistan, on September 29 1987. The activities of the company are the provision of medical and surgical services for in-patients and out-patients.

56.    While the hospital was under construction (i.e. while building work was in progress) the project needed further capital for completion of building works and equipment. Shifa was at that time seeking to source further direct foreign investment in the project.

57.    The incumbent Government in Pakistan at the time had implemented legislation to open up the economy with a view to attracting foreign investors. Simultaneously around the world, the emerging markets were performing well and at this time the Pakistan Stock Exchanges were also showing some solid growth.

58.    Accordingly in 1991 and with a view to sourcing further foreign investment the sponsors of Shifa made a presentation to me. During the presentation, it was highlighted that one aspect of the project was its commercial viability, but another

CONFIDENTIAL: This document is subject to a Protective Order
regarding confidential information in 03 MDL 1570 (GBD),
United States District Court for the Southern District of New York.

KADI0039588

0036

important aspect was to attract foreign qualified technical and professional expatriate Pakistanis back into Pakistan in order to reverse the so called "brain drain." The presentation was conducted by Dr Zaheer Ahmed, a US citizen, who is also a medical doctor.

59.     Following this presentation I participated in the project through an off-shore company, Muwaffaq Limited incorporated in the Isle of Man.   My strategic intention at the time was that I would exit at the time of an initial public offering or alternatively, through a private placement when the project matured.

60.     Since then, the hospital has become fully operational and is a multi-speciality healthcare institution, which provides the highest quality medical care to patients by an outstanding team of healthcare professionals.   It is in fact one of the leading hospitals in Pakistan with state-of-the-art equipment and medical facilities. It was identified as the hospital to be used in case of emergency by both US President Clinton on the occasion of his visit to Pakistan in March 2000 and by US First Lady Mrs Hillary Clinton on the occasion of her visit to Pakistan in 1995. It has also been on standby on many occasions routinely during the visits of international dignitaries such as the Prime Minister of Japan, President of South Africa Nelson Mandela and others.   The hospital also provided emergency care to the victims of the Islamabad church blast on March 17 2002 when more than 32 patients received emergency treatment there.

61.     Muwaffaq Limited owns some of the shares of Shifa, which are fully paid, issued and subscribed.   I no longer own any shares in Muwaffaq Limited.   However, Shifa's Board of Directors requested me to stay on their Board because, they

CONFIDENTIAL: This document is subject to a Protective Order
regarding confidential information in 03 MDL 1570 (GBD),
United States District Court for the Southern District of New York.

KADI0039589

0037

said, it was an honour for them to retain me as being one of the earliest investors, and they wanted to maintain continuity in board policies and direction. I decided to resign from the Board of Directors of Shifa on June 21 2002, after the allegations against me following September the 11th, in order to avoid causing embarrassment to my fellow board members.



62. Other shareholders in Shifa include Koninklijke Phillips Electronics N.V. and local banking and financial institutions that underwrote the share issue at the time of the initial public offering.

**The arrest of Amir Mehdi**

63. On March 21 1995 the Pakistan Government raided the local offices of the Foundation in Islamabad. Subsequently, the officials of the FIA (the Pakistan security services) arrested Amir Mehdi on March 29 1995. It should be noted that around this time the FIA also conducted raids and targeted other Muslim charities working in Pakistan with refugees. The FIA subsequently detained Amir Mehdi. The detention period was then extended by order dated April 20 1995 for another period of 30 days.

64. It appears that Amir Mehdi was arrested without any information from the FIA as to the grounds of his arrest. Subsequently, he was informed that telephone numbers including a telephone number installed at his residence had allegedly been used for contact by associates of terrorists operating in Pakistan and abroad. The Pakistan authorities put forward no evidence to establish any link between Amir Mehdi and terrorism, the proceedings against him were

CONFIDENTIAL: This document is subject to a Protective Order regarding confidential information in 03 MDL 1570 (GBD), United States District Court for the Southern District of New York.

KADI0039590

0039

discontinued and he was released.    At no time have I ever been aware of any link or connection between Amir Mehdi and any terrorist activity. I am not aware of any evidence or grounds to support the allegations made by the FIA which were, as I have explained, not pursued, and the criminal proceedings against Amir Mehdi were discontinued.

65.    Amir Mehdi's employment was terminated following his release and his deputy served as acting director. In March 1997 I gave instructions to my lawyers and accountants in Pakistan to close the Foundation in Pakistan. The Foundation was closed in April 1997. Copy documents relating to this are at pages 53 to 57.

**Afghanistan**

66.    In addition to Pakistan, the Foundation set up offices in Afghanistan in 1992 for implementing humanitarian projects and co-ordinating with other relief agencies. The basic objective was to provide financial or material assistance to organizations, institutions or centres to improve the standards of health care, education and relief to civilians suffering from dislocation. In Afghanistan the Foundation supported the following projects:

66.1    **Mosab Bin Umair School** in Kabul, an orphanage for Afghan orphans;

66.2    **New Kabul Refugees project** in Nanhangar province,for the resettlement and distribution of food aid to displaced persons due to civil war in Afghanistan;

66.3    **Mother and Child Clinic** in Jalalabad, for the provision of out-patient medical care, pre and post natal and paediatric care. The Foundation also provided aid to UNICEF in Jalalabad;

CONFIDENTIAL: This document is subject to a Protective Order regarding confidential information in 03 MDL 1570 (GBD), United States District Court for the Southern District of New York.

KADI0039591

0039

66.4   **Muhammed Bin Amin School in Kunar**, a primary school for Afghan children teaching in dari (Persian), Pushto languages, basic primary sciences, reading and writing, mathematics, calligraphy, sports and social responsibility;

66.5   **Rehabilitation Centre of Afghan Women in Jalalabad** for training in income generation skills such as sewing, embroidery, soap making and farming to support and supplement the family incomes.

**Bosnia and Croatia**

67.   As is widely known, during the early 1990's there was enormous concern at the plight of Muslims in Croatia and Bosnia. There was naturally considerable desire and incentive among both Muslim and non-Muslim humanitarian organisations and governments around the world to provide relief to Muslims in this area. When I first visited Croatia, during the early 1990's, some Muslim relief organizations had already established themselves there, for example, International Islamic Relief Organisation ("IIRO"). In addition to this, the United Nations High Commission for Refugees ("UNHCR") had also started work for refugees in the area. In 1992, in response to appeals from world humanitarian agencies, I decided to register the Foundation in Zagreb.

68.   I registered the Foundation's first office in Zagreb with the Croatian Ministry of Foreign Works on November 10 1992. This was followed approximately a year later with an office in Sarajevo, Bosnia, which was registered with the High Court in Sarajevo on October 22 1993. Further offices followed in 1994-95 in Konjic, Zenica, Tuzla, Mostar, Jablanica and Kladusa in Bosnia and Split in Croatia.

CONFIDENTIAL: This document is subject to a Protective Order regarding confidential information in 03 MDL 1570 (GBD), United States District Court for the Southern District of New York.

KADI0039592

0040

Zagreb was the head office until its closure in 1996. Thereafter Sarajevo was the head office until I gave instructions on March 1 1997 for the ceasing of all activities not yet implemented, to establish a committee to review all ongoing projects and to consider transferring these to other NGOs. The closure of the Bosnian offices, which included applications to the Bosnian Court for approval of the de-registration of the Foundation's offices in Bosnia, ran through to 1998 as will be noted from pages 87 to 94. Each office was headed by a director with, above them all, a general director. From 1992 until 1996 this was Chafiq Ayadi.

**Chafiq Ayadi**

69.   At this juncture, it is appropriate that I should explain my relationship with Chafiq Ayadi as he is an individual who has also been listed as a Specially Designated Global Terrorist ("SDGT") by the US Department of Treasury on October 12 2001 and designated by the United Nations as associated with Osama bin Laden. Moreover the UK Treasury allege, on the basis of information provided by their US counterparts, that I have an association with Mr Ayadi.

70.   I was first introduced to Chafiq Ayadi in Zagreb, Croatia, by Waa'el Julaidan in around 1992 in the following circumstances. Waa'el Julaidan had previously been head of the Saudi Red Crescent, an organization equivalent to the Red Cross, and was in 1992 involved in refugee relief work in Croatia. He assisted me to establish an advanced teachers' college in Zagreb for helping women refugees to become teachers. He nominated Chafiq Ayadi for the management of this college and introduced me for the first time to Chafiq Ayadi. Waa'el Julaidan recommended Chafiq Ayadi highly for his experience and his ability in the area of humanitarian work for refugees and for his honesty.

CONFIDENTIAL: This document is subject to a Protective Order
regarding confidential information in 03 MDL 1570 (GBD),
United States District Court for the Southern District of New York.

KADI0039593

0041

71.    I repeat that Chafiq Ayadi was an employee of the Foundation, employed as director in charge of the Foundation's European activities from late 1992 until March 1996 all of which, I should stress, were directed solely to providing relief and assisting refugees from Bosnia and Croatia.  The Foundation had no other purpose in Europe other than to assist Bosnian and Croatian refugees.



72.    My UK lawyers have made numerous requests to the UK Treasury for details of the allegations against Chafiq Ayadi but they have declined to say any more on this subject than merely that I have an association with Mr Ayadi and that he is an individual designated by the UN as a person associated with Osama bin Laden. My solicitors have examined an enormous quantity of documents and have interviewed a number of witnesses including former employees of the Foundation in connection with the Foundation's activities in Bosnia and Croatia and have found no evidence whatsoever that any transaction benefited Osama bin Laden, Al Qaeda, or any other terrorist activity or group.



73.    It may also assist if I recount my understanding of the circumstances as described by Chafiq Ayadi of his kidnapping in 1994 by the Serb forces and his detention for a period of several weeks.  During that time he was questioned by his captors who told him that they knew that he and the Foundation were not connected to Arab combatants and they knew that the Foundation was a genuine relief agency.  I understand from Chafiq Ayadi that their grievance was that the Foundation was providing relief only for Muslims, and not for Serbs.  Accordingly they requested a ransom for his release which I agreed to pay, thus securing his release.   I believe that had the Serbs had any suspicions that Chafiq was

CONFIDENTIAL: This document is subject to a Protective Order
regarding confidential information in 03 MDL 1570 (GBD),
United States District Court for the Southern District of New York.

KADI0039594

0042

connected to Arab fighters, Chafiq would not be alive today. In this regard the UNHCR was instrumental in helping to secure the release of Chafiq Ayadi. I refer to a letter from the UNHCR to various NGOs in Bosnia dated June 4 1994, a copy of which is at page 164.

**FBIS article dated July 31, 1995**

74.    I am aware of false claims that the "Muwafaq Society in Zagreb" belonged to bin Laden. These claims are totally untrue. These claims have been made in an article in Foreign Broadcast Information Service ("FBIS") dated July 31 1995, at pages 165 to 168, a copy of which has been supplied to my lawyers by the UK Treasury as part of their purported evidence against me.

75.    Contrary to the allegations in the FBIS article:-

75.1    The Foundation has at no time been a member or branch organisation of Human Concern International Society.

75.2    The "Muwaffaq Society in Zagreb" referred to in the FBIS article is not the name of the Foundation founded by me and my fellow Trustees. At pages 61 to 94 are documents relating to the Foundation's operation in Bosnia and Croatia in which the Foundation is referred to as Muwafaq Foundation or Fondacija and nowhere is it referred to as Muwaffaq Society. My lawyers have investigated whether a society by any such name exists in Zagreb, and their conclusions have been negative.

CONFIDENTIAL: This document is subject to a Protective Order regarding confidential information in 03 MDL 1570 (GBD), United States District Court for the Southern District of New York.

KADI0039595

0043

Additionally, as I have already asserted in my first submission to OFAC dated December 2001, and for the reasons explained below, I have grave doubts as to whether the so-called interview with bin Laden ever took place.

76.    It is clear on the face of the FBIS article that the alleged interview with bin Laden lacks any degree of credibility at all. As would be apparent to any critical reader the so-called interview with bin Laden must be of highly doubtful authenticity for the following reasons:-

76.1    The "source date" of the FBIS article is stated as July 31 1995 and yet it purports to be based on an interview with Osama bin Laden published in the Egyptian Arabic language publication Rose Al -Yusuf nearly a year later, on June 17 1996.

76.2    The FBIS Article alleges that the interviewer Fayizah Sa'd interviewed bin Laden in London at a "luxury villa in Wembley, North London."

76.3    By February 1994 bin Laden had already been stripped of his Saudi nationality and was a well-known supporter of Islamic terrorist causes. It is highly unlikely that such a high profile terrorist would have been granted an entry visa and actually visited the UK.

77.    Quite apart from the above, the FBIS article is inherently implausible in several important respects. Bin Laden is quoted as saying he was born in Mecca, Saudi Arabia and is 44 years old. However according to the Interpol website (www.interpol.int) at page 169 bin Laden was born in Jeddah on March 10 1957,

CONFIDENTIAL: This document is subject to a Protective Order
regarding confidential information in 03 MDL 1570 (GBD),
United States District Court for the Southern District of New York.

KADI0039596

0044

and so would have been 38 or at most 39 if the interview took place in 1996 and even younger if it had taken place any earlier.

