**MDL 1570 PLAINTIFFS' EXECUTIVE COMMITTEES**
In re: Terrorist Attacks on September 11, 2001 (S.D.N.Y)

| Plaintiffs' Executive Committee for Personal Injury and Death Claims | Plaintiffs' Executive Committee for Commercial Claims |
|---|---|
| Ronald L. Motley, *Co-Chair*<br>MOTLEY RICE LLC<br>James P. Kreindler, *Co-Chair*<br>KREINDLER & KREINDLER LLP | Elliot R. Feldman, *Co-Chair*<br>Sean Carter, *Co-Chair*<br>COZEN O'CONNOR |
| Andrew J. Maloney III, *Co-Liaison Counsel*<br>KREINDLER & KREINDLER LLP<br>Paul J. Hanly, Jr., *Co-Liaison Counsel*<br>HANLY CONROY BIERSTEIN SHERIDAN FISHER & HAYES LLP | J. Scott Tarbutton, *Liaison Counsel*<br>COZEN O'CONNOR |

**VIA ECF AND OVERNIGHT DELIVERY**

September 2, 2015

The Honorable Frank Maas
United States District Court
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street, Room 740
New York, NY 10007

    Re:    *In Re: Terrorist Attacks on September 11, 2001,* 03 MDL 1570 (GBD) (FM)

Dear Judge Maas:

    The Plaintiffs' Executive Committees, on behalf of all plaintiffs, submit this letter and accompanying exhibits in support of their request that the Court enter an order pursuant to Federal Rule of Civil Procedure 37(a), compelling defendants Abdullah Omar Naseef, Abdullah bin Saleh al Obaid, Abdullah Muhsen al Turki, and Adnan Basha (collectively referred to as the "Charity Official Defendants"), to immediately produce all documents and information responsive to plaintiffs' jurisdictional document requests. To date, the defendants have failed to produce meaningful and responsive documentation, and continue to engage in the deliberate obstruction of the discovery process that we have seen from other defendants in this litigation. Accordingly, plaintiffs seek this Court's intervention.

## I.    FACTUAL BACKGROUND

    The claims against the Charity Official Defendants relate primarily to their roles in establishing and fostering the institutional partnerships between al Qaeda and purported charities under their supervision and control. Under these defendants' stewardship, the charities under their control served as the primary vehicles for fueling and sustaining al Qaeda's campaign to attack the United States, from the date of al Qaeda's establishment through the September 11, 2001 attacks.

Historically, the collaboration between the charities and al Qaeda leadership grew out of the charities' well-documented and acknowledged roles in supporting the mujahideen during the "holy war" against the Soviet occupation of Afghanistan of the 1980s; the very network of charities Osama bin Laden used to serve as the foundation for al Qaeda's jihad against the United States. As al Qaeda's global footprint grew in the ensuing years, the charities' sponsorship of al Qaeda expanded significantly under the supervision and direction of the Charity Official Defendants. Indeed, plaintiffs' pleadings and extrinsic evidentiary materials establish that the charities were intimately involved in all aspects of al Qaeda's jihadist campaign, from the provision of financial support to the direct participation in al Qaeda plots and attacks, on a continuous basis for many years leading to the September 11th attacks. Each of the Charity Official Defendants is expressly alleged to have acted knowingly in facilitating the charities' institutional support for al Qaeda as described below.

### A. Abdullah Omar Naseef

Defendant Naseef served as the Secretary-General of the Muslim World League ("MWL") during al Qaeda's formative years when the MWL forged an enduring partnership with Osama bin Laden to support al Qaeda's targeting of the United States. During a 2002 raid of the Sarajevo offices of the Benevolence International Foundation ("BIF"), a designated al Qaeda front, investigators recovered extensive documentation relating to al Qaeda's operations from BIF's computer system, including numerous documents regarding al Qaeda's formation and the participation of purported Islamic charities in al Qaeda's support infrastructure, including the MWL and International Islamic Relief Organization ("IIRO"). Discovered within that file was a memo on MWL/IIRO letterhead detailing a meeting between Abu Abdullah (Osama bin Laden), Dr. Abdullah Naseef, in his capacity as Secretary-General of the MWL, and others. The U.S. intelligence translation of the document, with analyst notes, states in relevant part: "[L]et it be a secret (*agreement*), in a way that League offices will be opened as (*illegible*) for the Pakistanis, and the attacks will be launched from them (*these offices*)...." See Exhibit A. The document further states: "You must pursue finding an umbrella which you can stay under ... and I prefer the name of the League (*most likely, Muslim World League*) because Dr. Naseef is one of the brothers...." *Id.* Naseef has never denied that meeting took place.

