F8h4terM

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    In re TERRORIST ATTACKS ON
     SEPTEMBER 11, 2001 (Federal
4    Insurance Plaintiffs v.
     Islamic Republic of Iran,
5    et al.)

6
                                        03 MDL 01570
7
     ------------------------------x
8                                       New York, N.Y.
                                        August 17, 2015
9                                       10:45 a.m.

10   Before:

11                   HON. GEORGE B. DANIELS,

12                                       District Judge

13

14   APPEARANCES:

15

16   ROBERT FOOTE
     TOM MELLON III
17   RICHARD D. HAILEY
     STEPHEN A. CORR
18   TIMOTHY B. FLEMING
     JERRY S. GOLDMAN
19   BRUCE STRONG
          Attorneys for Plaintiffs
20

21

22

23

24

25

F8h4terM

1          (In open court)

2          THE DEPUTY CLERK:  In re Terrorist Attacks on

3     September 11, 2001, 03 MDL 01570.

4          Will the parties please rise and make their

5     appearances.

6          MR. FOOTE:  Robert Foote, your Honor, on behalf of the

7     plaintiffs.

8          THE COURT:  Good morning.

9          MR. HAILEY:  Richard Hailey on behalf of the

10    plaintiffs, your Honor.

11         THE COURT:  Good morning.

12         MR. MELLON:  Tom Mellon III on behalf of the

13    plaintiffs, your Honor.

14         THE COURT:  Good morning.

15         MR. CORR:  Stephen Corr on behalf of the plaintiffs.

16         THE COURT:  Good morning.

17         MR. FLEMING:  Good morning, your Honor.  Timothy

18    Fleming on behalf of the plaintiffs.

19         THE COURT:  Good morning.

20         I have the motion for default judgment against Iran

21    and other related entities.

22         Why don't we make an appropriate record.  Who wants to

23    lead this discussion?

24         MR. FOOTE:  With your permission, I will start.

25         THE COURT:  Mr. Foote, why don't you lay out what you

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

F8h4terM

1    want to accomplish today.

2              MR. FOOTE:  Thank you, Judge.

3              What we want to accomplish today is to get an order of

4    liability on behalf of 15 estates and 304 individuals.

5              This is similar to the case that you heard before that

6    was entitled Havlish.

7              If you would give me a moment, the reason I'm standing

8    here instead of Mr. Tom Mellon, Jr., who did this before you

9    last time, is he passed away.  He was the leader of our team,

10   the instrument behind this.  He started working on this right

11   after the terrorist event, and without his guidance and

12   perseverance through this, none of us would be here today.  His

13   son is here, but I'm a poor replacement for him, your Honor,

14   but I will try to get us through this.

15             THE COURT:  For the record, we're specifically talking

16   about, of the MDL cases within In re Terrorist attacks, the

17   Hoglan case?

18             MR. FOOTE:  That's correct, your Honor.

19             I would note for the record that none of the

20   defendants are here, and we are going to proceed to convince

21   you, as we did before, your Honor, that Iran and its entities

22   were implicit and provided material support to the terrorists,

23   and as a terrorist country, pursuant to statute, we have a

24   right to a judgment against them.

25             We understand we will follow up with Judge Maas after

F8h4terM

1    this, assuming your Honor finds, as he did in the other case,

2    liability.

3          There are three things we're going to do today, your

4    Honor.  First, I'm going to give you some introductory

5    information.  Second, Mr. Hailey, who you have known from

6    before, he is going to talk about the jurisdictional aspects

7    and the legal aspects, so that that is clear.  Finally,

8    Mr. Fleming will be our third speaker.  He is going to go

9    through in detail with you the proof.

10         All these claims, Judge, arise out of -- and this is

11    what you will hear today -- the material support that Iran and

12    its entities gave to Al Qaeda and the hijackers that resulted

13    in the worst terrorist attack on U.S. soil in history.

14         The proof, your Honor, is really three things:  One,

15    we collected over the period of years the best experts that

16    were available in terms of terrorism and the relationship

17    between Iran and Al Qaeda and between Al Qaeda and what

18    happened on 9/11, to show the complicity that Iran had in this.

19    We have slides.

20         Basically, these are the defendants, your Honor.  You

21    have seen these before.  There is no change from the original

22    defendants.  These are all instrumentalities of the terrorist

23    state.  Again, I note for the record, they have been and still

24    are a terrorist state pursuant to order of the President of the

25    United States.

F8h4terM

```
 1            THE COURT:  These are collectively referred to here as
 2    the Sovereign Defendants?
 3            MR. FOOTE:  Correct, your Honor.
 4            Our experts vary from people who actually worked on
 5    the 9/11 Commission, people who are experts in Iran itself, the
 6    people who worked for the CIA, people that worked for INTERPOL,
 7    people who have written about this extensively.
 8            You will see in your Powerpoint, your Honor, that I
 9    provided a little bit of background on each of these gentlemen.
10            Basically, Judge, you will see as you go through that
11    -- I'm not going to go through each of these -- this is a very,
12    very well thought-out team of experts, and a team of experts
13    who did a lot of work not only on the 9/11 Commission Report
14    but throughout their lives in terms of the relationships in the
15    Middle East and the fact that Iran has acted as a terrorist
16    state for many, many decades.  Most of these names will be
17    familiar to you because you have heard this proof before.
18    We're going to go through it again for your Honor, so it is
19    fresh in your mind.
20            THE COURT:  Is there an expert on this list?
21            MR. FOOTE:  Yes.  Every one of those on the first
22    slide, they are all experts, they are all affidavits before you
23    that Mr. Fleming will be talking about.
24            THE COURT:  Which one of these experts, if any, were
25    not before me in Havlish?
```

F8h4terM

1          MR. FOOTE:  All of them were before you in Havlish,

2     your Honor.

3          The sum and substance, as we go through these -- and

4     Mr. Fleming will talk about them in more detail -- the sum and

5     substance of this is you will be shown the relationship between

6     Iran and Al Qaeda and Osama bin Laden and how that relationship

7     was one of the material things that ended up with the terrorist

8     attack in New York.  You will be shown the explosives training

9     that really relates to how they were able to train the

10    terrorists in Iran.  You will be shown how travel is incredibly

11    important in this terrorist organization and that travel

12    facilitation was one of the main things that Iran did through

13    the government itself and the entities that are defendants.

14    You will be shown that there was a safe haven provided to the

15    eventual hijackers and others that worked behind the scenes to

16    make sure that this complicated attack occurred, and you will

17    be shown part of what was done is clean passports.  The

18    importance of clean passports you may remember from last time

19    but you're going to hear it again.  Part of the proof are these

20    experts.  You will hear, again, largely from Mr. Fleming on

21    that, as he has worked basically nonstop on this for the last

22    decade to prepare this proof for your Honor.  There are also

23    some government documents.  After going through thousands and

24    thousands of government documents, we gleaned those that we

25    thought would be important to your Honor in determining that

F8h4terM

 1   there was material support.

 2           Finally, there is the testimony of insiders.  As you

 3   remember, we gave them initials, Witness X, Y, and Z, to

 4   protect their own lives.  That is the sealed testimony that

 5   basically only your Honor has.  And we also have testimony from

 6   the ex-president of Iran.

 7           That's the outline of what we're going to do today,

 8   and at the end, your Honor, we're going to ask that you enter a

 9   judgment of liability and a date for us to go see Judge Maas

10   about the damages in this case, but we're not here for damages

11   today.

12           With that, I would turn it over to Mr. Hailey to talk

13   to you about the law, your Honor.

14           THE COURT:  Okay.  Mr. Hailey.

15           MR. HAILEY:  A couple of preliminary remarks, your

16   Honor.

17           On service, as the Court pointed out in the Havlish

18   case, service has to be well documented and made of record.

19   Service of our complaint and amended complaint was originally

20   filed on September the 9th of 2011.  Our complaint was amended

21   on September 13th.

22           This Court gains jurisdiction over this matter on

23   October the 17th, with a conditional transfer under the MDL

24   provisions.  The case, then, is properly before this Court.

25           On July the 2nd, we were permitted to amend our

F8h4terM

1     complaint by the Court.  It was mainly a housekeeping event.

2     We added some parties that we subsequently removed.

3          On October the 18th of 2012, we then applied for a

4     license from the Treasury Department, from OFAC, in order to

5     ship packages and perfect service by international courier DHL

6     express to Iran.

7          We then packaged them, under the rules, under Foreign

8     Sovereign Immunities Act, 1608(a)(3) and 1608(b)(3)(B).  We

9     then presented 16 sets of the documents to the Clerk of the

10    Court for the Southern District of New York for packaging and

11    delivering.  Those were, in fact, delivered and shipped by the

12    Clerk on July the 30th of 2013.  DHL tracking summaries

13    indicated that those packages reached Tehran on August the 4th

14    of 2013.  Those shipments were refused by the Ministry of

15    Foreign Affairs on the same date, and those were returned to

16    this Clerk of the Court in this district on August the 17th of

17    2013.

18         The service provisions of the Foreign Sovereign

19    Immunities Act allow for several ways to perfect service upon

20    refusal.  We spare explanation except for the one that we used,

21    the method that we did use, which is the diplomatic method.

22    These documents were served upon the State Department.  The

23    filing fees of $2,275 was paid.  And the State Department, in

24    fact, received from the Clerk of this Court on December 13th of

25    2013, the service packages.  Those were forwarded, on

SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300

F8h4terM

1    February the 16th, to the Foreign Interests Section of the

2    Embassy of Switzerland in Iran and served upon the Iranian

3    Minister of Foreign Affairs for the eight Iranian defendants

4    and their instrumentalities.  Service was then perfected under

5    the diplomatic provisions of the Foreign Sovereign Immunities

6    Act.

7         And the key date is February 16, 2014, is when it was

8    verified, that service was perfected.  To date, none of the

9    defendants have entered an appearance.  And therefore, 60 days

10   was their time frame to do so under 1608(d), and they have not

11   done so.

12        Procedurally, pursuant to Rule 55 and Local Civil Rule

13   55.1, we applied for and received a certificate of default from

14   the Clerk's Office on March the 17th of 2015, more than a year

15   after the formal service process was completed.

16        THE COURT:  Let me interrupt you for a second.  Would

17   you state more specifically on the record what was this service

18   package?

19        MR. HAILEY:  The service package contained translated

20   copies of the complaint, an ample supply; the seal of this

21   court; the transmission letter, a transmission document from

22   the Clerk of the Southern District; and there were 16 copies

23   translated into Farsi that were delivered.

24        THE COURT:  That was the second amended complaint?

25        MR. HAILEY:  Yes, sir.

F8h4terM

1          And summons.  I'm sorry, your Honor.  And proper

2   summons.

3          On March the 17th of 2015, the process was completed,

4   and a certificate of default was entered by the clerk, and it

5   is upon that certificate that we appear before you today.

6          With relationship to the law of this case, it will

7   involve both the Foreign Sovereign Immunities Act and the Alien

8   Tort Claims Act/Torture Victims Protection Act of 1991.

9   Because this case involves both U.S. and non-U.S. citizens,

10  therefore, the Alien Tort Claims Act will be applicable to

11  these claims.

12         Our requirement at this stage, having satisfied the

13  procedural prerequisites, is to present this Court with what

14  the statute states as proof convincing to the court that the

15  court can rely on that, in fact, there occurred an arrangement

16  and a fact situation upon which to base the material support

17  allegation that we make.

18         We believe that this case will involve both plaintiffs

19  of U.S. nationals and non-nationals under the Foreign Sovereign

20  Immunities Act.  I speak specifically now about the U.S.

21  nationals.  The case of Owens v. Republic of Sudan, we believe,

22  is most instructive, and it gives some guidance to this Court;

23  and of course, this Court's own finding in Havlish basically

24  gives guidance upon our facts as we will present them.

25         We believe that material support is being defined as

F8h4terM

1    support in transportation, support in education, and support in

2    housing, safekeeping.  The statute is quite broad, and we will

3    present specifics by way of expert testimony and deposition

4    sworn testimony and documents that support the finding of

5    material support herein.

6         We are asking that you also apply the Alien Tort

7    Claims Act, the Torture Victims Protection Act of 1991.  Here

8    we have satisfied the prerequisites.  Again, Iran has a

9    certificate of default entered.  It is designated as a sponsor

10   of terrorism since 1984, the first year that the list existed.

11   Iran supplied, we will prove, material support.  Some of the

12   plaintiffs are not U.S. nationals; and therefore, this

13   particular act must be used with regards to them.

