# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

—————————————————————x

In re Terrorist Attacks on September 11, 2001          **03 MDL 1570**

—————————————————————x

*This filing applies to the Estate of John P. O'Neill, Sr., et al. v. The Republic of Iraq et. al., 04 CV 1076 (RCC)*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| **Estate of  JOHN PATRICK O'NEILL, SR., on behalf of JOHN PATRICK O'NEILL, SR., deceased, and on behalf of decedent's heirs-at-law** ) | |
| ) | |
| **JOHN PATRICK O'NEILL, JR.** ) | |
| ) | |
| **CHRISTINE IRENE O'NEILL** ) | |
| ) | |
| **CAROL O'NEILL** ) | |
| ) | |
| **DOROTHY A. O'NEILL,** ) | **Civil Action No:  04-1076 (RCC)** |
| ) | |
| **Plaintiffs,** ) | |
| ) | **Second Amended Complaint** |
| **v.** ) | |
| ) | **Jury Trial Demanded** |
| **THE REPUBLIC OF IRAQ** ) | |
| ) | |
| **IRAQI INTELLIGENCE AGENCY** ) | |
| a/k/a/ THE MUKHABARAT a/k/a/ THE ) | |
| FEDAYEEN a/k/a/ AL-'QARE a/k/a/ ) | |
| "UNIT 999" a/k/a/ "M-8 SPECIAL ) | |
| OPERATIONS" ) | |

1

SADDAM HUSSEIN )
)
HUSHAM HUSSEIN )
)
THE ESTATE OF QUSAY HUSSEIN )
)
THE ESTATE OF UDAY HUSSEIN )
)
ABDEL HUSSEIN a/k/a/ "THE GHOST" )
)
AHMED KAHLIL IBRAHIM SAMIR )
AL-ANI )
)
FARUQ AL-HIJAZI )
)
HABIB FARIS ABDULLAH AL- )
MAMOURI )
)
TAHA YASSIN RAMADAN a/k/a )
TAHYA YASSIN RAMADAN )
)
MUHAMMED MADHI SALAH a/k/a )
MUHHAMED MAHDI SALAH )
)
SALAH SULEIMAN )
)
HAQI ISMAIL a/k/a HAQUI ISMAIL )
)
TAHA AL ALWANI a/k/a DR. TAHA )
JABIT AL'ALWANI )
)
ABU AGAB )
)
ABU WAIEL a/k/a  ABU AW'EL A/K/A )
SADOUN ABUDL LATIF )
)
ABU SAYYAF )
)
HAMSIRAJI SALI a/k/a ESTATE OF )
HAMSIRAGI SALI )
)
)
)
)
)

2

**AL QAEDA ISLAMIC AGENCY** a/k/a
AL QAEDA a/k/a AL QAEDA ISLAMIC
ARMY a/k/a AL QAEDA ISLAMIC
ARMY FOR THE LIBERATION OF THE
HOLY PLACES a/k/a ISLAMIC ARMY
FOR THE LIBERATION OF THE HOLY
PLACES

**OSAMA BIN LADEN** a/k/a USAMA
BIN LADEN

**SAAD BIN LADEN**

**AYMAN ZAWAHIRI** a/k/a AYMAN
AL-ZAWAHIRI

**ABU HAFS THE MARITANIAN**

**SAIF AL-ADIL** a/k/a SAIF AL-ADEL
a/k/a MUHAMAD IBRAHIM MUKKAWI
a/k/a IBRAHIM AL-MADANI a/k/a SEIF
AL ADEL a/k/a SAYF AL-ADL

**ISLAMIC REPUBLIC OF IRAN**

**HEZBOLLAH** a/k/a HIZBALLAH

**IMAD MUGHNIYEH**

**HEZBOLLAH SECRETARY
GENERAL
HASSAN NASRALLAH**

**IRANIAN SUPREME LEADER
AYATOLLAH ALI HOSEINI-
KHAMENEI.** a/k/a AYATOLLAH ALI
KHAMENEI

**USBAT AL-ANSAR**

**IRANIAN MINISTRY OF
INTELLIGENCE AND SECURITY
(MOIS)**

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

|  |  |
|---|---|
| **IRANIAN MINISTER OF INTELLIGENCE AND SECURITY ALI FALLAHIAN** | ) ) ) ) |
| **IRANIAN REVOLUTIONARY GUARD CORPS (IRGC)** | ) ) ) |
| **IRANIAN REVOLUTIONARY GUARD CORPS – QODS FORCE** a/k/a QODS DIVISION a/k/a JERUSALEM FORCE | ) ) ) ) ) |
| **IRANIAN REVOLUNTIONARY GUARD CORPS DEPUTY COMMANDER BRIG GENERAL MOHAMMAD BAQER ZOLQADR** | ) ) ) ) ) |
| **AHMAD VAHEDI** | ) ) |
| **HOSSEIN MOSLEH** | ) ) |
| **MORTEZA REZA'I** | ) ) |
| **SALAH HAJIR** | ) ) |
| **ADIB SHA'BAN** a/k/a ADEEB SHABAAN | ) ) ) |
| **ABU MUSAB ZARQAWI** a/k/a ABU MUSAB AL-ZARQAWI | ) ) ) |
| **EGYPTIAN ISLAMIC JIHAD** | ) ) |
| **AL-GAMMAAH AL ISLAMIAH** a/k/a AL GAMA'A AL-ISLAMIYYA | ) ) ) |
| **ABU ZUBAYDH** | ) ) |
| **KHALID SHEIKH MOHAMMED** a//k/a KHALED SHAIKH MOHAMMED | ) ) ) |
| **ABU ABDUL RAHMAN** | ) ) |
| **ABDUL RAHMAN YASIN** | ) ) ) |

**AL-JAEZEERA NEWS AGENCY**    )
Al-Jazeera Information Center    )
P.O. Box 724    )
Dalton, GA 30722    )
    )
**FORMER AL-JAZEERA**    )
**GENERAL MANAGER MOHAMMED**    )
**JASMIN AL-ALI** *AND* **TWO FORMER**    )
**EMPLOYEES**    )
    )
**SCHREIBER & ZINDEL**    )
Treuhand-Anstalt    )
Kirchstrasse 39    )
FL-9490 Vaduz, Liechtenstein    )
    )
**DR. FRANK ZINDEL**    )
Sonnblickstrasse 7    )
9490 Vaduz, Liechtenstein    )
    )
**ENGELBERT SCHREIBER**    )
Schreiber & Zindel    )
Treuhand-Anstalt    )
Kirkstrasse 39    )
9490 Vaduz, Liechtenstein    )
    )
**ENGELBERT SCHREIBER, JR.**    )
Schreiber & Zindel    )
Treuhand-Anstalt    )
Kirkstrasse 39    )
9490 Vaduz, Liechtenstein    )
    )
**MARTIN WACHTER**    )
Asat Trust Reg.    )
Altenbach 8, Vaduz 9490    )
Liechtenstein    )
    )
**ERWIN WACHTER**    )
Asat Trust Reg.    )
Altenbach 8, Vaduz 9490    )
Liechtenstein    )
    )
**SERCOR TREUHAND ANSTALT**    )
Kirkstrasse 39    )
9490 Vaduz, Liechtenstein    )
    )
    )

|  |  |
|---|---|
| **ALBERT FRIEDRICH ARMAND HUBER,** a/k/a AHMED HUBER  a/k/a ALBERT HUBER a/k/a ARMAND ALBERT FRIEDRIC  a/k/a ARMAND HUBER a/k/a/ AHMAD HUBER-EL BIALI c/o Nada Management Organization Viale Stefano Franscini 22, Lugano CH-6900 TI Switzerland | ) ) ) ) ) ) ) ) ) ) ) ) |
| **ALI GHALEB HIMMAT** Via Posero 2, Campione d'Italia CH-6911, Switzerland | ) ) ) ) |
| **AL TAQWA BANK** a/k/a BANK AL TAQWA**,** a/k/a BANK AL TAQWA LIMITED a/k/a BANK OF TAQWA LIMITED**,** c/o Arthur D. Hanna & Company 10 Deveaux Street P.O. Box N-4877 Nassau, Bahamas | ) ) ) ) ) ) ) ) ) ) |
| **AL TAQWA TRADE, PROPERTY AND INDUSTRY, LTD.** a/k/a AL TAQWA TRADE, PROPERTY AND INDUSTRY COMPANY LIMITED**,** a/k/a AL TAQWA TRADE, PROPERTY AND INDUSTRY ESTABLISHMENT a/k/a HIMMAT ESTABLISHMENT a/k/a HOCHBURG a/k/a WALDENBURG a/k/a AL TAQWA TRADE, PROPERTY AND INDUSTRY LIMITED  c/o Asat Trust Reg., Altenbach 8 Baduz 9490 Liechtenstein | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| **AKIDA BANK PRIVATE LIMITED** | ) ) |
| **AKIDA INVESTMENT CO. LTD** | ) ) ) ) ) |

6

**NADA MANAGEMENT
ORGANIZATION, S.A.**
Viale Stefano Franscini 22,
Lugano CH-6900 TI
Switzerland

**YOUSSEF M. NADA** a/k/a YOUSSEFF
MUSTAFA NADA a/k/a YOUSSEF
NADA
Via Arogno 32
Campione d'Italia 6911 Switzerland

**YOUSSEF M. NADA & CO.
GESELLSCHAFT, M.B.H.**
c/o Youssef M. Nada
Via Riasc 4
Campione d'Italia 6911 Switzerland

**NADA INTERNATIONAL ANSTALT**

**YOUSSEF M. NADA & CO.**

**NASCO BUSINESS RESIDENCE**

**CENTERSAS DI NASREDDIN
AHMED IDRIS EC**

**NASCO NASREDDIN HOLDING A.S.**

**NASCOSERVICE S.R. L.**

**NASCOTEX S.A.**

**BARZAN E-TIKRITI** a/k/a/ BARZAN
IBRAHIM HASAN a/k/a BARZAN
IBRAHIM HASAN AL-TIKRITI

**METALOR** a/k/a LA GROUPE
METALOR a/k/a LA GROUE METALOR
TECHNOLOGIES a/k/a METALOR
GROUP A/K/A METALOR
TECHNOLOGIES SA
B.P. 29
Rue des Aquées
28190 Courville sur Eure
France

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**BANCA DEL GOTTARDO** a/k/a )
BANCA DEL'GOTTARDO )
Viale S. Franscini 8 )
CH-6901 Lugano )
Switzerland )
 )
**NASREDDIN COMPANY NASCO SAS** )
**DI AHMED IDRIS NASREDDIN EC** )
 )
**NASREDDIN FOUNDATION** )
 )
**NASREDDIN GROUP** )
**INTERNATIONAL HOLDING** )
**LIMITED** )
 )
**NASREDDIN INTERNATIONAL** )
**GROUP LIMITED HOLDING** )
 )
**AHMAD I. NASREDDIN** a/k/a  HADJ )
AHMED NASREDDIN a/k/a AHMED )
IDRISS NASREDDIN *AND* )
**NASREDDIN GROUP** )
**INTERNATIONAL LIMITED** )
**HOLDINGS** a/k/a NASREDDIN )
INTERNATIONAL GROUP HOLDINGS )
LIMITED *a/k/a* NASREDDIN )
INTERNATIONAL GROUP LTD. )
c/o Rechta Treuhand-Anstalt )
Kirkstrasse 39 )
9490 Vaduz, Liechtenstein )
 )
**ASAT TRUST REG.** )
Altenbach 8, Vaduz 9490 )
Liechtenstein )
 )
**TERRORIST HIJACKERS:** )
 )
**The Estate of ABDULAZIZ AL OMARI** )
 )
**The Estate of WAIL AL SHEHRI** )
 )
**The Estate of WALEED M. AL** )
**SHEHRI** )
 )
 )

**The Estate of SATAM M.A. AL SUQAMI**  )
)
)
**The Estate of MOHAMMED ATTA**  )
)
**The Estate of FAYEZ AHMED** a/k/a/ BANIHAMMAD FAYEZ  )
)
)
**The Estate of AHMED AL-GHAMDI**  )
)
)
**The Estate of HAMZA AL-GHAMDI**  )
)
)
**The Estate of MARWAN AL-SHEHHI**  )
)
**The Estate of MOHALD AL-SHEHRI**  )
)
)
**The Estate of KHALID AL-MIDHAR**  )
)
)
**The Estate of NAWAF AL-HAZMI**  )
)
)
**The Estate of SALEM AL-HAZMI**  )
)
)
**The Estate of HANI HANJOUR**  )
)
)
**The Estate of MAJED MOQUED** a/k/a MAJED MOQED  )
)
)
**The Estate of SAEED AL GHAMDI**  )
)
)
**The Estate of AHMED IBRAHIM A. AL HAZNAWI**  )
)
)
**The Estate of AHMED AL NAMI**  )
)
)
**The Estate of ZIAD SAMIR JARRAH**  )
)
)
**ZACARIAS MOUSSAUI** a/k/a ZACARIAS MOUSSAOUI  )
)
)
)
**ESTATE OF MUHAMMAD ATEF** a/k/a MUHAMMAD ATEF a/k/a MUHAMMAD ATIF a/k/a ESTATE OF MUHAMMAD ATIF  )
)
)
)
)
)
**THE TALIBAN**  )
)
)

**MUHHAMAD OMAR** a/k/a )
MUHAMAD OMAR a/k/a MUHAMMAD )
OMAR )
 )
**MUSLIM BROTHERHOOD:** )
 )
**SYRIAN BRANCH** )
 )
**EGYPTIAN BRANCH** )
 )
**JORDANIAN BRANCH** )
 )
**KUWAITI BRANCH** )
 )
**IRAQI BRANCH** )
 )
*AND,* )
 )
**JOHN DOES 1-67,** )
 )
      **Defendants.** )
_____ )

## SECOND AMENDED COMPLAINT

## INTRODUCTION

1.     On September 11, 2001, Islamic terrorists perpetrated an attack on the

United States that was unprecedented in history.  On that day, over 3,000 Americans

were killed in simultaneous attacks on the World Trade Center in New York City and the

Pentagon in Arlington, Virginia.    The attacks were not isolated incidents, but rather a

coordinated effort by Islamic Terrorist Organizations.  The attacks of September 11, 2001

had been planned for years by an extensive network of Islamic militants with the support,

aid and assistance of banks, governments, and individuals.  Plaintiffs are the Estate and

immediate family of John Patrick O'Neill Sr., former head of the Federal Bureau of

Investigation's (F.B.I.) counterterrorism division and former Special Agent in Charge of

the National Security Division of the New York Office of the FBI, and the world's foremost expert on Islamic terrorism and Osama Bin Laden's terror network. John Patrick O'Neill, Sr. was killed in the attacks on the World Trade Center.

2.      John Patrick O'Neill, Sr. became Chief of Security for the World Trade Center less than two weeks prior to the September 11th attacks. On the morning of Septembere 11, 2001, John Patrick O'Neill Sr. was in his office on the 34th Floor in the South Tower, Tower 2, at the time the first plane hit the North Tower, Tower 1. He immediately left his office and headed to the lobby of the North Tower to determine what had happened, and to assess the damage. A command post was set up in the lobby of the North/ Tower from where he was able to direct the rescue efforts of the first responders. When the second plane hit the  South Tower, he returned there to coordinate the rescue efforts in that building, and was killed when that building collapsed.

3.      On the morning of September 11, 2001,  Mohammed Atta, Abdul Alomari, Wail al-Shehri, Waleed al-Shehri, and Satam al-Suqami hijacked American Airlines flight 11, bound from Boston to Los Angeles, and crashed it into the North Tower (Tower One) of the World Trade Center in New York.

4.      On the morning of September 11, 2001, Marwan al-Sheehhi, Fayez Ahmed a/k/a/ Bamihammad Fayez, Ahmed al-Ghamdi, Hazma al- Ghamdi, and Molahd al-Shehri hijacked United Airlines Flight 175, bound from Boston to Los Angeles, and crashed it into the South Tower (Tower Two) of the World Trade Center in New York.

5.      On the morning of September 11, 2001, Khalid al-Midhar, Nawalf al-Hazmi, Salem al-Hazmi, Hani Hanjour, and Majed Moqued a/k/a Majed Moqed hijacked

American Airlines Flight 77, bound from Dulles Airport in Sterling, Virginia, to Los

Angeles, California and crashed it into the Pentagon in  Arlington, Virginia.

6.     On September 11, 2001, Zihad Jarrah, Ahmed Al-Haznawi, Saeed Al-

Ghamdi, and Ahmed al-Nami hijacked United Airlines Flight 93, bound from Newark,

New Jersey to San Francisco, California with the intention of crashing that plane into

either the United States Capitol building or the White House.  In a heroic act of defiance

and courage, the passengers of Flight 93 overtook the hijackers, and the plane crashed in

Shanksville, Pennsylvania prior to reaching its target in Washington, D.C.

7.     All nineteen (19) hijackers were members of Osama Bin Laden's Al

Qaeda network.  All received sponsorship, funding and training through the Al Qaeda

network.

8.     Plaintiffs move for judgment against Defendants, jointly and severally.  In

support of their Complaint, Plaintiffs allege as follows:

## JURISDICTION, VENUE AND CHOICE OF LAW

9.     This court has jurisdiction over the subject matter of this action pursuant

to 28 U.S.C. §§1330(a), 1331, and 1332(a)(2).  Venue is proper in this District Court

pursuant to 28 U.S.C. §1391(f)(4).

10.     Actions for wrongful death, personal injury, and related torts perpetrated

by foreign state sponsors of terrorism through their officials, employees, and agents –

within the meaning of  28 U.S.C. §1605(a)(7) – are unique causes of actions arising out

of federal counter-terrorism statutes and are controlled by federal law.

11.     By its actions and the actions of its agencies and instrumentalities,

Defendant the Republic of Iraq and its agencies and instrumentalities forfeited their right

to claim immunity under the Foreign Sovereign Immunities Act 28 U.S.C. §§ 1605(a)(2),

1605(a)(5) and 1605(a)(7).  Pursuant to 28 U.S.C. §1605(a)(7) and Pub L. 104-208, Div.

A., Title I, §101(c), 110 Stat. 3008-172 (reprinted at 28 U.S.C. § 1605 note (West

Supp.)), all defendants who are officials, employees, or agents of the foreign state

defendants are individually liable to Plaintiffs for damages caused by their acts which

resulted in the death  of John Patrick O'Neill, Sr.

      12.     By its actions and the actions of its agencies and instrumentalities,

Defendant the Republic of Iran and its agencies and instrumentalities forfeited their right

to claim immunity under the Foreign Sovereign Immunities Act 28 U.S.C. §§ 1605(a)(2),

1605(a)(5) and 1605(a)(7).  Pursuant to 28 U.S.C. §1605(a)(7) and Pub L. 104-208, Div.

A., Title I, §101(c), 110 Stat. 3008-172 (reprinted at 28 U.S.C. § 1605 note (West

Supp.)), all defendants who are officials, employees, or agents of the foreign state

defendants are individually liable to Plaintiffs for damages caused by their acts which

resulted in the death  of John Patrick O'Neill, Sr.

      13.     Defendant the Republic of Iraq by its actions and the actions of its

agencies and instrumentalities described herein, conducted commercial activity that had a

direct effect on the United States, and they are not immune pursuant to the Foreign

Sovereign Immunities Act 28 U.S.C. §1605(a)(2).

      14.     Defendant the Republic of Iran by its actions and the actions of its

agencies and instrumentalities described herein, conducted commercial activity that had a

direct effect on the United States, and they are not immune pursuant to the Foreign

Sovereign Immunities Act 28 U.S.C. §1605(a)(2).

15.     Defendant the Republic of Iraq and its agencies and instrumentalities described herein, are subject to liability for said acts resulting in personal injury and death in the United States caused by the tortious act or omission of the foreign state and its officials and employees while acting within the scope of their office or employment and thus have forfeited their right to claim immunity pursuant to 28 U.S.C. §1605(a)(5).

16.     Defendant the Republic of Iran and its agencies and instrumentalities described herein, are subject to liability for said acts resulting in personal injury and death in the United States caused by the tortious act or omission of the foreign state and its officials and employees while acting within the scope of their office or employment and thus have forfeited their right to claim immunity pursuant to 28 U.S.C. §1605(a)(5).

17.     Defendant the Republic of Iraq is a foreign state and was designated a state sponsor of terrorism pursuant to section 6(j) of the Export Administration Act of 1979 (50 U.S.C. App. § 2405(j)) and section 602(A) of the Foreign Assistance Act of 1961 (22 U.S.C. §2371) – from the passage of the Act in 1979 until 1982, and from 1990 until May 7, 2003,[1] and was so designated at the time the acts complained of herein occurred.  Iraq provided material support and resources to the Al Qaeda terrorist organization.  Iraq funded, directed, and trained Al Qaeda terrorists and is therefore a sponsor of Al Qaeda within the meaning of 28 U.S.C. §§1605(a)(7) and 1605 note.

18.     Defendant the Republic of Iran is a foreign state and was designated a state sponsor of terrorism pursuant to section 6(j) of the Export Administration Act of 1979 (50 U.S.C. App. § 2405(j)) and section 602(A) of the Foreign Assistance Act of

---

1 On April 16, 2003, Congress enacted the Emergency Wartime Supplemental Appropriations Act § 1503 Public Law 108-11, 115 Stat. 579.  On May 7, 2003, the President exercised the authority granted to him by Congress in the Act, and, in effect made seized Iraqi assets unavailable for satisfying judgments in suits against the Republic of Iraq.

1961 (22 U.S.C. §2371) –, and was so designated at the time the acts complained of herein occurred. Iran provided material support and resources to the Al Qaeda terrorist organization. Iran funded, directed, and trained Al Qaeda terrorists and is therefore a sponsor of Al Qaeda within the meaning of 28 U.S.C. §§1605(a)(7) and 1605 note.

19. Defendant the Republic of Iraq was designated a state sponsor of terrorism at the time the acts complained of herein occurred, and is therefore subject to liability for said acts and for provision of material support for said acts resulting in injury and death in the United States as a result of torture, extrajudicial killings and aircraft sabotage, and has forfeited its right to claim immunity pursuant to the 1996 Anti Terrorism Effective Death Penalty Act codified as 28 U.S.C. §1605(a)(7).

20. Defendant the Republic of Iran was designated a state sponsor of terrorism at the time the acts complained of herein occurred, and is therefore subject to liability for said acts and for provision of material support for said acts resulting in injury and death in the United States as a result of torture, extrajudicial killings and aircraft sabotage, and has forfeited its right to claim immunity pursuant to the 1996 Anti Terrorism Effective Death Penalty Act codified as 28 U.S.C. §1605(a)(7).

21. The actions of Defendants as described herein subjected the Plaintiffs' decedent John Patrick O'Neill, Sr., to torture and extrajudicial killing within the meaning of the Torture Victim Protection Act, Pub.L. 102-256, 106 Stat. 73 (reprinted at 28 U.S.C.A. §1350 note (West 1993)).

22. In carrying out these terrorist acts that resulted in the injury and extrajudicial killing of John Patrick O'Neill, Sr., the actions of each Defendant were conducted under actual or apparent authority, or under color of law.

23.     As set forth above and below, Defendants, jointly and severally, aided, abetted, sponsored, materially supported, and conspired to proximately cause the death and injury of John Patrick O'Neill, Sr., through and by reason of acts of international terrorism.  These terrorist activities constitute violations of the law of nations otherwise referred to as contemporary international law, including those international legal norms prohibiting torture, genocide, air piracy, terrorism, and mass murder as repeatedly affirmed by the United Nations Security Council.

24.     As a result of Defendants' sponsorship of terrorism in violation of the law of nations and contemporary principles of international law, the Plaintiffs suffered injury and damages as set forth herein.  Violations of the law of nations and of international agreements include but are not limited to:

> a.      The Universal Declaration of Human Rights, Dec 10, 1956 G.A. Res. 217(A)(III), U.N. Doc A/810, at 71 (1948);
>
> b.      The International Covenant of Political and Civil Rights, art. 6 (right to life), U.N. Doc. A/6316, 999 U.N.T.S. (1992);
>
> c.      The Convention on the Prevention and Punishment of Crimes against Internationally Protected Persons, Including Diplomatic Agents, 28 U.S.T. 1975, T.I.A.S. No. 8532 (1977), implemented in 18 U.S.C. § 112;
>
> d.      The General Assembly Resolutions on Measures to Prevent International Terrorism, G.A. Res. 40/61 (1985) and G.A. Res. 42/158 (1987); and,

e.     The Convention on the High Seas, arts. 14-22 (piracy) 13 U.S.T. 2312, T.I.A.S. No. 5200 (1962).

