UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------x

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  10/23/15
```

In Re:                                    :

    TERRORIST ATTACKS            :
    ON SEPTEMBER 11, 2001

                            :

-------------------------------------------------x

**MEMORANDUM
DECISION AND ORDER**

03 MDL 1570 (GBD)(FM)

**FRANK MAAS**, United States Magistrate Judge.

I.    Introduction

        The Plaintiffs in this multidistrict litigation ("MDL"), which has been

pending for nearly twelve years, seek to recover legal fees related to this Court's prior

discovery rulings. There are, frankly, few tasks that judges dislike more than reviewing

applications for attorneys' fees. Essentially, the Court must determine counsels'

reasonable hourly rates and whether the time allegedly expended was reasonable.

        Answering the first of these questions necessarily involves a degree of

imprecision, unless a fee-paying client with market power has negotiated the hourly

billing rates with its law firm, the reviewing judge has recently joined the bench from a

firm comparable to the one that billed the time for which recovery is sought, or the case

involves a field such as ERISA or civil rights litigation in which reported decisions

concerning fee applications are common. Indeed, even when a court can avail itself of

prior decisions setting rates for certain classes of litigation and types of law firms in a

locality, the findings often are backward-looking, and thus potentially not fully in line

with current market rates. See Farbotko v. Clinton Cnty., 433 F.3d 204, 209 (2d Cir.

2005) ("Recycling rates awarded in prior cases without considering whether they continue to prevail" may lead to awards below the "compensation available in the marketplace.").

Deciding how many hours should have been spent by counsel in relation to various tasks is an effort equally fraught with difficulty. For example, the practice of block billing – which may make business sense when the only intended reviewer is the firm's client – frequently complicates the review process and requires a court to rely, to a certain extent, on the good faith of the fee applicant's counsel to deconstruct how time actually was spent. Generic descriptions of work activity also may make judicial review of legal bills difficult.

For reasons such as these, all that a court can do is approximate what the fees reasonably should have been. Ultimately, the goal is to achieve rough justice for both sides, without engendering a second round of protracted litigation. See Fox v. Vice, 131 S. Ct. 2205, 2216 (2011) ("[T]rial courts need not, and indeed should not, become green-eyeshade accountants."); Buckhannon Bd. and Care Home v. W. Va. Dep't of Health and Human Res., 532 U.S. 598, 609 (2001) (fee requests "should not result in a second major litigation.") (quoting Helmsley v. Eckerhart, 461 U.S. 424, 437 (1983)). This is the task the Court has undertaken in this proceeding. Having done so, for the reasons set forth below, the Plaintiffs' application is granted in part and denied in part.

II.     Relevant Facts and Procedural History

The Plaintiffs seek to hold numerous defendants liable for personal injury, property damage, and other claims arising out of the September 11 terrorist attacks in New York City, at the Pentagon, and in Shanksville, Pennsylvania.  Some measure of the complexity of the proceeding can be derived from the docket sheet, which contains more than 3,000 entries.

On October 28, 2013, in a combined Memorandum Decision and Report and Recommendation, (ECF No. 2789 ("October Decision" or "Oct. Dec.")), I resolved the Plaintiffs' letter-motions seeking discovery sanctions against several defendants, including Wa'el Jelaidan ("Jelaidan"), who had been designated by the United States Treasury Department as a terrorist, and the United States branch of the Al Haramain Islamic Foundation ("Al Haramain (USA)"), which had been designated by the Treasury Department as a terrorist organization.  (Jelaidan and Al Haramain (USA) are hereinafter referred to, together, as the "Defendants.").

In the October Decision, I found that Jelaidan had failed to comply with my discovery orders, despite repeated warnings, and had acted in bad faith.  (Id. at 9-15).  I further concluded that an adverse inference instruction was the appropriate sanction for Jelaidan's failure to comply with my orders.  (Id. at 16-17).  Finally, I indicated that, pursuant to Rule 37(b)(2)(C) of the Federal Rules of Civil Procedure, the Plaintiffs could

recover the reasonable fees and expenses that they incurred in bringing their Rule 37

motion against Jelaidan.[1] (Id. at 17-18).

     I further found that Al Haramain (USA) had delayed the production of the

documents previously maintained at its Oregon offices for reasons that were not

substantially justified.  As I explained, "even after I specifically ruled that [a protective

order entered in connection with a criminal case in the District of Oregon] did not restrict

the dissemination of any materials that the Government had seized, . . . Al Haramain

(USA) continued to claim that it was precluded from obtaining any responsive records."

(Id. at 33).   On that basis, and without justification, Al Haramain (USA) failed to request

its documents from the Government.  Eventually, however, Al Haramain (USA) obtained

an order granting it access to the Oregon documents, which it then produced.  (Id.).

Included among those documents were some 20,000 to 25,000 documents that Al

Haramain (USA) had erased, but that the Government was able to restore.  (Id. at 36).

Since there was no showing that the Plaintiffs were prejudiced by Al Haramain (USA)'s

delay or the erasures, I held that the Plaintiffs were not entitled to either an adverse

---

[1]    That wording in the October Decision regrettably failed to track the Rule.  Rule
37 contains two provisions regarding the payment of expenses, including attorneys' fees.  Under
Rule 37(a)(5), when a motion to compel is granted, the court ordinarily must require the party
that improperly failed to provide discovery or its counsel to "pay the movant's reasonable
expenses incurred in making the motion, including attorney's fees."  Fed. R. Civ. P.
37(a)(5)(A)(i) (emphasis added).  When the motion is occasioned by a party's failure to comply
with a discovery order, Rule 37(b)(2)(C) requires that the disobedient party or its counsel
ordinarily "pay the reasonable expenses, including attorney's fees, caused by the failure."  Id.
37(b)(2)(C).  Here, as both sides appear to recognize, the Plaintiffs are entitled to this broader
recovery.

inference or the entry of a default judgment.  (Id. at 34-35).  Nevertheless, because the

Plaintiffs had been put to the expense of moving to compel the production of the Oregon

documents, however, I concluded that they were entitled to recover the costs associated

with that aspect of their motion.  (Id.).

      Prior to the October Decision, I also had determined that Al Haramain

(USA) would be required to produce documents from the foundation's head office in

Saudi Arabia because the two entities were not separate.  I nonetheless found that Al

Haramain (USA) could not be held liable for its inability to produce documents from the

Al Haramain office in Saudi Arabia because it was not foreseeable that the Saudi

authorities would shutter that office in 2004, rendering its contents inaccessible.  (Id. at

36).

      The October Decision directed the Plaintiffs to submit, within thirty days,

affidavits and contemporaneous time records itemizing (a) the number of hours that they

had expended with respect to their motions concerning Jelaidan and Al Haramain (USA),

(b) the nature of the work performed, and (c) the reasonableness of their timekeepers'

rates.  (Id. at 17-18, 35).  I further directed that any opposition papers be submitted within

twenty-one days thereafter.  (Id.).[2]

      On January 24, 2014, the Plaintiffs filed a single, consolidated application

for attorneys' fees supported by the declaration of Robert T. Haefele, an attorney at the

---

[2]    By order dated April 23, 2014, Judge George B. Daniels, to whom this MDL case
is assigned, adopted the October Decision and overruled the objections that the Defendants had
interposed pursuant to Rule 72 of the Federal Rules of Civil Procedure.  (ECF No. 2851).

Motley Rice firm, who is a member of the Plaintiffs' Executive Committee ("PEC") for

Personal Injury and Death Claims.  (See ECF Nos. 2829-2831).  In that application, Mr.

Haefele sought to recover fees and expenses from the Defendants on behalf of four firms:

Anderson Kill; Cozen O'Connor; Kreindler & Kreindler; and Motley Rice.  (Id.).

Thereafter, on February 14, 2014, the Defendants filed opposition papers.  (ECF Nos.

2834-2836).  Between March 10 and March 25, 2014, the Court also received reply,

surreply, and other papers concerning the motions.  (ECF Nos. 2838, 2841-2845, 2847-

2848, 2864-2866, 2876-2877).  The onslaught of papers concerning the Plaintiffs' fee

applications has continued until recently.  (See, e.g., ECF No. 3038 (Al Haramain

(USA)'s Fourth Notice of Suppl. Authority); ECF No. 3059 (Jelaidan's Opp. to Pls.' Mot.

