**MDL 1570 PLAINTIFFS' EXECUTIVE COMMITTEES**
In re: Terrorist Attacks on September 11, 2001 (S.D.N.Y)

| Plaintiffs' Executive Committee for Personal Injury and Death Claims | Plaintiffs' Executive Committee for Commercial Claims |
|---|---|
| Ronald L. Motley, *Co-Chair*<br>MOTLEY RICE LLC<br>James P. Kreindler, *Co-Chair*<br>KREINDLER & KREINDLER LLP | Elliot R. Feldman, *Co-Chair*<br>Sean Carter, *Co-Chair*<br>COZEN O'CONNOR |
| Andrew J. Maloney III, *Co-Liaison Counsel*<br>KREINDLER & KREINDLER LLP<br>Paul J. Hanly, Jr., *Co-Liaison Counsel*<br>HANLY CONROY BIERSTEIN SHERIDAN FISHER & HAYES LLP | J. Scott Tarbutton, *Liaison Counsel*<br>COZEN O'CONNOR |

<u>**Via ECF and Federal Express**</u>

November 13, 2015

The Honorable Frank Maas
U.S. District Court for the Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street, Room 740
New York, NY 10007-1312

   Re: *In Re: Terrorist Attacks on September 11, 2001,* 03 MDL 1570 (GBD) (FM)

Dear Judge Maas:

  The Plaintiffs renew their request for an order, under Rule 37 and the Court's inherent powers, imposing sanctions against Sana-Bell, Inc. and Sanabel al Kheer, Inc. (collectively, "Sanabel") for failure to comply with discovery obligations, particularly after earlier motions to compel and for sanctions,[1] and for Sanabel's continuing failure to produce documents responsive to Plaintiffs' discovery requests.[2]

  Since the outset of the litigation, Sanabel has been elusive and prone to bizarre disconnection with its discovery obligations. Some of the more bizarre encounters include Sanabel repeatedly contradicting itself by stating that its production, while simultaneously promising that more documents were expected; Sanabel's insistence that it would agree to respond to Plaintiffs' discovery requests *only* if Plaintiffs agreed to dismiss Sanabel from the litigation; and Sanabel's efforts to justify its noncompliance by stating that it was reluctant to respond in discovery because it did not trust Plaintiff's counsel. And, ultimately, the recent complete disappearance of any representative of Sanabel to respond to Plaintiffs' discovery inquiries.

  Concerns over Sanabel's failure to meet its obligations led Plaintiffs to file an earlier motion to compel and for sanctions, to which the Court responded by granting the motion to compel, but deferring on the sanctions issue, suggesting a preference for a Rule 30(b)(6) deposition before determining whether sanctions are warranted. But when Plaintiffs served a Rule 30(b)(6) deposition notice, Sanabel's counsel explained that the only Sanabel representative her ever dealt with, Dr. Hillali, had disappeared, and counsel could not reach or locate him despite counsel's best efforts. Counsel has clarified that he has tried all means

---

[1] *See* Exhibits 1-2 (Letters of June 24, 2013 and July 26, 2013); Exhibit 3 (excerpts of Transcript of Oct. 29, 2013 Hearing). Referenced exhibits are attached to the Declaration of Robert T. Haefele, dated Nov. 13, 2015, hereafter "Exh. __."
[2] Exhs 4, 5, and 6 (Discovery Requests served on Sanabel on Sept. 13, 2007, Dec. 10, 2010, and July 31, 2012).

available to find Dr. Hillali – including mail, email, known associates, and in person visits to last known addresses.  Although initial concerns included that Dr. Hillali may have died, later indications suggest he is still alive.  Counsel has also indicated that, in his multiple efforts to reach Dr. Hillali, no communication had been returned or rejected, suggesting that at least some of the messages have been received and that the lack of response suggests unwillingness to cooperate in defending Sanabel.  Further, counsel has indicated that no other person exists with authority to speak for Sanabel in this case.

All told, Sanabel's failure to fulfil its discovery obligations – evidenced in its failure to appear for the Rule 30(b)(6) deposition, failure to implement litigation hold procedures, failure to search for substantial categories of documents within its control, and failure to exercise good faith in designating documents as confidential pursuant to the Court's umbrella confidentiality order – warrants an order striking their confidentiality designations; imposing sanctions, including default; imposing costs and expenses, and such other sanctions as this Court deems appropriate.  Under the circumstances here, where Sanabel has not only failed to defend itself, but has also remained unreachable to its own counsel for months, there remains no justification for requiring the parties or the Court to expend time and resources to engage Sanabel to defend itself.

1. **Procedural Background**

A thorough account of the procedural history concerning Sanabel through June 2013 is included in Plaintiffs' letter brief of June 24, 2013, and is incorporated by reference (Exh. 1).  On October 29, 2013, the Court addressed the dispute regarding Sanabel.[3]  In an order dated October 30, 2013 (ECF #2792), the Court reserved decision regarding Plaintiffs' request to impose sanctions against Sanabel and ordered Sanabel to produce any additional responsive documents in its control by November 26, 2013.  That date was extended by consent to December 6, 2013 (ECF #2796).

On December 4, 2013, Sanabel produced a flash drive re-producing electronically a set of documents previously produced in hard copy (Sana-Bell 00001-000678) and newly producing another set of documents (Sana-Bell 001179-005072).  None of the documents included a full set of Sanabel's bank records.  The documents produced *did not include*: (1) any account opening documents *for any time period* (*e.g.*, account signatories/signatures and other bank "Know your Customer" documentation); (2) any bank records pre-dating 2008; (3) full records from Sanabel accountants; (4) tax records before 2001; (5) full records from Sterling Management, Sanabel's longstanding financial manager; (6) records from the offices of Muslim World League ("MWL") or International Islamic Relief Organization ("IIRO"), Sanabel alter egos (see below), including Sanabel records that Sanabel sent to IIRO, and finally, (7) although the Court characterized production of closing documents from the February 2008 sale of property at 360 S. Washington Street, Falls Church, Virginia, as "a no-brainer" (Exh. 3 at 24), the closing documents were not produced.

