Exhibit 1

# MDL 1570 PLAINTIFFS' EXECUTIVE COMMITTEES
In re: Terrorist Attacks on September 11, 2001 (S.D.N.Y)

| Plaintiffs' Executive Committee for Personal Injury and Death Claims | Plaintiffs' Executive Committee for Commercial Claims |
|---|---|
| Ronald L. Motley, *Co-Chair*<br>MOTLEY RICE LLC<br>James P. Kreindler, *Co-Chair*<br>    KREINDLER & KREINDLER LLP | Elliot R. Feldman, *Co-Chair*<br>Sean Carter, *Co-Chair*<br>COZEN O'CONNOR |
| Andrew J. Maloney III, *Co-Liaison Counsel*<br>KREINDLER & KREINDLER LLP<br>Paul J. Hanly, Jr., *Co-Liaison Counsel*<br>    HANLY CONROY BIERSTEIN SHERIDAN FISHER & HAYES<br>    LLP | J. Scott Tarbutton, *Liaison Counsel*<br>COZEN O'CONNOR |

*Via Federal Express – Overnight*

June 24, 2013

The Honorable Frank Maas
United States District Court for the
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street, Room 740
New York, NY 10007-1312

       Re:    *In Re: Terrorist Attacks on September 11, 2001*, 03 MDL 1570 (GBD)(FM)

Dear Judge Maas:

       The Plaintiffs' Executive Committees, for all plaintiffs, request sanctions, under Rule 37(b) and the Court's inherent powers, against defendants Sana-Bell, Inc. ("Sana-Bell") and Sanabel Al Kheer, Inc. ("Sanabel") (collectively, "Defendants" or the "Sanabel Defendants") for their disregard of this Court's orders, including the March 18, 2008 discovery Order (ECF No. 2073),[1] and for their pattern of evasive and obstructionist conduct throughout discovery. After years of meet and confers and multiple counsels' unfulfilled promises to produce relevant documents, Defendants have still not fully responded to Plaintiffs' document requests, dated September 13, 2007, December 10, 2010, and July 31, 2012.

       For years, Defendants have offered a range of evolving excuses for their failure to fulfill their most basic discovery obligations, abandoning each excuse when proven inaccurate only to offer another excuse in its place. Defendants' most recent excuse is the most remarkable – while acknowledging that they are in possession of documents responsive to Plaintiffs' discovery requests, Defendants refuse to produce those materials because that they "do not trust" Plaintiffs' counsel. Insinuating that these materials may be helpful to the claims against other parties, Defendants have attempted to use the withholding of these responsive documents as leverage to extract their release from the litigation. Collectively, Defendants' approach to discovery, from the inception of the process and continuing to the present, reflects a basic unwillingness to comply with their discovery obligations and lack of respect for the discovery process itself. Defendants' actions render it impossible to have any expectation that they will ever willingly and fully

---

[1] Exhibit A to the Declaration of Robert T. Haefele dated June 24, 2013 (hereinafter "Haefele Decl."). Exhibits referenced herein, unless otherwise indicated, are attached to the Haefele Decl.

comply with their discovery obligations. Accordingly, Plaintiffs respectfully submit that no sanction other than default will remedy Defendants' misconduct.

The histrionics that have characterized the Sanabel Defendants' approach to discovery are well known to this Court. After the Court denied Sana-Bell's motion to dismiss and Plaintiffs served document requests, Defendants' then-counsel Martin McMahon refused to produce documents because he believed that the pendency of Sanabel's motion to dismiss made discovery as to Sana-Bell premature. After Judge Daniels' rejected that argument in a March 18, 2008 Order, Defendants made clear that they were indivisible entities because, to the extent that Sana-Bell produced documents in response to the Plaintiffs' discovery requests, it produced documents held by members of Sanabel's board. In fact, later Sana-Bell productions contained only Sanabel documents, and throughout this litigation, the Sanabel Defendants have been jointly represented either by Martin McMahon, through November 2009, or by Christopher Manning since Mr. McMahon was discharged. In fact, in producing documents in January 2009, Defendants' counsel referred to Sanabel as the "successor entity" to Sana-Bell.

Defendants have engaged in a repeated pattern of assuring Plaintiffs that more documents are forthcoming but failing to follow through on their assurances. When pressed for more discovery, Defendants discharged Mr. McMahon, hired Mr. Manning, and Plaintiffs' struggle for cooperation began anew. New counsel brought only new excuses for non-production. Mr. McMahon's excuse had been that Defendants possessed no relevant documents. With Mr. Manning, the new excuses are Defendants' lack money to defend and that Sanabel's present head does not trust the 9/11 Plaintiffs' counsel. For this latter reason, Defendants have indicated that they will comply with their discovery obligations only if Plaintiffs first agree to dismiss them, which Plaintiffs have refused to do and the rules do not require.

Now, over five years after the first set of discovery requests were served on Defendants, Plaintiffs move the Court to impose a default based on Defendants' abject unwillingness to engage in good-faith formal pre-trial discovery. In the end, compliance with discovery obligations cannot be policed wholesale, and the integrity of the process demands that the Court have an adequate basis to trust that a party will adhere to the rules and Court's orders on a voluntary basis. Where a party's conduct demonstrates that such faith is unwarranted, as here, entry of default is appropriate.

