# Exhibit 3

1

```
         DATCTERC
1        UNITED STATES DISTRICT COURT
1        SOUTHERN DISTRICT OF NEW YORK
2        ------------------------------x
2
3        In Re: Attacks on September
3        11, 2001
4                                         03 MDL 1570 (GBD) (FM)
4
5
5        ------------------------------x
6                                         New York, NY
6                                         October 29, 2013
7                                         10:23 a.m.
7
8        Before:
8
9                            HON. FRANK MAAS,
9
10                                      Magistrate Judge
10
11                            APPEARANCES
11
12       COZEN O'CONNOR
12            Attorneys  for Federal Insurance Company Plaintiffs
13       BY:  SEAN P. CARTER
13            J. SCOTT TARBUTTON
14
14       MOTLEY RICE
15            Attorneys   for Burnett Plaintiffs
15       BY:  ROBERT T. HAEFELE
16
16
17       ANDERSON, KILL & OLICK
17            Attorneys  for Plaintiff O'Neill
18       BY:  JERRY S. GOLDMAN
18
19       KREINDLER & KREINDLER
19            Attorneys  for Ashton Plaintiffs
20       BY:  ANDREW J. MALONEY
20
21       MANNING SOSSAMON
21            Attorneys  for Sana-Bell, Inc. and Sanabel Al Kheer, Inc.
22       Defendants
22       BY:  CHRISTOPHER C.S. MANNING
23
24
25
                       SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300
```

2

DATCTERC

1                              APPEARANCES
2

2   CLIFFORD CHANCE
3        Attorneys  for Dubai Islamic Bank Defendant
3   BY:  RONI E. BERGOFFEN
4

4   DOAR RIECK KALEY & MACK
5        Attorneys  for Yassin Abdullah Kadi Defendant
5   BY:  AMY ROTHSTEIN
6        PETER C. SALERNO
6

7   LEWIS BAACH
7        Attorneys  for MWL and IIRO Defendants
8   BY:  ERIC L. LEWIS
8   BY:  AISHA HENRY
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

3

DATCTERC

1               (Case called)
2               THE COURT:  Good morning everyone.  Yesterday, later
3       than I had planned, we filed a combined decision, and report,
4       and recommendation concerning three of the motions, and no
5       other counsel got notice of that at a time when they could
6       still look at it.  Plaintiffs' counsel seen it already.
7               MR. CARTER:  Your Honor, we did see it late last
8       night.  I will confess I haven't had a chance to read it
9       thoroughly.  The one thing that we did note, as I think your
10      Honor had indicated for the fee applications, a deadline had
11      been set for 30 days.
12              THE COURT:  If you want to extend that, and you work
13      it out, I have no problem with that.
14              MR. CARTER:  We will take stock of how much work is
15      involved --
16              THE COURT:  Obviously, if you wish to forego it,
17      that's fine, too.
18              MR. CARTER:  That seems unlikely, your Honor.
19              THE COURT:  If you didn't read it, I spared you two
20      pages, because it started out as a separate memorandum
21      decision, and report and recommendation, but I combined the two
22      when I entered the last two pages, which are a separate report
23      and recommendation that were filed and deleted.
24              For those of you who haven't seen it, basically I
25      concluded that an adverse inference was warranted and also an

4

DATCTERC

1  award of attorneys' fees as to Rabita trust, recommended that a
2  default judgment be entered as to Al Kheer, U.S.A.  I concluded
3  that sanctions were not warranted, but for reasons explained in
4  the decision, the costs of the motion were recoverable.  As to
5  Al Khair, Saudi Arabia, I concluded a default judgment was
6  appropriate.  I know on the proposed agenda for this session, I
7  had indicated that I thought the only thing that was right for
8  consideration was the Sana-Bell motion.
9          Is there anything else we will need to take up?
10         MR. LEWIS:  Your Honor, I just have a minor
11  housekeeping motion.  We filed pro hac vice motions for three
12  of my colleagues, my partner, Ms. Henry and two other
13  attorneys in my firm; and they have been on file for some
14  months; and I just thought I would mention it.
15         THE COURT:  They, obviously, got lost in the shuffle.
16  The last decision I mentioned is document 2789, so there is a
17  lot of forests.  If you just give my law clerk the approximate
18  date it was filed, we will see that it's taken care of.
19         MR. LEWIS:  Thank you, your Honor.
20         THE COURT:  Turning to Sana-Bell, I guess the first
21  question that I have as to the predecessor entity is if it
22  doesn't exist at the moment, who retained you, Mr. Manning?
23  Have you seen the decisions that have been filed?
24         MR. MANNING:  I have not gone through it with the
25  level of detail --

