# Exhibit 10

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| -v- | ) Case No. **03-365-A** |
| | ) |
| SOLIMAN S. BIHEIRI | ) |

DECLARATION IN SUPPORT OF PRE-TRIAL DETENTION

I, David Kane, a Senior Special Agent with the Bureau of Immigration and Customs Enforcement ("ICE"), under the Department of Homeland Security in Washington, DC, declare and state:

I.   Professional Experience of Affiant

   1.   I have served as a Special Agent ("SA") with the ICE (and its predecessor the United States Customs Service ("USCS")) for approximately six years. I have received training and gained experience in interviewing and interrogation techniques, arrest procedures, search and seizure, search warrant application, computer crimes, terrorism, and various other crimes. I have been the case agent on complex money laundering investigations that involved the domestic and international transfers of money, layering processes, falsified records and front organizations. I have been the case agent on four cases that were terrorism-related and the affiant on six federal search warrants involving money laundering violations.

   2.   Prior to joining the USCS, I obtained a B.A. degree in both German Language and Literature and Government and Politics and a Masters degree in International Transactions from George Mason University. I worked as a financial services agent with Prudential Preferred Financial Services, where I analyzed financial structures and executed financial transactions with complex, international

financial instruments on a regular basis.

II.   The Investigation

3.   Since December 2001, I and other agents of the USCS/ICE, the Internal Revenue Service-Criminal Investigation ("IRS-CI"), and the Federal Bureau of Investigation ("FBI"), have been investigating a group of individuals that are suspected of providing material support to terrorists, money laundering, violations of the International Emergency Economic Powers Act and tax evasion through the use of a variety of related for-profit companies and ostensible charitable entities under their control, most of which are located at 555 Grove Street, Herndon, Virginia, or at 360 South Washington Street, Falls Church, VA.

4.   The entities located at 555 Grove Street, include a Virginia Corporation named Sana-Bell, Inc. The entities located at 360 S. Washington Street, include the Muslim World League, Inc. ("MWL") and its various affiliated organizations, including the International Islamic Relief Organization ("IIRO"), which is also known as International Relief Organization ("IRO"). Central to my investigation is the financial relationship between these entities and a New Jersey corporation, BMI, Inc.

A.   MWL and IIRO Background

5.   The MWL, based in Saudi Arabia, was founded in 1962 with the goals of disseminating Islamic philosophy, culture, and religion, and defending Islamic causes.

6.   The head of IIRO in Canada, Arafat El-Asahi, testified in court in Canada in immigration proceedings against Mahmoud Jabbalah. I have reviewed portions of the transcript, a copy of which is available on the internet, in which El-Asahi confirms MWL is the same entity as the International Islamic Relief Organization ("IIRO"). Jaballah was arrested in Canada, and at these proceedings El-Asahi stated, "the IIRO and the Muslim World League is one, but sometimes they have two offices, although the umbrella organization is the same, which is the Muslim World League." El-

2

Asahi stated that the organization had offices all over the world, including one in Washington, D.C. I believe that he was referring to the office at 360 South Washington Street in Falls Church, Virginia.

7. According to a CIA report, recently made public in response to a FOIA request, of the more than 50 Islamic nongovernmental organizations in existence in 1996, "available information indicates that approximately one-third of these Islamic NGOs support terrorist groups or employ individuals who are suspected of having terrorist connections." It lists the IIRO, as having "extremist connections," including to the Palestinian group Hamas, Algerian radicals, and the Egyptian precursor to al Qaeda, Al-Gamaat Al-Islamiya. "The IIRO is affiliated with the Muslim World League, a major international organization largely financed by the government of Saudi Arabia," the report states, connecting the IIRO to al Qaeda leader Osama bin Laden and convicted terrorist Ramzi Yousef. "The former head of the IIRO office in the Philippines, Muhammad Jamal Khalifa, has been linked to Manila-based plots to target the pope and U.S. airlines; his brother-in-law is Usama bin Ladin," the report states, using alternate spellings of Mr. bin Laden's names. In addition, "another high-ranking [IIRO] official in the Philippines leads Hamas meetings, and the majority of Hamas members in the Philippines are employed by the organization." Finally, it says, "the IIRO helps fund six militant training camps in Afghanistan, according to a clandestine source."

8. I know that terrorists who have attacked or tried to attack the United States around the world have been associated with MWL/IIRO. For example, a Bangladeshi national by the name of Sayed Abu Nasir was arrested in India on January 7, 1999 with detonators and more than four pounds of explosives. According to Cecilia Dugger's article "Anti-U.S Plot in India is Foiled" in the January 21, 1999 edition of The International Herald Tribune, Karnal Singh, the Deputy Commissioner of Police in India, stated that Nasir was ordered to launch an attack on the United States Consulate in Madras by Sheikh Al-Gamdin, President of the IIRO in Asia.

