Exhibit 12

# In The Matter Of:

*IN RE: THE MATTER OF TERRORIST ATTACKS OF SEPTEMBER 11th, 2001*

---

### YAQUB  MIRZA
*May 19, 2010*

---

## CONFIDENTIAL
## TC REPORTING in affiliation with Merrill Corp.
### 11 AMY'S PATH
### EAST QUOGUE, N.Y. 11942

MIRZA, YAQUB - Vol. 1

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - +

IN RE:  The Matter of Terrorist    |

Attacks of September 11th, 2001    | Case No. 157

- - - - - - - - - - - - - - - - +

** CONFIDENTIAL **

Videotaped Deposition of YAQUB MIRZA, Ph.D.

Washington, D.C.

May 19, 2010

10:00 a.m.

Job No. 22-179410

Pages 1 - 285

Reported by:  Michele E. Eddy, RPR, CRR, CLR

YAQUB  MIRZA - 5/19/2010

Page 146

1      YAQUB MIRZA, PH.D. - CONFIDENTIAL
2  owned subsidiary named Linda Knoll. Were you
3  mistaken?
4      A   That was the name of the development.
5      Q   Okay. So the name of the subsidiary was
6  Ladova II, Inc.
7      A   Right.
8      Q   The project that Ladova was involved in was
9  the Linda Knoll project?
10     A   Development, yes.
11     Q   Development.
12         And that's the property in Prince George's
13  County?
14     A   Yes.
15         (Exhibit 4A was marked for identification
16  and retained by counsel.)
17     Q   And just to show you Exhibit 4A, it contains
18  a news article and there's some print-outs from public
19  records on land transfers, and take a look at that, if
20  you would. Is 4A referencing that same property that
21  you testified about earlier today, the Linda Knoll
22  property in Prince George's County?
23         MS. LUQUE: What now goes with this?
24         MR. BARENTZEN: This is separate. He's got
25  it as 4A.

Page 147

1      YAQUB MIRZA, PH.D. - CONFIDENTIAL
2         THE WITNESS: Separate.
3         MS. LUQUE: Yeah, but that's --
4         MR. BARENTZEN: He's asking about this
5  document.
6         MS. LUQUE: No, but he's asking about this.
7         MR. MALONEY: Yeah, I --
8         MS. LUQUE: You moved this --
9         MR. MALONEY: -- I'm including that as 4A.
10  They're --
11         MS. LUQUE: Okay.
12         MR. MALONEY: -- all --
13         MS. LUQUE: All right. I just didn't --
14         MR. MALONEY: One is press. One is
15  print-outs from land transfers.
16         MS. LUQUE: This is 4A?
17         MR. BARENTZEN: That's part of 4. This is
18  4A by itself. Everything else is 4, right?
19         MR. MALONEY: 4 is the incorporation, and 4A
20  are the press accounts.
21         MS. LUQUE: It's starts with --
22         MR. MALONEY: It starts -- it starts,
23  actually, with the press account --
24         MS. LUQUE: Okay.
25         MR. MALONEY: -- from The Washington Post.

Page 148

1      YAQUB MIRZA, PH.D. - CONFIDENTIAL
2         MS. LUQUE: Got you.
3         MR. MALONEY: And then it has, unless you
4  want 4B --
5         MS. LUQUE: Huh-uh.
6         MR. MALONEY: -- information obtained from
7  public records about the sale of the property.
8         MS. LAGUE: And you're on this 4A?
9         MR. MALONEY: Yeah.
10     A   So what's your question, please?
11     Q   Well, my question is, is this -- this news
12  article referring to the property that you testified
13  about, the Linda Knolls property in Prince George's
14  County?
15     A   And how do you think I should know that?
16     Q   Well, take a look at the article.
17     A   Yeah, I'm looking at it. It says Barnaby
18  Knoll. I know it as Linda Knoll.
19     Q   Why was it called the Linda Knoll project?
20     A   I have no idea.
21     Q   Does it have something to do with the
22  location of the property?
23     A   I don't know. I never invest in the site.
24     Q   Turn to page 2 of that news article and see
25  if you can tell if we're talking about the same

