UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------x

IN RE TERRORIST ATTACKS ON
SEPTEMBER 11, 2001

Civil Action No.
1:03 MDL 1570 (GBD) (FM)

----------------------------------------------------------x

**ALICE HOGLAN**, *a.k.a.* ALICE
HOAGLAND, individually and as Personal
Representative of the Estate of **Mark Kendall
Bingham**, Deceased, *et al*.,

Plaintiffs,

v.

THE ISLAMIC REPUBLIC OF IRAN,

AYATOLLAH  ALI  HOSEINI  KHAMENEI,

ALI AKBAR HASHEMI RAFSANJANI,

IRANIAN MINISTRY OF
INFORMATION AND SECURITY,

THE ISLAMIC REVOLUTIONARY
GUARD CORPS,

HEZBOLLAH,

THE IRANIAN MINISTRY  OF PETROLEUM,

THE NATIONAL IRANIAN
TANKER CORPORATION,

THE NATIONAL IRANIAN
OIL CORPORATION,

THE NATIONAL IRANIAN
GAS COMPANY,

IRAN AIRLINES,

THE NATIONAL IRANIAN
PETROCHEMICAL COMPANY,

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

This Document Relates to
**1:11 Civ. 7550 (GBD) (FM)**

**PLAINTIFFS' DAMAGES
INQUEST MEMORANDUM**

IRANIAN MINISTRY OF                            :
ECONOMIC AFFAIRS AND FINANCE,                  :
                                               :
IRANIAN MINISTRY OF                            :
COMMERCE,                                      :
                                               :
IRANIAN MINISTRY OF DEFENSE                    :
AND ARMED FORCES LOGISTICS,                    :
                                               :
THE CENTRAL BANK OF THE                        :
ISLAMIC REPUBLIC OF IRAN,                      :
                                               :
               Defendants.   :

_____

# **TABLE OF CONTENTS**

I.    INTRODUCTION……………………………………………………………1

II.   JURISDICTION……………………………………………………………1

III.  THE *HAVLISH* RELATED ACTION…………………………………….…..2

IV.   THE PARTIES………………………………………………………………3

V.    THE DAMAGES EVIDENCE…………………………………………………6

VI.   STANDARD OF REVIEW………...………………………………………9

VII.  DAMAGES SOUGHT……………………………………………………….9

      A.    Decedent Estate Plaintiffs' Economic Damages…………………………12

      B.    Decedents' Pain and Suffering Damages………………………………...13

      C.    Family Members' Solatium Damages………………………………...15

            1.    Category A:  Immediate Family Members………………………17

            2.    Category B:  Clear Functional Equivalents of Immediate
                  Family Members……………………………………………………20

            3.    Category C: Other Functional Equivalents of Immediate
                  Family………………………………………………………..…..31

      D.    Punitive Damages …………………………………………………39

      E.    Prejudgment Interest……………………………………………………...39

VIII. PLAINTIFFS WHO ARE NOT U.S. NATIONALS…………………………………40

IX.   CONCLUSION…………………………………………………………..…..51

# TABLE OF EXHIBITS

A.  LIST OF PLAINTIFFS

B.  SUMMARY OF PLAINTIFFS' CLAIMS AND RELATIONSHIPS TO DECEDENTS

C.  PLAINTIFFS' INDIVIDUAL DAMAGES DECLARATIONS
    (*Provided to Magistrate Judge Frank Maas on CD-ROM only*[1])

D.  EXPERT REPORT OF REAR ADMIRAL ALBERTO DIAZ, JR., M.D. (*U.S. NAVY, RET.*)

E.  *CURRICULUM VITAE* OF REAR ADMIRAL ALBERTO DIAZ, M.D. (*U.S. NAVY, RET.*)

F.  REPORT OF ECONOMIST STAN SMITH, PH.D.

G.  *CURRICULUM VITAE* OF STAN SMITH, PH.D.

H.  ECONOMIC DATA AND CALCULATIONS FOR EACH PLAINTIFF-DECEDENTS' ESTATE
    (*Provided to Magistrate Judge Maas on CD-ROM and Filed Under Seal on CD-ROM*)[2]

I.  SUMMARY OF CERTIFIED ECONOMIC LOSSES OF EACH PLAINTIFF-DECEDENT

J.  DECEDENT ESTATE DAMAGES SUMMARY BY DR. STAN SMITH

K.  PLAINTIFFS' PROPOSED DAMAGE AWARDS PER CLAIMANT

---

[1] Copies of all materials, including the CD-ROMs containing the Damage Declarations (Exhibit C) and economic data and backup documentation for each Plaintiff-Decedents' estate (Exhibit H), are being sent via Federal Express to the chambers of United States Magistrate Judge Frank Maas, United States Courthouse, 500 Pearl Street, New York, New York.

[2] The confidential economic data and backup documents for each Plaintiff-Decedent's estate (Exhibit H) were hand-delivered to the S.D.N.Y. and filed under seal on December 30, 2015 (docketed at ECF No. 152) pursuant to an Order dated November 9, 2015 (ECF No. 126).

# **TABLE OF AUTHORITIES**

***Cases:***

Alejandre v. Republic of Cuba, 996 F. Supp. 1239 (S.D.Fla. 1997)……………………………12

Battista v. United States, 889 F. Supp. 716 (S.D.N.Y. 1995)……………………………………13

Bettis v. Islamic Republic of Iran, 315 F. 3d 325 (D.C. Cir. 2003)……………………………...21

Burnett v. Al Baraka Inv. and Dev. Corp., 274 F. Supp. 2d 86 (D.D.C. 2003)…………...…….34

Campuzano v. Islamic Republic of Iran, 281 F. Supp. 2d 258 (D.D.C. 2003)……………………2

Cotton v. Slone, 4 F.3d 176 (2d Cir. 1993)……………………………………………………….9

Credit Lyonnais Sec. (USA), Inc. v. Alcantara, 183 F.3d 151 (2d Cir. 1999)……………………9

Dammarell v. Islamic Republic of Iran, 404 F. Supp. 2d 261 (D.D.C. 2005)…………...…12, 15, 34

Doe v. bin Laden, 663 F.3d 64 (2d Cir. 2011)…………………………………………………...50

Dunphy v. Gregor, 136 N.J. 99, 642 A.2d 372 (N.J. 1992)……………………………………...36

Eisenfeld v. Islamic Republic of Iran, 172 F. Supp. 2d 1 (D.D.C. 2000)………………………..13

Estate of Bland v. Islamic Republic of Iran, 831 F. Supp. 2d 150 (D.D.C. 2011)…….……18, 39

Estate of Doe v. Islamic Republic of Iran, 808 F. Supp. 2d 1 (D.D.C. 2011)…………….…...…45

Estate of Heiser v. Islamic Republic of Iran, 466 F. Supp. 2d 229 (D.D.C. 2006)…...8, 19, 32, 34

Estate of Heiser v. Islamic Republic of Iran, 659 F. Supp. 2d 20
       (D.D.C. 2009)………………………………………………………...16-17, 20-1, 32, 34

Gonzales v. New York City Housing Auth., 77 N.Y. 2d 663, 572 N.E. 2d 598,
       569 N.Y.S. 2d 915 (1991)………………………………………………………………..23

Graves v. Estabrook, 818 A.2d 1235 (N.H. 2003)……………………………………………….36

Harrison v. Republic of Sudan, 882 F. Supp. 2d 23 (D.D.C. 2012)……………………………..10

Havlish, *et al*. v. bin Laden, *et al*., 1:03 Civ. 09848 (S.D.N.Y. 2011)……………………..*passim*

*In Re* Terrorist Attacks on September 11, 2001, 2001 WL 4903584 (S.D.N.Y. 2011)…………...1

*In Re* Terrorist Attacks on September 11, 2001, 349 F. Supp. 2d 765 (S.D.N.Y. 2005)…………1

*In re* Terrorist Attacks on September 11, 2001, 392 F. Supp.2d 539 (S.D.N.Y. 2005)…………45

Jenco v. Islamic Republic of Iran, 154 F. Supp. 2d 27 (D.D.C. 2001)…………………...17, 34-35

Knox v. Palestinian Authority, 442 F. Supp. 2d 62 (S.D.N.Y. 2006)…………………………...21

Lamie v. U.S. Tr., 540 U.S. 626, 536, 124 S.Ct. 1023, 157 L.Ed.2d 1024 (2004)……………43-4

Leibovitch v. Islamic Republic of Iran, 697 F.3d 561 (7th Cir. 2012)………………………...41-6

Letelier v. Republic of Chile, 488 F. Supp. 665, 674 (D.D.C. 1980)…………………………....48

Liu v. Republic of China, 892 F.2d 1419, 1425 (9th Cir.1989)………………………………47-8

Mastrantuono v. United States, 163 F. Supp. 2d 244 (S.D.N.Y. 2001)…………………………13

Murphy v. Islamic Republic of Iran, 740 F. Supp. 2d 51 (D.D.C. 2010)………………………..39

Obergefell v. Hodges, 135 S.Ct. 2584 (2015)……………………………………………………30

Peterson v. Islamic Republic of Iran (*Peterson II*), 515 F. Supp. 2d 25 (D.D.C.

2007)……………………………………………………………………………..18, 34, 47

Philip Morris USA v. Williams, 549 U.S. 346 (2007)………………………………...………39

Salazar v. Islamic Republic of Iran, 370 F. Supp. 2d 105 (D.D.C. 2005)…………………...15, 34

Seynaeve v. Hudson Moving & Storage, Inc., 261 A.D.2d 168 (1st Dept. 1999)………………51

Smith *ex rel*. Smith v. Islamic Emirate of Afghanistan, 262 F. Supp. 2d 217

(S.D.N.Y. 2003), *amended*, 2003 WL 23324214 (S.D.N.Y. 2003)………….11, 20, 22-23

Stethem v. Islamic Republic of Iran, 201 F. Supp. 2d 78 (D.D.C. 2002)………………………..13

Surette v. Islamic Republic of Iran, 231 F. Supp. 2d 260 (D.D.C. 2002)…11, 15-6, 22-3, 26-7, 36

Time Warner Cable of N.Y.C. v. Barnes, 13 F. Supp. 2d 543 (S.D.N.Y. 1998)…………………9

Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp., 109 F.3d 105

(2d Cir. 1997)…………………………………………………………………………....9

Valore v. Islamic Republic of Iran, 700 F. Supp. 2d 52 (D.D.C.

2010)…………………………………………………………….......9-10, 11, 17, 21-2, 33, 40

Wagner v. Islamic Republic of Iran, 172 F. Supp. 2d 128 (D.D.C. 2001)………………………15

Walker v. Sheldon, 10 N.Y.2d 401 (1961)…………………………………………………....51

Worley v. Islamic Republic of Iran, 75 F. Supp. 3d 311 (D.D.C. 2014)…………..……………40

**Other Sources:**

Alien Torts Claims Act, 28 U.S.C. § 1350……………………………..…………………...2

Antiterrorism Act of 1991, 18 U.S.C. §§ 2331-2339………………….....……..…………21

Fed. R. Civ. P. 8(a)(2)……………………………………………………………………46

Foreign Sovereign Immunities Act, 28 U.S.C §§ 1602, *et seq*……..1, 5, 9-10, 15, 30-1, 35, 41-51

N.Y. Est. Powers & Trusts Law §§ 5-4.1 and 11-3.2(b)………………………………………46

RESTATEMENT (SECOND) OF TORTS………………………………………………………..31, 32, 35-36

RESTATEMENT (THIRD) OF TORTS……………………………………………..……22, 31-35, 38-9

The 9/11 COMMISSION REPORT……………………………………………………………………..14

The National Defense Authorization Act for Fiscal Year 2008…………………………………..2

16 H.R. Rep. 105-48…………………………………………………………………………………..44

8 U.S.C. § 1102(a)(22)………………………………………………………………………………..47

8 U.S.C. § 1436…………………………………………………………………………………………..47

28 U.S.C. § 1330…………………………………………………………………………………………..2

## I. INTRODUCTION

PLAINTIFFS NOW COME and seek an award of compensatory and punitive damages for the most outrageous act of terrorism ever committed on American soil and the most horrific premeditated crime against American citizens in our country's history. On September 11, 2001, nineteen members of the al Qaeda terrorist network hijacked four commercial passenger airliners and flew them into the Twin Towers of the World Trade Center in New York City, the Pentagon in Arlington, Virginia, and, due to passengers' and pilots' heroic efforts to foil the hijackers, an open field near Shanksville, Pennsylvania. Thousands of people on the planes and in the buildings, including first responders at the New York crash site, were killed in the attacks. Countless others were injured and property worth many billions of dollars was destroyed. See In Re Terrorist Attacks on September 11, 2001, 349 F. Supp. 2d 765, 779 (S.D.N.Y. 2005, Casey, J.); In Re Terrorist Attacks on September 11, 2001, 2001 WL 4903584 (S.D.N.Y. 2011, Maas, Mag. J.).

The Plaintiffs in this case, and in the related case of Havlish, et al. v. bin Laden, et al., 1:03 Civ. 09848 (S.D.N.Y. 2011) (GBD) (FM), have already proven, to the satisfaction of this Court, through duly admitted evidence, the liability of all of the Hoglan Defendants, as required by law. This Court must now award damages commensurate with the singularly heinous and resonating nature of the 9/11 attacks. U.S. District Judge George B. Daniels, by Order dated August 31, 2015, referred to the Honorable Frank Maas, U.S. Magistrate Judge, the matter of hearing the damages evidence and recommending the appropriate level of damages.

## II. JURISDICTION

This Court has already determined that it has subject matter and personal jurisdiction over all Defendants under the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602-1611, the

Alien Torts Claims Act, 28 U.S.C. § 1350, and pursuant to 28 U.S.C. § 1330.  See Hoglan

Findings of Fact and Conclusions of Law, entered by United Stated District Judge George B.

Daniels on August 31, 2015 (ECF No. 111), ¶¶ 1-20 at pp. 48-53.  See also, Campuzano v.

Islamic Republic of Iran, 281 F. Supp. 2d 258 (D.D.C. 2003).

