# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

IN RE: TERRORIST ATTACKS ON      :
SEPTEMBER 11, 2001      :     **MDL 03-1570 (GBD)(FM)**

**This Document Relates To:**
***Havlish, et al. v. bin Laden, et al.,* Case No. 03-CV-09848**
***Federal Insurance Co., et al. v. al Qaida, et al.,* Case No. 03-CV-06978**
***Ashton et al. v. al Qaeda Islamic Army, et al.*, Case No. 02-CV-06977**
***Estate of John P. O'Neill, Sr., et al. v. Republic of Iraq, et al.*, Case No. 04-CV-1076**

## MEMORANDUM OF LAW IN SUPPORT OF THE *HAVLISH* PLAINTIFFS' MOTION FOR AN ORDER CREATING A COMMON BENEFIT FUND TO COMPENSATE AND REIMBURSE *HAVLISH* ATTORNEYS FOR SERVICES PERFORMED AND EXPENSES INCURRED IN DEVELOPING AND PRESENTING EVIDENCE ESTABLISHING LIABILITY AND DAMAGES AGAINST DEFENDANT THE ISLAMIC REPUBLIC OF IRAN

## I.    SUMMARY OF THE RELIEF REQUESTED

This Court recently granted motions for entry of default judgment against the Islamic

Republic of Iran, certain of political subdivisions and agencies and instrumentalities (collectively

referred to as "Iran") in three separate actions: *Federal Insurance Co., et al. v. al Qaida, et al.,*

Case No. 03-CV-06978, *Ashton, et al. v. al Qaeda Islamic Army, et al.*, Case No. 02-CV-06977,

and *Estate of John P. O'Neill, Sr., et al. v. Republic of Iraq, et al.*, Case No. 04-CV-1076

(hereinafter referred to collectively as the "Free Rider Actions"[1]).  As the basis for their

---

[1]  The term "free rider" is used here in a manner consistent with its usage in economic literature and case law.  In economics, the term "free rider" refers to a situation that occurs when those who benefit from resources, goods or services do not pay for them.  The "free rider problem" deals with the question of how to limit free riding and its negative effects.  *See,* Baumol, William, WELFARE ECONOMICS AND THE THEORY OF THE STATE, Harvard University Press (1952).  In the relevant case law, courts often acknowledge that the common benefit doctrine is designed to address this issue in the context of litigation.  *See, e.g., In re Zyprexa Products Liability Litigation*, 594 F 3d 113, 129-130 (2d Cir. 2010; Kaplan, L. concurring)(observing that the common fund doctrine was designed to remedy the "free-rider problem" in class action

judgments, plaintiffs in each of the Free Rider Actions used, and exclusively relied on, evidence developed and presented in *Havlish v. bin Laden, et al.*, Case No. 03-CV-09848.  The *Havlish* evidence is the product of tens of thousands of attorney hours and the investment of $2 million in costs and expenses borne solely by the *Havlish* attorneys.  The plaintiffs and attorneys in the Free Rider Actions are now poised to reap the benefit of that evidence, having contributed nothing to its development and presentation.

For well over one hundred years, the United States Supreme Court has recognized the inherent equitable power of federal courts to correct this type of injustice, especially in the context of an MDL proceeding, and the federal courts in all circuits routinely do so.  Through this motion, the *Havlish* Plaintiffs ask this Court to exercise that equitable power here.  In particular, the *Havlish* Plaintiffs seek an order (1) requiring the Free Rider Actions plaintiffs to set aside eight percent (8%) of any judgment collected from Iran by any means; (2) directing counsel in the Free Rider Actions to deposit assessed amounts into a common benefit escrow account to be established and maintained by lead counsel for the *Havlish* Plaintiffs; and (3) directing the distribution of the common benefit escrow account to the *Havlish* attorneys as reimbursement of costs associated with, and compensation for, the benefit bestowed upon plaintiffs in the Free Rider Actions.  In support of their motion, the *Havlish* Plaintiffs state the following:

---

litigation and the same equitable considerations arise in MDL settings that warrant payment of counsel out of common funds generated by their efforts).  It is not *Havlish* plaintiffs' counsel's term, nor is it used to connote anything other than what is meant in the fields of economics and law.

## II.    FACTUAL BACKGROUND

### A.    THE *HAVLISH* PLAINTIFFS' DEVELOPMENT AND PRESENTATION OF EVIDENCE ESTABLISHING THE LIABILITY OF THE ISLAMIC REPUBLIC OF IRAN

On December 9, 2003, the Judicial Panel on Mutidistrict Litigation transferred to this Court all lawsuits brought by plaintiffs seeking "to hold liable an array of defendants who allegedly promoted, financed, sponsored, or otherwise supported the acts of terrorists that led to the deaths and injuries arising from the September 11, 2001 attacks on the United States." *See* 03-md-1570, Doc. No. 1, Conditional MDL Transfer Order.  In five of the actions consolidated pursuant to that Order, plaintiffs have asserted claims against the Islamic Republic of Iran.[2]

The claims asserted in the *Havlish* action are more focused and narrowly tailored than the claims asserted in the Free Rider Actions.  While the pleadings in all of these actions include common defendants Osama bin Laden, al Qaeda, and the 9/11 hijackers, the defendants being pursued in the Free Rider Actions are primarily businesses, charities, commercial organizations, and individuals located in the United States, Saudi Arabia, and other parts of the Middle East. As clearly demonstrated by the court dockets, the plaintiffs in the Free Rider Actions have devoted their efforts and resources almost exclusively to pursuing claims against those non-sovereign state defendants.

