G3M5terA

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   IN RE: TERRORIST ATTACKS ON
    SEPTEMBER 11, 2001,
4
                  v.                        03 MDL 1570 (FM)
5
    ------------------------------x
6                                           New York, N.Y.        -
                                            March 22, 2016
7                                           10:20 a.m.

8   Before:

9                      HON. FRANK MAAS,

10                     Magistrate Judge

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

G3M5terA

```
 1                                APPEARANCES

 2   KREINDLER & KREINDLER
            Attorneys for Plaintiff
 3   BY:  JAMES KREINDLER
            ANDREW J. MALONEY
 4
     MOTLEY RICE
 5          Attorneys for Plaintiff
     BY:  ROBERT T. HAEFELE
 6
     ANDERSON KILL & OLICK, P.C.
 7          Attorneys for Plaintiff
     BY:  JERRY S. GOLDMAN
 8          BRUCE STRONG

 9   COZEN O'CONNOR
            Attorneys for Plaintiff
10   BY:  SEAN CARTER
            SCOTT TARBUTTON
11
     BERNABEI & WACHTEL
12   BY:  ALAN KABAT

13   CLIFFORD CHANCE, US, LLP
            Attorneys for Defendant Dubai Islamic Bank
14   BY:  STEVEN T. COTTREAU
            KATIE BARLOW
15
     LEWIS BAACH, PLLC
16          Attorneys for Defendants Muslim World League and
     International Islamic Relief Organization
17   BY:  AISHA BEMBRY
            ERIC LEWIS
18          WALEED NASSAR

19   SALERNO & ROTHSTEIN
            Attorneys for Defendant Yassin Kadi
20   BY:  PETER C. SALERNO

21   MARTIN F. MCMAHON & ASSOCIATES  (via telephone)
            Attorneys for Defendant International Islamic Relief
22   Organization
     BY:  W. JAMESON FOX
23          MARTIN F. McMAHON

24

25
```

G3M5terA

1          (Case called)

2          THE DEPUTY CLERK:  Counsel, please state your name for

3    the record.

4          MR. CARTER:  Good morning, your Honor.  Sean carter

5    from Cozen O'Connor on behalf of the plaintiffs.

6          THE COURT:  Good morning.

7          MR. HAEFELE:  Your Honor, Robert Haefele from Motley

8    Rice for plaintiffs.

9          MR. COTTREAU:  Good morning, your Honor.  Steven

10   Cottreau on behalf of Dubai Islamic Bank.

11         MS. BARLOW:  Good morning, your Honor.  Katie Barlow

12   on behalf of Dubai Islamic Bank.

13         MR. TARBUTTON:  Good morning, your Honor.  Scott

14   Tarbutton for federal insurance plaintiffs.

15         MR. KABAT:  Good afternoon, your Honor.  Alan Kabat

16   for Dr. Al-Turki.

17         MR. SALERNO:  Good morning, your Honor.  Peter Salerno

18   for Yassin Abdullah Kadi.

19         MR. GOLDMAN:  Jerry Goldman with Bruce Strong,

20   Anderson Kill for the Plaintiffs Executive Committee and the

21   O'Neill plaintiffs.

22         MR. MALONEY:  Good morning, your Honor.  Andrew

23   Maloney with Jim Kreindler for the plaintiffs.

24         THE COURT:  Who is hiding.

25         MR. KREINDLER:  Good morning, your Honor.

G3M5terA

1          MR. NASSAR:  Good morning, your Honor.  Waleed Nassar

2     on behalf of the Muslim World League and International Islamic

3     Relief Organization.

4          THE COURT:  I guess that's everyone.

5          Were you given a copy of the appearance sheet?

6          OFFICIAL REPORTER:  Yes, your Honor.

7          THE COURT:  Great.

8          I am sure you were told I would like to start with the

9     Dubai Islamic Bank motion.

10         MR. CARTER:  Thank you, your Honor.

11         I think because of the telephone appearance, your

12    Honor, we need to be near a microphone, so.

13         THE COURT:  Okay, sure.

14         MR. CARTER:  If I stand here.

15         THE COURT:  And I understand Mr. McMahon or his

16    colleague but we can't hear them quite as the well, is that

17    correct?  Or not at all?

18         Okay, well let's go on.

19         MR. CARTER:  Your Honor, with regard to Dubai Islamic

20    Bank there are two motions presently before the Court and

21    before getting into the specifics of the motions themselves, I

22    would just like to take a very brief moment to discuss the

23    procedural history of the disputes that brought us to this

24    point.

25         As your Honor is aware, Judge Daniels denied Dubai

G3M5terA

1   Islamic Bank's motion to dismiss concluding that the

2   allegations of plaintiff's pleadings were sufficient to

3   establish personal jurisdiction over Dubai Islamic Bank and

4   also holding with the exception of a limited number of claims

5   that plaintiffs had stated a claim under Rule 12(b)(6).

6          Judge Daniel's decision did not include a complete

7   recitation of every allegation the plaintiffs had offered

8   against Dubai Islamic Bank in support of their claims but it

9   did recount the broad picture that plaintiffs had portrayed as

10  to the historical relationship between Dubai Islamic Bank and

11  al Qaeda and clearly deemed that significant and relevant in

12  denying the motions to dismiss.

13         Judge Daniels specifically held that it can reasonably

14  be inferred from the allegations that Dubai Islamic Bank

15  personally and intentionally provided support to al Qaeda in

16  aid of their plan to commit an aggressive terrorist strike

17  against the United States.  He cited in particular the pre-1999

18  collaboration between al Qaeda and Dubai Islamic Bank that

19  prompted U.S. officials to request a meeting with UAE officials

20  and seek an intervention; in their words clean up the bank.

21         He went on to thereafter deny Dubai Islamic Bank's

22  motion to dismiss under Rule 12(b)(6) and, in particular, the

23  arguments Dubai Islamic Bank had raised with respect to

24  causation explaining that al Qaeda's ability to accomplish the

25  coordinated large scale terrorist attacks of September 11th is

G3M5terA

dependent on the cumulative efforts and contributions of untold

thousands over an extended period of time.

It is the collective contributions of all such

sponsors that gives birth to a repository of seemingly endless

financial military and logistical resources from which the

terrorist organization draws upon with immunity to carry out

its attacks against innocent civilians.  Such a reality bears

directly on the issue of temporal and causal proximity.

The result of that decision, your Honor, is that

plaintiffs were authorized to proceed with merits discovery as

to Dubai Islamic Bank.  Of course, the scope of discovery

afforded in the context of that merits discovery as defined by

Rule 26(b) which broadly authorizes discovery into any matters

relevant to any party's claim or defense in the litigation.

The present dispute comes before the Court within that

framework and involves a set of very focused inquiries that go

directly to the heart of the nature, origin, and extent of

Dubai Islamic Bank's collaboration with al Qaeda and its

immediate partners.  As detailed in the papers, your Honor, the

motions to compel focus on records relating to essentially six

primary categories.

First, individual al Qaeda members who are alleged to

have held accounts at Dubai Islamic Bank.  In many cases

plaintiffs have provided the specific account numbers for the

accounts that those individuals held with the bank, at least to

G3M5terA

1        the extent known.

2               THE COURT:  One of the bank's arguments is

3        burdensomeness because, apparently, even though you can

4        electronically search the accounts to come up with the actual

5        transaction records you need to go into boxes in warehouses

6        some of which had have been destroyed.

7               MR. CARTER:  Your Honor, I think there are two

8        responses to that and one deserves a bit of context.

9               Dubai Islamic Bank has presented itself in dealing

10       with the plaintiff and to the Court as a sophisticated,

11       international financial institution which adheres to the

12       highest standards of international practice in banking and

13       financial markets that abhors terrorism of all kinds, and I

14       think that is significant in evaluating several of its

15       arguments including arguments about the feasibility of

16       searching for records relating to a specifically identified

17       account.

18              THE COURT:  Well, if we remove the case from this

19       context and this was a large American bank, Citibank coming in

20       in relation to a contract dispute and they said you are asking

21       us to search for account number for -- and it is sort of the

22       fill in the bank as I'm not sure what the right number

23       150-some-odd, 200-odd or 2,900 accounts, but even if it were 10

24       accounts, if you are looking for a lengthy period of time,

25       every transaction Citibank arguably would be saying that's

G3M5terA

unduly burdensome even though we are already obviously a large

bank.

MR. CARTER:  Your Honor, I think there are two points

that warrant examination here.  The first is that Dubai Islamic

Bank can't present its own unwieldy record-keeping system as a

defense to its obligations under the discovery rules.  The fact

that they don't maintain records allegedly in a form that

renders them easily searchable doesn't provide them with a

sword to defeat the normal operation of the discovery rules.

I think, additionally, it is difficult to reconcile

the description they've given of the record keeping processes

with their arguments concerning their operation as a

sophisticated international financial institution because there

must be circumstances in which authorities come to Dubai

Islamic Bank for a western bank and say, in relation to a

criminal investigation or a counter-terrorism investigation, we

need the records pertaining to a particular account.  And we

have evidence that that happened here in fact.  We have the

account of Ammar al-Baluchi for which there are documents in

the record indicating that the central bank of the UAE sent a

notification to Dubai Islamic Bank's CEO saying U.S.

authorities are going to come to visit you and request a

certification of the business records for this account.  About

a month later Dubai Islamic Bank's head of money laundering

sent back a letter indicating that this is the certification of

G3M5terA

1    the business records which are attached.

2            So, we see in that framing that Dubai Islamic Bank

3    appears to have the capacity to do this when asked by

4    authorities and in fact it says in its motion that we have

5    complied with authorities from the UAE and from the US

6    government in all these counter-terrorism investigations.

7            So you now, somewhat quizzically, we don't have the

8    actual records attached to that certification of business

9    records.  Also, with regard to the sufficiency of these

10   searches, the circumstances surrounding this Baluchi account

11   are concerning to us in that you have an inquiry from the

12   central bank that goes directly to the CEO of Dubai Islamic

13   Bank and then you, a month later, have the result of whatever

14   that inquiry was coming from the head of money laundering and

15   absolutely nothing in between.  Nothing in between to describe

16   what happened once the notification was received by the CEO,

17   what processes were initiated initially to conduct the

18   investigation that was required and in obtaining the records,

19   no internal correspondence and certainly not the case that the

20   CEO walked downstairs and found these records himself.  Some

21   process occurred and that process may very well reveal that

22   Dubai Islamic Bank does in fact have the capacity to find these

23   records.

24           On the burden, one other thing, your Honor, we have

25   been down this road before.  You will recall in earlier stages

G3M5terA

1    when Mr. McMahon was representing the Muslim World League and

2    IIRO he indicated that the searches we were requesting they

3    make of the financial records were going to be incredibly

4    burdensome because they didn't keep their records in an easily

5    searchable form and they were going to have to go into the

6    individual files.  And your Honor's response at that time was

7    this whole case is about money being diverted towards terrorist

8    goals.  As I understand it, the lion's share of the effort is

9    to see where money went so the notion that this is a lot of

10   paper or bytes of information and therefore burdensome,

11   Mr. McMahon, doesn't really resonate with me.

12           And that is the situation here as well, your Honor.

13           THE COURT:  I hope I said gigabytes.  But, other than

14   that, however it was transcribed.

15           MR. CARTER:  You probably did, your Honor.

16           THE COURT:  Terabytes.

17           MR. CARTER:  And so again, your Honor, with regard to

18   the individual accounts for the individual people, in most

19   cases we have identified the account numbers at least to the

20   extent we know them.  We are not asking for, you know, whatever

21   discussions may have occurred in the context of the meet and

22   confer, the issue that is presently before the Court from the

23   accounts that are the subject of the motion to compel, it is a

24   very focused and limited number of accounts.

25           THE COURT:  And what is that number?  Approximately.

G3M5terA

1              MR. CARTER:  Approximately?  Well, I should say, your

2     Honor, we don't know entirely how many accounts these

3     individuals held but you are talking about only 8 individuals

4     and the Taliban accounts.  Now, with regard though those it has

5     been argued it would be likely to, for them to search and find

6     any Taliban accounts.  The problem is that they are required by

7     the international sanctions regimes to search for and identify

8     any accounts they hold for Taliban members who are on the

9     consolidated lists.  We are simply asking them to do something

10    that they're required to do by law.

11             The additional problem, your Honor, is that we see a

12    notification from the period in 2003 to Dubai Islamic Bank

13    again from the Central Bank of the UAE asking them to search

14    for and freeze any accounts they hold with the below listed

15    members of the Taliban and Taliban-related entities.  The

16    letter goes on to identify apparently 152 individuals

17    associated with the Taliban and one entity.  All of the names

18    on that letter have been redacted in the production we

19    received.  It is difficult to understand why but clearly those

20    are Taliban members and Taliban entities for which DIB was

21    required to and presumably has conducted a search.

22             Lastly, your Honor, we also know from the record that

23    there is evidence that authorities asked Dubai Islamic Bank to

24    close down a certain number, 16 or so, Taliban accounts

25    following the embassy bombings.

G3M5terA

1          THE COURT:  Who made that request?  Also the central

2     bank?

3          MR. CARTER:  I believe it was UAE authorities.  I

4     would have to double check that, though.  So, we have a number

5     of circumstances in which these Taliban accounts have been very

6     specifically identified.

7          Now, with regard to the Taliban, your Honor, I also

8     want to address the relevance arguments.

9          THE COURT:  Before we get to that, part of

10    Mr. Cottreau's papers say that you folks were seeking searches

11    for 2,900 individuals.

12         MR. CARTER:  Well, your Honor --

13         THE COURT:  Are you using smaller numbers?

14         MR. CARTER:  Again, your Honor, these are issues that

15    most of the numbers are comprised of people who are on the

16    consolidated list and so that's a consolidated list, sanctions

17    list that goes out to all financial institutions and that all

18    financial institutions are required to conduct searches for.

19         Now, there were some additional al Qaeda-related

20    members that we had included in those lists but with regard to

21    the Taliban, it is not all that difficult to go back to the

22    list that exists say, for instance, between 2001 and 2004, a

23    relevant discovery period, and to determine which Taliban

24    members had accounts at DIB and which Taliban identified

25    entities had accounts at DIB and that's really all we are

G3M5terA

1    suggesting here.

2           THE COURT:  One thing that struck me as overbroad but

3    it is largely nomenclature is you were asking for records

4    concerning accounts that were frozen following the terrorist

5    attacks which could be a lot of accounts unrelated as opposed

6    to asking for accounts which were frozen as a result of the

7    terrorist attacks which, presumably, is a smaller universe.

8           MR. CARTER:  Yes, your Honor.

9           I think this issue about the nature of the request

10   potentially capturing the Foreign Narcotics Drug Kingpin Act

11   sanctions programs and other programs is a little bit of a red

12   herring.  We are talking about accounts that were frozen

13   pursuant to the terrorism sanctions regimes and we can easily

14   just simply limit it to the relevant terrorism sanctions

15   regimes and therefore constrain it to the entities and

16   individuals that most clearly relate to the claims at issue in

17   this case.  And we can conflate the period for which we are

18   seeking that information to a period reasonably following the

19   September 11th attacks and in that way substantially narrow

20   this.

21          THE COURT:  Well, reasonableness is in the eye of the

22   beholder.  Bear with me a second.  What are you suggesting

23   would be reasonable stop and start dates for a search?  And I

24   recognize it may be account-specific or category-specific.

25          MR. CARTER:  Okay, your Honor.  We were speaking a

G3M5terA

1    minute ago about the accounts frozen after 9/11.

2              THE COURT:  Okay.  Fair enough.

3              MR. CARTER:  So, for those we would be talking about

4    September 12, 2001 and going forward to the period that's been

5    determined by the Court to be the outside limit of discovery

6    which is 2004.

7              Now, for the other accounts, for the specific al Qaeda

8    individuals in particular, some of these accounts clearly date

9    back to the period of 1992 and move forward for a longer period

10   of time and, again, relative to the relevance arguments, Dubai

11   Islamic Bank has posited that the September 11, 2001 attacks,

12   the planning for the September 11, 2001 attacks did not begin

13   until late 1988 and 1999 and therefore it is relieved of

14   responsibility for searching for any records that predate that

15   time period.

16             First of all, your Honor, we have already been down

17   this road as well and we set a presumptive time frame for

18   discovery in these proceedings and we certainly haven't limited

19   discovery to individuals specifically involved in the September

20   11, 2001 attacks over a period of two years that preceded it.

21   The Court has repeatedly authorized plaintiffs to conduct

22   discovery and to the broader historical relationships between

23   the defendant and al Qaeda dated back to 1992 and we are simply

24   seeking that same discovery with respect to the particular

25   individuals that have been identified in the briefing papers.

1          So, the other problem with the argument that they have

2     made about the timing of the September 11, 2001 attacks and the

3     planning is that it is simply not correct.

4          They take a fragmented sentence out of the 9/11

5     Commission Report that really refers to the date on which

6     Bin Laden formally green lit the plot as a go ahead.  That has

7     nothing to do with the date on which planning, consideration,

8     and evaluation of attacks against Americans exploiting the

9     civil aviation system.  Al Qaeda began doing that much, much,

10    earlier.

11         Bin Laden was exploring those plots in the early

12    1990s.  Khalid Sheikh Mohammed developed a plot -- the Bojinka

13    plot -- using funding that was provided by al Qaeda during that

14    time.

15         Khalid Sheikh Mohammed goes to Afghanistan in 1996

16    around the same time that Bin Laden arrives, he stays there

17    thereafter collaborating with Bin Laden.  During that entire

18    period he is able to stay there, Bin Laden is able to stay

19    there because of the material support and resources being

20    provided by their benefactors.  So,

21         the arbitrary idea that September 11, 2001 appeared

22    out of the wind suddenly in the beginning of 1999 doesn't have

23    any merit and, in addition, it is contrary to evidence we have

24    seen.

25         Relatedly, on the relevance front, your Honor, DIB is

G3M5terA

1    seeking to avoid discovery into its relationships with the

2    Taliban.  This really goes to the heart of the claims.

3            In the period before September 11, Al Qaeda and the

4    Taliban had a symbiotic relationship, your Honor; they shared

5    common resources, intermingled their people.  Al Qaeda fighters

6    went to fight alongside the Taliban in conflicts in

7    Afghanistan.  Bin Laden lived side by side along with the

8    Taliban leadership in Kandahar.  Most notably they shared

9    financial resources.  The very foundation of this symbiotic

10   relationship was al Qaeda's provision of massive funding to the

11   Taliban to the tune of $20 million a year which Bin Laden was

12   able to draw on the relationships he had with wealthy patrons

13   in the gulf and use that money as a shared financial base for

14   the Taliban around al Qaeda in exchange for which Bin Laden

15   enjoyed safe haven in Afghanistan throughout that period.

16           So, there is no divide between al Qaeda money and

17   Taliban money between this time period.  If you want to find

18   al Qaeda money you are going to have to go to the Taliban

19   accounts.  In fact, one of the diplomatic cables that was

20   released from Secretary Clinton's office identified gulf

21   patrons as the primary benefactor of both al Qaeda and the

22   Taliban, and as a consequence, the Taliban accounts are

23   absolutely critical to this.  But you don't really have to take

24   our word for it, your Honor, the international sanctions and

25   declarations of United Nations Security Council make it

G3M5terA

1    absolutely clear.

2             In the wake of the embassy bombings the security

3    Council issued resolution 1267 which established the joint

4    al Qaeda and Taliban Sanctions Committee, a single committee

5    for both entities.  It condemned the Taliban's role in working

6    with al Qaeda and directed all states to freeze funds and other

7    financial resources including funds derived or generated from

8    property owned or controlled directly or indirectly by the

9    Taliban.

10            So, the United Nations security council response to

11   the embassy bombings was a direct recognition that the

12   provision of support to the Taliban was support to al Qaeda and

13   that that support had directly enhanced al Qaeda's operational

14   capabilities.  And so, the Taliban accounts, your Honor, go to

15   the very essence of whether or not this relationship existed.

16            On a related note, the issues that DIB has raised

17   again about the inquiries into its potential involvement in the

18   embassy bombings and in the accounts that were held by al Qaeda

19   members at DIB who were involved in the bombings go right to

20   the heart of whether or not DIB maintained relationships with

21   al Qaeda including support for its collaborational efforts to

22   attack the United States.

23            THE COURT:  Let's talk a bit about some of your other

24   requests which is the documentation to the Shariah board and

25   Fatwahs and the like.

G3M5terA

1          MR. CARTER:  Your Honor, if I may?  One last thing on

2     a related subject and then I will go there?

3          THE COURT:  Yes.

4          MR. CARTER:  The '98 and '99 meetings in the offices

5     in the U.S. and UAE, I think, deserves a little bit more

6     primacy.

7          Again, Dubai Islamic Bank has presented itself as this

8     reputable international financial institution that cares deeply

9     about its reputation in the world and abhors terrorism of all

10    kinds.  Following the 1999 meeting between U.S. officials and

11    UAE officials, a state department official publicly confirms

12    that a meting was held between the U.S. official and UAE

13    officials to discuss Dubai Islamic Bank's role in laundering

14    funds on behalf of the world's most notorious terrorist Osama

15    Bin Laden.

16         On the same day, the New York Times published a very

17    prominent article indicating that the CIA had uncovered

18    evidence that DIB was serving as a secret channel for

19    laundering funds on behalf of Osama Bin Laden.

20         The reputational, financial, and business implications

21    of being so publicly indicated in laundering funds on behalf of

22    Bin Laden are remarkable and if we accept Dubai Islamic Bank's

23    own representations about its standing in the world community

24    and concern about its world reputation, it follows that some

25    inquiry would have been initiated by the leadership of Dubai

G3M5terA

Islamic Bank concerning the nature of these allegations and
whether they had merit and that there would have been some
internal investigation.

All we have is a few correspondence about a potential
lawsuit against the New York Times but nothing -- nothing --
resembling the kind of response you would expect for these
kinds of accusations.

What makes the matter all the worse, your Honor, is
the nature of Dubai Islamic Bank's relationship to the
government of Dubai and the UAE generally.

At the time this meeting occurs --

THE COURT:  The bank is, in effect, government owned;
is that correct?

MR. CARTER:  They say it is largely owned by the
government of Dubai.  In addition, at the time of this
particular occurrence, it is publicly confirmed that U.S.
officials met with the ruling Maktoum family.

Now, at that time a member of the Maktoum family who
served as the vice president and prime minister of the UAE and
the leader of Dubai was the primary shareholder of Dubai
Islamic Bank.  Now, given those relationships one would also
expect that Dubai Islamic Bank would have sent inquiries to its
primary shareholder and its government owners asking what was
the nature of these accusations.  We need to investigate this
and we need to remedy this problem.

G3M5terA

1          Somewhat relatedly, your Honor, it also raises the

2     question as to whether or not Dubai Islamic Bank has the

3     practical ability to now obtain those documents from the

4     government itself through a request, or through a member of the

5     Maktoum family, by request.  To the extent it has the practical

6     ability by virtue of the nature of the way communication and

7     documents flow between the government and the bank to obtain

8     these documents it should be required to seek them.

9          Your Honor, with regard to the Sharia advisory board,

10    the issue here is that the cooperation that has existed between

11    most patrons of al Qaeda and Bin Laden is founded on shared

12    ideology and we have identified individuals on the Fatwah and

13    Sharia board who have made various declarations consistent with

14    logical principles underlying Bin Laden's jihad.

15          THE COURT:  It seems to me there are two separable

16    issues; one, Fatwahs where he is -- he can correct me when he

17    gets up if I have it wrong -- but part of the answer is we are

18    not responsible for anything somebody on the Sharia board may

19    have done individually which is a different question than the

20    discovery issue.

21          But, apart from specific Fatwahs, whether they are by

22    an individual or in individual capacity, or something official

23    from the bank, that's different than the Sharia board which I

24    gather is in effect the executive committee of the bank and has

25    dealings with every transaction to ensure that interest rate

G3M5terA

1     restrictions and the like are not violated.

2              MR. CARTER:  I think that's right, your Honor, and

3     obviously we are not interested in every ruling issued by the

4     Sharia board as to whether or not a particular transaction was

5     in accordance with Shariah and Islamic principles.  We are

6     really only interested in any declarations made concerning

7     supporting conflict in which al Qaeda were involved,

8     declarations to support jihad.

