UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (GBD) (FM)<br>ECF Case |

This document relates to:

*Ashton, et al. v. al Qaeda Islamic Army, et al., Case No. 02-CV-6977*
*Federal Ins. Co., et al. v. Al Qaida, et al., Case No. 03-CV-6978*
*Estate of O'Neill, et al. v. Republic of Iraq, et al., Case No. 04-CV-1076*
*Havlish, et al. v. bin Laden, et al., Case No. 03-CV-09848*

*ASHTON, FEDERAL* AND *O'NEILL* PLAINTIFFS'
CONSOLIDATED OPPOSITION TO THE *HAVLISH* MOTION
FOR AN ORDER CREATING A COMMON BENEFIT FUND TO
COMPENSATE *HAVLISH* ATTORNEYS REGARDING DEFAULT
JUDGMENTS AGAINST THE ISLAMIC REPUBLIC OF IRAN

May 5, 2016

**TABLE OF CONTENTS**

Page

I. THE APPLICATION IS PREMATURE...................................................................... 2

II. *HAVLISH* COUNSEL ELECTED TO ABANDON ITS ATTEMPT TO
CERTIFY A CLASS ACTION AGAINST IRAN AND ACCORDINGLY
ABANDONED ITS RIGHT TO SEEK A COMMON BENEFIT FUND............................ 5

III. *HAVLISH* COUNSEL ELECTED TO OPERATE OUTSIDE THE
PARAMETERS OF THE GENERAL STEERING COMMITTEE AND
EXECUTIVE COMMITTEES AND, AS SUCH, FORFEITED ANY
CLAIM TO COMPENSATION THROUGH A COMMON FUND. .................................... 6

IV. THE *HAVLISH* COUNSEL HAVE NOT ESTABLISHED THAT THEY
ARE ENTITLED TO THE FEES WHICH THEY SEEK. .................................................. 13

   A. The First Liability Default Does Not Warrant Fees or Expenses From Other
   Defaults................................................................................................................. 13

   B. Responding Plaintiffs Had Already Compiled Extensive Evidence Against Iran
   Before the *Havlish* Default Motion Was Filed. ............................................... 18

   C. *Havlish* Counsel, at Best, Merely Assisted in Establishing the Law of the Case as
   to an Uncontested Question of Liability. ........................................................... 23

   D. *Havlish* Counsel Have Not Otherwise Met Their Burden of Establishing their
   Entitlement to the Fees and Expenses Sought by Way of a Common Fund. ................. 23

nydocs1-1066081.6

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Ashton, et al. v. al Qaeda Islamic Army, et al.,*
  Case No. 02-CV-6977 ................................................................................1, 5, 10, 20

*Boim v. Holy Land Found. for Relief & Dev.,*
  549 F.3d 685 (7th Cir. 2008) (en banc) ........................................................16

*Comm. Bank of Kuwait v. Rafidain Bank,*
  15 F.3d 238 (2d Cir. 1994)..............................................................................14

*Estate of John P. O'Neill, et al. v. Republic of Iraq, et al.,*
  Case No. 04-CV-1076 ....................................................................................1, 5

*Federal Ins. Co., et al. v. Al Qaida, et al.,*
  Case No. 03-CV-6978......................................................................................1

*Gates v. Syrian Arab Republic,*
  580 F. Supp. 2d 53 (D.D.C. 2008) .................................................................15

*Haim v. Islamic Republic of Iran,*
  784 F. Supp. 2d 1 (D.D.C. 2011) ...................................................................14

*Harrison v. Republic of Sudan,*
  882 F. Supp. 2d 23 (D.D.C. 2012)..................................................................14

*Holder v. Humanitarian Law Project,*
  561 U.S. 1 (2010)......................................................................................16, 17

*In re Air Crash Disaster at Florida Everglades on Dec. 29, 1972,*
  549 F.2d 1006 (5th Cir. 1977) .........................................................................7

*In re MGM Grand Hotel Fire Litig.,*
  660 F. Supp. 522 (D. Nev. 1987)..................................................................7, 12

*In re Orthopedic Bone Screw Prods. Liab. Litig.,*
  MDL No. 1014, 1996 WL 900349 (E.D. Pa. June 17, 1996) .......................11

*In re Vioxx Prods. Liab. Litig.,*
  760 F. Supp. 2d 640 (E.D. La. 2010)...............................................................6

*In Re: Islamic Republic of Iran Terrorism Litigation,*
  659 F. Supp. 2d 31 (D.D.C. 2009)........................................................13, 16, 21

nydocs1-1066081.6

*Int'l Road Fed'n v. Embassy of the Democratic Republic of the Congo*,
    131 F. Supp. 2d 248 (D.D.C. 2001) ..................................................................................14

*Mulligan Law Firm v. Zyprexa MDL Plaintiffs' Steering Comm. II*,
    594 F.3d 113 (2d Cir. 2010) ...........................................................................................11

*Murphy v. Islamic Republic of Iran*,
    740 F. Supp. 2d 51 (D.D.C. 2010) ..................................................................................15

*Owens v. Republic of Sudan*,
    826 F.Supp.2d 128 (D.D.C. 2011) ...................................................................................15

*Rimkus v. Islamic Republic of Iran*,
    575 F. Supp. 2d 181 (D.D.C. 2008) ................................................................................14

*Smiley v. Sincoff*,
    958 F.2d 498 (2d Cir. 1992) ...................................................................................6, 7, 11

*Smith v. Islamic Emirate of Afghanistan*,
    262 F. Supp. 2d 217 (S.D.N.Y. 2003) ............................................................................13

*Sprague v. Ticonic Nat'l Bank*,
    307 U.S. 161 (1939) .........................................................................................................6

*Turner v. Murphy Oil USA, Inc.*,
    422 F. Supp. 2d 676 (E.D. La. 2006) ..............................................................................11

*U.S. v. Ali Mohamed*,
    98-cr-1023 ........................................................................................................................21

*U.S. v. Usama Bin Laden et al.*,
    98-cr-1023 ........................................................................................................................21

*Ungar v. Islamic Republic of Iran*,
    211 F. Supp. 2d 91 (D.D.C. 2002) ..................................................................................13

*Weinstein v. Islamic Republic of Iran*,
    175 F. Supp. 2d 13 (D.D.C. 2001) ..................................................................................14

*Wultz v. Islamic Republic of Iran*,
    864 F. Supp. 2d 24 (D.D.C. 2012) ..................................................................................14

STATUTES

18 U.S.C. § 2339A(b)(1) .........................................................................................................16

28 U.S.C. § 1608(e) ...........................................................................................................13, 14

Compensation for United States Victims of State Sponsored Terrorism Act, 42 U.S.C. § 10609...........................................................................................................................4

iv

Plaintiffs in *Ashton, et al. v. al Qaeda Islamic Army, et al.*, Case No. 02-CV-6977;

*Federal Ins. Co., et al. v. Al Qaida, et al.*, Case No. 03-CV-6978; *Estate of John P. O'Neill, et al.*

