**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| IN RE: TERRORIST ATTACKS ON | : | |
| SEPTEMBER 11, 2001 | : | MDL 03-1570 (GBD)(FM) |

**This Document Relates To:**
***Havlish, et al. v. Bin Laden, et al.,* Case No. 03-CV-09848**
***Federal Insurance Co., et al. v. al Qaida, et al.,* Case No. 03-CV-06978**
***Ashton et al., v. al Qaeda Islamic Army, et al.,* Case No. 02-CV-06977**
***Estate of John P. O'Neill, Sr., et al. v. Republic of Iraq, et al.,* Case No. 04-CV-1076**

**REPLY MEMORANDUM IN SUPPORT OF THE *HAVLISH* PLAINTIFFS' MOTION
FOR AN ORDER CREATING A COMMON BENEFIT FUND TO COMPENSATE
AND REIMBURSE *HAVLISH* ATTORNEYS FOR SERVICES PERFORMED AND
EXPENSES INCURRED IN DEVELOPING AND PRESENTING EVIDENCE
<u>ESTABLISHING LIABILITY AGAINST THE ISLAMIC REPUBLIC OF IRAN</u>**

The *Havlish* Plaintiffs have asked this Court for an Order establishing common benefit fees and approving a methodology for payment of those fees to *Havlish* counsel.  In their memorandum in opposition (the "MIO"), Respondents neither deny nor refute any of the four central tenets of the *Havlish* motion:

(1) Respondents and their counsel used in each of their cases *all* of the evidence and work product that was developed by *Havlish* counsel at great cost and effort;

(2) through the use of the appropriated *Havlish* work product, as well as the Court's extensive Findings of Fact and Conclusions of Law in *Havlish* that this work product secured, Respondents and their counsel *received major benefits* in the form of liability judgments against the Islamic Republic of Iran and its agencies and instrumentalities (referred to collectively as "Iran"), and, as well, in the form of a recommendation and report on damages that has been submitted to the Court on decedents' pain-and-suffering compensatory damages, and punitive damages;

(3) neither Respondents nor their counsel contributed *in any way* to the development of the appropriated work product, and they submitted to the Court *no evidence of their own* in support of their cases; and

(4) under such circumstances, this Court has inherent equitable power to award fees to *Havlish* counsel for the benefit bestowed on Respondents and their counsel.

I.   **RESPONDENTS' ARGUMENTS LACK LEGAL AND FACTUAL FOUNDATION AND DEMONSTRATE A MISUNDERSTANDING OF THE NATURE OF THE BENEFIT THEY HAVE RECEIVED**

Respondents' arguments in opposition to a common benefit fee order are built upon factually and legally deficient reasoning.  Respondents begin by half-heartedly proposing two red-herring arguments for which they cite no supporting authority – because none exists.

First, they contend that the motion is premature because there has not yet been any collection made on the judgments they obtained through use of *Havlish* work product.  Yet it is standard practice for MDL courts to enter common benefit fee orders well before any settlement is achieved or collection made.  That is as it should be, lest distribution of actual recoveries be needlessly delayed by further litigation that could have been addressed in the interim.  In short, Respondents' characterization of the *Havlish* motion as premature is simply contrary to the law and procedural practice established in every circuit, including the Second Circuit.

Second, Respondents contend that *Havlish* counsel "abandoned" their right to common benefit fees when they withdrew class allegations from their *Havlish* Amended Complaint in 2005.  Again, Respondents cite no supporting authority, and they cannot do so because their proposition is wholly contrary to prevailing law and practice.  Respondents would have the Court believe that an order establishing common benefit fees is appropriate only in a class setting.  But as this Court is well aware, common benefit fees are routinely awarded to counsel in MDL settings as well; thus, the withdrawal of the *Havlish* class allegations has no effect whatsoever on the ability of *Havlish* counsel to seek common benefit fees here.

Moreover, Respondents' argument is belied by the fact that, from the outset of this litigation, Respondents' counsel objected to the proposed *Havlish* class as "not the appropriate mechanism to pursue claims for compensatory or punitive damages against the terrorists."  *See* Letter from Lee S. Kreindler to Hon. James Robertson, July 2, 2002, attached hereto as Ex. C.

2

Now, after *Havlish* counsel yielded to Respondents' position that the class allegations should be withdrawn, Respondents argue that such withdrawal somehow immunizes Respondents from the equitable principles under which courts routinely require parties and their counsel to compensate attorneys who have bestowed a common benefit.  The law grants Respondents no such immunity, and a common benefit fee order is clearly appropriate here.

Respondents' arguments then move from the unsupported and unsupportable to the utterly specious.  They contend that *Havlish* counsel should be deemed to have "forfeited" their claim to common benefit fees because Respondents, as members of the PEC, had not pre-approved or sanctioned the plan that produced the very work product they later appropriated for their own benefit.  In essence, Respondents argue that their lack of pre-approval relieved them of any obligation to pay a fair fee for the benefit they received or even to contribute to the cost of producing that benefit.  Once again, Respondents do not, because they cannot, cite any case law to support their forfeiture argument.  Instead, they cite the litigation leadership structure contemplated by CMO No. 3, an order Respondents have honored in the breach as often as in the observance.  Respondents allege that, while they have worked cooperatively with each other in pursuit of an overarching strategy developed by PEC leadership, *Havlish* counsel operated outside the PEC structure and contrary to PEC strategy when they pushed to obtain an actual recoverable judgment.

Respondents' reliance on CMO 3 for support is misplaced because the order specifically anticipated the independent investigations conducted by *Havlish* counsel and each of Respondents' counsel.  Moreover, the relevant portions of the hearing transcripts attached to the *Havlish* motion clearly demonstrate that Respondents' counsel and this Court were well aware that *Havlish* counsel was proceeding toward judgment against Iran without the approval of the PEC and contrary to the PEC's preferred strategy.  It is abundantly evident from the Court's rulings – granting the *Havlish*

3

Plaintiffs leave to present their evidence in court, granting their motion for judgment on liability, and granting their motion for an assessment of individual damages – that the Court agreed that the *Havlish* approach of developing and presenting admissible evidence and obtaining a judgment against Iran was more appropriate than the ill-defined PEC strategy of waiting indefinitely and hoping for some kind of diplomatic intervention (a strategy which the PEC could never clearly articulate and which has never materialized).  It is illogical for Respondents to suggest now that the Court should punish *Havlish* counsel for pursuing in this Court an effective judicial process rather than the PEC's strategy which was based completely on wishful thinking.

