# EXHIBIT A

Case 1:03-md-01570-GBD-SN   Document 3347-1   Filed 09/30/16   Page 2 of 54
Case 1:03-cv-09848-GBD   Document 294   Filed 12/... Page ... of 53
Case 1:03-md-01570-GBD-FM   Document 2970-1   Filed ... Page 1 of 53

USDA SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: __DEC 2 2 20__

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------x

| | |
|---|---|
| IN RE TERRORIST ATTACKS ON | Civil Action No. |
| SEPTEMBER 11, 2001 | 03 MDL 1570 (GBD) |

----------------------------------------------------------x

FIONA HAVLISH, in her own right
and as Executrix of the ESTATE OF
DONALD G. HAVLISH, JR., Deceased, *et al.*,

             Plaintiffs,

      v.

USAMA BIN LADEN,

AL-QAEDA/ISLAMIC ARMY,        :  CIVIL ACTION NO. 03-CV-9848 –GBD

THE TALIBAN, a.k.a. the Islamic
Emirate of Afghanistan,

MUHAMMAD OMAR,

THE ISLAMIC REPUBLIC OF IRAN,

AYATOLLAH ALI HOSEINI KHAMENEI,

ALI AKBAR HASHEMI RAFSANJANI,

INFORMATION AND SECURITY,        :  FINDINGS OF FACT AND
                                           :  CONCLUSIONS OF LAW

THE ISLAMIC REVOLUTIONARY
GUARD CORPS,

HEZBOLLAH,

THE IRANIAN MINISTRY OF PETROLEUM,

THE NATIONAL IRANIAN
TANKER CORPORATION,

THE NATIONAL IRANIAN

Case 1:03-md-01570-GBD-SN   Document 3347-1   Filed 09/30/16   Page 3 of 54
Case 1:03-cv-09848-GBD   Document 294   Filed 12/22/11   Page 2 of 53
Case 1:03-md-01570-GBD-FM   Document 2970-1   Filed 07/09/15   Page 2 of 53

OIL CORPORATION,                                       :
                                                      :
THE NATIONAL IRANIAN                                  :
GAS COMPANY,                                          :
                                                      :
IRAN AIRLINES,                                        :
                                                      :
THE NATIONAL IRANIAN                                  :
PETROCHEMICAL COMPANY,                               :
                                                      :
IRANIAN MINISTRY OF                                   :
ECONOMIC AFFAIRS AND FINANCE,                        :
                                                      :
IRANIAN MINISTRY OF                                   :
COMMERCE,                                             :
                                                      :
IRANIAN MINISTRY OF DEFENSE                           :
AND ARMED FORCES LOGISTICS,                          :
                                                      :
THE CENTRAL BANK OF THE                               :
ISLAMIC REPUBLIC OF IRAN, *et al.*,                  :
                                                      :
            Defendants.                              :

---

### FINDINGS OF FACT
### AND CONCLUSIONS OF LAW

#### BACKGROUND AND PROCEDURAL HISTORY

On September 11, 2001, nineteen (19) members of the al Qaeda terrorist network

hijacked four (4) United States passenger airplanes and flew them into the twin towers of the

World Trade Center in New York City, the Pentagon in Arlington, Virginia, and, due to

passengers' efforts to foil the hijackers, an open field near Shanksville, Pennsylvania.

Thousands of people on the planes and in the buildings, including first responders at the New

York crash site, were killed in those attacks. Countless others were injured, and property worth

billions of dollars was destroyed. *In Re Terrorist Attacks on September 11, 2001*, 349 F.Supp.2d

765, 779 (S.D.N.Y. 2005, Casey, J.).

Plaintiffs in this action are family members and legal representatives of victims of the

9/11 attacks who seek to hold accountable the persons, entities, and foreign sovereigns that

directly and materially supported al Qaeda.  In particular, plaintiffs seek entry of a judgment

against the Islamic Republic of Iran, two (2) of its top leaders, and a number of Iran's political

and military subdivisions, agencies, and instrumentalities based on Iran's provision of material

support to al Qaeda and direct support for, and sponsorship of, the September 11, 2001 terrorist

attacks.[1]  The officials, subdivisions, and agencies and instrumentalities of Iran named as

defendants (collectively referred to as the "agency and instrumentality Defendants") are

Ayatollah Ali Hoseini Khamenei, Ali Akbar Hashemi Rafsanjani, Hezbollah (a./k./a. Hizballah),

the Iranian Ministry of Information and Security ("MOIS"), the Islamic Revolutionary Guard

Corps ("IRGC"), the Iranian Ministry of Petroleum, the Iranian Ministry of Economic Affairs

and Finance, the Iranian Ministry of Commerce, the Iranian Ministry of Defense and Armed

Forces Logistics, the National Iranian Tanker Corporation, the National Iranian Oil Corporation,

the National Iranian Gas Company, Iran Airlines, the National Iranian Petrochemical Company,

and the Central Bank of the Islamic Republic of Iran.

The Court's jurisdiction over Iran and the agency and instrumentality Defendants is

grounded in the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §1602, *et seq.*  Section

1605A of the FSIA also serves as the basis for liability claims asserted by plaintiffs who are

United States nationals.

This action was initiated in the United States District Court for the District of Columbia

---

[1]   Plaintiffs have also asserted claims against non-sovereign defendants Usama (or Osama) bin Laden, the
Taliban, Muhammad Omar, and the al Qaeda/Islamic Army, for wrongful death, survival, intentional infliction
of emotional distress, and conspiracy. The non-sovereign defendants were served with the Amended
Complaint pursuant to Fed. R. Civ. P. 4 and the alternative forms of service approved by the Court, including
service by publication in prominent periodicals in the Middle East. Plaintiffs seek entry of default judgments
against these defendants in a separate Motion for Judgment by Default Against Non-Sovereign Defendants
(MDL Docket Document No. 2125).

Case 1:03-md-01570-GBD-SN    Document 3347-1    Filed 09/30/16    Page 5 of 54

Case 1:03-cv-09848-GBD-FM    Document 294    Filed 12/22/11    Page 4 of 53
Case 1:03-md-01570-GBD-FM    Document 2970-1    Filed 07/09/13    Page 4 of 53

on February 19, 2002. Plaintiffs served Iran and the agency and instrumentality Defendants with

summonses and copies of the Amended Complaint pursuant to 28 U.S.C. §1608.[2] On November

1, 2002, plaintiffs' counsel filed an Affidavit of Service of Original Process Upon All

Defendants, providing the Court with a detailed description of how the Amended Complaint and

Summons were served upon each Defendant. No Defendant answered or responded to the

Amended Complaint, nor did any person enter an appearance on behalf of any Defendant. The

Clerk of the U.S. District Court for the District of Columbia then entered a Rule 55(a) Default

against each of the Defendants.[3] Fed. R. Civ. P. 55(a).

   After the case was consolidated into the present MDL proceedings, this Court granted

plaintiffs' Motion for Leave to File a Second Amended Complaint, which plaintiffs filed on

September 7, 2006 (*Havlish* Docket no. 214).[4] Although plaintiffs had already served

Defendants with the Amended Complaint and obtained Rule 55(a) defaults against them,

plaintiffs again served Iran and the agency and instrumentality Defendants with the Second

Amended Complaint. Such service was again made pursuant to 28 U.S.C. §1608. On August

24, 2007, plaintiffs' counsel filed an Affidavit of Service of the Second Amended Complaint

(MDL Docket Document No. 2033). Still, none of the defendants made an appearance or

otherwise responded to the Second Amended Complaint. On December 27, 2007, the Clerk of

---

[2]  Service under the FSIA is governed by 28 U.S.C. §1608. Subsection (a) provides for service on foreign states, while subsection (b) provides for service on an agency or instrumentality of a foreign state. To determine whether a foreign entity should be treated as the state itself or as an agency or instrumentality, courts apply the "core functions" test: if the core functions of the entity are governmental, it is treated as the state itself; and if the core functions are commercial, it is treated as an agency or instrumentality. *See Roeder v. Islamic Republic of Iran,* 333 F.3d 228, 232 (D.C. Cir. 2003).

[3]  For details of the steps taken to effectuate service on the defaulting defendants, *see* Plaintiffs' memorandum and supporting documents submitted to the Court via letter dated October 27, 2009.

[4]  Plaintiffs' Second Amended Complaint amended the prior Complaint in three areas: 1) it added certain named plaintiffs; 2) it removed certain plaintiffs represented by other counsel in other cases; and 3) it substituted certain instrumentality defendants for defendants previously designated as "Unidentified Terrorist Defendants."

Court entered a Clerk's Certificate for Default as to each Defendant. (*See also* n. 3, *supra*.)

In order to revise their pleading to conform to the new provisions of the FSIA enacted in section 1083 of the National Defense Authorization Act for Fiscal Year 2008 (the "NDAA"), Pub.L. No. 110–181, § 1083, 122 Stat. 341 (2008) (codified at 28 U.S.C. § 1605A (2009)), plaintiffs filed a motion for leave to file a Third Amended Complaint, which was granted by the Court. (*Havlish* docket no. 262.) The Third Amended Complaint (*Havlish* docket no. 363) asserts a claim by U.S. citizen plaintiffs against Iran and the agency and instrumentality defendants under §1605A and a claim by non-U.S. citizens against those defendants under the Alien Tort Claims Act, 28 U.S.C. §1350 (the "ATCA").[5]

This matter now comes before the Court upon plaintiffs' motion for entry of judgment by default against defendant Islamic Republic of Iran and the agency and instrumentality defendants. Before plaintiffs can be awarded any relief, this Court must determine whether they have established their claims "by evidence satisfactory to the court." 28 U.S.C. § 1608(e); *see also Roeder v. Islamic Republic of Iran,* 333 F.3d 228, 232 (D.C.Cir. 2003). This "satisfactory to the court" standard is identical to the standard for entry of default judgments against the United States in Federal Rule of Civil Procedure 55(e). *Hill v. Republic of Iraq,* 328 F.3d 680, 684 (D.C.Cir. 2003). In evaluating the Plaintiffs' proof, the Court may "accept as true the plaintiffs' uncontroverted evidence." *Elahi v. Islamic Republic of Iran,* 124 F.Supp.2d 97, 100 (D.D.C. 2000); *Campuzano v. Islamic Republic of Iran,* 281 F.Supp.2d 258, 268 (D.D.C. 2003). In FSIA default judgment proceedings, the plaintiffs may establish proof by affidavit. *Weinstein v. Islamic Republic of Iran,* 184 F.Supp.2d 13, 19 (D. D.C. 2002).

---

[5] While plaintiffs' Third Amended Complaint includes a claim under the ATCA, plaintiffs have presented evidence that every plaintiff is either a national of the United States or has asserted a claim that derives from a victim who was a national of the United States at the time of the 9/11 attacks. Accordingly, all plaintiffs meet the requirements established in 28 U.S.C. § 1605A(a)(2)(A)(ii) for recovery under the FSIA.

In support of their motion, plaintiffs have submitted to the Court expert affidavits, fact affidavits, videotaped witness testimony and other exhibits. Such proofs were the subject of an evidentiary hearing on December 15, 2011. Based on the established record, plaintiffs propose the following findings of fact and conclusions of law:

## FINDINGS OF FACT

### Defendants

1. The Islamic Republic of Iran (hereinafter, unless otherwise noted, "Iran") has engaged in, and supported, terrorism as an instrument of foreign policy, virtually from the inception of its existence after the Iranian Revolution in 1979. Ex. 3, Byman Affid. ¶¶19-22, 25; Ex. 8, Clawson Affid. Conclusion, p. 35; Ex. 6, Lopez-Tefft Affid. ¶¶62-63, 67-95; Ex. 13, State Department Country Reports on Terrorism, Patterns of Global Terrorism [excerpts regarding Iran]; Ex. 2, Timmerman 2nd Affid. ¶2; *see also* Ex. 11, Testimony of Abolhassan Banisadr, p. 16. Plaintiffs' First Memorandum Of Law In Support Of Motion For Entry Of Judgment By Default Against Sovereign Defendants ("First Memo") at pp. 37-42, 44-52, 59-68.

2. Iran has been waging virtually an undeclared war against both the United States and Israel for thirty years. Ex. 7, Bergman Affid. ¶24; Ex. 6, Lopez-Tefft Affid. ¶60.

3. Iran wages this undeclared war through asymmetrical, or unconventional strategies and terrorism, often through proxies such as Hizballah, HAMAS, al Qaeda, and others. Ex. 7, Bergman Affid. ¶¶19-21.

4. The U.S. State Department has designated Iran as a foreign state sponsor of terror every year since 1984. Ex. 3, Byman Affid. ¶15; Ex. 8, Clawson Affid. ¶40; *see Estate of Heiser v. Islamic Republic of Iran*, 466 F.Supp.2d 229 (D.D.C. 2006).

5. Since 1980, each of the State Department's annual reports on terrorism describes the Iranian state's consistent involvement in acts of terror. Ex. 13, State Department *Country Reports on Terrorism, Patterns of Global Terrorism* [excerpts regarding Iran] 1980-2009; Appendix F [selected excerpts]; Ex. 6, Lopez-Tefft Affid. ¶¶66-95.

6. Defendants Ali Hoseini Khamenei and Ali Akbar Hashemi Rafsanjani are two of the most important and powerful officials in Iran. Ex. 41, Clawson 2nd Affid. ¶9. Both Khamenei and Rafsanjani occupy positions at the very highest echelon of the Iranian government. Ex. 8, Clawson Affid. ¶18-21;-23-28; Ex. 41, Clawson 2nd Affid. ¶¶9-14.

7. Ayatollah Ali Hoseini Khamenei is, and has been since 1989, the Supreme Leader of the Islamic Republic of Iran. Ex. 41, Clawson 2nd Affid. ¶10; Ex. 35, Iran: U.S. Concerns and Policy Responses, Congressional Research Service.

8.   Ayatollah Ali Hoseini Khamenei is the commander-in-chief of the armed forces, appoints
     the head of each military service, declares war and peace, appoints the head of the
     judiciary, and may dismiss the elected president of Iran, among many other powers
     outlined in Article 110 of the Iranian Constitution. He is, as his title suggests, supreme.
     He is the head of state, and, for all intents and purposes, Khamenei *is* the Iranian
     government. Khamenei is certainly – by far – the most powerful person in the Iranian
     government. His term of office is unlimited. Ex. 41, Clawson 2nd Affid. ¶11; Ex. 35,
     "Iran: U.S. Concerns and Policy Responses," Congressional Research Service (March 4,
     2011), pp. 2-3.

9.   Defendant Ali Akbar Hashemi Rafsanjani, one of the wealthiest individuals in Iran, has
     held a number of top positions in Iran's government: from 1989 to 1997, he was the
     president of Iran; from 1981 to 1989, he was the speaker of the Iranian parliament.
     Currently, Rafsanjani heads two important bodies established by the Iranian Constitution:
     the Assembly of Experts and the Expediency Council. Ex. 41, Clawson 2nd Affid. ¶12;
     Ex. 35, "Iran: U.S. Concerns and Policy Responses," Congressional Research Service
     (March 4, 2011), pp. 2-4.

10.  The Assembly of Experts selects a new Supreme Leader when that position becomes
     vacant. Ex. 41, Clawson 2nd Affid. ¶12; Ex. 35, "Iran: U.S. Concerns and Policy
     Responses," Congressional Research Service (March 4, 2011), p. 3.

11.  The Expediency Council is a uniquely Iranian institution; its members are appointed by
     the Supreme Leader, and it is charged with responsibility for resolving deadlocks
     between the parliament and the Guardian Council. Ex. 41, Clawson 2nd Affid. ¶12; Ex.
     35, "Iran: U.S. Concerns and Policy Responses," Congressional Research Service (March
     4, 2011), p. 3.

12.  The Guardian Council is a body charged with vetting legislation to ensure that it is
     consistent with Islam and the Iranian Constitution, and which deals with other issues
     "forwarded to them by the [Supreme] Leader." Ex. 41, Clawson 2nd Affid. ¶12; Ex. 35,
     "Iran: U.S. Concerns and Policy Responses," Congressional Research Service (March 4,
     2011), pp. 2-3.

13.  Until Rafsanjani lost a bid for a new presidential term in 2005, he was widely considered
     to be the second most powerful figure in the Iranian government. Certainly, he was the
     second most powerful figure from 1989 to 2005. Ex. 41, Clawson 2nd Affid. ¶13.

14.  Khamenei and Rafsanjani both have long records of direct involvement in Iran's material
     support for terrorism, and both have been cited as key figures in numerous U.S. court
     cases finding Iranian state support for terrorism. Ex. 41, Clawson 2nd Affid. ¶13;
     regarding Rafsanjani, *see Owens, et al. v. Republic of Sudan, et al.*, Civ. Action No. 01-
     2244 (JDB), 2011 U.S. Dist. LEXIS 135961.

15.  As ruled by a German court in the "*Mykonos*" case, both Khamenei and Rafsanjani were

named as having been responsible for ordering the assassination of Iranian dissidents in Berlin. Ex. 41, Clawson 2nd Affid. ¶14.

16. Executive power in Iran is held not by the elected head of the government, Iran's president, but rather by the unelected Supreme Leader. *Id.*, pp. 55, 66; 127; Ex. 6, Lopez-Tefft Affid. ¶19; Ex. 8, Clawson Affid. ¶18.

17. Iran's Supreme Leader has the authority to make any decision – religious or political. Ex. 8, Clawson Affid. ¶¶19-20.

18. The political structure of Iran is divided conceptually: there is a formal governmental structure and a revolutionary structure. The Supreme Leader oversees both. Ex. 8, Clawson Affid. ¶25.

19. Iran's Supreme Leader holds power to dismiss the president, overrule the parliament and the courts, and overturn any secular law. Ex. 8, Clawson Affid. ¶21.

20. Iran's Supreme Leader wields sole authority to command, appoint, and dismiss every major leadership figure of any importance in the Iranian government system and the military. Ex. 6, Lopez-Tefft Affid. ¶20.

21. Defendants Iranian Ministry of Information and Security ("MOIS"), the Islamic Revolutionary Guard Corps ("IRGC"), the Iranian Ministry of Petroleum, the Iranian Ministry of Economic Affairs and Finance, the Iranian Ministry of Commerce, and the Iranian Ministry of Defense and Armed Forces Logistics are all political or military subdivisions of the nation-state the Islamic Republic of Iran. Each of these agencies has core functions which are governmental, not commercial, in nature. Ex. 41, Clawson 2nd Affid. ¶¶15-17, 23-28; Plaintiffs' Third Memorandum at pp. 9-14.

22. Except for the IRGC, these governmental ministries in Iran bear much the same relationship to Iran's government as do the cabinet departments in the United States government: they are established by law, their heads are appointed by the president subject to confirmation by the parliament, their budgets are proposed by the president and approved by the parliament, and their funding comes almost entirely from general tax revenues. Their core functions are governmental, and they are agencies within the government of the Islamic Republic of Iran. Ex. 41, Clawson 2nd Affid. ¶15.

23. The IRGC is a military force parallel to the regular Iranian military and to the formal governmental structure; although it is not subject to supervision by the Iranian parliament, it operates as an agent and instrumentality of the Supreme Leader himself. Ex. 8, Clawson Affid. ¶¶29-35; Ex. 41, Clawson 2nd Affid. ¶16; Plaintiffs' First Memorandum at pp. 43-45; Plaintiffs' Third Memorandum at pp. 9-13, 19.

24. The IRGC's responsibilities and powers are described in the Iranian Constitution, and the IRGC reports directly to Iran's Supreme Leader rather than to its president. Ex. 41, Clawson 2nd Affid. ¶16.

25.     The IRGC, also known as the *Sepah Pasdaran*, is both the guardian and the striking arm
        of the Islamic Revolution. Ex. 8, Clawson Affid. ¶¶29-35. The IRGC strongly asserts its
        constitutional role as defender of the Islamic Revolution. Ex. 41, Clawson 2nd Affid. ¶
        16; Plaintiffs' First Memorandum at pp. 43-45 and Ex. 8, Clawson Affid. ¶¶29-35.

