**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------X
IN RE TERRORIST ATTACKS ON SEPTEMBER 11, 2001 :   **PLAINTIFFS' OBJECTIONS**
  :  **TO MAGISTRATE**
  :  **JUDGE'S REPORT AND**
  :  **RECOMMENDATION;**
  :  **REQUEST FOR REFERRAL**
  :  **BACK TO THE MAGISTRATE**
  :  **JUDGE; ALTERNATIVELY,**
  :  **REQUEST FOR EXTENSION**
  :  **OF TIME**
  :
  :  1:03 MDL 1570 (GBD) (SN)
-------------------------------------------------------------------X

This Document Relates to
<u>Hoglan, et al. v. Iran, et al.</u>
1:11-cv-07550 (GBD) (SN)

      Pursuant to Federal Rule of Civil Procedure 72(b), 28 U.S.C. §636(b)(1)(C), and Local Rule 72.1, certain of the *Hoglan* Plaintiffs, through counsel, hereby respectfully object to portions of the Magistrate Judge's Report and Recommendation ("R&R II") (Doc. 172), issued October 14, 2016.  Specifically, those *Hoglan* Plaintiffs for whom the Magistrate Judge recommended no awards, on grounds that they did not demonstrate functional equivalence of an immediate family relationship to a 9/11 decedent, object to such findings.  These Plaintiffs assert that the Magistrate Judge erred in not recommending awards for them where the evidence demonstrates that they are functional equivalents of immediate family members of 9/11decedents, and therefore, should have been awarded solatium damages.

      Simultaneously, based upon the discussion at the status conference held before the Magistrate Judge on October 20, 2016, Plaintiffs request that the claims of these objecting Plaintiffs be referred back to the Magistrate Judge for further briefing and reconsideration of the functional equivalency of immediate family member relationships.  Other cases in these MDL

proceedings present issues similar to those of the *Hoglan* plaintiffs who assert functional equivalency to immediate family members of decedents who died on 9/11, and they have not yet been briefed at all.  Clearly, the jurisprudence in one case may affect all the cases.  Further, the exigencies of time due to the pendency of the claims process for the U.S. Victims of State Sponsored Terrorism Fund, a matter which have been raised by the Plaintiffs in *Hoglan* and other cases and were noted by the Magistrate Judge in her Reports and Recommendations, urged expedited rendering of Reports and Recommendations (for which the *Hoglan* Plaintiffs are duly grateful).  Such exigencies may, however, have hampered full consideration of the very difficult functional equivalency issues.  For example, the Magistrate Judge did not specifically address all the claims of the individual *Hoglan* Plaintiffs.  In any event, the Magistrate Judge informed the parties at the October 20 status conference that further briefing and reconsideration of the entire issue would be the best course, to which all parties agreed.[1]  A briefing schedule that extends to

---

[1]  Some of the salient points at the October 20, 2016, hearing including the following:

> MR. FLEMING:  We didn't file a formal 54(b) motion, but we wanted to make sure that those do get acted on because we do plan to file some objections for some of the persons who were not found to be functional equivalents of immediate family.  And we didn't want the filling of those objections to delay an entry of judgment for those who did receive a recommendation and would, in our view, be eligible for the VSST fund.  So if there is anything else to do, we stand ready to do that, but we think we made that clear to Judge Daniels in our letter to him.  (p. 11)
> . . . .
>
> MR. BAUMEISTER:  So the point is here we have two classes of people that clearly we, in our *Bauer* complaint, are filing default judgments on behalf, and that is the parents and siblings who were not covered by the VCF fund, and the tangential relationship people, whether or not they can recover from the Iran fund or not.  We will get you additional briefing to see whether the nexus of the relationship is good enough for the Court to hold they're entitled as a beneficiary to get money under the default judgment.  So this is a long-winded way of saying that these are the issues that are confronting the Court and us as attorneys

representing our clients, these are the classes of people.  And we would also ask that the Court, if you -- like *Hoglan*, I think as a practical matter, whether someone was a stepfather and not within the intestacy or the direct lineage you want additional evidence, we would be happy to give that to you.  But we would like to see, if all possible -- we understand the Court has been incredibly responsive, working very hard and getting us very quick answers -- to understand people with a relationship test becomes a question mark, we would like to have a chance to brief that issue but not hold up the people who fall into the class as parents and siblings, so we get a default judgment so we get in front of Ken Feinberg before the money runs out or maybe supplement it.  (p. 14)

. . . .

MR. KREINDLER:  While we're talking about the solatium claims, it's clear that siblings have those claims.  When we're talking about more remote family members, uncle, aunts, stepparents, half siblings, it might be helpful for the Court for us to, along with briefing punitive damages, submit a brief on how wide we believe the circle should go, because we're dealing with 3,000 deaths and the circle could grow very, very large.  So rather than just dealing with it on the basis of the relative handful of cases you have so far, it might make sense to do some briefing on functional equivalent and who can participate.  (pp. 21-22)
. . . .

THE COURT:  So let me talk a little bit about the potential objections to non-immediate family members.  It seems to me, again as a procedural matter, we issued an order recommending damages for certain non-immediate family members, stepfamily members and people who are not married but were functional equivalents to spouses, and we denied the balance of the non-immediate family members.  I think that the appropriate procedure would be to lodge objections as to those claims. I appreciate the comment that you never really had the opportunity to brief the issue, and I think it would be fair and appropriate to give you that opportunity, even arguably to do that before me in the first instance if Judge Daniels would prefer that.  (p. 23)
. . . .

THE COURT:  So I'm fine having briefing on these sort of third-tier family members, but I do think an objection should be lodged before Judge Daniels to preserve your rights.  And so I can notify Judge Daniels that you're going to submit an objection, just maybe even a statement of objection, and I can speak with him procedurally about what makes the most sense on how to then actually set forth that objection.  I think what you wanted is the non-objectionable judgments to go forward, and so it seems to me I think the most simple way to go forward would be to submit a short letter to Judge Daniels asking that he enter the partial judgments that have been recommended by me, for you to lodge objections, and I can ask Judge Daniels to sort of re-refer that issue back to me

January 13, 2017, was set by the Magistrate Judge for the functional equivalence and punitive damages issues.

Accordingly, following the Magistrate Judge's guidance, we hereby formally lodge objections to the denials of functional equivalent immediate family member status for all *Hoglan* Plaintiffs for whom the Magistrate Judge did not recommend any award in her second Report and Recommendation, issued October 14, 2016, and in her third Report and Recommendation, issued October 16, 2016.  We further request that the claims of *Hoglan* Plaintiffs who were so denied in those Reports and Recommendations be re-referred to the Magistrate Judge for further briefing and recommended decision.

