GAKTTERC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

IN RE:  TERRORIST ATTACKS ON
SEPTEMBER 11, 2001
                                    03 MDL 1570 (GBD)(FM)
------------------------------x


                                    New York, N.Y.
                                    October 20, 2016
                                    11:30 a.m.

Before:

                    HON. SARAH NETBURN,

                                    Magistrate Judge

                        APPEARANCES

KREINDLER & KREINDLER
        Attorneys for Ashton Plaintiffs
BY:  JAMES KREINDLER

MOTLEY RICE
        Attorneys for Burnett Plaintiffs
BY:  ROBERT T. HAEFELE
        JODI WESTBROOK FLOWERS

ANDERSON KILL & OLICK
        Attorneys for O'Neill Plaintiffs
        and Plaintiff's Executive Committee
BY:  JERRY S. GOLDMAN

WIGGINS, CHILDS, QUINN & PANTAZIS
        Attorneys for Havlish and Hoglan Plaintiffs
BY:  TIMOTHY B. FLEMING
        DENNIS G. PANTAZIS

GAKTTERC

1                              APPEARANCES (Cont'd)

2    COZEN O'CONNOR
          Attorneys for Federal Insurance Plaintiff
3    BY:  SEAN P. CARTER
          SCOTT TARBUTTON
4
     BAUMEISTER & SAMUELS
5         Attorneys for Foster, et al. Plaintiffs
     BY:  MICHEL BAUMEISTER
6
     BERNABEI & WACHTEL
7         Attorneys for Defendant Dr. Al-Turki, et al.
     BY:  ALAN R. KABAT
8
     CLIFFORD CHANCE
9         Attorneys for Defendant Dubai Islamic Bank
     BY:  STEVEN COTTREAU
10
     GOETZ & ECKLAND
11        Attorneys for Defendants WAMY and WAMY International
     BY:  FREDERICK GOETZ
12
     LEWIS BAACH
13        Attorneys for Defendants IIRO and MWL
     BY:  WALEED NASSAR
14
     SALERNO & ROTHSTEIN
15        Attorneys for Defendant Yassin Abdullah Kadi
     BY:  PETER SALERNO
16
     MOLO LAMKEN
17        Attorneys for Defendant Dallah Avco
     BY:  ROBERT KRY
18

19

20

21

22

23

24

25

GAKTTERC

```
 1              (In open court, case called)
 2         THE COURT:  Good morning.  Why don't I ask that just
 3    those people who are going to be speaking identify themselves,
 4    because otherwise we'll spend the whole morning introducing
 5    ourselves.
 6         MR. CARTER:  Good morning, your Honor, Sean Carter
 7    from Cozen O'Connor.  I'm counsel for the plaintiffs in the
 8    federal insurance action and I serve as a member of the
 9    Plaintiffs Executive Committee as well.
10         MR. HAEFELE:  Good morning, your Honor, Robert Haefele
11    from Motley Rice for the Burnett plaintiffs and for PEC as
12    well.
13         THE COURT:  Thank you.
14         MR. KREINDLER:  Good morning, your Honor, Jim
15    Kreindler.  We have the Ashton plaintiffs, and I'm one of the
16    co-chairman of the Death and Injury Committee.
17         THE COURT:  Thank you.
18         MS. FLOWERS:  Good morning, your Honor, Jodi Flowers
19    also on behalf of the Burnett plaintiffs and co-lead of the PEC
20    with Mr. Kreindler.
21         MR. KABAT:  Good morning, your Honor, Alan Kabat for
22    Dr. Al-Turki, et al. and five other defendants.
23         MR. COTTREAU:  Good morning, your Honor, and welcome
24    to the case, Steve Cottreau from Clifford Chance for Dubai
25    Islamic Bank.
```

GAKTTERC

1          MR. NASSAR:  Good morning, your Honor, Waleed Nassar

2     on behalf of the Muslim World League and the International

3     Islamic Relief Organization.

4          MR. GOETZ:  Good morning, your Honor, Frederick Goetz

5     for the World Assembly of Muslim Youth.  I'm co-counsel with

6     Omar Mohammedi, and Mr. Mohammedi was taken ill this morning so

7     he's not here.

8          THE COURT:  I hope he recovers well.

9          MR. GOETZ:  Thank you.

10          MR. FLEMING:  Good morning, your Honor, Timothy

11     Fleming, Wiggins, Childs, Pantazis, Fisher & Goldfarb, counsel

12     for the plaintiffs in Hoglan, et al. versus Iran, et al., and

13     also counsel in the Havlish case.

14          MR. PANTAZIS:  Good morning, your Honor, Dennis

15     Pantazis also with the Wiggins Childs firm representing the

16     same clients.

17          MR. SALERNO:  Good morning, your Honor, Peter Salerno,

18     Salerno & Rothstein, representing the defendant Yassin Kadi.

19          MR. KRY:  Your Honor, Robert Kry with Molo Lamken

20     representing the defendant Dallah Avco.

21          MR. GOLDMAN:  Jerry Goldman, Anderson Kill, for the

22     O'Neill plaintiffs, Plaintiff's Executive Committee.

23          THE COURT:  Good morning, everybody.

24          So as we now know, the case has been reassigned to me.

25     I won't tell you the way in which it was reassigned, but I

GAKTTERC

1    consider myself fortunate to have this case, and I'm looking

2    forward to working with all of you to manage this case in a way

3    that makes sense for everybody.

4            I have an agenda for the items that I want to talk

5    about.  Let me mention those to you so that we all keep them in

6    mind, and then we can proceed from there, and if there are

7    other things that you want to share with me, I'm happy to hear

8    them.  I'm hoping we'll be able to come up with a protocol so

9    we can move these cases forward, address the sort of immediate

10   issues with respect to the funds and some of the issues that

11   have come out of the recent decisions that I have issued and

12   make sure that we are focused on the future.

13           So on my list of agenda items for today is to just

14   make sure I understand so I can report to Judge Daniels whether

15   or not we're going to be expecting any objections from the

16   recent reports and recommendations that I have issued, or

17   whether or not he can go ahead and execute those judgments when

18   the time for objections has expired.

19           I also want to speak about some recent applications

20   that have been made in the Bauer and Ashton cases, there may

21   have been another in addition recently, that is aimed to be

22   consistent with the reports and recommendations that I have

23   issued recently.

24           I would like to hear what the Plaintiffs Executive

25   Committee believes will be the protocol with respect to the

GAKTTERC

1    Saudi Arabia cases, and I want to talk about sort of both

2    procedurally when we think those are going to be back in the

3    district court.  And I want to talk about whether or not the

4    folks that are in this room anticipate there being additional

5    cases brought, there may be another unrelated to the 9/11

6    terrorist attacks, if so or if not, whether or not an

7    application will be made to MDL panel in the first instance.

8             Going back to my prior reports and recommendations, I

9    want to talk about my punitive damages ruling and set a

10   briefing schedule on that particular issue.

11            We have tried to canvass this massive docket and get

12   ourselves up to speed as quickly as possible.  It is our

13   understanding that there are two pending motions, a motion to

14   compel in the Dallah Avco motion to compel, and I believe

15   there's also a motion for sanctions that's been fully briefed.

16   I want to make sure that those are the only two motions that

17   are pending judicial resolution, and then just sort of talk

18   about where we go from here.

19            So that's on my agenda list.  And to the extent you

20   all came with other items that you want me to talk about, I'm

21   happy to hear from you all as well.

22            Unless there are any objections, why don't we begin

23   with what's going on now with respect to the judgments that are

24   being sought against Iran and the need to get those judgments

25   finalized in order to allow the plaintiffs to apply to the

GAKTTERC

1    funds.

2           So with respect to those plaintiffs for whom I have

3    already issued reports and recommendations, does anybody

4    anticipate filing any objections that Judge Daniels should know

5    about?

6           MR. KREINDLER:  Good morning, your Honor.  No, because

7    time is of the essence.

