H1i1tera

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
In Re: Terrorist Attacks on
September 11, 2001

                                    03 MD 1570 (GBD)(SN)


                                    Oral Argument
------------------------------x
                                    New York, N.Y.
                                    January 18, 2017
                                    11:39 a.m.

Before:

                    HON. SARAH NETBURN,

                                        Magistrate Judge

                        APPEARANCES

COZEN O'CONNOR
        Attorneys for Plaintiffs' Executive Committee
BY:  SEAN P. CARTER, ESQ.
        J. SCOTT TARBUTTON, ESQ.

KREINDLER & KREINDLER LLP
        Attorneys for Plaintiffs' Executive Committee
BY:  JAMES P. KREINDLER, ESQ.

ANDERSON KILL
        Attorneys for Plaintiffs' Executive Committee
BY:  JERRY S. GOLDMAN, ESQ.

BAUMEISTER & SAMUELS, P.C.
        Attorneys for Plaintiffs' Executive Committee
BY:  MICHEL F. BAUMEISTER, ESQ.

THOMAS E. MELLON, III, ESQ.
        Attorney for Plaintiffs Havlish and Hoglan

MoloLAMKEN LLP
        Attorneys for Defendant Dallah Avco
BY:  ROBERT K. KRY, ESQ.
        ERIC R. NITZ, ESQ.

LAW FIRM OF OMAR T. MOHAMMEDI, LLC
        Attorneys for Defendants Wamy International,
                            World Assembly of Muslim Youth
BY:  OMAR T. MOHAMMEDI, ESQ.

H1i1tera

1          (Case called)

2          THE DEPUTY CLERK:  Please state your name for the

3     record.

4          MR. CARTER:  Good morning, your Honor.  Sean Carter

5     from Cozen O'Connor on behalf of the plaintiffs.

6          THE COURT:  Good morning.

7          MR. TARBUTTON:  Good morning, your Honor.  Scott

8     Tarbutton from Cozen O'Connor on behalf of the plaintiffs.

9          THE COURT:  Good morning.

10          MR. KREINDLER:  Good morning, your Honor.  James

11     Kreindler from Kreindler & Kreindler.

12          THE COURT:  Good morning.

13          MR. KRY:  Your Honor, Robert Kry with MoloLamken for

14     defendant Dallah Avco.

15          MR. NITZ:  Good morning, your Honor.  Eric Nitz, also

16     at MoloLamken, for Dallah Avco.

17          THE COURT:  Thank you.

18          One housekeeping matter.  I am hopefully at the tail

19     end of a terrible cough.  Our court reporter unfortunately

20     witnessed when I thought I was done with it last week and I

21     wasn't, so I'm hoping that I don't have a coughing fit on the

22     bench.  It has happened in the past.  I have water and cough

23     drops here which I may have to take.  I apologize, and if it

24     gets really bad, then I'll just step down for a minute and

25     regain my composure.

H1i1tera

1           So we are here on the pending motion to compel.  I

2     will give the plaintiffs an opportunity to begin, and if I can

3     ask, I know these motions have been pending for some time now,

4     and so I also wanted to know whether or not there's been any

5     developments or changes or whether the parties have had further

6     negotiations or further productions that are worth me knowing

7     about.

8           MR. CARTER:  Your Honor, we have not had any further

9     conversations since the motion.

10          THE COURT:  Okay.

11          MR. KRY:  Your Honor, if I can clarify, though, there

12    were developments during briefing, so there were some issues

13    raised in the original motion that were addressed.

14          THE COURT:  I think I picked up on that in the

15    briefing.

16          MR. KRY:  Thank you.

17          THE COURT:  So other than those sort of additional

18    productions and the like.

19          Okay.  So let me begin with Mr. Carter.  Are you going

20    to be taking the lead here?

21          MR. CARTER:  I am, your Honor.

22          THE COURT:  So why don't you talk to me a little bit

23    about -- I think it's helpful to focus on documents related to

24    al-Bayoumi specifically and some of the other areas of

25    discovery that you're seeking.  So with respect to the

H1i1tera

1    documents related to al-Bayoumi personally, the personnel files

2    and the like, what's your basis for your belief that a full

3    production hasn't been made at this point?

4            MR. CARTER:  Okay.  Your Honor, I think in terms of

5    the personnel files or the files relating to Bayoumi, we begin

6    our approach to this with a recognition that the circumstances

7    surrounding the manner in which these documents were handled

8    during the course of this litigation gives rise to very

9    legitimate concerns that responsive records weren't properly

10   preserved and that responsive records could have gone missing

11   over the course of this litigation.  And we're mindful of the

12   fact that Dallah Avco has indicated itself that the records

13   related to Bayoumi were effectively placed in a warehouse in or

14   around 2005, again, while the litigation was pending, while

15   Dallah Avco was a defendant, and fell into a state of disarray,

16   that within that warehouse various other parties associated

17   with the broader Dallah Al-Baraka group had access to the

18   facility where the records were being stored, and essentially,

19   again, using it as a dumping ground.

20           THE COURT:  Right.  And I looked at the pictures and

21   obviously read all of the documents, and I accept that the

22   warehouse was a mess.  The Yamani declaration details I think

23   in some significant measure the efforts that were taken to

24   clean up that mess and the substantial resources and time and

25   commitment that Dallah Avco undertook to remedy a problem of

H1i1tera

1    its own making.  And so based on that, it appears to me that

2    they have searched through these documents, mulled the relevant

3    al-Bayoumi documents, and produced those nonprivileged

4    documents to you.  And so I'm curious, though, whether or not

5    your position that you haven't received everything is sort of

6    anchored to the fact that the warehouse is a mess or that you

7    have other reason to believe that there are missing documents.

8            MR. CARTER:  Well, your Honor, I think in certain

9    cases it has to do with the nature of documents that we have

10   received, which in certain cases come completely out of any

11   associated context and seem on their face to be disassociated

12   from other documents that one would naturally expect to be

13   available and to have existed.  And let me give a few examples.

14   Omar al-Bayoumi appears from the first instance within the

15   Dallah Avco documents within the period of 1994.  And in that

16   setting the documents reflect that Dallah Avco was essentially

17   being asked to reimburse educational expenses allegedly being

18   incurred by Bayoumi, who was allegedly at that time studying on

19   a scholarship from the Saudi government.  So we begin with

20   Dallah Avco having an apparent awareness that Bayoumi was this

21   figure who was functioning as a full-time student in the 1994

22   period.  Then suddenly, sort of out of thin air, in May of

23   1995, the chairman of the board of Dallah Avco writes to the

24   Saudi Civil Aviation Authority to indicate that Dallah Avco

25   needs Omar al-Bayoumi to be assigned to Dallah Avco to work as

H1i1tera

1   an auditor on the ANSS project.

2           Now preceding that May 24, 1995 request from Dallah

3   Avco to the PCA to assign al-Bayoumi or second Bayoumi to

4   Dallah Avco, there's no indication in the available documents

5   as to the circumstances through which Bayoumi came to the

6   attention of Dallah Avco as an appropriate candidate to serve

7   as an auditor, the circumstances in which Bayoumi's candidacy

8   as a potential employee on the ANSS project came to the

9   attention not only of Dallah Avco itself but to the chairman of

10  the board of directors of Dallah Avco.  In addition, Dallah

11  Avco's own description of its role within this project is that

12  it never served as any sort of recruitment agent for Bayoumi,

13  never had any supervisory role over him, but served as a mere

14  paymaster, and yet we have this isolated document through which

15  the request for this relationship is coming to the board of

16  Dallah Avco.  On top of all of that --

17          THE COURT:  Sorry.  The request is coming from?

18          MR. CARTER:  The request to initiate this secondment

19  is coming from the chairman of Dallah Avco, not from the

20  Presidency of Civil Aviation.

21          In addition to all that, we have the reality that we

22  see in the other documents that Dallah Avco had an awareness

23  that Bayoumi was in fact a student at the time.  There's no

24  explanation in any of the documents that would shed light as to

25  why the chairman felt that Dallah Avco desperately needed to

H1i1tera

1    have an individual who was a full-time student residing in the

2    United States assigned to a project as an auditor, even though

3    he wasn't going to work on that project.  And so it all comes

4    completely out of thin air without any contextual documentation

5    that would show how this possibly could have come on the radar

6    screen of the chairman of the board.

