**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| 03 MDL 1570 PLAINTIFFS<br><br>Plaintiffs,<br><br>v.<br><br>KINGDOM OF SAUDI ARABIA; SAUDI HIGH COMMISSION FOR RELIEF OF BOSNIA & HERZEGOVINA<br><br>Defendants. | CIVIL ACTION NO.: 03 MDL 1570 (GBD) (SN)<br><br>**CONSOLIDATED AMENDED COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

<u>**CONSOLIDATED AMENDED COMPLAINT**</u>

*This document relates to*:  All Actions

## I.  <u>INTRODUCTION</u>

1.      Through actions filed between 2002 and the present date, the estates of individuals murdered in the terrorist attacks of September 11, 2001 ("the September 11th attacks" or "9/11 attacks"), thousands of family members of those killed in the attacks, thousands of individuals who were physically injured by the attacks, and commercial victims that incurred billions of dollars in property damage losses as a result of the attacks (collectively "the 9/11 plaintiffs" or "plaintiffs"), brought claims against the Kingdom of Saudi Arabia ("the Kingdom" or "Saudi Arabia") and/or the Saudi High Commission for Relief of Bosnia & Herzegovina ("SHC") for their injuries caused by the attacks.

2.      In support of those claims, the 9/11 plaintiffs presented facts and evidence that:  (1) da'awa (Arabic for proselytizing) organizations (a/k/a "charities") established, funded, directed, and controlled by the government of Saudi Arabia to propagate Wahhabi Islam throughout the world (including the SHC itself), as a core function of the Saudi state and under the supervision of the Kingdom's Ministry of Islamic Affairs and embassies and consulates outside of Saudi Arabia,

were responsible for providing the funding and material support that allowed Osama bin Laden and al Qaeda to acquire the global strike capabilities employed by al Qaeda with such tragic results on September 11, 2001, and acted as agents and alter-egos of the Saudi government in doing so; (2) individual employees, officials, and agents of the government of Saudi Arabia knowingly provided direct assistance to the September 11th hijackers and plotters and al Qaeda organization, while acting in the performance of their duties in promoting the anti-western and anti-American agenda of the Kingdom's Ministry of Islamic Affairs; and (3) the Kingdom's Ministry of Islamic Affairs and related components of Saudi Arabia's vast government apparatus established to proselytize Wahhabi Islam knowingly channeled extensive funds and material support to al Qaeda, through the da'awa organizations and other government platforms under their control.

3.      The evidence submitted by the 9/11 plaintiffs between 2002 and 2015 and incorporated herein by reference included dozens of declassified U.S. and foreign government intelligence reports; State Department diplomatic cables; evidence submitted by the U.S. government in terrorism prosecutions and military tribunal proceedings; affidavits of members of the National Commission on Terrorist Attacks Upon the United States ("9/11 Commission") and the co-chair of the Congressional Joint Inquiry Into the Terrorist Attacks of September 11, 2001 ("Congressional Joint Inquiry"); public statements of additional 9/11 Commission members; testimony and evidence presented to foreign and international courts; internal records produced by the Saudi government-controlled charities in discovery proceedings in this litigation; testimony of convicted al Qaeda members, including Zacarias Moussaoui and SHC employee Ali Ahmed Ali Hamad; affidavits filed by Saudi officials in the litigation; Royal Decrees issued by the Saudi government; statements of Saudi officials; documents authored and disseminated by the Saudi government and its controlled charities; expert affidavit testimony; statements and testimony of U.S. counter-terrorism officials, members of Congress and senior Executive Branch officials;

evidence from al Qaeda criminal prosecutions in Germany, Spain, and Bosnia; academic studies; and related materials.

4.      Plaintiffs' facts and evidence in support of their claims have taken on additional significance as a result of the recent enactment of the Justice Against Sponsors of Terrorism Act ("JASTA"), Pub. L. No. 114-222, 130 Stat. 852 (Sept. 28, 2016).

5.      From the commencement of the first suits against Saudi Arabia and the SHC through September 28, 2016, the proceedings in this litigation pertaining to the Kingdom and the SHC have focused exclusively on the availability of subject matter jurisdiction for plaintiffs' claims under the non-commercial tort exception of the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605(a)(5), which provides an exception to foreign sovereign immunity for cases "in which money damages are sought against a foreign state for personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment."

6.      On September 28, 2016, Congress enacted JASTA, following passage by both chambers and overwhelming votes in both the Senate and House to override a Presidential veto. *See* 162 Cong. Rec. S2845–48 (May 17, 2016) (unanimous consent); 162 Cong. Rec. H5239–44 (Sept. 9, 2016) (voice vote); 162 Cong. Rec. S6166–73 (Sept. 28, 2016) (veto override vote of 97-1); 162 Cong. Rec. H6023–32 (Sept. 28, 2016) (veto override vote of 348-77).

7.      Through JASTA, Congress established an additional exception to foreign sovereign immunity for cases against foreign states arising from acts of international terrorism occurring in the United States, supplementing the jurisdictional grant provided by the non-commercial tort exception, which continues to provide an independent basis of jurisdiction for such cases as well. JASTA § 3(a) (enacting 28 U.S.C. § 1605B).  In addition, JASTA made foreign sovereigns subject

to Anti-Terrorism Act ("ATA") claims, *see id.* § 3(a) (enacting 28 U.S.C. § 1605B(c)), and amended the ATA's civil liability provisions to "recognize the substantive causes of action for aiding and abetting and conspiracy liability." *Id.* § 2(a)(4); *see id.* § 4(a) (enacting 18 U.S.C. § 2333(d)).

8.       Although JASTA is a law of general application, its legislative history makes clear that Congress intended JASTA to provide a jurisdictional grant and basis of relief applicable specifically to plaintiffs' claims against the Kingdom and the SHC, and to eliminate immunity defenses advanced by the Kingdom and the SHC in earlier proceedings in this MDL.[1]

9.       JASTA does so by "provid[ing] civil litigants with the broadest possible basis … consistent with the Constitution … , to seek relief against persons, entities, and foreign countries, wherever acting and wherever they may be found, that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States." JASTA, § 2(b).

10.       To that end, JASTA removed non-textual judicial limitations on federal courts' jurisdiction over foreign sovereigns under the FSIA for acts of international terrorism occurring in

---

[1] *See* 162 Cong. Rec. at H6025 (Sept. 28, 2016) (Rep. King) ("What [JASTA] is going to do is finally allow the 9/11 families to have their day in court to seek the justice they have long been denied. And if the Government of Saudi Arabia has no involvement, if there is no liability, they have nothing to worry about."); 162 Cong. Rec. at H6029 (Sept. 28, 2016) (Rep. Smith) ("[T]he Second Circuit dismissed legal action against Saudi Arabia and other defendants . . . . JASTA corrects that. . . . Anyone who has read the recently de-classified 28 pages of findings from the House-Senate Intelligence Committee's joint inquiry in 2002 . . . knows the provocative evidence of Saudi complicity in 9/11, and that remains unexamined."); 162 Cong. Rec. at S6167 (Sept. 28, 2016) (Sen. Blumenthal) ("[T]he Justice Against Sponsors of Terrorism Act simply closes a loophole that was created by the courts, contrary to the intent of this body. . . . Saudi Arabia, is able to evade all responsibility under the decision made by the Second Circuit Court of Appeals in New York, which created that loophole. . . . That is wrong. . . . This loophole will be closed by this measure for the benefit of not only the 9/11 victims but also potential victims in the future."); 162 Cong. Rec. at S6172 (Sept. 28, 2016) (Sen. Schumer) ("Unfortunately, the courts in New York have dismissed the 9/11 victims' claims against certain foreign entities alleged to have helped the 9/11 attacks. These courts are following what I believe is a fundamentally incorrect reading of the Foreign Sovereign Immunities Act. . . . For the sake of these families, it should be made clear—beyond a shadow of a doubt—that every entity, including foreign states, will be held accountable if they are sponsors of heinous acts like 9/11. It is very simple. If the Saudis were culpable, they should be held accountable. If they had nothing to do with 9/11, they have nothing to fear."); *cf.* 162 Cong. Rec. at H6026 (Sept. 28, 2016) (Rep. Nadler) ("If the Saudi Government was not complicit in the attack on 9/11, the plaintiffs will fail to prove such complicity in an American court. Justice will have been served, and the Saudis will be vindicated after years of suspicion. But if it is proven in an American court that the Saudi Government was complicit in the attacks on 9/11, justice will have been served and we—not the Saudis—will have justification to be very angry."); 162 Cong. Rec. at H5241 (Sept. 9, 2016) (Rep. Poe) ("Based on the 28 pages held secret for years, there may be evidence that the country of Saudi Arabia and their officials may have had some involvement in planning the elements of that attack. I don't know. That is what the courtroom is for. Whether this involvement rises to the level to be held accountable at trial is an issue for a jury of Americans to decide.").

the United States, and eliminated judicial constrictions on ATA claims, in order to ensure the rights of victims of terrorism in the United States to "pursue civil claims against … countries that have knowingly or recklessly provided material support or resources, directly or indirectly, to the persons or organizations responsible for their injuries."  JASTA, § 2(a)(7).

11.    Among other features, JASTA's exception to foreign sovereign immunity confirms that jurisdiction can be based on a sovereign entity's actions undertaken abroad (not just in the United States), and predicated on acts undertaken by a sovereign entity's agent (not just an employee, official, or alter-ego).  JASTA § 3(a) (enacting 28 U.S.C. § 1605B(b)(2)).

12.    Through these and other provisions, JASTA "incorporates traditional principles of vicarious liability and attribution, including doctrines such as *respondeat superior*, agency and secondary liability," thus confirming that a foreign state is subject to jurisdiction and liability for tortious acts of employees and agents at every level acting within the scope of their employment or agency.  162 Cong. Rec. at S2845 (May 17, 2016) (Sen. Cornyn).

13.    JASTA also confirms that there is no "discretionary function" limitation on jurisdiction for claims against a foreign state arising from an act of international terrorism occurring in the United States, and that the "caused by" language of the new exception to sovereign immunity, codified at 28 U.S.C. § 1605B, requires only some "reasonable connection" between defendant's actions and plaintiffs' injuries, 162 Cong. Rec. at S2845 (May 17, 2016) (Sen. Cornyn) (citing case law affirming "reasonable connection" standard), a flexible standard that may be met based on a showing of  "tortious act or acts" attributable to the defendant.  JASTA § 3(a) (enacting 28 U.S.C. § 1605B(b)(2)).

14.    Following JASTA's enactment, plaintiffs whose claims against Saudi Arabia and the SHC were the subject of a then pending appeal before the Second Circuit Court of Appeals, along with Saudi Arabia and the SHC, jointly moved for vacatur of the district court's judgments

in favor of Saudi Arabia and the SHC, and for remand of their claims for further proceedings.  In that motion, the Kingdom and the SHC acknowledged that "JASTA was intended to apply to this case," and that "JASTA makes significant changes to the legal framework addressed in the district court's" September 29, 2015 decision.

15.    On February 7, 2017, the Second Circuit Court of Appeals granted the joint motion for vacatur and remand in all respects, and remanded the cases in issue "for further proceedings in light of Congress's enactment of the Justice Against Sponsors of Terrorism Act."

16.    This Consolidated Amended Complaint is filed on behalf of all plaintiffs with claims against the Kingdom and/or the SHC that have been remanded pursuant to the Second Circuit Court of Appeal's February 7, 2017 remand order, including members of the *O'Neill* putative class action against the Kingdom,[2] in support of their claims encompassed by that order against defendants Saudi Arabia and/or the SHC.

17.    This Consolidated Amended Complaint sets forth facts and evidence in support of those plaintiffs' claims and theories of jurisdiction as to the Kingdom and/or the SHC, under both JASTA and other law, for plaintiffs' injuries caused by the September 11th attacks.

18.    This Consolidated Amended Complaint is in the form of an amendment that supplements by incorporation into, but does not displace, the operative complaints in the remanded cases, as contemplated in multi-district litigation proceedings.[3]

---

[2]*See Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al., 04-cv- 1922*, Class Action Complaint, dated March 10, 2004 (ECF No. 1).The class allegations of the *O'Neill* Class Action Complaint are set forth in ¶¶ 15-22 and 108-114 of that document, and are incorporated herein by reference.

[3]*See* Manual For Complex Litigation (Fourth) § 22.632 (2004) ("Establishing a master file with standard pleadings . . . can be particularly helpful if the litigation will involve a number of actions filed."); *see also id.* § 40.52 (sample case management order allowing plaintiffs' steering committee to file "a master complaint containing allegations that would be suitable for adoption by reference in individual cases," "a sample complaint illustrating how allegations from the master complaint can be incorporated into an individual case," and "a master class action complaint containing allegations that encompass the entire range of allegations" in the multi-district litigation.).

19.     This Consolidated Amended Complaint relates solely to Saudi Arabia and the SHC, and does not apply to any other defendants in the September 11th MDL, as to which plaintiffs' operative complaints, pleadings, and related submissions remain in effect.

## II.   PARTIES

20.     Plaintiffs in the remanded actions include the estates of thousands of individuals murdered in the September 11th attacks, several thousand family members of those victims, thousands of individuals who themselves suffered physical injuries caused by the September 11th attacks, and commercial entities that incurred billions of dollars in losses due to physical injuries to property caused by the September 11th attacks.  In addition, the *O'Neill* class action complaint asserts claims against the Kingdom on behalf of all members of a putative class.

21.     Plaintiffs have described their particular injuries and the nexus between those injuries and the September 11th attacks in the complaints through which they initiated their actions and the associated pleadings in those cases, which this pleading supplements and which are incorporated herein by reference.[4]

22.     Defendant Kingdom of Saudi Arabia is a foreign state within the meaning of 28 U.S.C. § 1603(a).  Saudi Arabia maintains an Embassy within the United States at 601 New Hampshire Avenue, N.W., Washington, D.C. 20007.

23.     Defendant the Saudi High Commission for Relief of Bosnia & Herzegovina is a foreign state within the meaning of 28 U.S.C. § 1603(a).  The SHC has asserted based on affidavit testimony of a senior Saudi official that it "is an arm of the Saudi government," and that "[a]ctions

---

[4]The operative complaints are *Federal Insurance* First Amended Complaint with Incorporated More Definite Statements, RICO Statements and Rule 15(d) Supplemental Pleadings, Filed in Accordance with Paragraph 13 of Case Management Order Number 2, Case No. 03 Civ. 6978, ECF No. 772; *Pacific Employers Insurance* Complaint, Case No. 04 Civ. 7216, ECF No. 1; *Vigilant Insurance* Complaint,  Case No. 03 Civ. 8591, ECF No. 1; *Burnett* Third Amended Complaint, Case No. 02 Civ. 1616 (D.D.C.), ECF No. 29, and *Burnett's* Notice of Consolidation of Pleadings, 03 MDL 1570, ECF No. 1377; *Euro Brokers* Complaint, Case No. 04 Civ. 7279, ECF No. 1, and *Euro Broker's* Notice of Consolidation of Pleadings, 03 MDL 1570, ECF No. 1078; *O'Neill* Class Action Complaint, Case No. 04 Civ. 1922, ECF Nos. 1, 21-22, as amended by the *O'Neill* First Consolidated Complaint, Case No. 03 MDL 1570, ECF No. 1569; *Continental Casualty* Second Amended Complaint, Case No. 04 Civ. 5970, ECF No. 195; and *Cantor Fitzgerald* Complaint, Case No. 04 Civ. 7065, ECF No. 5.

taken by the Saudi High Commission may be viewed as actions of the government of Saudi Arabia."

## III.    VENUE AND JURISDICTION

24.    Venue in this district is proper pursuant to 28 U.S.C. §§ 1391(b)(2) and 1391(f)(1), as a substantial part of the events giving rise to the claims asserted herein occurred in this district. Venue is also proper in this district pursuant to 18 U.S.C. § 2334(a).

25.    This Court has subject matter jurisdiction over plaintiffs' claims against defendants Saudi Arabia and the SHC pursuant to 28 U.S.C. § 1330, as the claims against the defendants fall within the exceptions to foreign sovereign immunity set forth at 28 U.S.C. §§ 1605(a)(5) and 1605B of the FSIA, 28 U.S.C. § 1602 *et seq*.

### Jurisdiction Pursuant to 1605B – JASTA

26.    JASTA's exception to foreign sovereign immunity applies when a plaintiff presents plausible allegations satisfying the following elements:  (1) the suit seeks monetary damages for a physical injury to person, property, or death occurring in the United States; (2) caused by an act of international terrorism occurring in the United States; and (3) caused by a tortious act or acts of the foreign state defendant, or of any official, employee, or agent of that foreign state while acting within the scope of his or her office, employment, or agency, regardless of where the tortious act or acts of the foreign state occurred; provided that (4) the claim does not rest on allegations of "mere negligence."  28 U.S.C. § 1605B.

27.    In satisfaction of JASTA's first and second elements, plaintiffs' suits present claims for money damages for physical injuries to person and property and wrongful deaths occurring in the United States and caused by the September 11th attacks, including among others claims on behalf of the nearly three thousand innocent people killed in the attacks and their family members, claims for severe physical injuries suffered on September 11, 2001 by survivors of the attacks, and

claims relating to the physical destruction of the World Trade Center complex and much of lower Manhattan resulting from the attacks.

28.     Further, plaintiffs' allegations, facts, and evidence, along with the declarations of the United States government and Supreme Court, establish that the September 11th attacks were an "act of international terrorism" within the meaning of JASTA.

29.     Plaintiffs' claims satisfy JASTA's third element as well, in four ways.

30.     *First*, plaintiffs plausibly allege (and offer facts and evidence) that several Saudi government da'awa organizations collaborated intimately with al Qaeda during the decade leading up to the 9/11 attacks, providing funding and other forms of material support that enabled Osama bin Laden to build and sustain the al Qaeda organization and acquire the global strike capabilities employed on September 11, 2001.   These organizations were components of the Saudi government, and officials and employees of those organizations were officials and employees of the Kingdom.   Their material support of al Qaeda included assistance closely related to the September 11th attacks, such as the funding of the terrorist camps in Afghanistan where the 9/11 attacks were planned and the hijackers received training.

31.     The Saudi government da'awa organizations that engaged in that material support of al Qaeda, while acting as arms and components of the Saudi government, include the Muslim World League ("MWL"), International Islamic Relief Organization ("IIRO"), Al Haramain Islamic Foundation, Al Haramain al Masjed al Aqsa, Rabita Trust, World Assembly of Muslim Youth ("WAMY"), Saudi Red Crescent Society ("SRC"), Saudi Joint Relief Committee for Kosovo and Albania ("SJRC"), and the SHC (collectively "the da'awa organizations," "proselytizing organizations," or "charities").

32.     These organizations were repeatedly implicated in terrorist activities and the sponsorship of al Qaeda during the years preceding the September 11th attacks, and officials

throughout the Saudi government were thus aware that those government components were actively supporting al Qaeda.

33.     *Second*, plaintiffs plausibly allege (and offer facts and evidence) that the Kingdom's Ministry of Islamic Affairs and other components of the Kingdom's Wahhabi proselytizing apparatus broadly used the resources under their control to fund and materially support al Qaeda.  This material support included the direct involvement of employees of the Ministry in recruitment and fundraising activities for al Qaeda, to include the recruitment of several of the 9/11 hijackers.  In addition, officials of the Ministry were directly involved in directing and supervising organizations like Al Haramain Islamic Foundation, which was channeling massive resources and support to al Qaeda in the years immediately before the September 11th attacks.  In recent years, the Kingdom has removed thousands of extremists employed by the Ministry of Islamic Affairs and undertaken other reforms of the Ministry, and described those activities as measures necessary to counter terrorism.

34.     *Third*, plaintiffs plausibly allege (and offer facts and evidence) that individual Saudi government employees and agents knowingly provided material support to the September 11th hijackers and plotters, both from within the United States and elsewhere, while acting within the scope of their employment and agency in advancing the extremist agenda of the Kingdom's Ministry of Islamic Affairs and Wahhabi proselytizing apparatus.

35.     Over recent months, three significant additional and previously unavailable U.S. government investigative records have been declassified that provide further evidence of the involvement of employees and agents of the Saudi government in providing direct aid and assistance to the 9/11 hijackers and plotters, and the true nature of their roles with the Saudi government:  (1) the so-called 28 pages of the Report of the Congressional Joint Inquiry ("CJI"), attached as Appendix 2 hereto; (2) a 2012 "Summary Report" ("SR") concerning the status of the

continuing criminal investigation by the Federal Bureau of Investigation ("FBI") and Department of Justice ("DOJ") of Saudi government employees and agents who, in the FBI's own words, provided "substantial assistance" to the 9/11 hijackers, attached as Appendix 3 hereto; and (3) the investigative memo of the 9/11 Commission concerning evidence of Saudi government involvement in the attacks known as "Document 17," attached as Appendix 4 hereto.

36.     As reflected in those documents and by plaintiffs' further factual allegations and evidence, the individual Saudi government employees and agents who provided such material support to the 9/11 hijackers and plotters and al Qaeda include:

- Fahad al Thumairy and Omar al Bayoumi (both employees and agents of the Saudi government performing functions on behalf of the Ministry of Islamic Affairs), who working together provided "substantial assistance" to 9/11 hijackers Nawaf al Hazmi and Khalid al Mihdhar from within the United States (SR at p. 3);

- an as-yet unidentified individual who is also a "subject" of the ongoing U.S. criminal investigation and "tasked al-Thumairy and al-Bayoumi with assisting the hijackers" (SR at pp. 3-4);

- Saleh al Hussayen, a Saudi cleric and government employee who precipitously switched to the same hotel as Hazmi and Mihdhar the night before the 9/11 attacks, and was "deceptive" about his relationship with the hijackers when interviewed by the FBI according to the recently declassified pages of the 9/11 Congressional Joint Inquiry Report, going so far as to feign seizure and flee the United States to avoid further questioning (CJI at p. 418);

- Osama Bassnan, a Saudi government employee and close associate of Bayoumi and "a number of other individuals connected to the hijackers," who according to the FBI was an ardent supporter of Osama bin Laden and bragged to an FBI asset that he "did more than al-Bayoumi did for the hijackers" (CJI at pp. 417, 426);

- Muhammed Jaber al Fakihi, another employee of the Ministry of Islamic Affairs with extensive ties to terrorism, who according to declassified intelligence documents directly aided the Hamburg al Qaeda cell that coordinated the 9/11 attacks;

- Mohammed al Qudhaeein, another Saudi government agent whose "profile is similar to that of al-Bayoumi," who participated, along with another long-time Saudi government agent named Hamdan al Shalawi, in a dry run for the 9/11

attacks during a 1999 flight from Phoenix to Washington, D.C. "to attend a party at the Saudi embassy," attempting "on two occasions to enter the cockpit," in order "to test the security procedures of America West Airlines in preparation for and in furtherance of UBL/Al Qaeda operations" (CJI at pp. 419, 433-34);

- Omar Abdi Mohamed, another employee of the Kingdom's Ministry of Islamic Affairs stationed in California, who funded al Qaeda through a purported charity he established called the Western Somali Relief Agency;

- individual government officials and employees who headed and worked in the Kingdom's so-called charities; and

- individual Saudi government imams who served as recruitment agents and fundraisers for bin Laden's organization.

