# Appendix 2A

DAC-00411-03

# Congress of the United States
Washington, D.C.

January 29, 2003

The Honorable George J. Tenet
Director of Central Intelligence
Washington, DC 20505

Dear Director Tenet:

As you know, the final report of the Joint Inquiry into the events of September 11 has been submitted to the Intelligence Community for declassification review. We look forward to early release of the public report so that efforts at reforms can be accelerated.

Having been privileged to lead this bipartisan, bicameral investigation last year, we are committed to working in the current Congress to help secure implementation of its recommendations. In furtherance of that goal, we are writing to the President and heads of departments and agencies about portions of the Joint Inquiry's recommendations that may be of particular concern to them.

Our first recommendation calls for establishment of a Director of National Intelligence, or DNI, who in addition to being the President's principal intelligence adviser "shall have the full range of management, budgetary and personnel responsibilities needed to make the U.S. Intelligence Community operate as a coherent whole." To help promote both strong leadership of the entire Intelligence Community leadership and an effective CIA, the Joint Inquiry also recommended that Congress provide that the DNI not simultaneously serve as director of the CIA or any other agency. In considering this recommendation, the Congress will certainly, we believe, benefit from learning of your views about the strengthening of the role of head of the Intelligence Community.

A number of the recommendations that follow address proposed tasks of the Director of National Intelligence, but as that reform will require study and deliberation, for the immediate future those further recommendations are directed to the Director of Central Intelligence as the present statutory head of the Intelligence Community.

The Joint Inquiry found that prior to September 11 neither the U.S. Government as a whole nor the Intelligence Community had a comprehensive counterterrorist strategy. One of our recommendations calls on the National Security Council, in conjunction with key agency and department heads, to prepare such a strategy for the President's approval. The recommendation states that the strategy should be

The Honorable George J. Tenet
January 29, 2003
Page 2

"government wide," apply both "home and abroad," and include "the growing terrorism threat posed by the proliferation of weapons of mass destruction and associated technologies." The recommendation asks that this strategy identify and fully engage the Intelligence as well as foreign policy, economic, military and law enforcement elements that are "critical to a comprehensive blueprint for success in the war against terrorism." The Director of Central Intelligence's full participation in this overall process will be essential, as will the DCI's development of the Intelligence Community component of the full strategy. The Joint Inquiry recommended that the Intelligence Community's component of the overall strategy include a number of important items, among them development of human sources to penetrate terrorist organizations and networks.

To provide to the Congress and Executive Branch policymakers intelligence estimates on terrorism, the Joint Inquiry has recommended establishment on the National Intelligence Council of the position of National Intelligence Officer for Terrorism. The recommendation suggests that the person holding this position also assist the Intelligence Community in developing a program for strategic analysis.

Another recommendation addresses the need for Congress and the Administration to ensure development within the Department of Homeland Security of an effective all-source terrorism information fusion center, as mandated by the Homeland Security Act of 2002. The success of that fusion center will depend, as the recommendation states, on the center's "full and timely access to all counterterrorism-related intelligence information, including 'raw' supporting data as needed." Your action to ensure full cooperation between the entire Intelligence Community (including, of course, the CIA) and the Department of Homeland Security will be fundamental to the success of this vital reform. We applaud the President's announcement of the establishment of a new Terrorist Threat Integration Center, which we understand will be located under the Director of Central Intelligence. The important challenge, we believe, is to assure the full and harmonious implementation of both the information fusion requirement of the Homeland Security Act and the center that the President announced.

The recommendations include a list of significant reforms that the Intelligence Committees believe are essential for strengthening the FBI's domestic intelligence capability. In regard to these critically needed reforms, the Joint Inquiry has recommended that Congress should direct that the head of the Intelligence Community, together with the Attorney General and the Secretary of Homeland Security, should report to Congress on the FBI's progress. The report should include "the specific manner in which a new domestic intelligence service could be established in the United

The Honorable George J. Tenet
January 29, 2003
Page 3

States, recognizing the need to enhance national security while fully protecting civil liberties."

