# Exhibit A

```
                   UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF NEW YORK

In re:                            :
                                     Docket #03md1570
          TERRORIST ATTACKS ON    : 1:03-md-01570-GBD-FM
            SEPTEMBER 11, 2001
                                  : New York, New York
                                    July 8, 2016
------------------------------------:


                     PROCEEDINGS BEFORE
                 THE HONORABLE FRANK MAAS
        UNITED STATES DISTRICT COURT MAGISTRATE JUDGE



APPEARANCES:

For Plaintiffs:          MOTLEY RICE LLC
                         BY:  ROBERT HAEFELE, ESQ.
                         28 Bridgeside Boulevard
                         PO Box 1792
                         Mount Pleasant, South Carolina 29464

                         ANDERSON KILL PC
                         BY:  JERRY GOLDMAN, ESQ.
                         1251 Avenue of the Americas
                         New York, New York  10020

For Defendant            BERNABIE AND KATZ PLLC
  Al Haramain:           BY:  ALAN KABAT, ESQ.
                         1773 T Street, NW
                         Washington, DC  20009

For Defendant Yassin     SALERNO & ROTHSTEIN
  Abdullah Al Kadi:      BY:  PETER SALERNO, ESQ.
                         221 Schultz Hill Road
                         Pine Plains, New York 12567




Transcription Service: Carole Ludwig, Transcription Services
                       141 East Third Street #3E
                       New York, New York 10009
                       Phone:  (212) 420-0771
                       Fax:  (212) 420-6007

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.
```

2

<u>INDEX</u>

<u>E X A M I N A T I O N S</u>

| <u>Witness</u> | <u>Direct</u> | <u>Cross</u> | <u>Re-<br>Direct</u> | <u>Re-<br>Cross</u> | <u>Court</u> |
|---|---|---|---|---|---|

None

<u>E X H I B I T S</u>

| <u>Exhibit<br>Number</u> | <u>Description</u> | <u>ID</u> | <u>In</u> | <u>Voir<br>Dire</u> |
|---|---|---|---|---|

None

1

```
 1                                                        3
 2            THE CLERK:  This matter is on for a discovery
 3   conference, in re: Terrorist Attacks on September 11, 2001,
 4   counsel please state your name for the record.
 5            MR. ALAN KABAT:  Alan Kabat for Al Haramain.
 6            MR. ROBERT HAEFELE:  Good afternoon, Your Honor,
 7   Robert Haefele from Motley Rice for the plaintiffs.
 8            MR. JERRY GOLDMAN:  Good afternoon, Your Honor,
 9   Jerry Goldman for the plaintiffs.
10            THE COURT:  Good afternoon.  Just give me a second
11   here.  Why don't we start with the application that relates
12   to Mr. Seda Ghaty who I guess it's easier to call Mr. Seda.
13            MR. HAEFELE:  Thank you, Your Honor.  Plaintiffs
14   filed a motion to compel and a motion for sanctions
15   regarding Mr. Seda Ghaty and it's essentially a fairly
16   simple Rule 37 motion I think, Your Honor.  Plaintiffs'
17   position is that primarily that Mr. Seda Ghaty has,
18   throughout the course of this litigation, willfully chosen
19   not to defend himself in the litigation.  Initially he took
20   the position that he wasn't going to respond to discovery
21   based on his Fifth Amendment right, and he was told by this
22   Court, Your Honor, as well as the District Court Judge, as
23   well as the Second Circuit on two occasions that he could
24   not assert his Fifth Amendment right without running the
25   risk of exactly what we're here for today, Your Honor.  He
```

4

1

2  made that election and even after he received those orders

3  from the Courts, he continued to elect to not respond to

4  discovery, and here we are several years after the discovery

5  obligations have supposedly to have been completed.  I think

6  it was December of the year before last, December of '14

7  when the rolling production was done and still yet we have

8  nothing from Mr. Seda Ghaty.

9         I think one of his positions is that he wants to

10 rely on productions from other defendants but I think Your

11 Honor has already addressed that in the course of discovery

12 motions related to other defendants that he can't just rely

13 on other defendants' productions and he is obligated to

14 respond to discovery on his own.

15        I guess the only other point, Your Honor, that I

16 would make, is that he had in the course of his, and I'm not

17 sure that it even matters because Your Honor has already

18 ruled on the fact that the Fifth Amendment privilege doesn't

19 apply, but he has indicated that he's relied on that because

20 of the threat of incrimination related to criminal

21 proceedings that have long been dismissed, and the fact that

22 there are not criminal proceedings pending and there is no

23 likelihood of incrimination, there is absolutely no way that

24 the Fifth Amendment, even if it had applied before, could

25 continue to apply now.

