## MDL 1570 PLAINTIFFS' EXECUTIVE COMMITTEES
In re: Terrorist Attacks on September 11, 2001 (S.D.N.Y.)

| Plaintiffs' Executive Committee for Personal Injury and Death Claims | Plaintiffs' Executive Committee for Commercial Claims |
|---|---|
| Ronald L. Motley (1944-2013)<br>Jodi Westbrook Flowers / Donald A. Migliori, *Co-Chairs*<br>MOTLEY RICE LLC<br>James P. Kreindler, *Co-Chair*<br>KREINDLER & KREINDLER LLP | Elliot R. Feldman, *Co-Chair*<br>Sean Carter, *Co-Chair*<br>COZEN O'CONNOR |
| Andrew J. Maloney III, *Co-Liaison Counsel*<br>KREINDLER & KREINDLER LLP<br>Robert T. Haefele, *Co-Liaison Counsel*<br>MOTLEY RICE LLC | J. Scott Tarbutton, *Liaison Counsel*<br>COZEN O'CONNOR |

**VIA ECF**

April 14, 2017

The Honorable Sarah Netburn, U.S. Magistrate Judge
United States District Court for the S.D.N.Y.
Thurgood Marshall U.S. Courthouse, Room 430
40 Foley Square
New York, NY 10007

Re:     *In Re: Terrorist Attacks on September 11, 2001,* 03 MDL 1570 (GBD) (SN)

Dear Judge Netburn:

The Plaintiffs' Executive Committees ("PECs") submit this letter in response to the April 7, 2017 letter from the Kingdom of Saudi Arabia ("Saudi Arabia"), asking the Court to "reaffirm Judge Casey's order of May 25, 2004, directing counsel in this MDL not to try their cases in the press." Saudi Arabia's request is problematic on several levels.  First, Saudi Arabia cannot mean to suggest that speech relevant to political initiative and informing the public of root causes of terrorism should be suppressed; such a suggestion would be unconstitutional.  Even if the Court wholly agrees with the views Judge Casey expressed in colloquy during a hearing regarding a discrete dispute (which the Court declined to act upon) more than a decade ago, Saudi Arabia's request is ill-framed, ambiguous, and offered without recognition of the constitutional implications, without reference to any legal authority, and without any acknowledgement of Saudi Arabia's own massive, long-running multimillion-dollar public relations campaign to manipulate the public and governmental officials' perception of the evidence.  Second, the "order" that Saudi Arabia asks the Court to reaffirm never happened.  Aside from stating his views on the matter, Judge Casey expressly declined to take any action on the request that was before the Court in that hearing.  (Transcript of May 25, 2004 hearing, at 31 ("I am not going to take any action … at this time.").)  Because Saudi Arabia surely does not intend to ask the Court to suppress constitutionally protected speech, because Saudi Arabia has offered no context warranting such suppression, and because the order Saudi Arabia "cites" does not exist, Saudi Arabia's request should be denied.

The Honorable Sarah Netburn
April 14, 2017
Page 2

Although this litigation is the central component of the 9/11 families' and survivors' more than fifteen-year effort toward accountability concerning the September 11th attacks, their advocacy extends to other arenas as well.  Consistent with their constitutional right to petition our government for redress of grievances, the 9/11 families and survivors have worked, successfully, to persuade the Executive Branch to release evidence concerning sources of support for the 9/11 hijackers and al Qaeda, they have intervened in numerous criminal proceedings to garner evidence, and those efforts remain ongoing.  In addition, the families and survivors have engaged in efforts to encourage Congress to implement legislative measures to promote our national security and deter terrorism, efforts that most recently resulted in the enactment of the Justice Against Sponsors of Terrorism Act ("JASTA").

As with virtually any undertaking directed at the political branches of our government, and as contemplated and protected by the First Amendment, public advocacy has been an essential aspect of these and related initiatives, and the participation of counsel in that public advocacy has often been essential to advancing the families' and survivors' interests.  Indeed, the public debate surrounding any number of the families' and survivors' transparency and accountability initiatives has often centered on technical aspects of the law of sovereign immunity and other legal regimes that counsel were most equipped to address.  Saudi Arabia's massive campaign to control the public perception of its role in the 9/11 attacks has engaged more than a dozen of the nation's top lobbying and public relations firms, which includes powerhouse law firms like DLA Piper, Hogan Lovells, Squire Patton Boggs, King & Spalding, and Brownstein Hyatt Farber Schreck, LLP.[1]  Any suggestion that Saudi Arabia may have an army of professionals (including legal professionals) working to shape public perception and influence policy simply because it has millions to spend, while the 9/11 families and survivors cannot respond and similarly participate including through their counsel, should be dismissed from the start.

