UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| IN RE: TERRORIST ATTACKS ON  SEPTEMBER 11, 2001 | : : : : | Civil Action No.  03 MDL 1570 (GBD) (FM) |
| *This document applies to*  *Hoglan, et al. v. The Islamic Republic*  *of Iran, et al.*  *1:11-cv-07550-GBD* | : : : : | |

**PLAINTIFFS' MEMORANDUM ON RECONSIDERATION OF CLAIMS OF
"FUNCTIONAL EQUIVALENTS" OF IMMEDIATE FAMILY MEMBERS**

The Court, in its Order dated March 3, 2017, stated, "The Hoglan plaintiffs will be permitted, though not required, to make an additional submission in support of the non-immediate family member plaintiffs not recommended damages by the same date. The Court will also fully consider their October 31, 2016 Objections in its analysis."

Accordingly, the *Hoglan* Plaintiffs hereby submit this Memorandum, and file herewith Declarations from certain of the *Hoglan* Plaintiffs in support, or further support, of their claims.[1] The *Hoglan* Plaintiffs who were previously denied awards now urge the Court to find that they are the functional equivalent of immediate family members of 9/11 decedents, thereby entitling them to damages awards under the anti-terrorism exception in the Foreign Sovereign Immunities Act, 28 U.S.C. §1605A.

---

[1] The *Hoglan* Plaintiffs herewith submit declarations in support of claims for Plaintiffs who have not received awards, including Jennie Mandelino, James Mandelino, Mary Ann Pino, Anthony Dorf, Vaughn Hoglan, Linden Hoagland, Lee N. Hoglan, Kathleen B. Hoglan, Candyce Hoglan, Estate of Herbert K. Hoglan, Norma Ward, Carole Grazioso, Estate of Ken Jackson, Estate of Lenore Jackson, and Estate of Ida Reiss. Among the declarations are some from *Hoglan* Plaintiffs who have already received judgments, specifically, Alice Hoagland, Philomena Mistrulli, Angela Mistrulli, and Maryann Mistrulli Rosser, who now support the claims of other family members who have not received awards.

The *Hoglan* Plaintiffs submit, in addition to all the points made in their prior briefs and declarations, that the merits of these functional equivalent family member claims are fact-driven and not readily, or justly, determinable by means of a rigid rule or formulaic analysis. Therefore, the *Hoglan* Plaintiffs urge the Court to embrace a claim-by-claim, family-by-family, fact-driven analysis. Such an approach, at least generally, is in line with the concepts advanced today in other plaintiffs' filings.

As the *Hoglan* Plaintiffs argued in their initial damages submission in this case, the modern family fits no one pattern. The days of the classical "nuclear family" are gone. Any completely rigid analytical framework of the "functional equivalents" issue would likely result in unjust denials of functional equivalent immediate family member claims.

That is not to say that the sort of factors on which the Court has focused previously are invalid; on the contrary, they are indeed pertinent. Yet, society today, both in the United States and internationally (and, of course, foreign nationals may, in certain circumstances, present valid FSIA claims), is comprised of families in all shapes, sizes, and colors. Indeed, the parameters and legal grounding of family issues such as marriage are shifting rapidly, see generally, *Obergefell v. Hodges*, 576 U.S. ___ (2015). Regarding the question at hand, the *Hoglan* Plaintiffs submit that the Court should be flexible to take into account any salient facts that affect in any significant way whether a particular claimant in a family context is indeed the functional equivalent of a parent, child, sibling, or spouse of a victim of terrorism.

As the *Burnett* plaintiffs point out, co-habitation of fiancés is a matter that is not necessarily indicative of the realities of life affecting functional equivalent spouses because it may be that the religious, cultural, or personal values of the persons involved may preclude co-habitation. So too may other influences have an impact, such as finances, health, work and career, housing availability, and so on. The point is that rigid rules cannot accomplish complete

2

justice in this area, and while perfect justice may not be achievable in any event, justice is the goal of the FSIA.  While both traditional and emerging cultural factors have their places in a functional equivalence analysis, the Court ought to consider all salient facts in the totality of familial circumstances in order to render just decisions on substantially supported claims.  At the very least, if there is to be a particularized test, or set of rules, or some lines drawn, the Court may still adopt a posture that permits exceptions where the evidence nevertheless warrants a finding of functional equivalence, in appropriate cases.

