## MDL 1570 PLAINTIFFS' EXECUTIVE COMMITTEES
In re: Terrorist Attacks on September 11, 2001 (S.D.N.Y.)

| Plaintiffs' Executive Committee for Personal Injury and Death Claims | Plaintiffs' Executive Committee for Commercial Claims |
|---|---|
| Ronald L. Motley, (1944-2013) <br> Jodi Westbrook Flowers / Donald A. Migliori, *Co-Chairs* <br> MOTLEY RICE LLC <br> James P. Kreindler, *Co-Chair* <br> KREINDLER & KREINDLER LLP | Elliot R. Feldman, *Co-Chair* <br> Sean Carter, *Co-Chair* <br> COZEN O'CONNOR |
| Andrew J. Maloney III, *Co-Liaison Counsel* <br> KREINDLER & KREINDLER LLP <br> Robert T. Haefele, *Co-Liaison Counsel* <br> MOTLEY RICE LLC | J. Scott Tarbutton, *Liaison Counsel* <br> COZEN O'CONNOR |

**VIA ECF**

May 12, 2017

The Honorable Sarah Netburn
Thurgood Marshall United States Courthouse
40 Foley Square, Room 430
New York, NY 10007

      RE:    *In Re: Terrorist Attacks on September 11, 2001,* 03 MDL 1570 (GBD) (SN)

Dear Judge Netburn:

      On behalf of the Plaintiffs' Executive Committees, I write in response to the "status report" filed by counsel for defendant Wa'el Jelaidan, Martin McMahon, ECF No. 3574, concerning Mr. McMahon's purported efforts to obtain a license from the Office of Foreign Asset Control ("OFAC"), to pay the attorney fee and cost award previously imposed upon defendant Jelaidan for his persistent discovery violations. Plaintiffs offer five principal points in reply to the status report.[1]

      *First,* the status report acknowledges that Jelaidan and his counsel have failed entirely to file the interim status reports documenting the nature of efforts undertaken to secure the OFAC license, as expressly required by this Court's October 31, 2016 Order at ECF No. 3380. Their disregard for that obligation is especially egregious given the history of non-compliance with prior orders of this Court that led to the imposition of sanctions on Jelaidan in the first place, as briefly summarized below.

---

[1] As the Plaintiffs' Executive Committees were finalizing this letter this morning, Mr. McMahon sent an email to the undersigned stating as follows: "Dear Sean, We are in the process of securing that license. Who should I put down as the name of who is securing this license? A senior OFAC official advised me yesterday to prepare a letter explaining what we're trying to accomplish in order to speed up the process." That update does not moot the issues raised in plaintiffs' May 3, 2017 letter or this reply in further support of that application. If anything, Mr. McMahon's sudden progress with OFAC following plaintiffs' request for sanctions only punctuates the lack of diligence that preceded that submission.

The Honorable Sarah Netburn
May 12, 2017
Page 2

*Second,* Mr. McMahon's status report confirms that there have been *no* meaningful efforts undertaken to secure a license from OFAC since Mr. McMahon sent an initial letter to OFAC on April 9, 2016.  Indeed, the sole document submitted along with the status report is a May 5, 2017 letter to OFAC, the date of which confirms:  (1) that it was submitted only *after* plaintiffs' recent letter apprising the Court of Jelaidan's failures to file the mandated status reports (and on the same day as the status report to the Court); and (2) more than a year after his April 9, 2016 initial letter to OFAC, the only other document Mr. McMahon has ever submitted to the Court concerning alleged efforts to obtain the required license.  Thus, the status report reveals that more than a year passed without any written efforts having been undertaken to secure a license, even in the face of this Court's directive that Jelaidan and his counsel employ "diligent efforts to secure the necessary OFAC license" and file reports every 60 days to document the status of their efforts.

*Third,* the informal and undocumented conversations Mr. McMahon cites in his letter with individuals who are not affiliated with OFAC, as purported evidence of diligence on his and Mr. Jelaidan's part, in fact reflect the very pattern of deflection, inaction, and disregard for this Court's authority that produced the underlying sanctions in the first place.  The projected discovery disputes which produced the underlying sanctions award against Jelaidan spanned nearly five (5) years, and are summarized in plaintiffs' August 10, 2015 Letter Motion for additional sanctions against defendant Jelaidan, ECF No. 2988, attached hereto as Exhibit A.  As reflected in that letter, Judge Maas issued an Order on November 16, 2011 directing defendant Jelaidan to undertake a "full-court press" to secure banking and other records under his control and responsive to plaintiffs' discovery requests, and that Jelaidan's efforts to do so had "to be documented." *Id.* at p. 4.  Judge Maas specifically warned defendant Jelaidan and his counsel that "[i]f you're not sufficiently able to document a vigorous effort to obtain those documents, it may be that sanctions are imposed." *Id.*

When defendant Jelaidan and Mr. McMahon failed to provide any competent documentation supporting a diligent effort to comply with the Court's November 16, 2011 Order, plaintiffs filed an additional motion to compel on January 30, 2013, asking the Court to direct Jelaidan to immediately produce documents verifying all efforts he and his counsel had undertaken to request and secure documents responsive to plaintiffs' document requests, and to comply with the Court's November 16, 2011 Order.

