# EXHIBIT C

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


THOMAS BURNETT, SR., et al.,          :
                                      :
              Plaintiffs,             :   Docket No. CA 02-1616 JR
                                      :   Washington, D.C.
         v.                           :
AL BARAKA INVESTMENT AND              :   Tuesday, June 24, 2003
DEVELOPMENT CORPORATION, et           :   10:08 a.m.
al,                                   :
                                      :
              Defendants.             :
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .


TRANSCRIPT OF MOTIONS HEARING
BEFORE THE HONORABLE JAMES ROBERTSON
UNITED STATES DISTRICT JUDGE


APPEARANCES:


For the Plaintiffs:        MOTLEY RICE
                           RON MOTLEY, ESQ.
                           JODI WESTBROOK FLOWERS, ESQ.
                           28 Bridgeside Boulevard
                           Mt. Pleasant, South Carolina 29465

                           HANLY & CONROY
                           ANDREA BIERSTEIN, ESQ.
                           415 Madison Avenue
                           New York, New York 10017

                           HARRY HUGE LAW FIRM
                           HARRY HUGE, ESQ.
                           401 9th Street
                           Washington, D.C. 20004

                           G. ROBERT BLAKEY, Ph.D.
                           University of Notre Dame
                           326 Law School
                           Notre Dame, Indiana 46556

GERSON INTERNATIONAL LAW GROUP
ALLAN GERSON, ESQ.
4771 Lenore Lane
Washington, D.C. 20008

For the Defendants:        WHITE AND CASE
CHRISTOPHER M. CURRAN, ESQ.
FRANK PANOPOULOS, ESQ.
NICOLE ERB, ESQ.
601 13th Street, N.W.
Washington, D.C. 20005

BERNABEI & KATZ
LYNNE BERNABEI, ESQ.
ALAN KABAT, ESQ.
1773 T Street, N.W.
Washington, D.C. 20009

BAKER BOTTS
WILLIAM H. JEFFRESS, JR., ESQ.
CHRISTOPHER R. COOPER, ESQ.
SARA KROPF, ESQ.
1299 Pennsylvania Avenue, N.W.
Washington, D.C. 20004

BECKER, HADEED,KELLOGG & BERRY
MICHAEL HADEED, JR., ESQ.
5501 Backlick Road
Springfield, Virginia 22151

GORDON & SIMMONS
ROGER C. SIMMONS, ESQ.
131 West Patrick Street
Frederick, Maryland 21701

Court Reporter           DENNIS A. DINKEL, FAPR, RDR, CRR
Official Court Reporter
Room 6818, U.S. Courthouse
Washington, D.C. 20001
Phone:  (202) 289-8661

Proceedings reported by machine shorthand, transcript produced by computer-aided transcription

**P R O C E E D I N G S**

(10:08 a.m.)

1          THE DEPUTY CLERK:  Civil Action No. 02-1616, Thomas

Burnett, Senior and others versus Al Baraka Investment and

Development Corporation and others.

         Would counsel who are going to be speaking please

approach the lectern and introduce yourselves for the record?

         MR. HUGE:  Good morning, Your Honor.  I am Harry Huge.

We will have three people speaking for us.  Mr. Motley,

Ms. Bierstein, and Professor Blakey; and then I will be

addressing the court on the matter of seeking the depositions of

the affiants to defendant Sultan's motion to dismiss.

         THE COURT:  Thank you, Mr. Huge.

         MR. CURRAN:  I am Christopher Curran from White and

Case on behalf of one defendant.  That is Al Rajhi Bank.  I have

two counsel with me, Frank Ponopoulos and Nicole Erb.  Depending

upon what issues are addressed in this session, you may be

hearing from them as well as myself, Your Honor.

         THE COURT:  Okay.

         MS. BERNABEI:  I am Lynn Bernabei.  I am representing

Al Rajhi Islamic Foundation and Soliman Khudeira.  With me is

Mr. Kabat at counsel table.

         THE COURT:  Good morning, Ms. Bernabei.

         MR. SIMMONS:  Good morning, Your Honor.  I am Roger

Simmons here on behalf of Zahir Kazmi, one of the individual

1    defendants.  I'll be speaking on his motion to dismiss.

2                THE COURT:  Mr. Simmons, thank you.

3                MR. SIMMONS:  With me is Peter Asad.  He's not a member

4    of this court but a member of the Maryland bar.

5                THE COURT:  He's welcome.

6                MR. HADEED:  Good morning, Your Honor.  I'm Michael

7    Hadeed, Junior, here on behalf of Muslim World League, and I'll

8    be speaking as to any issue that may be different from the

9    issues that are being addressed by counsel on the defense

10   side --

11               THE COURT:  I appreciate that.

12               MR. HADEED -- that speak to our client.

13               THE COURT:  Thank you.

14               MR. JEFFRESS:  May it please the court, William

15   Jeffress for the defendant Prince Sultan Bin Abdul Aziz Al Saud.

16   I'll be addressing the discovery issue and either I or my

17   partner, Casey Cooper or our associate, Sara Kropf, might

18   address any other questions that Your Honor has.

19               THE COURT:  Thank you.  I have the feeling there are

20   some people here -- there have to be some people here who are

21   not lawyers in the case, although that's not necessarily so.

22               But I think some general introduction of what we're

23   about here today might be useful.

24               In this case, there are some 3,000 plaintiffs:

25   Victims, family members of victims, or representatives of the

1    estates of victims of the terrorist attacks on September 11,

2    2001.

3         They are suing by my count 189 defendants, and those

4    defendants include banks, business corporations, foundations,

5    Islamic organizations, governments and government entities,

6    Saudi royalty, and some individuals.

7         Not all of these defendants have even been served with

8    process yet in this case but many have.  And many of the

9    defendants have filed motions to contest various aspects of the

10   suits that have been brought against them.  These are motions to

11   dismiss; and a motion to dismiss, under the federal rules, is a

12   motion to throw a case out before you even get to the process of

13   deciding what the evidence is in the case.

14        These are, in other words, essentially purely legal

15   motions.  They raise important and sometimes difficult legal

16   questions including whether this court has personal jurisdiction

17   over some of the defendants, whether this court has subject

18   matter jurisdiction over some of the plaintiffs' claims, whether

19   this is the proper district in which this case should be heard,

20   whether to the extent the case involves claims against foreign

21   governments, government officials or royalty, it deals with

22   international questions that are even justiciable in our courts

23   and whether any defendant should be required to defend himself

24   or herself or itself against claims that are -- as they are

25   spelled out in this complaint.

1       There was no magic to the selection of the motions that

2  are going to be heard today.  They were simply the first motions

3  to dismiss that were filed and fully briefed and ready to be

4  heard and decided.

5       I have notified the lawyers in the case that the issues

6  that I am particularly interested in hearing arguments on are

7  the question of subject matter jurisdiction in this case, and

8  that refers principally to a piece of legislation that was

9  enacted 10 days after the September 11 attacks that contains

10 language suggesting that the only place these cases could be

11 heard is in the Southern District of New York; whether the

12 District of Columbia is the proper venue for these cases;

13 whether the plaintiffs' complaint -- and this is now the third

14 amended complaint -- properly alleges that the defendants caused

15 the actions of September 11; whether a claim brought under the

16 Alien Tort Claims Act may be asserted against non-state actors;

17 whether the RICO statute, the Racketeering Influenced Corrupt

18 Organization statute applies here so the damages resulting from

19 personal injury may be compensable under RICO; what law applies

20 to the common law claims of the plaintiffs; and whether their

21 claims are justiciable.

22       I notified the parties I expect there to be argument on

23 other issues raised by the motions.  I'm not limiting anybody to

24 those issue,s but those are the issues that I am most focused

25 on.

1        At least one of the defendants whose motions are not

2    set for hearing this morning has reminded the court that other

3    parties may have other points to make about some of the issues

4    that we're going to be talking about today.  That's a point well

5    taken, and I have no intention of making decisions on these

6    motions that will preempt other arguments.

7        But we are in the comparatively early stages of a case

8    that is certainly as large as any case I've dealt with since

9    I've been on the bench, and we're in the early process of

10    sorting out the issues.

11        I don't think actually I'll be issuing any rulings this

12    morning.  The hearing is probably the first of many as we

13    attempt to sort out the issues that this case presents.

14        Now, that will have to suffice by way of introduction.

15    I think I should probably hear from Mr. Curran first, because

16    his motion on the -- on the Air Transportation Safety and

17    Stabilization Act addresses a question that is common to all of

18    the parties in the case which is whether this case can possibly

19    be brought any place but in the Southern District of New York.

20        So Mr. Curran, I think you're first up.

21        MR. CURRAN:  Thank you, Your Honor.  Before I delve

22    into the issues under the statute you referred to, Your Honor, I

23    hope you'll permit me on behalf of myself and Al Rajhi Bank --

24    my client -- to at the very outset express sympathy for all the

25    victims and families of the 9/11 tragedy.

