1    to come forward and explain what it is that connects him here.

2    Why they brought him in other than perhaps his faith or the fact

3    that he did some outside accounting work, not explaining what

4    that work was or how it is connected or what it did.

5         We contend that before you have to go to the expense of

6    proposing a rule 11 motion or doing rule 11 discovery or

7    otherwise bringing himself down to this jurisdiction and

8    engaging in the cost of this, he's entitled to know through some

9    allegations which are not there yet what his connection was.

10        And it is one step removed from even being a bank with

11   some ATMs and officers that hold funds for the charity.

12        THE COURT:  It wouldn't cost too much to file a 12(e)

13   motion for a more definite statement, would it, Mr. Simmons?

14        MR. SIMMONS:  The problem is you then get some kind of

15   response that is -- maybe not that motion itself but first he

16   would have to defend himself on venue, jurisdiction, and on the

17   basic motion to dismiss.  He's already spent many thousands of

18   dollars to try to get the -- some explanation that has not come,

19   not in the briefs and certainly that's another step he can go

20   to.  Perhaps once we get that, then we can move to dismiss on

21   some rule 11 on similar basis; but the point of the fact is he's

22   been in this case now many months with a heavy, ugly accusation

23   that he has something to do with 9/11 without any explanation as

24   to why.  It impacts on him and his business in a way that is

25   really unjustified.  They could bring him back in if they find

1    something and tell us, but they haven't.

2            THE COURT:  Thank you, Mr. Simmons.

3            Ms. Bernabei, I suppose you want to talk about

4    Dr. Khudeira?

5            MS. BERNABEI:  Dr. Khudeira and also the Al Haramain

6    group which has moved to dismiss on the grounds of causation.

7    Starting with the easier of the two, Dr. Khudeira as we pointed

8    out in our brief -- and these are uncontested facts -- is a

9    civil engineer in Chicago.  An American citizen.  His only

10   involvement -- and this is involvement that we put forward in

11   our motion to dismiss -- is that he was a registered agent with

12   Benevolence International, a corporation out of Chicago that has

13   subsequently -- 10 years later was designated as a terrorist

14   organization.

15           There are no allegations in the complaint that he -- as

16   Your Honor pointed out, there is no allegation other than he was

17   a coconspirator.  All of the cases that have discussed causation

18   in detail, which is the two cases Your Honor wrote in Doe and

19   Ungar, and the Seventh Circuit decision in Boim, all talk about

20   the elements that need to be made out in a terrorist case such

21   as this.  You need to show, number one, that there was knowing

22   participation by the defendant in the case.  Here there is no

23   allegation, and we don't believe there can be any allegation

24   that Dr. Khudeira had any knowing participation in anything

25   illegal.

1        There has been no attempt on the part of the plaintiffs

2   to say that he has any knowing participation in anything that

3   was illegal.  In fact the only allegation against him is he was

4   a conspirator with others in Benevolence International.

5        The only other allegation that they have made -- the

6   only other connection he has with any of the defendants is that

7   he contributed in 1996 to the charity.  Of course, Your Honor,

8   if that were the standard, you would get in thousands and

9   thousands of Muslims that have contributed to charities in this

10  country.  We don't believe that any of those people would

11  necessarily have any connection with September 11.

12       We also believe that there -- our -- rule 11 problems

13  with the way the plaintiffs have proceeded.  This becomes

14  obvious if you look at the Al Haramain organization.  That is an

15  Oregon corporation.  It is affiliated with Al Haramain Saudi

16  Arabia.  The U.S. court has never designated either the Saudi

17  group or the Oregon group as terrorist organizations and has

18  endorsed the Saudi group as a legitimate charity.  They did that

19  at the same time as they designated several affiliated groups of

20  the Saudi group as terrorist organizations.

21       The only allegations against the Al Haramain Oregon

22  group is that it is an Oregon corporation, which is true.  It

23  has two directors which are directors of Al Haramain Saudi

24  Arabia.  As Your Honor knows, because of this involvement in the

25  suit, the Oregon group has ceased having any relationship, asked

1    for the resignation and received the resignations of the

2    directors of the Al Haramain Saudi group.  That's in the record

3    before you

4           THE COURT:  I think you just filed that yesterday,

5    didn't you?

6           MS. BERNABEI:  Yes, we did.  The reason that was done

7    is to prevent guilt by association over a Saudi group that our

8    client has no connection to.

9           The Al Haramain Saudi Arabia website did list the

10    Oregon group as one of its affiliates.  That is no longer the

11    case.  The Al Haramain Saudi Arabia it is alleged in the

12    complaint has two affiliated groups in Bosnia and Somalia

13    designated terrorist.  The Oregon group had absolutely nothing

14    to do, had no knowledge of those groups.  As we pointed out in

15    our briefs, neither the Saudi group nor the Oregon group had

16    ever been designated as terrorist organizations.  There are no

17    allegations in the complaint, specific allegations vis-a-vis Al

18    Haramain in Oregon that would indicate they financed terrorist

19    actions or did anything wrong.

20           If Your Honor looks at Browning versus Clinton as

21    Mr. Curran mentioned and I think you must do as the court did in

22    that case.  Look at what are the facts that are pled against the

23    individual defendants and see whether those facts make out the

24    claims that are set forth against them.

25           There are no allegations in the complaint that Al

1    Haramain Oregon had knowingly participated in any actions that
2    could be deemed terrorist, that could be deemed to give material
3    support to terrorists, or that could be deemed to give any
4    assistance whatsoever.

5        In terms of the conspiracy against -- alleged
6    against -- Dr. Khudeira is alleged to have participated in,
7    Boim, Doe, Ungar all make clear to be part of the conspiracy, a
8    defendant must know of a common plan, a common scheme and must
9    have knowingly participated in that common scheme.

10        In this case, there is absolutely no facts that could
11   allege that Dr. Khudeira or Al Haramain knew of any common
12   scheme to attack the World Trade Center, to attack -- or to
13   attack the Pentagon.

14        In fact, there is no information they had any specific
15   intent to participate in any terrorist action at all.

16        The question you asked at the beginning was we believe
17   sort of the heart of the matter.  What degree of specificity
18   does a plaintiff have to bring in terms of the factual
19   allegations?  I think it needs to bring -- and the Supreme Court
20   is replete -- the Supreme Court and this circuit is replete with
21   authority on this point.  You have to give the defendants notice
22   of what it is that they are being accused of.  What is it of
23   their wrongful actions that have haled them into court.  In this
24   case Dr. Khudeira has no idea.

25        The briefings on this which we felt might elucidate

1   what they are accusing him of doing utterly failed.  In fact, we
2   provided more specificities about his minimal involvement with
3   Benevolence International than they provided to us.  There is
4   still absolutely no specification of what Dr. Khudeira has done
5   that's allegedly led him to be labeled a terrorist in this
6   action.

7          With regard to Al Haramain, again we believe that
8   somehow -- again, reading the pleadings in the best way we
9   could, that somehow Al Haramain Oregon was alleged to have some
10  connection, remote though it was, with the Somali and Bosnia
11  groups which are two steps removed from Al Haramain Oregon.  In
12  fact, the plaintiffs in their briefs said no, that's not what we
13  are alleging.  We're not alleging the Oregon group had control
14  over the Saudi group or control over these groups.

15         We're alleging the Saudi group had control over Al
16  Haramain Oregon.  Given that, we are now sort of left in a total
17  bind.  We have no idea what wrongful acts are that Al Haramain
18  Oregon has been accused of.

19         Whatever the pleading requirement, whatever that
20  pleading requirement is, it has to give the defendant at least
21  minimal notice of what the acts that he or she committed or it
22  committed that are alleged to be illegal.  We have none of that
23  in this case.

24         I might also -- Your Honor referred to rule 11.  I
25  might also note in --

1          THE COURT:  Well, let me stop everybody on rule 11.

2     Everybody has picked up on rule 11 as if I'm about to issue a

3     rule 11 citation.  All I'm saying is that rule 11 imposes very

4     stringent obligations on plaintiffs' counsel.  My question is to

5     what extent Sparrow and Swierkiewicz or Sorema have reemphasized

6     the importance of that rule to permit courts to rely upon the

7     assertions of counsel in pleadings to the extent that -- or to

8     an extent that perhaps they didn't before those cases.

9          I'm certainly not inviting any rule 11 practice in this

10    case or in any case.

11         MS. BERNABEI:  What rule 11 requires is that counsel

12    can make representations to the court after a reasonable inquiry

13    into the facts.  We -- as we pointed out -- do not believe

14    counsel in this case made reasonable inquiry into the facts

15    concerning the two defendants that we represent.

16         Al Haramain Oregon specifically offered to open up all

17    its books, to have its president deposed, to show that there was

18    no involvement of the Oregon charity in any of the actions.

19    And, in fact, all of the actions it has taken are against

20    terrorism and against terrorist attacks of September 11.

21         The plaintiffs' counsel didn't want to do that.  I

22    don't think that's a reasonable inquiry.  I think the fact that

23    the plaintiffs' counsel, when given the opportunity with

24    informal discovery, to look at the books, depose the person that

25    was head of the group, and to see whether they had anything to

1    do with events didn't take us up on that opportunity, I think

2    that shows that that is not a reasonable inquiry.

