UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

```
┌──────────────────────────────┐
│ USDC SDNY                     │
│ DOCUMENT                      │
│ ELECTRONICALLY FILED          │
│ DOC #:                        │
│ DATE FILED:    8/8/2017       │
└──────────────────────────────┘
```

In re:

      TERRORIST ATTACKS ON
      SEPTEMBER 11, 2001

03-MDL-1570 (GBD)(SN)

REPORT AND
RECOMMENDATION

-----------------------------------------------------------------X

SARAH NETBURN, United States Magistrate Judge.

TO THE HONORABLE GEORGE B. DANIELS:

This document relates to:    Hoglan v. Islamic Republic of Iran, 11-CV-7550 (GBD)(SN)


      On October 14, 2016, I issued a Report and Recommendation in Hoglan v. Islamic Republic

of Iran, 11-CV-7550 (GBD)(SN), recommending that final judgments for solatium damages be

entered for 13 non-immediate family members of 9/11 decedents and denied for all other claimants.

ECF No. 3363 ("Hoglan II").[1] On October 31, 2016, the Hoglan plaintiffs submitted objections to my

findings that the claimants not awarded damages did not meet the legal standard to be considered

"functional equivalents" of immediate family members. ECF No. 3381. In light of other plaintiffs'

representations at an October 20, 2016 status conference that they were interested in briefing the

issues of non-immediate family members' entitlement to solatium damages, the Hoglan plaintiffs

asked that the issue be recommitted to me for further briefing. Id. On the same day, Judge Daniels

adopted the Report in its entirety as to the 13 plaintiffs awarded damages, and deferred judgment as

to all others until "all parties subject to the Scheduling Order have presented their motions and fully

briefed the issue of non-immediate family members' entitlement to solatium damage awards, and

---

[1] In October 2016, I issued three Reports and Recommendations related to the Hoglan plaintiffs' damages inquest. On October 12, 2016, I recommended that the solatium claims of immediate family members and the claims of estate plaintiffs be granted. ECF No. 3358 ("Hoglan I"). On October 14, 2016, I issued the Report and Recommendation at issue in this decision. ECF No. 3363 ("Hoglan II"). On October 24, 2016, I issued a Report and Recommendation concerning the claims of non-U.S. nationals. ECF No. 3374 ("Hoglan III").

Magistrate Judge Netburn has presented any further Report and Recommendations which such motions require." ECF No. 3384.

On March 3, 2017, I set a briefing schedule to bring to a conclusion the issue of non-immediate family members seeking solatium damages on the theory that they were "functionally equivalent" to an immediate family member. ECF No. 3451. Though many groups of Plaintiffs had initially expressed interest in briefing these issues, the Court received only submissions from the Hoglan and Burnett plaintiffs. ECF No. 3549, 3551–71. Accordingly, the Court proceeds to consider the claims presented.

## INTRODUCTION

The tragic loss of thousands of innocent lives in the attacks of September 11, 2001, shook our nation like no other event in our recent history. As the submissions that the Court has reviewed in this process amply demonstrate, the loss suffered went far beyond those who perished in the World Trade Center and the Pentagon. The people who died on that day left behind loving parents, spouses and partners, sons and daughters, brothers and sisters. While no amount of money damages can ever come close to making them whole for the wounds that these attacks have caused them, the Foreign Sovereign Immunities Act ("FSIA") unequivocally authorizes courts to award solatium damages to provide some measure of compensation and recognition for this loss.

While the evolution of FSIA law has been clear in compensating direct family members of those murdered in terrorist attacks, the intense bonds of affection that the deceased individuals wove during their lives often transcend the boundaries of a traditional nuclear family. In many cases, grandparents, uncles, or aunts developed almost parental bonds with the deceased, while stepsiblings, in-laws, cousins, or even friends cultivated relationships that were even closer than that of full-blood siblings. In declaration after declaration, the Court has read about the

2

outstanding personal qualities of the victims of the attacks, the deep connections that the grieving

relatives had with them, and the trauma that they suffered and continue to suffer.

The Court has no doubt about the genuineness of either these families' love or their pain.

Unfortunately, the availability of solatium money damages in a mass terrorism case does not and

cannot depend on the level of love and affection that the grieving family members had towards

their deceased loved one. Rather, as explained in Hoglan II, such damages depend on the state of

the common law today, which generally restricts solatium damages to direct family members.

The legal decisions crafting a "functional equivalent of immediate family members"

exception to the immediate family rule have consistently emphasized that this is a narrow

exception that applies to "a few limited circumstances." Bettis v. Islamic Republic of Iran, 315

F.3d 325, 337 (D.C. Cir. 2003); see also Estate of Heiser v. Islamic Republic of Iran, 659 F.

Supp. 2d 20, 29 (D.D.C. 2009) (referring to "rare cases" that may require a "slight stretching" of

the immediate-family requirement). The Court has attempted to identify factors that can be

applied with some degree of objectivity, in order to balance tort law's inherent need to limit

recovery to a consistently definable scope of individuals with the FSIA's recognition of the

uniquely heinous nature of terrorism.

