# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| *In re Terrorist Attacks on September 11, 2001* | 03 MDL 1570 (GBD)(SN)<br>ECF Case |

*This document relates to*:

> *Underwriting Members of Lloyd's Syndicate 2, et al. v. Al Rajhi Bank, et al.*, Civil Action No. 1:16-cv-07853 (S.D.N.Y.);
> *Aguilar et al. v. Kingdom of Saudi Arabia et al.*, Civil Action No. 1:16-cv-09663 (S.D.N.Y.);
> *Addesso et al. v. Kingdom of Saudi Arabia et al.*, Civil Action No. 1:16-cv-09937 (S.D.N.Y.);
> *Aiken et al. v. Kingdom of Saudi Arabia et al.*, Civil Action No. 1:17-cv-00450 (S.D.N.Y.);
> *Hodges et al. v. Kingdom of Saudi Arabia et al.*, Civil Action No. 1:17-cv-00117 (S.D.N.Y.);
> *The Charter Oak Fire Insurance Co., et al. v. Al Rajhi Bank, et al.*, Civil Action No. 1:17-cv-02651 (S.D.N.Y.);
> *Arrowood Indemnity Co., et al. v. Kingdom of Saudi Arabia, et al.*, Civil Action No. 17-cv-03908 (S.D.N.Y.);
> *Abarca, et al. v. Kingdom of Saudi Arabia, et al.*, Civil Action No. 17-cv-03887 (S.D.N.Y.);
> *Abedhajajreh, et al. v. Kingdom of Saudi Arabia, et al.*, Civil Action 17-cv-06123 (S.D.N.Y.).

## MEMORANDUM OF LAW OF THE NATIONAL COMMERCIAL BANK IN SUPPORT OF ITS MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

Dated: August 21, 2017
      Washington, D.C.

Mitchell R. Berger (MB-4112)
Alan T. Dickey (*pro hac vice* admission pending)
Alexandra E. Chopin (AC-2008)
SQUIRE PATTON BOGGS (US) LLP
2550 M Street, N.W.
Washington, D.C. 20037
Phone: 202-457-6000
Fax:    202-457-6315

*Attorneys for Defendant*
*The National Commercial Bank*

# TABLE OF CONTENTS

Page

I.     SUMMARY ................................................................................................................1
II.    RELEVANT PROCEDURAL HISTORY ..............................................................6
III.   APPLICABLE PERSONAL JURISDICTION STANDARDS...............................8

     A.     Procedural Standards...............................................................................8
     B.     Substantive Standards ..............................................................................9

IV.    PLAINTIFFS' SPECIFIC JURISDICTION ALLEGATIONS ARE LEGALLY
     DEFICIENT UNDER THIS COURT'S AND THE SECOND CIRCUIT'S
     PRIOR RULINGS ................................................................................................ 11

     A.     Allegations Concerning Financial Services to Foreign Customers.............................. 12
     B.     Allegations Concerning Donations or Support to Foreign Charities ........................ 18
     C.     Allegations against Third Parties ................................................................ 21

          1.     Allegations Concerning Khaled Bin Mahfouz.................................................. 22
          2.     Allegations Concerning Yassin Kadi................................................ 24
          3.     Allegations Concerning Muwafaq ................................................ 26

V.     STARE DECISIS REQUIRES DISMISSAL OF PLAINTIFFS' COMPLAINTS ............ 28
VI.    CONGRESS CANNOT LEGISLATE AROUND CONSTITUTIONAL DUE
     PROCESS REQUIREMENTS ............................................................................ 31
VII.   PLAINTIFFS ARE NOT ENTITLED TO JURISDICTIONAL DISCOVERY.............. 32
CONCLUSION....................................................................................................................... 35

## TABLE OF AUTHORITIES

**Page(s)**

<u>**CASES**</u>:

*7 W. 57th St. Realty Co. v. CitiGroup, Inc.,*
   2015 U.S. Dist. LEXIS 44031 (S.D.N.Y. Mar. 31, 2015) ............................................ 23, 31

*Al Rajhi Banking & Inv. Corp. v The Wall Street Journal Europe,*
   2003 EWHC 1776 (QB), 2003 WL 21554735 (High Court of Justice Queen's Bench
   Division, 21 July 2003 ............................................................................................24

*In re Aluminum Warehousing Antitrust Litig.,*
   90 F. Supp.3d 219 (S.D.N.Y. Mar. 3, 2015) ............................................................22

*Bristol-Myers Squibb Co. v. Superior Court,*
   137 S. Ct. 1773 (2017) ...............................................................................................3

*Brown v. Lockheed Martin Corp.,*
   814 F.3d 619 (2d Cir. 2016) ....................................................................................3, 4

*Burger King Corp. v. Rudzewicz,*
   471 U.S. 462 (1985) .......................................................................................3, 10, 17

*Burnett v. Al Baraka Inv. and Dev't Corp.,*
   292 F. Supp. 2d 9 (D.D.C. 2003) ..............................................................................19

*Calder v. Jones,*
   465 U.S. 783 (1984) .............................................................................................6, 10

*Catlin Ins. Co. (UK) Ltd. v. Beruth Lines Ltd.,*
   2012 U.S. Dist. LEXIS 46186 (S.D.N.Y. Mar. 28, 2012) ..........................................34

*Cohen v. Facebook, Inc.,*
   2017 U.S. Dist. LEXIS 76701 (E.D.N.Y. May 18, 2017) ......................................31, 32

*Commission and Others v Kadi,*
   ECLI:EU:C:2013:518, 2013 ECJ EUR-Lex LEXIS 4091 (July 18, 2013) .................25

*Daimler AG v. Bauman,*
   134 S. Ct. 746 (2014).....................................................................................2, 3, 4, 9

*Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.,*
   722 F.3d 81 (2d Cir. 2013) .........................................................................................8

*FedEx Home Delivery v. NLRB,*
   849 F.3d 1123 (D.C. Cir. 2017) ............................................................................2, 29

*Flowers v. U.S.,*
   764 F.2d 759 (11th Cir. 1985) ...................................................................................30

*Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co.,*
   284 F.3d 1114 (9th Cir. 2002) ..............................................................................31, 32

*Goodyear Dunlop Tires Operations, S.A. v. Brown,*
   564 U.S. 915 (2011) ..............................................................................................3, 9

*Gucci Am. v. Bank of China,*
   768 F.3d 122 (2d Cir. 2014) ....................................................................................4, 9

*Hubbard v. U.S.,*
   514 U.S. 695 (1995) ..................................................................................................30

*Hunter v. Deutsche Lufthansa AG,*
   863 F. Supp. 2d 190 (E.D.N.Y. 2012).......................................................................34

*Ingenito v. Riri USA, Inc.,*
   89 F. Supp. 3d 462 (E.D.N.Y. 2015) ..........................................................................9

*Int'l Shoe Co. v. Washington,*
    326 U.S. 310 (1945) ................................................................................................................32

*Kadi v. Geithner,*
    42 F. Supp.3d 1 (D.D.C. 2012) ..............................................................................24, 25, 26

*Karpus v. Hyperion Capital Mgmt.,*
    1997 U.S. Dist. LEXIS 4332 (S.D.N.Y. Apr. 2, 1997) ........................................................28

*LaShawn A. v. Barry,* 87 F.3d 1389 (D.C. Cir. 1996) *(en banc)* ..................................................2

*Laydon v. Mizuho Bank, Ltd.,*
    2015 U.S. Dist. LEXIS 44007 (S.D.N.Y. Mar. 31, 2015) ....................................................22

*Leasco Data Processing Equip. Corp. v. Maxwell,* 468 F.2d 1326 (2d Cir. 1972) ..........................11

*Licci v. Lebanese Canadian Bank,*
    732 F.3d 161 (2d Cir. 2013) ........................................................................................ 10, 11

*Lopez v. Shopify, Inc.,*
    2017 U.S. Dist. LEXIS 77708 (S.D.N.Y. May 23, 2017) ..................................................9, 31

*In re N. Sea Brent Crude Oil Futures Litig.,*
    2017 U.S. Dist. LEXIS 88316 (S.D.N.Y. June 8, 2017) ......................................................22

*O'Neill v. Asat Trust Reg.,*
    714 F.3d 659 (2d Cir. 2013), *cert. denied sub nom., O'Neill v. Al Rajhi Bank,* 134 S. Ct.
    2870 (2014) .............................................................................................................*passim*

*Patterson v. McLean Credit Union,*
    491 U.S. 164 (1989) ................................................................................................................30

*Payne v. Tennessee,*
    501 U.S. 808 (1991) ........................................................................................................29, 30

*Penguin Grp. (USA) Inc. v. Am. Buddha,*
    609 F.3d 30 (2d Cir. 2010) ......................................................................................................8

*In re Platinum & Palladium Antitrust Litig.,*
    2017 U.S. Dist. LEXIS 46624 (S.D.N.Y. Mar. 28, 2017) ....................................................33

*Price v. Socialist People's Libyan Arab Jamahiriya,*
    294 F.3d 82 (D.C. Cir. 2002) ................................................................................................31

*Quill Corp. v. North Dakota,*
    504 U.S. 298 (1992) ................................................................................................................31

*Rains v. Jil-Mic, Inc.,*
    301 F. Supp. 545 (S.D.N.Y. 1969) ........................................................................................28

*SEC v. Sharef,*
    924 F. Supp. 2d 539 (S.D.N.Y. 2013) ....................................................................................11

*Shaoulian-Tehrani v. Khatami,*
    2008 U.S. Dist. LEXIS 33426 (S.D.N.Y. Apr. 21, 2008) ......................................................9

*Siegel v. HSBC Holdings, plc,*
    2017 U.S. Dist. LEXIS 129188 (D. Ill. 2017) ......................................................................13

*Singh v. Singh,*
    2016 U.S. Dist. LEXIS 72131 (S.D.N.Y. June 2, 2016) ....................................................5, 9

*State Farm Fire & Cas. Co. v. Swizz Style, Inc.,*
    2017 U.S. Dist. LEXIS 43284 (S.D.N.Y. Mar. 23, 2017) ..................................................2, 3

*Sullivan v. Barclays PLC,*
    2017 U.S. Dist. LEXIS 25756 (S.D.N.Y. Feb. 21, 2017) ................................................33, 34

*Tarsavage v. Citic Trust Co., Ltd.,*
    3 F. Supp. 3d 137 ........................................................................................................ 10, 11

*Tasini v. New York Times Co.*,
    184 F. Supp. 2d 350 (S.D.N.Y. 2002)......................................................................9

*In re Terrorist Attacks on Sept. 11, 2001*,
    349 F. Supp. 2d 765 (S.D.N.Y. 2005) ("*Terrorist Attacks I*") .......................*passim*

*In re Terrorist Attacks on Sept. 11, 2011*,
    392 F. Supp. 2d 539 (S.D.N.Y. 2005) ("*Terrorist Attacks II*")...............................6, 9

*In re Terrorist Attacks on Sept. 11, 2001*,
    440 F. Supp. 2d 281 (S.D.N.Y. 2006) ("*Discovery Order I*")................................7, 12

*In re Terrorist Attacks on Sept. 11, 2001*,
    538 F.3d 71 (2d Cir. 2008) ("*Terrorist Attacks III*")....................................*passim*

*In re Terrorist Attacks on Sept.11, 2001*,
    689 F. Supp. 2d 552 (S.D.N.Y. 2010) ("*Discovery Order II*")............................*passim*

*In re Terrorist Attacks on Sept. 11, 2001*,
    718 F. Supp. 2d 456 (S.D.N.Y. 2010) ("*Terrorist Attacks IV*")..........................*passim*

*Tymoshenko v. Firtash*,
    2013 U.S. Dist. LEXIS 42754 (S.D.N.Y. Mar. 26, 2013) ........................................34

*Tymoshenko v. Firtash*,
    2013 U.S. Dist. LEXIS 43543 (S.D.N.Y. Mar. 27, 2013) ........................................22

*U.S. ex rel. Schnitzler v. Follette*,
    406 F.2d 319 (2d Cir. 1969) ....................................................................................29

*U.S. v. Int'l Bus. Machines Corp.*,
    517 U.S. 843 (1996) ................................................................................................28

*U.S. v. Windsor*,
    133 S. Ct. 2675 (2013) ............................................................................................31

*In re Vioxx Prods. Liab. Litig.*,
    360 F. Supp. 2d 1352 (J.P.M.L. 2005) ..................................................................33

*Vista Food Exch., Inc. v. Champion Foodservice, LLC*,
    124 F. Supp. 3d 301 (S.D.N.Y. 2015) ....................................................................34

*Walden v. Fiore*,
    134 S. Ct. 1115 (2014) ........................................................................................*passim*

*Waldman v. PLO*,
    835 F.3d 317 (2d Cir. 2016) ................................................................................*passim*

*Welch v. Texas Dep't of Highways and Pub. Transp.*,
    483 U.S. 468 (1987) ................................................................................................30

*Wilder v. News Corp.*,
    2015 U.S. Dist. LEXIS 137158 (S.D.N.Y. Oct. 6, 2015) ........................................10

*World-Wide Volkswagen v. Woodson*,
    444 U.S. 286 (1980) ................................................................................................11

## **STATUTES**:

18 U.S.C. § 2333, Explanatory Notes (Sept. 28, 2016).................................................32

## **OTHER AUTHORITIES**:

Benjamin Cardozo, *The Nature of the Judicial Process* 149 (1921)...............................30

Fed. Reg. Vol. 79, No. 234 (Dec. 5, 2014) ..................................................................25

The Federalist, No. 78, at 490 (Alexander Hamilton) (H. Lodge ed., 1888)) .................30

**MEMORANDUM OF LAW OF THE NATIONAL COMMERCIAL BANK IN SUPPORT
OF ITS MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION**

## I.    SUMMARY.

The Judicial Panel on Multidistrict Litigation ("JPML") transferred the *Lloyd's* action to this

Court over Plaintiffs' objections because *Lloyd's* is a clone of the cases this Court previously dismissed

against The National Commercial Bank ("NCB") for lack of personal jurisdiction.   *See* MDL No.

