# EXHIBIT 1

**COMPARISON OF THE *LLOYD'S* AMENDED COMPLAINT ALLEGATIONS AGAINST NCB WITH THOSE DISMISSED IN THE 9/11 LITIGATION**

**TABLE OF CONTENTS**

| ***LLOYD'S* AMENDED COMPLAINT ALLEGATIONS** | **CORRESPONDING PREVIOUSLY-DISMISSED ALLEGATIONS** |
|---|---|
| **I. ALLEGATIONS CONCERNING FINANCIAL SERVICES, DONATIONS, OR SUPPORT TO FOREIGN CHARITIES (17 total; pp. 1-6).** | |
| **A. ALLEGATIONS CONCERNING FINANCIAL SERVICES TO FOREIGN CHARITIES (9 total; pp. 1-4).** | |
| *Lloyd's* First Amended Compl. ("1AC") ¶ 204. | *Federal Insurance* plaintiffs' First Amended Complaint, MDL Dkt. #111 ("*Fed. Ins.* Compl.") ¶ 290. |
| 1AC ¶ 214. | Plaintiffs' Summary of Allegations and Evidence in support of their Theories of Specific Jurisdiction as to National Commercial Bank, Dkt. #2241-7 ("Pls' SJ Summary") ¶ 61. |
| 1AC ¶ 215. | Pls' SJ Summary ¶ 20; *Ashton* plaintiffs' Sixth Amended Complaint, MDL Dkt. #1463 ("*Ashton* Compl.") ¶ 342. |
| 1AC ¶ 201. | Pls' SJ Summary ¶ 81. |
| 1AC ¶ 202. | Pls' SJ Summary ¶ 57. |
| 1AC ¶ 237. | *Fed. Ins.* Compl. ¶ 292. |
| 1AC ¶ 234. | Conclusory summary of preceding allegations. |
| 1AC ¶ 240. | Pls' SJ Summary ¶ 64. |
| 1AC ¶ 241. | Pls' SJ Summary ¶ 65. |
| **B. ALLEGATIONS CONCERNING DONATIONS OR SUPPORT TO FOREIGN CHARITIES (INCLUDING SOME ADDITIONAL FINANCIAL SERVICES ALLEGATIONS) (8 total; pp. 4-6).** | |
| 1AC ¶ 212. | Pls' SJ Summary ¶ 57. |
| 1AC ¶ 235. | Pls' SJ Summary ¶ 62. |
| 1AC ¶ 236. | Pls' SJ Summary ¶ 63. |
| 1AC ¶ 238. | *Fed. Ins.* Compl. ¶ 290. |
| 1AC ¶ 239. | *Fed. Ins.* Compl. ¶ 290. |
| 1AC ¶ 213. | Pls' SJ Summary ¶ 58. |
| 1AC ¶ 243. | Pls' SJ Summary ¶ 92 |
| 1AC ¶ 216. | Conclusory summary of preceding allegations. |

| **II. <u>ALLEGATIONS AGAINST THIRD PARTIES (34 total; pp. 6-21)</u>.** | |
|---|---|
| **A. GENERAL ALLEGATIONS CONCERNING KHALED BIN MAHFOUZ (3 total; p. 6).** | |
| 1AC ¶ 195.[1] | Conclusory summary of subsequent allegations. |
| 1AC ¶ 200. | Conclusory summary of subsequent allegations. |
| 1AC ¶ 207. | Pls' SJ Summary ¶ 60. |
| **B. ALLEGATIONS AGAINST KHALED BIN MAHFOUZ AND BANK OF CREDIT AND COMMERCE INTERNATIONAL (5 total; pp. 7-9).** | |
| 1AC ¶ 196. | *Fed. Ins.* Compl. ¶ 288. |
| 1AC ¶ 197. | *Fed. Ins.* Compl. ¶¶ 288-289. |
| 1AC ¶ 198. | MDL Dkt #953, Pls' RICO Stmt. as to KBM at 7-8; *Fed. Ins.* Compl. ¶ 288. |
| 1AC ¶ 199. | Pls' RICO Stmt. as to KBM at 8. |
| 1AC ¶ 203. | Pls' SJ Summary ¶ 81. |
| **C. ALLEGATIONS AGAINST BIN MAHFOUZ, YASSIN AL KADI, AND MUWAFAQ (12 total; pp. 9-12).** | |
| 1AC ¶ 205. | Conclusory summary of subsequent allegations. |
| 1AC ¶ 206. | Pls' SJ Summary ¶¶ 68, 90. |
| 1AC ¶ 218. | Pls' SJ Summary ¶ 69. |
| 1AC ¶ 219. | Pls' SJ Summary ¶ 70. |
| 1AC ¶ 222. | Pls' SJ Summary ¶ 73. |
| 1AC ¶ 208. | Pls' SJ Summary ¶ 16. |
| 1AC ¶ 209. | Pls' SJ Summary ¶ 70. |
| 1AC ¶ 217. | Conclusory summary of preceding allegations. |
| 1AC ¶ 245. | Conclusory summary of preceding allegations. |
| 1AC ¶ 242. | Pls' SJ Summary ¶ 91. |
| 1AC ¶ 220. | Pls' SJ Summary ¶ 71. |
| 1AC ¶ 221. | Pls' SJ Summary ¶ 72. |

[1] The 22 paragraphs that do not even mention NCB are shaded in orange.

| **D. ALLEGATIONS AGAINST MUWAFAQ AND KADI (14 total; pp. 12-21).** | |
|---|---|
| *Lloyd's* Compl. ¶ 210. | Pls' SJ Summary ¶ 18. |
| *Lloyd's* Compl. ¶ 223. | Pls' SJ Summary ¶ 74. |
| *Lloyd's* Compl. ¶ 224. | Pls' SJ Summary ¶ 75. |
| *Lloyd's* Compl. ¶ 225. | Pls' SJ Summary ¶ 76. |
| *Lloyd's* Compl. ¶ 226. | Pls' SJ Summary ¶ 77. |
| *Lloyd's* Compl. ¶ 227. | Pls' SJ Summary ¶ 78. |
| *Lloyd's* Compl. ¶ 228. | Pls' SJ Summary ¶ 20. |
| *Lloyd's* Compl. ¶ 229. | Pls' SJ Summary ¶ 79. |
| *Lloyd's* Compl. ¶ 211. | Pls' SJ Summary ¶ 21. |
| *Lloyd's* Compl. ¶ 230. | Pls' SJ Summary ¶ 19. |
| *Lloyd's* Compl. ¶ 231. | Pls' SJ Summary ¶ 22. |
| *Lloyd's* Compl. ¶ 232. | Pls' SJ Summary ¶ 23. |
| *Lloyd's* Compl. ¶ 233. | Pls' SJ Summary ¶ 16. |
| *Lloyd's* Compl. ¶ 244. | Pls' SJ Summary ¶¶ 93-99. |

| **III. BACKGROUND ALLEGATIONS (2 total; pp. 21-22).** | |
|---|---|
| *Lloyd's* Compl. ¶ 193. | *Fed. Ins.* Compl. ¶ 285. |
| *Lloyd's* Compl. ¶ 194. | *Fed. Ins.* Compl. ¶ 286. |

| *LLOYD'S* AMENDED COMPLAINT ALLEGATIONS | CORRESPONDING PREVIOUSLY-DISMISSED ALLEGATIONS | LEGAL AND FACTUAL DEFICIENCIES |
|---|---|---|
| **I. ALLEGATIONS CONCERNING FINANCIAL SERVICES, DONATIONS, OR SUPPORT TO FOREIGN CHARITIES.** | | |
| **A. ALLEGATIONS CONCERNING FINANCIAL SERVICES TO FOREIGN CHARITIES.** | | |
| "In the years that followed, NCB's support for al Qaeda under Khalid bin Mahfouz would mirror that of Al Rajhi Bank. Like Al Rajhi Bank, NCB served as one of al Qaeda's preferred banks for many years, providing financial services for many of al Qaeda's 'charity' fronts, including the Muslim World League ('MWL'), International Islamic Relief Organization ('IIRO'), World Assembly of Muslim Youth ('WAMY'), Muwafaq Foundation (a/k/a Blessed Relief Foundation), Saudi Joint Relief Committee for Kosovo and Chechnya ('SJRC'), and Al Haramain Islamic Foundation, among others." (*Lloyd's* First Amended Complaint ("1AC") ¶ 204). | "National Commercial Bank has served as one of al Qaida's preferred banks for many years, maintaining accounts for many of the charity defendants that operate within al Qaida's infrastructure, including the IIRO, MWL, WAMY, BIF, Blessed Relief (Muwafaq) Foundation and al Haramain, among others." (*Federal Insurance* plaintiffs' First Amended Complaint, MDL Dkt. #111 ("*Fed. Ins.* Compl.") ¶ 290). | These allegations are nothing more than identical or materially-identical variants of plaintiffs' legally-deficient allegations that "NCB ... knowingly maintained bank accounts for individuals associated with al Qaeda as well as for purported front charities that aided al Qaeda, and ... that those accounts were used for al Qaeda operations," which are "not enough for personal jurisdiction purposes." *O'Neill v. Asat Trust Reg.*, 714 F.3d 659, 676 (2d Cir. 2013); *see* Memorandum of Law of The National Commercial Bank in Support if Its Motion to Dismiss for Lack Of Personal Jurisdiction ("MTD Memo") at 12-15. |
| "INTERPOL intelligence reports filed of record by the U.S. government in legal proceedings in the United States District Court for the District of Columbia, in support of Kadi's continued designation pursuant to Executive Order 13224, include details of a single transaction in which NCB transferred $2 million to Dr. Salim Bin Mahfouz, an official of Muwafaq in Europe. Dr. bin Mahfouz then transferred $500,000 to Chafiq Ayadi, the Specially Designated Global Terrorist Kadi appointed to head Muwafaq's European Operations at the suggestion of Wa'el Jelaidan, a founding member of al Qaeda. Dr. bin Mahfouz transferred an additional $1.4 million to an apparent shell company in Florida, which he had formed with a senior official of Taibah International, another designated al Qaeda front." (1AC ¶ 214). | "INTERPOL intelligence reports filed of record by the U.S. government in legal proceedings pending in the United States District Court for the District of Columbia, in support of al Kadi's continued designation, include details of a single transaction in which NCB transferred $2 million to Dr. Salim Bin Mahfouz, an official of Muwafaq in Europe. Dr. bin Mahfouz then transferred $500,000 to Chafiq Ayadi, the Specially Designated Global Terrorist al Kadi appointed to head Muwafaq's European Operations at the suggestion of Wa'el Jelaidan. Dr. bin Mahfouz transferred an additional $1.4 million to an apparent shell company in Florida, which he had formed with a senior official of Taibah International, another designated al Qaeda front." (Plaintiffs' Summary of Allegations and Evidence in support of their Theories | These previously-rejected allegations that NCB provided financial services to foreign charities cannot support personal jurisdiction over NCB as a matter of law. *See* MTD Memo at 12-15. Moreover, these allegations rely on unauthenticated purported INTERPOL intelligence reports that: expressly state that they are "not meant to be used as evidence"; state that the alleged transfer involving NCB was made by a person who received a check drawn on an NCB account in 1995 and thereafter <u>sought to avoid sending</u>, but was <u>ordered by a court to send</u>, money to the IIRO; and do not state or imply that NCB was a knowing participant in its customers' transfer of funds. *See* MTD Memo at 16-17. |

