# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- x
IN RE: TERRORIST ATTACKS ON        )     Civil Action No. 03 MDL 1570 (GBD) (SN)
SEPTEMBER 11, 2011              )
                                           )
------------------------------------------------------- x

This document relates to:

*Underwriting Members of Lloyd's Syndicates 2 v. Al Rajhi Bank*, No. 16-cv-07853 (GBD)
*Abarca v. Kingdom of Saudi Arabia*, No. 17-cv-03887 (GBD)
*Abedhajajreh v. Kingdom of Saudi Arabia*, No. 17-cv-06123 (GBD)
*Addesso v. Kingdom of Saudi Arabia*, No. 16-cv-09937 (GBD)
*Aguilar v. Kingdom of Saudi Arabia*, No. 16-cv-09663 (GBD)
*Aiken v. Kingdom of Saudi Arabia*, No. 17-cv-00450 (GBD)
*Arrowood Indemnity Co. v. Kingdom of Saudi Arabia*, No. 17-cv-03908 (GBD)
*Charter Oak Fire Ins. Co. v. Al Rajhi Bank*, No. 17-cv-02651 (GBD)
*Hodges v. Kingdom of Saudi Arabia*, No. 17-cv-00117 (GBD)

# MEMORANDUM IN SUPPORT OF DEFENDANT SAUDI BINLADIN GROUP'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION AND FOR FAILURE TO STATE A CLAIM

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................... 1

BACKGROUND AND STATEMENT OF THE CASE ............................................ 2

STANDARD OF REVIEW .................................................................................. 6

ARGUMENT .................................................................................................... 8

I.     THE CLAIMS AGAINST SBG MUST BE DISMISSED BECAUSE, AS BOTH
THIS COURT AND THE SECOND CIRCUIT HAVE PREVIOUSLY HELD,
THIS COURT DOES NOT HAVE PERSONAL JURISDICTION OVER SBG............ 8

     A.    Personal Jurisdiction in this Context Requires that Plaintiffs' Injuries
Arise out of Defendant's Intentional Tortious Conduct Purposefully
Directed at the United States........................................................... 8

     B.    The Bulk of Plaintiffs' Allegations Are Substantively the Same, if Not
Identical, to Those Against SBG that This Court Previously Rejected ............... 10

          1.    Alleged Pre-1993 Support to OBL, Whether in Sudan or
Elsewhere, Is too Remote as a Matter of Law to Support Personal
Jurisdiction ........................................................................... 12

          2.    Plaintiffs Allege No Facts to Contradict that SBG removed OBL as
a Shareholder of SBG in 1993-94 and Provided No Support
Thereafter ............................................................................. 15

     C.    Plaintiffs' "New" Allegations Do Not Cure the Jurisdictional Defects in
Plaintiffs' Pleadings .......................................................................... 17

          1.    The Abbottabad Sudan Document ............................................ 18

          2.    Moussaoui's Ex Parte Prison Statement .................................... 19

          3.    The "28 Pages" ...................................................................... 23

     D.    Plaintiffs Are Not Entitled to Jurisdictional Discovery .......................... 24

II.    Plaintiffs' Claims also Fail Under Rule 12(b)(6)............................................ 26

     A.    Plaintiffs Have Alleged No Facts Supporting an Inference that SBG's
Conduct Proximately Caused Their Injuries......................................... 26

     B.    Plaintiffs' Allegations Do Not Support the Requisite Knowledge to
Support a Claim under the ATA .......................................................... 29

     C.    The Insurance Plaintiffs Do Not Allege Facts Showing They Have
Standing to Bring ATA Claims ............................................................. 30

CONCLUSION.................................................................................................. 33

# TABLE OF AUTHORITIES

Page

CASES

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009)...............................................................................7, 8, 29, 30

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007).............................................................................................7

*Best Van Lines, Inc. v. Walker,*
  490 F.3d 239 (2d Cir. 2007)..............................................................................25

*Burger King Corp. v. Rudzewicz,*
  471 U.S. 462 (1985).............................................................................................9

*Chubb Custom Ins. Co. v. Space Systems/Loral, Inc.,*
  710 F.3d 946 (9th Cir. 2013) .......................................................................31, 32

*Dudnikov v. Chalk & Vermilion Fine Arts, Inc.,*
  514 F.3d 1063 (10th Cir. 2008) ..........................................................................7

*Frontera Res. Azerbaijan Corp. v. State Oil Co. of Azerbaijan Republic,*
  582 F.3d 393 (2d Cir. 2009)..........................................................................24, 25

*Haber v. United States,*
  823 F.3d 746 (2d Cir. 2016)..............................................................................24

*Helicopteros Nacionales de Colombia, S.A. v. Hall,*
  466 U.S. 408 (1984).............................................................................................9

*In re Terrorist Attacks on Sept. 11, 2001,*
  134 F. Supp. 3d 774 (S.D.N.Y. 2015)...............................................................19

*Hussein v. Dahabshiil Transfer Servs. Ltd.,*
  230 F. Supp. 3d 167, 174 (S.D.N.Y. 2017)........................................................6

*In re Terrorist Attacks on Sept. 11, 2001,*
  349 F. Supp. 2d 765 (S.D.N.Y. 2005) ("*Terrorist Attacks I*")................3, 15, 25, 29

*In re Terrorist Attacks on Sept. 11, 2001,*
  538 F.3d 71 (2d Cir. 2008) ("*Terrorist Attacks III*") ................................8, 9, 10, 14

*In re Terrorist Attacks on Sept. 11, 2001*,
    718 F. Supp. 2d 456 (S.D.N.Y. 2010) ("*Terrorist Attacks IV*") ...................................... passim

*In re Terrorist Attacks on Sept. 11, 2001*,
    740 F. Supp. 2d 494 (S.D.N.Y. 2010) ("*Terrorist Attacks V*")................................................17

*In re Terrorist Attacks on Sept. 11, 2001*,
    840 F. Supp. 2d 776 (S.D.N.Y. 2012) ("*Terrorist Attacks VI*") ...................................... passim

*In re Terrorist Attacks on Sept. 11, 2001,*
    714 F.3d 118 (2d Cir. 2013) ("*Terrorist Attacks VII*")...................................................7, 26, 29

*In re Terrorist Attacks on Sept. 11, 2001,*
    714 F.3d 659 (2d Cir. 2013) ("*Terrorist Attacks VIII*")................................................. passim

*In re Terrorist Attacks on Sept. 11, 2001*,
    No. 03-md-1570, 2007 WL 2907278 (S.D.N.Y. Oct. 5, 2007) .............................................29

*In re Terrorist Attacks on Sept. 11, 2001*,
    No. 03-md-01570, 2008 WL 8183819 (S.D.N.Y. May 21, 2008).........................4, 15, 22, 25

*In re Terrorist Attacks on Sept. 11, 2001*,
    No. 03-MDL-1570, 2011 WL 6318975 (S.D.N.Y. Dec. 16, 2011)..................................23, 31

*Jazini v. Nissan Motor Co.*,
    148 F.3d 181 (2d Cir. 1998).......................................................................................24

*Karpus v. Hyperion Capital Mgmt.*,
    No. 96-cv-4671, 1997 U.S. Dist. LEXIS 4332 (S.D.N.Y. Apr. 2, 1997) ...............................11

*Laydon v. Mizuho Bank, Ltd.*,
    No. 12-cv-3419, 2015 WL 1515358 (S.D.N.Y. Mar. 31, 2015).............................................25

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
    673 F.3d 50 (2d Cir. 2012).......................................................................................6

*MacDermid, Inc. v. Deiter*,
    702 F.3d 725 (2d Cir. 2012).......................................................................................6

*Mao v. Sands Bethworks Gaming LLC*,
    No. 15-cv-6252, 2016 WL 1717220 (S.D.N.Y. Apr. 28, 2016) .............................................6

*Marquez-Almanzar v. Immigration & Naturalization Servs.*,
    418 F. 3d 210 (2d Cir. 2005)......................................................................................31

*Metro. Life Ins. Co. v. Robertson-Ceco Corp.*,
  84 F.3d 560 (2d Cir. 1996) ........................................................................6

*Mohammadi v. Islamic Republic of Iran*,
  782 F.3d 9 (D.C. Cir. 2015) ......................................................................31

*O'Neill v. Al Rajhi Bank*,
  134 S. Ct. 2870 (2014) ..............................................................................5

*Palnik v. Westlake Entm't Inc.*,
  344 F. App'x 249 (6th Cir. 2009) ..............................................................6

*Rains v. Jil-Mic, Inc.*,
  301 F. Supp. 545 (S.D.N.Y. 1969) ..........................................................11

*Rothstein v. UBS AG*,
  647 F. Supp. 2d 292 (S.D.N.Y. 2009) ......................................................7

*Rothstein v. UBS AG*,
  708 F.3d 82 (2d Cir. 2013) ........................................................................7

*Samantar v. Yousuf*,
  560 U.S. 305 (2010) ..................................................................................8

*Smith v. Pennsylvania R. Co.*,
  239 F. 103 (2d Cir. 1917) ..........................................................................7

*Starr v. Sony BMG Music Entm't*,
  592 F.3d 314 (2d Cir. 2010) ......................................................................7

*Stengel v. Black*,
  486 F. Appx. 181 (2d Cir. 2012) ..............................................................33

*US Airways, Inc. v. McCutchen*,
  133 S. Ct. 1537 (2013) ..............................................................................33

*Waldman v. Palestine Liberation Org.*,
  835 F.3d 317 (2d Cir. 2016), *petition for cert. docketed, Sokolow v. Palestine
  Liberation Org.*, No. 16-1071 (U.S. Mar. 7, 2017) ..................................9

*World Trade Ctr. Props. LLC v. Al Baraka Inv. and Dev. Corp.*,
  No. 04-cv-07280 (S.D.N.Y. Sept. 10, 2004) ............................................21

*Wultz v. Islamic Republic of Iran*,
  755 F. Supp. 2d 1 (D.D.C. 2010) ........................................................29

STATUTES

8 U.S.C. § 1101(a)(22).........................................................................31

28 U.S.C. § 1605A ..............................................................................32

Anti-Terrorism Act, 18 U.S.C. § 2331 *et seq.* ....................................... passim

