of the project." See Exhibit 7. Given the control over those accounts that Jelaidan was shown to have, he should be compelled to request, obtain, and produce all responsive banking records relating to those accounts as well.

### 6. Jelaidan's bank accounts associated with the charities.

As this Court will recall from Plaintiffs' prior submissions in this case, Jelaidan is a long-time associate of Osama bin Laden, a founding member of al Qaeda, and an Executive Order 13224 Specially Designated Global Terrorist. The U.S. Treasury Department statement supporting Jelaidan's designation details the defendant's ties to the terror group and its senior members:

> Wa'el Hamza Julaidan, a Saudi citizen, is an associate of Osama bin Laden. Julaidan fought with bin Laden in Afghanistan in the 1980s. Julaidan is also associated with several individuals and entities linked to al Qaida, including bin Laden's lieutenants, Ayman al Zawahri, Abu Zubaida, and Mohammed Atef; and the organizations: Maktab al Khidmat, the Rabita Trust, and al-Gamma al Islamiya. These individuals and entities have been previously designated under President Bush's Executive Order and by the United Nations.
>
> Bin Laden himself acknowledged close ties to Julaidan during a 1999 interview with al-Jazeera TV. When referring to the assassination of al Qaida co-founder Abdullah Azzam, bin Laden stated that "we were all in one boat, as is known to you, including our brother, Wa'el Julaidan." Julaidan has established contacts with several known Islamic extremists, including bin Laden's principal lieutenant, Ayman al-Zawahri. Another bin Laden lieutenant, Abu Zubaida, claimed that he had accompanied Julaidan from Pakistan to Kandahar, Afghanistan during the summer of 2000. Zubaida said that Julaidan met with bin Laden and senior bin Laden lieutenant Mohammed Atef soon after arriving in Kandahar.
>
> In February 2000, Julaidan was appointed to the Board of Trustees of the Rabita Trust and served as its director general. The Rabita Trust is an NGO designated under President Bush's Executive Order as an organization that provided logistical and financial support to al-Qa'ida.
>
> BASIS FOR DESIGNATION
>
> The United States has credible information that Wa'el Hamza Julaidan is an associate of Osama bin Laden and several of bin Laden's top lieutenants. **Julaidan has directed organizations that have provided financial and logistical support to al-Qa'ida.** Accordingly, the United States is designating Julaidan under Executive Order 13224 as a person who supports terror.

(Emphasis added). See U.S. Treasury Department's September 6, 2002 press release discussing the Executive Order 13224 designation of Jelaidan, attached hereto as Exhibit 8. The United

The Honorable Frank Maas
October 17, 2011
Page 11

Nations similarly designated Jelaidan as a member of al Qaeda on September 11, 2002, attached as Exhibit 9.

Consistent with the U.S. government's position that the defendant oversaw organizations that supported al Qaeda, Plaintiffs have submitted compelling evidence in these proceedings in support of their contention that Jelaidan used his high-ranking leadership positions within several ostensible charities to deliberately direct material, logistical, ideological, and other forms of support to Osama bin Laden, al Qaeda, and affiliated terror groups, including massive amounts of money. *See* Plaintiff's Chart at Exhibit 10 (summarizing key allegations and evidence relating to Jelaidan's relationship with the Muslim World League ("MWL"), International Islamic Relief Organization ("IIRO"), Rabita Trust, Saudi Joint Relief Committee ("SJRC"), Al Haramain & Al Masjed Al Aqsa Charity Foundation ("AHAMAA"), and Saudi Red Crescent ("SRC")).

Importantly, as a principal official of those organizations, Jelaidan would have had signatory authority over the charities' bank accounts and thus the requisite control to direct the movement of funds in and out of those accounts in support of terror activities. For example, Jelaidan opened three bank accounts on behalf of the designated AHAMAA "between 1997 and 2001 and continued to have the authorization to handle two of their accounts as a signatory on two [of] the NGO's Bosnian accounts." *Id.* Additionally, as discussed in the previous section, Plaintiffs are aware of at least six (6) accounts at Habib Bank which were seized from Rabita Trust and frozen following the September 11, 2001 attacks (Account Nos. xx973-1, x536, xx206-4, x254, x255, and x414). As the Secretary General of Rabita Trust, Jelaidan would have had signatory authority and control over these accounts. In light of the evidence of Jelaidan's prominent role in funding the al Qaeda network via the charities, Plaintiffs served the defendant with the following requests seeking relevant bank account records:

- Request No. B-19 – From the period beginning January 1984 through the present, please provide all documents relating to any accounts in any banking or financial institution You hold or held jointly with, or on behalf of the Charities, and/or any Charity accounts over which You hold or have held signatory authority. [The term "Charities" refers to the Muslim World League ("MWL"), Rabita Trust, Saudi Joint Relief Committee ("SJRC"), and Saudi Red Crescent ("SRC").]

