# EXHIBIT F

## MDL 1570 PLAINTIFFS' EXECUTIVE COMMITTEES

In re: Terrorist Attacks on September 11, 2001 (S.D.N.Y)

| Plaintiffs' Executive Committee for Personal Injury and Death Claims | Plaintiffs' Executive Committee for Commercial Claims |
|---|---|
| Ronald L. Motley, *Co-Chair*<br>MOTLEY RICE LLC<br>James P. Kreindler, *Co-Chair*<br>KREINDLER & KREINDLER LLP | Elliot R. Feldman, *Co-Chair*<br>Sean Carter, *Co-Chair*<br>COZEN O'CONNOR |
| Andrew J. Maloney III, *Co-Liaison Counsel*<br>KREINDLER & KREINDLER LLP<br>Paul J. Hanly, Jr., *Co-Liaison Counsel*<br>SIMMONS HANLY CONROY LLC | J. Scott Tarbutton, *Liaison Counsel*<br>COZEN O'CONNOR |

**VIA ECF AND OVERNIGHT DELIVERY**

December 11, 2015

The Honorable Frank Maas
United States District Court
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street, Room 740
New York, NY 10007

      Re:    *In Re: Terrorist Attacks on September 11, 2001,* 03 MDL 1570 (GBD) (FM)

Dear Judge Maas:

The Plaintiffs' Executive Committees, on behalf of all plaintiffs, submit this reply in further support of their letter briefs filed on July 14, 2015 (ECF Nos. 2973 and 2974) ("July 14 Motions"), seeking an order from this Court compelling defendant Dubai Islamic Bank ("DIB") to produce documents and information responsive to Plaintiffs' discovery requests. For the reasons set forth below, Plaintiffs submit they are entitled to the relief sought in the July 14 Motions.

## I.    Bank Account and Related Financial Records for Key Al Qaeda Members and Terror Financiers

On July 14, 2015, Plaintiffs submitted their opening letter briefs requesting that the Court direct DIB to immediately undertake efforts to secure and produce critical bank account and related financial records for key al Qaeda members and terror financiers. *See* July 14 Letter Brief #1 at pp. 3-5 and 6-11 (ECF No. 2973). As Plaintiffs described in overwhelming detail, DIB has produced very few account records, if any, for Saidi Madani al Tayyib (al Qaeda's chief financial officer who held at least two accounts at DIB), Ali Abdul Aziz Ali (al Qaeda member who had an account at DIB and was responsible for transferring significant sums of money to the 9/11 hijackers in the United States), Mustafa Ahmed al Hawsawi (al Qaeda member who facilitated the movement of large sums of money to the 9/11 hijackers for travel, flight training, and other expenses), Mamdouh Mahmoud Ahmed Salim (a founding member of al Qaeda who had three DIB banking cards and was arrested for his connection to the 1998 U.S. Embassy bombings in Africa), Abdallah Azzam (co-founder of al Qaeda who used an account at DIB to direct monetary support to Osama bin

The Honorable Frank Maas
December 11, 2015
Page 2

_____

Laden's Islamic army), Fayez Banihammad (9/11 hijacker who had an account at DIB), Ali Salah
Muhammad al Marri (al Qaeda member linked to the 9/11 plot who had an account at DIB), and
Ahmed Nur Ali Jumale (al Qaeda financier who held personal and business accounts at DIB).

DIB effectively acknowledges that it has produced a mere 13 pages of documents for two
DIB bank accounts belonging to Saidi Madani al Tayyib. *See* Letter Brief #1 at pp. 6-7. Nor does
DIB dispute that it has failed to produce important bank account and investigation materials relating
to Ali Abdul Aziz Ali, *id.* at pp. 8-9, the nephew of Khalid Sheikh Mohammed, who the 9/11
Commission identified as "the principle architect of the 9/11 attacks." 9/11 Commission Report at
125. DIB similarly admits its failure to provide records relating to Fayez Banihammad, Ali Salah
Muhammad al Marri, and Ahmed Nur Ali Jumale. *Id.* at pp. 10-11.

