# EXHIBIT G

G3M5terA

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

IN RE: TERRORIST ATTACKS ON
SEPTEMBER 11, 2001,

       v.                       03 MDL 1570 (FM)

------------------------------x

                        New York, N.Y.
                        March 22, 2016
                        10:20 a.m.

Before:

                  HON. FRANK MAAS,

                  Magistrate Judge

G3M5terA

APPEARANCES

KREINDLER & KREINDLER
     Attorneys for Plaintiff
BY:  JAMES KREINDLER
     ANDREW J. MALONEY

MOTLEY RICE
     Attorneys for Plaintiff
BY:  ROBERT T. HAEFELE

ANDERSON KILL & OLICK, P.C.
     Attorneys for Plaintiff
BY:  JERRY S. GOLDMAN
     BRUCE STRONG

COZEN O'CONNOR
     Attorneys for Plaintiff
BY:  SEAN CARTER
     SCOTT TARBUTTON

BERNABEI & WACHTEL
BY:  ALAN KABAT

CLIFFORD CHANCE, US, LLP
     Attorneys for Defendant Dubai Islamic Bank
BY:  STEVEN T. COTTREAU
     KATIE BARLOW

LEWIS BAACH, PLLC
     Attorneys for Defendants Muslim World League and
International Islamic Relief Organization
BY:  AISHA BEMBRY
     ERIC LEWIS
     WALEED NASSAR

SALERNO & ROTHSTEIN
     Attorneys for Defendant Yassin Kadi
BY:  PETER C. SALERNO

MARTIN F. MCMAHON & ASSOCIATES  (via telephone)
     Attorneys for Defendant International Islamic Relief
Organization
BY:  W. JAMESON FOX
     MARTIN F. McMAHON

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

G3M5terA

```
 1          (Case called)

 2          THE DEPUTY CLERK:  Counsel, please state your name for

 3   the record.

 4          MR. CARTER:  Good morning, your Honor.  Sean carter

 5   from Cozen O'Connor on behalf of the plaintiffs.

 6          THE COURT:  Good morning.

 7          MR. HAEFELE:  Your Honor, Robert Haefele from Motley

 8   Rice for plaintiffs.

 9          MR. COTTREAU:  Good morning, your Honor.  Steven

10   Cottreau on behalf of Dubai Islamic Bank.

11          MS. BARLOW:  Good morning, your Honor.  Katie Barlow

12   on behalf of Dubai Islamic Bank.

13          MR. TARBUTTON:  Good morning, your Honor.  Scott

14   Tarbutton for federal insurance plaintiffs.

15          MR. KABAT:  Good afternoon, your Honor.  Alan Kabat

16   for Dr. Al-Turki.

17          MR. SALERNO:  Good morning, your Honor.  Peter Salerno

18   for Yassin Abdullah Kadi.

19          MR. GOLDMAN:  Jerry Goldman with Bruce Strong,

20   Anderson Kill for the Plaintiffs Executive Committee and the

21   O'Neill plaintiffs.

22          MR. MALONEY:  Good morning, your Honor.  Andrew

23   Maloney with Jim Kreindler for the plaintiffs.

24          THE COURT:  Who is hiding.

25          MR. KREINDLER:  Good morning, your Honor.
```

G3M5terA

1              MR. NASSAR:  Good morning, your Honor.  Waleed Nassar

2    on behalf of the Muslim World League and International Islamic

3    Relief Organization.

4              THE COURT:  I guess that's everyone.

5              Were you given a copy of the appearance sheet?

6              OFFICIAL REPORTER:  Yes, your Honor.

7              THE COURT:  Great.

8              I am sure you were told I would like to start with the

9    Dubai Islamic Bank motion.

10             MR. CARTER:  Thank you, your Honor.

11             I think because of the telephone appearance, your

12   Honor, we need to be near a microphone, so.

13             THE COURT:  Okay, sure.

14             MR. CARTER:  If I stand here.

15             THE COURT:  And I understand Mr. McMahon or his

16   colleague but we can't hear them quite as the well, is that

17   correct?  Or not at all?

18             Okay, well let's go on.

19             MR. CARTER:  Your Honor, with regard to Dubai Islamic

20   Bank there are two motions presently before the Court and

21   before getting into the specifics of the motions themselves, I

22   would just like to take a very brief moment to discuss the

23   procedural history of the disputes that brought us to this

24   point.

25             As your Honor is aware, Judge Daniels denied Dubai

G3M5terA

1   Islamic Bank's motion to dismiss concluding that the

2   allegations of plaintiff's pleadings were sufficient to

3   establish personal jurisdiction over Dubai Islamic Bank and

4   also holding with the exception of a limited number of claims

5   that plaintiffs had stated a claim under Rule 12(b)(6).

6          Judge Daniel's decision did not include a complete

7   recitation of every allegation the plaintiffs had offered

8   against Dubai Islamic Bank in support of their claims but it

9   did recount the broad picture that plaintiffs had portrayed as

10  to the historical relationship between Dubai Islamic Bank and

11  al Qaeda and clearly deemed that significant and relevant in

12  denying the motions to dismiss.

13         Judge Daniels specifically held that it can reasonably

14  be inferred from the allegations that Dubai Islamic Bank

15  personally and intentionally provided support to al Qaeda in

16  aid of their plan to commit an aggressive terrorist strike

17  against the United States.  He cited in particular the pre-1999

18  collaboration between al Qaeda and Dubai Islamic Bank that

19  prompted U.S. officials to request a meeting with UAE officials

20  and seek an intervention; in their words clean up the bank.

21         He went on to thereafter deny Dubai Islamic Bank's

22  motion to dismiss under Rule 12(b)(6) and, in particular, the

23  arguments Dubai Islamic Bank had raised with respect to

24  causation explaining that al Qaeda's ability to accomplish the

25  coordinated large scale terrorist attacks of September 11th is

G3M5terA

1   dependent on the cumulative efforts and contributions of untold

2   thousands over an extended period of time.

3          It is the collective contributions of all such

4   sponsors that gives birth to a repository of seemingly endless

5   financial military and logistical resources from which the

6   terrorist organization draws upon with immunity to carry out

7   its attacks against innocent civilians.  Such a reality bears

8   directly on the issue of temporal and causal proximity.

9          The result of that decision, your Honor, is that

10  plaintiffs were authorized to proceed with merits discovery as

11  to Dubai Islamic Bank.  Of course, the scope of discovery

12  afforded in the context of that merits discovery as defined by

13  Rule 26(b) which broadly authorizes discovery into any matters

14  relevant to any party's claim or defense in the litigation.

15         The present dispute comes before the Court within that

16  framework and involves a set of very focused inquiries that go

17  directly to the heart of the nature, origin, and extent of

18  Dubai Islamic Bank's collaboration with al Qaeda and its

19  immediate partners.  As detailed in the papers, your Honor, the

20  motions to compel focus on records relating to essentially six

21  primary categories.

22         First, individual al Qaeda members who are alleged to

23  have held accounts at Dubai Islamic Bank.  In many cases

24  plaintiffs have provided the specific account numbers for the

25  accounts that those individuals held with the bank, at least to

G3M5terA

1    the extent known.

2            THE COURT:  One of the bank's arguments is

3    burdensomeness because, apparently, even though you can

4    electronically search the accounts to come up with the actual

5    transaction records you need to go into boxes in warehouses

6    some of which had have been destroyed.

7            MR. CARTER:  Your Honor, I think there are two

8    responses to that and one deserves a bit of context.

9            Dubai Islamic Bank has presented itself in dealing

10   with the plaintiff and to the Court as a sophisticated,

11   international financial institution which adheres to the

12   highest standards of international practice in banking and

13   financial markets that abhors terrorism of all kinds, and I

14   think that is significant in evaluating several of its

15   arguments including arguments about the feasibility of

16   searching for records relating to a specifically identified

17   account.

18           THE COURT:  Well, if we remove the case from this

19   context and this was a large American bank, Citibank coming in

20   in relation to a contract dispute and they said you are asking

21   us to search for account number for -- and it is sort of the

22   fill in the bank as I'm not sure what the right number

23   150-some-odd, 200-odd or 2,900 accounts, but even if it were 10

24   accounts, if you are looking for a lengthy period of time,

25   every transaction Citibank arguably would be saying that's

G3M5terA

         1   unduly burdensome even though we are already obviously a large

         2   bank.

