G3M5terA

1          THE COURT:  Let me try and deal with some of these

2    issues and then we will take a break for a few minutes.

3          Let me start with the accounts that we have been

4    talking about whereas I indicated there are 421 or so accounts

5    or names perhaps also augmented by the accounts that Mr. Carter

6    just spoke about that will relate to the embassy bombings which

7    then there was a specific request that DIB close and perhaps

8    certain other similar requests.  For that universe of accounts

9    which I gather is larger than 421 but -- accounts or names

10   which I gather is larger than 421 but probably no larger than

11   500, I am going to direct that to the extent it hasn't already

12   been done, the account opening and if there is any account

13   closing paperwork, the periodic statements and the other

14   electronic information that exists such as the wire transfer

15   information that Mr. Cottreau alluded to, be produced.

16         And I am going to live it to the two sides to talk

17   about a timeline because obviously I don't know what is

18   realistic.  If I have to set a date unilaterally I will but I

19   would rather that there be an informed discussion about that

20   and hopefully some agreement.

21         MR. COTTREAU:  Your Honor, if I could just interject

22   to clarify one point?

23         THE COURT:  Yes.

24         MR. COTTREAU:  Because I didn't have a chance to

25   respond to Mr. Carter's suggestion.

G3M5terA

1      THE COURT:  Sure.

2      MR. COTTREAU:  We have no idea, sitting here today, I

3  have no idea the 16 names that the bank was allegedly asked to

4  close in the wake of the embassy bombings.  That's not

5  something that's in any of the papers in this case and it is

6  the first I have ever heard of it.

7      My only suggestion would be so that we can get --

8  completely comply with your Honor's order is this list of not

9  more than 500 names that the plaintiffs have that they just

10  gather it, send it to us as search terms, and we will query our

11  database using those as search terms using the same methodology

12  that we did to do the 261.

13      MR. CARTER:  Your Honor, the only hesitation I have is

14  that it is public reporting that indicates that there was a

15  request from the authorities to Dubai Islamic Bank to close the

16  accounts.  It doesn't identify what those accounts are.  Again,

17  we would have expected that the public reporting of that

18  information would have prompted an internal inquiry that there

19  would have been a communication and so we are asking that that

20  be searched.

21      THE COURT:  I presume that this would have been a

22  notification akin to the ones that I have copies of.  If the

23  bank is unable to identify it and Mr. Cottreau is nodding in

24  such a way that he indicates they can't, then I guess the onus

25  falls to you to provide them some further information about

G3M5terA

1    those accounts.

2            As you move forward in discovery there are a number of

3    areas like there are in a lot of domestic cases where one side

4    takes the view that there should be some information.  I really

5    can't deal with the "there should be" sort of allegations even

6    if I am inclined to agree with whichever side is making that

7    assertion because absent proof that there is such a category of

8    documentation, the notion that there should be doesn't really

9    enable me to take action absent some indication of spoliation.

10           So, for those 500 accounts/names I have indicated what

11   is to be produced in the first instance, and once that's been

12   accomplished there needs to be a discussion quickly by the two

13   sides about what will follow on from that, whether it's akin to

14   what would happen in a domestic circumstance with a grand jury

15   subpoena, namely let's circle these entries and ask you to look

16   at those, whether Mr. Carter and his colleagues circle every

17   entry on every periodic statement and Mr. Cottreau comes back

18   to me and says we will be at this 20 years from now or, you

19   know, it remains to be seen.  But, we need to take this first

20   step and then we will see where we go from there.

21           Were you about to say something, Mr. Carter?

22           MR. CARTER:  Your Honor, the only comment I had with

23   regard to your Honor's statement about the 16 accounts

24   following the embassy bombings is that DIB's position at this

25   point has been that they're irrelevant and therefore not within

G3M5terA

1    discovery and so all we really need is a verification that the

2    search has been conducted to try and find those accounts or to

3    find the information related to those accounts.  I don't know

4    that the discovery responses right now provide us with the

5    simple answer we have searched and are unable to find any

6    information pertaining to this request.

7        MR. COTTREAU:  Your Honor, I have never heard the

8    number 16 and I could be mistaken, but I don't believe I have

9    heard that.

10       The only thing that I am aware of that Mr. Carter

11   cited in his papers that supports the notion that this bank was

12   asked to close any accounts is a report in the "L.A. Times"

13   years and years and years after the fact that said that the

14   bank was asked to close certain accounts.  It didn't identify

15   the number of them, didn't identify a single name.  And so,

16   that's why we are a little bit lost.  We have checked our own

17   internal papers to the extent that we have them.  We are in a

18   pre-e-mail age and largely a pre-Internet age at the bank and

19   we don't have any records.

20       So, if I could just clarify your Honor's order so I

21   make sure that we can carry it forth precisely?  The plaintiffs

22   are going to provide us with a list of not more than 500 names

23   that we will search using the same methodology that we did to

24   search the 261 --

25       THE COURT:  Well, no.  They can't provide you with the

G3M5terA

1   152 names because they don't know what those names are.

2        MR. COTTREAU:  Your Honor, if it would ease this and

3   your Honor wants to order it, just so that we can have

4   precision in the list because the list, to me, is something I

5   can actually accomplish, we will make available, on your

6   Honor's order, the unredacted version of the list of 152 names.

7        THE COURT:  Well, that was implicit in what I have

8   said, but yes.  So ordered.

9        MR. COTTREAU:  So, plaintiffs will provide us a list

10  with 500 names, we will search it using the same methodology

11  that we searched the 261 names, and if there are any accounts

12  for any of those individuals, we will produce the first three

13  items that I talked about out of four items that we have;

14  account opening documentation, complete account statements, and

15  any electronic transaction data that exists in our primary

16  legacy account record keeping system.

17        THE COURT:  Except to the extent that the account is

18  still open, perhaps.

19        Well, forget whether it is still open, except to the

20  extent that the non-legacy system also has relevant data.  It

21  may not, but.

22        MR. COTTREAU:  The legacy system covers the period

23  that we have agreed and maybe that's one thing that is missing

24  from your Honor's order.  We agreed to produce and the

25  plaintiffs have never objected, all account statements from

G3M5terA

| | |
|---|---|
| 1 | 1992, January 1, 1992 through September 11, 2001.  And that's |
| 2 | what we have used in this case with plaintiffs, that's what we |
| 3 | have used beginning in 2012 when we produced account statements |
| 4 | and that's what they have already. |
| 5 | THE COURT:  Well, I am sure they don't object to the |
| 6 | onset data. |
| 7 | What is your position on the end date? |
| 8 | MR. CARTER:  The only problem with the end date, your |
| 9 | Honor, is it is not going to reflect accounts being frozen or |
| 10 | investigation of accounts immediately after 9/11 so I think if |
| 11 | we carry that date forward simply to the traditional deadline |
| 12 | we have used which is 2004, we would be fine. |
| 13 | THE COURT:  I think that's reasonable, Mr. Cottreau. |
| 14 | MR. COTTREAU:  So, through 12/31/2004? |
| 15 | THE COURT:  Precisely. |
| 16 | In terms of the Shariah board, I do think that the |
| 17 | requests -- and we are dealing with concepts rather than |
| 18 | specific requests today, do strike me as overbroad. |
| 19 | In terms of the Fatwahs that are not banking related, |
| 20 | we didn't talk about this in great detail but the plaintiff's |
| 21 | papers suggest that there were some people who are actively |
| 22 | supporting terrorism who have been affiliated with the Shariah |
| 23 | board over time.  The bank has either produced or offered to |
| 24 | produce the individuals who were on the board for the relevant |
| 25 | time period. |

G3M5terA

1          The plaintiffs, from that list, may identify specific

2     individuals who they have reason to believe, perhaps in their

3     individual capacity have either individually or together with

4     others, issued Fatwahs which are of interest because they're

5     not routine banking Fatwahs but these individuals and others

6     going off in a different direction and to the extent that the

7     plaintiffs do that, I will require the bank to produce any

8     information that it has.

9          The fact that somebody may have acted in their

10    individual capacity is largely irrelevant if the bank has

11    evidence that relates to those acts undertaken in the

12    individual capacity.  So, I hope that instruction is

13    intelligible.

14          MR. COTTREAU:  Your Honor, if I can clarify it to make

15    sure I have it?

