G3M5terA

```
1          THE COURT:  There is, on page 4 of his declaration, it
2    says:  I never had seven passports -- skipping a little -- and
3    the government of the Kingdom of Saudi Arabia never required me
4    to turn in any passport or other travel document.  Indeed, I
5    today have in my possession the Saudi Arabian passports that I
6    have ever had, all of which I have expired.
7          MR. HAEFELE:  Thank you, your Honor.  You have a very
8    good eye.
9          THE COURT:  And that's dated December 2011.
10         MR. HAEFELE:  And, your Honor, I would -- I guess that
11   obviates the next question which was did he get them back when
12   he was delisted but if he never had them taken, then there is
13   no reason for him to have gotten them back.
14         That's, I think the primary response that I had to
15   that.  In terms of what the proper scope of jurisdictional
16   discovery is, I think I will leave it to your Honor to -- we
17   have laid out what our position is, your Honor.
18         THE COURT:  How should one square the statement in the
19   2011 declaration of Mr. Al-Buthe with the representation you
20   made to the Court a little while ago?
21         MR. KABAT:  I will have to check with him.
22         THE COURT:  Well, as has been consistently true
23   throughout this case, drawing the line between merits discovery
24   and jurisdictional discovery can be difficult.
25         Before I rule let me also ask you, when I looked at
```

G3M5terA

1   paragraph 6 of your declaration which spoke about Mr. Seda you

2   also represent it seemed not to be tethered to what we are

3   talking about here with Mr. Al-Buthe, it looks like it was of a

4   problem of cutting and pasting.  I just wanted to make sure

5   that is right and that I wasn't missing something.

6          MR. KABAT:  Sorry.  Again?

7          THE COURT:  In your declaration that is document 53,

8   paragraph 6, the last paragraph deals with Mr. Seda and if

9   there is a point in there that relates to Mr. Al-Buthe I didn't

10  understand what it was.  I wasn't sure whether the reference is

11  to -- well, it seemed to me the paragraph belonged with some

12  other document and really didn't relate to this.  I just wanted

13  to make sure, your Honor.

14         MR. KABAT:  Actually, your Honor, if you look at the

15  first page of that declaration I submitted the same declaration

16  in opposition to both motions to compel.

17         THE COURT:  Oh.  Okay.  Then that explains it.  Thank

18  you.

19         MR. HAEFELE:  Your Honor, I guess I would make one

20  summary conclusion here.

21         THE COURT:  Sure.

22         MR. HAEFELE:  Defendant has an obligation to respond

23  to discovery and produce documents.  Zero documents is not a

24  response.  It is just an indication of actual nonparticipation.

25         THE COURT:  Well, there is that and there was the

G3M5terA

1    request for more time to produce what eventually became no more

2    documents.  As I indicated in relation to prior motions that we

3    have heard today, it seems to me that while there may not have

4    been an ideal interaction among counsel, there was an adequate

5    attempt to confer and that further conferring would not likely

6    have led to a different result since disagreement with some of

7    the requests isn't a license to ignore or not respond to all of

8    the requests.  And it seems to me clear that some of the

9    documents that are sought are potentially relevant not just to

10   merits discovery but to jurisdictional discovery including, as

11   we discussed a little while ago, the documents relating to

12   listing and delisting.

13          We didn't specifically talk about it but I assume

14   Mr. Kabat's position is the same as it was earlier with respect

15   to the communications in the hands of Mr. Al-Buthe that he had

16   with the Saudi government.

17          I take it you are not claiming sovereign immunity as

18   to those; is that correct?

19          MR. KABAT:  He is not asserting sovereign immunity but

20   it is not really relevant to the jurisdictional issues here.  I

21   mean, he remains an employee of the government, he always has

22   been.

23          THE COURT:  There is also, among the boiler plate

24   objections, the assertions that all of the records of either of

25   two Al-Haramain entities are the corporate property of those

G3M5terA

1    defendants and not Mr. Al-Buthe's property.  I take a different

2    view; namely, if there were documents in his possession that

3    relate to those entities that are responsive, they have to be

4    produced.  The objections that have been asserted are

5    essentially all boiler plate.  The letter that I received

6    essentially talks about several things that I don't think are

7    relevant, one of which is, as I discussed with Mr. Haefele and

8    we all had some interchange about, the fact of delisting and

9    also the collapse of the Oregon criminal case which occurred

10   for a number of reasons, none of which relate to whether

11   Mr. Al-Buthe is or is not somebody who supports terrorism in a

12   fashion that impacted the United States.

13           Among other things, there is, as I think indicated in

14   a footnote, there was a different standard applicable to the

15   criminal case in terms of burden of proof, and obviously Grady

16   applies as a concept in the criminal case and apparently may

17   have been somewhat tortured and is not applicable in this

18   setting.

19           So, I am going to require production of the documents

20   that the plaintiffs seek as well as a certification that

21   Mr. Al-Buthe has produced all the responsive documents in his

22   possession, custody or control.

23           So, that's my ruling regarding Mr. Al-Buthe.

24           MR. KABAT:  Your Honor, one question?

25           THE COURT:  Yes, sure.

G3M5terA

1          MR. KABAT:  Every document request pertains to

2     jurisdictional discovery.  Are you carving anything out?

3          THE COURT:  I am not carving anything out because my

4     view is the letter which didn't raise specific objections

5     essentially waived those objections and that the general

6     objections that are set forth in the formal document response

7     are not sufficient to assert an objection.

8          Let me just generally, while we are on that topic, the

9     rules applicable to this case, Federal Rules of Civil

10    Procedure, changed as you all know effective December 1st, and

11    the Advisory Committee's notes, I believe it is, suggest that

12    the they should be applied, to the extent possible or

13    practicable -- I am paraphrasing, not quoting -- in cases that

14    are ongoing.

15         So, as far as I'm concerned on a going-forward basis,

16    although I also held the view even before the rule's

17    amendments, general objections are not objections that the

18    Court will give any weight to.

19         Additionally, the change in the rule that I indicated

20    earlier says that if documents are being withheld based on an

21    objection, that must be disclosed in a Rule 34 response.

22         So, I intend to enforce both those provisions of the

23    revised rule.

24         The boiler plate objections that everybody has been

25    using since the beginning of time that objections are vague and

G3M5terA

ambiguous and unduly burdensome and the like, basically now, to

my mind, are surplusage, and when I see them I intend to turn

the page because they add nothing to the discussion and that's

been my view even before the rule's amendment.

So, that is part of the reason for the ruling that I

just made.

Let's move on to the next motion.  What is that now?

We are up to MWL and IIRO.

MR. NASSAR:  Good afternoon, your Honor.  Waleed

Nassar on behalf of the IIRO and the Muslim World League.

Your Honor, we are here today before you seeking

plaintiff's compliance with your November 3rd, 2015 order.  In

that order you obliged plaintiffs to disclose information in

their possession concerning the providence of a set of

suspected forgeries that were produced in late 2014 as well as

to provide us with original documents.  To date, plaintiffs

have not provided us with any of that information.

I want to briefly focus your attention on four points,

your Honor.  They are, number one, this issue has already been

decided and that ruling has been ignored by plaintiffs.  Number

two, I want to briefly discuss the danger of the documents at

issue and why it is critical to address this matter now.

Number three, I would like to discuss why plaintiff's position

that we are not entitled to the information we seek at this

juncture is incorrect.  And lastly, I would like to clarify

G3M5terA

1    what we are seeking from the plaintiffs at this juncture and by

2    contrast what we are not seeking.

3         THE COURT:  They also say that this is a skirmish

4    about something that eventually may be completely irrelevant so

5    why bother dealing with it now.  Maybe that's in one of your

6    other three?

7         MR. NASSAR:  Yes, it will be covered in this point.

8    The relevance of the documents, if you reviewed them, they're

9    essential to plaintiff's claim.

10        First I would like to emphasize that the present

11   dispute has already been ruled upon by the Court.  Since the

12   date of the Court's order some four months ago, we have reached

13   out to plaintiffs a variety of different ways.  We have served

14   them with narrowly tailored interrogatories, conducted meet and

15   confers, and also exchanged numerous correspondences back and

16   forth.  Despite the clear language of the order as well as our

17   repeated outreaches, we are no further along and have no

18   information on the providence of the documents.  We do not know

19   the identity of the source of the document.  We do not know

20   when they received them nor do we know the chain of custody or

21   any other circumstances relating to the receipt of the

22   documents.

