UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____
                                                    )       Civil Action No. 03 MDL 1570 (GBD) (SN)
IN RE:  TERRORIST ATTACKS ON            )       ECF Case
SEPTEMBER 11, 2001                             )
                                                    )
_____)

This document relates to:

*Ashton, et al. v. Kingdom of Saudi Arabia*, No. 17-cv-02003
*Ashton, et al. v. al Qaeda, et al.,* No. 02-cv-6977

**ATTORNEY AFFIDAVIT IN OPPOSITION TO THE MOTIONS TO DISMISS OF THE
KINGDOM OF SAUDI ARABIA AND THE SAUDI HIGH COMMISSION**

STATE OF NEW YORK       )
                                       ) ss.:
COUNTY OF NEW YORK   )

        James P. Kreindler and Steven R. Pounian, being duly sworn depose and say:

        1.        The undersigned counsel for the *Ashton* plaintiffs respectfully submit this

affidavit pursuant to the Federal Rules of Civil Procedure, including Rules 12 and 56, and the

Justice Against Sponsors of Terrorism Act ("JASTA"), in opposition to the motion to dismiss

filed by the Kingdom of Saudi Arabia ("KSA") and the Saudi High Commission ("SHC") and in

support of the *Ashton* plaintiffs' request for jurisdictional discovery.

        2.        This affidavit sets forth key source documents and information for the allegations

made in the *Ashton* plaintiffs' complaint and shows that before this Court may consider the

factual challenge in KSA's motion to dismiss, plaintiffs must be allowed to conduct Court

supervised discovery relevant to the issue of subject matter jurisdiction under the JASTA as set

forth herein, including discovery of the KSA, other defendants named in this litigation and third

parties, including the United States.

3.      As set forth in detail below, discovery is necessary to provide additional evidentiary proof of the jurisdictional facts set forth herein about the knowledge of and material support provided by the KSA's employees, agents and officials to al Qaeda and its 9/11 hijackers.

4.      Following a reasonable period for such discovery, this Court should schedule an evidentiary hearing/trial to decide the issue of subject matter jurisdiction.

## Saudi government participants in the al Qaeda cell which supported the 9/11 terrorists in California

5.      Plaintiffs are entitled to discovery to establish the facts set forth in their complaint that an al Qaeda terrorist support cell inside the Saudi government provided knowing assistance to 9/11 hijackers Nawaf al Hazmi (Hazmi) and Khalid al Mihdhar (Mihdhar) which facilitated the 9/11 attacks.  The responsible Saudi officials are:

- Saudi diplomat Fahad al Thumairy (Thumairy), who was also an Imam at the Saudi government funded King Fahad Mosque in Los Angeles;

- Saudi intelligence officer Omar Bayoumi ("Bayoumi"); and

- One or more senior KSA official(s) who (as the FBI found) "tasked" Thumairy and Bayoumi to provide assistance to hijackers Hazmi and Mihdhar.

6.      Attached as Exhibit 1 is the Declaration of Stephen K. Moore, the FBI Special Agent who in 2001-03 was in charge of the Los Angeles PENTTBOM task force team responsible for the official investigation of the 9/11 attacks.  The FBI task force investigated the facts regarding the considerable support provided by Saudi government officials in California to 9/11 hijackers Hazmi and Mihdhar.

7.      Retired Special Agent Moore confirms that based on their investigation, he and his team concluded that:

2

- Saudi government diplomatic and intelligence personnel knowingly provided material support to the two 9/11 hijackers and facilitated the 9/11 plot. *Id.* at 2.

- Saudi diplomat Thumairy and Saudi officer Bayoumi were active participants in a terror cell associated with al Qaeda that provided substantial financial and logistical support to the terrorists. *Id.* at 2.

- Saudi diplomat Thumairy knew that Hazmi and Mihdhar were al Qaeda terrorists on a mission in the United States involving aircraft. *Id.* at 3.

- Bayoumi was a Saudi intelligence officer. *Id.* at 2, 5.

- Thumairy was directed by a superior to assist Hazmi and Mihdhar. *Id.* at 5.

- Without the help furnished by Thumairy and Bayoumi, the two 9/11 hijackers would have had "zero chance of success." *Id.* at 3.

The Los Angeles task force investigators wanted to question Thumairy regarding his employment and directions he received from superiors at the Consulate, Saudi Embassy and the Ministry of Islamic Affairs. *Id.* at 5. They never got that chance. Thumairy left the United States in February 2003 and was denied reentry in May 2003 "based on a determination by the State Department that he might be connected with terrorist activity." 9/11 Report at 217. At the time that the KSA officers provided material support to al Qaeda, that organization had been designated as a Foreign Terrorist Organization ("FTO") by the U.S. Department of State. Ex. 7.

8.     Attached as Ex. 2 is an FBI Report of Oct 5, 2012, first publicly released in 2016, which shows that the FBI's 9/11 investigation is still ongoing and confirms that:

- Saudi diplomat Thumairy and Saudi officer Bayoumi provided "substantial assistance to 9/11 hijackers [Hazmi and Mihdhar] during their time in California". *Id.* at 3.

- When Hazmi and Mihdhar "first arrived in the United States…Al-Thumairy immediately assigned an individual to take care of them during their time in the Los Angeles area." *Id.* at 4.

- Thumairy and Bayoumi "provided (or directed others to provide) the hijackers with assistance in daily activities, including procuring living quarters, financial

assistance, and assistance in obtaining flying lessons and driver's licenses." *Id.* at 4.

- At the time he was assisting the hijackers, Bayoumi "was living in San Diego on a student visa, despite not attending classes, and receiving a salary from the Kingdom of Saudi Arabia for job duties he never performed." *Id.* at 4.

- More senior Saudi government official(s) were involved in assisting Hazmi and Mihdhar: "[t]here is evidence that [redacted] and tasked al-Thumairy and al-Bayoumi with assisting the hijackers." *Id.* at 4.

9.      While being interviewed in Saudi Arabia alongside Saudi intelligence agents,

Bayoumi and Thumairy repeatedly lied to 9/11 Commission investigators regarding the key facts

relating to their involvement in the 9/11 plot, including (but not limited to) the following:

- At his interview, Thumairy denied knowing Bayoumi, Ex. 3 at 6, 12, but another witness stated that they had met in person several times, Ex. 4 at 8, and the FBI found that they exchanged numerous calls to both their business and personal phones and worked together to assist the hijackers. Ex. 1 at 2-5; Ex. 2 at 4.

- Thumairy denied renting more than one apartment at the Avalon Westside in Los Angeles, Ex. 3 at 6 but he had an extensive rental history in that complex, Ex. 5 at 7 and arranged for the hijackers to stay there after their arrival on January 15, 2000.  Ex. 1 at 3.

- At his interview, Bayoumi said he had only a random several minute encounter with Hazmi and Mihdhar at a Los Angeles restaurant, Ex. 6 at 4, but it was a pre-planned meeting at Thumairy's direction, and Bayoumi had lunch with the hijackers and had conversations about various topics.  Ex. 1 at 3-4; Ex. 5 at 2-3.

- Bayoumi denied knowing where the hijackers stayed following their arrival in San Diego, Ex. 6 at 4, but it was Bayoumi who arranged an apartment for Hazmi and Mihdhar at the same Parkwood Apartments in San Diego where Bayoumi himself lived (the hijackers rented unit #150, next door to Bayoumi in #152), and Bayoumi filled out their rental application form, wrote that he was a "friend" of the hijackers, used his own credit history to secure their lease and signed a personal guarantee for their rental.  Ex. 8 at 5, 23, 42.  In addition, Bayoumi wrote in the application that the two hijackers had been living with him in apartment #152 from the date of their arrival on January 15, 2000 through February 4, 2000, the date of the rental application.  9/11 Report at 516 n. 24.  Bayoumi told the FBI that the hijackers were the only people he had ever helped in renting an apartment. Ex. 9 at 5.

- Bayoumi claimed that he rarely saw the hijackers, Ex. 6 at 5, but other witnesses stated that Bayoumi and the hijackers were together frequently, Ex. 10 at 3 and that Bayoumi allowed the hijackers to regularly use Bayoumi's cell phone to make and receive calls, 9/11 Report at 516 n. 26.

- Bayoumi "firmly denied" that he never asked Mohdar Abdullah to help the hijackers, Ex. 6 at 7, but Mohdar told authorities that Bayoumi asked him to assist the hijackers and help them acclimate to the United States and Mohdar provided them with transportation and cover, and helped them to obtain identification, learn English and attend flight school.  Ex. 2 at 3; Ex. 11 at 3.

- Bayoumi "denied having any relationship at all with" Osama Basnan ("Basnan"), Ex. 6 at 8, but an FBI source confirmed that Bayoumi and Basnan were the "closest of friends" and that "[p]hone records reveal roughly 700 calls between various phones subscribed to by Bayoumi and Basnan over a one-year period (even discounting some of the calls in view of the friendship between their wives, the calls between their cell phones are most likely between the two men)." Ex. 12 at 2.  Moreover, Basnan lived across the street from the apartment building where Bayoumi, Hazmi and Mihdhar lived and met the two hijackers "through al-Bayoumi."  Ex. 13 at 17.  Basnan's "close friend," a commercial pilot and flight instructor named Khalid al Kayed, was contacted by the hijackers about "learning to fly Boeing jet aircraft."  *Id.* at 18.

10.    After 9/11, U.S. investigators from the U.S. Treasury and Justice Departments sought information from the KSA regarding Bayoumi's employment and on January 21, 2002 held a meeting in Saudi Arabia with members of the KSA's Civil Aviation Presidency, which is part of the KSA's Ministry of Defense under Prince Sultan.  Following that meeting, the KSA provided the U.S. investigators with a "Record Report" which included a series of answers to the "US Team Questions Regarding Employee Omar Bayoumi."  The Report was signed by three men, including "Alb Carly," who the document stated was a representative of the "Dallah Avco Company." Ex. 14 at 3-4.

11.    The KSA Report told the U.S. investigators that Bayoumi had "worked for 17 years as a Civil Servant until mid-1995 then he was seconded to Dallah Avco company."  *Id.* The Report also stated that in 1995 Bayoumi

5

was on vacation in the United States and he decided to continue his higher education. Accordingly, he was seconded by the Civil Aviation Presidency to Dallah Avco company.

*Id.* at 3.

12.     In addition, the Report indicates that U.S. investigators were led by the KSA to believe that Bayoumi's education was paid by Dallah Avco, as the investigators asked: "Since [Bayoumi's] education was supported by Dallah company, does he have any obligations towards the company after finishing his studies?" *Id.* at 4.  In addition, the U.S. investigators asked "What is the method of financial support [Bayoumi] received from the company?"  The KSA's answer was that

> The payroll system of Dallah company was explained.  He was given his basic salary, housing and transportation allowances on a monthly basis.  This is in addition to other added bonuses….

*Id.* at 4.

13.     On February 4, 2002, the Chairman of Dallah Avco wrote to the KSA's Civil Aviation Presidency regarding the Record Report regarding Bayoumi, and stated that "we would like to point out some inaccurate data in the report."  Ex. 14 at 7-8.  He set forth those inaccuracies as follows:

- Bayoumi was never a Dallah Avco employee but worked for the KSA and that: "[t]his issue should have been explained to the US side so that there is no confusion."  *Id.*

- The KSA failed to tell the U.S. investigators that the KSA sent Bayoumi to the United States, not Dallah Avco.  *Id.*

- The KSA did not advise the investigators that the cost of Bayoumi's studies and stay in the United States were paid by the KSA, not Dallah Avco.  *Id.*

- In response to questions about financial support from the "company," the KSA should have told the investigators that all of the amounts paid to Bayoumi came from the KSA and that Dallah Avco provided "no independent financial support" to Bayoumi.  *Id.*

- Alb Carly signed the Report as a "Dallah Avco" representative, but in fact Carly was employed by the KSA. *Id.*

14.      An employee of the private contractor described the "ghost employee" arrangement whereby Bayoumi was employed by the KSA but received his KSA salary, benefits and "other allowances" via the contractor.  9/11 Report at 515 n.18.  Bayoumi held this ghost position from 1995-2001, and the KSA contractor told the FBI that they saw Bayoumi only once. When the contractor protested to the KSA, it was told it had to continue paying Bayoumi to retain its contract.  Prior to 9/11, the employer attributed this to "Saudi corruption."  Ex. 13 at 14. In April 2000, Bayoumi was awarded a promotion, salary increase and additional "other allowances."   Bayoumi's "other allowances" increased from $465 to $3,925, and continued at this or close to this rate until September 2001. 9/11 Report at 515 n.18.

15.      Bayoumi's superior at the KSA was Mohamed al Salmi, the Director General of Airways Engineering at the Presidency of Civil Aviation, KSA Ministry of Defense.  In 1995, Mohamed al Salmi first approved Bayoumi's employment and subsequently approved Bayoumi's pay increases, including those in April 2000. Ex. 14 at 9-10.  In August 2000, shortly after Bayoumi returned from a trip to Saudi Arabia, Ex. 15 at 2 n.192, Mohamed al Salmi's nephew Yazeed al Salmi arrived in San Diego.  Bayoumi found the al Salmi nephew accommodation with the hijacker Hazmi.  Mohamed al Salmi's nephew gave Hazmi at least $1,900 in traveler's checks and he had advance knowledge of the attacks. 9/11 Report at 222, 249, 518 n.41.

16.      Anwar Aulaqi a/k/a Awlaki ("Aulaqi") was the imam at two mosques that various hijackers visited, one in San Diego, CA and the other in Falls Church, VA.  On Feb 4, 2000, the day Bayoumi welcomed the hijackers to San Diego, there were four calls between Bayoumi's

phone and Aulaqi's phone. 9/11 Report at 517 n.33.  Bayoumi and Aulaqi had a relationship that pre-dated and post-dated February 2000, and Bayoumi stated that they "discussed religious matters…."  Ex. 6 at 6.  In December 2000, just after the hijackers left San Diego, Bayoumi spoke on the phone with Aulaqi, who was then in Falls Church. Ex. 16.

17.       The hijackers visited Aulaqi's mosque in San Diego on numerous occasions. 9/11 Report at 221.  In 2001, Hazmi and hijacker Hani Hanjour visited Aulaqi's Falls Church mosque, where they met an associate of Aulaqi who helped them acquire housing and identification. 9/11 Report at 223.  In July 2010, Aulaqi was named by the U.S. Treasury Department as a Specially Designated Global Terrorist ("SDG Terrorist) under Executive Order 13224.  Ex. 17 at 1.  In September 2011, Aulaqi was killed by a CIA drone strike in Yemen. Ex. 18 at 1.

18.       The 2012 FBI Report does not divulge the name(s) of the person(s) who "tasked [Thumairy and Bayoumi] with assisting the hijackers."  An FBI report states that Omar Benomrane, observed Thumairy being told by someone at the Saudi Consulate in Los Angeles to provide help to the two Saudis.  Ex. 19 at 2.  There is no indication that Thumairy was never questioned by authorities regarding the person(s) who "tasked" them with assisting the hijackers. Ex. 3.

19.       Plaintiffs are entitled to pursue discovery of the KSA regarding the persons who supervised and directed Thumairy and Bayoumi; the scope of their employment; and, the instructions that they were given.  Plaintiffs have identified four persons who were Thumairy's superiors at the KSA's Ministry of Islamic Affairs or the Cultural Mission in the United States: Musaed al-Jarrah, Majid Ghesheyan, Mazyed I. Mazyed and Khalid Sowailem ("Sowailem"). Ex. 20 at 2, 4; Ex. 21 at 2; Ex. 22 at 5.

