# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (GBD) (FM)<br>ECF Case |

This document relates to:

*Federal Insurance Co., et al. v. al Qaida, et al.*, No. 03-cv-6978
*Vigilant Insurance Co., et al. v. Kingdom of Saudi Arabia, et al.*, No. 03-cv-8591
*Thomas Burnett, Sr., et al. v. Al Baraka Inv. & Dev. Corp., et al.*, No. 03-cv-9849
*Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.*, No. 04-cv-1922
*Continental Casualty Co., et al. v. Al Qaeda, et al.*, No. 04-cv-5970
*Cantor Fitzgerald Assocs., et al. v. Akida Inv. Co., et al.*, No. 04-cv-7065
*Pacific Employers Insurance Co., et al. v. Kingdom of Saudi Arabia, et al.*, No. 04-cv-7216
*Euro Brokers Inc., et al. v. Al Baraka Inv. & Dev. Corp., et al.*, No. 04-cv-7279
*Beazley Furlonge Ltd. v. Saudi Binladin Group, Inc., et al.*, No. 16-cv-7456
*Bowrosen, et al. v. Kingdom of Saudi Arabia*, No. 16-cv-8070
*McCarthy, et al. v. Kingdom of Saudi Arabia*, No. 16-cv-8884
*Aguilar, et al. v. Kingdom of Saudi Arabia, et al.*, No. 16-cv-9663
*Addesso, et al. v. Kingdom of Saudi Arabia, et al.*, No. 16-cv-9937
*Hodges, et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-117
*DeSimone v. Kingdom of Saudi Arabia*, No. 17-cv-348
*Aiken, et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-450
*The Underwriting Members of Lloyd's Syndicate 53, et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-2129
*The Charter Oak Fire Insurance Co., et al. v. Al Rajhi Bank, et al.*, No. 17-cv-2651
*General Reinsurance Corp., et al. v. Kingdom of Saudi Arabia*, No. 17-cv-3810
*Abarca, et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-3887
*Arrowood Indemnity Co. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-3908
*Abrams, et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-4201
*Abtello, et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-5174
*Aasheim, et al. v. Kingdom of Saudi Arabia, et al.,* No. 17-cv-5471
*Allianz Versicherungs–Aktiengesellschaft, et al. v. Kingdom of Saudi Arabia*, No. 17-CV-6519
*Muenchener Rueckversicherungs-Gesellschaft Aktiengesellschaft in Muenchen, et al. v. Kingdom of Saudi Arabia, et al.,* No. 17-cv-07914
*Abbate v. Kingdom of Saudi Arabia*, No. 17-cv-8617

# PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO THE RENEWED MOTIONS TO DISMISS OF THE KINGDOM OF SAUDI ARABIA AND SAUDI HIGH COMMISSION FOR RELIEF OF BOSNIA & HERZEGOVINA

November 9, 2017

# TABLE OF CONTENTS

**Page**

I.   JASTA ESTABLISHES A NEW LEGAL FRAMEWORK THAT REQUIRES DISMISSAL OF THE KINGDOM'S MOTION...................................................4

    A.   Congress Designed JASTA to Ensure that the FSIA Posed No Impediment to Plaintiffs' Claims. .......................................................................4

    B.   JASTA Provides a Straightforward Exception to Sovereign Immunity that Plaintiffs' Claims Readily Satisfy.................................................7

        1.   The Claims Are Based On "Tortious Acts" in the Form of Material Support of Terrorism. ...................................................9

        2.   The Claims Are Based on Tortious Acts of the Kingdom and Its Employees, Officials and Agents..............................................10

        3.   Plaintiffs' Claims Are Based on Injuries "Caused By" the Kingdom's Material Support of Terrorism. ..............................18

II.   THE KINGDOM PRESENTS NO "FACTUAL CHALLENGE" TRIGGERING A HEIGHTENED BURDEN ON PLAINTIFFS TO PRODUCE EVIDENCE, AND PLAINTIFFS WOULD SATISFY ANY SUCH BURDEN IN ANY EVENT. ..............21

    A.   The Applicable Legal Framework Depends on Whether the Sovereign Introduces Evidence Contesting Specific Jurisdictional Facts or Fails to Do So. ...................................................................................21

    B.   The Kingdom Has Presented No Challenge to Plaintiffs' Jurisdictional Facts. ....................................................................................25

    C.   The Only Evidence Bearing on Jurisdictional Facts Supports a Finding of Jurisdiction and Further Requires Dismissal of the Kingdom's Motion. ............29

III.   PLAINTIFFS' ALLEGATIONS OF FACT AND EVIDENCE REQUIRE THAT THE KINGDOM'S AND SHC'S MOTIONS TO DISMISS BE DENIED. ...................31

    A.   The Kingdom's Employees and Agents Directly Supported the 9/11 Operation...................................................................................36

        1.   Thumairy and Bayoumi's Support for the Hijackers...............................36

            a)   Tortious Support .........................................................36

            b)   Thumairy and Bayoumi's Knowledge .........................................39

            c)   Causation....................................................................42

d)    Status as Both Employees and Agents............................................ 43

e)    Acts Within Scope of Employment and Agency .......................... 46

2.    Additional Employees and Agents' Direct Support for the September 11th Operation ......................................................... 49

a)    Osama Bassnan ........................................................................... 50

b)    Mohammed al Qudhaeein and Hamdan al Shalawi..................... 51

c)    Mohammed Jabar Hassan Fakihi and Saleh al Hussayen ............ 53

B.    Saudi Arabia's Funding and Sponsorship of al Qaeda ......................................... 56

1.    The Saudi State Committed Tortious Acts in Support of al Qaeda. ......... 57

2.    The SHC Materially Sponsored al Qaeda. ................................................. 62

3.    Saudi Officials Directed the Charities' Support of al Qaeda ................... 63

4.    Attributable Torts of Saudi Arabia's Charity Agents and Alter-Egos ...... 66

5.    Attribution of the Attacks Pursuant to Secondary Liability Principles..... 71

IV.    JURISDICTIONAL DISCOVERY IS WARRANTED. .................................................. 72

V.    JASTA IS CONSTITUTIONAL. .................................................................................... 75

VI.    CONCLUSION................................................................................................................ 76

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Antares Aircraft L.P. v. Fed. Republic of Nigeria,*
  1991 WL 29287 (S.D.N.Y. Mar. 1, 1991) ...........................................................24

*Arch Trading Corp. v. Republic of Ecuador,*
  839 F.3d 193 (2d Cir. 2016) ...................................................................16, 73

*Arriba Ltd. v. Petroleos Mexicanos,*
  962 F. 2d 528 (5th Cir. 1992) ...................................................................15

*Baglab Ltd. v. Johnson Matthey Bankers Ltd.,*
  665 F. Supp. 289 (S.D.N.Y. 1987) .............................................................24

*Bank Markazi v. Peterson,*
  136 S. Ct. 1310 (2016) .........................................................................75, 76

*Barapind v. Gov't of Republic of India,*
  844 F.3d 824 (9th Cir. 2016) ...................................................................23

*Barkanic v. Gen. Admin. of Civil Aviation,*
  923 F.2d 957 (2d Cir. 1991) ...................................................................12

*Billings v. United States,*
  57 F.3d 797 (9th Cir. 1995) ...................................................................12

*Boim v. Holy Land Found.,*
  549 F.3d 685 (7th Cir. 2008) .......................................................... *passim*

*Bolivarian Republic of Venez. v. Helmerich & Payne Int'l Drilling Co.,*
  137 S. Ct. 1312 (2017) ................................................................. *passim*

*BP Chems. Ltd. v. Jiangsu Sopo Corp.,*
  285 F.3d 677 (8th Cir. 2002) ...................................................................15

*Bradford Trust Co. of Boston v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,*
  805 F.2d 49 (2d Cir. 1986) ...................................................................33

*Chirag v. MT Marida Marguerite Schiffahrts,*
  604 F. App'x 16 (2d Cir. 2015) ...............................................................72

*Corley v. United States,*
  556 U.S. 303 (2009) ...........................................................................4

*De Csepel v. Republic of Hung.*,
714 F.3d 591 (D.C. Cir. 2013) ..............................................................................22

*Doe v. Bin Laden*,
580 F. Supp. 2d 93 (D.D.C. 2008) ...................................................................17, 71

*Doe v. Bin Laden*,
663 F.3d 64 (2d Cir. 2011)......................................................................................6

*Doe v. Pataki*,
120 F.3d 1263 (2d Cir. 1997)..................................................................................4

*Ehrenfeld v. Mahfouz*,
489 F.3d 542 (2d Cir. 2007)..................................................................................72

*EM Ltd. v. Banco Central de la Republica Arg.*,
800 F.3d 78 (2d Cir. 2015)..............................................................................16, 17

*Farmers Ins. Grp. v. Cnty of Santa Clara*,
11 Cal. 4th 992 (1995) ..........................................................................................12

*Fed. Energy Admin. v. Algonquin SNG, Inc.*,
426 U.S. 548 (1976).................................................................................................4

*Fields v. Sanders*,
29 Cal. 2d 834 (1947) ...........................................................................................12

*Figueiredo Ferraz E Engenharia De Projeta LTDA v. Republic of Peru, et al.*,
No. 09-3925 ...........................................................................................................16

*Filetech S.A. v. Fr. Telecom S.A.*,
157 F.3d 922 (2d Cir. 1998)............................................................................23, 26

*Filler v. Hanvit Bank*,
378 F.3d 213 (2d Cir. 2004)..................................................................................66

*Filus v. LOT Polish Airlines*,
907 F.2d 1328 (2d Cir. 1990)..........................................................................72, 73

*First City Tex-Hous. N.A. v. Rafidain Bank*,
150 F.3d 172 (2d Cir. 1998)............................................................................72, 73

*First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*,
462 U.S. 611 (1983)...................................................................................... *passim*

*Foremost-McKesson Inc. v. Islamic Republic of Iran*,
905 F.2d 438 (D.C. Cir. 1990) ...................................................................22, 23, 26

*Frontera Res. Azer. Corp. v. State Oil Co. of Azer. Republic*,
    582 F.3d 393 (2d Cir. 2009)......................................................................................75

*Funk v. Belneftekhim*,
    861 F.3d 354 (2d Cir. 2017)......................................................................................72

*Garb v. Republic of Pol.*,
    440 F.3d 579 (2d Cir. 2006)................................................................................16, 71

*Gentile v. County of Suffolk*,
    129 F.R.D. 435 (E.D.N.Y. 1990), *aff'd*, 926 F.2d 142 (2d Cir. 1991) ....................33

*Gill v. Arab Bank*,
    893 F.Supp.2d 474 (E.D.N.Y. 2012) ........................................................................10

*Globalnet Financial.com, Inc. v. Frank Crystal & Co.*,
    449 F.3d 377 (2d Cir. 2006)......................................................................................12

*Greenfield v. Bragman*,
    208 A.D. 635 (1942) .................................................................................................12

*Halberstam v. Welch*,
    705 F.2d 472 (D.C. Cir. 1983) ........................................................................ *passim*

*Han Kim v. Democratic People's Republic of Korea*,
    774 F.3d 1044 (D.C. Cir. 2014) ................................................................................30

*Havlish v. Bin Laden (In re Terrorist Attacks on September 11, 2001)*,
    2011 U.S. Dist. LEXIS 155899 (S.D.N.Y. Dec. 22, 2011) (Daniels, J.) ................19

*Holder v. Humanitarian Law Project*,
    561 U.S. 1 (2010).....................................................................................................62

*In re Terrorist Attacks on September 11, 2001*,
    134 F.Supp.3d 744 (S.D.N.Y. 2015)..............................................................5, 6, 70

*In re Terrorist Attacks on September 11, 2001*,
    349 F.Supp.2d 765 (S.D.N.Y. 2005).........................................................................6

*In re Terrorist Attacks on September 11, 2001*,
    538 F.3d 71 (2d Cir. 2008), revised .......................................................6, 22, 59, 76

*In re Terrorist Attacks on September 11, 2001*,
    714 F.3d 109 (2d Cir. 2013)...................................................................................5, 6

*In re Terrorist Attacks on September 11, 2001*,
    714 F.3d 118 (2d Cir. 2013)......................................................................................6

*In re Terrorist Attacks on September 11, 2001,*
 741 F.3d 353 (2d Cir. 2013) ................................................................6, 75

*In re Terrorist Attacks on September 11, 2001 (O'Neill v. Asat Trust Reg.),*
 714 F.3d 659 (2d Cir. 2013) .........................................................55, 64, 65

*Jazini v. Nissan Motor Co., Ltd.,*
 184 F.3d 181, 186 (2d Cir. 1998) ...............................................................72

*Kamen v. AT&T Co.,*
 791 F.2d 1006 (2d Cir. 1986) ...............................................................73, 74

*Kilburn v. Socialist People's Libyan Arab Jamahiriya,*
 376 F.3d 1123 (D.C. Cir. 2004) ......................................................... *passim*

*Kirschenbaum v. 650 Fifth Ave. & Related Props.,*
 830 F.3d 107 (2d Cir. 2016), *cert. denied,* 137 S. Ct. 1332 (2017) ........................................16

*Letelier v. Republic of Chile,*
 488 F. Supp. 665 (D.D.C. 1980) .................................................................7

*Lipsky v. Commonwealth United Corp.,*
 551 F.2d 887 (2d Cir. 1976) ...............................................................33, 34

*Liu v. Republic of China,*
 892 F.2d 1419 (9th Cir. 1989) .................................................................7

*OBB Personenverkehr AG v. Sachs,*
 No. 13-1607 (Apr. 2015) .......................................................................15

*Owens v. Republic of Sudan,*
 412 F. Supp. 2d 99 (D.D.C. 2006) ..........................................................22

*Owens v. Republic of Sudan,*
 531 F.3d 884 (D.C. Cir. 2008) ...............................................................19

*Owens v. Republic of Sudan,*
 864 F.3d 751 (D.C. Cir. 2017) ........................................................ *passim*

*PCO, Inc. v. Christensen, Miller, Fink, Jacobs, Glaser, Weil &Shapiro,*
 150 Cal. App. 4th 384 (2007) .................................................................12

*Perez v. Van Groningen & Sons,*
 41 Cal.3d 962 (1986) ..........................................................................12

*Phx. Consulting, Inc. v. Republic of Angl.,*
 216 F.3d 36 (D.C. Cir. 2000) .........................................................21, 23, 24

*Plaut v. Spendthrift Farm, Inc.*,
    514 U.S. 211 (1995)........................................................................................................75, 76

*Prakash v. American University*,
    727 F.3d 1174, 1179-80 (D.C. Cir. 1984)................................................................23

*Price v. Socialist People's Libyan Arab Jamahiriya*,
    389 F.3d 192 (D.C. Cir. 2004).........................................................................24, 26

*Republic of Arg. v. NML Capital, Ltd.*,
    134 S.Ct. 2250 (2014)................................................................................................22

*Robinson v. Gov't of Malay.*,
    269 F.3d 133 (2d Cir. 2001).............................................................................. *passim*

*Ross v. Mitsui Fudosan, Inc.*,
    2 F.Supp.2d 522 (S.D.N.Y. 1998) ........................................................................12

*Rothstein v. UBS AG*,
    708 F.3d 82 (2d Cir. 2013)................................................................................19, 20

*Rux v. Republic of Sudan*,
    461 F.3d 461 (4th Cir. 2006) ............................................................................ *passim*

*Ryan v. United States*,
    2015 U.S. Dist. LEXIS 162633 (S.D.N.Y., Dec. 3, 2015) ....................................73

*SerVaas Inc. v. Republic of Iraq*,
    2011 U.S. App. LEXIS 2709 (2d Cir. Feb. 16, 2011) ...........................................16

*Simpson v. Socialist People's Libyan Arab Jamahiriya*,
    470 F.3d 356 (D.C. Cir. 2006) .........................................................................24, 26

*Skanga Energy & Marine Ltd. v. Petroleos de Venezuela S.A.*,
    522 F. App'x 88 (2d Cir. 2013) .............................................................................24

*Spanierman Gallery, Profit Sharing Plan v. Merritt*,
    No. 00CIV5712LTSTHK, 2003 WL 22909160 (S.D.N.Y. Dec. 9, 2003) .............33

*Swarna v. Al-Awandi*,
    622 F.3d 123 (2d Cir. 2010)...................................................................................12

*Sweet v. Sheahan*,
    235 F.3d 80, 83 (2d Cir. 2000)...............................................................................21

*Tatum v. Jackson*,
    668 F. Supp. 2d 584 (S.D.N.Y. 2009)....................................................................40

*Tokio Marine Mgmt., Inc. v. M/V Zim Tokyo*,
  No. 91 Civ. 0063 (PKL), 1993 WL 322869 (S.D.N.Y. Aug. 17, 1993) ................................33

*Transamerica Leasing, Inc. v. La Republica de Venezuela*,
  200 F.3d 843 (D.C. Cir. 2000) ...........................................................................................15

*USAA Cas. Ins. Co. v. Permanent Mission of Republic of Namib.*,
  681 F.3d 103 (2d Cir. 2012)................................................................................................7

*Valentin v. Hosp.*,
  254 F.3d 358 (1st Cir. 2001) ........................................................................................22, 23

*Weitz Co. v. MH Wash.*,
  631 F.3d 510 (8th Cir. 2011) .............................................................................................15

*Wyatt v. Syrian Arab Republic*,
  736 F. Supp. 2d 106 (D.D.C. 2010) ...................................................................................22

*Zappia Middle East Constr. Co. v. Emirate of Abu Dhabi*,
  215 F.3d 247 (2d Cir. 2000)...............................................................................................74

## Statutes

18 U.S.C. § 2333(d) ................................................................................................................5

18 U.S.C. § 2339A(b)(1)........................................................................................................42

28 U.S.C. § 1603...............................................................................................................66, 71

28 U.S.C § 1605(a)(5)...................................................................................................5, 7, 31

28 U.S.C. § 1605B ....................................................................................................... *passim*

28 U.S.C. § 1606...................................................................................................................8

Justice Against Sponsors of Terrorism Act, Pub. L. No. 114-222, 130 Stat. 852
  (2016).......................................................................................................................... *passim*

## Other Authorities

162 Cong. Rec. H5239 (daily ed. Sept. 9, 2016) ...................................................................7

162 Cong. Rec. H6023 (daily ed. Sept. 28, 2016) .................................................................7

162 Cong. Rec. S2845 (daily ed. May 17, 2016)...................................................................1

162 Cong. Rec. S6166 (daily ed. Sept. 28, 2016)..................................................................4

Fed. R. Civ. P. 12 .................................................................................................................33

Fed. R. Civ. P. 60 .................................................................................................... 75, 76

Fed. R. Evid. 803 .......................................................................................................... 33

Restatement (Second) Agency (1958) ........................................................................... 69

*Restatement (Second) of Torts* (1979) .......................................................................... 18

*Restatement (Third) Agency* (2006) ............................................................................. 11

These cases are before this Court on remand from the Second Circuit, as a result of Congress's enactment of the Justice Against Sponsors of Terrorism Act, Pub. L. No. 114-222, 130 Stat. 852 (2016) ("JASTA").[1]  The parties agree that "JASTA was intended to apply to this case."[2]  Indeed, JASTA modified the Foreign Sovereign Immunities Act ("FSIA") specifically to provide plaintiffs in this case and those like them "with the broadest possible basis … to seek relief against … foreign countries … that have provided material support, directly or indirectly" to terrorist organizations, *id.* § 2(b), 130 Stat. at 853, and, in particular, to "allow the victims of 9/11 to pursue some small measure of justice by giving them a legal avenue" against "foreign sponsors of terrorism."  162 Cong. Rec. S2845, S2846 (daily ed. May 17, 2016) (Sen. Schumer). That is, Congress amended the FSIA to remove any jurisdictional barrier to a merits determination on plaintiffs' specific claims, thus eliminating the asserted basis for the Kingdom's current motion and requiring that the motion be denied.  *See infra* p. 4-21.

Plaintiffs are family members of the nearly 3,000 people killed in the September 11, 2001 terrorist attacks (the "September 11th attacks"), thousands of individuals severely injured as a result of the attacks, and commercial entities that incurred billions of dollars of property damage and other losses as a consequence of the attacks.  Plaintiffs seek to hold accountable the individuals and other parties, including defendants the Kingdom of Saudi Arabia ("the Kingdom") and the Saudi High Commission ("SHC") that provided al Qaeda with the means to conceive, plan, coordinate, and carry out the September 11th attacks.  Plaintiffs' Consolidated Amended Complaint ("CAC") provides detailed factual allegations regarding the specific individual agents and employees of the Kingdom operating within the United States and Germany that participated in the planning of the attacks or directly supported certain of the hijackers.  It also describes the acts of Kingdom officials, employees, and agents that provided

---

[1] *See* Order, Case Nos. 15-3426, *et al.* (2d Cir. Feb. 7, 2017) (ECF No. 287).
[2] *See* Joint Motion To Vacate and Remand In Light of Changes In Law at 2, Case Nos. 15-3426-cv *et al.* (2d Cir. filed Oct. 21, 2016).

essential financial and other support to al Qaeda, which enabled al Qaeda to train terrorists and achieve an international strike capability.  This occurred in part through the intertwined relationship between the Kingdom and da'awa (Arabic for "proselytizing") organizations (aka "charities," including SHC) that both directly supported al Qaeda and were directed, managed, and staffed by Kingdom officials and agents.  Detailed documentary materials, admissible expert testimony, and U.S. government documents that the Kingdom itself claims are admissible evidence buttress and confirm the jurisdictional facts and the legal theories supporting plaintiffs' factual allegations and legal claims.  *See infra* pp. 31-71.  In particular, four expert affidavits confirm the implications and reasonable inferences to be drawn from the matters set out in plaintiffs' CAC and supporting materials (inferences drawn from facts the Kingdom does not dispute), and those affidavits serve as admissible evidence in support of each aspect of the several bases supporting jurisdiction in this case.  *See infra* pp. 34-36.

Over many years, the Kingdom has sought to dismiss plaintiffs' claims by asserting a series of limiting constructions of the FSIA, certain of which this Court or the Second Circuit accepted at particular times in this litigation.  *See infra* pp. 5-6.  Now, JASTA completely resets the legal framework that governs this litigation.  It eliminates the bases for the supposed limitations on the FSIA and specifically seeks to correct judicial determinations that rested on them.  *See infra* pp. 5-6.  JASTA does so by eliminating the textual bases for certain defenses, by adding clarifying language designed to ensure the attribution of the acts of agents and others to the Kingdom, by making the Kingdom and other sovereigns subject to claims under the Anti-Terrorism Act ("ATA"), and by confirming that the scope of secondary liability and treatment of causation are to be flexible and appropriately tailored to the situation posed to victims of terrorist attacks.  JASTA §§ 2(b), 3(a), 4(a), 130 Stat. at 853-54; *infra* pp. 4-21.  JASTA's central purpose, and the touchstone for construing its provisions, is to ensure that victims of terrorism

have the chance to prove their case on the merits in court.  *See* JASTA §§ 2(a)(4)-(7), 2(b); 130 Stat. at 853; *infra* pp.4-8.

