# EXHIBIT 6

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (GBD) (SN)<br><br>ECF Case |
|---|---|

This document relates to:  *All Actions*

## AFFIDAVIT OF MICHAEL T. ROCHFORD

I, Michael T. Rochford, being duly sworn, declare and state as follows:

### I.  <u>Scope of Engagement</u>

1.      I have been asked to review government records and reports relating to investigations into sources of support for 9/11 hijackers Nawaf al Hazmi and Khaled al Mihdhar, and to provide expert testimony concerning the significance and import of the facts and evidence developed through those investigations from the perspective of a counterintelligence and counterespionage specialist.  Within that context, I specifically have been asked to address the evidence and facts concerning investigations of Saudi citizens Omar al Bayoumi, Fahad al Thumairy, Osama Bassnan, and related parties, including Mohdar Abdullah.

### II.  <u>Relevant Knowledge, Skill, Experience, Training, and Education</u>

2.      I served as an employee with the Federal Bureau of Investigation (FBI) for more than thirty (30) years, from 1974 until my retirement in August 2004, and as an agent for twenty-five (25) of those years.  At the time of my retirement, I was the Chief of the Espionage Section of the FBI's Counterintelligence Division.  Immediately prior to my appointment as Chief of the Espionage Section, I served as Unit Chief of Russian Overseas Espionage from 2000 through 2002.

3.      During my career with the FBI, I worked on numerous high-profile and significant espionage cases, including the espionage investigations of David Henry Barnett, Aldridge Ames, and Earl Pitts.  In addition, while serving as Unit Chief for the overseas espionage unit in the Counterintelligence Division, I was responsible for the major espionage investigations of Robert Philip Hanssen and George Trofimoff.

4.      During my service with the FBI, I participated in numerous counterintelligence and counterespionage classes at the FBI academy in Quantico, Virginia, as well as counterintelligence courses provided by the Central Intelligence Agency.

### III.  <u>Methodology</u>

5.      The methodology employed in formulating the opinions set forth in this report is based on my review of declassified and public records relating to investigations of Omar al

Bayoumi, Fahad al Thumairy, Osama Bassnan, and associated persons, including relevant portions of the National Commission on Terrorists Attacks Upon the United States' ("9/11 Commission") Final Report; Memoranda for the Record of the 9/11 Commission staff summarizing their witness interviews of Omar al Bayoumi, Fahad al Thumairy, and Osama Bassnan; relevant portions of the Final Report of the 9/11 Review Commission; declassified FBI reports concerning Bayoumi and related parties; and Part Four of the Final Report of the 9/11 Joint Inquiry (commonly referred to as the "28 pages").

6.     I have assessed the information contained in these materials on the basis of my experience as a counterintelligence and counterespionage specialist for the FBI, based on the analytical framework and applying factors used by U.S. counterespionage and counterintelligence specialists in evaluating whether an individual is acting as a covert agent, asset, or cooptee of a foreign power.  The information I have considered in formulating these opinions is of the nature and kind that counterintelligence and counterespionage specialists with the FBI use to determine whether an individual is working as a covert agent, asset, or cooptee of a foreign government, as further detailed below.

7.     To the extent there were any possible inconsistencies or conflicts within the various sources of information I have considered, I have sought to resolve those conflicts or inconsistencies based on the totality of the information and my knowledge and experience in counterintelligence and counterespionage matters.

## IV.     Background Concerning Foreign Government Covert Espionage Activities in the United States

8.     The opinions expressed in this report are based on my review of the pertinent facts.  I have assessed these facts using the context of my counterintelligence and counterespionage training and experience.  Accordingly, a brief overview of foreign government covert operations is warranted to explain concepts and provide a frame of reference.

9.     Virtually all developed nations maintain operatives in the United States to conduct covert activities.  Foreign governments place covert agents and employees in the United States for a range of reasons, bounded only by the interests, or perceived interests, of the foreign governments that send, employ, or recruit them.  Some are sent here to collect our most sensitive military and national security secrets, to give their governments a competitive advantage on the battlefield.  Others are deployed to steal business and trade secrets for commercial gain.

10.    In addition, there is a long and well established history of foreign governments placing agents and co-opted agents in the United States to monitor their émigré communities in the United States, including the activities of those expatriates in student organizations, churches, mosques, and religious establishments in the United States.  Non-Western and non-democratic countries have a particular history of conducting such monitoring of their émigré communities abroad.  These foreign powers tend to be very insecure, and almost paranoid, about the potential for émigrés living abroad to foment opposition to their regimes, and the potential that they may return from the United States and inject ideas and values into their societies that undermine their regimes' control and authority.  These foreign governments also recognize that the placement of

agents abroad to monitor their émigrés provides a network of covert agents who can be used to engage in other covert activities.

11. Many foreign governments also deploy employees and agents to the United States to engage in propaganda activities. The specific objectives of such propaganda programs vary according to the particular interests and goals of the state conducting them, but in general these efforts are designed to neutralize any potential antagonism towards the foreign government among its citizens living abroad; increase antipathy towards forces and values the foreign government views as contrary to its interests; and spread the foreign government's sphere of influence by promoting its own ideas and values.

12. To assist them in carrying out their missions, foreign covert operatives frequently recruit and employ others who are willing to collaborate with them and undertake assignments. These persons operating at the direction and control of foreign government operatives are typically referred to as "cooptees" or "assets."

13. To conduct effective covert action in a foreign country, secrecy and plausible deniability are paramount to success, particularly where the activities may be viewed as inimical by the foreign country. Indeed, the U.S prohibits and criminalizes the undisclosed in-country presence of foreign agents, cooptees and assets through the Foreign Agents Registration Act (FARA).[1] FARA requires that "[n]o person shall act as an agent of a foreign principal unless he has filed with the Attorney General a true and complete registration statement."[2] Foreign government employees who register as foreign agents are often subjected to intense scrutiny by U.S. internal security and counterintelligence agencies such as the FBI.

14. For these reasons, covert operatives of foreign governments typically operate in the United States undisclosed and under "cover." "Cover," as the name implies, is a pre-textual role designed to hide or conceal an operative's true role for the foreign government. Such "cover" traditionally takes two forms – "official" cover and "non-official" cover. "Official cover" refers to foreign government operatives who are posing as foreign government officials and employees – typically diplomats – working in the foreign government's embassy and consulates within the United States (*e.g.*, in the assumed capacity of a Cultural Attaché or Protocol Officer). Diplomatic "cover" positions occupied by foreign covert operatives frequently involve vague, ambiguous, or highly discretionary duties intended to afford the officers time to perform their real work for the foreign government.

15. "Non-official cover" refers to operatives who feign roles in organizations without official ties to the government for which they work (*e.g.*, posing as a journalist for a news service or humanitarian aid worker for a charitable non-government organization). Non-official cover further obscures the operative's ties to the foreign government, and is designed to imbue the foreign government with plausible deniability. The lack of overt government affiliation of most cooptees and assets makes them similarly suited to high risk covert operations for these same reasons. Indeed, the use of third parties to carry out government sponsored covert action in what is known as a "hidden hand" scenario has become a strategic paradigm in clandestine operations.

16.     In carrying out covert operations, operatives, agents, cooptees, and assets employ techniques, methods, and technologies to disguise payments, obfuscate funding sources, surreptitiously acquire information, secretly communicate and thwart surveillance.  To enhance attenuation from the government's intelligence service and institutions, payments to operatives, agents, cooptees, and assets may be made through cooperating and witting legitimate businesses (known as "cutouts"), shell corporations established by the government (known as "front companies") or other government agencies with no apparent affiliation with the agency for which they truly are working (*e.g.*, Department of Defense as a cover for the CIA).  To secure and vet communications, covert operatives may use encryption or paroles (phrases and passwords used by operatives to positively identify one another).  To transfer physical items or information between covert operatives, dead drops and brush passes may be employed. Reconnaissance and boundary probing of a target site may be conducted by posing as a tourist, a visitor who has become lost, or a job candidate.  Surveillance Detection Routes, which give the operative the opportunity to look back and spot potential followers, may be run to detect the presence of hostile surveillance.  These techniques of subterfuge used to thwart detection, maintain attenuation with the sponsoring government, or create the illusion of legitimacy are known as "tradecraft."

17.     By necessity, covert operations and activities have a strict hierarchy and chain of command.  As a result, the job duties of foreign covert operatives, agents, cooptees, or assets are to do what their superiors instruct them to do.

## V.     Factors Considered by FBI Counterintelligence Specialists to Identify Covert Operatives, Agents, Cooptees, and Assets of Foreign Powers

18.     In assessing whether a foreign individual is an intelligence officer, or covert agent of a foreign power, FBI counterintelligence and counterespionage specialists consider a variety of factors.

19.     The two most reliable indicators that a foreign individual is serving as an intelligence officer, covert agent, or coopted agent of a foreign power are:

    a)     Identifications provided by defectors or other sources recruited by the FBI, including double agents or cooperating witnesses, who on the basis of their placement and access are in a position to specifically identify spies and agents working for a foreign power; and

    b)     Identifications provided by the FBI's liaison intelligence partners around the world, who are often in a position to specifically identify agents or intelligence officers of foreign governments, based on their own sources and methods.

