# EXHIBIT 7

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (GBD) (SN) |
|---|---|
| | ECF Case |

This document relates to: *All Actions*

## AFFIDAVIT OF DAVID MITCHELL

I, David Mitchell, being duly sworn, declare and state as follows:

**I.   Scope of Engagement**

I have been asked to provide expert testimony about:

1.       Al-Qaeda and its leadership as they relate to the organization's planning and preparation for the terrorist attacks upon the United States of September 11, 2001 ("9/11").

2.       Al-Qaeda's selection and placement of Saudi 9/11 hijackers Nawaf al-Hazmi (hereinafter "Hazmi") and Khalid al-Mihdhar (hereinafter "Mihdhar") in California prior to the attacks.

3.       The activities of Saudi hijackers Hazmi and Mihdhar upon their arrival in the United States.

4.       The identities and activities of persons in the United States who assisted, helped, supported and/or facilitated Hazmi and Mihdhar while they resided in California and prepared for their roles in the attack.

5.       The connections and relationships of those in the United States who assisted the hijackers to each other, to other terrorists, and to the Government of Saudi Arabia.

**II.   Declarant's Knowledge, Skill, Experience, Training, and Education**

6.       I served for 26 years as a Special Agent with the FBI, completing my career as the Special Agent in Charge ("SAC") of the Milwaukee office in October 2004.  I was assigned to the New York FBI office and appointed to serve as a member of the nation's first terrorism task force from 1982-1987.  In that position I was the case agent for 2 major domestic terrorism investigations, prosecuted in the Southern District of New York.

7.       At the time of the 9/11 attacks, I was serving at FBI headquarters as an Inspector. After the attacks, I participated in daily executive briefings surrounding the 9/11 attacks and investigations of the 19 hijackers and al Qaeda, until my promotion to SAC Milwaukee in February 2002.  As an Inspector, I reviewed numerous highly classified documents involving the

9/11 attacks and the al Qaeda terrorist organization.  In addition, I have reviewed numerous documents related to terrorism financing and the operational planning of the 9/11 attack.

8.      In my position as the SAC of the Milwaukee Office, I was responsible for the oversight of all International Terrorism and Foreign Counterintelligence investigations in the state of Wisconsin.  I expanded the Wisconsin Joint Terrorism Task Force by inviting participation with multiple partners at all levels of government.

9.      In May 2003, I was deployed by Director Robert Mueller to be the On Scene Commander overseeing the investigation of the al Qaeda bombings in Riyadh, Saudi Arabia.  In that capacity, I directed 75 FBI resources in the joint investigation of the Riyadh bombings, working with the Saudi Mabahith Security Forces.  I met daily with the CIA and briefed Robert Jordan, the U.S. Ambassador to Saudi Arabia on the progress of the investigation.  I was privy to the highest level of intelligence regarding al Qaeda's planning and execution of the bombings.  In addition, I met personally with the Saudi Minister of Interior, Prince Nayef bin Abdul Aziz al Saud, when I briefed him with General Abdul Aziz of the Mahabith near the conclusion of the investigation.   Prior to my departure from Saudi Arabia at the conclusion of the investigation, I briefed FBI Director Mueller, when he traveled to Saudi Arabia.

10.      After retiring from the FBI in 2004, I was appointed by the Governor of Tennessee as the Commissioner of Safety and the Director of Homeland Security.  In this position, I was charged with working on a regular basis with the FBI in Tennessee on all international and domestic terrorism investigations.  I was routinely briefed on international investigations by the FBI and Department of Homeland Security.  I retained a top secret clearance for the 6 years I held that position, and worked closely with the International Terrorism Section at FBI Headquarters and with the leadership at the US Department of Homeland Security on enhancing the sharing of intelligence, among federal, State, and local agencies.

11.      I am familiar with investigative techniques of the FBI, to include FISA warrants and the authorization process for approval by the FISA court in international terrorism investigations.  I have been the affiant on behalf of the FBI in support of multiple federal search warrants.  I was also the affiant in an application for Title III wiretap authorization in a domestic terrorism investigation.

## III.   **Methodology**

12.      The methodology employed in formulating this report is derived from:  (1) my experience working for the Federal Bureau of Investigation for 26 years and for an additional six years as Tennessee's Commissioner of Safety and the Director of Homeland Security; (2) an examination of public records and reports detailing the investigative findings of the Joint Intelligence Committee Inquiry, the National Commission on Terrorist Attacks Upon the United States (9/11 Commission), the Central Intelligence Agency and the Federal Bureau of Investigation (FBI); and, (3) an examination of tertiary sources such as books and newspaper articles published by reputable, credentialed authors.  Because information in tertiary publications often comes from undisclosed sources and through an undocumented chain of custody, I have limited my use of tertiary sources to providing collateral detail for the purpose of

supplying additional context to information already confirmed by my direct personal knowledge or U.S. Government authored reports.

13.     In order to determine the credibility and trustworthiness of a particular tertiary source, I engage in a traditional social science method known as "comparative analysis." This requires me to compare and contrast particular sources in question with other analogous sources and with official public records, searching for common threads and corroborating themes. By drawing holistically on my direct personal knowledge, on official public records and reports, and on some tertiary sources which exhibit indicia of trustworthiness, I am able to establish a single objective assessment while concurrently noting any significant factual discrepancies or conflicting data.

14.     Where possible, public records and reports relied upon have been obtained from official government websites such as the Government Publishing Office (gpo.gov). There are several instances in which FBI Reports of Investigation (form FD-302), FBI Letterhead Memoranda, and FBI Electronic Communications (between field offices) are referenced and cited. In some instances, these FBI records have been produced by the FBI pursuant to a request made for them by third parties under the Freedom of Information Act, 5 U.S.C. § 552 and subsequently published on the internet by the requestor. Where such records are singularly relevant and bear the appearance of authenticity based upon my familiarity with the subject matter or type of document at issue, they have been used as sources and cited as references in this report.

## IV.    <u>Summary of Opinions</u>

15.     Al-Qaeda considered Hazmi and Mihdhar key assets and essential operatives in the 9/11 plot because they were seasoned mujahedin who had been through an Al-Qaeda training camp and were deemed loyal to Usama Bin Laden. Most importantly, they had acquired U.S. visas giving them access to the United States. But both operatives were saddled with significant handicaps. Their youth, lack of college education, complete unfamiliarity with western culture and U.S. customs, inability to speak English, and dearth of aviation experience presented hurdles to their assigned objectives: assimilate into the United States without raising suspicion, learn English and then learn to fly commercial jets. 9/11 mastermind Khalid Sheikh Mohammad ("KSM") says he decided to send the two to San Diego, California. The evidence indicates that he did so because of the embedded presence of a network of individuals who could be leveraged to provide the hijackers with the support and assistance they needed to prepare for their roles in the attack.

16.     Upon their arrival in southern California, Hazmi and Mihdhar were promptly cocooned by a highly matrixed network of aiders and facilitators who cleared a path to their success – supplying every physical and spiritual need to advance their mission. Accommodations which materialized upon their arrival included transportation, translators, interpreters, a spiritual mentor, and an attentive aid, Omar al-Bayoumi, who oversaw their relocation from their point of entry in Los Angeles to San Diego. Bayoumi rented an apartment for Hazmi and Mihdhar, co-signed their lease as a guarantor, occasionally paid their rent, introduced them to the San Diego Muslim community and assigned them a young bilingual adjutant – Mohdar Abdullah. Abdullah, acting on Bayoumi's tasking to help them get

acclimated, tutored the hijackers in English and helped them obtain drivers' licenses, open bank accounts, and find a flight school.

17.     All members of the identified network who provided substantial assistance to the hijackers in California were adherents of Wahhabi/Salafi extremism and some were ardent public advocates of Bin Laden.  Among those at the ideological epicenter of this network was the notorious Al-Qaeda terrorism proselytizer Anwar Aulaqi.  Aulaqi met privately and consistently with the hijackers at his San Diego mosque and was in telephonic contact with Bayoumi four times on the day the hijackers arrived in San Diego.  When interviewed by law enforcement and 9/11 Commission staffers, all members of the network provided dissembling or inconsistent statements indicative of deception.

18.     The connections of the Government of Saudi Arabia to the support network members are numerous.  Bayoumi, a 42-year-old Saudi in the U.S. on a "student visa," is a long-time employee of the Saudi government whose actions, behavior, finances, and lifestyle indicate that he was a covert agent of the Saudi government operating in the United States under non-official cover, and reporting to personnel in the Kingdom's embassies and consulates. Bayoumi's Saudi government salary (paid through a contractor) increased dramatically upon the hijackers' arrival in San Diego and remained elevated until Bayoumi left the U.S. one month before the attacks.  While in San Diego, Bayoumi exhibited conduct consistent with tradecraft of a covert operative, including extensive videotaping of Saudi nationals, serving as a conduit of funding from the Saudi Government to a local mosque, checking into and out of a hotel without staying the night, and engaging in erratic driving consistent with running a surveillance detection route during his initial meeting with the hijackers.  Moreover, he performed no work for the Saudi Government contractor that was told to pay him a monthly salary and he maintained frequent and extensive contact with Saudi diplomatic establishments in Washington and Los Angeles.

19.     Osama Basnan, a San Diego resident who claimed he did more for the hijackers than Bayoumi did, was a former employee of the Saudi Arabian Education Mission in Washington.  Basnan and his wife had no visible means of support in San Diego other than the checks they routinely received from the wife of the Saudi Ambassador to the United States and occasional checks from the Ambassador himself.

20.     Saudi diplomatic envoy Fahad al-Thumairy served as a representative of the Saudi Arabian Ministry of Islamic Affairs at the Los Angeles consulate, where he held diplomatic credentials, when Hazmi and Mihdhar arrived in Los Angeles in January 2000.  He is known to have assisted incoming Saudi "visitors" in finding housing and reportedly, in obtaining transportation.  From September 2001 through at least March 2015, the FBI has conducted an ongoing investigation into individuals known to have provided substantial assistance to Hazmi and Mihdhar during their time in California.  The FBI reports that Thumairy is a main subject of that investigation, and that the FBI's investigation has established that he "immediately assigned an individual to take care of [Hazmi and Mihdhar] during their time in the Los Angeles area."

21.     On the eve of September 11, 2001, while Hazmi, Mihdhar, and fellow 9/11 hijacker Hani Hanjour were staying at a Marriott Residence Inn hotel in Herndon, Virginia, they were joined at that hotel by Saudi Interior Ministry employee Saleh al-Hussayen, who is reported

to have switched from another hotel in the area and rented a room in the same hotel as the hijackers. What contact, if any, Hussayen made with the three hijackers is uncertain, principally because Hussayen feigned a seizure during an initial interview with the FBI, which terminated the questioning. He then left the country before he could be re-interviewed. Hussayen reportedly had extensive involvement with charitable entities engaged in terrorism fundraising.

22.     Based on the available evidence detailed in the reports, it is my professional opinion that the support and assistance provided to Hazmi and Mihdhar in southern California has the earmarks of a coordinated support network, orchestrated principally by Saudi government employees and agents Fahad al Thumairy and Omar al Bayoumi.

## V.     9/11 Attack Planning and Preparations Involving Flight 77 Hijackers Nawaf Al-Hazmi and Khalid Al-Mihdhar

23.     Flight 77 hijackers Nawaf Al-Hazmi and Khalid Al-Mihdhar entered the United States through Los Angeles International Airport on January 15, 2000.[1] They were 24 and 23 years of age, respectively.[2] Neither is believed to have attended college.[3] Much of what is known about the planning and preparation activities involving them comes from U.S. Intelligence Community debriefings of KSM. Dubbed the "mastermind" of the 9/11 attacks, KSM was put in charge of the operation by Usama Bin Laden.[4] Substantial portions of reports of KSM's debriefings were admitted into evidence during the 2006 federal criminal trial of Zacarias Moussaoui in the Eastern District of Virginia.[5]

24.     According to KSM, Al-Qaeda operatives who were Saudi Arabian citizens "were primarily chosen for the attacks in the United States because they could easily travel there."[6] Flight 77 hijackers Hazmi and Mihdhar were both Saudis.[7] Moreover, both had obtained U.S. visas in 1999 before going to an Al-Qaeda training camp in Afghanistan "to make themselves more attractive for any possible operation in the United States."[8] This initiative on their part paid off as KSM reported that both men were chosen for the operation because they arrived in Afghanistan with a U.S. visa in their passport.[9] KSM related that from the very first conceptual meeting he had with Usama Bin Laden to formulate the 9/11 plot, Bin Laden had "Nawaf al-Hazmi and Khalid al-Mihdhar in mind for the operation" to "simultaneously hit the Pentagon, White House, and U.S. Capitol building" - even before Mohammad Atta's group was identified.[10] KSM said he did not know Mihdhar at the time, but "Mihdhar was chosen personally for the operation by Bin Laden." KSM said Bin Laden told him "that Bin Laden wanted the two to go on the operation."[11]

25.     Although Hazmi and Mihdhar were both contemplated as hijackers from the plan's inception, KSM lamented that "they barely knew how to function in U.S. society."[12] "Al-Hazmi barely spoke English and al-Midhar spoke no English"[13] making them "poorly prepared for their entry into the U.S."[14] Hazmi's "very weak" English was identified by KSM as a "primary concern" but was outweighed by Hazmi's possession of a U.S. visa "which was relatively rare among the mujahidin."[15] KSM placed only "middling confidence" in the two "because of their lack of English and exposure to the West."[16] KSM said that "it was *his* idea that al-Mihdhar and al-Hazmi should reside in *San Diego*, *CA*, after arriving in Los Angeles, CA on January 15, 2000."[17] KSM told the two hijackers "to enroll in an English-language course and then, once their English was satisfactory, to enroll in a flight school."[18] KSM gave each

hijacker $8,000 for their travel to California.[19]  He also "spent a significant amount of time reviewing with Hazmi the timetables of the U.S. airlines that were eventually used in the operation" and taught Hazmi "basic survival skills."[20]

26.     KSM's uneasiness with the suitability of Hazmi and Mihdhar proved well founded.  They "unsuccessfully tried to enroll in language school" and demonstrated an "inability to complete flight training."[21]  As a result, they ultimately were reassigned to serve as so-called muscle hijackers.

## VI.     Opinion Concerning Planning and Preparations Involving Flight 77 Hijackers Nawaf Al-Hazmi and Khalid Al-Mihdhar

27.     It is my professional opinion that Al-Qaeda considered Hazmi and Mihdhar key assets and essential operatives in the 9/11 plot.  My opinion is based on their allegiance to Bin Laden, their prior mujahid experience as jihadist warriors in Bosnia, and most importantly, their possession of U.S. tourist visas which they acquired prior to their travel to Afghanistan.  They were dedicated jihadists with established access to the United States.  This made them among the most highly valued of the 9/11 terrorists as evidenced by Bin Laden's express desire for their participation in the plot from its inception.

28.     Al-Qaeda also recognized that risk of their discovery and/or failure was significant.  Unlike the other hijackers, Mihdhar and Hazmi faced unique challenges in completing the taskings they had been given to learn English and acquire at least rudimentary aviation capabilities.  These challenges included their youth, lack of college education, complete unfamiliarity with Western culture and U.S. customs, and inability to speak English.  While they were seasoned guerrilla war fighters, they were not international spies.  These handicaps presented significant obstacles to finding and acquiring housing, obtaining transportation, conducting financial transactions, and locating and enrolling in an English language school (a condition precedent to taking flight lessons).  Given their coveted value to Al-Qaeda and the heightened possibility of their failure in comparison to other 17 hijackers, it is implausible that the Al-Qaeda leadership planned Mihdhar's and Hazmi's entry into Los Angeles and their subsequent relocation to San Diego without arranging for one or more persons already present in the area to assist the two.  They needed help getting settled.  They also needed help in acquiring the language and aviation skills required for the attack.  As the 9/11 Commission observed:

> KSM denies that al Qaeda had any agents in Southern California. We do not credit this denial.  We believe it is unlikely that Hazmi and Mihdhar—neither of whom, in contrast to the Hamburg group, had any prior exposure to life in the West—would have come to the United States without arranging to receive assistance from one or more individuals informed in advance of their arrival.[22]

29.     In my professional opinion, the notion that Al-Qaeda sent the two hijackers to Los Angeles, with a direction to find their way to and settle in San Diego, provisioned only with the guidance that they depend upon the kindness of strangers taxes credulity.  To the contrary, it is my professional opinion, to a reasonable degree of certainty, that Al-Qaeda had collaborators and/or assets in Los Angeles and San Diego who were enlisted to assist Mihdhar and Hazmi

upon their arrival in the U.S.  The stakes were too high to leave to chance their successful assimilation into the local community and acquisition of the training they needed.

30.     First, with a population double that of San Diego, there are as many if not more English language schools, flight schools, and mosques in Los Angeles (the hijackers' point of arrival) than there are in San Diego.  As a consequence, the relocation and transport of the hijackers from Los Angeles to San Diego presented an unnecessary logistical complication in achieving KSM's purported objectives of allowing the hijackers to solicit the local Muslim community's assistance in getting settled and enrolling in language and flight schools.  Simply stated, moving to San Diego was not operationally necessary, and in the absence of a support network would have been operationally unsound.  The two hijackers could have achieved KSM's directives in Los Angeles without relocating.

31.     Second, KSM's claim that it was "his idea" to send the hijackers to San Diego based on his research indicating the availability of several schools and mosques is consistent with the use of a pretext to imbue the hijackers' contacts with aiders and abettors in Los Angeles and San Diego with the appearance of fortuity rather than design.   That is, KSM's direction for Mihdhar and Hazmi to seek help from the local Muslim community in general, rather than from specifically identified individuals, lends an aura of false happenstance to their meetings with those who did assist them.

32.     Third, KSM had imposed sound operational security protocols on the 9/11 operation and other 17 hijackers to preclude inadvertent discovery of the plot by third parties. KSM directed all but Hazmi and Mihdhar to avoid contact with local Muslims in the United States and to stay out of mosques.  Those directives evidence KSM's awareness that such contacts presented too great a risk of operational compromise.  KSM's departure from this rule as to Hazmi and Mihdhar would fit the operational profile of the plot only if it were intended and essential to facilitate their receipt of assistance from embedded California collaborators and/or assets of Al-Qaeda.

