# EXHIBIT 8

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (GBD)<br>ECF Case |

This document relates to:

*All Actions*

## AFFIRMATION OF DANIEL ROBERT "BOB" GRAHAM

I, Bob Graham, being duly sworn, declare and state as follows:

1. My full name is Daniel Robert Graham. From 1966 through 1970, I served as a member of the Florida State House of Representatives and from 1970 through 1978, as a Member of the Florida State Senate. Between 1979 and 1987, I served as Governor of the State of Florida. From January 3, 1987 to January 3, 2005, I served as a United States Senator for the State of Florida.

2. During my tenure as a United States Senator, I served on the Senate Select Committee on Intelligence for more than ten (10) years, and as Chairman of that Committee between June 6, 2001 and January 3, 2003. The activities of the Senate Select Committee on Intelligence are discussed in further detail below.

3. Following my retirement from the Senate, I served for one year as a senior follow at the Kennedy School of Government. Thereafter, from May 2008 to February 2010, I was appointed by the leadership of Congress and served as Chairman of the bi-partisan Congressionally authorized Commission on the Prevention of Weapons of Mass Destruction Proliferation and Terrorism, whose mandate was to build on the work of the National Commission on Terrorist Attacks Upon the United States (the "9/11 Commission"). I also served as a Commissioner on the bi-partisan Financial Crisis Inquiry Commission, established by

Congress in May 2009 to examine the global and domestic causes of the financial crisis. On

May 21, 2010, President Barack Obama appointed me as Co-Chair of the National Commission

on the BP Deepwater Horizon Oil Spill and Offshore Drilling. From 2010 to 2012, I served as a

member of the Central Intelligence Agency External Advisory Board. I am the Chair of the

Board of Overseers of the Graham Center for Public Service at the University of Florida, and the

author of numerous books and articles, including *Intelligence Matters: The CIA, the FBI, Saudi*

*Arabia and the Failure of America's War on Terror*, (Random House, 2004).

<u>The Senate Select Committee on Intelligence</u>

4.       The Senate Select Committee on Intelligence was established in 1976 to

strengthen Congressional oversight of the programs and activities of U.S. intelligence agencies.

5.       The civilian and military intelligence agencies and departments falling within the

Committee's oversight include the Central Intelligence Agency, Defense Intelligence Agency,

National Security Agency, National Imaging and Mapping Agency, National Reconnaissance

Office, as well as the intelligence-related components of the Department of State, Federal Bureau

of Investigation, Department of the Treasury, and Department of Energy (collectively "the

Intelligence Community").

6.       The Committee's charge is to ensure that the Intelligence Community provides

the accurate and timely intelligence necessary to identify and monitor threats to the national

security of the United States to support the executive and legislative branches in their decisions

on national security matters, ensure that U.S. military commanders have the intelligence support

to allow them to prevail swiftly and decisively on the battlefield, and to ensure that all

intelligence activities and programs conform with the Constitution and laws of the United States

of America.

2

7.      Among other activities undertaken in connection with its responsibilities, the Committee holds regular hearings, typically in closed session, to receive testimony from Intelligence Community officials concerning intelligence and national security matters.  In addition to these formal hearings, the Committee also holds on-the-record and off-the-record briefings.  The Special Report on the Committee's activities between January 6, 1999 through December 15, 2000[1] provides a glimpse into the scope of the Committee's regular hearing and briefing activities during a representative period when I served on the Committee:  during that period, the Committee held 99 hearings and on-the-record meetings, as well as 17 on-the-record briefings and over 250 off-the-record briefings.

8.      The Committee also engages in ongoing analysis of intelligence on a broad range of topics to inform policy decisions.  While all Senators have access to classified intelligence assessments, access to intelligence sources and methods, programs, and budgets is generally limited to Intelligence Committee members (and to members of the Defense Appropriations Subcommittee).  By law, the President is required to ensure that the Committee is kept "fully and currently informed" of intelligence activities—meaning that intelligence agencies are required, generally in writing, to notify the Committee of their activities and analysis.  This includes keeping the Committee informed of covert actions and any significant intelligence failure.

9.      In addition, the Committee conducts investigations and reviews of significant intelligence programs and events, ranging from routine and continuing study to formal inquiries. In relation to such investigations and inquiries, the Committee commonly reviews intelligence information, gathers information and evidence, and makes findings.

---

[1] Committee Activities, Special Report of the Select Committee on Intelligence of the United States Senate, January 6, 1999 through December 15, 2000, August 2, 2001, available at:
https://www.intelligence.senate.gov/sites/default/files/publications/10751.pdf

10.     During the more than decade that I served on the Committee, the Committee's work, as described above, increasingly focused on so-called "asymmetric threats" confronting the United States, including international terrorism in particular.  Of note, in the years preceding the September 11th terrorist attacks, the Committee's work on terrorist threats to the United States encompassed hearings, inquiries, and the evaluation of intelligence relating to the Khobar Towers bombing, the African embassy bombings, and the attack on the USS Cole.

11.     As chairman of the Senate Select Committee on Intelligence I was a member of the "Gang of Eight" composed of the four Congressional leaders and the four chairs and ranking members of the two Congressional intelligence committees.  In this position we were responsible for reviewing and in some instances sanctioning the most sensitive intelligence initiatives, including covert operations.

