# EXHIBIT 14

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------x

IN RE: TERRORIST ATTACKS ON
SEPTEMBER 11, 2001

------------------------------------------------------------------x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 17 JUN 2016

**MEMORANDUM DECISION
AND ORDER**
03 MDL 1570 (GBD)

GEORGE B. DANIELS, District Judge:

  This multi-district litigation seeks monetary damages from the named defendants who

allegedly participated, conspired, sponsored, aided, abetted and otherwise provided material

support to the terrorists who conducted the September 11, 2001 terrorist attacks on the United

States. Hundreds of defendants are alleged to have knowingly provided financial and other

means of material support directly or indirectly to Osama bin Laden, al Qaeda and its affiliated

terrorist organizations. Plaintiffs contend that the provision of material support by these

defendants assisted al Qaeda's ability to accomplish the terrorist attacks of September 11, 2001,

thereby resulting in death and injury.

  Since its inception in the late 1980's, al Qaeda has relied on well-placed financial

facilitators and logistical sponsors to raise, manage and distribute money and resources, enabling

it to grow rapidly into a formidable international terrorist network. Al Qaeda's ability to

maintain its far-reaching reign of terror is by virtue of an underground infrastructure of global

dimension. To defy detection, financial and other material support winds it way through a

labyrinth of interconnected individuals and entities before arriving at its final intended recipient,

al Qaeda. It is described, by plaintiffs, as an elaborate and complex web of banks, financial

institutions, businesses, individual financiers, relief organizations, charities, foreign governments

and their officials; all of whom purportedly use their united international efforts to covertly

infuse al Qaeda with massive amounts of financial and other material support. Charities cloaked

in a veil of legitimacy have allegedly amassed enormous sums of money for al Qaeda by diverting charitable donations from the hands of the needy into the hands of the terrorists. By allegedly feeding on years of financial, logistical, and other material support provided by others, al Qaeda grew in numbers, prominence and military strength, ultimately maturing into an organization, so highly skilled and proficient in the ways of terrorism, that it was able to accomplish attacks, including on United States soil, of unprecedented magnitude.

Plaintiffs maintain that, since at least the mid-1990's, it has been publicly known that Osama bin Laden and his al Qaeda network were engaged in a global campaign of terror directed at its proclaimed enemy, the United States. In 1996, Osama bin Laden identified the United States as al Qaeda's main enemy. In 1997, he declared jihad against the United States and, in 1998, made more explicit his declaration of war by calling upon all Muslims to kill Americans whenever and wherever they may be found. Osama bin Laden and al Qaeda affirmatively acted in carrying out their murderous threats against the United States as evidenced by the 1993 bombing of the World Trade Center, the 1998 bombings of two United States embassies in East Africa, and the 2000 bombing of the U.S.S. Cole.

Plaintiffs contend that, because it was publicly known since at least the mid-1990's that Osama bin Laden and al Qaeda had targeted the United States (including more specifically the World Trade Center) and its citizens, those who directly or indirectly provided material support to them, during that period of time, plainly knew they were assisting al Qaeda with its terrorist agenda. Plaintiffs further contend that, given the financial resources and operational logistics required to effectuate the 9/11 attacks, those attacks could not have been possible had it not been for the knowing material support provided to al Qaeda by charities, banks, foreign officials, as

2

well as other components of the terrorist matrix.

The numerous complaints assert causes of action for violations of international, foreign, federal and state law, and are pled on concerted theories of liability, *i.e.*, aiding and abetting, acting in concert, and conspiracy. Several defendants have separately and collectively moved, by way of more than one hundred motions, to dismiss the respective complaints against them: (1) pursuant to Fed.R.Civ.P. 12(b)(1), for lack of subject matter jurisdiction on the grounds that they are immune from suit pursuant to the Foreign Sovereign Immunities Act of 1976 ("FSIA"), 28 U.S.C. §§ 1602, *et seq*.; (2) pursuant to Fed.R.Civ.P. 12(b)(2), for lack of personal jurisdiction; (3) pursuant to Fed.R.Civ.P. 12(b)(6), for failure to state a claim upon which relief may be granted; and/or (4) pursuant to Fed.R.Civ.P. 12(b)(5), for insufficient service of process.


## PROCEDURAL HISTORY

Multiple cases were filed in various courts asserting similar and related claims in connection with the 9/11 terrorist attacks. In December of 2003, the Judicial Panel on Multidistrict Litigation ("MDL") determined that these "actions present common, complex legal and factual question concerning the efforts of plaintiffs to hold liable an array of defendants who allegedly promoted, financed, sponsored or otherwise supported the terrorists that led to the death and injuries arising from the September 11, 2001 attacks on the United States." In re Terrorist Attacks of Sept. 11, 2001, 295 F.Supp.2d 1377, 1378 (Jud.Pan.Mult.Lit. 2003). The MDL Panel accordingly ordered that the actions be consolidated and transferred to the United States District Court for the Southern District of New York, and assigned to Judge Richard C.

Casey.[1]

Following Judge Casey's death, the MDL litigation was reassigned to this Court in 2007. At the time of the reassignment, the docket sheet reflected the existence of hundreds of pending motions. Both Judge James Robertson, sitting in the District of Columbia, and the late-Judge Casey entertained motions to dismiss similar to the ones now pending. The motions to dismiss had previously been handled in a piecemeal fashion. This resulted in some moving defendants being granted dismissal as to a particular action, while still remaining a named defendant in several other similar actions comprising this MDL litigation.

In particular, Judge Casey entered partial final judgment dismissing the claims for lack of subject and/or personal jurisdiction against a sampling of twelve named defendants. In re Terrorist Attacks on Sept. 11, 2001, 349 F.Supp.2d 765 (S.D.N.Y. 2005) ("Terrorist I"), *on reconsideration in part* 392 F.Supp.2d 539 (S.D.N.Y. 2005) ("Terrorist II"). Plaintiffs appealed that judgment with respect to seven of the dismissed defendants, six of whom claimed sovereign immunity under the FSIA. Specifically, those dismissed defendants are: the Kingdom of Saudi Arabia, five Saudi princes, and the Saudi High Commission for Relief to Bosnia and Herzegovina ("SHC"), a non-corporate Saudi governmental entity created to provide humanitarian aid. Prior to this Court issuing its anticipated decision as to certain of the other pending motions to dismiss, the Second Circuit Court of Appeals issued its decision affirming the dismissal of the claims against the seven appellees. In re Terrorist Attacks on Sept. 11, 2001,

---

[1] Despite the standing MDL Order, related cases continued to be litigated in other courts and have only recently been transferred to this Court for their inclusion in the coordinated or consolidated pretrial proceedings. For example, the case of Doe v. Bin-Laden, *et al.*, 01 CV 2516, was commenced in 2001 in the District of Columbia, and had an appeal pending before the D.C. Circuit Court when it was transferred to this Court a few months ago.

4

538 F.3d 71 (2d Cir. 2008) ("Terrorist III"), *cert. denied sub nom.* Federal Ins. Co. v. Kingdom of Saudi Arabia, 129 S.Ct. 2859 (2009). The Second Circuit's decision focuses on the due process requirements for the exercise of personal jurisdiction over a foreign defendant under a specific theory of jurisdiction, and addresses issues relating to sovereign immunity under the FSIA.

The FSIA provides the sole means by which courts in this country can obtain jurisdiction over a "foreign state," which is defined to include its political subdivisions, agencies and instrumentalities. See, Guirlando v. T.C. Ziraat Bankasi A.S., 602 F.3d 69, 74 (2d Cir. 2010); 28 U.S.C. § 1603(a).[2] If the FSIA does not provide a basis for the exercise of jurisdiction over the foreign sovereign, the Court lacks subject matter jurisdiction. See, Saudi Arabia v. Nelson, 507 U.S. 349, 355 (1993) "In general, a foreign state or an 'agency or instrumentality of a foreign state,' ... is immune from federal court jurisdiction unless a specific exception to the FSIA applies". Anglo-Iberia Underwriting Mgmt. Co. v. P.T. Jamsostek, 600 F.3d 171, 175 (2d Cir. 2010). The Second Circuit Court of Appeals concluded, in Terrorist III , that the term "agency" of a foreign state is to be construed "to include senior members of a foreign state's government

---

[2] Under the FSIA, "[a]n 'agency or instrumentality of a foreign state' means any entity-

(1) which is a separate legal person, corporate or otherwise, and

(2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and

(3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (e) of this title, nor created under the laws of any third country."

28 U.S.C. § 1603 (b)(1-3).

5

and secretariat." <u>Terrorist III</u>, 538 F.3d at 83.  The Circuit accordingly held "that an individual

official of a foreign state acting in his official capacity is the 'agency or instrumentality' of the

state, and is thereby protected by the FSIA" "for [his] official-capacity acts".  <u>Id</u>. at 81, 83.

Having determined that none of the FSIA exceptions relied upon by plaintiffs were applicable,

the Second Circuit accordingly held that the FSIA protects from suit the Kingdom of Saudi

Arabia, the SHC as an "agency or instrumentality" of the Kingdom, and the Saudi officials,

insofar as they are sued in their official capacities.  <u>Id</u>. at 75.[3]

Plaintiffs filed a Petition for *Certiorari* before the United States Supreme Court.

Pursuant to the parties' request, the regularly scheduled conference before this Court was

adjourned for six months to await a determination on plaintiffs' application.  Ultimately, the

United States Supreme Court denied plaintiffs' request seeking a writ of *certiorari*.  Prior to

resolving the pending motions to dismiss, this Court afforded the parties an opportunity to

simultaneously file supplemental briefs addressing the import of the Second Circuit's decision,

and to thereafter file reply briefs.  Plaintiffs' subsequent application seeking to supplement their

previously filed supplemental briefing was denied by the Court.  Notwithstanding such a denial,

the parties have filed a number of further supplemental briefings, the last one filed only a few

---

[3] Plaintiffs argued the applicability of three FSIA's exceptions.  The Second Circuit "conclude[d] that none of the FSIA's exceptions applies.  The plaintiffs' claims do not come within the statutory exception for state-sponsored terrorist acts, 28 U.S.C. § 1605A ('Terrorism Exception'), because the Kingdom has not been designated a state sponsor of terrorism by the United States.  As to the exception for personal injury or death caused by a foreign sovereign's tortious act, *id*. § 1605(a)(5) ('Torts Exception'), [the Second Circuit] decline[d] to characterize plaintiffs' claims- expressly predicated on a state-sponsored terrorist act-as sounding in tort.  Nor do the plaintiffs' claim come within the statutory exception for a foreign sovereign's commercial activity, *id*. § 1605(a)(2) ('Commercial Activities Exception'), because the defendants' specific alleged conduct-supporting Muslim charities that promote and underwrite terrorism-is not conduct in trade, traffic or commerce."  <u>Terrorist III</u>, 538 F.3d at 75.

6

weeks ago on May 10, 2010.

A few days ago, on June 1, 2010, the United States Supreme Court held in <u>Samantar v.</u>
<u>Yousuf</u>, - - U.S. - - , 2010 WL 2160785, that an individual foreign official sued for conduct
undertaken in his official capacity is not a "foreign state" entitled to immunity from suit within
the meaning of the FSIA, thereby partially abrogating the Second Circuit's holding in <u>Terrorist</u>
<u>III</u>.  Yesterday, chambers received a letter from plaintiffs addressing the import of the Supreme
Court's most recent opinion.  The Court received a similar letter from defendants.

The Supreme Court holding pertains to a government official being sued in his "personal
capacity," as oppose to his official capacity, for "actions taken in his official capacity."  <u>Id</u>., at
*3, *9.  The Supreme Court noted, that since the FSIA is inapplicable to individuals, a plaintiff
seeking to sue a foreign official must demonstrate that personal jurisdiction exists over the
official on some basis other than reliance on the service of process and jurisdictional provisions
of the FSIA.  <u>Id</u>. at *9 n.20.

The Supreme Court further found that, although the FSIA will not provide immunity to
individuals, the suit "may still be barred by foreign sovereign immunity under the common law."
<u>Id</u>. at *9.  Resolution of an individual foreign official's claim of common-law immunity typically
involves a two-step procedure.  <u>Id</u>. at *4.  First, the State Department is afforded an opportunity
to make a "suggestion of immunity," and, if it does so, the Court surrenders jurisdiction.  <u>Id</u>.  In
the absence of the State Department's recognition of immunity, the Court still retains the
authority to determine for itself whether all requirements for immunity exists.  <u>Id</u>. (citations
omitted).  "In making that decision, a district court inquire[s] whether the ground of immunity is
one which it is the established policy of the State Department to recognize."  <u>Id</u>. (internal

7

quotation marks and brackets omitted).

The Supreme Court additionally observed that "not every suit can successfully be pleaded against an individual official alone." Id. at *9. "Even when a plaintiff names only a foreign official, it may be the case that the foreign state itself, its political subdivision, or an agency or instrumentality is a required party, because that party has 'an interest relating to the subject of the action' and 'disposing of the action in the person's absence may ... as a practical matter impair or impede the person's ability to protect the interest.' " Id. (quoting Fed.R.Civ.P. 19(a)(1)(B)) (alteration in original). "If this is the case, and the entity is immune from suit under the FSIA, the district court may have to dismiss the suit, regardless of whether the official is immune or not under common law." Id. The Supreme Court further noted "that some actions against an official in his official capacity should be treated as actions against the foreign state itself, as the state is the real party in interest." Id.

