# EXHIBIT 16

# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------- x

IN RE: TERRORIST ATTACKS ON　　　　)　　Civil Action No. 03 MDL 1570 (GBD) (SN)
SEPTEMBER 11, 2011　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　)
-------------------------------------------------------- x

This document relates to:

*Underwriting Members of Lloyd's Syndicates 2 v. Al Rajhi Bank*, No. 16-cv-07853 (GBD)
*Abarca v. Kingdom of Saudi Arabia*, No. 17-cv-03887 (GBD)
*Abedhajajreh v. Kingdom of Saudi Arabia*, No. 17-cv-06123 (GBD)
*Addesso v. Kingdom of Saudi Arabia*, No. 16-cv-09937 (GBD)
*Aguilar v. Kingdom of Saudi Arabia*, No. 16-cv-09663 (GBD)
*Aiken v. Kingdom of Saudi Arabia*, No. 17-cv-00450 (GBD)
*Arrowood Indemnity Co. v. Kingdom of Saudi Arabia*, No. 17-cv-03908 (GBD)
*Charter Oak Fire Ins. Co. v. Al Rajhi Bank*, No. 17-cv-02651 (GBD)
*Hodges v. Kingdom of Saudi Arabia*, No. 17-cv-00117 (GBD)

## MEMORANDUM IN SUPPORT OF DEFENDANT SAUDI BINLADIN GROUP'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION AND FOR FAILURE TO STATE A CLAIM

# TABLE OF CONTENTS

Page

INTRODUCTION .................................................................................................... 1

BACKGROUND AND STATEMENT OF THE CASE ............................................ 2

STANDARD OF REVIEW ..................................................................................... 6

ARGUMENT ........................................................................................................... 8

I.      THE CLAIMS AGAINST SBG MUST BE DISMISSED BECAUSE, AS BOTH
        THIS COURT AND THE SECOND CIRCUIT HAVE PREVIOUSLY HELD,
        THIS COURT DOES NOT HAVE PERSONAL JURISDICTION OVER SBG ............ 8

        A.      Personal Jurisdiction in this Context Requires that Plaintiffs' Injuries
                Arise out of Defendant's Intentional Tortious Conduct Purposefully
                Directed at the United States ................................................................. 8

        B.      The Bulk of Plaintiffs' Allegations Are Substantively the Same, if Not
                Identical, to Those Against SBG that This Court Previously Rejected ............... 10

                1.      Alleged Pre-1993 Support to OBL, Whether in Sudan or
                        Elsewhere, Is too Remote as a Matter of Law to Support Personal
                        Jurisdiction ............................................................................. 12

                2.      Plaintiffs Allege No Facts to Contradict that SBG removed OBL as
                        a Shareholder of SBG in 1993-94 and Provided No Support
                        Thereafter ................................................................................ 15

        C.      Plaintiffs' "New" Allegations Do Not Cure the Jurisdictional Defects in
                Plaintiffs' Pleadings ............................................................................ 17

                1.      The Abbottabad Sudan Document ............................................. 18

                2.      Moussaoui's Ex Parte Prison Statement ..................................... 19

                3.      The "28 Pages" ........................................................................ 23

        D.      Plaintiffs Are Not Entitled to Jurisdictional Discovery ....................... 24

II.     Plaintiffs' Claims also Fail Under Rule 12(b)(6) ........................................... 26

        A.      Plaintiffs Have Alleged No Facts Supporting an Inference that SBG's
                Conduct Proximately Caused Their Injuries ........................................ 26

        B.      Plaintiffs' Allegations Do Not Support the Requisite Knowledge to
                Support a Claim under the ATA .......................................................... 29

        C.      The Insurance Plaintiffs Do Not Allege Facts Showing They Have
                Standing to Bring ATA Claims ............................................................ 30

CONCLUSION ....................................................................................................... 33

## TABLE OF AUTHORITIES

Page

CASES

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009).................................................................7, 8, 29, 30

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007).................................................................................7

*Best Van Lines, Inc. v. Walker*,
490 F.3d 239 (2d Cir. 2007)...................................................................25

*Burger King Corp. v. Rudzewicz*,
471 U.S. 462 (1985).................................................................................9

*Chubb Custom Ins. Co. v. Space Systems/Loral, Inc.*,
710 F.3d 946 (9th Cir. 2013) ...........................................................31, 32

*Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*,
514 F.3d 1063 (10th Cir. 2008) ..............................................................7

*Frontera Res. Azerbaijan Corp. v. State Oil Co. of Azerbaijan Republic*,
582 F.3d 393 (2d Cir. 2009)..............................................................24, 25

*Haber v. United States*,
823 F.3d 746 (2d Cir. 2016)....................................................................24

*Helicopteros Nacionales de Colombia, S.A. v. Hall*,
466 U.S. 408 (1984).................................................................................9

*In re Terrorist Attacks on Sept. 11, 2001*,
134 F. Supp. 3d 774 (S.D.N.Y. 2015).....................................................19

*Hussein v. Dahabshiil Transfer Servs. Ltd.*,
230 F. Supp. 3d 167, 174 (S.D.N.Y. 2017)..............................................6

*In re Terrorist Attacks on Sept. 11, 2001*,
349 F. Supp. 2d 765 (S.D.N.Y. 2005) ("*Terrorist Attacks I*")...............3, 15, 25, 29

*In re Terrorist Attacks on Sept. 11, 2001*,
538 F.3d 71 (2d Cir. 2008) ("*Terrorist Attacks III*") ................................8, 9, 10, 14

*In re Terrorist Attacks on Sept. 11, 2001*,
 718 F. Supp. 2d 456 (S.D.N.Y. 2010) ("*Terrorist Attacks IV*") ..................................... passim

*In re Terrorist Attacks on Sept. 11, 2001*,
 740 F. Supp. 2d 494 (S.D.N.Y. 2010) ("*Terrorist Attacks V*")................................................17

*In re Terrorist Attacks on Sept. 11, 2001*,
 840 F. Supp. 2d 776 (S.D.N.Y. 2012) ("*Terrorist Attacks VI*") ..................................... passim

*In re Terrorist Attacks on Sept. 11, 2001*,
 714 F.3d 118 (2d Cir. 2013) ("*Terrorist Attacks VII*")................................................7, 26, 29

*In re Terrorist Attacks on Sept. 11, 2001*,
 714 F.3d 659 (2d Cir. 2013) ("*Terrorist Attacks VIII*").................................................. passim

*In re Terrorist Attacks on Sept. 11, 2001*,
 No. 03-md-1570, 2007 WL 2907278 (S.D.N.Y. Oct. 5, 2007) ..............................................29

*In re Terrorist Attacks on Sept. 11, 2001*,
 No. 03-md-01570, 2008 WL 8183819 (S.D.N.Y. May 21, 2008).........................4, 15, 22, 25

*In re Terrorist Attacks on Sept. 11, 2001*,
 No. 03-MDL-1570, 2011 WL 6318975 (S.D.N.Y. Dec. 16, 2011).................................23, 31

*Jazini v. Nissan Motor Co.*,
 148 F.3d 181 (2d Cir. 1998)....................................................................................................24

*Karpus v. Hyperion Capital Mgmt.*,
 No. 96-cv-4671, 1997 U.S. Dist. LEXIS 4332 (S.D.N.Y. Apr. 2, 1997) ...............................11

*Laydon v. Mizuho Bank, Ltd.*,
 No. 12-cv-3419, 2015 WL 1515358 (S.D.N.Y. Mar. 31, 2015).............................................25

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
 673 F.3d 50 (2d Cir. 2012)........................................................................................................6

*MacDermid, Inc. v. Deiter*,
 702 F.3d 725 (2d Cir. 2012)......................................................................................................6

*Mao v. Sands Bethworks Gaming LLC*,
 No. 15-cv-6252, 2016 WL 1717220 (S.D.N.Y. Apr. 28, 2016) .................................................6

*Marquez-Almanzar v. Immigration & Naturalization Servs.*,
 418 F. 3d 210 (2d Cir. 2005).................................................................................................31

*Metro. Life Ins. Co. v. Robertson-Ceco Corp.*,
    84 F.3d 560 (2d Cir. 1996)..................................................................6

*Mohammadi v. Islamic Republic of Iran*,
    782 F.3d 9 (D.C. Cir. 2015)...............................................................31

*O'Neill v. Al Rajhi Bank*,
    134 S. Ct. 2870 (2014).........................................................................5

*Palnik v. Westlake Entm't Inc.*,
    344 F. App'x 249 (6th Cir. 2009) ........................................................6

*Rains v. Jil-Mic, Inc.*,
    301 F. Supp. 545 (S.D.N.Y. 1969).....................................................11

*Rothstein v. UBS AG*,
    647 F. Supp. 2d 292 (S.D.N.Y. 2009).................................................7

*Rothstein v. UBS AG*,
    708 F.3d 82 (2d Cir. 2013)..................................................................7

*Samantar v. Yousuf*,
    560 U.S. 305 (2010).............................................................................8

*Smith v. Pennsylvania R. Co.*,
    239 F. 103 (2d Cir. 1917) ....................................................................7

*Starr v. Sony BMG Music Entm't*,
    592 F.3d 314 (2d Cir. 2010).................................................................7

*Stengel v. Black*,
    486 F. Appx. 181 (2d Cir. 2012)........................................................33

*US Airways, Inc. v. McCutchen*,
    133 S. Ct. 1537 (2013).......................................................................33

*Waldman v. Palestine Liberation Org.*,
    835 F.3d 317 (2d Cir. 2016), *petition for cert. docketed*, *Sokolow v. Palestine
    Liberation Org.*, No. 16-1071 (U.S. Mar. 7, 2017)..............................9

*World Trade Ctr. Props. LLC v. Al Baraka Inv. and Dev. Corp.*,
    No. 04-cv-07280 (S.D.N.Y. Sept. 10, 2004).....................................21

*Wultz v. Islamic Republic of Iran*,
   755 F. Supp. 2d 1 (D.D.C. 2010) ........................................................29

**STATUTES**

8 U.S.C. § 1101(a)(22)...........................................................................31

28 U.S.C. § 1605A................................................................................32

Anti-Terrorism Act, 18 U.S.C. § 2331 *et seq.* .................................... passim

Pub. L. No. 114-222..............................................................................25

**OTHER AUTHORITIES**

154 Cong. Rec. 500 (Jan. 22, 2008)........................................................32

Exec. Order No. 13099, 63 Fed. Reg. 45,167 (Aug. 20, 1998) ....................13

Lawrence Wright, *The Looming Tower* (2007) ...........................................14

Nat'l Comm'n on Terrorist Attacks Upon the U.S., The 9/11Commission Report
   (2004)........................................................................................2, 13, 28

Phil Hirschkorn, *Moussaoui: 'Crazy or not crazy? That is the question' 9/11*
   *conspirator's odd ideas, behavior detailed at trial*, CNN.com (Apr. 19, 2006) ....................19

Statement by the Office of the Director of National Intelligence on the
   Declassification of Part Four of the Senate Select Committee on Intelligence
   and House Permanent Select Committee on Intelligence's 2002 Report on the
   Committees' Joint Inquiry into Intelligence Community Activities Before and
   After the Terrorist Attacks of September 11, 2001 (July 15, 2016) .......................23

Steve Coll, *Young Osama*, The New Yorker (Dec. 12, 2005)........................20

U.S. Department of the Treasury, *Recent OFAC Actions*, (Nov. 7, 2001),
   http://www.treasury.gov/resource-center/sanctions/OFAC-
   Enforcement/Pages/20011107.aspx ......................................................16

## INTRODUCTION

This Court has already held, and the Second Circuit has affirmed, that allegations against the Saudi Binladin Group ("SBG") substantially identical to those made in the present Complaint are insufficient to establish personal jurisdiction over the company. *See In re Terrorist Attacks on Sept. 11, 2001*, 840 F. Supp. 2d 776, 782 (S.D.N.Y. 2012) ("*Terrorist Attacks VI*"), *aff'd* 714 F.3d 659 (2d Cir. 2013) ("*Terrorist Attacks VIII*"), *cert. denied sub nom. O'Neill v. Al Rajhi Bank*, 134 S. Ct. 2870 (2014). After an enormous investment of judicial resources, including four years of Court-supervised jurisdictional discovery, amended pleadings, RICO statements, and extensive supplemental "averments" and "summaries" by the previous plaintiffs, the Court dismissed those allegations with prejudice against SBG. The Court concluded that the allegations failed to satisfy the constitutional standard for establishing the Court's personal jurisdiction over SBG.

New Plaintiffs, led by counsel for the previously dismissed *Federal Insurance* plaintiffs, have now come nearly 16 years after the tragic events of September 11 to reopen that issue. As the accompanying chart demonstrates, Plaintiffs' Amended Complaint against SBG does little more than repeat, often virtually verbatim, the allegations and factual assertions made against SBG in the previous cases. *See* Ex. A. Plaintiffs, however, can offer no plausible justification to revisit jurisdiction over SBG. The sparse new allegations they seek to bolt onto the old complaints add nothing of jurisdictional significance to the analysis and fail for the same reasons as the old allegations: they either concern conduct far too remote in time and place to support jurisdiction under this Court's and the Second Circuit's prior rulings, or they concern conduct that cannot be attributed to SBG. This Court has covered this ground. It should not, after years of proceedings and a definitive judicial resolution affirmed by the Second Circuit, begin the process anew.

## BACKGROUND AND STATEMENT OF THE CASE

Much of the background will be familiar to the Court. SBG, founded in 1989, is one of the largest engineering and construction companies in the Arab world. SBG is owned by nineteen half-brothers of Osama Bin Laden ("OBL"). Until 1993, OBL held a small stake (approximately 2%) in the company, but he never held any management position at SBG and he certainly did not, as plaintiffs glibly assert, exercise any "control" over the company. (Compl. ¶ 246). In 1993, in response to OBL's increasingly strident criticism of the Saudi government, the owners of SBG passed a resolution to remove him as a shareholder. In February 1994, Bakr Binladin, the senior member of the family and Chairman of SBG, publicly denounced OBL in a statement released to the media,[1] and in April 1994, the Saudi government revoked OBL's citizenship and froze his assets.[2] All of this occurred long before Plaintiffs claim OBL began publicly targeting the United States, and years before OBL was designated as a terrorist.[3] The United States has never designated SBG or any of its executives, employees or shareholders as a terrorist, nor has it seized or frozen any of the company's assets. Instead, the United States government has long worked with SBG and its affiliates on such

---

[1] Suppl. Decl. of Bakr Binladin ¶ 7 and Exs. 6, 7 (Sept. 7, 2010) ("Bakr Decl.") (MDL Dkt. No. 2285).

[2] Nat'l Comm'n on Terrorist Attacks Upon the U.S., The 9/11 Commission Report 57 (2004), http://govinfo.library.unt.edu/911/report/911Report.pdf ("The 9/11 Commission Report") ("By 1994, the Saudi government would freeze [OBL's] financial assets and revoke his citizenship.").

[3] *See infra* 12-14; *see also* Mem. in Support of Def. Saudi Binladin Group's Renewed Mot. to Dismiss For Lack of Personal Jurisdiction and for Failure to State a Claim at 8-11 ("SBG Renewed Mot. to Dismiss") (MDL Dkt. No. 2284).

projects as the construction of an airbase and a 1200 km road to facilitate movement of U.S.

forces during the first Gulf War.[4]

The *Burnett* and *Ashton* plaintiffs in this multidistrict litigation sued SBG, among many

others, in 2002. SBG moved to dismiss those suits, and in 2005, in part as an alternative to

requiring a more definite statement under Rule 12(e) to remedy the dearth of specificity in

plaintiffs' complaints, Judge Casey ordered "limited jurisdictional discovery to investigate

whether SBG purposefully directed its activities at the United States . . . ." *In re Terrorist*

*Attacks on Sept. 11, 2001*, 349 F. Supp. 2d 765, 822, 836 (S.D.N.Y. 2005) ("*Terrorist Attacks*

*I*"). The *Federal Insurance* plaintiffs, represented by current counsel for the *Lloyd's* Plaintiffs,

filed suit against SBG and others in 2003, but due to the timing of service, that case was not

part of SBG's original motion to dismiss. Following Judge Casey's ruling, the plaintiffs and

SBG agreed to stay briefing in other cases until the completion of jurisdictional discovery, *see*

Order ¶¶ 12-13 (July 27, 2005) (MDL Dkt. No. 1071). By agreement, plaintiffs' counsel,

including counsel for the *Federal Insurance* plaintiffs, participated in that discovery consistent

with the Court's Case Management Orders instructing plaintiffs to pursue discovery jointly.

*See* Case Management Order # 2 ¶ 20 (June 16, 2004) (MDL Dkt. No. 247); Case

Management Order # 3 ¶ 9 (June 16, 2004) (MDL Dkt. No. 248-2).

Magistrate Judge Maas closely supervised jurisdictional discovery over the course of

which he received extensive written briefing and held four hearings. While recognizing that

plaintiffs were "stretching the discovery envelope," Judge Maas also allowed two depositions,

including one over which he presided personally. *See* Discovery Order at 1 (Oct. 3, 2007)

(MDL Dkt. No. 2042). After three years, however, in 2008 Judge Maas rejected the plaintiffs'

---

[4] *See* Aff. of Omar Mohammad Binladin ¶ 9 and Ex. 2 (Sept. 7, 2010) (MDL Dkt. No.
2288) (noting and including recognition from the U.S. military for SBG's assistance in Saudi
Arabia from 1990-98).

attempt to begin a fresh round of discovery, explaining that the "substantial additional

discovery" the plaintiffs sought was "of no jurisdictional significance whatsoever in this

litigation," aimed at "continuing to go over old ground," or sought further information as to

factual allegations that, even if true, "d[id] not suggest a basis for jurisdiction over SBG."

*In re Terrorist Attacks on Sept. 11, 2001*, No. 03-md-01570, 2008 WL 8183819, at *2-3, *7

(S.D.N.Y. May 21, 2008) (MDL Dkt. No. 2090), *aff'd* Order (July 14, 2008) (MDL Dkt. No.

2108). Judge Maas noted that "jurisdictional discovery must have boundaries" and that "the

Court and counsel have been mired at this preliminary stage for a considerable period of

time." *Id.* at *5.

    Following that discovery, this Court granted SBG's Renewed Motion to Dismiss for

lack of personal jurisdiction. *See Terrorist Attacks VI*, 840 F. Supp. 2d at 780-82.[5] Among

other things, the Court concluded:

> SBG's alleged support of Osama Bin Ladin before 1993 is too
> temporally remote to establish specific jurisdiction. *See Terrorist
> IV*, 718 F. Supp. 2d at 483, 486. ("Defendants' alleged provision
> of financial and other material support to al Qaeda in the early
> 1990's, enabling it to expand its base of operations in the Sudan, is
> too remote to the terrorist attacks of September 11, 2001, to confer
> specific jurisdiction.").

*Terrorist Attacks VI*, 840 F. Supp. 2d at 782. On review, considering the various claims that the

plaintiffs had submitted to this Court in their Summary of Allegations (MDL Dkt. No. 2386-1),

which was also presented to the appellate court, the Second Circuit "agree[d] with the District

Court's dismissal of SBG." *Terrorist Attacks VIII*, 714 F.3d at 676. In particular, the Second

Circuit

---

[5] We note that while the parties generally follow the same numbering nomenclature in
referring to prior decisions in this case, the recent motions to dismiss filed by the Kingdom of
Saudi Arabia and the Saudi High Council do not cite this decision, which pertained only to SBG,
and therefore designate one of the later Second Circuit opinions as "*Terrorist Attacks VI*" in their
unrelated motions.

