**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (GBD) (SN)<br><br>ECF Case |

This document relates to:

*Federal Insurance Co., et al. v. Al Qaida, et al.*, Case No. 03-cv-06978
*Thomas Burnett, Sr., at al. v. Al Baraka Inv. & Dev. Corp., et al.*, Case No. 03-cv-09849
*Estate of John P. O'Neill, Sr., et al. v. Al Baraka, et al.*, Case No. 04-cv-01923
*Continental Casualty Co., et al. v. Al Qaeda, et al.*, Case No. 04-cv-05970
*Cantor Fitzgerald & Co., et al. v. Akida Bank Private Ltd., et al.*, Case No. 04-cv-07065
*Euro Brokers, Inc., et al. v. Al Baraka, et al.*, Case No. 04-cv-07279

**PLAINTIFFS' REPLY MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
MOTION TO COMPEL DEFENDANT DUBAI ISLAMIC BANK TO COMPLY WITH
THE COURT'S MARCH 22, 2016 ORDER**

November 20, 2017

**TABLE OF CONTENTS**

I.   DISCUSSION ................................................................................................................. 1

   A.   DIB's Objections to Plaintiffs' List of Search Terms Are Without
        Merit and Should be Denied ................................................................................ 1

   B.   DIB Misrepresents Plaintiffs' Relevancy Allegations and Evidence ..................... 4

        1.   International Islamic Relief Organization ("IIRO") .................................. 4

        2.   Hamas Entities ................................................................................. 5

        3.   Al Qaeda Leaders Abdullah Azzam & Abu Ubaidah Al Banshiri ............. 7

        4.   Al Qaeda Co-Conspirator Khalid Ali Walid.............................................. 8

        5.   Abdelsamad Mohamed ....................................................................... 9

        6.   Saleh Salim Al Shamsi........................................................................ 9

        7.   Mohamed Ahmed Obaid Bin Mahfouz & Yasin Ahmed Mohamed Ali .. 10

II.  CONCLUSION.......................................................................................................... 10

The Plaintiffs' Executive Committees, on behalf of all plaintiffs, submit this reply brief in further support of their Motion to Compel, filed October 30, 2017 (ECF Nos. 3774-3776), seeking an order compelling defendant Dubai Islamic Bank ("DIB") to comply with Magistrate Judge Frank Maas's March 22, 2016 Order.

## I.     DISCUSSION

### A.     DIB's Objections to Plaintiffs' List of Search Terms Are Without Merit and Should be Denied

DIB primarily advances two arguments in opposition to Plaintiffs' Memorandum of Law at ECF No. 3775 ("MOL").  First, DIB's Opposition ("Opp.") contends that the 31 disputed individuals and entities included in plaintiffs' list of search terms fall outside of four specific categories allegedly required by Judge Maas's March 22, 2016 Order:  (1) "[t]he 261 … search terms that were agreed upon by the plaintiffs and by the defendants;" (2) "the 152 alleged Taliban accounts" listed in the document that the Court ordered DIB to produce in unredacted form; (3) "[t]he eight … actual accounts found and produced to the plaintiff[s]" by DIB in its prior productions; and (4) "accounts … relate[d] to the embassy bombings."  Opp. at 4.  That position is unsupported by the record.

During the course of the March 22 hearing, Judge Maas and the parties discussed a number of categories of relevant banking records and other documents plaintiffs sought, as detailed in plaintiffs' July 14, 2015 Motion to Compel.  *See* MOL at 1-3; Plt's Exs. D-F (ECF Nos. 3776-4 – 6).  Rather than adjudicate each individual potential inquiry implicated by plaintiffs' requests, Judge Maas used those various categories of relevant documents as a benchmark to construct a practical approach to resolving the dispute.  Under that approach, he simply set a numerical limit on the number of individuals and entities that plaintiffs would be permitted to submit.  Contrary to DIB's contention, however, Judge Maas did not limit the plaintiffs' right to choose which individuals, entities, or accounts were included on their search

term list.  Indeed, when Judge Maas issued his bench order instructing plaintiffs to provide DIB with their list of search terms "for those 500 accounts/names," Plt's Ex. G at 57 (ECF No. 3776-8), he conspicuously did not reference the four categories DIB relies upon, and his order was therefore subject to no such limitation.

