# EXHIBIT 2

1

```
1bgr911c
```

1  UNITED STATES DISTRICT COURT
1  SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x
2
3  In Re:  TERRORIST ATTACKS ON
3          SEPTEMBER 11, 2001          03 MDL 1570 (GBD)
4
4  ------------------------------x
5                                      New York, N.Y.
5                                      November 16, 2011
6                                      2:30 p.m.
6
7  Before:
7
8          HON. FRANK MAAS
8
9                                      Magistrate Judge
9
10
10
11          APPEARANCES
11
12
12  KREINDLER & KREINDLER LLP
13          Attorneys for Ashton Plaintiffs
13  BY:  JAMES KREINDLER
14          ANDREW J. MALONEY, III
14
15
15  COZEN O'CONNOR
16          Attorneys for Plaintiff Federal Insurance
16  BY:  SEAN CARTER
17          J. SCOTT TARBUTTON
17
18
18  MOTLEY RICE LLC
19          Attorneys for Burnett Plaintiffs
19  BY:  ROBERT T. HAEFELE
20
20
21  ANDERSON KILL & OLICK, P.C.
21          Attorneys for O'Neill Plaintiffs
22  BY:  JERRY S. GOLDMAN
22
23
23  BERNABEI & WACHTEL PLLC
24          Attorneys for Defendants Al Haramain Islamic Foundation
24          and Perouz Seda Ghaty
25  BY:  ALAN R. KABAT
```

```
                                                        2
     1bgr911c
1              APPEARANCES
2
2    CLIFFORD CHANCE US LLP
3         Attorneys for Defendant Dubai Islamic Bank
3    BY:  RONI E. BERGOFFEN
4
4
5    STEVEN K. BARENTZEN
5         Attorney for Dr. Jamal Barzinji
6
6
7    OMAR T. MOHAMMEDI
7         Attorney for defendants WAMY International, Inc.
8
8
9    MARTIN MCMAHON (telephone)
9         Attorney for Defendant Muslim World League
10
10
11   LUQUE GERAGOS MARINO LLP
11        Attorneys for Defendant African Muslim Agency
12   BY:  NANCY LUQUE (telephone)
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300
```

3

1bgr911c

```
 1                (Case called)
 2                THE COURT:  Good afternoon everyone.  Sorry we are
 3      starting late.  I guess we had some phone issues.
 4                One of the motions that is pending before me relates
 5      to Pete Seda.  I plan to resolve that motion shortly, but I had
 6      some factual questions that I want to make sure I'm accurate in
 7      my understanding in what I recite.
 8                As to the documents that were seized pursuant to a
 9      search warrant, it's not clear to me whether those were seized
10      from Mr. Seda's residence, from AHIF USA, or both.
11                MR. KABAT:  You mean the documents that came from Al
12      Haramain's law firm?
13                THE COURT:  They were documents you say you can't turn
14      over because they were returned to Mr. Seda by the government,
15      and under the Federal Defenders' understanding of the
16      magistrate judge's order in Oregon, those documents can't be
17      produced.  Those documents, as I understand it, were seized
18      pursuant to a search warrant from somewhere.  I just don't know
19      where somewhere is.
20                MR. KABAT:  From where Al Haramain is headquartered,
21      which is also where Mr. Seda lives.
22                THE COURT:  So the office was his house?
23                MR. KABAT:  He lived in the office.  Al Haramain owned
24      the building where he lived.
25                THE COURT:  Fair enough.  That answers one of my
```

4

1bgr911c

```
 1  questions.  Then were the documents returned to him before
 2  trial, do you know?
 3          MR. KABAT:  Yes.  They were turned over according to
 4  the Rule 16 protective order, that is, after Mr. Seda returned
 5  to this country and before the trial.
 6          THE COURT:  So once the magistrate judge signed the
 7  protective order, then the documents were returned?
 8          MR. KABAT:  I believe that's the correct timing.
 9          THE COURT:  I should be able to determine this from
10  the docket sheet.  I assume that the charges against AHIF USA
11  were dismissed prior to trial, correct?
12          MR. KABAT:  Correct.
13          THE COURT:  I think that's all I wanted to clear up
14  with regard to Mr. Seda.
15          I have the letters that have been submitted with
16  regard to various sanctions applications.  I also have the
17  binder that the plaintiff sent me relating to their October
18  17th motion regarding Wa'el Jalaidan.  There are a number of
19  other groups of exhibits that relate to the MWL/IIRO and Wa'el
20  Jalaidan motions that have been submitted that I don't have.
21  I'm not quite sure what the explanation for that is.
22          In some instances I think I have a reasonable
23  understanding of what the information is.  For example, in the
24  affidavits of Mr. al-Radhi and Mr. al-Mujeel and others that
25  Mr. McMahon submitted, I don't have the affidavits themselves.
```

5

1bgr911c

```
 1   I'm not sure what the explanation is, whether it never got sent
 2   to me, whether it ended up in Judge Daniels' chambers.  They
 3   recarpeted my chambers and moved me in and out, so I may be to
 4   blame.  But I will need copies of the binders other than the
 5   October 17th motion binder of exhibits sent to me in relation
 6   to these motions.
 7           That raises in my mind the related question of
 8   whether, going forward, to the extent that there were motions
 9   similar to these, they should be done on formal motion papers
10   rather than letter motions.
11           MR. CARTER:  Your Honor, we had raised at various
12   times the notion that certain of these motions should probably
13   be docketed just to preserve the record.
14           THE COURT:  Sure, the letters certainly would be
15   docketed or should be docketed.  You're basically saying toss
16   the answer, for example, of MWL/IIRO and put them in a
17   circumstance where a default judgment would be entered
18   eventually.  That's fairly significant relief.  It seems odd to
19   be doing it on a letter application, although the letter
20   application is single space is probably longer than a
21   double-spaced set of motion papers would be.
22           I'm trying to think through, since conceivably there
23   will be a lot more motion practice as we go forward, whether
24   for motions like this it makes sense to proceed by letter or
25   formal motion papers or you don't care.
```

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

6

1bgr911c

```
 1              MR. CARTER:  Your Honor, I don't think that we care.
 2     It harkens back to one of the original case orders that
 3     requires that all original discovery motions be done by letter,
 4     if my recollection is correct.  We have just adhered to that
 5     practice.
 6              THE COURT:  Unless somebody on the defense side has a
 7     different view, I'm content to go forward that way.  It just
 8     occurred to me that might account for some of the problem I had
 9     in terms of some of the exhibits, although I hadn't had that
10     problem in the past.
11              MR. McMAHON:  Your Honor, this is Mr. McMahon.  I
12     would prefer for you to decide.  I want to get clarified in my
13     mind, we owe you copies of all affidavits that we served with
14     our opposition letter for the motion for sanctions, is that it?
15              THE COURT:  Yes, exactly.
16              MR. McMAHON:  On Wa'el Jalaidan we filed a memorandum
17     letter opposition as well as an affidavit.  Do you have that?
18              THE COURT:  Let me tell you what I have.  I have your
19     September 26th letter relating to MWL and IIRO, and it says,
20     "In addition to the exhibits referenced herein, attached are."
21     The "attached are" part I'm missing.
22              On the plaintiffs' side I have the affirmation of
23     Scott Tarbutton dated October 14, 2011, annexing three
24     exhibits.  In relation to your letter about Wa'el Jalaidan, if
25     the only attachment is his affidavit, I have that.  Is it
```

7

1bgr911c

```
 1   correct, Mr. McMahon, that that is the only affidavit?
 2           MR. McMAHON:  I believe that's the case, your Honor.
 3           THE COURT:  I missed that.  I guess all I'm missing is
 4   the affidavits that relate to your opposition relating to MWL
 5   and IIRO.
 6           MR. McMAHON:  The 9/26 letter exhibits, yes.
 7           THE COURT:  Yes.
 8           MR. McMAHON:  What is the best way, your Honor, to get
 9   you physical possession of those?  FedEx them to your chambers?
10           THE COURT:  Exactly.
11           MR. CARTER:  Your Honor, for clarification on our end,
12   these are the exhibits that were submitted in support of the
13   motion for sanctions as to the Muslim World and IIRO.  Does the
14   Court have something approximating this?
15           THE COURT:  Yes.  Because of its impressive girth, I
16   didn't bring it upstairs today.
17           MR. CARTER:  That's why I made Mr. Tarbutton carry it.
18           THE COURT:  Turning to MWL and IIRO, one of the things
19   Mr. McMahon says in his papers is that he has 12,000 pages of
20   exhibits, possibly more, kicking around his office that you and
21   your colleagues have declined to come look at.
22           MR. CARTER:  Your Honor, we received notification of
23   the existence of those documents on the very day we were filing
24   the motion for sanctions.  We were very reluctant to continue
25   to embrace a moving target relative to what had been produced
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