78.   In the FBIS article the interviewer alleges (on page 167) that bin Laden was one of the founders of the Human Concern International Society "with the help of Iranian government and the CIA". The interviewer also quotes bin Laden as saying he is "on a mission for the US Embassy in London" which also seems inherently unlikely.

79.   In addition to this, if bin Laden had visited London and been interviewed in the 1990s, as has been alleged in the FBIS Article, I would expect this to have been reported by one or more of the leading London-based Arabic language newspapers. They have not reported on any such visit or interview by bin Laden.

80.   Given the inherent lack of credibility of the FBIS Article, and the highly doubtful authenticity of the so-called interview with bin Laden, the FBIS Article is a totally unreliable document and provides no proper basis for the maintenance of sanctions against me.

The Foundation's activities in Bosnia and Croatia

81.   As part of establishing the Foundation in Zagreb, I purchased 6 flats in the city. These were used as offices and as centers for the education courses run by the Foundation, which I describe below. As foreign individuals and organisations were not permitted to own property in Croatia, the flats were purchased in the name of a local Islamic center, Islamska Zajednica, which organised an Islamic school in Zagreb and with which the Foundation worked. During the period 1992-

CONFIDENTIAL: This document is subject to a Protective Order
regarding confidential information in 03 MDL 1570 (GBD),
United States District Court for the Southern District of New York.

KADI0039597

0045

96, the Foundation used all 6 flats for its own activities but from 1997, the Foundation allowed Islamska Zajednica to use 4 of the flats, rent free, as student housing. In 2001, after the Foundation had ceased all its activities in Croatia, I donated the 6 flats to Islamska Zajednica. I am aware of claims which have been made that one or more of these flats was used as temporary accommodation for Arab fighters in Zagreb and/or for the purpose of storing weapons for them. To the best of my knowledge, this allegation is totally untrue. In any event, I have never allowed or authorised any such activities, and I have never seen any evidence to support these claims. I believe it stretches credulity that there were any Arab fighters in Zagreb because it is well known that at the time the Croatian authorities were extremely hostile to Arab Muslims.

82.    In 1992-93 when the Foundation's first offices were opened, the war in the former Yugoslavia was at its height. Serbian forces had taken control of large areas of Croatia and Bosnia and large numbers of people, mainly Bosnian Muslims, had been forced to leave their homes. The UNHCR has estimated that 1.2 million persons fled Bosnia as a result of the conflict and 1.3 million persons were internally displaced. The Foundation was a major contributor to the international humanitarian effort which was needed to keep these individuals alive. In the early days of its operation in Bosnia/Croatia a very important aspect of the Foundation's activities was the supply of basic necessities to refugees and "displaced persons". The Foundation supplied food, blankets and clothes to refugee camps. Some goods came in the form of contributions from the Foundation's offices in Germany and Austria, which were established in order to organise the collection of donations. In the main, however, the Foundation purchased goods for distribution. In relation to this most basic form of aid, which

CONFIDENTIAL: This document is subject to a Protective Order
regarding confidential information in 03 MDL 1570 (GBD),
United States District Court for the Southern District of New York.

KADI0039598

0046

was intended literally to help people survive, I refer to the document entitled "Results and Achievements" of the Foundation's Balkans offices dated March 1995, a copy of which is at pages 170 to 183.

83.   To assist with the effective distribution of goods, the Foundation purchased trucks. By 1995 the Foundation had a small fleet of trucks, many of which were registered with UNHCR, issued with UNHCR number plates and made available to that body for the transportation of aid, including hospital equipment. To assist in this project the Foundation received contributions of fuel, oil, tires and other vehicle equipment from UNPROFOR, the United Nations Protection Force.

84.   The Foundation worked closely with UN organisations throughout this period. Representatives of the Foundation attended the regular inter-agency meetings held by UNHCR and approximately 30 of the Foundation's staff including myself were issued with UNHCR identity cards. The UNHCR made available to the Foundation all of their facilities to enable the Foundation to carry out its relief work in Bosnia and Croatia. Aside from UNHCR identity cards, these facilities included bulletproof jackets, free travel on board UN flights to and from Bosnia, UNHCR car registration plates, fuel and meals for the Foundation's staff who were travelling as well as financial assistance for the Foundation's Bosnian projects. The Foundation also worked with IFOR, the NATO Implementation Force and it had extensive links with other NGOs in Bosnia/Croatia.

85.   When the Foundation first set up its offices in Bosnia/Croatia the refugee situation was desperate, as described above. This meant that the urgent and immediate priority was the provision of emergency relief. Aid in the form of food

CONFIDENTIAL: This document is subject to a Protective Order
regarding confidential information in 03 MDL 1570 (GBD),
United States District Court for the Southern District of New York.

KADI0039599

0047

and clothing remained extremely important but as the Foundation became more established it also began to concentrate on regenerating projects designed to assist in the rebuilding of the countries, including food production programs, dairy and poultry farms, fish farms and crop projects.

86. In addition to this, the Foundation supported medical institutions, and also supported educational projects. The Foundation's investment in adult education included establishing technical centers for women, and the provision of skills-based courses and other courses such as languages, physics and computing. Many hundreds of students benefited from attending these courses, which were run from each of the Foundation's offices. The Foundation also supported education in other ways, for example through sponsorship of numerous schools in Bosnia.

87. In addition to all of the above, the Foundation founded its own private school, in Sarajevo. The school, originally named Muwafaq School, but now renamed Risala School, was set up in October 1996. This was a significant project, which entailed a great deal of preparation and planning. The Foundation purchased and completely renovated a derelict and bomb damaged building for the school. This was ready for use by the school in September 1998, which until then had occupied temporary premises. The standard of teaching is extremely high: in the academic year 2001-02, the school won first place in the public examinations in Bosnia-Herzegovina and was rated the best among the 58 schools in the country by the Bosnian Ministry of Education.

CONFIDENTIAL: This document is subject to a Protective Order regarding confidential information in 03 MDL 1570 (GBD), United States District Court for the Southern District of New York.

KADI0039600

0048

88.   In 1998 when the Foundation closed its activities, it handed over the running of
      the school to Risala d.o.o, a Bosnian corporation in which I own a majority
      interest, and which was set up for this purpose. Until my assets were frozen, I
      continued to support Risala each year, meeting the shortfall between its costs
      and the fees paid by parents.

89.   In addition to all of the above, the Foundation, until its closure in 1998, promoted
      social and cultural activities.  It made donations to a large variety of small
      projects.  It also contributed to an organisation called Nahla which was a
      community center for Bosnian women which had a gym, library and other
      facilities for women.  The Nahla center was visited last year by the wife of the US
      Ambassador who commended its work.

90.   Quite apart from the Foundation, I also supported and was a board director of Al
      Haramain Wa Al Masjed Al Aqsa Charity (the two holy shrines and the Aqsa
      Mosque Charity), which was registered in Saudi Arabia and had a branch in
      Sarajevo. I was invited to join this charity by its chairman Mahmood Taiba who is
      related to me. This charity was authorised to perform the following: Al-Walidein-
      Gazzaz primary school for children who had lost their father or both parents and
      the financing and supervising of Dar Al Walidein (a home for up to 320 children
      and single mothers  who had lost their husbands/fathers as a result of the war in
      Sarajevo). I stress this institution has no connection with the totally separate
      charity with a similar name, Al Haramain, which has been listed by the US
      Government. I confirm for the avoidance of doubt, that I have never had any
      connection whatsoever with Al Haramain, the charity listed by the US
      Government.  Indeed, Al Haramain Wa Al Masjed Al Aqsa was investigated by

CONFIDENTIAL: This document is subject to a Protective Order
regarding confidential information in 03 MDL 1570 (GBD),
United States District Court for the Southern District of New York.

KADI0039601

0049

the Bosnian Government, its accounts were frozen in April 2002 and on July 1 2002 the Bosnian authorities took a decision, having investigated the matter fully, unconditionally to unfreeze the charity's accounts.

## My introduction and first visit to Albania

91.   In 1991/1992 the political and economic circumstances in Albania underwent a radical transformation; years of communist rule came to an end and, following a general election held in March 1992, the Democratic Party won a landslide victory with over 65% of the popular vote.   With this change in the political climate, Albania underwent a difficult transition from a centralised communist system to a more open-market economy.   Albania's economy rebounded in 1993/1995 after a severe depression accompanying the end of the previous communism-based system. I now  explain how I first visited that country in 1993.

92.   In 1993, I participated in the 1st Muslim-Albanian International Investment Conference held in Tirana, Albania.  I was invited with a number of other leading Saudi Arabian businessmen to participate in this conference hosted by the Albanian Government and sponsored by the Islamic Development Bank ("IDB"). The conference was held in the Albanian Government's Palace of Congress.  It was opened by the Albanian President and attended by senior members of the Albanian Government, including, in addition to the President, the Prime Minister and Finance Minister. The purpose of the conference was to encourage foreign investment in Albania.

93.   By way of background, the IDB is an inter-governmental Muslim financial institution the purpose of which is to foster the economic development and social

CONFIDENTIAL: This document is subject to a Protective Order regarding confidential information in 03 MDL 1570 (GBD), United States District Court for the Southern District of New York.

KADI0039602

0050

progress of member countries and Muslim communities individually as well as jointly in accordance with the principles of Shari'ah law, i.e Islamic law. The present membership of the IDB consists of 54 Muslim countries. The IDB's principal office is in Jeddah.

94.   I recall that the other leading Saudi businessmen attending the conference included Dr Abdu Yamani and the chairman of IDB Dr Ahmed Mohamed Ali. I remember that, as in the case of my visit to Sudan, the Saudi delegation, including myself, attended the conference together.

**Dr Abdul Latif Saleh**

95.   At the conference I met, for the first time, **Dr Abdul Latif Saleh**, a Jordanian medical doctor. In recognition of Dr Saleh's excellent work in Albania, both in the Tirana Polyclinic and more generally in the health field within Albania, in October 1992, the Albanian Government granted him Albanian citizenship to reflect its appreciation for his positive role in the transitory period of Albania following the end of communist rule there. I now provide some background information on Dr Saleh, which he has provided to me concerning himself, as he is an important figure in my account of my activities in Albania.

96.   In the period immediately after the collapse of communism, there had been no NGOs working in Albania for some 40 years. Dr Saleh was in 1992 appointed medical supervisor of the Tirana Polyclinic (the central Polyclinic in Tirana) which was at that time run by the largest Saudi Arabian charity, the International Islamic Relief Organisation, otherwise known as the IIRO. (I mention in passing that it was Dr Saleh's excellent local contacts in Albania and knowledge of the country,

CONFIDENTIAL: This document is subject to a Protective Order regarding confidential information in 03 MDL 1570 (GBD), United States District Court for the Southern District of New York.

KADI0039603

C051

in addition to his experience of working with a Saudi organisation, the IIRO, that later in 1993 caused him to be of interest to me as a business associate). During the period 1992-1993, Dr Saleh succeeded in turning this Polyclinic around so that it became widely known as the best medical facility of its kind in Albania and for the excellence of its medical care and services.

97. The United Nations Development Program ("UNDP") initiated a forum for all NGOs working in Albania, both Albanian and foreign. During 1993/1994 Dr Saleh was twice elected, by the foreign and Albanian NGO's attending, as chairman of the NGOs' forum in Albania. Under Dr Saleh's chairmanship, this NGOs' forum achieved recognition by the Albanian Government. For a period of 1 year he ran the office of the forum jointly with the American Catholic Relief Service. His outstanding work as representative of NGOs in Albania caused him to be selected to represent them before the European Council. Dr Saleh was commended by the UNDP for his humanitarian works in Albania. In addition to this he was appointed in 1993 as advisor to the Albanian Government's Ministry of Health.

98. To understand why Dr Saleh was attending the IDB conference, it is necessary to explain that at that time in Albania there were only 3 embassies; and even those were headed by Chargés d'Affaires. None of them was Saudi Arabian. Dr Saleh's work at the Tirana Polyclinic, and his other work in Albania, had made him well known. The Polyclinic was, as I have mentioned, funded by the IIRO, which was at the time the largest Saudi Arabian charity in existence. The Chief of Protocol to the Albanian President invited Dr Saleh to attend as an observer

CONFIDENTIAL: This document is subject to a Protective Order
regarding confidential information in 03 MDL 1570 (GBD),
United States District Court for the Southern District of New York.

KADI0039604

0052

because of his excellent knowledge of conditions in Albania and his experience in his work for the IIRO.

99.    In November 1999, Dr Saleh, to my surprise, was deported from Albania notwithstanding that 7 years previously he had been granted Albanian citizenship. He was given one hour's notice to leave the country with his family, and young children. Dr Saleh now resides in Jordan. He has never been informed of any reason for his deportation, despite his commencing a Court action in Albania challenging his deportation and despite his numerous requests for details of the allegations against him. Dr Saleh has written to the US Ambassador in Albania seeking clarification and expressing his readiness to meet with the US authorities anywhere in the world and to answer any questions regarding his activities.