Naseef also founded the Rabita Trust and was responsible for appointing Wa'el Hamza Jelaidan, an al Qaeda co-founder and Executive Order 13224 designee, to a senior leadership position within that organization. At the time of the appointment, Jelaidan's ties to Osama bin Laden were well known to Naseef, given Jelaidan's role as head of the MWL office in Peshawar, which served as the rear base of operations for the Afghan mujahideen during the Afghan jihad. Rabita Trust was designated pursuant to Executive Order 13224 on October 12, 2001 "for its close ties to senior al Qaida leadership and for providing logistical and financial support to al Qaida."

Naseef is further responsible for approving the appointment of Mohammed Jamal Khalifa, Osama bin Laden's brother-in-law and senior al Qaeda member, to head the MWL and IIRO branch office in the Philippines. Like Jelaidan, Khalifa fought with bin Laden during the Afghan jihad, and was responsible for opening the MWL office in Pakistan that supported the jihad (the same office later headed by Jelaidan). Thus, Khalifa's deep ties to bin Laden on the

The Honorable Frank Maas
September 2, 2015
Page 3

---

one hand, and to the MWL on the other, were well known to Naseef as head of the MWL during that time. It was immediately after the conclusion of the Afghan jihad that Khalifa was appointed to open and head a MWL/IIRO office in the Philippines, which served as a platform for al Qaeda's expansion into Southeast Asia. By virtue of Naseef's dual status as Secretary-General of the MWL and Chairman of the IIRO at that time, Khalifa's appointment necessarily required Naseef's endorsement. *See* Exhibit B. Khalifa used the IIRO to provide funds and other support for the 1993 World Trade Center bombing and the 1995 "Bojinka" plot to simultaneously bomb multiple airlines while in transit to the United States. The Bojinka plot was conceived by September 11th mastermind Khalid Sheikh Mohammed and was a precursor to the September 11th attacks.

### B. Abdullah bin Saleh al Obaid

Defendant Obaid held significant leadership roles in numerous charities that operated as conduits for al Qaeda financing, including the MWL, IIRO, Rabita Trust, Sana-Bell, Inc., and Sanabel al Kheer, Inc. From 1995 through 2000, Obaid served as Secretary-General of the MWL, guaranteeing that the MWL's partnership with al Qaeda (brokered by defendant Naseef), continued unabated during his leadership. Obaid additionally served as an officer of Rabita Trust, designated by the U.S. government for its sponsorship of al Qaeda. Obaid further served for many years as a member of the Supreme Council for Islamic Affairs, a body with supervisory authority over the defendant charities.

The charities' pervasive sponsorship of Islamic extremists, including al Qaeda, was well-documented during the years that Obaid exercised authority over those organizations. Indeed, the MWL and its constituent charities, including the IIRO, World Assembly of Muslim Youth ("WAMY"), and Al Haramain Islamic Foundation, were repeatedly implicated in terrorist and extremist activities between 1990 and September 11, 2001. Given his supervisory authority over those charities, Obaid was fully aware of these reports. In fact, in a 1997 interview published in the MWL's own newspaper, Obaid himself acknowledged that charges of terrorism sponsorship had been leveled against the Saudi charities, including the MWL, and that those charges were accurate, though he offered a self-serving, benign characterization of the circumstances. "Answering a question on the reports regarding the League's funds being funneled to extremist groups, Dr. al Obeid said, 'this is a closed chapter…It has already been proven that there were people who exploited this situation and misused some funds." *See* Exhibit C. Nevertheless, Obaid continued to use his authority over the charities to provide significant material support and resources to al Qaeda.