14        The Congress expanded the Alien Tort Act to cover

15   specifically where one acts under color of law, of any foreign

16   nation, and includes, among other things, as a violation the

17   extra judicial killing of individuals.  All of our individuals

18   are claiming through decedents.  So we meet the definition.  We

19   believe that the Royal Dutch Petrol case and the Filartiga case

20   are both instructive in this matter, but here Havlish does not

21   have application because it wasn't proceeded under the Tort

22   Claims Act.  Those were U.S. citizens.

23        The service that I mentioned, it is of note, we did

24   receive our letter back from the State Department through the

25   diplomatic method of service, and it was sent to the State

F8h4terM

1    Department on the 13th of December of 2013, and it was served

2    on February 16th of 2014.  And all eight Iranian defendants and

3    Iran and the subdivision and instrumentalities were served.

4              MR. FOOTE:  Thank you, Rich.

5              Next, Judge, you will hear from Mr. Fleming, which

6    will be the longest of the presentations.

7              I wanted to start it out by looking back at the 9/11

8    Commission Report.  As you heard last time, there was a

9    deadline for the 9/11 Commission, and when they finished their

10   report, they say, I think at page 241, "We believe this topic"

11   -- meaning Iran -- "requires further investigation by the U.S.

12   Government."

13             It is the Tom Mellon team that followed that trail

14   left at the end of the 9/11 Commission Report, and Mr. Fleming

15   will now give you the trail that the Tom Mellon team found.

16             THE COURT:  Mr. Fleming.

17             MR. FLEMING:  Good morning again, your Honor.

18             THE COURT:  Good morning.

19             MR. FLEMING:  I would like to start, first, your

20   Honor, by making a few representations to the Court as an

21   officer of the court regarding the proof that we are

22   presenting.  I state, as an officer of the court, your Honor,

23   that I am a part of the legal team that was assembled by Tom

24   Mellon that gathered all of the evidence that was admitted into

25   evidence in the Havlish, et al., versus bin Laden, et al. case,

F8h4terM

1    which your Honor decided in 2011.

2            I personally reviewed and analyzed all of that

3    gathered evidence and prepared the evidentiary presentation to

4    the Court in Havlish, as well as what will be done here today,

5    presented most of that evidence, along with Mr. Mellon, to the

6    court in Havlish, and I'm doing so again here today.  I

7    personally, and as part of the legal team, interviewed all of

8    the expert witnesses and submitted the expert affidavits to the

9    Court.

10           I'm personally aware of the execution of all of the

11   submitted affidavits either by being present for the execution

12   or by having such execution confirmed to me verbally or in

13   writing.

14           I took the sworn video testimony of Witnesses X, Y,

15   and Z.  And I was present for the sworn video testimony of the

16   first president of Iran, Abolhassan Banisadr, which was taken

17   by my colleague here in the courtroom, Richard Hailey, who you

18   just heard from.

19           I personally gathered, reviewed the information for,

20   and wrote and submitted my own sealed affidavits to the Court

21   regarding the evidence that was submitted to the Court under

22   seal in the Havlish case.  The relationship of both of the

23   Havlish and Hoglan complaints to the evidence that we are using

24   in these cases is identical, and I can personally attest that

25   because I was a substantial and constant part of the

F8h4terM

1    evidence-gathering team.  I was also present for each and every

2    meeting with all of the witnesses who testified, both their

3    actual testimony and any prior information or debriefing that

4    we obtained from those witnesses and every other witness who

5    provided any information for our presentation.

6              I can represent as an officer of the Court that all of

7    the information and all of the evidence that we are submitting

8    is relevant and probative to the Hoglan plaintiffs' claims

9    against all the Iranian defendants and that I personally

10   reviewed all of the sealed and unsealed evidence in this case

11   that we're presenting to your Honor today.

12             Therefore, upon those grounds, I would move to admit

13   all of the sealed and unsealed evidence that was previously

14   admitted into evidence in the Havlish case, I would move that

15   evidence to be admitted in the Hoglan case.

16             THE COURT:  That motion is granted.

17             MR. FLEMING:  Further, I move to admit into evidence

18   one additional exhibit, which I have here on paper, and that is

19   the State Department Country Reports on Terrorism, excerpts

20   related to The Islamic Republic of Iran as a state sponsor of

21   terror.  We submitted all of those from 1980 through the date

22   of the Havlish hearing.  That is Exhibit 13 in Havlish.  We

23   wanted to update that with the Country Reports from the State

24   Department that have been published in the time since the

25   Havlish hearing, and that would be for the years 2010 through

F8h4terM

1    2014.  We can certainly file those by electronic submission,

2    but I do have paper copies of those excerpts here today.  So I

3    would move those into evidence just to show that nothing has

4    changed, despite anything that has happened diplomatically in

5    our world, absolutely nothing has changed with respect to our

6    government's designation of Iran as a state sponsor of terror,

7    as the most active state sponsor of terror on the planet.

8         THE COURT:  Do you have those designated as a

9    particular exhibit?

10        MR. FLEMING:  I don't, your Honor.  We could either

11   put them in as Exhibit 38, or we can do it as 13A because they

12   are a continuation of Exhibit 13.  I did not label them for

13   that reason.

14        THE COURT:  We will stick with 13A, and you can file

15   those electronically.

16        MR. FLEMING:  Very well.

17        Also, your Honor, because the sealed evidence in the

18   Havlish case resides in the vault of this Court and is labeled

19   "Havlish," I would move that we refile or that we file again

20   the sealed evidence on CD ROM or DVD, which would be the

21   testimony of the three witnesses, the sealed testimony, and the

22   affidavits, the sealed affidavits, which pertain mostly to that

23   testimony and to a few other matters and that we do so under

24   seal in Hoglan so that we ensure that we have a full record

25   pertaining to Hoglan and it is labeled as such.

F8h4terM

1          THE COURT:  That's fine.

2          MR. FLEMING:  We will do that in a few days.

3          In addition to that, I would move to submit one or

4    perhaps two additional affidavits to be filed under seal, which

5    pertain to the sealed evidence itself and to the ongoing

6    security situation regarding the witnesses to which I have

7    alluded several times in the past and I think the Court is

8    aware of through our sealed submissions.  There have been a few

9    developments in the past three years which I think it would be

10   important for the Court to be aware of, and I could do that

11   within a short period of time.  If your Honor would be disposed

12   to receive that, I would also like to make an arrangement to

13   hand-deliver a copy for your Honor through either your clerk or

14   courtroom deputy or whomever you should so designate.

15          THE COURT:  These are new affidavits that have yet to

16   be submitted?

17          MR. FLEMING:  These would be new.  They would be

18   brief.  They don't change anything that has previously been

19   submitted.  They are just some updates on a few points.

20          THE COURT:  All right.  They will be designated as

21   what?

22          MR. FLEMING:  They would be designated as sealed

23   exhibits, we can say A and B for the Hoglan case.  I don't

24   remember the last number for the Havlish case.  I think it was

25   S46, but I'm not a hundred percent sure.

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

F8h4terM

| 1 | THE COURT: They're attorney affidavits or witness |
| 2 | affidavits? |
| 3 | MR. FLEMING: There would be a third party, and the |
| 4 | other, if it is necessary, would be mine. |
| 5 | THE COURT: Is there some way we can designate the |
| 6 | third party consistent with a previous designation of that |
| 7 | third party? |
| 8 | MR. FLEMING: There's two ways I could do this. |
| 9 | There's two different people who could attest to it.  One would |
| 10 | be somebody who has already submitted an affidavit.  The other |
| 11 | would be someone whose name is in the sealed record of the |
| 12 | case. |
| 13 | THE COURT: They're not designated X, Y, or Z? |
| 14 | MR. FLEMING: One of them could be X.  There might be |
| 15 | another one, as well. |
| 16 | THE COURT: Okay. |
| 17 | MR. FLEMING: I will choose a letter, and it could |
| 18 | be S. |
| 19 | THE COURT: All right.  If it is being submitted by |
| 20 | someone who submitted an earlier affidavit in Havlish, if we |
| 21 | could use the same designation. |
| 22 | MR. FLEMING: Yes.  If that's true, then we would use |
| 23 | the X, Y, or Z designation.  If it is the other person, I would |
| 24 | choose another letter. |
| 25 | THE COURT: All right. |

F8h4terM

1          MR. FLEMING:  We probably should file a motion for

2     your Honor to sign in that regard, or does this suffice?

3          THE COURT:  No.  What is your application at this

4     point with regard to that?

5          MR. FLEMING:  The application is to simply file one or

6     two additional affidavits; one would be mine and one would be

7     the other person.

8          THE COURT:  I will grant that motion --

9          MR. FLEMING:  Under seal.

10         THE COURT:  -- on this record.

11         Is there any other indication of the nature of the

12    affidavits, by whom they're being submitted, that you want to

13    put on the record?

14         MR. FLEMING:  Not in open court, your Honor.

15         THE COURT:  All right.

16         MR. FLEMING:  Then, finally, I just wanted to mention

17    that your Honor had issued a standing order in Havlish that if

18    and when we were able to unseal any portion of the sealed

19    evidence that you would grant that at any time.  The situation

20    has not really changed.  It's the status quo.  We do hope at

21    some point to be able to unseal some of the evidence.  I am

22    going to refer to the testimony of Witness X freely today, and

23    it is that testimony which most likely has been sealed, but

24    there are still some ongoing security situations that counsel

25    against that at this time.  I would say the status quo remains

F8h4terM

1    as to unsealing, but we would like to perhaps unseal some of

2    that evidence at a future time.

3            I will begin, your Honor, with a very brief recap of

4    Iran's terrorist history.

5            The Islamic Republic of Iran, as very amply discussed

6    in our expert affidavits in this case, Iran is engaged in and

7    has supported terrorism as an instrument of foreign policy ever

8    since the inception of The Islamic Republic after the Islamic

9    Revolution in 1979.  Furthermore, Iran has been waging

10   virtually an undeclared war against both the United States and

11   Israel for 30 years.

12           As I go through here, I'm going to refer to some of

13   the experts who have discussed these very points.  I won't be

14   exhaustive in that regard.  Most of these are in our briefs.

15   If there is anything the Court desires, we would be happy to

16   supply it.  Everything I am saying about the history is

17   discussed in the affidavits principally of Dr. Ronen Bergman,

18   Dr. Patrick Clawson, Dr. Bruce Tefft, and Claire Lopez in their

19   combined affidavit, Mr. Kenneth Timmerman, and the 9/11

20   Commission witnesses, as well, and, finally, in the writings of

21   Robert Baer, an imminent expert on Iran whose materials have

22   been placed before the Court under circumstances the Court may

23   recall from the sealed information in the Havlish case.

24           In waging this undeclared war against the United

25   States and Israel, Iran has principally used asymmetrical or

F8h4terM

1    unconventional strategies and terrorism.  It acts almost

2    entirely through proxies, such as Hezbollah, Hamas, al Qaeda,

3    the Palestinian Front Liberation of Palestine General Command,

4    and others.

5            As Mr. Foote mentioned, the U.S. State Department has

6    designated Iran as a foreign state sponsor of terror every year

7    since 1984, and this continues to the present.

8            Dr. Ronen Bergman is one of the world's greatest

9    experts on Iranian terrorism.  He is an award-winning

10   investigative journalist from Israel.  His affidavit shows that

11   Iran was involved 133 terrorist operations in the nine years

12   between 1987 and 1995 alone and many others involving hundreds

13   of fatalities before and after.  He also discusses how

14   Hezbollah, which is Iran's own creation and its principal

15   terrorist proxy, it was an Iranian organization from its

16   inception.  It is funded, directed and controlled by the

17   government of Iran, actually the state of Iran, principally the

18   Supreme Leader.  Imad Fayez Mughniyah was its military leader,

19   its chief terrorist operative for 20-some years before his

20   death in 2008.  And we will have more to say about

21   Mr. Mughniyah in a little bit.

22           One of the defendants in this case is the Ayatollah

23   Ali Hoseini Khamenei.  He is the Supreme Leader of Iran and

24   certainly the most important and powerful official in Iran.  He

25   is only the second Supreme Leader Iran has ever had, and he is

F8h4terM

1    the Supreme Leader in every sense of the word.  He can make or

2    overrule any decision made by the government.  He can dismiss

3    the parliament.  He appoints the officeholders of almost every

4    powerful position in Iran, and his term of office is unlimited.

5    His role and how Khamenei in particular has used his powers is

6    discussed by Dr. Clawson, Dr. Tefft and Ms. Lopez,

7    Mr. Timmerman, prominent in the writings of Mr. Baer, and also

8    extensively in the testimony of Witnesses X, Y, and Z.