## THE PARTIES

25.     Plaintiff John Patrick O'Neill, Jr. is a United States citizen and domiciliary of  the State of Maryland.  He is the son of John Patrick O'Neill, Sr. who was killed in the September 11, 2001 terrorist attack on the World Trade Center.

26.     Plaintiff Christine Irene O'Neill is a United States citizen and a domiciliary of the State of New Jersey.  She is the widow of John Patrick O'Neill Sr., who was killed in the September 11, 2001 terrorist attack on the World Trade Center.

27.     Plaintiff Carol O'Neill is a United States citizen and a domiciliary of the state of New Jersey.  She is the daughter of John Patrick O'Neill, Sr. who was killed in the September 11, 2001 terrorist attack on the World Trade Center.

28.     Plaintiff Dorothy A. O'Neill is a United States citizen and a domiciliary of the State of New Jersey.  She is the mother of John Patrick O'Neill Sr., who was killed in the September 11, 2001 terrorist attack on the World Trade Center.

29.     Plaintiffs' decedent John Patrick O'Neill, Sr. was a United States citizen and domiciliary of the State of New Jersey.  He was killed in the September 11, 2001 attacks on the World Trade Center.

30.     Plaintiff the Estate of John Patrick O'Neill, Sr. is the legal entity created to recover damages on behalf of John Patrick O'Neill, Sr., deceased, and his heirs-at-law arising from the September 11, 2001 terrorist attack on the World Trade Center. Plaintiffs John Patrick O'Neill, Jr. and Christine Irene O'Neill are Co-Executors of the Estate of John Patrick O'Neill Sr., deceased.

31.     Defendant, the Republic of Iraq (hereinafter "Iraq")[2] is a foreign sovereign state located in the Middle East and shares borders with Saudi Arabia, Jordan, Syria, Turkey, Iran and Kuwait on September 11, 2001. The United States did not have formal diplomatic relations with the former government of Iraq, which maintained an office in New York, the Permanent Representative of Iraq to the United Nations, 14 East 59th Street, New York, NY, 10021.  This court should take judicial notice that Defendant The Republic of Iraq has been found to be liable as a foreign state supporting international terrorism under 28 U.S.C. § 1605(a)(7) to victims of state sponsored terrorism for the acts and actions of Defendant Al Qaeda in cases before this court, namely *Daliberti v. Republic of Iraq*, 97 F. Supp. 2d 38 (D DC 2000). Defendant the Republic of Iraq is *collaterally estopped* in this action from denying that it is liable for the acts and actions of Defendant Al Qaeda.

32.     Defendant, the Iraqi Intelligence Agency, also known as ("a/k/a") Mukhabarat, a/k/a the Fedayeen, a/k/a Al-Qare, a/k/a "Unit 999," a/k/a "M-8 Special Operations," was the intelligence and operational entity in charge of conducting clandestine operations for the Iraqi government and was an agency, instrumentality, and/or organ of the Iraqi government.

33.     Defendant, the Islamic Republic of Iran (hereinafter "Iran")  is a foreign sovereign state located in the Middle East and shares borders with Armenia, Azerbaijan, Turkmenistan, Afghanistan, Pakistan, Iraq and Turkey.  The United States has not had formal diplomatic relations with Iran since April 7, 1980.  Iran maintains an office in New York, the Permanent Representative of Iran to the United Nations, 14 East 59th

---

2  In April 2003, U.S. Armed forces overthrew the regime of Saddam Hussein.  Any successor government of Iraq remains liable for the state-sponsored acts of terrorism of its predecessor

Street, New York, NY, 10021.  Iran maintains an Interest Section in the Embassy of

Pakistan, located at 2209 Wisconsin Avenue, NW, Washington, DC 20007.

34.     The Government of Iran, along with its associated terrorist group,

Hezbollah a/k/a Hizballah, forged an alliance with Osama bin Laden a/k/a Usama bin

Laden and Al Qaeda for the purpose of working together against their perceived common

enemies in the West, particularly the United States.

35.     Defendant Hezbollah's involvement in the terrorist attacks on September

11, 2001 has been alleged by both American and Israeli military intelligence based on the

methodology of Hezbollah's previous terrorist activity.

36.     Defendants Saddam Hussein, the Estate of  Qusay Hussein, the Estate of

Uday Hussein, Husham Hussein, Tahya Yassin Ramadan a/k/a Taha Yassin Ramadan,

Muhammed Madhi Salah a/k/a Muhhamed Mahdi Salah, Faruq Al-Hijazi, Salah

Suleiman, Ahmed Khalil Ibrahim Samir al-Ani, Habib Faris Adullah al-Mamouri, Abdel

Hussein, a/k/a "The Ghost," Haqi Ismail a/k/a Haqui Ismail, Taha Al Alwani a/k/a Dr.

Taha Jabir al'Alwani, Abu Agab, and Abu Waiel a/k/a Abu Aw'el a/k/a Sadoun Abdul

Latif are natural persons, subjects and citizens of Iraq and leaders, officials, agents/or

employees of Iraq and/or its Intelligence Agency, who participated in the acts and

conspiracy described below while acting in the course and scope of their employment.

37.     Defendants Abu Hafs the Maritanian, Saif al-Adil a/k/a Saif al-Adel a/k/a

Muhamad Ibrahim Mukkawi a/k/a Ibrahim al-Madani a/k/a Seif Al Adel a/k/a Sayf al-

Adl, Imad Mughniyeh, Hezbollah Secretary General  Hassan Nasrallah, Iranian Supreme

Leader Ayatollah Ali Hoseini-Khamenei a/k/a Ayatollah Ali Khamenei, Usbat al-Ansar,

Ahmad Vahedi, Hossein Mosleh, Morteza Reza'i, Salah Hajir, Iranian Minister of

government.

Intelligence and Security Ali Fallahian, Iranian Revoluntiary Guard Corps Deputy

Commander Brig General Mohammad Baqer Zolqadr, and Adib Sha'ban a/k/a Adeeb

Shabaan are natural persons, subjects and citizens of Iran and leaders, officials, agents/or

employees of Iran and/or its Intelligence Agency, who participated in the acts and

conspiracy described below while acting in the course and scope of their employment.

38.     Defendants the Iranian Ministry of Intelligence and Security (MOIS),

Iranian Revolutionary Guard Corps, Iranian Revolutionary Guard Corps – Qods Division

a/ka Qods Force a/k/a Jerusalem Force, Iranian Minister of Intelligence and Security Ali

Fallahian , Iranian Revoluntiary Guard Corps Deputy Commander Brig General

Mohammad Baqer Zolqadr, Akida Bank Private Limited, Akida Investment Co. Ltd,

Nasco Business Residence, CenterSAS DI Nasreddin Ahmed Idris EC, Nasco Nasreddin

Holding A.S., Nascoservice S.R. L., Nascotex S.A., Nasreddin Company Nasco SAS DI

Ahmed Idris Nasreddin EC,  Nasreddin Foundation, Nasreddin Group International

Holding Limited, Nasreddin International Group Limited Holding,   The Al Qaeda

Islamic Agency a/ka Al Qaeda a/k/a Al Qaedi Islamic Army a/k/a Al Qaeda Islamic

Army for the Liberation of the Holy Places a/k/a Islamic Army for the Liberation of Holy

Places, Egyptian Islamic Jihad, Abu Sayyaf, Hamsiraji Sali a/k/a Estate of Hamsiraji Sali,

Abu Musab Zarqawi a/k/a Abu Musab al-Zarqawi, Abu Zubaydh, Khalid Sheikh

Mohammed a/k/a Khaled Shaikh Mohammed, Abu Abdul Rahman, Al Jazeera News

Agency, Mohammed Jasmin al-Ali, Schreiber & Zindel, Dr. Frank Zindel, Engelbert

 Schreiber, Engelbert Schreiber, Jr., Martin Wachter, Erwin Wachter, Sercor Treuhand

Anstalt, Abdul Rahman Yasin, Ahmad I. Nasreddin a/k/a Hadj Ahmed Nasreddin a.k.a

Ahmed Idriss Nasreddin and Nasreddin Group International Limited Holdings a/k/a

Nasreddin International Group Holdings Limited a/k/a Nasreddin International Group, Ltd., Al Taqwa Bank a/k/a **,** a/k/a Bank Al Taqwa, a/k/a Bank Al Taqwa Limited a/k/a Bank of Taqwa Limited, Al Taqwa Trade, Property, and Industry, Ltd. a/k/a  Al Taqwa Trade, Property and Industry Company Limited, a/k/a Al Taqwa Trade. Property and Industry Establishment, a/k/a Himmat Establishment a/k/a Hochburg a/k/a Waldenburg a/k/a Al Taqwa Property and Industry Limited, Al-Gammah Al Islamiah , a/k/a Al Gama'a al-Islamiyya , Ayman al-Zawahiri, Albert Freidrich Armand Huber a/k/a/ Armand Huber, a/k/a Ahmed Huber  a/k/a Albert Huber a/k/a Armand Albert Friedric a/k/a Armand Huber, Ali Ghaleb Himmat, Asat Trust Reg., Nada Management Organization, S.A., Yousef M. Nada a/k/a Yousseff Mustafa Nada a/k/a Youssef Nada,Yousef M. Nada & Co, Gesellschaft, M.B.H, Youssef M. Nada & Co., Nada International Anstalt, Barzan e-Tikriti a/k/a Barzan Ibrahim Hasan a/k/a Barzan Ibrahim Hasan Al-Tikriti, Metalor a/k/a La Groupe Metalor a/k/a  La Groupe Metalor Technologies a/k/a  Metalor Group a/k/a Metalor Technologies, SA,, Banca del Gottardo a/k/a Banca del'Gottardo,  Saad Bin Laden, The Terrorist Hijackers, Estate of Abdulaziz al Omari, Estate of Wail al Shehri, Estate of Waleed M. Al Shehri, Estate of Satam M.A. al Suqami, Estate of Mohammed Atta, Estate of Fayez Ahmed a/k/a Banihammad Fayez, Estate of Ahmed al-Ghamdi, Estate of Hamza al-Ghamdi, Estate of Marwan al-Shehhi, Estate of Mohald al-Shehri, Estate of Khalid al-Midhar, Estate of Nawaf al-Hazmi, Estate of Salem al-Hazmi, Estate of Hani Hanjour, Estate of Majed Moqued a/k/a Majed Moqed, Estate of Saeed al Ghamdi, Estate of Ahmed Ibrahim A. al Haznawi, Estate of Ahmed al Nami, Ziad Samir Jarrah, Zacarias Moussaui a/k/a Zacarias Moussaoui, Estate of Muhammad Atef a/k/a Muhammad Atef a/k/a Muhammad Atif a/k/a Estate of

Muhammad Atif, The Taliban, Muhammad Omar a/k/a Muhamad Omar a/k/a Muhhamad

Omar, Muslim Brotherhood – Syrian Branch, Muslim Brotherhood – Egyptian Branch,

Muslim Brotherhood – Jordanian Branch, Muslim Brotherhood – Kuwaiti Branch,

Muslim Brotherhood – Iraqi Branch, and John Does 1-67  are individuals, organizations,

banks, and charities located all over the world who conspired with Osama Bin Laden, Al

Qaeda, Iraq and the Taliban to raise, launder, transfer, distribute, and hide funds for Bin

Laden and Al Qaeda in order to support and finance their terrorist activities including, but

not limited to, the September 11th attacks.  Some of the businesses, banks and charities

operate legitimately but also maintain a secret dual role as Al Qaeda front organizations

and actively support its terrorist activities.  Some of those organizations are purely a

sham front for Al Qaeda.

     39.    Defendant Imad Mughniyeh, a Palestinian who operates directly on behalf

of Iranian intelligence, is regarded as the mastermind of Hezbollah kidnappings, suicide

bombings and violent airplane hiackings.

     40.    Defendant Dr. Ayman al Zawahiri is leader of the Egyptian Islamic Jihad

and Bin Laden's second in command.  American and Israeli intelligence have named both

him and defendant Imad Mughinyeh, as one of the masterminds behind the September

11, 2001 attacks.

     41.    Defendants Saddam Hussein, the Estate of  Qusay Hussein, the Estate of

Uday Hussein, Husham Hussein, Tahya Yassin Ramadan, Muhammed Madhi Salah,

Faruq Al-Hijazi, Salah Suleiman, Ahmed Khalil Ibrahim Samir al-Ani, Habib Faris

Adullah al-Mamouri, Abdel Hussein, a/k/a "The Ghost," Osama Bin Laden, Saad Bin

Laden, Haqui Ismail, Taha Al Alwani, Abu Agab, and Abu Waiel, Osama Bin Laden,

Case 1:04-cv-07076-GBD-SN   Document 21   Filed 12/30/14   Page 23 of 121

The Al Qaeda Islamic Agency, Egyptian Islamic Jihad, Abu Sayyaf, Hamsiraji Sali, Abu

Musab Zarqawi, Abu Zubaydh, Khalid Sheikh Mohammed, Abu Abdul Rahman, Al

Jazeera, Mohammed Jasmin al-Ali, Schreiber & Zindel, Dr. Frank Zindel, Engelbert

Schreiber, Engelbert Schreiber, Jr., Martin Wachter, Erwin Wachter, Sercor Treuhand

Anstalt, Abdul Rahman Yasin, Ahmad I. Nasreddin, Al Taqwa Bank, Al Taqwa Trade,

Property, and Industry, Ltd., Al-Gammah Al Islamiah, Ayman al-Zawahiri, Albert

Freidrich Armand Huber a/k/a/ "Armand Huber," Ali Ghaleb Himmat, Asat Trust Reg.,

Nada Management Organization, S.A., Yousef M. Nada, Yousef M. Nada & Co,

Gesellschaft, M.B.H, Youssef M. Nada & Co., Nada International Anstalt, Barzan e-

Tikriti, Metalor, Banca del Gottardo, Abdulaziz al Omari, Wail al Shehri, Waleed M. Al

Shehri, Satam M.A. al Suqami, Mohammed Atta, Fayez Ahmed a/k/a Banihammad

Fayez, Ahmed al-Ghamdi, Hamza al-Ghamdi, Marwan al-Shehhi, Mohald al-Shehri,

Khalid al-Midhar, Nawaf al-Hazmi, Salem al-Hazmi, Hani Hanjour, Majed Moqued,

Saeed al Ghamdi, Ahmed Ibrahim A. al Haznawi, Ahmed al Nami, Ziad Samir Jarrah,

Zaracias Moussaui, Muhammad Atef, The Taliban, Muhammad Omar, Muslim

Brotherhood – Syrian Branch, Muslim Brotherhood – Egyptian Branch, Muslim

Brotherhood – Jordanian Branch, Muslim Brotherhood – Kuwaiti Branch, Muslim

Brotherhood – Iraqi Branch, Iranian Ministry of Intelligence and Security, Iranian

Revolutionary Guard Corps, Iranian Revolutionary Guard Corps – Qods Division, Akida

Bank Private Limited, Akida Investment Co. Ltd, Nasco Business Residence, CenterSAS

DI Nasreddin Ahmed Idris EC, Nasco Nasreddin Holding A.S., Nascoservice S.R. L.,

Nascotex S.A., Nasreddin Company Nasco SAS DI Ahmed Idris Nasreddin EC,

Nasreddin Foundation, Nasreddin Group International Holding Limited, Nasreddin

International Group Limited Holding, Abu Hafs the Maritanian, Saif al-Adil. Imad
Mughniyeh, Hezbollah Secretary General  Hassan Nasrallah, Iranian Supreme Leader
Ayatollah Ali Khamenei, Usbat al-Ansar, Ahmad Vahedi, Hossein Mosleh, Morteza
Reza'i, Salah Hajir and Adib Sha'ban a/k/a Adeeb Shabaan, Hezbollah a/k/a Hizballah,
Iranian Minister of Intelligence and Security Ali Fallahian, Iranian Revoluntionary Guard
Corps Deputy Commander Birg General Mohamma Baqer Zolqadr, and John Does 1-67
are natural persons, subjects and citizens of Iraq and leaders, officials, agents/or
employees of Iraq and/or its Intelligence Agency or other agents or instrumentalities of
Iraq and/or are natural persons, subjects and citizens of Iran and leaders, officials,
agents/or employees of Iran and/or its Intelligence Agency or other agents or
instrumentalities of Iran and/or are individuals, organizations, banks, and charities
located all over the world, who participated in the acts and conspiracy described below,
in their individual capacities and while acting in the course and scope of their
employment. and/or who conspired with Osama Bin Laden, Al Qaeda, Hezbollah, Iran,
and the Taliban to raise, launder, transfer, distribute, and hide funds for Bin Laden and Al
Qaeda in order to support and finance their terrorist activities including, but not limited
to, the September 11th attacks.  Some of the businesses, banks and charities operate
legitimately but also maintain a secret dual role as front organizations for Hezbollah and
Al Qaeda and actively support its terrorist activities.  Some of those organizations are
purely a sham front for Hezbollah and Al Qaeda.

42.     In a similar fashion, some of the individual Defendants operate apparently
legitimate businesses, while maintaining a secret dual role as Hezbollah and Al Qaeda

operatives, and others are full-fledged members of Hezbollah and Al Qaeda who operate openly.

43.     Defendants Al Taqwa and Nada Management Organization are banks who had their origin in the late 1980's, during which time the leaders of the Muslim Brotherhood formed financial management firms and banks called "Al Taqwa" ("Fear of God"), that were dedicated to the overthrow of Western nations, and the creation of a worldwide Islamic government.  Headquartered in Lugano, Switzerland, with branches in Italy, Algeria, Liechtenstein, Malta, Panama and the Bahamas, they consist of the Al Taqwa Bank, Al Taqwa Management Organization SA, Al Taqwa Trade, Property and Industry, Ltd.  and The Asat Trust.

44.     Upon information and belief, the Al Taqwa Defendants have financed and laundered money for Arab and Islamic political and militant groups including the Algerian Armed Islamic Group (GIA) and the Egyptian Gala'a al-Islamiya, Islamic terrorist groups with links to Bin Laden and his Al Qaeda organization.  Additionally, international investigations indicate that Al-Taqwa facilitated the movement of Bin Laden's money around the world in the late 1990's, a task made easier because its complex structure was designed to prevent scrutiny of its operations.

45.     The Al Taqwa Defendants were founded by Defendant Yousef M. Nada, and its other principals are Defendants Ali G. Himmat, Ahmed Huber and Mohamed Mansour.  Defendants Huber and Mansour are senior members of the Muslim Brotherhood.

46.     Defendant Al Taqwa Bank is part of Defendant Al Taqwa Trade, Property and Industry Company which is located in Vaduz, Liechtenstein.  This entity is also

known as Himmat Establishment, run by a partner of Nada who, like Nada, is a member of the Egyptian Islamic Brotherhood.  Although Egyptian-born, Mr. Nada is a naturalized citizen of Italy.  Mr. Nada also is a member of Jamaa al-Islamiya, which is directly allied to Al Qaeda through Dr. Ayman al Zawahiri, second in command to Osama Bin Laden.

47.    Shortly after dual U.S. Embassy bombings in Kenya and Tanzania by Al Qaeda in 1998, U.S. intelligence agencies tracked telephone contact between Al Taqwa, members of Bin Laden's inner circle, and Albert "Ahmed" Huber, a convert to Islam in the 1960's who has publicly expressed support for Al Qaeda.  Huber has acknowledged that Ahmad I. Nasreddin, a/k/a Hadj Ahmed Nasreddin, a/k/a Ahmed Idriss Nasreddin, is, in fact, an Al Taqwa founding member and bank shareholder who was very active in financing and operating the Islamic Cultural Institute of Milan, which follows the violent teachings of convicted terrorist Omar Abdul Rahman.  The Institute was frequently visited by known Al Qaeda terrorists.  Upon information and belief, the Institute is known in Western intelligence communities as one of the main Al Qaeda stations in Europe and was used to move weapons, men, and money around the world. After September 11, 2001, Al Taqwa changed its name to the Nada Management Organization SA in an attempt to avoid scrutiny.  Al Taqwa and the Nada group, as well as their four principals – Nada, Himmat, Huber, and Mansour, have had their assets frozen and are believed by the U.S. Department of Justice to be co-conspirators of Al Qaeda.

48.    A direct link between Iran and the joint activities of Hezbollah and Al Qaeda is the Al-Taqwa bank of Switzerland and Liechtenstein.  The link primarily is through Ahmad Huber-El Biali (aka Ahmed Huber).  Huber is a principal shareholder of

Al-Taqwa bank which was sanctioned by the U.S. government for helping to finance Al

Qaeda.   Since 1983, Huber has repeatedly visited Iran.  In 1988, Huber first met

Youssef Nada in Iran.  Nada, an Egyptian belongs to the Muslim Brotherhood.  Like

Nada, Huber embraced the Muslim Brotherhood.  At a conference in Iran in 1988, Nada

asked Huber to participate in the founding of al-Taqwa.Al-Taqwa bank has been been a

funding source for activities involving Hamas, which has received direct funding from

Iran.  Hamas, an outgrowth of Palestinian Muslim Brotherhood founder Abdullah Azzam,

is closely associated with Hezbollah.  Azzam, along with Osama bin Laden, were

cofounders of the Maktab al-Khidamir (MAK), a precursor to Al Qaeda.  Iran is known

to have appointed Hezbollah's terrorist chief, Imad Mughniyeh as coordinator of Iran's

activities with the Hamas and the Palestinian Islamic Jihad in Lebanon.

49.     Defendant Asat Trust Reg. of Baduz, Liechtenstein, is another money

laundering organization whose assets were frozen after the events of September 11, 2001.

Defendant Yousef M. Nada founded and operated Asat Trust Reg.

50.     Defendant Abu Musab Zarqawi is a senior Al Qaeda member who escaped

through Iran to Iraq following the U.S. attack on Afghanistan.  While in Iraq, Zarqawi

received medical attention in Baghdad where he remained to recuperate for several

months.  During the months Zarqawi remained in Iraq, he was protected and shielded

from U.S. government efforts to arrest him by the Iraqi regime.

51.     Defendant Zarqawi was also a leader of the Ansar al-Islam which operated

in Northern Iraq to assist the Iraqi regime in going after Kurdish dissidents.  Defendant

Abu Waiel was a senior Iraq Intelligence agent who, along with Defendant Zarqawi,

operated the Ansar al-Islam camp.

52.     Defendants John Does 1-67 are other officials, employees, and/or agents of the Islamic Republic of Iran, or others, whose identities are presently unknown, who performed acts that resulted in acts of terrorism, including the actions relating to the attacks on the World Trade Center on September 11, 2001 which caused the extrajudicial killing of Plaintiffs decedent John Patrick O'Neill, Sr.  Defendants John Does 1-67 acted as agents of the Republic of Iraq, performed acts within the scope of their office, employment  and/or agency, within the meaning of 28 U.S.C. § 1605 note, which caused the extrajudicial killings described below.