to Compel); ECF No. 3060 (letter dated October 2, 2015, from Al Haramain (USA)'s

counsel to the Court)).[3]

     During a pretrial conference on April 23, 2014, I heard argument

concerning the Plaintiffs' fee applications.  In his declaration, as amended, Mr. Haefele

---

[3]    Some measure of the level of counsels' zealousness in this proceeding can be
garnered from the fact that the papers related to the Plaintiffs' fee application include Al
Haramain (USA)'s "Unopposed Motion for Leave to File Sur-Reply Brief," (ECF No. 2844), as
well as the Plaintiffs' "Memorandum of Law in Opposition" thereto, (ECF No. 2847).

    Suffice it to say, I have, with one exception, considered all of the papers filed in
connection with the Plaintiffs' fee application.  The exception relates to Jelaidan's "Opposition
to Plaintiffs' Motion to Compel." (ECF No. 3059).  In that submission, Jelaidan asks the Court,
in passing, to reconsider its prior award of attorneys' fees.  (Id. at 8).  I decline to do so for at
least two reasons:  first, none of the documents upon which Jelaidan relies have been properly
authenticated (and the allegedly pivotal one has not even been translated into English); and
second, Jelaidan has not satisfactorily shown that he could not have adduced at an earlier date
the information upon which he now relies.

attested that each of the four firms seeking reimbursement had assembled their billing

summaries "based on contemporaneous data" that they maintained.  (ECF No. 2842

(Decl. of Robert T. Haefele, Esq., dated March 10, 2014 ("Haefele Decl."))).

Nonetheless, because Mr. Haefele was employed by only one of those firms, I directed

that each of the three remaining firms submit sworn statements from knowledgeable

persons in support of their fee applications.  (ECF No. 2852).   Additionally, because the

Defendants questioned the accuracy of the Plaintiffs' billing summaries, I directed that

the Plaintiffs' law firms each produce their relevant contemporaneous time records for

two random months selected by the Defendants' counsel during the period for which

reimbursement was sought.  (Id.).  The Plaintiffs' law firms thereafter produced these

further materials to the extent that they existed.  (See ECF Nos. 2855-2859).

      The Plaintiffs' fee application consists of three components:  first, the time

that each of the Plaintiffs' four law firms expended in connection with the discovery

disputes leading to the award of sanctions; second, the time that two of those firms spent

preparing the Plaintiffs' fee application; and third, expenses incurred in connection with

the discovery disputes.  (ECF No. 2831-2, 2831-6, 2831-9; Haefele Decl. Ex. B, C).

      The first component of the Plaintiffs' fee application may be summarized as

follows:

| FIRM | JELAIDAN | AL HARAMAIN (USA) |
|---|---|---|
| Anderson Kill | $0 | $58,520.00 |
| Cozen O'Connor | 181,200.00 | 98,770.00 |
| Kreindler & Kreindler | 22,350.00 | 17,750.00 |
| Motley Rice | 65,932.50[4] | 236,625.00 |
| **TOTAL** | $269,482.50 | $411,665.00 |

The requests relating to the time that the Plaintiffs' law firms spent preparing the Plaintiffs' fee application (i.e., their request for fees-on-fees) may be summarized as follows:

| FIRM | AMOUNT |
|---|---|
| Anderson Kill | $12,922.50 |
| Motley Rice | 52,512.50 |
| **TOTAL** | $65,435.00 |

The Plaintiffs have further asked that the Court enhance all of the sums that they request "by 1.5" to further the goals of specific and general deterrence. (ECF No. 2830 (Pls.' Mem. in Supp. ("Pls.' Mem")) at 17-18). Were that multiplier to be applied, the Plaintiffs could recover more than $1 million in legal fees by virtue of the Defendants' discovery failings.

Finally, the Plaintiffs' request relating to expenses incurred in connection with the discovery disputes can be summarized as follows:

---

[4]     Motley Rice initially sought attorneys' fees of $66,932.50. (ECF No. 2831-6). This appears to be an error, which subsequently was corrected by subtracting $1,000 in attorneys' fees and adding $1,000 in expenses. (Haefele Decl. Ex. C at 2).

| FIRM | JELAIDAN | AL HARAMAIN (USA) |
|---|---:|---:|
| Anderson Kill | $0 | $625.14 |
| Cozen O'Connor | 978.50 | 1,798.85 |
| Motley Rice | 2,731.97 | 3,605.42 |
| **TOTAL** | $3,710.47 | $6,029.21 |

III.    Attorneys' Fees

A.    Legal Standard

To determine the reasonable attorneys' fees to which a party is entitled, a court must calculate the "presumptively reasonable fee," often referred to as the "lodestar." Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany, 522 F.3d 182, 183, 189-90 (2d Cir. 2008). The presumptively reasonable fee is arrived at by multiplying the number of hours reasonably expended by a reasonable hourly rate. See Millea v. Metro-North R.R. Co., 658 F.3d 154, 166 (2d Cir. 2011). At least in cases where the governing statute provides for fee shifting, the lodestar figure also may be enhanced, but courts have been cautioned to do so only in "rare and exceptional circumstances." Perdue v. Kenny A. ex rel. Winn, 559 U.S. 542, 552 (2010) (internal quotation marks omitted). Moreover, an enhancement cannot be based on factors such as the complexity of a case that are already subsumed in the lodestar analysis. Id. at 546, 555.

B.     Reasonable Hourly Rate

A fee applicant bears the burden of "produc[ing] satisfactory evidence" that its requested rates are "in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation."  Pearson Educ., Inc. v. Vergara, No. 09 Civ. 6832 (JGK) (KNF), at *6 (S.D.N.Y.  Sept. 27, 2010) (quoting Blum v. Stenson, 465 U.S. 886, 896 n.11 (1984)).  In exercising its "considerable discretion" as to attorneys' reasonable hourly billing rates, a court should determine the rates that a "paying client would be willing to pay," "bear[ing] in mind that a reasonable, paying client wishes to spend the minimum necessary to litigate the case effectively." Arbor Hill, 522 F.3d at 190.  In making this determination, the Court may rely on its own knowledge of private firm hourly rates.  Miele v. N.Y.S. Teamsters Conference Pension & Ret. Fund, 831 F.2d 407, 409 (2d Cir. 1987).

In Arbor Hill, the Second Circuit indicated that a court "should generally use the prevailing hourly rate in the district where it sits," but "may adjust the base hourly rate to account for other case-specific variables."  522 F.3d at 183-184.  The effect of this admonition was to deprive the Arbor Hill plaintiffs' New York City lawyers of their customary rates, reducing them to the obviously lower rates prevailing in the Albany, New York area.  Id. at 193.  Subsequently, in Simmons v. N.Y.C. Transit Auth., 575 F.3d 170 (2d Cir. 2009), the Second Circuit drew an even clearer line in the sand, stating:  "We now hold that, when faced with a request to award higher out-of-district rates, a district court must first apply a presumption in favor of application of the forum rule."  Id. at 176

(emphasis added).  The court explained that the purpose of this less lenient rule was to "promote[] cost-consciousness, increase[] the probability that attorneys will receive no more than the relevant market would normally permit, and encourage[] litigants to litigate with their own pocketbooks in mind, instead of their opponents'."  Id.

It is by no means clear that the Arbor Hill forum rule also entitles a plaintiff to enhance its fee recovery simply because the court hearing its case sits in a geographic area with a high cost of living.  As Magistrate Judge Andrew Peck noted in Ryan v. Allied Interstate, Inc., 882 F. Supp. 2d 628 (S.D.N.Y. 2012), hourly rates are "based, in part, on overhead costs, such as rent for office space and other 'local' conditions."  Id. at 633.  For that reason, Judge Peck held that if "the reasonable hourly rate for an out-of-district lawyer is less than the billing rate in the district where the court sits, the lower rate should apply."  Id. (quoting Arbor Hill, 522 F.3d at 191 n.8) ("Were a strict forum rule the settled law of this circuit, we could not have used a lower hourly rate than the hourly rate prevailing in the district where the district court sat to calculate the presumptively reasonable fee in Crescent Publishing Group, Inc. v. Playboy Enterprises, Inc., 246 F.3d 142 (2d Cir. 2001).") (alterations omitted); see also Davis Cnty. Solid Waste Mgmt. & Energy Recovery Special Serv. Dist. v. EPA, 169 F.3d 755, 759 (D.C. Cir. 1999) ("[W]e find the use of home market rates is preferable when the home market is substantially less costly and the site of the bulk of the legal work because it produces a result that better reflects the purpose of fee shifting statutes.").