On June 16, 2015, the Court set a deadline for discovery motions, including an August 30, 2015 deadline as to Sanabel (ECF #2963).  That deadline was extended to September 14, 2015 (ECF #2997) and then to November 13, 2015 (ECF #3030).  On August 25, 2015, Plaintiffs noticed a deposition of Sanabel pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, for September 9, 2015.[4]  In an initial response to the notice, Sanabel's counsel indicated that, despite significant efforts to contact a Sanabel representative, he had been unable to communicate with any representative to arrange for a corporate representative to testify, and that he anticipated needing a full 60 days to determine whether Sanabel had any living representatives, and if so, whether they might be available to testify.[5]  Since then, Sanabel counsel has

---

[3] *See* Exh. 3 (Transcript of October 29, 2013 Hearing at 4-31).

[4] Exh. 7 (Deposition Notice)

[5] Exh. 8 (ECF #3030, September 4, 2015 Letter to Judge Maas)

reconfirmed that, despite his best efforts to do so, he has been unable to communicate with any Sanabel representative for more than the past three months.[6]

   **2. Sanabel should be sanctioned for its failure to defend itself.**

The Court should impose on Sanabel sanctions listed in Rule 37(b)(2)(A)(i) to (vi), including default judgment, because Plaintiffs properly noticed Sanabel's deposition under Rule 30(b)(6) and Sanabel failed to appear. Fed. R. Civ. P. 37(d)(1)(A)(i) and 37(d)(3); *see Spaeth v Warner Bros. Pictures, Inc.*, 1 FRD 729 (S.D.N.Y. 1941); *see also Szilvassy v United States*, 82 FRD 752 (S.D.N.Y. 1979) (failure to attend deposition does not require noncompliance with court order before sanction may be imposed). Not only has Sanabel failed to appear for its deposition, but no Sanabel representative is available to defend the entity in the litigation. Under the circumstances, it would be futile, wasteful, and unfair require Plaintiffs to litigate further against an entity that has declined to defend.

   **3. Sanabel should be sanctioned for failing to implement adequate procedures to safeguard relevant documents, resulting in the documents' spoliation.**

   **a. Standard for Proving Spoliation**

Spoliation is "the destruction or the significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999) (quoting Black's Law Dictionary, 1401 (6th ed. 1990)). "The right to impose sanctions for spoliation arises from a court's inherent power to control the judicial process and litigation, but the power is limited to that necessary to redress conduct 'which abuses the judicial process.'" *Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 685 F. Supp. 2d 456, 465 (S.D.N.Y. 2010); *see also Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 106-07 (2d Cir. 2002); *Reilly v. NatWest Mkts. Grp., Inc.*, 181 F.3d 253, 267 (2d Cir. 1999) ("[w]hether exercising its inherent power or acting pursuant to Rule 37, a district court has wide discretion in sanctioning a party for discovery abuses"), *cert. denied*, 528 U.S. 1119 (2000).

A party moving for spoliation sanctions must demonstrate that: (1) the party charged with spoliation had an obligation to preserve the evidence; (2) the records were destroyed with a "culpable state of mind"; and (3) the affected evidence was relevant to the party's claim or defense. *Residential Funding Corp*, 306 F.3d at 107 (citing *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 107-08 (2d Cir. 2001)); *see also Pension Comm.*, 685 F. Supp. 2d at 467; *Arista Records LLC v. Usenet.com, Inc.*, 608 F. Supp. 2d 409, 430 (S.D.N.Y. 2009); *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 220 (S.D.N.Y. 2003) ("*Zubulake IV*").

   **b. Duty to Preserve**

"Identifying the boundaries of the duty to preserve involves two related inquiries: *when* does the duty to preserve attach, and *what* evidence must be preserved?" *Zubulake IV*, 220 F.R.D. at 216 (emphasis in original).

A party must preserve evidence when it has "notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation," no later than the time when the complaint was served. *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 436 (2d Cir.), *cert. denied*, 534 U.S. 891 (2001); *Creative Res. Grp. of New Jersey, Inc. v. Creative Res. Grp., Inc.*, 212 F.R.D. 94, 105 (E.D.N.Y. 2002). Here, Sanabel's obligation to preserve began *no later than* 2002, when the first lawsuit was filed. The date could be even earlier for Sanabel, because Sanabel may have been obligated to preserve similar evidence in anticipation of similar litigation from the 1993 WTC and 1998 U.S. embassy attacks. *See Kronisch v. United*

---

[6] Exh. 9 (Email of Oct. 13, 2015 from C. Manning to R. Haefele, indicating inability to find a Sanabel representative).

*States*, 150 F.3d 112, 126 (2d Cir. 1998) (a party's obligation to preserve may arise before litigation is filed if the party should have known that the evidence may be relevant to future litigation).

Once the duty to preserve has attached, a party must preserve "what it knows, or reasonably should know, is relevant to the action, is reasonably calculated to lead to the discovery of admissible evidence, is reasonably likely to be requested during discovery and/or is the subject of a pending discovery request." *Zubulake IV*, 220 F.R.D. at 217 (quoting *Turner v. Hudson Transit Lines, Inc.*, 142 F.R.D. 68, 72 (S.D.N.Y. 1991)). Moreover, once the duty attaches, the party should institute a litigation hold and is expected, *at the very least*, to "suspend its routine document and retention/destruction policy." *ACORN v. County of Nassau*, Dkt. No. CV 05-2301 (JFB) (WDW), 2009 U.S. Dist. LEXIS 19459, at *7 (E.D.N.Y. Mar. 9, 2009)(quoting *Zubulake IV*, 220 F.R.D. at 218); *see also Doe v. Norwalk Cmty Coll.*, 248 F.R.D. 372, 378 (D. Conn. 2007) (a party needs to take affirmative acts to prevent its system from routinely destroying information).

Here, Sanabel never suspended routine document retention/destruction policies, never took steps to preserve or otherwise secure documents, and even delayed any inquiry to collect or retain responsive documents until long after much of the information was no longer available.