## I.   PROCEDURAL HISTORY

Consolidated merits discovery began on Defendants in 2007. Since then, Plaintiffs' efforts to obtain meaningful discovery from Defendants have been frustrated by a range of improper tactics used to avoid their discovery obligations. These tactics have been discussed at length in prior correspondence to the Court and include: (1) significant delays in responding to discovery requests; (2) disregarding Judge Daniels' March 18, 2008 Order directing Defendants to respond to Plaintiffs' discovery requests; (3) failing to substantiate undue burden and expense objections; (4) misleading this Court and Plaintiffs about their abilities to search for and retrieve responsive documents; (5) failing to honor agreements reached after extended meet and confers and numerous correspondence exchanged; (6) unfulfilled promises to promptly produce volumes of responsive materials; and (7) reasserting arguments and objections previously overruled by the Court. These evasive and abusive practices have required Plaintiffs to expend significant time and resources in their attempts to obtain the most basic discovery, and have forced Plaintiffs to seek this Court's assistance on several occasions to resolve these discovery disputes.

After the Court denied Sana-Bell's Motion to Dismiss on July 27, 2007 (Exhibit B (ECF No. 2010)), Plaintiffs served their First Consolidated Set of Requests for Production of Documents on Sana-Bell on September 13, 2007 (Exhibit C). Sana-Bell initially refused to produce any documents, arguing that the Court had only partially denied its Motion to Dismiss. On March 18, 2008, Sana-Bell was ordered to respond to Plaintiffs' discovery requests. *See* Exhibit A. The Court determined that the evidence Sana-Bell

submitted was insufficient to establish that Sana-Bell had formally dissolved and was no longer a viable legal entity and that Sana-Bell must produce all responsive documents in its possession, custody, or control.

On May 27, 2008, Sana-Bell produced 15 documents totaling 93 pages in response to 21 document requests.[2] Plaintiffs contacted then-counsel for Defendants, Martin McMahon, on June 17, July 15 and August 7, 2008, to identify numerous deficiencies in Sana-Bell's responses and to arrange a meet and confer to discuss the responses.[3] On August 12, 2008, Mr. McMahon agreed to a meet and confer[4] that occurred on September 12, 2008, when Mr. McMahon committed to (1) contact the Board of Directors of defendant Sanabel, the claimed successor of Sana-Bell, and request that the organization search its records for responsive documents; (2) contact Nancy Luque, counsel for defendant Yaqub Mirza (a high ranking Sana-Bell official with administrative control over Sana-Bell's finances, assets, and investments, who was also serving as an officer of Sanabel), and determine whether Dr. Mirza had any documents about Sana-Bell; and (3) inform Plaintiffs of the result of these inquiries within a week (by September 19, 2008).[5]

After three more months passed, Plaintiffs told Mr. McMahon they planned to ask the Court to intervene,[6] and on January 6, 2009, Plaintiffs wrote to Judge Daniels, identifying deficiencies in Sana-Bell's production and asking for the Court's help.[7] Plaintiffs asked the Court to order good-faith responses to Plaintiffs' requests and "to consider applying appropriate sanctions for Sana-Bell's refusal to comply."

On January 23, 2009, Mr. McMahon repeated his previously-rejected argument that Sana-Bell "is a defunct entity," and the "only viable recipient for the discovery requests is [Sanabel], a successor entity, and its board of directors." He also reiterated his earlier assertion that he had "attempted to contact Nancy Luque . . . or her associate 4 or 5 times and ha[d] yet to receive a response." He also said that "[g]iven Mr. Mirza's apparent role in both [Sana-Bell] and [Sanabel al Kheer], it is possible that he may have possession of responsive documents, particularly for the years 2002 and prior." Mr. McMahon's letter indicated that Dr. Mirza was the only person who might be able to help in Plaintiffs' discovery efforts.[8] But a week later Sana-Bell produced 79 more pages with this qualification: "we do not feel that the enclosed documents are responsive. We further believe that we have valid grounds to object to producing some of the enclosed

---

[2] These documents included Sana-Bell's Articles of Incorporation; documents evidencing a transfer of ownership of property at 360 S. Washington Street, Falls Church, VA from Sana-Bell to Sanabel; leases for office space at the Falls Church building entered into by Sana-Bell; court documents about a dispute between Sana-Bell and BMI Real Estate Development, Inc., BMI Leasing, Inc., Soliman Bihieri, and Suleiman Bin Ali Alali regarding Sanabel investments in a real estate partnership with the defendants; results of a request for a Maryland criminal investigation of activities concerning the real estate partnership between Sana-Bell and the BMI entities; filings with the District of Columbia Department of Consumer and Regulatory Affairs; a November 24, 1992 memo faxed from Dr. Mirza to the President of Sana-Bell in Saudi Arabia regarding partnership investments in BMI Real Estate Development, Inc. and follow-up correspondence from BMI and Dr. Mirza ending on December 18, 1992; a March 27, 1998 fax from Dr. Mirza to Suleiman Al-Ali asking that a board meeting be convened to comply with Sana-Bell's by-laws about board membership; an undated memo from Mohammad A. Yamani stating that, in an April 10, 1998 board meeting, a new board of trustees was selected; an August 13, 1998 fax from Dr. Mirza to Abdullah bin Saleh Al Obeid expressing willingness to assist Sana-Bell despite Dr. Mirza's lack of inclusion of the new board and stating Dr. Mirza's displeasure with his time working with Sana-Bell; and a March 22, 1991 fax from Dr. Mirza to the Sana-Bell President about a potential investment in property in Texas.

[3] Exhibit D (E. Crotty e-mails of June 17, 2008, July 15, 2008, and August 7, 2008).

[4] Exhibit E (C. Hilgeman e-mail of August 12, 2008).

[5] See Exhibit F (September 17, 2008 letter from J.S. Tarbutton to M. McMahon); Exhibit G (September 24, 2008 letter from J.S. Tarbutton to M. McMahon).

[6] See Exhibit H (C. Hilgeman e-mail dated September 26, 2008); Exhibit I (C. Smith e-mail dated December 1, 2008); Exhibit J (M. McMahon e-mail dated December 5, 2008); Exhibit K (December 18, 2008 Letter from J. Kreindler to M. McMahon).