5

DATCTERC

1          THE COURT:  Basically, as to Rabita trust, one of the
2     things I concluded was that Mr. McMahon couldn't actually
3     represent the trust, because he didn't appear to have a client
4     whom he could communicate with.  And it was not only a defunct
5     organization, but one that didn't seem to have somebody who
6     served in a capacity whereby they could retain counsel.  That's
7     why I'm inquiring about Sana-Bell.
8          MR. MANNING:  Understood, your Honor.  There is some
9     question as to that issue in the case.  I currently am retained
10    by Sanabel Al Kheer, Inc.  They assumed certain property, as I
11    understand it, from Sana-Bell, Inc.  There hasn't been a legal
12    determination, I believe, as to the successor rights or
13    obligations of that party, but at this point in order to ensure
14    that all interests are, at least, represented to some extent, I
15    have asserted myself as someone who represents that company.
16         THE COURT:  I'm not sure you can do that.  When you
17    read the decision I just entered, you will see what my concern
18    is.
19         My other major concern is I gained a middle initial
20    that I never had in plaintiffs' papers, Frank B. Maas.  I don't
21    know where the "B" came from.  It was just a minor point.
22         Let me hear from the plaintiffs with respect to the
23    motion, and then I will get back to you.
24         MR. HAEFELE:  Thank you, your Honor.  First off, if I
25    might address the question you just asked, your Honor,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DATCTERC
1  regarding the existence or nonexistence --
2          THE COURT:  I thought you were going to address my
3  middle initial.
4          MR. HAEFELE:  No.  I will leave you to decide that.
5          THE COURT:  The jury is still out on that one.
6          MR. HAEFELE:  I think that's for the Court to decide,
7  your Honor.
8          As you may recall in the very early stages, if you
9  will, early stages at least with regard to Sanabel, there was a
10  decision by Judge Daniels that said there was insufficient data
11  in the record to determine that Sanabel did not exist.  And
12  that's why his Honor entered an order that allowed -- denied
13  the motion to dismiss on behalf of Sanabel.  So to the extent
14  that that order is still in existence, and I believe it still
15  is, there remains no data in the records; they don't exist.
16  And I think we have been moving forward that they either don't
17  exist or if they do exist -- I'm sorry.  Either they don't
18  exist and if they don't exist, Sanabel Al Kheer, the United
19  States entity, is the alter ego and the successor.  I think
20  your Honor --
21          THE COURT:  If Sana-Bell doesn't exist and has no
22  assets, there probably isn't much there for you in any event,
23  correct?
24          MR. HAEFELE:  To the extent there are individuals that
25  have documents related to that entity --
              SOUTHERN DISTRICT REPORTERS, P.C.
                     (212) 805-0300

7

DATCTERC
1          THE COURT:  That's a separate issue.
2          MR. HAEFELE:  That is a separate issue, I agree.
3          THE COURT:  I guess I'm looking at it in terms of the
4     big picture and your ability to recover damages from an entity,
5     if the entity, as a practical matter, no longer exists.  I
6     think if Sanabel is a successor entity does -- and recognized
7     there may be some overlap between the two -- I'm not sure
8     what's gained by pursuing Sanabel.
9          MR. HAEFELE:  I will address that in two stages, your
10    Honor.
11         THE COURT:  Sure.
12         MR. HAEFELE:  First off, I haven't looked at this
13    issue in quite sometime, but my recollection is even where an
14    entity is wrapping up, under New York law, if they -- either if
15    they existed at the time the suit was filed or within a short
16    time period before that, there is still the opportunity to
17    reach back into the entity, if they haven't fully wrapped up by
18    the time the lawsuits --
19         THE COURT:  No question.  Even a defunct entity can
20    continue to both prosecute and defend lawsuits.
21         MR. HAEFELE:  Right.  My recollection is that given
22    the question marks that existed.  The question marks
23    Sana-Bell's -- the first Sana-Bell's existence at the time of
24    the suit -- raised the issue that they clearly had not wrapped
25    up by the time the suit was started; and they may still not be
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

8

DATCTERC

1  wrapped up, I think is what the question is.  But the other
2  issue that I wanted to address -- and it goes to some other
3  things in the motion today -- is that it's important to
4  understand that this litigation was not brought just for
5  financial recovery.  It was also brought for the -- the 9/11
6  families, thousands and thousands of people that brought the
7  suit, much of it has to do with wanting accountability and
8  wanting to know what happened on 9/11; and part of that story
9  is Sanabel, both the old Sana-Bell and the new Sanabel, and
10  frankly, the Sanabel in Saudi Arabia, as well.  So it's both
11  the financial damages, as well as the accountability that they
12  can get through the judicial system.
13          THE COURT:  Fair enough.
14          MR. HAEFELE:  Your Honor, I don't know that -- when we
15  wrote the papers, I think, your Honor, we laid out quite a bit
16  of the timeline facts of this.  I resist boring you with that,
17  unless your Honor has any questions about those.  What I think
18  we tried to do was lay both the standard -- the willfulness or
19  bad faith on the part of the noncompliant party, the history of
20  the noncompliance that dates all the way back to the time that
21  we first filed.
22          THE COURT:  I think you have to parse, at times -- and
23  at other times I recognize, perhaps, it's fair to view this as
24  a single entity, but the Sana-Bell record appears to suggest it
25  dissolved.  Whether it ceased to function is another question;