9. I know, based on news reports, that the IIRO was banned in Kenya in September 1998 following the bombings of the U.S. embassies in Kenya and Tanzania in 1998 for suspicion of its involvement in the bombings.

10. According to the trial transcripts from the Embassy Bombing trial in United States District Court in the Southern District of New York in 2001, Ihab Ali, while working for MWL, relayed messages to Bin Laden and convicted terrorist Wadi EL-Hage in connection with the coordination of the Kenyan embassy bombing.

11. According to Richard Chesnoff's story, "It's More Than Just Who Plants the Explosives," in the July 31, 1996 edition of the New York Daily News, western intelligence sources traced IIRO money transfers to bank accounts in London and Amman, Jordan, from where the funds were then channeled to HAMAS in Gaza and the West Bank. I have found evidence corroborating that IIRO/IRO has transferred funds to HAMAS through HAMAS fronts such as Holy Land Foundation for Relief and Development ("HLF"). I have seen IRS Form 990s from IIRO/IRO which reveal that it gave at least $23,780 to HLF between 1996 and 1997.

B. The MWL and IIRO in Northern Virginia

12. There are branches of the MWL/IIRO located at suite 300 at 360 South Washington Street, Falls Church, Virginia. The offices of these branches of these organizations were searched pursuant to warrants issued in this District in March 2002.

13. Sana-Bell, Inc, is a District of Columbia Corporation established on July 28, 1989. As is discussed below in paragraph 16, it appears that Sana-Bell was established to generate funds for the operations of a Virginia non-profit corporation known as the International Relief Organization (IRO), which was the "United States arm" of IIRO. At the time, IRO was operated out of an office at 360 S. Washington St. in Falls Church, Virginia by Dr. Sulaiman bin Ali Al-Ali, who, according to a letter

4

written by Dr. Abdullah Al-Obaid, the Secretary General of the Muslim World League in Saudi Arabia, was a member of IIRO's Executive Committee in Jeddah, Saudi Arabia. I have reviewed a portion of the Al-Obaid letter which was cited in a pleading filed in the civil lawsuit discussed below in paragraph 15.

14. The articles of incorporation for BMI, Inc. show that Soliman Biheiri, who was then an Egyptian citizen visiting the United States on a tourist visa, formed an Islamic investing firm on March 19, 1986, which became known as Bait ul-Mal, Inc. (BMI, Inc.). Uzra Zeya in the article "Islam in America: How US Islamic Financial Institutions Provide Interest Free Services" in the March 1990 edition of <u>Washington Report on Middle Eastern Affairs</u>, described BMI as operating as an investment bank with customers both in the US and abroad focusing its resources in real estate and construction projects in the New Jersey, Boston and Washington, DC area. Initially, the article stated, BMI attracted mostly overseas investors from the Middle East.

15. In a deposition conducted in conjunction with a civil suit filed in Federal District Court in the District of Maryland, a transcript of which I have reviewed, Biheiri testified that BMI was in existence from 1985 through October 1999. New Jersey corporate records indicate that the last annual report filed by BMI was dated April 11, 1997. According to the corporate records and his deposition testimony, Bihieri was the President and sole director of BMI, Inc.

    C.    <u>Sana-Bell's Investments in BMI</u>

16. In the same deposition Biheiri testified that concurrently with the establishment of the IRO office in Virginia, Al-Ali told him that he (Al-Ali) was to receive $10 million dollars from IIRO in Jeddah, Saudi Arabia, which was earmarked to be given to Sana-Bell, Inc. and invested. The return on the investment to be used to operate IRO, the United States branch of IIRO.

17. According to the complaint in the civil lawsuit, during the years 1992 through 1998,

Sana-Bell, Inc. invested $3.7 million with BMI or one of its affiliates (all Biheiri controlled companies). The plaintiff in the civil lawsuit, Sana-Bell, Inc., the investment arm of IIRO,, was in effect a subsidiary or affiliate of IIRO. The basis of its lawsuit was that BMI had unlawfully disbursed Sana-Bell's investment in BMI at the direction of IIRO officer Suliman Al Ali. Sana-Bell was IIRO's investment arm. Thus, the victim of the fraud (Sana-Bell) and the supposed perpetrator of the fraud (IIRO) were the same.