Page 149

1      YAQUB MIRZA, PH.D. - CONFIDENTIAL
2  property. It mentions BMI.
3         MS. LUQUE: No.
4     A   I cannot tell you. BMI may have another
5  parcel being developed called Barnaby.
6     Q   In Prince George's County --
7     A   It could be.
8     Q   -- named Barnaby Knolls?
9     A   They were developers and doing business.
10     Q   Okay. We'll get to post 9-11 in a little
11  while, so let's -- let's go to the final group of
12  pages in 4A. These are the transfer -- these are --
13  these are public records from the property transfer.
14  And the seller was Ladova, Inc. -- Ladova II, Inc.,
15  that's the wholly owned subsidiary of Sana-Bell,
16  correct?
17     A   Yes.
18     Q   And are these the houses that you were
19  testifying about earlier today in the Linda Knoll
20  project?
21     A   The specific ones I cannot tell you. I know
22  that this was the project which was developed. I
23  cannot give you the addresses of the houses or how
24  many there were.
25     Q   Okay. Well, Ladova, which is Sana-Bell's

TC REPORTING in affiliation with Merrill Corp.,
(516) 795-7444

YAQUB MIRZA – 5/19/2010

| Page 150 | Page 152 |
|---|---|

**Page 150**

YAQUB MIRZA, PH.D.- CONFIDENTIAL

1            YAQUB MIRZA, PH.D.- CONFIDENTIAL
2  wholly owned subsidiary, correct?
3     A  Right.
4     Q  Right?
5     A  Yes.
6     Q  Did they sell any other property or develop
7  any other property other than the homes in the Linda
8  Knoll project?
9     A  There was -- they were.  There was no other
10  property developed by them, but I don't know this is a
11  complete list of those houses or not.
12     Q  I didn't ask you that.  I want to know if
13  what we're looking at are the houses that you
14  testified earlier today that were -- the land was
15  purchased by -- and now we now know Ladova --
16     A  Right.
17     Q  -- correct?
18     A  Yes.
19     Q  Developed by BMI, they built the houses,
20  correct?
21     A  Uh-hmm.
22     Q  And that were eventually sold?
23     A  Yes.
24     Q  And that land transfer became the subject of
25  litigation in part, correct?

**Page 151**

1            YAQUB MIRZA, PH.D. - CONFIDENTIAL
2     A  Not litigation, that was not part of
3  litigation.  Attorneys made a judgment that we want to
4  pursue a criminal complaint versus a civil litigation.
5     Q  I don't understand that.  You -- you did
6  sue -- Sana-Bell did sue BMI, correct?
7     A  Yes.
8     Q  And you testified earlier today that the
9  lawsuit was over a couple of things, one of which was
10  the transfer of this property in the Linda Knoll
11  project, correct?
12     A  I don't remember the specifics of the
13  lawsuit, but a criminal complaint was filed with the
14  Prince George's County for this purpose, and that was
15  a separate track the attorneys pursued.
16     Q  Okay.  Who filed a complaint with the
17  criminal authorities?
18     A  It was the law firm, Foley Hoag & Eliot.
19     Q  On behalf of Sana-Bell, Inc.?
20     A  Or Ladova.  I don't remember which one.
21     Q  One of the two or both?
22     A  Probably one of the two.
23     Q  Okay.  And so somebody at Sana-Bell said,
24  attorneys, we want you to file, Sana-Bell or Ladova,
25  file this criminal complaint on what basis; what was

**Page 152**

1            YAQUB MIRZA, PH.D. - CONFIDENTIAL
2  your understanding?
3     A  The fraudulent transfer --
4     Q  Okay.
5     A  -- of titles.
6     Q  Looking at the property transfer records
7  that we see here, the seller is Ladova II, Inc., do
8  you see that?
9     A  Yes.
10     Q  It doesn't list BMI as the seller, right?
11     A  They were not the owner.  They were the
12  manager.
13     Q  Okay.  So wouldn't the transfer, the money
14  be made out to the seller, in this case, Ladova?
15     A  Should have been, but it wasn't.
16     Q  So you're saying that BMI, despite not
17  having title to the property, somehow was able to
18  convince the bank and the buyer to transfer the money
19  to BMI rather than Ladova?
20     A  Not quite.  They signed off on behalf of
21  Ladova without any authority.
22     Q  Okay.  Going back now to the application
23  that you filed with the IRS in 1993, you did testify
24  about some --
25     A  The attorneys filed.