## III.    THE HAVLISH RELATED ACTION

This case has been found by this Court to be a "related-action" to the Havlish case, as

defined by § 1083(c)(3) of the National Defense Authorization Act for Fiscal Year 2008.  See

Hoglan Findings of Fact and Conclusions of Law [as to liability], ECF No. 111, dated August 31,

2015, ¶ 24 at p 54.  Havlish and Hoglan involve the same Iranian defendants, are based on the

same facts, and the same liability evidence was relevant to, and admitted in, both actions.  This

Court took judicial notice of the evidence in Havlish and admitted all of the Havlish evidence in

the instant Hoglan matter.  Id., ¶ 300, p. 47; ¶ 25, p. 54.  (In Hoglan, the Court admitted

additional evidence that the U.S. State Department has continued to designate Iran as a state

sponsor of terror during each of the years since the Havlish judgment in 2012 (Hoglan Exhibit

13A, ECF No. 106, entered August 26, 2015) and additional confidential materials filed under

seal (ECF No. 109, entered August 27, 2015)).  Many of the Plaintiffs in the instant Hoglan

action are family members of Havlish 9/11 decedent plaintiffs.  The Court's Findings of Fact and

Conclusions of Law regarding liability are virtually identical in both cases.

The Havlish plaintiffs submitted a Damages Inquest Memorandum on February 14, 2012,

and an Amended Damages Inquest Memorandum on February 15, 2012.  Havlish, ECF Nos. 301

and 303, respectively.  The Havlish plaintiffs also submitted proposed Findings of Fact and

Conclusions of Law regarding damages on February 14, 2012.  ECF No. 302.  In a Report and

Recommendation to the Honorable George B. Daniels in the Havlish case, dated July 30, 2012,

Magistrate Judge Frank Maas approved the Havlish plaintiffs' proposed economic, pain-and-suffering and solatium damage awards for all Havlish plaintiffs except one; the one exception was deemed not to have the sort of relationship that was the functional equivalent of an immediate family member.  See Havlish, Report and Recommendation of Magistrate Judge Frank Maas ("Havlish, Report of Mag. J. Maas") at p. 11, *n*. 2.  Judge Daniels subsequently issued an order that, *inter alia*, adopted Magistrate Judge Maas's Havlish Report and Recommendation in its entirety.  Havlish Memorandum Decision and Order, ECF No. 316, dated October 3, 2012 ("Havlish Order of October 3, 2012"), p. 2.  See also, Havlish Order and Judgment, ECF No. 317, dated October 12, 2012 and formally entered October 16, 2012.

**IV.    THE PARTIES**

The Plaintiffs in this case are family members and legal representatives of the murder victims of the September 11, 2001 terrorist attacks.  As this Court noted in 2012, "there remains one group of Americans affected by the September 11th tragedy for whom it will always be difficult to achieve closure - those whose immediate relatives lost their lives as a result of the terrorists' acts."  Report and Recommendation by Magistrate Judge Frank Maas to the Honorable George B. Daniels in Havlish, *et al*. v. bin Laden, *et al*., 1:03 Civ. 09848 (SDNY) (GBD) (FM), ECF Document No. 314, July 30, 2012 ("Havlish, Report of Mag. J. Maas"), at p. 1, adopted in its entirety by Judge George B. Daniels, Havlish Order of October 3, 2012.

In this case, the claims include those of the estates of fifteen persons who were killed on 9/11, presented by the legal representatives of such Decedents' estates ("Estate Plaintiffs") and

two hundred, seventy-eight (278) individual family member Plaintiffs, all related to a person killed in the 9/11 attacks, who present solatium claims. <u>See</u> Exhibit A.[1]

One of the fifteen 9/11 Decedent victims was killed in the World Trade Center South Tower, <u>see</u> Decedent Declarations, Exhibit C, No. 24, and ten (10) of these Decedent victims were killed in the WTC North Tower. Exhibit C, Folder Nos. 15, 22, 47, 73, 96, 126, 141, 206, 218, 318. One 9/11 Decedent victim was killed in the immediate vicinity of the World Trade Center. Exhibit C, No. 111. Three of the 9/11 Decedent victims were on United Airlines Flight 93, which crashed near Shanksville, including the Flight 93 co-pilot, Plaintiff Leroy Homer. Exhibit C, Nos. 1, 93, 163.

The lead Plaintiff in this case, Alice Hoglan, is the mother of Mark Kendell Bingham, and legal representative of his estate. Mark Bingham was one of the valiant passengers who battled the hijackers on UA Flight 93, resulting in the crash of the airliner near Shanksville, an incalculably heroic action that prevented the Flight 93 hijackers from reaching their destination at Washington, D.C. and saving countless lives as well as a venerated national monument. <u>Id.</u>, ¶ 1. Also Plaintiffs in this case are the Estate of Leroy Homer, who was the co-pilot of Flight 93, and his wife and daughter. Testimony from his wife, Melodie Homer, shows how the quick-thinking actions of Leroy Homer and the pilot, Jason Dahl, were also vital to thwarting the

---

[1] By separate motions, twenty-seven (27) Plaintiffs have, or will, seek voluntary dismissal and are so noted on the spreadsheet which is Exhibit K. These include twenty-six (26) Plaintiffs who have decided not to pursue claims as well as Michael LoGuidice, who was a plaintiff in <u>Havlish</u> and already has a judgment on his own behalf in his favor; he was erroneously included in this case. Michael is, however, the Personal Representative of the estate of his father, Carmello LoGuidice, which is a plaintiff in <u>Hoglan</u>. For nine (9) deceased Family Member Plaintiffs, estates have been substituted, per Orders of this Court dated December 12, 2015. Also, by separate motion, all counsel who have heretofore entered appearances are withdrawing from representation of one Plaintiff, Angie LeGrand.

hijackers (a fact which has been unfortunately obscured in media reporting on the battle for

Flight 93):

> Once the cockpit was breached, the autopilot, which could be described as the airplane version of cruise control, was turned off, but it was then turned on again one minute later.
>
> The hijackers were manually flying the airplane with the autopilot on. This did not seem intentional, especially when one of the hijackers said, "Inform them, and *tell them to talk to the pilot. Bring the pilot back*." They were having problems flying the plane, a plane that had been operating fine just minutes before. Something had been done in the cockpit to make the airplane more difficult to fly. This may have given the flight attendants and passengers enough time to organize themselves and disrupt the hijacking. Realizing they would not be able to reach their target, the hijackers made the decision to crash the plane. Both LeRoy and Jason played an integral part in the plane not reaching its target.

No. 94, Declaration of Melodie Homer, ¶ 28 (emphasis added).

All Plaintiffs in this case who are U.S. nationals sought and received a finding of liability

against all of the Defendants under the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605A

("FSIA"). Non-U.S. nationals have received, and are entitled to, liability findings on alternative

grounds. See Findings of Fact and Conclusions of Law, pp. 58-60, ¶¶51-58; see also Part VIII,

*infra*. The Defendants are the Islamic Republic of Iran; two of Iran's top political leaders, the

Supreme Leader of Iran, Ayatollah Ali Hoseini Khamenei, and former president of Iran Ali

Akbar Hashemi Rafsanjani; Iran's Ministry of Information and Security ("MOIS"); the Islamic

Revolutionary Guard Corps ("IRGC"); Iran's Ministry of Petroleum; Iran's Ministry of

Economic Affairs and Finance; Iran's Ministry of Commerce; Iran's Ministry of Defense and

Armed Forces Logistics; the National Iranian Tanker Corporation; the National Iranian Oil

Corporation; the National Iranian Gas Company; Iran Airlines; the National Iranian

Petrochemical Company; and the Central Bank of the Islamic Republic of Iran, and Iran's

terrorist proxy and training force, Hezbollah.  See Hoglan Findings of Fact, ECF Doc. No. 111, dated August 31, 2015, ¶¶ 1-65, and Conclusions of Law ¶¶ 1-58.

The direct and material support of the Defendants for the 9/11 attacks caused the 9/11 Decedents to suffer agonizing and horrible premature deaths and, thereafter and continuing, inflicted enduring anguish and distress upon the Hoglan family member Plaintiffs.  In addition to providing reparations for economic loss and the horrific pain and suffering of the Decedent victims, this Court must award solatium damages to compensate such family members for their emotional and mental trauma that can never be fully assuaged.  Based on established precedent, and the particularly malicious and spectacularly devastating crime against humanity committed by Defendants, Plaintiffs seek the highest possible justifiable compensatory and punitive damage awards.  Furthermore, because of the particularly malicious and heinous acts committed by Defendants, all family member Plaintiffs whose close relatives were killed on September 11, 2001, should be awarded solatium damages because they are either traditionally recognized immediate family members or the functional equivalents of traditionally recognized immediate family members.  Indeed, by the very nature of terrorist attacks, the close family members of the persons killed in New York City, the Pentagon, and at Shanksville, Pennsylvania, were among the actual intended victims of 9/11.

## V.     THE DAMAGES EVIDENCE

In support of this request for awards of compensatory and punitive damages, Plaintiffs hereby submit the following evidence:[2]

---

[2]  For the Court's convenience, Plaintiffs' declarations of damages and other evidence (Exhibit C) are produced in electronic format on a CD-ROM within individual folders, organized as sub-folders within family files.  Each folder is numbered consistently with the numbering relating to Plaintiffs in all other exhibits.  Some of the family files contain evidence, presented in Havlish previously, or newly presented in Hoglan, that is relevant to other, and sometimes all, Hoglan

- **Exhibit A**:  A spreadsheet listing each Plaintiff and his/her relationship to a 9/11 Decedent.  Because Plaintiffs' well-pleaded allegations regarding all issues other than damages must be accepted as true due to the Defendants' default, no specific proof regarding these Plaintiffs' familial relationships to Decedents is required.

- **Exhibit B**:  Summaries of the Family Member Plaintiffs' declarations describe, *inter alia*, their relationships to a 9/11 Decedent, organized by family, and also attest to their deep emotional distress and mental anguish, and the impact of the deaths of their loved ones upon their lives and the lives of other family members.

- **Exhibit C**:  Two hundred, forty-two (242) individual declarations by the <u>Hoglan</u> Plaintiffs detail the suffering endured by the Decedent victims and by each family member Plaintiff.  These Plaintiff declarations detail, *inter alia*, the nature of the relationship between the Plaintiff and a 9/11 Decedent, the extreme mental anguish suffered by the Declarant, which for all remains ongoing, and, in some cases, the pain and suffering of the 9/11 Decedent.  Additional declarations from the <u>Havlish</u> case provide further support for the claims of some Plaintiffs.  (Exhibit C is provided on CD-ROM only.)

- **Exhibits D and E**:  The expert report and *curriculum vitae* of Rear Admiral Alberto Diaz, M.D., Jr., RADM MC USN (*Ret*.).  Dr. Diaz's report addresses in detail the horrific last hours and minutes of the Decedents' lives on September 11, 2001, including the excruciating pain, suffering, and fear that they endured.  Dr. Diaz is a

---

Plaintiffs who are members of that family.  Such family evidence in common (<u>e.g.</u>, photographs) is placed into the family file.  Declarations from family members that are relevant to another family member are replicated in the files.  Declarations from <u>Havlish</u> that are used herein are the subject of a separate motion being filed contemporaneously herewith to admit the <u>Havlish</u> evidence in this case; thus, they are re-submitted here with their original <u>Havlish</u> caption.

retired physician and psychiatrist, certified by the American Board of Psychiatry and Neurology, with extensive experience in aircraft crashes.  He commanded various U.S. Navy medical centers around the world, reporting directly to the Navy Surgeon General.

- **Exhibits F, G, H, I, and J**:  The expert report and *curriculum vitae* from forensic economist Stan V. Smith, Ph.D., details the economic losses suffered by the 9/11 Decedents' Estates.  Dr. Smith's expert report states that, as a result of the 9/11 Decedent Plaintiffs' premature deaths, significant economic losses were incurred by their Estates.  Dr. Smith submitted a similar report of 9/11 Decedent Plaintiffs' Estates losses in the related <u>Havlish</u> case; there, he used the same analytical methodology, which was accepted by the Court.  Exhibit H is the background economic information and methodology for all fifteen of the 9/11 Decedent Plaintiffs which is being provided to the Court on CD-ROM and being filed confidentially under seal on CD-ROM pursuant to an Order dated November 9, 2015, ECF No. 126.

This <u>Hoglan</u> damages inquest submission is identical in many respects to the plaintiffs' damages inquest submission in <u>Havlish</u>.  Two exhibits hereto, specifically, the report and *curriculum vitae* of Admiral Diaz, M.D. (Exhibits D and E, respectively), are identical to exhibits admitted in the <u>Havlish</u> damages inquest.  Additionally, several of the family member declarations in <u>Havlish</u> are resubmitted here, where relevant to the claims of <u>Hoglan</u> Plaintiffs.  Although Plaintiffs believe that, in the August 15, 2015 hearing, Judge Daniels admitted in this case all of the <u>Havlish</u> evidence; if the Court admitted only the <u>Havlish</u> liability evidence, then Plaintiffs respectfully request that the Court also admit in <u>Hoglan</u> the <u>Havlish</u> damages evidence

that is utilized herein as well, and/or take judicial notice of such evidence in the related <u>Havlish</u> case.  (A separate formal motion and proposed form of order to this effect have been filed contemporaneously herewith.)

## VI.   STANDARD OF REVIEW

The Plaintiffs' well-pleaded allegations regarding all issues other than damages must be accepted as true due to the Defendants' default.  <u>See, e.g.</u>, <u>Cotton v. Slone</u>, 4 F.3d 176, 181 (2d Cir. 1993); <u>Time Warner Cable of N.Y.C. v. Barnes</u>, 13 F. Supp. 2d 543, 547 (S.D.N.Y. 1998). Plaintiffs seeking to recover damages against defaulting defendants must prove their claims through the submission of admissible evidence.  <u>See, e.g.</u>, <u>Credit Lyonnais Sec. (USA), Inc. v. Alcantara</u>, 183 F.3d 151, 155 (2d Cir. 1999).  However, this Court need not hold a hearing as long as it has determined the proper rule for calculating damages, and the evidence establishes, with reasonable certainty, the basis for the damages specified in the default judgment.  <u>See, e.g.</u>, <u>Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp.</u>, 109 F.3d 105, 111 (2d Cir. 1997).  Because the <u>Credit Lyonnais Sec.</u> and <u>Transatlantic Marine</u> evidentiary requirements have been fully met here, the <u>Hoglan</u> Plaintiffs suggest that a damages inquest hearing is not necessary in this matter.  <u>See, e.g.</u>, 183 F.3d at 155; 109 F.3d at 111.