By contrast, the *Havlish* action did not name the myriad defendants pursued by the Free

---

[2] Through this motion, the *Havlish* Plaintiffs seek an order requiring plaintiffs in three pending actions – *Ashton*, *Federal Insurance,* and *O'Neill* - to compensate and reimburse the *Havlish* attorneys for their expertise, effort, and investment in developing and presenting evidence that led to judgments for plaintiffs in those Free Rider Actions.  Plaintiffs in a fourth pending action – *Hoglan, et al. v. Islamic Republic of Iran, et al*., case no. 11-cv-07550 (GBD(FM) – also seek a judgment against Iran through use of the evidence presented in *Havlish*.  However, plaintiffs in *Hoglan* and *Havlish* are represented by common attorneys (with a couple of exceptions) and the *Hoglan* plaintiffs have agreed contractually to compensate the *Havlish* attorneys in a manner similar to the common benefit fund mechanism that the *Havlish* Plaintiffs seek here.  For that reason, the *Havlish* Plaintiffs have not included *Hoglan* among the Free Rider Actions.

Riders.  Rather, defendants named in the *Havlish* action consist primarily of foreign sovereigns, their political subdivisions, and their agencies and instrumentalities.  An initial investigation into the factual background of the events of 9/11 led the *Havlish* attorneys to believe that the sovereign state primarily responsible for providing direct and material support to the 9/11 hijackers was the Islamic Republic of Iran.  Thereafter, the *Havlish* Plaintiffs focused their efforts almost exclusively on establishing liability against Iran.

Over a ten-year period, the *Havlish* legal team invested tens of thousands of hours of attorney time and underwrote nearly $2 million in costs and expenses in pursuit of evidence against Iran.  *See Havlish* Docket 03-9848, Doc. No. 301, at Ex. M, Affidavit of Thomas E. Mellon, Jr., Regarding Attorney Expenses.  Among other things, *Havlish* attorneys identified, located and interviewed or consulted with dozens of expert and fact witnesses, in the United States, Canada, Europe, and the Middle East.  Those witnesses included a number of defectors from the Iranian military, the Islamic Iran's Revolutionary Guards Corps, and intelligence apparatus, as well as other persons connected with terrorist organizations, counter-terrorism agencies and organizations, domestic federal and international law enforcement, the militaries of several countries, and other individuals knowledgeable about terrorist financing, travel, planning, training, and/or communications.  *Havlish* counsel conducted extensive research, including a review of innumerable books, treatises, and government reports in order to develop familiarity with, and in fact gain some level of expertise in new areas of law, as well as language, geography, history, religion, culture, even weaponry and explosives.  Some of the work was risky, and even dangerous, other parts simply uncharted, complex, or arduous.  *See also* additional detail, *infra*.

In the early stages of this litigation, this Court appointed counsel in two of the Free Rider

Actions, *Ashton* and *Federal Insurance*, as Chairs of the Plaintiffs' Executive Committee

("PEC").  *See* Doc. No. 248, Case Management Order No. 3.  While the *Havlish* attorneys

devoted all of their efforts to discovering and presenting evidence of Iran's liability to this Court,

the PEC considered the development of such evidence to be of little consequence in the broader

MDL.  Indeed, in 2010, lead counsel in *Ashton* openly declared that the Plaintiffs' Executive

Committee "vigorously opposed" the *Havlish* Plaintiffs' presentation of evidence against Iran in

this Court, referring to the *Havlish* effort as "the hair on the tail of the dog doing something that

we think could kill the dog."  *See* Ex. 1, filed herewith, Transcript of Conference held April 15,

2010, at pp. 16-18 (*highlighted*).

In the face of opposition from the PEC, the *Havlish* Plaintiffs made every effort to ensure

that its anticipated judgment against Iran was appropriate both factually and procedurally.  In

their original pleadings, the *Havlish* Plaintiffs asserted claims against Iran pursuant to

§1605(a)(7) of the Foreign Sovereign Immunities Act (the "FSIA"), 28 U.S.C. §1602, *et seq.*, as

well as a number of state and federal common law and statutory claims.  In August 2008, the

*Havlish* Plaintiffs filed a motion for default judgment against Iran.  *See Havlish* Docket 03-9848,

Doc. No. 233.  Around the same time, Congress repealed the FSIA's §1605(a)(7) and replaced it

with §1605A, which created a federal private right of action against foreign state sponsors of

terrorism.  The *Havlish* Plaintiffs thereupon filed a motion for leave to amend their Complaint in

order to proceed under the new statutory scheme.  The *Havlish* motion set out the background

and substance of the new law and the basis for its retroactive application.  *Id.*, Doc. No. 250.