9              We are getting into a focused inquiry as to whether or

10    not the Sharia board issued any of the Fatwahs or rulings that

11    played overall in the decision of the bank to provide supported

12    to the Taliban or to Bin Laden or for causes they're

13    championing.  So, that's really the focus area there.

14             Your Honor, I would like to really quickly say a word

15    about the records that have been provided for the individuals.

16             THE COURT:  I am laughing because I was just about to

17    ask you that.  Go on.

18             MR. CARTER:  Essentially what we have gotten in most

19    cases are statements of the account and a few instances limited

20    numbers of documents relating to the opening of the account,

21    maybe a passport photo.  The problem with statements is that

22    they simply are a snapshot of debits and credits.  They don't

23    tell you where the money came from and they don't tell you

24    where the money went to and they're relatively useless.  They

25    also don't even tell you in most cases how the money was taken

G3M5terA

1    out of the bank when there is a debit.

2            THE COURT:  But they inform the discussion about

3    burdensomeness, don't they?

4            If, for example, a particular account only had three

5    transactions in a month, that's a different burden than if they

6    had 3,000.  And if there is a transaction that involves the

7    equivalent of $12, that's probably not one you are interested

8    in.

9            MR. CARTER:  Your Honor, there are a very limited

10   number of transactions involved in these accounts and so I

11   think, based on the number of transactions, there is not a

12   tremendous burden.  I think we would all agree that a

13   transaction for $12 is not one that needs to be searched

14   exhaustively but -- you know, we are not talking about hundreds

15   of thousands of transactions here by any stretch of the

16   imagination.

17           THE COURT:  The reason I am asking is if you were an

18   assistant U.S. Attorney and the grand jury subpoenaed and

19   subpoenaed a bank, a domestic bank here and said give me all

20   the records that relate to Frank Maas including but not limited

21   to copies of checks, deposits slips, and the kitchen sink, the

22   bank would respond in the first instance to the kitchen sink

23   grand jury subpoena with transaction records, monthly

24   statements and basically say circle the ones you really want.

25           And it sounds like there would be a two-step process

G3M5terA

1    from what you say here although you have seen relatively few

2    transactions and there probably could be some financial floor

3    such that de minimis transactions are not searched for

4    needlessly.

5           MR. CARTER:  I think that would be possible, your

6    Honor.  I think we also have to have all of the accounts.

7    Right now Dubai Islamic Bank has only agreed to search for a

8    very limited number of them.  For instance, we don't have any

9    statements for the Taliban accounts so I think when we go

10   through that process we would like to have all of the

11   statements at issue so we can establish the floor, so we can

12   establish the range, and proceed sort of on a comprehensive

13   basis rather than doing it based on a very limited spectrum of

14   information that we have presently.

15          Your Honor, I think that is all I have.  Thank you.

16          THE COURT:  Thank you.

17          Just out of curiosity while you are gathering your

18   papers, is there anybody on the telephone?

19          MR. FOX:  Hi.  This is Jameson Fox of Martin McMahon

20   and Associates.  We represent IIRO in this case.

21          THE COURT:  We didn't hear you earlier so that's why I

22   was asking.

23          Go ahead, Mr. Cottreau.

24          MR. COTTREAU:  Good morning, your Honor.

25          THE COURT:  Good morning.

G3M5terA

1          MR. COTTREAU:  Let me give a little bit of context to

2     the discovery disputes and what I consider to be the heart of

3     them.

4          Plaintiff's initial requests were not as Mr. Carter

5     said, very focused inquiries.  There were essentially give us

6     all Taliban accounts, all al Qaeda accounts that you have.

7     Indeed, they have requests to that effect.  They have issued

8     108 RFPs -- requests for production -- and they were incredibly

9     broad.  One of the challenges we had when we first sat down in

10     March 2011 to talk about the requests that they had issued was

11     we are a bank, we are not experts in who are members of the

12     Taliban and al Qaeda and who are not, who are the members of

13     al Qaeda, and that became the issue and how do we search for

14     them.

15          First, most of the members of al Qaeda, I presume, are

16     Arabic names.  Their Arabic names don't translate to English in

17     any rule-based way.  There are multiples of ways, indeed dozens

18     in many cases, of ways of spelling Osama Bin Laden alone.  So,

19     how is it that we even conduct this search of our account

20     records?

21          That was the initial problem.  And then the plaintiffs

22     didn't just want the al Qaeda members and the Taliban members'

23     accounts if they were the accounts records but including

24     accounts that were for -- and this is a quote from one of their

25     RFPs -- the actual or potential beneficial interests in those

G3M5terA

1    accounts or for the benefit of those accounts.

2            THE COURT:  Let me interrupt you for a second because

3    there are 152, I believe it is, accounts that apparently the

4    U.S. government believes were related to terrorism in some

5    fashion that formed part, even if it was a small part, of the

6    plaintiff's request.  There was a production of at least one

7    document, 152 names redacted.

8            I am not sure I understand (A) the basis for the

9    redaction; and (B) assuming that the U.S. government was of the

10   view that those were accounts related to the Taliban why

11   records related to those accounts haven't been produced

12   already.

13           MR. COTTREAU:  That's a good question, your Honor, and

14   let me try to address it very straightforwardly.

15           We agreed on two methodologies.  DIB conceded we

16   should have two methodologies here.  One is that any -- and

17   these are not U.S. government embassies, these came from the

18   UAE central bank.

19           Any government correspondence that Dubai Islamic Bank

20   received asking it about accounts that related to al Qaeda we

21   produced.  We produced correspondence back and forth that we

22   had in the bank's files and we produced any account statements

23   that related to that correspondence.

24           THE COURT:  But not the transactional records.

25           MR. COTTREAU:  Right.  So, if I can try to address

G3M5terA

 1    transactional records second to the first just so that we are

 2    covering it comprehensively?

 3             THE COURT:  Sure.

 4             MR. COTTREAU:  With respect to who are members of

 5    al Qaeda, that was an easy one for us.  Okay.  If we got some

 6    with government request giving us a name and we search for it

 7    and we identified accounts, we will give them over and we did

 8    and we have given all of those accounts.

 9             THE COURT:  When you say you have given the accounts,

10    the monthly statements in effect or the underlying transaction

11    records?

12             MR. COTTREAU:  Really, there are probably four types

13    of records associated, if I could --

14             THE COURT:  Sure.

15             MR. COTTREAU:  -- with a bank account.  Let's just

16    take a bank account.

17             First, there would be -- should be -- for most of

18    these accounts an account opening document when the customer is

19    new to the bank.  Those always didn't get retained but most of

20    them have been retained.  And so you have things like a copy of

21    the passport and address and things like that and so forth and

22    we have given those for any accounts that identified related to

23    al Qaeda in any of this correspondence.

24             Secondly, we can go to our legacy system.  This is a

25    legacy system so it is not a live system of people's accounts

G3M5terA

from the 1990s, this is a legacy system for the bank.  We can

access the databases that were kept by the legacy system and

query them with the help of an IT department.  It's not a front

end where you can go type on a terminal somewhere and access

this data anymore.

THE COURT:  All right.

MR. COTTREAU:  So, you can find the accounts and

generate essentially the account statements, what you would get

if you were a banking customer; records of debits and credits

from the account.  Then there is two types of transactional

records that are sometimes associated with each of the things

on the account statement.  First, there is additional --

sometimes additional electronic information that exists in the

databases about each transaction.  And then, fourth, there is

paper records that relate to each transaction.

So, if you go to the bank and you want to deposit cash

you would write a slip out, right, and give it to the teller.

In many cases pretty meaningless pieces of paper but,

nonetheless, those are collected by the tellers -- and this is

a generalization because branch by branch, over time, practices

may have changed -- but, generally speaking, the teller would

bundle up her bundle at the end of the day -- his or her

bundle -- put it together, those would be accumulated with the

other tellers' at that branch and put into a box or put into a

folder and eventually those things got filed in offsite

G3M5terA

1    storage.

2              There are transactions that are incredibly more

3    complicated to find than things like that.  If a customer would

4    send in a check that needed to be deposited it may sit at the

5    bank for two, three, four days after the date of deposit before

6    it is ultimately cleared and bundled up and they're very hard

7    to find, extremely hard to find.

8              So, with respect to those four types of account

9    records we agreed the following with plaintiffs and this was

10   back in our meet --

11             THE COURT:  Well, you have talked about deposits.  I

12   assume there were also transactions going out, checks or the

13   equivalent?  Wire transfers?

14             MR. COTTREAU:  Sure.

15             If a DIB customer writes a check, gives the person a

16   check, that check is deposited at another bank, for example,

17   eventually that check comes back and is presented to Dubai

18   Islamic Bank and the practices changed over time and the check

19   is either honored or not.  Those checks that are bundled up

20   together and cleared in that way are hard to find.  They're

21   obviously not teller records, they're going to be put in

22   various boxes over time and the index, you can imagine there

23   are over 50,000 boxes here.  It is hard to -- you are looking

24   for a needle in a hay stack every time.

25             So, what we agreed with the plaintiffs in our meet and

G3M5terA

confer -- and this is confirmed in my July 2011 letter that you
have as part of our submission -- what we agreed was we will
give you the account opening statements, those are easy --
relatively easy to pull.  We will give you the printouts from
our legacy computer system showing each and every transaction
in the accounts.  But, with respect to the transactional
records this is really burdensome to find, they're difficult.
I'm not even saying they're findable.  Some of them might not
be.  Come back to us and tell us which ones you want us to pull
and which ones you didn't.

That was a conversation we had in March 2011.  It was
confirmed in my letter in July 2011.  We produced -- we
completed our production minus some additional supplements over
the years but we completed our production in principle at the
end of August 2012 consistent with your order.  And largely we
produced the account statements in that August batch because it
was our production that was made after we finally got UAE
approval to produce account statements with your Honor's help.

THE COURT:  You said that was 2012?

MR. COTTREAU:  2012.

The plaintiffs never came to us in the intervening
years and said pull these transaction documents for these
accounts or pull them all.  They stayed silent.  The first time
we heard from plaintiffs on this issue was on the day before
they filed their motions to compel.  We had a quick meet and

G3M5terA

confer on July 13th, 2015 and that was the first time they ever

voiced that they wanted them all pulled.  And these aren't easy

to pull -- and the accounts records that we have already

produced, your Honor, we have produced, I believe, for seven

customers eight accounts with over 700 transactions on the

account statements.  And sometimes, just for example, if you

try to find a check that was cleared by Dubai Islamic Bank, I

have looked into the burden of this even as recently as last

month to make sure I try to fully understand what we are up

against here; you might look through two, three, four boxes for

that branch for that day and not find it.  And then you have to

look through two, three, four boxes per day afterwards and it

is not even easy to locate the two, three, four boxes on the

index because, as I said, it is essentially a hand-keyed index

for 50,000 boxes.  They are not even easy categories to

identify the boxes on the index.  If it is conceivable to try

to find one of these checks it may take a person around a day

or even longer to take a person to find one check that is

cleared by the bank.

THE COURT:  Presumably, if you had a defined universe

of accounts and checks -- restrict it to accounts.  If you had

a defined universe of accounts you wouldn't have to make

repetitive passes, you would look for all the checks for those

accounts in box one and move to box two?

MR. COTTREAU:  That's true, but there is almost no

G3M5terA

1    overlap, your Honor.

2           THE COURT:  Putting aside the question of whether

3    plaintiffs delayed too long, one of the problems with your

4    argument is assuming that these transactions or transfers are a

5    significant element to the plaintiff's case, you are basically

6    saying because of the burden they shouldn't be enabled to prove

7    their case, assuming they can.

8           MR. COTTREAU:  We have never said no transactions.

9    Here is what I think would be --

10          THE COURT:  Well, the transaction -- would you agree

11   that the transaction records with transaction summaries -- let

12   me call them that -- without the underlying transaction

13   records, are pretty useless?

14          MR. COTTREAU:  I wouldn't agree with that.  I agree

15   that in some cases they may have a more limited utility but I

16   don't think, for example --

17          THE COURT:  There is an account that can be shown to

18   be an Osama Bin Laden account and it shows a million dollars in

19   and a million dollars out every month for a year without

20   something that indicates where the million came from and where

21   it went.  Isn't it pretty useless?

22          MR. COTTREAU:  In that example it may be.  We don't

23   have any account for Osama Bin Laden.  We have never had an

24   account for Osama Bin Laden to the best of all of our

25   investigation efforts dating back to 1999.  And so, I will give

G3M5terA

you an example, your Honor, a cash deposit, $500.  Do we really
need to go find the deposit ticket for that?

THE COURT:  Okay.

MR. COTTREAU:  Okay.

THE COURT:  It seems to me that the answer is
self-evident.

MR. COTTREAU:  An electronic transfer from one account
to another and we can tell on the electronic transfer data what
that is.  That's another one.  There may have been a piece of
paper initiating it but we have a pretty good handle from the
electronic data what that is.

THE COURT:  Okay.  Well, you said in those accounts
there are 700 transactions.  How many of those are non-cash
paper transactions where one would have to look at the
underlying record to have an understanding of what actually
occurred?

MR. COTTREAU:  I think that's something we could
parse.  I know this, about 170 of them I think are ATM
transactions, maybe 169, but approximately 170 are ATM.  No
reason to pull those, obviously.

My suggestion would be this, your Honor, that we do
two things with respect to the transactional records.  Number
one, the electronic data that we have associated with each and
every one of the transactions, we produce that, because I think
that's something we can get out with a query fairly easily

G3M5terA

1    compared to the task of sorting through this index of over

2    50,000 boxes and try to assess where things might be.  And then

3    my other suggestion would be that we look at something that is

4    proximate in time.

5          Now, Mr. Carter said that we were taking the position

6    that we are not going to produce records back to 1992.  That's

7    not our position and, indeed, for each of these eight accounts

8    if we had any account statements between 1992 and September 11,

9    2001, they were produced.

10         THE COURT:  Tell me again what the eight accounts

11   relate to?

12         MR. COTTREAU:  The eight accounts were the result of

13   two-fold methodology that we were talking about earlier, your

14   Honor, which is any government correspondence but primarily

15   with the UAE Central Bank, I assume some of that may have been

16   cooperation with the U.S. authorities but that's a complete

17   assumption on my part.  But, beginning within two weeks after

18   9/11, the UAE Central Bank started sending around what they

19   call circulars to all of the banks asking whether you have

20   accounts in the following names.

21         THE COURT:  Copies of some of which are in the papers?

22         MR. COTTREAU:  Copies of some of which I think are

23   appended to their reply at A through H or so.

24         And we did account searches.  These aren't easy.  I

25   will give you an example of one of the accounts we produced to

G3M5terA

1   plaintiffs as part of this batch, the account that Mr. Carter

2   identified as Ammar al-Baluchi.  We didn't have an account for

3   Ammar al-Baluchi.  Okay?  And this is the challenge of what

4   plaintiffs want us to do.  They identify eight people and they

5   say:  Find the accounts.  But we did have an account for Ali

6   Abdul Aziz Ali.  It turns out that's Ammar al-Baluchi's alias.

7   We found it because we were given the name and the alias, but

8   otherwise we would have no way of knowing that Ammar al-Baluchi

9   is as Ali Abdul Aziz Ali.  The names are not close, they're not

10  in any way connected in our minds at the bank and certainly not

11  me as outside counsel.

12          And so, what we gave plaintiffs is the result of our

13  two-step process.  Step one, anything related to al Qaeda that

14  was an account identified in any government correspondence that

15  we got they have and they have it already and they have all of

16  the account statements and they have all of the account opening

17  documents that we have.

18          Secondly, we have this problem, the Ammar al-Baluchi

19  and Ali Abdul Aziz Ali problem and the question was you are

20  asking for every Taliban member, every al Qaeda member ever and

21  you want us to identify who is al Qaeda and who is not.

22          THE COURT:  That was the 2,900 names or individuals?

23          MR. COTTREAU:  Yes.

24          THE COURT:  It sounds like we are now talking about a

25  far smaller universe.

G3M5terA

1          MR. COTTREAU:  If we are, we are.  If we are talking

2     about 400 Taliban names that were on the list that we received

3     from Mr. Carter's colleague which is at Exhibit 2 to our

4     papers, there are, by our account -- some of these names aren't

5     easily identifiable but, by our count, almost 400 individuals

6     in the Taliban.  Some joined the Taliban after 9/11.  Some

7     people on the list of 2,900 names were 13 years old at the time

8     of 9/11.

9          THE COURT:  But their accounts could still be used.

10         MR. COTTREAU:  I suppose so but there is no -- I mean

11    even in plaintiff's own -- in their reply brief they talk about

12    what the financial flows are between al Qaeda and the Taliban

13    and they say it is from the al Qaeda to the Taliban to the tune

14    of $20 million in the annual budget.  There is no evidence that

15    the plaintiffs put forward that the Taliban is giving money to

16    al Qaeda or that somehow Taliban accounts throughout the world,

17    there is no allegations in plaintiffs complaint that we had

18    Taliban accounts, there is no allegations in their RICO

19    statements that we had Taliban accounts and what we had, your

20    Honor, was a list of 2,900 names and we have to hand write

21    queries, sequel queries of underlying databases in the legacy

22    system to find out if there is a hit on each one of those

23    names.

24         And so, the question was how do we reasonably cut it

25    back?  And so, what happened was we received this list in July,

G3M5terA

```
1    we analyzed the list and we tried to figure out how can we

2    reasonably cut back the list of 2,900 names to something that's

3    accomplishable?

4           And so, we went through the 9/11 Commission Report,

5    all 567 pages.  If a name appeared in the 9/11 Commission

6    Report to have anything to do with 9/11 we kept it on the list

7    and we took all the aliases that were listed in the documents

8    in the list that plaintiffs provided, and we took all the

9    aliases in with it.

10          So, anybody in all 567 pages of the 9/11 Commission

11   Report who is connected in any way to 9/11, we kept them on the

12   list.  That gave us a list with the search terms that we had

13   already agreed with plaintiffs to provide of 261 names.  And we

14   wrote to plaintiffs on September 8, 2011 and said, hey, this is

15   our methodology, here is what we have done.  Let us know.

16          We were up against, at that time, a more pressing

17   document discovery deadline and we wanted to move forward, we

18   then didn't hear anything for two weeks.  We wrote to them

19   again and this is these two letters are Exhibits 3 and 4 to our

20   papers, we wrote again to Mr. Carter and said we haven't heard

21   from you, we would like to move forward, we have increased the

22   list to take into account punctuation so if there is an accent

23   that might be recorded as a hyphen after the name or an

24   apostrophe after the name, we have added some additional search

25   terms and here the final list at 261.  Essentially, we are
```

G3M5terA

1    going to move forward unless we hear from you and we haven't

2    heard from you in in response to our prior letter.  We never

3    heard from them.

4            When they reach out to us -- and this is Exhibit 2

5    with a list of 2,900 names, it is an e-mail from Scott

6    Tarbutton and he attaches the two lists that amount to 2,900

7    names.  He ends his e-mail with this:  *I fully anticipate that*

8    *the list will be finalized next week once I have an opportunity*

9    *to speak with our translators and have further discussed the*

10   *same and received final approval from our co-plaintiffs.  Once*

11   *we provide you with the finalized list, plaintiffs will be in*

12   *touch to discuss the methodology and scope of the record system*

13   *searches to be conducted by DIB.*

14           And that was on July 15th.  We wrote back with our

15   alternative methodology at Exhibit 3 on September 8, wrote back

16   two weeks later on September 22nd.  Never heard from

17   plaintiffs.  They never called up with their finalized list,

18   they never reacted to our initial cut down of the list.  They

19   never reacted to 261 terms.  We produced the results of those

20   searches and the accounts that were identified in connection

21   with the government inquiries in August of 2012.

22           THE COURT:  One of the things you produced, though, is

23   a document that I gather relates to accounts that the U.S.

24   government, perhaps through the UAE Central Bank had requested

25   information about 152 names and there is a document within the

G3M5terA

1    exhibits I have been given which redacts all of those names and

2    I can't for the life of me figure out what the basis for the

3    redaction is.

4            MR. COTTREAU:  The basis for the redactions are

5    they're not related to al Qaeda and our responses to those are

6    not simple matters.  There are customers who are identified in

7    the responses who may not be the people they're looking for.

8    The government might not -- their response is --

9            THE COURT:  Where did the list of 152 names come from

10   originally?  I gather that traces back to -- and you may not

11   know the answer -- but I gather it traces back to a U.S.

12   government request?

13           MR. COTTREAU:  I don't have any idea.  I can speculate

14   that that's the case.

15           THE COURT:  Let me interrupt and ask Mr. Carter his

16   understanding.

17           MR. CARTER:  Your Honor, I don't know the origin of it

18   but the list specifically identified these individuals as

19   individuals who are members of the Taliban or entities

20   associated with the Taliban and this is the heart of the

21   problem.

22           THE COURT:  But I could generate a list that says Jim

23   Kreindler is a member of the Taliban and give it to

24   Mr. Cottreau.  There must be some understanding where this list

25   emanates from.  The U.S. government?

G3M5terA

| | |
|---|---|
| 1 | MR. CARTER:  I am sure it is the U.N. sanctions list, |
| 2 | your Honor, relatively sure, and the problem is Mr. Cottreau |
| 3 | just said we redacted them and didn't do anything because |
| 4 | they're not related to al Qaeda.  They're Taliban, they are |
| 5 | related to al Qaeda and that's the essence of -- |
| 6 | MR. COTTREAU:  The U.N. sanctions 1266 list which is |
| 7 | actually attached to Mr. Tarbutton's e-mail at Exhibit 2 to our |
| 8 | papers actually distinguishes the list person by person whether |
| 9 | they're affiliated with al Qaeda or the Taliban. |
| 10 | We had 2,900 names.  We weren't going to search all |
| 11 | 2,900 so we took the following approach.  If they're in the |
| 12 | 9/11 Commission Report, great.  If they're not, we have to draw |
| 13 | a line somewhere.  Then we are free to come back and say draw a |
| 14 | different line. |
| 15 | THE COURT:  Tell me the principal basis for saying we |
| 16 | have searched the 9/11 Commission Report and we have also been |
| 17 | given a list of 152 names, admittedly prospectively Taliban, |
| 18 | not al Qaeda but those (A) we are not searching, but (B) to |
| 19 | protect the identity of the account holdings we are withholding |
| 20 | the name. |
| 21 | MR. COTTREAU:  Your Honor, we had the following |
| 22 | methodology which we were completely transparent in several |
| 23 | pieces of correspondence with the plaintiffs and we were going |
| 24 | to take two approaches.  One is if a person was identified as |
| 25 | being affiliated with al Qaeda in government correspondence and |

G3M5terA

1   we had accounts for that person that we identified as part of

2   the process of responding, we would produce.

3          There was never, until I showed up at the hearing,

4   there was never any discussion with plaintiffs ever about other

5   people on other -- other people with other organizations in

6   government correspondence including the Taliban.

7          THE COURT:  Are the 152 within the 2,900?  Do you

8   know?

9          MR. COTTREAU:  I don't know.  I don't know.

10          THE COURT:  Mr. Carter, do you know?

11          MR. CARTER:  I don't, because the 152 have been

12   redacted.

13          THE COURT:  Well, that's fair.  Fair enough.

14          MR. COTTREAU:  There were almost 400 names in the list

15   that they sent on the 2,900 that were related to the Taliban.

16          THE COURT:  Okay.

17          MR. COTTREAU:  There is the John Smith problem

18   everywhere in the world as I have learned from searching bank

19   records from case to case, and in these pieces of

20   correspondence, your Honor, there are customers who are

21   identified who don't appear to be, "*these aren't the droids*

22   *they're looking for,*" if you will, and this was the Taliban.

23          In all of our discussions we never agreed to search

24   government lists related to Taliban or other organizations or

25   narcotics trafficking.  We always agreed -- and I thought this

G3M5terA

was the one area until I walked into the hearing today that we

had complete agreement on, that we would take government lists

that relate to al Qaeda and produce the accounts related to the

people on that list.  And the only time the Taliban ever came

up in any of the discussions before I walked in here today was

as part of plaintiff's list of 2,900 names in their July 2011

submission which was identified to us as a draft submission and

they never submitted a final list of terms.