*v. Republic of Iraq, et al.*, Case No. 04-CV-1076, represented by attorneys who constitute several

members of the Court-appointed Plaintiffs' Executive Committees ("PEC") for both death and

injury cases, as well as the commercial cases ("Responding Plaintiffs"),[1] respectfully submit this

Consolidated Memorandum of Law in opposition to the application filed by the attorneys who

represent a few dozen of the thousands of 9/11 victims ("*Havlish* Counsel"), seeking the creation

of a common fund for their personal benefit ("Application").  MDL Nos. 3235-36.  Specifically,

in their Application, *Havlish* Counsel, who represent but 47 of the 9/11 victims, prematurely

seek, by way of a creation of a common fund, compensation and expenses from clients they do

not represent and who are represented by the balance of the PEC, for unauthorized, unnecessary

---

[1]     In their moving papers, *Havlish* Counsel have curiously referred to their fellow counsel (and their clients) as "free riders."  *See, e.g.*, Memorandum of Law in Support of *Havlish* Plaintiffs' Motion for an Order Creating a Common Benefit Fund to Compensate and Reimburse *Havlish* Attorneys for Services performed and Expenses Incurred in Developing and Presenting Evidence Establishing Liability and Damages Against Defendant the Islamic Republic of Iran ("MOL"), MDL No. 3236.  Such a characterization, in this MDL, which presently has approximately 3270 docket items (with scores upon scores of non-docketed letter applications and briefs submitted to Magistrate Judge Maas in connection with discovery disputes prior to the permissive filing of letter applications via PACER), of which the filings submitted by the *Havlish* Counsel are a mere handful, could properly be categorized as absurd. Moreover, it ignores the hard and productive work of teams of attorneys, investigators, paralegals, translators, consultants, experts and others spanned across the globe since well before the MDL was even created.  As this Court is well aware, highly contested substantive motion practice has taken and continues to take place in this case before multiple district and appellate courts throughout the country; significant discovery efforts have been and continue to be undertaken; complex legal issues have been litigated in a variety of forums; intensive and productive investigative activities have been undertaken; and the legal interests of all of the 9/11 victims have been pursued against a variety of defendants usually represented by sophisticated counsel. This immense work on behalf of the 9/11 families and victims has been undertaken by the responding members of the PEC, acting collegially and collectively.  The term "free rider" is a forced and factitious legal construct.  *Havlish* Counsel attempt to deflect from their use of this pejorative term to describe responding counsel and their clients, meekly claiming that "[i]t is not *Havlish* plaintiffs' counsel's term, nor is it used to connote anything other than what is meant in the fields of economics and law."  *Havlish* MOL at pp. 1-2, n.1.  But the fact of the matter is that it is *Havlish* Counsel who chose to use the term as a label for responding counsel and their clients—a conscious decision that was unnecessary, inappropriate, and decidedly inaccurate given the realities. Responding Plaintiffs will not otherwise comment upon the use of the phrase, or the imaginary descriptions of their activities contained in the MOL.

1

and duplicative work and expenditures.  As detailed herein, *Havlish* counsel has prematurely

sought the creation of a fund prior to the receipt of any recoveries.  *See* Section I, *infra*.  They

have improperly sought payment of fees from clients that they do not represent after abandoning

their pursuit of a class action on behalf of the many unrepresented victims and their families.  *See*

Section II, *infra*.  They have acted in contravention of this Court's case management orders by

acting unilaterally, and failing to coordinate and cooperate with the PEC, all resulting in

unnecessary and duplicative work.  *See* Section III, *infra*.  They performed unnecessary work in

securing a non-adversarial default, in excess of the requirements under the Foreign Sovereign

Immunities Act ("FSIA"), and seek to be rewarded for doing so by clients they do not represent.

*See* Section IV-A, *infra*.  They performed duplicative work to that already undertaken by the

other active members of the PEC and/or obtained from publicly available sources, and wrongly

and without any basis in fact misrepresent the nature and scope of the work undertaken by

responding counsel.  *See* Section IV-B, *infra*.  Their work was limited in scope, as it went only to

securing an unopposed determination of liability, and did not include the determination of

damages nor the collection of any judgments.  *See* Section IV-C, *infra*.  Finally, *Havlish* Counsel

have not met their burden of establishing what *necessary* services they actually rendered and

what *necessary* costs they actually incurred in this extraordinarily complex case.  Accordingly,

the Application should, at this time, be denied.

I.      **THE APPLICATION IS PREMATURE.**

        The *Havlish* Counsel's Application is premature as there is neither a present recovery

from Iran nor the immediate prospect of any such meaningful recovery.  As discussed at greater

length below, simply put, all that the *Havlish* Counsel have done is obtain a non-adversarial

nydocs1-1066081.6

default judgment as to liability against a defendant who has not appeared.[2]  While the extent of the effort and investment necessary to potentially generate an actual (as opposed to symbolic) recovery against Iran is unknown at this time, the incontrovertible historical record establishing the decades-long efforts to recover other default judgments against Iran in terrorism litigations suggests that significant time, funds, and expertise will be required in this regard.   Realizing a recovery on the judgments is likely to require extensive and costly judgment recognition and execution proceedings in foreign countries, global investigations to identify Iranian assets, legislative action (potentially resulting from lobbying efforts), and other undertakings that are as of yet indiscernible.

The *Havlish* Counsel, in the absence of an actual recovery, cannot establish at this time (let alone assert in their moving papers), how such a recovery will take place, the extent of such a recovery, from whom funds may actually be recovered, when such funds will be recovered, or how other claims and efforts beyond any default proceedings may contribute to such a recovery. Most significantly, they have not and cannot establish by whose efforts such recovery will be possible, so that the 9/11 families and victims can finally obtain the compensation that they so rightfully deserve.

The Manual for Complex Litigation provides that although the Court should consider a number of criteria in determining whether to award a common benefit fee to any counsel, "the factor given the greatest emphasis is the size of the fund created, because a common fund is itself the measure of success and represents the benchmark from which a reasonable fee will be awarded." MANUAL FOR COMPLEX LITIGATION (FOURTH) § 14.122 (2004) (internal quotation

---

[2]      The standards regarding the obtaining of judgments against a defaulting party in a FSIA context is discussed *infra* at IV-A.

marks and alterations omitted).[3]   At the present time, it is impossible for the *Havlish* Counsel to establish the size of the recovered fund, let alone how recoveries relating to any such judgments may be achieved, and the extent of the efforts necessary to ever realize any recovery.  Any determination, in the absence of an existing recovery, would be speculative and premature.