Having provided no support for any of its primary arguments, Respondents revert to their familiar tactic of belittling the *Havlish* effort in an attempt to trivialize the value of the benefit the *Havlish* Plaintiffs have provided.  They begin by wrongly describing the standard for a default judgment against a sovereign state as "lenient," a self-serving mischaracterization of the level of proof demanded in FSIA cases.  MIO at pp. 13, 17.  Respondents use this mischaracterization to argue that it really should have taken only "minimal effort" to obtain a judgment against Iran.  MIO at p. 16.[1]  Respondents go so far as to suggest that a judgment could have been attained simply by presenting the Court with findings contained in the 9/11 COMMISSION REPORT.  *Id.*  This notion ignores the fact that the 9/11 Commission itself stated clearly that "this topic ['Assistance from Hezbollah and Iran to al Qaeda'] requires further investigation by the U.S. government."  9/11 COMMISSION REPORT, p. 241.[2]  Indeed, the *Havlish*

---

[1] The extensive efforts of *Havlish* counsel are amply demonstrated by the record in this case, summarized in Movants' principal brief, and again herein, *infra*.  On the other hand, Respondents obtained their judgment with "minimal effort" because they relied completely on the work of *Havlish* counsel.

[2] While the 9/11 Commission stated that there was significant evidence that Iran and Hezbollah provided assistance to al Qaeda members who perpetrated the 9/11 attacks, it was unable to

proof – and this Court's findings – not only develops the evidence alluded to in the 9/11 COMMISSION REPORT, but goes far beyond what the 9/11 Commission was able to uncover through its investigation.

Respondents' cavalier description of the "minimal" effort it "should have" taken to satisfy a "lenient" evidentiary standard places in bold relief the unrecognized value of the benefit they received from the *Havlish* Plaintiffs.  As Respondents acknowledge, recovery on the judgment is likely to require enforcement proceedings in foreign countries, lobbying and legislative assistance and "other undertakings that are as of yet indiscernible."  MIO at p. 3.  Such collection activity may subject the judgment, and its underlying legal bases and factual support, to intense scrutiny due to a lack of general knowledge of the evidence.  (The Court may take judicial notice that the direct and material support of Iran and Hezbollah for the 9/11 hijackers has never received substantial or in-depth media attention.)  Accordingly, it is to Respondents' distinct benefit that *Havlish* is not simply a judgment that satisfies a "lenient" standard of proof, but rather one that is supported by an enormous amount of admissible evidence that yielded 52 pages of detailed Findings of Fact and Conclusions of Law that make it capable of withstanding collateral attack and make it more likely to be enforceable in other jurisdictions (an argument that Respondents doubtlessly would make in future enforcement proceedings in other courts).  Under the circumstances, Respondents' superficial description of the *Havlish* effort as "pursuit of the path of

---

follow up on leads that might have developed that evidence.  The *Havlish* public brief on liability included the following significant observation, at footnote 15: "The Executive Director of the 9/11 Commission, Phillip Zelikow, noted in an e-mail dated March 14, 2007 to NEW YORK TIMES reporter Philip Shenon regarding Iranian involvement in 9/11: 'In effect, all we could do was present a set of questions that only the US government could answer, with further work, and ask the government to do that work. . . .  I never felt complacent, and remain ready to believe that *someone may, in the future, find evidence we missed or didn't know about.*'"  *See Havlish* Ex. 6, Lopez-Tefft Affid. ¶123.  (Emphasis added.)

least (or rather no) resistance" and "merely securing an uncontested default" reflects a shocking lack of understanding.

Further, Respondents' simplistic view ignores entirely the heightened standard of proof necessary to support a finding of punitive damages – a standard which Respondents met only by virtue of their complete reliance on the *Havlish* evidence. "While a plaintiff must demonstrate only a *prima facie* case to obtain a judgment of liability in a FSIA case, a plaintiff must show entitlement to punitive damages *by clear and convincing evidence*. *Peterson v. Islamic Republic of Iran,* 264 F.Supp.2d 46, 48 (D.D.C. 2003)." *Havlish* First Memorandum, at page 11.

Finally, Respondents allege that they had their own evidence against Iran that was sitting in their filing cabinets just waiting to be used at the right time. They provide a description and list of evidentiary items that they *could have* developed and submitted, or *might have* developed and submitted, and, if necessary, *would have* developed and submitted. First, Respondents pretend that their list somehow compares favorably with the *Havlish* evidence: it doesn't, and it's not remotely comparable, either as to quality or quantity. Furthermore, the fact remains that Respondents *never actually developed or submitted any evidence to the Court whatsoever*. And therein lies the rub. Rather than develop and produce their own work product, Respondents appropriated and relied upon the *Havlish* work product – and *only* the *Havlish* work product – in order to obtain their judgments. Under these circumstances, principles of equity and fairness call for an order establishing a common benefit fee to be paid to *Havlish* counsel.

## II.    RESPONDENTS MISSTATE THE RELEVANT FACTUAL BACKGROUND AND MISAPPREHEND THE BASIS FOR THE REQUESTED RELIEF

It is clear from the misguided nature of their arguments that Respondents misapprehend the basis for the *Havlish* request for common benefit fees. At the outset of their MIO, Respondents take umbrage with the *Havlish* description of them as "free riders" even though that term is

commonly used by courts and economists when discussing factual circumstances like those presented here.[3]  Respondents' counsel insist that they are not "free riders" because they have made their own investments of time and money in representing their clients in this litigation. However, none of those resources were used to procure their judgments against Iran.  Instead, Respondents used solely and exclusively the work product of *Havlish* counsel, a fact that is made irrefutably plain from a reading of Respondents' motions for judgment against Iran and the related orders issued by this Court.