26.     The IRGC is a governmental agency whose core functions are governmental. Ex. 41,
        Clawson 2nd Affid. ¶ 16; Plaintiffs' First Memorandum at pp. 43-45 and Ex. 8, Clawson
        Affid. ¶¶29-35.

27.     The IRGC is a major factor in the Iranian economy: it owns and controls hundreds of
        companies and commercial interests, particularly in the oil and gas sector, engineering,
        telecommunications and infrastructure, and it holds billions of dollars in military,
        business, and other assets and government contracts. One of the IRGC's companies has
        been awarded contracts worth billions of dollars by government agencies and the
        National Iranian Oil Company. The IRGC also engages in widespread smuggling,
        including, but not limited to, drugs and alcohol. Ex. 8, Clawson Affid. ¶37; Ex. 2,
        Timmerman 2nd Affid. ¶202; *see also* Ex. 11, Testimony of Abolhassan Banisadr, pp.
        19-20.

28.     The IRGC has a special foreign division, known as the *Qods* (or *Quds* or "Jerusalem")
        Force, which is the arm of the IRGC that works with militant organizations abroad and
        promotes terrorism overseas. The *Qods* Force has a long history of engaging in coups,
        insurgencies, assassinations, kidnappings, bombings, and arms dealing, and it is one of
        the most organized, disciplined, and violent terrorist organizations in the world. Ex. 3,
        Byman Affid. ¶62; *see also* Ex. 6, Lopez-Tefft ¶25; Ex. 11, Testimony of Abolhassan
        Banisadr, p. 19.

29.     For more than two decades, the IRGC has provided funding and/or training for terrorism
        operations targeting American citizens, including support for Hizballah and al Qaeda. In
        doing so, the IRGC is acting as an official agency whose activities are controlled by the
        Supreme Leader. Ex. 8, Clawson Affid. ¶36. Terrorism training provided to Hizbollah
        and al Qaeda by the IRGC is an official policy of the Iranian government. Ex. 8,
        Clawson Affid. ¶36.

30.     The U.S. Treasury Department has designated the IRGC-*Qods* Force as a "terrorist
        organization" for providing material support to the Taliban and other terrorist
        organizations, and the U.S. State Department has designated the IRGC as a "foreign
        terrorist organization." Ex. 6, Lopez-Tefft Affid. ¶65. Plaintiffs' First Memorandum at
        pp. 43. U.S. Government officials regularly state that the IRGC is considered an active
        supporter of terrorism. Ex. 41, Clawson 2nd Affid. ¶26.

31.     Iran's Ministry of Information and Security ("MOIS") is a well-funded and skilled
        intelligence agency with an annual budget between $100 million and $400 million. Ex.
        8, Clawson Affid. ¶38.

32.  MOIS has been involved in kidnappings, assassinations, and terrorism since its inception in 1985 after the ouster of president Abolhassan Banisadr, the Islamic Republic of Iran's first elected president. Ex. 8, Clawson Affid. ¶38; Ex. 11, Testimony of Abolhassan Banisadr, p. 12.

33.  The predecessor of MOIS was not the Shah's intelligence agency, SAVAK, which was dissolved, but rather the Supreme Leader's own intelligence service, which had no name. This special intelligence service reported directly to the Supreme Leader, who was, at that time, Ayatollah Khomeini, and it was engaged in the business of assassinations. Ex. 11, Testimony of Abolhassan Banisadr, pp. 11-12.

34.  Many of the U.S. State Department reports on global terrorism over the past twenty-five (25) years refer to MOIS as Iran's key facilitator and director of terrorist attacks. *See* Ex. 8, Clawson Affid. ¶39; Ex. 13. Witnesses X testifies to MOIS' role (as well as its successor, the Leader's special intelligence apparatus) in conducting and directing acts of international terrorism. Ex. S-3, Testimony of Abolghasem Mesbahi (March 1, 2008), pp. 56-72; Ex. S-4, Testimony of Abolghasem Mesbahi (March 2, 2008), pp. 56-64.

35.  After discovery of the involvement of MOIS in a series of assassinations and murders of intellectuals, writers, and dissidents in Iran in the late 1990s, known as the "Chain Murders," led to some reforms in MOIS, Iran's Supreme Leader, Ayatollah Khamenei, again formed a special intelligence apparatus that reported directly to him and worked under his direct control. The Supreme Leaders' special intelligence apparatus was engaged in the planning, support, and direction of terrorism. Ex. S-3, Testimony of Abolghasem Mesbahi (March 1, 2008), pp. 24-41and Abolghasem Mesbahi Dep. Ex. 14; Ex. S-6, Testimony of Witness Y (February 25, 2008), pp. 6, 14-18, 53-54.; *see also* Lopez-Tefft Affid. ¶206 and p. 83, n. 41; Bergman Affid. ¶¶75-76.

36.  As federal courts have found in several cases, MOIS as been a key instrument of the government of Iran for its material support of terrorist groups like Hizballah and as a terrorist agency of the Iranian government. Ex. 41, Clawson 2nd Affid. ¶24. *See, e.g.*, *Dammarell v. Islamic Republic of Iran*, 404 F.Supp.2d 261, 271-72 (D.D.C. 2005) ("through MOIS, Iran materially supported Hizbollah by providing assistance such as money, military arms, training, and recruitment."); *see also Flatow v. Islamic Republic of Iran*, 999 F.Supp. 1 (D.D.C. 1998); *Anderson v. Islamic Republic of Iran*, 90 F.Supp.2d 107, 112-13 (D.D.C. 2000); *Peterson v. Islamic Republic of Iran*, 264 F. Supp.2d 46 (D.D.C. 2002); *Salazar v. Islamic Republic of Iran*, 370 F.Supp.2d 105 (D.D.C. 2005); *Haim v. Islamic Republic of Iran*, 425 F.Supp.2d 56 (D.D.C. 2006); *Blais v. Islamic Republic of Iran*, 459 F.Supp.2d 40 (D.D.C. 2006); *Valore v. Islamic Republic of Iran*, 478 F.Supp.2d 101 (D.D.C. 2007). *See* Plaintiffs' First Memorandum at pp. 45-46.

37.  As federal courts have held in several cases, the IRGC and the MOIS are parts of the Iranian state itself. *See Rimkus v. Islamic Republic of Iran*, 575 F.Supp.2d 181, 198–200 (D.D.C. 2008) (Lamberth, C.J.); *Blais v. Islamic Republic of Iran*, 459 F.Supp.2d 40, 60–61 (D.D.C. 2006) (Lamberth, J.) (both MOIS and IRGC must be treated as the state of Iran itself for purposes of liability); *Salazar v. Islamic Republic of Iran*, 370 F.Supp.2d

105, 115–16 (D.D.C. 2005) (Bates, J.) (same).

38.   The entire apparatus of the Iranian state and government, and many parts of Iran's private
      sector, including corporations (*e.g.*, National Iranian Oil Company, Iran Air, Iran
      Shipping Lines); banks (*e.g.*, Central Bank, Bank *Sepah*); state-run media (*e.g.*, IRIB
      television, the Islamic Revolution News Agency ("IRNA"), KAYHAN, and other daily
      newspapers); private individuals; and even charities are at the service of the Supreme
      Leader, the IRGC, and the MOIS when it comes to support of terrorism. Ex. 11,
      Testimony of Abolhassan Banisadr, pp. 19-20; Ex. 2, Timmerman 2nd Affid. ¶¶91-96,
      *190-212; Ex. S-3, Testimony of Abolghasem Mesbahi (March 1, 2008), pp. 60-81; Ex. S-
      4, Testimony of Abolghasem Mesbahi (March 2, 2008), pp. 4-14.*

39.   In addition to the MOIS and the IRGC, the Iranian Ministry of Petroleum, the Iranian
      Ministry of Economic Affairs and Finance, the Iranian Ministry of Commerce, and the
      Iranian Ministry of Defense and Armed Forces Logistics are all divisions of the Iranian
      government, and are all part and parcel of the Iranian state. They are all agencies whose
      core functions are governmental, not commercial, in nature. Ex. 41, Clawson 2nd Affid.
      ¶¶15-17, 23-28.

40.   Iranian government ministries are responsible for carrying out the policies of the Iranian
      government, and the Iranian government's policies include state support for terrorism.
      Although much of that state support is done through clandestine means, the government
      ministries have also been involved in state support for terrorism, generally, and in support
      for al Qaeda and Hezbollah, in particular. Ex. 41, Clawson 2nd Affid. ¶17; S-4,
      Testimony of Abolghasem Mesbahi.

41.   The Iranian Ministry of Economic Affairs and Finance administers the state budget,
      which means that it has a key role in transferring state funds to many organizations and in
      verifying that state funds were properly used; thus, that Ministry had to have been
      involved in Iran's extensive financial support for terrorists generally and in support for al
      Qaeda and Hezbollah, in particular. Ex. 41, Clawson 2nd Affid. ¶17.

42.   The Iranian Ministry of Commerce and the Iranian Ministry of Petroleum are closely
      involved in Iran's export/import trade and the shipping used for such trade. On numerous
      occasions, what has purported to be normal commerce from Iran has been found instead
      to include shipments of weapons bound for terrorist groups. The Ministries of Commerce
      and Petroleum must have been aware of the planning and logistics for such disguised
      shipments. Ex. 41, Clawson 2nd Affid. ¶17; Ex. S-3, Testimony of Abolghasem Mesbahi
      (March 1, 2008), pp. 68-77; Ex. S-4, Testimony of Abolghasem Mesbahi (March 2,
      2008), pp. 4-5, 10-12.

43.   The Iranian government, including MOIS and individual defendants Rafsanjani and
      Khamenei in particular, used Iranian ministries such as the defendant Ministry of
      Petroleum, to funnel money to terrorist proxy groups through the procurement process,
      phony banking, and the use of shell companies registered in Nigeria and Cyprus that were
      fronts for terrorist organizations. Ex. S-3, Testimony of Abolghasem Mesbahi (March 1,

Case 1:03-cv-09848-GBD-M Document 294 Filed 12/22/11 Page 12 of 53
Case 1:03-md-01570-GBD-FM   Document 2970-1   Filed 07/09/15   Page 12 of 53

2008), pp. 67-81.

44.     Defendants National Iranian Tanker Corporation, the National Iranian Oil Corporation, the National Iranian Gas Company, Iran Airlines, the National Iranian Petrochemical Company, and the Central Bank of the Islamic Republic of Iran are all agencies and instrumentalities of the state of Iran. Each of these corporate defendants has a legal corporate existence outside the government and core functions which are commercial, not governmental, in nature. Each of these corporate defendants is, however, tightly connected to the government of Iran, and each is an organ of the government and/or has been owned, directed, and controlled by the Iranian state. Ex. 41, Clawson 2nd Affid. ¶¶18-22; 29-36.

45.     At all material times, each of these agencies/instrumentalities of Iran was "wholly owned and controlled by the government of Iran." Ex. 41, Clawson 2nd Affid. ¶30.

46.     Although Iran indicated in 2004 that it would "privatize" many corporations that had been started, operated, and controlled, by the Iranian government, including all of the above-mentioned corporate agency and instrumentality defendants, for the most part, such privatization has not, in fact, occurred, and, on the contrary, the privatization has been a sham. Ex. 41, Clawson 2nd Affid. ¶¶30-31. Shares in the companies have been sold to other companies, such as pension plans of state-controlled firms and state-controlled banks, which themselves are tightly controlled by the government or sold to politically well-connected people. Ex. 41, Clawson 2nd Affid. ¶31. The record of such transfers to date has been that they do not change the reality of Iranian government control. Ex. 41, Clawson 2nd Affid. ¶31. Key decisions about operations of the firms continued to be made by Iranian government officials. The nation-state of Iran continues to own, operate, and control these defendant companies, and they remain agencies and instrumentalities of Iran. Ex. 41, Clawson 2nd Affid. ¶31.

47.     The defendant National Iranian Tanker Corporation is, and has been since 1974, controlled by the Islamic Republic of Iran. Ex. 41, Clawson 2nd Affid. ¶32.

48.     As stated by the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC"), the National Iranian Oil Company is owned, controlled, and managed by the Government of Iran. Ex. 41, Clawson 2nd Affid. ¶33; Ex. S-3, Testimony of Abolghasem Mesbahi (March 1, 2008), p. 75. A large cash flow of money was funneled to terrorist organizations through the NIOC. Ex. S-4, Testimony of Abolghasem Mesbahi (March 2, 2008), pp. 6-7.

49.     Because of NIOC's role in material support of terrorism, OFAC has placed NIOC on its List of Specially Designated National and Blocked Persons ("OFAC SDN List"). As of September 11, 2001, the National Iranian Oil Corporation was wholly owned or controlled by the government of Iran. Ex. 41, Clawson 2nd Affid. ¶33.

50.     Defendant Iranian Ministry of Petroleum established the defendant National Iranian Gas Company in 1965, initially capitalizing it with Iranian government money. Ex. 41,

Clawson 2nd Affid. ¶34.

51.    In 2010, Iran's Oil Minister appointed a new managing director of the defendant National
       Iranian Gas Company, which equates to a continuing ownership and/or controlling
       interest by the state. Ex. 41, Clawson 2nd Affid. ¶34. Terrorists received monetary
       commissions from NIGC for operating as go-betweens for arrangements involving long-
       term payments. Ex. S-4, Testimony of Abolghasem Mesbahi (March 2, 2008), p. 7.

52.    The defendant National Petrochemical Company ("NPC") is a subsidiary of the Iranian
       Petroleum Ministry and is now, and as of September 2001, wholly-owned or controlled
       by the Government of Iran. Further, because of NPC's material support of terrorism, the
       OFAC placed NPC on the U.S. Treasury Department's OFAC SDN List. As of
       September, 2001, the defendant National Iranian Petrochemical Company was wholly
       owned or controlled by the government of Iran. Ex. 41, Clawson 2nd Affid. ¶35.
       Terrorists acted as go-betweens for arrangements with NPC involving long-term payment
       promises – that are never kept – and the terrorists receive monetary commissions for the
       bogus transactions. Ex. S-4, Testimony of Abolghasem Mesbahi (March 2, 2008), pp.
       10-11.

53.    Defendant Iran Airlines was, for many years, wholly owned by the government of Iran,
       and, whether or not the government of Iran ever sold its shares in the airline company,
       and there is no evidence that it ever did, it remained under *de facto* government control.
       Iranian agents who carried out acts of terrorism left the country in which the act was
       perpetrated on Iran Air flights which were specially held on the ground until the alleged
       perpetrator(s) could board the flight. Ex. 41, Clawson 2nd Affid. ¶36.

54.    Defendant Iran Air acted as a facilitator for the transfer of cash to terrorists on missions
       abroad, including one specific incident in which the head of MOIS instructed
       Abolghasem Mesbahi to tell the head of Iran Air in a particular European country to
       transfer cash to a member of a Pakistani Shia terrorist organization, who was at that time
       in that European country on a terrorist operation and was in need of funds. Ex. S-4,
       Testimony of Abolghasem Mesbahi (March 2, 2008), pp. 7-9.

55.    Defendant Central Bank of Iran (in Farsi, Bank Merkazi Iran or "BMI"), has core
       functions that are quasi-governmental, but it is a corporation rather than an agency within
       the government. Ex. 41, Clawson 2nd Affid. ¶18. Under Iranian law, BMI is owned by,
       and is tightly linked to, the Iranian government. Iran's Monetary and Banking Law
       ("MBL") provides that BMI is a joint-stock company whose capital is wholly owned by
       the Government. Ex. 41, Clawson 2nd Affid. ¶19. In practice, the Iranian government
       exercises tight control over BMI and ignores the law by issuing direct orders to the BMI.
       Ex. 41, Clawson 2nd Affid. ¶20. Although the BMI's governor has a five-year term
       specified in the MBL, in fact, he serves at the pleasure of Iran's president. In 2008, the
       BMI governor was dismissed by presidential decree when he refused to resign. Contrary
       to procedures set out in the MBL, the government cabinet regularly votes to order BMI to
       extend loans for specific purposes. Ex. 41, Clawson 2nd Affid. ¶20. From an economic
       perspective, "BMI has less independence from the Iranian government than do the central

Case 1:03-md-01570-GBD-FM   Document 294   Filed 12/22/11   Page 14 of 53
Case 1:03-md-01570-GBD-FM   Document 297   Filed 01/09/15   Page 14 of 53

banks in most developed countries." Ex. 41, Clawson 2nd Affid. ¶21.

56. The transfers of huge sums of Iranian money to terrorist organizations such as HAMAS and Hizballah, often millions of dollars of cash carried in suitcases, can only be accomplished with the complicity and/or knowledge and acquiescence of BMI. The same must be true in the case of banking transactions between Iranian agencies and instrumentalities and terrorist organizations. Ex. 41, Clawson 2nd Affid. ¶22. The Central Bank of Iran facilitates the transfer of money to terrorist groups. Ex. S-4, *Testimony of Abolghasem Mesbahi (March 2, 2008), p. 12.*

57. In the early to mid-1980s, Iran created Hizballah (the "Party of God"), an unincorporated association, as an extension of the Iranian Revolution into Lebanon. Iran has been the sponsor of Hizballah since its inception, providing funding, training, and leadership and advice via Hizballah's leadership councils. Ex. 7, Bergman Affid. ¶25; Ex. 6, Lopez-Tefft Affid. ¶28; Ex. 2, Timmerman 2nd Affid. ¶¶12-14; Ex. 8, Clawson Affid. ¶36; Ex. 3, Byman Affid. ¶44; *see also* Ex. 8, Clawson Affid. ¶36; Ex. 7, Bergman Affid. ¶27.

58. For more than a quarter century since its creation, Hizballah has received from Iran $100 million to $500 million in direct financial support annually. Ex. 8, Clawson Affid. ¶66; Ex. 6, Lopez-Tefft Affid. ¶31; Ex. 7, Bergman Affid. ¶26; Ex. 11, Testimony of Abolhassan Banisadr, p. 31.

59. From the beginning, Hizballah served as a terrorist proxy organization for Iran, created *specifically for the purpose of serving as a front for Iranian terrorism,* in effect, a cover name for terrorist operations run by Iran's IRGC around the world. Ex. 3, Byman Affid. ¶20; Ex. 7, Bergman Affid. ¶¶19-20, 25-28.

60. The U.S. State Department designated Hizballah a "foreign terrorist organization" in 1997. Ex. 6, Lopez-Tefft Affid. ¶63; Ex. 7, Bergman Affid. ¶22.

61. At all relevant times, defendant Hizballah was tightly connected to the government of Iran, was directed and controlled by the Iranian state, and was an agency or instrumentality of the Islamic Republic of Iran. Ex. 2, Timmerman 2nd Affid. ¶¶12-14; Ex. 3, Byman Affid. ¶¶20, 44; Ex. 6, Lopez-Tefft Affid. ¶¶28, 31; Ex. 7, Bergman Affid. ¶¶19-20, 25-28; Ex. 8, Clawson Affid. ¶¶36, 66; Ex. 11, Testimony of Abolhassan Banisadr, p. 31.

62. Imad Fayez Mughniyah (a/k/a Hajj Radwan) was, for decades prior to his death in February 2008, the terrorist operations chief of Hizballah. Mughniyah played a critical role in a series of imaginative high-profile terrorist attacks across the globe, and his abilities as a terrorist coordinator, director, and operative was an order of magnitude beyond anything comparable on the scene between 1980-2008. Ex. 6, Lopez-Tefft Affid. ¶204; Ex. 2, Timmerman 2nd Affid. ¶¶14-46; Ex. 7, Bergman Affid. ¶¶29-32.

63. Mughniyah was, since the early 1980s, an agent of the Islamic Republic of Iran, where he lived for many years. Ex. 7, Bergman Affid. ¶¶31, 40-41.

64. Imad Mughniyah had a *direct reporting relationship to Iranian intelligence and a direct role in Iran's sponsorship of terrorist activities.* Ex. 6, Lopez-Tefft Affid. ¶205; Ex. 2, Timmerman 2nd Affid. ¶¶14-46; Ex. 7, Bergman Affid. ¶¶40-43; Ex. S-4, Testimony of Abolghasem Mesbahi (March 2, 2008), pp. 61-67, 100-02; Ex. S-6, Testimony of Witness Y (February 25, 2008), pp. 30-31; 40-41; 35-52; *see also* Ex. 7, Affid. of Ronen Bergman, Ex. B (English translation).