In the alternative, in the event that the Court declines to make such a referral back to the Magistrate Judge, we request a two-week extension of time to brief more fully the issues pertaining to the objecting *Hoglan* Plaintiffs.

We state no objection to the Magistrate Judge's recommendation on the issue of the prejudgment interest rate to be applied in this case.  Nor do we object to the Magistrate Judge's recommendation that punitive damages be denied without prejudice to a further application for punitive damages.  The *Hoglan* Plaintiffs do intend to make such an application for punitive damages, and the Magistrate Judge has set that issue for briefing by January, 13, 2017.

Should the Court decline to make the referral back to the Magistrate Judge, and decline also to grant an extension of time, the objecting *Hoglan* Plaintiffs would nevertheless state the following for their objections.

---

and I can look at punitive damages and these non-immediate family member claims at once at a reasonable briefing schedule.  But I think as a procedural matter you should lodge an objection so you haven't waived your right to object to the denials.  (p. 25)

## I.   **OBJECTIONS**

The Magistrate Judge's first Report and Recommendation in this case ("R&R I") (MDL Doc. 3358), filed October 12, 2016, recommends compensatory damages awards for 13 of the 15 Estates represented in this case and for 190 of the 278 individual family member Plaintiffs. The Magistrate Judge's R&R II recommends awards to 13 additional plaintiffs as the functional equivalents of immediate family members.[2]  R&R II further recommends that all other non-immediate family members' claims be denied because they had not proven that they were functional equivalents of immediate family members.[3]

The Court should decline to adopt the Magistrate Judge's R&R II insofar as it pertains to the rejected non-immediate family members. Instead, this Court should grant awards to all those Plaintiffs whose claims were denied. In particular, the following twenty-five (25) *Hoglan* Plaintiffs, whose claims' merits the Magistrate Judge did not specifically address, fit the Magistrate Judge's own analysis of the factors and criteria indicative of functional equivalency of immediate family members as pertaining to solatium claims, as follows:

A. Twelve *Hoglan* Plaintiffs fit squarely within the Magistrate Judge's analysis pertaining to

---

[2]  All of the 13 *Hoglan* Plaintiffs for whom Magistrate Judge Netburn recommended an award in R&R II are either "fiancées and domestic partners" or "stepparents, stepchildren and stepsiblings." In some such instances, Magistrate Judge Netburn recommended awards in one-half the amount for traditional "full" immediate family members. R&R II, pp. 17-27. Plaintiffs do not object to any of these 13 awards.

[3] R&R II recommended rejection of all remaining claims except the two claims of the estates of Hagay Shefi and Nicholas Rowe, and the nine claims of family members associated with the Shefi and Rowe estates (Sigal Shefi-Asher, Dov Shefi, Esther-Rivka Shefi, Yishai Shefi, Pazit Baum-Shefi, Estate of Judith Rowe, Guardian of Nadine Rowe, Paul Rowe, and Rachael Logan,) which were all denied in R&R III (MDL Doc. 3374), to which the *Hoglan* Plaintiffs respectfully intend also to object. Another Rowe-related claim, that of Nicholas Rowe's fiancée, Michelle Baker, was impliedly denied in R&R II, and thus is the subject of objection here.

functional equivalency of immediate family members among relationships recognized in relevant

case law (with #4 being a lone compelling exception that tests the relationship rule):

    1.  Estate of Herbert K. Hoglan (Functional Equivalent of Parent (Grandfather));

    2.  Michelle Arthurs (Functional Equivalent of Parent (Step-Parent));

    3.  Kelly Arthurs (Functional Equivalent of Sibling (Step-Sibling));

    4.  Anthony Dorf (Functional Equivalent of Child (Nephew));

    5.  Carole Grazioso (Functional Equivalent of Parent (Step-Parent));

    6.  Karen Moreno (Functional Equivalent of Parent (Step-Parent));

    7.  Estate of Paul Scalogna (Functional Equivalent of Parent (Grandfather));

    8.  Donna Corbett-Moran (Functional Equivalent of Spouse (Fiancé));

    9.  Diane Ognibene (Functional Equivalent of Parent (Step-Parent));

    10. Norma Ward (Functional Equivalent of Parent (Step-Parent));

    11. Jessica Kramer (Functional Equivalent of Sibling (Step-Sibling)); and,

    12. Christi Pendergraft (Functional Equivalent of Sibling (Step-Sibling)).

  B.  Thirteen *Hoglan* Plaintiffs fulfill some of the central criteria of the Magistrate Judge's

analysis pertaining to functional equivalency of an immediate family relationship:

    1.  Karen Bingham (Functional Equivalent of Parent (Step-Parent))

    2.  Michelle Clendenney (Functional Equivalent of Sibling (Step-Sibling))

    3.  Heather Strickland (Functional Equivalent of Sibling (Step-Sibling))

    4.  Jeannette Coffey (Functional Equivalent of Parent (Grandparent))

    5.  Estate of Daniel F Coffey, Jr. (Functional Equivalent of Parent (Grandparent))

    6.  Estate of Ida Reiss (Functional Equivalent of Parent (Grandmother))

    7.  Estate of Lenore Jackson (Functional Equivalent of Parent (Grandmother))

8.  Estate of Ken Jackson (Functional Equivalent of Parent (Grandfather))

9.  Samuel Collazo (Functional Equivalent of Sibling (Step-Sibling))

10. Leonardo Collazo (Functional Equivalent of Sibling (Step-Sibling))

11. Gabriella Rinehart (Functional Equivalent of Sibling (Step-Sibling))

12. Estate of Louise Borzumato (Functional Equivalent of Parent (Grandmother))

13. Michelle Baker  (Functional Equivalent of Spouse (Fiancé))

In addition to the specific objections above to the claims denied by the Magistrate Judge in R&R II, the *Hoglan* Plaintiffs respectfully object to the denial of the claims of all of the remaining *Hoglan* Plaintiffs.  Although the Magistrate Judge did not specifically address the merits of any of these claims individually, her R&R II does provide a basis and framework for reasoned discussion of the whole issue of functional equivalence to immediate family relationships.  All of the remainder of the *Hoglan* Plaintiffs present fact patterns that can be measured against the functional-equivalents-of-immediate-family-members framework developed in R&R II, and/or other relevant case law, and/or the RESTATEMENT OF TORTS.  As stated, Plaintiffs seek to defer briefing on these claims until January, 2017, assuming the matter is referred back to the Magistrate Judge for further consideration.  In the event that the Court does not refer the matter back to the Magistrate Judge for further consideration, the Plaintiffs respectfully request a two-week extension of time to present further argument on these claims.