8           While we're here, let me just take a minute to talk

9    about the fund and the stages the fund will operate under.  The

10   fund is a very unusual fund.  It's written in a way so that

11   98 percent of the 9/11 victims cannot receive any money from

12   the fund as it is now because the 9/11 award is deemed to trump

13   whatever judgment you get and you have got a 100 percent

14   setoff.  So the only people who can go into the fund as it

15   exists now are the non-VCF people, our clients who continued

16   with their suits against American and United and eventually

17   settled.  We have submitted those to your Honor.  And your

18   Honor is quite right, punitive damages are not awardable in the

19   fund nor is prejudgment interest, so in the key components

20   we're anxious to get final judgments so we can participate.

21          Ken Feinberg's deadline for submitting the cases that

22   had final judgments was October 12, and we submitted four cases

23   by that deadline.  The reason the timing is significant is he's

24   got a little more than a billion dollars to spend on all these

25   judgments.  He has to total them up and then figure out what

GAKTTERC

1    percentage everyone can get.  At the end of the day it may be

2    very modest, it may be 6, 7, 8 percent, and no matter how big

3    the judgment is, it's effectively capped at $25 million.

4             We are anxious to get final judgments in the dozen

5    cases we just submitted to you.  With those final judgments, we

6    want to get them to Mr. Feinberg so he can include them in the

7    mix of cases he's looking at now and so we can get some money

8    from the fund.

9             THE COURT:  You mentioned an October 12 deadline.

10   What does that mean for cases where judgments are being entered

11   now?

12            MR. KREINDLER:  So the deadline is 90 days from final

13   judgment, but the reason we're in a rush is he's going to spend

14   all the money he has by the end of the year.  So for cases that

15   get final judgments in January, February, there's not going to

16   be any money left.

17            Now the fund may be replenished if another bank gets

18   into trouble for moving Iranian assets, it's possible that

19   money could come into the fund.  But to share in this very

20   limited pot, we really do need to get applications in

21   immediately, "immediately" being the next couple of days or a

22   week.

23            THE COURT:  So we understand that and we are

24   working -- the case was only just transferred to us, so we are

25   working as quickly as possible to get judgments out.  And I

GAKTTERC

1    think the 14-day deadline for objections will run I think next

2    Wednesday on some of the cases and I think next Friday on

3    others.  And absent hearing that there's going to be an

4    objection filed by the plaintiffs, and we don't expect anything

5    filed by the Iranians, but you never know, I think you'll get

6    judgments then.  So you should have those judgments by the end

7    of next week.

8         And with respect to applications that are being filed

9    now, again, I think we have set a framework so everybody

10    understands what we're talking about here.  We plan on moving

11    on those as quickly as possible.  So our goal, as the Court, is

12    to get those judgments out certainly by the first half of

13    November.  That sounds like it will still work for everybody.

14         MR. KREINDLER:  I think so.  What he said to me and to

15    some others is if you get some applications in the end of

16    October, I should be able to include them in my calculation of

17    who is going to share in the money I have now.  So that's why

18    timing is of the essence.

19         In terms of our briefing punitive, we appreciate that,

20    and just to reiterate, neither punitive damages or prejudgment

21    interests are elements you can get from Ken Feinberg's fund now

22    for purposes of this partial final judgment.

23         Just one more point on it.  In addition, we're in

24    somewhat of a quandary on this point.  We have four cases with

25    final judgments and we have got our applications in.  In those

GAKTTERC

1    cases, Judge Maas, as you know, used the multiplier of punitive

2    of 3.44, and 9 percent interest rate is the issue of New York

3    versus federal.  When you ask -- and by briefing on punitive,

4    it might make sense to also include the 9 versus the

5    4.9 percent prejudgment interest point, because we have got

6    this inconsistency between the first judgments rendered in

7    Havlish of 4.9 and ours at 9, but that I'm throwing out.

8             And then the last thing and then I will sit down is

9    even apart from these limited number of cases where the people

10   did not go to the VCF and participate in the fund, we do

11   intend, moving forward, to get judgments for all the 9/11

12   families against Iran in case the legislation is changed to

13   permit all 9/11 plaintiffs to share.  Or in the event that

14   there is ever a resolution with Iran itself outside the fund,

15   we think it's better to have final judgments for everybody

16   rather than just 10 percent of the 9/11 plaintiffs.  But there

17   is certainly no urgency, and that will take many months to run

18   through hundreds of thousands of cases to do that.

19             MR. FLEMING:  Tim Fleming for the Hoglan plaintiffs.

20             To add a little bit to what Mr. Kreindler explained

21   about the fund, what he says was correct with respect to the

22   estates who have recovered in the VCF-1, the 9/11 fund, there

23   is the problem of them being canceled out by the VCF award that

24   they got in those proceedings.  That does not apply to other

25   family members who did not get an award from the 9/11 fund

GAKTTERC

1    which covers a great deal of the Hoglan plaintiffs for whom you

2    in your report and recommendation to Judge Daniels did receive

3    a recommended award.

4             And so we want to be sure that we can move -- what we

5    did was we submitted to Judge Daniels the day before yesterday

6    exactly what you told us to do in the report and

7    recommendation, and that is submitted to a chart where

8    everybody who got those recommendations together with a

9    proposed order.

10            We didn't file a formal 54(b) motion, but we wanted to

11   make sure that those do get acted on because we do plan to file

12   some objections for some of the persons who were not found to

13   be functional equivalents of immediate family.  And we didn't

14   want the filling of those objections to delay an entry of

15   judgment for those who did receive a recommendation and would,

16   in our view, be eligible for the VSST fund.  So if there is

17   anything else to do, we stand ready to do that, but we think we

18   made that clear to Judge Daniels in our letter to him.

19            As I said, we are going to file some objections on

20   behalf of some of the people and also want to point out there

21   are two estates which your Honor has not ruled -- given a

22   recommendation with respect to, that's the Rowe family and the

23   Shefi family, and I want to point that out.

24            THE COURT:  They're on my radar screen.

25            MR. FLEMING:  Thank you very much.

GAKTTERC

1          MR. BAUMEISTER:  Good morning, your Honor, Mitch

2     Baumeister, Baumeister & Samuels.  Good to see you, your Honor.

3          THE COURT:  Good to see you.

4          MR. BAUMEISTER:  I agree with everything that has been

5     said.  I'm not going to belabor the point, but I think we need

6     a little structure, because in the Bauer case, in which you

7     issued the order, the two points I think you are concerned

8     about whether there would be objections would be the interest

9     rate and the punitive damages issue.  And on behalf of the

10    Bauer plaintiffs, Baumeister & Samuels clients, we do not

11    intend to offer any objections, and I do not believe anyone in

12    this courtroom is going to offer objections on the interest

13    rate or the punitive damages to Judge Daniels.  If they are,

14    they can speak up now.

15          I think Jim's point is to the extent there may be some

16    issue we would like to look at with respect to the 9 percent

17    versus the 4.6, because there is an inconsistency in that I

18    have clients who have Judge Daniels' orders with 9 percent and

19    with punitive multipliers.  And as a result, they stand in a

20    class that is going to be distinct depending upon your Honor's

21    ruling on the interest and on the punitive damages.  So we'll

22    have an inconsistency in the class of people.  So we'll have

23    Client A where they will get a multiplier and 9 percent

24    interest, and then depending upon your Honor's ruling it may be

25    different.  So I don't know how the Court handles that issue,

GAKTTERC

1    and I wanted to bring to the Court's attention.

2                THE COURT:  I'm well aware of the issue.

3                MR. BAUMEISTER:  So that's number one.

4                Number two, having dealt with Ken Feinberg quite a bit

5    along with Jim and the VCF fund, the next issue, the

6    objections, I don't think there's going to be any objections.

7                In terms of whether there's money in the Iran pot or

8    not is immaterial, it's a question of the clients are eligible

9    and have the right to do it, certain clients, and therefore as

10   lawyers we have to protect that right and go forward.  And

11   there really are two classes of people that have the potential.

12   And the 4.6, of the frequently asked questions for the Iran

13   fund, Ken Feinberg, who I had a recent conversation with, has

14   clarified that anyone who has gotten a VCF award, generally

15   spouses and children, will not be eligible to recover money

16   under the Iran fund.