7            We have a similar circumstance then, your Honor, in

8    this period of April of 1999.  At that point Bayoumi has been

9    seconded to Dallah Avco for a period of approximately four

10   years.  And again, Dallah Avco's stated position is that it had

11   no supervisory role, no idea what he was doing, that he was at

12   all times an employee of the Saudi government, that they didn't

13   much care what he was doing, that they were a simple paymaster.

14   And yet for some reason, on April 4, 1999, the chairman of the

15   board of Dallah Avco again writes personally to a

16   representative of the Presidency of Civil Aviation to advise

17   that Dallah Avco does not want to extend the secondment of Omar

18   Bayoumi any further.  And again, this comes without any context

19   explaining how this possibly could have come to the attention

20   of the chairman of the board of directors of a major private

21   company in relation to a project that was at the time worth

22   something on the order of 400 million rials, which I think

23   would roughly translate to $125 million, and relative to which

24   there was some 1400 employees.  And so somehow the status of

25   this single individual somehow bubbles up to the attention of

H1i1tera

1    the chairman of the board of directors.  There's no inquiry

2    relating to his status that's available that would show, you

3    know, why that happened; there's no evaluation related to his

4    activities or examination as to his suitability for the

5    project.  Again, just suddenly, out of thin air, the chairman

6    of the board personally becomes involved in this particular

7    project.

8            I think we also have, you know, related concerns with

9    respect to the grouping of documents that we've received

10   related to the 9/11 investigations themselves.

11           THE COURT:  Let me stop you before you go there.  I

12   understand that you have also been provided with I think three

13   employee files for other Saudi employees who are seconded to

14   Dallah Avco, is that correct?

15           MR. CARTER:  I think that's three.

16           THE COURT:  And in reviewing those folders, those

17   files, have you seen the sorts of documents that you're seeking

18   in the al-Bayoumi file or are there documents sort of equally

19   missing in those files that you think should be in this file?

20           MR. CARTER:  Well, I think what we see in some of the

21   other employee files is the more traditional recruitment

22   mechanism through which --

23           THE COURT:  I'm not asking about the other files.  I'm

24   asking about the three Saudi secondment files.

25           MR. CARTER:  I don't think we see anything remotely

H1i1tera

comparable to this kind of involvement of the chairman of the

board of directors, which is essentially what we're really

getting at.

　　　　　THE COURT:  So those files don't have sort of

correspondence from senior people at Dallah Avco communicating

with the PCA?

　　　　　MR. CARTER:  I don't recall off the top of my head,

your Honor, who was making those communications.  I'll have to

check.  I can check while --

　　　　　THE COURT:  Because I think everybody agrees that

al-Bayoumi's role at Dallah Avco was not the way most employees

were working there, and so to compare his personnel file to

your sort of average employee who's showing up for work and

doing his or her job isn't necessarily an apples-to-apples

comparison.  Which is I assume why you asked for some exemplars

of seconded Saudi government employees, which you received.

And so what I'd like to know is, comparing the Bayoumi file to

those, which I think is much more of an apples-to-apples

comparison, are you seeing documents that give you reason to

believe that documents are missing or that the file is somehow

incomplete?

　　　　　MR. CARTER:  Well, I mean, I think we do see some

similar categories of documents, payroll information and some

of those things that have been provided for Bayoumi, and I

think we're not especially concerned about those.  We're more

H1i1tera

1    concerned, in the context of Bayoumi, with these unusual

2    circumstances relating to, you know, the fact that he appears

3    without a résumé ever being submitted, without any inquiry as

4    to, you know, the appropriateness of his status or anything of

5    that nature.  So it's the unique categories of documents.

6           I think beyond that, with regard to the personnel

7    files, your Honor, I think the other issue would be that, you

8    know, as a paymaster, we have quite a bit of payroll

9    information for Bayoumi.  I think it's nearly complete.  What

10   we don't have a complete set of are bank transfer records for

11   Bayoumi.  Now we have a few, mostly in the period of 1996 and

12   1999, and while the payroll information is obviously relevant

13   and significant, it's apparent that, you know, Bayoumi was

14   receiving reimbursement or compensation for activities that

15   went beyond, you know, the circumstances of his mere

16   employment.  So we don't think the payroll records necessarily

17   show the entire picture.  And so Bayoumi is getting paid by

18   Dallah Avco.  That's their position:  We're the paymaster of

19   this guy.  So there had to be bank transfers facilitating those

20   payments.  And so we don't have those.  And that's one of the

21   more significant areas where we have an omission, with regard

22   to the core Bayoumi documents.

23           THE COURT:  Okay.

24           MR. CARTER:  I think in addition, your Honor, just

25   taking a bit of a step back, we remain a bit puzzled by the

H1i1tera

1    nature of the documents that were apparently collected in

2    response to the investigations post 9/11 of the arrangement

3    between Dallah Avco and Omar al-Bayoumi.  You know, we see

4    indications that the chairman, Kamel, is extremely, you know,

5    concerned about these inquiries and initiating efforts to

6    develop information that would allow them to gather all the

7    facts and be able to respond.  With Dallah Avco, you know, when

8    we entered into the discovery process, we would have expected,

9    quite candidly, that Dallah Avco could have reached under a

10   file folder and pulled out all of the relevant documents

11   relating to Bayoumi and any associated parties as a result of

12   due diligence done in response to being directly implicated in

13   the September 11th attacks.  And what we see instead is that,

14   you know, there's a limited number of documents identified on a

15   privilege log but nothing resembling the comprehensive

16   portfolio of documents associated with Bayoumi that were

17   subsequently collected.  And so again --

18             THE COURT:  Do you know who -- and I wanted to

19   categorize this instead of 9/11 investigations.  Are these FBI

20   investigations or do you know whether the Saudi government

21   engaged in an investigation?  What investigations are you

22   interested in?

23             MR. CARTER:  So what we know is that the U.S. Consul

24   in Saudi Arabia approached Dallah Avco and that Dallah Avco had

25   a meeting with the U.S. Consul with representatives of the U.S.

H1i1tera

1    Treasury Department and representatives of the Department of

2    Justice.  So this was a pretty significant inquiry that

3    included, you know, an in-person meeting.  And meanwhile,

4    Mr. Kamel's writing to the Presidency of Civil Aviation to

5    request additional information to allow Dallah Avco to respond

6    to all of these inquiries and raising concerns about them, and

7    so we would expect that there would be, among other things --

8    for instance, your Honor, it strikes us that this is an issue

9    that would rise to the level of the board of directors of

10   Dallah Avco and perhaps be reflected in minutes of the meetings

11   of the board of directors, but we don't have anything of that

12   nature.  And sort of similar to that issue, you know, with

13   regard to the scope of the search concerning, you know,

14   Bayoumi's specific records and the personnel records, what we

15   see in the Yamani declaration is various instances in which

16   Dallah Avco says:  We identified the people who would have

17   records relating to the ANSS project.  And so for instance, we

18   asked Chairman Kamel about his ANSS project files.