37.    *Fourth,* pursuant to state and federal law theories of secondary liability (aiding and abetting and conspiracy), plaintiffs' factual allegations and evidence support the attribution of the September 11th attacks themselves to Saudi Arabia for purposes of both jurisdiction and liability.

## Jurisdiction Pursuant to 1605(a)(5) – Non-Commercial Torts Exception

38.    The text of the FSIA's non-commercial tort exception provides that foreign states do not enjoy immunity for tort claims that:  "(1) are noncommercial, (2) seek 'money damages,' (3) for 'personal injury or death, or damage to or loss of property,' (4) that 'occur[ed] in the United States,' and (5) that was 'caused by the tortious act,' (6) 'of [a defendant] foreign state or [its] employee . . . acting within the scope of his . . . employment,' unless (7) the claim is based on a discretionary act or (8) it is for 'malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights.'  28 U.S.C. § 1605(a)(5)."  *Doe v Bin Laden, et al.*, 663 F.3d 64, 66 (2d Cir. 2011).

39.    As summarized above and set forth with particularity below, plaintiffs' claims seek money damages for personal injury, wrongful death, and damage to property occurring in the United States, pursuant to common law and statutory tort claims that are non-commercial and are not "for malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or

interference with contract rights," in satisfaction of the first four and eighth textual requirements of § 1605(a)(5).

40.    Further, plaintiffs' facts and evidence relating to the attributable tortious acts of Saudi Arabia and its employees, agents, and alter-egos in support of the September 11th attacks and al Qaeda, and implicated doctrines of secondary liability, satisfy the non-commercial tort exception's requirements that the claim seek redress for injuries that were "caused by" a tortious act of the foreign state, or of an employee or official of the foreign state acting within the scope of his employment or office.

41.    Plaintiffs' claims also satisfy any potential non-textual requirement under the non-commercial tort exception of an "entire tort" committed in the United States, as plaintiffs plead and offer facts and evidence that:  (1) individuals who were employees and agents of the Kingdom, acting within the scope of their employment and agency, knowingly provided critical support to the September 11th hijackers and plotters through activities undertaken in the United States; (2) several ostensible "charities" that extensively funded and supported al Qaeda, including from offices in the United States, were agents and controlled alter-egos of the Kingdom or discharged core government functions, making their U.S.-based torts attributable to the Kingdom; (3) the tortious acts of Saudi employees, agents, and alter-egos in support of al Qaeda outside of the United States were intimately related to, and thus part of the same tort as, the September 11th attacks here; and (4) the September 11th attacks were themselves an "entire tort" in the United States, attributable to the Kingdom and the SHC under state and federal common law secondary liability principles.

42.    Further, the tortious acts which form the basis of plaintiffs' claims do not fall within the discretionary function limitation of the non-commercial tort exception, as they involve the provision of material support and resources to al Qaeda in violation of U.S. and international law,

and were prohibited by the laws of numerous other jurisdictions where such support was provided. The activities facilitating the provision of that material support, including the placement of employees and agents of the Saudi government in the United States to perform undisclosed functions, violated other U.S. laws as well, including the Espionage Act and U.S. immigration laws.

43.      Recognizing this Court's considerable familiarity from prior proceedings in this litigation with the historical facts that inform and provide context for plaintiffs' claims, this Consolidated Amended Complaint now proceeds, in the interests of clarity, to discuss the September 11th attacks themselves, and then surveys the key evidence and facts concerning the tortious acts of the Saudi government and its employees, agents, and alter-egos in furtherance of those attacks.

44.      In further support of the claims set forth herein, plaintiffs incorporate by reference in its entirety their February 3, 2015 Averment of Facts and Evidence in Support of Their Claims Against the Kingdom of Saudi Arabia and the Saudi High Commission for Relief of Bosnia & Herzegovina ("Averment"), ECF No. 2927-1, attached as Appendix 1 hereto, which sets forth relevant details concerning al Qaeda's origins in the Afghan jihad and development of bin Laden's terrorist organization in the ensuing years (Averment ¶¶ 15-48); al Qaeda's targeting of the United States from the date of its foundation through September 11, 2001 (Averment ¶¶ 86-101, 307-308); the role of Wahhabi Islam in the Saudi state and the power and influence of the Kingdom's government clerics (Averment ¶¶ 49-124); the links between Saudi Wahhabism and terrorism (Averment ¶¶ 125-130); details concerning the September 11th plot itself (Averment ¶¶ 131-263); counter-terrorism reforms targeting the Kingdom's Ministry of Islamic Affairs after the September 11th attacks that reflect and evidence the Ministry's involvement in terrorist activities prior to September 11, 2001 (Averment ¶¶ 264-285); the Saudi government da'awa organizations' material

14

support of al Qaeda and terrorist activities (Averment ¶¶ 286-580); and the Kingdom's knowledge of the involvement of its charities and components of its proselytizing apparatus in supporting al Qaeda (Averment ¶¶ 581-587).

45.     Plaintiffs also incorporate by reference the evidence they filed of record in further support of the factual allegations of their Averment and their claims against the Kingdom and the SHC, ECF Nos. 2927, 2927-1 – 2927-24.[5]

## IV.   FACTUAL BACKGROUND

46.     On September 11, 2001, nineteen members of the al Qaeda terrorist organization, fifteen of whom were citizens of the Kingdom of Saudi Arabia, hijacked four commercial airliners, and used those planes as weapons in a coordinated terrorist attack upon the United States and its citizens (the "September 11th attacks").  The hijackers caused two jets to crash into the World Trade Center Towers in New York, and a third to crash into the Pentagon Building in Arlington County, Virginia.  The fourth airliner crashed into a field near the town of Shanksville, Pennsylvania, after innocent passengers challenged the hijackers and prevented them from reaching their apparent target in Washington, D.C.

47.     At the time of the September 11th attacks, al Qaeda was a designated foreign terrorist organization under section 219 of the Immigration and Nationality Act (8 U.S.C. § 1189).

48.     The September 11th attacks resulted in the tragic loss of several thousand lives, physical injuries to countless other persons, and property damage on a catastrophic scale, including the complete destruction of the World Trade Center Complex.

49.     The September 11th attacks were an "act of international terrorism" within the meaning of 18 U.S.C. § 2331.  *See Final Report of the National Commission on Terrorist Attacks Upon the United States* ("9/11 Commission Final Report") at pp. 172-73 (describing the 9/11

---

[5] Pursuant to the Court's Order of August 31, 2016, plaintiffs are not relying on the documents that were the subject of that Order and identified as exhibits 9, 10, and 11 in ECF No. 2927-24 (bates stamped PEC-KSA000191-196).

attacks as a "complex international terrorist operation"); *see also Hamdan v. Rumsfeld*, 548 U.S. 557, 567-568 (2006) ("On September 11, 2001, agents of the al Qaeda terrorist organization hijacked commercial airplanes and attacked the World Trade Center in New York City and the national headquarters of the Department of Defense in Arlington, Virginia. Americans will never forget the devastation wrought by these acts. Nearly 3,000 civilians were killed. Congress responded by adopting a Joint Resolution authorizing the President to 'use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks . . . *in order to prevent any future acts of international terrorism against the United States* by such nations, organizations or persons.' Authorization for Use of Military Force (AUMF), 115 Stat. 224, note following 50 U.S.C. § 1541 (2000 ed., Supp. III).") (Emphasis added).

50.     As confirmed by countless investigations, the September 11th attacks were the culmination of a more than decade long campaign by al Qaeda to carry out spectacular terrorist attacks against the United States, set in motion with the formation of al Qaeda in 1988.

51.     As further detailed below, the Kingdom provided material support to al Qaeda for more than a decade leading up to the September 11th attacks, with knowledge of al Qaeda's intent to conduct terrorist attacks against the United States, and an awareness that al Qaeda would use the support provided by the Kingdom to achieve that objective.

52.     As further detailed below, the support provided by the Kingdom enabled al Qaeda to obtain the global strike capabilities necessary to carry out the September 11th attacks, and was essential to the success of those attacks. Indeed, the material support provided to al Qaeda by employees, agents, and alter-egos of the Saudi government, all of which is attributable to the Kingdom itself, included direct assistance to the September 11th plotters and hijackers and massive

funding and logistical support that enabled Osama bin Laden to build and sustain the al Qaeda organization.

53.     As further detailed below, the material support provided by the Kingdom to al Qaeda encompasses the tortious acts of:  (1) individual Saudi government employees, officials, and agents, who knowingly provided direct aid and support to the September 11th hijackers and plotters and al Qaeda organization, from within the United States and elsewhere, while acting within the scope of their employment, office, or agency; (2) proselytizing organizations (including the SHC) established, funded, directed, and supervised by the Saudi government to propagate Wahhabi Islamist ideology throughout the world, as a core function and duty of the Saudi state, which knowingly, directly, and extensively supported al Qaeda's targeting of the United States by funding and collaborating intimately with al Qaeda, including through offices located in the United States; (3) additional components of the Kingdom's vast Wahhabi proselytizing apparatus in support of al Qaeda; and (4) the September 11th hijackers themselves, pursuant to theories of secondary liability (aiding and abetting and conspiracy).

## V.     MATERIAL SUPPORT FOR AL QAEDA AND THE 9/11 ATTACKS FROM SAUDI ARABIA'S PROSELYTIZING AGENTS AND ALTER-EGOS

54.     The emergence of al Qaeda under the patronage of the Saudi government's proselytizing apparatus is rooted in the unique relationship between the House of Saud and Wahhabi Islam.

55.     The modern Saudi state is a product of a pact forged in the 18th century between Muhammad Ibn al Saud, the head of the al Saud tribe in Arabia, and Muhammad Ibn Abd al Wahhab, a Muslim scholar from the Najd region of Arabia.

56.     Ibn Abd al Wahhab's ideas and teachings form the basis of the Islamic school of thought commonly known as Wahhabism, which forms the ideological foundation for the al Qaeda movement.   According to the 9/11 Commission, al Qaeda finds inspiration and religious

justification for its actions in "a long tradition of extreme intolerance" that flows "through the founders of Wahhabism." *See* 9/11 Commission Final Report at p. 362.

57.     Pursuant to the compact between the House of Saud and the Saudi Ulema (Wahhabi scholars and clerics), the Ulema provide religious legitimacy for the House of Saud's political rule. In exchange, the House of Saud provides the Ulema with government platforms and resources to promote their Wahhabi religious agenda.

58.     One of the most absolute conditions of this arrangement is the requirement that the Saudi state propagate Wahhabi Islam globally. *See* 9/11 Commission Final Report at p. 372 (confirming the "dedication of the [Saudi] government to propagating the Islamic faith, particularly the Wahhabi sect that flourishes in Saudi Arabia").

59.     In this regard, the Kingdom's Basic Law of Governance expressly provides that "[t]he State shall…undertake its duty regarding the propagation of Islam (Da'wah)." *See* Affirmation of Evan Francois Kohlmann ¶ 16, n. 2 (ECF No. 2927-9).

60.     To comply with this obligation, the Kingdom established several state da'awa organizations to serve as instruments for conducting proselytizing activities and otherwise advancing the Wahhabi agenda of the Saudi Ulema globally, including MWL, IIRO, WAMY, Al Haramain Islamic Foundation, Rabita Trust, the SHC, SJRC, SRC, Benevolence International Foundation ("BIF"), and Al Haramain al Masjed al Aqsa.

61.     From the formation of al Qaeda in 1988 through the September 11, 2001, those Wahhabi proselytizing organizations established, funded, directed and controlled by the government of Saudi Arabia, and supervised by the Kingdom's Ministry of Islamic Affairs and embassies and consulates outside of Saudi Arabia, were responsible for providing the massive funding and other forms of support that allowed Osama bin Laden and al Qaeda to acquire the

global strike capabilities employed by al Qaeda on September 11, 2001, and were at all times components of the Saudi government itself.

62.     Osama bin Laden's collaboration with the Saudi state da'awa organizations began during the jihad against the Soviet Union in Afghanistan, when several of those organizations formed the nucleus of a support network to provide funds, arms, and other assistance to the mujahideen (jihad fighters), at the direction of the Saudi government and working in close coordination with bin Laden.

63.     When Osama bin Laden formed al Qaeda in 1988 to conduct jihad against the United States, the support network established by the da'awa organizations during the Afghan campaign was adapted to support bin Laden's targeting of the United States.

64.     Indeed, internal al Qaeda documents detailing the formation of bin Laden's terror organization, seized by the United States during a 2002 raid of an al Qaeda front charity and analyzed in detail in a DOJ evidentiary proffer, indicate that Dr. Abdullah Omar Naseef, the then head of MWL and a member of the Kingdom's Majlis al Shura (government consultative council), personally met with bin Laden and other founding members of al Qaeda at the time of al Qaeda's formation, and agreed that MWL offices would be used as a platform for the new jihad organization, and that attacks would be launched from MWL's offices.  *See* Averment ¶ 345; Index of Evidence Supporting Plaintiffs' Averment of Facts, Ex. 125 (ECF No. 2927-24) (hereinafter referred to as "Index of Evidence").

65.     Contemporaneous with this agreement, Saudi government officials installed founding al Qaeda members in leadership posts of the Saudi da'awa organizations, in locations of strategic importance to al Qaeda.

66.     For example, Naseef appointed Wa'el Hamza Jelaidan, a founding al Qaeda member whom the United States designated as a terrorist after 9/11 for "direct[ing] organizations

19

that have provided financial and logistical support to al-Qaida," to serve as the head of the Peshawar, Pakistan office of MWL in 1989.  *See* Averment ¶ 564.

67.     Naseef also appointed Mohammed Jamal Khalifa, another founding al Qaeda member and Osama bin Laden's brother in law, to serve as the director of a new IIRO office in the Far East in this time period, another location of strategic importance to the new al Qaeda organization for recruitment and other reasons.  *See id.* ¶ 350.

68.     Shortly after assuming that post, Khalifa used IIRO funds and resources to support a terrorist cell in the Philippines, which included 9/11 masterminds Khaled Sheikh Mohammed and Ramzi Yousef, in relation to the development of an aviation-based terrorist plot involving the planned simultaneous in-flight detonations of twelve U.S. flag commercial airplanes.  That very plot, often referred to as "Operation Bojinka," was adapted by Khaled Sheikh Mohammed, using the knowledge he had acquired during its development about vulnerabilities in the aviation security system, into the September 11th plot.  *See id.*

69.     The internal documents relating to al Qaeda's establishment and other evidence indicate that founding al Qaeda members held senior posts in WAMY/BIF (Adel Batterjee), SRC (Wa'el Jelaidan), and Al Haramain Islamic Foundation (Aqeel al Aqeel) during the period surrounding al Qaeda's formation.

70.     In the years following al Qaeda's formation with the direct assistance of the Saudi officials who directed the Kingdom's da'awa organizations, support flowed continuously from the Kingdom's da'awa organizations to al Qaeda, providing the massive funding and other essential resources that enabled bin Laden to build and maintain al Qaeda.

71.     As the 9/11 Commission's Staff Monograph on terrorist financing explained, "al Qaeda was funded, to the tune of approximately $30 million per year, by diversions of money from Islamic charities."

20

72.     State Department cables, U.S. intelligence and counter-terrorism reports, declarations of U.S. officials, foreign intelligence reports, and other evidence confirm that the "Islamic charities" most responsible for channeling this essential support to al Qaeda were MWL, IIRO, WAMY, Al Haramain Islamic Foundation, Rabita Trust, SHC, SJRC, SRC, BIF and Al Haramain al Masjed al Aqsa.

73.     Plaintiffs have offered particularized facts and evidence in their Averment, spanning over 80 pages, documenting the terrorist activities of each of those organizations in support of al Qaeda.  *See* Averment at ¶¶ 286-587, incorporated herein by reference.

74.     Those factual allegations (and the evidence supporting them) document those da'awa organizations' massive funding of al Qaeda, intimate involvement in all aspects of al Qaeda's operations, and broad use of their infrastructures and resources to advance al Qaeda's terrorist agenda.

75.     The tortious acts of those da'awa organizations in support of al Qaeda included:

(a)     raising and laundering funds on behalf of al Qaeda and its affiliates;

(b)     channeling funds to al Qaeda;

(c)     providing financial and logistical support and physical assets to al Qaeda members;

(d)     directly participating in al Qaeda's terrorist activities, including the planning, coordination, funding and execution of terrorist attacks;

(e)     permitting al Qaeda members to use ostensible employment with their organizations as a cover for their travels and terrorist activities;

(f)     serving as liaisons to localized terrorist organizations on behalf of al Qaeda, thereby assisting al Qaeda in expanding its operational base and sphere of influence;

(g)     funding and facilitating shipments of arms and supplies to Islamic terrorist organizations and associated separatist movements, including al Qaeda;

(h)   funding camps used by al Qaeda and associated jihadist organizations to train soldiers and terrorists, including camps used to train the September 11th hijackers;

(i)   actively recruiting new members for al Qaeda;

(j)   working throughout the world to spread al Qaeda's jihadist ideology and draw new adherents to its cause;

(k)   serving as channels for distributing information and documentation within Islamic terrorist organizations and associated separatist movements, including al Qaeda, and from Islamic terrorist organizations and separatist movements to the media;

(l)   disseminating publications designed to advance al Qaeda's Wahhabi Islamist ideology throughout the Muslim world and legitimize violent jihad against Christians and Jews on the grounds that they are "infidels" who do not deserve to live; and

(m)   openly advocating for young Muslims to take up arms against Western and democratic societies, including the United States.

76.   The intimate collaborations between the Saudi government da'awa organizations and al Qaeda are further reflected by actions, statements, and reports by the U.S. government pertaining to each in the years immediately before and after the September 11th attacks.

77.   For instance, following the September 11th attacks, the United States designated the entire Al Haramain Islamic Foundation organization and its senior leadership pursuant to the Executive Order 13224 Specially Designated Global Terrorist program, explaining that Al Haramain was one of the principal organizations "providing support for the al Qaeda network and promoting militant Islamic doctrine worldwide."  *See* Averment ¶¶ 483-92, 503.

78.   The United States also designated Rabita Trust on October 12, 2001 "for its close ties to senior al Qaida leadership and for providing logistical and financial support to al Qaida." *See id.* ¶ 580.   As reflected in the designation, Rabita Trust's director during the period immediately before and through the 9/11 attacks was al Qaeda founding member Wa'el Jelaidan, who was again serving in a position of authority in a Saudi government da'awa organization by appointment of the Saudi government.

79.     The U.S. designated several offices of the IIRO as well, along with a senior IIRO official in Saudi Arabia (who in that capacity was an employee of the Saudi government), describing him as the "million dollar man' for supporting Islamic extremists." *See id.* ¶¶ 403-05.

80.     State Department cables further identify IIRO as "the principal sponsor of terrorist training camps in Afghanistan during the Taliban regime" and indicate that "Usama bin Ladin used the entire IIRO network for his terrorist activities." *See id.* ¶¶ 326, 330-32, 393-94.

81.     State Department cables similarly reveal that the U.S. embassy in Sarajevo recommended that the SHC be designated pursuant to Executive Order 13224 based on its activities in support of al Qaeda, and that U.S. counter-terrorism officials included the SHC in a group of terrorist fronts they referred to as the "dirty dozen." *See* Index of Evidence, Ex. 229.

82.     Department of Defense records likewise confirm the United States' determination that "WAMY is a Tier 1 Counterterrorism NGO target, defined as those that have demonstrated sustained and active support for terrorist organizations willing to attack U.S. persons or interests."

83.     In a confidential communication to UN peacekeeping forces, the United States identified SJRC as an organization that "move[s] money and men" for Osama bin Laden, and noted that SJRC's director, Wa'el Jelaidan (once again, by appointment of the Saudi government), was an associate of Osama bin Laden. *See* Averment ¶¶ 551, 566.

84.     Plaintiffs' Averment cites a range of additional U.S. actions, reports, and statements concerning the al Qaeda support activities of MWL, IIRO, WAMY, BIF, Al Haramain, SHC, SRC, SJRC, Al Haramain al Masjed al Aqsa, and Rabita Trust. *See id.* ¶¶ 40, 316-31, 342, 364, 369, 381-83, 385-90, 392-95, 397-404, 426-38, 472-75, 483, 484, 486-92, 503, 503, 507, 509-18, 536-42, 555-58, 562, 564, 566, and 580.

85.     The material support provided by the Saudi da'awa organizations included aid and operational assistance closely related to al Qaeda's efforts to target the United States through large scale terrorist attacks, including the September 11th attacks themselves.

86.     For example, U.S. government reports indicate that IIRO and Al Haramain Islamic Foundation funded the very terrorist camps where the 9/11 hijackers received their training.  *See id.* ¶¶ 315, 330-31, 382, 393-94.

87.     An IIRO official interrogated by Indian officials in relation to a 1999 al Qaeda plot to attack the U.S. diplomatic missions in Calcutta and Madras, Sayed Abu Naser, confirmed this funding program, telling his interrogators that he personally visited al Qaeda camps in Afghanistan on behalf of IIRO, to assess their funding needs.  Naser estimated that as much as 50-60% of IIRO funds were channeled to terrorist training camps in Afghanistan and Kashmir.

88.     The findings of a partial audit conducted by a Pakistani affiliate of Ernst & Young of funds distributed by IIRO's Saudi headquarters through its office in Pakistan align with this estimate.  *See* Index of Evidence, Ex. 166.

89.     Completed just months before the September 11th attacks and covering the period between January 1996 through February 2001, the partial audit found that over half of the funds distributed through the office – totaling millions of dollars – could not be accounted for, and that senior officials of IIRO had engaged in the wholesale fabrication of invoices, receipts, and entire construction projects to conceal the illicit use of the funds.  *See id.*

90.     According to Jamal al Fadl, a former al Qaeda official who became a cooperating witness for the United States and testified at length in the African embassy bombing trials, IIRO officials had been using fraudulent orphan distribution lists to conceal the funding of al Qaeda since at least the early 1990s.