The Committees expressed their strong conviction that "the Intelligence Community's employees remain its greatest resource." They recommend that the head of the Intelligence Community "should require that measures be implemented to greatly enhance the recruitment and development of a workforce with the intelligence skills and expertise needed for success in counterterrorist efforts." Several particular actions are set forth in the recommendation. One is that Intelligence Community agencies should expand and improve counterterrorism training, including about information sharing among law enforcement and intelligence personnel, the use of the Foreign Intelligence Surveillance Act, and watchlisting. The recommendation includes steps to improve Intelligence Community language capabilities and the utilization of the skills and experience of retired personnel. It calls on the Intelligence Community to "enhance recruitment of a more ethnically and culturally diverse workforce."

A further personnel recommendation proposes, in part, that Congress enact legislation, modeled on the landmark Goldwater-Nichols Department of Defense Reorganization Act of 1986, to help instill the concept of "jointness" throughout the Intelligence Community and ensure that its components will work more closely together than has been the case. The mechanisms identified in the recommendation include such things as joint tours for intelligence and law enforcement personnel as well as incentives for joint service throughout the Intelligence Community. In developing these ideas, Congress would benefit from the Administration's detailed proposals.

The Joint Inquiry identified several important objectives concerning classified information, including expanding access by federal agencies outside the Intelligence Community, by state and local authorities, and by the American public. To this end, we recommended that the Director of Central Intelligence, in consultation with the heads of key components of the Intelligence Community, including the Attorney General, should report to the Intelligence Committees on "proposals for a new and more realistic approach to the processes and structures that have governed the designation of sensitive and classified information." The report should also address "proposals to protect against the use of the classification process as a shield to protect agency self-interest."

The Congress and the Nation as a whole will be grateful for your attention and response to these and other matters identified in the course of the Joint Inquiry. Further, we are confident that the Congress will benefit from other recommendations

The Honorable George J. Tenet
January 29, 2003
Page 4

that you might have for legislative or administrative action to improve the Nation's counterterrorist capabilities.

Sincerely,

Bob Graham
Chairman, Senate Intelligence
Committee, 107th Congress

Porter Goss
Chairman, House Intelligence
Committee, 107th and 108th
Congresses

Richard Shelby
Vice Chairman, Senate Intelligence
Committee, 107th Congress

Nancy Pelosi
Ranking Minority Member, House
Intelligence Committee, 107th Congress
and Member ex officio (as Minority
Leader), 108th Congress

Enclosure: As stated

S. REPT. No. 107-    107TH CONGRESS, 2D SESSION    H. REPT. No. 107-

# JOINT INQUIRY INTO INTELLIGENCE COMMUNITY ACTIVITIES BEFORE AND AFTER THE TERRORIST ATTACKS OF SEPTEMBER 11, 2001

## REPORT

OF THE

### U.S. SENATE SELECT COMMITTEE ON INTELLIGENCE

AND

### U.S. HOUSE PERMANENT SELECT COMMITTEE ON INTELLIGENCE

TOGETHER WITH ADDITIONAL VIEWS

DECEMBER 2002

TOP SECRET//HCS/NF

## PART FOUR—FINDING, DISCUSSION AND NARRATIVE REGARDING CERTAIN SENSITIVE NATIONAL SECURITY MATTERS

20. <u>Finding</u>: While in the United States, some of the September 11 hijackers were in contact with, and received support or assistance from, individuals who may be connected to the Saudi Government. There is information, primarily from FBI sources, that at least two of those individuals were alleged by some to be Saudi intelligence officers. The Joint Inquiry's review confirmed that the Intelligence Community also has information, much of which has yet to be independently verified, indicating that individuals associated with the Saudi Government in the United States may have other ties to al-Qa'ida and other terrorist groups. The FBI and CIA have informed the Joint Inquiry that, since the September 11 attacks, they are treating the Saudi issue seriously, but both still have only a limited understanding of the Saudi Government's ties to terrorist elements. In their testimony, neither CIA nor FBI witnesses were able to identify definitively the extent of Saudi support for terrorist activity globally or within the United States and the extent to which such support, if it exists, is knowing or inadvertent in nature. The FBI's Washington Field Office created a squad devoted to ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. Only recently, and at least in part due to the Joint Inquiry's focus on this issue, did the FBI and CIA establish a working group to address the Saudi issue. In the view of the Joint Inquiry, this gap in U.S. intelligence coverage is unacceptable, given the magnitude and immediacy of the potential risk to U.S. national security. The Intelligence Community needs to address this area of concern as aggressively and as quickly as possible.