5

1

2          The other point we make, Your Honor, that we made

3   in the briefing was that even if he had a Fifth Amendment

4   that did apply, he'd waive that, Your Honor, when he put

5   himself in the Rule 26 disclosures as a witness that he

6   intended to rely upon at trial, and indicated that he would

7   produce documents for trial to defend himself, and I think

8   that, Your Honor, indicates that he can't use the Fifth

9   Amendment both as a shield and as a sword. So to the extent

10  that he tried to do that, he's waived any protection that he

11  had.

12          Your Honor, we've taken the position that as a

13  result of that, there's a series of sanctions that we ask

14  having posed.  The first one that we outline, Your Honor, is

15  a conditional default that would give him a period of time

16  to come into compliance, perhaps two weeks or thirty days to

17  come into and that would avoid the default, but, if not,

18  then the default would activate.  Alternatively or in

19  addition, we've asked for an order of preclusion that would

20  prevent him from, since he's taken the position that he

21  doesn't want to talk, then sticking to it and he can't talk

22  when it comes time to trial to defend himself, and/or

23  adverse inferences. And lastly, regardless of the other

24  sanctions, imposing costs.  And I know Your Honor probably

25  doesn't want to go through another one of those, but that's

```
 1                                                    6
 2  --
 3           THE COURT:  Not my favorite activity, you're
 4  correct.
 5           MR. HAEFELE:  But that is where we are, Your
 6  Honor. I think we've met the requirements for the sanctions
 7  that we've asked to be imposed, and those are outlined in
 8  the papers, I don't think Your Honor needs to listen to me
 9  to go through those.
10           I think that's all, Your Honor, thank you, unless
11  you have questions?
12           THE COURT:  No. Not at the moment.  Mr. Kabat, one
13  thing I don't understand is if you're taking the position
14  that Seda Ghaty or Seda had no documents, apart from those
15  that Al Haramain USA has, why in the world would you have
16  asserted the Fifth in response to document demands, or why
17  would your client have, more accurately?
18           MR. KABAT:  We (inaudible) before the 9th Circuit
19  vacated the conviction and before the prosecution
20  (inaudible), we are not asserting the Fifth at the present
21  time.
22           THE COURT:  But if he had no, the assertion of the
23  Fifth was if we were to produce the documents they would be
24  incriminating, that's in effect what you're saying.  And if
25  he had no documents, then not producing or failing to
```

```
 1                                                      7
 2   produce documents he didn't have couldn't very well be
 3   incriminating.  It seems to me you may have made a poor
 4   strategic choice here.
 5               MR. KABAT:  Most of the documents that Al Haramain
 6   produced were documents from the criminal trial and they
 7   were (inaudible) production (inaudible) disclosure, the
 8   grand jury documents in the criminal trial. So even Al
 9   Haramain produced some of these years ago they ultimately
10   denied from his own criminal prosecution so that's why he
11   had at the time a Fifth Amendment (inaudible) because those
12   documents were being used, potentially being used in the
13   criminal trial which the Court later vacated.
14               THE COURT:  Well a corporate entity has no Fifth
15   Amendment privilege, so to the extent they were corporate
16   documents he couldn't assert a Fifth Amendment with respect
17   to Al Haramain's documents.  And what I understand you to be
18   saying now is that he had no documents apartment from the
19   documents held by the corporation.
20               MR. KABAT:  When the government seized the
21   corporation documents, the corporation was housed in his
22   residence, so they also seized all of his personal
23   documents, personal computers and so forth, personal emails,
24   and so that Al Haramain production included his personal
25   emails, personal documents and so forth.
```

8

1

2          THE COURT:  Well today you take the position that

3  apart from what Al Haramain either has produced or now has

4  been produced by virtue of seized, formally seized documents

5  being made available to the plaintiffs, that he has no

6  additional documents, right?

7          MR. KABAT:  Correct, other than the privilege

8  communications he had with the federal public defender

9  (inaudible) with them, but there are no non-privilege Al

10 Haramain documents in his production.

11         THE COURT:  So one of the alternative remedies

12 that Mr. Haefele seeks is a preclusion order precluding you

13 from using at trial an documents that have not previously

14 been produced. If I enter a preclusion order your client is

15 not prejudiced by that, if I hear you.