As a corollary, evidence that is relevant to claims in this litigation, and in particular the claims against Saudi Arabia, is often also directly relevant to the families' and survivors' broader efforts to promote transparency, accountability, and public awareness concerning the September 11th attacks and the continuing threat posed to our nation by terrorism.  The more than decade-long effort to secure the declassification of the so-called 28 pages of the Congressional 9/11 Joint Inquiry Report is a prime, but by no means isolated, example.  The release of those pages was a matter of intensive public, national, and congressional interest[2], and the effort to secure their release was appropriately and necessarily informed by public discussion of other, related, evidence.

Saudi Arabia's own massive public relations, media, and communications campaigns concerning issues directly impacting this litigation underscore these realities, and convincingly

---

[1] In addition to the referenced law firms and myriad of other foreign agents serving Saudi Arabia (many who have registered under the Foreign Agents Registration Act and some who apparently remain unregistered) other FARA primary registrants acting as agents for Saudi Arabia include Qorvis/MSLGROUP Americas, Inc., Podesta Group, Inc., Glover Park Group LLC, The Hohlt Group, BGR Group, S.G.R. LLC, Dominique L. Russo, Flywheel Government Solutions, CGCN Group, and Capitol Media Group.

[2] On August 1, 2003, 46 United States senators wrote to President George W. Bush to urge that he release those pages.  In the years that followed, multiple legislative proposals were introduced in Congress to release those pages, ultimately culminating in S.1471 and H.Res. 14 in the 114th Congress.

_____

demonstrate both the irony of Saudi Arabia's present request (which it conspicuously raises in a complete contextual vacuum), and why it should be denied. Since even before the outset of this litigation, Saudi Arabia has been engaged in concerted efforts to influence public opinion and the views of U.S. government officials concerning the evidence of Saudi involvement in the sponsorship of al Qaeda and the September 11th attacks. The Saudi's efforts to influence the public perception of their involvement in the 9/11 attacks has long been readily apparent from the years of public commentary directly from Saudi officials, including numerous instances of officials denying any evidence associating Saudi Arabia in any way with the 9/11 attacks. In August 2004, Saudi Arabia is reported to have begun an advertising campaign in 19 American cities challenging allegations of Saudi Arabia association with the attacks. *See* Brian Whitaker, *Saudis Polish Their Image in U.S. Ads*, The Guardian (London), Foreign pages, Aug. 18, 2004, at 12. Even Mr. Kellogg has told the press that "The government of Saudi Arabia has long asserted . . . that [the plaintiffs'] allegations are categorically false." *U.S. Court Restores Saudi Arabia in Sept. 11 Lawsuit*, New Zealand Herald, Dec. 20, 2013. Saudi Arabia has issued and reissued press statements quoting a partial excerpt from the 9/11 Commission Report, claiming the 9/11 Commission exonerated Saudi Arabia. *See, e.g.,* Exhibit A (compilation of press releases from the Royal Embassy of Saudi Arabia). The 9/11 families and survivors take issue with that claim, and multiple 9/11 Commissioners have rejected the claim.