The *Hoglan* Plaintiffs acknowledge that the Court is not able to devote unlimited time to examination of every fact that a litigant may offer to support a functional equivalent claim.  That is always the case.  The ballast is that every plaintiff bears the burden of proof.  The *Hoglan* Plaintiffs submit that this burden, like the necessary proofs for liability, is "evidence satisfactory to the Court."[2]

As the Court ruled in regard to step-parents and step-siblings, the Court has within its power the ability to assess the facts in order to do substantial justice by making appropriate judgments regarding the size of awards to functional equivalents of immediate family members, in recognition of variance among the fact patterns of deserving plaintiffs.  A functionally equivalent sibling who did not grow up with the decedent may thus be deserving of an award that is less than the full amount awarded to a blood sibling who is entitled to an award by virtue of relation from birth.  Such matters are within the sound discretion of the Court.

---

[2] 28 U.S.C. Section 1608(e) provides:

No judgment by default shall be entered by a court of the United States or of a State against a foreign state, a political subdivision thereof, or an agency or instrumentality of a foreign state, unless the claimant establishes his claim or right to relief by evidence satisfactory to the court. A copy of any such default judgment shall be sent to the foreign state or political subdivision in the manner prescribed for service in this section.

Some of the *Hoglan* Plaintiffs whose claims are the subjects of particularly substantial new declarations are discussed below.

**Anthony Dorf**

Although this Court held in its Report and Recommendation that none of the Individual Plaintiffs in the nephew category met the "exacting standard" for recovery as set forth in *Sullivan v. Ford Motor Co.*, No. 97-CV-0593 (RCC), 2000 WL 343777 (S.D.N.Y. Mar. 31, 2000) and *Bettis v. Islamic Republic of Iran*, 315 F.3d 325 (D.C.Cir. 2003), the *Hoglan* Plaintiffs respectfully submit that at least one Individual Plaintiff, Anthony Dorf, does indeed meet this exacting standard.

Anthony Dorf lived with his mother and the 9/11 Decedent, his uncle Stephen Dorf, from the time he was born in April 1986 until September 11, 2001, when Stephen Dorf was murdered. See Declaration of Anthony Dorf (March 18, 2012) ¶ 4; Supplemental Declaration of Anthony Dorf (May 5, 2017) ¶ 2. Anthony never knew his biological father; his Uncle Stephen served as the sole male role model in Anthony's life and "became the father [he] never had." See Declaration at ¶ 4; Supplemental Declaration at ¶ ¶ 2-3. Anthony was 15 years old on September 11, 2001. Although adoption of Anthony by his Uncle Stephen was discussed at times due to the existing family dynamic, the plan was never effectuated and the opportunity to do so was cut short by the terrorist attacks. See Supplemental Declaration, ¶ 2. Anthony was named a beneficiary of a small life insurance policy held by his uncle. *Id.*, ¶ 3.

This Court acknowledged the D.C. Circuit holding in *Bettis* that "[i]n a few limited circumstances, some courts have allowed relatives who either *resided in the same household* with the victim or were *legal guardians* to recover for negligent of emotional distress…. In these cases, the parties in issue were members of the victim's household, and they were viewed as the functional equivalents of immediate family members." See Report and Recommendation at p. 5

citing *Bettis*, 315 F.3d at 337 (emphasis in original).  For the definition of "functional equivalent," this Court turned to its own precedent in *Sullivan*, above, in which solatium damages were awarded to an aunt involved in a serious car accident in which she witnessed her nephew sustain fatal injuries while seated next to her.  In awarding such damages, the Court noted that the aunt "performed all the duties of a natural or adoptive parent," and was "the only family with whom [the nephew] shared his life on a daily basis from the time he was an infant of 12 months until his death.  See Report & Recommendation at p. 5; citing *Sullivan* at *11 & n.3.  The same can be said of Anthony Dorf in this instance.  His Uncle Stephen also "performed all the duties of a natural or adoptive parent" and the household his mother shared with his Uncle Stephen was "the only family with whom [the nephew] shared his life on a daily basis from the time he was an infant" until Stephen Dorf's murder on September 11, 2001.