On October 28, 2013, Judge Maas issued a Memorandum Decision and Report and Recommendation, ECF No. 2789, rebuking Jelaidan for his blatant disregard of the Court's Orders and obvious failure to undertake any diligent efforts to secure responsive documents within his control, and imposing sanctions.  Judge Maas specifically noted that the few letters Jelaidan and his attorneys did send to the various banks were "woefully insufficient and do not demonstrate good faith," and noted the significant possibility "that the letters simply were sent in an eleventh-hour attempt to manufacture a basis upon which to oppose the Plaintiffs' Motion." *See* Report and Recommendation at pp. 9-12; *see also id.* at p. 9 ("Jelaidan's conduct throughout this case evidences a continued unwillingness to participate fairly in discovery and can only be characterized as proceeding in bad faith."); *id.* ("Jelaidan's failure to meet even his most basic discovery obligations thus has resulted in extreme delay."); p. 12 (stating there is "significant

The Honorable Sarah Netburn
May 12, 2017
Page 3

doubt" that Jelaidan "made prior good faith attempts to contact his banks"); p. 14 (stating that "Jelaidan has not made good faith efforts to satisfy his discovery obligations" and "has been less than forthcoming about the documents that he is capable of obtaining and producing"); p. 15 (finding "that Jelaidan has willfully disregarded his discovery obligations and acted in bad faith"); *id.* ("Jelaidan's failure to undertake any efforts to retrieve responsive documents for nearly one and one-half years after he was ordered to do so is clear evidence of his intentionally obstructive conduct.").

As these rulings reflect, the underlying sanctions award against defendant Jelaidan was directly predicated upon this Court's conclusion that he had demonstrated a profound lack of diligence in complying with this Court's Orders, and that the arguments and documents he had submitted to the Court in an effort to manufacture the appearance of some effort were not in the least bit credible.

Having already been sanctioned for failing to document diligent and good faith efforts to comply with this Court's prior orders, one would expect that Mr. Jelaidan and his counsel would have taken heed and proceeded with extraordinary care in complying with the Court's directives in relation to the efforts to obtain a license to facilitate payment of the attorney fee and sanction award, and in documenting those efforts. Instead, Mr. McMahon's status report simply evidences the same lack of diligence and pattern of deflection that resulted in the underlying sanctions in relation to the Court's orders concerning the mandated efforts to obtain the license.

For obvious reasons, any purported conversations Mr. McMahon may have had in informal settings with third parties who are not affiliated with the United States government or Department of the Treasury have no relevance to the adequacy of his and Mr. Jelaidan's efforts to obtain a license from OFAC, but I feel compelled to address the conversation with me that he cites in his status report. What I recall is that he approached me as I was walking out of the courtroom following the lengthy oral argument on the Motion to Compel as to Dallah Avco, one of Mr. McMahon's other clients. After exchanging pleasantries, Mr. McMahon made an unspecific statement about having difficulty dealing with OFAC, without identifying any efforts that had been made or any other specifics. I do not recall exactly how I responded, although I am certain it was not a substantive exchange, and I most certainly did not in any way suggest to Mr. McMahon that I or any of the other plaintiffs' counsel intended to do his work for him. In addition, I do not know anyone at the Office of Foreign Assets Control, so I certainly did not suggest otherwise during our conversation. By my recollection, the entirety of the conversation lasted less than 30 seconds.

*Fourth*, and finally, Mr. McMahon's professed helplessness in dealing with OFAC is puzzling given that he has been representing designated individuals and organizations from the outset of this litigation, and presumably has found a way to get himself paid. For instance, Mr. McMahon has represented defendant Jelaidan, who was designated by the United States government as a Specially Designated Global Terrorist pursuant to Executive Order 13224 on September 6, 2002, since the outset of this litigation. That representation has encompassed extensive motion practice dating as far back as October 2003, when Jelaidan filed a motion to dismiss the *Burnett* case (then pending in the District of Columbia), and continuing through the

The Honorable Sarah Netburn
May 12, 2017
Page 4

numerous discovery disputes and sanctions motions as to Jelaidan in the MDL over the last several years.  Given Mr. Jelaidan's designation, an OFAC license would be necessary in order for him to pay Mr. McMahon for that representation, so we have to infer that Mr. McMahon has obtained licenses from OFAC to receive payments from Mr. Jelaidan in the past.