1          The bank has unequivocally condemned that terrorist act

2     and, in fact, the bank has worked closely with the governments

3     of the United States and Saudi Arabia to try to get to the

4     bottom of what occurred and to bring to justice all those who

5     were responsible.

6          I note that Al Rajhi Bank has not been designated as a

7     terrorist organization or otherwise condemned by the U.S.

8     government.  Your Honor, none of the legal arguments that I have

9     advanced in the briefs on behalf of Al Rajhi Bank or that we'll

10    be discussing today are intended in any way to diminish the

11    tragedy and the personal sorrow inflicted upon the family

12    members and the victims.

13         Your Honor, to facilitate the discussion of the first

14    issue you identified, I would like to hand out to Your Honor a

15    booklet containing the relevant statutory provisions.  I already

16    provided it to counsel for the plaintiffs.  May I do that?

17         THE COURT:  All right.  I've got them up here, but

18    that's all right.  I'll be happy to see your booklet.  You don't

19    have copies for everybody, do you?

20         (Laughter.)

21         Thank you.

22         MR. CURRAN:  You'll see in addition to the booklets

23    Your Honor I've posted on a card here on a blown up chart the

24    key statutory language.  What I propose to do is to discuss the

25    statutory language, the structure, and then explain exactly why

1   it's clear from this congressional enactment that this case

2   belongs in New York where other similar cases are filed.

3           Okay.  Your Honor has already referred to or alluded to

4   the Air Transportation Safety and System Stabilization Act which

5   is a mouthful generally referred to as ATSSSA.

6           Your Honor also indicated that the act was passed

7   approximately 10 days after the 9/11 tragedy and signed by

8   President Bush the following day.  I'd like to focus our

9   discussion on title 4 which is entitled victim compensation.

10          Your Honor, I'm sure you are aware that that section of

11  the statute sets up a compensation scheme for the families of

12  victims.  It sets up a fund to be administered by a special

13  master appointed by the Department of Justice.  That fund, of

14  course, is well under way.

15          Title 4 also goes on to address the procedural and

16  substantive issues regarding the litigation that may be brought

17  for claims arising out of the 9/11 attack.

18          Focusing Your Honor's attention on section 408, which

19  is entitled limitation on liability, that section begins with a

20  subpart, subpart (a) which for the purpose of concision, I have

21  excluded from our chart here; but it is an important section

22  because it is in that section that Congress limited the

23  liability of certain parties, including air carriers, and the

24  city of New York, and various others; and by placing limitations

25  on liability, I'm referring specifically to financial caps on

1    that liability.

2          THE COURT:  There isn't any liability on any of the --

3    the statute doesn't purport to limit the liability of any of the

4    defendants in this case?

5          MR. CURRAN:  That's correct.  But nonetheless, that

6    section 408(a) is important to understanding the rights and

7    issues pertaining to all defendants including those who are in

8    this case.

9          Section 408(a), of course, limits liability to the

10   insurance limits of various parties and also places a strict

11   monetary cap of $350 million on the city of New York.

12         Now moving on to the substance of what's included on

13   the chart, 408(b), this is the crux of the issues raised by my

14   motion.  408(b)(1) creates an exclusive federal cause of action

15   for damages.  It does that pretty unequivocally.

16         The first sentence states in plain English there shall

17   exist a federal cause of action for damages arising out of the

18   hijacking and subsequent crashes of the flights at issue, and

19   the very next sentence, of course, states that this cause of

20   action shall be the exclusive remedy for damages arising out of

21   the hijacking and subsequent crashes of such flights.

22         Okay.  We think that that language couldn't be more

23   clear in indicating that this federal cause of action being

24   created is the exclusive, the one and only remedy for damages

25   for any claims arising out of the hijacking and crashing --

1    crashes of these flights.

2           Moving down then to 408(b)(2), that articulates the

3    substantive law that shall govern in the cause of action created

4    in 408(b)(1).  There, of course, the language indicates that the

5    substantive law for decision in any such suit -- again such suit

6    referring back to 408(b)(1) -- shall be derived from the law

7    including choice of law principles of the state in which the

8    crash occurred unless such law is inconsistent with or preempted

9    by federal law.

10           Okay.  We understand that provision 408(b)(2) to mean

11    that a court considering claims under the newly created

12    exclusive federal claim for damages shall look to -- for choice

13    of law purposes -- to New York law for the flights that crashed

14    into the World Trade Centers, to Pennsylvania law for the flight

15    that crashed there, and Virginia law for the flight that crashed

16    into the Pentagon.

17           THE COURT:  Do you perceive any difference in the laws

18    of those three jurisdictions as they relate to anything that's

19    involved in this case?

20           MR. CURRAN:  I believe -- I will not purport to have

21    analyzed all three states with respect to all issues; but I

22    believe that under certain wrongful death claims and

23    survivorship, there is a minor difference in Virginia state law.

24    I do not believe there's any difference among the various states

25    that would have any impact on the pending motions before Your

1    Honor.

2           Again, one last note.  At the end of that 408(b)(2),

3    there's a clause that says unless such law is inconsistent with

4    or preempted by federal law.  I'm not aware of any discussion or

5    explication of that provision in the legislative history; but to

6    me, it is an understandable inclusion in this provision and

7    probably was meant to make clear that issues such as sovereign

8    immunity and so forth that are established under federal law are

9    not being overridden by the application of the various state

10   laws.

11          Now, moving down to probably the central provision with

12   respect to this issue, and that's entitled jurisdiction,

13   408(b)(3), there Congress and President Bush have established

14   the Southern District of New York as the exclusive forum for any

15   and all cases.  Let me emphasize that.  This provision,

16   408(b)(3) is not limited by reference to the newly created

17   federal cause of action.

18          In sweeping and unequivocal language it states the

19   United States District Court for the Southern District of New

20   York shall have original and exclusive jurisdiction over all

21   actions brought for any claim (including any claim for loss of

22   property, personal injury, or death) resulting from or relating

23   to the terrorist-related aircraft crashes of September 11, 2001.

24          Forgive me for just reading the language, but I think

25   that puts in context the provisions that are at issue here.

1        Now, I believe if the statute had ended there, that we

2   would have agreement with the plaintiffs that this action would

3   have to be brought in New York.  I think that's correct, and

4   that should be a inescapable conclusion because 408(b)(3) could

5   not be more sweeping or clear in its terms.

6        In fact, it is even broader than 408(b)(1) because

7   (b)(1) creates a federal cause of action for damages arising out

8   of the hijacking and subsequent crashes of such flights, whereas

9   408(b)(3) talks about -- talks in even more sweeping language

10  about any claims relating to the terrorist-related aircraft

11  crashes and 408(b)(3) also does not limit itself to damages

12  remedies.

13        In other words, Your Honor, 408(b)(3) could not have

14  been more clear that any and all claims relating to the terrible

15  events of 9/11 are required to be brought in the Southern

16  District of New York, and we provided legislative history

17  statements from various senators confirming that that, in fact,

18  was their specific subjective intention when they adopted this

19  language.

20        Where we get into the issue here is 408(c).  The

21  plaintiffs point of 408(c) is to argue it modifies what would

22  otherwise obtain here.  In the language that states nothing in

23  this section shall in any way limit any liability of any person

24  who is a knowing participant in any conspiracy to hijack any

25  aircraft or commit any terrorist act.

1       Now the plaintiffs argue that that cuts back from the

2   language in 408(b), and they say that people who are accused of

3   being knowing participants in the tragic events should not claim

4   the benefit of the exclusive federal cause of action and the

5   federal jurisdiction.

6       But, Your Honor, the language that Congress used in

7   408(c) specifically relates to limiting any liability of a

8   person who is a knowing participant.  It does nothing in any

9   way, shape, or form to carve back from the exclusive choice of

10  forum designated in 408(b)(3).

11      Now, I believe that the only appropriate way to read

12  408(b) is that Congress there in talking about limit any

13  liability was referring back to 408(a) where Congress imposed

14  the limits on liability of air carriers and the city of New York

15  and various other organizations and people.

16      I think that's the only way to construe this entire

17  statutory scheme.  Even if I'm wrong about that, even if the

18  limit on liability refers to something else such as the

19  exclusive federal cause of action, it doesn't matter because

20  it's clear that 408(c) does not carve back from the exclusive

21  forum selection in 408(b)(3).

22      That in a nutshell -- or maybe it is not a nutshell,

23  Your Honor -- but that's our argument.  We believe that that's

24  the only appropriate way to interpret the statute.  We believe

25  that Your Honor ought to dismiss this claim -- this case or

 1      transfer it to New York where it would be joined together with

 2      claim -- with cases that are already existing up there.

 3              THE COURT:  What -- the last -- the very last sentence

 4      of subparagraph 408(c) says subsections (a) and (b) do not apply

 5      to civil actions to recover collateral source obligations.