3           THE COURT:  Okay.  Well I'm not making a rule 11

4    inquiry today.  Let's make that plain.

5           Mr. Motley, it's your turn.

6           MR. MOTLEY:  May it please the court?  Your Honor,

7    we're prepared to respond at length to the allegation that we

8    have made meaningless or conclusory allegations as to each of

9    these defendants and also to the statements that we have not

10    satisfied the requirements of Boim or Ungar or Doe 2.

11           Of course, Doe 2 and Ungar were at a different

12    procedural stage, as Your Honor points out.  This is a 12(b)(6)

13    motion.  Indeed Doe 1 survived 12(b)(6) scrutiny, although you

14    found the failure to satisfy the requisite proof in Doe 2 when

15    you took over that case.  Before I get going, Your Honor, we

16    passed up to Your Honor a book -- have we given him a bench

17    book, too -- of cases and authorities that we rely on.  We would

18    like to argue.  We have copies for the defendants also.

19           The other book we passed up Your Honor is I am -- is I

20    told you the first time I appeared before you, I am the king of

21    incompetence when it comes to matters like PowerPoint

22    presentations.  We have able staff here.  Hopefully they can

23    help me through this in the event I stumble.  We gave Your Honor

24    a copy of what's contained in the PowerPoint presentations in

25    that bound white nice looking manual.

1        Let me first, Your Honor, point out that we did not

2   make conclusory allegations against either of the individual

3   defendants.  If I might just start with that to clarify the

4   record?

5        As to the Benevolence foundation, there are 48

6   paragraphs of allegations.  As to the two individual defendants,

7   there's paragraph 203, 204, 205, 206, 207, 208, 209, 213, 222,

8   223, and 228.

9        What we did not do, Your Honor, and maybe that is

10  trying not to burn up the airwaves with pages of allegations.

11  We didn't repeat all these allegations as to each defendant.  We

12  related them back to the general allegations, but we did that in

13  a fashion to provide fair notice under rule 8.

14        If we aggrieved people by not giving them a perfect

15  road map, then it is very simple for us to file a rule 12(e).

16  As to each one of these paragraphs, put everybody's name down

17  whom we say violated them.  But I think we've given them fair

18  notice, and I think they have been duly advised of what our

19  complaints are about.  They're not just about somebody being a

20  depositor, as I will get to in a moment.

21        But, Your Honor, let me start out because there's been

22  a broad allegation -- not just an individual allegation -- that

23  our complaint fails to satisfy Boim, for example, which is a

24  12(b)(6) procedural status court of appeals decision which

25  explicates in great detail 2333.

1    I might also add, Your Honor, in that book we gave you
2    in the event you haven't seen it, we provided you both with a
3    copy of Judge Hellerstein's order of Friday and Judge Baer's
4    decision of a month or so ago finding that the 9/11 attacks on
5    the United States were, in fact, acts of international terrorism
6    within 2333.  This was on behalf of several individuals who sued
7    Iraq.
8        THE COURT:  I'm pretty close to taking judicial notice
9    of that proposition, Mr. Motley.
10       MR. MOTLEY:  Yes, sir.
11       THE COURT:  I don't think we need extended argument on
12   that point.
13       MR. MOTLEY:  I don't intend to have an extended
14   argument on that, Your Honor.
15       Your Honor, but I do feel like I have to place these
16   events in context because of the statements that we haven't made
17   specific allegations because we make multitudinous general
18   allegations that apply to all of the defendants.
19       At the expense of going on too long and making Your
20   Honor impatient with me, nevertheless, we feel like we have to
21   show you why it is that Congress' intent in 2333 that every
22   causal link in the structure of the terrorist activity brings a
23   defendant who participated in that causal link before the court.
24   That was the intention of Congress clearly and unequivocally in
25   2333.

1           If I might, Your Honor, the first slide, please?  This

2    is from the USA Patriot Act, if I can use that commonly applied

3    name to the series of acts that occurred after the horrific

4    attacks on the United States.

5           It says all Americans are united in condemning in the

6    strongest possible terms the terrorists who planned and carried

7    out the attacks against the United States on September 11 and in

8    pursuing all those responsible for those attacks and their

9    sponsors -- and their sponsors -- until they are brought to

10   justice.

11          Let me go back, Your Honor, if I might next, please.

12   This is from the anti-terrorism act of 1990, which became 2333.

13   This is a hearing before the subcommittee on courts and

14   administrative practice, Senate Committee on Judiciary in 1991.

15   The anti-terrorism act removes the jurisdictional hurdles in the

16   courts confronting victims and it empowers -- it empowers

17   victims with all the weapons available in civil litigation.  The

18   anti-terrorism act accords victims of terror all the remedies of

19   American tort law.

20          Your Honor, what does this have to do with the

21   charities and individuals who are involved in sponsoring

22   terrorism?  We cite in our complaint -- and I'll give you the

23   citation here so I'm just not adding new materials to the

24   record -- the Council on Foreign Relations, a very prestigious

25   bipartisan think tank here in Washington found in their

1    terrorist financing report for years, individuals and charities

2    based in Saudi Arabia have been the most important source of

3    funds for Al Qaeda; and for years, Saudi officials have turned a

4    blind eye to this problem.

5         We are going do prove that, Your Honor.  We allege that

6    in our complaint.  We allege all these paragraphs which I just

7    stated as to the two individual defendants, how they personally

8    facilitated what led to 911.

9         THE COURT:  Teach me what the complaint says about

10   those two individuals, Khudeira and Kazmi.  I did my little word

11   search and found them only mentioned once.

12        MR. MOTLEY:  That's why 12(e) is the remedy.  We tried

13   to facilitate not having a 2,000 page complaint -- it is heavy

14   enough as it is -- by referring to general allegations and then

15   referring to people as aiders and abettors or coconspirators.

16   It is true you may not have found his name more than once.

17   However, the general allegations include fraudulently soliciting

18   and obtaining money from donors.  That's 203.  204, used the

19   status as charities, tax-exempt to lessen scrutiny from the

20   government; 205 kept secret from donors and government

21   information about relationships to terrorist organizations; 206,

22   agreed to conduct financial transactions by wire transfers to

23   promote terrorist organizations and members of terrorist

24   organizations.

25        207, attempted, provided support, and helped to conceal

1    ownership of resources for use of terrorist and terrorist
2    organizations.
3           208, endeavored to influence, obstruct, and impede
4    administration of justice; 209 conspired to commit illegal acts;
5    213, conspired to ship anti-mine boots to Chechnyan Mujahedeen;
6    222, material support --
7           THE COURT:  Wait.  Wait.  Chechnyan Mujahedeen?
8           MR. MOTLEY:  You know my problem with pronunciation
9    Judge.
10          THE COURT:  I understood you correctly.  That's -- all
11   right.
12          MR. MOTLEY:  All right.  Yes, sir.  There is a
13   connection.  The connection is pled in the complaint.
14          THE COURT:  All right.
15          MR. MOTLEY:  Material support to terrorists knowingly
16   and intentionally supporting terrorism.  Transfer of wire funds
17   by BIF to checking accounts outside the United States including
18   proceeds of specific unlawful activities; and Mr. Kazmi and
19   Dr. Khudeira are listed as coconspirators in all these
20   activities with BIF and a gentleman who pled guilty in Chicago
21   named Arnauld.
22          THE COURT:  And if you were served with a 12(e) motion,
23   you would assert that each of those individuals did all those
24   things?
25          MR. MOTLEY:  Those individuals did, yes, sir.  And I'm

1   going to show you in a moment what --

2          THE COURT:  Then let's go on to Al Rajhi because all --

3   Al Rajhi.  What your complaint says about Al Rajhi has to do

4   with funneling proceeds to terrorists, but -- and I don't want

5   to be conclusory about this, but as far as I can tell, your

6   complaint asserts that Al Rajhi is the funnel.

7          MR. MOTLEY:  No, sir.  I believe -- again, we're the

8   victim of trying to streamline this; and if I could take you

9   through what we believe the allegations against Al Rajhi are.

10          THE COURT:  All right.

11          Before do you it, just answer one direct question.  Is

12   the assertion that Al Rajhi is vicariously liable for the acts

13   of the two persons named Al Rajhi who are the -- who are high

14   officers or officials?

15          MR. MOTLEY:  That is one assertion, yes, sir.  That is

16   correct.

17          THE COURT:  All right.  Go ahead and tell me about your

18   claim against Al Rajhi.

19          MR. MOTLEY:  Okay.

20          The next slide, please.

21          This is in the complaint, paragraph 40.  They have

22   admitted to Your Honor they are a large Islamic banking

23   institution.  Beginning in the 1970s, we allege, Islamic banking

24   system refined to promote Islam around the world.  The financial

25   funding vehicle is zakat.  Zakat is a legal alms-giving required

1    as one of the five pillars of Islam.

2          Paragraph 43, again these are general allegations.  I

3    mean we can come back and say Al Rajhi did every one of these

4    things.  But we did conduct a thorough investigation, Your

5    Honor.  Under rule 11 we understood our obligation.

6          THE COURT:  I tried to make it very clear.

7          MR. MOTLEY:  Yes, I know.  My hide is not -- is not

8    exposed I don't believe, Your Honor.