Having reviewed anew the claims of the non-immediate family members denied solatium

damages in Hoglan II, the Court recommends that all such claims be DENIED.

## I.     General Considerations

As a preliminary matter, the Court provides a brief summary of the sources of law that it

identified and the factors that it applied in Hoglan II.

Solatium claims in FSIA terrorism cases are "indistinguishable" from common-law

claims for intentional infliction of emotional distress. Heiser, 659 F. Supp. 2d at 27 n.4 (quoting

<u>Surette v. Islamic Republic of Iran</u>, 231 F. Supp. 2d 260, 267 (D.D.C. 2002)). Although such cases arise under a federal cause of action, 28 U.S.C. § 1605A(c), the common law of intentional infliction of emotional distress governs questions of who is entitled to recover damages. As such, courts have looked at "state decisional law, legal treatises, or the Restatements in order to find and apply what are generally considered to be the well-established standards of state common law . . . ." <u>Id.</u> at 24. In <u>Hoglan II</u>, the Court found that virtually all courts considering the availability of solatium damages under the FSIA relied on the definitions of Restatement (Second) of Torts § 46 as a proxy for state common law.

This section states:

Outrageous Conduct Causing Severe Emotional Distress

(1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.
(2) Where such conduct is directed at a third person, the actor is subject to liability if he intentionally or recklessly causes severe emotional distress
      (a) to a member of such person's immediate family who is present at the time, whether or not such distress results in bodily harm, or
      (b) to any other person who is present at the time, if such distress results in bodily harm.

Restatement (Second) of Torts § 46 (1965).

According to the Restatement, therefore, third parties towards whom extreme and outrageous conduct has not been directed, and who themselves did not suffer bodily harm, may recover under two conditions: (1) they were physically present at the time of the conduct; and (2) they are an immediate family member of the person at whom the conduct was directed. <u>Id.</u> These limitations were intended to limit "bystander liability" in intentional infliction of emotional distress claims to a readily definable class of individuals.

Nevertheless, most courts have waived the "physical presence" requirement for solatium claims arising under the FSIA's terrorism provisions. This is so because "[c]ourts have uniformly held that a terrorist attack—by its nature—is directed not only at the victims but also at the victims' families." Salazar v. Islamic Republic of Iran, 370 F. Supp. 2d 105, 115 n.12 (D.D.C. 2005); Jenco v. Islamic Republic of Iran, 154 F. Supp. 2d 27, 35 (D.D.C. 2001) ("'If the defendants' conduct is sufficiently outrageous and intended to inflict severe emotional harm upon a person which is not present, no essential reason of logic or policy prevents liability.'" (citing Dan B. Dobbs, The Law of Torts § 307, at 834 (2000))). The Court agreed with this analysis, and did not condition solatium damages awards on the family member's presence at the sites of the September 11 attacks.

Court who have considered the "immediate family member" requirement, however, found that it generally limits recovery to spouses, parents, siblings, and children only. See Bettis, 315 F.3d at 335–36 ("§ 46(2)(a) is perfectly plain in its reference to 'immediate family.' It does not refer to 'family members,' 'near relatives,' 'close associates,' or persons with whom the victim has 'close emotional ties' – rather, it says, plainly, 'immediate family.' And there is no doubt whatsoever that, in this case, nieces and nephews are not 'immediate family' members."). At the same time, certain courts in this District and in the District of Columbia began to stretch this requirement to cover "those rare cases in which the parties at issue had lived in the victim's immediate household and had been in other important respects like a spouse, parent, sibling, or child to the victim." Heiser, 659 F. Supp. 2d at 29; see also Valore v. Islamic Republic of Iran, 700 F. Supp. 2d 52, 79 (D.D.C. 2010) (awarding solatium damages to non-adoptive stepfather and stepbrother); Smith v. Islamic Emirate of Afghanistan, 262 F. Supp. 2d 217, 236 (S.D.N.Y. 2003) (awarding solatium damages to grandmother who acted as quasi "surrogate mother" to

decedent); <u>Knox v. Palestinian Authority</u>, 442 F. Supp. 2d 62 (S.D.N.Y. 2006) (awarding solatium damages to non-adoptive stepchildren under Antiterrorism Act of 1991, 18 U.S.C. §§ 2331-2339).

To date, the courts analyzing the availability of solatium damages have focused their attention on a limited number of potential claimants, and have not elaborated sophisticated frameworks that could be generally applicable to a large class of plaintiffs. In this case, the fact that there were thousands of victims of the heinous attacks of September 11, 2001, in turn means that there are thousands more eligible solatium claimants, even when considering immediate family members alone. As such, the realities of this case compel the Court to think more systematically in both recognizing the "rare cases" where a non-immediate family member is eligible for solatium damages because they truly were the functional equivalent of an immediate family member and the scope of tort liability for this case and others to come.