1570 (J.P.M.L. Oct. 3, 2016), Dkt. #77.  As a result, the JPML thought this Court could make short

work of *Lloyd's* based on its prior rulings, finding that transfer to this Court would "promote the just

and efficient conduct of the litigation" because "<u>highly similar claims</u> against [NCB] <u>previously have</u>

<u>been adjudicated</u> during the course of the MDL proceedings, and the transferee court's rulings

dismissing [NCB] were affirmed on appeal."  MDL No. 1570 (J.P.M.L. Oct. 3, 2016), Dkt. #77 at 1,

2 (emphasis added).

The amendments subsequently made in the *Lloyd's* First Amended Complaint ("1AC")[1] do

not change the JPML's assessment that, as to NCB, *Lloyd's* (which all other current Plaintiffs adopt)

is merely a copy of the *Federal Insurance*, *Ashton*, and other earlier MDL 1570 actions that this Court in

*Terrorist Attacks IV* dismissed as against NCB for lack of personal jurisdiction.  *See In re Terrorist Attacks*

*on Sept. 11, 2001*, 718 F. Supp. 2d 456, 476-78, 487-88 (S.D.N.Y. 2010) ("*Terrorist Attacks IV*") (Daniels,

J.) (dismissing cases against NCB).  The copycat nature of the NCB-related allegations in the *Lloyd's*

1AC is confirmed by a side-by-side comparison of the NCB-related allegations to the previously-

dismissed *Federal Insurance* and *Ashton* actions.  *See* Exhibit 1 hereto.  The *Lloyd's* allegations against

NCB are either verbatim or substantively identical to those that this Court in *Terrorist Attacks IV* found

jurisdictionally-deficient as to NCB.  Following five years of jurisdictional discovery, this Court in

---

[1] Filed at 1:16-cv-07853 (S.D.N.Y.), and adopted by all other Plaintiffs.  *See* 1:17-cv-02651 (S.D.N.Y.), Dkt. #15; MDL
Dkt. ##3596, 3599, 3602, 3681.

*Terrorist Attacks IV* applied to NCB due process principles of personal jurisdiction that the Second Circuit had earlier developed as to other MDL 1570 defendants in the *Terrorist Attacks III* decision. *See In re Terrorist Attacks on Sept. 11, 2001*, 538 F.3d 71 (2d Cir. 2008) ("*Terrorist Attacks III*"). In turn, the Second Circuit in its 2013 *O'Neill* decision affirmed this Court's dismissal of NCB under those same *Terrorist Attacks III* jurisdictional principles. *See O'Neill v. Asat Trust Reg.*, 714 F.3d 659, 669-70, 675-77 (2d Cir. 2013). The Supreme Court denied certiorari in 2014 in line with the views of the Solicitor General. *See id.*, *cert. denied sub nom.*, *O'Neill v. Al Rajhi Bank*, 134 S. Ct. 2870 (2014).

Plaintiffs—many of whom are represented by the same counsel who pursued the previously-dismissed claims—now frivolously burden this Court and NCB with a matching set of recycled allegations in the *Lloyd's* 1AC. *Stare decisis* compels the dismissal of these second-round claims against NCB because this Court previously dismissed the same claims as jurisdictionally deficient under the same due process principles of personal jurisdiction at issue here. "It is as clear as clear can be that '*the same issue* presented in a *later case* in the *same court* should lead to the *same result*.'" *FedEx Home Delivery v. NLRB*, 849 F.3d 1123, 1127 (D.C. Cir. 2017) (quoting *LaShawn A. v. Barry*, 87 F.3d 1389, 1393 (D.C. Cir. 1996) (*en banc*)). The fact that there are new Plaintiffs here is immaterial to *stare decisis* or to NCB's jurisdictional defenses because the different composition of the Plaintiffs relates only to the damages sought, not to Plaintiffs' factual predicates or legal theories of jurisdiction or liability.

Compounding Plaintiffs' problem here is the fact that, in the years since this Court dismissed the look-alike cases against NCB, the Supreme Court has made it even more difficult for a plaintiff to establish personal jurisdiction in Antiterrorism Act ("ATA") cases over foreign entities like NCB. *See Walden v. Fiore*, 134 S. Ct. 1115, 1121-23 (2014); *Daimler AG v. Bauman*, 134 S. Ct. 746, 761 (2014). The demonstrable effect of *Daimler* and *Walden* has been to "reduce[] the exercise of general jurisdiction in favor of specific jurisdiction. … But specific jurisdiction has receded as well under … *Walden*." *State Farm Fire & Cas. Co. v. Swizz Style, Inc.*, 2017 U.S. Dist. LEXIS 43284, at *15-*16 (S.D.N.Y. Mar. 23,

2017) (citing *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924 (2011); *Daimler*, 134 S. Ct. at 761; *Walden*, 134 S. Ct. at 1123)); *accord Bristol-Myers Squibb Co. v. Superior Court*, 137 S. Ct. 1773, 1782-83 (2017).

This Court determined in *Terrorist Attacks IV* that the plaintiffs who made these same allegations against NCB failed to hurdle the less-stringent requirements of jurisdictional due process prevailing at that time. 718 F. Supp. 2d at 476-78, 487-88.  It is self-evident, then, that these new Plaintiffs, with their old allegations, cannot establish a *prima facie* case for personal jurisdiction following *Walden* and *Daimler* because "the revised strictures of due process now require <u>something more</u>." *State Farm Fire & Cas. Co.*, 2017 U.S. Dist. LEXIS 43284, at *18 (emphasis added) (quotation omitted).  Plaintiffs here offer <u>nothing more</u>, relying solely on recycled allegations already found to be jurisdictionally-insufficient.

The Second Circuit's recent decisions in *Waldman v. PLO*, 835 F.3d 317, 335 (2d Cir. 2016) and *Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 627-30 (2d Cir. 2016) are particularly instructive. *Waldman* applied these narrowed standards in the specific jurisdiction context, emphasizing that "the plaintiff [must] show some sort of causal relationship between a defendant's U.S. contacts and the episode in suit." *Waldman v. PLO*, 835 F.3d at 341.  The Second Circuit explained that, for the exercise of personal jurisdiction to be "consistent with due process, the defendant's suit-related conduct must create a substantial connection with the forum." *Id.* (quoting *Walden*, 134 S. Ct. at 1121).  Moreover:

> The relationship between the defendant and the forum "must arise out of contacts that the 'defendant *himself*' creates with the forum." ... The "'minimum contacts' analysis looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there." … And the "same principles apply when intentional torts are involved."

*Id.* at 335 (quoting *Walden*, 134 S. Ct. at 1122-23; citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)).  Importantly, specific jurisdiction cannot be based on "activities that are not proscribed by the ATA and are not connected to the wrongs for which the plaintiffs here seek redress." *Id.* at 342.

*Brown* likewise applied these narrowed standards in the general jurisdiction context, holding

that *Daimler* "considerably altered the analytic landscape for general jurisdiction and left little room for" general jurisdiction "when a corporation is neither incorporated nor maintains its principal place of business in" the forum. *Brown*, 814 F.3d at 627-30; *see also, e.g., Gucci Am., Inc. v. Bank of China*, 768 F.3d 122, 134-36 (2d Cir. 2014) (holding that *Daimler* announced "for the first time" that continuous and systematic contacts of a defendant's local offices could not support general jurisdiction).

As confirmed by the accompanying side-by-side comparison chart (Exh. 1), Plaintiffs rely on the same three categories of allegations against NCB that this Court and the Second Circuit already have held cannot establish personal jurisdiction over NCB:

(1) Allegations of <u>financial services provided outside of the United States</u> to customers who, in turn, allegedly supported al Qaeda. *See* Exh. 1, at 1-4 (cross-referencing Plaintiffs' allegations against NCB with the dismissed, materially-identical allegations made by the *Federal Insurance* and *Ashton* plaintiffs). This Court and the Second Circuit previously foreclosed jurisdiction on this basis, holding that allegations that "NCB ... knowingly maintained bank accounts for individuals associated with al Qaeda as well as for purported front charities that aided al Qaeda, and ... that those accounts were used for al Qaeda operations," are "not enough for personal jurisdiction purposes." *O'Neill*, 714 F.3d at 676;

(2) Allegations of <u>donations or other support to charities outside of the United States</u> that supposedly were conduits to al Qaeda. *See* Exh. 1, at 4-6. This Court and the Second Circuit foreclosed jurisdiction on this same basis, holding that "[Plaintiffs'] burden" to establish personal jurisdiction "is not satisfied by the allegation that the [defendants] intended to fund al Qaeda through their donations to Muslim charities" because "[p]roviding indirect funding to an organization that was openly hostile to the United States does not constitute th[e] type of intentional conduct" that can subject a foreign entity to the jurisdiction of U.S. courts. *Terrorist Attacks III*, 538 F.3d at 94-95; *see also O'Neill*, 714 F.3d at 675-76 (quoting and applying the same to NCB); and

(3)  Allegations of <u>conduct by third parties outside of the United States</u> that cannot be imputed to NCB as a matter of law, because the allegations do not plausibly allege any actionable conduct of, or authorized by, NCB.  *See Waldman*, 835 F.3d at 335 ("The relationship between the defendant and the forum 'must arise out of contacts that the 'defendant *himself*' creates with the forum." (quoting *Walden*, 134 S. Ct. at 1122)).  Notably, these third-party allegations <u>constitute roughly two-thirds of all of the 1AC's allegations against NCB, yet most do not even mention NCB</u>.  *See* Exh. 1, at 6-22.

Also scattered throughout the 1AC are conclusory allegations of "NCB's material sponsorship of al Qaeda,"[2] which also are recycled from *Terrorist Attacks IV*.  None of these unsupported allegations can be credited for purposes of the jurisdictional analysis; indeed, it is undisputed that NCB did not participate in the September 11 attacks, conspire with the September 11 attackers, or interact with al Qaeda, and neither the U.S. government, nor any other government or organization, ever has designated NCB as connected with terrorism.  *See O'Neill*, 714 F.3d at 676 (finding that plaintiffs' allegations "are conclusory and insufficient" to establish personal jurisdiction); *Singh v. Singh*, 2016 U.S. Dist. LEXIS 72131, at *8 (S.D.N.Y. June 2, 2016) (holding under the Alien Tort Statute, 28 U.S.C. § 1350, that "a plaintiff may not rely on conclusory statements without any supporting facts, as such allegations would lack the factual specificity necessary to confer jurisdiction." (quotation omitted; citing *O'Neill*, 714 F.3d at 676)); *see also infra* at 12 n.6.