| | | |
|---|---|---|
| | of Specific Jurisdiction as to National Commercial Bank, Dkt. #2241-7 ("Pls' SJ Summary") ¶ 61). | |
| "In media reports published by Reuters and USA Today in 1999, U.S. intelligence sources stated that an investigation of NCB conducted by Saudi government officials had uncovered that $3 million from five of Saudi Arabia's prominent business leaders' accounts was transferred to Muwafaq." (1AC ¶ 215). | "According to press accounts, in 1998, the Saudi government audited the Jeddah-based National Commercial Bank and found that $3 million in bank funds was funneled improperly to Muwafaq (a.k.a. Blessed Relief), which allegedly transferred the money to bin Laden." (Pls' SJ Summary ¶ 20). "During the 1990s an audit of the Defendant National Commercial Bank of Saudi Arabia which was then run by Khalid Bin Salim Bin Mahfouz and his son Abdurahman Bin Mahfouz, revealed the transfer of $3 million for Osama Bin Laden that was moved from the accounts of wealthy Saudi businessmen to Blessed Relief." (*Ashton* plaintiffs' Sixth Amended Complaint, MDL Dkt. #1463 ("*Ashton* Compl.") ¶ 342) (all-capital party-name formatting omitted from all *Ashton* Compl. references herein). | These previously-rejected allegations that NCB provided financial services to foreign charities cannot support personal jurisdiction over NCB as a matter of law. *See* MTD Memo at 12-15. In addition to being jurisdictionally deficient, plaintiffs' allegations that, according to "media reports," a 1998 audit found that "five of Saudi Arabia's prominent business leaders" used their NCB accounts to transfer funds to Muwafaq have been thoroughly refuted and are factually unsupportable. *See* MTD Memo at 7-8, 15-16. |
| "Testifying before Congress just weeks after the September 11th Attacks, Vincent Cannistraro, the former Central Intelligence Agency Chief of Counterterrorism Operations, described NCB's relationship with Osama bin Laden as follows:<br><br>How does the al-Qaeda organization fund its worldwide network of cells and affiliated groups? Several businessmen in Saudi Arabia and in the Gulf contribute monies. Many of these contributions are given out of a sense of Islamic solidarity. But much of the money is paid as "protection" to avoid having the enterprises run by these men attacked. There is little doubt that a financial conduit to bin Laden was handled through the National Commercial Bank, until the Saudi government finally arrested a number of persons and closed down the channel. It was evident that several wealthy Saudis were funneling | "Vincent Cannistraro, the former CIA counter-terrorism Chief, echoed the findings of the German Intelligence investigations in testimony before Congress in the wake of the September 11th Attacks, testifying as follows:<br><br>There is little doubt that a financial conduit to bin Laden was handled through the National Commercial Bank, until the Saudi government finally arrested a number of persons and closed down the channel. It was evident that several wealthy Saudis were funneling contributions to bin Laden through this mechanism."<br><br>Pls' SJ Summary ¶ 59. | These previously-rejected allegations that NCB provided financial services to foreign charities cannot support personal jurisdiction over NCB as a matter of law. *See* MTD Memo at 12-15. Moreover, the cited congressional testimony of the former CIA official (Vincent Cannistraro) specified that he did not speak for the U.S. government, was not relying on government information, and did not portray NCB as anything more than a passive "conduit" used by its customers to make financial transfers through routine banking channels without any knowledge or intent by NCB. *See* MTD Memo at 17. |

| | | |
|---|---|---|
| contributions to bin Laden through this mechanism."<br><br>(1AC ¶ 201). | | |
| "The use of NCB by wealthy Saudi businessmen to transfer large sums of money to al Qaeda was confirmed by Zacarias Moussaoui, a key member of the terror organization. Moussaoui, personally handpicked by Osama bin Laden to build an electronic database to record the identities of al Qaeda's financial donors, their contributions and the sources of those monies, provided sworn testimony that he personally reviewed and documented financial transactions benefiting al Qaeda involving NCB." (1AC ¶ 202). | "National Commercial Bank has served as one of al Qaida's preferred banks for many years, maintaining accounts for many of the charity defendants that operate within al Qaida's infrastructure, including the IIRO, MWL, WAMY, BIF, Blessed Relief (Muwafaq) Foundation and al Haramain, among others." (*Fed. Ins.* Compl. ¶ 290). "From the date of Muwafaq's creation, NCB provided financial services and other support to facilitate Muwafaq's direct participation in al Qaeda's jihad against the United States, serving as an efficient conduit for wealthy Saudi businessmen to transfer funds to al Qaeda, via Muwafaq." (Pls' SJ Summary ¶ 57). | These allegations mirror the previously-dismissed allegations that NCB provided financial services to foreign charities and, thus, cannot support personal jurisdiction over NCB as a matter of law. *See* MTD Memo at 12-15. Moreover, plaintiffs' allegation that Zacarias Moussaoui testified about "financial transactions benefiting al Qaeda involving NCB" mischaracterizes the testimony, which, instead, stated only that some company, the identity of which Moussaoui could not recall, used its bank account at NCB to send money to Pakistan (without mentioning any knowledge by NCB). *See* MTD Memo at 14-15. |
| "The investigation of NCB conducted in or around 1998 revealed that over a 10 year period, $74 million was funneled by NCB's Zakat Committee to the IIRO." (1AC ¶ 237). | "During the 1990s, National Commercial Bank channeled in excess of $74 million to al Qaida through IIRO …" (*Fed. Ins.* Compl. ¶ 292). | These previously-rejected allegations that NCB provided financial services to foreign charities cannot support personal jurisdiction over NCB as a matter of law. *See* MTD Memo at 12-15. Moreover, these allegations that there was an "investigation of NCB conducted in or around 1998" have been thoroughly discredited and expressly rejected by this Court. *See* MTD Memo at 7-8, 15-16. |
| "As these facts demonstrate, Khalid bin Mahfouz and Yassin al Kadi established Muwafaq Foundation to serve as an extensive platform for supporting al Qaeda's efforts to attack the United States on a range of fronts, and operated the purported charity as an arm of al Qaeda itself. And, they used NCB to deliver critical funding to Muwafaq Foundation for those purposes, until international terrorist investgations [*sic*] led the alleged charity to simply merge into al Qaeda itself." (1AC ¶ 234). | Conclusory summary of preceding allegations. | These conclusory allegations mirror the previously-rejected allegations that NCB provided financial services to foreign charities and, thus, cannot support personal jurisdiction over NCB as a matter of law. *See* MTD Memo at 12-15. Moreover, plaintiffs' previously-dismissed allegations that Khalid Bin Mahfouz ("KBM") and Yassin Kadi were involved with the establishment and/or operation of Muwafaq involve mischaracterizations of evidence and are not imputable to NCB. *See* MTD Memo at 22-28. |