Pub. L. No. 114-222.............................................................................25

OTHER AUTHORITIES

154 Cong. Rec. 500 (Jan. 22, 2008)......................................................32

Exec. Order No. 13099, 63 Fed. Reg. 45,167 (Aug. 20, 1998) ...................13

Lawrence Wright, *The Looming Tower* (2007) ..........................................14

Nat'l Comm'n on Terrorist Attacks Upon the U.S., The 9/11 Commission Report
  (2004)....................................................................................2, 13, 28

Phil Hirschkorn, *Moussaoui: 'Crazy or not crazy? That is the question' 9/11
  conspirator's odd ideas, behavior detailed at trial*, CNN.com (Apr. 19, 2006) ...................19

Statement by the Office of the Director of National Intelligence on the
  Declassification of Part Four of the Senate Select Committee on Intelligence
  and House Permanent Select Committee on Intelligence's 2002 Report on the
  Committees' Joint Inquiry into Intelligence Community Activities Before and
  After the Terrorist Attacks of September 11, 2001 (July 15, 2016) ........................23

Steve Coll, *Young Osama*, The New Yorker (Dec. 12, 2005)......................20

U.S. Department of the Treasury, *Recent OFAC Actions*, (Nov. 7, 2001),
  http://www.treasury.gov/resource-center/sanctions/OFAC-
  Enforcement/Pages/20011107.aspx ..................................................16

# INTRODUCTION

This Court has already held, and the Second Circuit has affirmed, that allegations against the Saudi Binladin Group ("SBG") substantially identical to those made in the present Complaint are insufficient to establish personal jurisdiction over the company.  *See In re Terrorist Attacks on Sept. 11, 2001*, 840 F. Supp. 2d 776, 782 (S.D.N.Y. 2012) ("*Terrorist Attacks VI*"), *aff'd* 714 F.3d 659 (2d Cir. 2013) ("*Terrorist Attacks VIII*"), *cert. denied sub nom. O'Neill v. Al Rajhi Bank*, 134 S. Ct. 2870 (2014).  After an enormous investment of judicial resources, including four years of Court-supervised jurisdictional discovery, amended pleadings, RICO statements, and extensive supplemental "averments" and "summaries" by the previous plaintiffs, the Court dismissed those allegations with prejudice against SBG.  The Court concluded that the allegations failed to satisfy the constitutional standard for establishing the Court's personal jurisdiction over SBG.

New Plaintiffs, led by counsel for the previously dismissed *Federal Insurance* plaintiffs, have now come nearly 16 years after the tragic events of September 11 to reopen that issue.  As the accompanying chart demonstrates, Plaintiffs' Amended Complaint against SBG does little more than repeat, often virtually verbatim, the allegations and factual assertions made against SBG in the previous cases.  *See* Ex. A.  Plaintiffs, however, can offer no plausible justification to revisit jurisdiction over SBG.  The sparse new allegations they seek to bolt onto the old complaints add nothing of jurisdictional significance to the analysis and fail for the same reasons as the old allegations:  they either concern conduct far too remote in time and place to support jurisdiction under this Court's and the Second Circuit's prior rulings, or they concern conduct that cannot be attributed to SBG.  This Court has covered this ground.  It should not, after years of proceedings and a definitive judicial resolution affirmed by the Second Circuit, begin the process anew.

## BACKGROUND AND STATEMENT OF THE CASE

Much of the background will be familiar to the Court.  SBG, founded in 1989, is one of the largest engineering and construction companies in the Arab world.  SBG is owned by nineteen half-brothers of Osama Bin Laden ("OBL").  Until 1993, OBL held a small stake (approximately 2%) in the  company, but he never held any management position at SBG and he certainly did not, as plaintiffs glibly assert, exercise any "control" over the company. (Compl. ¶ 246).  In 1993, in response to OBL's increasingly strident criticism of the Saudi government, the owners of SBG passed a resolution to remove him as a shareholder.  In February 1994, Bakr Binladin, the senior member of the family and Chairman of SBG, publicly denounced OBL in a statement released to the media,[1] and in April 1994, the Saudi government revoked OBL's citizenship and froze his assets.[2]  All of this occurred long before Plaintiffs claim OBL began publicly targeting the United States, and years before OBL was designated as a terrorist.[3]  The United States has never designated SBG or any of its executives, employees or shareholders as a terrorist, nor has it seized or frozen any of the company's assets. Instead, the  United States government has long worked with SBG and its affiliates on such

---

[1] Suppl. Decl. of Bakr Binladin ¶ 7 and Exs. 6, 7 (Sept. 7, 2010) ("Bakr Decl.") (MDL Dkt. No. 2285).

[2] Nat'l Comm'n on Terrorist Attacks Upon the U.S., The 9/11 Commission Report 57 (2004), http://govinfo.library.unt.edu/911/report/911Report.pdf ("The 9/11 Commission Report") ("By 1994, the Saudi government would freeze [OBL's] financial assets and revoke his citizenship.").

[3] *See infra* 12-14; *see also* Mem. in Support of Def. Saudi Binladin Group's Renewed Mot. to Dismiss For Lack of Personal Jurisdiction and for Failure to State a Claim at 8-11 ("SBG Renewed Mot. to Dismiss") (MDL Dkt. No. 2284).

projects as the construction of an airbase and a 1200 km road to facilitate movement of U.S. forces during the first Gulf War.[4]

The *Burnett* and *Ashton* plaintiffs in this multidistrict litigation sued SBG, among many others, in 2002. SBG moved to dismiss those suits, and in 2005, in part as an alternative to requiring a more definite statement under Rule 12(e) to remedy the dearth of specificity in plaintiffs' complaints, Judge Casey ordered "limited jurisdictional discovery to investigate whether SBG purposefully directed its activities at the United States . . . ." *In re Terrorist Attacks on Sept. 11, 2001*, 349 F. Supp. 2d 765, 822, 836 (S.D.N.Y. 2005) ("*Terrorist Attacks I*"). The *Federal Insurance* plaintiffs, represented by current counsel for the *Lloyd's* Plaintiffs, filed suit against SBG and others in 2003, but due to the timing of service, that case was not part of SBG's original motion to dismiss. Following Judge Casey's ruling, the plaintiffs and SBG agreed to stay briefing in other cases until the completion of jurisdictional discovery, *see* Order ¶¶ 12-13 (July 27, 2005) (MDL Dkt. No. 1071). By agreement, plaintiffs' counsel, including counsel for the *Federal Insurance* plaintiffs, participated in that discovery consistent with the Court's Case Management Orders instructing plaintiffs to pursue discovery jointly. *See* Case Management Order # 2 ¶ 20 (June 16, 2004) (MDL Dkt. No. 247); Case Management Order # 3 ¶ 9 (June 16, 2004) (MDL Dkt. No. 248-2).

Magistrate Judge Maas closely supervised jurisdictional discovery over the course of which he received extensive written briefing and held four hearings. While recognizing that plaintiffs were "stretching the discovery envelope," Judge Maas also allowed two depositions, including one over which he presided personally. *See* Discovery Order at 1 (Oct. 3, 2007) (MDL Dkt. No. 2042). After three years, however, in 2008 Judge Maas rejected the plaintiffs'

---

[4] *See* Aff. of Omar Mohammad Binladin ¶ 9 and Ex. 2 (Sept. 7, 2010) (MDL Dkt. No. 2288) (noting and including recognition from the U.S. military for SBG's assistance in Saudi Arabia from 1990-98).

attempt to begin a fresh round of discovery, explaining that the "substantial additional discovery" the plaintiffs sought was "of no jurisdictional significance whatsoever in this litigation," aimed at "continuing to go over old ground," or sought further information as to factual allegations that, even if true, "d[id] not suggest a basis for jurisdiction over SBG." *In re Terrorist Attacks on Sept. 11, 2001*, No. 03-md-01570, 2008 WL 8183819, at \*2-3, \*7 (S.D.N.Y. May 21, 2008) (MDL Dkt. No. 2090), *aff'd* Order (July 14, 2008) (MDL Dkt. No. 2108). Judge Maas noted that "jurisdictional discovery must have boundaries" and that "the Court and counsel have been mired at this preliminary stage for a considerable period of time." *Id.* at \*5.

Following that discovery, this Court granted SBG's Renewed Motion to Dismiss for lack of personal jurisdiction. *See Terrorist Attacks VI*, 840 F. Supp. 2d at 780-82.[5] Among other things, the Court concluded:

> SBG's alleged support of Osama Bin Ladin before 1993 is too temporally remote to establish specific jurisdiction. *See Terrorist IV*, 718 F. Supp. 2d at 483, 486. ("Defendants' alleged provision of financial and other material support to al Qaeda in the early 1990's, enabling it to expand its base of operations in the Sudan, is too remote to the terrorist attacks of September 11, 2001, to confer specific jurisdiction.").

*Terrorist Attacks VI*, 840 F. Supp. 2d at 782. On review, considering the various claims that the plaintiffs had submitted to this Court in their Summary of Allegations (MDL Dkt. No. 2386-1), which was also presented to the appellate court, the Second Circuit "agree[d] with the District Court's dismissal of SBG." *Terrorist Attacks VIII*, 714 F.3d at 676. In particular, the Second Circuit

---

[5] We note that while the parties generally follow the same numbering nomenclature in referring to prior decisions in this case, the recent motions to dismiss filed by the Kingdom of Saudi Arabia and the Saudi High Council do not cite this decision, which pertained only to SBG, and therefore designate one of the later Second Circuit opinions as "*Terrorist Attacks VI*" in their unrelated motions.

> agree[d] with the District Court that nothing in the record supports
> the notion that these actions were "expressly aimed" at the United
> States or are connected in any meaningful way, for the purposes of
> establishing personal jurisdiction, to the September 11, 2001
> attacks.

*Id.* "We are persuaded," it said, "that the pre-1993 'support' provided by SBG to Osama Bin

Laden does not provide a valid basis for us to exercise personal jurisdiction over the company."

*Id.* at 677. The Supreme Court, with the recommendation of the U.S. Solicitor General, denied

plaintiffs' petition for certiorari. *O'Neill v. Al Rajhi Bank*, 134 S. Ct. 2870 (2014).