- Request No. B-43 – Please provide all documents relating to any accounts in any banking or financial institution You hold or held jointly with, or on behalf of the entities identified in Exhibit C, and/or any accounts over which You hold or have held signatory authority. [Entities identified in Exhibit C include, but are not limited to: International Islamic Relief Organization ("IIRO"), Al Haramain & Al Masjed Al Aqsa Charity Foundation ("AHAMAA"), Third World Relief Agency ("TWRA"), Al Haramain Islamic Foundation, and World Assembly of Muslim Youth ("WAMY").]

Jelaidan fails to produce documents in response to Request No. B-19, again chiefly relying upon his assertion that he has no documents in his possession. *See* Exhibit 2, pp. 11-12. Further, the defendant once again asserts that both the timeframe and breadth of the requests are "much too expansive and burdensome" to produce relevant documentation in response to

The Honorable Frank Maas
October 17, 2011
Page 12

---

Request No. B-43. *Id.* at p. 24. As discussed in Section I(A) supra, this Court previously struck the defendant's timeframe and burden objections and directed Jelaidan to respond to the Plaintiffs' discovery requests in accordance with that determination. To date, the defendant has failed to act in accordance with the Court's December 2007 Order and Plaintiffs respectfully submit that the defendant should be compelled to produce all responsive bank records.

### 7. Jelaidan's bank account associated with the Third World Relief Agency.

In addition to his use of the above mentioned charities to fulfill the terror group's fundraising needs, Jelaidan was determined to find and use other opportunities to direct financial and material support to the al Qaeda network. Jelaidan successfully did so by virtue of his relationship with the leaders of the Sudan-based Third World Relief Agency ("TWRA"), a purported charitable organization that provided the people of Bosnia-Herzegovina with humanitarian assistance during the war in the former Yugoslavia. According to CIA intelligence, the TWRA was in fact aiding Islamic terrorist groups in the region.[7] The 9/11 Commission similarly concluded that bin Laden "made use of the already-established Third World Relief Agency" to provide financial and other support for al Qaeda's terrorist activities. *See Final Report of the National Commission on Terrorist Attacks Upon the United States*, available at http://govinfo.library.unt.edu/911/report/911Report.pdf, at p. 58. German authorities, providing judicial assistance to the Office of the Prosecutor of the International Court of Criminal Justice for the former Yugoslavia, conducted an investigation of TWRA bank accounts and discovered large monetary transfers to those accounts from the Islamic world, including six (6) suspicious transactions directly linked to Jelaidan himself at Bank Austria (Acct. No. xxxxx1587), totaling more than $11 million. *See* German Intelligence Report regarding the TWRA, attached as Exhibit 11, pp. 13-15. Consequently, Plaintiffs served the following request:

- Request No. A-9 – Please provide any and all documents relating to any financial accounts held by You in the Bank Austria and/or any Bank Austria accounts over which You hold or have held signatory authority, including without limitation, monthly or annual account statements, correspondence, deposits, withdrawals, cleared or canceled checks, wire transfers, or investments, including the source or destination of funds deposited into or withdrawn from any such account.

Not surprisingly, the defendant fails to produce a single document in response to the Plaintiffs' request and continues to assert the following:

> No documents will be produced as WJ neither has knowledge of nor possession of any such documents.

*See* Exhibit 2, pp. 7-8.

---

[7] According to a 1996 CIA report, the TWRA was one of several charitable organizations facilitating the activities of terrorist groups operating in Bosnia-Herzegovina region. Employees of the TWRA have conducted suicide bombings and engaged in massive weapons smuggling operations. *See* Exhibit 27.

The Honorable Frank Maas
October 17, 2011
Page 13

---

Given the defendant's ongoing resistance to produce relevant bank account records under his control, which he has the legal right to request and obtain directly from the bank, this Court should compel Jelaidan to immediately produce all documents responsive to Request No. A-9.

### 8. Jelaidan's bank accounts in Turkey.

Maram Company, located in Istanbul, Turkey, is a Jelaidan-owned travel and trading firm that has significant ties to al Qaeda. Maram was founded by Mamdouh Mahmud Salim, a former al Qaeda financial officer who is now serving time in a U.S. prison for his involvement in the bombing of the U.S. embassies in Kenya and Tanzania in August 1998. In 1997, Jelaidan and his partner Mohamed Bayazid became owners of Maram when Salim transferred his shares in the company to them.[8]

In 1998, Yassin al Kadi, an Executive Order 13224 designee and al Qaeda financier, transferred $1.25 million to Jelaidan. *See* March 23, 2007 letter from the Office of the Swiss Federal Examining Magistrates office to U.S. authorities at Exhibit 12; *see also* Memorandum in Support of Defendants' Motion to Dismiss or, in the Alternative, For Summary Judgment (*Yassin Abdullah Kadi v. Timothy Geithner, et al.*, Case No. 09-0108), attached hereto as Exhibit 13, pp. 11 and 21. Although Kadi told U.S. authorities that the $1.25 million was intended for the Al Imam University in Yemen,[9] the money was suspiciously transferred to Jelaidan through a Turkish account connected to Maram.[10] *See* Exhibit 14 (Swiss prosecutors investigating Kadi's links to Jelaidan and al Qaeda stated that "the Turkish account Juleidan used in Turkey to receive al Qadi's money might be linked to the Maram Company, a ***ucture connected (according to your intel services) to al Qa'eda.").