In defense of its noncompliance as to Abdallah Azzam and Mamdouh Mahmoud Salim, DIB
primarily asserts that DIB's relationships with those individuals should be regarded as irrelevant to
Plaintiffs' claims. Opposition at pp. 8-9. According to the defendant, Azzam's death in 1989, and
Salim's arrest in 1998, negate any connection to the September 11th attacks. DIB's remarkably
narrow construction of the concept of relevance is entirely unsupportable. As plaintiffs point out in
their letter brief, Azzam was instrumental in establishing al Qaeda with Osama bin Laden at the
very same time when Azzam was collecting money to finance a mujahideen army for violent jihad
through the account in his name at DIB. The historical relationship between DIB and the senior-
most leadership of al Qaeda is directly relevant to the character of the relationship between DIB and
al Qaeda in the years that followed. Moreover, although Azzam may have died, the relevant
account at DIB continued to be active for many years after his death. *See* Letter Brief #1 at pp. 2-3.
DIB's knowledge about Azzam, his activities in forming al Qaeda, and the use of Account No. 1335
to raise money for bin Laden's Islamic army are most clearly relevant.

DIB's relationship with Salim, a founding member of al Qaeda like Azzam, is equally
relevant to plaintiffs' claims given his connection to the historical origins of the terror organization.
Moreover, as plaintiffs' letter brief explains, Salim was arrested for his role in the 1998 U.S.
Embassy bombings and was found to have three DIB banking cards in his possession at the time of
the arrest; an important fact when considering that the NATO Parliamentary Assembly's report,
released in the wake of the September 11th attacks, publicly affirms that al Qaeda used DIB to fund
the embassy bombings. *See* Letter Brief #1 at p. 3, Ex. A. Whether Salim was using his DIB
accounts to finance the embassy bombings is highly relevant to the inquiry whether DIB maintained
a supportive relationship with al Qaeda.[1]

DIB further argues that Plaintiffs ignore that the parties agreed to a "search term
methodology" by which the defendant would search its databases for relevant account and financial
records. But Plaintiffs did not at any point agree to the methodology proposed by the defendant.
On March 29 and 31, 2011, the parties conducted meet-and-confers to discuss Plaintiffs' requests

_____

[1] Salim also had a long business and financial relationship with Hamburg, Germany based Mamoun
Darkazanli. Darkazanli performed numerous business transactions in support of al Qaeda and was
instrumental in creating the al Qaeda Hamburg cell from which the 9/11 hijackers emerged. Salim gave
Darkazanli the power of attorney over at least one of his Deutsche Bank accounts during the same time frame
that Salim was using his DIB account.

The Honorable Frank Maas
December 11, 2015
Page 3

_____

for bank account records for individuals and entities Plaintiffs believe relevant to their claims. *See e.g.* Attachments A-E to Plaintiffs' First Set of Requests for Production of Documents Directed to DIB, Ex. L to Letter Brief #1 (seeking bank account and financial records for the 9/11 hijackers, al Qaeda members, terror financiers, and businesses linked to Osama bin Laden). During those meetings it became clear that DIB intended to unilaterally narrow the scope of Plaintiffs' requests. Counsel for DIB stated that it was unwilling to conduct searches for several of the individuals listed in Plaintiffs' requests, explaining that those individuals not specifically linked to the 9/11 plot, and/or who were detained prior to the attacks themselves, were not relevant to Plaintiffs' claims and should be omitted. As an example, DIB believed that Jamal al Fadl (former al Qaeda official) and Abu Ubaidah al Banshiri (al Qaeda's military emir), both members of Osama bin Laden's inner circle, should be removed from its searches. Plaintiffs expressed concerns that the defendant's proposed approach would exclude important categories of responsive documents warranting future court intervention, but stated they were willing to see what the defendant's searches produced before seeking this Court's assistance. Those searches produced very little, as Plaintiffs' letter briefs detail, and likely did so because DIB purposely constructed a search methodology intended to significantly limit the discovery of substantial amounts of responsive materials. At this juncture, intervention by the Court is necessary.

## II.    DIB Accounts Frozen Following the September 11, 2001 Attacks

There is no dispute that in the months and years following the September 11th attacks, the Central Bank of the UAE ("Central Bank") issued a number of directives to DIB to immediately search for and freeze the bank accounts of various individuals and entities linked to al Qaeda, affiliated terrorist groups, the Taliban, and terrorism. Nor is there any dispute that certain accounts at DIB were in fact frozen per those orders. DIB does not challenge these well documented facts, but rather continues to object to Plaintiffs' Request Nos. 37-45 and withhold responsive documents, arguing that the requests are overly broad and unduly burdensome, theorizing (without affirming as fact) that the responsive documents may potentially include accounts linked to narcotics trafficking, judgment enforcement, or other sanctions regimes. Opposition at p. 9. Those concerns are unfounded and belied by DIB's own documents.

As many of the post-9/11 Central Bank communications make abundantly clear, the orders to search for and freeze accounts are issued in conjunction with "international efforts to fight terrorism," and routinely list the Central Bank's targets as persons or entities "associated with Al-Qaida," "terrorist leaders," "terrorist organizations," or "persons connected to terrorists." *See* September 26, 2001 Central Bank correspondence at Exhibit A (ordering DIB to "search for immediately and freeze any accounts, deposits, and investments in the names of the following "Terrorist Organizations," "Terrorist Leaders," "Terrorist NGO's," and "Terrorist Entity" (*26 names in total*)); November 7, 2001 Central Bank correspondence at Exhibit B (ordering the freezing of accounts for "Terrorist Organizations or Terrorist Non-Government organization or entities" and "Terrorists or persons with connection to terrorists" (*39 names in total*)); November 7, 2001 Central Bank correspondence at Exhibit C (ordering the freezing of accounts for "Terrorist Organizations or Terrorist Non-Government organization or entities" and "Persons with Terrorist Connections" (*62 names in total*)); July 6, 2003 Central Bank correspondence at Exhibit D (directing the freezing of accounts for "Individuals/Entities belonging to/or associate with Al-Qaida Organization" (*56 names in total*)). *See also* March 11, 2002 Central Bank correspondence at

The Honorable Frank Maas
December 11, 2015
Page 4

_____

Exhibit E (ordering DIB to search for accounts, deposits or investments in the name of senior al
Qaeda official Sayed Madani al Tayeb); August 25, 2002 Central Bank correspondence at Exhibit F
(directing the freezing of accounts linked to al Qaeda members Ali Abdul Aziz Ali, Mustafa Ahmed
al Hawsawi and others (*16 names in total*)); September 4, 2002 Central Bank correspondence at
Exhibit G (ordering the search for financial transactions linked to al Qaeda members Ali Abdul
Aziz Ali, Mustafa Ahmed al Hawsawi and others (*21 names in total*)); and May 14, 2003 Central
Bank correspondence at Exhibit H (requesting DIB search for accounts linked to al Qaeda member
Ali Saleh al Marri).

There is simply no confusion as to the subject matter of these communications and their
relevance to Plaintiffs' claims that DIB knowingly provided financial services and other support to
Osama bin Laden, other members of al Qaeda, and terror financiers. DIB is in possession, custody
and control of documents and information responsive to Request Nos. 37-45, including without
limitation, records detailing the investigations and/or audits conducted by DIB upon receipt of the
Central Bank's orders, documents identifying which DIB accounts were frozen as a consequence of
those investigations, a full and complete set of banking records for each frozen account, and all
communications with the Central Bank and/or U.A.E. government concerning DIB's investigations
and findings. DIB should be ordered to immediately produce those documents.

### III.    1998 U.S. Embassy Bombings and Taliban Accounts

The argument advanced by the defendant that Plaintiffs' discovery requests seeking
documentation relating to DIB's role in the 1998 U.S. Embassy bombings, and the subsequent
closure of Taliban accounts at DIB per demands from U.S. officials, are irrelevant is equally
without merit. As Plaintiffs' opening letter briefs describe, in the wake of the 1998 embassy
bombings, U.S. officials were concerned that members of the Taliban were using DIB to fund al
Qaeda's terrorist activities, including the attacks on the embassies themselves. That the UAE
government agreed to close certain Taliban accounts at DIB after meeting with U.S. officials (a fact
that DIB does not challenge), gave legitimacy to those concerns. Plaintiffs contend that DIB's
recognition and support for the Taliban at a time when (i) the Taliban was closely aligned with
Osama bin Laden and al Qaeda,[2] and (ii) the Taliban was largely condemned by the international
community,[3] is demonstrative of DIB's intent to support al Qaeda's agenda and thus relevant to
their claims that DIB maintained institutional links to al Qaeda.

Whether DIB's support for the Taliban continued even after the U.N. Security Council
established sanctions regimes to cover individuals and entities associated with the Taliban and al
Qaeda in 1999 (Resolution 1267) and 2000 (Resolution 1333), would also be highly relevant.
Indeed, it would appear that the UAE government itself was concerned that DIB was providing
financial services to the Taliban as late as 2003 when it ordered the bank to search for and freeze

_____

[2] The Taliban maintained a symbiotic relationship with al Qaeda during the period leading up to 9/11.
Moreover, the 9/11 Commission concluded that al Qaeda's annual budget included approximately $20
million in payments to the Taliban in exchange for safe-haven in Afghanistan. 9/11 Commission Report at
171. The Taliban's accounts thus provide a direct channel for supporting al Qaeda itself.

[3] The Taliban received formal diplomatic recognition from only three countries – the UAE, Saudi Arabia,
and Pakistan.

The Honorable Frank Maas
December 11, 2015
Page 5

_____

accounts associated with the Taliban. *See* July 6, 2003 Central Bank correspondence at Exhibit D (ordering DIB to search for and freeze "any accounts, deposits, investments or remittances" for "Individuals/entities belonging to/or associated with the Taliban" (*152 names in total*)).

DIB additionally objects to producing responsive documents, arguing that the term "Taliban" is vague and ambiguous because it is unaware of the names of the people to which it would apply. Opposition at p. 9. That assertion is baseless. First, there is no question that DIB is fully aware of the specific Taliban accounts it closed in response to demands from the U.S. government in 1998, including account numbers and the names of account holders and account beneficiaries. Those records can be easily identified and secured and should be produced immediately. Moreover, the Central Bank's July 2003 directive at Exhibit D specifically identifies the names of 152 individuals "belonging to/or associated with the Taliban." DIB cannot credibly claim ignorance as to this issue. Indeed, DIB was fully aware of those individuals when it took the time to *redact* every one of those 152 names before producing the document to Plaintiffs. There is no reasonable justification for redacting each of those names. Plaintiffs respectfully submit DIB should be compelled to not only produce that document in full, but should be directed to search its records for account and other financial information for each of those 152 individuals belonging to, and/or associated with, the Taliban.

## IV.    July 1999 Meeting(s) in the UAE

DIB continues to evade its discovery obligation to produce documentation responsive to Plaintiffs' Request Nos. 22-28 seeking materials regarding the meeting(s) held in July 1999 in the UAE involving U.S. officials and representatives of the UAE government, relative to claims that Osama bin Laden was allowed to "funnel money through the Dubai Islamic Bank" with the approval of DIB officials. *See* Letter Brief #1 at pp. 3-4 (ECF No. 2973), Letter Brief #2 at pp. 3-5 (ECF No. 2974).

Despite very clear statements by the U.S. Department of State that U.S. officials traveled to Dubai to address "terrorist money laundering," and that "[t]he government of the United Arab Emirates has told us that the Dubai Emirate Government has taken steps to clean up the bank – the Dubai Islamic Bank – and to restore its reputation," Ex. G to Letter Brief #1, DIB continues to claim ignorance of the "*alleged meeting*," and merely cites to a handful of self-serving documents describing DIB's internal deliberations concerning a contemplated defamation action against the New York Times (which DIB never filed) for its reporting relative to the July 1999 meeting(s) and the underlying intelligence reports concerning DIB's links to Osama bin Laden, as proof that Plaintiffs' claims are "patently false." Opposition at p. 16; *see also* Letter Brief #1 at p. 4, Ex. H (New York Times, July 8, 1999 article).[4] Though DIB contends that no other documents responsive to Plaintiffs' requests are known to exist, *id.*, even the deliberations in contemplation of the defamation action would have necessitated a precipitating investigation by the bank to inform its course of action.

_____

[4] Notably, when DIB threatened the New York Times with a defamation suit unless it printed a retraction indicating that "DIB did not have any dealings with Bin Laden," DIB03195-96, the New York Times declined to do so, stating that the July 8, 1999 article "accurately reported the statements of United States government officials." DIB03215-16. DIB never filed the defamation claim following that exchange.

The Honorable Frank Maas
December 11, 2015
Page 6

_____

Remarkably, DIB would prefer that the Court just take its word that the bank and its officials are unaware of: (i) any meeting(s) held between U.S. and UAE government officials regarding the bank; (ii) any communications with the UAE government regarding statements made by the State Department; (iii) any communications with the UAE government regarding the allegations detailed in the New York Times article; and (iv) any internal investigations or audits of accounts conducted at DIB in response to those allegations. If DIB was truly uninformed of the July 1999 meeting(s) as it claims to be, surely concerned leadership at the bank would have submitted formal inquiries to the UAE government as to whether such meeting(s) occurred and whether DIB's relationship with Osama bin Laden was an issue of discussion. Moreover, the bank would have engaged in internal dialogue regarding the allegations. DIB has offered no such information, nor has the bank presented any affidavit testimony or other evidence refuting Plaintiffs' claim that the meeting(s) took place.

DIB's position on these issues is particularly implausible given the nature of the bank's relationship with the government of Dubai. As DIB makes clear in its own brief, "DIB is and has been owned substantially by the Government of Dubai." Opposition at p. 3. This fact not only makes DIB's professed ignorance about the meetings between officials of the U.S. and UAE implausible, but also indicates that DIB has the practical ability to secure documents from the government for purposes of defending the claims in this litigation.

Given the seriousness of the allegations, the public reporting of the July 1999 meeting(s), and the explicit confirmation by the State Department that the July 1999 meeting(s) did in fact take place, it is simply unconvincing that DIB is not in possession of a single document relative to that significant event.

## V.   DIB's Fatwa and Sharia Supervisory Board

DIB's argument that documents relating to DIB's Fatwa and Sharia Supervisory Board are "irrelevant" and "a fishing expedition" is similarly unconvincing. Opposition at pp. 16-18. Although the defendant would prefer that this Court believe that DIB's Sharia Board "is an independent entity" that functions merely to ensure compliance of DIB's transactions with the provisions and rules of Sharia, Opposition at p. 17, the reality is that the Sharia Board plays a fundamentally vital role at DIB, wielding significant influence over the policies, decision-making, and activities of the bank. For instance, excerpts from DIB's 2009 Annual Report detail some of the extensive duties and responsibilities of the Sharia Board:

- The Sharia Board issues fatwas to provide Islamic banking guidance to DIB management personnel and various departments.

- The Sharia Board develops Sharia compliant training courses for DIB personnel.

- The Sharia Board develops innovative banking products in line with the Islamic finance industry.

- The Sharia Board reviews auditing reports relative to DIB's operations, activities and services offered during the fiscal year.

The Honorable Frank Maas
December 11, 2015
Page 7

- The Sharia Board is responsible for <u>setting aside profits</u> from banking transactions which are found not to be in compliance with Sharia principles, and is further authorized to review DIB's <u>zakat account</u>.

- The Sharia Board reviews DIB's <u>financial statements</u>, including DIB's books of accounts, records and other documents.

- The Sharia Board reviews and approves DIB transactions, contracts, investment funds and portfolios, and Sukuk (Islamic bonds) offered by the bank.

*See* <u>Exhibit I</u>, at pp. 3-4. DIB's Articles of Incorporation provide the following insights as well:

- Article 81 – The Sharia Board supervises all Sharia aspects of DIB and has the right to verify compliance of DIB's transactions with the rules of Sharia. The Sharia Board has the right to object to any transactions that it concludes are not compliant with Sharia law.

- Article 85 – The Sharia Board has the authority to access all of DIB's books, records and entitlements and may request all necessary data when needed. The Sharia Board may also examine DIB's assets and liabilities.

- Article 87 – The Sharia Board submits comprehensive <u>annual reports</u> to DIB's Board of Directors summarizing their work for the year, including opinions rendered by the Sharia Board.

Opposition, Ex. 8.

As the defendant's own documents demonstrate, the members of DIB's Sharia Board exert significant control and authority over the operations of the bank. It logically follows that discovery as to these individuals, who held significant leadership positions with DIB while openly facilitating and promoting a violent extremist Islamic agenda, is entirely relevant to Plaintiffs' claims that DIB knew and intended that its support to Osama bin Laden and al Qaeda contribute to the targeting of the United States and its citizens. As Plaintiffs detailed in their Letter Brief #1 at p. 2, the members of DIB's Sharia Board publicly sanctioned violent jihad, endorsed suicide attacks, and encouraged Muslims to send *zakat* funds to radical Islamic groups intending to wage violent jihad.

DIB does not dispute the fact that these former and current Sharia Board members publicly promoted this militant ideology.[5] Instead, DIB argues that these fatwas and other radical declarations have nothing to do with their duties at the bank, and that DIB's own policies prohibit Sharia Board members from issuing individual fatwas while serving as a member of the board. Opposition at p. 18. If that is true, and DIB officials were aware that members of its Sharia Board

---

[5] DIB does refute Plaintiffs' assertion that Sheikh Yusuf al Qaradawi, an Islamic cleric who has publicly endorsed acts of terrorism against the United States, was one of the first Sharia advisors at DIB. Opposition at p. 18. However, Qaradawi's own personal webpage clearly indicates that he volunteered as a Sharia advisor to DIB for several years. *See* <u>Exhibit J</u>.

The Honorable Frank Maas
December 11, 2015
Page 8

_____

were openly issuing fatwas sanctioning jihad and martyrdom operations (and it is likely they did),
all actions undertaken by DIB's Board of Directors to investigate and discipline Sharia Board
members for openly promoting this radical ideology would also be relevant to these proceedings.
*See* DIB Articles of Incorporation at Ex. 8 (Article 86 provides that "[n]o member of the Fatwa and
Shari'a Supervisory Board may be suspended from work or dismissed, except upon a decision from
the Board of Directors based on the reasons necessitating such procedure, and such reasons shall be
communicated to such member.").

Finally, DIB states that it is willing to supplement its production by producing "all DIB
Sharia Board members' names and tenures from January 1, 1992 to September 11, 2001."
Opposition at p. 18. While that is productive, it does not relieve the defendant from producing all
documents responsive to Plaintiffs' Request Nos. 46-64, including without limitation, fatwas issued
by the Sharia Board, meeting minutes, annual reports, auditing reports, and other categories of
documents identified in Plaintiffs' Letter Brief #2 at p. 6.

## VI.   Conclusion

DIB has a long history of providing essential financial services and other forms of material
support to Osama bin Laden, al Qaeda, the Taliban, and global terror financiers; a fact well-
established by the U.S. Department of State, the U.S. Department of Defense, NATO and other
international bodies, and global counter-terrorism investigations. Even more compelling, DIB's
own documents confirm that the bank has provided assistance to key individuals directly linked to
the September 11th plot and attacks. Nevertheless, DIB continues to resist producing responsive
banking and financial records within its possession, custody and control that are clearly relevant to
Plaintiffs' claims. Accordingly, Plaintiffs respectfully request that this Court compel DIB to
undertake all efforts to immediately secure and produce all documents and information responsive
to Plaintiffs' discovery requests.

Respectfully submitted,

J. Scott Tarbutton, Esq.
THE MDL 1570 PLAINTIFFS' EXECUTIVE
COMMITTEES

JST

cc:   The Honorable George B. Daniels (via overnight UPS delivery)
      MDL-1570 Counsel of Record (via ECF)

LEGAL\25127147\1 00000.0000.000/117430.000