         3           MR. CARTER:  Your Honor, I think there are two points

         4   that warrant examination here.  The first is that Dubai Islamic

         5   Bank can't present its own unwieldy record-keeping system as a

         6   defense to its obligations under the discovery rules.  The fact

         7   that they don't maintain records allegedly in a form that

         8   renders them easily searchable doesn't provide them with a

         9   sword to defeat the normal operation of the discovery rules.

        10           I think, additionally, it is difficult to reconcile

        11   the description they've given of the record keeping processes

        12   with their arguments concerning their operation as a

        13   sophisticated international financial institution because there

        14   must be circumstances in which authorities come to Dubai

        15   Islamic Bank for a western bank and say, in relation to a

        16   criminal investigation or a counter-terrorism investigation, we

        17   need the records pertaining to a particular account.  And we

        18   have evidence that that happened here in fact.  We have the

        19   account of Ammar al-Baluchi for which there are documents in

        20   the record indicating that the central bank of the UAE sent a

        21   notification to Dubai Islamic Bank's CEO saying U.S.

        22   authorities are going to come to visit you and request a

        23   certification of the business records for this account.  About

        24   a month later Dubai Islamic Bank's head of money laundering

        25   sent back a letter indicating that this is the certification of

G3M5terA

1    the business records which are attached.

2              So, we see in that framing that Dubai Islamic Bank

3    appears to have the capacity to do this when asked by

4    authorities and in fact it says in its motion that we have

5    complied with authorities from the UAE and from the US

6    government in all these counter-terrorism investigations.

7              So you now, somewhat quizzically, we don't have the

8    actual records attached to that certification of business

9    records.  Also, with regard to the sufficiency of these

10   searches, the circumstances surrounding this Baluchi account

11   are concerning to us in that you have an inquiry from the

12   central bank that goes directly to the CEO of Dubai Islamic

13   Bank and then you, a month later, have the result of whatever

14   that inquiry was coming from the head of money laundering and

15   absolutely nothing in between.  Nothing in between to describe

16   what happened once the notification was received by the CEO,

17   what processes were initiated initially to conduct the

18   investigation that was required and in obtaining the records,

19   no internal correspondence and certainly not the case that the

20   CEO walked downstairs and found these records himself.  Some

21   process occurred and that process may very well reveal that

22   Dubai Islamic Bank does in fact have the capacity to find these

23   records.

24              On the burden, one other thing, your Honor, we have

25   been down this road before.  You will recall in earlier stages

G3M5terA

|     |                                                                              |
| --- | ---------------------------------------------------------------------------- |
| 1   | when Mr. McMahon was representing the Muslim World League and                 |
| 2   | IIRO he indicated that the searches we were requesting they                   |
| 3   | make of the financial records were going to be incredibly                    |
| 4   | burdensome because they didn't keep their records in an easily               |
| 5   | searchable form and they were going to have to go into the                    |
| 6   | individual files.  And your Honor's response at that time was                 |
| 7   | this whole case is about money being diverted towards terrorist               |
| 8   | goals.  As I understand it, the lion's share of the effort is                 |
| 9   | to see where money went so the notion that this is a lot of                   |
| 10  | paper or bytes of information and therefore burdensome,                       |
| 11  | Mr. McMahon, doesn't really resonate with me.                                 |
| 12  | And that is the situation here as well, your Honor.                           |
| 13  | THE COURT:  I hope I said gigabytes.  But, other than                         |
| 14  | that, however it was transcribed.                                            |
| 15  | MR. CARTER:  You probably did, your Honor.                                    |
| 16  | THE COURT:  Terabytes.                                                        |
| 17  | MR. CARTER:  And so again, your Honor, with regard to                         |
| 18  | the individual accounts for the individual people, in most                    |
| 19  | cases we have identified the account numbers at least to the                  |
| 20  | extent we know them.  We are not asking for, you know, whatever               |
| 21  | discussions may have occurred in the context of the meet and                 |
| 22  | confer, the issue that is presently before the Court from the                 |
| 23  | accounts that are the subject of the motion to compel, it is a                |
| 24  | very focused and limited number of accounts.                                  |
| 25  | THE COURT:  And what is that number?  Approximately.                          |

1          MR. CARTER:  Approximately?  Well, I should say, your

2     Honor, we don't know entirely how many accounts these

3     individuals held but you are talking about only 8 individuals

4     and the Taliban accounts.  Now, with regard though those it has

5     been argued it would be likely to, for them to search and find

6     any Taliban accounts.  The problem is that they are required by

7     the international sanctions regimes to search for and identify

8     any accounts they hold for Taliban members who are on the

9     consolidated lists.  We are simply asking them to do something

10    that they're required to do by law.

11         The additional problem, your Honor, is that we see a

12    notification from the period in 2003 to Dubai Islamic Bank

13    again from the Central Bank of the UAE asking them to search

14    for and freeze any accounts they hold with the below listed

15    members of the Taliban and Taliban-related entities.  The

16    letter goes on to identify apparently 152 individuals

17    associated with the Taliban and one entity.  All of the names

18    on that letter have been redacted in the production we

19    received.  It is difficult to understand why but clearly those

20    are Taliban members and Taliban entities for which DIB was

21    required to and presumably has conducted a search.

22         Lastly, your Honor, we also know from the record that

23    there is evidence that authorities asked Dubai Islamic Bank to

24    close down a certain number, 16 or so, Taliban accounts

25    following the embassy bombings.

G3M5terA

1      THE COURT:  Who made that request?  Also the central

2   bank?

3      MR. CARTER:  I believe it was UAE authorities.  I

4   would have to double check that, though.  So, we have a number

5   of circumstances in which these Taliban accounts have been very

6   specifically identified.

7      Now, with regard to the Taliban, your Honor, I also

8   want to address the relevance arguments.

9      THE COURT:  Before we get to that, part of

10  Mr. Cottreau's papers say that you folks were seeking searches

11  for 2,900 individuals.

12      MR. CARTER:  Well, your Honor --

13      THE COURT:  Are you using smaller numbers?

14      MR. CARTER:  Again, your Honor, these are issues that

15  most of the numbers are comprised of people who are on the

16  consolidated list and so that's a consolidated list, sanctions

17  list that goes out to all financial institutions and that all

18  financial institutions are required to conduct searches for.

19      Now, there were some additional al Qaeda-related

20  members that we had included in those lists but with regard to

21  the Taliban, it is not all that difficult to go back to the

22  list that exists say, for instance, between 2001 and 2004, a

23  relevant discovery period, and to determine which Taliban

24  members had accounts at DIB and which Taliban identified

25  entities had accounts at DIB and that's really all we are

G3M5terA

1    suggesting here.

2              THE COURT:  One thing that struck me as overbroad but

3    it is largely nomenclature is you were asking for records

4    concerning accounts that were frozen following the terrorist

5    attacks which could be a lot of accounts unrelated as opposed

6    to asking for accounts which were frozen as a result of the

7    terrorist attacks which, presumably, is a smaller universe.

8              MR. CARTER:  Yes, your Honor.

9              I think this issue about the nature of the request

10   potentially capturing the Foreign Narcotics Drug Kingpin Act

11   sanctions programs and other programs is a little bit of a red

12   herring.  We are talking about accounts that were frozen

13   pursuant to the terrorism sanctions regimes and we can easily

14   just simply limit it to the relevant terrorism sanctions

15   regimes and therefore constrain it to the entities and

16   individuals that most clearly relate to the claims at issue in

17   this case.  And we can conflate the period for which we are

18   seeking that information to a period reasonably following the

19   September 11th attacks and in that way substantially narrow

20   this.

21             THE COURT:  Well, reasonableness is in the eye of the

22   beholder.  Bear with me a second.  What are you suggesting

23   would be reasonable stop and start dates for a search?  And I

24   recognize it may be account-specific or category-specific.

25             MR. CARTER:  Okay, your Honor.  We were speaking a

G3M5terA

1    minute ago about the accounts frozen after 9/11.

2              THE COURT:  Okay.  Fair enough.

3              MR. CARTER:  So, for those we would be talking about

4    September 12, 2001 and going forward to the period that's been

5    determined by the Court to be the outside limit of discovery

6    which is 2004.

7              Now, for the other accounts, for the specific al Qaeda

8    individuals in particular, some of these accounts clearly date

9    back to the period of 1992 and move forward for a longer period

10   of time and, again, relative to the relevance arguments, Dubai

11   Islamic Bank has posited that the September 11, 2001 attacks,

12   the planning for the September 11, 2001 attacks did not begin

13   until late 1988 and 1999 and therefore it is relieved of

14   responsibility for searching for any records that predate that

15   time period.

16             First of all, your Honor, we have already been down

17   this road as well and we set a presumptive time frame for

18   discovery in these proceedings and we certainly haven't limited

19   discovery to individuals specifically involved in the September

20   11, 2001 attacks over a period of two years that preceded it.

21   The Court has repeatedly authorized plaintiffs to conduct

22   discovery and to the broader historical relationships between

23   the defendant and al Qaeda dated back to 1992 and we are simply

24   seeking that same discovery with respect to the particular

25   individuals that have been identified in the briefing papers.

G3M5terA

1              So, the other problem with the argument that they have

2     made about the timing of the September 11, 2001 attacks and the

3     planning is that it is simply not correct.

4              They take a fragmented sentence out of the 9/11

5     Commission Report that really refers to the date on which

6     Bin Laden formally green lit the plot as a go ahead.  That has

7     nothing to do with the date on which planning, consideration,

8     and evaluation of attacks against Americans exploiting the

9     civil aviation system.  Al Qaeda began doing that much, much,

10    earlier.

11             Bin Laden was exploring those plots in the early

12    1990s.  Khalid Sheikh Mohammed developed a plot -- the Bojinka

13    plot -- using funding that was provided by al Qaeda during that

14    time.

15             Khalid Sheikh Mohammed goes to Afghanistan in 1996

16    around the same time that Bin Laden arrives, he stays there

17    thereafter collaborating with Bin Laden.  During that entire

18    period he is able to stay there, Bin Laden is able to stay

19    there because of the material support and resources being

20    provided by their benefactors.  So,

21             the arbitrary idea that September 11, 2001 appeared

22    out of the wind suddenly in the beginning of 1999 doesn't have

23    any merit and, in addition, it is contrary to evidence we have

24    seen.

25             Relatedly, on the relevance front, your Honor, DIB is

G3M5terA

1   seeking to avoid discovery into its relationships with the

2   Taliban.  This really goes to the heart of the claims.

3            In the period before September 11, Al Qaeda and the

4   Taliban had a symbiotic relationship, your Honor; they shared

5   common resources, intermingled their people.  Al Qaeda fighters

6   went to fight alongside the Taliban in conflicts in

7   Afghanistan.  Bin Laden lived side by side along with the

8   Taliban leadership in Kandahar.  Most notably they shared

9   financial resources.  The very foundation of this symbiotic

10  relationship was al Qaeda's provision of massive funding to the

11  Taliban to the tune of $20 million a year which Bin Laden was

12  able to draw on the relationships he had with wealthy patrons

13  in the gulf and use that money as a shared financial base for

14  the Taliban around al Qaeda in exchange for which Bin Laden

15  enjoyed safe haven in Afghanistan throughout that period.

16           So, there is no divide between al Qaeda money and

17  Taliban money between this time period.  If you want to find

18  al Qaeda money you are going to have to go to the Taliban

19  accounts.  In fact, one of the diplomatic cables that was

20  released from Secretary Clinton's office identified gulf

21  patrons as the primary benefactor of both al Qaeda and the

22  Taliban, and as a consequence, the Taliban accounts are

23  absolutely critical to this.  But you don't really have to take

24  our word for it, your Honor, the international sanctions and

25  declarations of United Nations Security Council make it

G3M5terA

1    absolutely clear.

2              In the wake of the embassy bombings the security

3    Council issued resolution 1267 which established the joint

4    al Qaeda and Taliban Sanctions Committee, a single committee

5    for both entities.  It condemned the Taliban's role in working

6    with al Qaeda and directed all states to freeze funds and other

7    financial resources including funds derived or generated from

8    property owned or controlled directly or indirectly by the

9    Taliban.

10             So, the United Nations security council response to

11   the embassy bombings was a direct recognition that the

12   provision of support to the Taliban was support to al Qaeda and

13   that that support had directly enhanced al Qaeda's operational

14   capabilities.  And so, the Taliban accounts, your Honor, go to

15   the very essence of whether or not this relationship existed.

16             On a related note, the issues that DIB has raised

17   again about the inquiries into its potential involvement in the

18   embassy bombings and in the accounts that were held by al Qaeda

19   members at DIB who were involved in the bombings go right to

20   the heart of whether or not DIB maintained relationships with

21   al Qaeda including support for its collaborational efforts to

22   attack the United States.

23             THE COURT:  Let's talk a bit about some of your other

24   requests which is the documentation to the Shariah board and

25   Fatwahs and the like.

G3M5terA

1          MR. CARTER:  Your Honor, if I may?  One last thing on

2     a related subject and then I will go there?

3          THE COURT:  Yes.

4          MR. CARTER:  The '98 and '99 meetings in the offices

5     in the U.S. and UAE, I think, deserves a little bit more

6     primacy.

7          Again, Dubai Islamic Bank has presented itself as this

8     reputable international financial institution that cares deeply

9     about its reputation in the world and abhors terrorism of all

10    kinds.  Following the 1999 meeting between U.S. officials and

11    UAE officials, a state department official publicly confirms

12    that a meting was held between the U.S. official and UAE

13    officials to discuss Dubai Islamic Bank's role in laundering

14    funds on behalf of the world's most notorious terrorist Osama

15    Bin Laden.

16         On the same day, the New York Times published a very

17    prominent article indicating that the CIA had uncovered

18    evidence that DIB was serving as a secret channel for

19    laundering funds on behalf of Osama Bin Laden.

20         The reputational, financial, and business implications

21    of being so publicly indicated in laundering funds on behalf of

22    Bin Laden are remarkable and if we accept Dubai Islamic Bank's

23    own representations about its standing in the world community

24    and concern about its world reputation, it follows that some

25    inquiry would have been initiated by the leadership of Dubai

G3M5terA

Islamic Bank concerning the nature of these allegations and

whether they had merit and that there would have been some

internal investigation.

All we have is a few correspondence about a potential

lawsuit against the New York Times but nothing -- nothing --

resembling the kind of response you would expect for these

kinds of accusations.

What makes the matter all the worse, your Honor, is

the nature of Dubai Islamic Bank's relationship to the

government of Dubai and the UAE generally.

At the time this meeting occurs --

THE COURT:  The bank is, in effect, government owned;

is that correct?

MR. CARTER:  They say it is largely owned by the

government of Dubai.  In addition, at the time of this

particular occurrence, it is publicly confirmed that U.S.

officials met with the ruling Maktoum family.

Now, at that time a member of the Maktoum family who

served as the vice president and prime minister of the UAE and

the leader of Dubai was the primary shareholder of Dubai

Islamic Bank.  Now, given those relationships one would also

expect that Dubai Islamic Bank would have sent inquiries to its

primary shareholder and its government owners asking what was

the nature of these accusations.  We need to investigate this

and we need to remedy this problem.

 1              Somewhat relatedly, your Honor, it also raises the
 2    question as to whether or not Dubai Islamic Bank has the
 3    practical ability to now obtain those documents from the
 4    government itself through a request, or through a member of the
 5    Maktoum family, by request.  To the extent it has the practical
 6    ability by virtue of the nature of the way communication and
 7    documents flow between the government and the bank to obtain
 8    these documents it should be required to seek them.

 9              Your Honor, with regard to the Sharia advisory board,
10    the issue here is that the cooperation that has existed between
11    most patrons of al Qaeda and Bin Laden is founded on shared
12    ideology and we have identified individuals on the Fatwah and
13    Sharia board who have made various declarations consistent with
14    logical principles underlying Bin Laden's jihad.

15              THE COURT:  It seems to me there are two separable
16    issues; one, Fatwahs where he is -- he can correct me when he
17    gets up if I have it wrong -- but part of the answer is we are
18    not responsible for anything somebody on the Sharia board may
19    have done individually which is a different question than the
20    discovery issue.

21              But, apart from specific Fatwahs, whether they are by
22    an individual or in individual capacity, or something official
23    from the bank, that's different than the Sharia board which I
24    gather is in effect the executive committee of the bank and has
25    dealings with every transaction to ensure that interest rate

G3M5terA

1    restrictions and the like are not violated.

2            MR. CARTER:  I think that's right, your Honor, and

3    obviously we are not interested in every ruling issued by the

4    Sharia board as to whether or not a particular transaction was

5    in accordance with Shariah and Islamic principles.  We are

6    really only interested in any declarations made concerning

7    supporting conflict in which al Qaeda were involved,

8    declarations to support jihad.

9            We are getting into a focused inquiry as to whether or

10   not the Sharia board issued any of the Fatwahs or rulings that

11   played overall in the decision of the bank to provide supported

12   to the Taliban or to Bin Laden or for causes they're

13   championing.  So, that's really the focus area there.

14           Your Honor, I would like to really quickly say a word

15   about the records that have been provided for the individuals.

16           THE COURT:  I am laughing because I was just about to

17   ask you that.  Go on.

18           MR. CARTER:  Essentially what we have gotten in most

19   cases are statements of the account and a few instances limited

20   numbers of documents relating to the opening of the account,

21   maybe a passport photo.  The problem with statements is that

22   they simply are a snapshot of debits and credits.  They don't

23   tell you where the money came from and they don't tell you

24   where the money went to and they're relatively useless.  They

25   also don't even tell you in most cases how the money was taken

G3M5terA

1    out of the bank when there is a debit.

2              THE COURT:  But they inform the discussion about

3    burdensomeness, don't they?

4              If, for example, a particular account only had three

5    transactions in a month, that's a different burden than if they

6    had 3,000.  And if there is a transaction that involves the

7    equivalent of $12, that's probably not one you are interested

8    in.

9              MR. CARTER:  Your Honor, there are a very limited

10   number of transactions involved in these accounts and so I

11   think, based on the number of transactions, there is not a

12   tremendous burden.  I think we would all agree that a

13   transaction for $12 is not one that needs to be searched

14   exhaustively but -- you know, we are not talking about hundreds

15   of thousands of transactions here by any stretch of the

16   imagination.

17             THE COURT:  The reason I am asking is if you were an

18   assistant U.S. Attorney and the grand jury subpoenaed and

19   subpoenaed a bank, a domestic bank here and said give me all

20   the records that relate to Frank Maas including but not limited

21   to copies of checks, deposits slips, and the kitchen sink, the

22   bank would respond in the first instance to the kitchen sink

23   grand jury subpoena with transaction records, monthly

24   statements and basically say circle the ones you really want.

25             And it sounds like there would be a two-step process

1   from what you say here although you have seen relatively few

2   transactions and there probably could be some financial floor

3   such that de minimis transactions are not searched for

4   needlessly.

5           MR. CARTER:  I think that would be possible, your

6   Honor.  I think we also have to have all of the accounts.

7   Right now Dubai Islamic Bank has only agreed to search for a

8   very limited number of them.  For instance, we don't have any

9   statements for the Taliban accounts so I think when we go

10  through that process we would like to have all of the

11  statements at issue so we can establish the floor, so we can

12  establish the range, and proceed sort of on a comprehensive

13  basis rather than doing it based on a very limited spectrum of

14  information that we have presently.

15          Your Honor, I think that is all I have.  Thank you.

16          THE COURT:  Thank you.

17          Just out of curiosity while you are gathering your

18  papers, is there anybody on the telephone?

19          MR. FOX:  Hi.  This is Jameson Fox of Martin McMahon

20  and Associates.  We represent IIRO in this case.

21          THE COURT:  We didn't hear you earlier so that's why I

22  was asking.

23          Go ahead, Mr. Cottreau.

24          MR. COTTREAU:  Good morning, your Honor.

25          THE COURT:  Good morning.

G3M5terA

1          MR. COTTREAU:  Let me give a little bit of context to

2     the discovery disputes and what I consider to be the heart of

3     them.

4          Plaintiff's initial requests were not as Mr. Carter

5     said, very focused inquiries.  There were essentially give us

6     all Taliban accounts, all al Qaeda accounts that you have.

7     Indeed, they have requests to that effect.  They have issued

8     108 RFPs -- requests for production -- and they were incredibly

9     broad.  One of the challenges we had when we first sat down in

10    March 2011 to talk about the requests that they had issued was

11    we are a bank, we are not experts in who are members of the

12    Taliban and al Qaeda and who are not, who are the members of

13    al Qaeda, and that became the issue and how do we search for

14    them.

15         First, most of the members of al Qaeda, I presume, are

16    Arabic names.  Their Arabic names don't translate to English in

17    any rule-based way.  There are multiples of ways, indeed dozens

18    in many cases, of ways of spelling Osama Bin Laden alone.  So,

19    how is it that we even conduct this search of our account

20    records?

21         That was the initial problem.  And then the plaintiffs

22    didn't just want the al Qaeda members and the Taliban members'

23    accounts if they were the accounts records but including

24    accounts that were for -- and this is a quote from one of their

25    RFPs -- the actual or potential beneficial interests in those

G3M5terA

1    accounts or for the benefit of those accounts.

2              THE COURT:  Let me interrupt you for a second because

3    there are 152, I believe it is, accounts that apparently the

4    U.S. government believes were related to terrorism in some

5    fashion that formed part, even if it was a small part, of the

6    plaintiff's request.  There was a production of at least one

7    document, 152 names redacted.

8              I am not sure I understand (A) the basis for the

9    redaction; and (B) assuming that the U.S. government was of the

10   view that those were accounts related to the Taliban why

11   records related to those accounts haven't been produced

12   already.

13             MR. COTTREAU:  That's a good question, your Honor, and

14   let me try to address it very straightforwardly.

15             We agreed on two methodologies.  DIB conceded we

16   should have two methodologies here.  One is that any -- and

17   these are not U.S. government embassies, these came from the

18   UAE central bank.

19             Any government correspondence that Dubai Islamic Bank

20   received asking it about accounts that related to al Qaeda we

21   produced.  We produced correspondence back and forth that we

22   had in the bank's files and we produced any account statements

23   that related to that correspondence.

24             THE COURT:  But not the transactional records.

25             MR. COTTREAU:  Right.  So, if I can try to address

G3M5terA

1   transactional records second to the first just so that we are

2   covering it comprehensively?

3           THE COURT:  Sure.

4           MR. COTTREAU:  With respect to who are members of

5   al Qaeda, that was an easy one for us.  Okay.  If we got some

6   with government request giving us a name and we search for it

7   and we identified accounts, we will give them over and we did

8   and we have given all of those accounts.

9           THE COURT:  When you say you have given the accounts,

10  the monthly statements in effect or the underlying transaction

11  records?

12          MR. COTTREAU:  Really, there are probably four types

13  of records associated, if I could --

14          THE COURT:  Sure.

15          MR. COTTREAU:  -- with a bank account.  Let's just

16  take a bank account.

17          First, there would be -- should be -- for most of

18  these accounts an account opening document when the customer is

19  new to the bank.  Those always didn't get retained but most of

20  them have been retained.  And so you have things like a copy of

21  the passport and address and things like that and so forth and

22  we have given those for any accounts that identified related to

23  al Qaeda in any of this correspondence.

24          Secondly, we can go to our legacy system.  This is a

25  legacy system so it is not a live system of people's accounts

G3M5terA

1   from the 1990s, this is a legacy system for the bank.  We can

2   access the databases that were kept by the legacy system and

3   query them with the help of an IT department.  It's not a front

4   end where you can go type on a terminal somewhere and access

5   this data anymore.

6               THE COURT:  All right.

7               MR. COTTREAU:  So, you can find the accounts and

8   generate essentially the account statements, what you would get

9   if you were a banking customer; records of debits and credits

10  from the account.  Then there is two types of transactional

11  records that are sometimes associated with each of the things

12  on the account statement.  First, there is additional --

13  sometimes additional electronic information that exists in the

14  databases about each transaction.  And then, fourth, there is

15  paper records that relate to each transaction.

16              So, if you go to the bank and you want to deposit cash

17  you would write a slip out, right, and give it to the teller.

18  In many cases pretty meaningless pieces of paper but,

19  nonetheless, those are collected by the tellers -- and this is

20  a generalization because branch by branch, over time, practices

21  may have changed -- but, generally speaking, the teller would

22  bundle up her bundle at the end of the day -- his or her

23  bundle -- put it together, those would be accumulated with the

24  other tellers' at that branch and put into a box or put into a

25  folder and eventually those things got filed in offsite

G3M5terA

1    storage.

2              There are transactions that are incredibly more

3    complicated to find than things like that.  If a customer would

4    send in a check that needed to be deposited it may sit at the

5    bank for two, three, four days after the date of deposit before

6    it is ultimately cleared and bundled up and they're very hard

7    to find, extremely hard to find.

8              So, with respect to those four types of account

9    records we agreed the following with plaintiffs and this was

10   back in our meet --

11             THE COURT:  Well, you have talked about deposits.  I

12   assume there were also transactions going out, checks or the

13   equivalent?  Wire transfers?

14             MR. COTTREAU:  Sure.

15             If a DIB customer writes a check, gives the person a

16   check, that check is deposited at another bank, for example,

17   eventually that check comes back and is presented to Dubai

18   Islamic Bank and the practices changed over time and the check

19   is either honored or not.  Those checks that are bundled up

20   together and cleared in that way are hard to find.  They're

21   obviously not teller records, they're going to be put in

22   various boxes over time and the index, you can imagine there

23   are over 50,000 boxes here.  It is hard to -- you are looking

24   for a needle in a hay stack every time.

25             So, what we agreed with the plaintiffs in our meet and

G3M5terA

1   confer -- and this is confirmed in my July 2011 letter that you

2   have as part of our submission -- what we agreed was we will

3   give you the account opening statements, those are easy --

4   relatively easy to pull.  We will give you the printouts from

5   our legacy computer system showing each and every transaction

6   in the accounts.  But, with respect to the transactional

7   records this is really burdensome to find, they're difficult.

8   I'm not even saying they're findable.  Some of them might not

9   be.  Come back to us and tell us which ones you want us to pull

10   and which ones you didn't.

11         That was a conversation we had in March 2011.  It was

12   confirmed in my letter in July 2011.  We produced -- we

13   completed our production minus some additional supplements over

14   the years but we completed our production in principle at the

15   end of August 2012 consistent with your order.  And largely we

16   produced the account statements in that August batch because it

17   was our production that was made after we finally got UAE

18   approval to produce account statements with your Honor's help.

19         THE COURT:  You said that was 2012?

20         MR. COTTREAU:  2012.

21         The plaintiffs never came to us in the intervening

22   years and said pull these transaction documents for these

23   accounts or pull them all.  They stayed silent.  The first time

24   we heard from plaintiffs on this issue was on the day before

25   they filed their motions to compel.  We had a quick meet and

G3M5terA

confer on July 13th, 2015 and that was the first time they ever
voiced that they wanted them all pulled.  And these aren't easy
to pull -- and the accounts records that we have already
produced, your Honor, we have produced, I believe, for seven
customers eight accounts with over 700 transactions on the
account statements.  And sometimes, just for example, if you
try to find a check that was cleared by Dubai Islamic Bank, I
have looked into the burden of this even as recently as last
month to make sure I try to fully understand what we are up
against here; you might look through two, three, four boxes for
that branch for that day and not find it.  And then you have to
look through two, three, four boxes per day afterwards and it
is not even easy to locate the two, three, four boxes on the
index because, as I said, it is essentially a hand-keyed index
for 50,000 boxes.  They are not even easy categories to
identify the boxes on the index.  If it is conceivable to try
to find one of these checks it may take a person around a day
or even longer to take a person to find one check that is
cleared by the bank.

          THE COURT:  Presumably, if you had a defined universe
of accounts and checks -- restrict it to accounts.  If you had
a defined universe of accounts you wouldn't have to make
repetitive passes, you would look for all the checks for those
accounts in box one and move to box two?

          MR. COTTREAU:  That's true, but there is almost no

G3M5terA

1    overlap, your Honor.

2             THE COURT:  Putting aside the question of whether

3    plaintiffs delayed too long, one of the problems with your

4    argument is assuming that these transactions or transfers are a

5    significant element to the plaintiff's case, you are basically

6    saying because of the burden they shouldn't be enabled to prove

7    their case, assuming they can.

8             MR. COTTREAU:  We have never said no transactions.

9    Here is what I think would be --

10            THE COURT:  Well, the transaction -- would you agree

11   that the transaction records with transaction summaries -- let

12   me call them that -- without the underlying transaction

13   records, are pretty useless?

14            MR. COTTREAU:  I wouldn't agree with that.  I agree

15   that in some cases they may have a more limited utility but I

16   don't think, for example --

17            THE COURT:  There is an account that can be shown to

18   be an Osama Bin Laden account and it shows a million dollars in

19   and a million dollars out every month for a year without

20   something that indicates where the million came from and where

21   it went.  Isn't it pretty useless?

22            MR. COTTREAU:  In that example it may be.  We don't

23   have any account for Osama Bin Laden.  We have never had an

24   account for Osama Bin Laden to the best of all of our

25   investigation efforts dating back to 1999.  And so, I will give

1    you an example, your Honor, a cash deposit, $500.  Do we really

2    need to go find the deposit ticket for that?

3            THE COURT:  Okay.

4            MR. COTTREAU:  Okay.

5            THE COURT:  It seems to me that the answer is

6    self-evident.

7            MR. COTTREAU:  An electronic transfer from one account

8    to another and we can tell on the electronic transfer data what

9    that is.  That's another one.  There may have been a piece of

10   paper initiating it but we have a pretty good handle from the

11   electronic data what that is.

12           THE COURT:  Okay.  Well, you said in those accounts

13   there are 700 transactions.  How many of those are non-cash

14   paper transactions where one would have to look at the

15   underlying record to have an understanding of what actually

16   occurred?

17           MR. COTTREAU:  I think that's something we could

18   parse.  I know this, about 170 of them I think are ATM

19   transactions, maybe 169, but approximately 170 are ATM.  No

20   reason to pull those, obviously.

21           My suggestion would be this, your Honor, that we do

22   two things with respect to the transactional records.  Number

23   one, the electronic data that we have associated with each and

24   every one of the transactions, we produce that, because I think

25   that's something we can get out with a query fairly easily

1    compared to the task of sorting through this index of over

2    50,000 boxes and try to assess where things might be.  And then

3    my other suggestion would be that we look at something that is

4    proximate in time.

5         Now, Mr. Carter said that we were taking the position

6    that we are not going to produce records back to 1992.  That's

7    not our position and, indeed, for each of these eight accounts

8    if we had any account statements between 1992 and September 11,

9    2001, they were produced.

10         THE COURT:  Tell me again what the eight accounts

11    relate to?

12         MR. COTTREAU:  The eight accounts were the result of

13    two-fold methodology that we were talking about earlier, your

14    Honor, which is any government correspondence but primarily

15    with the UAE Central Bank, I assume some of that may have been

16    cooperation with the U.S. authorities but that's a complete

17    assumption on my part.  But, beginning within two weeks after

18    9/11, the UAE Central Bank started sending around what they

19    call circulars to all of the banks asking whether you have

20    accounts in the following names.

21         THE COURT:  Copies of some of which are in the papers?

22         MR. COTTREAU:  Copies of some of which I think are

23    appended to their reply at A through H or so.

24         And we did account searches.  These aren't easy.  I

25    will give you an example of one of the accounts we produced to

1    plaintiffs as part of this batch, the account that Mr. Carter

2    identified as Ammar al-Baluchi.  We didn't have an account for

3    Ammar al-Baluchi.  Okay?  And this is the challenge of what

4    plaintiffs want us to do.  They identify eight people and they

5    say:  Find the accounts.  But we did have an account for Ali

6    Abdul Aziz Ali.  It turns out that's Ammar al-Baluchi's alias.

7    We found it because we were given the name and the alias, but

8    otherwise we would have no way of knowing that Ammar al-Baluchi

9    is as Ali Abdul Aziz Ali.  The names are not close, they're not

10   in any way connected in our minds at the bank and certainly not

11   me as outside counsel.

12          And so, what we gave plaintiffs is the result of our

13   two-step process.  Step one, anything related to al Qaeda that

14   was an account identified in any government correspondence that

15   we got they have and they have it already and they have all of

16   the account statements and they have all of the account opening

17   documents that we have.

18          Secondly, we have this problem, the Ammar al-Baluchi

19   and Ali Abdul Aziz Ali problem and the question was you are

20   asking for every Taliban member, every al Qaeda member ever and

21   you want us to identify who is al Qaeda and who is not.

22          THE COURT:  That was the 2,900 names or individuals?

23          MR. COTTREAU:  Yes.

24          THE COURT:  It sounds like we are now talking about a

25   far smaller universe.

G3M5terA

1          MR. COTTREAU:  If we are, we are.  If we are talking

2    about 400 Taliban names that were on the list that we received

3    from Mr. Carter's colleague which is at Exhibit 2 to our

4    papers, there are, by our account -- some of these names aren't

5    easily identifiable but, by our count, almost 400 individuals

6    in the Taliban.  Some joined the Taliban after 9/11.  Some

7    people on the list of 2,900 names were 13 years old at the time

8    of 9/11.

9          THE COURT:  But their accounts could still be used.

10          MR. COTTREAU:  I suppose so but there is no -- I mean

11    even in plaintiff's own -- in their reply brief they talk about

12    what the financial flows are between al Qaeda and the Taliban

13    and they say it is from the al Qaeda to the Taliban to the tune

14    of $20 million in the annual budget.  There is no evidence that

15    the plaintiffs put forward that the Taliban is giving money to

16    al Qaeda or that somehow Taliban accounts throughout the world,

17    there is no allegations in plaintiffs complaint that we had

18    Taliban accounts, there is no allegations in their RICO

19    statements that we had Taliban accounts and what we had, your

20    Honor, was a list of 2,900 names and we have to hand write

21    queries, sequel queries of underlying databases in the legacy

22    system to find out if there is a hit on each one of those

23    names.

24          And so, the question was how do we reasonably cut it

25    back?  And so, what happened was we received this list in July,

G3M5terA

we analyzed the list and we tried to figure out how can we

reasonably cut back the list of 2,900 names to something that's

accomplishable?

        And so, we went through the 9/11 Commission Report,

all 567 pages.  If a name appeared in the 9/11 Commission

Report to have anything to do with 9/11 we kept it on the list

and we took all the aliases that were listed in the documents

in the list that plaintiffs provided, and we took all the

aliases in with it.

        So, anybody in all 567 pages of the 9/11 Commission

Report who is connected in any way to 9/11, we kept them on the

list.  That gave us a list with the search terms that we had

already agreed with plaintiffs to provide of 261 names.  And we

wrote to plaintiffs on September 8, 2011 and said, hey, this is

our methodology, here is what we have done.  Let us know.

        We were up against, at that time, a more pressing

document discovery deadline and we wanted to move forward, we

then didn't hear anything for two weeks.  We wrote to them

again and this is these two letters are Exhibits 3 and 4 to our

papers, we wrote again to Mr. Carter and said we haven't heard

from you, we would like to move forward, we have increased the

list to take into account punctuation so if there is an accent

that might be recorded as a hyphen after the name or an

apostrophe after the name, we have added some additional search

terms and here the final list at 261.  Essentially, we are

G3M5terA

1    going to move forward unless we hear from you and we haven't

2    heard from you in in response to our prior letter.  We never

3    heard from them.

4          When they reach out to us -- and this is Exhibit 2

5    with a list of 2,900 names, it is an e-mail from Scott

6    Tarbutton and he attaches the two lists that amount to 2,900

7    names.  He ends his e-mail with this:  *I fully anticipate that*

8    *the list will be finalized next week once I have an opportunity*

9    *to speak with our translators and have further discussed the*

10   *same and received final approval from our co-plaintiffs.  Once*

11   *we provide you with the finalized list, plaintiffs will be in*

12   *touch to discuss the methodology and scope of the record system*

13   *searches to be conducted by DIB.*

14         And that was on July 15th.  We wrote back with our

15   alternative methodology at Exhibit 3 on September 8, wrote back

16   two weeks later on September 22nd.  Never heard from

17   plaintiffs.  They never called up with their finalized list,

18   they never reacted to our initial cut down of the list.  They

19   never reacted to 261 terms.  We produced the results of those

20   searches and the accounts that were identified in connection

21   with the government inquiries in August of 2012.

22         THE COURT:  One of the things you produced, though, is

23   a document that I gather relates to accounts that the U.S.

24   government, perhaps through the UAE Central Bank had requested

25   information about 152 names and there is a document within the

G3M5terA

1    exhibits I have been given which redacts all of those names and

2    I can't for the life of me figure out what the basis for the

3    redaction is.

4            MR. COTTREAU:  The basis for the redactions are

5    they're not related to al Qaeda and our responses to those are

6    not simple matters.  There are customers who are identified in

7    the responses who may not be the people they're looking for.

8    The government might not -- their response is --

9            THE COURT:  Where did the list of 152 names come from

10   originally?  I gather that traces back to -- and you may not

11   know the answer -- but I gather it traces back to a U.S.

12   government request?

13           MR. COTTREAU:  I don't have any idea.  I can speculate

14   that that's the case.

15           THE COURT:  Let me interrupt and ask Mr. Carter his

16   understanding.

17           MR. CARTER:  Your Honor, I don't know the origin of it

18   but the list specifically identified these individuals as

19   individuals who are members of the Taliban or entities

20   associated with the Taliban and this is the heart of the

21   problem.

22           THE COURT:  But I could generate a list that says Jim

23   Kreindler is a member of the Taliban and give it to

24   Mr. Cottreau.  There must be some understanding where this list

25   emanates from.  The U.S. government?

1          MR. CARTER:  I am sure it is the U.N. sanctions list,

2     your Honor, relatively sure, and the problem is Mr. Cottreau

3     just said we redacted them and didn't do anything because

4     they're not related to al Qaeda.  They're Taliban, they are

5     related to al Qaeda and that's the essence of --

6          MR. COTTREAU:  The U.N. sanctions 1266 list which is

7     actually attached to Mr. Tarbutton's e-mail at Exhibit 2 to our

8     papers actually distinguishes the list person by person whether

9     they're affiliated with al Qaeda or the Taliban.

10         We had 2,900 names.  We weren't going to search all

11    2,900 so we took the following approach.  If they're in the

12    9/11 Commission Report, great.  If they're not, we have to draw

13    a line somewhere.  Then we are free to come back and say draw a

14    different line.

15         THE COURT:  Tell me the principal basis for saying we

16    have searched the 9/11 Commission Report and we have also been

17    given a list of 152 names, admittedly prospectively Taliban,

18    not al Qaeda but those (A) we are not searching, but (B) to

19    protect the identity of the account holdings we are withholding

20    the name.

21         MR. COTTREAU:  Your Honor, we had the following

22    methodology which we were completely transparent in several

23    pieces of correspondence with the plaintiffs and we were going

24    to take two approaches.  One is if a person was identified as

25    being affiliated with al Qaeda in government correspondence and

1    we had accounts for that person that we identified as part of

2    the process of responding, we would produce.

3              There was never, until I showed up at the hearing,

4    there was never any discussion with plaintiffs ever about other

5    people on other -- other people with other organizations in

6    government correspondence including the Taliban.

7              THE COURT:  Are the 152 within the 2,900?  Do you

8    know?

9              MR. COTTREAU:  I don't know.  I don't know.

10             THE COURT:  Mr. Carter, do you know?

11             MR. CARTER:  I don't, because the 152 have been

12   redacted.

13             THE COURT:  Well, that's fair.  Fair enough.

14             MR. COTTREAU:  There were almost 400 names in the list

15   that they sent on the 2,900 that were related to the Taliban.

16             THE COURT:  Okay.

17             MR. COTTREAU:  There is the John Smith problem

18   everywhere in the world as I have learned from searching bank

19   records from case to case, and in these pieces of

20   correspondence, your Honor, there are customers who are

21   identified who don't appear to be, "*these aren't the droids

22   they're looking for,*" if you will, and this was the Taliban.

23             In all of our discussions we never agreed to search

24   government lists related to Taliban or other organizations or

25   narcotics trafficking.  We always agreed -- and I thought this

G3M5terA

1    was the one area until I walked into the hearing today that we

2    had complete agreement on, that we would take government lists

3    that relate to al Qaeda and produce the accounts related to the

4    people on that list.  And the only time the Taliban ever came

5    up in any of the discussions before I walked in here today was

6    as part of plaintiff's list of 2,900 names in their July 2011

7    submission which was identified to us as a draft submission and

8    they never submitted a final list of terms.

9              So that's how we got in here and, quite frankly, you

10   know, 400 terms, we have searched 261 that are for al Qaeda and

11   looked through the government list for all core al Qaeda and

12   looked through all the electronic and account opening

13   statements that we have for those accounts.  It seems to me

14   that the Taliban issue, 400 names, they're not in the

15   complaint, they're not in the RICO statements, they can't even

16   identify any connection between these 400 names and 9/11 or

17   have any reason to believe that we have any of those 400 names

18   at our bank.  It is an enormity of an effort that surpasses the

19   one we have previously done in searching the 261 terms.

20             THE COURT:  Why don't you move on to some of the other

21   broad categories like the fatwas and the Sharia board?

22             MR. COTTREAU:  Sure.

23             In no particular order, your Honor, but I am going off

24   the list that Mr. Carter generated in my notes, with respect to

25   this alleged meeting in or over about July of 1999 between U.S.

G3M5terA

 1     and UAE officials, it was identified initially in plaintiff's

 2     discovery request to us as a meeting attended by DIB -- by

 3     Dubai Islamic Bank.  That was the basis on which we objected to

 4     it as ambiguous because we had no idea of any meeting attended

 5     by any official at the bank and, indeed, still do not.  And we

 6     ultimately redefined that term to include meetings that

 7     happened between officials at the UAE and the U.S. government.

 8     I still don't know what level of government that happened at,

 9     if that was the Dubai government, the UAE.  The plaintiffs

10     production entire production on that meeting consists of the

11     New York Times article and the State Department briefing and we

12     don't have any more information.  Plaintiffs have said we

13     produced nothing.  That's not true.

14          In the wake of the July 1999 article we conducted an

15     internal investigation with a gentleman who was there helping

16     with some asset tracing, his name is Robert Ellison.  We

17     produced a tremendous amount of correspondence with him.  At

18     the time the bank had engaged two U.S. lawyers as part of that

19     asset tracing project and they were around to assist.  We

20     waived privilege and produced the correspondence with those two

21     U.S. lawyers Alan Fine, who is a Judge in Miami; and Bill

22     Ritchie.

23          Their notes reveal the steps on the investigation

24     including calling various people in the U.S. government to try

25     to obtain more information about this meeting.  They vetted the

G3M5terA

1    issue of whether Osama Bin Laden was a bank customer -- and he

2    wasn't which was the core allegation.  They were trying to get

3    more information about who else are you looking for.  And all

4    of that is revealed in 101 pages in our production and the

5    plaintiffs -- and I was a little bit surprised to hear we

6    produced almost nothing today because the plaintiffs coincided

7    the 101 pages in their own papers in this case.

8         So, on that meeting we have produced everything we

9    have and, indeed, we have waived privilege on what we did have

10   with these U.S. lawyers who were helping to look into the

11   issue.

12        On the Fatwah and Sharia board -- let me try to

13   explain Islamic banking a little bit.  It is governed by a 1985

14   UAE law which we have attached as part of our submission as

15   well.  There are special banking laws in the UAE and in many

16   other countries that govern the federal laws to Exhibit 7 to

17   our papers.

18        A Shariah board, its function is to assure Shariah

19   compliance and that means compliance with principles of Islamic

20   law.  That usually means a number of things but probably the

21   most animated feature in most of its decision is a concept of

22   Riba which is similar to usery although it can have a broader

23   meaning.  Some folks take the view that maybe most folks that

24   it prevents the charging of interest at all.

25        The Shariah board's function isn't to go and find

G3M5terA

customers, it is not to approve which customers we do business

with, it is to approve transaction forms.  It doesn't look at

every checking account or, as they call it in the Middle East,

a current account.  It doesn't look at every savings account to

ensure that no interest is being paid in the account.  It

doesn't approve any customers.  It says here is -- when the

bank wants to have a certain type of account or product at the

bank they say here is the structure of the product and the

Shariah board looks at the structure and approves the

structure.

They may say well, you have to inform the customer for

fairness reasons of this, that, and the other, and that gets

written into the official product literature which is

ultimately issued and then the business people take the idea

and run with it.

The issue in this case is how do we get these

customers and was it intentional that we had these customers

because, as you know or may know, Citibank, Sun Trust, HSBC,

Chartered Bank all have accounts for people who are related to

al Qaeda and, indeed, no one knew who these people were and

that's why these people were let into this country, by and

large; at least many of these folks, the hijackers.

So, in terms of the Shariah board's function, we don't

see it as particularly relevant.  They don't pass on who our

customers are.  And what we said to them and what we gave them

1    in our initial productions were documents sufficient to show

2    the role of the Shariah board and that's what we have produced

3    thus far.

4        We were happy to include also the charter which we

5    attached that spells out that rule for the Shariah board.

6        THE COURT:  How about the Fatwahs?

7        MR. COTTREAU:  The Fatwahs, your Honor, are --

8        THE COURT:  You draw a distinction between those

9    instigated by individuals who may be a member of the Shariah

10   board in their individual capacity and anything that a Shariah

11   board does in its corporate capacity, if I can call it that.

12       MR. COTTREAU:  Well, let me try to confirm the term

13   Fatwah.

14       THE COURT:  Please.

15       MR. COTTREAU:  It is essentially a religious

16   pronouncement, okay, that generally speaking at least under

17   law, banking law has to be done by three or more members

18   together acting together.  Every single official Shariah board

19   Fatwah at Dubai Islamic Bank has to be approved by the entirety

20   of the board.  They do it by approving transactions.  A lot of

21   times they get the customer name, the customer details, the

22   details of the transaction, if it is a one-off type of

23   transaction.  This would be a specialized corporate banking

24   transaction, for example.

25       So, there are all kinds of personal details about bank

G3M5terA

1   customers in these documents.  Sometimes they're scrubbed,

2   sometimes they're not.  But they're all far afield from what we

3   are talking about here which is by and large retail banking for

4   individuals where there is no pronouncement at all by the

5   Shariah board about other than to say you can have a checking

6   account, what they call a current account or savings, what they

7   call an investment account.

8          So, in terms of the pronouncements of the Fatwas, they

9   just don't really have much to do here given the role of the

10  Shariah board at the bank.

11         THE COURT:  So, you are saying at least in relation to

12  the official acts of the Shariah board the fatwa is the Dubai

13  equivalent of a corporate resolution?

14         MR. COTTREAU:  Yes.  They look at the transaction.

15         Proposed is a joint investment because they don't do

16  loans.  A joint investment with customer ABC Company.  This is

17  not something that we have a stock form for so it is going to

18  be drafted by the lawyers.  Here is the draft of the paper, it

19  is a three-year partnership, we are going to contribute this.

20  Our partner is going to contribute that, we are going to share

21  the profits equally or however we are going to share it.  That

22  is presented to the Shariah board and they issue a Fatwa saying

23  you can or can't do it or you have to change this about it.

24         Again, they don't identify even those business

25  partners but they essentially have a negative function.  They

G3M5terA

1   can essentially veto, if you will, transactions.  Any of the

2   bank transactions that occurred which are the transactions that

3   would be relevant in this litigation, any of the bank

4   transactions that occurred weren't as a result of the Shariah

5   board identifying customers or telling anyone that you have to

6   engage in this type of transaction.  Their only function in

7   terms of a positive "you have to" has nothing to do with retail

8   banking.

9            So, that's where we are on the Shariah board.  We have

10  offered in our papers to also give them a complete list of

11  Shariah board members from 1992 to September 11, 2001 because

12  one of the people that they feature very prominently in their

13  papers with you, your Honor, issuing these personal Fatwas

14  wasn't even on the Shariah board at the time leading up to

15  September 11, 2001.  He was added to the board years after and

16  was ultimately -- you know, ultimately finished his service

17  with the board.

18           In terms of the Shariah board, just so your Honor has

19  some understanding of this, Dubai Islamic Bank is the first

20  Islamic bank in the modern world.  It was formed in 1975 to

21  offer these products for Muslims who believed that interest was

22  against the teachings of Islam and added its function since

23  1985 has functioned under the Shariah banking law of the UAE.

24  And there are Shariah board members who do this, it is not a

25  full-time job.  They come in and they meet and they pronounce

G3M5terA

on products periodically and they serve on, in some cases,

dozens and dozens of other bank's Shariah boards.  These are

people who have made a name for themselves of being Islamic

scholars, they're usually professors or other scholars and they

have something to do with the financial industry, have some

status to be able to say what is Shariah complaint and what is

not when they act together as a board.

THE COURT:  So they're not, just out of curiosity,

they're not clerics, typically?

MR. COTTREAU:  I don't believe so.  I believe they're

more professorial.  The head of our Shariah board was a former

Egyptian Attorney General.

So, these aren't people who -- they come to work, they

pronounce on the products and that's their role at the bank and

I don't see how it is particularly relevant and never have

here.

THE COURT:  Anything else?

MR. COTTREAU:  Not unless you have any questions.

THE COURT:  Not at the moment.  Thank you.

MR. COTTREAU:  Thank you.

THE COURT:  Anything further, Mr. Carter?

MR. CARTER:  Briefly a few things, your Honor.

Mr. Cottreau has spent quite a bit of time talking

about the back and forth around the meet and confer at the

beginning of discovery and candidly, your Honor, it is a

1    diversion that has very little to do with what we are here

2    about today.  We are talking about essentially agents, al Qaeda

3    members accounts, Taliban accounts, investigations into the

4    embassy bombings.  We are not talking about what ideas the

5    parties exchanged at the time.

6            What I will say about that --

7            THE COURT:  Well, there is a little question that the

8    ball got dropped for a considerable period of time.

9            MR. CARTER:  Well, your Honor, what I would say about

10   that is --

11           THE COURT:  Isn't that fair?  Regardless of who may

12   have dropped the ball, a lot of time has passed where virtually

13   nothing has occurred.

14           MR. CARTER:  A lot of time did pass, your Honor.

15           What I will say is at the first meeting, in conferring

16   with Mr. Cottreau he is incorrect in suggesting that we did not

17   raise an issue with the Taliban accounts.  We had a very

18   spirited discussion about the Taliban accounts as well as

19   accounts DIB maintained for Hamas related entities.

20           As to the Taliban accounts, we made clear our view

21   that they were very directly related to the support of

22   al Qaeda.  As to the Hamas accounts, we articulated our view

23   that they were relevant to our DIB defenses.  In particular, if

24   it is going to come into court and argue on the merits that it

25   abhors terrorism and would never be associated with a violent

G3M5terA

jihadist organization but is maintaining accounts for Hamas, we

thought that was relevant and that also going to the Taliban

accounts.  If you are maintaining accounts for Taliban during

the period when United Nations is condemning it for its role in

supporting Bin Laden, that's relevant not only to our claims

but their defenses.

What we decided was it was clear that Dubai Islamic

Bank was not willing to go into that territory without court

intervention and had decided to conduct the searches it wanted

to search.  We didn't know of anything about the internal

system or what the searches would yield.  So, we agreed to wait

to see what came back before seeking court intervention.

Candidly, your Honor, if they came back with a stack of papers

saying here is the transaction that the U.S. government was so

worried about that prompted its conversations with the UAE, we

may very well have rested on our laurels at that point.  It

didn't come to pass.

With regard to the delay, your Honor, we had always

indicated from the outset that we wanted to wait until all of

the defendants had produced their documents before moving

forward with full scale motion practice and there was a reason

to that.  We saw interconnectivity among the defendants and in

fact, your Honor, one of the recent productions from defendant

al Kadi includes a transaction involving an account held by an

individual who is identified as a close associate of Bin Laden

G3M5terA

```
 1    at DIB.  And so, we sent a supplemental request for that.  Most
 2    of the delays, your Honor, in going to the phase of motion
 3    practice have been related to the other defendants asking for
 4    more time to complete their productions.
 5            We finished ours in August 2012 as well, but at the
 6    end of the day --
 7            THE COURT:  Well, let's just be clear.
 8            In terms of accounts there is the 261 that the bank
 9    has proffered generated however.  There is the 152 alleged
10    Taliban accounts.  There are eight other accounts and I am not
11    sure how to generically describe those and I'm not sure whether
12    they're in the 261.
13            MR. COTTREAU:  Your Honor, if I can just clarify?
14            THE COURT:  Yes.
15            MR. COTTREAU:  The eight accounts are actual accounts
16    found and produced to the plaintiff.
17            THE COURT:  Okay.
18            MR. COTTREAU:  The 261 are search terms that were
19    agreed upon by the plaintiffs and the defendants and/or that we
20    added from the 9/11 Commission Report as a subset of their
21    2,900.
22            So, the 261 is a combination of names that we had
23    agreed already in our objections to search plus the subset of
24    this 2,900 that was in the 9/11 Commission Report.
25            THE COURT:  Okay.  So, there are 421 accounts, eight
```

G3M5terA

```
 1    of which have been produced.

 2              MR. COTTREAU:  Hold on.

 3              THE COURT:  The balance of which.

 4              MR. COTTREAU:  Search terms, not accounts.

 5              THE COURT:  Okay.

 6              MR. COTTREAU:  The 152 accounts don't exist and the

 7    261 accounts don't exist.

 8              THE COURT:  So it may well be that the 261 generates

 9    fewer accounts.

10              MR. COTTREAU:  It may be that it generates no

11    accounts.

12              THE COURT:  Right.  The 152, on the other hand, are

13    accounts.

14              MR. COTTREAU:  No.  Not necessarily.

15              THE COURT:  Oh okay.

16              MR. COTTREAU:  Those are, again, names that were

17    provided in a central bank circular that were affiliated with

18    the Taliban.

19              THE COURT:  Okay.  Let me then revert back to you,

20    Mr. Carter, and say beyond that universe of 421 today,

21    regardless of how we got there starting with 2,900 what, if

22    anything else, are you looking for?

23              MR. CARTER:  Well, your Honor, I think again the 261

24    was the list they generated from the 9/11 Commission.

25              THE COURT:  Right.
```

G3M5terA

1            MR. CARTER:  It would have excluded, for instance,

2    al Qaeda members involved in the embassy bombings who just

3    didn't happen to be mentioned in the 9/11 Commission Report

4    which was the case with a lot of people.

5            In terms of the accounts for which we are seeking

6    records, we have identified the specific individuals in the

7    papers.  There are eight al Qaeda members and one al Qaeda

8    financier for whom we are seeking the transactional records.

9    Then there is the issue of Taliban accounts.

10           THE COURT:  Just so I am clear on that, that's

11   different than the accounts for which some documents have been

12   produced by DIB or those are those accounts?

13           MR. CARTER:  Those are those accounts, your Honor, for

14   which we have statements.

15           THE COURT:  Okay.

16           MR. CARTER:  So, there is a handful of accounts we are

17   seeking more than account statements and a handful of opening

18   documents.

19           The second issue is the Taliban accounts and we still

20   don't have any meaningful production of Taliban accounts

21   whatsoever.

22           Now, on the 152, your Honor, I would simply caution

23   that that is one letter from the UAE.  Now, we don't know what

24   is on it, we don't know if it is synonomous with the list

25   that's maintained by the U.N. sanctions and so we would need to

1  see what that 152 names consisted of to see whether it

2  reconciles with what the United Nations said was the

3  composition of the Taliban as of essentially 9/11 and the

4  period before it.

5          Again, we just haven't seen the names so we don't have

6  an idea on that.

7          The next area relates to the investigations pertaining

8  to DIB accounts implicated in the embassy bombings.  One of the

9  logistics people for embassy bombings and procurement expert

10  who was arrested by German authorities had three cards for DIB

11  accounts and then there was separate indications that

12  authorities asked DIB to close, I believe it was, 16 Taliban

13  accounts at that time.

14          So, there is the general issue of Taliban accounts as

15  well as any particular accounts that they were asked to close

16  in the wake of the embassy bombings.

17          Your Honor, there was a comment about cash

18  transactions essentially being irrelevant on the whole.  I

19  think I agree with Mr. Cottreau that a debit/cash withdrawal of

20  $200 is not a big deal.  A cash withdrawal of $40,000 or

21  $50,000 from a branch that doesn't generate a suspicious

22  activity report may actually be relevant.

23          So, I just simply want to reserve the notion that not

24  every cash transaction might be irrelevant.

25          That's it, your Honor.