16          THE COURT:  Sure.

17          MR. COTTREAU:  The Fatwahs that the plaintiffs have

18    produced are, in some cases, web postings on these individuals'

19    personal websites.  Those aren't bank records, we don't -- by

20    and large I hear you that we should check our records to make

21    sure we don't maintain a copy but that's our obligation --

22          THE COURT:  Well, let me rephrase it.  It would be to

23    undertake a reasonable search to find such documents.

24          MR. COTTREAU:  If we have Fatwahs related to violent

25    pronouncements of those individuals?

G3M5terA

1          THE COURT:  Yes. I think that's the gist of it.

2          MR. COTTREAU:  Okay.

3          MR. CARTER:  I think that's the gist of it, your

4     Honor.  The language doesn't always say violence.

5          THE COURT:  Right.

6          I am looking through my notes but, Mr. Carter, are

7     there other broad categories I should be addressing?

8          MR. CARTER:  Your Honor, the only other area is

9     whether or not there is information about investigations of DIB

10    pertaining to the embassy bombings and this '99 meeting, and in

11    particular with respect to the '99 meeting whether or not a

12    search has been conducted to truly identify everything that

13    exists and, second, whether or not DIB has the practical

14    ability to find out what was going on at that meeting by virtue

15    of its relation to the government.

16         THE COURT:  Well, some of that was covered by my

17    comments about the fact that because something may be

18    implausible doesn't give anyone the ability to take steps of

19    any sort.  Presumably, as discovery moves forward, there will

20    be depositions at some stage and if something concrete occurs

21    then you can bring it back to the Court.

22         In terms of the 1999 meeting, we talked about that.

23    What was the other one you mentioned?

24         MR. CARTER:  The embassy bombings investigation, your

25    Honor.

G3M5terA

| | |
|---|---|
| 1 | THE COURT:  I take it the bank's position is it has |
| 2 | undertaken a good faith search for such documents? |
| 3 | MR. COTTREAU:  Your Honor, yes. |
| 4 | THE COURT:  And produced anything it has? |
| 5 | MR. COTTREAU:  Yes. |
| 6 | THE COURT:  So, that falls into the ruling I just |
| 7 | made.  At this juncture there is not much more I can do. |
| 8 | MR. CARTER:  Your Honor -- |
| 9 | MR. COTTREAU:  Your Honor, I just want to make sure |
| 10 | that I understood your question. |
| 11 | With respect to the embassy bombings, are we talking |
| 12 | about the 16 names or -- |
| 13 | THE COURT:  No.  We are talking about, I believe, |
| 14 | investigations or other responses that the bank internally may |
| 15 | have had in terms of checking whether it had troublesome |
| 16 | accounts or relationships.  And I gather you have made that |
| 17 | inquiry and produced anything you could find. |
| 18 | MR. COTTREAU:  I don't think we have produced on that |
| 19 | topic, your Honor. |
| 20 | THE COURT:  What's the basis for withholding that? |
| 21 | MR. COTTREAU:  The basis that we were trying to do on |
| 22 | this was in the midst of 108 requests so it is not something |
| 23 | that we did in isolation.  In the context of 108 requests and |
| 24 | the 2,900 names, as we were having these discussions with |
| 25 | plaintiffs, we had to draw a line. |

G3M5terA

1          THE COURT:  Okay.

2          MR. COTTREAU:  And the line that we suggested that be

3     taken was that the 9/11 Commission Report had identified that

4     the real planning for 9/11 began when Khalid Sheikh Mohammed

5     joined al Qaeda in late 1998 or early 1999 and that we would do

6     a fulsome search of al Qaeda-related documents after that date.

7          THE COURT:  Okay.  And as to that issue, the one we

8     are talking about, I am inclined to agree with the plaintiffs.

9     So, there you need to expand the search and I gather there are

10    documents that will be produced as a result.

11         MR. CARTER:  Your Honor, the only remaining issue is

12    with regard to the 1999 meeting, it is not merely an issue of

13    whether DIB has searched its internal records, there is also

14    this issue of whether or not, given its relationship, it has

15    the practical ability.

16         I think one of the areas of concern we have is you

17    have a member of the Maktoum family who is the prime minister

18    of UAE and also the largest shareholder of Dubai Islamic Bank

19    and does he attend the meeting, perhaps, with the U.S.

20    officials in his capacity as an official and then disclaim the

21    knowledge in his capacity as the primary shareholder of DIB.

22         And so, we are just trying to assess whether or not

23    there is a practical ability to get this information.

24         THE COURT:  Mr. Cottreau?

25         MR. COTTREAU:  I don't know of any way to get the

G3M5terA

1    information.  The shareholders of the bank were now 27 percent

2    owned by something called the Investment Corporation of Dubai

3    which I understand is an investment instrument of the ruling

4    family of Dubai.  But, in terms of this 1999 meeting, as I

5    tried to express today, I don't even know where the meeting

6    happened.  It would strike me that one possibility and one

7    logical possibility is that it happened at the UAE Central Bank

8    which is in Abu Dhabi and had nothing to do with the government

9    of Dubai itself.  But, as a practical matter, I don't have any

10   way of accessing any records.

11            THE COURT:  I am not going to make a direction as to

12   that because I think it is a complicated area and there are

13   issues of sovereign immunity and we will deal with that as we

14   go down the road.

15            Let's take a 10-minute break and just so you can tee

16   up what is next, the charity defendants.

17            MR. COTTREAU:  Thank you, your Honor.

18            THE COURT:  Sure.

19            (Recess)

20            THE COURT:  Let's go to the central charity

21   defendants, the gang of four.

22            MR. CARTER:  You are stuck with me for one more, your

23   Honor, and then I am going to turn it over to Mr. Haefele for a

24   while.

25            THE COURT:  Thank goodness.

1            MR. CARTER:  Yes, I agree.

2            Your Honor, the four charity official defendants were,

3    as you know, remanded by the Second Circuit through its

4    decision in 2013 in which the Court held that the allegations

5    concerning those defendants were always with the charities

6    which they controlled gave rise to the inference that they

7    conducted their tortious conduct at the United States business

8    directing support to al Qaeda through charities under their

9    command.  And so, the Second Circuit remanded the claims

10   essentially for discovery relating to the nature of their roles

11   and the kinds of decisions they were responsible for making

12   within the charitable organizations they controlled and

13   supervised.

14           To date, the four charity officials have produced

15   virtually no documents in response to plaintiff's discovery

16   requests.  In total, the four defendants have produced a mere

17   82 pages and those consist largely of the affidavits and

18   biographical statements they had earlier filed in the

19   litigation in support of their motions to dismiss in which,

20   among other things, several of them claimed that they were

21   officials of Saudi government entitled to claim sovereign

22   immunity, a defense that they have since withdrawn.

23           The charity officials seek to excuse their failure to

24   produce documents by arguing that certain of the charities that

25   are also defendants in the litigation have received similar

G3M5terA

document requests and are producing documents, and that

plaintiffs should look exclusively to those productions in

relation to the discovery we are seeking from the individuals.

Obviously, your Honor, the rules require that the

defendants respond individually to the document requests

directed to them and the fact that other defendants may or may

not be producing documents relating to the same areas of

inquiry does not relieve them of their independent discovery

obligations.

The related problem is that even if a party to

litigation could rely on the separate discovery responses of

another party to satisfy its obligations, the reality is that

many of the charities these officials had roles in are not

meaningfully participating in discovery at all.  So, for

example, your Honor, Abdullah Naseef was not merely the

secretary of the Muslim World League, he also founded

Rabidi Trust and that, your Honor will recall, was designated

by the United States government, failed to participate in

discovery in the case, and was ultimately defaulted by this

Court.

Naseef also had relationships with individuals of

considerable interest.  For example, he was responsible for

appointing Wael Jelaidain to his position in the Muslim World

League; also responsible for appointing Osama Bin Laden's

brother-in-law, Mohammed Jamal Khalifa to the designated IIRO

G3M5terA

1    branch in the Philippines.  Abdullah Bin Saleh Obaid was, in

2    addition to his secretary of Muslim World League also an

3    officer of Rabidi Trust and of many of the Sanabel entities

4    that were incorporated in the items.

5         Your Honor will recall that the Sanabel entities in

6    the United States have stated that they no longer have any

7    records relating to the periods of greatest interest including

8    the period when Obaid was an officer of the entity, Abdullah

9    bin Muhsen al Turki, your Honor, is currently the head of the

10   Muslim World League and therefore in a position to direct that

11   entity to respond to request relating to his position.

12        Before that, he was the Saudi Minister of Islamic

13   Affairs from 1993 to 1999.  In that capacity he had a

14   supervisory role over all of the kingdom's proselytizing

15   organizations according to the 9/11 Commission, the Muslim

16   World League, the International World Islamic Relief

17   Organization, the World Assembly of Muslims and al-Haramain

18   Islamic Foundation.

19        We also know, your Honor, that al-Haramain filed an

20   affidavit early in the case when it was still participating in

21   which it specifically stated that al-Haramain works under the

22   supervision of the Audi Minister of Islamic affairs who

23   appoints its board members and senior management personnel.

24        And, again, al-Haramain Saudi Arabia is no longer

25   participating in the proceedings.

1           So, there are a range of relationships and roles that

2      extend beyond those pertaining to the handful of charities that

3      are participating in discovery and the fact that those

4      charities are participating in discovery does not relieve the

5      defendants of their obligation to produce their own records.

6           I think, your Honor, we are reminded of the therefore

7      with Mr. Jelaidain where the Court ultimately issued an order

8      requiring him to undertake a full-court press not only to

9      locate documents within his physical custody, but under his

10     care and control.  And, it is warranted here.

11          In all candor, your Honor, we have some concern that

12     these defendants have not undertaken searches of their own

13     records precisely because they think it would reflect the

14     nature of their dealings, among others, with senior Saudi

15     officials.

16          The position these individuals held with these

17     charitable organizations and in the Saudi government are

18     positions of tremendous distinction within the kingdom and

19     within the Islamic world.  By way of an example, your Honor,

20     the MWL -- Muslim World League -- recently produced a document

21     pertaining to defendant al Turki's appointment as the head of

22     the Muslim World League in which the King equates it to being

23     appointed as a minister of the Saudi state.

24          These individuals have, in addition to the roles of

25     the charities, held very senior government positions -- the

G3M5terA

1    Shariah council, the Supreme Council for Islamic Affairs.  In

2    fact, the head of the Muslim World League automatically sits on

3    the Supreme Council of Islamic Affairs.

4             THE COURT:  Say that again.

5             MR. CARTER:  The head of the Muslim World League sits,

6    by automatic designation -- or sat, I should say -- on the

7    Supreme Council for Islamic affairs.  It is our understanding

8    that the current King has disbanded the Supreme Council for

9    Islamic affairs more recently.  But, in all years prior,

10   automatically sat.

11            We know a fair amount, your Honor, about how decisions

12   are made within these organizations from our own

13   investigations.  The Council for Islamic Affairs is or was the

14   policy making body responsible for formulating Saudi Arabia's

15   Islamic policy abroad.  A principal component of its foreign

16   policy, according to affidavits the kingdom filed in the

17   litigation, the ministry of Islamic affairs, in turn, was the

18   operational body responsible for deploying that strategy

19   principally through these ostensible charitable organizations

20   and so we have close coordination at the highest levels and at

21   the levels that these particular defendants would have operated

22   with very senior officials about making decisions about how

23   they were going to operate.

24            We are additionally concerned, your Honor, based on

25   the fact that you will recall that Sameer al Radhi of the IIRO

G3M5terA

1      filed an affidavit at one point way back in 2011 stating that

2      the IIRO had two kinds of documents; public documents and

3      documents that were protected from discovery by virtue of the

4      king and his immunity.

5           Now, again, that objection was withdrawn entirely but

6      it does indicate a certain desire to protect certain categories

7      of documents relating to the activities of the charities from

8      disclosure because of the governmental character.  There is

9      just no basis to do that.

10          I think, your Honor, there was a recent article in the

11     New York Times in September of 2015 that underscores the issue

12     and that I shared with Mr. Kabat in advance of the hearings.

13     It was issued in September of 2015 and describes the kingdom's

14     efforts to both spread a certain variant of Islam and use those

15     efforts to counter Iranian influence and describes the very

16     close coordination within the Saudi government in doing that.

17          The report indicates that the documents describe an

18     extensive apparatus inside the Saudi government dedicated to

19     missionary activity that brings in officials from the foreign

20     interior and Islamic affairs ministry, the intelligence

21     service, and the office of the king.  It goes on to say the

22     intelligence agency, sometime potentially the Saudi-supported

23     Muslim World League helps coordinate strategy.

24          And so, what we understand from all of the information

25     we have gathered largely on our own that these are very

G3M5terA

1   significant positions of respect and of achievement relative to

2   which these individuals interacted, traveled with, met with

3   some of the most senior officials of the Saudi government, as

4   well as foreign dignitaries.  People who reach that level of

5   accomplishment maintain some record of their life's work, your

6   Honor, and we are to believe that all four of these individuals

7   are so devoid of any interest in their own accomplishments that

8   they haven't retained a single record responsive to plaintiff's

9   requests?  That simply can't be the case.  They routinely gave

10  speeches at international conferences, they attended world

11  summits, they met with world leaders.  They have some records

12  in their possession that are responsive and we would simply ask

13  that they be directed to undertake the reasonable and necessary

14  efforts to collect them and produce them.

15          Thank you, your Honor.

16          THE COURT:  Thank you.

17          Mr. Kabat, why don't you use the microphone over

18  there.

19          MR. KABAT:  Your Honor, again, we need context of the

20  discovery.

21          What plaintiffs have not told you is that they served

22  a total of 129 document requests on the four charity officers

23  but of those 129 requests, 97 were identical or substantively

24  identical to the merits discovery request that they served on

25  the Muslim World League and the IIRO.

G3M5terA

1              Plaintiffs have yet to explain why the merits

2     discovery being served on the charities is the same or

3     justified as jurisdictional discovery to be served on the

4     individual defendants because the Second Circuit's opinion was

5     quite clear as to the basis for remanding those four charity

6     officers.  As we pointed out in our opposition, the Second

7     Circuit identified five areas and the first area was, quote,

8     whether they allegedly controlled and managed some of those

9     charitable organizations was definitely not a matter of much

10    dispute because the position that these individuals held with

11    each charity is a public record.  But, the remaining four

12    categories to the Second Circuit identified are quite narrow,

13    namely, whether through their positions of control of the

14    sureties they allegedly send financial and other material

15    support directly to al Qaeda, whether they directly provided

16    financial and other resources to al Qaeda knowing that al Qaeda

17    was engaged in global campaign, whether this support was

18    "expressly aimed at the United States."

19             Those are the areas that are properly the subject of

20    jurisdictional discovery.

21             THE COURT:  Although Mr. Carter would tell me that the

22    list is preceded by a "for example," correct?

23             MR. KABAT:  By what?

24             THE COURT:  By the phrase "for example."

25             MR. KABAT:  The plaintiffs have never told us how

G3M5terA

```
 1    those 129 requests, the vast majority of them they simply cut

 2    and paste from the merits discovery are relevant to

 3    jurisdictional discovery.

 4            THE COURT:  Well, your response reduced to a sentence

 5    or two is if there are responsive documents they're in the

 6    MWL/IRRO production, correct?

 7            MR. KABAT:  Yes, largely because they're identical

 8    document requests seeking documents of the sureties.

 9            THE COURT:  Well, I guess the follow-on question is

10    have you been through those document productions?

11            MR. KABAT:  I have reviewed them.  Not every page

12    because there is some 460,000 pages but I would note, and again

13    what plaintiffs fail to mention is the Muslim World League and

14    the IIRO have done incredibly detailed index documents which

15    they gave to the plaintiffs.

16            And if I may give you an example of one of the

17    indexes?

18            THE COURT:  Yes.

19            MR. KABAT:  This happens to be the index for their

20    most recent production, the December 19, 2014 index, and you

21    will see it indicates for each set of documents the document

22    request that it is responsive to, and in our opposition to the

23    motion to compel we gave the Court -- it is Exhibit 1 to our

24    opposition -- we indicated, for example, al Turki request

25    number is the same as Muslim World League no. 50.
```

G3M5terA

```
1          Now, what we could do, it would be an exercise in
2     busy-work, is we could take these indexes and we could simply
3     add the al Turki document requests, the Basha document
4     requests, so forth --
5          THE COURT:  But that begs the question of whether your
6     clients, as opposed to Muslim World League or IIRO, have other
7     documents that relate to those requests.  As I understand it
8     you are taking the position if there is something responsive it
9     must have been produced by those two entities so therefore we
10    don't have to look.
11         MR. KABAT:  It is not quite that simple, your Honor.
12         In a sense what plaintiff has done here is they put
13    the cart before the horse.  They came to this Court saying we
14    want discovery responses to all of these 129 requests that were
15    served on each of the four defendants.  At no time did
16    plaintiff attempt a meet and confer unlike for other
17    defendants.  They never sent us the discovery deficiency
18    letter.  They never arranged for a meet and confer where we
19    could go over these requests and figure out which ones were
20    relevant to jurisdictional discovery.
21         THE COURT:  Well, did you ever file a formal response?
22         MR. KABAT:  What?
23         THE COURT:  Did you ever file -- let me rephrase it.
24         Did you ever serve a formal response to their Rule 34
25    requests?
```

G3M5terA

1          MR. KABAT:  Yes, we did, and those are in the exhibits

2     and that was quite a few years back.

3          I mean, Rule 71 expressly requires a meet and confer

4     and plaintiffs, in fact they did meet and confer in our office

5     10 years ago with respect to Al Haramain so plaintiff's counsel

6     knows how to do a meet and confer, they know how to do

7     discovery deficiency letters, yet they deliberately chose not

8     to do so with respect to these four defendants.

9          Now, there are two categories of documents that we

10    discuss in our opposition that were not fully covered by the

11    Muslim World League and IIRO document requests.  One is the

12    relationship between the charity and the Saudi government.

13         What plaintiffs don't tell you is that Muslim World

14    League and IIRO collectively produced over 14,000 pages of

15    documents relevant in relationship between the surety and the

16    Saudi government and there is really no basis for the plaintiff

17    to argue that Dr. al Turki has produced the Muslim World League

18    documents relating to the Saudi government when there is some

19    14,000 pages and to the extent the plaintiffs believe that

20    there are some documents they are not included within those

21    14,000 pages that they seek from the Muslim World League.  As

22    we know, they should file a motion to compel or seek them from

23    the Muslim World League.

24         Judge Daniels, in his ruling in November, rejected the

25    plaintiff's attempt to link the Saudi government to the

G3M5terA

1    sureties because there is no evidence of day-to-day control and

2    it appeared that the only reason the plaintiffs are really

3    seeking this discovery from the four defendants is not to prove

4    their liability, instead it is a backdoor way to get the

5    government back in the case.  An example of that was yesterday

6    Mr. Carter sent me an article from the New York Times which he

7    said he was going to rely upon today.  That article actually

8    came out in July of 2015, it is based on Wikileaks which is

9    double hearsay --

10             THE COURT:  It is based on what?

11             MR. KABAT:  Wikileaks --

12             THE COURT:  Okay.

13             MR. KABAT:  -- which of course is double hearsay, but

14   the article that Mr. Carter gave me yesterday and aid he was

15   going to rely on specifically says the documents do not show

16   any Saudi support for militant activity.

17             That's what Mr. Carter wanted to rely upon today.

18             The last point I want to make is that plaintiffs, in

19   their document requests, had numerous requests relating to the

20   golden chain which he may remember from years ago when Judge

21   Casey had this case --

22             THE COURT:  Let me save you some time.  I'm not going

23   to require the production of any documents related to the

24   golden chain so we can move on from there.

25             MR. KABAT:  Thank you.

G3M5terA

1          But that illustrates why it would have been helpful to

2     have a meet and confer with the plaintiff's counsel, so we

3     could go over these categories instead of having to argue all

4     129 document requests.  And, again, we are still willing to

5     engage in the meet and confer but what the plaintiffs have done

6     is put the cart before the horse, file the motion to compel

7     without doing discovery, without doing a meet and confer.

8     While we are happy to go back and look at the Muslim World

9     League indexes and see which documents relates to our four

10    clients, we think the burden is on plaintiff to have the meet

11    and confer, to identify those few requests that are relevant to

12    jurisdictional discovery as opposed to merit discovery, and

13    then we will move from there.

14          Thank you.

15          THE COURT:  Two of your global objections at nos. 5

16    and 6, 5 objects to documents concerning communications by,

17    with, or from the kingdom or its agencies, etc.; and 6 objects

18    to production of documents that are business records of the

19    Muslim World League or IIRO.  Since those records are the

20    corporate property of those -- I am paraphrasing -- those

21    entities and the defendants lack personal possession of those

22    records, taking those one at a time, is it your position that

23    if a document that's responsive to a request reflects a

24    communication with the government, even though it is held by

25    one of your clients in his personal possession, it's to be

1   withheld on sovereign immunity grounds?

2            MR. KABAT:  No, we have not made that argument.

3            THE COURT:  It is an objection you have listed.

4            And, similarly, are you taking the position that if

5   one of your four clients has in his personal possession a

6   record which is a business record of one of those two

7   charities, that it doesn't have to produce it because the

8   record, in some fashion, belongs to MWL or IIRO?

9            MR. KABAT:  It is my understanding that the individual

10  defendants do not have Muslim World League or IIRO records in

11  their personal possession.  Only two of them are in fact

12  currently with the Muslim World League, the other two have been

13  long gone, and so while they have an office -- two of them have

14  an office in the Muslim World League there may be file cabinets

15  and such, Muslim World League has gone through those file

16  cabinets and so forth but they don't have the documents at home

17  if that's what you are getting at.

18           THE COURT:  Do you know whether to respond to the Rule

19  34 request to the charities their individual records were

20  searched?

21           MR. KABAT:  It's my understanding that they were.

22           And getting back to your first question about the

23  Saudi government issue, the point I was making there or the

24  objection we were making is that the individuals do not have in

25  their personal capacity, like at home or separate from the

G3M5terA

1    Muslim World League, Saudi government documents relating to the

2    Muslim World League/Saudi relationship.  Those documents would

3    be within the 14,000 pages that the Muslim World League and the

4    IIRO have produced that specifically relates to the Saudi

5    government.

6              Thank you.

7              THE COURT:  Mr. Carter?

8              MR. CARTER:  Your Honor, a few things.

9              Mr. Kabat made much of the overlap between the

10   discovery served on the charity official defendants and the

11   discovery served on Muslim World League and IIRO.

12             After the Second Circuit remanded the charity official

13   defendants we did two things, we served discovery requests on

14   the individual charity official defendants and we served

15   supplemental discovery requests on the Muslim World League and

16   IIRO and other charities relating to the activities of those

17   individuals as officials.

18             Essentially what happened is that the charity official

19   defendants said go look solely to what they give you and the

20   charity said these are untimely because the cutoff was August

21   2012.

22             Now, I am not at all interested in pre litigating any

23   disputes with regard to the Muslim World League or IIRO but at

24   least the origins of this presented as a bit of a shell game.

25   Now, the Muslim World League and IIRO have produced some

G3M5terA

documents that reflect activities of these individuals.  We do
not think it is at all complete.  Again, we will address the
sufficiency of their productions with those defendants.

THE COURT:  How about Mr. Kabat's argument that there
has been no meet and confer here?

MR. CARTER:  Your Honor, we laid out in our reply
brief at page 3 that we raised this at multiple hearings in
multiple letters to the Court and there was a consistent
response: *Go look for their stuff.*  And so we came to the
Court to say that is not sufficient.  That was our point all
along.

So, we went down this road for a while.  There simply
isn't an indication on the record, affirmative, in a response,
I have searched all of the records in my possession, custody,
or control and you have everything responsive to your discovery
requests.  And again, we don't want to end up at a deposition
and have one of these individuals say, well, of course I
maintained a diary during the time that I was Muslim World
League Secretary, or of course I have copies of all the
speeches I wrote and Fatwahs I issued during that time, or of
course I have a copy of my passport from those periods.

As an example, your Honor, there is an allegation
based on US government investigations that Abdullah Omar Naseef
was present at the founding meeting of al Qaeda with Bin Laden
in the Sudan.  The travels of these individuals, as reflected

G3M5terA

1   by their passports, are relevant.

2            To the extent they have received letters of

3   commendation or similar awards that have lauded their

4   activities during their service and outlined what they did, you

5   would have expected them to be kept.  One of them received the

6   King Faisal award for service to Islam.  That would describe

7   what that person did.

8            THE COURT:  How does that add to the jurisdictional

9   discovery?

10           MR. CARTER:  I think the proper question in the

11  jurisdictional discovery was what did these individuals do at

12  these charitable organizations, what was the nature of their

13  roles.  I can give you an example, your Honor.

14           In our own investigations we have, by way of example,

15  a report in the Arabic version of the Muslim World League

16  Journal dating to the period in 1992 where defendant Naseef

17  attends a meeting with members of the royal family and the

18  Saudi Grand Mufti, who is the government official during which

19  Naseef thanks the King for the generous support of the Muslim

20  World League and the Grand Mufti indicated the jihad fighters

21  must be encouraged worldwide.  A year later Naseef again thanks

22  King Fahd for a donation of 20 million given for Muslims in

23  Bosnia so they could continue their legal jihad against the

24  Serbs.

25           So, these kinds of dialogues about policy issues,

G3M5terA

```
1   global events, are very relevant to the determination as to

2   whether or not these individuals were responsible for setting

3   in motion the program of support we have described in other

4   pleadings.  And, again, it is a matter of them going and

5   searching their own records in the same way that the Court

6   directed defendant Jelaidain to do so.

7           Thank you, your Honor.

8           THE COURT:  How about the passports, Mr. Kabat?

9           MR. KABAT:  I can ask him for that but I think the

10  proper way --

11          THE COURT:  I gather there was a specific request that

12  asked for those.  What was your response to that request?

13          MR. KABAT:  I don't --

14          THE COURT:  Mr. Carter, can you point me in the right

15  direction here?

16          MR. KABAT:  Again, your Honor --

17          THE COURT:  Hang on just a minute.

18          MR. CARTER:  I think in a moment we will be able to.

19  I know there were requests relating to travel to places like

20  Sudan, Afghanistan, Pakistan during relevant periods and,

21  again, that certainly would have encompassed a passport.

22          THE COURT:  I thought there was a specific reference

23  to supports in the request.

24          MR. CARTER:  There probably was.  But I think, your

25  Honor, regardless of the individual request, the overarching
```

1    response was go look at what the charities produced.  And what

2    we are really here about is compelling the defendants to

3    conduct their own searches.

4              MR. KABAT:  Your Honor, regardless of whether the

5    request asked for the passport, the reality is the plaintiffs

6    simply cut and pasted their merits discovery into the four

7    individual defendants and they have not bothered -- they have

8    not bothered -- to meet with us, to send us a discovery

9    deficiency letter, completely at all with Rule 37 meet and

10   confer requirement.

11             THE COURT:  Well, but the passports would seem to be

12   something that the charities would not have produced that

13   perhaps -- well, I don't see one that relates to passports but

14   I do see 89:  Provide all documents relating to any trips you

15   took to Sudan; and 90 is the same for trips to Afghanistan.

16   Let me take a moment and look at the responses.

17             (pause)

18             THE COURT:  Unfortunately they don't track from

19   defendant to defendant.

20             (pause)

21             THE COURT:  Well, here.  For 89 and 90 the answer to

22   both is:  See objections to document request no. 10.  Document

23   request no. 10 says:  Defendant objects to this request as

24   overly broad seeking documents relating to his employment with

25   the government of the Kingdom of Saudi Arabia which has

G3M5terA

sovereign immunity; improperly seeks official records of the

Saudi government; improperly seeks business records of the MWL

and IRRO; and goes on and on.  And going back to the specific

answers it says:  Defendant will produce responsive documents,

if any, when available.

So, I think what I am going to do is, first of all,

invoke the current version of Rule 34 -- bear with me a

second -- which requires that an objection state

specifically -- let me read it:  *An objection must state*

*whether any responsive materials are being withheld on the*

*basis of that objection.*

So, I am going to require several things.  First, a

sworn or affirmed certification from each of the four charity

defendants that except to the extent to which they have

specified that a document is being withheld, they have produced

all documents responsive to the requests unless those documents

are part of the productions of the MWL or IIRO.  Secondly, that

there be a privilege log if there are documents being withheld

on the basis of privilege.

I think at the moment that's all I need direct with

respect to the motion related to these four defendants.

Is there something else you seek, Mr. Carter, at the

moment?

MR. CARTER:  Your Honor, only based on the response

that you read to the request, which very much seemed to invoke

G3M5terA

1    a sovereign immunity defense with respect to documents

2    potentially in the possession of these defendants and Mr. Kabat

3    had said that no such objection was being asserted and I think

4    we just want clarification that there is no sovereign immunity

5    objection being asserted.

6           MR. KABAT:  No, we are not asserting that defense with

7    respect to their own documents but I do have a question for

8    you.

9           THE COURT:  Let me just add that within the documents

10   to be listed on a privilege log are any documents being

11   withheld on sovereign immunity grounds that are responsive but

12   I gather you just told me that there are no such documents.

13          MR. KABAT:  Well, I will check with the clients,

14   obviously.

15          I do have two questions for you.

16          THE COURT:  Sure.

17          MR. KABAT:  First of all, you said that the requests

18   related to the golden chain are off the table.

19          THE COURT:  Correct.

20          MR. KABAT:  Now, of the remaining hundred-odd

21   requests, are you directing us to answer all of them regardless

22   of whether they have anything to do with jurisdictional

23   discovery?  I think it should be a little more focused on those

24   requests that relate to jurisdictional discovery as opposed to

25   the hundred-odd requests, many of which really are merits

G3M5terA

1    discovery and we have not undertaken a search for that.

2          THE COURT:  Well, I think by invoking the provision of

3    Rule 34 that I have directed you to comply with, it will become

4    clear whether you are withholding documents.  I think there may

5    be categories of documents or requests as to which your

6    response is we have nothing beyond what the corporate charities

7    have produced and therefore there is not much point in worrying

8    about whether the request relates to jurisdictional or merits

9    discovery.

10          If, at the end of the process I have just directed

11   there are lingering issues, you can bring those back to the

12   Court or Mr. Carter can, but I think for the moment this takes

13   us further down the road.

14          MR. KABAT:  Thank you.

15          MR. CARTER:  Thank you, your Honor.

16          THE COURT:  You said you had two points?

17          MR. KABAT:  Pardon?

18          THE COURT:  I guess the other was the golden chain.

19   Thank you.

20          MR. CARTER:  Your Honor, I'm sorry.

21          THE COURT:  Yes.

22          MR. CARTER:  With regard to the golden chain, and I

23   don't want to belabor this point because I understand the

24   Court's ruling, but there are people on the golden chain other

25   than the contributors, for instance Wael Jelaidain is listed on

G3M5terA

1    the golden chain, Osama Bin Laden is listed on the golden

2    chain.  And so, we just want clarity that you are not talking

3    about those people.

4                THE COURT:  That's correct.

5                MR. CARTER:  Thank you.

6                THE COURT:  I am talking specifically about the

7    requests that use the phrase "and seek those documents."

8                MR. CARTER:  Thank you, your Honor.

9                THE COURT:  So, if there were other more specific

10   requests, those, of course, are not affected by that ruling.

11               MR. CARTER:  Thank you, your Honor.

12               THE COURT:  We can break for lunch now or we can deal

13   with the next one.

14               Mr. Haefele?

15               MR. HAEFELE:  I leave it up to you, your Honor.

16               THE COURT:  Why don't we move on.

17               Okay.  Fire away, Mr. Haefele.

18               MR. HAEFELE:  Your Honor, I think it is a good

19   afternoon at this point.  We made it past, into the afternoon.

20               Robert Haefele from Motley Rice for the plaintiffs,

21   your Honor.  I am here to talk about the plaintiff's motion

22   regarding Soliman Al-Buthe.

23               Much of what Mr. Charter had to say about the other

24   charity officials applies also to Mr. Al-Buthe and I refer back

25   to the dialogue that you had with Mr. Carter for what was said

G3M5terA

1   for those defendants that crosses over to Mr. Al-Buthe and I

2   will stick, hopefully, with the stuff that is particular to

3   Mr. Al-Buthe.

4           What I understand that we are here to discuss is the

5   remedy that is sought by the motion that the plaintiffs filed

6   was under Rule 37(a) for an order compelling Mr. Al-Buthe to

7   produce documents and information responsive to the discovery

8   requests served on August 22, 2013, and the plaintiffs also

9   requested consistent with what your Honor did with

10  Mr. Jelaidain, that there be production verifying that the

11  defendants and his counsel moved to undertake vigorous efforts

12  to produce documents.

13          THE COURT:  I was about to ask you whether you want

14  something beyond what I just ruled with respect to the

15  charitable defendants.

16          MR. HAEFELE:  Your Honor, I think I didn't make all of

17  my notes and I didn't review my notes from what you had and I

18  think the answer is probably, to some extent, yes, we are

19  asking for that response.

20          One of the things we did in this, your Honor, is we

21  did go through and did articulate why each and every one of the

22  requests that we did for Mr. Al-Buthe -- and they were

23  distinct, I believe, from the ones on the other charitable

24  defendant I compared partly because Mr. Carter was taking care

25  of that motion, I didn't actually compare the requests and they

G3M5terA

1    were done separately so I do think the requests are separate.

2    I will give you a for instance.

3            I do know that with regard to Mr. Al-Buthe there is a

4    very specific request that relates to the request for his

5    passport and that's request for production 19 which very

6    specifically says not only his passport but identifies some of

7    the passports that we are articulating.  And we do know that he

8    has represented he has in his possession all of his passports,

9    not just the current ones but the past ones; he has all of them

10   in his possession.  At least at some point during the course of

11   the pendency of this litigation he represented so.

12           THE COURT:  I am looking at request 19, the response

13   says:  See the objections to request 2, which is similar to the

14   one I read with respect to the charity defendants except it

15   also says it is beyond the limited scope of jurisdictional

16   discovery authorized by the Court of Appeals and case

17   management order no. 2 and has a lot of similar verbiage.

18           MR. HAEFELE:  The way I would summarize it is overly

19   broad, seeks al-Haramain and other business entities' business

20   records.

21           THE COURT:  Right.

22           MR. HAEFELE:  Not jurisdiction; overstates filing of

23   the action and is not relevant.

24           THE COURT:  That is a summary.

25           MR. HAEFELE:  So, but I do think with regard to the

G3M5terA

1    substance of the fact that he has a passport and he hasn't

2    produced it is similar in vein with what your Honor addressed

3    with regard to the other charity officials.

4         THE COURT:  One distinction here is that Mr. Al-Buthe,

5    through counsel, asked for more time to produce documents but

6    then, as I understand it, didn't produce anything further.

7         MR. HAEFELE:  He did not.  He has produced zero

8    documents, although actually in his responses I think he

9    indicated that he was going to produce a document and he

10   indicated a week later or some short period later that there

11   was a tranche of documents related to Mr. Al-Buthe that they

12   anticipated producing but nothing ever surfaced with regard to

13   that.

14        If I can set a little bit of the context for

15   Mr. Al-Buthe's approach to the litigation?  I remind your Honor

16   of a hearing early in this litigation back in -- way back in

17   May of 2004 before Judge Casey where Mr. Al-Buthe was arguing

18   that the plaintiffs' service on him was defective and his

19   argument rested on the fact that the plaintiffs had initially

20   served Mr. Al-Buthe at an address that he had indicated in

21   government filings that he was -- that is to the IRS -- that

22   there was a particular location where it was his office here in

23   the U.S., that's where the service was made.  And the argument

24   was it wasn't really the right address, the right address was

25   nearby but the address that we had used to serve him was

G3M5terA

1    actually a post office box location.  And you know, that, just

2    to summarize, in the dialogue that Mr. Al-Buthe had with the

3    Court, Judge Casey ended up cautioning Al-Buthe saying, Don't

4    blow smoke at me, and ultimately he concluded the exchange by

5    admonishing Mr. Al-Buthe:  This kabuki dance is over.

6         I think one of the things that we are feeling is that

7    the kabuki dance has never ended and that we are near 12 years

8    later and Mr. Al-Buthe -- well, I would say he must be very

9    tired because he has still been dancing.

10         The procedural history we have here, your Honor, is on

11    April 16, 2013, the Second Circuit overturned the December 14th

12    2011 decision dismissing Mr. Al-Buthe.  On October 22, 2013,

13    plaintiff serves their jurisdictional discovery requests.

14    After receiving a requested four-week and then another

15    three-week extension, as your Honor indicated a total of seven

16    weeks from the original date of the production, on November 11,

17    2013 Mr. Al-Buthe served only objections with zero documents

18    included in the production and since then he has produced zero

19    documents in response to plaintiff's discovery requests.  And

20    then, on August 10, 2015, the plaintiffs moved.

21         What Mr. Al-Buthe does not respond to and so I think

22    our position is these issues are waived, aside from Al-Buthe's

23    conclusory assertion that plaintiffs requests fall outside of

24    the confines of the permitted jurisdiction of discovery which

25    our position is they obviously do not, he does not address any

G3M5terA

1   of the plaintiffs description of the jurisdictional nature of

2   the various categories in plaintiffs August 10, 2015 motion.

3            Mr. Al-Buthe does not counter plaintiff's arguments

4   against the various boiler plate objections including his

5   objection that requests are overly broad or that certain

6   requested documents post-dated the filing of the actions which

7   I think were also issues that were raised in the last

8   discussion regarding the other charity defendants, but he

9   doesn't oppose those in his opposition.

10            After evading his independent obligation to respond to

11   discovery since August 2013, he wrote that discovery is not

12   jurisdictional in nature and insists that he should otherwise

13   be excused from his independent obligations.

14            I think, your Honor, I believe your Honor addressed

15   what the scope of the jurisdictional discovery assessment was

16   from the Second Circuit but I can tell you what I think,

17   consistent with what you said, your Honor, the way we had

18   phrased it is whether Al-Buthe directed tortious conduct at the

19   U.S. through his role as the primary financier in support of

20   al Qaeda and Bin Laden including through the organizations and

21   financial networks under his control.  It was not the

22   statements that counsel selected out of the opinion to support

23   a very, very narrow, extremely narrow if it goes to these

24   statements then you can get discovery on it; it was based on

25   that articulation I think that we just said.

G3M5terA

1        In fact, the Second Circuit recognized that the

2   plaintiff's jurisdictionally relevant allegations concern

3   whether Al-Buthe had expressly aimed his conduct at the United

4   States by providing material support to al Qaeda when it was

5   known that al Qaeda was engaged in a global terrorist agenda

6   directed at the United States.

7        There were a number of document requests, your Honor.

8   First, before I go into the specific request I would like to

9   address some of the broad -- what I would call -- boiler plate

10  objections which, again, our position is they waived them but I

11  do want to not just cast them aside.

12       They're overly broad objections.  It just was never

13  supported, never indicated why they contend that they were

14  overly broad and they have the obligation to carry that burden,

15  your Honor.

16       I think your Honor already addressed the other

17  document objections, in other words production of documents

18  from other entities and our position is, your Honor, if the

19  documents that we have requested are in Mr. Al-Buthe's control

20  or he has the ability to produce them, he has the obligation to

21  produce them and there are documents, as we know from

22  al-Haramain's production and, just for the record, Mr. Al-Buthe

23  is an Al-Haramain official or was an Al Haramain official.

24       THE COURT:  Al Haramain, Saudi Arabia?

25       MR. HAEFELE:  Pardon me?

G3M5terA

1        THE COURT:  Al Haramain, Saudi Arabia?

2        MR. HAEFELE:  Well, he had a position -- he was one of

3   the officers of the Al-Haramain U.S.A. office but he was also

4   articulated in a number of documents as being a senior official

5   of Al-Haramain Saudi Arabia.  I don't know that he actually

6   held a title there but he certainly held a position of

7   authority there and it is my understanding from the documents

8   to be seen that he had an office, if you will, in Saudi Arabia

9   that was an Al-Haramain physical office or physical location.

10        THE COURT:  Al-Haramain, Saudi Arabia was the entity

11   that was shuttered by the government, correct?

12        MR. HAEFELE:  Allegedly so.

13        THE COURT:  Okay.

14        MR. HAEFELE:  It has been indicated to be so.

15        And, as we know from the Al Haramain production,

16   number one, we did not get Al Haramain, Saudi Arabia documents.

17   They did not participate in any of the productions, they did

18   not participate in essentially anything in the litigation.  And

19   as we know from the productions which your Honor addressed a

20   number of times with regard to Al Haramain, U.S.A., there were

21   gaps in their production, if you will.  I don't need to get

22   into that but your Honor has addressed those arguments before

23   and there were gaps.

24        So, bottom line, if there are documents that

25   Mr. Al-Buthe has in his care, custody or control or that he has

G3M5terA

1    the practical ability to produce for us, then he should be

2    doing that.

3         With regard to their objection about documents

4    post-dating the filing, I think your Honor may have addressed

5    this previously but just to be clear, for example, documents

6    about investigations that look back, documents about

7    investigations that happened post-2001 that look back to

8    earlier times, those documents would be documents that would be

9    relevant for production even if they fall outside of the date

10   of the filing of the case.

11        What I would like to do now is turn, your Honor --

12        THE COURT:  Let me just ask you about one of the

13   points that Mr. Kabat makes which is there was no meet and

14   confer here.

15        MR. HAEFELE:  Your Honor, similar to what Mr. Carter

16   addressed, in our response we did lay out substantially what

17   our meet and confer was.  If you look at ECF 3111 page 2 to 3?

18   If you give me a minute I can flip to that and go through that

19   with you.

20        THE COURT:  No, I have read that.

21        MR. HAEFELE:  Does that answer your question, your

22   Honor?

23        THE COURT:  Yes.  That's fine.

24        MR. HAEFELE:  In short, I would say that it is not

25   true that we didn't meet and confer.  In fact, we tried.  They

G3M5terA

rejected.  Their position consistently was we are not planning

on producing anything and it seemed that there was futility in

going further and being deferred at that point.  And I am

making it fairly concise but there was a number of instances

where that dialogue back and forth happened.

     If I can march through, it is in our moving papers but

we have categorized the document production requests in certain

categories and some of them may even combine further, for

example I think the first two categories are financial

transaction documents of Al-Buthe, his family, and accounts

related to Al-Haramain.

     He had access, obviously, to his own financial

accounts and accounts that were in his name, accounts where he

had signature authority.  His own accounts were part of the

allegations, actually regarding the moving money, Haramain

money to al Qaeda, Mujaheddin.

     He also had significant control over financial

dealings of al-Haramain U.S.A. but spent much of his time not

in the U.S. so many of the documents, presumably, would have

been in Saudi Arabia including, for example, documents related

to e-mails concerning financial transactions and things along

those lines.

     So, certainly whether it is documents related to

financial transactions of his own or Al-Haramain or folks that

he may have run financial transactions through, all of those

1    are documents that he would have been obligated to produce and,

2    again we have gotten nothing.

3         His alleged support for al Qaeda using his sources

4    under his control is at the core of the allegations that he

5    conducted his conduct at the U.S. and I think that demonstrates

6    the jurisdictional hook, if you will, for both discovery

7    requests 1 and 2{ }-- both categories 1 and 2.

8         Similarly, documents related to Al-Buthe's indictment

9    here in the U.S. by the Department of Justice, investigations

10   about him, his listing and delisting and sanctions by the U.S.,

11   U.N. and by other entities, as well as his internal inquiries

12   into those allegations.

13        For example, he is a man of -- a prominent businessman

14   with contacts and resources.  It is hard to believe that when

15   he had allegations being leveled against him including

16   indictments here in the U.S. and U.N. and U.S. sanctions and

17   sanctions by other worldwide entities, it is hard to believe

18   that he did nothing to investigate allegations of his

19   wrongdoing.  And the fact that he has produced nothing

20   regarding those investigations, those actions, or his

21   investigations into those allegations makes it hard to believe

22   that he has nothing to produce.  And clearly those allegations

23   are, again, at the heart of the allegations against him

24   concerning his direction and conduct at the U.S.

25        The next category is items personal to Mr. Al-Buthe;

1    his bio, a lot of information you would want in a case and that

2    is where his passport falls in.  Those are -- is it is hard to

3    believe that he doesn't have access to those documents, your

4    Honor.  As was mentioned earlier, the fact that prominent men

5    like this do not keep records of their accomplishments is just

6    very hard to believe, that he didn't have some kind of resume,

7    some kind of biographical information, and it is hard to

8    believe since he has articulated that he has a passport that he

9    didn't have his passport.

10            I think we already covered documents in his position

11   regarding the Al-Haramain entity then documents related to his

12   interrelationships within or among terrorists, those documents

13   evidence Al-Buthe's dealings with other alleged co-conspirators

14   and may underscore the defendant's knowledge so they have a

15   jurisdictional hook in that sense.

16            So, your Honor, we have gone through and it is -- my

17   summary right here I think is in some detail laid out in the

18   brief and there has never been a response to those allegations

19   of jurisdictional connection.

20            So, to the extent that there is argument on the other

21   side that we have not demonstrated why these document

22   production requests are jurisdictional, that's something that

23   has never been responded to.

24            THE COURT:  I think what we will do, rather than going

25   on to Mr. Kabat, is take our lunch break now.  Why don't we say

G3M5terA

1     we will resume at 2:15.

2              MR. HAEFELE:  Your Honor, can I --

3              THE COURT:  Oh sure.  I didn't mean to interrupt you.

4              THE MARSHAL:  I have three things to tie up.

5              THE COURT:  I thought you were done.

6              MR. HAEFELE:  I am nearly done.

7              THE COURT:  Okay.

8              MR. HAEFELE:  It is merely several of his

9     miscellaneous arguments that I just want to make sure we tie

10    up.

11             THE COURT:  Sure.

12             MR. HAEFELE:  Our position is they don't matter.

13             For example, he makes an argument that Mr. Sedaghaty's

14    conviction was vacated, that was material to Mr. Al-Buthe's

15    production.  We have argued multiple times that Mr. Al-Buthe's

16    U.N. delisting plays no part in what his production obligations

17    are.

18             THE COURT:  Stated more generically, as the merits are

19    essentially irrelevant at this stage, even if Mr. Kabat or

20    Mr. Al-Buthe are correct, that that's not the issue before me

21    now.

22             MR. HAEFELE:  I think the last two things I would say

23    is earlier we had some kind of chart that showed the cross

24    connection between the requests and the Al-Haramain requests

25    and that doesn't exist here so that is one differentiation.  I

G3M5terA

1    don't know whether that mattered to your Honor.

2          THE COURT:  It was the MWLA or IIRO.  I am aware of

3    that.

4          MR. HAEFELE:  Correct.

5          In this instance one of the -- I think there was a

6    reference from Mr. Carter indicating how the charity officials

7    there had interconnections with other entities in the

8    litigation and here I think it is obvious he had

9    interconnections with Al-Haramain, U.S.A., he had connections

10   with Al-Haramain, Saudi Arabia, and he also had connections

11   with the Kingdom of Saudi Arabia because he is an employee of

12   the Kingdom of Saudi Arabia.  He actually, in his position

13   reports, directly to the Mayor of Riyadh who was at the time

14   was royal.  I don't know who it is now.

15         THE COURT:  Do you still have an Al-Haramain U.S.A.

16   production or is it simply all of that material that eventually

17   became disclosable pursuant to Court order?

18         MR. HAEFELE:  There were Al-Haramain productions in

19   addition.  In fact, earlier than that.  That was the later of

20   the productions, I believe.

21         THE COURT:  Okay.

22         MR. HAEFELE:  That's all I have, your Honor.

23         THE COURT:  So, we will resume at -- why don't we say

24   2:15.  We will make it 2:20.

25         MR. CARTER:  Your Honor, a minor question.  We have

G3M5terA

1    some boxes of stuff here; do you mind if we leave them in the

2    courtroom?

3              THE COURT:  Not at all.

4              MR. CARTER:  Thank you.

5              THE COURT:  As long as it is something -- we are not

6    going to lock the courtroom.

7              MR. CARTER:  It is just the filings, your Honor, so.

8              (Luncheon recess)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

G3M5terA

1              A F T E R N O O N   S E S S I O N

2                        2:20 p.m.

3          THE COURT:  Go ahead.  Mr. Kabat.

4          MR. KABAT:  Good afternoon, your Honor.

5          I want to respond to some of the arguments that

6    Mr. Haefele raised about discovery about Mr. Al-Buthe but, most

7    importantly, Mr. Haefele misrepresented the Second Circuit's

8    opinion by saying that they were entitled to discovery that he

9    expressly aimed his conduct to this country.  That is not the

10   standard in the Second Circuit.

11         The Second Circuit decision is that whether there is

12   material support for al Qaeda was expressly aimed at the United

13   States, so jurisdictional discovery is not everything that

14   Mr. Al-Buthe did that might be directed at this country, it has

15   to relate to al Qaeda, material support for al Qaeda.  And that

16   gets back to the same problem we had with the other defendants

17   in terms of plaintiffs are trying to seek merits discovery for

18   Mr. Al-Buthe, were willing to discuss jurisdictional discovery

19   with either Mr. Carter or Mr. Haefele.  They have said that we

20   refused to meet with them and they quoted that Exhibit B

21   confirmed that I said that we had refused to meet.  In fact,

22   Exhibit B said no such thing, I have no idea what they're

23   referring to but, again, plaintiff as you know, did discovery

24   deficiency letters, or they never bothered to do a discovery

25   deficiency letter as to Mr. Al-Buthe and they reached out to me

G3M5terA

1    and said let's have a meet and confer.

2            There is no e-mail on that.  So, with that

3    clarification out of the way.

4            THE COURT:  Well, is it correct that you haven't

5    produced, on behalf of Mr. Al-Buthe, a single document?

6            MR. KABAT:  Pardon?

7            THE COURT:  Is it correct that you have produced no

8    documents?

9            MR. KABAT:  Apart from Al-Haramain?  That's correct.

10   Because Al-Haramain documents, originally Mr. Al-Buthe thought

11   that he would be able to get documents from Al-Haramain, Saudi

12   Arabia but what happened is the Saudi government shuttered

13   Al-Haramain, Saudi Arabia, as you observed before lunch, and

14   Mr. Al-Buthe was no longer able to access the Saudi documents

15   that he thought he might be able to produce and so there was

16   nothing left for him to produce with respect to Al-Haramain.

17           THE COURT:  What about with respect to -- let me go

18   back a step.

19           A lot of your letter deals with the merits basically

20   saying the result in the trial in Oregon involving Mr. Seda led

21   to a reversal and Mr. Al-Buthe has been delisted by the United

22   Nations.

23           MR. KABAT:  Right.

24           THE COURT:  But you haven't produced any documents

25   that relate to the delisting or your representation, which you

G3M5terA

1    seem to think is significant in terms of jurisdictional

2    discovery that the United States allegedly is also going to

3    delist him even though I presume those would not be Al-Haramain

4    documents but would be Mr. Al-Buthe's individual documents.

5              MR. KABAT:  Well, your Honor, the plaintiff's position

6    with respect to the de listing of Mr. Al-Buthe is that it has

7    no relevance to the claims or defenses in this litigation and

8    there is settled law you can't get discovery unless something

9    is relevant.

10             Plaintiffs are trying to have it both ways, they're

11   trying to say, oh yeah, the delisting is irrelevant to claims

12   and defenses.  On the other hand they're saying we want

13   discovery of something that we have admitted is irrelevant.

14             Plaintiff can't have it both ways.

15             THE COURT:  You seem to think it is relevant because

16   your letter goes on for several pages about that and

17   presumably, therefore, it is relevant in some fashion.

18             MR. KABAT:  Your Honor, our position with respect to

19   the relevancy of the delisting is that either plaintiff can

20   concede that both the designation and the delisting are

21   irrelevant, they're off the table, or if they concede that the

22   designations -- excuse me, if they insist that the delisting is

23   relevant --

24             THE COURT:  Well, I assume since they requested it --

25   Mr. Haefele can correct me if I am wrong -- they think it is

G3M5terA

1    potentially relevant.

2            MR. HAEFELE:  Your Honor, I don't need to correct you

3    because I think you are right, but I would add it is relevant

4    on the allegations underlying the listing as well as the

5    allegations of the considerations for the delisting.  The

6    arguments in response to the listing and delisting and to the

7    defendant's defenses.

8            MR. KABAT:  Well, all I can say is plaintiffs have

9    flip-flopped about the delisting.  We are willing to produce

10   the information about the delisting if plaintiff is willing

11   concede that it is relevant, but if plaintiff's position is not

12   relevant then we don't see why we should have to produce it.  I

13   mean --

14           MR. HAEFELE:  Your Honor, may I respond?  There is a

15   fundamental confusion there.

16           The fact of the delisting is not relevant.  The claims

17   why they were delisted and the considerations related to the

18   arguments for delisting is what is relevant.  It is the

19   arguments and the information exchanged, not the fact of the

20   delisting.

21           THE COURT:  Well, if you put the word "potentially" in

22   front of "relevant" I am inclined to agree with you.  Of

23   course, none of us know what that information is.  There could

24   be admissions or false statements or potentially useful

25   information there but I agree that the fact of delisting,

1    particularly since it is only by the United Nations not by the

2    U.S. at least at this point, is not relevant.

3              MR. KABAT:  Your Honor, we think the delisting is

4    relevant and would be willing to produce the documents if the

5    plaintiff would agree to that too, that it is relevant.

6              THE COURT:  If I order it, whether they agree to it or

7    not, you are going to produce it or other consequences will

8    flow.

9              MR. KABAT:  Mr. Haefele also discussed the criminal

10   case and why Mr. Al-Buthe had not produced anything with

11   respect to the criminal case.  It is a very simple answer.  He

12   has never been served with the indictment.  He has nothing to

13   produce in that sense.

14             So, because he was in Saudi Arabia around the time the

15   indictment was issued, he has not left the country since then,

16   and I should note with respect to plaintiff requests for the

17   passport it is my understanding that after he was designated

18   the Saudi government took his passport, confiscating it, so he

19   could not travel outside the country.

20             So, there is nothing to produce there.  Now that he

21   has been delisted by the United Nations he may be able to get

22   his passport back but we will see.

23             THE COURT:  So, in the period prior to -- well, forget

24   the period prior to, the representation is that he currently

25   has no passport and doesn't have any expired passports.

G3M5terA

1        MR. KABAT:  That is my understanding.

2        THE COURT:  Okay.

3        MR. KABAT:  And I would note that the document

4   requests that Mr. Haefele noticed were served after 2013 and

5   the passport and designation had been confiscated I think

6   around '04, '05, and likewise the shuttering of Al-Haramain was

7   also back in '04, '05, years before the discovery requests were

8   served on Mr. Al-Buthe.

9        Mr. Haefele also claimed that we should have produced

10   documents relating to Mr. Al-Buthe's "investigation of the

11   allegations in the complaint."  Well, whatever the

12   investigation did was in connection with his attorney and the

13   attorney-client privilege and this Court has already agreed

14   with the parties that they do not have to produce documents

15   relating to the attorney-client communications nor after 9/11

16   relating to them, any allegations in the complaint including

17   the investigation.

18        Mr. Haefele also mentioned that we should produce

19   Mr. Al-Buthe's resume and documents showing his

20   accomplishments.  Well, it is not clear to me how that is going

21   to tie back to whether he expressly aimed his support of

22   al Qaeda or expressly aimed "intentional tortious acts at

23   residents of the United States."  That gets back to the

24   original problem we have which is plaintiff is trying to seek

25   merits discovery against a jurisdictional defendant and, again,

G3M5terA

1      if we had had a meet and confer we could have hashed this out

2      with the plaintiffs.

3              And I would note that plaintiffs in fact did have a

4      meet and confer with us with respect to Al-Haramain many years

5      ago, we had two attorneys from South Carolina and two attorneys

6      from New York came to our office, we had a productive session.

7              So, plaintiffs know how to do a meet and confer but

8      apparently they don't want do it here and they didn't want to

9      do it for the al Turki defendants.  And, again, we are still

10     willing to meet and confer with them to identify the specific

11     document requests that go to jurisdictional discovery as

12     opposed to merits discovery.

13              If there are no further questions, thank you.

14              THE COURT:  Anything else, Mr. Haefele?

15              MR. HAEFELE:  Your Honor, just one quick point.

16              In Exhibit F to our -- it is at ECF no. 2990-6.

17              THE COURT:  Yes, I have it in front of me.

18              MR. HAEFELE:  I believe it is the declaration or as

19     part of that exhibit there is a declaration of Mr. Al-Buthe

20     dated August 4, 2010 and I believe it is from that declaration

21     that we quote and I haven't been able to locate it while we are

22     talking, it is from that declaration where we pulled the

23     statement that he has, in his possession, his passports.

24              While I am looking at it might I suggest that one of

25     the things your Honor might want to know --