23        Because of this impasse, we were forced to write to

24   you on January 21st and we are here before you today.  I would

25   like to provide a brief overview of the nature of the documents

G3M5terA

1   and why it is critical to address this matter now.

2            In December of 2014, some 20 years after the first

3   documents in this set of documents was allegedly authored in

4   Peshawar, Pakistan, and some 11 years after the first lawsuit

5   in this litigation was filed a set of irregular inflammatory

6   documents were attached to pleadings against the Kingdom of

7   Saudi Arabia in this litigation.  Plaintiffs provided no

8   explanation whatsoever as to where these documents came from or

9   why documents that originated from -- that were authored

10  between the dates of 1995 and 2005 would show up first in this

11  litigation in December of 2014.  The documents purportedly

12  originate from closed and/or non-existent offices in Peshawar,

13  Pakistan of the Muslim World League as well as the

14  International Islamic Relief Organization.  These suspected

15  forgeries contain a host of oddities that jump off it the page.

16  Among the most egregious include a doctored logo of the Muslim

17  World League that features a map, your Honor, of North America

18  and South America as opposed to the Muslim majority countries

19  that are located in Asia, Africa, with Mecca in the middle that

20  is worn on authentic Muslim World League letterhead.

21           Additionally, there is a basic big grammar mistake

22  imprinted on the letterhead of every single one of the IIRO

23  documents in this set describing a fictional office that never

24  existed.

25           Number three, there are elementary grammar mistakes

G3M5terA

littered throughout the documents that even then the documents
were allegedly authored by native Arabic speakers.

Number four, all of the documents were authored by
individuals who either never worked for IIRO or Muslim World
League or ceased working for them.  In fact, one of them was
incarcerated in Saudi Arabia on the same day that he allegedly
wrote a letter in Peshawar some thousands of miles away.

While each of the issues listed independently weighed
heavily against the authenticity of the documents, the
cumulative effect of the issues we have uncovered is
overwhelming.  This is only what our preliminary investigation
has uncovered.

To perform a full and comprehensive analysis we need
more information as to the providence of the documents, who
they got them from, as well as chain of custody, and we also
need the original documents so that we may perform the forensic
analysis into the ink, paper, as well as the numerous
extraneous documents littering all of the documents.

I would like to turn to why plaintiffs position that
now is not the time for the information that we seek is
incorrect.

On the date of the order we had already produced
information concerning the office closures of the IIRO and
Muslim World League Peshawar office as well as the employment
records of any of the individuals who had worked for IIRO and

1    Muslim World League.  Additionally, subsequent to your order,

2    we provided them with a specific Bates range of those documents

3    in order to facilitate their own internal investigation.

4         We have also offered to provide them with a detailed

5    list of all of the irregularities that we have located in each

6    of the documents provided on the one condition that they do not

7    provide this list to the source that they will not disclose.

8         Under this proposal they would be free to share with

9    any other analyst or any other source, just not the source,

10   because we have credible fears that more credible forgeries

11   would show up later in this litigation that may actually

12   resemble IIRO or Muslim World League documents and would be

13   hard to detect that is clear as forgery.  To date, plaintiffs

14   have refused this offer.

15        THE COURT:  Weren't you tipping off their source,

16   presumably for fewer than more or better once.

17        MR. NASSAR:  We have concerns that the source is

18   complicit in the generation of forgeries.  That is a concern

19   for us.

20        Plaintiff's chief response to us has been that our

21   requests for information on the providence of the documents is

22   premature.  They are incorrect.  They're incorrect for three

23   reasons.

24        First, the Court has already ordered disclosure.

25   Second, there are grave questions with respect to these

G3M5terA

documents and they are central to plaintiff's case.

         We need to know now, not five years from now, as this will impact the direction their case will head against both the Muslim World League and the International Islamic Relief Organization.

         Third, they have already submitted these documents as evidence as part of their claims against the Kingdom of Saudi Arabia both in 2015 as well as in their recent submissions in the Second Circuit.

         Your Honor, generally when authenticity is put into question, additional information must be provided by the proponent of the documents in order to allow the other party to conduct a meaning of the investigation. Plaintiff's claim a blanket work product privilege but the name of the source, the date they received the document, how they obtained them, those are all underlying factual matters and they are not work product.

         Under *In Re: Initial Public Offerings Public Securities Litigation*, the underlying factual matters of attorney-client privilege are not matters in fact. This issue arose in Strauss v. Credit Lyonnais where the Court ruled that interrogatory requests for the identity of the persons who supplied documents to plaintiffs does not fall under the protection of the work product privilege because it does not seek processes, opinions, or mental processes of plaintiff's

G3M5terA

1    counsel.

2              THE COURT:  I guess part of their fear is that the

3    source may be two-fold, it may be an original source that they

4    have no direct contact with and then an intermediary who they

5    don't want to give up alleging work product or other

6    privileges.

7              MR. NASSAR:  It is hard for us to discern that fear

8    because they provide us with no information on the providence,

9    so if they had given us something and were withholding

10   something then that would be a credible fear but they wholesale

11   have refused to provide us any information while simultaneously

12   claiming that they do not have the original which precludes our

13   ability to go after the originals from somebody who may have

14   had the documents at a previous stage.

15             THE COURT:  One of the things my November 3rd decision

16   said, and this was one-sided rather than bilateral, if the

17   Muslim World League/IIRO nevertheless wishes to limit the

18   disclosure of some of those reasons, parenthetically referring

19   to badges of fraud, in the first instance to opposing counsel

20   in order to limit the risk of further alleged spoliation, that

21   is the subject about which the two sides need to confer.

22             I take it there has been no such conference?

23             MR. NASSAR:  We have conducted a meet and confer, your

24   Honor.  It went nowhere.  We spoke for about an hour and a

25   half.  When it was made clear to us that they wouldn't provide

G3M5terA

1    us the basic fundamental name of who they got the documents

2    from or any information whatsoever, we left them with our offer

3    which we altered our -- previously we asked them to provide us

4    with a list of errors we noticed in the documents for attorneys

5    eyes only.  Subsequent to that order we amended our offer to

6    plaintiff's counsel and said you can share it with other

7    analysts, other experts but just not the source, and then they

8    refused that offer.

9         So, even if this Court were to consider this

10   information as protected work product, which it isn't,

11   disclosure may still be ordered because there is a substantial

12   need for the information and it is in the sole possession of

13   plaintiffs.  In In Re: Savit litigation the Court determined

14   that both the substantial need and undue hardship components

15   mandated disclosure because the critical information was in the

16   sole party of the adversary.

17        Plaintiffs also think that we must rely upon them for

18   their own internal investigation into the suspected forgers.

19   This is incorrect.  We not only have the right to perform our

20   own investigation, we have an obligation to our clients to do

21   so.  Plaintiffs propose approached so far, the best we can

22   tell, has amounted to we have asked our undisclosed source who

23   may have been complicit in concocting these documents and he

24   says they are legitimate and this is insufficient.

25        Furthermore, of the few signs of any investigation on

their part have revealed an inept process.  They have reported

to us, for instance, that they had the contents of the

documents analyzed by their Arabic linguist and that they

stated that the mistakes within them are minor.  In contrast,

we retained a senior Arabic linguist from Columbia University

who has looked through each of the documents and has detailed

over 90 elementary Arabic grammar errors in each of the

documents and he has concluded that the types of basic grammar

mistakes in the Peshawar letters would never have been made by

Arabic native speaker; with that, even an elementary school

student would be unlikely to make many of these mistakes.

Your Honor, I would like to conclude with clarifying

what we are seeking from plaintiffs at this juncture and by

contrast what we are not seeking.  At this juncture we are

simply seeking information that the Court has already ordered

in the November 3rd, 2015 order, namely information concerning

the providence of the documents, who they served them from,

when they got them, chain of custody, whatever information they

have, as well as the original documents.

Practically speaking, much of this information is

routinely shared in the course of discovery as a matter of

course and in fact, as plaintiffs themselves will acknowledge,

we have specifically provided such information to them at their

request without mandating the Court's involvement.

Again, to be clear, we are not seeking to strike the

G3M5terA

1    documents at present, nor are we seeking a ruling that the

2    documents are definitive forgers.  We are simply seeking

3    information that is solely in the possession of plaintiffs and

4    that will facilitate our own internal investigation.

5        The nature of the suspected forgeries has caused

6    significant alarm to our clients.  IIRO and the Muslim World

7    League have been defending themselves in this litigation for

8    well over a decade now only to receive what appear to be a set

9    of very sloppy forgeries dropped into a belated 2014 production

10   without any explanation whatsoever.  In fact, plaintiffs didn't

11   mark the documents as responsive to any of our document

12   requests.  We stumbled upon them when we were looking at

13   submissions against Osama Bin Laden and we noticed three of the

14   documents pertain to our clients.

15       As plaintiffs have not objected to the November 3rd

16   ruling they have a present obligation to comply with the order

17   and to provide us with the information that we seek.

18       Thank you.

19       THE COURT:  Mr. Haefele?

20       MR. HAEFELE:  Your Honor, once again, Robert Haefele

21   from Motley Rice for the plaintiffs.

22       First off, one of the things I wanted to make sure we

23   are clear on and maybe I misunderstood the scope of what we

24   were here for today, I was under the impression it was a

25   pre-motion conference that we were addressing and not

G3M5terA

1    necessarily the merits of the argument.

2             THE COURT:  Well, welcome to the Southern District of

3    New York where pre-motion conferences tend to merge into the

4    ultimate ruling and if I didn't follow that procedure we would

5    probably still be on the second of our conferences in this case

6    so I do intend to rule on the merits.  If you were misled about

7    that --

8             MR. HAEFELE:  Only a little bit, your Honor.

9             First off, let me just make clear, your Honor, that we

10   do disagree with IIRO's continual -- I will underscore

11   continual -- assertions that the documents at issue are bad

12   forgeries.  The write up is repeated again and again and we

13   take issue with it.  Nothing that IIRO has said, even today,

14   has convinced us that the documents are other than what they

15   purport to be on their face.  And I think there was some

16   language in one of your Honor's order that hinted that maybe we

17   had waived on that position.  It was merely, we have engaged

18   the defendants to try and figure out if we are wrong, if they

19   can tell us something that makes us move from that position and

20   we are -- as we have said from the beginning, if it turns out

21   that these documents are fraudulent documents, we don't want to

22   use them.

23             THE COURT:  Are you talking about the portion of my

24   order which said the plaintiffs do not deny that some of the

25   documents may be forged?

G3M5terA

1          MR. HAEFELE:  Yes, your Honor.  And I think your Honor

2     was being as careful as we were saying that, you know, lots of

3     things are possible and is it possible?  I suppose that's why

4     we are listening to them but our position is nothing has

5     changed our view that the documents are other than what they

6     purport to be.  The documents do show that the organization's

7     had direct dealings with financial and weapons support to

8     al Qaeda.  The defendants are right that there are some

9     interesting facts in the documents.  In one document from 1999

10    at page 4 of 7 of ECF 3086-2, the author indicates we have been

11    advised that the Mujaheddin in your camps need some weapons,

12    bombs, and bullets so we have sent you some assistance

13    including the financial assistance in the amount of 40 million

14    Pakistani rupees.  We ask that you receive it at the place

15    designated by you to purchase some of the weapons needed by the

16    Mujaheddin and to address their daily problems.

17          And in another document --

18          THE COURT:  And to address the what problems?  I

19    didn't hear.

20          MR. HAEFELE:  Daily problems.  I don't know that that

21    is necessarily pertinent but it was the end of the sentence.

22          THE COURT:  Oh.

23          MR. HAEFELE:  Another document from 2000 on page 3 of

24    7 in ECF 3086-2:  The author indicates:  As agreed with brother

25    Abul Hassan -- and the rest is illegible -- in Kandahar he has

G3M5terA

1    send ten one hundred thousands "one million" dollars for your

2    Jihadist needs and the various programs on which you have

3    agreed with Brother Abul Hassan.  We will send you this sum but

4    sending it is difficult for us so please send one of the

5    brothers to receive this sum from Pakistan from us.

6           So, they're right, that they are certainly the

7    statements in the documents do go -- they certainly support

8    plaintiff's claims, no doubt, but are they documents that are

9    essential to plaintiff's case?  I think that we have many other

10   documents related to Muslim World League and IIRO that support

11   plaintiffs claims significantly even if we didn't have these

12   documents but they certainly are strongly supportive of

13   plaintiff's allegations.

14          Let me rebut some of the things my colleague on the

15   other side said.  We do think that the issue is premature.

16   These defendants are insisting that plaintiffs authenticate

17   documents before we know the documents will be used at trial,

18   before they have finished their own production as part of --

19   and as part of their production even before we know whether the

20   documents need to be produced, in other words documents from

21   their production will address issues as to whether these

22   documents are authentic.

23          The issue is wasteful, it is wasteful of time.  The

24   parties and the Court have spent an enormous amount of time on

25   this issue especially when you consider the relative amount of

G3M5terA

1    the documents compared to all the other documents in the

2    litigation and the timing of the authentication issue early --

3    I mean, I know we are many years in this litigation but with

4    regard to documents that may be used at trial this is

5    relatively very, very early.

6            The issue is distractive, it is a distraction.  It is

7    distraction attention away from other important progress

8    actually necessary to advancing the case.  It distracts

9    attention away from the defendant's wrongdoing in discovery as

10   is evidenced by this Court's various earlier sanctions and

11   various other rulings on motions to compel.  And our presence

12   here today to argue other motions to compel for sanctions.

13           It distracts the defense's attention away from

14   finishing the long overdue obligations to search for responsive

15   documents at Muslim World League's and IIRO's multiple offices

16   worldwide, a task that purportedly has been ongoing for a

17   decade and still has not reached conclusion.

18           The issue is dangerous precedent.  In agreeing to

19   consider the defendant's motion to reconsidering authentication

20   of these documents now opens the door to similar inquiries

21   regarding other documents in the scores of documents that have

22   been produced at a stage in the case where we don't know

23   whether the documents will be produced and whether the

24   discovery will be necessary.  And we don't know if the

25   documents will be part of the trial.

G3M5terA

1              And we don't know, because we haven't seen it, whether

2       the documents the defense will produce will answer the

3       questions but, nonetheless, their approach is before they

4       flow -- before they produce their documents to us to answer

5       those questions they want to delve into our work product.

6              Their list of the problems with the documents remains

7       incomplete.  We don't know all the problems that they have and

8       they have told us that they'll be, under some

9       counsel's-eyes-only suggestion they have told us they'll allow

10      us a peek at what they say is wrong but the problem with that,

11      your Honor, is that what they want to do is handicap our

12      ability to investigate before they'll give us any information.

13             Presumably the person or the people who are the best

14      people to provide us with the information that will shed light

15      on whether these documents are fraudulent or not are the people

16      who they don't want us to have answer questions.

17             THE COURT:  Say that again.

18             MR. HAEFELE:  They don't want us to go back to the

19      people that gave us the document and have them go up the chain

20      and investigate whether or not there are benign reasons for

21      some of the things that they're pointing out and, quite

22      frankly, given what we have heard so far, there are presumably

23      very benign, possibly benign reasons for each of the things

24      they've told us so far and the question is, are they going to

25      give us 100 lists of other complaints serially over time that

G3M5terA

1    we can, you know, knock down every single one or can they give

2    us from now and we can investigate them and figure out whether

3    or not there really is something behind their complaints?

4    Presumably it would be much more efficient if we were going to

5    know what all the complaints are, we can investigate all the

6    complaints, tell them what the responses are, and if they still

7    have no problem, then we have advanced it to that extent

8    without going into plaintiffs' work product.

9         One of the crux -- they've listed so far, as I

10   understand, really three categories of complaints.  I know they

11   have more they haven't told us but they have listed three

12   categories of the complaint.  Number one, the documents are

13   from offices that weren't operating at the time.  Number two, I

14   think they have indicated they use Gregorian versus Hijri

15   dates.  There is problem with the letterhead, mathematical

16   errors, things along those lines.

17        One of the cruxes of their argument really relies on

18   the fact that there is no office in Peshawar at the time these

19   documents were purportedly authored.  The documents have dates

20   of, as I indicated earlier, some of them are dates in 1999,

21   dates in 2000.

22        So, much of the argument has been premised on their

23   unsupported assertion, it is just their word, that the IIRO and

24   Muslim World League offices in Peshawar were closed as of their

25   argument is 1996 and 1997.  So, they argue no office was open

G3M5terA

1    at the time the letters were purported to have been authored.

2            Well, whether the defendant's offices in Peshawar were

3    actually closed as they contend or whether or not that closing

4    happened in 1996 or 1997 is a question that's in dispute still

5    but the evidence suggests, your Honor, that the Peshawar office

6    was still opened at least into 2011.

7            What I would like to do, your Honor, if you would, I

8    would like to pass some documents up to you to take a look at.

9            THE COURT:  Have you shared those with your adversary?

10           MR. HAEFELE:  Well, they are documents that they

11   shared with us, they're their own documents.

12           THE COURT:  Okay.

13           MR. HAEFELE:  But I would be happy to give them a copy

14   as well.

15           THE COURT:  Please.

16           MR. HAEFELE:  May I approach?

17           THE COURT:  Please.

18           MR. HAEFELE:  Your Honor, one of the documents I have

19   passed up to you is IIRO 025784 through 25803.  If your Honor

20   takes a look at that, these are account statements for an IIRO

21   account that was frozen after 9/11.  The account statements

22   indicate that IIRO, if you look at the address on it, the dates

23   start in, I believe, 2001.

24           THE COURT:  Correct.

25           MR. HAEFELE:  And if you flip to the last one, they go

G3M5terA

1    through September 30th of 2011.  And if you look at the address

2    to the IIRO office in all of them it is the IIRO office in

3    Peshawar and their account statements for Standard Charter

4    Bank.  That's at least an indication --

5             THE COURT:  I see the transaction history.

6             MR. HAEFELE:  If you look at the top of the document

7    on the left-hand side there is an address.

8             THE COURT:  I see.  Yes.

9             MR. HAEFELE:  Just to be clear, the Bates stamp

10   indicates that they are produced to us by IIRO.  And if that's

11   not indicative enough, if we look at the other document I

12   provided you which is IIRO 149483, it is a declaration of a

13   Shoaib Sultan, who identifies himself in the affidavit here or

14   declaration as the accountant for IIRO Peshawar and the

15   declaration is dated April 9, 2001, again that is indicating

16   that the Peshawar office of IIRO was open sometime after the

17   date that the defendants have indicated to us.

18            These indicate, your Honor, that at the very least,

19   there is a question of fact as to whether or not the office

20   they claim was closed in 1996 or 1997 was indeed closed or

21   whether or not some office was closed but there was some office

22   that was still an IIRO office in Peshawar.

23            The use of Gregorian dates versus Hijri dates?  We are

24   talking about documents created in Pakistan that has a history

25   that in addition to having a history of using Arabic dates by

G3M5terA

1    some people, there is also a significant history of using

2    English or Gregorian calendar dates as well and whether an

3    author used one versus another, that is not a reason to

4    indicate the document isn't authentic, it is just a preference

5    of the particular author.

6          And the letterheads with the grammar and erroneous

7    information and the allegations of it being outdated letterhead

8    as well as the errors within the documents -- look -- if your

9    Honor looks, I hate to say it but if you look at one of my

10   briefs there is probably a typo in it somewhere, there is

11   probably problems or grammatical errors.

12         THE COURT:  I am glad you picked on yourself rather

13   than me.

14         MR. HAEFELE:  I am not really that dumb, your Honor.

15         There is also the possibility that the documents, the

16   letterhead may have been created by a local printing company in

17   Peshawar that may have been a non-Arabic native speaker.

18   Arabic is not the native language of Pakistan and the fact that

19   a non-native printer may have printed up the letterhead and

20   said something different than what a printer in Saudi Arabia

21   may have printed should be no surprise and it doesn't indicate

22   that the documents have to be non-authentic.

23         Part of the problem here, your Honor, is the

24   defendants, because they haven't completed their own

25   production, have not produced even a fraction of the documents

G3M5terA

1    that they should have but that that includes documents that

2    indicate misconduct attributed to the IIRO Pakistan office

3    related to fabrication of documents.

4            Discovery that relates to the fabrication of documents

5    at an office from which the documents that were here to talk

6    about originated is particularly telling.

7            Let me just digress for one moment.

8            During a hearing in November of 2011 your Honor

9    admonished these defendants, the same two defendants, that it

10   expected that among the documents they were to produce to the

11   plaintiffs are documents unlike audits done at the various

12   field offices which would have included documents underlying

13   the audits in the Pakistan office.  Still, years after the

14   Court's admonition to produce the documents, we don't have

15   documents produced from those offices related to those audits.

16           On page 6 or 16 of the November -- I think it is

17   November 2011 transcript, your Honor, you made clear that the

18   discussion applied to all the branch offices of the two

19   entities, Muslim World League and International Islamic Relief

20   Organization.  "Except to the extent that two sides can agree

21   that some branch office is not relevant, if each branch office

22   is not queried and documents from that branch produced, as far

23   as I'm concerned that will have been an inadequate search and

24   may lead to dispositive sanctions."

25           Then, on page 17 and to 19 your Honor said:  Talk for

G3M5terA

1      a moment about the audits.  It seems to me the defendants will

2      not have done their job as to audits unless they have searched

3      their own records to make sure that if they have retained

4      copies of audit reports and the documents that underline the

5      audit records.

6              Mr. McMahon, who represented the defendants at the

7      time, confirmed his understanding by repeating back to the

8      Court:  I hear, your Honor.  You want any and all records

9      produced that are still in the possession or control of the

10     charities that in any way supported the audit.

11             Then your Honor further clarified by stating:  Or that

12     are the audit, yes.  And then your Honor went on to explain

13     that you expected that all the branch offices to be searched

14     saying whether that is found in Saudi Arabia or in the

15     Philippines office doesn't matter.  Somebody, in an organized

16     way, has to query all of these offices and be in a position to

17     say that was done to follow up and you really need to document

18     the process.

19             Your Honor was very clear that all of the offices had

20     to be searched for the underlying audit reports -- or the

21     underlying documents to the audit reports as well as the audits

22     and you also have made clear, though not in this text, you have

23     also made clear that that extends to the practical ability to

24     obtain the document from agents, for example, the auditors who

25     performed, it was an external audit, to search and go to them

1    and ask them for documents as well.

2           And it appears that the admonition was at least

3    partially acted on by IIRO based on a letter from IIRO's

4    secretary general Dr. Adnan Basha to the directors of the

5    various IIRO offices and the letter was dated about two weeks

6    after that court hearing, December 2, 2011, and the court

7    hearing was November 16, 2011 and it asked and it went to a

8    number of offices including the Pakistani offices and the

9    document was titled Providing the IIRO Secretary General with a

10   Copy of the Working Papers Used by the External Auditor for

11   Issuing the Financial Statements of IIRO Office of Pakistan for

12   the period 1992 to 2004.  That's IIRO 16657.

13          So, it is very clear, again, not only that your Honor

14   ordered them to produce all the audits, all the underlying

15   documents and that that was at least followed through, to

16   asking for those documents to be collected.

17          Now, again, discovery of the fraudulently created

18   documents from the defendant's Pakistan office is particularly

19   pertinent to the issue that we are here for today, whether or

20   not there was some involvement of documents that were

21   fraudulently created or created outside the normal scope of how

22   documents would ordinarily be created because it also goes to

23   whether they had printers on standby, whether they were

24   generally going outside, producing documents internally that

25   were not the normal documents that would get used.

G3M5terA

1              As indicated in plaintiff's January 28, 2016 letter

2       which is ECF 3207 and Exhibit A attached to that, the

3       defendants produced a 2001 audit indicating gross financial

4       irregularities and the diversion of millions of dollars from

5       one of their Pakistani branch offices involving office

6       personnel conducting massive fabrications of invoices,

7       receipts, and other office documents in relation to

8       construction projects, medical services and other activities.

9              And there is another document that we have recently

10      come across, it is IIRO 0149346, it is an April 14, 2001 letter

11      Nazir Khan, the manager of the IIRO office, I would pass it up

12      to your Honor but it is in Arabic so I don't think it will help

13      you.

14             My understanding of what it is, it is another document

15      produced by these defendants that indicates that in April 2001,

16      IIRO's Pakistan office was conducting an audit for some kind of

17      an investigation of alleged fabrication of financial documents

18      and signatures related to an IIRO-supported hospital in

19      Peshawar.

20             The point, your Honor, is that there is indications

21      within their own documents of massive fabrication of documents

22      going on in Peshawar and in Pakistan offices of IIRO and

23      production of those sorts of documents, production of

24      information regarding the audits and the documents underlying

25      those audits may inform information about the offices that we

G3M5terA

1    are here to talk about as well as the conduct of what was going

2    on and it really comes back to the very beginning that this is

3    premature.  The defendants really need to produce documents to

4    us to tell us what the underlying facts are about what's going

5    on before they come to us and say that we are obligated to

6    produce our work product.

7         I won't belabor this, your Honor.  In our brief we

8    cited to some case law that contradicts what the defendants

9    have said about our obligation to tell them about who our

10   investigators are and you had it right, your Honor, that we

11   have our source, our consulting investigator that we take the

12   position, identification of who our working expert or who our

13   investigator is, is privileged.  Where our source got it from,

14   that's someone that we don't know, your Honor.  Even if your

15   Honor ordered me to tell them who the original source is I

16   can't comply because I don't know who it is.  That's something

17   that came from the investigator.

18        THE COURT:  You are saying the investigator doesn't

19   know either?

20        MR. HAEFELE:  I do believe that the investigator does

21   know but I will also add that the investigator has told us that

22   while he hasn't told us who it is, he has told us what the

23   position is and this is one of the reasons why he hasn't told

24   us, I think, revealing the original person or people who

25   provided the documents would put that person or those people in

G3M5terA

risk of grave harm in Pakistan and that's one of the reasons

why they have been very clear to us that they are very afraid

of us revealing who they are.

There is a mantra, your Honor, that you have already

ordered what they've asked for.  My understanding, your Honor,

reading through what your Honor ordered was you ordered us to

conduct discovery and we did that.  Your Honor ordered us to

respond to discovery, which we did.  But you surely, I hope,

your Honor, did not intend to overrule specific objections that

we asserted in discovery before the discovery was even

responded to.  So, the fact that they keep saying you have

already ordered this, I think, misunderstands the fact that

there was a process that your Honor ordered and I think our

position is not only have we engaged in that process but as

part of that process we have also served discovery on the

defendants and they have not produced a single document in

response.  They have identified certain things within their

document -- within their responses but they have -- my

recollection is they haven't responded, in full, to the

discovery.

Three other really short points.

Number one, I think there is a reference that we

hadn't produced the documents before and I think they've

indicated the first they came to know of the documents was in

the plaintiff's response to the Kingdom of Saudi Arabia's

G3M5terA

1    papers on appeal.  The fact is, though, that they were produced

2    in discovery during the document production period which

3    preceded that.  They just may not have seen the documents.

4           There is also a suggestion, your Honor, of a forensic

5    analysis on the documents that we have in our possession.  I am

6    afraid to say that since we just have the documents in pdf, all

7    we are going to do is find a printing from Motley Rice which is

8    no help at all.

9           It is also, your Honor, my last point and it is very

10   silly to suggest that we or any of the plaintiff's counsel

11   would accept more documents from a source that it had shown to

12   have fabricated documents.  So, the implication that they can't

13   give us the information without going back to the people who

14   have the most information to answer the question because for

15   fear that we would then take more documents from them if it was

16   deemed or determined that they were fraudulent, is foolish.  We

17   just wouldn't do it.  It wouldn't make sense.

18           I think that's all, your Honor.  Thank you.

19           THE COURT:  Thank you.

20           As to this issue, the --

21           MR. NASSAR:  Your Honor, can I respond to a few

22   points?

23           THE COURT:  Briefly, hopefully.

24           MR. NASSAR:  Your Honor, again, we are not seeking to

25   strike the documents.  So much of what plaintiffs argue is,

G3M5terA

frankly, irrelevant.  There is a Long discussion about our

discovery applications.  Plaintiffs have already indicated that

they're intending on raising a motion to compel next month and

I will save a lot of our response to those issues for a later

date.  We don't have to convince plaintiffs that they are

forgeries at this point, we have to raise certain issues that

weigh against the authenticity of the documents.

Plaintiffs seem to think that we must make a full

showing at this juncture but that is not what we are mandated

to do.

Additionally, they brought up our discovery -- they

brought up the Pakistan audit and the irregularities at the

Pakistan office.  We have recently provided the plaintiffs well

over 90,000 pages of documents concerning the Pakistan office

and the irregularities that occurred there.  That audit had to

do with the Islamabad office and had nothing to do with the

Peshawar office so, frankly, plaintiff's citation to that audit

is not relevant to the matter at hand.

THE COURT:  How about the documents that Mr. Haefele

handed up today which seem to suggest that there was a Peshawar

office?

MR. NASSAR:  Well, the documents -- any IIRO document

that has the letterhead refers to brick and mortar.  I wrote

the operation IIRO head on business conducted there and they

are long standing and they still conduct certain projects in

G3M5terA

1   Peshawar, that has not ceased.  So, we have seen other

2   indications where folks have signed as the representative of

3   IIRO in the location, would sign IIRO with the location listed.

4   It is not indicative of a brick and mortar operation there.

5          I haven't looked closely at the documents he cited but

6   that's the initial response.

7          Additionally, we are prevented from conducting our own

8   investigation into the documents so it is well taken that

9   they're not going to try to get more documents from somebody

10  who has been shown to have produced forgeries.  But, if we are

11  precluded from conducting our own investigation and showing

12  that there are forgeries, it is a circular situation where we

13  are not able to show that.

14         Additionally, your Honor, this inquiry is not

15  premature.  The plaintiffs are already relying on the

16  documents.  You have already ordered that certain information

17  should be disclosed on both sides.  Plaintiffs state that we

18  have not produced documents subsequent to your order but that's

19  because they had already been produced previous to your order.

20  We ended up specifying the Bates ranges but the fact that there

21  were no additional documents in there that we had already

22  provided that information to plaintiffs is no indication that

23  we have not complied with the order.

24         Additionally, your Honor, I have been to every

25  location personally and have supervised an Arabic team of

G3M5terA

attorneys where these documents may have been located.  They

are not in our files.  I have been to Islamabad, have been to

Riyadh which oversaw operations, and Mecca.  In addition to

that, to hear plaintiffs speak about discovery noncompliance,

we have also led a team to the Philippines, to Indonesia,

Bosnia, Kosovo, Macedonia, as well as Albania.  Our efforts

will be well documented but they have been Herculean and we

have produced well over 300,000 payments in the last three

years so I'm not sure what the nexus is to this dispute at

hand.

        We need to know who the source is at bottom.  It is

well taken that plaintiffs counsel does not know a lot of the

information concerning where the documents came from or how

they ended up in somebody's files, but by them not disclosing

the name of the source of the documents they're tying our hands

and we are unable to find that information ourselves.

        We have also offered the plaintiffs that we would

review the name of the source attorney's eyes only and we would

not disclose that to our clients.  We have previously offered

this to plaintiffs in a meet and confer and they have not

accepted that offer.  So, that would mitigate a lot of the

fears of safety concerns I think.

        That's all.

        MR. HAEFELE:  Your Honor, very quickly.

        THE COURT:  Yes.

G3M5terA

1    MR. HAEFELE:  We are not stopping them from

2    investigating.  They can investigate if they want and I would

3    welcome the investigation but that still doesn't mean that they

4    have the obligation or the right or authority to invade

5    plaintiff's work product information which is the crux of what

6    they're asking for us revealing our information about our

7    consulting -- it doesn't obligate us to produce information

8    about our consultants.

9        In terms of who is tying whose hands they're tying our

10    hands by not producing the information we have asked for.

11        Quite frankly, your Honor, one of the things I do want

12    to emphasize if your Honor is going to address this, it has to

13    be in the context of considering our objections to their

14    requests as well as our concerns over their noncompliance with

15    the production of documents relative to this issue.  It was a

16    two-way street in terms of discovery regarding these documents

17    and we produced information and they have not.

18        Lastly, your Honor, I think that on his request for

19    attorney's eyes only access to who the source is, just the

20    source, I believe, is a little uncomfortable with us telling

21    the lawyers for the defendants who he is as well.

22        THE COURT:  Say that again.

23        MR. HAEFELE:  What I am saying is that it is my

24    understanding that the source -- it is not a very easy thing to

25    say, oh, Mr. So-and-so in Pakistan, we are going to tell the

G3M5terA

1   lawyers for the people who may hurt you or people related to

2   the people who may hurt you who you are.  But, don't worry,

3   that won't get around.

4          I just don't think it is going to be well taken.

5          MR. NASSAR:  Your Honor, many of --

6          THE COURT:  I have heard enough.

7          I am not unsympathetic to the notion that this whole

8   exercise may be somewhat wasteful but it seems to me most of

9   the waste on a going forward basis to the extent it occurs will

10  be on the defendant's side because they'll have the laboring

11  oar in terms of proving that this document or these documents

12  are forgeries, if indeed they are.

13         I don't disagree that it's a bad precedent, perhaps,

14  in the sense that we could start going document by document and

15  having squabbles about the authenticity of documents that may

16  never factor into dispositive motion practice or a trial but we

17  did start down that road with respect to this document and my

18  rulings with respect to it are not an indication of what I

19  think should happen with respect to any future such documents

20  that may arise on either side.

21         To the extent that there were points raised about the

22  MWL and IIRO production, that will presumably be the subject of

23  yet another motion to compel.  So, it seems to me that that,

24  with one exception I will get into, is unrelated.

25         My November 3rd order did not set a date for

G3M5terA

1    compliance and may have used some language that was more

2    generic or unspecific than it should have been.  For example,

3    my statement that, similarly, the plaintiffs will be obliged to

4    disclose information in their possession concerning the

5    providence of the documents and, as counsel pointed out, no

6    objections to this order back in November, were filed.

7         I am not insensitive to the concerns about the safety

8    of sources or the dismay that an intermediary source who is

9    functioning in some sort of investigative function may have but

10   I do think reasonable accommodations can be made.

11        I am going to require that on a date certain -- and

12   the two sides can confer on what that date should be and if

13   they are unable to agree I will set a date -- the defendants

14   MWL and IIRO must disclose the specific badges of fraud that

15   they say establish the falsity or the fraudulent nature of the

16   document and that if there are documents that support that

17   claim, even if they're just specimen documents, that those

18   documents be produced as well.  The defendants can set the

19   restriction that they proposed which is that everybody other

20   than the source can be given that list of reasons why the

21   defendants believe the document is forged.

22        As to the source, there really are two sources, the

23   investigator and the ultimate source of the document which

24   Mr. Haefele may not know but certainly is something that

25   potentially the plaintiffs can find out.

G3M5terA

1          As to the investigative source of the document, if I

2     can call it that, I am going to direct that that be produced

3     for attorney's eyes only.

4          As to the ultimate source, I am going to make the same

5     direction but I will permit the plaintiffs to make a

6     particularized showing to me, why don't I say within two weeks,

7     as to what danger that would present -- and I do mean

8     particularized.  And I would expect that all or virtually all

9     of that submission would be shared with counsel for the

10    defendants so that hopefully there won't be a document with

11    redaction that defense counsel receives.

12         If it turns out that the accusation regarding the

13    providence of the document being fraudulent -- let me rephrase

14    that because it is coming out wrong.

15         If it turns out that the accusation that the document

16    is false or forged eventually proves to be incorrect, I may

17    well or the Court may well award the costs associated with all

18    of this to the plaintiffs against the defendants.

19         Originally I was going to reserve decision as to

20    whether the defendants could have their own expert test this

21    document but since it appears not to be an original there is

22    nothing that can be done by way of testing at this point.  I

23    want the two sides to discuss where the original is and whether

24    it can be brought to the United States or perhaps is in the

25    United States in the hands of the investigator.  If so, I would

G3M5terA

1    permit the defendants to inspect the original but would not

2    require that it be surrendered for purposes of expert testing

3    without a further order of the Court.

4              So, those are my rulings with respect to this issue.

5    Any questions?

6              MR. HAEFELE:  Your Honor, I do have some questions.

7              I think your Honor touched on it, but with regard to

8    our particularized showing, based on what your Honor said I'm

9    assuming that though it is not favored, some of the submission

10   may be in camera?

11             THE COURT:  That's exactly right.  Yes.

12             MR. HAEFELE:  Okay.

13             THE COURT:  I'm not in favor of that or would hope

14   that that wouldn't come to pass but I am not ruling it out.

15             MR. HAEFELE:  And, your Honor, to the extent that the

16   defendants, with regard to their, the document discovery

17   responses that they've proposed to us related to these

18   documents, to the extent that they purely object based on

19   filing grounds, a lot of it was that they thought that we

20   should go first and not them.

21             THE COURT:  When you say discovery responses?

22             MR. HAEFELE:  Based on your Honor's ruling the

23   defendants served discovery on us and we served document

24   requests and interrogatories on them.  Some of the responses

25   the defendants responded to us was that much of it was you go

G3M5terA

1    first and in light of your Honor's ruling that it is not

2    necessarily that plaintiffs go first, to the extent that that's

3    what their objection was, may we have that discovery?

4         THE COURT:  Well, my ruling is I hadn't focused on

5    discovery that the two sides may have served on each other but,

6    in essence, my ruling is you all go together when you go so on

7    certain dates both sides are to respond and I do mean respond,

8    not file a series of objections.

9         Anything else?

10        MR. NASSAR:  Your Honor, two things.

11        THE COURT:  Let me finish with Mr. Haefele.

12        MR. HAEFELE:  To the extent there are discovery

13   requests on both sides, the date that we select would be both

14   sides would be responding?

15        THE COURT:  Yes.

16        MR. HAEFELE:  Okay.

17        THE COURT:  Yes, sir.

18        MR. NASSAR:  Your Honor, we have two outstanding

19   questions aside from the name of the source of the documents,

20   namely the date on which they received the documents as well as

21   other circumstances surrounding how they obtained the

22   documents.  We didn't -- if you could rule on those as well?

23        THE COURT:  I think that's what Mr. Haefele in part

24   was asking me about.  I think I did just rule.

25        MR. HAEFELE:  I was asking about their responses to

G3M5terA

1    us.

2              THE COURT:  Okay, but it is comprised within that

3    ruling, it seems to me.

4              MR. NASSAR:  Thank you, your Honor.

5              THE COURT:  And I guess that brings us to Wael

6    Jelaidain.

7              Let's take five minutes.

8              (Recess)

9              THE COURT:  On to Wael Jelaidain.

10             MR. CARTER:  Your Honor, thank you.  I will be as

11   brief as possible.  I understand we have all been here for a

12   long time and we have already covered quite a bit of territory

13   along the way with Mr. Jelaidain.

14             The motions before your Honor include both request for

15   sanctions and to compel further production of documents from

16   defendant Jelaidain.  They include banking and other documents

17   Jelaidain secured for the benefit of co-defendant Yassin

18   al-Kadi, documents relating to the Swiss government's

19   investigation of Jelaidain including materials relating to the

20   interview that was conducted of him in Riyadh, documents

21   relating to the Maryam Company at Faisal Finance, a joint bank

22   account he held with fellow executive order 11234 designate

23   Sharif Ayadi, documents relating to his ties to government

24   offices of the Kingdom of Saudi Arabia and its charities, and

25   finally documents relating to his corporate agent and Abrar

G3M5terA

1    Caravan, Euro Investment, KA Stan and Maryam Travel.

2            As your Honor knows, this Court issued sanctions

3    against Defendant Jelaidain in October of 2013.  After a

4    somewhat tortured procedural history the Court imposed those

5    sanctions based on the record that existed at that time that

6    demonstrated that Defendant Jelaidain had not taken to heart

7    this Court's directive that he engage in a full court's press

8    and make diligent efforts to secure such documents within his

9    custody and control.

10           The further discovery we have received at this point

11   paints a more problematic picture of the state of affairs, your

12   Honor.  In particular, documents produced by defendant al Kadi

13   reveal a 2003 meeting between Mr. Kadi's attorneys and

14   Mr. Jelaidain's attorney which Mr. Jelaidain promised to

15   provide assistance to Mr. Kadi in relation to the

16   investigations of him and, in particular, to authorize access

17   to corporate documents for Maryam as well as banking documents

18   for Jelaidain's personal accounts and for Maryam accounts at

19   Faisal Finance.

20           Thereafter, on July 18, 2003, Defendant Jelaidain

21   received a letter from Faisal Finance indicating it had started

22   retrieving the records.  So, what we now know, your Honor, is

23   at the time Defendant Jelaidain was indicating to this Court

24   that it was impossible for him to secure his records and his

25   banking records, he had in fact successfully done so for the

G3M5terA

1    benefit of defendant al Kadi.

2           And so, that paints a much different picture of the

3    state of affairs when this Court issued its original sanctions

4    order and we think the misrepresentation warrants the

5    imposition of additional sanctions to ensure that we don't

6    continue to encounter this kind of conduct.  So, that's the

7    first component.

8           Your Honor, obviously we want the documents as well

9    that he secured for Mr. al Kadi as described in those materials

10   as well as documents relating to the Swiss government's

11   interrogation of him on May 3rd, 2004.  At the time that

12   occurred Mr. Jelaidain was a defendant in this litigation

13   represented by counsel and he obviously had an obligation to

14   retain records relating to that interrogation and his

15   associated engagements with the Swiss authorities.  We have

16   never received those materials and so we think Mr. Jelaidain

17   should be directed to provide all of those as well.

18          We have also already discovered some additional bank

19   accounts that we did not know of during the earlier proceedings

20   and so we don't know whether any effort has been undertaken

21   with respect to these additional bank accounts, they include an

22   Istanbul-based bank account for Jelaidain individually and also

23   an account for Maryam company.  In addition, some U.S.

24   diplomatic cables disclose an account Jelaidain held jointly

25   with Shafiq Ayadi in Croatia at Privedna Banka, Zagreb.

G3M5terA

1          So, your Honor, we ask for a directive that

2     Mr. Jelaidain undertake efforts to secure records from those

3     institutions as well.

4          We also have a bit of a fuller picture now of the

5     range of business activities that Mr. Jelaidain has and has

6     engaged in.  He is a very active businessman in addition to the

7     charitable associated activities that were the subject of much

8     of our earlier discussion.  Those business activities also

9     generally involve interactions with other designated parties

10    and al Qaeda affiliated parties.  Mr. Maloney is going to step

11    up in a minute to describe one of those and describe whether it

12    is relevant and why we are asking for discovery on these issues

13    but generally, as I said, all of these companies we have

14    identified in our papers, Abrar Caravan, Euro Investment, KA

15    Stan and Maryam Travel are entities that Jelaidain had

16    leadership position in.  In many cases, documents were being

17    sent to a common address he used for multiple of his businesses

18    suggesting that he clearly had possession of these materials.

19    And, lastly, any documents relating to his long history of work

20    on behalf of government agencies of the Kingdom of Saudi Arabia

21    and in particular its charities which he directed.

22          Basically, what we have heard in response to this

23    issue, your Honor, is the same thing we have heard before.  I

24    am under house arrest which does not really hold water.  We

25    have comments in the news in the kingdom from his own

G3M5terA

Saudi-based lawyer years ago indicating that he was operating

without restriction in conducting business and we have news

accounts much later in 2008 indicating that he was a featured

speaker at a charitable conference hosted by defendant WAMY.

So, every indication is that he is free to operate in

the kingdom and not subject to nip house arrest.

We have also heard this claim that all of his records

were sequestered and seized by the Swiss authorities.  The

document that's been cited relates to a single Citibank Geneva

account.  It doesn't require the sequestration of all of his

bank accounts.  There are literally dozens, some of them are

outside of the province of Switzerland anyway.

So, the explanations we have heard at this point

really don't stand.  We are sort of approaching the end of the

road.

With that, your Honor, I would like to briefly turn it

over to Mr. Maloney.

THE COURT:  Before you do that, your letter clearly

says and you repeat it today that you are not seeking a default

judgment but some other form of sanction or course of sanction.

What did you have in mind?

MR. CARTER:  Well, your Honor, I think what we had in

mind is if the court were agreeable to imposing the sanction we

would make application as we did in the past.  I think, in all

candor, it is unlikely to be a direct relationship to

G3M5terA

1    attorney's time spent on further efforts to bring Defendant

2    Jelaidain into compliance but rather to have an element

3    intended to deter this kind of conduct going forward.

4            There is also the issue, obviously, your Honor, that

5    there is already the existing sanction order against Defendant

6    Jelaidain which hasn't been made as of yet.

7            THE COURT:  Thank you.

8            MR. CARTER:  Thank you, Mr. Maloney has a few words.

9            MR. MALONEY:  Good afternoon, your Honor.  I am going

10   to be very, very brief.  It has been a long day.

11           One of the things I want to talk about is

12   Mr. McMahon's response to our motion and in it, if you read it,

13   he talks a lot about the Swiss authorities and the seizure of

14   records.  What he doesn't mention at all anywhere in there that

15   I saw was this company called Maryam that Mr. Carter referred

16   to that is in our papers both in our motion and in our reply

17   papers and that's because Maryam is in Turkey.  The Swiss have

18   nothing to do with it and no control over it.  So, in his

19   opposition he talks about the Swiss investigation and says

20   nothing about what is going on with Maryam and Turkey.  That

21   company was shut down in 2002 or 2003 but I want to give you a

22   snippet of why that company is important to us and why we ask

23   for the information and I will try to do it in two minutes.

24           THE COURT:  Sure.

25           MR. MALONEY:  That company, it is called Maryam

G3M5terA

Travel, sometimes Maryam Import/Export located in Turkey, as I
indicated.  It was founded by Mr. Salim, that's Mohammed Salim,
who was a senior al Qaeda member and very close to Bin Laden.
He was a suspect in the '98 embassy bombings, later arrested in
Germany and extradited to the United States where he stabbed a
prison guard in the eye and received a life sentence for that.
So, that's the founder of the company.

In '96 and '97 he sold the company to Mr. Jelaidain
and Mr. Jelaidain ran the company.  Salim stayed active in the
company for some period of time with another gentleman by the
name of Al Jazeed and Mr. Kadi then started funneling money to
the company Maryam in Turkey, allegedly so Maryam could build
some housing for the University in Yemen.  That university is a
university, it is a known educator for Jihad, the students
there later become Jihaddist.  Bin Laden referred to it in
support of the school.

There was over, I think, a million and change that we
found documentation on money transfer from Kadi to Maryam, i.e.
Jelaidain, that disappeared.  Most of that money disappeared.
We have some of that information, some of those records.  We
have asked for all of the records related to Maryam, the
business corporate records, financial records, anything to do
with Maryam as well as, of course, Mr. Jelaidain and the others
and the other intersects because there is a lot of especially
designated global terrorists associated with that company

1   meaning Mr. Kadi and Mr. Jelaidain.  We have received nothing.

2          Mr. McMahon doesn't even mention that company in his

3   opposition and doesn't say why he has not responded to those

4   specific and pointed document demands.

5          And just to quote Judge Casey and Mr. Haefele, it is

6   another kabuki dance that we have gotten year in and year out

7   from Mr. Jelaidain and Mr. McMahon.

8          THE COURT:  Thank you.

9          Mr. McMahon?

10          MR. McMAHON:  Yes.  Good afternoon, your Honor.  I

11   know it has been a long day for you and for all of us.  I will

12   try to be brief.

13          I would like to address maybe initially the Swiss

14   money situation.  We believe there was a valid argument about

15   sequestration because we had never been alerted to the fact

16   that we had appeal rights and we only recently were privy to

17   that information.  But, in terms of this Swiss bank account --

18          THE COURT:  Wait.  You have lost me.  An appeal right

19   in Switzerland?

20          MR. McMAHON:  You are supposed to be notified by the

21   bank that has received the sequestration order from the

22   government that, indeed, you, Mr. Jelaidain, have a right to

23   appeal this order.  We never got any notification from the

24   Swiss bank that we had a right to appeal that sequestration

25   order and that's in our papers, your Honor.  Had we been told

1   about that he could have hired Swiss counsel and had done an

2   appropriate appeal but I do think the sequestration issue is

3   different than the one that the expert focused on, Professor

4   Jaruli, he did not get into sequestration.  I think

5   sequestration poses a different issue in terms of someone's

6   ability to produce documents.

7          But, your Honor, I would like to come up with maybe

8   some sort of solution here instead of wasting your time and the

9   case has been going on for years, of course.

10          Could we perhaps draft, myself and plaintiff's

11   counsel, an order that you would be willing to sign which goes

12   to Citibank, the Swiss authorities, Bank Faisal and any other

13   banks they want in Switzerland and we authorize you produce

14   everything you have with respect to Wael Jelaidain and this new

15   entity Maryam which I guess was shut down in 2002?

16          We are not adverse, your Honor, to full disclosure of

17   anything that is in the Swiss bank accounts or Swiss financial

18   records, Swiss authorities.  We would like to get this all out.

19   We have been unable to do so.

20          When they talk about house arrest, your Honor, you can

21   be under house arrest and still receive permission to give a

22   speech, for example, at a function, or to attend your

23   daughter's wedding.  I don't know if he is wearing an ankle

24   bracelet but your Honor knows lots of times situations come up

25   with a potential criminal matter has to have access to some

G3M5terA

sort of medical treatment or whatever.  There are a number of
reasons why house arrest doesn't mean that you are totally
confined to the house.

Now, with respect to some of the new allegations that
I hear, let's talk about Turkey.

Again, your Honor, I checked before today and I
received no update in terms of we do have some information now
and so I have nothing to provide you, your Honor, in that
regard.  I know you are not a fisher of that.  My question is
can we craft a civil order with respect to any and all banks,
companies like Maryam, in Turkey, and if you are willing to
sign it then we send it and maybe then they will listen to a
court order in terms of producing things?

And we have no problem, your Honor, about full
disclosure.  Anything the plaintiffs want to request consistent
with their Rule 34 request, obviously, we would have no problem
with drafting, co-drafting an order to that effect.  We want to
get this behind us.  No one seems to believe, your Honor, that
even though counsel overseas has tried to secure those records
he couldn't.  And now we know why.  There was a sequestration
order in effect and basically everything was waiting for Wael
Jelaidain to be basically extradited to America.  And
consistent with my prior arguments, your Honor --

THE COURT:  Hang on.

One thing that counsel said was that the sequestration

G3M5terA

1    order only dealt with one Citibank account in Switzerland.

2            MR. McMAHON:  I don't think I read it that way, your

3    Honor, but I will go back and look at it, but my point is even

4    if there is no sequestration order, the attempts on Counsel

5    Bali, and he has sent letters to your Honor that we have

6    attached to our letter and he has tried to get, OFAC will slam

7    you for aiding and abetting an international terrorist and at

8    the time this all played out my guy was designated both by the

9    U.N. and by America, especially designated global terrorist.

10   Banks don't want to do business with someone like that because

11   they'll get into trouble but my point is, your Honor, I am

12   trying to come up with some solution so that you can be fairly

13   convinced that we have nothing to hide, we have an inability to

14   get records that the plaintiffs say they want, okay, let's

15   draft up an order that you are willing to sign, send the order

16   to the appropriate Swiss authorities whether it is Citibank,

17   Swiss authorities or Faisal, I don't care, and let's see if we

18   can bring this to a close, your Honor, because we are wasting

19   too much time on it.

20           In terms of further sanctions, I don't think it is

21   appropriate at this time for the Court to consider that unless

22   you are content that despite our diligent efforts we are sort

23   of hiding documents.

24           But, to the extent I authorize -- and I went through

25   this with counsel and the client -- let's send an order over

1    that you are signing which says produce all of this stuff and

2    give plaintiffs every document they want.

3             THE COURT:  Thank you.

4             Anything further, Mr. Carter?

5             MR. CARTER:  Your Honor, a couple of quick points.

6             The sequestration order that's attached to Jelaidain's

7    opposition papers refers to just a single account at Citibank,

8    that's pretty clear.

9             Second of all, your Honor, with regard to this idea

10   about drafting an order to send out to international

11   authorities.  We were down this road many, many years ago and I

12   think we said if Mr. McMahon and Mr. Jelaidain want to draft

13   letters interrogatory for your Honor's consideration and try

14   and fulfill their obligations that way, they can.  It is not

15   our responsibility to do that.  And that ship was in port and

16   sailed away quite a long time ago.

17            Lastly, with regard to the sanctions request, again,

18   it is based on the evidence that now exists that Mr. Jelaidain

19   affirmatively secured and was able to obtain copies of his

20   records and that's a different record than was before the Court

21   previously.

22            Thank you, your Honor.

23            MR. McMAHON:  Your Honor, on that last point again

24   Abdullah Kadi and his attorney got those records, we never got

25   those records until they were produced as of, I think last year

G3M5terA

1    by Abdullah Kadi's counsel.  Our guy never had those records,

2    it was Kadi's counsel -- sorry, Abdullah Kadi's counsel and his

3    aggressive law firm in London that was able to achieve, working

4    with a Swiss attorney, to achieve the production of these

5    documents.  Keep in mind, your Honor, that this is a man who is

6    no longer designated as a specially global designated terrorist

7    like Wael Jelaidain.  Again, a bank doesn't have a problem

8    dealing with somebody who has been delisted because that is

9    proof positive he is not a global terrorist.  We have the

10   lingering problem that we have been both designated by the U.N.

11   and America as a global terrorist and that's always been the

12   brunt of our problems, your Honor.

13            And to the extent there are new issues that they've

14   brought up, I heard some new allegations about links to this,

15   links to that.  Again, I would ask your Honor to consider I

16   haven't seen any factual linkage in terms of how Wael Jelaidain

17   assisted in destroying the U.S. S Cole or blowing up the first

18   World Trade Center or the embassy bombings.  I haven't seen

19   anything, your Honor.  It is just premised on newspaper

20   clippings and reliance on documents like the golden chain which

21   has been, you know, disregarded by these four or five federal

22   judges.

23            That's it for me, your Honor.  I know you have had a

24   long day.  Thanks for hearing me out.

25            MR. CARTER:  Your Honor, I am not going to address

G3M5terA

much of that.  I would just say that Defendant Kadi's very

aggressive attorneys obtained the documents because Jelaidain

assisted them and authorized them to get them.  So, attorneys

working with Defendant Jelaidain's assistance could get the

documents.

       Thank you, your Honor.

       THE COURT:  Well, I read the papers related to

Mr. Jelaidain and much of the written paperwork, perhaps more

so than the argument today, constitutes an attempt to

relitigate my prior award of sanctions and is a road I am not

going to go down.

       The letters that were appended are in French, they

aren't translated, and there is the conclusory, unsworn letter

from Mr. Alim, Jelaidain's Saudi counsel, indicating what the

letters purport to say.  But, again, that's much of the same in

terms of what was before the Court previously at the time that

the motion was before me.

       It seems to me the salient fact that Mr. Carter

detailed whether Mr. Kadi was de-designated or never

designated, with the assistance of Mr. Jelaidain he was able to

secure documents that relate to a personal Faisal finance

account of Wael Jelaidain in 2003 and there is no apparent

reason why Mr. Jelaidain, with Mr. Baseem's assistance could

not do the same with respect to the discovery requests here.

And, at times I have issued orders relating to financial

G3M5terA

1    documents overseas including in the Middle East -- not in this

2    case but in cases involving at least Egypt and talk about

3    kabuki dances?  That's a kabuki dance.

4           So, I will sign whatever orders, Mr. McMahon, you wish

5    me to sign, although the Hague Convention would be a much

6    better way to go assuming that any of the countries we are

7    talking about are signatories and haven't opted out of any of

8    the provisions but again, the key point is as I found

9    originally, there was inadequate effort to secure documents and

10   proof with respect to Mr. Kadi seems to simply underscore that.

11          I will order again, although it is really not

12   different from my prior orders, that Mr. Jelaidain produce the

13   documents with the sole exception of the so-called golden chain

14   documents.  And I will permit the plaintiffs to make a motion

15   for sanctions that they wish to make.

16          In a number of instances today I have suggested

17   actions that need to be taken but haven't set specific

18   schedules for most of those and I trust that two sides will

19   confer quickly and submit a proposed scheduling order to me.

20          Is there anything else that we ought to take up today?

21          Yes?

22          MR. KREINDLER:  Your Honor, I mentioned if we could

23   have two minutes on the Iran situation?

24          THE COURT:  Yes.  Sure.

25          MR. KREINDLER:  Thanks.