20.     Of particular interest is Sowailem, who acted from 1995 through 2003 as the "Head of the Office of Da'awa in the United States" for the Saudi Ministry of Islamic Affairs at the Saudi Embassy in Washington, D.C.  Ex. 23 at 2; Ex. 24 at 4.

21.     Bayoumi called Saudi government establishments in the United States, including the Saudi Embassy and Cultural Mission in Washington, D.C. and the Saudi Consulate in Los Angeles, a total of almost 100 times between January and May 2000. Ex. 13 at 14.  According to his phone records, Bayoumi made 30 calls to Sowailem's phone number ("202-342-3700") at the Saudi Embassy in Washington, D.C. between January 19, 2000 and March 24, 2000.  Ex. 25 at 6. This was the same period in which Thumairy and Bayoumi were providing substantial assistance to the two al Qaeda hijackers.  *See* ¶¶ 7-9, *supra*.

22.     Sowailem was posted by Saudi Arabia to its Embassy as a diplomatic "Attaché" from at least 1995 through the summer of 2003 but no longer remained in that post as of the winter of 2004.  Ex. 26 at 4.   Sowailem's departure from the United States occurred during a period in the second half of 2003 and early 2004 when the U.S. Department of State revoked the diplomatic status of about 70 Saudi diplomats.  A senior U.S. law enforcement official was quoted as saying that the revocations of Saudi diplomatic credentials were part of "an ongoing effort to protect the homeland."  Ex. 27 at 1.  The State Department reported that the Saudi diplomats "did not appear to be engaged full time in the conduct of diplomatic duties within the Saudi Embassy" and were "no longer performing the duties for which they were originally accredited" and "must depart the country."  Ex. 28 at 1.  A lawyer who contacted the KSA Embassy in July 2004 was advised that the office formerly headed by Sowailem had been closed approximately one year earlier.  Ex. 29 at 10 n.4.

23.        Plaintiffs are also entitled to pursue discovery of the KSA regarding its

relationship and payments to Basnan in 1998-2001, and his ties to Bayoumi and the hijackers.  In

February 1999, shortly after Basnan and his wife moved to San Diego, Basnan's wife began to

receive checks for $2,000 per month from an account controlled by Princess Haifa ("Haifa"), the

wife of the KSA's Ambassador to the United States, Prince Bandar ("Bandar").  The checks

were sent pursuant to a "standing order" on the account and continued through March 2002, for a

total of $74,000.  Ex. 13 at 18.  In addition, in January 1998, the KSA's Bandar sent Basnan's

wife a check for $10,000 and in May 1998 Bandar sent Basnan himself a check for $15,000.  *Id.*

During the same week, Yasin Kadi (later named by the U.S. as an SDG Terrorist, Ex. 30 at 2),

sent a wire transfer of $25,000 from his Swiss bank account to Prince Bandar's chief of staff,

who deposited it into the Mosaic Foundation account controlled by Haifa.  Ex. 31 at 2, 4, 6-7, 8.

24.        In addition, the FBI reports show that Basnan had a long history as "an extremist

and supporter of Usama Bin Laden."  Ex.13 at 8.  In 1992, while working at the KSA Embassy

in Washington, D.C., Basnan held an event to honor Omar Abdul Rahman, the "Blind Sheikh,"

an al Qaeda supporter later convicted for his role in masterminding a 1993 foiled terrorist attack

against various New York City landmarks.  *Id.* at 19.  That same year the FBI and the State

Department searched Basnan's car and found jihadist and al Qaeda related material.  Ex. 71 at 9-

10.  Basnan further claimed that he knew and regularly spoke with members of Bin Laden's

family in Saudi Arabia and the United States, Ex. 13 at 19, and in September 2000, he or an

associate had phone and email contacts with Ramzi Binalshibh, a member of al Qaeda's

Hamburg cell.  Ex. 12 at 4.

25.        Zacharias Moussaoui was an al Qaeda terrorist who worked directly for Osama

Bin Laden from 1998-2000 in Afghanistan and is currently serving a life sentence in U.S. prison

after being convicted of terrorism charges for the 9/11 attacks.  Moussaoui provided a statement in October 2014 to the plaintiffs in which he explained how he maintained a database of al Qaeda's financial operations, including a list of donors.  Ex. 32 at 10-11.  He stated that two of the direct contributors to al Qaeda were Prince Bandar and his wife Princess Haifa.  *Id.* at 12.

26.     The December 2002 Congressional Joint Inquiry Report, under a section titled "Phone Numbers Linking Abu Zubaida to a Company in the United States and a Saudi Diplomat in Washington," states that the phone book of senior al Qaeda leader Abu Zubaydah recovered by coalition forces contained several phone numbers affiliated with the KSA's Prince Bandar, including: the unlisted number for ASPCOL, N.V. (a Curacao limited liability company, Ex. 33), which managed Bandar's home in Colorado, and numbers for Bandar's bodyguard and another person associated with Bandar.  Ex. 13 at 9-10, 20.

27.     Exhibit 34 is the declaration of James Crum filed on August 5, 2004 in *Crum v. The Kingdom of Saudi Arabia*, Civ. No. 03CV2338 (D.D.C.), in which he states that he worked for the KSA Embassy as a driver from 1986 until August 2002; that he was fired by the Embassy for placing American flag decals on his personal car; and that he had a conversation with Prince Bandar's wife "in which she "referred to the individuals being held prisoner at Guantanamo Bay as Freedom Fighters."  *Id.* at 2.

**Saudi government money laundering schemes in San Diego to fund al Qaeda through Somali non-profit organizations including WSRA**

28.     Plaintiffs must conduct discovery of the KSA to confirm the detailed allegations and evidence that the KSA operated money laundering schemes involving Somali "non-profit organizations" in San Diego that funded al Qaeda and the 9/11 plot in 1998-2001.  Those schemes involved Saudi diplomat Thumairy (who assisted hijackers Hazmi and Mihdhar), along

with his superior in the Saudi Ministry of Islamic Affairs, Sowailem, a diplomat at the Saudi

Embassy in Washington, D.C.

29.     Two main sources of proof underlie plaintiffs' allegations.  According to the

Congressional Joint Inquiry, the FBI determined prior to 9/11 that "elements of the Saudi

Government may have provided support to terrorist networks" by "laundering money through the

Ibn Tamiyah Mosque in Los Angeles first to Somali non-profit organizations and then to other

entities affiliated with Usama Bin Ladin."  Ex.13 at 25-26.  The Ibn Tamiyah Foundation created

and operated the King Fahad Mosque.  Ex. 35.  The finances of that Mosque were controlled by

its Imam, the Saudi diplomat Thumairy.  Ex. 1 at 2.  The Congressional Joint Inquiry Report

states:

> In approximately 1998, the FBI became aware of millions of dollars in wire transfers
> from the Somali community in San Diego to Al Barakaat Trading Company and other
> businesses affiliated with Usama Bin Ladin. At the time, the funding appeared to be
> originating from the local Somali community in the form of donations to various Somali
> non-profits. However, the FBI now believes that the [sic] some of the funding actually
> originated from Saudi Arabia and that both the Ibn Tamiyah Mosque in Los Angeles and
> the Islamic Center of San Diego were involved in laundering the money.
> According to the former FBI agent in San Diego who was involved in this investigation,
> this scheme may allow the Saudi Government to provide al-Qa'ida with funding through
> covert or indirect means.

Ex.13 at 27.  Al Barakaat was a group of Somali-owned companies based in Dubai named as

SDG Terrorists by the U.S. and the UN for their support of al Qaeda from shortly after

September 11th, 2001 until February 2012.  Ex. 36.  Al Barakaat, together with another Somali

money transfer agency named Dahab Shil and also based in Dubai, were used interchangeably by

al Qaeda to surreptitiously fund its operations around the world.  For example, in the 2001 trial

of al Qaeda members for the 1998 US Embassy bombings, evidence was admitted into the record

that one of the al Qaeda plotters Mohamed Rashed Daoud al Owhali a/k/a Khalid Salim Saleh

Bin Rashed had received funds via Dahab Shil. Ex. 37 at 2, 15.  Also, in 2001, authorities in

Norway convicted several people associated with Dahab Shil for laundering drug dealing proceeds to an entity named Hirad Emergency Relief. Ex. 38 at 5.  In an indictment of the Spanish al Qaeda cell, Hirad Emergency Relief was named as a laundering mechanism for al Qaeda. Ex. 39 at 8.  Indeed, after it was named as an SDG Terrorist by the U.S. government, a close associate of al Barakaat's leader told the FBI that the designation had little impact as "Barakaat simply moved upstairs and began operating the Dahab Shil Hawala network." Ex. 40 at 8.

30.     In addition, records from the 2004 federal criminal trial and conviction of a KSA employee, a Somali citizen named Omar Abdi Mohamed ("Abdi Mohamed"), in the U.S. District Court for the Southern District of California showed that in 1998 through 2001, support plaintiffs' allegations that the KSA Ministry of Islamic Affairs conducted a money laundering scheme in San Diego that was situated to fund al Qaeda and the 9/11 attacks.  That scheme had the identical modus operandi as the KSA's 1998 al Qaeda funding plot through Somali-run non-profits and money transfer businesses.  The records show that the KSA:

- hired Abdi Mohamed in 1994 and had him fraudulently enter the United States in 1995 and continue to secretly work inside the United States for the KSA through 2004 without disclosing his employment with the KSA and under the false pretense that he was a religious worker, Ex. 41 at 3-5;

- established a "charity" in name only as a California non-profit corporation in 1997 called the Western Somali Relief Agency ("WSRA"), Ex. 42 and obtained charitable status for WSRA under 26 U.S.C. §501(c)(3); Ex. 43;

- used the WSRA as a terrorist money laundering operation between December 1998 and May 2001, when WSRA:

    (1) received "donations" totaling over $350,000 – including $326,000 from the Global Relief Foundation ("GRF") and $5,000 from the Al Haramain Islamic Foundation ("AHIF"), Ex. 41 at 2-3, Ex. 44 at 5-6, and

(2) sent 65 checks totaling $375,000 to Dahab Shil, a Somali owned money transfer company that was used by al Qaeda to secretly receive funds starting in December 1998 and ending in May 2001.  Ex. 44 at 6.

- had Saudi diplomat and Ministry of Islamic Affairs official Sowailem visit Omar Abdi Mohamed in San Diego in 1999 or earlier, likely while the WSRA laundering scheme was ongoing, Ex. 45 at 95.

31.      The GRF and the AHIF, which provided the known sources and bulk of WSRA's revenues, were designated after 9/11 by the U.S. Treasury as SDG Terrorists, specifically because of their ties to and monetary funding support for al Qaeda, Ex. 46.   With regard to the GRF, the U.S. Treasury Department stated in October 2002:

> The Global Relief Foundation (GRF), has connections to, has provided support for, and has provided assistance to Usama Bin Ladin, the al Qaida Network, and other known terrorist groups.
> One of the founders of GRF was previously a member of the Makhtab Al-Khidamat, the precursor organization to al Qaida. The GRF has received funding from individuals associated with al Qaida. GRF officials have had extensive contacts with a close associate of Usama Bin Ladin, who has been convicted in a U.S. court for his role in the 1998 bombings of the U.S. embassies in Kenya and Tanzania.

*Id.* at 1.  The Treasury Department first labeled the AHIF a SDG Terrorist in March 2002.  *Id.* at 2.  The KSA itself has admitted that the AHIF was "notoriously tied to Osama bin Laden, the Taliban and Al Qaeda's terror campaigns."  Ex. 47 at 4.

32.      The U.S. Department of Defense ("DOD") determined that prior to 9/11 the Dahab Shil office in Karachi, Pakistan was controlled by al Qaeda.  Ex. 48.  Mohamed Soliman Barre ("Barre"), a Somali citizen who was a member of al Qaeda and a GITMO detainee, told the DOD that pursuant to instructions, he established the Dahab Shil office in Karachi, Pakistan in August 1998.  *Id.* at 3.  The DOD stated that prior to 9/11, Barre "was in contact with other Somalis possibly linked to al-Qaida who were living in the United States and may have been involved in terrorist financing operations."  *Id.* at 5.

33.     During the relevant times prior to the 9/11 attacks, Khalid Sheikh Mohamed, the mastermind of the 9/11 attacks, was based in Karachi, where – starting in late 1999 through August 2000 – he handed and sent cash to the hijackers totaling approximately $400,000, which constituted the primary funding for the 9/11 attacks.  9/11 Report at 499 n. 131; KSA Ex. 2 at 131-35.  The source of the cash received by Khalid Sheikh Mohamed was never traced during the 9/11 investigation beyond Karachi.  9/11 Report at 172.  Plaintiffs are entitled to discovery to determine whether the WSRA charity formed by the KSA's Ministry provided the cover and means by which al Qaeda funded the 9/11 attacks.

34.     Abdi Mohamed's job title was "Propagator." Ex. 49 at 4-5.  There is no evidence that he had any job duties for the KSA other than running the WSRA.  The KSA paid Abdi Mohamed a monthly salary of $1,750, Ex. 41 at 2, gave him "raises and bonuses for doing good work."  Ex. 44 at 7.  The KSA imposed strict job rules that required Abdi Mohamed to get clearance for any absence from his post and permission to take leave. *Id*.  On May 2, 2000, Abdi Mohamed received a "financial award granted by his Royal Highness Prince Sultan Second Deputy Prime Minister," which he expressly authorized for all of KSA's propagators in the United States.  Ex. 50 at 14.  Another employee of Prince Sultan's Presidency of Civil Aviation, Omar al Bayoumi also based in San Diego, also received an increase in pay in April 2000.  *See* ¶ 10, *supra*.

35.     Abdi Mohamed was in regular contact with his supervisor Sowailem, the KSA's Ministry of Islamic Affairs official and diplomat at the Saudi Embassy in Washington, D.C.  Sowailem sent Abdi Mohamed a monthly signed letter with his paycheck and letters that were copied to all the KSA's Propagators in the United States.  Ex. 50 at 2-17.  Abdi Mohamed was also in contact with other of his superiors at the Saudi Embassy in Washington or in Saudi

Arabia, including Abdulrahman bin Abdullah Al Twaijri, Dr. Hamid bin Khalil Al-Saiji, Abdulrahman bin Mohamed Al-Balihi and Saleh bin Mansour Al-Jarboueh.  Ex. 29 at 10.

36.      While the WSRA scheme was ongoing, Abdi Mohamed was visited in San Diego by his supervisor Sowailem and had unspecified contacts with the Saudi Consulate in Los Angeles (where Thumairy was a diplomat). Ex. 45 at 95.  Abdi Mohamed made two trips to Saudi Arabia in August 1997 and July-August 2000.  Ex. 51at 3-4.  During those trips, Abdi Mohamed undoubtedly reported on his work to other superiors within the KSA's Ministry of Islamic Affairs.  Abdi Mohamed worked for the KSA inside the U.S. for nine years until 2004, when he was deported.  At no point during his employment with the KSA was there any suggestion that Abdi Mohamed was not doing the job he was assigned to do.

37.      Abdi Mohamed was convicted for violations of federal law in the Southern District of California for lying to federal immigration officials to hide the facts of his employment with the KSA's Ministry of Islamic Affairs and the KSA's money laundering scheme via the WSRA.  The jury found that Abdi Mohamed "knowingly made material false statements under oath" that:

- "he was only employed by Say San Diego, San Diego City School District, and Masjid ul Taqwa; which the defendant then and there knew was false, in that, in truth and in fact, between March 1994 and January 2004, defendant OMAR ABDI MOHAMED was also employed by the Kingdom of Saudi Arabia, Ministry of Islamic Affairs, Endowments, Da'wah, and Guidance; in violation of Title 18, United States Code, Section 1546(a)."

- "he was employed by Masjid ul Taqwa from August 1 1995 through February 1997; which the defendant then and there knew was false, in that, in truth and in fact, defendant OMAR ABDI MOHAMED was never employed by Masjid ul Taqwa; in violation of Title 18, United States Code, Section 1546(a)."

Ex. 41 at 3-5; Ex. 52 at 1.  Abdi Mohamed was also indicted on two counts for making the material false statements under oath that:

- that the Western Somali Relief Agency was an entity in name only, that it never received funds, and that the entity had insufficient funds to send two boxes of blankets to Somalia; which the defendant then and there knew was false, in that, in truth and in fact, between December 1998 and May 2001, the Western Somali Relief Agency received $326,838 from the Global Relief Foundation and $5,000 from the Al-Haramain Foundation.

*Id.* The jury acquitted Abdi Mohamed on those counts. *Id.* It is uncertain, however, whether the jury heard key evidence about the GRF and AHIF. The district court granted a motion *in limine* to suppress evidence regarding GRF and AHIF but the government moved for reconsideration and we could not glean from the public record the ultimate outcome of the motion. Ex. 49 at 16. In any event, the district court considered the evidence during the sentencing phase and found by a preponderance of the evidence that Abdi Mohamed

> had received money from organizations that would later be designated Specially Designated Global Terrorists and that this money's destination was unknown, that he had undisclosed employment with the government of Saudi Arabia, and that he had extensive foreign travel despite no apparent income to support it.

*United States v. Mohamed*, 203 F.App'x 879, 880 (9th Cir. 2006). The Ninth Circuit found these circumstances were "mysterious" and justified Abdi Mohamed's sentence because they were "so unusual as to differentiate his case from a normal case of immigration fraud." *Id.*

38.     Plaintiffs should be allowed to conduct discovery of the KSA regarding its WSRA scheme, Omar Abdi Mohamed's employment, his contacts and supervisors within the KSA, the WSRA's records, the directions provided to Abdi Mohamed, and the intended recipient of the funds that the KSA's Ministry of Islamic Affairs sent via its WSRA charity to the money transfer agency Dahab Shil.

**Saudi government knowledge and facilitation of al Qaeda's
travel through its marked passports and providing "cleansed" passports to the 9/11
hijackers so that they could obtain visas necessary for U.S travel**

39.      Plaintiffs are entitled to discovery regarding the passport indicators and the

KSA's passport and travel records of the 9/11 hijackers and others involved in the plot, including

Saudi employees Bayoumi and Thumairy.  The passports will likely show that the KSA had

specific knowledge well in advance of 9/11 that Mihdhar, Hazmi, and many (if not all) of the

other eventual hijackers, and others involved in the plot were Islamic extremists associated with

al Qaeda -- yet issued them new passports, including passports that were "cleansed" to hide

travel to Afghanistan and Pakistan.  The hijackers and others involved in the plot successfully

used their passports to obtain visas for travel to the United States and carry out the 9/11 attacks.

40.      The 9/11 and Terrorist Travel Staff Report of the 9/11 Commission, attached as

Ex. 53, shows that the KSA issued select passports with a secret indicator to allow the Saudi

government to track persons that it knew were associated with Islamic extremism and al Qaeda.

According to the Report, prior to 9/11 the KSA kept those passport indicators a secret: "this

indicator of extremism was unknown at the time to U.S. intelligence officials." *Id.* at 10.  It was

only after 9/11 that U.S. investigators found the indicators in "the passports of many al Qaeda

and other terrorists entering the United States as early as the first World Trade Center attack in

1993." *Id.* at 2.

41.      KSA placed the al Qaeda indicator in the passports issued to Hazmi on April 3,

1999; to Mihdhar on April 7, 1999, a second passport issued by the KSA to Mihdhar on June 1,

2001; and, to Hazmi's brother Salem on June 16, 2001.  *Id.* at 10, 13, and 14.  Many if not all of

the other Saudi hijackers had the indicator in their passports.  *Id.* at 8.  Mihdhar and Hazmi were

al Qaeda operatives since at least 1995. 9/11 Report at 155.

42.     In addition, an indicator was also placed by the KSA in Bayoumi's passport. According to the 9/11 Report, Bayoumi's passport was issued by KSA with "a cachet that intelligence investigators associate with possible adherence to al Qaeda" that "suggests the need for further inquiry…."  9/11 Report at 515-16  n. 19.  The indicator demonstrates the KSA's knowledge that Bayoumi was associated with al Qaeda while he was employed by the KSA in a stealth job in the United States.

43.     The 9/11 and Terrorist Travel Report shows that "most" of the hijackers (like Mihdhar) applied for their visas to enter the United States to commit the attacks "with new passports, possibly to hide travel to Afghanistan recorded in their old ones…" and that "[i]t is likely that many of the hijackers' passports contained indicators of extremism or showed ties to al Qaeda."  Ex. 53 at 8. The U.S. would likely not have issued visas had the passports included such travel to those countries where all of the hijackers attended al Qaeda training camps to prepare for the attacks.

44.     Zacharias Moussaoui, an al Qaeda member who directly worked for Osama Bin Laden in Afghanistan in the years prior to the 9/11 attacks, described how the KSA facilitated the cleansing of the 9/11 hijacker's passports to allow them to obtain U.S. travel visas.  He testified:

> for example, I know Osama bin Laden told me that he -- this is not directly to what you say -- but Osama bin Laden told me himself -- but I recall it now -- when I came back from -- from -- from Malaysia and London and I had to renew my passport, and there was a stamp, a Pakistani, so I got a new Pakistani stamp, and I didn't want -- didn't want Paki -- Paki -- Pakistani stamp when I knew that I was going over to the United States, and Shaykh Osama told me that if I had been Saudi, Turki will have renew my passport, and, so, I knew that most of the 19 hijackers had their passport renewed by Turki with the help of them.

Ex. 54 at 17-18.  The "Turki" referenced by Moussaoui is the KSA's Prince Turki al Faisal, who served as KSA's intelligence chief from the 1990's through August 2001.  Moussaoui's

statement is confirmed not only by the evidence of the actual "cleansing" of most of the 9/11

hijackers' passports, but the admissions of the KSA's Prince Turki and Prince Bandar

immediately set forth below.

45.        In July 2001, the KSA authorities issued a fraudulent passport to Khalid Sheikh

Mohamed, a Pakistani and the chief tactical planner and coordinator of the 9/11 attacks, under a

false name: "Abdulrahman al Ghamdi."  Khalid Sheikh Mohamed used the fraudulent KSA

passport to obtain a visa to the United States.  Ex. 53 at 18-20.  He never used that visa, but may

have used the July 2001 passport improperly provided by the KSA to facilitate and hide travel

related to the 9/11 plot.  Plaintiffs are entitled to discovery of the passport(s) issued to Khalid

Sheikh Mohamed by the KSA from 1992 until September 11, 2001; travel undertaken with those

passport(s); and the applications for those passport(s).

46.        *Admission of the KSA's Prince Turki.*  In October 2003, the KSA's Prince Turki al

Faisal, then the KSA's Ambassador to the United Kingdom who previously served as KSA's

intelligence chief from the 1990's through August 2001, gave an interview with the Associated

Press.  Plaintiffs seek discovery to confirm the admission of the KSA, through the public

statement of its Prince, that in late 1999 or early 2000, Mihdhar and Hazmi were placed on

KSA's "terror watch list" because of their involvement with al Qaeda and links to prior terror

incidents, including the 1998 attacks on U.S. embassies in Africa. Ex. 55 at 2.

47.        *Admission of the KSA's Prince Bandar.*  Attached as Ex. 56 is the November 2007

press interview of the KSA's former Ambassador to the U.S. Prince Bandar, acting at the time as

the KSA's National Security Advisor and Saudi spokesperson.  Plaintiffs seek discovery to

confirm the admission of the KSA, through the public statement of its Prince, that "Saudi

security was actively following the movements of most of the [9/11] terrorists with precision."
*Id.*

### The November 19, 1999 "Dry Run" of the 9/11 Attacks

48.     Plaintiffs are entitled to discovery from the KSA concerning its involvement in the November 19, 1999 "dry run" of the 9/11 attacks carried out by Hamdan Shalawi ("Shalawi") and Mohamed Qudhaieen ("Qudhaieen") on an America West flight from Phoenix to Washington, D.C.

49.     The ostensible purpose of the trip was for the two men to attend a symposium at Saudi Arabia's Institute of Islamic and Arabic Sciences in America (IIASA) that was to take place on November 19-21, 1999 in Washington D.C.   Ex. 22 at 4.   The symposium (which had been announced the previous June) was attended by various high ranking Saudi Arabia officials, including defendant Abdullah Naseef, former KSA Minister and Muslim World League ("MWL") Secretary-General, Vice-Chairman of the Shura Council and one of the founders of al Qaeda.   Ex. 57; Ex. 58 at 2; *see* ¶¶ 110-11, *infra*.   Shalawi and Qudhaieen reserved their American West flight on the night before leaving Phoenix on the trip.   Ex. 59 at 2.

50.     The Congressional Joint Inquiry, Ex. 13 at 24-25, states that "Phoenix FBI now believes both men [Shalawi and Qudhaieen] were specifically attempting to test the security procedures of America West Airlines in preparation for and in furtherance of UBL/Al Qaeda operations."   The report states that the men asked suspicious technical questions of the flight crew and that despite being told that the bathroom was in the back of the plane, Qudhaieen "went to the front of the plane and attempted on two occasions to enter the cockpit."   *Id.*   A passenger in the first class section stated that he observed Qudhaieen "walk directly to the cockpit and try to get into the cockpit.   Ex. 59 at 3.

51.       An FBI agent described Shalawi as a "trained AQ operative."  Ex. 60 at 2.

Shalawi admitted attending the Jaji training camp in Pakistan in the late 1980s, which was run by

Osama Bin Laden.  Ex. 22 at 6, Ex. 61 at 6.  The "FBI…also developed information tying Al-

Qudhaieen to terrorist elements as well."  Ex. 62 at 10.

52.       In November 1999, Shalawi and Qudhaieen were in the U.S. as graduate students

sponsored by the KSA.  Qudhaieen, and likely Shalawi, were receiving support from the KSA,

including stipends.  Ex. 63 at 2.  Their roundtrip airfare on the America West flight was paid by

the KSA.  Ex. 62 at 10.   The Congressional Joint Inquiry remarked that Qudhaieen's "profile is

similar to al-Bayoumi…" because he was "in the United States as a student and does not have a

visible means of income…"; "is in frequent contact with Saudi Government establishments in

the United States"; "runs a 'Saudi Club'"; and, "was receiving money from the Saudi

Government…."  Ex. 13 at 25.  The Saudi Club was funded by the KSA and part of the Saudi

Embassy's Cultural Mission.  Ex. 64 at 2; Ex. 65 at 1-2.  Prior to the dry run, hijacker Hani

Hanjour was acquainted with and attended services given by Shalawi, who was an Imam at a

KSA-funded mosque in Arizona. Ex. 22 at 3-4.

53.       Shalawi and Qudhaieen both previously received their bachelor's degrees at the

KSA's state-run Imam Muhammad Ibn Saud Islamic University ("Imam University"). Ex. 22 at

1, 3, Ex. 63 at 2.  Numerous instructors at the school had ties to al Qaeda and recruited students

for al Qaeda.  Ex. 66 at 4.  Four of the 9/11 hijackers and others involved in the plot, such as

Thumairy, attended Imam University. Ex. 3 at 2, Ex. 67 at 28, 36, 48, Ex. 68.  Shalawi was a

teaching assistant at Imam University and both he and Qudhaieen ultimately became teachers

there after they returned to Saudi Arabia. Ex. 22 at 1, 3, Ex. 63 at 2.

54.     In July 2000, Shalawi closed his Arizona bank account and travelled to Afghanistan.  Ex. 69 at 1.  And "[i]n November 2000, the FBI received reporting…that al-Shalawi had trained at the terrorist camps in Afghanistan and had received explosives training to perform "Khobar Towers"-type attacks." Ex. 13 at 24.  At the same time Shalawi was in Afghanistan, several of the 9/11 hijackers were also attending terrorist training camps there.  Ex. 70 at 8, 17, 18; Ex. 67 at 13.

**KSA funding of the Hamburg cell that recruited the hijackers and plot members**

55.     Plaintiffs are also entitled to discovery regarding their allegations of KSA funding of the Hamburg cell through a company called Twaik Est.   From 1997 to 1999, German residents Mamoun Darkazanli, Mohamed Zammar and Abdelfattah Zammar recruited the al Qaeda Hamburg cell, including hijackers Mohamed Atta, Marwan al Shehhi and Ziad Jarrah, as well as persons who supported the 9/11 plot, including Ramzi Binalshibh, Mounir Motaassedeq, Sayid Bahaji and others.  Darkazanli and the Zammars also convinced the hijackers and other members of the Hamburg cell to travel to the camps in Afghanistan where they trained for the plot.  9/11 Report at 163-166; Ex. 71 at 2-3, 5-9; Ex. 39 at 23.

56.     Darkazanli was a long running financial facilitator for al Qaeda.  Ex. 71 at 7-8; Ex. 39 at 9-13.  Between October 1995 and April 1999, a Deutsche Bank account held by Darkazanli together with an al Qaeda financial operative received over $200,000 from a Saudi-based company called Twaik Est. Ex. 39 at 9-13.  German authorities identified Twaik Est as an intelligence front company operated by the KSA.  Ex. 72.

**At all relevant times, the KSA was dedicated to the propagation of Wahhabi Islam through support for al Qaeda**

57.        In contrast to the United States, where the Constitution bars any religion from being part of our government, the KSA's equivalent governing laws advocate its Islamic religion and the importance of the "propagation" of that religion around the world.  The Basic Law of Governance of the KSA issued in 1992 states that the KSA shall "undertake its duty regarding the Propagation of Islam (Da'wa)."  Ex. 73 at 5.  At that time, King Fahd gave a speech in which he stated that "the Propagation of Islam in one of the most important functions of an Islamic state."  Ex. 74 at 3.

58.        An August 28, 1999 Lecture of the KSA's Deputy Minister of Islamic Affairs, Abdel Aziz al Ammar, stated that:

> Islamic advocacy is one of the policy goals of the Kingdom at all times. This is what King Abdel Aziz – may God have mercy on his soul – and his pious children after him, emphasized. Through this policy, the correct Islam was realized and spread. This includes… supporting Muslim stands and defending their causes, by calling for Islamic solidarity and the establishment of Islamic organizations, such as the Muslim World League, the World Assembly of Muslim Youth, the International Islamic Relief Organization.

Ex. 75 at 2.

59.        According to the Oxford Dictionary of Islam, the correct Islam recognized by the KSA "is interpreted according to conservative Wahhabi ideology."  Ex. 76 at 2.  The KSA has a dual power structure which includes both the royal family led by the King and Islamic authorities:

> The legitimacy of the monarchy rests on an alliance between the Saudi royal family and the ulama, who serve as consultants.  The monarchy has institutionalized religious organizations within the state power structure.  The most powerful religious body is the state-funded Council of Senior Ulama, which provides religious approval for policies determined by the government.

*Id.*

60.     Moussaoui described this dual power structure:

> the Saudi government is -- they have two heads of the snake, they have the Saudi, like Al
> Saud, and the Wahhabi were in charge of the Islamic Code of the Islam - - or Islamic
> power in Saudi Arabia…So the Saudi cannot keep power in Saudi Arabia without having
> the agreement, okay, of the Wahhab, the Wahhabi, the scholar, okay.

Ex. 32 at 21-22.

61.     Moussaoui stated that Osama Bin Laden was "a pure Wahhabi and will obey the

Wahhabi scholar to the letter" and that his attitude toward the ruling Saudi ulema was one of

"complete reverence and obedience." *Id.* at 13, 22.  Moussaoui described how numerous Saudi

government figures (including members of the royal family and the ulema) donated to al Qaeda

and that the Saudi royal family's support for al Qaeda was "a matter of survival for them" and

that "it was a credential" and that "money to bin Laden could be used by the Saudi [royals] to

say to the ulema, 'Look, see, we are not against Islam or the jihad, we finance bin Laden.'" *Id.* at

25.  Moussaoui also described how the money from the Saudi donors was "crucial" to al Qaeda

in a variety of ways, including to purchase guns, housing, food, dig wells, medical expenses and

construct training camps.  *Id.* at 25-26.

**The AHIF was created, operated and tightly controlled by the KSA**

62.     Plaintiffs are entitled to discovery to confirm the facts that the AHIF operated as

an arm and "alter-ego" of the KSA and that the AHIF acted as an agent of the KSA's Ministry of

Islamic Affairs in providing support to al Qaeda, and specifically to its 9/11 hijackers and

plotters.

63.     No discovery has been conducted of the AHIF, except for incomplete document

production from AHIF's U.S. branch prior to the entry of default judgments.  The AHIF - Saudi

Arabia made an initial appearance in the litigation but, as Magistrate Judge Maas found,

subsequently "flouted its discovery obligations and this Court's orders for many years." Ex. 77 at 5.   As a result, in 2014, this Court entered a default judgment against the AHIF – Saudi Arabia.  Ex. 78.   In addition, the Court ruled that because the AHIF – Saudi Arabia and AHIF U.S. "were not separate entities for discovery purposes" the AHIF's U.S. branch was obliged to produce documents of the AHIF – Saudi Arabia.  Ex. 77 at 3.   No such AHIF documents were ever produced, however, and the AHIF's U.S. branch advised the Court in July 2016 that it was dissolving and no longer intended to defend the action.  Ex. 79 at 1.   Thereafter, this Court also entered a default judgment against the AHIF's U.S. branch.  *Id.*

64.      The KSA created the AHIF.  In May 1989, the KSA's Saudi Red Crescent ("SRC") filed a pleading in a lawsuit in Pakistan.   Ex. 80.  In that pleading, the SRC admits that the AHIF was established by the KSA as a "branch" of the SRC in Pakistan in 1987. *Id.* at 6.

65.      Attached as Ex. 81 is the resume of Wael Jelaidan ("Jelaidan"), which shows that Jelaidan acted as the Director of the SRC's Pakistan office from 1986 through the end of 1988. *Id.* at 2.  It was during that time that, presumably at Jelaidan's request, an SRC employee in Pakistan, Aqeel Abdulaziz al Aqeel ("Aqeel"), formed the AHIF to support the Afghan mujahedeen.  Ex. 80 at 15.   In February 1989, a formal complaint was lodged by Pakistan with the KSA based on the "undesirable activities" of Aqeel concerning his religious proselytizing and Aqeel was forced to leave Quetta, Pakistan.  Ex. 80 at 4.

66.      A factsheet on the AHIF prepared by the French Organization Aid Watch states that the AHIF was formed in Pakistan in 1988 and in 1992 moved its headquarters to Riyadh, Saudi Arabia and was "officially launched with the help of Prince [now King] Salman bin Abdulaziz, the governor of Riyadh and a brother of King Fahd bin Abdulaziz…."   Ex. 82.

67.     Attached as Ex. 83 is a Profile of al Qaeda terrorist Abdullah Mohammed Fazul ("Fazul") published by the Combating Terrorism Center, United States Military Academy, West Point.  The Center confirms that AHIF moved its headquarters from Pakistan to Riyadh, Saudi Arabia in 1992 and that AHIF was "functionally an extension of al-Qa'ida." *Id.* at 4.  The document further confirms that Fazul planned and carried out the 1998 al Qaeda bombings of the U.S. Embassies in Africa with financial aid from the AHIF.  *Id.* at 6.

68.     From 1992 through 2004, the AHIF was directed by a senior official of the KSA, Saleh bin Abdulaziz Al Ash-Shaikh ("Ash-Shaikh") who became the KSA's Deputy Minister of Islamic Affairs in 1416 of the Islamic calendar (1995) and then, starting in 1420 (1999), as the KSA's Minister of Islamic Affairs.  Ex. 84 at 8.

69.     In a February 2001, the AHIF's webpage (copyrighted in 2000), and a later 2003 version of that same webpage, stated "[t]he superintendent of all Foundation [AHIF] activities is [Ash-Shaikh], Minister of Islamic Affairs…" of the KSA."   Ex. 85 at 2; Ex. 86 at 3.  The 2003 AHIF website stated that meetings of the "Administrative Board" overseeing AHIF were chaired by Ash-Shaikh and held at the office of the KSA's Minister of Islamic Affairs.  Ex. 86 at 3-4.

70.     Exhibit 87 is the April 2004 affidavit of Khalid Bin Obaid Azzahri, who states that he is AHIF's "Financial and Administrative Manager" and that "Al Haramain operates under the supervision of the Saudi Minister of Islamic Affairs, who appoints its Board of Directors and senior management personnel."  *Id.* at 2, 3.  Furthermore, while Azzahri swore before this Court that the AHIF had no connection to al Qaeda and provided no support to the terrorist group, the KSA later conceded the AHIF had operated "one of the biggest terror-financing operations in the world" including financing for the 1998 al Qaeda Embassy bombings in Africa.  *Id.* at 2; Ex. 47 at 3.

71.      Exhibit 88 is a 2001 report of the AHIF office in Bangladesh, which states that the AHIF "is operating under the supervision of the Saudi Ministry of Islamic Affairs."  *Id.* at 4.

72.      According to the Congressional Joint Inquiry a 2002 FBI statement found that the AHIF has "clear ties to the Saudi Government, and intelligence reporting suggests it is providing financial and logistical support to al-Qa-ida."  Ex. 13 at 27.  That document presents the testimony of U.S. Treasury General Counsel Aufhauser that the "[AHIF's] direct overseers are members of the [Saudi] Royal Family…" and that "significant contributors [to the AHIF] are members of the Royal Family." *Id.*  Zacharias Moussaoui confirmed in his statement that the AHIF was on his database of al Qaeda donors.  Ex. 32 at 14.

73.      Exhibit 89 is the June 2004 press release of the KSA Embassy which announced that the KSA had joined the U.S. in designating five offices of the AHIF as "financiers of terrorism" and that "the Saudi government is dissolving the Riyadh based Al-Haramain Islamic Foundation" and would place its assets into an organization called the "Saudi National Commission." *Id.* at 6.  As of September 2007, no such Commission had been created.  Ex. 90 at 22.  The KSA's ultimate disposition of the AHIF's assets is unknown.

74.      Exhibit 91 shows that on June 2, 2004 the AHIF's Aqeel, who reported to Ash-Shaikh, was named by the U.S. Treasury Department as a Specially Designated Global Terrorist for his support of al Qaeda through the AHIF.  *Id.* at 1.

**Saudi government money laundering scheme
to al Qaeda through the AHIF "charity" in 2000**

75.      A specific example of the detailed control that the KSA exercised over the AHIF is shown by its money laundering scheme to fund al Qaeda in 2000.   Exhibit 92 is the September 9, 2004 press release of the U.S. Treasury Department which states that it named Soliman Buthe, also spelled Buthi ("Buthe") as a SDG Terrorist based on his participation in that scheme.  That

year (and for many years before and after), Buthe was employed as a senior official of the KSA, assigned to the city of Riyadh.  In 2000, Buthe's direct supervisor was Prince Abdelzaiz Bin Ayyaf, the Mayor of Riyadh, Ex. 93 at 3 and Ex. 94, who reported to Prince Salman, the Governor of Riyadh.  Ex. 95 at 1.

76.     Exhibit 96 contains the business cards used by Buthe for his employment with the KSA for the City of Riyadh and his role as an officer of the AHIF, and shows that he used the same business office and phone number for both the KSA and the AHIF.  Buthe stated that he was an "unpaid volunteer" for the AHIF.  Ex. 93 at 3.

77.     The September 1, 2011 letter from Kimberly Prost, Ombudsperson of the United Nations, to Buthe, details that in 2000, Buthe received funds donated to the AHIF for Chechnya refugees and participated in a money laundering scheme to deliver $150,000 from the AHIF to al Qaeda.  Ex. 97 at 4.

78.     The July 2014 Statement of Facts signed by the AHIF and the U.S. Attorney's office in Oregon which confirms the details of the 2000 AHIF money laundering scheme and the involvement of the AHIF's accountant in Saudi Arabia, Abdulaziz S. Al-Shoumar, who sought to hide the trail of the AHIF funds.  Ex. 98 at 3.

79.     The May 14, 2004 letter from the AHIF's attorney, Lynne Bernabei, to Richard Newcomb of the U.S. Treasury Department states that "the funds that the AHIF transferred and collected on behalf of the Chechnya refugees were part of a Saudi government project which was approved at the highest levels of both the Saudi and Russian governments."  Ex. 99 at 7.  The letter further confirms that the AHIF transferred funds to Saudi Embassy in Moscow, which served as the conduit for AHIF's funding in Chechnya.  *Id.*

80.      During their investigation, U.S. federal investigators repeatedly sought to obtain the AHIF's banking records to show the receipt and disposition of the laundered funds.  The investigators were repeatedly thwarted by the KSA.  Attached as Exhibit 100 is the February 1, 2010 declaration of Assistant U.S. Attorney Christopher Cardani, which states that the KSA did not respond to diplomatic requests or respond favorably to government-to-government requests to obtain the banking records of the Al Rajhi Bank in Saudi Arabia where Buthe deposited the funds. *Id.* at 3.  Attached as Exhibit 101 is the subpoena served on the Al Rajhi Bank by the U.S. Department of Justice.  Attached as Exhibit 102 is the February 8, 2010 declaration of Ahmed Al-Kholaifi of the Al Rajhi Bank, which states that the KSA "has instructed the Bank that it may not comply with the Subpoena and that it will face the risk of criminal prosecution if it does so." *Id.* at 2.

81.      Prior to and after its financing of al Qaeda in Chechnya, the KSA made an official public announcement to deny that it was funding al Qaeda in Chechnya via AHIF. The KSA's press release in September 1999 stated:

> The Kingdom of Saudi Arabia today categorically denied a report that it is financially supporting the Chechen rebels in Russia. Agence France Presse (AFP) reported on Saturday that an official of the Russian intelligence authority had claimed that Saudi Arabia is among Arab and Islamic countries he said were financing the Islamic rebels in the area of Chechnya. This claim is totally false.

Ex. 103 at 1.  A later KSA press release from May 2000 stated that:

> An official source has categorically denied a report circulated by some new agencies quoting a statement said to have been issued by Russian security organs. The report alleged that Al Haramain Charitable Foundation has been financing Chechnyan combatants under the cover of supporting the Islamic religious activities. The report is baseless and entirely untrue, the source said.

*Id.* at 4.

82.     A February 4, 2002 e-mail from Shoumar to Buthe shows that AHIF's accountant Shoumar was an employee of the KSA's oil company, Aramco, and that Shoumar used his government email account to handle AHIF accounting matters. Ex. 104.

83.     According to a 2006 State Department Cable, after Buthe was named as an SDG Terrorist based on his participation in the AHIF's support for al Qaeda, the KSA not only continued to employ Buthe but gave him two promotions, additional responsibilities, substantial benefits (free schooling for his children) and paid him in cash (because his accounts were frozen by the SDG Terrorist designation).  Ex. 105 at 2.  The State Department observed that this was "a troubling indicator of the seriousness with which the [KSA] takes the designation."  *Id.*

84.     A series of e-mails produced by AHIF attached as Exhibit 106 show that Buthe and Shoumar were directly involved in the March 2000 transfer of $5,000 from the AHIF to the Somali charity created by the KSA, WSRA, as detailed above, *see* ¶ 26 *supra,* and had direct contacts with the KSA employee Abdi Mohamed, who used the alias "Omar Khatib."  Ex. 45 at 100; Ex. 106.

85.     Attached is an AHIF Monthly Summary Report for March 2000 showing that during that month: (1) the payment to WSRA of $5,000 and (2) the money laundered by Buthe (listed as "Brother Soliman") for $152,300 were made and that both payments were specifically "not included in the Total Balance" and therefore kept off the AHIF's books pursuant to the procedure Shoumar had established.  Ex. 107 at 1; *see* Ex. 98 at 3.

86.     A May 2016 "White Paper" produced by and an admission of the KSA, which states that: "By 2004, the U.S. Department of the Treasury and Saudi Arabia eliminated four branches of the Al-Haramain charity, one of the biggest terror-financing operations in the world

and the funding organ and channel for the Nairobi, Kenya and Dar es Salaam bombings in

1998." Ex. 47 at 3.

### In 1998-2001, the KSA Embassy in Kabul was used an al Qaeda guesthouse and operations base for the AHIF

87.        Plaintiffs are entitled to discovery regarding their allegations and the facts

showing that after Saudi diplomats left Afghanistan in 1998, the AHIF took over the Saudi

Embassy in Kabul and that al Qaeda used the KSA's property as a guesthouse that likely

supported the 9/11 plotters and hijackers.  According to a State Department Cable, in September

1998 the KSA announced that because of a claimed disagreement with the Taliban over its

refusal to turn over Osama bin Laden, the KSA removed its diplomats in Kabul, Afghanistan and

closed its Embassy.  Ex. 108 at 4.  A December 1998 State Department Cable shows that the

KSA nevertheless continued to allow the Taliban to staff their embassy in Riyadh. Ex. 109 at 2.

The Taliban aka the "Islamic Emirate of Afghanistan" continued to staff an embassy and a

consulate in KSA until at least 2001.  Ex. 110 at 2, 6.  A CNN press account reported that the

KSA recognized the Taliban government until September 25, 2001.  Ex. 111.

88.        Following the departure of the KSA's diplomats, the KSA Embassy and

Ambassador's Residence in Kabul became an al Qaeda guesthouse and an operations base for the

AHIF.  Exhibit 112 is an April 4, 2008 DOD Memorandum concerning a GITMO detainee

which states that: "The former Saudi Embassy in Kabul was owned by the head of [Osama Bin

Laden's] security, Hamza al-Ghamdi, and served as an al-Qaida guest house." *Id.* at 5.

89.        A report of the German Federal Criminal Police which states that in November

2001, the "Saudi leader" of the AHIF in Afghanistan testified to authorities that "he had been

given orders from Riyadh to operate in the Saudi Arabian embassy which had been closed down

since the beginning of the war."  Ex. 113 at 41.  An Intelligence Online News article which states

that in November 2001, the Coalition forces who arrived in Kabul, Afghanistan found the AHIF

operating in the Saudi Embassy building.  Ex. 114.  That article stated that:

> Within hours of arriving Northern Alliance soldiers detained the {AHIF's} director in
> Kabul, Nasser Bin Mohammed Al Gilale.  Under questioning that took place in the
> presence of Western intelligence officials, Al Gilale confirmed he had provided food and
> equipment to pro-Taliban elements and acknowledged he had received orders from
> Riyadh to continue helping Saudi families living in Kabul even after the beginning of
> U.S. air strikes.

*Id.*

90.     Exhibit 115 is a May 12, 2008 DOD Memorandum concerning a GITMO

detainee, which states that "the Azzam Guesthouse" was "the former residence of the Saudi

Ambassador" and "was owned and operated by Hamza al-Ghamdi, a senior al-Qaeda operative

and one of UBL's most trusted aides."  *Id.* at 9.

91.     Exhibit 116 is an April 15, 2008 DOD Memorandum concerning a GITMO

detainee, which states that the "[d]etainee stayed at an al-Qaida guesthouse in Kabul located in

the former Saudi Ambassador's residence" and was at that guesthouse on September 11, 2001.

The Memorandum states that: "This guesthouse was managed by Hamza al-Ghamdi, an al-Qaida

operative who decided what training a person received and where they went for training." *Id.* at

11.

92.     Exhibit 117 is an April 7, 2008 DOD Memorandum concerning a GITMO

detainee which states that in late 2000 the detainee stayed in the al Qaeda guesthouse located in

the "former residence of the Saudi Ambassador in the Wazir Akbar Khan area" of Kabul.  *Id.* at

4.

93.     Exhibit 118 is a June 9, 2008 DOD Memorandum concerning a GITMO detainee

which states that:

> Detainee admitted staying in al-Qaida guesthouses, and his name appeared

on an al-Qaida associated document confirming his admission.  Detainee reported he stayed at the Hamza al-Ghamdi Guesthouse in Kabul for two to three months. This guesthouse was located in the Wazir Akbar Khan District in the former Saudi Ambassador's house, and operated by al-Qaida.

*Id.* at 10.

### AHIF involvement in assassination related to 9/11 plot

94.        Tareq Maaroufi was a recruiter for the al Qaeda camps in Afghanistan and served

a prison sentence for a 1995 terrorist grenade attack in Belgium.  Ex. 39 at 18. In January 2001,

Maaroufi became the head of the AHIF in Belgium. Ex. 113 at 41-43. The AHIF in Belgium was

supervised by AHIF's European Committee, on which KSA's Buthe was a member. Ex. 119 at

2.  In 2001, the KSA provided funding for persons chosen by AHIF in Belgium to travel to

Mecca for the annual Haj.  Ex. 120 at 3.  Maaroufi, together with AHIF's Managing Director in

Belgium, were convicted for providing support for the September 9, 2001 assassination of

Ahmed Shah Massoud, the anti-al Qaeda leader in Afghanistan.  Ex. 121 at 3; Ex. 122 at 1-2.

The assassination, two days before the 9/11 attacks, was intended to inhibit the expected counter-

attack against al Qaeda after the 9/11 attacks.  9/11 Report at 252.

### Discovery of the MWL, IIRO and WAMY is ongoing and will address the key jurisdictional issue of the KSA's direction and control

95.        Discovery of the MWL, the International Islamic Relief Organization ("IIRO")

and the World Assembly of Muslim Youth ("WAMY") is ongoing and will not be completed

until next year.  The MWL and IIRO recently produced their last round of documents.   The

WAMY production is still ongoing with the final production due on November 30, 2017.  Most

of the documents produced are in Arabic and plaintiffs' counsel are still in the process of

translating the documents.  In addition, plaintiffs are preparing motions to compel production of

documents from the MWL and IIRO (due December 1, 2017) and depositions are set to begin in

April 2018 of the MWL, IIRO and WAMY that will address the key issue of the KSA's control over the three organizations.  Those depositions will include employees of the KSA who simultaneously had positions of authority directing the MWL, IIRO and WAMY.

96.      Before any jurisdictional motion can be considered, plaintiffs must be allowed to complete their discovery of the MWL, IIRO and WAMY and conduct Court supervised jurisdictional discovery of the KSA as detailed below.

**Led by a KSA Minister, the MWL/IIRO in 1994-2001 steered major funds to support al Qaeda and the camps where the 19 hijackers received their lethal training**

97.      Plaintiffs should be allowed discovery to confirm their allegations that from at least 1994 through September 2001, the MWL/IIRO, led by the KSA's Minister Obaid, knowingly proceeded to steer "charitable" funds to support al Qaeda and its camps where the 19 hijackers received their training to conduct the 9/11 attacks.  In their answers in this litigation, both the MWL and the IIRO made the identical affirmative defense claiming immunity from suit as "an instrumentality of the [KSA]."   Defendant MWL's Answer to Third Amended Complaint, *Ashton v. Al Qaeda Islamic Army*, MDL 1570, Doc. 346 at 68 (filed July 30, 2004); Defendant IIRO's Amended Answer to Plaintiffs First Amended Complaint, *Federal Ins. Co. v. Al Qaeda*, MDL 1570, Doc. 1548 at 66 (filed Dec. 13, 2005).

98.      Exhibit 123 is a 1996 CIA report which demonstrates that the KSA exercised its authority to fire MWL officials.  The report states that "Saudi Arabia fired the head of the Peshawar Pakistan branch of the Muslim World League, who was illicitly supplying League documentation and arms to militants in Afghanistan and Tajikistan."  *Id.* at 3-4.  In reality, the KSA apparently lied to or misled the United States, as the head of that Peshawar branch, Jelaidan, was never fired.  Ex. 81 at 2-3; Ex. 124 at 2.

99.      Exhibit 125 contains a summary exhibit list of donations (apart from the annual budgetary support of the KSA) made between 1994 and 2001 by various Saudi princes on behalf of the KSA to the MWL/IIRO, AHIF and WAMY, *id.* at 1-5, followed by the backup documents for that list.  Prince Sultan, who was previously sued in this litigation, advised this Court that "personal" donations made by him as a member of the Saudi royal family were "from government funds on behalf of the Kingdom as part of Prince Sultan's official duties."  Ex. 126 at 4.

100.     Exhibit 127 is the transcript and report of a July 1997 interview in Cairo of Obaid, then a KSA Minister, MWL Secretary General and IIRO President, who, "[a]nswering a question on the reports regarding the League's funds being funneled to extremist groups," stated that "[t]his is a closed chapter"; "there are no infallible authorities or even countries"; and, that "[i]t has been already proven that there were people who exploited the situation and misused some funds."  *Id.* at 5.  Obaid also stated that the League has spent 5.8 billion riyals, and that most of those funds were provided by Saudi Arabia.  *Id.* at 1.

101.     Exhibit 128 is an Ernst and Young report on the IIRO's Pakistan/Afghanistan finances for the period 1996-2001 which shows numerous examples of continuing financial mismanagement, fraud and misappropriation of funds.  The report stated that the IIRO's headquarters "paved the way towards providing opportunities for financial mismanagement and misappropriation of funds."  *Id.* at 8.  The report found evidence of "fraudulent intentions," *id.* at 21, based on the facts that:

- the head office had no monitoring controls in place, *id.* at 8;

- "forged" receipts and false invoices from non-existent companies for supposed donations to orphanages in Afghanistan, *id.* at 14;

- fake orphanage "purchases" were accepted by the head office, with no checking or verification, *id.* at 14;

- nearly half of the funds spent were unaccounted for, *id.* at 13, including $217,000 of -funds for a health project, *id.* at 16; and

- funds for supposed construction of a mosque in Afghanistan was backed by false invoices from non-existent companies, *id.* at 17.

102.     The orphan program fraud had been ongoing since the early 1990's and was the subject of an August 3, 1994 letter from the IIRO headquarters to the IIRO in Pakistan suggesting that headquarters would not send more money to the Afghan orphan program because of major discrepancies in the orphan lists and reports that many orphans were not receiving funds.  Ex. 129 at 3-4, Ex. 131 at 5.  Nevertheless, despite its specific knowledge and claims that the fraud was a "closed chapter," Ex. 127 at 5, the IIRO proceeded to fund the program as shown in the Ernst & Young report.  Ex. 128.

103.     The KSA funded the Afghan orphan program conducted by the IIRO through 2001.  On May 19, 2001, the IIRO announced that over the years it had donated "more than 264.4m Saudi riyals (approximately $70.4 million) to the Afghan people" and that the Saudi government was the main source of the funding:

> the relief assistance to the Afghan people was based on the donations extended by the philanthropists in the Kingdom of Saudi Arabia, notably the Custodian of the Two Holy Mosques King Fahd Bin-Abd-al-Aziz, Crown Prince Abdallah Bin-Abd-al-Aziz, the deputy premier and commander of the national guard, as well as the other members of the royal family.

Ex. 130.

104.     The IIRO stated that during the prior Islamic calendar year (March 2000-March 2001), the IIRO spent 14.9m riyals (approximately $4 million) "for the assistance of the orphans" in Afghanistan. *Id.*

105.        Exhibit 131 is an excerpt from a transcription of a videotaped interview of Jamal al Fadl ("Fadl"), an al Qaeda defector which explains the process of how IIRO funds were diverted to al Qaeda in the early and mid-1990's by the Manager of the IIRO's Peshawar office, Yousef Hamdan.  Fadl describes how the IIRO's procedures allowed Hamdan to directly fund al Qaeda and submit phony reports to his superiors.  Fadl said "it's all about paper."  *Id.* at 5.

106.        Exhibit 132 is an October 3, 1995 Saudi Gazette article which shows that following his assignment to Peshawar, Hamdan was promoted by the IIRO to be the Supervisor of its Relief Section in Jeddah, Saudi Arabia.

107.        Exhibit 133 are excerpts from an April 26, 2005 FBI Letter Head Memorandum which states that Fadl confirmed that the IIRO and the MWL headquarters sent funds to Jelaidan for distribution to al Qaeda.  *Id.* at 4.

108.        Attached as Exhibit 134 are excerpts of the United Nations Security Council Letter dated 1 December 2003 with the attached "Second report of the Monitoring Group established pursuant to resolution 1363 (2001) and extended by resolutions 1390 (2002) and 1455 (2003), on sanctions against Al-Qaida, the Taliban and individuals and entities associated with them."  The U.N. report states that: "A recently published report by the United States Central Intelligence Agency…indicated that IIRO funds directly supported six Al-Qaida training camps in Afghanistan prior to 11 September 2001."  *Id.* at 3.

109.        Exhibit 135 is an April 20, 2004 U.S. State Department Cable which states that the "IIRO has been cited as the principal sponsor of terrorist training camps in Afghanistan during the Taliban regime."  The Taliban regime was in power between 1994 and 2001. *Id.* at 2. The CIA confirmed that "all 19 of the hijackers spent time in al-Qa'ida training camps in Afghanistan in late 1999-2001."  Ex. 67 at 13.

110.     Exhibit 136 is March 11, 2003 testimony of Matthew Epstein and Evan Kohlmann before a House of Representatives Committee that "Abu Nasir was informed by his superiors that approximately 40 to 50 percent of IIRO's charitable funds was being diverted to finance terrorist training camps in Afghanistan and Kashmir." *Id.* at 7.

111.     Exhibit 137 is a DOD Memorandum in which a former detainee stated that for three months in 2000 he worked in the IIRO's accounting office in Saudi Arabia monitoring and reporting on IIRO donations and then attended the al Qaeda al-Faruq camp in 2000-2001 and an associated al Qaeda guesthouse. *Id.* at 2-3.

112.     Exhibit 138 is a DOD Memorandum which states that in 2001 the IIRO's office and guesthouse in Kandahar was run by an al Qaeda member and bodyguard of Osama Bin Laden and that the guesthouse was used as a transit point for recruits to attend al Qaeda's al Faruq training camp (which was attended by the 9/11 hijackers). *Id.* at 2-3.

113.     A 2007 State Department Cable which states that Osama Bin Laden "used the entire IIRO network for his terrorist activities." Ex. 139 at 2.

114.     The roots of the KSA and the MWL/IIRO support for al Qaeda can be traced back to the very formation of al Qaeda in Pakistan in 1988. Ex. 140 is a May 1987 Arab News article which describes a trip by Wael Jelaidan to Jeddah, Saudi Arabia to conduct fundraising for Afghan refugees in Pakistan. The article states that Jelaidan is President of the SRC (which is described as "a government agency") in Pakistan and that a "Saudi Relief Committee" had been formed by Prince Salman to assist in providing help to the Afghan refugees. According to Jelaidan, Prince Salman's committee was working in cooperation with the SRC.

115.     Exhibit 141 is an excerpt from the Yale University Library Manuscripts and Archives "Guide to the Islamic Fundamentalist Audio Recordings Collection" dated August

2012, which provides recordings "thought to have originated in Osama bin Laden's compound in

Kandahar, Afghanistan." *Id.* at 4.  One of the recordings is "A sermon on Jihad in Palestine and

Afghanistan" by Osama Bin Laden in 1988.  Bin Laden states that:

> He urges people to prepare for Jihad and get ready to fight and wage economic war on
> the West by boycotting American goods. He commends the decision of the "Martyr
> King"- without mentioning his name -- who cut off the oil supplies to USA and the West
> in 1973.  He urges people to make a contribution to the Mujahideen through a committee
> of Prince Salman in Peshawar, Pakistan... as well as Jihad fundraising committees in
> Saudi Arabia which are overseen by the deputy prince of Makkah, Saʻud ibn ʻAbd al-
> Muḥsin.

*Id.* at 5.

116.     Exhibit 142 is a February 1992 news article from the Guardian, which states that

prior to January 1992, at least $40 million for Arab jihadists in Afghanistan was "filtered through

Prince Salman, brother to King Fahd, and head of the Afghan *jihad* support committee."

117.     Exhibit 143 is the resume of Abdullah Omar Naseef ("Naseef") which shows that

he was appointed by Royal Decree as Chairman of the KSA's King Abdul Aziz University and

as the Secretary General of the MWL from 1983 to 1993 and Deputy Chair of the KSA's Shura

Council from 1993-2002.

118.     Exhibit 144 is an MWL/IIRO memorandum setting forth the agreement of Osama

Bin Laden (aka "Abu Abdullah," Ex. 145 at 37), and Naseef, then MWL's Secretary General

(and therefore a KSA Minister, *see* ¶121, *infra*) defining the operations of Bin Laden's jihadists

and the assistance that will be provided by the MWL/IIRO and the SRC.  The agreement was

made at a meeting of Osama Bin Laden and Naseef in Pakistan that likely occurred in late 1988

or early 1989, because (a) the document states that Jelaidan (aka "Abu Al-Hasan," Ex. 145 at 38)

of the SRC is assisting the jihadists by protecting their passports and is about the leave the SRC,

and (b) Jelaidan's resume states that he left the SRC in 1988 and joined the MWL in 1989.   Ex. 144 at 3-5; Ex. 81 at 2.

119.     The January 6, 2003 Government's Evidentiary Proffer in *United States v. Arnaout*, states that al Qaeda was created in 1988.  Ex. 145 at 21.  Citing Jelaidan's work for the MWL/IIRO in Pakistan, the document states that:

> Wael Julaidan was a leading supporter of the *jihad* through the relief organization network.  Persons affiliated with charities provided logistical support to the *mujahideen* so integral to the success of the *mujahideen* that, as discussed below, Julaidan was featured in organizational charts as the person responsible for "Jihad Support," even dating to the time prior to the forming of *al Qaeda*.

*Id.* at 19.  The KSA was aware of that Osama Bin Laden had established al Qaeda from at least 1989. Ex. 146 at 1.

**The MWL and its branch the IIRO were agents and alter-egos of the KSA and the KSA abused the corporate forms of the MWL and IIRO to suit its own purposes**

120.     The document discovery of the MWL/IIRO received and translated to date (with discovery still ongoing, *see* ¶95 *supra,* shows that the KSA exercised extensive day-to-day control over the two organizations.   Exhibit 147 is the October 22, 1995 letter of the KSA's Grand Mufti (who also served as Chair of the MWL's Constituent Council) showing that the King of Saudi Arabia nominated the Secretary General of the MWL Abdullah bin Saleh al Obaid ("Obaid") and directed the MWL to address the nomination at their next meeting.

121.     Exhibit 148 is the November 2, 2000 letter of the Obaid concerning his replacement, the new MWL Secretary General Abdul Moshen al Turki ("Turki").  The letter shows that the MWL Secretary General enjoyed the "rank of first minister" with the KSA and "shall receive all benefits of such rank."  As a first minister of the KSA, Turki (and Obaid before him) reported to the KSA's King.  The Secretary General of the MWL was the President of the IIRO and appointed the Secretary General of the IIRO. Ex. 149 at 1, 10.

122.     The King paid for the construction of the MWL's headquarters in Mecca, Saudi Arabia at a cost of over $26 million.  Ex. 150.

123.     Exhibit 151 is the second page of an April 16, 2001 letter of the KSA's King, who instructs the MWL to undertake projects in Malaysia, Vietnam and Pakistan.

124.     Exhibit 152 is a July 27, 1999 letter of the KSA's Ministry of Foreign Affairs, which states that the KSA issued a royal decree directing the MWL and WAMY to provide assistance to refugees in Bangladesh.

125.     Obaid's March 29, 2004 declaration states that he was the MWL's Secretary General from 1995 to 2000 and that the MWL "is sponsored and financially supported by the Saudi government."  Ex. 153.  Obaid also states that:

> As the [MWL's] Secretary General, I was also one of eight members of the [KSA's] Supreme Council for Islamic Affairs, established by King Fahd by Royal Decree No. 296/8 (1994). The Supreme Council has responsibility for Saudi Arabia's Islamic policies in other countries.

*Id.* at 2.

126.     Obaid, in a June 10, 2000 letter as the MWL Secretary General and as a member of the KSA's Supreme Council of Islamic Affairs, reported to Prince Sultan, Chair of the KSA's Supreme Council, about a MWL trip to Poland.  Ex. 154.

127.     The April 6, 2003 declaration of Abdulaziz H. al Fahd states that "the role of the Supreme Council of Islamic Affairs is to carry out foreign policy and is responsible for Islamic policy abroad."   Ex. 155 at ¶ 2.  The declaration also confirms that "[o]versight of government activities overseas via Islamic organizations such as MWL and WAMY is exercised through government officials who head those organizations…," *id.*  at ¶ 3, and that the "[d]isbursement of government funds includes grants to these Islamic charitable organizations in furtherance of national policy."  *Id.*  at ¶ 4.

128.     In a June 12, 1989 letter the KSA's Ministry of Foreign Affairs specified the criteria that must be used by the MWL for the KSA to approve support provided by the MWL to Islamic Centers in the U.S.  Ex. 156.

129.     The KSA selected the IIRO's employee in China and provided instructions to that employee regarding his work program, as shown by a March 6, 1999 letter from the IIRO to the KSA's Ambassador to China, and a May 13, 1999 letter from the KSA's Ambassador to the IIRO.  Ex. 157.

130.     Exhibit 158 is a September 6, 1999 letter of the KSA's Ministry of Islamic Affairs to the MWL's Director of the MWL, Philippines sanctioning the MWL's financial grant for an Islamic Institute in the Philippines.

131.     Exhibit 159 is a 1993 MWL funding application prepared by a Philippines mosque; the last page of the form provides for approval of the application by the KSA's Embassy.  *Id.* at 4.

132.     Exhibit 160 is a 1991 MWL form letter response to an application for financial assistance, which states that the application form must be certified by the KSA's Embassy.

133.     Exhibit 161 is a February 6, 2001 letter from the MWL confirming the urgent instructions of the KSA's Ministry of Islamic Affairs directing the MWL to form a delegation to immediately travel to Bulgaria.

134.     In 1999, the KSA's Minister of Internal Affairs directed the IIRO, WAMY, AHIF and the SRC to form a Committee lead by the KSA via a classified telegram that was referenced in a November 28, 1999 IIRO letter responding to that telegram.  Ex. 162.

135.     An IIRO spreadsheet regarding relief aid in Africa states that the aid is "under the supervision of the Saudi Embassy" and "implimented [sic] by (IIRO)" and notes that with regard

43

to "110 bails of clothes" they are "awaiting [sic] orders on how to distribute them from the Saudi Embassy…"  Ex. 163 at 1, 3.

136.     The Minister of Islamic Affairs Ash-Shaikh, gave a speech in which he stated that the Council of Ministers issued "tens of official regulations…regulating the work of charities," including "public" charities, and that one of the goals of the KSA was to strengthen "public Islamic institutions" such as the MWL and WAMY.  Ex. 164 at 7.

137.     In an April 2, 2003 declaration, Ali Muhamed al Kamal ('Kamal'), the MWL's Manager of Financial Affairs Administration, states:

> The MWL's policies are established by its Constitutive Council, which is chaired by the Grand Mufti of Saudi Arabia. The MWL's daily operations are conducted and supervised by its General Secretariat which is headed by a Secretary General appointed by the Constitutive Council based on a nomination by the Saudi Government. The MWL's annual budget is 80 million Saudi Riyals, which is funded by an annual grant from the Saudi Government.

Ex. 165 at 2.

138.     The MWL's 2002 statement of revenues shows that in 2001 the MWL received SR79,999,999.92 from the KSA, which represented 98.5% of the MWL's annual revenues.  Ex. 166.

139.     The KSA funded the IIRO via an annual budgetary allocation, emergency funds and KSA fund raising campaigns.  Ex. 167 at 2-3, Ex. 125.

140.     In 2000, the KSA prepared a list of the members of the KSA's Shura Council (the advisory body to the KSA's King), which shows that the Chairman of the KSA's Shura Council was also on the Jurisprudence Council of the MWL and that Mahmoud Ibn Abdullah Taybah ("Taybah") was a member of the KSA's Shura Council.  Ex. 168 at 2, 7.

141.     Exhibit 169 is a Saudi economic survey dated October 13, 1999, which shows that the IIRO held a meeting of its Board of Directors overseen by the MWL and that the KSA's Taybah (spelled "Tiaba") was a member of the IIRO Board.

142.     The May 1999 obituary of Abdul Aziz bin Baz states that he was the KSA's Grand Mufti, Head of the KSA's Senior Council of the Ulema and simultaneously served as the MWL's Chairman of its Constituting Council. Ex. 170.

143.     Exhibit 171 is a May 7, 1999 letter from the IIRO to Whaeeb bin Mohammed Al Sahly, who is addressed in his dual roles as both the KSA's Chargé d'Affairs at its Thailand Embassy, and as the IIRO's "office supervisor in Thailand".

144.     Exhibit 172 is an undated letter from MWL's Obaid to the KSA's Minister of Education asking for the KSA to temporarily "loan" a KSA employee to work as a supervisor for the MWL.

145.     Exhibit 173 is a September 18, 2001 letter from the IIRO's Secretary General addressed to Ibrahim Mohammad Al Hobr in his dual roles as both the KSA's Religious Attaché at its Ethiopian Embassy and as the Head of the IIRO in Ethiopia.

146.     Exhibit 174 is a MWL document from the late 1980's which shows that KSA's Ambassador to the United Kingdom also was a member of the MWL's Board in the United Kingdom.  The MWL stated, "Among the reasons why the office was registered . . .was to obtain indirect diplomatic immunity through the presidency of the ambassador of KSA to the office." *Id.* at 5.  The Ambassador also had the right to appoint new board members, to dissolve the office and dispose of office properties. *Id.*

147.        Exhibit 175 contains hotel receipts from September 2000 produced by the IIRO showing that their employees conducted their travel inside Pakistan as representatives of the KSA, specifically the KSA Embassy.

148.        Exhibit 176 is the April 24, 2001 letter from the MWL's Secretary General to the KSA's King requesting that the KSA issue Saudi diplomatic passports to the MWL office directors in Europe, Africa, Australia and the Middle East and for the KSA to establish a practice to issue such passports for all MWL office directors working abroad.

149.        Exhibit 177 is the June 2, 2017 letter from Alan Kabat, Esq., attorney for defendants Turki, Obaid, Naseef and Adnan Khalil Basha (who was the MWL's Deputy Secretary General from 1980-1997 and the IIRO's Secretary General from 1997-2013), stating that the travel of those defendants during their employment for the IIRO and MWL was on official KSA passports that the KSA government retained after each trip.  *Id.* at 1.  As a result, those defendants claimed that they could not produce their passports to the plaintiffs.  Those passports are therefore requested from the KSA in the proposed discovery plan.

150.        Correspondence from 1988, 1993, 2002 and 2003 among the Philippines government, the MWL and the KSA, shows that at the request of the KSA, through the MWL's Naseef, the MWL and the IIRO were granted "full diplomatic immunity" in the Philippines, Indonesia and Malaysia from 1988 through 2003.  Ex. 178.  In 1993, the KSA Embassy complained to the Philippines government about an immigration raid on the MWL office and stated that the MWL enjoyed the KSA's diplomatic immunity, and the Philippines government agreed that "appropriate steps" would be taken.  *Id.* at 2.  The KSA Embassy again complained to the Philippines that in June 2001, local authorities attempted to impose a tax on the MWL, and the KSA asserted that the MWL shared the KSA's tax-exempt diplomatic status.  *Id.* at 6.  The

KSA's letter confirms that the KSA arranged for Saudi government diplomatic status for the MWL in various other foreign countries, the "MWL offices in other ASEAN cities and elsewhere are tax exempt." *Id.* at 7.

151.     Exhibit 179 is a "Summary of Development Activities" prepared by Muhamed Jamal Khalifa, the Director of the MWL in the Philippines in 1988-1993, who states that the MWL worked "in close coordination with the Saudi embassy in Manila." *Id.* at 2.

152.     The MWL/IIRO used the offices of the KSA at its Embassies around the world. Exhibit 180 is a property deed dated August 24, 1989 which shows that the MWL's office in the Philippines was located at the KSA Embassy in Manila.   Exhibit 181 is a December 22, 1996 press account stating that the MWL's registered office in Britain is located at the KSA Embassy in London and that the MWL maintains other office locations at Saudi embassies around the world.

153.     The head of the MWL/IIRO in Canada testified in 1999 before a Canadian court that the MWL "is a fully government funded organization" and that "[i]n other words, I work for the government of Saudi Arabia" and "am an employee of that government...."; that "the IIRO is the relief branch of that organization [the MWL] which means that we are controlled in all of our activities and plans by the government of Saudi Arabia..."; and, that the MWL/IIRO "has to abide by the policy of the Government of Saudi Arabia..." and that "[i]f anybody deviates from that, he would be fired; he would not work at all with IIRO or with the [MWL]...."  Ex. 182 at 3, 5.

154.     The KSA routinely handled various types of financial transactions for the MWL/IIRO, including:

- an October 1998 authorization from the MWL to their bank to transfer funds to the KSA Embassy in Russia to pay the salaries and other expenses for MWL personnel in Russia, Ex. 183;

- the April 2000 transfer of SR1,106,881 (approximately $295,000) from the IIRO to the KSA's Islamic Affairs Attaché in Indonesia, Ex. 184;

- a December 1997 check in the amount of $682.40 from the IIRO to the KSA's Embassy in Zambia, Ex. 185;

- in July 1999, Abdullah al Noshan, the Director of the MWL in the United States, received "payroll" payments from the KSA (listed as "Saudi Cultural"), Ex. 186 at 1, 12;

- in September 1999, the KSA made the necessary legal arrangements and received the proceeds from the sale of an IIRO property in Germany, Ex. 187.

155.    The KSA's embassies and officials around the world defined, supervised,

monitored and/or implemented various MWL/IIRO projects and accepted funds from the

MWL/IIRO to carry out those projects.  Specifically, KSA personnel:

- identified a program (via the KSA Embassy) in Siberia in 2000, received the funds from MWL/IIRO and reported back to the MWL/IIRO on the implementation of the program; Ex. 188;

- paid the salaries of teachers at a school in Niger in 1999, Ex. 189;

- dispersed funds to local organizations in India in February 2000, Ex. 190;

- distributed dates in a November 1999 relief program in Eritrea, Ex. 191;

- purchased rice for an aid project in the Philippines in August 2000, Ex. 192;

- carried out aid programs in four African countries in September 1998, Ex. 193;

- delivered dates (via the Saudi military) to the Bangladesh military in February 1999, Ex. 194;

- provided dates to Islamic Centers and schools in Bangladesh in March 1999, through KSA's Religious Attaché, Ex. 195;

- shipped containers of dates to the Philippines, Ex. 196;

- handled a Moroccan orphan project in January 2001 through the Saudi Embassy in Rabat, Ex. 197.

- distributed financial assistance to various recipients in Lebanon in 1996 in a joint mission of the Saudi Ambassador and MWL/IIRO, Ex. 198

- ordered the IIRO to distribute KSA's Qurans in Bulgaria in May 2001 in a direct command from the King, Ex. 199 at 3.

156.    Exhibit 200 contains portions of the IIRO's "Financial Regulations," which show that the KSA ("a representative of the Saudi Arabian Embassy") is authorized to make purchasing decisions for the IIRO as a member of a local committee and shows that the IIRO was authorized to make "advance payments or trusts" (loans) to "Saudi Arabian embassy officials." *Id.* at 3-4

157.    Exhibit 201 is the July 18, 2000 letter from the IIRO to the KSA's Ministry of Foreign Affairs asking the KSA to obtain diplomatic license plates for IIRO vehicles in India, noting that the WAMY had previously obtained such diplomatic plates for its vehicles.

158.    Exhibit 202 is a May 2001 letter from the KSA's Embassy in Indonesia to the IIRO providing information and guidance to the IIRO regarding various aid projects suggested by the Indonesian government.

159.    Exhibit 203 is a confidential telegram dated July 27, 1999 from Prince Sultan, as Head of the Supreme Council of Islamic Affairs to the MWL's Secretary General (also listed as a Member of the Supreme Council) and six other KSA Cabinet Ministers and the KSA Director of Intelligence, sharing classified information of the KSA with the MWL.

160.    Exhibit 204 is a MWL/IIRO announcement dated April 21, 1999 from the KSA Education Minister regarding the KSA royal approval for IIRO to collect donations for Kosovo.

161.    Exhibit 205 is a fax dated July 11, 2000 from MWL/IIRO Secretary General asking the KSA Embassy in Moscow to provide information about an IIRO office in Russia.

162.     Exhibit 206 is a letter dated Aug 31, 2001 from MWL/IIRO to the KSA's Minister of Islamic Affairs affirming that all of IIRO's programs such as aid to orphans, sheltering refugees and medical programs take place within its efforts of the propagation of Islam and expressing IIRO's commitment to coordinate with the Ministry and that "all our efforts are attributed to our beloved Kingdom."

163.     Exhibit 207 is an IIRO 1996 circular mandating that all Ramadan programs be put under the authority of a committee made up of a member of the KSA Embassy, a member of the KSA's Imam University and IIRO.

164.     Exhibit 208 is a letter dated June 24, 2001 from the MWL Secretary General to the King, identifying a KSA owned property in Switzerland that is in arrears and requesting the King allocate funds to the MWL in order to reinstate ownership and maintain the property for the KSA.

165.     Exhibit 209 is a letter from the MWL/IIRO Director dated June 8, 1999 to the KSA Ambassador in Washington DC requesting that the Embassy deliver a check to a local mosque.

166.     Exhibit 210 is a letter dated May 31, 2000 from the KSA Embassy in Manila to the IIRO describing in detail how the Embassy implemented an IIRO program by distributing medicine in the Philippines.

167.     Exhibit 211 is a letter dated May 23, 2001 from the KSA Embassy in Pakistan to the Secretary-General of the IIRO stating that the Embassy was "steering the work of the organization's representative" in Afghanistan.

168.     Exhibit 212 is letter dated Oct 13, 2001 in which IIRO Pakistan informs the

IIRO's Secretary General that that the KSA Embassy in Islamabad has directed IIRO personnel

to refrain from speaking to the media.

**WAMY had close ties and provided direct
support to al Qaeda, including the 9/11 hijackers**

169.     The WAMY, the LBI and the BIF are different names for the same organization.

An undated WAMY document entitled "Brief Information about LBI," shows that as of 1987

LBI was "a subsidiary organization of World Assembly of Muslim Youth (WAMY) in Saudi

Arabia." Ex. 213 at 1.  In 1995, a letter of WAMY's Secretary General shows that he also acted

as the "Chairman of the Supervising Committee of the L.B.I" and referred to an employee as

working for LBI-WAMY.  *Id.* at 2.  As of December 1996, a WAMY – Pakistan memo shows

that the LBI had changed its name to WAMY.  *Id.* at 3.

170.     WAMY claims that BIF is a separate organization, but WAMY and BIF share the

same office addresses throughout the world and the LBI was renamed BIF as a subterfuge to hide

WAMY/LBI's terrorist activities.   The January 22, 2003 Second Superseding Indictment in

*United States v. Arnaout*, CITE states "In or about the early 1990s, LBI was renamed

Benevolence International Foundation (BIF)" and that one of the reasons for the change was "to

reduce scrutiny by authorities."  Ex. 61 at 4.  The Indictment states that: "In or about May 1991,

after agreement between al Qaeda and the NIF [Sudan's ruling party], BIF established an office

in the Sudan for the purpose of supporting *jihad* and the *mujahideen* generally with military and

logistical support by operating camps and providing field medical care for the *mujahideen*."  *Id.*

at 5.

171.     The WAMY/LBI/BIF had longstanding ties to Osama Bin Laden and had direct

links with al Qaeda.  The December 21, 2004 United States Treasury Department designation of

Adel Batterjee states that WAMY's predecessor "LBI was affiliated with Maktab Al-Khidamat (MK), which was co-founded and financed by UBL and is the precursor organization of al Qaida.  LBI later joined al Qaida upon the dissolution of MK."  Ex. 213 at 4.

172.     The government's evidentiary proffer in *Arnaout*, states that LBI and BIF supported Osama bin Laden and his affiliated groups prior to and after the formation of al Qaeda. Ex.145 at 16-17.   It also confirms that Muhamed Bayazid, one of the founders of al Qaeda, was the President of BIF in the United States "[a]t least as of fall 1994."   *Id.* at 23-24.

173.     A November 9, 2002 State Department Cable signed by Secretary Colin Powell sets forth in detail the close involvement and financial, logistical and military support of BIF and LBI for al Qaeda's terrorist operations in the 1990's through and including 2001.  Ex. 214.

174.     The WAMY office in Canada was under the authority of WAMY's U.S. office, headed by KSA Embassy diplomat Abdullah Bin Laden aka Abdullah Binladin. Ex. 215 at 1, 3; *see* ¶176, *infra*.  In 2001, "WAMY o/a [operating as] BIF" held an account in a Canadian bank. On March 24, 2001, the account received $50,293 via wire transfer from Saudi Arabia. Ex. 216. Between March 24 and June 12, 2001, the WAMY/BIF Canadian account sent $50,246 to a U.S. account for BIF's orphan program in Afghanistan.  Ex. 217 at 1, 16.  BIF internal documents and the plea agreement of BIF's President show that BIF's orphan program was operated by WAMY/BIF as a cover for the diversion of funds to "fighters overseas", *i.e.* al Qaeda.  Ex. 145 at 96-97; Ex. 218 at 4.   As a result, Canadian authorities revoked WAMY's charitable status. Ex. 219.

175.     Said Rageah, a WAMY employee and student at the IIASA school run by the KSA in Virginia, was simultaneously the Imam and President of the WAMY supported Islamic Center AYAH in Maryland in 2001.  Rageah was also a fund-raiser for the Global Relief

Foundation, an al Qaeda supporting charity.  Ex. 220; *see* ¶31, *supra*.   An FBI timeline shows that two days before the 9/11 attacks, hijackers Mihdhar and Hazmi visited the Islamic Center AYAH and left two bags.  Ex. 221.

176.     Osama Bin Laden's nephew, Abdullah Bin Laden was WAMY's President in the United States from 1991 until 2001 and worked at KSA's Embassy, allegedly as an Administrative Attaché.  Ex. 222 at 2. The Congressional Joint Inquiry report states that

> according to FBI documents, there is evidence that hijackers Marwan al-Shehhi and Mohammed Atta were in contact with Mohammed Rafique Quadir Harunani, the subject of an FBI counterterrorism investigation since 1999 and a close associate of Abdullah Bin Laden.

Ex. 13 at 23.  The report also states that "According to the FBI, Abdullah Bin Laden has a number of connections to terrorist organizations."  *Id.* at 24.

177.     Exhibit 223 shows that Mohamed Quadir Harunani received a call at (703) 941 7783 in July 2000 from Said Bahaji, a member of the Hamburg cell of al Qaeda directly linked to 9/11 hijackers Atta and Shehhi, who with prior knowledge of the impending attack, fled to Pakistan just days before the attack. 9/11 Report at 164, 249.

178.      WAMY and its President and KSA employee Abdullah Bin Laden had extensive business dealings in 1996-2000 with Harunani (aka Muhammed Quadir, Ex.13 at 23) through Harunani's company Transcom International.  Ex. 224.

179.     WAMY also had dealings in 2000 and/or 2001 with SDG Terrorist Anwar Aulaqi. WAMY's files contained a draft employment contract between Aulaqi and the Dar Al Hijra mosque in Virginia, where Aulaqi started work in January 2001 and where hijackers Hazmi, Hanjour and possibly others attended.  Ex. 225; 9/11 Report at 229.

**WAMY is an agent and alter-ego of the KSA**

180.        Exhibit 226 is the April 2003 declaration of Abu Unuq, Financial Director of

WAMY, which states that:

> WAMY was established by Royal Decree…WAMY is governed principally by its
> General Assembly and President who was appointed by the Saudi Government.  The
> current President of WAMY is the Minister of Islamic Affairs in Saudi Arabia. [ash-
> Shaikh).  The daily operations of WAMY are supervised by its Secretary General. The
> Government of Saudi Arabia funds a large portion of WAMY's budget.

*Id.* at 1-2.

181.        Exhibit 21 is the May 6, 2001 letter of the KSA's Sowailem to WAMY,

recommending that WAMY proceed with funding of a Muslim school project in Pennsylvania.

182.        Exhibit 227 is a January 2002 U.S. government Middle East Trip Summary which

states that it was told by a KSA agency that the operations of the AHIF and WAMY are

regulated by the KSA's Ministry of Islamic Affairs.  *Id.* at 1-2.

183.        The Declaration of Abdulaziz al Fahad dated April 6, 2003, states that

government officials of the KSA serve as the heads of WAMY and MWL.  Ex. 155 at 3

184.        The October 2002 obituary of Maneh al Johani ("Johani"), states that he was the

Secretary General of WAMY from 1987 until his death; the document also shows that Johani

was as a member of the KSA's Shura Council and the head of its sub-committee on Islamic

Affairs.  Ex. 228.

185.        As of November 1999, the KSA's Naseef was not only a Vice Chairman of the

Shura Council but a Vice Chairman of WAMY.  Ex. 58 at 6; Ex. 143 at 1.

186.        A page from WAMY's website shows that Hussein al Ayed worked for the

KSA's Ministry of Islamic Affairs in various countries around the world and as a Member of

WAMY's Board of Trustees.  Ex. 229 at 1, 2.

187.    The November 19, 2005 affidavit of Abdullah Bin Laden states for "several years" prior to and including September 2000 he was in the United States working as "an administrative officer at the Saudi Arabian Embassy, and worked full time in various information technology roles for entities associated with the Embassy."  Ex.222 at 2.  Abdullah Bin Laden further states that he founded WAMY's operations in the United States in 1991 and worked for WAMY at the same time he was working for the KSA in the United States.  *Id.*

188.    Exhibit 230 is a portion of the book entitled *The Bin Ladens* by Steve Coll, which quotes an FBI agent that prior to the 9/11 attacks the KSA arranged for WAMY employees in the United States to have diplomatic passports and that Abdullah Bin Laden was listed as an Attaché by the Saudi Arabia Embassy in Washington. *Id.* at 2-3.

189.    Exhibit 231 is the August 2003 Wachovia bank statement of a WAMY employee in the United States, Mohamed Bin Faris, which shows that he was on the payroll of the KSA Embassy ("Saudi Cultural").

190.    Exhibit 232 is the July 22, 1992 letter of the KSA's Ministry of Islamic Affairs to WAMY's Johani stating that the KSA was currently searching for a location for a WAMY office in the United States and once the KSA found the proper location it would study the possibility of buying it and determine the budget required to operate the office.

191.    Exhibit 233 is the June 15, 2001 letter from the KSA's Institute of Islamic and Arabic Sciences in America ("IIASA") to WAMY asking that WAMY make a scholarship grant to the daughter of an employee of the KSA's IIASA.

192.    WAMY regularly paid the phone bills of the KSA's IIASA, as shown by billing records from December 1993 and WAMY paid $1,500 for a "farewell party" at the KSA's IIASA on June 17, 2001.  Ex. 234, Ex. 235.

193.        Exhibit 236 is a letter from the KSA Embassy New Delhi to the WAMY Sec-Gen dated Feb 29, 2000 describing a press account regarding the KSA's funding of 31 mosques built by WAMY in India.

**The SHC provided critical financial and logistical support for al Qaeda**

194.        Plaintiffs are entitled to discovery of the SHC regarding its substantial financial and logistical support for al Qaeda which provided the terrorist organization with a safe haven to conduct its criminal activities and military training for its jihadists, including at least two of the 9/11 terrorists.

195.        The SHC's prior Motion to Dismiss, confirmed that "King Fahad vested in SHC and its President, Prince Salman, sole authority to collect donations and provide aid and humanitarian relief in Bosnia-Herzegovina, so KSA would "speak with one voice" as a nation toward Bosnia-Herzegovina." Ex. 237 at 4.

196.        A Department of Defense Intelligence Agency report says that in 1993 the KSA's SHC used humanitarian aid shipments to smuggle weapons to the Somali warlord responsible for the attacks against U.S. military personnel. Ex. 238 at 2-3.  As the 9/11 Commission noted, the al Qaeda "trainers were later heard boasting that their assistance led to the October 1993 shoot down of two U.S. Black Hawk helicopters by members of a Somali militia group and to the subsequent withdrawal of U.S. forces in early 1994." 9/11 Report at 60.

197.        Exhibit 239 is a Report prepared by the German Federal Office of Criminal Investigation for the International Criminal Tribunal for the former Yugoslavia, which shows that Prince Salman and the SHC funded the Third World Relief Agency ("TWRA") with over $120 million starting in July 1992 through July 1995.  *Id.* at 12.  The same report shows numerous transactions between April 1993 to July 1994 involving millions of dollars exchanged among Prince Salman, Wael Jelaidan and the TWRA, with Jelaidan transferring approximately

$6 million to the TWRA and receiving over $7 million from the TWRA. *Id.* at 14-15. Jelaidan was the director of MWL Pakistan at this time. Ex. 81 at 3.

198.     Exhibit 240 is an excerpt from a FBI interview report of a cooperating witness, Jamal al Fadl, an al Qaeda defector, and an FBI interview report dated February 4, 1998 of the same cooperating witness which states that the TWRA office in Zagreb, Croatia acted as a meeting point for visiting al Qaeda members and that the TWRA recruited for al Qaeda in Croatian refugee camps. *Id.* at 1, 8.

199.     The declaration of Ali Ahmed Ali Hamad ("Hamad"), Ex. 241, a deputy commander and member of al Qaeda from 1991-1997, states that in 1992, the TWRA facilitated transportation, food and supplies for al Qaeda fighters during the war in Bosnia. *Id.* at 1, 5-6. Hamad also confirms that the SHC provided regular and knowing support to al Qaeda in various ways, including:

- food and supplies, *Id.* at 6;

- allowed al Qaeda to use SHC vehicles, including vehicles bearing the mark of the United Nations to pass checkpoints, *Id.* at 7;

- gave al Qaeda access to SHC houses and offices, *Id.* at 7;

- appointed al Qaeda members to lead SHC positions, including the SHC office in the Mostar, headed by al Qaeda's Abu al Miqdad al Dosari, who later became head of the SHC office in the capital city of Sarajevo, *Id.* at 7;

- knowingly employed al Qaeda members with the SHC after the conclusion of the war in 1995 including Hamad in Mostar, *Id.* at 9.

200.     Exhibit 242 is DOD Memorandum regarding detainee Abdullah al Matrafi which states that Matrafi joined al Qaeda in the late 1980s and was with Osama bin Laden in Afghanistan. He was hired by the SHC and from 1993-1997 worked as the SHC's Director in Mecca, Saudi Arabia. In 2000, Matrafi returned to Afghanistan to support al Qaeda. *Id.* at 2-3.

In the memorandum, the DOD describes the SHC "as having available resources and being in a position to provide financial support to terrorist organizations willing to attack US persons or interests." *Id.* at 3 n. 4.

201.        Exhibit 243 is a 2002 State Department cable which lists the SHC as one of the "Dirty Dozen" terror supporting organizations in Bosnia with known links to terrorism. *Id.* at 2

202.        A CIA report shows that "[i]n the mid-1990s" hijackers Hazmi and Mihdhar fought "in Bosnia as members of a mujahidin force led by a prominent al-Qa'ida operative." Ex. 67 at 50.  SHC provided material support to the elite al Qaeda unit in Bosnia led by Abu Zubayr. Ex. 67 at 49.

203.        The statement of Yasin Kadi to OFAC states that "KA Stan" was a construction company operating in Bosnia in 1996-2001 that was jointly owned by Yasin Kadi, Wael Jelaidan and Chafiq Ayadi. Ex. 244 at 9.  The U.S. Treasury named Kadi, Jelaidan and Ayadi as SDG Terrorists based on their support of al Qaeda. *Id.* at 1, 4.  The designation of Jelaidan states that:

> The United States' has credible information that Wa'el Julaidan is an associate of Osama bin Laden and several of bin Laden's top lieutenants. Julaidan has directed organizations that have provided financial and logistical support to al Qaida. Accordingly, the United States is designating Julaidan…as a person who supports terror.

*Id.* at 2.

204.        Exhibit 246 contains KA Stan corporate documents from 1998 showing money transfers from SHC to KA Stan purportedly for construction projects in Bosnia.  The projects took place under the authority of the SHC offices controlled by al Qaeda. Supra at ¶199.  After paying all expenses such as labor, material and sub-contractors, the remainder demonstrates gross profits.  For instance, the project titled "Arab Institute" in Mostar shows 687,300 DM (approx. $400,000) remaining from an initial contract of 1,000,000 DM (approx. $600,000.) *Id.* at 6.  SDG Terrorist Yasin Kadi told the U.S. Treasury Department that "[t]he company ceased

58

to be financially viable during the course of 1998, with its expenses outstripping its income." Ex. 244 at 9.

205.     In 2000, the President of the SHC, Prince Salman visited with Jelaidan in Bosnia to oversee the SHC projects of KA Stan and Jelaidan.  Ex. 245 at 3.  Two years later, just days prior to the US and KSA's joint designation of Jelaidan as a SDG Terrorist, the KSA refused to provide any information related to Jelaidan to the U.S.  The General Counsel of the U.S. Treasury Department testified to the Congressional Joint Inquiry, "I think that taxes credulity, or there is another motive we are not being told."  Ex. 13 at 31.

## The SHC, SRC and SJRC function as part of the KSA

206.     No discovery has been conducted of the SHC, SRC or SJRC.

207.     The January 31, 2004 declaration of Matlib al Nafissa, as a Member of the KSA's Council of Ministers, states that the Saudi High Commission ("SHC") "is an arm of the Saudi Arabian government" and "[a]ctions taken by the Saudi High Commission may be viewed as actions of the government of Saudi Arabia...". Ex. 247 at 1.

208.     The February 17, 2004 declaration of Saud bin Mohammad al Roshood, Director of the Executive Office of the SHC, states that:

- the SHC was created by decision of the President of the Council of Ministers of Saudi Arabia and used by the KSA as a "primary instrument" of its foreign policy, *id.* at 9, 12;

- has been continuously headed by Prince Salman, *id.* at 9;

- SHC's Executive Committee and Supreme Commission of the SHC include KSA officials and makes grant decisions based on the KSA's foreign policy, *id.* at 9;

- the Director of the SHC was a KSA employee and member of the KSA civil service and reported to other Saudi Arabia employees, *id.* at 10;

- KSA decided the recipients and amounts of all grants made by the SHC, *id.* at 9;

- the SHC was staffed with civil servant employees of the KSA detailed from other KSA ministries and administrative organs, and such employees were paid by their respective ministries and administrative organs, rather than by the SHC, *id.* at 10.

209.    Exhibit 248 is the January 10, 2005 declaration of Abdulrahman al Suwailem ("Suwailem"), President of the Saudi Joint Relief Committee ("SJRC") and the SRC, which states that:

- The SJRC (together with its component organizations, the MWL, IIRO, WAMY and AHIF) was directed and controlled by the KSA's Minister of Interior and the SRC's President (Suwailem himself) together with other high-ranking officials of the KSA from various of the KSA's Ministries.  *Id.* at 3.

- Employees of the SRC and the SJRC include civil service employees of the KSA, and the KSA pays the salaries and benefits of those employees.  *Id.* at 3-4.

210.    Exhibit 249 is the April 2, 2004 declaration of Abdul Rahman al Swailem, President of the SRC which states that:  the SRC was established by Royal Declaration, *id.* at 1; the KSA sponsors and supervises the SRC, *id.* at 2; Suwailem held an "Excellency Diplomatic position" of the KSA, *id.* at 1.

211.    In March 2001, the King ordered the SRC to provide assistance in the form of medical supplies, food, tents and blankets inside Afghanistan, then controlled by the Taliban. Ex. 250.

212.    In January through July 2001, the King issued orders to the SRC to provide assistance in the form of medical supplies, food, tents and blankets inside Malawi, Indonesia, Ghana and Somalia. Ex. 251.

## The government reports relied upon by the KSA

213.    Unlike a typical government "accident" investigation, the 9/11 Commission did not use a manual or apply a consistent fact-finding standard such as "probable cause."  Rather, the Commission applied a variety of standards to different issues.  With regard to conclusions

related to the Saudi government and its actors, the Commission evidently used a heightened criminal standard of proof of "certainty."  The Commission Chairs Tom Kean and Lee Hamilton wrote in their book *Without Precedent* that to link Thumairy or Bayoumi with the plot, the evidence had "to conclusively suggest a firm connection" and the "dots" regarding Hazmi and Mihdhar's actions had to be linked "with certitude."  They acknowledged that there was circumstantial evidence that "Thumairy had been in contact with two hijackers and that Bayoumi had aided them" but stated "lacking corroborating evidence, one cannot be certain."  Ex. 252 at 3.  The Commission's Chairs also noted that KSA's Ambassador and Prince Bandar facilitated the Commission's trips to Saudi Arabia and that Prince Bandar "opened many doors" to conduct witness interviews, including Thumairy and Bayoumi. *Id.* at 2.

214.     According to one account, *The Commission* by Philip Shenon, days before the report was completed, there remained a sharp disagreement among the 9/11 staff members regarding appropriate standard of proof to be applied to the Saudi government actors.  One group, which prepared a draft report with "serious allegations against the Saudis," felt that "it was 'crazy' to insist on 100 percent proof of guilt" when it came to a terrorist network like al Qaeda or the workings of an authoritarian regime like Saudi Arabia."  But they were overruled by a more senior staff member (a former criminal prosecutor) who removed the Saudi government allegations because they could not be "backed up conclusively" and stated that "an allegation based on partial evidence should not be made at all...."   Ex. 253 at 2.

215.     Exhibit 254 is a Declaration of Richard Ben-Veniste, a 9/11 Commissioner who stated that the Commission's investigation was limited by time and resources and that he expected further investigation related to the KSA's involvement in support to the 9/11 plot was warranted.

216.        Numerous statements in the 9/11 Report and related Commission documents

concerning Thumairy and Bayoumi directly support the plaintiffs' allegations, facts and

inferences and the need for discovery:

- Thumairy "appears to have associated with a particularly radical faction within the community of local worshippers..." 9/11 Report at 216-17.

- "The circumstantial evidence makes Thumairy a logical person to consider as a possible contact for Hazmi and Mihdhar." 9/11 Report at 217.

- The Commission's Chairs acknowledged that Thumairy "had been in contact with two hijackers..." Ex. 252 at 2, but Thumairy denied to investigators that he even recognized them, a denial that the Commissioners "found suspect". 9/11 Report at 217.

- "Thumairy continued to deny knowing al- Bayoumi" even after he was confronted with evidence of their contacts. Ex. 3 at 12.

- Bayoumi and Thumairy had "numerous telephonic contacts between December 1998 and December 2000" including calls exchanged between their personal and cell phones.  9/11 Report at 515 n.13.

- Bayoumi "recalls consulting with Thumairy, solely on religious matters."  Bayoumi used to come frequently to the mosque to see Fahad Al Thumairy.  *Id.*

- "It is certainly possible that [Bayoumi] has dissembled about some aspects of his story, perhaps to counter suspicion."  9/11 Report at 218.

- Bayoumi had a KSA passport marker which indicates "possible adherence to al Qaeda" and that "we believe the marking suggests the need for further inquiry...."  9/11 Report at 516 n.19.

- On February 1, 2000, Bayoumi went to the Saudi Los Angeles Consulate, "met with a still-unidentified consular employee whom Bayoumi already knew" and later met Hazmi and Mihdhar at a halal food restaurant on Venice Boulevard. 9/11 Report at 515 n.15.

- Several days later, Hazmi and Mihdhar arrived in San Diego and met Bayoumi, who helped them find an apartment and open a bank account; Bayoumi also filled out their lease application, provided the certified check necessary to pay their cash deposit and co-signed their lease.  9/11 Report at 219.

- The lease application completed by Bayoumi "states that Hazmi and Mihdhar resided in Bayoumi's apartment from January 15 to February 2, 2000..." 9/11 Report at 516 n.24.

- Mohdar Abdullah stated that Bayoumi introduced him to Hazmi and Mihdhar, asked him to help them acclimate to the United States, and Abdullah became a "key associate" of the hijackers during their "critical first weeks in San Diego" and helped them in various ways including translation, obtaining identification, learning English, locating English classes and flight lessons. 9/11 Report at 220, 516 n 20.

- Mohdar Abdullah visited the King Fahad Mosque frequently and was very close to radical followers of Thumairy. 9/11 Report at 515 n.13.

- Bayoumi lent Hazmi and Mihdhar his cell phone and Hazmi answered calls on that phone. 9/11 Report at 516 n.26.

- Bayoumi knew Aulaqi and they exchanged four phone calls in February 2000 after the hijackers moved to San Diego. 9/11 Report at 517 n.33.

- Bayoumi "denied having any relationship at all with Basnan," despite numerous personal phone contacts. Ex. 6 at 8.

- Bayoumi refused a polygraph test. Ex. 6 at 9.

- A "fellow employee described Bayoumi as a 'ghost employee'" who did no work yet in April 2000 received a promotion, salary increase and additional stipend. 9/11 Report at 515 n. 18.

217.    The "background facts" cited by the KSA from the 9/11 Report, KSA's brief at 21-22, are taken out of context and ignore other contradictory information. Moreover, the trustworthiness of those facts is doubtful for various reasons, including the sources of information, many of which have not been disclosed, and the Commission's focus on improving diplomatic ties with Saudi Arabia.

a.    KSA's brief cites: "in 1994, Saudi Arabia froze the assets of Osama Bin Laden, Al Qaeda's founder, and revoked his citizenship," *id.* at 57, 170.

But while in Sudan (1992-1996), Bin Laden received $12 million from his brother on behalf of the Saudi Bin Laden Company of which Osama Bin Laden was a shareholder.  Ex. 255 at 7.  This is more than the amount ($9.9m) that the KSA claims it froze in 1994. Ex. 256 at 3.

b.      KSA's brief cites "in 1995, terrorists who "admitted being inspired by Bin Ladin" were convicted of a bombing in Riyadh, *id.* at 60."

In November 1998, the KSA's Prince Nayef, the Minister of Interior and head of KSA internal intelligence, told the U.S. that Osama Bin Laden was not responsible for Khobar or Riyadh bombings.  Ex. 257 at 2.   In October 2001, Prince Nayef made a public statement regarding the involvement of Saudis in the 9/11 attacks: "the Kingdom has found no proof of any Saudi being a member of the Al-Qaeda organization." Ex. 258 at 3.

c.      KSA's brief cites that "as of early 1996, Bin Laden believed that the "Egyptian or Saudi regimes, or both," were trying to have him killed, *id.* at 63.

But in 1996, the Saudi government turned down Sudan's offer to turn Osama Bin Laden over to the Saudis.  In *Ghost Wars* by Steve Coll and the 9/11 Commission Staff Statement No. 5 ("Staff Statement 5") according to the Sudanese, the Saudis did not want Bin Laden. Ex. 259 at 2; Ex. 260 at 4.

Moreover, in May 1996, the KSA gave permission for a plane belonging to Afghanistan's Ariana Airlines and carrying Osama Bin Laden and 150 of his family and followers to fly over Saudi territory on its way from Sudan to Afghanistan.  The KSA tracked the flight to Qatar where the KSA was aware that members of the Qatar government effusively welcomed bin Laden and refueled his plane before he flew on to Afghanistan. Ex. 259 at 2, 4; Ex. 261 at 11.

d.      KSA's brief cites that "in August 1996, Bin Laden issued a "self-styled fatwa" that "condemned the Saudi monarchy" for permitting American soldiers in Saudi Arabia, *id.* at 48.

This fatwa praised various terrorist attacks, particularly the 1993 firefight in Somalia after which the United States "left the area carrying disappointment, humiliation, defeat and your dead with you."  A Department of Defense Intelligence Agency report says that in 1993 the KSA's SHC used humanitarian aid shipments to smuggle weapons to the Somali warlord responsible for the attacks. Ex. 238 at 2-3.  As the 9/11 Commission noted, the al Qaeda "trainers were later heard boasting that their assistance led to the October 1993 shootdown of two U.S. Black Hawk helicopters by members of a Somali militia group and to the subsequent withdrawal of U.S. forces in early 1994." 9/11 Report at 60.

e.      KSA's brief cites that "in the spring of 1998, Saudi Arabia "quietly disrupted Bin Ladin cells in its country that were planning to attack U.S. forces with shoulder-fired missiles," *id.* at 115"

Prior to 9/11, all al Qaeda attacks in Saudi Arabia were against U.S. targets.  Osama Bin Laden states that the Saudi government and Royal Family were not targeted. "Even though some of the work was targeting the American centers, not the regime, and was useful in getting America to leave its huge military bases in Saudi Arabia and in educating young men about the jihad."  Ex. 255 at 31.

f.      KSA's brief states that "later in 1998, officials at the highest levels of the Saudi government worked with the United States, trying to have Bin Laden expelled from Afghanistan," *id.* at 115, 121-22.

The 9/11 Report states "Saudi Crown Prince Abdullah, who had taken charge from the ailing King Fahd, promised Tenet an all-out secret effort to persuade the Taliban to expel Bin Ladin so that he could be sent to the United States or to another country for trial. The Kingdom's emissary would be its intelligence chief, Prince Turki bin Faisal." 9/11 Report at 115. Prince Turki failed on his purported mission to get the Taliban to turn over Osama Bin Laden. Nevertheless, according to Ahmed Rashid's book, *Taliban* and *Staff Statement 5*, in the summer of 1998, the KSA provided 400 trucks and millions of dollars to the Taliban. Shortly afterwards, using these resources the Taliban and al Qaeda attacked and sacked the northern Afghan city of Mazar al Sharif. KSA material support to the Taliban continued for at least another year. Ex. 262 at 2 and Ex. 260 at 9-10.

218.      A CIA report and flight schedules show that after September 1998 until at least April 2000 the KSA allowed the Taliban controlled Ariana Airlines to operate between Saudi Arabia and Afghanistan and to be used by Osama Bin Laden to move cash, supplies and al Qaeda recruits between Saudi Arabia and Afghanistan. Ex. 263 at 1, 2, 4; Ex. 264; 9/11 Report at 66.

### *Ashton* Plaintiffs' Proposed Jurisdictional Discovery Plan of the KSA

219.      Based on their Complaint and the aforesaid facts, attached as Appendix 1 is the *Ashton* plaintiffs' jurisdictional discovery plan, the Plaintiffs Executive Committee served the KSA with discovery requests in June 2017. The KSA objected to all of the discovery requests in their entirety. Pursuant to Fed. R. Civ. at 26, this Court should hold a Scheduling Conference for jurisdictional discovery of the KSA and order the parties to confer and attempt to agree in good faith on a Discovery Plan. Absent agreement, the Court should determine the proper sequence

and content of jurisdictional discovery.  Attached is the *Ashton* plaintiffs' proposed discovery plan.

### Timeline of the KSA's support for al Qaeda

220.    Based on their Complaint and the aforesaid facts, attached as Appendix 2 is a timeline of KSA support for al Qaeda.

Dated: New York, New York
       November 9, 2017


_____
Steven R. Pounian

_____
James P. Kreindler

Sworn to before me this 9th
day of November, 2017

_____
Notary Public

MEGAN W. BENETT
NOTARY PUBLIC, STATE OF NEW YORK
QUALIFIED IN NEW YORK COUNTY
NO. 02BE6223361
COMMISSION EXPIRES JUNE 14, 20__8

Sworn to before me this 9th
day of November, 2017

_____
Notary Public

MEGAN W. BENETT
NOTARY PUBLIC, STATE OF NEW YORK
QUALIFIED IN NEW YORK COUNTY
NO. 02BE6223361
COMMISSION EXPIRES JUNE 14, 20__8

## CERTIFICATE OF SERVICE

I hereby certify that on the 9th day of November, 2017, I served a true and correct copy of the foregoing ATTORNEY AFFIDAVIT IN OPPOSITION TO THE MOTIONS TO DISMISS OF THE KINGDOM OF SAUDI ARABIA AND THE SAUDI HIGH COMMISSION via this Court's ECF/CM system to all parties registered to receive service and via UPS overnight mail, with a complete set of Exhibits upon:

Michael K. Kellogg, Esq.
Mark C. Hansen, Esq.
Gregory G. Rapawy,
Kellogg, Hansen, Todd, Figel & Frederick, P.L.L.C.
Summer Square 1615 M Street, N.W., Suite 400
Washington, D.C. 20026-3209
*Attorneys for The Kingdom of Saudi Arabia*

Lawrence S. Robbins, Esq.
Roy T. Englert, Jr.
Robbins, Russell, Englert, Orseck, Untereiner & Sauber LLP
1801 K Street, N.W., Suite 411
Washington, D.C. 20009
*Attorneys for the Saudi High Commission for Relief of Bosnia & Herzegovina*

s/ James P. Kreindler
James P. Kreindler, Esq.