The Kingdom's purported "factual challenge" and claims about "admissible evidence" do not require anything other than denial of the motion based on a simple and direct application of JASTA and the FSIA.  Indeed, the Kingdom does not present a factual challenge.  It offers no evidence contesting any fact relevant to jurisdiction, nor makes any affirmative presentation of facts at all.  Instead, it relies on U.S. government reports or statements that are not inconsistent with plaintiffs' theories, assess only the status of the U.S. government's own evidence-collection efforts, present political assessments of undisputed facts, or, most importantly, provide "admissible evidence" that *supports* plaintiffs' claims.  *See infra* pp. 21-30.  In addition, the Kingdom misstates the governing legal framework:  to the extent specific jurisdictional facts are not called into question, the usual motion to dismiss standards apply, requiring that the truth of the allegations be accepted and that reasonable inferences be drawn in the plaintiffs' favor.  *See infra* pp. 21-29.  Even had the Kingdom introduced evidence that controverted plaintiffs' jurisdictional facts, plaintiffs meet any resulting burden: each relevant fact, reasonable inference, and contested legal conclusion is supported by expert testimony, recognized as highly probative admissible evidence in support of a terrorism claim (as well as supported by the Kingdom's "evidence" in the form of U.S. reports).  *See infra* pp. 29-30.  In any event, the Kingdom's motion could not be granted based on a factual challenge without providing plaintiffs with the opportunity to undertake discovery.  Jurisdictional discovery is especially appropriate because the Kingdom's arguments focus on matters peculiarly within the Kingdom's control and knowledge, discovery would enable plaintiffs to buttress multiple bases for jurisdiction, and discovery would be necessary in all events before any final resolution of any evidentiary dispute presented by the Kingdom.

I.   **JASTA ESTABLISHES A NEW LEGAL FRAMEWORK THAT REQUIRES DISMISSAL OF THE KINGDOM'S MOTION.**

A.   **Congress Designed JASTA to Ensure that the FSIA Posed No Impediment to Plaintiffs' Claims.**

As confirmed by JASTA's very title—the *Justice* Against Sponsors of Terrorism Act—Congress amended the FSIA to eliminate jurisdictional barriers to claims like plaintiffs', and the jurisdictional barriers that had prevented a merits determination of plaintiffs' specific claims in particular.  It declares that "[t]he United States has a vital interest in providing persons and entities injured as a result of terrorist attacks committed within the United States with full access to the court system in order to pursue civil claims" against foreign sovereigns, JASTA § 2(a)(7), 130 Stat. at 852-53, and that the Act's basic purpose is to provide such victims "with the broadest possible basis … to seek relief against … foreign countries … that have provided material support directly or indirectly" to terrorist organizations, *id.* § 2(b), 130 Stat. at 853.  The floor sponsors of the Act stated that JASTA "would allow the victims of 9/11 to pursue some small measure of justice by giving them a legal avenue to hold foreign sponsors of terrorism accountable for their actions," 162 Cong. Rec. at S2846 (Sen. Schumer), and "would enable Americans and their family members who lost loved ones on [September 11th] to pursue their claims for justice against those who sponsored those acts of terrorism on the U.S. homeland."  *Id.* at S2845 (Senator Cornyn).[3]

As the Supreme Court recently confirmed, Congress's "basic objectives" in enacting a particular FSIA exception to immunity must govern the provision's construction.  *Bolivarian Republic of Venez. v. Helmerich & Payne Int'l Drilling Co.*, 137 S. Ct. 1312, 1319 (2017).

---

[3]*See also* 162 Cong. Rec. S6166, S6168 (daily ed. Sept. 28, 2016) (Sen. Cornyn) ("we should allow the victims of a terrorist attack on our soil the opportunity for their day in court …. The financing of terrorism in the United States is not behavior we should tolerate from any nation, allies included.").  Because Senators Cornyn and Schumer were co-sponsors of JASTA, their floor statements are entitled to considerable weight, particularly since Congress did not issue a conference or committee reports.  *See, e.g., Corley v. United States,* 556 U.S. 303, 318 (2009); *Fed. Energy Admin. v. Algonquin SNG, Inc.,* 426 U.S. 548, 564 (1976); *Doe v. Pataki,* 120 F.3d 1263, 1277 (2d Cir. 1997).

JASTA's particular provisions were clearly designed to ensure that plaintiffs' claims would proceed to a merits determination, and they function in just this manner.

Specifically, JASTA confirms that jurisdiction can be based on a foreign sovereign's actions undertaken abroad (not just in the United States). *Compare* JASTA § 3(a), 130 Stat. at 853 (enacting § 1605B(b)(2)), *with In re Terrorist Attacks on September 11, 2001,* 714 F.3d 109, 114-18 (2d Cir. 2013). Under JASTA, jurisdiction arises from the acts of a foreign sovereign's "agent," not just the foreign sovereign's employee or official, thus ensuring that artificial "scope of employment" and "alter-ego" limitations cannot provide a jurisdictional defense. *Compare* JASTA § 3(a), 130 Stat. at 853 (enacting § 1605B(b)(2)), *with In re Terrorist Attacks on September 11, 2001,* 134 F.Supp.3d 744, 783-87 (S.D.N.Y. 2015), *vacated and remanded*, No. 15-3426-cv(L) (2d Cir. Feb. 7, 2017) (ECF No. 287). JASTA also eliminates the Kingdom's ability to rely on a "discretionary function" limitation on jurisdiction. *Compare* JASTA § 3(a), 130 Stat. at 853 (new 28 U.S.C. § 1605B(b)), *with* 28 U.S.C § 1605(a)(5). JASTA also for the first time subjects the Kingdom and other foreign sovereigns to claims under the ATA, *see* JASTA § 3(a), 130 Stat. at 853 (enacting 28 U.S.C. § 1605B(c)), confirming that the provision of material support to terrorists is the focus of the "tortious acts" requirement and that the broad causation and attribution standards apply to such claims, JASTA § 2(b), 130 Stat. at 853. This was further confirmed by JASTA's substitution of "tortious acts" for Section 1605(a)(5)'s "tortious act," ensuring that the sovereign's entire course of support for terrorism, not just individual acts, would be considered in determining causation and attribution. JASTA also amended the ATA's civil liability provisions to expressly "recognize the substantive causes of action for aiding and abetting and conspiracy liability." *Id.* § 2(a)(4); 130 Stat. at 852; *see id.* § 4(a), 130 Stat. at 854 (enacting 18 U.S.C. § 2333(d)).

More broadly, JASTA directs the courts to employ the expansive causation and attribution standards that Congress deemed appropriate to ensure that victims of terrorism have a robust remedy in U.S. courts.  The Act calls on courts to construe the Act to provide "full access to the court system in order to pursue civil claims against … countries that have knowingly or recklessly provided material support or resources, directly or indirectly, to the persons or organizations" fostering terrorism, *id*. § (2)(a)(7), 130 Stat. at 852-53; states that the fundamental "purpose of the Act is to provide civil litigants with the broadest possible basis … to seek relief against … countries … that have provided material support, directly or indirectly," *id.* § 2(b), 130 Stat. at 853; relies on having "material support" for terrorist activities construed broadly to counter international terrorism, *id.* § 2(a)(1)-(3), (6), (7), 130 Stat. at 852-53; and directly invokes the leading D.C. Circuit case that provides a broad construction of when secondary liability arises, *id.* § (2)(a)(5), 130 Stat. at 852.  The Act thus directs the courts to apply and give even broader effect to the expansive constructions of the ATA and the FSIA in the counter-terrorism context that certain courts had already adopted.[4]  In contrast, prior determinations in this litigation have at times adopted much narrower, limiting constructions of both statutes, some of which the Second Circuit itself directly or indirectly repudiated.[5]  By enacting JASTA,

---

[4]*See, e.g., Owens v. Republic of Sudan*, 864 F.3d 751, 778, 784 (D.C. Cir. 2017) (noting "lighter" and "modest" jurisdictional standard); *Boim v. Holy Land Found.,* 549 F.3d 685, 693-97 (7th Cir. 2008) (en banc) (applying a "relaxed" standard and holding that plaintiff is not required to show "but-for" causation); *Rux v. Republic of Sudan*, 461 F.3d 461, 472-473 (4th Cir. 2006) (FSIA requires only that plaintiff show some "reasonable connection between the act or omission of the defendant and the damages which the plaintiff has suffered," because the FSIA is simply a *jurisdictional* statute that a plaintiff must satisfy in order to overcome a sovereign immunity-based challenge to a court's subject matter jurisdiction); *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1128 (D.C. Cir. 2004) (same).

[5]Indeed, the Kingdom had previously prevailed on constructions of the FSIA or other grounds that the Second Circuit declined to adopt, *see In re Terrorist Attacks on September 11, 2001*, 538 F.3d 71, 86-90 & n.15 (2d Cir. 2008)(affirming on alternative grounds), revised as erroneous, *see Doe v. Bin Laden*, 663 F.3d 64, 70 & n.10 (2d Cir. 2011) (per curiam), or reversed to rejoin the Kingdom to this case, *In re Terrorist Attacks on September 11, 2001*, 741 F.3d 353 (2d Cir. 2013).  As for decisions repudiated by JASTA, *see In re Terrorist Attacks*, 714 F.3d at 114-18 (2d Cir. 2013) (excluding reliance on acts occurring abroad); *In re Terrorist Attacks on September 11, 2001*, 714 F.3d 118, 122-125 (2d Cir. 2013) (no recovery under the ATA on an aiding-and-abetting theory or showing of less than "traditional" proximate causation); *In re Terrorist Attacks*, 134 F.Supp.3d at 782-85,787 (dismissing complaint for failure to satisfy the "entire tort rule");  *In re Terrorist Attacks on September 11, 2001*, 349 F.Supp.2d

Congress consciously rejected such limiting constructions of both statutes.[6]  Indeed, because JASTA functions in large measure to correct the limiting judicial constructions of the FSIA's torts exception, 28 U.S.C. § 1605(a)(5), JASTA confirms that plaintiffs' complaint satisfies that exception to sovereign immunity as well.[7]

> **B.**     **JASTA Provides a Straightforward Exception to Sovereign Immunity that Plaintiffs' Claims Readily Satisfy.**

The FSIA's new immunity exception readily encompasses plaintiffs' claims, just as it was designed to do.  The only issue before the Court is whether plaintiffs' claims make this a "case in which money damages are sought" based on the particular grounds described in the exception.  JASTA § 3(a), 130 Stat. at 853 (new section 28 U.S.C. § 1605B(b)).  Plaintiffs clearly seek money damages on precisely those grounds.

In particular, the Court is called upon to make only the jurisdictional determination of whether plaintiffs' claims present a case of that nature.  As a result, the required showings of material support, attribution, and causation for that jurisdictional determination are lower than the showings necessary to prevail on the merits.  *See, e.g., Owens v. Republic of Sudan*, 864 F.3d

---

765, 801 (S.D.N.Y. 2005) (dismissing Kingdom because alleged donations to "charities" were "discretionary functions").

[6] *See, e.g.,* 162 Cong. Rec. at S2846 (Senator Schumer: "The courts in New York have dismissed the 9/11 victims' claims … These courts are following what we believe is a nonsensical reading of" the FSIA); 162 Cong. Rec. H5239, H5241-42 (daily ed. Sept. 9, 2016) (Rep. Nadler: "because of certain court decisions misinterpreting" the FSIA and ATA, "the 9/11 victims and their families have been unable to pursue their claims in court against some of the parties they believe were responsible for funding the attacks"; *id.* at H5242 (Rep. Maloney: JASTA "would correct misinterpretations of previous legislation and lower court decisions"); 162 Cong. Rec. H6023, H6024 (daily ed. Sept. 28, 2016) (Rep. Goodlatte: "the courts have not consistently interpreted [the FSIA's] exceptions in such a manner that they cover the sponsoring of a terrorist attack on U.S. soil"); *id.* at H6029 (Rep. Smith: the Second Circuit's dismissal of Saudi Arabia and other defendants for lack of jurisdiction has "thwarted the full accountability Americans expect and deserve").

[7] Section 1605(a)(5) contains two additional limitations that are not part of JASTA's new exception, but neither impedes plaintiffs' claims here.  First, the exception for claims "arising out of malicious prosecution" and certain other torts, 28 U.S.C. § 1605(a)(5)(B), has no applicability here.  Nor does the exception for "discretionary function[s]," *id.* § 1605(a)(5)(A), because courts have recognized that foreign sovereigns have no "discretion" to engage in conduct that is illegal or contravenes international law, such as supporting terrorism.  *See, e.g., USAA Cas. Ins. Co. v. Permanent Mission of Republic of Namib.*, 681 F.3d 103, 113 (2d Cir. 2012) (defendant's conduct was not "discretionary" because it violated a city ordinance); *Liu v. Republic of China*, 892 F.2d 1419, 1431 (9th Cir. 1989) ("discretionary function" provision inapplicable because defendant had no discretion to violate law that prohibits murder); *Letelier v. Republic of Chile*, 488 F. Supp. 665, 673 (D.D.C. 1980) ("there is no discretion to commit, or to have one's officers or agents commit, an illegal act").

751, 778 (D.C. Cir. 2017) ("Establishing material support and causation for jurisdictional purposes is a lighter burden than proving a winning case on the merits."); *Rux v. Republic of Sudan*, 461 F.3d 461, 472 (4th Cir. 2006) ("[j]urisdictional causation [under the FSIA] is distinct from the substantive causation element of a claim.").  The "modest burden" that a plaintiff must bear to establish jurisdiction, *Owens*, 864 F.3d at 784, "serves simultaneously to weed out the most insubstantial cases without posing too high a hurdle to surmount at a threshold stage of the litigation," *Rux,* 461 F.3d at 473.  The jurisdictional inquiry should not limit the substantive claims that can be brought against foreign sovereigns, so as not to "run[] afoul of the FSIA's injunction that a non-immune 'foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances.'  28 U.S.C. § 1606."  *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1129 (D.C. Cir. 2004).  In this context, now that the ATA applies to sovereigns, this principle requires that the FSIA's jurisdictional provision be even less restrictive than the broad ATA provisions related to attribution and causation.  These conclusions are especially clear because JASTA sought to provide terrorism victims, and specifically the plaintiffs in this case, with "the broadest possible basis … to seek relief" and "full access to the court system," JASTA § 2(a)(7), (b), 130 Stat. at 852-53, and because the particular FSIA immunity exceptions must be construed to achieve the "basic objective" that Congress sought to achieve.  *Helmerich,* 137 S. Ct. at 1319, 1321.

Especially considered in light of this guiding principle of statutory construction, JASTA's new immunity exception readily encompasses plaintiffs' claims, just as Congress intended.  The case must be one in which "money damages are sought" for (1) "physical injury to person or property or death occurring in the United States"; (2) "caused by" an "act of international terrorism in the United States"; and (3) "caused by" a "tortious act or acts of the foreign state, or of any official, employee, or agent of that foreign state while acting with the scope of his or her

office, employment or agency."  28 U.S.C. § 1605B(b); *see* JASTA § 3(a), 130 Stat. at 853.  In this case, the first two elements are readily established with particularity in the CAC and related materials, which establish that the September 11th attacks were an "act of international terrorism in the United States" that caused extensive "physical injury to person or property or death occurring in the United States."  JASTA § 3(a), 130 Stat. at 853 (new section 28 U.S.C. § 1605B(b)).  The Kingdom does not contest this conclusion.  Equally clearly, "money damages are sought" on grounds satisfying the third element.  As shown below in general terms and later (at pp. 31-71) in particular detail, the CAC and related materials seek relief for: (1) tortious acts; (2) of the Kingdom and attributable to the Kingdom; and (3) injuries "caused by" the tortious acts.

**1.     The Claims Are Based On "Tortious Acts" in the Form of Material Support of Terrorism.**

As described in detail below, *see infra* pp. 31-71, plaintiffs' claims rest directly on the provision of material support to al Qaeda and its members, including the September 11th hijackers.  JASTA expressly recognizes that material support of terrorism is a tortious act encompassed by the new FSIA exception.  *See* JASTA § 2(b), 130 Stat. at 853 (JASTA's purpose is to provide civil litigants with "the broadest possible basis" to seek relief against "persons, entities, and foreign countries" that "have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States"); *id.* § 2(a)(6), 130 Stat. at 852 ("Persons, entities, or countries that knowingly or recklessly contribute material support or resources, directly or indirectly, to persons or organizations that pose a significant risk of committing acts of terrorism . . . should reasonably anticipate being brought to court in the United States to answer for such activities."); *id.* § 2(a)(7), 130 Stat. at 853 (the United States has a "vital interest" in providing victims of terrorism with "full access to the court system in order to pursue civil claims against persons, entities, or

9

countries that have knowingly or recklessly provided material support or resources, directly or indirectly, to the persons or organizations responsible for their injuries"). Courts have repeatedly recognized that the provision of material support to terrorists is a tortious act. *See, e.g., Boim v. Holy Land Found.,* 549 F.3d 685, 691 (7th Cir. 2008); *Gill v. Arab Bank,* 893 F.Supp.2d 474, 481 (E.D.N.Y. 2012). And Congress legislated against this backdrop. Plaintiffs, of course, seek money damages for precisely this type of "tortious act" through their ATA claim, CAC ¶¶ 317-46, and provision of material support to terrorism serves as the "tortious acts" causing injury and serving as the basis for their state law tort claims. *Id.* ¶¶ 363-65, 378-96. In addition, those claims sound in theories and rest on allegations of reckless or intentional conduct, *see, e.g., id.* ¶¶ 51, 318, 379, 399 & 411, not the "mere negligence" that falls beyond the exception's scope, JASTA § 3(a) (codified at 28 U.S.C. § 1605B(d)). Plaintiffs plainly seek money damages for "tortious acts" within the scope of JASTA's immunity exception.

### 2. The Claims Are Based on Tortious Acts of the Kingdom and Its Employees, Officials and Agents.

Equally clearly, plaintiffs seek money damages for the material support of terrorism undertaken by the Kingdom, directly and through acts of its "official, employee, or agent . . . while acting within the scope of his or her office, employment or agency." *See id.* § 1605B(b). In addition to directing courts to apply this attribution test in accord with the flexible standards appropriate for claims asserting material support of terrorism and to ensure that victims of terrorism can secure a merits determination, *see supra* pp. 4-8, JASTA added "agents" to the list of individuals whose acts are attributable to a foreign state under the FSIA, to ensure that plaintiffs' claims would not be defeated by unduly narrow or artificial views of the scope of employment or alter-ego tests. *See infra* pp. 43, 49, 65-71 (addressing scope of Bayoumi's agency).

Even before JASTA's enactment, and still more clearly now, victims of terrorism did not have to establish that the tortious acts were committed by senior foreign officials or that those acts were undertaken as a matter of official state policy.  *See infra* pp. 27, 46 (inapplicability of Kingdom's reliance on U.S. government assessments of Saudi policy and senior official actions).  Quite the contrary:  the FSIA's torts exception was intended to apply to even such minor torts as traffic accidents attributable to low-level foreign officials working in the United States, *see, e.g.,* H. Rep. No. 94-1487, at 20-21 (1976), S. Rep. No. 94-1310 at 20-21 (1976).  JASTA's reference to agents, employees, and officials, JASTA § 3(a), 130 Stat. at 853, makes this even plainer.  *See* 162 Cong. Rec. at S2845 (Senator Cornyn) (JASTA "incorporates traditional principles of vicarious liability and attribution, including doctrines such as respondeat superior [and] agency").  As a result, material support provided to al Qaeda or its members by *any* Saudi official, employee, or agent acting within those capacities is enough to meet the jurisdictional threshold.

The attribution principles reflected in JASTA are also broadly designed to encompass actions undertaken in the course of acting as an employee or agent, even if the resulting wrongful actions are not specifically authorized or are even contrary to official policy.  The *Restatement (Third) Agency* (2006), regularly cited by courts in this Circuit and elsewhere, provides a general guide on agency and scope of employment principles.  Agency is a fiduciary relationship where the principal agrees "that the agent shall act on the principal's behalf and subject to the principal's control," *id.* § 1.01.  In the employment context, an employee acts within the scope of employment "when performing work assigned by the employer or engaging in a course of conduct subject to the employer's control."  *Id.* § 7.07(2).  An employer is "subject to vicarious liability for a tort committed by its employee acting within the scope of employment," *id.* § 7.07(1), and the same principle applies for the principal-agent relationship.  *Id.* §§ 7.03(2),

7.07(3).  JASTA directly adopts these broad principles of vicarious liability.  *See* JASTA § 3(a), 130 Stat. at 853 (codified as 28 U.S.C. § 1605B(b)) (liability for acts whenever undertaken "while acting with the scope of his or her office, employment, or agency").

The breadth of vicarious liability is reflected in various state law decisions, including those of both California and New York.[8]  Liability arises for the full range of wrongful acts of the agent or employee, so long as they are acting in those capacities.  Under California law, an employee's conduct is within the scope of employment even if it is intentional and done with malice and breaches explicit rules set by the employer.  *Farmers Ins. Grp. v. Cnty of Santa Clara*, 11 Cal. 4th 992 (1995).  Even if the wrongful act is not directed, it is attributed to the principal or employer unless the agent or employee is acting for a manifestly personal reason independent of that role.  *PCO, Inc. v. Christensen, Miller, Fink, Jacobs, Glaser, Weil &Shapiro*, 150 Cal. App. 4th 384, 394 (2007).  That is so because an agent acts within the scope of his or her employment when the conduct at issue "was committed in the course of carrying out the employer's business."  *Billings v. United States*, 57 F.3d 797, 800 (9th Cir. 1995).  Agents create liability for their principals even when taking actions *not* in furtherance of their principal's business if the conduct occurred "while the agent was still occupying himself with the principal's business within the scope of his employment."  *Fields v. Sanders*, 29 Cal. 2d 834, 839 (1947); *see also Perez v. Van Groningen & Sons*, 41 Cal.3d 962, 969 (1986) (same).  The result under New York law is little different.[9]

---

[8]Forum choice-of-law principles should be applied to determine the governing state substantive law.  *Barkanic v. Gen. Admin. of Civil Aviation*, 923 F.2d 957, 959-60 (2d Cir. 1991).  Under New York's "interest analysis" conflict rules, the law of the state with the greatest interest in regulating the conduct at issue governs.  *Globalnet Financial.com, Inc. v. Frank Crystal & Co.*, 449 F.3d 377, 384 (2d Cir. 2006).  That is California, where Bayoumi, Thumairy, and Bassnan lived and worked, and engaged in the employment and tortious conduct in issue.

[9]Under New York law, an employee's tortious acts are imputable to the employer if "done while the servant was doing his master's work, no matter how irregularly, or with what disregard of instructions."  *Greenfield v. Bragman*, 208 A.D. 635, 636 (1942); *see also Swarna v. Al-Awandi*, 622 F.3d 123, 144 (2d Cir. 2010).  This principle is limited only to torts committed by the employee for wholly personal motives unrelated to the employer's business, such as "sexual misconduct and related tortious behavior [that] arise[s] from personal motives and do not further an employer's business."  *Ross v. Mitsui Fudosan, Inc.*, 2 F.Supp.2d 522, 531 (S.D.N.Y. 1998).

These vicarious liability principles and JASTA's attribution framework readily confirm that plaintiffs' claims rest on tortious acts (provision of material support of terrorism) attributable to the Kingdom under independent bases that can be grouped in three different categories.

*First* are the acts of Kingdom officials, agents, and employees that provided financial and other support directly to the September 11th attacks and the attackers themselves. These included, for example, Fahad al Thumairy, an official of the Saudi Ministry of Islamic Affairs ("MOIA") based in Los Angeles, who acted to establish and facilitate the actions of the two September 11th hijackers who resided in San Diego before the attacks, *see infra* pp. 36-49, and Omar al Bayoumi, a Saudi government employee, who acted as an agent for the MOIA and worked personally to establish the September 11th hijackers in San Diego and facilitate their activities in the U.S. *See infra* pp. 36-49. Others were in direct contact with members of the Hamburg al Qaeda cell that coordinated the September 11th attacks and diverted extensive funds to al Qaeda from Saudi embassy accounts, undertook a "dry run" of the hijackings on a domestic U.S. flight, or undertook other actions designed to advance the attacks. *See infra* pp. 51-56. All were deployed by the Saudi government to advance the anti-Western and pro-jihadi agenda of the MOIA, and acted in the course of their employment and agency for the Saudi government in supporting the hijackers and plot. *See infra* at pp. 47-49.

*Second*, other Kingdom officials and agents directly provided financial and other support to al Qaeda. For example, Kingdom officials directly funded various da'awa organizations that were intertwined with and operated to support al Qaeda, and they did so recklessly or with knowledge that the funds and other assistance would support al Qaeda's activities. *See*, *e.g.*, *infra* pp. 56-71. This funding is the tortious act of material support for terrorism, and under JASTA it is attributable to the Kingdom equally as direct action of the Kingdom itself or the acts of the Kingdom officials that approved and provided the funding and other assistance. In

13

addition, a multitude of Saudi officials and agents served as directors or managers or staffed various da'awa organizations that very directly supported al Qaeda and its members over many years, contributing to their training, logistical support, and development of capabilities to attack the interests of the United States and its allies.  *See infra* pp. 63-65.  For example, the Saudi Minister of Islamic Affairs served as a leader of al Haramain, an organization designated as a foreign terrorist organization by the United States.  *See infra* pp. 63-64.  The actions of Kingdom officials directing SHC were just an example of Kingdom officials' directing the actions of da'awa organizations in support of al Qaeda.  These officials, too, were acting in their capacities as Saudi officials, employees, and agents, and their resulting tortious acts of providing material support can be attributed directly to the Kingdom on this basis.

*Third*, a different set of vicarious liability theories also and more completely attributes to the Kingdom the extensive material support to al Qaeda provided by these da'awa organizations. Each of the theories rests on the intertwined nature of the Kingdom and the da'awa organizations, establishing variously that the entities acted as agents of the Kingdom for purposes of supporting jihadi activities, discharged related "core functions" of the Kingdom where the sovereign mission is in part to support certain religiously associated activities, or operated as the "alter-ego" of the Kingdom itself.  Any of these three relationships would attribute the da'awa organizations' support for al Qaeda's terrorist activities to the Kingdom.

The agency theory of attribution is the most straightforward.  The CAC, expert declarations, and related materials establish that the da'awa organizations are agents of the Saudi government under the principles set forth in the *Restatement*, to the extent that they carry out the Saudi government's program of propagating Wahhabi Islam and advancing jihadi activities including terrorist attacks.  Their pro-jihadi activities are funded by the Saudi government, headed by Saudi government officials, undertaken in accordance with policies set by government

officials, and performed under the supervision of Saudi government officials.  CAC ¶ 128; *see infra* at 56-71.  Even prior to JASTA, the United States and courts recognized that the actions of entities can be attributed to foreign sovereigns for purposes of the FSIA pursuant to general agency principles.  As the United States summarized in its amicus brief to the Supreme Court in *OBB Personenverkehr AG v. Sachs*, No. 13-1607 (Apr. 2015), alter-ego principles do "not purport to define the exclusive circumstances in which the actions of an entity should be attributed to a foreign state, or to displace common-law agency principles when an independent entity acts on behalf of a foreign state for a *particular* purpose."  *Id.* at 17.  The consequence of an alter-ego determination is that the entity "is treated as the state's agent for *all* purposes," but a foreign sovereign could be subject to FSIA jurisdiction based on particular acts of an agent, "even if the state and the agent have not merged their legal identities."  *Id.* at 17-18.  Certain courts have reached the same conclusion.[10]  JASTA's addition of "agent" to the exception, and its general reliance on agency principles of vicarious liability, *see supra* pp. 10-12, also support this conclusion.  At least for the discrete purposes of supporting anti-Western and jihadi activities directed against U.S. and Western interests, these da'awa organizations acted as agents of the Saudi officials who lead them, funded them, and otherwise fostered their support of jihadi activities.  CAC ¶¶ 2, 105-33; *infra* pp. 65-71.

The Kingdom attempts to avoid JASTA's attribution of the actions of agents to the sovereign by arguing that plaintiffs must meet the alter-ego test (discussed further below).  *See* KSA Mem. at 58.  But that argument makes no sense.  Plaintiffs' claims are not that the da'awa organizations operated as components of the Kingdom for all purposes, yet all-purpose attribution is what the alter-ego test is designed to determine.  *See, e.g., Weitz Co. v. MH Wash.,*

---

[10]*BP Chems. Ltd. v. Jiangsu Sopo Corp.*, 285 F.3d 677, 687 (8th Cir. 2002) ("[a] foreign state can surrender its immunity by virtue of activities committed by its agent"); *Transamerica Leasing, Inc. v. La Republica de Venezuela*, 200 F.3d 843, 848-49 (D.C. Cir. 2000) (alter-ego theory and agency principles are separate bases for attribution under FSIA); *Arriba Ltd. v. Petroleos Mexicanos*, 962 F. 2d 528, 535-36 (5th Cir. 1992) (same).

631 F.3d 510, 522-23 (8th Cir. 2011) (alter-ego liability and agency liability are separate causes of action).  Nor do the Kingdom or the decisions it cites (KSA Mem. at 58 n.55) address the construction and intended effect of JASTA and the "agency" component of attribution in that context.  Instead, those decisions simply addressed alter-ego questions, and had no occasion to construe the new FSIA exception adopted by JASTA or consider the question whether the alter-ego framework is the *only* means by which the tortious acts of an entity can be attributed to a foreign sovereign.[11]  In fact, Congress's addition of "agents" to the immunity exception underscores its incorporation of traditional agency principles of vicarious liability, and that addition would be meaningless if, as the Kingdom contends, agency relationships do "not change the analysis." *Id.* at 58.

Even if the da'awa organizations are not agents under JASTA's immunity exception, their actions in support of al Qaeda and its members and activities would still be attributable to the Kingdom under two separate theories.  Initially, an entity will be treated under the FSIA as the state itself, and not as a separate legal entity, when the "core functions" that it performs "are predominantly governmental" rather than commercial.  *Garb v. Republic of Pol.*, 440 F.3d 579, 590-94 (2d Cir. 2006).  Entities that perform such "core functions" are considered to be "organs or subdivisions" of the foreign state, and their actions are attributable to it.  *Id.*; *SerVaas Inc. v. Republic of Iraq*, 2011 U.S. App. LEXIS 2709, at *6 (2d Cir. Feb. 16, 2011).  The CAC and related materials establish that the da'awa organizations discharge a core government function of the Kingdom—the propagation of Wahhabi Islam globally—and are the principal instruments through which the Kingdom fulfills this state duty.  CAC ¶¶ 105-28; *see infra* at 70-71.[12]

---

[11]*See Arch Trading Corp. v. Republic of Ecuador,* 839 F.3d 193 (2d Cir. 2016); *EM Ltd. v. Banco Central de la Republica Arg.,* 800 F.3d 78 (2d Cir. 2015) (pre-JASTA), and *Kirschenbaum v. 650 Fifth Ave. & Related Props.*, 830 F.3d 107 (2d Cir. 2016), *cert. denied*, 137 S. Ct. 1332 (2017) (pre-JASTA).

[12]The United States has emphasized that courts should develop a complete record before resolving a dispute over an entity's "core functions."  *See* Brief for the United States as Amicus Curiae in Support of Vacatur and Remand, *Figueiredo Ferraz E Engenharia De Projeta LTDA v. Republic of Peru, et al.*, No. 09-3925 et al., at 12 (2d Cir. Feb.

Finally, even if the alter-ego test needs to be satisfied, the intertwined nature of the da'awa organizations and other components of the Saudi government meets that test. Although foreign government instrumentalities established as separate juridical entities "should normally be treated as such," *First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 626-27 (1983) ("*Bancec*"), this "presumption of separateness may be rebutted by evidence establishing an alter-ego relationship between the instrumentality and the sovereign state that created it," *EM Ltd. v. Banco Cent. De la Republica Arg.*, 800 F.3d 78, 90 (2d Cir. 2015). The "touchstone" establishing an alter-ego relationship is that "the sovereign state exercises significant and repeated control over the instrumentality's day-to-day operations." *Id.* at 91 (listing factors pertinent to the inquiry). The CAC and related materials establish that the Saudi government thoroughly dominates the da'awa organizations and controls their day-to-day operations through a broad range of legal, financial, policy, supervisory, administrative, and operational controls. CAC ¶¶ 129-32; *see infra* at 65-71.

*Fourth*, if more were needed, the actions of the hijackers, the da'awa organizations, and al Qaeda members acting in concert with them and with Saudi officials are attributable to the Kingdom under the theories of secondary liability endorsed and established by JASTA. *See* 162 Cong. Rec. at S2845 (Senator Cornyn: JASTA's new FSIA exception "incorporates traditional principles of vicarious liability and attribution, including doctrines such as . . . secondary liability"); *Doe v. Bin Laden*, 580 F. Supp. 2d 93, 98-99 (D.D.C. 2008) (recognizing attribution through conspiracy). Substantively, JASTA directs courts to apply the tests set forth in *Halberstam v. Welch,* 705 F.2d 472 (D.C. Cir. 1983), JASTA § 2(5), 130 Stat. at 852, and that case, in turn, addresses liability arising from conspiracy when there is agreement to participate in unlawful acts, and harm arises from an overt act done by a party to that agreement in furtherance

---

25, 2011) (proper analysis of core-function issues may require "additional submissions from the parties on important factual issues regarding the function" of the entity and its "status" in relation to the sovereign).

of it.  *Halberstam,* 705 F.2d at 477; *see Restatement (Second) of Torts* § 876 (1979).  It also

addresses aiding and abetting liability that arises when a defendant knowingly aids a party that

performs a wrongful act, and is generally aware of his or her role as part of the overall tortious

activity.  705 F.3d at 477.  And, as noted, the jurisdictional test is designed to be lower and more

flexible than the substantive standards.  *See supra* pp. 4-8. Whether deemed aid in support of a

conspiracy or aiding and abetting, the instances of material support to al Qaeda and the attackers

described above and in Part III were part of a coordinated effort designed to and having the

effect of advancing al Qaeda's terrorist actions, capabilities, and objectives.  *See infra* pp. 31-71.

     Under any or all of these theories, the tortious acts in the form of material support

provided to al Qaeda, including to the September 11th hijackers, are readily attributable to the

Kingdom and its officials, employees, and agents.

### 3. Plaintiffs' Claims Are Based on Injuries "Caused By" the Kingdom's Material Support of Terrorism.

     Plaintiffs' claims also readily fall within the broad causation standard of "some

reasonable connection" that JASTA establishes for jurisdiction, which is even lower than the

very flexible causation standard appropriate in the terrorism context for determinations of

substantive causation for ATA claims.

     Contrary to the Kingdom's assertion that JASTA requires "but-for" causation and

"traditional proximate cause," KSA Mem. at 14-18, JASTA makes clear that the standard for

determining jurisdictional causation under the FSIA is lower than the standard for determining

the substantive causation element of a claim at the merits stage.  Specifically, a plaintiff need

only establish "some reasonable connection" between the defendant's actions and the plaintiff's

injuries.  Senator Cornyn explained in a floor statement that § 1605B's "caused by" language

was meant to "incorporate" the analysis of "cases like *Kilburn*, *Rux*, and *Owens*."  162 Cong.

Rec. at S2845 (emphases added).  Under those cases, the FSIA requires only that a plaintiff show

"some reasonable connection between the act or omission of defendant and the damages which the plaintiff has suffered," a flexible standard adopted because the FSIA is merely a *jurisdictional* statute. *See Owens v. Republic of Sudan,* 531 F.3d 884, 894-95 (D.C. Cir. 2008);[13] *Rux*, 461 F.3d at, 472-73; *Kilburn*, 376 F.3d at 1128. A showing of "but-for" causation is not required. *Rux,* 461 F.3d at 472-73; *Kilburn,* 376 F.3d at 1128-30. Indeed, even before JASTA's passage, this Court embraced the *Kilburn-Rux-Owens* standard as the proper test for the FSIA's causation requirement when it found Iran liable for providing material support to al Qaeda and direct support for the September 11th attacks. *See Havlish v. Bin Laden (In re Terrorist Attacks on September 11, 2001)*, 2011 U.S. Dist. LEXIS 155899, at *202 (S.D.N.Y. Dec. 22, 2011) (Daniels, J.) ("Proximate causation may be established by a showing of a 'reasonable connection' between the material support provided and the ultimate act of terrorism.").

The Kingdom's claims are wrong even with respect to causation for the substantive causes of action. The Kingdom relies on the causation standard for the pre-JASTA ATA set out in *Rothstein v. UBS AG*, 708 F.3d 82 (2d Cir. 2013), *see, e.g.*, KSA Mem. at 14-17, but JASTA uses *different* language for its jurisdictional standard (focusing instead on injuries "caused by" tortious acts, not Section 2333(a)'s "by reason of" language[14]) and has completely repudiated *Rothstein*. Congress through JASTA amended the ATA to ensure that the aiding and abetting and secondary liability standards that *Rothstein* rejected would be recognized as establishing

---

[13]The Kingdom incorrectly claims that the *Owens* litigation left "open" the issue of whether the FSIA imposes "but-for" causation. *See* KSA Mem. at 15 n.19. An early *Owens* decision found it unnecessary to decide the issue, *Owens*, 531 F.3d at 894, but in its most recent decision, the D.C. Circuit reaffirmed and applied *Kilburn's* "reasonable connection" standard, describing it as "the standard for jurisdictional causation." *See Owens*, 864 F.3d at 766, 793-98.

[14]Even as to Section 2333(a)'s standard, the Seventh Circuit recognized in *Boim*, 549 F.3d at 697-98, that a "relaxed" causation standard is necessary because traditional principles of causation would often leave plaintiffs without a remedy since the funding for particular terrorist acts generally cannot be traced back to specific donors. Consistent with JASTA's remedial purposes, a broader notion of causation properly recognizes that "if you give money to an organization that you know to be engaged in terrorism, the fact that you earmark it for the organization's nonterrorist activities does not get you off the liability hook … Anyone who knowingly contributes to the nonviolent wing of an organization that he knows to engage in terrorism is knowingly contributing to the organization's terrorist activities." *Id.*

liability under the ATA, JASTA § 4(a), 130 Stat. at 854, and it for the first time subjected the Kingdom and other sovereigns to ATA claims.  *Id.* § 3(a), 130 Stat. at 853.  JASTA changes the focus from a "tortious act," to "tortious acts," which is less compatible with the *Rothstein* standard.  And as noted, even as a matter of substantive liability, JASTA directs the courts to apply the more flexible causation standards set out in *Halberstam*, JASTA § 2(a)(5), 130 Stat. at 852, as well as to construe JASTA to achieve its purpose of ensuring that the jurisdictional requirements are broadly construed to provide the victims of terrorist attacks "full access to the court system in order to pursue civil claims against persons, entities, or countries" that have provided material support to terrorists or terrorist organizations.  JASTA § 2(a)(7), 130 Stat. at 852-53.

Plaintiffs have more than satisfied JASTA's modest "reasonable connection" standard. For the Saudi officials, employees, and agents who directly assisted the September 11th hijackers or assisted in planning or preparing for the attacks, *see supra* p. 13, the connection between their acts and the resulting injury to plaintiffs is plain.  The same result applies for the Saudi officials who directed, managed, or staffed the da'awa organizations that so extensively supported al Qaeda, or those Saudi officials who financed those entities knowing of or recklessly disregarding that the funds would support for al Qaeda.  *See supra* pp. 13-14.  That type of financial and related support to a notorious terrorist organization directing its actions against the United States and its interests inherently causes precisely the harm that the ATA is designed to prevent and redress, and JASTA most clearly sought to ensure that FSIA immunity would not bar plaintiffs' assertion of ATA and related claims predicated on the provision of such material support to terrorists.  JASTA §§ 2(a)(6)-(7), 2(b), 4(a); *supra* pp. 8-9.  And, finally, causation is clearly satisfied under the aiding and abetting and conspiracy theories of attribution, *see infra* pp. 41, 43, 71, because those who conspire with the attackers or aid and abet the attack are part of the

20

broader enterprise causing harm, and have just as much caused the attack as the attackers

themselves.

## II.    THE KINGDOM PRESENTS NO "FACTUAL CHALLENGE" TRIGGERING A HEIGHTENED BURDEN ON PLAINTIFFS TO PRODUCE EVIDENCE, AND PLAINTIFFS WOULD SATISFY ANY SUCH BURDEN IN ANY EVENT.

### A.    The Applicable Legal Framework Depends on Whether the Sovereign Introduces Evidence Contesting Specific Jurisdictional Facts or Fails to Do So.

Apart from challenging the legal sufficiency of plaintiffs' allegations, the Kingdom

claims that it presents a factual challenge to jurisdiction, and thus that plaintiffs must present

"admissible evidence" that establishes the elements of the relevant exceptions to immunity.

KSA Mem. at 18-19 (emphasis omitted).  Leaving to one side plaintiffs' entitlement to

jurisdictional discovery prior to any dismissal based on a failure to introduce evidence, *see infra*

pp. 72-74, this claim dramatically misstates the governing legal framework.  As described below,

the traditional framework governing challenges to the legal sufficiency of plaintiffs'

jurisdictional allegations is altered only to the extent that the sovereign specifically contests,

through evidence, the truth of particular facts that support jurisdiction.[15]  Where the sovereign

does not mount such a challenge to any specific jurisdictional facts, *see infra* pp. 22-26, the court

applies the usual standards applicable to a motion to dismiss.

Where, as here, the defendant has made a *prima facie* case that it is a sovereign, the court

begins by reviewing the plaintiff's allegations to determine if an exception to immunity under the

FSIA applies.  *See Robinson v. Gov't of Malay.*, 269 F.3d 133, 140 (2d Cir. 2001).  At this step

in the analysis, "'the court must take all facts alleged in the complaint as true and draw all

reasonable inferences in favor of the plaintiff.'"  *Id.* (quoting *Sweet v. Sheahan*, 235 F.3d 80, 83

(2d Cir. 2000)); *see Phx. Consulting, Inc. v. Republic of Angl.,* 216 F.3d 36, 40 (D.C. Cir. 2000)

---

[15]Even then, the cases the Kingdom cites for the evidentiary standard it contends applies do not support its claim.
*See infra* pp. 33-34.

("the district court should take the plaintiff's factual allegations as true and determine whether they bring the case within any of the exceptions to immunity invoked by the plaintiff"); *In re: Terrorist Attacks on September 11, 2001*, 538 F.3d 71, 76 (2d Cir. 2008).

To the extent that the sovereign does not present evidence that calls into question particular jurisdictional facts asserted by the plaintiff, these usual standards for assessing the legal sufficiency of a complaint apply, and well-pled allegations defeat a motion to dismiss. *See Rux*, 461 F.3d at 474 (denying Sudan's motion to dismiss on the basis of plaintiffs' allegations alone); *De Csepel v. Republic of Hung.*, 714 F.3d 591, 601 (D.C. Cir. 2013) (finding that plaintiff had "alleged facts that, if true, would satisfy" requirements of FSIA's exception); *Valentin v. Hosp.*, 254 F.3d 358, 363 (1st Cir. 2001) ("the court must credit the plaintiff's well-pleaded factual allegations . . . draw all reasonable inferences from them in her favor, and dispose of the challenge accordingly").[16]  These cases confirm that uncontested facts can establish jurisdiction as well as defeat a motion to dismiss. *See also Helmerich*, 137 S.Ct. at 1316 ("Put differently, the relevant *factual allegations* must make out a legally valid claim that [the jurisdictional prerequisite is satisfied]." (emphasis added)).  Application of the usual motion to dismiss standards in these circumstances is required, too, by the principle that sovereigns are subject to the same rules as other litigants unless something in the FSIA expressly provides differently. *See Republic of Arg. v. NML Capital, Ltd.*, 134 S.Ct. 2250, 2256 (2014).

---

[16]*See also Foremost-McKesson Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 450 (D.C. Cir. 1990) ("[o]ne allegation of the complaint . . . may be sufficient to create jurisdiction" (alteration in original)); *Wyatt v. Syrian Arab Republic*, 736 F. Supp. 2d 106, 112 (D.D.C. 2010) ("the plaintiffs have pleaded that Syria provided a variety of forms of material support to the PKK . . . . Accordingly, the court concludes that the plaintiffs have alleged sufficient facts to support the court's jurisdiction"); *Owens v. Republic of Sudan*, 412 F. Supp. 99, 106-07 (D.D.C. 2006) (listing allegations in complaint that Sudan provided material support to al Qaeda and Hizbollah and finding that "under any imaginable standard of pleading specificity, these statements are sufficiently detailed to put the defendants on notice of the specific misconduct with which they are charged (and thereby to permit defendants to craft a reasonable response) and also to allow the Court to determine whether the alleged misconduct satisfies jurisdictional prerequisites").

In contrast, to the extent the sovereign defendant sufficiently contests the accuracy of allegations regarding particular jurisdictional facts, the analysis and the burden on the plaintiff change.  If the sovereign creates such a factual dispute, then the court reviews "the allegations in the complaint" and "the undisputed facts, if any, placed before it by the parties," including in affidavits submitted to the court, and determines whether the plaintiff has carried a burden of production on any factual issue addressed by conflicting evidence.  *Robinson*, 269 F.3d at 141. A district court must afford plaintiff "ample opportunity to secure and present evidence relevant to the existence of jurisdiction," *Phx. Consulting,* 216 F.3d at 40 (quoting *Prakash v. American University*, 727 F.3d 1174, 1179-80 (D.C. Cir. 1984)); *infra* pp. 72-74, and, following discovery, the plaintiff must introduce adequate support for points that the sovereign has contested, but need not *prove* the facts asserted; instead, the burden of persuasion shifts to the sovereign.  *See Robinson*, 269 F.3d at 141.

To trigger this altered burden and analysis, however, the sovereign must first "controvert the accuracy . . . of the jurisdictional facts asserted by the plaintiff and proffer material of evidentiary quality in support of that position."  *Valentin*, 254 F.3d at 363; *see also Barapind v. Gov't of Republic of India*, 844 F.3d 824, 829 (9th Cir. 2016).  Mere hand-waving or assertion by counsel is not enough.  The defendant must instead show that the facts as alleged by the plaintiff are, specifically, *incorrect.  See, e.g.*, *Foremost-McKesson Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 450 (D.C. Cir. 1990) (denying Iran's motion to dismiss where Iran challenged plaintiff's jurisdictional allegation but Iran "ha[d] offered no countervailing evidence indicating that these alleged commercial acts were subsumed within a sovereign activity"); *Filetech S.A. v. Fr. Telecom S.A.,* 157 F.3d 922, 931–32 (2d Cir. 1998) (sovereign raised factual challenge by introducing submissions directly showing that an asserted jurisdictional fact was not true), *overruled on other grounds by Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395

(2d Cir. 2014); *see also Phx. Consulting,* 216 F.3d at 38, 41; *Antares Aircraft L.P. v. Fed.*

*Republic of Nigeria*, 1991 WL 29287, at *4 (S.D.N.Y. Mar. 1, 1991), *aff'd*, 948 F.2d 90 (2d Cir.

1991), *vacated on other grounds*, 505 U.S. 1215 (1992).

For factual allegations the sovereign does not challenge through the introduction of

evidence of this sort, there is no "factual dispute" under the *Robinson* framework.  *Skanga*

*Energy & Marine Ltd. v. Petroleos de Venezuela S.A.*, 522 F. App'x 88, 90 (2d Cir. 2013) ("We

agree that [plaintiff] carried its burden . . . through its allegations . . .  and the transaction

documents . . . .  [The defendant], on the other hand, failed to submit *any* evidence [addressing

the jurisdictional fact.]  As a result, there was no 'factual dispute,' *Robinson,* 269 F.3d at 141, for

the District Court to resolve . . . ."); *see also Baglab Ltd. v. Johnson Matthey Bankers Ltd*., 665

F. Supp. 289, 294 (S.D.N.Y. 1987) ("If any of the [FSIA] exceptions appears in the pleadings or

is not refuted by the foreign state asserting the defense, the motion to dismiss the complaint must

be denied.").  For example, in *Price*, Libya's challenge failed "not only because it has not

identified any true contradictions to undermine the credibility of the amended complaint but also

because it does not dispute some of the most serious allegations in that complaint."  *Price v.*

*Socialist People's Libyan Arab Jamahiriya*, 389 F.3d 192, 198 (D.C. Cir. 2004).  The court

concluded:

> Libya cannot remain silent in the face of these allegations and still
> be said to have carried its burden of showing this case does not
> come within the subject matter jurisdiction of the district court via
> the terrorism exception to the FSIA.  *See Price II*, 294 F.3d at 93
> ("When reviewing a plaintiff's *unchallenged factual allegations* to
> determine whether they are sufficient to deprive a foreign state
> defendant of sovereign immunity, we assume those allegations to
> be true").

*Id.* at 199 (emphasis added); *see Simpson v. Socialist People's Libyan Arab Jamahiriya*, 470

F.3d 356, 362 (D.C. Cir. 2006) ("Libya's reference to an alternative, *but not necessarily*

*contradictory*, explanation . . . is not enough to establish that the plaintiffs' allegations do not

bring the case within a statutory exception to immunity." (emphasis added)).  Similarly, in

*Kilburn,* the court denied the sovereign's challenge because it had "submitted no affirmative

evidence whatsoever to show that [the defendants] fall outside [the relevant FSIA exceptions].

They did not, for example, file an affidavit denying that their agents [committed the alleged acts]

. . . .  They did not proffer testimony denying that they had provided material support for those

acts.  They did not even deny that [] was their agent," and, as a result it was "plain that the . . .

defendants have so far satisfied neither a burden of production nor their required burden of

persuasion."  *Kilburn*, 376 F.3d at 1132.  The same is true here.

    As noted above and contrary to the Kingdom's suggestion, KSA Mem. at 19-20, this

statement of the legal framework is entirely consistent with *Helmerich*.  Where plaintiffs'

allegations of jurisdictional fact are not specifically contested in a manner that creates a true

factual dispute, "factual allegations" can be sufficient to "make out a legally valid claim."  137

S.Ct. at 1316.  Where a true conflict arising from evidence submitted by the sovereign exists, it

must be resolved "as near to the outset of the case as is reasonably possible."  *Id.* at 1317; *see*

*supra* n.12.  Nothing in *Helmerich* alters the established *Robinson* framework as described

above, or in any way indicates that the factual resolution must be made prior to discovery (to the

contrary, *see infra* pp. 73-74).  *Helmerich*'s statement about the resolution of disputed

jurisdictional facts merely instructs that a court must act expeditiously, applying normal judicial

processes, *see NML Capital, Ltd.*, 134 S. Ct. at 2256, to resolve evidentiary disputes on which

jurisdiction hinges.

## B.     The Kingdom Has Presented No Challenge to Plaintiffs' Jurisdictional Facts.

    Under the principles described above, the Kingdom has presented no evidence that gives

rise to a "factual dispute" under *Robinson* and related cases.  It has therefore presented nothing

that requires plaintiffs to meet the burden of production beyond their factual allegations, much

less the burden to produce admissible evidence it alleges, or that requires this Court to resolve

factual disputes presented by conflicting evidence.  While the Kingdom contests the legal sufficiency (and, in some cases, legal significance) of the facts plaintiffs have presented— thereby raising a *legal* challenge under *Robinson*—the Kingdom fails to dispute any of the key jurisdictional facts themselves.  The Kingdom does not present facts disputing, for instance, Thumairy's and Bayoumi's status as Saudi employees and agents; the location and timing of Thumairy's meetings and communications with Bayoumi; the nature and importance of Bayoumi's support for the two hijackers during this period; Fakihi's role in Berlin; the hijackers' role in the September 11th attacks; or the vast range of related facts.  *See infra* pp. 31-71.  The same is true for Saudi officials and da'awa organizations.  The Kingdom does not dispute that certain of these organizations have themselves asserted that they are arms of the Saudi government; that Saudi officials serve as their directors, officials and staff members, directing their activities at all levels; that the organizations provided extensive material support to al Qaeda and its members, including support for the planning and execution of the  September 11th attacks; that such support was vital to al Qaeda's growth, achievement of international attack capabilities, and execution of the September 11th attacks; and does not dispute the many additional facts showing the intimately intertwined relationship between Saudi officials and the da'awa organizations.  *See infra* pp. 56-71.  The Kingdom has not, for example, introduced the affidavits of knowledgeable officials or other Saudi documents that show plaintiffs' facts to be incorrect, even though these matters are uniquely within the Kingdom's knowledge and control. It has simply made no showing of the falsehood of any jurisdictional fact.  And it certainly has made nothing like the showings that generated factual disputes in *Filetech* or *Phoenix Consulting*, and has fallen short in the same way that the sovereigns did in *Price*, *Foremost-McKesson*, and *Simpson*.

Instead, the Kingdom relies solely on certain U.S. government evaluations of the scope of the government's *own* records and investigation.  The key claim the Kingdom invokes, the 9/11 Commission's statement that the Commission had "found no evidence that the Saudi government as an institution or senior Saudi officials individually funded [al Qaeda]," *9/11 Commission Report*[17] at 171, has nothing to do with relevant jurisdictional facts.  This finding of "no evidence" establishes nothing about any fact at issue.  More importantly, it addresses matters irrelevant to JASTA's elements, which do not require any showing about the acts of "senior Saudi officials," much less "the Saudi government *as an institution*."   Individual officials' acts as employees and agents suffice.  *See* JASTA § 3(a), 130 Stat. at 853; *supra* pp. 8-12.  Nor need or do plaintiffs' claims rest on any programmatic and direct "fund[ing]" of al Qaeda by the "institution" or senior officials; material support establishing jurisdiction can take the form of Thumairy and Bayoumi's non-financial support, or of fundraising and financial and other support accomplished through da'awa organizations and other government platforms.  To be clear, the *9/11 Commission Report* stated that its conclusion "*does not* exclude the likelihood that charities with significant Saudi government sponsorship diverted funds to al Qaeda."  *9/11 Commission Report* at 171 (emphasis added). [18]  Thus the Commission's finding of no evidence that the Saudi government as an institution funded al Qaeda is doubly inapposite: plaintiffs' claims do not rely on the acts or knowledge of the Saudi government as an institution (or, for that matter, senior Saudi officials).  Nor do they rely on claims that the government as an institution supplied funds directly to al Qaeda. [19]

---

[17] *Final Report of the National Commission on Terrorist Attacks Upon the United States* (July 2004), https://www.9-11commission.gov/report/911Report.pdf.

[18] Moreover, the *9/11 Commission Report* expressly found that al Qaeda "use[d] charities for fund-raising," including by "rely[ing] on al Qaeda sympathizers in specific foreign branch offices of large, international charities . . . such as the Saudi-based al Haramain Islamic Foundation."  *9/11 Commission Report* at 170.

[19] The rest of the support the Kingdom cites falls short for much the same reasons.  The Kingdom, for instance, takes aim at strawmen, claiming that "the 9/11 Commission rejected 'speculation' that Al Bayoumi was a conduit of funds to the hijackers."  KSA Mem. at 31.  But the Commission Report itself confirms the relevant jurisdictional facts in the CAC; namely, that Bayoumi co-signed the hijackers' lease, opened a bank account for them with $9000 of his

More fundamentally, a finding of "no evidence" is just that: not proof that a particular asserted fact is *wrong* but rather proof that the finder has not found facts establishing that it was *right*. The truism that an absence of evidence is not evidence of absence applies with particular force here for two additional reasons. *First*, the report statements reflect very incomplete investigations, undertaken without access to Saudi documents and without examining key components of the alleged support.[20] *Second*, those statements often assume the *truth* of the facts plaintiffs set forth (*e.g.*, regarding Bayoumi's actions) but, because the Commission was engaged in a non-legal inquiry, it declined to draw different inferences from them required in a legal proceeding, or to ascribe significance to them appropriate in a legal context. None of the report's statements presents facts that contradict those plaintiffs assert—or even that call their reliability into question. They do not, for instance, show that Bayoumi was *not* a Saudi agent, did *not* open a bank account for the hijackers, or that he did *not* help the hijackers settle in San Diego. (To the contrary, as discussed *infra* at 32, the *9/11 Commission Report* is the *basis* for some of these assertions.) The statements likewise do not indicate that components of the Saudi Government did *not* funnel money through da'awa organizations to support al Qaeda's operations. (To the contrary, the *9/11 Commission Report* goes out of its way to note that it could not "exclude the likelihood"—in particular—that Saudi-sponsored charities gave money to al Qaeda. *9/11 Commission Report* at 171.). At most, the statements that the Commission was not able to find evidence of certain facts indicate *the limitations* of the Commission's knowledge following its time-restricted and resource-limited inquiry.[21]

---

own money (the Commission Report says $9900), and paid their rent (the Report says Bayoumi provided a certified check, which the hijackers reimbursed). Compare CAC ¶ 173, with *9/11 Commission Report* at 219.

[20] As the *9/11 Commission Report* itself explains, neither the Commission nor the U.S. Government at large, had "been able to determine the origin of the money used for the 9/11 attacks." *9/11 Commission Report* at 169, 172.

[21] As the Commission's Report candidly acknowledged, "in an event of this scale, touching so many issues and organizations, we are conscious of our limits. We have not interviewed every knowledgeable person or found every relevant piece of paper." *Id.* at xviii. The 9/11 Review Commission further highlighted that it was "important to acknowledge the report's limitations," noting that the Commission "took several months to assemble staff and hire personnel, due to bureaucratic, clearance, and other unpredictable and administrative issues. The staff worked for

Confirming these points, members of the 9/11 Commission who have spoken to the issues publicly have rejected Saudi Arabia's characterizations of the Commission's investigation and report, and affirmed that their inquiry developed evidence that supports plaintiffs' theories.  Senator Bob Kerrey, former Naval Secretary John Lehman, and (most recently) Richard Ben-Veniste have submitted sworn affirmations rejecting the Kingdom's claims of exoneration.  *See* Exhs. 1, 2, and 3.[22]  Lehman has additionally offered his professional conclusion that Thumairy and Bayoumi provided witting aid to the hijackers, Exh. 2 ¶ 8, and Ben-Veniste has declared that he expected that further investigation would be conducted following the conclusion of the Commission's work into "whether any official representative or entity related to the government of Saudi Arabia authorized or knew of the provision of any such assistance, aid, or comfort [to the Saudi national hijackers]."  Exh. 3.  Public statements by Ambassador Timothy Roemer and Commission Co-Chair Lee Hamilton have likewise discredited the notion that the Commission reached any conclusion in conflict with plaintiffs' claims here.  *See* Exh. 4 (Roemer), Exh. 5 (Hamilton).

### C. The Only Evidence Bearing on Jurisdictional Facts Supports a Finding of Jurisdiction and Further Requires Dismissal of the Kingdom's Motion.

Far from controverting the facts plaintiffs allege, the "evidence" on which the Kingdom relies consists of reports that in crucial respects confirm the facts and inferences that underpin plaintiffs' theories—and that is especially the case for the reports produced in recent years, qualifying or superseding the *9/11 Commission Report*.  These facts include basic points about Thumairy's acting to support the hijackers, the support Bayoumi provided to the hijackers, the intertwined nature of Saudi officials and the da'awa organizations, and the support the da'awa

---

11 months to address an extremely broad and challenging mandate from Congress."  9/11 Review Commission Report at 6.

[22] Citations to "Exh." refer to the exhibits to the Affirmation of J. Scott Tarbutton Transmitting Evidence in Support of Plaintiffs' Memorandum of Law in Opposition to the Renewed Motions to Dismiss of the Kingdom of Saudi Arabia and Saudi High Commission for Relief of Bosnia & Herzegovina ("Tarbutton Affirmation").

organizations supplied to al Qaeda and specifically to its planning and execution of the September 11th attacks. These and many other evidentiary points supporting plaintiffs' claims are canvassed in detail below, with specific reference to the reports the Kingdom concedes are "admissible evidence." *See infra* pp. 32, 36-39, 42-44, 47, 53, 56-59, 60. That is, the Kingdom's "evidence" not only fails to controvert any jurisdictional fact, or to create a "factual dispute" requiring this Court's resolution of contradictory evidence, but it undermines the Kingdom's motion by providing further bases for establishing jurisdiction.

That evidence is supplemented by extensive, additional admissible evidence in the form of various expert opinions that support both the key components of plaintiffs' theories and underscore the reasonableness of the inferences drawn from undisputed facts and which support plaintiffs' theories. *See infra* pp. 34-36. In *Owens v. Republic of Sudan*, the D.C. Circuit underscored the "crucial importance" of expert opinions in terrorism cases, in which "reliance upon secondary materials and the opinions of experts is often critical" because, among other things, "firsthand evidence of terrorist activities is difficult, if not impossible, to obtain."[23] 864 F.3d at 787; *see also Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1048 (D.C. Cir. 2014) ("Were we to demand more of plaintiffs like [these], few suits like this could ever proceed, and state sponsors of terrorism could effectively immunize themselves by killing their victims, intimidating witnesses, and refusing to appear in court."). As in *Owens* and *Kilburn*, plaintiffs here have introduced expert opinions that alone are sufficient to carry any applicable burden. *Owens*, 864 F.3d at 788-89; *Kilburn*, 376 F.3d at 1132. Thus, even if plaintiffs were required to produce evidence in support of their jurisdictional facts, they readily meet that standard as well.

---

[23]Plaintiffs' expert Evan F. Kohlmann, *see infra* pp. 35-36, 61-68, was an expert in *Owens* as well.

### III.   PLAINTIFFS' ALLEGATIONS OF FACT AND EVIDENCE REQUIRE THAT THE KINGDOM'S AND SHC'S MOTIONS TO DISMISS BE DENIED.

The record offered by plaintiffs in opposition to the Kingdom's motion to dismiss satisfies JASTA's modest jurisdictional requirements based on uncontested factual allegations and admissible evidence, including expert testimony, demonstrating three basic categories of tortious conduct attributable to Saudi Arabia, in support of al Qaeda and the September 11th attacks.[24]  It would, moreover, satisfy even the standard the Kingdom incorrectly claims should apply.

*First*, Saudi government employees and agents directly aided and abetted the 9/11 operation itself, by providing material support and resources to the September 11th hijackers and plotters, from within the United States and Germany.  This support was provided by Saudi government employees and agents Fahad al Thumairy, Omar al Bayoumi, Osama Bassnan, Mohammed Jabar Fakihi, Saleh al Hussayen, Hamdan al Shalawi, and Mohammed al Qudhaeein. Their direct support for the 9/11 operation encompassed essential assistance that enabled two of the hijackers to settle in the United States and begin their preparations for the attacks, testing of aviation security procedures during a "dry run" for the planes operation, and support to the Hamburg al Qaeda cell.  *See infra* pp. 35-56.

*Second*, the Saudi government pervasively funded and provided other forms of material support to the al Qaeda organization itself over more than a decade leading up to the September 11th attacks, enabling bin Laden to build the al Qaeda organization, establish the infrastructure essential to the September 11th attacks, and recruit and train the operatives who carried out those

---

[24]As discussed *supra* at pp. 5-7, JASTA is properly understood as having corrected the limiting judicial constructions of the FSIA's torts exception, 28 U.S.C. § 1605(a)(5), and thus confirms that plaintiffs' complaint satisfies that exception to sovereign immunity as well.  Even if the pre-JASTA constructions of the torts exception remain viable, the present record in support of plaintiffs' claims satisfies that separate exception.  Indeed, plaintiffs seek money damages for injuries "caused" by the tortious acts of the Kingdom's employees, officials, and agents, in their official capacities.  These encompass tortious acts of individual Saudi employees and agents in support of the hijackers and attacks in the United States, and of charity agents in the United States, in satisfaction of the Second Circuit's pre-JASTA "entire tort" rule.  Finally, the conduct at issue is broadly illegal, and therefore not discretionary.

attacks.  *See infra* pp. 56-71.  This lavish support flowed principally, but by no means exclusively, through the Kingdom's da'awa organizations (including SHC) under the direction and supervision of the MOIA, *see infra* pp. 57-67.  Saudi officials were responsible for directing the massive funding of al Qaeda that flowed through those da'awa organizations, despite clear awareness of their collaborations with al Qaeda, and the da'awa organizations were themselves headed and staffed by Saudi government officials who directed their campaigns to advance al Qaeda's jihad against the United States.  *See infra* pp. 34-36.  In addition, those da'awa organizations are themselves agents and alter-egos of the Saudi government, engaged in the performance of a core function of the Saudi state – namely, the propagation of an anti-Western, and pro-jihadi ideology intimately linked to al Qaeda's targeting of the United States.  *See infra* pp. 56-71.

*Third*, the broad and sustained collaborations between employees and agents of the Saudi government and al Qaeda satisfy all of the elements of attribution based on principles of aiding and abetting and conspiracy liability, as embedded in JASTA, making the actions of the September 11th hijackers themselves attributable to the Saudi government.  *See infra* pp. 41, 71.

Contrary to the Kingdom's arguments, plaintiffs' uncontested factual allegations in support of these theories of jurisdiction and liability are broadly corroborated by, and in fact primarily drawn from, evidence set forth in admissible U.S. government reports.  Indeed, the *9/11 Commission Report* and 9/11 Review Commission Report[25] are the principal sources for the material factual allegations offered in support of plaintiffs' theories concerning the essential support provided to the hijackers by Thumairy and Bayoumi, in their respective roles as employees and agents for the Saudi government.  *See infra* pp. 35-56.  Those factual allegations are further corroborated by a range of FBI investigative reports, which are themselves admissible

---

[25] 9/11 Review Commission, The FBI:  Protecting the Homeland in the 21st Century (Mar. 2015) ("9/11 Review Commission Report"), https://www.fbi.gov/news/pressrel/press-releases/the-fbi-releases-final-report-of-the-9-11-review-commission.

evidence.[26]  The admissible FBI reports and other government reports likewise corroborate

plaintiffs' key factual allegations concerning the direct support for the 9/11 hijackers and plotters

provided by five additional employees and agents of the Saudi government, *see infra* pp. 49-56,

and that evidence amply supports the reasonable inferences plaintiffs' CAC asserts should be

drawn from the conduct and relationships of those agents and employees.[27]  *See infra* pp. 45-56.

Once again, the Kingdom has not offered any affidavit of its own to contest any of these

points, and the isolated statements it cites from certain government reports neither contradict

plaintiffs' facts and evidence nor address matters relevant to the JASTA inquiry.  *See supra* at

pp. 25-28.  Meanwhile, its plea that the Court simply ignore clear evidence from U.S.

government reports directly contradicting its arguments, such as the 2012 FBI Summary Report

confirming that Bayoumi and Thumairy are "subjects" of an ongoing FBI investigation and are

known to have provided "substantial assistance" to the hijackers, is predicated on a fatal

misconstruction of the relevant burden, *see supra* pp. 29-33, and the incorrect argument that the

FBI and other government records harmful to the Kingdom's position are "inadmissible." [28]

---

[26]The FBI reports are admissible under Rule 803(8) or Federal Rule of Evidence 803(6) dealing with records of regularly conducted activity. *See Bradford Trust Co. of Boston v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 805 F.2d 49, 54 (2d Cir. 1986) (holding that the "district court correctly admitted the FBI reports as falling within the public records exception; but it erred in giving them no weight" (emphasis omitted)); *Spanierman Gallery, Profit Sharing Plan v. Merritt*, No. 00CIV5712LTSTHK, 2003 WL 22909160, at *5 (S.D.N.Y. Dec. 9, 2003) ("FBI reports are admissible in evidence as either business records, *see* Fed.R.Evid. 803(6), or as public records, *see* Fed.R.Evid. 803(8)."); *Tokio Marine Mgmt., Inc. v. M/V Zim Tokyo*, No. 91 Civ. 0063 (PKL), 1993 WL 322869, at *9 (S.D.N.Y. Aug. 17, 1993) (same); *Gentile v. County of Suffolk*, 129 F.R.D. 435, 448 (E.D.N.Y. 1990) (listing a variety of government reports admissible under the public records exception to hearsay, including FBI reports), *aff'd*, 926 F.2d 142 (2d Cir. 1991).  Not only are these materials admissible, they are "assumed to be trustworthy absent evidence to the contrary." *Gentile*, 129 F.R.D. at 449.

[27]Key findings of the FBI and other government reports are surveyed in the affidavits of plaintiffs' experts Michael Rochford and David Mitchell, which include extensive citations to the reports themselves.  The FBI reports are themselves included as exhibits to the Tarbutton Affirmation.

[28]Under Fed. R. Evid. 803(8)(B), it is the Kingdom that bears the burden of demonstrating that the FBI and other government reports should not be deemed admissible, and it can do so only by making "an affirmative showing of untrustworthiness, beyond the obvious fact that the declarant is not in court to testify." *Bradford Trust*, 805 F.2d at 54.  The Kingdom makes no attempt to carry that burden as to any of the particular FBI and government records invoked by plaintiffs. *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir. 1976) and other cases cited by the Kingdom have no bearing on the admissibility analysis.  Rather, those authorities concern the standards governing a motion to strike references to federal and state consent decrees and similar agreements in pleadings under Fed. R. Civ. P. 12(f), and provide no basis to circumvent the admissibility rules of Fed. R. Evid. 803(6) and 803(8).  And in fact, the *Lipsky* Court expressly held that "[e]videntiary questions . . . should

These arguments are entirely deficient to overcome the content, force, and logic of plaintiffs' detailed and uncontested factual allegations and the associated admissible government reports.

Although plaintiffs' factual allegations and supporting government reports are alone sufficient to defeat the Kingdom's motion to dismiss, plaintiffs have supplemented those facts and evidence with affidavits from four eminently qualified experts.  Given the terrorism context of this action, these affidavits play a unique and important role in placing the facts and evidence in context, and, in understanding their significance.  *See supra* pp. 29-30, 32-33.  As briefly described below, the professional opinions and testimony of these experts confirm the import assigned to the uncontested facts in plaintiffs' pleadings, and also serve as admissible evidence in support of each aspect of the several bases supporting jurisdiction in this case.

*Affidavit of Michael Rochford*.  Plaintiffs' affiant Michael Rochford is the former global head of the Espionage Section of the FBI's Counterterrorism Division and a 30–year veteran of the FBI.  In his affidavit, Exh. 6, Mr. Rochford analyzes the evidence developed through the government's investigations of Bayoumi, Thumairy, and their associates, using the methodology and analytical framework employed by FBI counterespionage specialists in determining whether individuals are covert agents of a foreign power engaged in covert operations.  Mr. Rochford offers his professional opinions that Bayoumi was a covert agent of the Kingdom, that he and Thumairy provided witting assistance to 9/11 hijackers Nawaf al Hazmi and Khalid al Mihdhar, and that they did so in furtherance of the roles assigned to them by the Saudi government.

*Affidavit of David Mitchell*.  David Mitchell is a retired FBI Special Agent in Charge who directed the on-scene investigation of the 2003 al Qaeda compound bombings in Riyadh, Saudi

---

especially be avoided at [the] preliminary stage of the proceedings. Usually the questions of relevancy and admissibility in general require the context of an ongoing and unfolding trial in which to be properly decided." *Lipsky*, 551 F.2d at 893.  *Lipsky* thus *undermines* not only the Kingdom's arguments about the ultimate admissibility of the FBI and other government records, but also the Kingdom's entire theory that the Court needs to and should undertake admissibility determinations in the context of deciding the present pre-discovery motion to dismiss.

Arabia.  Mr. Mitchell's affidavit, Exh. 7, offers a comprehensive and detailed overview of facts and evidence developed through the U.S. government's investigations into the activities of Nawaf al Hazmi and Khalid al Mihdhar in the United States, and the sources of support they received during their time in Los Angeles and San Diego.  Mr. Mitchell offers his professional opinion that "the support and assistance provided to Hazmi and Mihdhar in Southern California, has the earmarks of a coordinated support network, orchestrated principally by Saudi government employees and agents Fahad al Thumairy and Omar al Bayoumi."  In agreement with Mr. Rochford's professional opinions, Mr. Mitchell also concludes that Thumairy and Bayoumi were aware that Hazmi and Mihdhar were jihadists who intended to do harm to the United States.

    *Affidavit of Senator Bob Graham*.  Senator Graham served on the Senate Select Committee on Intelligence for more than ten years, and as chairman of that Committee between June 6, 2001 and January 3, 2003.  As chairman of the Senate Select Committee on Intelligence, Senator Graham co-chaired the Joint Inquiry of the Senate Select Committee on Intelligence and House Permanent Select Committee on Intelligence Into Intelligence Committee Activities Before and After the Terrorist Attacks of September 11, 2001 (the "Joint Inquiry").  Based on the series of events that unfolded upon the hijackers' arrival, the connections among the various parties who came to their aid, and other evidence surveyed in his affidavit, Exh. 8, Senator Graham offers his professional opinion that Thumairy and Bayoumi "served as the nucleus of the support network that received al-Hazmi and al-Mihdhar upon their arrival in the United States, and provided substantial assistance to al-Hazmi and al-Mihdhar that was essential to their successful assimilation into the United States in their preparations for the attacks."[29]

---

[29]Senator Graham's present affidavit is distinct from the affidavit he previously submitted in this litigation.

*Affidavit of Evan Kohlmann.*  Evan Kohlmann is a counter-terrorism expert who has testified for the United States government in 35 terrorism prosecutions, and who presently is serving as an expert for the United States in the Military Tribunal prosecutions of high value al Qaeda detainees.  Mr. Kohlmann's affidavit, Exh. 9, spans more than 78 pages and includes over 400 citations to primary and secondary source materials, including affidavits of Saudi government and charity officials, public statements of Saudi government and charity officials, and hundreds of internal documents produced by certain of the charities in discovery.  Mr. Kohlmann's testimony establishes that the Saudi government's charity arms collaborated intimately with al Qaeda, and that the funding and assistance provided by the Kingdom through its charities was essential to the 9/11 operation.  Mr. Kohlmann's testimony also establishes that the Kingdom uses the charities as agents to fulfill the Saudi government's state obligation to propagate Wahhabi Islam, and that it rigidly controls the charities in their performance of that core function through a range of financial, operational, and other controls.[30]

## A.    The Kingdom's Employees and Agents Directly Supported the 9/11 Operation.

The Kingdom challenges the adequacy of the uncontested factual allegations and evidence that Saudi employees and agents provided support to the September 11th hijackers and plotters, but its arguments ignore the key points of the pleadings, the facts established by the 9/11 Commission and 9/11 Review Commission Reports that the Kingdom itself invokes, and other evidence of record, now including plaintiffs' expert affidavits.

### 1.    Thumairy and Bayoumi's Support for the Hijackers

#### a)    Tortious Support

Plaintiffs' pleadings assert that Thumairy and Bayoumi "played witting roles in orchestrating and providing a critical support network" in the United States for 9/11 hijackers

---

[30]Mr. Kohlmann's present affidavit is distinct from the affidavit he previously submitted in this litigation.

Nawaf al Hazmi and Khaled al Mihdhar.  CAC ¶ 211.  In support of that express allegation, the

CAC cites the findings of the 9/11 Commission that Hazmi and Mihdhar were "ill prepared for a

mission in the United States," and that it was unlikely that al Qaeda would have sent them "to the

United States without arranging [for them] to receive assistance from one or more individuals

informed in advance of their arrival."  *Id.* ¶¶ 161-162.  Again citing the findings of the 9/11

Commission, the CAC documents that Hazmi and Mihdhar spent time during their critical first

days in the United States at the King Fahd Mosque, where Thumairy was an imam.  *Id.* ¶ 165.

The CAC details Thumairy's extremist beliefs and ties to terrorism, and cites the 9/11 Review

Commission's finding that "Al-Thumairy immediately assigned an individual to take care of

them [Hazmi and Mihdhar] during their time in the Los Angeles area."[31]*Id.* ¶¶ 167-169.

     The CAC then presents facts demonstrating that Thumairy separately enlisted and

directed Bayoumi to provide essential assistance in helping Hazmi and Mihdhar relocate from

Los Angeles to San Diego, "the precise city al Qaeda leadership had identified as the preferred

location for the hijackers to carry out their preparations for the attacks."  *Id.* ¶¶ 171-172.  As

confirmed by the 9/11 Commission, Bayoumi (who knew and was in regular contact with

Thumairy) had a closed-door meeting at the Saudi consulate, where Thumairy worked, just over

two weeks after the hijackers' arrival.  *Id.* ¶ 170.  Following that meeting, Bayoumi drove to a

restaurant several miles from the consulate, where he encountered the two hijackers and

promptly offered to help them move from Los Angeles to San Diego.  *Id.* ¶ 172.  The CAC

describes the extraordinary steps Bayoumi took after that meeting to facilitate the hijackers'

relocation to San Diego, including by immediately helping them find an apartment and open a

bank account, co-signing their lease as a guarantor, and connecting them with radical cleric and

terrorist Anwar al Aulaqi, who served as the jihadists' spiritual mentor during the preparation for

---

[31]In support of this finding, the Review Commission invoked the 2012 FBI Summary Report, Exh. 10, thus confirming the reliability of that document.  *See* Review Commission Report at p. 102, n. 330.

the attacks.  *Id.* ¶¶ 173-175.  In addition, Bayoumi directed Mohdar Abdullah, an extremist who according to the 9/11 Commission was "perfectly suited to assist the hijackers in pursuing their mission" as he shared their "extremist views" and "hatred for the U.S. government," "to assist in any way in [the hijackers'] affairs."  *Id.* ¶¶ 187-188.  Consistent with that unqualified directive from Bayoumi, Abdullah helped "Hazmi and Mihdhar locate and apply to language and flight schools" and "secure fake driver's licenses," and provided a range of additional aid essential to their assimilation into the United States and preparations for the attacks.  *Id.* ¶ 189.  Consistent with this evidence, the FBI has formally concluded that Thumairy and Bayoumi "are known to have provided substantial assistance to 9/11 hijackers Nawaf al-Hazmi and Khalid al-Mihdhar during their time in California" including by "provid[ing] (or direct[ing] others to provide) the hijackers with assistance in daily activities, including procuring living quarters, financial assistance, and assistance obtaining flight lessons and driver's licenses."  Exh. 10 at p. 4.

The *9/11 Review Commission Report* supplements these findings of the 9/11 Commission in a critical respect, by expressly confirming that Thumairy "immediately assigned an individual to take care of al-Hazmi and al-Mihdhar during their time in the Los Angeles area."  *9/11 Review Commission Report*, *supra*, at 102 n.330.  That key additional finding of the 9/11 Review Commission places Thumairy squarely at the center of the support network for the hijackers, and leaves no doubt that Thumairy and Bayoumi acted in concert with one another to coordinate ongoing aid for the ill-prepared hijackers.  This *evidence* points directly to the conclusion that the actions of Thumairy and Bayoumi were tortious and by design.

The Kingdom's arguments to the contrary are thoroughly unconvincing.  For instance, in arguing that plaintiffs have failed to "allege properly or to come forward with evidence that al Thumairy assisted the hijackers," KSA Mem. at 32, the Kingdom blatantly ignores the contrary findings presented in the 9/11 Review Commission Report confirming that al Thumairy

immediately assigned an individual to take care of the hijackers during their time in the Los

Angeles area, the finding in the 2012 FBI Summary Report (endorsed by the 9/11 Review

Commission) that Thumairy and Bayoumi are "known to have provided substantial assistance"

to Hazmi and Mihdhar, Exh. 10 at p. 3, as well as the obvious significance and import of the

additional facts and evidence summarized above from the *9/11 Commission Report*.  The

Kingdom's claim that Bayoumi did not provide funding to the hijackers, meanwhile, is irrelevant

(and not established by the government reports).[32]  Material support can take many forms, and

the myriad forms of aid Bayoumi provided and arranged for others to provide meets all standards

of tortious assistance, whether viewed through the lens of the ATA or state aiding and abetting

and conspiracy liability.

> b)      Thumairy and Bayoumi's Knowledge

The Kingdom also challenges the adequacy of plaintiffs' showing that Thumairy and

Bayoumi acted with "knowledge," but its arguments on this point misapprehend JASTA.

JASTA does not require an affirmative showing of knowledge as a matter of jurisdiction, but

instead merely requires that the nature of the claims that are the basis of the suit do not sound in

"mere negligence."  28 U.S.C. § 1605B(d).  Plaintiffs' causes of action here do not.

Moreover, even to the extent JASTA does require a showing of "knowledge" as a

jurisdictional matter, the Kingdom's arguments as to the sufficiency of that showing as to

Thumairy and Bayoumi simply sidestep the content of the pleadings and associated evidence.

To the extent its arguments on this point are intended to suggest that plaintiffs must show that

both Thumairy and Bayoumi "knew" that Hazmi and Mihdhar were here to fly planes into

prominent U.S. monuments, they are wrong for two additional reasons as well.  *First*, a showing

that either Thumairy or Bayoumi acted with "knowledge" is sufficient–plaintiffs need not

---

[32]For instance, the 2012 FBI Summary Report indicates that the "subjects" of its ongoing investigations provided "financial assistance" to the hijackers, directly or through others.  *See* Exh. 10 at p. 4.

establish that both of them did.  *Second*, this "knowledge" is satisfied by a showing that either

acted with a reckless disregard for their involvement in an overall tortious endeavor–knowledge

of the specific nature of the ultimate tort is not required.

Plaintiffs' factual allegations and the content of the government reports easily meet and

exceed these standards.  Indeed, the record plaintiffs have produced readily shows, and at a

minimum supports an inference, that both Thumairy and Bayoumi were aware that Hazmi and

Mihdhar were jihadists, and that the assistance they were providing to Hazmi and Mihdhar was

advancing a jihadist (and not merely tortious) endeavor.  This knowledge is established through

the range of facts and evidence, and inferences that flow from them, concerning:  the

relationships among Thumairy, Bayoumi, Abdullah and Bassnan; their respective ties to

terrorism and extremist views; the sequence and nature of their concentrated dealings leading to

the provision of the precise forms of assistance the hijackers most needed to assimilate into the

United States and begin preparations for the attacks without detection; their deceitfulness to U.S.

investigators; and the broader spectrum of evidence documenting the extensive involvement of

elements of the Kingdom's MOIA in supporting al Qaeda.  *See* CAC ¶ 211.  This evidence

would be sufficient to establish Thumairy and Bayoumi's knowledge at trial, and is certainly

sufficient for jurisdictional purposes.  *See Halberstam*, 705 F.2d at 480 ("agreement between

conspirators must generally be inferred from circumstantial evidence revealing a common

intent"); *Tatum v. Jackson,* 668 F. Supp. 2d 584, 593 (S.D.N.Y. 2009) (in a civil proceeding, it is

a "general principle of evidence law that the factfinder is entitled to consider a party's dishonesty

about a material fact as affirmative evidence of guilt").

The testimony of plaintiffs' experts reinforces this conclusion and provides independent

admissible evidence that both Thumairy and Bayoumi were not "mere[ly] negligent," JASTA §

3(a), 130 Stat. at 853 (codified as 28 U.S.C. § 1605B(d)), in providing material support to Hazmi

and Mihdhar.  As Mr. Rochford testifies, the evidence concerning the manner in which Thumairy and Bayoumi approached the provision of assistance to the hijackers itself establishes that each did so with a corrupt state of mind, as reflected by Bayoumi's extensive use of espionage tradecraft in relation to his initial meeting with the hijackers and in thereafter providing assistance to them.[33]  Exh. 6 ¶¶ 57-89.  In addition, given the evidence demonstrating Thumairy and Bayoumi's "clear understanding of the jihadist and anti-American agenda they were working to advance on behalf of the Ministry of Islamic Affairs, and the compelling evidence demonstrating that their work in that capacity involved extensive collaborations with jihadists," Mr. Rochford offers his professional opinion that "Thumairy and Bayoumi, and the superior(s) who tasked them to assist Hazmi and Mihdhar, understood that Hazmi and Mihdhar were themselves Wahhabi jihadists who posed a threat to the United States."  *Id.* ¶ 98.  Mr. Mitchell testifies along similar lines that "Hazmi and Mihdhar were promptly cocooned [upon their arrival in Southern California] by a highly matrixed network of aiders and facilitators who cleared a path to their success – supplying every physical and spiritual need to advance their mission." Exh. 7 ¶ 16.  Mr. Mitchell confirms that "the support and assistance provided to Hazmi and Mihdhar in Southern California has the earmarks of a coordinated support network, orchestrated principally by Saudi government employees and agents Fahad al Thumairy and Omar al Bayoumi" and that the full body of evidence establishes that Thumairy and Bayoumi knew Hazmi and Mihdhar were jihadists who intended to do harm to the United States.  *Id.* ¶¶ 22, 208-125.

---

[33]This included bringing an unwitting person with him to establish a cover story; stopping at the consulate prior to the operation; running a "Surveillance Detection Route" from the consulate to the location of the meeting with the hijackers; making a "cover stop" before going to the meeting location; sending a "coast is clear" signal outside the meeting location; and "daisy chaining" the support provided to the hijackers.  Exh. 6 ¶¶ 56-89.

c)        Causation

The Kingdom's arguments that the support Thumairy and Bayoumi provided and arranged for others to provide to the hijackers did not "cause" plaintiffs' injuries within the meaning of JASTA fare no better.  JASTA requires only a "reasonable connection" between their tortious conduct and plaintiffs' injuries, *see supra* pp. 18-20, a standard that is easily met and far exceeded here.  Indeed, the various forms of assistance coordinated by Thumairy and Bayoumi fit squarely within the definition of "material support" under the ATA, reflecting Congress's empirical determination that the precise categories of aid Thumairy and Bayoumi provided serve to enable and advance acts of terrorism.  *See* 18 U.S.C. § 2339A(b)(1) (defining material support or resources).  Moreover, under the common law aiding and abetting principles incorporated into JASTA, even minimal aid constitutes "substantial assistance" where the act encouraged is "particularly bad or opprobrious."  *Halberstam,* 705 F.2d at 484 & n.13.  In a conspiracy case, the showing of the defendant's agreement subjects it to liability for harm resulting from an overt act done by a party to that agreement in furtherance of it.  *Halberstam,* 705 F.2d at 477.  Thus, even as a matter of substantive liability, plaintiffs' showing as to "causation" is more than sufficient.

The evidence contained in the government reports and plaintiffs' expert testimony establish a causal connection that goes well beyond all of these standards, confirming that the aid and assistance Thumairy and Bayoumi provided and coordinated for Hazmi and Mihdhar was in fact essential to the September 11th plot.  In this regard, the *9/11 Commission Report* confirms that Hazmi and Mihdhar desperately needed assistance to settle in the United States and begin preparations for their mission, finding that they were "ill prepared for a mission in the United States" and that it was therefore "unlikely that Hazmi and Mihdhar … would have come to the United States without arranging to receive assistance from one or more individuals informed in advance of their arrival." *9/11 Commission Report* at 215.  Citing those findings and other

42

evidence in the government reports, Mr. Mitchell testifies that Hazmi and Mihdhar's "youth, lack of college education, complete unfamiliarity with western culture and U.S. customs, inability to speak English, and dearth of aviation experience presented hurdles to their assigned objectives," Exh. 7 ¶ 15, and that the support Thumairy and Bayoumi provided and arranged "was essential to the success of the 9/11 attacks because it allowed the hijackers, who were 'ill-prepared' for their mission in the United States, to live and function effectively in the U.S. and undertake preparations vital to the 9/11 operation." *Id.* ¶ 133.  Senator Graham documents al Qaeda's own recognition that the success of the September 11th operation hinged on the ability of Hazmi and Mihdhar to assimilate into the United States without arousing suspicion, and testifies that the aid Thumairy and Bayoumi provided was critical to the success of the plot.  Exh. 8 ¶¶ 18, 22.  This evidence readily exceeds the modest burden to show a reasonable connection between the tortious conduct of Thumairy and Bayoumi and plaintiffs' injuries.

d)      Status as Both Employees and Agents

Plaintiffs have alleged, and there appears to be no dispute, that Thumairy "held diplomatic credentials with the Saudi consulate in Los Angeles, where he served as an employee in the consulate's Islamic Affairs Office, and also served as an imam in the Saudi government-funded King Fahd Mosque." CAC ¶ 215. "Thumairy was appointed to both positions by the Kingdom's Ministry of Islamic Affairs." *Id.* ¶ 216.  As a representative of the Islamic Affairs office of the consulate and imam at the King Fahd Mosque, Thumairy's principal job duties for the Saudi government were to spread the radical Wahhabi variant of Islam in the United States, and to otherwise advance the radical agenda of the MOIA.  *See 9/11 Commission Report* at 372 (MOIA's mission is to "spread Wahhabi beliefs throughout the world, including in mosques and schools").  This scope of work involved implementing a broad agenda that included support for radical Islamist activities extending to terrorist acts.  *See infra* pp. 56-71.

As to Bayoumi, the agency standards incorporated into JASTA would support attribution of his conduct to the Kingdom based solely on facts showing that he supported the hijackers at Thumairy's direction, *see supra* pp. 10-12,[34] as plaintiffs expressly have alleged, but plaintiffs' facts and evidence readily meet a much higher standard.  The CAC alleges that Bayoumi was a covert "employee" and "agent" of the Saudi government whose "undisclosed duties involved the performance of activities on behalf of the Saudi embassies and consulates in the United States, under the direction of the clerics embedded in the Islamic Affairs offices and other officials of the Kingdom's embassies and consulates."  CAC ¶ 218.  This express allegation is amply supported by a broad spectrum of corroborating evidence from admissible government reports.  For instance, FBI investigative reports cited in the CAC and incorporated by reference demonstrate that Bayoumi entered the United States at an advanced age on a student visa, but never pursued any meaningful academic studies during the nearly seven years he resided in the United States.  *Id.* ¶¶ 220, 238; Exh. 6 ¶¶ 26-29.  Throughout the time he was in the United States, FBI reports confirm that Bayoumi was receiving a salary paid by the Saudi government, but filtered through a contractor to the Kingdom (Dallah Avco), an arrangement that served to obscure the true source of Bayoumi's funding.  *Id.* ¶¶ 221-222; Exh. 6 ¶¶ 31-35.  Although Bayoumi never performed any work for Dallah Avco or in relation to the project to which he was allegedly assigned, he did maintain ongoing and systematic contacts with the Saudi embassies and consulates in the United States, and with representatives of the MOIA in particular.  *Id.* ¶¶ 225, 227; Exh. 6 ¶¶ 39-40.  In fact, FBI records indicate that Bayoumi "called Saudi diplomatic missions in the United States at least 74 times during the period between January – March of 2000 alone, coinciding with his assistance to the hijackers, including 34 calls to the Saudi

---

[34]The 9/11 Commission confirmed that Bayoumi tasked Mohdar Adbullah to assist the hijackers, and plaintiffs' experts have offered their professional opinion that Abdullah was a cooptee of Bayoumi and Thumairy and that Thumairy directed his assignment.  Exh. 6 ¶ 87; Exh. 7 ¶ 127.  Because Adbullah was acting as an agent of Bayoumi and Thumairy, his actions also are attributable to the Kingdom.

Consulate in Los Angeles where Thumairy worked." *Id.* ¶ 226. The declassified FBI records further indicate that numerous witnesses who interacted with Bayoumi characterized him as some kind of agent or spy for the Saudi government, and reported that Bayoumi's undisclosed duties included monitoring Saudi citizens residing in the United States and reporting back on their activities to the Saudi government, as indicated by his constant videotaping of student gatherings and activities at local mosques. *Id.* ¶ 239 (citing Aver. ¶¶ 149, 188-89, 194).[35] The submitted FBI records also indicate that Bayoumi was extensively involved in activities related to other aspects of the MOIA's core mission in the United States, such as the dissemination of Wahhabi religious materials and the funding and administration of Wahhabi oriented mosques. *Id.* ¶¶ 229-237. Finally, the 2012 FBI Summary Report confirms that an individual whose name remains redacted from the declassified version of the report "tasked al-Thumairy and al-Bayoumi with assisting the hijackers," a finding that indicates that Bayoumi provided support to the hijackers pursuant to a chain of command, under the direction of Thumairy and (at least) one of Thumairy's superiors. Exh. 10 at p. 4.

Collectively, the evidence concerning the pretext pursuant to which Bayoumi entered the United States; the arrangement through which his Saudi government salary was channeled to him while in the United States; the fact that he performed no work in relation to the project to which he was allegedly assigned; his pattern of contacts and communications with Saudi government diplomatic missions and representatives of the MOIA; the witness observations concerning his monitoring of Saudi communities in the United States; the circumstances surrounding his meeting at the Saudi consulate immediately before offering to assist Hazmi and Mihdhar to settle in San Diego; and the FBI's finding that Thumairy and Bayoumi were tasked to assist the hijackers, amply support plaintiffs' allegation (and at a minimum give rise to an inference) that

---

[35]"Aver." refers to Plaintiffs' Averment of Facts and Evidence in Support of Their Claims Against the Kingdom of Saudi Arabia and the Saudi High Commission for Relief of Bosnia & Herzegovina (ECF No. 2927-1), incorporated herein by reference.

Bayoumi was an undisclosed agent for the Saudi government whose true scope of work involved the performance of duties assigned to him by the Wahhabi clerics in the Islamic Affairs offices of the Kingdom's diplomatic missions.

This appropriate understanding of the uncontested facts and evidence is confirmed by the expert affidavit of Michael Rochford, the former global chief of the Espionage Section of the FBI's Counterintelligence Division.  In his sworn affidavit, Mr. Rochford identifies at least ten separate categories of evidence that support his expert opinion and investigative conclusion that Bayoumi was a covert agent for the Saudi government working under the direction of the Islamic Affairs' representatives in the Kingdom's embassies and consulates.  Exh. ¶¶ 25-98.  This evidence includes the pre-textual nature of Bayoumi's presence in the United States, his pattern of communications with Saudi government institutions, his sources of funding, his activities in the community, and his extensive use of espionage tradecraft in supporting the hijackers.  *Id.* Mr. Rochford further testifies that Bayoumi assisted the hijackers at the direction of Thumairy, citing a range of evidence from the government reports.  *Id.*  From this testimony and the related evidence, Bayoumi's status as both an employee and agent of the Kingdom is plainly established for purposes of the jurisdictional inquiry. [36]

e)      Acts Within Scope of Employment and Agency

Plaintiffs also draw a clear nexus between the roles Thumairy and Bayoumi were performing for the Saudi government and their support for the 9/11 hijackers, establishing for purposes of the jurisdictional inquiry that both acted within the scope of their employment and agency for the Kingdom in providing that support.  Once again, it is not necessary under JASTA to show that Thumairy and Bayoumi aided the hijackers pursuant to the explicit directive of a

---

[36]The Kingdom has not submitted an affidavit challenging plaintiffs' factual allegations and evidence concerning Bayoumi's status and role, and as the discussion above and Mr. Rochford's affidavit make clear, the evidence is not remotely "compatible" with "a conclusion that Al Bayoumi was merely a well-connected Saudi Arabian expatriate pursuing an education in the United States at government expense."  KSA Mem. at 27.

senior Saudi official or as a matter of state policy.  It is enough for plaintiffs simply to show that they were acting in the context of performing their roles for the Kingdom, no matter how irregularly and even if their actions were intentional and contravened the instructions of the Kingdom.  *See supra* pp. 10-12.  Plaintiffs, however, made *both* showings.

Most basically, the facts and evidence (including plaintiffs' experts' testimony) indicate that Thumairy and Bayoumi – two Saudi government employees and agents – worked in coordination with one another to provide support to the hijackers, a showing that demonstrates that their actions were carried out within the context of their roles for the Saudi government. CAC ¶¶ 155-213.  The additional evidence demonstrating that Bayoumi acted at the direction of Thumairy, that Bayoumi's provision of essential aid to the hijackers ensued immediately following his closed-door meeting at the consulate, and the further finding in the 2012 FBI Summary Report that both Thumairy and Bayoumi were "tasked" to provide aid to Hazmi and Mihdhar, Exh. 10 at p. 4, fully reinforce this conclusion.  CAC ¶¶ 214-264.

The nature of the MOIA's mission and activities in the United States and elsewhere separately confirm that Thumairy and Bayoumi's tortious conduct was closely associated with, if not integral to, their assigned roles to implement the radical agenda the MOIA.  Indeed, the *9/11 Commission Report* documents that the MOIA's core mission is to spread Wahhabi orthodoxy throughout the world, and that Wahhabi teachings form the ideological foundation for al Qaeda's targeting of the United States.  *9/11 Commission Report* at 372.  Plaintiffs' factual allegations and evidence detail the pervasive involvement of MOIA officials, and da'awa organizations under its control, in promoting jihadist causes and terrorist organizations, in pursuit of their shared goal of spreading Wahhabi ideology and attacking the West.  CAC ¶¶ 105-154.  These submissions demonstrate a clear relationship between the MOIA's campaign to spread Wahhabi Islam and the promotion of jihadist causes.

The MOIA's support for jihadists, including al Qaeda, is further evidenced and corroborated by the facts and evidence concerning post- 9/11 investigations and actions targeting the MOIA, which confirm that the collaboration between the MOIA and jihadists extended to the targeting of the United States.  Indeed, plaintiffs have offered evidence that the United States government removed approximately seventy individuals associated with the Kingdom's Wahhabi proselytizing apparatus from the United States after 9/11 (including Thumairy), most of whom held diplomatic visas, as part of the what the State Department described as "a move to protect the homeland."  *Id.* ¶ 275.  In addition, the Kingdom itself removed thousands of clerics from the MOIA in connection with a "counter-terrorism" campaign initiated following the 2003 al Qaeda Riyadh complex bombing, thus acknowledging that employees and officials of the MOIA were extensively involved in terrorist activities during earlier periods.  *Id.* ¶ 153.

Beyond the extensive evidence concerning the MOIA's broad dealings with jihadists in advancing its Wahhabist agenda, plaintiffs have introduced specific evidence that Saudi government publications during the relevant period expressly endorsed violent jihad against the infidels as a necessary and appropriate tool to spread Wahhabi Islam.  *See* Exh. 11 at p. 29.  In fact, these government publications assert that spreading of Islam through violent jihad is a "religious duty."  *Id.*  More generally, these publications characterize Jews, Christians, and the West as infidels and enemies of Islam, thus plainly targeting them for acts of violence.  Given that Bayoumi and Thumairy were tasked by the Saudi government to spread Wahhabi Islam, the Saudi government's own statements endorsing violent jihad as an appropriate means to spread Wahhabism convincingly establish that the support provided by Thumairy and Bayoumi to the hijackers was in furtherance of the objectives their employer assigned them to pursue.

Finally, even if plaintiffs were required to show that Thumairy or Bayoumi's material support of the hijackers was specifically authorized, which they are not, the evidence would meet

even that standard.  For instance, Mr. Rochford testifies that the support network organized by Thumairy and Bayoumi for the hijackers bears the hallmarks of a covert operation coordinated among employees and agents of the Saudi government.  *Id.*

Saudi Arabia's arguments that the present record "echo(es) plaintiffs' prior claims," KSA Mem. at 31, and that the Court's prior rulings declining to find that Bayoumi and Thumairy acted within the scope of their employment should apply "with equal force," *id.* at 27, simply ignore that JASTA has reset the attribution inquiry, *see supra* pp. 7-18, and that there is now a much broader (and different) record before the Court specifically directed to the scope of employment and agency inquiries.  The CAC includes a focused set of factual allegations addressing the precise roles Bayoumi and Thumairy fulfilled as employees and agents of the Kingdom, and why their activities in support of the hijackers fell within the scope of that employment and agency for purposes of JASTA.  CAC ¶¶ 34, 155-159, 165-264.  Those explicit factual allegations are bolstered by evidence that was not available to plaintiffs or before the Court in the prior proceedings, such as the Kingdom's own statements endorsing jihad as a tool to spread Wahhabi Islam and the testimony of plaintiffs' experts.  *Id.* ¶¶ 35, 36, 155-159; Exh. 11 at p. 29.The Kingdom's arguments simply do not address the showing presented by the current record.

### 2.    Additional Employees and Agents' Direct Support for the September 11th Operation

Although the facts and evidence detailing the material support provided by five additional employees and agents of the Saudi government in direct furtherance of the September 11th operation are less detailed and comprehensive (due at least in part to the deceitfulness of the involved individuals and other factors that have impaired U.S. investigations, and because plaintiffs have not had the benefit of discovery), nonetheless the facts and evidence plaintiffs have offered in support of each of these additional bases of jurisdiction are uncontested, and thus

separately warrant denial of the Kingdom's present motion.  *See supra* pp. 25-29.  At a minimum, they are sufficient to justify discovery.  *See infra* pp. 72-74.

a)  Osama Bassnan

Plaintiffs' pleadings and related evidence allege, and plainly support an inference, that Osama Bassnan was an additional covert employee and agent of the Saudi government, also tasked with advancing the radical agenda of the MOIA, who also provided critical assistance to Hazmi and Mihdhar within the scope of his employment and agency for the Saudi government. CAC ¶¶ 197-205, 207, 210, 212, 218, 228, 248-257; Exh. 6 ¶¶ 99-111; Exh. 7 ¶¶ 90-98, 128-130.

As to Bassnan's status as an undisclosed agent for the Saudi government, the CAC cites FBI investigative reports documenting that Bassnan entered the United States under a false pretense; had "many ties to Saudi government" institutions in the United States; received unusual funding from the Saudi government; and was described by witnesses who interacted with him as some kind of "agent" for the Saudi government.  CAC ¶¶ 251-255; Exh. 6 ¶¶ 99-103.  The CAC also documents Bassnan's close ties to Bayoumi, as reflected by FBI reporting confirming the existence of roughly 700 calls between various phones subscribed to by Bayoumi and Bassnan over a one year period."  *Id.* ¶ 199.  These and other facts derived from admissible government investigative reports plainly give rise to a reasonable and credible inference that Bassnan was another undisclosed agent working on behalf of the Saudi government, whose duties mirrored those of Bayoumi and involved the advancement of the extremist agenda of the MOIA.

Again citing FBI reporting, the CAC asserts that Bassnan was an ardent bin Laden supporter who spoke of bin Laden "as if he were a God," and that Bassnan "made a comment to an FBI source after the September 11th attacks suggesting that he did more for the hijackers than al-Bayoumi did."  *Id.* ¶¶ 200-201; Exh. 6 ¶ 104.  Consistent with this claim made by Bassnan himself, the CAC cites the FBI's finding confirming "contact between the hijackers and a close friend of Bassnan, Khaled al Kayed, a commercial pilot and flight instructor living in San Diego"

who "was approached by Hazmi and Mihdhar about learning how to fly Boeing jet aircraft."[37]
*Id.* ¶ 203.  These and other uncontested facts readily establish a plausible inference that Bassnan
knowingly provided material support to the hijackers.  Because Bassnan's role for the Saudi
government mirrored that of Bayoumi, and centered on the advancement of the radical agenda of
the MOIA in the United States, his assistance to the hijackers also was within the scope of his
employment and agency with the Saudi government.[38]  Mr. Rochford's affidavit underscores the
significance and import of this evidence, and offers his professional opinion that Bassnan was in
fact a covert agent of the Saudi government who played some, as yet undetermined, role in
providing support to the hijackers.  Exh. 6 ¶¶ 99-106.  The Kingdom has offered no affidavit to
challenge plaintiffs' facts and evidence on these points, and its arguments focus instead on
advocating its preferred view of the significance of individual facts do not amount to one.[39]

        b)        Mohammed al Qudhaeein and Hamdan al Shalawi

The CAC also alleges that "Mohamed al Qudhaeein and Hamdan al Shalawi were
additional undeclared employees and agents of the Saudi government, whose duties also
involved the performance of activities on behalf of the [MOIA]," and that Qudhaeein and
Shalawi carried out a "dry run" for the 9/11 attacks while traveling to an event hosted by MOIA
representatives of the Saudi embassy in Washington, D.C.  CAC ¶¶ 36, 158, 267-274.

As confirmed by FBI investigative reports, Qudhaeein and Shalawi boarded a flight from
Phoenix to Washington, D.C. on November 19, 1999, and immediately began asking the crew a
variety of suspicious questions.  *Id.* ¶ 270.  Once airborne, Qudhaeein "went to the front of the

---

[37]This evidence was declassified in July of 2016 and was not before the Court in earlier proceedings.

[38]The Kingdom also ignores the broader body of evidence currently before the Court, demonstrating that Saudi Arabia maintained a network of undisclosed agents in the United States prior to the September 11th attacks, whose duties mirrored those of Bayoumi and involved the advancement of the Wahhabist agenda of the MOIA.  This additional evidence necessarily informs the evaluation of Bayoumi's particular contacts and associations.

[39]For instance, the Kingdom erroneously maintains that plaintiffs' theories as to Bassnan rest solely on the proposition that Bassnan provided support to the hijackers through Bayoumi.  KSA Mem. at 34.  However, plaintiffs have offered additional facts and evidence that give rise to a reasonable and appropriate inference that Bassnan directly assisted the hijackers himself, including the evidence establishing that the hijackers approached Bassnan's close friend about flight lessons.

plane and attempted on two occasions to enter the cockpit," and the FBI concluded that "both men were specifically attempting to test the security procedures of America West Airlines in preparation for and in furtherance of UBL/Al Qaeda operations." *Id.* ¶ 271; Exh. 12 ¶¶ 433-34. The United States also determined that Shalawi traveled to an al Qaeda camp in Afghanistan to receive training in the fall of 2000, where several of the September 11th "muscle hijackers" were simultaneously receiving training. *Id.* ¶ 279. In addition, evidence from the detainee proceedings at Guantanamo Bay establishes that Qudhaeein and Shalawi were, at the time of the 1999 flight, close associates of Ghassan al Sharbi, who was then also living in Arizona. *See* Exh. 34 at p. 3. Al Sharbi is another al Qaeda member who was captured during a raid of al Qaeda guesthouse in Pakistan in March 2002. Qudhaeein and Shalawi's extensive terrorist connections provide yet additional support for the FBI's specific determination that Qudhaeein and Shalawi were testing security protocols during the 1999 flight, in direct support of the planned 9/11 operation.

The uncontested facts and evidence of record also draw a direct relationship between the activities of Qudhaeein and Shalawi on the 1999 flight, and the roles they were assigned to fulfill as employees and agents of the Saudi government. In fact, the FBI specifically concluded that Qudhaeein's "profile" was "similar to that of al-Bayoumi and Bas[s]nan," citing his purported status as a "student," the fact that "he was in frequent contact with Saudi government establishments in the United States," "was very involved in the affairs of the local Saudi community," and "was receiving money from the Saudi government." CAC ¶¶ 268-269; Exh. 12 at 433-34. Moreover, Qudhaeein and Shalawi themselves confirmed that the Saudi embassy had paid for their tickets for the flight, and that they were traveling from Arizona to Washington in order to attend a conference being jointly held by the Islamic Affairs officials of the Saudi embassy and the Institute for Islamic and Arabic Sciences in America ("IIASA"), a Saudi

government proselytizing arm whose personnel held diplomatic status as representatives of the
Saudi embassy. *Id.* ¶¶ 273-274. IIASA was established by the Saudi government to spread
Wahhabism in the United States, and had extensive ties to terrorism. *Id.* ¶ 275. From this
evidence, the reasonable inference concerning the nexus between their tortious acts and their
roles for the Saudi government is evident.

The Kingdom attempts to explain away Qudhaeein and Shalawi's conduct during the
1999 flight by urging that the Court should conclude that Qudhaeein simply made a mistake
while looking for the lavatory. But the 9/11 Commission's interviews of Qudhaeein and Shalawi
confirm that both were experienced travelers, who had flown internationally and domestically on
numerous occasions prior to the 1999 flight, and certainly knew full well the difference between
a cockpit door and bathroom. *See* Exhs. 29 and 30. The Kingdom's arguments on this point also
ignore the evidence of Qudhaeein and Shalawi's extensive ties to al Qaeda, and are in any case in
direct conflict with the FBI's finding that they "were specifically attempting to test the security
procedures of America West Airlines in preparation for and in furtherance of UBL/Al Qaeda
operations."[40] CAC ¶ 271. In any case, it is the plaintiffs who are entitled to all reasonable
inferences from the uncontested facts, and those are sufficient to establish jurisdiction based on
the activities of Qudhaeein and Shalawi in this procedural setting.

c)      Mohammed Jabar Hassan Fakihi and Saleh al Hussayen

The CAC additionally alleges that Mohammed Jabar Hassan Fakihi, another
representative of the MOIA working in the Saudi embassy in Berlin and also charged with
advancing the MOIA's Islamist agenda, provided assistance to the Hamburg al Qaeda cell that
coordinated the September 11th attacks, and that Saleh al Hussayen, yet another Saudi

---

[40]The fact that Qudhaeein and Shalawi filed a civil rights action against the airline, which as the Kingdom
acknowledges was dismissed, is obviously irrelevant to the present inquiry.

government cleric with documented terrorist ties, provided aid to three of the September 11th

hijackers on the eve of the attacks while performing work for the Saudi government.

In support of their claims relating to the activities of Fakihi, the CAC documents his role

working the Islamic Affairs Office in the embassy in Berlin; his dedication to advancing the

Wahhabist agenda of the MOIA in Europe; the fact that he was closely associated with and

provided funding for the al Nur Mosque in Berlin, a notorious hub of al Qaeda activity in

Germany; his frequent meetings at the al Nur Mosque with the head of an al Qaeda cell that was

planning a large scale terrorist attack in Germany; the determination by U.S. officials that Fakihi

"was organizationally involved" with bin Laden's al Qaeda network, according to testimony

submitted to Congress under penalty of perjury; and that Fakihi was deceitful during his

interview with the 9/11 Commission.  CAC ¶¶ 288-301.  Collectively, these factual details

documenting Fakihi's terrorist connections, extremist views, organizational involvement in al

Qaeda, contact with the Hamburg al Qaeda cell, and deceitfulness to investigators, give rise to a

reasonable inference that Fakihi provided aid to the Hamburg al Qaeda cell that coordinated the

September 11th attacks.

Plaintiffs' facts and evidence similarly support an inference that Hussayen provided aid

and comfort to three of the 9/11 hijackers on the eve of the attacks, and that he did so while

acting within the scope of his employment for the Kingdom.  *Id.* ¶¶ 36, 281-287.  Plaintiffs have

expressly alleged, and offered evidence, that Hussayen was an extremist cleric and long-serving

employee of the Saudi government, engaged in advancing the Kingdom's Wahhabist agenda

through various government positions.  *Id.* ¶¶ 281-281; Aver. ¶¶ 232, 234.  In the immediate

aftermath of the 9/11 attacks, the FBI discovered that Hussayen (who filed an affidavit in this

litigation asserting that plaintiffs' claims against him implicated his activities as a Saudi

government official) had precipitously switched hotels on the evening before the September 11th

attacks, in order to stay at the same hotel as three of the September 11th hijackers.  CAC ¶¶ 36, 283.  Hussayen feigned a seizure during initial questioning by the FBI after the September 11th attacks, and the FBI concluded that he was "deceptive" when he "claimed to not know the hijackers."  *Id.* ¶¶ 284-285.  Following his release from the hospital for his entirely fabricated ailment, Hussayen fled the country to avoid further questioning by the FBI.  *Id.* ¶ 284.

Plaintiffs' facts and evidence on these points give rise to a logical inference that Hussayen provided aid and assistance to the September 11th hijackers.  Indeed, this conclusion is fully supported by the Second Circuit's prior ruling restoring plaintiffs' direct claims against Hussayen, in relation to which the Court held that less detailed allegations "not only suggest the possibility that [Hussayen] may have provided direct aid to members of al Qaeda, but they also raise the plausible inference that he may have intended his indirect support of al Qaeda to cause injury in the United States."  *In re Terrorist Attacks on September 11, 2001 (O'Neill v. Asat Trust Reg.),* 714 F.3d 659, 679 (2d Cir. 2013).

The Kingdom's arguments that the allegations and evidence relating to Fakihi and Hussayen are insufficient again ignore the obvious import of the proffered facts and evidence and attempt to distract the Court by challenging theories that plaintiffs have not advanced.  Along those lines, the Kingdom argues that Fakihi's funding of the al Nur Mosque is insufficient to establish a tort within the scope of his employment, because "it is not tortious to want to convert others to one's own religion."  KSA Mem. at 40 n.40.  The Kingdom similarly argues that this Court should discount plaintiffs' facts and evidence that Fakihi met frequently with the head of an al Qaeda terrorist cell in Germany, under the theory that "the law 'does not penalize mere association with a foreign terrorist organization.'"  *Id.* at 41.  Those arguments simply sidestep the obvious point of the allegations relating to Fakihi's associations with the al Nor Mosque, al Haramain, and other terrorist related entities, which demonstrate his extremist

leanings and jihadist ties, lending force to plaintiffs' argument that the complete record easily supports an inference that he aided the Hamburg 9/11 cell.[41]  CAC ¶¶ 36, 281-287.  The Kingdom's efforts to minimize plaintiffs' facts and evidence relating to Hussayen's ties to the hijackers are similarly misguided and again fail to grapple with the allegations of the CAC explaining the inferences that appropriately are drawn from the full body of facts and evidence relating to Hussayen's actions and associations with the Saudi government.  *See id.* ¶ 286.

### B.        Saudi Arabia's Funding and Sponsorship of al Qaeda

Jurisdiction under JASTA is separately established through plaintiffs' extensive factual detail and evidence demonstrating that al Qaeda's development into a sophisticated terrorist organization was fueled by the massive funding and support that flowed to it from the Saudi government, via the Kingdom's global apparatus to spread the extreme Wahhabi variant of Islam.  This massive support was channeled primarily through the Kingdom's charities, whose support and intimate dealings with al Qaeda were well known to the Saudi government.

The uncontested facts and evidence concerning the Kingdom's financing and sponsorship of al Qaeda through those known al Qaeda fronts, and describing the character of the charities' relationships with the Saudi government and their pervasive sponsorship of al Qaeda, establish jurisdiction under JASTA on at least three separate bases.  *First*, the Saudi State itself committed tortious acts in support of al Qaeda, by knowingly providing massive funding and other resources to known al Qaeda fronts.  *See* JASTA § 2(b) (JASTA provides "broadest possible basis … to seek relief against … foreign countries … that have provided support, directly or indirectly" to terrorist organizations).  *Second*, the charities that collaborated intimately with al Qaeda were directed and staffed by Saudi government officials, who were responsible in their governmental capacities for directing the charities' expansive sponsorship of al Qaeda.  The

---

[41]The Kingdom's arguments based on denials Fakihi made during interviews with 9/11 Commission staff members are irrelevant, and fail to acknowledge that the 9/11 Commission staff who interviewed Fakihi concluded that "he does not appear credible" on certain material issues.

tortious acts of those officials in doing so establish jurisdiction under JASTA as well.  *Third*, the charities are themselves agents and alter-egos of the Saudi government, engaged in the performance of core functions, making the tortious acts of the charities themselves attributable to the Kingdom.

### 1.     The Saudi State Committed Tortious Acts in Support of al Qaeda.

Plaintiffs' uncontested factual allegations and evidence readily demonstrate that the Saudi government provided massive funding and a range of other resources to a host of charities that were intimately intertwined with al Qaeda.  Affidavits filed by the Saudi government and the charities themselves confirm the Saudi government's unqualified commitment to funding and supporting these al Qaeda fronts through various platforms, in furtherance of the Kingdom's campaign to spread Wahhabi orthodoxy throughout the world.  For example, officials of the Muslim World League ("MWL") have attested that MWL's annual budget "is funded by an annual grant from the Saudi government."  Exh. 9 ¶ 46; Aver. ¶ 336.  Officials of the World Assembly of Muslim Youth ("WAMY") have likewise affirmed that the "Government of Saudi Arabia funds a large portion of WAMY's budget."  Exh. 9 ¶ 37; Aver. ¶ 441.  The Saudi Government also "sponsors and supervises the Saudi Red Crescent Society" and "appoints all of its directors."  Exh. 9 ¶ 33; Aver. ¶ 545.  Al Haramain Islamic Foundation officials have attested that it "operates under the supervision of the Saudi Minister for Islamic Affairs," Aver. ¶ 478, and publicly stated that 95% of al Haramain's funding came from Saudi Arabia.  *Id.*  "The largest source of funding for the Saudi High Commission is the treasury of the Government of Saudi Arabia."  *See* Declaration of Saud bin Mohammad Al-Roshood ¶ 24 (ECF No. 3672-1).  The Saudi Joint Relief Committee received its funding via a Royal Decree and donations through the Ministry of Finance.  *See* Declaration of Dr. Abdulrahman A. Al-Suwailem ¶ 11 (ECF No.

57

631-3).  Even beyond its massive financial support for these and the other al Qaeda fronts[42] discussed in the CAC, the Kingdom supported these organizations by providing them access to government resources and other protections that enabled their global operations.

That these organizations used the very resources provided by the Saudi government to fuel al Qaeda's growth, thereby enabling al Qaeda to acquire the global strike capabilities employed on September 11th, is also uncontested and beyond any reasonable dispute.  Indeed, their intertwined financial and operational dealings with al Qaeda, extending to support directly related to the September 11th attacks and targeting of the United States, is reflected by formal designations under U.S. counter-terrorism programs, findings presented in U.S. intelligence reports and State Department cables, statements of U.S. counter-terrorism officials, and similar evidence of record.  Aver. ¶¶ 35, 40, 41, 314-32, 389-404, 483-92, 502-03.  Consistent with all of this evidence, the 9/11 Commission acknowledged a "likelihood that charities with significant Saudi government sponsorship diverted funds to al Qaeda," *9/11 Commission Report* at 171, identifying al Haramain as one example.  *Id.* at 372.  Expanding on that finding, the 9/11 Commission's Staff Monograph on Terrorist Financing explains that "al Qaeda was funded, to the tune of approximately $30 million per year, by diversions of money from Islamic charities and the use of well-placed financial facilitators who gathered money from both witting and un-witting donors, primarily in the Gulf region."  Nat'l Comm'n on Terrorist Attacks Upon the U.S., *Monograph on Terrorist Financing* at 4 (2004);[43] CAC ¶ 71; Aver. ¶ 41.  The 9/11 Staff Monograph features al Haramain as a case study, explaining that "[s]ince at least 1996, the U.S. intelligence community has developed information that various al Haramain branches supported jihadists and terrorists, including al Qaeda."  *Id.* at 12.  Al Haramain's collaborations with al

---

[42]Underscoring the scale of the Kingdom's contributions to these organizations, Saudi officials interviewed by the 9/11 Commission estimated that the Kingdom funneled between $80-90 billion into the global Wahhabi proselytizing campaign implemented through these organizations and related platforms during the two decades leading up to the September 11th attacks.  Exh. 32 at p. 2.

[43]Available at https://govinfo.library.unt.edu/911/staff_statements/911_TerrFin_Monograph.pdf.

Qaeda led the U.S. to designate the entire organization and several of its officials as Specially Designated Global Terrorists ("SDGT"), describing it as one of the principal organizations "providing support for the al Qaeda network and promoting militant Islamic doctrine worldwide."  CAC ¶ 77; Aver. ¶ 490.

The other Saudi-sponsored charities' collaborations were of like kind and dimension. The United States designated Rabita Trust as an SDGT on October 12, 2001 "for its close ties to senior al Qaida leadership and for providing logistical and financial support to al Qaida."  CAC ¶ 78.  State Department cables filed of record identify the International Islamic Relief Organization ("IIRO") as the "principal sponsor of terrorist training camps in Afghanistan during the Taliban regime" and indicate that "Usama bin Ladin used the entire IIRO network for his terrorist activities."  CAC ¶ 80, Aver. Ind. Exh. 112.  IIRO's financial and operational integration with al Qaeda prompted the U.S. to designate several of its offices as SDGTs as well, along with a senior IIRO official in Saudi Arabia, describing him as the "million dollar man for supporting Islamic extremists."  CAC ¶ 79, Aver. Ind. Exh. 160.  The U.S. Department of Defense has designated WAMY as a "Tier 1 Counterterrorism" target, "defined as those that have demonstrated sustained and active support for terrorist organizations willing to attack U.S. persons or interests."  CAC ¶ 82.  Benevolence International Foundation, another beneficiary of the Kingdom's massive funding of Wahhabi organizations that were structurally intermeshed with al Qaeda, was also designated as an SDGT based on its material support of al Qaeda, including from offices located in the United States.[44]  Aver. ¶ 470.

Plaintiffs' submissions go well beyond demonstrating a "reasonable connection" between the Saudi State's funding and sponsorship of al Qaeda (as described above) and plaintiffs'

---

[44]The Second Circuit previously held that the factual allegations of plaintiffs earlier and less detailed pleadings "include a wealth of detail (conscientiously cited to published and unpublished sources) that, if true, reflect close working arrangements between ostensible charities and terrorist networks, including al-Qaeda."  *In re Terrorist Attacks on September 11, 2001*, 538 F.3d 71, 76 (2d Cir. 2008) ("*Terrorist Attacks III*").

injuries, all that is required by JASTA, and in fact establish that the Kingdom's material support very directly enabled al Qaeda to plan and carry out the September 11th attacks.  In this regard, the 9/11 Commission confirmed that the "9/11 attack was a complex international operation, the product of years of planning," *9/11 Commission Report* at 365, and that the organizational requirements to stage the attacks required a substantial and sophisticated infrastructure.  *Id.* at 365-66.  U.S. officials have estimated that al Qaeda's annual financial obligations to the Taliban alone approached $20 million annually, in exchange for which al Qaeda received the safe haven where its leadership planned and launched the attacks and maintained the camps where it trained the hijackers.  CAC ¶ 101.  The Saudi government was the principal source of this funding essential to acquire the global strike capabilities employed on September 11th, as confirmed by the evidence establishing the pervasive financial support flowing through the Kingdom's charities.  It is thus no wonder that U.S. counterterrorism officials described Saudi Arabia as the "epicenter" of al Qaeda financing in the period leading up to September 11th.  Aver. ¶ 316.

The record also establishes that the Kingdom was specifically aware that its massive funding and patronage of these and other al Qaeda fronts was fueling the growing operational capabilities of al Qaeda in the years preceding the September 11th attacks, but continued to lavish funds and resources on those organizations.  While any potentially applicable knowledge requirement would be satisfied by a showing of recklessness, and a showing of such recklessness on the part of any single Kingdom official would be sufficient, the present record goes well beyond those standards, documenting that U.S. officials specifically raised the Kingdom's funding of al Qaeda through its charities in bilateral meetings with senior Saudi officials.  Aver. ¶ 585.  The 9/11 Staff Monograph corroborates plaintiffs' express allegations and related evidence on this point, confirming that "the United States has raised al Haramain's involvement in terrorist financing with the Saudi government repeatedly, in different forms and through

different channels, since 1998." 9/11 Staff Monograph at 12. In reality, these communications were entirely unnecessary to apprise Saudi officials of the charities' intertwined dealings with al Qaeda, as those charities were repeatedly and publicly implicated in financial and operational involvement in al Qaeda's targeting of the United States prior to September 11th. For instance, the involvement of al Haramain and IIRO in the 1998 embassy bombings led to highly publicized closures of their offices in Kenya. *See* ECF No. 2241-7 ¶ 94. At the time, al Haramain was headed by the Saudi Minister of Islamic Affairs, and IIRO's operations in Kenya were being conducted under the auspices of a committee that was headed by the Saudi Ambassador to Kenya and included the embassy's MOIA representative. Exh. 9 ¶ 89. Those government officials (and their superiors) most obviously were aware of these high-profile terrorist activities of the very organizations they were directing.

Mr. Kohlmann's testimony provides additional admissible evidence establishing the Saudi government's own sponsorship of al Qaeda. Indeed, Mr. Kohlmann reviews in depth the evidence of the da'awa organizations' collaborations with al Qaeda, and how Saudi government money flowing through those organizations fueled al Qaeda in the years preceding the attacks. Exh. 9 ¶¶ 167-232. Kohlmann attests that although "some support to Al-Qaida was also provided by non-Saudi charitable fronts for terrorism, there was simply no other source that was even remotely close to being as prolific and consistent as entities that were funded and managed by the Kingdom of Saudi Arabia." Kohlmann also explains how the planning and execution of the attacks depended on this funding, and attests that "Saudi government money was the fuel for Al-Qaida's engine in the period leading up to the September 11th attacks." *Id.* ¶ 232.

Plaintiffs' factual allegations and evidence on these points readily establish jurisdiction based on the Saudi State's own funding and sponsorship of al Qaeda. Initially, the facts and admissible evidence concerning the Kingdom's massive funding of known al Qaeda fronts

establish that the Kingdom itself engaged in a tortious act that is a basis of plaintiffs' claims.
*Holder v. Humanitarian Law Project*, 561 U.S. 1, 7, 29-33 (2010) (contributions to charitable
fronts of terrorist organizations enable terrorist acts); *Boim,* 549 F.3d at 698.  Because the
Kingdom was specifically aware that those organizations were diverting the Kingdom's
contributions to al Qaeda to advance al Qaeda's targeting of the United States, its massive and
sustained contributions to those entities were not merely negligent.  Finally, plaintiffs' facts and
evidence easily satisfy and exceed JASTA's jurisdictional causation element, by demonstrating
that the Kingdom's contributions represented the primary source of funding for al Qaeda,
financing the very training camps where the 9/11 attacks were conceived and coordinated, and
that al Qaeda could not have carried out the September 11th attacks without those resources.[45]

### 2.      The SHC Materially Sponsored al Qaeda.

The SHC was one of the many Saudi-sponsored charities operating in lockstep with al
Qaeda.  As a self-described "arm" of the Saudi government, CAC ¶ 124, SHC provided
contributions that were especially important in enabling al Qaeda to acquire the strike
capabilities used to carry out the September 11th attacks.  Materials discovered during a raid on
SHC's offices one month after the September 11th attacks confirm that SHC served as an
operational hub for al Qaeda activities, both prior to and after the September 11th attacks, and
demonstrate SHC's direct involvement in the portfolio of plots al Qaeda was developing to
attack the American homeland during this time period.  *Id.* ¶¶ 94-95; Aver. ¶ 533.  Following the
raid, the Financial Police of the Federation of Bosnia Herzegovina Ministry of Finance described

---

[45]Saudi Arabia fails entirely in its motion to dismiss to address plaintiffs' claims and theories relating to the Saudi
State's own funding of al Qaeda, despite previously having urged this Court (and the Second Circuit and Supreme
Court) to look past plaintiffs' attribution theories based on direct support of al Qaeda and the 9/11 hijackers by Saudi
Arabia's employees and agents, and instead construe plaintiffs' complaints as merely turning on the
"allegation…that [Saudi Arabia] funneled money through certain charities to al Qaeda, thereby providing material
support to the terrorists."  Memorandum of Law in Support of Motion To Dismiss of The Kingdom of Saudi Arabia
and The Saudi High Commission for Relief of Bosnia & Herzegovina at 15, No. 03 MDL 1570 (S.D.N.Y., filed
Sept. 15, 2014) (ECF 2894).  Its failure entirely in its motion to dismiss to address plaintiffs' theories arising from
the Kingdom's pervasive funding of al Qaeda requires that its motion be denied.

SHC as a front for radical and terrorism-related activities.  Aver. ¶ 534.  Similarly, the U.S. identified SHC as a "terrorist support entit[y]" in a Matrix of Threat Indicators used to evaluate enemy combatants' ties to al Qaeda.  *See* ECF No. 2927-17.  Declassified State Department cables identify SHC as a member of a "dirty dozen" of charities in Bosnia supporting al Qaeda, Exh. 16 at 2, list SHC as one of the U.S. embassy in Sarajevo's "highest priorities" in shutting down funding for al Qaeda after 9/11, *id.*, and "strongly recommends the designation of … the Saudi High Commission," Exh. 18 at 2.  *See* Exhibits 13-18.

Far from "conclusory" or "boilerplate" (SHC Mem. at 1, 11, 15, 25 n.14), these facts and the related evidence demonstrate the SHC's key role in financing and facilitating al Qaeda's targeting of the United States, provision of "cover" jobs for numerous al Qaeda members (as opposed to "a few rogue employees," *id.* at 9), and provision of weapons to groups affiliated with al Qaeda, throughout the entire period that al Qaeda was planning and carrying out the September 11th attacks.  The pleadings and evidence thus demonstrate that the SHC conspired with and aided and abetted al Qaeda's targeting of the United States, through support closely linked to the September 11th attacks, showings that meet JASTA's modest requirement of showing a "reasonable connection" between the SHC's tortious acts and plaintiffs' injuries.

### 3.   Saudi Officials Directed the Charities' Support of al Qaeda.

The massive funding and support that flowed to al Qaeda from the charities establishes jurisdiction for plaintiffs' claims against the Kingdom on the additional grounds that Kingdom officials and employees detailed to head and staff the charities were responsible for directing the charities' sponsorship of al Qaeda, and did so within the scope of their government positions.

Consistent with its use of the charities as agents to carry out core government functions, *see infra* pp. 65-71, the Kingdom detailed senior government officials (typically from the government's religious components and ministries) to head and direct the charities, and embedded government employees and agents within the financial and operational structures of

those charities.  For instance, al Haramain was headed by the Saudi Minister of Islamic Affairs, who supervised its affairs.  Exh. 9 ¶ 98; CAC ¶¶ 121, 131; Aver. ¶ 478.  The 9/11 Commission separately concluded that at least two Saudi ministers had supervisory authority over al Haramain, and that lower-level Saudi officials had substantial influence over al Haramain's offices outside of Saudi Arabia.  9/11 Staff Monograph at 12; Aver. ¶ 479.  The Minister of Islamic Affairs headed WAMY as well.  Exh. 9 ¶ 130; CAC ¶ 131.  The MWL and its subsidiary the IIRO were likewise headed by Saudi government officials, including co-defendants Abdullah Naseef, Abdullah bin Saleh al Obaid, Abdullah Mohsen al-Turki, and Adnan Basha, all of whom have confirmed that they traveled on "official" Saudi government passports in their capacities as the heads of those organizations.  *See* ECF No. 3713 at 3.  Documents produced by the IIRO in discovery further reveal that various IIRO offices outside of the Kingdom were headed by a representative of the local Saudi embassy.  *See* Exh. 9 ¶ 88.  The SHC, SJRC, SRC, and WAMY have likewise confirmed that they were broadly headed, directed, and staffed by Saudi government officials and employees.  CAC ¶¶ 124-127.

The evidence convincingly implicates these Saudi government employees and agents in directing and facilitating the charities' collaborations with al Qaeda, in furtherance of the MOIA's mission to spread Wahhabi doctrine and practice worldwide.  Most basically, the evidence demonstrates that the charities' sponsorship of al Qaeda spanned many years, and extended to separate branch offices of the charities located throughout the world.  The sheer scope and duration of those collaborations confirms that their support for al Qaeda was coordinated, systematic, and necessarily directed by the individuals who headed the organizations.[46]  More specific evidence bears this out.  For example, internal records seized in a

---

[46]In restoring the claims against defendants Naseef, Obaid, Turki and Basha, the Second Circuit expressly recognized that plaintiffs' claims against them centered on allegations that "through their positions of control [of the charities], they allegedly sent financial and other material support *directly* to al Qaeda when al Qaeda allegedly  was known to be targeting the United States."  *In re Terrorist Attacks on September 11, 2001,* 714 F.3d at 678.  The Second Circuit concluded that the factual allegations of plaintiffs' earlier, and far less detailed, pleadings gave rise

raid of one of al Qaeda's charity fronts reflect that MWL head Abdullah Naseef attended the meeting at which al Qaeda was established, during which bin Laden and other participants discussed launching attacks from MWL offices.  CAC ¶ 64.  Naseef thereafter appointed bin Laden's brother-in-law and founding al Qaeda member Mohammed Jamal Khalifa to run the IIRO office in the Philippines, thus embedding a member of the al Qaeda leadership in the IIRO's structure.  *Id.* ¶ 67.  From that post, Khalifa funded Khalid Sheikh Mohammed and the development of his "Bojinka" plot, a pre-cursor to the 9/11 operation.  *Id.* ¶ 68.  Saudi government officials also appointed Wa'el Jelaidan, another founding al Qaeda member, to leadership positions in the MWL, Rabita Trust and the Saudi Joint Relief Committee, itself a component of the government – making Jelaidan a government employee in that post.  *Id.* ¶¶ 66, 78, 83.  In designating Jelaidan a SDGT, the United States confirmed that he "has directed organizations that have provided financial and logistical support to al-Qa'ida."  *Id.* ¶ 66.  As these examples demonstrate, Saudi government employees and officials were extensively involved in directing and coordinating the charities' sponsorship of al Qaeda.

Once again, plaintiffs have presented facts and evidence, and there appears to be no dispute, that the primary mission of the charities was to spread the extremist Wahhabi variant of Islam globally.  As part of that effort, the record readily establishes that the charities embraced broad partnerships with jihadists in service of their efforts to spread Wahhabi doctrine globally, thus establishing that the government officials were acting within the scope of their roles for the Saudi government in channeling support to al Qaeda via the charities under their control.  Accordingly, their tortious actions in support of al Qaeda are attributable to the Kingdom and establish jurisdiction under JASTA.

---

to a reasonable inference that the officials had in fact used their positions to "provide[] financial and other resources to al Qaeda knowing that al Qaeda was engaged in a global campaign of terror directed at the United States."  *Id.*

####           4.         Attributable Torts of Saudi Arabia's Charity Agents and Alter-Egos

Even if the Saudi State's own tortious acts in sponsoring al Qaeda and the activities of its officials and employees in directing the charities' collusion with al Qaeda were not enough, virtually all of the charities are agents and alter-egos of the Saudi government, engaged in the performance of a core function of the Saudi State, making their own tortious acts attributable to the Kingdom on three grounds.

Initially, the characterizations that many of the charities have assigned to themselves in this litigation readily establish that they are agents of the Saudi government for purposes of JASTA.  Using various labels and in different contexts, the MWL, IIRO, SHC, SJRC, and SRC each has claimed status as a foreign state within the meaning of the FSIA, 28 U.S.C. § 1603, in pleadings filed with the Court in this litigation.  CAC ¶ 111.  Because the charities do not issue stock, their claims to such status necessarily rest on the assertion that they are "organs" of the Saudi government.  *See* 16 U.S.C. § 1603.  While there is no precise test for organ status under the FSIA, the factors relevant to the inquiry confirm that organ status requires a nexus to the foreign government that far exceeds the showing necessary to demonstrate an entity's status as an agent under common law principles.  *See, e.g. Filler v. Hanvit Bank*, 378 F.3d 213, 217 (2d Cir. 2004) (describing factors relevant to organ inquiry).[47]  By claiming organ status in their own pleadings, these charities have established their status as agents of the Kingdom under JASTA, and no further inquiry is required to attribute their tortious actions to the Kingdom.

Nonetheless, plaintiffs have presented a range of specific facts in the CAC that separately satisfy the agency inquiry in this setting.  Plaintiffs have expressly alleged, and Saudi Arabia has not contested, that the charities served as the principal instruments through which the Kingdom fulfills its state obligation to propagate Wahhabi Islam throughout the world.  CAC ¶ 128.

---

[47]These include:  (1) whether the foreign state created the entity for a national purpose; (2) whether the foreign state actively supervises the entity; (3) whether the foreign state requires the hiring of public employees and pays their salaries; (4) whether the entity holds exclusive rights to some right in the [foreign] country; and (5) how the entity is treated under foreign state law.  *Id.*

Consistent with this tasking, the Kingdom systematically characterizes the activities of the charities as achievements of the Saudi State.  *Id.* ¶ 120.  Plaintiffs' uncontested factual allegations further describe in detail the myriad ways in which the Kingdom exercised complete control over the charities, describing how the charities are headed by officials of the Saudi government, appointed in most cases by the King, who rigidly control the day to day operations of the charities; are financially dependent upon, and receive the vast majority (if not all) of their funding from, the Saudi government; must submit their operational budgets to the Saudi government for approval; work under the direction of the Kingdom's Ministry of Islamic Affairs; are supervised on a day-to-day basis by the Islamic Affairs Departments of the Saudi embassies; require approval of the Saudi government for the opening of offices outside of Saudi Arabia; carry out operations pursuant to work plans provided by the Saudi government and from which they may not deviate; frequently benefit from diplomatic status in their host countries based on requests made by the Saudi government to those host countries; have Saudi officials embedded within their internal decision-making bodies and oversight committees; frequently operate from Saudi government offices, including offices within the Kingdom's diplomatic missions; and could be (and were in fact) instructed by the Saudi government to cease operations outside of the Kingdom, with instructions that they subordinate specified operations to a coordinating committee established by the Saudi government.  Exh. 9 ¶¶ 19-166; CAC ¶¶ 129-132.

Plaintiffs' detailed and uncontested factual allegations concerning the Kingdom's control of the charities are amply supported by evidence of record, including affidavits and statements by officials of the Saudi government and charities themselves.  For instance, a senior al Haramain official submitted an affidavit earlier in the litigation attesting that "al Haramain operates under the supervision of the Saudi Minister of Islamic Affairs, who appoints the Board of Directors and senior management personnel."  *Id.* ¶ 121.  Similarly, plaintiffs have offered

court testimony of a senior MWL and IIRO official that the MWL and IIRO are "fully government funded" organizations and that those organizations are "controlled in all of our activities and plans by the government of Saudi Arabia." *Id.* ¶ 122.  In addition, the MWL and IIRO have asserted in their answers in this litigation that they are "instrumentalities" of the Saudi government, an assertion that necessarily rests on the Kingdom's control over them.  *Id.* ¶ 127; Aver. ¶¶ 341, 373, 560.  The SHC, SJRC and SRC have likewise confirmed the Saudi government's complete financial and operational control over them in affidavits submitted in this litigation.  CAC ¶¶ 119, 121, 124-127.

Beyond even those materials, the Kohlmann affidavit presents a compelling body of evidence corroborating plaintiffs' factual allegations and other evidence. The affidavit includes over 400 citations to primary and secondary source documents concerning the Kingdom's control over the charities, including public statements by senior Saudi government and charity officials, U.S. Congressional testimony, U.S. intelligence reports, filings in criminal proceedings, foreign government investigation materials, and internal documents of certain of the da'awa organizations themselves.  These records, including most especially the records produced by certain of the da'awa organizations in discovery, fully corroborate plaintiffs' showing that the charities are the arms through which the Kingdom carries out its Wahhabi proselytizing activities, receive the majority of their funding from the government, are headed and staffed by government officials and employees, are subject to financial and operational controls imposed by the government, and must obtain approval from the government for matters as simple as trips by their leadership outside of the Kingdom, among other factors.  Exh. 9 ¶¶ 19-166.

This and the other uncontested evidence of record is more than sufficient to establish the charities' status as agents within the meaning of JASTA.  Once again, JASTA incorporates straightforward principles of agency law, which merely require a manifestation by the principal

that the agent shall act for him, the agent's acceptance of the undertaking, and the understanding of the parties that the principal is to be in control of the undertaking. As to that third element, the control asserted need not "include control at every moment; its exercise may be very attenuated and, as where the principal is physically absent, may be ineffective." Restatement (Second) Agency § 14 cmt. (a) (1958). Plaintiffs' facts and evidence readily satisfy those elements, by demonstrating that the charities were established and funded by the Saudi government to fulfill its obligation to propagate Wahhabi Islam, served as the principal instruments through which the Saudi government satisfied that duty, and that the Saudi government had the absolute authority to control their operations, including their activities beyond the Kingdom's borders.

Plaintiffs' submissions demonstrate that each of the charities is an alter-ego of the Saudi government as well, particularly for purposes of the resolution of the present pre-discovery motion to dismiss. Once again, plaintiffs' facts and evidence, including the Kohlmann affidavit, survey and confirm a broad range of financial, operational, and other controls maintained by the Saudi government over each of the charities. Among other showings, this uncontested evidence demonstrates that each of the charities is headed by a Saudi government official, who exercises complete control over the day to day activities of those organizations. Exh. 9 ¶¶ 42-43, 86-88, 98, 130, 153, 160; CAC ¶¶ 64, 125, 135-139. Quite obviously, the most effective mechanism for a government to exercise day to day control over one of its arms is by appointing a government official to run that entity, as the Kingdom did in the cases of al Haramain, MWL, IIRO, WAMY, SHC, SJRC, SRC, and Al Haramain al Masjil al Aqsa. The Kingdom's directives in establishing the SHC and SJRC further confirm its complete domination of those same organizations. Specifically, the Kingdom's royal decrees establishing the SHC and SJRC as specialized committees subordinated the operations of the other charities in regions beyond the Kingdom's borders to the SHC and SJRC, a demonstration of absolute control and authority that would be

impossible relative to any independent entity.  Aver. ¶¶ 522, 559-560; Aver. Ind. Exh. 222 at ¶ 4; Aver. Ind. Exh. 223 at ¶ 6; Aver. Ind. Exh. 246 at 1-2; Aver. Ind. Exh. 247 at ¶¶ 3-4.

The Kingdom's efforts to avoid attribution of the charities' conduct are entirely unavailing under JASTA and the FSIA generally.  As an initial matter, its arguments rest on the entirely incorrect premise that the *Bancec* alter-ego test is the only basis for attributing acts to a foreign state under JASTA, KSA Mem. at 49-52, and do not address the relevant common law agency inquiry under JASTA.  *See supra* pp. 7-18.  Beyond misunderstanding the standards of attribution under JASTA and the FSIA, the Kingdom's claims that plaintiffs have failed to make showings sufficient to satisfy the *Bancec* alter-ego test simply mischaracterize the content of the record before the Court,[48] and ignore the procedural setting of the present dispute.  Again, the Kingdom has not submitted an affidavit challenging any of the specific facts plaintiffs' have offered as to the various incidences control exercised by the Saudi government over the charities, even though those are matters within the exclusive control of the Saudi government.  Plaintiffs uncontested facts are entitled to be accepted as true, with all reasonable inferences drawn in their favor, and plaintiffs have provided ample facts to support their allegations that the charities are agents and alter-egos of the Saudi government, engaged in the performance for government functions.[49]  At a minimum, plaintiffs' proffer of facts and evidence is sufficient to trigger their entitlement to jurisdictional discovery concerning the agency and alter-ego status of the charities.

---

[48]For example, the Kingdom claims that the only "specific facts that plaintiffs have alleged [as to MWL] are that Saudi Arabia supposedly founded the MWL as a service organization, nominates or appoints its leadership, and funds and supports its operations."  KSA Mem. at 55 (internal citations omitted).  To the contrary, plaintiffs have specifically asserted and offered evidence that the MWL is headed by a government official, who rigidly controls the entire organization's affairs.  They have also submitted testimony from an MWL official, affirming that the MWL is controlled in all respects by the government of Saudi Arabia.

[49]The Court's prior holdings concerning the charities obviously did not address JASTA or the present record.  Further, based on the Second Circuit's "entire tort" rule, the Court's analysis focused exclusively on the U.S.-based offices of four of the charities, and thus did not consider the facts and evidence relating to the control over the charities' headquarters.  In re Terrorist Attacks on September 11, 2001, 134 F. Supp. 3d 774, 784 n.9 (S.D.N.Y. 2015), *vacated and remanded*, 15-3426-cv(L), ECF No. 287 (2d Cir. Feb. 7, 2017).

Saudi Arabia also misapprehends the operation of the core function test under *Garb* and its application here.  The Kingdom urges that *Garb* should not apply because none of the charities "is a ministry," KSA Mem. at 60, and wrongly accuses plaintiffs of advocating the "impossibly overbroad" view that *Garb* requires that "every Saudi Arabian organization that supports Islam is legally indistinguishable from its sovereign."  *Id*.  However, the rule announced in *Garb* is not limited to "ministries," but instead proscribes that *government* entities engaged in core functions should be treated as the state itself, even if organized as distinct legal entities (such as agencies).  Here, the majority of the charities have described themselves as governmental entities, invoking their status as "instrumentalities," or "arms" of the Kingdom, and plaintiffs have offered evidence that several who have not invoked such status explicitly are as well.  *Garb* applies because they are *government* entities within the meaning 28 U.S.C. § 1603, engaged in the performance of a core function of the Saudi State.  Exh. 9 ¶¶ 19-35.

### 5.   Attribution of the Attacks Pursuant to Secondary Liability Principles

Finally, plaintiffs' facts and evidence satisfy JASTA's jurisdictional elements by operation of principles of secondary liability.  As detailed above, plaintiffs allege that the Saudi government itself, and several of its employees and agents (including SHC), conspired with and aided and abetted al Qaeda and the 9/11 hijackers, both in the United States and abroad.  *See supra*, pp. 32-36.  The facts and evidence satisfy state law conspiracy and aiding and abetting liability, including the underlying agreement to undertake terrorist activities against U.S. targets and substantial assistance provided by the Kingdom, its employees, and agents in furtherance of that agreed course.  As a result, basic state law tort principles attribute the attackers' U.S.-based actions to the Kingdom and SHC.  *See, e.g.*, *Halberstam*, 705 F.2d at 479-86; *see Doe v. Bin Laden*, 580 F. Supp. 2d at 98-99.  JASTA's exception to foreign sovereign immunity expressly incorporates these state law principles for purposes of the jurisdictional inquiry, as reflected by the law's express endorsement of attribution of the acts of common law agents.

71

IV.     **JURISDICTIONAL DISCOVERY IS WARRANTED.**

To further confirm the existence of jurisdiction, or in the event that the Court seeks at this juncture to resolve any evidentiary disputes or address admissible evidence, jurisdictional discovery is warranted.

In the FSIA context, "generally a plaintiff may be allowed limited discovery with respect to the jurisdictional issue," *Filus v. LOT Polish Airlines,* 907 F.2d 1328, 1332 (2d Cir. 1990); *First City Tex-Hous. N.A. v. Rafidain Bank,* 150 F.3d 172, 176-77 (2d Cir. 1998), and a plaintiff that makes out a *prima facie* case that jurisdiction exists is entitled to more extensive jurisdictional discovery. *Funk v. Belneftekhim*, 861 F.3d 354, 366 (2d Cir. 2017); *Filus*, 907 F.2d at 1333; *Rafidain Bank*, 150 F.3d at 176-77.  That showing for more extensive discovery is clearly met where, as here, a plaintiff proffers "non-conclusory fact-specific allegations or evidence showing that [the] activity that constitutes the basis of jurisdiction has taken place," *Chirag v. MT Marida Marguerite Schiffahrts*, 604 F. App'x 16, 19 (2d Cir. 2015) (citing *Jazini v. Nissan Motor Co., Ltd.*, 184 F.3d 181, 186 (2d Cir. 1998)); *see supra* pp. 21-25, and a court may allow for discovery even where the plaintiff has made "legally sufficient allegations of jurisdiction."  *Ehrenfeld v. Mahfouz*, 489 F.3d 542, 550 n.6 (2d Cir. 2007).

Plaintiffs have, at a minimum, clearly met these thresholds for more extensive jurisdictional discovery through their pleadings, documentary support, expert testimony, and evidence in the form of U.S. government reports (submitted by plaintiffs and the Kingdom) with respect to the dealings among Bayoumi, Thumairy, and the September 11th hijackers based in San Diego, *see supra* pp. 36-50, as well as among the Saudi officials directing and supporting the da'awa organizations, other members of those organizations, and the al Qaeda members they supported.  *See supra* pp. 56-71.[50]   The parties are arguing over the implications, not the

---

[50]For these two bases for jurisdiction, plaintiffs' showing goes far beyond the "largely conclusory" averments of control at issue in *Arch Trading Corp. v. Republic of Ecuador*, 839 F.3d 193, 207-08 (2d Cir. 2016), where plaintiffs did not specify what discovery they might seek because they did "not yet know what they expect to find."

existence, of those facts.  Plaintiffs have met the standard for at least limited discovery with respect to the other Saudi officials and charitable officials operating in the United States and closely coordinating with one another and the September 11th attackers.  *See supra* pp. 50-71. Especially because the Kingdom's objections focus on those officials and inferences to be drawn from their actions, KSA Mem. at 68-70, discovery is likely to shed considerable light on key jurisdictional facts, and plaintiffs' discovery requests precisely anticipate production of documents that will confirm the asserted jurisdictional facts.  *See, e.g.,* KSA Mem., Exh. 7.

Discovery is especially warranted for these jurisdictional matters because further facts and materials concerning them are uniquely within the knowledge and control of the defendants. *Kamen v. AT&T*, invoked by the Kingdom, Mem. at 19, in fact held that it was an abuse to dismiss a complaint without affording plaintiffs discovery, especially when "the [jurisdictional] facts are peculiarly within the knowledge of the opposing party."  *Kamen v. AT&T Co.*, 791 F.2d 1006, 1011 (2d Cir. 1986); *Ryan v. United States*, 2015 U.S. Dist. LEXIS 162633, at *164 n.2 (S.D.N.Y., Dec. 3, 2015) (same).  Other cases in the FSIA context similarly hold that it is an abuse not to afford discovery before dismissing a complaint.  *See, e.g.*, *Filus*, 907 F.3d at 1333 (reversing dismissal for lack of subject matter jurisdiction under the FSIA where jurisdictional discovery needed to conduct "fully informed evaluation of the district court's jurisdiction"); *Rafidain Bank*, 150 F.3d at 176-77 (reversing dismissal for lack of subject matter jurisdiction under the FSIA where district court abused its discretion by denying jurisdictional discovery).

If the Court were to find that any "factual disputes" exist regarding jurisdictional facts, the Supreme Court, too, has indicated that, in those circumstances, district courts "will have to resolve those disputes," including by "tak[ing] evidence."  *Helmerich*, 137 S.Ct. at 1324. Discovery would be a necessary component, "in accord with principles of fundamental fairness," *Kamen*, 791 F.2d at 1011, prior to any resolution of such disputes.  Indeed, the two cases the

73

Kingdom (KSA Mem. at 19) invokes for its claim that plaintiffs must proffer "admissible evidence" either emphasize the need for plaintiffs first to have discovery, *see Kamen*, 791 F.2d at 1010-11, or involved circumstances where the plaintiffs were afforded extensive discovery.  *See Zappia Middle East Constr. Co. v. Emirate of Abu Dhabi*, 215 F.3d 247, 250 (2d Cir. 2000) (two years of jurisdictional discovery); *see also Kamen*, 791 F.2d at 1011 (the *defendant* needed to submit admissible evidence).

Plaintiffs have served discovery requests seeking materials and information relevant to the jurisdictional inquiry, but the Kingdom and SHC have refused to respond.  This discovery seeks information concerning the Kingdom's relationships with its implicated employees and agents, and the involvement of those employees and agents in supporting the September 11th attacks and al Qaeda.  KSA Mem., Exh 7.  The limited and incomplete discovery plaintiffs have received from a handful of the da'awa organizations has yielded substantial evidence of their status as agents and alter-egos of the Kingdom, *see* Exh. 9 (surveying evidence from discovery documents), and thus confirms that an opportunity to conduct discovery as to the Kingdom and SHC as to the issues raised in the discovery requests would enable plaintiffs to develop additional information supporting their theories of jurisdiction.[51]

---

[51]The Kingdom's suggestions that discovery could not possibly yield information not already collected by the U.S. government, KSA Mem. 67, and reliance on the Court's prior denial of discovery, *id.* at 67-70, are meritless.  U.S. investigators did not have access to the records of the Saudi government concerning the relevant matters, or the ability to depose the relevant witnesses under oath.  And in fact, the Kingdom has a long history on non-cooperation in U.S terrorism investigations.  Exh. 7 ¶ 103-104.  The Court's prior denial of discovery issued under a different legal framework and different record, and when many of the cases now before the Court had not even been filed.  Finally, the Kingdom's complaints about the scope of plaintiffs' discovery requests regarding the Kingdom's ties to the da'awa organizations and related matters are misguided.  Plaintiffs understand very well the myriad ways in which the Kingdom controls the da'awa organizations, and the requests were informed by evidence already collected.  Further, the scope of discovery can be refined through the meet and confer process and judicial management.  In fact, plaintiffs offered to confer with the Kingdom and SHC when they served the requests, but the defendants refused the request outright.

## V.     JASTA IS CONSTITUTIONAL

There is no merit to the Kingdom's argument that JASTA is unconstitutional, either on its

face or as applied to the plaintiffs whose claims were subject to the judgments of dismissal that

were subsequently reopened pursuant to Fed. R. Civ. P. 60(b)(6).  *See* KSA Mem. at 70-75.[52]

*Bank Markazi v. Peterson*, 136 S. Ct. 1310, 1317 (2016), confirms that JASTA does not

violate the separation of powers.  There, the Supreme Court rejected a separation-of-powers

challenge to an "unusual" statute that rendered particular assets available to satisfy judgments in

an enforcement proceeding against a sovereign "identifie[d] by the District Court's docket

number."  *Id.*  The statute was constitutional because Congress "establish[ed] new substantive

standards" and "entrust[ed] to the District Court application of those standards to the facts."  *Id.*

at 1326.  Since the precisely targeted statute in *Bank Markazi* posed "no threat to the

independence of the Judiciary," *id.* at 1317, JASTA cannot possibly do so.  JASTA is a law of

general application that creates a new FSIA exception.  Although that exception was designed to

facilitate a merits determination for certain types of claims (including the claims in this case), it

did so by leaving for judicial determination whether JASTA's elements are satisfied.

The Kingdom also improperly relies on *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211

(1995), to argue that JASTA cannot constitutionally apply to the plaintiffs who were bound by

this Court's original judgment dismissing the Kingdom and SHC on foreign sovereign immunity

grounds—which the Second Circuit held must be reopened pursuant to Rule 60(b)(6).  KSA

Mem. at 71-74; *see In re Terrorist Attacks*, 741 F.3d 353 (2d Cir. 2013).

*Plaut* has nothing to do with this case.  The Supreme Court held in *Plaut* that Congress

may not "retroactively command[] the federal courts to reopen final judgments."  514 U.S. at

219.  JASTA does not reopen any final judgments or command federal courts to reopen any final

---

[52]The Kingdom concedes (at 74-75) that its claims that JASTA violates its due process rights are barred by this Court's precedent.  *See Frontera Res. Azer. Corp. v. State Oil Co. of Azer. Republic,* 582 F.3d 393, 400 (2d Cir. 2009) (foreign sovereigns have no due process rights).

judgments.  Accordingly, JASTA does not implicate—much less transgress—the principles that the Supreme Court established in *Plaut*.

Instead, the Kingdom argues that JASTA somehow impinged on the Second Circuit's determination that this Court's prior judgments dismissing the Kingdom and SHC "should be reopened *to apply a particular set of legal rules*."  KSA Mem. at 71 (emphasis added); *see id.* at 71, 73.  The premise of the Kingdom's argument is mistaken.  The Second Circuit intended that this Court "apply the law established in *Doe*" regarding the FSIA's torts exception on remand, *id.* at 71, but did not—either expressly or implicitly—direct that the affected plaintiffs' claims be decided under any other legal rules or interpretations of the FSIA.  The Second Circuit simply reversed the denial of the Rule 60(b)(6) motion, which had the effect of restoring the Kingdom and SHC to the case.  In particular, the Second Circuit did not purport to freeze the law or exempt the plaintiffs affected by the proceeding from the usual rule that Congress can "change[] the law by establishing new substantive standards" to govern pending cases.  *Bank Markazi*, 136 S. Ct. at 1326.  Congress then did just that:  in JASTA, it changed the rules that apply to ongoing litigation.  Nothing about the Second Circuit's 60(b)(6) ruling dictates a different result for the plaintiffs affected by those proceedings.[53]

## VI.  CONCLUSION

For all of the foregoing reasons, plaintiffs respectfully submit that the renewed motions to dismiss of the Kingdom of Saudi Arabia and Saudi High Commission for Relief of Bosnia & Herzegovina should be denied.

---

[53]To the extent that the Kingdom's arguments invoke the need to protect this Court's prior judgments dismissing the Kingdom and SHC by Judge Casey, *see* KSA Mem. at 71, it is wrong because there is nothing to protect.  Judge Casey's discretionary function holding ceased to serve as the basis of the judgments after *Terrorist Attacks III*, which affirmed the dismissals solely on the basis of the Second Circuit's limiting construction of the FSIA's torts exception.  *Terrorist Attacks III*, 538 F.3d at 86-90 & n.15.  This is confirmed by the "Judgment Mandate" in *Terrorist Attacks III*, which stated that "the judgment of the district court is AFFIRMED *in accordance with the opinion of this court*."  Judgment Mandate, No. 03-md-1570 (2d Cir. Sept. 16, 2008) (ECF No. 2135) (emphasis added).

Dated:  November 9, 2017                    Respectfully submitted,

                                           /s/ Stephen A. Cozen
                                           Stephen A. Cozen, Esq.
                                           Sean P. Carter, Esq.
                                           Elliott R. Feldman, Esq.
                                           Scott Tarbutton, Esq.
                                           COZEN O'CONNOR
                                           1650 Market Street
                                           Philadelphia, PA  19103
                                           (215) 665-2000

                                           Plaintiffs' Executive Committee for Commercial
                                           Claims

                                           Jodi W. Flowers, Esq.
                                           Robert T. Haefele, Esq.
                                           MOTLEY RICE LLC
                                           28 Bridgeside Boulevard
                                           P. O. Box 1792
                                           Mount Pleasant, SC  29465
                                           (843) 216-9000

                                           -and-

                                           Andrea Bierstein, Esq.
                                           SIMMONS HANLY CONROY, LLC
                                           112 Madison Avenue
                                           7th Floor
                                           New York, NY  10016
                                           (212) 784-6400

                                           -and-

                                           Jerry S. Goldman, Esq.
                                           ANDERSON KILL, P.C.
                                           1251 Avenue of the Americas
                                           New York, NY  10020
                                           (212) 278-1000
                                           Plaintiffs' Executive Committee for Wrongful
                                           Death and Personal Injury Claims

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the Plaintiffs' Memorandum of Law in Opposition to the Motions to Dismiss of the Kingdom of Saudi Arabia and Saudi High Commission for Relief of Bosnia & Herzegovina was filed electronically this 9th day of November 2017.  Notice of this filing will be sent to all parties in 03 MDL 1570 by operation of the Southern District of New York's Electronic Case Filing ("ECF") system.  Parties may access this filing through the Court's ECF system.

/s/_____
J. Scott Tarbutton