20.     Where neither a defector/source nor a friendly liaison intelligence partner is in a position to provide specific information about a suspect foreign individual, the FBI considers a range of factors in assessing whether that foreign individual is serving as an intelligence officer, covert agent, cooptee, or asset of a foreign government.  These include the following:

c)    Actions within the community and overt contacts consistent with the behavior and activities of a foreign intelligence officer or agent of a foreign power;

d)    Extensive contacts with representatives of the foreign government, including in particular officials of the foreign government's diplomatic missions;

e)    Use of spy tradecraft;

f)    Clandestinity;

g)    Existence and nature of covert contacts;

h)    Surveillance-conscious driving ("dry cleaning") and evasive bike or walking routes;

i)    Use of "paroles" (signal words) at the beginning of conversations;

j)    Beginning a clandestine operation by meeting another agent or foreign government official at an official establishment, such as an embassy or consulate, and then driving from there to the operation;

k)    Indications that an individual is replacing another known or suspected covert operative, including by assuming their predecessor's cover position at a diplomatic mission or country-sponsored cover job;

l)    Use of overseas "cover slots" (positions with institutions to provide cover for foreign agents) within the same institutions that historically have provided cover slots for foreign intelligence or covert personnel;

m)    Use of non-witting contacts to provide cover and plausible deniability for actions taken when conducting covert operations;

n)    Crafting of cover stories to explain an operational act, and strict adherence to those cover stories;

o)    Indications that the individual does not spend appropriate time on cover job or activity, as covert and intelligence related activities demand flexibility for ops;

p)    Use of pre-arranged meeting sites with other agents;

q)    Impersonal exchanges of information through drop sites;

r)    Security consciousness in use of phones, including little or no use of phones within the official diplomatic establishment for fear of being monitored by the FBI;

5

s)      Use of cut-outs to hide or mask the original source of payments and operational funds;

t)      Exchange of information and clandestine arrangements for meetings;

u)      Frequent irregular travel to home country, which indicates trips to hold operational meetings with superiors;

v)      Evidence that the individual is operating under a hierarchy and chain of command.

## VI.    __Relevant Bodies of the Saudi Government__

21.     Like the CIA in the United States, the Government of Saudi Arabia has an external intelligence service tasked with conducting extraterritorial operations.  This external service, the General Intelligence Presidency ("GIP") (also known as the General Intelligence Directorate), has been in existence since 1955.  In addition, the Government of Saudi Arabia has (and had before September 11, 2001) various government ministries and components charged with promoting the Saudi Government's Islamic agenda globally, including its Supreme Council for Islamic Affairs, Ministry of Islamic Affairs, Dawah and Guidance ("MOIA"), and Ministry of Education ("MOE").  Both the MOIA and MOE had offices in the Kingdom's embassies and consulates in the United States prior to September 11, 2001.  As the 9/11 Commission explained, the MOIA "uses zakat and government funds to spread Wahhabi beliefs throughout the World."[3]

22.     During testimony before the House Committee on International Relations on May 22, 2002, former CIA Director James Woolsey[4] succinctly described the relationship between the House of Saud and the Kingdom's Wahhabi clerics, the jihadist and anti-Western nature of Wahhabism, and the Saudi Government's dedication to spreading Wahhabi orthodoxy globally, as follows:

> Beginning around 1979, the Saudis ceded an even larger share of control over daily life in Saudi Arabia to the Wahhabis. They have, for all practical purposes, forged a Faustian bargain with the Wahhabis such that they, the Saudi elite, get a free ride in both their corruption and their life-style, and the Wahhabis are free and indeed funded to export their particular form of anti-infidel, and in many ways very hatred-based form, of Islam into other countries. We have seen this occur in Pakistan. We have seen it occur in Afghanistan, and it is occurring in other places throughout the world.
>
> *******
>
> I had in my office not long ago a leader, a Muslim leader from an Asian country. He was in the United States seeking money from foundations so that he could have printed elementary school textbooks to compete with the Wahhabi-funded textbooks which are flooding into his country and that are being made available to

schools there at little or no cost. These preach, as the Wahhabis do, that all infidels are the enemy, the same attitude that we see reflected in the statements of the young students in the madrassahs in Pakistan on the evening news.

*******

Now, we also have in this country, I think, a substantial use of Wahhabi money for purposes of, in part, establishing institutions that are hostile to the United States and to our way of life.

## VII.   Summary of Professional Opinions and Conclusions

23.   Based on the methodology and principles described above, my professional opinions, to a reasonable degree of certainty, are as follows:

- Omar al Bayoumi was a covert employee and agent of the Saudi government, throughout the time he was residing in the United States.

- Bayoumi worked in his covert capacity under the direction of personnel within the Kingdom's diplomatic missions, including in particular representatives of the Islamic Affairs offices of those diplomatic missions.

- Bayoumi's covert activities centered on the advancement of the radical Wahhabi agenda of the Ministry of Islamic Affairs.

- Bayoumi was acting at the direction of Fahad al Thumairy, an official of the Islamic Affairs office of the Saudi Consulate in Los Angeles, and other superiors in the Saudi Government, in providing support to 9/11 hijackers Nawaf al Hazmi and Khaled al Mihdhar.

- Thumairy and Bayoumi provided support to Hazmi and Mihdhar pursuant to a highly coordinated, state-run and initiated covert operation.

- Thumairy, Bayoumi, and their superiors necessarily acted with an illicit state of mind in providing and arranging essential support for the hijackers.

- Osama Bassnan, another Saudi who entered the United States on a tourist visa in 1980, was another covert agent of the Saudi Government, or a cooptee or asset, whose role and duties mirrored those of Bayoumi.

## VIII.   Discussion of Professional Opinions and Conclusions

24.   My professional opinions, as a counterintelligence and counterespionage specialist, regarding the significance and import of the evidence and facts developed in the investigations of Omar al Bayoumi, Fahad al Thumairy, Osama Bassnan, Mohdar Abdullah, and Osama Bassnan, all of which I hold to a reasonable degree of certainty, are as follows:

A.    **Omar al Bayoumi and Fahad al Thumairy**

25.    Based on the evidence developed through the U.S. government's investigations, it is my professional opinion and conclusion that: (1) Omar al Bayoumi was serving as a covert employee and agent of the Saudi government during the period that he resided in the United States, working under the direction of employees in the Kingdom's diplomatic missions, including in particular representatives of the Ministry of Islamic Affairs' offices in those missions; (2) Bayoumi was acting at the direction of, and in concert with, Fahad al Thumairy, an official of the Islamic Affairs office of the Saudi Consulate in Los Angeles, and other superiors in the Saudi government, in providing support to 9/11 hijackers Nawaf al Hazmi and Khaled al Mihdhar; (3) Thumairy and Bayoumi provided support to Hazmi and Mihdhar pursuant to a state-run and initiated covert operation; and (4) Thumairy and Bayoumi necessarily knew that they were participating in an illicit enterprise, and were aware that Hazmi and Mihdhar were Wahhabi Islamic extremists.  The following factors amply support these professional opinions:

a)    **The Pretext for Bayoumi's Entry and Residence in the United States**

26.    Bayoumi entered the United States at an advanced age, in approximately 1994, pursuant to a student visa.[5]  He remained in the United States until just two months before the 9/11 attacks, but there is no evidence that he pursued any meaningful academic pursuits during the nearly seven years he lived here.[6]  Addressing his status contemporaneous with his provision of assistance to 9/11 hijackers Nawaf al Hazmi and Khalid al Mihdhar, the FBI wrote in 2012 that  "Omar al-Bayoumi was living in San Diego on a student visa, despite not attending classes, and receiving a salary from the Kingdom of Saudi Arabia for job duties he never performed."[7]

27.    Additional evidence indicates that the Saudi government directly assisted Bayoumi in maintaining his pre-textual status as a "student" while in the United States, as evidenced by his possession in 1998 of a letter from the Saudi Embassy stating that he "was getting a full scholarship from the Government of Saudi Arabia."[8]

28.    Based on these and other facts, it is my professional opinion that Bayoumi's entry and presence in the United States as a purported student served as unofficial cover for his true role as a covert agent of the Saudi government.  The fact that Bayoumi did not spend time in pursuit of any meaningful academic studies assured the time and flexibility necessary for covert operations, while his purported status as a "student" served to obscure his ties to the Saudi Government and provided the Saudi Government with plausible deniability in relation to his activities.

29.    The placement of persons of advanced age in the United States for purposes of conducting covert operations on behalf of foreign governments is a well-established espionage paradigm, particularly in the case of non-Western and non-democratic governments.  One function commonly performed by these covert agents is the monitoring of student émigré communities in the United States, as Bayoumi was reported to have done.[9]

30.    Based on all of the available evidence, including the additional points described below, it is my professional opinion that Bayoumi's profile fits this model perfectly.

### b)   Bayoumi's Funding While in the United States

31.     Before entering the United States, Bayoumi was a long term employee of the Saudi Presidency of Civil Aviation, [10] a division of the Kingdom's Ministry for Defense and Aviation.  Contemporaneous with his deployment to the United States, Bayoumi was "seconded" by the Government to Dallah Avco, an aviation contractor to the Saudi Government, allegedly to work on Dallah Avco's Air Navigation System Support ("ANSS") project for the Kingdom.[11]

32.     Throughout the time Bayoumi resided in the United States, the Saudi government paid him a salary and expenses, channeling the payments through Dallah Avco.[12]  However, Bayoumi performed no work for Dallah Avco or in relation to the ANSS project to which he was allegedly assigned.[13]  In addition, Dallah Avco has stated that it had no supervisory role over Bayoumi whatsoever, that Bayoumi did not report to or perform work for Dallah Avco, and that Bayoumi was at all times an employee of the Saudi government.[14]

33.     In 1999, Dallah Avco informed the Saudi Government's Presidency of Aviation that Dallah Avco "does not want to renew the secondment" of Bayoumi.[15]  Two days later, Dallah Avco's notification of the nonrenewal was met with a reply letter marked "Very Urgent" from the Saudi Ministry of Defense and Aviation.  It advised:

> With reference to your letter . . . under which you stated that you do not have the desire to renew the secondment of the above person [Bayoumi] for another year.
>
> We hereby inform you that the HQ desires to second him [Bayoumi] for one year only to complete the task for which the HQ agreed upon his secondment.
>
> Accordingly, we hope you renew the secondment of the said person for another year as of 08/01/1420ah.  The company [Dallah Avco] shall draft a letter with all due speed for the secondment arrangements to be completed in accordance with the law . . . .[16]

34.     In compliance with the Government's mandate, Dallah Avco responded the next day with a letter stating, "[W]e hope that you kindly approve the extension of the secondment period of the said employee [Bayoumi] for one more year" "to work as an accounts supervisor."[17]  This flurry of correspondence concluded with a letter from the President of Civil Aviation to the Assistant Minister of Defense and Aviation seeking approval to extend Bayoumi's secondment to Dallah Avco for a "fifth year" to accommodate Dallah Avco's "request" for the extension.[18]

35.     In my professional opinion, the arrangement pursuant to which Bayoumi was paid by the Saudi Government through Dallah Avco was what is known in intelligence circles as a "Cutout," an arrangement which serves to obscure the fact that funding for a covert agent is being paid by a foreign government.  Bayoumi was not reporting to or performing any work for Dallah Avco, or in relation to Dallah Avco's project for the Saudi government, and the evidence indicates that the true purpose of this arrangement was to conceal that the Saudi Government was the true source of Bayoumi's funding.

36.     The remarkable circumstances surrounding the extension of Bayoumi's secondment by the Government to Dallah Avco, following Dallah Avco's notification that it intended to terminate the unusual arrangement, makes clear that Bayoumi's secondment held a strategic purpose *for the Saudi Government*.  Dallah Avco's notification of its intention to terminate the arrangement was met with near immediate pushback from a senior Saudi official, and demand for the continued support for his extension.  This reaction is reminiscent of how the CIA would react to losing corporate support for a Non Official Cover slot, or how the FBI would respond to losing an undercover slot while an operation is about to go critical.  The Saudi Government response saying HQ supports the extension to allow him to complete the task for which he was seconded is a sham.  There was no agreed upon work being performed by Bayoumi.

37.     Taken together and in light of the other evidence discussed herein, these factors indicate that the arrangement through which Bayoumi's funding from the Saudi Government was channeled through Dallah Avco was a Cutout designed to obscure his role as a covert agent for the Saudi Government, and that the arrangement held strategic importance to the Saudi Government, indicating Bayoumi's active tasking to carry out an important covert operation assigned to him by his superiors.

### c)     Bayoumi's Connections to Saudi Diplomatic Missions and Representatives of the Ministry of Islamic Affairs

38.     The extent and nature of Bayoumi's contacts with Saudi diplomatic missions in the United States, and his ties to representatives of the Ministry of Islamic Affairs, reinforce my professional opinion that Bayoumi was a covert agent for the Saudi Government, and that his work in that capacity was undertaken under the direction of personnel in the Kingdom's diplomatic missions, and the representatives of the Islamic Affairs offices in particular.

39.     FBI analyses of telephone toll records reflect that Bayoumi called Saudi Government establishments in the U.S. almost 100 times between January and May of 2000,[19] coinciding with the hijackers' relocation and assimilation into the San Diego community. According to the FBI, these telephone records reflect that Bayoumi was in contact with "at least three individuals at the Saudi Embassy in Washington, D.C.; two individuals at the Saudi Arabian Cultural Mission in Washington, D.C.; and three individuals at the Saudi Consulate in Los Angeles."[20]  He also possessed the phone number for an individual at the Saudi Consulate in London.[21]  FBI reporting further indicates that Bayoumi traveled frequently back to Saudi Arabia, and to Washington, D.C. every one to two months to visit the Saudi embassy,[22] and that Bayoumi's circle of acquaintances included the Saudi Minister of Islamic Affairs.[23]

40.     Bayoumi also was in frequent contact with Fahad al Thumairy, a cleric who held diplomatic credentials with the Islamic Affairs office of the Saudi Consulate in Los Angeles. Specifically, Thumairy and Bayoumi had numerous telephone contacts between December 1998 and December 2000.[24]  Bayoumi called Thumairy's home telephone ten times during this period and Thumairy called Bayoumi's cellular and home phones 11 times from December 3-20, 2000.[25]

41.     Bayoumi's contacts with the Kingdom's diplomatic missions, and elements of the Ministry of Islamic Affairs, were pervasive and extended to numerous Saudi Government institutions across the United States and abroad.  The extent and scope of these communications and contacts are not consistent with the behavior of a simple émigré calling his local embassy or consulate on occasion for information, and instead reflect a pattern of reporting evidencing his status as a covert agent of the Saudi Government, working under the direction of personnel in those diplomatic missions.  Bayoumi's ties to Thumairy and other elements of the Kingdom's Ministry of Islamic Affairs were particularly extensive, and indicate (along with the other evidence discussed herein) that Bayoumi's covert activities were subject to the direction of the representatives of the Ministry of Islamic Affairs, including Thumairy.

### d)     Bayoumi's Frequent and Irregular Travel to Saudi Arabia and the Saudi Embassy in Washington, D.C.

42.     As mentioned above, FBI investigations indicate that Bayoumi made frequent irregular trips back to Saudi Arabia, and also took trips to Washington, D.C. to visit the Saudi embassy every one to two months.[26]  Particularly when considered in light of Bayoumi's other contacts with Saudi Government institutions and personnel, it is my professional opinion that this pattern of travel indicates that Bayoumi undertook trips for purposes of operational meetings with superiors in the Saudi Government, a common operational necessity for covert operatives.

### e)     Activities in the Local Community and Observations of Witnesses

43.     Numerous individuals interviewed by the FBI expressed their belief that Bayoumi was some kind of spy or agent for the Saudi Government, based on his activities in the community, unusual access to funds from Saudi Arabia, extensive contacts with the Saudi Government, videotaping of mosque services and other community events, and other factors.[27]

44.     Evidence developed by the FBI also indicates that Bayoumi was extensively involved in promoting "Islamic" initiatives in the local community, including the distribution of Wahhabi religious materials provided by the Islamic Affairs offices of the Kingdom's diplomatic missions,[28] and the provision of funding from Saudi Arabia for mosques.  On at least one occasion, Bayoumi provided a check drawn on the Saudi Embassy's account to a local mosque.[29]

45.     The nature of Bayoumi's activities in the community provide further evidence in support of my professional opinion that he was serving as a covert agent for the Saudi Government, and that his duties centered on the advancement of the agenda of the Ministry of Islamic Affairs in the United States.

46.     As indicated previously, foreign governments, particularly non-democratic governments like the Saudi Monarchy, have a long history of placing covert operatives in the United States to monitor émigré communities in the United States and report back on their activities to their governments.  Foreign powers like Saudi Arabia are extremely concerned that their citizens living abroad, and especially students, will become influenced by Western values and American democratic ideals and interject those values and ideals back into their home countries upon their return, and potentially threaten the regime's hold on power.

47.     Bayoumi's persistent videotaping of the local community and inquiries about Saudis residing in the United States fit this model precisely, and provide further evidence that his covert duties encompassed, but were by no means limited to, monitoring Saudis living in the San Diego area, as several witnesses assessed.[30]

48.     In that covert capacity, it is my professional opinion that Bayoumi would have reported to and worked under the direction of the Islamic Affairs offices of the Kingdom's diplomatic missions, and that the GIP and Saudi Foreign Ministry were secondary consumers and beneficiaries of his covert work.  Pursuant to their pact with the House of Saud, the Wahhabi clerics who controlled the Ministry of Islamic Affairs during this time period were the stewards and protectors of the Kingdom's Wahhabi character.  As their own hold on power depended on maintaining the dominance and absolute authority of Wahhabi theology in the Kingdom, the clerics in the Ministry of Islamic Affairs would have had a paramount interest in monitoring Saudis living abroad, to ensure that they did not embrace and return with "un-Islamic" ideas and values.  Their offices in the Kingdom's diplomatic missions provided the perfect platform for them to do so, using covert agents under their direction like Bayoumi.

49.     Bayoumi's additional activities in the community reinforce my professional opinion concerning Bayoumi's servitude to the representatives of the Ministry of Islamic Affairs.  Aside from his monitoring of the local community, the evidence indicates that Bayoumi was deeply involved in promoting Islamic causes, distributing Wahhabi religious materials provided by the Islamic Affairs office, funding mosques, and counseling young Saudis and local Muslims on religious matters.[31]  All of these activities fit squarely within the core agenda of the Ministry of Islamic Affairs, which was to promote the radical and anti-Western Wahhabi variant of Islam beyond the Kingdom's borders.

50.     Consistent with this evidence, as well as the nature and scope of Bayoumi's contacts with representatives and offices of the Ministry of Islamic Affairs, it is my professional opinion that Bayoumi's covert activities on behalf of the Saudi Government centered on promoting the Wahhabi religious agenda of the Ministry of Islamic Affairs, and that his activities were undertaken pursuant to the directives of the Ministry's representatives.

f)     **Evidence Indicating that Bayoumi and Thumairy Acted Under a Chain of Command in Supporting the Hijackers**

51.     An October 5, 2012 FBI Info Report identifies Bayoumi and Fahad al Thumairy as "subjects" of an ongoing "investigation into individuals known to have provided substantial assistance to 9/11 hijackers Nawaf al-Hazmi and Khalid al-Mihdhar during their time in California, prior to the attacks."[32]  According to the Final Report of the 9/11 Review Commission, that investigation remained open and active at least through March of 2015, when the Review Commission issued its Report.[33]  Public reporting indicates that the investigation remains open and active.

52.     The 2012 Info Report states that Thumairy "immediately assigned an individual to take care of them [Hazmi and Mihdhar] during their time in the Los Angeles area."[34]  It further states that Thumairy and Bayoumi, who had documented ties to one another, "provided (or directed others to provide) the hijackers with assistance in daily activities, including

procuring living quarters, financial assistance, and assistance obtaining flight lessons and driver's licenses."[35]  Finally, the 2012 Info Report indicates that an individual whose name is redacted "tasked al-Thumairy and al-Bayoumi with assisting the hijackers."[36]

53.     Additional FBI reporting and the 9/11 Commission establish that Bayoumi traveled from San Diego to the Saudi Consulate in Los Angeles on February 1, 2000.[37]  Upon his arrival, he was welcomed by a Consulate representative who knew Bayoumi and greeted him familiarly, and taken for a closed door meeting, which lasted for at least a half hour.[38]  Following that meeting at the Consulate, Bayoumi proceeded (in the manner described below) to a halal restaurant several miles away, where Bayoumi encountered 9/11 hijackers Nawaf al Hazmi and Khalid al Mihdhar.[39]  At that encounter immediately following his meeting at the Consulate, Bayoumi offered to assist the hijackers relocate from Los Angeles to San Diego.[40]  The hijackers promptly took Bayoumi up on the offer, and Bayoumi then proceeded to provide "substantial assistance" to them by providing and directing others to provide "assistance in daily activities, including procuring living quarters, financial assistance, and assistance obtaining flight and driver's licenses."[41]

54.     In my professional opinion, these and other circumstances and factors indicate that both Bayoumi and Thumairy were acting pursuant to a chain of command and established Saudi Government hierarchy in providing assistance to Hazmi and Mihdhar.  The FBI's conclusion that an individual, whose name remains redacted from the public version of the 2012 Info Report, "tasked" both Thumairy and Bayoumi with assisting the hijackers,[42] indicates that they undertook that assistance pursuant to an instruction from a person with common authority over both of them.  As Thumairy was a Ministry of Islamic Affairs representative, and given the wealth of evidence that Bayoumi was a covert operative working under the direction of representatives of the Ministry of Islamic Affairs, it is my professional opinion that this "tasking" to assist the hijackers was initiated by a superior in the Saudi Government.

55.     The circumstances surrounding the orchestration of essential assistance for the two hijackers provide further support for this conclusion.  Thumairy began organizing a network of support for the hijackers immediately upon their arrival on January 15, 2000, including by immediately assigning someone to take care of them during their initial time in Los Angeles.  Two weeks later, Bayoumi, who has established dealings with Thumairy and the Los Angeles Consulate where Thumairy was stationed, suddenly appears in Los Angeles for a meeting at the Consulate.  Following a closed door meeting at the Consulate, he proceeds to a separate location where he meets the hijackers, engages them in conversation, and offers to assist them in moving to San Diego.

56.     From a counterintelligence and counterespionage standpoint, this sequence of events involving the proximate provision of support to the terrorists by foreign government employees and agents with close associations to one another, and serving a common master in that foreign government, clearly indicates that they were acting as part of a coordinated operation, and pursuant to an established chain of command in providing that support.  Using multiple agents to carry out an operation and "daisy-chaining" the tasks required to fulfill the operation serves to insulate principals from direct exposure and provides them with plausible deniability.

### g)    Bayoumi's Use of Tradecraft in the Operation to Support the Hijackers

57.    The intelligence reporting concerning the events and circumstances surrounding Bayoumi's February 1, 2000 meetings at the Saudi Consulate and with 9/11 hijackers Nawaf al Hazmi and Khalid al Mihdhar, and the support that flowed to the hijackers following those meetings, are replete with evidence of premeditation and extensive use of espionage tradecraft by Bayoumi.  This evidence further supports my professional opinion that Bayoumi was a covert agent of the Saudi Government, and that Bayoumi and Thumairy approached the coordination and provision of support to the hijackers as a covert operation.

58.    In arriving at my professional opinions relating to Bayoumi's use of espionage tradecraft, I have not relied on any single piece of evidence or event in isolation.  Instead, consistent with the methodology I learned and employed as a counterespionage expert for the FBI, I have considered the evidence and facts as a whole.  Thus, each of my opinions below concerning the import and significance of particular acts and events is informed by the additional evidence of espionage tradecraft surveyed herein.

### i)    Meeting at the Saudi Consulate before the Rendezvous with the Hijackers

59.    Covert operatives will often begin a covert operation by stopping at one of their government's diplomatic missions, and proceed from there to the location of the operation.  This approach allows superiors to impart operational plans and instructions in a secure environment.  I personally observed the KGB employing this tactic on several occasions during my work as a counterespionage agent for the FBI.

60.    As discussed above, Bayoumi stopped first at the Saudi Consulate, where he was taken for a closed door meeting by a Consulate representative already familiar to him, and proceeded from there to his meeting with the hijackers.  The ministerial matters Bayoumi claimed he was going to the Consulate to attend to – the renewal of his visa and request for additional korans[43] – would not have required separating Bayoumi from his traveling companion for a closed door meeting, indicating that these claimed purposes for the trip to the Consulate were a pretext.

61.    The fact that Bayoumi went first to the Saudi Consulate, where he was taken to a private area for a meeting, is evidence of Bayoumi's use of espionage tradecraft for a covert operation, particularly given the other facts and circumstances discussed below.

### ii)    Inclusion of Cayson Bin Don on the Trip

62.    According to both FBI investigations and the 9/11 Commission Final Report, Bayoumi invited Cayson Bin Don, a recent convert to Islam who held radical beliefs but who did not speak Arabic, to accompany him on his trip to Los Angeles on February 1, 2000.[44]  In my professional opinion, Bayoumi's invitation to Bin Don to be his traveling companion is further evidence of Bayoumi's extensive use of espionage tradecraft in relation to his meeting at the Consulate and meeting with the hijackers thereafter.

63.     Inviting an unwitting person along for an operation is a common espionage tradecraft, used to corroborate an innocuous pretext for the operative's activities, establish an alibi, and afford the operative and his government deniability.

64.     Bin Don would have been well suited to such purposes as he had known Bayoumi only two to three months, was many years his junior, was a relatively new convert to Islam, and had been recently homeless.  It is therefore logical that Bayoumi perceived Bin Don as impressionable and undiscerning.  Moreover, because Bin Don held virulent and fundamentalist religious views,[45] it is likely that Bayoumi perceived that Bin Don's allegiance to an extremist brand of Islam would bias him toward subsequent concealment of any skepticism in Bayoumi's cover story.  Finally, Bin Don did not speak Arabic, thus ensuring that Bayoumi could control and define any account Bin Don might later be asked to provide concerning the (alleged) content of Bayoumi's conversations with the hijackers.

65.     Several of Bayoumi's statements to Bin Don and actions during the trip to Los Angeles bolster the conclusion that Bayoumi was using Bin Don to establish and corroborate an innocent narrative for Bayoumi's meetings at the Consulate and with the hijackers.  For instance, as discussed above, Bayoumi told Bin Don that he needed to go to Los Angeles to renew his visa, and even stopped along the journey to obtain a passport photo to reinforce that purpose to Bin Don.[46]  However, the circumstances surrounding Bayoumi's meeting at the Consulate indicates that the ministerial task Bayoumi offered as the purpose of the trip was a pretext.

iii)    Surveillance Detection Route

66.     In my professional opinion, Bayoumi ran a simple Surveillance Detection Route on his drive from the Consulate to the Mediterranean Gourmet Restaurant, where he met the hijackers, a further indicator of his use of espionage tradecraft throughout that day.

67.     As referenced above, a Surveillance Detection Route is a mode of driving, biking, or walking employed by covert operatives to enable them to determine whether they are under surveillance.  Surveillance Detection Routes employ numerous moves that afford the covert operative an opportunity to look back.  In order to appear to be natural, there must be some innocent plausible explanation for the maneuvers.

68.     The Mediterranean Gourmet restaurant, where Bayoumi met the hijackers, is located at 10821 Venice Boulevard, 3.4 miles from the Consulate office at 2045 Sawtelle Boulevard.[47]  Venice Boulevard and Sawtelle Boulevard intersect each other.  Traveling from the Consulate to the restaurant requires a single left turn from Sawtelle onto Venice.

69.     Bayoumi was a frequent traveler to the Saudi Consulate in Los Angeles and visitor of the King Fahd Mosque (located in close proximity to the restaurant),[48] and told Bin Don he had eaten at the restaurant previously with his family.[49]  Despite his familiarity with the area and restaurant itself, Bayoumi claimed to be lost during the short drive from the Consulate to the restaurant, causing him to make a few U-turns and miss some turns.[50]

70.     This use of meandering, serpentine, and circuitous driving routes to reach a destination represents classic counter surveillance tradecraft that intelligence operatives employ to determine whether they are being followed.  Driving in such a roundabout manner with extra

turns and U-turns provides the covert operative with numerous opportunities to look back and notice any vehicles following them on the obscure route they have chosen.  Purporting to be "lost" provides an innocuous explanation for the winding, indirect route.

71.     Bayoumi's conduct during the trip from the Consulate to the restaurant, as described above, evidences that he was running a Surveillance Detection Route during that drive.

### iv)     Cover Stop

72.     In my professional opinion, the FBI investigation also establishes that Bayoumi made a "cover stop" before going to the Mediterranean Gourmet restaurant where he met with the hijackers, an additional instance of his use of espionage tradecraft in relation to his meeting with the hijackers.

73.     According to Bin Don's account to the FBI, Bayoumi initially stopped at a butcher shop near the Mediterranean Gourmet restaurant.[51]  He and Bin Don then walked from the butcher shop to the Mediterranean Gourmet restaurant.[52]

74.     When a cover operative is going to a "hot spot" – the ultimate location of the operation – it is customary espionage tradecraft for the operative to go first to a distinct location nearby in the operational zone, referred to as a "cover stop."  Making a cover stop on the way to the operational location serves to draw out any surveillance that was not identified during the Surveillance Detection Route.  Changing the mode of transit – in this case by parking Bayoumi's car and then walking to the restaurant – further serves to draw out and expose surveillance.

75.     In addition, stopping first at the butcher shop under the guise of being mistaken as to the restaurant's location served to bolster in Bin Don's mind the appearance of fortuity regarding the meeting venue, making it seem as though Bayoumi was directed to the restaurant by a helpful store employee and might not otherwise have found it.

76.     In my professional opinion, the stop at the butcher shop was a classic cover stop.

### v)     Signal

77.     Bin Don's account of the events immediately preceding the arrival of the hijackers at the Mediterranean Gourmet restaurant further indicates that Bayoumi sent a conspicuous "coast is clear" signal to Hazmi and Mihdhar to initiate their in-person engagement, another classic element of espionage tradecraft.

78.     After initially entering the restaurant, Bayoumi went to the bathroom to wash his hands, and then went outside and laid down a rug in front of the restaurant to pray.[53]  He proceeded to pray with Bin Don for about five minutes in front of the restaurant, and they then went back inside to eat.[54]  Hazmi and Mihdhar entered the restaurant shortly thereafter, and Bayoumi began speaking with them.[55]

79.     Before a clandestine meeting occurs between two operatives, it is typical that one operative will utilize a prearranged signal to notify the other that it is safe to meet – that is, that no surveillance has been detected and the meeting should proceed.  In my professional opinion,

and based on the totality of the evidence, Bayoumi's seemingly legitimate act of laying a cloth on the ground to pray on before eating served such purpose – providing a conspicuous "coast is clear" signal to Hazmi and Mihdhar that Bayoumi had detected no physical surveillance and it was safe for them to enter the restaurant.

vi)   Paroles

80.    The FBI investigative reporting also includes evidence that Bayoumi commonly used "paroles," phrases used by covert operatives to identify one another or to initiate a specified activity.

81.    In several instances, the FBI reporting indicates that Bayoumi told representatives of the Saudi Consulate that he needed more "korans," and was then taken into a private area for a closed door meeting.[56] This reporting indicates that making a request for additional korans was a means for Bayoumi to request a private meeting, without arousing the suspicion of onlookers.

vii)   Mode of Dress for Rendezvous with Hijackers

82.    The mode of dress of Bayoumi on the day of his meeting with the hijackers is a further indication of his use of espionage tradecraft in relation to that meeting. Both Bayoumi and Bin Don were attired in traditional thobes (long-sleeved, gown-like garments worn chiefly by men of the Arabian Peninsula) for their trip to Los Angeles.[57] Bayoumi is known to have dressed in western clothes. In west Los Angeles, the thobe made Bayoumi immediately recognizable as a probable Saudi and Muslim, reducing the likelihood that Hazmi and Mihdhar might misidentify their contact at the restaurant or have an awkward conversation with other patrons. The wearing of unique items of clothing or jewelry to permit covert operatives to recognize each other is a common intelligence tradecraft practice, employed by Bayoumi in this case to send a signal to Hazmi and Mihdhar that he was their contact and that it was sage to proceed with the meeting.

viii)   Tasking of Mohdar Abdullah

83.    Bayoumi's appointment and selection of Mohdar Abdullah to provide essential assistance to the hijackers, in relation to highly sensitive and risky aspects of their preparations for the attacks, also reflects Bayoumi's use of espionage tradecraft in orchestrating support for the hijackers, in my professional opinion.

84.    As confirmed by the 9/11 Commission's investigation, Bayoumi directed Mohdar Abdullah, an extremist who "perfectly suited to assist the hijackers in pursuing their mission" as he shared their "extremist views" and "hatred for the U.S. government," "to assist in any way in [the hijackers'] affairs."[58] Consistent with that unqualified directive from Bayoumi, Abdullah helped Hazmi and Mihdhar locate and apply to language and flight schools, secure fake driver's licenses, and provided a range of additional aid essential to their assimilation into the United States and preparations for the attacks.[59]

85.    Closing the circle of relationships, Abdullah acknowledged to the FBI that he knew Thumairy, and witnesses confirmed that "Abdullah visited the [King Fahd] mosque frequently and was 'very close' to radical followers of Thumairy."[60]

86.     As a counterintelligence expert with decades of experience in counterespionage matters, this evidence (1) documenting Bayoumi's tasking of Abdullah to assist the hijackers in any way; (2) connecting Thumairy, Bayoumi, and Abdullah to one another; and (3) confirming Abdullah's affiliation with Thumairy's radical followers, Abdullah's perfect suitability to assist the hijackers given his own extremist views, and Abdullah's unqualified assistance to the hijackers (including as to overtly illegal activities), is of critical significance in several respects.

87.     Initially, it establishes in my professional opinion that Abdullah was a trusted cooptee and/or asset who had been recruited by Thumairy and Bayoumi, and was trusted by them to carry out highly sensitive tasks without questioning the directives provided, as reflected by the scope of assistance he in fact provided pursuant to Bayoumi's directive.  Indeed, the assistance Bayoumi tasked Abdullah to provide to the hijackers required time, engagement, and money. Abdullah was a college student who shared an apartment with others and had limited financial resources, but undertook the assignment without hesitation or limitation, a further indicator that he was a cooptee or asset (and that he likely was compensated by Bayoumi).

88.     In addition, this evidence reinforces my professional opinion that Thumairy and Bayoumi were acting pursuant to an established hierarchy and chain of command in providing support to the hijackers, by further connecting the principals involved in providing that support to one another.  The selection of Abdullah, an extremist follower of Thumairy, indicates in my professional opinion that Abdullah was selected for involvement in sensitive aspects of the operation by Thumairy, and that Bayoumi tasked Abdullah based on Thumairy's directive.

89.     Finally, it is my further opinion that Thumairy and Bayoumi used Abdullah to provide the most sensitive and risky forms of support to the hijackers, such as helping them enroll in flight classes and acquire fake driver's licenses, in order to distance themselves from the most risky aspects of the operation, an espionage tradecraft technique known as a "hidden hand" scenario.

### h)     The Deceitfulness of Bayoumi, Thumairy, Bassnan, and Abdullah

90.     The documented deceitfulness of Bayoumi, Thumairy, Bassnan, and Abdullah during interviews with U.S. investigators after the 9/11 attacks, and the particular issues they lied about, provide yet further support for my professional opinions that Bayoumi was a covert agent for the Saudi government, and that he and Thumairy provided support to Hazmi and Mihdhar as part of a covert operation initiated by their superiors in the Saudi Government.

91.     Abdullah was interviewed several times by the FBI in the immediate aftermath of the 9/11 attacks, before pleading to immigration fraud and being deported from the United States.  Thumairy, Bayoumi, and Bassnan were interviewed by 9/11 Commission staff in Saudi Arabia.  Of note, Saudi intelligence officers attended each of those interviews, occasionally speaking to the witnesses in Arabic during questioning, most pronouncedly during Thumairy's interviews.  The reporting relating to those interviews and available facts indicate that Thumairy, Bayoumi, Bassnan, and Abdullah all lied during those interviews, about their ties to one another and other material issues at the center of the investigation.

92.     For instance, the Memoranda for the Record of the 9/11 Commission staff's interviews of Thumairy describes him as "deceptive during both interviews," and notes that his answers "were either inconsistent or, at times, in direct conflict with information we have from other sources."[61]  In fact, Thumairy claimed that he did not even know Bayoumi, in conflict with Bayoumi's confirmation that they did in fact know one another and telephone records confirming contact between the two. [62]  Bassnan claimed to not know Bayoumi at all, despite hundreds of phone calls between the two and witness statements describing them as the closest of friends.[63]  On the whole, the 9/11 Commission staff adjudged that its interview of Bassnan "established beyond cavil the witness' utter lack of credibility on virtually every subject."[64]  Bayoumi, in turn, denied that he introduced the hijackers to Abdullah, despite Abdullah's statement to the contrary[65] (and in conflict with the findings of the 9/11 Commission and FBI).  Abdullah dissembled to U.S investigators on numerous issues, likely to include whether he received advance notice of the impending 9/11 attacks from Hazmi.[66]

93.     The pattern of deceitfulness exhibited by all of these associated individuals, and in particular their dishonesty about their relationships with one another, indicates a common desire to distance themselves from one another, and recognition that acknowledging their associations would reinforce the conclusion that they operated in concert with one another.  More generally, it indicates that they believed it to be necessary to deceive U.S. investigators about the evidence concerning their roles in providing support to the hijackers, and rigid adherence to their crafted cover stories (even in the face of contrary evidence).

### i)     Evidence Demonstrating Thumairy and Bayoumi's Illicit State of Mind and Awareness the Hijackers Were Jihadists

94.     Finally, it is my further professional opinion that the facts and evidence relating to Bayoumi and Thumairy's activities, associations, and roles for the Saudi Government, show that they acted with an awareness that they were engaged in an illicit endeavor in orchestrating support for the hijackers, and that Hazmi and Mihdhar were Wahhabi extremists who posed a danger to the United States.

95.     As discussed in further detail above, Thumairy and Bayoumi approached their provision of support for the hijackers as a covert operation, employing espionage tradecraft and operating within an established chain of command and hierarchy.  The character of the espionage activities in which they were engaged were, by definition, illegal.  They and the superior(s) who "tasked" them to carry out the operation were thus necessarily aware that they were engaged in an illicit endeavor in arranging covert support for the hijackers.

96.     The evidence also indicates that they were aware of the jihadist orientation of that operation, and of the hijackers they were assisting.  Indeed, Thumairy, Bayoumi, and the superior(s) who tasked them to assist the hijackers were operating within the context of their assigned roles to advance the radical agenda of the Ministry of Islamic Affairs.  Thumairy and Bayoumi were steeped in the jihadist, violent, and anti-American Wahhabi agenda the Ministry of Islamic Affairs was dedicated to advancing globally.  Thumairy was himself a cleric whose sermons and activities confirm his personal dedication to that agenda, and the FBI's review of Bayoumi's writings assessed that "after an exhaustive translations [sic] of Bayoumi's documents, it is clear that in Bayoumi's correspondence he is providing guidance to young Muslims and

some of his writings can be interpreted as jihadist."[67]  In addition, Bayoumi's passport contained a "cachet" that intelligence investigators associate with possible adherence to al Qaeda.[68]  In a word, Thumairy and Bayoumi, and the superior(s) who tasked them to assist the hijackers, were keenly aware of the pro-jihadist and anti-American agenda they were working to advance.

97.     Moreover, in the context of their work advancing the Wahhabist agenda of the Ministry of Islamic Affairs, the evidence plainly demonstrated that Thumairy and Bayoumi operated in a milieu populated by jihadists and terrorists.  Thumairy personally led a "an extremist faction" at the King Fahd mosque that was "supportive of the events of September 11, 2001,"[69] "had a network of contacts in other cities in the United States,"[70] and was denied reentry into the United States in 2003 based on evidence that he might be connected to terrorism.[71] Bayoumi's network of associates included Thumairy himself (whom he considered his "religious advisor");[72] Anwar al Aulaqi (the charismatic cleric who later assumed a leadership position in al Qaeda and was targeted and killed by the United States in a drone strike, and from whom Bayoumi sought guidance on "religious matters");[73] Osama Bassnan (an ardent bin Laden supporter);[74] and Mohdar Abdullah (among others).  This evidence confirms that Thumairy and Bayoumi knew well the nature of the people they were working and collaborating with in their roles for the Saudi Government, and embraced their associations with those extremists and jihadists willingly.

98.     Given their clear understanding of the jihadist and anti-American agenda they were working to advance on behalf of the Ministry of Islamic Affairs, and the compelling evidence demonstrating that their work in that capacity involved extensive collaborations with jihadists, it is my professional opinion that Thumairy and Bayoumi, and the superior(s) who tasked them to assist Hazmi and Mihdhar, understood that Hazmi and Mihdhar were themselves Wahhabi jihadists who posed a threat to the United States.

**B.     Osama Bassnan**

99.     Based on my review of the facts and evidence developed through U.S. investigations into the sources of support for Hazmi and Mihdhar, it is my further professional opinion that Osama Bassnan, a Saudi who entered the United States on a tourist visa in 1980 and stayed through September 11, 2001 without ever renewing that visa,[75] was another covert agent of the Saudi Government, or at least a cooptee or asset of the Saudi Government, whose role and activities mirrored those of Bayoumi.

100.    Like Bayoumi, Bassnan had extensive connections to Saudi Government institutions and officials, and unusual financial support from the Government.  On at least one occasion Bassnan received a lump sum payment from the Saudi Ambassador's account,[76] and his wife regularly received a $2,000 check each month from the Ambassador's wife, purportedly for nursing services.[77]  9/11 Commissioner John Lehman has indicated that he believes those payments were authorized by radical clerics in the Embassy's Islamic Affairs department, who had signatory authority over a charity associated with the Ambassador's wife.[78]  Bassnan had no other apparent sources of income.

101.    In 1992, Bassnan identified himself as an employee of the Saudi Arabian Education Mission within the embassy in Washington, D.C.[79]  As indicated previously, the

Ministry of Education is another arm of the Saudi government involved in the promotion of Wahhabi ideology, again under the control of the Kingdom's clerics.

102.    An FBI review of telephone toll records indicates 27 calls between Bassnan's cell phone and the Saudi embassy in Washington, D.C. from April 2000 to April 2002, as well as 8 calls between his cell phone and the office of the Saudi Ambassador's wife from December 2000 through April 2002.[80]  The review also documented 17 calls between his home phone and the Saudi consulate in Los Angeles in August 2002.[81]  The FBI further determined that "phone records reveal roughly 700 calls between various phone subscribed by Bayoumi and Bassnan over a 1-year period (even discounting some of the calls in view of the friendship between their wives, the calls between their cell phones are most likely between the two men)."[82]  Moreover, a CIA document reviewed by the Joint Inquiry indicates that the CIA has evidence that Bassnan may have received a fake passport from Saudi government officials.[83]

103.    This range of evidence supports my professional opinion that Bassnan was a covert agent, or at least a cooptee or asset, of the Saudi Government, serving a role analogous to that of Bayoumi.  Bassnan's extensive communications and relationships with Saudi institutions in the United States are consistent with the pattern of contacts of a covert agent or cooptee working on behalf of the Government.  Further, in his service as an employee of the Saudi Education Mission in the embassy, Bassnan would have had regular dealings with the clerics in that department and in the Ministry of Islamic Affairs, and likely exposure to Saudi intelligence officials attached to the embassy.  Those interactions would have provided an opportunity for those elements of the Government to recruit Bassnan.  Further, the unusual nature of his financial transactions with the Saudi Government are a further indication of his status as a covert agent or cooptee, again reflecting an effort to conceal the true source and purpose of his funding from the Government.  The prolific nature of the roughly "700 calls" between phones subscribed to by Bassnan and Bayoumi over a 1-year period indicates a working relationship between the two men, rather than mere friendship.  Consistent with all of this evidence, the FBI has specifically described Bassnan as an individual with a "profile" similar to that of Bayoumi, and witnesses who observed Bassnan described him as some sort of spy or agent for the Saudi government.[84]

104.    The evidence relating to Bassnan's extremist religious views indicates that he would have been an ideal candidate for recruitment by the Ministry of Islamic Affairs, in service of its radical agenda.  The FBI has determined that Bassnan was an "ardent" bin Laden supporter[85] who spoke of bin Laden "as if he were a God."[86]  Bassnan knew bin Laden's family in Saudi Arabia,[87] and hosted a party in 1992 at his house for Omar Abdel-Rahman, the "Blind Sheikh,"[88] the convicted mastermind of terrorist plots against the United States.  The FBI also developed evidence that Bassnan was connected to the Eritrean Islamic Jihad, an al Qaeda affiliated terrorist organization.[89]

105.    Bassnan's jihadist beliefs and organizational ties to jihadists would have made him an ideal candidate for recruitment to serve as a covert agent or cooptee or asset of the Ministry of Islamic Affairs, in advancement of its Wahhabist agenda.

106.    Finally, it is my professional opinion that Bassnan played some, as yet undefined, role in the covert operation to provide support to Hazmi and Mihdhar.  His working relationship with Bayoumi would have afforded Bassnan the opportunity to assist the hijackers, and his

physical proximity to the hijackers upon their relocation to San Diego (living directly across the street) would have made it quite easy to provide that assistance (and also made it likely that Bassnan would have interacted with them). Further, Bassnan bragged to an FBI informant that he did more to help the hijackers than Bayoumi did.[90]  Finally, FBI records confirm that Hazmi and Mihdhar were in contact with Khaled al-Kayed, a close friend of Bassnan.[91]  As it happens, al-Kayed was a commercial airline pilot flight instructor, and Hazmi and Mihdhar approached him about helping them learn to fly a Boeing airplane.[92]  Coupled with Bassnan's own assertions of assistance to the hijackers, their contact with a close friend of Bassnan who the precise aviation credentials they needed to carry out their mission lends support to my conclusion that Bassnan played some role in the covert operation to assist the hijackers.

107.    All of these conclusions are bolstered by the circumstances surrounding Bassnan's departure from the United States in 2002.  In particular, FBI records reflect that Bassnan visited the Saudi consulate in Las Angeles 2002 to obtain a "pass" in lieu of a renewed Saudi passport to allow him to leave the country.[93]  Consulate officials reportedly advised him to leave the United States "as soon as possible."[94]  Based on my experience as a counterintelligence and counterespionage specialist, this instruction indicates special concern on the part of the consulate about Bassnan's exposure to U.S. investigators, just as the net around individuals associated with the Saudi government was tightening.

108.    The highly redacted September 1, 2005 Executive Summary from the FBI and CIA to Congress is not inconsistent with my professional opinions expressed above.

109.    Initially, the content of the 2005 Executive Summary has obviously been superseded in material respects by further FBI investigations and findings.  For instance, the 2012 FBI Info Report unequivocally states that Bayoumi provided "substantial assistance" to Hazmi and Mihdhar, and that the FBI and Department of Justice are continuing their investigative efforts to build an evidentiary record sufficient to prosecute Bayoumi and Thumairy for having "provided such assistance with the knowledge that al-Hazmi and al-Mihdhar were here to commit an act of terrorism."  Given the heightened standard of proof applicable in criminal proceedings, and the extremely demanding evidentiary standards the Department of Justice employs before bringing any prosecution, these aspects of the 2012 Info Report confirm that Bayoumi did in fact provide substantial assistance to the hijackers, and that there is compelling evidence that he and Thumairy did so with a specific awareness that Hazmi and Mihdhar were preparing for a terrorist attack.  The body of evidence I have surveyed above confirms as much.

110.    Also of note, the 2005 Executive Summary conspicuously says nothing about Thumairy or the superiors who tasked him and Bayoumi to provide support to the hijackers.  Consistent with compartmentalization trade craft, it may very well be that Bayoumi was not specifically informed of the precise nature of Hazmi and Mihdhar's terrorist mission.  However, the superiors orchestrating the network of support and tasking Bayoumi to perform his assignments would have greater operational knowledge.  In any case, the fact Bayoumi may not have known the ultimate goals of Hazmi and Mihdhar's mission says nothing about whether he was aware that he was involved in an overall illicit endeavor, and that Hazmi and Mihdhar were jihadists.  For the reasons discussed above, the evidence indicates that Bayoumi was aware of those circumstances.

111.     Further, the statement in the Executive Summary that the U.S. did not at that time have "information" that Bayoumi and Bassnan were "intelligence officers of the Saudi Government" is highly ambiguous.  Based on my experience as a counterintelligence specialist, this language appears to address only whether the United States had received specific information from a source or liaison intelligence partner identifying Bayoumi and Basnan as formal intelligence officers employed by the Kingdom's General Intelligence Presidency.  It does not address the broader question of whether there is evidence that they were covert agents, assets or cooptess working for another component of the Saudi government, such as the Ministry of Islamic Affairs.

112.     In addition, the 2005 Executive Summary supports my opinions insofar as it confirms (1) that "official Saudi entities" provide financial and other support to individuals in the United States and around the world who are associated with terrorism; (2) the broad presence of al Qaeda sympathizers and associates in the Saudi government; and (3) the Saudi government's commitment to the propagation of Wahhabism in the United States, specifically explaining that jihadists "adhere to and interpret this sect to justify their actions."  The Executive Summary also includes highly redacted statements concerning activities of "Saudi-funded clerics" and "diplomats" in the United States.  The redactions make it impossible to know the specific character of those activities and parties involved, but the fact that the Executive Summary itself was proffered to summarize investigations into "Saudi Arabia's ties to terrorism, including the 2001 terrorist attacks," it follows that the redacted activities of the Saudi-funded clerics and diplomats are terrorism-related.

I certify under penalty of perjury that the foregoing is true and correct.

Michael T. Rochford

Executed this 7 day of November, 2017.

23

[1] 22 U.S.C. § 611, *et seq.*

[2] 22 U.S.C. § 612(a).

[3] Final Report of the National Commission on Terrorist Attacks Upon the United States ("9/11 Commission Final Report") at 372 (2004).

[4] *The Future of U.S.-Saudi Relations*, Hearing Before the House Subcommittee on the Middle East and South Asia of the Committee on International Relations, Prepared Statement of James L. Woolsey, May 22, 2002.

[5] Updates and Initiatives (as of 5 October 2012).  ECF Document 3463-4 at 4.

[6] *Id.*

[7] *Id.*

[8] S. Select Comm. on Intelligence and H.R. Permanent Select Comm. on Intelligence, Joint Inquiry into Intelligence Community Activities Before and After the Terrorist Attacks of September 11, 2001 at 423 (2002); FBI, *Connections of San Diego PENTTBOM Subjects to the Government of Saudi Arabia*, FBI Letterhead Memorandum (undated) at 2501 (FOIA request production published by INTELWIRE).

[9] During my career with the FBI, I was personally involved in numerous espionage cases involving foreign government intelligence and covert agents posing as students in the United States.  In each case, the agents posing as students were tasked with monitoring émigré students and citizens of their home countries in the U.S. and reporting back on their activities to their home governments, among other covert activities.

[10] S. Select Comm. on Intelligence and H.R. Permanent Select Comm. on Intelligence, Joint Inquiry into Intelligence Community Activities Before and After the Terrorist Attacks of September 11, 2001 at 423 (2002).

[11] Letter from Alawi Mohammed Saeed Kamel (Chairman, Dallah Avco) to H.H./President of Civil Aviation (dated 21/12/1419 A.H.) (corresponding to April 7, 1999); Letter from Dr. Ali Bin Abdul-Rahman Al-Khalaf (President of the Civil Aviation) to H.H. Assistant Minister of Defense and Aviation and Inspector General for Civil Aviation Affairs (dated 1/1/1420 A.H.) (corresponding to April 17, 1999).

[12] *Id.* at 423, 425.

[13] *Id.* at 423.

[14] Transcript of Record, Hearing before the Honorable George B. Daniels in the United States District Court for the Southern District of New York, *In Re Terrorist Attacks on September 11, 2001*, Case No. 03 MD 1570 (GBD), at 80 (July 30, 2015).

[15] Letter from Alawi Mohammed Saeed Kamel (Chairman, Dallah Avco) to H.E. Eng. Mohamed Ahmed Ai-Salmi (General Manager of Airway Engineering, Presidency of Civil Aviation) (dated 18/12/1419 A.H.) (corresponding to April 4, 1999).

[16] Letter from Engineer Muhammad Ahmad Al Salemi (General Manager of Airways Engineering) to His Excellency/Chairman of the Board of Directors of the Dallah Group (dated 20/12/1419G) (corresponding to April 6, 1999).

[17] Letter from Alawi Mohammed Saeed Kamel (Chairman, Dallah Avco) to H.H./President of Civil Aviation (dated 21/12/1419 A.H.) (corresponding to April 7, 1999).

[18] Letter from Dr. Ali Bin Abdul-Rahman Al-Khalaf (President of the Civil Aviation) to H.H. Assistant Minister of Defense and Aviation and Inspector General for Civil Aviation Affairs (dated 1/1/1420 A.H.) (corresponding to April 17, 1999).

[19] S. Select Comm. on Intelligence and H.R. Permanent Select Comm. on Intelligence, Joint Inquiry into Intelligence Community Activities Before and After the Terrorist Attacks of September 11, 2001 at 423 (2002).

[20] *Id.* at 423-24.

[21] *Id.* at 424.

[22] FBI, *Connections of San Diego PENTTBOM Subjects to the Government of Saudi Arabia*, FBI Letterhead Memorandum (undated) (FOIA request production published by INTELWIRE).

[23] FBI Letterhead Memorandum, *Omar Al Bayoumi – Employed by Dallah Al Baraka*, at 1/000000127 (April 15, 2002) (FOIA request production published by INTELWIRE).

[24] 9/11 Commission Final Report at 515.

[25] *Id.*

[26] FBI, *Connections of San Diego PENTTBOM Subjects to the Government of Saudi Arabia*, FBI Letterhead Memorandum (undated) (FOIA request production published by INTELWIRE).

[27] S. Select Comm. on Intelligence and H.R. Permanent Select Comm. on Intelligence, Joint Inquiry into Intelligence Community Activities Before and After the Terrorist Attacks of September 11, 2001 at 416 (2002); FBI, *Connections of San Diego PENTTBOM Subjects to the Government of Saudi Arabia*, FBI Letterhead Memorandum (undated) (FOIA request production published by INTELWIRE); FBI Letterhead Memorandum, *Omar Al Bayoumi – Employed by Dallah Al Baraka*, (April 15, 2002) (FOIA request production published by INTELWIRE). Reports of Bayoumi's suspected intelligence officer status are documented in an FBI Electronic Communication Re: "chronological summaries ECF references regarding possible ties of Al-Bayoumi to the Saudi Arabian Government, Embassies, or Consulates (no date) (part of FBI Report – September 12, 2001).

[28] FBI FD-302 of Caysan Bin Don at 2 (October 8, 2001) (FOIA request production published by INTELWIRE); 9/11 Commission Memorandum for the Record, *Interview of Cayson Bin Don*, at 2 (April 20, 2004); 9/11 Commission Final Report at 515, n. 15.

[29] FBI, *Connections of San Diego PENTTBOM Subjects to the Government of Saudi Arabia*, FBI Letterhead Memorandum (undated) (FOIA request production published by INTELWIRE); FBI Letterhead Memorandum, *Omar Al Bayoumi – Employed by Dallah Al Baraka*, at 1/000000130 (April 15, 2002) (FOIA request production published by INTELWIRE).

[30] FBI, *Connections of San Diego PENTTBOM Subjects to the Government of Saudi Arabia*, FBI Letterhead Memorandum (undated) (FOIA request production published by INTELWIRE); FBI Letterhead Memorandum, *Omar Al Bayoumi – Employed by Dallah Al Baraka*, at 1/000000127 (April 15, 2002) (FOIA request production published by INTELWIRE).

[31] FBI, *Connections of San Diego PENTTBOM Subjects to the Government of Saudi Arabia*, FBI Letterhead Memorandum (undated) (FOIA request production published by INTELWIRE); FBI Letterhead Memorandum, *Omar Al Bayoumi – Employed by Dallah Al Baraka*, at 1/000000130 (April 15, 2002) (FOIA request production published by INTELWIRE).

[32] Updates and Initiatives (as of 5 October 2012).  ECF Document 3463-4 at 3.

[33] *The FBI: Protecting the Homeland in the 21st Century*, Report of the Congressionally-Directed 9/11 Review Commission, at pp. 100-101.

[34] Updates and Initiatives (as of 5 October 2012).  ECF Document 3463-4 at 4.

[35] *Id.*

[36] *Id.*

[37] 9/11 Commission Final Report at 217.

[38] FBI, *FAHAD ALTHUMAIRY (NON-USPER)*, at 2 (September 9, 2004) (FOIA request production published by INTELWIRE).

[39] 9/11 Commission Final Report at 217; FBI, *FAHAD ALTHUMAIRY (NON-USPER)*, at pp. 2-3 (September 9, 2004) (FOIA request production published by INTELWIRE).

[40] 9/11 Commission Final Report at 217; FBI, *FAHAD ALTHUMAIRY (NON-USPER)*, at p. 3 (September 9, 2004) (FOIA request production published by INTELWIRE).

[41] Updates and Initiatives (as of 5 October 2012).  ECF Document 3463-4 at 4.

[42] *Id.*

[43] FBI FD-302 of Caysan Bin Don at 1-2 (October 8, 2001) (FOIA request production published by INTELWIRE); 9/11 Commission Memorandum for the Record, *Interview of Cayson Bin Don*, at 2 (April 20, 2004); 9/11 Commission Final Report at 515, n. 15.  It should be noted that Bayoumi says this trip was to apply for new Saudi passports for his family (not visas).  *See* 9/11 Commission Memorandum for the Record, *Interview of Omar Al-Bayoumi*, at 3 (October 16-17, 2003).

[44] 9/11 Commission Final Report at 217; 9/11 Commission Memorandum for the Record, *Interview of Cayson Bin Don*, at 1-2 (April 20, 2004); FBI FD-302 of Caysan Bin Don at 1-2 (October 8, 2001) (FOIA request production published by INTELWIRE); Josh Lefkowitz and Lorenzo Vidino, *America's Homegrown Jihadist*, (Apr. 27, 2005), available at http://archive.frontpagemag.com/Printable.aspx?ArtId=8790.

[45] Josh Lefkowitz and Lorenzo Vidino, *America's Homegrown Jihadist*, (Apr. 27, 2005), available at http://archive.frontpagemag.com/Printable.aspx?ArtId=8790.

[46] FBI FD-302 of Caysan Bin Don at 2 (October 8, 2001) (FOIA request production published by INTELWIRE); 9/11 Commission Memorandum for the Record, *Interview of Cayson Bin Don*, at 2 (April 20, 2004).

[47] Distance from the Mediterranean Gourmet restaurant at 10821 Venice Boulevard, Los Angeles California to the Saudi Consulate at 2045 Sawtelle Boulevard, Los Angeles, California.

[48] FBI, *Connections of San Diego PENTTBOM Subjects to the Government of Saudi Arabia*, FBI Letterhead Memorandum (undated) (FOIA request production published by INTELWIRE); FBI Letterhead Memorandum, *Omar Al Bayoumi – Employed by Dallah Al Baraka*, at 1/000000122 (April 15, 2002) (FOIA request production published by INTELWIRE); 9/11 Commission Memorandum for the Record, *Interview of Khalil A. Khalil*, at 8 (February 24, 2004).

[49] FBI FD-302 of Caysan Bin Don at 1, 3 (October 8, 2001) (FOIA request production published by INTELWIRE).

[50] *Id.* at 3.

[51] *Id.*; 9/11 Commission Memorandum for the Record, *Interview of Cayson Bin Don*, at 3 (April 20, 2004).

[52] A Review of the FBI's Handling of Intelligence Information Related to the September 11th Attacks, United States Department of Justice, Office of the Inspector General, p. 250 available at https://oig.justice.gov/special/0506/final.pdf; FBI FD-302 of Caysan Bin Don at 3 (October 8, 2001) (FOIA request production published by INTELWIRE); 9/11 Commission Memorandum for the Record, *Interview of Cayson Bin Don*, at 3 (April 20, 2004).

[53] FBI FD-302 of Caysan Bin Don at 3 (October 8, 2001) (FOIA request production published by INTELWIRE).

[54] *Id.*

[55] *Id.* at 4-5.

[56] 9/11 Commission Memorandum for the Record, *Interview of Cayson Bin Don*, at 2-3 (April 20, 2004).

[57] *Id.* at 2.

[58] 9/11 Commission Final Report at 218; FBI*, PENTTBOMB*, at 3 (April 11, 2002) (FOIA request production published by INTELWIRE).

[59] 9/11 Commission Final Report at 220; FBI, *Mihdhar Mohammad Al-Mihdar Zaid*, at 4 (May 17, 2004).

[60] 9/11 Commission Final Report at 515, n. 13 (citing FBI electronic communication, *Fahad Althumairy*, Oct. 25, 2002).

[61] 9/11 Commission Memorandum, *Summary of Interviews Conducted in Saudi Arabia*, at 2 (February 25, 2004).

[62] 9/11 Commission Final Report at 217; 9/11 Commission Memorandum for the Record, *Interview of Fahad al-Thumairy*, at 6 (February 23, 2004); 9/11 Commission Memorandum for the Record, *Interview of Fahad al-Thumairy*, at 3 (February 24-25, 2004); 9/11 Commission Memorandum for the Record, *Interview of Omar Al-Bayoumi*, at 6 (October 16-17, 2003).

[63] 9/11 Commission Memorandum for the Record, *Interview of Osama Basnan*, at 5 (October 22, 2003); 9/11 Commission Memorandum for the Record, *Interview of FBI Special Agent [Name Redacted]*, at 2 (November 17, 2003).

[64] 9/11 Commission Memorandum for the Record, *Interview of Osama Basnan*, at 1 (October 22, 2003).

[65] 9/11 Commission Final Report at 516, n. 20.

[66] *Id.* at 516, n. 23; FBI, *Mihdhar Mohammad Al-Mihdar Zaid*, at 2-3 (May 17, 2004).

[67] S. Select Comm. on Intelligence and H.R. Permanent Select Comm. on Intelligence, Joint Inquiry into Intelligence Community Activities Before and After the Terrorist Attacks of September 11, 2001 at 425 (2002).

[68] 9/11 Commission Final Report at 516, n. 19.

[69] *Id.* at 216.

[70] *Id.* at 217.

[71] *Id.*

[72] 9/11 Commission Memorandum for the Record, *Interview of Omar Al-Bayoumi*, at 6 (October 16-17, 2003).

[73] *Id.*

[74] FBI, *Connections of San Diego PENTTBOM Subjects to the Government of Saudi Arabia*, FBI Letterhead Memorandum (undated) at 1 (FOIA request production published by INTELWIRE).

[75] FBI Electronic Communication from San Diego to Counterterrorism, *PENTTBOM; MAJOR CASE 182*, at 5 (October 3, 2001) (Case File No. 265A-NY-280350).

[76] S. Select Comm. on Intelligence and H.R. Permanent Select Comm. on Intelligence, Joint Inquiry into Intelligence Community Activities Before and After the Terrorist Attacks of September 11, 2001 at 427 (2002).

[77] *Id.*

[78] Philip Shenon, *The Commission: The Uncensored History of the 9/11 Investigation*, p. 185 (2008).

[79] S. Select Comm. on Intelligence and H.R. Permanent Select Comm. on Intelligence, Joint Inquiry into Intelligence Community Activities Before and After the Terrorist Attacks of September 11, 2001 at 427 (2002).

[80] FBI Document Compiled by the JICI Task Force, ASAC Robert Blecksmith (October 9, 2002) at 000000082 (FOIA Production Request by INTELWIRE).

[81] *Id.*

[82] 9/11 Commission, Memorandum for the Record, *Interview of FBI Special Agent [Name Redacted]*, at 2 (November 17, 2003).

[83] S. Select Comm. on Intelligence and H.R. Permanent Select Comm. on Intelligence, Joint Inquiry into Intelligence Community Activities Before and After the Terrorist Attacks of September 11, 2001 at 417 (2002).

[84] *Id.* at 434.

[85] FBI, *Connections of San Diego PENTTBOM Subjects to the Government of Saudi Arabia*, FBI Letterhead Memorandum (undated) at 2500 (FOIA request production published by INTELWIRE).

[86] S. Select Comm. on Intelligence and H.R. Permanent Select Comm. on Intelligence, Joint Inquiry into Intelligence Community Activities Before and After the Terrorist Attacks of September 11, 2001 at 428 (2002).

[87] *Id.*

[88] *Id.*

[89] *Id.* at 417.

[90] *Id.* at 426.

[91] *Id.* at 427.

[92] *Id.*

[93] FBI Document Compiled by the JICI Task Force, ASAC Robert Blecksmith (October 9, 2002) at 2/000000083 (FOIA Production Request by INTELWIRE).

[94] *Id.*