33.     The evidence reveals an additional operational incentive for sending Mihdhar and Hazmi to San Diego.  It was the location of charismatic Islamic fundamentalist cleric Anwar Aulaqi - then the Imam at San Diego's Al-Ribat Mosque.  Aulaqi was reportedly investigated by the FBI as early as 1999 based on information that he may have been approached by an agent for Bin Laden.[23]  Upon arriving in Los Angeles, the two young Saudis were immediately immersed in a sea of sybaritic Western influences that Bin Laden and radical clerics and jihadists had long railed against as iniquitous.  Southern California's pleasant weather, sandy beaches, comely denizens, and easy access to alcohol, drugs, and pornography beckoned with temptation and invited distraction.  Bin Laden and KSM were acquainted with these lures of Western culture but Hazmi and Mihdhar were not.  These factors provide a strong indication that KSM sent the two to San Diego with the hope that Anwar Aulaqi's spiritual leadership would keep them religiously motivated and devoutly inspired.  History demonstrates that Aulaqi was adept at aligning hearts and minds with Al-Qaeda's objectives.

34.     Aulaqi was assassinated by the CIA in September 2011 via a drone strike in Yemen where he was functioning as the preeminent propagandist of Al-Qaeda in the Arabian Peninsula.[24]  His links to terrorism plots are extensive.  He cultivated Christmas Day underwear

bomber Umar Farouk Abdulmutallab who attempted to detonate a bomb on a U.S. airliner on December 25, 2009;[25] inspired and plotted with British Airways employee Rajib Karim to smuggle a bomb on board a British Airways flight in 2010;[26] was contacted numerous times by U.S. Army Major Nidal Hasan before Hasan shot to death 13 people at Fort Hood;[27] was behind the 2010 plot to blow up U.S. flagged airliners with bombs concealed in computer printers;[28] ostensibly inspired shooter Mohammod Abdulazeez who watched his videos and then opened fire on two military installations in Chattanooga, Tennessee killing five servicemen;[29] was cited as a source of religious insight and bomb making skills by the Tsarnaev brothers who bombed the Boston Marathon in 2013;[30] and was the radicalizing impetus for two men who shot up a Prophet Muhammad cartoon contest in Texas.[31]

## VII.   Assistance Provided to Nawaf Al-Hazmi and Khalid Al-Mihdhar in California

35.     After landing at Los Angeles International Airport, it is not known where Hazmi and Mihdhar went.[32]  Their exact whereabouts are unaccounted for from the date of their arrival on January 15, 2000 until February 1, 2000.[33]  Extensive investigative canvasses of hotels in the area produced negative results.[34]  There were no indications they stayed in a hotel or motel following their arrival.[35]  This provides strong evidence that they were received by someone who possessed advance knowledge of their arrival, prearranged lodging for them during their first days in Los Angeles, and transported them to that lodging after meeting them at the airport.  And in fact, there is evidence they obtained assistance from at least three individuals in southern California who were employed by or paid by the Government of Saudi Arabia:  Fahad al-Thumairy in Los Angeles, Omar al-Bayoumi in San Diego, and Osama Basnan in San Diego.

36.     In the first weeks after their arrival in Los Angeles, investigations indicate that Hazmi and Mihdhar spent time at the King Fahad mosque in Culver City.[36]  Built by the Saudi Government,[37] the mosque is located ten minutes from the Los Angeles airport.[38]  It is owned by the Islamic Foundation of Shaikh Ibn Taymiyah,[39] and was formerly known as "the Ibn Taymiyah mosque."[40]  Ibn Taymiyah is a 14th century Islamic fundamentalist scholar often quoted by ISIS and Al-Qaeda for the proposition that those who do not accept a fundamentalist view of Islam should be fought and killed.[41]  "The mosque is widely attended by members of the Saudi Consulate in Los Angeles and is well known for its anti-Western views."[42]  In addition, both the CIA and FBI have identified it "as a site of extremist activity."[43]  "Several subjects of FBI investigations prior to September 11 had close connections to the mosque and are believed to have laundered money through this mosque to non-profit organizations overseas affiliated with Usama Bin Laden."[44]

37.     According to the 9/11 Commission, "[i]t is fairly certain that Hazmi and Mihdhar spent time at the King Fahad mosque and made some acquaintances there."[45]  This belief is based on two events.  First, an unnamed witness interviewed by the FBI after the attacks said he first met the hijackers at the King Fahad mosque in early 2000.[46]  Second, San Diego resident Mohdar Abdullah said he accompanied Mihdhar and Hazmi to the King Fahad mosque in June 2000 and the two hijackers "greeted various individuals whom they appeared to have met previously."[47]  Abdullah's account is corroborated by records from Deano's motel on Sepulveda Boulevard in Culver City, California which indicate that the three stayed at the hotel on June 9, 2000.[48]  Accordingly, there is evidence that Mihdhar and Hazmi established relationships at the

King Fahad mosque in the three week interval between the time of their arrival in Los Angeles and their subsequent move to San Diego.

38.     The 9/11 Commission's finding is also potentially corroborated by Qualid Benomrane, a Los Angeles taxi cab driver from Tunisia who interacted with "two Saudis" upon their arrival in Los Angeles.[49]  In an FBI Report of Investigation which has been heavily redacted, Benomrane recounted driving two Saudi males from Los Angeles to San Diego to visit Sea World shortly after they arrived.[50]  He could not remember their names or when they arrived, only that it was before September 11, 2001.[51]  He reported hearing "that two Saudi Arabian men arrived at LAX and where [sic] met by a person unknown to the cab driver."[52]  "This unknown person took the two Saudis to an apartment complex that had been rented for them" in "a large white building located on Sepulveda Boulevard."[53]  The cab driver said that one or two days after the arrival of the Saudis, he was at the King Fahad Mosque and was introduced to the two Saudis by Fahad al-Thumairy.[54]  Thumairy was an Imam at the King Fahad Mosque when Hazmi and Mihdhar arrived in Los Angeles.[55]  Benomrane said someone at the consulate asked Thumairy to assist two Saudis who had recently arrived.[56]  Thumairy asked the cab driver "if he could help them during their time in Los Angeles because they did not speak [E]nglish."[57]  The cab driver agreed and gave the Saudis his taxi cab business card.[58]  Thereafter he took them on two days of sight-seeing.  The FBI Report of Investigation states:

> The next day the Saudis called [the cab driver Benomrane] and asked him to pick them up and drive them around Los Angeles. [The cab driver] picked them up at their apartment complex and then drove them around Santa Monica, took them to the beach, and to Hollywood.  That day they ate at the Cheesecake Factory and the Mediterranean Restaurant located on Venice Blvd.  At the end of the day [the cab driver] took them back their apartment complex.
>
> Two to three days later the Saudis called [the cab driver] again. This time they wanted to go to Sea World in San Diego.  They said they would pay [the cab driver] $200 plus gas and food for the day if he took them.  [The cab driver] agreed and picked them up at their apartment where he was given $100 and told he would get the remainder after the trip.  [The cab driver] stated they drove straight to San Diego and the only stop that they made was at a gas station. . . . They spent the entire day at Sea World and then returned to Los Angeles.[59]

39.     One or two days after they returned to Los Angeles, the cab driver said he called the two Saudis to collect the remainder of his money and was told that Thumairy would give him the rest of the money.[60]  When the cab driver was asked by investigators who else knew about the two Saudis, he "replied that no one at the King Fahad Mosque knew about them and that he was told by Sheik Fahad Althumairy to keep the presence of the two Saudis to himself."[61]  The cab driver "did say that the Saudi Consulate knew about the two Saudis because it was the consulate that told Sheik Fahad [Thumairy] to take care of the Saudis."[62]  The cab driver "was told by Sheik Fahad [Thumairy] that the Saudis were here to see their sick father who was in a

local hospital."[63]  Approximately one month later, the cab driver was told the Saudis had left Los Angeles.[64]

40.     When asked to look at photospreads that included the 19 hijackers involved in the 9/11 attacks, Benomrane "responded ambiguously, seeming first to pick out the photographs of Hazmi and Mihdhar but then denying that he recognized them."[65]  The FBI Los Angeles Division opined that "Benomrane may have been less than truthful with investigators regarding his recognition of anyone from the photographs,"[66] relating that:

> During the interview, Benomrane was shown photographs of all the hijackers and numerous photographs of unrelated individuals. Benomrane looked at all the photographs carefully and placed all the photographs in a pile on the left side of the desk.  When he viewed the photographs of Al-Mihdhar and Al-Hazmi, he placed the photographs on the right side of the desk.  Once he had gone through all the photographs, he mixed the photographs and stated that he did not recognize anyone from the photos.[67]

41.     The events reported by Benomrane align with the FBI's most recent finding that "Al-Thumairy immediately assigned an individual to take care of them during their time in Los Angeles."[68]

42.     FBI investigative records also reflect that San Diego resident Omar al-Bayoumi stayed for one night at the Half Moon motel in Culver City near the King Fahad mosque with two other unknown individuals on January 9, 2000, six days before Hazmi and Mihdhar arrived.[69]  On that same day, January 9, 2000, records of the Travel Lodge motel in Culver City, also near the mosque, show that Bayoumi checked into the hotel at 9:29 p.m. and checked out at 9:50 p.m.[70]  He was not charged for the room.[71]

43.     Less than one month later, on February 1, 2000, Bayoumi traveled with fellow San Diego resident Caysan Bin Don from San Diego to the Saudi Consulate in Los Angeles.[72] Bin Don is a white Caucasian U.S. citizen[73] who had recently been homeless and converted to Islam.   He is also known as Isamu Dyson and was formerly known as Clayton Morgan.   The following is Bin Don's account of their trip:

44.      The purported purpose of this trip was for Bayoumi to renew his U.S. visa which he claimed was going to expire.[74]  Bayoumi invited Bin Don "to come along on the trip Bayoumi needed to take to the consulate in LA."[75]  Bayoumi told Bin Don that Bayoumi "knew a good restaurant to stop at and eat in LA," noting that the "restaurant serves good food and is Halal."[76] At the time Bayoumi extended this invitation, he had known Bin Don "two to three months."[77] Bin Don accompanied Bayoumi the next day, citing a religious obligation not to reject invitations unless there is good reason.[78]  Bayoumi drove them to Los Angeles in Bayoumi's vehicle.[79] They were both dressed in traditional Islamic clothing for the trip, *i.e.*, a thobe.[80] They talked about religion during the drive, stopping only to obtain a passport-type photo needed for the new visa.[81]

45.     Upon reaching the Saudi Consulate, they parked in the building's underground parking lot and went to the reception area.[82]  After waiting in the lobby, a man wearing a suit came out and greeted Bayoumi.  Bayoumi and the man from the consulate conversed in Arabic which was not understood by Bin Don.[83]  Bin Don observed that the two men seemed to know each other and that it was obvious they had met before.[84]  After Bayoumi introduced Bin Don as "a friend who just became a Muslim," Bayoumi and the man from the consulate "went behind closed doors" for "up to approximately 30 minutes" while Bin Don waited in the lobby.[85]  Bin Don estimates that he and Bayoumi were at the consulate for no more than one hour.[86]  Bayoumi and Bin Don returned to Bayoumi's car and drove away, with Bayoumi indicating he had been successful in getting his visa extended.  By the time they left the consulate, it was "well past noon" according to Bin Don.[87]

46.     They then drove around looking for the restaurant, with Bayoumi again claiming it had good food and he had taken his family there before.[88]  Bin Don reported that "[t]hey made a few U-turns, got confused trying to find it, and missed some turns."[89]  Bin Don said that Bayoumi was not doing these maneuvers intentionally and had no reason to believe they were being followed or Bayoumi was attempting to evade anything.[90]

47.     After finally locating the restaurant, they parked on the street, walked inside and found it to be a butcher shop that did not serves meals.[91]  People inside the butcher shop directed them to another restaurant close by.[92]  Bin Don described it as a "Mediterranean café no larger than 500 square feet in size.[93]  After ordering food, Bayoumi went to the restroom to wash up for prayer before they ate.[94]  Bin Don took water from the table and went outside the restaurant to wash up near a tree because he realized the restaurant only had one restroom.[95]  Bayoumi came outside and joined him.[96]  Bayoumi laid down a cloth to pray on and they prayed together for about five minutes, then returned inside to eat.[97]

48.     While Bayoumi and Bin Don were eating, Hazmi and Mihdhar came into the restaurant and sat down.[98]  They appeared to Bin Don to be Arabic and were dressed in western clothes.[99]  Bin Don said he is not sure how the first exchange or interaction occurred with Hazmi and Mihdhar – whether he and Bayoumi initiated it or they did.[100]  Introductions started and Bayoumi played "the host" from the beginning to the end of the meeting.[101]  The conversation was in Arabic.[102]  Bayoumi translated so that Bin Don could follow the conversation because Bin Don did not understand Arabic well.[103]  Bayoumi invited Hazmi and Mihdhar to eat with them and offered to buy a meal for the two.[104]  They sat at an adjacent table.[105]

49.     During the conversation, Bayoumi reportedly learned that Hazmi and Mihdhar were currently living in Los Angeles, in an apartment somewhere in the area of the restaurant,[106] and claimed they did not like Los Angeles.[107]  Hazmi did most of the talking while Mihdhar was less talkative.[108]  At the end of their meal, Bayoumi gave his telephone number to Hazmi.[109]  Bin Don believes Bayoumi also obtained Hazmi and Mihdhar's telephone number.[110]  Bayoumi told Hazmi and Mihdhar that he and Bin Don lived in San Diego and invited them to San Diego to "check it out."[111]  Bayoumi told them if they liked San Diego, "he would be able to and was happy to help them."[112]  Bayoumi and Bin Don then left the restaurant with Hazmi and Mihdhar staying behind.[113]

50.     Bayoumi and Bin Don next drove to the "Culver City mosque" for sunset prayer, which Bin Don described as being a few blocks away from the restaurant.[114]  After spending 15-20 minutes at the mosque, they drove back to San Diego.[115]

51.     After Hazmi and Mihdhar moved to San Diego, Bin Don was in their apartment 10-20 times.[116]  On one occasion when Bin Don left the hijacker's apartment with Bayoumi after a visit, Bayoumi told Bin Don that Hazmi and Mihdhar had "visited San Diego previously."[117]

52.     At least as late as March 2015, the FBI was continuing to investigate the circumstances surrounding Bayoumi's contacts at the King Fahad mosque on February 1, 2000. An "FBI Info" document titled "Updates and Initiatives (as of 5 October 2012)" recites that an unidentified agency sent a lead to the Los Angeles Joint Terrorism Task Force "seeking confirmation of two possible current addresses" for an individual (whose name is redacted) "who was known to have extremist views, and was identified as having met with Omar al-Bayoumi in private on the same day as Bayoumi's alleged 'chance' first meeting with 9/11 hijackers Nawaf al Hazmi and Khalid al Mihdhar."[118]  The FBI says it has also developed evidence that an identified individual (whose name is redacted) "tasked al-Thumairy and al-Bayoumi with assisting the hijackers."[119]

53.     By February 4, 2000, Hazmi and Mihdhar had come to San Diego from Los Angeles.[120]  How they traveled from Los Angeles to San Diego and who transported them is not known.[121]  Bayoumi says his first encounter with them after the Mediterranean café was when they showed up at the Islamic Center of San Diego (ICSD) looking for him, saying they needed a place to stay.[122]  According to the Administrator of the ICSD, Hazmi and Mihdhar arrived at the mosque on their own, "describing themselves as clerks employed by the Saudi Arabian government."  "The administrator also suspected that Mihdhar might have been an intelligence agent of the Saudi government."[123]  The basis for this suspicion is apparently unknown.

54.     Bayoumi took Hazmi and Mihdhar to the Parkwood Apartments rental office, the same complex where Bayoumi lived[124] and obtained an apartment for them "right next door" to his own.[125]  He completed the rental application for them, but did not use his own name as a reference.[126]  Instead, he used the name of a friend that Bayoumi had used as a reference when Bayoumi first rented an apartment at Parkwood.[127]  When Parkwood would not accept cash from Hazmi and Mihdhar, Bayoumi took them to his bank and obtained a cashier's check in Bayoumi's name to pay their rent and security deposit.[128]  Bayoumi related there was a sense of urgency in completing these arrangements "and stressed his desire at the time to finish the transaction quickly."[129]  Bayoumi said that his haste was so great that he signed the paperwork without reading it.[130]  He reportedly allowed Hazmi and Mihdhar to stay in his apartment until they moved into theirs.[131]  The hijackers' rental application recites that Hazmi and Mihdhar resided in Bayoumi's apartment from January 15, 2000 through February 2, 2000.[132]

55.     Bayoumi co-signed the hijackers' San Diego apartment lease as a "guarantor" and paid their first month's rent and security deposit.[133]  He helped them open a bank account, which they did with a $9,900 deposit[134] (just below the Currency Transaction Reporting threshold of $10,000 that would have triggered notification to the Financial Crimes Enforcement Network). He also lent them his cell phone until telephone service was installed in their apartment.[135]  Soon after they moved in, he threw a party in their apartment.[136]  Bin Don, who attended, said the

party was to welcome Hazmi and Mihdhar.[137]  Bayoumi spent a lot of time at Hazmi's and Mihdhar's apartment, according to Bin Don.[138]

56.    Bayoumi also tasked (or "ordered")[139] Mohdar Abdullah, another individual from the Islamic Center of San Diego, to help the hijackers.[140] Abdullah reported that Bayoumi "specifically asked him to be the individual to acclimate the hijackers to the United States, particularly San Diego, California."[141]  Abdullah was a Yemeni university student in his early 20s who was fluent in both Arabic and English and "perfectly suited to assist the hijackers in pursuing their mission."[142]  Abdullah did as instructed, serving as their translator, helping them get drivers' licenses, tutoring them in English,[143] assisting them in locating flight schools,[144] and helping them open bank accounts.[145]  Documentary evidence found in the hijackers' car after 9/11 revealed that Mihdhar also obtained a medical prescription, car maintenance service, and an insurance card, transactions which would have likewise required translation assistance.[146]

57.    In addition to the assistance provided by Thumairy, Bayoumi and Abdullah, Osama Basnan, a close friend of Bayoumi who was in contact with Bayoumi several times a day, made a comment to an FBI source after the September 11 attacks "suggesting that he did more for the hijackers than al-Bayoumi did."[147]  Basnan lived in an apartment complex in San Diego across the street from Hazmi and Mihdhar.[148]  The hijackers were in contact with a close friend of Basnan's, Khaled al-Kayed, a commercial airline pilot and certified flight instructor living in San Diego.[149]  Hazmi and Mihdhar contacted Kayed and specifically asked him if they could learn to fly Boeing aircraft jets.[150]

58.    Anwar Aulaqi, the Imam of San Diego's Al-Rabat mosque, provided religious counsel to Hazmi and Mihdhar.  He has been characterized as their "spiritual leader" and reportedly met with them "consistently and privately."[151]  It is not known how or when Hazmi and Mihdhar first met Aulaqi.[152]  The 9/11 Commission found that the hijackers "may even have met or at least talked to him the same day they first moved to San Diego."[153]  The hijackers "reportedly respected Aulaqi as a religious figure and developed a close relationship with him."[154]  One witness reported seeing Hazmi and Mihdhar in the guest room on the second floor of the Al-Rabat mosque and, on one occasion, leaving the room just after Aulaqi, at the conclusion of a meeting.[155]

59.    From March 11, 2000 to March 27, 2000, Saudi Naval Officer Lafi al-Harbi was in telephonic contact with Mihdhar and Hazmi on nine occasions.[156]  The purpose and substance of these contacts is unknown.

60.    In May 2000 the hijackers took flight lessons in San Diego.[157]

61.    On June 10, 2000, Mihdhar returned to Saudi Arabia to visit family, leaving Hazmi by himself in San Diego until December 2000 when Hazmi moved to Mesa, Arizona with hijacker Hani Hanjour.[158]  On June 9, 2000, Mohdar Abdullah drove Hazmi and Mihdhar to Los Angeles in preparation for Mihdhar's departure the next day.[159]  While staying together at a local hotel that night, the three were visited by a man named "Khallam" whose identity is not known.[160]  Abdullah was asked to leave the room so that Hazmi, Mihdhar, and Khallam could meet in private.[161]  The purpose of this meeting remains unknown.[162]

62.     In June 2001, Mihdhar obtained a new U.S. visa in Jeddah, using a different passport than the one he had used to enter the United States in January 2000.[163]  He re-entered the U.S. on July 4, 2001.[164]

63.     Bayoumi left the United States in August 2001, shortly before the 9/11 attacks.[165]

64.     On September 10, 2001, Saudi Interior Ministry employee Saleh al-Hussayen stayed at the same hotel in Herndon, Virginia where Hazmi, Mihdhar, and Hanjour were staying.[166]  When the FBI sought to interview Hussayen after the attacks, he feigned a seizure and then left the United States before the FBI had an opportunity to interview him further.  The FBI agents who briefly interviewed him "believed he was being deceptive."[167]

## VIII.   Connections of Those Assisting the Hijackers to the Government of Saudi Arabia and Terrorism

### A.  Fahad al Thumairy

65.     Fahad al-Thumairy was an accredited diplomat at the Saudi Consulate in Los Angeles from 1996-2003.[168]  As of January 2000 when the hijackers arrived, Thumairy was employed by the Saudi Arabian Ministry of Islamic Affairs, Religious Endowments and Religious Guidance[169] to act as the Saudi Consulate's religious arbiter.  Thumairy also served as an Imam at the King Fahad Mosque, and during an interview with 9/11 Commission staff, Thumairy explained that his role at the mosque "was part of his official duties working for the consulate."[170]  Thumairy reported spending 60-70% of his time at the consulate and 20% at the King Fahad Mosque.[171]  He reported to the Consul General[172] and was appointed to the mosque by the Saudi Consulate, not the mosque's governing council.[173]  When interviewed, Thumairy denied that he placed Saudi visitors in local Los Angeles apartments as part of his duties:  "He repeated that he provided religious advice at the Saudi consulate and never provided help with apartments, taxis, or other similar things,"[174] observing that "it was beneath him to do things like look for apartments for guests."[175]  However, in a follow-up interview, when confronted with evidence to the contrary, Thumairy admitted that in July 2001 he rented a unit in his own apartment complex for a Saudi man and his sick father who had come to Los Angeles for a liver transplant.[176]

66.     Based on FBI documents which have not been disclosed, the 9/11 Commission found that Thumairy reportedly led "an extremist faction" at the mosque.[177]  He "was reputed to be an Islamic fundamentalist and a strict adherent to orthodox Wahhabi doctrine."[178]  "Some Muslims concerned about his preaching have said he "injected non-Islamic themes into his guidance/prayers at the King Fahad mosque" and had followers "supportive of the events of September 11, 2001."[179]  The 9/11 Commission also determined that Thumairy "appears to have associated with a particularly radical faction within the community of local worshippers, and had a network of contacts in other cities in the United States."[180]  The 9/11 Commission reported that "[h]e apparently lost his position at the King Fahad mosque after the 9/11 attacks, possibly because of his immoderate reputation."[181]

67.     Thumairy and Bayoumi had numerous telephone contacts between December 1998 and December 2000.[182]  Specifically, Bayoumi called Thumairy's home telephone ten

times during this period and Thumairy call Bayoumi's cellular and home phones 11 times from December 3-20, 2000.[183]  Bayoumi admitted contacting Thumairy by telephone and at the mosque, but claimed it was "solely on religious matters."[184]  The in-person contacts are corroborated by a witness who reported seeing Bayoumi meeting Thumairy on several occasions at the King Fahad Mosque.[185]

68.　　When interviewed by the FBI and 9/11 Commission Staff, Thumairy demurred and denied, maintaining he did not preach anti-Western sermons or promote violent jihad.[186]  He claimed not to recognize Hazmi and Mihdhar, denied knowing Bayoumi (contradicted by Bayoumi), and denied knowing Mohdar Abdullah (contradicted by Abdullah).[187]  The Commission found his denials suspect.[188]

69.　　The U.S. State Department revoked Thumairy's visa in May 2003[189] based on its determination that he might be connected with terrorist activity.[190]

70.　　From September 2001 through at least March 2015, the FBI has conducted an ongoing investigation "into individuals known to have provided substantial assistance to 9/11 hijackers Nawaf al-Hazmi and Khalid al-Mihdhar during their time in California, prior to the attacks."[191]  Thumairy is a main subject of that investigation based on the FBI finding that he "immediately assigned an individual to take care of them [Hazmi and Mihdhar] during their time in the Los Angeles area."[192]

## B.  Omar Al-Bayoumi

71.　　Bayoumi, a Saudi national,[193] entered the United States in 1993 on a student visa.[194]  While living in San Diego, he attended no classes.[195]  Prior to September 11, 2001, the FBI received numerous reports from individuals in the San Diego Muslim community, dating back to 1999, alleging that Bayoumi may be some kind of Saudi spy or intelligence officer.[196]  These reports are based on Bayoumi's employment with Saudi Government entities for which he performed no work, his frequent contacts with the Saudi Consulate in Los Angeles, his travel to Washington, D.C. every one to two months, his admissions to others in the San Diego Muslim community that he has friends/contacts in the Saudi Consulate, his access to large amounts of cash, his delivery of at least once check drawn on the Saudi Embassy's account to a local mosque, and his monitoring, inquiring about, and videotaping of Saudi citizens living in San Diego.[197]

72.　　According to the FBI, Bayoumi has "extensive ties to the Saudi Government."[198]  For 17 years, from 1976 until he relocated to the United States in 1993, Bayoumi was an accountant at the Saudi Government's Civil Aviation Administration,[199] a division of the Kingdom's Ministry of Defense and Aviation.  The FBI reports that he was in frequent contact with the Emir at the Saudi Ministry of Defense who was responsible for air traffic control.[200]  FBI records reflect that Bayoumi received $20,000 from the Saudi Ministry of Finance at one point.[201]

73.　　In connection with his application for admission to a doctoral program at Case Western Reserve University in 1998, Bayoumi submitted a letter from the "National Guard Office" of the "Royal Embassy of Saudi Arabia" in Washington, D.C. stating that he was a

candidate for a full scholarship from Government of Saudi Arabia.[202]  On the same application for admission, Bayoumi stated he was employed by the Saudi Civil Aviation Administration for 20 years and held the position of "Assistant to the Director of Finance, Contracts and Finance Control Division, PCA, Airways Engineering" of Dallah Avco Trans Arabia Company.[203]  Dallah Avco is a Saudi government aviation contractor.[204]  The Saudi Civil Aviation Authority supervisor apparently responsible for approving the salary of Bayoumi was also the father of an individual whose photo was found in a raid of an Al-Qaeda safe house in Karachi.[205]

74.    While living in San Diego, Bayoumi received money from the Saudi Government through Dallah Avco.  In 1999, Dallah Avco, informed the Saudi Government's Presidency of Aviation that Dallah Avco "does not want to renew the secondment" of Bayoumi (who was described as an "employee from the Presidency of Civil Aviation").[206]  Two days later, the Saudi Ministry of Defense and Aviation responded via a letter that stated:

> With reference to your letter . . . under which you stated that you do not have the desire to renew the secondment of the above person [Bayoumi] for another year.
>
> We hereby inform you that the HQ desires to second him [Bayoumi] for one year only to complete the task for which the HQ agreed upon his secondment.
>
> Accordingly, we hope you renew the secondment of the said person for another year as of 08/01/1420ah.  The company [Dallah Avco] shall draft a letter with all due speed for the secondment arrangements to be completed in accordance with the law . . . .[207]

75.    Dallah Avco responded the next day with a letter stating, "[W]e hope that you kindly approve the extension of the secondment period of the said employee [Bayoumi] for one more year" "to work as an accounts supervisor."[208]

76.    After the 9/11 attacks when Bayoumi was detained and questioned by New Scotland Yard, he claimed that the Saudi Civil Aviation Administration paid him $5,000 per month to study in England for his PhD.[209]

77.    Dallah Avco's/Ercan's payments to Bayoumi in San Diego fluctuated in general correlation with the hijackers' arrival and departure from San Diego:

> [A]l-Bayoumi's pay increased during the time that al-Hazmi and al-Mihdhar were in the United States.  According to a recent analysis of ties between the terrorist attacks and elements of the Saudi Government, before al-Hazmi and al-Mihdhar arrived in the U.S., al-Bayoumi generally received approximately $465 per month in "allowances."  . . . [I]n March 2000, a month after al-Hazmi and al-Mihdhar arrived in San Diego, his "allowances" jumped to over $3700 a month and stayed constant until December 2000, when al-Hazmi left San Diego.  Al-Bayoumi's allowances

were then decreased to approximately $3,200 a month and stayed at that rate until al-Bayoumi left the United States in August 2001, approximately one month before the September 11th attacks.[210]

78.     There were also attempted transfers of Saudi Government funding from Osama Basnan's wife to Bayoumi's wife.  Osama Basnan's wife regularly received money from Princess Haifa Bin Sultan, the wife of Prince Bandar, the Saudi Ambassador to the United States.[211]  FBI investigation revealed that while the hijackers were residing in San Diego, Bayoumi's wife attempted to deposit three checks from Prince Bandar's wife which were made payable to Basnan's wife, into her own accounts.[212]

79.     Another of the bases for the belief that Bayoumi was a covert operative for the Saudi government was his access to large amounts of money from Saudi Arabia, despite the fact that he did not appear to hold a job.[213]  On one occasion prior to 9/11, the FBI was informed that Bayoumi had received $400,000 from Saudi Arabia to fund a new mosque in San Diego.[214]

80.     FBI investigation also identified ties between Bayoumi and terrorist elements, particularly an individual associated with Bayoumi who was linked with Al-Qaeda.[215]  Moreover, the FBI reported that "after an exhaustive translations [sic] of Bayoumi's documents, it is clear that in Bayoumi's correspondence he is providing guidance to young Muslims and some of his writings can be interpreted as jihadist."[216]  In addition, Bayoumi's passport contained a "cachet" that intelligence investigators associate with possible adherence to Al-Qaeda.[217]  It is a marking that can be obtained by "especially devout Muslims."[218]  The 9/11 Commission found that while the cachet does not "conclusively link" Bayoumi's passport with a terrorist organization, "the marking suggests the need for further inquiry."[219]  During a 9/11 Commission interview, Bayoumi advised that he considered Saudi diplomat and fundamentalist cleric Fahad al-Thumairy his "religious advisor" and that he discussed "religious matters and ideas" with Anwar Aulaqi.[220]

81.     During this time frame of the hijackers' arrival in California, Bayoumi was in frequent telephone contact with Saudi Government establishments in the United States.[221]  FBI analyses of telephone toll records reflect that Bayoumi called Saudi Government establishments in the U.S. almost 100 times between January and May of 2000,[222] coinciding with the hijackers' relocation and assimilation into the San Diego community.  According to the FBI, these telephone records reflect that Bayoumi was in contact with "at least three individuals at the Saudi Embassy in Washington, D.C.; two individuals at the Saudi Arabian Cultural Mission in Washington, D.C.; and three individuals at the Saudi Consulate in Los Angeles."[223]  He also possessed the phone number for an individual at the Saudi Consulate in London.[224]  Information thus far disclosed by the FBI does not reveal whether one of the "at least three" individuals at the Saudi Embassy in Washington was Usama Bin Ladin's half-brother, Abdullah Bin Ladin, who claimed to work there as an Administrative Officer and was, at the time, "the subject of several FBI investigations."[225]  Abdullah Bin Ladin also served at the time as the President and Director of the World Assembly of Muslim Youth, characterized by the CIA as an organization "that provides funding, logistical support and training with possible connections to the Arab Afghans network, Hamas, Algerian extremists, and Philippine militants."[226]

17

82.     Similarly, an April 2002 telephone toll record analysis of telephone numbers associated with Bayoumi reflects 141 calls "to entities of the Saudi Arabian government in the Washington, D.C. Area" and 34 calls "to entities of the Saudi Arabian government in the Los Angeles, California area" during an undisclosed time frame.[227]

83.     Bayoumi denied that Hazmi and Mihdhar initially resided in his apartment as recited on their rental application.  Bayoumi denied introducing Abdullah to the hijackers or asking Abdullah to assist them, contrary to Abdullah's statements.[228]  While he admits hosting a party in the hijackers' apartment, he claimed that a visiting Sheikh, not Hazmi and Mihdhar, was the honoree.  Bayoumi reported that it was the hijackers, not he, who brought up the idea of moving to San Diego during their encounter at the Mediterranean café:  "[T]hey stated they wanted to study English and expressed interest in going to San Diego, especially after hearing OAB's description of the weather there."[229]

### C. Clayton Morgan (a/k/a Isamu Dyson; a/k/a Caysan Bin Don)

84.     News media outlets report that after the U.S. bombed Iraq in 1998, Clayton Morgan converted to Islam and adopted two names:  Isamu Dyson and Caysan Bin Don.[230]  Sometime prior to the 9/11 attacks, Bin Don moved to Portland, Maine – the launch point for hijackers Mohammed Atta and Abdulaziz Alomari on 9/11.[231]  Three days after the 9/11 attacks, Morgan voiced his support for the atrocity to two Portland police officers during a meeting at a local mosque, telling them that he would never tip off authorities if he knew of an impending attack.[232]  On September 26, 2001, he reportedly attempted to purchase an assault rifle and a handgun from a Portland gun shop.[233]  The attempt failed when a background check showed his ex-wife had filed a temporary restraining order against him.[234]

85.     On October 15, 2001, the *New York Post* depicted his photo on the front page along with the headline "Traitor" after he told the *Post*:  "I would consider it more noble for me to go and get myself out of the country, renounce my citizenship, end up in Afghanistan, pick up a gun and fight alongside everyone else against the enemy - American soldiers."[235]  In Bin Don's estimation, he was "a Muslim-American, not an American-Muslim" and thus had "a greater obligation to them than to anybody."[236]  In the *Post* article, Bin Don also voiced his support for targeting government workers in the Pentagon, and added, "Osama bin Laden says he wasn't involved - that is enough for me."[237]

86.     When Bin Don was initially interviewed by FBI Agents concerning his interactions with Hazmi and Mihdhar, he reported in two separate interviews that his "first significant interaction" with them was at a party in their apartment in San Diego after they moved there.[238]  When confronted with the fact that his actual first meeting with Hazmi and Mihdhar occurred at the Mediterranean restaurant in Los Angeles with Bayoumi, Bin Don attributed his prior inconsistent statements to his "attention deficit disorder," and being "confused" and "hesitant to provide misleading or inaccurate information to the agents."[239]

87.     When asked to opine on whether Bayoumi could have been using Bin Don for cover or to establish an alibi for his first meeting with the hijackers, Bin Don said he did not think so, but "believes that there is a remote possibility."[240]  He noted, however, that his ex-wife told him Bayoumi was making fun of Bin Don behind his back.[241]

### D.  Mohdar Abdullah

88.     Mohdar Abdulla is a citizen of Yemen.[242]   The FBI reports that Abdullah was recognized "as a frequent visitor to the KFM [King Fahad Mosque]" and "was very close to the young militants from North Africa."[243]   "He admitted knowing of Hazmi and Mihdhar's extremist leanings and Mihdhar's involvement with the Islamic Army of Aden (a group with ties to al Qaeda) back in Yemen."[244]   He "clearly was sympathetic to those extremist views."[245]   He was detained as a material witness following the attacks.[246]   While detained, "Abdullah stated that he had hatred in his heart for the U.S. government for the way the government was doing his people.  He also stated that the U.S. brought 'this' [9/11 attacks] on themselves."[247]   On September 19, 2001, Abdullah was arrested by the FBI on charges of immigration fraud based on his claim of being a Somali asylee.[248]   He pled guilty to these charges and was deported to Yemen in 2004.[249]   While in custody in an immigration facility, he bragged to two fellow inmates that he assisted the hijackers.[250]   Fellow inmates in a California prison report that in September-October 2003, Abdullah boasted that he had known Hazmi and Mihdhar were planning a terrorist attack.[251]   Specifically, Abdullah claimed to one inmate that an unnamed individual had notified him that Hazmi and Mihdhar would be arriving in Los Angeles with plans to carry out an attack.[252]   Abdullah reportedly told the same inmate that he had driven the two Al-Qaeda operatives from Los Angeles to San Diego, but did not say when this occurred.[253]   To another inmate, Abdullah claimed he first heard about the hijackers' terrorist plans after they arrived in San Diego, when they told him they intended to fly a plane into a building and invited him to join them on the plane.[254]   Abdullah reportedly told this inmate that he found out about the 9/11 attacks three weeks in advance.[255]   According to the 9/11 Commission, this claim "appears to dove-tail with evidence that Abdullah may have received a phone call from Hazmi around that time, that he stopped making calls from his phone after August 25, 2001, and, according to his friends, he started acting strangely."[256]

89.     According to one witness, Abdullah visited the King Fahad mosque frequently and was "very close" to radical followers of Thumairy.[257]

### E.  Osama Basnan

90.     Basnan, a native Saudi,[258] entered the United States in 1980 on a guest/visitor visa which he never renewed and continued to live in the U.S. illegally until he departed the country in 2002.[259]   Like Bayoumi, he worked for Saudi Arabian Airlines early in his career for several years.[260]

91.     In 1992, while he was living in Washington, D.C., Basnan listed his employment as the Saudi Arabian Education Mission.[261]   He also has other ties to the Saudi Government.  Basnan's wife received a monthly stipend from Princess Haifa, the wife of Prince Bandar, Saudi Ambassador to the U.S.[262]   Between February 1999 and May 2002, Basnan's wife received $74,000 in checks drawn on Princess Haifa's Riggs Bank account in Washington, D.C. pursuant to a "standing order" to send a $2,000 check each month to Basnan's wife for "nursing services."[263] The FBI found no evidence that Basnan's wife was performing "nursing services."[264]   She also received one additional check in 1998 from Bandar's wife in the amount of 10,000.[265]   However, it is possible that these payments were for medical treatments received by Basnan's wife.[266]   On one occasion in 1998, Basnan himself received a check directly from

Prince Bandar's account in the amount of $15,000.[267]  His wife also received at least one check directly from Bandar.[268]

92.     Telephone toll records indicate 27 calls between Basnan's cell phone and the Saudi Embassy in Washington, D.C. from April 2000 through April 2002 as well as 8 calls between his cell phone and Princess Haifa's office from December 2000 through April 2002, and 17 calls between his home phone and the Saudi Consulate in Los Angeles in August 2002.[269]

93.     According to the FBI, "Basnan is an extremist and supporter of Usama Bin Ladin."[270] In 1992, a car belonging to Basnan was seized by the Fairfax County Sheriff's Office in Virginia.[271]  An inventory search of the vehicle revealed jihadist propaganda.[272]  Basnan claimed although he drove the vehicle, it was part of the inventory for his used car business and he had no familiarity with any of the jihadist literature found in the car.[273]  While living in northern Virginia, Basnan attended the Dar Al-Hijra Mosque where Aulaqi later began preaching in January 2001 and where Hazmi and fellow hijacker-pilot Hani Hanjour attended services.

94.     Basnan has made laudatory remarks about Bin Laden to FBI sources, speaking of Bin Ladin "as if he were a god" and referring to him as the official Khalifate and ruler of the Islamic world.[274]  Basnan advised one FBI source that there are already enough Muslims in the United States to destroy the United States and make it an Islamic state within ten to fifteen years.[275]  FBI documents reflect that Basnan knew Bin Ladin's family in Saudi Arabia and that he spoke with members of the Bin Laden family who were living in the U.S.[276]  In 1992, Basnan hosted a party for the Blind Shaykh Omar Abdel-Rahman at his house in Washington, D.C.[277]  Adbel-Rahman was arrested the next year and convicted of seditious conspiracy for engaging in an extensive plot to wage a war of terrorism against the United States.[278]  Basnan claimed that this was a case of mistaken identity, that it was a look-alike Shaykh he hired to preside at a party commemorating the seventh day after his son's birth.[279]

95.     In August 2003, Basnan positively identified photographs of Hazmi and Mihdhar as the two hijackers who lived in San Diego near Basnan and said he personally observed them attending the mosque with a mutual acquaintance.[280]  Two months later, Basnan told 9/11 Commission staffers he didn't ever remember seeing the two hijackers or telling anyone he had.[281]  The Memorandum for the Record summarizing the Commission staff's interview of Basnan indicates that the "interview failed to yield any new information of note.  Instead, in the writer's opinion, it established beyond cavil the witness' utter lack of credibility on virtually every subject."[282]

96.     An FBI Agent has advised that "phone records reveal roughly 700 calls between various phones subscribed by Bayoumi and Basnan over a one-year period (even discounting some of the calls in view of the friendship between their wives, the calls between their cell phones are most likely between the two men)."[283]  In an interview with the 9/11 Commission, Basnan claimed "not to know Bayoumi at all."[284]

97.     FBI records reflect that Basnan visited the Saudi Consulate in Los Angeles on August 30, 2002 to obtain a "pass" in lieu of a renewed Saudi passport to allow him to leave the country.[285]  Consulate officials reportedly advised him to leave the United States "as soon as possible."[286]

98.     On June 27, 2001, an employee of the Barclay Square Apartments where Basnan was living at the time inspected his apartment and informed Basnan that Basnan would have to vacate the apartment in 30 days.[287]  Basnan reportedly became angry and told the employee, "You do not know who I am . . . I am a leader of . . . ."[288]  But Basnan did not finish the sentence.[289]

## F.     Anwar Aulaqi

99.     The son of Yemeni parents, Aulaqi was born in New Mexico while his father was on a diplomatic posting.[290]  Aulaqi was a U.S. citizen.[291]  He was raised in Yemen and educated in the U.S., earning an engineering degree from Colorado State University and a master's degree in education from San Diego State University.[292]  In February 2000 (specific February dates not specified but presumably after the hijackers arrived in San Diego), he participated in the Hajj to Saudi Arabia.[293]

100.    The FBI investigated Aulaqi in 1999 and 2000 after learning he may have been contacted by a possible procurement agent for Bin Ladin.[294]  During this investigation, the FBI learned that Aulaqi knew individuals from the Holy Land Foundation and others involved in raising money for the Palestinian terrorist group Hamas.[295]  Sources alleged that Aulaqi had other extremist connections.[296]  In 2004, the available evidence was not considered strong enough to support a criminal prosecution.[297]  Seven years later, in September 2011, he was targeted and killed in a drone strike for his terrorist plotting and proselytizing as one of the leaders of Al-Qaeda in the Arabian Peninsula.[298]  Telephone toll records reflect "four calls took place between Aulaqi's phone and Bayoumi's phone on February 4, 2000, the day Bayoumi helped Hazmi and Mihdhar find an apartment and perhaps lent them his phone."[299]  Aulaqi moved to Virginia in January 2001.[300]  In April 2001, Hazmi and hijacker Hani Hanjour followed him there, where they attended his mosque.[301]  Aulaqi is suspected of helping them find an apartment in Falls Church.[302]

101.    When interviewed after the 9/11 attacks, Aulaqi said he recognized a picture of Hazmi but did not know his name.  He admitted meeting Hazmi several times but claimed he could not remember what they discussed.[303]

## G.  Saleh al-Hussayen

102.    Saudi Interior Ministry employee Saleh al-Hussayen stayed at the Marriott Residence Inn in Herndon, Virginia where Hazmi, Mihdhar, and Hanjour were staying on September 10, 2001, the eve of the attacks.[304]  Investigative journalists have alleged that Hussayen originally stayed at a different nearby hotel, but moved to the Marriott hotel on the same day the hijackers checked in.[305]  He claimed not to know the hijackers during an interview with the FBI.[306]  Hussayen feigned a seizure during the FBI interview requiring medical treatment and he fled the country after being released from the hospital.[307]

## H.  Saudi Arabia's Lack of Cooperation in Terrorism Matters

103.    After the 9/11 attacks, the U.S. Intelligence Community uniformly reported that Saudi cooperation in counterterrorism matters related to Al-Qaeda was virtually non-existent:

According to the former Chief of Alec Station, the unit in the
DCI's Counterterrorist Center established in 1996 to focus
specifically on Usama Bin Ladin, it was clear from about 1996 that
the Saudi Government would not cooperate with the United States
on matters relating to Usama Bin Ladin.  There is a May 1996
memo from the DCI's Counterterrorist Center stating that the
Saudis had stopped providing background information or other
assistance on Bin Laden because Bin Laden had "too much
information about official Saudi dealings with Islamic extremists
in the 1980s for Riyadh to deliver him into U.S. hands."  In a June
1997 memo to the DCI, Alec Station reemphasized the lack of
Saudi cooperation and stated that there was little prospect of future
cooperation regarding Bin Ladin.  The former Chief of Alec
Station thought that the U.S. Government's hope of eventually
obtaining Saudi cooperation was unrealistic because Saudi
assistance to the U.S. Government on this matter was contrary to
Saudi national interests.[308]

104.    Among several examples cited was the Saudi Government's repeated refusal to
allow FBI and CIA personnel to interview Bin Ladin's senior financer and accountant Madani al-
Tayyib, rebuffing their requests with the representation "he doesn't know anything."[309]

## IX.    Opinions Regarding the Connections of Those Assisting the Hijackers to the Government of Saudi Arabia and Terrorism

105.    My professional opinions regarding the ties between those assisting hijackers
Hazmi and Mihdhar, the Government of Saudi Arabia, and Terrorism, are as follows:

106.    The foregoing facts support my professional opinion in agreement with the 9/11
Commission that "it is unlikely that Hazmi and Mihdhar – neither of whom, in contrast to the
Hamburg group, had any prior exposure to life in the West – would have come to the United
States without arranging to receive assistance from one or more individuals informed in advance
of their arrival."[310]  This investigative conclusion is well grounded in a key element of Al-
Qaeda's logistics model – the demonstrated use of in-country facilitators in at least two other
countries – Pakistan and the United Arab Emirates ("UAE").  Al-Qaeda maintained an embedded
logistics coordinator and a safe house escort in Karachi, Pakistan who ran safe houses and found
apartments for Al-Qaeda operatives dispatched there by KSM, including some of the 9/11
hijackers.[311]  Similarly, Al-Qaeda maintained two logistics facilitators in the United Arab
Emirates – the launch point from which nine of the hijackers entered the U.S.[312]  These two UAE
Al-Qaeda operatives assisted the 9/11 hijackers in acquiring plane tickets, purchasing travelers
checks, making hotel reservations, and gaining Western cultural familiarity to enable the routine
activities of daily living such as buying food and purchasing clothing.[313]  Accordingly, the
maintenance of embedded facilitators and coordinators in the United States is consistent with Al-
Qaeda's demonstrated modus operandi of globally supporting its operatives from matriculation
through martyrdom.  This U.S.-based support network is also consistent with Bin Laden's
implementation of a business process for the 9/11 plot which left no detail to chance.[314]  He

followed a planned, repetitive sequence of steps which included having each of the 15 "muscle" hijackers met at the airport by one of the hijacker pilots already in the U.S.[315]

107.     Hijackers Hazmi and Mihdhar arrived in southern California handicapped by their youth, lack of education, cultural naiveté, inability to speak English, and dearth of aviation know-how.  Available evidence indicates that Bin Laden was insistent on their participation in the 9/11 operation while KSM considered them to be manifestly ill-prepared for the mission.  Upon their arrival in the United States, they were immediately cocooned by a support network of aiders and facilitators who cleared their path, supplying every physical and spiritual need to advance their mission.  Such help included:  translation services, acquiring drivers' licenses, introduction to the San Diego Muslim community, renting an apartment in San Diego, opening a bank account, establishing telephone service, obtaining medical prescriptions, purchasing a car, obtaining car maintenance and repair services, securing car insurance, locating and enrolling in an English language school, locating and enrolling in a flight school, and providing spiritual counsel and religious guidance.  It also likely included transportation from the Los Angeles airport to their living quarters in Los Angeles, providing those living quarters, introduction to the Los Angeles Muslim community surrounding the King Fahad mosque, and transportation in and around Los Angeles upon their arrival.  In my professional opinion, it is inconceivable that this support network had its genesis in a rich tapestry of propitious coincidence.  To the contrary, the network of support which rallied to the aid of Hazmi and Mihdhar immediately upon their arrival in the United States exhibits the clear earmarks of a carefully arranged and coordinated support network organized to receive the future hijackers upon their arrival, and orchestrated by individuals employed by and associated with the extremist religious components of the Saudi government.  This highly matrixed cadre of helpers has many connections to the Government of Saudi Arabia.  All of its members appear to be adherents to a violent extremist view of Islam promoted by the Government of Saudi Arabia, through the Ministry of Islamic Affairs, that endorses jihadism as a necessary means to spread Wahhabi Islam, signifying ideological alignment with Al-Qaeda.

### A.   Fahad al Thumairy

108.     In my professional opinion, the hijackers' first contact with their support network occurred in Los Angeles upon their arrival on January 15, 2000.  An extensive investigative canvass of area hotels and motels produced no evidence that they stayed in such temporary lodging.  Moreover, they reportedly told Bayoumi and Bin Don that they were staying in an apartment nearby.  Although they had sufficient cash to rent an apartment, as their experience in San Diego demonstrates, it is unlikely that they could have found and rented an apartment on their own given their lack of a bank account, non-existent credit history, and poor English skills.  These and other factors all support my initial conclusion that they had assistance in locating and securing the housing they occupied in Los Angeles prior to relocating to San Diego.

109.     Based on all of the available evidence, it is my further professional opinion, to a reasonable degree of certainty, that Saudi diplomat and extremist cleric Fahad al Thumairy facilitated the hijackers' needs during their first days in Los Angeles, and then directed Omar al Bayoumi to assist Hazmi and Mihdhar in moving to San Diego, in accordance with KSM's plan.  The evidence indicates that Thumairy took these actions with an awareness that Hazmi and Mihdhar were jihadists.  According to recently released reports of an FBI investigation which

was ongoing through at least March 2015, Thumairy is the main subject of an investigation into individuals in California who are known to have provided substantial assistance to Hazmi and Mihdhar prior to the attacks.  Of particular note, the FBI's continuing investigation has concluded that Thumairy "immediately assigned an individual to take care of them [Hazmi and Mihdhar] during their time in the Los Angeles area."[316]  Moreover, the FBI reports that it has unearthed evidence that another individual (whose name is redacted from the report) "tasked al-Thumairy and al-Bayoumi with assisting the hijackers."[317]  This FBI finding that Thumairy was "tasked" to provide this assistance precludes alternative speculation that Thumairy may have provided such help of his own volition or for some innocent reason.  Inherent in such tasking would have been an express or implied articulation of Hazmi's and Mihdhar's importance for the purpose of establishing the worthiness of the two young and seemingly pedestrian Saudi males to receive such high-level assistance.  Given Thumairy's adamance that assisting run-of-the-mill Saudi tourists was beneath him, it follows that the taskings provided to Thumairy were accompanied by some explanation of Hazmi's and Mihdhar's distinguishing significance.  The publicly available evidence adduced to date in the case supports these FBI findings and demonstrates that Thumairy had the means, motive, and opportunity to assist the hijackers and almost certainly did so.

110.    Thumairy had the demonstrated propensity to help new Saudi arrivals to the U.S. as evidenced by taxi driver Benomrane's report that Thumairy once tasked him to assist two non-English speaking Saudis who had recently arrived in Los Angeles.  In addition, Thumairy reluctantly admitted to the 9/11 Commission that in July 2001 he rented an apartment in a complex where he was staying for two Saudis.   Both instances of assistance were rendered in his official capacity as a consulate employee.

111.    Thumairy was ideologically aligned with Al-Qaeda's extreme fundamentalist views of Islam which predisposed him to assist the hijackers.  The 9/11 Commission found that Thumairy "was reputed to be an Islamic fundamentalist and a strict adherent to orthodox Wahhabi doctrine"[318] who "injected non-Islamic themes into his guidance/prayers at the King Fahad mosque"[319] and reportedly led "an extremist faction" at the mosque that was "supportive of the events of September 11, 2001."[320]  The 9/11 Commission further found that Thumairy "had a network of contacts in other cities in the United States"[321] which suggests he possessed and exercised the liaison skills required to establish and maintain operational relationships outside the geographical confines of Los Angeles.  This is corroborated by Bayoumi's reported sighting of Thumairy in San Diego at an Eid festival for Saudi students which was held at the Saudi Student Club's house in San Diego.[322]  Further, by virtue of his cleric status and fundamentalist views, he was ideally suited to initially provide the same spiritual encouragement and religious counsel to Hazmi and Mihdhar that Anwar Aulaqi subsequently provided to them in San Diego.

112.    Wahhabism is Saudi Arabia's dominant faith and as an orthodox Wahhabist in the government's Ministry of Islamic Affairs, Thumairy necessarily subscribed to the teachings of Wahhabism founder and prophet Abd al-Wahhab.  Wahhab taught that those who do not follow his puritanical brand of Islam "should all be killed, their wives and daughters violated, and their possessions confiscated."[323]  As a consequence, supporting militant Islamic extremism by helping the hijackers in their jihadist quest remained rationally within the ambit of his government-funded duty to export the ultra-conservative theology of Wahhabism.  Accordingly,

it is my professional opinion that Thumairy was acting in his official capacity by assisting the hijackers upon their arrival in the U.S.

113.    Thumairy's denials that he knew Bayoumi and Abdullah, who substantially assisted the hijackers, are dubious.  His disavowals are belied by telephone toll records, eyewitness accounts which place the men together, and the contrary statements of Bayoumi and Abdullah which affirm such contacts between Thumairy and themselves.

114.    Lastly, Thumairy had unfettered opportunity to help the hijackers based on the physical proximity of the Saudi Consulate where he worked and the King Fahad Mosque where he served as an Imam.  The King Fahad Mosque, where the hijackers were seen and are known to have formed relationships with the congregants, was 7.6 miles from Los Angeles International Airport where they entered the U.S.[324]  The Saudi Consulate, where Thumairy worked, was located 3.2 miles from the mosque.[325]  By his own admission, Thumairy spent 20% of his time at the mosque in a liaison capacity, thus imbuing all his visits there with the appearance of official business while supplying a venue for meetings with others under the guise of religious counseling.

### B.  Omar al-Bayoumi

115.    It is my professional opinion, based on a reasonable degree of certainty, that Bayoumi was an undisclosed Saudi Government agent and the available evidence supports the investigative conclusion that Bayoumi acted with an awareness that Hazmi and Mihdhar were jihadists.

116.    Bayoumi appears at the epicenter of the hijackers' San Diego network.   His actions and behavior are consistent with those of a covert Saudi operative functioning under non-official cover as a "student."  The pretextual nature of this cover is indicated by Bayoumi's advanced age – 42 at the time – well beyond that of the typical Saudi co-ed studying in America.  Moreover, he did not attend classes.  This would have freed him to conduct clandestine work for the government.  Despite his "student" status, he contacted Saudi Government establishments over 100 times between January 2000 and May 2000, coinciding with the hijackers' arrival in San Diego.  While in San Diego he was paid by what appears to be a "cut-out."  The Saudi Government compelled its contractor Dallah Avco to pay Bayoumi a salary and stipend for living allowances despite the fact that he performed no services for the company.  Most importantly, those government payments fluctuated dramatically in correlation with the hijackers' arrival and his departure from San Diego.  His living allowances were increased one month after Hazmi and Mihdhar relocated to San Diego, jumping from $465 per month to $3,700 per month and stayed at that level until December 2000 when Hazmi moved to Arizona with Hanjour.  Payments to him then decreased to $3,200 until Bayoumi left the U.S. in August 2001.  In addition, Bayoumi's wife attempted to deposit three Saudi government checks drawn on the account of wife of the Saudi Ambassador to the U.S. which had been made payable to someone else but were endorsed over to Bayoumi's wife.

117.    Bayoumi is also known to have made frequent trips to the Saudi Embassy in Washington D.C. where Bin Laden's nephew was employed as an Administrative Officer and

concurrently served as president of the World Assembly of Muslim Youth, a known terrorism fundraising entity.

118.   In light of his extensive contacts with and knowledge of the hijackers, his departure from the U.S. about a month before the attacks is consistent with a preemptory extraction by the Saudi Government to preclude his arrest and detention as a material witness.

119.   The alleged "chance" or "happenstance" first meeting between Bayoumi and the hijackers exhibits indicia of intelligence service tradecraft consistent with a state-sponsored clandestine operation.  Creating the impression that their first meeting was the result of chance and spontaneity would have been critically important to countering any later suspicion that this initial meeting was planned or premeditated.  There are indications, however, that it was. Bayoumi stayed at a hotel close to the Saudi Consulate and King Fahad mosque in Los Angeles six days before the hijackers arrived there.  He was accompanied by two unknown individuals.  It is plausible that his checking into and out of another hotel the same night provided the opportunity for a covert meeting with another Saudi official/employee or Al-Qaeda operative who was part of the hijackers' support network.

120.   Bayoumi's first meeting with the hijackers on February 1, 2000 also exhibits indicia of a pre-arranged covert operation.  In extending an invitation to Caysan Bin Don to join him on his trip to the Los Angeles consulate to renew his visa, Bayoumi specifically mentioned that he knew a good halal restaurant near the consulate and indicated they would eat there.  This demonstrates that Bayoumi was contemplating the restaurant as an intended destination *before* they embarked on their trip.  Eating at this particular restaurant was not an afterthought subsequent to their consulate visit.  Bayoumi's invitation to Bin Don to be his traveling companion is consistent with the use of tradecraft to corroborate an innocuous pretext for the trip and the coincidental nature of the meeting.

121.   Further indicating the pretextual nature of the trip is Bayoumi's closed door meeting at the consulate with someone with whom Bayoumi was familiar, but whose true identity remains unknown.  How long the meeting lasted is unclear - up to 30 minutes according to Bin Don and "approximately one hour," according to the U.S. Department of Justice Office of the Inspector General.[326]  The renewal of Bayoumi's visa/passport and supplying him with religious books were both routine matters, lacking in the need for confidentiality or privacy. This closed-door meeting between Bayoumi and unidentified consulate employees is consistent, however, with an intelligence operative conferring with other members of the Saudi intelligence service working under official cover within the consulate.

122.   Further imbuing these events with the earmarks of a covert operation is recently disclosed FBI reporting from 2012.  That reporting, which has been declassified but still contains redactions, states that an undisclosed person "who was known to have extremist views" met with Bayoumi on the same day as Bayoumi's alleged chance meeting with Hazmi and Mihdhar.  The reporting also states that an identified but undisclosed individual tasked Thumairy and Bayoumi with assisting the hijackers.  In light of Thumairy's status as a high-level Saudi diplomat in charge of all religious affairs, it is logical that such tasking came from someone more highly placed in the Saudi Government than Thumairy.

123.     Further linking the hijackers to Saudi Government is their representation to the Administrator of the ICSD that they were clerks employed by the Saudi Arabian government. They made this representation upon their initial arrival in San Diego when they showed up at the mosque looking for Bayoumi.

124.     There is additional evidence that supports my professional opinion that the aid provided to the hijackers flowed through an orchestrated Saudi Government operation and that Bayoumi knew Hazmi and Mihdhar were jihadists:  (1) Bayoumi's expressed sense of urgency to get Hazmi and Mihdhar settled in his apartment complex.  The reason for his desire to finish the leasing process quickly is not apparent from investigative reports and raises the inference that Bayoumi understood the significance of the hijacker's presence and had been counseled on the importance of their rapid integration into the local community.  (2) Bayoumi's use of someone else's name as a reference on the hijacker's rental application.  This deception would have served as a subterfuge to attenuate Bayoumi's (and thus the Saudi government's) relationship with the hijackers in the written records of the apartment complex.  (3) In co-signing the hijacker's lease as a "guarantor," Bayoumi exposed himself to significant potential financial liability – agreeing to pay the hijackers' rent if they did not.  Despite Bayoumi's reputation for munificence, his willingness to assume financial liability for the housing costs of two students he had just met who did not speak English and were unemployed is not objectively reasonable, unless Bayoumi understood that the risk would be covered by another party, such as the Saudi Government, in the event the hijackers defaulted.

125.     While no one factor is singularly dispositive, the totality of circumstances surrounding Bayoumi, and the objectively reasonable inferences drawn from them, fully warrant two investigative findings:  (1) that Bayoumi was aware Hazmi and Mihdhar were jihadists on a mission in the U.S.; and (2) that he supported them in his official capacity.  Those circumstances can be summarized as follows:  Bayoumi's extensive telephone contacts with Saudi Government establishments coinciding with the relocation of Hazmi and Mihdhar to San Diego; the jump in his government-funded salary commensurate with the hijackers' arrival in San Diego; his selection of a fundamental extremist (Caysan Bin Don) to accompany him to his first meeting with the hijackers; his indicated use of a surveillance detection route on the way to the restaurant; his indicated use of tradecraft while at the restaurant; his acknowledged sense of exigency in getting the hijackers settled; his assignment of another fundamental extremist (Modhar Abdullah) to acclimate the two; his assumption of financial liability for any default on their rent; his use of a surrogate reference on their apartment rental application; the reflection on the rental application that Hazmi and Mihdhar lived with him upon their arrival in San Diego; his lending of his cell phone to them; his contacts with Anwar Aulaqi on the day they arrived; his identification of fundamentalist Imam Fahad al-Thumairy as his "religious advisor;" his own writings to young Muslims that provide guidance which can be interpreted as jihadist; his FBI-identified association with terrorist elements, including an individual linked with Al-Qaeda whose identity has not been disclosed; his exit from the United States one month before the September 11 attacks; and the FBI's recent investigative determination that a known but undisclosed individual tasked Bayoumi to assist the hijackers.

### C.   Clayton Morgan (a/k/a Isamu Dyson; a/k/a Caysan Bin Don)

126.   In my professional opinion, it is implausible that Bin Don functioned as a cooptee or asset of Bayoumi.  As a U.S. citizen and recent convert to Islam, it unlikely that Bayoumi would have trusted Bin Don sufficiently to enlist his aid in helping the hijackers.  Moreover, based on the available record, there is no evidence that Bin Don did provide any help to Hazmi and Mihdhar, although he did admit to being in their apartment 10-20 times.  Instead, the evidence indicates that Bayoumi invited Bin Don on his trip to Los Angeles on February 1, 2000 in an effort to establish a cover story for his meetings at the Consulate and with the hijackers.

### D.   Mohdar Abdullah

127.   In my professional opinion, it is likely that Mohdar Abdullah was a cooptee or asset of Bayoumi.  Bayoumi reportedly tasked Abdullah to acclimate the hijackers to San Diego and he did so without question or objection.  Abdullah was himself an extremist, making him an ideal candidate for recruitment.

### E.   Osama Basnan

128.   It is my professional opinion that Osama Basnan's actions and behavior are consistent with those an intelligence service cooptee or asset of the Saudi Government.  My opinion is based on the following:

129.   In an excited utterance made in anger, Basnan indicated that he held a covert position of leadership in the Muslim community but did not identify his role, cutting himself off before completing the sentence, "I am the leader of . . . ."  Basnan has former ties to the Saudi Government.  He previously worked for Saudi Arabian Airlines and the Saudi Arabian Education Mission in Washington, D.C.  He made 27 calls to the Saudi Embassy during a two-year period from 2000-2002; the specific purpose of those calls is not known, but they evidence contact with an establishment where intelligence officers are posted.  Basnan once received a lump sum payment from Saudi Ambassador Bandar's account, and his wife regularly received a $2,000 check each month from Ambassador Bandar's wife, purportedly for nursing services.  There is nothing in the available public record to indicate that Basnan's wife performed or received nursing services.

130.   Basnan reportedly bragged to a FBI informant that he did more to help the hijackers than Bayoumi did.  What help or assistance he rendered, if any, is not known.  The prolific nature of the "roughly 700 calls" between phones subscribed to by Basnan and Bayoumi over a one-year period are consistent with a working relationship between the two men.  Basnan's relationship with Bayoumi would have afforded Basnan the opportunity to assist the hijackers as he bragged.  Basnan claimed, however, not to know Bayoumi at all, which is contradicted by Bayoumi and telephone toll records.  This false statement indicates an attempt by Basnan to distance himself from Bayoumi in the aftermath of 9/11 and to deceive investigators.  In 2002, consulate officials reportedly advised Basnan to leave the United States as soon as possible.

### F.  Anwar Aulaqi

131.    Based on Aulaqi's previous terrorism ties, in my professional opinion, it is likely that KSM sent Hazmi and Mihdhar to San Diego, at least in part, because Aulaqi was there at the Al-Rabit mosque to provide spiritual leadership, guidance, and direction while the two completed their English language and flight training.  It is also plausible that immediately after their arrival, Aulaqi received in-person taskings directly from individuals in Saudi Arabia.  The FBI reports that Aulaqi traveled to Saudi Arabia in February 2000 to attend the Hajj pilgrimage. This trip would have provided a pretext for meeting personally with operatives right after Hazmi and Mihdhar arrived in San Diego.  In my professional opinion, no evidence has been adduced from the available public record to indicate that Aulaqi was a covert officer, cooptee, or asset of the Saudi Government.

### G.  Saleh al-Hussayen

132.    In my professional opinion, it is plausible that Saudi ministry employee Hussayen provided last minute advice and encouragement to hijackers Hazmi, Mihdhar, and Hanjour as the four stayed in the same Marriott Residence Inn Hotel in Herndon, Virginia on September 10, 2001.  While Hussayen's coincidental presence at the hijackers' hotel in Herndon could be attributed to the large number of Islamic charities in Northern Virginia and Hussayen's official responsibility to confer with them, his reported change of Herndon hotels from the one he was staying at to the one occupied by the hijackers on the eve of 9/11 lacks any colorable indication of an innocuous chance occurrence.  This is particularly so given Hussayen's reluctance and subsequent refusal to speak to FBI Agents, going so far as to feign a seizure requiring transport to the hospital.  The employment of this ruse and his subsequent refusal to be interviewed provide a substantial objective basis to doubt the veracity of his denials that he had no contact with the hijackers.

133.    Based on the available evidence detailed in this report, the assistance provided to Hazmi and Mihdhar in southern California has the earmarks of a highly coordinated support network, orchestrated by Fahad al Thumairy, Omar al Bayoumi and a superior who tasked them to assist the hijackers.  In my professional opinion, this support was essential to the success of the 9/11 attacks because it allowed the hijackers, who were "ill-prepared" for their mission in the United States, to live and function effectively in the U.S. and undertake preparations vital to the 9/11 operation.

I certify under penalty of perjury that the foregoing is true and correct.

_David Mitchell_

David Mitchell

Executed this _7th_ day of November, 2017

[1] 11 September 2001 Hijackers, https://www.cia.gov/news-information/speeches-testimony/2002/DCI_18_June_testimony_new.pdf.

[2] 11 September 2001 Hijackers, https://www.cia.gov/news-information/speeches-testimony/2002/DCI_18_June_testimony_new.pdf.

[3] The 9/11 Commission Report relates that Hazmi and Mihdhar traveled together to fight in Bosnia in 1995 when they would have been approximately 19 and 20 years old, respectively. 9/11 Commission Final Report at 155.

[4] Substitution for the Testimony of Khalid Sheikh Mohammed, Defendant's Trial Exhibit #941 at page 1, *United States v. Moussaoui,* No. 01-455-A (E.D. Va. 2006), http://www.vaed.uscourts.gov/notablecases/moussaoui/exhibits/defense/941.pdf.

[5] According to the U.S. Government, the substituted testimony of Khalid Sheikh Mohammed which was received in evidence at the 2006 criminal trial of Zacarias Moussaoui has the same indicia of truthfulness and credibility as if it were taken under oath in a courtroom and subject to penalty of perjury.  Substitution for the Testimony of Khalid Sheikh Mohammed, Defendant's Trial Exhibit #941 at page 1-2, *United States v. Moussaoui,* No. 01-455-A (E.D. Va. 2006), http://www.vaed.uscourts.gov/notablecases/moussaoui/exhibits/defense/941.pdf.

[6] Substitution for the Testimony of Khalid Sheikh Mohammed, Defendant's Trial Exhibit #941 at page 6, *United States v. Moussaoui,* No. 01-455-A (E.D. Va. 2006), http://www.vaed.uscourts.gov/notablecases/moussaoui/exhibits/defense/941.pdf.

[7] 11 September 2001 Hijackers, https://www.cia.gov/news-information/speeches-testimony/2002/DCI_18_June_testimony_new.pdf.

[8] Substitution for the Testimony of Khalid Sheikh Mohammed, Defendant's Trial Exhibit #941 at page 15, *United States v. Moussaoui,* No. 01-455-A (E.D. Va. 2006), http://www.vaed.uscourts.gov/notablecases/moussaoui/exhibits/defense/941.pdf.

[9] Substitution for the Testimony of Khalid Sheikh Mohammed, Defendant's Trial Exhibit #941 at page 17-18, *United States v. Moussaoui,* No. 01-455-A (E.D. Va. 2006), http://www.vaed.uscourts.gov/notablecases/moussaoui/exhibits/defense/941.pdf.

[10] Substitution for the Testimony of Khalid Sheikh Mohammed, Defendant's Trial Exhibit #941 at page 11-12, *United States v. Moussaoui,* No. 01-455-A (E.D. Va. 2006), http://www.vaed.uscourts.gov/notablecases/moussaoui/exhibits/defense/941.pdf.

[11] Substitution for the Testimony of Khalid Sheikh Mohammed, Defendant's Trial Exhibit #941 at page 18, *United States v. Moussaoui,* No. 01-455-A (E.D. Va. 2006), http://www.vaed.uscourts.gov/notablecases/moussaoui/exhibits/defense/941.pdf.

[12] Substitution for the Testimony of Khalid Sheikh Mohammed, Defendant's Trial Exhibit #941 at page 9, *United States v. Moussaoui,* No. 01-455-A (E.D. Va. 2006), http://www.vaed.uscourts.gov/notablecases/moussaoui/exhibits/defense/941.pdf.

[13] Substitution for the Testimony of Khalid Sheikh Mohammed, Defendant's Trial Exhibit #941 at page 17, *United States v. Moussaoui,* No. 01-455-A (E.D. Va. 2006), http://www.vaed.uscourts.gov/notablecases/moussaoui/exhibits/defense/941.pdf.

[14] Substitution for the Testimony of Khalid Sheikh Mohammed, Defendant's Trial Exhibit #941 at page 17, *United States v. Moussaoui,* No. 01-455-A (E.D. Va. 2006), http://www.vaed.uscourts.gov/notablecases/moussaoui/exhibits/defense/941.pdf.

[15] Substitution for the Testimony of Khalid Sheikh Mohammed, Defendant's Trial Exhibit #941 at page 16, *United States v. Moussaoui,* No. 01-455-A (E.D. Va. 2006),

http://www.vaed.uscourts.gov/notablecases/moussaoui/exhibits/defense/941.pdf.

[16] Substitution for the Testimony of Khalid Sheikh Mohammed, Defendant's Trial Exhibit #941 at pdf 18, *United States v. Moussaoui,* No. 01-455-A (E.D. Va. 2006). http://www.vaed.uscourts.gov/notablecases/moussaoui/exhibits/defense/941.pdf.

[17] Substitution for the Testimony of Khalid Sheikh Mohammed, Defendant's Trial Exhibit #941 at pdf 8, *United States v. Moussaoui,* No. 01-455-A (E.D. Va. 2006) (emphasis added), http://www.vaed.uscourts.gov/notablecases/moussaoui/exhibits/defense/941.pdf.

[18] Substitution for the Testimony of Khalid Sheikh Mohammed, Defendant's Trial Exhibit #941 at page 9, *United States v. Moussaoui,* No. 01-455-A (E.D. Va. 2006), http://www.vaed.uscourts.gov/notablecases/moussaoui/exhibits/defense/941.pdf.

[19] Substitution for the Testimony of Khalid Sheikh Mohammed, Defendant's Trial Exhibit #941 at page 15, *United States v. Moussaoui,* No. 01-455-A (E.D. Va. 2006), http://www.vaed.uscourts.gov/notablecases/moussaoui/exhibits/defense/941.pdf.

[20] Substitution for the Testimony of Khalid Sheikh Mohammed, Defendant's Trial Exhibit #941 at page 16, *United States v. Moussaoui,* No. 01-455-A (E.D. Va. 2006), http://www.vaed.uscourts.gov/notablecases/moussaoui/exhibits/defense/941.pdf.

[21] Substitution for the Testimony of Khalid Sheikh Mohammed, Defendant's Trial Exhibit #941 at page 19, *United States v. Moussaoui,* No. 01-455-A (E.D. Va. 2006), http://www.vaed.uscourts.gov/notablecases/moussaoui/exhibits/defense/941.pdf.

[22] Final Report of the National Commission on Terrorist Attacks Upon the United States ("9/11 Commission Final Report") at 215 (2004) (endnote references omitted).

[23] Amita Sharma, Islamic Cleric Raised Red Flags While in San Diego, http://www.kpbs.org/news/2010/jun/10/islamic-cleric-raised-red-flags-while-san-diego/.

[24] Washington Post, Legal memo backing drone strike that killed American Anwar al-Awlaki is released (June 23, 2014), https://www.washingtonpost.com/world/national-security/legal-memo-backing-drone-strike-is-released/2014/06/23/1f48dd16-faec-11e3-8176-f2c941cf35f1_story.html?utm_term=.59e5adc71fe6.

[25] Government's Sentencing Memorandum, Supplemental Factual Appendix 13 (ECF Doc. 130), *United States v. Abdulmutallab*, No. 2:10-cr-2005 (E.D. Mich. 2005), http://www.washingtonpost.com/wp-srv/world/documents/umar-farouk-abdul-mutallab-sentence-brief.pdf?tid=a_inl; *see also* FBI FD-302 of Umar Farouk Abdulmutallab (Dec. 25, 2009) (part of FBI Docs – Aulaqi and Abdulmutallab).

[26] Duncan Gardham, British Airways Bomber Jailed for 30 Years, http://www.telegraph.co.uk/news/uknews/terrorism-in-the-uk/8391162/British-Airways-bomber-jailed-for-30-years.html.

[27] David Johnson and Scott Shane, U.S. Knew of Suspect's Tie to Radical Cleric, http://www.nytimes.com/2009/11/10/us/10inquire.html.

[28] http://www.telegraph.co.uk/news/uknews/terrorism-in-the-uk/8102883/Al-Qaeda-plot-flight-ban-on-freight-from-Somalia.html.

[29] Scott Shane, The Lessons of Anwar al-Aulaqi, https://www.nytimes.com/2015/08/30/magazine/the-lessons-of-anwar-al-Aulaqi.html.

[30] Scott Shane, The Lessons of Anwar al-Aulaqi, https://www.nytimes.com/2015/08/30/magazine/the-lessons-of-anwar-al-Aulaqi.html.

[31] Scott Shane, The Lessons of Anwar al-Aulaqi, https://www.nytimes.com/2015/08/30/magazine/the-lessons-of-anwar-al-Aulaqi.html.

[32] Final Report of the National Commission on Terrorist Attacks Upon the United States ("9/11

Commission Final Report") at 216 (2004).

[33] Final Report of the National Commission on Terrorist Attacks Upon the United States ("9/11 Commission Final Report") at 216 (2004).

[34] Final Report of the National Commission on Terrorist Attacks Upon the United States ("9/11 Commission Final Report") at 216, n.8 (2004).

[35] Final Report of the National Commission on Terrorist Attacks Upon the United States ("9/11 Commission Final Report") at 216, n.8 (2004).

[36] Final Report of the National Commission on Terrorist Attacks Upon the United States ("9/11 Commission Final Report") at 216 (2004).

[37] https://kingfahadmosque.org/contacts/about-us/.

[38] https://kingfahadmosque.org/

[39] https://kingfahadmosque.org/

[40] 9/11 Commission Memorandum for the Record, Interview of Fahad al-Thumairy at 7 (Feb. 23, 2004).

[41] *See, e.g.*, ISIS Magazine *Dabiq*, Issue 7 at 21:  "Ibn Taymiyyah said:  'The basis of religion is a guiding book and supporting sword.'"  https://azelin.files.wordpress.com/2015/02/the-islamic-state-e2809cdc481biq-magazine-722.pdf.

[42] S. Select Comm. on Intelligence and H.R. Permanent Select Comm. on Intelligence, Joint Inquiry into Intelligence Community Activities Before and After the Terrorist Attacks of September 11, 2001 at 417 (2002).

[43] S. Select Comm. on Intelligence and H.R. Permanent Select Comm. on Intelligence, Joint Inquiry into Intelligence Community Activities Before and After the Terrorist Attacks of September 11, 2001 at 418 (2002).

[44] S. Select Comm. on Intelligence and H.R. Permanent Select Comm. on Intelligence, Joint Inquiry into Intelligence Community Activities Before and After the Terrorist Attacks of September 11, 2001 at 418, 434 (2002).

[45] Final Report of the National Commission on Terrorist Attacks Upon the United States ("9/11 Commission Final Report") at 216 (2004).

[46] Final Report of the National Commission on Terrorist Attacks Upon the United States ("9/11 Commission Final Report") at 216 (2004).

[47] Final Report of the National Commission on Terrorist Attacks Upon the United States ("9/11 Commission Final Report") at 216 (2004); S. Select Comm. on Intelligence and H.R. Permanent Select Comm. on Intelligence, Joint Inquiry into Intelligence Community Activities Before and After the Terrorist Attacks of September 11, 2001 at 430 (2002); *see also* FBI Electronic Communication (May 18, 2004) from Atlanta to Counterterrorism, Los Angeles, and San Diego Re:  Mihdar Mohammad Al-Mihdar Zaid at 2 (FOIA request production published by INTELWIRE); FBI Electronic Communication from Los Angeles to Counterterrorism and San Diego (January 8, 2002) Re:  Ziyat Kharfan at 2 (FOIA request production published by INTELWIRE); FBI FD-302 Re:  Canvass of Various Hotels on Sepulveda Boulevard (Jan. 15, 2002) (3 Versions) (FOIA request production published by INTELWIRE).

[48] FBI FD-302 Re:  Canvass of Various Hotels Located on Sepulveda Blvd. (Jan. 15, 2002) at 2 (3 Versions) (FOIA request production published by INTELWIRE).

[49] Final Report of the National Commission on Terrorist Attacks Upon the United States ("9/11 Commission Final Report") at 515 n.14 (2004).

[50] FBI FD-302 of Qualid Benomrane (Mar. 6, 2002) (File # 265A-LA-280901) at 1 (FOIA request production published by INTELWIRE).

[51] FBI FD-302 of Qualid Benomrane (Mar. 6, 2002) (File # 265A-LA-280901) at 4 (FOIA request production published by INTELWIRE).

[52] FBI FD-302 of Qualid Benomrane (Mar. 6, 2002) (File # 265A-LA-280901) at 3 (FOIA request production published by INTELWIRE).

[53] FBI FD-302 of Qualid Benomrane (Mar. 6, 2002) (File # 265A-LA-280901) at 1 (FOIA request production published by INTELWIRE).

[54] FBI FD-302 of Qualid Benomrane (Mar. 6, 2002) (File # 265A-LA-280901) at 1 (FOIA request production published by INTELWIRE); Updates and Initiatives (as of 5 October 2012) (ECF Document 3463-4 at 4); FBI Electronic Communication from Los Angeles to Counterterrorism, "Fahad Althumairy (NON-USPER), IT – Other (UBL/AL-Qaeda)" at 4 (Oct. 25, 2002) (FOIA request production published by INTELWIRE).

[55] Updates and Initiatives (as of 5 October 2012) (ECF Document 3463-4 at 4).

[56] Final Report of the National Commission on Terrorist Attacks Upon the United States ("9/11 Commission Final Report") at 515 (2004).

[57] FBI FD-302 of Qualid Benomrane (Mar. 6, 2002) (File # 265A-LA-280901) at 3 (FOIA request production published by INTELWIRE).

[58] FBI FD-302 of Qualid Benomrane (Mar. 6, 2002) (File # 265A-LA-280901) at 1 (FOIA request production published by INTELWIRE).

[59] FBI FD-302 of Qualid Benomrane (Mar. 6, 2002) (File # 265A-LA-280901) at 3-4 (FOIA request production published by INTELWIRE); *see also* FBI Electronic Communication from Los Angeles to Counterterrorism, "Fahad Althumairy (NON-USPER), IT – Other (UBL/AL-Qaeda)" at 4 (Oct. 25, 2002) (FOIA request production published by INTELWIRE).

[60] FBI FD-302 of Qualid Benomrane (Mar. 6, 2002) (File # 265A-LA-280901) at 4 (FOIA request production published by INTELWIRE).

[61] FBI Electronic Communication from Los Angeles to Counterterrorism, "Fahad Althumairy (NON-USPER), IT – Other (UBL/AL-Qaeda)" at 4 (Oct. 25, 2002) (FOIA request production published by INTELWIRE); *see also* FBI FD-302 of Qualid Benomrane (Mar. 6, 2002) (File # 265A-LA-280901) at 4 (FOIA request production published by INTELWIRE).

[62] FBI Electronic Communication from Los Angeles to Counterterrorism, "Fahad Althumairy (NON-USPER), IT – Other (UBL/AL-Qaeda)" at 4 (Oct. 25, 2002) (FOIA request production published by INTELWIRE); *see also* FBI FD-302 of Qualid Benomrane (Mar. 6, 2002) (File # 265A-LA-280901) at 4 (FOIA request production published by INTELWIRE).

[63] FBI Electronic Communication from Los Angeles to Counterterrorism, "Fahad Althumairy (NON-USPER), IT – Other (UBL/AL-Qaeda)" at 4 (Oct. 25, 2002) (FOIA request production published by INTELWIRE); *see also* FBI FD-302 of Qualid Benomrane (Mar. 6, 2002) (File # 265A-LA-280901) at 4 (FOIA request production published by INTELWIRE).

[64] FBI Electronic Communication from Los Angeles to Counterterrorism, "Fahad Althumairy (NON-USPER), IT – Other (UBL/AL-Qaeda)" at 4 (Oct. 25, 2002) (FOIA request production published by INTELWIRE); *see also* FBI FD-302 of Qualid Benomrane (Mar. 6, 2002) (File # 265A-LA-280901) at 4 (FOIA request production published by INTELWIRE).

[65] Final Report of the National Commission on Terrorist Attacks Upon the United States ("9/11 Commission Final Report") at 515 n.14 (2004).

[66] FBI Electronic Communication from Los Angeles to Counterterrorism, "Fahad Althumairy (NON-USPER), IT – Other (UBL/AL-Qaeda)" at 5 (Oct. 25, 2002) (FOIA request production published by INTELWIRE).

[67] FBI Electronic Communication from Los Angeles to Counterterrorism, "Fahad Althumairy

(NON-USPER), IT – Other (UBL/AL-Qaeda)" at 5 (Oct. 25, 2002) (FOIA request production published by INTELWIRE).

[68] Updates and Initiatives (as of 5 October 2012).  ECF Document 3463-4 at 4.

[69] FBI FD-302 of Canvass of Various Hotels on Sepulveda Blvd (Jan. 11, 2001 [sic]) at 2 (FOIA request production published by INTELWIRE) (3 versions exist).

[70] FBI FD-302 of Canvass of Various Hotels on Sepulveda Blvd (Jan. 11, 2001 [sic]) at 2 (FOIA request production published by INTELWIRE) (3 versions exist).

[71] FBI FD-302 of Canvass of Various Hotels on Sepulveda Blvd (Jan. 11, 2001 [sic]) at 2 (FOIA request production published by INTELWIRE) (3 versions exist).

[72] Final Report of the National Commission on Terrorist Attacks Upon the United States ("9/11 Commission Final Report") at 217 (2004).

[73] Final Report of the National Commission on Terrorist Attacks Upon the United States ("9/11 Commission Final Report") at 435 (2004).

[74] FBI FD-302 of Caysan Bin Don at 1 (Oct. 8, 2001) (FOIA request production published by INTELWIRE); It should be noted that Bayoumi says this trip was to apply for new Saudi passports for his family (not visas).  9/11 Commission Memorandum for the Record, Interview of Omar Al-Bayoumi at 3 (Oct. 16-17, 2003).

[75] FBI FD-302 of Caysan Bin Don at 1 (Oct. 8, 2001) (FOIA request production published by INTELWIRE).

[76] FBI FD-302 of Caysan Bin Don at 1 (Oct. 8, 2001) (FOIA request production published by INTELWIRE).

[77] 9/11 Commission Memorandum for the Record, Interview of Omar Al-Bayoumi at 3 (Oct. 16-17, 2003).

[78] FBI FD-302 of Caysan Bin Don at 1 (Oct. 8, 2001) (FOIA request production published by INTELWIRE).

[79] FBI FD-302 of Caysan Bin Don at 1 (Oct. 8, 2001) (FOIA request production published by INTELWIRE).

[80] 9/11 Comm. Memorandum for the Record, Interview of Caysan Bin Don at 2 (Apr. 20, 2004).

[81] FBI FD-302 of Caysan Bin Don at 2 (Oct. 8, 2001) (FOIA request production published by INTELWIRE).

[82] FBI FD-302 of Caysan Bin Don at 2 (Oct. 8, 2001) (FOIA request production published by INTELWIRE).

[83] FBI FD-302 of Caysan Bin Don at 2 (Oct. 8, 2001) (FOIA request production published by INTELWIRE).

[84] FBI FD-302 of Caysan Bin Don at 2 (Oct. 8, 2001) (FOIA request production published by INTELWIRE).

[85] FBI FD-302 of Caysan Bin Don at 2 (Oct. 8, 2001) (FOIA request production published by INTELWIRE).

[86] FBI FD-302 of Caysan Bin Don at 2 (Oct. 8, 2001) (FOIA request production published by INTELWIRE).

[87] FBI FD-302 of Caysan Bin Don at 2 (Oct. 8, 2001) (FOIA request production published by INTELWIRE).

[88] FBI FD-302 of Caysan Bin Don at 3 (Oct. 8, 2001) (FOIA request production published by INTELWIRE).

[89] FBI FD-302 of Caysan Bin Don at 3 (Oct. 8, 2001) (FOIA request production published by INTELWIRE).

[90] FBI FD-302 of Caysan Bin Don at 3 (Oct. 8, 2001) (FOIA request production published by INTELWIRE).

[91] FBI FD-302 of Caysan Bin Don at 3 (Oct. 8, 2001) (FOIA request production published by INTELWIRE).

[92] FBI FD-302 of Caysan Bin Don at 3 (Oct. 8, 2001) (FOIA request production published by INTELWIRE).

[93] FBI FD-302 of Caysan Bin Don at 3 (Oct. 8, 2001) (FOIA request production published by INTELWIRE).

[94] FBI FD-302 of Caysan Bin Don at 3 (Oct. 8, 2001) (FOIA request production published by INTELWIRE).

[95] FBI FD-302 of Caysan Bin Don at 3 (Oct. 8, 2001) (FOIA request production published by INTELWIRE).

[96] FBI FD-302 of Caysan Bin Don at 3 (Oct. 8, 2001) (FOIA request production published by INTELWIRE).

[97] FBI FD-302 of Caysan Bin Don at 3 (Oct. 8, 2001) (FOIA request production published by INTELWIRE).

[98] FBI FD-302 of Caysan Bin Don at 4 (Oct. 8, 2001) (FOIA request production published by INTELWIRE).

[99] FBI FD-302 of Caysan Bin Don at 4 (Oct. 8, 2001) (FOIA request production published by INTELWIRE).

[100] FBI FD-302 of Caysan Bin Don at 4 (Oct. 8, 2001) (FOIA request production published by INTELWIRE).

[101] FBI FD-302 of Caysan Bin Don at 4 (Oct. 8, 2001) (FOIA request production published by INTELWIRE).

[102] FBI FD-302 of Caysan Bin Don at 4 (Oct. 8, 2001) (FOIA request production published by INTELWIRE).

[103] FBI FD-302 of Caysan Bin Don at 4 (Oct. 8, 2001) (FOIA request production published by INTELWIRE).

[104] 9/11 Comm. Memorandum for the Record, Interview of Caysan Bin Don at 3 (Apr. 20, 2004); FBI FD-302 of Caysan Bin Don at 4 (Oct. 8, 2001) (FOIA request production published by INTELWIRE).

[105] FBI FD-302 of Caysan Bin Don at 4 (Oct. 8, 2001) (FOIA request production published by INTELWIRE).

[106] 9/11 Comm. Memorandum for the Record, Interview of Caysan Bin Don at 4 (Apr. 20, 2004).

[107] FBI FD-302 of Caysan Bin Don at 5 (Oct. 8, 2001) (FOIA request production published by INTELWIRE).

[108] FBI FD-302 of Caysan Bin Don at 5 (Oct. 8, 2001) (FOIA request production published by INTELWIRE).

[109] FBI FD-302 of Caysan Bin Don at 5 (Oct. 8, 2001) (FOIA request production published by INTELWIRE).

[110] FBI FD-302 of Caysan Bin Don at 5 (Oct. 8, 2001) (FOIA request production published by INTELWIRE).

[111] FBI FD-302 of Caysan Bin Don at 5 (Oct. 8, 2001) (FOIA request production published by INTELWIRE).

[112] FBI FD-302 of Caysan Bin Don at 5 (Oct. 8, 2001) (FOIA request production published by INTELWIRE).

[113] FBI FD-302 of Caysan Bin Don at 5 (Oct. 8, 2001) (FOIA request production published by INTELWIRE).

[114] FBI FD-302 of Caysan Bin Don at 5 (Oct. 8, 2001) (FOIA request production published by INTELWIRE).

[115] FBI FD-302 of Caysan Bin Don at 5 (Oct. 8, 2001) (FOIA request production published by INTELWIRE).

[116] FBI FD-302 of Caysan Bin Don at 7 (Oct. 8, 2001) (FOIA request production published by INTELWIRE).

[117] 9/11 Comm. Memorandum for the Record, Interview of Caysan Bin Don at 4 (Apr. 20, 2004).

[118] Updates and Initiatives (as of 5 October 2012).  ECF Document 3463-4 at 3.

[119]  Updates and Initiatives (as of 5 October 2012).  ECF Document 3463-4 at 4.

[120] Final Report of the National Commission on Terrorist Attacks Upon the United States ("9/11 Commission Final Report") at 218 (2004).

[121] Final Report of the National Commission on Terrorist Attacks Upon the United States ("9/11 Commission Final Report") at 218 (2004).

[122] 9/11 Commission Memorandum for the Record, Interview of Omar Al-Bayoumi at 4 (Oct. 16-17, 2003).

[123] Final Report of the National Commission on Terrorist Attacks Upon the United States ("9/11 Commission Final Report") at 517 n.29 (2004).

[124] 9/11 Commission Memorandum for the Record, Interview of Omar Al-Bayoumi at 4 (Oct. 16-17, 2003).

[125] 9/11 Commission Memorandum for the Record, Interview of Omar Al-Bayoumi at 5 (Oct. 16-17, 2003).

[126] 9/11 Commission Memorandum for the Record, Interview of Omar Al-Bayoumi at 4-5 (Oct. 16-17, 2003).

[127] 9/11 Commission Memorandum for the Record, Interview of Omar Al-Bayoumi at 4-5 (Oct. 16-17, 2003).

[128] 9/11 Commission Memorandum for the Record, Interview of Omar Al-Bayoumi at 5 (Oct. 16-17, 2003).

[129] 9/11 Commission Memorandum for the Record, Interview of Omar Al-Bayoumi at 5 (Oct. 16-17, 2003).

[130] 9/11 Commission Memorandum for the Record, Interview of Omar Al-Bayoumi at 5 (Oct. 16-17, 2003).

[131] FBI Electronic Communication to Counterterrorism from San Diego, "PENTTBOMB; MAJOR CASE 182) at 2-3 (Oct. 3, 2001) (FOIA request production published by INTELWIRE).

[132] Final Report of the National Commission on Terrorist Attacks Upon the United States ("9/11 Commission Final Report") at 516 n.24 (2004).

[133] S. Select Comm. on Intelligence and H.R. Permanent Select Comm. on Intelligence, Joint Inquiry into Intelligence Community Activities Before and After the Terrorist Attacks of September 11, 2001 at 416 (2002).  There is conflicting evidence as to whether Bayoumi was reimbursed for the rent and security deposit payments he made.  *See* page 422 n.1; FBI, Connections of San Diego PENTTBOM Subjects to the Government of Saudi Arabia, FBI Letterhead Memorandum (undated) at 2501/PEC-KSA000442 (FOIA request production published by INTELWIRE); Bayoumi also reportedly described himself as the "guarantor" on Hazmi and Mihdhar's apartment lease.  *See* FBI FD-302 of Caysan Bin Don (Oct. 8, 2001) at 7 (FOIA request production by INTELWIRE).  The 9/11 Commission says that Hazmi and

Mihdhar reimbursed Bayoumi "on the spot for the deposit." Final Report of the National Commission on Terrorist Attacks Upon the United States ("9/11 Commission Final Report") at 218 (2004).

[134] Final Report of the National Commission on Terrorist Attacks Upon the United States ("9/11 Commission Final Report") at 219 (2004).

[135] Final Report of the National Commission on Terrorist Attacks Upon the United States ("9/11 Commission Final Report") at 516 n.26 (2004).

[136] Final Report of the National Commission on Terrorist Attacks Upon the United States ("9/11 Commission Final Report") at 516 n.25 (2004).

[137] Final Report of the National Commission on Terrorist Attacks Upon the United States ("9/11 Commission Final Report") at 219, 516 n.25 (2004).

[138] FBI FD-302 of Caysan Bin Don (Oct. 8, 2001) at 7 (FOIA request production by INTELWIRE).

[139] 9/11 Commission Staffers Memorandum, "Updated Work Plans and Detailed List of Associates" (June 6, 2003), ECF Doc. 3463-5 at 8.

[140] S. Select Comm. on Intelligence and H.R. Permanent Select Comm. on Intelligence, Joint Inquiry into Intelligence Community Activities Before and After the Terrorist Attacks of September 11, 2001 at 422 (2002).

[141] Final Report of the National Commission on Terrorist Attacks Upon the United States ("9/11 Commission Final Report") at 516 n.20 (2004).

[142] Final Report of the National Commission on Terrorist Attacks Upon the United States ("9/11 Commission Final Report") at 218 (2004).

[143] Final Report of the National Commission on Terrorist Attacks Upon the United States ("9/11 Commission Final Report") at 221 (2004).

[144] S. Select Comm. on Intelligence and H.R. Permanent Select Comm. on Intelligence, Joint Inquiry into Intelligence Community Activities Before and After the Terrorist Attacks of September 11, 2001 at 422 (2002).

[145] 9/11 Commission Staffers Memorandum, "Updated Work Plans and Detailed List of Associates" (June 6, 2003), ECF Doc. 3463-5 at 9; *see also* FBI San Diego Letterhead Memorandum, "Ali Ahmad Mesdaq; International Terrorism – Usama Bin Laden" (Jan. 28, 2002) at 7 (FOIA production published by INTELWIRE).

[146] FBI San Diego Letterhead Memorandum, "Ali Ahmad Mesdaq; International Terrorism – Usama Bin Laden" (Jan. 28, 2002) at 5 (FOIA production published by INTELWIRE).

[147] S. Select Comm. on Intelligence and H.R. Permanent Select Comm. on Intelligence, Joint Inquiry into Intelligence Community Activities Before and After the Terrorist Attacks of September 11, 2001 at 426 (2002).

[148] S. Select Comm. on Intelligence and H.R. Permanent Select Comm. on Intelligence, Joint Inquiry into Intelligence Community Activities Before and After the Terrorist Attacks of September 11, 2001 at 426 (2002).

[149] S. Select Comm. on Intelligence and H.R. Permanent Select Comm. on Intelligence, Joint Inquiry into Intelligence Community Activities Before and After the Terrorist Attacks of September 11, 2001 at 427 (2002).

[150] S. Select Comm. on Intelligence and H.R. Permanent Select Comm. on Intelligence, Joint Inquiry into Intelligence Community Activities Before and After the Terrorist Attacks of September 11, 2001 at 427 (2002); FBI Electronic Communication from San Diego to Counterterrorism, Re: PENTTBOM; MAJOR CASE 182 (Oct. 3, 2001) (Case File No. 265A-

NY-280350).

[151] FBI Letterhead Memorandum, "Anwar Nasser Aulaqi, IT-UBL" at 2 (Sept. 26, 2001) (part of FBI Report – Sept. 12, 2001).

[152] Final Report of the National Commission on Terrorist Attacks Upon the United States ("9/11 Commission Final Report") at 221 (2004).

[153] Final Report of the National Commission on Terrorist Attacks Upon the United States ("9/11 Commission Final Report") at 221 (2004)

[154] Final Report of the National Commission on Terrorist Attacks Upon the United States ("9/11 Commission Final Report") at 221 (2004).

[155] Final Report of the National Commission on Terrorist Attacks Upon the United States ("9/11 Commission Final Report") at 221 (2004).

[156] S. Select Comm. on Intelligence and H.R. Permanent Select Comm. on Intelligence, Joint Inquiry into Intelligence Community Activities Before and After the Terrorist Attacks of September 11, 2001 at 431 (2002).

[157] S. Select Comm. on Intelligence and H.R. Permanent Select Comm. on Intelligence, Joint Inquiry into Intelligence Community Activities Before and After the Terrorist Attacks of September 11, 2001 at 148 (2002).

[158] S. Select Comm. on Intelligence and H.R. Permanent Select Comm. on Intelligence, Joint Inquiry into Intelligence Community Activities Before and After the Terrorist Attacks of September 11, 2001 at 148.

[159] Final Report of the National Commission on Terrorist Attacks Upon the United States ("9/11 Commission Final Report") at 216 (2004).

[160] Final Report of the National Commission on Terrorist Attacks Upon the United States ("9/11 Commission Final Report") at 216 (2004).

[161] Final Report of the National Commission on Terrorist Attacks Upon the United States ("9/11 Commission Final Report") at 216 (2004).

[162] Final Report of the National Commission on Terrorist Attacks Upon the United States ("9/11 Commission Final Report") at 216 (2004).

[163] S. Select Comm. on Intelligence and H.R. Permanent Select Comm. on Intelligence, Joint Inquiry into Intelligence Community Activities Before and After the Terrorist Attacks of September 11, 2001 at 151 (2002).

[164] S. Select Comm. on Intelligence and H.R. Permanent Select Comm. on Intelligence, Joint Inquiry into Intelligence Community Activities Before and After the Terrorist Attacks of September 11, 2001 at 151 (2002).

[165] Final Report of the National Commission on Terrorist Attacks Upon the United States ("9/11 Commission Final Report") at 515 n.18 (2004).

[166] S. Select Comm. on Intelligence and H.R. Permanent Select Comm. on Intelligence, Joint Inquiry into Intelligence Community Activities Before and After the Terrorist Attacks of September 11, 2001 at 430 (2002).

[167] S. Select Comm. on Intelligence and H.R. Permanent Select Comm. on Intelligence, Joint Inquiry into Intelligence Community Activities Before and After the Terrorist Attacks of September 11, 2001 at 418 (2002).

[168] S. Select Comm. on Intelligence and H.R. Permanent Select Comm. on Intelligence, Joint Inquiry into Intelligence Community Activities Before and After the Terrorist Attacks of September 11, 2001 at 417, 430 (2002); Final Report of the National Commission on Terrorist Attacks Upon the United States ("9/11 Commission Final Report") at 216 (2004).

[169] Final Report of the National Commission on Terrorist Attacks Upon the United States ("9/11 Commission Final Report") at 216 n.10 (2004).

[170] 9/11 Commission Memorandum for the Record, Interview of Fahad al-Thumairy at 2 (Feb. 23, 2004).

[171] 9/11 Commission Memorandum for the Record, Interview of Fahad al-Thumairy at 3 (Feb. 23, 2004).

[172] 9/11 Commission Memorandum for the Record, Interview of Fahad al-Thumairy at 3 (Feb. 23, 2004).

[173] 9/11 Commission Memorandum for the Record, Interview of Fahad al-Thumairy at 4 (Feb. 23, 2004).

[174] 9/11 Commission Memorandum for the Record, Interview of Fahad al-Thumairy at 5 (Feb. 23, 2004).

[175] 9/11 Commission Memorandum for the Record, Interview of Fahad al-Thumairy at 8 (Feb. 23, 2004).

[176] 9/11 Commission Memorandum for the Record, Interview of Fahad al-Thumairy (Feb. 24-25, 2004).

[177] Final Report of the National Commission on Terrorist Attacks Upon the United States ("9/11 Commission Final Report") at 216 n.10 (2004); *see also* http://intelfiles.egoplex.com/2002-12-02-FBI-Mohamed-Ibrahim-Aliter.pdf.

[178] Final Report of the National Commission on Terrorist Attacks Upon the United States ("9/11 Commission Final Report") at 216 (2004).

[179] Final Report of the National Commission on Terrorist Attacks Upon the United States ("9/11 Commission Final Report") at 216 (2004).

[180] Final Report of the National Commission on Terrorist Attacks Upon the United States ("9/11 Commission Final Report") at 216-217 (2004).

[181] Final Report of the National Commission on Terrorist Attacks Upon the United States ("9/11 Commission Final Report") at 217 (2004).

[182] Final Report of the National Commission on Terrorist Attacks Upon the United States ("9/11 Commission Final Report") at 515 (2004).

[183] Final Report of the National Commission on Terrorist Attacks Upon the United States ("9/11 Commission Final Report") at 515 (2004).

[184] Final Report of the National Commission on Terrorist Attacks Upon the United States ("9/11 Commission Final Report") at 515 (2004).

[185] 9/11 Commission Memorandum for the Record, Interview of Fahad al-Thumairy at 3 (Feb. 24-25, 2004).

[186] Final Report of the National Commission on Terrorist Attacks Upon the United States ("9/11 Commission Final Report") at 217 (2004).

[187] Final Report of the National Commission on Terrorist Attacks Upon the United States ("9/11 Commission Final Report") at 217 (2004).

[188] Final Report of the National Commission on Terrorist Attacks Upon the United States ("9/11 Commission Final Report") at 217 (2004).

[189] 9/11 Commission Staffers Memorandum, "Updated Work Plans and Detailed List of Associates" (June 6, 2003), ECF Doc. 3463-5 at 8.

[190] Final Report of the National Commission on Terrorist Attacks Upon the United States ("9/11 Commission Final Report") at 217 (2004).

[191] Updates and Initiatives (as of 5 October 2012).  ECF Document 3463-4 at 3.

[192] Updates and Initiatives (as of 5 October 2012).  ECF Document 3463-4 at 4.

[193] 9/11 Commission Staffers Memorandum, "Updated Work Plans and Detailed List of Associates" (June 6, 2003), ECF Doc. 3463-5 at 8.

[194] Updates and Initiatives (as of 5 October 2012).  ECF Document 3463-4 at 4.

[195] Updates and Initiatives (as of 5 October 2012).  ECF Document 3463-4 at 4.

[196] S. Select Comm. on Intelligence and H.R. Permanent Select Comm. on Intelligence, Joint Inquiry into Intelligence Community Activities Before and After the Terrorist Attacks of September 11, 2001 at 416 (2002).  Reports of Bayoumi's suspected intelligence officer status are documented in an FBI Electronic Communication Re: "chronological summaries ECF references regarding possible ties of Al-Bayoumi to the Saudi Arabian Government, Embassies, or Consulates (no date) (part of FBI Report – Sept. 12, 2001).

[197] FBI, Connections of San Diego PENTTBOM Subjects to the Government of Saudi Arabia, FBI Letterhead Memorandum (undated) at 2502/PEC-KSA000443.  FOIA request production published by INTELWIRE; *see also* FBI Electronic Communication Re: "chronological summaries ECF references regarding possible ties of Al-Bayoumi to the Saudi Arabian Government, Embassies, or Consulates (no date) (part of FBI Report – Sept. 12, 2001).

[198] S. Select Comm. on Intelligence and H.R. Permanent Select Comm. on Intelligence, Joint Inquiry into Intelligence Community Activities Before and After the Terrorist Attacks of September 11, 2001 at 423 (2002).

[199] S. Select Comm. on Intelligence and H.R. Permanent Select Comm. on Intelligence, Joint Inquiry into Intelligence Community Activities Before and After the Terrorist Attacks of September 11, 2001 at 423 (2002).

[200] S. Select Comm. on Intelligence and H.R. Permanent Select Comm. on Intelligence, Joint Inquiry into Intelligence Community Activities Before and After the Terrorist Attacks of September 11, 2001 at 423 (2002).

[201] S. Select Comm. on Intelligence and H.R. Permanent Select Comm. on Intelligence, Joint Inquiry into Intelligence Community Activities Before and After the Terrorist Attacks of September 11, 2001 at 423 (2002).

[202] S. Select Comm. on Intelligence and H.R. Permanent Select Comm. on Intelligence, Joint Inquiry into Intelligence Community Activities Before and After the Terrorist Attacks of September 11, 2001 at 423 (2002); FBI, Connections of San Diego PENTTBOM Subjects to the Government of Saudi Arabia, FBI Letterhead Memorandum (undated) at 2501/PEC-KSA000442.  FOIA request production published by INTELWIRE.

[203] FBI, Connections of San Diego PENTTBOM Subjects to the Government of Saudi Arabia, FBI Letterhead Memorandum (undated) at 2501/PEC-KSA000442.  FOIA request production published by INTELWIRE.

[204] S. Select Comm. on Intelligence and H.R. Permanent Select Comm. on Intelligence, Joint Inquiry into Intelligence Community Activities Before and After the Terrorist Attacks of September 11, 2001 at 425 (2002); FBI, Connections of San Diego PENTTBOM Subjects to the Government of Saudi Arabia, FBI Letterhead Memorandum (undated) at 2501/PEC-KSA000442.  FOIA request production published by INTELWIRE.

[205] 9/11 Commission Staffers Memorandum, "Updated Work Plans and Detailed List of Associates" (June 6, 2003), ECF Doc. 3463-5 at 10.

[206] Letter from Alawi Mohammed Saeed Kamel (Chairman, Dallah Avco) to H.E. Eng. Mohamed Ahmed Ai-Salmi (General Manager of Airway Engineering, Presidency of Civil Aviation) (dated 18/12/1419 A.H.) (corresponding to Apr. 4, 1999).

[207] Letter from Engineer Muhammad Ahmad Al Salemi (General Manager of Airways Engineering) to His Excellency/Chairman of the Board of Directors of the Dallah Group (dated 20/12/1419G) (corresponding to Apr. 6, 1999).

[208] Letter from Alawi Mohammed Saeed Kamel (Chairman, Dallah Avco) to H.H./President of Civil Aviation (dated 21/12/1419 A.H.) (corresponding to Apr. 7, 1999).

[209] FBI, Connections of San Diego PENTTBOM Subjects to the Government of Saudi Arabia, FBI Letterhead Memorandum (undated) at 2501/PEC-KSA000442. FOIA request production published by INTELWIRE.

[210] S. Select Comm. on Intelligence and H.R. Permanent Select Comm. on Intelligence, Joint Inquiry into Intelligence Community Activities Before and After the Terrorist Attacks of September 11, 2001 at 425 (2002).

[211] S. Select Comm. on Intelligence and H.R. Permanent Select Comm. on Intelligence, Joint Inquiry into Intelligence Community Activities Before and After the Terrorist Attacks of September 11, 2001 at 426 (2002).

[212] S. Select Comm. on Intelligence and H.R. Permanent Select Comm. on Intelligence, Joint Inquiry into Intelligence Community Activities Before and After the Terrorist Attacks of September 11, 2001 at 426 (2002).

[213] S. Select Comm. on Intelligence and H.R. Permanent Select Comm. on Intelligence, Joint Inquiry into Intelligence Community Activities Before and After the Terrorist Attacks of September 11, 2001 at 424 (2002).

[214] S. Select Comm. on Intelligence and H.R. Permanent Select Comm. on Intelligence, Joint Inquiry into Intelligence Community Activities Before and After the Terrorist Attacks of September 11, 2001 at 424 (2002).

[215] The identity of this individual with ties to Al-Qaeda is not disclosed in the Committee's Report. S. Select Comm. on Intelligence and H.R. Permanent Select Comm. on Intelligence, Joint Inquiry into Intelligence Community Activities Before and After the Terrorist Attacks of September 11, 2001 at 425 (2002).

[216] S. Select Comm. on Intelligence and H.R. Permanent Select Comm. on Intelligence, Joint Inquiry into Intelligence Community Activities Before and After the Terrorist Attacks of September 11, 2001 at 425 (2002).

[217] Final Report of the National Commission on Terrorist Attacks Upon the United States ("9/11 Commission Final Report") at 516 (2004).

[218] Final Report of the National Commission on Terrorist Attacks Upon the United States ("9/11 Commission Final Report") at 516 (2004).

[219] Final Report of the National Commission on Terrorist Attacks Upon the United States ("9/11 Commission Final Report") at 516 (2004).

[220] 9/11 Commission Memorandum for the Record, Interview of Omar Al-Bayoumi at 6 (Oct. 16-17, 2003).

[221] S. Select Comm. on Intelligence and H.R. Permanent Select Comm. on Intelligence, Joint Inquiry into Intelligence Community Activities Before and After the Terrorist Attacks of September 11, 2001 at 423 (2002).

[222] S. Select Comm. on Intelligence and H.R. Permanent Select Comm. on Intelligence, Joint Inquiry into Intelligence Community Activities Before and After the Terrorist Attacks of September 11, 2001 at 423 (2002).

[223] S. Select Comm. on Intelligence and H.R. Permanent Select Comm. on Intelligence, Joint Inquiry into Intelligence Community Activities Before and After the Terrorist Attacks of

September 11, 2001 at 423-24 (2002).

[224] S. Select Comm. on Intelligence and H.R. Permanent Select Comm. on Intelligence, Joint Inquiry into Intelligence Community Activities Before and After the Terrorist Attacks of September 11, 2001 at 424 (2002).

[225] S. Select Comm. on Intelligence and H.R. Permanent Select Comm. on Intelligence, Joint Inquiry into Intelligence Community Activities Before and After the Terrorist Attacks of September 11, 2001 at 418, 432 (2002).

[226] S. Select Comm. on Intelligence and H.R. Permanent Select Comm. on Intelligence, Joint Inquiry into Intelligence Community Activities Before and After the Terrorist Attacks of September 11, 2001 at 433 (2002); *see also* Statement of Steven Emerson to the National Commission on Terrorist Attacks Upon the United States (July 9, 2003), https://govinfo.library.unt.edu/911/hearings/hearing3/witness_emerson.htm.

[227] FBI Letterhead Memorandum, "Omar Al Bayoumi – Employed by Dallah Al Baraka" at 1/000000110 (Apr. 15, 2002) (FOIA request production published by INTELWIRE)

[228] Final Report of the National Commission on Terrorist Attacks Upon the United States ("9/11 Commission Final Report") at 516 n.20 (2004).

[229] 9/11 Commission Memorandum for the Record, Interview of Omar Al-Bayoumi at 4 (Oct. 16-17, 2003).

[230] Josh Lefkowitz and Lorenzo Vidino, America's Homegrown Jihadist (Apr. 27, 2005), http://archive.frontpagemag.com/Printable.aspx?ArtId=8790.

[231] Josh Lefkowitz and Lorenzo Vidino, America's Homegrown Jihadist (Apr. 27, 2005), http://archive.frontpagemag.com/Printable.aspx?ArtId=8790.

[232] Josh Lefkowitz and Lorenzo Vidino, America's Homegrown Jihadist (Apr. 27, 2005), http://archive.frontpagemag.com/Printable.aspx?ArtId=8790.

[233] Josh Lefkowitz and Lorenzo Vidino, America's Homegrown Jihadist (Apr. 27, 2005), http://archive.frontpagemag.com/Printable.aspx?ArtId=8790.

[234] Josh Lefkowitz and Lorenzo Vidino, America's Homegrown Jihadist (Apr. 27, 2005), http://archive.frontpagemag.com/Printable.aspx?ArtId=8790.

[235] Josh Lefkowitz and Lorenzo Vidino, America's Homegrown Jihadist (Apr. 27, 2005), http://archive.frontpagemag.com/Printable.aspx?ArtId=8790.

[236] Josh Lefkowitz and Lorenzo Vidino, America's Homegrown Jihadist (Apr. 27, 2005), http://archive.frontpagemag.com/Printable.aspx?ArtId=8790.

[237] Josh Lefkowitz and Lorenzo Vidino, America's Homegrown Jihadist (Apr. 27, 2005), http://archive.frontpagemag.com/Printable.aspx?ArtId=8790.

[238] FBI FD-302 of Caysan Bin Don at 5 (Oct. 8, 2001) (FOIA request production published by INTELWIRE).

[239] FBI FD-302 of Caysan Bin Don at 5 (Oct. 8, 2001) (FOIA request production published by INTELWIRE).

[240] FBI FD-302 of Caysan Bin Don at 6 (Oct. 8, 2001) (FOIA request production published by INTELWIRE).

[241] FBI FD-302 of Caysan Bin Don at 6 (Oct. 8, 2001) (FOIA request production published by INTELWIRE).

[242] Updates and Initiatives (as of 5 October 2012).  ECF Document 3463-4 at 4.

[243] FBI Electronic Communication from Los Angeles to Counterterrorism, "Fahad Althumairy (NON-USPER), IT – Other (UBL/AL-Qaeda)" at 7 (Oct. 25, 2002) (FOIA request production published by INTELWIRE).

[244] Final Report of the National Commission on Terrorist Attacks Upon the United States ("9/11 Commission Final Report") at 218 (2004).

[245] Final Report of the National Commission on Terrorist Attacks Upon the United States ("9/11 Commission Final Report") at 218 (2004).

[246] Final Report of the National Commission on Terrorist Attacks Upon the United States ("9/11 Commission Final Report") at 218 (2004).

[247] FBI FD-302 of Special Agent [Name Redacted] at 1 (Sept. 21, 2001) (part of "FBI Report – Sept. 12, 2001); *see also* Final Report of the National Commission on Terrorist Attacks Upon the United States ("9/11 Commission Final Report") at 218 (2004).

[248] Updates and Initiatives (as of 5 October 2012).  ECF Document 3463-4 at 4.

[249] Updates and Initiatives (as of 5 October 2012).  ECF Document 3463-4 at 4.

[250] Updates and Initiatives (as of 5 October 2012).  ECF Document 3463-4 at 4.

[251] Final Report of the National Commission on Terrorist Attacks Upon the United States ("9/11 Commission Final Report") at 218 (2004).

[252] Final Report of the National Commission on Terrorist Attacks Upon the United States ("9/11 Commission Final Report") at 218 (2004).

[253] Final Report of the National Commission on Terrorist Attacks Upon the United States ("9/11 Commission Final Report") at 219 (2004).

[254] Final Report of the National Commission on Terrorist Attacks Upon the United States ("9/11 Commission Final Report") at 219 (2004).

[255] Final Report of the National Commission on Terrorist Attacks Upon the United States ("9/11 Commission Final Report") at 219 (2004).

[256] Final Report of the National Commission on Terrorist Attacks Upon the United States ("9/11 Commission Final Report") at 219 (2004).

[257] Final Report of the National Commission on Terrorist Attacks Upon the United States ("9/11 Commission Final Report") at 515 (2004).

[258] 9/11 Commission Memorandum for the Record, Interview of Osama Basnan at 2 (Oct. 21-22, 2003).

[259] FBI Electronic Communication from San Diego to Counterterrorism, Re:  PENTTBOM; MAJOR CASE 182 at 5 (Oct. 3, 2001) (Case File No. 265A-NY-280350).

[260] 9/11 Commission Memorandum for the Record, Interview of Osama Basnan at 2 (Oct. 21-22, 2003).

[261] S. Select Comm. on Intelligence and H.R. Permanent Select Comm. on Intelligence, Joint Inquiry into Intelligence Community Activities Before and After the Terrorist Attacks of September 11, 2001 at 427 (2002).

[262] S. Select Comm. on Intelligence and H.R. Permanent Select Comm. on Intelligence, Joint Inquiry into Intelligence Community Activities Before and After the Terrorist Attacks of September 11, 2001 at 427 (2002).

[263] S. Select Comm. on Intelligence and H.R. Permanent Select Comm. on Intelligence, Joint Inquiry into Intelligence Community Activities Before and After the Terrorist Attacks of September 11, 2001 at 427 (2002).

[264] S. Select Comm. on Intelligence and H.R. Permanent Select Comm. on Intelligence, Joint Inquiry into Intelligence Community Activities Before and After the Terrorist Attacks of September 11, 2001 at 427 (2002).

[265] S. Select Comm. on Intelligence and H.R. Permanent Select Comm. on Intelligence, Joint Inquiry into Intelligence Community Activities Before and After the Terrorist Attacks of

September 11, 2001 at 427 (2002).

[266] 9/11 Commission Staffers Memorandum, "Updated Work Plans and Detailed List of Associates" (June 6, 2003), ECF Doc. 3463-5 at 8.

[267] S. Select Comm. on Intelligence and H.R. Permanent Select Comm. on Intelligence, Joint Inquiry into Intelligence Community Activities Before and After the Terrorist Attacks of September 11, 2001 at 427 (2002).

[268] S. Select Comm. on Intelligence and H.R. Permanent Select Comm. on Intelligence, Joint Inquiry into Intelligence Community Activities Before and After the Terrorist Attacks of September 11, 2001 at 427 (2002).

[269] FBI Document Complied by the JICI Task Force, ASAC Robert Blecksmith (Oct. 9, 2002) at 000000082 (FOIA Production Request by INTELWIRE).

[270] S. Select Comm. on Intelligence and H.R. Permanent Select Comm. on Intelligence, Joint Inquiry into Intelligence Community Activities Before and After the Terrorist Attacks of September 11, 2001 at 428 (2002).

[271] 9/11 Commission Memorandum for the Record, Interview of Osama Basnan at 3 (Oct. 21-22, 2003).

[272] 9/11 Commission Memorandum for the Record, Interview of Osama Basnan at 3 (Oct. 21-22, 2003).

[273] 9/11 Commission Memorandum for the Record, Interview of Osama Basnan at 3 (Oct. 21-22, 2003).

[274] S. Select Comm. on Intelligence and H.R. Permanent Select Comm. on Intelligence, Joint Inquiry into Intelligence Community Activities Before and After the Terrorist Attacks of September 11, 2001 at 428 (2002).

[275] S. Select Comm. on Intelligence and H.R. Permanent Select Comm. on Intelligence, Joint Inquiry into Intelligence Community Activities Before and After the Terrorist Attacks of September 11, 2001 at 428 (2002).

[276] S. Select Comm. on Intelligence and H.R. Permanent Select Comm. on Intelligence, Joint Inquiry into Intelligence Community Activities Before and After the Terrorist Attacks of September 11, 2001 at 428 (2002); FBI Electronic Communication, "PENTTBOMB; MAJOR CASE 182" at 2, ¶6 (10/03/2001) (Case ID # 265A-NY-280350) (FOIA request production published by INTELWIRE).

[277] S. Select Comm. on Intelligence and H.R. Permanent Select Comm. on Intelligence, Joint Inquiry into Intelligence Community Activities Before and After the Terrorist Attacks of September 11, 2001 at 428 (2002).

[278] https://www.washingtonpost.com/world/omar-abdel-rahman-blind-sheik-convicted-in-1993-world-trade-center-attack-dies-at-78/2017/02/18/807c4f2c-f603-11e6-8d72-263470bf0401_story.html?utm_term=.023c15555c68.

[279] 9/11 Commission Memorandum for the Record, Interview of Osama Basnan at 3 (Oct. 21-22, 2003).

[280] 9/11 Commission Memorandum for the Record, Interview of Osama Basnan at 6 (Oct. 21-22, 2003).

[281] 9/11 Commission Memorandum for the Record, Interview of Osama Basnan at 6 (Oct. 21-22, 2003).

[282] 9/11 Commission, Memorandum for the Record, "Interview of Osama Basnan" at 1 (Oct. 21-22, 2003).

[283] 9/11 Commission, Memorandum for the Record, "Interview of FBI Special Agent [Name

Redacted]" at 2 (Nov. 17, 2003).

[284] 9/11 Commission, Memorandum for the Record, "Interview of Osama Basnan" at 5 (Oct. 21-22, 2003).

[285] FBI Document Complied by the JICI Task Force, ASAC Robert Blecksmith (Oct. 9, 2002) at 2/000000083 (FOIA Production Request by INTELWIRE).

[286] FBI Document Complied by the JICI Task Force, ASAC Robert Blecksmith (Oct. 9, 2002) at 2/000000083 (FOIA Production Request by INTELWIRE).

[287] FBI Document Complied by the JICI Task Force, ASAC Robert Blecksmith (Oct. 9, 2002) at 9/000000098 (FOIA Production Request by INTELWIRE).

[288] FBI Document Complied by the JICI Task Force, ASAC Robert Blecksmith (Oct. 9, 2002) at 9/000000098 (FOIA Production Request by INTELWIRE).

[289] FBI Document Complied by the JICI Task Force, ASAC Robert Blecksmith (Oct. 9, 2002) at 9/000000098 (FOIA Production Request by INTELWIRE).

[290] Final Report of the National Commission on Terrorist Attacks Upon the United States ("9/11 Commission Final Report") at 221 (2004); FBI Letterhead Memorandum, "Anwar Nasser Aulaqi, IT-UBL" at 1 (Sept. 26, 2001) (part of FBI Report – Sept. 12, 2001).

[291] Final Report of the National Commission on Terrorist Attacks Upon the United States ("9/11 Commission Final Report") at 221 (2004); FBI Letterhead Memorandum, "Anwar Nasser Aulaqi, IT-UBL" at 1 (Sept. 26, 2001) (part of FBI Report – Sept. 12, 2001).

[292] FBI Letterhead Memorandum, "Anwar Nasser Aulaqi, IT-UBL" at 1 (Sept. 26, 2001) (part of FBI Report – Sept. 12, 2001).

[293] FBI Letterhead Memorandum, "Anwar Nasser Aulaqi, IT-UBL" at 2 (Sept. 26, 2001) (part of FBI Report – Sept. 12, 2001).

[294] Final Report of the National Commission on Terrorist Attacks Upon the United States ("9/11 Commission Final Report") at 517 (2004).

[295] Final Report of the National Commission on Terrorist Attacks Upon the United States ("9/11 Commission Final Report") at 517 (2004).

[296] Final Report of the National Commission on Terrorist Attacks Upon the United States ("9/11 Commission Final Report") at 517 (2004).

[297] Final Report of the National Commission on Terrorist Attacks Upon the United States ("9/11 Commission Final Report") at 517 (2004).

[298] https://www.nytimes.com/2015/08/30/magazine/the-lessons-of-anwar-al-awlaki.html

[299] Final Report of the National Commission on Terrorist Attacks Upon the United States ("9/11 Commission Final Report") at 517 (2004).

[300] Final Report of the National Commission on Terrorist Attacks Upon the United States ("9/11 Commission Final Report") at 229 (2004).

[301] Final Report of the National Commission on Terrorist Attacks Upon the United States ("9/11 Commission Final Report") at 229 (2004).

[302] Final Report of the National Commission on Terrorist Attacks Upon the United States ("9/11 Commission Final Report") at 229-230 (2004).

[303] Final Report of the National Commission on Terrorist Attacks Upon the United States ("9/11 Commission Final Report") at 221 (2004).

[304] S. Select Comm. on Intelligence and H.R. Permanent Select Comm. on Intelligence, Joint Inquiry into Intelligence Community Activities Before and After the Terrorist Attacks of September 11, 2001 at 430 (2002); The Telegraph, "Hijackers in same hotel as Saudi minister" (Oct. 3, 2003), http://www.telegraph.co.uk/news/worldnews/middleast/saudiarabia/

1443191/Hijackers-in-same-hotel-as-Saudi-minister.html.

[305] Susan B. Trenton and Joseph J. Trenton, Unsafe at Any Altitude:  Failed Terrorism Investigations, Scapegoating 9/11, and the Shocking Truth About Aviation Security Today at 45 (2006).

[306] S. Select Comm. on Intelligence and H.R. Permanent Select Comm. on Intelligence, Joint Inquiry into Intelligence Community Activities Before and After the Terrorist Attacks of September 11, 2001 at 430 (2002).

[307] S. Select Comm. on Intelligence and H.R. Permanent Select Comm. on Intelligence, Joint Inquiry into Intelligence Community Activities Before and After the Terrorist Attacks of September 11, 2001 at 430-31 (2002).

[308] S. Select Comm. on Intelligence and H.R. Permanent Select Comm. on Intelligence, Joint Inquiry into Intelligence Community Activities Before and After the Terrorist Attacks of September 11, 2001 at 438 (2002); *see also* pp. 437-440.

[309] S. Select Comm. on Intelligence and H.R. Permanent Select Comm. on Intelligence, Joint Inquiry into Intelligence Community Activities Before and After the Terrorist Attacks of September 11, 2001 at 439 (2002).

[310] Final Report of the National Commission on Terrorist Attacks Upon the United States ("9/11 Commission Final Report") at 215 (2004) (endnote references omitted).

[311] Final Report of the National Commission on Terrorist Attacks Upon the United States ("9/11 Commission Final Report") at 236 (2004) (endnote references omitted).

[312] Final Report of the National Commission on Terrorist Attacks Upon the United States ("9/11 Commission Final Report") at 236 (2004) (endnote references omitted).

[313] Final Report of the National Commission on Terrorist Attacks Upon the United States ("9/11 Commission Final Report") at 236 (2004) (endnote references omitted).

[314] Final Report of the National Commission on Terrorist Attacks Upon the United States ("9/11 Commission Final Report") at 236-237 (2004) (endnote references omitted).

[315] Final Report of the National Commission on Terrorist Attacks Upon the United States ("9/11 Commission Final Report") at 236-237 (2004) (endnote references omitted).

[316] Updates and Initiatives (as of 5 October 2012).  ECF Document 3463-4 at 4.

[317] Updates and Initiatives (as of 5 October 2012).  ECF Document 3463-4 at 4.

[318] Final Report of the National Commission on Terrorist Attacks Upon the United States ("9/11 Commission Final Report") at 216 (2004).

[319] Final Report of the National Commission on Terrorist Attacks Upon the United States ("9/11 Commission Final Report") at 216 (2004).

[320] Final Report of the National Commission on Terrorist Attacks Upon the United States ("9/11 Commission Final Report") at 216 (2004).

[321] Final Report of the National Commission on Terrorist Attacks Upon the United States ("9/11 Commission Final Report") at 216-217 (2004).

[322] 9/11 Commission Memorandum for the Record, Interview of Omar Al-Bayoumi at 6 (Oct. 16-17, 2003).

[323] Natana J. DeLong-Bas, Wahhabi Islam:  From Revival and Reform to Global Jihad 206 (2007); Alastair Crooke, You Can't Understand ISIS if You Don't Know the History of Wahhabism in Saudi Arabia, Huffington Post (undated), http://www.huffingtonpost.com/alastair-crooke/isis-wahhabism-saudi-arabia_b_5717157.html.

[324] Distance from Los Angeles International Airport to the King Fahad Mosque at 10980 Washington Boulevard., Culver City, California as measured by mapquest.com.

[325] Distance from the Saudi Consulate at 2045 Sawtelle Boulevard, Los Angeles, California to the King Fahad Mosque at 10980 Washington Boulevard, Culver City, California as measured by mapquest.com.

[326] U.S. Department of Justice, Office of the Inspector General, A Review of the FBI's Handling of Intelligence Information Prior to the September 11 Attacks (Special Report) (November 2004).