The Congressional Joint Inquiry

12.     In my capacity as Chairman of the Senate Select Committee on Intelligence, I co-chaired the Joint Inquiry of the Senate Select Committee on Intelligence and House Permanent Select Committee on Intelligence Into Intelligence Community Activities Before and After the Terrorist Attacks of September 11, 2001 (the "Joint Inquiry").

13.     The Joint Inquiry was established in February 2002, when the Senate Select Committee on Intelligence and the House Permanent Select Committee on Intelligence agreed to conduct a Joint Inquiry into the activities of the U.S. intelligence community in connection with the terrorist attacks perpetrated against our nation on September 11, 2001.  The Committees' decision was unprecedented in congressional history:  for the first time, two permanent committees, one from the House and one from the Senate, would join together to conduct a single, unified inquiry.

14.     The three principal goals of the Joint Inquiry were to:

- Conduct a factual review of what the intelligence community knew or should have known prior to September 11, 2001, regarding the international terrorist threat to the United States, to include the scope and nature of any possible international terrorist attacks against the United States and its interests;

- identify and examine any systemic problems that may have impeded the Intelligence Community in learning of or preventing these attacks in advance; and

- make recommendations to improve the Intelligence Community's ability to identify and prevent future international terrorist attacks.

15.     During the course of the Joint Inquiry, the Committees held nine public hearings, as well as thirteen closed sessions in which classified information was considered.  In addition, the Joint Inquiry staff reviewed almost 500,000 pages of relevant documents from the Intelligence Community agencies and other sources, conducted approximately three hundred interviews, and participated in numerous briefings and panel discussions that involved almost 600 individuals from the intelligence agencies, other U.S. government organizations, state and local entities, as well as representatives from the private sector and foreign governments.

16.     As part of the Joint Inquiry, the Joint Inquiry staff conducted an intensive investigation into the details of the 9/11 plot, the activities of the 19 hijackers, and the network of support that allowed them to carry out the September 11th Attacks.

17.     I submit this Affirmation on behalf of the Plaintiffs, to address the evidence of involvement of Saudi government employees and agents in providing support for the September 11th attacks.

Overview of Opinions and Conclusions

18.     Based on my decades of experience in intelligence and national security matters, my involvement in leading numerous high-profile government investigations,

5

including my experience as Co-Chair of the Joint Inquiry, the evidence collected by the Joint

Inquiry during the course of its investigation into the events of September 11, 2001, the

information contained in the Final Report of the 9/11 Commission, additional reports and

published materials I have reviewed (as referenced below), and investigations into

circumstances revealed after the conclusion of the Joint Inquiry, I have reached the following

relevant professional opinions and conclusions, to a reasonable degree of certainty,

concerning the September 11th plot and sources of support for the September 11th hijackers:

- The September 11th attacks were a sophisticated terrorist operation, which could not have been carried out without a financial and logistical support network for the hijackers.

- The al-Qaeda leadership were aware that the success of the September 11th plot depended on the ability of the 19 hijackers to enter the United States and begin preparations for the attacks without arousing suspicion or attention.

- The tasks the future hijackers were assigned to undertake in the United States, and which were essential to the success of the 9/11 plot, were daunting. The hijackers were being sent by al-Qaeda to a foreign country, where they had not lived previously, to rendezvous with a team, many of whom they had never met. While here, they were expected to learn a skill that is not commonly taught, and to refine, practice, and execute a plan to destroy several monuments of the most powerful nation in the world. And they needed to accomplish all of these tasks without arousing suspicion.

- 9/11 hijackers Nawaf al-Hazmi and Khalid al-Mihdhar were especially ill prepared for their roles in this terrorist mission in the United States, as neither spoke much, if any, English, and neither had spent any time living in the West. In my professional opinion, it would have been impossible for al-Hazmi and al-Mihdhar to assimilate into the United States and begin the preparations for the attacks assigned to them without receiving assistance from one or more persons alerted in advance of their arrival.

- Particularly given that al-Hazmi and al-Mihdhar were designated to be the first members of the September 11th plot to travel to the United States and initiate preparations for the attacks, it is my professional opinion that the al-Qaeda leadership would not have sent al-Hazmi and al-Mihdhar to the United States without arranging a logistical and financial support network in the United States to receive them.

6

- Saudi government employees Fahad al-Thumairy and Omar al-Bayoumi served as the nucleus of the support network that received al-Hazmi and al-Mihdhar upon their arrival in the United States, and provided substantial assistance to al-Hazmi and al-Mihdhar that was essential to their successful assimilation into the United States and their preparations for the attacks.

- Based on the facts and evidence now known about their relevant activities and interactions, it is my professional opinion that al-Thumairy and al-Bayoumi were aware, at the time they provided assistance to al-Hazmi and al-Mihdhar and tasked others to assist the two future hijackers, that al-Hazmi and al-Mihdhar were jihadists who intended to do harm to the United States.

- Omar al-Bayoumi was, at all relevant times, a covert employee of the Saudi government whose duties involved performing tasks at the direction of the Kingdom's embassies and consulates in the United States, including the Wahhabi religious components and offices of the embassies and consulates.

- Fahad al-Thumairy was, at all relevant times, a Wahhabi cleric who held diplomatic credentials with the Saudi consulate in Los Angeles, and served as an imam at the Saudi-funded King Fahd Mosque in Los Angeles.  Al-Thumairy was appointed to both positions by the Kingdom's Ministry of Islamic Affairs.

- The Kingdom's Ministry of Islamic Affairs plays a central role in the Saudi government's multi-billion dollar global campaign to promote the Wahhabi variant of Islam.  Wahhabi teachings, as promoted by the Kingdom of Saudi Arabia, form the ideological foundation for al-Qaeda's terrorist agenda, including its targeting of the United States.

- Numerous individuals and organizations associated with the Saudi government's global campaign to promote Wahhabi orthodoxy have been implicated in supporting terrorism, including al-Qaeda, during the years leading up to the September 11th attacks.  This is not a coincidence.  Many adherents to Wahhabi teachings regard jihad as a necessary and appropriate tool to promote Wahhabi Islam.

- Given the legacy of cooperation between elements of Saudi Arabia's Wahhabi proselytizing apparatus and jihadists, there is a direct nexus between the support al-Thumairy and al-Bayoumi provided to Nawaf al-Hazmi and Khalid al-Mihdhar and their assignment to spread Wahhabi Islam on behalf of the Kingdom's Ministry of Islamic Affairs.

Principal Facts and Evidence Supporting My Opinions and Conclusions

19.     My professional opinions and conclusions concerning the support network that provided essential assistance to Nawaf al-Hazmi and Khalid al-Mihdhar, and the central roles

Saudi government employees and agents Fahad al-Thumairy and Omar al-Bayoumi played in

that support network, are based on my evaluation and analysis of the following principal facts

and evidence, and insights drawn from my decades of experience in intelligence and national

security matters.

<u>The Sophistication of the 9/11 Plot and Essentiality of a Logistical Support Network</u>

20.     On June 18, 2002, then CIA Director George Tenet testified before the Joint

Inquiry concerning, among other things, al-Qaeda's planning, coordination and execution of

the September 11th plot.[2]  During that testimony, Director Tenet described the September 11th

plot as "professionally conceived and executed," "compartmented" and "resilient."

21.     In regard to the "professionalism" of the plot, Director Tenet described the

considerable care and effort undertaken by al-Qaeda to minimize the potential that the future

hijackers might draw suspicion during their preparations for the attacks.  Director Tenet

noted that the al-Qaeda leadership had the hijackers enter the United States at staggered

intervals, from different countries, and through different cities.  This approach served to

obscure their common purpose.  Director Tenet further testified that al-Qaeda carefully

selected operatives who had not previously participated in terrorist attacks (with the notable

exceptions of al-Hazmi and al-Mihdhar, who had extensive records of al-Qaeda

involvement), and who were therefore unlikely to draw the attention of intelligence services.

The hijackers also took steps to modify their appearances and behavior to avoid drawing

attention, for instance by shaving their beards and wearing western clothes.

22.     These and other aspects of the plot reflect careful and detailed planning by al-

Qaeda, a keen awareness by al-Qaeda that the success of the plot hinged on the ability of the

---

[2] Unclassified Version of Director of Central Intelligence George J. Tenet's Testimony Before the Joint Inquiry into Terrorist Attacks Against the United States, June 18, 2002, available at https://www.cia.gov/news-information/speeches-testimony/2002/dci_testimony_06182002.html

hijackers to assimilate into the United States and undertake their preparations without arousing suspicion, and an emphasis in the planning of the operation on precautions and measures to minimize that risk.

23.     The 9/11 Commission reached these same conclusions in its Final Report, confirming that the "9/11 Attack was a complex international operation, the product of years of planning," 9/11 Commission Final Report at p. 365, and documenting the many precautions undertaken to ensure that the hijackers did not draw unwanted attention.  *See* 9/11 Commission Final Report at p. 167, 215.

24.     Among the group of 19 hijackers, Nawaf al-Hazmi and Khalid al-Mihdhar were uniquely ill-prepared for their terrorist mission in the United States.  *See* 9/11 Commission Final Report at p. 215.  To fully appreciate their lack of preparedness, it is important to reflect on what they had been asked to do and the inherent challenges these assignments posed for them:  they were being sent to a foreign country, where they had virtually no understanding of the language or culture, and where they looked different from most people.  Upon arrival in this foreign country where they did not speak the language, they needed (among other things) to promptly find and secure suitable housing, open bank accounts to receive financing from al-Qaeda for their preparations, obtain driver's licenses, and secure a means of travel to accomplish those and other essential tasks.  They were then expected to locate and enroll in English language courses, as well as flight training courses, in order to learn how to pilot a commercial aircraft into prominent monuments of the most powerful nation in the world.  They were expected to then rendezvous with other members of the plot dispersed throughout the United States.  They needed to accomplish all of these tasks without arousing suspicion, in the country with the most sophisticated law enforcement

and intelligence capabilities on earth, which was at the time on alert for an impending

terrorist attack by the very terrorist organization that was directing, coordinating, and

financing their mission.

25.     In my professional opinion, it would have been impossible for al-Hazmi and

al-Mihdhar to assimilate into the United States and successfully undertake their mission,

without drawing suspicion, without the assistance of a domestic support infrastructure upon

their arrival.

26.     Osama bin Laden and Khalid Sheikh Mohammed, the so-called mastermind of

the 9/11 plot, were very much aware of the risks presented by the involvement of al-Hazmi

and al-Mihdhar in the plot, given their lack of preparedness for the tasks they would need to

undertake in the United States.  Moreover, because al-Hazmi and al-Mihdhar both had

extensive records of al-Qaeda involvement, any attention drawn to them could uniquely

jeopardize the entire plot.

27.     Given the sophistication of the 9/11 plot, including especially the extensive

precautions and measures implemented to minimize the risk that the hijackers' preparations

would result in unwanted attention or suspicion, and with the success of the entire operation

hanging in the balance, it is in my opinion simply implausible to suggest that Osama bin

Laden would have designated al-Hazmi and al-Mihdhar to be the first of the hijackers to set

foot on U.S. soil and sent them to the United States, without arranging in advance for

someone to receive and support them upon their arrival.

28.     The 9/11 Commission reached the same conclusions, stating in its Final

Report that:  (1) al-Hazmi and al-Mihdhar were "ill prepared for a mission in the United

States.  Their only qualifications for this plot were their devotion to Usama bin Laden, their

veteran service, and their ability to get valid U.S. visas.  Neither had spent any substantial

time in the West, and neither spoke much, if any, English."  9/11 Commission Final Report

at p. 215; and (2) "it is unlikely that Hazmi and Mihdhar – neither of whom, in contrast to

the Hamburg group, had any exposure to life in the West – would have come to the United

States without arranging to receive assistance from one or more individuals informed in

advance of their arrival."  9/11 Commission Final Report at p. 215.

   29.  The infrastructure put in place by al-Qaeda to support the so-called muscle

hijackers during their travels to and arrival in the United States further bears this out.  As

reflected in the 9/11 Commission's Final Report, al-Qaeda maintained a support network to

shepherd the muscle hijackers, who began arriving in the United States in late April 2001,

through every stage of their travels.  After completing their final training in Afghanistan, the

muscle hijackers went to Pakistan, where a trusted al-Qaeda courier brought them to a

safehouse run by one of Khalid Sheikh Mohammed's closest associates.  9/11 Commission

Final Report at p. 236.  From Pakistan, they were sent to the United Arab Emirates, where

two trusted al-Qaeda facilitators "helped them with plane tickets, traveler's checks and hotel

reservations," and "taught them about everyday aspects of life in the West, such as

purchasing clothes and ordering food."  9/11 Commission Final Report at p. 236.  Upon

arrival in the United States, the muscle hijackers were received by the more senior members

of the Hamburg cell, who had already established themselves and had experience living in

the West.  9/11 Commission Final Report at p. 237.  These arrangements further demonstrate

that al-Qaeda understood the necessity to provide a logistical support network to assist the

hijackers in settling in the United States, and would not have sent al-Hazmi and al-Mihdhar

to the United States without arranging a support network to receive them.

30.     The series of events that unfolded immediately upon the arrival of al-Hazmi and al-Mihdhar in the United States, as described below, fully reinforces my conclusion that a pre-arranged support network was in place to receive them when they landed here, and that Fahad al-Thumairy and Omar al-Bayoumi were key members of that support network.

The Central Roles of Al-Thumairy and al-Bayoumi in the Support Network for al-Hazmi and al-Mihdhar

31.     Al-Hazmi and al-Mihdhar arrived in Los Angeles on January 15, 2000, via a flight from Bangkok, Thailand.

32.     During their first days in that unfamiliar city in this unfamiliar country, the two terrorists spend time at the Saudi-funded King Fahd Mosque near Los Angeles.  9/11 Commission Final Report at p. 216.  Fahad al-Thumairy was then serving as an imam at the mosque, by appointment of the Kingdom's Ministry of Islamic Affairs.  9/11 Commission Final Report at p. 514, n.10.  Al-Thumairy also held diplomatic credentials with the Saudi consulate in Los Angeles, where he worked in the Islamic Affairs department, also by appointment of the Ministry of Islamic Affairs.  9/11 Commission Final Report at p. 514, n.10.

33.     Al-Thumairy led an extremist faction of the local Muslim community that included individuals "supportive of the events of September 11, 2001."  9/11 Commission Final Report at p. 216.  In 2003, al-Thumairy was denied re-entry into the United States, "based on a determination by the State Department that he might be connected with terrorist activity."  9/11 Commission Final Report at p. 217.

34.     The FBI has concluded that "Al-Thumairy immediately assigned an individual to take care of al-Hazmi and al-Mihdhar during their time in the Los Angeles area."  2012 FBI Summary of PENTTBOM Investigation ("2012 FBI Summary"), at p. 4; 9/11 Review

Commission Report at p. 102, n. 330.

35.     Approximately two weeks after al-Thumairy "immediately assigned an individual to take care of al-Hazmi and al-Mihdhar during their time in the Los Angeles area," al-Bayoumi drove 125 miles to Los Angeles from San Diego, where he lived, to the Saudi Consulate in Los Angeles where al-Thumairy worked, where al-Bayoumi had a closed door meeting.

36.     As further discussed below, al-Bayoumi was a Saudi government employee who had extensive contacts with Saudi diplomatic missions in the United States, and who was described by numerous witnesses as an agent or some kind of spy for the Saudi government.  Joint Inquiry Report at pp. 423-24.

37.     Immediately following his meeting at the Saudi consulate in Los Angeles, al-Bayoumi drove to a Middle Eastern restaurant a few miles from the consulate (one of about 134 Middle Eastern restaurants in Los Angeles at the time), called the Mediterranean Gourmet.

38.     At the Mediterranean Gourmet, al-Bayoumi encountered al-Hazmi and al-Mihdhar, and engaged the newly arrived terrorists in a conversation in Arabic.  During that conversation, al-Bayoumi offered to help al-Hazmi and al-Mihdhar relocate to San Diego. Of note regarding this invitation, Khalid Sheikh Mohammed has told U.S. investigators that, although al-Hazmi and al-Mihdhar arrived in the United States in Los Angeles, he had steered them to San Diego as a preferable city for undertaking their preparations.  9/11 Commission Final Report at p. 216.

39.     Al-Hazmi and al-Mihdhar thereafter took al-Bayoumi up on his offer of assistance to help them relocate to San Diego.  When they arrived in San Diego on February

4, 2000, al-Bayoumi helped take care of the most essential requirements necessary for them to assimilate into the United States without drawing attention:  he helped them find an apartment (in the same complex where he lived); co-signed their lease for them; and opened a bank account for them.  9/11 Commission Report at p. 219.  In addition, and as further discussed below, al-Bayoumi "assigned two individuals to care for [al-Hazmi and al-Mihdhar], one of whom was Mohdar Abdullah."  2012 FBI Summary at p. 4.  The FBI has expressly recognized that the assistance Bayoumi provided to the hijackers was "substantial."  2012 FBI Summary at p. 3 (stating that al-Bayoumi and al-Thumairy are "known to have provided substantial assistance to 9/11 hijackers Nawaf al-Hazmi and Khalid al-Mihdhar").

40.     On the same day al-Hazmi and al-Mihdhar arrived in San Diego and al-Bayoumi was going to great lengths to assist them, multiple calls were placed from al-Bayoumi's cell phone to Anwar al-Aulaqi, the radical cleric whose terrorist activities would later prompt the U.S. to target and kill him in a drone strike in Yemen.  9/11 Commission Memorandum for the Record, Interview of FBI Special Agent, November 17, 2003, at p. 3.  Al-Bayoumi admitted to U.S. investigators that he had a relationship with al-Aulaqi relating to "religious matters."  9/11 Commission Memorandum for the Record, Interview of Omar al-Bayoumi, October 18, 2003, at p. 6.  According to witnesses interviewed after the September 11th attacks by the FBI, al-Aulaqi thereafter "met consistently and privately with Alhazmi and Almihdhar" and "had closed-door meetings in San Diego with al-Mihdhar, al-Hazmi, and another individual, whom al-Bayoumi had asked to help the hijackers."  September 26, 2001 FBI Report, *Anwar Nasser Aulaqi*, at p. 2; Joint Inquiry Report at p. 178.  When al-Hazmi moved to the east coast in April 2001 to begin final preparations for

the attacks, he went immediately to the Dar al Hijra Mosque in Falls Church, Virginia, where al-Aulaqi had been serving as an imam since relocating from San Diego in January of 2001. FBI investigators suspect that al-Aulaqi assigned a member of the mosque to assist al-Hazmi and his fellow hijacker Hani Hanjour upon their arrival in Virginia, a suspicion the 9/11 Commission said it "share[d] … given the remarkable coincidence of Aulaqi's prior relationship with Hazmi." 9/11 Commission Final Report at p. 230.

41.     As briefly mentioned above, at the time al-Hazmi and al-Mihdhar relocated to San Diego with al-Bayoumi's assistance, al-Bayoumi also "assigned two individuals to care for [al-Hazmi and al-Mihdhar], one of whom was Mohdar Abdullah." 2012 FBI Summary at p. 4. Abdullah was himself an extremist. In fact, the 9/11 Commission concluded that Abdullah was "perfectly suited to assist the hijackers in their mission" given that he "clearly was sympathetic to [their] extremist views." 9/11 Commission Final Report at p. 218.

42.     Abdullah also knew al-Thumairy and, according to a witness interviewed by U.S. investigators, visited the King Fahd mosque frequently and "was very close to radical followers of Thumairy," 9/11 Commission Final Report at p. 515, n. 13.

43.     Adbullah has confirmed that al-Bayoumi tasked him to acclimate al-Hazmi and al-Mihdhar to the United States, and told him to "assist in any way in their affairs." April 11, 2002 FBI Report, *PENTTBOMB*, at p. 3.

44.     Consistent with that assignment, "Mohdar [Abdullah] played a key role in facilitating the daily lives and assisting future Flight 77 hijackers Nawaf al-Hazmi and Khalid al-Mihdhar." 2012 Summary Report at p. 3. For example, Abdullah helped al-Hazmi and al-Mihdhar locate and apply to flight schools, assisted them in procuring fake driver's licenses, translated between English and Arabic for them, and introduced them to

15

other like-minded extremists in the San Diego area.  9/11 Commission Final Report at p.
218.  Mohdar has "admitted knowing of Hazmi and Mihdhar's extremist leanings and
Mihdhar's involvement with the Islamic Army of Aden (a group with ties to al-Qaeda)."
9/11 Commission Final Report at p. 218.

45.     Al-Bayoumi's extremist connections were not, meanwhile, limited to his
relationships with al-Thumairy, al-Aulaqi, Abdullah, and the two future hijackers.  Al-
Bayoumi also was a close associate of another Saudi named Osama Bassnan, who like al-
Bayoumi had extensive connections to Saudi government officials and institutions in the
United States.  Bassnan was an "ardent UBL [Osama bin Laden]  supporter" who spoke of
bin Laden "as if he were a god."  U.S Intelligence Report, *Connections of San Diego
PENTTBOMB Subjects to the Government of Saudi Arabia*, at p. 1; Joint Inquiry Report at p.
428.  Witnesses interviewed by the FBI described al-Bayoumi and Bassnan as "the closest of
friends" and an FBI analysis of their respective phone records revealed "roughly 700 calls
between various phones subscribed to by Bayoumi and Basnan over a one year period."
9/11 Commission Memorandum for the Record, Interview of FBI Special Agent, November
17, 2003, at p. 2.

46.     During interviews with U.S. investigators following the September 11th
attacks, al-Thumairy, al-Bayoumi, Abdullah and Bassnan were all assessed to have lied or
dissembled about material issues raised by investigators during those interviews.

47.     For instance, 9/11 Commission investigators found al-Thumairy "deceptive
during both interviews," and noted that his answers "were either inconsistent or, at times, in
direct conflict with information we have from other sources."  9/11 Commission
Memorandum from Dieter Snell, Raj De, and Mike Jacobson to Philip Zelikow, February 25,

16

2004, at p. 2.  Indeed, al-Thumairy lied about even knowing al-Bayoumi, despite the latter's

acknowledgment that they did in fact know one another, and telephone records confirming

contact between the two.  In an interview with author Phillip Shenon, who wrote the

definitive account of the 9/11 Commission's investigation, a 9/11 Commission staff member

bluntly stated that it "was so clear Thumairy was lying" and "also so clear he was

dangerous."  *Declassified Documents Detail 9/11 Commission's Inquiry Into Saudi Arabia*,

Philp Shenon, The Guardian, May 13, 2016, available at https://www.theguardian.com/us-

news/2016/may/13/september-11-saudi-arabia-congressional-report-terrorism

48.     The 9/11 Commission's interview of Bassnan, in turn, "established beyond

cavil the witness' utter lack of credibility on virtually every subject."  9/11 Commission

Memorandum for the Record, Interview of Osama Basnan, October 22, 2003, at p. 1.

49.     Al-Bayoumi, meanwhile, denied that he introduced the hijackers to Abdullah,

despite Abdullah's statement to the contrary, 9/11 Commission Final Report at p. 516, n. 20,

and in conflict with the FBI's finding that al-Bayoumi "assigned two individuals to care for

[al-Hazmi and al-Mihdhar], one of whom was Mohdar Abdullah."  2012 FBI Summary at p.

4.

50.     Briefly to summarize:

- Al-Hazmi and al-Mihdhar, who are ill-prepared for their mission and unlikely to have come to the United States without a support network in place to receive them, go promptly after their arrival to the King Fahd Mosque.

- An imam at that mosque (al-Thumairy) who leads a radical faction that includes people supportive of the September 11th attacks, and who is later barred from the United States by the State Department for possible connections to terrorist activity, immediately assigns someone to take care of al-Hazmi and al-Mihdhar during their critical first days in Los Angeles.

- Days later, al-Bayoumi, who knows al-Thumairy, travels 125 miles from San Diego to Los Angeles for a closed door meeting at the Consulate where al-Thumairy works.

- Al-Bayoumi, who has a range of connections to Islamic extremists, proceeds immediately from that meeting to a restaurant several miles away, where he encounters the two terrorists who have been receiving assistance from al-Thumairy.

- Al-Bayoumi offers to assist the two alleged strangers to relocate to San Diego, where the mastermind of the 9/11 plot has said that he wanted them to settle.

- The future hijackers accept the offer, and al-Bayoumi then takes extraordinary steps to help them find housing and open a bank account, two of the most urgent needs of the ill-prepared terrorists sent to a foreign land.

- Al-Bayoumi also assigns another individual (Abdullah), who just happens to share the two terrorists' extremist views and to be associated with the extremist faction led by al-Thumairy, to assist them "in any way."

- Abdullah then proceeds to help them fulfill the other immediate assignments most critical to their preparations, by assisting them in locating and enrolling in English classes and flight schools, and helping them secure fake driver's licenses.

- When interviewed about their associations with one another and the circumstances surrounding their support for the hijackers, these principals lie or dissemble to U.S. investigators.

51. As this evidence convincingly establishes, the arrival of al-Hazmi and al-Mihdhar set in motion an immediate series of concentrated interactions and dealings among individuals with extremist and terrorist connections, leading to the provision of the precise forms of support the two hijackers most needed to assimilate into the United States and begin their preparations for the attacks without drawing suspicion.

52. Based on my more than two decades of experience in intelligence and national security matters, as well as my involvement in leading numerous high profile government investigations, including the Congressional 9/11 Joint Inquiry, it is my professional opinion,

to a reasonable degree of certainty, that these interactions and transactions reflect the operations of an organized support network for Nawaf al-Hazmi and Khalid al-Mihdhar, charged with helping the future hijackers assimilate into the United States and begin preparations for their terrorist mission without drawing the attention of law enforcement or the Intelligence Community.

53.     It is my further opinion that al-Thumairy and al-Bayoumi were aware, at the time they provided essential aid to al-Hazmi and al-Mihdhar and directed others to assist them, that al-Hazmi and al-Mihdhar were jihadists who intended to do harm to the United States.  This conclusion is properly drawn from the following facts and circumstances:  (1) the extremist links of al-Thumairy and al-Bayoumi themselves, as described above; (2) the nature of the assistance they provided and arranged to be provided to the two hijackers, which aligns exactly with the forms of support the future hijackers most needed to initiate their terrorist preparations upon arriving in the United States; (3) al-Bayoumi's selection of Abdullah, an extremist who was a member of the radical faction led by al-Thumairy, to befriend and provide further assistance to the hijackers; (4) al-Bayoumi's directive to Abdullah to assist the hijackers "in any way," reflecting a desire to provide continuing and unqualified support for the hijackers following their relocation to San Diego; (5) Abdullah's acknowledgement that he was aware of the extremist and anti-American views of al-Hazmi and al-Mihdhar; (6) the dishonesty of al-Thumairy, al-Bayoumi, Abdullah, and Bassnan during interviews with U.S. investigators, reflecting a common desire to conceal the true nature of their relationships and activities; and (7) the precautions taken by al-Qaeda to enable the hijackers to assimilate into the United States without drawing suspicion, which render it implausible to suggest that al-Qaeda would have sent the ill-prepared future

hijackers to the United States without arranging a support network to receive them.

54.     For the reasons discussed below, it is my further opinion that this domestic support network was organized and coordinated by employees and agents of the Saudi government, acting within the hierarchy and scope of the roles assigned to them by the Saudi government.

### Al-Thumairy's and Al-Bayoumi's Roles for the Saudi Government

55.     As mentioned previously, al-Thumairy was a Wahhabi cleric serving simultaneously as a representative of the Ministry of Islamic Affairs Office in the Saudi Consulate in Los Angeles, where he held diplomatic credentials, and as an imam at the Saudi-funded King Fahd Mosque.

56.     The Saudi government dispatches government-clerics like Thumairy, under the auspices of the Ministry of Islamic Affairs, "to spread Wahhabi beliefs throughout the world, including in mosques and schools." 9/11 Commission Final Report at p. 372.

57.     The Wahhabi variant of Islam is extremely intolerant and (particularly in the years leading up to the September 11th attacks) anti-American.  In fact, as late as 2006, official Saudi government textbooks encouraged jihad against infidels, and instructed students that it is a "religious obligation to do 'battle' against infidels in order to spread the [Wahhabi] faith." *See* Saudi Arabia's Curriculum of Intolerance, With Excerpts From Saudi Ministry of Education Textbooks, Center for Religious Freedom of Freedom House and Institute for Gulf Affairs, 2006, at p. 29.[3]

58.     Given that the Saudi government advocated in its own publications during the relevant time period that engaging in jihad to spread the Wahhabi faith was a religious obligation, and recognizing that al-Thumairy was deployed to the United States by the Saudi

---

[3] Available at https://www.hudson.org/content/researchattachments/attachment/907/crf_saudireport_2006.pdf

government to spread the Wahhabi faith, there is a direct nexus between al-Thumairy's actions in support of the 9/11 hijackers his Saudi-government assigned role to promote Wahhabi orthodoxy in the United States.  Indeed, al-Thumairy's own extremist teachings and sermons at the King Fahd Mosque – sermons that were delivered in his capacity as a Saudi government imam appointed to that post by the Ministry of Islamic Affairs – evidence that al-Thumairy viewed jihad as a tool to fulfill his charge to spread Wahhabi Islam outside of Saudi Arabia.

59.     Based on the evidence surveyed below, and my decades of experience in intelligence and national security matters, as well as my service on the 9/11 Congressional Joint Inquiry, it is my further opinion that Omar al-Bayoumi was, at all relevant times, an employee and agent of the government of Saudi Arabia acting in a covert capacity, whose true duties and functions involved carrying out activities on behalf of, and reporting to, representatives of the Islamic Affairs' departments of Saudi Arabia's diplomatic missions in the United States, including Fahad al-Thumairy.

60.     Al-Bayoumi first entered the United States in or around 1994 on a student visa. The Joint Inquiry investigation further revealed that in or around 1998, al-Bayoumi was in possession of a letter from the Saudi embassy stating that "he was getting a full scholarship from the government of Saudi Arabia."  Joint Inquiry Report at p. 423.

61.     Al-Bayoumi remained in the United States, on a nearly continuous basis, until July of 2001.

62.     Throughout this time, al-Bayoumi, who was a long time employee of the Saudi government, was segued by the Saudi government to a civil aviation contractor to the Saudi government, Dallah Avco.  Al-Bayoumi received a salary paid by the Saudi government through

Dallah Avco, and was purportedly assigned to Dallah Avco's "Air Navigation System Support" project for the Saudi government.

63.     However, during the lengthy period al-Bayoumi spent in the United States, there is no evidence that he pursued academic studies in any significant or sustained way, if at all, and there is no evidence that he performed any work whatsoever on behalf of Dallah Avco or on behalf of the Saudi government in relation to any aviation project.  In fact, Dallah Avco has expressly denied that al-Bayoumi was an employee of its company at any point.

64.     The FBI's 2012 summary on the status of its 9/11 investigation aptly summarizes the circumstances surrounding al-Bayoumi's lengthy presence in the United States, confirming that "Omar al-Bayoumi was living in San Diego on a student visa, despite not attending classes, and receiving a salary from the Kingdom of Saudi Arabia for job duties he never performed." 2012 FBI Summary at p. 4.

65.     Although al-Bayoumi was not pursuing academic studies or doing any work for Dallah Avco, he did have extensive and systematic contacts with the Saudi government establishments in the United States during his time here.  As reflected in the Joint Inquiry's final report, the FBI determined that "al-Bayoumi called Saudi Government establishments in the United States almost 100 times between January and May of 2000."  Joint Inquiry Report at p. 423.  In addition, the FBI also determined that "al-Bayoumi was in contact with at least three individuals at the Saudi Embassy in Washington, DC, two individuals at the Saudi Arabian Cultural Mission in Washington, DC, and three individuals at the Saudi Consulate in Los Angeles."  Joint Inquiry Report at p. 423-424.  Al-Bayoumi also was in possession of "the phone number for an individual at the Saudi Consulate in London."  Joint Inquiry Report at p. 424.

66.      In addition, al-Bayoumi had a close relationship with Osama Bassnan, who, like al-Bayoumi, had "many ties to the Saudi Government, including past employment by the Saudi Arabian Education Ministry" in the Saudi embassy in Washington, D.C.  Joint Inquiry Report at p. 417.  According to a CIA memo reviewed by the Joint Inquiry, "Bas[s]nan reportedly received funding and possibly a fake passport from Saudi Government officials."  Joint Inquiry Report at p. 417.

67.      Al-Bayoumi also had access to large sums of money from Saudi Arabia.  For instance, prior to September 11, 2001, the FBI received information that al-Bayoumi received $400,000 from Saudi Arabia to fund the construction of a mosque in San Diego.  Joint Inquiry Report at p. 424.  Of note, the construction of mosques outside of Saudi Arabia has been an initiative of the Saudi government for many years, as part of its mission to spread Wahhabi Islam globally.

68.      In addition, witnesses who interacted with al-Bayoumi regularly characterized him as some sort of spy or intelligence agent of the Saudi government during interviews with the FBI.  Joint Inquiry Report at p. 424.  Beyond his extensive contacts with the Saudi government, these witnesses noted that he was constantly videotaping Saudi students living in the United States and services at the mosque he attended.

69.      From these facts, we know that al-Bayoumi was in the United States under a false pretense for a period of many years, and assisted in maintaining that false pretense by documentation provided by the Saudi embassy.  Throughout his time here, he was receiving a salary from the Saudi government through an arrangement that served to obscure that the money was coming from the Saudi government.  He did no work on the project for which he was allegedly receiving compensation, but did have systematic and extensive contacts with Saudi

23

institutions and officials in the United States, including with Fahad al-Thumairy.  Al-Bayoumi
was extensively involved in the dissemination of religious materials and funding of mosques,
two principal missions of the Ministry of Islamic Affairs.  Further, witnesses who interacted with
him regularly believed that he was responsible for monitoring the activities of Saudi students in
the United States and reporting their activities to the Saudi government.[4]  Finally, al-Bayoumi
went immediately from his meeting at the Saudi Consulate (where al-Thumairy, who had
assigned someone to help al-Hazmi and al-Mihdhar during their time in Los Angeles, worked) to
the restaurant where he encountered al-Hazmi and al-Mihdhar, and then promptly offered to
assist them in settling in San Diego.

        70.     Based on all of this evidence, it is my professional opinion that Omar al-Bayoumi
was an undisclosed agent of the Saudi government, deployed to the United States to carry out
duties and functions on behalf of the Islamic Affairs and Education departments of Saudi
Arabia's embassies and consulates in the United States.  It is my further opinion that al-Bayoumi
was subject to the direction and control of al-Thumairy, and that al-Thumairy directed al-
Bayoumi to provide assistance to al-Hazmi and al-Mihdhar.  These conclusions are supported
and reinforced by the false pretext surrounding al-Bayoumi's presence in the United States; his
financial ties to the Saudi government; the nature of his known activities; his systematic contacts
with Saudi government establishments and representatives in the United States; and the

---

[4] During this time, the Wahhabi clerics in Saudi Arabia were very wary of potential Western influence on Saudi
students living abroad, as they feared that those students might introduce "un-Islamic" ideas upon their return to
Saudi Arabia.  The State Department's Country Reports on Human Rights Practices for 2000 confirms this fact,
noting in the section about Saudi Arabia that "Some professors [in Saudi universities] believe that informers monitor
their classrooms, and report to government and religious authorities.  The same report confirms that the Saudi
government "attempts to block all websites that it deems…. politically offensive, or 'un-Islamic'" and that the Saudi
authorities "monitor any large gathering of persons."  Given these practices of the Saudi government at home, it is
my professional opinion that the Saudis would also have maintained an apparatus for monitoring Saudi citizens
living abroad, and that this responsibility would have fallen principally to the Islamic Affairs offices of the
Kingdom's embassies and consulates.

circumstances surrounding his meeting with al-Hazmi and al-Mihdhar immediately following his meeting with al-Thumairy.

71.     These conclusions find further support in a critical finding revealed in the 2012 FBI Summary that "there is evidence" that an undisclosed individual who is also a subject of the FBI's ongoing investigation "tasked al-Thumairy and al-Bayoumi with assisting the hijackers." 2012 FBI Summary at p. 4.

72.     Finally, my opinions on this subject are in no way inconsistent with ambiguous statements by certain FBI officials declining to characterize Omar al-Bayoumi as a "Saudi intelligence agent."  Saudi Arabia's formal intelligence branch is known as the General Intelligence Presidency, or the General Intelligence Directorate.  At most, an ambiguous statement expressing doubt that al-Bayoumi was a "Saudi intelligence agent" would merely suggest doubt that al-Bayoumi was a formal employee of the General Intelligence Presidency. However, foreign governments often deploy agents to the United States to engage in espionage and other covert activities on behalf of their governments, who are not employees of those governments' formal intelligence arms.  In many cases, they are employed by some other component of the government that has its own interest in conducting covert activities in the United States.

Bob Graham

Executed on this 6 day of NOVEMBER, 2017.

25