There is presently pending five foreign officials' motions to dismiss on immunity grounds. Based on the Second Circuit's ruling, plaintiffs conceded that dismissal of the actions was warranted as to one defendant, and with regard to the others, plaintiffs limited the alleged wrongful acts of the officials to conduct purportedly undertaken outside the scope of their governmental duties. In light of the recent Supreme Court holding, plaintiffs' concessions are unwarranted and will be disregarded insofar as they relate to FSIA's applicability to individuals.[4]

---

[4] Plaintiffs still concede that the Second Circuit's holding is dispositive as to the following twelve defendants' respective motions to dismiss:

1. Alfaisaliah Group a/k/a Faisal Group Holding Company
2. Al Aqsa Islamic Bank
3. Binladin Group International
4. Hamad Al-Husaini

The government official-defendants are now asserting common-law immunity. Additionally, they contend that the claims based on alleged acts taken in their official capacity must be dismissed because they are in essence claims against their respective governments, which are immune from suit under the FSIA. Although this Court has thoroughly examined that issue, the issue of immunity need not, however, be resolved. These defendants have also moved, *inter alia*, to dismiss the claims against them for lack of personal jurisdiction, pursuant to Fed.R.Civ.P. 12(b)(2). Because the Court finds that their motions to dismiss for want of personal jurisdiction are meritorious as to the government official-defendants, the question of immunity need not be discussed here.

## PERSONAL JURISDICTION

Dozens of defendants have moved to dismiss the respective complaints against them for, among other grounds, lack of personal jurisdiction, pursuant to Fed.R.Civ.P. 12(b)(2). To withstand a Rule 12(b)(2) motion, plaintiffs bear the burden of showing that the Court has jurisdiction over the defendants. In re Magnetic Audiotape Antitrust Litig., 334 F.3d 204, 206 (2d Cir. 2003); Metro. Life Ins. Co. v. Robertson-Ceco Corp., 84 F.3d 560, 566 (2d Cir. 1996). "[T]he nature of plaintiff's obligation varies depending on the procedural posture of the

---

5. Zahir Kazmi
6. Mohammed Binladin Company
7. Mohamed Al Mushayt
8. Mushayt for Trading Establishment
9. Khalid Al Rajhi
10. Saudi Joint Relief Committee
11. Saudi Red Crescent Society
12. Ahmed Zaki Yamani

9

litigation." Ball v. Metallugie Hoboken-Overpelt, S.A., 902 F.2d 194, 197 (2d Cir. 1990).

Where no evidentiary hearing has been held, nor have the parties engaged in jurisdictional

discovery, plaintiff's *prima facie* showing may be established solely on the basis of legally

sufficient allegations of jurisdiction. In re Magnetic Audiotape, 334 F.3d at 206; Ball, 902 F.2d

at 197; Hoffritz for Cutlery, Inc. v. Amajac, Ltd., 763 F.2d 55, 57 (2d Cir. 1985). The Court is to

accept all averments of jurisdictional facts as true, and construe the pleadings and affidavits in

plaintiff's favor. In re Magnetic Audiotape, 334 F.3d at 206; PDK Labs, Inc. v. Friedlander,

103 F.3d 1105, 1108 (2d Cir. 1997). Where jurisdictional discovery has taken place, however,

plaintiff has the burden to make a factually supported *prima facie* showing which includes an

averment of facts that, if given credit by the ultimate trier of fact, would be sufficient to establish

jurisdiction over the defendant. Overseas Media, Inc. v. Skvortsov, 277 Fed.Appx. 92, 94 (2d

Cir. 2008) (*quoting* Ball, 902 F.2d at 197).; see also, Schultz v. Safra Nat'l Bank of New York,

2010 WL 1980234, at *1 (2d Cir. May 17, 2010) (citations omitted).[5]

    "Generally, personal jurisdiction has both statutory and constitutional components."

Frontera Res. Azerbaijan Corp. v. State Oil Co. of Azerbaijan Republic, 582 F.3d 393, 396 (2d

Cir. 2009). "A court must have a statutory basis for asserting jurisdiction over a defendant, and

the Due Process Clause typically also demands that the defendant, if not present within the

territory of the forum, have certain minimum contacts with it such that the maintenance of the

suit does not offend traditional notions of fair play and substantial justice." Id. (internal

---

    [5] Plaintiff was afforded an opportunity to engage in jurisdictional discovery as to a
number of defendants. In determining whether plaintiffs have satisfied their burden of
demonstrating jurisdiction as to each of the movants, the Court will apply the standard applicable
to that particular defendant based on the procedural posture of the case against that defendant.

citations, quotation marks and alterations omitted). "The Due Process Clause protects an

individual's liberty interest in not being subject to the binding judgments of a forum with which

he has established no meaningful 'contacts, ties, or relations.' " Burger King Corp. v.

Rudzewicz, 471 U.S. 462, 471-72 (1985) (quoting Int'l Shoe Co. v. Washington, 326 U.S. 310,

319 (1945)).

Due process requires a defendant to have "fair warning" that a particular activity may

subject him to the jurisdiction of a foreign court. Id. at 472. In determining whether the due

process requirements are satisfied, the Court must engage in a two step inquiry. Porina v.

Marward Shipping Co., Ltd., 521 F.3d 122, 127 (2d Cir. 2008). It must be initially determined

whether a defendant has sufficient minimum contacts with the forum. Id. "In judging minimum

contacts, a court properly focuses on 'the relationship among the defendant, the forum, and the

litigation.' " Calder v. Jones, 465 U.S. 783, 788 (1984) (quoting Shaffer v. Heitner, 433 U.S.

186, 204 (1977)). "Each defendant's contacts with the forum [ ] must be assessed individually."

Id. at 790. If the requisite minimal contacts exists, the Court must then consider whether the

exercise of jurisdiction over that defendant would be reasonable under the circumstances of the

particular case. Metro. Life, 84 F.3d at 568.

Where New York State's long-arm statute provides the basis to assert personal

jurisdiction over a defendant, the exercise of jurisdiction must satisfy the due process

requirements of the Fourteenth Amendment. Where personal jurisdiction is asserted under

Fed.R.Civ.P. 4(k), the exercise of jurisdiction must meet the due process requirements of the

Fifth Amendment. "[T]he due process analysis is basically the same under both the Fifth and

Fourteenth Amendments. The principal difference is that under the Fifth Amendment the court

11

can consider the defendant's contacts throughout the United States, while under the Fourteenth Amendment only the contacts with the forum state may be considered." Chew v. Dietrich, 143 F.3d 24, 28 n.4 (2d Cir. 1998). Plaintiffs bear the burden of establishing that each of the defendants' contacts with either New York or the United States as a whole is sufficient to support the exercise of personal jurisdiction.

The exercise of personal jurisdiction over a foreign defendant can be under a "general" or "specific" theory of jurisdiction. Under the specific theory, the cause of action is related to or arises out of the defendant's forum-related activities. Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414 n.8 (1984). Where the cause of action does not relate to or arise out of the foreign defendant's activities, a court may assert general jurisdiction if the defendant has "continuous and systematic" contacts with the forum at the time the initial complaint was filed. Id. at 414-16 & n.9. If it is determined that a defendant lacks the requisite minimal contacts for either general or specific jurisdiction, the Court need not consider the second prong of the due process test in order to determine whether the exercise of jurisdiction would be reasonable under the particular circumstances of the case. See, Metro Life, 84 F.3d at 568 (citation omitted).

## GENERAL JURISDICTION

Prior to the Second Circuit's issuance of its decision in Terrorist III, plaintiffs had predominantly opposed the respective motions to dismiss for lack of personal jurisdiction relying solely on specific theories of jurisdiction. Plaintiffs now argues that twenty-three of the moving defendants have extensive contacts with the United States, sufficient to sustain a *prima facie*

12

case of personal jurisdiction under general jurisdiction standards.[6]  The standard for evaluating

whether minimum contacts satisfy the test for general jurisdiction is more stringent than the test

applied to questions of specific jurisdiction.  Metro Life, 84 F.3d at 568 (citations omitted).  In

determining whether a defendant's general contacts can be characterized as having been

continuous and systematic as of the time of the commencement of the litigation, the Court

" 'examine[s] a defendant's contact with the forum [ ] over a period that is reasonable under the

circumstances-up to and including the date the suit was filed.' "  Porina, 521 F.3d at 128

(quoting Metro Life, 84 F.3d at 569).  For the exercise of general jurisdiction, it is essential that

there minimally be some act by which the defendant purposefully avails himself of the privilege

---

[6] Specifically, those defendants are:
1. Talal M. Badkook
2. M.M. Badkook Company
3. Shahir A. Batterjee
4. Abdullah Binladin
5. Bakr Binladin
6. Omar Binladin
7. Tariq Binladin
8. Yeslam Binladin
9. Dallah Avco Trans-Arabia Co. Ltd.
10. DMI Administrative Services S.A.
11. Saleh Al-Hussayen
12. Abdul Aziz bin Ibrahim Al-Ibrahim
13. Ibrahim bin Abdul Aziz Al-Ibrahim Foundation
14. Yousef Jameel
15. Abdulrahman Bin Mahfouz
16. Khalid Bin Mahfouz
17. National Commercial Bank
18. Abdullah bin Saleh Al Obaid
19. Abdullah Al Rajhi
20. Saleh Al Rajhi
21. Sulaiman Al Rajhi
22. Abdul Rahman Al Swailem
23. Abdullah Muhsen Al Turki

13

of conducting activities in the forum. Hanson v. Denckla, 357 U.S. 235, 253 (1958). The "purposeful availment" requirement is designed to eliminate random, fortuitous, or attenuated contacts or the unilateral activity of a third person, from serving as a basis for the exercise of jurisdiction. Burger King, 471 U.S. at 475 (citations omitted).

This Court determines that plaintiffs failed to make the requisite showing that any of the twenty-three defendants at issue have the requisite continuous and systematic contacts with the New York or the United States sufficient to satisfy the stringent minimal contacts test for the exercise of general personal jurisdiction.

Plaintiffs argue that defendant Abdullah Binladin's role in connection with United States-based charities is sufficient for the exercise of general jurisdiction. Abdullah Binladin identifies himself as the nephew of Osama bin Laden, not Osama bin Laden's brother as the plaintiffs represent. He indicates that had resided in Virginia for several years, during which time, his brother Omar Binladin also resided with him. Abdullah Binladin advises that he moved back to Saudi Arabia, in September of 2000, and has maintained his permanence residence there ever since. (Abdullah Binladin Aff. ¶ 3). Defendant indicates that, for several years prior to his return to Saudi Arabia, he was an administrative officer at the Saudi Arabian Embassy. (Id.). In 1991, Abdullah Binladin established and became president of the United States branch of the World Assembly of Muslim Youth ("WAMY-US"), a non-profit corporation in Virginia. Defendant indicates that his work for WAMY-US was in a volunteer capacity, and he has had no further contact with the charity after leaving Virginia in 2000. (Id. ¶¶ 6-7). Defendant also indicates that, from 1991 to 1994, he served on the board of Taibah International Aid Association, a charitable organization in Virginia. Abdullah Binladin's contacts with the United

14

States ceased to exist prior to the commencement of the cases against him, and even prior to the terrorist attacks of 9/11. Plaintiffs have failed to demonstrate that Abdullah Binladin, a permanent resident of Saudi Arabia since 2000, has the requisite presence in the United States to warrant the exercise of general jurisdiction.

Defendants Bakr, Omar, Tariq and Yeslam Binladin, who plaintiffs identify as Osama bin Laden's half-brothers, are claimed to each have sufficient contacts with the United States to subject them to general jurisdiction.[7] Plaintiffs seek to attribute the United States contacts of certain business and other entities, a particular defendant allegedly controlled, to that defendant individually. Jurisdiction over a corporation's board member, officer or employee, in his or her individual capacity, must be premised on the defendant's own personal contacts with the forum, and not the acts and/or contacts carried out by the defendant in his or her corporate capacity. See, In re AstraZeneca Sec. Litig., 559 F.Supp.2d 453, 467 (S.D.N.Y. 2008) ("A person's status as a board member is not alone sufficient to establish jurisdiction ...") (citations omitted), aff'd sub nom. State Univs. Ret. Sys. of Illinois v. Astrazeneca, PLC, 334 Fed.Appx. 404 (2d Cir. 2009); In re Alstom SA Sec. Litig., 406 F.Supp.2d 346, 398 (S.D.N.Y. 2005) ("Jurisdiction over the representatives of a corporation 'may not be predicated on jurisdiction over the corporation itself, and jurisdiction over the individual officers and directors must be based on their individual

---

[7] In one of the actions comprising this multi-district litigation, Judge Casey already dismissed Bakr, Omar and Tariq Binladin as defendants based on a complaint containing substantially similar allegations to the ones now at issue. Judge Casey found there was an absence of "any factual allegations against Tariq, Omar, or Bakr Binladin from which the Court could infer that they purposefully directed their activities at the United States, that they were members of a conspiracy pursuant to the New York long-arm statute, or that they have any general business contacts with the United States." Terrorist I, 349 F.Supp.2d at 822. Although a final order of dismissal was entered in that case, plaintiffs did not file an appeal.

15

contacts with the forum state.' ") (*quoting* Charas v. Sand Tech. Sys. Int'l, Inc., 1992 WL 296406, at *4-*5 (S.D.N.Y. Oct. 7, 1992)); Pilates, Inc. v. Pilates Inst., Inc., 891 F.Supp. 175, 180 -181 (S.D.N.Y. 1995) ("[I]t is well established that individual officers and employees of a corporation are not automatically subject to personal jurisdiction in New York simply because a court can exercise jurisdiction over the corporation."). While defendants may have profited as a result of those companies' United States-related activities, they are not, as a result, subject to general jurisdiction. See, World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 299 (1980) ("[F]inancial benefits accruing to the defendant from a collateral relation to the forum State will not support jurisdiction if they do not stem from a constitutionally cognizable contact with that State.").

Moreover, the United States contacts allegedly attributable to the defendants' in their individual capacity, such as receiving an education in the United States in the 1970's, significant donations to Harvard University, and having United States investments, are not individually or cumulatively of such a quality, nature or duration to support a finding that any of these defendants have the requisite continuous and systematic contact with the forum to satisfy the stringent general jurisdiction test. See e.g., In re Ski Train Fire in Kaprun, Austria on Nov. 11, 2000, 343 F.Supp.2d 208, 216 (S.D.N.Y. 2004) (finding that the act of providing funding to a United States University without more cannot support a finding of general jurisdiction); Schenker v. Assicurazioni Generali S.p.A., Consol., 2002 WL 1560788, at *3, *5 (S.D.N.Y. July 15, 2002) (investing money and maintaining bank account insufficient).[8]

---

[8] Plaintiffs allege, in a conclusory fashion, that defendant Omar Binladin was living in Virginia with his "brother" defendant Abdullah Binladin on September 11, 2001, and that both brothers had been investigated, in the mid-1990's, regarding their connections with the WAMY

16

Plaintiffs further argue that they "have presented factual allegations demonstrating that [defendants Talal M. Badkook and M.M. Badkook Company] maintained extensive and ongoing contacts with the United States, sufficient to demonstrate personal jurisdiction under general jurisdiction theories." (Pls.' Resp. to Defs.' List of Defs. at 1). Plaintiffs argue that, "[a]mong other activities in the United States," Talal Badkook was among the founders and original board member of the United States branch of Muwafaw, a purported charity allegedly used to provide money to al Qaeda. Through Muwafaw and its American operations, Talal Badkook is alleged to have become part of al Qaeda's infrastructure, both individually and through defendant M.M. Badkook Company, which Talal Badkook allegedly owns and controls.

Simply because jurisdiction may be exercised over a charity incorporated in the United States does not render its nonresident officer subject to jurisdiction in his individual capacity, and certainly not a company he purportedly owns which itself has no direct relationship to the charity. Even if the United States-based activities of the charity could be imputed to the Badkook defendants themselves, those activities would nevertheless be insufficient for the exercise of general jurisdiction. Plaintiffs allege that the United States branch of Muwafaw was incorporated in Delaware in 1992 and remained in operation until 1997. The Badkook-

---

charity. (Euro Brokers, Inc. v. Al Baraka Inv. & Dev. Corp., 04 CV 7279, & World Trade Ctr. Props., L.L.C. v. Al Baraka Inv. & Dev. Corp., 04 CV 7280, RICO Statements, Ex. A at 2). Consistent with the representations of Abdullah Binladin, defendant Omar Binladin denies ever living in Virginia with his nephew Abdullah Binladin, and explains that Abdullah's brother, who is also named "Omar Binladin" is the individual who resided with Abdullah in Virginia. (Omar Binladin Aff. ¶ 5; see also, Abdullah Binladin Aff. ¶ 5). Defendant further indicates that he lived in the United States while attending college in the 1970's, but has not lived in this country since 1974. (Omar Binladin Aff. ¶ 4). Plaintiffs' unsupport allegation regarding defendant Omar Binladin's United States residency is of no evidentiary significance in determining personal jurisdiction.

defendants, however, submitted a Certification of the Secretary of State of Delaware attesting to

the fact that the charity ceased to exist and became inoperative as of March 1, 1994. (Kabat

Decl. Ex. 1 at 3). Plaintiffs have not offered any evidence to contradict or discredit defendants'

showing in this regard. Thus, the record reflects that the charity was only in existence for

approximately two years, and ceased to exist seven years prior to the terrorist attacks of 9/11.

Although plaintiffs represent, in a conclusory fashion, that there exists other United States-based

activities that are attributable to Talal Badkook, they fail to uncover or otherwise identify any

specific activity. The Court's independent review of the voluminous submissions of plaintiffs

similarly failed to disclose the existence of any activities or contact with the United States that is

attributable to either of these defendants. Thus, neither defendant is subject to the exercise of

general jurisdiction.

Plaintiffs identify defendant Shahir A. Batterjee's United States contacts to include his

involvement in the establishment of the United States branch of the Benevolence International

Foundation ("BIF") in Illinois in 1992, and his service as a director of that organization.

Plaintiffs also claim that defendant Batterjee served as the Director of BIF's Florida branch.

Defendant Batterjee advises that his involvement with BIF ended in 1994. Such an assertion is

consistent with the documentary evidence submitted by plaintiffs which merely shows that he

was an officer of BIF's Illinois branch in 1993, and the charity's Florida branch has been defunct

since August of 1994. (Bierstein Aff. Ex. 2, Ex. 3). Plaintiffs' unsupported assertion that it

"appears" that defendant Batterjee is currently living in an apartment in Arizona, is of no

evidentiary weight. Defendant advises that he has lived in Saudi Arabia his entire life, except for

the brief time he was attending college in the United States from the late 1960's to 1970. He

18

indicates that he has visited the United States, both for vacation and business trips for the

company he works for and in which he has no ownership interest. To find a non-resident

defendant is present in the United States, sufficient to satisfy due process, requires more than

occasional trips to the United States. See e.g., Hoffritz, 763 F.2d at 57-58 (fifty-four visits found

insufficient); Aquascutum of London, Inc. v. S.S. American Champion, 426 F.2d 205, 211-12

(2d Cir. 1970) (visits "every few months" to solicit business found insufficient); Jacobs v. Felix

Block Erben Verlag fur Buhne Film und Funk KG, 160 F.Supp.2d 722, 733 (S.D.N.Y. 2001)

(occasional trips, on average of four to five visits per year, insufficient). Accordingly, the

jurisdictional facts asserted by plaintiffs are insufficient to support the exercise of general

jurisdiction over defendant Shahir Batterjee.

In arguing that defendants Abdulrahman and Khalid Bin Mahfouz are subject to general

jurisdiction, plaintiffs rely on their alleged conduct in establishing, funding and/or managing a

foreign suspect charity, as well as such United States contacts as: United States investments,

purported affiliates with entities allegedly having contacts with the United States, ownership of

two nonresidential apartments, and/or conduct undertaken in one's official corporate capacity.[9]

Such purported contacts do not rise to the requisite level of continuous and systematic to support

the exercise of general jurisdiction over either defendant. See e.g., Weil v. Am. Univ., 2008 WL

126604, at *4 (S.D.N.Y. Jan. 2, 2008) (finding ownership of property in forum is analogous to an

---

[9] Judge Casey previously dismissed one of the complaint against Abdulrahman Bin Mahfouz finding that it did "not contain any specific actions by Mr. bin Mahfouz from which the Court could infer that he purposefully directed his activities at the United States." Terrorist I, 349 F.Supp.2d at 820. Judge Casey further found that neither the defendant's affiliations with entities that are alleged to have United States contacts nor his status as a shareholder in a United States company, was sufficient to establish jurisdiction over him. Id. at 820-21.

19

investment which is insufficient to establish personal jurisdiction); Schenker, *supra* (investing

money insufficient); First Capital Asset Mgmt., Inc. v. Brickellbush, Inc., 218 F.Supp.2d 369,

393 (S.D.N.Y. 2002) (ownership and sale of apartment, which is not alleged to have ever served

as defendant's residence, insufficient), *on reconsideration* 219 F.Supp.2d 576 (S.D.N.Y. 2002),

*aff'd* 385 F.3d 159 (2d Cir. 2004); Bozell Group, Inc. v. Carpet Co-op of Am. Ass'n, Inc., 2000

WL 1523282, at *5 (S.D.N.Y. Oct. 11, 2000) (mere nominal affiliation with independent New

York entities and two visits taking place over three months period insufficient).

Plaintiffs similarly focus on defendant Yousef Jameel's role as an international

businessman as a basis to impute to him individually the United States-based activities of

companies allegedly controlled by Jameel and his family. Such corporate contacts cannot be

attributable to Yousef Jameel in his individual capacity, and accordingly the showing necessary

for the exercise of general jurisdiction is absent.

Plaintiffs further argue that both defendants Abdul Aziz bin Ibrahim Al-Ibrahim ("Ibrahim

Al-Ibrahim") and Ibrahim bin Abdul Aziz Al-Ibrahim Foundation ("Al-Ibrahim Foundation") are

subject to exercise of general jurisdiction. Plaintiffs, however, fail to identify any contacts the

Al-Ibrahim Foundation has ever had with the United States, and accordingly the Court finds

general jurisdiction does not exist as to that defendant.

Plaintiffs allege that defendant Ibrahim Al-Ibrahim, who established the Al-Ibrahim

Foundation, has lived on and off in the United States since the 1980's, during which time he

engaged in romantic pursuits. Plaintiffs further claim that defendant acquired real estate interests

in the United States through various companies he allegedly controls. Plaintiffs maintain that

defendant is subject to general jurisdiction because of his "extensive use of the United States for

20

residency, business and courtship". (Pls.' Opp'n Mem. at 7). Plaintiffs' allegations lack the

factual specificity necessary to demonstrate that the sporadic presence of Ibrahim Al-Ibrahim in

the United States is sufficient to support the exercise of general jurisdiction. Additionally,

courtship and other such romantic endeavors are not activities which alone provide a basis to

confer general jurisdiction over a foreign defendant. Finally, defendant's alleged ownership of

property through various independent entities does not confer jurisdiction as there are no factual

allegations pled to establish that such companies are mere shells and are in fact the alter egos of

Ibrahim Al-Ibrahim. See e.g., Reers v. Deutsche Bahn AG, 320 F.Supp.2d 140, 155 (S.D.N.Y.

2004) (mere fact that defendant owns or partially owns business registered to do business in

forum is insufficient to subject defendant to general jurisdiction); Ontel Prods., Inc. v. Project

Strategies, Corp., 899 F.Supp. 1144, 1148 (S.D.N.Y. 1995) (individual owner of corporation is

not subject to jurisdiction based on corporation's activities unless corporate veil can be pierced or

if corporation acted as agent of owner). Since plaintiffs argues that Ibrahim Al-Ibrahim is subject

to personal jurisdiction solely under theories of general jurisdiction, his motion to dismiss for lack

of personal jurisdiction is granted.

Plaintiffs allege that defendant DMI Administrative Services S.A. ("DMI S.A.") is

subject to jurisdiction under a general approach. In support of plaintiffs' contention that DMI

S.A. advertises and solicits business in the United States, plaintiffs identify a 1981 advertisement

in the Wall Street Journal and claim the existence of other advertisements in United States

publications issued by Saudi-based charities. There is no showing that DMI S.A. derived any

significant revenue as a result of advertising within the United States. The temporal remoteness

and limited nature of its purported advertising does not reflect an active or recent campaign to

solicit United States business, and is insufficient to establish DMI S.A.'s presence in the United

States.  See e.g., Howard v. Klynveld Peat Marwick Goerdeler, 977 F.Supp. 654, 662 (S.D.N.Y.

1997) (advertising and marketing activities do not constitute adequate basis for general

jurisdiction absent a systematic and continuous course of doing business in forum), aff'd 173 F.3d

844 (2d Cir. 1999).  Similarly unavailing, for purposes of conferring general jurisdiction, is

plaintiffs' assertion that DMI S.A. has investments in the United States.  Plaintiffs additionally

argue that DMI S.A. has significant business operations in the United States by virtue of the

activities of its wholly-owned subsidiaries, as oppose to its own forum-related activities.  The

allegations, however, do not demonstrate DMI S.A's pervasive control over those independent

entities to support the exercise of general jurisdiction over the non-resident defendant based on

the activities of its purported subsidiaries.  See e.g., Volkswagenwerk Aktiengesellschaft v. Beech

Aircraft Corp., 751 F.2d 117, 120 (2d Cir. 1984) ("It is true that the presence of a local

corporation does not create jurisdiction over a related, but independently managed, foreign

corporation.").

The allegations against defendant Dallah Avco Trans-Arabia Company, Ltd. ("Dallah

Avco"), a Saudi-based company, arise from the actions of one of its employees, a suspected

advance man who allegedly laid the ground work for the 9/11 attacks and provided  direct

assistance to two of the hijackers.  The employee was allegedly hired in the early 1990's for a

project in Saudi Arabia, but moved to the United States in 1994.  His employment with Dallah

Avco allegedly continued until 2001.  Plaintiffs argue that Dallah Avco is subject to general

jurisdiction because of its presence in this forum by virtue of its United States-based employee.

Dallah Avco indicates that it has never maintained any bank accounts in the United States;

22

was never domiciled, organized or incorporated in any form in the United States; has never been

licensed or registered to do business here; never owned or leased property in the United States;

never offered or advertised any activities or services within the United States; no shares in the

company have ever been offered or sold in the United States; and it never had a branch office,

representative or agent in the United States. Dallah Avco further denies ever having an employee

stationed in the United States. Plaintiffs maintain that the subject employee's "ostensible

employment" with Dallah Avco in the United States was a "ghost job." Plaintiffs assert that

"[t]he employee performed no traditional duties for Dallah Avco in the U.S. and only showed up

for work once." (Pls.' Resp. to Defs.' List of Defs. at 7).

A foreign corporation must be doing business in the forum with a fair measure of

permanence and continuity, as oppose to occasionally or casually, in order to be deemed to have a

presence in the forum. See, Li v. Hock, 2010 WL 1193446, at *2 (2d Cir. Mar. 30, 2010)

(quoting Wiwa v. Royal Dutch Petroleum Co., 226 F.3d 88, 95 (2d Cir. 2000)). The only basis

upon which plaintiffs claim Dallah Avco was doing business in the United States is the domicile

of an employee, who they claim was not performing any traditional or legitimate business-related

activities on behalf of his employer. Even if Dallah Avco stationed its employee in the United

States, Dallah Avco would not have the necessary continuous, permanent and substantial presence

for the exercise of general jurisdiction. See, Saudi v. Marine Atl., Ltd., 306 Fed.Appx. 653, 655

(2d Cir. 2009); see also, Int'l Shoe, 326 U.S. at 317.

The allegations against defendants Abdullah, Saleh and Sulaiman Al Rajhi focus primarily

on their relationship to their family-owned bank, Al Rajhi Banking and Investment Company ("Al

Rajhi Bank"), and their family's connection to the SAAR Foundation, a non-profit organization

23

that was headquartered in the United States. In arguing the existence of general jurisdiction over the Al Rajhi individuals, plaintiffs rely on the United States contacts of the SAAR-related entities and corporations, as well as donations made by defendants to United States-based charities. Those entities' United States contacts cannot be imputed to the defendants as individuals to support a finding of general jurisdiction over them. Nor is defendants' alleged conduct in donating to United States charities sufficient to confer jurisdiction.

The claims asserted against Sheikh Saleh Al-Hussayen ("Sheikh Al-Hussayen"), the Saudi General President of the Committee of the Two Holy Mosques, arise from alleged conduct undertaken outside the scope of his government duties. Plaintiffs argue that Sheik Al-Hussayen is subject to the Court's exercise of general jurisdiction based on his alleged continuous personal contacts with the United States. The record, however, indicates that, over a twenty-five year period, Sheik Al-Hussayen visited the United States on two occasion, the last being in August and September of 2001. During his last visit, Sheik Al-Hussayen allegedly met with officials from charitable organizations with purported terrorist ties. It is alleged that he stayed at the same hotel as certain of the 9/11 hijackers. Such isolated and sparse contacts with the United States are insufficient to confer personal jurisdiction under a general theory.

Dr. Abdul Rahman Al Swailem ("Dr. Al Swailem"), the Saudi Deputy Minister of Health for Executive Affairs, is being sued, in his personal capacity, for alleged conduct undertaken in both his personal and official capacities. In holding the that the FSIA does not extend to sovereign state's officials, the Supreme Court observed that plaintiffs must establish the existence of personal jurisdiction over the officials on some other basis other than the FSIA provision that makes personal jurisdiction over a foreign sovereign automatic when an exception to immunity

24

applies. Since Dr. Al Swailem is being sued in his personal capacity, the contacts he had with the United States while acting in his official capacity on behalf of the sovereign state, cannot be imputed to him for purposes of determining whether his individual due process rights will be violated by the exercise of personal jurisdiction over him. The claims against Dr. Swailem arise from his position as Chairman of the Saudi Joint Relief Committee and President of the Saudi Red Crescent Society; organizations which plaintiffs concede are entitled to FSIA immunity under the Second Circuit's holding. Dr. Swailem indicates that he only visited the United States for official visits relating to his government service as Deputy Minister. Plaintiffs have failed to make any showing that Dr. Swailem himself independently has any contacts with the United States, and accordingly general jurisdiction does not exist over this defendant.

Dr. Abdullah bin Saleh Al-Obaid ("Dr. Al-Obaid"), the Saudi Minister of Education, is claimed to be subject to the exercise of general jurisdiction based on his activities as a senior officer of numerous alleged al Qaeda front charities, including United States-based organizations. His status as officer of entities based in the United States cannot, standing alone, provide a basis to confer general jurisdiction over him. Plaintiffs have not alleged any United States contacts or activities attributable to Dr. Al-Obaid personally, but rather rely on those undertaken in his official capacity on behalf of independent entities.

Dr. Abdullah Muhsen Al Turki ("Dr. Al Turki") has served as both Saudi Minister of Islamic Affairs and Member of the Council of Ministers. In addition, he held the position of Secretary-General of the purported al Qaeda front charity World Assembly of Muslim Youth ("WAMY"). Dr. Al Turki acknowledges that, in his role as Secretary-General of WAMY, he visited the United States. There are no allegations that Dr. Al Turki personally had any other

25

contacts with the United States.  Dr. Al Turki's contacts with the United States in connection with

his role as an officer of an organization, cannot be imputed to him in his individual capacity for

the purpose of asserting general jurisdiction.

Plaintiffs argue that Saudi defendant, the National Commercial Bank ("NCB"), is subject

to general jurisdiction because it has continuously conducted its financial services in the United

States by various means over the last thirty years.[10]  Plaintiffs attempt to demonstrate NCB's

presence in the United States based on its doing business through its own New York office that

closed in 1992, and thereafter through the United States office of its purported subsidiary, SNCB,

which closed in 2001.  Neither NCB's office or that of its claimed subsidiary was in existence at

the time plaintiffs commenced their actions, and accordingly cannot be relied upon as a basis to

demonstrate NCB's presence for purposes of general jurisdiction.

Plaintiffs nevertheless allege that "although in theory, SNCB was closed in 2001, prior to

the commencement of this lawsuit, ... [it] was not truly closed and maintained its corporate status

in the U.S. through the time this action was filed" in 2002.  (Pls.' Opp'n Mem. at 41).  SNCB's

target date for closure was allegedly the end of 2000, which is when two of its officers

purportedly entered into renewable consultancy agreements with NCB.  Plaintiffs allege that, after

SNCB officially closed in early 2001, it continued to operate by virtue of the activities of those

two officers who, working from their private residences, managed SNCB's investments and bank

---

[10]  Having recently received plaintiffs' opposition papers to NCB's renewed motion to
dismiss, the Court deems it appropriate to resolve the motion at this time, without awaiting the
filing of a reply memorandum by NCB.  Additionally, although plaintiffs seek further
jurisdictional discovery in order to adequately oppose the renewed motion, the requested
discovery sought by plaintiffs relates to specific jurisdictional theories, and therefore will be
addressed in that context.  See discussion *infra* pp. 45-46.

accounts though at least 2001, with financial activities in the millions of dollars.  (Pls.' Factual

Averment ¶ 60).  Plaintiffs, therefore, contend that "[t]he renewable consultancy agreements,

couple with the intentions to continue to operate for NCB after the SNCB offices closed, indicates

that NCB continued to operate similarly in the United States through the consultancy agreements

with" these two former SNCB officers. (Id. ¶ 61).  Plaintiffs' contention is, at best, mere

speculation, unsupported by the relevant factual circumstances concerning the corporate existence

and activities of NCB and SNCB.

       Further, there is no merit to plaintiffs' contention that NCB maintains a presence in this

country by virtue of its correspondent banking relationship with financial institutions in the

United States.  " 'Without correspondent banking ... it would often be impossible for banks to

provide comprehensive nationwide and international banking services-among them, the vital

capability to transfer money by wire with amazing speed and accuracy across international

boundaries.' "  United States v. Davidson, 175 Fed.Appx. 399, 401 n.2 (2d Cir. 2006) (quoting

Hearings on the Role of U.S. Correspondent Banking in International Money Laundering,

Subcommittee on Investigations of Senate Committee on Government Affairs (opening

statements of Senator Susan M. Collins, Subcommittee Chairman)).  Thus, correspondent banking

relationships play an essential role in today's global economy, enabling foreign banks, having no

presence in the United States, to provide services to their customers that they would otherwise be

unable to do because of geographical limitations.  Id.  The mere maintenance of such

correspondent bank accounts by a foreign bank does not, standing alone, provide a basis upon

which to exercise general jurisdiction over a foreign financial institution.  See, Licci v. Am.

Express Bank, Ltd., - - F.Supp.2d - -, 2010 WL 1378807, at *3 (S.D.N.Y. Mar. 31, 2010) (cases

27

cited therein).

Similarly unavailing is plaintiffs' contention that NCB is subject to general jurisdiction because it maintains an interactive website which allow website visitors, who plaintiffs claim are mostly from Saudi Arabia, to manage accounts and access investment services. A foreign bank will not be subject to the general jurisdiction of American courts based solely on its operation of an interactive website that is accessible to its customers worldwide. See, Northrop Grumman Overseas Serv. Corp. v. Banco Wiese Sudameris, 2004 WL 2199547, at *7 (S.D.N.Y. Sept. 29, 2004) (interactive website allowing all clients to bank on line held insufficient to confer general jurisdiction over foreign bank, notwithstanding its New York correspondent banking accounts).

Plaintiffs further argue that NCB carries out banking services in the United States by making loans to United States companies. The dubious and isolated incidences upon which plaintiffs rely do not demonstrate the requisite continuity and degree of permanence necessary to support a finding that NCB is doing business in the United States for purposes of general jurisdiction. Finally, plaintiffs allege that NCB has a division within the bank that conducted aviation business in the United States. NCB denies the existence of an aviation division, and further indicates that it has not derived any revenues from the ownership or operation of aircrafts in the United States or from any business that owned or operated aircrafts in the United States. The supporting exhibits submitted by plaintiffs do not demonstrate, nor even give rise to a reasonable inference, that NCB maintained an aviation division or, more generally, did business or otherwise derived revenue from aviation-related activities in the United States. Accordingly, the totality of NCB's activities, upon which plaintiffs rely, is insufficient to confer general jurisdiction.

28

## SPECIFIC JURISDICTION

Plaintiffs argue that thirty-seven of the moving defendants are subject to the exercise of

specific jurisdiction; twenty-two of whom were also argued to be subject to general jurisdiction as

well.[11] As previously explained, specific jurisdiction exists where the cause of action relates to or

---

[11]  The following defendants are claimed to be subject to specific jurisdiction (an asterisk denotes those who were also argued to be subject to general jurisdiction):

   *1.  Talal M. Badkook
   *2.  M.M. Badkook Company
   *3.  Shahir A. Batterjee
   *4.  Abdullah Binladin
   *5.  Bakr Binladin
   *6.  Omar Binladin
   *7.  Tariq Binladin
   *8.  Yeslam Binladin
   *9.  Dallah Avco Trans-Arabia Co. Ltd.
 *10.  DMI Administrative Services S.A.
  11.  Dubai Islamic Bank
  12.  Faisal Islamic Bank-Sudan
  13.  Safer Al-Hawali
 *14.  Saleh Al-Hussayen
 *15.  Ibrahim bin Abdul Aziz Al-Ibrahim Foundation
 *16.  Yousef Jameel
 *17.  Abdulrahman Bin Mahfouz
 *18.  Khalid Bin Mahfouz
 *19.  National Commercial Bank
  20.  Salman Al-Oadah
 *21.  Abdullah bin Saleh Al Obaid
 *22.  Abdullah Al Rajhi
 *23.  Saleh Al Rajhi
 *24.  Sulaiman Al Rajhi
  25.  Schreiber & Zindel Treuhand Anstalt
  26.  Frank Zindel
  27.  Engelbert Schreiber, Sr.
  28.  Engelbert Schreiber, Jr.
  29.  Al Shamal Islamic Bank
 *30.  Abdul Rahman Al Swailem
  31.  Tadamon Islamic Bank
  32.  Sheikh Abdullah bin Khalid Al Thani
 *33.  Abdullah Muhsen Al Turki

29

arise out of the foreign defendant's activities. For purposes of specific jurisdiction, the "fair warning" requirement of due process is satisfied where "the defendant has 'purposefully directed' his activities at residents of the forum, and the litigation resulted from alleged injuries that 'arise out of or relate to' those activities. Burger King, 471 U.S. at 472 (internal citations omitted). The so-called "effects test," enunciated by the United States Supreme Court in Calder, supra, provides for the exercise of specific personal jurisdiction over a foreign defendant based on his alleged: (1) intentional, tortious actions; (2) which were expressly aimed at the United States; (3) that causes harm, the brunt of which is suffered-and which the defendant knows is likely to be suffered-in the United States; and (4) the injuries that are the subject of the litigation arise from or relate to defendant's subject conduct. Calder, 465 U.S. at 789-90. Under the effects tests, contacts that are too remote or attenuated to the United States will not suffice to confer specific jurisdiction.

In addressing the propriety of Judge Casey's dismissal of the actions for lack of personal jurisdiction against the five Saudi princes sued in their individual capacities, the Second Circuit's jurisdictional analysis, in Terrorist III, supra, focuses on the due process requirements associated with the exercise of specific jurisdiction. Four of the princes were alleged to have given money to Muslim charities knowing that their sizeable donations would be channeled to al Qaeda, which used the money to finance the September 11th attacks. As to the fifth prince, plaintiffs alleged that, in his capacity as an executive of various private banks, he knowingly and intentionally

---

34. Martin Wachter
35. Erwin Wachter
36. Sercor Treuhand Anstalt
37. Asat Trust Reg.

30

provided financial services to terrorists who, in turn, planned to attack the United States. The

Second Circuit held that plaintiffs failed to meet their burden of showing that the Saudi princes

took intentional and allegedly tortious action expressly aimed at the United States. With regard to

the four Saudi princes, the Second Circuit reasoned:

> The plaintiffs do not allege that the Four Princes directed the September 11 attacks or
> commanded an agent (or authorized al Qaeda) to commit them. Rather, the plaintiffs rely
> on a causal chain to argue a concerted action theory of liability: the Princes supported
> Muslim charities knowing that their money would be diverted to al Qaeda, which then
> used the money to finance the September 11 attacks. Even if the Four Princes were
> reckless in monitoring how their donations were spent, or could and did foresee that
> recipients of their donations would attack targets in the United States, that would be
> insufficient to ground the exercise of personal jurisdiction. Rather, the plaintiffs have the
> burden of showing that the Four Princes engaged in intentional, and allegedly tortious,
> actions expressly aimed at residents of the United States. That burden is not satisfied by
> the allegation that the Four Princes intended to fund al Qaeda through their donations to
> Muslim charities. Even assuming that the Four Princes were aware of Osama bin Laden's
> public announcements of jihad against the United States and al Qaeda's attacks on the
> African embassies and U.S.S. Cole, their contacts with the United States would remain far
> too attenuated to establish personal jurisdiction in American courts. It may be the case
> that acts of violence committed against residents of the United States were a foreseeable
> consequence of the princes' alleged indirect funding of al Qaeda, but foreseeablity is not
> the standard for recognizing personal jurisdiction. Rather, the plaintiffs must establish
> that the Four Princes expressly aimed intentional tortious acts at residents of the United
> States. Providing indirect funding to an organization that was openly hostile to the United
> States does not constitute this type of intentional conduct.

Terrorist III, 538 F.3d at 94-95 (internal citations, parentheticals, quotation marks and alterations
omitted).

In regard to the remaining prince, the Second Circuit observed that just because al Qaeda

would need access to financial institutions, to fund its terrorist attacks, does not mean that

managers of those financial institutions purposefully directed their activities at residents of the

United States. The prince was not a director, officer, shareholder or employee of the banks that

purportedly held terrorist deposits, but was once a manager of another bank which invested in

31

those terrorist-related banks.  The Second Circuit found that providing financial services to an

entity that carries out a terrorist attack on United States citizens was an insufficient basis, under

the circumstances presented, to subject the prince to the jurisdiction of American courts.  Id. at

96.

The Second Circuit's rulings can be synthesized to stand for the following cohesive

principle of controlling law:  The due process rights of a foreign defendant protects him from

being subject to the jurisdiction of the American courts based solely on allegations that he

provided material support to al Qaeda through either contributions to Muslim charities or

provision of financial services to entities with al Qaeda ties, and did so when he: (1) was "aware"

that Osama bin Laden has publicly declared war against the United States; (2) was "aware" that,

consistent with the declaration of war, al Qaeda has committed violent attacks against the United

States; (3) "intended" to provide support to al Qaeda through circuitous, indirect means aimed at

defying detection; (4) "did foresee" that the ultimate and intended al Qaeda recipients, of the

support given by him, would attack targets in the United States; and (5) did "foresee[ ]" that the

consequence of his indirect support of al Qaeda would be the commission of undisclosed acts of

violence against residents of the United States.

The Second Circuit identified a defendant's alleged intentional, tortious conduct that is

expressly aimed at the United States as being a necessary prerequisite to the exercise of specific

jurisdiction.  Although the Second Circuit concluded that providing indirect funding to al Qaeda

did not constitute this type of intentional conduct, the Second Circuit did not articulate what acts

would constitute intentional conduct for purposes of specific jurisdiction.  This Court finds that,

in the context of a terrorism-related litigation, a defendant's alleged intentional tortious conduct

32

aimed at the United States is conduct that is intended to directly aid in the commission of a terrorist act, with knowledge that the brunt of the injuries will be felt in the United States.

Defendants, however, argue that, pursuant to the Second Circuit's ruling, specific jurisdiction can only be exercised over a defendant who is alleged to have intentionally provided financial services or funding to specifically support the 9/11 terrorist attacks because, without more, allegations of providing support to a global organization, like al Qaeda-even if knowing and intentional-lacks a sufficient nexus to the September 11th attacks from which plaintiffs' injuries arise or relate. Defendants argue that plaintiffs would be required to allege a defendant's actual involvement in the September 11th attacks, or that the September 11th hijackers operated at the direction, under the control, at the request of, or on behalf of the defendant.

In finding that the allegations against the Saudi princes were insufficient to demonstrate that they had engaged in intentional tortious conduct expressly aimed at the United States, the Second Circuit observed that there was no allegations that they had themselves committed the attack, directed the September 11th attacks, commanded an agent to commit them or authorized al Qaeda to commit them. Terrorist III, 538 F.3d at 94. While the Second Circuit suggested, in dicta, that such allegations of direct personal involvement in the effectuation of the 9/11 attacks would be sufficient for the exercise of specific personal jurisdiction, the Second Circuit did not hold that those were the only grounds upon which specific jurisdiction could be found to exist.

Moreover, the Second Circuit's decision addresses the indirect provision of material support to al Qaeda, especially under the guise of charitable donations. A defendant who allegedly indirectly provides funding to al Qaeda through charitable donations, relinquishes all control over the donated funds. While a defendant-donor may intend, and have every reason to

33

believe, that the suspect charity will funnel those charitable funds to al Qaeda, the donor himself

has no authority to direct how the monies are used nor the power or ability to direct his monetary

donations into the hands of al Qaeda. In contrast, a defendant who, for example, provides money

laundering services directly for al Qaeda, assumes possession of and control over the monies, and

takes an active role in directing the flow of funds to and from al Qaeda and its operatives. If such

money laundering activities are intentionally performed to support some future attack to be

planned by al Qaeda against the United States, reasonably anticipating that the brunt of the

injuries will be felt there, the defendant need not know that the support provided is specifically

for the 9/11 attacks in order to be subject to the exercise of personal jurisdiction.

The secrecy of the specific nature of a terrorist attack is paramount to its success. Hence,

it would not be reasonable to require, as a prerequisite to the exercise of personal jurisdiction, that

such information be shared throughout al Qaeda's global infrastructure, or to all those who wish

to support such an attack. A defendant, who knowingly provides aid to support an attack against

the United States, cannot escape the exercise of jurisdiction by simply remaining safely within the

shadows, far removed from United States soil, as he awaits the anticipated harm to befall

America, even though unenlightened as to the specific means by which such harm will be

inflicted. As the United States Supreme Court aptly noted, "a man, who outside of a country

willfully puts in motion a force to take effect in it, is answerable at the place where the evil is

done ..." Ford v. United States, 273 U.S. 593, 623 (1927) (internal quotation marks omitted).

On the other hand, similarly unavailing is plaintiffs' argument that the Second Circuit's

decision is inapplicable to their conspiracy-based causes of action. The conspiracy theory of

jurisdiction was briefed and argued before the Second Circuit on appeal. Nevertheless, plaintiffs

34

argue that the absence of a specific reference to their conspiracy theory, in the Second Circuit's decision, compels a finding that the appellate court did not rule on the legal viability of such a theory. Plaintiffs accordingly contend that, "[b]ecause the Second Circuit did not address the extent to which the minimum contacts standard may be met by conspiracy allegations that include a defendant's participation in the conspiracy [with al Qaeda], substantial acts in the United States, and knowledge on the part of the defendant that the conspiracy would have direct and foreseeable effects in the United States, [its] Ruling provides no guidance," thereby necessitating this Court "to consider whether the requirement of due process have been met" as to each defendant "to whom such conspiracy allegations have been made". (Pls.' Supplemental Br. at 20).

"Under ... the law of the case doctrine, '[w]hen an appellate court has once decided an issue, the trial court, at a later stage of the litigation, is under a duty to follow the appellate court's ruling on that issue.' " Doe v. New York Dep't of Soc. Servs., 709 F.2d 782, 788 (2d Cir. 1983) (*quoting* United States v. Cirami, 563 F.2d 26, 32 (2d Cir. 1977)). "This doctrine applies to issues that have been decided 'either expressly or by necessary implication.' " Id. (*quoting* Munro v. Post, 102 F.2d 686, 688 (2d Cir. 1939)); see also, Fogel v. Chestnutt, 668 F.2d 100, 108 (2d Cir. 1981). The Second Circuit's rulings must accordingly be deemed to encompass, and be held applicable to, all jurisdictional theories which were explicitly raised by plaintiffs on appeal.

It is, therefore, of no import that plaintiffs' conspiracy theory of jurisdiction was not expressly identified in the Second Circuit's decision when it held that plaintiffs had failed to meet their burden of establishing the existence of personal jurisdiction. Nevertheless, it should be noted that, in rejecting plaintiffs' "concerted action theory of liability" as being a sufficient basis for the exercise of personal jurisdiction, the Second Circuit cited to Halberstam v. Welch, 705

35

F.2d 472 (D.C.Cir. 1983), as an authoritative source distinguishing between civil conspiracy and

aiding-abetting liability under the common law of torts. In Halberstam, it was observed that both

civil conspiracy and aiding-abetting are theories of concerted liability; the prime distinction

between the two being a conspiracy requires an agreement by the defendants to participate in a

wrongful activity. Halberstam, 705 F.2d at 478. The Second Circuit explicitly found that a

concerted action-based theory of jurisdiction, regardless of how plaintiffs label it, would not

support the exercise of jurisdiction over a foreign defendant who allegedly indirectly provided

financial services or support to al Qaeda which, having benefitted therefrom, then committed the

9/11 terrorist attacks.

This Court finds that plaintiffs have failed to allege sufficient facts to support the exercise

of specific jurisdiction as to all but one of the remaining moving defendants.

Plaintiffs argue that specific jurisdiction may be exercised over defendant Yousef Jameel

based on his alleged support of al Qaeda through donations to purported al Qaeda front charities

and a key al Qaeda fundraiser. Under the Second Circuit's holding, the indirect funding of al

Qaeda through charitable donations is alone insufficient for the exercise of specific jurisdiction.

Plaintiffs, however, also claims that defendant Jameel provided direct material support to al

Qaeda. Defendant's name appears on a document referred to as the "Golden Chain," which

purportedly lists the names of early direct donors to al Qaeda.

Plaintiffs maintain that, "to the extent that Plaintiffs allege that particular defendants

provided direct support to al Qaeda ... as ... evidenced in the 'Golden Chain' list, the document

recovered by the United States in Bosnia which lists the supporters who provided money from the

founding of bin Laden's organizations until at least the late 1990's, this Court should accept those

36

allegations as true in determining whether the material support those defendants [allegedly] provided to al Qaeda was sufficiently direct that defendants can be said to have purposefully directed their conduct at the United States by providing assistance directly to a group sworn to attack the U.S. and its citizens." (Pls.' Supplemental Reply Br. at 11 ). In addressing the evidentiary weight of the Golden Chain, Judge Casey concluded that, "with no indication of who wrote the list, when it was written, or for what purpose, the Court cannot make the logical leap that the document is a list of early al Qaeda supporters." Terrorist I, 349 F.Supp.2d at 817. This Court finds that, even if the document is in fact what plaintiffs purport it to be, it alone does not render those listed therein subject to the jurisdiction of this Court under specific jurisdictional theories. Generalized allegations that a defendant provided financial or other material support to al Qaeda, without the reasonable inference of the temporal, geographical or causal connection, or proximity to the 9/11 attacks, is an insufficient basis for the Court's exercise of jurisdiction over a foreign defendant. Thus, Yousef Jameel's alleged role as an al Qaeda sponsor, as purportedly evidenced by his inclusion on the Golden Chain list, does not demonstrate that he himself expressly aimed tortious conduct at the United States which resulted in, or relates to, the injuries sustained by plaintiffs.

Defendants Bakr, Omar, Tariq and Yeslam Binladin, Osama bin Laden's half-brothers, are also argued to be subject to personal jurisdiction under specific jurisdictional theories, based on their alleged direct sponsorship and material support of al Qaeda. "Plaintiffs maintain that the al Qaeda conspiracy began in the late 1980's, and that period, 1991-1996, the years [ ] Osama bin Laden spent in the Sudan, were crucial in preparation and planning for 9/11." (Pls.' Resp. to Defs.' List of Defs. at 10). "Plaintiffs allege an international network was developed by Tarek

37

(*sic*), Omar, Yeslam and Bakr Binladin in collaboration with their brother Osama, and served as a foundation for al Qaeda to expand its operations in early 1990's." (Id. at 4) (internal quotation marks omitted). For example, after Osama bin Laden went to the Sudan in 1991, Bakr Binladin allegedly protected Osama bin Laden's financial interests, thereby enabling Osama bin Laden to finance construction of Sudanese terrorist training camps from which he purportedly planned attacks on the United States. Defendants' alleged provision of financial and other material support to al Qaeda in the early 1990's, enabling it to expand its base of operations in the Sudan, is too remote to the terrorist attacks of September 11, 2001, to confer specific jurisdiction.

Furthermore, the allegations that Yeslam Binladin had authority over bank accounts, from which monies were transferred to Osama bin Laden, cannot support the exercise of jurisdiction, given the absence of any allegations that he ever did in fact exercise that authority in order to aid Osama bin Laden in the commission of the attacks that occurred against the United States. Similarly unavailing, for jurisdictional purposes, are the allegations that the defendants made donations to charities having terrorist-ties, and that Tariq Binladin served as a director of a charity that provided support to al Qaeda. Plaintiffs emphasize that the "Bin Laden Brothers" are listed third on the Golden Chain. Even if the Golden Chain was of jurisdictional relevance, there is no basis to conclude that the reference to the "Bin Laden Brothers" is specifically identifying Bakr, Omar, Tariq and Yeslam who, along with Osama bin Laden, are among the purported fifty-four children of Mohammed Awad Binladin.

Defendants Abdullah Binladin, Shahir Batterjee and Talaʾ Badkook are argued to be subject to the exercise of specific jurisdiction based on their respective roles as founders, directors and/or officers of United States branches of foreign-based charities that were allegedly part of al

38

Qaeda's complex system. Talal Badkook is alleged to have acted both in his individual capacity as well as through the company he allegedly owns, defendant M.M. Badkook Company. Defendants Abdulrahman and Khalid Bin Mahfouz's alleged conduct in establishing, funding and/or managing a foreign suspect charity is argued to be sufficient for the exercise of specific jurisdiction over them. Personal jurisdiction over Saudi official Dr. Al-Obaid is also premised on his alleged activities as a senior officer of numerous alleged al Qaeda front charities, including United States-based organizations. Being a founder, officer, director or administrator of a foreign or domestic charitable organization that allegedly provides material support to al Qaeda, cannot alone serve as a basis to impute the acts of the organization upon the individual defendant himself, and certainly not upon a company owned by a defendant having no direct relationship to the charity.

The culpable conduct of a corporation or other organization cannot give rise to jurisdiction over a non-resident officer based solely on his title, without any showing that he was personally involved as a primary actor in the conduct that is the subject of the litigation. See e.g., Terrorist III, 538 F.3d at 96; Karabu Corp. v. Gitner, 16 F.Supp.2d 319, 325-26 (S.D.N.Y. 1998); Pilates Inc. v. Pilates Inst., Inc., 891 F.Supp. 175, 180-81 (S.D.N.Y. 1995). Plaintiffs must demonstrate that the claimed wrongful acts of the entity were performed "with the knowledge and consent of the officer and the officer must have exercised control over the corporation in the transaction." Kinetic Instruments, Inc. v. Lares, 802 F.Supp. 976, 984 (S.D.N.Y. 1992). Plaintiffs have failed to make such a showing. Additionally, the allegations pled by plaintiffs are insufficient to demonstrate that any of these defendants had themselves taken any intentional tortious action expressly aimed at the United States.

39

The claims asserted against Saudi official Sheik Al-Hussayen are based on allegations of support he provided to al Qaeda through his involvement with a charity that solicits donations in the United States and through his membership on the "Sharia Board" of the Al Rajhi Bank, which plaintiffs claim is al Qaeda's preferred bank. Under Second Circuit controlling law, Sheik Al-Hussayen's alleged involvement with charities and financial institutions which are claimed to have provided material support to al Qaeda, which in turn committed the 9/11 attacks, is too attenuated to support the exercise of specific jurisdiction.

By virtue of his government position, Dr. Swailem is alleged to have exercise his control over the Saudi charity, the Red Crescent Society, to intentionally support al Qaeda's operations throughout the world. Plaintiffs similarly allege that defendant Dr. Al-Turki used his official government positions, as well as his position as Secretary-General of a purported suspect charity, to knowingly assist Saudi charities in sponsoring al Qaeda. Plaintiffs further allege that Dr. Al-Turki was engaged in business dealings with an al Qaeda financier, who purportedly laundered money from Saudi Arabia through Spain to al Qaeda cells in Germany. The allegations respectively pled against these defendants, accepted as true, do not support a finding that either defendant intentionally provided material aid to al Qaeda for the specific purpose that it be used to assist in the commission of a terrorist attack against the United States and its citizens.

Plaintiffs allege that ostensible charity defendant Al-Ibrahim Foundation, is present in Kenya, Bosnia, Chechnya, South America and South Asia. Plaintiffs' allegations of the Al-Ibrahim Foundation's provision of material support to al Qaeda in Africa and the former Soviet Union in the 1990's, coupled with vague and conclusory allegations of further support to terrorist organizations, does not demonstrate that the Al-Ibrahim Foundation purposefully directed tortious

40

conduct at the United States.

Defendants Sheik Safer Al-Hawali and Sheik Salman Al-Oadah are alleged to be al Qaeda leaders who provided "ideological justification and support for suicide attacks." (Pls.' Supplemental Reply Br. at 18). The defendants allegedly "set their sights on the United States and pointed young me in that direction[,]" and "[i]n this way, they 'purposefully directed their conduct' at the U.S.". (Id.). "Ideological justification" is not the type of intentional tortious conduct contemplated for the exercise of specific jurisdiction.

Defendant Sheikh Abdullah Bin Khalid Al-Thani ("Sheikh Al-Thani"), Qatar's Minister of the Interior, is accused of providing al Qaeda members, including the purported mastermind of the 9/11 attacks Khalid Sheik Mohammed ("KSM"), with safe haven, financial support, and blank passports sometime in the mid-1990's. Plaintiffs contend that "[w]ithout the intervention of a high [ranking] Qatar government official - believed and alleged to be Al-Thani - it appears that the FBI would have arrested KSM five years prior to the 9/11 attacks." (Pls.' Opp'n Mem. at 7). Plaintiffs claims "that, had the FBI successfully arrested KSM in 1996, he would not have been in a position to" "mastermind the September 11 attacks." (Id.). Specific jurisdiction cannot be premised on one, of an infinite number of theoretical possibilities, resulting from acts committed by a defendant several years earlier. Due process mandates more than mere serendipity and happenstance for the exercise of jurisdiction.

Defendant Dallah Avco is alleged to be subject to specific jurisdiction based on the acts of its employee who directly provided material aid to two of the 9/11 hijackers. The culpable acts of an employee cannot be the basis to exercise jurisdiction over a foreign corporation, absent a showing that the subject acts were authorized and performed in furtherance of the employer's

41

business.  See, Int'l Shoe, 326 U.S. at 318.  Plaintiffs have failed to allege any facts from which it can be reasonably inferred that the employee, who plaintiffs claim only showed up for work on one occasion and performed no traditional duties on behalf of Dallah Avco, committed the alleged wrongful acts in furtherance of Dallah Avco's business interests or at its direction.

Nor can specific jurisdiction be exercised over defendants Abdullah, Saleh and Sulaiman Al Rajhi based on the allegations that they exercised control over Al Rajhi Bank as its officers, and thereby participated in the provision of banking and financial services to al Qaeda by the bank.  The Al Rajhi Bank was a named codefendant against whom the claims in other cases were previously dismissed.  Both Judge Robertson and Judge Casey concluded that allegations that al Qaeda received funding from monies passing through Al Rajhi Bank, in connection with routine banking operations, was insufficient to hold codefendant Al Rajhi Bank responsible for the 9/11 attacks.  Burnett v. Al Baraka Inv. & Dev. Corp., 274 F.Supp.2d 86, 109 (D.D.C. 2003); Terrorist I, 349 F.Supp.2d at 832-33.  Judge Casey further found that "allegations concerning the Al Rajhi family cannot support a claim against Al Rajhi Bank because there is no allegation that the family members were acting in furtherance of Al Rajhi Bank business."  Terrorist I, 349 F.Supp.2d at 833.

Nor does the individual Al Rajhi defendants' alleged official roles with suspect charities and other financial institutions, their associations with individuals and entities designated as terrorist by the United States government and/or their personal donations to purported al Qaeda charities, demonstrate that they personally engaged in tortious conduct expressly aimed at the United States.  Neither the reference to "al Rajhi" on the Golden Chain document, nor the allegation that defendant Saleh Al Rajhi's telephone number was found in the phone book of

42

Osama bin Laden's secretary, is of any probative significance in establishing jurisdiction over these defendants.

Plaintiffs are also suing three Liechtenstein financial entities: the Asat Trust Reg. ("Asat Trust"), which has been designated by the United States Government as a "Specially Designated Global Terrorist," and two anstalts, *i.e.,* the Schreiber and Zindel Treuhand Anstalt and the Sercor Treuhand Anstalt. An "anstalt," also known as an "establishment," is a legally independent entity created under Liechtenstein law, which resembles a business trust. See, Cohn v. Rosenfeld, 733 F.2d 625, 628-29 (5th Cir. 1984). Defendants Frank Zindel, Engelbert Schreiber, Sr., Engelbert Schreiber, Jr., Martin Wachter, and Erwin Wachter are the principals of the Liechtenstein entities, who are purportedly responsible for overseeing the activities of their respective financial entities.

Plaintiffs allege that the Liechtenstein entities served as money laundering organizations, who along with their principals, and other natural persons, organizations, banks and charities located throughout the world, conspired with Osama bin Laden, al Qaeda, Hezbollah, Iran, Iraq and the Taliban to raise, launder, transfer, distribute and hide funds for bin Laden and al Qaeda in order to support and finance their terrorist activities, including, but not limited to, the September 11th attacks. Plaintiffs' conclusory allegations of wrongdoing are not accompanied by any factual allegations from which any of the defendant's personal or direct participation in a terrorist attack against the United States can be reasonably inferred. Such a deficiency cannot be overcome simply by alleging defendants were part of a conspiracy, and attributing to them all culpable acts of their purported co-conspirators. Plaintiffs failed to plead sufficient facts from which it could be reasonably inferred that the objective of the claimed conspiracy was to commit a tort against

43

the United States, and that the defendants were knowing members of the conspiracy who agreed to act with others to accomplish such an objective. Asat Trust's terrorist designation is not alone sufficient to establish that it purposefully engaged in misconduct for the purpose of aiding al Qaeda in committing a terrorist attack against the United States. This is especially true where, as here, plaintiffs allege that the Asat Trust provided material support to al Qaeda and other terrorist organizations in furtherance of those organizations' global jihad.

Plaintiffs allege that defendants DMI S.A., Faisal Islamic Bank-Sudan ("FIBS"), Al Shamal Islamic Bank ("Al Shamal") and Tadamon Islamic Bank ("Tadamon") are interrelated entities with overlapping ownership and management. Plaintiffs allege that Osama bin Laden is a shareholder in the three defendant-banks, *i.e.*, FIBS, Al Shamal and Tadamon. Bin Laden also allegedly invested millions of dollars in Al Shamal. Plaintiffs allege that all four defendants helped al Qaeda to grow, in its early years, by providing critical financial and logistical support to bin Laden in aid of al Qaeda's global jihad. Specifically, plaintiffs allege that, in the early 1990's, defendants provided Osama bin Laden with funding, banking services and the financial infrastructure, in the Sudan, that he employed to establish al Qaeda training camps, train terrorists, and carry out terrorist attacks against the United States, including the September 11th attacks. These defendants are further alleged to have provided material support to al Qaeda by managing and holding bank accounts of individuals and entities involved in al Qaeda's plot, making donations to purportedly al Qaeda front charities, and by becoming substantially involved in other banks and organizations actively supporting al Qaeda.

The alleged acts of rendering support to al Qaeda during its formative years, performing routine banking services for customers having terrorist ties, and having investors or shareholders

44

who purportedly are sponsors of terrorism, are too remote and attenuated to support the exercise

of specific jurisdiction. The purported indirect funding of al Qaeda through the funneling of

one's charitable donations is, under controlling Second Circuit law, of no jurisdictional import.

Plaintiffs oppose defendant NCB's renewed motion to dismiss for lack of personal

jurisdiction on the grounds that they are entitled to, and require, additional jurisdictional

discovery. In January of 2005, Judge Casey denied, without prejudice to renew, NCB's motion to

dismiss on the grounds of FSIA immunity and lack of personal jurisdiction, and afforded

plaintiffs an opportunity to engage in limited jurisdictional discovery. Terrorist I, 349 F.Supp.2d

765. In September of 2005, Judge Casey granted NCB's motion for reconsideration to the extent

that he allowed the parties to engage in jurisdictional discovery, and would determine the issue of

personal jurisdiction prior to requiring the parties to engage in FSIA-related discovery. Terrorist

II, 392 F.Supp.2d at 575. Judge Casey referred the matter to Magistrate Judge Frank Maas to

supervise those discovery proceedings.

The "limited" jurisdictional discovery ordered by Judge Casey and managed by

Magistrate Judge Maas has now spanned a period of several years. Nevertheless, plaintiffs

contend that they are being wrongfully denied the opportunity to take further jurisdictional

discovery with respect to specific jurisdictional theories, because plaintiffs chose to concentrate

almost exclusively on general jurisdictional discovery. This Court granted, over plaintiffs'

objections, NCB's application to renew its motion to dismiss, and instructed plaintiffs to respond

thereto and, if necessary, specifically identify the outstanding discovery they deem to be

necessary in order to fully oppose NCB's motion. This Court finds that the nature of the

discovery, which plaintiffs claim is essential to their opposition, has no bearing on the merits of

45

NCB's motion and the Court's determination thereof.

Plaintiffs indicates that they seek to establish specific jurisdiction over NCB based on its alleged support of al Qaeda and al Qaeda-front charities, including the Muwafaq Foundation ("Muwafaq"). Plaintiffs allege that Muwafaq was established by high-level NCB executives for the purpose of funding al Qaeda. They, therefore, contend that they require additional "discovery to establish that NCB was not merely a passive donor to Muwafaq, but that it was an active participant in efforts to use its infrastructure and resources to build and sustain Muwafaq, for the purpose of enabling al Qaeda to realize its stated ambition to attack America." (Pls.' Opp'n Mem. at 5) (internal quotation marks omitted). NCB is also alleged to have provided further support for al Qaeda's jihad via it relationship with two other ostensible charities with intimate financial and operational ties to al Qaeda.

The requested discovery would not be of any evidentiary value in establishing specific jurisdiction over NCB because the underlying legal theory, upon which plaintiffs seek to premise jurisdiction, is untenable. Plaintiffs are correct that the due process protections do not require a showing of direct participation in the 9/11 attacks themselves, to confer specific jurisdiction. However, specific jurisdiction minimally requires that the defendant's indirect provision of material support to al Qaeda be conducted with the specific intent that it be used to aid al Qaeda in the commission of a terrorist attack against the United States and its citizens, and that such a subsequent attack occurred, and caused the injuries claimed to be suffered by plaintiffs. Merely helping an organization, that is hostile to the United States, by providing financial support does not suffice to confer specific personal jurisdiction over a foreign defendant, even when it used the

received funds to continue to engage in violence.[12]

Accordingly, this Court finds that, with the exception of defendant Dubai Islamic Bank, plaintiffs have failed to make the requisite *prima facie* showing that the Court has jurisdiction over any of the moving defendants.[13] The Court further finds that it is appropriate to dismiss the claims against these defendants without affording plaintiffs any additional jurisdictional discovery as to these defendants.

The failure to make out a *prima facie* showing of jurisdiction is not a bar to jurisdictional discovery. Ehrenfeld v. Mahfouz, 489 F.3d 542, 550 n.6 (2d Cir. 2007). Nevertheless, "[a] district court has wide latitude to determine the scope of discovery, and is typically within its discretion to deny jurisdictional discovery when the plaintiff has not made out a *prima facie* case for jurisdiction." Frontera, 582 F.3d at 401(internal citations, quotation marks and brackets omitted). Plaintiffs have been allowed to engage in "limited" jurisdiction in this litigation as to certain defendants and certain discreet issues. After more than five years since Judge Casey

---

[12] Plaintiffs alternatively argue that the Court should not decide NCB's personal jurisdiction defense without affording plaintiffs discovery as to NCB's relationship to the government of Saudi Arabia. They argue that if NCB is found to be an instrumentality of Saudi Arabia, the law is unsettled whether NCB would be entitled to any due process protections. See e.g. Frontera, 582 F.3d at 401 (noting that it is unclear whether a foreign corporation that is owned, but not controlled, by a foreign state, has due process rights). Such an issue is of no relevance here. If NCB is an instrumentality of Saudi Arabia, it would be deemed to constitute the "foreign state" of Saudi Arabia itself," for purposes of the FSIA. Thus, a potential finding as to NCB's sovereign status would simply result in NCB being immune from suit by virtue of the FSIA, thereby necessitating dismissal for lack of subject matter jurisdiction, as oppose to dismissal for lack of personal jurisdiction.

[13] In contrast to the other moving defendants, plaintiffs have made a sufficient showing that the alleged wrongdoing of defendant Dubai Islamic Bank has a direct relationship to the September 11th terrorist attacks from which plaintiffs' claimed injuries are related. See, discussion, *infra* p. 48.

47

initially granted plaintiffs an opportunity to engage in purportedly "limited" jurisdictional discovery, plaintiff is still presently in the midst of conducting further requested jurisdictional discovery. Having carefully and thoroughly reviewed the voluminous and extensive submissions of the respective parties applicable to each defendant's individual motion, the Court finds that plaintiffs have not even made an arguable showing of jurisdiction or identified a genuine issue of jurisdictional fact, so as to warrant the granting of additional jurisdictional discovery as to any of these defendants.

## DEFENDANT DUBAI ISLAMIC BANK ("DIB")

Plaintiffs argues that DIB is subject to personal jurisdiction, under specific jurisdictional theories, based on its alleged direct sponsorship of al Qaeda and its provision of material support to al Qaeda in the form of banking and financial services. "Material support" is defined to mean "any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, [or] financial services ..." 18 U.S.C. § 2339A(b).

Plaintiffs allege that, in 1999, the United States government announced that DIB was laundering money for Osama bin Laden. United States intelligence officials had allegedly obtained evidence that Osama bin Laden had a financial relationship with DIB, which was believed to have been arranged with the approval of the officials who control the bank. Plaintiffs further allege that, in 1999, United States officials visited the United Arab Emirates to put a halt to such a relationship by demanding the government end its purported lax supervision of the bank. DIB allegedly continued to knowingly provide financial and other forms of material aid to Osama bin Laden and al Qaeda, while disregarding the warnings and refusing to adhere to even minimal

48

banking industry standards designed to thwart the support of terrorist networks through anti-terrorist and money laundering safeguards, and "know your customer" regulations.

Plaintiffs claim that, in addition to bin Laden being allowed to funnel money through the bank, al Qaeda operatives used their bank accounts at DIB to send money to suspect charities. Plaintiffs further allege that DIB itself provided direct financial services and support for the attacks against the United States on 9/11. Specifically, plaintiffs allege that the bank account of Osama bin Laden's Chief Financial Officer was the source of thousands of dollars of money transfers from DIB to two of the hijackers. The sole purpose of those fund transfers was allegedly to pay for the hijacker's training, including flight lessons, and other expenses incurred in preparing for the 9/11 terrorist attacks.

Generally, in the absence of any allegations that a bank has ties to a terrorist organization, or that it knew or had reason to believe that the monies it was processing through the bank would be used to carry out terrorist attacks on civilian targets, noncompliance with banking laws and industry standards will not alone render a bank liable for the violent attacks committed by a terrorist organization who benefitted, in some general, nondescript manner, from the monies passing through the bank during the performance of routine banking services. See, Licci, 2010 WL 1378807, at *6 (cases cited therein). The claimed wrongdoing of DIB, however, does not relate to the performance of routine banking and financial services, or its use as a passive conduit through which monies were indirectly channeled to and from al Qaeda. Rather, the allegations indicate that DIB was an intentional, knowing and direct participant in providing money laundering services to al Qaeda, which allowed for direct funding of terrorist attacks. The terrorist-related effects, of DIB's claimed misconduct, were of such significant alarm and concern

49

as to spur the United States government into action to end the banking services it believed DIB was performing for Osama bin Laden and al Qaeda. Despite the bank's purported knowledge that the material support it was allegedly providing to al Qaeda posed a threat to United States' interests, DIB allegedly continued to provide banking and other financial services directly to Osama bin Laden and al Qaeda, in violation of accepted international banking standards adopted to prevent the illicit movement of funds to terrorists. By allegedly doing so, DIB became directly involved in helping to fund the execution of the terrorist attacks of 9/11, carrying out financial services and transactions to aid the hijackers in preparing for those attacks. Thus, DIB's alleged activities go far beyond simply providing support to an organization openly hostile to the United States. It can be reasonably inferred, from the allegations pled, that DIB personally and intentionally provided material support to al Qaeda in aid of al Qaeda's plan to commit an aggressive terrorist strike against the United States, with knowledge that the United States and its residents would likely bear the brunt of the resulting injuries. Since plaintiffs' claimed injuries are related to DIB's alleged tortious conduct, the requirements for the exercising of specific jurisdiction are satisfied.

Having determining that DIB has the requisite minimal contacts for specific jurisdiction, it must next be determined, under the second prong of the due process test, whether the exercise of jurisdiction over DIB would be reasonable under these circumstances. Where, as here, a defendant has allegedly purposely directed its activity at the United States and its residents, defendant "must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." Burger King, 471 U.S. at 477. DIB has made no arguments relating to the reasonableness of exercising jurisdiction over it. The Court finds that litigation of

50

this matter in the United States will not be so unduly burdensome or inconvenient to DIB so as to unfairly place it at a disadvantage compared to plaintiffs. Accordingly, the exercise of personal jurisdiction over DIB would not be unreasonable, and it would otherwise comport with established principles of due process.

Due process, however, further mandates service of process or the defendant's waiver thereof. DIB has also moved, pursuant to Fed.R.Civ.P. 12(b)(5), to dismiss the claims against it for insufficient service of process. It argues that the court-authorized service of process via publication in the United Arab Emirates was unconstitutional because: (1) DIB could be directly served without need to resort to substitute service; and (2) the three newspapers, in which service was published, were not widely circulated in the United Arab Emirates.

Plaintiffs sought permission, before Judge Casey, to serve by publication arguing that service of process upon the defendants could not be effected in the United Arab Emirates, or in Saudi Arabia and the Sudan, because cultural hostilities and fear of retribution have made it impossible to find anyone in Saudi Arabia and the Gulf States region willing or able to execute service of process. Plaintiffs advised that the process server hired to serve some of the defendants was apparently murdered during his attempts to complete service of process for one of the instant lawsuits. Plaintiffs indicated that they did not want to risk another innocent life, when an acceptable alternative means of service was available. Judge Casey granted plaintiffs' application and authorized service of process by publication in three periodicals.

A district court is afforded broad discretion to allow service, upon an individual in a foreign country, by any means not prohibited by international agreement. Fed.R.Civ.P. 4(f)(3). For substitute service to meet the requirements of due process, it must be reasonably calculated,

51

under the circumstances, to provide notice to interested parties of the pendency of the action and afford them an opportunity to present their objections. <u>Securities & Exch. Comm'n v. Tome</u>, 833 F.2d 1086, 1093 (2d Cir. 1987) (*quoting* <u>Mullane v. Cent. Hanover Bank & Trust Co.</u>, 339 U.S. 306, 314 (1950)). The fact that a defendant knows of the action against it will not act to cure an improper service.

DIB argues that, since its location is a matter of public record, it was incumbent upon plaintiffs to directly serve it by traditional means, rather than resorting to substitute service. Plaintiffs demonstrated, before Judge Casey, that service of process upon a defendant within the United Arab Emirates was not merely impractical, but posed a genuine risk of loss to human life. Thus, a substitute form of service was determined by Judge Casey to be warranted under the circumstances. This Court will not disturb that determination.

DIB, however, further contends that because its mailing and e-mail addresses, and its telephone and fax numbers, are listed on its website, plaintiffs' failure to seek a court order directing notice by one of these readily available alternative routes, renders Judge Casey's order, directing service by publication, unconstitutional and an abuse of discretion. The Court is vested with the authority to order any alternative form of service that is reasonably calculated to provide a defendant with notice of the action against it and an opportunity to defend, and that is not otherwise prohibited by international agreement. Due process does not require the Court to consider all possible forms of alternative service available. Nor is it incumbent upon the Court to engage in a statistical analysis to determine which method would have the greatest probability of providing the requisite notice to a particular defendant. Where, as here, Judge Casey's order addressed the impracticality of effecting service of process on numerous defendants located

throughout Saudi Arabia, the Sudan and the United Arab Emirates, it was an appropriate exercise

of discretion to order service by publication as to all such defendants.  See, Securities & Exch.

Comm'n v. Anticevic, 2009 WL 361739, at *3 (S.D.N.Y. Feb. 13, 2009) (Rule (4)(3) " 'provides

the Court with flexibility and discretion empowering courts to fit the manner of service utilized to

the facts and circumstances of the particular case.' ") (quoting B.P. Prods. N. Am., Inc. v. Dagra,

236 F.R.D. 270, 271 (E.D.Va. 2006)).  This Court further finds that the court-authorized form of

substitute service was reasonably calculated, under the circumstances, to provide DIB with notice

of the pendency of the actions against it, especially given DIB's constructive notice of the claims

asserted against it as evidenced by the filing of its motion to dismiss.  Accordingly, DIB's motion

to dismiss for want of personal jurisdiction and improper service, pursuant to Fed.R.Civ.P.

12(b)(2) and (5) respectively, is denied.

DIB also seeks dismissal, pursuant to Fed.R.Civ.P. 12(b)(6), for failure to state a claim

upon which relief can be granted.  In determining such a motion, the Court's review is limited to

facts asserted in the complaint, exhibits attached thereto, and documents incorporated by

reference in the complaint.  McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir.

2007). To withstand a Rule 12(b)(6) motion, a complaint must allege a plausible set of facts that,

when accepted as true, is sufficient to state a claim for relief above the speculative level.

Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt., LLC, 595 F.3d 86, 91 (2d

Cir. 2010) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  "Broad allegations

of conspiracy are insufficient; the plaintiff 'must provide some factual basis supporting a meeting

of the minds, such that defendants entered into an agreement, express or tacit, to achieve the

unlawful end.' " Arar v. Ashcroft, 585 F.3d 559, 569 (2d Cir. 2009) (quoting Webb v. Goord, 340

53

F.3d 110 (2d Cir. 2003)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, - - U.S. - -, 129 S.Ct. 1937, 1949 (2009). "Where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, [ ] dismissal is appropriate." Starr v. Sony BMG Music Entm't, 592 F.3d 314, 321 (2d Cir. 2010) (internal quotation marks and alterations omitted).

DIB primarily argues that the allegations pled against it are insufficient to show that it: personally committed any tort, or that it knowingly, substantially or intentionally participated in any wrongdoing. DIB maintains that the only reasonable inference that can be drawn from the allegations is that it was providing routine banking services in the ordinary course of business, without knowledge of any terrorist activities. DIB's alleged money laundering activities on behalf of Osama bin Laden and al Qaeda was apparently of such magnitude and prevalence as to warrant the action by the United States government itself. The alleged continuation of improper financial services on behalf of Osama bin Laden and al Qaeda gives rise to the inference that DIB intentionally and knowingly assisted al Qaeda by providing banking services with knowledge that such services would be used to finance al Qaeda's plan to commit a terrorist attack against the United States. Plaintiffs have alleged sufficient factual allegations to support the concerted actions theories of liability upon which the substantive causes of action are premised.[14]

DIB further argues that plaintiffs failed to allege sufficient facts from which proximate

---

[14] Dismissal is nevertheless warranted insofar as plaintiffs have pled their concerted theories of liability as independent causes of action for aiding and abetting and civil conspiracy. Similarly, since punitive damages is a remedy, not a cause of action, the punitive damages causes of action pled by plaintiffs are also dismissed.

cause may be established. The issue of proximate cause is generally a factual one, resolution of which is best suited for the trier of fact. "Proximate causation is not a concept susceptible of precise definition" as it "depends to a great extent on considerations of fairness of imposing liability for remote consequences." Babbitt v. Sweet Home Chapter of Communities for a Great Oregon, 515 U.S. 687, 717 (O'Connor, concurring). "The concepts of direct relationship and foreseeability are . . . two of the many shapes proximate cause took at common law[.]" Hemi Group , LLC v. City of New York, N.Y., - - U.S. - -, 130 S.Ct. 983, 991 (Jan. 25, 2010) (internal quotation marks and brackets omitted). Thus, traditional tort causation requires a sufficient showing that the alleged wrongdoing was a substantial factor in leading to the injury, that the injury was directly related to the wrongdoing, and the injury was reasonably foreseeable. See, Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc., 191 F.3d 229, 235-36 (2d Cir. 1999).

It must, however, be emphasized that "[p]roximate cause is an elusive concept, one always to be determined on the facts of each case upon mixed considerations of logic, common sense, justice, policy and precedent." Laborers Local 17, 191 F.3d at 235 (internal quotation marks omitted). Thus, it has been recognized that, in actions arising from a terrorist attack, the proximate cause element is relaxed. See, Boim v. Holy Land Foundation for Relief and Dev., 549 F.3d 685, 697-98 (7th Cir. 2008) (finding that, for claims under the Anti-Terrorism Act, a showing that defendant gave material support to terrorist organization through the making of charitable donations, with awareness or deliberate indifference to the facts, is sufficient to establish the requisite causal connection to injuries sustained in terrorist attack.).

Al Qaeda's ability to accomplish the coordinated large-scale terrorist attacks of September

55

11th is dependent on the cumulative efforts and contributions of untold thousands over an extended period of time. The commingling of funds and services, and the fungible nature of money itself, essentially renders it impossible to identify the specific material support, (much less the original source thereof), that enabled al Qaeda to commit a particular terrorist attack. Individually, the financial or other material support provided by a particular person or entity may be of insignificant value. Yet, it is the collective contributions of all such sponsors that gives birth to a repository of seemingly endless financial, military, and logistical resources, from which the terrorist organization draws upon with impunity to carry out its violent attacks against innocent civilians. Such a reality bears directly on the issues of temporal and causal proximity.

As the Second Circuit recognized, al Qaeda needs access to financial institutions to fund terrorist attacks. Terrorist III, 538 F.3d at 96. Given the purported warnings by the United States government of the dangers posed by the perceived banking misconduct of DIB, it was reasonably foreseeable that DIB's alleged continuation of its performance of extraordinary banking services for al Qaeda would result in the injuries suffered from terror attacks launched against the United States by al Qaeda. Such direct and specific banking services allegedly included the transfers of money to two of the hijackers; which monies are claimed to have been used specifically to prepare for the 9/11 attacks. Thus, an articulable nexus exists between the wire transfer services allegedly provided by DIB to al Qaeda and the specific terrorist attacks that give rise to plaintiffs' claims against DIB. Since DIB's alleged wrongdoing is directly related to the injuries sustained in the terror attacks of September 11th, the plaintiffs have made a sufficient showing of causation for pleading purposes.

Dismissal is nevertheless warranted with regard to those separate claims pled under the

56

Alien Tort Statute, 28 U.S.C. §1350 ("ATS"), as well as the separately pled claims for violation

of international law. The ATS does not create an independent cause of action, but rather bestows

original jurisdiction upon the district court over civil actions by an alien for violation of a well-

defined and universally-accepted rule of international law. Sosa v. Alvarez-Machain, 542 U.S.

692, 714 (2004); Abdullahi v. Pfizer, Inc., 562 F.3d 163 (2d Cir. 2009). An ATS claim may be

brought against a non-governmental actor when his tortious acts violate norms of universal

concerns that are recognized to extend to the conduct of private parties, such as the hijacking of

an aircraft. Abdullahi, 562 F.3d at 173; Vietnam Ass'n for Victims of Agent Orange v. Dow

Chemical Co., 517 F.3d 104, 116 (2d Cir. 2008).

Plaintiffs contend that DIB is liable for aiding and abetting a violation of the international

law of hijacking based on its alleged conduct in directly, and in concert with others, financing and

materially supporting al Qaeda. A defendant who provides material support to aid in the

commission of some type of terrorist attack, without knowledge that the attack will involve the

hijacking of an airplane, cannot be held liable for the violation of international law by the primary

actor.[15]

"[T]he *mens rea* standard for aiding and abetting liability in ATS actions is purpose rather

than knowledge alone." Presbyterian Church of Sudan v. Talisman Energy, Inc., 582 F.3d 244,

259 (2d Cir. 2009). Thus, an individual who knowingly, but not purposefully, aids and abets in

the violation of international law, is not subject to liability under the ATS. Although the

availability of a conspiracy theory of liability under the ATS is still open to debate, the Second

---

[15] Judge Casey previously ruled that the ATS "may provide a basis for a concerted action claim of material support[.]" Terrorist I, 349 F.Supp.2d at 826.

Circuit has held that, "[e]ven assuming, without deciding, that plaintiffs could assert such a theory

in an ATS action, an essential element of a joint criminal enterprise is a criminal intention to

participate in a common criminal design." Id. at 260 (internal quotation marks omitted).

"Therefore, under a theory of relief based on a joint criminal enterprise, plaintiffs' conspiracy

claims would require the same *mens rea* as their claims for aiding and abetting." Id.

It may reasonably be inferred, from the pleadings, that DIB knew that the material support

it provided to al Qaeda, in the form of banking and financial services, would aid the al Qaeda in

the commission of a terrorist attack against the United States. Plaintiffs do not allege that DIB

had any knowledge of the nature or specifics of the planned terrorist attacks of 9/11. Thus, the

pleadings fail to demonstrate that DIB purposefully aided and abetted, or conspired with others to

hijack an aircraft. Accordingly, the claims pled under the ATS for violation of international law

must be dismissed.

DIB also seeks dismissal of the causes of action pled under the Torture Victim Protection

Act ("TVPA"), 28 U.S.C. §1350 note (a)(1), on the sole ground that, as Judge Casey previously

held, TVPA claims can only be asserted against individuals. See, Terrorist I, 349 F.Supp.2d 828

("Only individuals may be sued under the TVPA."). The TVPA imposes liability upon "[a]n

*individual* who, under actual or apparent authority, or color of law, of any foreign nation . . .

subjects an individual to extrajudicial killing . . ." 28 U.S.C. § 1350 note § 2(a) (emphasis

added). "For purposes of the TVPA, an individual "acts under color of law ... when he acts

together with state officials or with significant state aid.' " Khulumani v. Barclay Nat'l Bank,

Ltd., 504 F.3d 254, 260 (2d Cir. 2007) (*quoting* Kadic v. Karadzic, 70 F.3d 232, 245 (2d Cir.

1995)).

58

The plain language of the TVPA explicitly limits primary liability to individuals only. A corporation or other entity may, however, be subject to liability under the TVPA for aiding and abetting an individual who, acting with authority or under color of law of a foreign government, commits an extrajudicial killing. See e.g., Khulumani, *supra* (finding pleadings insufficient to hold corporation liable under TVPA where private actors not alleged to be acting under color of law). The allegations against DIBS do not demonstrate that it acted in concert with an individual, who was acting with the authority or under color of United Arab Emirates law, in carrying out al Qaeda's 9/11 terrorist attacks. Accordingly, the TVPA claims cannot be maintained against the defendant-bank.

Plaintiffs' civil RICO claims, for violations of 18 U.S.C. § 1962(a-d), are also not supported by the factual allegations pled. Among the pleading deficiencies, is the failure to adequately plead the heightened RICO causation between the predicate wrong and the harm, as well as alleging insufficient facts to demonstrate that DIB had some part in directing the operation or management of the al Qaeda enterprise itself, or was a central figure in the underlying scheme. "Simply alleging that certain entities provide services which are helpful to an enterprise without any allegation that these entities exerted any control over the enterprise does not sufficiently allege a claim under RICO against those entities." City of New York v. Smokes-Spirits.com, Inc., 541 F.3d 425, 449 (2d Cir. 2008), *rev'd on other grounds* Hemi Group, *supra*.

Furthermore, the causes of action pled, in the Federal Ins. Co. v. al Qaida, 03 CV 6798, for intentional infliction of emotional distress and assault and battery, are dismissed as time-barred under the applicable one year statute of limitations. See, N.Y. C.P.L.R. § 215; see also, Ross v. Louise Wise Servs., Inc., 868 N.E.2d 189, 197 (N.Y. 2007). DIB's motion to dismiss the

59

claims for contribution and indemnity on the grounds that they are premature, is denied.

## CONCLUSION

Other than to the limited extent indicated herein, defendant's Dubai Islamic Bank's motion to dismiss, pursuant to Fed.R.Civ.P. 12(b)(6), for failure to state a claim is denied. Dubai Islamic Bank's motion to dismiss for lack of personal jurisdiction and improper service of process, pursuant to Fed.R.Civ.P. 12(b)( 2) and (5) respectively, is also denied.

The remaining moving defendants' motions to dismiss for lack of personal jurisdiction, pursuant to Fed.R.Civ.P. 12(b)(2), are granted. Final judgement is entered as to those thirty-seven defendants, as well as to the twelve additional defendants whom plaintiffs concede dismissal is warranted.

As the Court indicated at the April 15, 2010 conference, the parties shall immediately meet and confer, and propose to the magistrate judge a schedule, commencing on or after July 15, 2010, to complete discovery in all cases.

Dated: New York, New York
      June 16, 2010

SO ORDERED:

_George B. Daniels_
GEORGE B. DANIELS
United States District Judge

60