> agree[d] with the District Court that nothing in the record supports
> the notion that these actions were "expressly aimed" at the United
> States or are connected in any meaningful way, for the purposes of
> establishing personal jurisdiction, to the September 11, 2001
> attacks.

*Id.* "We are persuaded," it said, "that the pre-1993 'support' provided by SBG to Osama Bin Laden does not provide a valid basis for us to exercise personal jurisdiction over the company." *Id.* at 677. The Supreme Court, with the recommendation of the U.S. Solicitor General, denied plaintiffs' petition for certiorari. *O'Neill v. Al Rajhi Bank*, 134 S. Ct. 2870 (2014).

Undeterred by those prior decisions, plaintiffs' counsel in *Federal Insurance* filed a new suit, brought by new insurance company plaintiffs, against SBG and two other companies who were also previously dismissed from the litigation. They sought to avoid this Court by filing in the Western District of Pennsylvania, *see Underwriting Members of Lloyd's Syndicate 2 v. Al Rajhi Bank*, No. 3:16-cv-00019 (W.D. Pa. Jan. 15, 2016), but the Judicial Panel on Multidistrict Litigation ("JPML"), over the *Lloyd's* Plaintiffs' objection, transferred the case to this Court. *See* Transfer Order, MDL No. 1570 (JPML Oct. 3, 2016) (Dkt. No. 77).[6] In doing so, the JPML noted that "highly similar claims against all three defendants previously have been adjudicated during the course of the MDL proceedings, and the transferee court's rulings dismissing the defendants have been affirmed on appeal." *Id.* at 2. The *Lloyd's* Plaintiffs argued against transfer on several grounds, including that "their action is premised on facts and evidence that were not available at the time the MDL actions were commenced," but the JPML found that

---

[6] Additional Plaintiffs, which include other insurance companies that claim damages for payments made for losses resulting from the September 11 attacks and individuals who allege that they have suffered health effects linked to exposure to toxins as a result of the attacks, filed follow-on actions, all of which have been consolidated in MDL 1570. Following a procedure established by Magistrate Judge Netburn, the *Lloyd's* Plaintiffs filed an Amended Complaint on May 19, 2017, the allegations of which the other Plaintiffs have adopted, in lieu of amending their own complaints, through a "Short Form Complaint." *See* Order (MDL Dkt. No. 3584). Therefore, the allegations of the Amended *Lloyd's* Complaint constitute the operative allegations for all Plaintiffs in the above-captioned actions.

Case 1:03-md-01570-GBD-SN Document 3791-16 Filed 03/21/17 Page 13 of 75

"[t]hese arguments are not convincing." *Id.* As will be shown below, Plaintiffs' claims against SBG rest almost entirely on the same allegations this Court and the Second Circuit have already addressed. And to the extent Plaintiffs plead supposed "new" evidence, they add nothing of jurisdictional relevance that should alter the courts' prior conclusion that they lack personal jurisdiction over SBG.

## STANDARD OF REVIEW

"On a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of showing that the court has jurisdiction over the defendant." *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 566 (2d Cir. 1996). A court may consider not just the pleadings themselves, but also documents quoted or referenced in the complaint, *see Mao v. Sands Bethworks Gaming LLC*, No. 15-cv-6252, 2016 WL 1717220, at *1 (S.D.N.Y. Apr. 28, 2016), as well as affidavits and other written materials, *see MacDermid, Inc. v. Deiter*, 702 F.3d 725, 727 (2d Cir. 2012).

In considering these allegations, "[t]he Court will construe 'all pleadings and affidavits in the light most favorable to the plaintiff' and resolve 'all doubts in the plaintiff's favor.'" *Hussein v. Dahabshiil Transfer Servs. Ltd.*, 230 F. Supp. 3d 167, 174 (S.D.N.Y. 2017) (quoting *Penguin Group (USA) Inc. v. American Buddha*, 609 F.3d 30, 34 (2d Cir. 2010)). Yet the court "will not draw argumentative inferences in the plaintiff's favor," nor "accept as true a legal conclusion couched as a factual allegation." *In re Terrorist Attacks VIII*, 714 F.3d at 673 (quotations omitted); *accord Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 59 (2d Cir. 2012). When "a court decides a motion to dismiss for lack of personal jurisdiction . . . the complaint must have established with reasonable particularity those specific facts that support jurisdiction." *Palnik v. Westlake Entm't Inc.*, 344 F. App'x 249, 251 (6th Cir. 2009) (quoting *Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 887 (6th Cir. 2002)). Therefore, the

Court should take as true only "all well-pled (that is, plausible, non-conclusory, and non-speculative) . . . facts alleged in plaintiffs' complaint." *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1070 (10th Cir. 2008). Inferences must be based in well-pled fact. While the Second Circuit has long accepted circumstantial proof of one "fact from the existence of other facts which have been proved[,] . . . the presumed fact must have an immediate connection with the established facts from which it is inferred. . . . '[O]ne presumption cannot be built on another.'" *Smith v. Pennsylvania R. Co.*, 239 F. 103, 104-05 (2d Cir. 1917) (citations omitted). Even on a motion to dismiss, the court need not indulge an "extended chain of inferences" that amounts to speculation. *Rothstein v. UBS AG*, 647 F. Supp. 2d 292, 293-94 (S.D.N.Y. 2009).

Similarly, on a motion to dismiss for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted); *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 118, 122 (2d Cir. 2013) ("*Terrorist Attacks VII*"); *accord Rothstein v. UBS AG*, 708 F.3d 82, 94 (2d Cir. 2013); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007). For a claim to have "facial plausibility," a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556) . This test "asks for more than a sheer possibility that a defendant has acted unlawfully" and it views "plead[ed] facts that are merely consistent with a defendant's liability" as "stop[ping] short of the line between possibility and plausibility of entitlement to relief." *Id.* (quotation omitted). Accordingly, "'[w]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct' . . . dismissal is appropriate." *Starr v. Sony BMG Music Entm't*, 592

F.3d 314, 321 (2d Cir. 2010) (quoting *Iqbal*, 556 U.S. at 679); *In re Terrorist Attacks on Sept.*

*11, 2001*, 718 F. Supp. 2d 456, 491 (S.D.N.Y. 2010) ("*Terrorist Attacks IV*").

## ARGUMENT

I.  **THE CLAIMS AGAINST SBG MUST BE DISMISSED BECAUSE, AS BOTH THIS COURT AND THE SECOND CIRCUIT HAVE PREVIOUSLY HELD, THIS COURT DOES NOT HAVE PERSONAL JURISDICTION OVER SBG.**

A.  **Personal Jurisdiction in this Context Requires that Plaintiffs' Injuries Arise out of Defendant's Intentional Tortious Conduct Purposefully Directed at the United States.**

Both times it has addressed personal jurisdiction in this case, the Second Circuit

recognized two fundamental requirements to establish specific jurisdiction over the foreign

defendants.  First, Plaintiffs must plead facts to show that a defendant "'expressly aimed'

intentional tortious acts at residents of the United States."  *In re Terrorist Attacks on Sept. 11,*

*2001*, 538 F.3d 71, 95 (2d Cir. 2008) ("*Terrorist Attacks III*") (quoting *Calder v. Jones*, 465 U.S.

783, 789 (1983)); *Terrorist Attacks VIII*, 714 F.3d at 674.  As this Court distilled the standard:

> [I]n the context of a terrorism-related litigation, a defendant's
> alleged intentional tortious conduct aimed at the United States is
> *conduct that is intended to directly aid in the commission of a*
> *terrorist act*, with knowledge that the brunt of the  injuries will be
> felt in the United States.

*Terrorist Attacks IV*, 718 F. Supp. 2d at 480 (emphasis added).  Second, and just as importantly,

Plaintiffs must also plead facts to show that their injuries "'arise out of or relate to' those

activities."  *Terrorist Attacks III*, 538 F.3d at 93 (quoting *Burger King Corp. v. Rudzewicz*, 471

U.S. 462, 472-73 (1985)); *Terrorist Attacks VIII*, 714 F.3d at 674.

Neither the Second Circuit's decisions nor those of this Court broke new ground.  "When

a controversy is related to or 'arises out of' a defendant's contacts with the forum, the Court has

said that a 'relationship among the defendant, the forum, and the litigation' is the essential

foundation of in personam jurisdiction."  *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466

U.S. 408, 414 (1984) (quoting *Shaffer v. Heitner*, 433 U.S. 186, 204 (1977)).  This constitutional limitation prevents a foreign defendant from "being subject to the binding judgments of a forum with which he has established no meaningful contacts, ties, or relations."  *Burger King*, 471 U.S. at 471-72 (internal quotation marks omitted).  It is therefore "'*essential in each case* that there be some act by which the defendant *purposefully avails* itself of the privilege of conducting activities within the forum State . . . .'"  *Id.* at 474-75 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)) (emphasis added).  This requirement is "essential" – and particularly important in cases such as this – because it ensures that jurisdiction is not premised on "'attenuated' contacts," *id.* at 475 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 299 (1980)), or "unilateral activity of another party," *id.* (quoting *Helicopteros Nacionales*, 466 U.S. at 417).  The cases are clear that "the defendant *himself* . . . [must] create a 'substantial connection' with the forum State."  *Id.* (quoting *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223 (1957)) (emphasis in original); *accord Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 335 (2d Cir. 2016), *petition for cert. docketed*, *Sokolow v. Palestine Liberation Org.*, No. 16-1071 (U.S. Mar. 7, 2017).

The Second Circuit and this Court have repeatedly applied this standard to Plaintiffs' allegations, holding that providing funds to intermediary organizations, even "with the knowledge that [they] would transfer the funds to al Qaeda," will not establish the necessary conduct directed at the United States.  *Terrorist Attacks III*, 538 F.3d at 77.  Even if "acts of violence committed against residents of the United States were a foreseeable consequence of " such conduct, "foreseeability is not the standard for recognizing personal jurisdiction.  Rather, the plaintiffs must establish that the [defendants] 'expressly aimed' intentional tortious acts at residents of the United States."  *Id.* at 95 (quoting *Calder*, 465 U.S. at 789).  That was the

conclusion the Second Circuit reached when addressing personal jurisdiction over several Saudi

princes in 2008. *Id.* When it addressed personal jurisdiction with respect other defendants five

years later, it found that the plaintiffs' allegations were in many respects "indistinguishable"

from those in *Terrorist Attacks III*, and that even where the plaintiffs' arguments were not

"directly foreclosed" by that decision, the court concluded that the allegations against SBG and

its chairman, among others, were likewise "conclusory and insufficient for specific jurisdiction

purposes." *Terrorist Attacks VIII*, 714 F.3d at 676; *see also id.* at 676-78. Plaintiffs may well

argue, as some of their counsel did in the Second Circuit and in twice-unsuccessful petitions to

the U.S. Supreme Court, that the standard should be different, but the law applicable to this case

is clear.

        B.      **The Bulk of Plaintiffs' Allegations Are Substantively the Same, if Not Identical, to Those Against SBG that This Court Previously Rejected.**

The allegations in Plaintiffs' Complaint will look familiar. The overwhelming majority

are substantively the same, in many cases phrased identically, to the allegations and factual

claims at issue in the prior suits against SBG. Attached as Exhibit A is a chart that compares,

with direct quotations, the current allegations to those from the prior litigation, which include

prior plaintiffs' "Summary of Allegations and Evidence in Support of Their Theories of Specific

Jurisdiction as to Saudi Binladin Group," submitted in 2010 in response to SBG's previous

motion to dismiss, as well as individual complaints, briefs, and RICO statements where

appropriate. Out of the 65 paragraphs directed against SBG in the new complaint, 59 are either

conclusory allegations or repeat, often verbatim, the same substantive allegations made in the

dismissed cases. (Compl. ¶¶ 278-79, 281, 310, 246-77, 280, 282-98, 301-05.). This Court

examined those allegations carefully and concluded that they did not suffice to establish

jurisdiction over SBG. *See Terrorist Attacks VI*, 840 F. Supp. 2d at 782. Notably, the Court also

assessed many of the same allegations in dismissing claims against SBG's chairman, Bakr

Binladin, and other members of the Binladin family. *See Terrorist Attacks IV*, 718 F. Supp. 2d at

483.

All of those decisions were affirmed by the Second Circuit, *see Terrorist Attacks VIII*,

714 F.3d at 676-77, so principles of *stare decisis* weigh against reconsidering these recycled

allegations now. *See, e.g.*, *Karpus v. Hyperion Capital Mgmt.*, No. 96-cv-4671, 1997 U.S. Dist.

LEXIS 4332, at *10-11 (S.D.N.Y. Apr. 2, 1997) (concluding that "given the plaintiff's total

failure to allege any facts that might serve to distinguish this case from [a prior appellate decision

regarding the same registration statement], the doctrine of *stare decisis* compels [the court] to

follow the determination of this issue by the Court of Appeals"); *Rains v. Jil-Mic, Inc.*, 301 F.

Supp. 545, 546 (S.D.N.Y. 1969) (concluding that "stare decisis dictates that this court follow the

decision, based on the same facts, of the Western District of New York and affirmed by the

Court of Appeals").  We will address those allegations briefly below, but will avoid burdening

the Court with the same arguments it has already addressed.  The few sparse new allegations are

addressed in the next section.

As the other plaintiffs before them, Plaintiffs do not claim that SBG participated in any

way in or provided any material support to the September 11 attacks or any other terrorist act.

Instead, they claim that SBG (or, more often, unidentified members of the Binladin family)

engaged in conduct outside the United States that somehow benefited OBL and that any such

conduct – no matter how temporally, geographically, or causally remote from the  September 11

attacks – constitutes conduct that is "purposefully directed" at the United States.  As this Court

and the Second Circuit have repeatedly held, that is not sufficient to establish personal

jurisdiction.

Plaintiffs' allegations against SBG fall primarily into two categories. First, Plaintiffs contend that SBG provided support to OBL prior to his removal as a shareholder in 1993 in places such as the Sudan. Second, they contend that SBG maintained a "lifeline" to OBL even after removing him as a shareholder in 1993. This Court has rejected both theories before. *See Terrorist Attacks VI*, 840 F. Supp. 2d at 782.

1. **Alleged Pre-1993 Support to OBL, Whether in Sudan or Elsewhere, Is too Remote as a Matter of Law to Support Personal Jurisdiction.**

Plaintiffs repeat prior plaintiffs' discredited claims that SBG worked with OBL on construction projects in the Sudan from 1989-92, and that such projects allowed OBL to fulfill a "quid pro quo" arrangement he made with a Sudanese politician, Hassan al Turabi. *See* Ex. A (comparing ¶¶ 252-258 to prior allegations). Undisputed affidavits previously submitted by SBG as well as the timing of SBG's construction of the Port Sudan airport conclusively rebut these claims. *See* SBG Renewed Mot. to Dismiss at 11-13 (MDL Dkt. No. 2284). Yet even if such allegations were factually supported, performance of a government contract from 1989-92 to construct an airport in the Sudan is simply not tortious conduct by SBG purposefully directed at the United States.

This Court has previously held as a matter of law that claims based on such temporally and geographically remote conduct do not support personal jurisdiction. As the Court explained with respect to other defendants, "alleged acts of rendering support to al Qaeda during its formative years . . . are too remote and attenuated to support the exercise of specific jurisdiction." *Terrorist Attacks IV*, 718 F. Supp. 2d at 486-87. Specifically as to SBG, this Court held that "SBG's alleged support of Osama Bin Ladin before 1993 is too temporally remote to establish specific jurisdiction." *Terrorist Attacks VI*, 840 F. Supp. 2d at 782. The Second Circuit expressly agreed: "[W]e are persuaded that the pre-1993 'support' provided by SBG to Osama

Bin Laden does not provide a valid basis for us to exercise personal jurisdiction over the company." *Terrorist Attacks VIII*, 714 F.3d at 677. Nor did that conclusion depend on the evidence presented by SBG debunking the allegations, because the Second Circuit also held, on the pleadings, that "the only alleged support given by Bakr, Omar, Tarek, and Yeslam Bin Laden through their positions at SBG necessarily occurred before 1993," which was insufficient to establish personal jurisdiction as to them as well. *Id*.

Plaintiffs seek to challenge this conclusion by asserting that, while OBL did not publicly target the United States until 1996 and was not designated as a terrorist by the U.S. government until 1998,[7] SBG (or at least, "Osama's family members") must have known of OBL's anti-US objectives as early as 1988 and no later than 1992. *See* Compl. ¶¶ 264, 267. But those assertions also are nothing new. *See* Ex. A (comparing ¶¶ 263-70 with prior allegations). This Court has previously considered, and expressly found insufficient, every one of the facts alleged to support the claim "that given 'the strong familial ties between SBG's principals and their half brother Osama, they were put on notice as early as 1988 and absolutely no later than 1990 that any funds going to Osama were supporting a growing anti-American terrorist organization.'" *Terrorist Attacks VI*, 840 F. Supp. 2d at 782 (quoting prior plaintiffs' brief in opposition to SBG's motion to dismiss). As noted above, the Second Circuit expressly affirmed that conclusion.

The current Complaint provides no reason to revisit that conclusion. Even if true, allegations that SBG was on notice of OBL's anti-American terrorist ambitions are not sufficient to establish jurisdiction because "foreseeability is not the standard for recognizing personal

---

[7] *See* Exec. Order No. 13099, 63 Fed. Reg. 45,167 (Aug. 20, 1998); *see also* The 9/11 Commission Report 108 ("Until 1996, hardly anyone in the U.S. government understood that Usama Bin Ladin was an inspirer and organizer of the new terrorism."). This Court noted that OBL identified the United States as al Qaeda's main enemy in 1996. *See Terrorist Attacks IV*, 718 F. Supp. 2d at 464.

jurisdiction.  Rather, the plaintiffs must establish that the [defendants] 'expressly aimed'

intentional tortious acts at residents of the United States."  *Terrorist Attacks III*, 538 F.3d at 95

(quoting *Calder*, 465 U.S. at 789).  But in addition, Plaintiffs' conclusory allegation about SBG's

"knowledge" is not supported by any well-pled facts.  For example, Plaintiffs claim, as the

plaintiffs before them did, that a New York Times article in 1993 put SBG on notice that OBL

was targeting the United States, *see* Ex. A (comparing ¶ 270 with prior allegation), but the cited

article describes an attack on a hotel in Yemen where an Australian was killed; there is no

mention in the article of attacks on U.S. interests or the presence of U.S. troops.  Plaintiffs cite,

as the plaintiffs before them did, U.S. intelligence reports but provide no facts explaining how

SBG could have had access to such confidential documents.  *See* Ex. A (comparing ¶ 269 with

prior allegation).  They cite a private 1992 fatwah issued by OBL but allege no facts suggesting

that anyone outside of a small group of sworn al Qaeda members was aware of it until many

years later.  *See* Ex. A (comparing ¶ 263 with prior allegations).  And they quote selectively

from a speech supposedly given by OBL in 1990 calling for jihad against Americans, but omit

that, according to their source,[8] the "jihad" OBL called for was an economic boycott of the

United States.  *See* Ex. A (comparing ¶ 264 with prior allegation).  As this Court and the Second

Circuit have already held, none of these allegations are sufficient to establish that SBG expressly

aimed tortious conduct at the United States.[9]

---

[8] Although ¶ 264 omits the citation, in prior proceedings in this MDL, the plaintiffs
identified the source of this allegation as Lawrence Wright, *The Looming Tower*, 150-51, 405
(2007).  Briefing on SBG's prior motion to dismiss provided the context Plaintiffs leave out.  *See*
Reply Br. in Support of Def. Saudi Binladin Group's Renewed Mot. to Dismiss for Lack of
Personal Jurisdiction and for Failure to State a Claim at 17-18 (Dec. 20, 2010) (MDL Dkt. No.
2395).

[9] Plaintiffs, like the plaintiffs before them, also cite, as part of the Complaint's recitation
of the factual background, the so-called "Golden Chain" document (*see, e.g.*, Compl. ¶¶ 90-91,
133, 136), which twelve years ago Judge Casey declared "does not say what the [p]laintiffs argue
it says," *Terrorist Attacks I*, 349 F. Supp. 2d at 818; *see also id.* at 817 (noting that "with no

2.    **Plaintiffs Allege No Facts to Contradict that SBG removed OBL as a Shareholder of SBG in 1993-94 and Provided No Support Thereafter.**

The facts surrounding OBL's removal as a shareholder from both SBG and a separately held but related company, Mohammed Binladin Company ("MBC"), have been put before this Court in great detail.  As Judge Maas explained:

> As the documents confirm, on June 16, 1993, SBG adopted a shareholder resolution that sought to transfer OBL's shares to Ghaleb and to remove OBL from the shareholder roster.  (Defs.' Letter Ex. 1 at 13).  Before the resolution could take effect, SBG needed governmental approval.  Accordingly, Bakr wrote to King Fahd that same day to seek approval.  (*Id.*).  Bakr also requested that the value of OBL's interest in SBG be held in a trust outside of OBL's control. (*Id.* at 14). After the government finally approved this plan of action, the shareholder resolution took effect on May 2, 1994.  (*Id.* at 17).  Subsequently, in 2000, following further governmental approval, Ghaleb transferred the value of the shares into a joint trust account at National Commercial Bank ("NCB").  (*Id.* at 20).

> This sequence of events, which is fully supported by the relevant documents, establishes that the process of transferring OBL's shares began in 1993, received preliminary governmental approval in 1994, and was completed in 2000.

*In re Terrorist Attacks on Sept. 11, 2001*, 2008 WL 8183819, at *4 (MDL Dkt. No. 2090).

Plaintiffs simply restate the same allegations that were rejected before.  *See* Ex. A (comparing Compl. ¶¶ 289-98 to prior allegations).  Thus, two essential facts remain unchallenged, that

---

(continued…)

indication of who wrote the list, when it was written, or for what purpose, the Court cannot make the logical leap that the document is a list of early al Qaeda supporters"), and which this Court rejected as a basis for personal jurisdiction over the individual Binladin defendants, let alone SBG.  *See Terrorist Attacks IV*, 718 F. Supp. 2d at 483 (noting that "[e]ven if the Golden Chain was of jurisdictional relevance, there is no basis to conclude that the reference to the 'Bin Laden Brothers' is specifically identifying [SBG's chairman] Bakr, Omar, Tariq and Yeslam who, along with Osama bin Laden, are among the purported fifty-four children of Mohammed Awad Binladin").

(1) SBG initiated action to remove OBL as a shareholder in 1993 and (2) OBL did not receive a penny for his shares.  *See* Bakr Decl. ¶¶ 3-4, 10 (MDL Dkt. No. 2285).

Plaintiffs also allege, as did the plaintiffs before them, that "SBG directors and [unspecified] Bin Laden family members kept a financial lifeline open" to OBL.  *See* Ex. A (comparing Compl. ¶ 284 to prior allegations.).  Plaintiffs do not identify which so-called "SBG director"[10] supposedly maintained such a "lifeline," nor how that was accomplished, but on its face, this allegation does not attribute any specific conduct to SBG.  In support of this allegation, Plaintiffs recycle previously rejected claims that an account Ghaleb Binladin established in 1993 at Bank al Taqwa is "*consistent with* the indirect investment of Osama bin Laden's funds in Bank al Taqwa by SBG."  Compl. ¶ 298 (emphasis added); *see also* Ex. A (comparing Compl. ¶ 298 to identical prior allegation).   But Plaintiffs do not claim that OBL actually received any benefit from that account, that the account had any connection to the September 11 attacks, or that SBG had any interest in or control over the account.[11]  As this Court has noted, "'Where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, [ ] dismissal is appropriate.'"  *Terrorist Attacks IV*, 718 F. Supp. 2d at 491 (quoting *Starr*, 592 F.3d

---

[10] SBG had no board of directors.  *See* Bakr Decl. ¶ 3 (MDL Dkt. No. 2285).

[11] In fact, the evidence previously submitted in this litigation, including by plaintiffs, contradicts any claim that the account has any connection to OBL's shares.  Ghaleb opened that account months before the Saudi government approved the resolution removing OBL as a shareholder, with an amount ($1 million, based on documents the plaintiffs previously submitted, *see* MDL Dkt. No. 2386-37, at 14) that bears no relation to the value of OBL's former shares ($9.8 million).  Bakr Decl. ¶ 9 (MDL Dkt. No. 2285).  Plaintiffs allege no payments from the account to anyone, much less OBL, and when Ghaleb sought to close the account in June 1997, the bank refused to return his money due to losses in the Asian financial crisis.  Ghaleb then sued the bank, seeking an order requiring its closure.  *See id.*  All of this took place years before Bank al Taqwa was designated a supporter of terrorism in November 2001.  *See* U.S.  Department of the Treasury, *Recent OFAC Actions*, (Nov. 7, 2001), http://www.treasury.gov/resource-center/sanctions/OFAC-Enforcement/Pages/20011107.aspx.

at 321) (alteration in original). This Court properly rejected identical allegations in prior complaints and should do so again. *Terrorist Attacks VI*, 840 F. Supp. 2d at 782.

Finally, Plaintiffs have revived the allegation that SBG "provided cover" for supposed al Qaeda supporter Mohammed Jamal Khalifa, as allegedly shown by Khalifa's use of MBC's address on a visa application in 1994. *See* Ex. A (comparing Compl. ¶ 270 to prior allegations). Plaintiffs allege no facts to connect that action to SBG,[12] nor do they explain how it could be jurisdictionally relevant to SBG when both the person who allegedly received the support (Khalifa) and the entity allegedly providing it (MBC) have been dismissed from this litigation for lack of jurisdiction despite that allegation. *See In re Terrorist Attacks on Sept. 11, 2001*, 740 F. Supp. 2d 494, 508-09 (S.D.N.Y. 2010) ("*Terrorist Attacks V*") (noting that plaintiffs "do not allege that Khalifa himself played any role in the 9/11 terrorist attacks" and concluding that '[t]he allegations of Khalifa's involvement in terrorist activities, during the 1990's, are insufficient to demonstrate that the injuries suffered, on September 11, 2001, are related to or arise from Khalifa's intentional tortious activities"); *Terrorist Attacks IV*, 718 F. Supp. 2d at 467 n.4.

### C. Plaintiffs' "New" Allegations Do Not Cure the Jurisdictional Defects in Plaintiffs' Pleadings.

Plaintiffs cite to three recently available documents as new evidence to support previously rejected jurisdictional allegations. None of them provides a basis to find that SBG expressly aimed tortious conduct at the United States.

---

[12] SBG and MBC are separate legal entities with different, albeit overlapping, sets of individual shareholders. *See* Bakr. Decl. ¶ 1 (MDL Dkt. No. 2285). Plaintiffs do not claim that MBC is a subsidiary of SBG and instead make the vague claim, as did the plaintiffs before them, that MBC is "under the umbrella of SBG," (Compl. ¶ 288) or that it is "part of its same corporate structure" as SBG (Compl. ¶ 280). *See also* Ex. A (comparing Compl. ¶ 288 to prior allegations). These characterizations are false but, even if true, they do not permit MBC's conduct to be attributed to SBG.

1.     **The Abbottabad Sudan Document.**

Plaintiffs cite a document retrieved during the raid on OBL's compound in

Abbottabad, Pakistan, ostensibly written by OBL regarding the disposition of funds he had in

Sudan.  Plaintiffs call it a "will," though it has no legal indicia of such.  The document, as

relevant here, makes reference to $12 million he received at an unspecified time from his

brother Bakr "on behalf of Bin Laden Company, for their investment in Sudan."  (Compl.

¶ 299, quoting document[13]).  Plaintiffs posit this as evidence of "a continuing financial

mechanism," *id.*, to support OBL after his removal as a shareholder, but there is nothing in

the document to support that, nor to attribute any actions to SBG.  Plaintiffs claim the

document was written in the late 1990s, but it says nothing about when he received the

money, and in fact the document is perfectly consistent with Plaintiffs' oft-repeated allegation

(*see, e.g.*, Compl. ¶ 248) that OBL received as much as $1 million a year from his family

between the early 1970s and 1993.  The document by its own terms indicates the purpose of

the funds was "for . . . investment in Sudan," which has no connection to attacks on the

United States.  This Court has twice ruled that alleged support to OBL in the Sudan is too

remote to confer jurisdiction:  "'Defendants' alleged provision of financial and other material

support to al Qaeda in the early 1990's, enabling it to expand its base of operations in Sudan,

is too remote to the terrorist attacks of September 11, 2001, to confer specific jurisdiction.'"

*Terrorist Attacks VI*, 840 F. Supp. 2d at 782 (quoting *Terrorist Attacks IV*, 718 F. Supp. 2d at

483).

Plaintiffs further allege, as is indicated in the document, that OBL urged his family

members to spend the remainder of the money on holy war and that this "suggest[s] that

---

[13] For purposes of this motion only, SBG assumes that Plaintiffs' translation of the
document as reflected in the Complaint is accurate.  SBG reserves its right to challenge aspects
of the translation should further proceedings follow.

Osama's siblings and relatives remained supportive of his jihadist agenda." Compl. ¶ 300.
But it suggests nothing of the kind. In OBL's words, "'I hope for my brothers, sisters and
maternal aunts to obey my will and to spend all the money that I have left in Sudan on jihad,
for the sake of Allah.'" *Id.* There is nothing in the document to suggest they were supportive
in the first place. And OBL's "hope" that they would join the cause cannot by any stretch
support jurisdiction against his family members, much less against SBG, which is not
mentioned in the document.

### 2. Moussaoui's *Ex Parte* Prison Statement.

Plaintiffs also make new allegations based on a statement counsel for the *Lloyd's*
Plaintiffs (then as *Federal Insurance* counsel) and other plaintiffs' counsel took, under the
auspices of the MDL 1570 litigation but without notice to any of the defendants, from Zacarias
Moussaoui, a federal prisoner currently serving six life sentences for his role in the September 11
attacks. This Court has seen Moussaoui's statement before, *see In re Terrorist Attacks on Sept.
11, 2001*, 134 F. Supp. 3d 774, 787 n.13 (S.D.N.Y. 2015) ("*Terrorist Attacks IX*") (holding
Moussaoui's statements did not give the Court a legal basis to strip defendants of immunity
under the FSIA), *appeal filed*, No. 15-3426 (2d Cir. Oct. 27, 2015), and his mental illness and
history of bizarre statements are well-documented.[14] Among other things, he has previously
testified under oath that he believed it was "okay to lie in court as part of jihad"[15] and that his
previous testimony about involvement in the September 11 attacks had been a "complete

---

[14] Phil Hirschkorn, *Moussaoui: 'Crazy or not crazy? That is the question' 9/11
conspirator's odd ideas, behavior detailed at trial*, CNN.com (Apr. 19, 2006),
http://www.cnn.com/2006/LAW/04/18/moussaoui.trial/index.html (outlining testimony from the
defense's leading mental health expert supporting his assessment that Moussaoui is a paranoid
schizophrenic who suffers from delusions).

[15] Trial Tr. 2382:11-24, *United States v. Moussaoui*, No. 01-cr-455 (E.D. Va. Mar. 27,
2006) (Dkt. No. 1756).

fabrication."[16]  Putting aside his competence or credibility as a witness, his statements with

respect to SBG and, often indistinguished, members of OBL's extended family are of no

jurisdictional significance.

Plaintiffs make two claims based on Moussaoui's statement.  First, they attempt to cast

doubt on SBG's documented removal of OBL as a shareholder in 1993-94.  Moussaoui claimed

no personal knowledge about that, so *Lloyd's* counsel instead asked him whether it was true that

"*the family* severed all ties with Osama in 1994."  Aff. of Sean P. Carter Transmitting Evidence

in Support of Pls. Mem. Of Law in Opp. to Mot. to Dismiss of the Kingdom of Saudi Arabia and

Saudi High Commission for Relief of Bosnia & Herzegovina, Ex. 5 (Statement Under Oath of

Zacarias Moussaoui) at 19:9-10 ("Moussaoui Stmt.") (MDL Dkt. No. 2927-5) (emphasis added).

Misrepresenting the transcript, the Complaint asserts that Moussaoui was "told that SBG had

made several representations in court proceedings that the bin Laden family *and SBG* had

severed all ties with Osama in 1994[.]"  Compl. ¶ 307 (emphasis added).  In fact, counsel for

*Lloyd's* Plaintiffs did not mention SBG in the question posed to Moussaoui, and Moussaoui's

answer addresses OBL's contacts with his family, including visits by his mother and children.

He does not claim that any of the family visitors had any connection to SBG or even to the

Binladin family,[17] which alone renders this new "evidence" irrelevant.  The question and

Moussaoui's rambling response are as follows:

---

[16] Aff. of Zacarias Moussaoui ¶ 13, attached to Def.'s Mot. To Withdraw Guilty Plea,
*United States v. Moussaoui*, 01-cr-455 (E.D. Va. May 8, 2006) (Dkt. No. 1857).

[17] OBL's parents divorced when he was young; he was the only child of that marriage.
His mother remarried and had children with her second husband.  OBL therefore has siblings
who are not members of the Binladin family.  *See, e.g.*, Steve Coll, *Young Osama*, The New
Yorker (Dec. 12, 2005), http://www.newyorker.com/magazine/2005/12/12/young-osama ("Bin
Laden is the only child of the marriage between Alia Ghanem, who was born in Syria, and
Muhammad bin Laden . . . .  Osama's parents divorced soon after he was born, according to
Khaled M. Batarfi, a Saudi journalist who knew Osama during the nineteen-seventies.  Osama's

Q: It -- it's been suggested in our litigation by the bin Ladens that the family severed all ties with Osama in 1994, from your experience do you know that to be true?

A: A complete lie. An -- an absolute lie. I have -- Shaykh Osama give me the name and the e-mail and the telephone number of his brother in the United State, okay, I went -- I went to -- to -- to what's Jeddah, I had contact with the -- one of the brother of Shaykh Osama -- and his brother I know, okay, and his brother I know was -- the first time I went he was sitting in the -- in the compound, okay, and he receive his -- his mother, okay, with two I think the brother -- it was one brother or a brother-in-law -- two brother, okay, but family member, okay.

And I saw all the -- the children of Osama bin Laden, even the one who wrote the book about Osama bin Laden, I knew exactly the -- that he was in Afghanistan, okay. Abdulla bin -- bin -- oh, Abdulla bin -- bin Laden, the son -- the -- the -- the oldest son of Osama Laden was in the hospital -- hospital -- Chinese hospital with me when I had malaria, and I remember because we were on the floor and I was receiving an IV, and I didn't know that he was the son of Osama bin Laden because he was dressed like an Afghan, okay.

Moussaoui Stmt. at 19:8-20:7 (MDL Dkt. No. 2927-5).

Of course, SBG never represented that OBL had no contact with any of his extended family, so Moussaoui's description of family visits does not create a dispute of fact, much less one of jurisdictional import. Indeed, prior plaintiffs had also alleged that OBL's mother and other unspecified family members visited OBL in Afghanistan, *see, e.g.*, Compl. ¶¶ 643, 663, *World Trade Ctr. Props. LLC v. Al Baraka Inv. and Dev. Corp.*, No. 04-cv-07280 (S.D.N.Y. Sept. 10, 2004), yet those allegations were insufficient to establish jurisdiction because the alleged conduct did not involve SBG, was not "expressly aimed" at the United States, and was not alleged to have had anything to do with the September 11 attacks. Similarly, prior plaintiffs unsuccessfully sought to create a dispute of jurisdictional fact

_____

(continued…)

mother then married a man named Muhammad al-Attas . . . . The couple had four children, and Osama lived in the new household with three stepbrothers and one stepsister.").

sufficient to warrant discovery by pointing to documents indicating that unspecified Binladin brothers had visited OBL in Sudan. Judge Maas, in a decision affirmed by this Court, rejected plaintiffs' claims because there was no indication that the family visits related to support for OBL's terrorist activities. *See In re Terrorist Attacks on Sept. 11, 2001*, 2008 WL 8183819, at *3 (MDL Dkt. No. 2090).[18] By the same token, even taking Moussaoui's account of such family visits as true this Court could not reasonably infer any conduct attributable to SBG or any tortious conduct purposefully directed at the United States.

Second, Plaintiffs allege that "Moussaoui further testified that SBG assisted al Qaeda in building the camps where the 9/11 hijackers received training by covertly shipping construction parts to Pakistan in the late 1990s, where it was received by al Qaeda members and later transported to Afghanistan." Compl. ¶ 306. That assertion misrepresents Moussaoui's actual statement. When asked if he had "any information indicating that the family in general was continuing -- continuing to send money to Osama bin Laden," Moussaoui replied: "[W]hen we wanted to buy spare part of -- okay, the -- the spare part were bought by the Saudi bin Laden group, and was sending to -- to Jeddah, and, then, after to Karachi." Moussaoui Stmt. at 21:4-12 (MDL Dkt. No. 2927-5). Plaintiffs' counsel chose not to follow up to clarify this ambiguous assertion but instead moved on to questions about the Saudi royal family.

Taking his statement as true for purposes of the current motion, Moussaoui did not say what the "spare part" was, nor even whether SBG knew that a part shipped to Jeddah, Saudi Arabia, where SBG is based, was later sent on by unspecified persons to Karachi. Contrary to the Complaint, Moussaoui does not say that the "spare part" ended up in Afghanistan, or that it

_____

[18] Indeed, Judge Maas noted that the actual facts, ignored by the prior plaintiffs, indicated just the opposite. *See In re Terrorist Attacks on Sept. 11, 2001*, 2008 WL 8183819, at *3 (noting that "the document that the plaintiffs quote indicates that the unnamed 'brothers' did not travel to OBL to support him, but, rather, 'to disassociate themselves from him and his conduct, and to sever their relationships with him completely.'").

was used to construct camps where the September 11 hijackers trained, or in fact that it had anything to do with attacks on the United States. Those embellishments were invented by Plaintiffs. As Judge Casey told the previous plaintiffs in the early stages of this litigation, "Do you maintain that anybody can just make up any sort of claims and conclusions and, therefore, you're entitled to discovery? That isn't quite what the law is, is it?" *In re Terrorist Attacks on September 11, 2001*, October 12, 2004 Hearing Transcript at 79:19-22 (MDL Dkt. No. 521). It is not.

3.    **The "28 Pages."**

Finally, Plaintiffs add two allegations regarding the recently declassified Part Four of the Report of the Congressional Joint Inquiry Into the Terrorist Attacks of September 11, 2001, commonly referred to as the "28 Pages." *See* Compl. ¶¶ 308-09. Notably, the 28 Pages document does not even mention SBG or anyone connected with it, and Plaintiffs do not allege otherwise. Nevertheless, Plaintiffs tout its relevance because it supposedly shows that "'an extremist and supporter of Usama bin Ladin' named Osama Bassnan 'knew bin Ladin's family in Saudi Arabia' and was in telephone contact with 'members of the family who are living in the United States.'" Compl. ¶ 308. Plaintiffs do not identify the particular family members or link any of them to SBG. Nor do they allege that the telephone contacts had anything to do with terrorist attacks. Thus, putting aside the fact that the 28 Pages does not represent an investigative determination by the 9/11 Commission,[19] the document provides no basis to infer that SBG engaged in tortious conduct directed at the United States.

_____

[19] *See* Statement by the Office of the Director of National Intelligence on the Declassification of Part Four of the Senate Select Committee on Intelligence and House Permanent Select Committee on Intelligence's 2002 Report on the Committees' Joint Inquiry into Intelligence Community Activities Before and After the Terrorist Attacks of September 11, 2001 (July 15, 2016), https://www.dni.gov/index.php/newsroom/congressional-testimonies/congressional-testimonies-2016/item/1612-statement-by-the-odni-on-the-

Even more of a stretch is Plaintiffs' last new allegation directed at SBG, which merits quotation in full:

> The 28 Pages also discloses an FBI finding that an individual named Fahad Abdullah Saleh Bakala was responsible for "flying Usama bin Ladin between Afghanistan and Saudi Arabia during UBL's exile," a fact that discloses another means through which bin Laden *may have been* maintaining contact with his family during that period.

Compl. ¶ 309 (emphasis added).  The speculative inference plaintiffs seek to draw regarding possible family contacts, even if true, falls woefully short of what is necessary to establish that *SBG* engaged in tortious conduct expressly aimed at the United States.

### D.    Plaintiffs Are Not Entitled to Jurisdictional Discovery.

Having failed to allege facts to support jurisdiction over SBG, Plaintiffs should not be permitted to conduct jurisdictional discovery in the hopes of finding some.  District courts in the Second Circuit retain broad discretion to grant or deny jurisdictional discovery.  *See, e.g.*, *Frontera Res. Azerbaijan Corp. v. State Oil Co. of Azerbaijan Republic*, 582 F.3d 393, 401 (2d Cir. 2009); *Jazini v. Nissan Motor Co.*, 148 F.3d 181, 185-86 (2d Cir. 1998) (denial of jurisdictional discovery of foreign entity where Plaintiffs made only "conclusory non-fact-specific jurisdictional allegations").  They may deny jurisdictional discovery if a plaintiff has failed to establish a prima facie case for jurisdiction.  *See Haber v. United States*, 823 F.3d 746,

_____

(continued…)

declassification-of-part-four-of-the-ssci-and-hpsci-s-2002-report-on-the-committees-joint-inquiry-into-intelligence-community-activities-before-and-after-the-terrorist-attacks-of-september-11-2001 ("[T]he decision to authorize the release of a portion of Part Four does not indicate the Intelligence Community's agreement with Part Four's accuracy or concurrence with any information it contains.").   Moreover, the pages themselves state that "[i]t should be clear that this Joint Inquiry has made no final determinations as to the reliability or sufficiency of the information regarding these issues that we found contained in FBI and CIA documents."  Joint Inquiry Into Intelligence Community Activities Before and After the Terrorist Attacks of September 11, 2001, at 421 (2002).

753 (2d Cir. 2016); *Frontera Res.*, 582 F.3d at 401; *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 255 (2d Cir. 2007). "This prima facie showing must include an averment of facts that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant." *Laydon v. Mizuho Bank, Ltd.*, No. 12-cv-3419, 2015 WL 1515358, at *1 (S.D.N.Y. Mar. 31, 2015) (Daniels, J.) (quoting *Terrorist Attacks VIII*, 714 F.3d at 673).

Plaintiffs have pled no such facts. Indeed, unlike the ordinary case, Plaintiffs have had the opportunity, directly through counsel for *Lloyd's* and indirectly through the extensive court record in this MDL, to assess the jurisdictional facts. After Judge Casey authorized "limited jurisdictional discovery," *Terrorist Attacks I*, 349 F. Supp. 2d at 836, SBG was burdened with four years of jurisdictional discovery, as was the Court, including four hearings before the magistrate judge, two depositions (one court-supervised), and numerous briefings. When Judge Maas ultimately closed off that discovery, he noted that the plaintiffs, including *Lloyd's* counsel, were "continuing to go over old ground." *In re Terrorist Attacks on Sept. 11, 2001*, 2008 WL 8183819, at *3 (MDL Dkt. No. 2090). Simply because one of the firms involved has found new insurance company plaintiffs, and other plaintiffs have joined in after the adoption of "Justice Against Sponsors of Terrorism Act," Pub. L. No. 114-222 ("JASTA"), this Court need not ignore the tortured history of this case and indulge the fiction that more discovery could change the conclusion. Plaintiffs have identified no disputes of material jurisdictional fact. Neither the old allegations nor Plaintiffs' few new ones allege any specific conduct by SBG that could possibly be construed as an agreement to support the September 11 attacks or as tortious conduct "purposefully directed" toward the United States. This Court would act well within its discretion in denying further discovery.

## II.  PLAINTIFFS' CLAIMS ALSO FAIL UNDER RULE 12(b)(6).

Even if there were doubt that Plaintiffs' claims fail for lack of personal jurisdiction over SBG, Plaintiffs independently (though relatedly) fail to allege facts sufficient to state a claim on which relief can be granted.

### A.  Plaintiffs Have Alleged No Facts Supporting an Inference that SBG's Conduct Proximately Caused Their Injuries.

Although plaintiffs in this litigation have repeatedly disputed the idea, the Second Circuit has made clear that Anti-Terrorism Act ("ATA")[20] claims require a showing of proximate cause. As it said in 2013, "we held in *Rothstein [v. UBS AG]* that Congress did not 'inten[d] to permit recovery under [18 U.S.C. §] 2333 on a showing of less than proximate cause,' *Rothstein*, 708 F.3d at 95, based on the Supreme Court's interpretation of the 'well-understood meaning' of the phrase 'by reason of' across multiple statutes." *Terrorist Attacks VII*, 714 F.3d at 123.  The court went on to explain that the plaintiffs in *Rothstein* failed, just as many in this litigation, because while they alleged the provision of funding – in *Rothstein*, "hundreds of millions of dollars in cash" – to terrorist entities, they alleged no direct connection between that funding and the terrorist attacks at issue.  *Id.* at 124-25.

In this litigation, the Second Circuit found no "factual allegations that the money allegedly donated by the Rule 12(b)(6) defendants to the purported charities actually was transferred to al Qaeda *and aided in the September 11 attacks*."  *Id.* at 124 (emphasis added). The appeals court went on to underscore that, although Congress intended to impose "'liability at any point along the causal chain of terrorism,' S. Rep. No. 102-342, at 22 (1992), the 'by reason of' language of the statute restricts the imposition of such liability to situations where plaintiffs plausibly allege that defendants['] actions proximately caused their injuries." *Terrorist Attacks*

---

[20] 18 U.S.C. § 2331 *et seq.*

*VII*, 714 F.3d at 125 (citing *Rothstein*, 708 F.3d at 95).  Where this Court has allowed claims to proceed past a 12(b)(6) motion, it has required, consistent with the Second Circuit, allegations supporting a direct proximate connection to the September 11 attacks.  With respect to one defendant, for example, this Court found sufficient to state a claim allegations that a bank "allegedly transfer[ed] . . .  money to two of the hijackers; *which monies are claimed to have been used specifically to prepare for the 9/11 attacks*."  *Terrorist Attacks IV*, 718 F. Supp. 2d at 493 (emphasis added).  Plaintiffs have alleged nothing of the kind against SBG, and their failure to do so precludes their ATA claims.

None of Plaintiffs' allegations against SBG even ostensibly relate to the September 11 attacks themselves.  Just as the last time this Court addressed these claims, Plaintiffs' theory rests primarily on two assertions:  that SBG (or more often, unspecified members of the Binladin family) provided early support for OBL in the Sudan or elsewhere, and that it maintained a "financial lifeline" to OBL thereafter.  *Cf. Terrorist Attacks VI*, 840 F. Supp. 2d at 782.  The early support Plaintiffs allege is far too remote to support an inference of proximate cause.  It is facially implausible that construction of an airport in the Sudan in the early 1990s or any other similar conduct proximately caused the September 11 attacks.

In addressing previous plaintiffs, this Court found no "reasonable inference of [a] temporal, geographic or *causal connection, or proximity to the 9/11 attacks*."  *Terrorist Attacks IV*, 718 F. Supp. 2d at 482 (emphasis added).  Specifically with respect to Plaintiffs' recycled allegations against SBG and its chairman (among others), this Court found that providing "financial and other material support to al Qaeda in the early 1990's, enabling it to expand its base of operations in the Sudan," was "too remote to the terrorist attacks of September 11, 2001," to establish the requisite connection.  *Id.* at 483.  The same conclusion applies equally to

the issue of proximate cause. Plaintiffs' sparse new allegations regarding the Sudan do nothing to supply the missing pieces. To the contrary, the Abbottabad document indicates that the funds OBL received from "the Bin Ladin Company" (not from SBG) were for "investment in Sudan" and that the money was still in the Sudan when the document was written.[21] There is nothing in the document that permits an inference that the funds were intended for or actually used in connection with the September 11 attacks.

Similarly, Plaintiffs' often repeated claims that members of the Binladin did or even just "may have" maintained contact or a "financial lifeline" with OBL, *see* Compl. ¶¶ 284, 309, 310, do not support any causal link to the September 11 attacks. There is no allegation, let alone any specific facts pled, to suggest that any of the alleged contacts with family members related to the September 11 attacks. There are no well pled allegations supporting the "financial lifeline" allegations, *see supra* at 16-17, and in the absence of any specific allegations regarding when or how OBL benefited from the supposed "lifeline," it is impossible to infer a proximate relationship to the September 11 attacks.

Also insufficient is Plaintiffs' allegation that "Moussaoui . . . testified that SBG assisted al Qaeda in building the camps where the 9/11 hijackers received training by covertly shipping construction parts to Pakistan in the late 1990s, where it was received by al Qaeda members and later transported to Afghanistan." Compl. ¶ 306. As an initial matter, the Court need not accept as true an allegation that is contradicted by the very source cited in the Complaint. Moussaoui did not, as shown above (*supra* at 22-23), say that the "spare part" was used in the construction of any terrorist training camps, much less camps at which the September 11 hijackers trained. Nor does he even say that the part ended up in Afghanistan. Even taking Moussaoui's

---

[21] The 9/11 Commission Report 108 (OBL was unable to withdraw funds from Sudan as "[a]ccording to a senior al Qaeda detainee, the government of Sudan seized everything Bin Ladin had possessed there").

incoherent statement at face value, he at most suggests that an unidentified person at SBG at some unspecified time purchased a spare part – for what, he does not say – that was sent to Jeddah and subsequently to Pakistan. There are certainly no well pled facts to connect any of that to the September 11 attacks. These vague claims "do not meet *Twombly's* plausibility standard with respect to the need for a proximate causal relationship" between a defendant's alleged conduct and the terrorist attacks that injured Plaintiffs. *Terrorist Attacks VII*, 714 F.3d at 124-25 (quoting *Rothstein*, 708 F.3d at 97).

> B.    **Plaintiffs' Allegations Do Not Support the Requisite Knowledge to Support a Claim under the ATA.**

Plaintiffs' ATA claims also fail to allege any facts supporting a plausible inference that SBG knowingly provided material assistance to al Qaeda. This Court has made clear that the plaintiffs' ATA claims must allege specific facts showing that the defendants knew of, intended to aid, and did in fact aid the terrorists' illegal activities. *See Terrorist Attacks I*, 349 F. Supp. 2d at 828; *see also In re Terrorist Attacks on Sept. 11, 2001*, No. 03-md-1570, 2007 WL 2907278, at *3 (S.D.N.Y. Oct. 5, 2007); *accord Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 47-48 (D.D.C. 2010). JASTA does not change this. By its terms, an aiding and abetting claim under new § 2333(d) requires that the defendant acted "knowingly." 18 U.S.C. § 2333(d)(2). The required facts must establish not just a mere possibility but a plausible inference. The Supreme Court in *Iqbal* applied this standard to the same kinds of issues of knowledge that are present here. In *Iqbal*, the plaintiff alleged that the defendants "knew of, condoned, and willfully and maliciously agreed to" subject him to harsh confinement on account of his race and national origin, and that named defendants were respectively the "principal architect" of and "instrumental" in adopting and executing that policy. 556 U.S. at 680-81 (quoting complaint).

These conclusory allegations were "not entitled to be assumed true" but instead were subject to the need for plausible support in "well-pleaded facts." *Id.*

The inadequacies in Plaintiffs' allegations about SBG's knowledge of OBL's terrorist plans are discussed *supra* at 13-14. For much the same reasons that this Court rejected those allegations for jurisdictional purposes, Plaintiffs have failed to sufficiently allege that SBG acted knowingly to cause their injuries. The ostensibly new allegations do not fill the void. As explained above, in the Abbottabad document, taken at face value, OBL himself states that the referenced funds were for "investment in Sudan," not for any terrorist purpose. Compl. ¶ 299. OBL's expressed "hope" many years later that his family would use that money for jihad says nothing about SBG's mental state when the funds were provided, much less that SBG knowingly supported al Qaeda's later terrorist aims. *See* Compl. ¶ 300. Similarly, Plaintiffs' mischaracterization of Moussaoui's statement is not entitled to any weight. *See supra* 19-23. Finally, the allegations concerning the "28 Pages" contain no reference at all to SBG and therefore provide no facts to support an inference that SBG provided knowing support to OBL, much less the September 11 attacks themselves.

C.  **The Insurance Plaintiffs Do Not Allege Facts Showing They Have Standing to Bring ATA Claims.**

The Complaints of the *Lloyds*, *Arrowood*, and *Charter Oak* Plaintiffs fail to state a claim for the separate reason that they do not allege facts sufficient to establish their standing to bring claims under the ATA. The insurance companies certainly cannot do so in their own right. Section 2333 authorizes claims by a "national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs." 18 U.S.C. § 2333(a). "[N]ational of the United States" "has the meaning given such term in . . . the Immigration and Nationality Act [('INA')]," 18 U.S.C. § 2331(2), and the INA in

turn defines it as "(A) a citizen of the United States, or (B) a person who . . . owes permanent allegiance to the United States."  8 U.S.C. § 1101(a)(22).  Corporations cannot be "citizens" within the meaning of the INA, nor are they persons owing permanent allegiance to the United States.  The text of the statute confirms that it provides a remedy only for natural persons: § 2333(a) refers to injuries to "his or her person, property, or business," and "his or her estate, survivors or heirs," terms which apply only to individuals.[22]

Plaintiff insurance companies assert that they may make their ATA claims on a subrogation theory.  *See* Compl. ¶ 65; Compl. ¶ 6, *Arrowood Indem. Co. v. Kingdom of Saudi Arabia*, No. 17-cv-03908 (S.D.N.Y. May 23, 2017); Compl. ¶ 28, *Charter Oak Fire Ins. Co. v. Al Rajhi Bank*, No. 17-cv-02651 (S.D.N.Y. Apr. 12, 2017).  There are three problems with that. First, although this Court has, on motions for default judgment without adversary briefing, allowed subrogation claims, *see In re Terrorist Attacks on Sept. 11, 2001*, No. 03-MDL-1570, 2011 WL 6318975 (S.D.N.Y. Dec. 16, 2011), the ATA does not provide for them.[23]

Subrogation rights are often determined under state law, but Congress may limit or even eliminate those rights.  *See Chubb Custom Ins. Co. v. Space Systems/Loral, Inc.*, 710 F.3d 946, 960 (9th Cir. 2013).  Such limits need not include a "clear statement" so long as the relevant

---

[22] The second part of § 1101(a)(22) is understood to be limited to the four categories of natural persons specified in § 1408.  *See Marquez-Almanzar v. Immigration & Naturalization Servs.*, 418 F.3d 210, 218-19 (2d Cir. 2005) (noting that "owes permanent allegiance" is a "term of art" derived from the history of non-citizen nationals and holding that "the only 'non-citizen nationals' currently recognized by our law are persons deemed to be so under 8 U.S.C. § 1408"); *see Mohammadi v. Islamic Republic of Iran*, 782 F.3d 9, 15 (D.C. Cir. 2015) ("The courts of appeals to consider the issue thus have overwhelmingly concluded that the status of non-citizen United States nationality is limited to those persons described in 8 U.S.C. § 1408 . . . .").

[23] This Court, reviewing the magistrate judge's recommendation under a "'clear error on the face of the record'" standard absent any objections, focused on the nature of the damages rather than the identity of the plaintiffs, which was not raised to the Court.  *See* 2011 WL 6318975, at *1-2.

statute evinces a congressional intent to limit or disallow subrogation. *Id.* (quoting *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 108 (1991)). The ATA by its terms permits claims only by a natural person – "a national of the United States – or "his or her estate, survivors, or heirs." Unlike other terrorism statutes such as § 1605A of the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605A, the ATA contains no reference to insurers or to indemnity claims.[24] Given that Congress chose to limit the authorized claimants in those terms, there is no reason to presume that common law subrogation gives insurance companies, alone among corporate entities, rights under the ATA. The treble damage remedy in the ATA makes this conclusion even more compelling. There is no support in the language of the statute or in its legislative history for the proposition that Congress intended to permit insurance companies – who have no standing to pursue a direct claim – to nevertheless collect windfall treble damages after paying only "single" damages to the injured individuals whom the statute is designed to protect.

Second, even if subrogation were generally allowed, the Plaintiff insurance companies have pled no facts to show that their claims derive from those of "nationals of the United States." Indeed, although some of the Plaintiff insurance companies make the boilerplate claim that they "made payments in compensation for injuries suffered by nationals of the United States to their persons, properties and businesses," Compl. ¶ 65; *Charter Oak* Compl. ¶ 28, the only payments any of them mention more specifically are "payments in compensation for the physical destruction of the World Trade Center and other buildings, structures, or property." Compl. ¶ 65. The owners and lessors of the World Trade Center, however, were corporations, partnerships, and various other legal entities that are not natural persons, and therefore are not "nationals" of the United States. Absent well-pled allegations showing that payments were made to individuals

---

[24] And unlike the ATA, the legislative history of § 1605A confirms that it was intended to embrace claims by insurers. *See* 154 Cong. Rec. 500 (Jan. 22, 2008) (statement of Sen. Lautenberg).

with standing to bring ATA claims, the Plaintiff insurance companies have failed to state a claim.

Third, while some of the Plaintiff insurance companies assert in conclusory fashion that none of the losses were the subject of prior claims against SBG, *see* Compl. ¶ 66; *Charter Oak* Compl. ¶ 29; *but see Arrowood* Compl. (making no such allegation), there are no facts alleged with respect to the claims from which that can be ascertained.  Plaintiff insurance companies can bring no claims, regardless of their subrogation rights, for payments to persons whose claims against SBG have previously been dismissed.  Under a subrogation theory, the Plaintiff insurance companies would "stand in the shoes" of their insureds and therefore would succeed to the same claims and would be subject to the same defenses as held by the insured.  *US Airways, Inc. v. McCutchen*, 133 S. Ct. 1537, 1546 n.5 (2013).  They would therefore be barred from relitigating the jurisdictional issues on allegations materially identical to those upon which the insureds themselves have already lost.  As the Second Circuit has acknowledged, "'It has long been the rule that principles of *res judicata* apply to jurisdictional determinations – both subject matter and personal.'"  *Stengel v. Black*, 486 F. Appx. 181, 183 (2d Cir. 2012) (quoting *Insurance Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 702 n.9 (1982)).  Therefore, "[a]lthough a dismissal for lack of jurisdiction is not an adjudication on the merits of a claim, *see* Fed.R.Civ.P. 41(b), such a dismissal precludes re-litigation of the issue it decided."  *Id.*

## CONCLUSION

For the foregoing reasons, Plaintiffs' claims against SBG should be dismissed with prejudice.

Dated: August 21, 2017

Respectfully submitted,

/s/ James E. Gauch
Mary Ellen Powers
James E. Gauch
JONES DAY
51 Louisiana Avenue, NW
Washington, DC 20001
Telephone: 202-879-3939
Facsimile: 202-626-1700
Email: jegauch@jonesday.com
Email: mepowers@jonesday.com

Fahad A. Habib
JONES DAY
555 California Street, 26th Floor
San Francisco, CA 94104
Telephone: 415-626-3939
Facsimile: 415-875-5700
Email: fahabib@jonesday.com

*Attorneys for Defendant Saudi Binladin Group*

**CERTIFICATE OF SERVICE**

I hereby certify that I served a copy of the foregoing upon all counsel of record via ECF

on August 21, 2017, including counsel for all of the parties to the following cases:

*Underwriting Members of Lloyd's Syndicates 2 v. Al Rajhi Bank*, No. 16-cv-07853 (GBD)
*Abarca v. Kingdom of Saudi Arabia*, No. 17-cv-03887 (GBD)
*Abedhajajreh v. Kingdom of Saudi Arabia*, No. 17-cv-06123 (GBD)
*Addesso v. Kingdom of Saudi Arabia*, No. 16-cv-09937 (GBD)
*Aguilar v. Kingdom of Saudi Arabia*, No. 16-cv-09663 (GBD)
*Aiken v. Kingdom of Saudi Arabia*, No. 17-cv-00450 (GBD)
*Arrowood Indemnity Co. v. Kingdom of Saudi Arabia*, No. 17-cv-03908 (GBD)
*Charter Oak Fire Ins. Co. v. Al Rajhi Bank*, No. 17-cv-02651 (GBD)
*Hodges v. Kingdom of Saudi Arabia*, No. 17-cv-00117 (GBD)

Dated: August 21, 2017                    Respectfully submitted,

                                          /s/ James E. Gauch
                                          James E. Gauch
                                          JONES DAY
                                          51 Louisiana Avenue, NW
                                          Washington, DC  20001
                                          Telephone:  202-879-3939
                                          Facsimile:  202-626-1700
                                          Email:  jegauch@jonesday.com

# EXHIBIT A

**COMPARISON OF TEXT OF PLAINTIFFS' ALLEGATIONS AGAINST SBG IN AMENDED *LLOYD'S* COMPLAINT AND TEXT OF PREVIOUSLY DISMISSED ALLEGATIONS**

| Amended *Lloyd's* Complaint | Previous Allegations |
|---|---|
| **Compl. ¶ 246.**<br><br>"Saudi Binladin Group, the family construction business operated and controlled by Osama bin Laden and his brothers, was an integral part of the al Qaeda network from the terrorist group's earliest days and provided assistance that was essential to establishing the network and capabilities that would ultimately carry out the September 11th attacks." | **Appellants' Redacted Opening Br. with Respect to Saudi Binladin Group at 9, *In re Terrorist Attacks on Sept. 11, 2001*, No. 11-3294 (2d Cir. June 26, 2012) (Dkt. No. 593).**<br><br>"Saudi Binladin Group, the family construction business operated and controlled by Osama Binladin and his brothers, was an integral part of the al-Qaeda network from the terrorist group's earliest days and provided assistance that was essential to establishing the network and capabilities that would ultimately carry out the September 11th Attacks." |
| **Compl. ¶ 247.**<br><br>"Throughout the period of the "holy war" against the Soviet occupation of Afghanistan of the 1980s, the bin Laden family construction business supported Osama bin Laden and his jihadist activities with significant contributions of money and construction equipment, used to build the infrastructure for training and sheltering the mujahideen fighters." | **First Amended Compl. ¶ 382, *Fed. Ins. v. Al Qaida*, No. 03-cv-06978 (S.D.N.Y. Sept. 30, 2005) (Dkt. No. 772) (MDL Dkt. No. 1380).**<br><br>"During the holy war against the Soviet occupation of Afghanistan, the Saudi Binladin Group materially assisted Osama bin Laden in his efforts to provide material suport [sic] to the mujihadeen fighters." |
| **Compl. ¶ 248.**<br><br>"According to the 9/11 Commission's *Monograph on Terrorism Financing*, Osama bin Laden received about a million dollars per year in support from his family starting in 1970 – $20-25 million in all, and at least $5 million since the beginning of al Qaeda." | **Pls.' Summary of Allegations and Evidence in Support of Their Theories of Specific Jurisdiction As to Saudi Binladin Group ("Pls. Summary of Allegations") ¶ 45 (MDL Dkt. No. 2386-1).**<br><br>"According to the 9/11 Commission's *Monograph on Terrorism Financing*, Osama received about a million dollars per year in support from his family starting in 1970 – $20-25 million in all, therefore, and at least $5 million since the beginning of al |

| Amended *Lloyd's* Complaint | Previous Allegations |
|---|---|
| | Qaeda." |
| **Compl. ¶ 249.**<br><br>"Contemporaneous with the conclusion of the Afghan jihad and formation of al Qaeda, the construction business founded in the 1930s by Osama bin Laden's father, Mohammed bin Awad bin Laden, was reorganized into Saudi Binladin Group ("SBG"). Osama, together with nineteen of his brothers, was one of the founding shareholders who controlled and operated the closely held family business. To this day, SBG is owned and operated by members of the bin Laden family." | **Appellants' Redacted Opening Br. with Respect to Saudi Binladin Group at 9-10,** *In re Terrorist Attacks on Sept. 11, 2001,* **No. 11-3294 (2d Cir. June 26, 2012) (Dkt. No. 593) (footnote omitted).**<br><br>"Around that same time, in 1989, the construction business founded by Osama Binladin's father was reorganized into Saudi Binladin Group. Osama Binladin, together with nineteen of his brothers . . . was one of the founding shareholders who controlled and operated the closely held family business."<br><br>*See also* **Pls.' Summary of Allegations ¶¶ 15 (MDL Dkt. No. 2386-1)**.<br><br>"15. At this same time [1989], SBG was formed by Osama and other members of the bin Laden family as a successor entity to the construction firm founded by their father in the 1930s. *See* Bakr Binladin Aff., dated January 25, 2006 (MDL Docket No. 1645, Ex. C)." |
| **Compl. ¶ 250.**<br><br>"Following the withdrawal of Soviet forces from Afghanistan, Osama bin Laden returned to Saudi Arabia to work for SBG. Between 1989 and 1991, while working for SBG, Osama continued to establish the infrastructure for his al Qaeda network, including finding a new haven to serve as a base of operations for al Qaeda." | **RICO Statement Applicable to Saudi Bin Laden Group, Abdullah Bin Laden, Bakr Bin Laden, Tarek Bin Laden, Omar Bin Laden and the Mohammed Bin Laden Organization ("Pls. RICO Stmt. as to SBG") at 7 (MDL Dkt. No. 1120).**<br><br>"After the Soviet Union withdrew from Afghanistan, Osama bin Laden returned to Saudi Arabia to work for SBG. While working for SBG, bin Laden began establishing the infrastructure for his al Qaida network." |

| Amended *Lloyd's* Complaint | Previous Allegations |
|---|---|
| **Compl. ¶ 251.**<br><br>"Despite the active support of the Arab countries, in particular Saudi Arabia which funded and transported the Arab *mujahideen*, at the conclusion of the war neither Saudi Arabia nor other Arab countries wanted to host these ideologically trained killers. Pakistan, the front-line state which had hosted the mujahideen during the war in Afghanistan was also anxious to get rid of the Arab fighters." | **Pls.' Summary of Allegations ¶ 12 (MDL Dkt. No. 2386-1).**<br><br>"Despite the active support of the Arab countries, in particular Saudi Arabia which funded and transported the Arab *mujahideen*, at the conclusion of the war neither Saudi Arabia nor other Arab countries wanted to host these ideologically trained killers. Pakistan, the front-line state which had hosted the mujahideen during the war in Afghanistan was also anxious to get rid of the Arab fighters." |
| **Compl. ¶ 252.**<br><br>"Osama bin Laden ultimately found the safe haven he was seeking when, in 1989, just as the Afghan jihad was ending, radical Muslim Brotherhood leader Hassan al Turabi led a *coup d'état* and seized power in Sudan. According to the 9/11 Commission, one of his first acts was to send emissaries to Osama bin Laden with an offer for him to relocate his new group, al Qaeda, to Sudan, 'in an ongoing war against African Christian separatists in southern Sudan and also to do some road building. Turabi and the National Islamic Front in return would let bin Laden use Sudan as a base for worldwide business operations and for preparations for jihad.' *See* 9/11 Commission Report at p. 57. Bin Laden was in a perfect position to make this *quid pro quo* arrangement because of his role coordinating the activities of SBG and al Qaeda." | **Appellants' Redacted Opening Br. with Respect to Saudi Binladin Group at 10,** *In re Terrorist Attacks on Sept. 11, 2001*, **No. 11-3294 (2d Cir. June 26, 2012) (Dkt. No. 593) (footnote omitted).**<br><br>"Following the withdrawal of Soviet forces from Afghanistan, Osama Binladin sought a new haven to serve as a base of operations for al-Qaeda. He found that haven when, in 1989, the newly-installed leader of Sudan, Hassan al Turabi, invited Binladin to set up operations in Sudan. In exchange, Turabi asked that Binladin help arrange infrastructure projects for the regime. Osama Binladin was in a perfect position to make this *quid pro quo* arrangement because of his role coordinating the activities of SBG and al-Qaeda."<br><br>***See also* Pls.' Summary of Allegations ¶ 13 (MDL Dkt. No. 2386-1).**<br><br>"As the Afghan jihad was ending, in 1989, radical Muslim Brotherhood leader Hassan al Turabi led a *coup d'état* and seized power in Sudan. One of his first acts was to send emissaries to Osama Bin Laden with an offer for him to relocate his new group, al Qaeda, to Sudan, 'in an ongoing war against African Christian |

| Amended *Lloyd's* Complaint | Previous Allegations |
|---|---|
|  | separatists in southern Sudan and also to do some road building. Turabi in return would let Bin Ladin use Sudan as a base for worldwide business operations and for preparations for jihad.' *See* 9/11 Report at p. 57." |
| **Compl. ¶ 253.**<br><br>"Osama bin Laden accepted Turabi's invitation and began moving his terror organization to Sudan in 1991. While in Sudan, bin Laden established numerous businesses to provide income for al Qaeda's operations. These business ventures included: Wadi al-Aqiq Company, Ltd, a holding firm; Ladin International Company, an import/export business; Taba Investment Company, Ltd., a currency trading firm; al-Hijrah for Construction and Development, a construction enterprise which performed several significant infrastructure projects on behalf of the ruling National Islamic Front; and the Themar al Mubaraka Company, an agricultural business." | **Pls.' Summary of Allegations ¶ 14 (MDL Dkt. No. 2386-1).**<br><br>"Osama did so in 1991. While in Sudan, Osama bin Laden established numerous businesses to provide income for al Qaida's operations. These business ventures included: Wadi al-Aqiq Company, Ltd, a holding firm; Ladin International Company, an import/export concern; Taba Investment Company, Ltd., a currency trading firm; al-Hijrah for Construction and Development, a construction enterprise which performed several significant infrastructure projects on behalf of the ruling National Islamic Front; and the Themar al Mubaraka Company, an agricultural concern. *See* 1996 U.S. State Department Factsheet at Exhibit 2." |
| **Compl. ¶ 254.**<br><br>"Throughout the early 1990s, the agreement went as planned: Osama bin Laden enjoyed a refuge for building up and training al Qaeda, including the launch of attacks against U.S. military forces en route to Somalia in 1992. Meanwhile, SBG, with Osama's personal oversight helped arrange infrastructure projects for the Turabi regime, including the construction of a new airport in Port Sudan and a major road linking Khartoum to the northern part of the country." | **Appellants' Redacted Opening Br. with Respect to Saudi Binladin Group at 10-11, *In re Terrorist Attacks on Sept. 11, 2001*, No. 11-3294 (2d Cir. June 26, 2012) (Dkt. No. 593) (footnote omitted).**<br><br>"Throughout the early 1990s, the agreement went as planned: Osama Binladin enjoyed a refuge for building up and training al-Qaeda, including the launch of attacks against U.S. military forces en route to Somalia in 1992. Meanwhile, SBG, with Osama Binladin's personal oversight, helped construct a new airport in Port Sudan and a major road linking Khartoum to the northern part of the country." |

| Amended *Lloyd's* Complaint | Previous Allegations |
|---|---|
| **Compl. ¶ 255.**<br><br>"One of the first major contracts SBG undertook, if not the first, was a major contract awarded by the Turabi regime to its 'Binladin Overseas' affiliate for the construction of the airport in Port Sudan." | **Pls.' Summary of Allegations ¶ 16 (MDL Dkt. No. 2386-1).**<br><br>"One of the first major contracts SBG undertook, if not the first, was a major contract awarded by the al Turabi regime to its 'Binladin Overseas' affiliate for the construction of the airport in Port Sudan. *See* Omar Binladin Aff., dated January 25, 2006 (MDL Docket No. 1645, Ex. B)." |
| **Compl. ¶ 256.**<br><br>"The airport construction project took place between February 1990 and mid-1992, the exact period of time in which al Qaeda was relocating from Afghanistan/Pakistan to Sudan. Osama bin Laden, still a SBG principal at the time, had an oversight role with the Port Sudan airport project." | **Pls.' Summary of Allegations ¶ 17 (MDL Dkt. No. 2386-1)**.<br><br>"The airport construction project took place between February 1990 and mid-1992, the exact period of time in which al Qaeda was relocating from Afghanistan/Pakistan to Sudan. There remains significant evidence that Osama (still an SBG principal at the time) had an oversight role with the Port Sudan project. *See* 1996 U.S. State Department Factsheet at <u>Exhibit 2</u>." |
| **Compl. ¶ 257.**<br><br>"According to affidavit testimony provided by Musa Dawoud Musa Mustafa, the SBG Project Manager responsible for executing and constructing the Port Sudan airport, Osama bin Laden visited the Port Sudan construction site accompanied by Sudanese government officials while he served as a shareholder and director of SBG." | **Pls.' Summary of Allegations ¶ 18 (MDL Dkt. No. 2386-1)**.<br><br>"By SBG's own admission, while Osama continued to serve as a shareholder and director of the company, he visited the Port Sudan construction site accompanied by Sudanese government officials. *See* Musa Dawoud Musa Mustafa Aff., dated Sept. 26, 2006, at ¶¶ 3-6 (MDL Docket No. 2291)." |
| **Compl. ¶ 258.**<br><br>"Turabi himself confirmed Osama bin Laden's involvement in the Port Sudan Airport project in a 1998 interview with the Arabic-language MBC TV:<br><br>    For those who know nothing about Saudi Arabia, | **Pls.' Summary of Allegations ¶ 20 (MDL Dkt. No. 2386-1)**.<br><br>"Turabi himself confirmed Osama's involvement in the Port Sudan Airport project in a 1998 interview with the Arabic-language MBC TV:<br><br>    For those who know nothing about Saudi Arabia, |

| Amended *Lloyd's* Complaint | Previous Allegations |
|---|---|
| Bin Laden has the biggest family and construction company that builds roads and institutions. *He came to Sudan as a branch of this company. He built the road linking Khartoum to the north, which could have been extended to reach Port Sudan. He also built the Port Sudan airport.* He stayed away from the social life in Sudan. He also set up an agriculture project in Sudan. He was a struggler, and he had full US and Arab backing when he was struggling in Afghanistan. After that, he was not expelled from Sudan by the Sudanese and did not leave because he hated Sudan. He just did not want to cause an embarrassment in the relations with Saudi Arabia, which stripped him of his nationality." | Bin Laden has the biggest family and construction company that builds roads and institutions. **He came to Sudan as a branch of this company. He built the road linking Khartoum to the north, which could have been extended to reach Port Sudan. He also built the Port Sudan airport.** He stayed away from the social life in Sudan. He also set up an agriculture project in Sudan. He was a struggler, and he had full US and Arab backing when he was struggling in Afghanistan. After that, he was not expelled from Sudan by the Sudanese and did not leave because he hated Sudan. He just did not want to cause an embarrassment in the relations with Saudi Arabia, which stripped him of his nationality.<br><br>*See* Exhibit 4, BBC Monitoring Service, Middle East, September 12, 1998, Recorded Interview with Sudanese National Assembly Speaker Hasan Al-Turabi (emphasis added)." |
| **Compl. ¶ 259.**<br><br>"Osama bin Laden's continuing financial support from SBG and continuing business ties on the various construction projects they were pursuing helped strengthen Osama's ties with his hosts from the National Islamic Front." | **Pls.' Summary of Allegations ¶ 47 (MDL Dkt. No. 2386-1).**<br><br>"While in Sudan, Osama's continuing financial support from SBG and continuing business ties on the various construction projects they were pursuing helped strengthen Osama's ties with his hosts from the National Islamic Front, which had initially invited Osama to assist them in their ongoing war against African Christian separatists in southern Sudan, in exchange for which Turabi let Bin Ladin use Sudan as a base for preparations for jihad. *See 9/11 Report* at p. 57." |

| Amended *Lloyd's* Complaint | Previous Allegations |
|---|---|
| **Compl. ¶ 260.**<br><br>"Indeed, while SBG and Osama bin Laden were performing lucrative construction work in Sudan, a period during which Osama remained an SBG shareholder and director, Sudan was that safe haven in which Osama could grow al Qaeda from a small jihadist army to what the 9/11 Commission Report deemed 'a true global terrorist network.' *See* 9/11 Commission Report at p. 58." | **Pls.' Summary of Allegations ¶ 48 (MDL Dkt. No. 2386-1)**.<br><br>"Indeed, while SBG and Osama were performing lucrative construction work in Sudan, a period during which Osama remained an SBG shareholder and director, Sudan was that safe haven in which Osama could grow from a single jihadist army to what the 9/11 Commission Report deemed 'a true global terrorist network.' See ¶ 22, supra." |
| **Compl. ¶ 261.**<br><br>"During his refuge in Sudan, SBG and the bin Laden family continued to facilitate financial transfers to Osama bin Laden. For instance, on October 28, 1991, the family transferred $482,034.37 (Osama's original deposit, plus accrued interest, less banking fees) to his half-brother Haider for Osama's use, and 'there is no indication it was withheld from Osama.' *See* Steven Coll, *The Bin Ladens*, at p. 383. In total, bin Laden received at least $5 million in distributions from SBG following the formation of al Qaeda until SBG *allegedly* severed ties with Osama bin Laden." | **Pls.' Summary of Allegations ¶ 19, 45 (MDL Dkt. No. 2386-1).**<br><br>"19. Moreover, it was on October 28, 1991 that the family transferred $482,034.37 (his original deposit, plus accrued interest, less banking fees) to his half-brother Haider for Osama's use, and 'there is no indication it was withheld from Osama.' *See* <u>Exhibit 3</u>, Steven Coll, *The Bin Ladens*, at p. 383."<br><br>"45. According to the 9/11 Commission's *Monograph on Terrorism Financing*, Osama received about a million dollars per year in support from his family starting in 1970-$20-25 million in all, therefore, and at least $5 million since the beginning of a! Qaeda." |
| **Compl. ¶ 262.**<br><br>"According to the 9/11 Commission Report, Osama bin Laden used his time in Sudan, while still an SBG principal, to build his terrorist army:<br><br>    Bin Ladin moved to Sudan in 1991 and set up a large and complex set of intertwined business and terrorist enterprises. In time, the former would | **Pls.' Summary of Allegations ¶ 22 (MDL Dkt. No. 2386-1)**.<br><br>"According to the 9//11 [sic] Commission Report, Osama bin Laden used his time in Sudan, while still an SBG principal, to build his terrorist army:<br><br>    Bin Ladin moved to Sudan in 1991 and set up a large and complex set of intertwined business and terrorist enterprises. In time, the former would |

| Amended *Lloyd's* Complaint | Previous Allegations |
|---|---|
| encompass numerous companies and a global network of bank accounts and nongovernmental institutions. Fulfilling his bargain with Turabi, Bin Ladin used his construction company to build a new highway from Khartoum to Port Sudan on the Red Sea coast. Meanwhile, al Qaeda finance officers and top operatives used their positions in Bin Ladin's businesses to acquire weapons, explosives, and technical equipment for terrorist purposes. One founding member, Abu Hajer al Iraqi, used his position as head of a Bin Ladin investment company to carry out procurement trips from Western Europe to the Far East. Two others, Wadi al Hage and Mubarak Douri, who had become acquainted in Tucson, Arizona, in the late 1980s, went as far afield as China, Malaysia, the Philippines, and the former Soviet states of Ukraine and Belarus. | encompass numerous companies and a global network of bank accounts and nongovernmental institutions. Fulfilling his bargain with Turabi, Bin Ladin used his construction company to build a new highway from Khartoum to Port Sudan on the Red Sea coast. Meanwhile, al Qaeda finance officers and top operatives used their positions in Bin Ladin's businesses to acquire weapons, explosives, and technical equipment for terrorist purposes. One founding member, Abu Hajer al Iraqi, used his position as head of a Bin Ladin investment company to carry out procurement trips from western Europe to the Far East. Two others, Wadi al Hage and Mubarak Douri, who had become acquainted in Tucson, Arizona, in the late 1980s, went as far afield as China, Malaysia, the Philippines, and the former Soviet states of Ukraine and Belarus. |
| Bin Ladin's impressive array of offices covertly provided financial and other support for terrorist activities. The network included a major business enterprise in Cyprus; a "services" branch in Zagreb; an office of the Benevolence International Foundation in Sarajevo, which supported the Bosnian Muslims in their conflict with Serbia and Croatia; and an NGO in Baku, Azerbaijan, that was employed as well by Egyptian Islamic Jihad both as a source and conduit for finances and as a support center for the Muslim rebels in Chechnya. He also made use of the already-established Third World Relief Agency (TWRA) headquartered in Vienna, | Bin Ladin's impressive array of offices covertly provided financial and other support for terrorist activities. The network included a major business enterprise in Cyprus; a "services" branch in Zagreb; an office of the Benevolence International Foundation in Sarajevo, which supported the Bosnian Muslims in their conflict with Serbia and Croatia; and an NGO in Baku, Azerbaijan, that was employed as well by Egyptian Islamic Jihad both as a source and conduit for finances and as a support center for the Muslim rebels in Chechnya. He also made use of the already-established Third World Relief Agency (TWRA) headquartered in |

| Amended *Lloyd's* Complaint | Previous Allegations |
|---|---|
| whose branch office locations included Zagreb and Budapest. (Bin Ladin later set up an NGO in Nairobi as a cover for operatives there.) | Vienna, whose branch office locations included Zagreb and Budapest. (Bin Ladin later set up an NGO in Nairobi as a cover for operatives there.) |
| Bin Ladin now had a vision of himself as head of an international jihad confederation. In Sudan, he established an "Islamic Army Shura" that was to serve as the coordinating body for the consortium of terrorist groups with which he was forging alliances. It was composed of his own al Qaeda Shura together with leaders or representatives of terrorist organizations that were still independent. In building this Islamic army, he enlisted groups from Saudi Arabia, Egypt, Jordan, Lebanon, Iraq, Oman, Algeria, Libya, Tunisia, Morocco, Somalia, and Eritrea. Al Qaeda also established cooperative but less formal relationships with other extremist groups from these same countries; from the African states of Chad, Mali, Niger, Nigeria, and Uganda; and from the Southeast Asian states of Burma, Thailand, Malaysia, and Indonesia. Bin Ladin maintained connections in the Bosnian conflict as well. The groundwork for a true global terrorist network was being laid. | Bin Ladin now had a vision of himself as head of an international jihad confederation. In Sudan, he established an "Islamic Army Shura" that was to serve as the coordinating body for the consortium of terrorist groups with which he was forging alliances. It was composed of his own al Qaeda Shura together with leaders or representatives of terrorist organizations that were still independent. In building this Islamic army, he enlisted groups from Saudi Arabia, Egypt, Jordan, Lebanon, Iraq, Oman, Algeria, Libya, Tunisia, Morocco, Somalia, and Eritrea. Al Qaeda also established cooperative but less formal relationships with other extremist groups from these same countries; from the African states of Chad, Mali, Niger, Nigeria, and Uganda; and from the Southeast Asian states of Burma, Thailand, Malaysia, and Indonesia. Bin Ladin maintained connections in the Bosnian conflict as well. The groundwork for a true global terrorist network was being laid. |
| Bin Ladin also provided equipment and training assistance to the Moro Islamic Liberation Front in the Philippines and also to a newly forming Philippine group that called itself the Abu Sayyaf Brigade, after one of the major Afghan jihadist commanders. Al Qaeda helped Jemaah Islamiya (JI), a nascent organization headed by Indonesian | Bin Ladin also provided equipment and training assistance to the Moro Islamic Liberation Front in the Philippines and also to a newly forming Philippine group that called itself the Abu Sayyaf Brigade, after one of the major Afghan jihadist commanders. Al Qaeda helped Jemaah Islamiya (JI), a nascent organization headed by Indonesian |

| Amended *Lloyd's* Complaint | Previous Allegations |
|---|---|
| Islamists with cells scattered across Malaysia, Singapore, Indonesia, and the Philippines. It also aided a Pakistani group engaged in insurrectionist attacks in Kashmir. In mid-1991, Bin Ladin dispatched a band of supporters to the northern Afghanistan border to assist the Tajikistan Islamists in the ethnic conflicts that had been boiling there even before the Central Asian departments of the Soviet Union became independent states.<br><br>This pattern of expansion through building alliances extended to the United States. A Muslim organization called al Khifa had numerous branch offices, the largest of which was in the Farouq mosque in Brooklyn. In the mid 1980s, it had been set up as one of the first outposts of Azzam and Bin Ladin's MAK. Other cities with branches of al Khifa included Atlanta, Boston, Chicago, Pittsburgh, and Tucson. Al Khifa recruited American Muslims to fight in Afghanistan; some of them would participate in terrorist actions in the United States in the early 1990s and in al Qaeda operations elsewhere, including the 1998 attacks on U.S. embassies in East Africa.<br><br>*See* 9/11 Commission Report at pp. 57-58." | Islamists with cells scattered across Malaysia, Singapore, Indonesia, and the Philippines. It also aided a Pakistani group engaged in insurrectionist attacks in Kashmir. In mid-1991, Bin Ladin dispatched a band of supporters to the northern Afghanistan border to assist the Tajikistan Islamists in the ethnic conflicts that had been boiling there even before the Central Asian departments of the Soviet Union became independent states.<br><br>This pattern of expansion through building alliances extended to the United States. A Muslim organization called al Khifa had numerous branch offices, the largest of which was in the Farouq mosque in Brooklyn. In the mid 1980s, it had been set up as one of the first outposts of Azzam and Bin Ladin's MAK. Other cities with branches of al Khifa included Atlanta, Boston, Chicago, Pittsburgh, and Tucson. Al Khifa recruited American Muslims to fight in Afghanistan; some of them would participate in terrorist actions in the United States in the early 1990s and in al Qaeda operations elsewhere, including the 1998 attacks on U.S. embassies in East Africa.<br><br>*See* 9/11 Report at 57-58." |

| Amended *Lloyd's* Complaint | Previous Allegations |
|---|---|
| **Compl. ¶ 263.**<br><br>"Osama bin Laden's terrorist agenda directed at harming the United States was no secret to the other principals within SBG or his family during this period. In fact, bin Laden's hatred for the United States was longstanding, dating to the U.S.'s role in the 1982 war between Israel and Lebanon when U.S. warships protected the Israelis invading Lebanon. "As I looked at those demolished towers in Lebanon," bin Laden would later recall, 'it entered my mind that we should punish the oppressor in kind and that we should destroy towers in America in order that they taste some of what we tasted.' *See* Lawrence Wright, *The Looming Tower*, at p. 151." | **Appellants' Redacted Opening Br. with Respect to Saudi Binladin Group at 11,** *In re Terrorist Attacks on Sept. 11, 2001,* **No. 11-3294 (2d Cir. June 26, 2012) (Dkt. No. 593) (footnote omitted).**<br><br>"Osama Binladin's terrorist agenda directed to harming the United States was no secret to the other principals within Saudi Binladin Group. Osama's hatred for the United States was longstanding, dating to the U.S.'s role in the 1982 war between Israel and Lebanon. 'As I looked at those demolished towers in Lebanon,' he would later recall, 'it entered my mind that we should punish the oppressor in kind and that we should destroy towers in America in order that they taste some of what we tasted.'" [citing Wright, *The Looming Tower* at 151]. |
| **Compl. ¶ 264.**<br><br>"Given their familial relationship and the family's role in supporting Osama bin Laden during the Afghan jihad, it is beyond any reasonable doubt that Osama's family members were aware of his plans to carry out jihad against the United States from the time of al Qaeda's formation in 1988, and they were certainly aware of his intentions to attack America by 1990 given Osama's pronouncement at the family's own Jeddah mosque (telling an audience of hundreds that '[t]he Americans won't stop their support of Jews in Palestine until we give them a lot of blows. They won't stop until we do jihad against them.'), and his personal investment in the creation of an Islamic army." | **Pls.' Summary of Allegations ¶ 31 (MDL Dkt. No. 2386-1).**<br><br>"Given their familial relationship and the family's role in supporting Osama during the Afghan jihad, it is beyond any reasonable doubt that his family members were aware of his plans to carry out jihad against the United States from the time of al Qaeda's formation in 1988, and they were certainly aware of intention to attack America by 1990, when Osama was filmed speaking, just after evening prayers, to an audience of hundreds in the Bin Laden family mosque in Jeddah. 'The Americans won't stop their support of Jews in Palestine until we give them a lot of blows. They won't stop until we do jihad against them.' *See* Wright, *The Looming Tower*, pp. 150-51, 405." |

-11-

| Amended *Lloyd's* Complaint | Previous Allegations |
|---|---|
| **Compl. ¶ 265.**<br><br>"Shortly thereafter, Iraq invaded Kuwait and Osama bin Laden sent a message to the Saudi Royal Family, offering to form and lead an army of 30,000 Afghan war veterans to expel Saddam Hussein from Kuwait. His offer was firmly rejected and U.S. troops were stationed in Saudi Arabia. This action, more than anything else, is what prompted Osama bin Laden's animus towards the Saudi rulers and further compelled him and other senior al Qaeda leadership to issue a formal *fatwa* in 1992 specifically calling for jihad against the United States and other Western allies. As the 9/11 Commission Report concluded:<br><br>In August 1990, Iraq invaded Kuwait. Bin Ladin, whose efforts in Afghanistan had earned him celebrity and respect, proposed to the Saudi monarchy that he summon mujahideen for a jihad to retake Kuwait. He was rebuffed, and the Saudis joined the U.S.-led coalition. After the Saudis agreed to allow U.S. armed forces to be based in the Kingdom, Bin Ladin and a number of Islamic clerics began to publicly denounce the arrangement. The Saudi government exiled the clerics and undertook to silence Bin Ladin by, among other things, taking away his passport….<br><br>Bin Ladin began delivering diatribes against the United States before he left Saudi Arabia. He continued to do so after he arrived in Sudan. In early 1992, the al Qaeda leadership issued a fatwa calling for jihad against the Western "occupation" of Islamic lands. Specifically singling out U.S. | **Pls.' Summary of Allegations ¶¶ 33, 38 (MDL Dkt. No. 2386-1).**<br><br>"33.   Shortly afterwards, Iraq invaded Kuwait, and as a consequence US troops were stationed in Saudi Arabia. This action, more than anything else, is what prompted Osama's animus towards the Saudi rulers. As the 9/11 Commission Report concluded:<br><br>In August 1990, Iraq invaded Kuwait. Bin Ladin, whose efforts in Afghanistan had earned him celebrity and respect, proposed to the Saudi monarchy that he summon mujahideen for a jihad to retake Kuwait. He was rebuffed, and the Saudis joined the U.S.-led coalition. After the Saudis agreed to allow U.S. armed forces to be based in the Kingdom, Bin Ladin and a number of Islamic clerics began to publicly denounce the arrangement. The Saudi government exiled the clerics and undertook to silence Bin Ladin by, among other things, taking away his passport….<br><br>Bin Ladin began delivering diatribes against the United States before he left Saudi Arabia. He continued to do so after he arrived in Sudan. In early 1992, the al Qaeda leadership issued a fatwa calling for jihad against the Western "occupation" of Islamic lands. Specifically singling out U.S. forces for attack, the language resembled that which would appear in Bin Ladin's public fatwa in August 1996. In ensuing weeks, Bin Ladin delivered an often-repeated lecture on the need to |

| Amended *Lloyd's* Complaint | Previous Allegations |
|---|---|
| forces for attack, the language resembled that which would appear in Bin Ladin's public fatwa in August 1996. In ensuing weeks, Bin Ladin delivered an often repeated lecture on the need to cut off "the head of the snake." <br><br> *See* 9/11 Commission Report at pp. 57, 59." | cut off "the head of the snake. <br><br> *See* 9/11 Report at p. 57." <br><br> "38. Osama had further offered the Saudi royal family to form and lead an army of 30,000 Afghan veterans to expel Saddam Hussein from Kuwait. *Id.*" |
| **Compl. ¶ 266.** <br><br> "The 9/11 Commission Report further noted, 'Though novel for its open endorsement of indiscriminate killing, Bin Ladin's 1998 declaration was only the latest in the long series of his public and private calls since 1992 that singled out the United States for attack.' *See* 9/11 Commission Report at p. 48." | **Pls.' Summary of Allegations ¶ 34 (MDL Dkt. No. 2386-1).** <br><br> "The 9/11 Commission Report further noted, 'Though novel for its open endorsement of indiscriminate killing, Bin Ladin's 1998 declaration was only the latest in the long series of his public and private calls since 1992 that singled out the United States for attack.' *See* 9/11 Report at p. 48." |
| **Compl. ¶ 267.** <br><br> "With the issuance of the 1992 *fatwa*, SBG and others were fully aware that any support provided to Osama bin Laden would inevitably support a violent attack against the United States." | **Pls.' Summary of Allegations ¶ 24 (MDL Dkt. No. 2386-1).** <br><br> "It was by 1992 that Osama bin Laden and other senior al Qaeda leadership issued a formal *fatwah* specifically calling for jihad against the United States and other Western allies, marking the point by which SBG and others were on full notice that any support provided to Osama would inevitably support a violent attack against the United States. *See* 9/11 Report at p. 59." |
| **Compl. ¶ 268.** <br><br> "True to his word, in December 1992, Osama bin Laden struck his first violent blow against the U.S. with the attempted bombing of U.S. military personnel staying in a hotel in Aden, Yemen, where U.S. troops often stayed en route to Somalia." | **Pls.' Summary of Allegations ¶ 39 (MDL Dkt. No. 2386-1).** <br><br> "It was in Yemen, in December 1992, where Osama struck his first violent blow against the U.S. with the attempted bombing of US military personnel staying in a hotel in Aden where troops often stayed en route to Somalia.. *See* 9/11 Report at pp. 59-60, 108-09." |

-13-

| **Amended *Lloyd's* Complaint** | **Previous Allegations** |
|---|---|
| **Compl. ¶ 269.**<br><br>"U.S. Intelligence was confident of Osama bin Laden's role in the attack. As the Congressional Joint Inquiry into Intelligence Community Activities before and after the Terrorist Attacks of September 11, 2011 noted:<br><br>    In December 1992, as U.S. military forces were deploying to Somalia as part of a United Nations operation to provide humanitarian assistance to a starving population, Islamic extremists attacked a hotel in Aden, Yemen housing U.S. service members supporting that operation. *An Intelligence Community paper from April 1993 concluded that [Bin Ladin's] group almost certainly played a role"* in that attack. An article from an April 1993 National Intelligence Daily also took note that three to four hundred Islamic militants had received training the previous year at military camps in Afghanistan funded by Persian Gulf Arabs. One camp was run by an Egyptian and funded by Bin Ladin." | **Pls.' Summary of Allegations ¶ 40 (MDL Dkt. No. 2386-1).**<br><br>"By April 1993, U.S. intelligence was confident of Bin Laden's role in the attack. As the Congressional Joint Inquiry into Intelligence Community Activities before and after the Terrorist Attacks of September 11, 2001 noted:<br><br>    In December 1992, as U.S. military forces were deploying to Somalia as part of a United Nations operation to provide humanitarian assistance to a starving population, Islamic extremists attacked a hotel in Aden, Yemen housing U.S. service members supporting that operation. **An Intelligence Community paper from April 1993 concluded that [Bin Ladin's] group almost certainly played a role" in that attack.** An article from an April 1993 National Intelligence Daily also took note that three to four hundred Islamic militants had received training the previous year at military camps in Afghanistan funded by Persian Gulf Arabs. One camp was run by an Egyptian and funded by Bin Ladin" |
| **Compl. ¶ 270.**<br><br>"By early 1993, Osama bin Laden's terrorist activities were so well known that U.S. and global news media were reporting that al Qaeda was targeting the United States. According to Chris Hedges, '*Muslim Militants Share Afghan Link*,' The New York Times (March 28, 1993):<br><br>    Yemeni officials contend that Afghanistan veterans in Yemen, financed by Osama Binladen, a wealthy | **Appellants' Redacted Opening Br. with Respect to Saudi Binladin Group at 12, *In re Terrorist Attacks on Sept. 11, 2001*, No. 11-3294 (2d Cir. June 26, 2012) (Dkt. No. 593) (footnote omitted).**<br><br>"By early 1993, Osama Binladin's terrorist activities were so well known that even U.S. news media communicated that al-Qaeda was targeting the United States." [citing Chris Hedges, *Muslim Militants Share Afghan Link*, N.Y. Times, Mar. 28, 1993]. |

| Amended *Lloyd's* Complaint | Previous Allegations |
|---|---|
| Saudi militant and former Afghan guerrilla now living in Khartoum, Sudan, have been behind a series of attacks, including two bombs in Aden hotels last year that killed an Australian tourist." | **Pls.' Summary of Allegations ¶ 41 (MDL Dkt. No. 2386-1).**<br><br>"Moreover, such suspicions had already been aired globally via the New York Times. *See* <u>Exhibit 12</u>, Chris Hedges, 'Muslim Militants Share Afghan Link,' <u>*The New York Times*</u> (March 28, 1993):<br><br>Yemeni officials contend that Afghanistan veterans in Yemen, financed by Osama Binladen, a wealthy Saudi militant and former Afghan guerrilla now living in Khartoum, Sudan, have been behind a series of attacks, including two bombs in Aden hotels last year that killed an Australian tourist." |
| **Compl. ¶ 271.**<br><br>"Not only was he attacking American interests in Yemen, but as the 9/11 Commission Report found, in nearby Somalia as well:<br><br>After U.S. troops deployed to Somalia in late 1992, al Qaeda leaders formulated a fatwa demanding their eviction. In December, bombs exploded at two hotels in Aden where U.S. troops routinely stopped en route to Somalia, killing two, but no Americans. The perpetrators are reported to have belonged to a group from southern Yemen headed by a Yemeni member of Bin Ladin's Islamic Army Shura; some in the group had trained at an al Qaeda camp in Sudan.<br><br>Al Qaeda leaders set up a Nairobi cell and used it to send weapons and trainers to the Somali warlords battling U.S. forces, an operation directly | **Pls.' Summary of Allegations ¶ 42 (MDL Dkt. No. 2386-1)**.<br><br>"Not only was he attacking American interests in Yemen, but as the 9/11 Commission Report found, in nearby Somalia as well:<br><br>After U.S. troops deployed to Somalia in late 1992, al Qaeda leaders formulated a fatwa demanding their eviction. In December, bombs exploded at two hotels in Aden where U.S. troops routinely stopped en route to Somalia, killing two, but no Americans. The perpetrators are reported to have belonged to a group from southern Yemen headed by a Yemeni member of Bin Ladin's Islamic Army Shura; some in the group had trained at an al Qaeda camp in Sudan.<br><br>Al Qaeda leaders set up a Nairobi cell and used it to send weapons and trainers to the Somali warlords battling U.S. forces, an operation directly |

| Amended *Lloyd's* Complaint | Previous Allegations |
|---|---|
| supervised by al Qaeda's military leader. Scores of trainers flowed to Somalia over the ensuing months, including most of the senior members and weapons training experts of al Qaeda's military committee. These trainers were later heard boasting that their assistance led to the October 1993 shoot down of two U.S. Black Hawk helicopters by members of a Somali militia group and to the subsequent withdrawal of U.S. forces in early 1994.<br><br>*See* 9/11 Commission Report at pp. 59-60." | supervised by al Qaeda's military leader. Scores of trainers flowed to Somalia over the ensuing months, including most of the senior members and weapons training experts of al Qaeda's military committee. These trainers were later heard boasting that their assistance led to the October 1993 shoot down of two U.S. Black Hawk helicopters by members of a Somali militia group and to the subsequent withdrawal of U.S. forces in early 1994.<br><br>*See* 9/11 Report at pp. 59-60." |
| **Compl. ¶ 272.**<br><br>"As former al Qaeda member Jamal al Fadl testified in 2001 at the U.S Embassy bombing trial, Osama bin Laden told his al Qaeda comrades in late 1993 that the American army had come to the Horn of Africa, 'and we have to stop the head of the snake. .... He said that the snake is America, and we have to stop them. We have to cut the head and stop them.'" | **Pls.' Summary of Allegations ¶ 43 (MDL Dkt. No. 2386-1).**<br><br>"As former al Qaeda member Jamal al-Fadl testified in 2001 at the embassy bombings trial, Osama told his al Qaeda comrades in late 1993 that the American army had come to the Horn of Africa, 'and we have to stop the head of the snake. .... He said that the snake is America, and we have to stop them. We have to cut the head and stop them.'" |
| **Compl. ¶ 273.**<br><br>"Moreover, given the generations of strong ties between the Bin Ladens and the Saudi Royal Family, dating back decades to the billions of dollars' worth of construction work that SBG's predecessor organization did on behalf of the Saudi Kingdom including the royal palace and expansion of the holy places in Mecca, it is beyond any reasonable doubt that whatever Saudi intelligence further learned about Osama's jihadist's ambitions was shared with bin Laden family members in conjunction with | **Pls.' Summary of Allegations ¶ 49 (MDL Dkt. No. 2386-1).**<br><br>"Given the generations of strong ties between the Binladins and the Saudi royal family, dating back decades to the billions of dollars worth of construction work that SBG's predecessor organization did on behalf of the Saudi Kingdom including the royal palace and expansion of the holy places in Mecca, it is beyond any reasonable doubt that whatever Saudi intelligence further learned about Osama's jihadist's ambitions was shared with Binladin family members in conjunction with their efforts to |

| Amended *Lloyd's* Complaint | Previous Allegations |
|---|---|
| their efforts to persuade him to return to the Kingdom." | persuade him to return to the Kingdom." |

| **Compl. ¶ 274.** | **Pls.' Summary of Allegations ¶ 36 (MDL Dkt. No. 2386-1).** |
|---|---|
| "Indeed, former Saudi Intelligence Director Prince Turki al Faisal al Saud made clear in a February 2006 event with the Council on Foreign Relations that they were 'aware' of Osama's role as the head of an Islamic jihadist army no later than 1989: | "Indeed, former Saudi Intelligence Director Prince Turki al-Faisal al-Saud made clear in a February 2006 event with the Council on Foreign Relations that they were 'aware' of Osama's role as the head of an Islamic jihadist army no later than 1989: |
| I met Osama bin Laden five times in my life as intelligence director. Mid-'80s to end of 1989 or beginning of 1990 was the last time I saw him. And when the withdrawal of Soviet troops in Afghanistan occurred, bin Laden and his supporters within Afghanistan—and by the way, that's where al Qaeda was born. As I like to—prefer to say, the al Qaeda was born in the hills of Afghanistan rather than in the deserts of Saudi Arabia. And they decided that they were going to form a group that will, in their view, protect Muslim interests throughout the world as they identified themselves as being the primary claimants to the credit of driving the Soviets out of Afghanistan. | I met Osama bin Laden five times in my life as intelligencedirector. Mid-'80s to end of 1989 or beginning of 1990 was the last time I saw him. And when the withdrawal of Soviet troops in Afghanistan occurred, bin Laden and his supporters within Afghanistan—and by the way, that's where al Qaeda was born. As I like to—prefer to say, the al Qaeda was born in the hills of Afghanistan rather than in the deserts of Saudi Arabia. And they decided that they were going to form a group that will, in their view, protect Muslim interests throughout the world as they identified themselves as being the primary claimants to the credit of driving the Soviets out of Afghanistan. |
| And so, by 1990 when I last saw him at the beginning of that year, he had come to me with a proposition that he wants to bring his Mujahedeen as he called them, to liberate the then-Marxist regime in south Yemen. And I advised him that that was not the right time to do it because there were other factors playing there politically and economically. South Yemen was being—not a favorite word of mine—weaned away from the | And so, by 1990 when I last saw him at the beginning of that year, he had come to me with a proposition that he wants to bring his Mujahedeen as he called them, to liberate the then-Marxist regime in south Yemen. And I advised him that that was not the right time to do it because there were other factors playing there politically and economically. South Yemen was being—not a |

| Amended *Lloyd's* Complaint | Previous Allegations |
|---|---|
| Soviet Union at that time. So, he left and that was the last that I saw of him.<br><br>He then remained in the kingdom for another two years after that, sometimes going to mosques and preaching without taking permission to do so and being arrested for doing that and reprimanded and then let go.<br><br>And I think at the end of 1992—perhaps Mr. Rubin can correct me on that—he asked for permission to leave Saudi Arabia. And he left and went to Afghanistan. And he went from there in—end of 1993 he went to the Sudan, and that's when he began operating against the kingdom from the Sudan. He was stripped of his Saudi citizenship in 1994. His financial assets were frozen at that time and even his personal family disowned him in public at that time.<br><br>By 1996, he moved from the Sudan to Afghanistan and it went on from there. *So we were pretty much aware of bin Laden from the very beginning, if you like.* Not perhaps so much in terms of how dangerous he could be, but as he grew and as his movement grew, people became more aware of his danger.<br><br>*See* 'A Conversation with Prince Turki al-Faisal,' Council on Foreign Relations (February 13, 2006)." | favorite word of mine—weaned away from the Soviet Union at that time. So, he left and that was the last that I saw of him.<br><br>He then remained in the kingdom for another two years after that, sometimes going to mosques and preaching without taking permission to do so and being arrested for doing that and reprimanded and then let go.<br><br>And I think at the end of 1992—perhaps Mr. Rubin can correct me on that—he asked for permission to leave Saudi Arabia. And he left and went to Afghanistan. And he went from there in—end of 1993 he went to the Sudan, and that's when he began operating against the kingdom from the Sudan. He was stripped of his Saudi citizenship in 1994. His financial assets were frozen at that time and even his personal family disowned him in public at that time.<br><br>By 1996, he moved from the Sudan to Afghanistan and it went on from there. So we were pretty much aware of bin Laden from the very beginning, if you like. Not perhaps so much in terms of how dangerous he could be, but as he grew and as his movement grew, people became more aware of his danger.<br><br>*See* Exhibit 10, 'A Conversation With Prince Turki Al-Faisal,' Council for Foreign Relations (February 13, 2006)." |

| Amended *Lloyd's* Complaint | Previous Allegations |
|---|---|
| **Compl. ¶ 275.**<br><br>"As the chairman of SBG and bin Laden family leader, Bakr bin Laden maintained close relationships with the most senior representatives of the Kingdom, including the King himself:<br><br>    Apart from Osama, the primary source of concern in Bakr's world seemed to be his relationship with the al-Saud… Bakr would leap to open the door deferentially for even a minor royal. He seemed to worry chronically about the disposition of the major Al-Saud on whom his business relied – Crown Prince Abdullah, of course, but also Prince Salman, the governor of Riyadh, and Abdulaziz bin Fahd, the son of the disabled king.<br><br>*See* Steven Coll, *The Bin Ladens*, at p. 500:" | **Pls.' Summary of Allegations ¶ 50 (MDL Dkt. No. 2386-1).**<br><br>"Indeed, as the chairman of SBG and Binladin family leader, Bakr Binladin maintained close relationships with the most senior representatives of the Kingdom, including the King himself. *See* Exhibit 13, Steven Coll, *The Bin Ladens*, at p. 500:<br><br>    Apart from Osama, the primary source of concern in Bakr's world seemed to be his relationship with the al-Saud… Bakr would leap to open the door deferentially for even a minor royal. He seemed to worry chronically about the disposition of the major Al-Saud on whom his business relied – Crown Prince Abdullah, of course, but also Prince Salman, the governor of Riyadh, and Abdulaziz bin Fahd, the son of the disabled king." |
| **Compl. ¶ 276.**<br><br>"Given the problems which Osama bin Laden's activities presented to SBG's business interests, the company itself had strong reason to closely monitor Osama's activities and statements at all times. As a result, SBG was uniquely aware of Osama bin Laden's jihadist activities from the earliest date." | **Pls.' Summary of Allegations ¶¶ 52, 53 (MDL Dkt. No. 2386-1).**<br><br>"52. In addition, given the problems which Osama's activities presented to SBG's business interests, the company itself had strong reason to closely monitor Osama's activities and statements at all times."<br><br>"53. As a result, SBG was uniquely aware of Osama's jihadist activities from the earliest date." |
| **Compl. ¶ 277.**<br><br>"Any support SBG provided Osama bin Laden from 1988 onwards, and certainly by 1990, was done with the awareness that | **Pls.' Summary of Allegations ¶ 54 (MDL Dkt. No. 2386-1).**<br><br>Any support SBG provided Osama from 1988 onwards, and certainly by 1990, was done with the awareness that it was for the |

| Amended *Lloyd's* Complaint | Previous Allegations |
|---|---|
| it was for the benefit of Osama's plans for terrorist strikes against America." | benefit of Osama's plans for terrorist strikes against America. |
| **Compl. ¶ 278.**<br><br>"Nevertheless, the bin Laden family members and principals of SBG continued to knowingly provide significant support to Osama bin Laden in furtherance of his jihadist activities.'" | **Conclusory summary of subsequent allegations.** |
| **Compl. ¶ 279.**<br><br>"SBG's controlling shareholders had intimate knowledge of al Qaeda's objectives, coordinated closely with al Qaeda leadership, and provided extensive support to al Qaeda with the intent of furthering its objectives and harming the United States. They did so in part through their actions undertaken through SBG." | **Appellants' Redacted Opening Br. with Respect to Saudi Binladin Group at 12-13, *In re Terrorist Attacks on Sept. 11, 2001*, No. 11-3294 (2d Cir. June 26, 2012) (Dkt. No. 593) (footnotes omitted).**<br><br>"Three of SBG's controlling shareholders . . . are alleged to have had intimate knowledge of al-Qaeda's objectives, coordinated closely with al-Qaeda leadership, and provided extensive support to al-Qaeda with the intent of furthering its objectives and harming the United States. Indeed, they are alleged to have done so in part through their actions undertaken through SBG." |
| **Compl. ¶ 280.**<br><br>"For instance, SBG provided cover for Mohammed Jamal Khalifa, a founding member of al Qaeda operative and Osama bin Laden's brother-in-law. The Mohammed Binladin Company ("MBC"), which SBG concedes is part of its same corporate structure, sponsored Khalifa's visa application to the United States. Khalifa, who was appointed to head the Philippines branch office of the International Islamic Relief Organization ("IIRO") following his participation in the Afghan jihad, used the IIRO as a platform for al Qaeda's expansion into Southeast Asia and | **Pls.' RICO Stmt. as to SBG at 9-10 (MDL Dkt. No. 1120).**<br><br>"In addition to its role in assisting Osama bin Laden perform construction projects for the NIF in Sudan, SBG provided cover for Mohammed Jamal Khalifa, a senior al Qaida operative and official of the International Islamic Relief Organization ("IIRO"), a 'charity' fronting for al Qaida. The Mohammed Bin Laden Organization, a subsidiary of SBG, sponsored Khalifa's visa application to the United States." |

| Amended *Lloyd's* Complaint | Previous Allegations |
|---|---|
| personally orchestrated IIRO's funding and support for the Abu Sayyaf Group and other terrorist organizations in the region." | |
| **Compl. ¶ 281.**<br><br>"As Osama bin Laden's role in anti-American terrorism was becoming more widely known abroad, SBG began to take steps to erase the formal ties between Osama bin Laden and the family-owned company." | **Appellants' Redacted Opening Br. with Respect to Saudi Binladin Group at 14,** *In re Terrorist Attacks on Sept. 11, 2001*, **No. 11-3294 (2d Cir. June 26, 2012) (Dkt. No. 593) (footnote omitted).**<br><br>"In 1993, under pressure from the Saudi government, SBG began to take steps to erase the formal ties between Osama Binladin and the company." |
| **Compl. ¶ 282.**<br><br>"The 9/11 Commission's staff *Monograph on Terrorist Financing* noted that these steps here were not undertaken by SBG voluntarily, but rather only occurred because the government compelled SBG to take some public action:<br><br>From about 1970 until 1993 or 1994, Usama Bin Ladin received about a million dollars per year— adding up to a significant sum, to be sure, but not a $300 million fortune. In 1994 *the Saudi government forced the Bin Ladin family to find a buyer for Osama's share of the family company and to place the proceeds into a frozen account.*" | **Pls.' Summary of Allegations ¶ 64 (MDL Dkt. No. 2386-1).**<br><br>"As the 9/11 Commission's staff *Monograph on Terrorist Financing* noted, these steps here were not undertaken by SBG voluntarily, but rather only occurred because the government compelled SBG to take some public action:<br><br>From about 1970 until 1993 or 1994, Usama Bin Ladin received about a million dollars per year—adding up to a significant sum, to be sure, but not a $300 million fortune. In 1994 **the Saudi government forced the Bin Ladin family to find a buyer for Osama's share of the family company and to place the proceeds into a frozen account.**" |
| **Compl. ¶ 283.**<br><br>"SBG claimed that it had severed financial ties with Osama bin Laden in 1993, prior to any inkling that Osama harbored anti-American sentiment, and that such severance was complete, totally and effective by 1993. However, strong evidence suggests | **Pls.' Summary of Allegations ¶ 55 (MDL Dkt. No. 2386-1)**.<br><br>"SBG claims it had severed financial ties with Osama in 1993, prior to any inkling that he harbored anti-American sentiment, and that such severance was complete, totally and effective by 1993. As a closer examination of the record will confirm, this is |

| Amended *Lloyd's* Complaint | Previous Allegations |
|---|---|
| SBG's continued links and support to Osama and al Qaeda persisted." | false." |
| **Compl. ¶ 284**.<br><br>"In fact, SBG directors and Bin Laden family members kept a financial lifeline open to Osama throughout the decade leading into the September 11[th] attacks." | **Pls.' Summary of Allegations ¶ 56 (MDL Dkt. No. 2386-1).**<br><br>"In fact, SBG directors and Bin Laden family members kept a financial lifeline open to Osama throughout the decade leading into the September 11 Attack." |
| **Compl. ¶ 285.**<br><br>"In addition to SBG itself, the Mohammed Binladin Organization ("MBO") was a loosely organized set of businesses established by Mohammed bin Awad bin Laden, father of Osama, Bakr, and the other SBG principals. Following Mohammed's sudden death in 1967, King Faisal appointed trustees to oversee the organization." | **Pls.' Summary of Allegations ¶ 57 (MDL Dkt. No. 2386-1).**<br><br>"In addition to SBG itself, the Mohamed Binladin Organization (MBO) was a loosely organized set of businesses established by Mohamed Binladin, father of Osama, Bakr, and the other SBG principals. Following his sudden death in 1967, King Faisal appointed trustees to oversee the organization." |
| **Compl. ¶ 286.**<br><br>"By 1988, many of Mohammed's sons had taken on managerial roles within the organization. Bakr bin Laden, a senior brother in the family, began the process of reorganization of the businesses. According to SBG, 'In 1989, as part of the natural progression in the growth of the company, various autonomous divisions were created under the umbrella of the Saudi Binladin Group (SBG).' *See* http://web.archive.org/web/20010814095646/www.saudi-binladin-group.com/history.htm." | **Pls.' Summary of Allegations ¶ 58 (MDL Dkt. No. 2386-1).**<br><br>By 1988, many of Mohamed's sons had taken on managerial roles within the organization. A senior brother, Bakr Binladin, began the process of reorganization of the businesses. According to SBG, 'In 1989, as part of the natural progression in the growth of the company, various autonomous divisions were created under the umbrella of the Saudi Binladin Group (SBG).' *See* http://web.archive.org/web/20010814095646/www.saudi-binladin-group.com/history.htm." |
| **Compl. ¶ 287**.<br><br>"Again, SBG had twenty founding shareholders. All were sons of Mohammed bin Laden, including Osama." | **Pls.' Summary of Allegations ¶ 59 (MDL Dkt. No. 2386-1).**<br><br>SBG had twenty founding shareholders. All were sons of Mohamed Binladin, including Osama. *See* Bakr Binladin Aff., |

| Amended *Lloyd's* Complaint | Previous Allegations |
|---|---|
| | dated Jan. 25, 2006 (MDL Docket No. 1645, Ex. C-1). |
| **Compl. ¶ 288**.<br><br>"One of the companies put under the umbrella of SBG was the Mohammed Binlladin Company ("MBC"), whose shareholders included all the sons, daughters and wives of Mohammed bin Laden. Osama had shares in MBC as well as SBG." | **Pls.' Summary of Allegations ¶¶ 60, 62 (MDL Dkt. No. 2386-1)**.<br><br>"60. One of the companies put under the umbrella of SBG was the Mohamed Binladin Company (MBC), whose shareholders included all the sons, daughters and wives of Mohamed Binladin. *See* Bakr Binladin Aff., dated Jan. 25, 2006 (MDL Docket No. 1645, Ex. C-2)."<br><br>"62. Osama had shares in MBC as well as SBG. *See* Bakr Binladin Aff., dated Jan. 25, 2006 (MDL Docket No. 1645; Ex. 2)." |
| **Compl. ¶ 289**.<br><br>"Bakr bin Laden initiated action against Osama at a January 1993 MBC board meeting to prohibit payment to Osama of his share of their profits. As Chairman of SBG, Bakr allegedly instructed SBG to do the same." | **Pls.' Summary of Allegations ¶ 63 (MDL Dkt. No. 2386-1).**<br><br>"As previously noted Bakr Binladin initiated action against Osama at a January 1993 MBC board meeting to prohibit payment to Osama of his share of their profits. Bakr allegedly instructed SBG to do the same. *See* Bakr Binladin Aff., dated June 2, 2010 (MDL Docket No. 2285)." |
| **Compl. ¶ 290**.<br><br>"In June 1993, shortly after U.S. intelligence had concluded that Osama bin Laden was behind the Yemen attack and the New York Times published similar claims, SBG claims that both it and MBC passed resolutions divesting Osama of his ownership of the shares. Osama's 'divested' shares in the company were transferred solely to his brother and SBG shareholder Ghaleb bin Laden, who had previously supported Osama during the Afghan mujahedeen campaign. The corporate resolutions state that the | **Pls.' Summary of Allegations ¶ 65 (MDL Dkt. No. 2386-1).**<br><br>"In June 1993, shortly after US intelligence had concluded that Osama was behind the Yemen attack and the New York Times published similar claims, SBG claims that both it and MBC passed resolutions divesting Osama of his ownership of the shares. The corporate resolutions state that the actions were taken at the request of Osama Binladin, and that Osama requested that his shares be put in the charge of his brother Ghalib. *See* Bakr Binladin Aff., dated June 2, 2010 (MDL Docket No. 2285, Ex. |

| Amended *Lloyd's* Complaint | Previous Allegations |
|---|---|
| actions were taken at the request of Osama, and that Osama himself designated Ghaleb as the recipient of his stake." | 2)." |
| **Compl. ¶ 291.**<br><br>"Ghaleb reportedly delivered as much as $50,000 in cash directly to Osama in Afghanistan during the battle for Jalalabad in April 1989." | **Pls.' Summary of Allegations ¶ 79 (MDL Dkt. No. 2386-1).**<br><br>"However the corporate resolutions clearly demonstrate that the shares were transferred to only one shareholder/director: Ghaleb Binladin, the half-brother who had reportedly delivered as much as $50,000 in cash directly to Osama in Afghanistan during the battle for Jalalabad in April 1989. *See* Bakr Binladin Aff., dated June 2, 2010, (MDL Docket No. 2285, Ex. 2 and 3); *see also* <u>Exhibit 22</u>, Steven Coll, *The Bin Ladens*, at p. 339." |
| **Compl. ¶ 292.**<br><br>"The SBG resolution itself does not reflect an involuntary divestment of one already shunned by the family; it states that Osama was 'represented by his lawful attorney' who 'wishes' and 'desired' to assign his shares to his brother Ghaleb, who did not pay for them." | **Pls.' Summary of Allegations ¶ 66 (MDL Dkt. No. 2386-1).**<br><br>"The SBG resolution itself does not reflect an involuntary divestment of one already shunned by the family; it states that Osama was 'represented by his lawful attorney' who 'wishes' and 'desired' to assign his shares to his brother Ghaleb, who did not pay for them. *Id.*" |
| **Compl. ¶ 293.**<br><br>"Bakr bin Laden has represented in sworn affidavit testimony that the value of Osama bin Laden's shares was placed in a trust outside of his brother's control in 1993, and that he strictly prohibited family members and individuals associated with the bin Laden companies from providing financial or other support to Osama. *See* Affidavit of Bakr Binladin, Case No. 1:03-md-1570 (ECF No. 2286, September 7, 2010) at ¶ 8 (stating 'the money was placed in a trust outside of Osama's control' and '[m]y family took these actions in June 1993'); ¶ 10 ('Osama has not | **Pls.' Summary of Allegations ¶ 69 (MDL Dkt. No. 2386-1).**<br><br>"Bakr Binladin represented in a sworn affidavit that the value of OBL's shares was placed in a trust in 1993 ('the money was placed in a trust outside of Osama's control. . . My family took those actions in June 1993'). *See* Bakr Binladin Aff., dated Jan. 25, 2006 (MDL Docket No. 1645)". |

| Amended *Lloyd's* Complaint | Previous Allegations |
|---|---|
| received a penny from MBC or SBG or any of their affiliates since, at the latest, June 1993. Nor has Osama received any other form of support from MBC, SBG or any of their affiliates since that time. I have not authorized and, indeed, have forbidden any person acting on behalf of MBC, SBG or any of their affiliates to make any payments, do any business with, or otherwise provide any support directly or indirectly to Osama or any of his companies since June 1993.')." | |
| **Compl. ¶ 294.**<br><br>"However, the value of those shares was not placed in trust until April 2000, 7 years later, when Ghaleb deposited $9.8 million into an account at NCB." | **Pls.' Summary of Allegations ¶¶ 67, 70 (MDL Dkt. No. 2386-1).**<br><br>"67. Moreover, SBG states that the shares in question were never 'monetized' until April 2000 when $9.8 million was placed into a trust account at the National Commercial Bank. *See* SBG Renewed MTD at 10."<br><br>"70. However, he admits the money was not placed into an actual bank account until April 2000, seven years later. *See* Bakr Binladin Aff., dated June 2, 2010 (MDL Docket No. 2285." |
| **Compl. ¶ 295.**<br><br>"Critically, the $9.8 million deposited in 2000 represented only the value of the shares in 1993, not the distributions related to the shares over the intervening seven years. Those distributions remained unaccounted for." | **Appellants' Redacted Opening Br. with Respect to Saudi Binladin Group at 15,** *In re Terrorist Attacks on Sept. 11, 2001*, **No. 11-3294 (2d Cir. June 26, 2012) (Dkt. No. 593) (footnote omitted).**<br><br>"As the magistrate judge noted below, however, that $9.8 million represented only the value of the shares in 1993, not the distributions related to the shares over the intervening seven years. Those distributions remained unaccounted for." |

| Amended *Lloyd's* Complaint | Previous Allegations |
|---|---|
| **Compl. ¶ 296.**<br><br>"This discrepancy becomes even more significant when coupled with the fact that over that same period Ghaleb was formally entitled to the benefits of holding Osama's shares, he and his brother Bakr bin Laden, using SBG's business address, invested substantial sums in Bank al Taqwa from November 1993 until March 2000. Shortly after 9/11, Bank al Taqwa was named by the U.S. Treasury Department as a terrorist entity for its activities in support of al Qaeda since the 1980s." | **Pls.' Summary of Allegations ¶ 71 (MDL Dkt. No. 2386-1).**<br><br>"This discrepancy becomes even more significant when coupled with the fact that Bakr Binladin and Ghalib Binladin, using SBG's business address, invested substantial sums in Bank Al Taqwa from November 1993 until March 2000. Shortly after 9/11, Bank al Taqwa was named by the U.S. Treasury Department as a terrorist entity for its activities in support of al Qaeda since the 1980s." |
| **Compl. ¶ 297.**<br><br>"In a January 4, 2002 letter from U.S. Department of the Treasury Deputy General Counsel George B. Wolfe to Claude Nicati, Substitut du Procureur General of Switzerland, some of Bank al Taqwa's activities were 'providing indirect investment services for Al Qa'ida, investing funds for bin Laden, and making cash deliveries on request to the Al Qa'ida organization.'" | **Pls.' Summary of Allegations ¶ 72 (MDL Dkt. No. 2386-1).**<br><br>"According to the Treasury Department, some of Bank al Taqwa's activities were 'providing indirect investment services for Al Qa'ida, investing funds for bin Laden, and making cash deliveries on request to the Al Qa'ida organization.' *See* Exhibit 17, January 4, 2002 letter from United States Department of the Treasury Deputy General Counsel George B. Wolfe to Claude Nicati, Substitut du Procureur General of Switzerland." |
| **Compl. ¶ 298.**<br><br>"These allegations are consistent with the indirect investment of Osama bin Laden's funds in Bank al Taqwa by SBG". | **Pls.' Summary of Allegations ¶ 73 (MDL Dkt. No. 2386-1).**<br><br>"These allegations are consistent with the indirect investment of Osama's funds in Bank al Taqwa by SBG." |
| **Compl. ¶ 299.**<br><br>"Contrary to the bin Laden's family's public repudiation of Osama bin Laden, Osama's own words confirm that there was a continuing financing mechanism to him and al Qaeda orchestrated by Bakr bin Laden and SBG, and that the terms of that financial | ***See* Mem. in Support of Def. Saudi Binladin Group's Mot. to Dismiss Section I.C.1.** |

| Amended *Lloyd's* Complaint | Previous Allegations |
| --- | --- |
| arrangement remained in effect for many years. In March 2016, the U.S. government declassified a tranche of documents that had been recovered during the raid on Osama bin Laden's compound in Abbottabad, Pakistan. Included in that tranche was a 'will' personally written by Osama bin Laden in which he states that he has approximately $29 million in Sudan, and 'out of this amount, 12 million dollars came from my brother, Bakr bin Muhammad Bin Laden, on behalf of Bin Laden Company, for their investment in Sudan.' U.S. intelligence believes the will was written in the late 1990's." | |
| **Comp. ¶ 300.**<br><br>"Osama's will also directs that the funds should be returned to his family members under terms set forth in the will, and bin Laden further urges his family members to spend the remainder of the money on holy war, suggesting that Osama's siblings and relatives remained supportive of his jihadist agenda: 'I hope for my brothers, sisters and maternal aunts to obey my will and to spend all the money that I have left in Sudan on jihad, for the sake of Allah.'" | ***See* Mem. in Support of Def. Saudi Binladin Group's Mot. to Dismiss Section I.C.1.** |
| **Comp. ¶ 301.**<br><br>"Beyond the material support, SBG principals maintained contact with Osama bin Laden via personal visits, letters, telephone calls, and via intermediaries during the years he took refuge in Sudan and Afghanistan." | **Pls.' Summary of Allegations ¶ 86 (MDL Dkt. No. 2386-1).**<br><br>"Beyond the material support, SBG principals maintained contact with Osama via personal visits, letters, telephone calls, and via intermediaries during the years this Court has deemed relevant given the public nature of his support for anti-American terrorism." |

| Amended *Lloyd's* Complaint | Previous Allegations |
|---|---|
| **Compl. ¶ 302.**<br><br>"SBG principals Omar bin Laden and Ghaleb bin Laden both were in phone contact with Osama after this disaffiliation – Omar in 1995, and Ghaleb repeatedly in 1998 in advance of the U.S. Embassy bombings." | **Pls.' Summary of Allegations ¶ 87 (MDL Dkt. No. 2386-1).**<br><br>"SBG principals Omar bin Laden and Ghaleb bin Laden both were in phone contact with Osama after this disaffiliation – Omar in 1995, and Ghaleb repeatedly in 1998 in advance of the Embassy bombings. Omar Binladin Aff. ¶ 3." |
| **Compl. ¶ 303.**<br><br>"Moreover, Osama's written contact with SBG principals was pervasive and certainly not antagonistic. The tone of both letters is friendly not bitter, and the dispute between them seems closer to an oversight or clerical error than of a bitter struggle over an inheritance or the waging of battle over divvying up of corporate assets." | **Pls.' Summary of Allegations ¶¶ 88, 90 (MDL Dkt. No. 2386-1).**<br><br>"88. Moreover, Osama's written contact with SBG principals was pervasive and certainly not antagonistic."<br><br>"90. The tone of both letters is friendly not bitter, and the dispute between them seems closer to an oversight or clerical error than of a bitter struggle over an inheritance or the waging of battle over divvying up of corporate assets." |
| **Compl. ¶ 304.**<br><br>"Consistent with this evidence that Osama bin Laden retained the support of his family long after they claimed to have disowned him, Michael Scheuer, the Chief of the CIA's Bin Laden Unit from 1996 through 1999, has stated that 'There is no solid evidence to suggest that [Osama] bin Laden ever found anything but warmth and acceptance from the family.' Scheuer has cast doubt on the claims by Bakr bin Laden and other family members that the family disavowed Osama bin Laden and withheld his share of the profits from SBG. On this point, Scheuer cites the following statement of Sa'd al-Faqih, one of bin Laden's colleagues in the Islamic Awakening movement in Saudi Arabia in the early 1990s: | **Sixth Amended Consolidated Master Compl. ¶ 401,** *Ashton v. Al Qaeda Islamic Army*, **No. 02-cv-06977 (S.D.N.Y. Sept. 30, 2005) (MDL Dkt. No. 1463).**<br><br>"401. The relationships between Osama Bin Laden and his family continued, despite claims to the contrary. Dr. Saad Al Fagih, Saudi dissident living in London, and former Afghan combatant, who kept close relationship with Osama Bin Laden for many years, stated in 1994: There's a very interesting thing in Islamic structure of the family: you are obliged to support your family members. Even if they are distant members. If it's a cousin or a niece or a nephew, especially a brother, you have to support them if you are a capable person. And the people feel sinful if they don't let this money go to its real owner, in this case, Osama Bin |

| Amended *Lloyd's* Complaint | Previous Allegations |
|---|---|
| There is a very interesting thing in the structure of [the Islamic] family. You are obligated to support your famiy [sic] members…. Well, [the bin Ladens] have to say that [that they disowned Osama]. They have to pretend to be cutting off bin Laden. But in all actuality they admire him, they respect him…I do not claim that all…the bin Laden brothers do. But quite a significant number of them work hard to get [rid of] what they see as singufl [sic] money – which has to reach the rightful owner." | Laden." <br><br> ***See also* Pls.' Summary of Allegations ¶ 46 (MDL Dkt. No. 2386-1).** <br><br> "46. Given their familial relationship and the family's role in supporting Osama during the Afghan jihad, it is beyond any reasonable doubt that his family members were aware of his plans to carry out jihad against the United States from the time of al Qaeda's formation in 1988, and they were certainly aware of intention to attack America by 1990 given Osama's pronouncement at the family's own Jeddah mosque." |
| **Compl. ¶ 305.** <br><br> "In line with Scheuer's assessments and al-Faqih's observations, Zacarias Moussaoui testified on the basis of his personal dealings with Osama bin Laden that Osama bin Laden continued to maintain strong ties to his family and enjoy the support of his family and SBG long after al Qaeda relocated from Sudan to Afghanistan. According to Moussaoui, who was resident in al Qaeda's operational base in Kandahar, Afghanistan and in direct contact with Osama bin Laden between 1998-2000, Osama regularly welcomed bin Laden family members visiting from Saudi Arabia in Afghanistan. When Osama's mother visited her son in Afghanistan, Moussaoui described it as a 'significant event,' 'a festivity' marked by the shooting of weapons such as rocket propelled grenades (RPG) and machine guns." | **Compl. ¶¶ 642, 643, 663, *World Trade Ctr. Props. LLC v. Al Baraka Inv. and Dev. Corp.*, No. 04-cv-07280 (S.D.N.Y. Sept. 10, 2004).** <br><br> "642. Osama bin Laden's name is still listed in the Saudi BinLaden Group's corporate records. Saad Al-Fagih, a London-based surgeon and Saudi dissident who heads a group called Movement for Islamic Reform in Arabia, and Abdel Bari Atwan, editor of Al-Quds al-Arabi who interviewed Osama Bin Laden in 1996, claim that Bin Laden's mother has met with him twice since he moved to Afghanistan in 1996. The first trip occurred in the spring of 1998. The second trip occurred in the spring of 2001. <br><br> 643. In January of 2001, Al Jazeera network aired footage of Osama bin Laden attending the wedding of his son, Muhammad, along with other members of the Bin Laden family." <br><br> "663. At the wedding of his son, Mohammad, Osama bin Laden |

| Amended *Lloyd's* Complaint | Previous Allegations |
|---|---|
| | read a poem describing the destruction of the USS Cole as the wedding audience cheered. Among those that attended the wedding were 'bin Laden's mother, two brothers, and a sister who flew to Kandahar from Saudi Arabia.'" |
| **Compl. ¶ 306.**<br><br>"Moussaoui further testified that SBG assisted al Qaeda in building the camps where the 9/11 hijackers received training by covertly shipping construction parts to Pakistan in the late 1990s, where it was received by al Qaeda members and later transported to Afghanistan." | ***See* Mem. in Support of Def. Saudi Binladin Group's Mot. to Dismiss Section I.C.2.** |
| **Compl. ¶ 307.**<br><br>"When told that SBG had made several representations in court proceedings that the bin Laden family and SBG had severed all ties with Osama in 1994, Moussaoui called it a 'complete lie' and 'absolute lie.'" | ***See* Mem. in Support of Def. Saudi Binladin Group's Mot. to Dismiss Section I.C.2.; *see also* Pls.' Summary of Allegations ¶ 55 (MDL Dkt. No. 2386-1).**<br><br>"55. SBG claims it had severed financial ties with Osama in 1993, prior to any inkling that he harbored anti-American sentiment, and that such severance was complete, totally and effective by 1993. As a closer examination of the record will confirm, this is false." |
| **Compl. ¶ 308.**<br><br>Part Four of the *Report of the Congressional Joint Inquiry Into the Terrorist Attacks of September 11, 2001*, commonly referred to as the so-called '28 Pages,' additionally affirms that bin Laden family members maintained ties with al Qaeda and Osama bin | ***See* Mem. in Support of Def. Saudi Binladin Group's Mot. to Dismiss Section I.C.3.** |

| Amended *Lloyd's* Complaint | Previous Allegations |
|---|---|
| Laden well beyond the point in time that they claim to have severed all such ties. In this regard, the report indicates that 'an extremist and supporter of Usama bin Ladin' named Osama Bassnan "knew bin Ladin's family in Saudi Arabia" and was in telephone contact with 'members of the family who are living in the United States.' These statements align with Moussaoui's testimony that bin Laden family members in the United States and elsewhere were in contact with al Qaeda operatives, and involved in providing support to al Qaeda throughout the 1990s." | |
| **Compl. ¶ 309.**<br><br>"The 28 Pages also discloses an FBI finding that an individual named Fahad Abdullah Saleh Bakala was responsible for 'flying Usama bin Ladin between Afghanistan and Saudi Arabia during UBL's exile,' a fact that discloses another means through which bin Laden may have been maintaining contact with his family during that period." | ***See* Mem. in Support of Def. Saudi Binladin Group's Mot. to Dismiss Section I.C.3.** |
| **Compl. ¶ 310.**<br><br>"Osama bin Laden left Sudan in 1996 under international pressure and returned to Afghanistan. By that point, he had launched al Qaeda as a sophisticated global terrorist network. It was well on its way to further attacks on the United States, including the 1998 bombing of American embassies in Kenya and Tanzania, the 2000 bombing of the U.S.S. Cole, and ultimately the September 11th attacks. None of this would have been possible without SBG's close coordination and support, including its arrangements with the Sudanese government that guaranteed a safe haven for al-Qaeda, direct financial support to Osama bin Laden during his time in Sudan, and continued financial lifelines after his | **Appellants' Redacted Opening Br. with Respect to Saudi Binladin Group at 15-16, *In re Terrorist Attacks on Sept. 11, 2001*, No. 11-3294 (2d Cir. June 26, 2012) (Dkt. No. 593).**<br><br>"Osama Binladin left Sudan in 1996 under international pressure and returned to Afghanistan. By that point, he had launched al-Qaeda as a sophisticated global terrorist network. It was well on its way to further attacks on the United States, including the 1998 bombing of American embassies in Kenya and Tanzania, the 2000 bombing of the U.S.S. Cole, and ultimately the September 11th Attacks. None of this would have been possible without SBG's close coordination and support, including its arrangements with the Sudanese government that guaranteed a safe haven for |

| Amended *Lloyd's* Complaint | Previous Allegations |
|---|---|
| departure." | al-Qaeda, direct financial support to Osama Binladin during his time in Sudan, and continued financial lifelines after his departure." |