DIB's assertion that plaintiffs and DIB had previously agreed to "[t]he 261 … search terms," is simply untrue.  As plaintiffs explained to the Court, the 261 search terms were generated solely by DIB based upon its independent review of the 9/11 Commission Final Report using a methodology that improperly excluded key members of al Qaeda not mentioned in the 9/11 Report, including for example, al Qaeda members involved in the 1998 U.S. Embassy bombings in Kenya and Tanzania.  *Id.* at 52-53 (ECF No. 3776-7).  DIB admitted to the Court that it only picked individuals from the 9/11 Report "who [are] connected in any way to 9/11," *id.* at 36,[1] one of several arbitrary limitations manufactured by DIB in attempting to unilaterally define the scope of discovery.  Plaintiffs specifically asserted that DIB's unilateral search terms and limitations were designed to prevent discovery of relevant information, and it simply is not at all accurate to suggest that plaintiffs agreed to allow DIB to define more than half the allocated search terms.  As plaintiffs argued in their MOL at 6-7, the entire point of Judge Maas's approach was to prevent DIB from micro-litigating plaintiffs' search term list and unilaterally deciding which individuals or entities are relevant to plaintiffs' discovery; the very thing that produced DIB's 261 search terms.  DIB's objections that plaintiffs' search term list fails to conform to the aforementioned categories is unfounded and should therefore be denied.

---

[1] DIB's improper tactic to unilaterally define relevance is further exemplified by DIB's resistance to searching for records relating to senior al Qaeda member Abu Ubaidah al Banshiri (a/k/a Ali Amin Al Rashidi).  *See infra* at 6-7.  The 9/11 Commission Final Report identifies Banshiri as the head of al Qaeda's military committee and a member of the terror organization's Shura Council, describing him as "one of the most capable and popular leaders of al Qaeda."  *See* 9/11 Report at 65.  Despite Banshiri's relevance to plaintiffs' claims, DIB excluded him from its 261 search terms and continues to object to his inclusion on plaintiffs' list, claiming that he is an "old" al Qaeda connection.  Opp. at 11-12.

Second, DIB contends plaintiffs' proposed search terms are beyond the numerical limit of 500 that Judge Maas ordered, arguing that the Court allowed plaintiffs to supplement the above four categories with alternative spellings, aliases, and other names that may fall in those categories, but were to total "no more than 500" search terms.  Opp. at 1, 5-6.  That argument is equally misleading and unsupported by the record.

In issuing his bench order, Judge Maas never used the phrasing "not more than 500 names," nor did he use those words during the March 22 conference.  Rather, that exact phrasing was used only by DIB's counsel during argument, Plt's Ex. G at 56, 58 (ECF No. 3776-8), but Judge Maas never adopted it as part of his ruling.  In fact, reading such a limitation into the Court's decision would be unreasonable, given the number of aliases commonly implicated when searching terrorist actors.  For example, the current United Nations Security Council 1267 Sanctions List includes 16 different aliases for current al Qaeda head Ayman al Zawahiri alone.[2]  Including every alias as an independent search term would dramatically and artificially reduce the number of "persons" to be searched well below the limit Judge Maas plainly intended.  It is thus not at all surprising that DIB cannot cite to any such limitation in the March 22 transcript.  To the contrary, the Court's March 22, 2016 Order allows plaintiffs to provide DIB with a listing of 500 individuals and/or entities of their choosing, including any and all aliases associated with each of those individuals and/or entities, and requires DIB to conduct comprehensive searches of its electronic legacy account database using each of those names and aliases in an effort to locate relevant banking records.[3]

---

[2] Available at https://scsanctions.un.org/fop/fop?xml=htdocs/resources/xml/en/consolidated.xml&xslt=htdocs/resources/xsl/en/al-qaida-r.xsl at 2.

[3] *See* Plt's Ex. G at 34 (ECF No. 3776-7).  DIB explained to the Court that it was able to find a DIB account for Ammar al Baluchi because plaintiffs provided DIB with his alias, Ali Abdul Aziz Ali.  Baluchi, an al Qaeda member and Khalid Sheikh Mohammed's nephew, was responsible for transferring significant sums of money to the 9/11 hijackers in the United States.

### B.  DIB Misrepresents Plaintiffs' Relevancy Allegations and Evidence

Although Judge Maas's approach was designed to avoid individualized inquiries about the specific relevance of each of the selections on plaintiffs' list, DIB plainly is wrong in arguing that the disputed entities and individuals are not "relevant" to the claims and defenses in this litigation, as reflected by the following summaries for each.

#### 1.  International Islamic Relief Organization ("IIRO")

DIB's implausible attempts to avoid discovery into accounts held for IIRO, itself a co-defendant engaged in discovery in this MDL, underscore the likelihood that DIB's objections are less about relevance and more about avoiding discovery its deems problematic.  Plaintiffs have submitted a wealth of evidence supporting their claims that IIRO provided pervasive funding to al Qaeda and collaborated intimately with that terrorist organization.  *See e.g.* ECF No. 2927-1 at ¶¶ 286-332, 371-438.  Indeed, former U.S. Deputy National Security Advisor Juan Zarate[4] has confirmed IIRO's important role in al Qaeda's global financial infrastructure:

> [T]he Saudis had built an extensive global network for spreading a certain brand of religious thought, but in so doing they had provided a platform for al Qaeda and its like-minded adherents, who benefited greatly from this network both financially and in terms of growth…  Many of the Wahhabi institutions funded out of Saudi Arabia serve as way stations for al Qaeda operatives and fundraising.  Distinguishing between some of the international Wahhabi organizations and terrorist support networks was nearly impossible, especially when support for al Qaeda and support for spreading Wahhabi beliefs seem to blend together so seamlessly.  This was true in the work of some of the branches of Saudi-based institutions, such as the International Islamic Relief Organization (IIRO).  For us, cutting off flows of funds to al Qaeda thus meant much more than just targeting a few select individuals or institutions.  It was ultimately about challenging a fundamental element of Saudi policy by constricting how the Saudis and their institutions funded activities abroad.

*See* Ex. 1 at ¶ 230 (ECF No. 3783-9).  In the face of this evidence, DIB's assertion that "discovery regarding IIRO is not even relevant to Plaintiffs' claims," Opp. at 12, is entirely

---

[4] Mr. Zarate has served as U.S. Deputy Assistant to the President, U.S. Deputy National Security Advisor for Combating Terrorism and U.S. Assistant Secretary of the Treasury for Terrorist Financing and Financial Crimes.

4

unsupportable. As this Court has previously stated: "This whole case is about money being diverted towards terrorist goals … the lion's share of the effort is to see where money went." *See* Ex. 2 at 15:7-9 (Magistrate Judge Maas ordering defendants MWL and IIRO to produce banking and financial records).

DIB's argument that plaintiffs' supplemental discovery requests for documents relating to IIRO's Account No. xxx0287 are untimely has no merit. The argument DIB makes now – that "Judge Maas ordered that Plaintiffs serve *all* document discovery requests on merits defendants by December 10, 2010," Opp. at 8 (emphasis added), and that any follow-up discovery must be based solely "upon facts Plaintiffs learned during the course of discovery in this matter," *id.*[5] – is the same one it advanced two years ago. The Court rejected it then, refusing to rule that plaintiffs' supplemental document requests were in any way untimely. Instead, Judge Maas directed plaintiffs on March 22, 2016 to provide a list of names and accounts for DIB to search, which is exactly what plaintiffs have done.

For the foregoing reasons, DIB should be ordered to immediately search for and produce all banking records for IIRO, including without limitation documents about IIRO Account No. xxx0287, and any DIB account associated with IIRO such as the Special Chechen Refugees Assistance Fund (DIB Account No. xxxxxxxxx6101). *See* MOL at 8; Plt's Ex. Q at 2, ¶ 2 (ECF No. 3776-20).

### 2. Hamas Entities

DIB's relevance objections to searching for and producing records of financial services DIB provided to known HAMAS fronts directly conflicts with DIB's defense that it could not have supported al Qaeda because support for terrorism is antithetical to DIB's principles as an Islamic bank. Discovery into the Bank's support for other known terrorist entities, like HAMAS,

---

[5] DIB advances the same argument as to Special Chechen Refugees Assistance Fund and Jamiat Dubai al Heiriyah. Opp. at 8-9. For the reasons set forth above as to the IIRO, DIB's objections should be denied.

5


is relevant because it wholly undermines DIB's claim that the Islamic principles on which the Bank is founded prevent it from supporting terrorist entities.

DIB has indicated that it plans to argue not only that it is comparable to Western financial institutions that abhor terrorism, but also that because of the Islamic principles on which the Bank was founded it could not provide support to a terrorist entity. In various remarks to the Court, DIB counsel has sought to paint DIB as a reputable entity that could not be involved with supporting terrorism.[6] The conflict between what DIB argues now and its defense is most apparent in the trial testimony that DIB has sought to preserve from its own trial witness. DIB recently preserved trial testimony of Dr. Hussein Hamid Hassan, Chair of the Bank's shariah board. Contrary to DIB's arguments here that its support for terrorism is beyond the realm of proper discovery, DIB elicited pages of trial testimony about Islam being a peaceful religion and that banking premised on Islamic principles is, therefore, at odds with terrorism.

Much of DIB's trial testimony was elicited presumably so that DIB may defend itself by arguing that DIB could not have supported terrorism because such support would be antithetical to its Islamic principles. For example, DIB elicited pages and pages of trial testimony about Dr. Hassan's opinions that the word "Islam" literally means "Peace" and that Islam is a peaceful religion opposed to violence.[7] *See* Ex. 8 at 161:3-16; 164:13 to 171:19. DIB also asked Dr. Hassan questions about his awareness of any intention on the part of DIB or its shariah board to

---

[6] On December 14, 2011, Mr. Cottreau stated, "Your Honor, let me say a few things. First of all, I don't represent a terrorist or a terrorist cohort. I represent a bank that has never been on a terrorist list ever produced by this government or any OFAC list, any sanctions list whatsoever." *See* Ex. 3 at 15:11-15. On March 23, 2017, Mr. Cottreau emphasized DIB's alleged upstanding nature, stating: "[M]y client is a publicly traded company in Dubai. It's not as it's been characterized, a terrorist hiding in any way. It is easy to be found." *See* Ex. 4 at 25:21-23.

[7] On cross-examination, Dr. Hassan agreed that another interpretation of the word Islam is "submission to Allah's will" and that is what he understands "peace" to mean. *See* Ex. 9, Transcript of Dr. Hassan (Cross-examination, Aug. 3, 2017) at 251:22 to 252:5. He also testified that, in contrast to his own views, some Islamic scholars believe that the nature of the relationship between the Muslim world and the non-Muslim world is a state of war. *Id*. at 255:4 to 258:14.

promote terrorism generally,[8] or if he was ever told that DIB knowingly held accounts for terrorists.[9] Based on DIB's counsel's characterizations and trial testimony elicited to date, DIB seems intent in defending itself by arguing that it adheres to the highest international financial standards, due to the Islamic principles on which it was founded, DIB could never support any terrorist organization. Evidence that DIB supported a range of known HAMAS fronts[10] is obviously relevant to a defense that DIB has itself introduced into the litigation.

### 3. Al Qaeda Leaders Abdullah Azzam & Abu Ubaidah Al Banshiri

DIB objects to searching for banking records and other documents relating to senior al Qaeda leaders Abdullah Azzam and Abu Ubaidah al Banshiri, arguing that Azzam's death in 1989 and Banshiri's presence at a 1988 al Qaeda meeting preclude plaintiffs from pursuing relevant discovery because those individuals pre-date the Court's discovery Order directing that "the appropriate temporal scope of discovery should reasonably begin in 1992" (ECF No. 2059). Opp. at 11-12. In doing so, however, DIB mischaracterizes the core of plaintiffs' allegations concerning these individuals.

First, although Azzam was assassinated in 1989, plaintiffs have specifically alleged that his book, "Ayyat al Rahman fee Jihad al-Afghan" ("God's Signs in the Afghan Jihad"), which encourages violent jihad against the enemies of Islam and directs Muslims to support jihad with monetary donations to DIB Account No. 1335, still features prominently on jihadist websites. *See* Plts' Ex. D at ECF No. 3776-4 at 2-3. Whether that DIB account continued to be active and

---

[8] *See* Ex. 8, Transcript of Dr. Hussein Hamid Hassan (Aug. 2, 2017) at 198:2-9 (Has anyone ever told you . . . that [DIB] wanted to promote terrorism?" "Has anyone ever told you . . . that [DIB] should help terrorists?"); 211:17-19 ("Did any of the Shariah Board fatwas at [DIB] seek to promote terrorism" ". . . seek to promote violence?").

[9] *Id*. at 237:10 to 238:5. Although on direct-examination by DIB's counsel, the witness generally denied knowledge of any relationship between DIB and anyone associated in any manner with terrorist ideology, on cross-examination he conceded that he was aware that two of the bank's shariah board members had issued proclamations encouraging suicide bombings and other support for terrorist organizations. *See* Ex. 9, Transcript of Dr. Hassan (Cross-examination, Aug. 3, 2017) at 282:12 to 285:11.

[10] Dr. Hassan readily admitted to being a terrorist organization. *See* Ex. 9, Transcript of Dr. Hassan (Cross-examination, Aug. 3, 2017) at 265:22-25.

7

accept donations in support of al Qaeda's activities in the years leading up to the September 11th attacks is undeniably relevant to plaintiffs' claims in this litigation.

Second, DIB would like this Court to believe that Banshiri was some inconsequential participant in a 1988 al Qaeda meeting, but DIB's own submission at ECF No. 3789-15 details Banshiri's role as the emir of al Qaeda's military committee during the 1990s and his close association with Osama bin Laden.[11] DIB's continuing objections as to Azzam and Banshiri are without merit and should be denied.

### 4. Al Qaeda Co-Conspirator Khalid Ali Walid

DIB objects to searching its database for Khalid Ali Walid, an accountant for al Qaeda, for the mere fact that "Walid was not a member of al Qaeda." Opp. at 14. As plaintiffs explained in their MOL at 6-7, unilateral determinations by DIB as to which individuals and entities on plaintiffs' list are insufficiently connected to al Qaeda are contrary to the intent of the Court's March 22, 2016 Order, and precisely the type of micro-litigating Judge Maas wished to avoid. Whether Walid swore bayat (loyalty oath) to Osama bin Laden and became an official member of al Qaeda is irrelevant to this inquiry. Instead, as DIB's submission at ECF No. 3789-15 makes clear: (1) Walid was employed by Osama bin Laden to oversee and manage the finances for al Qaeda front companies Taba Investments and Ladin International Company;[12] (2) Walid routinely paid monthly salaries to al Qaeda members; and (3) Walid provided al Qaeda members with travel expenses. *See* pp. 251-52, 254, 256, and 259.

---

[11] *See* pp. 207-08, 276, 322-24. *See also* April 26, 2005 FBI Memorandum at Ex. 5 at 60-61, ¶ 354 (identifying Banshiri as a member of al Qaeda's Financial Committee). In addition to Banshiri, other members of al Qaeda's Finance Committee included Osama bin Laden, Abu Fadl al Makki (a/k/a Saidi Madani al Tayyib), Abu Hajer al Iraqi (a/k/a Mamdouh Mahmud Salim), Abu Hafs al Masri (a/k/a Mohamed Atef), Wadih el Hage, and Abu Hammam al Saudi. *See id.* at 61. Notably, DIB has agreed to search its electronic database for accounts linked to these members of al Qaeda, but refuses to do so for Banshiri.

[12] *See also* Ex. 6, Indictment, *United States v. Usama Bin Laden, et al.*, Case No. S(2) 98 Cr. 1023 (LBS) at 7-8 (explaining that Osama bin Laden established a number of businesses in Sudan "to provide income to support al Qaeda to provide cover for the procurement of explosives, weapons and chemicals and for the travel of al Qaeda operatives," including Taba Investments, Ladin International Company, Wadi al Aqiq, Al Hijrah Construction, Al Themar Al Mubarka, and Qudarat Transport Company).

8

Moreover, Walid was one of several key individuals who managed the financial books for bin Laden, including Abu Fadl al Makki (a/k/a Saidi Madani al Tayyib), Abu Hajer al Iraqi (a/k/a Mamdouh Mahmud Salim), and Abu Hammam al Saudi. *See* Ex. 5 at 60, ¶ 353 ("The source advised that many individuals kept the books for al-Qaida including … Khalid Ali Walid."). Importantly, DIB has agreed to search its electronic database for these three individuals, but continues to object to plaintiffs' inclusion of Walid on their list of 500. DIB's objection is without merit and the Court should compel DIB to search its electronic database for Walid.

### 5. **Abdelsamad Mohamed**

DIB argues the "only justification" offered for Abdelsamad Mohamed's inclusion on plaintiffs' list "is that his brother-in-law was [] al Qaeda member Khalid Sheikh Mohamed," the mastermind of the September 11th attacks. Opp. at 14. However, DIB fails to advise the Court that plaintiffs' evidence shows that: (1) Mohamed was an employee of Union Beverage Company, a UAE company identified by the U.S. government as having provided significant financial support to the al Qaeda network; and (2) Mohamed was closely associated with Ali Abdul Aziz Ali, an al Qaeda member who had an account at DIB and was responsible for transferring significant sums of money to the 9/11 hijackers in the United States. *See* Plt's Ex. Q at 7, ¶ 28 (ECF No. 3776-20). Mohamed's association with two members of al Qaeda critically important to the 9/11 plot, and his employment with an al Qaeda support entity, provide more than enough justification for his incorporation into plaintiffs' list.

### 6. **Saleh Salim Al Shamsi**

DIB further objects to searching for Saleh Salim al Shamsi, citing plaintiffs' assertion "that the USG and the UAEG consider[ed] jointly submitting his name to the UN." Opp. at 14. Once again, DIB omits important evidence supporting plaintiffs' selection of al Shamsi. As

9

indicated in the September 20, 2004 U.S. State Department diplomatic cable at Ex. 7, the U.S. government identified al Shamsi as an "Al-Qaida financier" and explained to UAE government officials that there were "very specific concerns about this individual's activities in regards to transferring funds to Al-Qaida and Iraqi Jihadists, and that we are concerned about Al-Shamsi's network within the UAE." Whether al Shamsi had a bank account at DIB which he used to launder and transfer money to members of al Qaeda is highly relevant to plaintiffs' claims.

### 7. Mohamed Ahmed Obaid Bin Mahfouz & Yasin Ahmed Mohamed Ali

As described in Plt's Ex. Q at 7-8, ¶¶ 30 and 34 (ECF No. 3776-20), Mohamed Ahmed Obaid bin Mahfouz and Yasin Ahmed Mohamed Ali were closely associated with the Muwafaq Foundation, a terrorist support entity. DIB argues that plaintiffs have failed to allege these individuals assisted al Qaeda, Opp. at 17, but clearly ignores plaintiffs' evidence establishing that Muwafaq was in fact al Qaeda. *See* Plt's Ex. Q at ¶ 30.[13]

## II. CONCLUSION

For the foregoing reasons, plaintiffs again respectfully request that the Court enter an order directing defendant Dubai Islamic Bank to immediately: (1) search its electronic legacy account database for relevant banking and financial records for the 31 individuals and entities at issue; (2) search its electronic legacy account database for relevant banking and financial records for the individuals, entities, and accounts previously agreed to by the parties; and (3) search for and produce relevant documentation relating to the 1998 U.S. Embassy bombings in Dar es Salaam, Tanzania, and Nairobi, Kenya, as previously directed by this Court.

---

[13] *See also Yassin Abdullah Kadi v. Timothy Geithner, et al.*, Civil Action No. 09-0108 (JDB) (May 22, 2009) (The United States explained that under defendant Yassin al Kadi's leadership, Muwafaq served as "an al Qaeda front that receives funding from wealthy Saudi businessmen" and that there exists "substantial and credible evidence that both Muwafaq as an entity, and many of the individual charged with operating it and distributing its funds, were engaged in a long-standing pattern of supporting terrorist and extremist causes.").

10

Dated:  November 20, 2017

Respectfully Submitted,

/s/ Sean P. Carter
Sean P. Carter, Esq.
J. Scott Tarbutton, Esq.
COZEN O'CONNOR
1650 Market Street, Suite 2800
Philadelphia, PA 19103
Tel:  (215) 665-2000

Jodi Westbrook Flowers, Esq.
Robert T. Haefele, Esq.
MOTLEY RICE, LLC
28 Bridgeside Boulevard
P.O. Box 1792
Mount Pleasant, SC 29465
Tel:  (843) 216-9000

Jerry S. Goldman, Esq.
ANDERSON KILL P.C.
1251 Avenue of the Americas
New York, NY 10020
Tel:  (212) 278-1000

Robert M. Kaplan, Esq.
FERBER CHAN ESSNER & COLLER, LLP
60 East 42nd Street, Suite 2050
New York, New York 10165
Tel:  (212) 944-2200

Christopher T. Leonardo, Esq.
ADAMS HOLCOMB LLP
1001 Pennsylvania Ave., N.W.
Suite 740-South
Washington, D.C. 20004
Tel: (202) 580-8820

*Attorneys for Plaintiffs*

**CONSOLIDATED CERTIFICATE OF SERVICE**

I hereby certify that a true copy of Plaintiffs' Reply Memorandum of Law in Support of Plaintiffs' Motion to Compel Defendant Dubai Islamic Bank to Comply with the Court's March 22, 2016 Order, was filed electronically this 20th day of November 2017. Notice of this filing will be served upon all parties in 03 MDL 1570 by operation of the Southern District of New York's Electronic Case Filing ("ECF") system, which all parties may access.

          /s/
      J. Scott Tarbutton, Esq.

LEGAL\33399020\1 00000.0000.000/117430.000