8

1bgr911c

1  and what had not been produced.
2          We simply asked Mr. McMahon to brief the dispute on
3  the record that existed as of the deadline that the Court had
4  set and hold those documents to the extent the Court declined
5  to place his clients in default.  Obviously, our papers take
6  the position that that universe of documents still doesn't
7  represent anything nearly close to compliance with the Court's
8  orders.
9          THE COURT:  Just so I'm clear, and I know I've asked
10 this question before, from the plaintiffs' perspective what is
11 the relationship between MWL and IIRO?
12         MR. CARTER:  The Muslim World League is, for lack of a
13 better term, the parent of the IIRO.  The Muslim World League
14 established the IIRO in, if I remember correctly, 1978
15 primarily to serve as an operational arm so that the Muslim
16 World would set broad policies and the IIRO would carry out
17 operational activities that served those general policy
18 interests.  Although, we have seen in many instances that the
19 Muslim World League also maintains operational presences and
20 carries out operations on its own.
21         THE COURT:  Mr. McMahon, I'm not wholly clear on what
22 your present position is as to the extent to which the parent
23 organization or organizations, in the plural, control the
24 branches.  I saw some reference to certain branches being
25 within the control of the central agency, but I thought I saw

9

1bgr911c

1   another one that essentially conceded that all of the branches
2   are under the control of the parent organizations.  Let me get
3   from you what your position is to that.
4           MR. McMAHON:  Yes, your Honor.  I want to get back to
5   the 12,000 pages.  For your information, your Honor, we took
6   the time to put those on CD's, and they are ready to go if Mr.
7   Carter wants those.
8           With respect to your pertinent question here, they are
9   separate entities.  There may be certain parts of the globe
10  where there is an MWL office and an IIRO office, but they are
11  separate entities, have separate charters.  We don't deem IIRO
12  to be a subsidiary of the MWL.
13          THE COURT:  I'm asking a slightly different question.
14  For IIRO, for example, to the extent that the plaintiffs are
15  seeking documents from branch offices, what is your position as
16  to the IIRO's ability to secure documents from the Indonesian
17  branch, the London branch, etc.?  Is it branch-specific or do
18  you concede that all of the branches, in terms of document
19  flow, are within the control of the parent?
20          MR. McMAHON:  No, your Honor, we don't concede that.
21  We would look to IIRO for the different office records in terms
22  of a particular branch, like the Philippines, which the
23  plaintiffs are very interested in.  At one point I think the
24  MWL had presence there, but IIRO has whatever records IIRO it
25  has.

10

1bgr911c

```
 1              If the Court orders, I don't know what MWL records
 2    exist for the Philippines, because if there was an operational
 3    arm there at some juncture, I thought it was IIRO.  I would
 4    think, your Honor, that you look to the IIRO branch.  Your
 5    Honor, I only did due diligence in the sense that I did it at
 6    six or seven of the offices.  I don't want you to think that I
 7    traveled the globe and visited every one of those offices.  I
 8    haven't.
 9              MR. CARTER:  Your Honor, I think there is a fair
10    degree of specificity within the actual filings concerning the
11    relationship between the headquarters of the IIRO and various
12    branch offices.
13              THE COURT:  When you say the filings, do you mean the
14    letter briefing that I have?
15              MR. CARTER:  Yes, for the sanctions.  They make clear
16    that it is a highly centralized organization, that none of the
17    branch offices engage in any activity from the hiring of an
18    employee, to the opening of a bank account, to the issuance of
19    a check to a potential payee without authorization of the
20    headquarters.  There are controls in place requiring those
21    branch offices to turn documents back to the headquarters on a
22    routine basis.
23              We even see as a practical matter in the course of
24    this litigation Mr. al-Radhi mentions that, among other things,
25    he went to Indonesia at one point and the Indonesian office was
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

11

1bgr911c

 1   directed to give him anything he wanted.  The same is true for
 2   the Muslim World League, and we think that the papers lay that
 3   out.  It's their own documents.
 4            THE COURT:  I understand your position.  I just wanted
 5   to understand Mr. McMahon's.  I'm not sure I fully understand
 6   it now.  I think perhaps the better way to approach this is to
 7   look at some specific requests.
 8            The April 12th order, for the moment focusing on the
 9   first request, asked for annual, semiannual, and other periodic
10   financial reports of the two organizations, including branch
11   offices, including a number of specified documents.  Let's
12   focus on financial reports.
13            I understand that your position, Mr. McMahon, is
14   periodic reports would be submitted, they'd be consolidated
15   into an annual report, and then the periodic reports would not
16   be retained.  Do I have that right?
17            MR. McMAHON:  Yes, your Honor.
18            THE COURT:  I assume what you are telling me when you
19   say that is that IIRO central, for example, in Saudi Arabia,
20   would not keep the periodic reports once it had an annual
21   report.
22            MR. McMAHON:  Right, your Honor.  I think I addressed
23   that on page 13 of our letter opposition response, branch
24   office reporting, number 5.
25            THE COURT:  It's a little hard to understand, if some

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

12

1bgr911c

1  of these organizations have a thousand or thousands of
2  employees, how 12,000 pages, even if it's all financial
3  records, would be all the financial records, quarterly, etc.,
4  that relate to all of these branches for a multiyear period.
5  Are you representing that in response to this first category
6  somebody, Mr. al-Radhi or somebody else, on behalf of IIRO
7  queried every branch office to secure the documents that
8  plaintiffs have requested?
9              MR. McMAHON:  Your Honor, I believe that's the case.
10 I will have to go back and check his affidavit.  As I said at
11 page 13 paragraph 5, these documents were apparently sent to
12 counsel's office.
13             THE COURT:  Just to avoid the game of chicken, I'm
14 going to direct that you provide that CD to plaintiffs' counsel
15 and also that plaintiffs' counsel review it.
16             MR. McMAHON:  There are 12 CD's.
17             THE COURT:  Like I said, the 12 CD's.  I don't want to
18 leave anybody in suspense.  It's not my intent at the end of
19 today to grant or recommend -- I think it would be a grant,
20 since this is a discovery issue -- dispositive relief in terms
21 of something like striking the answer of any of these
22 defendants.  But I do think, unless I'm convinced otherwise, we
23 may be heading in that direction.
24             MR. McMAHON:  Does your Honor have a viewpoint on the
25 bank documents we have, which are difficult to read?  I asked

13

1bgr911c

```
 1   Mr. Cater to send somebody down here to look at these.  We
 2   inquired of the bank about a digital format, but that may be
 3   months away.  I simply suggest to send somebody down to look at
 4   the bank records.
 5            THE COURT:  I didn't go back through prior
 6   transcripts, but I thought that there was a representation at
 7   some prior session that there was no digital version of this.
 8   Maybe the representation was just that there was no digital
 9   file at these defendants' offices.
10            MR. McMAHON:  I think at that time, your Honor, we
11   didn't have total definition on this issue.  But subsequently,
12   in conference with the bank of Mr. al-Radhi, we discovered that
13   there is a hardcopy, and if they are to have access to the
14   digital records, that would take an enormous amount of time.  I
15   know I referenced that somewhere that that is something that is
16   still --
17            THE COURT:  You say it would take I guess it was at
18   least six months.  One of the things that plaintiffs pointed
19   out was the letter request seeking these documents, I guess
20   from just one bank, was dated August 15th, which hardly
21   suggests that the defendants are proceeding with dispatch.
22            MR. McMAHON:  Your Honor, I addressed this in point 4
23   on page 13, right before 5.  I just want to know what to do
24   with these records, because we do have them.  I want you to
25   know that I made the offer to come and visit and see if they
```

14

1bgr911c

1   can read these banking records if they so terribly want them.
2   I can't be more definite on what is in here regarding any
3   digital version.
4           MR. CARTER:  Your Honor, my recollection of this is
5   that we were initially told that this was an old dot matrix
6   printout of some banking records and that there were no digital
7   files that could ever be identified.  When we interviewed Mr.
8   al-Radhi at Mr. McMahon's request, what he told us is that
9   these were banking records that were printed out by their banks
10  during the course of this litigation.  That prompted an inquiry
11  from us.
12          If that is the case, then digital files have existed
13  during the course of this litigation.  Has anyone gone and
14  asked them to print it again so that we can have a legible copy
15  or to give us the digital files?  Mr. al-Radhi said we've never
16  asked them.
17          So, the first representation was that we've had
18  checked, it doesn't exist.  The second representation is no one
19  ever asked.  It's just difficult for us to figure out what the
20  actual playing field is.
21          THE COURT:  It seems to me that there is an obligation
22  to produce records not just in the possession of a party but
23  those that are in their custody or control.  To the extent that
24  there are electronic records or files that are available from
25  the banks, those have to be requested in a timely fashion and

15

1bgr911c

1    produced.
2              It also seems to me that the request, unless Mr.
3    Carter tells me otherwise, extends to each branch of the
4    organization.  And to the extent that there are nonduplicative
5    files in the branches, those have to be produced, whether it's
6    burdensome or not.
7              This whole case is about money being diverted toward
8    terrorist goals.  As I understand it, the lion's share of the
9    effort is to see where money went.  So the notion that this is
10   a lot of paper or bytes of information and therefore
11   burdensome, Mr. McMahon, doesn't really resonate to be me.
12             MR. McMAHON:  OK, your Honor.  I went back and tried
13   to find the reference to the banking records.  That's in
14   paragraph 22, I guess, of Mr. al-Radhi's affidavit.  My team
15   has also inquired of the al-Radhi bank if they have a digital
16   record of financial banking transactions, and they have stated
17   such inquiries should be requested to the head office and it
18   might take six months, and we are in the process of doing that
19   accordingly.
20             THE COURT:  I assume if you had a large number of
21   branches, there is also a fairly large number of banks.  What
22   is required here is not one request to one bank but, to the
23   extent that records don't exist in the branches themselves,
24   many requests to many banks.
25             While I said that I'm certainly at this stage not
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

16

1bgr911c

1     going to grant dispositive sanctions, at some point Mr.
2     al-Radhi or somebody else, as a 30(b)(6) witness, is going to
3     testify as to the efforts that these defendants made in
4     response to these requests.
5             Except to the extent that the two sides can agree that
6     some branch office is not relevant, if each branch office is
7     not queried and the documents from that branch produced, as far
8     as I'm concerned that will have been an inadequate search and
9     may lead to dispositive sanctions.
10            MR. McMAHON:  I hear and appreciate that, your Honor.
11            MR. CARTER:  Your Honor, we focused a lot during the
12    discussion today on the financial records and bank statements,
13    but there were a number of other categories.
14            THE COURT:  I had written down, just on the April 12th
15    order, I was going to focus on 1, 3, 4, 6, and 8.  We don't
16    have time to go through each one.  I know 2 is important to
17    you, but you seemed to get a list of orphans, so I skipped that
18    one.
19            3 relates to the annual constituent council meetings
20    where it would appear that there should be centrally located
21    files.  To the extent that there is something from the
22    Philippines' office, as an example, that the main office
23    doesn't have, if the Philippines office has it, it needs to be
24    produced from that office.
25            I guess 4 is similar, although I would imagine Mr.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

                                                                    17
          1bgr911c
 1    McMahon is going to tell me that some of this is among the
 2    12,000 documents that he has for your review.
 3              MR. McMAHON:  Yes, your Honor.
 4              MR. CARTER:  Your Honor, with regard to category 2,
 5    for instance, I know that it's been the defendants' response to
 6    that to produce orphan records.
 7              THE COURT:  I thought we had agreed that it's
 8    everything but orphans.
 9              MR. KREINDLER:  It is everything but orphans.  One of
10    the reasons that we want clarification on this issue is because
11    it is about the identity of the parties to whom they
12    transferred money.  The orphans aren't of interest, but some of
13    the organizations that received money are.
14              MR. McMAHON:  As I'm sure you read, your Honor, 50
15    percent of IIRO's annual expenses go to these orphans.
16              THE COURT:  You don't have to segregate out orphans.
17    That's the plaintiffs' problem.  But telling me about widows
18    and orphans doesn't really resolve the problem of producing
19    complete records that relate to who received aid during the
20    years we're talking about from either of the two defendants.
21              MR. McMAHON:  Every entity that receives any kind of
22    aid has to be identified?
23              THE COURT:  Correct.
24              Talk for a moment about audits.  It seems to me the
25    defendants will not have done their job as to audits unless
                      SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

18

1bgr911c

 1   they have searched their own records to make sure that if they
 2   have retained copies of audit reports and the documents that
 3   underlie the audit reports -- I guess the first of those is
 4   more likely than the second -- that that be produced.  Saying,
 5   well, we'll contact the auditor and see whether they will give
 6   it to us if a copy of the audit report is sitting in IIRO's
 7   office doesn't cut it, as far as I'm concerned.
 8           MR. McMAHON:  I hear your Honor.  You want any and all
 9   records produced that are still in the possession or control of
10   the charities that in any way supported the audit.
11           THE COURT:  Or that are the audit, yes.
12           MR. McMAHON:  OK.
13           THE COURT:  Whether that is found in Saudi Arabia or
14   in the Philippines office doesn't much matter.  Somebody, Mr.
15   al-Radhi or somebody else, in an organized way has to query all
16   of these offices and be in a position to say what was done to
17   follow up, and you really need to document the process.
18           As an example, in the April 26th order there was a
19   requirement that records that relate to Mr. al-Mujeel be
20   produced.  There is a representation that the Indonesian office
21   was checked, but I gather he worked in the eastern province
22   office.  It would be a little like reviewing the files of the
23   Southern District for an Eastern District of New York case.
24   That doesn't seem to be terribly helpful or likely to adduce
25   responsive documents.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

19

1bgr911c

```
 1              MR. McMAHON:  I understand, your Honor.  Thank you.
 2              THE COURT:  I know you understand.  I thought I was
 3    reasonably clear about this in our prior conferences.  We don't
 4    seem to be moving forward.  Perhaps it is that we never will
 5    and that the plaintiffs' motion ultimately will be granted.
 6    Even though you have been to Saudi Arabia, it sounds like folks
 7    don't understand what their duties are.
 8              For example, saying that somebody has contracted to
 9    have a further audit of records to my mind is somewhat
10    inexplicable in that the plaintiffs don't want audit documents
11    created now, they want preexisting financial records and
12    audits.  It's interesting, I suppose, that perhaps as part of
13    your defense somebody is doing an audit, but it really doesn't
14    relate at all, as far as I'm concerned, to document discovery
15    in this case.
16              Let me jump ahead a little.  At some point Mr. McMahon
17    will tell me that these organizations have produced all of the
18    records they have and I have indicated that I think it is going
19    to be appropriate to test that through a deposition of one or
20    more 30(b)(6) witnesses.  Where will a deposition like that
21    take place?
22              MR. McMAHON:  Your Honor, perhaps we can answer that.
23    We can very easily arrange to have that done in London.
24              THE COURT:  That may be the answer.
25              MR. McMAHON:  I think they even have a London office,
```
                        SOUTHERN DISTRICT REPORTERS, P.C.
                                (212) 805-0300

                                                                    20
        1bgr911c
 1   one of these law firms.
 2              THE COURT:  Looking at the number of people in the
 3   courtroom, I'm sure one of these law firms has a London office
 4   or can find a room at Heathrow.
 5              In terms of the indices, I agree that the
 6   responsibility of producing documents can't be shifted from the
 7   defendants to the plaintiffs, but I'm not sure that the
 8   plaintiffs have really looked through the indices to see
 9   whether there are categories of documents that can be excluded
10   or focused on or prioritized or whatever.
11              MR. CARTER:  Your Honor, as I've said, we have had
12   people go through the hundred or so thousand cells within the
13   spreadsheet.  There really is not enough in a descriptive sense
14   to allow us to use them.  So, they have limited value.
15              MR. McMAHON:  Maybe Mr. Carter can send me a brief
16   email on one of those categories, your Honor, to point out why
17   that particular characterization is too limited to afford the
18   9/11 lawyers to say that's the document I want.
19              THE COURT:  I'll go further than that.  You said that
20   there was an attempted meet-and-confer but that plaintiffs'
21   counsel, it appeared to you, didn't have the indices with them.
22              MR. McMAHON:  Right.
23              THE COURT:  I'm going to direct that there be a
24   meet-and-confer where both sides have the indices and you can
25   have a discussion about what they do or don't shed light on.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

21

1bgr911c

1         MR. McMAHON:  OK.  That would be before our 30(b)(6)?

2         THE COURT:  Presumably.

3         MR. McMAHON:  Yes.

4         THE COURT:  I view the 30(b)(6) as at a very late

5  stage of this process.  Conceivably, if the defendants produced

6  all the documents they had and convinced the plaintiffs that

7  that were so, there would be no need for a 30(b)(6) witness as

8  to the document search.  But if we are headed in the direction

9  of dispositive sanctions, I want there to be a clear record.

10        MR. McMAHON:  I understand, your Honor.

11        THE COURT:  I'm picking at random parts of the papers.

12  There is a request for records that relate to the expulsion of

13  some folks from which office?

14        MR. McMAHON:  The expulsion of offices allegedly from

15  Pakistan.  It's based on a newspaper clipping, your Honor.  It

16  refers to Arab charities.

17        THE COURT:  But the response is (a) nobody has been

18  arrested and (b) the conviction was thrown out.  There is a lot

19  of argument on both sides about the merits of this case, which

20  in terms of discovery is largely irrelevant.

21        MR. McMAHON:  There was no conviction, your Honor.

22        THE COURT:  That's fine.  But the request is not for

23  records related to the conviction or the arrest of folks in

24  Pakistan.  It's as to the expulsion of one or more people from

25  Pakistan.  It may be that nobody was expelled, but the response

22

1bgr911c

1  doesn't say that.  It talks about the convictions were thrown
2  out.  It talks about nobody was arrested.  The response, it
3  seems to me, is not responsive.  There either are or are not
4  records that relate to the expulsion of officers or employees
5  from Pakistan.
6           MR. McMAHON:  The reference to Arab charities, your
7  Honor, that's kind of broad.  That's what it says.  That's the
8  problem.  There could be a ton of Arab charities involved, and
9  maybe some of them were expelled for whatever reason.
10           THE COURT:  Let me get back to that portion of the
11  letter of plaintiffs.  It's page 15 of plaintiffs' letter.
12           MR. McMAHON:  It's actually page 9, your Honor.
13           THE COURT:  Page 15 of, I'm sorry, your letter says,
14  and you're quoting from the request, that you haven't produced
15  any documents related to the expulsion of IIRO personnel from
16  the Islamic Republic of Pakistan.  I suffer because I haven't
17  read that al-Radhi affirmation, but you're saying that the fact
18  that that didn't occur is confirmed by the director general's
19  office stating in a letter that "no employee has so far been
20  arrested having a link with al~Qaeda, the government of
21  Pakistan, or any other investigating agency.  The office is
22  running smoothly," etc.
23           The office could be running smoothly, nobody could
24  have been arrested or had a conviction that was affirmed, and
25  yet a dozen people could have been expelled.  If there were no

23

1bgr911c

1   documents that relate to expulsion because nobody was expelled,
2   that's one thing, but there needs to be a clear response to the
3   request.
4           MR. McMAHON:  That was my understanding, your Honor.
5   I went over that with Mr. al-Radhi.  It was basically the
6   newspaper clipping, to the extent he had any records pertaining
7   to that, they should be produced.  We didn't find any records
8   for that.  We'll verify that or re-verify.
9           MR. CARTER:  Your Honor, a few points.  We have
10  invested tremendous time and resources over a period of many
11  months to get to the point where the Court is again directing
12  these defendants to do what it told them to do back in April.
13  The only basis we had to try and maintain integrity in the
14  process was the fact that we did have some independent
15  information verifying that they weren't complying with their
16  discovery obligations.
17          It is only now that we have presented it to them that
18  they are acknowledging some of these gaps.  And now that we
19  have made the case, they are going to start to begin this
20  process of producing the documents.  We have lost time,
21  resources that could have been invested in other aspects of the
22  case.
23          This kind of process of discovery only plays into a
24  broader effort to outlast the plaintiffs by using up all of
25  their resources before they can get to a point of having an

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

24

1bgr911c

 1    opportunity to litigate this case on the merits.
 2             Where we are now is that we are going to have another
 3    meet-and-confer, Mr. McMahon and his clients are going to
 4    peruse droves of additional documents, and we are going to go
 5    back to the beginning with Arabic translators and consultants
 6    and everyone else combing through them in considerable detail
 7    to try and demonstrate that stuff has been withheld again.
 8             I just don't know, given where we have come thus far,
 9    that there is much basis to think that there is going to be
10    true compliance going forward or that there will be a
11    reasonably obtainable methodology for demonstrating
12    noncompliance once we have already sort of showed our hand.
13             MR. McMAHON:  Your Honor my short response to that is
14    Mr. Carter should take a look at the 12 disks, the CD's, the
15    12,000 pages, and maybe comment on that.
16             THE COURT:  I have already directed that he do that.
17    I recognize that the defendants, and perhaps not just these
18    defendants, are a bit of a moving target, but I don't think it
19    is appropriate to say, well, if they didn't give it to us by
20    the date we filed our motion, we're not going to look at it.
21             Part of what I need to consider is prejudice, and it's
22    hard to demonstrate prejudice if Mr. McMahon can say, well, if
23    they'd opened the file or come to my office, all of the records
24    they want are there, admittedly late, but they are there.  I
25    suspect if it's 12,000 documents, it may make a dent in what

1bgr911c
```
 1   you are seeking, but it probably makes a fairly small dent.
 2              MR. CARTER:  Your Honor, part of the prejudice I think
 3   we would identify is that, for instance, the 12,000 documents
 4   can include branch office reporting that in one of the early
 5   filings we were told didn't exist.  We then invested all the
 6   time and resources to have investigators go out and collect
 7   information and comb through documents to prove that they did
 8   exist.  The prejudice we have suffered so far, is the
 9   incredible investment of money, time, and resources simply to
10   get to the point where the defendants acknowledge effectively,
11   yes, there's a whole bunch of stuff that we never looked for.
12              THE COURT:  The alternative, I suppose, is to proceed
13   directly to the 30(b)(6) deposition.  That might put a finer
14   point on what you are telling me and what seems to be correct
15   in terms of what was and wasn't done.  But I'm not sure that at
16   the end of the day I wouldn't have to provide some relief short
17   of throwing out the defendants' answer before taking that step.
18              I guess I understand your frustration.  I'm prepared
19   to move forward on the basis of the motion papers I already
20   have, supplemented as is appropriate so that you are not
21   starting from scratch again.  But I do think we need to take
22   this a step at a time.
23              MR. CARTER:  Your Honor, could we reserve at a minimum
24   that if we get to the end of that process, the Court would
25   entertain an application, if we fall short at the end of an
```

1bgr911c

1  actual dispositive motion, for a motion for sanctions to
2  recover some of the costs and expense we have incurred over
3  nine months of simply proving that these documents exist?
4         THE COURT:  Oh, sure.  Yes.
5         MR. McMAHON:  Your Honor, you should be aware that Mr.
6  al-Radhi has invited these lawyers to come to London at his own
7  expense or at the charity's expense to go to an overseas office
8  and actually learn how the office operates.  It would be a
9  wonderful education for them.  I wrote them and said WML would
10  pay for that trip.
11         It is extraordinary, I think, the affirmative response
12  from these charities to accommodate these attorneys.  Keep in
13  mind, your Honor, we have been sued for a trillion dollars.  I
14  have never been involved in one of these trillion-dollar
15  lawsuits before.  Now, with these 12,000 pages, we are up to
16  35,000 pages of discovery.  But you have heard my speech
17  before.  I'm sorry.
18         THE COURT:  The trillion-dollar ad damnum and the
19  seriousness that you view it with is hard to square with an
20  earlier stage where I think you were having trouble getting
21  advanced sufficient funds to go to Saudi Arabia.
22         Putting that aside, I think there has to be greater
23  focus here.  I've said in the past that if I were the
24  plaintiffs, I'd take you up on the offer to visit these
25  offices.  But if they want to proceed the way they are and on

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1bgr911c

```
 1  the record they have, I'm not going to require that they go to
 2  London or the Philippines or anyplace else.
 3          MR. McMAHON:  Your Honor, we should forget about,
 4  then, the vendor proposals that we brought to your attention?
 5          THE COURT:  Yes.  Getting a bid to copy every scrap of
 6  paper, if that's what the offer is, in Saudi Arabia is a
 7  nonstarter.  The duty of identifying responsive documents
 8  really belongs to the defendants.  There are also other issues.
 9  Once you move documents, for example, from Mecca to another
10  city, I don't know that you can say we're producing them as
11  they are maintained in the ordinary course and therefore the
12  plaintiffs have to come inspect them.
13          MR. McMAHON:  I think in United LEXIS, your Honor --
14  I'll have to go back and double-check -- there would be an
15  analysis of all the documents to say these documents are
16  responsive to number 1 or number 4 or number 6 or number 3.
17          THE COURT:  I'm sorry, I didn't get that.
18          MR. McMAHON:  I think in United LEXIS, your Honor,
19  there certainly was, for instance 2 to 6,000 MWL folders.  That
20  would be an attempt to narrow that down in the sense that these
21  are the documents that are necessarily responsive to X, go
22  through the use of classic work, discovery work.
23          THE COURT:  I have directed that the two sides meet
24  and confer with regard to the indices that either will or won't
25  shed light on this process.  Given the track records so far, I
```

28

1bgr911c

 1   understand the plaintiffs' reluctance to write a check for
 2   files that may or may not be responsive.
 3            MR. CARTER:  Your Honor, if I could add one thing to
 4   that.  After having spent all the time and money we have to
 5   prove that the documents exist, I think we are doubly reluctant
 6   to write a check, now that they acknowledge them to exist, for
 7   them to produce them.  It's tripling the investment,
 8   effectively.
 9            THE COURT:  Let's move on, unless somebody wants to
10   add something with respect to MWL and IIRO, to Wa'el Jalaidan.
11            MR. CARTER:  Your Honor, before we move on, I
12   apologize, but we didn't set any time frame for this process.
13            THE COURT:  That's true.  I want to tie it to the
14   discussion of the timetable for fact discovery in this case,
15   which was one of the points you wanted to raise.  In fact,
16   let's do that next rather than moving on to Wa'el Jalaidan.
17            MR. CARTER:  Your Honor, I had some conversations with
18   counsel for Dubai Islamic Bank and some of the other members of
19   the defendants' executive committee about what we contemplated
20   would be a brief extension of the rolling production probably
21   to 60 days.  The process that was just described with regard to
22   the Muslim World League and IIRO gives me some pause to suggest
23   that we can complete everything we are doing and the additional
24   work with those defendants in 60 days.
25            THE COURT:  Is it feasible to have, in terms of

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

                                                                    29
        1bgr911c
 1   document discovery, two different schedules?
 2            MR. CARTER:  I think that would be fine.  You mean one
 3   as to the Muslim World League and IIRO and one as to other
 4   parties?
 5            THE COURT:  Yes.
 6            MR. CARTER:  That would be acceptable to us, I think.
 7            THE COURT:  For the others you're proposing a 60-day
 8   extension?
 9            MR. CARTER:  Of the rolling production deadline, yes,
10   your Honor.
11            THE COURT:  Which takes us to when?
12            MR. CARTER:  January 30th, if I'm correct.
13            THE COURT:  I don't have a problem with that.
14            MR. KABAT:  Your Honor, we would also request that the
15   summary judgment deadline would be extended correspondingly.
16            THE COURT:  That's obviously going to have to shift
17   other dates.  Candidly, I tried to call Judge Daniels right
18   before this conference to let him know that that was one of the
19   applications and to see whether he had any strong views.
20   Perhaps fortunately for you folks, I wasn't able to reach him.
21   As far as I'm concerned, that necessitates readjusting all of
22   the other dates that we're talking about.
23            What do you suggest as an extension as to MWL and
24   IIRO?
25            MR. CARTER:  Your Honor, in terms of the production of
                       SOUTHERN DISTRICT REPORTERS, P.C.
                               (212) 805-0300

1bgr911c

1  the actual documents, I'm not really sure that it makes sense
2  to give them more time than other defendants by virtue of their
3  failure to make a diligent search to this point.
4          What I would ask, though, because of the track record
5  we have with these particular defendants, is that we have a
6  pause from our obligation to collect everything potentially
7  responsive to their requests and give us an opportunity to
8  focus on making our productions to the other defendants.  I
9  think we would be in a position to produce our documents to the
10 Muslim World League and IIRO say some 30 days after they had
11 completed their production.
12         THE COURT:  I'm not going to do that.  What I'm going
13 to do is extend the rolling discovery deadline for both sides
14 as to those defendants for the same 60 days.  If I see some
15 good-faith effort to move forward in terms of document
16 production, maybe there will be some additional adjustment.  If
17 I don't, there is not much point in me extending this ad
18 nauseam.
19         MR. CARTER:  Thank you, your Honor.
20         THE COURT:  I guess I will do the same with respect to
21 Wa'el Jalaidan.
22         MR. CARTER:  Thank you, your Honor.
23         THE COURT:  It seemed to me there were issues as to
24 whether banking records were in Mr. Jalaidan's position or a
25 representation that they were not in his possession versus the

1bgr911c

1  plaintiffs' view, which I agree with, that if they are in his
2  custody or control, they are also producible, and that if he
3  has the practical ability to get them from his banks, they are
4  within his control.
5         Part of the response that I received from you, Mr.
6  McMahon, was, well, the accounts have all been seized.  I have
7  no doubt that perhaps he couldn't write a check against one or
8  more of these accounts, but that's not the same as saying that
9  he can't obtain records that relate to them.
10        MR. McMAHON:  Your Honor, I have had a lot of
11  experience with designated entities, for good and bad.  Banks
12  are conservative institutions to begin with.  They would
13  hesitate to have any kind of dialogue with respect to alleged
14  designated terrorists because without having procured a
15  license, for example, from OFAC, you can't deal with such
16  people, you're breaking the law.
17        I think they would be very hesitant to do anything.
18  And Jalaidan I guess would have to pay attorney's fees to the
19  bank to hire special counsel to investigate all of this to see
20  whether or not they are even allowed to take a request from him
21  for certain bank records that are no longer in his physical
22  possession but in the bank's control.
23        MR. CARTER:  Your Honor, effectively what Mr. Jalaidan
24  is trying to do is use his designation by the United States and
25  the UN as a shield from the discovery process.  In articulating

1bgr911c

 1   that position, all he gave us was a very generic affirmation in
 2   which he said, for instance, that he has contacted some of his
 3   banks but that effectively they won't take his calls.
 4           We don't see any sort of documentation establishing
 5   the kind of diligent effort to obtain the records that one
 6   would expect, particularly from someone who is trying in good
 7   faith to obtain records that in his position to the Court would
 8   exonerate him from the claims in this litigation.  We don't see
 9   letters from counsel or anything of that nature.
10           THE COURT:  Since he is a designated terrorist,
11   apparently, I've indicated how I would expect the record to be
12   made clear with respect to MWL and IIRO.  I would anticipate
13   that there would be some complications whether you're taking
14   his deposition regarding documents or as to the merits of this
15   case.  How do you envision that unfolding if indeed the case
16   goes forward as against him?
17           MR. CARTER:  Your Honor, I think what we had in mind
18   at this point was simply an order for him to undertake all
19   diligent efforts to obtain the bank records and to provide the
20   Court and the plaintiffs with some documentation verifying that
21   he has done that.
22           As your Honor saw, we produced an affidavit from
23   Professor Gerulli, who in large degree was the architect of the
24   executive order 13224 program that liaisoned to the UN relative
25   to its program.  He is quite clear that the programs don't

33

1bgr911c

1    prohibit the banks from sharing this information.  And the
2    record seems to establish that in that one of the banks Mr.
3    Jalaidan says he can't get records from is Faisal Finance,
4    which gave him records three years after his designation.
5             What we are really looking for is some record to
6    establish that he has undertaken those efforts.
7             THE COURT:  He's produced records.  Does that
8    necessarily mean that he obtained them from the bank rather
9    than from his own files?
10            MR. CARTER:  He is producing a 2005 account statement
11   from a bank that froze his account in 2002.
12            THE COURT:  If he had that in his back pocket, then he
13   didn't need to go to the bank.
14            MR. CARTER:  What I'm saying is he is taking the
15   position that from the date of the freezing of his accounts,
16   all of his banks have uniformly refused to deal with him and to
17   provide him bank statements, yet he has a bank statement from
18   three years after that point in time.
19            THE COURT:  I see your point.  I guess, Mr. McMahon,
20   it comes down to the same thing I said with respect to your
21   other two clients, namely, that there has to be a full-court
22   press.  And, as Mr. Carter indicated and I've said before, it
23   has to be documented.  If you're not sufficiently able to
24   document a vigorous effort to obtain those documents, it may be
25   that sanctions are imposed.

34

1bgr911c

1          MR. McMAHON:  Your Honor, if I could ask Mr. Carter
2   this.  What precludes the plaintiffs' lawyers from issuing
3   subpoenas to these banks and demanding the Jalaidan records?
4   Then they might have an excuse to produce the records, that
5   they are not dealing with global terrorists, they are producing
6   records pursuant to a valid subpoena.
7          THE COURT:  I'll let Mr. Carter answer that, but my
8   answer to it is they have the right to ask the defendant
9   produce that which is in his control.  You're saying it's not
10  within his control, but I'm not sure this has adequately been
11  established.
12         MR. McMAHON:  They have a track record, your Honor, of
13  seeking extrajudicial assistance throughout the course of the
14  litigation.  I'm just curious if they even tried one of these
15  things to see what the response was.
16         MR. CARTER:  Your Honor, they are beyond the subpoena
17  power, so it's not a simple matter of issuing a subpoena.  I
18  think what we are running into here is a problem that we have
19  run into consistently, which is an effort to reformulate the
20  discovery process in a manner that deserves the defendants'
21  interests but bears no relationship to the rules.  We have seen
22  it with the Muslim World League and the IIRO, and we are seeing
23  it with Mr. Jalaidan.
24         If there is a record that he has undertaken good faith
25  and diligent efforts to obtain these records and has been

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

                                                              35
        1bgr911c
 1   unable to, a joint application to this court for letters
 2   rogatory to a foreign tribunal may make sense.  But that is a
 3   time-consuming process and we are trying to adhere to a
 4   schedule.  Until he has undertaken his direct efforts, I don't
 5   see a point of going down that road.
 6           THE COURT:  I agree.  Can we move on from Mr.
 7   Jalaidan?
 8           MR. CARTER:  Your Honor, there was one issue in that,
 9   and also a request, that the time frame as to Mr. Jalaidan,
10   particularly with respect to bank records, go back to 1988.
11           THE COURT:  I'm going to deny that request without
12   prejudice.
13           MR. CARTER:  Thank you, your Honor.
14           THE COURT:  That brings us to the agenda letter and
15   the remaining points on it.  I appreciate the report that I
16   received as to other defendants.  I know that there was a
17   request regarding the deposition transcripts of Dr. Mirza, Dr.
18   Barzinji, and a third deponent.  What else is there to discuss
19   today?
20           MR. CARTER:  Your Honor, there was the scheduling
21   issue, which I think the Court has addressed.
22           THE COURT:  Right.
23           MR. CARTER:  We have one issue that wasn't on the
24   agenda letter simply because it came up on Monday of this week
25   and has no bearing on any of the defendants here, if I could
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

36

1bgr911c

```
 1    take a moment.
 2                THE COURT:  Sure.
 3                MR. CARTER:  It deals with your Honor's report and
 4    recommendation on the al~Qaeda default judgment, the monetary
 5    award on behalf of certain of the Federal Insurance plans.
 6                THE COURT:  You haven't collected the full amount yet?
 7                MR. CARTER:  We have not.  There is, however, an
 8    ongoing forfeiture proceeding in the Northern District of
 9    Illinois through which the government is seeking to seize
10    approximately $6.6 million in al~Qaeda assets.  We have
11    appeared in that proceeding.
12                THE COURT:  I thought you sent a letter to Judge
13    Daniels.
14                MR. CARTER:  We did, and a proposed order.  One of the
15    things that we would like to have very much in a somewhat
16    urgent time frame is a ruling on that so that we can present
17    that to the Court in Chicago.
18                THE COURT:  Yes.  I work for him, not the other way
19    around, but I was going to urge him to turn to the Al Haramain
20    objections as well.  I'll try to take up both those issues with
21    him this week.
22                MR. CARTER:  Thank you, your Honor.
23                THE COURT:  Anything else?
24                MR. KREINDLER:  Yes, your Honor.  This is for the next
25    conference.
```

37

1bgr911c

```
 1                THE COURT:  Do we have a date by the way?
 2                MR. KREINDLER:  It's the December conference.
 3                THE COURT:  There is a date scheduled?
 4                MR. KREINDLER:  Yes.  This is the defendants' request
 5      from us for information on standing and the plaintiffs'
 6      damages.  If I spend two, three minutes on it, I think we can
 7      save hours of future brief writing and discussion.
 8                THE COURT:  Sure.
 9                MR. KREINDLER:  First of all, I think it is important
10      to keep in mind where we are trying to go on this case.  This
11      is not the regular case where there is going to be varying
12      individual damages.  Speaking personally, my goal is a uniform
13      recovery on each death case and each injury case and an
14      allocation to the economic and property damage plaintiffs.  So,
15      any information about whether a victim was married or had
16      children or who is the executor or how many people are involved
17      really isn't going to be relevant here.
18                Second, as a practical matter, the only way this case
19      is going to work --
20                THE COURT:  Wait.  Let me stop you at point one.  I'm
21      probably not the judge who should be asking this question, it's
22      probably Judge Daniels, but let's say that every victim was
23      single and childless or, conversely, every victim was married
24      and had 12 children.  Wouldn't that affect the equation?
25                MR. KREINDLER:  As a practical it's not going to here,
```

38

1bgr911c

```
 1   your Honor.  The precedent is the numbers used now by the
 2   foreign claims commission for all terrorist claims against
 3   Libya, which is 10 million a death, 3 million an injury.  That
 4   is our goal.  People receive damages from the VCF, some
 5   received damages from the insurers for American and United.
 6   Some didn't sue at all.
 7           The common element here is driven by and of the
 8   intentional tort punitive damages type of case.  The way we are
 9   handling the case is on that uniform basis.
10           Now, if any one of these defendants or any group of
11   defendants got to the point where they wanted to talk about
12   settlement, it would not be making 25,000 offers on each injury
13   and death case.  As a practical matter, a defendant would come
14   forward and say, we want out of this case, we can put up a
15   hundred million dollars, what can we do?  Then, with the
16   Court's assistance, we would find a mechanism with your Honor
17   or special master to create a fund following the proportions
18   that we have recommended to our clients.
19           THE COURT:  I guess some of this must have been
20   followed in the Libya case?
21           MR. KREINDLER:  Exactly.  It's a paradigm that the
22   state department and the justice department and the
23   administration are using with Libya, and it's the model we're
24   following in other cases, the Mumbai case, etc.
25           Right here I want to say that apart from wasting
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1bgr911c

1   thousands and thousands of hours of going to all these families
2   and saying who was appointed -- it's a colossal waste of time
3   and it doesn't advance the litigation.
4           One specific thing came up, and really this is my
5   request that the defendants withdraw a demand.  What is coming
6   up ahead is an ostensible standing issue under the VCF.  The
7   defendants have focused on the language of the VCF to advance
8   an argument that some plaintiffs may be eligible against some
9   defendants.  It just isn't the case.  Let me lay it out right
10  now.  Here is the legislative history of how the VCF came
11  about.
12          Senator Schumer passed the first version.  Five
13  minutes after it came out, my father and I called him up -- my
14  dad had known him for 30 years -- and said, Chuck, you screwed
15  it up, you forgot to leave the exemption for the suit we're
16  working on against the backers of al~Qaeda.  He said, oops,
17  we'll fix it up.  The fix three or four days later was to
18  permit these very suits that we have been litigating for ten
19  years.  Now, if there is any doubt about what I'm saying, I can
20  have Senator Schumer verify it.  Ken Feinberg will verify it.
21          I would like now to take all these nonissues that will
22  waste hundreds and thousands of hours out of the case so we can
23  be at a point in the very near future where we're not doing
24  exactly what we are doing with you and pulling teeth to get
25  liability documents.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

```
                                                                    40
      1bgr911c
 1              I think the case can move forward.  If the defendants
 2    need Ken Feinberg or Senator Schumer to verify what I'm saying
 3    here on the record, we can do that.  But I'm representing that
 4    that's the fact.  I'd request that they withdraw those demands.
 5              THE COURT:  Let's assume that everything you said, I
 6    have no reason not to, is a hundred percent accurate.  If the
 7    legislation is unambiguous and reads the other way, aren't the
 8    plaintiffs entitled perhaps to discovery but at least to make
 9    the argument that the statute unambiguously requires something
10    other than what you just said?
11              (Pause)
12              THE COURT:  Off the record.
13              (Discussion off the record)
14              THE COURT:  Now we are on the record.
15              MR. KREINDLER:  I wanted to bring it up now.  I think
16    it is unambiguous.  I wanted to say what I just said because I
17    think we can save a lot of time.  Defendants can call me about
18    it tomorrow or next week to discuss it further.  But I would
19    like to focus on the work that must be done and not be diverted
20    by things that are going to wind up being irrelevant.
21              THE COURT:  I guess ultimately, absent some agreement,
22    it becomes a discovery issue as to whether that discovery is or
23    is not appropriate.
24              MR. KREINDLER:  Yes.  Our position is that we are
25    doing liability discovery, which is the defendants' conduct,
```

41

1bgr911c

1  whether it's called standing or damages, and it's premature to
2  waste any time on it until we get to the point of the
3  possibility of the defendants paying money to some of the
4  victims.
5           THE COURT:  It may be that discovery gets staged and
6  that this is stage 2 if it's at any point relevant.
7           MR. KREINDLER:  Right.
8           THE COURT:  But I will duck the issue rather than
9  resolving the issue, which in a sense solves your problem.  I
10 think it is appropriate for the parties, as you said, to talk
11 first, and then we'll talk some more about it in December.
12          MR. KREINDLER:  OK.
13          MS. BERGOFFEN:  Your Honor, if I may respond with
14 regard to the motion on the consolidated requests?
15          THE COURT:  Sure.
16          MS. BERGOFFEN:  As your Honor put it, this is an issue
17 for a discovery brief.  We have submitted to the plaintiffs a
18 brief and given them an extension on a response.  I think, with
19 all due respect, Mr. Kreindler's response oversimplifies the
20 position that we have taken in that brief, and it does need to
21 be fully briefed on the papers to address the legal issues.
22          If I may for a moment, there are many issues with
23 regard to standing.  As you know, standing is an issue as to
24 liability rather than damages.  With regard to the VCF point,
25 as I state in our papers, it's not simply a matter of whether

1bgr911c

1   or not the VCF allows suits to go forward, it's what the
2   standard would be once you're under the VCF and once a
3   potential plaintiff has actually become under the victims
4   compensation fund.
5           All of this is borne out in our papers and, with
6   respect, needs to be fully briefed before the Court.  It isn't
7   something that can just be summarily dismissed based on Mr.
8   Kreindler's statements.
9               THE COURT:  Let's talk about it more next month.
10              MS. BERGOFFEN:  Very good.  Thank you.
11              THE COURT:  Why shouldn't I direct that plaintiffs
12  turn over the three deposition transcripts?
13              MR. BARENTZEN:  Your Honor, Steven Barentzen on behalf
14  of Dr. Jamal Barzinji.  Should I walk over that that podium to
15  speak?
16              THE DEFENDANT:  Ms. Luque, can you hear?
17              THE COURT:  You're good where you are.
18              MR. BARENTZEN:  I prefer to go to the podium if I'm
19  allowed to, because I've got a place to put my stuff.
20              THE COURT:  Be my guest.  However, make sure that that
21  microphone is plugged in, because it may not help you.
22              MR. BARENTZEN:  I have a pretty loud voice.  I'm not
23  sure the microphone is going to be necessary.
24              The short story is we do not and never have had any
25  objection to any of the current parties to this case ordering

43

1bgr911c

1  from the court reporter a copy of the transcripts provided they
2  are willing to be bound by the confidentiality provisions that
3  we agreed to in our resolution agreement with the plaintiffs.
4  I think we shouldn't have to give them over, I think you have
5  to buy them, but that's besides the point.
6           I think this letter application that you got is a
7  classic example of why they have meet-and-confer rules in the
8  place in the first place.  Had nobody anybody to call us, they
9  would have known that and maybe I wouldn't have had to come up
10 here.
11          I look at the letter that you are looking at right
12 now.  Four attorneys signed it.  When I got it and looked at
13 it, I said, what is this thing?  I emailed the court reporter
14 and I said, which of those four have actually asked for a copy
15 of the transcript?  Three of them had not.  Only one had, had
16 only asked for one transcript, and that was WAMY's counsel, Mr.
17 Mohammedi.  I'm going to back up a little bit and explain how
18 that happened.
19          I do want to say that there is a legitimate issue as
20 to former defendants who have been dismissed and who are now on
21 appeal at the Second Circuit getting copies of those deposition
22 transcripts.  As to those people, we have objected to them
23 getting them because that was not part of our bargain with the
24 plaintiffs.  We would like an order from the Court to that
25 effect, because I know that at least one of those defendants

44

1bgr911c

```
 1   has been trying to get those things.
 2              THE COURT:  Who was dismissed and is seeking the
 3   transcript?
 4              MR. BARENTZEN:  The lawyers for Yousef Jameel.  I
 5   think it is at the Bancroft firm.  A couple of different
 6   lawyers I have been dealing with.  They are not part of the
 7   this application at all.
 8              THE COURT:  I don't see them in the letter
 9   application.
10              MR. BARENTZEN:  They are not part of the application.
11   Four lawyers signed it:  Mr. Mohammedi; Mr. Kabat, who was at
12   the depositions who the day before he signed this letter, I
13   exchanged emails with him about what we are going do at these
14   depositions.  The other two lawyers who signed it were Chris
15   Manning, who I haven't spoken to about this case in two years,
16   and Martin McMahon, who is on the phone, has never been at any
17   of these depositions, I have never heard from.
18              To back up briefly, I think this issue started at the
19   time of the depositions in the first place.  If you remember,
20   they had been noticed on a very short notice by the plaintiffs.
21   We had negotiated confidentiality and finality with our
22   resolution agreement.  That's what we were trying to protect.
23              THE COURT:  Right.  I had forgotten the context.  This
24   was your way out.
25              MR. BARENTZEN:  Exactly.  Due to no fault of our own,
```

45

1bgr911c

1    the plaintiffs noticed these depositions on very short notice.
2    Some of the defendants objected, they wanted them moved.  We
3    said no, we want to hold the plaintiffs' feet to the fire.
4    That's what we negotiated and that's what we ended up doing,
5    and I absolutely think it was the right thing to do.
6              The other defendants counsel, like WAMY's counsel Mr.
7    Mohammedi, rather than call us, rather than talk to us, they
8    told you that we were trying to block them from getting into
9    the depositions.  It was never the case at all.  I think your
10   order actually said something to the effect like it was absurd
11   for us to try to block them from going to the depositions.
12             THE COURT:  I don't remember that.  I just remember
13   saying that it would be without prejudice to anybody's right to
14   say we want a further deposition.
15             MR. BARENTZEN:  There was one part of the order which
16   we interpreted as suggesting that you thought maybe we were
17   trying to block people.  Never the case at all.  We went
18   forward.  Numerous of the defense counsel showed up.
19             THE COURT:  I don't think I suggested that you were
20   trying to block people but were, as you just told me, desirous
21   of standing on your rights to have it done within the
22   particular time period pursuant to the stipulation, which at
23   least as to one lawyer I thought made it impractical or
24   impossible for him to attend.
25             MR. BARENTZEN:  Ms. Luque will get to that lawyer, who
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

46

1bgr911c

```
 1   is Mr. Mohammedi, because we now know what he is doing and why
 2   he couldn't get there, which I think you might find
 3   interesting.  The point is we did the depositions, took them.
 4   Several defendants showed up.  Dubai Islamic Bank's lawyer
 5   showed up.  They got the transcripts, no problem.
 6             What actually happened was, because these are
 7   confidential transcripts, I said to the court reporter at the
 8   completion of the three depositions, listen, I don't know who's
 9   going to try to get these, it might be some nonparties, it
10   might be some people outside the case.  They are confidential.
11   If somebody asks for them, I'll be the lightning rod.  I don't
12   want you to be in the middle of it.  Just say, listen, call Mr.
13   Barentzen, talk to him.
14             I had absolutely no intention, never have said to
15   anybody, that you can't have these things.  It was never the
16   case other than the nonparties, who I did say that to.
17             As to the actual party that tried to call, the WAMY
18   lawyers, Ms. Luque, they have actually been actively avoiding
19   us.  Instead of talking to us, instead of doing the meet-and-
20   confer, they have actively avoided us and filed this motion.
21             I think maybe now Ms. Luque can explain to you the
22   background as to what has gone on with the WAMY lawyers.
23             MR. McMAHON:  Your Honor, this is Mr. McMahon.  Can I
24   be excused?
25             THE COURT:  Fine by me.
```

47

1bgr911c

```
 1              MR. McMAHON:  Thank you.
 2              THE COURT:  Ms. Luque?
 3              MS. LUQUE:  Your Honor, I appreciate your going
 4    through the extra efforts to get me on the line.  I wish that
 5    Mr. McMahon hadn't gotten off.  I was very troubled by his
 6    refusal to get me back on the line, particularly since in my
 7    view I was somewhat adverse to him, at least in the position
 8    that Mr. Barentzen is articulating.
 9              I think Mr. Barentzen and I felt that the Court may
10    have been somewhat disappointed in thinking that we were trying
11    to avoid our obligations.  I think that is maybe what we got a
12    sense out of your order.
13              THE COURT:  I guess maybe I had the sense that you
14    were playing hardball but well within your rights.  I may have
15    conveyed that thought.  Maybe I was more subtle, but probably
16    not, I think I might have said this problem would go away when
17    the depositions were adjourned.
18              MS. LUQUE:  Yes.  I appreciate what the Court is
19    saying today.  However, I think what's happened is we have
20    become a bit of a political football here with the defendants.
21    One of the reasons I wanted to speak to the Court is to try and
22    get the Court's help in reminding them of their obligations to
23    talk to us before they write letters which contain what I think
24    are gross inaccuracies.
25              THE COURT:  Wait.  Let me ask, as to folks who are
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

48

1bgr911c

1  currently defendants, is there any objection to producing the
2  transcripts subject to the confidentiality that I gather was
3  designated at the outset of the deposition?
4          MS. LUQUE:  No, your Honor.  The inquiry I got from
5  Mr. Mohammedi was that I provide him with a copy of the
6  transcript, which I don't believe is appropriate.  I think that
7  court reporters everywhere don't like that.
8          THE COURT:  That's true.  Maybe there is no track
9  record here, but I was about to ask what has happened thus far
10 to the extent there have been depositions?  Maybe there haven't
11 been depositions except for NCB a long time ago and things like
12 that.
13         MS. LUQUE:  I believe maybe one of the plaintiffs
14 ordered the transcript directly from the court reporter.  Is
15 that true, Mr. Barentzen?
16         MR. BARENTZEN:  Yes.
17         THE COURT:  I would assume so.  They have to produce a
18 copy to the deponent.
19         MS. LUQUE:  That's true, your Honor.  I you assumed
20 everyone knew that they should order the transcript from the
21 reporter.  It never occurred to me that people would look to us
22 to give them copies.
23         Having said that, I'd like to talk about Mr. Mohammedi
24 just a bit.  If the Court will recall, I think the Court did
25 recall --

49

1bgr911c

 1              THE COURT:  Wait.  Maybe I can short circuit this.  If
 2     somebody other than Mr. Mohammedi or the other applicants is
 3     going to pay for the transcript, it seems to me it would be the
 4     plaintiff, not the deponent's counsel.  But I'm not sure that
 5     it's appropriate for plaintiffs' counsel to pay for it either.
 6     Either way, I think I get to where Mr. Barentzen was a minute
 7     ago, which is this hasn't been discussed amongst the attorneys,
 8     so it seems to me it's something that ought to be discussed and
 9     brought to me next month.
10              MS. LUQUE:  With one exception, your Honor.  I want to
11     put this on the record because I find it extremely troubling.
12     The Court will recall and recalled a moment ago that Mr.
13     Mohammedi apparently couldn't attend these depositions because
14     he was traveling in Saudi Arabia.  It turned out that he was
15     contacting one of my clients, former clients, in this very
16     matter directly to obtain an interview.
17              When I found out about this, I told Mr. Mohammedi that
18     I wished to be present at least telephonically and then he
19     could proceed with an interview.
20              THE COURT:  You're talking about one of the deponents?
21              MS. LUQUE:  Yes, someone who was overseas.
22              THE COURT:  OK.
23              MS. LUQUE:  What happened, however, was that instead
24     of arranging the interview at a time when I could be present,
25     Mr. Mohammedi arranged for that interview to occur

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

50

1bgr911c

```
 1  simultaneously with one of the depositions he knew would be
 2  occurring in the States and went ahead talking to my client
 3  without my presence.
 4          It is with some distress that I wanted to be in front
 5  of the Court today.  I don't understand why our former
 6  co-defendants are approaching this matter this way.  Your
 7  Honor, it is somewhat troubling to me that somebody before the
 8  Court would take the position they couldn't attend noticed
 9  depositions because they were busy contacting a represented
10  party and then particularly scheduling that interview to
11  coincide with the deposition that that lawyer knew that I had
12  to attend, and then on top of that to object to the Court that
13  it was I that was keeping him from the deposition transcript
14  and somehow impeding him.
15          MR. MOHAMMEDI:  Can I answer this, have an opportunity
16  to answer this?
17          THE COURT:  Yes.
18          MR. MOHAMMEDI:  I think the first time that we were
19  aware of this deposition was when we saw a notice of the
20  deposition that was forwarded to us a few days before we were
21  traveling to Saudi Arabia.  At that time we were not even
22  intending to interview anyone.
23          When we saw that, my associate, who is here in this
24  court, reached out to Ms. Luque and asked her if she could
25  postpone this deposition.  She said to her, no, I will not be
```

1bgr911c

1   able to do that, because there is a confidentiality agreement
2   here and there is no way I can do this.  Afterwards, when we
3   heard that, obviously we had to check.  We did reach out to Ms.
4   Luque and we spoke with her.
5           THE COURT:  Did you interview one of Ms. Luque's
6   clients?
7           MR. MOHAMMEDI:  That's where I'm going to.  First I'd
8   like to address this issue about the deposition.
9           THE COURT:  Do it in the order I'd like.  Did you
10  interview Ms. Luque's client?
11          MR. MOHAMMEDI:  I did know that Ms. Luque was
12  representing her client, who was actually working for WAMY.
13          THE COURT:  Who was working for?
14          MR. MOHAMMEDI:  That was a witness.  We were going to
15  interview some of the witnesses.  I sat down with him and I
16  asked him who is representing him.  He said Ms. Luque.  I said
17  to him, now we need to stop this interview, I'd like you to
18  call Ms. Luque and ask her if it's OK to sit down with you in
19  her presence to interview you.
20          For the record, I sent her an email and I mentioned
21  this to her.  Afterwards I called her and spoke to her on the
22  phone, she cannot deny that, for almost an hour where she was
23  arguing why I made this application to the Court to make sure I
24  will not appear in that deposition.  We could not resolve that
25  issue.

52

1bgr911c

1              I asked her about --
2              THE COURT:  Wait.  If you were able to in that time
3    slot interview this individual, why couldn't you attend the
4    deposition by telephone?
5              MR. MOHAMMEDI:  I was in Saudi Arabia, your Honor.  I
6    was not here.  The witness was in Saudi Arabia, was not in the
7    United States.  The deposition was held in the United States.
8    I could not be in two places.
9              THE COURT:  Was the deposition by telephone?  How was
10   this done?
11             MR. MALONEY:  It was done in Virginia, your Honor, in
12   Herndon, Virginia, as noticed.  That's where they lived, the
13   three witnesses.  There was a fourth witness, who was not
14   deposed, who I believe resides in Saudi Arabia.
15             THE COURT:  The person we are talking about, Ms.
16   Luque, was not one of the deponents?
17             MS. LUQUE:  No, your Honor.  But, your Honor, just for
18   the record, he was a defendant in this case until the dismissal
19   which just occurred.  Everyone should have known I represented
20   him.
21             MR. MOHAMMEDI:  Your Honor, I made sure --
22             THE COURT:  Wait.  If he was a defendant and if Ms.
23   Luque entered a notice of appearance on his behalf, how could
24   you not know that she was representing him?
25             MR. MOHAMMEDI:  I did not know it when I sat with him.

53

1bgr911c

```
 1   Your Honor should note the fact that I stopped the interview
 2   right away when he mentioned.  I asked him who was representing
 3   him, and he said Ms. Luque, and I said we have to stop this
 4   deposition -- I mean this interview.
 5             Afterwards, I reached out to her and she said to me, I
 6   need to be present, if I can, at least in the beginning of that
 7   interview.  I said that's fine.  I sent her an email, which I
 8   have, and asked her if she could do it at this time.  I can't
 9   remember if she replied to me, she said to me yes, it's fine.
10   I can't remember.  Something like that.
11             MS. LUQUE:  Ha.
12             MR. MOHAMMEDI:  What happened was that afterwards I
13   got a confirmation from her client telling me that Ms. Luque
14   had spoke with her, and she said it was fine, she would not be
15   there, it would be fine if I could sit down and talk to him.
16             MS. LUQUE:  Your Honor, that is not true.
17             MR. BARENTZEN:  I have the emails in my hand, your
18   Honor, which say the opposite.
19             THE COURT:  We are not going to go down this path at
20   4:15 today, because I have another conference.  You may have
21   seen folks gathering in the back.
22             Ms. Luque, if you want to pursue this, that's fine.
23   Send me a letter setting forth what you believe occurred.  I'll
24   let Mr. Mohammedi respond.  What I may end up doing is
25   referring it to the grievance committee of the Southern
```

54

1bgr911c

1   District, which unfortunately I also sit on but would recuse
2   myself from this one.  That is likely what I would do, which
3   may be consistent with what you are seeking.  You haven't told
4   me your bottom line.
5              MS. LUQUE:  Your Honor, I will be brief.  My bottom
6   line -- I will consider doing that although I'm loathe to do
7   it.  What I am more interested in is causing the lawyers in
8   this case to proceed with civility and to contact us about the
9   issues before troubling the Court and causing my clients to
10  incur additional expenses.
11             MR. MOHAMMEDI:  Your Honor, we reached out to Ms.
12  Luque.  If you read the transcript, we called the transcript
13  committee.  We have the email that said that they were directed
14  not to provide the transcript.  We have an email from the court
15  reporter they cannot deny.
16             MR. BARENTZEN:  I have the email I sent her.  I know
17  exactly what I said.
18             THE COURT:  Mr. Barentzen agrees that he said that he
19  instructed the court reporter not to produce it to any
20  requesters, I gather, other than the plaintiff unless he
21  cleared it.  I'm not troubled by that.  But in terms of (a) Mr.
22  Mohammedi and the other signers of the letter, your entitlement
23  to the transcript, who pays for it if you're entitled to it, I
24  want you folks to talk and we'll talk about it next month.
25             MR. BARENTZEN:  The one thing I would ask your Honor,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

55

1bgr911c

1   and maybe you can rule on it now or not, do you agree with me,
2   and I have spoken at least informally with Mr. Carter and other
3   people, that if you are dismissed as a defendant, you went and
4   asked this Court to get out of this case, this Court has no
5   jurisdiction on it, you're on appeal, that you are not going to
6   be entitled to these confidential documents?  If you lose the
7   appeal and you come back in, different story.  But at least
8   while you're on appeal, and that's what we negotiated.
9           THE COURT:  Yes is the short answer.
10          MR. BARENTZEN:  Good.
11          THE COURT:  If you're not a party to the litigation,
12  you're not a party to the litigation.  That may change down the
13  road, but you're the same as somebody passing by the
14  courthouse.
15          MR. BARENTZEN:  Thank you, your Honor.
16          THE COURT:  When is our conference Mr. December?
17          MR. CARTER:  The 14th, your Honor, at 2:00.
18          THE COURT:  How far out have we scheduled conferences?
19          MR. CARTER:  To February 15th, your Honor.
20          THE COURT:  Have we been doing these in the afternoon
21  or you folks don't care?
22          MR. CARTER:  We have been doing them at 2:00.
23          THE COURT:  Why don't I say March 15th and April 12th,
24  just to block out some dates, and May 17th.  Thank you all.
25          (Adjourned)