100.    So far as I am aware, Dr Saleh has a clean record. Neither I, nor so far as I am aware Dr Saleh himself, has any knowledge of why he was deported in November 1999, or any information as to the allegations against him. This is even more difficult to understand in light of the excellent working relationship Dr Saleh enjoyed throughout his time in Albania with American relief agencies, including the American Catholic Relief Service, US Aid, the American Relief Service, and other western agencies including the United Nations High Commission for Refugees ("UNHCR") and UNDP. In Dr Saleh's most recent talks with my lawyers he has in fact renewed his calls to be interviewed by the US authorities.

CONFIDENTIAL: This document is subject to a Protective Order regarding confidential information in 03 MDL 1570 (GBD), United States District Court for the Southern District of New York.

KADI0039605

0053

101. Since OFAC listed me on October 12 2001, I have tried to find out more about the Albanian Government's decision to deport Dr Saleh. I can only attribute this to what one Western reliable source has told me is a case of mistaken identity. I believe that Dr Saleh has been confused with an Egyptian citizen of the same name who was extradited by the Albanian authorities to Egypt where he was imprisoned for allegedly being a member of the **Jihad Group**. I have never met or had any dealings with this other Abdul Latif Saleh, nor did I even know of his existence until my lawyers told me about him.

102. So far as I am aware from my long relationship with Dr Saleh he is a peaceful man and is not the type who would ever become involved with extremism or terrorism in any form.

## Albania

103. Before I describe my activities in Albania it is necessary to understand that in 1996/97 economic conditions in Albania changed for the worse. This was caused by two factors: first, a weakening of government resolve to maintain stabilization policies in the election year of 1996, which contributed to renewal of inflationary pressures. Secondly, a substantial portion of Albania's population had invested in financial pyramid schemes, which collapsed in early 1997 triggering severe social unrest, many deaths and widespread destruction of property. I make it clear that I had nothing whatsoever to do with the financial pyramid schemes in Albania.

CONFIDENTIAL: This document is subject to a Protective Order regarding confidential information in 03 MDL 1570 (GBD), United States District Court for the Southern District of New York.

KADI0039606

C054

104.  After I started commercial activities in Albania, in conjunction with Dr Saleh. In late 1994 I asked Dr Saleh to register the Foundation in Albania. The activities of the Foundation in Albania included:

**Building and running community centers and Mosques in Kukes, Krome and Tirana:**

105.  During the communist rule, many Mosques, along with other aspects of Islamic religious culture were obliterated. To regenerate Islamic communities following the collapse of communism, the Foundation built, furnished and equipped Mosques and community centers. The Foundation did this at the request of official religious leaders in Albania.

106.  Kukes and Krome are in the northern part of Albania, near the border with Kosovo. At the request of the Albanian Government, I decided that the Foundation should carry out relief work in this area because at that time, in 1994, it was extremely poor, and there were no humanitarian agencies working there and there was a pressing need for relief work. By an agreement dated February 2 1994 between the General Mufti of Albania and the President of the Islamic Call Society and the Director of Muwafeq Foundation Albania, a copy of which is at pages 184 to 186 together with a translation, the Foundation was requested, amongst other things, to build and renovate community centers in Kukes, and Krome, and Tirana, a Mosque in Bajaram Curri and ten small Mosques in the villages of the provinces of Kukes, Bajaram Curri, and Dhe Has, to sponsor Imams and staff and to pay their salaries.

CONFIDENTIAL: This document is subject to a Protective Order regarding confidential information in 03 MDL 1570 (GBD), United States District Court for the Southern District of New York.

KADI0039607

0055

107.    For the purpose of building Mosques and community centers in Kukes and Krome, the Government or local municipality donated land to the Foundation. It was also agreed that the Foundation would pay for the costs of furnishing and equipping these community centers and Mosques. Ownership of the Mosques was in each case upon completion transferred to the local Muslim community. In both Kukes and Krome the Foundation built and ran a Mosque, community center and annexed shops. In Tirana, the Foundation built and ran a womens' center, with a Mosque attached to it, called Al Xhora, on land which was donated by a local businessman. These Mosques and community centers were all completed in 1997, before the troubles in Kosovo, but due to the unstable circumstances prevailing in Albania in 1997 following the financial pyramid selling crisis, to which I have already referred, it was not possible for the Foundation to furnish or equip these projects fully.

**Classes and seminars**

108.    In the Al Xhora community center the Foundation provided classes in languages and computers and secretarial classes. The Al Xhora center was established in 1995 and upon completion of its construction was run by the FLS (Fountain of Life and Science Foundation), a local Albanian foundation founded by Dr Saleh. The Al Xhora community center is still in existence. It is run by local qualified staff. About 1,000 women attend the Al Xhora center every year and a total of 5,000 women have graduated from Al Xhora. In addition to this, the Foundation arranged and sponsored a training course for NGOs in 1994/95 bringing an expert from the UNDP to address a seminar for NGOs in Tirana which lasted 2 to 3 days.

CONFIDENTIAL: This document is subject to a Protective Order
regarding confidential information in 03 MDL 1570 (GBD),
United States District Court for the Southern District of New York.

KADI0039608

0056

**School:**

109. In Kukes there used to be a school which the Foundation supported financially. The school was monitored by the local Albanian education department based in Kukes and was run according to the same educational curriculum as other government schools in Albania. All the staff employed at the school were local Albanians, apart from one Arabic language teacher. Following the financial pyramid selling crisis in 1997, which I explain above, the school was looted, stripped of all equipment and furniture and closed down. Subsequently, Dr Saleh, at the request of the Albanian Ministry of Education, restarted the school but due to lack of finance it closed down again after about 1 year.

110. In all its activities, the Foundation co-operated and co-ordinated closely with the relevant Albanian Government authorities and international relief agencies. The Foundation, like other NGOs, signed a Memorandum of Understanding with the Albanian Ministry of Labor. In fact, all the Foundation's projects in Albania were requested or approved by the official authorities in Albania. On March 1 1997, I instructed the local Foundation staff by letter, copy of which with a translation is at pages 95 to 96 to cease all activities not yet implemented in Albania, to establish a committee to review all ongoing projects and to consider transferring these to other NGOs. The Foundation eventually ceased all its activites in Albania in July 1997.

111. In addition to the Foundation, in Albania, I supported the following charitable activities:

111.1 **FLS (Fountain of Life and Science Foundation):** As mentioned above, the FLS was a local Albanian foundation founded by Dr Saleh in 1995/96.

CONFIDENTIAL: This document is subject to a Protective Order
regarding confidential information in 03 MDL 1570 (GBD),
United States District Court for the Southern District of New York.

KADI0039609

0057

The FLS published educational calendars, pocket diaries and periodical magazines, which included information on such matters as science, history, the dangers of drugs and AIDS. The diaries included a quote or statement for each day designed to promote good social practices and universal understanding. In some cases these quotes were by Arabs and in other cases by Westerners. These publications were very popular as the Ministries, Local Authorities, Universities and Schools of Albania used to place advance reservations to ensure their orders were met. The FLS also had a language center and a womens' development center in addition to providing language and computer courses for both men and women. The FLS has also been supported by Yussuf Islam, the British singer formerly known as Cat Stevens. I supported the activities of FLS in 1996 and 1997. In addition to this FLS took over various activities of the Foundation, including the Al Xhora center.

111.2 **Albanian Sports Club :** This was run by an individual of Kosovar nationality called Sulaiman Charchizi. It was registered with the Ministry of Youth, a Ministry of the Albanian Government. Along with other businessmen, I made donations to the sports club in 1996 and 1997 to help it run soccer competitions for young people and other sports activities. I now understand that Sulaiman Charchizi later, following the intervention of NATO in Kosovo, left Albania and went to Kosovo where he set up a political party. I had nothing to do with him after 1997 and had no link with or interest in any political ambitions he may have had, or any political party he may have established.

CONFIDENTIAL: This document is subject to a Protective Order regarding confidential information in 03 MDL 1570 (GBD), United States District Court for the Southern District of New York.

KADI0039610

0058

111.3 **Albanian Thoughts and Civilization Institute:** This institute, which Dr Saleh introduced me to, published a family based magazine covering Albanian heritage and cultural issues, including such topics as divorce and AIDS. I provided this institute with offices.

111.4 **Footbridge on Dursee Street, Tirana:**

Karavan Sh.P.K. ("Karavan"), an Albanian company in which I own shares, has contributed to charitable activity in Albania by constructing a footbridge on Dursee Street as a gift for the municipality of Tirana.

## Kosovo

112. When my legal team met with Mr Newcomb on August 1 2002, he enquired about my commercial and charitable activities in Kosovo. I would like to confirm that I have never conducted any charitable activities in Kosovo. Karavan in the ordinary course of its business activity constructed, as part of its work for the Saudi Joint Relief Committee ("SJRC") a warehouse at Shtima in Kosovo. Other than this, neither I nor any of my companies have ever carried out any commercial activities in Kosovo. Moreover, I have never even visited Kosovo. However, I believe that confusion may have arisen as a result of one or more of the following matters:

113. The last director of the Foundation in Albania was Yussuf Ismail. He was director when the Foundation closed down in Albania in July 1997. Yussuf Ismail is of Jordanian origin. After the closure of the Foundation in July 1997 he left Albania to go to Jordan. Some time later I heard that he was in Kosovo working for a Saudi relief organisation, which I believe was the SJRC. I should emphasise that

CONFIDENTIAL: This document is subject to a Protective Order
regarding confidential information in 03 MDL 1570 (GBD),
United States District Court for the Southern District of New York.

KADI0039611

C059

after Yussuf Ismail left the Foundation, he had nothing further to do with me or any of my companies in Albania or elsewhere. I have no knowledge of any activities he may have engaged in while he was in Kosovo after having left the Foundation's employment. I add for the sake of completeness that I did not personally recruit Yussuf Ismail, but he was recruited by one of the former managers of the Foundation in Albania Mr Abu Sukkur and later promoted as director.

114. A further source of confusion may be facilities which Albanian companies associated with me have provided to the SJRC, on arms length commercial terms, to facilitate the SJRC's humanitarian efforts assisting refugees fleeing from Kosovo. In 1999, there were literally tens of thousands of refugees being forced out Kosovo into the neighbouring countries of Albania and Macedonia. In 1999, following an appeal from the Albanian Government and international relief agencies, it was decided by the Saudi relief authorities that the number of refugees fleeing Kosovo was so high that Muslim relief work had to be conducted by way of a joint co-ordinated effort of the 5 main Saudi relief organisations in that region. The SJRC was thus formed and was headed by the chairman of the Saudi Red Crescent Society Dr Abdurahman Swailem. At the request of Dr Swailem I arranged for Albanian companies associated with me to provide facilities to the SJRC at the time of the Kosovo crisis. These transactions were undertaken on a commercial basis to assist the SJRC in its humanitarian relief work for refugees from Kosovo. I explain this in detail below as I believe the assistance provided to the SJRC, at the request of Dr Swailem, may have given rise to some confusion. Before I do so, however, it is appropriate that I provide background information on my relationship with Waa'el Julaidan who was

CONFIDENTIAL: This document is subject to a Protective Order
regarding confidential information in 03 MDL 1570 (GBD),
United States District Court for the Southern District of New York.

KADI0039612

0060

appointed Executive Director of the SJRC, as he has been designated by the US Department of Treasury as a Specially Designated National and Blocked Person.

**Waa'el Julaidan**

115.    First of all, I have known Waa'el Julaidan, who is a Saudi citizen, as a family friend since the 1980's.   He is well known for his humanitarian relief work for the Afghan refugees during the Soviet occupation of Afghanistan in the 1980s. The only aspect of his life which has ever been of any interest to me is his humanitarian relief work for refugees.   Waa'el Julaidan assisted me and the Foundation to establish a women's teachers' college  for refugees in Croatia and relief programs in Bosnia. He recommended Chafiq Ayadi for the management of this institute.     Waa'el Julaidan recommended Chafiq Ayadi highly for his experience and his ability in the area of humanitarian work for refugees and for his honesty.

116.    In 1999, Waa'el Julaidan was appointed as the executive director of the SJRC in Albania and Kosovo.  I describe below how at the request of Dr Swailem, the chairman of the SJRC, Albanian companies associated with me provided to the SJRC in 1999 necessary facilities in establishing a temporary hospital for refugees, stores for medicines and relief supplies and apartments and office space.   All these transactions were carried out on a commercial basis.

117.    I should stress that my relationship with Waa'el Julaidan has never encompassed any element of support whatsoever for Osama bin Laden or Al-Qaeda.  I have known him as a family friend, and socially.  Our relationship focused on relief and limited business activities.  By way of example when I was invited to join the

CONFIDENTIAL: This document is subject to a Protective Order
regarding confidential information in 03 MDL 1570 (GBD),
United States District Court for the Southern District of New York.                                    KADI0039613

0061

board of Dar Al Walidain School in Bosnia, to which I refer above, Waa'el Julaidan was already a board member of it. I am also involved as described below, in Abrar, a company incorporated in Saudi Arabia, which is a small scale business venture also involving Waa'el Julaidan and other members of his family. Waa'el Julaidan is a minority shareholder in Euroinvest, a Bosnian company in which I have an interest and which I describe further below. He came to be a shareholder in this company by way of reward for the assistance he provided to my charitable activities in Bosnia.

118. In the late 1990's, I was invited by Mahmood Taiba, a relative of mine, and the chairman of the board of directors of Dar Al Walidain school, to join its board of directors. Dar Al Walidain is a school and hostel in Sarajevo for Bosnian children who have lost either their father or both parents, under the patronage of Al-Haramain Wa Al Masjed Al Aqsa Charity, which I refer to above and, as I have mentioned, is entirely separate from the Al-Haramain Foundation. At the time I joined the board, Waa'el Julaidan was already a member of it.

119. In addition to this, I became involved in a small-scale business venture with Waa'el Julaidan and other members of his family. I am a shareholder and director of Abrar, a company incorporated in Saudi Arabia, for the purpose of carrying on business in the travel and tourism industry. I am a director of this company along with Qays Julaidan who is a cousin of Wa'el Julaidan. Wa'el Julaidan is not and never has been a director of this company, although he is a minority shareholder in it. Abrar of Saudi Arabia was incorporated to carry on business in the travel and tourism sector, specifically for Muslim pilgrims, especially during the pilgrimage (Hajj) season and, throughout the year, for minor pilgrimages

CONFIDENTIAL: This document is subject to a Protective Order regarding confidential information in 03 MDL 1570 (GBD), United States District Court for the Southern District of New York.

KADI0039614

0062

(Omrah). It should be noted that this company has never carried out any significant level of business. In addition, as explained below, both Waa'el Julaidan and I have held shares in Euroinvest and KA Stan, 2 Bosnian companies to which I refer below. My involvement with these companies has absolutely nothing whatsoever to do with Osama bin Laden, Al-Qaeda, or any terrorist activities or purposes.

**Assistance provided by companies associated with me to the SJRC**

120.   As part of his work for the SJRC, Waa'el Julaidan obviously spent time in Albania before the SJRC shifted its activities to Kosovo. While Waa'el Julaidan was in Tirana, he frequently met Dr Saleh and had close relations with senior government officials in Albania. At the outset the chairman of the SJRC, Dr Swailem, asked me to help because they had no previous experience working in Albania, nor were they aware of the inadequate infrastructure in the country or the difficulties of dealing with official institutions there. My companies in Albania were among the few organisations in Albania at that time that had the resources, capacity and management structure to assist the SJRC. Being a Saudi relief agency, I was keen to assist the SJRC and instructed Dr Saleh to make their mission successful. My companies undertook this work on commercial terms to facilitate the humanitarian efforts of the SJRC in various ways.

121.   First of all the SJRC rented spare warehouse space in Tirana owned by a company in which I am a shareholder, **Lojali Sh.P.K.**, ("Lojali") for the purpose of storing medicines and relief supplies. The SJRC also rented from Lojali a large yard outside the warehouse where **Karavan**, another Albanian company in which I am a shareholder, constructed a prefabricated temporary hospital for refugees

CONFIDENTIAL: This document is subject to a Protective Order regarding confidential information in 03 MDL 1570 (GBD), United States District Court for the Southern District of New York.

KADI0039615

0063

at the request of the SJRC. The tender for the construction of this hospital was awarded to Karavan due to their experience in construction project supervision. The construction of this hospital was completed within only 18 days. The Albanian President and other senior Albanian Government officials attended the opening ceremony of the hospital, which was covered by the local and international media. The SJRC paid for both the use of the warehouse and the construction of the hospital.

122. At the time of the arrival of the SJRC, Karavan had just finished completion of the development of a major commercial and residential development on the main road in Tirana, Dursee Street, comprising 123 flats and some offices and shops and were beginning to sell apartments within the building. I refer to this property as the "Dursee Street Building." The SJRC urgently needed both living accommodation for their staff and office space from which to run their activities. Karavan rented to the SJRC vacant apartments and office space which were awaiting sale in the Dursee Street Building. About 50 SJRC workers occupied the building. They would come and go at various times and it is possible that the congregation of a number of Arabs at the same time in the building may have caused confusion.

123. I refer above to the community center and Mosque which the Foundation built in Kukes near the border with Kosovo. At the time of the arrival of the SJRC the community center was not being used. The SJRC through its chairman Dr Swailem asked me if it could use the community center as a clinic. I agreed, and accordingly the SJRC used the community center, which the Foundation formerly ran in Kukes, as a medical point for refugees fleeing Kosovo in 1999. The SJRC

CONFIDENTIAL: This document is subject to a Protective Order
regarding confidential information in 03 MDL 1570 (GBD),
United States District Court for the Southern District of New York.

KADI0039616

0064

used the same community center as a clinic again later at the time of the repatriation of the refugees. I have recently been told that the refugees would use the Kukes center as a temporary stop for one or two days while they were on their way to more permanent refugee camps within Albania. It is possible that the movement of large numbers of people to and from the Kukes center, situated very near to the border with Kosovo, is also a cause of confusion.

124.   A further source of confusion may be that these centers and the Mosque were being used after 1998, even though the Foundation had closed in Albania in July 1997. It is quite possible that since the centers and Mosque were built by the Foundation, they continued to be referred to by local people as the Muwafaq centers or the Muwafaq Mosque. This may have given rise to a mistaken belief that the Foundation continued to exist after its closure.

125.   It is also possible that the presence of Waa'el Julaidan, the Executive Director of the SJRC, in both the Dursee Street Building and the warehouse and hospital may have caused confusion.

126.   I wish to make it crystal clear that the sole reason I assisted the SJRC in the ways I have described was to help their humanitarian causes and the relief effort in Albania. I should reiterate that this assistance was provided on a commercial basis. All the assistance provided was with the full knowledge and approval of both the Saudi and the Albanian authorities, and the international relief agencies operating in Albania. I have never intended whether through the assistance provided to the SJRC or otherwise, to support in any way or manner any armed or terrorist group, including Osama bin Laden or Al-Qaeda. In addition to this, I

CONFIDENTIAL: This document is subject to a Protective Order regarding confidential information in 03 MDL 1570 (GBD), United States District Court for the Southern District of New York.

KADI0039617

0065

must emphasise that the Foundation was not in existence in Albania after 1997 and I have no knowledge of or responsibility for anything which may have been done by former Foundation employees after 1997 which may have caused confusion. Ever since the Foundation closed down in Albania in 1997, I have continued to receive requests for financial assistance for repairs or renovation of Mosques and/or community centers which the Foundation set up in Albania. I should make clear that I have never, through any commercial or charitable activities, supported Osama bin Laden or Al Qaeda, whether in Albania, Kosovo or elsewhere.

## Ethiopia

127.　In April 1993 the Foundation signed a General Agreement with the Relief and Rehabilitation Commission of the Ethiopian Government. A copy of this Agreement is at pages 187 to 193. Further to this, the Foundation undertook the following programs in Ethiopia: -

127.1　Educational programs covering:

    a.　Elementary education in 3 schools.

    b.　Training Programs for School Teachers teaching Arabic Language, with emphasis on lexicology, phonology, syntax and grammar, literature, recitation, rhetoric and learning methodology.

127.2　Iftaar Saim (breaking of fast at sunset during the month of Ramadan) food stuff distribution to 1,500 poor people daily, for 30 days of the month of Ramadan, undertaken annually.

CONFIDENTIAL: This document is subject to a Protective Order regarding confidential information in 03 MDL 1570 (GBD), United States District Court for the Southern District of New York.

KADI0039618

C066

128.   In late 1995, as a result of the allegations published in the London based magazine Africa Confidential, the Ethiopian authorities decided to close down the operations of the Foundation along with all other non-western NGOs that also had a presence in Sudan. This was hardly surprising given that as authoritative a publication as Africa Confidential had wrongly accused the Foundation of being party to an attempt to assassinate the President of Egypt on Ethiopian soil, an allegation of which the trustees were later totally vindicated. When the Foundation discussed the position with the Ethiopian authorities it was confirmed to us that the Foundation was not, in fact, itself under suspicion of involvement in the assassination attempt, but that since Sudanese links were suspected, a decision had been taken to close down the operations of all non-western NGOs that also had a substantial presence in Sudan. The Foundation was only one of a number of organisations affected by this decision. Among the other NGOs affected were the Islamic African Relief Agency and Al Da'awa al Islamiya.

Somalia

129.   The Foundation commenced activities in Somalia in December 1992. The Foundation was never formally registered there because no proper governmental structure existed there. The Foundation's director in Somalia was Sohaib Abdul Lateef Sheikh Bashir, a Somali citizen who had been educated in Saudi Arabia. I refer to the listing of International NGO activities in Somalia dated March 15 1994 a copy of which is at pages 194 to 197. The Foundation developed the following programs in Somalia:

129.1   In **Mogadishu** the Foundation ran 10 schools, a women's development project for training women in nursing and sewing skills. The Foundation

CONFIDENTIAL: This document is subject to a Protective Order regarding confidential information in 03 MDL 1570 (GBD), United States District Court for the Southern District of New York.

KADI0039619

0067

distributed free sewing machines and materials for dress-making.   In addition to this the Foundation distributed food and clothes for the poor people of Mogadishu.

129.2   In **Lower Shabelle** area, the Foundation had a demonstration farm project in Samey Samey village where it assisted poor families in the local community.   The Foundation also distributed food and relief aid to a number of villages in the area of Genale.

129.3   In **Middle Shabelle** area, the Foundation distributed food and relief aid to a number of villages in the Jowhar region.

129.4   In the **Bay** Region, the Foundation opened a number of feedings centers for orphans and poor children, and in addition to the above:

129.5   Health and Sanitation programs in **Mogadishu**

129.6   Education programs for the rehabilitation support of existing schools or institutions which had been destroyed or vandalised.   These education programs followed the Somali national curricula.

129.7   Textile project in **Mogadishu** the object of which was to create jobs by the production of hand-woven textiles on looms.

CONFIDENTIAL: This document is subject to a Protective Order regarding confidential information in 03 MDL 1570 (GBD), United States District Court for the Southern District of New York.

KADI0039620

0068

The Foundation ceased activities in Somalia in early 1996 when all the ongoing projects in progress at the time were transferred to ZamZam Foundation, another NGO active in Somalia.

**Germany**

130. The Foundation was registered in Karlsruhe, Germany on March 17 1995. The reason for registering the Foundation in Germany was to collect goods from donors in Germany for onward distribution by the Foundation to Bosnian refugees. The sole purpose of all the Foundation's activities in Germany and throughout Europe was to assist Bosnian refugees. The Foundation was registered with a new address in Munich on March 4 1996. Copies of the registration documents for the Foundation in Germany are at pages 97 to 108.

**Austria**

131. During 1993 the Foundation was registered in Austria where an office was opened to distribute humanitarian relief to the Bosnian refugees located in Austria. The Foundation's activities in Austria consisted of the distribution of food to the Bosnian refugees and assisting displaced Bosnian students to find education. The Foundation's office in Austria was closed in 1996. I understand that the Foundation's registration in Austria will have automatically lapsed by reason of the non-payment of annual fees.

**UK**

132. The Foundation never actively operated in the UK. However it did make a donation in 1993 to the Muslim Welfare House, in North London, to enable the Muslim Welfare House to have a new library which was named after the Foundation.

CONFIDENTIAL: This document is subject to a Protective Order regarding confidential information in 03 MDL 1570 (GBD), United States District Court for the Southern District of New York.

KADI0039621

0069

## Women's College and other Humanitarian Activities in Saudi Arabia

133.    Personally, I am strongly committed to promoting education in society in general and among women in particular, to enable women to exercise leadership roles in the family and society.   Accordingly in 1996 I founded and led a planning committee to establish higher educational institutions for women in Saudi Arabia. This ultimately led to the founding of a pioneering women's college in Jeddah named Dar Al Hekma College in 1999.  Dar Al Hekma College is now one of the first private colleges for women in the Kingdom, offering university level degrees. It is also unique as it educates women in an English language setting.

134.    As well as leading the planning committee of the college, I am chairman of its academic committee.  I decided to base the curriculum on the American higher education model.   Thus, under my initiative and direction the college sought professional assistance and expertise from the United States.  This led us to identifying and later contracting with the Texas International Education Consortium ("TIEC"), which is based in Austin, Texas.  TIEC is a consortium of 32 public universities in the State of Texas formed for the purpose of developing, co-ordinating and implementing international education projects and academic programs.

135.    The collaboration between TIEC and the college has been most successful in preparing the complete academic program and administrative and organisational structure for the college. At the completion of the TIEC project, I recruited several American administrators and faculty members and have supported their

CONFIDENTIAL: This document is subject to a Protective Order
regarding confidential information in 03 MDL 1570 (GBD),
United States District Court for the Southern District of New York.

KADI0039622

0070

involvement ever since the establishment of the college. The college now employs internationally qualified faculty members representing ten different nationalities, including American and many others who are American trained, including the Saudi Dean and Vice Deans who have earned their doctorates in the United States.

136. The college was inaugurated by HRH Crown Prince Abdullah of Saudi Arabia in September 1999 after 4 years of planning. The college has won support from the Saudi Royal family, business people, local and foreign dignitaries, all of whom have commended its work. The college has been visited by Ambassadors and their wives including the US Ambassador to Saudi Arabia and by his wife and the wife of the UK Ambassador. I also had the honour of receiving the former President of the United States, President Jimmy Carter and Mrs Rosalyn Carter, during their visit to Saudi Arabia in the year 2000. They were very pleased with their visit to the college. President Carter gave a speech expressing his pride to be given the opportunity to visit the college; he said the college reflected the advances made by Saudi society and stressed the importance of private education adding that education was a source of freedom. Rosalyn Carter remarked that she had been very impressed by the achievements of Saudi women and that she had met many women during her visit to the college who had asked her to speak of the positive impression she had gained.

137. I have supported the college, not only ideologically by supporting the aims of the college, but also financially, by providing finance myself and raising funds for the college from others. Since 1996 I have personally contributed substantial sums to the college and have raised very substantial donations and scholarship funds

CONFIDENTIAL: This document is subject to a Protective Order regarding confidential information in 03 MDL 1570 (GBD), United States District Court for the Southern District of New York.

KADI0039623

0071

from others.  I am also a very active member of the Board of Trustees of the college and attend the college meetings and other functions one or more times per week throughout the year.

138.  Soon after the tragic events of September 11th, I called a meeting with the American staff and faculty to express personally my regrets, sympathy and support for them; to offer them help in contacting their families back in the USA; and to reassure them that they would be protected and secure while working at the college and living in Saudi Arabia.  I also sought to assure them of the solidarity of myself and of my fellow Board members against the vile acts of September 11th.

139.  In addition to my involvement in the promotion of higher education in the Kingdom through the founding of this non-profit private college, I support various charities in Saudi Arabia, as follows.  I stress that I am merely a donor to these charities and am not actively involved in the running or management of any of them:

139.1  **Al Haia Al Alamiah -li- Tahfeez Al Quran Al Kareem** – (International Memorizing of The Holy Quran Organization): this is a new charity, founded in 2001.

139.2  **Al Jamaia Al Khairia -lil- Khidmat Al Ijtemaiah in the Holy City of Medina** – (The Philanthropy Committee for Social Services in Medina Munawara City): this is a charity set up to help and educate people in the

CONFIDENTIAL: This document is subject to a Protective Order regarding confidential information in 03 MDL 1570 (GBD), United States District Court for the Southern District of New York.

KADI0039624

C072

city of Medina. It is under the supervision of the Ministry of Labour and
Social Affairs, Kingdom of Saudi Arabia.

139.3 **Jamiat Al Bir,** Jeddah, Saudi Arabia: this is a social charity which looks
after orphans or fatherless children in Saudi Arabia. It provides them with
food and other aid, social activities and education.

139.4 **Al Majlis Al Tanfeeze -li- Mashrooh Jamiat Taibah Al Nisaiah Al
Khairia, Medina Munawara** – (Executive Council for the Project of
Taibah Women Philanthropy Committee): the objects of this charity are to
create a women's college in the City of Medina.

I cite these as further examples of my commitment to improving education in
Saudi Arabia and amongst the poor and needy.

**Commercial Activities**

**Saudi Arabia**

140. Up until late 2001 the bulk of my commercial activities in Saudi Arabia was
devoted to the business operations of the National Management Consultancy
Center (NMCC), Saudi Arabia, which I headed as chairman. As I describe above,
NMCC advised and assisted local and international financial institutions in
developing and implementing Islamic banking and Islamic investment products.
Prior to the start of my activities through NMCC, I registered, in 1976, Yassin A.
Kadi Establishment for undertaking general commercial activities in Saudi Arabia
and worldwide. In addition to the above, I would mention the following:

KADI0039625

CONFIDENTIAL: This document is subject to a Protective Order
regarding confidential information in 03 MDL 1570 (GBD),
United States District Court for the Southern District of New York.

0073

140.1 I am a board member of **Dar Ul Ilm Company Limited (Andalus Schools).** an organisation which provides private educational services in schooling for boys and girls from kindergarten to high school level.

140.2 I was a member of the **Islamic Banking Services Committee,** which was formed by the National Commercial Bank in July 1997 and on which I served until December 8 1999. This is a committee responsible for the strategic development of Islamic banking services which was chaired by the CEO of the NCB. I served on this committee with other senior bank officials.

140.3 I was chairman of **Cortoba Trading Company Limited,** which was active in the property development field, constructing and developing exclusive commercial real estate and residential complexes. It has not carried out any business for some years. A branch of the bin Mahfouz family (not related to KBM) also had an interest in this company.

140.4 I have a shareholding in **Shirikat Injizat Muqawalat Al Fanee Al Hadeesa -- Ibtikarat ("Injizat"),** which is currently in the process of liquidation. This company supplied kitchen and bathroom equipment in Saudi Arabia.

140.5 I have already mentioned in the context of my explanation of my relationship with Waa'el Julaidan above my involvement as shareholder and director of **Abrar of Saudi Arabia.** This company has no connection with Abrar Investments Inc. USA mentioned below

CONFIDENTIAL: This document is subject to a Protective Order
regarding confidential information in 03 MDL 1570 (GBD),
United States District Court for the Southern District of New York.

KADI0039626

0074

140.6 I am a minority shareholder in **Saudi Najam Services and Development Company** which is a company incorporated in Saudi Arabia to carry on business in the travel and tourism sector, specifically for Muslim pilgrims, especially during the pilgrimage (Hajj) season and, throughout the year, for minor pilgrimages (Omrah)

140.7 I am a shareholder in **Jeddah Holding Company for Development** which is a contracting company for the development and maintenance of Jeddah City.

### Sudan

141. In 1990 I learned that Al Shamal Islamic Bank was achieving much greater returns on Islamic-style investments than those institutions such as Faisal Finance SA with which my funds were then placed. I had not previously had any dealings with Al Shamal Islamic Bank (although it had been founded in, and followed Islamic precepts since, 1985) but I discovered that these higher returns were generated by the adoption of a more vigorous approach to investment. In some cases, Al Shamal Islamic Bank was able to achieve returns in excess of 15% through investment arrangements which complied with Islamic precepts. I also discovered, that in comparison with other institutions, Al Shamal Islamic Bank operated in a more transparent fashion, providing its investors with a more detailed picture of the projects and businesses in which their funds were invested. Both of these aspects were attractive to me and thus, for solely commercial reasons, and in order to obtain a better return on my money, I decided to make investments with Al Shamal Islamic Bank.

CONFIDENTIAL: This document is subject to a Protective Order regarding confidential information in 03 MDL 1570 (GBD), United States District Court for the Southern District of New York.

KADI0039627

0075

142.   It was my intention that all the funds I transferred to Al Shamal be invested in strict accordance with Islamic precepts. This means that generally funds would be invested according to Islamic principles and procedures. These modes have a built-in element of profit (or risk) which replaces the interest that would be payable were the parties non-Muslim. At no stage did I ever transfer funds to Al Shamal Bank for any purpose connected with terrorism or to support Osama bin Laden, Al-Qaeda or any other terrorist group.

143.   Before committing funds for investments with Al Shamal Islamic Bank, the bank provided me with a list of correspondent banks. A copy of this list is at pages 198 to 201. It will be seen that Al Shamal's correspondent banks included such names as American Express Bank, Commerz Bank and Credit Lyonnais (Suisse) SA. The correspondent banks also included Al Barakah Bank and others. At that time, none of these institutions had, so far as I am aware, ever been the subject of any official sanction relating to money laundering or other illegal activity. Whenever I wished to invest with Al Shamal Bank, they directed me to transfer my funds to the relevant correspondent bank nominated by them. This did not cause me any concern as it is quite usual in banking transactions to transfer monies to a bank via its correspondent bank. In this case I understood that there was no facility for the direct transfer of funds to Al Shamal Bank in Sudan. Upon the transfer being effected, Al Shamal would credit my US dollar investment account in Sudan.

144.   The correspondent banks to which Al Shamal Bank instructed me to transfer funds were Credit Lyonnais (Suisse) S.A. and Al Barakah Bank in London. I

CONFIDENTIAL: This document is subject to a Protective Order regarding confidential information in 03 MDL 1570 (GBD), United States District Court for the Southern District of New York.

KADI0039628

0076

understand this is an issue because it has been alleged in the *Burnett* civil law suit that Osama bin Laden maintained one or more accounts at Al Shamal Bank, and that Al Barakah Bank has supported Al Haramain Charity and Osama bin Laden. I have no knowledge of whether these allegations are true; in any case I confirm that I never transferred funds to Al Shamal Bank or any of its correspondent banks including Al Barakah Bank to support Osama bin Laden, Al-Qaeda or any terrorist group or activity and I am not aware that any of these banks has ever engaged in financing or supporting any such terrorist group or activity. In all my dealings with Al Shamal Bank I never had any knowledge whatsoever of the identity of any other client or investor with that bank or any of its correspondent banks or any financial institution associated with it. Obviously, it follows from this that my reasons for investing with Al Shamal Bank had nothing whatever to do with the identity of any of its other clients or investors, none of whom were known to me.

145. To the best of my knowledge none of the funds I transferred to Al Shamal Bank or any of its correspondent banks including Al Barakah Bank were ever used for any purpose connected with Osama bin Laden, Al-Qaeda or any terrorist group or activity. At all times I intended the funds I invested with Al Shamal Bank to be applied for one or more of the following purposes:

145.1 to enable Al Shamal Bank to issue a guarantee to the Sudanese Government in respect of a substantial scrap metal tender issued by the Sudanese Government, which I won after a contested bid in 1990 and which I considered to be a good business opportunity. The tender for this

CONFIDENTIAL: This document is subject to a Protective Order regarding confidential information in 03 MDL 1570 (GBD), United States District Court for the Southern District of New York.

KADI0039629

0077

contract expressly required payment to be made to the Sudanese Government in US dollars;

145.2   to make payment in US dollars, to the Sudanese Government of monies due to it under the scrap metal contract;

145.3   concurrently with the issuing of the guarantee I refer to above, Al Shamal Bank used the funds to invest in specific Islamic investments including the purchase of wheat for sale in Sudan and other commodities;

145.4   to meet the costs involved in cutting, transporting and exporting the scrap metal I had purchased from the Sudanese Government. Under the scrap metal contract it was agreed that I was to be responsible for these costs;

145.5   to invest in the manufacture and supply of construction rods by a Sudanese company called SMT Engineering Co.;

145.6   to invest in a contract with the Sudan Petroleum Corporation for the supply of gas oil;

145.7   to invest in shares in the Saudi - Sudanese Bank;

145.8   to invest in a large quantity of sesame;

145.9   to invest in the purchase of aircraft equipment for Sudanese Airlines from General Electric Company in the USA.;

CONFIDENTIAL: This document is subject to a Protective Order regarding confidential information in 03 MDL 1570 (GBD), United States District Court for the Southern District of New York.

KADI0039630

0078

145.10 to invest in duty free shops run by the Sudanese Government.

I add that I have not made any transfers to Al Shamal Bank since 1994.

146.   Many of these investments achieved excellent rates of return. For example in the case of the aircraft equipment purchased for Sudanese Airlines, the rate of return was in excess of 30%, which I earned over a period of 1 year.

147.   Many of my activities in Sudan were conducted through two companies associated with me: Leemount Limited and Solano Limited. Leemount Limited was a company registered on January 15 1992 in the Isle of Man (de-registered in March 2002). I owned shares in this company. Leemount maintained US dollar and Sudanese pound accounts with Al Shamal Islamic Bank. On May 19 1999, Solano Limited was incorporated in the Bahamas, a company in which I also had a shareholding until it was de-registered in April 2001. Solano Limited also had an account with Al Shamal Islamic bank. It engaged in the trading of commodities and agricultural products. Both these companies were registered in Sudan as foreign companies.

148.   Finally, and for the sake of completeness, I add this: in 1991 I attended a convention of leading Saudi businessmen in Khartoum, Sudan, hosted by the Sudanese Government, which at the time was seeking to persuade foreign investors to invest in Sudan. I travelled to Khartoum with other leading Saudi businessmen, including, I recall, H.R.H. Prince Mohamed Al Faisal, Ibrahim Affendi, Saleh Kamel, representatives of Al Rahji Banking and Investment

CDNFIDENTIAL: This document is subject to a Protective Order
regarding confidential information in 03 MDL 1570 (GBD),
United States District Court for the Southern District of New York.

KADI0039631

0079

Corporation along with other Arab businessmen. We attended at the invitation of the Sudanese Minister of Finance and Chairman of the Sudanese Economic Committee.

**Albania**

149.    I have already explained how I met Dr Abdul Latif Saleh in 1993 at the 1st Muslim-Albanian International Investment Conference held in Tirana, Albania. At the conference, Dr Saleh outlined to me the business opportunities for foreign investors in Albania. He described Albania to me as an emerging market with excellent investment opportunities. He told me that there was no sugar in Albania and good returns were to be made from importing sugar provided the opportunity was seized quickly. Dr Saleh had no capital but he was able to offer to our joint enterprise his expertise and contacts within Albania. We agreed to share profits. We started trading activities, slowly and on a trial basis, importing sugar through a company called Loks **Holl Sh.P.K. ("Loks Holl")** registered in Albania. These transactions yielded exceptional returns. We then expanded our activities to rice, wheat and other food stuffs.

150.    I also started other business activities in Albania sharing the profits with Dr Saleh:

150.1 **Real Estate:**   Following the collapse of communism, for the first time in 40 years Albanian citizens were permitted to own real property. There was a shortage of liquidity in the real estate market, and many of the new land owners wished to sell. Dr Saleh and I decided to start a real estate business by arranging to purchase properties from new owners, who were keen to liquidate their assets, which resulted in good discounts

CONFIDENTIAL: This document is subject to a Protective Order regarding confidential information in 03 MDL 1570 (GBD), United States District Court for the Southern District of New York.

KADI0039632

0080

being available. We carried out this business through **Lojall**, also registered in Albania. The properties we purchased included **warehouse/store space in Tirana**, purchased in order to store our imports of sugar, rice and wheat and also pharmaceuticals **for our** pharmaceutical distribution business described below; six **shops** on the main Dursee Street in Tirana; four **flats**; two **villas**; a small covered **market**; two pieces of **land** and a **carpet shop**.



150.2  **Pharmaceuticals:**  This business started in 1994 for the import and distribution of medicines through a company called **Medicare SH.P.K.** **("Medicare")**, once again registered in Albania.  As before, I shared profits with Dr Saleh.   We succeeded in being appointed the main distributors in Albania by such leading pharmaceutical companies as Beecham and Merck and became the main contractors and suppliers of intravenous fluids to the Albanian Ministry of Health hospitals.

151.  Following the success of these businesses, in 1995 Dr Saleh and I started a construction and property development business which we carried on through Karavan, a company registered in Albania. Once again, Dr Saleh and I shared the profits of this company. The first project was Dursee Street Building, which I have already described above, which we developed in a 50/50 joint venture with a locally registered company called **Alinted SH.P.K. ("Alinted")**. Alinted was an investment holding company formed by Dr Yamani, and some of the other leading Saudi Arabian investors who had attended the 1993 conference in Tirana sponsored by the IDB.

CONFIDENTIAL: This document is subject to a Protective Order
regarding confidential information in 03 MDL 1570 (GBD),
United States District Court for the Southern District of New York.

KADI0039633

0081

152. Through the same joint venture company, Karavan, in 2000 we began to develop the Boulevard Towers in the city center of Tirana. The present status of this development is that Karavan owns a share of the development and the remainder is owned by local Albanian shareholders and Dr Saleh. At the time of freezing of my assets in Albania the development was partly completed. The Boulevard Towers comprise two office towers built over a three storey shopping center. I understand that construction of the towers is continuing.

153. Due to the change in economic conditions in Albania in 1997, including the financial pyramid schemes which collapsed in early 1997, I ceased all my business activities within Albania by 1998 with the exception of the pharmaceutical distribution business, which I ceased in 2000 upon the resignation of its General Manager, and the property development at Boulevard Towers, which I have continued.

**Kazakhstan**

154. I have never been to Kazakhstan, nor have I ever visited Russia or any of the former Soviet Republics. During the pilgrimage season in Saudi Arabia in 1990 (the Hajj) I met Dr Yahia Khairy Abdul Rahman through a mutual acquaintance, Soliman El-Khereiji. The latter had already had business dealings with Dr Yahia. Dr Yahia, a US citizen, is a banker active in the field of Islamic banking, who is based in California. A copy of his resume is at pages 202 to 205. In 1992, the various Governments of the newly independent Central Asian Republics invited Dr Yahia to visit them for the purpose of considering foreign investment opportunities. After the dissolution of the former Soviet Republics, Dr Yahia identified Kazakhstan as an emerging market ripe for foreign investment. Many

CONFIDENTIAL: This document is subject to a Protective Order
regarding confidential information in 03 MDL 1570 (GBD),
United States District Court for the Southern District of New York.

KADI0039634

0082

major multi-national corporations, especially those in the oil and gas sector, were at that time investing in Kazakhstan.

155. On September 22 1993, Dr Yahia formed Kazakhstan American Finance House Lariba, a Nevada Corporation. I understand Kazakhstan American Finance House Lariba received appropriate approvals from both the UK and US banking authorities. Dr Yahia asked me to subscribe to this company and to invest in an interest free bank in Kazakhstan, named "Lariba Bank". I agreed. I now understand that Kazakhstan American Finance House Lariba was dissolved in October 2000. I hold my shareholding directly in Lariba Bank. Apart from my shareholding in Lariba Bank, I have never had any commercial interests or charitable activities in Kazakhstan.

## Bosnia

156. After the 1995 Dayton Peace Accord the prospects for social and economic regeneration in Bosnia seemed promising. Accordingly, I was happy to be part of that reconstruction process of the country and commit investment to it. In addition to this I was concerned to create employment opportunities for the people of that country who had suffered during the war in the 1990s. I therefore decided to make investments in the region.

## Depozitna Bank

157. In May 1996 I purchased a majority holding in Depozitna Bank, based in Sarajevo. As a business proposition, I found the idea attractive, not least because, assuming things continued to normalise, I would end up with a bank which benefited from a European banking licence. In addition to this the price

PCR1-180007.1

KADI0039635

CONFIDENTIAL: This document is subject to a Protective Order regarding confidential information in 03 MDL 1570 (GBD), United States District Court for the Southern District of New York.

0083

was right. I purchased a majority shareholding and Chafiq Ayadi, who has Bosnian nationality, held the shares as nominee for me. It was a requirement under local law that the shareholders of a Bosnian bank be of Bosnian nationality. The other shareholders were parties unconnected to me. Apart from seeking a good return on my investment my aim in making this investment was to help the financial infrastructure in Bosnia. I also planned at that time to run Depozitna Bank in accordance with Islamic precepts (in other words, no usury). I was never involved in the day to day activities of Depozitna Bank and the Bank was managed by its Executive Director Suad Sahovic. Following the sale of some of my shares, my stake was reduced in about 1999 as part of an exercise in raising capital, and in 2001 the bank merged with Vakufska Bank in which I now hold a minority interest.

158.    In addition to Depozitna Bank I made other investments in Bosnia. I invested in a company called Euroinvest, which was set up in April 1996, with an office in Sarajevo. It was officially registered with the Court in Sarajevo on April 24 1996. I am still a majority shareholder in Euroinvest although the company ceased its activities in 1998 because of appalling losses suffered by it and the level of debts owed to it. I refer to a copy of Euroinvest's current and historic list of debtors (pages 206 to 207) from which it will be noted that all its debtors are local Bosnian individuals or companies. Euroinvest continues to exist but only for the purpose of collecting trading debts owed to it. In addition Waa'el Julaidan is a minority shareholder in Euroinvest. He came to be a shareholder in this company by way of reward for the assistance he provided to my charitable activities in Bosnia.

CONFIDENTIAL: This document is subject to a Protective Order regarding confidential information in 03 MDL 1570 (GBD), United States District Court for the Southern District of New York.

KADI0039636

0084

159.    When Euroinvest was set up by Chafiq Ayadi  I invested capital to cover its initial

costs and to purchase equipment such as trucks, cars, forklift trucks and cranes.

In the period 1996-99 Chafiq Ayadi was the sole director, and he operated and

managed the company on a day to day basis.   The company imported

commodities for sale from abroad, such as oil, sugar and flour. I acted as the

guarantor of its activities with Faisal Finance for the funds required for these

purchases throughout this period. Until 1998 it was an active company and in the

period 1996 to 1998, it imported goods to a very substantial value.  Unfortunately

the company floundered because Chafiq Ayadi sold a substantial quantity of

goods on credit to local Bosnians in order to help them establish themselves after

peace in the region following the Dayton Peace Accord. Many of these customers

were not in a position to pay for the goods they had purchased.  As a result of

this Euroinvest's level of debtors reached a level where trading could no longer

be sustained due to Euroinvest's debts not being paid.   Although a shareholder

and guarantor of the business, I have played no active management role in it.

When Chafiq Ayadi left Euroinvest, he recruited Tarik Swadi, a Bosnian citizen, to

take on his role.   I did not personally recruit Tarik Swadi and know nothing of his

background save that he was one of the employees of Euroinvest, and hired and

retained by Chafiq Ayadi.


Other investments in Bosnia

160.    In addition to Euroinvest I invested, in the period since April 1996, in other

companies in Bosnia

CONFIDENTIAL: This document is subject to a Protective Order
regarding confidential information in 03 MDL 1570 (GBD),
United States District Court for the Southern District of New York.

KADI0039637

0085

**KA Stan**

161.   I was a majority shareholder in KA Stan until the company was dissolved by means of a Court decision dated January 24 2001.

162.   KA Stan was set up in March 1996, and also had offices in Sarajevo. It was officially registered with the Court in Sarajevo on March 1 1996.   The shareholders were myself and Waa'el Julaidan and Chafiq Ayadi. Waa'el Julaidan came to be a shareholder in this company by way of reward for the assistance he provided to my charitable activities in Bosnia.  KA Stan ceased work in 1999 and was dissolved, as I have mentioned, on  January 24 2001. KA Stan was a construction company, which was responsible for a number of large projects in Bosnia, including construction of houses, a Mosque, restoration of Risala School and student housing.  The company ceased to be financially viable during the course of 1998, with its expenses outstripping its income.

163.   As with Euroinvest, I played no active management role in the company which was run by Chafiq Ayadi, the sole director until 1999, and by Tarik Swadi from 1999 until its dissolution on January 24 2001.

164.   Other investments I had in Bosnia are as follows:

164.1  Shareholding in KA Profarm, formed in 1996 for farming, agriculture and fisheries.  It ceased work in 1998 and now trades solely for the collection of debts owed.

CONFIDENTIAL: This document is subject to a Protective Order
regarding confidential information in 03 MDL 1570 (GBD),
United States District Court for the Southern District of New York.

KADI0039638

0086

164.2   6 homes bought by Chafiq Ayadi in 1996 in Sarajevo. Since foreign individuals were not at that time permitted to own property in Bosnia, these were bought by Chafiq Ayadi as nominee for me. 3 are now sold.

164.3   I am a minority shareholder in a company called Mahmal Confectionary Company registered in Sarajevo, Bosnia.

**Saudi Arabian Financiers**

165.   At the meeting on August 1 2002, Mr Newcomb asked for details of my relationships with other wealthy Saudi Arabian citizens or entities who are in a position of providing finance. I now describe these:

**Al Barakah Bank**

166.   I now describe my relationship with Al Barakah Bank:

166.1   As described in the section on Sudan above, I have transferred funds for investment to Al Shamal Bank via Al Barakah Bank, London in the period 1990 to 1992. In all my dealings with Al Shamal Bank I never had any knowledge of the identity of any other client or investor with that bank or any of its correspondent banks or any financial institution associated with it. Until my lawyers advised me of the allegation in the Burnett civil law suit that Al Barakah Bank supported Al-Haramain Charity and Osama bin Laden, I was not aware of any alleged link between Al Barakah Bank or any of its associated institutions, investors or clients and Osama bin Laden and/or Al-Haramain Charity.

CONFIDENTIAL: This document is subject to a Protective Order regarding confidential information in 03 MDL 1570 (GBD), United States District Court for the Southern District of New York.

KADI0039639

0087

166.2   In addition to this, until 1997 I invested in an investment fund through Leemount Limited. This investment fund was managed by Al – Tawfeek Co for Investment Funds, CR 432500 of the Cayman Islands, which is member of the Dallah Al-Baraka Group. A copy of a valuation report for this fund  is at page 208. My interest in this investment fund was liquidated by the end of December 1997.

166.3   I have never transferred any funds to Al Barakah Bank or any individual or institution associated with it  – or any other individual or entity – for the purpose of supporting any terrorist group or activity, including Osama bin Laden or Al-Qaeda.

**Dar Al – Maal Al Islami Trust**

167.     This is the holding company of Faisal Finance (Switzerland) SA, a well known financial institution incorporated in Switzerland with which I have invested for the past 12 years.  It also owns Faisal Islamic Bank, with which I have invested because of it's Islamic banking services.  After I began investing in the bank, I met socially its head, H.R.H. Prince Mohammed Al Faisal Al Saud.

**Bin Laden Group**

168.     In 1999 I invested in Global Diamond Resources Inc., a US company.  I was appointed to the board of directors of Global Diamond Resources as a nominee of New Diamond Holdings Limited, incorporated in the British Virgin Islands, a family company owned by me and my wife on behalf of our children. The Bin

KADI0039640

CONFIDENTIAL: This document is subject to a Protective Order regarding confidential information in 03 MDL 1570 (GBD), United States District Court for the Southern District of New York.

C088

Laden Group is also a shareholder in Global Diamond Resources. I point out that, as is well known, the Bin Laden family, who own the Bin Laden Group, have publicly disowned Osama bin Laden. I have already provided OFAC with details of my investment in Global Diamond Resources. My investment in Global Diamond Resources should not, therefore, be understood as implying any form of link or support or sympathy for Osama bin Laden or Al-Qaeda. To the best of my knowledge Osama bin Laden has no shares or interest in Global Diamond Resources.

**Mr Yahya bin Laden**

169.    **Yahya bin Laden** is a brother of Osama bin Laden. As is well known Osama bin Laden has more than 50 brothers and sisters. I know him as he is on the board of trustees of Dar El Hekma College.

**Mr Zuhair H Fayez**
**Mr Qays Julaidan**
**Mr Hussain Shobokshi**

170.    These three gentleman are also on the board of trustees of Dar El Hekma College. In addition to this I have a limited business relationship with Qays Julaidan as he is associated with the Abrar company of Saudi Arabia as I have described above.

**Mr Saleh Kamel**

171.    I know him socially. He is a well known financier and media magnate in Saudi Arabia and elsewhere in the Muslim world. He owns Al Barakah Bank and has also contributed to Dar Al-Hekma College in Jeddah. He was part of the Saudi

CONFIDENTIAL: This document is subject to a Protective Order
regarding confidential information in 03 MDL 1570 (GBD),
United States District Court for the Southern District of New York.

KADI0039641

0089

delegation of investors who attended the conference in Sudan as described above.

**Dr Mohamed Abdu Yamani**

172.  I know him as a friend of my maternal uncle and as a friend of my family. He was part of the Saudi delegation of investors who attended the conference sponsored by the IDB and the Albanian Government which I have mentioned above. He is the former Saudi Information Minister. He is a shareholder in Alinted in Albania which is a partner of mine in Karavan. Apart from this I have never had any business relationship with him. I have known him socially for many years.

**Mr Khalid bin Mahfouz**
**Mr Abdul Rahman bin Mahfouz**
**Mr Sultan Khalid bin Mahfouz**
**Mr Rais bin Mahfouz**

173.  I refer to the relevant paragraphs above for my account of my relationship with these individuals. I also invested in a Vancouver registered diamond prospecting company called MIT Ventures Corp. in June 1999. I have recently learned that a year before, Abdul Rahman bin Mahfouz and his brother Sultan Khalid bin Mahfouz invested in MIT Ventures in 1998 through their private company Al Murjan Minerals. My interest in MIT Ventures was held through New Diamond Holdings Limited, a British Virgin Islands company.

CONFIDENTIAL: This document is subject to a Protective Order
regarding confidential information in 03 MDL 1570 (GBD),
United States District Court for the Southern District of New York.

KADI0039642

0090

**Mr Talal Badkook**

174.    As I describe above, I worked for him for one year and suggested his name to KBM as a trustee of the Foundation.  I have known Talal Badkook since I worked for him in the late 1980's.  To the best of my knowledge he has never had any connection whatsoever with any terrorist group or activity including Osama bin Laden or Al Qaeda.  My relationship with him is solely and exclusively concerned with the work I carried out for his company in the late 1980's, and his trusteeship of the Foundation from 1992.  Our relationship has never been concerned with any issues relating to Osama bin Laden or Al-Qaeda.

**Dr Mohamed El Gheiri**

175.    He was the General Manager of NMCC at the time of NMCC's consultancy agreement with NCB.   We worked closely together on developing Islamic banking products for NCB.  He is a leading expert in Islamic Economics and holds a doctorate in this subject.  I nominated him as a trustee of the Foundation.

**Abdul Gani El Khereiji**

176.    I know him as a friend.  He is involved in the construction business. He headed the Al Andalus school in Jeddah.  I would not describe him as a financier.  I am a shareholder with him in Dar Ul Ilm school, which I describe above.  I nominated him as a trustee of the Foundation.

**Mr Saleh Al-Turki**

177.    Mr Al-Turki is the owner of an engineering and construction company NESMA and also other diversified interests in Saudi Arabia and internationally.  He holds

CONFIDENTIAL: This document is subject to a Protective Order regarding confidential information in 03 MDL 1570 (GBD), United States District Court for the Southern District of New York.

KADI0039643

C091

minority investments in 2 investments I have: Vakufska Bank in Sarajevo and Mahmal Confectionery Company.

**Article in the Wall Street Journal dated November 26, 2002 by Glenn Simpson**

178.    I now respond to the allegations published about me in an article entitled "Businessman's Actions Show How Saudi Money May Get To Extremists", published in the issue of the Wall Street Journal dated November 26 , 2002 ("the Article"). I was disturbed to read the contents of the Article given that prior to its publication, my English lawyers had provided its author, Mr Simpson, with information and clarification which unequivocally refuted the allegations which subsequently appeared in the Article. For the same purpose, my US lawyers, prior to publication of the Article, met with Mr Simpson and went through the main allegations which form the substance of the Article demonstrating to him that there was no foundation to them. It would appear Mr Simpson ignored what he learned in these meetings to write a sensationalist article concerning me and my activities.

179.    This Article alleges that there are very strong grounds to suspect me of knowingly supporting HAMAS, Osama bin Laden and Al-Qaeda; that I am connected with the bombing of 2 US Embassies in East Africa in August 1998 through investments I made in BMI, Inc.; and that through an investment I made in Abrar Investments Inc. I have assisted in financing the manufacture of explosives.

180.    Each and everyone of these allegations is totally untrue. The Wall Street Journal purport in their Article to support these allegations by referring to 3 issues which are as follows:

CONFIDENTIAL: This document is subject to a Protective Order
regarding confidential information in 03 MDL 1570 (GBD),
United States District Court for the Southern District of New York.                    KADI0039644

0092

180.1  My financial support for the Quranic Literary Institute of Chicago, Illinois ("QLI").

180.2  My investment through a New Jersey company formerly owned by me, Kadi International Inc., in a real-estate and leasing company, also incorporated in New Jersey, named BMI, Inc.

180.3  My investment in Abrar Investments Inc. of Stamford, Connecticut.

I respond to each of these issues in turn:

**Quranic Literary Institute of Chicago, Illinois ("QLI")**

181.  I refer to my supplemental witness statement dated July 23 2002 (my "Supplemental Witness Statement"), copies of which have been provided to OFAC. In my Supplemental Witness Statement I have provided a point by point rebuttal of the US Government's Verified Complaint for Forfeiture in *USA v. One 1997 E35 Ford Van et al Civil Action No. 98 C 3548* ("the forfeiture proceedings") and the affidavit of FBI agent Robert Wright sworn on June 9 1998 in those proceedings ("the Robert Wright Affidavit").   As I demonstrate in my Supplemental Witness Statement, the Robert Wright Affidavit, which is the basis of the US Government's Complaint in the forfeiture proceedings, contains numerous fundamental mis-statements of fact; it omits at least one material fact which I believe must have been within the knowledge of the FBI at the time Robert Wright swore his affidavit; and it provides a wholly mis-represented account of the transaction with which I was involved concerning the Woodridge,

CONFIDENTIAL: This document is subject to a Protective Order regarding confidential information in 03 MDL 1570 (GBD), United States District Court for the Southern District of New York.

KADI0039645

0093

Illinois property. Given these points, which I amplify in detail in my Supplemental Witness Statement, the Robert Wright Affidavit should be understood as based essentially on errors, a lack of proper analysis and unjustifiable inferences.

182. In light of the above, I do not propose in this statement to repeat the contents of my Supplemental Witness Statement save in respect of the specific issues relied upon by the Wall Street Journal in the Article.

183. The Article refers to allegations in the Robert Wright Affidavit (paragraph 33) that

**"The [Woodridge land] transaction resulted in the Quranic institute [QLI] "gaining possession and ownership of the Woodridge property in a manner that obscured its connection to the overseas transfer of $820,000 from the Saudi entity [K]adi International".**

184. There was nothing illegal, sinister or concealing in the Woodridge land transaction which was conducted in accordance with normal business practices. At no stage was it ever my intention to conceal my involvement in the Woodridge land transaction or my interest in the land, which I held through Kadi International, Inc., a company incorporated in New Jersey, USA, bearing my name and most obviously associated with me. I have never concealed my connection with QLI; the Annual Reports of QLI for the years 1994-1998, all of which are publicly available documents, all list me as one of the directors of QLI. There are, in addition to this, numerous documents connected with the Woodridge land transaction which recognise or otherwise reference myself or Kadi International, Inc. as a party with an interest in or otherwise connected to

CONFIDENTIAL: This document is subject to a Protective Order
regarding confidential information in 03 MDL 1570 (GBD),
United States District Court for the Southern District of New York.

KADI0039646

0094

the Woodridge property. Of these, the deeds of transfer of the Woodridge land are publicly available documents.

185. The Article also alleges that QLI:

**"sold the Woodridge property in 1994 for more than the initial purchase price but never repaid [my loan of] $820,000"**

and implies that some or all of these funds were used to support terrorism.

186. This allegation is, once again, totally untrue: when QLI sold the Woodridge property in 1994, the proceeds of sale were put into a bank account and remained there largely undisturbed for 4 years. During this 4 year period QLI continued their charitable activities and were engaged in finding suitable premises. To this end they made various offers to purchase property at 17972 East 9000 North Road, Grant Park, Illinois. QLI's bids were all rejected. By the Spring of 1998 QLI had found suitable premises which they were preparing to purchase at the time of the forfeiture proceedings in 1998. The premises QLI were negotiating to acquire were the Reformed Church of Palos Heights located at 6600 W. 127th Street, Palos Heights, Illinois. In fact by May 1998 QLI's attorney had prepared a draft contract for the purchase of this building. There is thus no evidence that these funds were ever used to fund any illegal or HAMAS related activities, but they were intended to buy premises for QLI to use as a Mosque.

187. The Article further alleges:

CONFIDENTIAL: This document is subject to a Protective Order regarding confidential information in 03 MDL 1570 (GBD), United States District Court for the Southern District of New York.

KADI0039647

0095

> "According to FBI agent Wright 1998 Affidavit, Mr Salah received most of about $110,000 in income generated by the Woodridge property."

188.  Once again, this allegation, which appears in paragraph 31 of the Robert Wright Affidavit, is totally untrue. Robert Wright's allegation is that rent proceeds were in effect funnelled from QLI to Mr Salah via Faisal Finance by means of QLI's endorsement of rent proceeds due to QLI from the lessee of the Woodridge property. However the entire factual matrix underpinning this allegation is totally false in fundamental respects. The true facts are: rent cheques in respect of the Woodridge property were never endorsed, as alleged in the Robert Wright Affidavit, to Faisal Finance or, so far as I am aware, to any party connected with me. They were endorsed to North America Islamic Trust ("NAIT") a body which manages funds on behalf of Islamic communities in North America and which invests in non-interest bearing instruments. QLI in common with other Islamic institutions maintained a regular account with NAIT. Moreover, the date Robert Wright alleges QLI endorsed the rent cheques occurred after my faxed instructions to Faisal Finance to send the first transfer to Mr Salah. If the rent had been funnelled as alleged by Robert Wright from QLI via Faisal Finance to Mr Salah one would expect QLI's endorsement of the rent cheques to have occurred before any instruction from me authorising the transfer of funds to Mr Salah. Furthermore, there is no allegation anywhere in the Robert Wright Affidavit that these monies were connected in any way with any HAMAS related purposes or any unlawful activities whatsoever.

CONFIDENTIAL: This document is subject to a Protective Order regarding confidential information in 03 MDL 1570 (GBD), United States District Court for the Southern District of New York.

KADI0039648

0096

189.   In my Supplemental Witness Statement I have effectively refuted each and every allegation referring to me contained in the Robert Wright Affidavit, I have proved that the transaction with which I was involved was entirely legitimate and conducted and negotiated by lawyers acting on both sides. It is unfortunate that the Wall Street Journal are relying for the purposes of the Article on the Robert Wright Affidavit which I believe has been thoroughly discredited.

**BMI, Inc.**

190.   The article alleges that through my investment in BMI Inc. I am connected with financing "the Embassy bombings in Africa". Once again, this allegation is completely untrue.

191.   In 1991, I decided to invest in a company named BMI, Inc. based at Secaucus, Newark in New Jersey, USA. BMI, Inc. carried out real estate business activities and subsequently leasing activities. The company interested me as an investment opportunity as it adhered to Islamic principles of investment. Specifically, the leasing activities related to medical equipment which was a field I have some experience and knowledge of from my first business in the late 1970's as sole agent in Saudi Arabia of American Hospital Supplies.

192.   BMI, Inc. suggested to me that part of my investment in the company should be held through a new corporation, Kadi International, Inc. I agreed to let them establish Kadi International, Inc. for me. BMI, Inc. registered Kadi International, Inc. with a registered office c/o BMI, Inc. at their address in Secaucus, New Jersey.

CONFIDENTIAL: This document is subject to a Protective Order regarding confidential information in 03 MDL 1570 (GBD), United States District Court for the Southern District of New York.

KADI0039649

0097

193.   The Article alleges that BMI "described itself as an Islamic bank". So far as I am aware, this allegation is untrue as BMI was never licensed as a depository institution and BMI described itself as an Islamic financial institution. The Article alleges that BMI "solicited investments by means of pamphlets distributed at Muslim gatherings". So far as I am aware this allegation is also untrue: I refer to copies of promotional literature BMI supplied to me, at pages 209 to 218, as a potential private investor.

194.   As I have stated, my investments with BMI, Inc. in the company's real-estate and leasing investment funds, were passive and were entirely innocent. At the time of my investment in BMI I was totally unaware of the identity, nature or activities of any other investors in BMI. I am not aware that BMI, Inc. has ever had any connection with Osama bin Laden, Al-Qaeda, Mousa Abu Marzouk, International Relief Organisation or Sulaiman Al-Ali or Mercy International as alleged in the Article. It follows that the allegation in the Article that I am connected, through my investment in BMI, Inc., with the bombing of 2 US Embassies in East Africa in August 1998 is totally baseless and untrue.

195.   In 1995 I became unhappy with my investment in BMI, Inc. and decided to withdraw my investment. I instructed BMI, Inc. to terminate my relationship with them, dissolve Kadi International, Inc. and return my investment. In this regard I refer to the documents appearing at pages 219 to 229.

196.   On June 17 1996, my Chief Accountant, Masood Syed, spoke to BMI who reported on progress concerning the withdrawal of my investment from the company. As will be seen from Masood Syed's memorandum of his

CONFIDENTIAL: This document is subject to a Protective Order
regarding confidential information in 03 MDL 1570 (GBD),
United States District Court for the Southern District of New York.

KADI0039650

0098

conversation to me (page 226) BMI expected that by the end of June 1996 the appropriate documentation would be received from the competent US tax authorities and "Then the company [Kadi International Inc.] will be officially dissolved and final distribution will be made to close down the affairs".

197. I would also refer to page 230 being the Certificate of Dissolution of Kadi International, Inc., dated December 5 1996.

198. In 1996 I learned that there were other investors with BMI who were also unhappy with BMI, Inc. In November 1996 my Chief Accountant Masood Syed made a request to the Office of Investor Education and Assistance of the Securities and Exchange Commission for copies of investor complaints filed with the SEC against BMI. The SEC supplied copies of the investor complaints to Mr Syed with the names and identifying details of the investors concealed. These documents together with the SEC's covering letter to Mr Syed are at pages 232 to 244. They show that BMI was making distributions to shareholders far in excess of the profits BMI earned and were thus distributing part of BMI's capital as profit.

199. In conclusion therefore I would say that my investment in BMI, Inc. was an innocent passive investment, and I was not involved in the day to day activities of the company, any management decisions or any decisions regarding the company's allocation of investments. I along with other investors suffered as a result of the company's activities and its distributions of capital to shareholders.

CONFIDENTIAL: This document is subject to a Protective Order regarding confidential information in 03 MDL 1570 (GBD), United States District Court for the Southern District of New York.

KADI0039651

**Abrar Investments Inc.**                                                    0099

200.    The article alleges that through an investment I made in a US company, Abrar
        Investments Inc. I have assisted in financing the manufacture of explosives by
        Global Chemical Corporation, an Illinois corporation.

201.    The basis for this allegation is tenuous in the extreme: it appears, from the
        Article, to be based on an affidavit by FBI agent, Valerie Donahue, in an
        investigation by the FBI concerning "possible mail and wire fraud and money
        laundering" by Global Chemical.  From this affidavit it would appear that Global
        Chemical Corporation was involved in fraud and that Abrar Investments Inc. was
        one of the victims of the fraud.  There is no indication in Ms Donahue's affidavit
        that Abrar Investments Inc. had any knowledge of any allegedly inappropriate
        activity by Global Chemical Corporation nor is there any mention of me in that
        affidavit.

202.    The true position is this:  in May 1993 I placed the sum of US$ 1 million with
        Abrar Investments Inc., USA ("Abrar USA"), a US based fund management
        company. I intended Abrar USA to invest these funds in public companies in the
        USA. Subject only to this, Abrar USA, as fund manager, had complete discretion
        as to all investment decisions.  In the period 1993 – 1995, Abrar USA reported
        satisfactorily on the state of my investment.  However, subsequently, my staff
        stopped receiving regular reports.  In late 1998, I instructed my Chief Accountant,
        Masood Syed, to check on my investment and he discovered, for the first time,
        that a sum of money had been invested by Abrar USA in a company named
        Global Chemicals.  Thus, the first I ever knew about the investment in Global
        Chemicals was in late 1998, some years after the investment had apparently

CONFIDENTIAL: This document is subject to a Protective Order
regarding confidential information in 03 MDL 1570 (GBD),
United States District Court for the Southern District of New York.

KADI0039652

0100

been made. I have never had any knowledge of what other funds were invested by Abrar USA in Global Chemicals or what other investors' funds Abrar USA had mixed my funds with.

203. Moreover, I add that nowhere in Valerie Donahue's affidavit is there any evidence or even any allegation that Global Chemical was in fact engaged in any bomb or explosive manufacturing activities, and so the allegation in the Article that it was appears to be based entirely on speculation.

204. In summary, I would state that I gave Abrar USA complete discretion to manage my funds on my behalf, at the time of Abrar USA's investment in Global Chemicals I was completely unaware of it, and it was not until some years later, in 1998, that I first became aware of the investment in Global Chemicals following the investigation carried out by Masood Syed.

Summary

205. In summary, I make the following points about the basis on which US and UK Treasury have placed me on their Specially Designated Global Terrorists lists. In a Witness Statement of Mr Joseph Halligan, assistant secretary at the UK Treasury, dated November 16 2001, Mr Halligan states that on the morning of October 12 2001 he was given a fax from the US Treasury Department dated October 11 2001, which included details about me. I shall refer to this as the "US Treasury Department's fax". A copy of the US Treasury Department's fax appears at pages 1 to 2. The US Treasury Department's fax is the only document my lawyers have ever received setting out what I understand to be the

CONFIDENTIAL: This document is subject to a Protective Order regarding confidential information in 03 MDL 1570 (GBD), United States District Court for the Southern District of New York.

KADI0039653

0 1 0 1

allegations against me. I believe I have refuted the allegations in the US Treasury Department's fax in detail as I explain and summarise below.

**QLI**

206.    The primary basis on which US and UK Treasury have placed me on their lists (and I would add the **only** piece of evidence cited in footnotes to the US Treasury Department's fax, which is not hearsay) appears to be my financial support of QLI, and the allegations against me in the Robert Wright Affidavit.  Having investigated this fully, I have refuted each and every allegation referring to me contained in the Robert Wright Affidavit.  I have shown the Robert Wright Affidavit to contain numerous fundamental mis-statements of fact and a wholly mis-represented account of the transaction with which I was involved concerning the Woodridge, Illinois property.  I believe I have demonstrated that the allegations in the Robert Wright Affidavit are based essentially on errors, a lack of proper analysis and unjustifiable inferences.  In this regard I refer to my Statement dated December 17 2001 ("my First Statement"), paragraphs 23-45, my Supplemental Witness Statement, paragraphs 15-99 and paragraphs 181 to 189 above.

**The Foundation**

207.    I have explained in detail my extensive charitable activities, conducted through the Foundation.   My solicitors have examined an enormous quantity of documentation and have interviewed numerous witnesses, including former employees of the Foundation and have found no evidence whatsoever that any transaction benefited or was intended to benefit Osama bin Laden, Al-Qaeda or any other terrorist activity or group.  There is no basis for concluding that there was anything illegal or improper about my support of the Foundation's

CONFIDENTIAL: This document is subject to a Protective Order
regarding confidential information in 03 MDL 1570 (GBD),
United States District Court for the Southern District of New York.

KADI0039654

0102

considerable charitable endeavours. In this regard I refer to my First Statement, paragraphs 9-14, my Supplemental Witness Statement, paragraphs 10-13, and my detailed account of my charitable activities through the Foundation appearing in paragraphs 24 to 132 above.

## Chafiq Ayadi

208.  I have shown that Chafiq Ayadi was the European Director of the Foundation from 1992-1996 and that during this period I transferred substantial sums of money to the accounts of the Foundation in Bosnia and Croatia through European correspondent banks for the charitable objectives of the Foundation and specifically to further the Foundation's considerable charitable objectives and purposes in Bosnia and Croatia. I have never transferred any funds, to Chafiq Ayadi or anybody else, for the purpose of supporting Osama bin Laden, Al-Qaeda or any other terrorist group or activity nor have I ever seen any evidence that any funds I did transfer to Chafiq Ayadi have actually been used for any such purposes.   In this regard I refer to my First Statement, paragraph 15, my Supplemental Witness Statement, paragraphs 9-13 and paragraphs 67 to 89 above.

## FBIS Article

209.  I believe I have demonstrated that it is highly improbable that the so-called "interview" with bin Laden ever took place and that the FBIS article, aside from being a hearsay document, and of no evidential value at all, is wholly unreliable. In this regard I refer to my First Statement, paragraphs 16-21 and paragraphs 74 to 80 above.

CONFIDENTIAL: This document is subject to a Protective Order
regarding confidential information in 03 MDL 1570 (GBD),
United States District Court for the Southern District of New York.

KADI0039655

**USA Today Article**

0103

210.    I believe I have demonstrated that the Foundation never had any account with the National Commercial Bank (NCB).  I have shown that NCB management have vehemently denied the existence of any Saudi Government audit showing that money had been diverted to the Foundation and transferred to bin Laden and described the allegations as "incorrect, false and frivolous".  I have also shown that the USA Today article repeats allegations made in 1995 in the London-based magazine, Africa Confidential, which were totally discredited in proceedings for libel which I and my fellow trustees commenced in 1995 in the High Court in London against the Editor and Publisher of Africa Confidential.  In this regard, I refer to my First Statement, paragraphs 22-22.3, and paragraphs 40 to 43 above.


**Global Diamond Resources**

211.    I believe I have demonstrated that contrary to the allegations in the US Treasury Department's fax, and as is perfectly clear from publicly available documents, I served on the Board of Directors of Global Diamond Resources as a nominee of New Diamond Holdings Limited.  It is totally untrue, as alleged in the US Treasury Department's fax, that I served on the Board of Global Diamond Resources as a representative of one of two "foreign, anonymous, investor groups" an allegation which is calculated to create the most mysterious and sinister of impressions about me. In this regard I refer to my First Statement, paragraph 47 and paragraph 168 above.

CONFIDENTIAL: This document is subject to a Protective Order
regarding confidential information in 03 MDL 1570 (GBD),
United States District Court for the Southern District of New York.                    KADI0039656

0104

**Shifa International Hospitals**

**MM Badkook Co. for Catering & Trading**

212.    It is unclear to me on what basis, if any, my involvement with these entities is a separate ground of criticism against me. I have explained my involvement with these entities in detail, which is completely innocent. I refer to my First Statement, paragraphs 48-49 and paragraph 9-11 above and paragraph 174 above. In regard to Shifa International Hospitals I also refer to paragraphs 55 to 62 above.

**Al-Abrar Group International**

**Abrar Investments Inc. (Abrar USA)**

213.    It is unclear to me what, if any, wrongdoing Al-Abrar Group International is alleged to have carried out and on what ground this allegation is a separate basis of criticism against me. As I have demonstrated in paragraphs 200 to 204 above, my investment with Abrar Investments Inc. was completely innocent and I am not aware that any of the funds I invested with this company were used to support any terrorist group or activity. In relation to Al-Abrar Group International Inc. I would also refer to my First Statement, paragraphs 50 to 51.

**My so-called brother "Omar Al-Qadi" and Mercy International**

214.    I have demonstrated that I do not have any brother. As is very well known in Saudi Arabia, I am the only son of my parents and have 6 sisters. It frankly is beyond belief that the US Treasury Department, followed by HM Treasury in the UK, have apparently based their allegations against me in part on my having a so-called brother who is supposedly a director of Mercy International, an

CONFIDENTIAL: This document is subject to a Protective Order
regarding confidential information in 03 MDL 1570 (GBD),
United States District Court for the Southern District of New York.

KADI0039657

0105

allegation which the most basic of enquiries would have revealed to be false. The statement regarding the relationship between someone called Omar Al-Qadi and me is completely untrue. Since the case against me is based, in so easily verifiable a matter, on a factual error, I am very concerned that the other allegations, which are even more vague and subjective, should equally be understood as based essentially on errors and a lack of proper analysis. In this regard I refer to my First Statement, paragraph 52, and paragraph 13 above.

**Conclusion**

215.   For the avoidance of doubt I would reiterate that none of my dealings or relationships with the individuals or entities I have mentioned above have ever been involved to my knowledge with supporting terrorism, Osama bin Laden, Al-Qaeda or any terrorist group or activity. I have made full and frank disclosure in response to all the questions raised by Mr Newcomb at the meeting on August 1 2002. My lawyers have spent literally thousands of hours reviewing documents and interviewing witnesses and have found no evidence that I intended any of my activities to benefit Osama bin Laden, Al-Qaeda or any terrorist group. I believe that the burden now falls upon OFAC to identify precisely what matters (if any) would justify maintaining sanctions against me. The basis of the case against me seems to be that I am a wealthy Saudi Arabian businessman who has made substantial charitable donations throughout the world. I believe I have fully explained when and why such donations were made. It is now over a year since my assets were frozen on a worldwide basis as a result of the actions of the US authorities.

CONFIDENTIAL: This document is subject to a Protective Order regarding confidential information in 03 MDL 1570 (GBD), United States District Court for the Southern District of New York.

KADI0039658

DEC 19 '02 09:02AM

P.2

0106

I believe I am a victim of a gross miscarriage of justice. Accordingly, I now ask

that my assets be de-listed by OFAC without any further delay.

I believe that the facts stated in this statement are true.

Signed ........................................................   Dated December 19th, 2002

**Yassin Abdullah Kadi**

100

CONFIDENTIAL: This document is subject to a Protective Order
regarding confidential information in 03 MDL 1570 (GBD),
United States District Court for the Southern District of New York.

KADI0039659

CONFIDENTIAL: This document is subject to a Protective Order
regarding confidential information in 03 MDL 1570 (GBD),
United States District Court for the Southern District of New York.

KADI0039660