### C. Abdullah Muhsen al Turki

Defendant Turki similarly used his prominent leadership positions within the Saudi government to assist the charities in sponsoring al Qaeda and other Islamic extremists. In 1993, Turki was appointed to head the Ministry of Islamic Affairs. In that role, Turki was directly responsible for supervising and directing the activities of several of al Qaeda's most important front charities, including the MWL, IIRO, WAMY, and Al Haramain. In 1995, he was appointed to the Saudi Council of Ministers, the highest decision-making body of the Saudi government. Later, in 2000, Turki was appointed as the Secretary-General of the MWL, a

Case 1:03-md-01570-GBD-SN   Document 3024   Filed 09/02/15   Page 4 of 10

The Honorable Frank Maas
September 2, 2015
Page 4

position he holds to this day. In each of those roles, Turki knowingly used his authority to foster the partnerships between al Qaeda and the charities under his control.

For example, affidavit testimony submitted in this litigation by Al Haramain's own officials document the hands-on character of that oversight, stating that "al Haramain operates under the supervision of the Saudi Minister of Islamic Affairs, who appoints its Board of Directors and senior management personnel." *See* Exhibit D. Additional submissions in this case confirm Turki's responsibility for directing and supervising al Haramain, an organization so singularly dedicated to al Qaeda's jihad that the United States designated every one of its global branches, stating that "when viewed as a single entity, AHF is one of the principal Islamic NGOs providing support for the al Qaida network and promoting militant Islamic doctrine worldwide."

Turki is further connected to al Qaeda's European financial chief, Muhammed Zouyadi. Zouyadi used various Spanish businesses to launder money from Saudi Arabia through Spain to al Qaeda cells in Germany, including the Hamburg cell that participated in the September 11th attacks.

### D. Adnan Basha

Defendant Basha served for many years as the Secretary-General of the IIRO,[1] an organization that channeled massive funding to al Qaeda and has directly participated in numerous al Qaeda attacks targeting the United States, including the 1993 World Trade Center bombing, the 1995 "Bojinka" plot, the 1995 plot to assassinate President Clinton, the 1998 United States embassy bombings in Kenya and Tanzania, the plot to attack the U.S. consulates in Madras and Calcutta, and the transfer of weapons and ammunition to al Qaeda fighters in Bosnia.

As the IIRO Secretary-General, Basha himself knew and intended that the IIRO provide al Qaeda with $60 million to fund terrorist training camps in Afghanistan, where several of the 9/11 hijackers were trained. According to a 1996 Central Intelligence Agency report, the IIRO was financing six al Qaeda camps in Afghanistan. *See* Exhibit E.

Basha further oversaw the appointment of Mohammed Jamal Khalifa to head the IIRO office in the Philippines. As described above, Khalifa used that office as a platform for al Qaeda's expansion, and to provide support to al Qaeda cells plotting attacks against the United States.

Moreover, in 2006, while under Basha's leadership, the IIRO's terrorist activities prompted the U.S. government to formally designate the IIRO branch offices in the Philippines and Indonesia, and a senior IIRO official in Saudi Arabia, "for facilitating fundraising for al Qaida and affiliated groups" and "bankroll[ing] the al Qaida network in Southeast Asia." *See* Exhibit F.

---

[1] Defendant Basha additionally held significant leadership roles with Sana-Bell, Inc., Sanabel al Kheer, Inc., and Sanabel al Khair-Saudi Arabia.

## II.     PROCEDURAL HISTORY

On April 16, 2013, the Second Circuit Court of Appeals vacated the district court's dismissal of the Charity Official Defendants, concluding that plaintiffs' allegations, as summarized above, warranted remand for jurisdictional discovery. *O'Neill v. Asat Trust Reg. (In re Terrorist Attacks on September 11, 2001)*, 714 F.3d 659, 678-679 (2d Cir. 2013). According to the Court, "these allegations suggest that the Charity Official Defendants ... *directly* provided financial and other resources to al Qaeda knowing that al Qaeda was engaged in a global campaign of terror directed at the United States." *Id.* at 678.

Plaintiffs served their consolidated First Set of Jurisdictional Requests for Production of Documents Directed to defendants Naseef, Obaid, Turki and Basha on August 22, 2013, attached hereto as Exhibits G-J respectively. Those requests generally seek *inter alia*: (i) documents detailing or describing each defendant's authority to supervise and direct the operations, activities, and policies of the charities; (ii) documents detailing or describing each defendant's management or supervision over the charities' funds, including control over the charities' accounts in any banking or financial institution; (iii) documents relating to the charities' organizational structure, funding and activities, including but not limited to annual and periodic reports, financial reports, auditing reports, branch office reports, and delegation reports; (iv) documents relating to all delegations each defendant participated in as an official representative of the charities and/or Saudi government; (v) documents relating to all trips each defendant took to Sudan (between 1988-1997) and Afghanistan (between 1988-2002); (vi) documents relating to any information or notification received that the charities were involved in the sponsorship of radical, extremist, or terrorist organizations such as al Qaeda; (vii) documents relating to any investigation or inquiry into allegations that the charities, or the defendants themselves, were diverting funds or providing material support to Islamic extremists, al Qaeda, or other terror organizations; (viii) documents relating to any investigation or audit of the charities' banking and financial accounts, investments, or assets conducted by the Kingdom of Saudi Arabia or other third party; (ix) documents relating to any meetings the defendants participated in with representatives of the Saudi government, Saudi royal family, and/or representatives from other foreign governments or international bodies regarding any investigation or inquiry into allegations that the charities were providing material support to al Qaeda or other terror groups; and (x) documents detailing or describing the defendants' relationships with al Qaeda members Wa'el Hamza Jelaidan and Mohammed Jamal Khalifa.

On November 11, 2013, the Charity Official Defendants served their Objections and Responses to Plaintiffs' First Set of Jurisdictional Requests for Production of Documents, attached hereto as Exhibits K-N. But rather than make any affirmative showing of a good faith attempt to locate and secure documents responsive to plaintiffs' discovery, the defendants assert and rely upon numerous objections to justify the withholding of documentation and information within their possession, custody, and control. Principally arguing that the documents plaintiffs seek are under the control of the charities themselves, the four defendants have collectively produced a total of 82 pages of documents since the commencement of jurisdictional discovery two years ago.

Even more egregious, the defendants' productions are nearly exclusively comprised of various affidavits and other documents previously filed with this Court in 2003 and 2005 in support of their initial motions to dismiss. For example, defendant Naseef has produced a mere 17 pages of documents since the commencement of jurisdictional discovery. *See* Exhibit O. Those materials chiefly consist of declarations and other attachments filed with his September 7, 2005 motion to dismiss (ECF No. 1206): (i) Declaration of Alan R. Kabat in Support of Defendant Dr. Abdullah Naseef's Consolidated Motion to Dismiss; (ii) Declaration of Abdullah Naseef; and (iii) Attachments 1 and 2 to the Naseef Declaration. Also included in this meager production is a brief biography attributed to Naseef captured from an internet webpage.

Defendants Obaid and Turki have similarly produced the declarations and other documents submitted in support of their 2005 motions to dismiss, including a brief biography or curriculum vitae. *See* Obaid production (30 pages total) and Turki production (34 pages total) at Exhibits P and Q respectively.

Defendant Basha has evidently made no attempt to locate responsive documentation, producing only a single page resume, attached hereto as Exhibit R.

Given their apparent unwillingness to engage in good faith efforts to secure and produce responsive documentation, plaintiffs have legitimate concerns that the Charity Official Defendants do not intend to fulfill their discovery obligations in this important litigation and are in fact deliberately withholding the production of responsive documentation. Court intervention is now necessary. Accordingly, plaintiffs respectfully request that the Court order the defendants to immediately undertake all efforts to obtain and produce all responsive materials.

### III. THERE IS NO EVIDENCE THE CHARITY OFFICIAL DEFENDANTS HAVE UNDERTAKEN ANY EFFORTS TO SECURE AND PRODUCE RESPONSIVE DOCUMENTATION

The Charity Official Defendants largely object to plaintiffs' jurisdictional discovery requests on the basis that they improperly seek the business records of the MWL, IIRO or other entities. *See* General Objection No. 6 at Exhibits K-N (stating that the Charity Official Defendants lack "personal possession of those records"); *see also* defendants' Objections and Response to Request No. 1 at p. 5. But the defendants' objection is without merit. Although the defendants may not have personal custody of the requested documents as they represent, they do have the practical ability to request and secure responsive documentation from the charities pursuant to Fed. R. Civ. Pro. 34.

Rule 34 "control" does not require a party to have legal ownership or actual physical possession of any documents at issue. Instead, "documents are considered to be under a party's control when that party has the right, authority, or practical ability to obtain the documents from a non-party to the action." *See In re NTL, Inc. Secs. Litig.*, 244 F.R.D. 179, 195 (S.D.N.Y. 2007); *Golden Trade, S.r.L. v. Lee Apparel Co.*, 143 F.R.D. 514, 525 (S.D.N.Y. 1992) (courts have "interpreted Rule 34 to require production if the party has the practical ability to obtain the documents from another, irrespective of his legal entitlement to the documents."). Courts have interpreted the meaning of "practical ability" to mean the possibility that a party could

potentially obtain the documents on demand. *See SEC v. Credit Bancorp, Ltd.*, 194 F.R.D. 469, 471 (S.D.N.Y. 2000) ("control" has been broadly construed by the courts to include the "practical ability to obtain the materials sought upon demand").

Courts have consistently held that corporate officers and directors have "control" over corporate documents. *See Savage & Assocs., P.C. v. Mandl (In re Teligent, Inc.)*, 358 B.R. 45, 60 (Bankr. S.D.N.Y. 2006) (holding that a high-ranking officer has the practical ability to request and produce documents from his current employer, including his personnel file, and was obliged to do so); *Scott v. Arex, Inc.*, 124 F.R.D. 39, 41 (D. Conn. 1989) (holding that a party's control over third-party documents extends to the records of a corporation for which the party serves as an officer); *Riddell Sports v. Brooks*, 158 F.R.D. 555, 558 (S.D.N.Y. 1994) ("It is well-established that an individual party to a lawsuit can be compelled to produce relevant information and documents relating to a non-party corporation of which it is an officer, director or shareholder.").

Consistent with those decisions, defendant Turki (who has continuously held the position of Secretary-General of the MWL from 2000 to the present; the highest ranking position within that organization), has the requisite "control" under Rule 34 and thus the practical ability to obtain responsive documentation from the MWL and its subsidiary organizations, including the IIRO and Al Haramain. But there is not a shred of evidence (e.g., affidavit testimony or otherwise), that Turki has made any such attempts to formally request and secure requested materials from those entities, including his personnel file.

Defendants Naseef, Obaid, and Basha similarly have the practical ability under Rule 34 to request and obtain responsive documentation despite the fact that they have stepped down from their executive roles as Secretary-Generals to the MWL and IIRO. Indeed, the Courts in this Circuit frequently mandate that former high-level officials produce documents. *See In Re Flag Telecomm Holdings, Ltd. Sec. Litg.*, 236 F.R.D. 177, 181-182 (S.D.N.Y. 2006) (holding that a senior executive of the corporation has the practical ability to obtain documents sought by plaintiffs' discovery, even when the individual resigned from his executive position, but planned to continue as a consultant to the corporation); *Wiwa v. Royal Dutch Petroleum Co.*, 2009 U.S. Dist. LEXIS 61898, *14-16 (S.D.N.Y. 2009) (finding that even where plaintiff individuals ceased to hold leadership positions with the corporate entity, "this did not necessarily end their control over [the corporation's] documents and thus their obligation to produce those that were responsive").

Although defendants Naseef, Obaid, and Basha represent that they have resigned from their leadership roles with the charities, evidence suggests that they maintain significant influence over the policies, decision-making, and activities of the charities by virtue of their continuing advisory positions and on-going relationships with MWL/IIRO leadership. In certain instances, these individuals have held, or continue to hold, high-level prominent positions with the charities.

For instance, defendant Naseef asserts that his tenure as MWL Secretary-General ended in or around 1993, *see* Exhibit K, General Objection No. 6, but fails to advise this Court that he has maintained significant contacts with the MWL and IIRO long after he left that position. For

The Honorable Frank Maas
September 2, 2015
Page 8

---

example, as recently as February 24, 2015, Naseef was a featured speaker at a MWL conference in Mecca discussing the war on terrorism. In March 2014, Naseef presided over a Pakistan Repatriation Council event held in Jeddah in which the former MWL Secretary-General urged for the reactivation of the Rabita Trust which had been shut down following its 2001 designation by the U.S. government for providing material support to al Qaeda.[2] In September 2014, Naseef attended a meeting of the IIRO's General Assembly to discuss the IIRO's humanitarian and relief efforts. According to media reports, Naseef (a member of the IIRO General Assembly) was one of several "leading participants."[3] On October 21, 2012, Naseef delivered a speech at a MWL conference. In December 2008, Naseef chaired a panel discussion at an Islamic religious conference organized by the MWL. In June 2008, in his capacity as Secretary-General of the International Islamic Council for Da'wa and Relief ("IICDR"), Naseef was a featured speaker at an Islamic conference hosted by the MWL at its headquarters in Mecca.[4] In April 2003, the MWL weekly magazine, Al Alaam Al Islami, reported that the Holy Mecca Institution ("Mecca al Mukaramah"), an integral part of the MWL, held a Board of Trustees meeting. The meeting was led by MWL Secretary-General Turki, who simultaneously served as the Chairman of the Holy Mecca Institution's Board of Trustees. Naseef participated in that meeting as Deputy Chairman of the Board of Trustees.

Defendant Obaid, who served as MWL Secretary-General from 1995-2002, has also maintained a continuing relationship with the MWL and IIRO, serving in several high-level positions since 2002. In a May 21, 2015 report posted on the MWL's website, Secretary-General Turki presided over a meeting of representatives from numerous MWL bodies and affiliated organizations. Obaid attended in his official role as the head of the MWL Monitoring Committee and was responsible for presenting the resolutions of the conference to the attendees. In December 2014, Obaid is identified in media reports as a member of the MWL Supreme Council. In September 2014, Obaid attended the meeting of the IIRO's General Assembly. A member of the General Assembly like Naseef, Obaid was reported to be one of several "leading participants." In August 2008, Obaid was responsible for chairing a panel discussion at a conference organized by the MWL. Obaid has also served as Vice-President of the International Islamic Council for Da'wa and Relief ("IICDR"), mentioned above. Member organizations include the MWL, IIRO and WAMY. As of April 2003, Obaid served as a member of the Holy Mecca Institution's Board of Trustees, closely associated with the MWL and defendants Turki and Naseef. In 2002, following his tenure as MWL Secretary-General, Obaid served as a member of the MWL Constituent Council.

---

[2] The MWL jointly established Rabita Trust with the government of Pakistan in 1992.

[3] The IIRO General Assembly is a governing body responsible for *inter alia*: (i) discussing and adopting IIRO policies and strategies; (ii) issuing recommendations and instructions relative to the global activities of the charity; (iii) selecting members of the Board of Directors; (iv) reviewing and approving financial statements and balance sheets; (v) appointing financial auditors; and (vi) setting policies and procedures for branch offices.

[4] The IICDR consists of approximately 86 Islamic organizations from around the world which are tasked with promoting the message of Islam, improving relations between Islamic communities, and providing aid and assistance to needy Muslims. Member organizations include the MWL, IIRO, and WAMY.

The Honorable Frank Maas
September 2, 2015
Page 9

---

Defendant Basha stepped down as IIRO Secretary-General in January 2013, but remains as an advisor to the MWL, the IIRO's parent organization. *See* Resume for Adnan Khalil Basha at Exhibit R.

Despite these continuing professional relationships with the charities and their leaders, defendants Naseef, Obaid and Basha have failed to present any evidence that they have undertaken any efforts to locate, request, and obtain responsive documentation and information.

Defendants further object to plaintiffs' discovery on the basis that "the MWL and the IIRO have already produced their relevant business records in this litigation." *See* Exhibits K-N, General Objection No. 6.[5] To the extent the Charity Official Defendants intend to rely upon the documents already produced in this litigation by the MWL, IIRO, or other of the charity defendants, plaintiffs respectfully submit that each of the charity officials should be directed to produce an index identifying which documents they believe are responsive to plaintiffs' discovery, and further specify which requests those documents are responsive to. *See* Fed. R. Civ. Pro. 34(b)(2)(E)(i).

Importantly, the defendants' objections do not preclude them from producing responsive documents within their possession. Without question, the positions held by the Charity Official Defendants are prominent, high-profile roles in internationally known Islamic institutions. Their appointments to those leadership positions would have marked a singular achievement in their Islamic careers. In these roles, the defendants traveled throughout the world meeting with foreign government leaders, working collectively with international bodies, appearing in various media outlets, attending various speaking engagements, and convening with the highest leadership in the Saudi government, including the Saudi royal family, to plan and implement the global operations and activities of the charities under their supervision. The notion that the defendants did not retain a single document, photograph, passport, press release, award, or memento during their tenure with the charities is simply inconceivable.

Defendants additionally object to plaintiffs' jurisdictional discovery, arguing that plaintiffs' requests: (i) improperly seek discovery beyond the limited scope of jurisdictional discovery authorized by the Second Circuit Court of Appeals; (ii) improperly seek information that post-dates the filing of the actions in the MDL-1570 proceeding; (iii) improperly seek information that is not relevant to the exercise of personal jurisdiction; (iv) improperly seek information that is neither relevant or reasonably calculated to lead to the discovery of relevant or admissible information; or (v) improperly sees documents relating to the charity officials' employment with the government of Saudi Arabia, which is entitled to sovereign immunity under the Foreign Sovereign Immunities Act ("FSIA"). Plaintiffs urge the Court to require the defendants to clarify whether they are withholding responsive documentation and information on the basis of any of these other objections.

---

[5] Plaintiffs respectfully disagree with the defendants' characterization that the MWL and IIRO have produced all relevant business records. Plaintiffs' analysis of the MWL and IIRO document productions has revealed significant gaps of missing records, including documentation detailing and describing the Charity Official Defendants' authority, control, and supervision over the charities' operations, funding, and global operations. Plaintiffs intend to address these deficiencies and other important issues in their motions to compel.

The Honorable Frank Maas
September 2, 2015
Page 10

---

Plaintiffs respectfully submit that the Charity Official Defendants' aversion to meaningfully respond to discovery is just more of the same obstructionist behavior we have seen from other Saudi defendants in this litigation. Your Honor will recall that another charity official, defendant Wa'el Hamza Jelaidan, also represented to this Court and the parties that he did not have access to, or have the practical ability to request and obtain, certain categories of documents. Indeed, Jelaidan similarly suggested that the plaintiffs should go seek the documents from the appropriate custodians. But new evidence detailed in plaintiffs' August 10, 2015 motions to compel as to Jelaidan makes clear that those statements were demonstrably false.

Given the history of the Saudi defendants' noncompliance, plaintiffs served supplemental discovery requests on the MWL, IIRO and WAMY on August 22, 2013, seeking documents specifically relating to the Charity Official Defendants. *See* Exhibits S-U. Remarkably, the charity defendants advanced the position that the supplemental requests, served more than two years before the document production deadline (which was itself extended numerous times at the request of the defendants), were untimely and therefore refused to produce responsive documents.

Defendants are playing a classic shell game, with each objecting to producing any responsive materials and advising plaintiffs that they should seek discovery from other sources. Nothing suggests the Charity Official Defendants are actively engaged in the discovery process or have undertaken any good faith efforts to produce responsive documents. Accordingly, plaintiffs ask this Court to order the defendants to immediately conduct a "full-court press"[6] to request and obtain responsive documentation and information, and to further require the defendants to document their attempts to secure those responsive materials.

Respectfully submitted,

J. Scott Tarbutton, Esq.
THE MDL 1570 PLAINTIFFS' EXECUTIVE COMMITTEES

JST

cc:   The Honorable George B. Daniels (via overnight UPS delivery)
      MDL-1570 Counsel of Record (via ECF)

LEGAL\24029322\1 00000.0000.000/117430.000

---

[6] November 16, 2011 Discovery Hearing Transcript, p. 33 (ordering defendant Jelaidan to undertake expeditious efforts to obtain requested materials and "to document a vigorous effort to obtain those documents").