9            Another individual defendant in this case is Ali Akbar

10    Hashemi Rafsanjani, the former president from 1989 to 1997 and

11    the former speaker of the parliament in the '80s.  He is also

12    one of the wealthiest individuals in all of the Middle East.

13    He was certainly the second most powerful figure in the Iranian

14    government at the time of the 9/11 attacks and for a much

15    longer period, basically from 1989 until at least 2005, and he

16    still holds very powerful positions in Iran.  He is discussed

17    also by the same experts, as well as the testimony of

18    Witness X, who knew him very well.

19            Both Khamenei and Rafsanjani have long records of

20    direct involvement in Iran's material support for terrorism.

21    They are key figures in several court cases in the United

22    States and in the so-called Mykonos case in Germany, which

23    involved the assassination of five Kurdish leaders who were in

24    a Greek restaurant in Berlin.  They were assassinated by agents

25    of their regime.  The terrorists were apprehended and

F8h4terM

```
1   prosecuted and convicted.  Testifying in the Mykonos case were
2   two of our witnesses.  Former President Abolhassan Banisadr
3   testified in the Mykonos case, as well as Witness X, who I will
4   say right now and will say throughout is Abolghassem Mesbahi, a
5   very prominent member of the Iranian Intelligence Services
6   until his defection to the West in 1995.
7        Banisadr endorsed and vouched for Mesbahi, whose
8   testimony in the Mykonos case was absolutely critical to the
9   conviction of the defendants, and he implicated directly both
10  the Supreme Leader and former-President Rafsanjani in the
11  decision to undertake the assassinations in the Mykonos case.
12       Another defendant in the case is the IRGC, the Islamic
13  Revolutionary Guard Corps, known in Iran as the Sepah Pasdaran.
14  This is a special kind of military, paramilitary, and terrorist
15  organization, as well as a business conglomerate that really
16  knows no parallel in the West.  It is not controlled by the
17  president of Iran or is not accountable to the parliament.  It
18  is accountable only to the Supreme Leader and to the Islamic
19  Revolution as a concept itself.  It is the guardian and
20  striking arm of the Islamic Revolution, as it is described by
21  Dr. Patrick Clawson, and it is a major factor in the Iranian
22  economy, owning and controlling hundreds of businesses and
23  entire industries.  When the new Ayatollah Khomeini Airport was
24  opened in Tehran, the day before the IRGC rolled up in tanks
25  and simply took it over because it can, and it holds it to this
```

F8h4terM

1    day.  The IRGC is discussed in detail by Mr. Clawson, by Dr.

2    Bergman, by Mr. Timmerman, by Lopez and Tefft, by Robert Baer,

3    and in the testimony of Witnesses X, Y, and Z.  Witness Y was a

4    member of the IRGC.

5        The Qods Force is a special division of the IRGC,

6    which is its overseas or international terrorist arm.  It has a

7    long history of engaging in coups, insurgencies,

8    assassinations, kidnappings, bombings, and arms dealing.  It is

9    one of the most organized, disciplined, and violent terrorist

10   organizations in the world.  It has been designated by the U.S.

11   Treasury Department as a terrorist organization providing

12   material support to the Taliban and other terrorist

13   organizations.  The same experts discuss the Qods Force that I

14   just named regarding the IRGC.

15       Another defendant is the MOIS, The Ministry of

16   Information and Security.  This is, basically, Iran's version

17   of the CIA.  It is one of the best funded, most skilled, most

18   feared intelligence agencies in the world, certainly in the

19   Middle East.  Like the IRGC, it has a very long history in

20   terrorism, assassinations, kidnappings, and other crimes.  All

21   three of the defector witnesses, X, Y, and Z, were agents of

22   the MOIS.  And they testify extensively about the MOIS.  Many

23   of the State Department Global Reports on Terrorism for the

24   past 25 or 30 years, actually, refer to MOIS as Iran's key

25   facilitator and director of the terrorist attacks.

F8h4terM

1           But after a series of events in Iran known as the

2     "Chain Murders" from 1988 to roughly 1998 -- the "Chain

3     Murders" were a series of murders of dissidents, writers,

4     newspaper people, even poets -- and they were discovered, and

5     some of the dealings of MOIS and certainly their involvement

6     was revealed, and there was a great public outcry about the

7     "Chain Murders."  This led to some reforms, but more

8     importantly, it led Ayatollah Khamenei, the Supreme Leader, to

9     form a special intelligence apparatus that has no name that

10    reported directly to him and worked under his direct control.

11    This had a predecessor, Ayatollah Khomeini had done the same

12    thing before MOIS was formed, and Khamenei reinvented that, and

13    it is significant for our case, as you will see in a few

14    minutes.

15          Both Witnesses X and Z testify to both MOIS but also

16    the Supreme Leader's special intelligence apparatus and its

17    conduct of acts of international terrorism.  It is also

18    significant that the MOIS is described in particular by

19    Witness X.  He described how the entire apparatus of the

20    Iranian state and government and many parts of its private

21    sector, including otherwise private companies, are at the

22    service of the Supreme Leader, the IRGC, and MOIS, to be called

23    into service to support terrorism.  And Witness X has a great

24    deal of detail about that because he was a direct participant

25    in so using those arms of the government and private sectors.

F8h4terM

1          Another defendant is Hezbollah.  Hezbollah, as I

2   mentioned, was a creature of Iran in the early to mid-1980s as

3   an extension of the Iranian Revolution into Lebanon.  It is

4   well funded, well trained, and serves as a terrorist proxy

5   organization for Iran.  The U.S. State Department designated

6   Hezbollah a foreign terrorist organization in 1997, and it

7   remains so today.

8          This is quite significant because, first, as

9   Dr. Clawson attests, it is the closest relationship of any

10  state to any terrorist organization ever, and Hezbollah is

11  frequently the most skilled and most often called upon

12  terrorist instrumentality at the disposal of the Supreme Leader

13  and MOIS and IRGC, and they are worldwide.  Hezbollah has cells

14  probably on every continent, certainly throughout the Middle

15  East, Asia, South America, and probably the United States.

16          Now, one of the common misconceptions that you still

17  can read about very easily in today's publications, or see it

18  on TV and the news, is people referring to the divide between

19  Sunnis and Shia and discounting how they could possibly work

20  together.  As Robert Baer said, nothing could be further from

21  the truth.  Al Qaeda, which of course conducted the 9/11

22  operation itself on September 11, 2001, is a Sunni

23  organization; whereas, Iran is a Shia nation.  So it raises the

24  question about, well, how Sunnis and Shias work together, is

25  that a likely thing?  Contrary to the common misconception, all

F8h4terM

1    of our experts discuss in great detail how, in fact, they do

2    work together, particularly in matters of terrorism where it is

3    in their own interest to do so.  Even the 9/11 Commission

4    Report found this to be the case, somewhat understating it by

5    saying the relationship between al Qaeda and Iran demonstrated

6    the Sunni-Shia division did not necessarily pose an

7    insurmountable barrier to cooperation in terrorist operations,

8    and then they, of course, have several pages about it and how

9    they did it together.  Our experts, including Daniel Byman,

10   Lopez, Tefft, Timmerman, Clawson, all discuss at great length

11   how the Sunni-Shia divide was surmounted for purposes of

12   terrorism.  Witnesses X, Y, and Z do the same thing.  And

13   indeed, President Banisadr testified to that.

14        Both Iran and Al Qaeda can be ruthlessly pragmatic.

15   Iran, even though it is Shia, is willing to use, co-opt, and

16   support Suni proxies to carry out acts of terrorism.  The

17   religious differences, to the extent that they exist, are

18   mainly at the sort of everyday person level, and it is a

19   historical hatred that has fomented in order to cause chaos on

20   the streets whenever they need it.  But at the levels of power,

21   at the levels where terrorist actions are planned and decided

22   upon, the Sunni and Shia terrorist organizations very

23   frequently work together.  And it is an excellent tactic from

24   Iran's standpoint because, frankly, it has much of the world

25   fooled as to whether or not Sunnis and Shias would work

F8h4terM

together.  But the experts and the State Department and our own

investigative agencies know better.

As Mr. Banisadr testified, Iran's leaders don't

actually care very much about Islam.  What they care about is

power.  And as Mr. Baer has written, they care about territory,

control of populations, control of resources, and other

geopolitical factors.  Terrorism is not really fueled nearly as

much by religion -- although it is a factor, to be sure, I'm

not saying it is not a factor -- but a key aspect of terrorist

decision-making is geopolitical, not religious.  There is a

very well documented history to this, starting in the early

1990s, and I will get to that in a moment.

Dr. Daniel Byman lays out some of the reasons for this

cooperation, and that is that both the Sunnis and Shias, Iran

and Al Qaeda, for example, see the United States as its enemy,

and both believe that it is an imperialistic power.

Dr. Byman also lays out that Iranian Shia Islam

basically incorporates the Zoroastrianism precepts, the ancient

religion of Persia, more so than any other religion.  That

precept is that there are really only two states of being:

Good and evil.  It sees itself as good, and it sees the United

States and Israel as evil, and it looks at everything through

that dualistic world-view prism.  Dr. Byman lays it out better

than I just did, but it is a very important point to realize

that the religion is certainly not a barrier to cooperation

F8h4terM

1    when it is viewed in a very simplistic light as that.

2            Now, historically, the bridging of the Sunni-Shia

3    divide began in 1991, when the Sudanese leader, Hassan

4    al Turabi, promoted the idea of casting aside this centuries

5    old debate about who the proper successor to Muhammad was,

6    which is the basic schism between Sunni and Shia.  Al Turabi,

7    who is the principal cleric in the Sudan, said let's put that

8    aside for a century or so or however long it takes and focus on

9    our real enemy, which is the West, the United States,

10   principally, and Israel.  He held the first popular Arab and

11   Islamic Congress in 1991, where he promoted this idea, and

12   invited terrorists and clerics from 45 countries.  This was

13   attended by Iran.  Importantly, as one of the by-products of

14   the 1991 Congress was a meeting that Hassan al Turabi arranged

15   in Khartoum, Sudan, between Osama bin Laden and Ayman

16   al Zawahiri and the Hezbollah terror chief, Imad Mughniyah, who

17   I referred to earlier, as well as Iran officials, including

18   IRGC Brigadier General Mohammad Baqr Zolqadr.  They basically

19   forged an agreement to work together -- again, these are Sunni

20   and Shia organizations -- against the West.

21           Thereafter, they immediately began funneling al Qaeda

22   operatives and trainers to Iran and to Lebanon for training by

23   the IRGC and MOIS in Iran and by Hezbollah in Lebanon with

24   regard to terror tactics and, in particular, one of Hezbollah's

25   areas of expertise, that is explosives.  This agreement at the

F8h4terM

1993 meeting in Khartoum, Sudan, led to an ongoing arrangement,

alliance, which involved training, joint operations, ongoing

communications between Iran and Al Qaeda with Imad Mughniyah as

the focal point, the major connection point, Imad Mughniyah,

the master terrorist of Hezbollah, as the go-between.

Interestingly, prior to the 1993 meeting in Khartoum,

Sudan, Osama bin Laden was really known as a "freedom fighter."

He was on the front lines of the war against the Soviet Union

in Afghanistan, which was more or less on the same side that we

were on.  That all changed in 1993.  Bin Laden was never any

fan of the United States, but he was not a terrorist yet.  It

was Imad Mughniyah who was a very accomplished terrorist by

then.  And I just point out that he was involved in all of the

planning and execution of the major terrorist events of the

1980s, which included a wave of assassinations, kidnappings,

which included the Lebanese hostage crisis of the 1980s, which

ultimately culminated in the Iran-Contra scandal.  Imad

Mughniyah was at the center of that.  He is the person who

personally tortured and killed the CIA station chief in Beirut,

William Buckley.  He was a master terrorist, and the FBI and

the CIA and all experts in the United States agree on his

particular genius for terrorism, if you will.  He is the one

who converted bin Laden to terrorism because Mughniyah showed

bin Laden and al Zawahiri that you can affect U.S. foreign

policy with spectacular simultaneous terrorist attacks that the

F8h4terM

1    world would see.  There are several examples.  Imad Mughniyah

2    was the one who organized and conducted through his operatives

3    the suicide bombings of the United States Embassy in Beirut in

4    1983.  There were two of them.  They bombed the embassy and

5    then the annex, truck-bombed the annex.  Shortly thereafter,

6    the same year, Imad Mughniyah masterminded the simultaneous

7    truck bombings of the United States Marine Corps barracks

8    outside of the Beirut Airport, simultaneously attacking in the

9    same fashion the French paratroopers barracks.  And in fact,

10   according to well-documented intelligence reports, Mughniyah

11   himself filmed the event, the truck bombings of the marine

12   barracks, from a nearby hilltop, which is a film that actually

13   Witness X has, in fact, seen.  The result of the simultaneous

14   bombing of the two barracks in Lebanon caused President Reagan

15   to pull the United States marines out of Lebanon.  This was an

16   enormous signal to Iran and to Hezbollah that they could

17   directly affect U.S. policies with spectacular and simultaneous

18   bombings, simultaneous to show the organized coordinated threat

19   that they really posed.  Because that happened, Mughniyah

20   became convinced, and convinced everyone else in the terrorist

21   world that this was the best way to affect American foreign

22   policy, and he convinced bin Laden of this and al Zawahiri at

23   the 1993 meeting in Khartoum, leading to their alliance

24   thereafter.

25           Directly afterward, al Zawahiri, the number two in

F8h4terM

1    Al Qaeda, now number one, repeatedly visited Tehran during the

2    '90s and met with officers in MOIS, including its chief,

3    Ali Fallahian, and the Qods Force Chief, Ahmad Vahidi.  This is

4    well documented.  This is discussed by many of our experts,

5    including Dr. Bergman, Lopez, Tefft, Timmerman, Mr. Baer, as

6    well as the witnesses.  There is no doubt that this meeting

7    occurred.  It was well documented in the plea allocution of the

8    man who set up the meeting, Ali Muhammad, who was convicted in

9    New York Federal Court terrorism charges.  His plea allocution,

10   which is one of the exhibits in Havlish, lays out in some

11   detail what he did to set up the meeting.  That would be

12   Exhibit 31 in Havlish.

13          As Dr. Byman attests, Zawahiri has stated publicly in

14   interviews that before 9/11, Iran and Al Qaeda were

15   cooperating.  As part of their cooperation, Iran used Hezbollah

16   as a facilitator.  This is very important, as one of the other

17   pieces of evidence will show in a few moments.  Again, this is

18   discussed by all of these experts that I have been mentioning.

19          Throughout the 1990s, the al Qaeda-Iran-Hezbollah

20   terrorist training arrangement continued both in Lebanon and

21   inside Iran.  Mughniyah himself coordinated these training

22   activities in both countries, but interestingly -- and this is

23   in the testimony of Witness Z -- the IRGC maintained a separate

24   terrorist training camp located in Iraqi Kurdistan, especially

25   for Saudi nationals because of their distinct habits.  This was

F8h4terM

1    run by Iran.  The reason they did this is because, as I

2    mentioned, at the common level, the everyday person level, the

3    Sunni-Shia animosity remains.  So they ran some separate camps,

4    especially in those early days, but it was Shia trainers and

5    Sunni operatives.

6         Now, this terrorist alliance went beyond training and

7    led to specific acts of terrorist strikes directly against the

8    United States and its allies beginning in March 1992, when the

9    Hezbollah terrorist team, operating directly under Imad

10   Mughniyah, truck-bombed the Israeli Embassy in Buenos Aires,

11   Argentina.  There is no question who was responsible for this.

12   Our NSA intercepted communications from the Iranian Embassies

13   in Buenos Aires and in Brazil to the Foreign Ministry of Iran,

14   proving Iran's involvement in the attacks.  Again, this is

15   discussed by various of the experts, but in particular

16   interesting was Ronen Bergman's information.  He has access to

17   the highest levels of Israeli intelligence.  He said that there

18   was unequivocal proof -- not a smoking gun, but a blazing

19   cannon of proof -- that Imad Mughniyah and another Hezballah

20   member, Talal Hamia, actually executed the terrorist bombing of

21   the Israeli Embassy.

22        That was followed shortly thereafter in July 1994 by a

23   second bombing in Argentina of the Asociacion Mutual Issraelita

24   Argentina, better known as AMIA.  This is the Jewish Cultural

25   Center in Buenos Aires.  The United States, Israel, and

F8h4terM

1    Argentina, all concluded that Iran, Hezbollah, and Imad

2    Mughniyah were directly responsible for the bombing.  But the

3    Argentinean investigation went much further and showed that the

4    action was taken at the highest levels of Iran's government,

5    including the Supreme Leader and President Rafsanjani, both

6    defendants in this case.  This is discussed in great detail in

7    the Timmerman and Bergman affidavits.  Mr. Timmerman was one of

8    the investigators who provided evidence to the Argentinean

9    investigators.  Additionally, Witness X, Abolghassem Mesbahi,

10   was a key witness in the AMIA bombing case, working directly

11   with the prosecutors.  The Argentines sought issuance of

12   INTERPOL Red Notices for seven or eight top officials of Iran,

13   including major figures in the government, including the

14   Supreme Leader and Rafsanjani.  These INTERPOL Red Notices were

15   blocked through some extraordinary international actions at the

16   state level, and that is the subject of the affidavit of Edgar

17   Adamson, one of our other expert witnesses, who was the United

18   States chief law enforcement official assigned to INTERPOL.  He

19   discussed the extraordinary measures Iran took to block their

20   top leaders from being arrested and tried for the AMIA bombing.

21          THE COURT:  Just indicate what exactly the Red

22   Notice is.

23          MR. FLEMING:  The Red Notice, basically, is a look-out

24   notice.  It is an official notice from INTERPOL to all member

25   organizations of INTERPOL that certain individuals are wanted,

SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300

F8h4terM

1    and arrest warrants are issued or indictments have been issued

2    in countries.  INTERPOL cannot actually indict or arrest

3    anyone.  It is mainly an information conduit, basically saying

4    these individuals are wanted, to be arrested or extradited, if

5    possible, to Argentina, in this case.

6         The AMIA bombing situation, by the way, the plot

7    thickened even more last year, as the Court may be aware, with

8    the violent death of the Chief Prosecutor Alberto Nisman on the

9    eve of his presentation of evidence to the legislature of that

10   country.  He was killed in his hotel room, shot in the head,

11   and the official pronouncements are suicide, but very few

12   believe that.  That is a subject for another courtroom and

13   another day.

14        The terrorist campaign continued July 7, 1995.  This

15   time in Ethiopia, where Ayman al Zawahiri's Egyptian gunmen

16   associated with the Muslim Brotherhood, which was a precursor

17   to al Qaeda, attempted to assassinate Hosni Mubarak, the

18   Egyptian president, near Addis Ababa.  The attempt failed.

19   This is laid out in some detail in the affidavit of

20   Dr. Bergman.  But most importantly, the assassins were

21   extricated from the theater in Ethiopia by the IRGC, who

22   arranged for their protection in Lebanon by Hezbollah and

23   inside Iran, in particular, for the assassination team's

24   leader, Mustafa Hamza, who is an associate of al Zawahiri.

25        In May 1996, political pressure from the United

F8h4terM

States, Saudi Arabia, and Egypt on Sudan forced the expulsion
of bin Laden.  As is pretty well known, he moved to
Afghanistan.  Bin Laden and his Al Qaeda associates relocated
to Afghanistan with the assistance of the Iranian Intelligence
Services, as set forth in the affidavit of Ronen Bergman.
After bin Laden and al Zawahiri had moved to Afghanistan, at
that time, Iranian authorities continued to help them, on many
occasions passing weaponry and reinforcements across the border
to the Al Qaeda camps.

         The next significant event occurred on June 25, 1996,
the Khobar Towers bombing in Dhahran, Saudi Arabia, which
killed 19 U.S. soldiers and wounded 500.  It was an enormous
bombing.  The FBI said it was the largest manmade explosion on
earth since Hiroshima, or Nagasaki, I guess technically.  The
FBI sent investigators to Saudi Arabia, who concluded, on a
tremendous amount of evidence, the operation was conducted as a
joint operation by Iran and Hezbollah, with involvement of
Al Qaeda, and that it was done on direct order of senior
Iranian government leaders and that the bombers were funded and
trained by the IRGC in Lebanon's Bekaa Valley, which is the
home of Hezbollah.  The 9/11 Commission itself examined
classified CIA documents and established IRGC Qods Force
Commander Ahmad Vahidi planned the Khobar Towers attack with
Ahmad al Mugassil, who is a Saudi-born Al Qaeda operative.  And
the U.S. District Court in the District of Columbia ruled that

F8h4terM

1    Iran was factually and legally responsible for the Khobar

2    Towers bombing in the Heiser v. Iran case.  The 9/11 Commission

3    noted that Al Qaeda was involved in the planning and the

4    preparation of the Khobar Towers bombing and that Osama bin

5    Laden Laden's role was that he facilitated a shipment of

6    explosives to Saudi Arabia that was used in the bombing; and

7    further, that the NSA intercepts revealed that bin Laden was

8    specifically talking to people on his satellite telephone,

9    congratulating each other for the Khobar Towers attack.

10         Indeed, the next month, in August, Osama bin Laden

11   made his first fatwa against the United States, where he

12   specifically cited the Khobar Towers bombing as his

13   accomplishment, saying, "The crusader army became dust when we

14   detonated al Khobar."

15         An interesting episode occurred immediately thereafter

16   that is documented well by Robert Baer, who was one of the most

17   accomplished CIA agents in the field in this entire arena.  He

18   was specifically the person who had the Imad Mughniyah

19   portfolio.  He was on the trail of bin Laden.  And he documents

20   in two of his books how an Iranian intelligence operative who

21   was directly involved in the Khobar Towers bombing in June of

22   1996 met with Osama bin Laden in Jalalabad, Afghanistan, in

23   August 1996, to discuss the continuing secret strategic

24   agreement to undertake a joint terrorism campaign against the

25   United States.  He also documents at this very time one of

F8h4terM

bin Laden's most dangerous associates was meeting with one of

Mughniyah's colleagues at his offices in Beirut.  At the very

same time, Iranian and Hezbollah trainers were traveling

between Iran and Afghanistan, transferring Al Qaeda blueprints

and drawings of bombs and other materials, and that is

documented in the Bergman affidavit.  And I would note, also,

that Witness Y was one of those trainers who was traveling back

and forth, and testifies as such during that time period, doing

exactly what Bergman says was going on between Iranian and

Hezbollah trainers in al Qaeda camps in Afghanistan, and

Witness Y testifies in some detail about that.

As Lopez and Tefft's affidavits conclude, there is

overwhelming evidence that Al Qaeda and the highest levels of

the Iranian regime were acting in concert to plot and execute

attacks against the United States throughout this entire

period.  Dr. Bergman says essentially the same thing.

That leads to February 23, 1998, when Osama bin Laden

issued his second public fatwa in the name of the World Islamic

Front, calling for the murder of Americans "as the individual

duty for every Muslim who can do it in any country in which it

is possible to do it."

A few months later only, August 7, 1998, the United

States Embassies in Kenya and Tanzania were truck-bombed

simultaneously, consistent with the Mughniyah design.  These

killed more than 300 persons and wounded more than 5,000, and

F8h4terM

1    the responsibility for these heinous attacks is well documented

2    in the courts of the United States.  It was committed by

3    Al Qaeda operatives.  This is also part and parcel of the

4    confession and plea allocution of Ali Muhammad, which is

5    Exhibit 31 in Havlish.  He led the team that cased the embassy,

6    if you will, in Nairobi, beginning several years before and,

7    interestingly, shortly after the Khartoum meeting that created

8    the alliance.  This is noted in the 9/11 Report at page 68.

9    Again, the twin bombings bore the unmistakable modus operandi

10   of Imad Mughniyah.  A United States District Court in

11   Washington, D.C. held that Iran, the IRGC, and MOIS were

12   factually and legally responsible for the U.S. Embassy bombings

13   in Kenya and Tanzania in the Owens v. Republic of Sudan case.

14   Sudan also was liable.  But, noteworthy, it is al Qaeda

15   operatives who carried out the U.S. attacks.  They were trained

16   by Hezbollah in handling the sophisticated explosives used, and

17   the government of Iran was fully aware and authorized the

18   training and assistance in the attacks.  Among those who

19   trained in the Hezbollah camps at the time was a man named Saef

20   al Adel, who was convicted in absentia in the United States for

21   his role in the twin embassy bombings and who spent the years

22   after 9/11 in safe haven inside Iran, an undisputable fact.

23          The next significant event is the October 2000 suicide

24   bombing of the U.S.S. Cole in the harbor of Aden, Yemen, which

25   killed 17 Navy sailors and injured 39 more.  As documented in

F8h4terM

the affidavits of Lopez, Tefft, and Kenneth Timmerman, at just that time, the U.S. Defense Intelligence Agency Analyst Kie Fallis was alerting his superiors to a whole web of connections that he was finding among al Qaeda, the Iranian intelligence agencies controlled by the Supreme Leader of Iran, Hezbollah, and other active terrorist groups.

The 9/11 Commission Report noted this, as well, at page 240, when they said, "Iran made a concerted effort to strengthen relations with Al Qaeda after the October 2000 attack on the U.S.S. Cole."

At pages 240, 241, the report also states that during this same time frame, Iranian officials facilitated the travel of Al Qaeda members, including some of the 9/11 hijackers, through Iran on their way to and from Afghanistan, where the hijackers trained at Al Qaeda's terrorist training camp.

The conclusion from all of that is that throughout the 1990s, it is very well documented and accepted in the 9/11 Commission Report itself that Iran, Hezbollah, and Al Qaeda were working together constantly on terrorist operations, training, equipment, movement of operatives, and worked very closely together on a whole string of attacks, and this leads directly to 9/11.

Dietrich Snell is one of our experts who has an extremely impressive resume of professional work in the counterterrorism field as a prosecutor, as an investigator, and

F8h4terM

1    as the senior counsel to the 9/11 Commission, in particular was

2    the team leader for analyzing and sorting out and gathering the

3    evidence for and writing the report with regard to the 9/11

4    conspiracy itself.  Dietrich Snell gave a detailed affidavit to

5    our legal team, in which he concludes, "There is clear and

6    convincing evidence pointing to the involvement on the part of

7    Hezbollah and Iran in the 9/11 attacks, especially as it

8    pertains to travel facilitation and safe haven."

9            Dietrich Snell is a very careful lawyer and is a very

10   experienced prosecutor.  When he says there is clear and

11   convincing evidence, that definitely means what he is saying.

12   He knows what he is saying.  Dietrich Snell, actually, was a

13   liaison even previously to the FBI's own investigation, which

14   was called the PENTTBOM team.  The FBI had already figured out

15   before the 9/11 Commission was created that the hijackers

16   transited Iran to and from Pakistan and Afghanistan in

17   furtherance of the conspiracy, and as Snell explains, this

18   explains the absence of a clear document trail.  And he points

19   out that Ramzi Binalshibh and Khalid Sheikh Mohammed

20   corroborate Iran's role in this regard.  I will go through this

21   in some detail in a moment.

22           One of our other experts, Dr. Daniel Byman --

23           THE COURT:  Before we go to Dr. Byman, let me give the

24   court reporter a 10-minute break, and then we will continue.

25           MR. FLEMING:  Yes, your Honor.

SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300

F8h4terM

1          (Recess)

2          THE COURT:  You can continue.

3          MR. FLEMING:  Thank you, your Honor.

4          As I mentioned just before the break, Mr. Dietrich

5     Snell, the veteran prosecutor in terrorist cases, was the 9/11

6     Commission's liaison to the PENTTBOM team of the FBI.  As part

7     of his investigation into the nature of the conspiracy, the

8     plot that led to 9/11 itself, he saw the FBI's evidence that

9     the highjackers transited Iran to and from Pakistan in

10    furtherance of the conspiracy.

11         As our expert Dr. Daniel Byman attests, keeping the

12    passports of the highjackers clean and devoid of stamps that

13    would raise the attention and suspicions of INS agents at the

14    border or consular officials in the embassies abroad, this was

15    vital to reducing the risk of discovery and arrest and the

16    successful completion of Quod.  As Dr. Byman's says, travel

17    assistance is invaluable; also, as a general matter, for

18    al Qaeda to make recruitment and training easier, and enabling

19    the communication and coordination of terrorist operations is

20    vital.

21         Thus, we obtained the affidavit of the 9/11

22    Commission's staff member Janice L. Kephart, who was on the

23    travel team.  It was her responsibility for her and her team to

24    investigate how the hijackers got into the United States and

25    how they were able to do so without detection.  Ms. Kephart was

F8h4terM

responsible for determining what happened with respect to the

so-called 20th hijacker because the plane that ultimately

crashed in Shanksville, Pennsylvania, had one fewer muscle

hijacker, if you will, than the other planes did.  It was

Ms. Kephart who discovered what had happened there.  In brief,

it was that an alert INS inspector at the airport in Orlando,

Florida, became suspicious of a person seeking entry in Orlando

in the several months prior to 9/11.  His name was al-Qahtani,

Mohammed al-Qahtani, and he was denied entry into the United

States.  He was supposed to be the 20th hijacker and the fifth

hijacker that went down in Shanksville.  This turned out to be

absolutely critical in the operation itself because, as we all

know, it was the only flight that did not reach its

destination, the only hijacked flight that did not reach its

destination and precisely because the passengers, who did get

apparently cell phone messages of what was happening on that

day, but they took on the highjackers in the cabin and

overwhelmed the hijackers, who again were missing one hijacker,

and they were able somehow to get to the cockpit and disrupt

the flight that was on its way to Washington, D.C. to hit

either the United States Capitol or the White House.  That

plane, instead, went down in Shanksville, Pennsylvania.  The

lead plaintiff in our case, Alice Hoglan, her son is Mark

Bingham and was one of those hijackers who famously said,

"Let's roll," and was part of the passengers that took on the

F8h4terM

1    highjackers and prevented that flight from reaching its

2    destination in Washington.  So we're very proud to have her as

3    our lead plaintiff.

4           In any event, Janice Kephart's affidavit goes in great

5    detail as to the terrorist travel.  In fact, she writes very

6    persuasively that not only is it crucial to the success of the

7    overall operation, but itself, the coordinated travel plan,

8    constituted a specific terrorist operation in and of itself

9    that had to be coordinated.

10          The 9/11 Commission wrote -- and it's possibly the

11   most famous, certainly one of the most often quoted portions of

12   it -- "For terrorists, travel documents are as important as

13   weapons."  Because the travel operation was so coordinated and

14   so well planned out, Kephart concluded that the facilitation of

15   the Al Qaeda operatives traveled by Iran, as you will see in a

16   moment, including at least eight of the 9/11 hijackers,

17   amounted to essential material support, indeed direct support,

18   that further enabled Al Qaeda to perpetrate the 9/11 attack

19   successfully except, as I say, for the fourth plane that was

20   brought down in Shanksville, Pennsylvania.

21          Now, as to that terrorist travel operation, there were

22   two separate but related ways in which Iran furnished material

23   and direct support for the hijackers' operation.  First -- and

24   this is in the 9/11 Commission Report, detailed at pages 240

25   and 241 -- Iran facilitated the transit of Al Qaeda members,

F8h4terM

1    the hijackers, into and out of Afghanistan before 9/11 by

2    ordering its border inspectors not to place telltale stamps in

3    the passports of these future hijackers as they traveled to and

4    from Afghanistan and the training camps via Iran.  This is

5    critical because Afghanistan was on the State Department's list

6    as a state sponsor of terror, and a traveler arriving at a U.S.

7    airport with a stamp indicating they had been to Afghanistan

8    or, for that matter, Iran would almost certainly be denied

9    entry.  If they applied for visas or passports in Saudi Arabia,

10   having gone through Pakistan, they would also have been denied

11   passports by the Saudis upon the appearance of a Pakistani

12   stamp.  Therefore, the hijackers moved to the al Qaeda training

13   camps in Afghanistan through Iran, where they had made

14   arrangements not to have their passports stamped.  The 9/11

15   Commission said -- and this is Dietrich Snell in particular --

16   that it obtained evidence that 8 to 10 of the 14 Saudi muscle

17   operatives traveled into or out of Iran between October 2000

18   and February 2001.  That is on page 240.  This was essential

19   for the success of the 9/11 operation, for the reasons I

20   stated.  It is clear that al Qaeda knew that the Americans were

21   well aware of the existence of the al Qaeda training camps in

22   Afghanistan, and it was a state sponsor of terror.  They knew

23   that they would be denied entry or be denied visas entirely.

24          Further, NSA intercepts made available to the 9/11

25   Commission just in the few days before the publication of the

F8h4terM

1    9/11 report showed that the Iranian border inspectors had been

2    ordered not to place telltale stamps in the operatives'

3    passports and that the Iranians were aware they were helping

4    operatives of al Qaeda who were preparing attacks against the

5    United States.  At least three of the Saudi hijackers who went

6    through Iran on their way to Afghanistan were carrying

7    passports with indicators of Islamic extremism and that these

8    were probably Al Qaeda calling cards used by the terrorists to

9    identify themselves to the Iranian border inspectors.

10          The 9/11 Commission Report concluded that the actions

11   of the Iranian border authorities in refraining from stamping

12   the passports of the Saudi hijackers vastly increased the

13   likelihood of the operational success of the plot.  We don't

14   know, as the attorneys, what the indicators of Islamic

15   extremism were because that's classified information, and

16   Ms. Kephart cannot reveal it, but there is no doubt in her mind

17   and in the Commission's mind that these indicators in the

18   passport appeared to be identifying the Al Qaeda operatives to

19   the border inspectors, who would not then stamp their

20   passports.  Corroborating that is the fact that, as is

21   documented in United States Treasury Department reports in the

22   mid-1990s, which is the time period when the

23   Iran-Hezbollah-Al Qaeda terror alliance was forming that I

24   described earlier, the al Qaeda operative Mustafa Hamid had

25   negotiated a secret relationship with Iran that allowed safe

F8h4terM

transit via Iran to Afghanistan.  That is a direct quote from
Exhibit 30, U.S. Treasury Department press release, January 16,
2009.  This safe passageway was managed by MOIS.  Additionally,
numerous admissions from Al Qaeda prisoners at Guantanamo Bay
confirmed the existence of the clandestine Iran-Afghanistan
passageway managed by MOIS.

There is a good deal more information about the
existence of this clandestine passageway in the affidavit of
Jean-Louis Bruguiere, one of our experts.  Mr. Bruguiere is the
most prominent terrorism investigator in Europe.  He was the
top official in France, and he was an investigative judge, top
official in France investigating terrorism for many years.  He
is credited as the person who basically discovered the
existence of Al Qaeda in the early 1990s, prosecuted many
terrorists, uncovered many of the linkages between the various
terrorist groups that became Al Qaeda, and was instrumental in
disrupting an Al Qaeda plot in the 1990s of a hijacked plane
which was destined for Paris that was going to be crashed into
the Eiffel Tower.  This happened in the mid-1990s, and France
was able to abort that at a refueling stop and prevent that
disaster.

Mr. Bruguiere met with myself, Mr. Hailey, Mr. J.D.
Lee, and Kenneth Timmerman in this case several times, and he
wrote that affidavit, and prominent among the affidavits, one
of the reasons we most wanted it, is that his investigations

F8h4terM

1    discovered and documented very well, through his interrogations

2    of prisoners, the existence of what he called the rat

3    line leading all the way from Europe through Iran to

4    Afghanistan to the Al Qaeda camps.  And it turns out that this

5    is the passageway that the Al Qaeda hijackers used in order to

6    reach bin Laden's training camps without any evidence in their

7    passports.

8         The second way in which Ms. Kephart details that Iran

9    facilitated the travel operation of the 9/11 hijackers is that

10   Hezbollah's chief terrorist agent escorted and helped

11   coordinate travel and security of the future hijackers; that

12   is, specifically the 9/11 Commission Report states, at

13   pages 240 and 241, that in October 2000, a senior operative of

14   Hezbollah visited Saudi Arabia to coordinate activities there.

15   He also planned to assist individuals in Saudi Arabia in

16   traveling to Iran during November, and a top Hezbollah

17   commander and Saudi Hezbollah contacts were involved.

18        Then, in November 2000, one of the muscle hijackers

19   specifically was determined, Imad Mughniyah, to have flown to

20   Beirut on the same plane as a, quote/unquote, senior Hezbollah

21   operative.  Our investigation revealed the name of that senior

22   Hezbollah operative, and that is detailed in the second

23   affidavit of Kenneth Timmerman.  And I believe it was confirmed

24   publicly at one of the public hearings, but it is very

25   difficult to find otherwise.  The senior Hezbollah operative

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

F8h4terM

1    was Imad Mughniyah, who again is the most dangerous terrorist

2    in the world of his time, the terrorism chief of Hezbollah, and

3    responsible for the deaths of more Americans and more

4    Westerners worldwide than any other single person.

5            Further, in November 2000, the three muscle hijackers,

6    having obtained U.S. visas in Saudi Arabia, traveled as a group

7    from Saudi Arabia to Beirut and then onward to Iran.  An

8    associate of the senior Hezbollah operative was on that same

9    flight.  And finally, that Hezbollah officials in Beirut and

10   Iran were expecting the arrival of a group during the same time

11   period.  Travel of this group was important enough to merit the

12   attention of senior figures of Hezbollah.

13           Now, of course, the three hijackers in question were

14   not known to be important people.  They were rather ordinary.

15   That they were received in Beirut and on the way and then in

16   Iran by senior figures of Hezbollah and accompanied by a close

17   associate of Imad Mughniyah is extraordinary and telling.  What

18   was happening at this time, of course, is that the muscle

19   hijackers, who were inexperienced generally, were obtaining

20   their new passports and obtaining visas at the United States

21   consulate and then needing to travel internationally to get to

22   the camps.  It was very important that that be done

23   successfully; that that be done without giving anything away,

24   and also that they don't back out.  And Imad Mughniyah made it

25   his personal business to escort them and make sure that those

F8h4terM

1    things happened as planned.  This is part of the direct

2    testimony of Witness Y, who was privy to certain details in

3    that exact regard.  The fact that Imad Mughniyah was the senior

4    Hezbollah operative is something of a game changer, would have

5    been something of a game changer, and on our legal team, we

6    always suspected the reason his name was not placed in the

7    report is that it would have really sort of upset the apple

8    cart, and this all happened, the 9/11 Commission found out

9    about all of this information just a few days or maybe a few

10   weeks before the publication of the report and the date on

11   which the Commission would go out of existence.  And it was due

12   to the enterprising work of one particular staff member named

13   Lorry Fenner, an Air Force Captain, who did the perhaps

14   otherwise thankless work of going to the reading room and going

15   through the NSA intercepts, files and files, cabinet files

16   worth of material, and she found this, when all of the other

17   staff members were working on the FBI beat and the CIA beat and

18   the government beat.  She went and read the NSA materials and

19   came back to the more senior members of the staff, showed them

20   what she had found.  And they took that to Philip Zelikow, the

21   Executive Director of the 9/11 staff, who actually said, we

22   have to hold the presses, because the Commission Report was due

23   out in a few days.  They held it over for four days before they

24   published the report.  He took a team to Fort Meade to look at

25   those NSA intercepts, which by the way, as Lopez and Tefft

F8h4terM

1    describe, two very experienced CIA veterans, those are the gold

2    standard of intelligence, and it's unfortunate they weren't

3    looked at until the last minute.  But Zelikow said, hold the

4    presses, we have to look at this.  The product was pages 240

5    and 241, which were inserted into the text of the 9/11

6    Commission Report, which as Mr. Foote read earlier, culminated

7    with the sentence, "We believe this topic requires further

8    investigation by the U.S. Government."  No such investigation

9    has been made public, if one has occurred at all, but as

10   Mr. Foote explained, that was the starting point really for the

11   Mellon legal team.  And it is because of the importance of Imad

12   Mughniyah and the travel facilitation to the overall plan, it

13   is an extraordinarily important part of the 9/11 Commission

14   Report.

15         Now, to be sure, Dietrich Snell also, in his

16   affidavit, found out about this information, and in order to

17   try to corroborate it, he drafted questions which he passed on

18   to the FBI or the CIA and the military through the channel that

19   had been established, he passed questions about this topic to

20   the interrogators, the authorities at Guantanamo, and these

21   questions were put to Ramzi Binalshibh and Khalid Sheikh

22   Mohammed.  Khalid Sheikh Mohammed I will have more to say about

23   in a moment, but he is the 9/11 so-called mastermind, which I

24   will basically debunk that in a moment.  Ramzi Binalshibh, who

25   was supposed to be one of the hijackers, could not get a visa

F8h4terM

1     and became the liaison.  He was the Hamburg, Germany, roommate

2     of Mohammed Atta, and together they led the Hamburg cell of

3     al Qaeda.  Ramzi Binalshibh was ultimately captured and is at

4     Guantanamo.  Dietrich Snell drafted the questions regarding

5     these travel members to be put to Khalid Sheikh Mohammed and

6     Ramzi Binalshibh, to see if it corroborated the NSA intercepts.

7     And indeed, he got back the information very quickly and,

8     indeed, it did.  As Binalshibh and KSM confirmed, that 8 to 12

9     of the muscle hijackers moved through Iran to Afghanistan in

10    order to avoid telltale stamps in their passports.

11         Binalshibh himself, as I mentioned, was the

12    coordinator, and he reported directly to Osama bin Laden in

13    Afghanistan.  Eight months before 9/11, Ramzi Binalshib stopped

14    in Tehran, Iran, en route to meetings with al Qaeda leaders in

15    Afghanistan.  This is important, and it is not in the 9/11

16    Commission Report.  This is information and evidence that the

17    Mellon legal team obtained in Europe and presented to this

18    Court in Havlish.  That is Exhibit 18.  We got this material,

19    myself and Mr. Hailey, and Mr. J.D. Lee, as well as Ken

20    Timmerman, and met with the federal prosecutors in Karlsruhe,

21    Germany, and they gave us the documents that proved that Ramzi

22    Binalshibh had, on his way to meet with bin Laden in

23    Afghanistan, traveled and stopped in Tehran en route.  This is

24    incredibly important information because Binalshibh, as I said,

25    was a very, very important member and was the liaison between

F8h4terM

bin Laden and Mohammed Atta, who was the pilot of the plane
that hit the North Tower of the World Trade Center.

        The federal prosecutors in that meeting, they also, in
that meeting, vouched for the credibility of Abolghassem
Mesbahi, who they were familiar with from the Mykonos
prosecution and other cases and had been working with Mesbahi
over a period of several years.

        Now, precisely during the time that Binalshibh was
traveling between Europe and Afghanistan via Iran, Iran was
hosting a secret meeting of al Qaeda terrorists and Hezbollah
representatives and Iranian officials, intelligence agency in
the political realm.  These meetings included Ayman al Zawahiri
and Saef al Adel.  Saef al Adel was the number three in
al Qaeda at the time, and he still to this day, I believe,
lives in Iran, or did until recently, at least.  Also present
was Imad Mughniyah, who is again the terrorist chief of
Hezbollah.  This is in the sealed testimony of Witness Z in
great detail.

        Now, from there, we note that there is a conclusion
regarding the travel.  The Iranian travel facilitation by Iran
helped ensure their continued training and access to the United
States, as concluded by Dr. Tefft and Ms. Lopez.

        Returning to Imad Fayez Mughniyah, whose role as the
senior Hezbollah operative, as referenced on page 240 and 241,
is absolutely critical.  He is a well-known figure.  He is now

F8h4terM

1    deceased, killed in an assassination in 2008 in Damascus,

2    Syria.  Robert Baer has written extensively on him because Baer

3    was basically the CIA agent on Mughniyah's trail for many, many

4    years.  Ronen Bergman, Timmerman, Lopez, and Tefft all write

5    extensively about Mughniyah's terrorist pedigree, as well as

6    his involvement in particular acts of terrorism against the

7    West.  The testimony of Witnesses X, Y, and Z do the same and

8    in some great detail, as all three of them knew Mughniyah

9    rather well, and they have extensive testimony about Mughniyah.

10   Dr. Bergman notes that Mughniyah conceived, designed, planned,

11   commanded and/or carried out terrorist operations involving

12   hundreds of deaths, more than any other single figure in the

13   world, and he was an agent of Iran and lived in Iran for many

14   years as the chief of terrorism operations for Hezbollah.  He

15   was the individual again, to recap, that came to Khartoum,

16   Sudan, for the 1993 meeting with bin Laden and al Zawahiri and

17   Iranian General Zolqadr and originated the concept of suicide

18   attacks performed simultaneously in order to affect Western

19   foreign policy.

20        Now, Dr. Bergman had access, because of his extensive

21   connections with the intelligence community in Israel, to two

22   top secret, highly classified Israeli documents which disclose

23   that Iran is aided by Hezbollah's operational infrastructure

24   through Mughniyah, for the purpose of attacks, and that it

25   almost always employs Mughniyah for those attacks.  Now,

F8h4terM

Bergman's affidavit has an attachment to it, which is a copy of

a May 14, 2001 letter from Ali Akbar Nateq Nouri, to the head

of the Iranian intelligence apparatus at the time, Mustapha

Pourkanad.

Nateq Nouri has held many very high offices in Iran,

including the speaker of the parliament, but he also was at

this time the head of the Supreme Leader's unnamed auxiliary

intelligence office, if you will, that reported directly to the

Supreme Leader and was otherwise unknown to the Western world.

Now, Dr. Bergman says that the May 14, 2001 letter is

authentic, having been examined by top officials in the United

States intelligence community and in Israeli intelligence

community, and I can add the French intelligence community,

because that letter itself, Bergman had a copy of it, that

letter is an exhibit to one of the defector witness's testimony

in this case.  He didn't have the copy of it; he had the

original.  And he holds it up for the camera for the Court to

see.  That document, as Dr. Bergman says, reveals high-level

links between the Supreme Leader's intelligence apparatus,

which is headed by Nateq Nouri, and Al Qaeda, and involves

knowledge and support of a major upcoming operation, the goal

of which was to damage America's and Israeli's economic

systems, discrediting their institutions and, as part of a

political confrontation, undermining their stability and

security.  9/11 did all that, of course, in an unprecedented

F8h4terM

1      way and by many orders of magnitude.  It changed, as we all

2      know, the entire way the entire federal government almost is

3      organized and has made fundamental changes in our daily lives,

4      which we all experience every day.  We experienced it coming

5      into this courtroom.  That was part of the goal.  The May 14th,

6      2001 letter states that.

7              More specifically, Nateq Nouri says in that memo that

8      he is speaking for the Supreme Leader himself, and he talks

9      specifically about al Qaeda's plans for the impending terrorist

10     strike against the United States.  It has been reviewed and

11     found authentic by intelligence agencies in Israel, Europe, and

12     the U.S., and I would add, in France, according to the

13     defector's testimony.  It references specifically, it directly

14     connects Iran and Mughniyah to al Qaeda and to the planned

15     attack that was forthcoming.  Again, this was May 14, 2001.  It

16     refers to Iran's support for al Qaeda's future plans and

17     cautions the intelligence service headed by Pourkanad, it

18     cautions them to be alert to the possible negative future

19     consequences of this cooperation between Iran and Al Qaeda, and

20     it says the Supreme Leader emphasized that with regard to

21     cooperation with al Qaeda, no traces must be left that might

22     have negative and irreversible consequences, and that the

23     activity must be limited to the existing contacts with Imad

24     Mughniyah and al Zawahiri.

25              We would submit that this memorandum clearly refers to

F8h4terM

1    the upcoming 9/11 attacks and anticipated retaliation by the

2    United States, and it was very important because they did not

3    want Iran to be known to have been supporting it, did not want

4    Iran to be attacked, which is something, by the way, that makes

5    imminently good sense, not only for Iran to be attacked, but

6    they knew since bin Laden was going to take credit for it, they

7    knew that in all probability the United States would attack

8    Afghanistan instead, where Iran's hated enemy, the Taliban, was

9    in power.  And as Dr. Clawson and Dr. Byman note in their

10    affidavits, the overthrow of the Taliban was decidedly in

11    Iran's interests.

12            Now, there is, of course, in the same defector's

13    testimony, a second document, which was a follow-up memorandum,

14    which I won't discuss in great detail here, but it is known to

15    be in the hands of the French intelligence agencies, and it

16    describes in some more great detail the timing of the expected

17    attack, being basically telling the intelligence committee in

18    Iran to be ready as of September 1st.

19            Now, moving on to defector Witness X, Abolghassem

20    Mesbahi, as I mentioned, although the testimony itself is

21    sealed, Mr. Mesbahi has authorized us to reveal his name and

22    the substance of much of his testimony because he thinks it is

23    important.  Abolghassem Mesbahi was known to be an excellent

24    intelligence operative, known by the Israeli intelligence

25    agency's Mossad, which was tracking him for many years, knew

F8h4terM

1    about Mesbahi.  In fact, Mr. Bergman's book, which I happened

2    to bring a copy of, he notes in his affidavit, similarly, that

3    Mesbahi was known to be the chief of intelligence for Iran in

4    Paris until he became persona non grata literally and left the

5    country, and then he became Iran's chief spy in Western Europe,

6    headquartered in Belgium.  Importantly, in the book,

7    Dr. Bergman devotes an entire chapter to Mesbahi, saying the

8    Israelis for years were trying to get him and never could.

9    They knew that he was an excellent operative, first-class

10   operative, and they were never able to get him, and they hold

11   him responsible for numerous acts that really are not germane

12   here, but he was not only under radar screen, but they knew a

13   lot about him.

14          After Mesbahi changed his stripes, if you will, and

15   defected to the West and began working with Western

16   intelligence and law enforcement, and he became probably the

17   leading defector witness and the leading intelligence agent in

18   terms of providing valuable information and evidence to Western

19   prosecutors and intelligence agencies, probably unsurpassed by

20   any other figure.  Dr. Bergman states that Mesbahi was an

21   important asset to the investigation of many assassinations and

22   acts of terror by the Iranian regime and its proxies in several

23   countries and that Mesbahi's testimony has been received with

24   high reliability by the courts and by law enforcement and by

25   intelligence agencies worldwide.  As I mentioned, he was a key

F8h4terM

1   witness in the Mykonos prosecution and in the AMIA

2   investigation in Argentina.

3          Mesbahi himself was a regime insider.  He was from a

4   well educated family, and he was something of a prodigy

5   himself.  He speaks five languages.  He has got several

6   advanced degrees in various areas.  I have spent many days with

7   Mesbahi.  He is a very, very bright individual.  He is also a

8   very repentant individual in the sense he regrets deeply his

9   role as a MOIS agent and the top operative who was involved in

10  terror campaigns, and he is doing everything he can at this

11  part of his life to atone for that and help the West battle the

12  regime in Tehran and to defeat terrorism.

13         He personally knew Ayatollah Khomeini from the time he

14  was a small child due to his family connections, and he knew

15  and worked for the other individual defendant in this case, Ali

16  Akbar Hashemi Rafsanjani, having served under him during the

17  Iran-Iraq War of 1980.  This he describes in some really very

18  difficult detail in his testimony, particularly where he

19  describes how Rafsanjani callously sent waves of Iranian boys

20  to their deaths in battles that they could not win.  And this,

21  he said, was the starting point of when he began to realize

22  that this regime was corrupt and inhumane and not to be

23  cooperated with.  It was at that point he began to wonder about

24  his own role, but it was years before he got out, and he did

25  many things still in service of the regime thereafter.

F8h4terM

1          He was also a friend of Saeed Emami, who was the top

2     official of MOIS.  He held a number of prominent positions.

3     Like I say, he began at the Iranian Embassy in France when he

4     was a very young man.  He was involved in the Islamic

5     Revolution when he was a very young man.  He was in charge of

6     espionage in France and later throughout Western Europe.  He

7     subsequently played a significant role in the Lebanon hostage

8     crisis in the 1980s, being Iran's liaison to the Prime Minister

9     of Sweden with regard to some of the hostages that were of

10    Swedish descent.

11         Mesbahi returned to Iran in 1984 and '85 to work on

12    the creation and organization of the new intelligence service

13    which turned out to be MOIS.  He was in that from the very

14    beginning.

15         As I mentioned, there's been an undeclared war going

16    on between the countries for years, but in the 1980s, so many

17    hostages were being taken; many terrorist attacks, hijackings,

18    assassinations were going on.  The threat of war between the

19    United States and Iran was constant.  The Iranian government

20    knew that it could not defeat the United States in a

21    conventional war.  So, in the mid-1980s, the Iranians formed an

22    MOIS-IRGC task force that was charged with the responsibility

23    to come up with contingency plans for asymmetrical warfare

24    against the United States; basically, a long way of saying

25    terrorist operations that might be used against the United

F8h4terM

1   States to prevent the United States from engaging in a full-on

2   military war with Iran.  Remember, they had had the lesson

3   already in 1983 from the marine barracks bombings that they

4   could affect American foreign policy overseas by spectacular

5   terrorist attacks.  So they began a task force to create

6   contingency plans for asymmetrical warfare.  Mesbahi was one of

7   its principal members.  Now, there is some corroboration for

8   this in the United States State Department report, country

9   reports, which is Exhibit 13 in Havlish, which says that in the

10  1987 report -- this is page 56 of Exhibit 13 -- the country

11  report on terrorism states, although no Iranian backed

12  terrorist attacks were staged against specific U.S. targets

13  during the year, we believe that during the summer of 1987 Iran

14  began to formulate contingency plans for anti-U.S. operations.

15  That is exactly what Mesbahi testifies to.

16        He testifies in great detail about what they did.

17  These contingency plans were aimed at breaking the backbone of

18  the American economy, crippling and disheartening the United

19  States and its people, the government, disrupting the economic,

20  social, military, political order, but not risking a

21  head-to-head military confrontation, which Iran knew it would

22  lose.  And therefore, they would use terrorist acts by proxies.

23  Importantly, among other things -- and there were many plans

24  that Mesbahi describes -- one of them was that the MOIS-IRGC

25  task force devised a scheme to crash hijacked Boeing 747s into

F8h4terM

1    major American cities, principally New York and Washington.

2    And the targets from the very beginning, the assumed targets or

3    identified targets from the very beginning were the World Trade

4    Center in New York, the White House, and the Pentagon in

5    Washington, D.C.

6         The contingency plan's code name was -- this is the

7    whole set of plans, and Mesbahi describes many of the others,

8    and they involve things like attacking nuclear plants,

9    hijacking oil tankers on the highways and crashing them,

10   bombing gas stations where there were lots of people, and many

11   others -- but the contingency plan as a whole, its code name

12   was "Shaitan dar Atash," which is Farsi for "Satan in Fire" or

13   "Satan in Hell."  The Shaitan dar Atash plans used a variety of

14   tactics, as I said, chemical weapons and radioactive dirty

15   bombs among them, power plants, and so forth.  But one of them

16   was the use of passenger airliners as bombs or missiles to

17   attack U.S. cities.  They specifically decided upon 747s

18   because of their large fuel tanks.

19        Now, at this point, I would like to mention that the

20   9/11 Commission Report accepts, or at least it cites, the

21   statements of Khalid Sheikh Mohammed as the mastermind or the

22   architect of 9/11 from A to Z.  That's in his plea allocution

23   in Guantanamo, but it is one line.  He literally says, "I was

24   the mastermind of 9/11 from A to Z."  But he doesn't spell out

25   A, B, C, D, or anything.  He just says it.  And there is

F8h4terM

 1    actually very, very little -- in fact, there is no evidence --

 2    that KSM was the mastermind of 9/11 other than his own

 3    bragging.  In fact, Robert Baer wrote a column published in

 4    Time Magazine in 2007 called "Why KSM's confession rings

 5    false."  It mentions that KSM basically comes across as

 6    boasting or possibly even mentally unstable, because indeed his

 7    guilty plea at Guantanamo takes credit for almost every

 8    terrorist operation ever conducted or ever conceived, including

 9    wild things like the attempt to assassinate the Pope, attempt

10    to assassinate President Clinton in Malaysia, and myriad other

11    plans.  Robert Baer is not buying it.

12            What is really interesting, it is public information

13    that KSM was waterboarded by the CIA at Guantanamo 187 times.

14    He ended up talking a lot.  The problem is that the 9/11

15    Commission Report, 567 pages, I think it is, contains hardly a

16    word about KSM's supposed authorship of the 9/11 operation.

17    There's about two sentences total, and they don't say anything

18    at all.  You would think that a man who has taken credit for

19    and was the mastermind from A to Z of every detail would have

20    told the interrogators a great deal about how they developed

21    the plan, how he developed the plan, which was incredibly

22    sophisticated and evilly ingenious in its scope, and yet he

23    can't do it because he didn't do it.  He can't explain it

24    because he was not the architect of the plan.

25            There are more details in the 9/11 Commission's Report

F8h4terM

about KSM's wild plan to hijack a dozen airliners over the

Pacific Ocean called the Bojinka plot or the outlandish plot to

assassinate President Clinton than there is about the 9/11

plot.  There are no details at all on the evolution of the 9/11

plan at pages 149 and 150, 155 to 156.  There is nothing about

how they decided upon the numbers of terrorists per plane, the

use of box cutters as weapons, how to coordinate the timing,

how to take the flights, nothing like that.  There is not a

word in the 9/11 Commission Report about KSM's handling of

those planning details.  And it does say that he knew that it

would require sophisticated planning and personnel and money

and logistical support, but he provides none of those details,

and so his taking credit for it is highly suspicious.  As I

said, Robert Baer, surely an expert in these matters, wasn't

buying it.

Instead, what happened, we believe, is that Iran

delivered the contingency plan for asymmetric warfare.  It

delivered the Shaitan dar Atash plan to Al Qaeda itself, which

then adopted it and used it.  There is support for this when

Baer notes the planning meetings between the Iranian IRGC

officials and bin Laden in Jalalabad, but they don't have the

specific details of that.  In any event, there is corroboration

in Mesbahi's testimony.  What happened is that Mesbahi left --

because he had become soft on the West, he fell out of favor

with the hardliners in Tehran, and he defected to Europe after

F8h4terM

finding out that he was slated to be killed.  He was informed

of that by his friend, Saeed Emami, who was the head of the

MOIS and who was himself eliminated subsequently.

Mesbahi then took up residence in Germany, but before

he left, he still made sure he had in place his communication

methodologies with his own trusted colleagues inside the

regime, and that included a code system for communications,

which leads us to July 23, 2001, when Mesbahi received a coded

message from one of his trusted friends inside the Iranian

government, which was three words "Shaitan dar Atash."  And

Mesbahi, when he received the coded message, he knew exactly

what it meant, that "Shaitan dar Atash" plan for asymmetrical

warfare with the United States was being activated in some

fashion, and he knew this was serious, and he immediately

informed his handlers in the German police, met with them, told

them that some big event, terrorist operation, was about to

happen, and probably in America, and he asked the officers to

convey this information to the American authorities.  He does

not know what happened after that, whether it was ever

conveyed.

Three weeks later, on August 13, 2001, Mesbahi

received another coded message from Iran, clarifying the

"Shaitan dar Atash," that the aspect of the contingency plan,

the particular plan that was being activated, was, in fact, the

plan to crash hijacked civilian airliners into American cities.

F8h4terM

The Court will note from the sealed materials how that was
conveyed and what the precise message was, but it does seem
quite clear that that would have been a plan that was being
activated.  Mesbahi immediately contacted his German police
handlers, told them about the message, pleaded for them to take
action, and they responded that they would convey it.  They had
conveyed the earlier message.  They would let them know if they
needed anything else.

        Two more weeks passed, August 27, 2001, and Mesbahi
received a third message, coded message, which confirmed the
activation of "Shaitan dar Atash" and added that Germany was
somehow involved.  This also proved quite prophetic as the
Mohammad Atta-Ramzi Binalshibh-al Qaeda terrorist cell that was
the head of the 9/11 attack was, in fact, based in Hamburg,
Germany, as is well documented in the 9/11 Commission Report.

        Mesbahi saw the attacks on television and then made
repeated efforts to continue to convey his information to
German and American governmental authorities, even went to the
United States Embassy in Berlin, but by that time it was all
buttoned up and closed down because of security concerns.  He
made sure that he was photographed by the cameras, held his
card up to one of the cameras and said, call me, I have
information.  He received one call, which he is unclear about
what happened, but nobody ever came to meet with him.  He was
not sure who that caller was, and he doesn't know more about

F8h4terM

what was conveyed.  But he related the story in very great

detail in his testimony in this case, which shows that the

Iranian intelligence community knew, as indicated in the

memoranda that we talked about earlier, they knew that an

attack was about to happen.  And this is also, in general,

corroborated by the testimony of Witness Z, who had similar

forewarnings and knew about certain parts of the information,

which he conveyed to an American Embassy abroad.  But his

information, it is unclear what the American government, what

the CIA did with it.  He did meet with CIA officers, as his

testimony is quite clear.  It is unclear what happened to it.

It is clear that the meeting happened, and we don't know how

the information was used, if at all.

Mesbahi also testified about the fact that Iran had

purchased an aircraft flight simulator through a Chinese flight

company for MOIS.  He learned this, again through messages from

his allies inside the Iranian intelligence community.  That

airline simulator was transported to Iran in 2000 by an IRGC

front company, and computer software to program the flight

simulator was purchased and obtained.  The computer software

was to simulate a Boeing 757, 767, or 777 aircraft, and the

flight simulator was set up with that software at a very

secure, secret facility which Mesbahi names explicitly and

discusses in his testimony.  It is significant because each of

the four airliners highjacked on September 11, 2001, and used

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

F8h4terM

in the attacks, were Boeing 757 or 767 models; and yet, Iran

has never owned any Boeing 757, 767 or 777 aircraft ever, due

to international sanctions against their sale to Iran.

In late September 2001, frustrated about his attempts

to get his information about what he knew from the coded

message to authorities or at least seeing any action taken --

no one had contacted him -- in late September 2001, Mesbahi

telephoned Kenneth Timmerman, the prominent investigator

journalist, who was an expert witness in our case, told

Timmerman about the information he had received and about the

flight simulator that I have just discussed.  This is

significant because it is confirmed by Timmerman in his

affidavits, and it shows that Mesbahi's story that he testified

in this case in 2008 is exactly the same as the substance of

what he told Kenneth Timmerman in September 2001, just two

weeks after the attacks.

And finally, Mesbahi also related that he learned from

his sources inside Iran that at least one of the 9/11

hijackers, Majid Moqed, who was a muscle hijacker on Flight 77

that hit the North Tower of the World Trade Center, was housed

at an IRGC-MOIS safe house in Tehran with which Mesbahi was

particularly familiar.

To conclude about Mesbahi, Dr. Tefft and Claire Lopez

looked at his testimony, all of it -- it is, I think,

three days of testimony -- and found his sworn testimony not

F8h4terM

only to be credible and that particularly about the contingency

planning, which of course as I pointed out the State Department

knew about, and as I said, the German prosecutors and Israeli

intelligence community also has said that Mesbahi is credible.

Further, Lopez and Tefft, in their expert opinions, state that

Mesbahi's testimony concerning his communication sources inside

Iran via encoded encrypted messages and the method and manner

of those communications is credible, and they are both

experienced CIA operatives and knowledgeable in these areas.

I do want to point out just one other thing about the

plot, and that is that the Court may have noticed that

Witness Z also gives some testimony about what he understood to

be the genesis of the plot, which emanates from Imad Mughniyah

himself and his observations about an aircraft disaster in

Europe.  There is nothing inconsistent about this at all

because, if Mughniyah was thinking about the effect of aircraft

crashing into buildings shortly after takeoff and the

devastating effect it would have, the merest mention of it with

his colleagues at MOIS and IRGC and the notion that he was

working with bin Laden, that would have immediately triggered a

realization and a pulling off of the shelf of the contingency

plan from Shaitan dar Atash, and said, well, we already have

that plan, look here, help us do it, work with bin Laden.  So

there is nothing inconsistent about what the two witnesses say

about the genesis of the actual plot.  I just wanted to mention

F8h4terM

1    that because, at first glance, it would seem inconsistent, but

2    it really is not.

3              Now, I think I mentioned earlier Iran had provided

4    material support to al Qaeda before, during, and after the 9/11

5    plot.  I have already discussed the "before" and "during" with

6    regard to the various elements I've discussed already, but

7    after 9/11 --

8              THE COURT:  Before we go into that area, why don't we

9    take a lunch break.

10             MR. FLEMING:  I won't be much longer, I can assure

11   you.

12             THE COURT:  How much longer?

13             MR. FLEMING:  I can do this part in ten minutes, five

14   to ten minutes.

15             THE COURT:  Okay.

16             MR. FLEMING:  In the years immediately after 9/11 Iran

17   provided significant material support to al Qaeda in several

18   ways; most significantly, by providing safe haven to Al Qaeda

19   leaders and operatives and keeping them safe from retaliation

20   by U.S. forces which invaded Afghanistan.  This had been opened

21   up earlier in the '90s by Mustafa Hamid's negotiations with

22   Iran, but the fact that this happened, that al Qaeda evacuated

23   its hundreds of al Qaeda members and top leaders and their

24   families to Iran is not a matter of speculation.  This is a

25   matter of clear government conclusions and U.S. Treasury

F8h4terM

1    Department designations and releases, as well as public

2    comments made by Secretary of Defense Rumsfeld and President

3    Bush, who noted that Iran was harboring al Qaeda operatives

4    after 9/11, which included Seif al-Adl, who I referred to, as

5    well as members of Zawahiri's family and bin Laden's own

6    immediate family, including his eldest son, Saad bin Laden, and

7    that latter figure actually figures prominently in the

8    testimony of one of the MOIS defector witnesses who saw Saad

9    bin Laden and accompanied him in Iran before 9/11, and in the

10   testimony of another defector witness who provided for him

11   after 9/11, provided for his needs and took an active role in

12   the housing and provisions for dozens of Al Qaeda families.

13   This one particular defector was very involved in helping

14   Al Qaeda operatives and their families in their safe refuge in

15   Iran after 9/11.  Again, U.S. Government reports, as well as

16   the defector testimony, are entirely consistent in this regard.

17          And in the years that followed 9/11, those al Qaeda

18   operatives, specifically Saad bin Laden and Seif al-Adl,

19   operated and directed and supervised terrorist attacks in the

20   Middle East, in Saudi Arabia, particularly, from the territory

21   of Iran.  This is in any number of exhibits, all from the U.S.

22   Government reports, and there were exhibits from the Treasury

23   Department.

24          And Dr. Clawson, in particular, notes Executive Order

25   13224, issued by the Treasury Department in 2009, makes that

SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300

F8h4terM

explicit statement, that Saad bin Laden managed terrorist

operations from Iran after September 11.

So in conclusion, your Honor, the testimony from the

defectors is very compelling, very detailed, very explicit

about Iran's knowledge and direct support of the 9/11 operation

before, during, and after.  And I wish I could go into it in

more detail, but the Court, I'm sure, has read and perhaps seen

those videotapes.  They are very compelling testimony about the

role of Iran, about the role of Hezbollah and Imad Mughniyah

himself in the 9/11 operation.  This is consistent with the

conclusions of the 9/11 Commission, which basically was unable

to finish the task of investigating the Iranian and Hezbollah

connection to 9/11.  But for our experts, all of them conclude

that in one form or another that Iran provided material

support.  Dr. Daniel Byman concludes, "There is clear and

convincing evidence that Iran has provided material support for

al Qaeda with regard to travel, safe haven, and training, at

the very least.  And the support for that conclusion comes from

a range of sources, including U.S. Government reports and

statements of al Qaeda.  These experts, by the way, did not

have, except for Lopez and Tefft, and Timmerman, they didn't

have access to the defector testimony.  But they are completely

consistent with the sealed testimony, as well.  They have a

very strong foundation in all regards.  Janice Kephart

concludes, "There is clear and convincing evidence that Iran

F8h4terM

1   and Hezbollah provided material support to al Qaeda by actively

2   facilitating the travel of the hijackers into and out of

3   Afghanistan through Iran.  And it was specifically for the

4   purpose of carrying out the 9/11 attacks.  Dr. Patrick Clawson

5   agrees and points out that U.S. Government sources have issued

6   repeated and detailed descriptions of Iranian material support

7   to al Qaeda before, during, and after the 9/11 attacks, and

8   notes that few, if any, noted terrorism experts would dispute

9   that Iran provides material support to Al Qaeda within the

10  meaning of 18 U.S.C., Section 2339(A)(b)(1).  Lopez and Tefft

11  come to the same conclusion, as does Dr. Ronen Bergman and

12  Dietrich Snell.  All conclude that Iran provided direct

13  material support and resources to Al Qaeda before and during

14  and after 9/11 attacks.

15          That concludes my presentation, your Honor.  Again, I

16  understand that the evidence has been moved in and that we are

17  clear to file some more sealed evidence, sealed affidavits.

18  But those affidavits really don't impact the major evidence

19  that we put forward here today, and we will get that done as

20  soon as possible, but it need not hold up a ruling if the Court

21  is so inclined.  As Mr. Foote mentioned and is going to mention

22  again, I think, we're here to hopefully get a liability finding

23  so that we can move on, but I will let Mr. Foote address that.

24          THE COURT:  When do you intend to submit those?

25          MR. FLEMING:  I will do it as soon as possible.  There

F8h4terM

1    is a little bit of a logistical problem, but I can overcome

2    that in just a few days.  Because it has to be filed in person

3    sealed, we're here for another proceeding next week, I thought

4    I would deliver it next week.  I could do it potentially

5    faster, but I have to jump through some hoops.  I can do it, I

6    believe, as fast as a few days.

7             THE COURT:  I should anticipate it by when?

8             MR. FLEMING:  By the 27th, for sure.  Ten days, at the

9    max, but I will try to do it as fast as possible.  As I said,

10   it does not impact any of the other evidence, the reliability

11   of it.

12            Thank you.

13            THE COURT:  Yes.

14            MR. FOOTE:  Thank you, Judge.  I will be very brief.

15            First off, as a terrorist state, any material support

16   makes them strictly liable for the events, and we've gone well

17   beyond that standard.  So my suggestion for process, Judge, is

18   the additional information that Mr. Fleming wants in the record

19   is just that.  It will be part of the record.  I don't think

20   you need to have it or rely on it in order to enter an order if

21   you're so inclined.  What we would propose to do is to email to

22   you our proposed order and our proposed findings of fact and

23   conclusions of law by tomorrow.  And then if the Court again is

24   so inclined, this should be referred to Magistrate Maas for his

25   determination of damages, as was done in the Havlish case.

F8h4terM

1          With that, Judge, we conclude this hearing.  Thank

2     you.

3          THE COURT:  Similar to the process and the

4     determination with regard to the Havlish case, I've reviewed

5     the evidence that was presented and summarized here today and

6     the voluminous evidence that was submitted in the Havlish case

7     during those proceedings.

8          I am going to make this determination at this point,

9     that there has been an extensive record submitted to this

10    Court; that that extensive record, which includes sealed and

11    unsealed submissions, including fact and expert testimony, as

12    outlined here at this hearing, establishes plaintiffs' claims

13    that credible evidence satisfactory to this Court, pursuant to

14    28 U.S.C, Section 1608(e), and I accept it as uncontroverted

15    evidence.  Based on that determination, this Court will issue

16    an order consistent with the plaintiffs' proposed findings of

17    fact and conclusions of law and enter the order of default

18    against the sovereign defendants, including Iran and the other

19    named defendants, entities, and individuals.  The evidence in

20    this case supports a finding that's consistent with the

21    findings by this Court in Havlish and consistent with the

22    designation by our government that Iran is a state sponsor of

23    terrorism.  The evidence supports a finding that Iran and the

24    sovereign defendants were, indeed, responsible for providing

25    material aid and support for terrorist acts against the United

F8h4terM

1   States, its citizens and interests and others, including the

2   terrorist attacks on 9/11; and that it provided such material

3   aid and support before, during, and after 9/11.

4          This Court will issue a default judgment against all

5   defendants, defaulting defendants, based upon the record that

6   exists before this Court.  And I will, consistent with the

7   process that we engaged in in the Havlish case, refer the

8   matter to Magistrate Judge Maas for his review and

9   determination of the recommendation with regard to the

10  appropriate level of damages to be awarded to the plaintiffs

11  based on the finding here and the judgment to be entered

12  against the defendants.

13         You say that I can expect to receive it tomorrow?

14         MR. FOOTE:  Yes, Judge.

15         THE COURT:  I will be prepared either tomorrow or the

16  next day but clearly before the end of the week.  If I have any

17  questions, I will contact the parties.  If I think any

18  modification should be made to the order, I will notify you

19  before I sign it.  Otherwise, if the order is consistent with

20  the proposal that I have already seen, I will be prepared to

21  enter that order this week.  I will speak with Magistrate Judge

22  Maas today about being prepared to schedule a time for

23  submission of damages before Magistrate Judge Maas and any

24  appearances before him that he finds are necessary.  Obviously,

25  his process should be significantly expedited by the fact that

F8h4terM

1    he has gone through this process and has at least familiarity

2    and a framework for determination of the appropriate damages

3    depending on the evidence that is submitted.  So you can expect

4    that that order will be issued this week, and Magistrate Judge

5    Maas will contact you.  You should probably try to figure out

6    what time frame you want for submission of material to

7    Magistrate Judge Maas, if you want to give him a letter

8    directly telling him what he can anticipate, so he can figure

9    out exactly what the process will be.

10            MR. FOOTE:  Judge, we are ready for that.  If you talk

11   to Judge Maas, we are ready in about two weeks to supply him

12   with that information.

13            THE COURT:  I will tell him that.  I will ask him to

14   either reach out to you in the next ten days, or if you haven't

15   heard directly from him in the next ten days, you should

16   contact his chambers about how he wants to proceed.

17            MR. FOOTE:  Thank you, Judge.

18            THE COURT:  You're welcome.

19            (Adjourned)

20

21

22

23

24

25