## COMMON FACTUAL ALLEGATIONS RELEVANT TO ALL OF THE COUNTS OF THE COMPLAINT.

53.     The horrific events of September 11th were the result of a world-wide terror conspiracy against the United States involving Defendants Saddam Hussein, the Estate of  Qusay Hussein, the Estate of Uday Hussein, Husham Hussein, Tahya Yassin Ramadan, Muhammed Madhi Salah, Faruq Al-Hijazi, Salah Suleiman, Ahmed Khalil Ibrahim Samir al-Ani, Habib Faris Adullah al-Mamouri, Abdel Hussein, a/k/a "The Ghost," Osama Bin Laden, Saad Bin Laden, Haqui Ismail, Taha Al Alwani, Abu Agab, and Abu Waiel, Osama Bin Laden, The Al Qaeda Islamic Agency, Egyptian Islamic Jihad, Abu Sayyaf, Hamsiraji Sali, Abu Musab Zarqawi, Abu Zubaydh, Khalid Sheikh Mohammed, Abu Abdul Rahman, Al Jazeera, Mohammed Jasmin al-Ali, Schreiber & Zindel, Dr. Frank Zindel, Engelbert Schreiber, Engelbert Schreiber, Jr., Martin Wachter, Erwin Wachter, Sercor Treuhand Anstalt, Abdul Rahman Yasin, Ahmad I. Nasreddin, Al Taqwa Bank, Al Taqwa Trade, Property, and Industry, Ltd., Al-Gammah Al Islamiah, Ayman al-Zawahiri, Albert Freidrich Armand Huber a/k/a/ "Armand Huber," Ali Ghaleb

Himmat, Asat Trust Reg., Nada Management Organization, S.A., Yousef M. Nada, Yousef M. Nada & Co, Gesellschaft, M.B.H, Barzan e-Tikriti, Metalor, Banca del Gottardo, Abdulaziz al Omari, Wail al Shehri, Waleed M. Al Shehri, Satam M.A. al Suqami, Mohammed Atta, Fayez Ahmed a/k/a Banihammad Fayez, Ahmed al-Ghamdi, Hamza al-Ghamdi, Marwan al-Shehhi, Mohald al-Shehri, Khalid al-Midhar, Nawaf al-Hazmi, Salem al-Hazmi, Hani Hanjour, Majed Moqued, Saeed al Ghamdi, Ahmed Ibrahim A. al Haznawi, Ahmed al Nami, Ziad Samir Jarrah, Zaracias Moussaui, Muhammad Atef, The Taliban, Muhammad Omar, Muslim Brotherhood – Syrian Branch, Muslim Brotherhood – Egyptian Branch, Muslim Brotherhood – Jordanian Branch, Muslim Brotherhood – Kuwaiti Branch, Muslim Brotherhood – Iraqi Branch, Iranian Ministry of Intelligence and Security, Iranian Revolutionary Guard Corps, Iranian Revolutionary Guard Corps – Qods Division, Akida Bank Private Limited, Akida Investment Co. Ltd, Nasco Business Residence, CenterSAS DI Nasreddin Ahmed Idris EC, Nasco Nasreddin Holding A.S., Nascoservice S.R. L., Nascotex S.A., Nasreddin Company Nasco SAS DI Ahmed Idris Nasreddin EC,  Nasreddin Foundation, Nasreddin Group International Holding Limited, Nasreddin International Group Limited Holding, Abu Hafs the Maritanian, Saif al-Adil. Imad Mughniyeh, HEzbOllah Secretary General Hassan Nasrallah, Iranian Supreme Leader Ayatollah Ali Khamenei, Usbat al-Ansar, Ahmad Vahedi, Hossein Mosleh, Morteza Reza'i, Salah Hajir and Adib Sha'ban (A/K/A Adeeb Shabaan),   and John Does 1-67, who have conspired for many years to attack the United States and murder United States' citizens.  Defendants supported, conspired, aided and abetted, sponsored, planned and executed the September 11th terror attacks that killed thousands of people and injured many thousands more.

54.     Iraq has sworn revenge against the United States since 1992 for Iraq's humiliating defeat in the Persian Gulf War.  Since Iraq could not defeat the U.S. Military, it resorted to terror attacks on U.S. citizens.  In order to avoid another confrontation with U.S. military forces, Iraq contracted with or sponsored Islamic fundamentalists who were willing to commit terrorist attacks on Iraq's behalf.  Indeed, in 1993, Iraqi agents tried to destroy the World Trade Center by planting a bomb in the World Trade Center parking garage.

55.     For many years, Al Qaeda wanted to drive the United States from the Arabian Peninsula, topple Middle Eastern governments supported by the United States, including Egypt and Israel, and create an Islamic empire based upon its narrow interpretation of the Koran.  Over the years, Al Qaeda has grown, as it absorbed or became allied with other like-minded Islamic terrorist groups, including the Egyptian Islamic Jihad.

56.     Over the past 10 years, Iraq's leadership and Al Qaeda shared a virulent hatred of the United States.

57.     As early as 1992, Al Qaeda terrorists established close working relations with Iraqi Intelligence agents in Iraq, the Sudan, Afghanistan, and elsewhere.  Soon thereafter, Iraqi Intelligence decided to support Al Qaeda and to employ Al Qaeda terrorists willing to carry out Iraq's terror attacks.  The Iraq-Al Qaeda relationship benefited Iraq because it provided that state with trained terrorists willing to die in terror attacks.  As a secular state, Iraq does not have a large number of citizens wishing to become martyr warriors.  In addition, by using Al Qaeda suicide terrorists, Iraq could disavow involvement in attacks and avoid retribution.  The relationship benefited Al

Qaeda who received support, funding, facilities, and training that it needed to carry out its terror campaigns.

58.     During the mid-1990's Iraq began actively supporting Al Qaeda operations by providing intelligence, training, weapons, supplies, passports, travel documents, and financial support to co-conspirators,  Significantly, one of Iraq's training camps contained the fuselage of a Boeing 707 used to train Al Qaeda terrorists in hijacking a commercial aircraft.  The training camp was established at Salman  Pak by members of the Iraqi intelligence service (Mukhabarat), who had contact with some of the September 11th hijackers.  The terrorist training camp adjoins a facility at Salman Pak used for chemical weapons development.  Al Qaeda members who were at Salman Pak may have also received training in chemical weapons.

59.     Al Qaeda, backed by Iraq, Iran and others, carried out the September 11th terror attacks with the financial and logistical support of numerous individuals and organizations.  These individuals and organizations provided Al Qaeda with the means to recruit, train, and employ thousands of terrorists, including the twenty assigned to the heinous mission to murder United States citizens and destroy U.S. landmarks on September 11, 2001.

60.     This lawsuit seeks to strip the assets of Iraq, Iran, Hezbollah, Al Qaeda, Bin Laden, and those individuals and organizations who participated in or supported the September 11th terror attacks and to recover compensatory and punitive damages for the Plaintiffs.  By doing so, Plaintiffs hope to obtain a measure of justice and to deter future acts of terrorism.

## The Birth of Al Qaeda

61.    Starting in 1989, an international terrorist group emerged dedicated to opposing non-islamic governments with brutal force and terrifying violence.  This organization grew out of the "mekhtab al khidernat" (the "Azzam Service Center") organization which maintained offices in Peshawar, Pakistan, and received funds from Islamic charities, wealthy Saudi families, mosques, legitimate businesses and criminal enterprises, among others.

62.    Under the leadership of Defendants Bin Laden, Muhammad Atef, a/k/a "Abu Hafs al Masry," Sheikh Tasyir Abdullah, Abu Fatima, Abu Khadija, together with "Abu Ubaidah al Banshiri" (Deceased in 1996), Ayman al Zawahiri and others, the Azzam Service Center expanded, created terrorist cells in various parts of the world, including Afghanistan, Pakistan, and the United States, financed and supported other terrorist groups dedicated to committing acts of violence, murder, destruction and mayhem.  From approximately 1989 until the present, this terrorist group called itself "Al Qaeda" ("the Base").

63.    At all relevant times, Al Qaeda was led by Bin Laden.  Members of Al Qaeda pledged an oath of allegiance (called a "bayat") to Bin Laden and Al Qaeda, committing them to become martyrs in their depraved cause.

64.    Al Qaeda actively and vehemently opposed the United States for several reasons.  First, it regarded the United States as a "kafir" or "infidel" nation governed in a manner inconsistent with the group's interpretation of Islam.  Second, it believed the United States was providing essential support for other "infidel" nations and organizations, particularly the government of Egypt, Israel, and the United Nations,

which Al Qaeda regarded as enemies.  Third, Al Qaeda opposed the involvement of the

United States armed forces in the Gulf War in 1991 and its presence in Muslim-

dominated countries afterwards as illustrated by Operation Restore Hope in Somalia in

1992 and 1993.  Al Qaeda viewed these pretextual preparations for an American

occupation of Islamic Countries.  In particular, Al Qaeda opposed the continued presence

of American Military forces in Saudi Arabia and elsewhere on the Saudi Arabian

peninsula following the Gulf War.  Fourth, Al Qaeda opposed the United States

Government because of the arrest, conviction, and imprisonment of Al Qaeda members

or other terrorists, with whom it worked, including the Islamic Group's Sheik Omar

Abdel Rahman who was convicted of conspiring to bomb bridges and tunnels in New

York City.  Fifth, Al Qaeda believed United Nation sanctions against Iraq were

orchestrated by the United States out of eagerness to destroy Iraq.

65.     One of the Al Qaeda's principal goals was to use violence to drive the

United States armed forces out of Saudi Arabia and Somalia.  Members of Al Qaeda

issued fatwas (rulings on Islamic law) stating that attacks on the United States were both

proper and necessary.

66.     At least as early as 1991, Bin Laden and Al Qaeda began working closely

with Defendant Ayman al Zawahiri, a/k/a "Abdel Muaz," a/k/a Dr. Ayman al Zawahiri,"

a/k/a "the Doctor," a/k/a "Nur," a/k/a "Ustaz," a/k/a/ "Abu Mohammed," a/k/a "Dr.

Mohammed Nur Al-Deen" whose Egyptian Islamic Jihad terrorist group shared Bin

Laden and Al Qaeda's goals.  Bin Laden had met Zawahiri in Peshawar, Pakistan, in

1987 during the Afghan-Soviet war.

67.     From in or about 1987, until in or about December 1997, Ayman al Zawahiri led the Egyptian Islamic Jihad, a group dedicated to the forceful overthrow of the Egyptian Government and committing violence against the United States, in part, for what Zawahiri believed to be the United States support of the Egyptian Government. Members of the Egyptian Islamic Jihad pledged allegiance to al Zawahiri. Many of the leading members of the Egyptian Islamic Jihad ultimately became influential members of Al Qaeda, including Ayman al Zawahiri and Muhammad Atef. By February 1998, the Egyptian Islamic Jihad led by Al Zawahiri had effectively merged with Al Qaeda and had joined with Al Qaeda in targeting United States citizens. In turn, Al Qaeda and the Egyptian Islamic Jihad in February 1998 founded an umbrella terrorist organization called the "International Islamic Front for the Jihad Against Jews and Crusaders." In May 1998, Bin Laden declared a fatwa in the name of the "International Islamic Front for the Jihad against Jews and Crusaders," to "kill the Americans and their allies – civilians and military."

68.     Al Qaeda had a command and control structure which included a "majalis al shura" (consultation council) of 10 members that discussed and approved major undertakings, including terrorist operations. Bin Laden, Muhammad Atef, a/k/a "Abu Hafs," Ayman al Zawahiri, Saif al Adel, Mamdouh Mahmud Salim a/k/a/ "Abu Hajer" a/k/a Abu Hajer al Iraqi and Abdullah Ahmed Abdullah, a/k/a "Abu Mohammed el Masry," a/k/a "Saleh," among others, sat on the majalis al shura (or consultation council) of Al Qaeda. Its affiliate, the Egyptian Islamic Jihad, had a Founding Council, on which Ibrahim Eidarous sat.

69.     Al Qaeda also maintained a "military committee" which considered and approved "military" matters.  Defendant Muhammad Atef sat on the military committee and was one of Bin Laden's two principal military commanders, together with "Abu Ubaidah al Banshiri," until his death in May 1996.  Muhammad Atef had the principal responsibility for supervising the training of Al Qaeda members.  Saif al Adel also served on the military committee reporting to Muhammed Atef.  He took over the military committee after Atef's death.

70.     Al Qaeda functioned both on its own and as a conduit for other terrorist organizations in other parts of the World that shared its ideology, such as the Egyptian Islamic Jihad, Ahmed Refai Taha, a/k/a "Abu Yasser al Masri," and a member of jihad terrorist groups in other countries, including the Sudan, Egypt, Saudi Arabia, Yemen, Somalia, Eritrea, Djibouti, Afghanistan, Pakistan,  Bosnia, Croatia, Albania, Algeria, Tunisia, Lebanon, Indonesia, the Philippines, Tajikistan, Azerbaijan, the Kashmiri region of India and the Chechnyan region of Russia.  Al Qaeda camps were used to train terrorists to fight in Islamic causes, such as supporting Pakistan in its dispute with India over the province of Kashmir.  Al Qaeda maintained terrorist cells and personnel in a number of countries to facilitate its activities, including Kenya, Germany, Tanzania, the United Kingdom, Canada, and the United States.

71.     Bin Laden and Al Qaeda also forged alliances with the National Islamic Front in the Sudan and with representatives of the government of Iran, and its associated terrorist group Hezbollah, for the purpose of working together against their perceived common enemies in the West, particularly the United States.

72.     At various times from as early as 1989, Bin Laden, and others known and unknown, ran terrorist training "camps and guesthouses" in various areas, including Afghanistan, Iraq, Iran, Pakistan, the Sudan, Somalia, Kenya, Malaysia, Philippines, and Germany for the use of Al Qaeda and its affiliated groups.  Mamdouh Mahmud Salim a/k/a Abu Hajer al Iraqi managed some of these training camps and guesthouses in Afghanistan and Pakistan.

73.     Since 1991, Bin Laden, Al Qaeda, and many of their co-defendants unlawfully, willfully and knowingly combined, conspired, confederated, and agreed to murder and injure United States citizens throughout the world, including in the United States, and to conceal their activities and methods by, among other things, establishing front companies, providing false identity and travel documents, financing terrorist operations, engaging in coded correspondence, providing false information to the authorities in various countries, and seeking to detect and kill informants.

**Iraqi Terrorism**

74.     Since the early 1990s, Iraq and Iraqi Intelligence have used both Iraqi agents and independent "contractors" to commit terrorist acts against the United States in revenge for Iraq's Gulf War defeat.  Al Qaeda was Iraq's favorite partner in terror.

75.     Upon information and belief, there have been numerous meetings between Iraqi  Intelligence agents and high-ranking Al Qaeda terrorists to plan terror attacks.  One such meeting occurred in 1992, when Defendant Zawahiri (Egyptian Islamic Jihad leader and Al Qaeda officer) met with Iraqi Intelligence agents in Baghdad, Iraq over several days.  An Iraqi serving with the Taliban who fled Afghanistan in the fall of 2001, was captured in Kurdistan and has corroborated this meeting and confirmed that Iraqi contacts

with Al Qaeda began in 1992.  In fact, Abu Iman al-Maliki, who spied on the Kurds as an

Iraqi intelligence officer for 20 years, said that the 1992 meeting not only included Iraqi

intelligence officers, but also Defendant Dr. al-Zawahiri, top lieutenant of Bin Laden,

who was known to have met with Saddam Hussein.

### The 1993 World Trade Center Bombing

76.     On February 26, 1993, a bomb was detonated in the World Trade Center

underground parking lot, killing six (6) U.S. citizens and injuring close to one thousand

(1,000).  Iraqi sponsored terrorists planned, financed, executed and carried out that World

Trade Center bombing.

77.     The 1993 World Trade Center bombing took place on the Friday before

the two year anniversary of Iraq's defeat in Kuwait, which was February 28, 1991.  The

anniversary in 1993 was a Sunday, and few people would have been working at the

World Trade Center that day; and Iraq and the terrorists wanted to maximize the number

of American casualties.

78.     During the initial planning of the World Trade Center bombing, Mahmud

Abu Halima (who was later convicted for his role in the bombing), was in regular and

frequent contact with his uncle, Kadri Abu Bakr, who lived in Iraq and had been a

member of a PLO faction allied with Saddam Hussein.  Shortly after these calls, the

mastermind of the bombing, Ramzi Ahmed Yousef, on information and belief, an Iraqi

Intelligence agent and/or asset and/or associate,  traveled to the United States using travel

documents forged in Kuwait during the Iraqi occupation of that country in 1991.

79.     Ramzi Yousef arrived in New York on September 1, 1992 using an Iraqi

passport and requesting asylum.  On December 31, 1992, he presented photocopies of

passports for Abdul Basit at the Pakistani consulate in New York, claiming to be Basit and requesting replacement of his "lost" passport. The real Basit was a Pakistani citizen who had moved to Kuwait and disappeared during the Iraqi occupation in August 1990. Iraqi Intelligence had access to the Kuwaiti Interior Ministry files and upon information and belief, inserted Yousef's fingerprints into the file and provided him with photocopies of two older passports from Basit's file. The Pakistani Consulate, accordingly, provided Yousef a temporary passport, based on the false documents. This provided Yousef with a means to escape the U.S. two days after the World Trade Center bombing. In fleeing the United States after the bombing, Yousef first traveled through Baluchistan, an uncontrolled region of Iran straddling the border of Iran and Pakistan with strong ties to Iraq. By the following year, 1994, Yousef was living in the Philippines. He fled from there; however, after authorities discovered a plan he was working on to bomb United States' airliners. Yousef fled to Pakistan and was eventually sheltered at an Al Qaeda guesthouse. He was arrested in February 1995 in Pakistan and transported to the U.S. for prosecution and was eventually convicted in the 1993 World Trade Center bombing conspiracy.

80.     Abdul Rahaman Yasin, who was born in the United States to Iraqi parents but had been raised in Iraq, was questioned in New York and New Jersey in connection with the World Trade Center bombing, but was released after appearing to cooperate with U.S. officials. He fled the country the next day and traveled to Baghdad, Iraq. U.S. prosecutors later learned that he, along with others, had prior training in bomb making, and had mixed the chemicals and constructed the bomb that was used on the World Trade Center. Iraqi intelligence knew of Yasin's presence in Iraq and provided him with

refuge.  On August 4, 1993, Yasin was indicted in absentia for the World Trade Center
bombing.

     81.    In June 1994, Yasin was seen in Baghdad by an ABC news correspondent
who was told that Yasin worked for the Iraqi government.  U.S. law enforcement officials
confirmed that fugitive Yasin worked for the Iraqi government.  U.S. law enforcement
officials confirmed that fugitive Yasin has been sheltered in Iraq, a continuing violation
of United Nations Security Council Resolution 687, which makes it unlawful to harbor a
suspected terrorist.  In June 2002, Yasin was interviewed in Baghdad by Leslie Stahl
from CBS.  Upon information and belief, Yasin still remains in Iraq.

     82.    Ramzi Ahmed Yousef, Mohammed Salameh, Nidal Ayyad, Mahmud Abu
Halima and Ahmad Mohammed Ajaj were all eventually convicted in the Southern
District of New York for  the 1993 conspiracy to bomb the World Trade Center.

     83.    Following his arrest in 1995, Ramzi Yousef told U.S. investigators that his
intent was to create an explosion that would cause one of the World Trade Center Towers
to fall over onto the other, destroying both and causing massive American casualties.
Yousef had also planned to use sodium cyanide to create a toxic cyanide gas cloud
throughout the area that would poison those in the building.  Fortunately, the sodium
cyanide was consumed in the blast and vaporized.  Before the Gulf War, Iraq had the
largest and most diversified terrorist chemical weapons program in stockpiles of sodium
cyanide, and had experience in the late 1980's using chemical weapons against its
Kurdish population.  Upon information and belief, it was Iraq that supplied Yousef with
the sodium cyanide and/or trained him in the use and/or manufacture of chemical
weapons.

84.     Upon information and belief, Al Qaeda terrorists met and conspired in November, 1995, with Iraqi Intelligence and the Iranian Hezbollah to bomb the Khobar towers complex located in Dhahran, Saudi Arabia.  Their plan called for the detonation of a truck bomb outside an apartment complex that was used as a barracks for United States servicemen.  The resultant attack on Khobar Towers of June 25, 1996, took the lives of 19 U.S. Servicemen.  Fearing further attacks by Bin Laden and Al Qaeda, some Saudi government officials and businessmen agreed to provide financial support to Al Qaeda and began funneling millions of dollars to charities that would then forward the money to Al Qaeda.  Some of these charities were Madras schools that preached a form of Islam that is intolerant of non-Muslims and provided new recruits for terrorism.

### Bin Laden's Return to Afghanistan

85.     In 1996, Bin Laden was asked to leave the Sudan by Sudanese officials pressured by the United States to crack down on terrorism.  Bin Laden returned to Afghanistan after the Taliban seized control of most of that country.  The number of Al Qaeda members and terrorist training camps in Afghanistan grew rapidly following Bin Laden's return.  Al Qaeda actively supported the Taliban and violently suppressed all opposition to the Taliban.  Bin Laden and Omar developed a very close relationship.

86.     From 1996 until 2001, Bin Laden with the financial and logistical support of  Omar and others in the Taliban and Iraq and Iraqi Intelligence, created, supplied and operated at least five training camps in order to create an "Islamic Foreign Legion" capable of attacking their enemies throughout the world.  These camps trained men from 15 nations in guerrilla warfare, terrorist activities, rocket warfare, demolition and bombing, including the use of mines, grenades, TNT, nitroglycerine and plastic

explosives.  Classes were also given in "how to kill a policeman" and "traps, murder, and terrorist moves."

87.     On August 23, 1996, a strengthened Bin Laden issued another *fatwa* declaring a jihad against Americans present in Muslim lands.  The message was disseminated throughout all Al Qaeda cells and associated terrorist groups, such as the Egyptian Islamic Jihad.  The London Al Qaeda cell, run by Khalid Al Fawwaz under the name Advice and Reformation Committee, and the Egyptian cell, run by al Zawahiri and Abdel Barry, were used to send the *fatwa* to Muslims living in the Western World.  Wadih El Hage was also used by Bin Laden in order to deliver messages, money and terrorist material to Al Qaeda operatives in the U.S. and U.K.

### The Public Merger of Iraqi and Al Qaeda Interests

88.     In February 1997, Bin Laden publicly expressed his support for Iraq in its conflict with the United States, stating:

> "The hearts of the Muslims are filled with hatred towards the United States of America and the American President for American conduct towards Iraq."

89.     Having decided to carry out acts of terrorism, Saddam Hussein, with the advice and prompting of his son and Iraqi Intelligence chief, the late Qusay Hussein and his other son, the late Uday Hussein, head of an Iraqi Intelligence Subdivision known as the "Fedayeen" and "Al-Qare," concluded that a campaign of terrorist attacks against the United States, under the banner of Bin Laden and Al Qaeda, was the most effective means of both deflecting U.S. attempts to topple his regime and obtaining Iraqi revenge.

90.     Upon information and belief, Iraq agreed to supply arms to Al Qaeda and provide Al Qaeda with access to and training in the use of chemical and biological

weapons.  Iraq also agreed to instruct Al Qaeda terror trainers at its Salman Pak camp in

Baghdad that contained a Boeing 707 used to practice hijacking.  Iraq also agreed to

supply Al Qaeda terrorists with new identities and passports from Yemen and the United

Arab Emirates.

91.     In exchange, Al Qaeda agreed to provide protection from political

opponents to Iraq and Saddam Hussein, and to commit assassinations and other acts of

violence to create instability in regions of Iraq, particularly Kurdistan, to assist the regime

of Saddam Hussein.  Al Qaeda further agreed to provide trained terrorists, assassins, and

martyrs to carry out terror attacks in concert with Iraq against their common enemies,

including the United States.

92.     On February 22, 1998, Bin Laden, Khalid Al Fawwaz, and Ayman al

Zawahiri of the Egyptian Islamic Jihad issued a fatwa published in the Arabic newspaper

Al-Quds stating:

> "The ruling to kill the Americans and their allies – civilians
> and military – is an individual duty for every Muslim who
> can do it in any country in which it is possible to do it…"

93.     In their February 22, 1998 fatwa, Bin Laden and Al Qaeda expressly

referenced the United States' "continuing aggression" towards Iraq as one of their

reasons for calling on all Muslims to kill Americans "wherever and whenever" they are

found:

> "The best proof of this is the Americans' continuing
> aggression against the Iraqi people using the [Arabian]
> Peninsula as a staging post, even though all its rulers are
> against their territories being used to that end, still they are
> helpless."

94.     The Bin Laden and Al Qaeda fatwa also cited the alleged "great devastation inflicted on the Iraqi people" by the United States, as well as the United States' alleged "eagerness to destroy Iraq."

95.     Additional fatwas of a similar nature were issued in May 1998 and published in Al-Quds under the banner of the Ulema Union Of Afghanistan.  A May 29, 1998 Fatwa issued by Bin Laden called to the use of a nuclear bomb to "terrorize the Jews and Crusaders who were enemies of God."  At the time Bin Laden was seeking to obtain nuclear material from Iraq and others who possessed nuclear material and was in the process of developing nuclear weapons.

96.     Between April 25 and May 1, 1998, two of Bin Laden's senior military commanders, Muhammad Abu-Islam and Abdullah Qassim visited Baghdad for discussions with Saddam  Hussein's son – Qasay Hussein – the "czar" of Iraqi Intelligence.

97.     The late Qusay Hussein's participation in those meetings highlights the importance of the talks in both symbolic and practical terms.  Upon information and belief, as a direct result of those meetings, Iraq again made commitments to provide training, intelligence, clandestine Saudi border crossings, financial support and weapons and explosives to Al Qaeda.

98.     Iraqi Intelligence officials met with Bin Laden in Afghanistan several more times.  A second group of Bin Laden and Al Qaeda operatives from Saudi Arabia were then trained by Iraqi Intelligence in Iraq to smuggle weapons and explosives into Saudi Arabia and other countries, which they later accomplished in an effort to carry out future terrorist acts of violence.  A third group of Bin Laden and Al Qaeda operatives

received a month of sophisticated guerilla operations training from Iraqi Intelligence officials later in the Summer of 1998.

99.    Despite philosophical and religious differences with Saddam Hussein, Bin Laden continually sought to strengthen and reinforce the support he and Al Qaeda received from Iraq.

100.    Upon information and belief, documents recently found in the bombed headquarters of the Mukhabarat, Iraq's intelligence service, reveal that an Al Qaeda envoy was invited clandestinely to Baghdad in March 1998.  The documents reveal that the purpose of the meeting was to establish a relationship between Baghdad and Al Qaeda based on their mutual hatred of America and Saudi Arabia.  The meeting apparently went so well that it ended with arrangements being discussed for Bin Laden to visit Baghdad.

101.    In March 1998, Bin Laden had reportedly visited Baghdad for consultations.  According to Giovanni DeStafant, an international lawyer visiting Baghdad on business, he encountered Bin Laden in the lobby of the five-star Al-Rashid Hotel in Baghdad.  They engaged in light conversation.

102.    In mid-July, 1998, Bin Laden sent Dr. Ayaman al-Zawahiri, the Egyptian co-founder of Al Qaeda, to Iraq to meet with senior Iraqi officials, including the Iraqi vice-president Taha Yassin Ramadan.  Upon information and belief, the purpose of this meeting was to discuss and plan a joint  strategy for a terrorist campaign in the United States.  Five months later, the American embassies in Kenya and Tanzania were bombed.

103.    Upon information and belief, Iraqi Intelligence officials pledged Iraq's full support and cooperation in exchange for a promise that Bin Laden and Al Qaeda not to

incite the Iraqi Muslim Brotherhood inside Iraq to oppose, undermine or attack the regime of Iraqi dictator Saddam Hussein.

104.     During the July 1998 visit, Zawahiri toured a potential site for a new headquarters for Bin Laden and Al Qaeda, and went to an Iraqi military base and nuclear and chemical weapons facility near al-Fallujah in Iraq.  Upon information and belief, Dr. Zawahiri observed training by Iraqi Intelligence officials of Al Qaeda operatives at the al-Nasiyirah military and chemical weapons facility in Iraq.  In recognition of Bin Laden's and Al Qaeda's leadership role in the terrorist war against the United States, Iraqi officials allowed Zawahiri to assume formal command over the al-Nasiyirah training camp in the name of Bin Laden and Al Qaeda.

## U.S. Embassy Bombings

105.     To demonstrate its commitment to Iraq and its anti-U.S. policies, in the Spring of 1998, Al Qaeda planned terrorist bombing attacks on the U.S. Embassies in Nairobi, Kenya, and Dar Es Salaam, Tanzania.  A, Khalfan Khamis Mohamed, Mustafa Mohamed Fadhil, Mohamed Rashed Daoud Al-'Owali, Sheikh Ahmed Salim Swedan, Fahid Mohamed Aly Msalam and an individual known as Abdulla Azzam were chosen as some of the Al Qaeda terrorists who would conduct the coordinated attacks in Nairobi and Dar Es Salaam.

106.     In July and early August 1998, Al Qaeda terrorist Mustafa Mohamed Fadhil, Khalfan Khamis Mohamed, Ahmed Khalfan Ghailini, Fahid Mohammed Ally Msalam, Ahmed the German, Sheikh Ahmed Salim Swedan, Mohamed Sadeek Odeh and Fazul Abdullah Mohammed were stationed in Dar es Salaam where they purchased a 1987 Nissan Atlas truck and outfitted it with oxygen, acetylene tanks, TNT, batteries,

detonators, fertilizer and sand bags, creating a massive bomb to be driven into the U.S. Embassy.  Odeh, Fazul Adullah Mohammed and others who participated in the bombings had been  with Bin Laden since the early 1990s and Bin Laden's days in the Sudan.

107.    On July 30, 1998, Iraq warned it would take action unless the United Nations embargo was lifted.  Iraq blamed the United States for the United Nations embargo.  On August 4, 1998, Iraq refused to cooperate with the United nations embargo. On August 4, 1998, Iraq refused to cooperate with United Nations weapons inspectors in Iraq and talks for a resolution of the crisis collapsed, causing U.N. inspectors to leave.

108.    Three days later, on August 7, 1998, at approximately 10:30 a.m., Fazul, Al-'Owhali and Azzam drove a Toyota Dyna truck (outfitted similarly to a Nissan Atlas truck in Dar Es Salaam) to the U.S. Embassy in Nairobi, Kenya, and detonated a large bomb damaging the Embassy and demolishing a nearby Secretarial College building and Cooperative Bank building, resulting in the more than 213 deaths (12 Americans) and injuries to more than 4.500 people.

109.    On August 7, 1998, at approximately 10:40 a.m., ten minutes after the bombing in Kenya, Khalfan Khamis Mohamed and Ahmed the German detonated the Dar Es Salaam bomb in the vicinity of the U.S. Embassy in Dar Es Salaam, Tanzania, severely damaging the Embassy building and resulting in the death of 11 people and injuries to more than 85 people.

110.    On August 6, 1998, shortly before the bombing, Eidarous, an Al Qaeda member in London, sent a letter to news organizations in Paris, Doha, Qatar and Dubai, UAE, claiming responsibility for the embassy bombings under the fictitious name Islamic Army for the Liberation of Holy Places.

111.     At the trial in New York of some of Al Qaeda-U.S. Embassy bombers, some of the defendants elicited testimony in their defense that cited the poor living conditions in Iraq.  They blamed those conditions on the U.S.-U.N. sanctions, and used it as motivation and explanation for the Al Qaeda attacks on the Embassies.

### The 1998 U.S. Air Strikes on Al Qaeda

112.     On August 20, 1998, the United States initiated a pre-emptive and retaliatory air  strike with cruise missiles on Al Qaeda training camps in Khost, Afghanistan and a factory in Khartoum, Sudan, believed at the time to be a chemical weapons plant used by the Sudanese and Iraqi governments to manufacture weapons for their use and that of Al Qaeda terrorists.

113.     On August 20, 1998, President Clinton issued a statement on the air strike:

> "Our target was terror…our mission was clear to strike at
> the network of radical groups affiliated with and funded by
> Bin Laden, perhaps the preeminent organizer and financier
> of international terrorism in the world today."

114.     By mid-November, 1998, Saddam Hussein reportedly came to the conclusion (with the advice and prompting of his son and intelligence chief, the late Qusay Hussein), that a campaign of terrorist attacks against the United States, under the banner of Bin Laden and Al Qaeda, was the most effective means of deflecting U.S. attempts to topple his regime.

115.     Shortly thereafter, Iraqi intelligence officials reportedly met with Bin Laden in Afghanistan.  Bin Laden, Al Qaeda, and Iraq reportedly agreed to join efforts in a detailed, coordinated plan for a protracted terrorist war against the United States.  Iraq also reportedly agreed to provide Bin Laden and Al Qaeda with the assistance of an

expert in chemical weapons, and Bin Laden reportedly agreed to hunt down Iraqi

opposition leaders who cooperated with the United States against Hussein.  In furtherance

of this agreement, Bin Laden reportedly dispatched four hundred of Al Qaeda's "Afghan"

Arabs to Iraq to fight Kurdish dissidents.

116.    In December 1998, after a standoff between the U.N. and Iraq and a

discovery of weapons violations in Iraq, the United States with U.N. approval, led a

coalition of allies in a four-day air strike on Iraq.  Iraqi Trade Minister Muhammed

Madhi Salah then stated that he expected terrorist activities against the United States to

*increase* as a result of the bombing of Iraq.  The Arabic language daily newspaper Al-

Quds Al-Arabi a/k/a Al Quds cited the cooperation between Iraq, Bin Laden and Al

Qaeda in a late December 1998 editorial which predicted that

> "President Saddam Hussein, whose country was subjected
> to a four day air strike, will look for support in taking
> revenge on the United States and Britain by cooperating
> with Saudi oppositionist Osama Bin Laden, whom the
> United States considers to be the most wanted person in the
> world."

117.    The editorial noted that this type of cooperation was already taking place,

considering that "Bin Laden was planning on moving to Iraq before the recent strike."

118.    Following the December 1998 air strikes on Iraq, Saddam Hussein

dispatched Faruq al-Hijazi to Kandahar, Afghanistan in order to meet with Bin Laden and

plot their revenge.  Al-Hijazi also offered Bin Laden terrorist resources and asylum in

Iraq.

119.    The late Qusay Hussein had also dispatched representatives to follow-up

with Bin Laden and obtained his firm commitment to exact revenge against the United

States for the December 1998 bombing campaign.  Iraq offered Bin Laden and Al Qaeda

an open-ended commitment to joint operations against the United States and its

"moderate" Arab allies in exchange for an absolute guarantee that Bin Laden, Al Qaeda

and their allies would not attempt to overthrow Saddam Hussein's regime in Iraq.

120.    To demonstrate Iraq's commitment to Bin Laden and Al Qaeda, Hijazi

presented Bin Laden with a pack of blank, official Yemeni passports, supplied to Iraqi

Intelligence from their Yemeni contacts.  Hijazi's visit to Khandahar was followed by a

contingent of Iraqi Intelligence officials who provided additional training and instruction

to Bin Laden and Al Qaeda operatives in Afghanistan.

121.    Upon information and belief, Bin Laden, Al Qaeda and Iraq agreed to join

efforts in a detailed, coordinated plan for a protracted terrorist war against the United

States.

122.    "Unit 999" was located at Salman Pak, south of Baghdad.  It was here that

training would be given to Al Qaeda fighters to use chemical and biological weapons in

sabotage operations in Europe and across the United States.

123.    In 1998, reports revealed that Saudi and Palestinian dissidents were

trained in Iraq at secret camps run by an Iraqi Intelligence group known as Unit 999.

124.    A trainer at Unit 999, Abu Mohammad, who had escaped Iraq, confirmed

that such training was underway on how to lay bombs and how to use chemical and

biological weapons in operations in the Middle East and the West.  Unit 999 ran a course

for a number of extremist Middle Eastern groups, including Al Qaeda.  Mohhamad was

recruited into Saddam Fedayeen in 1998 and had his first encounter with Bin Laden

fighters that year at Salman Pak.

125.     Iraq maintained an advanced chemical and biological weapons program, part of which was located at Salman Pak.  Iraq is one of only three countries in the world producing a highly developed weaponized anthrax.  Sometime during or after 1998, Iraq agreed to help Bin Laden and Al Qaeda develop a laboratory in Afghanistan designed to produce anthrax.

126.     In addition to the al-Nasiriyah and Salman Pak training camps, by January 1999, Bin Laden and Al Qaeda operatives were being trained by Iraqi Intelligence and military officers at other training camps on the outskirts of Baghdad.

127.     Those locations were the Nahrawan camp at the old Diyala Bridge, southeast of Baghdad and Tell Aswad Ridhwaniya, northwest of Baghdad.  The Mukhabarat (Iraqi Intelligence Agency) runs the training facilities at both locations.  Relocation occurred due to publicity surrounding Salman Pak, where kamikaze, explosives, and assassination training included "foreigners" said to be Palestinians and Iranians from the Mujahedin-e Khalq (MEK).  Iraq supports the anti-Iranian terrorist group, MEK, to which Ramzi Yousef was connected due to his Iraqi background.  Bin Laden also reportedly is being sheltered by the Iranian guerilla fighters of the MEK in the eastern portion of Iran.  He and close associates reportedly crossed into Iran using smuggling routes with the help of the MEK, and took refuge in caves said to be more extensive and sophisticated than those of the Tora Bora mountain chain in Afghanistan.  The MEK, who are fighting a war against the Shiite government of Tehran, are minority Sunnis.  They maintain good relations with certain Afghan and Pakistani tribes.  When the Iranian government cracks down on the group, MEK members take refuge in the Pakistani or Afghani tribal areas.

128.    In January 1999, Iraq began reorganizing and mobilizing Iraqi Intelligence front operations throughout Europe in support of Bin Laden and Al Qaeda.  Haqi Ismail, believed to be a member of Iraq's Mukhabarat Secret Service, left Iraq to train in an Afghanistan Al Qaeda camp.  Ismael was believed to be a liaison between Iraq, the Taliban, and Al Qaeda and was rewarded with a position in the Taliban Foreign Ministry.

## Attack on the U.S.S. Cole DDG-67

129.    In the spring of 2000, Iraqi Intelligence began planning to attack United States warship[s in the Persian Gulf in an effort to prompt a United States withdrawal. Iraq sought suicide bombers who would employ small boats packed with explosives to ram United States' warships.

130.    On October 12, 2000, Iraqi Intelligence and members of Al Qaeda including Bin Laden, Jamal al-Badawi, Khalid al-Midhar, Mohammed Omar al –Harazi, Walid al Sourori, Fatha Abdul Rahman, Yasser Al-Azzani, Jamal Ba Khorsh, Ahmad Al-Shinni, Raed Hijazi, Jamil Quasim Saeed Mohammed, as well as the two suicide boat bombers Abd Al-Mushin Al-Taifi (deceased)(and a suspect in the August 1998 Embassy bombings) and Hassan Said Awadh Khemeri (deceased) carried out their plan to bomb the U.S.S. Cole by ramming a small boat loaded with explosives into the side of the ship as it was anchored in the harbor at Aden, Yemen, resulting in the deaths of 17 American sailors and injuring an additional 39.

131.    The Yemeni government investigation reported that the terrorists behind the attack were Islamic extremists who fought the Soviets in the Afghan war and who were tied to the Egyptian Islamic Jihad and Al Qaeda and who were trained in Afghanistan.  Four were arrested in Yemen.  Jamil Qaseri Saeed Mohammed was

arrested a year later in Pakistan.  After his arrest, Al-Badawi admitted that he received his instructions to bomb the U.S.S. Cole from Al Qaeda member Al-Harazi whom he had met during the war in Afghanistan.

### Al Qaeda Hijacking of Saudi Airline

132.    On October 14, 2000, just two days after the attack on the U.S.S. Cole, two Saudis hijacked a Boeing 777 from Saudi Arabia and it had flown to Baghdad, Iraq. The hijackers were given "asylum" in Iraq.  They were extensively interviewed in the Iraqi press and criticized the Saudi government.

133.    Upon information and belief, this hijacking was a message between Bin Laden and Iraq intended to demonstrate that Al Qaeda terrorists could seize control of large commercial aircraft  that could be used as a weapon in the hands of suicide terrorists, foreshadowing a coordinated attack that was less than a year away.

### Iraqi Launch of Terror War

134.    On January 22, 2001, the Arab language newspaper Al Watan Al Arabi, reported that Saddam Hussein and his sons had called for an Arab alliance to "launch a global terrorist war against the United States and its allies."  The newspaper characterized Hussein's statement as calling for an uncompromising campaign and "scorched earth policy."

135.    In May 2001, Al Qaeda operatives in Kurdistan assassinated Franso Hariri, a member of the Kurdish Democratic Party, as part of a deal with Saddam Hussein.  The killing of Hariri created instability in the region by damaging relations between the co-leaders of Kurdistan.  This benefited the Hussein regime in Iraq.

136. Also in May 2001, Iraqi physician and kidney specialist Dr. Mohammed Khyal was dispatched from Baghdad to Afghanistan for three days to treat Bin Laden's kidney problem, further demonstrating the important relationship between Iraq and Bin Laden less than four months before the single largest terrorist attack in history.

137. During the May 2001 trial of some of the Al Qaeda defendants who bombed the U.S. Embassies in Africa, the defendants expressed sympathy, solidarity, and support for Iraq, and further expressed condemnation of the United States as their motivation for the bombings.

138. On May 29, 2001, Wadih El-Hage, a U.S. citizen believed to be Bin Laden's personal secretary, was convicted in the Southern District of New York, along with Mohamed Sadeek Odeh, Mohammed Rashed Daoud Al-'Owali and Khalfan Khamis Mohamed, for participating in the conspiracy to bomb the Untied States Embassies in Nairobi and Dar es Salaam in August of 1998. Bin Laden and other Al Qaeda members were indicted but still remain at large.

## Iraqi Involvement in the September 11th Attacks

### Al Nasiriyah News Article:

139. Iraq knew in advance that Al Qaeda was planning to attack U.S. landmarks and civilians in September 2001 in Washington and New York and supported the planned attacks.

140. Upon information and belief, Iraqi news columnist Naeem Abd Mulhalhal has been connected with Iraqi intelligence since the early 1980s. As such, he has commented on matters of Iraqi political interest for the Al Nasiriyah newspaper, a weekly paper published in the provincial capital city of Al Nasiriyah. On September 1, 2001, he

was honored for his "documentation of important events and heroic deeds that proud Iraqis have accomplished" and praised by Saddam Hussein.  In addition, Al Nasiriyah contains a military base that is believed to house a chemical weapons storage facility.  Iraq had previously denied access to this base to U.N. weapons inspectors.  It was visited by Zawahiri as early as 1998 and Al Qaeda terrorists trained there for several years.

141.    On July 21, approximately six weeks before the September 11th attacks, Iraqi columnist Mulhalhal reported that Bin Laden was making plans to "demolish the Pentagon after he destroys the White House."

142.    Mulhalhal's July 21 article further informed that Bin Laden would strike America "on the arm that is already hurting."  Upon information and belief, this references a second Iraqi sponsored attack on the World Trade Center.  This interpretation is further bolstered by another reference to New York as "[Bin Laden] will curse the memory of Frank Sinatra every time he hears his songs." (e.g. "New York, New York") identifying New York, New York as a target.

143.    Mulhalhal further indicated "The *wings* of a dove and the *bullet* are all but one in the same in the heart of a believer." (Emphasis supplied).  This appears to be a reference to the use of commercial aircraft as a weapon.  The information was reported in an Iraqi newspaper whose editor-in-chief served as secretary to the late Uday Hussein's Iraqi Syndicate of Journalists.  The article expressed Iraqi admiration and support for Bin Laden's plans and its appearance in the newspaper would clearly have to be endorsed by Saddam Hussein himself.

144.    All Iraqi news media were strictly controlled and censored by the government of  Saddam Hussein and were under the direct oversight of the late Uday

Hussein.  Various members of Iraqi intelligence worked at and controlled the context of each and every newspaper published inside Iraq.

145.    The information contained in Mulhalhal's published statements was known prior to the events of September 11th, as was the fact that Mulhalhal had ties to Iraqi intelligence.  His actions and words demonstrated foreknowledge of the planned attacks by Bin Laden and indicated support by Iraqi co-conspirators.

146.    Iraq's July 21 public statements also exemplify the Bin Laden pattern of publicly threatening violent strikes against the United States prior to and after committing them.  For example, weeks before the August 1998 Al Qaeda attacks on the U.S. embassies in Africa, Bin Laden threatened U.S. civilians and shortly thereafter bombed the embassies in Kenya and Tanzania within minutes of each other, killing 223 civilians.

147.    Additionally, after the suicide boat bombing of the U.S.S. Cole in Yemen in October 2000, Bin Laden publicly threatened violence against America while wearing traditional Yemeni clothing including a Yemeni war dagger.  Bin Laden sought media attention to taunt the United States and to recruit additional Muslim supporters.

### *Preparation For September 11th Attacks*

148.    According to U.S. and foreign intelligence officials, in the Spring of 2000, Iraqi Intelligence agents met with September 11th plot hijackers Zaid Samir Jarrah and Marwan al-Shehhi in Dubai, UAE in order to advance the hijacking of U.S. aircraft to commit terrorist acts.  Not long after the meeting, al-Shehhi entered the United States on May 29 and Jarrah entered on June 27 to begin preparations for the attacks.

149.    According to Czech intelligence sources, on June 2, 2000, co-conspirator and Defendant Mohammad Atta, a pilot and the operational leader of the September 11th

terrorist attacks, traveled to Prague to meet other co-conspirators. The following day, Atta arrived at Newark International Airport in the United States.

150.    According to the FBI, from July 2000 through March 2001, Atta, Shehhi, Hanjour, Jarran and Hamzi traveled to the U.S., where they resided and took pilot courses to learn to fly the Boeing 747, 757, 767 and Airbus A320 in furtherance of the Al Qaeda Iraqi conspiracy to hijack U.S. aircraft to commit terrorist acts.

151.    Upon information and belief, between April 8-11, 2001, Atta left Florida where he was a flight student, to again meet in Prague with Iraqi Intelligence agent al-Ani. Czech Interior Minister Stanislav Gross confirmed that Atta met with al-Ani in early April 2001 in Prague. Atta returned to Florida and within two weeks opened a Sun Trust Bank account with $100,000 sent through a money changer in the UAE. Later in 2001, al-Ani was expelled from the Czech Republic for espionage activities. Other intelligence reports indicate that al-Ani met with another September 11th hijacker, Khalid al Midhar as well. Atta reportedly also met with the Iraqi ambassador to Turkey and former Iraqi Deputy Intelligence director Farour al-Hijaziin in Prague sometime in early April, 2001.

152.    Italian security sources reported that Iraq made use of its embassy in Rome to foster and cultivate Iraq's partnership with Bin Laden and Al Qaeda. Habib Faris Abdullah al-Mamouri, a general in the Iraqi Secret Service, and a member of Iraq's M-8 Special Operations branch, who was responsible for developing links with Islamist militants in Pakistan and Afghanistan, was stationed in Rome as an "instructor" for children of Iraqi diplomats. Al-Mamouri met with September 11th pilot hijacker

Mohammed Atta in Rome, Hamburg, and Prague. Al-Mamouri has not been seen in Rome since July 2001, shortly after he last met with Atta.

153.    Al-Mamouri's meeting with Atta was in keeping with his previous duties at Salman Pak. Al-Hijazihad recommended to Saddam Hussein the appointment of al-Mamouri to head the Special Operations Branch at Salman Pak. Al-Mamouri's working relationship with al-Hijazihad had been strengthened when they worked together at Salman Pak to devise a new range of terrorist methods. It is here that the plan of controlling a civilian airplane with full fuel tanks by teams of five using items that can be easily carried aboard a plane and using the plane as a guided missile was developed by al-Mamouri and al-Hijazi at Salman Pak, sometime before 1995.

154.    At Salman Pak, al-Mamouri was placed in charge of coordinating activities with fundamentalist Islamic movements in Pakistan, Afghanistan, the Persian Gulf Countries and Sudan. This came about after Saddam Hussein had decided to seek links with the Islamic terrorist network after the Gulf War. From 1982 to 1990, al-Mamouri worked for the secret service's Special Operations Branch at Salman Pak. In 1990, he was put in charge of relations with the various Islamic fundamentalist movements. Until 1996, al-Mamouri then traveled to strengthen his relations with various fundamentalist organizations under the auspices of Section M4, the clandestine division of the Mukhabarat. Saddam Hussein, realizing that he could not defeat the U.S in a conflict, decided to resort to terrorism. He then realized that the simplest and most effective way was to resort to Kamikaze terrorism. He gave instructions to the Mukhabarat to establish contacts with those fundamentalist groups, including the Hamburg cell, thereby making Atta a co-optee of the Iraqi Mukhabarat.

155.     Between on or about April 23, 2001 and on or about June 29, 2001, Satam M.A. al-Suqami (Flt. 11), Waleed al Shehri (Flt. 11), Ahmed al Ghamdi (Flt. 175), Majeed Moqued (Flt. 77), Ahmed al Nami (Flt. 93), Hamza al Ghamdi (Flt. 175), Mohald al Shehri (Flt. 175), Wael al Shehri (Flt. 11), Ahmed al Haznawi(Flt. 93), and Fayez Ahmed(Flt. 175), traveled from various points in the world to the United States.

156.     The FBI has reported that Atta visited commercial crop dusting aircraft facilities in Florida in March and August of 2001.  In the wake of the September 11th attacks, authorities concluded that Atta was investigating the possibility of spraying chemical or biological weapons on U.S. civilians.  In July and August 2001, on several occasions several other Middle Eastern men also visited the same crop dusting facility.

157.     On July 7, 2001, two members of the Iraqi Mukhabarat, Abu Agab and Abu Wa'el traveled together from Germany to Afghanistan and eventually to Kurdistan. Abu Wa'el trained at Al Qaeda terror camps and became the authority for fundamentalist groups operating in Kurdistan intent on crushing opposition to Saddam Hussein.  The Iraqi Mujabarat agent, Abu Wa'el is regarded as the real leader of Arsar al-Islam, a Taliban-style group of radical Islamists with links, including financial, to Osama  Bin Laden and Saddam Hussein.  Indeed, former Anser al-Islam leader Mallah Krekar, while in detention in Norway, told ABC News that he would bring Abu Wa'el who is in Baghdad to the United States for an interview.  Ansar al-Islam reportedly had received more than $600,000 from Bin Laden.

158.     The FBI reported that in furtherance of his participation in the hijacking conspiracy, Zacarias Moussoui purchased flight deck videos for the Boeing 747 on June 20, 2001 and took a three day Boeing 747 simulator course in Minneapolis, Minnesota on

August 13-15, 2001.  He also purchased two knives in Oklahoma City, Oklahoma on August 3, 2001.  Moussaoui received approximately $14,000 from Ramzi Bin al-Shibh on August 1-3, 2001.

159.    U.S. government officials reported that in the summer of 2001, Fayez Banihammad (Flt. 175), Saeed Al Ghamdi (Flt. 93), Hamza Al Ghamdi (Flt. 175), Waleed al Shehri (Flt. 11), Ziad Jarrah (Flt. 93), Satam Al Suqami (Flt. 11), Mohald al-Shehri (Flt. 175), Ahmed al Ghamdi (Flt. 93) and Ahmed al Hanzawi (Flt. 93) each opened a Florida Sun Trust Bank account with a cash deposit.  These and other bank accounts were used by the September 11th hijackers for living expenses, travel, pilot training, weapons, and other incidentals and served as places where Al Qaeda operatives could wire money to support the terrorist conspiracy in the months and weeks leading up to September 11, 2001.

160.    On September 9, 2001, Bin Laden and other Al Qaeda members, Omar and other members of the Taliban, carried out their plan to assassinate Ahmad Shah Masood, the military leader of the Afghanistan Northern Alliance opposition forces that had been fighting the Taliban for many years.  Al Qaeda terrorists posed as television journalists seeking an interview with Masood.  The video camera was armed with explosives and when detonated at the purported interview, killed Ahmad Shah Masood, one of the suicide terrorists and other high ranking members of the Afghanistan Northern Alliance opposition forces.

161.    This assassination solidified Bin Laden's asylum and protection in Taliban controlled Afghanistan and cleared the way for Al Qaeda's unprecedented attack on the

United States two days later. The Taliban would continue to refuse to surrender Bin Laden or Al Qaeda members to the United States after the September 11th attacks.

**Hezbollah and its Leaders**

162.   Hezbollah receives its principal financing of some $100 million a year and logistical support and training from the government of Iran. This assistance is funneled to Hezbollah through the Iranian Republican Guard (IRGC) and the Ministry of Intelligence and Security (MOIS) with the knowledge of the Iranian Supreme leader Ayatollah Ali Hoseini-Khamenei. In addition, Hezbollah earns tens of millions of dollars a year from the drug trade. To show the closeness of Hezbollah to the Government of Iran, the website for "Hezbollah Party of God" pictures Hezbollah Secretary General Hassan Nasrallah along with the late Iranian Supreme Leader Ayatollah Khomeni and the current Supreme Leader Ayatollah Ali Hoseini-Khamenei. . In 1997, the United States placed the Hezbollah on the State Department terrorist list.

163.   Iran, through Hezbollah, has provided direct assistance to groups connected to the Palestinian conflict and, although Shiite, shares many of the goals of Al Qaeda and the International Islamic Front for the Jihad Against Jews and Crusaders. For example, the capture of the Karine A, a vessel loaded with more than 50 tons of high quality arms and explosives, points to the very close cooperation on an official level between Iran and the Palestinian Authority. The assistance came through Iran's primary subcontractor and proxy, Hezbollah.

164.   For 18 years, with financial and intelligence support from Iran, Hezbollah fought to end Israel's military occupation of a buffer zone in southern Lebanon. It attacked American targets through suicide attacks in an attempt to drive the United States

from the country.  In the past 20 years, Hezbollah has killed some 300 Americans

overseas, including 241 U.S. Marines in the suicide attack on the U.S. Marine barracks in

Beirut in 1983.  In a bench trial, U.S. District Judge Royce C. Lamberth concluded that

Hezbollah was formed under the auspices of the Iranian government, was completely

reliant on Iran in the 1983 attack and assisted Iranian Ministry of Intelligence and

Security agents in carrying out the operation.

165.    Imad Mughniyeh, who heads the terrorist wing of Hezbollah and Dr.

Ayman-Alzawahiri, senior member of Al-Qaeda directed the terrorist attacks on

September 11, 2001, according to Israeli intelligence.

166.    Defendant Mughniyeh is regarded as being behind the terrorist attack that

took more than 300 American lives in Beirut durng the 1980s.  Mughniyeh also oversaw

the kidnapping, torture and death of the CIA Beirut station chief William Buckley and the

kidnapping, torture and death of Lt.Col. William Higgins, a Marine officer serving with

UN forces in Lebanon. Mughniyeh now is said to reside in Iran and has had significant

contact with bin Laden's leadership, including Ayman al-Zawahiri. The September 11,

2001 hijackings show a remarkable similarity to Mughniyeh's methods.  According to the

U.S. Justice Department, Imad Mughniyeh has close ties to bin Laden.  Contacts between

Imad Mughniyeh and Osama bin Laden, for example, mainly have occurred through

Usbat al-Ansar, a Palestinian Sunni Islamist group operating primarily  at the Ein al-

Hilweh Palestinian refugee camp in the southern Lebanese port of Sidon and the Nahr al-

Bared camp in northern Lebanon.  Usbat al-Ansar received considerable financing during

the late 1990s from bin Laden.  In addition, dozens of Palestinian refugees in Lebanon

were sent to bin Laden's training camps in Afghanistan under the auspices of Usbat al-Ansar.

167.    A recent defector, Hamid Reza Zakeri, has linked Iran's Revolutionary Guards and Ministry of Intelligence with Al Qaeda.  Zakeri said that Al Qaeda also had contacts with an Iranian elite military unit which has helped terrorists train and plot attacks against Americans.  Zakeri said that Al Qaeda leader Ayman Zawahiri maintained close ties with the Islamic Revolutionary Guards Corps (IRGC) – Qods Division, said to be Iran's Islamic shock troops.  Zakeri said that Zawahiri is close to Revolutionary Guards deputy commander Brig. General Mohammad Baqer Zolqadr.

168.    Zolqadr has ties to other Revolutionary Guards, or IRGC Qods Forces commanders including Ahmad Vahedi and Hossein Mosleh who are the Guards' former commander in Lebanon.  The IRGC Qods forces are a special operations unit that conducts terrorist operations abroad.  Separate information also reveals that Zawahiri was a frequent guest of Iran's Minister of Intelligence and Security, Ali Fallahian, in addition to Ahmad Vahedi, whose position as commander of Qods forces places him as the head of foreign terrorist operations.  Zakeri confirms the relationship of Al Qaeda to Hezbollah dating back to the 1990s.  Zakeri said that Mughniyah remained the liaison officer with Zawahiri and other fundamentalist organizations' leaders.  Zakeri confirms reports of other informants that there were models of the two towers of the World Trade Center in New York and the Pentagon in Washington.  In addition, there were models of the White House and CIA headquarters.  Zakeri said that Mughniyeh had come to Iran and met with some senior officials and had brought with him a message from Zawahiri.  That message said that Al Qaeda needed help to "carry out an extremely serious operation in the Great

Satan's country." While Iranian officials didn't want any direct involvement, Zakeri said that the head of his department had asked Mughniyeh to maintain his ties with Zawahiri. Iranian knowledge of the Septembert 11, 2001 terrorist attack coincides with comments made by another Iranian national, Abdolghassem Meshabi who resides in Munich, Germany.

169.     Meshabi claims that a friend of his in Tehran with access to intelligence plans in Tehran sent an urgent message on/about 02 September 2001. It warned that Iranian-backed terrorists, interpreted by Meshabi to be members of Hezbollah, planned to hijack commercial airlines with plans to crash them into major U.S. targets. Meshabi said that his friend, who is part of the Iranian intelligence service (MOIS), had told him that the MOIS had received a coded message signifying that an attack was imminent. The coded message read: "Shaitan der artash," (The U.S.) Satan in flames." Meshabi said he received a second such message on 05 September 2001. Zakeri maintains that Imad Mughniyeh still is in Iran and believes that he organized escape of dozens of Al Qaeda into Iran. Zakeri's belief that Mughniyeh is in Iran coincides with separate, independent reports. Zakeri further asserts that Osama bin Laden could have entered Iran with Mughniyeh's help. This prospect reinforces separate information by knowledgeable sources that bin Laden may have escaped into eastern Iran, a part of Baluchestan under heavy influence from Iraq due to its Sunni influence to offset the Shiite government in Tehran. Zakeri's linkage of Mughniyeh to Zawahiri reinforces earlier analysis by the Israeli military intelligence service, Aman, that Mughniyeh and Zawahiri *directed* the suicide attacks against the World Trade Center towers and the Pentagon, while Iraq *sponsored* the attacks.

170.    In addition to Iran's close ties to Hezbollah, an Iraqi intelligence officer, Salah Suleiman who was captured by the Pakistanis near the border with Afghanistan, said that Iraq also had established strong ties with Imad Mughniyeh.  This reinforces information from other sources which reveal that Mughniyeh, who is a Palestinian, in his past had been a bodyguard for Yasser Arafat and had lived in Baghdad.   According to Israeli intelligence, Israel had put out a warning some six weeks prior to September 11, 2001 that an "unprecedented massive terror attack" was expected.  Israeli sources said that one indication was that Mughniyeh met with agents on a secret trip to Germany.  Despite the fact that Mughniyeh is known to have been going back and forth to Iran, the Aman believes the operational brains behind the 9-11 attacks were Mughniyeh and Zawahiri.  In turn, they probably were financed and received logistical support from both the Iranian and Iraqi intelligence services, as well as financial contributions from Saudi Arabia.

## Hezbollah's Relationship with Al Qaeda

171.    The relationship between Al Qaeda and the Government of Iran goes back to at least 1992 in Albania when they both supported the Kosovo Liberation Army to fight in the Muslim province of Kosovo in neighboring Serbia.  U.S. intelligence has acknowledged bin Laden's al Qaeda link to the KLA and had "both trained and financially supported" the Albanians and that the Kosovo border had been infiltrated by Bosnian, Chechnyn and Afghan mujaheedin…"  Other information suggests bin Laden's support for KLA from Albania began in 1994, after telling the Albanian government that he headed  a Saudi humanitarian agency to help Albania.

172.     In a December 18, 2001 statement, J. T. Caruso, then Acting Assistant
Director of the Counter-Terrorism Division of the Federal Bureau of Investigation,
testified that a witness recounted how the Al Qaeda network had privately declared war
on America and was operating both on its own and as an umbrella for other terrorist
groups.  The FBI witness, who is a former member of bin Laden's Al Qaeda network,
recounted that bin Laden and Al Qaeda were seeking to obtain nuclear and chemical
weapons and that the organization engaged in sophisticated training.  The witness also
revealed that Al Qaeda obtained specialized terrorist training from and worked with
Iranian government officials and the terrorist group Hezbollah.  Considerable information
is available to show that there not only was ideological but operational connections
between Hezbollah and Al Qaeda.  U.S. officials report that they had first detected the
alliance of Hezbollah and Al Qaeda in early 2002.  In March, envoys from Al Qaeda,
Hamas and Hezbollah had met in Lebanon's Bekaa Valley to discuss strategy.  The
officials said that by April 2002, Hezbollah leaders were meeting with Al Qaeda
operatives who had escaped Afghanistan for Iran.  In expressing concern over the link,
U.S. officials said that the Hezbollah-Al Qaeda links are tactical and involve mid- and
low-level operatives from both groups.  They add that this cooperation between the two
groups mutes years of rivalry between Hezbollah, which is Shiite, and Al Qaeda, which is
predominantly Sunni.  U.S. officials also believe that the assets and organization of
Hezbollah's formidable militant wing will enable a hobbled Al Qaeda network to
increase its ability to attack American targets.  Although Hezbollah and Al Qaeda have
their differences, their alliance shows that they share the goals of crippling the United
States, forcing the U.S. military out of the Middle East and Israel out of Palestinian

territory.  In testimony in the East Africa embassy bombings trial, it was revealed that there were connections between Al Qaeda and the Iranian government, along with an unidentified senior Iranian religious leader and Hezbollah beginning in the early 1990s.

173.     Trial transcripts reveal that by 1998, the U.S. Government was aware that on various occasions during the early to mid-1990s, high-ranking Al Qaeda members met with Iranian officials and that Osama bin Laden himself met with the Imad Mughniyeh, leader of the terrorist wing of Hezbollah, to "cooperate against the perceived common enemy," the United States.   Ali Mohammed, bin Laden's security chief and a former U.S. army intelligence analyst, stated during the guilty plea in the embassy bombings case in October 2000 that "I was aware of certain contacts between al Qaeda and Egyptian Islamic Jihad on one side and Iran and Hezbollah on the other side.  I arranged security for a meeting in the Sudan between Mughniyeh, Hezbollah's chief and bin Laden.

174.     Hezbollah provided explosives training for al Qaeda and Egyptian Islamic Jihad.  Iran supplied Egyptian Jihad with weapons.  Iran also used Hezbollah to supply explosives that were disguised to look like rocks."Upon information and belief, such disguised explosives were used extensively by Hezbollah against Israeli army patrols in South Lebanon.  Mohamed testified that "much of this type of training is actually carried out at a training camp there, in Iran, run by the Iranian Ministry of Information and Security."

175.     A former CIA official has been cited as saying that Al Qaeda relied on experts from Hezbollah to build the shaped charge that badly damaged the U.S.S. Cole in Yemen in October 2000.  According to UPI:

"A U.S. government official told (UPI) that the blast was a 'cone-shaped charge' tht used 'moldable high explosives such as SEMTEX H,' shaped to create a high-speed, high temperature blast wave. During the first state of the blast, the explosion 'forces all the air out with tremendous force,' creating a vacuum, but as air rushes back in, it creates another tremendous force that causes further damage. 'It's a trademark of bombs made by Hezbollah and raises the question of the involvement of Iran,' he said. A former CIA official agreed: 'We have to start looking at Iran's involvement in the incident. The evidence warrants this.'"

176.     Ali Mohammed also stated that Mughniyeh had discussed how Hezbollah had forced the United States out of Beirut by blowing up the Marine barracks. Mohammed added that al Qaeda planned to "use the same method to force the United States out from Saudi Arabia." Mohammed further testified that Al Qaeda's method for driving the United States out of the Middle East was to be modeled on the successes of the Lebanese Hezbollah, which implied suicide bombings.

177.     Magnus Ranstorp, deputy director of the Centre for the Study of Terrorism and Political Violence at the University of St. Andrews in Scotland, stated that the suspects in the East Africa embassy bombings mentioned individuals who had gone to Lebanon for explosives training from Hezbollah. "The military manuals of Al Qaeda showed innovation in the making of explosives including RDX and C4," he said, "but there was an admission that some of its members had gone to Lebanon to get that expertise." Such expertise would have come from the Hezbollah.

178.     The meetings between Al Qaeda and an Iranian religious leader took place in Sudan with Mamdouh Mahmud Salim a/k/a Abu Hajer al Iraqi, Osama bin Laden's former financial manager, representing Al Qaeda. The meetings took place at various times between 1992 and 1996, according to trial prosecutors, and the bin Laden meeting

with Mughniyeh, held in 1994 took place in the Sudan.  Prosecutors further stated that the meetings held "at various times" between 1992 and 1996 were to arrange a tripartite agreement among Al Qaeda, the National Islamic Front of Sudan and elements of the government of Iran "to work together against the United States, Israel and other western countries."

179.    U.S. intelligence has stated that Osama bin Laden's operatives had approached Iranian Ministry of Intelligence and Security agents in 1995 and again in 1996, offering to join forces against the United States.  Phone records obtained by U.S. officials investigating the 1998 embassy bombings in Kenya and Tanzania reveal that 10 percent of the calls made from the Compact-M satellite phone used by bin Laden and his key lieutenants were to Iran.  In its 1998 indictment, the U.S. Justice Department said that bin Laden, working through al Qaeda, forged alliances with government officials in Iran, the National Islamic Front in the Sudan and the Iranian terrorist organization Hezbollah.

### Hezbollah's Connection with the International Islamic Front for the Jihad against Jews and Crusaders

180.    Al Qaeda, Al-Gamma Al-Islamiyya and the Egyptian Islamic Jihad, formed the International Islamic Front ("The Front") for the Jihad Against Jews and Crusaders in 1988.  Among other things, the goal of Al Qaeda and purpose of the Front is support of the Palestinians against Israel, as well as expulsion of non-Muslims from Muslim countries.  The Front is a group of some 50 independent terrorist organizations from such countries as Sudan, Egypt, Saudi Arabia, Yemen, Somalia, Eritrea, Djibouti, Afghanistan, Pakistan, Bosnia, Croatia, Albania, Algeria, Tunisia, Lebanon, the Philippines, Tajikistan, Azerbaijan, the Kashmiri region of India and the Chechnyn region of Russia.  Those Iranian-supported organizations that belong to the Front include

the Gama'a al-Islamiyah, the Egyptian al-Jihad, the Algerian GIA and the Egyptian Islamic Jihad whose leader, Ayman Zawahiri, is the second in command in Al Qaeda. While Muslims of the Iranian Government are Shiites, the organizations which belong to the Front and supported by Iran are Sunni.

181.     Among the prominent groups belonging to the Front is the Hezbollah, which is regarded as Iran's proxy army and serves as the chief tool for the implementation of Iran's foreign policy. In turn, Hezbollah is funded, armed and trained by the Iranian Revolutionary Guards. Lebanon's Hezbollah movement was founded by Ali Akbar Mohtashemi, an Iranian Shiite cleric, in the aftermath of the 1982 Israeli invasion of Lebanon. Its purpose is to support the Palestinians in Lebanon and fight against Israeli occupation of Lebanon.

### Iranian Provision of Safe Haven to Al Qaeda Fugitives

182.     Iran has become a safe haven to senior al Qaeda fugitives. There have also been reports that Iranian Revolutionary Guards assisted al Qaeda commanders in entering Iran from Afghanistan to Iran. In addition to being a transit route, Iran also has allowed Al Qaeda to use the country as a staging area.

183.     On February 15, 2002, Turkish police arrested two Palestinians and a Jordanian who entered Turkey illegally from Iran on their way to conduct bombing attacks in Israel. Turkish police said the three had fought for the Taliban, receiving terrorist training from Afghanistan and were members of Beyyiat el-Imam, a group linked to al Qaeda. The terrorists said they were acting on orders from Abu Musaab, whom Israeli intelligence has identified as Abu Musaab Zarqawi. U.S. and Israeli

intelligence agencies say that Zarqawi had fled Afghanistan in October 2001 and later turned u n Tehran under the protection of Iranian security forces.

184.    Upon information and belief, Zarqawi then left for Iraq where he received medical treatment for one of his legs.  He then went to Syria.  Zarqawi also is linked with Hezbollah.

185.    Although Iran was against the Taliban in Afghanistan prior to U.S. action, that opposition did not translate into opposition to Osama bin Laden or Al Qaeda.  Under the watchful surveillance of Iran's military and intelligence services, U.S. intelligence has detected what it describes as a suspected Al Qaeda training camp in a remote area of eastern Iran along the border with Afghanistan.  Overhead imagery shows a training camp complete with a terrorist obstacle course and a rifle range, much like those Al Qaeda used in Afghanistan to train for assassinations.

186.    For some time, the U.S. Government believes, Iranian officials who control the military and intelligence services are working with Al Qaeda.  In April 2002, Defense Secretary Donald Rumsfeld said "there is no question but that Al Qaeda has moved into Iran, out of Iran to the south and dispersed to some other countries."  Israeli intelligence also has told U.S. officials that it had strong evidence that Al Qaeda members went through Iran and Iraq to the Bekaa Valley of Lebanon and teamed up with Hezbollah.

187.    In a February 6, 2002 *Christian Science Monitor* article, a Saudi captive, Haji Mohamad Akram, a chef to Osama bin Laden, said in an interview that bin Laden had escaped to Iran following the bombing of Tora Bora in November 2001.  The captured Saudi chef further claims that bin Laden had three offers of escape. "One from

Iraq, one from Iran, and another from some mafia types…We received a lot of Iranian currency, and the commanders distributed it to the soldier," he said, adding that he received 700,000 rials ($1,400) for personal use.

188.    Western intelligence sources also say that Al Qaeda has extended its involvement in the Palestinian areas by transferring a base of operation from Afghanistan to Lebanon and seeking to develop operatives and recruit personnel.  On 1 February 2002, the British daily, *The Times*, reported that a senior al Qaeda operative traveled to Lebanon in January 2002 to discuss the relocation with Hiballah leaders.  The operative was identified as a Yemeni national traveling under the alias of Salah Hajir.  He reportedly had discussed relocating with Hezbollah in Palestinan camps, particularly Ein al-Hilweh in southern Lebanon.

189.    Western intelligence agencies confirm that Syria has allowed between 150 and 200 al Qaeda operatives to settle in Ein el-Hilweh since the start of the U.S. offensive in Afghanistan.  These sources report that the group, including senior Al Qaeda commanders, arrived from Afghanistan through Iran and went directly to Lebanon.

190.    In August 2002, fighting had erupted when Al Qaeda operatives tried to gain control over the camp.  Lebanese officials said that the fighting was initiated by Al Qaeda in the camps, three of whom were killed.  There have been at least 19 bombings in Ein al-Hilweh since the end of September 2002. Usbat al-Ansar is seen as the culprit behind the violence.

191.    Upon information and belief, Al Qaeda terrorists have escaped to eastern Iran following U.S. action in Afghanistan, in addition to western Pakistan.  Both areas are known for a concentration of Sunni Muslims.  The area encompasses the region called

Baluchestan, with the eastern part of Iran being a haven for Sunni Arabs under heavy influence of Iraq to offset the Shiite regime in Tehran. The Iranian Ministry of Intelligence and Security (MOIS) is aware of the concentration of Al Qaeda terrorists in the region but has taken no action against them. MOIS began to monitor the eastern part of Iran due to the Mujahedin-E-Khalq (MEK), which is anti-Iranian but pro-Iraqi. The MEK has assisted the escape of members of Al Qaeda into Iran. In February 2003, U.S. intelligence agencies reported that Osama bin Laden's oldest son, Saad, is in Iran along with other senior al Qaeda terrorists. Saad bin Laden had been spotted in Iran in January 2003, according to U.S. officials. Saad bin Laden is believed to be a key leader of the Al Qaeda terrorist network since U.S. and allied forces ousted the ruling Taliban militia in Afghanistan. In testimony before the U.S. Senate in February 2003, CIA Director George Tenet said that "we see disturbing signs that al Qaeda has established a presence in both Iran and Iraq."

192.     Defense Secretary Donald H. Rumsfeld also said in a Senate hearing in September 2002 that the Iranian government is "currently harboring reasonably large numbers of al Qaeda." The al Qaeda (is) functioning in that country, both transiting and located, and operating, "Secretary Rumsfeld told the Senate Armed Services Committee.

### Cooperation among Hezbollah, Al Qaeda, Iran, and Iraq

193.     Intelligence officials said Iran's support for terrorists, including al Qaeda, in the past was carried out by agents of the Ministry of Intelligence and Security, and the Islamic Revolutionary Guards Corps Qods Force a/k/a Qods Division a/k/a  a/k/a Jerusalem Force. The Defense Intelligence Agency in 2000 uncovered information linking al Qaeda to Iran's government. Such cooperation among Iran, Iraq and the

Hezbollah and Al Qaeda terrorist groups they support became publicly apparent in a February 18, 2003 Al-Zaman article in which Uday Hussein, son of deposed Iraqi President Saddam Hussein, conveyed messages to Hezbollah.   Adib Sha'ban (also spelled Adeeb Shabaan), trade and press secretary to Uday Hussein, reportedly conveyed messages to leaders of Hezbollah and other influential organizations and figures in Lebanon.   In a speech in Beirut in the presence of the Iranian ambassador to Lebanon, Hezbollah Secretary General Shaykh Hasan Nasrallah reportedly had called on the Iraqi opposition groups to reconcile with the Iraqi regime.  Uday Hussein urged Hezbollah and other Lebanese leaders to coordinate with party militias and Uday's organization, called the "fedayeen commandos of Saddam" if the United States launched a war against Iraq. Uday reportedly also had invited some of the leaders to a secret meeting in Iraq to discuss cooperation to carry out joint operations against U.S. interests in the world.

194.      In addition to Al Qaeda training bases, intelligence reports in August 2002 revealed that Al Qaeda leaders Abu Hafs the Mauritanian and Saif al-Adil were in eastern Iran. *The Washington Post* reported that the two may have been planning Al Qaeda operations from Iran.  This information coincides with reports of Zarqawi also going to Iran but leaving for Iraq and then Syria and possibly to Syrian-controlled territory in Lebanon where Hezbollah operates.   This complicated picture mirrors an observation by Zakeri that Iranian Guards' intelligence under Morteza Reza'i had a close connection with Iraq.  Zakeri said that Reza'i had established commercial companies to create jobs for the Iranian Republican Guard.  He said that these companies started to deal with the Babil Company that had been chaired by Qusay Hussein since the mid-1990s.  In

addition to smuggling and marketing Iraqi oil, the Iranian companies also smuggled Iraqi dates.

195.     In published accounts, Zakeri asserts that smuggling and trade cooperation between the Guards' intelligence and Iraq stopped about a year ago.  However, the Guards' intelligence had maintained some ties with Hussein and Iraqi intelligence up until U.S. action against Iraq.  In a further indication of Iranian-Iraqi intelligence cooperation, Zakeri said that there was coordination between the two on issues like confining the Kurds and confronting the United States.  Zakeri also revealed that the Ansar al-Islam organization in northern Iraq had the support and protection of the Iranian Guards and the Iraqi intelligence services.  Separately, it is known that members of Ansar al-Islam went back and forth to Iran and had as one of its leaders Abu Wa'il, whom separate data reveals was an Iraqi intelligence officer in Baghdad assisting Ansar al-Islam.

### Iranian Assistance to Other Islamic Terrorist Organizations

196.     According to claims made by Albanian authorities and the U.S. Central Intelligence Agency in 1998, Osama bin Laden set up the terrorist network in Albania, a Muslim country, to be used as a springboard for operations in Europe.  On March 22, 1998, the *Times of London* confirms that Bin Laden and the Iranian Revolutionary Guards had "joined forces" by signing a pact on 16 February 1998 in Tehran to consolidate their operations in Albania and Kosovo, hoping "to turn the region into their main base for Islamic armed activity in Europe."

197.     These fighters were bolstered by hundreds of Iranian fighters, called Mujahadeen, who infiltrated from nearby Albania and called themselves the Kosovo

Liberation Army. Separate reporting reveals that the Iranian Revolutionary Guard operated from Albania to train KLA members. Iran also used Albania as a base from which it smuggled arms and ammunition to the KLA. According to Ephraim Kam, deputy director of Tel Aviv University's Jaffee Center for Strategic Studies, "Iran has been active in helping out the Kosovo rebels. Iran sees Kosovo and Albania as containing Moslem communities that require help and Teheran is willing to do it." In Albania, Iranian and Saudi representatives opened foundations to provide patronage. An Islamic bank was launched in the Albanian capital of Tirana. In Skadar, Iranian agents opened the Society of Ayatollah Khomeini. In the Kosovo town of Prizren, Islamic fundamentalists formed a society funded by the Iranian Culture Center in Belgrade. Selected groups of Albanians were sent to Iran to study that country's version of militant Islam. Based on U.S. congressional sources, the former Clinton administration was fully aware of Iranian activities in Bosnia and Kosovo, but looked the other way to maintain the 1995 Dayton Accords. One congressional source asserts that the Clinton administration wanted "to keep the lid on the pot at all costs. And if that means that Iran benefits and operates freely in the region," he added, "so be it. Needless to say, the Europeans have been quite upset by this."

### The Terrorist Attacks on September 11, 2001

198.    On September 11, 2001, Defendants Mohammed Atta, Abdul Aziz al-Omari, Wa'il al-Shehri, Waleed al-Shehri, and Satam Al Suqami hijacked American Airlines flight 11 carrying 92 persons, bound from Boston to Los Angeles, and at approximately 8:46 a.m., crashed it into the North Tower (also known as Tower 1) of the World Trade Center in New York.

199.     On September 11, 2001, Defendants Marwan al-Shehhi, Fayez Ahmed a/k/a/ "Banihamad Fayez," Ahmed al-Ghamdi, Hamza al-Ghamdi, and Mohaud al-Shehri hijacked United Airlines Flight 175 carrying 65 persons, bound from Boston to Los Angeles, and at approximately 9:02 a.m. crashed it into the South Tower (also known as Tower 2) of the World Trade Center in New York.

200.     On September 11, 2001, Defendants Khalid al-Mihdhar, Nawaf al-Hazmi, Hani Hanjour, Salem al-Hazmi and Majed Moqed hijacked American Airlines Flight 77 carrying 64 persons, bound from Virginia to Los Angeles, and at approximately 9:37 AM, crashed it into the Pentagon.

201.     On September 11, 2001, Defendants Zihad Jarrah, Ahmed al-Haznawu, Saeed al-Ghamdi, and Ahmed al-Nami hijacked American Airlines flight 93 carrying 45 persons, bound from Newark to San Francisco with the intention of crashing it into a target in Washington, D.C., probably the White House or U.S. Capitol.  At approximately 10:10 a.m., because of the heroic intervention of Flight 93's passengers, the aircraft crashed into a field in Shanksville, Pennsylvania.

202.     At approximately 9:59 a.m. the South Tower of the World Trade Center (2 World Trade Center) collapsed; at approximately 10:28 a.m. the North Tower of the World Trade Center (1 World Trade Center) collapsed.  Defendants intentionally caused the deaths of and injuries to thousands of innocent persons, including Plaintiffs' decedent John Patrick O'Neill, Sr.

203.     The hijackings referenced above were the culmination of a conspiracy among the defendants to attack the United States and murder United States citizens and to disrupt economic activities within the United States and of the victims of the attacks.

## AFTERMATH OF SEPTEMBER 11th

204.    On two videotapes made by Al Qaeda in September and October 2001,
Bin Laden took credit for the September 11th attacks and stated that the attacks went
better than expected.

205.    Saddam Hussein is the only national leader who publicly praised the
attacks and said that the United States of America deserved them.  Iraq has offered
sanctuary to Bin Laden and Taliban leaders.  Abu Zeinab al-Quarairy, an Iraqi defector
who was an officer in the Mukhabarat and was familiar with its operations, reported that
when he learned about the World Trade Center attacks on September 11th, he turned to a
friend and said "That's ours."

206.    Upon information and belief, several hundred Al Qaeda members,
including Abu Abdul Rahman, fled Afghanistan for Kurdistan in Iraq to try to take
control of towns not under the control of Saddam Hussein and Iraq, including Halabja,
Tawela, and Biyarah.  On September 23, 2001, Kurdish forces ousted Ansar al-Islam
from Halabja, but the Islamic fundamentalist group remained in control of Tawela and
Biyarah.

207.    Israeli intelligence sources verify that for the past two years, Iraqi
Intelligence officers have been shuttling back and forth between Baghdad and
Afghanistan.  According to the Israelis, one of these Iraqi Intelligence officers, Salah
Suleiman, was captured in October 2001 by Pakistani officials near the border between
Pakistan and Afghanistan.

208.    The British Government has also identified at least two individuals who
are Iraqi Intelligence officers trained in Iraq in the use of terror against the Kurds in

Northern Iraq.  They are Fowzi Saad al-Obeijdi, a/k/a Abu Zubair and Abu Omer al-Kurdi, a/k/a Rafid Fatah.  Although they are Iraqi Intelligence officers still linked to the former Hussein Iraqi government, they are also Al Qaeda operatives.  In its published dossier to show Iraq's links to Osama Bin Laden, the British government added that Iraq had allowed al-Qaeda and Bin Laden to train in Iraq.

209.    In March 2002, U.S. and allied forces discovered a laboratory near Khandahar, Afghanistan that was designed to produce weapons-grade anthrax.  Upon information and belief, Iraqi Intelligence were supplying technology, materials, and training to develop this facility in coordination with Al Qaeda and the Taliban. Instruction documents on an artillery weapon known as the "Super Gun" were found in Al Qaeda camps when they were captured by U.S. forces in the winter of 2001-2002. Iraq is the only state known to have purchased and assembled the Super Gun, a weapon so large it must be constructed in segments.  It has a range of several hundred miles. U.S. Government officials, including the U.S. Defense Secretary, confirm the relationship between Al Qaeda and the Iraqi regime.  The Secretary of Defense as recently as March 2003 stated that there is "solid evidence" that senior Al Qaeda operatives have visited Baghdad and that the intelligence on these activities is "current."

# CAUSES OF ACTION

## *AS AND FOR THE FIRST CAUSE OF ACTION*

## COUNT I
## WRONGFUL DEATH

210.     Plaintiffs repeat, allege and hereby incorporate by reference the preceding allegations contained in Paragraphs 1 through 209 of this Complaint, as though the same were fully and completely set forth herein.

211.     As a direct and proximate cause of the willful, wrongful, intentional and reckless acts of Defendants, John Patrick O'Neill, Sr. was killed by the attack upon and subsequent collapse of the World Trade Center in New York City.

212.     Defendants are directly and vicariously responsible for the terrorists' actions, because they funded, trained and directed the terrorist hijackers and acted in concert in sponsoring the terrorist attack on the World Trade Center.

213.     As a proximate result of these acts, Plaintiffs have suffered injury and loss, including both economic and non-economic damages, in an amount to be proven at trial. The economic damages, include, but are not limited to, losses to business and property, loss of income, loss of support, loss and/or damage to personal property, and funeral and burial expenses.

214.     For the reasons stated above, Defendants are jointly and severally liable to Plaintiffs.

WHEREFORE, Plaintiffs demand that judgment be entered against Defendants, jointly and severally, in the amount of ONE HUNDRED MILLION DOLLARS

($100,000,000.00) in compensatory damages, plus interest, costs, punitive damages, and such other monetary and equitable relief as is just and proper for each Plaintiff.

### *AS AND FOR THE SECOND CAUSE OF ACTION*

## COUNT II
## ACTION FOR SURVIVAL DAMAGES

215.     Plaintiffs repeat, allege and hereby incorporate by reference the preceding allegations contained in Paragraphs 1 through 214 of this Complaint, as though the same were fully and completely set forth herein.

216.     Immediately before his death, Decedent John Patrick O'Neill, Sr. suffered extreme bodily pain and suffering as a result of the attack upon and subsequent collapse World Trade Center thereby entitling his Estate to compensatory damages.

217.     Defendants are directly and vicariously responsible for the attack upon and subsequent collapse of the World Trade Center because they funded, trained, and directed the terrorist hijackers and acted in concert in sponsoring the terrorist attack on the World Trade Center.

218.     As a proximate result of these acts, Plaintiffs have suffered injury and loss in an amount to be proven at trial.

219.     For the reasons stated above, Defendants are jointly and severally liable to Decedent's estate.

WHEREFORE, Plaintiffs demand that judgment be entered against Defendants, jointly and severally, in the amount of ONE HUNDRED MILLION DOLLARS ($100,000,000.00) in compensatory damages, plus interest, costs, punitive damages, and such other monetary and equitable relief as is just and proper for each Plaintiff.

## *AS AND FOR THE THIRD CAUSE OF ACTION*

### COUNT III
### ACTION FOR ECONOMIC DAMAGES

220.     Plaintiffs repeat, allege and hereby incorporate by reference the preceding allegations contained in Paragraphs 1 through 219 of this Complaint, as though the same were fully and completely set forth herein.

221.     As a direct and proximate result of the willful, wrongful, intentional, and reckless acts of the Defendants, Plaintiffs incurred economic damages through the deprivation of Decedent's income in an amount to be proven at trial.

222.     Defendants are directly and vicariously responsible for the terrorists' actions, because they funded, trained and directed the terrorist hijackers and acted in concert in sponsoring the attack upon and subsequent collapse of the World Trade Center. As a proximate result of these acts, Plaintiffs have suffered injury and loss. As a proximate result of these acts, Plaintiffs have suffered injury and loss.

223.     For the reasons stated above, Defendants are jointly and severally liable to the Decedent's Estate.

WHEREFORE, Plaintiffs demand that judgment be entered against Defendants, jointly and severally, in the amount of ONE HUNDRED MILLION DOLLARS ($100,000,000.00) in compensatory damages, plus interest, costs, punitive damages, and such other monetary and equitable relief as is just and proper for each Plaintiff.

## *AS AND FOR THE FOURTH CAUSE OF ACTION*

## COUNT IV
## ACTION FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

224.     Plaintiffs repeat, allege and hereby incorporate by reference the preceding allegations contained in Paragraphs 1 through 223 of this Complaint, as though the same were fully and completely set forth herein.

225.     The act of crashing two airplanes into the twin towers of the World Trade Center in New York, NY with the intent to kill Americans, and which, in fact, did kill American John Patrick O'Neill, Sr. constituted extreme and outrageous conduct on the part of the Defendants.

226.     Plaintiff John Patrick O'Neill Jr. was on his way to visit his father at the World Trade Center at the time the attacks occurred.  He was on a New York-bound commuter train from New Jersey, when a fellow passenger told him that a plane had just struck the World Trade Center.  Plaintiff John Patrick O'Neill, Jr. reached his father by cell phone at 9:17 A.M., and confirmed that the Center had been attacked and that his father was alive and well.   When the commuter train got nearer to Manhattan, John Patrick O'Neill Jr. could see the smoke billowing from the World Trade Center site. John Patrick O'Neill, Jr. arrived at Penn Station, and immediately ran downtown towards the World Trade Center.  John Patrick O'Neill, Jr. made it to the vicinity of St. Vincent's hospital from where he watched in horror as the first of the towers collapsed, knowing that his father was probably inside.  From there he ran to the police station known as Southern District of Manhattan, First Precinct, which is approximately four blocks away from the Trade Center.  From there he witnessed the collapse of the second tower.  John

Patrick O'Neill, Jr. repeatedly tried to call his father's cell phone number, and could not get through. When he finally did get through, he only reached his father's voicemail. He would have been inside his father's office and become a casualty himself had he taken an earlier train.

227.    Plaintiff Christine Irene O'Neill received a call from John Patrick O'Neill, Sr. at 8:53 A.M., less then ten minutes after the first plane struck. He told her what had occurred and that he was alive and well. She turned on the television and was horrified as she watched the live coverage of the second plane striking and of the subsequent collapses of both towers.

228.    Plaintiff Carol O'Neill is the daughter of the late John Patrick O'Neill, Sr. She was in her high school class in New Jersey at the time of the attacks on September 11, 2001. When the first plane hit the World Trade Center, classes were interrupted and every student in the school was given access to a television to watch the events unfold. Soon thereafter, she watched the Second plane hit the World Trade Center, and then watched both Towers collapse. She knew that her father was in one of the two Towers, and was fearful for his life.

229.    Plaintiff Dorothy A. O'Neill was the mother of John Patrick O'Neill, Sr. John Patrick O'Neill, Sr. was her only son. She was at her home in New Jersey at the time of the attacks of September 11, 2001. She was watching television when the news interrupted the show she was watching, to show the first plane hit the World Trade Center. She subsequently watched the second plane hit the World Trade Center, and then both Towers collapsing. She knew that her only son was in one of the two Towers, and was fearful for his life.

230.     As a direct and proximate result of the willful, wrongful, intentional, and reckless acts of the Defendants, Plaintiffs suffered extreme emotional distress, including extreme mental anguish and emotional and physical pain and suffering in an amount to be proven at trial.

231.     Defendants are directly and vicariously responsible for the terrorist hijackers' actions, because they funded, trained and directed the terrorist hijackers and acted in concert in sponsoring the attack upon and subsequent collapse of the World Trade Center.

232.     As a proximate result of these acts, Plaintiffs have suffered injury and loss.

WHEREFORE, Plaintiffs demand that judgment be entered against Defendants, jointly and  severally, in the amount of ONE HUNDRED MILLION DOLLARS ($100,000,000.00) in compensatory damages, plus interest, costs, punitive damages, and such other monetary and equitable relief as is just and proper for each Plaintiff.

### *AS AND FOR THE FIFTH CAUSE OF ACTION*

### COUNT V
### ACTION FOR LOSS OF CONSORTIUM

233.     Plaintiffs repeat, allege and hereby incorporate by reference the preceding allegations contained in Paragraphs 1 through 232 of this Complaint, as though the same were fully and completely set forth herein.

234.     As a direct and proximate result of the willful, wrongful, intentional, and reckless acts of the terrorist hijackers, Plaintiff Christine Irene O'Neill was deprived of the assistance, society, companionship, and consortium of her husband, John Patrick O'Neill, Sr.  This caused Plaintiff Christine Irene O'Neill to suffer, among other things,

extreme mental anguish and emotional and physical pain and suffering in an amount to be proven at trial.

WHEREFORE, Plaintiffs demand that judgment be entered against Defendants, jointly and severally, in the amount of ONE HUNDRED MILLION DOLLARS ($100,000,000.00) in compensatory damages, plus interest, costs, punitive damages, and such other monetary and equitable relief as is just and proper for each Plaintiff.

## *AS AND FOR THE SIXTH CAUSE OF ACTION*

## COUNT VI
## ACTION FOR LOSS OF SOLATIUM

235.    Plaintiffs repeat, allege and hereby incorporate by reference the preceding allegations contained in Paragraphs 1 through 234 of this Complaint, as though the same were fully and completely set forth herein.

236.    As a direct and proximate result of the willful, wrongful, intentional, and reckless acts of the terrorist hijackers, John Patrick O'Neill, Jr., Christine Irene O'Neill, Carol O'Neill and Dorothy A. O'Neill, and were deprived of the assistance, society, and companionship of their father, husband and son, respectively, John Patrick O'Neill, Sr. This loss caused John Patrick O'Neill, Jr., Christine Irene O'Neill, Carol O'Neill and Dorothy A. O'Neill to suffer, among other things, extreme mental anguish and emotional and physical pain and suffering in an amount to be proven at trial.

237.    For the reasons stated above, and pursuant to 28 U.S.C. §1605, which specifically authorizes a cause of action of solatium in civil actions for money damages resulting from terrorist acts, Defendants are jointly and severally liable to Plaintiffs.

WHEREFORE, Plaintiffs demand that judgment be entered against Defendants, jointly and severally, in compensatory damages, plus interest, costs, punitive damages, and such other monetary and equitable relief as is just and proper for each Plaintiff, in the amount of ONE HUNDRED MILLION DOLLARS ($100,000,000.00) for each Plaintiff.

### *AS AND FOR THE SEVENTH CAUSE OF ACTION*

### COUNT VII
### CONSPIRACY

238.    Plaintiffs repeat, allege and hereby incorporate by reference the preceding allegations contained in Paragraphs 1 through 237 of this Complaint, as though the same were fully and completely set forth herein.

239.    As set forth above, the defendants unlawfully, willfully and knowingly combined, conspired, confederated, aided and abetted, tacitly and/or expressly agreed to participate in unlawful and tortious acts pursuant to a common course of conduct, resulting in the death and injury of Plaintiffs.

240.    As set forth above, the defendants conspired with and agreed to provide material support, funding, sponsorship and/or resources to Al Qaeda, Osama bin Laden, and the sponsors of terror.

241.    As set forth above, Defendants engaged in common, concerted and conspiratorial acts, efforts, transactions, and activities designed and intended to cause a terrorist attack on the United States, its citizens and society, and – attack those foreign citizens found within the United States, resulting in the harm to Plaintiffs, which was done pursuant to and furtherance of this common scheme.

242.     Defendants' concert of action and conspiracy to support and promote Osama bin Laden and Al Qaeda were a proximate cause of the September 11, 2001, terrorist attacks that killed and injured the Plaintiffs.

243.     As a result of Defendants' concert of action and conspiracy to further terror, Plaintiff has suffered damages as set forth herein.

WHEREFORE, Plaintiffs demand judgment in their favor against all Defendants, jointly, severally, and/or individually, in an amount in excess of ONE HUNDRED MILLION DOLLARS ($100,000,000.00) in compensatory damages, plus interest, punitive damages, costs, and such other monetary and equitable relief as this Honorable Court deems appropriate to prevent Defendants from ever again committing terrorist acts.

### *AS AND FOR THE EIGHTH CAUSE OF ACTION*

### COUNT VIII
### 18 U.S.C. §2333-TREBLE DAMAGES FOR U.S. NATIONALS

244.     Plaintiffs repeat, allege and hereby incorporate by reference the preceding allegations contained in Paragraphs 1 through 243 of this Complaint, as though the same were fully and completely set forth herein.

245.     As set forth above, Defendants, jointly, severally and proximately caused the deaths and injuries of Plaintiff's person, property and business through and by reason of acts of international terrorism.

246.     As set forth above, Defendants provided material support and assistance to Osama bin Laden, Al Qaeda and the September 11, 2001 terrorists, enabling them to carry out terrorist attacks on the United States, including the September 11, 2001 terrorist attacks.

247.     As a result of Defendants' acts in furtherance of international terrorism, Plaintiff suffered damages as set forth herein.

248.     Pursuant to 18 U.S.C. §2333, et. seq., the estates, survivors and heirs of the decedents who are nationals of the United States are entitled to recover threefold the damages they have sustained and the cost of suit, including attorneys' fees.

WHEREFORE, Plaintiffs, who are nationals of the United States, demand judgment in their favor against all Defendants, jointly, severally, and/or individually, and demand treble damages in excess of THREE HUNDRED MILLION DOLLARS ($300,000,000.00), plus interest, costs, and such other monetary and equitable relief as this Honorable Court deems appropriate to prevent Defendants from ever again committing such terrorist acts.

## *AS AND FOR THE NINTH CAUSE OF ACTION*

### COUNT IX
### VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT
### 18 U.S.C. § 1962

249.     Plaintiffs repeat, allege and hereby incorporate by reference the preceding allegations contained in Paragraphs 1 through 248 of this Complaint, as though the same were fully and completely set forth herein.

250.     Non-sovereign Defendants are each "persons" within the meaning of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, et seq. ("RICO").

251.     The Defendant charities, banks, and terrorists are each an "enterprise" within the meaning of RICO, the activities of which affect interstate and foreign commerce.

252.     By virtue of the predicate acts described in this Complaint, including without limitations, engaging in the predicate acts of terrorism, murder, kidnapping, forgery, false use and misuse of passports, fraud and misuse of visas, laundering of monetary instruments, engaging in monetary transaction in improperly derived from unlawful activity, the use of interstate commerce, interstate transportation of terrorist property, and bringing in and harboring illegal aliens, and aiding and assisting illegal aliens in entering the United States, Osama bin Laden and Al Qaeda, along with other non-sovereign Defendants herein, transferred, received, and supplied financing and income that was derived, both directly and indirectly, from a pattern of racketeering activity in which each of them participated as a principal, and used and invested, both directly and indirectly, such income and the proceeds of such income, in establishing and operating terrorist enterprises in violation of 18 U.S.C. § 1962(a).

253.     As a direct and proximate result of Defendants' violation of 18 U.S.C. § 1962(a), Plaintiffs suffered the loss of valuable property, financial services and support, and suffered other pecuniary damages in an amount to be determined at trial.

WHEREFORE, Plaintiffs demand judgment in their favor against all Defendants, jointly, severally, and/or individually, in an amount to be determined at trial, but not less than ONE HUNDRED MILLION DOLLARS ($100,000,000.00) and for treble damages in an amount in excess of THREE HUNDRED MILLION DOLLARS ($300,000,000.00) plus interest, costs, legal fees, and such other monetary and equitable relief as this

Honorable Court deems appropriate to prevent  Defendants from ever again committing such terrorist acts.

## *AS AND FOR THE TENTH CAUSE OF ACTION*

## COUNT X
## ACTION FOR PUNITIVE DAMAGES

254.     Plaintiffs repeat, allege and hereby incorporate by reference the preceding allegations contained in Paragraphs 1 through 253 of this Complaint, as though the same were fully and completely set forth herein.

255.     The actions of Defendants, acting in concert to carry out their unlawful objectives, were malicious and willful, wanton and reckless in their disregard of the life of John Patrick O'Neill, Sr. and the other victims of the September 11 terrorist attacks. Defendants intended to carry out actions that would end the lives of persons at the World Trade Center, including the life of John Patrick O'Neill, Sr.

256.     Defendants Saddam Hussein, the Estate of  Qusay Hussein, the Estate of Uday Hussein, Husham Hussein, Tahya Yassin Ramadan, Muhammed Madhi Salah, Faruq Al-Hijazi, Salah Suleiman, Ahmed Khalil Ibrahim Samir al-Ani, Habib Faris Adullah al-Mamouri, Abdel Hussein, a/k/a "The Ghost," Osama Bin Laden, Saad Bin Laden, Haqui Ismail, Taha Al Alwani, Abu Agab, and Abu Waiel, Osama Bin Laden, The Al Qaeda Islamic Agency, Egyptian Islamic Jihad, Abu Sayyaf, Hamsiraji Sali, Abu Musab Zarqawi, Abu Zubaydh, Khalid Sheikh Mohammed, Abu Abdul Rahman, Al Jazeera, Mohammed Jasmin al-Ali, Schreiber & Zindel, Dr. Frank Zindel, Engelbert Schreiber, Engelbert Schreiber, Jr., Martin Wachter, Erwin Wachter, Sercor Treuhand Anstalt, Abdul Rahman Yasin, Ahmad I. Nasreddin, Al Taqwa Bank, Al Taqwa Trade,

Property, and Industry, Ltd., Al-Gammah Al Islamiah, Ayman al-Zawahiri, Albert

Freidrich Armand Huber a/k/a/ "Armand Huber," Ali Ghaleb Himmat, Asat Trust Reg.,

Nada Management Organization, S.A., Yousef M. Nada, Yousef M. Nada & Co,

Gesellschaft, M.B.H, Barzan e-Tikriti, Metalor, Banca del Gottardo, Abdulaziz al Omari,

Wail al Shehri, Waleed M. Al Shehri, Satam M.A. al Squami, Mohammed Atta, Fayez

Ahmed a/k/a Banihammad Fayez, Ahmed al-Ghamdi, Hamza al-Ghamdi, Marwan al-

Shehhi, Mohald al-Shehri, Khalid al-Midhar, Nawaf al-Hazmi, Salem al-Hazmi, Hani

Hanjour, Majed Moqued, Saeed al Ghamdi, Ahmed Ibrahim A. al Haznawi, Ahmed al

Nami, Ziad Samir Jarrah, Zaracias Moussaui, Muhammad Atef, The Taliban, Muhammad

Omar, Muslim Brotherhood – Syrian Branch, Muslim Brotherhood – Egyptian Branch,

Muslim Brotherhood – Jordanian Branch, Muslim Brotherhood – Kuwaiti Branch,

Muslim Brotherhood – Iraqi Branch, Iranian Ministry of Intelligence and Security

(MOIS), Iranian Revolutionary Guard Corps, Iranian Revolutionary Guard Corps – Qods

Division, Akida Bank Private Limited, Akida Investment Co. Ltd, Nasco Business

Residence, CenterSAS DI Nasreddin Ahmed Idris EC, Nasco Nasreddin Holding A.S.,

Nascoservice S.R. L., Nascotex S.A., Nasreddin Company Nasco SAS DI Ahmed Idris

Nasreddin EC,  Nasreddin Foundation, Nasreddin Group International Holding Limited,

Nasreddin International Group Limited Holding, Abu Hafs the Maritanian, Saif al-Adil.

Imad Mughniyeh, Hezbollah Secretary General  Hassan Nasrallah, Iranian Supreme

Leader Ayatollah Ali Khamenei, Usbat al-Ansar, Ahmad Vahedi, Hossein Mosleh,

Morteza Reza'i, Salah Hajir and Adib Sha'ban a/k/a Adeeb Shabaan,  Hezbollah, Iranian

Minister of Intelligence and Security Ali Fallahian, Iranian Revoluntionary Guard Corpos

Deputy Commander Brig General Mohammad Baqer Zolqadr, Ayman al-Zawarhiri, Ali

Ghaleb Himmat, Nada International Anstalt, Youssef M. Nada & Co., and John Does 1-67, caused the extrajudicial killing of John Patrick O'Neill, Sr.

257.    For the reasons stated above, and pursuant to 28 U.S.C. §1605 note and 28 U.S.C. §1606, which specifically authorizes a cause of action for punitive damages in civil actions for money damages resulting from terrorist acts, Defendants are jointly and severally liable to Plaintiffs.

WHEREFORE, Plaintiffs collectively demand that judgment in their favor be entered against Defendants, jointly and severally, in the amount of ONE BILLION DOLLARS ($1,000,000,000.00) in punitive damages, costs, and such other monetary and equitable relief as this Court deems appropriate to prevent Defendants from ever again committing terrorist acts.

## RELIEF REQUESTED

258.    WHEREFORE, Plaintiffs request that the court grant judgment in their favor and against Defendants, jointly and severally, on Counts I through X, and grant plaintiffs:

> a.    Compensatory Damages against Defendants, for each cause of action in the amounts described above, including Counts I, II, III, IV, V, VI, VII, and IX, as established at trial;
>
> b.    Punitive damages against Defendants, as provided for in Counts I-VII, and X, inclusive,  in the amount of ONE BILLION DOLLARS ($1,000,000,000.00), as determined by the trier of fact;
>
> c.    Treble damages as provided for by law as to counts VIII and IX;
>
> d.    Reasonable costs and expenses;

e.  For prejudgment and post-judgment interest on those damages as

allowed by law;

f.  Reasonable attorneys' fees; and,

g.  Such other and further relief that the court may determine to be just

and equitable under the circumstances.

Dated:  December 29, 2004

Respectfully submitted,

/s/_____
Joshua M. Ambush, Esquire
LAW OFFICES OF JOSHUA M. AMBUSH,
    LLC
600 Reisterstown Road
Suite 200 A
Baltimore, MD 21208
Tel: (410) 484-2070
Fax: (410) 484-9330
Bar Number: MD 27025

/s/_____
Jerry S. Goldman, Esquire
LAW OFFICES OF JERRY S. GOLDMAN
    AND ASSOCIATES, P.C.
111 Broadway, 13thFloor
New York, New York 10006
Tel:(212)385-1005
Fax: (212) 346-4665
NY Bar Number: 1302454
S.D.N.Y. Bar No. JG 8445

*Attorneys for the Plaintiffs*

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Iraq\IraqSecondAmendedComplaint.doc

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

_____x

*In re Terrorist Attacks on September 11, 2001*          ***03 MDL 1570***
_____x


_____
                                              :
ESTATE OF JOHN P. O'NEILL, *et al.,*          :
                            Plaintiffs,       :          2004 CV 1076
                                              :
              v.                              :          DEMAND
                                              :          FOR  JURY TRIAL
                                              :
REPUBLIC OF IRAN, *et. al.*                   :
                            Defendants.       :
_____    _:


        Plaintiffs hereby demands trial by jury pursuant to the Federal Rules of Civil

Procedure, Rule 38(b) on all issues properly heard by a jury.


Dated:  December 29, 2004

                              LAW OFFICES OF JERRY S. GOLDMAN
                                  & ASSOCIATES, P.C.



                              By:/s/_____
                                  Jerry S. Goldman, Esquire (JG 8445)
                                  The Trinity Building
                                  111 Broadway
                                  13th Floor
                                  New York, New York, 10006
                                  Telephone:  (212) 242 2232
                                  Fax: (212) 346-4665

LAW OFFICES OF JOSHUA M. AMBUSH, LLC


By:/s/_____

    Joshua M. Ambush, Esquire

    600 Reisterstown Road

    Suite 200 A

    Baltimore, MD 21208

    Tel: (410) 484-2070

    Fax: (410) 484-9330

    Bar Number: MD 27025


    *Attorneys for the Plaintiffs*

## <u>CERTIFICATION OF SERVICE</u>

I hereby certify that, I caused to be served a copy of the foregoing Second

Amended Complaint with Certificate of Service on counsel as set forth on the attached

lists of defendants' counsel and plaintiffs' counsel, who have entered appearances in

In re Terrorist Attacks on September 11, 2001, 03 MDL 1570,  by the email to the

addresses set forth therein, on this date.


Dated: December 29, 2004

/s/_____
JERRY S. GOLDMAN, ESQUIRE

# Defendant's Counsel

03 MDL 1570 SERVICE LIST

*In re: Terrorist Attack on September 11, 2001*, 03 MDL 1570 (Judge Richard Casey),
U.S. District Court of the Southern District of New York

| DEFENDANTS' COUNSEL |
|---|
| **ARNOLD & PORTER LLP**<br>555 Twelfth Street, NW<br>Washington, DC 20004<br>Tel: (202) 942-5000<br>Fax: (202) 942-5999<br><br>*Counsel for Saudi Economic & Development Company, International Development Foundation, and Sheikh Mohammed Salim bin Mahfouz*<br><br>David Gersch, Esquire<br>david_gersch@aporter.com<br><br>Jean E. Kalicki, Esquire<br>jean_kalicki@aporter.com<br><br>Brian C. Wilson<br>brian_wilson@aporter.com |
| **ARNOLD & PORTER LLP**<br>399 Park Avenue<br>New York, NY 10022-4690<br>Tel: (212) 715-1000<br>Fax: (212) 715-1399<br><br>*Counsel for Saudi Economic & Development Company, International Development Foundation, and Sheikh Mohammed Salim bin Mahfouz*<br><br>Craig Stewart, Esquire<br>craig_stewart@aporter.com |

**BAKER BOTTS LLP**
The Warner
1299 Pennsylvania Avenue, N.W.
Washington, DC 20004-2400
Tel: (202) 639-7700
Fax: (202) 639-7890

*Counsel for HRH Prince Sultan Bin Abdulaziz Al-Saud and HRH Prince Salman Bin Abdulaziz Al-Saud*

Casey Cooper, Esquire
William H. Jeffress, Jr., Esquire
Jamie Kilberg, Esquire
Sara Kropf, Esquire

MDL1570@bakerbotts.com

**BECKER, HADEED, KELLOGG & BERRY**
5501 Backlick Road, Suite 220
Springfield, VA 22151
Tel:  (703) 333-3224
Fax: (703) 256-5431

*Counsel for Success Foundation, Inc.; Muslim World League Offices-NY; Muslim World League-VA; and Mohamed S. Omeish*

Michael Hadeed, Jr., Esquire
mhadeed@beckerhadeed.com

**BERNABEI & KATZ, PLLC**
1773 T Street, N.W.
Washington, DC 20009-7139
Tel: (202) 745-1942
Fax: (202) 745-2627

*Counsel for Dr. Abdullah Mushen Al-Turki; Dr. Abdullah Naseef; Dr. Abdullah Al-Obaid; Dr. Abdul Rahman Al Swailem; Sheik Saleh Al-Hussayen; Skeik Shahir Batterjee; Mushayt for Trading Company;Mohammed Al Sayed Mushayt; Sheik Hamad Al-Husaini; Saudi Arabian Red Crescent Society; Sheik Salman Al-Oadah; Sheik Safer Al-Hawali; Al Haramain Islamic Foundation, Inc.; Soliman H.S. Al-Buthi; Soliman J. Khuderia; Talal M. Badkook; Dr. Adnan Basha; and Perouz Seda Ghaty*

Lynne A. Bernabei, Esquire
LBernabei@aol.com

Alan R. Kabat, Esquire
Kabat@bernabeiandkatz.com

**BONNER, KIERNAN, TREBACH AND CROCIATA**
1250 Eye Street, N.W.
Washington, DC 20005
Tel: (202) 712-7000
Fax: (202) 712-7100

*Counsel for Khalid Bin Mahfouz*

Michael Nussbaum, Esquire
mnussbaum@bktc.net

**BRYAN CAVE LLP**
1290 Avenue of the Americas
New York, NY 10104-3300
Tel: (212) 541-2000
Fax: (212) 541-4630

*Counsel for Prince Naif bin Abdulaziz Al-Saud*

Michael G. Biggers, Esquire
mgbiggers@bryancave.com

**BRYAN CAVE, LLP**
700 Thirteenth Street, N.W.
Washington , DC 20005-3960
Tel: (202) 508-6000
Fax: (202) 508-6200

*Counsel for Prince Naid bin Abdulaziz Al-Saud*

James M. Cole, Esquire
jmcole@bryancave.com

James J. Murphy, Esquire
jjmurphy@bryancave.com

**BUSCH & NUBANI, P.C.**
5029 Backlick Road, Suite A
Annandale, VA 22003
Tel: (703) 658-5151
Fax: (703) 658-9200

*Counsel for Al Haranain Islamic Foundation, Aqeel Al-Aqeel, Saleh O. Budahdah, Adballah bin Adbul Aziz Almosleh,Abdullah M. Al-Mahdi, Adel A.J. Batterjee; Jamal AAhmad Mostafa Kalifa, Islamic Assemply of North America; and Siulaiman Al-Ali*

Ashraf W. Nubani, Esquie
anubani@rbanlaw.com

**CHADBOURNE & PARKE LLP**
30 Rockefeller Plaza
New York, NY 10112
Tel: (212) 408-5581
Fax: (212) 710-5581

Counsel for Yousef Jameel

Kenneth A. Caruso, Esquire
Marvin R. Lange, Esquire
Jeffrey I. Wasserman, Esquire

+MDL1570@chadbourne.com

**CURTIS, MALLET-PREVOST, COLT & MOSLE LLP**
101 Park Avenue
New York, NY 10178
Tel: (212) 696-6000
Fax: (212) 697-1559

*Counsel for HRH Prince Abdullah Al Faisal Bin Abdulaziz Al Saud, Alfaisaliah Group, Faisal Group Holding Co., and Mohammed Bin Abdulrahman Al Ariefy*

T. Barry Kingham. Esquire
bkingham@cm-p.com

Daria M. Ciaputa, Esquire
dciaputa@cm-p.com

**DUTTON & DUTTON PC**
5017 Tilden Street, N.W.
Washington, DC 20013

*Counsel for Prince Bandar bin Sultan*

Nancy C. Dutton, Esquire
DuttonDC@aol.com

**FISH & RICHARDSON P.C.**
1717 Main Street
Suite 500
Dallas, TX 75201
Tel: (214) 292-4012
Fax: (214) 747-2091

*Counsel for Abdullah Salim Al Rajhi and Khalid Sulaiman Al Rajhi*

John M. Helms, Esquire
helms@fr.com

**FULBRIGHT & JAWORSKI, LLP**
801 Pennsylvania Avenue, N.W.
Washington, DC 20004
Tel: (202) 662-4659
Fax: (202) 662-4643

*Counsel for Nimir Petroleum, LLC*

Matthew H. Kirtland, Esquire
mkirtland@fulbright.com

**GIBSON, DUNN & CRUTCHER LLP**
1050 Connecticut Avenue, N.W.
Washington, DC 20036
Tel: (202) 955-8213
Fax: (202) 530-9566

*Counsel for Salamiddin Abduljawad*

John C. Millian, Esquire
jmillian@gibsondunn.com

**GILLEN PARKER & WITHERS LLC**
One Securities Centre, Suite 1050
3490 Piedmont Road, NE
Atlanta, GA 30305-1743
Tel: (404) 842-9700
Fax: (404) 842-9750

*Counsel for Mar-Jac Poultry, Inc.*

Wilmer Parker, III, Esquire
bparker@gcpwlaw.com

**GORDON & SIMMONS, LLC**
131 West Patrick Street
P.O. Box 430
Frederick, MD 21705-0430
Tel: (301) 662-9122
Fax: (301) 698-0392

*Counsel for Zahir H. Kazmi*

Roger C. Simmons, Esquire
Victor E. Cretella, III, Esquire
officemail@gordonsimmons.com

**GRAY CARY WARE & FREIDENRICH LLP**
1625 Massachusetts Avenue, N.W., Suite 300
Washington, DC 20036
Tel: (202) 238-7700
Fax: (202) 238-7701

*Counsel for African Muslim Agency; Heritage Education Trust; International Institute of Islamic Thought; Mar-Jac Investments, Inc.; Reston Investments, Inc; Safa Trust; York Foundation; Taha Al-Alwani; Muhammad Ashraf; M. Omar Ashraf; M. Yaqub Mirza; Iqbal Unus; Jamal Barzinji; Sterling Management Group; Sterling Charitable Gift Fund Inc.; Mena Corporation; Grove Corporate, Inc.; and Sana-Bell, Inc.*

Nancy Luque, Esquire
Donna Sheinbach, Esquire

MDL1570@graycary.com

**HANANIA & KHADER**
6066 Leesburg Pike, Suite 101
Falls Church, VA 22041
Tel: (703) 778-2400
Fax: (703) 778-2407

*Counsel for Abdul Rahman Al-Almoudi; Tarik Hamdi; World Assembly of Muslim Youth; Mohammed Hussein Al Almoudi; and Taibah International Aid Association*

Maher Hanania, Esquire
Mhanania@hknlaw.com

Angela Hensley
Ahensley@hknlaw.com

**HUNTON & WILLIAMS LLP**
1900 K Street, N.W.
Washington, D.C. 20006-1109
Tel: (202) 419-2063
Fax: (202) 778-2201

*Counsel for Yassin Abdullah Al Kadi*

Bonnie Arthur, Esquire
barthur@hunton.com

**JONES DAY**
51 Louisiana Avenue, N.W.
Washington, DC 20001
Tel: (202) 879-3939
Fax: (202) 626-1700

*Counsel for Saudi Binladin Group, Inc.; Bakr M. Bin Laden; Omar Bin Laden; Tarek M. Bin Laden; and Khalid Bin Mahfouz*

Stephen J. Brogan, Esquire
Timothy J. Finn, Esquire
James E. Gauch, Esquire
Michael P. Gurdak, Esquire
Jonathan C. Rose, Esquire
Michael Shumaker, Esquire
Jennifer Shumaker, Esquire
Melissa Stear, Esquire
JonesDayMDL1570@jonesday.com
dmcCaffrey@jonesday.com

**JONES DAY**
222 East 41st Street
New York, NY 10017-6702
Tel: (212) 326-3939
Fax: (212) 755-7306

*Counsel for Saudi Binladin Group, Inc.; Bakr M. Bin Laden; Omar Bin Laden; and Khalid Bin Mahfouz*

E. Michael Bradley, Esquire
Geoffrey S. Stewart

JonesDayMDL1570@jonesday.com
mdcCaffrey@jonesday.com

**JOSHUA L. DRATEL, P.C.**
14 Wall Street, 28th Floor
New York, NY 10005
Tel: (212) 732-0707
Fax: (212) 571-6341

*Counsel for Sami Omar Al-Hussayen*

Joshua L. Dratel, Esquire
jdratel@joshuadratel.com

Marshall A. Mintz, Esquire
mmintz@joshuadratel.com

**KELLOGG, HUBER, HANSEN, TODD & EVANS, P.L.L.C.**
1615 M Street, N.W., Suite 400
Washington, DC 20036-3209
Tel: (202) 326-7900
Fax: (202) 326-7999

*Counsel for Prince Turki Al-Faisal Bin Abdulaziz Al-Saud, Prince Bandar bin Sultan bin Abdulaziz, Princess Haifa Al Faisal, and The Kingdom of Saudi Arabia*

David C. Frederick, Esquire
Michael J. Guzman, Esquire
Mark S. Hansen. Esquire
Michael K. Kellogg, Esquire
J.C. Rozendaal, Esquire

KelloggMDL1570@khhte.com
Mguzman@khhte.com

**KING & SPALDING LLP**
1185 Avenue of the Americas
New York, NY 10036
Tel: (212) 556-2100
Fax: (212) 556-2222

*Counsel for Arab Bank PLC*

Richard T. Marooney, Esquire
rmarooney@kslaw.com

Jeanette M. Viggiano, Esquire
jviggiano@kslaw.com

**LAW FIRM OF OMAR T. MOHAMMEDI**
200 Madison Avenue, Suite 1901
New York, NY 10016-3903

*Counsel for World Assembly of Muslim Youth; WAMY International*

Omar T. Mohammedi, Esquire
omohammedi@otmlaw.com

**LAW FIRM OF OMAR T. MOHAMMEDI**
22 NE 52nd Street, Suite 205
Lighthouse Point, FL 33064
Tel: (954) 428-7757

*Counsel for World Assembly of Muslim Youth; WAMY International*

Khurrum Wahid, Esquire
Khurrum.Wahid@verizon.net

**LAW OFFICES OF JOHN F. LAURO, P.A.**
Bank of America
101 East Kennedy Boulevard
Suite 2180
Tampa, FL 33602
Tel: (813) 222-8990
Fax:  (813) 222-8991

*Counsel for Faisal Islamic Bank (Sudan)*

John F. Lauro, Esquire
Laulaw1@aol.com

**MARTIN F. McMAHON & ASSOCIATES**
1150 Connecticut Avenue, N.W., Suite 900
Washington, DE 20036
Tel: (202) 862-4343
Fax:  (202) 828-4130

*Counsel for Saleh Abdullah Kamei; Al Baraka Investment & Development Corp.; International Islamic Relief Organization; Rabita Trust; Dallah Al Baraka Group, LLC; Makkah  Mukarrahman Charity Trust; Wael Jalaidan and Omar Abdullah Kamel; Muslim World League*

Martin F. McMahon, Esquire
Christopher D. Brown, Esquire
Stephanie Wall Fell

lawmfm@aol.com

**NEVIN, BENJAMIN & McKAY LLP**
303 W. Bannock
P.O. Box 2772
Boise, Idaho 83701
Tel: (208) 343-1000
Fax: (208) .45-8274

*Counsel for  Sami Omar Al-Hussayen*

David Nevin, Esquire
dnevin@nbmlaw.com

Scott McKay, Esquire
smckay@nbmlaw.com

Dean Arnold, Esquire
dean@nbmlaw.com

**PATTON BOGGS LLP**
2550 M Street, N.W.
Washington, DC 20037
Tel: (202) 457-6000
Fax: (202) 457-6315

*Counsel for National Commerce Bank*

Ronald S. Liebman, Esquire
Mitchell Berger, Esquire
Ugo Colella, Esquire

MDL1570@pattonboggs.com

**ROBBINS, RUSSELL, ENGLERT, ORSECK & UNTEREINER LLP**
1801 K Street, N.W., Suite 411
Washington, DC 20006
Tel: (202) 775-4500
Fax: (202) 775-4510

*Counsel for Saudi High Commission*

Lawrence S. Robbins, Esquire
lrobbins@robbinsrussell.com

Roy T. Englert, Jr., Esquire
renglert@robbinsrussell.com

Max Huffman, Esquire
mhuffman@robbinsrussell.com

**SHEARMAN & STERLING LLP**
599 Lexington Avenue
New York, NY 10022-6069
Tel: (212) 848-4000
Fax: (212) 848-7179

*Counsel for Saudi American Bank*

Brain H. Polovoy, Esqyure
Daniel M. Segal, Esquire
Henry Weisburg, Esquire

MDL1570@shearman.com

| |
|---|
| **HUSSEIN SHOUKRY LAW FIRM**<br>Adham Commercial Center, 9th Floor<br>Medina Road<br>P.O. Box 667<br>Jeddah 21421, Saudi Arabia<br><br>*Counsel for HRH Prince Mohamed al Faisal al Saud*<br><br>Kamal Hussein Shoukry |
| **SHEPPARD MULLIN RICHTER & HAMPTON**<br>30 Rockefeller Plaza<br>Suite 4250<br>New York, NY 10112<br>Tel: (212) 332-3800<br>Fax: (212) 332-3888<br><br>*Counsel for DMI Administrative Services, S.A.*<br><br>Tim McCarthy, Esquire<br>tmccarthy@sheppardmullin.com<br><br>James J. McGuire, Esquire<br>jmcguire@sheppardmullin.com |
| **STEPTOE & JOHNSON, L.L.P.**<br>1330 Connecticut Avenue, N.W.<br>Washington, DC 20036<br>Tel: (202) 429-3000<br>Fax: (202) 429-3902<br><br>*Counsel for Mohammad Bin Abdullah Aljomaih*<br><br>Christopher T. Lutz, Esquire<br>clutz@steptoe.com |
| **UNITED STATES ATTORNEY'S OFFICE**<br>86 Chambers Street, Third Floor<br>New York, NY 10007<br>Tel: (212) 637-2709<br>Fax: (212) 637-2717<br><br>Sarah S. Normand<br>Assistant U.S. Attorney<br>Sarah.normand@usdoj.gov |

**UNITED STATES DEPARTMENT OF JUSTICE**
Civil Division, Federal Programs Branch
P.O. Box 883
Washtington, DC 20044
Tel: (202) 514-3367
Fax: (202) 616-8470

Elizabeth J. Shapiro, Esquire
Elizabeth.Shapiro@usdoj.gov

**WHITE & CASE LLP**
701 Thirteenth Street, N.W.
Washington, DC 20005-3807
Tel: (202) 626-3600
Fax: (202) 639-9355

*Counsel for Al Rajhi Banking & Investment Corporation*

Christopher M. Curran, Esquire
Nicole E. Erb, Esquire  (202) 626-3694

AlRajhiBankMDL1570@whitecase.com

**WILLIAMS & CONNOLLY LLP**
725 12th Street, N.W.
Washington, DC 20005
Tel: (202) 434-5046
Fax: (202) 434-5049

*Counsel for Abdul Rahman Bin Kahlid Bin Mafouz*

MDL1570@wc.com

**WILMER CUTLER PICKERING HALE AND DORR LLP**
1600 Tysons Boulevard, 10th Floor
McLean, VA 22102
Tel: (703) 251-9700
Fax: (202) 663-6363

*Counsel for HRH Prince Mohamed Al Faisal Al Saud*

David P. Donovan, Esquire
david.donovan@wilmerhale.com

**WILMER CUTLER PICKERING HALE AND DORR LLP**
2445 M Street, N.W.
Washington, DC 20037
Tel: (202) 663-6000
Fax: (202) 663-6363

*Counsel for HRH Prince Mohamed Al Faisal Al Saud*

Louis R. Cohen, Esquire
louis.cohen@wilmerhale.com

Tracey Allen, Esquire
tracey.allen@wilmerhale.com

**WILMER CUTLER PICKERING HALE AND DORR LLP**
399 Park Avenue
New York, NY 10022
Tel: (212) 230-8800
Fax: (212) 663-6363

*Counsel for HRH Prince Mohamed Al Faisal Al Saud*

David Bowker
david.bowker@wilmerhale.com

# Plaintiff's Counsel

03 MDL 1570 SERVICE LIST

*In re: Terrorist Attack on September 11, 2001*, 03 MDL 1570 (Judge Richard Casey),
U.S. District Court of the Southern District of New York

| Plaintiffs' Counsel | Underlying Case Name |
|---|---|
| **ALLAN GERSON, ESQUIRE**<br>2131 S Street, N.W.<br>Washington, DC 20008<br>Tel: (202) 234-9717<br>Fax: (202) 234-9727<br>gerson@gilgintl.org | Burnett, et al. v. Al Baraka Investment and Development Corp., et al. |
| **BARASCH McGARRY SALZMAN PENSON & LIM**<br>11 Park Place<br>New York, NY 10007<br>Tel: (212) 385-8000<br>Fax: (212) 385-7845<br><br>Michael Barasch, Esquire<br>michael@personalinjuryjustice.com | Ashton, et al. v. Al Qaeda, et al. |
| **BARTIMUS, FRICKLETON, ROBERTSON & OBETZ**<br>200 Madison Avenue, Suite 1000<br>Jefferson City, MO 65101<br>Tel: (573) 659-4454<br>Fax: (573) 659-4460<br><br>Edward D. Robertson, Esquire<br>chiprob@earthlink.net | Burnett, et al. v. Al Baraka Investment and Development Corp., et al. |
| **BAUMEISTER & SAMUELS, PC**<br>One Exchange Place, 15th Floor<br>New York, NY 10006-3008<br>Tel: (212) 363-1200<br>Fax: (212) 363-1346<br><br>Michael F. Baumeister, Esquire<br>mbaumeister@baumeisterlaw.com<br><br>Thea M. Capone, Esquire<br>tcapone@baumeisterlaw.com<br><br>Douglas A. Latto, Esquire<br>dlatto@baumeisterlaw.com | Ashton, et al. v. Al Qaeda, et al. |

| | |
|---|---|
| **BRODER & REITER**<br>350 Fifth Avenue, Suite 2811<br>New York, NY 10118<br>Tel: (212) 244-2000<br>Fax: (212) 268-5297<br><br>Aaron J. Broder, Esquire<br>Jonathan C. Reiter, Esquire<br><br>info@broderreiter.com | Ashton, et al. v. Al Qaeda, et al. |
| **BROWN, GAVALAS & FROMM, LLP**<br>355 Lexington Avenue, 9th Floor<br>New York, NY 10017<br>Tel: (212) 983-8500<br>Fax: (212) 983-5946<br><br>Robert J. Brown, Esquire<br>rjb@browngavalas.com | New York Marine and General Insurance Company v. Al Qaida, et al. (04-cv-6105) |
| **BROWN, TERRELL, HOGAN, ELLIS, McCLAMMA, YEGELWEL PA**<br>8th Floor – Blackstone Building<br>233 East Bay Street<br>Jacksonville, FL 32202<br><br>Evan J. Yegelwel, Esquire<br>ejy@bthemy.com<br><br>D'Vorah Ben-Moshe<br>dbm@bthemy.com | Havlish, et al. v. Bin Laden, et al. |
| **BURBIDGE and MITCHELL**<br>139 East South Temple, Suite 2001<br>Salt Lake City, UT 84111<br>Tel: (801) 355-6677<br>Fax: (801) 355-2341<br><br>D. Richard Burbidge, Esquire<br>rburbidge@burbidgeandmitchell.com | Havlish, et al v. Bin Laden, et al. |
| **CORDRAY LAW FIRM**<br>40 Calhoun Street, Suite 420<br>Post Office Drawer 22857<br>Charleston, SC 29413-2857<br>Tel: (843) 577-9761<br>Fax: (843) 853-6330<br><br>Jack D. Cordray, Esquire<br>jack@cordraylawfirm.com | Burnett, et al. v. Al Baraka Investment and Development Corp., et al. |

| | |
|---|---|
| **COZEN O'CONNOR**<br>1900 Market Street<br>Philadelphia, PA 19103<br>Tel: (215) 665-2000<br>Fax: (215) 665-2013<br><br>Stephen A. Cozen, Esquire<br>Elliot F. Feldman, Esquire<br>Sean P. Carter, Esquire<br>Mark T. Mullen, Esquire<br>Lisa Haas, Esquire<br>J. Scott Tarbutton, Esquire<br>MDL1570@cozen.com | Federal Insurance Co., et al. v. Al Qaeda, et al. |
| **DAVIS, SAPERSTEIN & SALOMON, P.C.**<br>375 Cedar Lane<br>Teaneck, NJ 07666<br>Tel: (201) 907-5000<br>Fax:  (210) 692-0444<br><br>Samuel L. Davis, Esquire<br>sam@dsslaw.com | Burnett, et al. v. Al Baraka Investment and Development Corp., et al. |
| **DICKSTEIN SHAPIRO MORIN & OSHINSKY LLP**<br>1177 Avenue of the Americas<br>New York, NY 10036-2714<br>Tel: (212) 835-1446<br>Fax: (212) 997-9880<br><br>Stacey A. Saiontz, Esquire<br>SaiontzS@dsmo.com<br><br>Jonathan M. Goodman, Esquire<br>Goodmanj@dsmo.com<br><br>Kenneth L. Adams, Esquire<br>2101 L Street, NW<br>Washtingon, DC 20037-1526<br>Tel: (202) 828-2202<br>Fax: (202) 887-0689<br>AdamsK@dsmo.com | Cantor Fitzgerald Associates, LP v. Akida Investment Co., Ltd. |
| **EPSTEIN BECKER & GREEN, P.C.**<br>250 Park Avenue<br>New York, NY 10177-1211<br>Tel: (212) 351-4500<br>Fax:  (212) 661-0989<br><br>Clare M. Sproule, Esquire<br>scproule@ebglaw.com | Burnett, et al. v. Al Baraka Investment and Development Corp., et al. |

| | |
|---|---|
| **GAIR, GAIR, CONASON, STEIGMAN & MACKAUF**<br>80 Pine Street<br>New York, NY 10005<br>Tel:  (212) 943-1090<br>Fax: (212) 425-7513<br><br>Robert Conason, Esquire<br>rconason@gairgair.com<br><br>Howard Hershenhorn, Esquire<br>hsh@gairgair.com | Burnett, et al. v. Al Baraka Investment and Development Corp., et al. |
| **GALIHER, DeROBERTIS, NAKAMURA, ONO & TAKITANI**<br>610 Ward Avenue, Suite 200<br>Honolulu, HI 96814<br>Tel: (808) 597-1400<br>Fax: (808) 591-2608<br><br>Gary O. Galiher, Esquire<br>gog@gogaliher.com | Burnett, et al. v. Al Baraka Investment and Development Corp., et al. |
| **HANLY CONROY BIERSTEIN & SHERIDAN LLP**<br>415 Madison Avenue<br>New York, NY 10017<br>Tel:  (212) 401-7600<br>Fax: (212) 401-7618<br><br>Andrea Bierstein, Esquire<br>abierstein@hanlyconroy.com<br><br>Mary Palmer, Paralegal<br>mpalmer@hanlyconroy.com<br><br>Jayne Conroy, Esquire<br>jconroy@hanlyconroy.com | Burnett, et al. v. Al Baraka Investment and Development Corp., et al.<br><br><br><br><br><br><br><br>World Trade Center Properties, LLC et al. v. Al Baraka Investment and Development Corporation, et al.  (04-cv-7280) |
| **HOWARTH & SMITH**<br>800 Wilshire Boulevard, Suite 750<br>Los Angeles, CA 90017<br>Tel: (213) 955-9400<br>Fax: (213) 622-0791<br><br>Robert D. Brain, Esquire<br>Don Howarth, Esquire<br>Suzelle M. Smith, Esquire<br><br>MDL1570@howarth-smith.com | Burnett, et al. v. Al Baraka Investment and Development Corp., et al.<br><br>Havlish, et al. v. Bin Laden, et al. |

| | |
|---|---|
| **THE HUGE LAW FIRM PLLC**<br>7th Floor<br>1001 Pennsylvania Avenue, NW<br>Washington, DC 20004<br>Tel: (843) 722-1628<br>Fax: (202) 318-1261<br><br>Harry Huge, Esquire<br>harryhuge@comcast.net | Burnett, et al. v. Al Baraka Investment and Development Corp., et al. |
| **J. DAVID O'BRIEN, ESQUIRE**<br>20 Vesey Street, Suite 700<br>New York, NY 10007<br>Tel: (212) 571-6111<br>Fax: (212) 571-6166<br><br>obrienlawusa@aol.com | Tremsky, et al. v. Osama Bin Laden, et al. |
| **JAROSLAWICZ & JAROS, ESQUIRES**<br>150 William Street<br>New York, NY 10038<br>Tel: (212) 277-2780<br>Fax: (212) 227-5090<br><br>David Jaroslawicz, Esquire<br>davidjaroslawicz@yahoo.com | Ashton, et al. v. Al Qaeda, et al. |
| **JUDICIAL WATCH, INC.**<br>501 School Street, SW, Suite 725<br>Washington, DC 20024<br>Tel: (202) 646-5175<br>Fax: (202) 646-5199<br><br>Paul J. Orfanedes, Esquire<br>James F. Peterson, Esquire<br><br>jpeterson@judicialwatch.org | Burnett v. Al Baraka Inv. and Dev. Corp., et al. |

| **KREINDLER & KREINDLER LLP**<br>100 Park Avenue<br>New York, NY 10017<br>Tel:  (212) 687-8181<br>Fax: (212) 972-9432<br><br>Justin T. Green, Esquire<br>jgreen@kreindler.com<br><br>James P. Kreindler, Esquire<br>jkreindler@kreindler.com<br><br>Andrew J. Maloney, III, Esquire<br>amaloney@kreindler.com<br><br>Marc S. Moller, Esquire<br>mmoller@kreindler.com<br><br>Vince Parrett, Esquire<br>vparrett@kreindler.com<br><br>Steven Habig<br>shabig@kreindler.com | Ashton, et al. v. Al Qaeda, et al. |
| --- | --- |
| **LAMM, RUBENSTONE, TOTARO & DAVID, LLC**<br>4 Greenwood Square, Suite 200<br>P.O. Box 8544<br>Bensalem, PA 19020-8544<br>Tel:  (215) 638-9330<br>Fax: (215) 638-2867<br><br>Edward H. Rubenstone, Esquire<br>erubenstone@lrtd.com | Havlish, et al. v. Bin Laden, et al. |
| **LAW OFFICES OF JERRY S. GOLDMAN & ASSOCIATES, P.C.**<br>111 Broadway, 13th Floor<br>New York, NY 10006<br>Tel: (212) 385-1005<br>Fax: (212) 346-4665<br><br>Jerry S. Goldman, Esquire<br>jgoldman@goldmanlawyers.com<br><br>Gina Mac Neill, Esquire<br>GMacNeill@goldmanlawyers.com | Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.<br><br>Estate of John P. O'Neill, Sr., et al. v. Al Baraka Investment and Development Corp., et al.<br><br>Estate of John P. O'Neill, Sr., et al. v. Republic of Iraq, et al. |

| | |
|---|---|
| **LAW OFFICES OF JOSHUA M. AMBUSH, LLC**<br>600 Reistertown Road<br>Suite 200 A<br>Baltimore, MD 21208<br>Tel: (410) 484-2070<br>Fax: (410) 484-9330<br><br>Joshua M. Ambush, Esquire<br>joshua@ambushlaw.com<br><br>Helen Louise Hunter, Esquire<br>hlsh@aol.com | Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.<br><br>Estate of John P. O'Neill, Sr., et al. v. Al Baraka Investment and Development Corp., et al.<br><br>Estate of John P. O'Neill, Sr., et al. v. Republic of Iraq, et al. |
| **LEE LEE & LEE**<br>422 S. Gay Street<br>Knoxville, TN 37902<br>Tel: (865) 544-0101<br>Fax: (865) 544-0536<br><br>J.D. Lee, Esquire<br>CGobert@JDLee.com<br><br>David Lee, Esquire<br>davidl@lancairsouth.com | Burnett, et al. v. Al Baraka Investment and Development Corp., et al.<br><br>Havlish, et al. v. Bin Laden, et al. |
| **LESSOFF & OSTROW**<br>350 Broadway, Suite 703<br>New York, NY 10013<br>Tel: (212) 219-9257<br>Fax: (212) 226-4055<br><br>Jeffrey Lewis Lessoff, Esquire<br>jeff@lessofflaw.com | Morrison v. The Kingdom of Saudi Arabia et al. (04-cv-07210) |
| **MELLON WEBSTER & SHELLY**<br>87 North Broad Street<br>Doylestown, PA 18901<br>Tel:  (215) 348-7700<br>Fax:  (215) 348-0171<br><br>Thomas E. Mellon, Jr., Esquire<br>tmellon@mellonwebster.com<br><br>Stephen Corr, Esquire<br>scorr@mellomwebster.com<br><br>Jack Corr, Esquire<br>jcorr@mellonwebster.com | Havlish, et al. v. Bin Laden, et al.<br><br>Burnett, et al. v. Al Baraka Investment and Development Corp., et al. |

| | |
|---|---|
| **MICHAEL J. BAZYLER**<br>PROFESSOR OF LAW<br>Whittier Law School<br>3333 Harbor Blvd.<br>Costa Mesa, CA 92626<br>Tel: (310) 926-0149<br>Fax: (714) 444-1854<br><br>Michael J. Bazyler<br>bazyler@aol.com | Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.<br><br>Estate of John P. O'Neill, Sr., et al. v. Al Baraka Investment and Development Corp., et al.<br><br>Estate of John P. O'Neill, Sr., et al. v. Republic of Iraq, et al. |
| **MOTLEY RICE LLC**<br>28 Bridgeside Boulevard<br>P.O. Box 1792<br>Mount Pleasant, SC 29465<br>Tel: (843) 216-9000<br>Fax: (843) 216-9450<br><br>Ronald L. Motley, Esquire<br>Jodi Westbrook, Esquire<br>Donald A. Migliori, Esquire<br>Jeffrey S. Thompson, Esquire<br>William Narwold, Esquire<br>Michael E. Elsner, Esquire<br>Ingrid Moll, Esquire<br>Juston Kaplan, Esquire<br><br>MDL1570@motleyrice.com | Burnett, et al. v. Al Baraka Investment and Development Corp., et al.<br><br>Havlish, et al. v. Bin Laden, et al. |
| **PROF. PAUL R. DUBINSKY**<br>New York Law School<br>7 Worth Street<br>New York, NY 10013<br>Tel: (212) 431-2157<br>Fax: (212) 431-1830<br><br>Paul R. Dubinsky, Esquire<br>pdubinsky@nyls.edu | Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.<br><br>Estate of John P. O'Neill, Sr., et al. v. Al Baraka Investment and Development Corp., et al.<br><br>Estate of John P. O'Neill, Sr., et al. v. Republic of Iraq, et al. |
| **NOLAN LAW GROUP**<br>20 North Clark Street, 30th Floor<br>Chicago, IL 60602<br>Tel: (312) 630-4000<br>Fax: (312) 630-4011<br><br>Floyd Wisner, Esquire<br>faw@nolan-law.com<br><br>Paula Jett, Assistant<br>plj@nolan-law.com | Salvo, et al. v. Al Qaeda Islamic Army, et al. |

| OLIVER & SELLITTO, ESQS.<br>205 Bond Street<br>Asbury Park, NJ 07712<br>Tel: (732) 988-1500<br>Fax: (732) 775-7404<br><br>Anthony M. Sellitto, Jr. Esquire<br>asellitto.911suit@aslaw.com | Burnett, et al. v. Al Baraka Investment and Development Corp., et al. |
|---|---|
| PROF. ROGER ALFORD<br>Pepperdine University School of Loaw<br>24255 Pacific Coast Highway<br>Malibu, CA 90263<br>Tel: (310) 506-7626<br>Fax: (310) 506-4063<br><br>Professor Roger Alford<br>roger.alford@pepperdine.edu | Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.<br><br>Estate of John P. O'Neill, Sr., et al. v. Al Baraka Investment and Development Corp., et al.<br><br>Estate of John P. O'Neill, Sr., et al. v. Republic of Iraq, et al. |
| PRYOR CASHMAN SHERMAN & FLYNN LLP<br>410 Park Avenue,10th Floor<br>New York, New York 10022<br>Tel:  (212) 421-4100<br>Fax: (212) 326-0806<br><br>Vincent F. Pitta, Esquire<br>vpitta@pryorcashman.com | Burnett, et al. v. Al Baraka Investment and Development Corp., et al. |
| RAMEY & HAILEY<br>3815 River Crossing Parkway, Suite 340<br>Indianapolis, IN 46240<br>Tel: (317) 848-3249<br>Fax: (317) 848-3259<br><br>Richard D. Hailey, Esquire<br>rhailey@sprynet.com | Burnett, et al. v. Al Baraka Investment and Development Corp., et al.<br>Havlish, et al. v. Bin Laden, et al. |
| RILEY DeBROTA LLP<br>3815 River Crossing Parkway, Suite 340<br>Indianapolis, IN 46240<br>Tel: (317) 848-7939<br>Fax: (317) 848-7831<br><br>Amy Ficklin DeBrota, Esquire<br>William Riley, Esquire<br><br>saudisuit@rileydebrota.com | Burnett, et al. v. Al Baraka Investment and Development Corp., et al.<br><br>Havlish, et al. v. Bin Laden, et al. |

| | |
|---|---|
| **ROBSON, FERBER, FROST, CHAN & ESSNER, LLP**<br>530 Fifth Avenue<br>New York, NY 10036<br>Tel:  (212) 944-2200<br><br>Robert M. Kaplan, Esquire<br>rkaplan@ferberfrost.com | Continental Casualty Company v. Al Qaeda Islamic Army  (04-cv-05970) |
| **RUBENSTEIN & RYNECKI**<br>16 Court Street, Suite 1717<br>Brooklyn, NY 11241<br>Tel: (718) 522-1020<br>Fax: (718) 522-3804<br><br>Sanford A. Rubenstein, Esquire<br>Rubrynlaw@aol.com | Burnett, et al. v. Al Baraka Investment and Development Corp., et al. |
| **RUSSO, SCAMARDELLA & D'AMATO, P.C.**<br>1010 Forest Avenue<br>Staten Island, NY 10310<br>Te; (718) 442-0900<br>Fax:  (718) 816-8037<br><br>Guy Molinari, Esquire<br>jdamato@statenlaw.com | Burnett, et al. v. Al Baraka Investment and Development Corp., et al. |
| **SACKS & SACKS LLP**<br>150 Broadway<br>New York, NY 10038<br>Tel: (212) 964-5570<br>Fax:  (212) 349-2141<br><br>Kenneth N. Sacks, Esquire<br>wtcmail@sacks-sacks.com | Burnett, et al. v. Al Baraka Investment and Development Corp., et al. |
| **SCHONBRUN, DE SIMONE, SEPLOW, HARRIS & HOFFMAN**<br>723 Ocean Front Walk<br>Venice, California 90291<br>Tel:  (310) 396-0731<br>Fax:  (310) 399-7040<br><br>Paul L. Hoffman, Esquire<br>Hoffpaul@aol.com | Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.<br><br>Estate of John P. O'Neill, Sr., et al. v. Al Baraka Investment and Development Corp., et al.<br><br>Estate of John P. O'Neill, Sr., et al. v. Republic of Iraq, et al. |

| | |
|---|---|
| **SPEISER, KRAUSE, NOLAN & GRANITO**<br>140 East 45th Street, 34th Floor<br>New York, NY 10017<br>Tel: (212) 661-0011<br>Fax: (212) 953-6483<br><br>Frank H. Granito, III, Esquire<br>F3g@ny.speiserkrause.com<br><br>Kenneth P. Nolan, Esquire<br>kpn@ny.speiserkrause.com<br><br>Jeanne M. O'Grady, Esquire<br>jog@ny.speiserkrause.com<br><br>John F. Schutty, Esquire<br>jfs@ny.speiserkrause.com | Ashton, et al. v. Al Qaeda, et al |
| **SULLIVAN, PAPAIN, BLOCK, McGRATH & CANNAVO, P.C.**<br>120 Broadway, 18th Floor<br>New York, NY 10271<br>Tel: (212) 732-9000<br>Fax: (212) 266-4141<br><br>Michael N. Block, Esquire<br>mblock@triallaw1.com<br><br>Edward Marcowitz, Esquire<br>emarcowitz@triallaw1.com<br><br>Andrew Carboy, Esquire<br>acarboy@triallaw1.com | Burnett, et al. v. Al Baraka Investment and Development Corp., et al. |
| **WIGGINS, CHILDS, QUINN & PANTAZIS, PC**<br>7 Dupont Circle, SW, Suite 200<br>Washington, DC 20036<br><br>Dennis G. Pantazis, Esquire<br>dgp@wcqp.com<br><br>Timothy B. Fleming, Esquire<br>tfleming@wcqp.com<br><br>Lori B. Kisch, Esquire<br>lkisch@wcqp.com | Havlish, et al. v. Bin Laden, et al. |

| **WINDER & HASLAM P.C.**<br>175 West 200 South, Suite 4000<br>P.O. Box 2668<br>Salt Lake City, UT 84111-2668<br>Tel: (801) 322-2222<br>Fax: (801) 322-2282<br><br>Donald J. Winder, Esquire<br>dwinder@winhas.com | Havlish, et al. v. Bin Laden, et al. |