11

This case differs from Arbor Hill, Simmons, and Ryan in that the fee application is not made by the victorious party in a matter arising under a fee-shifting statute.  It is, instead, the outgrowth of a successful motion for sanctions.  In that circumstance, even after Arbor Hill and Simmons, some courts have approved the use of higher out-of-district rates.  See On Time Aviation, Inc. v. Bombardier Capital, Inc., 354 F. App'x 448, 452 (2d Cir. 2009) (approving use of higher out-of-district rates because "the reasoning behind the calculation of awards under fee-shifting statutes . . . is not . . . precisely analogous to that applicable to Rule 11 awards," the intent of which is not compensation of victims, but the "curbing of abuses."); Ceglia v. Zuckerberg, No. 10-CV-00569A (LF), 2012 WL 503810 (W.D.N.Y. Feb. 12, 2012) ("Plaintiff's arguments proffered in opposition to Defendants' use of out-of-district hourly rates . . . fail to perceive any distinction between attorney's fees awarded pursuant to a fee-shifting statute, and attorney's fees awarded as a sanction.").

In this litigation, application of the Arbor Hill forum rule would serve to enhance the fees recoverable by at least two of the Plaintiffs' firms, which would be permitted to bill at New York City rates, rather than those prevailing in the smaller communities where their principal offices are located.  Although this might serve the punitive goals of a sanctions award, it also would mean that those lawyers and their clients would receive a windfall.  Suffice it to say, no case requires a court to bestow such a gift merely because a party has prevailed on a sanctions motion, and I decline to do so here.  The fee award for out-of-town counsel therefore will be calculated with the

prevailing rates in their home communities in mind.  The Court nevertheless will also consider the fact that the cost of litigating in a jurisdiction such as the Southern District of New York unquestionably imposes an additional burden on out-of-town lawyers from smaller jurisdictions.

With these precepts in mind, I will turn to the hourly rates requested for each of the Plaintiffs' four law firms.

### 1.   Anderson Kill

Anderson Kill is a firm with offices in seven cities.  (ECF No. 2855 (Decl. of Jerry S. Goldman, Esq., dated May 15, 2015 ("Goldman I")) ¶ 11).  Jerry S. Goldman, the partner assigned to the O'Neill cases that comprise part of this MDL, received his law degree from Boston University School of Law in 1976 and has an LLM in taxation.  (Id. ¶ 6).  He served as a prosecutor in Kings County and has tried more than fifty cases before juries in state and federal court.  (Id. ¶¶ 8, 12).  Rene Hertzog, his former associate, is a graduate of Fordham Law School who has been practicing law since 2008.  (Id. ¶ 18). Anderson Kill seeks reimbursement for their time at the rate of $800 per hour for Mr. Goldman and $475 per hour for Ms. Hertzog.  (Id. ¶ 19).  Mr. Goldman represents that his requested hourly rate is his "current standard" billing rate and that Ms. Herzog's requested rate is slightly lower than her "standard" $490 per hour rate.[5]  (Id.).

---

[5]     Anderson Kill does not explain why it is seeking a slightly reduced rate for Ms. Hertzog.

The Defendants challenge the use of a New York City rate for Mr.

Goldman, alleging that it is inconsistent with the fact that he has billed for travel time

from Philadelphia and back in connection with several court conferences before me.

(ECF No. 2864 at 11-12) ("There would be no reason for Mr. Goldman to record time for

round trip travel from Philadelphia to New York if his office was in New York, as his

affidavit now claims.").[6]  The Anderson Kill website, in fact, indicates that Mr. Goldman

maintains offices in both cities.  (See Haefele Decl. Ex. H at 1;

(http://www.andersonkill.com/PeopleDetails?PeopleID=38) (last visited Oct. 13, 2015)).

Mr. Goldman avers, however, that the "vast majority of [his] personal practice is in New

York and [that he] spends most of [his] time in Anderson Kill's New York office."

(See Goldman I ¶ 16; see also ECF No.  2866 (Decl. of Mr. Goldman, dated June 6, 2014

("Goldman II")), ¶ 3 ("I am assigned to the New York office of Anderson Kill which is

where I spend the bulk of my time.")).  Presumably, Mr. Goldman knows where he

works.  Indeed, it appears that his predecessor law firm, Jerry S. Goldman & Associates,

P.C., which is where he worked when he filed the O'Neill actions, also maintained its

offices in New York City.  (See 04 Civ. 1076 (RCC), ECF No. 15 ("Entry of

Appearance") (listing 111 Broadway as his firm's office location)).  The fact that Mr.

Goldman was in Philadelphia both before and after certain conferences thus may simply

mean that he was conferring with attorneys at Cozen O'Connor, a Philadelphia firm,

---

[6]       The Plaintiffs apparently do not seek to recover the cost of that travel as an expense.  (See Haefele Decl. Ex. B at 69-76).

which also represents the Plaintiffs.  (See Goldman II ¶ 6 ("The references [to] travel time

between Philadelphia and New York in the time entries submitted in support of Plaintiffs'

Fee Application represent instances where I traveled between the two locations related to

the [A]l Haramain matter.")).  In any event, Mr. Goldman's travel to and from

Philadelphia is not a basis upon which to second-guess his sworn representation that New

York City is the location of his principal office.

      As noted above, the actual rates that Anderson Kill seeks for its

timekeepers, although high, are represented to be their "current standard" billing rates or

less.  Indeed, Mr. Goldman avers that first-year associates in Anderson Kill's New York

office are billed at the rate of $295 per hour and that the firm's highest partner billing rate

is "believed to be $1,025/hour."  (Goldman I ¶ 20).  The Defendants do not directly

challenge these representations.  Instead, they advance two further arguments as to why

these rates should not be accepted:  first, that the disputes that gave rise to the discovery

motion practice here "involved civil procedure issues that every litigator is expected to

know," rendering New York City premium rates unwarranted; second, that in another

action, I recently found hourly rates of $450 for attorneys with thirty years of experience,

$300 for attorneys with twenty-five years of experience, and $75 for paralegals to be "'in

line with the prevailing market rates . . . in the Southern District of New York.'"  (ECF

No. 2835 at 10 (quoting Romeo & Juliette Laser Hair Removal, Inc. v. Assara I, LLC,

No. 08 Civ. 442 (TPG) (FM), 2013 WL 3322249, at *5 (S.D.N.Y. July 2, 2013))).  These

assertions overlook the extraordinary complexity of this MDL proceeding, as well as the

fact that Anderson Kill, a firm of approximately eighty lawyers, is in no way comparable to the small law firm to which fees were awarded in Romeo & Juliette.  Compare (www.martindale.com/Anderson-Kill/law-firm-293288.htm), with (www.kmm.com/attorneys.html) (both last visited Oct. 13, 2015).  Indeed, in the course of determining the recoverable rates in Romeo & Juliette, I cited one then-recent decision in which Magistrate Judge James Cott had approved the requested rate of $450 per hour for a law firm partner with over twenty years of experience.  Romeo & Juliette, 2013 WL 3322249, at *5 (citing Underdog Trucking, L.L.C. v. Verizon Corp., 276 F.R.D. 105, 110 (S.D.N.Y. 2011)).  Notably, in that case, although the partner requested only $450 per hour, his standard rate was $750 per hour and his sixth-year associate's standard rate was $325 per hour.  Underdog Trucking, 276 F.R.D. at 109 n.5. The firm in question also was much smaller than Anderson Kill.

For these reasons, the rates that were appropriate in Romeo & Juliette in 2013 do not set a ceiling for what would be reasonable here.  That said, the Court also must recognize that the actions comprising this MDL have been brought on a contingency fee basis in the hope that some deep-pocket defendants – such as banks, state actors, or large charitable organizations – will eventually be found liable.  As a consequence, although the Anderson Kill attorneys' "standard" billing rates may be instructive, they cannot be considered dispositive, since there is no suggestion that any of the Plaintiffs has actually paid the firm that amount.

Considering all of these factors, including the size of the firm, its location, the nature of the litigation, and the experience of its timekeepers, the Court will fix Mr. Goldman's hourly rate at $600 per hour and Ms. Hertzog's rate at $375 per hour.

2.     Cozen O'Connor

According to its website, Cozen O'Connor has nearly 600 lawyers in twenty-three cities on two continents.  See (https://www.cozen.com/attorney-search?keyword=&name=&practice=&subpractice=&industry=&location=&school=&bar=; https://www.cozen.com/offices) (both last visited Oct. 13, 2015).  Three Cozen O'Connor lawyers have billed time for which the Plaintiffs seek to recover:  Sean P. Carter; J. Scott Tarbutton; and Adam Bonin.  Messrs. Carter and Tarbutton are members of the firm.  Mr. Bonin was a member of the firm until 2012, when he left to start his own practice.  All three lawyers work (or worked) in the Subrogation and Recovery Department of the firm's Philadelphia office.  (ECF No. 2857 (Decl. of Stephen A. Cozen, Esq., dated May 15, 2014 ("Cozen Decl.")) ¶ 3-5).  According to the firm's website, the Subrogation and Recovery Department consists of more than one hundred attorneys and recovers in excess of $200 million annually on behalf of its insurance clients.  (Haefele Decl. Ex. E).

Mr. Carter co-chairs one of the PECs, (Cozen Decl. ¶ 3), and he has played a very active role in the frequent conferences before me.  He also has played a significant role in several appeals in this MDL case.  (Id.).  He is a 1993 graduate of the College of

William and Mary and a 1996 graduate of the Villanova University School of Law, where he served on the law review.  (Id.).

Mr. Tarbutton is also a member of the PEC.  He graduated from Fordham University in 1993 and received his law degree in 2001 from the Catholic University Columbus School of Law, where he served on the law review.  (Id. ¶ 4).  Finally, Mr. Bonin is a 1994 graduate of Amherst College and a 1997 graduate of the University of Chicago Law School, where he served on a journal.  (Haefele Decl. Ex. F).

Unlike Anderson Kill, Cozen O'Connor has not set forth any billing rates that it claims its timekeepers customarily charge paying clients.  Instead, the firm has submitted the declarations of two attorneys involved in firm management in support of its fee application.  (Cozen Decl.; ECF No. 2858 (Decl. of Elaine M. Rinaldi, Esq., dated May 15, 2014("Rinaldi Decl.")).  Based on those declarations, the Plaintiffs contend that they should be reimbursed for the Cozen O'Connor timekeepers' services at the following rates:  Mr. Carter, $750 per hour; Mr. Tarbutton, $600 per hour; and Mr. Bonin, $500 per hour.  (Cozen Decl. ¶ 6).  Both declarants maintain that these rates are "consistent with the rates charged by attorneys with comparable experience and expertise in the New York area, particularly for cases of similar complexity and scale."  (Id. ¶ 7; Rinaldi Decl. ¶ 7).  One of the declarants further notes that the rates that Cozen O'Connor seeks are consistent with the "rates set forth in the Laffey Matrix."  (Cozen Decl. ¶ 8).  The Laffey Matrix often is used to determine the reasonable hourly rates for attorneys practicing in

the District of Columbia area.[7]  As the Plaintiffs correctly observe, (see ECF No. 2841 at

4-5), in House v. Wackenhut Services, Inc., No. 10 Civ. 9476 (CM) (FM), 2012 WL

3538083 (S.D.N.Y. Aug. 8, 2012), I considered the Laffey Matrix in the course of

deciding the reasonable hourly rate for an attorney practicing there.

      The Cozen O'Connor declarations do not explain whether the timekeepers

for whom the Plaintiffs seek to recover fees have billing rates that they customarily

charge clients for work performed in the Philadelphia area, much less what those rates

are.  In their opposition papers, however, the Defendants note that the United States

District Court for the Eastern District of Pennsylvania has awarded fees to Cozen

O'Connor in a recent copyright infringement case at hourly rates of $350 per partner and

$285 per associate – rates considerably more modest than those that they seek here.  (ECF

No. 2835 at 11 (citing Maule v. Philadelphia Media Holdings, LLC, No. 08-3357, 2010

WL 3859613, at *13 (E.D. Pa. Oct. 1, 2010)).  Even more recently, in a case pending in

the District of Maryland, the court found that a Cozen attorney with forty years of

experience, who had charged his insurance client $320 per hour, was at the low end of

---

    [7]    The Laffey Matrix is a table based on the hourly billing rates that the court found reasonable in Laffey v. Northwest Airlines, Inc., 572 F. Supp. 354, 371 (D.D.C. 1983), aff'd in part and rev'd in part on other grounds, 746 F.2d 4 (D.C. Cir. 1984).  Since that case was decided, the United States Attorney's Office for the District of Columbia has published an index that adjusts those rates annually, based on changes in the Consumer Price Index ("CPI") for the Washington, D.C. area.  See (http://www.justice.gov/sites/default/files/usao-dc/legacy/2014/07/14/Laffey%20Matrix_2014-2015.pdf) (last visited Oct. 13, 2015).  An alternative form of the Laffey Matrix, used by certain courts to determine fees, adjusts the Laffey Matrix rates based on the higher rate of inflation in the legal services component of the CPI.  See Baker v. D.C. Pub. Schs., 815 F. Supp. 2d 102, 113 (D.D.C. 2011); (www.laffeymatrix.com/see.html) (last visited Oct. 13, 2015).

certain guidelines routinely used in that district to gauge the reasonableness of fee applications. <u>Chu v. Great N. Ins. Co.</u>, No. 10-CV-1422-RWT, 2014 WL 3810590, at *3 (D. Md. July 31, 2014).  Those guidelines suggested that an hourly rate of $300 to $475 was reasonable in that jurisdiction for an attorney admitted to practice for twenty or more years. <u>Id.</u>

Perhaps more instructive is the decision in <u>United States v. All Funds on Deposit with R.J. O'Brien & Assocs.</u>, No. 11-C-4175, 2014 WL 1876139 (N.D. Ill. May 9, 2014) ("Illinois Action"), in which the court awarded Cozen O'Connor fees based on an hourly rate of $650 for firm "shareholders" and $375 for "members." <u>Id.</u>, at *9-10.  In that case, Steven A. Cozen, chairman of the firm, attested that these rates were "consistent with the standard billing rates that [these timekeepers] charge[d] for their services in other complex litigation matters involving hourly paying clients." <u>See id.</u>; (Illinois Action, ECF No. 169-1 (Decl. of Stephen A. Cozen, Esq., dated Dec. 18, 2013) ¶ 14). Significantly, both Messrs. Carter and Tarbutton were among the attorneys for whom the plaintiffs sought to recover fees in the Illinois Action.  (Decl. of Stephen A. Cozen, Esq., dated Dec. 18, 2013 ¶¶ 3,6).  Similarly, in <u>Canada Dry Delaware Valley Bottling Co. v. Hornell Brewing Co.</u>, No. 11 Civ. 4308 (PGG), 2013 WL 6171660 (S.D.N.Y. Nov. 25, 2013), Judge Gardephe of this District awarded a Cozen O'Connor partner with thirty years of experience his regular Philadelphia billing rate of $575 to $600 per hour and a fifth-year associate in the New York City office her regular billing rate of $330 to $350 per hour.  2013 WL 6171660, at *2-3.

20

Mr. Carter has approximately twenty years of legal experience and is described in the Plaintiffs' motion papers as a firm shareholder; Messrs. Tarbutton and Bonin also have considerable legal experience and are described, respectively, as a member and former member of the firm.  (Cozen Decl. ¶ 3-5).  Taking into account all of the factors set forth above, including the venue of this litigation and the nature of the tasks performed, the Court will award fees based on an hourly rate of $500 per hour for Mr. Carter, and $400 per hour for Messrs. Tarbutton and Bonin.

3.    Kreindler & Kreindler

Kreindler & Kreindler is a boutique law firm, particularly noted for its expertise in aviation accident litigation, but which also has other areas of specialization. The firm has approximately twenty-five attorneys and maintains offices in New York, Boston, and Los Angeles.  (http://www.kreindler.com/Attorneys/) (last visited Oct. 13, 2015).  As the firm's website clearly explains, "almost all of [its] cases [are accepted] on a contingent fee basis."  (www.kreindler.com/About-the-Firm/) (last visited Oct. 13, 2015).  Undoubtedly for that reason, the firm has not made any submission concerning its customary rates.  (See ECF No. 2858 (Aff. of James P. Kreindler, Esq., sworn to on May 14, 2014 ("Kreindler Aff."))).  Nonetheless, Kreindler & Kreindler seeks to recover fees for the two partners assigned to this MDL at the following rates:  James P. Kreindler, $800; and Andrew Maloney, III, $750.  Kreindler & Kreindler also seeks to recover fees for the time spent by a non-attorney at the rate of $350 per hour.  (Haefele Decl. Ex. B at 66).

Mr. Kreindler is a 1977 graduate of Dartmouth College and a 1980 graduate of Columbia Law School, who began his career as an Assistant District Attorney in Kings County.  (Id. Ex. G at 8).  Mr. Maloney is a 1985 graduate of Boston College and a 1988 graduate of Fordham Law School, where he was a member of the Urban Law Journal.  Before joining Kreindler & Kreindler, Mr. Maloney was an Assistant United States Attorney in this District.  (Id. at 9, 17).  The non-attorney is John Fawcett, who has been with Kreindler & Kreindler since 2002.  Mr. Fawcett works as an investigative researcher; he has an M.Sc. degree in international relations from Bristol University in the United Kingdom and has worked in the human rights field for years.  (Id. at 18).

Although Kreindler & Kreindler is smaller than both Anderson Kill and Cozen O'Connor, its timekeepers work in New York City.  It therefore is reasonable to permit the Plaintiffs to recover fees for any allowable Kreindler & Kreindler time at the rate of $550 per hour for Mr. Kreindler and $500 per hour for Mr. Maloney.  There is no evidence that Mr. Fawcett, the investigator, has performed tasks different than those that might typically be expected of a skilled paralegal.  As a consequence, any fees for his time will be calculated at the rate of $125 per hour that Judge Gardephe fixed for the Cozen O'Connor paralegal assistants in Canada Dry.  See 2013 WL 6171660, at *3.  For reasons described below, this rate-setting will not actually result in any award of fees to Kreindler & Kreindler.  Nonetheless, because numerous other discovery motions have been, and will be filed, and because Kreindler & Kreindler may opt eventually to start

keeping track of its timekeepers' hours, it makes sense to set the firm's rates in this Decision and Order.

      4.   <u>Motley Rice</u>

    The last firm for which the Plaintiffs seek to recover fees is Motley Rice. Motley Rice is a Charleston, South Carolina, firm of more than seventy attorneys with offices in seven jurisdictions, including New York.  The firm has considerable expertise in mass tort litigation.  (http://www.motleyrice.com/about) (last visited Oct. 14, 2015). The Plaintiffs seek to recover fees for the time expended by one partner and four associates at Motley Rice, each of whom practices in the firm's Anti-Terrorism and Human Rights Group.

      The Motley Rice partner is Jodi Westbrook Flowers, who chairs the Group. Ms. Flowers is a 1989 graduate of the College of Charleston and a 1993 graduate of the University of South Carolina School of Law, where she was a Carolina Legal Scholar. She also is a member of the PEC.  (Haefele Decl. Ex. E at 15).

      Mr. Haefele, despite being described as an associate, is a highly experienced attorney, who has been with Motley Rice since 2003.  He is a 1986 graduate of Rutgers College and a 1989 graduate of Rutgers University-Camden School of Law. Prior to practicing law, Mr. Haefele clerked for a judge in the Appellate Division of the New Jersey Superior Court.  He is admitted in several jurisdictions, including New York, and has played a significant role in this case.  (<u>Id.</u> at 25-26).

Elizabeth Smith is a 1995 graduate of Furman University and a 2000 graduate of the University of South Carolina School of Law.  John Eubanks is a 1996 graduate of Georgetown University and a 2003 graduate of the Georgetown University Law Center.  Both Smith and Eubanks are Motley Rice associates.  (Id.).

Finally, during the relevant time period, Brian Frutig was a Motley Rice associate.  He is a 2000 graduate of Georgetown University, has a masters degree in international conflict analysis from King's College of the University of London, and received his law degree from William and Mary Law School in 2008.  While in law school, Mr. Frederick worked with the International Criminal Tribunal for the Former Yugoslavia.  (Id.).

Motley Rice seeks to recover fees for the time spent by these attorneys at the following hourly rates:  Ms. Flowers, $800; Mr. Haefele, $750; Ms. Smith, $600; Mr. Eubanks, $550; and Mr. Frutig, $400.  (Haefele Decl. Ex. B at 4-26).  Judging by the office telephone numbers listed on the firm's website, it appears that Ms. Smith is in the firm's Washington D.C. office and that the remaining timekeepers maintain their offices in South Carolina.  (See http://www.motleyrice.com/attorneys) (last visited Oct. 14, 2015).

It seems self-evident that the cost of living – and hence the cost of retaining counsel – is considerably less in the District of South Carolina than in this District. Indeed, as Al Haramain (USA) notes, in one recent case, two South Carolina firms considerably larger than Motley Rice were awarded fees at hourly rates less than half the

24

rates proposed by the Plaintiffs.  See Grayson Consulting, Inc. v. Cathcart, No. 2:07-

02992-DCN, 2013 WL 436217, at *3 & n.1 (D.S.C. Feb. 5, 2013) (awarding $300 per

hour for partners with fifteen and twenty-five years of experience, as well as a third

attorney with eight years of experience, in complex Ponzi scheme case).  In another

recent case cited by Al Haramain (USA), a partner, a "counsel," and an associate at a

South Carolina firm were awarded fees at the rate of $265 per hour because the court

found that the work was more appropriate for an associate.  See H&C Corp. v. Puka

Creations, LLC, No 4:12-cv-00013-RBH, 2013 WL 2303248, at *2 (D.S.C. May 24,

2013).  In that case, one "member" of the firm had submitted an affidavit stating that his

billing rate was $450 per hour, the billing rate of a counsel at his firm was $330 per hour,

and the associate's billing rate was $265 per hour.  Id. at *1; (2013 WL 2303248, ECF

No. 27-1 (Aff. of William Y. Klett, III, Esq., sworn to on Nov. 26, 2012)).

      Given the complexity of this case, it clearly was reasonable to have senior

Motley Rice personnel participate.  Moreover, in determining the reasonable hourly rates

for those Motley Rice timekeepers, there must be some acknowledgment that this MDL is

pending in the Southern District of New York, not the District of South Carolina, and has

required frequent appearances here – at least by Mr. Haefele.  Also, Ms. Smith works in

Washington, D.C., an area that presumably has a higher cost of living than Charleston,

South Carolina.  For these reasons, the Court will award fees at the rate of $450 per hour

for Ms. Flowers, Ms. Smith, and Mr. Haefele, and $350 per hour for Messrs. Eubanks and

Frutig.

C.    <u>Hours Reasonably Expended</u>

1.    <u>Contemporaneous Time Records</u>

In this Circuit, to enable a court to determine whether an attorney's time charges are reasonable, the party seeking to recover fees must submit contemporaneous time records indicating the number of hours expended and the nature of the work done. <u>See</u> <u>Lewis v. Coughlin</u>, 801 F.2d 570, 577 (2d Cir. 1986); <u>N.Y.S. Ass'n for Retarded Children, Inc. v. Carey</u>, 711 F.2d 1136, 1148 (2d Cir. 1983); <u>Puglisi v. Underhill Park Taxpayer Ass'n</u>, 964 F. Supp. 811, 817 (S.D.N.Y. 1997).  Here, there is no reason to question the contemporaneousness of the billing records of three of the four law firms. As noted earlier, although those firms initially presented abstracts from their time recording systems, they now have permitted the Defendants to review their original time entries for two exemplar months chosen by the Defendants.  Despite having been afforded this opportunity, the Defendants – with minor exceptions – have been unable to show that there are any discrepancies between the billing summaries and the underlying records. Additionally, each of the three firms has tendered a sworn statement by one or more of its knowledgeable representatives attesting that its fee request is based on contemporaneous billing records.  (Haefele Decl. ¶ 15; ECF Nos. 2855, 2857-2859).

The firm that has not adequately made this showing is Kreindler & Kreindler.  As part of the Plaintiffs' original fee application, Mr. Haefele represented that the applicant firms' billing entries – including those of Kreindler & Kreindler – were based on "contemporaneous data maintained by each firm."  (Haefele Decl. ¶ 15).

26

Thereafter, when I required further substantiation by a knowledgeable firm representative,

Mr. Kreindler submitted his own affidavit stating, insofar as relevant, that:

> Our application setting out the time we devoted to plaintiffs'
> motion is based on Court records, email traffic and the
> monthly contemporaneous time records of John Fawcett, our
> investigator and researcher.

(Kreindler Aff. ¶ 3).  The only Kreindler & Kreindler time records that were turned over

to the Plaintiffs, however, consisted of a chart reflecting the total hours that Mr. Fawcett

worked on "al Haramain" or "Jel/Rabita" on six separate dates from February 1 through

March 21, 2013.[8]  (See ECF No. 2864-2 (letter dated May 22, 2014, from Mr. Kreindler

to Defendants' counsel) (enclosing "contemporaneous time records for . . . John

Fawcett")).  That chart does not contain so much as a syllable indicating what specific

services Mr. Fawcett performed on those dates, nor does it reflect any time expended by

Messrs. Kreindler and Maloney.  Accordingly, any suggestion that the spreadsheet entries

constituted "contemporaneous time records" within the meaning of Carey obviously is

wholly misplaced.

As the Second Circuit explained in Scott v. City of New York, 626 F.3d

130 (2d Cir. 2010), although the language of Carey suggests that contemporaneous time

records are "a mandatory requirement," the decision left some room for the exercise of

discretion, stating that any post-Carey fee applications that failed to comply "should

---

[8]     The Rabita Trust was one of the defendants whose conduct was considered in the
October Decision.  For unrelated reasons, I recommended the entry of a default judgment against
the Rabita Trust.  (Oct. Dec. at 25-26).

normally be disallowed." <u>Scott</u>, 626 F.3d at 133 (emphasis added) (quoting <u>Carey</u>, 711

F.2d at 1147, 1154).  In <u>Scott</u>, the Second Circuit sought to harmonize these seemingly

contradictory statements by declaring that "<u>Carey</u> establishes a strict rule from which

attorneys may deviate only in the rarest of cases." <u>Scott</u>, 626 F.3d at 133.  Indeed, in the

few cases in which the Second Circuit has approved an award of attorneys' fees despite

the lack of complete contemporaneous records, "counsel has always maintained at least

<u>some</u> contemporaneous records." <u>Id.</u> (collecting cases) (emphasis in original); <u>see also</u>

<u>Marion S. Miskin Law Office v. Lapalo</u>, 767 F.3d 144, 149 (2d Cir. 2014) (remanding

case because counsel's time-stamping of documents may satisfy <u>Carey</u>).[9]  If fees are to be

awarded in such circumstances, however, the district court must explain the basis for its

departure from the usual rule in sufficient detail to permit appellate review.  <u>Scott</u>, 626

F.3d at 134.

      Here, there simply are <u>no</u> records – incomplete or otherwise – reflecting any

contemporaneous time entries that Kreindler & Kreindler attorneys made in relation to the

discovery issues addressed in the October Decision.  Nor was there any catastrophe at

Kreindler & Kreindler's offices causing the loss or destruction of such records.  Instead,

as is true of many contingency fee firms, Kreindler & Kreindler simply chose, for

business reasons, not to require its attorneys to keep track of their time.  Moreover, the

---

[9]    In <u>Scott</u>, the court observed that there also might be "rare circumstances where an award of fees might be warranted even in the total absence of contemporaneous records – such as where the records were consumed by fire or rendered irretrievable by a computer malfunction before counsel had an opportunity to prepare his application."  626 F.3d at 134.

sketchy time records for Mr. Fawcett seem intended merely to comply with the requirements of the overtime and spread-of-hours laws entitling him, as a non-attorney, to premium pay if he worked more than forty hours per week or ten hours per day.  Thus, the most extensive entry in Mr. Fawcett's time records reads, in its entirety, "Jel/Rabita." (ECF No. 2864-2 Ex. B).  Three other entries say simply, "Al Haramain," and the remaining entry is redacted and reveals nothing at all about the nature of Mr. Fawcett's work.  Id..  These extraordinarily terse time entries cannot seriously be characterized as the sort of time records that a fee-paying law firm client would accept to assess the reasonableness of the time being charged by its law firm.  Indeed, absolutely no detail has been provided.  Nor can Mr. Fawcett's chart – even if it is supplemented by court records and email traffic – be considered an acceptable substitute for detailed contemporaneous time records completed by Kreindler & Kreindler attorneys.

In sum, to the extent that Mr. Haefele represented that the Kreindler & Kreindler fee request was based on "contemporaneous data maintained by [that] firm," (see Haefele Decl. ¶ 15), his statement was, at a minimum, misleading since there clearly are no contemporaneous Kreindler & Kreindler attorney time records.  Moreover, even if court records and email could be considered contemporaneous data, Kreindler & Kreindler's extrapolation therefrom clearly does not satisfy Carey and Scott, which require the submission of "contemporaneous time records" in all but the most unusual circumstances.  See Scott, 626 F.3d at 133 (emphasis added) (quoting Carey, 711 F.2d at 1154).

I could conceivably award Kreindler & Kreindler some or all of the time that its attorneys spent in court during conferences before me while the discovery disputes that led to the awarding of fees were being discussed, since I know firsthand who was there and for approximately how long.  See Scott v. City of New York, 643 F.3d 56, 59 (2d Cir. 2011) ("Where the court's docket reflects that [counsel] was in the courtroom participating in trial or was in chambers in conference with the judge and other counsel, these entries, comparable to contemporaneous attorney time records, may be effective substitutes for [counsel's] own contemporaneous time records.").  That, however, would recognize a limited exception to Carey and Scott enabling attorneys who choose not to keep time records nevertheless to recover fees.  While there may be circumstances where this is appropriate, in this case, in which the Defendants and the Court have both had to spend time unearthing the true facts, this strikes me as unwarranted.  I therefore decline to exercise my discretion to award Kreindler & Kreindler any fees for the time that its attorneys may have expended in relation to the disputes that led me to award fees, including any time that they spent in court.[10]

The Defendants argue that the three firms other than Kreindler & Kreindler that submitted fee applications, and certainly Mr. Haefele as their collective spokesman, must have known that their joint fee application was materially misleading since Kreindler & Kreindler kept no contemporaneous time records of its attorneys' time and

---

[10]     This will hardly deal a crippling blow to Kreindler & Kreindler.  The firm's fee application sought a total of only $40,100, consisting of $17,750 allegedly owed by Al Haramain (USA) and an additional $22,350 owed by Jelaidan.  (Haefele Ex. B at 2, Ex. C at 2).

Mr. Fawcett had no detailed billing entries.  (ECF No. 3864 at 9).  The careful wording of

Mr. Haefele's representation that the summaries were based on "contemporaneous data

maintained by each firm," (Haefele Decl. ¶ 15), certainly suggests that this may be so.

For that reason, the Defendants urge the Court to exercise its discretion not to award any

fees to any of the Plaintiffs.  (ECF No. 2864 at 9-11).  Although the Plaintiffs' decision

not to be fully up-front about the shortcomings in Kreindler & Kreindler's record keeping

is certainly far from praiseworthy, it pales in comparison to the Defendants' dodging and

weaving with respect to discovery over the past few years.  Accordingly, I decline the

invitation to punish the three other law firms for Kreindler & Kreindler's sins.

### 2.   Defendants' Other Arguments

Over the months that the two sides have been briefing the Plaintiffs'

entitlement to fees, the Defendants have advanced a number of other arguments why no

fees – or only substantially reduced fees – should be awarded to any of the Plaintiffs'

firms.  I will address their principal arguments briefly.

First, the Defendants contend that a substantial haircut is warranted because

the Plaintiffs' discovery motions were only partially successful.  Jelaidan, for example,

seeks a one-third reduction of any fee award because I found that an adverse inference

instruction was warranted and also awarded attorneys' fees, but did not further impose the

sanction of a default judgment that the Plaintiffs had requested.  (ECF No. 2834 at 2-3).

Using this logic, had I concluded that Jelaidan's behavior was so egregious that a default

judgment should be entered, Jelaidan still would be entitled to a one-third reduction

because there would have been no need to impose an adverse inference instruction.  As this example demonstrates, the mere fact that some of the relief requested by the Plaintiffs was not awarded scarcely means that their claims were only partly meritorious.

Using the same playbook, Al Haramain (USA) seeks a two-thirds reduction because I found that:  (a) its refusal to comply with this Court's orders regarding the Oregon documents did not lead to any long-term prejudice and consequently did not warrant either an adverse inference instruction or a default judgment; and (b) Al Haramain (USA) could not have predicted that the Saudi authorities would seal the offices of its Saudi counterpart, thus rendering inaccessible any documents that had been kept there.  (ECF No. 2835 at 12).  While the second of these theories has some limited merit, Al Haramain (USA) hardly deserves any credit for the fact that its wholly unjustified refusal to request the Oregon documents eventually caused no prejudice because of the protracted document discovery schedule in this matter, or that the federal authorities in Oregon were able to restore some 20,000 to 25,000 emails that had been erased.  Moreover, as is true with respect to Jelaidan, the fact that I declined to impose an adverse inference instruction, or recommend the entry of a default judgment by reason of Al Haramain (USA)'s delayed production of its Oregon documents, clearly does not warrant any reduction of the fees and expenses that the Plaintiffs reasonably incurred in connection with their motion.

Al Haramain (USA) also contends that the Plaintiffs' fee request is so grossly excessive – particularly in light of their request for a lodestar enhancement – as to

warrant the denial of any fees.  (ECF No. 2835 at 4-5 & n.2 (citing, inter alia, Thelen Oil

Co. v. Fina Oil & Chem. Co., 962 F.2d 821, 824 (8th Cir. 1992) ("[I]t is not inappropriate

to deny fees completely when the fee request is outrageously excessive and unsupported

by adequate documentation."); Brown v. Iowa, 152 F.R.D. 168, 175 (S.D. Iowa 1993)

(indicating that, in the context of civil rights fee-shifting statutes, "federal courts have

consistently held that an intolerably inflated fee request justifies a complete denial of

fees."))).  The denial of fees under Rule 37 is an extreme measure to be imposed only in

"very limited circumstances."  Brown, 152 F.R.D. at 175 (quoting Jordan v. United States

Dep't of Justice, 691 F.2d 514, 518 (D.D.C. 1982)).  Here, whatever the shortcomings of

the Plaintiffs' fee application may be, they have not placed their thumbs on the scale so

heavily that the total disallowance of their fee request is the only appropriate remedy.

> The Defendants also question the appropriateness of certain billings.  One

of their central contentions is that they should not be held liable for the fees charged by

four separate law firms to attend discovery conferences where only one attorney argued in

favor of the relief sought.  They similarly contend that they should not be held responsible

for the time expended in connection with the conferences by other attorneys at the same

firm as the attorney who argued the motion because those additional attorneys were

unnecessary.  (ECF No. 2835 at 14).  Ironically, many attorneys on the defense side who

were not directly involved in these motions also attended the conferences in order to

ensure that they were up to date regarding the progress (or lack of progress) in this MDL

case.  That they did so is scarcely surprising since this litigation involves complicated and

often novel claims and issues being raised (and opposed) by numerous parties with

potentially divergent interests.  For example, on the Plaintiffs' side, the various plaintiffs'

interests are represented through a Plaintiffs' General Steering Committee, which, in turn,

operates through two PECs representing, respectively, the interests of plaintiffs with

wrongful death or personal injury claims and property damage or other commercial

claims.  The PECs also include lawyers at all four of the firms seeking fees.  As this

structure suggests, the various firms' clients have interests that may differ, and for that

reason, among others, are each entitled to have input into such tactical decisions as when

discovery motions should be filed and what relief should be sought.  Finally, as is

apparent from the $6 billion default judgment awarded with respect to only one aspect of

this complex case, (ECF No. 2623), the potential recoveries against the numerous

defendants named in this case are nothing short of staggering.  In these circumstances, it

is unlikely that the Plaintiffs could have been adequately represented simply by sending

one partner from one firm to argue each discovery motion, as the Defendants suggest.

   In a further effort to whittle away at the sums to be awarded, the Defendants

also point out discrepancies and errors in the Plaintiffs' counsels' time entries.  In one

instance, attorneys who traveled to a conference together did indeed have conflicting time

entries and subsequently made upward adjustments to some of those entries to bring their

time allocations into agreement.  (ECF No. 2864 at 12).  In another instance, however, the

Plaintiffs made a downward adjustment as a result of such a discrepancy.  (Id.).  The

existence of adjustments of this nature does not suggest that the Plaintiffs' summaries of

their attorneys' time are fundamentally incorrect.  Nor does the fact that certain time

charges may have been extrapolated from block-billed time mean that the Plaintiffs

cannot recover for the subset of time that reasonably was spent on issues related to the

October Decision.  See, e.g., Nat'l Law Ctr. on Homelessness and Poverty v. U.S. Dep't

of Veterans Affairs, 10 F. Supp. 3d 21, 28 (D.D.C. 2013) ("When a fee application has

block-billed time, 'the court must estimate the reduction to be made because of such

insufficient documentation.'") (quoting In re Olson, 884 F.2d 1415, 1429 (D.C. Cir.

1989) (per curiam)); Sentry Ins.[,] a Mut. Co. v. Brand Mgmt. Inc., No. 11-CV-3966,

2013 WL 2644675, at *4 (E.D.N.Y. June 12, 2013) (imposing ten percent reduction

because ad hoc estimates derived from block billing are disfavored).

   Based on an analysis of the number of transcript pages devoted to each of

them, the Defendants also suggest that the Plaintiffs' time allocations for time spent

addressing the Defendants' discovery shortcomings at conferences are inaccurate.  (ECF

Nos. 2835 at 19-20, 2836 at 1-4).  The Plaintiffs obviously are entitled to be paid only

once for each hour of time that a particular attorney expended in connection with the

matters giving rise to their fee application.  There consequently must be some allocation

between the Defendants (and possibly with other defendants who were discussed during

the conferences) to ensure against overbilling.  Recognizing this, in their reply papers, the

Plaintiffs have acceded to certain reductions.  (See ECF No. 2841 at 12-13) (agreeing to

reduce by fifty to eighty percent Al Haramain (USA)'s share of the time Plaintiffs'

counsel spent at three court conferences).

The Defendants also contend that the approximately sixty-five hours that Anderson Kill and Motley Rice attorneys spent to prepare the Plaintiffs' fee application are excessive.  (ECF No. 2834 at 8-9).  The time reasonably spent on such applications is compensable.  See, e.g., Ceglia, 2012 WL 503810, at *18 (citing Weyant v. Okst, 198 F.3d 311, 316 (2d Cir. 1999)); Warren v. James C. Bender & Assocs., No. 14 Civ. 5976 (AJP), 2014 WL 6792060, at *1 (S.D.N.Y. Dec. 3, 2014); but see Lopalo, 767 F.3d 144, 150 (2d Cir. 2014) ("When an attorney chooses to submit reconstructions of contemporaneously kept time records, denying fees for time spent preparing the application is an appropriate and necessary penalty for omitting to include the time records.") (quoting Lewis v. Coughlin, 801 F.2d 570, 577 (2d Cir. 1986)) (internal quotation marks omitted).  Nevertheless, there must be appropriate adjustments for portions of the Plaintiffs' fee application that have been denied.  One such category of fees relates to the Plaintiffs' attempt to recover enhanced fees through a lodestar multiplier, which (as set forth below) I have concluded must be denied.  Another area in which cuts must be made relates to any time that the Plaintiffs' attorneys spent attempting to justify the Kreindler & Kreindler fee application.

    D.    Lodestar

        Rather than separately reviewing each entry in an extensive application, and each objection thereto, the Court may rely on "across-the-board percentage cuts in hours 'as a practical means of trimming fat from a fee application.'"  In re Agent Orange Prod. Liab. Litig., 818 F.2d 226, 237 (2d Cir. 1987) (quoting Casey, 711 F.3d at 1146); accord

36

<u>McDonald ex rel Prendergast v. Pension Plan of the NYSA-ILA Pension Trust Fund</u>, 450

F.3d 91, 96 (2d Cir. 2006).  Here, the Plaintiffs plainly are not entitled to recover all of

the fees that they have requested for the reasons detailed above.  Accordingly, I will first

reduce the billings of the three firms that have submitted contemporaneous time records

to account for the lower hourly billing rates that I have found are reasonable.  Then, to

account for each of the additional factors that warrant an offset here, particularly the time

Plaintiffs' counsel spent seeking sanctions for Al Haramain (USA)'s failure to produce

documents from Saudi Arabia, I will impose further reductions as follows:  Al Haramain

(USA), forty percent; Jelaidan, twenty-five percent.[11]  For time expended in connection

with the subsequent fee application, I will impose a fifty percent reduction and further

assess only half of the resulting fees against each of the Defendants.

       The foregoing analysis results in the following awards to the Plaintiffs for

attorneys' fees incurred in connection with matters other than the preparation and

prosecution of the fee application:

---

[11]    I am imposing these percent reductions based on the amounts requested in the Plaintiffs' initial request for attorneys' fees.  (ECF Nos. 3830-2831).  As noted above, the Plaintiffs subsequently agreed to certain reduction of those fees.  (ECF No. 2841 at 11-13). Since the Court's and the Plaintiffs' reductions are based on similar considerations, reducing the Plaintiffs' amended fee application by the percentages I deem necessary would punish the Plaintiffs twice for the same errors.  This obviously would not be just.

| AL HARAMAIN (USA) | | | | |
|---|---|---|---|---|
| **LAW FIRM** | **INITIAL REQUEST** | **ADJUSTED FEES** | **40 PERCENT REDUCTION** | **FINAL AWARD** |
| Anderson Kill | $58,520.00 | $43,890.00 | $26,334.00 | $32,917.50 |
| Cozen O'Connor | 98,770.00 | 66,060.00 | 39,636.00 | 39,636.00 |
| Motley Rice | 236,625.00 | 157,962.50 | 94,777.50 | 94,777.50 |
| **TOTAL** | $393,915.00 | $267,912.50 | $160,747.50 | $160,747.50 |

| JELAIDAN | | | | |
|---|---|---|---|---|
| **LAW FIRM** | **INITIAL REQUEST** | **ADJUSTED FEES** | **25 PERCENT REDUCTION** | **FINAL AWARD** |
| Cozen O'Connor | $181,200.00 | $120,800.00 | $90,600.00 | $90,600.00 |
| Motley Rice | 65,932.50 | 39,952.50 | 29,964.38 | 29,964.38 |
| **TOTAL** | $247,132.50 | $160,752.50 | $120,564.38 | $120,564.38 |

The fees that the Plaintiffs may recover from the Defendants for the time that Anderson Kill and Motley Rice expended in connection with the preparation and prosecution of the fee application are as follows:

| LAW FIRM | INITIAL REQUEST | ADJUSTED FEES | 50 PERCENT REDUCTION | FINAL AWARD |
|---|---|---|---|---|
| Anderson Kill | $12,922.50 | $9,892.50 | $4,946.00 | $4,946.00 |
| Motley Rice | 52,512.50 | 31,490.00 | 15,745.00 | 15,745.00 |
| **TOTAL** | $65,435.00 | $41,382.50 | $20,691.25 | $20,691.25 |

This, in turn, results in a total award of attorneys' fees against the

Defendants as follows:

| DEFENDANT | BASE FEE AWARD | FEE APPLICATION AWARD | TOTAL |
|---|---|---|---|
| Al Haramain (USA) | $160,747.50 | $10,345.63 | $171,747.13 |
| Jelaidan | 120,564.38 | 10,345.63 | 130,910.01 |
| **TOTAL** | $320,598.38 | $20,691.25 | $302,003.14 |

E.    <u>Lodestar Enhancement</u>

The Plaintiffs contend that the purpose of attorneys' fees awarded as a

sanction (unlike those awarded pursuant to a fee-shifting statute) is to deter abusive

conduct.  (Pls.' Mem. at 17-18 (citing <u>Bombardier Capital</u>, 354 F. App'x at 452).

Accordingly, in a rather terse portion of their initial memorandum, the Plaintiffs ask that

an "enhancing multiplier" of one and one-half times their reasonable fees be imposed

against the Defendants to further the goals of specific and general deterrence.  (<u>Id.</u> (citing

<u>Ceglia</u>, 2012 WL 503810)).

In Ceglia, a case of some notoriety, the plaintiff claimed to have entered into an agreement with Mark Zuckerberg that granted him an ownership interest in what eventually came to be the Facebook website.  2012 WL 503810, at *1.  After granting a motion to compel and fining the plaintiff $5,000 for his failure to comply with a discovery order, Magistrate Judge Leslie Foschio of the Western District of New York addressed the defendants' application  to recover the attorneys' fees incurred in connection with their motion.  In his decision, Judge Foschio distinguished attorneys' fees awarded under fee shifting statutes from those awarded as sanctions under the Federal Rules of Civil Procedure, noting that the latter are intended not only as compensation, but to "deter abusive litigation practices."  Id. at *7.  In particular, Judge Foschio observed that sanctions under Rule 37 should further the goals of specific and general deterrence.  Id.  For that reason, notwithstanding Arbor Hill, the judge awarded the defendants the fees related to their successful Rule 37 motion based on their counsel's New York City rates, rather than the rates prevailing in the Western District of New York.  Id. at *10.  That outcome, of course, simply made the defendants whole.

Suffice it to say, the Plaintiffs have not cited any case in which a percentage lodestar enhancement has been awarded to a successful movant under Rule 37, nor am I aware of any such authority.  Although I would not categorically rule out the possibility that circumstances yet to be encountered might warrant such a departure from existing practice in connection with a future fee application in this MDL, the Defendants' conduct

was not so egregious as to warrant such an extreme remedy here.  The Plaintiffs' request

for a lodestar enhancement is therefore denied.

IV.    Expenses

    The Defendants raise two principal objections regarding the $9,739.68 in

expenses that the Plaintiffs seek.  First, they contend that the Plaintiffs should not be

awarded any travel expense because they chose to litigate in this District.  (ECF No. 2835

at 20).  Second, they allege that the cost of expedited transcript copies should be

disallowed, and that the cost of transcripts must further be allocated among the various

defendants whose alleged discovery abuses were under consideration during each

conference with the Court.  (Id. at 21).

    Turning first to the contested travel expenses, the parties have markedly

different views as to which side favored this District as the MDL transferee court.  (Id.;

ECF No. 2841 at 13).  Had the cases been transferred elsewhere, however, there still

would likely have been travel expenses, although they might have involved different

attorneys and travel to a different court.  For this reason, I will decline the Defendants'

invitation to reject the Plaintiffs' travel expenses.

    The dispute regarding transcripts involves astonishingly small sums of

money.  Anderson Kill is seeking reimbursement for $620.64 in transcript costs from Al

Haramain (USA) following four court conferences.  (See ECF No. 2842-2 at 69-76).  As

Al Haramain (USA) notes, I previously have disallowed an award of the cost of daily

transcript copies in a case in which defendants who had ordered two copies of daily

transcripts solely for their counsel's convenience sought to impose that expense on

plaintiffs of modest means.  See Sylvester v. City of N.Y., No. 03 Civ. 8760 (FM), 2006

WL 3230152, at *16 (S.D.N.Y. Nov. 8, 2006).  There, however, the defendants were

proceeding under 28 U.S.C. § 1920, which is a narrow cost-shifting statute.  Pursuant to

that statute, to recover transcript costs, the requesting party must establish that they were

"necessarily obtained."  See 28 U.S.C. § 1920(2); Sylvester, 2006 WL 3230152, at *15

("The mere convenience to counsel is insufficient to justify taxation of costs.") (quoting

Carmody v. Pronav Ship Mgmt., Inc., 02 Civ. 7158 (DF), 2004 WL 1837786, at *1

(S.D.N.Y. Aug. 17, 2004)).  Here, by comparison, Rule 37(b)(2)(C) allows an award of

the successful movant's "reasonable expenses."  Given the complexity of this case, the

number of attorneys involved, the host of plaintiffs that they represent, and the amounts in

controversy, I find that it was reasonable for counsel to expedite the availability of

transcripts after court conferences.  Nevertheless, because defendants other than Al

Haramain (USA) were discussed during these conferences, I will impose a fifty percent

reduction in the transcript costs to ensure against double billing.

Accordingly, the expenses sought by Anderson Kill in connection with their

successful discovery motions will be reduced by $310.32.  The remaining expenses, in the

amount of $9,429.56, which are not disputed, are allocated as follows:

| FIRM | JELAIDAN | AL HARAMAIN (USA) |
|---|---|---|
| Anderson Kill | $0 | $314.82 |
| Cozen O'Connor | 978.50 | 1,798.85 |
| Motley Rice | 2,731.97 | 3,605.42 |
| **TOTAL** | $3,710.47 | $5,719.09 |

V.    Alleged Good Faith

       Finally, in a last ditch effort to avoid the entry of an award against them, the

Defendants continue to claim that they have proceeded in the utmost good faith.  In

particular, Al Haramain (USA) maintains that it could not produce any of the records

from its Oregon office that had been seized by federal authorities pursuant to a search

warrant until its concerns regarding the protective order were resolved.  (See, e.g., ECF

No. 2835 at 2 ("The problems with production arose from the legitimate basis that Al

Haramain (USA) lacked access to documents in the criminal case in Oregon.")).  Jelaidan

similarly contends that the Plaintiffs' fee application should be denied because it "ignores

the multiple good-faith attempts Jelaidan made to obtain the requested documentation."

(ECF No. 2834 at 2).  I previously have found, however, that Al Haramain (USA)

wrongfully continued to claim that it could not produce its Oregon records even after I

had confirmed that the protective order issued by a magistrate judge in the District of

Oregon did not preclude Al Haramain (USA) from obtaining the documents requested by

the Plaintiffs.  (Oct. Dec. at 33).  I also found that Jelaidan had both "wilfully disregarded

43

his discovery obligations and acted in bad faith." (Id. at 15).  Subsequently, Judge

Daniels rejected the Defendants' objections to these findings regarding their respective

mental states.  (ECF Nos. 2789 at 1-3, 2799 at 4-5, 2851).  Accordingly, to the extent that

the Defendants seek to reargue these issues in connection with the Plaintiffs' fee

applications, their belated efforts are wholly misplaced.  See, e.g., Local Civil R. 6.3

(motions for reconsideration or reargument of a court order determining a motion must be

served within fourteen days).

VI.     Conclusion

        For the reasons set forth above, the Plaintiffs are awarded attorneys fees and

expenses against defendant Wa'el Jelaidan in the amount of $134,620.47, and against

defendant Al Haramain Islamic Foundation in the amount of $177,466.22.

        SO ORDERED.

Dated:        New York, New York
              October 23, 2015

_____
          FRANK MAAS
    United States Magistrate Judge

Copies to all counsel via ECF

44