### c. Culpability

In considering sanctions, the Court must assess the level of culpability attributable to Sanabel in failing to uphold its preservation obligation. The "culpability" factor is satisfied by a showing that the evidence was destroyed "knowingly, even if without intent to [breach a duty to preserve it], or negligently." *Residential Funding Corp.*, 306 F.3d at 108. "[A] finding of bad faith or intentional misconduct is not a *sine qua non* to sanctioning a spoliator." *Reilly*, 181 F.3d at 268. Rather, a finding of gross negligence or knowing or negligent destruction of evidence will satisfy the "culpability" requirement. *Id.*; *Residential Funding Corp.*, 306 F.3d at 108 ("[t]he sanction . . . may be appropriate in some cases involving the negligent destruction of evidence because each party should bear the risk of its own negligence"); *Zubulake IV*, 220 F.R.D. at 220 ("a 'culpable state of mind' for purposes of a spoliation inference includes ordinary negligence"). The Second Circuit observed that a sanction should be available even for negligent destruction if it is necessary to further the remedial purpose of the sanction. *Residential Funding Corp.*, 306 F.3d at 108.

In fact, Sanabel's failure to implement a litigation hold, either at the outset of the litigation or at any stage in the litigation, suggests gross negligence under the circumstances here. *See Toussie v. County of Suffolk*, CV 01-6716 (JS)(ARL), 2007 U.S. Dist. LEXIS 93988, at *23 (S.D.N.Y. Dec. 21, 2007); *Chan v. Triple 8 Palace, Inc.*, 03 Civ. 6048 (GEL) (JCF), 2005 U.S. Dist. LEXIS 16520, at *19 (S.D.N.Y. Aug. 11, 2005); *Zubulake IV*, 220 F.R.D. at 221. Moreover, even if a litigation hold had been implemented, counsel was required to oversee compliance with the litigation hold and to monitor the party's efforts to retain and produce relevant documents. *Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 432 (S.D.N.Y. 2004) ("*Zubulake V*"). None of that was done at any point during the litigation.[7]

### d. Relevance

Relevance, in this context, means sufficient evidence (including circumstantial evidence) to raise an inference that the unavailable evidence "would have been of the nature alleged by the party affected by its destruction." *Kronisch*, 150 F.3d at 127; *Byrnie*, 243 F.3d at 110. Courts considering this point must not "hold[] the prejudiced party to too strict a standard of proof regarding the likely contents of the . . . [unavailable]

---

[7] Though the Second Circuit, in *Chin v. Port Auth. of N.Y. & N.J.* 685 F.3d 135, 162 (2d Cir. 2012), declined to find that failure to implement a "litigation hold" constitutes gross negligence *per se*, under the circumstances here – where Sanabel engaged in discovery avoidance conduct to delay their accountability (*e.g.*, questionably timed firing of counsel on the eve of sanctions proceeding, delaying the Court's adjudication) and failed to obtain documents from banks, agents, and alter egos for many years – Sanabel was grossly negligent under the case-by-case approach adopted by the Second Circuit.

The Honorable Frank Maas
November 13, 2015
Page 5

evidence," because doing so "would subvert the . . . [sanction's purpose], and would allow parties who have . . . destroyed evidence to profit from that destruction." *Kronisch*, 150 F.3d at 128; *Byrnie*, 243 F.3d at 110.

Here, the various categories of documents that Sanabel failed to safeguard are among the types of financial documents considered highly relevant in litigation concerning allegations of terrorism support. Sanabel's document productions, through the last production in December 2013, included only limited bank records (spanning only from 2008 to 2012 and no account opening documents), sporadic records from an accountant (including some records from 2004 and others from 2008 and tax filings starting in 2001), and limited records from February and June 2001 and October 2005 from Sterling Management, the company that "managed" Sanabel activities. The production of those documents indicates that Sanabel had the practical ability to obtain and produce such documents from the banks, accountants, and Sterling Management, but never engaged in any process to collect, preserve, or produce the documents in any reasonably timely or thorough manner.

Sanabel's lack of effort to preserve relevant documents is apparent from the fact that the financial records produced do not include bank records, accounting records, or other financial account records from before the inception of the litigation. In fact, though the parties began to meet and confer on Sanabel's motions to dismiss in 2006 and the first discovery was served in 2007, the earliest banking records are not dated before 2008. Had Sanabel properly implemented litigation hold procedures and advised all of their banks, accountants, lawyers, financial advisors, and other agents to retain financial records dating back to a period of years before the litigation was filed in 2002, financial records dating back to at least 1995 should have been available (assuming a modest seven year retention period).

The missing financial records, particularly from the mid-to-late 1990s, are particularly relevant because during that time period substantial sums of Sanabel's money went missing and an accountant reported suspicions that the money went to support al Qaeda.[8] Between 1993 and 2000, Sanabel was using a "loan" from IIRO to finance several investments including real estate construction and sale projects.[9] The proceeds from the sales, totaling over $2 million, went missing.[10] The developer, a company called BMI, was owned by Soliman Biheiri. After the 9/11 attacks, Biheiri was convicted of making false statements during a terror financing investigation.[11] During the investigation, Biheiri's accountant told the FBI that he suspected the funds from BMI went to support al Qaeda.[12] Sanabel, under instructions from IIRO, sued Biheiri and when Biheiri stopped appearing in court, Sanabel was granted a default judgment for over $2.3 million.[13] Sanabel never attempted to collect on the judgment.[14] Financial records from that time period, which should have been largely captured by application of timely litigation hold procedures, would have shed significant light on the financial dealings surrounding the funds that went missing.

Documents from sources other than Sanabel show that Sanabel sent substantial documentation to Sanabel alter ego IIRO, representing an additional category of documents that Sanabel should have preserved and produced in discovery. Throughout at least the 1990s, Sanabel routinely sent IIRO copies of records,

---

[8] *See, e.g.*, Exh. 10 (Declaration in Support of Pretrial Detention at 4-6, 9-10, *United States v. Biheiri*, Case No. 03-365-A (E.D. Va., Aug. 14, 2003).

[9] Exh. 11 (ASH027438--27439, Notes to Financial Statements of Sana Bell Inc.).

[10] Exh. 12 (Deposition of Yaqub Mirza, May 19, 2010, at 146-153, 240-245).

[11] *United States v. Biheiri*, 356 F. Supp. 2d 589 (E.D. Va. 2005).

[12] Exh. 10 (Declaration in Support of Pre Trial Detention at 9-10).

[13] Exh. 13 (NL001458, Order of Judgment, granting judgement for $2.3 million, plus post-judgment interest).

[14] Exh. 12 (Deposition of Yaqub Mirza, May 19, 2010, at 203).

including corporate documents and banking and investment records.[15] IIRO made regular demands for Sanabel documentation to audit Sanabel.[16] But Sanabel did not produce any documents sent to IIRO.

Finally, another category of missing documents, which Plaintiffs identified as a priority for production, includes documents concerning the 2008 sale and disposition of the real estate at 360 S. Washington Street, Falls Church, Virginia, and all documents demonstrating the disposition of assets from Sanabel to Sanabel alter ego, defendant IIRO. The Court previously characterized the production of the closing binder for the real estate transaction as a "no-brainer" in terms of the need for its production.[17]. Because the documents were created during the course of discovery for Sanabel by one of the counsel representing Sanabel in this litigation, they were unquestionably available during the course of this litigation (Sanabel counsel, Martin McMahon, conducted the closing). Nonetheless, they have still not been produced.

4. **Sanabel is an indistinguishable alter ego of defendants MWL/IIRO and, as a consequence, Sanabel failed in its discovery obligations by failing to produce documents from MWL/IIRO responsive to the discovery requests.**

Since the founding of the US-based Sanabel in 1989, information has flowed freely between Sanabel and Saudi-based defendants MWL/IIRO, with MWL/IIRO consistently treating Sanabel as an alter ego, controlled and dominated by MWL/IIRO for their own investment purposes. To summarize, MWL/IIRO created Sanabel to generate funds for IIRO operations, and through the duration of Sanabel's existence they have freely exchanged information, indicating that Sanabel has had a practical ability to obtain records from MWL/IIRO, and MWL/IIRO have always treated Sanabel as their own, at times referring to it as a subsidiary or IIRO's "investment arm".[18]

Examination of the factors considered for alter ego analysis reinforces that Sanabel is little more than an alter ego of MWL/IIRO such that there is no basis to distinguish one from the other for any purpose. In deciding whether to treat one entity as the alter ego of another the Court applies federal common law, importing into its decision those principles of state law that it finds persuasive and appropriate to subsume. *Bergesen d.y. v. Lindholm*, 760 F. Supp. 976, 987 (D. Conn. 1991). (See also, *e.g.*, ECF #2382, transcript of hearing on October 28, 2010, at 16-17, where this Court found defendant Al Haramain's U.S. branch office in Oregon to be an alter ego of the Al Haramain entity headquartered in Saudi Arabia.) Although the determinations are fact specific and differ with the circumstances in each case, the general rule is that entities lose their distinct corporate identities when their conduct demonstrates a virtual abandonment of separateness. *Thomson-CSF, S.A. v. American Arbitration Ass'n*, 64 F.3d 773, 777 (2d Cir. 1995).

Under federal common law in the Second Circuit, an alter ego relationship exists where one entity has so dominated and disregarded its alter ego's corporate form that the alter ego was actually carrying on the controlling party's business.[19] New York law also provides for piercing the veil when a corporate entity is completely controlled by another and has no separate will of its own. *Holborn Oil*, 774 F. Supp. at 844; *see Gartner v. Snyder*, 607 F.2d 582, 586 (2d Cir. 1979) ("New York courts disregard corporate form …when the corporation has been so dominated by an individual or another corporation . . ., and its separate identity so

---

[15] *See, e.g.*, Exh. 14 (Collection of documents sent to IIRO).

[16] *Id.*

[17] Exh. 3 at 24.

[18] *See* Exh. 10 (Declaration in Support of Pretrial Detention at 5-6 ("Sana-Bell . . . was in effect a subsidiary or affiliate of IIRO. . . . Sana-Bell was IIRO's investment arm")).

[19] *IMO Holborn Oil Trading Ltd.Arbitration*, 774 F. Supp. 840, 844 (S.D.N.Y. 1991); *see Sabine Towing & Transp. Co. v. Merit Ventures, Inc.*, 575 F. Supp. 1442, 1446 (E.D. Tex. 1983) ("To find an alter ego relationship, the evidence must disclose a pattern of control or domination of a corporation by an individual or corporation, and this domination was used to support a corporate fiction.").

disregarded, that it primarily transacted the dominator's business rather than its own and can be called the other's alter ego."); *see also ITEL Containers Int'l Corp. v. Atlanttrafik Express Service, Ltd.*, 908 F.2d 698, 703 (2d Cir. 1990) ("New York law allows the corporate veil to be pierced *either* when there is fraud or when the corporation has been used as an alter ego." (emphasis in original)).

Although each case is *sui generis,* with no set formula governing whether entities are alter egos, courts have looked to fifteen factors whose presence, either alone or in combination, may weigh in favor of disregarding juridical separateness.[20]  Those fifteen factors are: (1) common or overlapping stock ownership between parent and subsidiary; (2) common or overlapping directors and officers; (3) use of same corporate office; (4) inadequate capitalization of subsidiary; (5) financing of subsidiary by parent; (6) parent exists solely as holding company of subsidiaries; (7) parent's use of subsidiaries' property and assets as its own; (8) informal intercorporate loan transactions; (9) incorporation of subsidiary caused by parent; (10) parent and subsidiary's filing of consolidated income tax returns; (11) decision-making for subsidiary by parent and principals; (12) subsidiary's directors do not act independently in interest of subsidiary but in interest of parent; (13) contracts between parent and subsidiary that are more favorable to parent; (14) non-observance of formal legal requirements; (15) existence of fraud, wrongdoing or injustice to third parties.

Applying the fifteen factors here, sufficient criteria are met to establish alter ego relationships among the entities, demonstrating MWL/IIRO domination of Sanabel such that Sanabel was merely carrying on business of the Saudi-based alter egos. At least 10 of the 13 alter ego factors that could apply weigh in favor of finding the entities to be alter egos.[21]

**There was significant overlap of directors and officers among Sanabel, MWL and IIRO (Factor #2).** Between July 1989, when Sana-Bell was incorporated in Washington DC, and July 31, 2001, when its charter was revoked in Virginia, fourteen separate people held positions as directors or officers of Sana-Bell. Thirteen of the fourteen Sana-Bell directors or officers also held senior positions at MWL/IIRO. The MWL/IIRO positions included four Secretary Generals, two Assistant Secretary Generals, a Director of Finance, and several members of the Executive Committee. The Sana-Bell director who did not hold a senior position with MWL/IIRO was a major donor to those entities, indicating a substantial relationship between the individual and the organizations.[22] Between August 14, 2000, when Sanabel al Kheer was

---

[20] *Bergesen*, 760 F. Supp. at 987 (citing *Sabine*, 575 F. Supp. at 1446-48).

[21] The stock ownership (#1) and tax filing (#10) factors do not apply because the entities at issue are ostensible "charitable" entities with no stock ownership and the Saudi-based entities do not file U.S. tax filings.

[22] The Sana-Bell individuals (*see* Exh. 15, ASH 19223-25; Exh. 16, ASH 19226-37, Exh. 17, ASH 28499) were:

- Abderahim al Saati, who was Assistant General Manager for Investment IIRO (Exh. 18, ASH 023148);
- Hassan Bahafzallah, who was Secretary-General of Investment Committee, IIRO Saudi Arabia (Exh. 19, ASH 000697); Vice President of MWL US (Exh. 20, ASH 019080), and Director of Real Estate Investment for Sanabil al Khair (the entity based in Saudi Arabia) (Exh. 21, ASH 024049 );
- Hassan Ahdal, who was Director of IIRO (Exh. 22, ASH 000864) and Director General  MWL (Exh. 23, MWL 008921);
- Yaqub Mirza, who was Founder and Secretary and Treasurer, MWL US (Exh. 24, ASH 019079);
- Farid Yasin Quraishi, who was Secretary General, IIRO (Exh. 25, IIRO 063672);
- Sulaiman Al Rajhi, who was on IIRO's Executive Council (Exh. 26, ASH 000866);
- Ibrahim Afandi, who was on IIRO's Executive Council and Board of Directors and used IIRO's address on Sana-Bell's Articles of Incorporation (Exh. 26, ASH 000866; Exh. 22, ASH 000864; Exh. 27, ASH 019232);
- Abdullah Saleh al Obaid, who was Secretary General, MWL (Exh. 28, Al-Obaid 0001-0005), and President/Director, MWL US (Exh. 29, ASH 019079-80);
- Adnan Basha, who was Secretary General, IIRO, and Deputy Secretary General, MWL (Exh. 20, Basha 0001);

incorporated in Virginia, and 2006, six separate people held positions as Directors or Officers of Sanabel al Kheer. All six held senior positions with MWL/IIRO.[23]

**Sanabel received nearly all assets from MWL/IIRO and remained consistently under-capitalized (Factors #4 & #5).** All funds Sanabel used to operate and invest came from IIRO.[24] The IIRO funds transferred to Sanabel were invested immediately afterwards for the benefit of IIRO, and Sanabel had very few other expenses and no operational role other than to generate investment returns for the benefit of IIRO.[25] The returns generated by Sanabel investments were insufficient to maintain the property in which Sanabel had invested, evidenced by the fact that IIRO transferred $60,000 to Sanabel which in turn transferred the funds to IIRO US for a tenant fit out. (*See* Exh. 45, ASH022563 $60k transfer; *see also* Exh. 46, IRS Interview of Dr. Abdelmonien Mohamed Al-Hillali (indicating that Sanabel's property was in disrepair and the entity had insufficient assets to maintain the property to attract new tenants))

Even throughout the course of this litigation, Sanabel's counsel has indicated that Sanabel was not sufficiently capitalized to defend itself in litigation.[26] The insufficiency of independent assets to pay counsel appears to be longstanding. Even in 2000, Sanabel was apparently not sufficiently solvent to pay its own legal bills and passed them on to the Sanabel office in Saudi Arabia for payment. (*See* Exh. 47, ASH021948).

**Sanabel and MWL/IIRO have interchangeably used the same offices and MWL/IIRO have treated Sanabel property as their own (Factors #3 & #7).** All of the entities have used Sanabel addresses in Virginia as their primary address, while at times also indicating Saudi Arabia as their primary

---

- Saleh al Saqri, who was the Director of the New York Office of MWL US (Exh. 31, Printed from hard drive produced by MWL, November 2007 MWL Hard Drives\Allocated Files\Task 4\C\RECYCLED\UN_NGOs .doc);
- Abdullah Noshan, who was Director of MWL US (Exh. 32, BUR-PEC 013414-013420, at -013416);
- Mohamed Yamani, who was President of the Sanabel Committee within the Office of the Secretary General of the MWL (Exh. 33, ASH 026880) and used IIRO's address on Sana-Bell's Articles of Incorporation (Exh. 27, ASH 019232);
- Saleh Kamel, who was a major donor to IIRO (Exh. 34, BUR-PEC 014010) and used IIRO's address on the Sana Bell incorporation papers (Exh. 27, ASH 019232); and
- Sulaiman al Ali, who was a fulltime fundraiser for IIRO (Exh. 35, ASH 004509-10).

[23] The Sanabel al Kheer individuals (*see* Exh. 36) were:
- Hassan Bahafzallah, who was Secretary-General of Investment Committee, IIRO SA (Exh. 19, ASH 000697); Vice President of MWL US, and Director of Real Estate Investment for Sanabil al Khair (the entity based in Saudi Arabia) (Exh. 21, ASH 024049);
- Abdullah Saleh al Obaid, who was Secretary General, MWL (Exh. 28, Al-Obaid 0001-0005) and President/Director, MWL US (Exh. 29, ASH 019079);
- Yaqub Mirza, who was Founder and Secretary and Treasurer, MWL US (Exh. 29, ASH 019079);
- Khalid Fadlalla, who was Executive Director and Accountant, MWL US (Exh. 32, BUR-PEC 013414-013420, at -013418; Exh. 37, MWL IIRO 22329);
- Abdelmoneim Hillali, who was Vice President, MWL US (Exh. 38, ASH 019011); and
- Abdelrahman al Zayid, who was Deputy Secretary General of IIRO and used IIRO's Saudi Arabia address in Sanabel documentation (Exh. 39, MWL 008710; Exh. 40, Sana-Bell 3793; Exh. 41, Sana-Bell 4131).

[24] Exh. 42 (ASH023688, Sana Bell Loans and Investments); *see also* Exh.s 43 (ASH028495) and Exh. 44 (ASH022360, regarding a $250,000 'loan' to Sana-Bell as an investment directive from IIRO).

[25] *See* Exh. 42 (ASH023688, Sana Bell Loans and Investments).

[26] *See, e.g.* Exh. 48 (Email of Aug. 30, 2012, from C. Manning to S. Tarbutton, asserting that "[Sanabel] has no funds to really continue a defense."); *see also* Exh. 8 (ECF #3030, Sept. 4, 2015 Letter to Judge Maas indicating Sanabel's counsel's inability to reach any representative of Sanabel).

location. For example, when Sana-Bell was incorporated in 1989, and when Sanabel al Kheer and MWL's US-branch were both incorporated in 2000, each of them listed the same address, 555 Grove Street, #116, Herndon, Virginia 20170, as their principle location.[27] In addition, the various entities have likewise shared resources such as telephones and facsimile machines, evidenced by the fact that IIRO and Sanabel have used the same telephone facsimile number.[28]

In addition, IIRO operated from office space in a building nominally owned by Sanabel without paying market value for the space. Although Sanabel "leased" office space to IIRO at 360 S. Washington Street, the value IIRO paid was well below market rate, despite the fact that the expenses to operate the commercial space exceeded revenue.[29] In fact, though the deed for the property was nominally in the name of Sanabel, within the organizations they insisted that the property belonged to IIRO.[30] Moreover, when Sanabel sold the S. Washington Street property in 2008, proceeds of the sale, at the direction of MWL/IIRO, were used to pay legal fees due to counsel for MWL/IIRO for representation in this litigation.[31]

Finally, the under terms of the Articles of Incorporation of both Sanabel al Kheer[32] and the U.S. branch of MWL,[33] upon the dissolution of either entity, the remaining assets of the dissolving entity would go to the surviving entity.

For the reasons set forth in this section, Plaintiffs submit that the facts and evidence are more than sufficient to establish that Sanabel is an alter-ego of IIRO/MWL. But in any case, the submitted facts and evidence more than establish that records and information flowed fluidly between Sanabel and IIRO/MWL, and that Sanabel had the practical ability to obtain relevant records from IIRO/MWL.

**The decision to incorporate Sanabel appears to have been driven by ranking MWL/IIRO individuals. (Factor #9)** According to IIRO, Sanabil al-Khair, the Sanabel entity in Saudi Arabia, was established by IIRO as an endowment fund to generate a stable income to finance its activities.[34] When Sana-Bell was initially organized in 1989, it was likewise established to fund IIRO's U.S.-branch office,

---

[27] Exh.s 15 (ASH 019225, Sana-Bell Application for a Certificate of Authority); Exh. 49 (Articles of Incorporation of Sanabel al Kheer), Exh. 50 (Articles of Incorporation of Muslim World League Foundation).

[28] Exhs 51, 52, 53 (NL 0016571, -16593, -16602). But in a 1998 Maryland federal complaint, Sanabel stated that its principal place of business is in, Saudi Arabia, Exh. 54 (ASH000741, *Sana-Bell v BMI* Complaint, at 1), where the office of the CEO for Sanabel was located. According to Sanabel's bylaws, the president is the CEO. From the time of Sana-Bell's 1989 incorporation until at least 2001 and from the time of Sanabel al Kheer's 2000 incorporation until at least 2006, the president of both entities was Abdullah Saleh al Obaid, who held varying positions in Saudi Arabia, including as Secretary General of the MWL in Saudi Arabia, the umbrella organization that included the IIRO. Exh. 55 (ASH 018588, Sana-Bell By-laws); Exh. 15 (ASH 019223-019225, VA Corporation Commission Sana Bell); Exh. 28 (AL OBAID 001-005); Exh. 56 (SANA-Bell 4341, excerpt from Sanabel Al Kheer By-laws); Exh. 36, ASH 019291-019313 (VA Corporation Commission Sanabel); s*ee also* Exh. 40 (Sana-Bell 3791-3793, including terms of employment contract requiring IIRO to pay legal fees for Sanabel employee, and including IIRO Secretary General in signature block of Sanabel employee contract), Exh. 16 (ASH 019226-10237, DC Registry Articles of Incorporation), and Exh. 57 (ASH018958, Ladova II Articles of Incorporation).

[29] Exh. 58 (ASH 021728-21855, at 37, Deposition of Yaqub Mirza (October 25, 1999)). IIRO and Sana-Bell jointly insured the property. Exh. 59 (ASH 023358 Premium Statement Feb 8, 1994).

[30] *See* Exh. 58 (ASH 021728-21855, Deposition of Yaqub Mirza October 25, 1999, at 37); Exh. 60 (ASH 022932-933, referring to the building as "the IIRO building"); Exh. 61 (ASH 023486, an April 29, 1999 letter to IIRO, wherein Sana Bell comments about the building, "of course it is your building").

[31] Exh. 62 (Sana-Bell 003281, Letter from Sanabel al Kheer to Sameer Al-Raddi, IIRO, dated Nov 27, 2009); Exh. 63 (Sana-Bell 000226, Letter from Dr. Adnan Basha to Abdel Moniem El Hillali).

[32] Exh. 49 (ASH 019307-019310, at -019310).

[33] Exh. 50.

[34] Exh. 64 (IIRO 1996 website).

established at the same time.  Concurrent with the establishment of both Sana-Bell and IIRO's U.S.-branch in Virginia, IIRO earmarked millions of dollars to go to Sana-Bell for investment at IIRO's direction and IIRO would use the investment returns to fund its operations.[35]  The Sanabel al Kheer entity continued the same function as Sana-Bell.  Again, at the time of the formation of each of the Sanabel entities, the decisions were controlled by officers and directors of MWL/IIRO for the benefit of MWL/IIRO.  In short, the decision to form Sanabel was made by MWL/IIRO.

**MWL/IIRO made investment decisions for Sanabel and dealings between the entities were based on what benefited IIRO, not what benefited Sanabel (Factors #11, #12 & #13).**

MWL/IIRO made a vast range of decisions for Sanabel, from such minor points as the choice of logo to major decisions on appointment of board members and choice of investment strategy.  The degree of control exercised over Sanabel is shown by the fact that MWL appointed a specific person to be responsible for "Sanabel in USA" and directed Sanabel's officer in the U.S. to cooperate by "handing him over all papers related to Sanabel."[36]  IIRO made the decision on which letterhead, logo and telephone number to use.[37]  MWL/IIRO organized the first Sana-Bell Trustees meeting, held at Dallah Tower, an office building in Jeddah, Saudi Arabia.[38]  MWL/IIRO directed Sana-Bell officers to communicate, on behalf of Sana-Bell, with a third-party to inquire regarding a potential real estate deal in Columbus, Ohio.[39]

IIRO exercised authority over Sanabel by making the final decisions regarding where Sanabel would invest assets.  For example, in a memorandum from a Sanabel officer in the U.S. to IIRO in Saudi Arabia, the Sanabel officer first raises concerns about an investment instruction from IIRO, but then concludes the message saying "I realize you have decided to invest and if this decision is based only on trust and letting BMI manage as they wish, with no involvement from [Sanabel] then please let me know [and] we will send out the funds right away."[40]  The very next day, the Sanabel officer sent the $800,000 to BMI as IIRO had instructed.[41]  In another instance, MWL/IIRO transferred $250,000 directly into a Sanabel account and directed Sanabel to invest the money in BMI "as soon as possible."[42]  In 1998, the Sanabel entity in Saudi Arabia, itself a part of MWL/IIRO, on Sana-Bell letterhead, faxes instructions to lawyers to instruct them to proceed with litigation on behalf of Sana-Bell against BMI and committing a $15,000 retainer for Sana-Bell.[43]  In fact, the Sanabel entity in Saudi Arabia routinely paid the legal bills for Sana-Bell.[44]

For benefits favoring MWL/IIRO over Sanabel, one need look no further than the fact that Sanabel always suffered the financial loss.  Examples of that are seen in the favorable leasing arrangement for the office space at 360 S. Washington Street, and the fact that, after the sale of the property, MWL/IIRO received money but the Sanabel entities were left virtually penniless.  In fact, after the sale of the property, the Sanabel

---

[35] *See* Exh. 10 (Declaration in Support of Pretrial Detention at 4-6).

[36] Exh. 65 (ASH 26880).

[37] Exh. 66 (ASH 022247-249, -22361, -22367, -22327).

[38] Exh. 67 (ASH 022430 IIRO MWL calls first Sana Bell Board Meeting).

[39] Exh. 68 (ASH 022431, Letter from Dr. al Saati).

[40] Exh. 69 (ASH 022116-117, Letter of Nov 24, 1992).

[41] Exh. 70 (ASH 022121, -22141, Checks dated Nov 25, 1992).

[42] Exh. 43 (ASH 028495).

[43] Exh. 52 (NL 0016593, Letter of Sep 28, 1998).

[44] *See* Exh. 71 (ASH 023447, Letter of June 3, 1999).

directors voted to increase the debt to IIRO that it had been reporting on its books for many years, and reporting to the U.S. Treasury, from $629,000 to $785,000, effectively giving IIRO an additional $156,000.[45]

**Finally, the use of Sanabel to the benefit of IIRO/MWL, in furtherance of their terrorist agenda, also satisfies the last factor (Factor #15), "the existence of fraud, wrongdoing or injustice to third parties."** During the existence of the Sanabel entities, proceeds from the sale of over fifteen real estate properties and over $2.3 million in investments went missing as part of deals IIRO/Sanabel made with a man who was later convicted following a terror financing investigation,[46] and at least one witness told the FBI he suspected missing money went to fund Al Qaeda. *See* Exh. 10 (Declaration in Support of Pre Trial Detention at 9-10).

Viewed properly as a single entity, indistinguishable from the MWL/IIRO defendants – alter egos – Sanabel was obligated, but failed, to preserve and produce documents responsive to the Plaintiffs' discovery requests, regardless of which alter ego entity housed the documents. *See Cacace v. Meyer Mktg. (Macau Commer. Offshore) Co.*, No. 06 Civ. 2938 (KMK) (GAY), 2011 U.S. Dist. LEXIS 50753, at *10 (S.D.N.Y. May 12, 2011) ("a corporate party is not obligated to obtain discovery materials from employees of a non-party affiliate company *unless said affiliate is an alter-ego of the litigating entity . . . .*") (emphasis added); *cf. Perini America Inc. v. Paper Converting Machine Co.*, 559 F. Supp. 552 (E.D. Wis. 1983); *Alimenta (U.S.A.) v. Anheuser-Busch Co.*, 99 F.R.D. 309 (N.D. Ga. 1983).

### 5. Sanabel should be sanctioned for abusing confidentiality designations.

Plaintiffs ask that the Court sanction Sanabel for its indiscriminant designation of documents, purportedly pursuant to the umbrella confidentiality order entered in this litigation (ECF #1900). In an April 6, 2015 letter from the PECs to the Court (ECF #2945), Plaintiffs called to the Court's attention that the defendants' indiscriminant designation of documents as confidential had become a problem. In an order addressing the issue on April 9, 2015 (ECF #2946), the Court instructed all parties to review their confidentiality designations "in advance of the [May 13, 2015] conference," warning that if the Court found that documents had been designated as confidential without justification the Court would likely "impose sanctions not only on the party that acted improperly, but on its counsel as well." Sanabel never addressed its indiscriminant confidentiality designations, either before the May 13 deadline or afterward.

In Sanabel's document productions, it produced documents indiscriminately designated as confidential pursuant to the umbrella confidentiality order entered in this litigation (ECF #1900). For example, over 4,500 pages (every page of the documents bates stamped Sana-Bell 00001-00678 and Sana-Bell 001179-005072) have been indiscriminately designated as confidential, with no good faith basis for the designations. Given that both Sanabel organizations were purportedly "charitable" IRS 501(c)(3) entities and, purportedly neither of them remain particularly active, there is no confidential information for Rule 26 or the umbrella confidentiality order to protect. Broad examples of the types of *obviously* non-confidential items included in the designated documents are Sana-Bell's certificate and articles of incorporation, By-Laws, Certificates of Good Standing (Sana-Bell 00001-11, -1180, -4819-4831, -4833-4854), deed information recorded in the Office of the Clerk of the Circuit Court of Arlington County, Virginia (Sana-Bell 00014-16, -658-660, -4998), filings in litigation captioned as *The Sana-Bell, Inc. v. BMI Real Estate Dev., Inc.*, Case No. 98-CV-4177 (PJM)(D. Md.) (Sana-Bell 00017-36, -42-44), documents available from the government of the District of Columbia or the Commonwealth of Virginia (Sana-Bell 00037, -95, -1263, -1267, -1269), copies

---

[45] Exh. 72 (Sana-Bell 004461).

[46] *See* Exh. 10 (Declaration in Support of Pretrial Detention at 4-6); Exh. 12 (Deposition of Yaqub Mirza, May 19, 2010, 146-153, 240-45); Exh. 13 (NL 0001458, Order of Judgment).

of leases between Sana-Bell, Inc. (as lessor) and lessees (Sana-Bell 00046-61, -66-84), tax forms of IRS "exempt organizations" which by IRS requirements were subject to public disclosure (Sana-Bell 00096-149, -153-171, -1261, -2864-2949, -4435-4451, -5007-5023, -5055-5072), certified mail receipt (Sana-Bell 00150), a grant proposal (Sana-Bell 00195-204, -314-445), and documents that the plaintiffs had previously produced in discovery – *i.e.*, documents bearing a bates number from Plaintiffs' production (Sana-Bell 04855-4859, but also bearing bates numbers FED-PEC0056197-56209 from a collection produced by Plaintiffs).

Given the Court's clear message to the parties in April 2015 that the parties would face sanctions if they had designated documents confidential with no good faith basis for the designations and had failed to correct the over-designation before the May 13, 2015 conference, Plaintiffs request that the Court impose sanctions on Sanabel, including a determination striking all of the confidentiality designations on each of the documents produced by Sanabel and such other sanctions as the Court may deem appropriate.[47]

6. **Entry of default judgment against Sanabel is warranted given its refusal to participate in discovery, spoliation of evidence, and continued refusal to obey this Court's orders.**

In considering whether to impose the sanction of a default judgment for discovery abuse, the Second Circuit has recognized the following factors as useful in evaluating a district court's exercise of discretion to dismiss an action under Rule 37: "(1) the willfulness of the non-compliant party or the reason for noncompliance; (2) the efficacy of lesser sanctions; (3) the duration of the period of noncompliance, and (4) whether the non-compliant party had been warned of the consequences of . . . noncompliance." *Agiwal v. Mid Island Mortg. Corp.*, 555 F.3d 298, 302-303 (2d Cir. 2009) (quoting *Nieves v. City of New York*, 208 F.R.D. 531, 535 (S.D.N.Y. 2002)). In addition, the Second Circuit has recognized that "dismissal pursuant to Rule 37 is appropriate 'not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a sanction.'" *Agiwal*, 555 F.3d at 303 (quoting *Nat'l Hockey League v. Metro. Hockey Club*, 427 U.S. 639, 643 (1976)).

Here, notwithstanding its multiple early assurances that discovery was complete at multiple earlier stages of discovery, Sanabel never implemented any litigation hold procedure to collect or preserve any documents, allowing the spoliation of years of documents from banks, accountants, financial firms, and failed to collect any responsive documents from its alter egos in Saudi Arabia. Despite facing a previous motion resulting in a stern warning to produce all responsive documents, Sanabel still failed to produce substantial sets of documents. And when faced with a Rule 30(b)(6) deposition notice, not only has Sanabel failed to designate a witness and failed to appear for a deposition, but it appears that no representative is available to defend the entity in any respect in the litigation. There is no indication that any additional warnings to Sanabel or financial sanctions alone will result in any additional documents being produced from Sanabel. In fact, Sanabel's inability to respond to Plaintiffs' recent Rule 30(b)(6) deposition – indeed, its complete lack or responsiveness to its own counsel -- indicates that Sanabel is no longer equipped to defend itself in this litigation, which (by itself) warrants default judgment. Accordingly, Plaintiffs request imposition of default judgment against Sanabel.

7. **Conclusion**

For the reasons set forth above, Sanabel's confidentiality designations should be stricken and Plaintiffs' motion for sanctions should be granted, default judgment ordered, expenses and attorney's fees directed, along with such other sanctions as this Court deems appropriate.

---

[47] Given Sanabel's resistance to fulfilling its discovery obligations premised on Dr. Hillali distrust of Plaintiffs' counsel, Plaintiffs think it likely the wholesale designation of Sanabel's records was undertaken at Dr. Hillali's insistence.

The Honorable Frank Maas
November 13, 2015
Page 13

                                Respectfully submitted,

                                FOR THE MDL 1570 PLAINTIFFS' EXEC. COMMITTEES

cc:    Christopher Manning, Esq.
       The Honorable George B. Daniels, U.S.D.J.