[7] Exhibit L (January 6, 2009 Letter from J. Kreindler to The Honorable George B. Daniels).

[8] Exhibit M (January 23, 2009 Letter from M. McMahon to The Honorable George B. Daniels).

The Honorable Frank Maas                                          Page 4 of 13
June 24, 2013

documents, given that they are public information."[9]  These documents primarily post-dated the requested time period and pertained almost exclusively to Sanabel, not Sana-Bell.[10]

On October 22, 2009, Judge Daniels referred the dispute to Judge Maas.  Plaintiffs argued that "many documents have not been produced and little or no explanation has been provided.  Sana-Bell contends that it, as well as its' successor entity, have produced all relevant documents in their possession."[11]  The relative absence of documents produced about Sana-Bell investments shows Sana-Bell clearly has not produced all documents responsive and provided no reasonable explanation for its failure.[12]

On November 23, 2009, Mr. McMahon informed the Court that, as of November 20, 2009, Sanabel had relieved him of his duties,[13] and on November 24, 2009, he filed a Motion to Withdraw as Counsel for Defendant Sanabel Al Kheer, which Plaintiffs opposed on November 30, 2009.[14]  Mr. McMahon's request to withdraw was filed only days before a scheduled December 4, 2009 hearing dealing with Plaintiffs' motion to obtain discovery from Sana-Bell, and Sana-Bell used the proposed counsel change as grounds for further delay, seeking to delay the hearing until new counsel appeared.  Although the Court conditioned adjournment on appearance of new counsel, the substance of the hearing was nonetheless delayed until new counsel appeared and "got up to speed."  On December 3, 2009, Sanabel's "prospective" counsel, Chris Manning, contacted Plaintiffs' counsel, and filed a motion to appear *pro hac vice* for Sana-Bell and Sanabel on February 2, 2010.  After over two years of trying to obtain discovery from McMahon on behalf of his clients, Plaintiffs were required to, in essence, "start over" with new counsel.

On February 9, 2010, Judge Maas issued an Order permitting the plaintiffs to take Dr. Mirza's deposition,[15] and entered an Order on May 18, 2010 stating, "Dr. Mirza may be questioned about Sana-Bell, Inc. and the whereabouts of its documents.  If Dr. Mirza does not want to answer questions about other areas, he may decline to do so, understanding that he may be deposed again after Judge Daniels rules."[16]  Notwithstanding Defendants' assertions, at Dr. Mirza's deposition, he produced 289 additional pages of Sana-Bell documents and a privilege log of other documents withheld on various grounds.

On November 23, 2010 – despite the long overdue discovery and his retention only a year earlier – Mr. Manning claimed that Sanabel lacked funding to defend the claims asserted against it or Sana-Bell and proposed that Plaintiffs voluntarily dismiss his clients in exchange for production of additional responsive

---

[9] Exhibit N (January 30, 2009 Letter from M. McMahon to Plaintiffs' counsel).  Sana-Bell produced 79 pages in this January 30, 2009 production consisting of Sanabel's 2001 and 2002 Form 990 Return of Organization Exempt from Tax showing Sanabel's receipt of the property at 360 S. Washington Street, Falls Church, Virginia, from Sana-Bell, the February 11, 2004 Order of Reinstatement of Sanabel by the Commonwealth of Virginia, and an incomplete "Written Consent in Lieu of Director's Meeting of Sanabel Al Kheer, Inc." allowing a reconstitution of the Board of Directors with no date.

[10] Subsequently, Dr. Mirza's counsel intervened stating that Dr. Mirza did not have any additional documents related to Sana-Bell.  *See* Exhibit O (February 10, 2009 Letter from S. Barentzen to The Honorable George B. Daniels).

[11] Exhibit P (October 22, 2009 Letter from J. Kreindler to The Honorable Frank B. Maas).

[12] On November 9, 2009, Dr. Mirza's counsel reiterated the arguments made previously.  *See* Exhibit Q (November 9, 2009 Letter from S. Barentzen to The Honorable Frank B. Maas).

[13] Exhibit R (November 23, 2009 Letter from M. McMahon to The Honorable Frank B. Maas).

[14] Exhibit S (Motion to Withdraw as Counsel of Record for Defendant Sanabel al Kheer, including Declaration in Support of the Motion to Withdraw, ECF Nos. 2202-2203); Exhibit T (Plaintiffs' Opposition to the Motion to Withdraw as Counsel of Record for Defendant Sanabel al Kheer).

[15] Exhibit U (ECF No. 2225).

[16] Exhibit V (ECF No. 2248).

documents that he confirmed Defendants possessed.  In short, Plaintiffs were offered documents to which they are entitled in formal discovery but only in exchange for a voluntary dismissal.[17]

On December 10, 2010, Plaintiffs served a First Consolidated Set of Requests for Production of Documents, consisting of 24 requests.[18]  Following up on the November 23, 2010 call with Mr. Manning, Plaintiffs' counsel e-mailed Mr. Manning on December 21, 2010 to identify the bare minimum information the PECs would need to review to even begin to consider whether to engage Mr. Manning's proposal:

> 1.  Financial documents for Sana-Bell, Inc. and Sanabel al Kheer, Inc. (including financial statements, bank statements, tax returns, audits, annual reports, statements of financial position (balance sheets), statements of activities (profit-loss statements), and asset statements), for the period 1998-present.
>
> 2.  Documents about the composition of the Board for Sana-Bell, Inc. and Sanabel al Kheer, Inc., including any documents relating to the withdrawal or resignation of Board members, or the appointment of new Board members, for the period 1998-present.
>
> 3.  Documents relating to the sale of the building at 360 S. Washington St., Falls Church, VA, including documents about the use or distribution of the proceeds from the sale.
>
> 4.  Documents sent to or received from Sanabil al Khair Saudi Arabia, from 1998 to present.[19]

This request did not relieve Defendants from responding to the entirety of Plaintiffs' September 13, 2007 and December 10, 2010 discovery requests; rather, the list provided a focused sampling of necessary documents that the PECs needed to review to assess Mr. Manning's request that the PECs entertain settlement discussions with the Sanabel Defendants.

Mr. Manning e-mailed Plaintiffs' counsel on January 5, 2011 to advise that his clients preferred to provide the requested documents through the formal discovery process, explaining that "we plan to serve our responses to the discovery requests on [January 21, 2011].  The documentation will still be being gathered, however, so the production will be on a rolling basis (as contemplated by the Court)."[20]  Although Defendants served their joint responses to those discovery requests on January 21, 2011, the responses were essentially nothing but *promises to produce documents at a later time.*  They responded to each and every request as follows:  "Subject to the above objections, Defendants will produce relevant, responsive materials in their possession, custody or control for inspection at a mutually convenient time and place."[21]  After numerous e-mails between Plaintiffs' counsel and Mr. Manning, with repeated promises to respond to Plaintiffs' requests in a timely fashion, Defendants finally served a partial document production (SANA-

---

[17] While Plaintiffs recognize that sometimes circumstances warrant such decision-making, there is evidence that this ultimatum – a continuation of similar comments from previous counsel for these defendants – may have been a disingenuous ploy.  At about the same time that Mr. Manning was making these representations, Sanabel had – only months earlier – approved paying substantial amounts of legal fees to its predecessor counsel, Mr. McMahon, as payment of legal fees for two other defendants in this case that have also been represented by Mr. McMahon, IIRO and MWL.  It is difficult to reconcile the longstanding claims of no money, pending bankruptcy, and looming default with the payment of substantial sums to lawyers for two other defendants in the case.  As of November 2009, Sanabel paid Mr. McMahon $385,635 for IIRO.  That amount does not include an additional $411,100 paid to Mr. McMahon by Sanabel at the closing of the sale of Sanabel's property.  *See, e.g.,* Exhibit W (SANA-BELL-000659).  Moreover, on or about August 2008, Sanabel sought to send $785,000 to IIRO after it sold property in Virginia.

[18] Exhibit X (Plaintiffs' First Consolidated Set of Requests for Production of Documents Directed to Sanabel Al Kheer, Inc.).

[19] Exhibit Y (S. Carter e-mail to C. Manning dated December 21, 2010).

[20] Exhibit Z (C. Manning e-mail to S. Carter dated January 5, 2011).

[21] Exhibit AA (Defendant Sana-Bell, Inc.'s and Sanabel Al Kheer, Inc.'s Responses to Plaintiffs' First Requests for Production of Documents dated January 21, 2011).

The Honorable Frank Maas                                                                    Page 6 of 13
June 24, 2013

BELL000173-678) on October 20, 2011, more than 10 months after the initial requests were served upon defendants. But, the 579 pages produced on October 20, 2011 – with the exception of Sanabel's 2004, 2005, 2006, and 2007 Form 990 Return of Organization Exempt from Tax – consisted of documents post-dating January 1, 2008 and not directly relevant to Plaintiffs' requests. Notably absent were the limited categories of documents identified in Plaintiffs' December 21, 2010 letter. Moreover, in an October 19, 2011 e-mail, Mr. Manning wrote that the documents described above would be produced, but "[w]e will have one more small production ready for you late next week."[22] On April 11, 2012, Mr. Manning indicated that Defendants had additional documents to produce when he wrote to Plaintiffs' counsel that "I am still working hard to get things for you from my client. My challenge has been convincing my client that turning over the information will actually lead to a binding release."[23] Plaintiffs continue to wait for these additional documents – or any other documents from Sana-Bell or Sanabel.

On July 31, 2012, Plaintiffs served on the Sanabel Defendants Supplemental Requests for Production of Documents, consisting of 5 requests.[24] Rather than producing documents in response to these supplemental requests, Mr. Manning e-mailed Plaintiffs' counsel on August 30, 2012 and stated that his client, Sanabel, has no funds to continue a defense, and asked that Plaintiffs provide him with a settlement proposal and release terms to "give my client comfort that you would be providing a full release" notwithstanding the lack of any agreement on this issue previously.[25] On September 6, 2012, plaintiffs' counsel e-mailed Mr. Manning in response stating:

> [A]s I am sure your own correspondence files will reflect, we advised you in late 2010 that we would need to review certain categories of information before we could even begin to entertain substantive discussions about a possible settlement. You thereafter expressed your preference to provide the materials at issue within the context of the formal discovery process, and we consented to several extensions for your clients to respond to our discovery demands. It was our expectation that we would have received the responsive productions some time ago and most certainly before the August 30, 2012 production deadline. Your email of August 30 suggests that plaintiffs had at some point proposed potential parameters for a settlement with your clients, which is not the case. Again, we made clear that we would (at a minimum) need to review certain categories of information, which we identified in late 2010, in order to consider your clients' expressed interest in settlement discussions. Given that we still have not received that information, we are frankly a bit puzzled by the request for us to outline a settlement proposal and release terms. We'd be happy to have a conference call to discuss these issues further.[26]

Without acknowledging that there had been no agreement that production of the requested documents would necessarily result in substantive discussions concerning settlement (let alone a release), on September 6, 2012, Mr. Manning e-mailed and stated that, "it has admittedly been difficult to get my clients onboard to date because Mr. Hillali is, quite frankly, a very cautious individual. My point in my email was to request a writing laying out the terms of what you would propose (to include language indicating that all

---

[22] Exhibit BB (C. Manning e-mail to A. Maloney dated October 19, 2011).

[23] Exhibit CC (C. Manning e-mail to A. Maloney dated April 11, 2012). Again, Plaintiffs never suggested that mere compliance with their discovery obligations would result in Defendants' release. To the contrary, Plaintiffs consistently made clear that they would not even consider engaging in settlement discussions until they had received the outstanding discovery.

[24] Exhibit DD (Plaintiffs' Supplemental Requests for Production of Documents Directed to Sanabel Al Kheer, Inc. dated July 31, 2012).

[25] Exhibit EE (C. Manning e-mail to J.S. Tarbutton dated August 30, 2012).

[26] Exhibit FF (S. Carter e-mail to C. Manning dated September 6, 2012).

Plaintiffs in the case could not later sue my clients). I would then be able to show that writing to Mr. Hillali to give him a greater level of comfort with proceeding."[27]  Plaintiffs e-mailed Mr. Manning on September 28 and October 1, 2012 reaffirming that Plaintiffs had never promised to release Sana-Bell or Sanabel in return for documents produced in response to Plaintiffs' discovery requests and that Mr. Manning's "client's trust issues … doesn't seem to be a good rationale for not engaging in discovery obligations."[28]

On October 2, 2012, Mr. Manning stated that Sanabel has no money and wants to settle this case and that he is having a hard time convincing his client to be more trustful of Plaintiffs' counsel, and the legal proceedings generally. Mr. Manning also stated that his client has financial records going back to 2003-2004, including 2010-2011 financials; however, his client has no documentation pre 9/11. He stated his and his client's willingness to cooperate and assist Plaintiffs in pursuing documentation seized by the FBI in 2002 in return for a release from the case. Rather than agree to Mr. Manning's suggestion, Plaintiffs reiterated that Mr. Manning's clients have an obligation under the Federal Rules to turn over *now* all of the documents that had been previously promised.

Despite the tenor of the conversations and correspondence, Mr. Manning attempted to turn these discussions into "settlement negotiations" in e-mails of October 9 and 15, 2012, even though no settlement discussions were on the table.[29]  On October 16, 2012, Plaintiffs' responded, stating, "we indicated two years ago what we would need to even consider any kind of settlement proposal, and arrived at the decision we needed to simply go through with document discovery, and always understood it was forthcoming. As we hope you can appreciate, our discussions after the expiration of the production deadline simply do not provide a basis for abandoning our discovery rights and preexisting agreements."[30]

## II.   DEFENDANTS HAVE FAILED TO OBEY THIS COURT'S MARCH 18, 2008 ORDER DIRECTING THEM TO RESPOND TO DISCOVERY REQUESTS

Based on the entire Procedural History recited above, Defendants have failed to fully respond to Plaintiffs' Requests for Production dated September 13, 2007 and December 10, 2010, and have produced zero documents responsive to Plaintiffs' Supplemental Requests for Production of Documents served on July 31, 2012. In fact, they did not even acknowledge the supplemental requests until the day before the discovery deadline. Over and over, Defendants and their counsel have said there were no responsive documents. Now, they admittedly possess relevant documents, but refuse to produce them until they are guaranteed dismissal from the case. The Court's order of March 18, 2008 did not place any conditions as to Defendants' response to Plaintiffs' document requests. Nor do the Federal Rules condition Defendants' production obligations on their dismissal. Defendants have an obligation to produce responsive documents but have actively declined to do so – disobeying the Court's Order. Such intentional conduct warrants the sanction of default under Rule 37.

### A.   The Standard for Imposing Sanctions for Violation of Discovery Orders

Rule 37(b)(2)(A)(vi) states:

If a party or a party's officer, director, or managing agent … fails to obey an order to provide or permit discovery, including an order under Rule 26(f), 35, or 37(a), the court where the action is pending may issue further just orders. They may include the following:

---

[27] Exhibit GG (C. Manning e-mail to S. Carter and J.S. Tarbutton dated September 6, 2012).

[28] Exhibit HH (S. Carter e-mail to C. Manning dated September 28, 2012); Exhibit II (R. Haefele e-mail to C. Manning dated October 1, 2012).

[29] While Plaintiffs dispute that these were settlement negotiations, these e-mails have not been included in the Haefele Decl.

[30] Exhibit JJ (S. Carter e-mail to C. Manning dated October 16, 2012).

. . .

(vi) rendering a default judgment against the disobedient party.

The "imposition of litigation-ending sanctions under Rule 37 is a matter of judicial discretion." *Nat'l Hockey League v. Metro. Hockey Club*, 427 U.S. 639, 640 (1976); *Microsoft Corp. v. Computer Care Ctr.*, No. 06-1429, 2008 U.S. Dist. LEXIS 112080, *10 (E.D.N.Y. April 8, 2008); *Crawford v. Franklin Credit Mgmt. Corp.*, 261 F.R.D. 34, 43 (S.D.N.Y. 2009) (J. Maas) (stating "Under Rule 37, the Court has 'broad authority to impose sanctions' for such discovery misconduct"). The Second Circuit has repeatedly recognized "the importance of appropriate sanctions as a necessary means of dealing with a recusant party." *Update Art, Inc. v. Modiin Publishing, Ltd.*, 843 F.2d 67, 71 (2d Cir. 1988). The availability of severe sanctions, such as dismissal of an action or entry of a default judgment, is "necessary to achieve the purpose of Rule 37 as a credible deterrent rather than a 'paper tiger.'" *Id.* Such sanctions are routinely imposed and are justified for discovery abuse because "discovery orders are meant to be followed." *Bambu Sales, Inc. v. Ozak Trading Inc.*, 58 F.3d 849, 853 (2d Cir. 1995). As this Court stated in *MCI Worldcom Comm., Inc. v. Gamma Comm. Group Inc.*, 204 F.R.D. 259, 262 (S.D.N.Y. 2001), courts "do not look favorably upon parties that fail to respond to court orders or remain silent in the face of repeated discovery requests."

When considering a motion for a default judgment pursuant to Rule 37(b) for failure to obey a discovery order, a district court is guided by the following factors: "(a) willfulness or bad faith on the part of the noncompliant party; (b) the history, if any, of noncompliance; (c) the effectiveness of lesser sanctions; (d) whether the noncompliant party had been warned about the possibility of sanctions; (e) the client's complicity; and (f) prejudice to the moving party." *Am. Cash Card Corp.* v. *Amcash New York W. Corp.*, 184 F.R.D. 521 (S.D.N.Y. 1999); *Agiwal v. Mid Island Mortgage Corp.*, 555 F.3d 298, 302 (2d Cir. 2009).

While strong sanctions are imposed only for serious or repetitive violations of discovery orders, "courts should not shrink from imposing harsh sanctions where … they are clearly warranted." *Cine Forty-Second St. Theatre Corp. v. Allied Artists Pictures Corp.*, 602 F.2d 1062, 1068 (2d Cir. 1979); *see also United States Freight Co. v. Penn Cent. Transp. Co.*, 716 F.2d 954, 954-55 (2d. Cir. 1983) (per curiam) (upholding sanction of default judgment where defendant failed to comply with discovery order despite having had proper notice).

## B.    Defendants Have Repeatedly Failed to Comply with the March 18, 2008 Order and Have Ignored Repeated Discovery Requests

Judicial intervention is necessitated because of Defendants' continued refusal to provide responsive documents (which, based on correspondence between counsel, unquestionably exist in Defendants' possession, custody, or control and are being held to leverage a dismissal), intentional production of non-responsive documents, and general delay and obfuscation in the discovery process.

To date, Sana-Bell has failed to produce *any* documents in response to eight of the 21 requests. It is beyond belief that responsive documents do not exist for certain of Plaintiffs' requests. For example, in Document Request #4, Plaintiffs seek documents identifying all bank accounts opened for or on behalf of Sana-Bell, including the identity of all persons with signatory authority over those accounts. It is undisputed that during the course of its 12-year existence, Sana-Bell: (i) received millions of dollars from the International Islamic Relief Organization in Saudi Arabia; (ii) purchased a building in Falls Church, Virginia; (iii) received rents and paid expenses on the Falls Church building; (iv) invested in various real estate funds, and (v) paid employees. Sana-Bell's position that it made the forgoing transactions without the benefit of bank accounts, wire transfers, or any paper or electronic trail is simply not credible.[31]

---

[31] Though Plaintiffs anticipate using the information produced to follow up with supplemental requests for banking information, the goal was first to determine the scope of the banking record archive before serving coordinated, more targeted requests.

Of the 13 requests for which Sana-Bell did produce documents, the deficiencies are systematic and an obvious attempt to stifle discovery. For instance, Plaintiffs' Request #5 seeks agendas and meeting minutes of Sana-Bell's Trustees, Board of Directors and Executive and Investment Committees. In response, Sana-Bell produced a one-page letter referencing a 1998 Board meeting. It simply defies logic that Sana-Bell, an organization in existence for over a decade, has maintained only a single page referencing a single Board meeting and no documents referencing or otherwise concerning any other Board meeting or meetings of committees it had purposefully established.

Plaintiffs' Request #13 seeks documents sent to or received from the government of Saudi Arabia. Although Plaintiffs clearly requested documents in the possession, custody or control of Sana-Bell, Sana-Bell's disingenuous response simply objected to producing documents "in the possession of the Kingdom of Saudi Arabia."

Plaintiffs' Request #14 seeks documents relating to Yaqub Mirza, including any and all documents relating to his employment with Sana-Bell. As previously asserted, Dr. Mirza is a long-time official of Sana-Bell, was a founder of both Sana-Bell and Sanabel, acted as Secretary and Treasurer for both organizations, sat on the Board of Directors of both organizations, and is believed to have performed most, if not all, of the administrative, clerical, and financial tasks of both Sana-Bell and Sanabel during the relevant period. In response to Request #14, Sana-Bell produced only 12 pages relating to acts of the Board of Directors and Dr. Mirza's opinions on two Sana-Bell investments. There were no contracts, scope of work, performance reviews, or any other documents about Sana-Bell's original employee.

Plaintiffs' Request #15 seeks documents relating to fifteen people who have been formally affiliated with Sana-Bell (e.g., directors, accountants, registered agents, or investment managers). In response, Sana-Bell produced nothing more than the same 12 pages they did for Request #14 relating to Dr. Mirza. Eleven of the fifteen people included in this Request are not even referenced in the documents.

Plaintiffs' Document Request #17 seeks documents about former Sana-Bell director, Abdullah al Noshan. While with Sana-Bell, Mr. Al Noshan was simultaneously an officer of the U.S. branch of another defendant in the litigation, the Muslim World League. Following the September 11 attack, al Noshan was arrested by the FBI's Joint Terrorist Task Force, pled guilty to immigration fraud, and deported. Sana-Bell produced only three pages in response to Request #17, none of which mention or relate to al Noshan.

Even after plaintiffs sought to help the Sanabel Defendants prioritize their discovery production by identifying four categories of documents for priority production, Defendants still failed to produce any documents within the referenced four categories.

### C.      Defendants Have Willfully and in Bad Faith Refused to Produce Documents

Since discovery began, Defendants have refused to meaningfully respond to Plaintiffs' requests. A few examples illustrate the magnitude of Defendants' attempts to frustrate discovery: significant delays in responding to document requests, claiming that no responsive documents exist, using pending dismissal orders to delay production, claiming that Sanabel has no obligation to produce documents for Sana-Bell,[32] continuing to assert that they will produce documents only if they are released and a settlement agreement is in place, and unfulfilled promises to promptly produce significant amounts of responsive materials. Any suggestion that these productions represent a good faith effort is disingenuous.

Sana-Bell has twice hired counsel to defend it in this litigation and continues to feign active defense despite urging the Court that it no longer exists. The March 18, 2008 order determined that the evidence Sana-Bell submitted was insufficient to establish that the entity had formally dissolved and was no longer a

---

[32] This claim has been made despite repeated assertions by counsel for both entities that Sanabel is a successor entity to Sana-Bell.

viable legal entity. As a result, Sana-Bell "minimally has the responsibility to respond to plaintiffs' discovery requests by indicating whether there are any responsive documents in its possession or control, and if so, indentifying the documents, their location, and their custodian." Exhibit A at 3. Courts have reasoned that such on-going behavior is grounds for the entry of a default judgment.

In *Montblanc-Simplo GMBI-J v. Colibri Corp.*, 692 F. Supp. 2d 245 (E.D.N.Y 2010), the court granted the plaintiffs' motion for a default judgment as a sanction under Rule 37(b), based on the defendant's continuing dilatory conduct. The plaintiffs initially brought suit against the defendants for intellectual property violations. The case was initially referred to mediation but before the mediation date, the parties informed the court that the defendants had closed down, released their employees, and been placed in receivership. After the defendants' receiver failed to respond to the plaintiffs' discovery demands, the court ordered the defendants to either respond or notify the court that they would not defend the case or had settled the case. When no response was filed, plaintiffs sought entry of a default judgment as a sanction. Eventually, the receiver confirmed that he was not authorized to defend.

In granting the default judgment, the Court cautioned that "culpability or intent is a primary concern under Rule 37, which does not authorize a sanction terminating the case where the 'failure to comply has been due to inability, and not to willfulness, bad faith, or any fault on the part of the party against whom sanctions are sought.'" *Id.* at 251. But, "dispositive relief" is necessary in the face of a "continuing sage of dilatory conduct." *Id.* The court reasoned that defendants willfully refused to participate in the litigation and advised the receiver to inform the court that they would not pursue a defense. Further, the receiver advised the court that he was not authorized to participate in the litigation. Given this willful disregard of its obligations, the Court granted the motion for a default judgment.

Similarly, in *State Farm Mut. Auto. Ins. Co. v. Semion Grafman*, No. 04-2609, 2011 U.S. Dist. LEXIS 53382 (E.D.N.Y. April 4,2011), the court entered a default judgment against two defendants under Rule 37 for discovery abuse. The defendants engaged in obstructionist discovery practices over nearly five years of discovery including missing court-ordered discovery deadlines, failing to produce documents, and failing to make timely disclosures. *Id.* at *9. The court granted the plaintiffs' motion for case-terminating sanctions against the defendants due to their discovery abuses. The court reasoned that the defendant willfully disregarded discovery obligations and "nothing in the record … demonstrated that [the defendant's] conduct was merely an oversight or was the product of a good faith attempt at compliance." *Id.* at 30.

A similar result was reached in *Am. Cash Card Corp. v. AT&T Corp.*, 184 F.R.D. 521 (S.D.N.Y. 1999), where the court reasoned that the defendant's disobedience was willful, as demonstrated by its failure to comply with court orders; its failure to produce such "basic documents as checking statements, financial records, and tax returns; and its representative's non-credible statements in discovery. *Id.* at 524.

Here, no evidence suggests that Defendants' conduct has been anything other than a deliberate, orchestrated plan to delay these proceedings and withhold production of responsive (and likely damaging) documents. Plaintiffs' discovery requests have been outstanding for over five years and Defendants have been given multiple chances to cure their deficiencies and produce responsive materials. Plaintiffs emphasize that the productions underlying this motion were the product of a long series of meet and confer sessions where Plaintiffs agreed to prioritize and narrow discovery. Defendants have refused to produce even the most basic documents, and like the defendant in *Amcash,* have failed to comply with this Court's Order of March 18, 2008. Thus, Defendants have willfully and in bad faith refused to meaningfully respond to Plaintiffs' requests and case terminating sanctions are appropriate.

Plaintiffs served an initial set of requests in September 2007, and consolidated and supplemental requests in December 2010 and July 2012. From the start of discovery to the present, Plaintiffs have worked in good faith with Defendants on many occasions via numerous meet and confers to address all

perceived areas of dispute, and where possible, narrow and/or prioritize the requested information so that Defendants could manage their obligations and promptly produce the relevant, responsive documents.

But Defendants have not demonstrated good-faith cooperation. For example, Defendants' previous counsel, Mr. McMahon, promised to reach out to counsel for Dr. Mirza to obtain documents responsive to Plaintiffs' requests, then represented to Plaintiffs and the Court that his efforts were unsuccessful. But, assertions from Mr. Mirza's counsel, Mr. Barentzen, that Mr. Barentzen had communicated with Mr. McMahon some three months before McMahon's representation to the Court indicate that Mr. McMahon's representation about his inability to reach Dr. Mirza's counsel was false. Moreover, despite counsel's repeated statements that Dr. Mirza possessed no Sana-Bell documents, Dr. Mirza arrived at his deposition with 289 pages *and* a privilege log. Then, after being served with a prioritization of Plaintiffs' requests on December 10, 2010, for documents from the corporations' formation to the present, the few documents Defendants provided dated back to only 2008. They failed to produce any earlier documents *despite* their obligation to preserve and avoid spoliation of evidence once they were on notice of the litigation as early as August 2002. Finally, Plaintiffs served their supplemental requests in July 2012 and have yet to receive *any* response whatsoever to these requests. Defendants have indicated that one reason for their non-compliance with their discovery obligations is Sanabel's officer's distrust of Plaintiffs' counsel and, in essence, the judicial process in which Defendants find themselves. But, that lack of trust is not a good-faith basis to withhold relevant discovery.

Although Plaintiffs have necessarily sought the Court's involvement on numerous occasions in their efforts to obtain discovery, Defendants still have not responded to Plaintiffs' discovery demands in any meaningful way and have willfully disobeyed the Court's March 18, 2008 Order, necessitating this motion. The history of Defendants' noncompliance is both long and tortured, but not without numerous opportunities for Defendants to redeem themselves – something they have failed to do.

### D.     No Lesser Sanction Will Deter the Defendants' Evasive and Abusive Conduct

The Second Circuit has explained that one purpose of discovery sanctions under Rule 37 is to deter discovery abuse by a recalcitrant party and to serve as a "general deterrent." *Update Art, Inc. v. Modiin Publishing, Ltd., et al.,* 843 F.2d 67, 71 (2d Cir. 1988). The Supreme Court has explained that 'the most severe in the spectrum of sanctions provided by statute or rule must be available to the district court in appropriate cases, not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent." *Nat'l Hockey League v. Metro. Hockey Club, Inc., cit. at.,* 427 U.S. 639, 643 (1976). And, when "'less harsh sanctions, including orders compelling defendants to [comply] have already proven fruitless,' the default sanction is the only appropriate remedy." 2011 U.S. Dist. LEXIS 53382 at *34 (citing *Microsoft Corp. v. Computer Care Ctr.,* 2008 U.S. Dis. LEXIS" 112080, at *14)(E.D.N.Y. Apr. 8, 2008)). Here, lesser sanctions *have* proven fruitless. Despite an order to produce responsive documents in their possession, Defendants have not complied. More fundamentally, Defendants have offered numerous inaccurate excuses to avoid discovery, and have acknowledge that they have withheld responsive documents without any justification. These actions reveal a basic disregard for the discovery process, rendering it impossible for Plaintiffs or the Court to have any faith that Defendants can be trusted to comply voluntarily with their discovery obligations.

Plaintiffs even provided a prioritization of the documentation they needed from the Defendants, but even this prioritization was unsuccessful in achieving Defendants' participation. Plaintiffs – to no productive end – have been eminently patient and accommodating in an attempt to facilitate discovery. Given the Defendants' history of noncompliance with this Court's Orders, and the egregious tactics that they have used throughout these proceedings, no lesser sanction will deter Defendants' conduct.

### E.      Failure to Preserve Evidence

Beyond failing to actively participate in discovery and ignoring the Court's March 18, 2008 Order, neither Defendants nor their attorneys have met their respective obligations to protect relevant information and prevent the disappearance, destruction, or departure overseas of evidence.

The obligation to preserve all relevant evidence is clear, broad, and begins the moment a party *anticipates* a legal proceeding. "[T]he obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation." *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 436 (2d Cir. 2001); *see also Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 217 (S.D.N.Y. 2003) ("[A]nyone who anticipates being a party or is a party to a lawsuit must not destroy unique, relevant evidence that might be useful to an adversary").

In this action, Defendants' obligations to preserve all relevant evidence began *at the latest* on August 15, 2002 when the initial complaint was filed in *Burnett, et al. v. Al-Baraka Invest. & Dev. Co., et al.*, which specifically named Defendants – and by extension its officers, directors, employees, and agents – as defendants. Complaint, *Burnett, et al. v. Al-Baraka Invest. & Dev. Co., et al.*, (02-cv-01616, D.C.D.C.), *Burnett* DC ECF No. 1. This obligation extended to all relevant evidence that *might* be useful in the litigation – and applied to any documents sought thereafter by Plaintiffs' discovery requests. Yet, here, Defendants never preserved relevant evidence nor even took any steps to do so.

### F.      Defendants' Refusal to Obey the Court's Discovery Timetables and Produce Responsive Document Has Prejudiced Plaintiffs.

Defendants have engaged in a pattern of deliberate discovery abuses that have prejudiced the Plaintiffs' ability to obtain responsive documentation critical to their claims. Despite numerous empty promises to produce requested information, Defendants withheld the production of significant documents for over five years, even after the Court ordered them to produce documents. Such abuses have significantly delayed progress of discovery and prejudiced Plaintiffs.

## III.    CONCLUSION

For over five years, Plaintiffs have pursued targeted discovery from defendant Sana-Bell, an organization that operated under the laws of the District of Columbia and the Commonwealth of Virginia from 1989-2001. The Sanabel Defendants initially sought to avoid responding to any discovery. When this Court ordered them to respond, Defendants then produced only 93 pages of documents and asserted that no other documents exist. While the production for the Sanabel Defendants combined now rests at about 750 pages, Defendants admit that additional responsive documents exist but continue to offer excuse after excuse to frustrate production.

For the foregoing reasons, Plaintiffs respectfully request that this Court grant Plaintiffs' motion for sanctions and enter default judgments against the Sanabel Defendants pursuant to Rule 37(b).

Respectfully submitted,

THE MDL 1570 PLAINTIFFS' EXECUTIVE
COMMITTEE

cc:    The Honorable George B. Daniels, U.S.D.J. (Via Federal Express – Overnight)
       Christopher Manning, Esquire (Via Federal Express – Overnight)

The Honorable Frank Maas
June 24, 2013

Alan Kabat, Esquire – Defendants' Liaison Counsel (Via Federal Express – Overnight)
Omar T. Mohammedi, Esquire (Via Federal Express – Overnight)
Frederick J. Goetz, Esquire (Via Federal Express – Overnight)
Steven T. Cottreau, Esquire (Via Federal Express – Overnight)
Eric L. Lewis, Esquire (Via Federal Express – Overnight)
Martin F. McMahon, Esquire (Via Federal Express – Overnight)