9

DATCTERC
```
 1   at least it was formally dissolved before 9/11.  I assume
 2   that's not a matter of dispute,  Is it?
 3           MR. HAEFELE:  It is.  Your Honor, I'm not sure it's
 4   still not -- I know that my colleague, Mr. Manning and his
 5   predecessor counsel, Mr. McMahon, have frequently and
 6   repeatedly argued what was decided by the Court, that Sana-Bell
 7   doesn't exist; the first Sana-Bell doesn't exist.  But there
 8   still remains the same questions, that were in the record
 9   before Judge Daniels, haven't changed.
10           THE COURT:  Well, Dr. Nirza was at least an officer of
11   the successor entity, correct?
12           MR. HAEFELE:  I believe he was an officer of both.
13           THE COURT:  That was my next question.  I know I
14   permitted you to depose him, and I know I narrowed the topic.
15   I'm not sure whether it was as to Sana-Bell, Sanabel Al Kheer,
16   or both as a practical matter.  He is one of the people who
17   presumably knows what happened to Sana-Bell, correct?
18   Sana-Bell -- when I say "Sana-Bell" without a further verbiage,
19   I'm talking about the first entity.
20           MR. HAEFELE:  He would be someone that would have, at
21   least, familiarity with that, but I don't know -- I mean, I
22   don't know that he knows the legal aspect of whether or not it
23   completed the wrap-up.  In other words, as far as I know, he
24   wasn't the lawyer, or the person, that filled out the papers
25   that concluded everything that was necessary to wrap up the
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

10

DATCTERC
1    first Sana-Bell.
2              THE COURT:  Well, there's two possibilities here as to
3    the first Sana-Bell, one of which is it was dissolved before
4    9/11, presumably but not reasonably, they hadn't anticipated
5    litigation at that point; and, therefore, probably sanctions
6    are inappropriate.
7              The other is that it had some continuing existence,
8    either by itself or in combination with Sanabel Al Kheer, in
9    which then there could be discussion about sanctions.  Don't I
10   need to know which side of the line the first entity falls on
11   before I can decide sanction motions?
12             Another way of asking that is:  Is the motion
13   premature?
14             MR. HAEFELE:  Well, I think, your Honor, it's one of
15   the two things.  It is either that the two Sanabels are alter
16   egos of one another, or the two Sanabels -- or the second
17   Sanabel is the successor and the first Sana-Bell does not
18   exist.  But in either instance, I think what's important is
19   through all of this, whether it's one Sanabel or two Sanabels
20   currently in existence, through the entire time that's
21   significant here, the strings were being pulled in Saudi Arabia
22   from the parent entity of the two Sanabels, which would be
23   Sanabel Al Khair, the Saudi entity --
24             THE COURT:  K-h-a-i-r?
25             MR. HAEFELE:  Sanabel Al Khair.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

DATCTERC

1      MR. HAEFELE:  I know.  And the parent, essentially,
2  the effective parent of Sanabel Al Khair, Saudi Arabia would be
3  IIRO and Muslim World League.  So essentially, we still have
4  one close-knit happy family that is running the show in Saudi
5  Arabia for the Sanabel entities.
6      THE COURT:  Well, in relation to the motion that's
7  before me now, how do I know that strings are being pulled by
8  the Saudi entity or its parents, IIRO/MWL?
9      MR. HAEFELE:  What I would suggest, your Honor, is
10  that if that becomes the string that holds things together for
11  the opinion the Court is coming to, we would be happy to brief
12  that issue.  Much of the facts of that have been developed
13  through or have gotten, both -- some of what we got from
14  Sanabel, but also what we've received from IIRO and Muslim
15  World League, what -- we are doing a rolling production from
16  Sanabel -- or from IIRO, Muslim World League now.
17      In going through that, we are finding out more
18  information about the relationship between Sanabel Al Kheer,
19  Muslim World League and Sanabel Al Khair, Inc., Saudi Arabia,
20  and the connection between them and the U.S. entities.
21      THE COURT:  If the first Sana-Bell entity ceased to
22  exist before 9/11, then I'm not sure you can make out a
23  spoliation claim for its records, assuming that they were
24  destroyed or handed off to somebody else before litigation was
25  reasonably anticipated.

12

DATCTERC

1          One thing that concerns me is I'm not sure there is an
2     adequate record as to that.  I mean, Sanabel Al Kheer --
3     K-h-e-e-r -- the U.S. successor entity, the analysis may be
4     much different, but as to the first entity, I'm not sure there
5     is an adequate record to award sanctions at the present.  Maybe
6     ultimately.  I'm just not sure you have gotten there yet.
7          MR. HAEFELE:  I would have to think through that.  I
8     think I understand where you are coming from.  Clearly, there
9     was an obligation just under corporation law to turn over the
10    documents to -- separate and apart from what their
11    obligations -- to preserve evidence for the litigation, because
12    obviously the litigation hadn't started, if they didn't exist
13    pre-9/11/11.
14          THE COURT:  Do you have records that related to the
15    real estate transaction?  I know there are records that show
16    that Mr. McMahon did okay as a result of the real estate
17    transaction, so there was some records.
18          MR. HAEFELE:  Right.  There are a few.
19          THE COURT:  It doesn't sound like you have a whole
20    closing binder.
21          MR. HAEFELE:  That's correct.  That closing happened
22    in 2008, I believe.  So clearly, it was long after the
23    litigation started and deep into the obligation to exchange
24    documents, let alone preserve documents.
25          THE COURT:  And the seller was the first Sana-Bell

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

13

DATCTERC
```
 1   entity selling property to the second?
 2               MR. HAEFELE:  No.  I don't know who -- I don't recall
 3   who the purchaser was.  But it was the -- the sale was --
 4   again, it was orchestrated and there is evidence -- there is
 5   documentation within -- I think what we showed your Honor, but
 6   certainly within what we have -- that shows that there was
 7   permission to sell the property given in an exchange between
 8   IIRO and Sanabel, U.S.A.  Interestingly, your Honor, the
 9   permission comes from Samir Al Rhadi.  I don't know if you
10   remember Samir Al Rhadi, but he was the gentleman, the supposed
11   kindly volunteer that was helping IIRO and Muslim World League
12   to go through the documents with Mr. McMahon, and we were
13   supposed to have a telephone conference call with him, and he
14   was a nice, older gentleman that was just sort of, quote,
15   unquote, helping out.
16               THE COURT:  I vaguely recall that.
17               MR. HAEFELE:  Well, it turns out he must have a little
18   bit more of a position than a kindly volunteer helping out on
19   his own, because he is the one that was -- gave the power of
20   attorney that allowed them to sell the property here in the
21   U.S. and pretty much he is the one that the Sanabel Al Kheer
22   people here in the U.S. were reporting to at the IIRO.  So
23   that's some indicator of how IIRO and Muslim World League were
24   pulling the strings.
25               THE COURT:  Let me hear from Mr. Manning a bit, and
```

14

DATCTERC
1  then I will get back to you.  One of the problems I have with
2  your side of the equation, Mr. Manning, is what we were just
3  talking about.  Even if I assumed that this is the equivalent
4  of some benign entity, a stamp club that existed in one format,
5  Dr. Nirza was a member of a club and an officer.  He resigned
6  from the first entity and when the second one started up, he
7  was an officer of that.  The position is that the two were
8  unrelated.  The stamp club, nonetheless, had engaged in
9  transactions for which it didn't, evidently, retain paperwork
10 long after litigation was contemplated, and the flow of funds
11 clearly was an issue.
12        So why isn't the mere fact that things one would
13 expect to be held either by the successor stamp club, or here
14 Sanabel Al Kheer, related to the real estate transaction,
15 documents that should have either been preserved by Sanabel Al
16 Kheer, the U.S. entity, or its counsel as its agent.  And why
17 shouldn't I be troubled that documents like that are not
18 available.
19        MR. MANNING:  Your Honor, I think, first of all, it's
20 important to clarify what these entities are.  There's Sanabel
21 Al Kheer, K-h-e-e-r, which is a Virginia corporation.
22        THE COURT:  Right.
23        MR. MANNING:  There is a Sana-Bell, D.C, which is a
24 D.C. corporation.  That's the entity that is now defunct.
25        THE COURT:  That's the one that's B-e-l-l?

15

DATCTERC

1        MR. MANNING:  S-a-n-a, hyphen, B-e-l-l.  Then there is
2   this other entity that I don't represent and that was alluded
3   to as being a sally company.  So the two companies that we're
4   talking about here, as far as the relationship, is Sana-Bell,
5   D.C., I'll call it, and Sanabel of Virginia -- Sanabel Al
6   Kheer, Virginia.
7        THE COURT:  I agree.  That's why I was saying to
8   counsel that I think that the record as to the Saudi entity and
9   the supposed parents or folks pulling the strings on behalf of
10  the Saudi entity, I don't think there is a record in relation
11  to this motion.
12       MR. MANNING:  So, you know, I think what we have is,
13  for a very brief timeline, as you mentioned, Dr. Nirza was --
14  did have a relationship with Sana-Bell of D.C.  Then he had a
15  relationship also with Sanabel Al Kheer, Virginia.  In 2004 --
16       THE COURT:  Does he continue to be affiliated with the
17  Virginia entity?
18       MR. MANNING:  With neither entity.  In 2004, the
19  current president of Sanabel of Virginia, and their two people
20  on the board currently, the current president was essentially
21  given a box of documents that related to Sanabel Al Kheer.  We
22  produced all of that documentation to include, as was
23  mentioned, some documents as related to the transaction.
24  Whatever documents that related to Sana-Bell, D.C. have,
25  likewise, been produced.  And then in a series of, I think it's

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

16

DATCTERC

1  now four supplements to that production, we have produced bank
2  records up to 2011.
3           THE COURT:  Well, one troublesome thing, and I
4  apologize for jumping around is that a large part of the
5  production occurred on July 17th of this year, two days before
6  your response was due as to this motion.
7           MR. MANNING:  Right, your Honor.  There is one thing
8  that I personally have to apologize for.  To get -- to step
9  back just for a moment, there were, starting in 2011,
10  settlement conversations that began.  And part of the delay in
11  those settlement negotiations was that my client, not being as
12  completely conversant in American law as others, didn't
13  completely understand what a settlement fully meant.  And so
14  the reason for that delay was from my client asking for some
15  sort of an averment that if this documentation that they were
16  requesting was produced, that he would, in fact, be released.
17  Because we weren't able to get that assurance, the settlement
18  negotiations broke down -- and I'm getting to your timing
19  issue.
20           They broke down early 2013, I believe, or late 2012.
21  And my personal apology is, as I referenced in the briefs,
22  during early 2013, I was dealing with a personal family issue
23  that resolved itself in early June.  It's not an excuse.  I did
24  certainly create a delay in the production, but once we
25  received this motion, I, as quickly as possible, turned that

17

DATCTERC

1   around.  So that's the reason for the lack of timeliness of the
2   most recent production, or the most recent supplementation.
3          THE COURT:  Let's take, as an example, the real estate
4   transaction.  Was Sanabel Al Kheer, the Virginia entity, a
5   party to that transaction?
6          MR. MANNING:  It was.
7          THE COURT:  So shouldn't there be a fuller record than
8   the documents that you turned over, such as a complete closing
9   binder?
10          MR. MANNING:  Again, your Honor, what's been produced
11   is what my client is in possession, custody and control of.
12   There hasn't been any spoliation --
13          THE COURT:  Possession and custody, perhaps, but I
14   assume there was some real estate lawyer in the loop
15   representing Sanabel Al Kheer.  Did anybody reach out to that
16   lawyer and say, We need your documents?
17          MR. MANNING:  I'm trying to figure out the extent to
18   which I can discuss my conversations with my client.  But there
19   were -- there was outreach to that -- to the lawyer that had
20   handled the transaction.  And if you would like, we can
21   certainly make that outreach again, but I think everyone knows
22   the result of the transaction --
23          THE COURT:  I think your client has the obligation to
24   produce that which is in his control, and that which is held by
25   agents is clearly within his control.  I presume the lawyers

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

18

DATCTERC
1  were paid their fees and, therefore, have no lien as part of
2  the real estate transaction, and I can't imagine why every
3  record that's responsive to the plaintiffs' requests is held by
4  counsel that represented the Virginia corporation in relation
5  to the closing hasn't already been produced.
6           MR. MANNING:  Your Honor, we can --
7           THE COURT:  There's also the issue of a producing
8  party's obligation to reach out to former employees.  And in
9  one of his letters, Mr. Haefele -- I guess it's probably his
10 reply -- cites a series of cases -- Footnote 4 on Page 2 of the
11 reply letter brief says that there is no indication that
12 Sanabel Al Kheer has taken any steps over the last several
13 years to secure missing corporate records from Sana-Bell
14 officers and employees, something it was obligated to do;
15 citing a series of cases that suggest that that obligation
16 exists, including at least one in the Southern District of New
17 York.
18           I haven't actually read those cases, but it makes
19 sense to me that there was at least an obligation to reach out
20 and have the sense that that didn't occur here either.
21           MR. MANNING:  Well, your Honor, I wasn't a party to
22 the litigation.  At that point, Mr. McMahon was and he also
23 represented the company from a corporate context.  So I think
24 that when it gets back -- to kind of step back, I think your
25 Honor is right.  We might be premature to some degree, because

19

DATCTERC

1  we have factual issues that we're essentially trying to try in
2  the context of this motion for sanctions.  But also, to your
3  point, I think that there could be, perhaps, the involvement of
4  my predecessor to clarify a few of those issues, although it's
5  certainly my obligation to know all of that, but he -- it's
6  sometimes difficult to engage that person.
7           THE COURT:  One of the points that you make is that
8  Sanabel entities, if you give me a second.
9           Off the record.
10          (Off the record)
11          THE COURT:  It's not jumping out at me, but I thought
12 within your letter you made the point that the Court had never,
13 perhaps, previously directed or warned Sanabel that -- here, it
14 is here.
15          Cited on Page 3 to American Cash Card saying, "One of
16 the factors to be considered is (d) whether the noncompliant
17 party has been warned about the possibility of sanctions.  And
18 specifically with respect to Sanabel Al Kheer, although there's
19 been a lot of backing and forthing between them among counsel,
20 I don't know that I have ever specifically done that.
21          So what I'm inclined to do at the interim measure is
22 to make such a directive and say that Sanabel Al Kheer, the
23 Virginia entity, has to boil the ocean and produce any
24 additional documents that it has within four weeks and then
25 revisit this question.

20

DATCTERC

1    I know I'm kicking the can down a little, Mr. Haefele,
2  but any reaction to that?
3         MR. HAEFELE:  Pardon me, your Honor?
4         THE COURT:  I said I know I'm kicking the can down the
5  road a bit, but any reaction to that?
6         MR. HAEFELE:  I do have a reaction to a number of
7  items.  First off, the one thing I wanted to address quickly is
8  that, as I think it was in our motion papers -- if not the
9  original one, but the reply letter -- there were never any
10 settlement discussions.  I know repeatedly Mr. Manning has
11 articulated a dialogue of settlement discussions, but I think
12 you made the point that there has never been any settlement
13 discussions.
14        THE COURT:  Whether there were or weren't -- let me
15 assume for the sake of argument that there were -- is utterly
16 irrelevant in terms of the duty to produce documents.
17        MR. HAEFELE:  I agree, your Honor.  I agree.
18        THE COURT:  I think that's really not terribly
19 informative with respect to the motion that's before me.  On
20 the other hand, when Mr. Manning tells me that there were
21 personal issues that delayed the last production, that's
22 something I am certain of.
23        MR. HAEFELE:  As were we, your Honor.  I'm not sure --
24 we had some dialogue on it, I'm not sure when his personal
25 issues started.  I'm aware of what they are and I think we've

DATCTERC
1   been happy, I suppose -- I don't know if that's the right word
2   -- to provide him with extensions that were needed to address
3   the motion.  So absolutely, your Honor, we agree with you on
4   that.  But I think we have been chasing basic discovery since
5   2007, and certainly I know for a fact that the issues don't go
6   back that far.
7           Going back to one of the things we said earlier --
8           THE COURT:  Nor does his representation of this
9   client.
10          MR. HAEFELE:  I know that his representation also
11  significantly precedes the issues --
12          THE COURT:  Fair enough.
13          MR. HAEFELE:  I will gladly defer, let him tell you
14  more if that's the case.
15          Going back to one of the issues that you raised
16  earlier, your Honor, it has been called to my attention that
17  Sana-Bell existed, at least, as of September 9, 2002, because
18  it was on that day that Sana-Bell -- I'm sorry.  September 9,
19  2002, certificate from the government of the District of
20  Columbia Department of Consumer and Regulatory Affairs
21  certified that on that day Sana-Bell's articles of
22  incorporation were revoked.  So I think that calls, at least
23  clarifies, that as of at least that day Sana-Bell existed, the
24  first Sana-Bell existed.
25          And in addition, in this litigation, Sana-Bell filed
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

22

DATCTERC

1   motions, made appearances, twice hired lawyers, and it was only
2   to the extent -- I mean, they represented that they existed
3   through their counsel in motions and in appearances at least
4   until it was to their benefit to begin arguing that they didn't
5   exist.
6           THE COURT:  But so did Rabita trust.  When you sit
7   down with my decision, you will see I concluded really
8   Mr. McMahon was not in a position to represent Rabita trust.
9           MR. HAEFELE:  Right.  I understand.
10          THE COURT:  It may be the same circumstance here that
11  he abrogated onto himself the ability to represent the D.C.
12  corporation, because somebody on behalf of the Virginia
13  corporation decided to retain him.
14          MR. HAEFELE:  Going to Mr. McMahon for a moment, you
15  may recall, your Honor, that at the time, Mr. Manning came on
16  board, I think shortly after or right around the time period,
17  Mr. McMahon filed a motion to withdraw as counsel as well.
18          THE COURT:  When was that?
19          MR. HAEFELE:  I don't actually recall --
20          THE COURT:  Mr. Manning.
21          MR. MANNING:  I don't remember the exact date.  2010.
22          THE COURT:  Approximately.
23          MR. MANNING:  2010.
24          MR. HAEFELE:  And right around that time, when
25  Mr. McMahon filed his motion to withdraw as counsel, plaintiffs
               SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

23

DATCTERC

1   actually opposed that, because there was some issues that we
2   felt Mr. McMahon needed to continue to be at least in the
3   litigation related to Sana-Bell, because he had involvement
4   with certain facts.
5           Well, one of the things that he had involvement in was
6   the 2008 closing.  I believe -- I'm not certain -- but I
7   believe he was the lawyer that did the closing.  If he wasn't,
8   he was at least involved in it, and we believe that he would
9   have all of the records from that 2008 closing.  We find it
10  very odd if he was involved with the closing, why those
11  documents were not available to be produced to the plaintiffs.
12          THE COURT:  You have refreshed my recollection that
13  there is something in your letter that suggests that his firm
14  at least was involved.  And if that's correct, it boggles the
15  mind that you don't have those records.  And certainly
16  Mr. Manning, that's one of the things you need to look at.
17          MR. HAEFELE:  I think one of the issues --
18          THE COURT:  In the 30-day window.
19          MR. MANNING:  To clarify, your Honor, I mean, we have
20  requested from Mr. McMahon all documents relating to both
21  entities, to the extent they existed.  So we will be following
22  up with him as well.
23          MR. HAEFELE:  Other than the 2008 closing documents,
24  there are a host of other things that we have requested that
25  are basic discovery things -- things that are particular that
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

24

DATCTERC

1  ought to exist -- and we don't have any of them.  And I know --
2  the problem that comes is that Mr. McMahon and Mr. Manning have
3  repeated a number of times, Sorry folks, that's all there is.
4  And then, you know, later on, when we start honing in on what
5  it really is, or what ought to exist, suddenly we get a dribble
6  drabble.
7       THE COURT:  I'm not sure you made the record even to
8  Sanabel Al Kheer.  I mean, the closing binder is a no-brainer.
9  Someplace that should exist.  But let's take minutes of
10  meetings of the Virginia entity from its formation until now, I
11  agree with you, those should exist and if you haven't gotten
12  them, I'm not saying that's a potential problem, but saying
13  they should exist is different than saying they ever did exist.
14  If there were no minutes of meetings, then you can't produce
15  that which didn't exist.  It seems to me that what I said
16  earlier that the motion may be premature.  What may be missing,
17  in part, is a deposition of a 30(b)(6) witness who says, Yes, we
18  did take minutes; we took minutes after 9/11; after the suit
19  was filed; and we don't have them now.  Then you would have a
20  failure to preserve, or spoliation, and a much stronger motion;
21  but the mere fact that it's logical that there should be
22  minutes is not the same as saying there were minutes, and now
23  they no longer exist.
24       MR. HAEFELE:  I understand your point, your Honor.  I
25  think that overriding point, though, is that from the time of
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

DATCTERC
1   discovery -- from the time discovery started in 2007, we have
2   been fighting tooth and nail to get any document.  We have been
3   chasing them from 2007 until 2013 to get anything that we have
4   gotten, and it's only when we continually hound them that we
5   get anything.  And I will be honest, I haven't had the
6   opportunity to read your decision from last night, but it's
7   pretty clear that that is not particular, unfortunately, to the
8   Sanabel defendants.  It's, unfortunately, from most of the
9   defendants or all of the defendants in this litigation, where
10  there is this unfortunate notion that they aren't obligated to
11  produce discovery unless plaintiffs' hound them and then come
12  to the Court to ask the Court for assistance.  And during that
13  process they let out a few documents to make the argument that,
14  Oh, we are making our efforts.
15          The fact is there is -- plaintiffs' view is there is
16  an orchestrated process in the defendants' part to delay,
17  obfuscate and drain the plaintiffs of their resources until the
18  clock runs out on the litigation, and that is something that
19  needs to be stopped.
20          THE COURT:  Assuming your assumption is correct, I
21  don't disagree with you certainly, I think the ground rules and
22  the ability to find excuses will decline as some of the earlier
23  decisions related to this move forward, but I think for the
24  time being what I'm going to do is reserve decision as to the
25  Sana-Bell motion.  I direct that Mr. Manning go back to the

26

DATCTERC
1  well to produce the documents that should have been produced,
2  to the extent they exist, within four weeks, but I also think
3  there's a burden on the plaintiffs to show that, not that the
4  documents should have existed, but that the documents did, in
5  fact, exist.  So I think really what plaintiffs need to do is
6  take a 30(b)(6) deposition and connect those dots, and I
7  probably will award sanctions, or recommend a default judgment,
8  or whatever the appropriate remedy is.
9         MR. HAEFELE:  Your Honor, in regard to what they are
10  obligated to produce, we would like for it to be the universe
11  of documents for Sanabel Al Kheer, and any entity that they
12  have the ability, the practical ability, to get documents from;
13  and we believe that that would include their Saudi alter ego,
14  the Sanabel Al Khair entity.  They are essentially -- again,
15  like we said earlier, the strings get pulled from Saudi Arabia.
16         THE COURT:  Well, I think I said that in relation to
17  this case -- if not, I have certainly said it in relation to
18  other cases -- if there's either the practical ability, as a
19  matter of business, routine to get documents from a parent
20  company, or if there is an adequate showing that they are alter
21  egos -- I guess as to Al Khair, that's what I was thinking
22  of -- I made that finding, then I don't disagree with you.  If
23  documents are available from the parent entity on either of
24  those two bases, they would have to be produced.
25         MR. LEWIS:  Your Honor, we were not -- I represent

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

27

DATCTERC

```
 1    IIRO and the Muslim World League.  I am also part of the
 2    post-McMahon era, so I don't go back and have all of the
 3    factual background.  But there have been --
 4              THE COURT:  Just so I understand, did Mr. McMahon, in
 5    the era before your arrival, represent MWL and IIRO by himself?
 6              MR. LEWIS:  He did, your Honor, and there have just
 7    been a number of statements made that pertain to my client, and
 8    unless silence implies assent, I just want to make clear on the
 9    record we do not accept that IIRO or MWL are pulling any
10    strings for anybody.  Sanabel is a separate entity.  There may
11    have been a debt, but again, I don't want to make a
12    representation on the record money that they may have been
13    owed, but we don't accept that one was controlling the other.
14              There was also a comment made about chasing after
15    documents.  Your Honor, I think they will find that they will
16    have finally caught the bus.  We have a team that your Honor
17    will have seen in our report of September 20th, that's going
18    around the world to these offices, and are reviewing documents;
19    there are Arabic speakers.  So there are documents that have
20    been produced in a large volume that are in the process of
21    being produced.
22              And finally with respect to Mr. Al Rhadi, there was a
23    suggestion made that somehow he is not the kindly older
24    gentleman that he seems, or not a volunteer.  It is not unusual
25    in Saudi charities for there to be many volunteers.  Nor is
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DATCTERC

1   there any reason to suspect that Mr. Rhadi is other than as he
2   represents, a concerned person who works at the charity as a
3   volunteer and does a great deal of work and continues to do a
4   great deal of work to help with our compliance.  So I just
5   wanted to let your Honor know that the suggestion that Mr. Al
6   Rhadi is playing some nefarious identity game just has no
7   basis.  Thank you.
8         THE COURT:  And I preceded my last remark by saying if
9   there is a showing of impracticality or that MWL and/or IIRO
10  are alter egos of Sanabel Al Kheer, the U.S. entity, then
11  consequences would flow from that, but the first word in the
12  sentence was "if."  And to date, there hasn't been such a
13  showing, at least in relation to this motion.
14        MR. LEWIS:  Nor has it even been alleged in the
15  motion, at least as I...
16        THE COURT:  I think it is sort of alluded to in the
17  motion or the reply, but certainly there's discussion of MWL
18  and IIRO, probably in relation to the real estate closing.
19        MR. HAEFELE:  Your Honor, very quickly.  First off, I
20  meant -- I have no knowledge of whether or not Mr. Rhadi is
21  either kindly or elderly.  It certainly seems as though he has
22  authority with relation to IIRO, and Muslim World League, and
23  also with regard to the Sanabel entities.  And if that becomes
24  something, your Honor, we would be happy to brief that further
25  and provide the additional information for your Honor with

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DATCTERC

1    regard to the relationship.
2              And with regard to the "pulling the strings" issue, I
3    call your Honor's attention to the fact that the original
4    Sana-Bell board -- I'm not sure about the later board of the
5    new Sanabel -- but the original board consisted of six Muslim
6    World League and IIRO representatives, officers on the board,
7    so I think there is some indication that at least at that
8    point, at the inception -- and there seems to be no indication
9    that that ever changed, given the kind of interactions that
10   happened with regard to things that were in the briefing.
11             MR. LEWIS:  Your Honor, if that motion is ever tee'd
12   up, we're happy to respond.  I live in the District, around the
13   District of Columbia.  I suspect if 2002 they got around to
14   revoking the articles for nonpayment, I suspect Sana-Bell was
15   not doing its corporate work for some years, but -- well before
16   that.  Again, that's premature and we can address that in due
17   course.  Thank you.
18             MR. MANNING:  Exactly, your Honor.  My understanding
19   of the cause of that document being sent was very likely that
20   the entity didn't, in fact, exist.  So, in fact, if anything,
21   it might be evidence that it wasn't there.
22             THE COURT:  Well, it hadn't paid whatever fees were
23   required, I would assume.
24             MR. MANNING:  Understood.
25             And just to clarify, I'm certainly interested in
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

DATCTERC
1   working with the plaintiffs to, as you said, boil the ocean,
2   but I want to clarify that the showing that you just alluded to
3   as to strings being pulled from Sanabel, Saudi Arabia, et
4   cetera, has not been made at this point.  So as a result, the
5   universe of what we need to be boiling the ocean for is that
6   which relates to Sana-Bell, D.C. and Sanabel Al Kheer,
7   Virginia.
8          THE COURT:  I'm not sure I wholly agree with that.  At
9   some point down the road, I may have to make a determination as
10  to whether, either MWL or IIRO -- let me rephrase it.
11         I may have to make a determination down the road as to
12  whether Sanabel, the Virginia entity, had either the practical
13  ability to obtain documents from the Saudi Arabian entity; or
14  the two were so intricately intertwined, that they are one in
15  the same.  If I make that determination down the road, and if
16  prior to that determination, the Virginia entity had not
17  obtained documents responsive to the plaintiffs' requests that
18  it could have obtained or should have obtained, consequences
19  will flow from that.
20         So I think that's a determination that you and your
21  client need to make.  If you believe that neither of those is
22  correct, then presumably you won't produce and wouldn't be able
23  to produce documents held by the Saudi Arabian entity.
24         On the other hand, if, in your discussions with your
25  client, you can prove either of those is correct, I think you

DATCTERC
1  do have the obligation to produce documents from Saudi Arabia.
2          MR. MANNING:  Understood.
3          MR. HAEFELE:  Your Honor, only one last thing.
4          THE COURT:  Sure.
5          MR. HAEFELE:  I hope.
6          The only concern that we have, I think, your Honor,
7  one of the major concerns we have really is the timeline in the
8  litigation.  If we keep a proposed endline for ending discovery
9  and we keep drawing out when we're going to get things from the
10 defendants, we're putting our back to the wall -- we are
11 putting plaintiffs' back to the wall in terms of how we
12 proceed -- and we have been doing this since 2007, or actually
13 in the litigation earlier than that.  I just wanted to make
14 sure we put that on the record, and call your Honor's attention
15 to that.  You know, none of us wants this to go on forever.  We
16 want a time period where we can actually get to a trial, or
17 some kind of resolution.
18         Our purpose here, our request here was for dispositive
19 sanctions, because, quite frankly, if they are saying they are
20 not going to give us any more, and, you know, we don't want to
21 waste the time chasing our tails to get nothing.
22         THE COURT:  I'm mindful of that, but I don't think
23 there is an adequate record at the moment.  Certainly, let me
24 take the default judgment that you asked for.  I don't think
25 there is an adequate record to grab a default judgment

32

DATCTERC

1  certainly with respect to the Virginia entity.
2          So if I were to decide the motion today, I would
3  probably deny that.  So I think I'm benefiting the plaintiffs
4  by reserving decision and proceeding down the road.  I am, even
5  though it subtracts from it somewhat.  I understand in terms of
6  the big picture, that -- believe me.  I share your desire to
7  see, you know, the end of this litigation.  Whether I will in
8  my lifetime remains to be seen, but as an aspirational goal, I
9  certainly share that.
10          MR. HAEFELE:  I just don't want your Honor surprised
11  when somewhere down the road, we say, We still need more time
12  to get more from the defendants.
13          THE COURT:  I will not be flabbergasted to hear that.
14          We also should set up a time for the next conference.
15          MR. CARTER:  Your Honor, there is one thing and I will
16  raise it with the defendants separately.  There are sort of two
17  orders floating around concerning briefing.  There was a
18  briefing system that was in place set by your Honor's order
19  back in 2011, January of 2011, which is -- if I can read the
20  ECF document 2401  --
21          THE COURT:  What did I say then?
22          MR. CARTER:  -- which is the old procedure where you
23  file a letter brief three weeks in advance of the hearing, and
24  the response would come in two weeks, and the reply five days,
25  everything will be delivered at that time to your Honor in a

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

33

DATCTERC

1  package.
2          And then in 2013 your Honor issued a briefing schedule
3  for motions to compel.  Document 2649, which essentially
4  provides a three-week response period, and then a one-week
5  period for replies.
6          The two schedules are not harmonious, and in certain
7  cases we have had instances where motions are raised as being
8  motions other than motions to compel, and there is some
9  confusion.  So I think we're going to request that we be under
10 a single briefing motion.
11         THE COURT:  That certainly makes sense.  And why don't
12 you confer with the other side and tell me what schedule will
13 makes sense.  As long as it gives me sufficient time before any
14 of our conferences, it's fine with me.
15         MR. CARTER:  Thank you, your Honor.
16         THE COURT:  When should we set our next conference
17 for?  We are coming up against the holidays. I've got two
18 back-to-back trials in early December.  Is December 13th too
19 soon?
20         MR. CARTER:  No, your Honor.
21         THE COURT:  That's a Friday.  Could we say, then, 10
22 o'clock on Friday the 13th?
23         MR. MANNING:  Your Honor, is it possible to do 11:00?
24         THE COURT:  That day it's absolutely possible.  Thank
25 you all.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300