18. In the course of the lawsuit, Sana-Bell, Inc. obtained a judgment in the amount of $2.3 million against BMI Leasing, Inc., BMI Real Estate Development, Inc., Soliman S. Biheiri and Suliman Al-Ali. Significantly, Sana-Bell never collected on its judgment. The disposition of Sana-Bell's investment in BMI was never disclosed.

    D. <u>BMI's Other Connections to the Funding of Terrorism</u>

19. My investigation demonstrates that BMI and its affiliates may have transferred funds to or for terrorists. I am aware that BMI made or conducted financial transaction with persons who were or are now Specially Designated Terrorists or Specially Designated Global Terrorists, including Yassin Kadi, Mousa Abu Marzook and Mohammad Salah. Most of the transactions for which we currently have evidence occurred prior to these designations.

20. Under the provisions of the International Emergency Economic Powers Act (IEEPA), 50 U.S.C. §1701, *et seq.*, the President of the United States may take actions under IEEPA to deal with any "unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat." Accordingly, on January 23, 1995, the President issued Executive Order (EO) 12947 declaring a national emergency regarding the "grave acts of violence committed by foreign terrorists that

disrupt the Middle East peace process and constitute an unusual and extraordinary threat to the national security." On January 25, 1995, the Department of the Treasury, Office of Foreign Assets Control (OFAC), issued a list of persons and groups designated by the President under EO 12947 as "Specially Designated Terrorists" (SDTs) threatening the Middle East peace process or found to be owned or controlled by, or to be acting for or on behalf of, these terrorist organizations, including the Islamic Resistance Movement (aka HAMAS). Subsequently, on August 27, 1995, Mousa Abu Marzook was named an SDT. The effect of this designation was to make it illegal to deal in property in which Mousa Abu Marzook has an interest or make any contribution of goods or services to Marzook.

21. Marzook is the self-professed head of the political branch of HAMAS. In addition, in extradition proceedings against Marzook in the spring of 1996, the United States District Court for the Southern District of New York found probable cause to believe that HAMAS was the perpetrator of numerous acts of terrorism, including the April 4, 1994, suicide bombing of a passenger bus in Afula, Israel, which killed eight civilian passengers and seriously wounded 44 civilians and two Israeli soldiers, and the April 13, 1994 bombing of another passenger bus between Afula and Tel Aviv, which killed six persons, including four civilians and one Israeli soldier, and wounded an additional 12 civilians and 18 Israeli soldiers. In the district court proceedings, Abu Marzook expressly acknowledged his position as the leader of the political branch of HAMAS. The court found that Marzook knew about the terrorist activities and promoted them. The district court's decision is published in <u>In the Matter of the Extradition of Abu Marzook v. Christopher</u>, 924 F. Supp. 565 (S.D.N.Y. 1996).

21. Yassin Qadi was named a Specially Designated Global Terrorist ("SDGT") by the United States Secretary of Treasury on October 12, 2001, pursuant to Executive Order 13224.

On September 23, 2001, under the authority of IEEPA, the President issued Executive Order 13224, which declared a national emergency regarding grave acts of terrorism and threats of terrorism, including the terrorist attacks in New York, Pennsylvania and the Pentagon committed on September 11, 2001. Under Executive Order 13224 any transaction or dealing by United States persons or within the United States in property or interests in blocked property is prohibited, including but not limited to the making or receiving of any contribution of funds, goods, or services to or for the benefit of those persons designated under the order. Persons named under EO 13224 are referred to as Specially Designated Global Terrorists. (SDGT).

22. The Treasury Department Press Release issued on the date of Yassin Qadi's designation as an SDGT, and newspaper accounts, such as the October 28, 2001 Chicago Tribune article, "Money Trail Leads to Saudis," written contemporaneous with Qadi's designation, state that Qadi was named an SDGT on the basis that he and other well-connected Saudi citizens transferred millions of dollars to Osama bin Laden through charities and trusts like the Muwafaq Foundation, (also known as Blessed Relief), supposedly established to feed the hungry, house the poor and alleviate suffering. Qadi was a trustee of Muwafaq Foundation.

23. On July 27, 1995, Mohammad Salah was named a Specially Designated Terrorist by the United States Department of Treasury pursuant to Executive Order 12947. According to the Affidavit of FBI Special Agent Robert Wright, dated June 8, 1998, Mohammad Salah, a naturalized American citizen and Chicago area resident, was arrested in Israel, in June 1993 for his membership and participation in HAMAS. In January of 1995, Salah pled guilty in an Israeli military court to belonging to HAMAS and illegally channeling funds to the outlawed HAMAS organization, including funds transferred through a joint bank account held with his wife Azita, at LaSalle Talman Bank in Chicago. For his crimes, the Israelis sentenced Salah to five years imprisonment. Salah was released from an

Israeli prison in November of 1997, at which time he was permitted to return to the United States.

24.  I also know that the defendant had contact information for three persons named as SDGTs pursuant to EO 13224 in the address book maintained on his laptop computer, which was searched pursuant to his consent in mid-July 2003. One of the SDGTs is Yassin Kadi, who I have discussed above. In addition, I am advised by Special Agent Craig Moldowan of BICE, who conducted the review of the computer, that there was contact information, for Yousef Nada and Ghaleb Himmat, both of whom were named as SDGTs on November 7, 2001, on the basis of their roles with Al Taqwa Bank. In the press release that accompanied the designation of Al Taqwa, the Treasury Department stated: "The Al Taqwa group has long acted as financial advisers to al Qaeda, with offices in Switzerland, Lichenstein, Italy and the Caribbean." The contact entry on the computer for Nada reads "YN," however, I recognize the address listed as Youssef Nada's business address in Switzerland.

25.  In addition, the name and telephone number of Sami al-Arian, who is the North American leader of another SDT, the Palestinian Islamic Jihad, was in the defendant's contacts list. PIJ was designated an SDT on January 25, 1995. Sami al-Arian was indicted in the Middle District of Florida on or about February 20, 2003, for material support to terrorism and a RICO conspiracy based upon his activities on behalf of PIJ in the United States.

26.  In addition I have learned the following information regarding the disposition of funds by BMI. FBI Special Agent Robert Wright was conducting an investigation of terrorist financing in 1999, which focused on BMI, Inc., among others. In an affidavit executed March 21, 2002, SA Wright stated that in the course of that investigation he had subpoenaed both Biheiri and a person identified as the Vice President of BMI. In response to those events, a BMI accountant contacted an FBI Agent and stated that "funds the accountant was transferring overseas on behalf of the company may have been used to finance the embassy bombings in Africa." This is a reference to a possible

9

funding source for the 1998 bombings of the American Embassies in Kenya and Tanzania which killed 223 people.

E.  Biheiri Is a Risk of Flight

27.  On May 28, 2002, I participated in an interview of Soliman Biheiri's estranged wife, Mahshid Fatoohi. She stated that Biheiri was unemployed for approximately two years and left the United States in June or July 2002. According to Ms. Fathoohi, Biheiri is employed at the Lichtenstein Bank in Switzerland, and has not returned to the United States since his departure in 2002. I interviewed the defendant when he arrived in the United States on June 15, 2003. The defendant told me that his job involves investment banking with high net worth clients and includes significant travel between Egypt and Saudi Arabia.

29.  She indicated that Biheiri had planned to come to the United States in November 2002, which he postponed until December 2002 and then further postponed until February 2003 Around that time Biheiri called to explain that he did not feel he could come to the United States because he and BMI had been mentioned in the newspapers connecting it to terrorism, or words to that effect.

30.  A check of the WestNews electronic database shows that between November 2002 and March 2003, there were approximately two dozen stories that mentioned BMI in connection with federal investigations of terrorist financing.

31.  According to Ms. Fatoohi, she and Biheiri continued to share the same house until he left the country in 2002. After the events of September 11, 2001, she witnessed Biheiri destroying records.

32.  Ms. Fatoohi also told me that the defendant's brother, Ahmed Behairy, had told her that he had heard Biheiri state that some day he would come back and take the kids to the Middle

East. She thought enough of this threat that she went to both the FBI and the Loudon County Police in March 2003. I spoke to Detective Ron Weckenham, of Loudon County and he stated she was concerned that Biheiri was coming to kidnap the children. She also told Detective Weckenham that Bihieri had contacted his daughter and arranged for her to obtain a visa from the Saudi Arabian embassy in Washington, D.C. so that he could travel from Cairo to Saudi Arabia., which Detective Weckenham understood to be part of his work.

33. I again interviewed Ms. Fatoohi on June 13, 2003. She indicated that Biheiri has called her and stated that he had a new job, was able to provide for the entire family and indicated that he wanted to take the entire family, Ms. Fatoohi and her 5 children, back to an undetermined country in the Middle East.

34. When I interviewed the defendant he confirmed that he had returned to the United States with the goal of taking his family with him to the Middle East. He also stated that he had been unemployed for approximately three years before he departed the United States in June 2002.

35. A check of property records indicated that Biheiri did not own any property.

I declare, under penalty of perjury that the foregoing is true and correct.

David C. Kane
Senior Special Agent
Bureau of Immigration and Customs Enforcement

Executed in Alexandria, VA
August 14, 2003