**Page 153**

1            YAQUB MIRZA, PH.D. - CONFIDENTIAL
2     Q  The attorneys filed but that you signed off
3  on.
4     A  Yes.
5     Q  In fact, your signature, I think, is on
6  here, correct?
7     A  Yes.
8     Q  Okay.  So you were the voice for Sana-Bell
9  in signing this and authorizing the attorneys to
10  physically send it to the IRS, correct?
11     MS. LUQUE:  Objection.
12   A  And Dr. Saati.
13     MS. LUQUE:  Objection.
14     Q  You can answer.
15   A  Dr. Saati also.
16     Q  Did Dr. Saati signed off on this?
17   A  No.
18     Q  You --
19     MS. LUQUE:  Objection to the
20  characterization, voice.
21     Q  You signed off, correct?
22   A  Yes, I did.
23     MS. LUQUE:  He signed it.
24     Q  I want to direct you to --
25   A  But I'm not sure I appreciate the word

39 (Pages 150 to 153)

YAQUB  MIRZA - 5/19/2010

## Page 202

YAQUB MIRZA, PH.D. - CONFIDENTIAL

1 the money was repaid to Mr. Al-Ali and the IIRO?
2     A  He may have.  I'm not aware of it because I
3 did not read all the briefings and filings and --
4     Q  I understand.  I'm not trying to probe in
5 terms of the actual legal issues, but factually
6 speaking, did you ever learn that Bihieri was
7 claiming, hey, we did give the money back, we gave it
8 to Al-Ali, who claimed to be, you know, Sana-Bell and
9 the IIRO?  Did you ever hear something like that?
10     A  He paid some monies to him, I don't know how
11 much, and when did he do that?
12     Q  And what?
13     A  When did he do that?
14     Q  I'm asking you what you remember.
15     A  Yeah.  I don't know.  I mean, he -- he
16 did -- there were documents to show that he disbursed
17 some monies to Al-Ali, and that was subject of the
18 meeting.  And prior to that they had discussions in
19 Saudi Arabia.  But I don't know what was his claim,
20 how much he gave it to him.
21     Q  Did -- did Mr. Al-Ali ever sit for a
22 deposition, to your knowledge?
23     A  He was deposed.
24     Q  He was deposed?

## Page 203

YAQUB MIRZA, PH.D. - CONFIDENTIAL

1     A  Yes.
2     Q  And do you know what he said in terms of his
3 connection, if any, to Sana-Bell?
4     A  I did not read his deposition.
5     Q  I know, but do you know what he said about
6 it?
7     A  No, I don't.
8     Q  When you got the -- when Sana-Bell got the
9 default judgment -- withdrawn.
10        Do you recall approximately how much the
11 default judgment was for?
12     A  No.  It was several million, but I don't
13 remember the number.
14     Q  Okay.  Once you had the default judgment for
15 several million, you said that Sana-Bell's attorneys
16 tried to collect it.  Do you know if they went to the
17 IIRO to try to collect it?
18     A  I don't know, no.
19     Q  Do you know if they went to Mr. Al-Ali to
20 try to collect it?
21     A  He wasn't here.  He left the country by that
22 time.
23     Q  How about Mr. Bihieri?
24     A  I think he was also in Egypt after folding

## Page 204

YAQUB MIRZA, PH.D. - CONFIDENTIAL

1 the company.
2     Q  Folding BMI?
3     A  BMI, yes.
4     Q  When did that fold?
5     A  I'm not sure when it happened but it
6 happened during those periods.
7     Q  Did you ever speak to Mr. Al-Ali when he was
8 living or staying in San Diego, California?
9     A  He called me one time.
10     Q  Why did he call you?
11     A  He said he's going to be in Virginia, if he
12 can see me.  And I told him, yeah, sure, if you come,
13 that's fine.
14     Q  Did he tell you what he wanted to see you
15 about?
16     A  You know, there was -- he was rambling about
17 the organizations and we need to reorganize and we do
18 this and that, but it didn't make much sense.
19     Q  I'm not following.  He was talking about
20 Sana-Bell needing to reorganize?
21     A  Sana-Bell -- yes.
22     Q  And did you ask him why he was --
23     A  He was an investment --
24     Q  -- interfering with Sana-Bell?  He's not

## Page 205

YAQUB MIRZA, PH.D. - CONFIDENTIAL

1 part of Sana-Bell, according to you.
2     A  -- investment committee member.
3     Q  Okay.  So as an investment committee member,
4 he called you and said, we need to reorganize
5 Sana-Bell, something like that?
6     A  I cannot be very sure, but it's something
7 like this, yes.
8     Q  And you recall that call -- phone call was
9 in sometime late '98 and -- or '99?
10     A  Some -- in that time frame, yes.  There were
11 a lot of confusion, the faxes back and forth, and all
12 that went on.
13     Q  Faxes back and forth between who?
14     A  Saudi Arabia, and they are asking for the
15 accounting from BMI, and I've been asked and then I
16 respond to them and ...
17     Q  Why -- why were they asking that in mid --
18 late '98 and then '99.  Why was that a big issue?
19     A  I don't know, but their investment, they can
20 ask anytime.
21     Q  Was Mr. Al-Ali living in San Diego at the
22 time he called you in '99?
23     A  I don't know.
24     Q  Did you understand he was calling you from

52 (Pages 202 to 205)

YAQUB  MIRZA – 5/19/2010

Page 238

1      YAQUB MIRZA, PH.D. - CONFIDENTIAL
2         MS. LUQUE:  We were looking at it earlier.
3   Now I can't find it.  I should have numbered these
4   before.
5         THE WITNESS:  Yeah.
6         MS. LUQUE:  All right.  Okay.
7   BY MR. CARTER:
8      Q   Within that document, Dr. Mirza, the third
9   paragraph --
10     A   Yes.
11     Q   -- and I recognize that it's very difficult
12  to read --
13     A   Right.
14     Q   -- appears to describe the amount of the
15  loans that had already been made to Sana-Bell, Inc.,
16  by IIRO.  Do you see that paragraph?
17     A   Yes.
18        MS. LUQUE:  I can't read this.  Can you read
19  that?
20        THE WITNESS:  Just the middle, middle part.
21        MS. LUQUE:  Well, can you read it enough to
22  answer that question yes?
23        THE WITNESS:  It just says, "IIRO has
24  provided loans of."  I don't know what the amount is.
25        MS. LUQUE:  To who is not visible.  How much

Page 239

1      YAQUB MIRZA, PH.D. - CONFIDENTIAL
2   is not visible.  I don't think --
3         MR. CARTER:  Counsel, I'll clarify that.
4   BY MR. CARTER:
5      Q   This is Sana-Bell's financial statement?
6      A   Auditor's statement, yes.
7      Q   Would you expect that the auditor's
8   statement for Sana-Bell would have reflected the
9   amount of the loans that had been provided and to
10  which Sana-Bell was obligated to repay IIRO?
11     A   Sure.
12     Q   So if we can get a legible copy of that
13  document, it should provide us with the aggregate
14  amount of the IIRO loans to Sana-Bell as of that date
15  in 1994?
16     A   It should provide who are the lenders.
17  Whether it's IIRO or other entities, I cannot say.
18     Q   But it should identify the IIRO loans?
19     A   The 2 million, which I know for sure, and
20  it's also shown in the liabilities.  It doesn't have
21  to be in the notes.  That's more accurate accounting
22  when we look at the assets and liabilities.
23     Q   But the assets and liabilities won't
24  identify the lender, will it?
25     A   It won't, yeah, it's just line item, total

Page 240

1      YAQUB MIRZA, PH.D. - CONFIDENTIAL
2   liability.
3         MS. LUQUE:  However, it's clear.  The amount
4   is clear, which it isn't here.
5         THE WITNESS:  All right.
6   BY MR. CARTER:
7      Q   Now, you mentioned that there were some
8   difficulties providing -- obtaining an accurate
9   accounting from BMI sometime in the late 1990s.  What
10  allowed you to identify the problems with BMI's
11  accounting?
12     A   What do you mean, allowed me?
13     Q   Did they fail to provide some information to
14  you?
15     A   Yeah, as I mentioned, they were sending us
16  the K-1s and no details of the accounts, and there
17  were amount disbursed.  We couldn't get the
18  explanation where this money has gone.
19     Q   Did you need that information to file tax
20  returns?
21     A   Of course.  How do you reconcile your books?
22     Q   Did you have difficulty filing tax returns
23  in any years as a result of not having that
24  information?
25     A   It did, yes.

Page 241

1      YAQUB MIRZA, PH.D. - CONFIDENTIAL
2      Q   Did the tax returns that you filed actually
3   reflect that difficulty?
4      A   You don't file if you have a problem.  The
5   accountants, whatever they could do, they filed.  When
6   we couldn't get the information, I don't believe they
7   filed any tax returns.
8      Q   Do you recall the first contact that anyone
9   from Sana-Bell had with BMI in an attempt to obtain
10  the necessary information?
11     A   What's your question?
12     Q   Do you recall when the first contact --
13     A   Oh, first contact.
14     Q   -- occurred from Sana-Bell to BMI to try and
15  reconcile this information?
16     A   It was yearly, yearly function, and someone
17  from my office accountant would call to say, we need
18  the K-1.  They came for a couple of years.  Then they
19  stopped.
20     Q   And did you communicate the difficulties you
21  were having in obtaining the K-1s from BMI to anyone
22  in Saudi Arabia?
23     A   It was Al Saati first and then Bahafzallah.
24     Q   For the early years of Sana-Bell, you dealt
25  exclusively with Al Saati?

61 (Pages 238 to 241)

YAQUB   MIRZA  -  5/19/2010

<table>
<tr><td>

Page 242

1       YAQUB MIRZA, PH.D. - CONFIDENTIAL
2   A  Al Saati, yes.
3   Q  Did you have occasion to call him?
4   A  He will call me.
5   Q  Did you ever call him during that period?
6   A  It's possible, but it was really him calling
7 me.
8   Q  Did you ever send him any correspondence?
9   A  Sure.
10   Q  Where did you send that correspondence, do
11 you recall?
12   A  He gave me a fax number and I will fax it.
13   Q  The Sana-Bell investments in the two BMI
14 limited partnerships, was that money, in your
15 estimation, illegally transferred out of the limited
16 partnerships?
17   A  I don't know.
18   Q  Was it Sana-Bell's contention in the
19 litigation filed against BMI that the money had been
20 illegally transferred out of the limited partnerships?
21   A  No. Nobody talked about it. It was simply
22 try to find out where is the money and get the
23 accounting for it.
24   Q  Was it the contention in the lawsuit that
25 Al-Ali had authorized the transfer of the money out of

</td><td>

Page 244

1       YAQUB MIRZA, PH.D. - CONFIDENTIAL
2 transferred.
3   Q  Is there any reason Sana-Bell would have
4 remained in business with BMI relative to the Prince
5 George's project after it had discovered BMI's
6 misconduct with regard to the investments in the
7 limited partnerships?
8   A  There wasn't any business. Land was owned
9 by Ladova, which was Knoll -- Linda Knoll development,
10 wholly owned subsidiary, and a management agreement
11 was signed to do the construction. So there was no
12 ongoing relationship except that we were supposed to
13 get the money, which we never did.
14   Q  Was there any effort made to stop BMI from
15 illegally transferring the Prince George's properties
16 after you discovered the problems with the limited
17 partnerships?
18   A  We left it to the attorneys, and attorneys
19 did call the Attorney General's office of Prince
20 George's County, and they refused to investigate.
21   Q  No criminal charges were filed in relation
22 to the Prince George's County problem?
23   A  They refused to investigate so how could
24 they file criminal charges?
25   Q  And there was an election not to pursue a

</td></tr>
<tr><td>

Page 243

1       YAQUB MIRZA, PH.D. - CONFIDENTIAL
2 limited partnerships?
3   A  It might have. I -- I don't remember.
4   Q  Who was responsible for handling the
5 litigation from Sana-Bell's perspective?
6   A  Bahafzallah and myself.
7   Q  Ultimately, all of the money that Sana-Bell
8 had invested in the BMI limited partnerships was lost,
9 correct?
10   A  Yes.
11   Q  And all of the money that was invested in
12 the Prince George's County investments was lost,
13 correct?
14   A  Yes.
15   Q  So that aggregate loss was somewhere
16 approaching 3 million dollars?
17   A  No, 2.6.
18   Q  2.6 million dollars. I shouldn't round up.
19   A  That's okay.
20   Q  It's a significant round up. Fair point.
21     Mr. Maloney mentioned earlier that some of
22 the transfers of the properties in the Prince George's
23 development project seemed to have occurred in 1999
24 and 2000. Is that your recollection?
25   A  No. I didn't know when they were

</td><td>

Page 245

1       YAQUB MIRZA, PH.D. - CONFIDENTIAL
2 civil suit relative to that problem?
3   A  I -- I don't know what strategies the
4 attorneys followed.
5   Q  Under the original Articles of
6 Incorporation, the initial directors had
7 staggered-term periods, correct?
8   A  Yes.
9   Q  My recollection is that your initial term
10 was five years; is that accurate?
11   A  Correct.
12   Q  Was that timely renewed before the five-year
13 period expired?
14   A  No.
15   Q  What about with respect to the other
16 directors?
17   A  There was no meeting.
18   Q  At any point did you have any meeting
19 between 1989 and 1996 with the Board of Directors?
20   A  No.
21     MR. CARTER: Can we make this 10.
22     (Exhibit 10 was marked for identification
23 and retained by counsel.)
24   A  Yes.
25   Q  Do you recognize the document that's been

</td></tr>
</table>

62 (Pages 242 to 245)

YAQUB  MIRZA - 5/19/2010

Page 282

```
1        YAQUB MIRZA, PH.D. - CONFIDENTIAL
2                    * * *
3          ACKNOWLEDGEMENT OF WITNESS
4     I, YAQUB MIRZA, Ph.D., do hereby acknowledge
5  that I have read and examined the foregoing testimony,
6  and the same is a true, correct and complete
7  transcription of the testimony given by me, and any
8  corrections appear on the attached Errata sheet signed
9  by me.
10
11
12  _____    _____
13  (DATE)        (SIGNATURE)
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 283

```
1        YAQUB MIRZA, PH.D. - CONFIDENTIAL
2        CERTIFICATE OF SHORTHAND REPORTER
3     I, Michele E. Eddy, Registered Professional
4  Reporter and Certified Realtime Reporter, the court
5  reporter before whom the foregoing deposition was
6  taken, do hereby certify that the foregoing transcript
7  is a true and correct record of the testimony given;
8  that said testimony was taken by me stenographically
9  and thereafter reduced to typewriting under my
10  supervision; and that I am neither counsel for,
11  related to, nor employed by any of the parties to this
12  case and have no interest, financial or otherwise, in
13  its outcome.
14
15       IN WITNESS WHEREOF, I have hereunto set my
16  hand and affixed my notarial seal this 28th day of
17  May, 2010.
18
19  My commission expires June 12, 2012
20
21
22
23  _____
24  MICHELE E. EDDY
    NOTARY PUBLIC IN AND FOR
25  THE DISTRICT OF COLUMBIA
```

Page 284

```
1        YAQUB MIRZA, PH.D. - CONFIDENTIAL
2              E R R A T A  S H E E T
3  IN RE:  In The Matter of Terrorist Attacks of
4  September 11th, 2001
5
6
7  RETURN BY: _____
8  PAGE  LINE        CORRECTION AND REASON
9  ____  ____  _____
10  ____  ____  _____
11  ____  ____  _____
12  ____  ____  _____
13  ____  ____  _____
14  ____  ____  _____
15  ____  ____  _____
16  ____  ____  _____
17  ____  ____  _____
18  ____  ____  _____
19  ____  ____  _____
20  ____  ____  _____
21  ____  ____  _____
22  ____  ____  _____
23  ____  ____  _____
24  (DATE)        (SIGNATURE)
25
```

Page 285

```
1        YAQUB MIRZA, PH.D. - CONFIDENTIAL
2              E R R A T A  S H E E T
3  IN RE:  In The Matter of Terrorist Attacks of
4  September 11th, 2001
5
6
7  RETURN BY: _____
8  PAGE  LINE        CORRECTION AND REASON
9  ____  ____  _____
10  ____  ____  _____
11  ____  ____  _____
12  ____  ____  _____
13  ____  ____  _____
14  ____  ____  _____
15  ____  ____  _____
16  ____  ____  _____
17  ____  ____  _____
18  ____  ____  _____
19  ____  ____  _____
20  ____  ____  _____
21  ____  ____  _____
22  ____  ____  _____
23  ____  ____  _____
24  ____  ____  _____
25  (DATE)        (SIGNATURE)
```

72 (Pages 282 to 285)