## VII.   DAMAGES SOUGHT

The Court has entered a liability order in favor of the <u>Hoglan</u> Plaintiffs against all of the Iranian Defendants for the extrajudicial killings of the 9/11 Decedent Plaintiffs, and solatium for the Family Member Plaintiffs, under FSIA § 1605A, or, for some Plaintiffs, under alternate legal bases where neither the Plaintiff nor the decedent are/were U.S. nationals.  For such liability, "damages may include economic damages, solatium, pain and suffering, and punitive damages." 28 U.S.C. § 1605A(c)(4).  <u>See, e.g.</u>, <u>Valore v. Islamic Republic of Iran</u>, 700 F. Supp. 52, 83

(D.D.C. 2010).  See also Havlish, Report of Mag. J. Maas, p. 5.  Because FSIA § 1605A creates the cause of action and expressly provides for solatium damages, plaintiffs need only demonstrate their standing in order to receive an award.  In determining standing; i.e., eligibility for an award, under § 1605A, the federal courts have found it appropriate to consider the legal principles and commentary in the RESTATEMENT OF TORTS and other leading legal treatises.  See, e.g., Harrison v. Republic of Sudan, 882 F. Supp. 2d 23, 30 (D.D.C. 2012) (C.J. Lamberth).  The exact same considerations apply to the Plaintiffs who are not U.S. nationals for their otherwise identical claims.

In this case, Plaintiffs submit that the claim value determinations and damages methodologies applied by this Court in Havlish are the law of the case and/or precedential for Hoglan.  Thus, the damages awards in Hoglan for similar claims should follow consistently the awards in Havlish.  Accordingly, this Court's determinations in Havlish of the methodology for determining economic damages of the Decedents' Estates, and for assessing the pain-and-suffering claims of the 9/11 Decedents, as well as the values of solatium claims for traditional immediate family members – parents, children, spouses, and siblings – would be applied directly to Hoglan.

Some Hoglan Plaintiffs present claims that do not fall neatly into the damages rubric that is set forth in Havlish for parents, children, spouses, and siblings.  Specifically, Hoglan presents some claims in which traditional extended family members are the "functional equivalents" of immediate family, based upon non-adoptive step relationships, cohabitation, rearing of children, financial support, and/or other indicia well-established in the case law.  Hoglan also presents some claims in which other extended family relatives are also the functional equivalents of

immediate family due to the nature and extent of close and loving family relationships and other similar factors, albeit in ways not heretofore expressly treated in the case law.

In <u>Havlish,</u> this Court acknowledged that the law does permit courts to make "solatium awards to *more distant relatives who served functionally as immediate family members,*" <u>Havlish</u>, Report of Mag. J. Maas, p. 11, *n.* 2 (emphasis added), citing <u>Smith *ex rel*. Smith v. Islamic Emirate of Afghanistan</u>, 262 F. Supp. 2d 217, 234 (S.D.N.Y. 2003), *amended*, 2003 WL 23324214 (S.D.N.Y. 2003) (grandmother who raised decedent from an early age), and <u>Surette v. Islamic Republic of Iran</u>, 231 F. Supp. 2d 260, 270 (D.D.C. 2002) (decedent's unmarried partner of over 20 years) (emphasis added).  Nevertheless, the Court found that one <u>Havlish</u> Plaintiff "did not have that sort of relationship with her aunt."  <u>Havlish</u>, Report of Mag. J. Maas, p. 11, *fn*. 2.  Here, Plaintiffs present the claims of traditional extended family members who are the "functional equivalent" of immediate family because they *did* "have that sort of relationship" with a 9/11 Decedent.

Thus, this damages inquest submission organizes the family member Plaintiffs' claims into the following categories:

- **Category A** - Immediate family members of a 9/11 Decedent, related either by blood or law as a spouse, parent, child, or sibling.  These Category A Plaintiffs are each one of the four immediate family member relationships previously recognized in <u>Havlish</u>, as well as in <u>Heiser</u>, *infra*, and numerous other cases.

- **Category B** - Family members who are the "functional equivalent" of immediate family members of a 9/11 Decedent, based on the facts pertaining to that relationship, as recognized in the case law.  <u>See, e.g.</u>, <u>Valore</u>, *infra*.

- **Category C** - Extended family members whose familial and factual relationship to a 9/11 Decedent makes them a "functional equivalent" of immediate family, albeit in a manner not explicitly described in historical case law.

A.      **Decedent Estate Plaintiffs' Economic Damages**

The fifteen Estate Plaintiffs seek economic damages for the past and future lost wages and benefits of each 9/11 Decedent, such Estate's loss of household services; its loss of advice, counsel, guidance, instruction, and training services, and its loss of accompaniment services.  In support of their claims for these damages, the Estate Plaintiffs hereby submit extensive financial analyses by forensic economist Dr. Stan V. Smith.  See Exhibit G, Dr. Smith's *curriculum vitae.* Dr. Smith's methodology for such analyses is the same as the methodology he used, and the Court accepted, in Havlish.  Havlish, Report of Mag. J. Maas, pp. 6-7; Havlish Order of October 3, 2012, pp. 2-4.

Dr. Smith calculated each Hoglan 9/11 Decedent's lost wages and benefits under the assumption that the 9/11 Decedent would have worked until the age of sixty-seven (67) years, adjusting the calculations through the use of growth and discount rates.  See Exhibit F.  Dr. Smith also calculated each 9/11 Decedent Estate's non-wage-related losses by determining the replacement cost of those services.  Id.  Dr. Smith has provided detailed economic reports with calculations and backup data and tables for all 9/11 Decedents, see Exhibit H; *filed under seal*. Dr. Smith has attested that his calculations are reasonable and yield proposed economic damages awards comparable to those in other terrorism cases.  See Exhibit I; see, also, e.g., Dammarell v. Islamic Republic of Iran, 404 F. Supp. 2d 261, 310-24 (D.D.C. 2005); Alejandre v. Republic of Cuba, 996 F. Supp. 1239, 1249 (S.D.Fla. 1997).  As mentioned, this Court accepted Dr. Smith's methodology and calculations in Havlish.

Plaintiffs submit that Dr. Smith's findings regarding lost wages, benefits, and services should be adopted by the Court.  Accordingly, Plaintiffs therefore propose that the fifteen 9/11 Decedent Estate Plaintiffs be awarded economic damages in the individual amounts set forth in Dr. Smith's report and related exhibits, totaling for the fifteen Estates the sum of $510,723,270.

### B.      Decedents' Pain and Suffering Damages

The 9/11 Decedent Estate Plaintiffs also seek damages for the pain and suffering that the 9/11 Decedents endured in the final minutes and, in some cases, hours before their deaths on September 11, 2001.  A "standard of reasonableness" should be the Court's guide in determining the appropriate monetary damages to be awarded for pain and suffering.  Mastrantuono v. United States, 163 F. Supp. 2d 244, 258 (S.D.N.Y. 2001); Battista v. United States, 889 F. Supp. 716, 727 (S.D.N.Y. 1995).[3]

Plaintiffs have submitted the expert report of Dr. Alberto Diaz, Jr., M.D., a retired Navy Rear Admiral, which extensively details the pain and suffering endured by each of the Decedent Plaintiffs before his or her death.  See Exhibits D and E.  Dr. Diaz opines that "[t]he express purpose of this 'operation' was to achieve the highest possible human toll in terms of lives lost, injuries sustained and lasting psychological trauma.  It also sought to maximize human suffering through the incredibly cruel and horrific means of death and the prolongation of that suffering."  See Exhibit D, Report of Alberto Diaz, M.D., § Case History.  As Dr. Diaz's report confirms, there is little doubt that the 9/11 Decedents experienced unimaginable pain and suffering on September 11, 2001.  Dr. Diaz recounts how human neurophysiology and natural physiological

---

[3]  See, e.g., Stethem v. Islamic Republic of Iran, 201 F. Supp. 2d 78, 89 (D.D.C. 2002) ($1.5 million for the pain and suffering of a decedent who was tortured for fifteen (15) hours before being killed); Eisenfeld v. Islamic Republic of Iran, 172 F. Supp. 2d 1, 8 (D.D.C. 2000) ($1 million for pain and suffering of a victim of a bus bombing who had survived for several minutes before dying).

responses to extreme fear caused extraordinary agony during the event, and how death by immolation ranks as one of the greatest fears among humans and animals, and is neither rapid nor merciful.  The need to escape the holocaust must have generated a visceral panic response in the victims.  Many people trapped in the WTC leapt from windows to their certain deaths. Passengers on the planes became visibly sick from the violent rolling of the planes combined with the near certainty of impending doom.  See Exhibit D, § United Airlines Flight 175 and American Airlines Flight 11 (physical illness of passengers was a fact corroborated via live telephone calls from the planes, as detailed in the 9/11 COMMISSION REPORT at pp. 7-8).  Further, nature compounds the pain and anguish by subjectively slowing time down, so that what transpired over the course of a few seconds was experienced as happening in very slow motion, thus prolonging the agony.  See Exhibit D, § Background.

The damage declarations submitted by Plaintiffs in this case, some of whom spoke to their family members on the morning of September 11, 2001, support the opinion of Dr. Diaz and attest to the pain and suffering of the 9/11 Decedents.  See, e.g., Exhibit C, No. 319, Declarations of Debra Zeplin ¶¶ 10, 12; No. 219, Sigal Shefi, ¶ 5; and, No. 97 Ju-Hsiu Jian, ¶ 11. Debra Zeplin describes the horror:

> Marc initially survived the attack and was in constant communication with Cantor offices in Chicago and L.A. via the Cantor squawk box...  Marc stated that they could not breathe from the smoke and they were all under their desks trying to get air to survive... *The New York Times* ran a photograph on the front page shortly after the attacks depicting workers in the North Tower standing at the windows to get oxygen and to avoid the flames.  The photo appeared to show an area near Marc's office.  I had the photo enlarged and I recognized it was Marc in the picture.  It was a horrible feeling to see my husband in such a desperate and helpless situation.  I cannot imagine how he must have suffered that day.  Marc's body was never recovered.  The only thing I have of him is his charred Cantor Fitzgerald identification card.

No. 319, Declaration of Debra Zeplin, ¶¶ 10, 12.

14

Magistrate Judge Maas found in his <u>Havlish</u> Report and Recommendation:

> …the decedents in this case experienced different levels of pain and suffering dependent upon whether they were in the North Tower (the first to be hit but the second to collapse), the South Tower (where they may have had knowledge of the first attack but less notice that a structural collapse was likely), the Pentagon, one of the airplanes, or on the ground. The decedents' precise locations when the attack occurred also may have affected their levels of conscious pain and suffering.  In these circumstances, calculating a precise award for each decedent's individual pain and suffering would be impossible.  Nonetheless, the Estate Plaintiffs are entitled to fair compensation for their injuries…

<u>Havlish</u>, Report of Mag. J. Maas, p. 9; <u>see also</u> <u>Havlish</u> Order of October 3, 2012, pp. 3-4.

As this Court ruled in <u>Havlish</u> and as the awards in other FSIA terrorism cases suggest, $2 million per Decedent is "fair compensation" for the <u>Hoglan</u> Decedents'pain and suffering.  <u>Id.</u> Accordingly, consistent with <u>Havlish</u>, the <u>Hoglan</u> Plaintiffs propose that the total recommended pain-and-suffering award for the fifteen (15) 9/11 Decedent Estates be set at $2 million ($2,000,000) per 9/11 Decedent Estate, for a combined total sum of $30 million ($30,000,000).

## C.    Family Members' Solatium Damages

Under § 1605A of the FSIA, family members of the Decedents are entitled to damages for solatium; <u>i.e.</u>, the mental anguish, bereavement, and grief that those with a close relationship to the Decedent experience as a result of the Decedent's death, as well as the harm caused by the loss of the Decedent's society and comfort.  <u>See, e.g.</u>, <u>Dammarell</u>, *supra*, 261 F. Supp. 2d at 310-24.  In FSIA cases, courts, including this Court in <u>Havlish</u>, have recognized that a solatium claim is "'indistinguishable' from the claim of intentional infliction of emotional distress."  <u>See, e.g.</u>, <u>Surette</u>, *supra*, 231 F. Supp. 2d at 267 *n.* 5 (quoting <u>Wagner v. Islamic Republic of Iran</u>, 172 F. Supp. 2d 128, 135 *n.* 11 (D.D.C. 2001)); <u>Havlish</u>, Report of Mag. J. Maas, at p. 10.

> Courts have uniformly held that a terrorist attack—by its nature—is directed not only at the victims but also at the victims' families.  <u>Salazar v. Islamic Republic of Iran</u>, 370 F. Supp. 2d 105, 115 (D.D.C.2005) (Bates,

J.) (collecting cases).  Indeed, the <u>Salazar</u> court found that the
"defendant's campaign of attacks against Westerners was intended not
only to harm the victims, but to instill terror in their loved ones and others
in the United States."  <u>Id.</u>

<u>Estate of Heiser v. Islamic Republic of Iran</u>, 659 F. Supp. 2d 20, 27 (D.D.C. 2009).

Indeed, there can be no doubt that an event of the type and magnitude of the September
11, 2001, terrorist attacks was, by its nature and indeed its design, directed not only at the
victims but also at the victim's families.  This Court so held in <u>Havlish</u>: "… there remains one
group of Americans affected by the September 11th tragedy for whom it will always be difficult
to achieve closure - those whose immediate relatives lost their lives as a result of the terrorists'
acts.  The plaintiffs in this multidistrict litigation include many such persons…"  <u>Havlish</u>, Report
of Mag. J. Maas, p. 1.

Each of the <u>Hoglan</u> Family Member Plaintiffs has, in fact, suffered extreme mental
anguish, bereavement, and grief because of the terrible death of their close familial relative on
9/11.  Their declarations and the other evidence submitted herein attest, sometimes dramatically,
sometimes poignantly, to the terrible suffering and grieving each has endured and continues to
endure.  Further, the post-9/11 security precautions that are, for most people, somewhat routine
inconveniences, are for them constant reminders of the horrific terrorist acts which took the lives
of their loved ones.  Further, many of these families lack even the closure that a final resting
place for human remains is designed to provide, because, for many, there were no remains.
There are only national monuments which the 9/11 families share with the rest of the citizenry.

This Court found in <u>Havlish</u> that the extraordinarily traumatic circumstances of 9/11, the
indelible impact the manner of attacks had on the families, and the frequent reminders of 9/11 to
which each family member has been, and forever will be, subjected made it appropriate to grant
upward departures from the <u>Heiser</u> framework for the <u>Havlish</u> immediate family members.

Again, Hoglan and Havlish are, in this sense, not only conceptually identical, but indeed closely

overlapping because many of the Hoglan Family Member Plaintiffs are related to Havlish 9/11

Decedent Plaintiffs.  Therefore, and for the reasons set forth below, the proposed solatium

damage awards for the Hoglan Plaintiffs are the same as those adopted by this Court in Havlish,

as follows:[4]

| Relationship to Decedent | Proposed Solatium Award |
|---|---|
| SPOUSE or Functional Equivalent | $12,500,000 |
| PARENT or Functional Equivalent | $8,500,000 |
| CHILD or Functional Equivalent | $8,500,000 |
| SIBLING or Functional Equivalent | $4,250,000 |

See Havlish, Report of Mag. J. Maas, p. 11; see also Havlish Order of October 3, 2012, p. 4.

### 1.    Category A:  Immediate Family Members

The vast majority of the Hoglan Family Member Plaintiffs fall squarely within the

"immediate family" guidelines for solatium recovery under the FSIA, set out in Jenco v. Islamic

Republic of Iran, 154 F. Supp. 2d 27, 36, n. 8 (D.D.C. 2001), and addressed by this Court in

Havlish.  Havlish, Report of Mag. J. Maas, p. 11; Havlish Order of October 3, 2012, p. 2.

Specifically, the majority of Hoglan Family Member Plaintiffs are spouses, parents, children, or

siblings of a 9/11 Decedent.[5]  See Exhibits B and C.  Like the immediate family members in

---

[4]  Exhibit K, a spreadsheet embedded with equations for totaling the rows and columns, is
provided for the Court's convenience in electronic format on CD-ROM and a USB-compatible
"thumb drive."  The spreadsheet incorporates the economic damages figures to which Dr. Smith
attests, and the proposed awards for pain and suffering to the 9/11 Decedent Plaintiffs (based on
Havlish), but does not contain solatium damages awards.  The proposed 1:3.44 punitive damages
multiplier (see Part VII., D., infra) is also embedded.

[5]  Half-blood relations are treated in terrorism solatium cases exactly the same as full blood
relations.  As then Chief Judge Royce Lamberth stated in Valore, supra, the concept of

Havlish, their declarations provide compelling and heart breaking stories of the profound tragedy that is 9/11. The emotional scars and the physical manifestations of such terrible shock, grief, and trauma – the expressions of loss of joy, comfort, support, and love that the Plaintiffs' declarations, taken largely from recorded conversations, entail – are overwhelming to the reader, which can only serve to underscore how incredibly difficult they must be for the Plaintiffs to live with every day, for the rest of their lives.

In Estate of Heiser v. Islamic Republic of Iran, 466 F. Supp. 2d 229 (D.D.C. 2006), U.S. District Judge Royce Lamberth articulated a well-reasoned framework for determining solatium damages for spouses, parents, children, and siblings of terrorism victims. Judge Lamberth held that the spouses of deceased victims in Heiser would each receive awards of approximately $8 million, each parent or child would receive an award of $5 million, and siblings would each receive an award of $2.5 million. Id. at 356-60. Courts subsequently have followed the Heiser framework while acknowledging that upward or downward departures are sometimes appropriate. See, e.g., Estate of Bland v. Islamic Republic of Iran, 831 F. Supp. 2d 150, 156 (D.D.C. 2011); Valore, supra, 700 F. Supp. 2d at 85. This Court expressly did so in Havlish, with an upward departure from the Heiser framework. Havlish, Report of Mag. J. Maas, pp. 10-12; Havlish Order of October 3, 2012, p. 4.

In this case, most of the Category A Plaintiffs – each a spouse, parent, child, or sibling of a 9/11 Decedent – have submitted a declaration attesting to the traumatic effects of the loss of his or her immediate family member in the 9/11 attacks. See Exhibit C. Some also rely upon

---

"immediate family" "does include… immediate family members of the half blood, as "[s]iblings of half-blood to the servicemen in this case are presumed to recover as a full-blood sibling would…." Valore v. Iran, supra, 700 F. Supp. 2d at 79, quoting Peterson v. Islamic Republic of Iran (Peterson II), 515 F. Supp. 2d 25, 52 (D.D.C. 2007). Thus, all such half-blood relations in this case are designated as Category A on par with full blood relatives.

declarations of other family members previously submitted in <u>Havlish</u>.  As in <u>Havlish</u>, these

declarations demonstrate that all of the Category A Immediate Family Member Plaintiffs "have

suffered profound grief and continuing mental anguish as a result of the death of a close family

member on September 11, 2001."  Further, as this Court held in <u>Havlish</u> regarding similar

evidence:

> A review of those submissions makes clear that all of the Individual
> Plaintiffs have suffered profound agony and grief as a result of the tragic
> events of September 11th.  Worse yet, the Individual Plaintiffs clearly are
> faced with frequent reminders of the events of that day…  Considering the
> extraordinarily tragic circumstances surrounding the September 11th
> attacks, and their indelible impact on the lives of the victims' families, I
> find that it is appropriate to grant the upward departures from the <u>Heiser</u>
> framework that the Individual Plaintiffs collectively have requested.

<u>Havlish</u>, Report of Mag. J. Maas, p. 11; <u>Havlish</u> Order of October 3, 2012, p. 4.

One Plaintiff in this case deserves special mention because the cases generally hold that

the plaintiff must be an immediate family relationship at the time of terrorist act.  <u>See, e.g.</u>,

<u>Peterson v. Islamic Republic of Iran</u>, 515 F. Supp. 25, 45 (D.D.C. 2007).  On September 11,

2001, Katherine Soulas, who is the surviving spouse of 9/11 Decedent Timothy P. Soulas, was

pregnant with Timothy's son, Daniel.  (Ms. Soulas was a Plaintiff in <u>Havlish</u> on her own behalf

and as Personal Representative of her husband's estate.)  After a difficult and dangerous birth,

Daniel grew up without a father, never knowing him except through stories and photographs.

"Daniel pours over the photos and memorabilia that I have kept in albums.  He often sits on the

couch and looks through a scrapbook that I made to show at his father's memorial services."  No.

262, Declaration of Katherine Soulas, ¶ 4.  Some of his young peers make fun of Daniel for not

having a father, and he misses out on a lot of father-son activities, particularly sports.  Unlike his

older siblings, he struggles in school.  His best friends are two other kids who also lost fathers on

9/11.  Daniel and his mother are subjects of a Columbia University longitudinal study on the

effects of traumatic grief.  Id., ¶¶ 1-9.  Because Daniel's grief cannot be distinguished from those of children already born to 9/11 decedents, except perhaps in ways that can only be regarded as especially painful, confusing, and lonely, Daniel Soulas should receive a solatium award like any other child of a 9/11 Decedent.[6]

Accordingly, each such <u>Hoglan</u> Plaintiff should receive a solatium award consistent with those awarded in <u>Havlish</u>, as reflected in the chart above.

## 2.    <u>Category B: Clear Functional Equivalents of Immediate Family Members</u>

In <u>Havlish</u>, this Court acknowledged that the law permits courts to make "solatium awards to more distant relatives who served functionally as immediate family members…"

<u>Havlish</u>, Report of Mag. J. Maas, p. 11, *fn*. 2.  As Judge Lamberth explained in <u>Heiser</u>,

> Yet, in distinguishing the niece-and-nephew action from those involving "functional equivalents of immediate family members," the Court of Appeals subtly acknowledged that, in those rare cases in which the parties at issue had lived in the victim's immediate household and had been in other important respects like a spouse, parent, sibling, or child to the victim, circumstances may require a slight stretching of the immediate-family requirement, comparable to the way in which the unconventional nature of terrorist activity sometimes demands a suspension of the presence requirement.

<u>Id.</u>, 659 F. Supp. 2d at 30.

Non-adoptive step children, step parents, and step siblings have generally been treated by the courts the same as blood relations where there is evidence that the persons involved treated each other as if they were natural family.  In <u>Estate of Heiser v. Iran</u>, 659 F. Supp. 2d 20 (D.D.C. 2009), *supra*, the court awarded solatium damages to the non-adoptive stepfathers of two decedents and a non-adopted stepson of a decedent.  Judge Lamberth reasoned that the non-

---

6 Daniel Soulas did receive an FSIA solatium award as a child of Timothy Soulas, in <u>Smith *ex rel*. Smith v. Afghanistan</u>, *supra*, 262 F. Supp. 2d at 241.

adoptive stepfathers had been the functional equivalents of fathers because they both lived in the same household as their stepsons while the stepsons were still minors and treated them as their own sons (e.g., financially, emotionally, socially).  Similarly, another decedent had treated the non-adopted stepson as if he had been the biological father, and the two maintained a close relationship until the decedent's death, including some level of financial responsibility.  Heiser, supra at 29.

The same result obtained in Valore v. Iran, supra, where the immediate-family requirement was "stretched to include nieces and nephews, aunts and uncles, non-adoptive stepparents, non-adopted stepchildren, and stepsiblings."  700 F. Supp. 2d at 79, citing Bettis v. Islamic Republic of Iran, 315 F. 3d 325, 337 (D.C. Cir. 2003).  In Valore, the court awarded damages to non-adoptive step-parents as "the functional equivalent of immediate family members" where the claimants "were members of the victim's household" and remembered engaging in such familiar activities as hunting and fishing or swimming together.  Valore, supra, at 79-80.  The court also clearly indicated it would have done the same for nieces and nephews and uncles and aunts if the special master had "reported … evidence that these non-immediate family members were members of [the decedent's] household such that they were the functional equivalent of immediate family members of [the decedent]."  Id. at 80; accord, Knox v. Palestinian Authority, 442 F. Supp. 2d 62 (S.D.N.Y. 2006).[7]

Significantly, the required showing for functional equivalency is not a high threshold

---

[7] Knox was brought under the Antiterrorism Act of 1991, 18 U.S.C. §§ 2331-2339.  There, this Court awarded damages to the non-adoptive stepchildren of an American who was murdered by terrorists, noting decisions involving other federal statutes that looked deeper than the legal relationship.  Knox considered many other factors, including "the relationship of parent to child, continuous living together, harmonious family relationships, and participation of the deceased in family services and his disposition and habit to tender aid, solace and comfort when required."  Id. at 76.  These sorts of factors are present in many of the Hoglan step-relatives' declarations.

(despite the reference to "those rare cases") because the inquiry does not depend on fine

gradations of the relationships, nor on specific family activities, nor on a particular volume of

such activities.  Judge Lamberth required *only* that the plaintiffs' evidence demonstrate a level of

personal, financial, or emotional attachment, which, in <u>Valore</u>, was as limited as recollections of

hunting and fishing or swimming together, to prove functional equivalency of immediate family

relationships.  See <u>Valore</u>, *supra*, at 79-80.  The touchstone is whether the relationship was one

in which the persons involved treated each other as if they were natural family, which, as

recognized by the RESTATEMENT OF TORTS (THIRD), is not as rare as Judge Lamberth may have

surmised.  <u>See</u> discussion *infra*.  Obviously, such family relationships may vary with the ages

and living arrangements of the step family members, both as to the nature of the indicative

activities and the volume or quantum of interactions.  There is no particular checklist of activities

or required timeline of interactions; rather, the key is the closeness and reality of the family ties

at meaningful points during the lifetime of the decedent.

One of the Plaintiffs in this case, the Estate of Marion Thomas, who was the grandmother

of 9/11 Decedent George Smith, has already been found by Judge Baer of this Court to be the

"surrogate mother" - and therefore the functional equivalent of a mother - of George Smith.  In

<u>Smith *ex rel*. Smith v. Islamic Emirate of Afghanistan</u>, *supra*, 262 F. Supp. 2d at 236, the

plaintiffs, who were raised in the same household by this same grandmother, presented evidence

establishing the closeness of the Smith household and the family's relationships.  Judge Baer

concluded:

> On these facts, the Court has no reservation about concluding that George
> [Smith]'s paternal grandmother Marion Thomas is entitled to loss-of-
> solatium damages.  Although plaintiffs have not cited any precedent where
> a grandparent has been awarded these damages, it is clear that she was
> George's surrogate mother since 1973 and that they developed an
> extremely close bond.  *Cf*. <u>Surette</u> [*supra*], 231 F. Supp. 2d at 270

(awarding solatium to decedent's unmarried partner for over twenty
years).  All testimonials submitted note the closeness of this relationship,
which Ms. Thomas described as follows:

> *He and I were very close when he was a boy and that
> closeness did not diminish when he got older.  He made a
> point to keep in touch with me no matter where he was or
> what he was doing.  If he was out of town, he would call me
> on the phone.  If he went on vacation, he would send me
> letters or postcards.  If he was in the area, he would always
> stop in to see me.*

Marion Thomas Aff. at 1-2.  She also poignantly attested that she was
recently diagnosed with ovarian cancer and is in hospice care and that it
has been especially difficult facing her illness and end of her life without
her grandson, who was clearly as important to her as she was to him.
Accordingly, Ms. Thomas is entitled to recover $3 million for loss of
solatium.

Id. at 236.[8]

Some of the other relatives within the Smith family, who are Plaintiffs here, were not

awarded solatium damages in Smith, but that occurred because, in Smith, the plaintiffs did not

provide the court with evidence of the functional equivalence.  The Plaintiffs here rectify that

matter and provide a wealth of such evidence.  See Exhibit C, Nos. 235-41.

For purposes of this damages inquest, close family relatives who are the clear functional

equivalent of a spouse, parent, child, or sibling have been placed into Category B.  Each such

Category B Plaintiff submits persuasive evidence, in the form of declarations and supporting

documents, to establish the functional equivalency of the immediate family relationship of the

Category B Plaintiff to a 9/11 Decedent in either Havlish or Hoglan.  Such Plaintiffs' evidence

demonstrates factors such as cohabitation for long periods of time, being raised or raising

---

[8]  See also, Gonzales v. New York City Housing Auth., 77 N.Y. 2d 663, 572 N.E. 2d 598, 569
N.Y.S. 2d 915 (1991) (recognizing the profound nature of relationships when people are all
raised in the same household and allowing adult grandchildren raised by their grandmother to
recover for wrongful death of their grandmother).

children together as a nuclear family, pervasive involvement in each others' lives over long periods of time, financial support, and caregiving.

For example, 9/11 Decedent Mark Bingham was raised by a binuclear family, because his parents were divorced early on, and he grew up, for substantial periods of time in the loving care of the nuclear family of his biological father (Bingham), including his stepmother, three stepsisters, as well as in the extended family of his biological mother (Hoglan), where Mark's maternal grandfather was a father figure, his maternal uncles were like brothers, and his maternal aunts were like sisters. All are Plaintiffs in this case, and all attest to the close and loving relationships they had with Mark. See Nos. 1-14, Declarations of the Bingham and Hoglan families.

The Grazioso family lost two members on September 11, 2001, brothers John and Timmy, who both worked at Cantor Fitzgerald. Their stepmother, Carole Grazioso, had a large part in raising both brothers, from the ages of six and seven, and remained very close to both men for the rest of their lives. No. 72, Declaration of Carole Grazioso.

Another example is the family of 9/11 Decedent Michael Bane. Michael's biological mother died in childbirth. His stepmother, Plaintiff Arline Peabody Bane married Michael's father in 1984, when Michael was in the ninth grade. Arline already had children, so, after the marriage, they "became a family of four children and two parents." No. 19, Declaration of Arline Peabody Bane, ¶ 4. Michael Bane clearly considered Arline his mother. Id., ¶ 6. Her two children grew up as Michael's siblings. The boy, Brian, who was about the same age, shared a bedroom with Michael for many years, and they played together, watched sports and listened to music together. Brian has cognitive disabilities, and the family had planned for Michael to care for Brian in later years. No. 20, Declaration of Brian Major, ¶¶ 4-5. Michael's step-sister,

Brenda Jobe, was best friends with Michael even before their respective parents met.  As children, they ran away after summer camp and hitch-hiked to Florida together - which is how their respective parents met.  The parents soon married, and thus Michael and Brenda became step-siblings.  When the step-siblings were sixteen, they purchased a car together.  They remained close and frequently visited even after Michael left the home for college, a career, and his own family.  No. 21, Declaration of Brenda E. Jobe, ¶ 4.  Ms. Jobe's poignant declaration shows how close the step-siblings were, the essence of sibling love and affection.

Another example is Plaintiff Anthony Dorf, who was the functional equivalent of a son to his uncle, 9/11 Decedent Stephen Dorf.  Anthony's mother and her brother, 9/11 Decedent Stephen Dorf, purchased and lived in a home together, with her son Anthony.  "... Stephen and I decided to buy a house together. We could not afford to buy separate houses, but together we could do it...  My brother made $32,000 a year and would unselfishly give it toward the house and my son."  Havlish Declaration of Michelle Dorf, ¶¶ 9, 19.  In this household, Stephen Dorf fulfilled the role of father for Anthony Dorf:

> My uncle and I were very close.  I never knew my biological father.  My mother and her brother, my Uncle Stephen bought a home together. Maybe he felt sorry for me, but he became the father I never had.  He made me feel special and he was special.  He took me to movies, fishing, camping and sometimes we just hung out on the couch.  He was my role model.  He was a great man.  He loved me unconditionally.

No. 54, Declaration of Anthony Dorf, ¶ 4.

Another example is Plaintiff Paul Scalogna, now deceased, who was the functional equivalent of a father to 9/11 Decedent Brian Nunez.  Joanne Lovett, the Personal Representative of the Estate of her father Paul Scalogna, explains in her declaration: "Brian's biological father was only minimally involved in Brian's life.  Brian had lived with his grandfather both as an infant and for 3 years in his late teens and early twenties.  They always maintained a close

relationship with each other throughout their lives, whether it was trips to the butcher shop as a kid, the constant telephone calls, watching baseball together, or passing down family tradition." One of the most important family traditions was Italian sausage made from scratch that was presented to the entire extended family at midnight on Christmas Eve after celebrating the Feast of the Seven Fishes.  "When Brian moved in with my father, he taught Brian how to make the sausage...  Brian loved helping to make the sausage and bragged how he knew the secret recipe. Brian was to carry on this tradition, passed onto him by his loving grandfather.  Unfortunately, this is a tradition that died along with my father and son."  No. 167, Declaration of JoAnne Lovett on Behalf of Paul Scalogna, ¶¶ 4, 12-13, 16.  Paul Scalogna's other grandson, Eric Nunez, also speaks of the bond between his brother Brian and his grandfather in his declaration:

> ... our grandfather lived with me.  One day grandpa was not feeling so well.  I was on the phone with Brian and told him that I was going to have to take grandpa to the hospital.  Brian told me to wait for him because he wanted to come with me.  We stayed by our grandfather's side until he finally got a room at 4:00 a.m.  Our grandfather recovered that time, but, in the end, Brian's death killed him.  Brian's murder was too much for our grandfather to bear, and he was never the same after 9/11.  He lost his will to live, and died of a broken heart on November 24, 2001.

No. 165, Declaration of Eric Nunez, ¶ 15.

Not only have the federal courts made awards to numerous such family members in terrorism cases on the basis that they were the functional equivalent of a spouse, parent, child, or sibling, indeed, the courts have done so even when there is *no actual legal or blood relationship* between the terrorism decedent victim and the family member victim.  In Surette v. Islamic Republic of Iran, *supra*, the plaintiff, Beverly Surette, was never legally married to the male victim (the CIA's Beirut station chief William Buckley) who was kidnapped and murdered by terrorists, and therefore, she had no blood or legal relationship to the decedent at all.  However, the court considered the "nature and closeness of the relationship" in which the plaintiff had

shared a home with the decedent - albeit only part of the time, because Mr. Buckley lived abroad much of the time - over a period spanning twenty years and factors such as keeping in touch via letters, post cards, phone calls, and audio tapes, as well as financial contributions, and, perhaps most tellingly, Mr. Buckley's family's welcoming the plaintiff into their midst and inviting her to family gatherings over the years.  On the basis of a "closeness" and a "longstanding, loving, loyal and trusting" relationship, the court found that the couple had a "bond that was the functional equivalent of a legal marriage," and awarded solatium damages.  Id. at 270-71.

Several Plaintiffs in this case present fact patterns like that in Surette, *supra*.  Plaintiffs Colleen McDonald, Aleese M. Hartmann, Donna Corbett Moran, and Michelle Baker were all fiancés of 9/11 Decedents, and Keith Bradkowski was, under state law, a registered domestic partner of a 9/11 Decedent; all had the indicia of "longstanding, loving, loyal and trusting" relationships of the kind present in Surette.  Further, each had a demonstrable intent to marry or, in Bradkowski's case, the functional equivalent of marriage, a fact not even present in Surette. (The Court may take judicial notice that the status of betrothal, or engagement, has been of cultural, religious, legal, and practical significance for hundreds of years.)

Plaintiff Colleen McDonald was profoundly impacted by the death of her fiancé, 9/11 Decedent Jason Coffey.  Ms. McDonald has been unable to function or move on with her life, and she now suffers from multiple sclerosis brought on by her overwhelming grief.  No. 36, Declaration of Colleen McDonald, ¶ 22.  Her connection to Jason and Daniel Coffey's family – the family lost two men on 9/11, Daniel and his son Jason – is still very deep, and her later-adopted daughter carries Jason Coffey's last name.  Incalculably tragically, Colleen was on the telephone with Jason at the very moment when one of the planes hit the World Trade Center. Id., ¶ 6.

> [Jason] and I had known each other since we were probably 13 years old. We were in the process of planning our wedding, and we had just cleared out his grandparents' home… We were getting ready to overhaul the house, and move into it… I have not remarried. I do not date. I am stuck. I was so young. I remember going to bed at night and thinking I am so blessed. I can clearly tell you I would go to bed and I would say somebody loves me so unconditionally. I love his family. He loves my family. We are going to have children together. We are going to build a family. And then, within an instant it was taken away from me. It was almost as if my dream was given back to me when they mistakenly told me he was alive. And then my dream became a nightmare again when they told me that it was a mistake, it was like he died again. So far I have not even met somebody that could hold a candle to him ever, because I still have this beautiful, perfect relationship. It is just not here... I died that day. The young, happy Colleen died that day. It was the most horrific thing you could really imagine happening. And I look at [Jason's mother and Daniel's wife] Fran, she lost a child and a husband. I love her. She is my second mother. Watching her pain constantly is so hard for me... Not only Jason and Dan lost their lives that day. We lost our lives, our hope and our dreams as well.

Id., ¶¶ 5, 22, 23.

Plaintiff Aleese M. Hartmann was the fiancé of 9/11 Decedent William Godshalk, who describes her courtship with him and her terrible memory of September 11, 2011:

> Bill and I dated when I was 23 and he was 28 for a year and then... we got back together when he was 30…, [t]hen we dated seriously from 1999 until we became engaged in August of 2001. We moved in together the day before 9/11. Although we did not live together for long we took vacations together. We rented a winter house in Vermont two winters from January until April for the two years prior to September 11th. I would go up to Buck Hill Falls, to their summer house in Pennsylvania in the Poconos. And he came to Brussels, Belgium in June of 2001. That summer we were in Hilton Head with Jane. In May of 2001, we went to St. Bart's together for 10 days for our birthdays. We have gone to Vegas together and on trips with friends. We met at a wedding in Buck Hill when I was 23... Bill and I lived on Park and 35th Street. I was getting on the bus outside of my apartment when I saw the first plane fly overhead. I got on the bus and tried to call Bill but I was disconnected… My colleague, who had actually talked to Bill, told me that he had called in to say he was okay... Bill finally got through to me, he was crying and I asked him what was going on. He would not tell me much except that he loved me, but he finally told me that people had been jumping from the windows... [I]t was probably January or February before Bill's death really hit home. I had lost so much weight. I was 140 pounds on

September 11th and the day after the Super Bowl I fainted in the subway at about 97 pounds.  I was hospitalized briefly.

No. 64, Declaration of Aleese Hartman, ¶¶ 4, 5, 12, 20-22, 24.

Plaintiff Donna Corbett Moran was the fiancé of 9/11 Decedent Brian Nunez:

Brian and I met in college.  We were in an English class together and we did not even finish the semester without starting to see each other.  We instantly started spending all our free time with each other.  We would go to movies, have dinners, we became part of each other's everyday lives.  When Brian moved in his own apartment, he was living with his little brother.  Brian and I could not get a place of our own because he wanted to help his brother financially.  But of course, I was always there.  I spent most nights there.  I would shower and leave to go to work from the apartment.  We both shared in the food expenses and we would take turns cooking dinners for one and other.  Financially we shared in the expenses of everyday life.  We were a couple so we took turns with picking up the tab for different expenses...  I had no idea that I would never see him again; never see the man that held my hand, the man that shared my dreams and thoughts, the man that I thought was too good to be true, my future husband.  But that was the case; I never saw him again, I never got to say good bye, I never got to say thank you for loving me...  My life will never be the same.  I had beautiful memories of Brian.  We were one person.

No. 169, Declaration of Donna Corbett Moran, ¶¶ 5, 6, 10, 11.

Plaintiff Michelle Baker was the fiancé of 9/11 Decedent Nicholas Rowe:

Nicholas and I had been together for three years when he was killed on 9/11.  The Christmas before 9/11 we traveled to South Africa together to spend the holidays with his family…  Nick's parents… told me they knew how serious Nick was about our relationship because he had never brought a girl home to South Africa to meet his family.  They knew how committed we were to each other by how he acted with me…  When 9/11 happened, Nick was helping me financially because when I had to start making payments on my student loans, I was not making enough by myself to pay all of my expenses.  Even after Nick died, his parents continued to help me finish paying off the loans...  Nick's parents are like a second set of parents to me…

No. 211, Declaration of Michelle Baker, ¶¶ 4, 12.

Finally, Plaintiff Keith Bradkowski and 9/11 Decedent Jeffrey Collman were together as

a couple for more than eleven years before Jeffrey was murdered on September 11, 2001.  Keith

29

and Jeffrey were registered domestic partners under California state law and had taken every step possible to have their same-sex relationship recognized as legal.  No. 42, Declaration of Keith Bradkowski, ¶¶ 4, 13.  The relationship between Mr. Bradkowski and Mr. Collman was very much like the relationship between Beverly Surette and William Buckley: both were long-term, loving, and caring relationships in which the couple shared a home over a long period of time, communicated regularly when Mr. Collman traveled as a flight attendant, and shared a bond akin to marriage.  Indeed, had the U.S. Supreme Court's landmark ruling in Obergefell v. Hodges, 135 S.Ct. 2584 (2015), which declared prohibitions on same-sex marriage unconstitutional, been handed down before 9/11, there is no doubt that Mr. Collman and Mr. Bradkowski would have married.  Therefore, it is right and just that Keith Bradkowski be recognized in this case as the functional equivalent of Jeffery Collman's spouse, for purposes of FSIA solatium damages.

It is submitted that all of the Category B Plaintiffs are the functional equivalents of a spouse, parent, child, or sibling to the 9/11 Havlish or Hoglan Decedent, as demonstrated by the evidence submitted for each such Plaintiff, in a manner similar to the functional equivalent relationships clearly recognized in the case law.  Accordingly, each such Category B Plaintiff should be treated the same as a Category A immediate family member.  Plaintiffs respectfully request that this Court award the Hoglan Immediate Family Functional Equivalent Plaintiffs in Category B solatium damages to the same extent as Category A Immediate Family Members.

### 3. Category C: Other Functional Equivalents of Immediate Family

The FSIA's section 1605A expressly allows a solatium claim for an act of terrorism, and such claim may be brought by any "claimant or victim [who] was, at the time the [terrorist] act… occurred - (I) a national of the United States; (II) a member of the armed forces; or (III) otherwise an employee of the Government of the United States, or of an individual performing a

contract awarded by the United States Government, acting within the scope of the employee's employment..." FSIA § 1605A(a)(2)(A)(ii). The FSIA does not otherwise define the class of persons who may maintain a solatium claim.[9]

The courts have thus been left to determine what family relationships qualify a person for a solatium claim. While cases under the pre-2008 amendment FSIA; i.e., prior to creation of the § 1605A cause of action, generally limited solatium recovery to immediate family members, the courts since the amendment have found exceptions for functional equivalents of immediate family members, such as fiancés, grandparents who reared children, and step-relatives. Some courts have considered state law cases and the RESTATEMENT (SECOND) OF TORTS pertaining to the closest analog cause of action - intentional and negligent infliction of emotional distress ("IIED" and "NIED," respectively). Significantly, in its more recent version, the RESTATEMENT (THIRD) OF TORTS embraces updated thinking about the evolving nature of modern families in the context of infliction of emotional distress claims, giving greater recognition to other types of close family relatives who are the functional equivalents of immediate family members. Indeed, whereas the RESTATEMENT (SECOND) OF TORTS stated that the IIED cause of action was limited to "immediate family members" of the victim, the RESTATEMENT (THIRD) eliminates that restriction for the IIED tort,[10] and expressly expands the availability of the NIED tort to any "close family member."[11]

---

[9] All the Plaintiffs in this case who are non-U.S. citizens, as discussed in Part VIII, *infra*, are among the four easily recognized "immediate family member" relationships to a 9/11 Decedent, and are therefore placed in Category A. One Category B Plaintiff, Michelle Baker, was the fiancé of 9/11 Decedent Nicholas Rowe, a non-citizen, but Michelle Baker herself is a citizen of the United States, and thus her claim is clearly covered by the FSIA's §1605A(c).

[10] *Compare* the RESTATEMENT (SECOND) OF TORTS, § 46:

Further, the RESTATEMENT (THIRD) comments as follows:

> Role of judge and jury…  [D]etermining which classes of family members are owed a duty by those who negligently cause serious physical injury to another is a question of law for the court.  Those who are not within the class are not owed a duty.  If the class of relationships is specifically defined, ordinarily there will not be a factual dispute requiring jury determination.  *On the other hand, if the class is defined more generally or functionally . . ., it may be necessary in some cases for the [factfinder] to decide whether a given plaintiff has the requisite relationship.*  Among those in the class permitted to maintain a claim under this Section, *the quality of the relationship between the plaintiff and the accident victim will bear primarily on the measure of damages, not on the question of liability.*

Section 48, *Comment h* (emphases added).

As mentioned above, the FSIA does not define the class of family members who may maintain a solatium claim.  Thus, this Court must decide whether a given plaintiff has the requisite relationship; i.e., is a "close family member" akin to a functional equivalent to a spouse,

---

> (1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm. (2) Where such conduct is directed at a third person, the actor is subject to liability if he intentionally or recklessly causes severe emotional distress: (a) to a member of *such person's immediate family* who is present at the time, whether or not such distress results in bodily harm, or (b) to any other person who is present at the time, if such distress results in bodily harm.

(emphasis added), *with* the RESTATEMENT (THIRD) OF TORTS, § 46:  "An actor who by extreme and outrageous conduct intentionally or recklessly causes severe emotional harm *to another* is subject to liability for that emotional harm, and, if the emotional harm causes bodily harm, also for the bodily harm."  RESTATEMENT (THIRD) OF TORTS, § 46 (emphasis added).

11 "An actor who negligently causes sudden serious bodily injury to a third person is subject to liability for serious emotional harm caused thereby to a person who: (a) perceives the event contemporaneously, and (b) is a *close family member* of the person suffering the bodily injury."  RESTATEMENT (THIRD) OF TORTS, § 48 (emphasis added).  Federal courts have, however, discarded the presence and contemporaneous perception requirements in terrorism cases.  See Estate of Heiser v. Iran, *supra*, 466 F. Supp. 2d at 329.

parent, child, or sibling.  RESTATEMENT (THIRD), § 48 and *Comment h*.  In doing so, the

RESTATEMENT (THIRD) adds the following significant observation:

> *Sometimes people live functionally in a nuclear family without
> formal legal family ties*.  When defining what constitutes a close
> family relationship, courts should take into account *changing
> practices and social norms and employ a functional approach to
> determine what constitutes a family*.  See Principles of the Law of
> Family Dissolution: Analysis and Recommendations § 2.03(1)(c)
> and Comment c.

RESTATEMENT (THIRD) OF TORTS, § 48, *Comment f* (emphases added).

Indeed, the RESTATEMENT (THIRD) expresses quite clearly why the immediate family

limitation should be construed broadly in regard to infliction of emotional distress in terrorism

cases, in much the same way that the "presence" requirement is discarded:[12] "If an actor harms

someone *for the purpose of inflicting mental distress on another person*, the limitations

contained in this Comment do not apply."  RESTATEMENT (THIRD) OF TORTS, § 46, *Comment m*

(emphasis added).  Terrorist acts, by their very nature, are not so much directed at the victim(s),

but rather are intended specifically for the purpose of inflicting mental distress upon the living,

---

[12] In Valore, Judge Lamberth explained:

> Concerning the presence requirement, the Restatement's caveat "suggests
> that… '[i]f the defendants' conduct is sufficiently outrageous and intended
> to inflict severe emotional harm upon a person which is not present, no
> essential reason of logic or policy prevents liability.'" *Heiser II, supra*,
> 659 F. Supp. 2d at 27 (quoting Dan B. Dobbs, THE LAW OF TORTS, § 307,
> at 834 (2000)).  As this Court recently noted, "[t]errorism, unique among
> the types of tortious activities in both its extreme methods and aims,
> passes this test easily." Id.  One therefore need not be present at the time
> of a terrorist attack upon a third person to recover for severe emotional
> injuries suffered as a result.  These plaintiffs, although not present at the
> Beirut bombing, may therefore recover for the emotional injuries they
> suffered as a result of that attack.

Valore, *supra*, 700 F. Supp. 2d at 80.

most particularly all who have close, loving relationships with the victim(s). See Peterson v. Iran, *supra*, 515 F. Supp. 2d at 44; Estate of Heiser v. Iran, *supra*, 466 F. Supp. 2d. at 328-29; Salazar v. Iran, *supra*, 370 F. Supp. 2d at 115, *n*. 12; Burnett v. Al Baraka Inv. and Dev. Corp., 274 F. Supp. 2d 86, 107 (D.D.C. 2003).[13]  Therefore, a strict nuclear family limitation is inappropriate, and instead, "a functional analysis of what constitutes a close family relationship,... tak[ing] into account changing practices and social norms" should be employed. RESTATEMENT (THIRD) OF TORTS, § 48, *Comment f.*

    It is true that early cases and the RESTATEMENT (SECOND) were concerned with line-drawing as a necessary means of providing some reasonable limit to IIED and NIED claims. See RESTATEMENT (THIRD) OF TORTS, *Comment m*; see also, Jenco v. Islamic Republic of Iran, 154 F. Supp. 2d 27, 36 (D.D.C. 2001).  However, in the context of terrorism - most particularly state-sponsored terrorism - a reasonable line-drawing distinction is readily available.  The general public is affected by a terrorist act in terms of anger, outrage, and fear for the safety of one's own person, family, friends, and the innocent population, as well as a general empathy for the victims and their families.  On the other hand, as shown by the declarations submitted herewith and in

---

13  As explained in Salazar:

> Courts have uniformly held that a terrorist attack - by its nature - is
> directed not only at the victims but also at the victims' families.  See
> Burnett v. Al Baraka Inv. and Dev. Corp., 274 F. Supp. 2d 86, 107
> (D.D.C. 2003) ("A terrorist attack on civilians is of course intended to
> cause emotional distress to the victims' families."); Jenco, [*supra,* 154 F.
> Supp. 2d at 35] ("If the defendants' conduct is sufficiently outrageous and
> intended to inflict severe emotional harm upon a person which is not
> present, no essential reason of logic or policy prevents liability.").  In this
> case, the evidence demonstrates that defendant's campaign of attacks
> against Westerners was intended not only to harm the victims, but to instill
> terror in their loved ones and others in the United States.  See Dammarell,
> *supra*, 281 F. Supp. 2d at 109-113.

370 F. Supp. 2d at 115, *n*. 12 (internal citations omitted).

Havlish, close family relatives of the victims are affected not particularly out of any sense of fear for their own safety (with some exceptions being children), nor a generalized empathy, but rather by a very specific emotional distress caused by the horrific crime perpetrated *upon their loved one*. Thus, solatium claims under FSIA § 1605A should be available to any close family member who can show that the nature of his or her family relationship - functionally like that of a spouse, parent, sibling, or child - has caused him or her to experience that type of specific emotional distress in response to the terrorist act.[14] Accordingly, the evolved thinking behind the RESTATEMENT (THIRD) suggests that this Court should not restrict "functional equivalent family members" to the exclusion of close family members who have the same sort of relationships to a decedent, even if situated somewhat differently from those functionally equivalent relationships recognized in terrorism cases decided under the guidance of the RESTATEMENT (SECOND).

As stated above, even in cases where the relationships in question lacked any actual blood or legal relationship at all, solatium awards may be predicated on close functional family ties resulting from a variety of factual underpinnings such as living in the same household (even for a limited time), being guided or cared for by family relative, engaging in family activities, being welcomed into the family, the nature and frequency of communications, financial contributions, participation in each other's lives, observations of holidays and birthdays and similar occasions, and similar factors - in short, having a "closeness" and "longstanding, loving,

---

14 The RESTATEMENT (THIRD) contains the following observation: "Pure emotional harm is generally not recoverable not because the harm is not genuine or foreseeable, but because *as a matter of policy* it is an injury whose cost the legal system should not normally shift, even to someone who is negligent." RESTATEMENT (THIRD) OF TORTS, § 48, *Comment g* (emphasis added). Whatever the general utility of that observation, there is no policy justification for not shifting the cost of solatium damages to terrorist tortfeasors.

loyal and trusting" relationship.[15]  See, e.g., Surette v. Islamic Republic of Iran, *supra*.  It may be

that the *measure* of solatium damages could be affected by such factors as the length of time the

close family relationship existed, the recency of that relationship, the ages of the persons

involved, any geographical separations that constrained the opportunities for those functionally

equivalent relationships to be manifested, the amount of time spent together versus apart, the

quality of interactions, and similar factors.  That is, "[a]mong those in the class permitted to

maintain a [solatium] claim..., the quality of the relationship between the plaintiff and the…

victim will bear primarily on the measure of damages, not on the question of liability."

RESTATEMENT (THIRD) OF TORTS, § 48, *Comment h*.

Some of the Hoglan Family Member Plaintiffs are exemplars of the ever-changing

dynamics of families in the United States, and this Court should, as counseled by the

RESTATEMENT (THIRD), "take into account changing practices and social norms and employ a

functional approach to determine what constitutes a family." RESTATEMENT (THIRD) OF TORTS, §

---

15   State courts are considering such factors in damages awards in non-terrorism cases involving
negligent infliction of emotional distress as well.  In Graves v. Estabrook, 818 A.2d 1235 (N.H.
2003), a fiancée who was not related by blood or marriage, but had lived with the decedent for
seven years, was able to recover based upon "a relationship of significant duration that… is deep,
lasting and genuinely intimate."  Disposing of "particular labels" as unjust, the New Hampshire
Supreme Court stated "that the expedience of a bright line rule 'does not outweigh the need to
recognize claims that are legitimate and just.'"  Id., quoting Dunphy v. Gregor, 136 N.J. 99, 642
A.2d 372, 378 (N.J. 1992).  The Graves decision cites cases from a number of jurisdictions
which agree with this analysis, including Tennessee, West Virginia, Nebraska, Ohio,
Pennsylvania, Hawaii and New Jersey and concludes: "We thus recognize that unmarried
cohabitants may have a close relationship; i.e., a 'relationship that is stable, enduring, substantial,
and mutually supportive, cemented by strong emotional bonds and providing a deep and pervasive
emotional security.'"  Id. at 1260, quoting Dunphy, 642 A.2d at 380.  In determining
whether a relationship meets the standard of "stable, enduring, substantial, and mutually
supportive," a court may "take into account the duration of the relationship, the degree of mutual
dependence, the extent of common contributions to a life together, the extent and quality of
shared experience, and… whether the plaintiff and the injured person were members of the same
household, their emotional reliance on each other, the particulars of their day to day relationship,
and the manner in which they related to each other in attending to life's mundane requirements."
Graves, 818 A.2d at 1262, quoting Dunphy, 642 A.2d at 378.

48, *Comment f.*  A number of such <u>Hoglan</u> Family Member Plaintiffs were close family relations who demonstrate that they have had "longstanding, loving, loyal and trusting" relationships that are the functional equivalent of an immediate family member to a <u>Havlish</u> or <u>Hoglan</u> 9/11 Decedent, despite not having all the indicia of immediacy, in particular, full time living or financial arrangements.  Nevertheless, because these relationships were characterized by many of the same attributes of well-recognized functional equivalencies, these family members are also deserving of a solatium award, the measure of which may be subject to an adjustment based upon the types of factors listed above regarding "the quality of the relationship between the plaintiff and the.... victim." <u>Id.</u>  The claims of these Plaintiffs are collected within Category C.

Some of these Category C relationships existed for a lesser amount of time than the clear examples of functional equivalents in Category B.  Others manifested in ways that did not involve lengthy cohabitation.  Some involved geographic separations.  In modern America, however, close family ties are not always reflected in cohabitation, *per se*, or even proximity.  Nevertheless, strong personal and emotional bonds, as evidenced in the statements of some <u>Hoglan</u> Plaintiffs, warrant consideration as indicia of immediate family members where the evidence shows a "longstanding, loving, loyal and trusting" relationship.

For example, 9/11 Decedent John Perry, despite some geographical separation, was the father figure to his nephew, James Montoya:

> I was very special to Uncle John, and he was very special to me.  He did not have any children of his own, and my father died when I was still a toddler, so I never really knew him.  Since my father was gone, Uncle John became a very important male figure in my life.  Uncle John visited me regularly, and we spoke on the phone at least several times a week.  He would come to New Mexico about once a year and would stay a week and a half to two weeks each visit.  Of course, we would also visit Uncle John in New York at least once a year.  With him it was always fun and always something new…  I always trusted Uncle John to keep me safe and to have my best interest in mind…  I was ten years old on 9/11…  Losing

> Uncle John was far more difficult and more horrible than losing my father... The beginning of my mental health problems can be traced back to Uncle John's death. I was never the same after that, and I have not been emotionally stable since. Prior to 9/11, I was a normal kid. Then, Uncle John was murdered and my downward spiral began... After 9/11, I developed anxiety and depression. I went to a doctor and he told me that I have to learn to let go of the past. He said that life goes on no matter what, that I have to keep my focus on the future. However, these words did not help and my condition got worse. I was eventually diagnosed with Bipolar Disorder... I was put on medication and I am still on a very high dosage of medication. In 2010, while I was in college, I had a mental breakdown and had to be admitted to a locked psychiatric unit in a hospital.

No. 179, Declaration of James Montoya, ¶¶4, 5, 6.

In another moving example, Vincent Papasso, Jr. a minor, was cared for by his uncle and godfather, 9/11 Decedent Salvatore T. Papasso, because his mother suffered from a debilitating illness that kept her hospitalized much of the time:

> Vincent's Uncle Sal would take care of him as if he were his father. Vincent was a little kid and, at the time, he needed somebody who would be more like a parent than a grandparent figure. He had that in Uncle Sal, who, luckily, still lived at home with his parents. Sal would jump on the bed, watch cartoon, play on the floor and fall asleep with Vincent… After Uncle Sal died, Vincent became a totally different kid. He became sullen and withdrawn. He would not get his schoolwork done. He was having problems in school and started wetting his pants... He was in therapy for about a year and did show some improvement… But, he was never the same kid. It was as if in one day he went from being five to being forty. He worries about everything. He worries if we have enough money. He worries about whether I am going to die. He worries that there is going to be a fire and that the house will burn down. He is constantly afraid and constantly thinks something is going to happen. We lived right near the Newark Airport, and for months afterwards, when a plane would fly overhead, he would get hysterical. At times I thought Vincent was suicidal because he talked about not wanting to be here anymore and wanting to go 'see' Uncle Sal.

No. 173, Declaration of Bernadette Papasso on behalf of Vincent Papasso, Jr., ¶¶ 4, 7, 8, 9, 10.

For the above reasons, Plaintiffs submit that the Category C Plaintiffs should be awarded solatium damages consistent with those in Category B; i.e., either the same or in some other

commensurate amount, perhaps adjusted as suggested by the RESTATEMENT (THIRD).   The

closest analogous immediate family relationship (i.e., spouse, parent, child, sibling) is noted for

each Category C Plaintiff on the spreadsheets in Exhibits A and K.

> **D.**     **Punitive Damages**

The Hoglan Plaintiffs seek punitive damages pursuant to FSIA § 1605A(c)(4) and New

York state tort law.  Plaintiffs propose that this Court follow Estate of Bland, supra, 831 F. Supp.

2d at 158, as this Court has previously done in Havlish.  Havlish, Report of Mag. J. Maas, pp.

12-13; Havlish Order of October 3, 2012, p. 5.  In Bland, an FSIA case arising out of the

bombing of the United States Marine barracks in Beirut, the court applied a 1:3.44 ratio of

compensatory to punitive damages, noting that several courts previously had applied that ratio in

FSIA cases.  Estate of Bland, supra (relying on the Supreme Court's opinion in Philip Morris

USA v. Williams, 549 U.S. 346 (2007); see also Murphy v. Islamic Republic of Iran, 740 F.

Supp. 2d 51, 75 (D.D.C. 2010); Valore, supra, 700 F. Supp. 2d at 52.  As the court explained in

Bland, the 1:3.44 ratio "has been established as the standard ratio applicable to cases arising out

of" terrorist attacks.  831 F. Supp. 2d at 158.

Thus, in Havlish, this Court calculated punitive damages by multiplying the Plaintiffs'

compensatory damages by 3.44.  Havlish, Report of Mag. J. Maas, p. 13; Havlish Order of

October 3, 2012, p. 5.  The Hoglan Plaintiffs propose that punitive damages be awarded in this

case based on the same 3.44 multiplier.

> **E.**     **Prejudgment Interest**

Prejudgment interest is appropriate to compensate Plaintiffs for the delay in recovering

compensation for their non-economic injuries; i.e., pain-and-suffering and solatium damages.

Plaintiffs whose claims arise out of losses in New York State request prejudgment interest at the

nine percent (9%) rate applicable to property damage and wrongful death claims under New York law.  See Sections 5001 and 5004 of New York Civil Practice and Rules.  See also, Worley v. Islamic Republic of Iran, 75 F. Supp. 3d 311, 332 n. 6 (D.D.C. 2014).  Alternatively, the Plaintiffs request that prejudgment interest be awarded at the rate of 4.96 percent (4.96%), compounded annually, consistent with this Court's award in Havlish, as discussed below.

For those Plaintiffs whose claims arise out of losses in Pennsylvania [16] or Virginia, [17] Plaintiffs propose prejudgment interest on the Plaintiffs' non-economic damages be set at 4.96 percent (4.96%) per annum, compounded annually, from the date of the September 11, 2001 terrorist attacks through the date that final judgment is entered in Hoglan.  In Havlish, this Court awarded prejudgment interest on the plaintiffs' non-economic damages at the rate of 4.96 percent (4.96%) per annum from the date of the September 11, 2001 terrorist attacks through the date that final judgment was entered.  Report of Mag. J. Maas, pp. 13-14; Havlish Order of October 3, 2012, p. 5.

## VIII.  PLAINTIFFS WHO ARE NOT U.S. NATIONALS

All of the Decedent-Plaintiffs in this case are U.S. nationals with the exception of two: Nicholas Rowe, who was a citizen of South Africa, and Hagay Shefi, who was a citizen of Israel. Both Nicholas Rowe and Hagay Shefi were lawful permanent residents of the United States at

---

16  Hoglan Decedent-Plaintiffs and Family Member Plaintiffs losses that result from the crash of Flight 93 near Shanksville, Pennsylvania, include Flight 93 co-pilot Leroy Homer and passengers Mark Bingham and Louis Nacke, and members of their families.  See Nos. 1-14, 93-95, and No. 163.

17  Although no Hoglan Decedent-Plaintiff was killed at the Pentagon on September 11, 2001, eight (8)  Hoglan family member Plaintiffs (Nos. 180-187) base their solatium claims on the death of a Havlish decedent-plaintiff, Marsha Dianah Ratchford, who was killed at the Pentagon on 9/11.  One Hoglan Plaintiff, Tanya Davis (No. 48), spouse of Havlish decedent-plaintiff Wayne T. Davis, was in the Navy and assigned to the Pentagon on September 11, 2001, but she was not present at the Pentagon on that day.  She and her husband lived at Ft. Meade in Maryland; 9/11 decedent Wayne T. Davis was killed in the WTC in New York; thus, Tanya Davis' claim arises out of a loss in New York.

the time of their deaths in New York City on September 11, 2001.  Immediate members of the

Rowe and Shefi families are also Plaintiffs in this case, some of whom are U.S. nationals and

some of whom are citizens of foreign countries.  Those members of the Rowe and Shefi families

who are Plaintiffs in this case that are not U.S. nationals, or are a U.S. national making a claim

on behalf of someone who is not, are as follows:

The Rowe Family

1. Alexander Rowe,[18] a citizen of the United States, as Personal Representative of the Estate of Nicholas Rowe, Deceased, a citizen of South Africa who on September 11, 2001 was a lawful permanent resident of the United States;

2. Alexander Rowe (the same person as above), a citizen of the United States, as Personal Representative of the Estate Judith Rowe, Deceased, the mother of Nicholas Rowe and a citizen of South Africa;

3. Alexander Rowe (the same person as above), a citizen of the United States, as Guardian of Nadine Rowe, sister of Nicholas Rowe and a citizen of South Africa;

4. Paul Rowe, brother of Nicholas Rowe and a citizen of South Africa; and,

5. Rachael Logan, sister of Nicholas Rowe who was a citizen of South Africa on September 11, 2001, but who subsequently obtained U.S. citizenship.

Plaintiffs assert that the Estate of Nicholas Rowe is eligible to recover in this case under

the private cause of action provided by FSIA § 1605A(c) because the claim is made on behalf of

the Estate is by a Personal Representative, Alexander Rowe, who is an American citizen.

Similarly, the claims made by Alexander Rowe on behalf of the Estate of Nicholas Rowe's

deceased mother, and as guardian of the Decedent's disabled sibling, are made by an American

citizen, and, thus, solatium should be awarded under the FSIA's private right of action.  In the

alternative, pass-through claims are asserted for all such family members under Leibovitch v.

Islamic Republic of Iran, 697 F.3d 561 (7th Cir. 2012), as discussed below.

---

18 Alexander Rowe, the father of the Decedent is a United States citizen; he was a plaintiff individually in his own right in Havlish and was awarded solatium damages.

The Shefi Family[19]

1. Sigal Asher Shefi, Individually as the Spouse of, and as Personal Representative on behalf of the Estate of Hagay Shefi, Deceased, a citizen of Israel who on September 11, 2001 was a lawful permanent resident of the United States, who intended U.S. citizenship. Sigal Asher Shefi was a citizen of Israel on 9/11 but soon after September 11, 2001, obtained U.S. citizenship, having been a permanent resident of the U.S. for more than five years. The Decedent, Sigal's husband, Hagay Shefi, had the same status and intended U.S. citizenship, and would have attained U.S. citizenship at the same time that Sigal in fact attained U.S. citizenship;

2. Dov Shefi, father of Hagay Shefi and a citizen of Israel;

3. Esther Shefi, mother of Hagay Shefi and a citizen of Israel;

4. Yishai Shefi, brother of Hagay Shefi and a citizen of Israel;

5. Pazit Shefi Baum, sister of Hagay Shefi and a citizen of Israel.

The fact that a decedent or immediate family member of a decedent is not a U.S. national does not preclude a claim under the FSIA. In Leibovitch v. Islamic Republic of Iran, 697 F.3d 561 (7th Cir. 2012), the Seventh Circuit held that the immediate family members of a terror victim, who were not citizens of the United States, were able to invoke the district court's jurisdiction under the FSIA to present a tort claim against Iran for sponsoring a terror attack that occurred in Israel. Several members of the Leibovitch family were traveling on the Trans-Israel highway when attacked by agents of the Palestinian Islamic Jihad, a terror organization committed to the destruction of Israel that has received significant financial support from Iran. The Leibovitchs' seven-year-old daughter, an Israeli citizen, was killed by gunshots. The family's three-year-old daughter, an American citizen, was seriously wounded but survived.

All members of the Leibovitch family who were attacked that day subsequently brought action against Iran under the state sponsor of terrorism exception to the FSIA. Only the injured

---

[19] Hagay and Sigal Shefi's two children, both Plaintiffs in this case, are natural born citizens of the United States, and thus are clearly entitled to assert a private right of action under FSIA § 1605A(c).

three-year-old daughter was a U.S. national; the remaining family members were Israeli citizens.

The U.S. district court adjudicated the claim of the youngest daughter and awarded both

compensatory damages and solatium for the loss of her sibling. The trial court dismissed all

claims made by the Israeli citizens for lack of subject matter jurisdiction on the basis that the

state sponsor of terrorism exception to the FSIA only confers a private right of action upon U.S.

citizens and U.S. nationals. The family members whose claims were dismissed appealed.

The Seventh Circuit reversed, holding that it "[did] not find evidence to support the

conclusion that Congress intended to foreclose claims by noncitizen family members when it

enacted § 1605A(c)." Leibovitch, supra, 697 F.3d 561 at 571. Although the Seventh Circuit

engaged in a lengthy analysis of the "twelve-year dialogue" between Congress and the courts

over state sponsor of terrorism exception, the court primarily relied on the plain language of the

statute in reaching its holding.

The FSIA contains two provisions regarding subject matter jurisdiction in § 1605A. The

first is found in the portion of the statute that strips the defense of sovereign immunity from

foreign states for claims arising out of their state sponsorship of terror. This provision allows a

court to hear claims in which either "the claimant or the victim" was a national of the United

States at the time of the terrorist attack. 28 U.S.C. § 1605A(a)(2)(A)(ii). The second provision

is found at § 1605(c), which explicitly establishes a private right of action against state sponsors

of terror for U.S. nationals only. 28 U.S.C. § 1605(c)(1). The Seventh Circuit held that that

these two provisions were not coterminous in their jurisdictional scope, as evidenced by the

inclusion of the word "victim" in § 1605A(a)(2)(A)(ii):

> The plain text and meaning of § 1605A(a)(2)(A)(ii) extends jurisdiction to
> cases where either "the claimant or the victim was, at the time of the
> [terrorist] act" a United States citizen. The claimant and the victim need
> not both be American citizens. As a general matter, "we should prefer the

> plain meaning since that approach respects the words of Congress."
> Lamie v. U.S. Tr., 540 U.S. 626, 536, 124 S.Ct. 1023, 157 L.Ed.2d 1024
> (2004).  If Congress intended a jurisdictional scope coterminous with that
> of § 1605A(c)'s private right of action for United States nationals, there
> would have been no need to include the word "victim."  We would show
> little deference to Congress's chosen language if we simply read the word
> "victim" out of the statute entirely.  Denying jurisdiction over family
> members' claims for American victims would require us to ignore the
> disjunctive structure of § 1605A(a)(2)(A)(ii).

Leibovitch, *supra*, 697 F.3d 561, 570 (7th Cir. 2014).

The Seventh Circuit also looked to the legislative history that accompanied the 1996

precursor of § 1605A(a)(2)(A)(ii), formerly codified at 28 U.S.C. § 1605(a)(7)(B)(ii), which

originally required that a court decline to hear a case if "the claimant or the victim was not a

national of the United States … when the act upon which the claim is based occurred."[20]  In

1997, only one year following the addition of the state sponsor of terrorism exception to the

FSIA, Congress slightly modified the language of § 1605(a)(7)(B)(ii) to require a court to

decline jurisdiction if "*neither* the claimant *nor* the victim was a national of the United States …

when the act upon which the claim was based occurred."  Id.  The accompanying House Report

explained that the language of § 1605(a)(7)(B)(ii) was so modified to ensure recovery for foreign

national family members:

> The intent of the drafters was that a family should have the benefit of these
> provisions if either the victim of the act or the survivor that brings the
> claim is an American national.  Due to a drafting error, the current law can
> be read to require that both the victim and the claimant must be American
> nationals before the claimant can use these provisions.

Id., citing 16 H.R. Rep. 105-48 at 2 (1996).

Given the plain language of § 1605A(a)(2)(A)(ii) and the legislative history of its

predecessor provision, § 1605(a)(7)(B)(ii), the Seventh Circuit held that the status of the

---

[20] The state sponsor of terrorism exception to foreign sovereign immunity was originally added
to the FSIA in 1996.  It was subsequently amended in 2008 to its current form.

Leibovitchs' three-year-old American daughter as the victim of a terrorist attack conferred the

benefit of the FSIA's jurisdictional provisions upon her immediate family members, even if

those family members could not make use of the federal private right of action codified at §

1605A(c).  Id.  In such a case, the immediate family members would be permitted to assert a

pass-through claim under state or foreign law to recover damages.  Id.

The Seventh Circuit's interpretation of the statute in Leibovitch was cited favorably by

Judge Lamberth of the U.S. District Court for the District of Columbia, who directed a special

master to hear the claims of four plaintiffs who did not show they were U.S. nationals or U.S.

servicemen or U.S. government contractors –

> because these four plaintiffs base their claims on injuries suffered by
> victims who meet the statute's requirements. See Leibovitch v. Islamic
> Republic of Iran, 697 F.3d 561, 570, 572 (7th Cir. 2012) (interpreting
> section 1605A(a)(2)(A)(ii) as allowing the court to hear intentional
> infliction of emotional distress ("IIED") claims under the FSIA brought by
> foreign family members of terrorism victims on the basis of those victims
> meeting one of section 1605A(a)(2)'s four categories).
>
> ....
>
> Section 1605A allows plaintiffs who are not entitled to pursue subsection
> (c)'s cause of action to use section 1605A as a pass through to causes of
> action arising under other bodies of law.  See Estate of Doe, 808 F. Supp.
> 2d at 20 ("Although § 1605A created a new cause of action, it did not
> displace a claimant's ability to pursue claims under applicable state or
> foreign law upon the waiver of sovereign immunity.").

Worley, et al. v. Islamic Republic of Iran, 75 F. Supp. 3d, 311, 332, n. 6 (D.D.C. 2014).

Under New York law, plaintiffs who are personal representatives of the estate of a

decedent, who sufficiently allege that named defendants caused the death of their represented

decedent, also state a valid claim for wrongful death and survival.  N.Y. Est. Powers & Trusts

Law §§ 5-4.1 (providing claim for wrongful death) and 11-3.2(b) (providing claim for survival).

In re Terrorist Attacks on September 11, 2001, 392 F. Supp. 2d 539, 566 (S.D.N.Y. 2005).  The

Hoglan Plaintiffs have sufficiently alleged that the Iranian Defendants caused the deaths of each represented Decedent in this case through their direct and material support to al Qaeda in carrying out the 9/11 attacks.  Although the Hoglan Plaintiffs did not expressly plead N.Y. Est. Powers & Trusts Law §§ 5-4.1 and 11-3.2(b) in the Second Amended Complaint, the Hoglan Plaintiffs do make a claim for wrongful death and personal injury in ¶¶9 and 416 to 423, and, clearly, invoked FSIA jurisdiction in ¶6.  The Hoglan Plaintiffs thus have met the simplified notice pleading standard embodied in Rule 8(a)(2), Fed. R. Civ. P., which requires only "a short and plain statement of the claim showing that the pleader is entitled to relief."  Id. at 564.[21]

Therefore, by applying the Seventh Circuit precedent in Leibovitch, the Personal Representatives of both the Estate of Nicholas Rowe and the Estate of Hagay Shefi are able to assert a pass-through claim under the FSIA via New York tort law, and both Estates are entitled to damages for the murder of these two Decedents on 9/11.

In the alternative, Plaintiffs submit that the claims of Hagay and/or Sigal Shefi should be regarded as claims of U.S. nationals under 28 U.S.C. § 1605A.  Although neither were U.S. citizens on September 11, 2001, both intended to become naturalized U.S. citizens as soon as they were eligible after a five-year period of permanent resident status, which, as of September 11, 2001, was less than a year away.  They had begun the process of applying for citizenship by retaining immigration counsel.  Indeed, Sigal Shefi did become a naturalized U.S. citizen within a year as a result of actions that 9/11 decedent Hagay Shefi had already set in motion.  Thus,

---

[21] Had the Iranian Defendants accepted service of the Second Amended Complaint in this matter, there is no doubt that the Iranian Defendants would have been placed on notice that claims for wrongful death and personal injury were being asserted by the Personal Representatives of the Estate of Nicholas Rowe and Estate of Hagay Shefi, and their immediate family members.  Further, had the Iranian Defendants answered the Second Amended Complaint, the operation of any number of procedural mechanisms during the course of litigation would have resulted in a clarification, probably via an amendment.

both Hagay and Sigal Shefi demonstrably were in the process of pledging their allegiance to the United States.[22]

It is recognized that § 1605A requires U.S. national status as of the date of the terrorist act.  "The term 'U.S. national' embraces both United States citizens and non-citizens who owe permanent allegiance to the United States.  8 U.S.C. § 1101(a)(22) (2006)."[23]  Peterson, et al. v. Iran, 515 F. Supp. 2d 25, 39, n.4.  In at least two cases, federal courts have accepted demonstrations of permanent allegiance to the United States as qualifications for standing to sue as a U.S. national under the FSIA.  First, in Peterson, supra, the court accepted as qualifying evidence of allegiance to the United States, thereby conferring the plaintiff U.S. national status under the FSIA, a foreign-born plaintiff's enlistment in the U.S. Army, his oath taken after enlistment, and his subsequent service in the Army, during which he died in a terrorist attack:

> His oath, and ultimate heroic act of dying while a member of the United States Army establishes beyond any doubt that Diomedes J. Quirante's allegiance to the United States was permanent.  Therefore, this Court finds that Diomedes J. Quirante was a United States national at the time he was killed.  Accordingly, Diomedes has standing under the FSIA to recover against the defendants.

Id.

---

[22] Sigal Shefi is in the process of obtaining copies of the naturalized citizenship application materials from their immigration counsel, and these will be submitted in a supplemental filing as soon as they are available, along with a declaration of Sigal Shefi, in order to support all assertions herein.  Due to the passage of time, the file has apparently been archived, or, perhaps, destroyed.  Counsel will keep the Court apprised of these efforts.  If found, the citizenship applications and all relevant materials will be filed, with additional advocacy, as necessary and appropriate.

[23] "The term 'national of the United States' means (A) a citizen of the United States, or (B) a person who, though not a citizen of the United States, owes permanent allegiance to the United States.'  8 U.S.C. § 1102(a)(22).  See also 8 U.S.C. § 1436 ("Nationals but not citizens" .... "A person not a citizen who owes permanent allegiance to the United States, and who is otherwise qualified, may, if he becomes a resident of any State, be naturalized upon compliance with the applicable requirements of this subchapter....").

In the second case, <u>Asemani v. Islamic Republic of Iran</u>, 266 F. Supp. 2d 24 (D.D.C. 2003), the court found that the plaintiff was a U.S. national for purposes of standing to sue under the FSIA on grounds very similar to those urged here – that the plaintiff, by commencing proceedings to obtain naturalized citizenship, albeit citizenship not having yet been obtained, had demonstrated allegiance to the United States and therefore would be considered a "U.S. national" under the FSIA.  "As the Court of Appeals for the Fourth Circuit said in *Morin,* an application for citizenship is 'the most compelling evidence of permanent allegiance to the United States short of citizenship itself.'  <u>See</u> 80 F.3d at 126; <u>see also</u>, <u>Shekoyan v. Sibley Int'l Corp.</u>, 217 F. Supp. 2d 59 (D.D.C. 2002)."  <u>See</u> <u>United States v. Morin</u>, 80 F.3d 124, 126 (4th Cir. 1996).

Thus, upon these precedents, where allegiance to the United States as of September 11, 2001, can be demonstrated by plaintiffs who had already retained immigration counsel to apply for citizenship immediately upon completion of the five-year waiting period, and where U.S. citizenship was in fact obtained by the surviving spouse within a year after the terrorist act, and where the couple already had two natural born U.S. citizen children (providing clear motivation, along with the family's U.S. residence, employment, and other indicia of setting down roots in the U.S.), such intending citizens should be regarded as "U.S. nationals" for the purpose of standing to bring an action pursuant to § 1605A.  Thus, the cases of Hagay and Sigal Shefi warrant an interpretation of the term "U.S. national," as used in 28 U.S.C. § 1605A(a)(2)(A)(ii) and § 1605A(c), to include a plaintiff who is able to demonstrate allegiance to the United States as of the date of the terrorist act in such a manner by the factors cited herein, as was done in

Asemani and, albeit on a different basis, in Peterson.[24]  As footnoted above, Plaintiff Sigal Shefi

will supplement the record with any pertinent naturalization evidence that can be obtained.

Finally, and again in the alternative, non-citizen Plaintiffs in this case may rely on the

non-commercial tort exception to assert a claim for damages as a result of the murder of their

loved ones on 9/11.[25]  The non-commercial tort exception to the FSIA states that:

> (a) A foreign state shall not be immune from the jurisdiction of courts of
> the United States or of the States in any case -
>
> . . .
>
> (5) not otherwise encompassed in [the commercial activity exception to
> foreign sovereign immunity] above in which money damages are sought
> against a foreign state for personal injury or death, or damage to or loss of
> property, occurring in the United States and caused by the tortious act or
> omission of that foreign state or of any official or employee of that foreign
> state while acting within the scope of his office or employment; except
> this paragraph shall not apply to -
>
> (A) any claim based upon the exercise or performance or the failure to
> exercise or perform a discretionary function regardless of whether the
> discretion be abused, or
>
> (B) any claim arising out of malicious prosecution, abuse of process, libel,
> slander, misrepresentation, deceit, or interference with contract rights.

28 U.S.C. § 1605(a)(5)(A)-(B).

---

[24] Such an interpretation of the term "U.S. national" for purposes of 28 U.S.C. §
1605A(a)(2)(A)(ii) and § 1605A(c), as applied to Hagay Shefi, would operate to qualify all
members of the Shefi family who are plaintiffs in this case for solatium awards because Hagay
Shefi would then be a "victim" within the meaning of § 1605A(a)(2)(A)(ii).  If the Court were to
determine that the intending citizen actually must have become a U.S. citizen within a short
period of time after the terrorist act, then, of course, Hagay would not be a "victim" within the
meaning of the statute, yet Sigal Shefi would still qualify as a "claimant" under that section.

[25] Counsel is aware of the various Second Circuit rulings related to the non-commercial tort
exception, and the ruling of this Court with regard to this exception made on September 29,
2015.  Because that ruling of this Court is currently on appeal to the Second Circuit, the Hoglan
Plaintiffs assert the availability of the non-commercial tort exception in order to preserve their
claims in the event that a decision is rendered in favor of the appellants in those cases by the
Second Circuit or the Supreme Court of the United States.

Unlike the private right of action codified at § 1605A(c), the plain language of the non-commercial tort exception does not require United States citizenship as a jurisdictional prerequisite to asserting a claim.  In Doe v. bin Laden, 663 F.3d 64 (2d Cir. 2011), a claim on behalf of a victim of the 9/11 attacks was made against the Islamic Emirate of Afghanistan ("Afghanistan"), which entered an appearance in the action.  Afghanistan argued that the non-commercial tort exception was not a viable cause of action because plaintiff Doe's sole relief was to be found in the state sponsor of terrorism exception to sovereign immunity.  The Second Circuit disagreed, holding that:

> Afghanistan's proposed narrow reading of the noncommercial tort exception would not so much be a reading of the statute as it would be a decision that the terrorism exception amounts to a partial repeal by implication of the noncommercial tort exception.  Prior to the terrorism exception's enactment, several courts had allowed suits against foreign governments under the noncommercial tort exception for tortious—and arguably "terrorist" - acts occurring in the United States.  For example, in Liu v. Republic of China, 892 F.2d 1419, 1425 (9th Cir. 1989), the Ninth Circuit allowed the widow of a man killed by Taiwanese intelligence forces in California to maintain a wrongful death action against the Taiwanese government.  Similarly, in Letelier v. Republic of Chile, 488 F.Supp. 665, 674 (D.D.C. 1980), the district court permitted a wrongful death suit against the Chilean government for its alleged role in a car bombing in the District of Columbia.  Under the narrow reading of the noncommercial tort exception urged by Afghanistan, both these cases would now be barred (unless Taiwan and Chile were designated state sponsors of terrorism) because the alleged acts constitute extrajudicial killings, i.e., acts specifically listed in the terrorism exception.  Were the narrow reading correct, the enactment of the terrorism exception would therefore have constituted a repudiation of the then-prevailing interpretation of the noncommercial tort exception.

Doe v. bin Laden, 663 F.3d 64, 68-69 (2d Cir. 2011).

Plaintiffs here have asserted causes of action against the world's foremost state sponsor of terrorism as a result of extrajudicial killings that occurred here in the United States.  Two of the Decedents and several of their immediate family members are arguably barred from asserting

the private cause of action under § 1605A(c) because of their status as citizens of foreign nations. The non-commercial tort exception serves to place these claimants who are not United States citizens on equal footing with those who are United States citizens and therefore eligible to pursue claims under § 1605A(c).  The non-citizen victims of the 9/11 attacks suffered no less a loss than their U.S. citizen counterparts.  There injuries should be compensable under the plain language of the non-commercial tort exception found at § 1605(a)(5).

Plaintiffs submit that the damages to be awarded to the non-citizen Plaintiffs should be measured in the same manner as those of the citizen Plaintiffs, including the award of punitive damages which are available under New York state tort law.  In New York, punitive damages are available in actions in which a defendant is "morally culpable, or is actuated by evil and reprehensible motives."  Seynaeve v. Hudson Moving & Storage, Inc., 261 A.D.2d 168, 169 (1st Dept. 1999) (quoting Walker v. Sheldon, 10 N.Y.2d 401, 404 (1961)).  The purpose of such punitive damages is "not only to punish the defendant, but to deter [it], as well as others who might otherwise be so prompted, from indulging in similar conduct in the future."  Id.  There could not be a more appropriate case for the imposition of punitive damages than the conduct of the Iranian Defendants here.

## IX.  CONCLUSION

Plaintiffs have prepared this Damages Inquest submission, including hundreds of family member declarations, numerous family documents, a summary of family member declarations that also assigns the Hoglan Plaintiffs to three categories in order to reflect candidly the salient factual aspects of their relationships to a 9/11 Decedent, analyses by two expert witnesses (one regarding the physiological and psychological bases for Decedents' pain and suffering awards; the other being individual certified estate economic damages data and calculations), the instant

thorough brief addressing the facts and legal points and authorities, and a spreadsheet, all to facilitate the Court's consideration of awards.  Plaintiffs have thus endeavored to create a full and robust record in this case, as Plaintiffs did in the related <u>Havlish</u> case, to support all findings, conclusions, and awards.  Should the Court require any additional facts, argument, evidence, or authorities in order to reach its just conclusions and awards in this case, Plaintiffs' counsel stands ready to respond to any such request.

For the reasons set forth above, the Plaintiffs request damages be awarded to the 9/11 Decedents' Estates for economic losses and for the Decedents' pain and suffering, and to the Family Member Plaintiffs for solatium, and for punitive damages to be awarded to all Plaintiffs, against all of the Defendants, jointly and severally, as set forth hereinabove and in the exhibits filed herewith.  The Plaintiffs further request that prejudgment interest on their non-economic compensatory damages for pain and suffering and solatium be awarded at the rate of 9 percent (9%) from September 11, 2001, for Plaintiffs whose injuries arose in New York and, alternatively, and for all other Plaintiffs, at the rate of 4.96 percent (4.96%) per annum, compounded annually, from September 11, 2001, through the date that judgment is entered.  A bill of costs will be submitted separately.

<div style="margin-left: 45%">

Respectfully submitted,

</div>

Date: January 11, 2016

<div style="margin-left: 45%">

/s/ Timothy B. Fleming_____
Timothy B. Fleming (DC Bar No. 351114)
WIGGINS CHILDS PANTAZIS
FISHER GOLDFARB PLLC
1850 M Street, NW, Suite 720
Washington, DC  20036
(202) 467-4489

Dennis G. Pantazis (AL Bar No. ASB-2216-A59D)
Melina Goldfarb (AL Bar No. ASB- 3739-R71M)
WIGGINS CHILDS PANTAZIS

</div>

FISHER GOLDFARB LLC
The Kress Building
301 19th Street North
Birmingham, AL  35203
(205) 314-0500

Richard D. Hailey (IN Bar No. 7375-49)
Mary Beth Ramey (IN Bar No. 5876-49)
RAMEY & HAILEY
9333 North Meridian Street, Suite 105
Indianapolis, IN  46260
(317) 582-0000

Robert M. Foote (IL Bar No. 03124325)
Craig S. Meilke (IL Bar No. 03127485)
FOOTE, MIELKE, CHAVEZ
 & O'NEIL, LLC
10 West State Street, Suite 200
Geneva, IL  60134
(630) 232-7450

*Attorneys for the* Hoglan *Plaintiffs*