This Court granted that motion on June 17, 2010.  *Id.*, Doc. No. 262.

Having ensured the proper procedural framework, the *Havlish* Plaintiffs proceeded to file

its proof on liability in the form of three separate legal memoranda, a lengthy appendix, and 85

exhibits.  *Id*. at Doc. Nos. 270, 273-276, 280, 283.  Four of these eighty-five (85) exhibits comprised, collectively, approximately thirty (30) hours of sworn videotaped testimony taken overseas by *Havlish* counsel, each containing scores of additional exhibits.  Due to the highly sensitive nature of some of the presented material, the Court granted the *Havlish* Plaintiffs' motion to file three of the witnesses' testimony, the accompanying exhibits, and several affidavits, under seal, as well as the lengthy legal memorandum discussing that evidence.  *Id*. at Doc. Nos. 278-280.

Also constituting a substantial portion of the *Havlish* evidence were sworn affidavits, with exhibits, totaling approximately 1,000 pages, by ten experts in the fields of terrorism, intelligence, criminal investigation, and the structural aspects of the state, the government, and the agencies and instrumentalities of the Islamic Republic of Iran.  These ten experts included three senior staff members of the 9/11 Commission, three former CIA operatives or analysts, the most esteemed American expert on Iran's government and economics, France's preeminent terrorism prosecutor, the top terrorism and military intelligence investigative journalist in Israel, and the former top U.S. official of Interpol.  Another witness was an authoritative American terrorism investigative journalist who worked hundreds of hours with *Havlish* counsel throughout the investigation, domestically and overseas; he submitted two affidavits, one of them sealed, pertaining to the *Havlish* investigation.  Most of these experts appended additional exhibits and attachments to their affidavits.  All of these experts were retained, vetted, and presented by *Havlish* Plaintiffs' counsel.

Further, *Havlish* counsel interviewed and consulted with scores of other experts, witnesses, and current and former government officials in the U.S., Europe, and the Middle East. One *Havlish* attorney made fourteen (14) separate trips overseas during the investigation, some

of those with the aforementioned American investigator; another *Havlish* attorney made four trips abroad in connection with the investigation and the testimony, as well as consulting with experts; other *Havlish* attorneys also traveled internationally and all of them, on innumerable occasions, travelled extensively within and across the United States.  The leader of the *Havlish* consortium of attorneys, Thomas E. Mellon, Jr., worked valiantly on the case for more than a decade while being treated for advanced cancer; indeed, he continued to work on the case and lead the *Havlish* consortium until the day he died, on January 15, 2013.

Subsequent to the filing of the evidence, *Havlish* counsel requested an opportunity to present the evidence in open court.  Subsequently, at a hearing on July 13, 2011, the co-chairman of the PEC argued to this Court that such a hearing should not be afforded to the *Havlish* Plaintiffs because it would, somehow, interfere with some vague notion of diplomatic negotiations emanating from the birth of the state of South Sudan, which would then "start a cascade of resolutions with other defendants over time."

> 13       I want to comment on the Havlish motion that your
> 14   Honor addressed.  We are very concerned with timing.  If a
> 15   hearing occurs at the wrong time, it will or it could derail
> 16   resolution with Sudan. . . . . .
> . . . .
> 23   . . . .  But we have a well-thought-out strategy for the
> 24   thousands of death cases, the thousands of injury cases, and
> 25   the property damage, and we are very concerned with the timing.
>  1   If a hearing there occurs at the wrong moment, it could kill
>  2   the process with Sudan. . . . .

*See* Ex. 2, filed herewith, Transcript of Conference held July 13, 2011, at pp. 10-11 (*highlighted*).[3]  This Court nevertheless granted a hearing over the objections of the Plaintiffs'

---

[3] Notably, the *Havlish* Plaintiffs did not pursue a judgment against Sudan, or South Sudan, and there is not a scintilla of evidence offered to the Court or in available open source information that any such diplomatic negotiations regarding these liability cases were affected in the slightest by the *Havlish* hearing, or, indeed, that they ever occurred.

Executive Committee.

At the evidentiary hearing on December 15, 2011, the *Havlish* Attorneys made an in-depth presentation of the public evidence, and some of the sealed evidence, in open court. Based upon that evidence, this Court adopted and entered fifty-three (53) pages of detailed Findings of Fact and Conclusions of Law proposed by the *Havlish* attorneys. *Id.*, at Doc. No. 294. The Court entered a liability judgment against Iran in favor of the *Havlish* Plaintiffs on December 22, 2011. *Id.* at Doc. No. 295.

Shortly thereafter, the *Havlish* Plaintiffs submitted voluminous damages evidence that included not only evidence from the *Havlish* Plaintiffs themselves, but also from two experts. The first was an expert in economic analysis of lost earnings; the other was retired Rear Admiral Alberto Diaz, Jr., M.D., of the United States Navy who was, *inter alia*, Chief of Staff for the Navy's Bureau of Medicine and Surgery. Dr. Diaz attested to the overwhelming physical, psychological, and neurophysiological aspects of the horrific deaths of the 9/11 victims. In significant part, the expert testimony of Admiral Diaz underpinned the pain-and-suffering awards of $2 million for each decedent that ultimately comprised a portion of the *Havlish* judgment. In his July 30, 2012, Report and Recommendation on Damages, Magistrate Judge Frank Maas relied specifically upon Dr. Diaz' report regarding his "chilling account of the horrific conditions" encountered by each of the 9/11 decedents and their "unimaginable pain and suffering on September 11, 2001," as well as case law cited in the *Havlish* Plaintiffs' damages inquest memorandum, recommending that this Court award $2 million in pain-and-suffering damages to each decedent estate. *Id.*, at Doc. 314, p. 8. This Court adopted Magistrate Judge Maas' Report and Recommendation in its entirety, also citing Plaintiffs' expert report by Dr. Diaz, and awarded $2 million for each decedent's pain and suffering. *Id.*, at Doc. 316, p. 3.

Finally, this Court awarded punitive damages at a ratio of 3:44 to 1, adopting Judge Maas' recommendation based upon case law cited in the *Havlish* Plaintiffs' damages inquest brief. *Id.* at Doc. 314, pp. 12-13, and at Doc. 316, p. 5.

This Court entered final judgment in *Havlish* on October 12, 2012. *Id.* at Doc. 317.

### B.    THE USE OF THE *HAVLISH* EVIDENCE IN THE FREE RIDER ACTIONS

On the same day this Court entered judgment against Iran in *Havlish*, plaintiffs in the Free Rider Actions took the required initial step in obtaining default judgments by filing a request for a Clerk's Certificate of Default against Iran. *See Ashton*, Docket 02-06977, Doc. No. 651. Two and a half years later, the Free Rider Plaintiffs filed motions for leave to file amended complaints in order to proceed under §1605A of the FSIA. These were classic "me too" motions wherein the Free Rider Plaintiffs relied almost exclusively on the legal analysis, reasoning, and result obtained by the *Havlish* attorneys in their 2008 filing. *See* Docket 03-1570, Doc. Nos. 2968 (joint motion of *Federal Insurance* and *Ashton* plaintiffs), and 2922 (motion of the *O'Neill* plaintiffs).

At the same time, the Free Rider Plaintiffs filed motions for entry of default judgments against Iran. *Id.*, at Docs. Nos. 2969, 2970, 2994-2995, 3000. The Free Rider Plaintiffs cited the *Havlish* liability evidence, and the Findings of Fact and Conclusions of Law resulting from them, thoroughly and repeatedly, and cited virtually nothing else (except one expert's testimony, also from another case), while contributing no new evidence themselves. Doc. Nos. 2970, *passim*; *see also O'Neill*, Doc. No. 3000.[4]

---

[4] The *Ashton* and *Federal Insurance* plaintiffs' memorandum acknowledged that it did not offer any new or different evidence and relied entirely on the *Havlish* evidentiary record and findings, stating: "Although additional materials could be offered to augment that record, the Court's holdings in *Havlish* render any such supplementation unnecessary. . . . . " The *Ashton* and *Federal Insurance* plaintiffs then asked for default judgment to be entered on the basis of the

The Court, correctly assessing that the Free Rider's motions for default judgment were entirely derivative of *Havlish*, ordered all to file revised proposed forms of default judgment that "track the language and format of the Order of Judgment issued in *Havlish, et al. v. bin Laden, et al.,* 1:03-cv-09848 (GBD), such that all proposed orders are uniform but for any substantive differences (*e.g.*, the individual defendants at issue)." Doc. No. 3004. The Court granted those refiled motions. Doc. Nos. 3020-3022.

In their damages submissions, the Free Rider *Ashton* plaintiffs again utilized the evidence and findings from *Havlish* to support their requests for damages awards. Indeed, the *Ashton* plaintiffs predicated their compensatory and punitive damages entirely upon the *Havlish* compensatory and punitive damages awards and the testimony of the *Havlish* Plaintiffs' pain-and-suffering expert, Admiral Diaz, in support of their request for $2 million compensatory damages awards, and punitive damages set at a ratio of 3:44 to 1 for each *Ashton* estate plaintiff. *Ashton*, Doc. No. 3123, *passim*, (and, as to Admiral Diaz specifically: "Despite this challenge, the magistrate judge found that while "the specifics of each decedent's demise remain largely unknown," the expert report of a retired Navy Rear Admiral established "that many, if not all, of the decedents in this case experienced unimaginable pain and suffering on September 11, 2001.'" *Id.*, p. 7.)[5]

---

[*Havlish*] evidence the Court previously received and analyzed . . . ." Doc. 2970 at p. 21.

[5] The *Ashton* plaintiffs requested:

> that in light of the Court's recent Order of Default Judgment on Liability against Iran in their behalf, and on the basis of the facts detailed in the damages submissions provided by the *Havlish* plaintiffs in connection with the Damages Decision and the Damages Judgment in that matter, this Court grant the *Ashton* plaintiffs compensatory damages of $2,000,000 for the conscious pain and suffering experienced by each of their decedents and a punitive damages award at the rate of 3.44 times the compensatory damages award (as it did in the *Havlish* cases) ....

*Id*. at p. 2.

On December 28, 2015, Magistrate Judge Maas issued a Report and Recommendation regarding the *Ashton* and *Federal Insurance* plaintiffs' damages.  Regarding *Ashton*, he recommended pain-and-suffering damages of $2 million per decedent estate, and punitive damages at the ratio of 3:44 to 1, both the same as in *Havlish*, citing the *Havlish* evidence and awards upon which *Ashton* had relied.  Doc. No. 3175, at pp. 2-3.  On March 9, 2016, this Court adopted the Report and Recommendation in its entirety, and awarded default judgments in those amounts.  Doc. No. 3229.

So far, the judgments entered against Iran and in favor of the Free Rider Plaintiffs exceed $10 billion.  *Id.* at Doc. Nos. 3226, 3229, 3233.[6]

## III.   ARGUMENT

### A.   THIS COURT HAS INHERENT EQUITABLE AUTHORITY TO CREATE THE COMMON BENEFIT FUND REQUESTED HERE BY THE *HAVLISH* PLAINTIFFS

In U.S. courts, the question of attorney fees is generally governed by the "American Rule" under which each party is responsible for the attorney fees charged by its retained counsel and is not responsible for attorney fees of any other counsel.  *See Alyeska Pipeline Serv. Co. v. Wilderness Society*, 421 U.S. 240, 264-65 (1975).  However, there are a number of exceptions to the American Rule, one of which is the "common fund" or "common benefit" doctrine.  Under the common benefit doctrine, attorneys who provide a substantial benefit to a successful class or group of plaintiffs are entitled to fees for the work performed and expenses incurred in delivering that benefit.  *See In re Vioxx Products Liability Litigation*, 760 F.Supp.2d 640, 647 (E.D. La.

---

[6]  Damage determinations of the *O'Neill* plaintiffs and the *Ashton* personal injury plaintiffs (*i.e.*, those injured but not killed on 9/11) remain pending.  Should judgments be entered in favor of those plaintiffs, the Havlish Plaintiffs would move for the same relief to be extended with respect to those judgments on the same grounds as set forth herein.  Indeed, the *Ashton* personal injury plaintiffs also seek identical $2 million compensatory damages and 3:44 ratio punitive damages awards, predicated almost entirely on the *Havlish* Report and Recommendation and the *Havlish* evidence.  *See Ashton* Motion for Partial Summary Judgment, Doc. No. 3191, pp. 2-4.

2010); *see generally* Hon. Eldon E. Fallon, *Common Benefit Fees in Multidistrict Litigation*, 74 La. Law Rev. (2014).

Three of the earliest common benefit cases – *Trustees v. Greenough*, 105 U.S. 527 (1881), *Central Railroad & Banking Co. v. Pettus*, 113 U.S. 116 (1885), and *Sprague v. Ticonoc Nat. Bank*, 307 U.S. 161 (1939) – are instructive on the scope of a court's equitable authority to grant the relief sought here by the *Havlish* Plaintiffs.  The seeds for what is now recognized as the common benefit doctrine were planted in *Greenough*, a case where one Francis Vose, a large holder of railroad bonds, filed suit to preserve certain assets of a trust fund that served as security for his bonds.  After a decade of litigation, Vose's lawsuit resulted in the restoration of substantial fund assets, the appointment of a receiver to manage the trust, and the recovery of money and dividends to the bondholders.  *Greenough*, 105 U.S. at 529.

Vose bore the entire cost of the litigation that had bestowed benefits on all bondholders. He therefore petitioned the court for reimbursement of his costs from the trust fund.  The court granted the requested relief and ordered reimbursement from the fund.  The Supreme Court found that order to be appropriate based on principles of equity:

> [denial of Vose's reimbursement request] would not only be unjust to him, but it would give to the other parties entitled to participate in the benefits of the fund an unfair advantage.  He has worked for them as well as for himself; and if he cannot be reimbursed out of the fund itself, they ought to contribute their due proportion of the expenses which he has fairly incurred.  To make them a charge upon the fund is the most equitable way of securing such contribution.

*Id*. at 532.

Thus, the Court in *Greenough* determined that, where a party litigant has incurred costs that resulted in a benefit to similarly situated litigants and non-litigants, an order requiring reimbursement of those costs from a common fund is an appropriate use of a court's equitable authority.  Four years later, in *Pettus*, another case involving railroad bondholders, the Court

extended that reasoning to an attorney's petition for common benefit legal fees.

In *Pettus*, a small number of unsecured railroad corporation bondholders hired attorneys to prosecute litigation aimed at protecting the bondholders' interest in certain corporate property. After obtaining a successful result, the attorneys petitioned the court for an award of fees to be paid by non-client bondholders who had reaped the benefits of the attorneys' work.  The non-client bondholders objected on the grounds that the attorneys had been compensated under fee agreements with their clients.  *Pettus*, 113 U.S. at 125.  In response to that argument, the Court observed that it was clear that the attorneys "had the right to demand, and would demand, such additional compensation as was reasonable, in respect of unsecured creditors who accepted the fruits of their labor . . . ."  *Id.*

The absence of a contract of employment between the attorneys and the non-client bondholders was of little concern to the Court.  Rather, the Court noted that the work of the attorneys had provided a clear benefit to the non-client bondholders, particularly because the successful litigation had allowed the bonds to retain their value in the financial marketplace. *Id.* at 126.  The Court then observed that those who accepted the "fruits of the labors" of the attorneys should expect to be called upon to contribute to the expenses, including reasonable attorney fees. *Id.* at 127.  To secure their right to those fees, the lawyers were given a lien on the railroad assets which had been preserved for the bondholders through the litigation.

While the common benefit doctrine was initially applied primarily to attorney fee awards in class actions, courts have long recognized that its application is not limited to the class action context.  For instance, the Supreme Court in *Sprague, supra,* upheld the district court's power to grant reimbursement for a plaintiff's litigation expenses even though she had sued only on her own behalf and not for a class, because her success would have a *stare decisis* effect entitling

others to recover out of specific assets of the same defendant.  Although those others were not

parties before the court, they could be required to contribute to the costs of the suit by an order

reimbursing the plaintiff from the defendant's assets out of which their recoveries later would

have to come.  The Court observed that "the absence of an avowed class suit or the creation of a

fund, as it were, through *stare decisis* rather than through a decree – hardly touch[es] the power

of equity in doing justice as between a party and the beneficiaries of his litigation."  *Sprague*,

307 U.S. at 167.

In recent years, it has become clear that the common benefit doctrine has particular

significance and value in the MDL context.

> As class actions morph into multidistrict litigation, as is the modern trend, the
> common benefit concept has migrated into the latter area.  The theoretical
> bases for the application of this concept to MDLs are the same as for class
> actions, namely equity and her blood brother, quantum meruit.

*In re Vioxx Product Liability Litigation*, 760 F.Supp. 2d 640, 647 (E.D. La. 2010).  Thus "MDL

courts have consistently cited the common fund doctrine as a basis for assessing common benefit

fees in favor of attorneys who render legal services beneficial to all MDL plaintiffs."  *Id*.  The

Fifth Circuit in *In re Air Crash Disaster at Florida Everglades*, 594 F.2d 1006 (5th Cir. 1977),

expressed a similar view that where attorneys in an MDL setting perform "duties beyond their

responsibilities to their own clients," assessment of prospective recoveries to reimburse counsel

is "a necessary incident to the goals of multi district litigation." *Id*. at 1011.  *See Smiley v.

Sincoff,* 958 F.2d 498, 501-02 (2d Cir. 1992); *In re Guidant Corp. Implantable Defibrillators

Prods. Liab. Litig.,* MDL No. 05-1708 (DWF/AJB), 2006 U.S. Dist. LEXIS 9232 (D. Minn. Feb.

15, 2006);  *In re MGM Grand Hotel Fire Litig.,* 660 F. Supp. 522, 525-29 (D. Nev. 1987).

**B.    THE CIRCUMSTANCES HERE PRESENT A COMPELLING CASE FOR THE CREATION OF THE COMMON BENEFIT FUND REQUESTED BY THE *HAVLISH* PLAINTIFFS**

The case law discussed above provides strong support for the creation of a common benefit fund under the circumstances presented here.  It is beyond question that the *Havlish* attorneys have conferred a substantial benefit upon plaintiffs in the Free Rider Actions.  Like the non-client bondholders in *Pettus*, the Free Rider Plaintiffs and their counsel have accepted and used the "fruits of the labor" of the *Havlish* attorneys, *i.e.*, the evidence which the *Havlish* attorneys developed both as to liability and as to damages.  The Free Rider Plaintiffs cited the *Havlish* liability evidence, and the Findings of Fact and Conclusions of Law resulting from them, thoroughly and repeatedly – and cited virtually nothing else (except one expert's testimony, also from another case), while contributing no new evidence themselves.  Doc. Nos. 2970, and 3123, *passim*; *O'Neill*, Doc. No. 3000.[7]

In their motions, the Free Rider Plaintiffs requested the entry of judgment against Iran by relying exclusively on the evidence that was developed and presented by the *Havlish* Plaintiffs through great effort and at great cost, and upon the Court's Findings of Fact and Conclusions of Law entered in *Havlish* based upon that evidence.  In support of their judgments, the Free Riders developed and offered none of their own fact witnesses, no expert witnesses, no documentary

---

[7] The *Ashton* memorandum argued:

> On December 22, 2011, in connection with the *Havlish* Order for Default Judgment on Liability, this Court concluded that the plaintiffs had "established by evidence satisfactory to the Court that [The Islamic Republic of Iran] had provided material support and resources to" the perpetrators of the September 11th terrorist attacks, by, "inter alia, planning funding, [and] facilitat[ing] . . . the hijackers' travel and training," and providing the hijackers with "services, money, lodging, training, expert advice or assistance, safehouses, false documentation or identification, and/or transportation." *See* 03-md-1570 (GD) (S.D.N.Y.) (GD)(FM), Doc. No. 2515, Entered 12/22/2011 ("Findings of Fact and Conclusions of Law"), pp. 50– 53.  . . . .
> As liability against Iran has now been established . . . .

*Ashton* Doc. No. 3123 at p.5.

evidence, nor any other form of evidence, apart from a few references to an expert not of their own, but from another case.  Instead, the Free Riders cite the *Havlish* evidence and the *Havlish* Findings of Fact and Conclusions of Law repeatedly and extensively, quote the experts' testimony presented in *Havlish* affidavits, and point to the "complete identity" of their claims and the *Havlish* claims.   While they clearly intended to, and did, reap the benefit of the *Havlish* work product, the Free Riders provided no assistance whatsoever to the *Havlish* team.[8]  To the contrary, the Free Rider Plaintiffs "vigorously opposed" the *Havlish* effort to develop and present the evidence they now cite repeatedly and with such zeal.

It would be patently unjust for the Free Rider Plaintiffs to be permitted to secure the benefits of their judgments against Iran without contributing in any way to the fees and costs incurred in procuring and presenting the evidence on which those judgments are based.  The common benefit device is designed for the very purpose of correcting that type of injustice.  It is for that reason that the *Havlish* Plaintiffs ask the Court to utilize that device here.  The Free Riders should now be required to contribute to the legal fees and other costs incurred in procuring that benefit.

### C.    THE *HAVLISH* PLAINTIFFS' PROPOSE AN APPROPRIATE METHODOLOGY FOR CREATING AND ADMINISTERING THE COMMON BENEFIT FUND

The *Havlish* Plaintiffs propose that the common benefit fund be created by requiring primary counsel for the Free Rider Plaintiffs to set aside 8% of any amount recovered pursuant to, and/or in full or partial satisfaction of, their judgments against Iran, by whatever method or form, including any U.S. Government payment, and deposit that amount into a common benefit

---

[8] As noted above, a substantial portion of the *Havlish* evidence from fact witnesses was submitted to the Court under seal due to its sensitive nature.  The fact that the Free Rider plaintiffs and their counsel have relied upon, and reaped the benefit of, evidence they have never seen or read – and may not even know exists – is a clear indication of the manifest injustice that must be corrected here.

escrow account that will be administered by lead counsel for the *Havlish* Plaintiffs.  In a typical MDL setting, the defendants would be tasked with setting aside the common benefit amount from each settlement or award.  Here, however, defendant Iran has defaulted and is not likely to appear, and so collection will likely occur only as a result of judgment enforcement and collection litigation, or from U.S. Government action, such as the legislation under the Consolidated Appropriations Act, 2016.  The value of the benefit bestowed upon plaintiffs in the Free Rider Actions is evidenced by the fact that the time-sensitive victim compensation provisions of the Consolidated Appropriations Act, 2016, are predicated upon the claimants' having first secured a judgment, such as those the Free Rider Plaintiffs have secured or will secure as a result of using the *Havlish* evidence.[9]  Under these circumstances, responsibility for procuring and transmitting the set aside amounts must rest with each plaintiff's counsel.  This procedure is consistent with the cases such as *Pettus* and *Sprague*, where the common benefit fund was created without the involvement of defendants.

Appointing lead counsel in *Havlish* as the administrator of the escrow fund is also appropriate under the circumstances here.  In a typical MDL setting, the common benefit escrow account is managed and administered by a special master or other third party. That administrator is then responsible for distributing common benefit funds to attorneys who performed common benefit work.  Here, however, only *Havlish* attorneys performed common benefit work.  It is therefore more efficient and practical for *Havlish* lead counsel to administer the common benefit fund, subject to court supervision, and determine the appropriate distribution among the *Havlish*

---

[9]   The Consolidated Appropriations Act, 2016 (H.R. 2029, Pub. L. No. 114-113) provides for the creation of the United States Victims of State Sponsored Terrorism Fund, which earmarks funds from fines and penalties paid into the U.S. Treasury by banks that settled federal prosecutions for money laundering for foreign state sponsors of terrorism, principally Iran.  See Pub. L. No. 114-113, Sec. 404, pp. 766-776.

attorneys.

**D.    THE PROPOSED AMOUNT OF THE COMMON BENEFIT FUND ASSESSMENT IS CONSISTENT WITH THE PRACTICE IN MDL PROCEEDINGS AND IS APPROPRIATE UNDER THE PRESENT CIRCUMSTANCES**

The *Havlish* Plaintiffs propose an assessment equal to 8% of amounts recovered pursuant to their judgments against Iran.  That assessment percentage is well within the range of assessments levied in MDL proceedings in recent years. The following is a sample of fee assessments imposed pursuant to the common benefit doctrine by MDL courts:

- *In re Orthopedic Bone Screw Prods. Liab. Litig*.      17% assessment
  1996 WL 900349 (E.D. Pa. 1996)

- *In re Genetically Modified Rice Litigation,*      10% assessment
  Case No. 4:06-md-1811 (E.D. Mo. 2009)

- *Turner v. Murphy Oil USA, Inc*.,      12% assessment
  422 F.Supp.2d 676 (E.D. La. 2006)

- *In re Fresenius Granuflo/Naturalyte Dialysate*      9% assessment
  *Products Liability Litigation*
  Case No. 13-md-2428 (D. Mass,)

- *Smiley v. Sincoff*, 958 F.2d 498 (2d Cir. 1992)      8% assessment

- *In re MGM Grand,* 660 F. Supp. 522 (D. Nev. 1987)      7% assessment

- *In re Air Crash Disaster,* 549 F.2d 1006 (5th Cir. 1977)      8% assessment

- *In re Avandia Prods. Liab. Litig*.,      7% assessment
  Case No. 07-md-1871 (E.D. Pa. 2009)

- *In re Diet Drugs Prods. Liab. Litig*.,      6% assessment
  553 F.Supp.2d 442 (E.D. Pa. 2008)

- *In re Vioxx Prods. Liab. Litig*.,      3% assessment
  MDL 1657 (E.D. La. 2005)

- *In re Silicone Gel Breast Implants Prods. Liab. Litig*.,      4% assessment
  MDL No. 926, 92-CV-10000, (N.D. Ala. 1993)

The evidence developed by the *Havlish* attorneys and the Findings of Fact and Conclusions of Law entered in *Havlish*, as well as the Report and Recommendation of the Magistrate Judge and this Court's adoption of same, were used in the Free Rider Actions to establish liability against Iran as well as the amounts of compensatory and punitive damages awards. This collectively resulted in Free Rider Actions judgments in excess of $10 billion, and counting. Given the level of investment by the *Havlish* attorneys in terms of time, expertise, effort, risk, and money to develop that evidence, and the judgments obtained as a result of that evidence, an 8% assessment is reasonable in the present case.

## IV.    **CONCLUSION**

For the reasons set forth above, the Court should enter an order (1) requiring the Free Rider Plaintiffs to set aside 8% of any judgment collected pursuant to, and/or in full or partial satisfaction of, their judgments against Iran; (2) directing counsel in the Free Rider Actions to deposit assessed amounts into a common benefit escrow account to be established and maintained by lead counsel for the *Havlish* Plaintiffs; and (3) directing the distribution of the common benefit escrow account to the *Havlish* attorneys as reimbursement of costs associated with, and compensation for, the benefit bestowed upon plaintiffs in the Free Rider Actions.

Date: March 19, 2016                    /s/ Timothy B. Fleming_____
                                        Timothy B. Fleming (DC Bar No. 351114)
                                        WIGGINS CHILDS PANTAZIS
                                        FISHER GOLDFARB PLLC
                                        1850 M Street, NW, Suite 720
                                        Washington, DC  20036
                                        (202) 467-4489

                                        Dennis G. Pantazis (AL Bar No. ASB-2216-A59D)
                                        WIGGINS CHILDS PANTAZIS
                                        FISHER GOLDFARB LLC        (*Lead Counsel*)
                                        The Kress Building
                                        301 19th Street North

Birmingham, AL  35203
(205) 314-0500

John A. Corr (PA Bar No. 52820)
LAW OFFICE OF JOHN A. CORR
301 Richard Way
Collegeville, PA 19426
(610) 482-4237

Stephen A. Corr (PA Bar No. 65266)
BEGLEY, CARLIN & MANDIO, LLP
680 Middletown Boulevard
Langhorne, PA  19047
(215) 750-0110

Richard D. Hailey (IN Bar No. 7375-49)
Mary Beth Ramey (IN Bar No. 5876-49)
RAMEY & HAILEY
9333 North Meridian Street, Suite 105
Indianapolis, IN  46260
(317) 582-0000

Robert M. Foote (IL Bar No. 03124325)
Craig S. Meilke (IL Bar No. 03127485)
FOOTE, MIELKE, CHAVEZ
 & O'NEIL, LLC
10 West State Street, Suite 200
Geneva, IL  60134
(630) 232-7450

David C. Lee (TN Bar No. 015217)
422 South Gay Street, 3rd Floor
Knoxville, TN  37902
(865) 544-0101

Evan J. Yegelwel (FL Bar No. 319554)
TERRELL HOGAN ELLIS
    YEGELWEL, P.A.
233 East Bay Street
Blackstone Building, 8th Floor
Jacksonville, FL  32202
(904) 632-2424

Edward H. Rubenstone (PA Bar No. 16542)
EDWARD H. RUBENSTONE, LLC
812 N. Fairway Rd.

Glenside, PA 19038
215-887-9786

Donald J. Winder (UT Bar No. 3519)
WINDER & COUNSEL, PC
175 West 200 South, Suite 4000
P.O. BOX 2668
Salt Lake City, UT  84110-2668
(801) 322-2222

**Attorneys for the *Havlish* Plaintiffs**