So that's how we got in here and, quite frankly, you

know, 400 terms, we have searched 261 that are for al Qaeda and

looked through the government list for all core al Qaeda and

looked through all the electronic and account opening

statements that we have for those accounts.  It seems to me

that the Taliban issue, 400 names, they're not in the

complaint, they're not in the RICO statements, they can't even

identify any connection between these 400 names and 9/11 or

have any reason to believe that we have any of those 400 names

at our bank.  It is an enormity of an effort that surpasses the

one we have previously done in searching the 261 terms.

THE COURT:  Why don't you move on to some of the other

broad categories like the fatwas and the Sharia board?

MR. COTTREAU:  Sure.

In no particular order, your Honor, but I am going off

the list that Mr. Carter generated in my notes, with respect to

this alleged meeting in or over about July of 1999 between U.S.

G3M5terA

and UAE officials, it was identified initially in plaintiff's

discovery request to us as a meeting attended by DIB -- by

Dubai Islamic Bank.  That was the basis on which we objected to

it as ambiguous because we had no idea of any meeting attended

by any official at the bank and, indeed, still do not.  And we

ultimately redefined that term to include meetings that

happened between officials at the UAE and the U.S. government.

I still don't know what level of government that happened at,

if that was the Dubai government, the UAE.  The plaintiffs

production entire production on that meeting consists of the

New York Times article and the State Department briefing and we

don't have any more information.  Plaintiffs have said we

produced nothing.  That's not true.

          In the wake of the July 1999 article we conducted an

internal investigation with a gentleman who was there helping

with some asset tracing, his name is Robert Ellison.  We

produced a tremendous amount of correspondence with him.  At

the time the bank had engaged two U.S. lawyers as part of that

asset tracing project and they were around to assist.  We

waived privilege and produced the correspondence with those two

U.S. lawyers Alan Fine, who is a Judge in Miami; and Bill

Ritchie.

          Their notes reveal the steps on the investigation

including calling various people in the U.S. government to try

to obtain more information about this meeting.  They vetted the

G3M5terA

1    issue of whether Osama Bin Laden was a bank customer -- and he

2    wasn't which was the core allegation.  They were trying to get

3    more information about who else are you looking for.  And all

4    of that is revealed in 101 pages in our production and the

5    plaintiffs -- and I was a little bit surprised to hear we

6    produced almost nothing today because the plaintiffs coincided

7    the 101 pages in their own papers in this case.

8         So, on that meeting we have produced everything we

9    have and, indeed, we have waived privilege on what we did have

10   with these U.S. lawyers who were helping to look into the

11   issue.

12        On the Fatwah and Sharia board -- let me try to

13   explain Islamic banking a little bit.  It is governed by a 1985

14   UAE law which we have attached as part of our submission as

15   well.  There are special banking laws in the UAE and in many

16   other countries that govern the federal laws to Exhibit 7 to

17   our papers.

18        A Shariah board, its function is to assure Shariah

19   compliance and that means compliance with principles of Islamic

20   law.  That usually means a number of things but probably the

21   most animated feature in most of its decision is a concept of

22   Riba which is similar to usery although it can have a broader

23   meaning.  Some folks take the view that maybe most folks that

24   it prevents the charging of interest at all.

25        The Shariah board's function isn't to go and find

G3M5terA

customers, it is not to approve which customers we do business

with, it is to approve transaction forms.  It doesn't look at

every checking account or, as they call it in the Middle East,

a current account.  It doesn't look at every savings account to

ensure that no interest is being paid in the account.  It

doesn't approve any customers.  It says here is -- when the

bank wants to have a certain type of account or product at the

bank they say here is the structure of the product and the

Shariah board looks at the structure and approves the

structure.

They may say well, you have to inform the customer for

fairness reasons of this, that, and the other, and that gets

written into the official product literature which is

ultimately issued and then the business people take the idea

and run with it.

The issue in this case is how do we get these

customers and was it intentional that we had these customers

because, as you know or may know, Citibank, Sun Trust, HSBC,

Chartered Bank all have accounts for people who are related to

al Qaeda and, indeed, no one knew who these people were and

that's why these people were let into this country, by and

large; at least many of these folks, the hijackers.

So, in terms of the Shariah board's function, we don't

see it as particularly relevant.  They don't pass on who our

customers are.  And what we said to them and what we gave them

G3M5terA

1    in our initial productions were documents sufficient to show

2    the role of the Shariah board and that's what we have produced

3    thus far.

4         We were happy to include also the charter which we

5    attached that spells out that rule for the Shariah board.

6         THE COURT:  How about the Fatwahs?

7         MR. COTTREAU:  The Fatwahs, your Honor, are --

8         THE COURT:  You draw a distinction between those

9    instigated by individuals who may be a member of the Shariah

10   board in their individual capacity and anything that a Shariah

11   board does in its corporate capacity, if I can call it that.

12        MR. COTTREAU:  Well, let me try to confirm the term

13   Fatwah.

14        THE COURT:  Please.

15        MR. COTTREAU:  It is essentially a religious

16   pronouncement, okay, that generally speaking at least under

17   law, banking law has to be done by three or more members

18   together acting together.  Every single official Shariah board

19   Fatwah at Dubai Islamic Bank has to be approved by the entirety

20   of the board.  They do it by approving transactions.  A lot of

21   times they get the customer name, the customer details, the

22   details of the transaction, if it is a one-off type of

23   transaction.  This would be a specialized corporate banking

24   transaction, for example.

25        So, there are all kinds of personal details about bank

G3M5terA

1    customers in these documents.  Sometimes they're scrubbed,

2    sometimes they're not.  But they're all far afield from what we

3    are talking about here which is by and large retail banking for

4    individuals where there is no pronouncement at all by the

5    Shariah board about other than to say you can have a checking

6    account, what they call a current account or savings, what they

7    call an investment account.

8        So, in terms of the pronouncements of the Fatwas, they

9    just don't really have much to do here given the role of the

10   Shariah board at the bank.

11       THE COURT:  So, you are saying at least in relation to

12   the official acts of the Shariah board the fatwa is the Dubai

13   equivalent of a corporate resolution?

14       MR. COTTREAU:  Yes.  They look at the transaction.

15       Proposed is a joint investment because they don't do

16   loans.  A joint investment with customer ABC Company.  This is

17   not something that we have a stock form for so it is going to

18   be drafted by the lawyers.  Here is the draft of the paper, it

19   is a three-year partnership, we are going to contribute this.

20   Our partner is going to contribute that, we are going to share

21   the profits equally or however we are going to share it.  That

22   is presented to the Shariah board and they issue a Fatwa saying

23   you can or can't do it or you have to change this about it.

24       Again, they don't identify even those business

25   partners but they essentially have a negative function.  They

G3M5terA

1    can essentially veto, if you will, transactions.  Any of the

2    bank transactions that occurred which are the transactions that

3    would be relevant in this litigation, any of the bank

4    transactions that occurred weren't as a result of the Shariah

5    board identifying customers or telling anyone that you have to

6    engage in this type of transaction.  Their only function in

7    terms of a positive "you have to" has nothing to do with retail

8    banking.

9            So, that's where we are on the Shariah board.  We have

10   offered in our papers to also give them a complete list of

11   Shariah board members from 1992 to September 11, 2001 because

12   one of the people that they feature very prominently in their

13   papers with you, your Honor, issuing these personal Fatwas

14   wasn't even on the Shariah board at the time leading up to

15   September 11, 2001.  He was added to the board years after and

16   was ultimately -- you know, ultimately finished his service

17   with the board.

18           In terms of the Shariah board, just so your Honor has

19   some understanding of this, Dubai Islamic Bank is the first

20   Islamic bank in the modern world.  It was formed in 1975 to

21   offer these products for Muslims who believed that interest was

22   against the teachings of Islam and added its function since

23   1985 has functioned under the Shariah banking law of the UAE.

24   And there are Shariah board members who do this, it is not a

25   full-time job.  They come in and they meet and they pronounce

G3M5terA

1   on products periodically and they serve on, in some cases,

2   dozens and dozens of other bank's Shariah boards.  These are

3   people who have made a name for themselves of being Islamic

4   scholars, they're usually professors or other scholars and they

5   have something to do with the financial industry, have some

6   status to be able to say what is Shariah complaint and what is

7   not when they act together as a board.

8           THE COURT:  So they're not, just out of curiosity,

9   they're not clerics, typically?

10           MR. COTTREAU:  I don't believe so.  I believe they're

11   more professorial.  The head of our Shariah board was a former

12   Egyptian Attorney General.

13           So, these aren't people who -- they come to work, they

14   pronounce on the products and that's their role at the bank and

15   I don't see how it is particularly relevant and never have

16   here.

17           THE COURT:  Anything else?

18           MR. COTTREAU:  Not unless you have any questions.

19           THE COURT:  Not at the moment.  Thank you.

20           MR. COTTREAU:  Thank you.

21           THE COURT:  Anything further, Mr. Carter?

22           MR. CARTER:  Briefly a few things, your Honor.

23           Mr. Cottreau has spent quite a bit of time talking

24   about the back and forth around the meet and confer at the

25   beginning of discovery and candidly, your Honor, it is a

G3M5terA

1    diversion that has very little to do with what we are here

2    about today.  We are talking about essentially agents, al Qaeda

3    members accounts, Taliban accounts, investigations into the

4    embassy bombings.  We are not talking about what ideas the

5    parties exchanged at the time.

6              What I will say about that --

7              THE COURT:  Well, there is a little question that the

8    ball got dropped for a considerable period of time.

9              MR. CARTER:  Well, your Honor, what I would say about

10   that is --

11             THE COURT:  Isn't that fair?  Regardless of who may

12   have dropped the ball, a lot of time has passed where virtually

13   nothing has occurred.

14             MR. CARTER:  A lot of time did pass, your Honor.

15             What I will say is at the first meeting, in conferring

16   with Mr. Cottreau he is incorrect in suggesting that we did not

17   raise an issue with the Taliban accounts.  We had a very

18   spirited discussion about the Taliban accounts as well as

19   accounts DIB maintained for Hamas related entities.

20             As to the Taliban accounts, we made clear our view

21   that they were very directly related to the support of

22   al Qaeda.  As to the Hamas accounts, we articulated our view

23   that they were relevant to our DIB defenses.  In particular, if

24   it is going to come into court and argue on the merits that it

25   abhors terrorism and would never be associated with a violent

G3M5terA

1    jihadist organization but is maintaining accounts for Hamas, we

2    thought that was relevant and that also going to the Taliban

3    accounts.  If you are maintaining accounts for Taliban during

4    the period when United Nations is condemning it for its role in

5    supporting Bin Laden, that's relevant not only to our claims

6    but their defenses.

7         What we decided was it was clear that Dubai Islamic

8    Bank was not willing to go into that territory without court

9    intervention and had decided to conduct the searches it wanted

10   to search.  We didn't know of anything about the internal

11   system or what the searches would yield.  So, we agreed to wait

12   to see what came back before seeking court intervention.

13   Candidly, your Honor, if they came back with a stack of papers

14   saying here is the transaction that the U.S. government was so

15   worried about that prompted its conversations with the UAE, we

16   may very well have rested on our laurels at that point.  It

17   didn't come to pass.

18        With regard to the delay, your Honor, we had always

19   indicated from the outset that we wanted to wait until all of

20   the defendants had produced their documents before moving

21   forward with full scale motion practice and there was a reason

22   to that.  We saw interconnectivity among the defendants and in

23   fact, your Honor, one of the recent productions from defendant

24   al Kadi includes a transaction involving an account held by an

25   individual who is identified as a close associate of Bin Laden

G3M5terA

1    at DIB.  And so, we sent a supplemental request for that.  Most

2    of the delays, your Honor, in going to the phase of motion

3    practice have been related to the other defendants asking for

4    more time to complete their productions.

5         We finished ours in August 2012 as well, but at the

6    end of the day --

7         THE COURT:  Well, let's just be clear.

8         In terms of accounts there is the 261 that the bank

9    has proffered generated however.  There is the 152 alleged

10   Taliban accounts.  There are eight other accounts and I am not

11   sure how to generically describe those and I'm not sure whether

12   they're in the 261.

13        MR. COTTREAU:  Your Honor, if I can just clarify?

14        THE COURT:  Yes.

15        MR. COTTREAU:  The eight accounts are actual accounts

16   found and produced to the plaintiff.

17        THE COURT:  Okay.

18        MR. COTTREAU:  The 261 are search terms that were

19   agreed upon by the plaintiffs and the defendants and/or that we

20   added from the 9/11 Commission Report as a subset of their

21   2,900.

22        So, the 261 is a combination of names that we had

23   agreed already in our objections to search plus the subset of

24   this 2,900 that was in the 9/11 Commission Report.

25        THE COURT:  Okay.  So, there are 421 accounts, eight

G3M5terA

1    of which have been produced.

2         MR. COTTREAU:  Hold on.

3         THE COURT:  The balance of which.

4         MR. COTTREAU:  Search terms, not accounts.

5         THE COURT:  Okay.

6         MR. COTTREAU:  The 152 accounts don't exist and the

7    261 accounts don't exist.

8         THE COURT:  So it may well be that the 261 generates

9    fewer accounts.

10        MR. COTTREAU:  It may be that it generates no

11   accounts.

12        THE COURT:  Right.  The 152, on the other hand, are

13   accounts.

14        MR. COTTREAU:  No.  Not necessarily.

15        THE COURT:  Oh okay.

16        MR. COTTREAU:  Those are, again, names that were

17   provided in a central bank circular that were affiliated with

18   the Taliban.

19        THE COURT:  Okay.  Let me then revert back to you,

20   Mr. Carter, and say beyond that universe of 421 today,

21   regardless of how we got there starting with 2,900 what, if

22   anything else, are you looking for?

23        MR. CARTER:  Well, your Honor, I think again the 261

24   was the list they generated from the 9/11 Commission.

25        THE COURT:  Right.

G3M5terA

1          MR. CARTER:  It would have excluded, for instance,

2     al Qaeda members involved in the embassy bombings who just

3     didn't happen to be mentioned in the 9/11 Commission Report

4     which was the case with a lot of people.

5          In terms of the accounts for which we are seeking

6     records, we have identified the specific individuals in the

7     papers.  There are eight al Qaeda members and one al Qaeda

8     financier for whom we are seeking the transactional records.

9     Then there is the issue of Taliban accounts.

10          THE COURT:  Just so I am clear on that, that's

11     different than the accounts for which some documents have been

12     produced by DIB or those are those accounts?

13          MR. CARTER:  Those are those accounts, your Honor, for

14     which we have statements.

15          THE COURT:  Okay.

16          MR. CARTER:  So, there is a handful of accounts we are

17     seeking more than account statements and a handful of opening

18     documents.

19          The second issue is the Taliban accounts and we still

20     don't have any meaningful production of Taliban accounts

21     whatsoever.

22          Now, on the 152, your Honor, I would simply caution

23     that that is one letter from the UAE.  Now, we don't know what

24     is on it, we don't know if it is synonomous with the list

25     that's maintained by the U.N. sanctions and so we would need to

G3M5terA

 1    see what that 152 names consisted of to see whether it

 2    reconciles with what the United Nations said was the

 3    composition of the Taliban as of essentially 9/11 and the

 4    period before it.

 5            Again, we just haven't seen the names so we don't have

 6    an idea on that.

 7            The next area relates to the investigations pertaining

 8    to DIB accounts implicated in the embassy bombings.  One of the

 9    logistics people for embassy bombings and procurement expert

10    who was arrested by German authorities had three cards for DIB

11    accounts and then there was separate indications that

12    authorities asked DIB to close, I believe it was, 16 Taliban

13    accounts at that time.

14            So, there is the general issue of Taliban accounts as

15    well as any particular accounts that they were asked to close

16    in the wake of the embassy bombings.

17            Your Honor, there was a comment about cash

18    transactions essentially being irrelevant on the whole.  I

19    think I agree with Mr. Cottreau that a debit/cash withdrawal of

20    $200 is not a big deal.  A cash withdrawal of $40,000 or

21    $50,000 from a branch that doesn't generate a suspicious

22    activity report may actually be relevant.

23            So, I just simply want to reserve the notion that not

24    every cash transaction might be irrelevant.

25            That's it, your Honor.

G3M5terA

1      THE COURT:  Let me try and deal with some of these

2  issues and then we will take a break for a few minutes.

3      Let me start with the accounts that we have been

4  talking about whereas I indicated there are 421 or so accounts

5  or names perhaps also augmented by the accounts that Mr. Carter

6  just spoke about that will relate to the embassy bombings which

7  then there was a specific request that DIB close and perhaps

8  certain other similar requests.  For that universe of accounts

9  which I gather is larger than 421 but -- accounts or names

10  which I gather is larger than 421 but probably no larger than

11  500, I am going to direct that to the extent it hasn't already

12  been done, the account opening and if there is any account

13  closing paperwork, the periodic statements and the other

14  electronic information that exists such as the wire transfer

15  information that Mr. Cottreau alluded to, be produced.

16      And I am going to live it to the two sides to talk

17  about a timeline because obviously I don't know what is

18  realistic.  If I have to set a date unilaterally I will but I

19  would rather that there be an informed discussion about that

20  and hopefully some agreement.

21      MR. COTTREAU:  Your Honor, if I could just interject

22  to clarify one point?

23      THE COURT:  Yes.

24      MR. COTTREAU:  Because I didn't have a chance to

25  respond to Mr. Carter's suggestion.

G3M5terA

1        THE COURT:  Sure.

2        MR. COTTREAU:  We have no idea, sitting here today, I

3   have no idea the 16 names that the bank was allegedly asked to

4   close in the wake of the embassy bombings.  That's not

5   something that's in any of the papers in this case and it is

6   the first I have ever heard of it.

7        My only suggestion would be so that we can get --

8   completely comply with your Honor's order is this list of not

9   more than 500 names that the plaintiffs have that they just

10  gather it, send it to us as search terms, and we will query our

11  database using those as search terms using the same methodology

12  that we did to do the 261.

13       MR. CARTER:  Your Honor, the only hesitation I have is

14  that it is public reporting that indicates that there was a

15  request from the authorities to Dubai Islamic Bank to close the

16  accounts.  It doesn't identify what those accounts are.  Again,

17  we would have expected that the public reporting of that

18  information would have prompted an internal inquiry that there

19  would have been a communication and so we are asking that that

20  be searched.

21       THE COURT:  I presume that this would have been a

22  notification akin to the ones that I have copies of.  If the

23  bank is unable to identify it and Mr. Cottreau is nodding in

24  such a way that he indicates they can't, then I guess the onus

25  falls to you to provide them some further information about

G3M5terA

1    those accounts.

2         As you move forward in discovery there are a number of

3    areas like there are in a lot of domestic cases where one side

4    takes the view that there should be some information.  I really

5    can't deal with the "there should be" sort of allegations even

6    if I am inclined to agree with whichever side is making that

7    assertion because absent proof that there is such a category of

8    documentation, the notion that there should be doesn't really

9    enable me to take action absent some indication of spoliation.

10         So, for those 500 accounts/names I have indicated what

11   is to be produced in the first instance, and once that's been

12   accomplished there needs to be a discussion quickly by the two

13   sides about what will follow on from that, whether it's akin to

14   what would happen in a domestic circumstance with a grand jury

15   subpoena, namely let's circle these entries and ask you to look

16   at those, whether Mr. Carter and his colleagues circle every

17   entry on every periodic statement and Mr. Cottreau comes back

18   to me and says we will be at this 20 years from now or, you

19   know, it remains to be seen.  But, we need to take this first

20   step and then we will see where we go from there.

21         Were you about to say something, Mr. Carter?

22         MR. CARTER:  Your Honor, the only comment I had with

23   regard to your Honor's statement about the 16 accounts

24   following the embassy bombings is that DIB's position at this

25   point has been that they're irrelevant and therefore not within

G3M5terA

1    discovery and so all we really need is a verification that the

2    search has been conducted to try and find those accounts or to

3    find the information related to those accounts.  I don't know

4    that the discovery responses right now provide us with the

5    simple answer we have searched and are unable to find any

6    information pertaining to this request.

7           MR. COTTREAU:  Your Honor, I have never heard the

8    number 16 and I could be mistaken, but I don't believe I have

9    heard that.

10          The only thing that I am aware of that Mr. Carter

11   cited in his papers that supports the notion that this bank was

12   asked to close any accounts is a report in the "L.A. Times"

13   years and years and years after the fact that said that the

14   bank was asked to close certain accounts.  It didn't identify

15   the number of them, didn't identify a single name.  And so,

16   that's why we are a little bit lost.  We have checked our own

17   internal papers to the extent that we have them.  We are in a

18   pre-e-mail age and largely a pre-Internet age at the bank and

19   we don't have any records.

20          So, if I could just clarify your Honor's order so I

21   make sure that we can carry it forth precisely?  The plaintiffs

22   are going to provide us with a list of not more than 500 names

23   that we will search using the same methodology that we did to

24   search the 261 --

25          THE COURT:  Well, no.  They can't provide you with the

G3M5terA

1    152 names because they don't know what those names are.

2         MR. COTTREAU:  Your Honor, if it would ease this and

3    your Honor wants to order it, just so that we can have

4    precision in the list because the list, to me, is something I

5    can actually accomplish, we will make available, on your

6    Honor's order, the unredacted version of the list of 152 names.

7         THE COURT:  Well, that was implicit in what I have

8    said, but yes.  So ordered.

9         MR. COTTREAU:  So, plaintiffs will provide us a list

10   with 500 names, we will search it using the same methodology

11   that we searched the 261 names, and if there are any accounts

12   for any of those individuals, we will produce the first three

13   items that I talked about out of four items that we have;

14   account opening documentation, complete account statements, and

15   any electronic transaction data that exists in our primary

16   legacy account record keeping system.

17        THE COURT:  Except to the extent that the account is

18   still open, perhaps.

19        Well, forget whether it is still open, except to the

20   extent that the non-legacy system also has relevant data.  It

21   may not, but.

22        MR. COTTREAU:  The legacy system covers the period

23   that we have agreed and maybe that's one thing that is missing

24   from your Honor's order.  We agreed to produce and the

25   plaintiffs have never objected, all account statements from

G3M5terA

1    1992, January 1, 1992 through September 11, 2001.  And that's

2    what we have used in this case with plaintiffs, that's what we

3    have used beginning in 2012 when we produced account statements

4    and that's what they have already.

5                THE COURT:  Well, I am sure they don't object to the

6    onset data.

7                What is your position on the end date?

8                MR. CARTER:  The only problem with the end date, your

9    Honor, is it is not going to reflect accounts being frozen or

10   investigation of accounts immediately after 9/11 so I think if

11   we carry that date forward simply to the traditional deadline

12   we have used which is 2004, we would be fine.

13               THE COURT:  I think that's reasonable, Mr. Cottreau.

14               MR. COTTREAU:  So, through 12/31/2004?

15               THE COURT:  Precisely.

16               In terms of the Shariah board, I do think that the

17   requests -- and we are dealing with concepts rather than

18   specific requests today, do strike me as overbroad.

19               In terms of the Fatwahs that are not banking related,

20   we didn't talk about this in great detail but the plaintiff's

21   papers suggest that there were some people who are actively

22   supporting terrorism who have been affiliated with the Shariah

23   board over time.  The bank has either produced or offered to

24   produce the individuals who were on the board for the relevant

25   time period.

G3M5terA

1          The plaintiffs, from that list, may identify specific

2     individuals who they have reason to believe, perhaps in their

3     individual capacity have either individually or together with

4     others, issued Fatwahs which are of interest because they're

5     not routine banking Fatwahs but these individuals and others

6     going off in a different direction and to the extent that the

7     plaintiffs do that, I will require the bank to produce any

8     information that it has.

9          The fact that somebody may have acted in their

10     individual capacity is largely irrelevant if the bank has

11     evidence that relates to those acts undertaken in the

12     individual capacity.  So, I hope that instruction is

13     intelligible.

14          MR. COTTREAU:  Your Honor, if I can clarify it to make

15     sure I have it?

16          THE COURT:  Sure.

17          MR. COTTREAU:  The Fatwahs that the plaintiffs have

18     produced are, in some cases, web postings on these individuals'

19     personal websites.  Those aren't bank records, we don't -- by

20     and large I hear you that we should check our records to make

21     sure we don't maintain a copy but that's our obligation --

22          THE COURT:  Well, let me rephrase it.  It would be to

23     undertake a reasonable search to find such documents.

24          MR. COTTREAU:  If we have Fatwahs related to violent

25     pronouncements of those individuals?

G3M5terA

1          THE COURT:  Yes. I think that's the gist of it.

2          MR. COTTREAU:  Okay.

3          MR. CARTER:  I think that's the gist of it, your

4     Honor.  The language doesn't always say violence.

5          THE COURT:  Right.

6          I am looking through my notes but, Mr. Carter, are

7     there other broad categories I should be addressing?

8          MR. CARTER:  Your Honor, the only other area is

9     whether or not there is information about investigations of DIB

10    pertaining to the embassy bombings and this '99 meeting, and in

11    particular with respect to the '99 meeting whether or not a

12    search has been conducted to truly identify everything that

13    exists and, second, whether or not DIB has the practical

14    ability to find out what was going on at that meeting by virtue

15    of its relation to the government.

16         THE COURT:  Well, some of that was covered by my

17    comments about the fact that because something may be

18    implausible doesn't give anyone the ability to take steps of

19    any sort.  Presumably, as discovery moves forward, there will

20    be depositions at some stage and if something concrete occurs

21    then you can bring it back to the Court.

22         In terms of the 1999 meeting, we talked about that.

23    What was the other one you mentioned?

24         MR. CARTER:  The embassy bombings investigation, your

25    Honor.

G3M5terA

1          THE COURT:  I take it the bank's position is it has

2     undertaken a good faith search for such documents?

3          MR. COTTREAU:  Your Honor, yes.

4          THE COURT:  And produced anything it has?

5          MR. COTTREAU:  Yes.

6          THE COURT:  So, that falls into the ruling I just

7     made.  At this juncture there is not much more I can do.

8          MR. CARTER:  Your Honor --

9          MR. COTTREAU:  Your Honor, I just want to make sure

10    that I understood your question.

11         With respect to the embassy bombings, are we talking

12    about the 16 names or --

13         THE COURT:  No.  We are talking about, I believe,

14    investigations or other responses that the bank internally may

15    have had in terms of checking whether it had troublesome

16    accounts or relationships.  And I gather you have made that

17    inquiry and produced anything you could find.

18         MR. COTTREAU:  I don't think we have produced on that

19    topic, your Honor.

20         THE COURT:  What's the basis for withholding that?

21         MR. COTTREAU:  The basis that we were trying to do on

22    this was in the midst of 108 requests so it is not something

23    that we did in isolation.  In the context of 108 requests and

24    the 2,900 names, as we were having these discussions with

25    plaintiffs, we had to draw a line.

G3M5terA

1          THE COURT:  Okay.

2          MR. COTTREAU:  And the line that we suggested that be

3    taken was that the 9/11 Commission Report had identified that

4    the real planning for 9/11 began when Khalid Sheikh Mohammed

5    joined al Qaeda in late 1998 or early 1999 and that we would do

6    a fulsome search of al Qaeda-related documents after that date.

7          THE COURT:  Okay.  And as to that issue, the one we

8    are talking about, I am inclined to agree with the plaintiffs.

9    So, there you need to expand the search and I gather there are

10   documents that will be produced as a result.

11         MR. CARTER:  Your Honor, the only remaining issue is

12   with regard to the 1999 meeting, it is not merely an issue of

13   whether DIB has searched its internal records, there is also

14   this issue of whether or not, given its relationship, it has

15   the practical ability.

16         I think one of the areas of concern we have is you

17   have a member of the Maktoum family who is the prime minister

18   of UAE and also the largest shareholder of Dubai Islamic Bank

19   and does he attend the meeting, perhaps, with the U.S.

20   officials in his capacity as an official and then disclaim the

21   knowledge in his capacity as the primary shareholder of DIB.

22         And so, we are just trying to assess whether or not

23   there is a practical ability to get this information.

24         THE COURT:  Mr. Cottreau?

25         MR. COTTREAU:  I don't know of any way to get the

G3M5terA

1    information.  The shareholders of the bank were now 27 percent

2    owned by something called the Investment Corporation of Dubai

3    which I understand is an investment instrument of the ruling

4    family of Dubai.  But, in terms of this 1999 meeting, as I

5    tried to express today, I don't even know where the meeting

6    happened.  It would strike me that one possibility and one

7    logical possibility is that it happened at the UAE Central Bank

8    which is in Abu Dhabi and had nothing to do with the government

9    of Dubai itself.  But, as a practical matter, I don't have any

10    way of accessing any records.

11         THE COURT:  I am not going to make a direction as to

12    that because I think it is a complicated area and there are

13    issues of sovereign immunity and we will deal with that as we

14    go down the road.

15         Let's take a 10-minute break and just so you can tee

16    up what is next, the charity defendants.

17         MR. COTTREAU:  Thank you, your Honor.

18         THE COURT:  Sure.

19         (Recess)

20         THE COURT:  Let's go to the central charity

21    defendants, the gang of four.

22         MR. CARTER:  You are stuck with me for one more, your

23    Honor, and then I am going to turn it over to Mr. Haefele for a

24    while.

25         THE COURT:  Thank goodness.

1            MR. CARTER:  Yes, I agree.

2            Your Honor, the four charity official defendants were,

3    as you know, remanded by the Second Circuit through its

4    decision in 2013 in which the Court held that the allegations

5    concerning those defendants were always with the charities

6    which they controlled gave rise to the inference that they

7    conducted their tortious conduct at the United States business

8    directing support to al Qaeda through charities under their

9    command.  And so, the Second Circuit remanded the claims

10   essentially for discovery relating to the nature of their roles

11   and the kinds of decisions they were responsible for making

12   within the charitable organizations they controlled and

13   supervised.

14           To date, the four charity officials have produced

15   virtually no documents in response to plaintiff's discovery

16   requests.  In total, the four defendants have produced a mere

17   82 pages and those consist largely of the affidavits and

18   biographical statements they had earlier filed in the

19   litigation in support of their motions to dismiss in which,

20   among other things, several of them claimed that they were

21   officials of Saudi government entitled to claim sovereign

22   immunity, a defense that they have since withdrawn.

23           The charity officials seek to excuse their failure to

24   produce documents by arguing that certain of the charities that

25   are also defendants in the litigation have received similar

G3M5terA

document requests and are producing documents, and that

plaintiffs should look exclusively to those productions in

relation to the discovery we are seeking from the individuals.

Obviously, your Honor, the rules require that the

defendants respond individually to the document requests

directed to them and the fact that other defendants may or may

not be producing documents relating to the same areas of

inquiry does not relieve them of their independent discovery

obligations.

The related problem is that even if a party to

litigation could rely on the separate discovery responses of

another party to satisfy its obligations, the reality is that

many of the charities these officials had roles in are not

meaningfully participating in discovery at all.  So, for

example, your Honor, Abdullah Naseef was not merely the

secretary of the Muslim World League, he also founded

Rabidi Trust and that, your Honor will recall, was designated

by the United States government, failed to participate in

discovery in the case, and was ultimately defaulted by this

Court.

Naseef also had relationships with individuals of

considerable interest.  For example, he was responsible for

appointing Wael Jelaidain to his position in the Muslim World

League; also responsible for appointing Osama Bin Laden's

brother-in-law, Mohammed Jamal Khalifa to the designated IIRO

G3M5terA

branch in the Philippines.  Abdullah Bin Saleh Obaid was, in

addition to his secretary of Muslim World League also an

officer of Rabidi Trust and of many of the Sanabel entities

that were incorporated in the items.

Your Honor will recall that the Sanabel entities in

the United States have stated that they no longer have any

records relating to the periods of greatest interest including

the period when Obaid was an officer of the entity, Abdullah

bin Muhsen al Turki, your Honor, is currently the head of the

Muslim World League and therefore in a position to direct that

entity to respond to request relating to his position.

Before that, he was the Saudi Minister of Islamic

Affairs from 1993 to 1999.  In that capacity he had a

supervisory role over all of the kingdom's proselytizing

organizations according to the 9/11 Commission, the Muslim

World League, the International World Islamic Relief

Organization, the World Assembly of Muslims and al-Haramain

Islamic Foundation.

We also know, your Honor, that al-Haramain filed an

affidavit early in the case when it was still participating in

which it specifically stated that al-Haramain works under the

supervision of the Audi Minister of Islamic affairs who

appoints its board members and senior management personnel.

And, again, al-Haramain Saudi Arabia is no longer

participating in the proceedings.

G3M5terA

1          So, there are a range of relationships and roles that

2     extend beyond those pertaining to the handful of charities that

3     are participating in discovery and the fact that those

4     charities are participating in discovery does not relieve the

5     defendants of their obligation to produce their own records.

6          I think, your Honor, we are reminded of the therefore

7     with Mr. Jelaidain where the Court ultimately issued an order

8     requiring him to undertake a full-court press not only to

9     locate documents within his physical custody, but under his

10    care and control.  And, it is warranted here.

11         In all candor, your Honor, we have some concern that

12    these defendants have not undertaken searches of their own

13    records precisely because they think it would reflect the

14    nature of their dealings, among others, with senior Saudi

15    officials.

16         The position these individuals held with these

17    charitable organizations and in the Saudi government are

18    positions of tremendous distinction within the kingdom and

19    within the Islamic world.  By way of an example, your Honor,

20    the MWL -- Muslim World League -- recently produced a document

21    pertaining to defendant al Turki's appointment as the head of

22    the Muslim World League in which the King equates it to being

23    appointed as a minister of the Saudi state.

24         These individuals have, in addition to the roles of

25    the charities, held very senior government positions -- the

G3M5terA

Shariah council, the Supreme Council for Islamic Affairs.  In
fact, the head of the Muslim World League automatically sits on
the Supreme Council of Islamic Affairs.

THE COURT:  Say that again.

MR. CARTER:  The head of the Muslim World League sits,
by automatic designation -- or sat, I should say -- on the
Supreme Council for Islamic affairs.  It is our understanding
that the current King has disbanded the Supreme Council for
Islamic affairs more recently.  But, in all years prior,
automatically sat.

We know a fair amount, your Honor, about how decisions
are made within these organizations from our own
investigations.  The Council for Islamic Affairs is or was the
policy making body responsible for formulating Saudi Arabia's
Islamic policy abroad.  A principal component of its foreign
policy, according to affidavits the kingdom filed in the
litigation, the ministry of Islamic affairs, in turn, was the
operational body responsible for deploying that strategy
principally through these ostensible charitable organizations
and so we have close coordination at the highest levels and at
the levels that these particular defendants would have operated
with very senior officials about making decisions about how
they were going to operate.

We are additionally concerned, your Honor, based on
the fact that you will recall that Sameer al Radhi of the IIRO

G3M5terA

1    filed an affidavit at one point way back in 2011 stating that

2    the IIRO had two kinds of documents; public documents and

3    documents that were protected from discovery by virtue of the

4    king and his immunity.

5           Now, again, that objection was withdrawn entirely but

6    it does indicate a certain desire to protect certain categories

7    of documents relating to the activities of the charities from

8    disclosure because of the governmental character.  There is

9    just no basis to do that.

10          I think, your Honor, there was a recent article in the

11   New York Times in September of 2015 that underscores the issue

12   and that I shared with Mr. Kabat in advance of the hearings.

13   It was issued in September of 2015 and describes the kingdom's

14   efforts to both spread a certain variant of Islam and use those

15   efforts to counter Iranian influence and describes the very

16   close coordination within the Saudi government in doing that.

17          The report indicates that the documents describe an

18   extensive apparatus inside the Saudi government dedicated to

19   missionary activity that brings in officials from the foreign

20   interior and Islamic affairs ministry, the intelligence

21   service, and the office of the king.  It goes on to say the

22   intelligence agency, sometime potentially the Saudi-supported

23   Muslim World League helps coordinate strategy.

24          And so, what we understand from all of the information

25   we have gathered largely on our own that these are very

G3M5terA

1    significant positions of respect and of achievement relative to

2    which these individuals interacted, traveled with, met with

3    some of the most senior officials of the Saudi government, as

4    well as foreign dignitaries.  People who reach that level of

5    accomplishment maintain some record of their life's work, your

6    Honor, and we are to believe that all four of these individuals

7    are so devoid of any interest in their own accomplishments that

8    they haven't retained a single record responsive to plaintiff's

9    requests?  That simply can't be the case.  They routinely gave

10   speeches at international conferences, they attended world

11   summits, they met with world leaders.  They have some records

12   in their possession that are responsive and we would simply ask

13   that they be directed to undertake the reasonable and necessary

14   efforts to collect them and produce them.

15           Thank you, your Honor.

16           THE COURT:  Thank you.

17           Mr. Kabat, why don't you use the microphone over

18   there.

19           MR. KABAT:  Your Honor, again, we need context of the

20   discovery.

21           What plaintiffs have not told you is that they served

22   a total of 129 document requests on the four charity officers

23   but of those 129 requests, 97 were identical or substantively

24   identical to the merits discovery request that they served on

25   the Muslim World League and the IIRO.

G3M5terA

1          Plaintiffs have yet to explain why the merits

2    discovery being served on the charities is the same or

3    justified as jurisdictional discovery to be served on the

4    individual defendants because the Second Circuit's opinion was

5    quite clear as to the basis for remanding those four charity

6    officers.  As we pointed out in our opposition, the Second

7    Circuit identified five areas and the first area was, quote,

8    whether they allegedly controlled and managed some of those

9    charitable organizations was definitely not a matter of much

10   dispute because the position that these individuals held with

11   each charity is a public record.  But, the remaining four

12   categories to the Second Circuit identified are quite narrow,

13   namely, whether through their positions of control of the

14   sureties they allegedly send financial and other material

15   support directly to al Qaeda, whether they directly provided

16   financial and other resources to al Qaeda knowing that al Qaeda

17   was engaged in global campaign, whether this support was

18   "expressly aimed at the United States."

19          Those are the areas that are properly the subject of

20   jurisdictional discovery.

21          THE COURT:  Although Mr. Carter would tell me that the

22   list is preceded by a "for example," correct?

23          MR. KABAT:  By what?

24          THE COURT:  By the phrase "for example."

25          MR. KABAT:  The plaintiffs have never told us how

G3M5terA

1    those 129 requests, the vast majority of them they simply cut

2    and paste from the merits discovery are relevant to

3    jurisdictional discovery.

4                THE COURT:  Well, your response reduced to a sentence

5    or two is if there are responsive documents they're in the

6    MWL/IRRO production, correct?

7                MR. KABAT:  Yes, largely because they're identical

8    document requests seeking documents of the sureties.

9                THE COURT:  Well, I guess the follow-on question is

10   have you been through those document productions?

11               MR. KABAT:  I have reviewed them.  Not every page

12   because there is some 460,000 pages but I would note, and again

13   what plaintiffs fail to mention is the Muslim World League and

14   the IIRO have done incredibly detailed index documents which

15   they gave to the plaintiffs.

16               And if I may give you an example of one of the

17   indexes?

18               THE COURT:  Yes.

19               MR. KABAT:  This happens to be the index for their

20   most recent production, the December 19, 2014 index, and you

21   will see it indicates for each set of documents the document

22   request that it is responsive to, and in our opposition to the

23   motion to compel we gave the Court –– it is Exhibit 1 to our

24   opposition –– we indicated, for example, al Turki request

25   number is the same as Muslim World League no. 50.

G3M5terA

1          Now, what we could do, it would be an exercise in

2    busy-work, is we could take these indexes and we could simply

3    add the al Turki document requests, the Basha document

4    requests, so forth --

5          THE COURT:  But that begs the question of whether your

6    clients, as opposed to Muslim World League or IIRO, have other

7    documents that relate to those requests.  As I understand it

8    you are taking the position if there is something responsive it

9    must have been produced by those two entities so therefore we

10   don't have to look.

11         MR. KABAT:  It is not quite that simple, your Honor.

12         In a sense what plaintiff has done here is they put

13   the cart before the horse.  They came to this Court saying we

14   want discovery responses to all of these 129 requests that were

15   served on each of the four defendants.  At no time did

16   plaintiff attempt a meet and confer unlike for other

17   defendants.  They never sent us the discovery deficiency

18   letter.  They never arranged for a meet and confer where we

19   could go over these requests and figure out which ones were

20   relevant to jurisdictional discovery.

21         THE COURT:  Well, did you ever file a formal response?

22         MR. KABAT:  What?

23         THE COURT:  Did you ever file -- let me rephrase it.

24         Did you ever serve a formal response to their Rule 34

25   requests?

G3M5terA

1         MR. KABAT:  Yes, we did, and those are in the exhibits

2    and that was quite a few years back.

3         I mean, Rule 71 expressly requires a meet and confer

4    and plaintiffs, in fact they did meet and confer in our office

5    10 years ago with respect to Al Haramain so plaintiff's counsel

6    knows how to do a meet and confer, they know how to do

7    discovery deficiency letters, yet they deliberately chose not

8    to do so with respect to these four defendants.

9         Now, there are two categories of documents that we

10   discuss in our opposition that were not fully covered by the

11   Muslim World League and IIRO document requests.  One is the

12   relationship between the charity and the Saudi government.

13        What plaintiffs don't tell you is that Muslim World

14   League and IIRO collectively produced over 14,000 pages of

15   documents relevant in relationship between the surety and the

16   Saudi government and there is really no basis for the plaintiff

17   to argue that Dr. al Turki has produced the Muslim World League

18   documents relating to the Saudi government when there is some

19   14,000 pages and to the extent the plaintiffs believe that

20   there are some documents they are not included within those

21   14,000 pages that they seek from the Muslim World League.  As

22   we know, they should file a motion to compel or seek them from

23   the Muslim World League.

24        Judge Daniels, in his ruling in November, rejected the

25   plaintiff's attempt to link the Saudi government to the

G3M5terA

1    sureties because there is no evidence of day-to-day control and

2    it appeared that the only reason the plaintiffs are really

3    seeking this discovery from the four defendants is not to prove

4    their liability, instead it is a backdoor way to get the

5    government back in the case.  An example of that was yesterday

6    Mr. Carter sent me an article from the New York Times which he

7    said he was going to rely upon today.  That article actually

8    came out in July of 2015, it is based on Wikileaks which is

9    double hearsay --

10             THE COURT:  It is based on what?

11             MR. KABAT:  Wikileaks --

12             THE COURT:  Okay.

13             MR. KABAT:  -- which of course is double hearsay, but

14   the article that Mr. Carter gave me yesterday and aid he was

15   going to rely on specifically says the documents do not show

16   any Saudi support for militant activity.

17             That's what Mr. Carter wanted to rely upon today.

18             The last point I want to make is that plaintiffs, in

19   their document requests, had numerous requests relating to the

20   golden chain which he may remember from years ago when Judge

21   Casey had this case --

22             THE COURT:  Let me save you some time.  I'm not going

23   to require the production of any documents related to the

24   golden chain so we can move on from there.

25             MR. KABAT:  Thank you.

G3M5terA

1          But that illustrates why it would have been helpful to

2    have a meet and confer with the plaintiff's counsel, so we

3    could go over these categories instead of having to argue all

4    129 document requests.  And, again, we are still willing to

5    engage in the meet and confer but what the plaintiffs have done

6    is put the cart before the horse, file the motion to compel

7    without doing discovery, without doing a meet and confer.

8    While we are happy to go back and look at the Muslim World

9    League indexes and see which documents relates to our four

10   clients, we think the burden is on plaintiff to have the meet

11   and confer, to identify those few requests that are relevant to

12   jurisdictional discovery as opposed to merit discovery, and

13   then we will move from there.

14          Thank you.

15          THE COURT:  Two of your global objections at nos. 5

16   and 6, 5 objects to documents concerning communications by,

17   with, or from the kingdom or its agencies, etc.; and 6 objects

18   to production of documents that are business records of the

19   Muslim World League or IIRO.  Since those records are the

20   corporate property of those -- I am paraphrasing -- those

21   entities and the defendants lack personal possession of those

22   records, taking those one at a time, is it your position that

23   if a document that's responsive to a request reflects a

24   communication with the government, even though it is held by

25   one of your clients in his personal possession, it's to be

G3M5terA

1    withheld on sovereign immunity grounds?

2              MR. KABAT:  No, we have not made that argument.

3              THE COURT:  It is an objection you have listed.

4              And, similarly, are you taking the position that if

5    one of your four clients has in his personal possession a

6    record which is a business record of one of those two

7    charities, that it doesn't have to produce it because the

8    record, in some fashion, belongs to MWL or IIRO?

9              MR. KABAT:  It is my understanding that the individual

10   defendants do not have Muslim World League or IIRO records in

11   their personal possession.  Only two of them are in fact

12   currently with the Muslim World League, the other two have been

13   long gone, and so while they have an office -- two of them have

14   an office in the Muslim World League there may be file cabinets

15   and such, Muslim World League has gone through those file

16   cabinets and so forth but they don't have the documents at home

17   if that's what you are getting at.

18             THE COURT:  Do you know whether to respond to the Rule

19   34 request to the charities their individual records were

20   searched?

21             MR. KABAT:  It's my understanding that they were.

22             And getting back to your first question about the

23   Saudi government issue, the point I was making there or the

24   objection we were making is that the individuals do not have in

25   their personal capacity, like at home or separate from the

G3M5terA

Muslim World League, Saudi government documents relating to the Muslim World League/Saudi relationship.  Those documents would be within the 14,000 pages that the Muslim World League and the IIRO have produced that specifically relates to the Saudi government.

Thank you.

THE COURT:  Mr. Carter?

MR. CARTER:  Your Honor, a few things.

Mr. Kabat made much of the overlap between the discovery served on the charity official defendants and the discovery served on Muslim World League and IIRO.

After the Second Circuit remanded the charity official defendants we did two things, we served discovery requests on the individual charity official defendants and we served supplemental discovery requests on the Muslim World League and IIRO and other charities relating to the activities of those individuals as officials.

Essentially what happened is that the charity official defendants said go look solely to what they give you and the charity said these are untimely because the cutoff was August 2012.

Now, I am not at all interested in pre litigating any disputes with regard to the Muslim World League or IIRO but at least the origins of this presented as a bit of a shell game. Now, the Muslim World League and IIRO have produced some

G3M5terA

documents that reflect activities of these individuals.  We do
not think it is at all complete.  Again, we will address the
sufficiency of their productions with those defendants.

THE COURT:  How about Mr. Kabat's argument that there
has been no meet and confer here?

MR. CARTER:  Your Honor, we laid out in our reply
brief at page 3 that we raised this at multiple hearings in
multiple letters to the Court and there was a consistent
response:  *Go look for their stuff.*  And so we came to the
Court to say that is not sufficient.  That was our point all
along.

So, we went down this road for a while.  There simply
isn't an indication on the record, affirmative, in a response,
I have searched all of the records in my possession, custody,
or control and you have everything responsive to your discovery
requests.  And again, we don't want to end up at a deposition
and have one of these individuals say, well, of course I
maintained a diary during the time that I was Muslim World
League Secretary, or of course I have copies of all the
speeches I wrote and Fatwahs I issued during that time, or of
course I have a copy of my passport from those periods.

As an example, your Honor, there is an allegation
based on US government investigations that Abdullah Omar Naseef
was present at the founding meeting of al Qaeda with Bin Laden
in the Sudan.  The travels of these individuals, as reflected

G3M5terA

1   by their passports, are relevant.

2           To the extent they have received letters of

3   commendation or similar awards that have lauded their

4   activities during their service and outlined what they did, you

5   would have expected them to be kept.  One of them received the

6   King Faisal award for service to Islam.  That would describe

7   what that person did.

8           THE COURT:  How does that add to the jurisdictional

9   discovery?

10          MR. CARTER:  I think the proper question in the

11  jurisdictional discovery was what did these individuals do at

12  these charitable organizations, what was the nature of their

13  roles.  I can give you an example, your Honor.

14          In our own investigations we have, by way of example,

15  a report in the Arabic version of the Muslim World League

16  Journal dating to the period in 1992 where defendant Naseef

17  attends a meeting with members of the royal family and the

18  Saudi Grand Mufti, who is the government official during which

19  Naseef thanks the King for the generous support of the Muslim

20  World League and the Grand Mufti indicated the jihad fighters

21  must be encouraged worldwide.  A year later Naseef again thanks

22  King Fahd for a donation of 20 million given for Muslims in

23  Bosnia so they could continue their legal jihad against the

24  Serbs.

25          So, these kinds of dialogues about policy issues,

G3M5terA

global events, are very relevant to the determination as to

whether or not these individuals were responsible for setting

in motion the program of support we have described in other

pleadings.  And, again, it is a matter of them going and

searching their own records in the same way that the Court

directed defendant Jelaidain to do so.

Thank you, your Honor.

THE COURT:  How about the passports, Mr. Kabat?

MR. KABAT:  I can ask him for that but I think the

proper way --

THE COURT:  I gather there was a specific request that

asked for those.  What was your response to that request?

MR. KABAT:  I don't --

THE COURT:  Mr. Carter, can you point me in the right

direction here?

MR. KABAT:  Again, your Honor --

THE COURT:  Hang on just a minute.

MR. CARTER:  I think in a moment we will be able to.

I know there were requests relating to travel to places like

Sudan, Afghanistan, Pakistan during relevant periods and,

again, that certainly would have encompassed a passport.

THE COURT:  I thought there was a specific reference

to supports in the request.

MR. CARTER:  There probably was.  But I think, your

Honor, regardless of the individual request, the overarching

G3M5terA

response was go look at what the charities produced.  And what

we are really here about is compelling the defendants to

conduct their own searches.

MR. KABAT:  Your Honor, regardless of whether the

request asked for the passport, the reality is the plaintiffs

simply cut and pasted their merits discovery into the four

individual defendants and they have not bothered -- they have

not bothered -- to meet with us, to send us a discovery

deficiency letter, completely at all with Rule 37 meet and

confer requirement.

THE COURT:  Well, but the passports would seem to be

something that the charities would not have produced that

perhaps -- well, I don't see one that relates to passports but

I do see 89:  Provide all documents relating to any trips you

took to Sudan; and 90 is the same for trips to Afghanistan.

Let me take a moment and look at the responses.

(pause)

THE COURT:  Unfortunately they don't track from

defendant to defendant.

(pause)

THE COURT:  Well, here.  For 89 and 90 the answer to

both is:  See objections to document request no. 10.  Document

request no. 10 says:  Defendant objects to this request as

overly broad seeking documents relating to his employment with

the government of the Kingdom of Saudi Arabia which has

G3M5terA

sovereign immunity; improperly seeks official records of the
Saudi government; improperly seeks business records of the MWL
and IRRO; and goes on and on.  And going back to the specific
answers it says:  Defendant will produce responsive documents,
if any, when available.

        So, I think what I am going to do is, first of all,
invoke the current version of Rule 34 -- bear with me a
second -- which requires that an objection state
specifically -- let me read it:  *An objection must state*
*whether any responsive materials are being withheld on the*
*basis of that objection.*

        So, I am going to require several things.  First, a
sworn or affirmed certification from each of the four charity
defendants that except to the extent to which they have
specified that a document is being withheld, they have produced
all documents responsive to the requests unless those documents
are part of the productions of the MWL or IIRO.  Secondly, that
there be a privilege log if there are documents being withheld
on the basis of privilege.

        I think at the moment that's all I need direct with
respect to the motion related to these four defendants.

        Is there something else you seek, Mr. Carter, at the
moment?

        MR. CARTER:  Your Honor, only based on the response
that you read to the request, which very much seemed to invoke

G3M5terA

1    a sovereign immunity defense with respect to documents

2    potentially in the possession of these defendants and Mr. Kabat

3    had said that no such objection was being asserted and I think

4    we just want clarification that there is no sovereign immunity

5    objection being asserted.

6        MR. KABAT:  No, we are not asserting that defense with

7    respect to their own documents but I do have a question for

8    you.

9        THE COURT:  Let me just add that within the documents

10   to be listed on a privilege log are any documents being

11   withheld on sovereign immunity grounds that are responsive but

12   I gather you just told me that there are no such documents.

13       MR. KABAT:  Well, I will check with the clients,

14   obviously.

15       I do have two questions for you.

16       THE COURT:  Sure.

17       MR. KABAT:  First of all, you said that the requests

18   related to the golden chain are off the table.

19       THE COURT:  Correct.

20       MR. KABAT:  Now, of the remaining hundred-odd

21   requests, are you directing us to answer all of them regardless

22   of whether they have anything to do with jurisdictional

23   discovery?  I think it should be a little more focused on those

24   requests that relate to jurisdictional discovery as opposed to

25   the hundred-odd requests, many of which really are merits

G3M5terA

1    discovery and we have not undertaken a search for that.

2            THE COURT:  Well, I think by invoking the provision of

3    Rule 34 that I have directed you to comply with, it will become

4    clear whether you are withholding documents.  I think there may

5    be categories of documents or requests as to which your

6    response is we have nothing beyond what the corporate charities

7    have produced and therefore there is not much point in worrying

8    about whether the request relates to jurisdictional or merits

9    discovery.

10           If, at the end of the process I have just directed

11   there are lingering issues, you can bring those back to the

12   Court or Mr. Carter can, but I think for the moment this takes

13   us further down the road.

14           MR. KABAT:  Thank you.

15           MR. CARTER:  Thank you, your Honor.

16           THE COURT:  You said you had two points?

17           MR. KABAT:  Pardon?

18           THE COURT:  I guess the other was the golden chain.

19   Thank you.

20           MR. CARTER:  Your Honor, I'm sorry.

21           THE COURT:  Yes.

22           MR. CARTER:  With regard to the golden chain, and I

23   don't want to belabor this point because I understand the

24   Court's ruling, but there are people on the golden chain other

25   than the contributors, for instance Wael Jelaidain is listed on

G3M5terA

1    the golden chain, Osama Bin Laden is listed on the golden

2    chain.  And so, we just want clarity that you are not talking

3    about those people.

4                THE COURT:  That's correct.

5                MR. CARTER:  Thank you.

6                THE COURT:  I am talking specifically about the

7    requests that use the phrase "and seek those documents."

8                MR. CARTER:  Thank you, your Honor.

9                THE COURT:  So, if there were other more specific

10   requests, those, of course, are not affected by that ruling.

11               MR. CARTER:  Thank you, your Honor.

12               THE COURT:  We can break for lunch now or we can deal

13   with the next one.

14               Mr. Haefele?

15               MR. HAEFELE:  I leave it up to you, your Honor.

16               THE COURT:  Why don't we move on.

17               Okay.  Fire away, Mr. Haefele.

18               MR. HAEFELE:  Your Honor, I think it is a good

19   afternoon at this point.  We made it past, into the afternoon.

20               Robert Haefele from Motley Rice for the plaintiffs,

21   your Honor.  I am here to talk about the plaintiff's motion

22   regarding Soliman Al-Buthe.

23               Much of what Mr. Charter had to say about the other

24   charity officials applies also to Mr. Al-Buthe and I refer back

25   to the dialogue that you had with Mr. Carter for what was said

G3M5terA

1    for those defendants that crosses over to Mr. Al-Buthe and I

2    will stick, hopefully, with the stuff that is particular to

3    Mr. Al-Buthe.

4         What I understand that we are here to discuss is the

5    remedy that is sought by the motion that the plaintiffs filed

6    was under Rule 37(a) for an order compelling Mr. Al-Buthe to

7    produce documents and information responsive to the discovery

8    requests served on August 22, 2013, and the plaintiffs also

9    requested consistent with what your Honor did with

10   Mr. Jelaidain, that there be production verifying that the

11   defendants and his counsel moved to undertake vigorous efforts

12   to produce documents.

13        THE COURT:  I was about to ask you whether you want

14   something beyond what I just ruled with respect to the

15   charitable defendants.

16        MR. HAEFELE:  Your Honor, I think I didn't make all of

17   my notes and I didn't review my notes from what you had and I

18   think the answer is probably, to some extent, yes, we are

19   asking for that response.

20        One of the things we did in this, your Honor, is we

21   did go through and did articulate why each and every one of the

22   requests that we did for Mr. Al-Buthe -- and they were

23   distinct, I believe, from the ones on the other charitable

24   defendant I compared partly because Mr. Carter was taking care

25   of that motion, I didn't actually compare the requests and they

G3M5terA

1   were done separately so I do think the requests are separate.

2   I will give you a for instance.

3           I do know that with regard to Mr. Al-Buthe there is a

4   very specific request that relates to the request for his

5   passport and that's request for production 19 which very

6   specifically says not only his passport but identifies some of

7   the passports that we are articulating.  And we do know that he

8   has represented he has in his possession all of his passports,

9   not just the current ones but the past ones; he has all of them

10  in his possession.  At least at some point during the course of

11  the pendency of this litigation he represented so.

12          THE COURT:  I am looking at request 19, the response

13  says:  See the objections to request 2, which is similar to the

14  one I read with respect to the charity defendants except it

15  also says it is beyond the limited scope of jurisdictional

16  discovery authorized by the Court of Appeals and case

17  management order no. 2 and has a lot of similar verbiage.

18          MR. HAEFELE:  The way I would summarize it is overly

19  broad, seeks al-Haramain and other business entities' business

20  records.

21          THE COURT:  Right.

22          MR. HAEFELE:  Not jurisdiction; overstates filing of

23  the action and is not relevant.

24          THE COURT:  That is a summary.

25          MR. HAEFELE:  So, but I do think with regard to the

G3M5terA

substance of the fact that he has a passport and he hasn't

produced it is similar in vein with what your Honor addressed

with regard to the other charity officials.

THE COURT:  One distinction here is that Mr. Al-Buthe,

through counsel, asked for more time to produce documents but

then, as I understand it, didn't produce anything further.

MR. HAEFELE:  He did not.  He has produced zero

documents, although actually in his responses I think he

indicated that he was going to produce a document and he

indicated a week later or some short period later that there

was a tranche of documents related to Mr. Al-Buthe that they

anticipated producing but nothing ever surfaced with regard to

that.

If I can set a little bit of the context for

Mr. Al-Buthe's approach to the litigation?  I remind your Honor

of a hearing early in this litigation back in -- way back in

May of 2004 before Judge Casey where Mr. Al-Buthe was arguing

that the plaintiffs' service on him was defective and his

argument rested on the fact that the plaintiffs had initially

served Mr. Al-Buthe at an address that he had indicated in

government filings that he was -- that is to the IRS -- that

there was a particular location where it was his office here in

the U.S., that's where the service was made.  And the argument

was it wasn't really the right address, the right address was

nearby but the address that we had used to serve him was

G3M5terA

actually a post office box location.  And you know, that, just
to summarize, in the dialogue that Mr. Al-Buthe had with the
Court, Judge Casey ended up cautioning Al-Buthe saying, Don't
blow smoke at me, and ultimately he concluded the exchange by
admonishing Mr. Al-Buthe:  This kabuki dance is over.

     I think one of the things that we are feeling is that
the kabuki dance has never ended and that we are near 12 years
later and Mr. Al-Buthe -- well, I would say he must be very
tired because he has still been dancing.

     The procedural history we have here, your Honor, is on
April 16, 2013, the Second Circuit overturned the December 14th
2011 decision dismissing Mr. Al-Buthe.  On October 22, 2013,
plaintiff serves their jurisdictional discovery requests.
After receiving a requested four-week and then another
three-week extension, as your Honor indicated a total of seven
weeks from the original date of the production, on November 11,
2013 Mr. Al-Buthe served only objections with zero documents
included in the production and since then he has produced zero
documents in response to plaintiff's discovery requests.  And
then, on August 10, 2015, the plaintiffs moved.

     What Mr. Al-Buthe does not respond to and so I think
our position is these issues are waived, aside from Al-Buthe's
conclusory assertion that plaintiffs requests fall outside of
the confines of the permitted jurisdiction of discovery which
our position is they obviously do not, he does not address any

G3M5terA

1    of the plaintiffs description of the jurisdictional nature of

2    the various categories in plaintiffs August 10, 2015 motion.

3            Mr. Al-Buthe does not counter plaintiff's arguments

4    against the various boiler plate objections including his

5    objection that requests are overly broad or that certain

6    requested documents post-dated the filing of the actions which

7    I think were also issues that were raised in the last

8    discussion regarding the other charity defendants, but he

9    doesn't oppose those in his opposition.

10           After evading his independent obligation to respond to

11   discovery since August 2013, he wrote that discovery is not

12   jurisdictional in nature and insists that he should otherwise

13   be excused from his independent obligations.

14           I think, your Honor, I believe your Honor addressed

15   what the scope of the jurisdictional discovery assessment was

16   from the Second Circuit but I can tell you what I think,

17   consistent with what you said, your Honor, the way we had

18   phrased it is whether Al-Buthe directed tortious conduct at the

19   U.S. through his role as the primary financier in support of

20   al Qaeda and Bin Laden including through the organizations and

21   financial networks under his control.  It was not the

22   statements that counsel selected out of the opinion to support

23   a very, very narrow, extremely narrow if it goes to these

24   statements then you can get discovery on it; it was based on

25   that articulation I think that we just said.

G3M5terA

1       In fact, the Second Circuit recognized that the

2  plaintiff's jurisdictionally relevant allegations concern

3  whether Al-Buthe had expressly aimed his conduct at the United

4  States by providing material support to al Qaeda when it was

5  known that al Qaeda was engaged in a global terrorist agenda

6  directed at the United States.

7       There were a number of document requests, your Honor.

8  First, before I go into the specific request I would like to

9  address some of the broad -- what I would call -- boiler plate

10  objections which, again, our position is they waived them but I

11  do want to not just cast them aside.

12       They're overly broad objections.  It just was never

13  supported, never indicated why they contend that they were

14  overly broad and they have the obligation to carry that burden,

15  your Honor.

16       I think your Honor already addressed the other

17  document objections, in other words production of documents

18  from other entities and our position is, your Honor, if the

19  documents that we have requested are in Mr. Al-Buthe's control

20  or he has the ability to produce them, he has the obligation to

21  produce them and there are documents, as we know from

22  al-Haramain's production and, just for the record, Mr. Al-Buthe

23  is an Al-Haramain official or was an Al Haramain official.

24       THE COURT:  Al Haramain, Saudi Arabia?

25       MR. HAEFELE:  Pardon me?

G3M5terA

1            THE COURT:  Al Haramain, Saudi Arabia?

2            MR. HAEFELE:  Well, he had a position -- he was one of

3    the officers of the Al-Haramain U.S.A. office but he was also

4    articulated in a number of documents as being a senior official

5    of Al-Haramain Saudi Arabia.  I don't know that he actually

6    held a title there but he certainly held a position of

7    authority there and it is my understanding from the documents

8    to be seen that he had an office, if you will, in Saudi Arabia

9    that was an Al-Haramain physical office or physical location.

10           THE COURT:  Al-Haramain, Saudi Arabia was the entity

11   that was shuttered by the government, correct?

12           MR. HAEFELE:  Allegedly so.

13           THE COURT:  Okay.

14           MR. HAEFELE:  It has been indicated to be so.

15           And, as we know from the Al Haramain production,

16   number one, we did not get Al Haramain, Saudi Arabia documents.

17   They did not participate in any of the productions, they did

18   not participate in essentially anything in the litigation.  And

19   as we know from the productions which your Honor addressed a

20   number of times with regard to Al Haramain, U.S.A., there were

21   gaps in their production, if you will.  I don't need to get

22   into that but your Honor has addressed those arguments before

23   and there were gaps.

24           So, bottom line, if there are documents that

25   Mr. Al-Buthe has in his care, custody or control or that he has

G3M5terA

1    the practical ability to produce for us, then he should be

2    doing that.

3          With regard to their objection about documents

4    post-dating the filing, I think your Honor may have addressed

5    this previously but just to be clear, for example, documents

6    about investigations that look back, documents about

7    investigations that happened post-2001 that look back to

8    earlier times, those documents would be documents that would be

9    relevant for production even if they fall outside of the date

10   of the filing of the case.

11         What I would like to do now is turn, your Honor --

12         THE COURT:  Let me just ask you about one of the

13   points that Mr. Kabat makes which is there was no meet and

14   confer here.

15         MR. HAEFELE:  Your Honor, similar to what Mr. Carter

16   addressed, in our response we did lay out substantially what

17   our meet and confer was.  If you look at ECF 3111 page 2 to 3?

18   If you give me a minute I can flip to that and go through that

19   with you.

20         THE COURT:  No, I have read that.

21         MR. HAEFELE:  Does that answer your question, your

22   Honor?

23         THE COURT:  Yes.  That's fine.

24         MR. HAEFELE:  In short, I would say that it is not

25   true that we didn't meet and confer.  In fact, we tried.  They

G3M5terA

rejected.  Their position consistently was we are not planning

on producing anything and it seemed that there was futility in

going further and being deferred at that point.  And I am

making it fairly concise but there was a number of instances

where that dialogue back and forth happened.

        If I can march through, it is in our moving papers but

we have categorized the document production requests in certain

categories and some of them may even combine further, for

example I think the first two categories are financial

transaction documents of Al-Buthe, his family, and accounts

related to Al-Haramain.

        He had access, obviously, to his own financial

accounts and accounts that were in his name, accounts where he

had signature authority.  His own accounts were part of the

allegations, actually regarding the moving money, Haramain

money to al Qaeda, Mujaheddin.

        He also had significant control over financial

dealings of al-Haramain U.S.A. but spent much of his time not

in the U.S. so many of the documents, presumably, would have

been in Saudi Arabia including, for example, documents related

to e-mails concerning financial transactions and things along

those lines.

        So, certainly whether it is documents related to

financial transactions of his own or Al-Haramain or folks that

he may have run financial transactions through, all of those

G3M5terA

are documents that he would have been obligated to produce and, again we have gotten nothing.

His alleged support for al Qaeda using his sources under his control is at the core of the allegations that he conducted his conduct at the U.S. and I think that demonstrates the jurisdictional hook, if you will, for both discovery requests 1 and 2{ }-- both categories 1 and 2.

Similarly, documents related to Al-Buthe's indictment here in the U.S. by the Department of Justice, investigations about him, his listing and delisting and sanctions by the U.S., U.N. and by other entities, as well as his internal inquiries into those allegations.

For example, he is a man of -- a prominent businessman with contacts and resources. It is hard to believe that when he had allegations being leveled against him including indictments here in the U.S. and U.N. and U.S. sanctions and sanctions by other worldwide entities, it is hard to believe that he did nothing to investigate allegations of his wrongdoing. And the fact that he has produced nothing regarding those investigations, those actions, or his investigations into those allegations makes it hard to believe that he has nothing to produce. And clearly those allegations are, again, at the heart of the allegations against him concerning his direction and conduct at the U.S.

The next category is items personal to Mr. Al-Buthe;

G3M5terA

his bio, a lot of information you would want in a case and that
is where his passport falls in.  Those are -- is it is hard to
believe that he doesn't have access to those documents, your
Honor.  As was mentioned earlier, the fact that prominent men
like this do not keep records of their accomplishments is just
very hard to believe, that he didn't have some kind of resume,
some kind of biographical information, and it is hard to
believe since he has articulated that he has a passport that he
didn't have his passport.

          I think we already covered documents in his position
regarding the Al-Haramain entity then documents related to his
interrelationships within or among terrorists, those documents
evidence Al-Buthe's dealings with other alleged co-conspirators
and may underscore the defendant's knowledge so they have a
jurisdictional hook in that sense.

          So, your Honor, we have gone through and it is -- my
summary right here I think is in some detail laid out in the
brief and there has never been a response to those allegations
of jurisdictional connection.

          So, to the extent that there is argument on the other
side that we have not demonstrated why these document
production requests are jurisdictional, that's something that
has never been responded to.

          THE COURT:  I think what we will do, rather than going
on to Mr. Kabat, is take our lunch break now.  Why don't we say

G3M5terA

1    we will resume at 2:15.

2              MR. HAEFELE:  Your Honor, can I --

3              THE COURT:  Oh sure.  I didn't mean to interrupt you.

4              THE MARSHAL:  I have three things to tie up.

5              THE COURT:  I thought you were done.

6              MR. HAEFELE:  I am nearly done.

7              THE COURT:  Okay.

8              MR. HAEFELE:  It is merely several of his

9    miscellaneous arguments that I just want to make sure we tie

10   up.

11             THE COURT:  Sure.

12             MR. HAEFELE:  Our position is they don't matter.

13             For example, he makes an argument that Mr. Sedaghaty's

14   conviction was vacated, that was material to Mr. Al-Buthe's

15   production.  We have argued multiple times that Mr. Al-Buthe's

16   U.N. delisting plays no part in what his production obligations

17   are.

18             THE COURT:  Stated more generically, as the merits are

19   essentially irrelevant at this stage, even if Mr. Kabat or

20   Mr. Al-Buthe are correct, that that's not the issue before me

21   now.

22             MR. HAEFELE:  I think the last two things I would say

23   is earlier we had some kind of chart that showed the cross

24   connection between the requests and the Al-Haramain requests

25   and that doesn't exist here so that is one differentiation.  I

G3M5terA

1    don't know whether that mattered to your Honor.

2              THE COURT:  It was the MWLA or IIRO.  I am aware of

3    that.

4              MR. HAEFELE:  Correct.

5              In this instance one of the -- I think there was a

6    reference from Mr. Carter indicating how the charity officials

7    there had interconnections with other entities in the

8    litigation and here I think it is obvious he had

9    interconnections with Al-Haramain, U.S.A., he had connections

10   with Al-Haramain, Saudi Arabia, and he also had connections

11   with the Kingdom of Saudi Arabia because he is an employee of

12   the Kingdom of Saudi Arabia.  He actually, in his position

13   reports, directly to the Mayor of Riyadh who was at the time

14   was royal.  I don't know who it is now.

15             THE COURT:  Do you still have an Al-Haramain U.S.A.

16   production or is it simply all of that material that eventually

17   became disclosable pursuant to Court order?

18             MR. HAEFELE:  There were Al-Haramain productions in

19   addition.  In fact, earlier than that.  That was the later of

20   the productions, I believe.

21             THE COURT:  Okay.

22             MR. HAEFELE:  That's all I have, your Honor.

23             THE COURT:  So, we will resume at -- why don't we say

24   2:15.  We will make it 2:20.

25             MR. CARTER:  Your Honor, a minor question.  We have

G3M5terA

1    some boxes of stuff here; do you mind if we leave them in the

2    courtroom?

3              THE COURT:  Not at all.

4              MR. CARTER:  Thank you.

5              THE COURT:  As long as it is something -- we are not

6    going to lock the courtroom.

7              MR. CARTER:  It is just the filings, your Honor, so.

8              (Luncheon recess)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

G3M5terA

```
1                    A F T E R N O O N   S E S S I O N

2                            2:20 p.m.

3         THE COURT:  Go ahead.  Mr. Kabat.

4         MR. KABAT:  Good afternoon, your Honor.

5         I want to respond to some of the arguments that

6  Mr. Haefele raised about discovery about Mr. Al-Buthe but, most

7  importantly, Mr. Haefele misrepresented the Second Circuit's

8  opinion by saying that they were entitled to discovery that he

9  expressly aimed his conduct to this country.  That is not the

10 standard in the Second Circuit.

11        The Second Circuit decision is that whether there is

12 material support for al Qaeda was expressly aimed at the United

13 States, so jurisdictional discovery is not everything that

14 Mr. Al-Buthe did that might be directed at this country, it has

15 to relate to al Qaeda, material support for al Qaeda.  And that

16 gets back to the same problem we had with the other defendants

17 in terms of plaintiffs are trying to seek merits discovery for

18 Mr. Al-Buthe, were willing to discuss jurisdictional discovery

19 with either Mr. Carter or Mr. Haefele.  They have said that we

20 refused to meet with them and they quoted that Exhibit B

21 confirmed that I said that we had refused to meet.  In fact,

22 Exhibit B said no such thing, I have no idea what they're

23 referring to but, again, plaintiff as you know, did discovery

24 deficiency letters, or they never bothered to do a discovery

25 deficiency letter as to Mr. Al-Buthe and they reached out to me
```

G3M5terA

1    and said let's have a meet and confer.

2            There is no e-mail on that.  So, with that

3    clarification out of the way.

4            THE COURT:  Well, is it correct that you haven't

5    produced, on behalf of Mr. Al-Buthe, a single document?

6            MR. KABAT:  Pardon?

7            THE COURT:  Is it correct that you have produced no

8    documents?

9            MR. KABAT:  Apart from Al-Haramain?  That's correct.

10   Because Al-Haramain documents, originally Mr. Al-Buthe thought

11   that he would be able to get documents from Al-Haramain, Saudi

12   Arabia but what happened is the Saudi government shuttered

13   Al-Haramain, Saudi Arabia, as you observed before lunch, and

14   Mr. Al-Buthe was no longer able to access the Saudi documents

15   that he thought he might be able to produce and so there was

16   nothing left for him to produce with respect to Al-Haramain.

17           THE COURT:  What about with respect to -- let me go

18   back a step.

19           A lot of your letter deals with the merits basically

20   saying the result in the trial in Oregon involving Mr. Seda led

21   to a reversal and Mr. Al-Buthe has been delisted by the United

22   Nations.

23           MR. KABAT:  Right.

24           THE COURT:  But you haven't produced any documents

25   that relate to the delisting or your representation, which you

G3M5terA

1   seem to think is significant in terms of jurisdictional

2   discovery that the United States allegedly is also going to

3   delist him even though I presume those would not be Al-Haramain

4   documents but would be Mr. Al-Buthe's individual documents.

5          MR. KABAT:  Well, your Honor, the plaintiff's position

6   with respect to the de listing of Mr. Al-Buthe is that it has

7   no relevance to the claims or defenses in this litigation and

8   there is settled law you can't get discovery unless something

9   is relevant.

10         Plaintiffs are trying to have it both ways, they're

11   trying to say, oh yeah, the delisting is irrelevant to claims

12   and defenses.  On the other hand they're saying we want

13   discovery of something that we have admitted is irrelevant.

14         Plaintiff can't have it both ways.

15         THE COURT:  You seem to think it is relevant because

16   your letter goes on for several pages about that and

17   presumably, therefore, it is relevant in some fashion.

18         MR. KABAT:  Your Honor, our position with respect to

19   the relevancy of the delisting is that either plaintiff can

20   concede that both the designation and the delisting are

21   irrelevant, they're off the table, or if they concede that the

22   designations -- excuse me, if they insist that the delisting is

23   relevant --

24         THE COURT:  Well, I assume since they requested it --

25   Mr. Haefele can correct me if I am wrong -- they think it is

G3M5terA

1    potentially relevant.

2             MR. HAEFELE:  Your Honor, I don't need to correct you

3    because I think you are right, but I would add it is relevant

4    on the allegations underlying the listing as well as the

5    allegations of the considerations for the delisting.  The

6    arguments in response to the listing and delisting and to the

7    defendant's defenses.

8             MR. KABAT:  Well, all I can say is plaintiffs have

9    flip-flopped about the delisting.  We are willing to produce

10   the information about the delisting if plaintiff is willing

11   concede that it is relevant, but if plaintiff's position is not

12   relevant then we don't see why we should have to produce it.  I

13   mean --

14            MR. HAEFELE:  Your Honor, may I respond?  There is a

15   fundamental confusion there.

16            The fact of the delisting is not relevant.  The claims

17   why they were delisted and the considerations related to the

18   arguments for delisting is what is relevant.  It is the

19   arguments and the information exchanged, not the fact of the

20   delisting.

21            THE COURT:  Well, if you put the word "potentially" in

22   front of "relevant" I am inclined to agree with you.  Of

23   course, none of us know what that information is.  There could

24   be admissions or false statements or potentially useful

25   information there but I agree that the fact of delisting,

G3M5terA

1    particularly since it is only by the United Nations not by the

2    U.S. at least at this point, is not relevant.

3            MR. KABAT:  Your Honor, we think the delisting is

4    relevant and would be willing to produce the documents if the

5    plaintiff would agree to that too, that it is relevant.

6            THE COURT:  If I order it, whether they agree to it or

7    not, you are going to produce it or other consequences will

8    flow.

9            MR. KABAT:  Mr. Haefele also discussed the criminal

10   case and why Mr. Al-Buthe had not produced anything with

11   respect to the criminal case.  It is a very simple answer.  He

12   has never been served with the indictment.  He has nothing to

13   produce in that sense.

14           So, because he was in Saudi Arabia around the time the

15   indictment was issued, he has not left the country since then,

16   and I should note with respect to plaintiff requests for the

17   passport it is my understanding that after he was designated

18   the Saudi government took his passport, confiscating it, so he

19   could not travel outside the country.

20           So, there is nothing to produce there.  Now that he

21   has been delisted by the United Nations he may be able to get

22   his passport back but we will see.

23           THE COURT:  So, in the period prior to -- well, forget

24   the period prior to, the representation is that he currently

25   has no passport and doesn't have any expired passports.

G3M5terA

1        MR. KABAT:  That is my understanding.

2        THE COURT:  Okay.

3        MR. KABAT:  And I would note that the document

4    requests that Mr. Haefele noticed were served after 2013 and

5    the passport and designation had been confiscated I think

6    around '04, '05, and likewise the shuttering of Al-Haramain was

7    also back in '04, '05, years before the discovery requests were

8    served on Mr. Al-Buthe.

9        Mr. Haefele also claimed that we should have produced

10   documents relating to Mr. Al-Buthe's "investigation of the

11   allegations in the complaint."  Well, whatever the

12   investigation did was in connection with his attorney and the

13   attorney-client privilege and this Court has already agreed

14   with the parties that they do not have to produce documents

15   relating to the attorney-client communications nor after 9/11

16   relating to them, any allegations in the complaint including

17   the investigation.

18       Mr. Haefele also mentioned that we should produce

19   Mr. Al-Buthe's resume and documents showing his

20   accomplishments.  Well, it is not clear to me how that is going

21   to tie back to whether he expressly aimed his support of

22   al Qaeda or expressly aimed "intentional tortious acts at

23   residents of the United States."  That gets back to the

24   original problem we have which is plaintiff is trying to seek

25   merits discovery against a jurisdictional defendant and, again,

G3M5terA

1    if we had had a meet and confer we could have hashed this out

2    with the plaintiffs.

3            And I would note that plaintiffs in fact did have a

4    meet and confer with us with respect to Al-Haramain many years

5    ago, we had two attorneys from South Carolina and two attorneys

6    from New York came to our office, we had a productive session.

7            So, plaintiffs know how to do a meet and confer but

8    apparently they don't want do it here and they didn't want to

9    do it for the al Turki defendants.  And, again, we are still

10   willing to meet and confer with them to identify the specific

11   document requests that go to jurisdictional discovery as

12   opposed to merits discovery.

13           If there are no further questions, thank you.

14           THE COURT:  Anything else, Mr. Haefele?

15           MR. HAEFELE:  Your Honor, just one quick point.

16           In Exhibit F to our -- it is at ECF no. 2990-6.

17           THE COURT:  Yes, I have it in front of me.

18           MR. HAEFELE:  I believe it is the declaration or as

19   part of that exhibit there is a declaration of Mr. Al-Buthe

20   dated August 4, 2010 and I believe it is from that declaration

21   that we quote and I haven't been able to locate it while we are

22   talking, it is from that declaration where we pulled the

23   statement that he has, in his possession, his passports.

24           While I am looking at it might I suggest that one of

25   the things your Honor might want to know --

G3M5terA

1          THE COURT:  There is, on page 4 of his declaration, it

2    says:  I never had seven passports -- skipping a little -- and

3    the government of the Kingdom of Saudi Arabia never required me

4    to turn in any passport or other travel document.  Indeed, I

5    today have in my possession the Saudi Arabian passports that I

6    have ever had, all of which I have expired.

7          MR. HAEFELE:  Thank you, your Honor.  You have a very

8    good eye.

9          THE COURT:  And that's dated December 2011.

10          MR. HAEFELE:  And, your Honor, I would -- I guess that

11    obviates the next question which was did he get them back when

12    he was delisted but if he never had them taken, then there is

13    no reason for him to have gotten them back.

14          That's, I think the primary response that I had to

15    that.  In terms of what the proper scope of jurisdictional

16    discovery is, I think I will leave it to your Honor to -- we

17    have laid out what our position is, your Honor.

18          THE COURT:  How should one square the statement in the

19    2011 declaration of Mr. Al-Buthe with the representation you

20    made to the Court a little while ago?

21          MR. KABAT:  I will have to check with him.

22          THE COURT:  Well, as has been consistently true

23    throughout this case, drawing the line between merits discovery

24    and jurisdictional discovery can be difficult.

25          Before I rule let me also ask you, when I looked at

G3M5terA

paragraph 6 of your declaration which spoke about Mr. Seda you

also represent it seemed not to be tethered to what we are

talking about here with Mr. Al-Buthe, it looks like it was of a

problem of cutting and pasting.  I just wanted to make sure

that is right and that I wasn't missing something.

MR. KABAT:  Sorry.  Again?

THE COURT:  In your declaration that is document 53,

paragraph 6, the last paragraph deals with Mr. Seda and if

there is a point in there that relates to Mr. Al-Buthe I didn't

understand what it was.  I wasn't sure whether the reference is

to -- well, it seemed to me the paragraph belonged with some

other document and really didn't relate to this.  I just wanted

to make sure, your Honor.

MR. KABAT:  Actually, your Honor, if you look at the

first page of that declaration I submitted the same declaration

in opposition to both motions to compel.

THE COURT:  Oh.  Okay.  Then that explains it.  Thank

you.

MR. HAEFELE:  Your Honor, I guess I would make one

summary conclusion here.

THE COURT:  Sure.

MR. HAEFELE:  Defendant has an obligation to respond

to discovery and produce documents.  Zero documents is not a

response.  It is just an indication of actual nonparticipation.

THE COURT:  Well, there is that and there was the

G3M5terA

1    request for more time to produce what eventually became no more

2    documents.  As I indicated in relation to prior motions that we

3    have heard today, it seems to me that while there may not have

4    been an ideal interaction among counsel, there was an adequate

5    attempt to confer and that further conferring would not likely

6    have led to a different result since disagreement with some of

7    the requests isn't a license to ignore or not respond to all of

8    the requests.  And it seems to me clear that some of the

9    documents that are sought are potentially relevant not just to

10   merits discovery but to jurisdictional discovery including, as

11   we discussed a little while ago, the documents relating to

12   listing and delisting.

13        We didn't specifically talk about it but I assume

14   Mr. Kabat's position is the same as it was earlier with respect

15   to the communications in the hands of Mr. Al-Buthe that he had

16   with the Saudi government.

17        I take it you are not claiming sovereign immunity as

18   to those; is that correct?

19        MR. KABAT:  He is not asserting sovereign immunity but

20   it is not really relevant to the jurisdictional issues here.  I

21   mean, he remains an employee of the government, he always has

22   been.

23        THE COURT:  There is also, among the boiler plate

24   objections, the assertions that all of the records of either of

25   two Al-Haramain entities are the corporate property of those

G3M5terA

1   defendants and not Mr. Al-Buthe's property.  I take a different

2   view; namely, if there were documents in his possession that

3   relate to those entities that are responsive, they have to be

4   produced.  The objections that have been asserted are

5   essentially all boiler plate.  The letter that I received

6   essentially talks about several things that I don't think are

7   relevant, one of which is, as I discussed with Mr. Haefele and

8   we all had some interchange about, the fact of delisting and

9   also the collapse of the Oregon criminal case which occurred

10  for a number of reasons, none of which relate to whether

11  Mr. Al-Buthe is or is not somebody who supports terrorism in a

12  fashion that impacted the United States.

13          Among other things, there is, as I think indicated in

14  a footnote, there was a different standard applicable to the

15  criminal case in terms of burden of proof, and obviously Grady

16  applies as a concept in the criminal case and apparently may

17  have been somewhat tortured and is not applicable in this

18  setting.

19          So, I am going to require production of the documents

20  that the plaintiffs seek as well as a certification that

21  Mr. Al-Buthe has produced all the responsive documents in his

22  possession, custody or control.

23          So, that's my ruling regarding Mr. Al-Buthe.

24          MR. KABAT:  Your Honor, one question?

25          THE COURT:  Yes, sure.

G3M5terA

1          MR. KABAT:  Every document request pertains to

2     jurisdictional discovery.  Are you carving anything out?

3          THE COURT:  I am not carving anything out because my

4     view is the letter which didn't raise specific objections

5     essentially waived those objections and that the general

6     objections that are set forth in the formal document response

7     are not sufficient to assert an objection.

8          Let me just generally, while we are on that topic, the

9     rules applicable to this case, Federal Rules of Civil

10    Procedure, changed as you all know effective December 1st, and

11    the Advisory Committee's notes, I believe it is, suggest that

12    the they should be applied, to the extent possible or

13    practicable -- I am paraphrasing, not quoting -- in cases that

14    are ongoing.

15         So, as far as I'm concerned on a going-forward basis,

16    although I also held the view even before the rule's

17    amendments, general objections are not objections that the

18    Court will give any weight to.

19         Additionally, the change in the rule that I indicated

20    earlier says that if documents are being withheld based on an

21    objection, that must be disclosed in a Rule 34 response.

22         So, I intend to enforce both those provisions of the

23    revised rule.

24         The boiler plate objections that everybody has been

25    using since the beginning of time that objections are vague and

G3M5terA

ambiguous and unduly burdensome and the like, basically now, to

my mind, are surplusage, and when I see them I intend to turn

the page because they add nothing to the discussion and that's

been my view even before the rule's amendment.

So, that is part of the reason for the ruling that I

just made.

Let's move on to the next motion.  What is that now?

We are up to MWL and IIRO.

MR. NASSAR:  Good afternoon, your Honor.  Waleed

Nassar on behalf of the IIRO and the Muslim World League.

Your Honor, we are here today before you seeking

plaintiff's compliance with your November 3rd, 2015 order.  In

that order you obliged plaintiffs to disclose information in

their possession concerning the providence of a set of

suspected forgeries that were produced in late 2014 as well as

to provide us with original documents.  To date, plaintiffs

have not provided us with any of that information.

I want to briefly focus your attention on four points,

your Honor.  They are, number one, this issue has already been

decided and that ruling has been ignored by plaintiffs.  Number

two, I want to briefly discuss the danger of the documents at

issue and why it is critical to address this matter now.

Number three, I would like to discuss why plaintiff's position

that we are not entitled to the information we seek at this

juncture is incorrect.  And lastly, I would like to clarify

G3M5terA

1    what we are seeking from the plaintiffs at this juncture and by

2    contrast what we are not seeking.

3         THE COURT:  They also say that this is a skirmish

4    about something that eventually may be completely irrelevant so

5    why bother dealing with it now.  Maybe that's in one of your

6    other three?

7         MR. NASSAR:  Yes, it will be covered in this point.

8    The relevance of the documents, if you reviewed them, they're

9    essential to plaintiff's claim.

10        First I would like to emphasize that the present

11   dispute has already been ruled upon by the Court.  Since the

12   date of the Court's order some four months ago, we have reached

13   out to plaintiffs a variety of different ways.  We have served

14   them with narrowly tailored interrogatories, conducted meet and

15   confers, and also exchanged numerous correspondences back and

16   forth.  Despite the clear language of the order as well as our

17   repeated outreaches, we are no further along and have no

18   information on the providence of the documents.  We do not know

19   the identity of the source of the document.  We do not know

20   when they received them nor do we know the chain of custody or

21   any other circumstances relating to the receipt of the

22   documents.

23        Because of this impasse, we were forced to write to

24   you on January 21st and we are here before you today.  I would

25   like to provide a brief overview of the nature of the documents

G3M5terA

1      and why it is critical to address this matter now.

2                  In December of 2014, some 20 years after the first

3      documents in this set of documents was allegedly authored in

4      Peshawar, Pakistan, and some 11 years after the first lawsuit

5      in this litigation was filed a set of irregular inflammatory

6      documents were attached to pleadings against the Kingdom of

7      Saudi Arabia in this litigation.  Plaintiffs provided no

8      explanation whatsoever as to where these documents came from or

9      why documents that originated from -- that were authored

10     between the dates of 1995 and 2005 would show up first in this

11     litigation in December of 2014.  The documents purportedly

12     originate from closed and/or non-existent offices in Peshawar,

13     Pakistan of the Muslim World League as well as the

14     International Islamic Relief Organization.  These suspected

15     forgeries contain a host of oddities that jump off it the page.

16     Among the most egregious include a doctored logo of the Muslim

17     World League that features a map, your Honor, of North America

18     and South America as opposed to the Muslim majority countries

19     that are located in Asia, Africa, with Mecca in the middle that

20     is worn on authentic Muslim World League letterhead.

21                 Additionally, there is a basic big grammar mistake

22     imprinted on the letterhead of every single one of the IIRO

23     documents in this set describing a fictional office that never

24     existed.

25                 Number three, there are elementary grammar mistakes

G3M5terA

1  littered throughout the documents that even then the documents

2  were allegedly authored by native Arabic speakers.

3      Number four, all of the documents were authored by

4  individuals who either never worked for IIRO or Muslim World

5  League or ceased working for them.  In fact, one of them was

6  incarcerated in Saudi Arabia on the same day that he allegedly

7  wrote a letter in Peshawar some thousands of miles away.

8      While each of the issues listed independently weighed

9  heavily against the authenticity of the documents, the

10  cumulative effect of the issues we have uncovered is

11  overwhelming.  This is only what our preliminary investigation

12  has uncovered.

13      To perform a full and comprehensive analysis we need

14  more information as to the providence of the documents, who

15  they got them from, as well as chain of custody, and we also

16  need the original documents so that we may perform the forensic

17  analysis into the ink, paper, as well as the numerous

18  extraneous documents littering all of the documents.

19      I would like to turn to why plaintiffs position that

20  now is not the time for the information that we seek is

21  incorrect.

22      On the date of the order we had already produced

23  information concerning the office closures of the IIRO and

24  Muslim World League Peshawar office as well as the employment

25  records of any of the individuals who had worked for IIRO and

G3M5terA

Muslim World League.  Additionally, subsequent to your order,

we provided them with a specific Bates range of those documents

in order to facilitate their own internal investigation.

We have also offered to provide them with a detailed

list of all of the irregularities that we have located in each

of the documents provided on the one condition that they do not

provide this list to the source that they will not disclose.

Under this proposal they would be free to share with

any other analyst or any other source, just not the source,

because we have credible fears that more credible forgeries

would show up later in this litigation that may actually

resemble IIRO or Muslim World League documents and would be

hard to detect that is clear as forgery.  To date, plaintiffs

have refused this offer.

THE COURT:  Weren't you tipping off their source,

presumably for fewer than more or better once.

MR. NASSAR:  We have concerns that the source is

complicit in the generation of forgeries.  That is a concern

for us.

Plaintiff's chief response to us has been that our

requests for information on the providence of the documents is

premature.  They are incorrect.  They're incorrect for three

reasons.

First, the Court has already ordered disclosure.

Second, there are grave questions with respect to these

G3M5terA

documents and they are central to plaintiff's case.

         We need to know now, not five years from now, as this
will impact the direction their case will head against both the
Muslim World League and the International Islamic Relief
Organization.

         Third, they have already submitted these documents as
evidence as part of their claims against the Kingdom of Saudi
Arabia both in 2015 as well as in their recent submissions in
the Second Circuit.

         Your Honor, generally when authenticity is put into
question, additional information must be provided by the
proponent of the documents in order to allow the other party to
conduct a meaning of the investigation.  Plaintiff's claim a
blanket work product privilege but the name of the source, the
date they received the document, how they obtained them, those
are all underlying factual matters and they are not work
product.

         Under *In Re: Initial Public Offerings Public
Securities Litigation*, the underlying factual matters of
attorney-client privilege are not matters in fact.  This issue
arose in Strauss v. Credit Lyonnais where the Court ruled that
interrogatory requests for the identity of the persons who
supplied documents to plaintiffs does not fall under the
protection of the work product privilege because it does not
seek processes, opinions, or mental processes of plaintiff's

G3M5terA

1    counsel.

2              THE COURT:  I guess part of their fear is that the

3    source may be two-fold, it may be an original source that they

4    have no direct contact with and then an intermediary who they

5    don't want to give up alleging work product or other

6    privileges.

7              MR. NASSAR:  It is hard for us to discern that fear

8    because they provide us with no information on the providence,

9    so if they had given us something and were withholding

10   something then that would be a credible fear but they wholesale

11   have refused to provide us any information while simultaneously

12   claiming that they do not have the original which precludes our

13   ability to go after the originals from somebody who may have

14   had the documents at a previous stage.

15             THE COURT:  One of the things my November 3rd decision

16   said, and this was one-sided rather than bilateral, if the

17   Muslim World League/IIRO nevertheless wishes to limit the

18   disclosure of some of those reasons, parenthetically referring

19   to badges of fraud, in the first instance to opposing counsel

20   in order to limit the risk of further alleged spoliation, that

21   is the subject about which the two sides need to confer.

22             I take it there has been no such conference?

23             MR. NASSAR:  We have conducted a meet and confer, your

24   Honor.  It went nowhere.  We spoke for about an hour and a

25   half.  When it was made clear to us that they wouldn't provide

G3M5terA

us the basic fundamental name of who they got the documents

from or any information whatsoever, we left them with our offer

which we altered our -- previously we asked them to provide us

with a list of errors we noticed in the documents for attorneys

eyes only.  Subsequent to that order we amended our offer to

plaintiff's counsel and said you can share it with other

analysts, other experts but just not the source, and then they

refused that offer.

So, even if this Court were to consider this

information as protected work product, which it isn't,

disclosure may still be ordered because there is a substantial

need for the information and it is in the sole possession of

plaintiffs.  In In Re: Savit litigation the Court determined

that both the substantial need and undue hardship components

mandated disclosure because the critical information was in the

sole party of the adversary.

Plaintiffs also think that we must rely upon them for

their own internal investigation into the suspected forgers.

This is incorrect.  We not only have the right to perform our

own investigation, we have an obligation to our clients to do

so.  Plaintiffs propose approached so far, the best we can

tell, has amounted to we have asked our undisclosed source who

may have been complicit in concocting these documents and he

says they are legitimate and this is insufficient.

Furthermore, of the few signs of any investigation on

G3M5terA

their part have revealed an inept process.  They have reported

to us, for instance, that they had the contents of the

documents analyzed by their Arabic linguist and that they

stated that the mistakes within them are minor.  In contrast,

we retained a senior Arabic linguist from Columbia University

who has looked through each of the documents and has detailed

over 90 elementary Arabic grammar errors in each of the

documents and he has concluded that the types of basic grammar

mistakes in the Peshawar letters would never have been made by

Arabic native speaker; with that, even an elementary school

student would be unlikely to make many of these mistakes.

Your Honor, I would like to conclude with clarifying

what we are seeking from plaintiffs at this juncture and by

contrast what we are not seeking.  At this juncture we are

simply seeking information that the Court has already ordered

in the November 3rd, 2015 order, namely information concerning

the providence of the documents, who they served them from,

when they got them, chain of custody, whatever information they

have, as well as the original documents.

Practically speaking, much of this information is

routinely shared in the course of discovery as a matter of

course and in fact, as plaintiffs themselves will acknowledge,

we have specifically provided such information to them at their

request without mandating the Court's involvement.

Again, to be clear, we are not seeking to strike the

G3M5terA

1  documents at present, nor are we seeking a ruling that the

2  documents are definitive forgers.  We are simply seeking

3  information that is solely in the possession of plaintiffs and

4  that will facilitate our own internal investigation.

5       The nature of the suspected forgeries has caused

6  significant alarm to our clients.  IIRO and the Muslim World

7  League have been defending themselves in this litigation for

8  well over a decade now only to receive what appear to be a set

9  of very sloppy forgeries dropped into a belated 2014 production

10 without any explanation whatsoever.  In fact, plaintiffs didn't

11 mark the documents as responsive to any of our document

12 requests.  We stumbled upon them when we were looking at

13 submissions against Osama Bin Laden and we noticed three of the

14 documents pertain to our clients.

15      As plaintiffs have not objected to the November 3rd

16 ruling they have a present obligation to comply with the order

17 and to provide us with the information that we seek.

18      Thank you.

19      THE COURT:  Mr. Haefele?

20      MR. HAEFELE:  Your Honor, once again, Robert Haefele

21 from Motley Rice for the plaintiffs.

22      First off, one of the things I wanted to make sure we

23 are clear on and maybe I misunderstood the scope of what we

24 were here for today, I was under the impression it was a

25 pre-motion conference that we were addressing and not

G3M5terA

1    necessarily the merits of the argument.

2              THE COURT:  Well, welcome to the Southern District of

3    New York where pre-motion conferences tend to merge into the

4    ultimate ruling and if I didn't follow that procedure we would

5    probably still be on the second of our conferences in this case

6    so I do intend to rule on the merits.  If you were misled about

7    that --

8              MR. HAEFELE:  Only a little bit, your Honor.

9              First off, let me just make clear, your Honor, that we

10   do disagree with IIRO's continual -- I will underscore

11   continual -- assertions that the documents at issue are bad

12   forgeries.  The write up is repeated again and again and we

13   take issue with it.  Nothing that IIRO has said, even today,

14   has convinced us that the documents are other than what they

15   purport to be on their face.  And I think there was some

16   language in one of your Honor's order that hinted that maybe we

17   had waived on that position.  It was merely, we have engaged

18   the defendants to try and figure out if we are wrong, if they

19   can tell us something that makes us move from that position and

20   we are -- as we have said from the beginning, if it turns out

21   that these documents are fraudulent documents, we don't want to

22   use them.

23             THE COURT:  Are you talking about the portion of my

24   order which said the plaintiffs do not deny that some of the

25   documents may be forged?

G3M5terA

1              MR. HAEFELE:  Yes, your Honor.  And I think your Honor

2    was being as careful as we were saying that, you know, lots of

3    things are possible and is it possible?  I suppose that's why

4    we are listening to them but our position is nothing has

5    changed our view that the documents are other than what they

6    purport to be.  The documents do show that the organization's

7    had direct dealings with financial and weapons support to

8    al Qaeda.  The defendants are right that there are some

9    interesting facts in the documents.  In one document from 1999

10   at page 4 of 7 of ECF 3086-2, the author indicates we have been

11   advised that the Mujaheddin in your camps need some weapons,

12   bombs, and bullets so we have sent you some assistance

13   including the financial assistance in the amount of 40 million

14   Pakistani rupees.  We ask that you receive it at the place

15   designated by you to purchase some of the weapons needed by the

16   Mujaheddin and to address their daily problems.

17              And in another document --

18              THE COURT:  And to address the what problems?  I

19   didn't hear.

20              MR. HAEFELE:  Daily problems.  I don't know that that

21   is necessarily pertinent but it was the end of the sentence.

22              THE COURT:  Oh.

23              MR. HAEFELE:  Another document from 2000 on page 3 of

24   7 in ECF 3086-2:  The author indicates:  As agreed with brother

25   Abul Hassan -- and the rest is illegible -- in Kandahar he has

G3M5terA

send ten one hundred thousands "one million" dollars for your

Jihadist needs and the various programs on which you have

agreed with Brother Abul Hassan.  We will send you this sum but

sending it is difficult for us so please send one of the

brothers to receive this sum from Pakistan from us.

So, they're right, that they are certainly the

statements in the documents do go -- they certainly support

plaintiff's claims, no doubt, but are they documents that are

essential to plaintiff's case?  I think that we have many other

documents related to Muslim World League and IIRO that support

plaintiffs claims significantly even if we didn't have these

documents but they certainly are strongly supportive of

plaintiff's allegations.

Let me rebut some of the things my colleague on the

other side said.  We do think that the issue is premature.

These defendants are insisting that plaintiffs authenticate

documents before we know the documents will be used at trial,

before they have finished their own production as part of --

and as part of their production even before we know whether the

documents need to be produced, in other words documents from

their production will address issues as to whether these

documents are authentic.

The issue is wasteful, it is wasteful of time.  The

parties and the Court have spent an enormous amount of time on

this issue especially when you consider the relative amount of

G3M5terA

1   the documents compared to all the other documents in the

2   litigation and the timing of the authentication issue early --

3   I mean, I know we are many years in this litigation but with

4   regard to documents that may be used at trial this is

5   relatively very, very early.

6          The issue is distractive, it is a distraction.  It is

7   distraction attention away from other important progress

8   actually necessary to advancing the case.  It distracts

9   attention away from the defendant's wrongdoing in discovery as

10  is evidenced by this Court's various earlier sanctions and

11  various other rulings on motions to compel.  And our presence

12  here today to argue other motions to compel for sanctions.

13         It distracts the defense's attention away from

14  finishing the long overdue obligations to search for responsive

15  documents at Muslim World League's and IIRO's multiple offices

16  worldwide, a task that purportedly has been ongoing for a

17  decade and still has not reached conclusion.

18         The issue is dangerous precedent.  In agreeing to

19  consider the defendant's motion to reconsidering authentication

20  of these documents now opens the door to similar inquiries

21  regarding other documents in the scores of documents that have

22  been produced at a stage in the case where we don't know

23  whether the documents will be produced and whether the

24  discovery will be necessary.  And we don't know if the

25  documents will be part of the trial.

G3M5terA

1          And we don't know, because we haven't seen it, whether

2     the documents the defense will produce will answer the

3     questions but, nonetheless, their approach is before they

4     flow -- before they produce their documents to us to answer

5     those questions they want to delve into our work product.

6          Their list of the problems with the documents remains

7     incomplete.  We don't know all the problems that they have and

8     they have told us that they'll be, under some

9     counsel's-eyes-only suggestion they have told us they'll allow

10    us a peek at what they say is wrong but the problem with that,

11    your Honor, is that what they want to do is handicap our

12    ability to investigate before they'll give us any information.

13         Presumably the person or the people who are the best

14    people to provide us with the information that will shed light

15    on whether these documents are fraudulent or not are the people

16    who they don't want us to have answer questions.

17         THE COURT:  Say that again.

18         MR. HAEFELE:  They don't want us to go back to the

19    people that gave us the document and have them go up the chain

20    and investigate whether or not there are benign reasons for

21    some of the things that they're pointing out and, quite

22    frankly, given what we have heard so far, there are presumably

23    very benign, possibly benign reasons for each of the things

24    they've told us so far and the question is, are they going to

25    give us 100 lists of other complaints serially over time that

G3M5terA

we can, you know, knock down every single one or can they give

us from now and we can investigate them and figure out whether

or not there really is something behind their complaints?

Presumably it would be much more efficient if we were going to

know what all the complaints are, we can investigate all the

complaints, tell them what the responses are, and if they still

have no problem, then we have advanced it to that extent

without going into plaintiffs' work product.

One of the crux -- they've listed so far, as I

understand, really three categories of complaints.  I know they

have more they haven't told us but they have listed three

categories of the complaint.  Number one, the documents are

from offices that weren't operating at the time.  Number two, I

think they have indicated they use Gregorian versus Hijri

dates.  There is problem with the letterhead, mathematical

errors, things along those lines.

One of the cruxes of their argument really relies on

the fact that there is no office in Peshawar at the time these

documents were purportedly authored.  The documents have dates

of, as I indicated earlier, some of them are dates in 1999,

dates in 2000.

So, much of the argument has been premised on their

unsupported assertion, it is just their word, that the IIRO and

Muslim World League offices in Peshawar were closed as of their

argument is 1996 and 1997.  So, they argue no office was open

G3M5terA

1    at the time the letters were purported to have been authored.

2            Well, whether the defendant's offices in Peshawar were

3    actually closed as they contend or whether or not that closing

4    happened in 1996 or 1997 is a question that's in dispute still

5    but the evidence suggests, your Honor, that the Peshawar office

6    was still opened at least into 2011.

7            What I would like to do, your Honor, if you would, I

8    would like to pass some documents up to you to take a look at.

9            THE COURT:  Have you shared those with your adversary?

10           MR. HAEFELE:  Well, they are documents that they

11   shared with us, they're their own documents.

12           THE COURT:  Okay.

13           MR. HAEFELE:  But I would be happy to give them a copy

14   as well.

15           THE COURT:  Please.

16           MR. HAEFELE:  May I approach?

17           THE COURT:  Please.

18           MR. HAEFELE:  Your Honor, one of the documents I have

19   passed up to you is IIRO 025784 through 25803.  If your Honor

20   takes a look at that, these are account statements for an IIRO

21   account that was frozen after 9/11.  The account statements

22   indicate that IIRO, if you look at the address on it, the dates

23   start in, I believe, 2001.

24           THE COURT:  Correct.

25           MR. HAEFELE:  And if you flip to the last one, they go

G3M5terA

1    through September 30th of 2011.  And if you look at the address

2    to the IIRO office in all of them it is the IIRO office in

3    Peshawar and their account statements for Standard Charter

4    Bank.  That's at least an indication --

5              THE COURT:  I see the transaction history.

6              MR. HAEFELE:  If you look at the top of the document

7    on the left-hand side there is an address.

8              THE COURT:  I see.  Yes.

9              MR. HAEFELE:  Just to be clear, the Bates stamp

10   indicates that they are produced to us by IIRO.  And if that's

11   not indicative enough, if we look at the other document I

12   provided you which is IIRO 149483, it is a declaration of a

13   Shoaib Sultan, who identifies himself in the affidavit here or

14   declaration as the accountant for IIRO Peshawar and the

15   declaration is dated April 9, 2001, again that is indicating

16   that the Peshawar office of IIRO was open sometime after the

17   date that the defendants have indicated to us.

18             These indicate, your Honor, that at the very least,

19   there is a question of fact as to whether or not the office

20   they claim was closed in 1996 or 1997 was indeed closed or

21   whether or not some office was closed but there was some office

22   that was still an IIRO office in Peshawar.

23             The use of Gregorian dates versus Hijri dates?  We are

24   talking about documents created in Pakistan that has a history

25   that in addition to having a history of using Arabic dates by

G3M5terA

1    some people, there is also a significant history of using

2    English or Gregorian calendar dates as well and whether an

3    author used one versus another, that is not a reason to

4    indicate the document isn't authentic, it is just a preference

5    of the particular author.

6         And the letterheads with the grammar and erroneous

7    information and the allegations of it being outdated letterhead

8    as well as the errors within the documents -- look -- if your

9    Honor looks, I hate to say it but if you look at one of my

10   briefs there is probably a typo in it somewhere, there is

11   probably problems or grammatical errors.

12        THE COURT:  I am glad you picked on yourself rather

13   than me.

14        MR. HAEFELE:  I am not really that dumb, your Honor.

15        There is also the possibility that the documents, the

16   letterhead may have been created by a local printing company in

17   Peshawar that may have been a non-Arabic native speaker.

18   Arabic is not the native language of Pakistan and the fact that

19   a non-native printer may have printed up the letterhead and

20   said something different than what a printer in Saudi Arabia

21   may have printed should be no surprise and it doesn't indicate

22   that the documents have to be non-authentic.

23        Part of the problem here, your Honor, is the

24   defendants, because they haven't completed their own

25   production, have not produced even a fraction of the documents

G3M5terA

1     that they should have but that that includes documents that

2     indicate misconduct attributed to the IIRO Pakistan office

3     related to fabrication of documents.

4          Discovery that relates to the fabrication of documents

5     at an office from which the documents that were here to talk

6     about originated is particularly telling.

7          Let me just digress for one moment.

8          During a hearing in November of 2011 your Honor

9     admonished these defendants, the same two defendants, that it

10    expected that among the documents they were to produce to the

11    plaintiffs are documents unlike audits done at the various

12    field offices which would have included documents underlying

13    the audits in the Pakistan office.  Still, years after the

14    Court's admonition to produce the documents, we don't have

15    documents produced from those offices related to those audits.

16         On page 6 or 16 of the November -- I think it is

17    November 2011 transcript, your Honor, you made clear that the

18    discussion applied to all the branch offices of the two

19    entities, Muslim World League and International Islamic Relief

20    Organization.  "Except to the extent that two sides can agree

21    that some branch office is not relevant, if each branch office

22    is not queried and documents from that branch produced, as far

23    as I'm concerned that will have been an inadequate search and

24    may lead to dispositive sanctions."

25         Then, on page 17 and to 19 your Honor said:  Talk for

G3M5terA

a moment about the audits.  It seems to me the defendants will

not have done their job as to audits unless they have searched

their own records to make sure that if they have retained

copies of audit reports and the documents that underline the

audit records.

Mr. McMahon, who represented the defendants at the

time, confirmed his understanding by repeating back to the

Court:  I hear, your Honor.  You want any and all records

produced that are still in the possession or control of the

charities that in any way supported the audit.

Then your Honor further clarified by stating:  Or that

are the audit, yes.  And then your Honor went on to explain

that you expected that all the branch offices to be searched

saying whether that is found in Saudi Arabia or in the

Philippines office doesn't matter.  Somebody, in an organized

way, has to query all of these offices and be in a position to

say that was done to follow up and you really need to document

the process.

Your Honor was very clear that all of the offices had

to be searched for the underlying audit reports -- or the

underlying documents to the audit reports as well as the audits

and you also have made clear, though not in this text, you have

also made clear that that extends to the practical ability to

obtain the document from agents, for example, the auditors who

performed, it was an external audit, to search and go to them

G3M5terA

1     and ask them for documents as well.

2                 And it appears that the admonition was at least

3     partially acted on by IIRO based on a letter from IIRO's

4     secretary general Dr. Adnan Basha to the directors of the

5     various IIRO offices and the letter was dated about two weeks

6     after that court hearing, December 2, 2011, and the court

7     hearing was November 16, 2011 and it asked and it went to a

8     number of offices including the Pakistani offices and the

9     document was titled Providing the IIRO Secretary General with a

10    Copy of the Working Papers Used by the External Auditor for

11    Issuing the Financial Statements of IIRO Office of Pakistan for

12    the period 1992 to 2004.  That's IIRO 16657.

13                So, it is very clear, again, not only that your Honor

14    ordered them to produce all the audits, all the underlying

15    documents and that that was at least followed through, to

16    asking for those documents to be collected.

17                Now, again, discovery of the fraudulently created

18    documents from the defendant's Pakistan office is particularly

19    pertinent to the issue that we are here for today, whether or

20    not there was some involvement of documents that were

21    fraudulently created or created outside the normal scope of how

22    documents would ordinarily be created because it also goes to

23    whether they had printers on standby, whether they were

24    generally going outside, producing documents internally that

25    were not the normal documents that would get used.

G3M5terA

1           As indicated in plaintiff's January 28, 2016 letter

2      which is ECF 3207 and Exhibit A attached to that, the

3      defendants produced a 2001 audit indicating gross financial

4      irregularities and the diversion of millions of dollars from

5      one of their Pakistani branch offices involving office

6      personnel conducting massive fabrications of invoices,

7      receipts, and other office documents in relation to

8      construction projects, medical services and other activities.

9           And there is another document that we have recently

10     come across, it is IIRO 0149346, it is an April 14, 2001 letter

11     Nazir Khan, the manager of the IIRO office, I would pass it up

12     to your Honor but it is in Arabic so I don't think it will help

13     you.

14          My understanding of what it is, it is another document

15     produced by these defendants that indicates that in April 2001,

16     IIRO's Pakistan office was conducting an audit for some kind of

17     an investigation of alleged fabrication of financial documents

18     and signatures related to an IIRO-supported hospital in

19     Peshawar.

20          The point, your Honor, is that there is indications

21     within their own documents of massive fabrication of documents

22     going on in Peshawar and in Pakistan offices of IIRO and

23     production of those sorts of documents, production of

24     information regarding the audits and the documents underlying

25     those audits may inform information about the offices that we

G3M5terA

1    are here to talk about as well as the conduct of what was going

2    on and it really comes back to the very beginning that this is

3    premature.  The defendants really need to produce documents to

4    us to tell us what the underlying facts are about what's going

5    on before they come to us and say that we are obligated to

6    produce our work product.

7         I won't belabor this, your Honor.  In our brief we

8    cited to some case law that contradicts what the defendants

9    have said about our obligation to tell them about who our

10   investigators are and you had it right, your Honor, that we

11   have our source, our consulting investigator that we take the

12   position, identification of who our working expert or who our

13   investigator is, is privileged.  Where our source got it from,

14   that's someone that we don't know, your Honor.  Even if your

15   Honor ordered me to tell them who the original source is I

16   can't comply because I don't know who it is.  That's something

17   that came from the investigator.

18        THE COURT:  You are saying the investigator doesn't

19   know either?

20        MR. HAEFELE:  I do believe that the investigator does

21   know but I will also add that the investigator has told us that

22   while he hasn't told us who it is, he has told us what the

23   position is and this is one of the reasons why he hasn't told

24   us, I think, revealing the original person or people who

25   provided the documents would put that person or those people in

G3M5terA

risk of grave harm in Pakistan and that's one of the reasons

why they have been very clear to us that they are very afraid

of us revealing who they are.

There is a mantra, your Honor, that you have already

ordered what they've asked for. My understanding, your Honor,

reading through what your Honor ordered was you ordered us to

conduct discovery and we did that. Your Honor ordered us to

respond to discovery, which we did. But you surely, I hope,

your Honor, did not intend to overrule specific objections that

we asserted in discovery before the discovery was even

responded to. So, the fact that they keep saying you have

already ordered this, I think, misunderstands the fact that

there was a process that your Honor ordered and I think our

position is not only have we engaged in that process but as

part of that process we have also served discovery on the

defendants and they have not produced a single document in

response. They have identified certain things within their

document -- within their responses but they have -- my

recollection is they haven't responded, in full, to the

discovery.

Three other really short points.

Number one, I think there is a reference that we

hadn't produced the documents before and I think they've

indicated the first they came to know of the documents was in

the plaintiff's response to the Kingdom of Saudi Arabia's

G3M5terA

1  papers on appeal.  The fact is, though, that they were produced

2  in discovery during the document production period which

3  preceded that.  They just may not have seen the documents.

4  There is also a suggestion, your Honor, of a forensic

5  analysis on the documents that we have in our possession.  I am

6  afraid to say that since we just have the documents in pdf, all

7  we are going to do is find a printing from Motley Rice which is

8  no help at all.

9  It is also, your Honor, my last point and it is very

10  silly to suggest that we or any of the plaintiff's counsel

11  would accept more documents from a source that it had shown to

12  have fabricated documents.  So, the implication that they can't

13  give us the information without going back to the people who

14  have the most information to answer the question because for

15  fear that we would then take more documents from them if it was

16  deemed or determined that they were fraudulent, is foolish.  We

17  just wouldn't do it.  It wouldn't make sense.

18  I think that's all, your Honor.  Thank you.

19  THE COURT:  Thank you.

20  As to this issue, the --

21  MR. NASSAR:  Your Honor, can I respond to a few

22  points?

23  THE COURT:  Briefly, hopefully.

24  MR. NASSAR:  Your Honor, again, we are not seeking to

25  strike the documents.  So much of what plaintiffs argue is,

G3M5terA

frankly, irrelevant.  There is a Long discussion about our

discovery applications.  Plaintiffs have already indicated that

they're intending on raising a motion to compel next month and

I will save a lot of our response to those issues for a later

date.  We don't have to convince plaintiffs that they are

forgeries at this point, we have to raise certain issues that

weigh against the authenticity of the documents.

Plaintiffs seem to think that we must make a full

showing at this juncture but that is not what we are mandated

to do.

Additionally, they brought up our discovery -- they

brought up the Pakistan audit and the irregularities at the

Pakistan office.  We have recently provided the plaintiffs well

over 90,000 pages of documents concerning the Pakistan office

and the irregularities that occurred there.  That audit had to

do with the Islamabad office and had nothing to do with the

Peshawar office so, frankly, plaintiff's citation to that audit

is not relevant to the matter at hand.

THE COURT:  How about the documents that Mr. Haefele

handed up today which seem to suggest that there was a Peshawar

office?

MR. NASSAR:  Well, the documents -- any IIRO document

that has the letterhead refers to brick and mortar.  I wrote

the operation IIRO head on business conducted there and they

are long standing and they still conduct certain projects in

G3M5terA

1   Peshawar, that has not ceased.  So, we have seen other

2   indications where folks have signed as the representative of

3   IIRO in the location, would sign IIRO with the location listed.

4   It is not indicative of a brick and mortar operation there.

5         I haven't looked closely at the documents he cited but

6   that's the initial response.

7         Additionally, we are prevented from conducting our own

8   investigation into the documents so it is well taken that

9   they're not going to try to get more documents from somebody

10  who has been shown to have produced forgeries.  But, if we are

11  precluded from conducting our own investigation and showing

12  that there are forgeries, it is a circular situation where we

13  are not able to show that.

14        Additionally, your Honor, this inquiry is not

15  premature.  The plaintiffs are already relying on the

16  documents.  You have already ordered that certain information

17  should be disclosed on both sides.  Plaintiffs state that we

18  have not produced documents subsequent to your order but that's

19  because they had already been produced previous to your order.

20  We ended up specifying the Bates ranges but the fact that there

21  were no additional documents in there that we had already

22  provided that information to plaintiffs is no indication that

23  we have not complied with the order.

24        Additionally, your Honor, I have been to every

25  location personally and have supervised an Arabic team of

G3M5terA

1    attorneys where these documents may have been located.  They

2    are not in our files.  I have been to Islamabad, have been to

3    Riyadh which oversaw operations, and Mecca.  In addition to

4    that, to hear plaintiffs speak about discovery noncompliance,

5    we have also led a team to the Philippines, to Indonesia,

6    Bosnia, Kosovo, Macedonia, as well as Albania.  Our efforts

7    will be well documented but they have been Herculean and we

8    have produced well over 300,000 payments in the last three

9    years so I'm not sure what the nexus is to this dispute at

10   hand.

11          We need to know who the source is at bottom.  It is

12   well taken that plaintiffs counsel does not know a lot of the

13   information concerning where the documents came from or how

14   they ended up in somebody's files, but by them not disclosing

15   the name of the source of the documents they're tying our hands

16   and we are unable to find that information ourselves.

17          We have also offered the plaintiffs that we would

18   review the name of the source attorney's eyes only and we would

19   not disclose that to our clients.  We have previously offered

20   this to plaintiffs in a meet and confer and they have not

21   accepted that offer.  So, that would mitigate a lot of the

22   fears of safety concerns I think.

23          That's all.

24          MR. HAEFELE:  Your Honor, very quickly.

25          THE COURT:  Yes.

G3M5terA

1          MR. HAEFELE:  We are not stopping them from

2     investigating.  They can investigate if they want and I would

3     welcome the investigation but that still doesn't mean that they

4     have the obligation or the right or authority to invade

5     plaintiff's work product information which is the crux of what

6     they're asking for us revealing our information about our

7     consulting -- it doesn't obligate us to produce information

8     about our consultants.

9          In terms of who is tying whose hands they're tying our

10    hands by not producing the information we have asked for.

11         Quite frankly, your Honor, one of the things I do want

12    to emphasize if your Honor is going to address this, it has to

13    be in the context of considering our objections to their

14    requests as well as our concerns over their noncompliance with

15    the production of documents relative to this issue.  It was a

16    two-way street in terms of discovery regarding these documents

17    and we produced information and they have not.

18         Lastly, your Honor, I think that on his request for

19    attorney's eyes only access to who the source is, just the

20    source, I believe, is a little uncomfortable with us telling

21    the lawyers for the defendants who he is as well.

22         THE COURT:  Say that again.

23         MR. HAEFELE:  What I am saying is that it is my

24    understanding that the source -- it is not a very easy thing to

25    say, oh, Mr. So-and-so in Pakistan, we are going to tell the

G3M5terA

1    lawyers for the people who may hurt you or people related to

2    the people who may hurt you who you are. But, don't worry,

3    that won't get around.

4            I just don't think it is going to be well taken.

5            MR. NASSAR:  Your Honor, many of --

6            THE COURT:  I have heard enough.

7            I am not unsympathetic to the notion that this whole

8    exercise may be somewhat wasteful but it seems to me most of

9    the waste on a going forward basis to the extent it occurs will

10   be on the defendant's side because they'll have the laboring

11   oar in terms of proving that this document or these documents

12   are forgeries, if indeed they are.

13           I don't disagree that it's a bad precedent, perhaps,

14   in the sense that we could start going document by document and

15   having squabbles about the authenticity of documents that may

16   never factor into dispositive motion practice or a trial but we

17   did start down that road with respect to this document and my

18   rulings with respect to it are not an indication of what I

19   think should happen with respect to any future such documents

20   that may arise on either side.

21           To the extent that there were points raised about the

22   MWL and IIRO production, that will presumably be the subject of

23   yet another motion to compel. So, it seems to me that that,

24   with one exception I will get into, is unrelated.

25           My November 3rd order did not set a date for

G3M5terA

1    compliance and may have used some language that was more

2    generic or unspecific than it should have been.  For example,

3    my statement that, similarly, the plaintiffs will be obliged to

4    disclose information in their possession concerning the

5    providence of the documents and, as counsel pointed out, no

6    objections to this order back in November, were filed.

7            I am not insensitive to the concerns about the safety

8    of sources or the dismay that an intermediary source who is

9    functioning in some sort of investigative function may have but

10   I do think reasonable accommodations can be made.

11           I am going to require that on a date certain -- and

12   the two sides can confer on what that date should be and if

13   they are unable to agree I will set a date -- the defendants

14   MWL and IIRO must disclose the specific badges of fraud that

15   they say establish the falsity or the fraudulent nature of the

16   document and that if there are documents that support that

17   claim, even if they're just specimen documents, that those

18   documents be produced as well.  The defendants can set the

19   restriction that they proposed which is that everybody other

20   than the source can be given that list of reasons why the

21   defendants believe the document is forged.

22           As to the source, there really are two sources, the

23   investigator and the ultimate source of the document which

24   Mr. Haefele may not know but certainly is something that

25   potentially the plaintiffs can find out.

G3M5terA

1          As to the investigative source of the document, if I

2     can call it that, I am going to direct that that be produced

3     for attorney's eyes only.

4          As to the ultimate source, I am going to make the same

5     direction but I will permit the plaintiffs to make a

6     particularized showing to me, why don't I say within two weeks,

7     as to what danger that would present -- and I do mean

8     particularized.  And I would expect that all or virtually all

9     of that submission would be shared with counsel for the

10     defendants so that hopefully there won't be a document with

11     redaction that defense counsel receives.

12          If it turns out that the accusation regarding the

13     providence of the document being fraudulent -- let me rephrase

14     that because it is coming out wrong.

15          If it turns out that the accusation that the document

16     is false or forged eventually proves to be incorrect, I may

17     well or the Court may well award the costs associated with all

18     of this to the plaintiffs against the defendants.

19          Originally I was going to reserve decision as to

20     whether the defendants could have their own expert test this

21     document but since it appears not to be an original there is

22     nothing that can be done by way of testing at this point.  I

23     want the two sides to discuss where the original is and whether

24     it can be brought to the United States or perhaps is in the

25     United States in the hands of the investigator.  If so, I would

G3M5terA

1    permit the defendants to inspect the original but would not

2    require that it be surrendered for purposes of expert testing

3    without a further order of the Court.

4             So, those are my rulings with respect to this issue.

5    Any questions?

6             MR. HAEFELE:  Your Honor, I do have some questions.

7             I think your Honor touched on it, but with regard to

8    our particularized showing, based on what your Honor said I'm

9    assuming that though it is not favored, some of the submission

10   may be in camera?

11            THE COURT:  That's exactly right.  Yes.

12            MR. HAEFELE:  Okay.

13            THE COURT:  I'm not in favor of that or would hope

14   that that wouldn't come to pass but I am not ruling it out.

15            MR. HAEFELE:  And, your Honor, to the extent that the

16   defendants, with regard to their, the document discovery

17   responses that they've proposed to us related to these

18   documents, to the extent that they purely object based on

19   filing grounds, a lot of it was that they thought that we

20   should go first and not them.

21            THE COURT:  When you say discovery responses?

22            MR. HAEFELE:  Based on your Honor's ruling the

23   defendants served discovery on us and we served document

24   requests and interrogatories on them.  Some of the responses

25   the defendants responded to us was that much of it was you go

G3M5terA

1    first and in light of your Honor's ruling that it is not

2    necessarily that plaintiffs go first, to the extent that that's

3    what their objection was, may we have that discovery?

4            THE COURT:  Well, my ruling is I hadn't focused on

5    discovery that the two sides may have served on each other but,

6    in essence, my ruling is you all go together when you go so on

7    certain dates both sides are to respond and I do mean respond,

8    not file a series of objections.

9            Anything else?

10           MR. NASSAR:  Your Honor, two things.

11           THE COURT:  Let me finish with Mr. Haefele.

12           MR. HAEFELE:  To the extent there are discovery

13   requests on both sides, the date that we select would be both

14   sides would be responding?

15           THE COURT:  Yes.

16           MR. HAEFELE:  Okay.

17           THE COURT:  Yes, sir.

18           MR. NASSAR:  Your Honor, we have two outstanding

19   questions aside from the name of the source of the documents,

20   namely the date on which they received the documents as well as

21   other circumstances surrounding how they obtained the

22   documents.  We didn't -- if you could rule on those as well?

23           THE COURT:  I think that's what Mr. Haefele in part

24   was asking me about.  I think I did just rule.

25           MR. HAEFELE:  I was asking about their responses to

G3M5terA

1  us.

2          THE COURT:  Okay, but it is comprised within that

3  ruling, it seems to me.

4          MR. NASSAR:  Thank you, your Honor.

5          THE COURT:  And I guess that brings us to Wael

6  Jelaidain.

7          Let's take five minutes.

8          (Recess)

9          THE COURT:  On to Wael Jelaidain.

10          MR. CARTER:  Your Honor, thank you.  I will be as

11  brief as possible.  I understand we have all been here for a

12  long time and we have already covered quite a bit of territory

13  along the way with Mr. Jelaidain.

14          The motions before your Honor include both request for

15  sanctions and to compel further production of documents from

16  defendant Jelaidain.  They include banking and other documents

17  Jelaidain secured for the benefit of co-defendant Yassin

18  al-Kadi, documents relating to the Swiss government's

19  investigation of Jelaidain including materials relating to the

20  interview that was conducted of him in Riyadh, documents

21  relating to the Maryam Company at Faisal Finance, a joint bank

22  account he held with fellow executive order 11234 designate

23  Sharif Ayadi, documents relating to his ties to government

24  offices of the Kingdom of Saudi Arabia and its charities, and

25  finally documents relating to his corporate agent and Abrar

G3M5terA

1   Caravan, Euro Investment, KA Stan and Maryam Travel.

2         As your Honor knows, this Court issued sanctions

3   against Defendant Jelaidain in October of 2013.  After a

4   somewhat tortured procedural history the Court imposed those

5   sanctions based on the record that existed at that time that

6   demonstrated that Defendant Jelaidain had not taken to heart

7   this Court's directive that he engage in a full court's press

8   and make diligent efforts to secure such documents within his

9   custody and control.

10         The further discovery we have received at this point

11   paints a more problematic picture of the state of affairs, your

12   Honor.  In particular, documents produced by defendant al Kadi

13   reveal a 2003 meeting between Mr. Kadi's attorneys and

14   Mr. Jelaidain's attorney which Mr. Jelaidain promised to

15   provide assistance to Mr. Kadi in relation to the

16   investigations of him and, in particular, to authorize access

17   to corporate documents for Maryam as well as banking documents

18   for Jelaidain's personal accounts and for Maryam accounts at

19   Faisal Finance.

20         Thereafter, on July 18, 2003, Defendant Jelaidain

21   received a letter from Faisal Finance indicating it had started

22   retrieving the records.  So, what we now know, your Honor, is

23   at the time Defendant Jelaidain was indicating to this Court

24   that it was impossible for him to secure his records and his

25   banking records, he had in fact successfully done so for the

G3M5terA

1    benefit of defendant al Kadi.

2          And so, that paints a much different picture of the

3    state of affairs when this Court issued its original sanctions

4    order and we think the misrepresentation warrants the

5    imposition of additional sanctions to ensure that we don't

6    continue to encounter this kind of conduct.  So, that's the

7    first component.

8          Your Honor, obviously we want the documents as well

9    that he secured for Mr. al Kadi as described in those materials

10   as well as documents relating to the Swiss government's

11   interrogation of him on May 3rd, 2004.  At the time that

12   occurred Mr. Jelaidain was a defendant in this litigation

13   represented by counsel and he obviously had an obligation to

14   retain records relating to that interrogation and his

15   associated engagements with the Swiss authorities.  We have

16   never received those materials and so we think Mr. Jelaidain

17   should be directed to provide all of those as well.

18         We have also already discovered some additional bank

19   accounts that we did not know of during the earlier proceedings

20   and so we don't know whether any effort has been undertaken

21   with respect to these additional bank accounts, they include an

22   Istanbul-based bank account for Jelaidain individually and also

23   an account for Maryam company.  In addition, some U.S.

24   diplomatic cables disclose an account Jelaidain held jointly

25   with Shafiq Ayadi in Croatia at Privedna Banka, Zagreb.

G3M5terA

1          So, your Honor, we ask for a directive that

2    Mr. Jelaidain undertake efforts to secure records from those

3    institutions as well.

4          We also have a bit of a fuller picture now of the

5    range of business activities that Mr. Jelaidain has and has

6    engaged in.  He is a very active businessman in addition to the

7    charitable associated activities that were the subject of much

8    of our earlier discussion.  Those business activities also

9    generally involve interactions with other designated parties

10   and al Qaeda affiliated parties.  Mr. Maloney is going to step

11   up in a minute to describe one of those and describe whether it

12   is relevant and why we are asking for discovery on these issues

13   but generally, as I said, all of these companies we have

14   identified in our papers, Abrar Caravan, Euro Investment, KA

15   Stan and Maryam Travel are entities that Jelaidain had

16   leadership position in.  In many cases, documents were being

17   sent to a common address he used for multiple of his businesses

18   suggesting that he clearly had possession of these materials.

19   And, lastly, any documents relating to his long history of work

20   on behalf of government agencies of the Kingdom of Saudi Arabia

21   and in particular its charities which he directed.

22          Basically, what we have heard in response to this

23   issue, your Honor, is the same thing we have heard before.  I

24   am under house arrest which does not really hold water.  We

25   have comments in the news in the kingdom from his own

G3M5terA

1    Saudi-based lawyer years ago indicating that he was operating

2    without restriction in conducting business and we have news

3    accounts much later in 2008 indicating that he was a featured

4    speaker at a charitable conference hosted by defendant WAMY.

5         So, every indication is that he is free to operate in

6    the kingdom and not subject to nip house arrest.

7         We have also heard this claim that all of his records

8    were sequestered and seized by the Swiss authorities.  The

9    document that's been cited relates to a single Citibank Geneva

10   account.  It doesn't require the sequestration of all of his

11   bank accounts.  There are literally dozens, some of them are

12   outside of the province of Switzerland anyway.

13        So, the explanations we have heard at this point

14   really don't stand.  We are sort of approaching the end of the

15   road.

16        With that, your Honor, I would like to briefly turn it

17   over to Mr. Maloney.

18        THE COURT:  Before you do that, your letter clearly

19   says and you repeat it today that you are not seeking a default

20   judgment but some other form of sanction or course of sanction.

21   What did you have in mind?

22        MR. CARTER:  Well, your Honor, I think what we had in

23   mind is if the court were agreeable to imposing the sanction we

24   would make application as we did in the past.  I think, in all

25   candor, it is unlikely to be a direct relationship to

G3M5terA

1    attorney's time spent on further efforts to bring Defendant

2    Jelaidain into compliance but rather to have an element

3    intended to deter this kind of conduct going forward.

4            There is also the issue, obviously, your Honor, that

5    there is already the existing sanction order against Defendant

6    Jelaidain which hasn't been made as of yet.

7            THE COURT:  Thank you.

8            MR. CARTER:  Thank you, Mr. Maloney has a few words.

9            MR. MALONEY:  Good afternoon, your Honor.  I am going

10    to be very, very brief.  It has been a long day.

11            One of the things I want to talk about is

12    Mr. McMahon's response to our motion and in it, if you read it,

13    he talks a lot about the Swiss authorities and the seizure of

14    records.  What he doesn't mention at all anywhere in there that

15    I saw was this company called Maryam that Mr. Carter referred

16    to that is in our papers both in our motion and in our reply

17    papers and that's because Maryam is in Turkey.  The Swiss have

18    nothing to do with it and no control over it.  So, in his

19    opposition he talks about the Swiss investigation and says

20    nothing about what is going on with Maryam and Turkey.  That

21    company was shut down in 2002 or 2003 but I want to give you a

22    snippet of why that company is important to us and why we ask

23    for the information and I will try to do it in two minutes.

24            THE COURT:  Sure.

25            MR. MALONEY:  That company, it is called Maryam

G3M5terA

Travel, sometimes Maryam Import/Export located in Turkey, as I
indicated.  It was founded by Mr. Salim, that's Mohammed Salim,
who was a senior al Qaeda member and very close to Bin Laden.
He was a suspect in the '98 embassy bombings, later arrested in
Germany and extradited to the United States where he stabbed a
prison guard in the eye and received a life sentence for that.
So, that's the founder of the company.

         In '96 and '97 he sold the company to Mr. Jelaidain
and Mr. Jelaidain ran the company.  Salim stayed active in the
company for some period of time with another gentleman by the
name of Al Jazeed and Mr. Kadi then started funneling money to
the company Maryam in Turkey, allegedly so Maryam could build
some housing for the University in Yemen.  That university is a
university, it is a known educator for Jihad, the students
there later become Jihaddist.  Bin Laden referred to it in
support of the school.

         There was over, I think, a million and change that we
found documentation on money transfer from Kadi to Maryam, i.e.
Jelaidain, that disappeared.  Most of that money disappeared.
We have some of that information, some of those records.  We
have asked for all of the records related to Maryam, the
business corporate records, financial records, anything to do
with Maryam as well as, of course, Mr. Jelaidain and the others
and the other intersects because there is a lot of especially
designated global terrorists associated with that company

G3M5terA

1    meaning Mr. Kadi and Mr. Jelaidain.  We have received nothing.

2         Mr. McMahon doesn't even mention that company in his

3    opposition and doesn't say why he has not responded to those

4    specific and pointed document demands.

5         And just to quote Judge Casey and Mr. Haefele, it is

6    another kabuki dance that we have gotten year in and year out

7    from Mr. Jelaidain and Mr. McMahon.

8         THE COURT:  Thank you.

9         Mr. McMahon?

10        MR. McMAHON:  Yes.  Good afternoon, your Honor.  I

11   know it has been a long day for you and for all of us.  I will

12   try to be brief.

13        I would like to address maybe initially the Swiss

14   money situation.  We believe there was a valid argument about

15   sequestration because we had never been alerted to the fact

16   that we had appeal rights and we only recently were privy to

17   that information.  But, in terms of this Swiss bank account --

18        THE COURT:  Wait.  You have lost me.  An appeal right

19   in Switzerland?

20        MR. McMAHON:  You are supposed to be notified by the

21   bank that has received the sequestration order from the

22   government that, indeed, you, Mr. Jelaidain, have a right to

23   appeal this order.  We never got any notification from the

24   Swiss bank that we had a right to appeal that sequestration

25   order and that's in our papers, your Honor.  Had we been told

G3M5terA

about that he could have hired Swiss counsel and had done an
appropriate appeal but I do think the sequestration issue is
different than the one that the expert focused on, Professor
Jaruli, he did not get into sequestration.  I think
sequestration poses a different issue in terms of someone's
ability to produce documents.

But, your Honor, I would like to come up with maybe
some sort of solution here instead of wasting your time and the
case has been going on for years, of course.

Could we perhaps draft, myself and plaintiff's
counsel, an order that you would be willing to sign which goes
to Citibank, the Swiss authorities, Bank Faisal and any other
banks they want in Switzerland and we authorize you produce
everything you have with respect to Wael Jelaidain and this new
entity Maryam which I guess was shut down in 2002?

We are not adverse, your Honor, to full disclosure of
anything that is in the Swiss bank accounts or Swiss financial
records, Swiss authorities.  We would like to get this all out.
We have been unable to do so.

When they talk about house arrest, your Honor, you can
be under house arrest and still receive permission to give a
speech, for example, at a function, or to attend your
daughter's wedding.  I don't know if he is wearing an ankle
bracelet but your Honor knows lots of times situations come up
with a potential criminal matter has to have access to some

G3M5terA

1    sort of medical treatment or whatever.  There are a number of

2    reasons why house arrest doesn't mean that you are totally

3    confined to the house.

4            Now, with respect to some of the new allegations that

5    I hear, let's talk about Turkey.

6            Again, your Honor, I checked before today and I

7    received no update in terms of we do have some information now

8    and so I have nothing to provide you, your Honor, in that

9    regard.  I know you are not a fisher of that.  My question is

10   can we craft a civil order with respect to any and all banks,

11   companies like Maryam, in Turkey, and if you are willing to

12   sign it then we send it and maybe then they will listen to a

13   court order in terms of producing things?

14           And we have no problem, your Honor, about full

15   disclosure.  Anything the plaintiffs want to request consistent

16   with their Rule 34 request, obviously, we would have no problem

17   with drafting, co-drafting an order to that effect.  We want to

18   get this behind us.  No one seems to believe, your Honor, that

19   even though counsel overseas has tried to secure those records

20   he couldn't.  And now we know why.  There was a sequestration

21   order in effect and basically everything was waiting for Wael

22   Jelaidain to be basically extradited to America.  And

23   consistent with my prior arguments, your Honor --

24           THE COURT:  Hang on.

25           One thing that counsel said was that the sequestration

G3M5terA

1    order only dealt with one Citibank account in Switzerland.

2              MR. McMAHON:  I don't think I read it that way, your

3    Honor, but I will go back and look at it, but my point is even

4    if there is no sequestration order, the attempts on Counsel

5    Bali, and he has sent letters to your Honor that we have

6    attached to our letter and he has tried to get, OFAC will slam

7    you for aiding and abetting an international terrorist and at

8    the time this all played out my guy was designated both by the

9    U.N. and by America, especially designated global terrorist.

10   Banks don't want to do business with someone like that because

11   they'll get into trouble but my point is, your Honor, I am

12   trying to come up with some solution so that you can be fairly

13   convinced that we have nothing to hide, we have an inability to

14   get records that the plaintiffs say they want, okay, let's

15   draft up an order that you are willing to sign, send the order

16   to the appropriate Swiss authorities whether it is Citibank,

17   Swiss authorities or Faisal, I don't care, and let's see if we

18   can bring this to a close, your Honor, because we are wasting

19   too much time on it.

20             In terms of further sanctions, I don't think it is

21   appropriate at this time for the Court to consider that unless

22   you are content that despite our diligent efforts we are sort

23   of hiding documents.

24             But, to the extent I authorize -- and I went through

25   this with counsel and the client -- let's send an order over

G3M5terA

1      that you are signing which says produce all of this stuff and

2      give plaintiffs every document they want.

3                THE COURT:  Thank you.

4                Anything further, Mr. Carter?

5                MR. CARTER:  Your Honor, a couple of quick points.

6                The sequestration order that's attached to Jelaidain's

7      opposition papers refers to just a single account at Citibank,

8      that's pretty clear.

9                Second of all, your Honor, with regard to this idea

10     about drafting an order to send out to international

11     authorities.  We were down this road many, many years ago and I

12     think we said if Mr. McMahon and Mr. Jelaidain want to draft

13     letters interrogatory for your Honor's consideration and try

14     and fulfill their obligations that way, they can.  It is not

15     our responsibility to do that.  And that ship was in port and

16     sailed away quite a long time ago.

17               Lastly, with regard to the sanctions request, again,

18     it is based on the evidence that now exists that Mr. Jelaidain

19     affirmatively secured and was able to obtain copies of his

20     records and that's a different record than was before the Court

21     previously.

22               Thank you, your Honor.

23               MR. McMAHON:  Your Honor, on that last point again

24     Abdullah Kadi and his attorney got those records, we never got

25     those records until they were produced as of, I think last year

G3M5terA

by Abdullah Kadi's counsel.  Our guy never had those records,

it was Kadi's counsel -- sorry, Abdullah Kadi's counsel and his

aggressive law firm in London that was able to achieve, working

with a Swiss attorney, to achieve the production of these

documents.  Keep in mind, your Honor, that this is a man who is

no longer designated as a specially global designated terrorist

like Wael Jelaidain.  Again, a bank doesn't have a problem

dealing with somebody who has been delisted because that is

proof positive he is not a global terrorist.  We have the

lingering problem that we have been both designated by the U.N.

and America as a global terrorist and that's always been the

brunt of our problems, your Honor.

          And to the extent there are new issues that they've

brought up, I heard some new allegations about links to this,

links to that.  Again, I would ask your Honor to consider I

haven't seen any factual linkage in terms of how Wael Jelaidain

assisted in destroying the U.S. S Cole or blowing up the first

World Trade Center or the embassy bombings.  I haven't seen

anything, your Honor.  It is just premised on newspaper

clippings and reliance on documents like the golden chain which

has been, you know, disregarded by these four or five federal

judges.

          That's it for me, your Honor.  I know you have had a

long day.  Thanks for hearing me out.

          MR. CARTER:  Your Honor, I am not going to address

G3M5terA

1    much of that.  I would just say that Defendant Kadi's very

2    aggressive attorneys obtained the documents because Jelaidain

3    assisted them and authorized them to get them.  So, attorneys

4    working with Defendant Jelaidain's assistance could get the

5    documents.

6          Thank you, your Honor.

7          THE COURT:  Well, I read the papers related to

8    Mr. Jelaidain and much of the written paperwork, perhaps more

9    so than the argument today, constitutes an attempt to

10   relitigate my prior award of sanctions and is a road I am not

11   going to go down.

12         The letters that were appended are in French, they

13   aren't translated, and there is the conclusory, unsworn letter

14   from Mr. Alim, Jelaidain's Saudi counsel, indicating what the

15   letters purport to say.  But, again, that's much of the same in

16   terms of what was before the Court previously at the time that

17   the motion was before me.

18         It seems to me the salient fact that Mr. Carter

19   detailed whether Mr. Kadi was de-designated or never

20   designated, with the assistance of Mr. Jelaidain he was able to

21   secure documents that relate to a personal Faisal finance

22   account of Wael Jelaidain in 2003 and there is no apparent

23   reason why Mr. Jelaidain, with Mr. Baseem's assistance could

24   not do the same with respect to the discovery requests here.

25   And, at times I have issued orders relating to financial

1    documents overseas including in the Middle East -- not in this

2    case but in cases involving at least Egypt and talk about

3    kabuki dances?  That's a kabuki dance.

4           So, I will sign whatever orders, Mr. McMahon, you wish

5    me to sign, although the Hague Convention would be a much

6    better way to go assuming that any of the countries we are

7    talking about are signatories and haven't opted out of any of

8    the provisions but again, the key point is as I found

9    originally, there was inadequate effort to secure documents and

10   proof with respect to Mr. Kadi seems to simply underscore that.

11          I will order again, although it is really not

12   different from my prior orders, that Mr. Jelaidain produce the

13   documents with the sole exception of the so-called golden chain

14   documents.  And I will permit the plaintiffs to make a motion

15   for sanctions that they wish to make.

16          In a number of instances today I have suggested

17   actions that need to be taken but haven't set specific

18   schedules for most of those and I trust that two sides will

19   confer quickly and submit a proposed scheduling order to me.

20          Is there anything else that we ought to take up today?

21          Yes?

22          MR. KREINDLER:  Your Honor, I mentioned if we could

23   have two minutes on the Iran situation?

24          THE COURT:  Yes.  Sure.

25          MR. KREINDLER:  Thanks.

G3M5terA

1        I can talk to your Honor now.  It doesn't concern

2   any --

3        MR. McMAHON:  Your Honor I can't hear what that party

4   said.

5        MR. KREINDLER:  Jim Kreindler.

6        That does not concern any of the defendants here so I

7   don't want to put them out.

8        THE COURT:  Well, we can do it in this forum or we can

9   do it in the robing room.  It really deals with the default.

10       MR. KREINDLER:  If it is all right, your Honor, why

11  don't we go to the robing room when we are done?

12       THE COURT:  Does anyone object to me dealing with

13  Mr. Kreindler ex parte about that?  Everyone looks eager to

14  leave.

15       Thank you, all.  I take it counsel are ordering the

16  transcript?

17       MR. CARTER:  Yes.

18       THE COURT:  And I am sure you will need to work with

19  the reporter on some of those names.

20                        o0o

21

22

23

24

25