Accordingly, this Court should deny the *Havlish* Counsel's Application as premature. [4]

---

[3]    While the court has the power to award a percentage of a common fund to counsel as a fee, it should consider the following factors in doing so:

- the size of the fund and the number of persons who actually receive monetary benefits;

- any understandings reached with counsel at the time of appointment concerning the amount or rate for calculating fees; any budget set for the litigation; or other terms proposed by counsel or ordered by the court;

- any agreements or understandings, including side agreements, between attorneys and their clients or other counsel involved in the litigation;

- any substantial objections to the settlement terms or fees requested by counsel for the class by class members (it is, however, a court's duty to scrutinize applications for fees, independently of any objection)—in the appropriate case, a court has authority to award fees to an objector that assists the court in scrutinizing the settlement, the fee requests, or both;

- the skill and efficiency of the attorneys;

- the complexity and duration of the litigation;

- the risks of nonrecovery and nonpayment;

- the amount of time reasonably devoted to the case by counsel; even where fees are to be awarded on a percentage-of-fund basis, some judges cross-check the percentage by conducting a modified lodestar analysis; and

- the awards in similar cases.

MANUAL FOR COMPLEX LITIGATION (FOURTH) § 14.122 (2004) (collecting cases).

[4]    To the extent *Havlish* Counsel's application is motivated by the recent passage of the legislation known as Compensation for United States Victims of State Sponsored Terrorism Act, 42 U.S.C. § 10609 in December 2015, it is misplaced. The regulations regarding compensation from the fund of seized assets have yet to be promulgated by the newly appointed Special Master Kenneth Feinberg. As the law currently reads, victims of Iranian terror who have recovered money from the 9/11 Victims Compensation Act ("VCF") must wait until other Iranian terror judgments are satisfied from a limited fund and, in the end, could be unable to share at all in this fund.  Further, the statute limits eligibility to participate in the fund to "natural person[s]," and the fund as currently structured thus provides no potential remedy in relation to the judgment issued against Iran in favor of the *Federal* plaintiffs.  Hopefully, other developments will occur which will enable the 9/11 families and victims to recover on the basis of their judgments against Iran.  Only at that time can this Court properly establish the value of the purported

4

II.     *HAVLISH* COUNSEL ELECTED TO ABANDON ITS ATTEMPT TO
        CERTIFY A CLASS ACTION AGAINST IRAN AND ACCORDINGLY
        ABANDONED ITS RIGHT TO SEEK A COMMON BENEFIT FUND.

*Havlish* Counsel's original complaint included class action allegations against Iran.

(*Havlish*) Civil Action/Class Action Complaint, 02-CV-00305, *Havlish* Dkt. No. 1, filed

February 19, 2002. The *Ashton*, *Federal* and *O'Neill* plaintiffs asserted claims against Iran as

well.[5, 6] On May 9, 2002, the *Havlish* plaintiffs filed a motion to certify the class. 02-CV-00305,

*Havlish* Dkt. No. 18. On September 30, 2005, however, they amended their complaint to

withdraw their class allegations, withdrew their class certification motion, and instead pursued

claims on behalf of a handful of victims. 03-cv-09848, Dkt. No. 116, MDL Dkt. No. 1322.[7] On

January 12, 2006, in response to a letter from Thomas Mellon, Judge Casey granted the motion

to withdraw the class certification motion. *Id.*, Dkt. No. 181; MDL Dkt. No. 1622. On August 8,

2007, Judge Daniels confirmed that the Second Amended Complaint, without class allegations,

was *Havlish*'s operative complaint. *Id.*, Dkt. No. 227, MDL Dkt. No. 2024.

Accordingly, by 2005, *Havlish* Counsel had abandoned any attempt to certify a class

against Iran. By abandoning their efforts to certify a class to protect the interests of all of the

9/11 victims as to Iran, and operating outside of the Executive Committee mechanism

established by this Court (as further detailed below), the *Havlish* Counsel abandoned any right to

---

*Havlish* efforts and expenditures, if any, to the realization of an actual recovery from Iran, as compared to the contributions of others.

[5]     These items were filed prior to the creation of the MDL in December, 2003.

[6]     The *O'Neill* plaintiffs' class claims against sovereigns only include the *Kingdom of Saudi Arabia, Syria and Sudan. O'Neill et al vs. Kingdom of Saudi Arabia*, et al, 04-cv-1922 (GBD)(FM). On December 30, 2004, the *O'Neill* plaintiffs added Iran to a pre-existing complaint which did not contain class allegations so not to overlap with the then pending class allegations contained within the *Havlish* complaint. 04-cv-1076 (GBD)(FM), Dkt. No. 21; 03-md-1570, Dkt. No. 619.

[7]     It does not appear that the members of the putative class against Iran were ever provided notice of this proposed or actual withdrawal of the class allegations by *Havlish* Counsel.

nydocs1-1066081.6

seek a common benefit fund for fees and expenses, and the Application should be denied. MDL

Dkt. No. 248, Case Management Order No. 3 ("CMO 3") (6/16/04).[8] *Cf. In re Vioxx Prods.*

*Liab. Litig.*, 760 F. Supp. 2d 640 (E.D. La. 2010) (settlement in drug liability litigation created

common fund for paying all claims); *Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161 (1939).

III.   ***HAVLISH* COUNSEL ELECTED TO OPERATE OUTSIDE THE
PARAMETERS OF THE GENERAL STEERING COMMITTEE AND
EXECUTIVE COMMITTEES AND, AS SUCH, FORFEITED ANY CLAIM
TO COMPENSATION THROUGH A COMMON FUND.**

In multi-district litigations, the district court determines procedures by "which one or

more attorneys are selected and authorized to act on behalf of other counsel and their clients with

respect to specified aspects of the litigation." MANUAL FOR COMPLEX LITIGATION (FOURTH) §

10.22 (2004). Plaintiffs' Committees "are most commonly needed when group members'

interests and positions are sufficiently dissimilar to justify giving them representation in decision

making." *Id.* at § 10.221. In such a structure, "[a] Committee depends for it [sic] success on

cooperation among its members and would function less effectively if its members were to

compete with one another and with the Committee itself to serve plaintiffs' attorneys on an

individual basis." *Smiley v. Sincoff*, 958 F.2d 498, 502 (2d Cir. 1992). The goal of such a

structure is to operate efficiently and "avoid unnecessary duplication of efforts and control fees

and expenses" without jeopardizing fairness to the parties. *Id.* As a result, Lead Counsel

typically "act for the group—either personally or by coordinating the efforts of others—in

presenting written and oral arguments and suggestions to the court, working with opposing

counsel in developing and implementing a litigation plan, initiating and organizing discovery

requests and responses, conducting the principal examination of deponents, employing experts,

---

[8]      A copy of CMO 3 is attached as Exhibit A to the Affirmation of Jerry Goldman, Esq., dated May
5, 2016.

6

arranging for support services, and seeing that schedules are met." MANUAL FOR COMPLEX

LITIGATION (FOURTH) § 10.22 (2004).

This Court specifically established such a structure when it promulgated, with the

participation of the *Havlish* Counsel, CMO 3.  MDL Dkt. No. 248 (6/16/2004).

> There shall be one Plaintiffs' General Steering Committee ("General
> Committee"), which shall operate through two Plaintiffs' Executive
> Committees, one representing the interests of the plaintiffs who have
> asserted wrongful death and/or personal injury claims and the other
> representing the interests of the plaintiffs asserting commercial claims,
> including property damage claims, subrogation claims, claims for certain
> workers' compensation benefit payment liens in regard to wrongful death
> and/or personal injury claims, and wrongful death and personal injury
> claims which have been assigned to workers' compensation insurers.

CMO 3, ¶ 1, MDL Dkt. No. 248.  *See also* CMO 3, ¶ 2.

Typically, any and all consolidated efforts by plaintiffs' counsel, including expenditures

and attorney work, are contemplated in cooperation agreements and court orders, in order to

avoid lawyers conducting unauthorized work and later seeking compensation for it.  While

*Havlish* Counsel cite to a number of cases they claim support their contention that they should be

entitled to compensation for any work involving "duties beyond their responsibilities to their

own clients," they seem to ignore that all of those cases address compensating lawyers who were

members of plaintiffs' committees for their work within the structure of the MDL and its orders,

not counsel who deliberately flouted those orders and the attempts of the court-appointed

Committees to cooperate.  *See In re Air Crash Disaster at Florida Everglades on Dec. 29, 1972*,

549 F.2d 1006, 1011 (5th Cir. 1977) (holding that plaintiff's committee was entitled to

percentage fee of all funds recovered); *Smiley v. Sincoff*, 958 F.2d 498, 501-02 (2d Cir. 1992)

(attorney must share part of his 8% fee with other members of the plaintiffs' committee); *In re*

*MGM Grand Hotel Fire Litig.*, 660 F. Supp. 522, 525-29 (D. Nev. 1987) (awarding members of

the plaintiffs' committee a 7% fee for its exemplary work in obtaining a common benefit fund in

excess of $205,000,000.00).  The 8% assessment against the fees of all other attorneys sought by
*Havlish* Counsel, for work done outside and against the express directives and requests of the
Court-ordered PEC, is totally unprecedented. [9]  In any event, it is certainly premature given the
very speculative nature of any recovery from Iran based on the default judgment *Havlish*
Counsel obtained against it.

In the present litigation, the Court established a strong committee structure to address the
anticipated complexities in the litigation based upon the number of plaintiffs and the nature and
number of the defendants, along with the numerous factual and legal issues and challenges
anticipated (and which did in fact come to pass).  The committee structure was designed to guide
the entire litigation and force counsel to act in concert, not only for discovery matters and motion
practice, but for strategy and tactics.  The CMO specifically provided that:

> The two Executive Committees shall coordinate and, wherever possible,
> submit joint discovery demands, discovery responses, and other filings
> regarding all matters common to the Individual Actions. The Chairs shall
> ensure that all plaintiffs act together where possible in an effort to avoid
> duplicative filings. Each Plaintiffs' Executive Committee shall have final
> authority with respect to matters pertaining to the claims of its
> constituencies.

CMO 3, ¶ 9.  *See also* CMO 3, ¶ 3 ("The Plaintiffs' committees shall coordinate discovery and
motion papers to the extent practicable to promote judicial economy, avoid duplicative effort,
and limit the burden on parties responding to discovery.").

CMO 3 further provides:

> 10.    The Plaintiffs' Executive Committee shall conduct all pretrial
> proceedings involving common legal and factual issues, whether relating
> to liability or damages, on behalf of all plaintiffs. The members of the
> Plaintiffs' General Committee shall, at the request of the Plaintiffs'
> Executive Committees, provide assistance as required in handling the
> liability pretrial proceedings.

---

[9]     Responding Plaintiffs have differing methods of computing attorneys' fees in this case.

11.     In order to fulfill its responsibilities, the Plaintiffs' Executive Committees are authorized to, among other things:

> a.     Prepare, serve, and file motion papers and argue motions;
>
> b.     Prepare, serve and file interrogatories, requests for admissions, document requests and other necessary discovery;
>
> c.     Prepare, serve and file answers and responses to defendants' discovery to the extent that such discovery involves common issues;
>
> d.     Prepare for and conduct depositions;
>
> e.     Enter into fact stipulations with the defendants;
>
> f.     Consult and hire expert consultants and witnesses; and
>
> g.     Otherwise coordinate the work of plaintiffs' counsel and perform such other functions as necessary and appropriate to complete pretrial proceedings in the Consolidated Action and/or as may be authorized by the Court.

CMO 3, ¶¶ 10-11. *See also id.* at ¶ 12 ("[t]he Co-Chairs of each of the Plaintiffs' Executive Committees shall … assign responsibilities to Committee members or others, as necessary. The chairs shall jointly distribute all work assignments in such a manner as to promote the orderly and efficient conduct of this litigation, and shall avoid unnecessary duplication and unproductive effort."); *id.* at ¶ 13 ("Any plaintiffs' attorney may give advice and suggestions to the Plaintiffs' Executive Committees; may, when necessary, present individual and divergent positions to the positions of the Plaintiffs' Executive Committees at pretrial conferences; and may attend all depositions and suggest areas of inquiry and questions to the Plaintiffs' Executive Committees.")

Counsel for the Responding Plaintiffs were hired by over 1,000 individual plaintiffs in death and injury cases, as well as insurance companies who sought recovery for several billion dollars in economic losses and for assigned wrongful death and injury claims. *Havlish* Counsel

nydocs1-1066081.6

claim to represent but forty seven (47) plaintiffs[10] and hold four (4) of the combined twenty nine (29) seats on the two (2) Plaintiffs' Executive Committees. *Havlish* Counsel chose to ignore this directive and instead determined to act unilaterally, contrary to their authority under the CMO.

As the Court is aware, 15 of the 19 hijackers were from Saudi Arabia, and none were Iranian. Many of the efforts have been directed against the Kingdom of Saudi Arabia and its officials, charities, banks, as well as prominent Saudi businessmen.[11] The Court is also well aware that the balance of the PEC has been collectively and collegially pursuing extensive factual investigations and substantial and sophisticated advocacy on behalf of all of the 9/11 victims, in a variety of forums, for 14 years.[12]

*Havlish* Counsel, instead of working cooperatively with the PEC, declined to contribute to the monumental efforts in the 9/11 litigation, and elected to take the lone wolf approach over objections from Lead Counsel.

*Havlish* Counsel never obtained PEC approval or even submitted proposals for the work it was doing or expenditures it was making. *Havlish* Counsel did not ask what evidence against Iran the rest of the PEC already had (see below) and chose to instead embark on uncoordinated efforts defined solely by their own narrow interests. In fact, *Havlish* Counsel steadfastly and repeatedly refused to provide to the other members of the PEC details as to either their proofs or

---

[10]    In an earlier pleading, *Havlish* Counsel claimed that seven (7) of the *Ashton* plaintiffs were plaintiffs in their case. In a spirit of cooperation, *Ashton* counsel produced retainers in most of the contested cases, but *Havlish* despite agreeing to do so, never produced any similar retainers showing who retained them and when they were retained.

[11]    The relationship between Iran and Saudi Arabia and their relationship to the 9/11 Attack is complex and has been considered and investigated by the PEC and is, in part, cause for pause in any premature efforts to pursue a default against Iran.

[12]    The enormous MDL docket represents only a small portion of the efforts by counsel for the Responding Plaintiffs via the PEC mechanism.

their precise litigation strategy.  If they had consulted with the Committees, they would have avoided duplicative and wasteful work and expenditures, and potentially could have devoted their resources for the betterment of all of the 9/11 victims.

Careful reading of the cases cited by *Havlish* Counsel in their Application reveals that the so-called "free rider" problem arises where unrepresented parties seek recovery without compensating lawyers who worked on their behalf, not where a single party seeks judgment despite the existence of a plaintiffs' committee.  Those cases further demonstrate that common benefit funds are designed to reward plaintiffs' committees for their efforts on behalf of all plaintiffs.  *Havlish* Counsel's own cases establish that courts will not approve of efforts by counsel to act outside of the Committee and then seek compensation for their lone wolf approach in consolidated or class litigation.  *See, e.g.*, *Mulligan Law Firm v. Zyprexa MDL Plaintiffs' Steering Comm. II*, 594 F.3d 113, 129 (2d Cir. 2010) (cited by *Havlish* Counsel, but without explaining that *Mulligan* defines the free-rider problem as "class members who do not hire counsel [that] nonetheless benefit from any recovery"); *Smiley v. Sincoff*, 958 F.2d 498 (2d Cir. 1992) (affirming district court order critical of committee member who sought to avoid assessment to committee by separate arrangement with clients, because making "separate arrangements with plaintiffs' attorneys to do the work that the Committee was appointed to do" undermined purpose of the Committee); *Turner v. Murphy Oil USA, Inc.*, 422 F. Supp. 2d 676 (E.D. La. 2006) (ruling on challenges to common benefit assessment requested by plaintiffs' committee, filed by defendants and two parties who opted out of the settlement); *In re Orthopedic Bone Screw Prods. Liab. Litig.*, MDL No. 1014, 1996 WL 900349 (E.D. Pa. June 17, 1996) (assessment against other plaintiffs to be paid to plaintiffs' committee if right to fees

established following hearing and findings by the court); *In re MGM Grand Hotel Fire Litig.*, 660 F. Supp. 522 (D. Nev. 1987) (awarding assessment in favor of plaintiffs' committee).

*Havlish* Counsel completely upend these legal principles and seek to be paid for undermining the Plaintiffs' Committee, at the expense of Committee members who worked tirelessly on behalf of all claimants, including the *Havlish* parties, all while *Havlish* Counsel acted only in their own interests on behalf of a handful of parties. Rather than supporting their position, the cases cited in *Havlish*'s brief make clear that the Application should be denied. The Court should not reward gamesmanship with assessments against other attorneys in this litigation.

*Havlish* Counsel make much of the fact that the majority of the Executive Committee opposed their efforts to move forward with the default proceedings against Iran in 2010. The issue is entirely irrelevant. In point of fact, all other PEC members who had named Iran as a defendant opted to defer moving for default against Iran at that time for various strategic reasons, including to continue the monumental efforts to pursue all sponsors of al Qaeda and the September 11th Attacks, not solely Iran. The responding members of the PEC also resisted *Havlish* Counsel's efforts to proceed precisely because *Havlish* Counsel had refused to coordinate any of their efforts with the PEC, making it impossible for the active members of the PEC to determine whether the *Havlish* Counsel would be proceeding in a manner consistent with the interests of all plaintiffs. Lead Counsel for the Executive Committees discussed this strategy with *Havlish* Counsel.[13]

By virtue of their complete abandonment of the coordinating structure established by the Court, *Havlish* Counsel have waived any right to seek compensation for their alleged work and

---

[13]    As this Court is well aware, the pursuit of judgments against Iran was just a part of the global effort by the PEC to protect the interests of all of the victims of 9/11 against a variety of defendants.

investment from clients they do not and did not represent.  In light of their refusal to act within

the committee structure as ordered by this Court, they cannot now claim that they should expect

compensation and reimbursement for their rogue actions.  To do so would undermine the very

purposes of consolidating cases into MDLs and establishing Plaintiffs' committees.

IV.   **THE *HAVLISH* COUNSEL HAVE NOT ESTABLISHED THAT THEY
      ARE ENTITLED TO THE FEES WHICH THEY SEEK.**

   A.   **The First Liability Default Does Not Warrant Fees or Expenses From
        Other Defaults.**

There have been at least a half dozen default judgments against Iran for terrorist acts

against Americans preceding the *Havlish* default against Iran.  *See, e.g., In Re: Islamic Republic

of Iran Terrorism Litigation*, 659 F. Supp. 2d 31 (D.D.C. 2009).  Iran has been listed as a state

sponsor of terrorism by the U.S. State Department for many years and has consistently refused to

appear and challenge any motion for default and damages.  Accordingly, it was a foregone

conclusion that Iran was not going to appear in the 9/11 actions.

The FSIA imposes relatively lenient standards for securing default judgments against

foreign state defendants.  Under the FSIA, "[n]o judgment by default shall be entered by a court

of the United States or of a state against a foreign state . . . unless the claimant established his

claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e).  To prevail in

a FSIA default proceeding, a plaintiff must present a "legally sufficient evidentiary basis for a

reasonable jury to find for plaintiff."  *Ungar v. Islamic Republic of Iran*, 211 F. Supp. 2d 91, 98

(D.D.C. 2002).

Second Circuit courts hold that the proper standard for establishing liability under the

FSIA should be "less than normally required." *Smith v. Islamic Emirate of Afghanistan*, 262 F.

Supp. 2d 217, 222 (S.D.N.Y. 2003).  A plaintiff need merely demonstrate a prima facie case to

obtain a judgment of liability. *See Ungar*, 211 F. Supp. 2d at 98.  A plaintiff meets its burden of

13

proof by affidavit or similar evidence and a court considering entry of default judgment may "accept plaintiffs' uncontroverted evidence as true*." Rimkus v. Islamic Republic of Iran*, 575 F. Supp. 2d 181, 193 (D.D.C. 2008).

Section 1608(e) does not require an evidentiary hearing to establish liability when a foreign sovereign is in default. *See Comm. Bank of Kuwait v. Rafidain Bank*, 15 F.3d 238, 242 (2d Cir. 1994) (finding evidence in form of affidavits and exhibits sufficient to satisfy § 1608(e)); *Int'l Road Fed'n v. Embassy of the Democratic Republic of the Congo*, 131 F. Supp. 2d 248, 252 n.4 (D.D.C. 2001) (accepting as true plaintiffs' uncontroverted factual allegations supported by documentary and affidavit evidence without evidentiary hearing). Rather, a plaintiff seeking a default judgment under the FSIA may meet its burden by entering into evidence certified transcripts of relevant testimony presented in a previous proceeding. *See Weinstein v. Islamic Republic of Iran*, 175 F. Supp. 2d 13, 22 (D.D.C. 2001) (adopting findings by relying on affidavit testimony and certified transcript from another proceeding are sufficient to establish Iran's provision of material support and resources to al Qaeda); *see also Harrison v. Republic of Sudan*, 882 F. Supp. 2d 23, 31 (D.D.C. 2012) ("when a court has found facts relevant to a FSIA case involving material support to terrorist groups, courts in subsequent, related cases may 'rely upon the evidence presented in earlier litigation . . . without necessitating the formality of having that evidence reproduced'") (internal citations omitted). Courts may take judicial notice of such testimony and documentary evidence presented in earlier litigation. *See, e.g., Wultz v. Islamic Republic of Iran*, 864 F. Supp. 2d 24, 29 (D.D.C. 2012) ("a FSIA court may take judicial notice of related proceedings and records in cases before the same court"); *Haim v. Islamic Republic of Iran*, 784 F. Supp. 2d 1, 10 (D.D.C. 2011) (taking judicial notice of sworn testimony and documentary evidence presented in prior proceedings arising out of 1995 Gaza

14

strip bombing); *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 59 (D.D.C. 2010) ("'the FSIA does not require this Court to re-litigate issues that have already been settled' in previous decisions. . . . Instead, the Court may review evidence considered in an opinion that is judicially noticed, without necessitating the re-presentment of such evidence").

The burden of proof is particularly accommodating under the broad liability standards imposed by the state sponsor exception to the FSIA.  Pursuant to § 1605A, a country designated as a state sponsor of terrorism shall be liable to a national of the United States for personal injury or death caused by that country's provision of material support or resources. § 1605A(a)(1); (c).  As the District Court for the District of Columbia has explained:

> A straightforward reading of § 1605A(c) is that it creates a federal cause of action for four categories of individuals: a national of the United States, a member of the U.S. armed forces, a U.S. Government employee or contractor, or a legal representative of such a person . . . The cause of action is further described as "for personal injury or death caused by acts described in subsection (a)(1) of that foreign state, or of an official employee or agent of that foreign state, for which the courts of the United States may maintain jurisdiction under this section for money damages."

*Owens v. Republic of Sudan*, 826 F.Supp.2d 128, 152 (D.D.C. 2011) ("liability under section 1605A(c) will exist whenever the jurisdictional requirements of section 1605A are met") (citing *Calderon-Cardona v. Democratic People's Republic of Korea*, 723 F. Supp. 2d 441, 460 (D.P.R. 2010)).

In evaluating whether the substantive standards of section 1605A are satisfied, a court must "determine whether a defendant country has provided material support to terrorism . . . consider[ing] first, whether a particular terrorist group committed the terrorist act and second, whether the defendant foreign state generally provided material support or resources to the terrorist organization which contributed to its ability to carry out the terrorist act." *Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53, 67 (D.D.C. 2008).

15

Section 1605A(h) adopts the expansive definition of "material support or resources" set forth in 18 U.S.C. § 2339A(b)(1) and applies a minimal causation standard. Specifically, a "plaintiff need not establish that the material support or resources provided by a foreign state for a terrorist act contributed directly to the act for which his claim arises in order to satisfy [the terrorism exception of the FSIA]." *In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d 31, 44 (D.D.C. 2009) (holding that there is no but-for causation requirement) (internal citations omitted); *see also Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685 (7th Cir. 2008) (en banc) (interpreting ATA and establishing sweeping standards of civil liability applicable to all persons who "knowingly" provided material sponsorship to a terrorist organization, whether directly or indirectly, and permitting element of knowledge to be satisfied through deliberate indifference); *Holder v. Humanitarian Law Project*, 561 U.S. 1, 33 (2010) ("[t]he State Department informs us that '[t]he experience and analysis of the U.S. government agencies charged with combating terrorism strongly suppor[t] Congress's findings that all contributions to foreign terrorist organizations further their terrorism'") (internal citations omitted).

Given the prior findings of fact and affidavits and documentary evidence already of record in this case and in similar cases involving Iran, minimal effort on the part of the *Havlish* Counsel was required to support entry of default against Iran pursuant to the substantive liability standards governing the § 1605A claims. In fact, a default judgment against Iran properly would have issued under the governing standards based solely on the public findings of the 9/11 Commission, as set forth in its Final Report. Indeed, the 9/11 Report confirmed that Iran established a cooperative relationship with al Qaeda in 1991 or 1992, and began providing training and other assistance to al Qaeda at that time. 9/11 Report at p. 61. The Final Report

16

further documented the "willingness of Iranian officials to facilitate the travel of al Qaeda members through Iran, on their way to and from Afghanistan. For example, Iranian border inspectors would be told not to place telltale stamps in the passports of these travelers. Such arrangements were particularly beneficial to Saudi members of al Qaeda." *Id.* at p. 240. The 9/11 Commission also established that the assistance provided by Iran to al Qaeda directly assisted operational aspects of the 9/11 plot, concluding that "there is strong evidence that Iran facilitated the transit of al Qaeda members into and out of Afghanistan before 9/11, and that some of these were future 9/11 hijackers." These facts establish Iran's provision of material support to al Qaeda, and the required nexus between that support and the attacks which gave rise to Responding Plaintiffs' injuries.

In a word, the *Havlish* Counsel's Application rests on a palpable overstatement of the value and necessity of the uncoordinated work they allegedly performed. In reality, the *Havlish* Counsel merely secured an uncontested default judgment as to liability[14] against a defendant which did not appear, under the relatively lenient procedural and evidentiary standards established by the Foreign Sovereign Immunities Act.

The *Havlish* Counsel were of course free to invest their own time and financial resources as they saw fit, and to negotiate appropriate compensation *from their own clients* for doing so. However, they have no right to seek compensation from plaintiffs they do not represent for uncoordinated work that was unnecessary under the requisite legal standard, and not operating in a simple and straightforward manner in obtaining the determination of liability under the FSIA. Accordingly, the Application should be denied.

---

[14]     Separate damage determinations will be required for each plaintiff seeking a judgment, as discussed in Section IV-C, below. While concededly Responding Plaintiffs utilized the findings of the Court as to liability as a basis for their judgment, they chose to rely upon the law of the case for purposes of judicial economy, and to avoid the unnecessary duplication of effort and expense.

nydocs1-1066081.6

**B.**     **Responding Plaintiffs Had Already Compiled Extensive Evidence Against Iran Before the *Havlish* Default Motion Was Filed.**

The *Havlish* race to the courthouse to pursue the path of least (or rather no) resistance, does not entitle them to be paid by 9/11 families who did not retain them and did not authorize them to engage in such a race. Responding Plaintiffs' counsel were hired to pursue, and have pursued throughout the course of this litigation, the complex investigation of all sources of support that enabled al Qaeda to carry out the September 11th attacks, including assistance provided by Iran. In point of fact, the Responding Plaintiffs were in possession of all necessary evidence to establish the default judgment against Iran through their own investigations, and the *Havlish* Counsel largely duplicated work that had already been performed by the other active members of the PEC, who were properly coordinating their efforts.

*Havlish* Counsel predicate their entire application for an 8% fee on the grossly inaccurate assertion that Responding Plaintiffs did not undertake efforts to investigate Iran's role in supporting al Qaeda and assemble evidence to support their claims against Iran. *Havlish* Counsel make this irresponsible misrepresentation without any attempt at due diligence. In fact, Responding Plaintiffs' far more comprehensive investigations into all sources of support that enabled al Qaeda to carry out the September 11th attacks encompassed extensive and professional investigative efforts relating to Iranian support for bin Laden's organization and the attacks. Such investigative activities performed by the participating members of the PEC in the MDL included locating and interviewing witnesses, obtaining documents, translating documents, gathering publicly available information, consulting with experts, and analyzing information.

By way of example, in 2003, the *Federal* plaintiffs retained Dr. Shaul Shay, a former Israeli Military Intelligence officer who more recently served as the Deputy Head for the Israeli National Security Council, to serve as an expert *with respect to the claims against Sudan and*

18

*Iran.* Dr. Shay is one of the world's foremost experts on Iranian-sponsored terrorism, and has authored 16 books on international terrorism. Dr. Shay was retained for the specific purpose of developing a body of evidence and expert testimony to support the imposition of default judgments against Iran and Sudan, and remained on retainer through April of 2006. During that period, Dr. Shay worked to assemble a body of evidence to support default judgments against Sudan and Iran. Dr. Shay provided numerous expert reports to the *Federal* plaintiffs' counsel for that very purpose. *See* Affirmation of Sean P. Carter, Esquire, dated May 5, 2016.

Separately, an additional group of counter-terrorism consultants working on behalf of the *Federal Insurance* plaintiffs on a range of investigations since the commencement of the litigation were tasked to use their contacts and resources to develop an evidentiary portfolio concerning al Qaeda's global infrastructure and the sources of support which allowed the terror organization to plan, coordinate and conduct the September 11th attacks. Those separate experts, whose identities must remain confidential given other work they are performing, have been actively collecting evidence concerning al Qaeda's sources of financial and material support on a continuous basis for the last 12 years, including support provided by Iran. *Id.* at p. 2. In addition to the work being done by these counter-terrorism experts retained by the *Federal* plaintiffs, counsel for the *Federal* plaintiffs were engaged in wide-ranging investigative efforts as to all sources of support for al Qaeda, including any Iranian support, through additional channels. For example, promptly after the issuance of the 9/11 Commission's final report, counsel for the *Federal* plaintiffs combed through the thousands of footnotes to that report, to identify any intelligence or other governmental documents cited by the Commission that may be relevant to the claims in the litigation. As a result of those efforts, counsel for the *Federal* plaintiffs sent numerous FOIA requests to federal agencies seeking production of documents cited in the 9/11

nydocs1-1066081.6

Commission's footnotes, including a number of documents dealing specifically with Iranian support for al Qaeda.  These efforts yielded a number of significant CIA intelligence reports confirming Iran's sponsorship for al Qaeda and the 9/11 attacks, which were received by the *Federal* plaintiffs well before they moved for entry of default judgment against Iran.   Such examples are merely illustrative, and other active members of the PEC performed other significant and substantive work and incurred expenses to further the efforts on behalf of all of the 9/11 victims in accordance with the committee structure.  Thus, *Havlish* Counsel's suggestion that the Responding Plaintiffs failed to undertake efforts to develop evidence in support of the claims against Iran is blatantly wrong.

In fact, as a result of their own efforts, the Responding Plaintiffs were in possession of all of the principal evidence relied upon by *Havlish* Counsel in the default proceedings against Iran. There are six main points in *Havlish*'s default motion of May 2011 and the December 2011 default hearing pertaining to the relationship between Iran and al Qaeda.  Each of the points below are followed by some of the key evidence and sources of information that the Responding Plaintiffs had pertaining to that topic, followed by the date the evidence was secured by Responding Plaintiffs or became available publicly.[15, 16, 17]

---

[15]   These examples, for illustrative purposes only, are based upon a cursory review of the non-privileged materials contained within the *Ashton* files and relate solely to publicly available information. *See* Affirmation of Andrew J. Maloney, Esquire, dated May 5, 2016.

[16]   The dates listed are those that the information became part of the public domain.

[17]   We are not able to assess the evidence filed and maintained under seal as we were not provided with copies.

1.   Al Qaeda and Iran began their cooperation in 1993 in Sudan.  This led to joint training in Lebanon and Iran. There were also some sporadic contacts elsewhere.

- *U.S. v. Ali Mohamed*, 98-cr-1023 S.D.N.Y.: Guilty Plea. October 20, 2000
- *U.S. v. Usama Bin Laden et al.*, 98-cr-1023: Trial Transcripts.  Feb 5-July 10, 2001
- FBI Interviews and summaries of interviews of Jamal al Fadl. 2005-2009
- *U.S. v. Usama Bin Laden et al.*, 98-cr-1023: Exhibits May, 2001
- REPORT OF THE 9/11 COMMISSION (July 22, 2004)
- Middle East Intelligence Bulletin, September 2001
- *The al Qaida-Hizballah Connection* (Feb. 26, 2002), INT'L INST. FOR COUNTER-TERRORISM, https://www.ict.org.il/Article.aspx?ID=820
- Rohan Gunaratna, INSIDE AL QAEDA (2002)
- Yossef Bodansky, BIN LADEN, THE MAN WHO DECLARED WAR ON AMERICA (1999)
- Michael Griffin, REAPING THE WHIRLWIND (2000)
- Washington Institute for Near East Policy.  Nov, 1998
- *Treasury Targets Al Qaida Operatives in Iran*, TREASURY.GOV (Jan 16, 2009), https://www.treasury.gov/press-center/press-releases/Pages/hp1360.aspx
- James Risen, *A Nation Challenged: Qaeda Diplomacy; Bin Laden Sought Iran as an Ally, U.S. Intelligence Documents Say*, N.Y. TIMES, December 31, 2001
- Doug Farah, BLOOD FROM STONES (2004)

2.   Afghan warlord Gulbuddin Hekmatyar was allied to both Iran and al Qaeda.  Iran and Hekmatyar aided in relocating UBL from Sudan to Afghanistan.

- Peter Bergen, HOLY WAR, INC. (2002)
- Martin Arostegui, *Al Qaeda Finds a Friend in Iran*, INSIGHT MAGAZINE, November 12, 2002

3.   Iran provided travel assistance for al Qaeda members, including the 9/11 hijackers for trips via Iran to Afghanistan.

- REPORT OF THE 9/11 COMMISSION (July 22, 2004)
- REPORT OF THE 9/11 COMMISSION MONOGRAPH ON TERROR TRAVEL (Aug. 21, 2004)
- al Sharaq al Awsat: Iranian Sponsorship. Feb 18, 2003
- Philip Shenon, THE COMMISSION: WHAT WE DIDN'T KNOW ABOUT 9/11 (2008)

nydocs1-1066081.6

4.      9/11 plotter Ramzi Binalshibh and hijacker Ziad Jarrah were in Iran preparing for the 9/11 attacks.

- German Federal Prosecutor Report:  January, 2004. Cozen 2004. *See* Exhibit C to the Affirmation of Jerry S. Goldman.

5.      Iranian government defectors claimed that Iran had prior knowledge of, and provided assistance to the 9/11 plot.  Despite the evidence being public knowledge as early as 2002, *Havlish* placed under seal until the day of the hearing.

- MEMRI: Top Iranian Defector (Mesbahi).  Feb 27, 2003
- William Drozdiak, *German Court: Tehran Ordered Exile Killings*, WASH. POST, Apr. 11, 1997, at A1
- *Iran Blamed for the Lockerbie Disaster*, IMPACT, July 1997 (Mesbahi)
- German Federal Prosecutor Report:  January, 2004 (Zakeri). Cozen 2004.
- Kenneth R. Timmerman, *Defector Says Iran Played Role in 9/11*, INSIGHT MAGAZINE, June 12, 2003 (Zakeri)
- Kenneth R. Timmerman, *Defector Points Finger at Iran*, INSIGHT MAGAZINE, Feb. 4, 2004 (Zakeri)
- Kenneth R. Timmerman, *Evidence Fuels Iran Terror Debate*, INSIGHT MAGAZINE, June 24, 2003 (Mesbahi)
- Kenneth R. Timmerman, *Iran Co-Sponsors al Qaeda Terrorism*, INSIGHT MAGAZINE, Nov. 12, 2001 (Shaitan der Artash. Defector unnamed.)
- al Sharaq al Awsat: Iranian Sponsorship (Zakeri). Feb 18, 2003[18]

6.      Post 9/11 Iran provided safe haven to al Qaeda.

- *Patterns of Global Terrorism 2002*, U.S. STATE DEPT. (April, 2003), http://www.state.gov/j/ct/rls/crt/2002/pdf/index.htm
- Peter Finn, *Al Qaeda Deputies Harbored by Iran*, WASH. POST, August 28, 2002
- Martin Arostegui, *Al Qaeda Finds a Friend in Iran*, INSIGHT MAGAZINE, November 12, 2002
- *Treasury Targets Al Qaida Operatives in Iran*, TREASURY.GOV (Jan 16, 2009), https://www.treasury.gov/press-center/press-releases/Pages/hp1360.aspx

The Court granted a default judgment, as to liability, against Iran on December

22, 2011 after the *Havlish* presentation[19] of evidence at an uncontested hearing. Thereafter, there

---

[18]     Kreindler & Kreindler had an investigative consultant interview Mesbahi on or around November 7, 2002, the content of which also supports point five.

was no point in having Responding Plaintiffs request a separate default hearing against Iran for the same 9/11 sponsorship by Iran, because the decision as to liability was now law of the case. It would have been more than inappropriate for Responding Plaintiffs to burden the Court with a separate presentation of evidence.[20]

### C.   *Havlish* Counsel, at Best, Merely Assisted in Establishing the Law of the Case as to an Uncontested Question of Liability.

At best, *Havlish* Counsel merely assisted in establishing the law of the case as to the uncontested question of Iran's liability.  They further presented evidence as to the damages suffered by their particular clients which led to their individual judgments.  They did not, however, undertake the herculean efforts required to gather the requisite proofs and submit same as to the damages suffered by the Responding Plaintiffs, let alone take any meaningful steps to secure the collection of any amounts from any defendant, either on the behalf of their clients, or any of the victims of 9/11.  As such, their request for the creation of a common fund and their arbitrary assertion of a percentage allocation of a recovery must be rejected.

### D.   *Havlish* Counsel Have Not Otherwise Met Their Burden of Establishing their Entitlement to the Fees and Expenses Sought by Way of a Common Fund.

*Havlish* Counsel have not met their burden of establishing their entitlement to such a substantial percentage of the fee and the recovery of expenses.  The Application describes the

---

[19]     No witnesses were called at the hearing.  Rather, *Havlish* Counsel merely summarized the evidence for the Court.

[20]     *Havlish* Counsel's application also wrongly asks the Court to look at the claims against Iran in isolation, without regard for the full scope of work Responding Counsel have undertaken for their clients. However, Responding Plaintiffs retained their counsel to pursue a broad spectrum of claims against alleged sponsors of al Qaeda, as part of their effort to hold accountable all wrongdoers responsible for the events of 9/11 and deter the financing of terrorism going forward.  The representation of those clients was thus conditioned on that full undertaking, and the full breadth of Responding Counsel's investments in all aspects of this litigation must be weighed against the comparably minimal work of *Havlish* Counsel in order to value the respective counsels' work.

judgment and summarily proclaims that *Havlish* Counsel expended a staggering amount of time and incurred an unknown, but allegedly substantial, amount of expenses. Given the paucity of evidence in support of these claims, Responding Plaintiffs lack any meaningful ability to examine and challenge them, and this Court, on this record, cannot properly evaluate them.

Not once has *Havlish* Counsel substantiated exactly what they did with the time that they claimed to have expended, or the expenses which they assert that they incurred. We have explored, above, whether it was necessary (no), whether it was duplicative (yes), whether it was authorized (no), and whether there were positive results benefiting all plaintiffs (no), but we do not really know what they did other than generally claim victory. What did they do that required these extensive investigations? How extensive were these investigations? What were these investigations? How were they conducted? It is simply unclear what *Havlish* Counsel did and what they are seeking payment for.[21]

Furthermore, they have provided no basis, and Responding Plaintiffs respectfully submit, can provide no basis, for the assertion that the arbitrary sum of 8% of the recovery, payable to them, is an appropriate award of attorneys' fees. The record, as it stands now, reveals that such percentage is but a random number, without any legal or factual support. As such, their Application, being devoid of merit, must be denied.

---

[21]   As early as February 2004, *Havlish* Counsel claimed in a letter to the Court that they already had "expended approximately 10,000 attorney hours and in excess of a half million dollars in pursuit of their claims." *See* February 27, 2004 *Havlish* Status Report and Proposed Case Management Order faxed to the Honorable Richard C. Casey, at p. 5, attached as Exhibit B to the Affirmation of Jerry S. Goldman. This was before they made any default motion and before any hearing on Iran.

## CONCLUSION

For the foregoing reasons, the *Havlish* motion for a common benefit fund to compensate and reimburse *Havlish* attorneys for services performed and expenses incurred to establish liability and damages against Iran should be denied in its entirety.

Respectfully submitted,

Dated: May 5, 2016
      New York, NY

KREINDLER & KREINDLER LLP

By: */s/James P. Kreindler*
James P. Kreindler, Esq.
Andrew J. Maloney, III, Esq.
750 Third Avenue, 32nd Floor
New York, New York 10017
Tel: (212) 687-8181
*Attorneys for Ashton Plaintiffs*

COZEN O'CONNOR, LLP

By: */s/Sean P. Carter*
Sean P. Carter, Esq.
J. Scott Tarbutton, Esq.
1650 Market Street
Suite 2800
Philadelphia, Pennsylvania 19103
Tel: 215-665-2105
*Attorneys for Federal Insurance Plaintiffs*

ANDERSON KILL, P.C.

By: */s/Jerry S. Goldman*
Jerry S. Goldman, Esq.
1251 Avenue of the Americas
42nd Floor
New York, NY 10020
Tel: 212-278-1000
*Attorneys for O'Neill Plaintiffs*