As Respondents admit, nearly all of their efforts in this litigation have been devoted to pursuing claims against defendants other than Iran, especially "the Kingdom of Saudi Arabia, and its officials, charities, banks, as well as prominent Saudi businessmen."  MIO at p.10. Respondents defend their decision to concentrate their efforts on these defendants by noting that "15 of the 19 hijackers were from Saudi Arabia, and none were from Iran."  *Id.*[4]  It is not the intention of *Havlish* counsel to denigrate the efforts of the PEC in this regard (even though the PEC continues to denigrate and belittle the efforts of *Havlish* counsel), nor does *Havlish* counsel wish to debate the wisdom of the PEC's pursuit of those defendants and their decision to place

---

[3] In their Motion for Common Benefit Fees, the *Havlish* Plaintiffs refer to *Federal Insurance Co., et al. v. al Qaida, et al.,* Case No. 03-CV-06978, *Ashton, et al. v. al Qaeda Islamic Army, et al.*, Case No. 02-CV-06977, and *Estate of John P. O'Neill, Sr., et al. v. Republic of Iraq, et al.*, Case No. 04-CV-1076, as the "Free Rider Actions" not out of disrespect, but because the plaintiffs in those cases have benefited from resources and services provided by *Havlish* counsel without paying for them, a classic "free rider" scenario in the cases and scholarly literature.  In their consolidated MIO, plaintiffs in those actions and their counsel object to the term "free rider" and refer to themselves simply as "Responding Plaintiffs" or "Respondents."  The *Havlish* Plaintiffs use that term in this Reply Memorandum.

[4] Respondents' focus on the predominantly Saudi nationality of the 9/11 hijackers raises a rather basic point that is a prominent feature of the *Havlish* proofs: for decades, Iran, a recognized state sponsor of terror, routinely utilized proxies to carry out terrorist operations in order to maintain plausible deniability.  Iran's practice of using proxies, such as the Saudi al Qaeda members who perpetrated the 9/11 attacks, meant that developing evidence of Iran's involvement in those attacks took much more than "minimal effort."

claims against Iran on the litigation "back burner."  However, it is relevant to the instant motion that this was, in fact, the strategy Respondents chose to follow.  *See* MIO at p. 12 (noting that "all other PEC members who had named Iran as a defendant opted to defer moving for default against Iran [in 2010] for various strategic reasons," including to continue pursuit of non-Iranian defendants).  While Respondents were deferring their claims against Iran, the *Havlish* attorneys were working to build the case against Iran and the other Iranian defendants.

In their MIO, Respondents attempt to derail the *Havlish* Plaintiffs' request for a fair fee allocation by advancing arguments built on a factual foundation that is, at best, inaccurate. Respondents claim that "the balance of the PEC [other than *Havlish* counsel] has been collectively and collegially pursuing . . . advocacy on behalf of all the 9/11 victims."  MIO at p. 12.  That is not entirely true.  As noted previously, Respondents are primarily pursuing myriad non-Iranian defendants that are not named in the *Havlish* action.  Respondents do not represent any of the *Havlish* Plaintiffs, and they have never advocated pursuit of the *Havlish* claims.  To the contrary, and as Respondents admit, they advocated repeatedly for deferral and delay of the *Havlish* claims.[5]

Respondents claim that their decision to delay the pursuit of judgment against Iran was part of a grand strategy.  This enigmatic strategy of inertia was explained to the Court only in obtuse and oblique terms, *e.g.*, some kind of grand diplomatic bargain involving the independence of

---

[5] Respondents' odd notion that the *Havlish* common benefit fee motion may have been spurred by the passage of the Compensation for United States Victims of State Sponsored Terrorism Act, 42 U.S. §10609, in December 2015, MIO at p. 4, note 4, appears to have the matter exactly backward.  Passage of that Act had nothing to do with the filing of this motion, but would appear to have everything to do with Respondents' decision to obtain judgments in early 2016. Eligibility for an award from the victims' compensation fund embedded in that Act is predicated upon having secured a final, non-appealable judgment.  *Havlish* has had such a judgment for several years; the Respondents filed motions for judgments just a few weeks after the passage of the Act.  The instant motion was spurred by the Respondents' motions for judgment based on *Havlish*.

South Sudan.[6]  *See* Havlish Motion Ex. A and Ex. B.  For their part, *Havlish* counsel were concerned that a delay in obtaining judgment against Iran could potentially cost their clients an opportunity to participate in the recovery of hundreds of millions of dollars from Iran.  Certainly, the *Havlish* strategy has been vindicated.

In 2008, the U.S. Attorney's office filed suit in the Southern District of New York against two organizations it claimed were entities controlled and directed by Iran.  *See In re: 650 Fifth Avenue and Related Properties*, case number 08-cv-10934.  In 2013, Judge Forrest ruled that the defendants were, in fact, Iran, and she forfeited to the U.S. Government – and, at the same time, turned over to Iran's terrorism judgment creditors who are private parties, including the *Havlish* judgment debtors – certain real estate in New York, Texas, California, Maryland, and Virginia, as well as other assets.  The Iranian assets in question are estimated to be worth more than $800 million.  The U.S. government has settled competing priority claims with the private judgment creditors and agreed to distribute most of the proceeds from the sale of those Iranian assets to the private judgment creditors.  Because this Court allowed the *Havlish* Plaintiffs to present their case and obtain judgment against Iran over the objection of the PEC, they were able to file timely a turnover suit and, thus, are included among the *650 Fifth Avenue* claimants.  Respondents, who insisted on an unfathomable strategy of delay and do not have a judgment, are not involved.

Also in 2008, the U.S. Treasury Department uncovered $1.8 billion in Iranian funds held at the New York branch of Citibank.  In 2010, certain victims of Iranian terrorism who held judgments against Iran filed suit, again in the Southern District of New York, seeking an order directing that the funds be turned over to the judgment creditors to satisfy their judgments.

---

[6] As we now know, no such diplomatic solution has ever been completed, and there is no evidence in this case, or public information generally, that it has ever been discussed – not even in the context of the Iran nuclear agreement.

*Peterson v. Islamic Republic of Iran*, Case No. 10-04518.  Judge Forrest ultimately granted that

relief, a result that has been affirmed by the Second Circuit, 758 F.3d 185 (2014), and the U.S.

Supreme Court.  *Bank Markazi v. Peterson*, 578 U.S. ___ (April 20, 2016).  Neither *Havlish* nor

Respondents are involved in that case.

Around the time the *Peterson* plaintiffs were filing suit in Judge Forrest's court to recover

on their judgments against identified Iranian assets, the co-chair of the PEC was telling this Court

that, for "really very well thought out reasons" (which were never explained), the PEC "vigorously

opposed" the *Havlish* request to present evidence supporting judgment against Iran.  *See* Motion,

Ex. A, Transcript of Conference held April 15, 2010, at pp. 16-18.  It is now clear that such

vigorous opposition was, at best, unwise, and we can only now presume that, because all

Respondents have by now embraced the *Havlish* evidence entirely, even they are glad that the

Court correctly overruled the objections and permitted the *Havlish* Plaintiffs to proceed with their

proofs.  Yet still, even after their failed strategy has resulted in squandered opportunities for

recovery, Respondents nevertheless continue to criticize the *Havlish* strategy, which resulted in a

judgment after ten years of effort, as a "race to the courthouse."  MIO at p. 18.  Unexplained is

how there could be a "race" when only one party was moving forward at all.

Respondents go so far as to suggest that they resisted the *Havlish* efforts to proceed

against Iran because *Havlish* counsel's non-cooperation made it impossible for Respondents'

counsel to determine if a judgment against Iran was in their clients' best interest.  *See* MIO at p.

12.  Yet lead counsel for the PEC has repeatedly stated in open court the bizarre conclusion that

a judgment against Iran was not in *any* plaintiff's best interest.  *See* Motion, Ex. A, Transcript of

Conference held April 15, 2010, at p. 17 (stating the PEC's position that a judgment against Iran

would "disadvantage all of the plaintiffs" for reasons that have never been explained); Motion,

Ex. B, Transcript of Conference held July 13, 2011, at p. 17 (stating the PEC's new position that a judgment against Iran could somehow derail a hoped-for, but again unexplained, resolution process with South Sudan that never occurred); *see also* MIO at p. 12 (stating that Respondents opted to defer moving for default against Iran for "various strategic reasons").  Thus, Respondents' self-imposed torpor had nothing to do with *Havlish* counsel's alleged non-cooperation, and their attempt to blame *Havlish* counsel for their inexplicable inactivity regarding their claims against Iran rings hollow.

Respondents' assertion that *Havlish* counsel refused to advise the PEC of their litigation strategy is also not accurate.  *Havlish* counsel made no secret of their strong disagreement with the PEC's do-nothing strategy that placed their claims against Iran in mothballs while the PEC pursued claims against Saudi defendants.  *Havlish* counsel also made clear their intention to push forward with their claim against Iran.  In an attempt to avoid burdening this Court with the task of resolving their conflict with the PEC, the *Havlish* Plaintiffs filed a motion in 2008 asking the Court for a remand to the District of Columbia where the *Havlish* case was originally filed.  The Court denied that motion.  *See* Docket 03-1570, Doc. Nos. 2097 and 2102.  The *Havlish* Plaintiffs accordingly asked this Court to grant them an opportunity to present their evidence, and the Court granted that request over the objections of the PEC.  Thus, while the course pursued by the *Havlish* Plaintiffs may not have been sanctioned by the PEC, it was certainly sanctioned by the Court.

## III.   *HAVLISH* COUNSEL'S APPLICATION FOR COMMON BENEFIT FEES IS NOT PREMATURE

Respondents contend that an order establishing the parameters for payment of common benefit fees would be premature because there has not yet been a monetary recovery on the judgment.  This position finds no support in the case law and is contrary to the procedural practice in every circuit, including the Second Circuit.  While courts in class litigation often wait

until a settlement has been reached or verdict rendered before entering a common benefit fee order, the same does not hold true in MDL courts.  As a practical matter, because MDLs are, by definition, comprised of a large collection of individual cases that resolve at various and unpredictable times during the lifespan of the litigation, it would be infeasible in most MDLs for a court to delay entry of a common benefit order.  Rather, it is the standard practice of MDL courts to enter orders establishing common benefit procedures and fee percentages at an earlier stage of the litigation.  *See, e.g., In re Zyprexa Products Liability Litigation*, 594 F.3d 113, 116-117 (2d Cir. 2010)(noting that the district court entered a common benefit fee order in late 2006 prior to cases beginning to settle in 2007); *see also* William B. Rubenstein, *On What a "Common Benefit Fee" Is, Is Not, and Should Be,* 3 CLASS ACTION ATTORNEY FEE DIGEST 87 (March 2009)(noting that MDL courts often set the common benefit fee early in the litigation with the fund being created from future collections on settlements or judgments, if any).

Respondents correctly observe that the realization of a recovery on their judgments against Iran is likely to require an investment of time and money, possibly in pursuing judgment recognition and execution proceedings in foreign countries, global investigations, and other undertakings.  While it is incontrovertible that Respondents used *Havlish* work product to obtain a liability judgment and establish damage amounts, Respondents strangely complain that *Havlish* counsel have not undertaken the "herculean efforts" to prove Respondents' clients' damages or, indeed, the burdens associated with collecting on either the *Havlish* judgments or on behalf of any 9/11 victims.  MIO, p. 23.  Both assertions are untrue in part and nonsensical as well.

First, Respondents did, in fact, appropriate *Havlish* damages evidence, work product, and findings for the purposes of (1) proving the level of compensatory damages for pain and suffering on behalf of each decedent in Respondents' cases, (2) proving entitlement to punitive

damages, and (3) providing a basis for determining the appropriate punitive damages ratio. Naturally, *Havlish* counsel did not seek to prove the individual economic loss damages and solatium damages of Respondents' clients, but *Havlish* did establish a methodology for doing so. (Except for the insurance company Respondents, neither have Respondents' counsel done so, to date, and it remains unclear whether or when they will.)  Indeed, if *Havlish* counsel had assumed those burdens, they effectively would have acted as Respondents' attorneys in connection with *the entirety* of their claims against Iran.  In that event, *Havlish* counsel arguably would be entitled to a greater portion of the legal fees upon recovery rather than the moderate portion sought here.

Second, it is patently false to say that *Havlish* attorneys have not undertaken the task of collection.  *Havlish* counsel has been extremely active in judgment collection litigation in this Court in two separate cases, *In Re: 650 Fifth Avenue and Related Properties*, *supra*, and *Havlish, et al. v. Royal Dutch Shell*, No. 13-cv-7074 (GBD), as well as myriad other collection and judgment enforcement activities.  It is true that *Havlish* counsel's work in this regard has not been for the benefit of Respondents' clients, but of course, it could not be so, particularly because Respondents' judgments have not yet been perfected.

Finally, Respondents protest that *Havlish* counsel cannot establish how a recovery will take place, the extent of such a recovery, from whom funds may actually be recovered, or when such funds will be recovered.  MIO at p. 3.  These are truly red herrings, for the uncertainty of ultimate recovery is a feature of every MDL and is hardly unique to Respondents' circumstances. These considerations do not impact the question at hand because the instant motion is bottomed on the value of the *Havlish* work product to Respondents' cases to date, expressed as a percentage, not a dollar figure.  Indeed, as Professor Rubenstein notes, MDLs routinely establish

fee percentages early in the litigation with the expectation that those fees will be paid out of future recoveries.  The same should be true here.

## IV.   THE WITHDRAWAL OF THE *HAVLISH* CLASS CLAIM DID NOT NEGATE THE RIGHT OF *HAVLISH* COUNSEL TO SEEK COMMON BENEFIT FEES

Respondents contend that by withdrawing their class allegations in 2005, *Havlish* counsel abandoned their right to seek common benefit fees.  In support of that position, Respondents cite two cases, *In re Vioxx Product Liability Litigation*, 760 F.Supp.2d 640, 647 (E.D. La. 2010), and *Sprague v. Ticonoc Nat. Bank*, 307 U.S. 161 (1939).  Neither says anything about an attorney's abandonment of his right to common benefit fees.  While Respondents were apparently hoping that inclusion of these phantom citations would lend their argument a veneer of legitimacy, they have accomplished just the opposite.

The Supreme Court's holding in *Sprague* directly refutes Respondents' arguments regarding both prematurity and the absence of class claims.  *Sprague* upheld the district court's power to grant reimbursement for a plaintiff's litigation expenses even though she had sued only on her own behalf and not for a class, because her success would have a *stare decisis* effect entitling others to recover out of assets of the same defendant.  Although those others were not parties before the court, they were required to contribute to the costs of the suit by an order reimbursing the plaintiff from the defendant's assets out of which their recoveries later would have to come.  The Court observed that "the absence of an avowed class suit or the creation of a fund, as it were, through *stare decisis* rather than through a decree – hardly touch[es] the power of equity in doing justice as between a party and the beneficiaries of his litigation." *Sprague*, 307 U.S. at 167.

Similarly, the *In re Vioxx Product Liability Litigation* court observed:

> As class actions morph into multidistrict litigation, as is the modern trend, the
> common benefit concept has migrated into the latter area.  The theoretical bases

14

> for the application of this concept to MDLs are the same as for class actions, namely equity and her blood brother, quantum meruit.

*In re Vioxx Product Liability Litigation*, 760 F.Supp. at 647.

The author of the *In re Vioxx Product Liability Litigation* opinion, Judge Fallon, has elaborated on that point, unequivocally stating that class allegations are not a necessary prerequisite for a common benefit fee award:

> The common fund doctrine was originally, and perhaps still is, most commonly applied to awards of attorneys' fees in class actions. ***But this doctrine is not limited solely to class actions***: It has been used in complex litigation to compensate attorneys whose work benefits others similarly situated. ***As class actions were combined with individual actions to form MDLs, as is the modern trend, the common benefit concept migrated into the latter area.***

Hon. Eldon E. Fallon, *Common Benefit Fees in Multidistrict Litigation*, 74 La. Law Rev. 375-376 (2014)(emphases added).

Additionally, as stated previously, the conflicting positions taken by Respondents with regard to the *Havlish* class allegations further demonstrate the disingenuous nature of their "abandonment" argument.  Shortly after the *Havlish* Plaintiffs filed their original Complaint in the District of Columbia, counsel for the *Ashton* Plaintiffs sent that court a letter advocating the dismissal of the class allegations on several grounds.  *See* Letter from Lee S. Kreindler to Hon. James Robertson, July 2, 2002, attached as Ex. A (objecting to the proposed *Havlish* class as "not the appropriate mechanism to pursue claims for compensatory or punitive damages against the terrorists").  Respondents' attempt to use the voluntary dismissal of those class claims as the basis for a manufactured waiver argument should be rejected outright.

## V.   *HAVLISH* COUNSEL DID NOT FORFEIT A CLAIM FOR COMMON BENEFIT FEES BY PURSUING AND OBTAINING JUDGMENT AGAINST IRAN

Equally fallacious is Respondents' claim that *Havlish* counsel forfeited any right to common benefit fees by operating outside of the parameters of the leadership structure

established by CMO No. 3.  As an initial matter, paragraph 20 of CMO No. 3 explicitly

contemplates that "independent investigations" would be undertaken by "various plaintiffs'

counsel."  In connection with claims against Iran, the individual declarations of each Respondent

attached to the MIO demonstrate that each Respondent conducted some level of independent

investigation, although none by Respondents remotely comparable to the breadth or depth of the

*Havlish* investigation.  In that regard, Respondents' claim that *Havlish* counsel worked "outside"

of the process contemplated by CMO 3 is simply wrong.

Nevertheless, Respondents argue that *Havlish* counsel declined to cooperate with the

PEC and thereby forfeited all rights to common benefit fees.  Respondents have it exactly

backwards.  Because the Court approved of the *Havlish* Plaintiffs' procedural approach, it is

more accurate to say that the *Havlish* Plaintiffs were able to obtain judgment against Iran despite

the non-cooperation of the PEC.  At the end of the hearing on April 15, 2010, the Court asked

*Havlish* counsel to share and discuss their Amended Complaint with the PEC.  Judge Daniels

specifically observed that "they [the PEC] might have some helpful suggestions."  *See* Motion,

Ex. A, Transcript of Conference held April 15, 2010, at pp. 19-20.

*Havlish* counsel did as Judge Daniels asked, provided the PEC with a copy of the

Amended Complaint and discussed the allegations and the planned evidentiary presentation.

However, when it subsequently became clear that the Court would allow the *Havlish* Plaintiffs to

present the case against Iran, there were no suggestions from the PEC.  The PEC never offered to

help in any way.  PEC leadership never sought a joint presentation of evidence on behalf of all

9/11 plaintiffs, choosing instead to stick by its stand-still strategy.  While Respondents now

contend that they had compiled their own evidence against Iran, they never shared that evidence

with *Havlish* counsel.  In fact, Respondents never even hinted that such evidence existed at a

time when it may have been useful.[7]  Even today, it is just a list, and the listed evidence has

never seen the light of day except to the extent that much of it is open source material, and thus,

generally available to the public.

In any event, Respondents' attempt to use the terms of CMO 3 as support for their

argument is unavailing because the PEC's adherence to the order's provisions has been selective,

to say the least.  As far as *Havlish* counsel is aware, the PEC has made no proposal for an initial

assessment for liability expenses, as required by paragraph 15; there has been no depository

account established, as directed by paragraph 17; and no document depository has been created,

pursuant to paragraph 19.  Those provisions clearly contemplate the sharing of costs and a fair

allocation of fees among counsel having common interests.

While counsel for the *Havlish* Plaintiffs and Respondents shared a common interest in

obtaining a judgment against Iran, they do not have a common interest with respect to claims

against other defendants.  Thus, Respondents' repeated representation that the work of

Respondents' counsel has benefited all claims in this consolidated litigation simply is not true.

As noted previously, none of the work of Respondents' counsel has been of any benefit with

respect to the claims asserted in the *Havlish* action.[8]  By contrast, all of the liability work, and

some of the damages work, of *Havlish* counsel has benefited Respondents and Respondents'

counsel.  Under these circumstances, a failure to allocate some fees to *Havlish* counsel would

defy the long-established principles of equity and *quantum meruit* that serve as the bases for all

---

[7] *Havlish* counsel made their evidentiary presentation in this Court in December 2011, with at
least one of Respondents' attorneys observing from the gallery.

[8] A number of *Havlish* Plaintiffs are represented by the Motley Rice firm in connection with
claims against defendants other than Iran, in *Thomas E. Burnett, Sr., et al. v. Al Baraka
Investment & Development Corp., et al.*, Case No. 03-CV-9849 (GBD).  *Havlish* counsel is not
aware of any agreements related to the sharing of costs and fees among Respondents' counsel,
Motley Rice, and other counsel with shared interests in claims against those defendants.

common benefit orders.

Respondents' suggestion that *Havlish* counsel's pursuit of a judgment against Iran acts as a forfeiture of their right to common benefit fees is wholly unsupportable. The cases cited in Respondents' MIO simply confirm that common benefit fees are often awarded in MDL settings to counsel who provide a benefit to claimants other than their own clients. None of those cases stand for the proposition that Respondents had the right to appropriate *Havlish* work product without fair compensation or contribution to cost. To the contrary, even if CMO 3 had not contemplated the liability investigation undertaken by the *Havlish* Plaintiffs (which it did), *Havlish* counsel would still be entitled to a fair allocation of fees based on principles enunciated in the case law for more than a century. *See Central Railroad & Banking Co. v. Pettus*, 113 U.S. 116 (1885), and *Sprague v. Ticonoc Nat. Bank*, *supra*. *See generally Havlish* Plaintiffs' Memorandum of Law, pp. 10-14.

## VI.   RESPONDENTS' ERRONEOUS ATTEMPT TO BELITTLE THE VALUE OF THE *HAVLISH* WORK PRODUCT FAILS TO NEGATE *HAVLISH* COUNSEL'S RIGHT TO COMMON BENEFIT FEES

Respondents spend the lion's share of their MIO in an erroneous attempt to trivialize the value of the benefit they received from *Havlish* counsel. However, because three separate collections actions involving more than $5 billion in identified Iranian assets have been litigated in this very courthouse since 2008 (*In re: 650 Fifth Avenue and Related Properties*, *supra*), since 2010 (*Bank Markazi v. Peterson, supra*), and since 2013 (*Havlish, et al. v. Royal Dutch Shell, supra*), it is difficult to imagine that even Respondents' counsel believe in the disparaging argument they now advance. The crux of that argument is that the value of the *Havlish* work product that Respondents appropriated and used for their benefit was not really worth much because (1) the evidentiary standard for a default judgment under the FSIA is "lenient," so obtaining a judgment here should have required only a "minimal effort;" and (2) for more than a

decade, Respondents' counsel has been in possession of evidence sufficient to support the entry of judgment against Iran, therefore, Respondents did not really need the *Havlish* work product that they did, in fact, appropriate.

In essence, Respondents ask this Court to believe that, rather than expend the "minimal effort" required to obtain a judgment against Iran, Respondents' counsel purposefully chose to sit on evidence sufficient to support such a judgment and forego the opportunity to participate in the potential recovery of billions of dollars for their clients. Then, when finally presenting the case for liability on behalf of their own clients, they chose to rely exclusively on the supposedly low-value work product of other counsel rather than strengthen their case with additional evidence they had allegedly spent years developing. Because that scenario is extremely unlikely – given Respondents' counsel's high degree of competence and professionalism – it must mean that the underlying arguments are irredeemably defective. And indeed they are. The proof of the matter is that, in fact, Respondents chose to rely exclusively on the *Havlish* evidence, work product, and findings and, further, chose to add no evidence of their own.

### A.   RESPONDENTS UNDERESTIMATE THE VALUE OF THE BENEFIT THEY RECEIVED FROM *HAVLISH* COUNSEL

Respondents include in their MIO a lengthy recitation of the evidentiary standards a plaintiff must satisfy in order to establish liability in an FSIA default case. Through that recitation, Respondents apparently hoped to demonstrate that obtaining a default judgment against Iran should have been an easy task because the bar for establishing liability was low. *Havlish* Plaintiffs will not waste time here correcting the many erroneous representations[9]

---

[9] For example, Respondents cite *Smith v. Islamic Emirate of Afghanistan*, 262 F.Supp. 2d 217 (S.D.N.Y. 2003), for the proposition that courts in the Second Circuit hold that the proper standard for establishing liability under the FSIA should be "less than normally required." MIO at p. 13. But that was actually the standard advocated by the plaintiff in *Smith*, not the standard

contained in Respondents' recitation because the entire discussion is irrelevant.  In their MIO,

Respondents describe a meager judgment that barely satisfies a "lenient" standard.  But that

judgment is not the judgment that Respondents obtained through the *Havlish* evidence, work

product, and findings.  *Havlish* counsel spent much time and treasure building a case against Iran

that was designed not only to provide evidence "satisfactory to the Court," but also to (1) meet

the "clear and convincing" evidentiary standard required for an award of punitive damages in a

FSIA default case, s*ee Peterson v. Islamic Republic of Iran,* 264 F.Supp.2d 46, 48 (D.D.C.

2003), and (2) withstand the heightened scrutiny to which the judgment would potentially be

subjected in the course of enforcement attempts in foreign jurisdictions.

In their attempt to denigrate the *Havlish* effort, Respondents demonstrate an astonishing

lack of understanding regarding the level of proof required under the present circumstances and

the corresponding value of the judgment that was virtually handed to them.  For instance,

Respondents mistakenly contend that the judgment against Iran would have been appropriate

based solely on the 9/11 COMMISSION REPORT, pointing specifically to the Report's statement

that "there is strong evidence that Iran facilitated the travel of al Qaeda members into and out of

Afghanistan before 9/11, and that some of these were future 9/11 hijackers."  MIO at p. 17.  But

there is an important difference between merely citing the Report's statement that "strong

evidence exists" and actually developing the evidence, which is precisely what *Havlish* counsel

did.  The quoted passage of the Report, for example, was the subject of extensive expert

elaboration and analysis by two 9/11 Commission staff members who were directly involved in

the Commission's investigation leading to the quoted passage (Dietrich Snell, who prepared the

---

adopted by the court.  The standard adopted by the court was "a legally sufficient evidentiary
basis for a reasonable jury to find for plaintiff."  *Id*. at 224.

questions to be put to, and evaluated the responses of, the two terrorists at Guantanamo who gave some of the information that led to the quoted passage, and Janice Kephart, one of the Commission's main staffers investigating the hijackers' travels).  Additionally, two former CIA operatives (Dr. Bruce Tefft and Clare Lopez), elaborated thoroughly on the factual basis, reliability, and significance of that evidence.  All four of these experts were retained, tasked, and presented by *Havlish* counsel.  Indeed, the above example is illustrative of the overall manner in which *Havlish* counsel presented open source material: most of it was vetted, discussed, and analyzed by eminently qualified experts who were retained, tasked, and presented via appropriate expert opinions by *Havlish* counsel.  Respondents did none of that work, but reaped the benefits thereof.

> ### B. THE EVIDENCE THAT RESPONDENTS MIGHT HAVE SUBMITTED, BUT NEVER DID SUBMIT, TO THE COURT IS IRRELEVANT TO THE QUESTION OF *HAVLISH* COUNSEL'S ENTITLEMENT TO COMMON BENEFIT FEES

Respondents argue that they had compiled their own evidence against Iran and therefore the work product of *Havlish* counsel was duplicative and unnecessary.  Once again, Respondents have it exactly backwards.  The only evidence that supports Respondents' judgments against Iran is the evidence that was painstakingly developed and presented by *Havlish* counsel.  So it is the evidence compiled by Respondents, to the extent it exists, that is duplicative and unnecessary.

Respondents say they have expert reports from Dr. Shay (whose retainer apparently ended a decade ago), CIA intelligence reports (without mention of any authenticating testimony) and other evidence distilled from their "wide ranging investigative efforts."  Yet none of this evidence has ever been submitted to the Court; hence, it is of no value.  Respondents contend that they also had all the evidence produced by the *Havlish* Plaintiffs, a claim that is palpably false.  Respondents admit in certain parts of the MIO, and demonstrate in other parts of the MIO,

that they are not even familiar with the totality of the *Havlish* evidence.  Nevertheless, Respondents include a list of books, articles, and government reports that purportedly contain, or at least discuss, the *Havlish* evidence.

Respondents could have shared their evidence at the time the Court granted *Havlish* counsel leave to present their case against Iran.  The fact that they did not produce their evidence then, or at any time subsequently, to add support to *Havlish* or for their own judgments gives rise to the presumption that the evidence was not of significant weight.  In any event, because that evidence has never been produced or submitted, it has been of no benefit either to Respondents or to the *Havlish* Plaintiffs, and is irrelevant to the issue of common benefit fees.

### C. *Havlish* Counsel Are Entitled to Common Benefit Fees Because Their Work Product Has Been Used for the Common Benefit of All Plaintiffs Who Asserted Claims Against Iran

Respondents' final objection to the proposed common benefit fee order demonstrates that they simply are not familiar with the quantum and quality of the evidence and work product that provided them with the basis for their judgments and set the parameters for their damage awards. Incredibly, Respondents, having appropriated the work product of *Havlish* counsel while contributing little to the effort that delivered them multi-billion dollar judgments, now argue that *Havlish* counsel should not get a fair fee allocation because "we do not really know what they did other than generally claim victory."  MIO at 24.  The best indicator of "what *Havlish* counsel did" is the actual work product which, as *Havlish* counsel explained in their initial brief, includes three separate detailed legal memoranda, a lengthy appendix, and 85 exhibits.  *See Havlish* Docket 03-9848 at Doc. Nos. 270, 273-276, 283.  Four of these 85 exhibits comprised, collectively, approximately thirty (30) hours of sworn videotaped testimony taken overseas by *Havlish* counsel, each containing scores of additional, authenticated, exhibits.  Three of the witnesses' testimony, and the accompanying exhibits, were filed under seal, as well as the

lengthy legal memorandum discussing that evidence.  *Id*. at Doc. Nos. 278-280.

The *Havlish* work product also includes sworn affidavits, with exhibits, totaling approximately 1,000 pages, by ten experts in the fields of terrorism, intelligence, criminal investigation, and the structural aspects of the state, the government, and the agencies and instrumentalities of the Islamic Republic of Iran.  These ten experts included three senior staff members of the 9/11 Commission, three former CIA operatives or analysts, the most esteemed American expert on Iran's government and economics, France's preeminent terrorism prosecutor, the top terrorism and military intelligence investigative journalist in Israel, and the former top U.S. official of Interpol.  Another witness was an authoritative American terrorism investigative journalist who worked hundreds of hours with *Havlish* counsel throughout the investigation, domestically and overseas; he submitted two affidavits, one of them sealed, pertaining to the *Havlish* investigation.  Most of these experts appended additional exhibits and attachments to their affidavits.  *Havlish* attorneys retained, vetted, and worked countless hours with each of these experts in order to present a comprehensive and cohesive case against Iran.

In the course of developing this evidence, *Havlish* counsel interviewed and consulted with scores of other experts, witnesses, researchers, investigators, intelligence operatives, and current and former government officials in the U.S., Europe, and the Middle East.  One *Havlish* attorney made fourteen (14) separate trips overseas during the investigation, some of those with the aforementioned American investigator; another *Havlish* attorney made four trips abroad in connection with the investigation and the testimony, as well as consulting with experts; other *Havlish* attorneys also traveled internationally and all of them, on innumerable occasions, travelled extensively within and across the United States.

The damages evidence developed by *Havlish* counsel also featured expert reports,

including a report from retired Rear Admiral Alberto Diaz, Jr., M.D., of the United States Navy who was, *inter alia*, Chief of Staff for the Navy's Bureau of Medicine and Surgery.  Dr. Diaz attested to the overwhelming physical, psychological, and neurophysiological aspects of the horrific deaths of the 9/11 victims.  In significant part, the expert testimony of Admiral Diaz underpinned the pain-and-suffering awards of $2 million for each decedent that ultimately comprised a portion of the judgments awarded to *Havlish* Plaintiffs and Respondents.  As with all other experts, *Havlish* counsel worked extensively with Dr. Diaz in order to provide the Court with an efficient and balanced presentation on damages.

As Respondents' counsel is no doubt well aware, the production of this kind of work product requires a commitment of massive amounts of attorney time and money, and that was certainly true here.  However, the award of common benefit fees here is not only justified by the quality and quantity of work product the Respondents appropriated, it is also justified by the result achieved.  As noted previously, through the efforts of *Havlish* counsel, Respondents will obtain multi-billion dollar judgments capable of withstanding heightened scrutiny that may well be part of future collection efforts.

*Havlish* Plaintiffs have proposed that an assessment equal to 8% of amounts Respondents recover on their judgments against Iran be placed in an escrow account to be administered by *Havlish* Plaintiffs' lead counsel.  As established in the *Havlish* Plaintiffs' initial brief, that assessment percentage is well within the range of assessments levied in MDL proceedings in recent years.

## CONCLUSION

For the reasons set forth above and those in *Havlish* Plaintiffs' Motion for an Order Creating a Common Benefit Fund, the Court should enter an order (1) requiring the Respondents to set aside 8% of any judgment collected pursuant to their judgments against Iran; (2) directing

counsel for Respondents to deposit assessed amounts into a common benefit escrow account to be established and maintained by lead counsel for the *Havlish* Plaintiffs; and (3) directing the distribution of the common benefit escrow account to the *Havlish* attorneys as reimbursement of costs associated with, and compensation for, the benefit bestowed upon Respondents.

Date: June 3, 2016                             /s/ Timothy B. Fleming
                                               Timothy B. Fleming (DC Bar No. 351114)
                                               WIGGINS CHILDS PANTAZIS
                                               FISHER GOLDFARB PLLC
                                               1850 M Street, NW, Suite 720
                                               Washington, DC  20036
                                               (202) 467-4489

                                               Dennis G. Pantazis (AL Bar No. ASB-2216-A59D)
                                               WIGGINS CHILDS PANTAZIS
                                               FISHER GOLDFARB LLC         (*Lead Counsel*)
                                               The Kress Building
                                               301 19th Street North
                                               Birmingham, AL  35203
                                               (205) 314-0500

                                               John A. Corr (PA Bar No. 52820)
                                               LAW OFFICE OF JOHN A. CORR
                                               301 Richard Way
                                               Collegeville, PA 19426
                                               (610) 482-4237

                                               Stephen A. Corr (PA Bar No. 65266)
                                               BEGLEY, CARLIN & MANDIO, LLP
                                               680 Middletown Boulevard
                                               Langhorne, PA  19047
                                               (215) 750-0110

                                               Richard D. Hailey (IN Bar No. 7375-49)
                                               Mary Beth Ramey (IN Bar No. 5876-49)
                                               RAMEY & HAILEY
                                               9333 North Meridian Street, Suite 105
                                               Indianapolis, IN  46260
                                               (317) 582-0000

                                               Robert M. Foote (IL Bar No. 03124325)
                                               Craig S. Meilke (IL Bar No. 03127485)

FOOTE, MIELKE, CHAVEZ
 & O'NEIL, LLC
10 West State Street, Suite 200
Geneva, IL  60134
(630) 232-7450

David C. Lee (TN Bar No. 015217)
422 South Gay Street, 3rd Floor
Knoxville, TN  37902
(865) 544-0101

Evan J. Yegelwel (FL Bar No. 319554)
TERRELL HOGAN ELLIS
   YEGELWEL, P.A.
233 East Bay Street
Blackstone Building, 8th Floor
Jacksonville, FL  32202
(904) 632-2424

Edward H. Rubenstone (PA Bar No. 16542)
EDWARD H. RUBENSTONE, LLC
812 N. Fairway Rd.
Glenside, PA 19038
215-887-9786

Donald J. Winder (UT Bar No. 3519)
WINDER & COUNSEL, PC
175 West 200 South, Suite 4000
P.O. BOX 2668
Salt Lake City, UT  84110-2668
(801) 322-2222

**Attorneys for the *Havlish* Plaintiffs**