65. *Imad Mughniyah, as an agent of Iran, conducted and directed numerous terrorist operations against American citizens during the 1980s and 1990s,* and he was on the FBI's "Most Wanted" list for twenty-one (21) years, until his assassination in Damascus, Syria, in February 2008. Ex. 7, Bergman Affid. ¶¶29-32; Ex. 2, Timmerman 2nd Affid. ¶¶14-46.

## Bridging of the Sunni-Shia Divide

66. Both Iran and al Qaeda can be ruthlessly pragmatic, cutting deals with potential future adversaries to advance their causes in the short-term. Ex. 3, Byman Affid. ¶¶41-42; *see also* Ex. 2, Timmerman 2nd Affid. ¶4.

67. Members of the Shiite and Sunni sects – particularly at the leadership level – often work together on terrorist operations. The religious differences, to the extent they retain any vitality at the leadership level, are trumped by the leaders' desire to confront and oppose common enemies, particularly the U.S. and Israel. Ex. 7, Bergman Affid. ¶46; Ex. 6, Lopez-Tefft Affid. ¶¶57, 186; Ex. 3, Byman Affid. ¶¶41-44; Ex. 2, Timmerman 2nd Affid. ¶¶112-13; Ex. 11, Testimony of Abolhassan Banisadr at 23.

68. Iran, though Shiite, is willing to use, co-opt, and support Sunnis as proxies to carry out acts of terrorism. Ex. 7, Bergman Affid. ¶46; Ex. 6, Lopez-Tefft Affid. ¶58; Ex. 3 Byman Affid. ¶¶41-44; Ex. 8, Clawson Affid. ¶¶36, 66; Ex. 2, Timmerman 2nd Affid. ¶¶112-13.

69. The factual reality – as found by the 9/11 REPORT – is that "[t]he relationship between al *Qaeda and Iran demonstrated that Sunni-Shia divisions did not necessarily pose an* insurmountable barrier to cooperation in terrorist operations." 9/11 REPORT, p. 61.

70. During the mid-to-late 1980s, Iran began formulating contingency plans for anti-U.S. terrorist operations. Ex. 13 (U.S. Department of State Reports, *Patterns of Global Terrorism / Country Reports on Terrorism,* 1980-2009 (excerpts *re:* Iran)) at p. 56; *see* Ex. 6, Lopez-Tefft Affid. ¶74.

71. In 1991-92, Iran founded a new organization, *al Majma' al Alami lil-Taqrib bayna al Madhahib al Islamiyyah* (International Institute for Rapprochement Among the Islamic Legal Schools) to promote publicly a reconciliation of the rival Sunni and Shi'a sects of Islam. Ex. 2, Timmerman 2nd Affid. ¶47.

72.   In the early 1990s, casting aside the historic bitterness between the Sunni and Shi'a sects of Islam, Sudanese religious-political leader Hassan al Turabi and Iran's political leadership and intelligence agencies established close ties, including paramilitary and intelligence connections, beginning a united Sunni-Shiite front against the United States and the West. Ex. 6, Lopez-Tefft Affid. ¶¶132-33; Ex. 2, Timmerman 2nd Affid. ¶48.

73.   While Osama bin Laden and al Qaeda were headquartered in Sudan in the early 1990s, Hassan al Turabi fostered the creation of a foundation and alliance for combined Sunni and Shi'a opposition to the United States and the West, an effort that was agreed to and joined by Osama bin Laden and Ayman al Zawahiri, leaders of al Qaeda, and by the leadership of Iran.  9/11 REPORT, pp. 60-61; Ex. 6, Lopez-Tefft Affid. ¶132; Ex. 3, Byman Affid. ¶23; *see also* ¶¶18-22, 24-28.

74.   In the 1990s, Hassan al Turabi and Ayman al Zawahiri became key links between the various radical Islamic terrorists, members of different Islamic sects, both Sunni and Shia, who were assembled in Sudan and Iran. Ex. 6, Lopez-Tefft Affid. ¶¶131-33; Ex. 7, Bergman Affid. ¶54.

75.   In 1991, al Zawahiri paid a clandestine visit to Iran to ask for help in his campaign to overthrow the government of Egypt.  There, and in subsequent visits in Iran and Sudan, al Zawahiri met with Imad Mughniyah, who convinced him of the power of suicide bombing, a significant event because suicide was prohibited by most Islamic clerics, both Sunni and Shi'a.  Zawarhiri also developed close relations during visits to Iran with Ahmad Vahidi, the commander of the IRGC's *Qods* Force. Ex. 7, Bergman Affid. ¶51; Ex. 2, Timmerman 2nd Affid. ¶54-55.

76.   In December 1991, Iran's President Ali Akbar Hashemi Rafsanjani, Intelligence Minister Ali Fallahian, IRGC Commander Mohsen Rezai, and Defense Minister Ali Akbar Torkan paid an official visit to Sudan where, in meetings also attended by Imad Mughniyah, they committed to send weapons shipments and as many as two thousand (2,000) *Revolutionary Guards* to Sudan. Ex. 6, Lopez-Tefft Affid. ¶136.

77.   In 1991 or 1992, discussions in Sudan between al Qaeda and Iranian operatives led to an informal agreement to cooperate in providing support for actions carried out primarily against Israel and the United States. 9/11 REPORT, p. 61.

78.   Thereafter, senior al Qaeda operatives and trainers traveled to Iran to receive training in explosives.  Osama bin Laden also sent senior aides to Iran for training with the IRGC and to Lebanon for training with Hizballah. Ex. 1, 9/11 REPORT, p. 61; Ex. 7, Bergman Affid. ¶58; *see also* Ex. S-5 and S-6, Testimony of Witness Y; Ex. S-11, Timmerman 2nd Affid. ¶95.

79.   In 1993, in a meeting in Khartoum, Sudan, arranged by Ali Mohamed, a confessed al Qaeda terrorist and trainer now in a U.S. prison, Ex. 31, Plea allocution, *USA v. Ali Mohamed*, S(7) 98 Cr. 1023 (LBS) (S.D.N.Y. October 20, 2000), Osama bin Laden and

Ayman al Zawahiri met directly with Iran's master terrorist Imad Mughniyah and Iranian officials, Ex. 7, Bergman Affid. ¶¶58-61; Ex. 6, Lopez-Tefft Affid. ¶¶137-38; Ex. 8, Clawson Affid. ¶58, including IRGC Brigadier General Mohammad Baqr Zolqadr, "a multipurpose member of the Iranian terrorist structure." Ex. 11, Testimony of Abolhassan Banisadr at 17; Ex. 2, Timmerman 2nd Affid. ¶¶49-51.

80.  At the 1993 Khartoum conference, representatives of Iran, Hizballah, and al Qaeda worked out an alliance of joint cooperation and support on terrorism. Ex. 6, Lopez-Tefft Affid. ¶¶135, 137-39; Ex. 7, Bergman Affid. ¶58-61; Ex. 2, Timmerman 2nd Affid. ¶¶48-52.

81.  Imad Mughniyah convinced Osama bin Laden of the effectiveness of suicide bombings in driving the U.S. out of Lebanon in the 1980s, and Mughniyah became a major connection point between Iran and al Qaeda. Ex. 7, Bergman Affid. ¶¶58-59; Ex. 6, Lopez-Tefft Affid. ¶187.

82.  Osama bin Laden had been a guerilla fighter in Afghanistan and it was Mughniyah who made bin Laden into an accomplished terrorist. Ex. 6, Lopez-Tefft Affid. ¶187.

83.  The 1993 meeting in Khartoum led to an ongoing series of communications, training arrangements, and operations among Iran and Hizballah and al Qaeda. Osama bin Laden sent more terrorist operatives, including Saef al Adel (who would become number 3 in al Qaeda and its top "military" commander), to Hizballah training camps operated by Mughniyah and the IRGC in Lebanon and Iran. Among other tactics, Hizballah taught bin Laden's al Qaeda operatives how to bomb large buildings, and Hizballah also gave the al Qaeda operatives training in intelligence and security. Ex. 6, Lopez-Tefft Affid. ¶¶151-52; Ex. 2, Timmerman 2nd Affid. ¶¶56-59.

84.  Another al Qaeda group traveled to the Bekaa Valley in Lebanon to receive training in explosives from Hizballah, as well as training in intelligence and security. 9/11 REPORT, p. 61; see also Ex. 6, Lopez-Tefft Affid. ¶151.

85.  Iran's Charge d'Affaires in Khartoum, Sudan, Majid Kamal, an IRGC commander, coordinated the training expeditions; Kamal had performed the same function in Beirut, Lebanon, in the early 1980s during the formation of Hizballah. Ex. 6, Lopez-Tefft Affid. ¶152.

86.  The well-known historical religious division between Sunnis and Shi'a did not, in fact, pose an insurmountable barrier to cooperation in regard to terrorist operations by radical Islamic leaders and terrorists. Iran, which is largely Shiite, and its terrorist proxy organization, Hizballah, also Shiite, entered into an alliance with al Qaeda, which is Sunni, to work together to conduct terrorist operations against the United States during the 1990s and continuing through, and after, September 11, 2001. 9/11 REPORT, p. 61; Ex. 7, Bergman Affid. ¶54; Ex. 3, Byman Affid. ¶¶33-43; Ex. 8, Clawson Affid. ¶47; Ex. 6, Lopez-Tefft Affid. ¶¶39, 42, 56; Ex. 2, Timmerman 2nd Affid. ¶¶48, 52, 112-13.

87.   As a result of the creation of this terrorist alliance, al Qaeda's Ayman al Zawahiri repeatedly visited Tehran during the 1990s and met with officers of MOIS, including chief Ali Fallahian, and *Qods* Force chief Ahmad Vahidi. Ex. 7, Bergman Affid. ¶67; Ex. 6, Lopez-Tefft Affid. ¶¶170-71; Ex. 2, Timmerman 2nd Affid. ¶55.

88.   Throughout the 1990s, the al Qaeda-Iran-Hizballah terrorist training arrangement continued. Imad Mughniyah himself coordinated these training activities, including training of al Qaeda personnel, with Iranian government officials in Iran and with IRGC officers working undercover at the Iranian embassy in Beirut, Lebanon. At all times, Iran's Supreme Leader was fully aware that Hizballah was training such foreign terrorists. Ex. 6, Lopez-Tefft Affid. ¶¶50, 58, 104, 108-11, 135, 138, 151-52, 169, 179, 182-83, 194, 293, 341-42; Ex. 7, Bergman Affid. ¶¶53, 61, 68; Ex. 2, Timmerman 2nd Affid. ¶¶56-67; Ex. 11, Testimony of Abolhassan Banisadr, pp. 32-33; Ex. S-1, Testimony of Witness X Abolghasem Mesbahi and Ex. 8, 9; Ex. S-4, Testimony of Abolghasem Mesbahi and Ex. 18; Ex. S-5 and S-6, Testimony of Witness Y. *See also* Ex. 8, Clawson Affid. ¶36.

89.   The IRGC maintained a separate terrorist training camp especially for Saudi nationals because of their distinct cultural habits and religious practices. This training camp was located in Iraqi Kurdistan and controlled first by Iranian intelligence and later by Abu Musab Zarqawi, later to be the notorious head of "al Qaeda in Iraq." Ex. 2, Timmerman 2nd Affid. ¶64.

### Terrorist Attacks By the Iran-Hizballah-al Qaeda Terrorist Alliance

90.   The creation of the Iran-Hizballah-al Qaeda terrorist alliance was followed by a string of terrorist strikes directly against the U.S. and its allies. 9/11 REPORT, p. 60 and n. 48, p. 68; Ex. 2, Timmerman 2nd Affid. ¶¶38-46, 78-86; Ex. 6, Lopez-Tefft Affid. ¶¶148-50, 162-68, 178-83, and p. 66, n. 29; Ex. 7, Bergman Affid. ¶¶42-44, 62-63, 74; Ex. 9, Bruguière Affid. ¶¶18-20; Ex. 10, Adamson Affid. ¶¶21-33; *Heiser v. Islamic Republic of Iran*, 466 F.Supp.2d 229 (D.D.C. 2006).

91.   While in Sudan, Osama bin Laden founded and funded *al Shamal* Bank and Taba Investments, through which he financed, in part, various terrorist activities. Through *al Shamal* Bank, bin Laden worked with Iran to fund oil sales that channeled money into terrorist activities. Ex. 6, Lopez-Tefft Affid. ¶¶140-46; Ex. 2-S, Timmerman 1st Affid. ¶¶102-110; Ex. 2, Timmerman 2nd Affid. ¶¶91-96.

92.   In March 1992, a Hizballah terrorist team operating under Mughniyah's command truck-bombed the Israeli embassy in Buenos Aires, Argentina, killing twenty-nine (29) people and wounding two hundred forty-two (242) others. Ex. 7, Bergman Affid. ¶42; Ex. 2, Timmerman 2nd Affid. ¶¶38-39.

93.   National Security Administration ("NSA") intercepts of communications from the Iranian embassies in Buenos Aires and Brasilia, Brazil, to the Foreign Ministry in Iran proved

Iranian involvement in the 1992 attack on the Israeli embassy in Buenos Aires; the NSA provided Israel with "unequivocal proof – 'not a smoking gun, but a blazing cannon'" – that Imad Mughniyah and another senior Hizballah member, Talal Hamiaa, executed the terrorist operation. Ex. 7, Bergman Affid. ¶42; Ex. 2, Timmerman 2nd Affid. ¶39.

94.     On February 26, 1993, the first World Trade Center bombing occurred, killing six (6) persons and injuring more than one thousand (1,000). A few months later, an al Qaeda conspiracy to bomb several New York City landmarks, including the Lincoln Tunnel and the Holland Tunnel, was disrupted. Egyptian cleric Omar Abdul Rahman, a/k/a the "Blind Sheikh," whose Egyptian radical group is linked to al Zawahiri and al Qaeda, was convicted of masterminding the plot to engage in urban warfare against the United States. Ex. 6, Lopez-Tefft Affid. ¶150; Ex. 22.

95.     In July 1994, Mughniyah and his Hizballah cadres followed up the 1992 bombing of the Israeli embassy in Buenos Aires by again attacking Israeli interests there. A terrorist sleeper network was activated, again under Imad Mughniyah's command, and it detonated a truck bomb to destroy the *Asociación Mutual Israelita Argentina* ("AMIA"), the Jewish cultural center in Buenos Aires. The explosion that killed eighty-six (86) persons and injured two hundred fifty-two (252). "The U.S., Israel, and Argentina all concluded that Iran, Hizballah, and Imad Mughniyah were responsible for the AMIA bombing." Ex. 7, Bergman Affid. ¶43; Ex. 2, Timmerman 2nd Affid. ¶40.

96.     Argentine investigators determined that the decision to bomb the AMIA center was taken at the highest levels of Iran's government, which directed Mughniyah and Hizballah to perform the operation. Specifically, this direction was made by Iran's Supreme Leader Khamenei, President Rafsanjani, Foreign Minister Velayati, and MOIS Minister Fallahian – the "*Omar-e Vijeh*" (or Special Matters Committee) – during an August 14, 1993 meeting in Mashad, Iran, also attended by Mohzen Rezai, Ahmad Vahidi, Mohsen Rabbani, and Ahmad Reza Asgari. Ex. 2, Timmerman 2nd Affid. ¶¶38-46.

97.     The Argentinean investigation revealed that nine (9) Iranians (including the Iranian agent Mughniyah) were responsible for the AMIA bombing, and the Argentines sought the issuance of INTERPOL Red Notices on all nine (9). However, Iran took extraordinary measures to try to block the issuance of the Red Notices by INTERPOL, and Iran succeeded in part, as the General Assembly of INTERPOL upheld a decision by the Executive Committee to issue only six (6) Red Notices, instead of the nine sought by the Argentines. The six who were the subjects of Red Notices included Imad Mughniyah (Hizballah chief of terrorism), Ali Fallahian (MOIS minister), Mohsen Rabbani (Iranian cultural attaché), Ahmad Reza Asgari (senior MOIS official), Ahmad Vahidi (*Qods* Force commander), and Mohsen Rezai (IRGC commander). Ex. 10, Adamson Affid. ¶¶21-33; Ex. 2, Timmerman 2nd Affid. ¶¶40-45; Ex. 7, Bergman Affid. ¶¶43-44.

98.     In December 1994, Algerian terrorists associated with al Qaeda hijacked a French airliner, intending to crash it into the Eiffel Tower in Paris, a precursor to 9/11. They were foiled by a French SWAT team. Ex. 9, Bruguière Declaration ¶¶18-20; Ex. 2, Timmerman 2nd Affid. ¶¶78-80.

99.   On July 7, 1995, Ayman al Zawahiri's Egyptian gunmen, supported, trained, and funded
      by Iran, attempted to assassinate Egyptian President Hosni Mubarak near Addis Ababa,
      Ethiopia. The attempt failed. The IRGC extricated some of the assassins from Ethiopia
      and arranged for their protection in Lebanon by Hizballah, and, for the assassins' team
      leader, Mustafa Hamza, inside Iran itself. Ex. 7, Bergman Affid. ¶74.

100.  U.S., Saudi, and Egyptian political pressure on the Sudanese eventually forced them to
      expel Osama bin Laden in May 1996. Radical Afghan Sunni warlord Gulbuddin
      Hekmatyar, a strong Iranian ally, invited bin Laden to join him in Afghanistan.
      Hekmatyar and bin Laden had known each other during the 1980s Afghan *mujaheddin*-
      Soviet war. Osama bin Laden then relocated to Afghanistan with the assistance of the
      Iranian intelligence services. Ex. 15, U.S. Embassy (Islamabad) Cable, November 12,
      1996; Ex. 7, Bergman Affid. ¶64; Ex. 2, Timmerman 2nd Affid. ¶99; *see also* 9/11
      REPORT at p. 65.

101.  On June 25, 1996, terrorists struck the Khobar Towers housing complex in Dhahran,
      Saudi Arabia, with a powerful truck bomb, killing nineteen (19) U.S. servicemen and
      wounding some five hundred (500). Ex. 6, Lopez-Tefft Affid. ¶162; Ex. 2, Timmerman
      2nd Affid. ¶84. FBI investigators concluded the operation was undertaken on direct
      orders from senior Iranian government leaders, the bombers had been trained and funded
      by the IRGC in Lebanon's Bekaa Valley, and senior members of the Iranian government,
      including Ministry of Defense, Ministry of Intelligence and Security and the Supreme
      Leader's office had selected Khobar as the target and commissioned the Saudi Hizballah
      to carry out the operation. Ex. 6, Lopez-Tefft Affid. ¶162.

102.  The 9/11 Commission examined classified CIA documents establishing that IRGC-*Qods*
      Force commander Ahmad Vahidi planned the Khobar Towers attack with Ahmad al
      Mugassil, a Saudi-born al Qaeda operative. 9/11 REPORT, p. 60, n. 48. *See* Ex. 2,
      Timmerman 2nd Affid. ¶¶85-86.

103.  A U.S. district court held that Iran was factually and legally responsible for the Khobar
      Towers bombing. *Heiser v. Islamic Republic of Iran*, 466 F.Supp.2d 229 (D.D.C. 2006).

104.  Al Qaeda was involved in the planning and preparations for the Khobar Towers bombing.
      Osama bin Laden tried to facilitate a shipment of explosives to Saudi Arabia, and, on the
      day of the operation, bin Laden was, according to NSA intercepts, congratulated on the
      telephone. Ex. 6, Lopez-Tefft Affid. ¶¶163-68; 9/11 REPORT, p. 60.

105.  Two months later, in August 1996, Osama bin Laden would cite the Khobar Towers
      bombing in his first *fatwa*, a "Declaration of War Against the Americans Occupying the
      Land of the Two Holy Places": "The crusader army became dust *when we detonated* al
      Khobar . . . ." Ex. 6, Lopez-Tefft Affid. ¶¶52, 166, p. 66, n. 29 *(emphasis added)*.

106.  In August 1996 – the same month bin Laden issued his first *fatwa* declaring war against
      the United States, Ex. 6, Lopez-Tefft Affid. ¶52 – one of the Iranian intelligence

operatives involved in the Khobar Towers attack (in June 1996) traveled to Jalalabad, Afghanistan, to meet with Osama bin Laden. The subject was continuing the secret strategic agreement to undertake a joint terrorism campaign against the U.S. *See* Ex. 6, Lopez-Tefft Affid. ¶172.

107. At this time, Iranian and Hizballah trainers traveled between Iran and Afghanistan, transferring to al Qaeda operatives such material as blueprints and drawings of bombs, manuals for wireless equipment, and instruction booklets for avoiding detection by unmanned aircraft. Ex. 7, Bergman Affid. ¶68.

108. On February 23, 1998, Osama bin Laden issued his second public *fatwa* in the name of a "World Islamic Front" against America, calling for the murder of Americans "as the individual duty for every Muslim who can do it in any country in which it is possible to do it." 9/11 REPORT, pp. 47-48, 69.

109. On August 7, 1998, two nearly simultaneous truck bombings destroyed the U.S. embassies in Nairobi, Kenya, and Dar-es-Salaam, Tanzania, killing more than three hundred (300) persons and wounding more than five thousand (5,000). Although known to have been committed by al Qaeda operatives (due to the confession of Ali Mohamed, who led the team that studied the embassy in Nairobi, beginning as early as December 1993, shortly after the Khartoum meeting, 9/11 REPORT, p. 68, Ex. 6, Lopez-Tefft Affid. ¶180), the twin East Africa U.S. embassy bombings also bore the unmistakable *modus operandi* of Imad Mughniyah, the Hizballah commander and agent of Iran: multiple, simultaneous, spectacular suicide bombings against American symbols. Ex. 6, Lopez-Tefft Affid. ¶¶178-83.

110. A U.S. district court in Washington, D.C. has held that Iran, the IRGC, and MOIS, as well as the Republic of Sudan and its Ministry of the Interior, were factually and legally responsible for the U.S. Embassy bombings in Kenya and Tanzania. "Support from Iran and Hezbollah was critical to al Qaeda's execution of the 1998 embassy bombings." *Owens, et al. v. Republic of Sudan, et al.*, Civ. Action No. 01-2244 (JDB), 2011 U.S. Dist. LEXIS 135961.

111. The U.S. District Court also found that the material support of Iran, the IRGC, and MOIS was supplied to al Qaeda through Iran's sponsorship of Hizballah. *Owens, et al. v. Republic of Sudan, et al., supra.*

112. The al Qaeda operatives who carried out the U.S. embassy attacks in East Africa were trained by Hizballah in handling the sophisticated explosives used in those bombings, and "[t]he government of Iran was aware of and authorized this training and assistance." 9/11 REPORT, p. 68; Ex. 6, Lopez-Tefft Affid. ¶¶179; 182-83; *Owens, et al. v. Republic of Sudan, et al., supra.*

113. One of the specific types of training Hizballah provided was in blowing up large buildings. Among those who trained at the Hizballah camps was Saef al Adel, the al Qaeda chief of terrorist operations, who was convicted *in absentia* in the U.S. for his role

in the twin embassy bombings, and who would spend the years after 9/11 in safe haven inside Iran. Ex. 6, Lopez-Tefft Affid. ¶¶194-95; Ex. 2, Timmerman 2nd Affid. ¶¶57-59 and Ex. B-4 thereto; *see also Owens, et al. v. Republic of Sudan, et al., supra.*

114.    On October 12, 2000, al Qaeda suicide bombers attacked the *U.S.S. Cole* in the harbor of Aden, Yemen, killing seventeen (17) sailors and injuring thirty-nine (39). At just that time, a U.S. Defense Intelligence Agency analyst was alerting his superiors to a web of connections he was finding between and among al Qaeda, the Iranian intelligence agencies controlled by Iran's Supreme Leader, Hizballah, and other active terrorist groups. *See* Ex. 6, Lopez-Tefft Affid. ¶¶188-192; 196-97.

115.    As stated in the 9/11 REPORT, "Iran made a concerted effort to strengthen relations with al Qaeda after the October 2000 attack on the *USS Cole* . . . ." 9/11 REPORT, p. 240; Ex. 6, Lopez-Tefft Affid. ¶264. It was during this very same time frame that, as documented in the 9/11 REPORT, Iranian officials facilitated the travel of al Qaeda members – including some of the 9/11 hijackers – through Iran on their way to and from Afghanistan, where the hijackers trained at al Qaeda's terrorist training camps. 9/11 REPORT at pp. 240-41.

## Iran and Terrorist Travel

116.    Iran's facilitation of al Qaeda's operatives' travel, including at least eight (8) of the 9/11 hijackers, amounted to essential material support, indeed, direct support, for the 9/11 attacks. Ex. 4, Kephart Affid. ¶71.

117.    The 9/11 terrorists engaged in a specific terrorist travel operation. Ex. 4, Kephart Affid. ¶37. As stated in the 9/11 Commission Report, "For terrorists, success is often dependent on travel. . . . For terrorists, travel documents are as important as weapons." 9/11 REPORT, p. 384.

118.    There were two separate, but related, ways in which Iran furnished material and direct support for the 9/11 terrorists' specific terrorist travel operation, as set forth below. Ex. 4, Kephart Affid. ¶¶52-70.

119.    Travel to training camps in Afghanistan by the future 9/11 hijackers was essential for the success of the 9/11 operation. Ex. 4, Kephart Affid. ¶53.

120.    Operatives of al Qaeda knew that the Americans were well aware of the existence of al Qaeda training camps in Afghanistan. Ex. 4, Kephart Affid. ¶52.

121.    Evidence reviewed by the 9/11 Commission demonstrated that Al Qaeda's travel planners believed that a terrorist operative trying to obtain a visa at an American embassy or consulate, or trying to enter the United States itself, faced a very serious risk if his passport showed travel to Afghanistan or Iran. Ex. 4, Kephart Affid. ¶52.

122.    The first way in which the Iranian government materially and directly supported the 9/11

Case 1:03-md-01570-GBD-FM   Document 2929   Filed 12/22/07   Page 24 of 53

terrorist travel operation was by ordering its border inspectors not to place telltale stamps in the passports of these future hijackers traveling to and from Afghanistan via Iran. Several of the 9/11 hijackers transited Iran on their way to or from Afghanistan, taking advantage of the Iranian practice of not stamping Saudi passports. Thus, Iran facilitated the transit of al Qaeda members into and out of Afghanistan before 9/11. Some of these were future 9/11 hijackers. 9/11 REPORT at p. 241; Ex. 5, Snell Affid. ¶¶20-21.

123. National Security Administration intercepts, made available to the 9/11 Commission shortly before publication of the 9/11 REPORT, showed that Iranian border inspectors had been ordered not to put telltale stamps in the operatives' passports and that the Iranians were aware they were helping operatives who were part of an organization preparing attacks against the United States. Ex. 2, Timmerman 2nd Affid. ¶¶123-24.

124. Of three Saudi hijackers who were carrying passports with possible indicators of extremism, at least one went to Iran. Such indicators were probably al Qaeda "calling cards" used by terrorists to identify themselves covertly. It is likely that the Iranian border authorities were aware of this covert calling card system and, thus, knew when not to stamp Iranian travel stamps into Saudi al Qaeda passports. Ex. 4, Kephart Affid. ¶67.

125. The actions of Iranian border authorities in refraining from stamping the passports of the Saudi hijackers, vastly increased the likelihood of the operational success of the 9/11 plot. 9/11 REPORT, p. 240.

126. Shielding the passports of future hijackers, who were Saudi members of al Qaeda, from indicia of travel to Iran and Afghanistan, was perceived as essential not only to prevent potential confiscation of passports by Saudi authorities, but also to hide complicity of Iran in supporting al Qaeda. Ex. 4, Kephart Affid. ¶66.

127. In the mid-1990s, when the Iran-Hizballah-al Qaeda terror alliance was forming, al Qaeda operative Mustafa Hamid had "negotiated a secret relationship with Iran that allowed safe transit via Iran to Afghanistan." This safe Iran-Afghanistan passageway was managed by MOIS. Ex. 30, U.S. Treasury Department press release, January 16, 2009; Ex. 3, Byman Affid. ¶47; Ex. 2, Timmerman 2nd Affid. ¶¶115-19, 216.

128. Numerous admissions from lower level al Qaeda members who were interrogated at the detention facility at Guantanamo Bay confirm the existence of the clandestine Iran-Afghanistan passageway, managed by MOIS. *See* Ex. 2, Timmerman 2nd Affid. ¶¶115-19. Al Qaeda had "'total collaboration with the Iranians,' and had its own organization in Iran 'that takes care of helping the mujahedin brothers cross the border.'" *Id.* ¶119.

129. The 9/11 Commission obtained "evidence that 8 to 10 of the 14 Saudi 'muscle' operatives traveled into or out of Iran between October 2000 and February 2001." 9/11 REPORT at p. 240.

130. Although al Qaeda operatives Khalid Sheikh Mohammed and Ramzi Binalshibh (now Guantanamo detainees) denied any reason, other than the Iranian's refraining from

stamping passports, for the hijackers to have traveled through Iran or any relationship
between the hijackers and Hizballah, *see* 9/11 REPORT at p. 241, their denials are not
credible. Ex. 5, Snell Affid. ¶21; Ex. 6, Lopez-Tefft Affid. ¶119.

131. The actions of Iranian border authorities in refraining from stamping the passports of the
Saudi hijackers vastly increased the likelihood of the operational success of the 9/11 plot.
Ex. 4, Kephart Affid. ¶66.

132. Iran's willingness to permit the undocumented admission and passage of al Qaeda
operatives and 9/11 hijackers provided key material support to al Qaeda. By not
stamping the hijackers' passports, by providing safe passage through Iran and into
Afghanistan, and by permitting Hezbollah to receive the traveling group … Iran, in
essence, acted as a state sponsor of terrorist travel. Ex. 4, Kephart Affid. ¶70.

133. Iran's facilitation of the hijackers' "terrorist travel" operation, including that Iranian
border inspectors were directed not to place telltale stamps in the passports of these future
hijackers traveling to and from Afghanistan, and that Iran permitted the undocumented
admission and passage of al Qaeda operatives and 9/11 hijackers, constituted direct
support and material support for al Qaeda's 9/11 attacks. 9/11 REPORT, pp. 240-41; Ex.
4, Kephart Affid. *passim* and specifically ¶¶3-5, 66, 70, 78; Ex. 3, Byman Affid. ¶¶32;
46-47, 49-50; Ex. 6, Lopez-Tefft Affid. ¶¶104-07; 112-20; 264, 277; Ex. 2, Timmerman
2nd Affid. ¶¶118-19, 120-24; Ex. 7, Bergman Affid. ¶17; Ex. 8, Clawson Affid. ¶¶48-49,
59.

134. The second way in which Iran furnished material and direct support for the 9/11 attacks
was that a terrorist agent of Iran and Hizballah helped coordinate travel by future Saudi
hijackers. As found by the 9/11 Commission, "[i]n October 2000, a senior operative of
Hezbollah visited Saudi Arabia to coordinate activities there. He also planned to assist
individuals in Saudi Arabia in traveling to Iran during November. A top Hezbollah
commander and Saudi Hezbollah contacts were involved." 9/11 REPORT at p. 240.

135. On their travels into and out of Iran, some of them through Beirut, some of the 9/11
hijackers were accompanied by senior Hizballah operatives. 9/11 REPORT at pp. 240-41.

136. The 9/11 Commission determined that, in November 2000, "muscle" hijacker Ahmed al
Ghamdi "flew to Beirut – perhaps by coincidence -- on the same flight as a senior
Hezbollah operative." 9/11 REPORT at p. 240.

137. As found by the 9/11 Commission, in mid-November 2000, three muscle hijackers,
having obtained U.S. visas, "traveled in a group from Saudi Arabia to Beirut and then
onward to Iran. An associate of a senior Hezbollah operative was on the same flight that
took the future hijackers to Iran." 9/11 REPORT at p. 240.

138. As found by the 9/11 Commission, "Hezbollah officials in Beirut and Iran were expecting
the arrival of a group during the same time period. The travel of this group was
important enough to merit the attention of senior figures of Hezbollah." 9/11 REPORT at

p. 240.

139.  The "senior operative of Hizballah" (or "senior Hizballah operative") referenced in the 9/11 REPORT was the master terrorist and agent of Hizballah and Iran, Imad Mughniyah. Ex. 2, Timmerman 2nd Affid. ¶¶126-27; Ex. 6, Lopez-Tefft Affid. ¶114-17.

140.  The "activities" that Mughniyah went to Saudi Arabia to "coordinate" revolved around the hijackers' travel, their obtaining new Saudi passports and/or U.S. visas for the 9/11 operation, the hijackers' security, and the operation's security. Ex. 4, Kephart Affid. ¶¶60-64 and Ex. A thereto; Ex. 6, Lopez-Tefft Affid. ¶114.

141.  All the evidence now available demonstrates that there was no realistic possibility of a "coincidence," as suggested by the 9/11 REPORT: if a (1) "senior operative of Hizballah [Mughniyah] (2) planned (3) to assist individuals (4) in Saudi Arabia (5) in traveling (6) to Iran (7) in November 2000." Likewise, it could not have been by coincidence that Ahmed al Ghamdi (1) "in November" (2) "flew from Saudi Arabia" (3) "to Beirut" (4) "on the same flight" (5) "as a senior Hizballah operative." These travel arrangements were by design, not coincidence. Ex. 6, Lopez-Tefft Affid. ¶114.

142.  The confluence of events described above, together with the fact that al Qaeda used travel facilitators and was extremely careful about all aspects of the terrorist travel operation, makes a coincidence of such magnitude in this situation prohibitively unlikely. Ex. 6, Lopez-Tefft Affid. ¶¶115, 117, 120.

143.  Iran's agent Imad Mughniyah and other Hizballah officials in Lebanon and in Iran had actual foreknowledge of the 9/11 conspiracy. Ex. 6, Lopez-Tefft Affid. ¶¶117, 120; Ex. 2, Timmerman 2nd Affid. ¶¶123-24.

144.  The actions of the "senior Hizballah operative," Imad Mughniyah, and his "associate" and a "top commander" of Hizballah, in escorting 9/11 hijackers on flights to and from Iran, and coordinating passport and visa acquisition activities in Saudi Arabia also constituted direct and material support for the 9/11 conspiracy. 9/11 REPORT, pp. 240-41; Ex. 4, Kephart Affid. *passim* and specifically ¶¶3-5, 66, 70, 78; Ex. 6, Lopez-Tefft Affid. ¶¶104-07, 112-20, 264, 277; Ex. 3, Byman Affid. ¶¶32; 46-47, 49-50; Ex. 2, Timmerman 2nd Affid. ¶¶118-24; Ex. 7, Bergman Affid. ¶17; Ex. 8, Clawson Affid. ¶¶48-49, 59.

145.  Ramzi Binalshibh was unable to obtain a U.S. visa needed to participate directly as a hijacker in the 9/11 attacks, and instead served as a coordinator for the operation, particularly with regard to the members of the Hamburg, Germany-based cell of Mohammed Atta. 9/11 REPORT, pp. 161, 167-68; 225, 243-46, Ch. 5, note 46; *see also* Ch. 7, note 52 and Ex. 4, Kephart Affid. ¶¶72-73.

146.  Eight (8) months before 9/11, Ramzi Binalshibh stopped in Tehran *en route* to meetings with al Qaeda leaders in Afghanistan. From the Iranian embassy in Berlin, Binalshibh obtained a four-week tourist visa to Iran on December 20, 2000. He flew to Iran on January 31, 2001, via Amsterdam on January 27-28, but Iran was not, contrary to his visa

application, his final destination. From Iran, Binalshibh traveled on to Afghanistan,
where he delivered a progress report from the operations team to Osama bin Laden and
Ayman al Zawahiri. Binalhshibh returned to Germany on February 28, 2001, to clear out
the Hamburg cell's apartment. Ex. 18; Ex. 2, Timmerman 2nd Affid. ¶¶148-54 and Ex.
B-13 thereto; Ex. 6, Lopez-Tefft Affid. ¶¶272-75.

### Testimony of Abolghasem Mesbahi

147.   Abolghasem Mesbahi was an Iranian regime "insider" who knew many of the Islamic
       regime's top leaders during the 1980s and early 1990s, including Ayatollah Ruhollah
       Khomeinei, the Supreme Leader of Iran until his death in 1989, defendant Ali Akbar
       Hashemi Rafsanjani, who is a former President of Iran and former Speaker of the
       Parliament of Iran, and Saeed Emami, who was a top official of MOIS, and many others.
       Ex. S-1, Testimony of Abolghasem Mesbahi (February 22, 2008), pp. 49-50, 85; Ex. S-3,
       Testimony of Abolghasem Mesbahi (March 1, 2008), pp. 15-18, 75-81; Ex. S-4,
       Testimony of Abolghasem Mesbahi (March 2, 2008), pp. 84, 94-102.

148.   Mesbahi held a number of prominent positions in the diplomatic and intelligence organs
       of the Iranian regime, including a position at the Iranian embassy in France. There, he
       was in charge of espionage for Iran in France until December 1983, when he was
       expelled by the French government. Mesbahi soon returned to Europe, where, based in
       Belgium, he ran Iran's espionage operations throughout Western Europe. Ex. S-1,
       Testimony of Abolghasem Mesbahi (February 22, 2008), pp. 51, 55-71; Ex. S-13,
       Bergman Affid. ¶¶72-73.

149.   Subsequently, Mesbahi played a role in negotiations on behalf of Iran during the
       "Lebanon Hostage Crisis" of the 1980s. Ex. S-1, Testimony of Abolghasem Mesbahi
       (February 22, 2008), pp. 93-95, 102-03.

150.   Mesbahi returned to Iran in 1984-85 to work on the creation and organization of the new
       intelligence service, MOIS. Ex. S-1, Testimony of Abolghasem Mesbahi (February 22,
       2008), pp. 68-71.

151.   During the mid-1980s, the Iranian government believed its best hope to defeat the United
       States, in case of war, was to engage in unconventional warfare strategies. Therefore,
       Iran's government formed a MOIS-IRGC task force that created contingency plans for
       asymmetrical, *i.e.*, unconventional, warfare against the United States. Ex. S-1,
       Testimony of Abolghasem Mesbahi (February 22, 2008), pp. 78-80, 84-86; 88-89.
       During the mid-to-late 1980s, Iran began formulating contingency plans for anti-U.S.
       terrorist operations. *Id.; see also* Ex. 13 (U.S. Department of State Reports, *Patterns of
       Global Terrorism / Country Reports on Terrorism*, 1980-2009 (excerpts *re*: Iran)) at p.
       56.

152.   During the period 1985-86 timeframe, Mesbahi worked on the MOIS-IRGC task force.
       Ex. S-1, Testimony of Abolghasem Mesbahi (February 22, 2008), pp. 78, 84-85.

153.    The MOIS-IRGC task force devised contingency plans aimed at breaking the backbone
        of the American economy, crippling or disheartening the United States and its people,
        and disrupting the American economic, social, military, and political order, all without
        the risk of a head-to-head military confrontation, which Iran knew it would lose. Ex. S-1,
        Testimony of Abolghasem Mesbahi (February 22, 2008), pp. 77-89.

154.    Among other things, this planning group devised a scheme to crash hijacked Boeing 747s
        into major American cities, principally, the World Trade Center in New York, and the
        White House and the Pentagon in Washington, D.C. The contingency plan's code name
        was "*Shaitan dar Atash*" (Farsi for "Satan in Fire" or "Satan in Hell"). Ex. S-1,
        Testimony of Abolghasem Mesbahi (February 22, 2008), pp. 78-80; Ex. S-2, Testimony
        of Abolghasem Mesbahi (February 23, 2008), pp. 77-89; Ex. S-3 (Mesbahi Tr. 3/1/08), p.
        14.

155.    The *Shaitan dar Atash* plan involved the use of tactics such as chemical weapons and
        radioactive "dirty" bombs; bombings of electrical power plants, gas stations, oil tankers
        by the hundreds, and railroads; and the use of passenger airliners as bombs to attack U.S.
        cities, primarily New York, Washington, and Chicago. Boeing 747s were the focus of
        the MOIS-IRGC task force for aircraft hijackings because their large fuel tanks made
        them suitable for high value targets such as the World Trade Center and the Empire State
        Building in New York City, and the White House and the Pentagon in Washington were
        specifically targeted. Ex. S-1, Testimony of Abolghasem Mesbahi (February 22, 2008),
        pp. 77-89.

156.    After falling into disfavor with certain hardline elements of the Islamic regime, Mesbahi
        was arrested and imprisoned several times. After his release, he was banned from official
        government positions. Ex. S-1, Testimony of Abolghasem Mesbahi (February 22, 2008),
        pp. 103-05.

157.    After setting up a private business, Mesbahi was called upon to perform continuing tasks
        for MOIS, using his business as cover. He worked with MOIS front companies involved
        in transactions such as Iraqi oil sales using reflagged (Iranian flag) coastal tankers,
        importation of supercomputers, and weapons procurement deals and other kinds of
        transactions. Ex. S-1, Testimony of Abolghasem Mesbahi (February 22, 2008), pp. 106-
        14.

158.    Mesbahi left Iran in April 1996 after being informed by Saeed Emami, then the number
        two official in MOIS, that he was on a list of persons to be killed. Ex. S-1, Testimony of
        Abolghasem Mesbahi (February 22, 2008), pp. 114-16; Ex. S-3, Testimony of
        Abolghasem Mesbahi (March 1, 2008), pp. 20-23.

159.    Mesbahi obtained a United Nations Refugee card and made his way to Germany, where
        he lived in hiding for a time. Mesbahi became an informant for the German
        *Bundeskriminalamt* ("BKA"), and he was placed in a German witness protection
        program. Ex. S-1, Testimony of Abolghasem Mesbahi (February 22, 2008), pp. 13-18;
        Mesbahi Ex. 1.

160.    Mesbahi was an important witness, at the time anonymously, known as "Witness C" in a German prosecution of Iranian-backed killers who assassinated several Kurdish leaders at the *Mykonos* restaurant in Berlin in September 1992. He was introduced to the German court in the *Mykonos* case by Iran's former president, Abolhassan Banisadr, himself an exile, who was also a witness in this case. Ex. S-1, Testimony of Abolghasem Mesbahi (February 22, 2008), pp. 23-25; Ex. S-4, Testimony of Abolghasem Mesbahi (March 2, 2008), pp. 58-60; Ex. S-10, Timmerman 1st Affid. ¶¶69-71; Ex. S-11, Timmerman 2nd Affid., ¶155 and p. 42, n.51.

161.    The *Mykonos* trial resulted in the convictions of all the defendants and led to a German arrest warrant being issued for MOIS chief Ali Fallahian. The *Mykonos* trial exposed the inner workings of MOIS and the role of the Supreme Leader in matters of terrorism. Ex. S-4, Testimony of Abolghasem Mesbahi (March 2, 2008), pp. 58-60; Ex. S-21, *Mykonos Urteil* (Mykonos Judgment), *Urteil des Kammergerichts Berlin vom* 10. April 1997 (Judgment of the Court of Appeal of Berlin, April 10, 1997), pp. 22-23; *see also* Ex. S-15-20, 22-23.

162.    Mesbahi thereafter assisted other Western prosecutors in criminal matters exposing Iran's involvement in acts of terror, including assistance to Argentinean prosecutors in connection with the AMIA bombing in Buenos Aires in 1994, for which nine (9) Iranians, including high governmental officials, as well as Hizballah master terrorist Imad Mughniyah, were all indicted. Mesbahi named Imad Mughniyah as responsible for the AMIA bombing operation and the Supreme Leader Ayatollah Khamenei for the order authorizing the attack. Mesbahi also named others involved in the AMIA bombing and a subsequent cover-up. Ex. S-1, Testimony of Abolghasem Mesbahi (February 22, 2008), pp. 23, 25-26; March 2, 2008, pp. 61-64, 82-85.

163.    The Argentines indicted nine (9) Iranian officials for the AMIA bombing, and INTERPOL issued Red Notices on six (6) of them. Only through a protracted campaign of resistance did Iran avoid three additional INTERPOL Red Notices naming three (3) very high Iranian officials which would have implicated the state directly in the AMIA bombing. Ex. 10, Adamson Affid. ¶¶21-33; Ex. 2, Timmerman 2nd Affid. ¶¶40-45; Ex. 7, Bergman Affid. ¶¶43-44.

164.    Mesbahi has also assisted other Western prosecutors in criminal investigations and prosecutions exposing Iran's involvement in numerous heinous acts of terror. Ex. S-1, Testimony of Abolghasem Mesbahi (February 22, 2008), pp. 23-24, 26-29; Ex. S-4, Testimony of Abolghasem Mesbahi (March 2, 2008), pp. 67-84; Timmerman 1st Affid. ¶72.

165.    Mesbahi left the German witness protection program in 2000. Ex. S-1, Testimony of Abolghasem Mesbahi (February 22, 2008), pp. 16-18; Ex. S-2, Testimony of Abolghasem Mesbahi (February 23, 2008), pp. 22-23.

166.    Mesbahi remained in contact with two police officers of the German *Landeskriminant*

28

("LKA"), which handles domestic, non-federal criminal matters. Ex. S-2, Testimony of Abolghasem Mesbahi (February 23, 2008), pp. 8-9.

167.    Before he left Iran, Mesbahi had established a code methodology for communicating with trusted friends who worked in sensitive positions in the Iranian government and who he had known for years. Ex. S-2, Testimony of Abolghasem Mesbahi (February 23, 2008), pp. 6-7; Ex. S-3, Testimony of Abolghasem Mesbahi (March 1, 2008), pp. 6-7; Ex. S-9, Sealed Affidavit of Abolghasem Mesbahi, ¶¶8, 17.

168.    From all his experience in intelligence work, Mesbahi was well versed in sophisticated code methodologies. Knowing the volume of sensitive information he possessed, and having fled Iran on a tip from Saeed Emami that he was to be murdered by the regime, Mesbahi's original motivation for establishing a coded message system was so that his friends could alert him in case MOIS were to discover his location and send assassins his way. Ex. S-3, Testimony of Abolghasem Mesbahi (March 1, 2008), pp. 7, 12, 20-23; Ex. S-2, Testimony of Abolghasem Mesbahi (February 23, 2008), pp. 6-7.

169.    On July 23, 2001, Mesbahi received a coded message via an Iranian newspaper from one of these trusted friends inside the Iranian government. Ex. S-2, Testimony of Abolghasem Mesbahi (February 23, 2008), pp. 5-8; Ex. S-9, Sealed Affidavit of Abolghasem Mesbahi, ¶¶17, 61.

170.    The decoded message Mesbahi received was three words: "*Shaitan dar Atash*" which means "Satan in Hell" or "Satan in Fire." Ex. S-2, Testimony of Abolghasem Mesbahi (February 23, 2008), pp. 5-8; Ex. S-1, Testimony of Abolghasem Mesbahi (February 22, 2008), pp. 77-78; Ex. S-9, Sealed Affidavit of Abolghasem Mesbahi, ¶¶17, 61.

171.    In Iran's military-intelligence community, including the MOIS, the IRGC, and the Bassij, the word "Satan" is understood to refer to the United States and its government. Ex. S-1, Testimony of Abolghasem Mesbahi (February 22, 2008), pp. 77-78; Ex. S-5, Testimony of Witness Y (February 24, 2008), pp. 71-72.

172.    Mesbahi knew what this coded message meant because he had worked on the project code-named "*Shaitan dar Atash*" years before while he worked in MOIS. "*Shaitan dar Atash*" was the contingency plan for waging asymmetrical warfare against the United States. Ex. S-1, Testimony of Abolghasem Mesbahi (February 22, 2008), pp. 77-89.

173.    Mesbahi understood that the coded message meant that Iran had activated the "*Shaitan dar Atash*" contingency plan. Ex. S-2, Testimony of Abolghasem Mesbahi (February 23, 2008), pp. 7-8. He did not know which aspect of the contingency plan was being activated, or whether it was some combination of actions, because the "*Shaitan dar Atash*" contingency plan included the use of chemical bombs, "dirty" bombs, attacks on power plants, gas stations, and oil tankers, as well as the hijacking of civilian airliners to be crashed into New York, Washington, and Chicago. Ex. S-9, Sealed Affidavit of Abolghasem Mesbahi, ¶¶65-68.

Case 1:03-cv-09848-GBD-FM   Document 2949   Filed 12/22/07   Page 30 of 53

174.    Mesbahi knew the meaning of the message was serious, and he immediately contacted his former handlers in the German *Landeskriminalamt* (LKA).  Ex. S-2, Testimony of Abolghasem Mesbahi (February 23, 2008), pp. 8-9.

175.    Mesbahi met the officers and told them that a big event was about to happen in America, a huge terrorist operation, and asked the officers to convey this information to relevant authorities.  Ex. S-2 (Mesbahi Tr. 2/23/08), p. 11.  The officers responded that they would convey the information to the higher authorities and would let him know if the authorities responded.

176.    Three (3) weeks later, on August 13, 2001, Mesbahi received another coded message from his sources in Iran, clarifying that the *Shaitan dar Atash* contingency plan that had been activated was the plan to crash hijacked civilian airliners into American cities.  Ex. S-2, Testimony of Abolghasem Mesbahi (February 23, 2008), pp. 11-13; Ex. S-9, Sealed Affidavit of Abolghasem Mesbahi, ¶¶ 69-70.

177.    Again, Mesbahi immediately contacted the two (2) LKA officers and told them about the message, pleading with them for action.  They responded that they had conveyed the earlier message and if there were any developments, they would let him know.  *Id.*, p. 14. Mesbahi emphasized to the LKA officers that many lives were at risk.  Ex. S-2, Testimony of Abolghasem Mesbahi (February 23, 2008), pp. 14-15.

178.    Two (2) more weeks passed, and Mesbahi received a third coded message on August 27, 2001.  *The third message confirmed the activation of "Shaitan dar Atash,"* but added an unspecified reference to Germany.  Ex. S-9, Sealed Affidavit of Abolghasem Mesbahi, ¶¶71-72.

179.    The Mohammad Atta-Ramzi Binalshibh al Qaeda terrorist cell that headed the 9/11 attacks was based Hamburg, Germany.  9/11 REPORT, pp. 160-69.

180.    On September 11, 2001, Mesbahi saw the reports of the 9/11 attacks on television, then he desperately tried to reach the LKA officers, as well as German *Bundeskriminalamt* (BKA) with whom he had previously worked, but he could reach no one.  Ex. S-2, Testimony of Abolghasem Mesbahi (February 23, 2008), pp. 15-17.

181.    One of the LKA officers called Mesbahi on September 13, 2001, and arranged a meeting where Mesbahi was interviewed by a German regional security official.  Mesbahi told the officer that the planning and logistics for the 9/11 attacks were done by Iran.  Ex. S-2, Testimony of Abolghasem Mesbahi (February 23, 2008), pp. 17-20.  The regional security officer appeared not to believe him.  *Id.*, p. 20.

182.    A few days later, Mesbahi tried again to convince the regional security officer; this time, the officer phoned the BKA, but he then told Mesbahi that the BKA was not interested in having a meeting.  Mesbahi pleaded with the officer to contact American authorities, particularly the FBI or the CIA, but the regional security officer said he would not do it. *Id.*, pp. 23-24.

Case 1:03-md-01570-GBD-FM   Document 2049-7   Filed 12/22/07   Page 32 of 53

183.   Mesbahi subsequently called the U.S. embassy in Germany, left a voice message identifying himself and noting that he is "Witness C" from the *Mykonos* case. He stated that he had information about the 9/11 attacks and left his phone number. No one called back. Ex. S-2 (Mesbahi Tr. 2/23/08), p. 26.

184.   Mesbahi tried, through a German journalist, to reach Dr. Manouchehr Ganji, a former Education Minister under the Shah, who had become a noted dissident and who moved from Paris to Washington, D.C. *Id.*, pp. 25-28. Mesbahi wanted Dr. Ganji to put him in touch with the FBI or CIA. Dr. Ganji apparently tried, as he told Mesbahi that someone from the U.S. embassy would call him. But no one called, except one unidentified person who would not give Mesbahi any name or phone, who just wanted his code information. *Id.*, pp. 24-25, 29-30.

185.   Mesbahi then traveled to Berlin and went to the U.S. embassy in person. He told the guard at the door that he is "Witness C of [the] *Mykonos* Court" and that he had important information for the ambassador. He showed his *U.N. refugee card to prove his* identity. However, Mesbahi was told that under no circumstances would any message be taken inside the embassy after September 11, 2001, as the practice had been banned. Seeing the closed circuit television camera, Mesbahi held up his refugee card in front of it so that there would be a record of his attempt. *Id.*, pp. 31-32.

186.   A guard suggested Mesbahi write a letter, so Mesbahi took down the address of the embassy and spent several hours writing what he knew. He brought the letter back to the embassy, but the guards refused to take it. Mesbahi left and mailed the letter. *Id.*, pp. 32-35. Mesbahi never received any response to this letter. *Id.*, pp. 34-35.

187.   Dr. Ganji gave Mesbahi the telephone number of a man in Washington, D.C., the investigative journalist Kenneth Timmerman. Mesbahi and Timmerman spoke over the telephone in late September 2001. *Id.*, pp. 29, 34; Ex. S-10, Timmerman 1st Affid. ¶68.

188.   Mesbahi telephoned Kenneth Timmerman and told him about the *Shaitan dar Atash* messages he had received in the weeks before 9/11, meaning that an Iranian plan for attacking American cities using civilian airliners had been activated, and that he, Mesbahi, had tried to pass this information on to the U.S. Government, without success. Ex. S-11, Timmerman 2nd Affid. p. 157. Ex. S-2 (Mesbahi Tr. 2/23/08), p. 29-30; Ex. S-10, Timmerman 1st Affid. ¶68; Ex. S-11, Timmerman 2nd Affid. ¶¶155, 157-58, 162.

189.   What Mesabahi told Timmerman in September 2001 regarding the *Shaitan dar Atash* messages was consistent with his testimony in *Havlish*. Ex. S-11, Timmerman 2nd Affid. ¶162.

190.   In his videotaped testimony, Mesbahi stated that he received two (2) coded messages concerning "*Shaitan dar Atash*," one in August and the other in early September 2001. As he explained in his separate, sealed affidavit, Mesbahi actually received three (3) such coded messages: the first on July 23, the second on August 13, and the third on August

27, 2001. Ex. S-9, Sealed Affidavit of Abolghasem Mesbahi, ¶¶59-63. Mesbahi refreshed his recollection by finding reproductions of the coded messages from the newspapers. *Id.*, ¶¶13, 19, 69-70.

191. Through his sources inside the Iranian government, Mesbahi also learned that Iran purchased an aircraft flight simulator through a Chinese company called "*Fuktad*," based in Taiwan, with which MOIS had relations. *Fuktad* obtained the simulator from AVIC (Aviation Industries Corporation of China), a Chinese state-owned entity. The simulator was transported to Iran in 2000 by an IRGC front company called "*Safiran*" that was frequently used for clandestine procurement and transport operations. Computer software to program the module to simulate Boeing 757-767-777 aircraft was purchased by for MOIS through East China Airlines. The flight simulator was set up in a very secure, secret facility at *Doshen Tappeh* air base near Tehran. Ex. S-4, Testimony of Abolghasem Mesbahi (March 2, 2008), pp. 15-35, 40, and Mesbahi Ex. 15, 16; Ex. S-11, Timmerman 2nd Affid. ¶¶159-60, and n.53.

192. Based on his source of information, and in light of his professional experience, Mesbahi believes that the simulator was probably used to train the 9/11 hijacker pilots. Ex. S-4 (Mesbahi Tr. 3/2/08), p. 40 and Mesbahi Ex. 16.

193. Iran has never owned any Boeing 757, 767, or 777 aircraft due to international sanctions against their sale to Iran. Ex. S-11, Timmerman 2nd Affid. ¶¶159-60, and n.53; Ex. S-4 (Mesbahi Tr. 3/2/08), p. 35.

194. Each of the four (4) airliners hijacked on September 11, 2001 and used in the 9/11 attacks was a Boeing 757 or 767 model. 9/11 REPORT, pp. 242, 248; Ex. S-11, Timmerman 2nd Affid. ¶161.

195. In late September, 2001, Mesbahi telephoned Kenneth Timmerman and told him about the information he had received about the flight simulator that was installed at *Doshen Tappeh* air base near Tehran. Ex. S-2 (Mesbahi Tr. 2/23/08), p. 29-30; Ex. S-10, Timmerman 1st Affid. ¶68; Ex. S-11, Timmerman 2nd Affid. ¶¶155, 157, 159, 162.

196. What Mesabahi told Timmerman in September 2001 regarding the flight simulator was consistent with his testimony in *Havlish*. Ex. S-11, Timmerman 2nd Affid. ¶162.

197. Mesbahi also learned from his sources inside the Iranian government that at least one of the 9/11 hijackers was present inside Iran before the 9/11 attacks. Majid Moqed, a muscle hijacker on American Airlines Flight 77 (North Tower WTC) was housed at the Hotel *Sepid*, an IRGC-MOIS safe house, on *Nejatolahi* Street in Tehran. Ex. S-4, Testimony of Abolghasem Mesbahi (March 2, 2008), pp. 37-40, and Mesbahi Dep. Ex. 17.

## Iran's Provision of Safe Haven to al Qaeda

198.   Iran provided material support to al Qaeda after the 9/11 attacks in several ways, most significantly by providing safe haven to al Qaeda leaders and operatives, keeping them safe from retaliation by U.S. forces, which invaded Afghanistan.

199.   In the late 1990s, Mustafa Hamid passed communications between Osama bin Laden and the Government of Iran.  In late 2001, while in Tehran, Hamid negotiated with the Iranians to relocate al Qaeda families to Iran after the 9/11 attacks. Ex. 30, U.S. Treasury Department press release, January 16, 2009; Ex. 8, Clawson Affid. ¶53; Ex. 2, Timmerman 2nd Affid. ¶¶213-15.

200.   When the United States-led multi-national coalition attacked the Taliban regime in Afghanistan in the fall of 2001, Iran facilitated the exit from Afghanistan, into Iran, of numerous al Qaeda leaders, operatives, and their families.  The Iran-Afghanistan safe passageway, established earlier to get al Qaeda recruits into and out of the training camps in Afghanistan, was utilized to evacuate hundreds of al Qaeda fighters and their families from Afghanistan into Iran for safe haven there.  The IRGC knew of, and facilitated, the border crossings of these al Qaeda fighters and their families entering Iran.  Ex. 6, Lopez-Tefft Affid. ¶¶278-79; 9/11 AND TERRORIST TRAVEL, p. 67; Ex. 2, Timmerman 2nd Affid. ¶¶171-73; *see also* Ex. 9, Bruguière Affid. ¶32.

201.   Osama bin Laden's friend, Gulbuddin Hekmatyar, who was then in exile in Iran near the Afghan border, was instrumental in the evacuation of al Qaeda into Iran, as were Imad Mughniyah and Iran's *Qods* Force commander Ahmad Vahidi.  Ex. 6, Lopez-Tefft Affid. ¶¶129, 280, 290.

202.   Among the high-level al Qaeda officials who arrived in Iran from Afghanistan at this time were Saad bin Laden and the man who would soon lead "al Qaeda in Iraq," Abu Mussab Zarqawi.  Ex. 2, Timmerman 2nd Affid. ¶171.

203.   The number 2 official of al Qaeda, Ayman al Zawahiri, made particular arrangements for his own family's safe haven in Iran after 9/11, with the aid of his son-in-law Muhammad Rab'a al Sayid al Bahtiyti, an Egyptian-born al Qaeda operative.  Ex. 2, Timmerman 2nd Affid. ¶217 and Ex. B-15 thereto; Ex. 8, Clawson Affid. ¶53.

204.   In late 2001, Sa'ad bin Laden facilitated the travel of Osama bin Laden's family members from Afghanistan to Iran.  Thereafter, Sa'ad bin Laden made key decisions for al Qaeda and was part of a small group of al Qaeda members involved in managing al Qaeda from Iran.  Ex. 34; Ex. 2, Timmerman 2nd Affid. Ex. B-15; Clawson Affid ¶¶54, 62.

205.   There have been numerous instances of al Qaeda operatives and leaders meeting, planning, and directing international terrorist operations from the safety of Iranian territory.  Senior al Qaeda members continued to conduct terrorist operations from inside Iran.  The U.S. intercepted communications from Saef al Adel, then in Mashad, Iran, to al Qaeda assassination teams in Saudi Arabia just before their May 12, 2003 assault on

three (3) housing compounds in Riyadh. Al Qaeda leaders in Iran planned and ordered the Riyadh bombing. Ex. 2, Timmerman 2nd Affid. ¶¶177, 179, 218-219, and Ex. B-15 thereto; Ex. 3, Byman Affid. ¶55; Ex. 6, Lopez-Tefft Affid. ¶¶292-94, 297-300; Ex. 8, Clawson Affid. ¶61.

## Other Findings

206.    A memorandum, dated May 14, 2001, demonstrates Iran's and Hizballah's awareness of, and involvement in, al Qaeda's plans for an impending terrorist strike against the U.S. The memorandum, which has been reviewed and found to be authentic by U.S. and Israeli intelligence, is from Ali Akbar Nateq-Nouri (overseer of the Supreme Leader's intelligence apparatus), speaking for the Supreme Leader, and is addressed to the head of Iran's intelligence operations Mustapha Pourkanad. The memorandum clearly demonstrates Iran's awareness of an upcoming major attack on the United States and directly connects Iran and Imad Mughniyah to al Qaeda and to the planned attack. The memorandum references Iran's "support for al-Qaeda's future plans," and cautions "to be alert to the [possible] negative future consequences of this cooperation [between Iran and al-Qaeda]." The memorandum also states that, while "expanding the collaboration with the fighters of al-Qaeda and Hizballah [Lebanon]," the Supreme Leader "emphasizes that, with regard to cooperation with al-Qaeda, no traces must be left [] that might have negative and irreversible consequences, and that [the activity] must be limited to the existing contacts with [Hizballah Operations Officer Imad] Mughniyeh and [bin Laden's deputy Ayman] al-Zawahiri." Ex. 7, Bergman Affid. ¶¶75-76, and Ex. B thereto.

207.    Iran further assisted al Qaeda's preparations for the 9/11 attacks by assisting in the assassination of Ahmad Shah Massoud, the U.S.-allied leader of Afghanistan's Northern Alliance, two (2) days before September 11, 2001. The assassination of Massoud was critical because he would have would have become America's most important military ally in Afghanistan after 9/11 in any retaliatory counterstrike against al Qaeda in Afghanistan. 9/11 REPORT, pp. 214, 252; Ex. 6, Lopez-Tefft Affid. ¶276; Ex. 7, Bergman Affid. ¶71.

208.    On July 28, 2011, the Obama Administration and the U.S. Treasury Department took actions indicating the U.S. Government's finding that Iran has materially assisted al Qaeda by facilitating the transport of money and terrorist recruits across Iran's territory. *The U.S. Government concluded that there is "an agreement between al-Qaida and the Iranian government . . . demonstrat[ing] that Iran is a critical transit point for funding to support al-Qa'ida's activities in Afghanistan and Pakistan." "This network serves as the core pipeline through which al-Qa'ida moves money, facilitators and operatives from across the Middle East to South Asia . . . ." Ex. 38, U.S. Department of Treasury Press Release (July 28, 2011).*

209.    Obama Administration officials have stated that senior Iranian officials know about the money transfers and allow the movement of al-Qaeda foot soldiers through Iranian territory. Ex. 38, U.S. Department of Treasury Press Release (July 28, 2011).

## Expert Testimony

210. **Dietrich L. Snell**, a highly experienced prosecutor, served as Senior Counsel on the staff of the *National Commission on Terrorist Attacks upon the United States* (commonly known as the "9/11 Commission") between May 2003 and July 2004. Mr. Snell was the Team Leader of the Commission staff assigned to investigate the plot culminated in the 9/11 attack. It was Mr. Snell's responsibility to design and coordinate the staff's investigation of the 9/11 plot ensuring that the Commission considered all relevant evidence gathered from myriad sources — both classified and public record — that were made available to the Commission. Mr. Snell's assignment involved reviewing countless documents and interviewing hundreds of witnesses including law enforcement and intelligence communities in the United States and overseas. Specifically, Mr. Snell supervised the preparation of the Staff Statement on the plot including the drafting and editing of those portions of the 9/11 COMMISSION REPORT that dealt with the plot. Ex. 5, Snell Affid. ¶7.

211. During Mr. Snell's work with the Commission, he became intimately familiar with the FBI's criminal investigation of the 9/11 attack (the "PENTTBOM investigation"), an investigation of unprecedented scope in the history of the FBI. Mr. Snell states the FBI emphasized its view that a substantial number of the nineteen (19) al Qaeda operatives who hijacked the four (4) targeted US airliners likely transited through Iran on their way to and from Pakistan and Afghanistan during and in furtherance of the conspiracy. Snell states that according to the PENTTBOM Team, the willingness of Iranian border officials to refrain from stamping passports of al Qaeda members help explain the absence of a clear document trail showing the travels of those members to and from Afghanistan, the center of al Qaeda training, starting in the late 1990s and leading up to September 11. Ex. 5, Snell Affid. ¶17.

212. Snell notes in his affidavit that senior 9/11 conspirators Ramzi Binalshibh and Khalid Sheikh Mohammed (KSM) provided information tending to corroborate the FBI's evidentiary support that already existed regarding the important role played by Iran in facilitating the 9/11 attack. Ex. 5, Snell Affid. ¶¶20 and 21.

213. In sum, Snell concludes, based on his experience as an investigator, prosecutor, and Senior Staff Member of the 9/11 Commission, that his fellow colleagues on the 9/11 Commission, Dr. Daniel L. Byman and Ms. Janice Kephart, are correct in their analysis that **there is clear and convincing evidence pointing to the involvement on the part of Hezbollah and Iran in the 9/11 attack, especially as it pertains to travel facilitation and safe haven.** Ex. 5, Snell Affid. ¶23.

214. **Dr. Daniel L. Byman** is a professor at Georgetown University and a member of the Brookings Institute. He is a regular consultant to the United States government on terrorism and national security-related matters. Previously, Dr. Byman's professional career involved the CIA and as Research Director of the RAND's Center for Middle East Public Policy. During his time at RAND, Dr. Byman worked closely with the U.S. Military, U.S. intelligence communities and other governmental agencies. Upon leaving

the RAND Corporation in 2002, Dr. Byman joined the House and Senate Intelligence Committees in a joint investigation regarding the 9/11 terrorist attack (the so-called "9/11 Inquiry"). Dr. Byman served as one of the main investigators for the 9/11 Inquiry spending considerable time on al Qaeda. Thereafter, Dr. Byman joined the *National Commission on Terrorist Attacks on the United States*, better known as the "9/11 Commission," with particular emphasis on al Qaeda operations. For both the 9/11 Inquiry and the 9/11 Commission, Dr. Byman travelled to the Middle East to interview many officials. Ex. 3, Byman Affid. ¶¶5-8.

215.  It is Dr. Byman's professional judgment **there is clear and convincing evidence** that Iran has provided material support for al Qaeda in general as defined in 18 U.S.C. §2339A(b)(1). Dr. Byman notes in his affidavit the Iranian assistance predated the 9/11 attack and continued after it, and it had a profound implication on the 9/11 attack itself. Dr. Byman states that over the years the Iranian support included assistance with travel, unlimited safe haven, and some training at the very least. Byman further states that it is quite possible there was additional and far more considerable support but that Iran has deliberately kept its relationship with al Qaeda shrouded and ambiguous. Ex. 3, Byman Affid. ¶14.

216.  Dr. Byman states that one reason for the cooperation between Iran and al Qaeda is that both see the "United States as its enemy . . . both believe the United States is an imperialistic power bent on subjugating Muslims and want to weaken its influence." Iran and al Qaeda also have other foes in common, including pro-Western Arab regimes like Saudi Arabia and Egypt. Iran's relationship towards these countries has vacillated from outright hostility and calls for such regimes to be overthrown to efforts toward conciliation, but the use of violence and the threat of force have been part of its foreign policy towards these states. In short, while Iran and al Qaeda often have wildly different goals regarding many issues, they both want to weaken and hurt many of the same adversaries. Ex. 3, Byman Affid. ¶25.

217.  Dr. Byman notes that al Qaeda has admitted some relationship existed with Iran before 9/11 and al Qaeda justified this on the basis of strategic commonality. Al Qaeda leader, Ayman al-Zawahiri, admitted that before 9/11, Iran and al Qaeda worked together "on confronting the American-lead Zionist/Crusader alliance." Ex. 3, Byman Affid. ¶26.

218.  Dr. Byman's affidavit notes that after 9/11, and before the U.S.-led invasion of Afghanistan, hundreds of al Qaeda members, including many key al Qaeda leaders, and their families, fled Afghanistan and were permitted to enter and stay in Iran. Ex. 3, Byman Affid. ¶29.

219.  In many of its terror operations, Iran used Hizballah as a facilitator [Imad Mughniyah] for many reasons. First, Iran's involvement in Hizballah's creation, large-scale funding, constant provision of training, and role in Hizballah's leadership councils has given Iran an important role in the Lebanese organization. Iran trusts Hizballah and Hizballah trusts Iran – one of the closest relationships in history between a terrorist group and its sponsor. Second, although Hizballah is a Shi'a organization, it is an Arab group, while Iran is a

Persian state. As such, Hizballah has stature in the Arab community and can better bridge the Shi'a-Sunni divide because it is not also suspect due to a difference in ethnicity. Third, Hizballah is highly capable and has a high degree of independence in Lebanon. Thus the training offered at Hizballah camps is superb, and it can be done without having to hide it from the Lebanese government. Finally, working through Hizballah offers Iran some degree of deniability if it chooses, as it places one more degree of separation between the group in question and Iran. Ex. 3, Byman Affid. ¶44.

220. Perhaps the most important form of aid Iran gave al Qaeda prior to 9/11 (and continues to give today) involves the facilitation of travel. Keeping passports "clean" was vital to reducing the risk of discovery and arrest in Saudi Arabia and later the United States. In the mid-1990s, al Qaeda operative Mustafa Hamid negotiated a secret relationship with Iran that allowed safe transit via Iran to Afghanistan. In the years before 9/11, one of al Qaeda's key military commanders, Seif al-Adl, acknowledged transit through Iran to coordinate issues of mutual interest. Ex. 3, Byman Affid. ¶¶46-7.

221. Travel assistance "is invaluable," not only to avoid detection and arrest, but established lines of transit make recruitment and training easier, as individuals can travel to and from training camps without fear of interference. Also, travel facilitation enables better communication and coordination. Even before 9/11, al Qaeda was aware that the United States monitored phones and other forms of communication and recognized that many sensitive deliberations are best done face-to-face. Doing so requires individuals who can travel freely from one area to another. Ex. 3, Byman Affid. ¶50.

222. In the 1990s, individuals linked to al Qaeda received training in explosives in Iran itself. More al Qaeda individuals trained in Hizballah facilities in Lebanon – facilities that were set up by Iran and regularly hosted by Iranian paramilitary personnel. It is Iran's common approach to use both its own people and facilities and "outsourcing" to its close ally Hizballah. Such training included explosives training and on methods pertaining to the collection of intelligence and operational security. Ex. 3, Byman Affid. ¶60.

223. Dr. Byman summarizes his affidavit with a statement that in his judgment, there is strong support for the claim that Iran has provided important material support for al Qaeda including direct travel facilitation for the so-called muscle hijackers as noted in the 9/11 Commission Report. This support comes from a range of sources including U.S. government documents and even a statement by al Qaeda themselves. This Iranian support has helped make al Qaeda the formidable organization it was on 9/11 and remains today. Ex. 3, Byman Affid. ¶69.

224. **Janice L. Kephart** is a border control expert and is former counsel to the U.S. Senate Judiciary Subcommittee on Technology, Terrorism and Government Information. From 2003 to July 2004 Ms. Kephart served as counsel to the the 9/11 Commission. Ms. Kephart was assigned to the "Border Team" and was one of the principal authors of 9/11 AND TERRORIST TRAVEL: A STAFF REPORT OF THE NATIONAL COMMISSION ON TERRORIST ATTACKS UPON THE UNITED STATES. Ex. 4, Kephart Affid. ¶13. Stated otherwise, Ms. Kephart was specifically responsible for all aspects of the 9/11

investigation regarding how and when the 9/11 hijackers attained entry into, and were able to stay in, the United States. Ex. 4, Kephart Affid. ¶26.

225.  Ms. Kephart's analysis of the terrorists' "travel operation" or "terrorist travel" was based, in part, on the examination performed by her team of thousands of travel documents, including the six (6) hijackers' passports which were recovered, and approximately two hundred (200) interviews, including speaking with 26 border inspectors as to hijacker entries. Ex. 4, Kephart Affid. ¶¶31, 33, 37.

226.  Ms. Kephart's affidavit concludes that: (1) facilitation of terrorist travel is crucial material support to terrorist operations; and (2) Iran's facilitation of al Qaeda operative travel, including at least eight (8) 9/11 hijackers, amounted to essential material support, indeed direct support, that further enabled al Qaeda to perpetrate the 9/11 attack successfully. Ex. 4, Kephart Affid. ¶3.

227.  Iran itself, and through its surrogate, Hezbollah, gave direct support to the 9/11 conspirators by Iran's and Hezbollah's active facilitation of hijackers' travel into and out of Afghanistan and by actions of "a senior Hezbollah operative" [Imad Mughniyeh] and travel into Saudi Arabia "to coordinate activities there" and "to assist individuals in Saudi Arabia in traveling to Iran during November" 2001. Ex. 4, Kephart Affid. ¶3.

228.  Ms. Kephart provides expert opinion that al Qaeda's complex and well-executed travel plan that, at a minimum, required complicity by Iranian government officials, including transit through Iran and Afghanistan and into Iran after acquisition of U.S. visas, contributed to the success of the 9/11 operations. Ex. 4, Kephart Affid. ¶3.

229.  Ms. Kephart's sworn testimony states that Iran supported 9/11 hijacker travel into Iran and placed a "senior Hezbollah operative" [Imad Mughniyeh] on flights with slated 9/11 hijackers *immediately after* they had acquired U.S. visas in Saudi Arabia. Kephart continues that keeping those passports "clean" of Iranian or Afghani travel stamps was essential since the critical steps in acquiring U.S. visas were achieved. Ex. 4, Kephart Affid. ¶4.

230.  Ms. Kephart notes that the 9/11 terrorists had engaged **in a specific terrorist travel operation. Kephart notes that not only did the four (4) nearly simultaneous hijackings of four commercial airplanes constituted a coordinated operation, but so did the hijackers' travel. For terrorists, success is often dependent on travel. "For terrorists, travel documents are as important as weapons."** 9/11 COMMISSION REPORT at p. 384. Ex. 4, Kephart Affid. ¶¶37-39 (emphasis added).

231.  Ms. Kephart details that the twenty-six (26) al Qaeda terrorist operatives were whittled down to nineteen (19) hijackers mostly due to failure to obtain U.S. visas. Kephart states twenty-three (23) visas were applied for resulting in twenty-two (22) visas being obtained which involved thirty-four (34) hijackers entering into the United States over a period of twenty-one (21) months. Ex. 4, Kephart Affid. ¶¶35-36, 44.

232.   Ms. Kephart notes that terrorists must travel clandestinely to meet, train, plan, case
       targets, and gain access to attack.  To terrorists, international travel presents great danger,
       because the terrorist must surface to pass through regulated channels, present themselves
       to border security officials, or attempt to circumvent inspection points.  Ex. 4, Kephart
       Affid. ¶41.

233.   Ms. Kephart notes that her study of the nineteen (19) hijackers paints a picture of
       conspirators who put the ability to exploit U.S. border security high on their operational
       security concerns.  *See* 9/11 AND TERRORIST TRAVEL STAFF REPORT at page 130.  Ex. 4,
       Kephart Affid. ¶51.

234.   Ms. Kephart states in her expert opinion the actions of Iranian border authorities in
       refraining from stamping the passports of Saudi hijackers vastly increased the likelihood
       of the operational success of the 9/11 plot.  **"Thus, Iran's facilitation of the hijackers'
       terrorist travel operation constituted material support—indeed direct support—for
       al Qaeda 9/11 attacks,"** says Kephart.  Ex. 4, Kephart Affid. ¶66 (emphasis added).

235.   Shielding the Saudi passports from indicia of travel to Iran and Afghanistan was
       perceived as essential to prevent potential confiscation of passports by Saudi officials, in
       order to hide complicity of Iran in supporting al Qaeda, states Kephart.  Ex. 4, Kephart
       Affid. ¶66.

236.   Ms. Kephart notes that Iran's willingness to permit the undocumented admission and
       passage of al Qaeda operatives and 9/11 hijackers provided key material support to al
       Qaeda.  By not stamping the hijackers' passports, by providing safe passage through Iran
       and into Afghanistan, and by permitting Hezbollah to receive the traveling group and,
       apparently, to actively support the human trafficking of the 9/11 hijackers, Iran, in
       essence, acted as a state sponsor of terrorist travel.  Ex. 4, Kephart Affid. ¶70.

237.   Agreeing with her 9/11 Commission Staff colleagues, Dr. Daniel L. Byman and Mr.
       Dietrich L. Snell, Ms. Janice Kephart concludes that, **"it is my expert opinion that there
       is clear and convincing evidence that Iran and Hezbollah provided material support
       to al Qaeda by actively facilitating the travel of eight to ten of the 9/11 hijackers to
       Iran or Beirut immediately after their acquisition of their U.S. visas and into and
       out of Afghanistan and that these U.S. visas were garnered specifically for the
       purpose of terrorist travel into the United States to carry out the 9/11 attacks."**  Ex.
       4, Kephart Affid. ¶78 (emphasis added).

238.   **Dr. Patrick Clawson** is one of the country's foremost experts on all matters pertaining to
       Iran for the last thirty (30) years.  Dr. Clawson has done consulting work for the Central
       Intelligence Agency, the Defense Intelligence Agency, the National Security Agency, and
       the Defense Department, among other governmental agencies.  Dr. Clawson has lectured
       worldwide on the subject matter of Iran and terrorism.  Dr. Clawson has been qualified
       by federal courts as an expert witness on matters involving Iran approximately twenty-
       five (25) times.  Notably, Dr. Clawson has written widely, including many books and
       scholarly publications on Iran and terrorism in several languages.  Ex. 8, Clawson Affid.

¶¶1-11.

239.   In Dr. Clawson's affidavit, he notes that in the State Department's Annual Reports,
       dating from 1981 through 2010, Iran is consistently cited as the primary state sponsor of
       terrorism throughout the world. Additionally, Dr. Clawson notes that the most
       authoritative U.S. government sources have issued repeated and detailed descriptions of
       Iranian material support to al Qaeda before, during and after the 9/11 attacks. **Noting the
       evidence is clear and convincing,** Dr. Clawson states, "there is simply no ambiguity or
       unclarity in U.S. government statements about this matter." Ex. 8, Clawson Affid. ¶43.

240.   Dr. Clawson notes that Executive Order 13224 issued by the United States Treasury
       Department on January 16, 2009, states that Sa'ad bin Laden, one of Usama bin Laden's
       sons, made key decisions for al Qaeda and was a small group of al Qaeda members that
       was involved in managing the terrorist organization from Iran after September 11, 2001.
       Ex. 8, Clawson Affid. ¶54.

241.   Dr. Clawson notes that "few if any noted terrorism experts would dispute that Iran
       provides material support to al Qaeda within the meaning of 18 U.S.C. § 2339A(b)(1)."
       Ex. 8, Clawson Affid. ¶56.

242.   It is Dr. Clawson's expert opinion that Iran has provided material support for al Qaeda
       before, during and after the events of September 11, 2001. Iranian support of al Qaeda
       through its instrumentalities, the Revolutionary Guard, and MOIS, is consistent with its
       foreign policy of supporting terrorism against the United States. Dr. Clawson asserts that
       without the technical training, funding, cash incentives, and other material support
       provided to terrorist organizations by Iran through its instrumentalities, the IRGC and
       MOIS, it is accepted by most experts that those organizations, such as al Qaeda, would
       not be able to carry out many of their most spectacular terrorist actions. The central
       assistance for material support provided by Iran to al Qaeda regarding September 11,
       2001 is on the present state of the record of travel facilitation and safe haven. Ex. 8,
       Clawson Affid. ¶73, *et seq*.

243.   **Claire M. Lopez and Dr. Bruce D. Tefft** have been engaged by the CIA as undercover
       operations officers and supervisors for over twenty-five (25) years each. While currently
       retired, both are privately retained by various federal contractors engaged in intelligence
       gathering and security matters. Specifically, Bruce Tefft has been found to be certified as
       an expert in the United States District Courts in Washington, DC in approximately seven
       (7) different cases involving terrorism by Iran and Libya. Ex. 6, Lopez-Tefft Affid. ¶12.

244.   Lopez and Tefft conclude in their affidavit that the material support provided by
       Iran/Hezbollah to al Qaeda both before and after September 11 involved, among other
       matters, planning, recruitment, training, financial services, expert advice and assistance,
       lodging and safe houses, false documentation and identification, communications
       equipment, facilities, weapons, lethal substances, explosives, personnel and travel
       facilitation. Ex. 6, Lopez-Tefft Affid. ¶37.

245. Lopez and Tefft also conclude that with regard to the September 11 attacks, Iranian travel facilitation enabled eight (8) to fourteen (14) muscle hijackers to acquire needed Saudi passports and U.S. visas thus ensuring **their continued training** in Afghanistan and **access** to the United States. This travel facilitation to and from Iran, Saudi Arabia and Afghanistan was a vital link in the 9/11 conspiracy, and an indispensible aspect of the terrorist success. Ex. 6, Lopez-Tefft Affid. ¶38.

246. Lopez and Tefft conclude that the Iranian/al Qaeda joint terror attacks against the United States were preceded by the Khobar Towers bombing in 1996, the twin bombings of two (2) United States embassies in Africa in 1998, and the boat suicide bombings of the Destroyer *U.S.S. Cole* off the coast of Yemen in 2000. Lopez and Tefft further conclude that Hezbollah and its terror operations chief Imad Mughniyeh provided explosives, operational planning and training support for all of these al Qaeda attacks against America. Ex. 6, Lopez-Tefft Affid. ¶34.

247. Lopez and Tefft conclude their sworn affidavit by stating, **"we are convinced that the overwhelming evidence assembled in this affidavit leaves no doubt that al Qaeda and the official Iranian Regime at the highest levels have been acting in concert to plot and execute attacks against the United States since early 1990s.** The pan-Islamic alliance that was forged across the supposed Sunni-Shi'a divide has been directed by the Iranian Mullahs in close cooperation with Usama bin Laden, Ayman al-Zawahiri, and other top al Qaeda leaders." Ex. 6, Lopez-Tefft Affid. ¶352 (emphasis added).

248. Lopez and Tefft declare that the al Qaeda-Iran alliance was responsible for all of the most significant terrorist attacks against U.S. national interests from the 1990s up to and including the attacks of September 11. Ex. 6, Lopez-Tefft Affid. ¶353.

249. Lopez and Tefft conclude that the sworn testimony of former MOIS officer, Abolghasem Mesbahi, is generally credible, and, of particular significance is his testimony that the Ayatollah Ruhollah Khomeini initiated contingency plans in the mid-1980s for an operation against the United States Government and American cities, called *"Shaitan dar Atash"* ("Satan in the Fire"). This contingency plan for unconventional or asymmetrical warfare against the United States was the origin of subsequent terror attacks against the United States [Khobar Towers (1996), East African Embassy bombings (1998), U.S.S. Cole (2000)], up to and including the terrorist attacks of 9/11. Osama bin Laden and al Qaeda joined the Iranian operational planning in the early to mid-1990s. See Ex. S-12, Lopez-Tefft Affidavit. (unredacted) ¶45.

250. Lopez and Tefft conclude that Abolghasem Mesbahi's testimony concerning his communication sources inside Iran via coded, encrypted messages and the manner and method of such communications is credible. Also, it is consistent with, and indicative of, sophisticated intelligence trade craft, in particular, communication techniques and methodologies. Lopez and Tefft conclude and credit Mesbahi's testimony that he received from high level sources in Tehran advance notice of a major terrorist attack without specifics of time, date and place within two (2) months of September 11, 2001. See Ex. S-12, Lopez-Tefft Affidavit. (unredacted) ¶46.

251. Lopez and Tefft also conclude that Mesbahi's testimony that an MOIS front company

purchased and installed a flight simulator with Boeing aircraft software at the IRGC's Doshan-Tappeh Airbase inside Iran to train the 9/11 hijacker pilots on Boeing passenger aircraft is credible. Lopez and Tefft also conclude that the testimony provided to the court under seal regarding witnesses Y and Z is generally credible. See Ex. S-12, Lopez-Tefft Affidavit. (unredacted) ¶¶43-49.

252. Lopez and Tefft state it is their "**expert opinion to a reasonable degree of professional certainty** that the Iranian Regime's use of terror and, specifically, its material support of al Qaeda and terroristic attacks, including 9/11, is beyond question." See Ex. 6, Lopez-Tefft Affidavit. ¶50 (emphasis added).

253. **Dr. Ronen Bergman** is an Israeli expert on international intelligence, especially the Mossad and terrorism. Bergman has conducted extensive interviews with many former Iranian intelligence and military personnel, both high-ranking individuals and field operatives, as well as with former political figures of the Iranian Regime. See Ex. 7, Bergman Affidavit at. ¶7.

254. Dr. Bergman is considered one of the principal experts on the Israeli intelligence community's assessment of Iran. See Ex. 7, Bergman Affidavit. ¶9. Dr. Bergman states that his Affidavit is based on "intensive research, including review of thousands of documents, including intelligence material gathered by Israel, United States, France, the United Kingdom, Egypt, Jordan and Germany." See Ex. 7, Bergman Affidavit at. ¶10.

255. Dr. Bergman has lectured widely at universities throughout the world pertaining to issues involving terrorism and is extensively published on the subjects of military, intelligence, espionage, international affairs, law and history. Dr. Bergman has researched and published material about Abolghasem Mesbahi, an Iranian intelligence operative who defected to Germany and became an important intelligence "asset." Dr. Bergman states, "I have read Mesbahi's sworn testimony [in the *Havlish* case] taken February 22 and 23, 2008 in Frankfurt, German and March 1 and 2, 2008 in Paris, regarding his knowledge of an upcoming attack of the West which proved to be the September 11, 2001 attack." See Ex. S-13, Bergman Affidavit. (unredacted) ¶¶10-13.

256. Dr. Bergman notes that Mesbahi is the former head of Iran's entire European intelligence operation. Noting that he engaged "in extensive research of Mesbahi," Dr. Bergman attests that Mesbahi was known to be "an excellent intelligence operative." Dr. Bergman is also familiar with the French intelligence agency (DGSE) information on Mesbahi. As the leader of Iran's MOIS intelligence team in Europe in the 1980s, the Germans recruited Mesbahi as a source of information and evidence. See Ex. S-13, Bergman Affid. (unredacted) ¶72.

257. Dr. Bergman reveals that Mesbahi "became an important asset in the investigation of many assassinations and acts of terror by the Iranian regime and its proxies in several countries… **Mesbahi's testimony has been received with high reliability by the courts and by law enforcement and intelligence agencies worldwide.**" See Ex. S-13, Bergman Affidavit. ¶73 (unredacted) (emphasis added).

Case 1:03-md-01570-GBD-FM   Document 2297   Filed 11/22/07   Page 43 of 53

258. Dr. Bergman notes the U.S. State Department asserts that Iran was involved in one hundred, thirty-three (133) terrorist operations in the nine (9) years between 1987 and 1995 alone; many other acts of terrorism involving hundreds of fatalities preceded and follows this eight-year period. See Ex. 7, Bergman Affidavit. ¶18.

259. Affirming that Hizballah was an Iranian organization from its inception, Bergman confirmed that Imad Fayez Mughniyah was its military leader. See Ex. 7, Bergman Affidavit. ¶¶25 and 29. Bergman asserts that the authorities in the Israeli and American intelligence services believe that Hizballah's Imad Mughniyah conceived, designed, planned, commanded, and/or carried out terrorist operations involving hundreds of deaths, more than any other single figure in the world before his death in Damascus, Syria in February, 2008. See Ex. 7, Bergman Affidavit. ¶¶29-38.

260. Bergman asserts that Mughniyah, as the leading figure in Hizballah's military/terrorism arm, and his top lieutenants, all trained in Iran. See Ex. 7, Bergman Affidavit. ¶¶38-39.

261. Bergman reveals that he has had access to two (2) top-secret, highly classified Israeli documents which disclose: "Iran is aided by Hizballah's operational infrastructure abroad… through… Imad Mughniyah, for the purpose of attacks." The documents also reveal Hizbollah's terrorist training in Iran and clearly states, "Iran usually refrains from carrying out attacks directly, and its involvement usually follows an indirect course." Bergman writes **"that indirect course went through Imad Mughniyah."** See Ex. 7, Bergman Affidavit. ¶¶40-41 (emphasis added).

262. Dr. Bergman confirms other sources that Imad Mughniyah came to Khartoum, Sudan, for a meeting with bin Laden in 1993. There, Mughniyah told bin Laden about the enormously effective tactic of suicide attacks and their role in driving the American and French out of Lebanon in the early 1980s. From this point on, Mughniyah became a major connection point between Iran and al Qaeda. See Ex. 7, Bergman Affidavit. ¶¶58-59.

263. As a result of the 1993 Khartoum meeting, Iran used Hizballah to supply al Qaeda with explosives instruction and to provide bin Laden with bombs. "Much of the al Qaeda training was carried out in camps in Iran run by MOIS," declares Dr. Bergman. See Ex. 7, Bergman Affidavit. ¶61.

264. In 1996 when Osama bin Laden and al Qaeda were forced to leave Sudan, the Iranian intelligence services assisted al Qaeda in moving their operation and members to Afghanistan, Iran, Pakistan, Yemen and Lebanon. See Ex. 7, Bergman Affidavit. ¶64.

265. Dr. Bergman discloses in February 1998, when the veterans of the Egyptian Islamic Jihad, headed by Ayman al Zawahiri, United with al Qaeda, the link between al Qaeda and Iran was strengthened. Dr. al Zawahiri became the chief go-between of al Qaeda and Iran. According to information gathered by the United States National Security Agency and Mossad, al Zawahiri travelled to Iran several times as the guest of MOIS Chief Ali Fallahian and the MOIS Chief of Iranian Operations Abroad, Ahmad Vahidi. See Ex. 7, Bergman Affidavit. ¶67.

266.   Dr. Bergman states Iranian and Lebanese Hizbollah trainers travelled between Iran and
       Afghanistan, transferring to al Qaeda fighters such material as blueprints and drawings of
       bombs, manuals for wireless equipment, instruction booklets for avoiding detection by
       unmanned aircraft. See Ex. 7, Bergman Affid. ¶68.

267.   Dr. Bergman reveals that after al Zawahiri's arrival in Afghanistan, Iranian authorities
       helped him on many occasions to pass weaponry and reinforcements to al Qaeda forces
       across the border from Iran to Afghanistan. Ayman al Zawahiri, who has been marked as
       the successor to Osama bin Laden, according to Israeli intelligence, was responsible for
       planning the attacks on 9/11. See Ex. 7, Bergman Affidavit. ¶69.

268.   After 9/11, according to Dr. Bergman, Iran harbored and sheltered many al Qaeda
       members who fled Afghanistan to avoid the American invasion. In particular, Iran
       harbored Osama bin Laden's son, Saad bin Laden, and Saif al Adel, the number three
       man in al Qaeda and head of its military wing. See Ex. 7, Bergman Affidavit. ¶74.

269.   Dr. Bergman states that both Israeli and American intelligence agents have examined the
       document dated May 14, 2001 from Ali Akbar Nateq Nouri, and concludes that it appears
       to be authentic. Nateq Nouri's document reveals both high-level links between the Iran
       Supreme Leader's intelligence apparatus and al Qaeda and involves knowledge and
       support of a major upcoming operation. See Ex. 7, Bergman Affidavit. ¶75. The
       document states it is the Iranian government's goal to damage America's and Israel's
       "economic systems, discrediting [their] institutions... . . . as part of political
       confrontation, and undermining [their] stability and security..." . . . ." The May 14, 2001
       memo further states that with regard to cooperation with al Qaeda that no traces must be
       left and that future activity must be limited to the **"existing contacts"** between
       Mughniyah and al Zawahiri. See Ex. 7, Bergman Affidavit. ¶76.

270.   Dr. Bergman summarizes his Affidavit by attesting that, based on all of his sources,
       materials, and interviews: ""... it is my expert opinion that the Islamic Republic of Iran
       was, and is, a benefactor of, and provided material aid, resources and support to Osama
       bin Laden and al Qaeda both before and after the attacks of September 11, 2001 on the
       United States.... . . . Iran consistently supports terrorist operations against a number of
       targets throughout the world, including the United States." See Ex. 7, Bergman Affidavit
       at ¶16.

271.   Dr. Bergman states that his opinions are consistent with the conclusion of the *9/11 Report*
       that Iran facilitated travel of hijackers between Iran, Saudi Arabia, and Afghanistan
       within a year before the attacks. Dr. Bergman further attests that travel facilitation
       enabled the acquisition of important travel documents, passports and visas and therefore
       entry into the United States. Finally, Dr. Bergman concurs with many other experts that
       Iran provided safe harbor to the members of the al Qaeda leadership shortly after the 9/11
       attacks. See Ex. 7, Bergman Affidavit. ¶17.

272.   **Kenneth Timmerman**, investigative journalist, author and noted Iran expert, provides an
       expert affidavit (his Second Affidavit) in addition to a fact affidavit (First Affidavit,
       which is sealed). Timmerman's Second Affidavit (Ex. 2, redacted; Ex. S-11,

unredacted), comprising two hundred, nineteen (219) paragraphs, lays out his expert analysis of the early connections between Ayatollah Khomeini and Yasser Arafat, Iran's creation of Hizballah in Lebanon, the emergence of Imad Mughniyah and his long terrorist history, connections between Iran, Hizballah, al Qaeda, and the Taliban, Iran as a travel facilitator for terrorists, and other details from the *Havlish* investigation. Ex. 2, Timmerman 2nd Affid. *passim.*

273.   Timmerman's Second Affidavit states that the 9/11 Commission was given access to thousands of NSA documents, very shortly before the publication date of the 9/11 REPORT. Ex. 2, Timmerman 2nd Affid. ¶¶120-29. These NSA documents, which included electronic intercepts, were described to Timmerman by a member of the 9/11 Commission staff team that conducted the review as showing that Iran had facilitated the travel of the al Qaeda operatives and that Iranian border inspectors had been ordered not to place telltale stamps in the operatives' passports, thus keeping their travel documents clean. Ex. 2, Timmerman 2nd Affid. ¶¶120-24.

274.   In his Second Affidavit, Timmerman states that he was told by the 9/11 Commission staff member that the Iranians were fully aware they were helping operatives who were part of an organization preparing attacks against the United States. Ex. 2, Timmerman 2nd Affid. ¶¶123-24. It was Timmerman who first published the story of the Commission's late discovery of the NSA material. Ex. 2, Timmerman 2nd Affid., ¶¶120-29.

275.   In his Second Affidavit, Timmerman reveals information he received from a 9/11 Commission staff member who identified by name the "senior operative of Hezbollah" who, as well as the senior operative's associate, accompanied some of the 9/11 muscle hijackers on airline flights into and out of Iran and Beirut, Lebanon in the fall of 2000. That "senior Hezbollah operative," referenced cryptically, though not identified by name, in pages 240-241 of the 9/11 REPORT, was the master terrorist Imad Mughniyah – a known agent of Iran. Ex. 2, Timmerman 2nd Affid. ¶¶126-27. Mughniyah, too, was the "senior operative of Hezbollah" who, in October 2000, visited Saudi Arabia to coordinate activities there and who also planned to assist individuals in Saudi Arabia in traveling to Iran during November. Ex. 2, Timmerman 2nd Affid. ¶75.

276.   In his Second Affidavit, Timmerman states: "[I]t is my expert opinion that senior al Qaeda operatives, including their top military planners, sought — and were provided — refuge in Iran after the 9/11 attacks and that they used Iran as a base for additional terrorist attacks after 9/11, with the knowledge, approval, and assistance of the highest levels of Iranian government." Ex. 2, Timmerman 2nd Affid. ¶179; see also ¶¶171-78.

## CONCLUSIONS OF LAW

1.   The Court finds the affidavits offered by plaintiffs' as expert testimony to be admissible pursuant to Fed. R. Evid. 702 and 703. Each of the proffered witnesses are qualified experts by their knowledge, skill, experience, training and/or education on the subject matters of terrorism, the Iran-Hizbollah-al Qaeda connection, and the 9/11 terrorist attacks.

## A. The Court Has Jurisdiction Over All Defendants and All Claims

2.     The Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602–1611, is the sole basis for
       obtaining jurisdiction over a foreign state in the United States. *Argentine Republic v.
       Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989); *Brewer v. Islamic Republic of
       Iran,* 664 F.Supp.2d 43, 50 (D.D.C. 2009).

3.     Although the FSIA provides that foreign states are generally immune from jurisdiction in
       U.S. courts, *see* 28 U.S.C. § 1604, a federal district court can obtain personal and subject
       matter jurisdiction over a foreign entity in certain circumstances. A court can obtain
       personal jurisdiction over a defendant if the plaintiff properly serves the defendant in
       accordance with 28 U.S.C. § 1608. *See* 28 U.S.C. § 1330(b).

4.     Subject matter jurisdiction exists if the defendant's conduct falls within one of the
       specific statutory exceptions to immunity. *See* 28 U.S.C. §§ 1330(a) and 1604. *Owens v.
       Republic of Sudan,* 2011 WL 5966900 (D.D.C. Nov. 28, 2011). Here, this Court has
       jurisdiction because service was proper and defendants' conduct falls within both the
       "state sponsor of terrorism" exception set forth in 28 U.S.C. § 1605A and the
       "noncommercial tort" exception of §1605(a)(5).

### 1. Jurisdiction Related to Claims of U.S. Citizens: The FSIA's State Sponsor of Terrorism Exception

5.     The provisions relating to the waiver of immunity for claims against state-sponsors of
       terrorism are set forth at 28 U.S.C. § 1605A(a). Section 1605A(a)(1) provides that a
       foreign state shall not be immune from the jurisdiction of U.S. courts against claims such
       as those presented here where:

> money damages are sought against [it] for personal injury or death that was
> caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage
> taking, or the provision of material support or resources for such an act if such
> act or provision of material support or resources is engaged in by an official,
> employee, or agent of such foreign state while acting within the scope of his or
> her office, employment, or agency.

6.     The FSIA refers to the Torture Victim Protection Act of 1991 ("TVPA") for the
       definition of "extrajudicial killing." See *28 U.S.C. § 1605A(h)(7).* The TVPA provides
       that:

> the term "extrajudicial killing" means a deliberate killing not authorized by a
> previous judgment pronounced by a regularly constituted court affording all of
> the judicial guarantees which are recognized as indispensable by civilized
> peoples. Such term, however, does not include any such killing that, under
> international law, is lawfully carried out under the authority of a foreign nation.

*28 U.S.C. § 1350* note; see also *Valore v. Islamic Republic of Iran,* 700 F. Supp. 2d 52,
74 (D.D.C. 2010) (adopting the TVPA definition of "extrajudicial killing" in bombing of

Case 1:03-cv-09848-GBD   Document 49-76   Filed 12/22/17   Page 48 of 53

U.S. Marine barracks in Beirut, Lebanon).

7. Here, plaintiffs have established that their injuries were caused by the defendants' acts of "extrajudicial killing" and/or the provision of "material support" for such acts. *See Doe v. Bin Laden*, 2011 WL 5301586 (2nd Cir. Nov. 7, 2011).

8. For a claim to be heard under the immunity exception of § 1605A, the foreign state defendant must have been designated by the U.S. Department of State as a "state sponsor of terrorism" at the time the act complained of occurred.[6]  *Id.*

9. The U.S. Secretary of State designated Iran as a state sponsor of terrorism on January 19, 1984, and Iran has been so designated ever since. *See* Ex. 8, Clawson Affid. ¶40; Ex. 7, Bergman Affid. ¶18; *see also Estate of Heiser v. Islamic Republic of Iran*, 466 F.Supp.2d 229 (D.D.C. 2006); *Flatow v. Islamic Republic of Iran*, 999 F.Supp. 1, 11. (D.D.C. 1998).[7]

10. Finally, subsection (a)(2)(A)(ii) requires that claims under the immunity exception of § 1605A may be brought where the "claimant or the victim was, at the time the act ... occurred -- (I) a national of the United States; (II) a member of the armed forces; or (III) otherwise an employee of the Government of the United States ... acting within the scope of the employee's employment...." 28 U.S.C. § 1605A(a)(2)(A)(ii)

11. Plaintiffs have presented evidence that they were either themselves nationals of the United States at the time of the September 11 attacks, or their claims are derived from injuries to victims who were U.S. nationals. Plaintiffs have satisfied the jurisdictional requirement of §1605A(a)(2)(A)(ii).

### *2. Plaintiffs Have Satisfied the Personal Jurisdiction Requirement of Providing Defendants Notice of the Lawsuit Through Proper Service of Process*

12. Courts may exercise personal jurisdiction over a foreign state where the defendant is properly served in accordance with 28 U.S.C. § 1608. Plaintiffs satisfied the service requirements of § 1608 as follows:

 a. Service of process was completed upon each defendant named in the First Amended Complaint:  The Islamic Republic of Iran was served with process on October 9,

---

[6] The Secretary of State designates state sponsors of terrorism pursuant to three statutory authorities: §6(j) of the Export Administration Act of 1979, 50 U.S.C. app. § 2405(j); §620A of the Foreign Assistance Act, 22 U.S.C. §2371; and §40(d) of the Arms Export Control Act, 22 U.S.C. §2780(d).

[7] In its August 2010 *Country Reports on Terrorism*, the State Department reported that "Iran remained the most active state sponsor of terrorism," and "Iran's financial, material, and logistic support for terrorist and militant groups throughout the Middle East and Central Asia had a direct impact on international efforts to promote peace, threatened economic stability in the Gulf and undermined the growth of democracy." Ex. 13, U.S. Department of State, *Country Reports on Terrorism 2009*, p. 182. *See* http://www.state.gov/s/ct/rls/crt/2009/index.htm. This report echoes similar State Department conclusions about Iran's material support for terrorism for three decades. *See* Ex. 13; Ex. 6, Lopez-Tefft Affid. ¶¶66-95; Ex. 8, Clawson Affid. ¶¶40-42.

2002, pursuant to 28 U.S.C. § 1608(a)(4) [U.S.D.C., District of Columbia Docket No. 1:02-cv-305 (JR) Entry 35 and Entry 36]; Ayatollah Ali Hoseini-Khamenei was served with process on September 30, 2002 and October 3, 2002 by alternative service pursuant to Fed.R.Civ.P. 4(f) and the Order of the Honorable James Robertson dated September 30, 2002 [U.S.D.C., District of Columbia Docket No. 1:02-cv-305 (JR) Entry 32 and Entry 35]; the Iranian Ministry of Information and Security was served with process on October 9, 2002, pursuant to 28 U.S.C. § 1608(a)(4) [U.S.D.C., District of Columbia Docket No. 1:02-cv-305 (JR) Entry 35 and Entry 36]; The Islamic Revolutionary Guard Corps. was served with process on October 9, 2002, pursuant to 28 U.S.C. § 1608(a)(4) [U.S.D.C., District of Columbia Docket No. 1:02-cv-305 (JR) Entry 35 and Entry 36]; Hezbollah was served with process on October 9, 2002, pursuant to 28 U.S.C. § 1608(a)(4) [U.S.D.C., District of Columbia Docket No. 1:02-cv-305 (JR) Entry 35 and Entry 36]; The Iranian Ministry of Petroleum was served with process on October 9, 2002, pursuant to 28 U.S.C. § 1608(a)(4) [U.S.D.C., District of Columbia Docket No. 1:02-cv-305 (JR) Entry 35 and Entry 36]; The Iranian Ministry of Economic Affairs and Finance was served with process on October 9, 2002, pursuant to 28 U.S.C. § 1608(a)(4) [U.S.D.C., District of Columbia Docket No. 1:02-cv-305 (JR) Entry 35 and Entry 36]; The Iranian Ministry of Commerce was served with process on October 9, 2002, pursuant to 28 U.S.C. § 1608(a)(4) [U.S.D.C., District of Columbia Docket No. 1:02-cv-305 (JR) Entry 35 and Entry 36]; the Iranian Ministry of Defense and Armed Forces Logistics was served with process on October 9, 2002, pursuant to 28 U.S.C. § 1608(a)(4) [U.S.D.C., District of Columbia Docket No. 1:02-cv-305 (JR) Entry 35 and Entry 36].

b.  Service of process was completed upon each of the non-sovereign defendants named in the First Amended Complaint: Sheik Usamah bin-Muhammad bin-Laden, a/k/a Osama bin-Laden, The Taliban, a/k/a the Islamic Republic of Afghanistan, Muhammed Omar, Al Qaeda/Islamic Army and Unidentified Terrorist Defendants 1 – 500 were served by publication on September 4, 11, 18, 25 and October 2, 2002 pursuant to Fed.R.Civ.P. 4(f) and the Order of the Honorable James Robertson dated May 9, 2002 [U.S.D.C., District of Columbia Docket No. 1:02-cv-305 (JR) Entry 11, Minute Entry, dated May 9, 2002, granting Motion set forth in Entry 11 and Entry 35].

c.  Service of Process was completed upon defendants newly identified in the Second Amended Complaint: The Central Bank of the Islamic Republic of Iran was served January 7, 2007 at 9:49 a.m. pursuant to 28 U.S.C. § 1608(a)(3) [Docket Entry 2033]; the National Iranian Petrochemical Company was served January 8, 2007 at 9:32 a.m. pursuant to 28 U.S.C. § 1608(a)(3) [Docket Entry 2033]; National Iranian Oil Company was served January 7, 2007 at 2:45 p.m. pursuant to 28 U.S.C. § 1608(a)(3) [Docket Entry 2033]; National Iranian Tanker Corporation was served January 9, 2007 at 8:35 a.m. pursuant to 28 U.S.C. § 1608(a)(3) [Docket Entry 2033]; Iran Air was served January 5, 2007 at 1:28 p.m. pursuant to 28 U.S.C. § 1608(a)(3) [Docket Entry 2033]; National Iranian Gas Company was served January 20, 2007 at 11:09 a.m. pursuant to 28 U.S.C. § 1608(a)(3) [Docket Entry 2033].

Case 1:03-md-01570-GBD-SN   Document 2049   Filed 12/22/07   Page 49 of 53

 

   d.  Plaintiffs made additional service of the Second Amended Complaint upon defendants that were previously served with the First Amended Complaint and determined to be in default by Judge Robertson: Iranian Ministry of Petroleum was re-served January 9, 2007 at 7:46 a.m. pursuant to 28 U.S.C. § 1608(a)(3) [Docket Entry 2033]; Iran Ministry of Economic Affairs and Finance was re-served January 9, 2007 at 9:24 a.m. pursuant to 28 U.S.C. § 1608(a)(3) [Docket Entry 2033]; Iran Ministry of Commerce was re-served January 7, 2007 at 2:45 p.m. pursuant to 28 U.S.C. § 1608(a)(3) [Docket Entry 2033].

   e.  On December 23, 2002, Nancy M. Mayer-Whittington, Clerk of the United States District Court, District of Columbia, entered defaults, pursuant to Fed.R.Civ.P. 55(a) for failure to plead or otherwise defend this action, against the following defendants: The Islamic Republic of Iran; Iranian Ministry of Information and Security; The Islamic Revolutionary Guard Corps.; Hezbollah; Iranian Ministry of Petroleum; Iranian Ministry of Economic Affairs and Finance; Iranian Ministry of Commerce; Iranian Ministry of Defense and Armed Forces Logistics; Ayatollah Ali Hoseini Khamenei.

   f.  On December 27, 2007 J. Michael McMahon, Clerk of the Court, United States District Court, Southern District of New York, entered defaults, pursuant to Fed.R.Civ.P. 55(a) for failure to plead or otherwise defend this action against the following defendants: Central Bank of the Islamic Republic of Iran; National Iranian Petrochemical Company; National Iranian Oil Company; National Iranian Tanker Company; Iran Air; National Iranian Gas Company; Iran Ministry of Defense and Armed Forces Logistics; Iran Ministry of Petroleum; Iran Ministry of Economic Affairs and Finance; Iran Ministry of Commerce and acknowledged the earlier entry of defaults by the U.S.D.C., District of Columbia [Docket Entry 2124-9].

13.   As described above, Plaintiffs properly effected service on all Defendants and Defendants did not respond or make an appearance within 60 days. As Defendants received notice through proper service in accordance with § 1608, this Court has personal jurisdiction over them.

## B.  Defendants Are Liable for Damages to U.S. National Plaintiffs Under FSIA § 1605A

14.   Once jurisdiction has been established over Plaintiffs' FSIA claims, the entry of judgment against defendants is appropriate where plaintiffs have established their claim by evidence satisfactory to the Court. 28 U.S.C. § 1608(e). The Court finds that Plaintiffs have satisfied that burden here.

15.   Plaintiffs who are U.S. nationals have asserted claims against Defendants under section 1605A(c) which authorizes claims against state sponsors of terrorism to recover compensatory and punitive damages for personal injury or death as follows:

     (c) Private right of action.--A foreign state that is or was a state sponsor of terrorism as described in subsection (a)(2)(A)(i), and any official, employee, or

Case 1:03-md-01570-GBD-SN   Document 2497   Filed 12/02/10   Page 50 of 53

agent of that foreign state while acting within the scope of his or her office, employment, or agency, shall be liable to--

(1) a national of the United States,

(2) a member of the armed forces,

(3) an employee of the Government of the United States, or of an individual performing a contract awarded by the United States Government, acting within the scope of the employee's employment, or

(4) the legal representative of a person described in paragraph (1), (2), or (3), for personal injury or death caused by acts described in subsection (a) (1) of that foreign state, or of an official, employee, or agent of that foreign state, for which the courts of the United States may maintain jurisdiction under this section for money damages. In any such action, damages may include economic damages, solatium, pain and suffering, and punitive damages. In any such action, a foreign state shall be vicariously liable for the acts of its officials, employees, or agents.

28 U.S.C. § 1605A(c).

16. The 9/11 terrorist attacks are contrary to the guarantees "recognized as indispensable by civilized peoples." 28 U.S.C. § 1350 note. Accordingly, the 9/11 attacks and the resulting deaths constitute "extrajudicial killings" that give rise to private right of action under 28 U.S.C. § 1605A(c).

17. The provision of "material support or resources" includes "any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, [and] personnel." *18 U.S.C. § 2339A(b)*. As described in detail above, defendants provided several kinds of material support to al Qaeda.

18. Plaintiffs have established by evidence satisfactory to the Court that the Islamic Republic of Iran provided material support and resources to al Qaeda for acts of terrorism, including the extrajudicial killing of the victims of the September 11, 2001 attacks. The Islamic Republic of Iran provided material support or resources, within the meaning of 28 U.S.C. § 1605A, to al Qaeda generally. Such material support or resources took the form of, *inter alia*, planning, funding, facilitation of the hijackers' travel and training, and logistics, and included the provision of services, money, lodging, training,[8] expert advice or assistance, safehouses, false documentation or identification, and/or transportation.

---

[8] Plaintiffs established that the Iranian government both trained al Qaeda members and authorized the provision of training by Hizballah. This support qualifies as "training, expert advice or assistance" under *18 U.S.C. § 2339A(b)*. See *§ 2339A(b)(2) and (3)* (defining "training" as "instruction or teaching designed to impart a specific skill, as opposed to general knowledge" and "expert advice or assistance" as "advice or assistance derived from scientific, technical or other specialized knowledge").

Case 1:03-md-01570-GBD-SN   Document 2947   Filed 04/09/15   Page 52 of 53

19.    Beyond the evidence that the Islamic Republic of Iran provided general material support or resources to al Qaeda, plaintiffs have established that Iran provided direct support to al Qaeda specifically for the attacks on the World Trade Center, the Pentagon, and Washington, DC (Shanksville, Pennsylvania), on September 11, 2001. Such material support or resources took the form of, *inter alia*, planning, funding, facilitation of the hijackers' travel and training, and logistics, and included the provision of services, money, lodging, training, expert advice or assistance, safehouses, false documentation or identification, and/or transportation.

20.    Such provision of material support or resources by various Iranian officials, including, but not limited to, Iran's Supreme Leader the Ayatollah Ali Khamenei and his subordinates, by officers of the IRGC/Qods Force, by the MOIS, and by the intelligence apparatus of the Supreme Leader, was engaged in by Iranian officials, employees, or agents of Iran while acting within the scope of his or her office, employment, or agency.

21.    Hizballah was created by Iran, is funded by, and serves as Iran's proxy and agent, particularly in matters of international terrorism, and was doing so before, contemporaneously with, and after, September 11, 2001.

22.    Hizballah provided material support, within the meaning of 28 U.S.C. § 1605A, to al Qaeda generally. Such material support or resources took the form of, *inter alia*, planning, funding, facilitation of the hijackers' travel and training, and logistics. Such material support or resources included services, money, lodging, training, expert advice or assistance, safehouses, false documentation or identification, and/or transportation.

23.    Beyond the evidence that Hizballah provided general material support or resources to al Queda, plaintiffs have established that Hizballah provided direct support to al Qaeda specifically for the attacks on the World Trade Center, the Pentagon, and Washington, D.C. (Shanksville, Pennsylvania), on September 11, 2001. Such material support or resources took the form of, *inter alia*, planning, funding, facilitation of the hijackers' travel and training, and logistics, and included the provision of money, lodging, training, expert advice or assistance, safehouses, false documentation or identification, and/or transportation.

24.    Such provision of material support or resources by various Hizballah officials, including, but not limited to, Imad Fayez Mughniyah, was engaged in by such persons as agents of Iran while acting within the scope of their agency.

25.    After the 9/11 attacks, Iran again gave material support or resources to al Qaeda by, *inter alia*, facilitating the escape of some of al Qaeda's leaders and many of its operatives from the U.S.-led invasion of Afghanistan in late 2001 and early 2002. Such material support or resources took the form of, *inter alia*, planning, funding, facilitation of the hijackers' travel and training, and logistics, and included the provision of services, money, lodging, training, expert advice or assistance, safehouses, false documentation or identification, and/or transportation.

26.    After the 9/11 attacks, Hizballah continued to give material support or resources to al Qaeda by, *inter alia*, facilitating the escape of some of al Qaeda's leaders and many of its operatives from the U.S.-led invasion of Afghanistan in late 2001 and early 2002. Such material support or resources took the form of, *inter alia*, planning, funding, facilitation

of the hijackers' travel and training, and logistics, and included the provision of services, money, lodging, training, expert advice or assistance, safehouses, false documentation or identification, and/or transportation.

27.   Since the 9/11 attacks, and continuing to the present day, Iran continues to provide material support and resources to al Qaeda in the form of safe haven for al Qaeda leadership and rank-and-file al Qaeda members.

28.   Such provision of material support or resources since the 9/11 attacks by various Iranian officials, including, but not limited to, Iran's Supreme Leader the Ayatollah Ali Khamenei and his subordinates, by officers of the IRGC/Qods Force, by the MOIS, and by the intelligence apparatus of the Supreme Leader, has been engaged in by Iranian officials, employees, or agents of Iran while acting within the scope of his or her office, employment, or agency.

29.   Such provision of material support or resources since the 9/11 attacks by various Hizballah officials, including, but not limited to, Imad Fayez Mughniyah, has been engaged in by such persons as agents of Iran while acting within the scope of their agency.

30.   The FSIA also requires that the extrajudicial killings be "caused by" the provision of material support. The causation requirement under the statute is satisfied by a showing of proximate cause. Proximate causation may be established by a showing of a "reasonable connection" between the material support provided and the ultimate act of terrorism. *Valore*, 700 F. Supp. 2d at 66. "Proximate cause exists so long as there is 'some reasonable connection between the act or omission of the defendant and the damages which the plaintiff has suffered.'" *Id.* (quoting *Brewer*, 664 F. Supp. 2d at 54 (construing causation element in 28 U.S.C. § 1605A by reference to cases decided under 28 U.S.C. § 1605(a)(7))).

31.   Plaintiffs have demonstrated several reasonable connections between the material support provided by defendants and the 9/11 attacks. Hence, plaintiffs have established that the 9/11 attacks were caused by Defendants' provision of material support to al Qaeda.

32.   Under the FSIA, "a 'foreign state' . . . includes a political subdivision of a foreign state or an agency or instrumentality of a foreign state" as defined in the FSIA. 28 U.S.C. §1603(a). The FSIA defines the term "agency or instrumentality of a foreign state" as any entity (1) which is a separate legal person, corporate or otherwise, and (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and (3) which is neither a citizen of . . . the United States . . . nor created under the laws of any third country. 28 U.S.C. §1603(b)(1)-(3); *see Estate of Heiser, et al. v. Islamic Republic of Iran*, No. 00-cv-2329 (RCL), Consolidated With No. 01-cv-2104 (RCL) (D.D.C. August 10, 2011). Accordingly, Iran's Ministry of Information and Security, the Islamic Revolutionary Guard Corps, Iran's Ministry of Petroleum, Iran's Ministry of Economic Affairs and Finance, Iran's Ministry of Commerce, and Iran's Ministry of Defense and Armed Forces Logistics, which are all political subdivisions of Defendant Iran, are all legally identical to Defendant Iran for purposes liability under the FSIA.

33.     Further, Defendants Hizballah, the National Iranian Tanker Corporation, the National Iranian Oil Corporation, the National Iranian Gas Company, Iran Airlines, the National Iranian Petrochemical Company, and the Central Bank of the Islamic Republic of Iran, at all relevant times acted as agents or instrumentalities of defendant Iran. Each of these Defendants is subject to liability under as agents of Iran under §1606A(c) of the FSIA and as co-conspirators, aiders and abetters under the ATCA.

34.     The two Iranian individuals, Defendant Ayatollah Ali-Hoseini Khamenei and Ali Akbar Hashemi Rafsanjani, each are an "official, employee, or agent of [Iran] . . . acting with the scope of his or her office, employment, or agency" and therefore, Khamenei and Rafsanjani are legal equivalent to defendant Iran for purposes of the FSIA which authorizes against a cause of action against them to the same extent as it does a cause of action against the "foreign state that is or was a state sponsor of terrorism" itself. 28 U.S.C. §1605A(c). Each of these Defendants is subject to liability under as agents and officials of Iran under §1606A(c) of the FSIA and as co-conspirators, aiders and abetters under the ATCA.

35.     Iran is liable for damages caused by the acts of all agency and instrumentality Defendants because "[i]n any such action, a foreign state shall be vicariously liable for the acts of its officials, employees, or agents." *Id.* 28 U.S.C. §1605A(c). [9]

The above Findings of Fact and Conclusions of Law are hereby entered.

DATED   DEC ___ 2011

*George B. Daniels*

George B. Daniels
United States District Judge

---

[9]  Plaintiffs have also asserted state law claims for wrongful death, survival, intentional infliction of emotional distress, and conspiracy. In circumstances where the federal cause of action is not available, courts must determine whether a cause of action is available under state or foreign law and engage in a choice of law analysis. *Owens v. Republic of Sudan*, 2011 WL 5966900 (D.D.C. 2011). Because the Court finds that defendants are liable under plaintiffs' federal claims, an analysis of liability under state law is unnecessary.