## II.   <u>ARGUMENT</u>

In the event that the Court decides not to refer all of these claims back to Magistrate Judge Netburn for further briefing by the parties and consideration by the Magistrate Judge, the objecting Plaintiffs rely on the arguments raised in their damages briefs and supporting papers filed in January, 2016, and, in summary thereof, submit the following points.

Magistrate Netburn stated in R&R II, "The Court has received numerous declarations from uncles, aunts, nieces, nephews and cousins of the 9/11 decedents.... [N]o court to date considering FSIA claims has awarded solatium damages to a family member in the above categories."  The only two categories of non-immediate family members that the Magistrate recognized as being considered "immediate family members" in FSIA cases are "fiancées and domestic partners" and "stepparents, stepchildren and stepsiblings."  R&R II, pp. 13-16. Magistrate Netburn further identifies three additional factors which she determined affect whether a person may qualify as the functional equivalent of an immediate family member: long-term or semi-permanent cohabitation, guardian or custodian-like role, including emotional, financial, and social relationships, particularly where one of the persons was a minor, and whether the biological family member in question was absent from the family's life.  R&R II, pp. 10-12.

The *Hoglan* Plaintiffs object to the Magistrate's R&R II insofar as her recommendations do not include all of *Hoglan* Plaintiffs who have demonstrated that they are the functional equivalents of immediate family members.

Specifically, eleven of the *Hoglan* Plaintiffs for whom no award was recommended are "fiancées and domestic partners" or "stepparents, stepchildren and stepsiblings."  Additionally, these eleven *Hoglan* Plaintiffs for whom no award was recommended satisfy many of the additional criteria that the Magistrate Judge considered when qualifying as a functional equivalent to an immediate family member – such as having cohabitated with the decedent for substantial periods of time, having been in a guardian or custodian-like relationship with the decedent, and/or fulfilling the role of an absent equivalent biological family member.  R&R II, pp. 10-12.  A twelfth plaintiff, Anthony Dorf, provides a compelling case of functional

equivalence to an immediate family member that demonstrates why this Court should reject the Magistrate Judge's bright line dividing "fiancées and domestic partners" and "stepparents, stepchildren and stepsiblings," on the one hand, from all other familial relationships, on the other, as the exclusive set of those relationships that are amenable to a functional equivalence analysis.  As shown below and in the original damages evidence submission, as much as any young nephew could be, Anthony Dorf was the functional equivalent of a son to his uncle, 9/11 decedent Stephen Scott Dorf.  The law of terrorism damages should not reject the prospect of compensation for such a relationship out of hand.

A second set of twelve *Hoglan* Plaintiffs for whom no award was recommended also meet many of Magistrate Netburn's stated criteria for functional equivalence to an immediate family member.

The remainder of the declined *Hoglan* Plaintiffs also exhibit close familial relationships sufficient to be granted an award, based in part on the criteria discussed in the Magistrate Judge's analysis and in part on other considerations that the Magistrate Judge did not embrace.  As stated previously, the discussion at the October 12, 2016, hearing before Magistrate Judge Netburn resulted in a reservation of the issues surrounding the entire matter of immediate family functional equivalence as deserving of further briefing by all of the plaintiffs in all of the cases seeking judgments against Iran in these MDL proceedings, and a consensus, as stated by the Magistrate Judge, that a referral back to the Magistrate Judge by this Court would be the preferred procedure to do so.

## III.   SPECIFIC OBJECTIONS

### 1.   Estate of Herbert K. Hoglan

Mr. Herbert Hoglan, who died on March 8, 2013, was the grandfather of a 9/11 decedent

but should be considered the functional equivalent of the decedent's parent.  Mr. Hoglan lived with, and helped to raise, 9/11 decedent Mark Bingham.[4]  Mr. Hoglan lived with Mark during Mark's early formative years, and helped to support Mark Bingham from shortly after birth through his adulthood, when Mark was murdered on 9/11.

Mark Bingham's parents, Gerald Bingham and Alice Hoagland, divorced a few months after his birth.  Declaration of Alice Hoagland, ¶5.  Alice Hoagland and her newborn infant son, Mark, moved in and lived with her father, Herbert Hoglan, her mother, and her siblings and continued to live with them for most of Mark's childhood, first in Miami, Florida, and then in California.  In her Declaration on behalf of her father, Alice Hoagland explains the long-term close relationship between her parents and her only son:

> In the summer of 1970, when I was 20 years old, my then husband and my three-month-old son, 'Kerry' and I traveled from Phoenix to live under the same roof with my parents and siblings in my parents' family home near Miami Florida.  My marriage was troubled, and did not last…  I was extremely grateful to my parents for helping me at that low point in my life…  Grandpa Herb and Grandma Betty were the sole caregivers for my growing son during those years as I finished my college education and later, into the late 1970s, during those numerous lengthy absences I was forced to take as a flight attendant.  My son loved his Grandpa Herb and Grandma Betty and looked to them for protection and guidance in every facet of his young life.  His grandparents provided Kerry and me with the roof over our heads and all the food we put into our mouths for several years, from 1970 to 1975…  Dad housed us again, beginning in 1977, when our entire family relocated, first to southern California, then to Northern California.

Declaration for the Estate of Herbert Hoglan by Alice Hoagland, PR, ¶¶6, 8, 9.

---

[4]  Mark Bingham was a passenger on United Airlines Flight 93; he was the last person to board the plane.  A former rugby player at the University of California, Berkeley, Mark participated in "The Battle for United 93."  *The 9/11 Commission Report: Final Report of the National Commission on Terrorist Attacks Upon the United States*.  Washington, D.C.: National Commission on Terrorist Attacks upon the United States, 2004, pp. 10-14.  Mark ran a successful public relations firm in San Francisco, California, and in the summer of 2001, opened a satellite office in New York.  Havlish, *et al.* v. bin Laden, *et al*. Civ. No. 03-CV-9848-GBD 03, MDL 1570 (GBD)(FM) ("Havlish"), Declaration of Gerald Bingham, ¶6.

> Midmorning on September 11, 2001, Herb and Betty were awakened by a phone call from their children.  We were miserably certain that Mark had been killed, but hadn't gotten official word from either the airlines or the FBI.  So Mark's grandparents rushed to Vaughn's house where all their children were gathering, and stayed there most of that day and the days following ….

Declaration for the Estate of Herbert Hoglan by Alice Hoagland, PR, ¶12.

## 2.  <u>**Michelle Arthurs**</u>

Michelle Arthurs, even though she was a step-mother, should be considered the functional equivalent of a parent to 9/11 decedent Mark Kendall Bingham.

Michelle Arthurs was married to the Decedent's father, Gerald Bingham, each brought into their marriage their own natural born children, when their respective children were small. The couple's children, Kelly and Mark, respectively, had previously both been the only children of their parents, and so they became brother and sister when their parents remarried.  Michelle and Gerald made a concerted effort to foster the sibling relationship between Mark and Kelly.

> Mark or "Little Jerry" as we always called him, was Gerald Bingham's only biological child.  Gerald and I divorced in 1976, but we remained good friends and so my daughter and I always spent time with Mark whenever he came to visit his father in Florida.  My daughter, Kelly, remained close to Gerald and has always considered him her father.  Kelly and Mark were very close in age, and Gerald and I raised them as brother and sister.  When we were married, I was a stay-at-home mom.  "Little Jerry" was just a baby, only about one and a half when I married his father Gerald.  My daughter, Kelly was only about 11 months older…  Mark was with us quite often because his mother traveled, and we loved to have him with us…  Even after Gerald and I were divorced, we stayed close and kept the kids together.  We even took the kids on a trip to Disney World together after our divorce...  I asked the people I worked with not to talk to me about 9/11 because I could not handle it.  I asked them to go about the business of the day, and my coworkers respected that.  I was sad for a long time, but I just put up a wall between my emotions and functioning.  I felt as if I had lost my son.  I may have only been his step-mother, but to me he was a big part of my life.

Declaration of Michelle Arthurs, ¶¶5, 9.

Accordingly, Michelle Arthurs fulfills all three of the Magistrate Judge's central criteria for functional equivalence as a mother: lengthy co-habitation when Mark was a young child; s

guardian or custodian-like role, including emotional, and social relationships; and the absence of the true biological mother from the family's life.

### 3.   <u>Kelly Arthurs</u>

Ms. Kelly Arthurs was the step-sister to decedent Mark Bingham but their relationship was like brother-and-sister, and she should be considered the functional equivalent of a sibling. The decedent and Ms. Bingham lived together and always considered each other brother and sister.  Kelly Arthurs and Mark Bingham lived together as brother and sister until their parents' divorce but their relationship did not end there, but rather was a bond that lasted into adulthood.

> When Mark was two and I was three my mom, Micki Arthurs, married Gerald Bingham.  He would call his father, "Dad" and naturally, I followed suit.  My biological father died when I was seven and even before that I rarely saw him.  To this day, Mark's biological father is still my "Dad."  Mark's father, Gerald, has always and still does fill that role of father for me.  We continue to have a close, father/daughter relationship today.  Mark has always been my brother.  We grew up together.  When we were young and Mark's mother was training to be a flight attendant, Mark lived with us most of the time. My mom was at home, our dad was running a restaurant and Mark's mom was flying because of her job.

Declaration of Kelly Arthurs, ¶5.

Accordingly, Kelly Arthurs fulfills the all of the Magistrate Judge's central criteria for functional equivalence as a sibling: lengthy co-habitation when both she and Mark were young children, true sibling emotional and social relationships; and, while the third factor – absence of the true biological relative from the family's life – is logically not applicable, the fact remains that there were no other siblings of either child.  Because their sibling relationship extended into their adulthood and lasted until Mark's death on 9/11, similar logic tends to weigh strongly in her favor as a functional equivalent to a sibling.

### 4.   <u>Anthony Dorf</u>

Even though Anthony Dorf was a nephew of 9/11 decedent Stephen Scott Dorf, Anthony

should be considered the functional equivalent of Stephen Dorf's child for this litigation because of the incredibly close bond between Anthony and his uncle Stephen. All three of the Magistrate Judge's central criteria are present: lengthy co-habitatation, including when Anthony was a child, a significant guardianship role, and the fact that the biologically equivalent person, Anthony's biological father, was absent from the family's life.

Decedent Stephen Scott Dorf and his sister, mother of Anthony Dorf, lived in a home Stephen and his sister purchased together. Anthony lived there as well. "Once I was settled with my job and making a little money, Stephen and I decided to buy a house together. We could not afford to buy separate houses, but together we could do it.… We split all the bills down the middle… My brother made $32,000 a year and would unselfishly give it toward the house and my son." <u>Havlish</u> Declaration of Michelle Dorf, ¶¶9, 19.

Stephen Dorf fulfilled the role of father for Anthony Dorf:

My uncle and I were very close. I never knew my biological father. My mother and her brother, my Uncle Stephen bought a home together. Maybe he felt sorry for me, but he became the father I never had. He made me feel special and he was special. He took me to movies, fishing, camping and sometimes we just hung out on the couch. He was my role model. He was a great man. He loved me unconditionally... September 11, 2001, began like any other day. My Uncle Stephen woke me for school. He knew I was not a morning person and he did that to ensure I would not be late for school. I got ready and screamed up the stairs to tell him I was leaving and that I loved him… The principal made an announcement that the World Trade Center had been hit by a plane. I stood up and became hysterical in the middle of class. My mother spoke to my uncle on the phone and told him to leave immediately. He told her that people were jumping out of the windows and that he needed to help those who were trapped. Shortly after, I saw the building that my uncle was in fall [on television]. My heart dropped. Life as I knew it would never be the same. My life fell apart with that building.

Declaration of Anthony Dorf, ¶¶4-6.

Clearly, Anthony Dorf fulfills all of the Magistrate Judge's central criteria: long-term or semi-permanent cohabitation, a guardian or custodian-like role, including emotional, financial,

and social relationships, particularly where one of the persons was a minor, and whether the biological family member in question was absent from the family's life.

Anthony Dorf's claim is not expressly discussed in R&R II.  What apparently caused the Magistrate Judge from finding functional equivalence in this case was the uncle-nephew relationship, where the Magistrate Judge drew a bright line based on the fact that such a relationship had not been sanctioned in prior case law.  Anthony case is a good example of an issue that requires further briefing, and is precisely the sort of issue that the *Ashton* and *Bauer* counsel indicated would be raised in their briefs to be filed in January, which *Hoglan* counsel, as indicated previously, would do as well.

If the Court chooses to rule at this time, Plaintiff Anthony Dorf submits that, because he meets all the criteria for functional equivalence of being the child of a decedent, this Court should look past what is, in reality, a technicality of a line on a family tree that ignores the reality of human familial interrelationships in the modern age.  A close blood relative, Anthony Dorf was being raised in the same household, from childhood, as functionally, emotionally, and financially the son of 9/11 decedent Stephen Scott Dorf.  Anthony never knew his biological father.  The only father he ever knew was Stephen Scott Dorf.  Anthony's abject suffering caused by Stephen Scott Dorf's murder on 9/11 has been that of a son, not some distant relative.

Anthony's case is truly the exception that tests the rule.  This case should be the one that recognizes that, on these facts, functional equivalence of a father-son relationship can be real even though it is just outside a formal "line" designating a stepfather and stepson.  Here, functional equivalence is presented in the most compelling fashion.  This Court does not need some other court to have set the precedent.  Even in the long and sad history of state-sponsored

terrorism, there has never been a case quite like *In Re: Terrorist Attacks on September 11, 2001*. This is the precedent.

**5.**    **Carole Grazioso**

Ms. Carole Grazioso lost *two* family members on September 11, 2001: her step-children John Grazioso and Timmy Grazioso.  She should certainly be considered the functional equivalent of a mother to both John and Timmy.  Among the reasons evidenced in the numerous declarations attesting to the strength of her bond with her stepsons are both lengthy cohabitation and a guardian or custodian-like role, including emotional, financial, and social relationships, particularly where the decedent was a minor for much of that time, and the absence of the biological family member in question from the family's life.

Carole Grazioso explains that she lost both her stepsons on 9/11, and describes her own pain and anguish watching the suffering of her daughters Carolee, Kristy, and Karen, as well as Sandra Grazioso, which is as real as that of any parent.  Carole Grazioso's relationship to her two stepsons spanned most of John and Timmy Grazioso's lives.  She was a very important part of their family, providing emotional and financial support when even their father could not do so.  Even further proof of the fact of this strong family bond is that Carole Grazioso continued her relationship with each of the decedents even after she and their father, Hank, divorced and indeed, she continues to function as an integral part of the Grazioso family after the death of John and Timmy.

Carole Grazioso explains in her sworn statement:

> When I married Hank Grazioso he had three young children.  Carolee was three, Johnny was six, and Timmy was seven.  Hank and I were married for 21 years.  Their mother, Sandy had custody of them, but we were with the children a lot.  I cheered for them at sporting events.  We took a vacation and sometimes two with them every year.  I lived with them every other weekend and holidays too.  We only lived about 10 to 15 minutes from them.  Hank and I had two daughters

together, Kristy and Karen who are the half siblings of Hank's three children from his first marriage.  I find comfort in the memories of the vacations we took together.  One vacation was in a Winnebago…  Many of my fondest memories with them were on vacations to the ocean.  I love looking at all the beautiful pictures.

Declaration of Carole Grazioso, ¶¶4, 8.

Sandra Grazioso, the biological mother of 9/11 Decedents John and Timmy Grazioso,

also explains the family relationship:

My ex-husband got remarried to Carole, but they are now divorced also… Carole and I are good enough friends that we give each other a kiss hello.  We have to get along if we want to be there with the kids for Easter, Thanksgiving or for Christmas…  We are all together for holidays: me and my boyfriend; my daughter and her husband and her two children; my ex-husband's sister and her children; Carole, who is my children's stepmother and my ex-husband's second ex-wife, and their children.  It was this way before 9/11 and it has been this way since 9/11.

Declaration of Sandra Grazioso, ¶13.  See also ¶81.

Decedent Timmy Grazioso was the Chief Operating Officer of Cantor Fitzgerald on

September 11, 2001.  His office was located on the 104th floor of the WTC North Tower.  At the

time of his death, Timmy was president of the Securities Traders Association in New York

(STANY).  ¶17 Declaration of Deborah Grazioso.

Tim's brother, John, was also killed in the World Trade Center.  We always wondered if the two brothers were together or talked on that day. Actually, Cantor had what is called the, "hoot and holler system" so that the trading staff could speak to all of the other Cantor people in all the different states.  Cantor employees all over the country could hear them up there in the Towers when they were hit.  When the plane hit they said that Tim said, "Come on.  Everybody get your things because this one looks bad.  I don't think we are going to be coming back for a long time…  The people at Cantor said that they had tried to go down the stairs but they could not get down.  They even tried to get up, but they could not get up.  Somebody had asked what they were doing there.  He said they were not screaming and that they sounded somewhat calm. But when they were asked, "What are you doing?"  Someone responded, "We are dying.  We are dying."  I don't know if that was my husband.  I guess they could not breathe at that point.  This haunts me.

Declaration of Deborah Grazioso, ¶10.

Carole Grazioso explains in her sworn statement:

> Timmy and Johnny were great kids and they grew up into wonderful men… We all got along well as a family… Sandy thanks me all the time. She tells me that the boys loved me and she thanks me for treating them as my own children, which I did even when it came to supporting them. Their dad was a compulsive gambler, so I made sure she got her monthly money… They loved their dad and I think as they got older, they understood his issues and problems. Carolee and my sister in law told me that Johnny was very upset when he heard that his dad and I were getting divorced. Even after their dad and I split up I stayed in contact with the boys, who were already married at that time.

Declaration of Carole Grazioso, ¶¶10, 11. <u>See also</u> ¶72.

Because Carole Grazioso meets all of the criteria discussed by the Magistrate Judge, she should be deemed the functional equivalent of her two stepsons, John and Timmy Grazioso. Indeed, it is not at all apparent why the Magistrate Judge did not find that she was the functional equivalent of their mother. Ms. Grazioso squarely meets the criteria discussed in part 3 of R&R II at pp. 15-16: Carole Grazioso entered John and Timmy's life when they were six and seven years old, respectively, and she remained integral to their lives through their adulthood until 9/11, and she has remained an important part of the family's life thereafter. Accordingly, Carole Grazioso deserves to be awarded full solatium (not half, as for instances involving shorter period of a step-relationship).

**6.** <u>**Karen Moreno**</u>

Ms. Karen Moreno was a step-parent to 9/11 decedent Yvette Nichole Moreno, yet fits some of the Magistrate Judge's criteria to be considered the functional equivalent of Yvette's mother. Karen Moreno "was married to Yvette's father and first met her when she was approximately three years old. I was a part of Yvette's life for her whole life... We all lived in the Bronx within walking distance of where Yvette lived with her mother, Ivy, and her younger

brother Roland, so we did not have to travel a long way to see each other… I have two daughters by the same father as Yvette and Roland. So my daughters, Leiana and Noelia are their half siblings… Yvette was about 10 years older than them... " Declaration of Karen Moreno, ¶¶4-5.

Decedent Yvette Nichole Moreno worked on the 92nd Floor of the North Tower of the WTC. She managed to escape the building after it was hit by the hijacked American Airlines Flight 11. After calling home, where she lived with her mother and brother, to let them know she was on her way home, she tragically perished on an overpass as a result of debris falling from the Towers or their collapse. Yvette Nichole Moreno's body was identified via dental records and a tattoo a few days following what would have been her 25th birthday. On 9/11, her step-mother, Plaintiff Karen Moreno, was a NYC police officer and a paramedic as well. She was among the many first responders who searched the WTC site for the remains of the victims, including, it turned out, her step-daughter.

Because Karen Moreno demonstrated a long-term relationship with her step-daughter, dating back to when the Decedent was a toddler, including strong emotional and social relationships from her step-daughter's young childhood through her adulthood, Karen Moreno should be deemed the functional equivalent of a parent in this case.

## 7.    Estate of Paul Scalogna

Mr. Paul Scalogna was the grandfather of 9/11 decedent Brian Nunez , but he should be considered the functional equivalent of Brian Nunez's father. He clearly fulfilled all three of the Magistrate Judge's central criteria for functional equivalence to a parent: long-term or semi-permanent cohabitation, guardian or custodian-like role, including emotional, financial, and

social relationships, particularly where one of the persons was a minor, and fulfilling the role of

biological family member who was absent from the family's life.  It is not at all apparent why the

Magistrate Judge did not so find because she did not discuss the Paul Scalogna estate's claim at

all.  The Magistrate Judge did, however, rule that a grandparent performing the role of a parent

may be considered the functional equivalent of a parent.  Because Mr. Scalogna clearly fulfilled

all of the Magistrate Judge's criteria, his objection should be granted and his claim merits a full

solatium award for a parent.

Brian Nunez and his brothers had no other father figure in their life and their grandfather,

Paul Scalogna, functioned as part of their nuclear family.  Due to their difficult childhood,

Decedent Brian Nunez and his brothers were very close and remained close as young adults.

The circumstances of their childhood – with a mother often struggling to provide for her sons –

explains why her father, their maternal grandfather, should be regarded as the functional

equivalent of their father in this case.

Joanne Lovett is the Personal Representative of the Estate of her father Paul Scalogna,

and she explains in her Declaration submitted on his behalf:

> Brian's biological father was only minimally involved in Brian's life.
> Brian had lived with his grandfather both as an infant and for 3 years in his late
> teens and early twenties.  They always maintained a close relationship with each
> other throughout their lives, whether it was trips to the butcher shop as a kid, the
> constant telephone calls, watching baseball together, or passing down family
> tradition.  One of the most important family traditions was Italian sausage made
> from scratch that was presented to the entire extended family at midnight on
> Christmas Eve after celebrating the Feast of the Seven Fishes.  When Brian
> moved in with my father, he taught Brian how to make the sausage....  He would
> spread the chopped pork in a very large pan and add all the spices.  I don't know
> which was harder – mixing the ingredients or putting it in the casing.  Though my
> aunt had gotten my father a meat grinder with a sausage attachment, he preferred
> doing it the old fashioned way.  Brian loved helping to make the sausage and
> bragged how he knew the secret recipe.  Brian was to carry on this tradition,
> passed onto him by his loving grandfather.  Unfortunately, this tradition died
> along with my father and son.  It is evidence of their close bond.

Declaration of JoAnne Lovett on Behalf of Paul Scalogna, ¶¶4, 12-13, 16.

Paul Scalogna's other grandson, Eric Nunez, also speaks of the bond between his brother Brian and his grandfather in his Declaration:

> … [O]ur grandfather lived with me.  One day grandpa was not feeling so well.  I was on the phone with Brian and told him that I was going to have to take grandpa to the hospital.  Brian told me to wait for him because he wanted to come with me.  We stayed by our grandfather's side until he finally got a room at 4:00 a.m.  Our grandfather recovered that time, but, in the end, Brian's death killed him.  Brian's murder was too much for our grandfather to bear, and he was never the same after 9/11.  He lost his will to live, and died of a broken heart on November 24, 2001.

Declaration of Eric Nunez, ¶15.

## 8.    **Donna Corbett-Moran**

Ms. Donna Corbett Moran was a fiancée Brian Nunez's on 9/11 and should be considered the functional equivalent of his spouse.  The Magistrate Judge did not explain why she denied Ms. Moran's claim, whereas the Magistrate Judge did grant the claim of two other fiancées (Colleen McDonald and Aleese M. Hartmann, R&R II, pp. 26-27) and a spouse equivalent domestic partner (Keith Bradkowski, pp. 20-21).  The Magistrate Judge set forth the following standard:  "In determining which partners qualify as being functionally equivalent to a spouse, the Court has considered the duration of the relationship, the degree of mutual financial dependence and investments in a common life together, the duration of cohabitation and the presence or absence of a formal engagement as important factors."  R&R II, pp. 14-15.  Because Donna Corbett Moran meets these criteria, she should be granted a solatium award, as were the other fiancées and the domestic partner.  In her declaration, Donna Corbett Moran wrote:

> I had no idea that I would never see him again; never see the man that held my hand, the man that shared my dreams and thoughts, the man that I thought was too good to be true, my future husband.  But that was the case; I never saw him

again, I never got to say good bye, I never got to say thank you for loving me... Brian and I met in college. We were in an English class together and we did not even finish the semester without starting to see each other. We instantly started spending all our free time with each other. We would go to movies, have dinners, we became part of each other's everyday lives. When Brian moved in his own apartment, he was living with his little brother. Brian and I could not get a place of our own because he wanted to help his brother financially. But of course, I was always there. I spent most nights there. I would shower and leave to go to work from the apartment. We both shared in the food expenses and we would take turns cooking dinners for one and other. Financially, we shared in the expenses of everyday life. We were a couple so we took turns with picking up the tab for different expenses... When people now say, "how does 9/11 still affect you so strongly?" My response is; we had a funeral for Brian, we had a coffin with nothing in it, so we put pictures around the room to remember his beautiful soul. Roughly 3 weeks later, a part of Brian's femur was found and we had another funeral. We had to relive the process of his murder on two separate occasions. We are reminded of this terrible day every year by the media, replaying his death, so visibly and graphic. For anyone that lost a love one, can you imagine to be forced to sit and watch how your loved one was murdered, every year, over and over again? It's living hell!... My life will never be the same. I had beautiful memories of Brian. We were one person. Now I have to admit, I cannot remember a lot of those memories because I had to suppress everything. What I see in my nightmares is people jumping from the towers, thinking it was better than being burned to death. I see the building collapsing, knowing my man was inside of it.

Declaration of Donna Corbett Moran, ¶¶5, 6, 10, 11.

9.   **Diane Ognibene**

Mrs. Diane Ognibene was the step-mother of 9/11 decedent Philip Ognibene but should be considered the functional equivalent of his mother. Mrs. Ognibene cohabitated with Philip Ognibene for about ten years in lieu of his biological mother and she had no children of her own. Furthermore, she assumed the role of his absent biological mother. Accordingly, she meets the Magistrate Judge's criteria of long-term or semi-permanent cohabitation, a guardian or custodian-like role, including emotional, financial, and social relationships, and the absence of the biological family member in question from the family's life.

9/11 decedent Philip Ognibene was employed by KBW on the 89th Floor of the South

Tower of the WTC.  His step-mother, Diane Ognibene explains in her Declaration that she

married Vincent Ognibene, Philip's father, in 1981 when Philip was 18 years-old.  Because she

had no children of her own, she became very close to her stepchildren.  Philip moved in with

Diane and his father when he was 18 and lived with them for about ten years.  Diane states:

> Being a step mother is difficult, but I never felt like an outsider around
> Philip.  We enjoyed lengthy conversations.  I believe Philip felt that he could
> confide in me things that he could not confide in anyone else...  [On 9/11,] I called
> Vincent and was on the phone with him when a co-worker told me that there was
> smoke coming from the First World Trade Center Tower.  At that time I worked
> in Jersey City and I had a clear view of both Trade Center Towers from across the
> river.  I told Vincent about the smoke.  At that time, he was working part-time.
> His office was on Barclays Street which is right next to the WTC.  Fortunately he
> was off work that Tuesday…. told Vincent that I would call Philip at work to
> check on him… His Tower had not yet been hit when I called him… He was
> shaken up and told me that the authorities had told everyone in his Tower to stay
> inside, not to leave… Philip's office was located above the spot of the impact…
> His employer, KBW, lost one-third of the people in their office on September
> 11th....
>
> After the attacks on September 11th, 2001 we had no communication with
> Philip.  We had a terrible feeling that we would never hear from him again.  I
> stayed at work that entire day and called every hospital in the City… My heart
> was heavy because I had actually seen the second plane crash into Tower Two
> from my window at work....

Declaration of Diane Ognibene, ¶¶4, 5, 6, 10.

**10.   <u>Norma Ward</u>**

Mrs. Norma Ward was the step-parent of 9/11 decedent Timothy Raymond Ward and

should be deemed the functional equivalent of his biological parent.  Mrs. Ward's long, close

relationship with decedent Timothy Raymond Ward demonstrates fulfillment of the Magistrate

Judge's central criteria of long-term or semi-permanent cohabitation, guardian or custodian-like

role, including emotional, financial, and social relationships, particularly where one of the

persons was a minor, and whether the biological family member in question was absent from the family's life.

Decedent Timothy Raymond Ward was a passenger on United Airlines Flight 175 which was hijacked and flown into the South Tower of the WTC.  The evidence presented from Norma Ward and her daughters, exhibits the close-knit family relationships of 9/11 decedent Timothy Raymond Ward's step-parents and step-siblings who lived with, and shared a childhood with him.  Norma Ward met Doyle Raymond Ward, the decedent's father, in 1981 when she was a single mother raising two young daughters.  Tim was a teenager, living with his father Ray at the time; he was Ray's only child.  Norma and Ray were married two years later and the relationship between Tim and his stepmother grew closer when they began living together.  Tim continued living with his father and stepmother when he attended a local college for a year.  Declaration of Norma Ward, ¶¶4, 9.

## 11/12. **Jessica Kramer  and Christi Pendergraft**

Jessica Kramer and Christi Pendergraft are the step-sisters of Decedent Timothy Raymond Ward, and for reasons similar to those of Norma Ward, *supra*, both should be considered the functional equivalent of Timothy Ward's full biological sibling.  They both exhibit all the indicia of a substantially equivalent sibling, as suggested by the Magistrate Judge: a long-term or semi-permanent cohabitation, and a traditional sibling role, including long-term emotional and social relationships, beginning when they were children.  Again, for siblings, there is no logical reason for an absent family member criterion; more importantly here, the kids related to each other as biological siblings.  "We would go places and do things as a family."

In her Declaration, Jessica Kramer explains:

I was 9 and my sister, Christi was 4 when we first met Tim in the summer

23

of 1981 when our mother started dating Tim's father Ray.  We would go places and do things together as a family…  Tim left Visalia, CA where we lived, to attend college at San Diego State… but he worked for his dad and lived with us every summer.  Tim was also with us for the holidays…  Tim continued to live and work in San Diego when he graduated from college but we went to San Diego at least twice a year to visit him, on his birthday and for his Dad's birthday.  Tim also came to our house for holidays and vacations with his dad.  Tim was a wonderful step brother, very kind and considerate...  I was devastated to learn that Tim was aboard United Flight 175 that morning.  I honestly do not remember the specifics regarding the conversation.  I simply remember feeling physically sick to my stomach as I broke down and began sobbing uncontrollably. The immediate grief was overwhelming, but anger soon followed...  I will never forget the way my step-dad looked that day waiting to get confirmation if Tim was aboard that plane or not.  The worried look on his face haunts me to this day.

Declaration of Jessica Kramer, ¶¶5, 7, 9.

In her Declaration, Christi describes growing up with Tim:

Tim and I met when my mother and his father started dating.  I was just six years old when I met Tim and he was in his junior or senior year in high school.  We met soon after our parents began dating because the first year of them dating we did a lot of family trips together; camping trips, going up skiing, and the beach.  Tim was a great big brother.  I was kind of a tom-boy, so I really enjoyed running around with Tim and his buddies.  I did not have a brother until Tim so it was great to all of a sudden get a big brother.  Tim went away to college soon after my mother married his father…  Tim was the biggest sweetheart.  When I was younger, Tim and I went ATV'ing together.  Tim would ride me around when I was little.  I loved that.  He also taught me how to drive an ATV.  Tim was very into sports and an outdoorsy kind of guy.  He got his love of sports from his father.  I was really not into sports so much, but we watched football and NASCAR at home.  My mom's side of the family is very into racing.  That was another interest Tim and I shared...

The year 2001 was pretty much the year from hell for our family.  Our family kind of fell apart even more after that.  We were hit with quite a lot that year.  My brother-in-law (my sister's husband) had a severe head injury… and my cousin lost his life that year also…  At that time, I did not seek counseling or a doctor's help.  Instead I began to self-medicate.  So, that turned into a bad issue for me that year also, one which I am still fighting today.

Declaration of Christi Pendergraft, ¶¶4, 8.[5]

---

[5] An additional *Hoglan* Plaintiff who was not recommended for an award in R&R III (Michelle Baker) will be addressed in Plaintiffs' next Objections in the next few days.

IV.     **ADDITIONAL OBJECTIONS**

The following Plaintiffs also exhibit at least one of the categories or some of the criteria recognized by the Magistrate Judge as indicative of functional equivalence to an immediate family relationship.  As stated above, Plaintiffs seek to defer briefing on these claims until January, assuming the matter is referred back to the Magistrate Judge for further consideration. In the event that the Court does not refer the matter back to the Magistrate Judge for further consideration, the Plaintiffs respectfully request a two-week extension of time to present argument on the claims of these plaintiffs.

1.     Karen Bingham (Functional Equivalent of Parent (Step-Parent))

2.     Michelle Clendenney (Functional Equivalent of Sibling (Step-Sibling))

3.     Heather Strickland (Functional Equivalent of Sibling (Step-Sibling))

4.     Jeannette Coffey (Functional Equivalent of Parent (Grandparent))

5.     Estate of Daniel F Coffey, Jr. (Functional Equivalent of Parent (Grandparent))

6.     Estate of Ida Reiss (Functional Equivalent of Parent (Grandmother))

7.     Estate of Lenore Jackson (Functional Equivalent of Parent (Grandmother))

8.     Estate of Ken Jackson (Functional Equivalent of Parent (Grandfather))

9.     Samuel Collazo (Functional Equivalent of Sibling (Step-Sibling))

10.     Leonardo Collazo (Functional Equivalent of Sibling (Step-Sibling))

11.     Gabriella Rinehart (Functional Equivalent of Sibling (Step-Sibling))

12.     Estate of Louise Borzumato (Functional Equivalent of Parent (Grandmother))

13.     Michelle Baker  (Functional Equivalent of Spouse (Fiancé))

In addition to the specific objections above to the claims denied by the Magistrate Judge in R&R II, the *Hoglan* Plaintiffs respectfully object to the denial of the claims of all of the remaining *Hoglan* Plaintiffs.  Although the Magistrate Judge did not specifically address the merits of any of these claims, her R&R II does provide a basis and framework for reasoned discussion of the whole set of issues pertaining to functional equivalence to immediate family relationships.  All of the remainder of the *Hoglan* Plaintiffs present one or more fact patterns that can be measured against the functional-equivalents-of-immediate-family-members framework developed in R&R II, and/or the relevant case law, and/or the RESTATEMENT OF TORTS.  As stated above, Plaintiffs seek to defer briefing on these claims until January, 2017, assuming the matter is referred back to the Magistrate Judge for further consideration.  In the event the Court does not refer the matter back to the Magistrate Judge for further consideration, the Plaintiffs respectfully request a two-week extension of time to present further argument on these claims.

Functional Equivalent of a Son:

1. Mateo Pino
2. Martin Smith
3. Anthony Pino
4. Vincent Papasso, Jr.
5. Brendan Cofresi (Minor)
6. James Montoya
7. Addison Friedman
8. Anthony Friedman-Ceraso
9. Daniel Huber

Functional Equivalent of a Daughter:

1. Danielle Smith
2. Brittney Cofresi (Minor)

3.  Troia Johnson

4.  Diane Smith

5.  Tawanda Smith

6.  Kaitlin Steiner Keller

7.  Kristyn Steiner Martin

8.  Kristen Druckenmiller

9.  Stephanie Feher

10. Nina Fuller

Functional Equivalent of a Parent:

1.  James Mandelino Sr.

2.  Pedro Gerardino

3.  Kathryn Collman

4.  Gail Smith

Functional Equivalent of a Sibling:

1.  Candyce Sue Hoglan

2.  Kathleen Brady Knudsen Hoglan

3.  Julie Bertelsen Hoglan

4.  Tony Pino

5.  Michael Mandelino

6.  James Mandelino, Jr.

7.  Raymond Woods

8.  Scott Woods

9.  Lisa Smith

10. Mike Smith

11. Jason Smith

12. Lance Ward

13. Marc Ward

14. Maryann Pino

15. Jennie Mandelino

16. D. Linden Hoagland

17. Lee N. Hoglan

18. Vaughn V. Hoglan

All *Hoglan* Plaintiffs should be granted some award, even if it is appropriate to award the one-half amounts recommended by Magistrate Judge Netburn in some cases in her R&R II.

## V.   <u>CONCLUSION</u>

The Court should decline to adopt the Magistrate Judge's Report and Recommendations insofar as she recommended denial of certain *Hoglan* Plaintiffs claims on grounds that they are not "functional equivalents" of immediate family members such that they are qualified for solatium awards under the FSIA, for the reasons stated above and in the *Hoglan* Plaintiffs' original damages evidence and briefing submission.  The Court should enter awards for such Plaintiffs commensurate with those requested in Plaintiffs' damages inquest submission, or in other appropriate amounts.

Alternatively, the Court should refer this matter back to the Magistrate Judge for further consideration and a report and recommendation, after further briefing and submissions.

Alternatively, if the Court does not refer this matter back to the Magistrate Judge, the Court should grant Plaintiffs' request for an extension of time for two weeks to submit further argument on these claims.

Respectfully submitted,

Date:  October 28, 2016

/s/ Timothy B. Fleming_____
Timothy B. Fleming (DC Bar No. 351114)
WIGGINS CHILDS PANTAZIS
FISHER GOLDFARB PLLC
1850 M Street, NW, Suite 720
Washington, DC  20036
(202) 467-4489

Dennis G. Pantazis (AL Bar No. ASB-2216-A59D)
Melina Goldfarb (AL Bar No. ASB- 3739-R71M)
WIGGINS CHILDS PANTAZIS
FISHER GOLDFARB LLC
The Kress Building
301 19th Street North
Birmingham, AL  35203
(205) 314-0500

Richard D. Hailey (IN Bar No. 7375-49)
Mary Beth Ramey (IN Bar No. 5876-49)
RAMEY & HAILEY
9333 North Meridian Street, Suite 105
Indianapolis, IN  46260
(317) 582-0000

Robert M. Foote (IL Bar No. 03124325)
Craig S. Meilke (IL Bar No. 03127485)
FOOTE, MIELKE, CHAVEZ
 & O'NEIL, LLC
10 West State Street, Suite 200
Geneva, IL  60134
(630) 232-7450

**_Attorneys for the Hoglan Plaintiffs_**