17               But as Hoglan has just said, there is another distinct

18   category within the definition of the Iran fund of the

19   beneficial class under the frequently asked questions, and they

20   essentially cut it off at spouses and children can't get

21   anything under 4.6.  But we now have parents and siblings, and

22   the Court has expanded that potential class by also adding what

23   I call the tertiary relationship-type test for people who may

24   not fit within the exact definition, at least under the default

25   judgment.  Whether that will be accepted ultimately by the Iran

GAKTTERC

1    fund is another issue.

2           So the point is here we have two classes of people

3    that clearly we, in our Bauer complaint, are filing default

4    judgments on behalf, and that is the parents and siblings who

5    were not covered by the VCF fund, and the tangential

6    relationship people, whether or not they can recover from the

7    Iran fund or not.  We will get you additional briefing to see

8    whether the nexus of the relationship is good enough for the

9    Court to hold they're entitled as a beneficiary to get money

10   under the default judgment.

11          So this is a long-winded way of saying that these are

12   the issues that are confronting the Court and us as attorneys

13   representing our clients, these are the classes of people.  And

14   we would also ask that the Court, if you -- like Hoglan, I

15   think as a practical matter, whether someone was a stepfather

16   and not within the intestacy or the direct lineage you want

17   additional evidence, we would be happy to give that to you.

18          But we would like to see, if all possible -- we

19   understand the Court has been incredibly responsive, working

20   very hard and getting us very quick answers -- to understand

21   people with a relationship test becomes a question mark, we

22   would like to have a chance to brief that issue but not hold up

23   the people who fall into the class as parents and siblings, so

24   we get a default judgment so we get in front of Ken Feinberg

25   before the money runs out or maybe supplement it.

GAKTTERC

1          So I don't know if I clarified any of the issues for

2     the Court or I made them murkier, but I tried my best to tell

3     you these are the things that we're grappling with now.

4          THE COURT:  Let me tell you how I have been

5     approaching this, which hopefully has been self-evident.

6          I'm sort of looking at low hanging fruit because I

7     understand you have immediate needs, and so we have been

8     issuing our orders with that in mind, the things that I think

9     are the least complicated versus things that get progressively

10    more complicated.  I'm aware that we have two non-citizen

11    estates outstanding that fall within the more complicated

12    category, so we're working on getting something out as soon as

13    possible on those family members' claims.

14         So let me talk about a few items.

15         One, Mr. Kreindler, you mentioned that you would

16    like -- and I think, Mr. Baumeister, you intimated as well --

17    an opportunity to challenge not just the punitive damages

18    piece, which I have invited, but also the interest issue, the

19    prejudgment interest.  I think as a procedural matter probably

20    what makes the most sense for you all is to submit something to

21    Judge Daniels that indicates that you intend to object to

22    the --

23         MR. BAUMEISTER:  Judge, we're not objecting to it.

24    You asked for briefing.  I'm not objecting.

25         Jim, are you objecting?

GAKTTERC

1              MR. KREINDLER:  No.

2              MR. BAUMEISTER:  I want the Court to understand, we're

3      not objecting to the way you're handling it.  You asked us to

4      brief the punitive damages, and all we ask is you give us a

5      chance to brief that.  But we're not here to object to your

6      order that you issued in Bauer and --

7              THE COURT:  So long as you understand that --

8              MR. BAUMEISTER:  The time run and we waive our right,

9      we understand that.

10             THE COURT:  The recommendation that I have given with

11     respect to prejudgment interest thus far, if you don't object,

12     your opportunity to object for these particular individuals

13     will pass.

14             MR. BAUMEISTER:  We understand.

15             THE COURT:  Good.  So then to your point about

16     different cases, trust me, I did a lot of legal research

17     working with my law clerk trying to get as good a handle on the

18     law as I can.  I think the law is a bit of a mess, as I'm sure

19     you all have come to realize, and it's not clear to me that the

20     path that Judge Maas took, while I think it is one that is

21     defensible, when I look at the case law it's not clear that his

22     conclusions grew out of the way the case law developed.

23             And so rather -- I know you all were doing what I

24     understand you to be doing, which is just to follow what Judge

25     Maas had done in the past, and that makes perfect sense.

GAKTTERC

1    Because I think it's a more complicated issue, I didn't want to

2    make a recommendation to Judge Daniels without the benefit of

3    your thinking on this issue.

4           And given that this was not part of the fund, it made

5    more sense in my view to set aside this very significant issue

6    that I think is significant for the families.  I think it's

7    significant for questions about how families are treated within

8    cases and within single terrorist attacks and how the law has

9    developed generally.  Much of this law arises out, of as you

10   know, a totally different terrorist attack with a totally

11   different volume of participants in those litigations.  So when

12   you get to a case like this one, when the numbers start getting

13   so enormous, I think you have to pull back for a minute and

14   make sure we're following the law in a rational way.  So we can

15   talk about where we're going to go with that.

16          Before we move on, on the immediate needs, some of the

17   plaintiffs, I believe in Bauer and Ashton, recently submitted

18   applications to me for non-immediate family members.  My

19   understanding is that a lot of these are not supported by

20   individual -- Mr. Baumeister, I think some of these are your

21   clients, maybe, but they're not personal affidavits submitted,

22   it's just a lawyer affidavit, which struck me as unusual.

23   Certainly the other cases that I have been looking at already

24   there was a personal affidavit.

25          And I guess I would like to hear from you -- obviously

GAKTTERC

1    your testimony or attorney affidavit wouldn't be admissible at

2    trial.  I appreciate we're in a different posture.  I think the

3    best practice is to have individual affidavits, and I'm

4    wondering whether or not that is something that you're working

5    on or whether it's something I can expect.

6            MR. BAUMEISTER:  To break it down, you used a term of

7    art there, which, as you said, is confusing, and that was

8    immediate family members.  It is our belief that when you

9    define for default judgment purposes and ultimately in the

10   fund, the Iran fund, immediate family, spouse, children,

11   parents and siblings, beyond that cut off we then get into what

12   I call other potential beneficiaries.

13           So I don't think the Court is saying to me if you have

14   a parent or you have a brother or sister you need a personal

15   affidavit from them.  What I think the Court has asked for in

16   the Hoglan cases and in the Bauer cases, of which we have

17   three, is if there's a situation where there isn't a clear what

18   I call intestacy nexus of either parent, spouse, children,

19   parent or sibling, and in those, like a stepfather or

20   stepdaughter, a relationship where someone had a very close

21   relationship but didn't formally adopt them, you have asked us

22   to get personal affidavits on those three cases, and we will

23   endeavor to do that.

24           That is a little more complicated given that we have

25   got to go back to the clients and got to explain it to them,

GAKTTERC

1    and we will get that for the Court in what I call categories of

2    clients that fall outside of the four classes that are

3    recognized under the Iran fund and generally recognized in the

4    default judgments that we have gotten.

5         THE COURT:  So with respect to your case, the Bauer

6    case, you believe there are three individuals who fall within

7    that category?

8         MR. BAUMEISTER:  Yes.  In fact, your law clerk wrote

9    us, three solatium plaintiffs who claim to be what I call, and

10   call them now, functionally equivalent of an immediate family

11   member.  So that means to me that they fall outside the four

12   categories I just mentioned.

13        And you said to me:  Would you -- on those three

14   functionally equivalent solatium damage plaintiffs, would you

15   please give us more than your attorney's affidavit?  We will

16   endeavor to do that.  We thoughts the lawyer's affidavit would

17   be sufficient.  If it's not for this Court, we will go to the

18   clients and get individual affidavits to create a quantum of

19   proof that you're comfortable with to make a decision upon.

20        THE COURT:  Are there any other plaintiffs that are

21   seeking judgments at this time that have not been presented to

22   me or that fall outside of the immediate category and for which

23   I would want personal affidavits?

24        MS. FLOWERS:  May it please the Court, Jodi Flowers on

25   behalf of the Burnett plaintiffs.

GAKTTERC

1   We do expect to have received confirmation of service

2   literally any moment and file it, and then we will seek our

3   defaults in an additional subcategory of our plaintiffs that

4   will be following the same framework that you put forward.

5   THE COURT:  Is that confirmation of service?

6   MS. FLOWERS:  Upon Iran.  We were able to get back

7   from the State Department confirmation of service of process,

8   which was the first step that we had to file before we could

9   get our default.

10   THE COURT:  So you don't have a default yet.

11   MS. FLOWERS:  That's correct.

12   THE COURT:  Okay.  Do you have a sense of when you

13   will be making that application?

14   MS. FLOWERS:  I think the application should probably

15   go in this week if not early next week.

16   THE COURT:  Okay.  Thank you.

17   MR. CARTER:  Your Honor, Sean Carter on behalf of

18   federal insurance plaintiffs.  So the commercial plaintiffs in

19   the federal insurance action also have judgments against Iran,

20   liability judgments.  A subset of them filed affidavits and

21   received damages awards approved by Judge Maas and then entered

22   by Judge Daniels.  Another subset of them had not yet filed

23   their damages affidavits, and we're going to be doing that

24   shortly following the same process that we did, it's a personal

25   affidavit of a corporate representative.

GAKTTERC

1          THE COURT:  Are they eligible for funds?

2          MR. CARTER:  They are not.  So we sort deferred and

3     held back.

4          THE COURT:  So if we put you on the back burner you

5     won't be offended.

6          MR. CARTER:  I will not be offended, and I held off to

7     stay on the back burner.

8          THE COURT:  Thank you.

9          MR. FLEMING:  I just wanted to be clear that for all

10    the functional equivalents for everyone in the Hoglan case we

11    did submit personal affidavits rather than lawyer affidavits.

12    I wanted to make clear you're not waiting for anything from us.

13         THE COURT:  As I sit here right now, I'm not sure, but

14    if you haven't heard from us, then probably not.  Thank you.

15         MR. KREINDLER:  Your Honor, just one thought that

16    occurred to me here.  While we're talking about the solatium

17    claims, it's clear that siblings have those claims.  When we're

18    talking about more remote family members, uncle, aunts,

19    stepparents, half siblings, it might be helpful for the Court

20    for us to, along with briefing punitive damages, submit a brief

21    on how wide we believe the circle should go, because we're

22    dealing with 3,000 deaths and the circle could grow very, very

23    large.  So rather than just dealing with it on the basis of the

24    relative handful of cases you have so far, it might make sense

25    to do some briefing on functional equivalent and who can

GAKTTERC

1    participate.

2            And on punitive damages, our history is the same as

3    yours from dealing with Libya, we're used to a more uniform

4    result, but of course we have the precedent in this case and

5    others of the multipliers.  So we would like to give some

6    thought to that and submit briefing on punitive damages, but

7    maybe a schedule to brief all the issues that this fund is

8    causing the Court to have to deal with quickly might make some

9    sense to do it on a comprehensive basis.

10           THE COURT:  Sure.  For those of you -- Mr. Kreindler

11   raised my prior involvement, so in case anyone is interested,

12   when I was a lawyer before I was a judge I represented a

13   certain number of families in litigation against Libya rising

14   out of the Pan Am bombing of Flight 103.  I do not believe

15   there is a conflict.  I thought about it when the case was

16   reassigned to me.  I was not a member of the plaintiff's

17   committee, although I was colleagues with Mr. Kreindler and

18   Mr. Baumeister, so I raise that issue.

19           If anyone thinks there's a problem and wants to make

20   an application to me, I will certainly hear it, but I did

21   consider whether or not I thought there would an appearance of

22   impropriety.  This was many years ago, probably six or eight

23   years ago, I don't quite remember, maybe longer, maybe ten

24   years ago or twelve years.

25           MR. BAUMEISTER:  Please don't date us.

GAKTTERC

1          THE COURT:  In any event, the reference was to the

2     fact that I was a lawyer representing a small number of

3     families in the Pan Am litigation.

4          MR. BAUMEISTER:  Judge, for the Baumeister firm, we

5     see absolutely not even an appearance of impropriety, so it's

6     not an issue as far as we're concerned.

7          MR. KREINDLER:  Of course it's not an issue.  You

8     share the same burden we have of a little knowledge and

9     experience can be a dangerous thing, so we're all in the same

10    boat.

11         THE COURT:  So let me talk a little bit about the

12    potential objections to non-immediate family members.  It seems

13    to me, again as a procedural matter, we issued an order

14    recommending damages for certain non-immediate family members,

15    stepfamily members and people who are not married but were

16    functional equivalents to spouses, and we denied the balance of

17    the non-immediate family members.

18         I think that the appropriate procedure would be to

19    lodge objections as to those claims.  I appreciate the comment

20    that you never really had the opportunity to brief the issue,

21    and I think it would be fair and appropriate to give you that

22    opportunity, even arguably to do that before me in the first

23    instance if Judge Daniels would prefer that.

24         I don't know whether or not -- the need for briefing

25    and the urgency, whether or not we'll be able to hit a November

GAKTTERC

deadline, I think it's unlikely that we will, but as you

mentioned, it may be that you want the potential to get these

judgments for something that may come in the future.

        So I'm fine having briefing on these sort of

third-tier family members, but I do think an objection should

be lodged before Judge Daniels to preserve your rights.  And so

I can notify Judge Daniels that you're going to submit an

objection, just maybe even a statement of objection, and I can

speak with him procedurally about what makes the most sense on

how to then actually set forth that objection.

        I think what you wanted is the non-objectionable

judgments to go forward, and so it seems to me I think the most

simple way to go forward would be to submit a short letter to

Judge Daniels asking that he enter the partial judgments that

have been recommended by me, for you to lodge objections, and I

can ask Judge Daniels to sort of re-refer that issue back to me

and I can look at punitive damages and these non-immediate

family member claims at once at a reasonable briefing schedule.

But I think as a procedural matter you should lodge an

objection so you haven't waived your right to object to the

denials.

        Let's talk about what a reasonable briefing schedule

would be for now both the punitive damages and the third tier

of family members.  So we are at October 20.  I imagine that

there is both a lot of legal research and some factual inquiry

GAKTTERC

1    that you are all going to need to do, so I will take my leave

2    from you.  I don't know if you want 30 days to brief it, 60

3    days to brief it.  Do you have a sense of what is the schedule

4    that makes the most sense?

5            MR. KREINDLER:  As between the two, I think 60 days

6    makes more sense.  We have our hands full with some other

7    aspects of the case that we're going to be talking about.  And

8    as I said, the important thing is the non-objectionable

9    judgments going into Mr. Feinberg in the next two weeks, but a

10   briefing on the two other topics in 60 days I think makes

11   sense.

12           MR. PANTAZIS:  I was going to agree, your Honor.  We

13   have 88 people that fell in that category.  Not all of them may

14   be appealed or objected to, but there is a lot of individual

15   facts to those folks that might require the 60 days, so we

16   would appreciate a 60-day period.

17           THE COURT:  60 days puts us right before the Christmas

18   holiday.  I don't know if that's better or worse for you all.

19   60 days would get us to December 20, so we could do that,

20   that's a Tuesday, or we could make it December 23rd, which is a

21   Friday, or if you would rather, we could look to the first or

22   second week in January.  I leave it to you all.

23           MR. KREINDLER:  I think January is easier.

24           MR. PANTAZIS:  That's fine.

25           THE COURT:  Let's say, unless anyone is superstitious,

GAKTTERC

1   Friday the 13th.

2         So let's set January 13th as the deadline to file

3   these submissions, so we'll be talking about punitive damages

4   and about the non-immediate family members.

5         I'm going to give the defaulting defendants an

6   opportunity to respond, so I will -- we'll start looking at

7   this issue, but I will not issue a decision probably for 30

8   days to allow the potential for the defaulting defendants to

9   come forward.  So you should assume that I'm going to wait

10  probably until the middle of February.  If the defaulting

11  defendants want to file anything, they can file something.  I

12  will set it for February 17, and then hearing nothing, I will

13  assume that the motion is fully submitted.

14        Okay.  Let's talk about Saudi Arabia and the new

15  legislation.

16        MR. CARTER:  Sure, your Honor, Sean Carter again on

17  behalf of the PEC.

18        As I think we indicated in the letter to Judge

19  Daniels, the plaintiffs were intending to file a motion with

20  the Second Circuit in the context of the pending appeal of the

21  dismissals of the kingdom and Saudi High Commission seeking to

22  have the decision below vacated, the cause remanded to the

23  district court for further proceedings in accordance with the

24  new law, and to authorize some repleading.

25        Per the Second Circuit rules, we reached out to

GAKTTERC

1    counsel for Saudi Arabia and for the Saudi High Commission to

2    see whether they would consent.   That led to a dialogue about

3    presenting a joint motion to the Second Circuit.   And after

4    some back and forth on the actual text of the motion itself, we

5    reached agreement yesterday on a joint motion that will be

6    submitted to the Second Circuit, my expectation is either later

7    today or tomorrow.

8         So we will jointly be asking for the decision to be

9    vacated, for the case to be remanded for the district court for

10   further proceedings in accordance with the Justice Against

11   Sponsors of Terrorism Act, and then there's likely to be a

12   disagreement about the scope of repleading that should be

13   authorized once the case is back before the district court.

14        I think we are in agreement that there should be

15   repleading at a minimum to allow for the assertion of the new

16   cause of action that is created under the statute and to invoke

17   the jurisdictional authorization that's embodied in the law.

18        We also think that there is some additional factual

19   pleading that needs to occur to align the record and the

20   allegations with the requirements of the new law.   And so we

21   have not had a chance to speak about a particular schedule for

22   that or what exactly it might look like with counsel for the

23   kingdom.   He's been traveling.   My expectation is that as soon

24   as he's back we'll begin discussing those issues.

25        What we did in the proceedings in 2014/2015 was that

GAKTTERC

1    we proceeded to file simultaneously our motion to amend at the

2    same time the kingdom and the Saudi High Commission filed their

3    renewed motion to dismiss, and we may very well proceed under

4    that same sort of framework.

5         THE COURT:  Okay.  I note that Judge Daniels has

6    scheduled a conference for January 18, so presumably by then,

7    which is three months from now, the case will have been

8    remanded back to this Court.  I'm wondering if it make sense to

9    hold off on any motion practice until that conference, which

10   will, one, give you some additional time to continue speaking

11   with your adversary about whether or not any agreements can be

12   reached with respect to the amendment -- I don't know if you

13   have provided your adversary with the draft amendment.

14        MR. CARTER:  We have not, your Honor.

15        THE COURT:  So that will give you the time to do that.

16        I think what I would recommend is to have you draft

17   your proposed amended pleading and provide it to counsel, allow

18   some conversation about that, and then when we meet jointly on

19   January 18 we can discuss whether or not your adversary, having

20   seen and reviewed the pleading, is willing to consent to its

21   amendment and set schedules either for a motion to amend, or if

22   it's not necessary, the anticipated motion to dismiss.

23        MR. CARTER:  I'm happy to communicate that back to

24   counsel for the two defendants at issue, and if there's any

25   concern on our part we can advise your Honor and Judge Daniels

GAKTTERC

1   in writing.

2           THE COURT:  The goal should be that we're not filing

3   motions before we meet again on that particular issue.

4           MR. CARTER:  Thank you, your Honor.  The other

5   question your Honor raised was whether or not we expected

6   additional cases to be filed against the kingdom, and I think

7   your Honor referenced cases not involving the September 11

8   attacks.  We don't expect other cases unrelated to the

9   September 11 attacks.  With that said, there are a universe of

10  victims and family members of the September 11 attack, victims

11  who have not previously filed suit against the kingdom, and

12  there's obviously a potential that some of those folks will

13  come forward at this point and file claims.

14          To the extent we are aware of firms that have broad

15  representation in the 9/11 family community, we have gone out

16  to them and tried to bring them under the umbrella of the

17  Plaintiffs Executive Committee to try and promote an orderly

18  process with respect to any further claims that might be filed

19  so that pleadings look relatively the same and so that we can

20  try and coordinate any further proceedings as to the kingdom as

21  much as is possible.

22          I think that we have done a good job in identifying

23  most of the camps that fall into that universe, but we can't be

24  sure that we have reached out to everyone.

25          THE COURT:  Okay.  I understand that one case was

GAKTTERC

1   recently filed.  I don't know if the lawyer representing those

2   plaintiffs is here today.

3          There was just recently a case filed and an

4   application to be deemed related.  One question that we, the

5   Court, has is whether or not the appropriate protocol is to

6   first go to the MDL panel before coming here or filing and then

7   filing with the MDL panel.  It seems to me that it probably

8   makes the most sense to have cases be blessed through the MDL

9   panel before they are formally placed into this MDL here.  Is

10  that the recommendation that you're giving to lawyers that

11  you're reaching out to?

12         MR. CARTER:  I think we would.  I think we would tell

13  them if they file elsewhere and they want to come into the MDL,

14  the best approach is to notify the judicial panel of the

15  multi-district litigation of the related case and then expect a

16  conditional transfer order would be issued.  And if there's no

17  objection, then they would become part of the MDL relatively

18  quickly.

19         THE COURT:  And that would also be true, I think, for

20  people who are filing in the first instance in the Southern

21  District of New York.

22         MR. CARTER:  That's correct, your Honor.

23         THE COURT:  We want to let the MDL panel know that we

24  anticipate that there may be an additional body of cases that

25  are coming in now as a result of this litigation so they can be

GAKTTERC

looking to that and turning it around quickly.  So it seems to

me the message I can send back to them is yes, we anticipate

having some number of additional cases brought against the

kingdom, they will be related to the 9/11 attacks and not

separate claims, and that the parties will make an application

to the MDL panel when they file.  Is that accurate?

            MR. CARTER:  That's what we'll recommend.

            THE COURT:  That's what you're recommending.

            Okay.  We think it makes the most sense for things to

run through the MDL panel so that we all have a firm sense of

what is in and what is not in this case

            MR. CARTER:  Thank you, your Honor.

            THE COURT:  Good.  All right.  Next thing on my list

is the Dallah Avco motion to compel.

            Are the parties who brought that here?

            MR. CARTER:  Your Honor, it was filed on behalf of the

plaintiffs generally.  It is fully briefed, as your Honor is

aware, and counsel for Dallah Avco and plaintiffs are prepared

today to discuss with your Honor a date for argument, if that

makes sense.

            THE COURT:  I don't know that I'm ready to discuss a

date for argument, but I think I would benefit from a

two-minute primer on what the motion is about.

            MR. CARTER:  Sure, your Honor.  Very broadly speaking,

the plaintiffs have alleged that Dallah Avco provided

GAKTTERC

essentially a cover job to an individual named Omar Al-Bayoumi.

Omar Al-Bayoumi was a Saudi residing in the United States in

the San Diego area who, according to the 9/11 Commission and

various other reports, provided direct assistance to two of the

9/11 highjackers, Khalid Al-Mihdhar and Nawaf Al-Hazmi, after

they arrived in the United States.

It's relatively undisputed that Bayoumi did provide

some assistance to them.  There are various disputes

surrounding whether or not he did so knowingly, the full nature

of that dispute, there's also a question surrounding Bayoumi as

to the true nature of his relationship to the Saudi government.

Bayoumi was on government payroll for many years, allegedly on

secondment to Dallah Avco, while he was here in the United

States purportedly to pursue educational activities.  The

plaintiffs have alleged that in fact Bayoumi was a part of a

network of undisclosed Saudi government agents here in the

United States who were reporting to the kingdom's Ministry of

Islamic Affairs, and that he provided support to the

highjackers at the direction of a cleric resident in the Los

Angeles Consulate of –- the Saudi Los Angeles consulate.

And so with regard to Dallah Avco, the claims

essentially proceeded up to appeal before the Second Circuit as

to whether or not Dallah Avco had directed his tortious

activity at the United States by, as we said, providing a cover

job to Bayoumi that allowed him to carry out his undisclosed

GAKTTERC

1    activities here in the United States.

2            The Second Circuit Court of Appeals overturned the

3    dismissal of Dallah Avco and remanded the case for

4    jurisdictional discovery.  We have had some disputes regarding

5    the appropriate scope of that discovery, and I will allow

6    counsel for Dallah Avco to address their position.  Our view is

7    obviously that it encompasses documents related to Dallah

8    Avco's relationship with Omar Bayoumi as well as communications

9    with the Saudi government concerning Mr. Bayoumi.

10           There were also indications in some of the FBI reports

11   that have been declassified that witnesses felt there were

12   additional undisclosed employees on the Dallah Avco payroll who

13   never showed up for work, and so we served discovery

14   surrounding those issues.  One of the problems that we

15   encountered in the context of that is that Dallah Avco, during

16   the course of litigation, took the records relating to the

17   project on which Bayoumi was seconded, put them in a giant

18   warehouse, for lack of a better term, in a relatively

19   disorganized manner, and they became increasingly disorganized

20   over time.

21           So there is a dispute in the motion as to whether or

22   not the efforts Dallah Avco has undertaken today are adequate

23   to have returned all the potentially relevant records.  We

24   identified some specific records that we think are especially

25   important to the theories that have been advanced that we

GAKTTERC

1    believe are missing from what we received, and Dallah Avco's

2    position, again, I will let them speak to that.

3              THE COURT:  Okay, thank you.  That helps.

4              MR. KRY:  For some additional context, first in terms

5    of the facts, Dallah Avco's role with respect to the Saudi

6    government was that there was a project for an air navigation

7    assistance support project for which Dallah Avco essentially

8    acted as a contractor providing manpower, procurements, and

9    payroll processing services.

10             Mr. Al Bayoumi was one of I think about 1,500

11   employees that were attached to that Saudi project, and so, as

12   with other employees, Dallah Avco essentially handled payroll.

13   Its relationship with Mr. Al Bayoumi, its knowledge about his

14   activities, was extremely minimal.  All the evidence that has

15   been produced in the case so far has shown that Dallah Avco did

16   not supervise his work, doesn't direct his work, and so many of

17   the complaints that are raised with this motion to compel I

18   think rest on the misimpression that they are expecting us to

19   have more -- they're expecting Dallah Avco to have more than it

20   would logically have given the very limited relationship

21   between Dallah Avco and Mr. Al Bayoumi.

22             On the specific points that are raised in the motion,

23   I think it really falls into two categories.  About half of the

24   60 or so requests they served sought documents relating to

25   Mr. Al Bayoumi, various types of documents, and we never

GAKTTERC

1   disputed those are fair game.  So on those issue, what the

2   motion really comes down to is:  Has Dallah Avco's search been

3   comprehensive and thorough enough?

4           As set out in our opposition papers, we believe that

5   it absolutely has.  We face special challenges, and that was

6   alluded to.  Many of the documents were in off-site storage,

7   not for any nefarious reason, but that's where they were

8   stored.  So it was a major undertaking that took a ton of

9   resources and a lot of expense from our client to retrieve

10  those to find everything.  Our client went through the

11  warehouse not once but twice to dig that all that stuff up and

12  bring it back.

13          And I think our opposition papers make a persuasive

14  showing that whatever there is that relates to Mr. Al Bayoumi

15  we searched for several times and produced whatever we have

16  been able to come up with.  And the documents on that are not

17  just our opposition, but in connection with the opposition we

18  filed a lengthy and very detailed affidavit from the general

19  counsel of the Dallah Group who is in charge of Dallah Avco's

20  legal defense.  So there's a very detailed factual record in

21  terms of what was done with the search and why we believe it's

22  comprehensive enough to find the documents relating to

23  Mr. Al-Bayoumi that the plaintiffs are seeking.

24          The second half of the motion to compel relates to

25  broader topics that do not relate to Mr. Omar Bayoumi, and in a

GAKTTERC

1   number of respects we have -- through the meet and confer

2   process we tried to accommodate those concerns.  For example,

3   some of the things they mentioned, they raised the issue of:

4   Are there other employees who are similarly situated to

5   Mr. Al-Bayoumi?

6           While one thing we did in response to that is we not

7   only looked for and produced all the documents relating to

8   Mr. Al-Bayoumi's comments about that ANSS project, but we also

9   went through all the 1,500 other employees files and looked for

10  any evidence of anyone else that had similarly been seconded to

11  the project from the Kingdom of Saudi Arabia.  And we found a

12  small number of instances, but the relevant files on those were

13  produced as well.  And so we have gone beyond just the stuff

14  directly relating to Mr. Al-Bayoumi, but essentially that piece

15  of the motion relates to whether -- other topics not relating

16  to Mr. Al-Bayoumi which nevertheless we have to search for

17  documents, and those are also fully briefed in the motion.

18          I want to clarify one factual point for the record.

19  There was a reference Mr. Al-Bayoumi being seconded to Dallah

20  Avco, and I think we have been clear from the outset of the

21  case that Mr. Al-Bayoumi was seconded to the ANSS project.  His

22  work was not directly supervised by Dallah Avco.  And is that

23  an important point to keep in mind not only for the merits of

24  the case but also in the context of this motion to compel,

25  because it explains why a lot of documents one might expect to

GAKTTERC

1    see if we were actually supervising and actually had knowledge

2    of what he was doing aren't there.  Because what a company like

3    Dallah Avco might be expecting to have about somebody whose

4    payroll they're handling is going to be very different if

5    they're just performing very limited administrative services as

6    a contractor for the entity that actually directs and

7    supervises its work.

8             THE COURT:  Good, that was helpful.  Thank you.

9             The other motion that I'm aware of is a motion for

10   sanctions, Perouz Sedaghaty motion for sanctions.

11            MR. HAEFELE:  Good morning again, your Honor, Robert

12   Haefele from Motley Rice.

13            The Sedaghaty issue, I think that the issue is that

14   the briefing was done on that, your Honor, and we finished the

15   briefing on the Sedaghaty motion several months ago.  I think

16   we were just waiting for an order from the Court.

17            I spoke to Mr. Kabat today who represents

18   Mr. Sedaghaty, who is here somewhere.  I think both of our

19   positions are it was something that we anticipated -- unless

20   your Honor, who now took the case over from Judge Maas, wanted

21   some oral argument -- we understood that it was to be done

22   based on briefing because the briefing was really something

23   that the Court had asked for.  At the original argument Judge

24   Maas indicated that he was leaning in one direction, but then

25   entertained the notion of having some briefing from Mr. Kabat

GAKTTERC

1    on a limited issue of whether or not the Court would impose as

2    a sanction adverse inference at trial.

3           THE COURT:  Okay.

4           MR. HAEFELE:  And that was the issue that he asked for

5    briefing on, which has been briefed, and he asked us, the

6    plaintiffs, to hold off on responding until the Court indicated

7    whether or not it wanted briefing.  Eventually it did, and that

8    briefing was done.

9           And so, from our perspective, we anticipated that it

10   would be -- we expected an order issued from Judge Maas before

11   he left, but apparently it's something that has been passed on

12   to your Honor.

13          THE COURT:  I will betray my lack of engagement on

14   this particular motion.  Does the motion indicate clearly where

15   the hearing was so that I can read the transcript that Judge

16   Maas --

17          MR. HAEFELE:  Yes, I can tell you the date, July 8,

18   2016.

19          THE COURT:  July 8, 2016.  So I will focus on that

20   transcript and read the submissions.  And sounds like we won't

21   need oral argument.  If we do, I will let you know and we will

22   turn to it.  Consistent with my low hanging fruit and urgency

23   approach to triaging the case right now, I had put the two

24   pending motions a bit on the back burner, and I will turn to

25   them in the ordinary course.

GAKTTERC

1           MR. HAEFELE:  Thank you.

2           MR. KRY:  Will argument be scheduled on the motion to

3      compel?

4           THE COURT:  I will admit I have not read the motion

5      papers yet, so I don't know whether or not oral argument will

6      be helpful to me or not.  I will let you know as soon as I do.

7           I was thinking as we were talking, given your sort of

8      suggestion that oral argument might be useful, that maybe what

9      I would do would be to schedule it on the 18th of January since

10     you're already going to be in court and it be the most

11     efficient way to handle it.  Certainly by then I will have

12     gotten up to speed.  So I'm thinking that that might make the

13     most sense.

14          MR. KRY:  Thank you, your Honor.

15          MR. CARTER:  I think that would be fine, and I'm

16     trying to think back to the specifics of the briefing, but I

17     would guess that it sort of drops out of thin air without a

18     whole lot of context because there had been a lot of prior

19     briefing that preceded it, so it may very well prove that oral

20     argument would be helpful.

21          THE COURT:  And as far as timing goes, if we delay

22     getting a ruling out until sometime after the January 18

23     conference, that works for everybody?

24          MR. CARTER:  It does, your Honor.

25          MR. KRY:  Yes.

GAKTTERC

1      THE COURT:  Why don't we assume now that we will have

2  oral argument on the motion on the 18th of January unless I

3  find that of all my other cases disappear and I have nothing

4  else to do but focus on this motion in the next month or two.

5      MR. KABAT:  Your Honor, I'm also the attorney for

6  Perouz Sedaghaty, and we're willing to rest on the submission

7  of docket number 3317, which is our letter to Judge Mass from

8  July 15.  But if you wish to have oral argument, we're willing

9  to participate on January 18 or some later date with respect to

10  the motion that you mentioned.

11      THE COURT:  Okay.  Thank you very much.

12      On my schedule, the next question is:  Are there any

13  other pending motions?  Anything else that I should know about?

14      MR. CARTER:  Your Honor, Sean Carter again.  It's not

15  so much a pending motion as there are a few loose ends relating

16  to issues that Judge Maas addressed previously.

17      Judge Maas had issued a monetary penalty against Wa'el

18  Jalaidan, one of the defendants involved in discovery.  Judge

19  Daniels thereafter formalized that monetary penalty and

20  required defendant Jalaidan, who has an executive order 13224

21  especially designated global terrorist, to undertake steps to

22  obtain a license from the Office of Foreign Assets Control, as

23  would be required in order to make payment of the penalty to

24  us.

25      Several months ago there was an indication that an

GAKTTERC

1    application to the Office of Foreign Assets Control had been

2    submitted.  It's been quite a while and we haven't heard

3    anything further regarding the issue, so from the plaintiffs'

4    perspective I think we're wondering whether or not the license

5    has been issued; if it has not, whether or not we can perhaps

6    see some of the communications with the Office of Foreign

7    Assets Control so we can better understand what the delay might

8    be, and to the extent the license has been issued, whether or

9    not the defendant intends to make the payment mandated by the

10   Court.

11          THE COURT:  Is the Court the entity that was supposed

12   to make this application?

13          MR. CARTER:  No, the defendant himself made the

14   application and affirmed to the Court, and as required by Judge

15   Daniels, that an application had been submitted.

16          THE COURT:  I'm sorry, I'm not clear on what you're

17   asking of me, or maybe you're just giving me an update.

18          MR. CARTER:  Your Honor, I think what we're asking is

19   that counsel for defendant Jalaidan apprise both the Court and

20   the plaintiffs as to the status of the application to obtain

21   the license necessary to make this payment, and if the license

22   has been issued, to explain why the payment has not issued.

23          THE COURT:  Okay.  Is counsel for Wa'el Jalaidan in

24   the room?

25          No.

GAKTTERC

1              MR. CARTER:  I don't think so, your Honor.

2              THE COURT:  I will take that request under advisement.

3         Okay.  Before we end let me pull the lens back a

4    little bit now and talk to you all about going forward with

5    this case.  And maybe, Mr. Carter, you're the one to talk to me

6    about this.  Is there a vision of how this case moves forward

7    in this sort of traditional litigation posture, which is to say

8    is there a schedule for discovery, should there be a schedule

9    for discovery, are there depositions that can be taken and

10   should be taken?  Where are things?

11             MR. CARTER:  Your Honor, what we did I think a little

12   over a year ago, with Judge Maas' approval, is to suggest a

13   sort of rolling schedule for filing motions to compel as to the

14   defendants.  And the deadline for filing the motions to compel

15   was determined in large degree by when the defendants

16   themselves indicated that they would be done making their

17   rolling productions of documents.

18        The two problems that we had encountered were, one, in

19   an environment where the defendants were still producing

20   documents, it was very difficult for us to determine what might

21   be missing, and therefore very difficult for us to file the

22   necessary motions to compel.

23        And in the same vain, in a world where there was a

24   potential that a massive influx of additional documents were

25   going to be submitted, it was difficult for us to move forward

GAKTTERC

1    with depositions, particularly overseas depositions that we

2    might have to then retake by virtue of the most important

3    documents coming at the tail end.

4         So the vision I think for the case was to try and get

5    through this document production phase, resolve any residual

6    issues relating to motions to compel after the defendants said

7    they were finished, and then go out and take the depositions

8    that we need to take.

9         Over the last several months a number of defendants

10   have indicated they need some more time to complete their

11   rolling productions.  They have discovered additional

12   documents.  And so a few of the defendants have come to us and

13   said we're still going to be producing documents essentially

14   through the end of this year.

15        In another instance or two, for instance defendants

16   Muslim World League and IIRO, they came to us indicating they

17   believed they had completed their productions.  We had a number

18   of meet and confers, and they agreed after that dialogue to go

19   back and look for some additional documents.  And about two

20   weeks ago we sat down again in Washington to discuss the issue,

21   and they have indicated to us that they are going to be

22   producing further documents.

23        So I think broadly we hope that the document

24   production phase will be done in the very early part of next

25   year, at the latest, and that we will be able to wrap up any

GAKTTERC

1    motions to compel associated with that not very long

2    thereafter.

3            One of the challenges is if a defendant produces a

4    hundred thousand additional documents very near to the end of

5    the rolling production and they're in seven different

6    languages, which has been the case, it takes a little while for

7    us to get through that.  And so I think we would like just to

8    get a very clear assessment from the defendants of when they

9    realistically would be done producing their documents, and then

10   we can set a schedule for wrapping up all the motions to

11   compel.

12           On the plaintiffs' side, we finished our production in

13   August of 2012.  Our investigations have continued since that

14   time, so there is some additional documentation we'll be

15   producing principally by virtue of FOIA requests that we sent

16   out seven years ago and that we're now receiving responses to.

17   But our productions have been done for a very long time and

18   we're really waiting for the defendants all to wrap up theirs.

19           THE COURT:  Okay.  Any defense counsel want to speak

20   to that issue?

21           MR. COTTREAU:  I will start, your Honor.  Steve

22   Cottreau for Dubai Islamic Bank.

23           We, too, completed our production in August 2012.

24   After three years, plaintiffs moved to compel, and in March the

25   Court ordered some clean-up categories.  By and large we have

GAKTTERC

1   complied with those clean-up categories and are still working

2   through a few issues with plaintiffs.

3           The only other issue I would raise on that -- and we

4   fully expect that we'll work those issues out hopefully with

5   plaintiffs and complete our production and response to the

6   motion to compel early next year.  The only issue I would raise

7   with you is that some of the witnesses in the case on the

8   witness list are getting quite aged.  And making no judgment

9   being able to predict their health in the future, we would like

10  to move forward with at least a couple of those depositions.  I

11  raised the issue today with Mr. Carter and he seemed amenable

12  to it, but want to make sure that's fine with the Court to go

13  ahead and move forward with people who may be getting up in

14  years.

15          THE COURT:  I think that make sense.

16          MR. CARTER:  Yes, your Honor.

17          THE COURT:  Here's what I would like to propose:  I

18  would like to set a deadline for paper discovery at the end of

19  the year so that we have some concrete backstop --

20          MR. GOETZ:  Your Honor, before you do that, may I

21  weigh in for WAMY?

22          THE COURT:  Yes, sir.

23          MR. GOETZ:  WAMY is one of the defendants that

24  Mr. Carter alluded to that has made some production and is now

25  submitting that on a rolling basis.  We produced over 586,000

GAKTTERC

documents or pages so far.  Realistically, there are a number
of other documents that we have now received from our client.
We think that the receipt process is completed, but we're still
reviewing those, determining if there's duplications, et
cetera.  There are a number of documents go to through.

        Our target date was the end of the year, but we
anticipate asking plaintiffs for one further extension of some
months.  So I want to let the Court know that before you set
the end of the year as a firm date.  We think realistically,
from our perspective, given the amount of documents to review,
the different languages that they're in, most are in Arabic,
that we will not meet that end of the year deadline.

        THE COURT:  You said you were hoping to get it by the
end of year and then you think you will need several more
months.  What's both reasonable and realistic -- those two
things may not always work together -- time frame?

        MR. GOETZ:  Your Honor, I anticipate asking for
another extension of a few months, I don't want to say three or
four, but we would hope it would be somewhere in that ballpark.
I want to be candid with the Court about the number of
documents that we still have to review.  It's a large number,
and I agree with Mr. Carter that before we get to the motion to
compel stage or the deposition stage that that discovery --
paper discovery should be complete.

        THE COURT:  Okay.

GAKTTERC

1          Yes, sir.

2          MR. NASSAR:  Your Honor, Waleed Nassar on behalf of

3     the International Islamic Relief Organization and the Muslim

4     World League.

5          We're expecting an influx of documents from several

6     overseas locations.  There's been delays in obtaining the

7     documents.  Some of the documents are coming from Tanzania,

8     Kenya, some far-flung places.  So we're still waiting for

9     receipt of the documents, but we do anticipate producing the

10    remainder of documents that plaintiffs have requested of us by

11    the end of January.  But I think given the recent holidays and

12    overseas and whatnot, we don't anticipate receiving the

13    documents in the upcoming weeks, so there will be a slight

14    delay on that.

15          THE COURT:  Okay.

16          Mr. Carter, I have just heard from the WAMY defendants

17    and the Muslim World League defendants.  Are there other

18    defendants for whom you are receiving documents and you believe

19    you either received most or will have received most by the end

20    of the year?

21          MR. CARTER:  Your Honor, as Mr. Cottreau said, we're

22    working through some issues with him relating to his client,

23    Dubai Islamic Bank.  I do think that the additional productions

24    we are expecting from Muslim World League, International

25    Islamic Relief, and World Assembly of Muslim Youth represent

GAKTTERC

likely the bulk -- along with Mr. Salerno's client, Mr. Kadi,
those are the camps where we expect to receive the bulk of the
documents.  And I think everyone was sort of targeting towards
the end of the year.  We're now receiving notice that we're
probably going to bleed over a few months after that, but we
would expect to see everything within that first quarter of
next year from the defendants.

          The one difficulty we have is then moving forward
after that point in terms of what we do with regard to timing
of motions to compel.  It's very difficult for us to predict
right now because we have no idea what the nature of documents
might be, the scale of the productions that are being made, the
languages that are implicated.  So we would like to get more of
the documents in-house before we address specifically a
schedule for completing all the motions to compel.

          THE COURT:  Here's what I'm going to do, I'm going to
set a deadline for document production of March 31st.  Then
what I'm going to do is request that a letter is submitted to
me on April 21st advising me of whether or not the parties
anticipate any motion to compel and setting forth a reasonable
briefing schedule on those motions.

          So that will give you time, hopefully, to go through
those documents, continue the meet and confer process, which
sounds like it's been largely successful to date, and maybe
there will be no need for motions to compel.  But that should

GAKTTERC

1   give you a few weeks, once you have everything, to engage in a

2   meet and confer.  So let's at least now set those as deadlines.

3   So March 31st for document production and April 21st for a

4   status letter to me on any motions to compel.

5           MR. CARTER:  Your Honor, one thing with regard to

6   those deadlines.  Would it be helpful -- to the extent that we

7   identify issues where we're not in agreement with the

8   defendants and determine well before that March 31st deadline

9   that there's an area where there's going to be a dispute that

10  will have to be resolved by the Court, would it be helpful for

11  us to simply proceed and file those motions to compel on a

12  rolling basis between?

13          THE COURT:  I think we should talk in January, because

14  I think that's probably a reasonable time to know whether that

15  in fact has come to pass.  So let's plan when we meet in

16  January to check in where document discovery is, and to the

17  extent that you identify whole areas that the defendants are

18  refusing to either produce or search, we can tee up then

19  whether or not it makes sense to front load some motions.  So

20  why don't we wait until then to evaluate that.

21          MR. CARTER:  Sounds good, your Honor.  Thank you.

22          THE COURT:  Anything else that we want to talk about?

23          I think when we meet in January we'll discuss sort of

24  the status of discovery, but we're also going to talk a lot

25  about Saudi Arabia and what is going on with those cases.  So

GAKTTERC

1    you should come to that conference prepared to discuss whether

2    or not a motion to amend is going to be required, and if so or

3    if not, what the motion to dismiss that we're anticipating,

4    when that should be filed and whether to do cross motions or

5    not.

6            Anything further?

7            I have a couple of housekeeping questions.  The first

8    one is there are a lot of you here.  I try to run my cases in

9    the most practical and efficient way possible.  Sometimes that

10   is sending emails to a couple of lawyers to get an answer.  I

11   think there are lawyers -- I just want you to let us know, and

12   particularly let Andrew, my clerk, know:  Who are the people

13   that we should be contacting both from the plaintiffs' and the

14   defendants' side if we need to -- either we have a question

15   about what is going on or where things stand, where should we

16   be going?

17           MR. KABAT:  Your Honor, Sean Carter and I have been

18   handling that, and we coordinate with our respective colleagues

19   on that point.

20           THE COURT:  Perfect.  Remind me of your name again?

21           MR. KABAT:  Alan Kabat.

22           THE COURT:  Great.

23           MR. CARTER:  And your Honor, as Mr. Kabat said, I

24   generally have coordinated this, but it would be helpful to

25   also copy Mr. Haefele just in case I'm away.

GAKTTERC

1      THE COURT:  Okay.  So I will assume that, unless

2      somebody tells me later that someone else should be on that

3      list, as long as I email Messrs. Carter, Haefele and Kabat,

4      then I have communicated to the two adversarial parties, so to

5      speak.  I don't plan on sort of issuing orders that way, but to

6      the extent I just need some help locating documents or just

7      need some guidance, I'm going to go ahead and look there.

8          The other housekeeping question is just to confirm

9      that I'm going to be issuing orders under the MDL docket number

10     and not under the individualized case.  If it goes under the

11     MDL order, we should assume it applies to everything.

12         Obviously, the discovery schedule that I just imposed

13     with respect to document discovery will be revisited if and

14     when Saudi Arabia is back in this case, but otherwise we should

15     assume that I'll issue orders just under the MDL number, as was

16     Judge Maas' practice, which I have adopted.  To the extent an

17     order addresses only a particular case within the MDL, we'll

18     indicate at the front line which case is affected by the order,

19     but I assume that's the best way to proceed so we can keep

20     everything in the MDL docket.  Everybody agree to that?

21         Okay.  Good.  Well, I'm pleased to be presiding over

22     this case, and I want again to extend to you all, if you think

23     there's a better way, more efficient way for me to be handling

24     this complex case, I'm open to hearing about it, but I do plan

25     on trying to keep us moving in the right direction and keep us

GAKTTERC

1    on as short a leash as is reasonably possible in a case that is

2    this complex.  Obviously there is enormous both public interest

3    in the case, and for the families I know there's a desire to

4    have closure as soon as is reasonably possible, and that's

5    going to be my goal.

6            It's nice to see you all, and I will see you on

7    January 18.

8                              o0o

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25