19           THE COURT:  In what context?  Did you depose him or --

20           MR. CARTER:  No, no.  I'm sorry.  Dallah Avco.  And

21   Dallah Avco's counsel asked him about his project files.

22           THE COURT:  Oh.

23           MR. CARTER:  But just as an example, we know that he's

24   personally involved in these time periods in addressing these

25   issues going back to the original secondment period in 1999

H1i1tera

```
1    when it comes to his attention that they no longer want him
2    seconded to Dallah Avco and then with the post investigations.
3    I have to infer that the chairman of the board of a corporation
4    of this nature maintains a calendar that itself may reflect
5    conversations, meetings that occurred during this time period
6    that would be relevant to this inquiry, that may shed light on
7    how some of these issues came to his attention.  I don't see
8    any indication that anything of that nature was so.  Again, the
9    records of the board of directors, I think the search has been
10   circumscribed largely to the ANSS project files.  And our
11   concern, your Honor, at base is really that Dallah Avco has
12   described what it has done so far, and we don't want to find
13   ourselves in a situation later where it suddenly comes to light
14   that there are additional repositories with potentially
15   responsive information in the possession of the chairman, in
16   possession of the chairman of the board of directors, in
17   possession of the human resources department, for example, that
18   have not yet been searched.  And so, you know, our focus is on
19   ensuring that a search of all relevant repositories has gone on
20   and not merely a search of the ANSS project files that had
21   fallen into disarray.
22          THE COURT:  Let me ask about the Ercan files, which I
23   understand Dallah Avco has segregated.  They contend that they
24   have searched those files and produced whatever documents
25   relate to Mr. Bayoumi, which I think sounds like is really only
```

H1i1tera

the 1994-95 period.  What's your position with respect to

Ercan?  Do you think there are more documents there?  Is there

a targeted search that you think hasn't been conducted that

needs to be done?

MR. CARTER:  Your Honor, I think Ercan's relevance

goes beyond Bayoumi himself, and that's why we have concerns

about this search having been restricted to Bayoumi only.  And

with that, on that point, I think a footnote in the 9/11

Commission's report on this issue is highly probative of the

issue, and this appears at footnote 18 to Chapter 7.  It

indicates that the Saudi Civil Aviation Authority employment

records for Bayoumi for March 2000 through January 2002

provided to the 9/11 Commission by the FBI and other materials

indicate that while in San Diego, Bayoumi was officially

employed by Ercan, a subsidiary of a contractor for the Saudi

Civil Aviation Administration, although a fellow employee

described Bayoumi as a ghost employee, noting that he was one

of many Saudis on the payroll who was not required to work.

And so that description, along with other documents, and the

acknowledgments that Dallah Avco has made, indicate that, among

other things, Ercan served as a functionary for making payments

relating to the ANSS project for which Dallah Avco was making

reimbursements to Ercan.  Now while documents indicating

payments directly to Bayoumi are certainly probative, there is

a broader question here related to our allegations that this

H1i1tera

mechanism, this ANSS project mechanism and Dallah Avco's role
in it, along with those of related parties, was being used to
conceal the true nature of undisclosed Saudi agents here in the
United States.  The possibility that there were 50 or so such
employees being paid by Ercan and potentially being reimbursed
by Dallah Avco goes to the heart of whether or not this
mechanism exists and what Dallah Avco knew or should have known
about it.  In addition --

            THE COURT:  How does that not go beyond the scope of
jurisdictional discovery that the circuit has authorized?

            MR. CARTER:  I think the scope of discovery, the
inquiry that the Second Circuit authorized was related to the
allegation that Dallah Avco was providing cover employment for
Bayoumi that allowed him and facilitated his presence in the
United States serving as an undisclosed agent of the Saudi
government, performing functions for, among others, the
individuals in the Islamic affairs offices of the embassies and
consulates.  Dallah Avco is certainly going to raise as a
defense the notion that, we had no supervisory authority over
Bayoumi, we had no reason to know that there was anything
untoward about him.  And if you look squarely at the Bayoumi
records, they support our view on that.  If, however, Ercan is
telling them, we have 50 people on this payroll that don't show
up for any work, do you have any understanding of what these
folks are doing, that's directly probative of a problem here

H1i1tera

1    with respect to this relationship.  The contention by the Ercan

2    employees who knew these folks was that this wasn't an isolated

3    incidence, that Bayoumi was a member of a larger group of

4    Saudis who were not performing any work but being paid for

5    being associated with the ANSS project.  And so again, that

6    goes to the heart of sort of the mechanism that we say was in

7    place to provide this cover employment.  I think beyond that,

8    your Honor, if you --

9         THE COURT:  Can I ask -- sorry -- how would you

10   propose that Dallah Avco search its files in connection with

11   Ercan for ghost employees, cover employees?

12        MR. CARTER:  Well, I think, your Honor, that we don't

13   know how large these Ercan files are, and so, you know, it may

14   very well be -- they've indicated already that there would be

15   no burden associated with producing these documents.  They can

16   make the production, you know, while reserving their objection

17   on relevance grounds and maintaining their position that the

18   documents are irrelevant.  You know, certainly the documents

19   reflecting circumstances in which Dallah Avco was being asked

20   to reimburse Ercan for expenses associated with the ANSS

21   project, in our view, would be within the scope of reasonable

22   discovery, given both the direction from the Second Circuit and

23   what the 9/11 Commission has said about Ercan's role with

24   regard to Bayoumi and other --

25        THE COURT:  What the 9/11 Commission has reported with

H1i1tera

 1  respect to --

 2           MR. CARTER:  Reported.  Fair enough, your Honor.

 3           THE COURT:  They didn't draw any conclusions.

 4           MR. CARTER:  No.  They reported essentially the

 5  content of the FBI documents, but again, they're basing this,

 6  in their citations, to records received from the Civil Aviation

 7  Authority, so they've seen more than we have, because they got

 8  the direct documents from Saudi Civil Aviation.

 9           So again, you know, the Ercan documents sort of are at

10  the heart of this, which I think leads to the Avco

11  Overseas/Textron documents, which is sort of, you know, as it's

12  been described to us by Dallah Avco, you know, Avco

13  Overseas/Textron sits in a similar position to that of Ercan.

14  It's being used by the Saudi government to facilitate payments

15  associated with the ANSS project, and Dallah Avco was then

16  being asked to reimburse Avco Overseas/Textron --

17           THE COURT:  Why didn't you ask for documents regarding

18  Avco Overseas?

19           MR. CARTER:  Well, I think Avco Overseas' significance

20  in this principally came to our attention as a result of the

21  production by Dallah Avco of documents reflecting a specific

22  circumstance in which Dallah Avco was being asked to reimburse

23  Avco Overseas for expenses associated with Bayoumi himself,

24  and, you know, our view, your Honor, is that when Dallah Avco,

25  in the context of searching this disorganized mess of a record

H1i1tera

1    collection, came across records relating to another entity

2    similarly situated to Ercan, which we had already said was

3    relevant by virtue of its relationship to both Dallah Avco and

4    Bayoumi, the logical thing to have done would have been to

5    segregate those records at that time.  You already had certain

6    records relating to Avco Overseas and Textron that showed

7    direct transfers going effectively from Dallah Avco to Bayoumi.

8    You know, the broader question of whether or not other aspects

9    of the Avco Overseas/Textron relationship might be relevant was

10    best explored once those documents were preserved.  And again,

11    it's hard to tell.  From what they've said about the nature of

12    the records, it may very well be that until they put them in

13    the state of disarray, the Avco Overseas/Textron documents were

14    themselves quite neatly organized in some way that would have

15    rendered them searchable.  And the problem is that they're

16    using their own state of disrepair that they allowed the

17    records to fall into as a justification for not searching them.

18    And again, because of the way that the records fell into

19    disrepair, our view is that as soon as they found records

20    associated with the related entity that also related directly

21    to Bayoumi, the records of that entity should have been set

22    aside.  It's not a difficult task.

23         THE COURT:  How about then the production of the

24    documents related to the 1994 reimbursement by Dallah Avco to

25    Avco Overseas?  Are there any other documents or maybe

H1i1tera

reference in the 9/11 report that implicate Avco Overseas?

          MR. CARTER:  I think there's a passing reference in
one of the FBI reports but no more.  To my recollection, your
Honor, I'm not even sure that there's a reference to Dallah
Avco in the 9/11 report.  They just referred to it as a, you
know, Saudi contractor to the government.  So, you know, the
9/11 Commission isn't, you know, comprehensive on that point.

          THE COURT:  Okay.  Let me ask you about an area that
seems quite broad, and that's requests for all out-of-Kingdom
expenses for the ANSS project.  I guess my question for you is
sort of, that seems like a substantial undertaking, to identify
all those documents, receipts and all of that, and it's not
clear to me how closely tethered that is to the jurisdictional
discovery that you're entitled to, and so I'm trying to balance
what I think would be a substantial burden on Dallah Avco with
the likelihood that it will produce meaningful documents that
are geared towards the jurisdictional issues.  So can you speak
to that point.

          MR. CARTER:  Your Honor, I think as a starting point,
I should say that when we served the document requests, we
didn't have any reason to really believe that this would be a
very broad request, because the ANSS project related to the air
navigation system in Saudi Arabia, and I think we thought in
all likelihood that Bayoumi and maybe a few others were
discrete cases of people assigned to the project who weren't in

H1i1tera

1    the United States.  I think we're gathering from what they've

2    since said that there are, you know, a broader spectrum of

3    expenses that go beyond Saudi borders associated with this

4    project, and that's a fair point.  I think we could narrow it

5    down substantially if we just look at the expenses, for

6    instance, associated with the U.S. payments that flowed through

7    Ercan and Avco Overseas.

8             THE COURT:  Okay.  Is there a time limitation here?

9             MR. CARTER:  I think, you know, our time limitation is

10   really, you know, during the period that Bayoumi was himself

11   associated with Dallah Avco, which would essentially be from --

12            THE COURT:  '94 to 2002?

13            MR. CARTER:  That's about it, yes, your Honor.

14            THE COURT:  Okay.  Anything further you want to

15   discuss?

16            While you're looking, I'll ask you a question.

17            MR. CARTER:  Sure.

18            THE COURT:  There's references primarily in the

19   defendant's or Dallah Avco's responses about having produced

20   nonprivileged documents, and I'm going to ask Dallah Avco the

21   same question.  I assume there was a privilege log that has

22   been provided and that, at least right now, those issues are

23   not sort of ready for litigation?

24            MR. CARTER:  They're not, your Honor.  The one thing

25   that, you know, we may need clarification on, we drafted a sort

H1i1tera

1    of omnibus order relating to, you know, privilege logs, and it

2    does not require every potentially privileged document to be

3    listed.  Documents, for instance, from counsel who were

4    involved in litigation don't need to be on the privilege log.

5    So, you know, in the context of Dallah Avco, for example, with

6    regard to, in particular, the steps taken after 9/11 to

7    investigate the circumstances surrounding Bayoumi, involvement

8    with the board of directors, some of those things, I think we

9    have a question as to whether or not there are privileged

10   documents of that nature that aren't on the privilege log.  But

11   that would be the one issue.

12            THE COURT:  Okay.  All right.  That's helpful.  Thank

13   you.

14            MR. CARTER:  Yes, your Honor.

15            MR. KRY:  Thank you, your Honor.

16            THE COURT:  Thank you.

17            MR. KRY:  So there's a lot I want to respond to there.

18   But at the beginning, I think it's important to appreciate just

19   what Dallah Avco was doing in connection with this project.  It

20   was a contractor of a Saudi agency to provide manpower

21   procurement and payroll processing for projects that the Saudi

22   Civil Aviation Agency was running.  Dallah Avco did not direct

23   or supervise any of the employees that were attached to that

24   project; all it did was helped recruit them, in most cases, and

25   then also processed their payroll.

H1i1tera

1          THE COURT:  So let me stop you for one second, because

2     one of the documents that Mr. Carter seeks is sort of

3     recruitment type documents, and in his view, al-Bayoumi sort of

4     appears all of a sudden as an employee without any sort of

5     underlying or precipitating recruitment documents, and then

6     sort of next thing you know, the chairman of the board is

7     talking about him.  And so the question is, how is it possible

8     that this person gets to the highest levels of Dallah Avco and

9     there are no underlying documents related to his recruitment or

10    how he came to be sort of brought to the attention of the

11    chairman?

12         MR. KRY:  Right.  So in the substantial majority of

13    cases, Dallah Avco did perform a recruitment function, so what

14    it would do is, the agency would say, we need people that have

15    these skills, Dallah Avco would get its manpower people to go

16    out and get people's résumés from various different countries,

17    arrange them to be interviewed, and then they would be shipped

18    off to the project, if the agency decided they want to hire

19    somebody.  That process didn't happen with respect to the very

20    small number of individuals that were seconded from the agency

21    itself.

22         THE COURT:  Does that mean that the agency said:  Hire

23    this person?

24         MR. KRY:  Yes, your Honor.

25         THE COURT:  And is there a document that shows PCA

H1i1tera

1    saying to Dallah Avco:  Hire al-Bayoumi?

2            MR. KRY:  There is not, but this has been a subject of

3    extensive investigation.  Under Saudi law, if the government

4    agency wants to second somebody to another project, technically

5    the secondment request has to come from the private contractor.

6    The government can't initiate that process.  So as a matter of

7    Saudi law formality, that March 1995 request, or April 1995

8    request had to come from Dallah Avco to the agency, because

9    that's the way Saudi law requires it to be.  The testimony in

10   this case is going to be that that was done at the request of

11   the agency.  Dallah Avco would never have any reason to request

12   somebody like Omar al-Bayoumi be put on a project where, at the

13   end of the day, it's the Saudi agency that's running this

14   project.  They know --

15           THE COURT:  I think, though, the plaintiff's problem,

16   and the documents that they're seeking are the documents that

17   precede that letter, right?

18           MR. KRY:  Right.

19           THE COURT:  And so obviously somehow al-Bayoumi's name

20   was brought to the attention of Dallah Avco.

21           MR. KRY:  Sure.

22           THE COURT:  And, you know, maybe it's always done by

23   telephone and so there are no documents.  That seems

24   surprising, but maybe that's your position.  But otherwise, you

25   would think that there would be an email or a memo or some

H1i1tera

document that says, this is the guy that we, the Saudi

government, want you to now ask to place on this project, and

then you get the letter.  But here, I think the first document

that you're seeing, besides the Ercan reimbursement documents,

the first letter that you're seeing is the letter from Dallah

Avco saying, we want this guy.

      MR. KRY:  Right.  And your Honor, first of all,

there's no email being used at this period of time.  This is

now 20, 23 years ago.  So there's any number of ways in which

that initial request could have been communicated -- phone

call, in an in-person meeting.  Again, remember, for purposes

of complying with Saudi law, the request has to formally come

from Dallah Avco.  So it's entirely sensible that if somebody

at the PCA wanted Mr. al-Bayoumi put on the project -- and

remember, I mean, he was already connected with the PCA.  He

was, as the Kingdom of Saudi Arabia told the Court when that

case was argued last year, he was previously a PCA employee.

So he's somebody already attached to them.  And if they want

him attached to the ANSS project, for whatever reason, it's

entirely logical that they might just ask Dallah Avco to do

that in person, in a meeting, you know, or by phone.  There's

any number of reasons.  Because the formal request has to come

from Dallah Avco to comply with Saudi law.  And so there's no

real reason to expect that there would necessarily be a letter

requesting that Dallah Avco send its letter back.  There might

H1i1tera

be, and that's why we spent just an unbelievable amount of time

trying to see if there was such a document, because of course

that would be very material to our case if we had that letter,

and so we looked for it at length.  You know, we spoke to

everyone involved in the process.  And I want to add this too.

For Mr. -- the chairman that signed the letter of request, what

the testimony --

THE COURT:  This is the '95 letter or the '99 letter?

MR. KRY:  It's the same person so --

THE COURT:  Okay.

MR. KRY:  The testimony on that will show that as a

matter of protocol, letters that go to the PCA get signed by

the chairman, but these would all have been prepared by

somebody else, and he typically wouldn't have any substantive

involvement in preparing that request or in the reasons why

that request was prepared as a matter of --

THE COURT:  Who would be responsible for preparing

that?

MR. KRY:  Other people involved in the ANSS project

management part of Dallah Avco, but many of them are no longer

with the company, your Honor.

So, you know, there was also a suggestion that we

didn't adequately try and find out whether Mr. Kamel, who's the

individual that signed those letters, had other files separate

from the ANSS project, but with Mr. Kamel and with everyone

H1i1tera

1  else, we went to Jeddah -- I mean, I personally went to Jeddah

2  and spoke with him and asked him whether he had -- without

3  getting into the details of any privileged communications,

4  asked him whether, you know, those efforts were undertaken and

5  whether there were any other files he knew about where

6  documents relating to Omar al-Bayoumi might be.  And so all of

7  those things were already searched.  These were all things that

8  were done as part of the search protocol.

9        THE COURT:  What about documents just generally from,

10  you know, requests from the Saudi government to second its

11  employees?

12        MR. KRY:  Yes.  So the way that we did the search for

13  that -- and this was at the request of plaintiff's counsel --

14  is that as part of our search process, one of the things we

15  retrieved from the warehouse was the set of what are called the

16  ANSS employee files, and so for each employee, they have a

17  file, and that's where these documents get put.  That's where

18  this correspondence with the PCA about secondments, if it

19  exists, gets put.

20        THE COURT:  But outside of the ANSS project, is there

21  a separate file maintained at corporate headquarters for every

22  time the government directs that one of its employees be

23  seconded?

24        MR. KRY:  Well, I mean, it's a very unusual case, and

25  so, to put this in perspective, in the ANSS project, there were

H1i1tera

```
 1    about 1400, or a little over 1400 employees connected to that

 2    project.  We're aware of, or we were able, after conducting a

 3    diligent search, to identify four cases, al-Bayoumi and three

 4    others, where they were seconded by the government.  So these

 5    are very unusual cases, so it's not like there would be a

 6    secondment file sitting there over the course of an eight-year

 7    project, if there's only four instances out of 1400.  This is

 8    not going to be a large amount of -- or a recurring issue.

 9            THE COURT:  Right.  But the ANSS project wasn't the

10    only project that Dallah Avco worked on where the Saudi

11    government may have asked for its employees to be seconded.

12            MR. KRY:  You know --

13            THE COURT:  As far as I've heard from everybody, the

14    fact that he was seconded to the ANSS project is meaningless

15    because he didn't work on that project, so he could have been

16    seconded to any project, it sounds like.

17            MR. KRY:  Right.  Well, I mean, so the PCA -- or

18    evidently he traveled to the United States to pursue

19    educational studies.

20            THE COURT:  Okay.

21            MR. KRY:  The question is, can we investigate every

22    other project that he --

23            THE COURT:  I'm just wondering whether or not there

24    was a separate file of requests from the Saudi government to

25    second its employees regardless of which project they were
```

H1i1tera

1    being asked to be placed in.

2             MR. KRY:  Right.  So our investigation didn't identify

3    anything like that.  The common correspondence that we

4    identified was invariably put in -- not invariably, but

5    everything we've seen indicated that it was put in the employee

6    files for the specific project.  The ANSS project was the one

7    that Omar al-Bayoumi was attached to, so that's a situation

8    where you can identify the discrete custodians who worked on

9    that project.  Any effort to go to a sort of completely

10   different project, like a local data management contract for a

11   local airport in Saudi Arabia somewhere, and to try to go

12   through all those employee files, that would be just a

13   monumental undertaking, and I don't think it would be possible.

14            THE COURT:  You said that Mr. Kamel -- am I saying his

15   name correctly, the chairman?

16            MR. KRY:  Yes.

17            THE COURT:  That he was not, or anybody in the company

18   was not using email at the relevant period of time here.  Have

19   you gathered his calendars?  He probably had a hard copy

20   calendar book during the relevant period of time.  Have you

21   looked at that?

22            MR. KRY:  So Mr. Kamel did keep a set of documents in

23   his capacity as chairman.  Those were maintained by another

24   individual there, Mr. Baderaldin, and then when the ANSS

25   project lapsed at the end of 2005, those were among the

H1i1tera

documents that were put back in Dallah City.  When the Dallah

City search was conducted, one of the things we located was the

set of Mr. Kamel's documents, and those were among the hard

copy documents that were searched.

THE COURT:  And were they produced?

MR. KRY:  Anything related to al-Bayoumi, yes.

THE COURT:  What if there was a notation in a calendar

entry, you know, two weeks before the letter to the PCA asking

for his secondment, if there was a calendar entry that said,

meeting with PCA minister, or whoever you would be meeting

with?

MR. KRY:  I'm not aware of a document like that

existing, but I do know those files were retrieved, they were

searched for anything related to al-Bayoumi, whether or not

they expressly referred to al-Bayoumi, and any responsive

documents located as a result of that process were produced.

THE COURT:  Okay.

MR. KRY:  Turning back to another issue you mentioned,

and this is the issue of the disarray in the warehouse, because

I think those two are different issues that are being combined

here.  When the project ended in 2005, the boxes with the ANSS

files were put in the warehouse, and then over the intervening

I guess 12 years now, you know, it's undeniable that other

affiliated companies within the Dallah Avco group put

additional stuff there and the warehouse fell into a bit of

H1i1tera

1    disarray.  But there's no evidence and there's no reason to

2    think that that disarray in the warehouse somehow meant that

3    the files themselves became disorganized or lost, because the

4    files are in boxes, and those boxes had to be dug out, but they

5    were.  Two searches of the warehouse were done.  The ANSS boxes

6    were retrieved.  And that was a lot of work because of the

7    disarray in the warehouse.  But there's no reason to think that

8    once those boxes were taken out, that the files within those

9    boxes somehow became incomplete or documents got lost.  And so

10   I'm not arguing that the state of disarray in the warehouse is

11   an excuse for Dallah Avco not having to comply with its

12   discovery demands.  Obviously the litigation has been pending

13   since then.  What creates the undue burden is the fact that the

14   files within those boxes are very voluminous, and for some of

15   the things they're asking for, it's very difficult to identify

16   responsive documents.

17          And I want to turn to the Ercan and Avco Overseas

18   documents, because those are important.

19          THE COURT:  Right.  Can you tell me how large the

20   Ercan file is.

21          MR. KRY:  Right.  So there's no single Ercan file.

22   Unlike With Avco Overseas, Ercan was actually in their document

23   requests, so when we were going through the Dallah City boxes,

24   and that's like, you know, 2 or 3 million-some pages of hard

25   copy documents that were gone through manually, because we were

H1i1tera

        1    aware that that request was outstanding, we did segregate files

        2    relating to Ercan, whether or not they related to al-Bayoumi.

        3    Our search did not identify any documents that related to Ercan

        4    and al-Bayoumi.  There is a reference in one FBI document that

        5    says that -- where an anonymous source who's not even

        6    identified claims that someone at PCA told Ercan to put

        7    al-Bayoumi on Ercan's payroll and said their contract would be

        8    jeopardized if that didn't happen.  Our files didn't find

        9    anything, anything whatsoever to do with that.  Now Ercan is

       10    another ANSS contract vendor and so there are documents

       11    relating to Ercan that are totally unrelated from Omar

       12    al-Bayoumi.  And to give you an example, there's a bunch of

       13    documents where, for example, Ercan supplies a piece of

       14    electronics equipment, a piece of hardware to the ANSS project,

       15    and then the PCA wants to bill that back to the project and so

       16    they say, you know, Dallah Avco, pay Ercan for the expense it

       17    incurred, and then we'll pay you to the ANSS project contract.

       18    So there are a bunch of documents like that, but that has

       19    nothing whatsoever to do with this case.  That said, we were

       20    mindful this request was out, so we went through Dallah City,

       21    we set this aside, so we have in total, going through those

       22    3 million pages, we came across about 900 pages of documents

       23    relating to Ercan.  That's what Mr. Carter's referring to when

       24    he says it would be no burden to produce those if that's what

       25    the Court orders, and in fact, during the course of this, we

H1i1tera

1    had offered to produce that as part of our larger compromise.

2              The situation With Avco Overseas is different in a

3    very important way.  Their document request, despite the fact

4    that they have I think 56 different requests covering

5    everything under the sun, never once requested Avco Overseas,

6    and that's despite the fact that they knew it was a potentially

7    relevant entity.  And in fact, if you look at Exhibit J,

8    page 30 of the motion in this case, this is the FBI report.  It

9    says at the end -- there's a redaction, but I think everyone

10   agrees that at least plaintiffs contend that refers to

11   Mr. Bayoumi.

12             THE COURT:  Where are you?  Sorry.

13             MR. KRY:  This is page 31 of 32 on the ECF header at

14   the top, but it's page 30 on the bottom of the document.

15             THE COURT:  Yes.

16             MR. KRY:  So it says, redacted, "identified" redacted

17   "as a ghost employee Of Avco Overseas.  Estimated that there

18   were approximately 50 individuals carried on the books and PCA

19   or Dallah and being paid for doing nothing."  So this is not a

20   company that came out of nowhere.  It's just not true that the

21   first time they found out about this was from our papers.  Avco

22   Overseas was absolutely referenced in the 9/11 report -- I'm

23   sorry, not the 9/11 report, this FBI document.  Had they made

24   that request, we could have done the same thing for Avco

25   Overseas that we did with Ercan.  We could have set aside the

H1i1tera

1   stuff we came across so that we could resolve it now without

2   having to redo the entire search.  But because they never had

3   an Avco Overseas document request, we had no reason to do that.

4   We had no reason to expect that they would want those

5   documents.  The documents we did find for Avco Overseas, and

6   these are the ones from 1994, where there was a period, a brief

7   period before Mr. al-Bayoumi was seconded to the ANSS project.

8   Those documents we came across, and that was the proverbial

9   needle in the haystack.  I mean, that we came up with at the

10  very end of this manual, laborious review of 2 or 3 million

11  documents.  If we had found that at the beginning of that

12  review, then maybe we would have said, well, maybe this is

13  relevant after all and we could have started to set aside

14  documents relating to it.  But this came at the very end, your

15  Honor.

16          So the result of all this is that there's simply no

17  way to find documents relating to Avco Overseas unrelated to

18  al-Bayoumi other than repeating this incredibly laborious,

19  time-consuming, expensive, resource-intensive process that

20  Mr. Yamani describes in his declaration.

21          One of the basic requirements for a motion to compel

22  is that if you're compelling production, it has to be documents

23  you've actually asked for.  They didn't ask for these

24  documents.  We've suffered enormous prejudice as a result of

25  the fact that they didn't ask for the documents because now the

H1i1tera

1  only way to find them would be to redo a process that's been

2  incredibly laborious and time-consuming.  And so for that

3  reason, I just think there's a fundamental distinction between

4  the Ercan documents on the one hand and the Avco Overseas

5  documents on the other hand, because the Avco Overseas

6  documents have just this enormous undue burden issue.

7          THE COURT:  Okay.  I have a couple of targeted

8  questions for you.  The first has to do with the bank wire

9  transfers or checks.  It sounds like there's evidence of I

10  guess maybe paystubs, some type of payment evidence of Dallah

11  Avco to al-Bayoumi, but there's not evidence of the actual

12  transfer of funds.

13          MR. KRY:  No, there is.  I don't think there's

14  evidence -- I mean, I believe the complaint was just, it's not

15  a complete record of everything.  But there's certainly plenty

16  of documents we've produced along those lines reflecting that

17  those amounts were paid.

18          THE COURT:  I thought Mr. Carter said that there was

19  no bank transfer information.

20          MR. KRY:  We produced wire transfer applications,

21  among other documents.  There's plenty of that.  Dallah Avco's

22  function was payroll processing, and so they asked for a

23  million things that we wouldn't be expected to have.  That's

24  certainly something we would be expected to have, and we've

25  produced whatever we have.  It's definitely not a hundred

H1i1tera

percent complete.  There are various things missing here or
there.  But bear in mind, these are payments that go back to
1995, so that's now 22 years ago, and it's also seven years
before the litigation began, and so there's, you know, there's
no necessary reason to expect that every single document that
existed when it was generated would necessarily be kept for the
seven years until the litigation started, especially when it's
a relatively ministerial and not very important document like a
payroll record.  You know, there are plenty of documents that
have been produced that show the entire history of payments
being made, and if for specific payments we don't happen to
have every corresponding paper for, I don't know that it
indicates anything terribly important.

          THE COURT:  Let me also ask you about investigations.

          MR. KRY:  Sure.

          THE COURT:  My reading of your response is that you've
produced any documents that were either provided in the course
of investigations or requests that came in to Dallah Avco as
part of the investigations, insofar as it deals with
Mr. al-Bayoumi.

          MR. KRY:  Right.

          THE COURT:  So I take it from that that you have not
produced the sort of file on various 9/11 investigations.  Is
that accurate?

          MR. KRY:  No, we're not aware of any investigations of

H1i1tera

1   Dallah Avco that don't relate to al-Bayoumi, so as far as -- I

2   mean, to the best of our knowledge, we produced everything

3   along those lines.

4           THE COURT:  So Mr. Carter was talking about a meeting

5   with the U.S. Consulate in Saudi Arabia, along with the

6   Department of Treasury and Justice.

7           MR. KRY:  Yes.

8           THE COURT:  Have you produced all of the documents,

9   either requests for information or documents that were provided

10  to those entities in connection with the investigation?

11          MR. KRY:  Yes.  I think there's a little bit of

12  confusion of what happened.  There was a meeting between U.S.

13  Consul and the PCA.  Attending that meeting, there was one

14  person who's technically a PCA employee but also interacts with

15  Dallah Avco.  Dallah Avco has a bunch of documents that relate

16  to that meeting because of the fact that this guy was there,

17  and in summary, what they relate to is that Dallah Avco didn't

18  agree with some of the way certain things had been

19  characterized at that meeting, so there was some back-and-forth

20  communications between the PCA and Dallah Avco about what

21  transpired at that meeting.  All that information was

22  definitely searched for and produced, and that was, you know,

23  certainly within the scope of what we think is an appropriate

24  production.  So nothing, to our knowledge, has been withheld on

25  that.

H1i1tera

1          There was a separate question or a separate comment

2     made when Mr. Carter was speaking, because in addition to that

3     set of documents, around the time that the press started

4     speculating about Mr. al-Bayoumi, as Mr. Yamani discusses in

5     his declaration, there was an internal effort to collect the

6     documents that Dallah Avco had relating to al-Bayoumi, and

7     those were put in a file.  That file, minus the privileged

8     documents, was produced to plaintiffs in its entirety a couple

9     years ago now.  That would have been back in September of 2014,

10    and the months after that.  There is a question of whether that

11    file was ever produced to any of the entities investigating the

12    9/11 investigation.  I didn't see any indication that it was.

13    I can't exclude the possibility that maybe somebody asked for

14    it and a copy was given to them, but there's no correspondence

15    record of that, so, you know, to the best of our knowledge,

16    there's nothing like that.  But, you know, as Mr. Carter

17    explained, certainly when these allegations began surfacing,

18    there was an internal effort, certain documents relating to

19    al-Bayoumi were collected, and the results of that collection

20    effort were produced to plaintiffs quite some time ago.

21          THE COURT:  Okay.

22          MR. KRY:  There were a couple other items.  So the

23    request was whether there are relevant differences between the

24    other secondment files we produced and Mr. al-Bayoumi's

25    secondment file.  First of all, we don't agree that those are

H1i1tera

1    different in any significant way.  And our notes indicate that

2    the secondment letters that are in those files are similar to

3    the ones in Mr. al-Bayoumi's file too.  You know, I will say

4    that's speaking based on our notes, because if there was any

5    issue with those secondment files being different, that was

6    never brought to our attention by plaintiffs.  We produced

7    these other three files about a year ago, and so if they

8    thought that those files somehow revealed gaps in our

9    production, it would have made more sense to bring that to our

10   attention back then so we could go back and see if there was an

11   issue or not.

12          THE COURT:  So your notes don't reflect, for instance,

13   a requesting letter from the agency asking Dallah Avco to ask

14   for the secondment.

15          MR. KRY:  No.  We don't see any indication of that,

16   your Honor.

17          THE COURT:  Okay.  When was that meeting with the U.S.

18   Consul?

19          MR. KRY:  Approximately February 2002.  Maybe January.

20          THE COURT:  Okay.  Do you want to talk about the

21   burden that it would impose, if any, to produce all

22   out-of-Kingdom expenses?  Or maybe I could even limit it to all

23   US-based expenses for the ANSS project.  And Mr. Carter

24   suggested even narrowing it further to just expenses paid

25   either to Avco or to Ercan from '94 to 2002.

H1i1tera

1           MR. KRY:  Right.  So with Ercan, those are the 819

2      pages we've already set aside, so if the Court concludes those

3      should be produced, there's no burden entailed in producing

4      those.

5           For Avco Overseas, I mean, it would be astronomical,

6      because even as so limited, what we would have to do would be

7      to go back through those 2 million pages of documents, which

8      are largely boxes of receipts that may be like chronological,

9      that may be in some other order, but they're not organized by

10     geography or let alone necessarily a particular vendor.  So,

11     you know, it would be extremely laborious and it would be

12     having to redo what we've already done.  And again, you know,

13     the Avco Overseas request was not something that was in their

14     document requests.  They did at some point ask for

15     out-of-Kingdom expenses, but the universe of out-of-Kingdom

16     expenses is -- that would be impossible to do, because that

17     would be completely unrelated projects and unrelated expenses.

18     I don't even know how you would start going about doing that.

19     If they had asked us for payments to Avco Overseas at the start

20     of the case, we'd be in a different situation, because then we

21     could have done the same thing we did with Ercan, but because

22     that request wasn't made, that wasn't done.  So the answer to

23     your question is that it would be extremely burdensome.  And

24     anything that requires us to go back through the 2 or 3 million

25     pages of documents from Dallah City and the similar hard copy

H1i1tera

finance files from Dallah Avco Power that had to be manually

searched would just be extremely laborious.  The Ercan files

are on a different level because those we already have.

THE COURT:  Okay.  Anything further?

MR. KRY:  Not right now, unless your Honor has any

further questions.

THE COURT:  No.

MR. KRY:  Thank you.

THE COURT:  Mr. Carter, anything you want to follow up

on?

MR. CARTER:  Just a few notes, your Honor.

You spent some time asking Mr. Kry about whether or

not there were circumstances in which the letter requesting

that a secondment be initiated originated from the Presidency

of Civil Aviation, and that is in fact what we see happen in

1999 when Mr. Kamel writes to the PCA and says:  We don't want

to keep Bayoumi on any longer.  The mechanism to try and turn

that around is a written correspondence directed to Dallah

Avco, not a phone call, so at least to the extent we have any

records relating to how this formally functions, they indicate

that it was by letter request.

With regard to Avco Overseas and Textron, the argument

seems to be that because there's a passing reference in a

highly redacted FBI document to Avco Overseas, a singular

reference, it's all plaintiff's fault for not having

1   specifically requested records relating to Avco Overseas.

2   Candidly, I don't know, sitting here, when that particular

3   version of the FBI document came into our possession.  The

4   document in question has been produced by the FBI in about

5   three or four different versions, with different redactions.

6   Something that sort of came to our attention late in the game.

7   But again, from our perspective, Dallah Avco was on notice that

8   we were very much interested in any vendors on the ANSS project

9   that were involved in facilitating payments to Bayoumi or other

10   similarly situated people by virtue of the request for Ercan.

11   In the course of going through documents, they themselves

12   discovered the documents indicating that Dallah Avco, or Avco

13   Overseas, was involved in facilitating such payments, and at

14   that point they were on notice that these were potentially

15   probative and relevant documents that should have been set

16   aside.  So I don't think it's appropriate for them to cast all

17   of the blame with regard to this on the plaintiffs.  They had

18   their own independent notice that these were potentially

19   relevant but chose to proceed without setting them aside and

20   look only for documents that referenced Omar al-Bayoumi

21   specifically.  So that's an area of concern.

22          There was a mention by Mr. Kry that efforts were

23   undertaken, once the inquiries into 9/11 started coming to

24   Dallah Avco, to collect the records associated with Bayoumi and

25   that those were made part of this 9/11 investigation file, for

H1i1tera

1     lack of a better term.  That was produced very early on.  I

2     think what strikes as a bit odd with respect to that framing is

3     that we've been told that at least until they were sent to the

4     warehouse in 2005, the ANSS projects were very well ordered and

5     within the very well-ordered set of ANSS projects was an

6     employee file for Omar al-Bayoumi that could simply be pulled

7     off the shelf, but yet the collection of documents we got

8     associated with the assembly of materials relating to Bayoumi

9     from that period when the inquiries came in doesn't include

10    many of the documents in the employee file.  So there's just a

11    bit of a disconnect as to exactly what happened post9/11 and

12    whether or not we have the comprehensive file that was

13    collected at that time as a result of Dallah Avco's instruction

14    for there to be an inquiry into Bayoumi's status.

15          Again, I think your Honor touched on a few issues that

16    are areas of concern for us, and I suppose the record is clear

17    at this point.  You know, we do have this question as to

18    whether or not calendars, for instance, for Mr. Kamel around

19    that time may have, you know, a reference to a meeting that

20    someone reviewing the files would not immediately recognize as

21    being associated with Bayoumi but on further reflection and

22    analysis would potentially relate to Bayoumi but simply not

23    reference his name specifically.  We're also, you know, again

24    concerned about whether or not there might be, you know,

25    distinct sort of PCA files separate and apart from any

H1i1tera

1    particular project file where things might have been filed

2    independent of the ANSS project.  If the confirmation is that

3    none of those exist, we'll take that representation.

4              THE COURT:  Okay.  Thank you.

5              MR. KRY:  May I just speak briefly to the Avco

6    Overseas point.  I want to be clear.  When I spoke about the

7    fact that they knew about Avco Overseas, I'm not trying to cast

8    blame on plaintiff's counsel or suggest that should be held

9    against them.  But I do think, when we're talking about

10   something that is at best a very tangentially relevant set of

11   documents which are Avco Overseas documents not relating to

12   al-Bayoumi, because we looked for and produced the Avco

13   Overseas documents that do relate to al-Bayoumi -- that's the

14   1994 documents relating to his education -- but if the question

15   is whether we should have to search the ones that don't relate

16   to al-Bayoumi, which is at best an extremely tangentially

17   relevant set of documents, then in assessing the enormous

18   burdens that would be imposed on Dallah Avco from having to

19   redo a manual search of millions of pages of documents to

20   locate those, I do think it's fair for the Court to take into

21   consideration that we never had notice of that from their

22   document requests; we never had notice of that from our own

23   records because, as I mentioned before, we didn't find those

24   1994 records until the very end of going through those

25   2 million pages.  So I think those are all relevant

H1i1tera

considerations in terms of the burden that that would impose on
us.

Thank you, your Honor.

THE COURT:  Thank you.

Thank you, everybody, for your arguments and for your
briefs.  They were well written and helpful.

So I'm sensitive to what I think is a relatively
narrow scope of discovery that the plaintiffs are entitled to
in light of the circuit's ruling, and I also find that Dallah
Avco has undertaken an appropriate and reasonable effort to
uncover these documents.  I thought the Yamani declaration was
very clear and indicated that the company had taken its
obligation seriously.  It obviously invested a lot of time and
money in the issue.  And I think that it has conducted itself
appropriately.  So I'm satisfied that the efforts that have
been undertaken have been legitimate.

I'm going to grant the plaintiff's motion in part and
otherwise deny it.  I am going to direct that the Ercan
documents be produced.  It seems to me that they are easily
available.  I don't know how much relevance they're going to
provide, but I think that they are segregated and can be easily
produced.

But I'm not going to require Dallah Avco to go back to
the well to search for the Avco Overseas documents that are
unrelated to al-Bayoumi.  I don't think there's been a

H1i1tera

1    legitimate showing that that's an appropriate burden to impose

2    upon Dallah Avco.

3         I am going to direct that Dallah Avco go back to its

4    ANSS files and/or to Mr. Kamel's files.  I want calendar

5    entries to be produced for the period surrounding the 1995

6    decision to second Mr. al-Bayoumi and then the 1999 decision

7    both to deny his extension and then to grant the request that

8    he stay on.  So I think calendar entries should be provided for

9    Mr. Kamel let's say for four months prior to those letters

10   going out.

11        But also, I want you to search for calendars of the

12   appropriate ANSS project managers.  You represented that it's

13   unlikely that Mr. Kamel himself actually drafted that letter on

14   his own.  That was done probably through the ANSS organization.

15   And so I want whoever would have been the appropriate project

16   managers at those relevant times, 1995 and 1999, to search for

17   those people's calendars and to produce those calendars

18   regardless of whether there's a specific reference to

19   al-Bayoumi.

20        With respect to the investigations, it's not clear

21   whether this has been produced already.  I feel like I've

22   gotten sort of mixed information.  But I want in its entirety

23   all of the documents related to the early 2002 meeting with the

24   U.S. Consul, any requests in advance of those meetings, any

25   documents that were provided in connection to those meetings,

H1i1tera

1    any notes that are nonprivileged that Dallah Avco has of those

2    meetings, and, to the extent that Dallah Avco was

3    investigated -- and I use that word in the informal way, which

4    is to say even if there wasn't a full-blown FBI open

5    investigation but there was some inquiry related to 9/11 -- all

6    of those documents need to be produced, regardless of whether

7    al-Bayoumi himself was referenced in connection with those

8    investigations.  So any 9/11 inquiry or investigation, those

9    documents should be produced.

10          MR. KRY:  And your Honor, all those documents have

11   been produced.

12          THE COURT:  Okay.  I also want, if it hasn't been

13   produced, any board minutes around the time of those

14   investigations, so to the extent that the chairman was

15   reporting back to Dallah Avco about those investigations and

16   the information that was sought and information that was

17   provided, I want that information to be produced.

18          With respect to the out-of-Kingdom expense request,

19   you're going to get those documents in the Ercan production, so

20   you'll be able to review that, but as I said earlier, I'm not

21   going to require a separate review of documents for Avco.  You

22   have already received the documents related to the 1994

23   reimbursement.

24          I know counsel said that he's produced all of the bank

25   transfer or wire transfer information, but I want to make sure

H1i1tera

1    you just go back and speak with your client to confirm that any

2    documents reflecting wire transfers have been produced.  And I

3    also want you to go back to look at the documents related to

4    the ANSS project, with a particular focus on the 1995 period,

5    about documents from the PCA or anyone from the Saudi

6    government saying, we have someone we want you to second.  It

7    may be that that document does not specifically request that

8    the person be al-Bayoumi, but there may be documents in advance

9    of the date when the letter actually went out requesting the

10   secondment that reflect that the Saudi government had somebody

11   in mind, even if his name is not identified.

12        MR. KRY:  I can speak to that, that we already

13   searched for those documents when we were looking for the other

14   employees seconded we spoke about earlier.

15        THE COURT:  It sounds to me like in many of your

16   documents, it was always qualified that it was regarding

17   al-Bayoumi, so what I want to make sure is, it's possible that

18   there's a letter from the PCA that says:  We have a guy and we

19   want you to second him.  We'll talk with you later with more

20   information.

21        MR. KRY:  I understand.  On this particular issue, the

22   search was not limited to al-Bayoumi.

23        THE COURT:  Okay.  Okay.  In all other respects, I'm

24   going to deny the motion to compel.  Again, I think that Dallah

25   Avco has done a fair job in producing responsive documents.

H1i1tera

1        Yes, Mr. Carter.

2        MR. CARTER:  Your Honor, just one or two areas of

3   clarification, and this is due to an omission on my part.  With

4   regard to the bank transfers that you've directed Dallah Avco

5   to provide, as I understand it from Mr. Kry's presentation,

6   Dallah Avco looked within its own records and produced their

7   bank transfer records that it had in its possession, but of

8   course Dallah Avco's bank records resident with its bank are

9   Dallah Avco's records, so what we'd ask -- and this has been a

10  direction that's been issued previously in the litigation -- is

11  that Dallah Avco go to the banks that were providing it banking

12  services at the time and ensure that they have a complete set

13  of the records relating to transfers for Bayoumi.

14       MR. KRY:  Your Honor, this request is coming out of

15  nowhere.  You know, I would like to discuss this with my

16  client, because I don't know what burdens are involved in that.

17  I don't even know if those banks still exist or what would be

18  there.  This has been pending a year.  I don't know why I'm

19  hearing it for the first time after your Honor has given her

20  ruling.

21       THE COURT:  Okay.  What I want is for as complete as

22  possible a production of payments that were made to al-Bayoumi,

23  and to the extent it's an incomplete record and there may be

24  records that are from the banks and -- why don't you speak with

25  Mr. Carter, speak with your client, and see whether or not

H1i1tera

 1   those documents can be readily obtained, but I am interested in

 2   the production of all wire transfers.

 3            MR. KRY:  I understand.  With respect to the documents

 4   on the Dallah Avco side, that is definitely something that's

 5   already been searched for and produced.

 6            THE COURT:  Okay.  So you and Mr. Carter can talk

 7   about whether there's additional documents that a bank might be

 8   able to produce.

 9            MR. KRY:  We're happy to discuss that with Mr. Carter.

10            MR. CARTER:  Just really quickly on that point, the

11   request obviously sought documents in the care, custody, or

12   control of Dallah Avco, and again, this is territory that was

13   addressed many times in this litigation.  Documents resident

14   with your bank, that are your records, are within your care,

15   custody, and control.  So --

16            THE COURT:  Okay.  I think they're going to look into

17   this.

18            Let me ask a question, just so I can think about the

19   future.  Once jurisdictional discovery is completed, I guess

20   one question is, when will that happen.  Is there any schedule

21   in place?  I know we're going to meet in a couple of weeks to

22   sort of pull the lens back a little bit on this case, but is

23   there a deadline for when this phase of discovery is going to

24   be completed?  And then I presume what's anticipated is that

25   the plaintiffs will file an amended complaint identifying the

H1i1tera

1    information that they think better supports their

2    jurisdictional basis.

3              MR. CARTER:  Your Honor, the way it's been structured

4    thus far is that there was a preference to have all of the

5    document productions complete and then move on to a deposition

6    phase.  And there was a reluctance on the part of parties on

7    both sides to start taking depositions when document

8    productions were ongoing, given the potential that, you know,

9    witnesses would have to be redeposed, and so the order that was

10   in place was for there to be a deadline for completion of all

11   document productions, which has been extended a few times, most

12   recently at the request of the defendants, but I think your

13   Honor contemplated that the document productions should be

14   complete by either end of March or sometime in April.  I

15   don't --

16             THE COURT:  So I've ruled on this.

17             MR. CARTER:  You did, and at the hearing in October

18   you gave us a deadline and said, let's come in at that time and

19   talk about a deadline for any remaining motions to compel

20   related to those productions and then to set a table for taking

21   the necessary depositions.

22             THE COURT:  Sounds imminently reasonable.  So I'll

23   just expect a letter from you all around that time.

24             MR. CARTER:  Certainly, your Honor.

25             THE COURT:  Anything further for us?

H1i1tera

1            Great.  Well, I will see you all again I think in a

2     few weeks.  Take care.

3            ALL COUNSEL:  Thank you, your Honor.

4            THE DEPUTY CLERK:  All rise.

5            (Adjourned)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25