91.     U.S. and foreign investigations also document the direct involvement of both IIRO and Al Haramain Islamic Foundation in the planning, coordination, and execution of the 1998 al Qaeda bombings of the U.S. embassies in Kenya and Tanzania, as well as IIRO's role in the aviation-related terrorist plot that was adapted and became the September 11th plot.  *See* Averment ¶¶ 362, 419, 486, 502.

92.     In addition, the director of Al Haramain Islamic Foundation's office in Belgium, Tarek Maaroufi, was arrested in late 2001 by Belgian authorities and thereafter convicted for involvement in the assassination of anti-Taliban Northern Alliance commander Ahmed Shah Massoud.

93.     The assassination was a component of the 9/11 plot itself:  Massoud was killed in Afghanistan just two days before the September 11th attacks, as part of al Qaeda's efforts to limit operational capabilities of the Northern Alliance to mount an offensive against al Qaeda in response to the attacks.  Maaroufi, who was hired by Al Haramain following his release from prison for involvement in a terrorist grenade attack in Belgium, recruited the assassins and provided them with fake passports for the operation.

94.     A post-9/11 counter-terrorism raid of the Sarajevo office of the SHC, meanwhile, uncovered a range of materials confirming the SHC's direct involvement in the portfolio of plots al Qaeda was developing during that time period to attack the American homeland (of which the September 11th plot was a component), including photographs of the World Trade Center before and after its collapse, photographs of the United States embassies in Kenya and Tanzania and the U.S.S. Cole, files on deploying chemical agents with crop dusters, information about how to make fake State Department badges, and photographs and maps of Washington marking prominent government buildings.  *See* Averment ¶¶ 533-34.

95.     The subject matter of those materials recovered in the raid of the SHC's offices, within weeks of the September 11th attacks, mirrors several of the plots Zacarias Moussaoui testified that he was sent to the United States by al Qaeda to explore.  ECF No. 2927-8 (describing plot to use crop dusting plane in terrorist attack on U.S. soil).

96.     Separately, convicted al Qaeda member and SHC employee Ali Ahmed al Hamad affirmed in his testimony that al Qaeda members were broadly embedded in SHC offices, and were using SHC facilities to plot attacks against the West.  *See* Averment ¶¶ 525-27.

97.     The SHC's material sponsorship of al Qaeda also encompassed arms trafficking on behalf of Osama bin Laden's organization, and the laundering of millions of dollars for al Qaeda's benefit, as reflected by U.N. and Bosnian investigations.  *See id.*  ¶¶ 530, 542.  The SHC's fundraising activities in support of al Qaeda included money laundering operations carried out in collaboration with Wa'el Jelaidan, Yassin Kadi and Chafiq Ayadi, all of whom were designated by the United States after the September 11th attacks pursuant to Executive Order 13224.

98.     More broadly, statements of U.S. officials and government reports demonstrate how the expansive support provided by the Saudi government da'awa organizations enabled Osama bin Laden to build and sustain the al Qaeda organization, and acquire the resources and assets necessary to carry out the September 11th attacks.  *See id.* ¶¶ 316-32.

99.     In this regard, the 9/11 Commission expressly found that the "9/11 attack was a complex international operation, the product of years of planning."  *See* 9/11 Commission Final Report at p. 365.

100.    The 9/11 Commission's Final Report further confirms that plans for the attacks were carefully vetted through al Qaeda's most senior leadership over a period of nearly six years, while those leaders were safely ensconced in training camps and safe houses funded by al Qaeda's financial supporters; that the individuals selected to participate in the attacks were chosen from an

enormous pool of potential candidates, all of whom were recruited, trained, and indoctrinated with funds provided by the organization's supporters; and that details of the plans were revised up until the last minute, through a sophisticated global communication network capable of evading the surveillance and intelligence operations of the United States and its allies, the development and existence of which was also dependent on the financial sponsorship of al Qaeda's supporters. *See* Averment ¶ 33.

101.   The cost of maintaining this essential infrastructure in the years immediately leading up to the September 11th attacks was massive:  al Qaeda's budget included $20 million in payments to the Taliban alone, in exchange for the safe haven the Taliban provided to al Qaeda, from which al Qaeda planned, coordinated, and directed the September 11th attacks.

102.   Based on these and other findings of its investigation concerning the relationship between al Qaeda's global infrastructure and the organization's operational capability to plan, coordinate, and mount the September 11th attacks, the 9/11 Commission reached the following conclusions regarding the basic organizational requirements for staging a sophisticated terrorist attack:

> A complex international terrorist operation aimed at launching a catastrophic attack cannot be mounted by just anyone in any place. Such operations appear to require
>
> - time, space, and ability to perform competent planning and staff work;
>
> - a command structure able to make necessary decisions and possessing the authority and contacts to assemble needed people, money, and materials;
>
> - opportunity and space to recruit, train, and select operatives with the needed skills and dedication, providing the time and structure required to socialize them into the terrorist cause, judge their trustworthiness, and hone their skills;

- a logistics network able to securely manage the travel of operatives, move money, and transport resources (like explosives) where they need to go;

- access, in the case of certain weapons, to the special materials needed for a nuclear, chemical, radiological, or biological attack;

- reliable communications between coordinators and operatives; and

- opportunity to test the workability of the plan.

*See* 9/11 Commission Final Report at pp. 365-66.

103.     U.S. counter-terrorism officials have expressed complete agreement with these empirical conclusions, affirming consistently and repeatedly the critical importance of al Qaeda's broader infrastructure and resources to its capacity to conceive, plan, coordinate, and successfully conduct sophisticated terrorist attacks, including the September 11th attacks themselves.  *See* Averment ¶¶ 316-31.

104.     Plaintiffs' facts and evidence establish that the Saudi government da'awa organizations were principal providers of the funds and other resources used to build and sustain that infrastructure and acquire the organizational assets al Qaeda required to plan and carry out the attacks, thus drawing a direct and clear causal nexus between their contributions of support and the attacks.

### The Tortious Acts of the Kingdom's Da'awa Organizations in Support of al Qaeda Are Attributable to Saudi Arabia

105.     The tortious acts of the Saudi da'awa organizations in support of al Qaeda are attributable to the Kingdom on three separate grounds:  (1) the da'awa organizations perform core functions of the Saudi state; (2) the da'awa organizations are agents of the Kingdom; and (3) the Saudi government dominates and controls the da'awa organizations, making them alter-egos of the Saudi government as well.

106.     Saudi Arabia's Basic Law of Governance expressly provides that "[t]he State shall … undertake its duty regarding the propagation of Islam (Da'wah)," thus confirming that the propagation of Wahhabi Islam globally is both a core function and duty of the Saudi government. *See* Affirmation of Evan Francois Kohlmann ¶ 16, n. 2 (ECF No. 2927-9) ("Kohlmann Affirmation").

107.     Indeed, in a speech on the issuance on the Basic Law of Governance in 1992, then-King Fahd bin Abdulaziz identified the nine bases for the foundation of the modern Saudi state, including "the undertaking of the Propagation of Islam (Dawah) and its dissemination, since the Propagation of Islam is one of the most important functions of an Islamic state." *See* Kohlmann Affirmation ¶ 17.

108.     Reinforcing this point, a senior Saudi official has testified in this litigation that da'awa activities have been a "core policy and function of the Kingdom since its founding." *See* Declaration of Abdulaziz H. Al Fahad ¶ 8 (ECF No. 85-3).

109.     During the period from al Qaeda's formation through the September 11th attacks, MWL, IIRO, WAMY, BIF, Al Haramain Islamic Foundation, SHC, SRC, SJRC, Al Haramain al Masjed al Aqsa, and Rabita Trust served as the primary agents through which the Saudi government fulfilled this core function and duty to proselytize Wahhabi Islam globally.

110.     The legal characterizations several of the charities have assigned to themselves in this litigation confirm their governmental character, and necessarily establish their status as agents of the Saudi government responsible for conducting the Saudi government's da'awa activities abroad.

111.     In this regard, the SHC, MWL, IIRO, SJRC, and SRC each has asserted status as a "foreign state" within the meaning of 28 U.S.C. § 1603, in filings submitted to the Court in this litigation.

112.    Because none of those entities issues stock, their claims to such status necessarily rest on the assertion that they are "organs" of the Saudi government.

113.    By claiming organ status, the SHC, MWL, IIRO, SJRC, and SRC have themselves affirmed that they were created to fulfill a state obligation or purpose, and operate under the supervision of the state.  *See, e.g., Filler v. Hanvit Bank*, 378 F.3d 213, 217 (2d Cir. 2004) (describing characteristics of "organ").

114.    Consistent with these and other facts and evidence of record, the da'awa organizations are agents of the Saudi government, engaged in the performance of core functions and duties of the Kingdom.

115.    Further on this point, plaintiffs' expert Evan Kohlmann has offered testimony concerning the architecture of the government apparatus established and operated by the Saudi government to fulfill its obligation to spread Wahhabi doctrine and practice globally, and the roles of the da'awa organizations within that government framework.  *See* Kohlmann Affirmation (ECF No. 2927-9), incorporated herein by reference.

116.    As reflected by the Kohlmann Affirmation and related evidence, the Kingdom's government proselytizing apparatus is comprised of three principal components:  the Supreme Council for Islamic Affairs; the Ministry of Islamic Affairs; and the individual da'awa organizations themselves (MWL, IIRO, WAMY, Al Haramain Islamic Foundation, SHC, SRC, SJRC, Al Haramain al Masjed al Aqsa, and Rabita Trust).  *See* Kohlmann Affirmation ¶ 20.

117.    As Saudi officials quoted in the Kohlmann Affirmation have explained, the Supreme Council for Islamic Affairs is the "planning body" responsible for "the Islamic work by the Kingdom abroad," a function that includes coordinating "Saudi activities undertaken by the Islamic [da'awa] organizations."  *See id.* ¶ 21.

118.    The Ministry of Islamic Affairs is, in turn, an operational body that implements the Supreme Council's decisions, including through its funding, supervision, and direction of the individual da'awa organizations.  *See* ECF No. 2927-16; Averment ¶¶ 115-16.

119.    The da'awa organizations undertake their Wahhabi proselytizing work pursuant to the policies established by the Saudi government, with funding provided by the government, under the supervision of the Ministry of Islamic Affairs and local embassies and consulates, subject to the approvals of the Saudi government (including the Supreme Council of Islamic Affairs and Ministry of Islamic Affairs), and under the leadership of the "government officials who head those organizations."  *See* Declaration of Abdulaziz H. Al Fahad ¶ 11 (ECF No. 85-3); Averment ¶¶ 117-18.

120.    Consistent with this framework described in the Kohlmann Affirmation, the Kingdom regularly cites the activities of the da'awa organizations as achievements of the state itself, and employees of those organizations have in various settings confirmed that their activities are supervised by the Saudi government, undertaken pursuant to policies set by the Kingdom, and overwhelmingly funded by the Saudi government.  *See* Kohlmann Affirmation ¶ 24.

121.    For example, Al Haramain Islamic Foundation submitted an affidavit in this litigation attesting that "al Haramain operates under the supervision of the Saudi Islamic Affairs, who appoints its Board of Directors and senior management personnel," and a senior Al Haramain official elsewhere has stated that "we work under the supervision of Saudi government."  *See* Averment ¶ 47.  That same official confirmed that 95% of Al Haramain's funding comes from Saudi Arabia.  *See id.*

122.    Arafat El Asahi, the Director of IIRO in Canada and a full-time employee of the MWL, similarly testified as follows during a Canadian court proceeding:

> Let me tell you one thing, the Muslim World League, which is the mother of IIRO, is a fully government funded organization.  In other

> words, I work for the government of Saudi Arabia.  I am an
> employee of that government.  Second, the IIRO is the relief branch
> of that organization which means that we are controlled in all of our
> activities and plans by the government of Saudi Arabia.  Keep that
> in mind, please … I am paid by my organization which is funded by
> the [Saudi] government . . . The [IIRO] office, like any other office
> in the world, here or in the Muslim World League, has to abide by
> the policy of the Government of Saudi Arabia.  If anybody deviates
> from that, he would be fired; he would not work at all with IIRO or
> with the Muslim World League.

*See* Averment ¶ 340.

123.    Consistent with Asahi's testimony, MWL Secretary General Abdullah Mohsen al Turki confirmed in November of 2000 that the Saudi government provides "over 90%" of MWL's budget.

124.    Dr. Mutlib bin Abdullah Al Nafissa, Minister of State of the Council of Ministers of Saudi Arabia, has testified that the SHC "is an arm of the Saudi Arabian government.  Actions taken by the SHC properly are viewed as actions of the Government of Saudi Arabia."  *See* Averment ¶ 521; Declaration of Dr. Mutlib Bin Abdullah Al Nafissa ¶ 3 (ECF Nos. 141-5, 262-5).  SHC official Saud bin Mohammad Al Roshood has separately attested that "[t]he largest source of funding for the Saudi High Commission is the treasury of the Kingdom of Saudi Arabia."  *See* Declaration of Saud Bin Mohammad Al Roshood ¶ 24 (ECF No. 262-3).

125.    Mutaz Saleh Abu Unuq, Financial Director of WAMY, has similarly confirmed in affidavit testimony that "WAMY is governed principally by its General Assembly and President who was appointed by the Saudi Government.  The current President of WAMY is the Minister of Islamic Affairs in Saudi Arabia."  *See* Averment ¶ 441.  Officials of WAMY have also confirmed in correspondence that WAMY is subordinate to the Ministry of Islamic Affairs and supervised by the Ministry of Islamic Affairs.  Senior WAMY officials have elsewhere confirmed that WAMY's primary source of funding comes from the Saudi government's annual budget.

126.     Abdulrahman al Swailem, President of SRC, has testified that the Government of the Kingdom "sponsors and supervises the Saudi Arabian Red Crescent Society, and the Saudi Government appoints all of its directors."  *See* Averment ¶ 545; Declaration of Abdul Rahman Al Swailem ¶ 9 (ECF No. 96-2).

127.     Swailem further attested that SJRC has "always functioned as a political subdivision, agency, or instrumentality of the Kingdom of Saudi Arabia," was "supervised by the Minister of Interior of the Kingdom of Saudi Arabia," and that "SJRC's mission was largely subsidized by the Kingdom of Saudi Arabia."  *See* Averment ¶ 560; Declaration of Dr. Abdulrahman A. Al-Suwailem ¶¶ 2, 7, 11 (ECF No. 631-3).

128.     These and other facts demonstrating that the da'awa organizations are the principal instruments through which the Saudi government fulfills its state duty to propagate Wahhabi Islam, are funded by the government and headed by government officials, and act in accordance with policies set by the government and under the supervision of the government, readily establish that they are agents of the Saudi government engaged in the performance of core functions and duties of the Kingdom.

129.     The facts and evidence of record also demonstrate that the Saudi government rigidly controlled the operations of the da'awa organizations, a showing that both further confirms that they are agents of the Kingdom, and establishes that their conduct is attributable to the Kingdom on the separate legal basis that they also are controlled alter-egos of the Saudi government.

130.     The Kohlmann Affirmation surveyed facts and evidence reflecting this control, separately as to the individual da'awa organizations, accumulated without the benefit of an opportunity to conduct discovery of the Kingdom concerning its relationship with the charities (which plaintiffs request).  *See* Kohlmann Affirmation ¶¶ 26-129.

131.    As reflected by the facts presented in the Kohlmann Affirmation and in other sources, including the limited materials produced by a handful of the da'awa organizations in discovery, the Kingdom's complete domination of the da'awa organizations is manifested through a broad range of legal, financial, policy, supervisory, administrative, and operational controls, applied in substantially the same manner as to each of the entities, as evidenced by the following:

(a)    The da'awa organizations are established by royal decree, issued by the King of Saudi Arabia and with the formal approval of high-ranking officials of the Saudi government.

(b)    The da'awa organizations are funded almost entirely by the government of Saudi Arabia.

(c)    Funds are allocated to the da'awa organizations via government grants authorized by the Special Committee of the Council of Ministers, which are paid from Saudi government bank accounts with government funds.

(d)    The government of Saudi Arabia appoints the senior officials of the da'awa organizations.

(e)    Leadership positions of the da'awa organizations are dominated by high-ranking officials of the Saudi government, who typically hold other senior posts in the Saudi government. For example, Dr. Maneh el Johani simultaneously served as both the Secretary General of WAMY and a member of the Kingdom's Shura Council. Additionally, Saleh bin Abdul Aziz al Sheikh, while serving as the Minister of Islamic Affairs, also served as a chairman of WAMY and Al Haramain Islamic Foundation. The Secretary General of MWL holds a position equivalent to that of a "Minister" in the Saudi government. As the director of the SRC, Abdul Rahman al Swailem held a position at an "Excellency level" per the appointment by the Saudi King.

(f)    The da'awa organizations report to senior Saudi officials, including in certain cases the King, concerning their operations and activities outside of Saudi Arabia.

(g)    The da'awa organizations submit resolutions prepared by their governing bodies to the Saudi government's Council of Ministers for approval.

(h)    The da'awa organizations operate under significant administrative guidance and regulation from senior members of the Saudi government. Indeed, the activities and projects undertaken by the da'awa organizations, including

the collection and transferring of funds, are approved at the highest levels of the Saudi government.

(i)    The da'awa organizations seek approval from the Ministry of Islamic Affairs for the annual operating budgets of projects managed by the da'awa organizations.

(j)    Policy making bodies of the Saudi government commonly direct the da'awa organizations concerning the projects and activities they are to conduct abroad, and determines which of the da'awa organizations will conduct those activities.

(k)    The provision of aid by the da'awa organizations is subject to the approval of senior Saudi officials, including in certain instances the Saudi Foreign Minister and Ministry of Foreign Affairs.

(l)    Senior officials of the Saudi government, including from within the Special Ministers Council, are embedded in the governing bodies of the da'awa organizations.

(m)    The Supreme Council for Islamic Affairs issues guidelines concerning relief activities to be undertaken by the da'awa organizations outside of Saudi Arabia.

(n)    The Ministry of Islamic Affairs has primary responsibility for supervising and directing the operations and activities of the da'awa organizations in the Kingdom and abroad.  The Minister of Islamic Affairs appoints individuals to the organizations' board of directors, committees, and senior management.

(o)    The Minister of Islamic Affairs has confirmed that the da'awa organizations' activities are based on the institutional principles of the Kingdom, and that the Kingdom provides clear work plans which the da'awa organizations must follow.

(p)    Meetings of senior leaders of the da'awa organizations are in certain cases conducted at the government offices of the Ministry of Islamic Affairs.

(q)    The operations of the da'awa organizations' overseas branch offices are directed and closely supervised by the local Saudi embassies in the region, under the supervision of the embassy's Islamic Affairs Division.

(r)    Operations of the da'awa organizations outside of Saudi Arabia are commonly carried out under the direction of a joint committee consisting of representatives of the da'awa organizations and Saudi embassy personnel.

(s)     Saudi officials serving within the Islamic Affairs Departments of the Saudi embassies and consulates abroad simultaneously hold positions in the committees of the local branch offices of the da'awa organizations.

(t)     Employees of the Ministry of Islamic Affairs have worked for the da'awa organizations, while being paid by the Ministry of Islamic Affairs.

(u)     Internal correspondence of the da'awa organizations confirms that aid distributed by the da'awa organizations abroad is monitored by the Saudi embassies and the committees of the overseas offices, which include representatives of the embassies;

(v)     The da'awa organizations have indicated that the operations abroad are undertaken on behalf of the Saudi government and local Saudi embassy in those countries.

(w)     The Kingdom commonly requests that host countries grant the da'awa organizations diplomatic status, and issues diplomatic passports to employees of those offices.

(x)     Employees of the da'awa organizations have confirmed that the organizations operate as government arms, and that they themselves are Saudi government employees in their roles working for the da'awa organizations.

(y)     The branch offices of the da'awa organizations are subject to the direction of the local Saudi embassies on projects undertaken by those offices, as reflected by a 1996 directive from the IIRO's Director of the Overseas Offices Administration reminding "all managers of the IIRO overseas offices, its representatives and delegates" of "the duty to cooperate and coordinate with the brothers in charge in the host country," including the representative of the Ministry of Islamic Affairs office within the Saudi embassy and other government officials.

(z)     Branch offices of the da'awa organizations have been opened under the auspices of the local representative of the Ministry of Islamic Affairs, pending establishment of a local office.

(aa)    Internal correspondence of the IIRO indicated that the opening of offices of the da'awa organizations is subject to the approval of the Ministry of Foreign Affairs.

(bb)    Officials of the Saudi embassies abroad initiated the opening of offices of the da'awa organizations.

(cc)    The da'awa organization seek approval from the Ministry of Islamic Affairs to establish delegations to visit foreign countries.

(dd)    The Saudi government often purchases or leases buildings to house the operations of the da'awa organizations, as for example was the case with MWL's headquarters in the Kingdom, which was donated by the King, and WAMY's office in Washington, D.C., the purchase of which was coordinated by the Under Secretary of the Ministry of Islamic Affairs, and handled by the local embassy.

(ee)    Representatives of the Ministry of Islamic Affairs directly intervened in personnel decisions of the da'awa organizations at every level, such as the appointment of Abdullah bin Laden to serve as WAMY's representative in the United States.

(ff)    Saudi diplomats have held signatory authority over bank accounts of the da'awa organizations.

(gg)    The Saudi government has issued diplomatic license plates for vehicles of the da'awa organizations abroad.

(hh)    Funds transferred from the organization's headquarters in Saudi Arabia to the overseas branch offices cannot be used for anything other than the objectives for which they are allocated.

(ii)    The senior Saudi officials who head the da'awa organizations retain stringent administrative and financial control over the daily operations of the various branch offices and affiliates around the world.

(jj)    The senior Saudi officials who head the da'awa organizations have the authority to appoint and terminate employees in the overseas branch offices.

(kk)    Per the directives of the senior Saudi officials who head the da'awa organizations, the overseas branch offices are incapable of independent action. All significant administrative or financial decisions or undertakings by the overseas offices, even relatively minor decisions, are reviewed and approved at the highest levels of the organization inside the Kingdom, by the offices of the senior Saudi officials who head those organizations.

(ll)    The overseas branch offices are required to submit quarterly and annual operations and financial reports to the senior Saudi officials who head the da'awa organizations.

(mm)    The overseas branch offices are required to send copies of their monthly bank statements to the senior Saudi officials who head the da'awa organizations for review.

(nn)    The overseas branch offices are required to send monthly expense reports to the senior Saudi officials who head the da'awa organizations.

(oo)   Requests for financial aid submitted to the overseas branch offices must be sent to the senior Saudi officials who head the da'awa organizations for review.

(pp)   The overseas branch offices are forbidden from opening any bank account, or withdrawing any office funds or capital, without prior written consent of the senior Saudi officials who head the da'awa organizations.

(qq)   The overseas branch offices are forbidden from spending their own independently raised donations on projects or other activities without authorization from the senior Saudi officials who head the da'awa organizations.

132.   As reflected by the foregoing facts, the Saudi government thoroughly dominates the da'awa organizations and controls their day-to-day operations.[6]

133.   The tortious acts of the da'awa organizations in support of al Qaeda were, in turn, undertaken in furtherance of their core mission to spread Wahhabi doctrine and practice, and therefore within the scope of their agency as the Saudi government's principal instruments for spreading Wahhabism globally.  *See infra* pp. 63-65; Averment ¶¶ 115-129.

## VI.   TORTIOUS ACTS OF SAUDI GOVERNMENT OFFICIALS AND EMPLOYEES WHO DIRECTED AND CONTROLLED THE KINGDOM'S DA'AWA ORGANIZATIONS

134.   As discussed above and further detailed in plaintiffs' Averment, the Saudi government's proselytizing organizations extensively aided and abetted al Qaeda's targeting of the United States, and provided funding and other assistance closely related and essential to the September 11th attacks.

135.   Apart from the fact that the tortious acts of those organizations are attributable to the Saudi state, the tortious acts of the Saudi officials who directed those organizations' support of al Qaeda, many of whom held broader roles in the Saudi government beyond their positions

---

[6]At a minimum, these facts demonstrate how an opportunity to conduct discovery of the Kingdom concerning its relationships with the various da'awa organizations is reasonably calculated to adduce further evidence establishing that the charities are agents and controlled alter-egos of the government.

with the da'awa organizations, also are attributable to the Kingdom for purposes of both jurisdiction and liability.

136.    The facts and evidence documenting the terrorist activities of these so-called charities reflect broad institutional partnerships between those organizations and al Qaeda, confirming the involvement of those government officials in directing and facilitating their support for al Qaeda, as indicated by:

(a)    The direct involvement of government officials who headed the da'awa organizations in the formation of al Qaeda;

(b)    the sheer magnitude of the financial and other forms of material support they provided to Osama bin Laden's organization;

(c)    the systematic placement of al Qaeda members and collaborators in positions of authority within the da'awa organizations;

(d)    the intimacy of their collaboration in al Qaeda's operations, as documented in government investigations;

(e)    the evidence showing that offices of the charities throughout the world were simultaneously all acting in identical ways to advance al Qaeda's terrorist agenda;

(f)    the duration of their support for al Qaeda, spanning in most cases more than a decade;

(g)    the fact that their support for al Qaeda continued without interruption even after offices and employees of those organizations were repeatedly and publicly implicated in terrorist activities; and

(h)    their ideological alignment with al Qaeda's jihadist agenda, as reflected in their own publications, statements, and speeches.

137.    As also detailed above, the individuals who headed these proselytizing organizations throughout the duration of their institutional partnerships with al Qaeda were Saudi government officials and employees.

138.    Individuals who controlled and worked in the branch offices of those organizations that were directly involved in al Qaeda's operations were Saudi government employees as well, as

reflected by the issuance of diplomatic passports to employees of those offices, the appointment of embassy personnel from the Ministry of Islamic Affairs to the operating committees and leadership positions of those offices, and the statements of numerous employees of those da'awa organizations describing themselves as employees of the Saudi government.

139.    The material sponsorship of al Qaeda by these da'awa organizations under the direction of these Saudi government officials and employees was in furtherance of their core mission to spread Wahhabi influence throughout the world, and the tortious acts of the government officials who directed and participated in those organizations' support for al Qaeda thus fall squarely within the scope of their office and employment. *See infra* pp. 63-65; Averment ¶¶ 115-129.

## VII.    TORTIOUS ACTS OF THE MINISTRY OF ISLAMIC AFFAIRS AND EMPLOYEES AND OFFICIALS OF THE MINISTRY OF ISLAMIC AFFAIRS

140.    Saudi Arabia's Ministry of Islamic Affairs was broadly involved in the promotion of al Qaeda's terrorist activities during the period leading up to the September 11th attacks.

141.    The Ministry of Islamic Affairs has been described as a "stronghold of zealots" during the period before 9/11, and 9/11 Commissioner John Lehman has testified that it was "well known in intelligence circles that the Islamic Affairs Departments of Saudi Arabia's diplomatic missions were deeply involved in supporting Islamic extremists."

142.    The Ministry of Islamic Affairs assumed control over the Kingdom's global da'awa apparatus following the Ministry's formation in 1993.

143.    In the ensuing years, and under the Ministry of Islamic Affairs' direction and supervision, the Kingdom's da'awa organizations pervasively channeled resources provided to them by the Ministry to al Qaeda, and collaborated intimately with bin Laden's terrorist organization.

144.     Employees of the Ministry used additional resources and institutions under their control to launder funds for al Qaeda as well, including from within the United States.

145.     For example, in or around 1998, the FBI became aware of millions of dollars in transfers from the Somali community in San Diego to fronts associated with Osama bin Laden. The FBI's further investigations indicated that "some of the funding originated from Saudi Arabia" and that the funds were laundered through mosques and Islamic centers under the control and influence of the Ministry of Islamic Affairs.

146.     Representatives of the Islamic Affairs offices of the Kingdom's embassies and consulates also provided large cash transfers to al Qaeda.  In this regard, U.S. Defense intelligence investigations determined that Saudi embassies in the Far East were providing large sums of cash, including individual transfers totaling several hundred thousand dollars, to the al Qaeda affiliated Umm al-Qura Islamic Foundation, an organization whose "activities in support of terrorism include suspicious money transfers, document forgery, providing jobs to wanted terrorist suspects, and financing travel for youths to attend jihad training." *See* CJI at p. 435.

147.     In addition, documents recovered from the personal files of Taliban leader Mullah Omar following the September 11th attacks indicate that on November 21, 1999, Omar instructed the Afghan Ambassador in Pakistan to distribute "$2 million from Saudi aids" to Jon Juma Namangani, a close associate of Osama bin Laden who was then serving as al Qaeda's commander in Uzbekistan.

148.     The Ministry of Islamic Affairs' broad collaboration with al Qaeda before 9/11 is further reflected by the evidence implicating at least seven employees and agents of the Ministry in providing support to the 9/11 hijackers and plotters, and the fact that employees of the Ministry have been implicated in separate terrorist activities in the Netherlands, Germany, Paris, Brussels, and elsewhere.

149.    In addition, Zacarias Moussaoui has testified that Osama bin Laden maintained strong relationships with the clerics who controlled the Ministry of Islamic Affairs and related components of the Kingdom's government proselytizing and Wahhabi religious apparatus.  Based on his personal knowledge, Moussaoui stated that bin Laden's attitude toward the Saudi Ulema "was of complete reverence and obedience;" bin Laden's activities were conducted with the "consent and directive of the Ulema;" bin Laden would not undertake any operations without the Ulema's approval; and representatives of the senior Ulema regularly traveled to Afghanistan to visit with bin Laden.

150.    Saudi government imams were deeply involved in recruitment and fundraising for al Qaeda, as reflected in records from the detainee tribunal proceedings at Guantanamo Bay and prominent academic studies.

151.    Indeed, Saudi government clerics recruited certain of the 9/11 hijackers, as confirmed by the 9/11 Commission's investigation.

152.    In the wake of the September 11th attacks, the United States took action to address the extremist activities of the Ministry of Islamic Affairs through its offices in the United States, removing between 60-70 individuals associated with the Islamic Affairs and religious offices of the Kingdom's embassies and consulates in what a State Department official described as part of "an ongoing effort to protect the homeland."

153.    In addition, following al Qaeda's 2003 attacks in Saudi Arabia, the Kingdom itself removed thousands of clerics from the payroll of the Ministry, and has characterized those removals as part of a counter-terrorism effort, thus drawing a direct connection between the Ministry and terrorism in earlier periods.

154.    The nature and extent of the Ministry of Islamic Affairs' support for al Qaeda and other terrorists demonstrate that collaborating with jihadists was within the scope of the activities

of the Ministry and its employees, in furtherance of the Ministry's efforts to export Wahhabi doctrine and practice.

## VIII. ATTRIBUTABLE TORTIOUS ACTS OF INDIVIDUAL EMPLOYEES AND AGENTS OF THE SAUDI GOVERNMENT IN SUPPORT OF THE 9/11 HIJACKERS AND PLOTTERS

155.    On July 15, 2016, the United States released a partially declassified version of Part Four of the 2002 *Report of the Congressional Joint Inquiry into the Terrorist Attacks of September 11, 2001,* commonly described in media reports as the so-called "28 pages."

156.    Thereafter, in December of 2016, the FBI and DOJ released a declassified version of a 2012 FBI/DOJ "Summary Report" describing the status and principal findings of ongoing investigations into sources of support for the 9/11 hijackers, in response to a Freedom of Information Act lawsuit.

157.    These documents offer additional facts and evidence in support of plaintiffs' claims that employees and agents of the Saudi government, while engaged in performing functions on behalf of the Ministry of Islamic Affairs and Saudi proselytizing apparatus, directly aided and assisted the 9/11 hijackers and plotters.

158.    Among other factors, these newly released documents further corroborate and provide further evidence in support of the following facts:

(a)    the Saudi government maintained a network of agents in the United States in the years preceding the 9/11 attacks, whose undisclosed functions involved performing activities on behalf of and at the direction of the Wahhabi clerics who populated the Islamic Affairs Offices of the Kingdom's embassies and consulates in the United States (CJI at pp. 415-37);

(b)    members of that network maintained extensive contacts and supportive dealings with members of al Qaeda and related terrorist organizations (CJI at pp. 420-21, 428-29, 430-37);

(c)    Saudi government employees and agents who were members of that network directly aided the 9/11 hijackers at the direction of more senior Saudi officials (CJI at pp. 416-28, 430-31, 433-34) (SR at pp. 2-4);

(d)     the FBI has confirmed that Saudi government employees Omar al Bayoumi and Fahad al Thumairy provided "substantial assistance" to 9/11 hijackers Nawaf al Hazmi and Khalid al Mihdhar (SR at p. 3);

(e)     Thumairy and Bayoumi substantially assisted the 9/11 hijackers by, among other things, providing "(or direct[ing] others to provide) the hijackers with assistance in daily activities, including procuring living quarters, financial assistance, and assistance in obtaining flight lessons and driver's licenses" (SR at p. 4);

(f)     Thumairy, an extremist Wahhabi cleric who held diplomatic credentials with the Saudi consulate in Los Angeles and was denied re-entry into the United States by the State Department in 2003 based on his ties to terrorism, "immediately assigned an individual to take care of them [al Hazmi and al Mihdhar]" upon their arrival in the United States (SR at p. 4);

(g)     Bayoumi, one of the Kingdom's employees and agents in the United States performing undisclosed functions on behalf of the Kingdom's embassies and consulates and reporting to Thumairy, simultaneously maintained both extensive ties to terrorists and to Islamic Affairs representatives employed in the Kingdom's embassies and consulates in the United States and elsewhere;

(h)     Bayoumi proffered a letter from the Saudi embassy representing that he would be studying in the United States pursuant to "a full scholarship from the Saudi government" but in fact was "living in San Diego [at the time he assisted the hijackers] on a student visa despite not taking classes and receiving a salary from the Kingdom of Saudi Arabia for job duties he never performed" (CJI at p. 423; SR at p. 4);

(i)     the continuing FBI and DOJ joint criminal investigation "seeks to prove these subjects [referring to Thumairy, Bayoumi and a third individual whose name is redacted but is identified as having "tasked al-Thumairy and al-Bayoumi with assisting the hijackers"] provided such assistance with the knowledge that al-Hazmi and al-Mihdhar were here to commit an act of terrorism" (SR at p. 4);

(j)     another member of the Kingdom's network of agents in the United States whose "profile is similar to that of al-Bayoumi," Mohammed al-Qudhaeein, participated along with an al Qaeda member named Hamdan al-Shalawi, who "had trained at the terrorist training camps in Afghanistan," in a dry run for the 9/11 attacks during a 1999 flight from Phoenix to Washington, D.C. "to attend a party at the Saudi embassy" (CJI at pp. 419, 433-34);

(k)     during that 1999 flight, al-Qudhaeein "went to the front of the plane and attempted on two occasions to enter the cockpit," and the FBI "believes both men [whose airline tickets were paid for by the Saudi Embassy] were

specifically attempting to test the security procedures of America West Airlines in preparation for and in furtherance of UBL/Al Qaeda operations" (CJI at pp. 419, 433-34);

(l)     the Congressional 9/11 Joint Inquiry documented numerous other contacts, dealings, and transactions between individuals employed or associated with the Saudi government and known terrorists and extremists, reflecting a broad presence of al Qaeda supporters within Saudi government institutions in the years leading up to 9/11 (CJI at pp. 415-37); and

(m)     the former head of the CIA's unit established in 1996 to "focus specifically on Usama bin Laden" told U.S. investigators that "it was clear from about 1996 that the Saudi Government would not cooperate with the United States on matters relating to Usama bin Laden," explaining that "Saudi assistance to the U.S. Government on this matter was contrary to Saudi national interests" (CJI at p. 438).

159.    The additional details and findings presented in these documents and summarized above reinforce and augment a far broader range of facts and evidence that Saudi government employees and agents associated with the Kingdom's Ministry of Islamic Affairs directly aided the September 11th hijackers and plotters, from within the United States and elsewhere, as surveyed below.

**9/11 Hijackers Nawaf al Hazmi and Khalid al Mihdhar**

160.    Al Qaeda members and future 9/11 hijackers Nawaf al Hazmi and Khalid al Mihdhar arrived in Los Angeles on January 15, 2000, to commence critical U.S.-based preparations for the September 11th attacks.

161.    As the 9/11 Commission confirmed in its Final Report, Hazmi and Mihdhar were "ill prepared for a mission in the United States. Their only qualifications for this plot were their devotion to Usama bin Laden, their veteran service, and their ability to get valid U.S. visas. Neither had spent any substantial time in the West, and neither spoke much, if any, English." *See* 9/11 Commission Final Report at p. 215.

162.     For those and other reasons, the 9/11 Commission correctly concluded that it was "unlikely that Hazmi and Mihdhar … would have come to the United States without arranging to receive assistance from one or more individuals informed in advance of their arrival." *See id.*

163.     Consistent with the 9/11 Commission's conclusion on this point, the facts and evidence confirm that several individuals with extensive ties to terrorism immediately mobilized to provide the precise forms of assistance Hazmi and Mihdhar most needed to assimilate into the United States without detection and initiate essential preparations for the attacks.

164.     Those individuals were employees and agents of the Kingdom of Saudi Arabia, whose duties involved the performance of functions in furtherance of the extremist agenda of the Kingdom's Ministry of Islamic Affairs, including in particular Fahad al Thumairy, Omar al Bayoumi, and Osama Bassnan.

### Substantial Assistance Provided by Thumairy, Bayoumi, and Bassnan

165.     Witnesses interviewed by the FBI after 9/11 placed Hazmi and Mihdhar at the Saudi government-funded King Fahd Mosque near Los Angeles in the days immediately after their arrival in the United States.  At the time, Thumairy was the resident imam at the mosque, by appointment of the Kingdom's Ministry of Islamic Affairs.

166.     Thumairy was an extremist Wahhabi cleric employed by the Islamic Affairs Department of the Saudi consulate in Los Angeles, where he held diplomatic credentials, also by appointment of the Kingdom's Ministry of Islamic Affairs.

167.     As reflected in the 9/11 Commission's Final Report, Thumairy led a particularly radical faction within the local Muslim community, including persons "supportive of the events of September 11, 2001," and "had a network of contacts in other cities in the United States." *See* 9/11 Commission Final Report at pp. 216-17.

168.     As also detailed in the 9/11 Commission Final Report, the State Department banned Thumairy from re-entering the United States in 2003, based on his apparent ties to terrorism.  *See id.* at p. 217.

169.     Thumairy was squarely at the center of orchestrating the U.S.-based support network for the hijackers upon their arrival in the United States, as reflected by the 2012 Summary Report's finding that "Al-Thumairy immediately assigned an individual to take care of them [Hazmi and Mihdhar] during their time in the Los Angeles area."  *See* SR at p. 4; *see also* 9/11 Commission Final Report at p. 217 ("The circumstantial evidence makes Thumairy a logical person to consider as a possible point of contact for Hazmi and Mihdhar"); October 25, 2002 FBI Report, *Fahad Althumairy (NON-USPER), IT-OTHER (UBL/AL-QAEDA)* (detailing evidence that Thumairy tasked a member of the King Fahd Mosque named Benomrane to assist the hijackers and "that he [Benomrane] was told by Sheik Fahad Althumairy to keep the presence of the two Saudis to himself.").

170.     Just two weeks after the hijackers' arrival in the United States, Thumairy met for an hour in his office at the Saudi consulate with Bayoumi, a Saudi national who was residing in San Diego.

171.     At the time, Bayoumi was one of several employees and agents of the Saudi government in the United States, whose undisclosed duties involved the advancement of the agenda of the Ministry of Islamic Affairs, under the direction of Thumairy and other more senior representatives of the Ministry's offices in the United States.

172.     Immediately following that meeting, Bayoumi traveled to a restaurant located in the Los Angeles area, where he met with Hazmi and Mihdhar and promptly offered to assist the future hijackers settle in San Diego, the precise city al Qaeda leadership had identified as the preferred location for the hijackers to carry out their preparations for the attacks.

173.    Following that meeting, Bayoumi did in fact provide critical assistance to the hijackers, including by helping them find an apartment in San Diego, co-signing the lease for that apartment as a guarantor, opening a bank account for the hijackers with $9000 from his own account, and paying their rent on occasion.

174.    In addition, Bayoumi took steps to ensure that the hijackers received essential assistance from other members of the San Diego Muslim community who shared the hijackers' extremist views, including Anwar al Aulaqi (a/k/a Anwar al Awlaki) and Mohdar Abdullah.

175.    In this regard, U.S. investigations have confirmed that Hazmi and Mihdhar arrived in San Diego on February 4, 2000, and that Bayoumi spent the day with the hijackers undertaking extraordinary efforts to facilitate their settlement in the area.

176.    On that same day, four telephone calls were placed from Bayoumi's cell phone to Aulaqi, who would later flee the United States and assume a leadership position in al Qaeda, prompting the United States to target and kill him in a drone attack on September 30, 2011.

177.    Investigators have determined that additional calls from Bayoumi's cell phone to Aulaqi were placed on February 10, 16, and 18, and that Bayoumi and Aulaqi were in telephone contact another five times between November of 1998 and April of 2000, and again on December 8, 2000.

178.    In an interview with 9/11 Commission staff members, Bayoumi admitted to having a relationship with Aulaqi, describing him as someone "with whom he discussed religious matters and ideas similar to those he would discuss with other imams."

179.    Aulaqi, who was covertly acting as a senior recruiter for al Qaeda and affiliated terrorist organizations and advocating jihad against the United States, had spent nearly five years as the imam of the Al Ribat Al Islami Mosque  (or "Rabat") in La Mesa, CA, northeast of San

Diego.  Aulaqi had a following of approximately 200-300 people and would become an important religious leader to Hazmi and Mihdhar.

180.    FBI sources reported that "Aulaqi met consistently and privately with Alhazmi and Almidhdir for prayers," and a witness interviewed by the FBI specifically recounted seeing Hazmi and Mihdhar in the guest room on the second floor of the mosque and, on one occasion, leaving the room just after Aulaqi, at the conclusion of a meeting.  Other witnesses "informed the FBI after September 11 that [Aulaqi] had closed-door meetings in San Diego with al-Mihdhar, al-Hazmi, and another individual, whom al-Bayoumi had asked to help the hijackers."

181.    Aulaqi eventually left San Diego in mid-2000, and by January 2001 had relocated to Virginia where he took a position at the Dar al Hijra Mosque in Falls Church, VA.  The Department of Treasury's Enforcement Communications System's ("TECS") records state that Dar al Hijra "is a mosque operating as a front for Hamas operatives in U.S.," "is associated with Islamic extremists," "has been under numerous investigations for financing and providing aid and comfort to bad orgs and members," and has "been linked to numerous individuals linked to terrorism funding."

182.    Hazmi and 9/11 hijacker Hani Hanjour arrived in Virginia in April 2001 to begin critical last-phase preparations for the attacks, and immediately sought out Aulaqi at Dar al Hijra. Upon their arrival, Aulaqi tasked a Jordanian named Eyad al Rababah to assist the hijackers get settled and find an apartment.  They eventually moved into Rababah's friend's apartment in Alexandria, VA.  On May 8, 2001, Rababah went back to the apartment to pick up Hazmi and Hanjour for a trip to Connecticut, and found they had new roommates – muscle hijackers Ahmed al Ghamdi (United Airlines Flight 175) and Majed Moqed (American Airlines Flight 77).

183.    Following the September 11th attacks, Aulaqi submitted to four FBI interviews between September 15 and 19, 2001.  Although Aulaqi admitted meeting with Hazmi several

times, he claimed not to remember any specifics of what they discussed.  Aulaqi told the FBI that he did not recognize Mihdhar, but did admit to knowing fellow 9/11 hijacker Hani Hanjour. According to the FBI, information in their possession at the time of the interviews suggested "a more pervasive connection" between Aulaqi and the 9/11 hijackers than he was willing to admit.

184.    These contacts and circumstances, coupled with Aulaqi's pervasive connections to terrorism (Averment ¶¶ 210-12), have led investigators, including Senator Bob Graham, the Co-Chair of the 9/11 Congressional Joint Inquiry, to conclude that Aulaqi served as Hazmi's and Mihdhar's spiritual leader during the year preceding the September 11th attacks, and that he was a trusted confidant of the hijackers who was fully aware of the planned 9/11 attacks.

185.    Bayoumi also introduced Hazmi and Mihdhar to Mohdhar Mohamed Abdullah (a/k/a "Mihdar Mohammad al Mihdar Zaid"), and directed Abdullah to assist the two hijackers.

186.    Abdullah was a member of Aulaqi's mosque over whom both Bayoumi and Aulaqi exercised influence.

187.    According to the 9/11 Commission, Abdullah was "perfectly suited to assist the hijackers in pursuing their mission" as he "clearly was sympathetic to [their] extremist views" and shared their "hatred for the U.S. government."  *See* 9/11 Commission Final Report at p. 218.

188.    In a post-9/11 interview with law enforcement, Abdullah claimed that Bayoumi specifically tasked him "to be the individual to acclimate the hijackers to the United States, particularly San Diego, CA," and that Bayoumi told him "to assist in any way in their affairs."

189.    Per Bayoumi's instructions to provide unqualified assistance, Abdullah helped Hazmi and Mihdhar locate and apply to language and flight schools, and assisted them in translating between English and Arabic.  Abdullah also undertook extensive efforts to secure fake driver's licenses for Hazmi and Mihdhar, driving the hijackers from San Diego to an area in Los

Angeles, where Abdullah purchased approximately four or five fraudulent California Department of Motor Vehicle identification cards and gave them to Hazmi and Mihdhar.

190.    Abdullah also helped Hazmi conduct surveillance of the Los Angeles International Airport in June 2000.  On June 9, Abdullah traveled with Hazmi and Mihdhar to Los Angeles where they visited the King Fahd Mosque, where Abdullah learned that the hijackers already knew several people at the mosque, including an individual identified as "Khallam."

191.    FBI investigators believe the individual identified as Khallam is Khallad bin Attash, a trusted member of Osama bin Laden's inner al Qaeda leadership circle who is linked to the 1998 U.S. Embassy bombings and the purported mastermind behind the U.S.S. Cole bombing.  CIA reports and other evidence indicate that bin Attash was in the United States that same month and was seen in the company of Fahad al Thumairy.

192.    On June 10, Los Angeles International Airport security tapes show Abdullah, Hazmi and an unidentified man (potentially Khallad) using a video camera to scout out the airport.

193.    During a number of interviews with the FBI following the 9/11 attacks, Abdullah admitted knowing of Hazmi's and Mihdhar's extremist leanings and Mihdhar's involvement with the Islamic Army of Aden, an Islamic extremist group in Yemen with ties to al Qaeda.

194.    Just eight days after the September 11th attacks, Abdullah "was arrested by FBI San Diego on charges of immigration fraud for his claim of being a Somali asylee" and "pled guilty to the immigration charges and was deported to Yemen in 2004."  *See* SR at p. 3.

195.    While "detained in an immigration facility he bragged to two fellow inmates that he assisted the hijackers."  *See id.*  Those individuals have cooperated with the FBI and federal prosecutors and would be available to testify as witnesses.

196.    Consistent with this and other evidence, the 2012 Summary Report confirms that "[s]hortly after February 4, 2000, al-Bayoumi tasked Mohdar [Abdullah] to assist al-Hazmi and

al-Mihdhar" and that "Mohdar [Abdullah] played a key role facilitating the daily lives and assisting future Flight 77 hijackers Nawaf al-Hazmi and Khalid al-Mihdhar."  *See* SR at p. 3.

197.    Another close associate of Bayoumi and fellow employee of the Saudi government, Osama Yousef Bassnan (or "Basnan"), was in contact with and aided Hazmi and Mihdhar from within the United States as well, as reflected in evidence developed by the FBI and Congressional Joint Inquiry.

198.    Like Bayoumi, Bassnan was another employee and agent of the Saudi government engaged in performing undisclosed functions for and at the direction of the extremists in the Ministry of Islamic Affairs' offices in the United States and elsewhere.

199.    Witnesses interviewed by the FBI described Bayoumi and Bassnan as "the closest of friends" and confirmed that the two were "close to each other for a long time."  According to the FBI, Bayoumi and Bassnan were in telephone contact "several times a day while they were both in San Diego" and "phone records reveal roughly 700 calls between various phones subscribed to by Bayoumi and Basnan over a one year period."

200.    FBI investigations have further confirmed that Bassnan had extensive ties to terrorism and was an "ardent UBL [Osama bin Laden] supporter," who spoke of bin Laden "as if he were a god" and was "in contact with UBL family members."  According to a federal law enforcement official, Bassnan "celebrated the heroes of September 11" and talked about "what a wonderful, glorious day it had been" at a party shortly thereafter.

201.    As detailed in the Congressional Joint Inquiry Report, "Bassnan made a comment to an FBI source after the September 11 attacks suggesting that he did more for the hijackers than al-Bayoumi did."  *See* CJI at p. 426.

202.    Consistent with this claim, an October 3, 2001 FBI report indicates that Bassnan also was in telephone contact with Anwar Aulaqi, and an FBI agent interviewed by the 9/11

Commission indicated that an associate of Bassnan was in "phone and email contact with Ramzi Binalshibh in September 2000." At the time of those contacts, Binalshibh was a senior al Qaeda figure who was actively involved in planning and coordinating the September 11th attacks.

203.   The FBI's investigation has also documented "contact between the hijackers and a close friend of Bassnan's, Khaled al-Kayed, a commercial airline pilot and certified flight instructor living in San Diego. Al-Kayed admitted to the FBI that in May 2000, al-Mihdhar and al-Hazmi contacted him about learning to fly Boeing jet aircraft."

204.   In addition, U.S. investigations have established that contemporaneous with the arrival of Hazmi and Mihdhar in the United States, Bassnan's wife began signing checks issued to her by a charity associated with the wife of the Saudi Ambassador to the United States over to Bayoumi's wife.

205.   According to Senator Graham, the Co-Chair of the Congressional Joint Inquiry, these transfers, which coincided with Bayoumi's provision of assistance to the hijackers, "looked suspiciously like another backdoor way of channeling money to al-Hazmi and al-Mihdhar."

206.   9/11 Commissioner John Lehman has, in turn, expressed his understanding based on the investigation conducted by the 9/11 Commission that the charity that issued the payments was under the control of "the radicals who worked in the embassy's Islamic Affairs office in Washington."

207.   During the course of their investigation, members of the 9/11 Commission staff interviewed Thumairy, Bayoumi, and Bassnan in Saudi Arabia. During those interviews, all three lied pervasively about their relationships with one another and other material issues raised by the Commission investigators.

208.   According to the 9/11 Commission's Memorandum for the Record concerning its interviews of Thumairy: "Our general impression of Thumairy is that he was deceptive during

both interviews.  His answers were either inconsistent or, at times, in direct conflict with information we have from other sources.  During some of the more pointed exchanges, his body language suggested that he grew increasingly uncomfortable (for instance, he would cross his arms, sit back in his chair, etc.)."

209.    In an interview with the Guardian last year, a 9/11 Commission staff member reaffirmed those conclusions and offered further details about the interview, stating that "[i]t was so clear Thumairy was lying," and "[i]t was also so clear he was dangerous."

210.    The memorandum recounting the Commission's Bassnan interview similarly explains that "The interview [of Bassnan] failed to yield any new information of note.  Instead, in the writer's opinion, it established beyond cavil the witness' utter lack of credibility on virtually every material subject. This assessment is based on: the witness' demeanor, which engendered a combination of confrontation, evasiveness, and speechmaking, presumably for the benefit of his Mabahith [Saudi Intelligence] audience; his repudiation of statements made by him on prior occasions; and the inherent incredibility of many of his assertions when viewed in light of the totality of the available evidence."

211.    Particularly when viewed collectively, these and plaintiffs' additional facts and evidence relating to the relationships among Thumairy, Bayoumi, Abdullah, and Bassnan; their respective ties to terrorism and extremist views; their concentrated dealings leading to the provision of the precise forms of assistance the hijackers most needed to assimilate into the United States and begin preparations for the attacks without detection; their deceitfulness to U.S. investigators[7]; the findings and focus of the ongoing criminal investigations of Bayoumi and Thumairy; and the broader spectrum of evidence documenting the extensive involvement of elements of the Kingdom's Ministry of Islamic Affairs in supporting al Qaeda, readily establish:

---

[7] *See Tatum v. City of N.Y.*, 668 F. Supp. 2d 584, 593 (S.D.N.Y. 2009) (in a civil proceeding, it is a "general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as affirmative evidence of guilt").

(1) that Thumairy, Bayoumi, and Bassnan knew that Hazmi and Mihdhar were extremists who were engaged in efforts to target the United States; (2) that Thumairy, Bayoumi, and Bassnan knew that they were substantially advancing that tortious endeavor through the assistance they were providing; and (3) that Thumairy, Bayoumi, and Bassnan played witting roles in orchestrating and providing a critical support network for Hazmi and Mihdhar.

212.   Congressional Joint Inquiry Co-Chair Bob Graham has testified, based on his decades of experience in intelligence matters and personal knowledge of the evidence collected by the Congressional Joint Inquiry, that "I am convinced that there was a direct line between at least some of the terrorists who carried out the September 11th Attacks and the government of Saudi Arabia," that "a Saudi government agent living in the United States, Omar al Bayoumi, provided direct assistance" to two of the hijackers, and that "al Bayoumi was acting at the direction of elements of the Saudi government."

213.   9/11 Commissioner John Lehman has likewise testified, based on his personal knowledge of the 9/11 Commission's separate investigation and his work for more than four decades in the national security arena, that "[b]y the time our Commission began its work, it was already well known in intelligence circles that the Islamic Affairs Departments of Saudi Arabia's diplomatic missions were deeply involved in supporting Islamic extremists," and that "it is implausible to suggest that the broad spectrum of evidence developed by the 9/11 Commission concerning the relationships among Omar al Bayoumi, Fahad al Thumairy, the Islamic Affairs Departments of the Saudi diplomatic missions, and 9/11 hijackers Nawaf al Hazmi and Khalid al Mihdhar can be explained away as merely coincidental.  To the contrary, I believe Nawaf al Hazmi and Khalid al Mihdhar knew who to go to for support" and that "Fahad al Thumairy and Omar al Bayoumi knew that al Mihdhar and al Hazmi were bad actors who intended to do harm to the United States."

## Nature and Scope of Employment and Agency

214.    At the time they were substantially assisting the 9/11 hijackers, Thumairy, Bayoumi, and Bassnan were employees and agents of the Saudi government, and their activities in support of the hijackers were directly related to their core functions and duties involving the advancement of the Wahhabi agenda of the Kingdom's Ministry of Islamic Affairs.

215.    As documented in the 9/11 Commission Final Report, 2012 FBI Summary Report, and numerous other U.S. investigative records, Thumairy held diplomatic credentials with the Saudi consulate in Los Angeles, where he served as an employee in the consulate's Islamic Affairs office, and also served as an imam at the Saudi government-funded King Fahd Mosque.

216.    Thumairy was appointed to both positions by the Kingdom's Ministry of Islamic Affairs.

217.    The U.S. government's investigations also document Thumairy's extremist beliefs, jihadist sermons, and terrorist connections, thus reinforcing both the radical character and agenda of the Ministry of Islamic Affairs and of Thumairy's scope of work for the Ministry.

218.    Bayoumi and Bassnan were, in turn, employees and agents of the Saudi government whose undisclosed duties involved the performance of activities on behalf of the Saudi embassies and consulates in the United States, under the direction of the clerics embedded in the Islamic Affairs offices and other officials of the Kingdom's embassies and consulates.

219.    Nominally, Bayoumi entered the United States in or around 1994 on a student visa, and thereafter proffered a letter from the Saudi embassy representing that he would be studying pursuant to "a full scholarship from the Government of Saudi Arabia." *See* CJI at p. 423.

220.    Bayoumi remained in the United States pursuant to student visas for nearly seven years, until he departed the United States very shortly before the September 11th attacks, despite never pursuing any meaningful academic studies during that period.   Saudi officials actively

perpetuated the false claim that Bayoumi was undertaking studies in the United States during that seven year period.

221.     Throughout that time, including the period when he was substantially assisting the hijackers, Bayoumi received a salary from the Saudi government, for alleged job duties he never performed.

222.     As the 2012 Summary Report succinctly confirms, at the time of Bayoumi's critical meeting with Thumairy and assistance to the hijackers, "Omar al-Bayoumi was living in San Diego on a student visa, despite not attending classes, and receiving a salary from the Kingdom of Saudi Arabia for job duties he never performed." *See* SR at p. 4.

223.     These findings indicate that Bayoumi was an employee and agent of the Saudi government, stationed in the United States to perform undisclosed duties that the Kingdom sought to conceal.

224.     The facts concerning Bayoumi's actual activities while he was in the United States, and receiving a salary from the Saudi government, demonstrate that his undisclosed functions for the Kingdom involved the performance of activities in furtherance of the agenda of the Ministry of Islamic Affairs, reporting to officials in the Kingdom's embassies and consulates, including Thumairy.

225.     In this regard, Bayoumi had extensive and systematic dealings and communications throughout his residency in the United States with the Saudi embassies and consulates in the United States.

226.     An FBI review of Bayoumi's telephone records confirmed that he called Saudi diplomatic missions in the United States at least 74 times during the period between January-March of 2000 alone, coinciding with his assistance to the hijackers, including 34 calls to the Saudi Consulate in Los Angeles where Thumairy worked.

227.    In addition, U.S. investigations established that Bayoumi was directly connected to numerous employees and officials of Saudi Arabia's embassies and consulates and Ministry of Islamic Affairs, including the Minister of Islamic Affairs in Saudi Arabia; Thumairy; "an individual at the Saudi consulate in London[;]" and "at least three individuals at the Saudi Embassy in Washington, DC; two individuals at the Saudi Arabian Cultural Mission in Washington, DC; and three individuals [likely including Thumairy] at the Saudi Consulate in Los Angeles."

228.    Bayoumi also had pervasive contacts and dealings with Bassnan, who was himself deeply intertwined with the Saudi government structure in the United States, and according to FBI reports may have succeeded Bayoumi in 2001.

229.    This range of contacts with officials of the Saudi diplomatic missions and Ministry of Islamic Affairs, and pattern of communications with the Kingdom's consulates and embassies, reflect that Bayoumi was reporting to officials in the embassies and consulates, including representatives of the Islamic Affairs offices, in relation to his undisclosed work for the Saudi government.

230.    Bayoumi's "seemingly endless" access to funds from Saudi Arabia, and use of those funds in support of causes within the core mission of the Ministry of Islamic Affairs, further evidence that Bayoumi's functions for the government involved the performance of activities to advance the Ministry of Islamic Affairs' Wahhabi agenda.

231.    For instance, as detailed in the Congressional Joint Inquiry Report, "Al-Bayoumi was known to have access to large amounts of money from Saudi Arabia, despite the fact that he did not appear to hold a job.  On one occasion prior to September 11, the FBI received information that al-Bayoumi had received $400,000 from Saudi Arabia to fund a new mosque in San Diego." *See* CJI at p. 424.

232.    FBI investigations also determined that Bayoumi communicated with Al Haramain Islamic Foundation concerning Al Haramain's "interest[] in appointing the imam of the mosque in Cajon, California, that al-Bayoumi managed." *Id.* at p. 436.

233.    The construction of mosques outside of Saudi Arabia and placement of Wahhabi imams in mosques and Islamic centers abroad were two of the most important goals and functions of the Ministry of Islamic Affairs during this period, in support of its mission to spread Wahhabi Islam globally.

234.    Relatedly, at the time of Bayoumi's communications with Al Haramain about the selection of an imam for the mosque Bayoumi managed, that organization was headed by the Saudi Minister of Islamic Affairs, supervised by the Ministry of Islamic Affairs, and actively collaborating with al Qaeda.

235.    Bayoumi's other reported activities while in the United States closely relate to the mission and work of the Ministry of Islamic Affairs as well.

236.    For example, Bayoumi maintained extensive connections to extremist clerics engaged in propagating Wahhabi Islamic doctrine in the United States and elsewhere, with regard to "religious" matters in particular, including Thumairy, Aulaqi, and "Abd al-Rahman Barzanji, an imam in Norway who, according to FBI documents, has suspected ties to high-level al-Qa'ida members." *See* Document 17 at p. 35.

237.    In addition, Bayoumi's own writings could "be interpreted as jihadist" according to FBI analysts, CJI at p. 425, and his Saudi passport contained "a cachet that intelligence investigators associate with possible adherence to al Qaeda," according to the 9/11 Commission, further indications of his role in advancing extremist Wahhabi objectives. *See* 9/11 Commission Final Report at p. 516.  The Saudi passports of at least three of the 9/11 hijackers, including Nawaf

al Hazmi and Khalid al Mihdhar, included the same indicator of extremism and "adherence to al Qaeda." *See id.*

238.    Bayoumi also interjected himself aggressively into the activities of the local Muslim community, and the Saudi student community in particular (despite his advanced age), including through involvement in the Saudi student club.

239.    Several witnesses who interacted with him in those settings indicated to the FBI that Bayoumi was responsible for monitoring Saudi students and citizens living in the United States, as reflected by his persistent videotaping of their activities and other factors, and described him as some kind of "agent" working for the Saudi government in an undisclosed capacity. *See* Averment ¶¶ 149, 188-89, 194.

240.    The covert monitoring of Saudi students living outside of the Kingdom was a common function and activity of the Saudi embassies and consulates during that period, carried out principally by the Ministry of Islamic Affairs, as a component of the Ministry's role in protecting the Kingdom's "Islamic" character. *See* Averment ¶ 119.

241.    In this regard, a report published by the Sydney Morning Herald concerning activities of the Saudi embassy in that country, based on a review of Saudi government cables, is insightful.  According to the report, the cables reflect "sustained Saudi efforts to influence political and religious opinion within [local] Arabic and Islamic communities," that the Saudi embassies "pay close attention to the political and religious beliefs of Saudi university students studying [abroad] with reports sent to" officials in the Kingdom, and that the embassies coordinate "funding for building mosques and supporting Islamic community activities."

242.    Bayoumi's activities undertaken in the United States while receiving a salary from the Saudi government (and performing no other duties for the Kingdom), and while

communicating on a systematic basis with the Kingdom's diplomatic missions, align completely with these documented functions of the Kingdom's embassies and consulates.

243.    The circumstances surrounding Bayoumi's assistance to the hijackers further evidence that his undisclosed duties for the Saudi government involved the performance of tasks assigned to him by the Wahhabi extremists in the Kingdom's embassies and consulates.

244.    In this regard, U.S. investigations have established that Bayoumi met and offered to assist the hijackers immediately following a meeting with Thumairy in the Saudi consulate, and that a third subject of the ongoing investigation "tasked al-Thumairy and al-Bayoumi with assisting the hijackers." *See* SR at p. 4.

245.    These facts indicate that Bayoumi was acting within a chain of command and direction in which he was subordinate to Thumairy, a Saudi government official, and a third person with common authority over both of them. The fact that the third individual had such authority over both Thumairy and Bayoumi indicates that that person was a more senior Saudi official.

246.    The declassified 28 pages of the Congressional Joint Inquiry Report, meanwhile, draw a direct parallel between Bayoumi's role for the Saudi government and that of another extremist with deep connections to the Saudi government's Wahhabi proselytizing apparatus in the United States, Mohammed al Qudhaeein, who as discussed below also provided aid to the September 11th plotters from within the United States.

247.    Like Bayoumi, Qudhaeein was purportedly in the United States as a student; was "in frequent contact with Saudi government establishments in the United States," including officials from the Ministry of Islamic Affairs; was "very involved in the affairs of the local Saudi community," and was "receiving money from the Saudi government." *See* CJI at p. 438.

248.    Based on these and other factors, the FBI described Qudhaeein's "profile" as "similar to that of al-Bayoumi and Bassnan." *See id.* at p. 434.

249.   This assessment and the facts supporting it, coupled with the related findings pertaining to Bassnan, further evidence that the Saudi government had a network of employees and agents in the United States prior to 9/11 performing undisclosed functions for the Kingdom; that the duties of those employees and agents involved the advancement of the Wahhabi agenda of the Ministry of Islamic Affairs; and that Bayoumi was one of those employees and agents.

250.   Bassnan's true functions for the Saudi government mirrored those performed by Bayoumi, with whom Bassnan closely interacted and had unusual financial dealings.

251.   Bassnan entered the United States in 1996 on a tourist visa, even though he was in fact working for the Saudi government.

252.   Bassnan had "many ties to the Saudi Government, including past employment by the Saudi Arabian Education Mission," a component of the Saudi embassy falling under the Ministry of Islamic Affairs' authority.  *See* CJI at p. 417.

253.   "According to a CIA memo, Bassnan reportedly received funding and possibly a fake passport from Saudi Government officials."  *Id.*

254.   This funding included substantial transfers from a charity under the control of the extremists in the Kingdom's embassy in Washington, D.C.

255.   Like Bayoumi, Bassnan had extensive ties to Wahhabi extremists and terrorists in the United States and elsewhere, and witnesses who interacted with him also described Bassnan as some kind of "agent" for the Saudi government.  *See* Averment ¶¶ 197-99, 206; Index of Evidence, Exs. 26 and 49.

256.   These and other facts establish that Bassnan was, like Bayoumi, an employee and agent of the Saudi government responsible for performing activities in furtherance of the agenda of the Ministry of Islamic Affairs, under the direction of the Saudi embassies and consulates in the United States.

257.    The critical support Thumairy, Bayoumi, and Bassnan provided to the 9/11 hijackers as employees and agents of the Saudi government was, meanwhile, well within the scope of their office, employment, and agency in furthering the radical mission and agenda of the Ministry of Islamic Affairs and Kingdom's government proselytizing apparatus.

258.    Saudi Arabia established the Ministry of Islamic Affairs in 1993, in response to intensive pressure from the Kingdom's Wahhabi clerics, who sought greater government resources and platforms to advance their Wahhabi agenda globally.

259.    As the 9/11 Commission explained, al Qaeda finds inspiration and religious justification for its actions "in a long tradition of intolerance" that flows "through the founders of Wahhabism," and the Kingdom's Ministry of Islamic Affairs "uses zakat and government funds to spread Wahhabi beliefs throughout the world." *See* 9/11 Commission Final Report at pp. 362, 372.

260.    Following its formation and under the control of the Kingdom's government clerics, the Ministry of Islamic Affairs quickly evolved into "a stronghold of zealots," with global reach and operations. *See* Averment ¶ 125. The Ministry assumed control over Saudi Arabia's da'awa activities outside of the Kingdom, carried out principally through the Kingdom's proselytizing arms under the direction and control of the Ministry, and established offices in the Kingdom's diplomatic missions, which it populated with extremist clerics like Thumairy.

261.    During the decade preceding the September 11th attacks, the Ministry of Islamic Affairs used the government platforms and funds available to it to pursue an extremist and anti-American global agenda, which included broad support for jihadist causes. *See* Averment ¶¶ 120-29.

262.    Of particular relevance in these respects, 9/11 Commissioner John Lehman has testified, again based on his decades of experience in national security and intelligence matters and involvement in the 9/11 Commission's investigation, that:

> At least until September 11, 2001, the Islamic Affairs Departments of Saudi Arabia's diplomatic missions throughout the world were populated and controlled by Wahhabi imams from the Kingdom Ministry of Islamic Affairs, like Fahad al Thumairy.  Wahhabism is a puritanical, intolerant and virulently anti-American strand of Islam, and the state religion of the Kingdom of Saudi Arabia.  The Kingdom has dedicated vast sums over the last several decades to promote the Islamist agenda of Saudi Arabia's Wahhabi clerics.  This vast Saudi funding has been deployed to promote Wahhabi teachings throughout the world, fueling the jihadist tide that now confronts the civilized world.  Wahhabi teachings from the ideological foundation for al Qaeda and a host of other jihad organizations that threaten our national security, including the so-called Islamic State of Iraq and the Levant (ISIL, a/k/a ISIS).
>
> The links between Saudi Arabia's Wahhabi clerics and al Qaeda did not exist solely at the ideological level, but rather also involved collaboration on financial and logistical fronts.  Saudi clerics, paid by the government of the Kingdom and preaching at state funded mosques, issued fatwas that provided religious justification for al Qaeda's terrorist actions.  By the time our Commission began its work, it was already well known in intelligence circles that the Islamic Affairs Departments of Saudi Arabia's diplomatic missions were deeply involved in supporting Islamic extremists.

263.    Commissioner Lehman's testimony concerning the Ministry of Islamic Affairs' extremist agenda, and deep involvement in jihadist causes during the years preceding the September 11th attacks, is amply supported by the pervasive involvement of the da'awa organizations under its control in supporting al Qaeda; the extensive connections between employees of the Ministry of Islamic Affairs and terrorists; the involvement of employees of the Ministry of Islamic Affairs in recruiting and fundraising activities on behalf of al Qaeda; the jihadist content of literature distributed by the Ministry of Islamic Affairs; and the numerous counter-terrorism initiatives targeting the Ministry of Islamic Affairs after 9/11 (including the

Kingdom's removal of 3,500 clerics from the Ministry's payroll and re-education of an additional 20,000).

264.     The range of terrorist connections maintained by the very employees of the Ministry of Islamic Affairs who aided the 9/11 hijackers, including Thumairy, Bayoumi, and Bassnan, further demonstrate the Ministry's extremist character during the period leading up to the September 11th attacks, and confirm that collaborating with jihadists was within the scope of the office, employment, and agency of those individuals.

### Additional Assistance Provided by Saudi Government Employees and Agents Qudhaeein, Shalawi, Hussayen, Fakihi, and Mohamed

265.     Plaintiffs' claims concerning the witting involvement of Thumairy, Bayoumi, and Bassnan in supporting the September 11th hijackers, and deep connections between the Ministry of Islamic Affairs and terrorism during the period leading up to the attacks, are further reinforced and supported by declassified intelligence documents evidencing the involvement of five additional employees of the Saudi government's religious apparatus in also knowingly providing substantial assistance to the September 11th hijackers, plotters and al Qaeda: Mohammed al Qudhaeein, Hamdan al Shalawi,  Muhammed Jabar Fakihi, Saleh al Hussayen, and Omar Abdi Mohamed.

266.     The tortious acts of those additional employees and agents of the Saudi government were likewise committed in the course of their employment and agency in advancing the extremist agenda of the Kingdom's Ministry of Islamic Affairs and related components of the Saudi government's Wahhabi proselytizing apparatus.

### Mohammed al Qudhaeein and Hamdan al Shalawi

267.     Mohammed al Qudhaeein and Hamdan al Shalawi were additional undeclared employees and agents of the Saudi government, whose duties also involved the performance of activities on behalf of the Ministry of Islamic Affairs.

268.    Like Bayoumi, Qudhaeein was purportedly in the United States as a student, was "in frequent contact with Saudi government establishments in the United States," was "very involved in the affairs of the local Saudi community," and was "receiving money from the Saudi government." *See* CJI at p. 434.

269.    Based on these and other factors, FBI investigators described Qudhaeein's "profile" as "similar to that of al-Bayoumi and Bassnan." *See id.*

270.    During a 1999 flight from Phoenix to Washington, D.C. to attend an event "at the Saudi embassy," Qudhaeein participated along with a fellow Saudi named Hamdan al Shalawi, who "had trained at the terrorist training camps in Afghanistan," in a dry run for the 9/11 attacks. *See id.* at pp. 419, 433.

271.    During that flight, Qudhaeein "went to the front of the plane and attempted on two occasions to enter the cockpit," and the FBI "believes both men were specifically attempting to test the security procedures of America West Airlines in preparation for and in furtherance of UBL/Al Qaeda operations." *See id.* at pp. 433-34.

272.    Shalawi was himself a long time employee of the Saudi government as well, and was receiving a stipend from the Saudi government at the time of the incident.

273.    Both Qudhaeein and Shalawi told investigators that the Saudi embassy in Washington had paid for their tickets. *See id.* at p. 433.

274.    The event they were traveling to attend was a symposium hosted by the Saudi embassy in collaboration with the Institute for Islamic and Arabic Sciences in America ("IIASA"), a Saudi government proselytizing arm with extensive ties to terrorism.

275.    Following the September 11th attacks, the United States revoked the diplomatic visas of 16 people associated with IIASA, who were using their diplomatic status as representatives of the Saudi Embassy in Washington D.C. to promote and spread radical Wahhabi ideology in the

United States.  According to senior U.S. law enforcement officials, in all, approximately seventy (70) individuals with Saudi diplomatic credentials were expelled from the United States as part of "an ongoing effort to protect the homeland."

276.    In response to the revocation of the visas, IIASA issued a "Declaration About the Revoking of Diplomatic Visas," in which IIASA confirmed that it was a Saudi government arm conducting da'awa activities under the auspices of the Saudi embassy:

> The Institute of Islamic and Arabic Sciences in America (IIASA) is a non-profit educational institution affiliated with Al-Imam Muhammad Ibn Saud Islamic University (IMSIU) in Riyadh, Kingdom of Saudi Arabia, which was established by the order of the Custodian of the Two Holy Sanctuaries King Fahd Ibn Abdul Aziz more than fifteen years ago.  This Institute continues to receive support from the University and from the Royal Embassy of the Kingdom of Saudi Arabia…

> ***

> Under the auspices of the Royal Embassy of the Kingdom of Saudi Arabia and its Ambassador to the USA, the personnel of the Institute were registered at the Imam Muhammad Ibn Saud Islamic University and the US State Department as diplomatic personnel and consequently were granted diplomatic A2 visas since the IMSIU is a government University.

277.    The State Department's actions coincided with investigations conducted by the Internal Revenue Service and Senate Finance Committee into IIASA and its links to terrorist groups, which eventually led to its closure.

278.    In the years after the 1999 incident, both Qudhaeein and Shalawi held posts as government employees at the Imam Muhammed Ibn Saud Islamic University, the parent of IIASA, a further indication of their longstanding ties to the Saudi government.

279.    In the fall of 2000, Shalawi received training at an al Qaeda camp in Afghanistan where several of the 9/11 muscle hijackers were simultaneously receiving training.

280.    Based on intelligence indicating Shalawi's presence at the camp, the United States placed him on a terrorist watch list and he was denied a visa when he attempted to re-enter the United States in August 2001, likely as part of an al Qaeda operation.

**Saleh al Hussayen**

281.    Saleh al Hussayen was a senior government cleric who held various positions in the Saudi government over a period of many years, and asserted in filings in this litigation that plaintiffs' direct claims against him implicated his activities as a government official.

282.    In the weeks prior to the attacks, Hussayen was in the United States on a fundraising mission with members of the Islamic Association of North America ("IANA"), a radical Islamic organization in Ypsilanti, Michigan, which receives money from the Saudi government and other Saudi donors.  The IANA has promoted teachings and fatwas issued by radical Saudi clerics Safar Hawali and Salman Ouda, which advocated violence against the United States.  Hawali and Ouda were identified in the 1993 World Trade Center bombing trial as spiritual advisors to Osama bin Laden.

283.    On September 6, 2001, Hussayen arrived in Herndon, VA.  Then, just days before the September 11th attacks, Hussayen abruptly moved from his original hotel to the Marriott Residence Inn, where September 11th hijackers Hazmi, Mihdhar, and Hanjour also were staying on the eve of the September 11th attacks.

284.    Directly after the attacks, FBI agents attempted to interview Hussayen in his hotel room, but Hussayen "feigned a seizure, prompting the agents to take him to a hospital, where the attending physicians found nothing wrong with him."  Averment ¶ 239.  Hussayen then "managed to depart the United States despite law enforcement efforts to locate and re-interview him."  *See* CJI at p. 431.

285.    The recently declassified 28 pages of the Congressional Joint Inquiry Report provide further details of the FBI's investigation of Hussayen, including the FBI's determination that Hussayen "is apparently a 'Saudi Interior Ministry employee/official'" and that the FBI agents who interviewed him "believed he was being deceptive" when he "claimed to not know the hijackers." *Id.* at pp. 418, 430-31.

286.    Hussayen's ties to terrorist elements, precipitous relocation to the same hotel as the 9/11 hijackers on the eve of the attacks, deceitfulness to U.S. investigators, and remarkable efforts to avoid questioning by U.S. authorities concerning his ties to the hijackers, all indicate that he provided aid and assistance to the hijackers in support of the September 11th attacks.

287.    Even before disclosure of the additional facts in the Congressional Joint Inquiry Report, the United States Second Circuit Court of Appeals found that Hussayen's "travels to the United States shortly before the September 11, 2001 attacks, *as well as his decision to switch hotels to stay in the same hotel as at least three of the hijackers* … not only suggest the possibility that he may have provided direct aid to members of al Qaeda, but they also raise a plausible inference that he may have intended his alleged indirect support of al Qaeda to cause injury in the United States." *O'Neill v. Asat Trust Reg.* (*In Re: Terrorist Attacks on September 11, 2001* (Asat Trust Reg.)), 714 F.3d 659, 679 (2d Cir. 2013).  (Emphasis in original).

## Mohammed Jabar Fakihi

288.    Muhammed Jabar Fakihi was an employee of the Ministry of Islamic Affairs, who served as head of the Islamic Affairs office at the Saudi Embassy in Berlin, beginning in or around June of 2000, and like Thumairy was a Wahhabi extremist with extensive ties to terrorism.

289.    Investigations following the September 11th attacks revealed that Fakihi was in direct contact with members of the Hamburg al Qaeda cell that coordinated the September 11th

attacks, diverted extensive funds to al Qaeda from Saudi embassy accounts, and was "organizationally involved" in bin Laden's organization.  *See* Averment ¶ 261.

290.    The "Hamburg cell" consisted of key operatives in the September 11th attacks, including Mohammad Atta (the ringleader of the 19 hijackers who piloted American Airlines Flight 11), Marwan al Shehhi (piloted United Airlines Flight 175), Ziad Jarrah (piloted United Airlines Flight 93), Ramzi Binalshibh, Mounir el Motassadeq, Said Bahaji, Zakariya Essabar, Abdelghani Mzoudi, and others.

291.    As a representative of the Saudi Embassy and Ministry of Islamic Affairs, Fakihi frequently attended the Saudi funded Al Nur Mosque in Berlin.

292.    A notorious haven for Islamic extremists, the mosque often hosted clerics that preached intolerance of non-Muslims and justified violence in the name of defending Islam.  Dr. Salem Rafei, a Lebanese cleric who served as an imam at the mosque, openly supported Palestinian suicide attacks and called Muslims to kill all unbelievers standing in the way of Islam.  Documents containing the mosque's address were seized from individuals detained by Pakistani authorities who are alleged to have received military training at al Qaeda camps in Afghanistan in 2001.

293.    Fakihi, himself an adherent to the most extreme teachings of Wahhabi ideology, advocated for the development of mosques across Europe and told his superiors in the Kingdom that his ultimate goal was to turn Berlin into an Islamic proselytizing center for Eastern Europe. In June 2000, Fakihi wrote a letter to the Saudi Minister of Islamic Affairs, Saleh bin Abdulaziz al Ashaikh, proposing to turn the Al Nur Mosque into a center for Islamic missionary activity aimed at "ethnic European" populations in Eastern Europe.  Fakihi, who planned to move his office to the Al Nur Mosque, proposed to carry the word of Islam to Poland, the Czech Republic and Hungary, the last of "which once belonged to the Islamic Caliphate under Ottoman Empire rule." *See* Averment ¶ 256.

294.     The expansion of the Al Nur Mosque was originally conceived by Ahmad al-Dubayan, Fakihi's predecessor in the Islamic Affairs office in the Saudi embassy in Berlin, who served as a mentor to Fakihi and likely had contact with members of the Hamburg al Qaeda cell at the al Nur Mosque as well.

295.     Fakihi arranged for the expansion of the Al Nur Mosque consistent with the vision outlined in his letter, using funds from Al Haramain Islamic Foundation, one of the al Qaeda affiliated charities supervised and directed by the Saudi Ministry of Islamic Affairs and headed by the Minister of Islamic Affairs.

296.     Mohammad Atta and other members of the Hamburg cell, including Mounir el Motassadeq, were seen visiting the mosque and German investigators believe Fakihi met with Motassadeq at al Nur.  Fakihi's business card was found in the apartment of Motassadeq, who was later arrested and convicted in a German court for being an accessory to murder relative to the September 11th attacks, given his membership in the Hamburg cell and his knowledge and involvement in the preparation of the plans to hijack the planes.

297.     In March 2003, German police raided a suspected terrorist cell in Berlin and arrested a half-dozen men who were planning a large scale terrorist attack in Germany.  Bomb-making equipment, forged passports, flight-simulator software, chemicals and a handbook for brewing poisons were seized during the raid.  German police said Fakihi met frequently at the Al Nur Mosque with the terror cell's leader, Ihsan Garnaoui, a Tunisian al Qaeda member.

298.     Two days after the arrests, on March 22, 2003, the German Foreign Ministry, following a recommendation from the country's domestic-intelligence service, told the Saudi Embassy that Fakihi's diplomatic accreditation would be withdrawn unless he left the country. That same day, Dubayan flew from London to Berlin to meet Fakihi, and Fakihi then flew back to Saudi Arabia the following day.

299.    Saudi authorities thereafter obstructed the German government's further investigation into links between Fakihi and the members of the Hamburg cell.  The Saudi Embassy in Berlin never responded to a formal request from German prosecutors to explain the presence of Fakihi's business card in Motassadeq's apartment or an alleged meeting between Fakihi and Motassadeq in Berlin shortly before the al Qaeda member's arrest in November 2001.  In an interview with the Wall Street Journal in 2003, a German police official stated that the Saudi Embassy failed to cooperate in the probe.

300.    Nonetheless, evidence presented to U.S. officials led them to conclude that Fakihi was "more than just a sympathizer of bin Laden" and was "organizationally involved" with bin Laden's al Qaeda network.  *See* Averment ¶ 261.

301.    The 9/11 Commission staff conducted an interview with Fakihi in October 2003 in Riyadh relative to his duties with the Ministry of Islamic Affairs, his association with the Al Nur Mosque, and his relationships with Motassadeq and Garnaoui.  The interview was conducted under the watchful eye of the Saudi secret police, the Mabahith.  According to 9/11 Commission's memorandum concerning the interview, Fakihi's testimony on a material issue "did not appear credible."  *See* Averment ¶ 263.

**Omar Abdi Mohamed**

302.    Omar Abdi Mohamed entered the United States in or around 1998 as a religious worker.

303.    In fact, Mohamed was an employee of Saudi Arabia's Ministry of Islamic Affairs, holding the title "Propagator," material facts that neither he nor the Kingdom disclosed on his visa application.

304.    Following his entry into the United States and while employed by the Ministry of Islamic Affairs, Mohamed established a purported charity called the Western Somali Relief

Agency in San Diego under supervision of his superiors with the Ministry of Islamic Affairs, to serve as a front for funding al Qaeda.

305.    Between December 1998 and May 2001, Mohamed issued 65 checks totaling nearly $400,000 to another prominent al Qaeda front called Dahab Shil, the Pakistan office of which was at the time under the control of 9/11 mastermind Khalid Sheikh Mohamed, who at that very time was planning the September 11th attacks and providing funds to the 9/11 hijackers.

306.    Following the September 11th attacks, Mohamed was deported from the United States following his conviction on immigration charges, including for failing to disclose that he was employed by the Saudi government.

**Additional Saudi Government Contacts With the 9/11 Hijackers, Plotters, and al Qaeda**

307.    U.S. investigations concerning the September 11th attacks and sources of support for al Qaeda before the attacks have documented a range of other links between persons and institutions associated with the Saudi government and elements of al Qaeda, including the September 11th hijackers and plotters.

308.    The Congressional Joint Inquiry and Document 17 survey some of these ties, which indicate additional sources of support from within the Saudi government for al Qaeda and the September 11th plot.

309.    In addition, a federal judge in Florida currently is reviewing, for possible declassification, approximately 80,000 pages of FBI records relating to investigations concerning the extensive links between 9/11 hijackers Mohammed Atta, Marwan al Shehhi, and Ziad Jarrah, and a Saudi family residing in Florida with ties to Saudi officials, in connection with an ongoing FOIA lawsuit.

310.    Discovery relating to these additional linkages between Saudi government officials, employees, and agents and elements of al Qaeda is likely to adduce further evidence in support of plaintiffs' claims.

## IX.    U.S. INVESTIGATIONS FULLY SUPPORT PLAINTIFFS' CLAIMS

311.    Investigations conducted by the U.S. government, including those of the 9/11 Commission and Congressional Joint Inquiry, broadly and directly support the 9/11 plaintiffs' factual allegations and theories.

312.    As discussed above, 9/11 Commission members John Lehman and Bob Kerrey, along with 9/11 Congressional Joint Inquiry Co-Chair Bob Graham, have offered sworn affidavit testimony, based on their decades of experience in national security matters and direct involvement in two of the principal investigations in to the September 11th attacks, in support of plaintiffs' claims.

313.    Further, several additional 9/11 Commission members and staff have joined Secretary Lehman and Senator Kerrey in the last year in directly rejecting the Kingdom's false (and irrelevant) claims of exoneration and characterizations of the Commission's investigation.

314.    Most recently, the declassification of the 2012 Summary Report of the ongoing FBI and DOJ investigations of Bayoumi and Thumairy and associated individuals who aided the 9/11 hijackers has confirmed central facts underlying plaintiffs' claims based on the tortious acts of Bayoumi and Thumairy.

315.    Separately, plaintiffs' claims based on the funding and material sponsorship of al Qaeda by the Kingdom's proselytizing arms are fully supported by the 9/11 Commission's finding that there was a substantial "likelihood that charities with significant Saudi government sponsorship diverted funds to al Qaeda."

316.    Stated most simply, U.S. investigations broadly support plaintiffs' claims herein.

## COUNT I

### AIDING AND ABETTING AND CONSPIRING WITH AL QAEDA TO COMMIT THE SEPTEMBER 11th ATTACKS UPON THE UNITED STATES IN VIOLATION OF 18 U.S.C. § 2333(d) (JASTA)

### ON BEHALF OF ALL "U.S. NATIONAL" PLAINTIFFS[8]

317.　Plaintiffs incorporate all previous allegations by reference.

318.　As set forth above, defendants Kingdom of Saudi Arabia and the SHC knowingly provided material support, resources, and substantial assistance to, and conspired with, al Qaeda over many years, with an awareness and intent to further al Qaeda's campaign to carry out terrorist attacks against the United States and its citizens on September 11, 2001.

319.　As set forth above, plaintiffs' claims against defendants Kingdom of Saudi Arabia and the SHC relating to their tortious acts in support of al Qaeda fall within the exception to foreign sovereign immunity set forth at 28 U.S.C. § 1605B, and plaintiffs are thus authorized to assert causes of action against the Kingdom of Saudi Arabia and the SHC pursuant to the Anti-Terrorism Act, 18 U.S.C. § 2331 *et seq.*

320.　Through the tortious acts in support of al Qaeda described above, defendants Kingdom of Saudi Arabia and the SHC aided and abetted, and conspired with, al Qaeda to carry out acts of international terrorism against the United States and its citizens on September 11, 2001, in violation of 18 U.S.C. § 2333(d).

321.　At the time of the September 11th attacks, al Qaeda was a designated foreign terrorist organization under section 219 of the Immigration and Nationality Act (8 U.S.C. § 1189).

322.　The funding and other material support defendants Kingdom of Saudi Arabia and the SHC provided to al Qaeda, as described above, enabled al Qaeda to acquire the global strike

---

[8] The causes of action pursuant to the ATA, 18 U.S.C. § 2331 *et seq.*, are asserted on behalf of plaintiffs who are U.S. nationals; estates, heirs, and survivors of U.S. nationals; U.S. nationals who are members of a putative class represented by such plaintiffs; plaintiffs who are subrogated to the rights of U.S. nationals who incurred physical injuries to property and related losses as a result of the September 11th attacks; and plaintiffs who are assignees of U.S. nationals killed or injured in the September 11th attacks. The term "U.S. National Plaintiffs" refers to all such parties.

capabilities employed on September 11, 2001, and was essential to al Qaeda's ability to carry out the attacks.

323.    During the decade preceding the September 11th attacks, al Qaeda repeatedly made clear, through both declarations and actions, its intent to use funds and resources provided to it to conduct large scale terrorist attacks in order to kill innocent civilians, destroy property on a mass scale, and cause catastrophic economic harm.

324.    The September 11th attacks were a direct and foreseeable result of the material support and sponsorship of al Qaeda by defendants Kingdom of Saudi Arabia and the SHC.

325.    Plaintiffs and/or their insureds suffered injuries to their persons, property or businesses by reason of the September 11th attacks and defendants' tortious acts in support of al Qaeda.

**WHEREFORE**, plaintiffs demand judgment against defendants Kingdom of Saudi Arabia and the SHC, jointly and severally, for an amount authorized by governing law to be determined at trial, together with treble damages, punitive damages, pre- and post-judgment interest, attorney's fees, costs of this action and such other and further relief as the Court may deem appropriate under the circumstances.

## COUNT II

### AIDING AND ABETTING AND CONSPIRING WITH AL QAEDA TO COMMIT THE SEPTEMBER 11th ATTACKS UPON THE UNITED STATES IN VIOLATION OF 18 U.S.C. § 2333(a)

### ON BEHALF OF ALL "U.S. NATIONAL" PLAINTIFFS

326.    Plaintiffs incorporate all previous allegations by reference.

327.    As enacted in 1992, the express civil cause of action established under 18 U.S.C. § 2333(a) authorized claims for aiding and abetting and conspiring to commit an act of international terrorism.

328.     Through the tortious acts in support of al Qaeda described above, defendants Kingdom of Saudi Arabia and the SHC aided and abetted, and conspired with, al Qaeda to carry out acts of international terrorism against the United States and its citizens on September 11, 2001, in violation of 18 U.S.C. § 2333(a).

329.     The relentless campaign by al Qaeda and its material supporters to carry out terrorist attacks against the United States and its citizens, which culminated in the September 11th attacks, involved continuous acts of violence and acts dangerous to human life, that violate the criminal laws of the United States, including the prohibitions set forth in 18 U.S.C. § 2332.  *See* 18 U.S.C. § 2332b(a) (prohibiting conduct transcending national boundaries:  killing or attempting to kill persons within the United States; causing serious bodily injury or attempting to cause serious bodily injury to persons within the United States; destroying or damaging any structure, conveyance, or other real or personal property within the United States; or attempting or conspiring to destroy any or damage any structure conveyance, or other real or personal property within the United States).

330.     Plaintiffs and/or their insureds suffered injuries to their persons, property or businesses by reason of acts committed by al Qaeda that involved the murder and attempted murder of persons within the United States, and the mass destruction of real and personal property within the United States, in violation of the criminal laws of the United States, including the prohibitions set forth in 18 U.S.C. § 2332.

331.     Through the tortious acts in support of al Qaeda described above, defendants Kingdom of Saudi Arabia and the SHC aided and abetted, and conspired with, al Qaeda to carry out acts of international terrorism against the United States and its citizens on September 11, 2001, in violation of 18 U.S.C. §§ 2332(a), 2332(b), 2332(c), and 2333.

332.     Defendants Kingdom of Saudi Arabia and the SHC knew at all times that they were providing material support for al Qaeda's campaign to carry out acts of international terrorism against the United States and its citizens, and were both aware and intended that the resources they provided would substantially assist al Qaeda in that objective.

333.     Defendants Kingdom of Saudi Arabia and the SHC also agreed to combine and conspire with al Qaeda and other persons to act unlawfully, in the manners set forth in this complaint, and committed overt acts in furtherance of the conspiracy.   At all relevant times, defendants Kingdom of Saudi Arabia and the SHC knew of the conspiracy and of the roles of the al Qaeda elements they were supporting in furtherance of the conspiracy.

334.     By aiding and abetting violations of 18 U.S.C. § 2332 that have caused injuries to plaintiffs and/or their insureds, defendants Kingdom of Saudi Arabia and Saudi High Commission are jointly and severally liable pursuant to 18 U.S.C. § 2333 for any and all damages that plaintiffs and/or their insureds have sustained as a result of such injuries.

335.     By conspiring to act with al Qaeda and other components of that terrorist organization's financial, logistical, and operational infrastructures, in furtherance of their campaign to conduct terrorist attacks against the United States and its citizens, in violation of 18 U.S.C. § 2332, defendants Kingdom of Saudi Arabia and the SHC are jointly and severally liable pursuant to 18 U.S.C. § 2333 for any and all damages that plaintiffs and/or their insureds have sustained by reason of the September 11th attacks.

336.     The September 11th attacks were a direct and foreseeable result of the material support and sponsorship of al Qaeda by defendants Kingdom of Saudi Arabia and the SHC.

**WHEREFORE**, plaintiffs demand judgment against defendants Kingdom of Saudi Arabia and the SHC, jointly and severally, for an amount authorized by governing law to be determined at trial, together with treble damages, punitive damages, pre- and post-judgment interest, attorney's

fees, costs of this action and such other and further relief as the Court may deem appropriate under the circumstances.

## COUNT III

### COMMITTING ACTS OF INTERNATIONAL  TERRORISM IN VIOLATION OF 18 U.S.C. § 2333

### ON BEHALF OF ALL "U.S. NATIONAL" PLAINTIFFS

337.    Plaintiffs incorporate all previous allegations by reference.

338.    The actions of defendants Kingdom of Saudi Arabia and the SHC in providing funding and other forms of material support to al Qaeda and its agents would constitute "a criminal violation if committed within the jurisdiction of the United States or of any State" and "appear to be intended to intimidate or coerce a civilian population ... to influence the policy of a government by intimidation or coercion or to affect the conduct of a government by mass destruction" within the meaning of 18 U.S.C. § 2331.

339.    The actions of defendants Kingdom of Saudi Arabia and the SHC in providing funding and other forms of material support to al Qaeda and its agents, and in providing substantial assistance to al Qaeda and its agents in planning, coordinating and carrying out the September 11th attacks in violation of 18 U.S.C. § 2333, caused injuries to the persons, businesses, or property of plaintiffs and/or their insureds.

340.    By participating in the commission of violations of 18 U.S.C. § 2339A and 18 U.S.C. § 2339B that have caused plaintiffs and/or their insureds to be injured in their persons, businesses, or property, defendants Kingdom of Saudi Arabia and the SHC have engaged in acts of international terrorism and are jointly and severally liable pursuant to 18 U.S.C. § 2333 for any and all damages that plaintiffs and/or their insureds have sustained as a result of such injuries.

341.    By virtue of their willful violations of 18 U.S.C. § 2339C, which proximately caused the injuries suffered by plaintiffs and/or their insureds, defendants Kingdom of Saudi

Arabia and the SHC committed acts of international terrorism and are jointly and severally liable pursuant to 18 U.S.C. § 2333 for any and all damages that plaintiffs and/or their insureds have sustained as a result of such injuries.

342.    The actions of defendants Kingdom of Saudi Arabia and the SHC in providing funding and other forms of material support to al Qaeda and its agents were dangerous to human life, by their nature and as evidenced by their consequences.

343.    The actions of defendants Kingdom of Saudi Arabia and the SHC in providing funding and other forms of material support to al Qaeda and its agents either occurred outside the territorial jurisdiction of the United States or transcended national boundaries in terms of the means by which they were accomplished.

344.    Accordingly, the actions of defendants Kingdom of Saudi Arabia and the SHC in providing funding and other forms of material support to al Qaeda and its agents constitute acts of international terrorism as defined by 18 U.S.C. §§ 2331 and 2333 and through incorporation of 18 U.S.C. §§ 2339A, 2339B, and 2339C.

345.    As set forth above, but for the assistance provided by defendants Kingdom of the SHC, al Qaeda could not have successfully planned, coordinated, and carried out the September 11th attacks, which were a foreseeable and intended result of their material support and sponsorship of al Qaeda.

346.    For the reasons set forth above, defendants Kingdom of Saudi Arabia and the SHC are jointly and severally liable pursuant to 18 U.S.C. § 2333 for any and all damages that plaintiffs and/or their insureds have suffered to their persons, businesses or property as a result of the September 11th attacks.

**WHEREFORE**, plaintiffs demand judgment against defendants Kingdom of Saudi Arabia and the SHC, jointly and severally, for an amount authorized by governing law to be determined

at trial, together with treble damages, punitive damages, pre- and post-judgment interest, attorney's fees, costs of this action and such other and further relief as the Court may deem appropriate under the circumstances.

## COUNT IV

## WRONGFUL DEATH

## ON BEHALF OF ALL PLAINTIFFS BRINGING WRONGFUL DEATH CLAIMS

347.    Plaintiffs incorporate all previous allegations by reference.

348.    Plaintiffs herein bring this action for the wrongful death proximately caused by defendants Kingdom of Saudi Arabia and the SHC engaging in, materially supporting or sponsoring, financing, aiding and abetting, scheming and/or otherwise conspiring to commit or cause to occur acts of murder and wrongful death, specifically, the mass murder committed by the terrorist attacks acts of September 11, 2001.

349.    Surviving family members or estates of those wrongfully killed are entitled to recover damages from defendants Kingdom of Saudi Arabia and the SHC for these illegal and wrongful deaths.  The family members or estates are entitled to recover full damages incurred, as fair and just compensation for the injuries resulting from these wrongful deaths.  Those responsible for these deaths must be held accountable for the losses incurred.

350.    The injuries and damages suffered by plaintiffs were proximately caused by the intentional, malicious, reckless, criminal, violent, grossly negligent or negligent acts of defendants Kingdom of Saudi Arabia and the SHC as described herein.

351.    As a direct and proximate result of the wrongful deaths of the decedents, their heirs and families have suffered financially and been deprived of all future aid, income, assistance, services, comfort, companionship, affection and financial support of their loved ones.

352.     As a direct and proximate result of the Kingdom of Saudi Arabia's and the SHC's acts of international terrorism, torture, conspiracy, and racketeering resulting in the wrongful death of decedents, the heirs and families of those murdered suffer and will continue to suffer permanent, physical and emotional distress, severe trauma, and lasting physical, emotional, and psychological injuries.

353.     As a further result of intentional, willful, wanton, malicious, reckless, criminal, negligent, wrongful, illegal and tortious acts and conduct of defendants Kingdom of Saudi Arabia and the SHC, plaintiffs have incurred actual damages including but not limited to ongoing medical expenses related to psychological trauma, physical injuries, and other expenses and losses for which they are entitled to full and fair recovery.

**WHEREFORE**, plaintiffs demand judgment against defendants Kingdom of Saudi Arabia and the SHC, jointly and severally, for an amount authorized by governing law to be determined at trial, together with punitive damages, pre- and post-judgment interest, and such other and further relief as the Court may deem appropriate under the circumstances.

<u>**COUNT V**</u>

<u>**SURVIVAL**</u>

<u>**ON BEHALF OF ALL PLAINTIFFS BRINGING WRONGFUL DEATH CLAIMS**</u>

354.     Plaintiffs incorporate all previous allegations by reference.

355.     As a result of the intentional, malicious, reckless, conspiratorial, criminal, unprivileged, nonconsensual, grossly negligent and negligent acts of defendants Kingdom of Saudi Arabia and the SHC as described herein, those killed on September 11, 2001, were placed in a severe, often prolonged, extreme, traumatic, apprehension of harmful, offensive unwarranted bodily contact, injury and assault.  Those murdered suffered intensely severe and offensive harmful bodily contact, personal injury and battery; including but not limited to extreme fear, terror,

anxiety, emotional and psychological distress, knowledge of pending death and physical and emotional trauma, and intentionally inflicted physical pain.  Decedents were mentally, physically and emotionally damaged, harmed, trapped, and falsely imprisoned prior to their personal physical injury and deaths.

356.    As a result of the Kingdom of Saudi Arabia's and the SHC's criminal and tortious conduct, those killed suffered damages including pain and suffering, severe trauma, fear, anxiety, permanent physical and emotional distress, ultimate loss of life and life's pleasures, companionship and consortium, loss of family, career, earnings and earning capacity, loss of accretion to their estates, and other immeasurable items of damages to be shown at trial.  Plaintiffs herein seek and are entitled to survival damages for those tortured and killed on September 11, 2001.

**WHEREFORE**, plaintiffs demand judgment against defendants Kingdom of Saudi Arabia and the SHC, jointly and severally, for an amount authorized by governing law to be determined at trial, together with punitive damages, pre- and post-judgment interest, and such other and further relief as the Court may deem appropriate under the circumstances.

## COUNT VI

## ALIEN TORT CLAIMS ACT[9]

## ON BEHALF OF ALL ALIEN NATIONAL PLAINTIFFS

357.    Plaintiffs incorporate all previous allegations by reference.

358.    The Alien Tort Claims Act, 28 U.S.C. § 1350, allows aliens to sue for torts committed in violation of the law of nations or a treaty of the United States.  Certain of the plaintiffs in this action are non-U.S. citizen aliens.

359.    As set forth above, defendants Kingdom of Saudi Arabia and the SHC, individually, jointly, and severally, aided and abetted, sponsored, financed, promoted, fostered, materially supported, or otherwise conspired to proximately cause the death and injury of innocent persons namely the alien plaintiffs herein through and by reason of acts of international terrorism – the heinous attacks of September 11, 2001.  These terrorist acts constitute a clear violation of the law of nations, otherwise referred to as customary international law, which includes international legal norms prohibiting crimes against humanity, mass murder, genocide, torture, extrajudicial killing, air piracy, financing of terrorism, and terrorism.  These international legal norms can be found in and derived from, among other things, the following conventions, agreements, U.N. declarations and resolutions, and other documents:

(1)    Charter of the International Military Tribunal, Aug. 8, 1945, 59 Stat. 1544, 82 U.N.T.S. 279;

(2)    Allied Control Council Law No. 10 (Dec. 20, 1945);

(3)    Convention on the Prevention and Punishment of the Crime of Genocide, Dec. 9 1948, 78 U.N.T.S. 277;

(4)    Geneva Convention (IV) Relative to the Protection of Civilian Persons in Time of War, Aug. 12, 1949, 75 U.N.T.S. 287;

---

[9]The causes of action pursuant to the Alien Tort Claims Act (ATCA), 28 U.S.C. § 1350, are asserted on behalf of plaintiffs who are alien nationals; estates, heirs, and survivors of alien nationals who are not themselves U.S. nationals; alien nationals who are members of a putative class represented by such plaintiffs; subrogated to the rights of alien nationals who incurred injuries to property and related losses as a result of the September 11th attacks; and assignees of alien nationals killed or injured in the September 11th attacks.

(5)     Hague Convention for the Suppression of Unlawful Seizure of Aircraft (Hijacking), Dec. 16, 1970, 22 U.S.T. 1641, 860 U.N.T.S. 105;

(6)     International Convention for the Suppression of Terrorist Bombings, Dec. 15, 1997, 2149 U.N.T.S. 284 (entered into force May 23, 2001);

(7)     International Convention for the Suppression of the Financing of Terrorism, Dec. 9, 1999, 2178 U.N.T.S. 229 (entered into force Apr. 10, 2002);

(8)     U.N. Security Council Resolution 1267, U.N. Doc. S/RES/1267 (Oct. 15, 1999);

(9)     U.N. Security Council Resolution 1373, U.N. Doc. S/RES/1373 (Sept. 28, 2001);

(10)    Protocol Additional (I) to the Geneva Conventions of 12 August 1949, and Relating to the Protection of Victims of International Armed Conflict, June 8, 1977, 1125 U.N.T.S. 3;

(11)    Protocol Additional (II) to the Geneva Conventions of 12 August 1949, and Relating to the Protection of Victims of Non-International Armed Conflicts, June 8, 1977, 1125 U.N.T.S. 609;

(12)    Statute of the International Criminal Tribunal for the Former Yugoslavia (ICTY), in Report of the Secretary-General pursuant to paragraph 2 of S.C. Res.808, May 3, 1993, U.N. Doc. 8/25704, adopted unanimously by S.C. Res. 827, U.N. SCOR, 48th Sess., 3217th mtg., 16, U.N. Doc. S/PV.3217 (1993);

(13)    The Convention on the Prevention and Punishment of Crimes Against International Protected Persons, Including Diplomatic Agents, 28 U.S.T. 1975, T.I.A.S. No. 8532 (1977), implemented in 18 U.S.C. § 112l;

(14)    The General Assembly Resolutions on Measures to Prevent International Terrorism, G.A. Res. 40/61 (1985) and G.A. Res. 42/159 (1987); and

(15)    The Convention on the High Seas, April 29, 1958, arts. 14-22 (piracy), 13 U.S.T. 2312, 450 U.N.T.S. 11.

360.    As a result and proximate cause of the Kingdom of Saudi Arabia's and the SHC's activities set forth above in violation of the law of nations, the alien plaintiffs suffered injury and damages as set forth herein.

361.    As a result and proximate cause of the Kingdom of Saudi Arabia's and the SHC's sponsorship of terrorism in violation of the law of nations and customary principles of international law, the plaintiffs suffered injury and damages as set forth herein.

362.    Pursuant to 28 U.S.C. § 1350, the plaintiffs herein who are alien nationals; estates, heirs, and survivors of alien nationals who are not themselves U.S. nationals; alien nationals who are members of a putative class represented by such plaintiffs; subrogated to the rights of alien nationals who incurred injuries to property and related losses as a result of the September 11th attacks; and assignees of alien nationals killed or injured in the September 11th attacks are entitled to recover damages they have sustained by reason of the Kingdom of Saudi Arabia's and the SHC's actions in furtherance of this crime against humanity.

**WHEREFORE**, plaintiffs who are alien nationals; estates, heirs, and survivors of alien nationals who are not themselves U.S. nationals; alien nationals who are members of a putative class represented by such plaintiffs; subrogated to the rights of alien nationals who incurred injuries to property and related losses as a result of the September 11th attacks; and assignees of alien nationals killed or injured in the September 11th attacks, demand judgment against defendants Kingdom of Saudi Arabia and the SHC, jointly and severally, for an amount authorized by governing law to be determined at trial, together with punitive damages, pre- and post-judgment interest, and such other and further relief as the Court may deem appropriate under the circumstances.

## COUNT VII

## ASSAULT AND BATTERY

## ON BEHALF OF ALL PLAINTIFFS BRINGING WRONGFUL DEATH AND PERSONAL INJURY CLAIMS

363.    Plaintiffs incorporate all previous allegations by reference.

364.    As a result of the intentional, malicious, reckless, conspiratorial, criminal, unprivileged, nonconsensual, grossly negligent and negligent acts of defendants Kingdom of Saudi Arabia and the SHC as described herein, which culminated in the September 11th attacks, plaintiff decedents and/or personal injury plaintiffs were placed in apprehension of harmful and/or

offensive bodily contact, and suffered harmful, offensive bodily contact, from which they ultimately died or suffered serious permanent personal injury.

365.   By reason of all of the foregoing, plaintiffs were killed, seriously and severely injured, shocked, bruised and wounded and suffered great physical, mental, and emotional pain and injury, and they were rendered sick, sore, lame and disabled, and were otherwise injured or killed, and/or were confined to a hospital, and/or to bed and home for a period of time by reason thereof, and/or required and received medical care and treatment, and/or incurred medical expenses and will continue to incur future expenses therefor, and were prevented from attending to the duties of their employment and prevented from pursuing the furthering their careers and lost salary and earnings and will lose future salary and earnings thereby.

**WHEREFORE**, plaintiffs demand judgment against defendants Kingdom of Saudi Arabia and Saudi High Commission, jointly and severally, for an amount authorized by governing law to be determined at trial, together with punitive damages, pre- and post-judgment interest, and such other and further relief as the Court may deem appropriate under the circumstances.

<u>**COUNT VIII**</u>

<u>**CONSPIRACY**</u>

<u>**ON BEHALF OF ALL PLAINTIFFS**</u>

366.   Plaintiffs incorporate all previous allegations by reference.

367.   As set forth above, defendants Kingdom of Saudi Arabia and the SHC, unlawfully, willfully and knowingly combined, conspired, confederated, aided and abetted, tacitly and/or expressly agreed to participate, cooperate and engage in unlawful and tortious acts pursuant to a common course of conduct, namely the promotion and sponsoring of international terrorism, resulting in the death and injury of plaintiffs and/or their insureds.

368.   As set forth above, defendants Kingdom of Saudi Arabia and the SHC conspired with; encouraged; and furthered and agreed to provide material support, funding, sponsorship, aiding and abetting and/or other material resources to al Qaeda, Osama bin Laden, and the hijackers in furtherance of this conspiracy.

369.   As set forth above, defendants Kingdom of Saudi Arabia and the SHC engaged in commonly motivated, organized, concerted and conspiratorial acts, efforts, transactions, material support, and activities designed, intended, and foreseeably to cause acts of international terrorism including the terrorist attack on the United States, its citizens and society on September 11, 2001. Co-conspirators herein continue in their quest to attack the United States, resulting in the harm to plaintiffs, which was done pursuant to and furtherance of this concert of action, agreement, enterprise, civil and criminal conspiracy and common scheme.

370.   The Kingdom of Saudi Arabia's and the SHC's concert of action, scheme, enterprise and conspiracy to support and promote Osama bin Laden, al Qaeda, the hijackers and international terrorism was a proximate cause of the September 11, 2001, terrorist attacks that killed and injured plaintiffs and/or their insureds.

371.   As a result of the Kingdom of Saudi Arabia's and the SHC's concert of action and conspiracy to further international terrorism, plaintiffs have suffered damages as will be shown at trial.

**WHEREFORE**, plaintiffs demand judgment against defendants Kingdom of Saudi Arabia and the SHC, jointly and severally, for an amount authorized by governing law to be determined at trial, together with punitive damages, pre- and post-judgment interest, and such other and further relief as the Court may deem appropriate under the circumstances.

## COUNT IX

## AIDING AND ABETTING

## ON BEHALF OF ALL PLAINTIFFS

372.    Plaintiffs incorporate all previous allegations by reference.

373.    As set forth above, defendants Kingdom of Saudi Arabia and the SHC knowingly and substantially assisted in the sponsorship of Osama bin Laden, al Qaeda, international terrorism and the September 11, 2001 terrorist attacks that killed and injured plaintiffs and/or their insureds.

374.    At the time of such aiding and abetting, defendants Kingdom of Saudi Arabia and the SHC knew or should have known that their role was part of an overall and ongoing illegal, criminal and/or tortious activity.

375.    As set forth above, defendants Kingdom of Saudi Arabia and the SHC aided and abetted in concerted efforts, transactions, acts and activities designed to cause the attacks of September 11, 2001, on the United States, its citizens, foreign citizens, its liberties and freedoms.

376.    The Kingdom of Saudi Arabia's and the SHC's aiding and abetting of international terrorism through material sponsorship of al Qaeda was a proximate cause of the September 11, 2001 terrorist attacks that killed and injured plaintiffs and/or their insureds.

377.    As a direct and proximate result of the Kingdom of Saudi Arabia's and the SHC's aiding and abetting activities, plaintiffs have suffered damages as set forth herein.

**WHEREFORE**, plaintiffs demand judgment against defendants Kingdom of Saudi Arabia and the SHC, jointly and severally, for an amount authorized by governing law to be determined at trial, together with punitive damages, pre- and post-judgment interest, and such other and further relief as the Court may deem appropriate under the circumstances.

## COUNT X

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

## ON BEHALF OF ALL INDIVIDUAL PLAINTIFFS

378.     Plaintiffs incorporate all previous allegations by reference.

379.     Defendants Kingdom of Saudi Arabia and the SHC intended or knew or should have known, that their conduct and actions would lead to the killing of or injury to innocent persons and resulting severe emotional distress.

380.     Defendants Kingdom of Saudi Arabia and the SHC intended, knew or should have known that the September 11, 2001, suicide hijackings and intended mass murder would kill, maim, and/or permanently injure innocent people, leaving devastated family members to grieve for their losses with ongoing physical, psychological and emotional injuries and ongoing post-traumatic stress disorder on a horrific and massive scale.

381.     The actions of defendants Kingdom of Saudi Arabia and the SHC were unconscionable, extreme, outrageous, and done with an intentional, malicious, and willful disregard for the rights and lives of those murdered, those injured, and the surviving loved ones.

382.     As a direct and proximate cause of the Kingdom of Saudi Arabia's and the SHC's intentional misconduct and reckless disregard for human life, plaintiffs have suffered and will forever continue to suffer severe, debilitating, permanent emotional, physical and psychiatric disorders, ongoing emotional distress and anxiety, physical and mental distress, and significant mental injury and impairment causing ongoing and long-term expenses for medical treatment, services, and counselling and long-term care, particularly for all minor plaintiffs.

383.     The acts and conduct of defendants Kingdom of Saudi Arabia and the SHC were undertaken in an intentional manner intended to or reasonably foreseeable to result in the killing and injuring of innocent people.  These criminal and tortious acts culminated in the murder and

maiming of innocent people on September 11, 2001, and beyond, causing continuing, permanent emotional, mental and physical suffering to the families and heirs of the decedents.

384.    Defendants Kingdom of Saudi Arabia and the SHC, by engaging in this intentional, and unlawful conduct, intentionally inflicted emotional distress upon the plaintiffs.

**WHEREFORE**, plaintiffs demand judgment against defendants Kingdom of Saudi Arabia and the SHC, jointly and severally, for an amount authorized by governing law to be determined at trial, together with punitive damages, pre- and post-judgment interest, and such other and further relief as the Court may deem appropriate under the circumstances.

## COUNT XII

### LIABILITY PURSUANT TO RESTATEMENT (SECOND) OF TORTS § 317 AND RESTATEMENT (THIRD) OF AGENCY § 7.05: SUPERVISING EMPLOYEES AND AGENTS

### ON BEHALF OF ALL PLAINTIFFS

385.    Plaintiffs incorporate all previous allegations by reference.

386.    Defendants Kingdom of Saudi Arabia and the SHC were reckless in their supervision of their agents or employees, including Fahad al Thumairy, Omar al Bayoumi, Osama Bassnan, Saleh al Hussayen, Mohammed al Qudhaeein, Muhammed Jaber al Fakihi and others, in that the Kingdom of Saudi Arabia and the SHC knew of these employees' and agents' propensity for the conduct that caused injury to plaintiffs or plaintiffs' insureds prior to the injuries' occurrence, and the Kingdom of Saudi Arabia and the SHC failed to exercise due care in supervising their employees and agents.

387.    The ability of the above-referenced agents or employees to provide wide-ranging material support to al Qaeda, Osama bin Laden, and the September 11th hijackers, referenced above, and the resulting injuries to plaintiffs, were caused by reason of the reckless supervision by the Kingdom of Saudi Arabia and the SHC of their agents or employees.

388.     Due to the reckless supervision on the part of defendants Kingdom of Saudi Arabia and the SHC, plaintiffs and/or their insureds sustained injuries.

389.     The injuries sustained by plaintiffs and/or their insureds, as a result of the recklessness of defendants Kingdom of Saudi Arabia and the SHC, were foreseeable and defendants Kingdom of Saudi Arabia and the SHC knew or should have known of the risk of injury to the plaintiffs and/or plaintiffs' insureds.

390.     The torts committed by the above-referenced employees and agents of defendants Kingdom of Saudi Arabia and the SHC were committed, among other places, on the premises of the Kingdom of Saudi Arabia and the SHC or with the chattels of the Kingdom of Saudi Arabia and the SHC, as these employees and agents provided wide-ranging material support to al Qaeda and the September 11th hijackers from, among other places, facilities owned and operated by the Kingdom of Saudi Arabia and the SHC using money and resources of these defendants.

**WHEREFORE**, plaintiffs demand judgment against defendants Kingdom of Saudi Arabia and the SHC, jointly and severally, for an amount authorized by governing law to be determined at trial, together with punitive damages, pre- and post-judgment interest, and such other and further relief as the Court may deem appropriate under the circumstances.

## COUNT XIII

### LIABILITY PURSUANT TO RESTATEMENT (SECOND) OF TORTS § 317 AND RESTATEMENT (THIRD) OF AGENCY § 7.05: HIRING, SELECTING, AND RETAINING EMPLOYEES AND AGENTS

### ON BEHALF OF ALL PLAINTIFFS

391.     Plaintiffs incorporate all previous allegations by reference.

392.     Defendants Kingdom of Saudi Arabia and the SHC were reckless in hiring, selecting, and retaining as and for its employees and agents individuals, including Fahad al Thumairy, Omar al Bayoumi, Osama Bassnan, Saleh al Hussayen, Mohammed al Qudhaeein,

Muhammed Jaber al Fakihi and others, in that the Kingdom of Saudi Arabia and the SHC knew of these employees' and agents' propensity for the conduct that caused injury to plaintiffs and/or their insureds prior to the injuries' occurrence.

393.    Defendants Kingdom of Saudi Arabia and the SHC hired, selected, and retained the above-referenced agents and employees and placed them in a situation where they could create an unreasonable risk of harm to others.

394.    The ability of the above-referenced agents and employees to provide wide-ranging material support to al Qaeda and the September 11th hijackers, referenced above, and the resulting injuries to plaintiffs, were caused by reason of the reckless hiring, selecting, and/or retention by defendants Kingdom of Saudi Arabia and the SHC.

395.    The injuries sustained by plaintiffs and/or their insureds, as a result of the recklessness of defendants Kingdom of Saudi Arabia and the SHC, were foreseeable and defendants Kingdom of Saudi Arabia and the SHC knew or should have known of the risk of injury to the plaintiffs.

396.    The torts committed by the above-referenced employees and agents of defendants Kingdom of Saudi Arabia and the SHC were committed, among other places, on the premises of the Kingdom of Saudi Arabia and the SHC or with the chattels of the Kingdom of Saudi Arabia and the SHC, as these employees and agents provided wide-ranging material support to al Qaeda and the September 11th hijackers from, among other places, facilities owned and operated by the Kingdom of Saudi Arabia and the SHC using money and resources of these defendants.

**WHEREFORE**, plaintiffs demand judgment against defendants Kingdom of Saudi Arabia and the SHC, jointly and severally, for an amount authorized by governing law to be determined at trial, together with punitive damages, pre- and post-judgment interest, and such other and further relief as the Court may deem appropriate under the circumstances.

## COUNT XIV

## 18 U.S.C. § 1962(a)-(d) – CIVIL RICO

## ON BEHALF OF ALL PLAINTIFFS

397.     Plaintiffs incorporate all previous allegations by reference.

398.     Defendants Kingdom of Saudi Arabia and the SHC constitute "persons" as such term is used in 18 U.S.C. § 1961(3).

399.     Defendants Kingdom of Saudi Arabia and the SHC, as principals, agents and co-conspirators, performed "racketeering activity" as defined in 18 U.S.C. § 1961(1) by knowingly providing material support to Osama bin Laden and al Qaeda prior to the September 11th attacks, as described above.

400.     Defendants Kingdom of Saudi Arabia and the SHC, including the agents, officials, officers, and employees of defendants Kingdom of Saudi Arabia and the SHC whose attributable conduct in support of al Qaeda is discussed above, and Osama bin Laden and al Qaeda, were associated in fact with a common purpose of spreading extremist Wahhabi doctrine and rule, including through acts of jihad, and constituted an "enterprise" as that term is defined in 18 U.S.C. § 1961(4), which enterprise was engaged in, and the activities of which affected, interstate and foreign commerce (the "RICO Enterprise").

401.     The RICO Enterprise constitutes an "enterprise" because all members thereof, including but not limited to defendants Kingdom of Saudi Arabia and the SHC, had the same goal of spreading Wahhabi doctrine and rule, including through acts of jihad, and in fact worked together to achieve that goal.

402.     Defendants Kingdom of Saudi Arabia and the SHC committed two or more of the aforesaid acts of racketeering activity within ten years of one another by continuously participating in the sponsorship of al Qaeda, and thereby committed a "pattern" of racketeering activity as defined in 18 U.S.C. § 1961(5).

403.     Defendants Kingdom of Saudi Arabia and the SHC, as principals, agents of, and co-conspirators with Osama bin Laden and al Qaeda, used and invested, both directly and indirectly, the income and the proceeds of the pattern of racketeering activity, to establish the RICO Enterprise in violation of 18 U.S.C. § 1962(a).

404.     Defendants Kingdom of Saudi Arabia and the SHC, as principals, agents of, and co-conspirators with Osama bin Laden and al Qaeda, maintained, directly and indirectly, an interest in and control of the RICO Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(b).

405.     Defendants Kingdom of Saudi Arabia and the SHC, as principals, agents of, and co-conspirators with Osama bin Laden and al Qaeda, conducted and participated, directly and indirectly, in the conduct of the affairs of the RICO Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

406.     Defendants Kingdom of Saudi Arabia and the SHC, as persons associated with the RICO Enterprise, which engaged in acts of racketeering activity which affected interstate and foreign commerce, did conspire with other persons known and unknown, to violate 18 U.S.C. § 1962(d).  It was part of the conspiracy that defendants Kingdom of Saudi Arabia and the SHC and co-conspirators devised, intended to devise, and participated in a scheme to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and material omissions.  It was a further part of the conspiracy that defendants Kingdom of Saudi Arabia and the SHC and others would and did misrepresent, conceal and hide, and cause to be misrepresented, concealed and hidden the purposes of, and acts done, in furtherance of the conspiracy.

407.     Defendants Kingdom of Saudi Arabia and the SHC violated 18 U.S.C. § 1962(a-d) by investing in, maintaining an interest in, conducting and participating, directly and indirectly, or

by conspiring to do the same, in the RICO Enterprise through a pattern of racketeering activity, that is, through multiple acts indictable under the laws of the United States, including but not limited to:

(a)    18 U.S.C. § 1341 (mail fraud);

(b)    18 U.S.C. § 1343 (wire fraud);

(c)    18 U.S.C. § 1503 (obstruction of justice);

(d)    18 U.S.C. § 1956 (money laundering);

(e)    18 U.S.C. § 2339A (material support to organizations engaged in violent activities); and

(f)    18 U.S.C. § 2339B (material support to designated foreign terrorist organizations).

408.    The damages suffered by plaintiffs and/or their insureds, as described herein, were the direct and proximate result of the aforesaid pattern of racketeering activity by defendants Kingdom of Saudi Arabia and the SHC, acting individually and in concert with one another.

409.    The loss of business and property by plaintiffs and/or their insureds included loss of tangible and intangible personal property, loss of employment, personal effects, pecuniary losses, past and future wages and profits, business opportunities, personal property, support, funeral and burial expenses, prospective inheritance, and the other economic contributions that plaintiffs' decedents would have made to plaintiffs' households, as well as loss of money and physical destruction of real property ("losses"). Such losses were a direct and proximate result of the racketeering activities of defendants Kingdom of Saudi Arabia and the SHC.

**WHEREFORE**, plaintiffs demand judgment against defendants Kingdom of Saudi Arabia and the SHC, jointly and severally, for an amount authorized by governing law to be determined at trial, together with treble damages, punitive damages, pre- and post-judgment interest, attorney's

fees, costs of this action and such other and further relief as the Court may deem appropriate under the circumstances.

## COUNT XV

## TRESPASS

## ON BEHALF OF ALL PLAINTIFFS ASSERTING CLAIMS FOR PROPERTY DAMAGE AND ECONOMIC INJURIES

410.    Plaintiffs incorporate all previous allegations by reference.

411.    The September 11th attacks constituted an intentional and unwanted trespass upon plaintiffs' real and personal property, and/or upon the real and personal property of plaintiffs' insureds, to which plaintiffs and/or their insureds did not consent.

412.    As a result of the intentional and unwanted trespass upon plaintiffs' real and personal property, and/or that of their insureds, plaintiffs incurred losses as described more fully in their operative complaints, which are incorporated herein by reference.  Those losses include, without limitation, the physical destruction of plaintiffs' real and personal property, or that of their insureds, and resulting economic losses.

413.    As set forth above, defendants Kingdom of Saudi Arabia and the SHC knowingly provided material support and resources and substantial assistance to al Qaeda over many years, with an awareness and intent to further al Qaeda's campaign to carry out terrorist attacks against the United States and its citizens on September 11, 2001.

414.    Through the tortious acts in support of al Qaeda described above, defendants Kingdom of Saudi Arabia and the SHC aided and abetted and conspired with al Qaeda in the commitment of the intentional and unwanted trespass upon plaintiffs' real and personal property, and/or that of their insureds.

415.    The funding and other forms of material support defendants Kingdom of Saudi Arabia and the SHC provided to al Qaeda, as described above, enabled al Qaeda to acquire the

global strike capabilities employed on September 11, 2001, and were essential to al Qaeda's ability to carry out the attacks.

416.    During the decade preceding the September 11th attacks, al Qaeda repeatedly made clear, through both declarations and actions, its intent to use funds and resources provided to it to conduct large scale terrorist attacks resulting in the mass destruction of property, in order to kill innocent civilians and cause catastrophic economic harm.

417.    The September 11th attacks were a direct and foreseeable result of the material support and sponsorship of al Qaeda by defendants Kingdom of Saudi Arabia and the SHC.

**WHEREFORE**, plaintiffs demand judgment against defendants Kingdom of Saudi Arabia and Saudi High Commission, jointly and severally, for an amount authorized by governing law to be determined at trial, together with treble damages, punitive damages, pre- and post-judgment interest, attorney's fees, costs of this action and such other and further relief as the Court may deem appropriate under the circumstances.

## COUNT XVI

## VIOLATIONS OF INTERNATIONAL LAW

## ON BEHALF OF ALL PLAINTIFFS

418.    Plaintiffs incorporate all previous allegations by reference.

419.    Defendants Kingdom of Saudi Arabia and the SHC are jointly and severally liable for plaintiffs' injuries under the principles of international law.

420.    It is long settled that the law of nations is part of federal common law, and that federal courts are empowered to address claims against those that commit, aid, or abet violations of international law

421.    The terrorist attacks of September 11, 2001 involved the hijacking of four airplanes. Aircraft hijacking is widely recognized as a violation of international law of the type that gives rise to liability against the hijackers and those who aided or abetted the aircraft hijacking.

422.    Through the tortious acts in support of al Qaeda described above, defendants Kingdom of Saudi Arabia and the SHC aided and abetted, and conspired with, al Qaeda in the commission of a violation of international law, aircraft hijacking, because their conduct substantially assisted al Qaeda's commission of the September 11th attacks.

423.    In addition, and in the alternative, the tortious conduct of the Kingdom of Saudi Arabia and the SHC aided and abetted the violation of the following additional conventions, agreements, U.N. declarations, resolutions, and principles of international law:

(1)     Charter of the International Military Tribunal, Aug. 8, 1945, 59 Stat. 1544, 82 U.N.T.S. 279;

(2)     Allied Control Council Law No. 10 (Dec. 20, 1945);

(3)     Convention on the Prevention and Punishment of the Crime of Genocide, Dec. 9 1948, 78 U.N.T.S. 277;

(4)     Geneva Convention (IV) Relative to the Protection of Civilian Persons in Time of War, Aug. 12, 1949, 75 U.N.T.S. 287;

(5)     Hague Convention for the Suppression of Unlawful Seizure of Aircraft (Hijacking), Dec. 16, 1970, 22 U.S.T. 1641, 860 U.N.T.S. 105;

(6)     International Convention for the Suppression of Terrorist Bombings, Dec. 15, 1997, 2149 U.N.T.S. 284 (entered into force May 23, 2001);

(7)     International Convention for the Suppression of the Financing of Terrorism, Dec. 9, 1999, 2178 U.N.T.S. 229 (entered into force Apr. 10, 2002);

(8)     U.N. Security Council Resolution 1267, U.N. Doc. S/RES/1267 (Oct. 15, 1999);

(9)     U.N. Security Council Resolution 1373, U.N. Doc. S/RES/1373 (Sept. 28, 2001);

(10)    Protocol Additional (I) to the Geneva Conventions of 12 August 1949, and Relating to the Protection of Victims of International Armed Conflict, June 8, 1977, 1125 U.N.T.S. 3;

(11)   Protocol Additional (II) to the Geneva Conventions of 12 August 1949, and Relating to the Protection of Victims of Non-International Armed Conflicts, June 8, 1977, 1125 U.N.T.S. 609;

(12)   Statute of the International Criminal Tribunal for the Former Yugoslavia (ICTY), in Report of the Secretary-General pursuant to paragraph 2 of S.C. Res.808, May 3, 1993, U.N. Doc. 8/25704, adopted unanimously by S.C. Res. 827, U.N. SCOR, 48th Sess., 3217th mtg., 16, U.N. Doc. S/PV.3217 (1993);

(13)   The Convention on the Prevention and Punishment of Crimes Against International Protected Persons, Including Diplomatic Agents, 28 U.S.T. 1975, T.I.A.S. No. 8532 (1977), implemented in 18 U.S.C. § 112l;

(14)   The General Assembly Resolutions on Measures to Prevent International Terrorism, G.A. Res. 40/61 (1985) and G.A. Res. 42/159 (1987); and

(15)   The Convention on the High Seas, April 29, 1958, arts. 14-22 (piracy), 13 U.S.T. 2312, 450 U.N.T.S. 11.

424.   Plaintiffs and/or their insureds suffered injuries by reason of the above conduct for which defendants the Kingdom of Saudi Arabia and the SHC are jointly and severally responsible.

**WHEREFORE**, plaintiffs demand judgment against defendants Kingdom of Saudi Arabia and Saudi High Commission, jointly and severally, for an amount authorized by governing law to be determined at trial, together with treble damages, punitive damages, pre- and post-judgment interest, attorney's fees, costs of this action and such other and further relief as the Court may deem appropriate under the circumstances.

**JURY DEMAND**

Plaintiff demands a trial by jury as to all claims so triable.

Dated:  March 1, 2017                    Respectfully submitted,


/s/ Stephen A. Cozen
Stephen A. Cozen, Esq.
Sean P. Carter, Esq.
Elliott R. Feldman, Esq.
J. Scott Tarbutton, Esq.
COZEN O'CONNOR
1650 Market Street
Suite 2800
Philadelphia, PA  19103
Tel: (215) 665-2000
Fax: (215) 665-2013
SCozen@cozen.com
SCarter1@cozen.com
EFeldman@cozen.com
STarbutton@cozen.com


Attorneys for *Federal Insurance*, *Vigilant Insurance*, and *Pacific Employers Insurance* Plaintiffs, Lead Counsel for the Property Damage and Commercial Plaintiffs, and Plaintiffs' Executive Committee for Commercial Claims


/s/ Jodi Westbrook Flowers
Jodi Westbrook Flowers, Esq.
Donald A. Migliori, Esq.
Michael Elsner, Esq.
Robert T. Haefele, Esq.
John Eubanks, Esq.
MOTLEY RICE LLC
Mount Pleasant, SC 29464
Tel: (843) 216-9000
Fax: (843) 216-9450
jflowers@motleyrice.com
dmigliori@motleyrice.com
melsner@motleyrice.com
rhaefele@motleyrice.com
jeubanks@motleyrice.com

101

Attorneys for *Burnett* and *Euro Brokers* Plaintiffs,
Co-Lead Counsel for Personal Injury and Wrongful
Death, and Plaintiffs' Executive Committee for
Personal Injury and Wrongful Death


/s/ Jerry S. Goldman
Jerry S. Goldman, Esq.
Bruce Strong, Esq.
Nicholas R. Maxwell, Esq.
ANDERSON KILL, P.C.
1251 Avenue of the Americas
New York, NY  10020
Tel: (212) 278-1000
Fax: (212) 278-1733
jgoldman@andersonkill.com
Bstrong@andersonkill.com
Nmaxwell@andersonkill.com


Attorneys for *O'Neill* Plaintiffs and the *O'Neill*
Class Action, and Plaintiffs' Executive Committee
for Personal Injury and Wrongful Death


/s/ Paul Hanly
Paul Hanly, Esq.
Jayne Conroy, Esq.
Andrea Bierstein, Esq.
SIMMONS HANLY CONROY
112 Madison Avenue
7th Floor
New York, NY 10016
Tel: (212) 784-6400
Fax: (212) 213-5949
phanly@simmonsfirm.com
jconroy@simmonsfirm.com
abierstein@simmonsfirm.com


Attorneys for *Burnett* and *Euro Brokers* Plaintiffs
and Plaintiffs' Executive Committee for Personal
Injury and Wrongful Death

/s/ Allan Gerson
Allan Gerson, Esq.
AG INTERNATIONAL LAW, PLLC
2131 S Street NW
Washington, DC 20008
Tel: (202) 234-9717
Fax: (202) 234-9727
AG@AG-IL.com

Attorneys for *Burnett* Plaintiffs and Plaintiffs'
Executive Committee for Personal Injury and
Wrongful Death


/s/ Richard D. Hailey
Richard D. Hailey, Esq.
RAMEY & HAILEY
9333 North Meridian Street, Suite 105
Indianapolis, IN 46240
Tel: (317) 582-0000
Fax: (317) 582-0080
rich@rameyandhaileylaw.com

Attorneys for *Havlish* Plaintiffs and Plaintiffs'
Executive Committee for Personal Injury and
Wrongful Death


/s/ Dennis G. Pantazis
Dennis G. Pantazis, Esq.
WIGGINS CHILDS PANTAZIS FISHER
GOLDFARB LLC
The Kress Building
301 Nineteenth Street North
Birmingham, AL 35203
Tel: (205) 314-0531
Fax: (205) 314-0731
dgp@wigginschilds.com

Attorneys for *Havlish* Plaintiffs and Plaintiffs'
Executive Committee for Personal Injury and
Wrongful Death

/s/ Christopher T. Leonardo
Christopher T. Leonardo, Esq.
ADAMS HOLCOMB LLP
1001 Pennsylvania Ave., N.W.
Suite 740-South
Washington, D.C.  20004
Tel: (202) 580-8803
Fax: (202) 580-8821
leonardo@adamsholcomb.com

Attorneys for *Cantor Fitzgerald* Plaintiffs


/s/ Robert M. Kaplan
Robert M. Kaplan, Esq.
FERBER CHAN ESSNER & COLLER, LLP
One Grand Central Place
Suite 2050
New York, NY 10165
Tel: (212) 944-2200
Fax: (212) 944-7630
rkaplan@ferberchan.com

Attorneys for *Continental Casualty* Plaintiffs

LEGAL\29559564\1