<u>Discussion:</u> One reason for the limited understanding is that it was only after September 11 that the U.S. Government began to aggressively investigate this issue. Prior to September 11th, the FBI apparently did not focus investigative resources on ▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇ Saudi nationals in the United States due to Saudi Arabia's status as an American "ally." A representative of the FBI ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ testified that, prior to

415

TOP SECRET ████████ ████NF

September 11, 2001, the FBI received "no reporting from any member of the Intelligence Community" that there was a ████████ presence in the United States.

According to various FBI documents and at least one CIA memorandum, some of the September 11 hijackers, while in the United States, apparently had contacts with individuals who may be connected to the Saudi Government. While the Joint Inquiry uncovered this material during the course of its review of FBI and CIA documents, it did not attempt to investigate and assess the accuracy and significance of this information independently, recognizing that such a task would be beyond the scope of this Joint Inquiry. Instead, the Joint Inquiry referred a detailed compilation of information uncovered by the Inquiry in documents and interviews to the FBI and CIA for further investigation by the Intelligence Community and, if appropriate, law enforcement agencies. A brief summary of the available information regarding some of these individuals is illustrative for purposes of this report:

- Omar al-Bayoumi. The FBI has received numerous reports from individuals in the Muslim community, dating back to 1999, alleging that al-Bayoumi may be a Saudi intelligence officer. FBI files suggest that al-Bayoumi provided substantial assistance to hijackers Khalid al-Mihdhar and Nawaf al-Hazmi after they arrived in San Diego in February 2000. Al-Bayoumi met the hijackers at a public place shortly after his meeting with an individual at the Saudi consulate and there are indications in the files that his encounter with the hijackers may not have been accidental. During this same timeframe, al-Bayoumi had extensive contact with Saudi Government establishments in the United States and received financial support from a Saudi company affiliated with the Saudi Ministry of Defense. According to FBI files, ████████ at the company said that al-Bayoumi received a monthly salary even though he had been there on only one occasion. This support increased substantially in April 2000, two months after the hijackers arrived in San Diego, decreased slightly in December 2000, and stayed at that same level until August 2001. That company reportedly had ties to Usama Bin Ladin and al-Qa'ida. In addition, the FBI determined that al-Bayoumi was in contact with several individuals under FBI investigation and with the Holy Land Foundation, which has been under investigation as a fundraising front for Hamas;

TOP SECRET

- Osama Bassnan. Bassnan may have been in contact with al-Mihdhar and al-Hazmi during their time in San Diego. Bassnan was a close associate of al-Bayoumi and Omar Bakarbashat, another one of the hijackers' close associates. He also lived across the street from the hijackers, and made a comment to an FBI asset that he did more than al-Bayoumi did for the hijackers. According to an FBI document, Basnan told another individual that he met al-Hazmi through al-Bayoumi and later that he met two of the hijackers through al-Bayoumi. He also told the asset that al-Bayoumi was arrested because he knew al-Hazmi and al-Mihdhar very well. The document goes on to state that Bassnan and al-Bayoumi have been "close to each other for a long time." Bassnan has many ties to the Saudi Government, including past employment by the Saudi Arabian Education Mission, referred to in FBI documents as ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. The FBI also received reports from individuals in the Muslim community alleging that Bassnan might be a Saudi intelligence officer. According to a CIA memo, Bassnan reportedly received funding and possibly a fake passport from Saudi Government officials. He and his wife have received financial support from the Saudi Ambassador to the United States and his wife. A CIA report also indicates that Bassnan traveled to Houston in 2002 and met with an individual who was ▮▮▮▮▮▮▮▮▮▮▮▮▮▮. The report states that during that trip a member of the Saudi Royal Family provided Bassnan with a significant amount of cash. FBI information indicates that Bassnan is an extremist and supporter of Usama Bin Ladin, and has been connected to the Eritrean Islamic Jihad and the Blind Shaykh;

- Shaykh al-Thumairy. According to FBI documents and a CIA memorandum, al-Hazmi and al-Mihdhar may have been in contact with Shaykh al-Thumairy, an accredited diplomat at the Saudi Consulate in Los Angeles and one of the "imams" at the King Fahad mosque in Culver City, California. Also according to FBI documents, the mosque was built in 1998 from funding provided by Saudi Arabia's Crown Prince Abdulaziz. The mosque is reportedly attended by members of the Saudi Consulate in Los Angeles and is widely recognized for its anti-Western views;



TOP SECRET                                         417

TOP SECRET//HCS//

- Saleh al-Hussayen. In September 2001, Saleh al-Hussayen, reportedly a Saudi Interior Ministry official, stayed at the same hotel in Herndon, Virginia where al-Hazmi was staying. While al-Hussayen claimed after September 11 not to know the hijackers, FBI agents believed he was being deceptive. He was able to depart the United States despite FBI efforts to locate and re-interview him; and

- Abdullah Bin Ladin. Abdullah Bin Ladin claims to work for the Saudi Embassy in Washington, D.C. as an administrative officer. He is identified by the FBI as Usama Bin Ladin's half brother. He is a close friend of Mohammed Quadir-Harunani, a possible associate of Mohammed Atta and Marwan al-Shehhi prior to September 11, 2001.

The Joint Inquiry also found other indications that individuals connected to the Saudi Government have ties to terrorist networks, including:

- The CIA and FBI have identified the Ibn Tamiyah Mosque in Culver City as a site of extremist-related activity. Several subjects of FBI investigations prior to September 11 had close connections to the mosque and are believed to have laundered money through this mosque to non-profit organizations overseas affiliated with Usama Bin Ladin. In an interview, an FBI agent said he believed that Saudi Government money was being laundered through the mosque;

- Another Saudi national with close ties to the Saudi Royal Family, ███████, is the subject of FBI counterterrorism investigations and reportedly was checking security at the United States' southwest border in 1999 and discussing the possibility of infiltrating individuals into the United States;

- According to FBI documents, several of the phone numbers found in the phone book of Abu Zubaida, a senior al-Qa'ida operative captured in Pakistan in March 2002, could be linked, at least indirectly, to telephone numbers in the United States. One of those U.S. numbers is subscribed to by the ASPCOL Corporation, which is located in Aspen,



TOP SECRET//HCS//    418

TOP SECRET                                                                    HCS/NF

Colorado, and manages the affairs of the Colorado residence of the Saudi Ambassador Bandar. The FBI noted that ASPCOL has an unlisted telephone number. A November 18, 2002 FBI response to the Joint Inquiry states that "CIA traces have revealed no direct links between numbers found in Zubaida's phone book and numbers in the United States."

- According to an FBI document, the telephone number of a bodyguard at the Saudi Embassy in Washington, DC, who some have alleged may be a [REDACTED] was also found in Abu Zubaida's possessions; and

- According to an FBI agent in Phoenix, the FBI suspects Mohammed al-Qudhaeein of being [REDACTED]. Al-Qudhaeein was involved in a 1999 incident aboard an America West flight, which the FBI's Phoenix office now suspects may have been a "dry run" to test airline security. During the flight, al-Qudhaeein and his associate asked the flight attendants a variety of suspicious questions; al-Qudhaeein then attempted to enter the cockpit on two occasions. Al-Qudhaeein and his associate were flying to Washington, D.C. to attend a party at the Saudi Embassy, and both claimed that their tickets were paid for by the Saudi Embassy. During the course of its investigations, the FBI has discovered that both al-Qudhaeein and the other individual involved in this incident had connections to terrorism.

Finally, the Committees are particularly concerned about the serious nature of allegations contained in a CIA memorandum found by the Joint Inquiry Staff in the files of the FBI's San Diego Field Office. That memorandum, which discusses alleged financial connections between the September 11 hijackers, Saudi Government officials, and members of the Saudi Royal Family, was drafted by a CIA officer [REDACTED], relying primarily on information from FBI files. The CIA officer sent it to the CTC to determine whether CIA had additional information. He also provided a copy to the FBI agent responsible for the investigation of one of the individuals discussed in the memorandum. Despite the clear national implications of the CIA memorandum, the FBI agent included the memorandum in an individual case file and did not forward it to FBI Headquarters. FBI Headquarters, therefore, was unaware

TOP SECRET                                                HCS/NF            419

TOP SECRET ████████ ████████

of statements in the memorandum until the Joint Inquiry brought the memorandum's implications to the Bureau's attention. ████████
████████

### Possible Saudi Government Connections to Terrorists and Terrorist Groups

While in the United States, some of the September 11 hijackers were in contact with, and received support or assistance from, individuals who may be connected to the Saudi Government. There is information, from FBI sources, that at least two of those individuals were alleged to be Saudi intelligence officers. The Joint Inquiry's review confirmed that the Intelligence Community also has information, much of which remains speculative and yet to be independently verified, indicating that Saudi Government officials in the United States may have other ties to al-Qa'ida and other terrorist groups.

The Committees are particularly concerned about the serious nature of allegations contained in a CIA memorandum found within the files of the FBI's San Diego Field Office. That memorandum, which discusses alleged financial connections between the September 11 hijackers, Saudi Government officials, and members of the Saudi Royal Family, was drafted by a CIA officer ████████, relying primarily on information from FBI files.

In their testimony before the Joint Inquiry, neither the CIA nor the FBI was able to definitively identify for these Committees the extent of Saudi support for terrorist activity globally or within the United States and the extent to which such support, if it exists, is intentional or innocent in nature. Both the FBI and CIA have indicated to the Committees that they are now aggressively pursuing Saudi-related terrorism issues.

Prior to September 11th, the FBI apparently did not focus investigative ████
████████████████████████████████ Saudi nationals in the United States due to Saudi Arabia's status as an American "ally". ████████
████████████████████████
████████. A representative of the FBI's ████████████ testified in closed

TOP SECRET

hearings that, prior to September 11th, the FBI received "no reporting from any member of the Intelligence Community" that there is a ▇▇▇▇▇▇▇ presence in the United States.

It should be clear that this Joint Inquiry has made no final determinations as to the reliability or sufficiency of the information regarding these issues that we found contained in FBI and CIA documents. It was not the task of this Joint Inquiry to conduct the kind of extensive investigation that would be required to determined the true significance of any such alleged connections to the Saudi Government. On the one hand, it is possible that these kinds of connections could suggest, as indicated in a ▇▇▇▇▇▇▇ dated July 2, 2002, "incontrovertible evidence that there is support for these terrorists within the Saudi Government." On the other hand, it is also possible that further investigation of these allegations could reveal legitimate, and innocent, explanations for these associations.

Given the serious national security implications of this information, however, the leadership of the Joint Inquiry is referring the staff's compilation of relevant information to both the FBI and the CIA for investigative review and appropriate investigative and intelligence action.

Possible Connections Between the September 11 Hijackers and Saudi Government Officials in the United States

In reviewing FBI documents and the CIA memorandum, the Joint Inquiry Staff has examined information suggesting that:

- One individual who provided assistance to Nawaf al-Hazmi and Khalid al-Mihdhar may be connected to the Saudi Government. A second individual who may have been in contact with al-Hazmi and Al-Mihdhar also has ties to the Saudi Government, including connections to the Saudi Ambassador to the United States. There is reporting in FBI files that persons have alleged that both of these individuals may be Saudi intelligence officers;



TOP SECRET ▓▓▓▓ ▓▓▓▓

- The September 11 hijackers may have been in contact with other Saudi Government officials in the United States prior to the September 11 attacks; and

- Saudi Government officials in the United States may have ties to Usama Bin Ladin's terrorist network.

Omar al-Bayoumi and Osama Bassnan

Two individuals known to the FBI prior to September 11, 2001 – Omar al-Bayoumi and Osama Bassnan – may have provided assistance or support to al-Hazmi and al-Mihdhar while the two hijackers-to-be were living in San Diego. While the documentary evidence that al-Bayoumi provided assistance to al-Hazmi and al-Mihdhar is solid, the files contain only limited evidence that Osama Bassnan had contacts with the two individuals.

When al-Hazmi and al-Mihdhar moved to San Diego, al-Bayoumi provided them with considerable assistance. Before the hijackers moved in with the long-time FBI informant, they stayed at al-Bayoumi's apartment for several days until al-Bayoumi was able to find them an apartment. Al-Bayoumi then co-signed their lease and may have paid their first month's rent and security deposit.[1] After al-Hazmi and al-Mihdhar moved into their own apartment, al-Bayoumi threw a party to welcome them to the San Diego community. He also tasked Modhar Abdullah, another individual from the Islamic Center of San Diego (ICSD), to help them get acclimated to the United States. Abdullah served as their translator, helped them get drivers' licenses, and assisted them in locating flight schools. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓

---

[1] The FBI notes, in its November 18, 2002 response that "financial records indicate a cash deposit of the same amount as the cashier's check into al-Bayoumi's bank account on the same day, which suggests that the hijackers reimbursed him." FBI November 18 Response, 3. However, another FBI document, dated October 14, 2002, appears to reach a slightly different conclusion. This document states that "a review of Khalid Al-Mihdhar and Nawaf Al-Hazmi's bank records indicate there is no bank documentation that supports the reimbursement of [the rent money], or any monies to Omar Al-Bayoumi from al-Hazmi or Al-Midhar."

TOP SECRET//HCS/NF

During the post-September 11 investigation, the FBI discovered that al-Bayoumi had far more extensive ties to the Saudi Government than previously realized. In fact, according to an October 14, 2002 FBI document, al-Bayoumi has "extensive ties to the Saudi Government." The connections identified by the FBI are:

- Al-Bayoumi had been an accountant at the Saudi Civil Aviation Administration from 1976 to 1993, when he relocated to the United States;

- According to the FBI, al-Bayoumi was in frequent contact with the Emir at the Saudi Ministry of Defense, responsible for air traffic control;

- The FBI has also located records, indicating that al-Bayoumi received $20,000 from the Saudi Ministry of Finance at one point;

- When al-Bayoumi applied to schools in the United States in 1998, he had a letter from the Saudi Embassy, which stated that he was getting a full scholarship from the Government of Saudi Arabia; and

- While in San Diego, al-Bayoumi was receiving money from the Saudi Ministry of Defense through a Saudi company called "Ercan." ▆▆▆▆ of that company informed the FBI after September 11, 2001 that, although al-Bayoumi only showed up at the company on one occasion, he received a monthly salary and allowances. ▆▆▆▆ stated that, at first, he attempted to refuse to pay al-Bayoumi a monthly salary, but he was told that his company would lose their contract if he did not pay him. ▆▆▆▆ informed the FBI that at the time, he attributed this to Saudi corruption.

Al-Bayoumi also had frequent contact with Saudi establishments in the United States. In a review of telephone toll records, the FBI learned that al-Bayoumi called Saudi Government establishments in the United States almost 100 times between January and May of 2000. According to the FBI, al-Bayoumi was in contact with at least three individuals at the Saudi

TOP SECRET//HCS/NF                          423

Embassy in Washington, DC; two individuals at the Saudi Arabian Cultural Mission in Washington, DC; and three individuals at the Saudi Consulate in Los Angeles. In a search of Bayoumi's [REDACTED], they also discovered that he had the phone number for an individual at the Saudi Consulate in London.

Two former San Diego agents addressed the issue of whether al-Bayoumi was an intelligence officer at the October 9, 2002 closed hearing. The former case agent who handled Muppet testified:

> [Al-Bayoumi] acted like a Saudi intelligence officer, in my opinion. And if he was involved with the hijackers, which it looks like he was, if he signed leases, if he provided some sort of financing or payment of some sort, then I would say that there's a clear possibility that there might be a connection between Saudi intelligence and UBL.

A former Assistant Special Agent in Charge in San Diego testified that the FBI received "numerous, I would say half a dozen" reports from individuals who believed that al-Bayoumi was a Saudi intelligence officer. The FBI's November 18th response is inconsistent as to whether the FBI currently is designating al-Bayoumi as a suspected Saudi intelligence officer. In its response, the FBI notes that al-Bayoumi [REDACTED] until after September 11th, but the response also states that "there is no evidence" to conclude that al-Bayoumi is a Saudi intelligence officer.

The FBI had received reporting from a reliable source well prior to September 11, 2001 indicating that al-Bayoumi might be a Saudi intelligence officer. Al-Bayoumi was known to have access to large amounts of money from Saudi Arabia, despite the fact that he did not appear to hold a job. On one occasion prior to September 11, the FBI received information that al-Bayoumi had received $400,000 from Saudi Arabia to help fund a new mosque in San Diego. The FBI conducted a counterterrorism investigation on al-Bayoumi in 1998 and 1999, but closed the investigation at that point.

TOP SECRET█████████████████████

Since September 11, 2001 FBI investigation revealed that al-Bayoumi has some ties to terrorist elements. Pasquale J. D'Amuro, the Executive Assistant Director for Counterterrorism and Counterintelligence testified in the October 9, 2002 hearing that

> [w]e've been talking with the ████ Government about collection on an individual named ████ who has ties to al-Qa'ida, who has ties to Bayoumi.

In addition, the FBI reported the results of their search of al-Bayoumi's ████ that, "after an exhaustive translations of Bayoumi's documents, it is clear that in Bayoumi's correspondence he is providing guidance to young Muslims and some of his writings can be interpreted as jihadist."

According to information acquired by the FBI after September 11, 2001, al-Bayoumi also noted on one of his school applications that he worked for a company called "Dallah/Avco." According to the FBI, Ercan is a San Diego subcontractor of Dallah/Avco. According to a separate ██ document, Dallah and Avco are under the same umbrella company, Avco Dallah Trans Arab, which is a subsidiary of Al Barakaat Investment and Development Company. Avco Dallah reportedly holds the contracts for cleaning and maintenance at the three major airports in Saudi Arabia. The ██ document states that ███████████████████████ the company has links to Usama Bin Ladin. FBI Headquarters was informed of the affiliation between Dallah/Avco and Al Barakaat in February 2001, but the San Diego Field Office apparently never got this information.

According to FBI documents, al-Bayoumi's pay increased during the time that al-Hazmi and al-Mihdhar were in the United States. According to a recent ██ analysis of ties between the terrorist attacks and elements of the Saudi Government, before al-Hazmi and al-Mihdhar arrived in the U.S., al-Bayoumi generally received approximately $465 per month in "allowances." According to the ██ document, in March 2000, a month after al-Hazmi and al-Mihdhar arrived in San Diego, his "allowances" jumped to over $3700 a month and stayed constant until December 2000, when al-Hazmi left San Diego. Al-Bayoumi's allowances were then decreased to approximately $3,200 a month and stayed at that rate until al-Bayoumi left the United States in August 2001, approximately one month before the September 11th attacks.

~~TOP SECRET~~

The ▮▮▮ memorandum dated July 2, 2002, incorrectly noted that al-Bayoumi's wife, while living in San Diego, was receiving $1200 a month from Princess Haifa Bint Sultan, the wife of Prince Bandar, the Saudi Ambassador to the United States. The FBI has now confirmed that only Osama Bassnan's wife received money directly from Prince Bandar's wife, but that al-Bayoumi's wife attempted to deposit three of the checks from Prince Bandar's wife, which were payable to Bassnan's wife, into her own accounts.

The Joint Inquiry also found, in FBI files, information suggesting that Osama Bassnan may have also been in contact with al-Mihdhar and al-Hazmi, including:

- Bassnan was a very close associate of Omar al-Bayoumi's and was in telephone contact with al-Bayoumi several times a day while they were both in San Diego. Bassnan also has close ties to a number of other individuals connected to the hijackers, including Omar Bakarbashat, discussed below, who is referred to in FBI documents as Bassnan's brother-in-law;

- According to an October 16, 2001 FBI document, Bassnan informed an asset that he had met Nawaf al-Hazmi through al-Bayoumi. He went on to say that he met two of the nineteen hijackers through Omar al-Bayoumi. According to the FBI document, he also told the asset that al-Bayoumi was arrested because he knew al-Hazmi and al-Mihdhar very well. The document goes on to state that Bassnan and al-Bayoumi have been "close to each other for a long time."

- Bassnan lived in the apartment complex in San Diego across the street from al-Hazmi and al-Mihdhar;

- Bassnan made a comment to an FBI source after the September 11 attacks suggesting that he did more for the hijackers than al-Bayoumi did;