16         MR. KABAT:  That order would have impact because

17 he has no other documents.

18         THE COURT:  Well it would have the effect of

19 meaning that Mr. Seda can't come marking in at the 11th hour

20 and say I found a bunch of documents under my mattress and I

21 now wish to use those in my defense.

22         MR. KABAT:  (inaudible) Mr. Seda has the right

23 then to call an expert witness and whatever documents the

24 expert witness might generate, those would be produced down

25 the road, but other than that --

```
 1                                                    9

 2              THE COURT:  But those are documents that don't

 3   exist today so, and they wouldn't be underlying documents,

 4   they'd be an expert report. So at a minimum it seems to me

 5   the plaintiffs are entitled to a preclusion order.

 6              Let me turn to one of the alternative forms of

 7   relief that they asked for which is, correct me if I'm

 8   wrong, Mr. Haefele, an order entitling the finder of fact,

 9   whoever that may be, to draw an adverse inference from the

10   assertion of the Fifth where, as Mr. Haefele said I said,

11   Judge Daniels said, and the Second Circuit all said, you

12   have sort of a difficult choice to make if you have both

13   pending criminal and civil proceedings, but he opted to

14   assert his Fifth and an adverse inference typically can be

15   drawn from that.  Why shouldn't I again order that?  Let me

16   rephrase it, why are the plaintiffs not entitled to that?

17              MR. KABAT:  To an adverse inference?

18              THE COURT:  Yes.

19              MR. KABAT:  Because Mr. Seda had not asserted the

20   Fifth since August, 2013, when the $9^{th}$ Circuit vacated the

21   conviction and government, the prosecution thought the Fifth

22   Amendment issue was ancient history that predated the filing

23   of the motion.

24              THE COURT:  Well, he may have withdrawn it at this

25   stage, but he asserted it -- let's take OJ Simpson, and
```

let's assume that he had signed a confession that he was

guilty of a homicide. It was collateral civil litigation.

And let's assume that notwithstanding his confession, he was

acquitted and then said, but when asked for, in connection

with the civil case asserted the Fifth. And then he's

acquitted and he says now I wish to testify at the civil

trial, and counsel for the estate of the woman he killed or

is alleged to have killed seeks an adverse inference

instruction. The fact that OJ Simpson, having beaten the

criminal case, now says never mind the Fifth, doesn't

obviate the fact that at an earlier stage for whatever

reason he asserted the Fifth from which an adverse inference

could be drawn.  It's not a mandatory inference, it's an

inference that can be explained, and maybe the explanation

for OJ Simpson is, well, my lawyer told me to assert the

Fifth because criminal charges were pending, but now that I

was acquitted in that case I want to testify. The fact that

at an earlier time he thought that producing documents in

response to these requests would incriminate him, it seems

to me is potentially relevant. Even if circumstances now

have changed such that the assertion of the Fifth is

withdrawn, it seems to me that's equally applicable here,

there may be an explanation for why in the first instance it

was asserted and now it's withdrawn, but it doesn't mean

```
 1                                               11
 2  that an adverse inference couldn't be drawn from the earlier
 3  assertion. And as, I guess most importantly, the Second
 4  Circuit said, you know, that's the hard choice people have
 5  to make.
 6          MR. KABAT:  Your Honor, I don't know the answer
 7  off the top for that because I have not looked at the
 8  adverse inference issue in several years because I thought
 9  it was off the table, frankly. I would be happy to submit a
10  short letter in response if you think that might be
11  appropriate.
12          THE COURT:  Okay, I'll tell you that what I'm
13  inclined to do is grant preclusion which is more of an
14  assurance to the plaintiffs than a penalty in this
15  circumstance to the plaintiff, to the defendant, excuse me,
16  and also, for the reason I just identified, to allow the
17  finder of fact to draw an adverse inference. I may be
18  somewhat usurping Judge Daniels' authority in doing that,
19  but I don't think I am because it's discovery related, and
20  if I am I am sure he won't hesitate to tell me that.  But,
21  sure, if you want to submit a letter related to that issue
22  or more focused on that issue, I'm glad to let you do that
23  and give Mr. Haefele a chance to respond.
24          MR. HAEFELE:  Your Honor, if I could just respond
25  briefly.
```

                                                                    12

1

2          THE COURT:  Let me just finish this thought.

3          MR. HAEFELE:  Yes, I'm sorry.

4          THE COURT:  What I'm inclined not to do is grant,

5   you know, a conditional or an unconditional order finding

6   that there should be a default here because as a practical

7   matter saying you have two weeks to send any documents,

8   we've been told repeatedly there are no documents other than

9   the Al Haramain documents.

10          MR. HAEFELE:  Your Honor, that's the issue I

11   wanted to address.

12          THE COURT:  Okay.

13          MR. HAEFELE:  It's one of the issues I wanted to

14   address.  First, I just wanted to make the point that never

15   has there ever been any indication that the Fifth Amendment

16   assertion has been withdrawn.  The entire briefing presumes

17   that the Fifth Amendment was one of the issues that was on

18   the table and it was never indicated in any briefing, and

19   the briefing has been done for years now, that it was

20   withdrawn.  In fact, even, there was an April 2015, and May

21   25th hearings where the issue was raised and they reasserted

22   the fact that, you know, based on their assertions to the

23   Fifth Amendment that they weren't producing anything.  If

24   that wasn't the issue they should have told us that at that

25   point in time instead of waiting until we're sitting here in

```
 1                                                          13
 2   the hearing.

 3           The other issue --

 4           THE COURT:  Let me modify what I said. I told you

 5   that I'm inclined to grant that request, I'll also permit

 6   Mr. Kabat to submit a letter, but if I don't find it

 7   persuasive then I will probably just summarily rule and not

 8   require you to go through further briefing on the issue.

 9           MR. HAEFELE:  Thank you, Your Honor.  On the point

10   of, I understand Mr. Kabat has regularly insisted that

11   there's no more documents, but every defendant in this

12   litigation has continually insisted that there are no more

13   documents and then has begged for more time to produce

14   documents and they trickle in more documents, sometimes

15   they're relevant, sometimes they're not --

16           THE COURT:  But the preclusion order protects you

17   against that.

18           MR. HAEFELE:  Well, it does and it doesn't, Your

19   Honor. If there are other documents that are relevant to our

20   claims, for example, there are bank account records for the

21   individual that are not Al Haramain records, there are IRS

22   records for the gentleman that are not Al Haramain records.

23   And it's the same issue that we've come up against with

24   regard to each of the individuals that have insisted that

25   they don't have any documents but they haven't gone where
```

14

1

2  the documents are. And if you're not looking where the

3  documents are, if you're not going, for example, I don't

4  know that he hasn't gone to his accountants, I don't know

5  that he hasn't gone to the banks to get the documents and if

6  you're not looking where the documents are, of course you

7  are not going to have the documents.  And that's an issue

8  that we've repeatedly come up in this litigation.

9          THE COURT:  I think there is a distinction to be

10  drawn between accountants and banks, and let me explain what

11  I think the distinction is.  Obviously, somebody who is

12  served with a document demand or a subpoena has to produce

13  documents within his or her possession, custody or control.

14  And your accountant is your agent, so that if your

15  accountant or spouse has responsive documents, those have to

16  be produced because they're sitting in the accountant's file

17  cabinet somewhere or it might be electronic equivalent.

18          Banks I draw a distinction because to go to the

19  bank a party who is asked for documents would, in effect, be

20  asking the bank to create documents, to print out documents

21  from their files, and that's something equally so that the

22  plaintiffs could do. I understand you may not know where Mr.

23  Seda banked currently but that's information that can be

24  gotten.  And to the extent that somebody has to go to the

25  bank and get the documents, they are equally available to

1
2  you.  It really then becomes sort of a cost shifting.

3          MR. HAEFELE:  Your Honor, I'm not sure,

4  respectfully, I'm not sure I agree with you entirely.

5          THE COURT:  That's why I'm raising it, to find

6  out.

7          MR. HAEFELE:  The example I would give, and it's

8  an example that we had with Wile Jilaydan (phonetic), if

9  there are accounts overseas we don't have equal access to

10  those and I don't know whether Mr. Seda has accounts

11  overseas or not.  But that would be an example where we

12  certainly wouldn't necessarily have, I can't subpoena a bank

13  in the Middle East.  And I would, and I mean that's the

14  example, one of the examples we had with Mr. Jilaydan where

15  he assured us that he was trying to get documents and we've

16  come to find out that he really wasn't ever trying to get

17  those documents.

18          THE COURT:  That was a circumstances where, as you

19  just said, the documents were not equally available to both

20  sides.  Mr. Seda says through Mr. Kabat that there are no

21  documents.

22          MR. HAEFELE:  As did Mr. Jilaydan, too. I'm

23  finding it harder and harder throughout this litigation, and

24  I'd beg Your Honor to define harder and harder, to believe a

25  defendant when they say they don't have documents when it's

1

2    been repeated over and over again from the beginning of this

3    litigation by every, I think I can safely say, every single

4    defendant, and yet here we are and some of them are still

5    producing documents.

6            THE COURT:  Mr. Kabat.

7            MR. KABAT:  Well I did say, meant to say they had

8    no more relevant, responsive documents in his production and

9    if the plaintiffs want to do a subpoena of Bank of America

10   for his bank statements going back to 1995, they can do so,

11   but I doubt that the Bank of America keeps banks statements

12   for 15 years, Mr. Seda certainly doesn't, so.

13           MR. HAEFELE:  Your Honor, that kind of plays

14   directly into the problem is that the reason why they

15   haven't been produced in a timely fashion is because the

16   defendant didn't preserve those documents.  And that's part

17   of the problem here, Your Honor, is that there has been this

18   extraordinary delay in getting the information to the

19   plaintiffs so that we have, in fact, I mean Mr. Kabat has

20   actually indicated to us now exactly what one of the

21   problems is that has prejudiced the plaintiffs.

22           THE COURT:  Well, as I said, what I'm inclined to

23   do is grant a preclusion order, grant a request for an

24   adverse inference, either instruction or a conclusion, if

25   there were some day a bench trial, but not grant relief

17

1

2    beyond that.  I'll give you, Mr. Kabat, one week to send me

3    a letter explaining why the adverse inference instruction is

4    not warranted and Mr. Haefele, you need not respond to that

5    unless I ask for further briefing on the issue. I don't

6    anticipated being swayed by whatever I receive, but maybe

7    there's some issue I've missed and, if so, I will ask you to

8    respond.  But the conditional direction to compel -- oh, I'm

9    sorry, the conditional default judgment conditioned on

10   production of documents in some short period of time, it

11   strikes me as just more of a waste of time because there

12   aren't going to be more documents produced it would appear.

13   And simply defaulting the defendant entirely, it seems to

14   me, is not warranted on the facts of this case.  And

15   implicit in what I've just said is, I've not sure you've

16   mentioned it heretofore today, but there is also an

17   application for costs and I'll entertain such an application

18   related to this discovery motion.

19          MR. HAEFELE:  I'm sorry, Your Honor, I didn't hear

20   the end of that.

21          THE COURT:  Related to this motion.

22          MR. HAEFELE:  Okay.

23          THE COURT:  As was true in the prior application

24   for costs, I recognize there's a fair amount of baggage

25   going backward that relates to this.

1                                                                 18

2              So let's turn then to Al Haramain.  Let me just

3    ask why you're looking, and that's the only other issue

4    we're taking up today, correct?

5              MR. HAEFELE:  That's correct, Your Honor.

6              THE COURT:  Okay, thanks.

7              MR. HAEFELE:  Regarding Al Haramain, Your Honor, I

8    think part of the issue that was raised in the briefs Your

9    Honor has already taken care of and I think we had raised

10   the request at the time that this was briefed that we, that

11   Your Honor issue an order setting the costs or setting the

12   value of the sanctions motion before. And that's already

13   water under the bridge.

14             THE COURT:  And Judge Daniels took care of the

15   other piece of it which was directing that Al Haramain seek

16   to unfreeze the funds.  Mr. Kabat, within the time period

17   that Judge Daniels required, sent a letter indicating they

18   had made the request, is there any further news about that?

19             MR. KABAT:  I'll be brief, we got the OPEC

20   (phonetic) (inaudible) in about a month ago and by way of

21   background, back in 2014, which was before the whole

22   sanctions issue came up, Al Haramain, OPEC and me had three-

23   way negotiations about settling the OPEC designation

24   challenge on remand from the 9th Circuit, and OPEC agreed to

25   deem that Al Haramain, (inaudible) and OPEC required that

19

 1

 2  the organization, in turn, would agree to dissolve.  Now the

 3  dissolution, which plaintiff didn't know about, was

 4  (inaudible) because nobody wanted to keep on working with

 5  the organization, they had all moved on with their lives --

 6       THE COURT:  The consequence was there was money

 7  sitting in a piggybank someplace.

 8       MR. KABAT:  Well, and part of the discussion, we

 9  put the dissolution on hold while the plaintiff filed their

10  motion to compel, motion for sanctions, so the dissolution

11  was on hold for two years. Now, OPEC this spring authorized

12  (inaudible) fund to pay the attorney fees that Your Honor

13  awarded, and, in fact, the check came in the mail today,

14  (inaudible).  Meanwhile, our law firm had not been paid in

15  several years for our work on the OPEC designation challenge

16  which had several different Court decisions, now in second

17  appeal, so OPEC agreed to do a (inaudible) fund, $81,000

18  could be applied to those fees. Now we are actually owed,

19  according to my bookkeeper, $375,000 so we're taking a

20  substantial loss on that, but we will have (inaudible) write

21  up the remainder that we're owed.

22       And I want to say a brief word about the Executive

23  Branch decision under Second Circuit --

24       THE COURT:  Before you get to that, I want to

25  understand what you just said, does that mean the plaintiffs

1
2  are getting paid?

3          MR. KABAT:  Yeah, the check came in the mail today
4  and my office in DC will send it out Monday.

5          THE COURT:  Okay.

6          MR. KABAT:  So we're good on that.

7          THE COURT:  I just wanted to make sure you weren't
8  asserting some formal lien or something.

9          MR. KABAT:  Now, I did want to say a brief word
10  about the legal consequences of OPEC's decision that
11  required the dissolution of Al Haramain to (inaudible) the
12  organization and decide that its remaining assets are to be
13  used to pay the (inaudible) prior award and that the very
14  partial payment on our law firm (inaudible), that's a non-
15  justifiable political question, the Second Circuit and the
16  District Judge in the Southern District have consistently
17  held that OPEC's decision regarding where and how blocked
18  assets are to be distributed, is a non-justifiable political
19  question under the Supreme Court decision in Baker v. Kearn
20  (phonetic). And let me just briefly run through the
21  (inaudible), I think they are quite relevant here. Judge
22  Leger (phonetic) (inaudible) back in 1993, and the
23  plaintiffs sought blocked assets and Judge Leger readily
24  rejected plaintiffs' claim on the grounds that their action
25  implicated fundamental political questions that only the

1                                                                    21

2   Executive Branch has the power to resolve. The Second

3   Circuit confirmed that.  (inaudible) would beg the same

4   question by the same plaintiffs (inaudible) from the same

5   plaintiffs, and again, he held in two decisions that OPEC

6   had made the decision regarding the disposition of the

7   assets. So plaintiffs' demands for any additional assets

8   were a "non-justifiable political question." Again, the

9   Second Circuit affirmed both Judge Keenan's decision and he

10  said the judgment about previously blocked assets are the

11  sole discretion of the Executive Branch without merit

12  (inaudible) from the plaintiff in (inaudible) to seek

13  (inaudible). So we had six decisions, three from this Court

14  and three from the Second Circuit, each making clear the

15  OPEC decision about the dispersion of assets and what to do

16  with blocked assets is a non-justifiable political question

17  for the same reason OPEC's decision to issue (inaudible)

18  requiring the dissolution of the organization and the

19  dispersal of the remaining assets to plaintiff with the

20  small balance left over to our law firm is a non-justifiable

21  political question. A dissolved corporation is a legal non-

22  entity, it cannot participate any further in litigation, so

23  once the dissolution is effective we will file a notice with

24  the Court, probably at the end of this month, maybe sooner,

25  to advise the Court of the final dissolved status and we can

22

1

2 all put Al Haramain behind us.  Thank you.

3 　　　　MR. HAEFELE:  Your Honor, Mr. Kabat emailed us I

4 think it was just yesterday and asked us to provide him each

5 of the firms' tax ID numbers, indicating that he thought

6 later this month the money would be available to disburse to

7 each of the firms.  And at the time, since it was just

8 yesterday and we hadn't really heard anything about this,

9 although now I'm hearing that it was in play for the past

10 month, I was clear that we wanted to make sure that there

11 was a license out there because can't take the money without

12 there being a license. So I've asked Mr. Kabat to provide a

13 copy of the license to each of the firms and we'd ask Your

14 Honor if we could have Your Honor order him to provide us

15 the copy of the license forthwith.

16 　　　　THE COURT:  Let me interrupt you, is there a

17 license and do you have a copy of it?

18 　　　　MR. KABAT:  Yeah, we got it on June 6th and we're

19 going to give it to them with the checks on Monday.

20 　　　　MR. HAEFELE:  Your Honor, we really want a copy of

21 the license before we take possession of the money.  We want

22 to make sure --

23 　　　　THE COURT:  If it arrives in the same envelope I

24 don't think there's a problem.

25 　　　　MR. KABAT:  Exactly.

23

```
 1
 2          MR. HAEFELE:  Technically speaking, we can't, I
 3  want to make sure everything is in place before we take the
 4  money.  So it would be very important for us to make sure
 5  that the license, I'm assuming but I don't want to take it
 6  for granted, I think the proper way --
 7          THE COURT:  I think you are being hyper technical
 8  because getting a check is different than cashing a check.
 9          MR. HAEFELE:  Fair enough.
10          THE COURT:  And you'll get the license, you don't
11  have to cash --
12          MR. KABAT:  It's a cashier check from Bank of
13  America.
14          THE COURT:  Okay, but it's basically Bank of
15  America drawing down funds against and Al Haramain account.
16          MR. KABAT:  Blocked account, correct.
17          THE COURT:  And I assume Bank of America had the
18  same concerning you had in terms of issuing the check.
19          MR. HAEFELE:  I guess what I'm concerned about is,
20  Your Honor, I don't understand why we weren't provided a
21  copy of the license since we knew it was an issue, and he
22  got it, you know, he knew he was getting it a month ago.
23          THE COURT:  In any event, you are going to get it
24  and if you don't want to cash the check or you need
25  something else --
```

1                                                           24

2              MR. HAEFELE:  Obviously we want the money but we

3    also want to make sure that I's are dotted, T's are crossed.

4    And I guess the other concern I have is that just like he's

5    know about this for a month and he raises it today, the

6    briefing that we just heard is something that obviously that

7    Mr. Kabat was quite aware of, enough that he had done his

8    research and he's standing here reading things.  There is no

9    possible way that plaintiffs can respond to the verbal

10   briefing that we just heard.

11             THE COURT:  Nor would I ask you to, I gather that

12   was being done more for the record and as a heads up that,

13   in effect, Al Haramain will default by virtue of its

14   dissolution, although there's the interesting question of

15   what law applies. If you apply New York law, a corporation

16   that's dissolved can continue to be a defendant or can bring

17   actions.

18             MR. HAEFELE:  Well, Your Honor, in light of the

19   fact that the defendant has indicated that it will not

20   defend itself any longer and that is part of what the

21   plaintiffs have been claiming, we would ask Your Honor that

22   you evaluate that as part of our request and you do enter a

23   default against Al Haramain.

24             THE COURT:  Well I can't enter a default, that's

25   Judge Daniels bailiwick. But as a practical matter, it

```
 1                                              25
 2  sounds like that that's where we're headed here, correct,
 3  Mr. Kabat?
 4          MR. KABAT:  A default judgment would be a nullity
 5  because you can't collect anything --
 6          THE COURT:  Well it won't be a nullity, it may be
 7  a useless exercise but it's a default judgment against a
 8  defunct entity that by definition will have no assets, all
 9  of which still leaves Mr. Seda in the suit, but Al Haramain
10  as a practical matter will cease to be a player in this
11  lawsuit, or series of lawsuits.
12          MR. HAEFELE:  To be clear, Your Honor, the
13  plaintiffs see value in the default judgment against the
14  entity.
15          THE COURT:  Sure.
16          MR. HAEFELE:  So even though others may think it
17  has no value --
18          THE COURT:  Well if, for example, at some stage
19  you are able to pierce the corporate veil, I suppose it may
20  have value.  It certainly would be a judgment with a lot of
21  zeros.
22          MR. HAEFELE:  I'm not, I mean now we're getting
23  back to what the original motion was and I mean I don't know
24  whether there is any value in going through the rest of the
25  motion to demonstrate that there are documents that Al
```

1
2  Haramain has intentionally delayed in getting to the

3  plaintiffs, and there are additional documents that they

4  still have yet to produce and I mean it demonstrates an

5  intent on the behalf of the entity that we would continue to

6  press that a default is nonetheless warranted, particularly

7  in light of the intention.

8       THE COURT:  Well I suppose what I could do is a

9  very short R and R to Judge Daniels summarizing the

10  discussion we just have had and recommending that a default

11  judgment be entered against Al Haramain USA.

12       MR. HAEFELE:  That's what our recommendation would

13  be.

14       THE COURT:  and is that going to be opposed?

15       MR. KABAT:  We certainly think so because the

16  government has already made the decision to dissolve the

17  organization and disburse its assets so nothing that the

18  Court can do can have any impact on that, and the plaintiff

19  won't be able to collect on any default judgment because the

20  government has already decided to dissolve the organization

21  and disburse the assets.

22       THE COURT:  Well by virtue of the plaintiffs

23  cashing the check to their counsel and you cashing the check

24  to your firm, there is no money left in the till, correct?

25       MR. KABAT:  Absolutely not.

1

2         THE COURT:  So except to the extent that there is

3 somebody else who could be held liable for the indebtedness

4 of Al Haramain, it does sound like Al Haramain is pretty

5 much done.  Which is not to say that there couldn't, you

6 know, be down the road some discovery request that somebody

7 might have to respond to or, well, having said that it's

8 hard to envision how that would arise.  But I think it

9 somewhat moots the application you were making with respect

10 to Al Haramain except to the extent that I will issues the R

11 and R I just described.

12         MR. HAEFELE:  As I said, Your Honor, except to the

13 extent that it gives a vehicle for Your Honor to make a

14 recommendation to the District Judge.

15         THE COURT:  No, even though that's not

16 specifically the relief that was requested, it seems to me

17 that's appropriate and also unopposed. So consider it done.

18         MR. HAEFELE:  Thank you, Your Honor.

19         THE COURT:  Anything else from the plaintiffs'

20 perspective?

21         MR. HAEFELE:  No, Your Honor.

22         THE COURT:  Okay.

23         MR. HAEFELE:  Thank you.

24         THE COURT:  I gather, were there people who were

25 on the phone?

                                                                    28

1

2          MR. HAEFELE:  There were at least one or two.

3          THE COURT:  Can we just get those appearances if

4  you are still on the phone?

5          MR. PETER SALERNO:  Peter Salerno, Salerno &

6  Rothstein, for Yassin Kadi.

7          MR. HAEFELE:  That's the only one I knew, Your

8  Honor, I thought there was somebody else.

9          THE COURT:  Okay, so it sounds like Mr. Salerno

10  was the only person who wasn't out in the Hamptons on a

11  Friday afternoon.

12          MALE VOICE:  (off microphone) Your Honor, my name

13  is (inaudible) I work for a law firm (inaudible).

14          THE COURT:  Okay, thank you.

15          MR. KABAT:  I did want to briefly mention one

16  thing.

17          THE COURT:  But is there?

18          FEMALE VOICE:  (off microphone) Yes, Your Honor,

19  Katie (inaudible) for Dubai Islamic Bank.

20          THE COURT:  Okay, thank you.

21          MR. KABAT:  I just want to briefly mention that I

22  was checking the docket and there are two other matters that

23  are pending that we might want to (inaudible). One is the

24  Hagwish (phonetic) plaintiff filed a motion for a common

25  benefit fund.

```
 1                                                       29

 2              THE COURT:  Right.

 3              MR. KABAT:  That is fully briefed, and that's a

 4   dispute between the plaintiff and counsel, we don't have any

 5   involvement in that. The other item that will be ready very

 6   soon is the plaintiffs' motion to compel the Dallah Avco,

 7   the plaintiff replied briefly July 15th.  Now I have not

 8   talked with the attorney for Dallah Avco so I don't know if

 9   they and plaintiff want to have a motion hearing or whether

10   they want (inaudible) but I did want to mention that's out

11   there.

12              THE COURT:  Yeah, I think we were aware of both of

13   those, certainly the Hagwish common benefit fund one was.

14   The Dallah Avco I guess I'll wait till July 15th and then

15   we'll see where we go from there.

16              MR. KABAT:  Thank you.

17              THE COURT:  Okay, thank you, everyone.

18              MR. HAEFELE:  Your Honor, I'd like to have a word,

19   very quick word off the record, Your Honor, regarding

20   Burnett Iran claims.

21              THE COURT:  Sure.  Let's go off the record.

22                   (Whereupon the matter is adjourned.)

23

24

25
```

30

C E R T I F I C A T E

     I, Carole Ludwig, certify that the foregoing transcript of proceedings in the United States District Court, Southern District of New York, In re:  Terrorist Attacks on September 11, 2001, Docket Number 03md1570, was prepared using PC-based transcription software and is a true and accurate record of the proceedings.

Signature_____

Date:  July 23, 2016