But Saudi Arabia's most recent campaign to control the public messaging about its involvement in 9/11 is of historic proportions. According to recent reports, Saudi Arabia has been spending more than $1.3 million per month in fees (plus expenses) on high powered lobbyists and public relations professionals, in Washington, D.C. and nationwide, to influence the American public and U.S. officials, and otherwise advantage Saudi Arabia's position in this litigation. Documents filed with the Department of Justice pursuant to the Foreign Agents Registration Act (FARA), enacted in 1938 to counter Nazi propaganda activities in the United States, confirm that Saudi Arabia's foreign agents, of which there are more than 100, have been extensively engaged in sophisticated and unprecedented efforts to influence and craft media coverage of evidence and U.S. government legislative and executive officials' perceptions, all directly relevant to the claims in this litigation. For instance, FARA reports filed by Qorvis/MSL Group, one of the world's largest public relations and crisis management firms and a foreign agent for Saudi Arabia, demonstrate that the Saudi agent orchestrated a massive media outreach on Saudi Arabia's behalf in the period leading into and immediately after the release of the 28 pages in July 2016, the obvious goal of which was to frame the public discourse on the evidence in terms favorable to Saudi Arabia. The 28 pages are directly relevant to this litigation. The Qorvis/MSL Group FARA reports show that, just during the limited period from April through July 2016, the PR firm communicated with major media outlets in over 200 instances where the principal subject of the communication was the 28-pages, JASTA, or counterterrorism. *See* Exhibit B (Excerpts from Qorvis/MSL Groups FARA report for six-month period ending June 30, 2016). FARA reports filed by the Podesta Group, another prominent Washington, D.C.-based lobbying and public affairs firm working for Saudi Arabia, indicate that, during the same April to July 2016 time period, the Podesta Group added another 100 contacts with the media for Saudi Arabia's benefit. *See* Exhibits C and D (Excerpts from Podesta Group FARA Reports for six-month periods ending September 30, 2016 and December 31, 2016). Commenting to the press during that time period, Saudi foreign minister, Adel al-Jubeir, said "investigations have revealed that these allegations are not correct." Mark Mazzetti and Scott Shane, *A Saudi Imam, 2 Hijackers and Lingering 9/11 Mystery*, New York Times, June 17, 2016. Despite the evidence to the

contrary (*see, e.g.*, Simon Henderson, *Saudis have reason to be red-faced; Report finds links between 9/11 hijackers, royal family*, Ottawa Citizen, July 19, 2016, at N6), Mr. al-Jubair commented to the press about the 28-pages: "There is no there there."  Mazzetti and Shane, *supra*.

In addition to Saudi Arabia's campaign regarding the 28-pages, Qorvis/MSL also initiated a massive public relations campaign in a failed attempt to block the passage of JASTA, the singular goal of which was to advantage Saudi Arabia in this litigation. The Qorvis FARA reports include scores of additional references to Saudi Arabia's PR agents communicating with major media outlets regarding JASTA.  *See* Exhibit B.  Likewise, the Podesta Group FARA reports, though they lack the detail required by FARA as to the substance of the communications, indicate that Saudi Arabia's agents had many more contacts with the media as JASTA was approaching a vote in Congress in September 2016.  *See* Exhibits C and D.

Late last year, evidence of more stealthy efforts to sway public opinion became apparent, when different authors in multiple major newspapers nationwide began publishing what were portrayed as independent opinion pieces criticizing JASTA.  The subterfuge that those articles were independent was ultimately belied by the use of nearly identical language throughout the writings, indicating that a single source had a prominent hand in writing all of the pieces.[3]

After surveying the writings, Eric Owens of the Daily Caller concludes that the likely common source for the writings is the multimillion-dollar army of lobbying firms hired by Saudi Arabia.  Accepting Owens' point – that the articles represent a coordinated astroturfing effort by agents for Saudi Arabia – the context of the articles, published nationwide in widely read newspapers (and placed on their internet websites), their purpose was undoubtedly to influence public opinion, including specifically about the evidence, to advantage Saudi Arabia.

The Saudis' campaign to influence public opinion and lawmakers is further evidenced by the news that agents of Saudi Arabia have engaged scores of U.S. veterans and duped them into lobbying Congress in support of Saudi interests by providing them with false information, failing to advise them that efforts in which they were engaged were underwritten and in support of Saudi Arabia, and relying on the veteran's lack of understanding of federal disclosure requirements when lobbying on behalf of a foreign nation.  See, e.g., Eric Owens, *EXCLUSIVE: Saudi Cash Is Sending Veterans On LUXURY Trips To Washington To Oppose 9/11 Law*, Daily Caller, Feb. 7, 2017.  An

---

[3] A December 5, 2016 article by Eric Owens in the Daily Caller summarizes the commonalities among articles purportedly by five unrelated authors from newspapers in Tennessee, Colorado, Michigan, New Hampshire, and Florida.  Eric Owens, *EXCLUSIVE: Saudi Arabia Is Astroturfing America to Roll Back 9/11 Law*, Daily Caller, Dec, 5, 2016.  Owens makes the point that, throughout their writings, the five purportedly unrelated authors in different locations throughout the country "use virtually the same – or exactly the same – words to make their arguments."  Importantly, one commonly worded theme among the astroturfing articles is an admonition that "there is no evidence" that Saudi Arabia "was complicit in the attacks of 9/11." Compare, for example  http://www.thegazette.com/subject/opinion/guest-columnists/jastas-negative-consequences-20161128 ("Remember, there is no evidence that the government of Saudi Arabia was complicit in the attacks of 9/11") and  http://www.tennessean.com/story/opinion/contributors/2016/  11/04/jasta-harm-our-soldiers-and-diplomats-overseas/93285786/ ("Remember, … there is no solid evidence the government of Saudi Arabia was complicit in the attacks of 9/11").

The Honorable Sarah Netburn
April 14, 2017
Page 5

organization of the 9/11 families and survivors has asked the U.S. Justice Department to open an investigation into what federal laws may have been violated in connection with those activities.

As Mr. Kellogg acknowledges, it has been a long time since Judge Casey offered his remarks on media activity. Developments since that time, as discussed above, readily confirm that Judge Casey's colloquy with counsel nearly thirteen years ago has no bearing on, and could not possibly be interpreted to extend to, the families' and survivors' legitimate and protected public advocacy activities. To hold otherwise would require the Court to conclude that Saudi Arabia is asking the Court to direct it to dismantle its own massive public relations, communications and lobbying apparatus.

Because that is presumably not the case, Saudi Arabia's request is simply unsupportable on its face. In fact, Saudi Arabia's April 10, 2017 reply to the response submitted by Mr. Kreindler concedes as much, by urging that statements to the media about the litigation and evidence by Saudi Arabia's counsel are appropriate, but statements by Mr. Kreindler were not. Simply stated, the Saudis cannot have it both ways. They cannot ask the Court to gag the Plaintiffs while the Saudis are permitted to say whatever they please.

Where Saudi Arabia would have the Court draw the line is entirely unclear, and as a practical matter it would be impossible and inappropriate to attempt to do so at this point in time, given the common relevance of evidence to both the litigation and families' and survivors' public advocacy activities. Judge Casey's determination at the May 25, 2004 hearing was clear: "I am not going to take any action . . . at this time." His remarks were, at most, a generalized cautionary warning in a given context, rather than a concrete order with any defined scope. Saudi Arabia is thus asking the Court to reaffirm an advisory colloquy, issued in the context of a particularized dispute and legal arguments that have no relevance to the current circumstances.

If Saudi Arabia's concern is the impact of pretrial publicity on a jury trial, that concern can be properly addressed, including through Rule 47, closer to the start of trial. *See Ruggieri v. Johns-Manville Products Corporation*, 503 F. Supp. 1036, 1040 (D.R.I. 1980) ("The impact of pretrial publicity can be evaluated through Rule 47(a) … which gives the trial judge broad discretion in conducting the examination of prospective jurors."). Though the Court may determine at an appropriate time that protections necessary to a jury trial are warranted, wholesale restraint of First Amendment speech through decades of litigation when the date for a jury to be empaneled is not on the calendar is generally problematic, but especially inappropriate here. As the court in *Ruggieri* commented, and PEC counsel in this litigation observed in response to the defendants' accusations in 2004:

> [I]n our present society many important social issues became entangled to some degree in civil litigation. Indeed, certain civil suits may be instigated for the very purpose of gaining information for the public. Often actions are brought on behalf of the public interest on a private attorney general theory. Civil litigation in general often exposes the need for governmental action or correction. Such revelations should not be kept from the public. Yet it is normally only the attorney who will have this knowledge or realize its significance. Sometimes a class of poor or powerless citizens

The Honorable Sarah Netburn
April 14, 2017
Page 6

_____

challenges, by way of a civil suit, actions taken by our established private or semi-private institutions or governmental entities. The lawyer representing the class plaintiffs may be the only articulate voice for that side of the case. Therefore, we should be extremely skeptical about any rule that silences that voice.

*Ruggieri*, 503 F. Supp. 1039-40 (D.R.I. 1980).

An observation of Plaintiffs' counsel from the 2004 dispute that applies equally today as then is this: "These defendants should not be allowed to speak, spend and litigate freely while plaintiffs' counsels' role is limited. The notion of shutting down the public debate over the issues encompassed by this case is simply untenable. If there was ever an instance that causes strong opinions and necessitate strong advocacy, the events of 9/11 so qualify."

For the reasons stated herein, Saudi Arabia's request should be rejected outright.

Respectfully,

/s/ Robert T. Haefele
ROBERT T. HAEFELE
*PLAINTIFFS' EXECUTIVE COMMITTEES*

cc:     The Hon. George B. Daniels, U.S.D.J. – Via ECF
        All Counsel – via ECF