     The recommendation of a recovery for solatium for Anthony Dorf as the functional equivalent of a son is supported by both *Bettis* and *Sullivan*.  Further, the recommendation of such an award "will not open the court to the potential of sweeping liability, nor will it transform the 'narrow avenue [of liability into] a broad concourse, impeding reasonable or practicable limitations.'"  *Sullivan* at *35 quoting *Trombetta v. Conkling*, 82 N.Y.2d 549, 553, 626 N.E.2d 653, 605 N.Y.S.2d 678 (1993).  As in *Sullivan*, "the determination that [Anthony] and [Stephen] were immediate family does not result in an open-ended, indefinite, complicated judicial analysis and assessment of emotional ties of an attenuated or embroidered nature.  [Anthony] plainly falls into 'an eminently foreseeable [and] clearly discrete class of potential plaintiffs' and is exactly the type of plaintiff who should be permitted to recover under the…negligent infliction of emotional distress cause of action." [3]  *Sullivan* at *35 quoting *Dunphy v. Gregor*, 136 N.J. 99,

---

[3] Although the "bystander" or presence requirement of a traditional negligent infliction of emotional distress claim was also at issue in *Dunphy*, the presence requirement has been dispensed with in cases under the anti-terrorism exception to foreign sovereign immunity.  See *Bettis* at 331.

109, 642 A.2d 372, 377 (N.J. 1994).

In *Sullivan*, the Court quoted with approval a case from the Northern District on Indiana, *Pieters v. B-Right Trucking, Inc.*, 669 F.Supp. 1463 (N.D.Ind. 1987), that is equally persuasive in this instance:

> "[T]o foreclose [Anthony Dorf] from making a claim based upon emotional harm because [his] relationship with the injured person does not carry a particular label is to work a potential injustice, not only in this case but also in too many other instances in which the events leading to injury or death are indelibly stunning, and where the emotional injury is genuine and substantial and is based upon a relationship of significant duration that, at the time of injury, is deep, lasting and genuinely intimate."

*Pieters*, 669 F.Supp. at 1471.

### **Jennie Mandelino, James Mandelino, Mary Ann Pino, and Michael Mandelino**

Several family members of 9/11 decedent Joseph D. Mistrulli present compelling and moving declarations attesting to their close bonds to, and shared life experiences with, their "brother" Joe. Although they all did reside together with Joe Mistrulli at the same family home for more than a decade, indeed, during a critical formative period of their lives (albeit they were, of course, of varying age ranging from children to teenagers when Joe married their sister and came to live with the Mandelino family), and they also lived within short walking distances ever after, the declarations demonstrate how co-habitation alone cannot begin to describe the significance of their familial relationship to him. Each of the relatives also filled a sibling void created by the circumstances of Joe Mistrulli's own biological family, another established criterion. Yet, the declarations demonstrate in still other way that the common label of "in-laws" is simply inadequate in their case. Although periods of co-habitation and filling the void of absent blood relatives were factors, the Mistrulli-Mandelino-Pino maternal family members, in reality, were functionally equivalent to brothers and sisters to Joe Mistrulli in myriad additional ways. Joe and his "in-law" siblings spoke of each other as blood siblings, treated each other as

6

blood siblings, and, indeed, lived their lives as actual siblings in every discernible way for every day of the two-and-a-half decades that Joe Mistrulli was married to their sister Philomena. Jennie Mandelino, James Mandelino, Mary Ann Pino, and Michael Mandelino were, as the declarations show, truly functional equivalents of Joe Mistrulli's brothers and sisters.[4]

Their claims are also compellingly supported by the three declarations of Joe Mistrulli's widow and two children, who, with nothing to gain themselves, passionately support the claims of their relatives. As several of the family members attest, if the words "functional" and "equivalent" actually mean, for legal purposes, what they would seem to denote on their face, then the label accurately describes the realities of the Mistrulli-Mandelino-Pino family. The family's declarations provide compelling evidence, steeped in family history and told in loving, and sometimes painful detail, that shows convincingly that, in all manner of functioning, Jennie, James, Mary Ann, and Michael were the equivalent of siblings to Joe Mistrulli for two-and-a-half decades before Joe's death on 9/11, and, further, that they each continued to function as Joe's siblings for all the years since September 11, 2001. This evidence should be accepted as a satisfactory, indeed, wholly convincing demonstration of functional equivalence in this case.

### Vaughn Hoglan, Linden Hoagland, Lee N. Hoglan, Kathleen B. Hoglan, Candyce Hoglan, and the Estate of Herbert K. Hoglan

Many of these same types of supporting facts are present in the various declarations supporting the claims of several members of the Hoglan family, who were the functional equivalents of immediate family members to 9/11 decedent Mark Bingham.

---

[4] Tragically, one of these relatives, Michael Mandelino, is unable to submit a declaration because he passed away, in large part due to lung-related disease derived from his work at Ground Zero in the months after 9/11. Michael's functionally equivalent sibling relationship to Joe Mistrulli is attested to by all the other family members who submit declarations herewith. Counsel was unaware of Michael Mandelino's passing until these declarations were prepared. A substitution of his estate will be prepared and filed as soon as possible.

Mark Bingham did in fact reside with his grandparents and his aunts and uncles for substantial periods of time, as described in the declarations of Alice Hoagland, Vaughn Hoglan, Linden Hoagland, Lee N. Hoglan, Kathleen B. Hoglan, Candyce Hoglan, and the Estate of Herbert K. Hoglan.  Thus, Mark was raised not just by his natural parents, who were divorced, but also by his uncles and aunts, who helped to nurture, guide, educate, transport, and support him financially and emotionally from the time Mark was an infant, throughout his formative years, and, indeed, all the years of his life.  They gave of themselves to Mark as would biological parents and siblings, unconditionally and lovingly.  Their compelling declarations detail the many ways in which they provided the equivalence of parental and sibling figures in Mark's life, often filling a void left by the absence of other such familial figures during important years of Mark's childhood, adolescence, and early adulthood.

If Mark Bingham's immediate family was perhaps slightly unconventional, compared to some, still they functioned equivalently as a loving, nurturing, and supportive set of siblings and substitute parental role models for a man who would grow up to become one of the heroes on Flight 93 on September 11, 2001.  They deserve for their family history to be considered on its own merits, outside the strictures of any rigid test or set of rules defining what a family must consist of, or how it should live.  In the case of the Hoglans, they were truly the functional equivalents of immediate family to Mark Bingham in every sense.

### **Conclusion**

In this case, all the evidence submitted on behalf of the *Hoglan* Plaintiffs, both here and previously, that is satisfactory to the Court should result in appropriate damages awards to all meritorious claimants.

                                                  Respectfully submitted,

Date:   May 5, 2017                      /s/ Timothy B. Fleming_____
                                                Timothy B. Fleming (DC Bar No. 351114)

WIGGINS CHILDS PANTAZIS
FISHER GOLDFARB PLLC
1850 M Street, NW, Suite 720
Washington, DC  20036
(202) 467-4489

Dennis G. Pantazis (AL Bar No. ASB-2216-A59D)
WIGGINS CHILDS PANTAZIS
FISHER GOLDFARB LLC
The Kress Building
301 19th Street North
Birmingham, AL  35203
(205) 314-0500

Richard D. Hailey (IN Bar No. 7375-49)
Mary Beth Ramey (IN Bar No. 5876-49)
RAMEY & HAILEY
9333 North Meridian Street, Suite 105
Indianapolis, IN  46260
(317) 582-0000

Robert M. Foote (IL Bar No. 03124325)
Craig S. Meilke (IL Bar No. 03127485)
FOOTE, MIELKE, CHAVEZ
 & O'NEIL, LLC
10 West State Street, Suite 200
Geneva, IL  60134
(630) 232-7450

Attorneys for the *Hoglan* Plaintiffs