In addition to his role as counsel for Mr. Jelaidan, Mr. McMahon also represented Rabita Trust, an entity also designated pursuant to Executive Order 13224, until Judge Maas entered a default judgment against Rabita Trust.  ECF Nos. 2789, 2851, and 2853.  Further, Mr. McMahon previously represented the International Islamic Relief Organization ("IIRO"), an organization whose offices in the Philippines and Indonesia were designated during the course of his representation of the IIRO.  Mr. McMahon was replaced as counsel for IIRO not long after plaintiffs moved for entry of a default judgment against the IIRO for non-compliance with its discovery obligations.

Although plaintiffs are not privy to all dealings Mr. McMahon has had with OFAC in relation to his representation of these and other defendants in this litigation, documents produced by defendant Sanabel al Kheer, Inc. (Sanabel) in discovery indicate that Mr. McMahon has had considerable experience in dealing with OFAC in order to facilitate financial payments, including payments to Mr. McMahon for legal fees.  For instance, the discovery documents produced by Sanabel[2] indicate that Mr. McMahon had significant involvement with OFAC in 2008-2009 in relation to the sale of a property owned by Sanabel, and the distribution of the proceeds of the sale of that building to IIRO, another defendant Mr. McMahaon represented at the time, and to Mr. McMahon himself, in compensation for legal services provided to Sanabel and IIRO.

Engagement with OFAC became necessary because of the designation of two of IIRO's offices.  The records reflect that Mr. McMahon exchanged several letters with OFAC in relation to the transactions, *see* Exhibits B, C, D and E (correspondence)[3] and that Mr. McMahon's own bank account was at one point frozen in relation to the distributions, but later unfrozen through engagement with OFAC.  *See* Exhibit F (January 21, 2009 Memo to Sanabel Board of Directors) at p. 2.  Ultimately, the transactions were successfully executed with the aid of Mr. McMahon's counsel and involvement, with Mr. McMahon receiving the bulk of the proceeds from the sale in

---

[2] Sanabel was at one time represented by Mr. McMahon, but was later replaced by Christopher Manning, Esquire.  Plaintiffs had requested copies of all records relating to the sale of Sanabel's property as relevant to several issues, and Sanabel produced the documents referenced in this letter in response to those demands, again during Mr. Manning's representation.

[3] The letters were, for some unexplained reason, marked as confidential.  While that designation was inappropriate, plaintiffs note in the interests of clarity that Judge Casey's 2004 Confidentiality and Protective Order authorizes (and in fact requires) the filing of materials designated as confidential in the public court record where submitted in relation to a motion, hearing, or other proceeding.  *See* Memorandum and Order on Confidentiality and Protective Order at p. 6.

The Honorable Sarah Netburn
May 12, 2017
Page 5

compensation for his legal services.[4]  *See* Exhibit G (November 24, 2009 letter from Sanabel to IIRO Saudi Arabia).  Thus, it is apparent that Mr. McMahon has considerable expertise in dealing with OFAC.

For all of the foregoing reasons, plaintiffs respectfully submit that imposition of additional sanctions is warranted for the complete failure of Mr. Jelaidan and his counsel to comply with this Court's orders relating to the procurement of a license from OFAC to pay the attorney fee and cost award previously imposed as a sanction, and to file periodic status reports documenting diligent efforts in that regard.

Respectfully submitted,

COZEN O'CONNOR

By:     Sean P. Carter

SPC/:bdw

cc:     The Honorable George B. Daniels (via ECF)
        All MDL Counsel of Record (via ECF)

LEGAL\30347604\1

---

[4] Of note, the sale of the Sanabel property facilitated by Mr. McMahon occurred while Sanabel was an active defendant in this litigation, and plaintiffs would later learn that the building was essentially the only asset of Sanabel.  Although the specific timing of the distributions of the proceeds of the sale are unclear, it appears that Mr. McMahon withdrew as counsel for Sanabel very shortly after receiving proceeds from the sale, asserting that his representation had been terminated.  *See* Exhibit G, (November 24, 2009 Sanabel letter reporting distributions to Mr. McMahon through at least November 6, 2009); Exhibit H, (Declaration of Martin McMahon is Support of Motion to Withdraw, also dated November 24, 2009) (ECF No. 2203).  Plaintiffs thereafter moved to compel additional discovery from Sanabel, including additional records relating to the sale of the building and basis for distributing proceeds of the sale to IIRO, and to depose Sanabel's sole remaining representative, Dr. Moniem Abdel El Hillali on those and other subjects.  Dr. Hillali thereafter ceased responding to Sanabel's new counsel, leading to the entry of a default judgment against Sanabel.  *See* ECF No. 3311 (Memorandum Opinion and Order of Judge George B. Daniels); *see also* ECF No. 3220 (Report and Recommendation of Judge Frank Maas).