 6              Teach me what a collateral source obligation is.

 7      Insurance claims?

 8              MR. CURRAN:  Yes.  In fact, that's defined elsewhere in

 9      the act.  I believe that's section 402 --

10              THE COURT:  So that's not applicable to your argument?

11              MR. CURRAN:  That's not applicable.  But it is

12      interesting that 408(c), the language that's chosen there, the

13      first sentence says nothing in this section.  Section, of

14      course, is the entire section 408, so that includes 408(a), and

15      then the sentence Your Honor referred to, refers to sections (a)

16      and (b) do not apply to civil actions.

17              It seems pretty clear to me that in the exclusions

18      section Congress was trying to be careful in addressing what

19      sections it was relating to when it was excluding certain

20      things.  Generally careful.  As careful as Congress gets in

21      these things, I think, Your Honor.

22              THE COURT:  You will -- you will agree with the

23      plaintiffs at least insofar as they argue that the general

24      thrust of ATSSSA is to deal with claims against air carriers,

25      aircraft manufacturers, airport sponsors, persons with property

1    interests in the World Trade Center?  That's what Congress was

2    thinking about when they passed the statute, wasn't it?  10 days

3    after the act?.

4            MR. CURRAN:  No.  I disagree with that, Your Honor.  I

5    don't think you can square that with the limits purpose of the

6    language in the taught.

7            THE COURT:  I understand that.  You're going to hang on

8    to that language.  I understand that.  I want to know about the

9    overall thrust of this -- the genesis of this statute was

10   congressional concern about basically bankrupting all the

11   airlines in the United States and the airports in the United

12   States, wasn't it?

13           MR. CURRAN:  That was a concern, but reading the

14   statute and reading the legislative history there were other

15   concerns that were animating Congress, and those were assuring

16   that victims would have fair compensation in an orderly

17   procedure.

18           Now I think Congress was concerned that if they just

19   limited the liability of the air carriers, then they might be

20   leaving insufficient funds to fairly compensate the victims and

21   the families.  So it was part and parcel with that limitation on

22   liability that they created a structure, that was both a

23   litigation structure that we've been discussing here as well as

24   a non-litigation compensation scheme.

25           I think it is all mixed together; and, in fact, if you

1   look at the title, title 4 is entitled victim compensation.

2              So it is not correct to say that Congress was only or

3   primarily concerned with the fate of the airlines.  It clearly

4   had other interests and purposes in mind.  And I believe the

5   statement of purpose in ATSSSA is sufficiently broad to reflect

6   the dual or multi-part purposes that were motivating Congress.

7              THE COURT:  All right.  Now your reference to

8   legislative history, there certainly isn't much legislative

9   history for something enacted 10 days after the World Trade

10  Center bombing.  There are no House or Senate reports, am I

11  correct?

12             MR. CURRAN:  That's correct.

13             THE COURT:  The words you cited by Senator Schumer and

14  others were spoken on the floor?

15             MR. CURRAN:  Yes.

16             THE COURT:  No hearings?

17             MR. CURRAN:  No hearings.  But it was not just a single

18  isolated statement.  First of all, our position is you look at

19  the statutory language, and that's the end of the inquiry.

20             THE COURT:  I got that part, counsel.

21             (Laughter.)

22             MR. CURRAN:  But if you are required to consult with

23  the legislative history, my point is we're not talking about an

24  isolated statement by Senator Schumer.  We have Senator Hatch,

25  Senator McCain.  And there's also nothing in the legislative

1    history that would suggest some other approach.

2           It appears, Your Honor, there's a sensible approach

3    that's being adopted here and that's something akin to a

4    multi-district litigation panel approach.  Congress wanted to

5    avoid a situation where there would be confusion and

6    inconsistent results in cases throughout the country, perhaps in

7    state courts as well as federal courts and so forth.

8           They wanted all of these claims resolved in a single

9    place and in a fair manner.  And that's what they were trying to

10   enact here.

11          THE COURT:  The very first words of this statute,

12   unavailability of actions, say notwithstanding section 40120-C

13   of title 49, which is what?

14          MR. CURRAN:  That's the international navigation rules

15   act which has a simple -- I don't know why -- there must have

16   been some specialist in aviation law involved in this.  There is

17   a reference in that act -- and it is in subsection (c) that

18   states a remedy under this part is in addition to other remedies

19   provided by law.

20          THE COURT:  All right.

21          MR. CURRAN:  Okay.

22          THE COURT:  So Congress was careful to carve out that

23   provision in the notwithstanding language.  There isn't any

24   notwithstanding language with respect, for example, to the

25   multi-district litigation panel.

1        MR. CURRAN:  Well, the multi-district litigation
2   panel --
3        THE COURT:  Or the Alien Tort Claims Act or the
4   anti-terrorism act or RICO.
5        MR. CURRAN:  Well, I think there's a logic to it,
6   though.  None of those statutes that you referred to have a
7   statement saying that it's -- to my knowledge -- have a
8   statement saying that the remedies under that statute are in
9   addition to other provisions.  I think that's ordinarily
10  understood but in this aviation statute, there was an explicit
11  statement that it was in addition to other statutory remedies.

12       Now somebody in Congress who must have been familiar
13  with this international navigational rules act of 1977 must have
14  saw some tension between that statutory provision and the
15  creation of an exclusive cause of action arising from these
16  aircraft flights, from these aircraft crashes.  So whoever
17  inserted that provision I think was using a little bit of belts
18  and suspenders to make it clear, to underscore, that the
19  exclusiveness of 408(b)(1) was unequivocal.

20       Now, naturally, Your Honor, people in Congress,
21  congressmen, senators, their staffers and so forth must have
22  known that there were preexisting federal statutes that would
23  have provided for claims even without the enactment of this
24  specific legislation.

25       In that context, the creation of an exclusive remedy

1    for damages has to be understood to be withdrawing claims under

2    such preexisting statutes.

3         Otherwise, they wouldn't have used the word exclusive

4    in there and they would have just left it alone as there shall

5    be a cause of action as an additional remedy for damages.

6         THE COURT:  All right.  Thank you.

7         Let me hear the other side of this argument.  Mr. Huge?

8         MR. HUGE:  Ms. Bierstein is going to argue.  Thank you.

9         THE COURT:  Ms. Bierstein?

10        MS. BIERSTEIN:  Good morning, Your Honor.  Andrea

11   Bierstein from Hanly and Conroy, representing the plaintiffs.

12   We were going to use our PowerPoint presentation in connection

13   with this argument.  I think I need to alert somebody to that

14   fact.

15        THE COURT:  I think you just did.

16        MS. BIERSTEIN:  Your Honor, before turning to the text

17   of the ATSSSA, I want to spend a minute talking about the

18   circumstances in which the statute was passed.  The court has

19   already alluded --

20        THE COURT:  Let me just -- since we have this wonderful

21   screen up here that can be folded away from the wall so that the

22   people even back in the corner can see it, let me just -- we

23   might as well use it.

24        MS. BIERSTEIN:  Your Honor --

25        THE COURT:  PowerPoint comes to the courtroom.

1           MS. BIERSTEIN:  Yes.  Moving into the twenty-first
2   century.

3           THE COURT:  That's pretty twentieth century.

4           MS. BIERSTEIN:  We moved into the twentieth century
5   just in time for the new one.

6           Your Honor has alluded to the circumstances under which
7   the statute was passed, but I want to elaborate for a minute on
8   that.  As the court is no doubt aware, on September 11, the
9   nation's air transportation system was completely shut down, all
10  flights were grounded, and air transportation in this country
11  came to a halt.

12          After several days, flights resumed; but when they did,
13  two things became clear:  One was that very few people were
14  willing to fly; and the other was that in the face of
15  potentially huge liability arising from the events of September
16  11 itself, the solvency of the airlines, especially United and
17  American but, in fact, all the airlines was in doubt.

18          The ATSSSSA was debated and passed on Friday, September
19  21, just 10 days after the attacks and signed into law the next
20  day.  I think -- despite what Mr. Curran has to say -- when you
21  read the debates in the House and Senate, it is clear that
22  Congress acted with such haste because it believed unless a bill
23  was in place the following Monday, that is September 21 was a
24  Friday, those debates were taking place Friday night.  Congress
25  believed that unless there was a statute in place to protect the

1    airlines on Monday morning when Wall Street opened, that if the

2    markets opened without a safety net for the airlines, that the

3    credit to the airlines would be shut off, that they would then

4    have to cease flying; and as Representative Foley from Florida

5    put it in the House debate, the economy of the United States

6    will grind to an absolute halt.

7            Senator Bond from Missouri stated in the Senate debate,

8    we have put our entire airline industry at great risk.  This

9    bill is necessary if we're to solve these problems and if we are

10   to get the planes back in the air.

11           So what they passed was the ATSSSA; and, unfortunately,

12   it may not be as clear as we would like it to be.  I think the

13   words don't mean -- don't -- they're not as clear as Mr. Curran

14   would say, but I think the haste with which Congress had to pass

15   the bill may be the explanation for that.

16           I want to go to the next slide, number 14.

17           Because we're going to look first with the provisions

18   of the statute in section 408.  But I note in Mr. Curran's

19   argument, he suggests that section 408(b)(3), standing alone he

20   says, if you just looked at that, without anything else, he

21   suggests it would be crystal clear.

22           Maybe that's true, but I think the problem with that

23   argument, Your Honor, is that you can't look at 408(b)(3) alone.

24   You need to look at 408(b)(3) first of all in the context of

25   408(c) as Mr. Curran acknowledges; but I think you also have to

1    look at it in the context of the rest of the statute.  You also

2    have to harmonize it with all the rest of the laws in the United

3    States Code; and I think that in this situation, looking to the

4    legislative history as well is appropriate; and in my argument,

5    I'm going to look at all of those things.  Take us first, as I

6    say, through the statute, then to other statutes, and then into

7    the legislative history.

8         Now as we've already discussed, 408(b) creates a knew

9    federal cause of action for claims arising out of the September

10   11 attacks.  It rests exclusive jurisdiction for, in our view,

11   that particular claim in the Southern District of New York.  It

12   makes that claim the exclusive remedy for, as we're going to

13   see, most claims arising from the attacks.

14        It specifically provides that the liability of knowing

15   participants is not limited by this section; and as we

16   understand it, because liability of the defendants is not

17   limited, plaintiffs in this action are not limited to that cause

18   of action.

19        That is, there are causes of action outside of this

20   that provide, for example, for trebling of damages that would

21   increase the liability of the defendants; and so our

22   understanding of this is that since the liability of knowing

23   participants is not limited, they are not limited to this cause

24   of action.  If the plaintiffs can pursue their other claims

25   including the claims under the anti-terrorism act, our

1    understanding is that the jurisdictional provision, which

2    limited the new federal cause, is equally inapplicable.

3        Now, in order to see why that's the case, I think the

4    first thing that confirms that is the overall statutory scheme

5    that this is a part of.  Your Honor made reference to that.  I

6    think Mr. Curran tried to kind of sweep it under the rug; but I

7    think it is important to remember that as the D.C. Circuit has

8    held, the court should not be guided by a single sentence or

9    member of a sentence but look to the provision of the whole law.

10   I think when we do that -- let's turn to the next slide, slide

11   number 15 -- the bill as has been noted was called the Air

12   Transportation Safety and Systems Stabilization Act.  This is a

13   statute about cushioning the airline industry from the effects

14   of the inevitable lawsuits that would arise from the September

15   11 attacks.  The statute is codified in the transportation title

16   of the United States Code.  They put it in there in title 49

17   behind this obscure transportation statute that Mr. Curran

18   referenced.

19        If you look at the overall structure of the act, title

20   1 is the section entitled airline stabilization, and that's

21   where Congress provided for aviation disaster relief, both for

22   an infusion of cash to the airlines to compensate for the losses

23   and also for federal credit to the airlines.

24        Title 2, headed aviation insurance, Congress amended

25   existing law, allowing the government to provide insurance to

1    air carriers.  Title 3 provides an extension for tax deposits

2    for the airlines.  Title 4, the title that we're dealing with

3    deals with victim compensation.  I'll come back to that shortly.

4         Title 5 is called air transportation safety.  It

5    affirms the president's decision to spend money on safety,

6    expresses a commitment to enhance airport security; and title 6

7    is the separability provision.

8         The overall structure is precisely about rescuing the

9    airline industry and making sure that this country still had an

10   airline industry and why is that victim compensation provision

11   stuck in there?  I think we'll see as we move on to legislative

12   history, Congress was concerned that in limiting the liability

13   of the airlines that it not at the same time cut off the ability

14   of victims to get a fair recovery.

15        When we turn to title 4, we see section 401 states this

16   title may be cited as the September 11 victim compensation fund

17   of 2001.  So even when we get to title 4, what Congress is

18   thinking about is the victim compensation fund.  Section 404

19   sets up that fund.  Section 405 deals with the eligibility for

20   compensation from the fund; and I note that to be eligible, what

21   Congress did was to offer victims a choice.  They could either

22   be in the fund or they could sue pursuant to this new federal

23   cause of action; but if they were suing knowing participants,

24   they did not have to make that choice.  That is the victim

25   compensation fund has nothing to do with this lawsuit because

1    Congress specifically said that plaintiffs would not have to

2    make that election.  They could be in the fund.  They could also

3    sue people who they alleged were knowing participants.

4          The rest of the title also deals with the fund.

5    Section 406 deals with payments from the fund.  Section 407

6    authorizes the attorney general and the special master to

7    promulgate regulations for the fund; and then we get to 408, the

8    section that is at issue here.  Let's go to the next slide.

9          Now as Mr. Curran noted earlier, the first paragraph of

10   408 limits liability of certain persons to the amount of their

11   insurance coverage.  One of Mr. Curran's arguments about 408(c),

12   the exclusion that says that nothing limits the liability of the

13   knowing participants, Mr. Curran says that was intended to take

14   care of a situation where a person specifically given limited

15   liability in 408(a) turns out to be a knowing participant in the

16   attacks; and so what Mr. Curran says is Congress just wanted to

17   make sure that when they came up with this laundry list of

18   people, if you look on your screen, the first provision, 408(a)

19   is 408(a) as it appears today.  There's a laundry list of people

20   who have a limited liability, the includes anyone with a

21   property interest in the World Trade Center, and Mr. Curran says

22   Congress wanted to be sure in 408(c) that none of those people

23   were getting limited liability.

24         But that's not a tenable reading of the statute the way

25   it passed on September 21, Your Honor.  If you look at the lower

1    portion of the screen, the 408(a), you see at the bottom is the

2    way this provision looked on September 21 when the statute was

3    enacted.

4           At that time the language in 408(c) about knowing

5    participants was exactly the way it appears today; but 408(a)

6    was much narrower.  The only people who had a limitation of

7    liability in 408(a) at the time were air carriers.

8           So according to Mr. Curran, the only way to read this

9    is to say that Congress, in Mr. Curran's interpretation, is that

10   Congress was concerned that the air carriers, that is United and

11   American Airlines were knowing participants in the September 11

12   attacks.  We don't think that's a tenable reading.

13          We don't think 408(c) can be read simply to take out of

14   the 408 limitation anyone who happened to be a bad guy because

15   as they wrote 401(a) at the time the limitation on liability

16   protected only the airlines, and I don't think that Congress

17   thought the airlines were in on it.

18          So I think that explanation of 408(c) does not hold

19   water.

20          Now, as I said, I think if you look at the overall

21   statutory scheme, you see that the statute is dealing with

22   protecting the airlines while also protecting the rights of the

23   victims to compensation.  But this interpretation is confirmed

24   when you look at the statute in the context of other statutes.

25   Go to the next slide, please.

1          Because another principle of statutory construction
2     says the court should not construe two statutes as conflicting
3     with one another unless there is no possible interpretation that
4     will allow the court to give effect to both.  The D.C. Circuit
5     has noted that principle recently in a case that unfortunately
6     we did not cite in our brief, Dedwyler versus Pena, 38 F. 3rd
7     591.  It is a previous D.C. Circuit case, Stewart versus Smith,
8     673 F. 3rd the interpretation that the defendants offer of the
9     ATSSSA conflicts unnecessarily with the provisions of the
10    anti-terrorism act while the construction that we offer
11    harmonizes and allows the court to give effect.

12          18 USC section 2333 provides that an action under that
13    section of the anti-terrorism act can be brought in any
14    appropriate District Court of the United States.

15          Section 2334 further elaborates, providing that an
16    action under 2333 may be instituted in the District Court of the
17    United States for any district where any plaintiff resides or
18    where any defendant resides or is served or has an agent.

19          This provision reflects congressional intention that
20    plaintiffs be able to bring suits under the anti-terrorism act
21    wherever the plaintiffs are.  And this is unusual, Your Honor,
22    because the general venue statute for federal jurisdiction does
23    not allow plaintiff residents venue.  But this statute does.
24    Congress was accommodating plaintiffs by saying that they could
25    sue wherever any of the plaintiffs reside.

1           Now, the way we read the ATSSSA, there is no conflict

2     between them, because we understand that section 408 which has

3     the exclusive jurisdiction in the southern district governs

4     lawsuits against people who are not knowing participants in the

5     September 11 attack.

6           That is it governs the new federal cause of action

7     which is exclusive except for the suits against the known

8     participants while the anti-terrorism act, on the other hand,

9     governs lawsuits against terrorists and their supporters.  But

10    here is what is even more significant, Your Honor -- I apologize

11    because this point is not in our brief -- which is that this

12    section 2333 which creates the civil cause of action under the

13    anti-terrorism act, this is part of chapter 113(b) of title 18,

14    that's the section dealing with terrorism.

15          This section has been -- this title has been amended

16    now numerous times, first in the USA Patriot Act both in 2001

17    and 2002, also in the Terrorist Bombing Convention

18    Implementation Act, and in the Suppression of Terrorist

19    Financing Convention Implementation Act in 2002.  All of these

20    enactments are after September 11.

21          Most important, they are all after passage of the

22    ATSSSA.  Congress came in and amended this title in a number of

23    ways.  They explained the definition of international terrorism

24    in 2331.  That's the definition that is applicable here.

25          They amended the criminal provisions.  They added new

1    crimes in 2339 and 2339(c).  They added a new provision to
2    2339(a) to make it clear where the crimes when there was a
3    criminal prosecution could be brought.  They amended the
4    substance of 2339(a) to explain the conduct that violates the
5    statute.

6         They just marched through this title amending,
7    amending, amending; but here is what they didn't do:  They
8    didn't amend the jurisdictional grant in 2333 or 2334.  They
9    didn't say except as provided in the ATSSSA or except for claims
10   arising out of the September 11 attacks.

11        Now if they hadn't been busy amending this very title
12   maybe you wouldn't read as much into it.  But here they are.
13   They are in this part of the code.  They're amending it, trying
14   to bring it into conformity with these conventions,
15   international conventions on terrorism.

16        The one thing they don't do is try to harmonize it with
17   Mr. Curran's interpretation of the ATSSSA; and we think that's
18   because Congress understands that the ATSSSA does not conflict
19   with this statute, and so there was no need to clarify that and
20   add clarifying language.

21        And I think the section that Your Honor pointed to at
22   the end of Mr. Curran's argument, that language in 408(b) that
23   says -- the notwithstanding section 401(2)(a)C phrase confirms
24   that because when Congress saw a conflict between this statute
25   and existing law, they dealt with it.  They put in the

1    notwithstanding language.

2            When they went to amend the anti-terrorism act, they

3    didn't see a conflict.  If they had, I think they would have

4    used a similar either notwithstanding or except for.  They would

5    have told us which statute was supposed to be given precedence.

6    I think they didn't because there wasn't a conflict as they

7    understood it.

8            We think that this comparison with the anti-terrorism

9    act makes the intention of Congress in 408 absolutely clear.

10   But if the -- if the -- if the meaning is still not clear, the

11   court can look to the legislative history.  I think when you do

12   that, as I mentioned before, all of the debates focus on

13   balancing the protection of the domestic transportation

14   industry -- not just the airlines but all of the companies that

15   are part of that industry -- with the need to provide

16   compensation for the victims.

17           And I think the sweeping nature of the exclusive cause

18   of action is important because in the original version of the

19   statute, only the air carriers had limited liability; but

20   everybody in the industry that are referenced in the debates,

21   the congressmen were concerned about Boeing, aircraft

22   manufacturers, other people who work in that industry.  All of

23   them were to be protected by that sweeping language in 408(b).

24           But this is what Congress was agonizing over.  The

25   airline industry and yet balancing how people were to recover if

1    the airline industry were to be protected.

2         Now, in this context, Your Honor, I note that just last

3    Friday, Judge Hellerstein of the Southern District of New York

4    issued a 52-page decision in one of the cases that deals with

5    injury to the rescue workers, the people who then both did the

6    rescue operations and then worked on the World Trade Center cite

7    to dismantle the remains of it.

8         This is a brand-new decision that came down on Friday.

9    I don't have a cite for it.  We provided the court a copy in the

10   bench book we prepared and that we will be providing both the

11   court and the defendants with a copy of.

12        In that decision, judge Hellerstein found that the

13   major congressional purposes driving this legislation, that is

14   this exact same statute, the ATSSSA were, one, the desire to

15   protect the airlines and other defendants while preserving the

16   rights of victims to claim compensation; and, two, to promote

17   efficiency and facilitate judicial economy and consistency of

18   rulings.

19        Judge Hellerstein held -- and I'm quoting from his

20   decision -- Congress thus intended that title 4 would promote

21   the efficiency and rationality of litigation for those victim

22   who chose to sue rather than file a claim with the victim

23   compensation fund and would limit the aggregate exposure of the

24   non-terrorist defendants, especially the airline defendants to

25   maintain their viability and stability.

1    So Judge Hellerstein reads this as dealing with the

2    plaintiffs who had a choice in the fund or sue and said that it

3    was designed to limit exposure of the non-terrorist defendants.

4    He's construing this exclusive jurisdiction provision because

5    the question in front of him was whether to remand a number of

6    these injury cases; and he ended up remanding most of them, Your

7    Honor, finding that they were also not within his exclusive

8    grant of jurisdiction.

9         THE COURT:  Remanding them to where?

10        MS. BIERSTEIN:  To state court.  These cases were

11   originally filed in state court in New York.

12        THE COURT:  And removed.

13        MS. BIERSTEIN:  And removed.  And he remanded them back

14   to where they came from, finding there was no federal

15   jurisdiction for the majority of those claims.

16        THE COURT:  These are claims of injuries to rescue

17   workers?

18        MS. BIERSTEIN:  Yes.  Claims of injuries to rescue

19   workers, and I can elaborate a little more.

20        THE COURT:  Did he make a determination as to whether

21   he considered those to be claims resulting from or relating to

22   the terrorist-related aircraft crashes?

23        MS. BIERSTEIN:  He concluded that the claims that arose

24   within the first two weeks were claims that arose from or

25   related to and were covered within the grant of jurisdiction and

1    that everything else, all the injuries that happened after the

2    first two-week trials, were not; and -- because those were

3    injuries that could have happened on any construction or

4    excavation site anywhere in the city and they were not covered

5    by this cause of action and he remanded those claims.

6              THE COURT:  Okay.

7              MS. BIERSTEIN:  His actual holding doesn't address the

8    precise issue here; but his reasoning in getting there when he

9    realized what the statute did I think is extremely helpful and

10   enlightening.

11             I want to turn back -- as I said Judge Hellerstein gave

12   his view of the congressional history; and I want to turn for a

13   moment to the legislative history.  The defendants had supplied

14   the court with excerpts from the debates; but unfortunately they

15   edited the excerpts they provided the court, taking the

16   statements out of context.

17             If you put those statements back in context, which

18   you'll see from the emphasized portions on the next slide, the

19   early -- the beginning parts of the statements of Senator McCain

20   and Senator Leahy, when you put them back in context, you can

21   see that when Senator McCain talked about providing some sense

22   by consolidating, it was in the context of removing the specter

23   of devastating potential liability from the airlines and

24   guaranteeing that victims and their families will receive

25   compensation.  And that's the context he was speaking of.

1    The same with Senator Leahy.  When he talked about

2    that, it was in the context of limiting the liability of the

3    airlines.

4    And I want to note that one of the courts that has

5    construed the statute -- now, there's a statement earlier there

6    were no hearings on this bill.  Although there are no reports,

7    I'm not sure it's true there were no hearings because in the

8    International Fine Art and Antique Dealers case -- let's have

9    the next slide -- which is cited in our brief, that's a decision

10   in the Southern District of New York, the court there quoted an

11   exchange that took place during a hearing apparently that was

12   held on September 20 relating to this bill where Senator McCain

13   asked the CEO of Delta Airlines about this provision, about

14   consolidating all suits in one district court.  The CEO of Delta

15   Airlines said it was important to the airlines to do that.

16   I think that this colloquy takes on additional

17   significance in light of a statement which is not mentioned in

18   the case but which is in the House debates.  There's a statement

19   made by Representative DeFazio from Oregon who spoke during the

20   House debate; and he said the bill was written by the airline

21   CEOs.  The airline CEOs apparently, according to Congress, wrote

22   this affidavit.  The airline CEOs thought this was important to

23   them as the judge in New York held in this -- International Fine

24   Art decision.  What the judge said was this exchange suggests

25   that the initial motivation for section 408(b)(3) was to

1  consolidate potential suits against the airlines in the Southern

2  District of New York.

3      And that case -- International Fine Art -- is another

4  case holding that insurance claims were not part of that.

5      The last point I want to raise, Your Honor, has to do

6  with that final bit in 408(c) dealing with collateral source

7  obligations.  Why don't we put up the next slide.  I know Your

8  Honor had a question -- well, that was not the next slide.

9  Let's -- actually.  This is the next slide.  Sorry.  I

10  apologize, Your Honor.  Getting myself confused.

11      As Your Honor noted, 408(c) has a specific exclusion

12  for collateral source obligations.  Mr. Curran focuses on the

13  difference in wording between the exclusion for knowing

14  participants and the other exclusion.  I want to note they were

15  not passed at the same time, so the difference in wording

16  doesn't overly impress me; but I think that the reasoning in Al

17  Rajhi's reply brief when Congress wanted to exclude something

18  specifically from sections A and B, they knew how to say it.  I

19  think that is exactly backwards.  If you look at the slide, what

20  we put up was a quotation from the court in another one of the

21  cases, another one of these insurance cases construing exactly

22  this statute.  This is Goodrich versus Winterthur International

23  America Insurance Company.

24      The court thought it was exactly the opposite.  What

25  they said the collateral source amendment did was further

1   demonstrates that Congress clearly intended only certain

2   lawsuits to be subject to the original and exclusive

3   jurisdiction of the Southern District of New York; and then they

4   noted that because actions against collateral source providers

5   do not draw from the finite pool created by the liability

6   limitations, the factors favoring jurisdiction in the Southern

7   District of New York are not present.

8        And I think that does shed some additional light on

9   what Congress thought it was doing with this exclusive

10  jurisdiction provision.  After they limited the liability of the

11  airlines and then amended it to be all those other people, there

12  was going to be a limited pool of money available to the

13  plaintiffs, and Congress wanted all the cases in one place.

14  Because if you're adjudicating a limited pool of funds that have

15  to be parceled out to everyone, you want to be sure one court is

16  doing the parceling out so that it's handed out fairly.

17       When you're not dealing with a limited pool of funds,

18  Congress didn't have the same concern, and so they added this

19  collateral source provision, oh, that doesn't have to be done

20  together, that's coming out of a different pocket.

21       We think the same is true with the knowing

22  participants.  That's why they carved that out in part because

23  they didn't want to limit their liability.  They didn't want to

24  protect them.  Since those funds were going to come from a

25  different pocket, not from the same limited 3508, then there was

1    no need to put them into one place where one judge could make

2    sure that this limited fund was parceled out evenly.

3        So we think when you look at the entire statute, all of

4    its provisions and its structure, when you look at the other

5    statutes in the United States Code, in particular the

6    anti-terrorism act, in particular the amendments to the

7    anti-terrorism act, and when you look at the legislative history

8    and the subsequent amendments to this statute, we think it's

9    clear when Congress said nothing -- nothing here limits the

10   liability of knowing participants, they meant without limiting

11   their liability, you're not limited to this cause of action, if

12   you're not suing under this cause of action, then we're not --

13   we're not saying anything here about jurisdiction and our other

14   jurisdictional grants stand uncontradicted.

15       THE COURT:  Ms. Bierstein, just one question.  It is

16   sort of a loaded question, but I'll give it to you anyway.  Your

17   way into this is through interpretation of the statute, and you

18   began or early in your argument talked about the language -- I

19   think it is from the National Bank of Oregon case in which the

20   Supreme Court said we must not be guided by a single sentence or

21   member of a sentence but look to the provisions of the whole

22   law, to its object and policy.

23       Now that case was followed up in this circuit by a more

24   recent case called United States against Barnes which says that

25   if language has a plain and unambiguous meaning, our inquiry

1    ends so long as the resulting statutory scheme is coherent and
2    consistent.

3         Is there anything ambiguous or unplain about section
4    408(b)(3) which says the United States District Court for the
5    Southern District of New York shall have original and exclusive
6    jurisdiction over all actions brought for any claim including
7    any claim for loss of property, personal injury, or death
8    resulting from or relating to the terrorist-related aircraft
9    crashes of September 11, 2001?

10        MS. BIERSTEIN:  I think what's unplain about it or
11   unclear, Your Honor, is that it conflicts with the next sentence
12   in the very same statute that says nothing in this section shall
13   in any way limit any liability of any person who was a knowing
14   participant.

15        So I think that that's what makes it -- I think the
16   second part of your quotation from Barnes unless it is a result
17   that is -- and I don't remember the exact words Your Honor
18   used --

19        THE COURT: In coherent -- well, coherent and
20   consistent.

21        MS. BIERSTEIN:  I think it is exactly what it is not if
22   you were to take those words out of context to what appears to
23   be their plain meaning because it is not coherent or consistent
24   with the rest of this statute itself, that is -- or talk --

25        THE COURT:  Or 2333?

1          MS. BIERSTEIN:   Or 2333.  But even without looking

2     beyond it, I think your first clue you need to look beyond it is

3     it is not consistent with the rest of this statute.  Yes, once

4     you look at 2333, you get that inconsistency that I think what

5     the courts have said you try to construe statutes so they are

6     not inconsistent with each other.  The D.C. Circuit has said

7     that as well.  I don't think you can do that if you -- if you

8     put blinders on and read just that provision.

9          THE COURT:   Okay.  Thank you, Ms. Bierstein.

10          Mr. Curran, brief reply; and then I'm going to ask you

11     to segue into the next subject which is -- which relates to the

12     venue provisions.

13          MR. CURRAN:   Very good, Your Honor.  When we get to

14     that point, I'll turn it over to Ms. Bernabei.

15          THE COURT:   All right.  Then you get even a briefer

16     reply because I'll be able to tell where one starts and the

17     other stops.

18          MR. CURRAN:   There is a reason why I -- I met

19     Ms. Bernabei yesterday, and we agreed on that allocation.  That

20     makes sense.  If I'm right with my interpretation here, then

21     venue is a foregone conclusion.  If I'm wrong, then it becomes

22     an issue.

23          THE COURT:   All right.

24          MR. CURRAN:   Very briefly, Your Honor, obviously we

25     believe that the interpretation we're propounding here is

1    coherent and consistent and has been all along.  Ms. Bierstein

2    referred to the original enactment of the ATSSSA and the term

3    air carrier being in 408(a).  I just want to point out that air

4    carrier is a defined term.  Back in section 402, it is defined

5    to include employees and agents of airlines as well as anyone

6    else connected to the provision of air services.

7            So I think when Congress passed this act on -- passed

8    it on September 21 and when President Bush signed it on the

9    following day, no one really knew who might be involved in the

10   terrorist attack; and I think it was perfectly appropriate for

11   Congress to leave open the possibility that there could be

12   knowing participants who were employees or agents of airlines or

13   others providing air services.

14           So that's why this statute is not only coherent and

15   consistent now, but it has been all along.

16           THE COURT:  Would you respond to Ms. Bierstein's point

17   about the amendments to other statutes?

18           MR. CURRAN:  Yes.  They are irrelevant.  Congress --

19   Congress has every reason to want to amend and sharpen terrorist

20   statutes going forward, and it's done that in a number of

21   instances; and I hope it does it further in the future.

22           But those amendments to other statutes do not purport

23   to be retroactive to September 11.  They purport to be

24   forward-looking, providing remedies to those who in the future

25   unfortunately but inevitably will be injured through some sort

1    of terrorist attack.  It makes perfect sense for Congress to

2    address those issues on a forward-looking basis without in any

3    way withdrawing the statutory structure that they've set up in

4    this statute.

5        Your Honor, Ms. Bierstein also referred to the recent

6    Hellerstein decision which I should have mentioned in my opening

7    statement.  The cite for that is 2003 Westlaw 21419613.

8        I think when Your Honor has an opportunity to look at

9    that decision, it will be clear Judge Hellerstein agrees with my

10   interpretation of the statute here.  At page -- slip opinion

11   page 8, he says Congress clearly intended that the claims for

12   injuries arising out of, resulting from, or relating to the

13   terrorist-related aircraft crashes into the World Trade Center

14   would be federal claims brought only in the United States

15   District Court for the Southern District of New York.

16       As Ms. Bierstein I think acknowledged in that case,

17   Judge Hellerstein was simply holding that certain claims being

18   asserted by rescue workers could not fairly be said to arise

19   from, relate to, or result from the aircraft crashes.

20       With that, Your Honor, unless you have further

21   questions on this statute --

22       THE COURT:  I think we've taken all the time we can on

23   that point.  Thank you, sir.

24       MR. CURRAN:  I'll turn it over to Ms. Bernabei.

25       MS. BERNABEI:  Good morning, Your Honor.

1      THE COURT:   Good morning, Ms. Bernabei.

2      MS. BERNABEI:   I'll address the venue arguments made by

3  the defendants I represent and also Al Rajhi Bank.   As Your

4  Honor knows, there are no tortious actions alleged in this

5  action that have occurred in this jurisdiction.   The gravamen of

6  the complaint are the injuries that were caused by the -- at the

7  World Trade Center, the Pentagon attacks, and the crashing of

8  the airplane in Pennsylvania.

9      None of the plaintiffs is claiming damages for injuries

10  that occurred in this jurisdiction, as the plaintiffs have

11  conceded.   The plaintiffs concede that nothing happened in this

12  jurisdiction that would provide venue, but they argue that there

13  was an intended attack in the -- in the District of Columbia and

14  that this attack -- all of these attacks were an attack against

15  the U.S. government; and, therefore, this is the appropriate

16  venue.

17      I think you have to look very broadly at what the

18  purpose of venue is.   As Your Honor knows and the Supreme Court

19  has said the purpose of statutorily specified venue is to

20  protect the defendant against a risk that a plaintiff will seek

21  or select an unfair, inconvenient place of trial.   The -- as in

22  this case the defendants I represent, one is an Oregon

23  corporation, an Islamic charity incorporated in Oregon, does not

24  do business in the District of Columbia or near the District of

25  Columbia.

1          THE COURT:  They'd rather be in New York?

2          MS. BERNABEI:  Well, it is no less inconvenient.

3          THE COURT:  That is actually a serious question.  I'm

4     trying to understand the motivation of this venue argument the

5     defendants are making.

6          MS. BERNABEI:  It seems that there is no connection

7     here, number one.  Number two, the particular -- although we

8     obviously -- we've made a number of other arguments on the

9     motion to dismiss which we think Your Honor can address

10    regardless of the venue.  However, as Your Honor brought up, the

11    law that will be applied will not be D.C. law, it will be either

12    New York, Pennsylvania, or Virginia; and although there are --

13    I'm sure this court is fully capable of determining that law,

14    that is not the usual business of this court.

15         THE COURT:  We do do it all the time.  I'll put to you

16    the same question I put to Mr. Curran:  Are there any

17    differences as far as you know?

18         MS. BERNABEI:  The one we know about is that there are

19    some more restrictions under Virginia law.  By and large, the

20    law is the same.  And as you know, the cases have developed

21    primarily in terms off causation.  There is a case out of the

22    Seventh Circuit and a number of cases in this circuit, but the

23    law is generally the same.

24             However, in terms of if you look at the general venue

25    provisions, it is very clear that a civil action may be brought

1    in the judicial district where substantial part of the events

2    giving rise to the claim occurred.  That would not be this

3    district.  That would be New York, Pennsylvania, or Virginia.

4          In addition, although it is permissive, the defendants

5    are really claiming -- and I don't really understand their

6    argument -- that this case cannot be brought in any of those

7    districts, and that simply is not the case.

8          If you take a look at the -- if you take a look at the

9    statutes which they say provides jurisdiction and venue in

10    this -- in this district, it is the foreign state -- the Foreign

11    Sovereign Immunities Act, because there is a state defendant in

12    this action; but again, that is permissive.  A foreign defendant

13    may be sued in this district, but it is not exclusive

14    jurisdiction.

15          The other two statutes we say are irrelevant, the

16    anti-terrorism action and the civil RICO action because there is

17    not -- there are not claims made out against our clients under

18    those statutes.

19          So again the venue provisions in those statutes are

20    permissive.  You asked the question whether it would be better

21    if our clients were sued in New York.  In fact, they were sued

22    in New York. So we are essentially defending -- and I think

23    there is the says with many defendants -- we are essentially

24    defending two cases although the service has not been affected

25    in the New York case.

1          So essentially what -- the particular plaintiffs
2    bringing the claims in this court has really caused the
3    situation in which the defendants are being sued both in New
4    York and here.
5          THE COURT:  Let me stop you for a minute.
6          The anti-terrorism act provides for venue where any
7    plaintiff resides, does it not?
8          MS. BERNABEI:  That's right.
9          THE COURT:  There are five of the plaintiffs, as I
10   understand it, that are residents of the District of Columbia.
11         MS. BERNABEI:  That's right.
12         THE COURT:  You say there's no terrorism complaint
13   against your clients, against any of your clients?
14         MS. BERNABEI:  There is such a claim, but we say that
15   it cannot be sustained on the facts alleged in the complaint.
16         THE COURT:  Oh, okay.  I thought you were telling me
17   there was no such claim brought against your client.
18         MS. BERNABEI:  No.  What we're saying is they have
19   alleged such a claim, but the allegations do not make out any
20   such claim under the anti-terrorism act.
21         THE COURT:  Then let's assume for the moment that we're
22   still dealing with the terrorism act claim.  Why isn't that a
23   necessary -- why isn't that a sufficient assertion or -- why
24   doesn't the terrorism act support venue here?
25         MS. BERNABEI:  Because the whole purpose of -- as the

1    Supreme Court has said and as this circuit has said, the whole

2    purpose of venue is to assure the plaintiff does not sue in a

3    forum that is unfair and inconvenient to the defendant.

4         In this case, not only is it unfair to defendants who

5    reside across the country, in Dr. Khudeira's case in Chicago,

6    but in this case it has caused -- because the cases have not

7    been consolidated -- these particular defendants to be sued both

8    in New York and here.  So it seems to us it would be more

9    appropriate to transfer this case to New York, so that they're

10   consolidated so the particular defendants who have no contacts

11   with this forum could defend against one suit.  And I'm not

12   saying New York would be more convenient than this forum, but in

13   any case it would at least be providing them one opportunity to

14   defend against the very same charges rather than two.

15        The case as Your Honor knows up in New York has mostly

16   different plaintiffs.  10 percent of the plaintiffs are an

17   overlap as we understand, but essentially very, very similar

18   claims if not identical claims for the most part.

19        We say that, one, it is unfair because this is not a

20   venue where any of the events occurred. It would be asking the

21   court to apply law that is not from this jurisdiction and would

22   also cause the defendants that I represent to defend themselves

23   in two forums.  And I think that's the case with most of the

24   other defendants in this case.

25        THE COURT:  Thank you, Ms. Bernabei.

1          MS. BERNABEI:  Yes.

2          THE COURT:  Who is going to talk about venue?

3          MS. BIERSTEIN:  I will, Your Honor.

4          THE COURT:  Ms. Bierstein again.

5          MS. BIERSTEIN:  Your Honor, I'm going to be very brief

6     because I think Your Honor has cut to the very crux of this

7     which is that the anti-terrorism act specifically provides for

8     venue where any plaintiff resides; and as pleaded in our

9     complaint, some of the plaintiffs are here.  So whatever general

10    considerations may apply to the general venue statute I think

11    are not inapplicable here.

12          So I just want to make I think two quick points.  One

13    is to reference the argument -- well, three quick points.  One

14    is Ms. Bernabei talks about the fact her clients have also been

15    sued in New York.  It may be, Your Honor, that at some point it

16    may be appropriate for these cases to go to some kind of

17    multi-district setup; and we hope that if that happens, that

18    will be here in front of Your Honor; but I think that's not the

19    question today, whether a multi-district litigation would be

20    more appropriate.  The question as Ms. Bierstein raised is

21    whether there is venue in this court, and I think there is no

22    doubt that under the ATA, there is.

23          I think other than that, the arguments on venue and

24    covering the claims as set out in our briefs; but I do want to

25    add just one point; and that is something Ms. Bernabei actually

1    touched on it and it relates to something that was in our brief

2    in connection with the Al Haramain motion.

3            That is that there's a suggestion in our briefs that

4    venue might also be proper under 28 USC 1319(b)(3).  That is

5    part of the general venue provision; and I wanted to clarify,

6    Your Honor, when we offered that argument, and that's the

7    situation where there is no proper venue under 1319(b)(1)

8    or (b)(2), but I want to clarify we offered that as an

9    alternative situation just to cover the arguments that if for

10   some reason the ATA venue didn't apply, and if this court were

11   to find that the events of September 11 didn't take place in any

12   particular district, but I want to say it is not our position in

13   this case and I wanted to clarify that the argument is there

14   only in the alternative because it is not our position that

15   these events didn't happen in any of these districts; and it's

16   just there in the alternative, even though we don't think the

17   facts would necessarily warrant that.

18           In any case, we think the anti-terrorism venue is

19   dispositive.  So unless Your Honor has questions on that --

20           THE COURT:  The only question I have is -- relates to

21   those plaintiffs who are foreign nationals.  Those plaintiffs,

22   as I understand it, are not entitled to take advantage of the

23   venue provision of 2333.  I don't know how many foreign national

24   plaintiffs there are or who they are, but I'd be interested in

25   knowing the answer to that question if you have it.  If you

1  don't have it, in any event, what do you suggest I do with them?

2  Dismiss them?  Transfer them?

3  MS. BIERSTEIN:  Your Honor, if I could, I don't have an

4  answer here for that.  I believe there's about 30 of them.  If

5  we could defer that question until we're going to be talking

6  about the Alien Tort Claims Act later which relates specifically

7  to the alien defendants and I'd like to be able to address the

8  question at that time.

9  THE COURT:  All right.  That's fine.

10  Then let's go on to the next issue on my list which I

11  have lumped generally under the heading of allegations of

12  knowledge and intent.

13  In some ways, this is to me at least the most puzzling

14  part of this case because the Federal Rules of Civil Procedure

15  provide for short, simple statements of claims and notice

16  pleading; and that's been underscored and double underscored by

17  the Supreme Court and by our court of appeals in two recent

18  cases that the lawyers know as Swierkiewicz and Sparrow.

19  And the motions to dismiss assert that there are

20  inadequate or insufficient allegations to hold these defendants

21  to answer to the claims that have been made against them.

22  And I don't want to preempt anybody's argument on this

23  point, but the puzzling part of this issue is just how far the

24  Swierkiewicz and Sparrow rulings can go in a case like this one.

25  The lawyers all remember that sort of the paradigm of this

1    argument is in the Sparrow case in which the court of appeals

2    said all a plaintiff has to say in a title VII case is I was

3    turned down because of my race.  That's all that has to be said,

4    and that states a case that can be permitted to go forward to

5    discovery.

6         But in Sparrow, there was no question that the

7    defendant was the employer of the plaintiff, and there was a

8    relationship there.  In this case, the question is whether the

9    defendant -- individual defendants Khudeira and Kazmi should be

10   required to retain counsel and defend themselves against a

11   phalanx of attorneys on the allegation -- simple allegation that

12   they are coconspirators.  That's all the complaint says about

13   them.

14        Or the bank, Al Rajhi Bank, would be required to defend

15   itself on the allegations that its chairman and its president

16   were associated with terrorists.  So when we talk about this, I

17   am -- I would like to hear from both sides, of course, exactly

18   what the complaint is against Al Rajhi, whether it's a vicarious

19   liability or not; and if so, whether the complaint is sufficient

20   to make out that claim.

21        And on the -- with respect to the -- to the individual

22   defendants, as I say again, I want to hear something about

23   whether a bare bones allegation of conspiracy is enough.

24        And if you care to talk about it, anything about the

25   interplay of rule 12(e) which is a motion for more definite

1    statement which has sort of disappeared in the mist of history,

2    but I wonder whether Swierkiewicz hasn't revised it somewhat.

3    And good old rule 11 and exactly what I'm to take from the

4    assertions of plaintiffs' counsel under rule 11, that to the

5    best of their knowledge, information, and belief, formed after

6    an inquiry reasonable under the circumstances, the allegations

7    and other factual contentions of the pleading have evidentiary

8    support.

9         That I hope generally describes the puzzling series of

10   issues that I think are presented by these motions; and,

11   Mr. Curran, I suppose you're going to say some of the things

12   I've already said, but stand up and say them.

13        MR. CURRAN:  Well, I'll try not to do too much of that,

14   Your Honor.  Let's begin with the standard that you identified.

15   Swierkiewicz versus Sorema.  The Supreme Court in that case did

16   reaffirm the long-standing principle that rule 8 only requires a

17   short statement in a complaint.  But I think we need to probe

18   exactly what the court meant there, given the context in which

19   that case arose and so forth.

20        THE COURT:  You're going to probe the meaning but not

21   the language.  And the other argument is the language but not

22   the meaning.  All right.  Okay.  That's all right.  You're

23   allowed to do that.

24        MR. CURRAN:  My point is really pretty simple.  If you

25   look at the allegations in Swierkiewicz, as identified by

1    Justice Thomas, it's clear that that -- that the allegations

2    there met a minimum notice pleading.  And the court in

3    Swierkiewicz was careful I think in talking about -- that the

4    statement -- quoting Conley versus Gibson, the statement in a

5    complaint must give the defendant fair notice of what the

6    plaintiffs' claim is and the grounds upon which it rests.

7         It also -- the court in that case also reaffirmed that

8    the traditional rules of pleading apply; so putting all of that

9    together, I believe that the real issue for Your Honor is to

10   weigh how did the allegations in this case and specifically the

11   allegations against a given defendant measure up to the standard

12   identified in Sorema, Swierkiewicz, and also how did they

13   measure up to the allegations in that case.  Then I think we

14   ought to also consider the Browning case in the D.C. circuit

15   which postdated Swierkiewicz.  In that case, the D.C. Circuit

16   engaged in a fairly sedulous analysis looking at each defendant

17   and determining whether the allegations were sufficient as to

18   that defendant.  Group pleading, conclusion or allegations,

19   allegations of law do not cut it.

20        So here let's take the situation of Al Rajhi Bank.  The

21   complaint has a section addressing Al Rajhi Bank; and we at

22   least initially thought that that section contained the

23   principal allegations upon which this case was being brought

24   against Al Rajhi Bank.  The bank, of course, is a big bank.  It

25   is the number one retail bank in Saudi Arabia.  It has ATMs all

1    over the country.  It has 2 million depositors.

2         The allegations in the complaint -- the principal

3    allegations we thought were that one of the hijackers had a

4    deposit account at the bank and that a certain number of

5    charities also had deposit accounts at the bank.  No allegation

6    that the bank funded, gave money to, or even lent money to the

7    charities at issue.  Instead, simply we thought the original

8    allegations were that an arm's length banking relationship was

9    sufficient to have liability asserted over the bank because

10   certain depositors are alleged to have engaged in bad acts,

11   terrible acts; and, Your Honor, with respect to the terrorist --

12   the hijacker in question, Al Omari, we acknowledge that there's

13   a depositor relationship.

14        But what does that mean?  Is the bank liable for the

15   actions of all 2 million of its depositors even if those

16   depositors have no history or no alleged history of misconduct

17   in the past?  That kind of aggressive assertion of liability we

18   think is unfounded.

19        With regard to the charities, again, if the bank had

20   strictly an arm's length relationship with the charities, then

21   how can that relationship give rise to liability or even an

22   adequate pleading of liability in a federal complaint?

23        Now, we filed our motion to dismiss and obviously we

24   got the plaintiffs' opposition.  In that opposition, they seemed

25   to shift gears a little bit and minimize the original

1    allegations and instead now they're arguing that officers or

2    directors of the bank have some association with charities, and

3    those charities are alleged to be supporters of terrorism, and

4    that support of terrorism allegedly had some connection with

5    September 11.

6         Now, Your Honor, there are a lot of links in that chain

7    separating the bank from September 11; and we believe that

8    there's no clear link alleged.  We believe that some clear link

9    has to be alleged under Swierkiewicz, under Browning.  There has

10   to be some factual allegation, not a conclusion of law and not a

11   sweeping factual conclusion that the bank supports terrorism.

12        There have to be facts alleged, and nothing in

13   Swierkiewicz is inconsistent with that position.  In fact, in

14   Swierkiewicz, the plaintiff there alleging discrimination on the

15   basis of alienage was very specific alleging that so and so was

16   promoted ahead of me, my boss discriminated against me because

17   of my alienage, I missed out on this promotion, I was demoted.

18   Then dates, times, facts alleged.  We have nothing like that

19   here against Al Rajhi Bank.  Al Rajhi Bank appears to have been

20   named because it has attenuated and remote connections to

21   wrongdoers.  There is no causal link alleged.

22        We think that at a minimum under rule 12 and rule 8,

23   that kind of causal link is required.  Now, such a causal link

24   we think is required under every one of the claims asserted

25   against the bank.  We note also that this court and other courts

1  interpreting terrorist claims have required a causal link.  Your

2  Honor did that in Ungar and in Doe.  The Seventh Circuit did

3  that in Boim.  The plaintiffs rely on Boim.  They cite it in

4  their complaint.  Look at the allegations there.  The

5  allegations there were the organizations in question which again

6  were not the donors but they were the actual gatherers of funds,

7  the allegations that those people, that those allegations

8  gathered funds and that those funds were used to train and arm

9  the terrorists that then killed David Boim.

10  We have nothing like that here, certainly not against

11  Al Rajhi Bank.  There is no causal link like that.  Instead, it

12  is an attenuated allegation that the bank has some association

13  with people who directly or through association with others did

14  something wrong.

15  That ought not to be a sufficient basis upon which to

16  hale a party into Federal Court.

17  THE COURT:  All right, sir.  Thank you.

18  MR. CURRAN:  Thank you.

19  THE COURT:  Mr. Motley?  Or Mr. Huge?  Who is going to

20  address this?

21  MR. HUGE:  Mr. Motley.

22  MR. SIMMONS:  Would you like me to add a few comments

23  about Zahir Kazmi?

24  THE COURT:  Sure.  Step right up here.

25  MR. SIMMONS:  I represent a small accountant up in the

1    Chicago area that lives in a suburb there and does local county

2    work.  He's been named, as the court noted, in this case on the

3    bare allegation that he is a coconspirator.  He has a

4    not-even-explained connection with what they contend to be a --

5    the conspiracy.  Obviously there was a conspiracy on 9/11; but

6    Mr. Kazmi's connection is not explained at all.  He is said to

7    be simply a coconspirator.  He's obviously done some accounting

8    work for one of the charities, two of the charities; but he's

9    not a -- alleged to have ever been an officer, made any decision

10   where to collect funds or to spend funds, or any of that

11   connection.

12       He's not -- has been -- as has been pointed out in his

13   personal jurisdiction motion which is constitutionally-based as

14   opposed to venue-based, he has no connection with the District

15   of Columbia, no connection with Pennsylvania, no connection with

16   New York or Virginia.

17       What you have is a situation where a single individual

18   is invited to the party with 300 parties here, with some deep

19   pockets, some shallow pockets, to defend himself without any

20   explanation, not even -- not even an attenuated explanation of

21   the type that the bank has been told of.

22       He has been given absolutely zero facts upon which he

23   can start to build a defense or start to understand the case.

24   In that context, we believe that whether you call it rule 11 or

25   any of the other federal rules, there is first some obligation