9          Islamic banking system.  The Al Qaeda network relies on

10   funds diverted from zakat accounts in Islamic banks.  Since

11   1998, Osama Bin-Laden called for Muslims to donate to his

12   organization through zakat.

13          "Muslims should give their zagat in support of this

14   Taliban which is reminiscent of the state of Medina."  That's

15   complaint paragraph 43.

16          Again on the complaint page 205, Your Honor, citing in

17   the complaint specifically to an extensive report by the Council

18   on Foreign Relations, Al Qaeda abuses the Islamic banking

19   system.  Many prominent Islamic banks operate under loose

20   regulatory oversight.  Islamic banks regularly co-mingle funds

21   from depositors, creating ready opportunities for anonymous

22   money transfers and settlement.  Al Qaeda is also more likely to

23   find willing collaborators within the Islamic banking system.

24          This shows, Your Honor, this is from the complaint,

25   paragraphs 84 to 87.

1          Specific to Al Rajhi Banking and Investment
2    Corporation, they provide significant financial support of
3    terrorism.  They're the primary bank for these charities that
4    fund terrorism.  Your Honor this is not in the complaint but
5    would be in a rule 12(e) because we didn't find out about it
6    until afterwards --
7              THE COURT:  Let me just stop you at this slide.
8              MR. MOTLEY:  Yes, sir.
9              THE COURT:  Primary bank for charities that fund
10   terrorism.
11             MR. MOTLEY:  Yes.
12             THE COURT:  Above that, there's a line that says
13   significant financial supporter of terrorism?
14             MR. MOTLEY:  Yes, sir.
15             THE COURT:  Are those -- are those two concepts the
16   same in your mind, or is there a difference between them.
17             MR. MOTLEY:  I think there is a difference between
18   them.
19             THE COURT:  And where in your complaint does it say
20   that Al Rajhi is a significant financial supporter of terrorism?
21             MR. MOTLEY:  I will try to find the exact paragraph
22   where that statement is made.  If it is not made specific to Al
23   Rajhi, it is made specific to the Islamic banking defendants as
24   a group.
25             Your Honor, what is not in the complaint but what will

1    be if you allow a 12(e) amendment is that we have subsequent to

2    the filing of the third amended complaint discovered that the

3    United States government actually travelled to Saudi Arabia in

4    1999 and again in the year 2000, met with the banking overseers

5    of the Islamic banks who operated in Saudi Arabia, and told them

6    specifically that Al Haramain and several of the other charities

7    were funneling money specifically to Al Qaeda and to Osama

8    Bin-Laden; and this was after the '98 embassy bombings.  That

9    will be in a 12(e) statement.  That was not available to us at

10   the time.  We do have that information now at this time.

11        12(e) will help us bring forth a lot of stuff that we

12   learned since we've been conducting our -- I don't know if you

13   will call it informal discovery or discovery against third

14   parties that Your Honor has allowed us to conduct under the

15   letters rogatories that we have sent out throughout the world

16   which is -- has identified Al Rajhi in fact was one of the

17   original supporters of Al Qaeda, which I will show new a second.

18        The next slide, Your Honor, shows that Saleh -- I

19   cannot pronounce these names, I apologize that I can't -- Saleh

20   Al Rajhi, chairman of Al Rajhi Banking and Investment

21   Corporation is linked to Wadih El-Hage, Osama Bin-Laden's

22   personal secretary.

23        Wadih El-Hage, a convicted terrorist and known Al Qaeda

24   member was convicted for the 1998 embassy bombing in Kenya and

25   Tanzania.  That is at paragraphs 84 and 86.

1          Let me back up for a second, Your Honor.  There is a

2     fundamental disconnect between the defendants and plaintiffs as

3     to what 2333 requires.

4          When we get to the Ungar stage in this case, we are

5     going to be arguing to Your Honor -- and I'd like to opportunity

6     to argue to you today although we are not at a rule 56 stage --

7     we don't believe that 2333 stands for the proposition that we've

8     got to prove that Al Rajhi somehow facilitated money going to

9     Mohammad Atta to help him take his pilot training course in

10    Florida.

11         We believe if you look at this Al Qaeda as a factory,

12    and we believe that anybody who laid plans for the factory,

13    anybody who supplied a building block that went into the

14    factory, anybody who provided fuel for the factory, anybody who

15    took the factory products which are actually terror and left

16    that factory, they are all guilty under aiding and abetting as

17    expansively defined by the Boim court and by several other

18    courts; and, Your Honor, Ms. Bierstein mentioned the amendment

19    to 2339 in her arguments about the statutory construct.

20         2339(c) which was amended on June 25, 2002 specifically

21    does not require that the financing and sponsoring of terrorism

22    relate to the predicate act.  In other words, we don't have to

23    link it in our view -- and again it is 12(b)(6) but since they

24    raised this, we don't have to link September 11 if we can prove

25    that they knew that the contributions they were making to the

1    charities and the individuals were going to the construct of a

2    terrorism factory; and if it was reasonably foreseeable -- and

3    it should have been after 1998 when Osama Bin Laden issued his

4    fatwah declaring war and the duty of Muslims to kill innocent

5    American civilians -- that it was reasonably foreseeable that a

6    terrible act would occur.

7            So any contribution they made to that factory, whether

8    it was in '98, or '99, or 2000, or August of 2001, if they knew

9    that Al Haramain, for example, was funneling money through

10   Bosnia or elsewhere, through Al Qaeda to help fuel his terrorist

11   conduct, then they're liable under Boim, under aiding and

12   abetting.

13           And we urge Your Honor that that when we get to rule

14   56, that's where we are going to be.  But that's not where we

15   are right now.  We are alleging that we have satisfied Boim by

16   making allegations that the general -- that these defendants had

17   knowledge; but the knowledge they had was that money was being

18   funneled to terrorist organizations and that it was reasonably

19   foreseeable.

20           Now, in Boim, Your Honor, they interpret 2339(a) and

21   (b), although they were enacted after David Boim was killed, as

22   shedding light on congressional intent.  We, in the same

23   fashion, allege that 2339(c) sheds light on congressional intent

24   with respect to what does it mean to be a sponsor of

25   international terrorism.  So that you don't have to relate this

1    to the predicate act; and I believe, Your Honor, that Boim says

2    exactly that; and in Boim, Your Honor, they -- they say -- they

3    quote the Department of Justice, the Bush administration

4    Department of Justice filed an amicus brief in the Seventh

5    Circuit.  The Department of Justice stated in that amicus brief

6    exactly what I just said:  That if you know generally that the

7    money is going to a terrorist organization and that it's

8    reasonably foreseeable that a terrorist act would occur, that

9    you are aiding and abetting the construct of a terrorist

10   factory, if you will, then you're liable, at least at the

11   12(b)(6) stage.

12        And that's what we rely on Your Honor.  We rely on

13   Boim, 2339(c), the clear congressional intent to cut off and

14   imperil the flow of money at every stage of the chain of the

15   funding of -- and sponsoring of terrorism.

16        That's the crux of our case.  If we are required at the

17   12(b)(6) stage to have -- without ever having served a single

18   piece of discovery on the defendants, we got 500 pages of

19   allegations that we built on our own investigation, Your Honor.

20   Without any information from any of these defendants.  Zero.

21   From public records and from our own investigation and from the

22   responses we received to letters rogatory.

23        As every expert pointed out, this is not a simple jump

24   from a contribution to Al Haramain where the person who receives

25   the money says I'm going to send a thousand dollars to Mohammad

1   Atta so he can get some flight simulator.  If that's the burden,

2   Judge, we don't have a case against most of these defendants.

3          We do have a case against the banks because they were

4   put specifically on notice in 1990 by two high-level members of

5   the United States government who travelled to Saudi Arabia, met

6   with the government officials, met with ministers who

7   administered these charities, met with the banking authorities,

8   and told them, laid it on them, told them chapter and verse what

9   was going on with Al Haramain, Muslim World League, and others.

10  Laid it on them.  Told them chapter and verse.  1999 and again

11  in the year 2000.  We will allege that --

12         THE COURT:  And what do you assert is the duty of a

13  bank when told that one of its depositors is funneling money

14  through the bank to terrorists?

15         MR. MOTLEY:  They didn't just tell them that.  They

16  told the banking authorities how they were abusing the Islamic

17  banking system as I set forth earlier in one of the slides.

18  They didn't just tell them about the charities.  They told them

19  how the Islamic banking system was being abused.  They named

20  names.  They named names.  You may have read this week, they're

21  just now starting to arrest some of these folks who are

22  defendants in our case.

23         They were told in 1999, Your Honor, and a 12(e)

24  complaint if you give us the opportunity, we have a whole host

25  of new information we can put in the complaint.  But you're

1    Judge, Judge, we failed the court by not putting Al Rajhi's name
2    or Al Haramain's name in front of every numbered paragraph.   We
3    thought that we facilitated that by referring the defendants
4    back to the general allegations of the complaint.

5           But if I can go to the next one, please?

6           This, Your Honor, is the fruits of one of the letters
7    rogatory which Your Honor issued to the Bosnian Supreme Court
8    and which they complied with and which the U.S. justice
9    department turned over some of these documents to us.   This is
10   the golden chain.   What we have had -- these are translated.
11   Here you see the names of the principal contributors to Al
12   Qaeda.   Here you see many of the defendants in our case.   You
13   see Al Rajhi.   Bin Mahfouz.   Of course, he doesn't have his
14   motion before us today.   I think there's 11 or 12 of them here,
15   Your Honor, who are defendants in our case.   The Bin-Laden
16   brothers.   Et cetera.

17          Next please?

18          Now here what is they want to say this is all we said
19   about them.   This is not all we said about them.   This is one
20   little thing we said about them.   This is, in fact, the -- one
21   of the hijackers of flight 11.   He had an Al Rajhi Banking and
22   Investment Corporation account.   That is not the sole pillar
23   upon which our building is constructed as to Al Rajhi, Your
24   Honor.

25          I listed all the various paragraphs that we think they

1   are involved with.  We have a whole section in the complaint on
2   general allegations about Islamic banking systems, what was
3   wrong with it and how it facilitated the transfer of money to
4   the terrorist organization Al Qaeda.
5              Now, here, Judge, they also alleged that we hadn't --
6   we didn't have personal jurisdiction over them.  This next slide
7   addresses that issue.  They got an Al Rajhi Worldwide Express
8   with an American flag on it.  And they said that they have
9   refined this checking service for over 50 years and talk about
10  the Islamic banking system.  They list their current banks in
11  the United States.
12             On the next slide, Al Rajhi thinks so much of the
13  United States justice system they filed suit themselves in the
14  United States, one of their subsidiaries.
15             In -- I don't know if they want to be transferred to
16  Houston, Texas or not, Judge, but this is where they brought
17  their case in Houston, Texas.  Even asked for punitive damages.
18             We believe Your Honor and if I can, now, let's -- this
19  is what I will use for the jury, but at this stage, Judge --
20             THE COURT:  You might use that with a jury.
21             (Laughter.)
22             MR. MOTLEY:  I would seek the court's permission to use
23  this.  It looks pretty good, though, doesn't it?
24             And this is what I'm trying to address, Your Honor, is
25  that at this stage, it is fundamentally unfair not to the

1    defendants but to the plaintiffs who have done all this outside

2    research, cited all these international studies, findings of

3    Congress, findings of the United Nations Security Council, the

4    French Assembly, their Congress, all these findings which have

5    been made worldwide about how complicated this -- this terrorism

6    funding system is; but it all boils down to this:  There is an

7    Al Qaeda terrorist factory.  And there are people who materially

8    support it.  They supported it beginning in 1888 -- 1988 and

9    they continue to support it up to August or whatever the cutoff

10   date would be which Your Honor would find.

11         And this Al Qaeda Inc. spewed out all kind of terrorist

12   acts in 1993 with the World Trade Center bombing.  1995, our

13   government found and publicized the plot to hijack a plane,

14   commercial plane and fly it into the CIA Langley headquarters

15   just like they did to the Pentagon.

16         In 1999, our government went over and begged the Saudis

17   to do something about the charities and the Islamic banking

18   system.

19         So we are going to be able to prove an awful lot of

20   actual knowledge, but we're not going to be able to prove that

21   that $1,000 check was written by defendant A and he was told

22   that we're going to send this to Florida and give it to Mr. Atta

23   to take an extra flying lesson.

24         That kind of proof is not going to come as to very many

25   defendants.  I don't think and we don't believe that's what Boim

1    requires.  Certainly if you take the Boim analysis that you find

2    what Congress meant in 2333 by resort to the criminal statutes,

3    then the same logic applies to 2339(c) which clearly and

4    unequivocally, Your Honor, and we provided that in your book,

5    the June 25, 2002 adoption of the international treaty against

6    the financing of terrorism, you don't have to relate it to the

7    predicate act.  They want to criminalize paying money to help

8    build this factory and providing resources that result in the

9    terrorist activity.

10         Should I, Your Honor, do the -- would you like for me

11   to sit down or can I argue some more about Boim?  Because I've

12   been Boim'ed around for weeks.

13         THE COURT:  I understand.  I've read Boim.  Let me ask

14   you just a couple of questions, Mr. Motley.

15         MR. MOTLEY:  Yes, sir.

16         THE COURT:  Please do not take these as questions that

17   telegraph any particular thinking of mine, but they're only sort

18   of hypothetical questions.

19         MR. MOTLEY:  Yes, sir.

20         THE COURT:  If hypothetically, I were to dismiss the

21   claims against any of the parties on the grounds that the

22   allegations of the complaint are not adequate, what if anything

23   is the impact of that on your statute of limitations' situation?

24   Is there a statute of limitations that runs; and if so, what is

25   it, and how would it operate?

1          MR. MOTLEY:  I would have to think that through, Your

2    Honor; but as Your Honor has found in a similar situation, some

3    of the statutes, federal statutes that we allege have 10-year

4    statutes of limitations.  Obviously that wouldn't impact that.

5    A lot of people back in my office wouldn't be happy, but if

6    there is a two-year statute somewhere, you know, we --

7          THE COURT:  You have until September.

8          MR. MOTLEY:  Yes, sir.  I think we do.  I'm going to be

9    arguing the choice of law things.  There are a lot of big

10   differences in our view; but I'll hold off on that until we get

11   to that.

12         THE COURT:  All right.  Thank you, sir.

13         MR. MOTLEY:  I have an answer also to your question

14   about how many foreign claimants there are.

15         THE COURT:  All right.

16         MR. MOTLEY:  There are 198.

17         THE COURT:  198 foreign claimants?

18         MR. MOTLEY:  Yes, sir.  There are now in our case 3,996

19   plaintiffs.

20         THE COURT:  Do you have the answer to the rest of that

21   question?  Which is what do we do with those people?  Is venue

22   proper as to those people; and if so, how?

23         MR. MOTLEY:  We -- I didn't anticipate that that

24   question was going to be asked, and I would like -- if you don't

25   mind -- if we have a lunch break, to take a quick peek at that

1    and see if that means we get tossed --

2          THE COURT:  I thought Ms. Bierstein asked for even more

3    time than lunch.

4          MR. MOTLEY:  Ms. Bierstein will be providing the

5    answer, so...

6          (Laughter.)

7          I'm going to have lunch.

8          THE COURT:  All right, sir.

9          MR. MOTLEY:  Thank you, Your Honor.

10         THE COURT:  Thank you.  Mr. Simmons, I don't think -- I

11   don't think I need to hear a reply on this particular point.

12         MR. SIMMONS:  There are a couple of points -- it would

13   take me 10, 15 seconds.

14         THE COURT:  All right, Mr. Simmons.

15         MR. SIMMONS:  Sometimes you sit down and think of the

16   answer to a good question with a judge, and you realize you

17   should have given it.  One of the points he has been making up

18   here about facts he could have alleged and might have alleged

19   and could make if given the opportunity, brought home one of the

20   points that we encountered early in the case and that we heard

21   that they had issued these letters rogatory and had gotten this

22   information.  We requested access to it because as court

23   custodians we felt they acted as an arm of the court and should

24   let us have it.  At this juncture our reasonable response

25   according to where we stand in the case as it exists right now

1    is we have to issue discovery and proceed forward.  So we're not

2    on the juncture where we can get access to the things he's

3    telling the court about that supposedly lay these ties.

4           As I sat here and heard what he had to say, I became

5    more and more convinced as to my client, Mr. Kazmi up in

6    Chicago, the little accountant, none of the items he listed

7    pertaining to Benevolence have anything to do with an outside

8    accountant.  He didn't do any of the solicitation of funds and

9    so forth that Mr. Motley walked through that Benevolence is

10   involved in.  At this juncture the cleanest and best from my

11   standpoint is to get a dismissal.

12          If they come up with facts that make that tie and can

13   support them and tell us what they are, bring us back in.  But

14   at this juncture, there is no good-faith basis to hold this man

15   here in this court, Your Honor.

16          THE COURT:  All right.

17          MR. MOTLEY:  My colleagues reminded me I didn't address

18   Al Haramain.  Do you want me to address that?

19          THE COURT:  No.  I think I know what you are going to

20   say and I don't think -- frankly, it is -- it's pushing 12:30.

21   Although we're talking about a lunch break, I really would like

22   to press through and see if we can finish these matters before

23   lunch or at least before my lunch.

24          What I'd like to hear about next is RICO.  Yes?

25          MS. BERNABEI:  I'm going to handle that for the

1    defendants.  May I just address something for Dr. Khudeira?

2         If you look at the time line that was provided by

3    Mr. Motley and you look at Dr. Khudeira's involvement with

4    Benevolence, it was all prior to 1998.  In other words, he was a

5    registered agent in 1992.  He was -- he made his donations in

6    1996.  Those were all time periods prior to any information

7    that -- you know -- the charities could have any relationship

8    with Al Qaeda.  And that was the date Mr. Motley said that the

9    U.S. officials went to Saudi Arabia.  Well, it was clearly

10   before -- Dr. Khudeira's only involvement with Benevolence

11   International was not doing any of the things that are alleged

12   in the complaint, which I believe would have occurred in 1998 or

13   later.  His only involvement was 1996 and before.

14        THE COURT:  Now, on RICO, I'm going to shift the --

15   sort of shift the argument here.  I want to hear from the

16   plaintiffs on RICO because it occurs to me without the need for

17   any extended argument from the defendants in this case that

18   there is a serious standing problem with the RICO claim in this

19   case.  Namely that section 1964(c) provides for damages for any

20   person injured in his business or property by reason of a

21   violation of section 1962.  The Sedima case says that's a

22   standing provision.  There is a mountain of cases holding that

23   there is no standing to advance a RICO claim on behalf of people

24   asserting personal injuries or for that matter the sort of

25   downstream consequences of personal injuries which is injuries

1    to my particular business because I was injured and so forth.

2          I don't know that there are any plaintiffs in this case

3    who are asserting business loss instead of losses arising from

4    wrongful death.  And so I want to hear from the plaintiffs on

5    this, because it seems to me just on the papers, the defendants

6    clearly have the better of this argument; and I want to hear if

7    you can talk me out of it.

8          Professor Blakey.

9          MR. BLAKEY:  Your Honor, --

10         THE COURT:  The Professor Blakey.

11         MR. BLAKEY:  Well, I know -- you know, Mr. Blakey is

12   fine, Your Honor.  Let's see if I can swim upstream.  If my

13   colleagues here would give me my 145?

14         Your Honor, I recognize there are cases and a mountain

15   of cases that say this statute does not include property

16   injuries if they're connected to personal injuries; and that's

17   what I would like to talk you out of and do it in the following

18   way.

19         Mr. Justice Frankfurter once said there were three

20   rules for reading a statute.  Read the statute, read the

21   statute, and read the statute.

22         If we take a look at this statute, it says any person

23   injured in his business or property; and the question before you

24   is injured in his business or property, are those words of

25   limitation so that we read in any person who is only injured in

1     his business or property by reason of or are they words of

2     illustration, which we would say any person at least injured in

3     his business or property may sue.

4          That statute is open to either of those two

5     interpretations.  If you wanted to resolve that question, it

6     seems to me there are two ways of doing it.

7          One is -- and this is the oldest principle of statutory

8     construction I know of, necator iso cais [phonetic], which is

9     Latin for saying you read words by the words with which they are

10    connected.  We go down that sentence and it says "by reason of a

11    violation of 1962."

12        Well, what does 1962 say, because 1962 has to be read

13    into this section and that is the substantive provisions of

14    RICO.  A, B, and C, A being an investment, B being a takeover,

15    and C being an operation.  Each of those sections are predicated

16    upon a pattern of racketeering activity.  This sort of sounds

17    like tab A and tab B, building something for a kid at Christmas,

18    but this is the way it is drafted.

19        You go back to 1961, and 1961(a)(1) specifies three

20    predicate acts:  Murder, arson, kidnapping, all of which happen

21    to be applicable here.

22        What would be the primary injury in a murder, arson,

23    and a kidnap?  Surely there would be personal injuries but also

24    there would be property injuries.  Now, why would Congress,

25    trying to read this as a whole, limit these injuries to only

1   business or property and not business or property connected to

2   personal when the predicate acts are murder, arson, and

3   kidnapping at least.

4       Well there is an answer why somebody might want to do

5   that.  This section is modeled on section 4 of the Clayton Act,

6   and this is what the courts have done.  They've gone to section

7   4 of the Clayton Act and said we're going to read section C like

8   section 4.

9       The problems with that move, the first problem is you

10  don't go to a parallel statute unless what you want to do is

11  resolve an ambiguity; and we don't have an ambiguity in this if

12  the liberal construction clause -- which is part of this

13  statute -- says read it liberally and not strictly.  Read it to

14  mean "at least" and not "only."

15      And if we go to the Clayton Act, section 4, we ask what

16  are violations of the Clayton Act?  Well the Clayton Act can

17  only be violated by price fixing and other business offenses.

18      In that sense that statute is not analogous to this

19  statute.  It's simply not.  And reading it in has the effect of

20  reading out of RICO property injuries simply because they are in

21  some sense connected to personal injuries, and that's not a

22  plain reading of the statute.

23      I suggest to you if you want to work your way through

24  this, out of that mountain, take two cases.  Take the Grogan

25  case which they cite and lay it down and then take the Rice

1    versus Janowicz, which is the Supreme Court of Washington.

2         What happened in that case is there was a federal RICO

3    prosecution brought and subsequently a janitor involved in arson

4    bombing sued; and Rice versus Janowicz and Grogan each took

5    Sedima and took this very language and parsed it; and Rice

6    versus Janowicz squarely held that you can recover the property

7    injuries associated with -- in this case it was an assault; and

8    it parsed it and explained why the antitrust was not

9    appropriate.

10        If you take a look at Grogan it starts its opinion by

11   saying these are words of limitation, but that begs the

12   question.  The issue before you is are these words of

13   limitation.  Now what's happened is that they say personal

14   injury that can be connected to property injury has the effect

15   of taking out all of the property injury; but that's not a plain

16   reading of the statute.  A plain reading of the statute is

17   anybody who's injured in his property or business.

18        And if I am injured personally, I am both injured with

19   wrongful death and pain and suffering, and I suggest there's one

20   argument that even that's covered, but I'll put that aside for a

21   moment.  That's in the brief, and I'll rest in the brief.

22        But the statute says injured in his business or

23   property.  It doesn't say but not when it's connected to

24   personal injury.  That's a reading into the statute.  But this

25   statute was designed to give remedies for people who are

1     victimized by patterns of criminal behavior.

2           In this situation, murder, arson, and kidnapping.

3           If there was ever a situation where RICO applied, it's

4     Al Qaeda, an organization.  No different in kind than a family

5     in the Mafia, engaging in what?  Murder, arson, and kidnapping.

6     No different in kind than what the mob does.

7           And we turn to this statute and say Congress wanted to

8     give these people, victims, remedies.  They wanted to give them

9     treble damages and counsel fees.  You go in and read it and say

10    oh, wait a second.  I'm specifically told in this statute by the

11    liberal construction clause to read it liberally in light of its

12    remedial purposes.

13          Reading these words as injured in its business or

14    property as words of property is a strict reading not a liberal

15    reading.  Adding to this no personal injury and then taking out,

16    what shall we call it, collateral damage?  Taking out as

17    collateral damage the property injury associated with personal

18    injury, is not only reading this strictly, it is adding words to

19    it.  Seems to me, Your Honor, that's wholly inappropriate.

20          And I think we are entitled for the opportunity to

21    prove that we had financial injury associated with what happened

22    to us on September 11.

23          And therefore, we are entitled to sue for that

24    financial injury.  We'll get our wrongful death through other

25    mechanisms, but our property injuries, this statute in so many

1      words says we're entitled to it.

2              Can I answer any questions?

3              THE COURT:  I think you've answered all my questions

4      very eloquently.  Thank you, sir.  I just have a question for

5      the plaintiffs -- defendants I mean for -- excuse me, for the

6      defendants.  You are the plaintiffs.

7              MS. BERNABEI:  Your Honor?

8              THE COURT:  Can you think of any kind of a plaintiff

9      who could sue under RICO in this case?

10             MS. BERNABEI:  Yes, a plaintiff -- for instance, any of

11     the firms that had offices in the World Trade Center whose

12     offices were damaged.  You know, there were a number of firms.

13     Insurance companies who had to insure the loss of the buildings.

14     I assume --

15             THE COURT:  Actually the people that had offices in the

16     World Trade Center might come pretty clearly under the

17     limitation of this provision, wouldn't they (indicating.)

18             MS. BERNABEI:  Of this, yes.  Yes.  We believe that's

19     the case.  In terms of the people that could sue, I assume

20     you're referring to if they added a predicate act of terrorism,

21     who could sue?  I think it would be people who suffered property

22     damage.  I think if you look at the statute -- and Professor

23     Blakey, in fact, has written on this -- Congress clearly did not

24     intend the statute to apply to personal injury, whether it's a

25     mass tort or an act of terrorism such as this.  They intended it

1    to apply to property damage.  That was its genesis.  In 1990

2    there was an attempt to have -- to amend the act -- RICO -- to

3    have it include losses for personal injury.  In fact, Professor

4    Blakey in the Vanderbilt Law Review article in 1995 simply

5    stated RICO does not authorize recovery for personal injuries.

6    The cases he cited talk about property that is derived from the

7    personal injury.

8            That was the state of the law in 1990, and that's the

9    state of the law today.  Any property damage that is derived

10   from the personal injury, the death or injury of a person is not

11   included.

12           I think Congress if they had wanted when they added

13   predicate acts to amend RICO to say that it also covered

14   personal injuries could have done so.  But there has been over

15   the years a number of attempts to amend RICO, and I think

16   Congress has deliberately not done so because they did not want

17   to extend RICO to encompass general personal injury kinds of

18   cases.

19           And so it has been by most courts except for what we

20   believe is sort of an outlying decision in New York all the

21   courts that have considered it, certainly all the circuits that

22   considered it, all the District Courts in this district have

23   limited it to property or economic injury which are the words of

24   the statute.

25           THE COURT:  Okay.

1        MR. BLAKEY:  Your Honor, she cited me.  May I comment

2   on me?

3        THE COURT:  Yes.

4        MR. BLAKEY:  On me on me?

5        THE COURT:  Fair enough.

6        MR. BLAKEY:  One of the problems a law professor --

7        THE COURT:  Just don't don't get yourself nominated for

8   the court of appeals.

9        MR. BLAKEY:  No.  Judge, there's too much out there in

10  my paper trail for me to ever be nominated for any -- for --

11  that I got to get a clearance for.

12        They cite me twice and this is the classic case of

13  citing you out of context.  They've cited me for saying that it

14  only includes personal injury.  I did do that, and I did cite

15  two cases, Drake out of the Sixth Circuit and Grogan out of the

16  11th Circuit.  But I never evaluated those cases at the time.  I

17  took them at that context as plainly what they said.  I don't

18  deny that that's what they said.  But I'm here before you now

19  evaluating those cases.

20        THE COURT:  And there is no square holding in this

21  circuit.

22        MR. BLAKEY:  You're not bound -- no D.C. Circuit --

23  you're not necessarily bound by your colleagues.  What I really

24  ask you to do Judge, this is an honest intellectual endeavor,

25  take the two best reasoned cases, Drake is not well reasoned.

1     Grogan is reasoned.  Lay it down there and lay down Rice versus
2     Janowicz, Supreme Court of Washington.  It is not a trial court.
3     And each of them purports to follow Sedima.  I'll tell you,
4     Judge, the Federal Court and the 11th Circuit was reaching out
5     to narrow this statute and playing word games with well, that's
6     what it says, Congress can change it.  Ignoring the liberal
7     construction clause and begging the question by saying there
8     were words of limitation.  Take a look at Rice versus Janowicz.
9              THE COURT:  All right, sir.
10             MR. BLAKEY:  When you do that, Your Honor, I think you
11    will come out recognizing that we have standing.  Thank you.
12             THE COURT:  Thank you.
13             Now, I think we have covered the most important of the
14    questions that I wanted to talk about this morning before we get
15    to this discovery issue on Prince Sultan, but there are -- there
16    is a justiciability issue raised by the papers.  There is a
17    personal jurisdiction -- let me just ask, Mr. Curran, on your
18    personal jurisdiction argument as to Al Rajhi.
19             You know, you can move to dismiss for want of personal
20    jurisdiction.  You have not exactly done that.  You've
21    complained about the personal jurisdiction but you haven't moved
22    to dismiss and haven't shifted the burden to the plaintiffs to
23    demonstrate personal jurisdiction.
24             Are you or are you not moving to dismiss on grounds of
25    want of personal jurisdiction.

1          MR. CURRAN:  We absolutely are.  In fact, I'm puzzled

2     by the question.  I thought we had identified that in our motion

3     and included a section in our brief on personal jurisdiction

4     with the express intent of shifting the burden to them which we

5     maintain they've been unable to bear.

6          THE COURT:  And you're asserting there is no personal

7     jurisdiction as to Al Rajhi.

8          MR. CURRAN:  Well, ultimately that's our position, of

9     course, Your Honor.  At this pleading juncture, they bear the

10    burden of coming forward with sufficient factual allegations to

11    make a prima facie showing.

12         THE COURT:  They don't have to make that prima facie

13    showing in their complaint.  That's clear.

14         MR. CURRAN:  They have to make it in response to our

15    motion.  We raised the issue in our motion.  They came back and

16    made some arguments in their opposition papers.  We don't

17    believe they've satisfied their burden.  And we addressed

18    seriatim each of the points that they asserted in their

19    opposition papers.

20         Mr. Motley has referred to some of those here today

21    including the excerpt from the website with the American flag;

22    and I think Your Honor will see if you read that excerpt, it

23    actually indicates that it's -- the website is talking about

24    people in the Middle East who want to wire money to the United

25    States, which we maintain is not a purposeful availment of U.S.

1    jurisdiction, so we don't think that gets them anywhere.

2         Mr. Motley also referred in his PowerPoint presentation

3    to a lawsuit filed in Houston, Texas.  Certainly, Your Honor,

4    the filing of a single lawsuit does not subject one to personal

5    jurisdiction in the United States.  But more importantly, I

6    note -- although Mr. Motley did not -- that that lawsuit was

7    filed by an affiliate of Al Rajhi Bank.  I believe it was Al

8    Rajhi BV; and therefore, that act by a corporate affiliate can

9    have no jurisdictional significance for the Saudi bank.

10        THE COURT:  Well, then let me hear from the plaintiffs

11   on the question of personal jurisdiction as to Al Rajhi.

12        Thank you, Mr. Curran.

13        MR. CURRAN:  Thank you, Your Honor.

14        THE COURT:  Perhaps I, too, had misunderstood Al

15   Rajhi's motion.  I had taken it Al Rajhi had not quite asserted

16   that I lacked personal jurisdiction or moved to dismiss under

17   123(b)(2).

18        MR. MOTLEY:  That's how we read it, Your Honor.  Out of

19   an abundance of caution in our papers we did ask for the

20   opportunity and leave to take discovery specific to the issue of

21   Al Rajhi and its corporate empire, whether that vested us with

22   proper jurisdiction in this court.

23        THE COURT:  How about that, Mr. Curran?  That's the law

24   in this jurisdiction.  Limited jurisdictional discovery if you

25   contest it.

1          MR. CURRAN:  I don't think that is the law, Your Honor.

2    Under the cases we cited, there has to be a prima facie showing

3    before you can get jurisdictional discovery.  They haven't made

4    that.  I also don't understand the confusion.  I've been handed

5    now our motion.  Our motion specifically cites rule 12(b)(2).

6          THE COURT:  Well, confusion is confusion.

7          MR. CURRAN:  All right.

8          (Laughter.)

9          In any event, we have cited cases in our papers from

10   this circuit, from the Second Circuit as well, and we believe

11   those cases hold that there has to be some prima facie showing

12   before a foreign defendant can be subjected even to

13   jurisdictional discovery.

14         Now obviously we hope Your Honor never gets there; and

15   the reason why we put that argument toward the back of our brief

16   was because we believe you need not get there because of the

17   subject matter jurisdiction arguments and the arguments on the

18   insufficiency of the substantive allegations against Al Rajhi

19   Bank.

20         THE COURT:  Your primary argument, of course, is

21   ATSSSA.  That would send you to New York, where you would also

22   contest personal jurisdiction, I assume.

23         MR. CURRAN:  We probably would, Your Honor, yes.  But I

24   don't think that affects the ATSSSA argument.  ATSSSA obviously

25   is a subject matter jurisdiction point.  I believe Your Honor is

1    bound to address that first before even getting to the

2    sufficiency of the allegations; and it is for that reason we

3    think the personal jurisdiction argument, while meritorious is

4    not central to the issues before Your Honor.

5                    THE COURT:  Okay.  Thank you.

6                    MR. MOTLEY:  Your Honor, we certainly showed them

7    waving the American flag on their website in order to entice

8    them to do business with them.  I think that's a prima facie

9    showing of standing alone to allow us the discovery on this

10   issue now that he's clarified what was confusing at best to us

11   in his motion, and I think we're entitled to discovery on that

12   issue if you find subject matter jurisdiction.

13                   Thank you.

14                   MS. BIERSTEIN:  Your Honor, if I might, I just wanted

15   to add a couple of points.

16                   First of all, I think the confusion -- to the extent

17   there was any -- comes from the fact that although Al Rajhi

18   moved to dismiss on the grounds of permanent jurisdiction, one

19   thing they never asserted until perhaps today in this courtroom,

20   Mr. Curran, but they never asserted in their papers that they

21   lacked minimum contacts.  That is they said we didn't plead it.

22   They said we don't have it.  And I have taken that to mean

23   because if we had discovery we'd find that they do.  And some of

24   that, Mr. Curran also made reference to that lawsuit in Texas

25   which Mr. Motley had raised.

1        I want to note although that was brought by an

2   affiliate and I believe Mr. Motley mentioned that, the

3   allegations in the lawsuit are not about the affiliate, they

4   define the -- they talk about transactions of the bank which is

5   defined as the parent of the whole entity.  It is a whole story

6   about their transactions with Enron in the United States.

7        So I think there's a lot more going on here in terms of

8   Al Rajhi's business dealings in the United States than we're

9   seeing, and I think discovery would shed light on that.

10       The last point I want to raise is Mr. Curran said in

11  his reply he went through piece by piece each of the contacts

12  that we did adduce in our opposition; but you know, to show why

13  they're not sufficient.  But I think it is a question of whether

14  each one alone.  When you take the whole picture together of

15  each of those as to the role of the bank, the relationship with

16  the correspondent banks, their efforts to facilitate

17  transactions with banks in the United States, and now

18  apparently -- as we recently learned -- their own transactions

19  in the United States in a business context, I think that there

20  are numerous contacts between them in the United States which

21  discovery would show.

22       THE COURT:  It is now a quarter to 1:00.  There are

23  some -- I really hate to take a break but there's -- with this

24  many people.  It will be difficult to get everybody back

25  together and -- in any kind of timely fashion.

1      I have two more subjects that I want to talk about

2   briefly and then I have said that this is without limitation to

3   your issues.  So if anybody has anything you're just burning to

4   talk about we haven't already talked about, we will have a

5   reasonable amount of time; but the two additional matters that

6   are on my mind are these.

7      The first is another one of these purely hypothetical

8   questions.  Assume for the sake of discussion that I find

9   notwithstanding Mr. Curran's argument that this court does have

10  jurisdiction -- subject matter jurisdiction of these claims, and

11  assume that the defendants will then immediately seek an

12  interlocutory appeal; and assume further that I would certify

13  that question for an interlocutory appeal.

14      What if anything would happen to the rest of the case

15  while that appeal is pending?

16      Anybody have a quick answer to that question?  Or would

17  you like to think about it?

18      MR. CURRAN:  I don't think I have a quick answer and

19  I'd prefer not to attempt to give one.  I do think that under

20  principles of the law of the case, the -- this court would be

21  arguably deprived of the power to go forward while an appeal is

22  pending; but again without having done real research on this

23  specifically, that's just top of my mind.

24      THE COURT:  'Cause it seems to me there's so much

25  answering and sorting out to be done with this case just as a

1    matter of administering a major case like this that to stop it

2    in its tracks for the year it would take the court of appeals to

3    deal with that issue is problematical at best.

4            MR. CURRAN:  Let me respond in two ways to that.  If

5    Your Honor were to take that hypothetical approach, an appeal

6    could be expedited; and given the nature of this case, that the

7    court of appeals might be willing to proceed along those lines.

8            Secondly, a concern about expedition may not be wholly

9    warranted here.  Al Rajhi is here today I think Your Honor

10   knows.  We were never served. We showed up on our own volition

11   here to clear our names from scurrilous allegations.  It was a

12   very serious step the bank took.  The bank, therefore, has been

13   pushed up front.  That's why we are here.  Most -- the

14   overwhelming majority of defendants -- have not been served in

15   this case.

16           THE COURT:  I understand that.  I understand that.

17           MR. CURRAN:  So there is no loss of time as to those

18   parties.

19           THE COURT:  All right.

20           MR. CURRAN:  Thank you.

21           MR. MOTLEY:  Your Honor, we are in the process pursuant

22   to duly entered court orders of serving a multitude of

23   defendants.  We are staging this, as you know.  We have already

24   served a large number, the first stage of publication, service

25   by publication.

1      We would strenuously resist, with all due respect, any
2   certification.  We feel so confident of this subject matter
3   jurisdiction issue that we're right and they're clearly
4   manifestly wrong we object to any certification to it or any
5   effort to halt this case for a year.  These -- I don't want to
6   wax emotional about the families, but we all know what they have
7   been through.  To delay this case for a year over something that
8   we feel dead certain about, we deliberately chose this
9   jurisdiction, we believe in our arguments.
10      THE COURT:  Well, I hear you.  It is a very big
11   question, though, and it is a long way to take 3,000 plaintiffs
12   and 139, 189 defendants to go all the way through a case and
13   find out then there is no subject matter jurisdiction at the end
14   of the road.
15      MR. HUGE:  But the case shouldn't be stopped if the
16   assumptions you are talking about occur.
17      THE COURT:  That's my question.  Shouldn't be stopped.
18   Would it have to be stopped?  What would have to be stopped?
19   Maybe the claims against one or maybe the claims against the
20   people who have advanced that claim in this court would have to
21   be stopped.
22      I simply invite further short memoranda on this
23   question.  And I don't want to put too much freight on the
24   question as indicating a conclusion that I haven't drawn yet.
25   Let's be very clear about that.

1      MR. HUGE:  Discovery could clearly go forward and --
2  during that period and should not be stopped.
3      THE COURT:  I'm not responding to that.  I want you to
4  write something.
5      Now, the other -- the other matter is the -- is not
6  directly associated with any of the motions to dismiss that are
7  pending before me now, but it is a sort of collateral question
8  that has to do with whether plaintiffs should have or must have
9  discovery as to Prince Sultan before responding to or before I
10  go ahead and decide his claim, his motion to dismiss on -- among
11  other grounds, justiciability and sovereign immunity.
12      Mr. Huge is up.  I'll recognize him.
13      MR. HUGE:  I'll pick up on where I left off about
14  discovery should proceed.
15      Defendant Sultan filed his motion to dismiss claiming
16  immunity under the Foreign Sovereign Immunities Act, and he
17  submitted an affidavits of four officials of charities that
18  you've heard Mr. Motley describe earlier and his lawyer and
19  Saudi Arabia.
20      Our complaint -- one of the issues in our complaint
21  regarding the defendant is that he made these personal
22  contributions to these charities to assist the terrorist acts.
23      They filed these affidavits saying no, these were not
24  personal contributions, these were contributions instead by the
25  Saudi government kind of in his name.

1    Well, the Saudi government has said that it has a

2    policy that it does not permit any support of terrorism.  So if

3    Sultan is the head of the government agency or arm that

4    determines that these charities receive government moneys, then

5    he is acting ultra vires and contradicting the stated policy of

6    the government, so either way he is subject to jurisdiction of

7    this court.

8         Once Sultan filed these affidavits, putting at issue

9    the personal nature of his contributions, we then developed from

10   the official Saudi press agency, which is a part of the ministry

11   of information of the Saudi government, facts which put that

12   personal contribution question at issue.

13        First about the Saudi press agency.  Its office here in

14   Washington is the same as the Saudi embassy's address, on New

15   Hampshire Avenue.  You noted this first slide has the letterhead

16   of the Saudi Arabian Information Resource.  It defines what it

17   is.  It forms a part of the ministry of culture and information,

18   is the central department for the collection and dissemination

19   of official news, it distributes news reports.  It is not the

20   Associated Press.

21        The United States State Department in its annual

22   country reports on human rights practices in Saudi in 2001, said

23   the government owns the Saudi press agency which expresses

24   official government views.

25        Second slide.

1          The declaration of Saleh Abdullah Al Saykhan states --

2     he is with the IIRO -- that he had a review of the records

3     without specifying what that those records were and flatly

4     contradicts what the Saudi press reports had that there was no

5     financial donations from Prince Sultan during the above time

6     period.

7          The next slide, please.

8          The monthly newsletter, official newsletter says deputy

9     prime minister and minister of defense et cetera, et cetera,

10    made a personal donation to the committee of five million Saudi

11    riyals and also donated funds to help the relief efforts of the

12    IIRO.

13          THE COURT:  If I am to believe it was personal, am I to

14    believe he made it for the specific purpose of obtain two

15    helicopters?

16          MR. HUGE:  I think you should.

17          THE COURT:  So I'm going to take it all?

18          MR. HUGE:  Take it all.

19          THE COURT:  All right.

20          MR. HUGE:  Personal by the way is not an ambiguous

21    term.  Personal means personal.

22          THE COURT:  Well, the defendant says that it may not be

23    quite that in the native language in which the word was written,

24    but go on.

25          MR. HUGE:  Okay.  We'll come to that.

1          Next slide, please.

2          Again, a personal donation, others followed and donated

3     according to their means and capabilities.

4          The next affidavit attached to the motion to dismiss is

5     from WAMY, an official at WAMY, who I think had been on, in his

6     position for something like two months.  Again, we have a

7     search.  We don't know what the search was.  What kind of

8     records what kind of accounting trail.  Again these are not

9     government officials.  These are charity officials.  These

10    are -- quote -- private officials.  Not the Saudi government.

11         The press agency -- in the Saudi Gazette on March 7,

12    again flatly contradicts what the affidavit submitted says.

13    Personally donated.

14         Now, to counter the information we developed which

15    contradicted the affidavits, the defendants filed a surreply and

16    said no, we hadn't done our homework sufficiently, that there

17    was a full text of what the press agency said.  So let's -- and

18    they said this -- these two new exhibits indeed contradicted the

19    government's official press statement; but if you read it

20    carefully, it doesn't contradict the official press statement at

21    all.  His royal highness made a contribution in the amount of

22    such and such representing the second installment of the annual

23    contribution that he makes.  Doesn't say makes on account of the

24    Saudi government, doesn't specify to the Saudi people that this

25    money is really their money.

1          Instead, he takes full complete credit for it.  You
2     also note that this Exhibit 1 that they say is -- you know -- an
3     official -- is some kind of translation of the full text
4     doesn't -- you will note it just has Exhibit 1 and starts out
5     illegible, doesn't have any kind of official imprimatur of where
6     this -- quote -- full translation came from.  Their papers don't
7     specify it.  We don't know whether it is a full translation, an
8     official translation, their translation.  We have no idea.

9          Exhibit 2 precisely the same thing.  It doesn't
10    contradict what the Saudi press agency said.  It doesn't
11    contradict that these are personal contributions.  It uses the
12    same language.  His highness' contribution, not the Saudi
13    government's contribution.  His generous and continuing support.

14         The contributions of his highness to the organization.
15    Doesn't talk about the -- that these contributions are made on
16    behalf of the government, that they weren't his personal funds.
17    It says, in fact, the opposite.

18         Now once this kind of factual dispute or questions are
19    raised, the circuit court of appeals here has made very clear we
20    have the right to take this early discovery on the
21    jurisdictional basis.

22         THE COURT:  Mr. Huge, I apologize for cutting you off.
23    I've got your argument.  I understand your argument.  I need to
24    hear from Mr. Jeffress.  I have an absolute deadline to be off
25    this bench at 1:15 because there are some people in my chambers

1   with a time sensitive matter I have to deal with.  We don't have

2   any more time than that.  Unless we want to all come back this

3   afternoon and that could prove endless.

4           MR. JEFFRESS:  I'm conscious of being the last one to

5   speak before lunch, Your Honor.  I'll try to hurry it up.

6           The issue here really relates to one of the issues in

7   the motion to dismiss.  It is the issue whether the conduct

8   alleged against Prince Sultan is official conduct or not

9   official conduct, which is obviously consequential for the

10  sovereign immunity motion.

11          We submitted the declarations of four -- actually a

12  Saudi lawyer to describe the organizations themselves and the

13  official capacity of Prince Sultan, and we submitted the

14  declarations of four representatives of the charities concerned

15  all of whom say that they have reviewed the records and with a

16  limited exception -- which the plaintiffs don't rely on -- there

17  were no personal contributions from Prince Sultan.  Now as to

18  three of the charities, the plaintiffs have not submitted any

19  information to challenge that.

20          There are press reports as to the IIRO, the Islamic

21  International Relief Organization in these press releases; and,

22  by the way, although it is a Saudi government agency in Saudi

23  Arabia, a lot of things that are government agencies are not

24  government functions here.  It is a press release.  It

25  attributes the contribution that is made -- the 1 million dollar

1  annual contribution made to IIRO which is made as explained in

2  the affidavits by the joint committee which is a committee of

3  the council of ministers made from government funds, attributes

4  those as personal donations of Prince Sultan.

5       One of the press releases Mr. Huge put on the

6  PowerPoint is December 1997, I think the very first one, 500,000

7  riyals which is, Your Honor, we have submitted in support of the

8  motion attached to the affidavit of Saykhan, is the actual check

9  for that very donation in -- actually late November of 1997,

10 500,000 Saudi riyals.  That is a check drawn on government

11 funds.  There is a cover letter to the organization of the joint

12 committee.

13      Why is there this conflict?  There is a conflict

14 because in Saudi Arabia, particularly when it comes to

15 government officials, including the king, including the

16 ministers much -- whether it is building of a desalinization

17 plant or whether it's a contribution to a charity -- are

18 attributed to the individual personally as opposed to attributed

19 to the government; and that fact is in the affidavit of Abdullah

20 Azia Fahd which we submitted also in support of the motion.

21      As far as discovery is concerned, the only as I say

22 with respect to -- there is one exhibit and one challenge made

23 by the plaintiffs with respect to the World Assembly of Muslim

24 Youth which is the donation -- and the slide that Mr. Huge put

25 up doesn't reflect it but if you read the actual exhibits, you

1    will see the only thing involved there was a consignment of
2    medicine for Chechnyan relief in 1997.

3         Now I heard Mr. Motley argue this morning and it may be
4    that the plaintiffs contend that if medicine is given for
5    Chechnyan relief, and one of the people who receives a shot or
6    some kind of medicine from that consignment happens to be a
7    member of Al Qaeda, you're liable for a trillion dollars in this
8    lawsuit.

9         I don't think the courts, I don't think Your Honor is
10   going to find that.  I don't think that ultimately is going to
11   be a standard for liability in this case.

12        But in any event, that is the sole basis for any of the
13   charities other than IIRO that the plaintiffs have for
14   challenging what is in a case involving a motion to dismiss on
15   jurisdictional grounds a factual showing, submission of
16   affidavits and proffers of evidence and the actual checks
17   involved which we are required to do, that's the only thing that
18   they have challenged.

19        Now Mr. Huge suggests that they wish to -- look, they
20   have to find out what kind of search was made.  There are these
21   indications and press releases.  I would only say to Your Honor
22   that these are people who do not speak English.  They are people
23   who are in Saudi Arabia.

24        If the court decides and the court -- I want to make
25   clear the court has a discretion to decide, although that

1    discretion may as in the -- well, in the D.C. Circuit where they
2    reversed Judge Urbina for going a little too far, it is limited;
3    but the court does have discretion in all fairness to make sure
4    the facts are ascertained.  The court may allow limited
5    discovery.
6        If it does so, it does have an obligation to allow that
7    discovery in a manner that is the least intrusive on the values
8    that the Foreign Sovereign Immunities Act was designed to --
9        THE COURT:  What are the other arguments that Prince
10   Sultan makes before he gets to this?
11       MR. JEFFRESS:  Number one, there is a lack of personal
12   jurisdiction.  To the extent that the plaintiffs contend there
13   is non-governmental conduct -- if it is governmental conduct,
14   the Foreign Sovereign Immunities Act provides jurisdiction if
15   there is an exception to the extent it is met.  To the extent
16   they say this is personal conduct, there is absolutely no
17   personal connection alleged with the United States except for
18   one thing.  He is the ex officio chairman of Saudi Airlines
19   which flies into Dulles Airport and New York and so forth and so
20   on.
21       There's plenty of case law -- and I don't think the
22   plaintiffs are going to rely on that -- to establish a basis for
23   personal jurisdiction.  There is what is perhaps the most
24   sensitive issue in the entire case, but one of the most
25   fundamentally important issues on this particular case when it

1    comes to the Saudi Arabia -- members of the Saudi Arabian

2    government, the high ranking officials, is the political

3    question doctrine and the justiciability of the claims made

4    against these individuals.

5         There are the same causation arguments -- not the same

6    but similar causation arguments that arise from those you heard

7    this morning.  This goes far beyond the Boim case.  The Boim

8    case is one where it was truly a charitable front.  As alleged

9    this was -- giving money to this charity was giving money to

10   Hamas.  And the court held that this was plainly on notice that

11   you were supporting terrorist acts.  Didn't have to know it was

12   David Boim that was going to be killed, but you had to know that

13   the money would be used to kill innocent people.

14        And just in this case, you don't have to know it was

15   Mohammad Atta, but they have to prove that anybody who actually

16   gave money to the factory Mr. Motley talks about knew that that

17   factory was going to commit terrorist acts that would result in

18   the deaths of innocent people.

19        I don't know how they intend to prove that.  I assume

20   that they have a good faith belief that they can prove that.

21   But certainly they haven't alleged that as to Prince Sultan,

22   who's only conduct is to give in his official capacity to cause

23   the government to make grants to charities that have existed for

24   25 to 40 years supplying relief to Islamic Muslims all over the

25   world.

1          I come back, Your Honor, to say if there was a -- any

2    basis for discovery in the case, it should be by written

3    interrogatories under rule 31 not rule 30 depositions.

4          Frankly, Your Honor, I haven't covered this.  There's

5    causation, immunity, lack of personal jurisdiction, and there is

6    the political question doctrine.  Those are the issues that --

7    that are raised in our complaint -- motion.

8          THE COURT:  Have the plaintiffs responded to your

9    motion or is there only response that they want discovery?

10         MR. JEFFRESS:  It was just filed --

11         MR. HUGE:  Last week.

12         THE COURT:  On the merits of the motion?

13         MR. HUGE:  On the merits of the motion was filed last

14   week, which dealt with all the things Mr. Jeffress --

15         THE COURT:  I promised you no answers today, and that's

16   what you're going to get.

17         MR. MOTLEY:  Your Honor, may I ask one indulgence for

18   two minutes.

19         THE COURT:  Two minutes is all I've got, Mr. Motley.

20         MR. MOTLEY:  I just wanted to respond to the choice of

21   law issue, if I might, Your Honor.

22         If Your Honor looks to the D.C. -- the D.C. analysis

23   for choice of law, they use the governmental interest analysis;

24   and there's a case that we cited where a car was stolen in

25   D.C. and the accident occurred in Maryland and the court applied

1    D.C. law, using the governmental analysis approach.

2         And we believe in this case that Your Honor should

3    apply Massachusetts law to the -- to the victims of 11 and 175,

4    which hit the World Trade Center; that you should apply New

5    Jersey law to 93 which crashed in Pennsylvania; and you should

6    apply Virginia law to flight 77.

7         The reason for that is if a breach of security -- the

8    gross lack of security at these airports would implicate the

9    governmental interests of those entities as opposed to the

10   fortuity of where the planes crashed.  That's all I have to say.

11        I think I said it in less than two minutes.

12        THE COURT:  I think you did, too.  Thank you.

13        All right, counsel.  I will get an answer out very soon

14   on the discovery question.  The other issues may take a while

15   longer.

16        MS. BIERSTEIN:  If I could say three words on the venue

17   question.  Literally three words:  Pendant venue and RICO.  I

18   can elaborate on them, but those are the two answers.  Pendant

19   venue and RICO.

20        THE COURT:  This has been very helpful.  Excellent

21   illuminating arguments.  These motions are submitted.  I'll get

22   you an answer as quickly as I can.  Thank you.

              (Proceedings adjourned at 1:10 p.m.)

\*   \*   \*   \*   \*   \*

CERTIFICATE

     I, DENNIS A. DINKEL, Official Court Reporter, certify

that the foregoing pages are a correct transcript from the

record of proceedings in the above-entitled matter.

            Dennis A. Dinkel