At the same time, every plaintiff is entitled to have their damages claim fully evaluated by the Court. As such, the Court heartily agrees with the <u>Hoglan</u> plaintiffs' argument that rather than apply "a rigid rule or formulaic analysis," it must "embrace a claim-by-claim, family-by-family, fact-driven analysis." ECF No. 3551 at 2; <u>see also</u> ECF No. 3549 at 5 (<u>Burnett</u> plaintiffs' argument that determination for fiancées and domestic partners "is necessarily fact-driven and requires a case-by-case determination based on the facts that are inherent in each relationship.") This is precisely what the Court has done in <u>Hoglan II</u> and proceeds to do today: apply objective factors of general applicability to the unique circumstances of each plaintiff seeking relief. What the Court cannot do, however, is root its claim-by-claim determinations in its subjective views of whether the family members in question have demonstrated sufficient love, empathy, support, and attachment to the deceased victim. The judicial system is not capable of making

such determinations, and such an approach would necessarily lead to arbitrary inequities between different plaintiffs based on the unquantifiable inclinations of the adjudicator. More importantly, such an approach would not comport with "generally accepted legal standards of the states, [which] provide the only stead foundation for the rules of decision." Heiser, 659 F. Supp. 2d at 24.

## II.     Factors to be Applied

In light of the foregoing analysis, the Court reiterates the factors that it applied in Hoglan II and applies today.

### A.     General Factors

The first factor is long-term residence or co-habitation in the decedent's household. This was a key, if not decisive, factor mentioned in virtually all of the FSIA terrorism cases that have discussed awarding solatium damages to non-family members. Bettis, 315 F.3d at 337 (referencing court decision that allowed relatives who "*resided in the same household*" with the victim to recover); Heiser, 659 F. Supp. 2d at 29 ("[T]hose rare cases in which the parties at issue had lived in the victim's immediate household . . .  may require a slight stretching of the immediate-family requirement . . . ."); Valore, 700 F. Supp. 2d at 79 (same). This requirement serves as a useful proxy to distinguish between family relationships that are emotionally strong and those that approximate that of "immediate family." Intermittent or sporadic cohabitation (such as that characterized by brief periods of help in times of particular need instead of a long-standing, semi-permanent arrangement) would not generally be sufficient to fulfill this requirement.

The second factor in determining the "functional equivalence" of a non-immediate family member in the parent or child role is whether the non-immediate family member ever played a

guardian or custodian-like role in the decedent's life (or, vice versa, whether the decedent played such a role in the life of the family member). While the Bettis court referred expressly to "legal guardians," 315 F.3d at 337, in the context of stepparent/stepchild relationships, the Heiser and Valore decisions did not view legal guardianship as dispositive, instead looking at whether the stepparent emotionally, financially, and socially treated their stepchild as equivalent to a biological child. Heiser, 659 F. Supp. 2d at 29; Valore, 700 F. Supp. 2d at 79. The Court will follow the Heiser and Valore decisions in considering whether the family members claiming to be "functional equivalents of parents" or "functional equivalent of children" on the facts of each case, rather than by treating their legal status as controlling. The Court considers as important factors the length of the alleged guardian- or custodian-like relationship and the number of years the functional equivalent to a child was a minor living in the claimant's home.

The third factor in determining the "functional equivalence" of a non-immediate family member in the parent or child role is whether the biological family member in question was absent in the family life. For example, a stepmother would be less likely to be considered a "functional equivalent" of a (biological) parent if the decedent maintained close contact with and/or received support from his or her (biological) mother, even if they lived in the custody of their stepmother and received significant support from her. On the other hand, if the non-immediate family member was stepping in to play a "functionally equivalent" role because of the death or long-term absence of the biological family member, this would make a functional equivalence finding more likely.

**B.    Specific Classes of Individual Plaintiffs**

**1.    Aunts, Uncles, Nieces, Nephews, and Cousins**

In Hoglan II, the Court noted that no court considering an FSIA solatium damages claim to date has awarded solatium damages to family members in the above categories. See Bettis,

315 F.3d at 338 ("As the law now stands, the nieces and nephews of a victim have no viable basis for a third-party claim of intentional infliction of emotional distress under the statute."). Nevertheless, the Court did not announce in Hoglan II and does not declare now a per se rule categorically barring such relatives from seeking solatium damages. The Court stated, instead, that upon overwhelming evidence that the family member in question either adopted the decedent (in the case of uncles or aunts), was adopted by the decedent (in the case of nephews or nieces), or was adopted into the same family as the decedent (in the case of cousins) in all but name, an individual in one of these categories may be eligible for solatium damages. To clarify, in using the "all but name" language, the Court does not require a legal adoption as a per se requirement to recover solatium damages, and does not consider the legal relationship between the parties as dispositive.[2]

In articulating precisely the standard to be applied, the Court examines Sullivan v. Ford Motor Co., No. 97-CV-0593 (RCC), 2000 WL 343777 (S.D.N.Y. Mar. 31, 2000), more closely. Sullivan is the only precedential decision that Plaintiffs rely on that has awarded the equivalent of solatium damages to an individual in these categories—the aunt of the victim.

In Sullivan, the plaintiff aunt proceeded on a bystander negligent infliction of emotional distress theory after witnessing her nephew be killed in a car accident. Id. at *1. Judge Casey noted that the plaintiff "was the only family on which [the nephew] had come to rely, and the only family with whom he shared his life on a daily basis from the time he was an infant of 12 months until his death." Id. at *11. Furthermore, plaintiff "had rights and responsibilities as her

---

[2] Nevertheless, a legal adoption or other type of guardianship or custodianship would, of course, be highly probative of a relationship that was "functionally equivalent" to an immediate family member because these statuses carry with them many of the legal rights and obligations inherent in immediate family relationships.

nephew's legal custodian, granted to her by a Court Order and recognized as binding under the laws of the State of New York. As legal custodian, she performed all of the duties and responsibilities of a natural or adoptive parent, and reaped the benefits of a 'parent-child' relationship." Id. at *11 n.3. Plaintiff had "the duty to make decisions about [her nephew's] life, education, religion, discipline and medical care. But for genetics, Sullivan was [the nephew]'s parent. [The nephew] depended on Sullivan as he would have depended on his natural or adoptive parents." Id. Finally, Judge Casey found relevant that "[b]oth of [the nephew]'s natural parents were living, as they voluntarily relinquished custody of [him], demonstrating that it was in his best interests for legal and physical custody, and the responsibilities that go along with raising and caring for a child, be relinquished to Sullivan." Id.

This case reflects the exacting "adopted in all but name" standard that the Court referred to in Hoglan II. While the Court shall not require a legal custodianship relationship as existed in Sullivan as a *sine qua non* of demonstrating functional equivalence for these categories of plaintiffs, only in the rarest cases will such a plaintiff be able to demonstrate functional equivalence absent one. Such a showing could be made, for example, as in Sullivan, where both biological parents were wholly absent from the decedent's life, such that the relevant individual fulfilled the entirety of the parental role. Given the need for the Court's decisions to rest on "generally accepted legal standards," and the still unequivocal rejection of such claims by courts considering FSIA solatium claims, the Court shall not extend Sullivan to more ambiguous cases. See Bettis, 315 F.3d at 336 ("As much as we sympathize with appellants' claims, we have no authority to stretch the law beyond its *clear bounds* to satisfy our sense of justice.").

## 2.     Fiancées and Domestic Partners

In <u>Hoglan II</u>, the Court noted that only one FSIA terrorism case has awarded damages to an individual who intended to, but did not or could not legally marry a decedent victim of a terrorist attack. <u>Surette v. Islamic Republic of Iran</u>, 231 F. Supp. 2d 260, 270–71 (D.D.C. 2002) (awarding solatium damages to a partner who had been in a relationship with decedent for twenty years and shared a home with him). After analyzing the sharp split of state authority on the question of whether a nonmarital domestic partner could ever recover on a bystander tort claim as an "immediate family member," the Court decided that, in order to effectuate the broad remedial aims of the FSIA's terrorism private cause of action, it would consider claims brought by fiancées and long-term domestic partners. In making these determinations, the Court identified as relevant factors: (1) the duration of the relationship; (2) the degree of mutual financial dependence and investments in a common life together; (3) the duration of cohabitation; and (4) the presence or absence of a formal engagement.[3]

The <u>Burnett</u> plaintiffs argue that the criteria used by the Court "does not appear to take into consideration the situation where individuals have not cohabited prior to marriage despite being engaged—whether for personal or religious reasons unrelated to the closeness of their relationship." ECF No. 3549. The Court disagrees. The duration of cohabitation is only one of four factors identified, and in every case the Court shall conduct an analysis of their application to each individual case. Therefore, in the scenario posited by the <u>Burnett</u> plaintiffs, a lack of

---

[3] These factors are adapted from those enunciated by the New Hampshire Supreme Court, which considered "the duration of the relationship, the degree of mutual dependence, the extent of common contributions to a life together, the extent and quality of shared experience, and . . . whether the plaintiff and the injured person were members of the same household, their emotional reliance on each other, the particulars of their day to day relationship, and the manner in which they related to each other in attending to life's mundane requirements." <u>Graves v. Estabrook</u>, 149 N.H. 202, 209–10 (2003).

cohabitation would not be dispositive of an individual's claims, provided they can demonstrate that they meet the other criteria and establish credible reasons for the lack of cohabitation.

The Burnett plaintiffs also note that, in light of the Court's award of solatium damages to Keith Bradkowski, a long-term cohabiting same-sex domestic partner of a 9/11 decedent, the criteria of "presence or absence of a formal engagement" should not be a factor for same-sex couples because most states had not adopted any form of marriage, civil union, or domestic partner legislation for same-sex couples before September 11, 2001. The Court agrees, though in the absence of an engagement—a highly probative act evincing the intent to enter a legal relationship—such a claimant would have to demonstrate that they were the functional equivalent of a spouse in all other respects.

By the same token, the Court considers that the presence or absence of a formal engagement is virtually dispositive for any fiancée claim where no legal barrier would have impeded the couple from getting married. While an engagement is not a legal act, it is, at the very least, a statement made to the parties' family and community that they intend to enter into a legally binding marriage. Though the Court may still entertain claims by domestic partners who cannot prove a formal engagement in extraordinary circumstances (such as decades of relationship or cohabitation, coupled with full commingling of finances), much of the basis of granting solatium damages to fiancée claimants is the certainty that they would have been married (and thus eligible for solatium damages as an immediate family member) but for the terrorists' tortious actions. Absent a formal engagement, the Court will not easily conclude that this standard is met.

### 3.     Stepparents, Stepchildren, and Stepsiblings

In <u>Hoglan II</u>, the Court noted that stepparents, stepchildren, and stepsiblings present special difficulties because the relationship between the decedent and their step-relatives is typically not established at birth, but at some time thereafter.

Therefore, the Court adopted the following framework. Stepparents and stepsiblings who became part of the family when the decedent was in early childhood (roughly until the age of eight) may be deemed fully functional equivalent to biological parents or siblings and would be entitled to full solatium damages, and stepchildren who were in the same range when the decedent became part of their family would be deemed fully equivalent to biological children. Stepparents and stepsiblings who became part of the family when the decedent had passed early childhood but was still living in the family home (ages nine and above) may be entitled to solatium damages reduced by one-half, and stepchildren who were in this age range when the decedent became part of the family would receive half damages as well. Stepparents and stepsiblings who became part of the decedent's family when the decedent had nearly finished his secondary education would likely not be deemed functional equivalents of immediate family members and would not be illegible for solatium awards, with the same being true for stepchildren who were this age when the decedent became part of their family.

The Court reaffirms this framework with one clarification—any step-relative receiving solatium damages must demonstrate that they continuously cohabited with the decedent for a significant period of time prior to the date the claimant (for stepchild claims) or decedent (for stepparent claims) turned 18 and attained the age of majority. This period of time is presumptively at least two years.

Moreover, as discussed further in the Court's adjudication of the Mandelino Plaintiffs' claims below, for stepsibling claims, the Court clarifies that that the ages of <u>both</u> "functional equivalents of" siblings are relevant in the inquiry, which is fundamentally targeted at determining the degree to which the claimant and the decedent "grew up together" as brothers or sisters. Therefore, for example, a stepsibling who enters the family at a young age will not be eligible for solatium damages if the decedent was already at or approaching the age of majority (18) at the time; by the same token, a stepsibling who was at or near the age of majority when the decedent entered the family would be similarly ineligible.

## III.   Application

### A.   Anthony Dorf

In their May 5, 2017 submission, the <u>Hoglan</u> Plaintiffs argue that Anthony Dorf, the nephew of 9/11 decedent Stephen Dorf, should be eligible for solatium damages as the functional equivalent of a child. The Court is constrained to conclude that, despite Stephen Dorf's special relationship with his nephew, he does not meet the "exacting standard" that the Court extrapolates from <u>Sullivan</u>, 2000 WL 343777.

Anthony Dorf never knew his biological father and lived with his mother and her brother Stephen Dorf from his birth in August 1986 until September 11, 2001. ECF No. 3552, Dorf Supp'l Decl. at ¶ 2. Anthony declares that Stephen Dorf was his primary male role model and "the father [he] never had," and noted that his uncle considered formally adopting him and named him as a beneficiary on a small life insurance policy. <u>Id.</u> at ¶¶ 2–3.

The Court agrees that Stephen Dorf was a father figure in his nephew's life and therefore, his relationship was in some respects functionally equivalent to a parent. Unlike the plaintiff in <u>Sullivan</u>, however, Stephen Dorf did n

ot have custodianship or any other legal relationship with his nephew; Anthony's biological

mother did. Nor was Anthony solely and wholly dependent on his uncle for financial support.

The Court celebrates the positive role that Stephen Dorf had in supporting his sister as a single

parent and providing much-needed moral and financial support and guidance to his nephew and

acknowledges the genuine grief that Anthony Dorf has suffered because of his loss. In light of

the fact, however, that no court in an FSIA terrorism case has ever allowed an uncle or aunt to

recover solatium damages, the Court can only do so in the most exceptional of circumstances,

such as those presented in Sullivan. The Court therefore recommends that Anthony Dorf's claim

be DENIED.

### B.    Jennie Mandelino, James Mandelino, Mary Ann Pino, and Michael Mandelino

Jennie Mandelino, James Mandelino, Mary Ann Pino, and Michael Mandelino ("the

Mandelinos") became the four brothers- and sisters-in-law of 9/11 decedent Joseph D. Mistrulli

after he married Philomena Mistrulli in 1978. ECF No. 3557, Philomena Mistrulli Decl. at ¶ 6. In

1980, Joseph and Philomena Mistrulli moved into a household that included Jennie, James, and

Michael Mandelino and Mary Ann Pino, who at that time were children or teenagers, and lived

together for over a decade until the early 1990s. ECF No. 3554, James Mandelino Decl. at ¶¶ 7–

8. In declarations submitted by Jennie and James Mandelino and Mary Ann Pino,[4] as well as

Philomena Mistrulli and her two children, the Mandelinos compellingly describe how Joseph

Mistrulli was fully incorporated into their family after his marriage to Philomena, participating in

family celebrations and serving as a role model for the younger family members. When illness

befell Philomena Mistrulli, the Mandelinos were present to support Joseph Mistrulli in every

---

[4] Michael Mandelino is now deceased.

way. There is also every indication that the Mandelinos have played an important role in the lives of Joseph Mistrulli's children, both before and after his tragic death.

The Mandelinos have certainly demonstrated a long period of tight bonds and love with decedent Joseph Mistrulli—an extraordinarily close relationship that persisted over time. As the Court of Appeals for the District of Columbia Circuit held, however, asserting that non-immediate family members "enjoyed a close relationship with [the decedent] . . . is far short of what § 46(2)(a) requires." Bettis, 315 F.3d at 337. The Court does not doubt the deep love that the Mandelinos felt for Mr. Mistrulli, but their legal relationship to him was one of siblings-in-law.

The Mandelinos' claim illustrates an ambiguity in the Court's treatment of "functional equivalent of siblings" claims, which in the stepsibling context has emphasized the age at which cohabitation began to determine whether an individual is entitled to a solatium damages award. The Court now clarifies that the ages of both "functional equivalents of" siblings are relevant in the inquiry, which is targeted at determining the degree to which the claimant and the decedent "grew up together" as brothers or sisters.

The Court has already established that a stepsibling relationship—no matter how emotionally close or intense—that begins when the individual is roughly finishing his or her secondary education, is ineligible for solatium damages. Therefore, given that the age of majority is 18, a simple extension of the Court's analysis as to stepsiblings indicates that, even under the unusual circumstances of extensive cohabitation presented in this case, a brother-in-law or sister-in-law can never recover solatium damages. Regardless of the particularities of their relationship, the love that they shared, and the intertwined nature of their lives, the fact remains that Joseph

Mistrulli entered the Mandelino family as an adult, and the Mandelinos are ineligible for solatium damages.

This is necessarily the case, because there would be no intelligible line to draw between the Mandelinos' claim and that of a close friend who could also prove a long period of cohabitation and strong emotional ties. This is because the crux of the Mandelinos' claim is that being the "functional equivalent of a sibling" can be proven by demonstrating emotional ties, bonds, and commitments that are stronger, more intense, and more long-lasting than those of mere friendship. This is how the phrase "like a brother" or "like a sister" is commonly used in our language, but this is not "functional equivalence" for the purpose of negligent or intentional infliction of emotional distress and solatium claims. Rather, "functional equivalence" in this context refers only to whether the decedent and the "functional equivalent of a sibling" grew up together in the same household (usually by virtue of the marriage of their parents).

Accordingly, the Court recommends that the claims of Jennie Mandelino, James Mandelino, Mary Ann Pino, and Michael Mandelino be DENIED.

### C.    Vaughn Hoglan, Linden Hoagland, Lee N. Hoglan, Kathleen B. Hoglan, Candyce Hoglan, Michelle Arthurs, Kelly Arthurs and Estate of Herbert K. Hoglan

These Plaintiffs are the grandfather, stepmother, stepsister, uncles, and aunts of 9/11 decedent Mark Bingham. Mark Bingham's parents, Gerald Bingham and Alice Hoagland, divorced a few month after his birth, and Alice Hoagland moved in with her father Herbert Hoglan, her mother, and her siblings. ECF No. 3560, Decl. of Alice Hoagland at ¶ 6. Herbert Hoglan and his wife Betty took care of Mark Bingham when he was a child, were the "sole caregivers" for Mark between 1970 and 1975 as Ms. Hoagland finished her college education, and housed them again for an unspecified period of time in 1977. Id. at ¶¶ 6, 8. Ms. Hoagland's

brothers Lee N. Hoglan, Linden Hoagland and Vaughan Hoglan and younger sister Candyce Hoglan also lived in the family home at that time as teenagers, served as role models and "big brothers" and "big sisters" to Mark in the household, and maintained close ties with Mark Bingham throughout his adult life. Kathleen B. Hoglan is Vaughn Hoglan's wife, and met Mark Bingham in 1992.

While Ms. Hoagland's parents, including her father Herbert Hoglan, were the sole caregivers for Mark Bingham for five years when he was a child, there is no indication that they were "functional equivalents of parents," as opposed to grandparents assisting their daughter with parenting for a determinate (even if extended) period of time. Such a situation is not unusual. While grandparents may be considered the functional equivalents of parents in certain limited circumstances, this would generally require permanent abandonment by both parents. See Smith v. Islamic Emirate of Afghanistan, 262 F. Supp. 2d 217, 236 (S.D.N.Y. 2003) (awarding solatium damages to grandmother who had acted as the decedent's "surrogate mother" continuously since 1973).

Though the Court does not doubt that Lee Hoglan, Linden Hoagland, Vaughan Hoglan and Candyce Hoglan had a close relationship with Mark Bingham when they cohabited with him when he was a child, there is no indication that they were functionally equivalent to siblings. Barring extraordinary circumstances not present here, an uncle or aunt cannot skirt the general rule that they are not immediate family members merely by proving significant cohabitation and a strong emotional bond. Moreover, there is no basis for Kathleen B. Hoglan's claim.

Michelle Arthurs was Mark Bingham's stepmother, who divorced from Mark's father Gerald Bingham in 1976. Arthurs Decl. ¶ 5. While she tried to foster a "sibling relationship" between her daughter Kelly and Mark, Mark was in the custody of his mother Alice Hoagland,

and Ms. Arthurs saw Mark only when he would come to visit his father. Therefore, Michelle Arthurs fails to meet the long-term cohabitation requirement for a stepmother.

Kelly Arthurs is Michelle Arthurs's daughter and was Mark Bingham's stepsister; however, Michelle Arthurs and Mark's biological father Gerald Bingham divorced when both were young, and they appear to have cohabited as children only sporadically. Though she remained close to Mark Bingham through adulthood, she does not meet the cohabitation requirement to be considered the functional equivalent of a sibling.

Accordingly, the Court recommends that the claims of Vaughn Hoglan, Linden Hoagland, Lee N. Hoglan, Kathleen B. Hoglan, Candyce Hoglan, Michelle Arthurs, Kelly Arthurs and Estate of Herbert K. Hoglan be DENIED.

### D.     Carole Grazioso

Carole Grazioso was the stepmother of 9/11 decedents John and Timmy Grazioso. Though she married their father Hank Grazioso when they were six and seven years old, respectively, they grew up in the custody of their mother, Sandra Grazioso. Carole Grazioso Decl ¶¶ 4, 8; see also ECF No. 3566, Grazioso Decl. at ¶ 1 (referencing being custodian only during "vacations, week-end sleepovers, holidays, sporting events, day trips, and many other occasions"). There is no indication in the record of any lengthy period of cohabitation or that John and Timmy's biological mother was absent for any portion of their childhood. Accordingly, the Court recommends that Carole Grazioso's claim be DENIED.

### E.     Karen Moreno

Karen Moreno was the stepmother of 9/11 decedent Yvette Nichole Moreno, who was married to Yvette Moreno's father and has known her since she was three years old. Though they lived in the same neighborhood, there is no indication of any cohabitation, or that Yvette

Moreno's biological mother was absent in her life. Accordingly, the Court recommends that Karen Moreno's claim be DENIED.

### F.     Estate of Paul Scalogna

Paul Scalogna was the grandfather of 9/11 decedent Brian Nunez. Brian Nunez's biological father was absent in his life, and Mr. Scalogna provided support and guidance as a "father figure" in his early life. Moreover, Brian Nunez lived with his grandfather both as an infant and for 3 years in his late teens and early twenties. Decl. of Joanne Lovett on Behalf of Paul Scalogna ¶¶ 4, 12–13, 16.

Once again, though the Court does not doubt the important role that Mr. Scalogna played in Brian Nunez's life, there is no indication that Mr. Scalogna was the functional equivalent of a parent, rather than a grandparent who ably assisted his daughter with the difficulties attendant to being a single parent. Accordingly, the Court recommends that the Estate of Paul Scalogna's claim be DENIED.

### G.     Donna Corbett-Moran

While Plaintiffs' counsel argue in their objections that Donna Corbett-Moran was 9/11 decedent Brian Nunez's "fiancée," there is no evidence in the record of a formal engagement or other extraordinary circumstances. Accordingly, the Court recommends that Donna Corbett-Moran's claim be DENIED.

### H.     Diane Ognibene

Diane Ognibene was 9/11 decedent Philip Ognibene's stepmother who cohabited with Philip Ognibene for about 10 years. She married Philip Ognibene's father Vincent Ognibene when the decedent was 18 years old. Decl. of Diane Ognibene ¶ 4. Accordingly, she was not present as a parent for any of Philip Ognibene's childhood. The Court recommends that, in line

with its framework for solatium damages for step-relatives, Diane Ognibene's claim be DENIED.

### I.      Norma Ward

Norma Ward was 9/11 decedent Timothy Raymond Ward's stepmother. It appears from the record that she only cohabited with Timothy Raymond Ward for one year when he was in college, and in the summer months, and was not present during the decedent's childhood. ECF No. 3571, Norma Ward Supp'l Decl. ¶¶ 1–3. The Court recommends that, in line with its framework for solatium damages for step-relatives, Norma Ward's claim be DENIED.

### J.      Jessica Kramer and Christi Pendergraft

Jessica Kramer and Christi Pendergraft are Norma Ward's daughters, who became 9/11 decedent Timothy Raymond Ward's stepsisters when Norma Ward married Timothy Raymond Ward's stepfather. Though they were children when they became Timothy Raymond Ward's stepsisters, Timothy Raymond Ward was already around 18 years old at this time. Moreover, as is the case with Norma Ward, there is no evidence in the record of significant cohabitation. Accordingly, the Court recommends that Jessica Kramer and Christi Pendergraft's claims be DENIED.

### K.      Other Claimants

Because the Plaintiffs have not presented substantial objections to Hoglan II's recommendation that the claims of other claimants be denied, the Court recommends that the claims of Michelle Clendenney, Heather Strickland, Jeanette Coffey, Estate of Daniel F. Coffey, Jr., Estate of Ida Reiss, Estate of Lenore Jackson, Estate of Ken Jackson, Samuel Collazo, Leonardo Collazo, Gabriella Rinehart, Estate of Louise Borzumato, Michelle Baker, Martin Smith, Mateo Pino, Martin Smith, Anthony Pino, Vincent Pappasso, Jr., Brendan Cofresi

(Minor), James Montoya, Addison Friedman, Anthony Friedman-Ceraso, Daniel Huber, Danielle Smith, Brittney Cofresi (Minor), Troia Johnson, Diane Smith, Tawanda Sith, Kaitlin Steiner Keller, Kristyn Steiner Martin, Kristen Druckenmiller, Stephanie Feher, Nina Fuller, James Mandelino Sr., Pedro Geraldino, Kathryn Collman, Gail Smith, Julie Bertelsen Hoglan, Raymond Woods, Scott Woods, Lisa Smith, Mike Smith, Jason Smith, Lance Ward and Marc Ward, as well as any other Plaintiff unintentionally omitted from this list, be DENIED.

## IV.    Final Considerations

The Court believes that this Report and Recommendation, which has been issued after all groups of Plaintiffs have had an opportunity to be heard, establishes an intelligible framework that can be used in evaluating the circumstances under which different classes of individuals may be considered "functional equivalents" of immediate family members for the purposes of entitlement to solatium damages, with whatever modifications the Judge Daniels shall deem proper to impose.

Accordingly, having established this framework, the Court strongly urges the Plaintiffs' counsel to use the utmost discretion in bringing future solatium damages claims on behalf of non-immediate family members who potentially qualify as "functional equivalents" of immediate family members.[5]

There are two reasons for these words of caution. First, as the parties to this litigation can appreciate, in a case where there are thousands of plaintiffs, the Court does not have sufficient resources to conduct a fact-intensive, case-by-case analysis for thousands of potential solatium

---

[5] This statement is not to be taken as an admonition of counsel for the Hoglan plaintiffs. The Hoglan plaintiffs made their filing when the Court had not yet had the opportunity to establish a framework to consider such claims, and therefore cannot be faulted for being maximally inclusive of non-immediate family members who may have a colorable claim to relief.

claimants, especially when some of those claims might be directly foreclosed by the framework established here.

But the most important reason is not the difficulty in judicial administration. The Court has read dozens of declarations expressing deep grief for the loss of their loved ones, vividly recounting the fond memories of childhoods spent together, the unspeakable trauma of the fear and despair caused by the September 11 attacks themselves, and the long and arduous process of putting their lives back together. The process of dredging up these memories is certain to be difficult and deeply distressing to many of these individuals. And yet, as Plaintiffs' counsel know, the Court's functional equivalence framework cannot account for all of these families' suffering—indeed, no framework can. Once again, the Court does not and cannot consider the strength of the emotional bonds between solatium claimant-relatives and their deceased loved ones absent the objective factors that it has identified. It may be doubly traumatic for these individuals to first go through the emotional experience of presenting their connection with the deceased for the Court's review, and then receiving a judicial determination that they were not "functional equivalents" of immediate family members. In sensitive litigation such as this, counsel has a special obligation to advise potential solatium claimants of the nature of the Court's framework, so that they may be guided not by a lay understanding of "functional equivalence," but by the specific legal standard established here.

## CONCLUSION

For the reasons stated above, the Court reaffirms the standards established in its October 14, 2016 Report and Recommendation and as further set forth herein, and recommends that the claims referenced in the current Report and Recommendation be DENIED.

DATED:          August 8, 2017
                New York, New York

SARAH NETBURN
United States Magistrate Judge

\*          \*          \*

## NOTICE OF PROCEDURE FOR FILING OBJECTIONS
## TO THIS REPORT AND RECOMMENDATION

The parties shall have fourteen days from the service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. See also Fed. R. Civ. P. 6(a), (d) (adding three additional days when service is made under Fed. R. Civ. P. 5(b)(2)(C), (D), or (F)). A party may respond to another party's objections within fourteen days after being served with a copy. Fed. R. Civ. P. 72(b)(2). Such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable George B. Daniels at the United States Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b). Any requests for an extension of time for filing objections must be addressed to Judge George B. Daniels. The failure to file these timely objections will result in a waiver of those objections for purposes of appeal. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b); Thomas v. Arn, 474 U.S. 140 (1985).