The Second Circuit has established that "foreseeability is not the standard for recognizing personal jurisdiction," but rather that "plaintiffs must establish that the [defendants] 'expressly aimed'

---

[2] Plaintiffs make this same allegation in other generic terms.  *See, e.g.,* 1AC ¶ 200 (alleging Khaled Bin Mahfouz "continued to support terrorist causes, including al Qaeda in particular, through NCB"); ¶ 205 (alleging "NCB's material sponsorship of al Qaeda"); ¶ 216 (alleging "NCB maintained close and intimate organizational connections with Muwafaq"); ¶ 245 (alleging "NCB knowingly used its infrastructure and resources to advance al Qaeda's campaign"); *see also* ¶ 196 (alleging NCB "was closely related to, and often worked in collaboration with" BCCI).

intentional tortious acts at residents of the United States." *Terrorist Attacks III*, 538 F.3d at 94-95

(citing *Calder v. Jones*, 465 U.S. 783, 789 (1984)).   None of Plaintiffs' recycled allegations against NCB

in the 1AC comes any closer to satisfying that standard than the original allegations did in *Terrorist*

*Attacks IV*.  *Stare decisis* compels dismissal of Plaintiffs' copycat claims against NCB.

## II.  **RELEVANT PROCEDURAL HISTORY.**

The original MDL 1570 complaints "vary somewhat in their details, but they share[d] a core

allegation: the defendants played a critical role in the September 11 attacks by funding Muslim charities

that, in turn, funded al Qaeda." *Terrorist Attacks III*, 538 F.3d at 76.  The Second Circuit rejected the

plaintiffs' theory that "NCB is subject to specific personal jurisdiction because it maintained accounts

for several of the purported charity organizations that allegedly supported al Qaeda … and was a

'conduit' for financing al Qaeda." *O'Neill*, 714 F.3d at 669 (quoting plaintiffs' allegations); *see also In*

*re Terrorist Attacks on Sept. 11, 2001*, 349 F. Supp. 2d 765, 787 (S.D.N.Y. 2005) ("*Terrorist Attacks I*")

("Plaintiffs claim … al Qaeda used NCB as a 'financial arm, operating as a financial conduit for

[its] operations.'").  In the 1AC, Plaintiffs simply recycle that previously-rejected theory of jurisdiction

over NCB.  *See* 1AC ¶ 201 (alleging "a financial conduit to bin Laden was handled through" NCB);

*id.* ¶ 212 (alleging NCB was a "conduit for wealthy Saudi businessmen to transfer funds to al

Qaeda").  There is no reason for this Court to travel down that road again.

Almost twelve years ago, Judge Casey directed "limited" jurisdictional discovery as to NCB,

confined to personal jurisdiction issues that the Court considered "straightforward." *In re Terrorist*

*Attacks on Sept. 11, 2011*, 392 F. Supp. 2d 539, 572, 575 (S.D.N.Y. 2005) ("*Terrorist Attacks II*").

"More than four years" of that "limited" jurisdictional discovery ensued under the supervision of

Magistrate Judge Frank Maas. *See In re Terrorist Attacks on Sept.11, 2001*, 689 F. Supp. 2d 552, 558-61

(S.D.N.Y. 2010) ("*Discovery Order II*").

In 2008, NCB renewed its motion to dismiss for lack of personal jurisdiction with leave of the

Court.  MDL Dkt. ##2106, 2110-2117.  Before requiring the plaintiffs to respond to NCB's renewed motion to dismiss, the Court allowed the plaintiffs still further jurisdictional discovery on both their general and specific jurisdiction theories.  Altogether, this Court granted the plaintiffs jurisdictional discovery on all of NCB's business contacts with the U.S. during the six years before the filing of the original complaints, (*In re Terrorist Attacks on Sept. 11, 2001*, 440 F. Supp. 2d 281, 285 (S.D.N.Y. 2006) ("*Discovery Order I*")), and on the plaintiffs' central, but disproven, specific-jurisdiction "alleg[ation] that there was … a [Saudi government] report, which discussed NCB's financing of terror through charities related to Osama Bin Laden and al Qaeda."  *Discovery Order II*, 689 F. Supp. 2d at 558.

During the jurisdictional-discovery process: (i) NCB submitted written confirmation from its regulator, the Saudi Arabian Monetary Agency ("SAMA"), that NCB was not audited, examined, or investigated for alleged involvement in terrorism financing (MDL Dkt. #2115, ¶3, Exhs. 8, 10); (ii) Judge Maas conducted an *in camera* review of an audit report on NCB and found "nothing … which relates to the issues presently before the Court concerning NCB" (MDL Dkt. #1971); and (iii) Judge Maas presided over the deposition of a former NCB officer who testified that NCB was not audited, examined, or investigated for alleged involvement in terrorism financing.[3]  *See* MDL Dkt. ##1964, 2045 at 7 & Exh. B at 2-5.  When the plaintiffs sought yet further discovery, Judge Maas conducted two hearings before issuing a comprehensive decision denying those requests.  *Discovery Order II*, 689 F. Supp. 2d at 558-61, 564, 570.  The Court determined that the additional requested discovery would not lead to jurisdictionally-relevant evidence, and thus would "not be productive" under the Second Circuit's *Terrorist Attacks III* decision.  *Id.* at 564.  Judge Maas found that, "although the Plaintiffs certainly have not been given all the items they requested, the Court has afforded them considerable jurisdictional discovery regarding NCB's activities and related matters."  *Id.* at 570.

---

[3] These discredited audit allegations continue to form a central theory of Plaintiffs' allegations against NCB.  *See* 1AC ¶¶ 215, 228; *infra* at 15-16; Exh. 1 at 2, 15-16.

Thereafter, the first-round plaintiffs opposed NCB's renewed motion to dismiss with extensive factual "averments" that attempted to provide a basis for personal jurisdiction over NCB— many of which the 1AC simply replicates. *Compare* 61-page Summary of Allegations and Evidence in Support of Their Theories of Specific Jurisdiction (MDL Dkt. #2241-7, "Pls.' SJ Summary"), *with* Exh. 1. This Court quickly dismissed NCB for lack of personal jurisdiction, announcing that it had opted not to wait for NCB to file a reply to the Motion to Dismiss, because the "plaintiffs have failed to make the requisite *prima facie* showing that the Court has jurisdiction" over NCB. *Terrorist Attacks IV*, 718 F. Supp. 2d at 476 n.10, 476-78, 488. The Second Circuit affirmed that dismissal:

> The central allegations against ... NCB ... that [it] (1) knowingly maintained bank accounts for individuals associated with al Qaeda as well as for purported front charities that aided al Qaeda, and (2) that those accounts were used for al Qaeda operations ... are not enough for personal jurisdiction purposes.

*O'Neill*, 714 F.3d at 676; *see id.* at 680-81 (finding a lack of general jurisdiction). The Supreme Court requested the views of the Solicitor General, and ultimately denied certiorari. *O'Neill*, 134 S. Ct. at 2870.

## III.   APPLICABLE PERSONAL JURISDICTION STANDARDS.

### A.   Procedural Standards.

"A plaintiff bears the burden of demonstrating personal jurisdiction over a person or entity against whom it seeks to bring suit." *Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34 (2d Cir. 2010) (citation omitted). As the Second Circuit has held:

> Prior to discovery, a plaintiff challenged by a jurisdiction testing motion may defeat the motion by pleading in good faith, legally sufficient allegations of jurisdiction. At that preliminary stage, the plaintiff's *prima facie* showing may be established solely by allegations. After discovery, the plaintiff's *prima facie* showing, necessary to defeat a jurisdiction testing motion, must include an averment of facts that, if credited by the trier, would suffice to establish jurisdiction over the defendant. At that point, the *prima facie* showing must be factually supported.

*Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84-85 (2d Cir. 2013) (quotation omitted). The post-discovery standard applies here because a full jurisdictional-discovery record was developed over

five years as to the look-alike allegations of the first-round plaintiffs. *See supra* at 6-8; *infra* at 32-34.

"Conclusory allegations based only on information and belief are not sufficient to provide such factual support." *Ingenito v. Riri USA, Inc.*, 89 F. Supp. 3d 462, 472 (E.D.N.Y. 2015) (quotations omitted); *see also O'Neill*, 714 F.3d at 676 (holding that plaintiffs' allegations "are conclusory and insufficient" to establish personal jurisdiction). "Nor does the court 'draw argumentative inferences' in plaintiff's favor." *Singh*, 2016 U.S. Dist. LEXIS 72131, at *9 (quoting *Terrorist Attacks II*, 392 F. Supp. 2d at 556). Likewise, a *prima facie* case of personal jurisdiction cannot be based on inadmissible hearsay. *See Shaoulian-Tehrani v. Khatami*, 2008 U.S. Dist. LEXIS 33426, at *6 (S.D.N.Y. Apr. 21, 2008) ("Plaintiffs have failed to make a prima facie showing that this Court has personal jurisdiction over [defendant]. First, plaintiffs have relied only on newspaper articles—hearsay—for the proposition that [defendant] was present in New York. These hearsay statements are inadmissible."); *Tasini v. New York Times Co.*, 184 F. Supp. 2d 350, 357 n.8 (S.D.N.Y. 2002) ("Evidence relied upon outside the pleadings must be competent. … [A]rticles and newspaper clippings do not rise to the level of competent evidence.").

## B.   <u>Substantive Standards</u>.

Plaintiffs pursue only a theory of specific jurisdiction over NCB, which fails on the basis of this Court's rulings dismissing the first-round cases against NCB.[4]  In order to establish specific

---

[4] The 1AC does not pursue general personal jurisdiction over NCB, for which there would be no basis in any event. After considering the abundant jurisdictional-discovery record, this Court held that NCB's U.S. forum-contacts did not support general jurisdiction. *Terrorist Attacks IV*, 718 F. Supp. 2d at 477-78. The Second Circuit affirmed. *O'Neill*, 714 F.3d at 680-81. Developments in the law following those rulings have further restricted general jurisdiction, with the Second Circuit holding that, under *Daimler*, even a bank that has "branch offices in the forum, but is incorporated and headquartered elsewhere" is not subject to general jurisdiction because its forum-contacts are not "'so continuous and systematic as to render [it] essentially at home in the forum.'" *Gucci*, 768 F.3d at 135 (quoting *Daimler*, 134 S. Ct. at 761 n.19). The "at home" standard forecloses general jurisdiction over NCB, a commercial bank established and operating in Saudi Arabia with no U.S. branch. *Terrorist Attacks I*, 349 F. Supp. 2d at 787; *see also Lopez v. Shopify, Inc.*, 2017 U.S. Dist. LEXIS 77708, at *12 (S.D.N.Y. May 23, 2017) ("Plaintiffs who assert general jurisdiction outside a corporation's state of incorporation or principal place of business face a very heavy burden after *Goodyear* and *Daimler*.").

personal jurisdiction, Plaintiffs must show that NCB engaged in "suit-related conduct," which "create[d] a substantial connection with the forum State." *Waldman v. PLO*, 835 F.3d at 335 (quoting *Walden*, 134 S. Ct. at 1122; *Burger King*, 471 U.S. at 475). NCB <u>itself</u> must have created that connection with the <u>forum</u>, and not simply with "persons who reside there." *Id.* "Regardless of where a plaintiff lives or works, an injury is jurisdictionally relevant only insofar as it shows that the defendant has formed a contact with the forum State. The proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way." *Walden*, 134 S. Ct. at 1125-26.

Because Plaintiffs allege that the conduct at issue here occurred "entirely out-of-forum, and the only relevant jurisdictional contacts with the forum are therefore in-forum effects harmful to the plaintiff …, the exercise of personal jurisdiction may be constitutionally permissible [only] if the defendant <u>expressly aimed</u> its conduct at the forum." *Licci v. Lebanese Canadian Bank*, 732 F.3d 161, 173 (2d Cir. 2013) (citing *Calder*, 465 U.S. at 789); *accord Waldman*, 835 F.3d at 339 (noting that, in *O'Neill*, the Second Circuit "first clarified that specific personal jurisdiction properly exists where the defendant took intentional, and allegedly tortious, actions … expressly aimed at the forum" (quotations omitted)).[5]  Under this standard, "the fact that harm in the forum is foreseeable … is insufficient for the purpose of establishing specific personal jurisdiction over a defendant." *O'Neill*, 714 F.3d at 674; *see also Wilder v. News Corp.*, 2015 U.S. Dist. LEXIS 137158, at *21-*22 (S.D.N.Y. Oct. 6, 2015) ("It is not sufficient that conduct incidentally had an effect in the forum, or even that effects in the forum were foreseeable. …  Instead, the defendant must have intentionally caused—i.e., expressly aimed to

---

[5] This requirement, that a defendant whose relevant conduct lies entirely outside of the forum is subject to specific personal jurisdiction only when the "defendant took 'intentional … actions … expressly aimed' at the forum," also has been phrased as requiring that the "defendant has '<u>purposefully directed</u>' his activities at residents of the forum." *O'Neill*, 714 F.3d at 674 (emphasis added) (quoting *Burger King*, 471 U.S. at 472-73). The "alternative 'purposeful availment'" test is irrelevant here because it only "applies 'where the conduct on which the alleged personal jurisdiction is based occurs within the forum.'" *Tarsavage v. Citic Trust Co.*, 3 F. Supp. 3d 137, 145 n.5 (S.D.N.Y. 2014) (quoting *Licci*, 732 F.3d at 173).

cause—an effect in the forum through his conduct elsewhere.") (citing *Licci*, 732 F.3d at 173; *Terrorist Attacks III*, 538 F.3d at 71; *Tarsavage*, 3 F. Supp. 3d at 145)).  Accordingly, specific jurisdiction in ATA cases cannot be based on "activities that are not proscribed by the ATA and [that] are not connected to the wrongs for which the plaintiffs here seek redress." *Waldman v. PLO*, 835 F.3d at 342.

The 1AC alleges only overseas conduct by NCB.  Accordingly, NCB must be dismissed for lack of personal jurisdiction because, as the first-round rulings of this Court and the Second Circuit demonstrate, Plaintiffs cannot establish that NCB "expressly aimed" or "purposefully directed" intentionally tortious conduct—violating the ATA—at the United States.  *O'Neill*, 714 F.3d at 674. The "exercise [of] personal jurisdiction over a foreign defendant who causes an effect in the forum by an act committed elsewhere … must be applied with caution, particularly in an international context." *SEC v. Sharef*, 924 F. Supp. 2d 539, 545 (S.D.N.Y. 2013) (quoting *Leasco Data Processing Equip. Corp. v. Maxwell*, 468 F.2d 1326, 1341 (2d Cir. 1972); *World-Wide Volkswagen v. Woodson*, 444 U.S. 286, 295 (1980)).

The Second Circuit upheld this Court's determination that the first-round allegations (recycled in the 1AC) cannot establish personal jurisdiction over NCB under the "expressly aimed" test.  *O'Neill*, 714 F.3d at 676.  That conclusion applies equally to the copycat allegations in the 1AC, which must be dismissed as against NCB based on *stare decisis*.

## IV.  PLAINTIFFS' SPECIFIC JURISDICTION ALLEGATIONS ARE LEGALLY DEFICIENT UNDER THIS COURT'S AND THE SECOND CIRCUIT'S PRIOR RULINGS.

This Court and the Second Circuit, armed with an ample jurisdictional-discovery record, already have rejected as jurisdictionally-insufficient all of the 1AC's allegations against NCB.  *See* Exh. 1.  This Court "carefully and thoroughly reviewed the voluminous and extensive submissions of the respective parties applicable to each defendant's individual motion" and found "that plaintiffs have not even made an arguable showing of jurisdiction [over NCB and certain other defendants] or

11

identified a genuine issue of jurisdictional fact."[6]   *Terrorist Attacks IV*, 718 F. Supp. 2d at 488.  This Court emphasized that "plaintiffs have failed to make the requisite *prima facie* showing that the Court has [specific] jurisdiction" over NCB.  *Id.*  The Second Circuit affirmed this Court's dismissal of NCB and its holding that "the underlying legal theory, upon which the plaintiffs seek to premise jurisdiction, is untenable" (*id.* at 487), holding that "the allegations against … NCB itself … are indistinguishable from plaintiffs' allegations in *In re Terrorist Attacks III*, which we held to be insufficient for personal jurisdiction purposes."  *O'Neill*, 714 F.3d at 676 (citing *Terrorist Attacks III*).

All of the allegations against NCB in the 1AC either copy verbatim or substantively mirror the allegations that this Court and the Second Circuit found insufficient to support personal jurisdiction over NCB.  *See* Exh. 1.  While the 1AC contains fifty-three (53) separately-numbered paragraphs in the section titled "National Commercial Bank" (1AC ¶¶ 193-245), they all fall into the categories that this Court and the Second Circuit both previously held to be jurisdictionally deficient as to NCB, namely: (i) allegations of financial services provided outside of the U.S. to bank customers, who in turn allegedly supported al Qaeda; (ii) allegations of donations or other support to charities outside of the U.S. that supposedly were alleged conduits to al Qaeda; and (iii) allegations of the conduct of third parties that as a matter of law is not imputable to NCB.  Each is discussed further below.

## A.  Allegations Concerning Financial Services to Foreign Customers.

Nine (9) 1AC paragraphs repeat verbatim, or substantively replicate from the first-round cases the allegations that NCB provided financial services outside the United States to foreign charities and other bank customers that allegedly were conduits to al Qaeda.  *See* 1AC ¶¶ 201-202, 204, 214-215,

---

[6] It is undisputed that NCB did not participate in the September 11 attacks or conspire with the September 11 attackers and that NCB did not provide any support directly to al Qaeda.  *See Discovery Order I*, 440 F. Supp. 2d at 286 ("There has been no showing ... that NCB played a direct role in any of the September 11 terrorist attacks."); *Discovery Order II*, 689 F. Supp. 2d at 568 n.9 (denying "discovery on the basis of 'conspiracy' jurisdiction" because "Plaintiffs have not made a prima facie showing of jurisdiction under this theory").  Further, the Treasury Department never has sought or recommended any sanction against NCB (*see* MDL Dkt. #2117-17 at p. 11), and neither the U.S. government, nor any other government or organization, ever has designated NCB as a financier or any other type of facilitator of terrorism.

234, 237, 240-241; Exh. 1 at 1-4.  Plaintiffs allege, just as the prior plaintiffs did, that "NCB ... knowingly maintained bank accounts for individuals associated with al Qaeda as well as for purported front charities that aided al Qaeda, and ... that those accounts were used for al Qaeda operations." *O'Neill*, 714 F.3d at 676; *see* 1AC ¶ 204 ("NCB served as one of al Qaeda's preferred banks for many years, providing financial services for many of al Qaeda's 'charity' fronts").  The Second Circuit has already held that these same allegations are "not enough for personal jurisdiction purposes."  *O'Neill*, 714 F.3d at 676 (emphasis added).  The Second Circuit emphasized:

> Just as we concluded in *In re Terrorist Attacks III* that the "managers of ... financial institutions" who allegedly "knowingly and intentionally provided material support to terrorists" by "actively sponsor[ing] and support[ing] the al Qa[e]da movement through several ... subsidiaries" did not "expressly aim" their conduct at the United States, ... the allegations against these various banking and financial institutions [including NCB]—as well as the individuals who managed them—similarly fall short. Indeed, as in *In re Terrorist Attacks III*, "we decline ... to say that the provision of financial services to an entity that carries out a terrorist attack on United States citizens could make [a defendant], in the circumstances presented here, subject to the jurisdiction of American courts."

*Id.* (quoting *Terrorist Attacks III*, 538 F.3d at 95-96).[7]

Accordingly, the 1AC's financial-services allegations are jurisdictionally deficient because both this Court and the Second Circuit already have held that specific jurisdiction over NCB cannot be based on an alleged role in providing banking services to customers who in turn allegedly transferred funds to al Qaeda.  *See id.* at 669 (rejecting the argument "that NCB is subject to specific personal jurisdiction because it maintained accounts for several of the purported charity organizations that allegedly supported al Qaeda, ... and was a 'conduit' for financing al Qaeda"); *see also id.* at 677, 680-81 (dismissing for lack of personal jurisdiction claims alleging that a defendant was used "to funnel

---

[7] *See also accord Siegel v. HSBC Holdings, plc*, 2017 U.S. Dist. LEXIS 129188, at *11-*12 (D. Ill. 2017) (adopting the *O'Neill*, 714 F.3d at 676, holding that allegations "that [defendants] provided financial services to clients that purportedly were associated with al Qaeda, and thereby aided al Qaeda ... are not enough for personal jurisdiction purposes" and dismissing for lack of personal jurisdiction a claim that a Saudi bank that allegedly engaged in a "scheme ... to transfer U.S. dollars through the United States in a way that circumvent[ed] monitoring by U.S. regulators" (quotations omitted)).

support to Osama Bin Laden").

The 1AC simply replicates the allegations and theories that the Court found insufficient to support jurisdiction over NCB in *Federal Insurance* and *Ashton*. Exhibit 1 to NCB's Motion details <u>hundreds</u> of examples, too numerous to duplicate in the discussion here. For instance:

| | |
|---|---|
| "INTERPOL intelligence reports filed of record by the U.S. government in legal proceedings in the United States District Court for the District of Columbia, in support of Kadi's continued designation pursuant to Executive Order 13224, include details of a single transaction in which NCB transferred $2 million to Dr. Salim Bin Mahfouz, an official of Muwafaq in Europe. Dr. bin Mahfouz then transferred $500,000 to Chafiq Ayadi, the Specially Designated Global Terrorist Kadi appointed to head Muwafaq's European Operations at the suggestion of Wa'el Jelaidan, a founding member of al Qaeda. Dr. bin Mahfouz transferred an additional $1.4 million to an apparent shell company in Florida, which he had formed with a senior official of Taibah International, another designated al Qaeda front." (1AC ¶ 214). | "INTERPOL intelligence reports filed of record by the U.S. government in legal proceedings pending in the United States District Court for the District of Columbia, in support of al Kadi's continued designation, include details of a single transaction in which NCB transferred $2 million to Dr. Salim Bin Mahfouz, an official of Muwafaq in Europe. Dr. bin Mahfouz then transferred $500,000 to Chafiq Ayadi, the Specially Designated Global Terrorist al Kadi appointed to head Muwafaq's European Operations at the suggestion of Wa'el Jelaidan. Dr. bin Mahfouz transferred an additional $1.4 million to an apparent shell company in Florida, which he had formed with a senior official of Taibah International, another designated al Qaeda front." (Plaintiffs' Summary of Allegations and Evidence in support of their Theories of Specific Jurisdiction as to National Commercial Bank, Dkt. #2241-7 ("Pls' SJ Summary") ¶ 61). |

And, further:

| | |
|---|---|
| "The investigation of NCB conducted in or around 1998 revealed that over a 10 year period, $74 million was funneled by NCB's Zakat Committee to the IIRO." (1AC ¶ 237). | "During the 1990s, National Commercial Bank channeled in excess of $74 million to al Qaida through IIRO …" (*Fed. Ins.* Compl. ¶ 292). |

And again:

| | |
|---|---|
| "In addition to maintaining the SJRC's bank accounts, NCB actively promoted those accounts on behalf of the organization. Advertisements running in multiple issues of the Muslim World League Journal in 2000 and 2001 openly solicited funds and directed donors to SJRC accounts managed by NCB and Al Rajhi Bank." (1AC ¶ 240). | "In addition to maintaining the SJRC's bank accounts, NCB actively promoted those accounts on behalf of the organization. Advertisements running in multiple issues of the MWL Journal in 2000 and 2001 openly solicited funds and directed donors to SJRC accounts managed by the National Commercial Bank and Al Rajhi Banking & Investment Corporation." (Pls' SJ Summary ¶ 64). |

The 1AC includes <u>only one allegation with new factual content as to NCB</u>: that, as Plaintiffs put it, Zacarias Moussaoui, the self-described 20th 9/11 hijacker, ostensibly claimed that "he personally reviewed and documented financial transactions benefiting al Qaeda involving NCB." 1AC

14

¶ 202.   In fact, Moussaoui actually testified only that some company, the identity of which he could

not recall, used its bank account at NCB to send money to Pakistan.   *See* MDL Dkt. #2927-5, at 28-

29.   In any event, Plaintiffs' mischaracterized version of Moussaoui's testimony is simply another

variant of the jurisdictionally-insufficient theory that "NCB ... knowingly maintained bank accounts

for individuals associated with al Qaeda as well as for purported front charities that aided al Qaeda,

and ... that those accounts were used for al Qaeda operations."   *O'Neill*, 714 F.3d at 676 (financial-

services theory "not enough for personal jurisdiction purposes").

Plaintiffs' allegations fail not simply because they repeat already-dismissed allegations from the

first-round cases against NCB, but also because Plaintiffs have mischaracterized the documents on

which those allegations rely, ground those allegations entirely on inadmissible hearsay, and/or rely on

statements have been disproven and/or retracted by their original proponents.   Examples of these

deficient allegations include:

- "Media reports" that a 1998 audit found that "five of Saudi Arabia's prominent business leaders"
  used their NCB accounts to transfer funds to Muwafaq (1AC ¶¶ 215, 228).   These statements have
  been refuted and retracted by their original sources:  the 1999 *USA Today* article on which Plaintiffs
  rely regarding the alleged audit of NCB (1AC ¶ 215) was fabricated by the reporter, and *USA
  Today* retracted it in 2004, stating:

  > USA TODAY has not been able to locate any record of such an audit and has no
  > reason to believe that one was conducted, though other, routine audits may have
  > occurred. … The story was written by Jack Kelley, a reporter who was found recently
  > to have fabricated several high-profile stories.  In this case, the story's assertions had
  > been widely reported and subsequently retracted by others.

http://www.usatoday.com/news/2004-04-12-correction_x.htm (last visited Aug. 20, 2017).  Also,

NCB's regulator, SAMA, twice expressly confirmed that NCB has not been audited, investigated, or

sanctioned in connection with any alleged involvement in financing terrorist activities.  *See supra* at 7.

This Court previously concluded there was no factual support for a Saudi government terror-financing

"audit" of NCB.  *Discovery Order II*, 689 F. Supp. 2d at 558-61 ("I reviewed the entire three-volume

[1998 audit report] *in camera* and concluded that it was not relevant to the jurisdictional issues in this

case." (quotations and citations omitted)).  Moreover, the first-round plaintiffs' original source for the

audit allegations was a purported summary from their investigator Jean-Charles Brisard, who

subsequently retracted his assertion that any such audit had occurred, stating:

> On reflection I should have said that this document was a summary of what I believed
> to be an audit document of the NCB. …  I also acknowledge that the document
> appears to be a summary of a regular audit of the NCB that all banks carry out on a
> yearly basis …  I now understand  …  that this was a standard audit of the NCB that
> was carried out on a yearly basis as with all banks …  I have no evidence to suggest
> that the Saudi Arabian Government ordered a special audit of the NCB to address
> concerns of the American authorities that "*uncovered massive transfers made to charity
> organizations with ties to Osama bin Laden ...*"

MDL Dkt. #1904, Exh. A ¶¶ 23, 24, 25.2.

- A Treasury Department report on Yassin Kadi, which recycles the same refuted "audit" allegations

  about NCB.  *See* 1AC ¶¶ 227, 228, 244; *see also* MDL Dkt. 2241-7, Exh. 10 ("OFAC Memo")

  (discussing "press accounts" of the now-refuted Saudi government "audit" of NCB).  NCB is

  otherwise mentioned only in connection with Kadi's claim to have provided consulting services

  to NCB from 1990-91.

- Two purported, but unauthenticated, INTERPOL reports (1AC ¶ 214), which are inadmissible

  hearsay and state they that are "not meant to be used as evidence."  MDL Dkt. #2241-7, Exhs. 8

  at 1, 9 at 1; *see supra* at 9.  Further: (i) one report states only that a Dr. Saleem Bin Mahfouz received

  a check drawn on an NCB account in 1995 and thereafter <u>sought to avoid sending</u>, but was <u>ordered</u>

  <u>by a court to send</u>, money to the International Islamic Relief Organization ("IIRO") (*id.* at Exh. 8

  at 24); and (ii) the other report mentions no NCB bank accounts at all (*id.* at Exh. 9).  Neither

  report depicts NCB as a knowing or intentional participant in any customers' transfer of funds to

  supposed al-Qaeda charity-fronts.  Instead, these inadmissible "reports" are simply another variant

  of the allegations that NCB provided financial services to customers, which both this Court and

the Second Circuit have held cannot provide a basis for specific jurisdiction over NCB.

- Congressional testimony of a former CIA official (Vincent Cannistraro) (1AC ¶ 201, replicating the content of Pls.' SJ Summary ¶ 59), which disclaimed any intent to speak for the U.S. government and or reliance on government information.[8]  In any event, Cannistraro's testimony portrays NCB as nothing more than a banking channel for customers, without ascribing any knowing or intentional NCB involvement in its customers' purposes.  *See* 1AC ¶ 201; Exh. 1 at 2-3 (Cannistraro describing that "several wealthy Saudis were funneling contributions to bin Laden" using their NCB accounts).  This testimony again exemplifies the type of financial-services allegations against NCB that both this Court and the Second Circuit have held to jurisdictionally-deficient as to NCB.

- Alleged advertisements by NCB customers like the SJRC (1AC ¶ 240), which notified potential donors that they could remit donations to the customer's account at NCB in Saudi Arabia.  These allegations do not include any U.S.-directed conduct by NCB and, in any event, cannot support jurisdiction over NCB because the required relationship between NCB and the forum "must arise out of contacts that the defendant *himself* creates with the forum."  *Walden*, 134 S. Ct. at 1122 (quotation omitted); *Burger King*, 471 U.S. at 475 (a defendant "will not be haled into a jurisdiction solely as a result of … unilateral activity of another party or third person." (quotation omitted)).  Similarly, Plaintiffs' recycled allegation that "NCB opened two 'shared accounts' with Al Rajhi Bank … for the IIRO as a member of the SJRC, thereby allowing the SJRC to serve as a conduit for funneling donations to al Qaeda fighters in Kosovo and Chechnya" (1AC ¶ 241), also focuses on third-party conduct that, in any event, was not "expressly aimed" at the U.S.  *O'Neill*, 714 F.3d

---

[8] *See* http://commdocs.house.gov/committees/intlrel/hfa75562.000/hfa75562_0.HTM ("Mr. Revell: I hope you know that none of us speak for the Government.  Mr. Cannistraro: If we did, we would have been fired today.").  Cannistraro ceased CIA employment in 1991, ten years before 9/11 and his cited congressional testimony. https://en.wikipedia.org/wiki/Vincent_Cannistraro.

at 674.

There is nothing new here, and *stare decisis* compels dismissal.  *See infra* at 28-31.

**B.**     **Allegations Concerning Donations or Support to Foreign Charities**.

Eight (8) 1AC paragraphs repeat verbatim, or substantively replicate, the same jurisdictionally-deficient allegations, which the Second Circuit rejected in *O'Neill*, that NCB knowingly provided donations or "support" to various foreign charities.[9]  *See* Exh. 1 at 4-6.  For example, the Second Circuit held that plaintiffs' allegations that "NCB … helped fund the IIRO and the SJRC" are among the allegations that "are indistinguishable from plaintiffs' allegations in *In re Terrorist Attacks III*, which we held to be insufficient for personal jurisdiction purposes."  *O'Neill*, 714 F.3d at 669, 676.  The Second Circuit emphasized that "[t]hese allegations are not enough for personal jurisdiction purposes" because it had "concluded in *In re Terrorist Attacks III* that" persons "who allegedly 'knowingly and intentionally provided material support to terrorists' by 'actively sponsor[ing] and support[ing] the al Qa[e]da movement through several … subsidiaries' did not 'expressly aim' their conduct at the United States."  *Id.* at 676 (quoting *In re Terrorist Attacks III*, 538 F.3d at 95-96).

This Court similarly explained:

> A defendant who allegedly indirectly provides funding to al Qaeda through charitable donations, relinquishes all control over the donated funds.  While a defendant-donor may intend, and have every reason to believe, that the suspect charity will funnel those charitable funds to al Qaeda, the donor himself has no authority to direct how the monies are used nor the power or ability to direct his monetary donations into the hands of al Qaeda.

*Terrorist Attacks IV*, 718 F. Supp. 2d at 480-81.  For the same reason, the recycled allegations of the 1AC are jurisdictionally-deficient as to NCB because they cannot factually support a theory that NCB ever had the "authority to direct" how donated funds "[we]re used nor the power or ability to direct

---

[9] 1AC ¶¶ 212-213, 216, 235-236, 238-239 243.  Five of these paragraphs (1AC ¶¶ 212, 235-236, 238-239) also allege the provision of financial services along with the nine paragraphs discussed in the preceding section.

monetary donations into the hands of al Qaeda." *Id.* at 481.

The Second Circuit affirmed NCB's dismissal in *O'Neill*, 714 F.3d at 674-75, stressing that its prior holdings in *Terrorist Attacks III* mandated that outcome.  In *Terrorist Attacks III*, the Second Circuit likewise affirmed the dismissal of the same type of allegations against other defendants, holding that:

> [T]he plaintiffs rely on a causal chain to argue a concerted action theory of liability: the [defendants] supported Muslim charities knowing that their money would be diverted to al Qaeda, which then used the money to finance the September 11 attacks. … Even if the [defendants] were reckless in monitoring how their donations were spent, or could and did foresee that recipients of their donations would attack targets in the United States, that would be insufficient to ground the exercise of personal jurisdiction. …
>
> [Plaintiffs'] burden is not satisfied by the allegation that the [defendants] intended to fund al Qaeda through their donations to Muslim charities.  Even assuming that the [defendants] were aware of Osama bin Laden's public announcements of jihad against the United States …, their contacts with the United States would remain far too attenuated to establish personal jurisdiction in American courts. …  [T]he plaintiffs must establish that the [defendants] "expressly aimed" intentional tortious acts at residents of the United States …  Providing indirect funding to an organization that was openly hostile to the United States does not constitute this type of intentional conduct.  In the absence of such a showing, American courts lacked personal jurisdiction over the [defendants].

*Terrorist Attacks III*, 538 F.3d at 94-95; *see also O'Neill*, 714 F.3d at 674-75, 678 (same); *Waldman v. PLO*, 835 F.3d at 339 ("In *O'Neill*, this Court emphasized that the mere 'fact that harm in the forum is foreseeable' was 'insufficient for the purpose of establishing specific personal jurisdiction over a defendant …'") (quoting *O'Neill*, 714 F.3d at 674).[10]

In addition to being jurisdictionally immaterial, Plaintiffs' recycled charitable-donation allegations mischaracterize the inadmissible hearsay on which they rely.  *See supra* at 9.  Plaintiffs altered the text of the unauthenticated purported German intelligence report inspiring their charity-support

---

[10] *See also* Order, MDL Dkt. #2134 ("Personal jurisdiction in American courts is not established by merely alleging that the defendant intended to fund al Qaeda through donations to Muslim charities.") (Daniels, J.) (citing *Terrorist Attacks III*).  The law is the same in other jurisdictions.  *See, e.g., Burnett v. Al Baraka Inv. and Dev't Corp.*, 292 F. Supp. 2d 9, 22-23 (D.D.C. 2003) (holding that an allegation that a defendant "donated money to the IIRO [and other charities] knowing that those foundations funded terrorist organizations including Al Qaeda … stops well short of alleging that Prince Sultan's actions were 'expressly aimed' or 'purposefully directed' at the United States.").

allegations (1AC ¶ 213) to shape its meaning by adding "[for the sponsorship]" to inject a new phrase: "one route [for the sponsorship] of al-Qaeda was the transfer of large funds from the National Commercial Bank to Islamic (charities)." *Compare id. with* MDL Dkt. #2241-7, Exh. 4. In fact, the document does not suggest that NCB knew, or intended to support, whatever purpose NCB customers may have had in using NCB accounts to effectuate their banking transactions. *Id.*[11]

Equally, another recycled allegation—that, "[u]nder the supervision of Suleiman Abdul Aziz al Rajhi, NCB also managed the budget of the SJRC" (1AC ¶¶ 238-239) (whatever that means)—cannot support jurisdiction over NCB given that the Second Circuit rejected jurisdiction over other defendants based on claims relating to their alleged direct supervision or management of the SJRC. *Terrorist Attacks III*, 538 F.3d at 78, 94-95 (rejecting, as insufficient to support jurisdiction over Prince Naif, allegations that he "served as the General Supervisor of the SJRC," in addition to fund-raising for, and making donations to, the SJRC).

Further, the Second Circuit deemed jurisdictionally inadequate plaintiffs' allegations that "NCB … provided material support and resources to al Qaeda via the IIRO and SJRC" and "NCB provided funds and financial support to IIRO." 1AC ¶¶ 235-236; *see O'Neill*, 714 F.3d at 669, 676 (holding that plaintiffs' allegations that "NCB … helped fund the IIRO and the SJRC" are among the allegations that "are indistinguishable from plaintiffs' allegations in *In re Terrorist Attacks III*, which we held to be insufficient for personal jurisdiction purposes"). In any event, the U.S. government notably never issued any designation implicating either the SJRC or the Saudi Arabian operations of the IIRO in terrorism. OFAC's far more limited designation of the Philippine and Indonesian branch offices of the IIRO[12] did not occur until August 2006, years after the 9/11 attacks, and there is no alleged

---

[11] The document also bears the legend "DATE UNKNOWN/ENGLISH TRANSLATION," does not identify the author or translator (MDL Dkt. #2241-7, Exh. 4), and thus lacks evidentiary foundation, and contains multi-layer hearsay.

[12] https://www.treasury.gov/resource-center/sanctions/OFAC-Enforcement/Pages/20060803.aspx.

NCB connection to those branches.  *See Terrorist Attacks I*, 349 F. Supp. 2d at 800-01 (when an OFAC designation occurs after the time that defendants allegedly were affiliated with designated entities, plaintiffs must "allege specific facts showing that the [defendants] knew or should have known that the [designated entities] were actually fronts for al Qaeda.").  By contrast, OFAC affirmatively allows financial transactions with IIRO-Saudi Arabia even to this day.  *See* MDL Dkt. # 3582-5 (April 29, 2009 letter from OFAC to an applicant, stating that "no license is needed at this time in order for IIRO-SA to send or receive wire funds transfers" in part because the IIRO, "as a whole, and its headquarters in Saudi Arabia were not designated").

Again, there is nothing new here, and *stare decisis* compels dismissal.

**C.     Allegations against Third Parties.**

Thirty four (34) 1AC paragraphs allege only activities of third parties that, as a matter of law, cannot be imputed to NCB, including twenty two (22) paragraphs (almost half of the NCB chapter) that do not mention NCB at all.[13]  *See* Exh. 1 at ii-iii, 6-22.  Actions of third-parties cannot support jurisdiction over a defendant who does not direct those activities.  *See Waldman v. PLO*, 835 F.3d at 335 ("The relationship between the defendant and the forum 'must arise out of contacts that the 'defendant *himself*' creates with the forum." (quoting *Walden*, 134 S. Ct. at 1122); *Terrorist Attacks IV*, 718 F. Supp. 2d at 480-81 ("[T]he donor himself has no authority to direct how the monies are used nor the power or ability to direct his monetary donations into the hands of al Qaeda")).  Further, the Second Circuit rejected, as "insufficient to ground the exercise of personal jurisdiction," plaintiffs' "concerted action theory of liability," in which plaintiffs allege that "[defendants] supported Muslim charities knowing that their money would be diverted to al Qaeda, which then used the money to

---

[13] *See* 1AC ¶¶ 195, 200, 207 (general allegations concerning KBM); ¶¶ 196-199, 203 (allegations concerning KBM and Bank of Credit and Commerce International ("BCCI"); ¶¶ 205-206, 208-209, 217-222, 242, 245 (allegations concerning KBM, Yassin al Kadi, and Muwafaq); ¶¶ 210-211, 223-233, 244 (allegations concerning Kadi and Muwafaq).

finance the September 11 attacks." *Terrorist Attacks III*, 538 F.3d at 94-95.  This Court has explained

that it "is aware of … no authority that allows this Court to assert specific jurisdiction over a defendant

solely because that defendant allegedly aided and abetted the actions of a third-party over which there

is jurisdiction." *Laydon v. Mizuho Bank, Ltd.*, 2015 U.S. Dist. LEXIS 44007, at *15 n.5 (S.D.N.Y. Mar.

31, 2015) (Daniels, J.).[14]  Plaintiffs' jurisdictionally-deficient allegations against third-parties ostensibly

linked to NCB are analyzed below.

> 1.     **Allegations Concerning Khaled Bin Mahfouz ("KBM").**  Plaintiffs' recycled

allegations concerning KBM cannot support personal jurisdiction over NCB.  This Court, affirmed

by the Second Circuit, held that it could not exercise jurisdiction over KBM himself based on his

alleged co-founding of Muwafaq during his affiliation with NCB.  *See O'Neill*, 714 F.3d at 677 (holding

that there is "no basis in the record to support our exercise of personal jurisdiction over … Khaled

Bin Mahfouz" despite allegations that he "co-founded the Muwafaq Foundation and was an officer

of NCB"); *see also Terrorist Attacks IV*, 718 F. Supp. 2d at 483-84 ("Being a founder, officer, director

or administrator of a foreign or domestic charitable organization that allegedly provides material

support to al Qaeda, cannot alone serve as a basis to impute the acts of the organization upon the

individual defendant himself, and certainly not upon a company owned by a defendant having no

direct relationship to the charity.").

Given that personal jurisdiction could not be exercised over KBM himself based on those

---

[14] *See also In re N. Sea Brent Crude Oil Futures Litig.*, 2017 U.S. Dist. LEXIS 88316, at *31-*32 (S.D.N.Y. June 8, 2017) ("[T]here is reason to think that basing specific personal jurisdiction on the acts of a defendant's co-conspirators is questionable after *Walden*," in which "the Supreme Court emphasized that personal jurisdiction must be based on 'the defendant's contacts with the forum State itself'" and that "a defendant's relationship with a plaintiff or third party, standing alone, is an insufficient basis for jurisdiction."; and holding that, even if *Walden* did not "eliminate[] the availability of personal jurisdiction based on a conspiracy theory, … an agency relationship is required to uphold jurisdiction based on a conspiracy theory" (quoting *Walden*, 134 S. Ct. at 1122-23)); *In re Aluminum Warehousing Antitrust Litig.*, 90 F. Supp. 3d 219, 227 (S.D.N.Y. Mar. 3, 2015) ("The rules and doctrines applicable to personal jurisdiction are sufficient without the extension of the law to a separate and certainly nebulous 'conspiracy jurisdiction' doctrine"); *Tymoshenko v. Firtash*, 2013 U.S. Dist. LEXIS 43543, at *14-*15 (S.D.N.Y. Mar. 27, 2013) (recognizing that the "use of this conspiracy jurisdiction has been widely criticized by courts and scholars" and "declin[ing] to consider the contacts of [defendant's] co-conspirators to establish personal jurisdiction over [defendant]") (citations omitted).

allegations, then *a fortiori* jurisdiction cannot be exercised over NCB solely because KBM worked for or owned NCB at the time. *See Walden*, 134 S. Ct. at 1118, 1121 (the "'minimum contacts' analysis looks to the defendant's contacts with the forum State itself") (quotation omitted)). The same is true for the 1AC's recycled allegations that KBM donated funds to the Muwafaq Foundation, a charity that supposedly helped fund al Qaida. *See O'Neill*, 714 F.3d at 678 & n.13 (holding that allegations that KBM "'made substantial contributions to many of the charities operating within al Qaida's infrastructure, with full knowledge that those funds would be used to support al Qaida's operations and terrorist attacks,'… [we]re insufficient to establish personal jurisdiction over" KBM himself (quoting *Terrorist Attacks III*)).

Further, KBM never was designated by the U.S. government, or any other government or organization, as a terrorist supporter. *See* https://www.treasury.gov/resource-center/sanctions/SDN-List/Pages/default.aspx ("OFAC SDN List"). Moreover, whatever role KBM played with Muwafaq, it was not part of his NCB duties or in furtherance of NCB's interests, and thus cannot be attributed to NCB. *See Terrorist Attacks I*, 349 F. Supp. 2d at 836 ("An employee's actions cannot be a basis for employer liability unless the employee was acting in furtherance of the employer's business."); *id.* at 833 (holding that charity-related "allegations concerning the Al Rajhi family cannot support a claim against Al Rajhi Bank because there is no allegation that the family members were acting in furtherance of Al Rajhi Bank business"); *7 W. 57th St. Realty Co. v. CitiGroup, Inc.*, 2015 U.S. Dist. LEXIS 44031, at *35-*37 (S.D.N.Y. Mar. 31, 2015) (rejecting specific jurisdiction over foreign banks where "Plaintiff has not pled facts suggesting that the conduct of [the banks'] employees has any connection with the injury suffered by [plaintiff].").

Equally, the 1AC's recycled allegations about a 1992 report on BCCI and an alleged contribution by KBM to Osama bin Laden in 1988 (1AC ¶¶ 196-199, 203; Exh. 1 at 7-8) cannot suggest that KBM (let alone NCB) expressly aimed intentionally tortious acts at U.S. residents, as

*Terrorist Attacks III* requires.  Instead, these allegations, at most, merely allege that KBM funded the anti-Soviet operations of the *mujahadeen* at the encouragement of the U.S. government in 1988—13 years before the September 11, 2001 attacks.  Finally, as one court correctly found, KBM's purported appearance on the "Golden Chain" document:

> relates to a donation of a quarter of a million US dollars some 15 years ago ... at the behest of the US and Saudi officials seeking support for the Afghan resistance to the Soviet Union.  That does not demonstrate, or provide reasonable grounds to suspect, funding of Osama bin Laden or Al Qaeda ... still less at any time after the objectives of that organisation diverged from those of the United States foreign policy, and were directed to a 'global jihad' and a concentrated attack on Western capitalist societies.

*Al Rajhi Banking & Inv. Corp. v The Wall Street Journal Europe*, 2003 EWHC 1776 (QB), 2003 WL 21554735, at ¶ 24 (High Court of Justice Queen's Bench Division, 21 July 2003).

**2.      Allegations Concerning Yassin Kadi.**   The Second Circuit also found no jurisdictional significance as to NCB in plaintiffs' allegations (recycled in the 1AC) concerning Kadi and his alleged connections to NCB.  *O'Neill*, 714 F.3d at 669-671, 675-76.  Consistent with that appellate holding, the U.S. government designation of Kadi "does not reflect that [he] aimed [his] conduct at the United States."  *Waldman v. PLO*, 835 F.3d at 340 n.13; *see Terrorist Attacks III*, 538 F.3d at 94-95 ("[P]laintiffs must establish that the [defendants] 'expressly aimed' intentional tortious acts" at U.S. residents).  The U.S. government did not link Kadi's sanctioned or Muwafaq-related activities either to NCB or to any terrorist activity aimed at the U.S.  Instead, OFAC imposed sanctions on Kadi personally based on his alleged conduct involving extremists located in, and relating to, other parts of the world.  *See Kadi v. Geithner*, 42 F. Supp.3d 1, 13, 16 (D.D.C. 2012); MDL Dkt. #2241-7, Exh. 11. Moreover, Kadi was not designated until October 12, 2001, long after his alleged affiliation with NCB ended.  *See Terrorist Attacks I*, 349 F. Supp. 2d at 800-01 (when an OFAC designation occurs after a defendant's alleged affiliation with a designated entity/individual, plaintiffs must "allege specific facts showing that [defendants] knew or should have known that the [designated entities/individuals] were actually fronts for al Qaeda.").   Apparently after further fact-finding, OFAC removed Kadi's

designation in 2014.  *See* Fed. Reg. Vol. 79, No. 234 (Dec. 5, 2014).  The Court of Justice of the European Union similarly found that "no information or evidence has been produced" by the EU or UK governments "to substantiate the allegations of the Muwafaq Foundation's involvement in international terrorism in the form of links with … Al-Qaeda," and removed EU sanctions against him. *Commission and Others v Kadi*, ECLI:EU:C:2013:518, 2013 ECJ EUR-Lex LEXIS 4091, at ¶¶ 153, 163 (July 18, 2013); *cf. Kadi*, 42 F. Supp.3d at 16 (noting that OFAC relied, in part, on a *USA Today* article in designating Kadi, and "the published correction post-dated OFAC's decision" originally to designate Kadi, as did its author's resignation).

Whatever Kadi's activities may have been long ago, they no more were linked to NCB than they were to Merrill Lynch, Chase Manhattan, or other financial institutions to which he provided consulting services.  *See* Exh. 6 to 4/25/2008 letter from *Lloyd's* Plaintiffs' counsel to the Court, at 0007730 (an exhibit to the OFAC Memo) (stating that Kadi "worked as a financial consultant for National Commercial Bank of Jeddah, Islamic Development Bank, Saudi British Bank, Merrill Lynch, Bankers Leasing Corporation, Chase Manhattan" and numerous others); *see also* MDL Dkt. #2241-7, Exh. 84 at ¶¶ 19, 24 (Kadi confirmed merely that he helped KBM "[d]uring 1990/91" when, as an outside consultant, he "advised and assisted NCB in developing Islamic banking products" that led to the establishment of NCB's "Islamic Banking Department.").

Plaintiffs' recycled allegations that Kadi consulted with NCB on Islamic banking products and services (1AC ¶¶ 206, 217-219) also cannot support personal jurisdiction over NCB because they do not allege any intentionally tortious activity in violation of the ATA, much less any such activity by NCB, expressly aimed at the U.S.  *See Terrorist Attacks III*, 538 F.3d at 95-96 (noting that plaintiffs' "characterization of sharia banking … does not reflect that [defendant] engaged in 'intentional' conduct 'expressly aimed at the United States.'").  To the contrary, the Federal Reserve Bank of New York has "emphasize[d] that … U.S. regulators are open to Islamic financial products."  MDL Dkt.

#2115 ¶17, Exh. 33 (MDL Dkt. # 2116-24) at 1.

    **3.**    **Allegations Concerning Muwafaq.**  The Second Circuit affirmed the dismissal of

NCB for lack of personal jurisdiction after considering the same allegations concerning KBM's and

Kadi's alleged connections to Muwafaq that Plaintiffs recycle here in the 1AC.  *See O'Neill*, 714 F.3d

at 669-70, 675-78.  As in the first-round cases, the 1AC does not allege that NCB established or

operated Muwafaq, and there is no factual support for the assertion that KBM operated it at all—let

alone on behalf of NCB—but rather only that KBM told Kadi "that he wanted to start charity in

memory of his parents" and that he originally endowed it.  *See* OFAC Memo at 2790, 2806.  The

Second Circuit already has rejected the 1AC's unsupported claim that KBM "played an active role in

directing" Kadi's operation of Muwafaq (1AC ¶ 222) by holding:

> [W]hile plaintiffs ambiguously assert that Khaled Bin Mahfouz "*directly participate[d]* in
> the management, funding and operation of ... [the Muwafaq Foundation]," … the
> weight of the factual allegations suggest that Yassin Abdullah Al Kadi (and not Khaled
> Bin Mahfouz) "ran [Muwafaq] from 1992 through 1997."

*O'Neill*, 714 F.3d at 677-78 (citations omitted); *see also Kadi*, 42 F. Supp.3d at 13 ("Kadi … was the

driving force behind the administration of [Muwafaq]") (quotation omitted).

    Consistent with the fact that the U.S. government never sanctioned Muwafaq (*see* OFAC SDN

List), Plaintiffs have alleged no facts to suggest that NCB's knowledge of Muwafaq before the

September 11 attacks, if any, related to anything other than the "substantial charitable activities" in

which it was it engaged. *See Kadi*. 42 F. Supp. 3d at 17 ("OFAC acknowledged that Kadi had provided

evidence of Muwafaq's involvement 'in substantial charitable activities.'").  As a result, this Court and

the Second Circuit held that plaintiffs' allegations concerning Muwafaq cannot establish personal

jurisdiction over NCB, and that conclusion applies equally here to the recycled allegations of the 1AC.

    Similarly, Plaintiffs' recycled allegations that NCB managers and advisors were, at times,

Muwafaq board members or trustees (1AC ¶¶ 220-222) have no jurisdictional significance as to NCB.

The Second Circuit already has held that such allegations fall short even of providing a basis for

personal jurisdiction against the board members or trustees themselves:

> [W]e find no basis in the record to support our exercise of personal jurisdiction over … Khaled Bin Mahfouz[] or Abdulrahman Bin Mahfouz.  Indeed, the only non-conclusory allegations against these … defendants are that they served in various positions of authority within organizations that are alleged to have supported terrorist organizations. …  Khaled Bin Mahfouz co-founded the Muwafaq Foundation and was an officer of NCB…; and Abdulrahman Bin Mahfouz served as a director of the Muwafaq Foundation and NCB.

*O'Neill*, 714 F.3d at 677.  Necessarily, because these allegations provide no basis for personal

jurisdiction over the third parties themselves, they cannot provide a basis for jurisdiction over NCB,

simply because those third parties were affiliated with NCB.  *See id.* at 676 (affirming dismissal of

NCB).

Moreover, in addition to being jurisdictionally immaterial, Plaintiffs' recycled Kadi and

Muwafaq allegations mischaracterize the documents on which they rely, which are inadmissible

hearsay.  *See supra* at 9.  The Aufhauser letter referenced by Plaintiffs (1AC ¶ 211) does not mention

NCB, and it does not suggest that NCB funded or was involved with Muwafaq.  *See* 11/29/2001 letter

from David D. Aufhauser, MDL Dkt. #2241-7, Exh. 3 at 2-4 (referring to "The pattern of activity

displayed by Mr. Kadi, and his foundation …  Mr. Kadi's actions and those of <u>his Muwafaq

Foundation</u> ..." (emphasis added)).

Further, the quotations in the recycled allegations at 1AC ¶ 230 come from a 2009 U.S. legal

brief in Kadi's challenge to U.S. government sanctions.  *See Yassin Abdullah Kadi v. Timothy Geithner*,

09-cv-0108 (D.D.C. May 22, 2009), Dkt. #12; MDL Dkt. #2241-7, Exh. 11.  That brief does not

mention NCB at all, and anyway focuses solely on alleged actions by Muwafaq relating to "Africa,

Eastern Europe, the Middle East, and Central Asia," and thus not "expressly aimed" at the U.S.  The

alleged CIA report Plaintiffs recycle in 1AC ¶ 231 likewise does not mention NCB, let alone tie NCB

in any way to Muwafaq's activities, which in any event were expressly aimed at Bosnia and Afghanistan,

not at the United States.  *See* MDL Dkt. #2241-7, Exh. 2 ("CIA Report"), at 4, 11.[15]  The same is true

for Plaintiffs' recycled allegations regarding Ayman Awad (1AC ¶ 232), which are not connected to

NCB in any way and, in any event, are related to Bosnia and Herzegovina, rather than the U.S.[16]

In sum, the 1AC's third-party allegations present nothing new, and deal solely with actions of

others that cannot be attributed to NCB.  Again, *stare decisis* compels their rejection as a basis for

personal jurisdiction over NCB, as explained more fully below.

**V.    *STARE DECISIS* REQUIRES DISMISSAL OF PLAINTIFFS' COMPLAINTS.**

Principles of *stare decisis* compel dismissal of the 1AC against NCB on the same grounds that

this Court and the Second Circuit previously dismissed the first-round cases against NCB—lack of

personal jurisdiction.  When, as here, different Plaintiffs advance exactly the same arguments and

averments that were unsuccessful in another case against the same defendant, such claims fail under

*stare decisis*.  *See Karpus v. Hyperion Capital Mgmt.*, 1997 U.S. Dist. LEXIS 4332, at *10-*11 (S.D.N.Y.

Apr. 2, 1997) ("Plaintiff was not a party to the *Olkey* action, and thus is not automatically bound by

that ruling. ...  Yet, given the plaintiff's total failure to allege any facts that might serve to distinguish

this case from *Olkey*, the doctrine of *stare decisis* compels me to follow the determination of this issue

by the Court of Appeals.") (citing *U.S. v. Int'l Bus. Machines Corp.*, 517 U.S. 843, 856 (1996)); *Rains v.

Jil-Mic, Inc.*, 301 F. Supp. 545, 546 (S.D.N.Y. 1969) ("[S]*tare decisis* dictates that this court follow the

decision, based on the same facts, of the [W.D.N.Y.] and affirmed by the Court of Appeals").  The

---

[15] The alleged CIA Report also is unauthenticated, inadmissible hearsay (*see supra* at 9) and lacks a proper foundation and contains no heading, title, or identifying mark or notation that would suggest it was produced by the CIA or any other government agency.  *See* CIA Report.

[16] The only remaining two (2) of the fifty three (53) paragraphs in the 1AC's NCB chapter not addressed by the categories above simply recycle allegations as to the historical establishment, ownership, and governance of NCB.  1AC ¶¶ 193-194; *see also* Exh. 1 at 21-22.  Specific jurisdiction in Antiterrorism Act cases cannot be based on such allegations of "activities that are not proscribed by the ATA and are not connected to the wrongs for which the plaintiffs here seek redress," *Waldman v. PLO*, 835 F.3d at 342, and cannot be based on such allegations that do not involve conduct "expressly aimed" at the U.S.  *O'Neill*, 714 F.3d at 675-76.

doctrine of *stare decisis* is essential to "promote[] the evenhanded, predictable, and consistent development of legal principles, foster[] reliance on judicial decisions, and contribute[] to the actual and perceived integrity of the judicial process." *Payne v. Tennessee*, 501 U.S. 808, 827 (1991).

"It is as clear as clear can be that *the same issue* presented in a *later case* in the *same court* should lead to the *same result*." *FedEx Home Delivery*, 849 F.3d at 1127 (quotations omitted). A court is "required to follow a binding precedent of a superior court" when, as here, it is presented with "a factual and legal background identical" to that on which it ruled in a prior case. *U.S. ex rel. Schnitzler v. Follette*, 406 F.2d 319, 322 (2d Cir. 1969).

The 1AC simply repeats allegations that this Court and the Second Circuit concluded were jurisdictionally deficient as to NCB in the first-round *Federal Insurance* and *Ashton* cases. *See* Exh. 1. Indeed, the *Lloyd's* action, in which the 1AC is filed, was transferred to this Court by the Judicial Panel on Multidistrict Litigation over the Plaintiffs' objections, because the JPML found that "highly similar claims against [NCB] previously have been adjudicated during the course of the MDL proceedings, and the transferee court's rulings dismissing [NCB] were affirmed on appeal." MDL No. 1570 (J.P.M.L. Oct. 3, 2016), Dkt. #77 at 2 (emphasis added).

The JPML was correct that this Court already has held that allegations materially-identical to those recycled in the 1AC "have failed to make the requisite *prima facie* showing that the Court has [specific] jurisdiction" over NCB, and there was no "specific jurisdiction over NCB because the underlying legal theory, upon which plaintiffs seek to premise jurisdiction, is untenable." *Terrorist Attacks IV*, 718 F. Supp. 2d at 487-488. Both the factual predicates and legal theory of the 1AC are entirely the same as those advanced in the dismissed earlier cases, such that this Court is bound to respect its earlier ruling and that of the Second Circuit. Indeed, the controlling law since then has become only less receptive to Plaintiffs' theory of specific jurisdiction (*see supra* at 2-4).

The Supreme Court has emphasized that "[s]*tare decisis* is the preferred course because it

promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process." *Payne*, 501 U.S. at 827; *Welch v. Texas Dep't of Highways and Pub. Transp.*, 483 U.S. 468, 494 (1987) ("[T]he doctrine of *stare decisis* is of fundamental importance to the rule of law."). Even when *stare decisis* is not binding, it is wise judicial policy to adhere to rules announced in earlier cases. *Hubbard v. U.S.*, 514 U.S. 695, 711 (1995) ("The labor of judges would be increased almost to the breaking point if every past decision could be reopened in every case, and one could not lay one's own course of bricks on the secure foundation of the courses laid by others who have gone before him." (citing Benjamin Cardozo, *The Nature of the Judicial Process* 149 (1921))).

*Stare decisis* thus assures consistency in rulings across multiple look-alike cases brought by different plaintiffs, and guards against the waste of judicial resources that should not be consumed in disposing of serial copycat cases. *Patterson v. McLean Credit Union*, 491 U.S. 164, 172 (1989) ("[I]t is indisputable that *stare decisis* is a basic self-governing principle within the Judicial Branch, which is entrusted with the sensitive and difficult task of fashioning and preserving a jurisprudential system that is not based upon 'an arbitrary discretion.'" (citing The Federalist, No. 78, at 490 (Alexander Hamilton) (H. Lodge ed., 1888))). It reflects the central idea that like cases should be treated alike. *Flowers v. U.S.*, 764 F.2d 759, 761 (11th Cir. 1985) ("*Stare decisis* means that like facts will receive like treatment in a court of law.").

The fact that there are different plaintiffs in all of these actions is immaterial to NCB's jurisdictional defenses. The different composition of the Plaintiffs here is irrelevant except as to the nature and amount of the damages sought, and has nothing to do with the Plaintiffs' factual predicates or legal theories of jurisdiction or liability. Indeed, the 1AC does not allege that NCB had any interaction with any of the Plaintiffs or—more importantly—with the U.S. (the forum), ruling out any potential relevance of the identity of Plaintiffs to their theories of personal jurisdiction against NCB.

*See Waldman v. PLO*, 835 F.3d at 335 ("The relationship between the defendant and the forum 'must arise out of contacts that the 'defendant *himself*' creates with the forum.") (quoting *Walden*, 134 S. Ct. at 1122); *7 W. 57th St. Realty Co.*, 2015 U.S. Dist. LEXIS 44031, at *35-*37 ("The Foreign Banks' suit-related conduct must tie them to New York itself, not just to a plaintiff who happens to reside in New York.").

*Stare decisis* thus compels dismissal of the 1AC as against NCB on the same grounds that this Court and the Second Circuit dismissed the first-round cases against NCB.

## VI.   CONGRESS CANNOT LEGISLATE AROUND CONSTITUTIONAL DUE PROCESS REQUIREMENTS.

The *stare decisis* effect of the prior rulings is not diluted by Plaintiffs' claims congressional intent concerning personal jurisdiction in ATA actions, as expressed in legislative findings at prefacing the Justice Against Sponsors of Terrorism Act ("JASTA").  *See* 1AC at ¶¶ 73-82.  Because Congress cannot dispense with constitutional requirements, "federal courts cannot exercise jurisdiction in a civil case beyond the limits prescribed by the due process clause of the Constitution."  *Waldman v. PLO*, 835 F.3d at 344; *see also U.S. v. Windsor*, 133 S. Ct. 2675, 2695 (2013); *Quill Corp. v. North Dakota*, 504 U.S. 298, 305 (1992) (Congress "does not ... have the power to authorize violations of the Due Process Clause"); *see also Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 92 (D.C. Cir. 2002) ("[I]t is well-settled that a statute cannot grant personal jurisdiction where the Constitution forbids it.") (citations omitted); *Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co.*, 284 F.3d 1114, 1121 (9th Cir. 2002) ("It is a bedrock principle of civil procedure and constitutional law that a statute cannot grant personal jurisdiction where the Constitution forbids it." (citations omitted)); *Lopez v. Shopify, Inc.*, 2017 U.S. Dist. LEXIS 77708, at *18-*19 (S.D.N.Y. May 23, 2017) ("[E]ven if a statutory basis for jurisdiction exists, the exercise of jurisdiction would not comport with due process."); *Cohen v. Facebook, Inc.*, 2017 U.S. Dist. LEXIS 76701, at *20 (E.D.N.Y. May 18, 2017) ("Even where statutorily authorized, the exercise of personal jurisdiction must be consistent with constitutional due process

requirements.").

"District courts determine the existence *vel non* of personal jurisdiction not by reference to statutory imprimatur, but by inquiring whether maintenance of a suit against the defendant comports with the constitutional notions of due process as outlined in *International Shoe Co. v. Washington*, 326 U.S. 310 … (1945), and its progeny." *Glencore*, 284 F.3d at 1121. The Second Circuit implemented that principle when it affirmed this Court's dismissal of NCB for lack of personal jurisdiction on due process grounds, applying the Supreme Court's holding in *International Shoe*.[17]

Notably, the legislative history of JASTA evinces that Congress expressly acknowledged that JASTA and its amendments to the ATA are *constrained* by the Constitution. For example, Plaintiffs' selective quotation of the Explanatory Notes to JASTA's Amendment of 18 U.S.C. 2333 (1AC at ¶¶ 79-82) omits Congress's critical commentary that "[t]he purpose of this Act … is to provide civil litigants with the broadest possible basis, <u>consistent with the Constitution of the United States</u>, to seek relief against persons, entities, and foreign countries." 18 U.S.C. § 2333, Explanatory Notes (Sept. 28, 2016) (emphasis added). Congress's statements of intent regarding the application of the ATA (via JASTA) to foreign parties necessarily and expressly are restricted by constitutional due process requirements, which in turn provided the basis for the prior rulings dismissing NCB for lack of personal jurisdiction. *O'Neill*, 714 F.3d at 669, 675-77.

## VII.   **PLAINTIFFS ARE NOT ENTITLED TO JURISDICTIONAL DISCOVERY**.

The JPML transferred the *Lloyd's* action to this Court expressly because:

> Transfer would … facilitate [Plaintiffs'] access to the discovery that already has occurred. Furthermore, given that plaintiffs are represented by the same law firm that serves in a key leadership role in the MDL, the smooth integration of this action into the centralized proceedings is virtually assured.

---

[17] *See O'Neill*, 714 F.3d at 673, 676 ("To establish personal jurisdiction over a defendant, <u>due process requires</u> a plaintiff to allege … that a defendant has 'certain minimum contacts' with the relevant forum …"; "we find the allegations against … NCB itself … are indistinguishable from plaintiffs' allegations in *In re Terrorist Attacks III*, which we held to be insufficient for personal jurisdiction purposes" (emphasis added) (quoting *Int'l Shoe*, 326 U.S. at 316)).

Transfer Order, MDL No. 1570 (J.P.M.L. Oct. 3, 2016), Dkt. #77 at 2.  Indeed, a principal reason for multidistrict consolidated proceedings is "to eliminate duplicative discovery, avoid inconsistent pretrial rulings, and conserve the resources of the parties, their counsel and the judiciary."  *In re Vioxx Prods. Liab. Litig.*, 360 F. Supp. 2d 1352, 1354 (J.P.M.L. 2005).

In accord with those goals, and after permitting extensive jurisdictional discovery as to NCB, this Court "carefully and thoroughly reviewed the voluminous and extensive submissions of the respective parties applicable to each defendant's individual motion" and found "that plaintiffs have not even made an arguable showing of jurisdiction [over NCB and certain other defendants] or identified a genuine issue of jurisdictional fact, so as to warrant the granting of additional jurisdictional discovery as to any of these defendants."  *Terrorist Attacks IV*, 718 F. Supp. 2d at 488.  More than five years had been consumed by the "purportedly 'limited' jurisdictional discovery" authorized as to NCB. *Id.*; *see supra* at 6-8 (describing the same).  In dismissing NCB and rejecting the plaintiffs' requests for additional discovery, this Court emphasized that additional discovery "would not be of any evidentiary value in establishing specific jurisdiction over NCB because the underlying legal theory, upon which the plaintiffs seek to premise jurisdiction, is untenable."  *Id.* at 487; *Discovery Order II*, 689 F. Supp. 2d at 568 n.9 (denying "discovery on the basis of 'conspiracy' jurisdiction" because "Plaintiffs have not made a prima facie showing of jurisdiction under this theory").

All of that applies equally to the 1AC.  The Second Circuit affirmed the dismissal of materially-identical claims against NCB without additional jurisdictional discovery (unlike rulings as to other defendants) because "[t]he central allegations against ... NCB ... are not enough for personal jurisdiction purposes."  *O'Neill*, 714 F.3d at 676; *cf. id.* at 677.

This Court accordingly should decline to afford jurisdictional discovery because it would be futile.  *See In re Platinum & Palladium Antitrust Litig.*, 2017 U.S. Dist. LEXIS 46624, at *152 (S.D.N.Y. Mar. 28, 2017); *Sullivan v. Barclays PLC*, 2017 U.S. Dist. LEXIS 25756, at *150 (S.D.N.Y. Feb. 21,

2017); *Vista Food Exch., Inc. v. Champion Foodservice, LLC*, 124 F. Supp. 3d 301, 314-15 (S.D.N.Y. 2015) (finding "jurisdictional discovery to be improper, as additional discovery would not uncover unknown facts or cure the deficiencies in the Plaintiff's pleading" and holding that "[d]iscovery need not be granted to allow a plaintiff to engage in an unfounded fishing expedition for jurisdictional facts") (quotations omitted); *Catlin Ins. Co. (UK) Ltd. v. Bernuth Lines Ltd.*, 2012 U.S. Dist. LEXIS 46186, at *24 (S.D.N.Y. Mar. 28, 2012) (Daniels, J.) ("[W]hile discovery may uncover additional contacts, there is no reason to conclude that the nature and extent of additional contacts would be any more jurisdictionally significant than those which have already been analyzed.").

This Court's holding in the first-round cases that "plaintiffs have not even made an arguable showing of jurisdiction [over NCB] or identified a genuine issue of jurisdictional fact, so as to warrant the granting of additional jurisdictional discovery as to" NCB (*Terrorist Attacks IV*, 718 F. Supp. 2d at 488) makes futile jurisdictional discovery as to the 1AC's look-alike allegations against NCB.  *See also Tymoshenko v. Firtash*, 2013 U.S. Dist. LEXIS 42754, at *41 n.7 (S.D.N.Y. Mar. 26, 2013) (denying "jurisdictional discovery [that] would be futile"); *Hunter v. Deutsche Lufthansa AG*, 863 F. Supp. 2d 190, 202 (E.D.N.Y. 2012).  Plaintiffs' request for additional jurisdictional discovery should be denied.

## **CONCLUSION**

For the foregoing reasons, NCB's Motion to Dismiss for Lack of Personal Jurisdiction should

be granted.


Dated:  August 21, 2017                         Respectfully submitted,
Washington, D.C.

                                                /s/ Mitchell R. Berger
                                                Mitchell R. Berger (MB-4112)
                                                Alan T. Dickey (*pro hac vice* admission pending)
                                                Alexandra E. Chopin (AC-2008)
                                                SQUIRE PATTON BOGGS (US) LLP
                                                2550 M Street, N.W.
                                                Washington, D.C. 20037
                                                Phone: 202-457-6000
                                                Fax:     202-457-6315
                                                *Attorneys for Defendant*
                                                *The National Commercial Bank*

35

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on this 21ˢᵗ day of August 2017, I caused a true and correct copy of the Defendant's Memorandum of Law in Support of Its Motion to Dismiss for Lack of Personal Jurisdiction to be served through the Court's CM/ECF System on the consolidated MDL docket to all counsel for the parties to the cases consolidated in this MDL, including counsel for all of the parties to the following cases in which The National Commercial Bank is named as a Defendant:

*Underwriting Members of Lloyd's Syndicate 2, et al. v. Al Rajhi Bank, et al.*, Civil Action No. 1:16-cv-07853 (S.D.N.Y.);

*Aguilar et al. v. Kingdom of Saudi Arabia et al.*, Civil Action No. 1:16-cv-09663 (S.D.N.Y.);

*Addesso et al. v. Kingdom of Saudi Arabia et al.*, Civil Action No. 1:16-cv-09937 (S.D.N.Y.);

*Aiken et al. v. Kingdom of Saudi Arabia et al.*, Civil Action No. 1:17-cv-00450 (S.D.N.Y.);

*Hodges et al. v. Kingdom of Saudi Arabia et al.*, Civil Action No. 1:17-cv-00117 (S.D.N.Y.);

*The Charter Oak Fire Insurance Co., et al. v. Al Rajhi Bank, et al.*, Civil Action No. 1:17-cv-02651 (S.D.N.Y.);

*Arrowood Indemnity Co., et al. v. Kingdom of Saudi Arabia, et al.*, Civil Action No. 17-cv-03908 (S.D.N.Y.);

*Abarca, et al. v. Kingdom of Saudi Arabia, et al.*, Civil Action No. 17-cv-03887 (S.D.N.Y.);

*Abedhajajreh, et al. v. Kingdom of Saudi Arabia, et al.*, Civil Action 17-cv-06123 (S.D.N.Y.).

/s/ Mitchell R. Berger
Mitchell R. Berger