| | | |
|---|---|---|
| "In addition to maintaining the SJRC's bank accounts, NCB actively promoted those accounts on behalf of the organization. Advertisements running in multiple issues of the Muslim World League Journal in 2000 and 2001 openly solicited funds and directed donors to SJRC accounts managed by NCB and Al Rajhi Bank." (1AC ¶ 240). | "In addition to maintaining the SJRC's bank accounts, NCB actively promoted those accounts on behalf of the organization. Advertisements running in multiple issues of the MWL Journal in 2000 and 2001 openly solicited funds and directed donors to SJRC accounts managed by the National Commercial Bank and Al Rajhi Banking & Investment Corporation." (Pls' SJ Summary ¶ 64). | These previously-rejected allegations that NCB provided financial services to foreign charities cannot support personal jurisdiction over NCB as a matter of law. *See* MTD Memo at 12-15, 20-21. Moreover, the advertisements on which plaintiffs rely simply suggest that SJRC, on its own, advertised that it had accounts at NCB to which persons could transmit charitable donations. NCB had no control over, or knowledge of, the decision by SJRC to solicit donations to any accounts it had at NCB. The allegation involves the conduct of third parties not imputable to NCB. *See* MTD Memo at 17-18. |
| "NCB opened two 'shared accounts' with Al Rajhi Bank (Special Joint account #22 and #33) for the IIRO as a member of the SJRC, thereby allowing the SJRC to serve as a conduit for funneling donations to al Qaeda fighters in Kosovo and Chechnya." (1AC ¶ 241). | "NCB opened two 'shared accounts' with Al Rajhi Banking & Investment Corporation (Special Joint account #22 and #33) for IIRO as a member of the SJRC, thereby allowing the SJRC to serve as a conduit for funneling donations to al Qaeda fighters in Kosovo and Chechnya." (Pls' SJ Summary ¶ 65). | These previously-rejected allegations that NCB provided financial services to foreign charities cannot support personal jurisdiction over NCB as a matter of law. *See* MTD Memo at 12-15. Moreover, these allegations regarding NCB opening accounts "allowing the SJRC to serve as a conduit for funneling donations to al Qaeda fighters in Kosovo and Chechnya" affirmatively alleges conduct that was not "expressly aimed" at the U.S. *See* *O'Neill*, 714 F.3d at 674; MTD Memo at 17-18. |
| **B. ALLEGATIONS CONCERNING DONATIONS OR SUPPORT TO FOREIGN CHARITIES (INCLUDING SOME ADDITIONAL FINANCIAL SERVICES ALLEGATIONS).** | | |
| "From the date of the Muwafaq Foundation's creation, NCB provided financial services and other support to facilitate Muwafaq's central role in advancing al Qaeda's jihad against the United States, serving as an efficient conduit for wealthy Saudi businessmen to transfer funds to al Qaeda." (1AC ¶ 212). | "From the date of Muwafaq's creation, NCB provided financial services and other support to facilitate Muwafaq's direct participation in al Qaeda's jihad against the United States, serving as an efficient conduit for wealthy Saudi businessmen to transfer funds to al Qaeda, via Muwafaq." (Pls' SJ Summary ¶ 57). | To the extent that these previously-rejected allegations concern purported donations or other support to foreign charities, the Court is bound by the Second Circuit's rejection of plaintiffs' "concerted action theory of liability," which claimed that defendants, like NCB, are subject to personal jurisdiction based on allegations that they "supported Muslim charities knowing that their money would be diverted to al Qaeda, which then used the money to finance the September 11 attacks." *In re Terrorist Attacks on Sept. 11, 2001,* 538 F.3d 71, 94 (2d Cir. 2008) ("*Terrorist Attacks III*"). The Second Circuit conclusively determined that plaintiffs' allegations that "NCB … helped fund the IIRO and the SJRC" are among the allegations that "are indistinguishable from plaintiffs' |
| "NCB similarly provided material support and resources to al Qaeda via the IIRO and SJRC. … For instance, NCB provided funds and financial support to IIRO over a period of many years, including maintaining and servicing numerous accounts for | "NCB similarly provided funds and financial support to IIRO over a period of many years. NCB maintained numerous accounts for IIRO, and also donated its own funds to the organization. ... SJRC also received valuable financial services from NCB which allowed | |

| | | |
|---|---|---|
| IIRO. NCB also donated its own funds to the organization." (1AC ¶¶ 235-236). | the organization to provide direct financial and logistical support to al Qaeda ..." (Pls' SJ Summary ¶¶ 62-63). | allegations in *In re Terrorist Attacks III*, which we held to be insufficient for personal jurisdiction purposes." *O'Neill*, 714 F.3d at 669, 676 ("[Plaintiffs'] 'burden is not satisfied by the allegation that the [defendants] intended to fund al Qaeda through their donations to Muslim charities.'") (quoting *Terrorist Attacks III*, 538 F.3d at 95). *See* MTD Memo at 18-21. To the extent these previously- rejected allegations claim that NCB provided financial services to foreign charities, they also cannot support personal jurisdiction over NCB as a matter of law. *See* MTD Memo at 12-15.<br><br>Plaintiffs' previously-rejected allegation that, "[u]nder the supervision of Suleiman Abdul Aziz al Rajhi, NCB also managed the budget of the SJRC" (whatever that means) does not support personal jurisdiction over NCB given that the Second Circuit rejected jurisdiction based on another defendant's alleged supervision or management of, and donations to, the SJRC. *See* MTD Memo at 20. |
| "The NCB investigation stated that direct donations were 'received through those [NCB] facilities to the Red Crescent Saudi Committee, International Islamic Relief Organization and Muwafaq Foundation.' ... The SJRC also received valuable financial services from NCB which allowed the organization to provide direct financial and logistical support to al Qaeda for several years leading up to the 9/11 attack. Under the supervision of Suleiman Abdul Aziz al Rajhi, NCB also managed the budget of the SJRC." (1AC ¶¶ 238-239). | "National Commercial Bank has served as one of al Qaida's preferred banks for many years, maintaining accounts for many of the charity defendants that operate within al Qaida's infrastructure, including the IIRO, MWL, WAMY, BIF, Blessed Relief (Muwafaq) Foundation and al Haramain, among others. Under the supervision of Suleiman Abdul Aziz al-Rajhi, National Commercial Bank also managed the budget of SJRC." (*Fed. Ins.* Compl. ¶ 290). | |
| "NCB's role in this process was confirmed by a German Internal Intelligence Service investigation of Muwafaq, which found that 'one route [for the sponsorship of al Qaeda] was the transfer of large sums from the National Commercial Bank to Islamic (charities). These included Muwafaq el Kheiriya and Islamic Relief [IIRO]. There are institutional links between Muwafaq and Usama bin Laden's network.'" (1AC ¶ 213). | "NCB's role in this process was confirmed by a German Internal Intelligence Service investigation of Yassin al Kadi and Muwafaq, which found that 'one route [for the sponsorship of al Qaeda] was the transfer of large sums from the National Commercial Bank to Islamic (charities). These included Muwafaq el Kheiriya and Islamic Relief [IIRO]. There are institutional links between Muwafaq and Usama bin Laden's network.'" (Pls' SJ Summary ¶ 58). | These previously-rejected allegations that NCB provided financial services, donations, or other support to foreign charities cannot support personal jurisdiction over NCB as a matter of law. *See* MTD Memo at 12-15, 18-21. Moreover, plaintiffs' recycled allegations concerning an unauthenticated purported German intelligence report alters the text of it to shape its meaning by adding a new lawyer-created phrase; the purported intelligence report bears the legend "DATE UNKNOWN/ENGLISH TRANSLATION"; does not identify the author or translator; lacks evidentiary foundation, and contains multi-layer hearsay; and merely summarized a supposed investigation by "Saudi Arabian authorities" without suggesting that NCB knew, or intended to support, whatever purpose NCB customers may have had in using NCB accounts to effect their banking transactions. *See* MTD Memo at 19-20. |

| | | |
|---|---|---|
| "NCB was also placed on notice of the terrorist activities of the Muwafaq Foundation, IIRO and SJRC through media reports and widely publicized governmental investigations." (1AC ¶ 243). | "NCB was also placed on notice of the terrorist activities of Muwafaq, IIRO and SJRC through media reports and widely publicized governmental investigations." (Pls' SJ Summary ¶ 92). | These previously-rejected allegations that NCB provided financial services, donations, or other support to foreign charities, and that NCB could have foreseen the actions of third parties, cannot support personal jurisdiction over NCB as a matter of law. *See* MTD Memo at 12-15, 18-21. |
| "From the date of the Muwafaq Foundation's establishment until its merger into al Qaeda, NCB maintained close and intimate organizational connections with Muwafaq." (1AC ¶ 216). | Conclusory summary of preceding allegations. | |
| **II. <u>ALLEGATIONS AGAINST THIRD PARTIES</u>.** | | |
| **A. GENERAL ALLEGATIONS CONCERNING KHALED BIN MAHFOUZ.** | | |
| "Khalid bin Mahfouz's support of terrorism through financial institutions under his control began years before al Qaeda's formation, and continued through the September 11th Attacks." (1AC ¶ 195). | Conclusory summary of subsequent allegations. | These previously-dismissed allegations concern activities of KBM and other third parties that are not connected with, or imputable to, NCB as a matter of law. *See* MTD Memo at 21-24.<br>• KBM never has been designated by the U.S. government, or any other government or organization, as a terrorist supporter. *Id.* at 23.<br>• The Second Circuit already has rejected plaintiffs' concerted action theory of liability. *Id.* at 19, 20-21 & n.14.<br>• The Second Circuit specifically already has held that such allegations concerning KBM do not even establish personal jurisdiction over KBM himself. Necessarily, because plaintiffs' allegations that KBM indirectly supported al Qaeda cannot support personal jurisdiction over KBM, those allegations, let alone those concerning the conduct of others who never were paid or employed by NCB, certainly cannot sustain personal jurisdiction over NCB. *Id.* at 22-23. |
| "Nonetheless, Khalid bin Mahfouz continued to support terrorist causes, including al Qaeda in particular, through NCB and other entities under his control in the ensuing years." (1AC ¶ 200). | Conclusory summary of subsequent allegations. | |
| "Abdulrahman bin Mahfouz, Khalid bin Mahfouz's son, has publicly stated that Khalid bin Mahfouz provided up to $30 million for Muwafaq's operations. Kadi also made significant contributions to Muwafaq, from his personal fortune." (1AC ¶ 207). | "Abdulrahmann Khalid bin Mahfouz, Khalid bin Mahfouz's son, has publicly stated that Khalid bin Mahfouz provided up to $30 million for Muwafaq's operations. Al Kadi also made significant contributions to Muwafaq, from his personal fortune." (Pls' SJ Summary ¶ 60). | |

| **B. ALLEGATIONS CONCERNING KHALED BIN MAHFOUZ AND BANK OF CREDIT AND COMMERCE INTERNATIONAL.** | | |
|---|---|---|
| "Throughout the 1980s and early 1990s, NCB was closely related to, and often worked in collaboration with, the Bank of Credit and Commerce International ('BCCI'), a banking institution in which Khalid bin Mahfouz held a substantial equitable interest and served as the CEO." (1AC ¶ 196). | "Throughout the 1980s and early 1990s, the National Commercial Bank was closely related to, and often worked in collaboration with, the Bank of Credit and Commerce International (BCCI), a banking institution in which Khalid bin Mahfouz held a substantial equitable interest and served as the CEO." (*Fed. Ins.* Compl. ¶ 288). | These previously-rejected allegations largely do not mention NCB, do so only in a conclusory manner, and concern activities of KBM and other third parties that are not connected with, or imputable to, NCB. *See* MTD Memo at 21-24. Moreover, plaintiffs' previously-rejected allegations concerning a 1992 report about conduct relating to BCCI that occurred in the 1980s and concerning an alleged contribution by KBM to Osama bin Laden in 1988 cannot suggest that KBM (let alone NCB) expressly aimed intentionally tortious acts at U.S. residents, as *Terrorist Attacks III* requires. Instead, these allegations, at most, merely allege that KBM funded the anti-Soviet operations of the *mujahadeen* at the encouragement of the U.S. government in 1988—13 years before the September 11, 2001 attacks. *See* MTD Memo at 23-24. |
| "Under Khalid bin Mahfouz, BCCI was directly implicated in supporting terrorism. Specifically, in the course of targeting BCCI for laundering drug money, the CIA discovered BCCI's extensive involvement in manipulating certain financial markets, arms trafficking, and supporting international terrorism. A federal investigation into BCCI's operations further revealed extensive involvement in corrupt practices, including money laundering, hiding assets, and the obstruction of a U.S. Senate investigation." (1AC ¶ 197). | "A 1992 U.S. Senate Investigative Report regarding BCCI's fraudulent activities directly implicated National Commercial Bank in BCCI's corrupt practices, including the manipulation of financial markets, arms trafficking and sponsorship of international terrorism ..." (*Fed. Ins.* Compl. ¶ 289). "A federal investigation into BCCI's operations revealed extensive involvement in corrupt practices, including money laundering, hiding assets, the obstruction of a Senate investigation and the sponsorship of international terrorism." (*Fed. Ins.* Compl. ¶ 288). | |
| "The 1992 U.S. Senate Investigative Report on the so-called "BCCI affair" linked the bank under bin Mahfouz to financial funding of the Afghan war, and supporting terrorism. According to the Report:<br><br>BCCI may have been moving money through the National Bank of Oman to fund the war in Afghanistan. The bank's role began to surface in the mid-1980's (...). This was confirmed in the Wall Street Journal of 23 October 1991 which quotes a member of the late General Zia's cabinet as saying 'It was Arab money that was pouring through BCCI.' The Bank which carried the money on from Oman to Pakistan and into Afghanistan was National Bank of Oman, where BCCI owned 29%.<br>********** | "The 1992 US Senate Report on the BCCI Affair … linked the bank to financial funding of the Afghan war:<br><br>BCCI may have been moving money through the National Bank of Oman to fund the war in Afghanistan. The bank's role began to surface in the mid-1980's (...). This was confirmed in the Wall Street Journal of 23 October 1991 which quotes a member of the late General Zia's cabinet as saying 'It was Arab money that was pouring through BCCI. The Bank which carried the money on from Oman to Pakistan and into Afghanistan was National Bank of Oman, where BCCI owned 29%. …" | |

| | | |
|---|---|---|
| In the course of targeting BCCI for laundering drug money, the CIA learned of BCCI's involvement in manipulating certain financial markets, in arms trafficking, and in supporting international terrorism, including handling the finances of Sabri Al-Bannah or Abu Nidal, and his terrorist organization.<br>**********<br>BCCI's support of terrorism and arms trafficking developed out of several factors. First, as a principal financial institution for a number of Gulf sheikhdoms, with branches all over the world, it was a logical choice for terrorist organizations, who received payment at BCCI-London and other branches directly from Gulf-state patrons, and then transferred those funds wherever they wished without apparent scrutiny. Secondly, BCCI's flexibility regarding the falsification of documentation was helpful for such activities. Finally, to the extent that pragmatic considerations were not sufficient of themselves to recommend BCCI, the bank's pan-third world and pro-Islam ideology would have recommended it to Arab terrorist groups."<br><br>(1AC ¶ 198). | (MDL Dkt #953, Pls' RICO Stmt. at 7-8).<br><br>"In particular, investigations by the CIA and U.S. Senate directly implicated BCCI in the laundering of drug money, manipulation of financial markets, arms trafficking, and in handling the finances of Sabri al-Bannah or Abu Nidal, and his terrorist organization." (*Id.* at 7).<br><br>"According to the Senate Report, BCCI's support of terrorism and arms trafficking developed out of several factors.<br><br>First, as a principal financial institution for a number of Gulf sheikhdoms, with branches all over the world, it was a logical choice for terrorist organizations, who received payment at BCCI-London and other branches directly from Gulf-state patrons, and then transferred those funds wherever they wished without apparent scrutiny. Secondly, BCCI's flexibility regarding the falsification of documentation was helpful for such activities. Finally, to the extent that pragmatic considerations were not sufficient of themselves to recommend BCCI, the bank's pan-third world and pro-Islam ideology would have recommended it to Arab terrorist groups."<br><br>(*Id.* at 8). "A 1992 U.S. Senate Investigative Report regarding BCCI's fraudulent activities directly implicated National Commercial Bank in BCCI's corrupt practices, including the manipulation of financial markets, arms trafficking and sponsorship of international terrorism, including handling the finances of Abu Nidal and his terrorist organization." (*Fed. Ins.* Compl. ¶ 289). "A federal investigation into BCCI's operations revealed extensive involvement in corrupt practices, including money laundering, hiding assets, the obstruction of a Senate investigation and the sponsorship of international terrorism." (*Fed. Ins.* Compl. ¶ 288). | |

| | | |
|---|---|---|
| "As a result of the investigations, Khalid bin Mahfouz was indicted on charges of participation in a Scheme to Defraud in the First Degree in violation of New York Penal Law § 190.65, in connection with his acts and omissions relative to BCCI Holdings and certain related entities. Khalid bin Mahfouz paid over $200 million in fines to settle the matter and avoid prosecution." (1AC ¶ 199). | "On July 1, 1992 bin Mahfouz was indicted in New York for his role in BCCI's criminal activites [*sic*]. … Bin Mahfouz paid over $200 million in fines to avoid further prosecution." (MDL Dkt #953, Pls' RICO Stmt. as to KBM at 8). | |
| "For his own part, Khalid bin Mahfouz has acknowledged making a $270,000 contribution to Osama bin Laden in 1988, contemporaneous with the establishment of al Qaeda." (1AC ¶ 203). | "Khalid bin Mahfouz has acknowledged making a $270,000 contribution to Osama bin Laden in 1988, contemporaneous with the establishment of al Qaeda." (Pls' SJ Summary ¶ 81). | |
| **C. ALLEGATIONS CONCERNING BIN MAHFOUZ, YASSIN AL KADI, AND MUWAFAQ.** | | |
| "Muwafaq Foundation played an especially prominent role in NCB's material sponsorship of al Qaeda, and its activities serve to underscore Khalid bin Mahfouz's centrality within the al Qaeda financial and logistical support infrastructure." (1AC ¶ 205). | Conclusory summary of subsequent allegations. | These previously-rejected allegations concern activities of third parties (KBM, Kadi, and Muwafaq) that are not connected with, or imputable to, NCB. *See* MTD Memo at 22-28.<br>• It is undisputed that NCB did not participate in the September 11th attacks or conspire with the September 11th attackers and that NCB did not provide any support directly to al Qaeda. *See* MTD Memo at 12 n.6.<br>• Plaintiffs' conclusory allegations of "NCB's material sponsorship of al Qaeda" (1AC ¶ 205) and the like are legally deficient and contradicted by the significant undisputed fact that neither the U.S. government, nor any other government or organization, ever has designated NCB as a financier or any other type of facilitator of terrorism—even though the U.S. government has aggressively utilized its broad authority to designate thousands of other entities that have been |
| "Not long after making his $270,000 contribution to Osama bin Laden, Khalid bin Mahfouz founded the Muwafaq Foundation in 1991, personally choosing Yassin Abdullah Kadi to help him manage the organization's operations. Al Kadi, an Executive Order 13224 Specially Designated Global Terrorist ('SDGT') from October 12, 2001 to November 26, 2014, was hired by bin Mahfouz to establish NCB's Islamic Banking Division." (1AC ¶ 206). | "Following his $270,000 contribution to Osama bin Laden, Khalid bin Mahfouz founded Muwafaq Foundation, personally choosing Specially Designated Global Terrorist al Kadi to manage its operations." (Pls' SJ Summary ¶ 90). "Muwafaq was established by NCB's then chairman, Khalid bin Mahfouz, and the architect of NCB's Islamic banking division, Yassin al Kadi." (Pls' SJ Summary ¶ 68). | |

| | | |
|---|---|---|
| "In his Statement to the U.S. Treasury Department's Office of Foreign Assets Control, Kadi himself confirmed that he and bin Mahfouz jointly conceived Muwafaq when Kadi was working 'with KBM for NCB.' Further explaining his role in NCB, Kadi has stated that 'KBM [bin Mahfouz] turned to me to help in realizing this ambition ['to convert NCB from a bank which offered purely conventional banking services to one that could also offer Islamic banking products']. To do this, we established a new department within NCB called the 'Islamic Banking Department.'" Kadi has further explained that he was "a member of the Islamic Banking Services Committee, which was formed by the National Commercial Bank in July 1997 and on which I served until December 8, 2009. This is a committee responsible for the strategic development of Islamic banking services which was chaired by the CEO of the NCB. I served on this committee with other senior bank officials."' (1AC ¶ 218). | "Al Kadi himself confirmed that he and bin Mahfouz jointly conceived Muwafaq when al Kadi was working 'with KBM for NCB.' Further explaining his role in NCB, al Kadi has stated that 'KBM [bin Mahfouz] turned to me to help in realizing this ambition ['to convert NCB from a bank which offered purely conventional banking services to one that could also offer Islamic banking products']. To do this, we established a new department within NCB called the 'Islamic Banking Department.'" Kadi has further explained that he was 'a member of the Islamic Banking Services Committee, which was formed by the National Commercial Bank in July 1997 and on which I served until December 8, 2009. This is a committee responsible for the strategic development of Islamic banking services which was chaired by the CEO of the NCB. I served on this committee with other senior bank officials."' (Pls' SJ Summary ¶ 69). | suspected of doing so. *See* MTD Memo at 5 & n.2, 12 n.6.<br><br>• This non-designation is no accident, given the Treasury Department's testimony that the U.S. government never has sought or recommended any sanction against NCB. *See* MTD Memo at 12 n.6. |
| "By his own design, Khalid bin Mahfouz hand-picked designated terror financier Kadi, with whom he maintained a 'close personal relationship,' to oversee the establishment and operation of the Muwafaq Foundation and NCB's Islamic Banking division." (1AC ¶ 219). | "By his own design, Khalid bin Mahfouz hand-picked designated terrorist sponsor Yassin al Kadi, with whom he maintained a 'close personal relationship,' to oversee the establishment and operation the Muwafaq Foundation and NCB's Islamic Banking division." (Pls' SJ Summary ¶ 70). | |
| "Throughout the time he was working for 'NCB,' Kadi was also responsible for the management and operations of the Muwafaq Foundation, along with Khalid bin Mahfouz, who also played an active role in directing Muwafaq's operations." (1AC ¶ 222). | "Throughout the time he was working for 'NCB,' al Kadi was also responsible for the management and operations of Muwafaq, along with Khalid bin Mahfouz, who also played an active role in directing Muwafaq's operations." (Pls' SJ Summary ¶ 73). | |
| "In establishing the Muwafaq Foundation, bin Mahfouz and Kadi sought to create a platform for al Qaeda's global expansion and the advancement of al Qaeda's jihad against the United States." (1AC ¶ 208). | "In establishing Muwafaq Foundation, bin Mahfouz and al Kadi sought to create a platform for the advancement of al Qaeda's jihad against the United States." (Pls' SJ Summary ¶ 16). | |

| | | |
|---|---|---|
| "Consistent with their vision, bin Mahfouz and Kadi opened a Muwafaq branch in Sudan when al Qaeda established operations in that country in the early 1990s. Around this same time, Kadi acknowledges having personally met with bin Laden in Sudan." (1AC ¶ 209). | "Consistent with their vision for Muwafaq to serve as a platform for al Qaeda's global expansion, bin Mahfouz and al Kadi opened a Muwafaq branch in the Sudan when al Qaeda established operations in that country." (Pls' SJ Summary ¶ 17). "Al Kadi acknowledges meeting with Osama Bin Laden around the time the Muwafaq Foundation was being funded and established." (Pls' SJ Summary ¶ 70). | |
| "As indicated above, the Muwafaq Foundation was established by NCB's then chairman, Khalid bin Mahfouz, and the architect of NCB's Islamic banking division, Yassin Abdullah Kadi." (1AC ¶ 217). | Conclusory summary of preceding allegations. | |
| "Collectively, the evidence documenting the intimate dealings among Khalid bin Mahfouz, Yassin al Kadi, NCB and numerous components and members of al Qaeda's core structure, including Osama bin Laden himself, firmly establish that NCB knowingly used its infrastructure and resources to advance al Qaeda's campaign to attack the United States, with the intent that the resources they provided to bin Laden would be used for that specific purpose." (1AC ¶ 245). | Conclusory summaries of preceding allegations. | |
| "Given their prominent roles within al Qaeda's financial infrastructure, active participation in facilitating the sponsorship of al Qaeda, and personal involvement in the creation of charity platforms to support al Qaeda's operations, NCB officials Khalid bin Mahfouz and Yassin Abdullah Kadi necessarily were aware through a variety of channels of the terrorist activities of the Muwafaq Foundation, IIRO, and SJRC at all relevant times." (1AC ¶ 242). | "Given their prominent roles within al Qaeda's financial infrastructure and active participation in facilitating the sponsorship of al Qaeda, NCB officials Yassin al Kadi and Khalid necessarily were aware through a variety of channels of the terrorist activities of Muwafaq Foundation, IIRO, and SJRC." (Pls' SJ Summary ¶ 91). | |
| "Khalid bin Mahfouz similarly appointed several other senior NCB personnel to positions in the management structure of Muwafaq Foundation. Abdulrahman bin Mahfouz served as a Board member and Trustee of | "Abdulrahman bin Mahfouz served as a Board member and Trustee of Muwafaq, and simultaneously held numerous senior positions in NCB, including: Vice President; Deputy General | These previously-rejected allegations that NCB managers and advisors were, at times, Muwafaq board members or trustees have no jurisdictional significance as a matter of law. The Second Circuit already has held that such |

| | | |
|---|---|---|
| Muwafaq, and simultaneously held numerous senior positions in NCB, including: Vice President; Deputy General Manager; Member of the Board of Directors; and Chairman of the Management Committee of NCB." (1AC ¶ 220). | Manager; Member of the Board of Directors; and Chairman of the Management Committee of NCB." (Pls' SJ Summary ¶ 71). | allegations fall short of even providing a basis for personal jurisdiction against those individuals themselves. Necessarily, because these previously-dismissed allegations do not provide a basis for personal jurisdiction over the alleged former NCB employees themselves, they cannot, even further removed, provide a basis for jurisdiction over their former employer, NCB, as confirmed by the Second Circuit's affirmance of the dismissal of these same allegations against NCB. *See* MTD Memo at 13, 26-27. |
| "Mohamed al Ali al Qari bin Eid ('al Gari') was a founding Board member of Muwafaq in the United States, and in collaboration with Yassin Abdullah Kadi, developed Islamic Finance at NCB. Al Gari was also appointed as NCB's Sharia Board Advisor, giving him authority over the use and attribution of NCB's zakat funds." (1AC ¶ 221). | "Mohamed al Ali al Qari bin Eid (El Gari) was a founding Board member of Muwafaq in the United States, and in collaboration with Yassin al Kadi, developed Islamic Finance at NCB. Al Gari was also appointed as NCB's Sharia Board Advisor, giving him authority over the use and attribution of NCB's zakat funds." (Pls' SJ Summary ¶ 72). | |
| **D. ALLEGATIONS CONCERNING MUWAFAQ AND KADI.** | | |
| "For the next decade, the Muwafaq Foundation provided resources through offices located around the world to support al Qaeda's jihad against the United States. Muwafaq served as a front for laundering contributions from wealthy al Qaeda sympathizers, and permitted al Qaeda fighters to use ostensible employment with Muwafaq as a vehicle for gaining access to conflict regions, thereby allowing them to carry out terrorist activities on behalf of al Qaeda in those areas. Muwafaq funded al Qaeda training camps in Afghanistan and Bosnia, and directly participated in al Qaeda operations. In 2001, Muwafaq merged directly into al Qaeda." (1AC ¶ 210). | "For the next decade, Muwafaq provided resources through offices located around the World to support al Qaeda's jihad against the United States. Muwafaq served as a front for laundering contributions from wealthy al Qaeda sympathizers, and permitted al Qaeda fighters to use ostensible employment with Muwafaq as a vehicle for gaining access to conflict regions, thereby allowing them to carry out terrorist activities on behalf of al Qaeda in those areas. Muwafaq has funded al Qaeda training camps in Afghanistan and Bosnia, and directly participated in al Qaeda operations. In 2001, Muwafaq merged directly into al Qaeda." (Pls' SJ Summary ¶ 18). | These previously-rejected allegations do not mention NCB and thus concern activities of third parties (Muwafaq, Kadi, and others) that are not connected with, or imputable to, NCB as a matter of law. *See* MTD Memo at 21-28.<br>• NCB's offering of Islamic banking products and services is not an intentionally tortious activity, much less any by NCB expressly aimed at the U.S. *Id.* at 25-26.<br>Plaintiffs' previously-rejected allegations against Kadi cannot support personal jurisdiction over NCB because:<br>• The Second Circuit affirmed the dismissal of NCB for lack of personal jurisdiction after considering the |

| | | |
|---|---|---|
| "Throughout the time he and bin Mahfouz were directing Muwafaq's operations, Kadi admits having close relationships with senior al Qaeda officials, including founding al Qaeda member and close bin Laden associate Wa'el Jelaidan, who held senior leadership positions in the IIRO and SJRC and played a central role in the terrorist activities of those al Qaeda charity front organizations." (1AC ¶ 223). | "Throughout the time he and bin Mahfouz were directing Muwafaq's operations, al Kadi admits having close relationships with senior al Qaeda officials, including Wa'el Jelaidan, who as noted above held senior positions in the IIRO and SJRC and played a central role in the terrorist activates of those organizations." (Pls' SJ Summary ¶ 74). | substance of plaintiffs' newly-recycled allegations Kadi's alleged conduct. *See* MTD Memo at 24-28.<br><br>• An exhibit to the 2004 U.S. Treasury Department Evidentiary Memorandum for Kadi ("OFAC Memo"), on which plaintiffs rely for their Kadi allegations (1AC ¶¶ 227-228), states that Kadi "worked as a financial consultant for National Commercial Bank of Jeddah, Islamic Development Bank, Saudi British Bank, Merrill Lynch, Bankers Leasing Corporation, Chase Manhattan" and numerous others. Whatever Kadi's activities may have been long ago, they are no more linked to NCB than they are to Merrill Lynch, Chase Manhattan, or the other financial institutions to which he provided consulting services long ago. *See* MTD Memo at 25.<br><br>• The U.S. government never linked Kadi's sanctioned or Muwafaq-related activities either to NCB or to any terrorist activity aimed at the U.S. Instead, OFAC sanctions were imposed on Kadi personally because of his alleged conduct involving the activities of Islamic extremists located in, and relating to, other parts of the world. *See* MTD Memo at 24-25.<br><br>• Kadi's designation occurred on October 12, 2001, long after his alleged affiliation with NCB ended; apparently after further fact-finding, OFAC removed Kadi's designation in September 2014; the Court of Justice of the European Union removed the EU's designation of Kadi in July 2013 for lack of evidence to support it. *See* MTD Memo at 24-25.<br><br>Plaintiffs' previously-dismissed allegations against Muwafaq cannot support personal jurisdiction over NCB because:<br><br>• The Second Circuit affirmed the dismissal of NCB for lack of personal jurisdiction after considering the substance of plaintiffs' here-recycled allegations concerning Muwafaq and KBM's and Kadi's alleged connections thereto. *See* MTD Memo at 22-28. |
| "During the period that Jelaidan served as Director of the SJRC, Kadi acknowledges providing support to the SJRC through an Albanian company Kadi owned. Kadi has stated that he has known Jelaidan as a family friend since the 1980's." (1AC ¶ 224). | "During the period that Jelaidan served as Director of the SJRC, al Kadi acknowledges providing support to the SJRC through an Albanian company al Kadi owned. … he has known Jelaidan as a family friend since the 1980's." (Pls' SJ Summary ¶ 75). | |
| "In relation to the management and operation of the Muwafaq Foundation, Kadi acknowledges having consulted with Jelaidan, and appointed terrorist operatives to run Muwafaq offices on the basis of Jelaidan's recommendation. In fact, Kadi has stated that he 'was first introduced to [Specially Designated Global Terrorist] Chafiq Ayadi in Zagreb, Croatia, by Wa'el Juladain in or around 1992' and further 'recommended Chafiq Ayadi for the management' of the Muwafaq Foundation. Kadi would hire Ayadi to head Muwafaq's European operations upon the recommendation of Jelaidan in 1992." (1AC ¶ 225). | "In relation to the management and operation of Muwafaq, Kadi acknowledges having consulted with Jelaidan, and appointed terrorist operatives to run Muwafaq offices on the basis of Jelaidan's recommendation. *See* Statement of Yassin Abdullah Kadi to the Office of Foreign Assets Control attached hereto as Exhibit 84 (stating that he 'was first introduced to [Specially Designated Global Terrorist] Chafiq Ayadi in Zagreb, Croatia, by Waa'el Juladain in or around 1992.'" (Pls' SJ Summary ¶ 76). | |
| "Kadi has longstanding ties to many other senior terrorist operatives including Muhammad Salah, a high-level HAMAS operative and Specially Designated Global Terrorist under Executive Order 12947, and Dr. Abdul Latif Saleh, founder of the Albanian Islamic Jihad." (1AC ¶ 226). | "Al Kadi has longstanding ties to many other senior terrorist operatives including: Muhammad Salah, a high-level HAMAS operative and Specially Designated Terrorist under Executive Order 12947; and Dr. Abdul Latif Saleh, founder of the Albanian Islamic Jihad." (Pls' SJ Summary ¶ 77). | |
| "As a result of its intensive investigation of Kadi, the United States concluded that his ties to senior members | "As a result of its intensive investigation of al Kadi, the United States concluded that his ties to senior | |

| | | |
|---|---|---|
| of al Qaeda and several affiliated terrorist organizations could not be viewed as a coincidence, but rather reflected Kadi's own central role in al Qaeda's financial network. According to the 2001 U.S. Treasury Department's Evidentiary Memorandum in Support of the Designation of Yassin al Kadi Pursuant to Executive Order 13224:<br><br>Yassin Al Qadi is an experienced and sophisticated businessman and financier. He has operated companies, including investment vehicles and banks, in many corners of the world. He is presumed to be capable of understanding his investments, his companies, and his charities, and of being responsible for the actions of those entities which he founds, funds and/or controls.<br><br>Al Qadi's defense, however, to all the charges that he has supported terrorist through his provision of funds to Muwafaq and other entities he controls and the persons with ties to terrorists is that either there is no evidence that these entities and individuals have been involved in terrorism, or that to the extent that they were, this involvement was beyond his knowledge.<br><br>There is, however, substantial and credible evidence that both Muwafaq as an entity, and many of the individuals charged with operating it and distributing its funds, were engaged in a longstanding pattern of supporting terrorist and extremist causes. This evidence comes from both classified and unclassified sources.<br><br>Al Qadi admits his longstanding and intimate association with SDGT Julaidan, SDGT Chafiq Ayadi, Dr. Abdul Latif Saleh, and Amir Mehdi. The latter three individuals have been, according to the information available to OFAC arrested and/or deported from their countries of operation because of associations with terrorists, and Julaidan is a known close associate of Usama Bin Ladin. Each | members of al Qaeda and several affiliated terrorist organizations could not be viewed as a coincidence, but rather reflected al Kadi's own central role in al Qaeda's financial network:<br><br>Yassin Al Qadi is an experienced and sophisticated businessman and financier. He has operated companies, including investment vehicles and banks, in many corners of the world. He is presumed to be capable of understanding his investments, his companies, and his charities, and of being responsible for the actions of those entities which he founds, funds and/or controls.<br><br>Al Qadi's defense, however, to all the charges that he has supported terrorist through his provision of funds to Muwafaq and other entities he controls and the persons with ties to terrorists is that either there is no evidence that these entities and individuals have been involved in terrorism, or that to the extent that they were, this involvement was beyond his knowledge.<br><br>There is, however, substantial and credible evidence that both Muwafaq as an entity, and many of the individuals charged with operating it and distributing its funds, were engaged in a longstanding pattern of supporting terrorist and extremist causes. This evidence comes from both classified and unclassified sources.<br><br>Al Qadi admits his longstanding and intimate association with SDGT Julaidan, SDGT Chafiq Ayadi, Dr. Abdul Latif Saleh, and Amir Mehdi. The latter three individuals have been, according to the information available to OFAC arrested and/or deported from their countries of operation because of associations with terrorists, and Julaidan is a known close associate of Usama Bin Ladin. Each | • Plaintiffs do not allege that NCB established or operated Muwafaq, and there is no factual support for the assertion that KBM operated it, but only that KBM told Kadi "that he wanted to start charity in memory of his parents" and that he originally endowed it. KBM established Muwafaq for family reasons, and the Second Circuit already has rejected plaintiffs' unsupported argument that KBM participated in Kadi's operation of Muwafaq. *See* MTD Memo at 26.<br><br>• Consistent with the fact that the U.S. government did not ever sanction Muwafaq, plaintiffs have alleged no facts to suggest that NCB's knowledge of Muwafaq, if any, related to anything other than the "substantial charitable activities" in which it was it engaged. *See* MTD Memo at 26. |

| | | |
|---|---|---|
| one of these individuals handled significant sums of money provided to him by Al Qadi.<br><br>It strains credulity that Al Qadi could have unintentionally found himself in a repeating cycle of hiring individuals based on his assessment of their character and that these individuals kept deceiving him about their intents on providing his funds to terrorists and extremists. These are individuals who Al Qadi had opportunity to personally observe over a period of years, and he gave them significant sums of money to handle on his behalf. Indeed, Al Qadi continues to refer to Julaidan and others as trustworthy and does not question their motives.<br><br>In making this determination no one element, no one contact, no one accusation of funding is taken as being determinative of the assessment that Al Qadi has been providing support to terrorists through his actions. [Redacted text] associated with Al Qadi that have connections with terrorism and dating over too long a time period, to give credence to a defense that all of the reports are in error. OFAC concludes that when considering the number of sources, the number of activities and length of time, the totality of the evidence, both classified and unclassified provides a reason to believe Yaseen Al Qadi has funded terrorist and extremist individuals and operations."<br><br>(1AC ¶ 227). | one of these individuals handled significant sums of money provided to him by Al Qadi.<br><br>It strains credulity that Al Qadi could have unintentionally found himself in a repeating cycle of hiring individuals based on his assessment of their character and that these individuals kept deceiving him about their intents on providing his funds to terrorists and extremists. These are individuals who Al Qadi had opportunity to personally observe over a period of years, and he gave them significant sums of money to handle on his behalf. Indeed, Al Qadi continues to refer to Julaidan and others as trustworthy and does not question their motives.<br><br>In making this determination no one element, no one contact, no one accusation of funding is taken as being determinative of the assessment that Al Qadi has been providing support to terrorists through his actions. [Redacted text] associated with Al Qadi that have connections with terrorism and dating over too long a time period, to give credence to a defense that all of the reports are in error. OFAC concludes that when considering the number of sources, the number of activities and length of time, the totality of the evidence, both classified and unclassified provides a reason to believe Yaseen Al Qadi has funded terrorist and extremist individuals and operations."<br><br>(Pls' SJ Summary ¶ 78). | |
| "The Treasury Department Evidentiary Memorandum provides further details concerning Kadi's and Muwafaq's al Qaeda sponsorship and terrorist activities:<br><br>• Of these seven [Muwafaq] offices/operations:<br><br>• <u>Sudan</u>: Closed by Kadi following publication of *Africa Confidential* article inking Muwafaq to 1995 attempt on President Mubarak, and ceased operations in 1996 at about the same time that Bin | "A 2004 Treasury Department Evidentiary Memorandum … provides further detail concerning al Kadi's and Muwafaq's al Qaeda sponsorship and terrorist activities..:<br>• Of these seven [Muwafaq] offices/operations:<br><br>• <u>Sudan</u>: Closed by Kadi following publication of *Africa Confidential* article linking Muwafaq to 1995 attempt on President Mubarak, and ceased operations in 1996 at about the same time that | These previously-rejected allegations do not mention NCB (other than the discredited, retracted, and court-rejected audit allegations) and concern activities of third parties (Muwafaq, Kadi, and others) that are not connected with, or imputable to, NCB as a matter of law. *See* MTD Memo at 21-28.<br><br>The allegation that, "[a]ccording to press accounts, in 1998, the Saudi government audited the Jeddah-based National Commercial Bank and found that $3 million in bank funds |

| | | |
|---|---|---|
| Ladin left Sudan. Additionally A.L-QADI is quoted as saying the office provided assistance to 'jihad activities.'<br><br>• Pakistan: Headed by Amir Mehdi, [REDACTED]. The Pakistan government on March 21, 1995 raided the office and Medhi was arrested on May 29, 1995. The office shut shortly thereafter.<br><br>• Ethiopia: Closed in 1995 by the Ethiopian government subsequent to the Africa Confidential report.<br><br>• Europe: Headed by Chafiq Ayadi, who is designated as an SDGT and was a leader of the radical Tunisian Islamic Front.<br><br>• Albania: Office was headed by Dr. Abdul Latif Saleh who founded the Albanian Islamic Jihad, and who was deported from Albania in 1999 for his links to terrorism.<br><br>• AL-QADI hired Chafiq Ayadi, an SDGT designated at the same time as AL-QADI on October 12 2001, to head Muwafaq's European operations upon the recommendation of Wa'el Julaidan in late 1992.<br><br>• Kadi states in his submissions that during the 1990 to 1991 time period he was working with Khalid Bin Mahfouz for National Commercial Bank, and that they developed a relationship of mutual trust and respect. During this time period Bin Mahfouz told AL-QADI that he wanted to start charity [Muwafaq] in memory of his parents.<br><br>• According to press accounts, in 1998, the Saudi government audited the Jeddah-based National Commercial Bank and found that $3 million in bank funds was funneled improperly to Muwafaq (a.k.a Blessed Relief), which allegedly transferred the money to bin Laden. | Bin Ladin left Sudan. Additionally AL-QADI is quoted as saying the office provided assistance to 'jihad activities.'<br><br>• Pakistan: Headed by Amir Mehdi, [REDACTED]. The Pakistan government on March 21, 1995 raided the office and Medhi was arrested on May 29, 1995. The office shut shortly thereafter.<br><br>• Ethiopia: Closed in 1995 by the Ethiopian government subsequent to the Africa Confidential report.<br><br>• Europe: Headed by Chafiq Ayadi, who is designated as an SDGT and was a leader of the radical Tunisian Islamic Front.<br><br>• Albania: Office was headed by Dr. Abdul Latif Saleh who founded the Albanian Islamic Jihad, and who was deported from Albania in 1999 for his links to terrorism.<br><br>• AL-QADI hired Chafiq Ayadi, an SDGT designated at the same time as AL-QADI on October 12, 2001, to head Muwafaq's European operations upon the recommendation of Wa'el Julaidan in late 1992.<br><br>• Kadi states in his submissions that during the 1990 to 1991 time period he was working with Khalid Bin Mahfouz for National Commercial Bank, and that they developed a relationship of mutual trust and respect. During this time period Bin Mahfouz told AL-QADI that he wanted to start charity [Muwafaq] in memory of his parents.<br>• According to press accounts, in 1998, the Saudi government audited the Jeddah-based National Commercial Bank and found that $3 million in bank funds was funneled improperly to Muwafaq (a.k.a. Blessed Relief), which allegedly transferred the money to bin Laden. | was funneled improperly to Muwafaq (a.k.a Blessed Relief), which allegedly transferred the money to bin Laden" has been retracted, thoroughly refuted, rejected by the Court, and is factually unsupportable. *See* MTD Memo at 7-8, 15-16. |

| | | |
|---|---|---|
| • There is however substantial and credible evidence that both Muwafaq as an entity, and many of the individuals charged with operating it and distributing its funds, were engaged in a longstanding pattern of supporting terrorist and extremist causes. This evidence comes from both classified and unclassified sources."<br><br>(1AC ¶ 228). | • There is however substantial and credible evidence that both Muwafaq as an entity, and many of the individuals charged with operating it and distributing its funds, were engaged in a longstanding pattern of supporting terrorist and extremist causes. This evidence comes from both classified and unclassified sources."<br><br>(Pls' SJ Summary ¶ 20). | |
| "Consistent with the foregoing findings, the United States designated Kadi as a 'Specially Designated Global Terrorist' on October 12, 2001, describing him as 'a Saudi businessman whose companies span the Middle East, Europe, North America and South Asia, [who] has been consistently identified as a financial supporter of Usama bin Laden and other known extremists for more than a decade.'" (1AC ¶ 229). | "Consistent with the foregoing findings, the United States listed al Kadi as a 'Specially Designated Global Terrorist' on October 12, 2001, describing him as 'a Saudi businessman whose companies span the Middle East, Europe, North America and South Asia, [who] has been consistently identified as a financial supporter of Usama bin Laden and other known extremists for more than a decade.'" (Pls' SJ Summary ¶ 79). | |
| "In a November 29, 2001 letter from David D. Aufhauser, Department of the Treasury General Counsel, to Switzerland's M. Claude Nicati, Substitut du Procureur General, Mr. Aufhauser provided details concerning the Muwafaq Foundation's role in providing cover for members of al Qaeda and other terrorist organizations:<br><br>• A number of individuals employed by or otherwise associated with the Muwafaq Foundation have connections to various terrorist organizations. Muhammad Ali Harrath, main activist of the Tunisian Islamic Front (TIF) in the United Kingdom, was associated with Muwafaq personnel in Bosnia and other TIF members worked at the Muwafaq Foundation. Syrian citizen Mahmoud Mehdi, once a director of the Muwafaq Foundation in Pakistan, was a member of Al Qa'ida and the Al-Faran terrorist group responsible for the kidnapping of Westerners in Kashmir. | "In a November 29, 2001 letter from David D. Aufhauser, Department of the Treasury General Counsel, to Switzerland's M. Claude Nicati, Substitut du Procureur General, Mr. Aufhauser provided additional details concerning Muwafaq's role in providing cover for members of al Qaeda and other terrorist organizations:<br><br>• A number of individuals employed by or otherwise associated with the Muwafaq Foundation have connections to various terrorist organizations. Muhammad Ali Harrath, main activist of the Tunisian Islamic Front (TIF) in the United Kingdom, was associated with Muwafaq personnel in Bosnia and other TIF members worked at the Muwafaq Foundation. Syrian citizen Mahmoud Mehdi, once a director of the Muwafaq Foundation in Pakistan, was a member of Al Qa'ida and the Al-Faran terrorist group | These previously-rejected allegations do not mention NCB and thus concern activities of third parties (Muwafaq, Kadi, and others) that are not connected with, or imputable to, NCB as a matter of law. *See* MTD Memo at 21-28.<br><br>Moreover, the David D. Aufhauser letter at issue in plaintiffs' recycled Kadi and Muwafaq allegations does not mention NCB, and does not suggest that NCB funded or was involved with Muwafaq. *See* MTD Memo at 27. |


| | | |
|---|---|---|
| • The Muwafaq Foundation also provided support to HAMAS and the Abu Sayyaf Organization in the Philippines.<br><br>• Following the dissolution of MK [Makhtab al Khidamat] in early June 2001 and its absorption into Al-Qa'ida, a number of NGOs formerly associated with MK, including Muwafaq, also merged with Al-Qa'ida.<br><br>• From 1993, the head of the European offices of the Muwafaq Foundation was Ayadi Chafiq Bin Muhammad, who has been identified as Mr. Kadi's closest associate. Ayadi Chafiq fought in Afghanistan in the 1980s and is known to be associated with the Tunisian Islamic Front (TIF) in Algeria and Nabil Ben Mohammad Salah Maklouf, its leader. Mr. Chafiq was expelled from Tunisia because of his membership in the TIF.<br><br>• Mr. Kadi's actions and those of his Muwafaq Foundation and businesses fit this pattern and give rise to a reasonable basis to believe that they have facilitated terrorist activities."<br><br>(1AC ¶ 211). | responsible for the kidnapping of Westerners in Kashmir.<br><br>• The Muwafaq Foundation also provided support to HAMAS and the Abu Sayyaf Organization in the Philippines.<br><br>• Following the dissolution of MK [Makhtab al Khidamat] in early June 2001 and its absorption into Al-Qa'ida, a number of NGOs formerly associated with MK, including Muwafaq, also merged with Al-Qa'ida.<br><br>• From 1993, the head of the European offices of the Muwafaq Foundation was Ayadi Chafiq Bin Muhammad, who has been identified as Mr. Kadi's closest associate. Ayadi Chafiq fought in Afghanistan in the 1980s and is known to be associated with the Tunisian Islamic Front (TIF) in Algeria and Nabil Ben Mohammad Salah Maklouf, its leader. Mr. Chafiq was expelled from Tunisia because of his membership in the TIF.<br><br>• Mr. Kadi's actions and those of his Muwafaq Foundation and businesses fit this pattern and give rise to a reasonable basis to believe that they have facilitated terrorist activities."<br><br>(Pls' SJ Summary ¶ 21). | |
| "The United States government summarized its findings regarding the Muwafaq Foundation's terrorist activities in a filing supporting Kadi's continued designation as a terrorist sponsor and supporter pursuant to Executive Order 13224. The United States explained that under Kadi's leadership Muwafaq served as 'an al Qaeda front that receives funding from wealthy Saudi businessmen' and that there exists 'substantial and credible evidence that both Muwafaq as an entity, and many of the individual charged with operating it and distributing its funds, were engaged in a long-standing pattern of | "The United States government recently summarized its findings regarding Muwafaq's terrorist activities in a filing supporting Yassin al Kadi's continued designation as a terrorist sponsor and supporter. The United States explained that under al Kadi's leadership Muwafaq served as 'an al Qaeda front that receives funding from wealthy Saudi businessmen' and that there exists 'substantial and credible evidence that both Muwafaq as an entity, and many of the individual charged with operating it and distributing its funds, were engaged | These previously-rejected allegations do not mention NCB and thus concern activities of third parties (Muwafaq, Kadi, and others) that are not connected with, or imputable to, NCB as a matter of law. *See* MTD Memo at 21-28.<br><br>Moreover, the U.S. litigation filing in the *Kadi v. Geithner* case at issue in plaintiffs' recycled Kadi/Muwafaq allegations does not suggest that NCB had any knowledge concerning the alleged activities of Kadi or Muwafaq, and indicated that they took place in other regions of the world and were not directed at the U.S. *See* MTD Memo at 27-28. |

| | | |
|---|---|---|
| supporting terrorist and extremist causes.' The government presented the following additional details of the Muwafaq Foundation's deep participation in al Qaeda's jihad:<br><br>• Kadi hired Amir Mehdi to be the local director of Muwafaq's operation in Pakistan in 1992. In 1995, the Pakistani Government raided the offices and arrested Mehdi after he had handled and distributed Muwafaq funds for over two years. A news organization reported that the arrest of Ramzi Yousef for the first World Trade Center bombing prompted the raid on the Muwafaq office in Islamabad.<br><br>• Muwafaq provided logistical support and financial support for Al-Gama'at Al-Islamiya, a mujahadin battalion in Bosnia. That organization was designated as an SDGT on October 31, 2001.<br><br>• Muwafaq transferred $500,000 to terrorist organizations in the Balkans in the mid-1990s.<br><br>• '[I]n the mid-1990s, Muwafaq was involved in providing financial support for terrorist activities of the mujaheddin, as well as arms trafficking from Albania to Bosnia. Some involvement in the financing of these activities had also been provided by Usama bin Ladin.'<br><br>• 'As of late 2001, ... [Kadi] continued to finance various fundamentalist institutions and organizations in the Balkans after Muwafaq ceased operations there in 1996,' including two entities that were designated as SDGTs in early 2002 – The Revival of Islamic Heritage Society's Pakistan and Afghanistan offices and the Bosnia-Herzegovina branch of the Al-Haramain Foundation."<br><br>(1AC ¶ 230). | in a longstanding pattern of supporting terrorist and extremist causes.' The government presented the following additional details of Muwafaq's deep participation in al Qaeda's jihad:<br><br>• Kadi hired Amir Mehdi to be the local director of Muwafaq's operation in Pakistan in 1992. In 1995, the Pakistani Government raided the offices and arrested Mehdi after he had handled and distributed Muwafaq funds for over two years. A news organization reported that the arrest of Ramzi Yousef for the first World Trade Center bombing prompted the raid on the Muwafaq office in Islamabad.<br><br>• Muwafaq provided logistical support and financial support for Al-Gama'at Al-Islamiya, a mujahadin battalion in Bosnia. That organization was designated as an SDGT on October 31, 2001.<br><br>• Muwafaq transferred $500,000 to terrorist organizations in the Balkans in the mid-1990s.<br><br>• '[I]n the mid-1990s, Muwafaq was involved in providing financial support for terrorist activities of the mujaheddin, as well as arms trafficking from Albania to Bosnia. Some involvement in the financing of these activities had also been provided by Usama bin Ladin.'<br><br>• 'As of late 2001, ... [Kadi] continued to finance various fundamentalist institutions and organizations in the Balkans after Muwafaq ceased operations there in 1996,' including two entities that were designated as SDGTs in early 2002–The Revival of Islamic Heritage Society's Pakistan and Afghanistan offices and the Bosnia-Herzegovina branch of the Al-Haramain Foundation."<br><br>(Pls' SJ Summary ¶ 19). | |

<table>
<tr>
<td>“The Muwafaq Foundation also features prominently in a 1996 Central Intelligence Agency Report concerning the involvement of Islamic NGO’s in terrorist activities (‘1996 CIA Report’), which notes that Muwafaq ‘helps fund the Egyptian Mujahedin battalion in Bosnia, according to foreign government service, and it also funds at least one training camp in Afghanistan.’” (1AC ¶ 231).</td>
<td>“Muwafaq appears prominently in a 1996 Central Intelligence Agency Report concerning the involvement of Islamic NGO’s in terrorist activities (‘1996 CIA Report’), which notes that Muwafaq ‘helps fund the Egyptian Mujahedin battalion in Bosnia, according to foreign government service, and it also funds at least one training camp in Afghanistan.’” (Pls’ SJ Summary ¶ 22).</td>
<td rowspan="3">These previously-rejected allegations do not mention NCB and thus concern activities of third parties (Muwafaq, Kadi, and others) that are not connected with, or imputable to, NCB as a matter of law. See MTD Memo at 21-28.<br><br>The purported CIA report at issue in plaintiffs’ previously-rejected Muwafaq allegations is unauthenticated, hearsay, and/or lacks a proper foundation; does not mention NCB; does not suggest that NCB funded, or was involved with, Muwafaq; does not suggest that Muwafaq’s alleged activities were directed at the U.S.; and instead contends that Muwafaq supported terrorist activities in Bosnia and Afghanistan. See MTD Memo at 27-28 & n.15.<br><br>Similarly, plaintiffs’ previously-rejected allegations regarding Ayman Awad are not tied to NCB in any way and affirmatively allege activities of third parties, as disconnected as they were from NCB, that were not expressly directed at the U.S. See MTD Memo at 28.</td>
</tr>
<tr>
<td>“Ayman Awad, a participant in the Bosnian jihad and former employee of the Muwafaq Foundation, confirmed during testimony before the International Criminal Tribunal for the Former Yugoslavia that Muwafaq assisted al Qaeda fighters in gaining entry into the Balkans to participate in the jihad. According to Awad: ‘I said that I worked for a humanitarian organisation. I joined the organisation, the Mowafaq foundation, thinking that they were organising training for soldiers in Bosnia and Herzegovina, for Bosniak soldiers in Bosnia and Herzegovina. I wanted to work as an interpreter and translator, and I also wished to participate in the fighting.’” (1AC ¶ 232).</td>
<td>“Ayman Awad, a participant in the Bosnian jihad and former employee of Muwafaq, confirmed during testimony before the International Criminal Tribunal for the Former Yugoslavia that Muwafaq assisted al Qaeda fighters in gaining entry into the Balkans to participate in the jihad. … ‘I said that I worked for a humanitarian organisation. I joined the organisation, the Mowafaq foundation, thinking that they were organising training for soldiers in Bosnia and Herzegovina, for Bosniak soldiers in Bosnia and Herzegovina. I wanted to work as an interpreter and translator, and I also wished to participate in the fighting.’” (Pls’ SJ Summary ¶ 23).</td>
</tr>
<tr>
<td>“In a June 17, 1996 interview with Osama bin Laden in Cairo, bin Laden expressed his support for ‘the Muwaffaq Society in Zagreb.’” (1AC ¶ 233).</td>
<td>“In a June 17, 1996 interview with Osama bin Laden in Cairo, bin Laden expressed his support for ‘the Muwaffaq Society in Zagreb.’” (Pls’ SJ Summary ¶ 16).</td>
</tr>
<tr>
<td>“As the Treasury Department’s Evidentiary Memorandum in Support of the Designation of Yassin al Kadi Pursuant to Executive Order 13224 makes clear, the terrorist activities of the Muwafaq Foundation were the subject of numerous public reports prior to September 11, 2001, and several of Muwafaq’s offices were closed by foreign governments between 1995 and 1999. Further, forced closures of the IIRO and Al Haramain offices in Kenya in 1998 were similarly reported by a number of media outlets when Kenyan officials banned those organizations for supporting</td>
<td>“As the Treasury Department’s Evidentiary Memorandum in Support of the Continued Designation of Yassin al Kadi Pursuant to Executive Order 13224 makes clear, the terrorist activities of Muwafaq Foundation were the subject of numerous public reports prior to September 11, 2001, and several of Muwafaq’s offices were closed by foreign governments between 1995 and 1999. … Forced closures of the IIRO and al Haramain offices in Kenya in 1998 were similarly reported by a number of media outlets when Kenyan officials</td>
<td>These previously-rejected allegations do not mention NCB and thus concern activities of third parties (Muwafaq, Kadi, and others) that are not connected with, or imputable to, NCB as a matter of law. See MTD Memo at 21-28.<br><br>The Second Circuit already held that plaintiffs’ allegations that “NCB … helped fund the IIRO and the SJRC” are among the allegations that “are indistinguishable from plaintiffs’ allegations in In re Terrorist Attacks III, which we held to be insufficient for personal jurisdiction purposes.” O’Neill, 714 F.3d at 669, 676. See MTD Memo at 17-21.</td>
</tr>
</table>

| | | |
|---|---|---|
| terrorism. Likewise, the IIRO's support for the Abu Sayyaf Group, al Qaeda's affiliate in the Philippines, was widely reported upon by the press during this same time frame. Prominent media reports also documented the SJRC's role in facilitating the movement of 'money and men to and from the Balkans' for Osama bin Laden." (1AC ¶ 244). | banned those organizations for supporting terrorism. … The IIRO's support for Abu Sayyaf Group, al Qaeda's affiliate in the Philippines, was widely reported upon by the press during this same time frame. … Prominent media reports also documented the SJRC's role in facilitating the movement of 'money and men to and from the Balkans' for Osama bin Laden." (Pls' SJ Summary ¶¶ 93-96). | Plaintiffs' previously-rejected allegations against NCB concerning IIRO and SJRC are factually irrelevant for the additional reasons that:<br><br>• The U.S. government never designated Muwafaq or SJRC. OFAC designated only the Philippine and Indonesian branch offices of the IIRO and did not do so until August 2006. Plaintiffs allege no connection between NCB and IIRO's Philippine or Indonesian offices. Those post-9/11 designations do not apply to the IIRO's activities outside of the Philippines or Indonesia; and OFAC affirmatively allows financial transactions with IIRO-Saudi Arabia even to this day. *See* MTD Memo at 20-21, 25.<br><br>• The designation of two of IIRO's overseas operations five years after September 11, 2001 shows that any concerns about IIRO were not known even by the U.S. Government antiterrorism officials until five years after September 11, 2001, and NCB could not be expected to possess any knowledge of any alleged wrongful activities by those two IIRO offices, let alone the undesignated remainder of the organization, during the timeframe relevant to this litigation. *See* MTD Memo at 20-21. |
| **III. <u>BACKGROUND ALLEGATIONS</u>.** | | |
| "National Commercial Bank ('NCB') was established in 1950 by Salim bin Mahfouz, father of Khalid bin Mahfouz." (1AC ¶ 193). | "The National Commercial Bank was established in 1950 by Salim bin Mahfouz, father of defendant Khalid bin Mahfouz." (*Fed. Ins.* Compl. ¶ 285). | Plaintiffs' previously-rejected allegations do not allege any conduct by NCB that is expressly aimed at the U.S. or that violates the Antiterrorism Act and thus do not support |

| | | |
|---|---|---|
| "With his father's death in 1996, Khalid bin Mahfouz became President and CEO of NCB, and its principal shareholder with control over more than 50% of the bank's capital.  Khalid bin Mahfouz served as President and CEO of NCB until he was pushed out of that position by Saudi authorities in 1999."  (1AC ¶ 194). | "With his father's death in 1996, Khalid bin Mahfouz became Presdient [*sic*] and CEO of National Commercial Bank. Khalid bin Mahfouz served as President and CEO of National Commercial Bank until 1999, when the Kingdom of Saudi Arabia bought out bin Mahfouz's controlling interest in the bank." (*Fed. Ins.* Compl. ¶ 286). | specific personal jurisdiction over NCB as a matter of law. *See* MTD Memo at 3, 11, 28 n.16. |