Undeterred by those prior decisions, plaintiffs' counsel in *Federal Insurance* filed a new

suit, brought by new insurance company plaintiffs, against SBG and two other companies who

were also previously dismissed from the litigation. They sought to avoid this Court by filing in

the Western District of Pennsylvania, *see Underwriting Members of Lloyd's Syndicate 2*

*v. Al Rajhi Bank*, No. 3:16-cv-00019 (W.D. Pa. Jan. 15, 2016), but the Judicial Panel on

Multidistrict Litigation ("JPML"), over the *Lloyd's* Plaintiffs' objection, transferred the case to

this Court. *See* Transfer Order, MDL No. 1570 (JPML Oct. 3, 2016) (Dkt. No. 77).[6] In doing

so, the JPML noted that "highly similar claims against all three defendants previously have been

adjudicated during the course of the MDL proceedings, and the transferee court's rulings

dismissing the defendants have been affirmed on appeal." *Id.* at 2. The *Lloyd's* Plaintiffs argued

against transfer on several grounds, including that "their action is premised on facts and evidence

that were not available at the time the MDL actions were commenced," but the JPML found that

---

[6] Additional Plaintiffs, which include other insurance companies that claim damages for payments made for losses resulting from the September 11 attacks and individuals who allege that they have suffered health effects linked to exposure to toxins as a result of the attacks, filed follow-on actions, all of which have been consolidated in MDL 1570. Following a procedure established by Magistrate Judge Netburn, the *Lloyd's* Plaintiffs filed an Amended Complaint on May 19, 2017, the allegations of which the other Plaintiffs have adopted, in lieu of amending their own complaints, through a "Short Form Complaint." *See* Order (MDL Dkt. No. 3584). Therefore, the allegations of the Amended *Lloy*d's Complaint constitute the operative allegations for all Plaintiffs in the above-captioned actions.

"[t]hese arguments are not convincing." *Id.* As will be shown below, Plaintiffs' claims against SBG rest almost entirely on the same allegations this Court and the Second Circuit have already addressed. And to the extent Plaintiffs plead supposed "new" evidence, they add nothing of jurisdictional relevance that should alter the courts' prior conclusion that they lack personal jurisdiction over SBG.

## STANDARD OF REVIEW

"On a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of showing that the court has jurisdiction over the defendant." *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 566 (2d Cir. 1996). A court may consider not just the pleadings themselves, but also documents quoted or referenced in the complaint, *see Mao v. Sands Bethworks Gaming LLC*, No. 15-cv-6252, 2016 WL 1717220, at *1 (S.D.N.Y. Apr. 28, 2016), as well as affidavits and other written materials, *see MacDermid, Inc. v. Deiter*, 702 F.3d 725, 727 (2d Cir. 2012).

In considering these allegations, "[t]he Court will construe 'all pleadings and affidavits in the light most favorable to the plaintiff' and resolve 'all doubts in the plaintiff's favor.'" *Hussein v. Dahabshiil Transfer Servs. Ltd.*, 230 F. Supp. 3d 167, 174 (S.D.N.Y. 2017) (quoting *Penguin Group (USA) Inc. v. American Buddha*, 609 F.3d 30, 34 (2d Cir. 2010)). Yet the court "will not draw argumentative inferences in the plaintiff's favor," nor "accept as true a legal conclusion couched as a factual allegation." *In re Terrorist Attacks VIII*, 714 F.3d at 673 (quotations omitted); *accord Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 59 (2d Cir. 2012). When "a court decides a motion to dismiss for lack of personal jurisdiction . . . the complaint must have established with reasonable particularity those specific facts that support jurisdiction." *Palnik v. Westlake Entm't Inc.*, 344 F. App'x 249, 251 (6th Cir. 2009) (quoting *Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 887 (6th Cir. 2002)). Therefore, the

Court should take as true only "all well-pled (that is, plausible, non-conclusory, and non-speculative) . . . facts alleged in plaintiffs' complaint." *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1070 (10th Cir. 2008). Inferences must be based in well-pled fact. While the Second Circuit has long accepted circumstantial proof of one "fact from the existence of other facts which have been proved[,] . . . the presumed fact must have an immediate connection with the established facts from which it is inferred. . . . '[O]ne presumption cannot be built on another.'" *Smith v. Pennsylvania R. Co.*, 239 F. 103, 104-05 (2d Cir. 1917) (citations omitted). Even on a motion to dismiss, the court need not indulge an "extended chain of inferences" that amounts to speculation. *Rothstein v. UBS AG*, 647 F. Supp. 2d 292, 293-94 (S.D.N.Y. 2009).

Similarly, on a motion to dismiss for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted); *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 118, 122 (2d Cir. 2013) ("*Terrorist Attacks VII*"); *accord Rothstein v. UBS AG*, 708 F.3d 82, 94 (2d Cir. 2013); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007). For a claim to have "facial plausibility," a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556) . This test "asks for more than a sheer possibility that a defendant has acted unlawfully" and it views "plead[ed] facts that are merely consistent with a defendant's liability" as "stop[ping] short of the line between possibility and plausibility of entitlement to relief." *Id.* (quotation omitted). Accordingly, "'[w]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct' . . . dismissal is appropriate." *Starr v. Sony BMG Music Entm't*, 592

F.3d 314, 321 (2d Cir. 2010) (quoting *Iqbal*, 556 U.S. at 679); *In re Terrorist Attacks on Sept. 11, 2001*, 718 F. Supp. 2d 456, 491 (S.D.N.Y. 2010) ("*Terrorist Attacks IV*").

## ARGUMENT

I.    **THE CLAIMS AGAINST SBG MUST BE DISMISSED BECAUSE, AS BOTH THIS COURT AND THE SECOND CIRCUIT HAVE PREVIOUSLY HELD, THIS COURT DOES NOT HAVE PERSONAL JURISDICTION OVER SBG.**

A.    **Personal Jurisdiction in this Context Requires that Plaintiffs' Injuries Arise out of Defendant's Intentional Tortious Conduct Purposefully Directed at the United States.**

Both times it has addressed personal jurisdiction in this case, the Second Circuit recognized two fundamental requirements to establish specific jurisdiction over the foreign defendants.  First, Plaintiffs must plead facts to show that a defendant "'expressly aimed' intentional tortious acts at residents of the United States."  *In re Terrorist Attacks on Sept. 11, 2001*, 538 F.3d 71, 95 (2d Cir. 2008) ("*Terrorist Attacks III*") (quoting *Calder v. Jones*, 465 U.S. 783, 789 (1983)); *Terrorist Attacks VIII*, 714 F.3d at 674.  As this Court distilled the standard:

> [I]n the context of a terrorism-related litigation, a defendant's alleged intentional tortious conduct aimed at the United States is *conduct that is intended to directly aid in the commission of a terrorist act*, with knowledge that the brunt of the  injuries will be felt in the United States.

*Terrorist Attacks IV*, 718 F. Supp. 2d at 480 (emphasis added).  Second, and just as importantly, Plaintiffs must also plead facts to show that their injuries "'arise out of or relate to' those activities."  *Terrorist Attacks III*, 538 F.3d at 93 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472-73 (1985)); *Terrorist Attacks VIII*, 714 F.3d at 674.

Neither the Second Circuit's decisions nor those of this Court broke new ground.  "When a controversy is related to or 'arises out of' a defendant's contacts with the forum, the Court has said that a 'relationship among the defendant, the forum, and the litigation' is the essential foundation of in personam jurisdiction."  *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466

U.S. 408, 414 (1984) (quoting *Shaffer v. Heitner*, 433 U.S. 186, 204 (1977)).  This constitutional limitation prevents a foreign defendant from "being subject to the binding judgments of a forum with which he has established no meaningful contacts, ties, or relations."  *Burger King*, 471 U.S. at 471-72 (internal quotation marks omitted).  It is therefore "'*essential in each case* that there be some act by which the defendant *purposefully avails* itself of the privilege of conducting activities within the forum State . . . .'"  *Id.* at 474-75 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)) (emphasis added).  This requirement is "essential" – and particularly important in cases such as this – because it ensures that jurisdiction is not premised on "'attenuated' contacts," *id.* at 475 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 299 (1980)), or "unilateral activity of another party," *id.* (quoting *Helicopteros Nacionales*, 466 U.S. at 417).  The cases are clear that "the defendant *himself* . . . [must] create a 'substantial connection' with the forum State."  *Id.* (quoting *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223 (1957)) (emphasis in original); *accord Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 335 (2d Cir. 2016), *petition for cert. docketed*, *Sokolow v. Palestine Liberation Org.*, No. 16-1071 (U.S. Mar. 7, 2017).

The Second Circuit and this Court have repeatedly applied this standard to Plaintiffs' allegations, holding that providing funds to intermediary organizations, even "with the knowledge that [they] would transfer the funds to al Qaeda," will not establish the necessary conduct directed at the United States.  *Terrorist Attacks III*, 538 F.3d at 77.  Even if "acts of violence committed against residents of the United States were a foreseeable consequence of" such conduct, "foreseeability is not the standard for recognizing personal jurisdiction.  Rather, the plaintiffs must establish that the [defendants] 'expressly aimed' intentional tortious acts at residents of the United States."  *Id.* at 95 (quoting *Calder*, 465 U.S. at 789).  That was the

conclusion the Second Circuit reached when addressing personal jurisdiction over several Saudi princes in 2008.  *Id.*  When it addressed personal jurisdiction with respect other defendants five years later, it found that the plaintiffs' allegations were in many respects "indistinguishable" from those in *Terrorist Attacks III*, and that even where the plaintiffs' arguments were not "directly foreclosed" by that decision, the court concluded that the allegations against SBG and its chairman, among others, were likewise "conclusory and insufficient for specific jurisdiction purposes."  *Terrorist Attacks VIII*, 714 F.3d at 676; *see also id.* at 676-78.  Plaintiffs may well argue, as some of their counsel did in the Second Circuit and in twice-unsuccessful petitions to the U.S. Supreme Court, that the standard should be different, but the law applicable to this case is clear.

> B.    **The Bulk of Plaintiffs' Allegations Are Substantively the Same, if Not Identical, to Those Against SBG that This Court Previously Rejected.**

The allegations in Plaintiffs' Complaint will look familiar.  The overwhelming majority are substantively the same, in many cases phrased identically, to the allegations and factual claims at issue in the prior suits against SBG.  Attached as Exhibit A is a chart that compares, with direct quotations, the current allegations to those from the prior litigation, which include prior plaintiffs' "Summary of Allegations and Evidence in Support of Their Theories of Specific Jurisdiction as to Saudi Binladin Group," submitted in 2010 in response to SBG's previous motion to dismiss, as well as individual complaints, briefs, and RICO statements where appropriate.  Out of the 65 paragraphs directed against SBG in the new complaint, 59 are either conclusory allegations or repeat, often verbatim, the same substantive allegations made in the dismissed cases.  (Compl. ¶¶ 278-79, 281, 310, 246-77, 280, 282-98, 301-05.).  This Court examined those allegations carefully and concluded that they did not suffice to establish jurisdiction over SBG.  *See Terrorist Attacks VI*, 840 F. Supp. 2d at 782.  Notably, the Court also

assessed many of the same allegations in dismissing claims against SBG's chairman, Bakr Binladin, and other members of the Binladin family.  *See Terrorist Attacks IV*, 718 F. Supp. 2d at 483.

All of those decisions were affirmed by the Second Circuit, *see Terrorist Attacks VIII*, 714 F.3d at 676-77, so principles of *stare decisis* weigh against reconsidering these recycled allegations now.  *See, e.g.*, *Karpus v. Hyperion Capital Mgmt.*, No. 96-cv-4671, 1997 U.S. Dist. LEXIS 4332, at *10-11 (S.D.N.Y. Apr. 2, 1997) (concluding that "given the plaintiff's total failure to allege any facts that might serve to distinguish this case from [a prior appellate decision regarding the same registration statement], the doctrine of *stare decisis* compels [the court] to follow the determination of this issue by the Court of Appeals"); *Rains v. Jil-Mic, Inc.*, 301 F. Supp. 545, 546 (S.D.N.Y. 1969) (concluding that "stare decisis dictates that this court follow the decision, based on the same facts, of the Western District of New York and affirmed by the Court of Appeals").  We will address those allegations briefly below, but will avoid burdening the Court with the same arguments it has already addressed.  The few sparse new allegations are addressed in the next section.

As the other plaintiffs before them, Plaintiffs do not claim that SBG participated in any way in or provided any material support to the September 11 attacks or any other terrorist act. Instead, they claim that SBG (or, more often, unidentified members of the Binladin family) engaged in conduct outside the United States that somehow benefited OBL and that any such conduct – no matter how temporally, geographically, or causally remote from the  September 11 attacks – constitutes conduct that is "purposefully directed" at the United States.  As this Court and the Second Circuit have repeatedly held, that is not sufficient to establish personal jurisdiction.

Plaintiffs' allegations against SBG fall primarily into two categories.  First, Plaintiffs contend that SBG provided support to OBL prior to his removal as a shareholder in 1993 in places such as the Sudan.  Second, they contend that SBG maintained a "lifeline" to OBL even after removing him as a shareholder in 1993.  This Court has rejected both theories before.  *See Terrorist Attacks VI*, 840 F. Supp. 2d at 782.

> 1. **Alleged Pre-1993 Support to OBL, Whether in Sudan or Elsewhere, Is too Remote as a Matter of Law to Support Personal Jurisdiction.**

Plaintiffs repeat prior plaintiffs' discredited claims that SBG worked with OBL on construction projects in the Sudan from 1989-92, and that such projects allowed OBL to fulfill a "quid pro quo" arrangement he made with a Sudanese  politician, Hassan al Turabi.  *See* Ex. A (comparing ¶¶ 252-258 to prior allegations).  Undisputed affidavits previously submitted by SBG as well as the timing of SBG's construction of the Port Sudan airport conclusively rebut these claims.  *See* SBG Renewed Mot. to Dismiss at 11-13 (MDL Dkt. No. 2284).  Yet even if such allegations were factually supported, performance of a government contract from 1989-92 to construct an airport in the Sudan is simply not tortious conduct by SBG purposefully directed at the United States.

This Court has previously held as a matter of law that claims based on such temporally and geographically remote conduct do not support personal jurisdiction.  As the Court explained with respect to other defendants, "alleged acts of rendering support to al Qaeda during its formative years . . . are too remote and attenuated to support the exercise of specific jurisdiction."  *Terrorist Attacks IV*, 718 F. Supp. 2d at 486-87.  Specifically as to SBG, this Court held that "SBG's alleged support of Osama Bin Ladin before 1993 is too temporally remote to establish specific jurisdiction."  *Terrorist Attacks VI*, 840 F. Supp. 2d at 782.  The Second Circuit expressly agreed:  "[W]e are persuaded that the pre-1993 'support' provided by SBG to Osama

Bin Laden does not provide a valid basis for us to exercise personal jurisdiction over the company." *Terrorist Attacks VIII*, 714 F.3d at 677.  Nor did that conclusion depend on the evidence presented by SBG debunking the allegations, because the Second Circuit also held, on the pleadings, that "the only alleged support given by Bakr, Omar, Tarek, and Yeslam Bin Laden through their positions at SBG necessarily occurred before 1993," which was insufficient to establish personal jurisdiction as to them as well. *Id.*

Plaintiffs seek to challenge this conclusion by asserting that, while OBL did not publicly target the United States until 1996 and was not designated as a terrorist by the U.S. government until 1998,[7] SBG (or at least, "Osama's family members") must have known of OBL's anti-US objectives as early as 1988 and no later than 1992. *See* Compl. ¶¶ 264, 267.   But those assertions also are nothing new.  *See* Ex. A (comparing ¶¶ 263-70 with prior allegations).  This Court has previously considered, and expressly found insufficient, every one of the facts alleged to support the claim "that given 'the strong familial ties between SBG's principals and their half brother Osama, they were put on notice as early as 1988 and absolutely no later than 1990 that any funds going to Osama were supporting a growing anti-American terrorist organization.'" *Terrorist Attacks VI*, 840 F. Supp. 2d at 782 (quoting prior plaintiffs' brief in opposition to SBG's motion to dismiss).  As noted above, the Second Circuit expressly affirmed that conclusion.

The current Complaint provides no reason to revisit that conclusion.  Even if true, allegations that SBG was on notice of OBL's anti-American terrorist ambitions are not sufficient to establish jurisdiction because "foreseeability is not the standard for recognizing personal

---

[7] *See* Exec. Order No. 13099, 63 Fed. Reg. 45,167 (Aug. 20, 1998); *see also* The 9/11 Commission Report 108 ("Until 1996, hardly anyone in the U.S. government understood that Usama Bin Ladin was an inspirer and organizer of the new terrorism.").  This Court noted that OBL identified the United States as al Qaeda's main enemy in 1996. *See Terrorist Attacks IV*, 718 F. Supp. 2d at 464.

jurisdiction. Rather, the plaintiffs must establish that the [defendants] 'expressly aimed' intentional tortious acts at residents of the United States." *Terrorist Attacks III*, 538 F.3d at 95 (quoting *Calder*, 465 U.S. at 789). But in addition, Plaintiffs' conclusory allegation about SBG's "knowledge" is not supported by any well-pled facts. For example, Plaintiffs claim, as the plaintiffs before them did, that a New York Times article in 1993 put SBG on notice that OBL was targeting the United States, *see* Ex. A (comparing ¶ 270 with prior allegation), but the cited article describes an attack on a hotel in Yemen where an Australian was killed; there is no mention in the article of attacks on U.S. interests or the presence of U.S. troops. Plaintiffs cite, as the plaintiffs before them did, U.S. intelligence reports but provide no facts explaining how SBG could have had access to such confidential documents. *See* Ex. A (comparing ¶ 269 with prior allegation). They cite a private 1992 fatwah issued by OBL but allege no facts suggesting that anyone outside of a small group of sworn al Qaeda members was aware of it until many years later. *See* Ex. A (comparing ¶ 263 with prior allegations). And they quote selectively from a speech supposedly given by OBL in 1990 calling for jihad against Americans, but omit that, according to their source,[8] the "jihad" OBL called for was an economic boycott of the United States. *See* Ex. A (comparing ¶ 264 with prior allegation). As this Court and the Second Circuit have already held, none of these allegations are sufficient to establish that SBG expressly aimed tortious conduct at the United States.[9]

---

[8] Although ¶ 264 omits the citation, in prior proceedings in this MDL, the plaintiffs identified the source of this allegation as Lawrence Wright, *The Looming Tower*, 150-51, 405 (2007). Briefing on SBG's prior motion to dismiss provided the context Plaintiffs leave out. *See* Reply Br. in Support of Def. Saudi Binladin Group's Renewed Mot. to Dismiss for Lack of Personal Jurisdiction and for Failure to State a Claim at 17-18 (Dec. 20, 2010) (MDL Dkt. No. 2395).

[9] Plaintiffs, like the plaintiffs before them, also cite, as part of the Complaint's recitation of the factual background, the so-called "Golden Chain" document (*see, e.g.*, Compl. ¶¶ 90-91, 133, 136), which twelve years ago Judge Casey declared "does not say what the [p]laintiffs argue it says," *Terrorist Attacks I*, 349 F. Supp. 2d at 818; *see also id.* at 817 (noting that "with no

2. **Plaintiffs Allege No Facts to Contradict that SBG removed OBL as a Shareholder of SBG in 1993-94 and Provided No Support Thereafter.**

The facts surrounding OBL's removal as a shareholder from both SBG and a separately held but related company, Mohammed Binladin Company ("MBC"), have been put before this Court in great detail.  As Judge Maas explained:

> As the documents confirm, on June 16, 1993, SBG adopted a shareholder resolution that sought to transfer OBL's shares to Ghaleb and to remove OBL from the shareholder roster.  (Defs.' Letter Ex. 1 at 13).  Before the resolution could take effect, SBG needed governmental approval.  Accordingly, Bakr wrote to King Fahd that same day to seek approval.  (*Id.*).  Bakr also requested that the value of OBL's interest in SBG be held in a trust outside of OBL's control. (*Id.* at 14). After the government finally approved this plan of action, the shareholder resolution took effect on May 2, 1994.  (*Id.* at 17).  Subsequently, in 2000, following further governmental approval, Ghaleb transferred the value of the shares into a joint trust account at National Commercial Bank ("NCB").  (*Id.* at 20).
>
> This sequence of events, which is fully supported by the relevant documents, establishes that the process of transferring OBL's shares began in 1993, received preliminary governmental approval in 1994, and was completed in 2000.

*In re Terrorist Attacks on Sept. 11, 2001*, 2008 WL 8183819, at *4 (MDL Dkt. No. 2090).

Plaintiffs simply restate the same allegations that were rejected before.  *See* Ex. A (comparing Compl. ¶¶ 289-98 to prior allegations).  Thus, two essential facts remain unchallenged, that

---

(continued…)

indication of who wrote the list, when it was written, or for what purpose, the Court cannot make the logical leap that the document is a list of early al Qaeda supporters"), and which this Court rejected as a basis for personal jurisdiction over the individual Binladin defendants, let alone SBG.  *See Terrorist Attacks IV*, 718 F. Supp. 2d at 483 (noting that "[e]ven if the Golden Chain was of jurisdictional relevance, there is no basis to conclude that the reference to the 'Bin Laden Brothers' is specifically identifying [SBG's chairman] Bakr, Omar, Tariq and Yeslam who, along with Osama bin Laden, are among the purported fifty-four children of Mohammed Awad Binladin").

(1) SBG initiated action to remove OBL as a shareholder in 1993 and (2) OBL did not receive a penny for his shares.  *See* Bakr Decl. ¶¶ 3-4, 10 (MDL Dkt. No. 2285).

Plaintiffs also allege, as did the plaintiffs before them, that "SBG directors and [unspecified] Bin Laden family members kept a financial lifeline open" to OBL.  *See* Ex. A (comparing Compl. ¶ 284 to prior allegations.).  Plaintiffs do not identify which so-called "SBG director"[10] supposedly maintained such a "lifeline," nor how that was accomplished, but on its face, this allegation does not attribute any specific conduct to SBG.  In support of this allegation, Plaintiffs recycle previously rejected claims that an account Ghaleb Binladin established in 1993 at Bank al Taqwa is "*consistent with* the indirect investment of Osama bin Laden's funds in Bank al Taqwa by SBG."  Compl. ¶ 298 (emphasis added); *see also* Ex. A (comparing Compl. ¶ 298 to identical prior allegation).   But Plaintiffs do not claim that OBL actually received any benefit from that account, that the account had any connection to the September 11 attacks, or that SBG had any interest in or control over the account.[11]  As this Court has noted, "'Where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, [ ] dismissal is appropriate.'"  *Terrorist Attacks IV*, 718 F. Supp. 2d at 491 (quoting *Starr*, 592 F.3d

---

[10] SBG had no board of directors.  *See* Bakr Decl. ¶ 3 (MDL Dkt. No. 2285).

[11] In fact, the evidence previously submitted in this litigation, including by plaintiffs, contradicts any claim that the account has any connection to OBL's shares.  Ghaleb opened that account months before the Saudi government approved the resolution removing OBL as a shareholder, with an amount ($1 million, based on documents the plaintiffs previously submitted, *see* MDL Dkt. No. 2386-37, at 14) that bears no relation to the value of OBL's former shares ($9.8 million).  Bakr Decl. ¶ 9 (MDL Dkt. No. 2285).  Plaintiffs allege no payments from the account to anyone, much less OBL, and when Ghaleb sought to close the account in June 1997, the bank refused to return his money due to losses in the Asian financial crisis.  Ghaleb then sued the bank, seeking an order requiring its closure.  *See id.*  All of this took place years before Bank al Taqwa was designated a supporter of terrorism in November 2001.  *See* U.S.  Department of the Treasury, *Recent OFAC Actions*, (Nov. 7, 2001), http://www.treasury.gov/resource-center/sanctions/OFAC-Enforcement/Pages/20011107.aspx.

at 321) (alteration in original).  This Court properly rejected identical allegations in prior

complaints and should do so again.  *Terrorist Attacks VI*, 840 F. Supp. 2d at 782.

Finally, Plaintiffs have revived the allegation that SBG "provided cover" for supposed

al Qaeda supporter Mohammed Jamal Khalifa, as allegedly shown by Khalifa's use of MBC's

address on a visa application in 1994.  *See* Ex. A (comparing Compl. ¶ 270 to prior allegations).

Plaintiffs allege no facts to connect that action to SBG,[12] nor do they explain how it could be

jurisdictionally relevant to SBG when both the person who allegedly received the support

(Khalifa) and the entity allegedly providing it (MBC) have been dismissed from this litigation for

lack of jurisdiction despite that allegation.  *See In re Terrorist Attacks on Sept. 11, 2001*, 740 F.

Supp. 2d 494, 508-09 (S.D.N.Y. 2010) ("*Terrorist Attacks V*") (noting that plaintiffs "do not

allege that Khalifa himself played any role in the 9/11 terrorist attacks" and concluding that

'[t]he allegations of Khalifa's involvement in terrorist activities, during the 1990's, are

insufficient to demonstrate that the injuries suffered, on September 11, 2001, are related to or

arise from Khalifa's intentional tortious activities"); *Terrorist Attacks IV*, 718 F. Supp. 2d at 467

n.4.

C.    **Plaintiffs' "New" Allegations Do Not Cure the Jurisdictional Defects in
      Plaintiffs' Pleadings.**

Plaintiffs cite to three recently available documents as new evidence to support

previously rejected jurisdictional allegations.  None of them provides a basis to find that SBG

expressly aimed tortious conduct at the United States.

---

[12] SBG and MBC are separate legal entities with different, albeit overlapping, sets of
individual shareholders.  *See* Bakr. Decl. ¶ 1 (MDL Dkt. No. 2285).  Plaintiffs do not claim that
MBC is a subsidiary of SBG and instead make the vague claim, as did the plaintiffs before them,
that MBC is "under the umbrella of SBG," (Compl. ¶ 288) or that it is "part of its same corporate
structure" as SBG (Compl. ¶ 280).  *See also* Ex. A (comparing Compl. ¶ 288 to prior
allegations).  These characterizations are false but, even if true, they do not permit MBC's
conduct to be attributed to SBG.

1.      **The Abbottabad Sudan Document.**

Plaintiffs cite a document retrieved during the raid on OBL's compound in

Abbottabad, Pakistan, ostensibly written by OBL regarding the disposition of funds he had in

Sudan.  Plaintiffs call it a "will," though it has no legal indicia of such.  The document, as

relevant here, makes reference to $12 million he received at an unspecified time from his

brother Bakr "on behalf of Bin Laden Company, for their investment in Sudan."  (Compl.

¶ 299, quoting document[13]).  Plaintiffs posit this as evidence of "a continuing financial

mechanism," *id.*, to support OBL after his removal as a shareholder, but there is nothing in

the document to support that, nor to attribute any actions to SBG.  Plaintiffs claim the

document was written in the late 1990s, but it says nothing about when he received the

money, and in fact the document is perfectly consistent with Plaintiffs' oft-repeated allegation

(*see, e.g.*, Compl. ¶ 248) that OBL received as much as $1 million a year from his family

between the early 1970s and 1993.  The document by its own terms indicates the purpose of

the funds was "for . . . investment in Sudan," which has no connection to attacks on the

United States.  This Court has twice ruled that alleged support to OBL in the Sudan is too

remote to confer jurisdiction:  "'Defendants' alleged provision of financial and other material

support to al Qaeda in the early 1990's, enabling it to expand its base of operations in Sudan,

is too remote to the terrorist attacks of September 11, 2001, to confer specific jurisdiction.'"

*Terrorist Attacks VI*, 840 F. Supp. 2d at 782 (quoting *Terrorist Attacks IV*, 718 F. Supp. 2d at

483).

Plaintiffs further allege, as is indicated in the document, that OBL urged his family

members to spend the remainder of the money on holy war and that this "suggest[s] that

---

[13] For purposes of this motion only, SBG assumes that Plaintiffs' translation of the document as reflected in the Complaint is accurate.  SBG reserves its right to challenge aspects of the translation should further proceedings follow.

Osama's siblings and relatives remained supportive of his jihadist agenda." Compl. ¶ 300. But it suggests nothing of the kind. In OBL's words, "'I hope for my brothers, sisters and maternal aunts to obey my will and to spend all the money that I have left in Sudan on jihad, for the sake of Allah.'" *Id.* There is nothing in the document to suggest they were supportive in the first place. And OBL's "hope" that they would join the cause cannot by any stretch support jurisdiction against his family members, much less against SBG, which is not mentioned in the document.

2.   **Moussaoui's *Ex Parte* Prison Statement.**

Plaintiffs also make new allegations based on a statement counsel for the *Lloyd's* Plaintiffs (then as *Federal Insurance* counsel) and other plaintiffs' counsel took, under the auspices of the MDL 1570 litigation but without notice to any of the defendants, from Zacarias Moussaoui, a federal prisoner currently serving six life sentences for his role in the September 11 attacks. This Court has seen Moussaoui's statement before, *see In re Terrorist Attacks on Sept. 11, 2001*, 134 F. Supp. 3d 774, 787 n.13 (S.D.N.Y. 2015) ("*Terrorist Attacks IX*") (holding Moussaoui's statements did not give the Court a legal basis to strip defendants of immunity under the FSIA), *appeal filed*, No. 15-3426 (2d Cir. Oct. 27, 2015), and his mental illness and history of bizarre statements are well-documented.[14] Among other things, he has previously testified under oath that he believed it was "okay to lie in court as part of jihad"[15] and that his previous testimony about involvement in the September 11 attacks had been a "complete

---

[14] Phil Hirschkorn, *Moussaoui: 'Crazy or not crazy?  That is the question'  9/11 conspirator's odd ideas, behavior detailed at trial*, CNN.com (Apr. 19, 2006), http://www.cnn.com/2006/LAW/04/18/moussaoui.trial/index.html (outlining testimony from the defense's leading mental health expert supporting his assessment that Moussaoui is a paranoid schizophrenic who suffers from delusions).

[15] Trial Tr. 2382:11-24, *United States v. Moussaoui*, No. 01-cr-455 (E.D. Va. Mar. 27, 2006) (Dkt. No. 1756).

fabrication."[16]  Putting aside his competence or credibility as a witness, his statements with respect to SBG and, often indistinguished, members of OBL's extended family are of no jurisdictional significance.

Plaintiffs make two claims based on Moussaoui's statement.  First, they attempt to cast doubt on SBG's documented removal of OBL as a shareholder in 1993-94.  Moussaoui claimed no personal knowledge about that, so *Lloyd's* counsel instead asked him whether it was true that "*the family* severed all ties with Osama in 1994."  Aff. of Sean P. Carter Transmitting Evidence in Support of Pls. Mem. Of Law in Opp. to Mot. to Dismiss of the Kingdom of Saudi Arabia and Saudi High Commission for Relief of Bosnia & Herzegovina, Ex. 5 (Statement Under Oath of Zacarias Moussaoui) at 19:9-10 ("Moussaoui Stmt.") (MDL Dkt. No. 2927-5) (emphasis added). Misrepresenting the transcript, the Complaint asserts that Moussaoui was "told that SBG had made several representations in court proceedings that the bin Laden family *and SBG* had severed all ties with Osama in 1994[.]"  Compl. ¶ 307 (emphasis added).  In fact, counsel for *Lloyd's* Plaintiffs did not mention SBG in the question posed to Moussaoui, and Moussaoui's answer addresses OBL's contacts with his family, including visits by his mother and children. He does not claim that any of the family visitors had any connection to SBG or even to the Binladin family,[17] which alone renders this new "evidence" irrelevant.  The question and Moussaoui's rambling response are as follows:

---

[16] Aff. of Zacarias Moussaoui ¶ 13, attached to Def.'s Mot. To Withdraw Guilty Plea, *United States v. Moussaoui*, 01-cr-455 (E.D. Va. May 8, 2006) (Dkt. No. 1857).

[17] OBL's parents divorced when he was young; he was the only child of that marriage. His mother remarried and had children with her second husband.  OBL therefore has siblings who are not members of the Binladin family.  *See, e.g.*, Steve Coll, *Young Osama*, The New Yorker (Dec. 12, 2005), http://www.newyorker.com/magazine/2005/12/12/young-osama ("Bin Laden is the only child of the marriage between Alia Ghanem, who was born in Syria, and Muhammad bin Laden . . . .  Osama's parents divorced soon after he was born, according to Khaled M. Batarfi, a Saudi journalist who knew Osama during the nineteen-seventies.  Osama's

- 20 -

> Q:  It -- it's been suggested in our litigation by the bin
> Ladens that the family severed all ties with Osama in 1994, from
> your experience do you know that to be true?
>
> A:  A complete lie.  An -- an absolute lie.  I have -- Shaykh
> Osama give me the name and the e-mail and the telephone number
> of his brother in the United State, okay, I went -- I went to -- to --
> to what's Jeddah, I had contact with the -- one of the brother of
> Shaykh Osama -- and his brother I know, okay, and his brother I
> know was -- the first time I went he was sitting in the -- in the
> compound, okay, and he receive his -- his mother, okay, with two I
> think the brother -- it was one brother or a brother-in-law -- two
> brother, okay, but family member, okay.
>
> And I saw all the -- the children of Osama bin Laden, even
> the one who wrote the book about Osama bin Laden, I knew
> exactly the -- that he was in Afghanistan, okay.  Abdulla bin -- bin
> -- oh, Abdulla bin -- bin Laden, the son -- the -- the -- the oldest
> son of Osama Laden was in the hospital -- hospital -- Chinese
> hospital with me when I had malaria, and I remember because we
> were on the floor and I was receiving an IV, and I didn't know that
> he was the son of Osama bin Laden because he was dressed like an
> Afghan, okay.

Moussaoui Stmt. at 19:8-20:7 (MDL Dkt. No. 2927-5).

Of course, SBG never represented that OBL had no contact with any of his extended family, so Moussaoui's description of family visits does not create a dispute of fact, much less one of jurisdictional import.  Indeed, prior plaintiffs had also alleged that OBL's mother and other unspecified family members visited OBL in Afghanistan, *see, e.g.*, Compl. ¶¶ 643, 663, *World Trade Ctr. Props. LLC v. Al Baraka Inv. and Dev. Corp.*, No. 04-cv-07280 (S.D.N.Y. Sept. 10, 2004), yet those allegations were insufficient to establish jurisdiction because the alleged conduct did not involve SBG, was not "expressly aimed" at the United States, and was not alleged to have had anything to do with the September 11 attacks. Similarly, prior plaintiffs unsuccessfully sought to create a dispute of jurisdictional fact

---

(continued…)

mother then married a man named Muhammad al-Attas . . . .  The couple had four children, and Osama lived in the new household with three stepbrothers and one stepsister.").

sufficient to warrant discovery by pointing to documents indicating that unspecified Binladin brothers had visited OBL in Sudan.  Judge Maas, in a decision affirmed by this Court, rejected plaintiffs' claims because there was no indication that the family visits related to support for OBL's terrorist activities.  *See In re Terrorist Attacks on Sept. 11, 2001*, 2008 WL 8183819, at *3 (MDL Dkt. No. 2090).[18]  By the same token, even taking Moussaoui's account of such family visits as true this Court could not reasonably infer any conduct attributable to SBG or any tortious conduct purposefully directed at the United States.

Second, Plaintiffs  allege that "Moussaoui further testified that SBG assisted al Qaeda in building the camps where the 9/11 hijackers received training by covertly shipping construction parts to Pakistan in the late 1990s, where it was received by al Qaeda members and later transported to Afghanistan."  Compl. ¶ 306.  That assertion misrepresents Moussaoui's actual statement.  When asked if he had "any information indicating that the family in general was continuing -- continuing to send money to Osama bin Laden," Moussaoui replied:  "[W]hen we wanted to buy spare part of -- okay, the -- the spare part were bought by the Saudi bin Laden group, and was sending to -- to Jeddah, and, then, after to Karachi."  Moussaoui Stmt. at 21:4-12 (MDL Dkt. No. 2927-5).  Plaintiffs' counsel chose not to follow up to clarify this ambiguous assertion but instead moved on to questions about the Saudi royal family.

Taking his statement as true for purposes of the current motion, Moussaoui did not say what the "spare part" was, nor even whether SBG knew that a part shipped to Jeddah, Saudi Arabia, where SBG is based, was later sent on by unspecified persons to Karachi.  Contrary to the Complaint, Moussaoui does not say that the "spare part" ended up in Afghanistan, or that it

---

[18] Indeed, Judge Maas noted that the actual facts, ignored by the prior plaintiffs, indicated just the opposite.  *See In re Terrorist Attacks on Sept. 11, 2001*, 2008 WL 8183819, at *3 (noting that "the document that the plaintiffs quote indicates that the unnamed 'brothers' did not travel to OBL to support him, but, rather, 'to disassociate themselves from him and his conduct, and to sever their relationships with him completely.'").

was used to construct camps where the September 11 hijackers trained, or in fact that it had anything to do with attacks on the United States.  Those embellishments were invented by Plaintiffs.  As Judge Casey told the previous plaintiffs in the early stages of this litigation, "Do you maintain that anybody can just make up any sort of claims and conclusions and, therefore, you're entitled to discovery?  That isn't quite what the law is, is it?"  *In re Terrorist Attacks on September 11, 2001*, October 12, 2004 Hearing Transcript at 79:19-22 (MDL Dkt. No. 521).  It is not.

   3. **The "28 Pages."**

   Finally, Plaintiffs add two allegations regarding the recently declassified Part Four of the Report of the Congressional Joint Inquiry Into the Terrorist Attacks of September 11, 2001, commonly referred to as the "28 Pages."  *See* Compl. ¶¶ 308-09.  Notably, the 28 Pages document does not even mention SBG or anyone connected with it, and Plaintiffs do not allege otherwise.   Nevertheless, Plaintiffs tout its relevance because it supposedly shows that "'an extremist and supporter of Usama bin Ladin' named Osama Bassnan 'knew bin Ladin's family in Saudi Arabia' and was in telephone contact with 'members of the family who are living in the United States.'"  Compl. ¶ 308.  Plaintiffs do not identify the particular family members or link any of them to SBG.  Nor do they allege that the telephone contacts had anything to do with terrorist attacks.  Thus, putting aside the fact that the 28 Pages does not represent an investigative determination by the 9/11 Commission,[19] the document provides no basis to infer that SBG engaged in tortious conduct directed at the United States.

---

   [19] *See* Statement by the Office of the Director of National Intelligence on the Declassification of Part Four of the Senate Select Committee on Intelligence and House Permanent Select Committee on Intelligence's 2002 Report on the Committees' Joint Inquiry into Intelligence Community Activities Before and After the Terrorist Attacks of September 11, 2001 (July 15, 2016), https://www.dni.gov/index.php/newsroom/congressional-testimonies/congressional-testimonies-2016/item/1612-statement-by-the-odni-on-the-

Even more of a stretch is Plaintiffs' last new allegation directed at SBG, which merits quotation in full:

> The 28 Pages also discloses an FBI finding that an individual named Fahad Abdullah Saleh Bakala was responsible for "flying Usama bin Ladin between Afghanistan and Saudi Arabia during UBL's exile," a fact that discloses another means through which bin Laden *may have been* maintaining contact with his family during that period.

Compl. ¶ 309 (emphasis added).  The speculative inference plaintiffs seek to draw regarding possible family contacts, even if true, falls woefully short of what is necessary to establish that *SBG* engaged in tortious conduct expressly aimed at the United States.

### D. **Plaintiffs Are Not Entitled to Jurisdictional Discovery.**

Having failed to allege facts to support jurisdiction over SBG, Plaintiffs should not be permitted to conduct jurisdictional discovery in the hopes of finding some.  District courts in the Second Circuit retain broad discretion to grant or deny jurisdictional discovery.  *See, e.g.*, *Frontera Res. Azerbaijan Corp. v. State Oil Co. of Azerbaijan Republic*, 582 F.3d 393, 401 (2d Cir. 2009); *Jazini v. Nissan Motor Co.*, 148 F.3d 181, 185-86 (2d Cir. 1998) (denial of jurisdictional discovery of foreign entity where Plaintiffs made only "conclusory non-fact-specific jurisdictional allegations").  They may deny jurisdictional discovery if a plaintiff has failed to establish a prima facie case for jurisdiction.  *See Haber v. United States*, 823 F.3d 746,

---

(continued…)

declassification-of-part-four-of-the-ssci-and-hpsci-s-2002-report-on-the-committees-joint-inquiry-into-intelligence-community-activities-before-and-after-the-terrorist-attacks-of-september-11-2001 ("[T]he decision to authorize the release of a portion of Part Four does not indicate the Intelligence Community's agreement with Part Four's accuracy or concurrence with any information it contains.").  Moreover, the pages themselves state that "[i]t should be clear that this Joint Inquiry has made no final determinations as to the reliability or sufficiency of the information regarding these issues that we found contained in FBI and CIA documents."  Joint Inquiry Into Intelligence Community Activities Before and After the Terrorist Attacks of September 11, 2001, at 421 (2002).

753 (2d Cir. 2016); *Frontera Res.*, 582 F.3d at 401; *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 255 (2d Cir. 2007).  "This prima facie showing must include an averment of facts that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant."  *Laydon v. Mizuho Bank, Ltd.*, No. 12-cv-3419, 2015 WL 1515358, at *1 (S.D.N.Y. Mar. 31, 2015) (Daniels, J.) (quoting *Terrorist Attacks VIII*, 714 F.3d at 673).

Plaintiffs have pled no such facts.  Indeed, unlike the ordinary case, Plaintiffs have had the opportunity, directly through counsel for *Lloyd's* and indirectly through the extensive court record in this MDL, to assess the jurisdictional facts.  After Judge Casey authorized "limited jurisdictional discovery," *Terrorist Attacks I*, 349 F. Supp. 2d at 836, SBG was burdened with four years of jurisdictional discovery, as was the Court, including four hearings before the magistrate judge, two depositions (one court-supervised), and numerous briefings.  When Judge Maas ultimately closed off that discovery, he noted that the plaintiffs, including *Lloyd's* counsel, were "continuing to go over old ground."  *In re Terrorist Attacks on Sept. 11, 2001*, 2008 WL 8183819, at *3 (MDL Dkt. No. 2090).  Simply because one of the firms involved has found new insurance company plaintiffs, and other plaintiffs have joined in after the adoption of "Justice Against Sponsors of Terrorism Act," Pub. L. No. 114-222 ("JASTA"), this Court need not ignore the tortured history of this case and indulge the fiction that more discovery could change the conclusion.  Plaintiffs have identified no disputes of material jurisdictional fact.  Neither the old allegations nor Plaintiffs' few new ones allege any specific conduct by SBG that could possibly be construed as an agreement to support  the September 11 attacks or as tortious conduct "purposefully directed" toward the United States.  This Court would act well within its discretion in denying further discovery.

II.     **PLAINTIFFS' CLAIMS ALSO FAIL UNDER RULE 12(b)(6).**

Even if there were doubt that Plaintiffs' claims fail for lack of personal jurisdiction over SBG, Plaintiffs independently (though relatedly) fail to allege facts sufficient to state a claim on which relief can be granted.

A.      **Plaintiffs Have Alleged No Facts Supporting an Inference that SBG's Conduct Proximately Caused Their Injuries.**

Although plaintiffs in this litigation have repeatedly disputed the idea, the Second Circuit has made clear that Anti-Terrorism Act ("ATA")[20] claims require a showing of proximate cause. As it said in 2013, "we held in *Rothstein [v. UBS AG]* that Congress did not 'inten[d] to permit recovery under [18 U.S.C. §] 2333 on a showing of less than proximate cause,' *Rothstein*, 708 F.3d at 95, based on the Supreme Court's interpretation of the 'well-understood meaning' of the phrase 'by reason of' across multiple statutes." *Terrorist Attacks VII*, 714 F.3d at 123.  The court went on to explain that the plaintiffs in *Rothstein* failed, just as many in this litigation, because while they alleged the provision of funding – in *Rothstein*, "hundreds of millions of dollars in cash" – to terrorist entities, they alleged no direct connection between that funding and the terrorist attacks at issue.  *Id*. at 124-25.

In this litigation, the Second Circuit found no "factual allegations that the money allegedly donated by the Rule 12(b)(6) defendants to the purported charities actually was transferred to al Qaeda *and aided in the September 11 attacks*."  *Id.* at 124 (emphasis added). The appeals court went on to underscore that, although Congress intended to impose "'liability at any point along the causal chain of terrorism,' S. Rep. No. 102-342, at 22 (1992), the 'by reason of' language of the statute restricts the imposition of such liability to situations where plaintiffs plausibly allege that defendants['] actions proximately caused their injuries." *Terrorist Attacks*

_____
[20] 18 U.S.C. § 2331 *et seq.*

*VII*, 714 F.3d at 125 (citing *Rothstein*, 708 F.3d at 95).  Where this Court has allowed claims to proceed past a 12(b)(6) motion, it has required, consistent with the Second Circuit, allegations supporting a direct proximate connection to the September 11 attacks.  With respect to one defendant, for example, this Court found sufficient to state a claim allegations that a bank "allegedly transfer[ed] . . . money to two of the hijackers; *which monies are claimed to have been used specifically to prepare for the 9/11 attacks*."  *Terrorist Attacks IV*, 718 F. Supp. 2d at 493 (emphasis added).  Plaintiffs have alleged nothing of the kind against SBG, and their failure to do so precludes their ATA claims.

None of Plaintiffs' allegations against SBG even ostensibly relate to the September 11 attacks themselves.  Just as the last time this Court addressed these claims, Plaintiffs' theory rests primarily on two assertions:  that SBG (or more often, unspecified members of the Binladin family) provided early support for OBL in the Sudan or elsewhere, and that it maintained a "financial lifeline" to OBL thereafter.  *Cf. Terrorist Attacks VI*, 840 F. Supp. 2d at 782.  The early support Plaintiffs allege is far too remote to support an inference of proximate cause.  It is facially implausible that construction of an airport in the Sudan in the early 1990s or any other similar conduct proximately caused the September 11 attacks.

In addressing previous plaintiffs, this Court found no "reasonable inference of [a] temporal, geographic or *causal connection, or proximity to the 9/11 attacks*."  *Terrorist Attacks IV*, 718 F. Supp. 2d at 482 (emphasis added).  Specifically with respect to Plaintiffs' recycled allegations against SBG and its chairman (among others), this Court found that providing "financial and other material support to al Qaeda in the early 1990's, enabling it to expand its base of operations in the Sudan," was "too remote to the terrorist attacks of September 11, 2001," to establish the requisite connection.  *Id.* at 483.  The same conclusion applies equally to

the issue of proximate cause.  Plaintiffs' sparse new allegations regarding the Sudan do nothing

to supply the missing pieces.  To the contrary, the Abbottabad document indicates that the funds

OBL received from "the Bin Ladin Company" (not from SBG) were for "investment in Sudan"

and that the money was still in the Sudan when the document was written.[21]  There is nothing in

the document that permits an inference that the funds were intended for or actually used in

connection with the September 11 attacks.

Similarly, Plaintiffs' often repeated claims that members of the Binladin did or even just

"may have" maintained contact or a "financial lifeline" with OBL, *see* Compl. ¶¶ 284, 309, 310,

do not support any causal link to the September 11 attacks.  There is no allegation, let alone any

specific facts pled, to suggest that any of the alleged contacts with family members related to the

September 11 attacks.  There are no well pled allegations supporting the "financial lifeline"

allegations, *see supra* at 16-17, and in the absence of any specific allegations regarding when or

how OBL benefited from the supposed "lifeline," it is impossible to infer a proximate

relationship to the September 11 attacks.

Also insufficient is Plaintiffs' allegation that "Moussaoui . . . testified that SBG assisted

al Qaeda in building the camps where the 9/11 hijackers received training by covertly shipping

construction parts to Pakistan in the late 1990s, where it was received by al Qaeda members and

later transported to Afghanistan."  Compl. ¶ 306.  As an initial matter, the Court need not accept

as true an allegation that is contradicted by the very source cited in the Complaint.  Moussaoui

did not, as shown above (*supra* at 22-23), say that the "spare part" was used in the construction

of any terrorist training camps, much less camps at which the September 11 hijackers trained.

Nor does he even say that the part ended up in Afghanistan.  Even taking Moussaoui's

---

[21] The 9/11 Commission Report 108 (OBL was unable to withdraw funds from Sudan as "[a]ccording to a senior al Qaeda detainee, the government of Sudan seized everything Bin Ladin had possessed there").

incoherent statement at face value, he at most suggests that an unidentified person at SBG at some unspecified time purchased a spare part – for what, he does not say – that was sent to Jeddah and subsequently to Pakistan.  There are certainly no well pled facts to connect any of that to the September 11 attacks.  These vague claims "do not meet *Twombly's* plausibility standard with respect to the need for a proximate causal relationship" between a defendant's alleged conduct and the terrorist attacks that injured Plaintiffs.  *Terrorist Attacks VII*, 714 F.3d at 124-25 (quoting *Rothstein*, 708 F.3d at 97).

> **B.   Plaintiffs' Allegations Do Not Support the Requisite Knowledge to Support a Claim under the ATA.**

Plaintiffs' ATA claims also fail to allege any facts supporting a plausible inference that SBG knowingly provided material assistance to al Qaeda.  This Court has made clear that the plaintiffs' ATA claims must allege specific facts showing that the defendants knew of, intended to aid, and did in fact aid the terrorists' illegal activities.  *See Terrorist Attacks I*, 349 F. Supp. 2d at 828; *see also In re Terrorist Attacks on Sept. 11, 2001*, No. 03-md-1570, 2007 WL 2907278, at *3 (S.D.N.Y. Oct. 5, 2007); *accord Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 47-48 (D.D.C. 2010).  JASTA does not change this.  By its terms, an aiding and abetting claim under new § 2333(d) requires that the defendant acted "knowingly."  18 U.S.C. § 2333(d)(2).  The required facts must establish not just a mere possibility but a plausible inference.  The Supreme Court in *Iqbal* applied this standard to the same kinds of issues of knowledge that are present here.  In *Iqbal*, the plaintiff alleged that the defendants "knew of, condoned, and willfully and maliciously agreed to" subject him to harsh confinement on account of his race and national origin, and that named defendants were respectively the "principal architect" of and "instrumental" in adopting and executing that policy.  556 U.S. at 680-81 (quoting complaint).

These conclusory allegations were "not entitled to be assumed true" but instead were subject to the need for plausible support in "well-pleaded facts." *Id.*

The inadequacies in Plaintiffs' allegations about SBG's knowledge of OBL's terrorist plans are discussed *supra* at 13-14. For much the same reasons that this Court rejected those allegations for jurisdictional purposes, Plaintiffs have failed to sufficiently allege that SBG acted knowingly to cause their injuries. The ostensibly new allegations do not fill the void. As explained above, in the Abbottabad document, taken at face value, OBL himself states that the referenced funds were for "investment in Sudan," not for any terrorist purpose. Compl. ¶ 299. OBL's expressed "hope" many years later that his family would use that money for jihad says nothing about SBG's mental state when the funds were provided, much less that SBG knowingly supported al Qaeda's later terrorist aims. *See* Compl. ¶ 300. Similarly, Plaintiffs' mischaracterization of Moussaoui's statement is not entitled to any weight. *See supra* 19-23. Finally, the allegations concerning the "28 Pages" contain no reference at all to SBG and therefore provide no facts to support an inference that SBG provided knowing support to OBL, much less the September 11 attacks themselves.

C. **The Insurance Plaintiffs Do Not Allege Facts Showing They Have Standing to Bring ATA Claims.**

The Complaints of the *Lloyds*, *Arrowood*, and *Charter Oak* Plaintiffs fail to state a claim for the separate reason that they do not allege facts sufficient to establish their standing to bring claims under the ATA. The insurance companies certainly cannot do so in their own right. Section 2333 authorizes claims by a "national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs." 18 U.S.C. § 2333(a). "[N]ational of the United States" "has the meaning given such term in . . . the Immigration and Nationality Act [('INA')]," 18 U.S.C. § 2331(2), and the INA in

turn defines it as "(A) a citizen of the United States, or (B) a person who . . . owes permanent allegiance to the United States."  8 U.S.C. § 1101(a)(22).  Corporations cannot be "citizens" within the meaning of the INA, nor are they persons owing permanent allegiance to the United States.  The text of the statute confirms that it provides a remedy only for natural persons: § 2333(a) refers to injuries to "his or her person, property, or business," and "his or her estate, survivors or heirs," terms which apply only to individuals.[22]

Plaintiff insurance companies assert that they may make their ATA claims on a subrogation theory.  *See* Compl. ¶ 65; Compl. ¶ 6, *Arrowood Indem. Co. v. Kingdom of Saudi Arabia*, No. 17-cv-03908 (S.D.N.Y. May 23, 2017); Compl. ¶ 28, *Charter Oak Fire Ins. Co. v. Al Rajhi Bank*, No. 17-cv-02651 (S.D.N.Y. Apr. 12, 2017).  There are three problems with that.  First, although this Court has, on motions for default judgment without adversary briefing, allowed subrogation claims, *see In re Terrorist Attacks on Sept. 11, 2001*, No. 03-MDL-1570, 2011 WL 6318975 (S.D.N.Y. Dec. 16, 2011), the ATA does not provide for them.[23]

Subrogation rights are often determined under state law, but Congress may limit or even eliminate those rights.  *See Chubb Custom Ins. Co. v. Space Systems/Loral, Inc.*, 710 F.3d 946, 960 (9th Cir. 2013).  Such limits need not include a "clear statement" so long as the relevant

---

[22] The second part of § 1101(a)(22) is understood to be limited to the four categories of natural persons specified in § 1408.  *See Marquez-Almanzar v. Immigration & Naturalization Servs.*, 418 F.3d 210, 218-19 (2d Cir. 2005) (noting that "owes permanent allegiance" is a "term of art" derived from the history of non-citizen nationals and holding that "the only 'non-citizen nationals' currently recognized by our law are persons deemed to be so under 8 U.S.C. § 1408"); *see Mohammadi v. Islamic Republic of Iran*, 782 F.3d 9, 15 (D.C. Cir. 2015) ("The courts of appeals to consider the issue thus have overwhelmingly concluded that the status of non-citizen United States nationality is limited to those persons described in 8 U.S.C. § 1408 . . . .").

[23] This Court, reviewing the magistrate judge's recommendation under a "'clear error on the face of the record'" standard absent any objections, focused on the nature of the damages rather than the identity of the plaintiffs, which was not raised to the Court.  *See* 2011 WL 6318975, at *1-2.

statute evinces a congressional intent to limit or disallow subrogation.  *Id.* (quoting *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 108 (1991)).  The ATA by its terms permits claims only by a natural person – "a national of the United States – or "his or her estate, survivors, or heirs."  Unlike other terrorism statutes such as § 1605A of the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605A, the ATA contains no reference to insurers or to indemnity claims.[24] Given that Congress chose to limit the authorized claimants in those terms, there is no reason to presume that common law subrogation gives insurance companies, alone among corporate entities, rights under the ATA.  The treble damage remedy in the ATA makes this conclusion even more compelling.  There is no support in the language of the statute or in its legislative history for the proposition that Congress intended to permit insurance companies – who have no standing to pursue a direct claim – to nevertheless collect windfall treble damages after paying only "single" damages to the injured individuals whom the statute is designed to protect.

Second, even if subrogation were generally allowed, the Plaintiff insurance companies have pled no facts to show that their claims derive from those of "nationals of the United States." Indeed, although some of the Plaintiff insurance companies make the boilerplate claim that they "made payments in compensation for injuries suffered by nationals of the United States to their persons, properties and businesses," Compl. ¶ 65; *Charter Oak* Compl. ¶ 28, the only payments any of them mention more specifically are "payments in compensation for the physical destruction of the World Trade Center and other buildings, structures, or property."  Compl. ¶ 65. The owners and lessors of the World Trade Center, however, were corporations, partnerships, and various other legal entities that are not natural persons, and therefore are not "nationals" of the United States.  Absent well-pled allegations showing that payments were made to individuals

---

[24] And unlike the ATA, the legislative history of § 1605A confirms that it was intended to embrace claims by insurers.  *See* 154 Cong. Rec. 500 (Jan. 22, 2008) (statement of Sen. Lautenberg).

with standing to bring ATA claims, the Plaintiff insurance companies have failed to state a claim.

Third, while some of the Plaintiff insurance companies assert in conclusory fashion that none of the losses were the subject of prior claims against SBG, *see* Compl. ¶ 66; *Charter Oak* Compl. ¶ 29; *but see Arrowood* Compl. (making no such allegation), there are no facts alleged with respect to the claims from which that can be ascertained.  Plaintiff insurance companies can bring no claims, regardless of their subrogation rights, for payments to persons whose claims against SBG have previously been dismissed.  Under a subrogation theory, the Plaintiff insurance companies would "stand in the shoes" of their insureds and therefore would succeed to the same claims and would be subject to the same defenses as held by the insured.  *US Airways, Inc. v. McCutchen*, 133 S. Ct. 1537, 1546 n.5 (2013).  They would therefore be barred from relitigating the jurisdictional issues on allegations materially identical to those upon which the insureds themselves have already lost.  As the Second Circuit has acknowledged, "'It has long been the rule that principles of *res judicata* apply to jurisdictional determinations – both subject matter and personal.'"  *Stengel v. Black*, 486 F. Appx. 181, 183 (2d Cir. 2012) (quoting *Insurance Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 702 n.9 (1982)).  Therefore, "[a]lthough a dismissal for lack of jurisdiction is not an adjudication on the merits of a claim, *see* Fed.R.Civ.P. 41(b), such a dismissal precludes re-litigation of the issue it decided."  *Id.*

## CONCLUSION

For the foregoing reasons, Plaintiffs' claims against SBG should be dismissed with prejudice.

Dated: August 21, 2017

Respectfully submitted,

/s/ James E. Gauch
Mary Ellen Powers
James E. Gauch
JONES DAY
51 Louisiana Avenue, NW
Washington, DC  20001
Telephone:  202-879-3939
Facsimile:  202-626-1700
Email: jegauch@jonesday.com
Email:  mepowers@jonesday.com

Fahad A. Habib
JONES DAY
555 California Street, 26th Floor
San Francisco, CA  94104
Telephone:  415-626-3939
Facsimile:  415-875-5700
Email:  fahabib@jonesday.com

*Attorneys for Defendant Saudi Binladin Group*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I served a copy of the foregoing upon all counsel of record via ECF

on August 21, 2017, including counsel for all of the parties to the following cases:

*Underwriting Members of Lloyd's Syndicates 2 v. Al Rajhi Bank*, No. 16-cv-07853 (GBD)
*Abarca v. Kingdom of Saudi Arabia*, No. 17-cv-03887 (GBD)
*Abedhajajreh v. Kingdom of Saudi Arabia*, No. 17-cv-06123 (GBD)
*Addesso v. Kingdom of Saudi Arabia*, No. 16-cv-09937 (GBD)
*Aguilar v. Kingdom of Saudi Arabia*, No. 16-cv-09663 (GBD)
*Aiken v. Kingdom of Saudi Arabia*, No. 17-cv-00450 (GBD)
*Arrowood Indemnity Co. v. Kingdom of Saudi Arabia*, No. 17-cv-03908 (GBD)
*Charter Oak Fire Ins. Co. v. Al Rajhi Bank*, No. 17-cv-02651 (GBD)
*Hodges v. Kingdom of Saudi Arabia*, No. 17-cv-00117 (GBD)

Dated: August 21, 2017                    Respectfully submitted,

                                          /s/ James E. Gauch
                                          James E. Gauch
                                          JONES DAY
                                          51 Louisiana Avenue, NW
                                          Washington, DC  20001
                                          Telephone:  202-879-3939
                                          Facsimile:  202-626-1700
                                          Email:  jegauch@jonesday.com