As the owner of Maram, Jelaidan has the legal right, authority, and practical ability to request and obtain responsive banking records relating to any and all bank accounts associated with that company. Accordingly, this Court should compel the defendant to produce all banking records for Maram, including any other accounts associated with Jelaidan in Turkey.

---

[8] Bayazid (a/k/a Abu Rida) is an al Qaeda founding member (like Jelaidan) who participated in obtaining weapons and communications equipment for the terror organization. Bayazid also sought to obtain uranium for a nuclear weapon for Osama bin Laden.

[9] Al Imam is not the ordinary university one would expect. Founded by Sheikh Abd al Majid al Zindani, a bin Laden associate and al Qaeda recruiter who was designated by the U.S. Department of the Treasury, "Al Imam students are suspected of being responsible, and were arrested, for recent terrorist attacks, including the assassination of three American missionaries and the assassination of the number two leader for the Yemeni Socialist party, Jarallah Omar. Notably, John Walker Lindh was also a student at Al Iman University before he joined the Taliban." *See* February 24, 2004 OFAC press release regarding the designation of Abd al Majid al Zindani which can be found at http://www.treasury.gov/press-center/press-releases/Pages/js1190.aspx.

[10] The $1.25 million came from the account of Kadi's company, Karavan Development Group. Karavan's account was held at Faisal Finance (Switzerland) S.A.

The Honorable Frank Maas
October 17, 2011
Page 14

---

> 9. **Jelaidan should be ordered to produce affidavit testimony and other supporting documentation detailing his efforts to request and obtain responsive banking records.**

As demonstrated by the foregoing, including Plaintiffs' Chart at Exhibit 10, the breadth of Jelaidan's involvement in the financial support infrastructure used to fund the al Qaeda terrorist network is staggering. Using his leadership positions within multiple charitable organizations, including his relationships with other prominent financiers of the al Qaeda network, the al Qaeda co-founder was able to direct massive amounts of material, financial, and other forms of support to Osama bin Laden and his terror organization. Consequently, any and all banking accounts linked to Jelaidan, one of the premier al Qaeda financiers over the past 20+ years, should be fair game in these discovery proceedings.

Jelaidan contends in his discovery responses that he does not physically possess the requested banking documents. As a central figure in a global terror organization responsible for the murder of nearly 3,000 innocent individuals on September 11, 2001, it is feasible that Jelaidan would choose not to personally retain copies of sensitive banking records that could be easily seized from him by investigating authorities. However, the Federal discovery rules and the courts are clear that the defendant must do more than merely assert that he does not have possession of responsive banking documents which are under his control. Rather, Jelaidan is required to request the production of those records directly from the bank and produce those immediately to the Plaintiffs upon receipt. To date, Plaintiffs have yet to see any evidence that Jelaidan has made any such effort to request, obtain, and produce the relevant documents.

Plaintiffs therefore respectfully request that Your Honor compel Jelaidan to immediately request and produce *all* bank account records requested by the Plaintiffs. In the event that the defendant is unable to obtain the banking records after a formal request, Plaintiffs respectfully submit that Jelaidan should be ordered to submit an affidavit and all supporting documentation detailing his efforts to obtain the requested materials, including without limitation: (1) identification of all bank representatives that were contacted relative to the defendant's request to produce all banking records, attaching all written communications exchanged in requesting the information; (2) a description of the specific subject matters that were discussed with the bank representatives; (3) a description of the search conducted by the bank, including locations searched; (4) a detailed description as to why the defendant was unable to obtain the requested records; and (5) any other detail that demonstrates the defendant made a reasonable, good faith attempt to obtain the requested documents.

### C. Jelaidan Should Be Compelled to Produce Documentation Relating To His Relationships with Other Executive Order 13224 Designees

Plaintiffs served the defendant with discovery requests seeking documents relating to his relationship with fellow Executive Order 13224 designees Yassin Abdullah al Kadi, Chafiq Ayadi, Hasan Cengic, and Adel Batterjee, including documents relating to the transfers of funds between Jelaidan and those individuals and any banking or financial accounts Jelaidan held jointly with those individuals: