# EXHIBIT 3

```
                                                          1
          1CE3TERC
  1  UNITED STATES DISTRICT COURT
  1  SOUTHERN DISTRICT OF NEW YORK
  2  ------------------------------x
  2
  3  IN RE:  TERRORIST ATTACKS ON
  3  SEPTEMBER 11, 2001                03 MDL 1570 (GBD)(FM)
  4
  4  ------------------------------x
  5
  5                                    December 14, 2011
  6                                    2:10 p.m.
  6
  7  Before:
  7
  8                    HON. FRANK MAAS,
  8
  9                                    Magistrate Judge
  9
 10                    APPEARANCES
 10
 11  ANDERSON KILL & OLICK PC
 11       Attorneys for O'Neill Plaintiffs and PEC
 12  BY:  JERRY S. GOLDMAN
 12
 13  KRIENDLER & KREINDLER LLP
 13       Attorneys for Plaintiff Ashton
 14  BY:  JAMES P. KREINDLER
 14
 15  COZEN O'CONNOR
 15       Attorneys for Federal Insurance Plaintiffs
 16  BY:  SEAN P. CARTER
 16       J. SCOTT TARBUTTON
 17
 17  MOTLEY RICE
 18       Attorneys for Burnett Plaintiffs
 18  BY:  ROBERT T. HAEFELE
 19
 19  BERNABEI & WACHTEL
 20       Attorneys for Al Haramain USA and the Defendants'
 20       Executive Committee
 21  BY:  ALAN R. KABAT
 21
 22  CLIFFORD CHANCE
 22       Attorneys for Defendant Dubai Islamic Bank
 23  BY:  STEVEN T. COTTREAU
 23          ANGELA E. STONER
 24
 25
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
```

2

```
       1CE3TERC
1              APPEARANCES (cont'd)
2   CLEARY GOTTLIEB STEEN & HAMILTON
2        Attorneys for Defendant Dubai Islamic Bank
3   BY:  LINDSAY PINTO
3
4   LAW FIRM OF OMAR T. MOHAMMEDI LLC
4        Attorneys for Defendants WAMY and WAMY International
5   BY:  OMAR T. MOHAMMEDI
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

3

1CE3TERC

```
 1              (In open court; case called)
 2              THE COURT:  Good afternoon, everyone.  Why don't we
 3    start with the easiest issue which is whether there should or
 4    should not be reply submissions concerning discovery issues
 5    where the order that I entered said yes and had a schedule.
 6    There were references to an informal agreement that counsel may
 7    or may not have had regarding no replies.  I guess my reaction
 8    is I don't care which of those two we follow as long as
 9    everybody plays by the same rules.
10              MR. CARTER:  Your Honor, if I may.  I think the
11    agreement had to do with whether or not there would be replies
12    in the context of the agenda letters not as to substantive
13    briefing on discovery motions.
14              THE COURT:  Which makes more sense.
15              MR. CARTER:  We're all in agreement that we are going
16    to continue to do reply briefs on substantive discovery
17    motions.
18              THE COURT:  I missed that nuance.  I think on the
19    agenda letters I don't really benefit from replies.  So, why
20    don't we say that as to agenda submissions, ideally there
21    shouldn't be a reply in any event because ideally there would
22    just be one letter setting forth two positions.  But if that's
23    not feasible, then there would be a submission from the
24    plaintiffs and the defendants.  I don't need a reply.
25              Stated more affirmatively, I don't want a reply.
```

4

1CE3TERC

```
 1              Refresh my recollection, I know there is the document
 2    demands and interrogatories.  There was a third topic I had
 3    indicated.
 4              MR. HAEFELE:  The stay for Pete Seda.
 5              THE COURT:  As far as I'm concerned there is no stay
 6    in place.  So, as far as I'm concerned, the materials ought to
 7    be produced now, and I know that the defense takes a different
 8    view of that.  And as a practical matter, I suppose until
 9    somebody makes a motion or Judge Daniels visits the question, I
10    don't know there is anything particular for me to do.
11              MR. HAEFELE:  So just to clarify, your Honor, we don't
12    really need you to indicate a date when the response -- when
13    the documents are to be produced.  They are to be produced
14    immediately.
15              THE COURT:  I had not done that?
16              MR. HAEFELE:  You had not given us a date, no.
17              THE COURT:  I'm going to say January 20.
18              MR. KABAT:  Your Honor, may I be heard on that?
19              THE COURT:  Yes.
20              MR. KABAT:  In our objection, which I don't know if
21    you've had the chance to review, we briefed at length the case
22    law from the jurisdiction that the Fifth Amendment privilege
23    remains intact while an appeal is pending.  And I recognize
24    that the parties did not fully brief that issue because we were
25    thinking in the context that that was going to be the motion
```

1CE3TERC

```
 1   for a new trial might be granted, so we were looking at it in
 2   that context.  And we are willing to move forward with the
 3   motion to stay discovery in addition to the objection that we
 4   filed.  But as a matter of judicial economy, we would prefer a
 5   ruling from the bench on that.
 6            THE COURT:  Believe it or not, I actually am aware
 7   that there is a Fifth Amendment and it continues to apply when
 8   an appeal is pending.  But as my decision said, sometimes it is
 9   appropriate to require a party to make what may be a difficult
10   choice and the thrust of my decision was that you should, for
11   reasons I outlined in my original decision, Mr. Seda should be
12   put to that hard choice.
13            You can make the motion for a stay and I will look at
14   it.  But I'm likely to deny it.  And so unless and until Judge
15   Daniels rules otherwise or he grants a stay, I'm going to stick
16   with the January 20 date for production I've just set.
17            Anything else on that?  We have the October 26 letter
18   motion to compel where it seems to me what makes sense is to go
19   through the document requests, the interrogatories just
20   parallel that.
21            MR. COTTREAU:  Your Honor, I don't believe there are
22   interrogatories that have been propounded by the defense group
23   as a whole.  This is just the document requests.
24            THE COURT:  Okay.  I thought I saw a group of
25   interrogatories that had been furnished.  Is that in the big
```

6

1CE3TERC

```
 1  pile of documents you gave me, Mr. Haefele?
 2              MR. HAEFELE:  I don't recall there being
 3  interrogatories that are the subject of this motion.
 4              MR. CARTER:  Your Honor --
 5              MR. HAEFELE:  There were a voluminous number of
 6  document requests that are not the subject of the discovery
 7  that are the individual defendant's discovery demands to
 8  plaintiff.
 9              THE COURT:  Right.  This is the first consolidated
10  set.
11              MR. HAEFELE:  Correct.  The only set that was at issue
12  is a set of document requests.
13              THE COURT:  Okay.
14              MR. HAEFELE:  I believe there is a set of 15 I think.
15              THE COURT:  Exhibit C to the October 26.
16              MR. COTTREAU:  Exhibit C is the plaintiff's
17  objections.
18              MR. HAEFELE:  Exhibit A is the actual request.
19              THE COURT:  It doesn't make sense to look at A without
20  C so I've turned to C.
21              Document request number one is all documents
22  concerning standing to sue on behalf of the individual whose
23  rights you represent.  There is a lot of definitions if I
24  recall correctly, but "individual" isn't one of them.
25              I suppose to the extent it deals with the insurer
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

7

1CE3TERC

1    plaintiffs, I'm not sure I understand it in relation to true
2    individuals.
3              MR. COTTREAU:  Sure, your Honor.  Just a few words
4    about that.  First with respect to the individual victims who
5    are deceased, it would refer to the standing to sue on behalf
6    of the personal representatives.  And same with respect to
7    something that would be akin to the New York survivor statute.
8    If there were injured victims who became deceased after the
9    injury, but yet those claims are being brought on behalf of an
10   injured victim who didn't die from the events of September 11,
11   there is at least in New York there is a survivor statute that
12   requires something similar in the wrongful death context, but
13   just for injured plaintiffs who then subsequently die of other
14   causes.
15             So that's how it would relate on individuals.  But for
16   some of the individuals it would have no applicability.
17             THE COURT:  I understand why ultimately that may be
18   relevant and it probably does go to liability rather than
19   damages.  But, since that's unlikely to eliminate any or even
20   many of the plaintiffs, why is that a productive way of
21   proceeding now?  Other than as a make work exercise for the
22   plaintiffs.
23             MR. COTTREAU:  Sure, your Honor.  It is a little bit
24   hard to get transparency in this process and precisely who a
25   lot of the plaintiffs are.  At least it is for us on the
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

8

1CE3TERC

1    defense side.  We know this from some news reports that the
2    special master of the victim compensation fund had apparently
3    planned to reject 2,000 claims.  We are not sure on what
4    grounds he rejected them, either personal representative that
5    was inappropriate, whether they weren't injured at all, but
6    given the high participation rate of actual victims and given
7    the other claims that have been rejected apparently, it is a
8    little bit difficult to understand who may be left.  And that's
9    what we're trying to get at with this request.
10         MR. HAEFELE:  Your Honor, if we can probably address
11    what I would say is one, two, three and maybe some of four all
12    together I think --
13         THE COURT:  I was going to say I thought this was sort
14    of a generic way of getting at some of the others, but please
15    go ahead.
16         MR. HAEFELE:  If I can speak predominantly to the
17    issue of the requests for the information from the individual
18    plaintiffs for what the defendants call the standing issue or
19    the VCF claim issues, or they go so far as to say "or any other
20    fund" without really delineating what funds they want to have
21    information from.
22         But I think we would break it down into three separate
23    reasons why the discovery shouldn't be had.  Number one, the
24    defendants' argument makes the Court's order phased discovery
25    meaningless.  Essentially what they argue is because standing

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

9

1CE3TERC

 1   this information they are seeking is necessary for in the long
 2   run liability to be had, it must be discovery regarded
 3   liability so it falls into the liability category.  But the way
 4   they're lumping it in, you can make the same argument as to
 5   damages.  And in other words, if you are talking about a
 6   negligence case, what are the elements of negligence.  One of
 7   the elements to have liability for negligence is damages.  And
 8   they're lumping the standing issue in exactly the same way.
 9   Which means that the order of the Court for bifurcating the
10   discovery is absolutely meaningless.  Nothing falls outside of
11   liability based on that argument.
12          THE COURT:  Is it correct that a victim or a victim's
13   estate that applied for relief from the 9/11 victims fund
14   waived the right to proceed against anybody else?
15          MR. HAEFELE:  Depends on what you mean by "anybody
16   else."  If you are saying against -- have they waived the right
17   to go against everyone?  The answer is no.  Have they waived
18   the right to go against any certain entity?  Yes, they have.
19          THE COURT:  Airlines I gather.
20          MR. HAEFELE:  The airlines, the security companies,
21   and Judge Hellerstein addressed those issues in a number of
22   cases where there were some plaintiffs in front of Judge
23   Hellerstein that had gone into the VCF or had filed a document
24   with the VCF that Judge Hellerstein indicated that that
25   indicated a waiver and --

10

1CE3TERC

```
 1          THE COURT:  Even if he didn't get funds, is that
 2   correct, if you submitted an application and went into the
 3   process?
 4          MR. HAEFELE:  Well, I think the answer for that -- I
 5   can recall at least one instance where it was a filing that was
 6   a denial and it was indicated that that wasn't an election.
 7   Meaning they didn't get funds because they were rejected from
 8   the VCF so they weren't in the VCF.  In that instance, the
 9   answer was no, that's not a waiver.  But if you did go -- if
10   did you make a filing that resulted in a claim getting accepted
11   into the VCF, it was a waiver as to the airlines and the other
12   defendants that were in those -- in that litigation.
13          MR. KREINDLER:  If I can just jump in because, your
14   Honor, this point, as you know from last time, has me very
15   exercised.
16          THE COURT:  Has been very?
17          MR. KREINDLER:  Has me very exercised.  As all
18   remember, this legislation creating a fund was enacted very
19   quickly after 9/11.  First of all, within five days Congress
20   passed a law to save American and United and their insurers,
21   and then the fund legislation was created.
22          In the original version, the original version said if
23   you go into the fund, you waive your right to bring a civil
24   suit.  An hour after that was published, I and my father were
25   on the phone with Chuck Schumer who introduced it and said you
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1CE3TERC

```
 1   screwed it up.  You meant to do exactly what we're doing in the
 2   Libya case, where, after settlement with the airline, the
 3   security company, all civil defendants, except for the
 4   terrorists and those who knowingly supported the terrorists,
 5   that's the limitation of the waiver.
 6            So that day a new version was introduced, our version,
 7   specifically to enable these suits to go forward.  I'll testify
 8   to it, Senator Schumer will testify to it.  Special Master
 9   Feinberg at the 100 meetings I had with him and the families
10   would say we're limited in what we can do.  Your ultimate
11   recovery is against the terrorist sponsors.
12            THE COURT:  If the statute is unambiguous on its face,
13   and wrong, it seems to me you don't get civil legislative
14   history.  If it says the earth is flat and we can stipulate
15   that the earth is round, if it says unambiguously the earth is
16   flat, that has to be the conclusion from analysis of the
17   legislation.  That obviously is an issue for Judge Daniels, I
18   suppose, ultimately to deal with.
19            Of these first few requests, it seems to me one that
20   perhaps -- and maybe you can enlighten me -- is not unduly
21   burdensome is to say who submitted an application.  Not did you
22   get money, not give us a copy of the application.  But there
23   ought to be a way I would think to get a printout of who
24   submitted an application.
25            MR. KREINDLER:  Well, your Honor, I'd say two things.
```

12

1CE3TERC

```
 1    Number one, it is enormously burdensome.  Remembering in 2001,
 2    at least our office did not have a computer system that would
 3    enable us to do then what we can do readily 10 years later.  To
 4    do that, we would need to send teams of people to warehouses in
 5    Queens, going through the boxes of each plaintiff's file to
 6    compile that list.  That is going to cost thousands and
 7    thousands of hours, and in my opinion, is a complete waste of
 8    time because there is no legitimacy to this request at all.
 9    This is not a situation where a defendant will come in and say,
10    well, listen, if we're only facing a hundred plaintiffs, maybe
11    we're going to settle, but we're not going to settle if there
12    is 3,000.
13            Until such time as they come forward and say in good
14    faith we're prepared to offer money to settlement, in my
15    opinion, this is wholly illegitimate and is simply designed to
16    harass us so we can't do the liability work we want to do.
17            And if I can add one other thing.  I know I'm
18    exercised about it.  In this case, this case will only be
19    resolved one way.  And it is the way terrorism cases have gone.
20    If, whether it is Sudan who goes first or charities or Saudi
21    defendants or Iran, at some point, the dam will break, and some
22    defendant will say we want to get out of this case, and we're
23    prepared to offer a billion dollars, 500 million.  And then
24    your Honor or a special master would have to work with that
25    willingness to invite us to submit demands on all our cases
```

13

1CE3TERC

1   that would total the sum of the money the defendants will have
2   to spend.  It will make no difference to any defendant whether
3   they're facing 4,000 death and injury claims or 1,000 claims.
4   I think it is just an attempt to prevent us, after 10 years of
5   work, from continuing to do what we're doing, and wasting a
6   huge such money and manhours for no legitimate purpose at all.
7              THE COURT:  You've told me that Kreindler & Kreindler
8   was in the dark ages back in --
9              MR. KREINDLER:  Me especially, your Honor.
10             THE COURT:  -- 2001.  But is it clear that Ken
11  Feinberg was equally limited?  I can't imagine that there isn't
12  some printout that answers, not in terms of source documents,
13  but says that victim one submitted an application on this date,
14  and perhaps answers all the questions and the check was cut on
15  Y date for the amount.
16             MR. KREINDLER:  I can't speak for him.  I know he's
17  got his hands full with BP and Deepwater.  I don't know whether
18  any of those records exist.  I doubt they would be in his
19  possession if they did.  But again, I get back to the point it
20  makes no difference.
21             THE COURT:  I understand that.  And as a practical
22  matter, you may be correct.
23             MR. HAEFELE:  Two additional points.  And I think go
24  along with what Mr. Kreindler said.  The first one is, and I
25  think he may have said this but I'm not sure.  It makes no

14

1CE3TERC

```
 1   difference whatsoever, because the Court can make a
 2   determination on the substantive question that the defendants
 3   are raising without a stitch of piece of information that they
 4   are asking for.  It is a legal issue.  It is a legal question.
 5   Either there was waiver under the statute or there wasn't
 6   waiver under the statute.  They don't need anything from the
 7   plaintiffs to make that argument and to make the legal
 8   argument.  There is not a piece of paper that would evidence
 9   one way or the other on that legal argument.  So none of the
10   discovery they are asking for in these three or four questions
11   has anything to do with the substance of that issue.  And if --
12            THE COURT:  Yes.
13            MR. HAEFELE:  If I can also address the defendants'
14   interpretation of the ATSSSA.  First off, the statute itself is
15   the Air Transportation Safety and Systems Stabilization Act.
16   It has nothing do with terrorist defendants.  And the carve-out
17   that was there was intended by Congress to say we're carving
18   out, we're focused on the non-terrorist defendants.  We're not
19   focused on the terrorist defendants.  The name of the act says
20   that, Judge Robertson when he made his decision in Burnett v.
21   Al Baraka, 274 F. Supp. 2d 86 (DDC 2003), he indicated that the
22   purpose of the statute was to save the airline industry.  It
23   wasn't to protect terrorists.  And if it gets interpreted in a
24   way that protects the terrorists' cohorts, it is going to be
25   completely contrary to the intent of the ATA which is to step
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

15

1CE3TERC

1     up and prevent terrorists from acting.
2               So you have the ATA, you have the ATSSSA.  You are
3     going to create a conflict if you interpret it -- I know
4     defendants say it is not a conflict, but I don't see how you
5     can say that to carve out something and interpret it so it
6     protects alleged terrorist cohorts isn't contrary to the
7     interests of the ATA, it is.  So that's one of the reasons why
8     you just can't interpret it the way the defendants -- or we
9     would argue that you can't interpret it that way.  It would
10    create a conflict.
11              MR. COTTREAU:  Your Honor, let me say a few things.
12    First of all, I don't represent a terrorist or a terrorist
13    cohort.  I represent a bank that has never been on a terrorist
14    list ever produced by this government or any OFAC list, any
15    sanctions list whatsoever.  So the notion we don't fall within
16    the waiver, and I am sure my co-defendants feel the same, at
17    least with respect to some of the clients here if not all.
18              What the statute says is that a claimant who files for
19    compensation waives any right to file a civil action or to be a
20    party to an action in any federal or state court for damages
21    sustained as a result of the terrorist related aircraft crashes
22    of September 11.
23              And the waiver form which is in our appendix at D and
24    E, under appendix D at page 16, says in part 3D which is the
25    last part of page 16 in our exhibit D, says on page 16:  I

16

1CE3TERC

1    hereby acknowledge -- this is the last two paragraphs on the
2    page -- I hereby acknowledge that submitting a substantially
3    complete compensation form for deceased victims, I am waiving
4    the right to file a civil action or be party to an action in
5    any federal or state court for damages sustained as a result of
6    the terrorist related aircraft crashes of September 11.
7              It goes on and says in the second sentence of the next
8    paragraph:  This waiver does not apply to a civil action to
9    recover collateral source obligations or to a civil action
10   against any person who is a knowing participant in any
11   conspiracy to hijack any aircraft or commit any terrorist act.
12             THE COURT:  Which language -- I understand it is
13   fairly broad, but I can think of at least two arguments that
14   plaintiffs could make to say that it doesn't preclude the suits
15   against banks and others.  It seems to me that --
16             MR. COTTREAU:  Can I say one quick word, and I don't
17   mean to interrupt.  But I think it is an important point.
18             THE COURT:  That's fine.
19             MR. COTTREAU:  The point is about why it is we
20   requested the forms.  We are sensitive to the issue.  We don't
21   want to overly burden victims here.  We tried to focus on
22   documents that were likely to be in the lawyer's possession.
23   We tried to focus on documents that would be relatively easy to
24   produce.  This isn't damages discovery.  We are not asking to
25   take interrogatories of the amount that they earned, what their

17

1CE3TERC

1    earning potentials were, what damage it did to their families.
2    I am not here to dispute that.  Okay.
3            I'm here to just say we need the form for the
4    following reasons:  One, the waiver, there might be disputes
5    about whether the waiver is substantially complete or the form
6    substantially complete or not substantially complete.  The
7    waiver turns on that as the language says.
8            THE COURT:  But as a practical matter, if there are
9    3,000 potential plaintiffs, certainly a large group of those
10   will fall into category of folks who successfully completed the
11   process, which in your view may be the end of their claims
12   here.  Or in the plaintiffs' view doesn't matter one iota.  And
13   that's something ultimately Judge Daniels will decide.  But,
14   let me take --
15           MR. COTTREAU:  If I can mention two other things about
16   why we need the form.
17           THE COURT:  Let me just jump ahead a little and then
18   I'll let you go back.
19           As to the insurers there was a submission to me that
20   enabled me to come up with nine billion some other numbers and
21   99 cents as the appropriate treble damages a few weeks ago.
22   That wasn't shared with the defendants, but it seems to me is
23   responsive to at least some of these requests and obviously not
24   burdensome to produce.
25           MR. CARTER:  Your Honor, it is misleading to suggest

18

1CE3TERC
1    it wasn't provided because it was in fact provided.  The
2    schedules to which your Honor is referring as well as the
3    affidavits were submitted with that motion for the assessment
4    of damages as to al Qaeda.
5             After we submitted that motion to your Honor for
6    resolution, Mr. Kabat and Mr. Cottreau contacted me and advised
7    that the schedules that supported the affidavits had been filed
8    under seal.  And they wanted to view those schedules in order
9    to determine whether or not they would be opposing the motion
10   for assessment as to al Qaeda, and I provided the schedules to
11   them in that context so they have seen them.  Those schedules
12   cover a fairly large group of the insurer plaintiffs.  There
13   are a few that didn't participate in the motion for assessment.
14            When we initially had the meet and confer about this
15   issue way back in a May or so, the solution that I offered to
16   their inquiry about standing and the basis of the subrogation
17   rights was to say we filed schedules that identified every
18   insured, the location of the loss, the policy number, amount
19   that was paid, I will give them to you.  And they will verify
20   for you these insurer plaintiffs do in fact have standing to
21   bring their claims.  There is no further dialogue about that.
22            So in a separate setting, most of the schedules have
23   been provided.  I'm perfectly willing to provide the rest of
24   them subject to the appropriate confidentiality provisions of
25   the existing confidentiality order.  It just was not an offer

1CE3TERC

```
 1   that was pursued by defendants at all.
 2              THE COURT:  I guess there are also issues, the extent
 3   to which umbrella coverage perhaps took somebody out of the
 4   claim to a certain extent.  I am not sure whether that was part
 5   of what you were getting at, Mr. Cottreau.
 6              MR. COTTREAU:  There was.  We are entitled to discover
 7   whether they've been made whole by reinsurers or what the
 8   arrangements were with respect to the policies.
 9              THE COURT:  But again, why does it matter at this
10   stage?  Let me assume for the sake of argument that this is
11   liability oriented.  As a practical matter, why is this
12   important to get now?
13              MR. COTTREAU:  Your Honor, we believe that this case
14   can be substantially narrowed.  This isn't just a modest
15   narrowing.  We believe on the individual claimants, we are not
16   sure if anybody would be left under the standards of liability
17   that are pled in any of the complaints.  It may be under the
18   waiver standard.  With respect to the --
19              THE COURT:  But, you don't need any applications to
20   make a motion to Judge Daniels saying -- or perhaps you need a
21   few specimens, one of somebody who submitted the claim and was
22   paid, somebody whose claim was submitted and rejected, and
23   maybe there are categories of rejections that would be useful
24   to have specimens for, rather than 3,000 files.
25              MR. COTTREAU:  Your Honor, if that's a suggestion that
```

1CE3TERC
```
 1   the plaintiffs are willing, and if there is a judgment that
 2   could bind those individuals without naming them or putting
 3   their names into the categories, I suppose that would be
 4   workable.  But as a practical matter, I think it might be
 5   difficult without being able to do that.
 6              MR. CARTER:  I think we just jumped from insurance to
 7   the individuals so --
 8              THE COURT:  We did.  I'm sorry to be dancing around
 9   that way with you.
10              MR. COTTREAU:  Your Honor --
11              MR. HAEFELE:  I do want to finish but I don't want to
12   jump in on Mr. Cottreau.
13              MR. COTTREAU:  If I can say a couple of words about
14   the forms themselves, and they are lengthy forms.  But I think
15   it is helpful to just say what types of information we're into.
16              We were amenable to letting the plaintiffs, if they
17   wanted to, redact the forms.  We thought that would be more
18   burdensome to request parts of the forms than just request the
19   forms.
20              But there are basic information about both the site
21   where the victim was injured, where the victim worked, and
22   where the victim lived on 9/11.  All of those three facts are
23   going to be potentially relevant to the choice of law analysis.
24   We're facing a class action here.  We will want to know how
25   many potentially different states law applies.  These forms
```

1CE3TERC

```
 1  would be useful to that exercise.
 2           In addition, in addition to that, there is information
 3  in there about insurance and other payments.  There may be
 4  workman's compensation issues here that bear on the issue as
 5  well as other issues.  So there are other important facts in
 6  these forms.
 7           In part one, I'm referring to parts 1A, 1B, if you are
 8  looking at, depending which form you are looking at, I'm
 9  looking at the wrongful death personal representative form.
10           THE COURT:  Which is D or E?
11           MR. COTTREAU:  D, your Honor.  Section 1A asks you
12  where you lived on 9/11 or where the victim lived on 9/11,
13  essentially residence.  Part 1B asks you simply to identify the
14  nature of where your injury occurred.  What was the location of
15  the attack.  Part C goes to information about the personal
16  representative and there is a related document request in part
17  4 that Mr. Feinberg required them to submit forms showing they
18  were a duly appointed personal representative.  Those are very
19  easy issues to get through.
20           THE COURT:  Well --
21           MR. COTTREAU:  Here's one of the important points
22  here.  A lot of these claims, wrongful death, and some of the
23  other claims there is a negligent infliction of emotional
24  distress claim in some of these complaints.  What we fear is on
25  summary judgment this is going to become a negligence case.
```

22

1CE3TERC

1 And we don't believe it is a negligence case on our side.  And
2 under the ATA, the standard is not the same as a conspiracy.
3 There doesn't need to be an agreement under the ATA.  And we
4 believe the waiver fundamentally shifts how this case is
5 briefed on summary judgment, as well as some of the choice of
6 law issues that might apply not only to the individuals but to
7 the carriers.
8        We've asked for and we're willing to accept modest
9 discovery on those issues.  We understand that there is going
10 to be some burden, because Mr. Kreindler may have not organized
11 his files in a warehouse in a manner that makes this perfectly
12 easy.  But we think with some amount of effort, some reasonable
13 amount of effort, what we are requesting here is not unduly
14 burdensome in light of how it frames and will shape summary
15 judgment.
16        THE COURT:  Mr. Haefele.
17        MR. HAEFELE:  Thank you, your Honor.  First point I'd
18 make is in Mr. Cottreau's argument he went through and quoted
19 that language from the statute and the language from the forms
20 and the language here and the language there.  Indicating that
21 for the most part, if not entirely, he has everything that he
22 needs to make his argument on the waiver issue.  I think your
23 Honor picked up on that when you said either lots of the
24 plaintiffs did waive or lots of the plaintiffs didn't waive,
25 depending on how the statute is interpreted.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1CE3TERC

```
 1              Again I say, not a stitch of any piece of paper is
 2   necessary to make the argument.  And I think Mr. Cottreau made
 3   that point by going through and trying to make the argument
 4   here.
 5              The other point I'd make is that, to my knowledge,
 6   many if not all of the plaintiffs who are in this litigation
 7   who also went into the VCF were told this litigation is not
 8   among the litigations that are waived when you go into the VCF.
 9   It will be fundamentally unjust to turn around after the fact,
10   after the representations have been made, including
11   representations from the special master to induce them into the
12   fund and then say, by the way, that's waived.  I know I told
13   you it wasn't, but it was.
14              THE COURT:  But Mr. Cottreau's clients and the other
15   defendants weren't among the people making those
16   misrepresentations, if they were misrepresentations, which
17   remains to be seen.
18              Hear me out for a minute.  Even if this is liability
19   oriented, I think it is somewhat premature to go through it in
20   fine detail.  There is the problem that was pointed out in
21   terms of the way the Kreindler & Kreindler files are organized,
22   I'm going to reserve decision on these first few document
23   requests because I want the parties to explore the possibility
24   of sampling with a fairly small sample, or agreeing that there
25   are claims that followed different trajectories from submission
```

24

1CE3TERC

1  of the claim approval and the check being cut, to categories of
2  reasons why certain numbers of claims were rejected and perhaps
3  producing specimens of those.
4          We're a long way off from summary judgment I sense,
5  and it seems to me there probably are non-burdensome ways, not
6  unduly burdensome ways, of dealing with this as to the
7  individual claimants to the VCF.
8          As to the insurers, Mr. Carter indicates that
9  defendants have received schedules which was not my
10 understanding from the letters, and maybe it occurred after the
11 letters.  But --
12         MR. COTTREAU:  If I could say a word on that.  I
13 believe we have received some of the schedules that were
14 shared.  I am not sure whether it was all of them that were
15 shared with your Honor.  But the ones we have are only as to
16 five or maybe 10 of the insurance companies.  Not to all of
17 Mr. Carter's 40 some clients.
18         MR. CARTER:  Your Honor, the schedules that were
19 relevant to the motion for assessment were actually provided
20 back in August.  So they've had them for some time, and again,
21 I offered during the meet and confer in May to provide them for
22 all the carriers as an accommodation and as a way to work out
23 this dispute, and the proposal was never pursued.  And so, it
24 has been out there since that time, and I'm perfectly happy to
25 provide the schedules.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

25

1CE3TERC

1          MR. COTTREAU:  We're happy to accept them, and would
2     ask for that and any reinsurance information as well that might
3     extinguish claims.
4          MR. CARTER:  With regard to the reinsurance
5     information --
6          THE COURT:  I guess the theory would be that if
7     carrier A paid X, but either was reimbursed from reinsurance or
8     didn't pay X because some portion of that was paid by the
9     reinsurance carrier, the claim resides with the reinsurance
10    carrier who now is time barred from bringing a claim and
11    effectively it is cut off.  Is that where you're headed?
12         MR. COTTREAU:  That would be an outline of one
13    argument we would make.
14         MR. CARTER:  That wouldn't be an argument that would
15    carry much weight.  With regard to the reinsurance, to the
16    extent there is reinsurance, first of all, it is not going to
17    wipe out wholesale the claims of these carriers.  The
18    reinsurance within the context of September 11 operated in a
19    way that is unique in the history of reinsurance, which dates
20    back many hundreds of years.  Because you had various lines
21    responding to an event that never contemplated to respond it to
22    a single catastrophe.  They were viewed as completely unrelated
23    so they were coming together.
24         What is almost universally true within the reinsurance
25    arena is the treaties, the custom and practice, dictate that

26

1CE3TERC

1    the decedent is responsible for pursuing subrogation and
2    salvage for the benefit of the reinsurers.  And there is some
3    very complicated process through which they resolve how the
4    money goes.
5            But it is much the same as and has been recognized in
6    New York that an insured can bring an action for recovery of an
7    entire loss, even if it has been partially compensated, in
8    which case it holds in trust the amount that was paid by the
9    insurer, and is then reimbursed for them.  And that's how New
10   York operates in this area.
11           The case they cite on this point to suggest that it
12   would somehow impact standing has absolutely nothing to do with
13   reinsurance.  It has to do with another state's somewhat
14   unusual uninsured motorist law, and the state agency that sort
15   of uses insurers as proxies for administering claims.
16           What is interesting is that the statute that the
17   insurance company relied upon in that case as a basis to bring
18   the claim appears to support them bringing a claim for
19   subrogation.  It just didn't support the fraud claim they were
20   bringing in that particular context.  It doesn't speak
21   meaningfully at all to this issue, and the fact that it doesn't
22   speak meaningfully is an indication that there aren't cases
23   that support this view.
24           What I would say in addition, your Honor, is one of
25   the problems is these requests aren't in the least bit focused.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

27

1CE3TERC

```
1   The request is for any information concerning any insurance
2   arrangement or any insurance policy.  It literally encompasses
3   the sun and the moon with regard to billions of dollars' worth
4   of insurance claims.
5              And in prior context, where plaintiffs have come here
6   with very broad discovery requests, I think the Court has
7   appropriately told us that I'm going to deny it as overbroad.
8   And that happened in the context of the Muslim World League and
9   the IRO when we wanted their documents pertaining to their
10  activities in Afghanistan.  You told us not as frame, but if
11  you want another shot in a way that's reasonably focused maybe
12  we'll do that.
13             I think maybe if we pursue a more focused inquiry, we
14  might advance the ball a little bit.  But, as it is framed
15  presently, we would be obligated to give the individual claims
16  schedules for the personal property items that were in people's
17  offices.  It is tens of millions of documents I'm quite sure.
18             MR. COTTREAU:  It is a little hard for me to answer as
19  to the applicability of case law when Mr. Carter has had full
20  discovery and apparently has gone through all of these
21  arrangements in great detail and has looked at the documents
22  and we haven't.  All we are asking for is parity in the
23  discovery process so we can come back and make a legal
24  argument.
25             THE COURT:  Are these by and large treaty reinsurance
```

28

1CE3TERC
1    arrangements?
2            MR. CARTER:  I believe they are.  In all candor, I
3    haven't gone through them in considerable detail.  I read an
4    article about how the reinsurance industry responded to 9/11.
5    I would prefer in my life to avoid getting deeply involved in
6    reviewing reinsurance treaties, quite frankly.
7            I am sure these carriers have actual losses of their
8    own so I don't think this is going to most ball substantially
9    forward.
10           It is another one of these issues, it seems that we
11   should be focusing our effort on the issues that are pivotal
12   and have the capacity to result in some kind of resolution in
13   this, either by dismissal wholesale or by a settlement.  And
14   the issue that's going to get to that is the discovery into
15   whether or not there is sufficient evidence that these
16   defendants engaged in conduct that gives rise to liability such
17   that they can be held over past the summary judgment phase.
18           If it turns out that they all, as they are advocating
19   presently, are dismissed at the close of discovery on
20   liability, all of this becomes entirely unnecessary.  If, on
21   the other hand, it turns out that they're held over for trial,
22   and we're then going down a road of damage discovery, all of
23   this information becomes part of the inquiry we are doing
24   anyway, and we may at that point be investigating whether or
25   not a special master is the best person to go through this
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

29

1CE3TERC

1    process and to come up with some creative ways, as your Honor
2    suggested, to do smaller inquiries to get at the whole samples.
3           THE COURT:  I recognize that much of what you say has
4    merit.  My reaction to a lot of these requests was, quite
5    frankly, they're overbroad.  But I don't think the solution is,
6    nor do I think I appropriately could say, if we back burner all
7    of the discovery that the plaintiffs might provide in these
8    areas, as a practical matter it may never need to occur.  That
9    could be said about virtually every lawsuit, because if the
10   defendant wins on summary judgment, there is not a lot for the
11   need for the plaintiff to provide discovery.
12           I am going to require that to the extent that there
13   are treaty reinsurance agreements that relate to these claims,
14   that they be produced.   To the extent that there are I guess it
15   is facultative agreements.
16           MR. CARTER:  There is such a thing as facultative
17   reinsurance, yes, your Honor.
18           THE COURT:  There I think there needs to be some
19   exploration of how many such agreements there are.  There has
20   to be some showing of burden and we can have a discussion about
21   how we proceed with respect to those, if at all.  But, I'm not
22   willing to back burner that completely.
23           As I said, with respect to the individuals' claims, I
24   think there needs to be some discussion about ways to sample or
25   come up with specimens of the different tracks that various
                   SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

1CE3TERC

```
 1   claims may have been on.  Understanding we're not going to
 2   capture every claim, but providing some meat for the bones when
 3   Mr. Cottreau and his colleagues on the defense side file
 4   summary judgment motions, if that's necessary.  It may be that
 5   you're correct that it is totally unnecessary, but I think it
 6   is not an unreasonable discovery request to make.
 7           I'm jumping ahead a little just because I think it is
 8   illustrative, I think request number seven, "all documents
 9   concerning your contention that class certification is
10   appropriate" strikes me as uncommonly broad and it guess worse
11   as you go along.  Request number nine, "all documents
12   concerning or reflecting any communication concerning any
13   document you received from any third parties."
14           MR. COTTREAU:  Your Honor, if I could attempt to
15   explain where we got eight through 15.
16           THE COURT:  It may be the reverse of what they've
17   asked you for.
18           MR. COTTREAU:  No, it's not, your Honor.  I wouldn't
19   think of that as a legitimate reason and wouldn't come here and
20   assert it.
21           What we have is, as you know, we went through three
22   rounds I believe last winter and spring of trying to narrow
23   this case through initial disclosures.  And initially we got a
24   list of initial disclosures from the plaintiffs that were very
25   vague, with categories and then what we got is a lengthy sort
```

31

1CE3TERC

```
 1   of amalgam of witnesses and documents that still had a lot of
 2   categories in them.  Then ultimately we got some witnesses
 3   broken down by defendant, but still the document amalgams
 4   stuck.  And eight through 15 really tries to probe what the
 5   plaintiffs are talking about in their initial disclosures.
 6          Just to give you a few examples.  On the document
 7   front, they had an initial disclosure number paragraph nine in
 8   their initial initial disclosures, they said they were going to
 9   be relying on it to prove liability in this case all documents
10   received from as a result of their FOIA requests.  Documents
11   received from third parties via FOIA, and then they had in
12   their amended initial disclosures at page 103 all documents or
13   documents they obtained via letter rogatory processes.  Very
14   vague.  And then further they had in their initial disclosures
15   about 23 categories of documents that they referred to just
16   generally, including government intelligence reports regarding
17   al Qaeda, government intelligence reports regarding funding
18   terrorists, trials related to al Qaeda.
19          Instead of listing 23 categories which is what they
20   gave us, we tried to come up with one broad enough category to
21   encompass what it is they are talking about in their initial
22   disclosures, which the initial disclosures didn't illuminate in
23   any way since those were disclosures about categories of
24   documents.  We're trying to get the categories of documents.
25   To the extent we could have engage in a narrowing discussion,
```

32

1CE3TERC

1    we would have been happy to do so.  Their perspective has been
2    since last fall that discovery should be one way from us at
3    this stage and nothing from them and that's the kind response
4    we got back.
5                MR. CARTER:  I guess a couple points.  The one is to
6    take us back to the beginning when we had the initial dialogue
7    about the defendants doing consolidated discovery, the Court
8    had directed the plaintiffs executive committee to conduct
9    consolidated discovery of the defendants such that defendants
10   would only receive one set of discovery requests from the
11   plaintiffs' side.  And as a reciprocal consideration we asked
12   the defendants to sit down and think amongst themselves to try
13   to reduce the burden on us.
14               The reason we gave you all the discovery requests
15   we've gotten from the individual defendants was to show there
16   has been wholesale discovery by each of the individual
17   defendants as to every fact that has been potentially relevant
18   to the claim against that defendant.  As a result, the
19   consolidated discovery requests just end up being an additional
20   set of discovery for which we have to index tens and tens of
21   thousands of documents and respond to the defendants.
22               It has not been one sided.  I should say, your Honor,
23   we've produced tens of thousands of documents already in
24   discovery, and in most cases our productions outstrip the
25   productions that we've received from the defendants.  And we

33

1CE3TERC
```
 1   are going through a process of indexing all of the documents
 2   and identifying the individual defendant's request to which
 3   they're responsive.  Everything is covered by these.  In fact,
 4   for most of the defendants, we got a request that said any
 5   document identified in your initial disclosure.  Which is
 6   exactly what Mr. Cottreau just described the consolidated --
 7            THE COURT:  What was the response to that?
 8            MR. CARTER:  Your Honor, I'm not sure.  I think some
 9   of them came recently.  I am not sure we responded to all of
10   them.  What I would say is the letters rogatory is the perfect
11   example.  The procedure in this case in place requires us to
12   serve letters rogatory on notice to all parties and that's been
13   done.  That's one category of information they have.  Subpoenas
14   is the same thing.  They mentioned FOIA requests.  We make
15   clear in our response we have no objection to providing the
16   documents we received in response to the FOIA requests to the
17   defendants, to the extent they are relevant to remaining claims
18   in the litigation.  Going through the process of going through
19   our files to the extent there is communications with FOIA
20   officers at various agencies concerning the status of requests
21   that have been pending for eight years, quite honestly, your
22   Honor, I think the reason that catch all is in there in the
23   initial disclosures is because of the FOIA process itself.  You
24   send your FOIA request in 2003.  You are doing initial
25   disclosures in 2010, and you have no idea what you are going to
```

34

1CE3TERC

1    get.  When we get substantive documents back from the agencies,
2    we have and we'll continue to produce them.
3            THE COURT:  You mention the fact that you're indexing
4    documents in response to the individual requests that are part
5    of the larger binder that I have.  These are really catchall
6    requests I gather trying to capture documents which may not be
7    captured by the individual requests.  And going back to request
8    number nine, "all documents concerning or reflecting any
9    communication concerning (A) any document you received from any
10   third party" struck me as hopelessly overbroad.
11           But, when Mr. Cottreau says that -- correctly and I
12   recall the list -- that in the response to the initial
13   disclosure requirement I guess there is a paragraph that says
14   "documents we've received from third parties."
15           At some point the plaintiffs have to put up or shut up
16   in terms of documents.  Later acquired documents is always a
17   problem.  But, as to documents currently in your possession,
18   and by that I mean the plaintiffs collectively, it seems to me
19   perhaps the catchall request ought to be any documents that
20   relate to the plaintiffs' claims which are referred to in the
21   initial disclosures.  And that requires you to go through some
22   sorting process.  And I guess the caveat would be which have
23   not been produced in response to individual requests.  I am not
24   sure there is a need then to index them.  So in a way it is
25   sort of a focused kitchen request if I can characterize it that

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

35

1CE3TERC

1    way.
2              Does that alleviate some of the burden?
3              MR. CARTER:  I don't think that's a problem with one
4    caveat.  The way it is framed relates to any claim ever
5    asserted in the litigation.
6              THE COURT:  No.  It should be claims that remain in
7    the litigation.  That's a perfectly valid point.
8              MR. CARTER:  I think our point all along was once we
9    finished the productions as to the individual defendants, there
10   is not going to be anything left in the universe to produce in
11   response to these.  But, if that ends up being the result, then
12   it is obviously no burden at all.
13             MR. COTTREAU:  We agree it is no burden.  Not undue,
14   at least.
15             THE COURT:  Okay.  I may not have worded it terribly
16   artfully and maybe I'll take a stab at it in an order that
17   follows this conference.
18             But, given that generic ruling, what else should we
19   talk about in terms of the requests?  There is all documents
20   relating to any witness you may depose or call at trial.
21             MR. COTTREAU:  Again, this goes back to the initial
22   disclosures.  It is one that I think folks on our side are
23   really perplexed about.  We're going to be in a real quandary
24   as to how to conduct depositions, given the initial disclosures
25   of plaintiffs.  Given that there are literally hundreds of
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

36

1CE3TERC

1    witnesses that have been disclosed to us, how is it that we
2    decide which of those people to depose and which of them not to
3    depose.  We can send them an interrogatory if they're a party
4    and ask them what they know and try to figure that out.
5    Because all of these witnesses are third parties by and large,
6    we don't know how to conduct discovery.
7             One good guide to it is they have unprivileged
8    communications with folks or they've received documents from
9    folks, it going to be a pretty good indication that that person
10   may have information that's relevant to this litigation that
11   they may call as a witness and somebody may want to depose, and
12   that's the purpose of these inquiries.
13            THE COURT:  Isn't that covered to a large extent by
14   the ruling I just made?
15            MR. COTTREAU:  Depending upon how it is phrased, it
16   may be, your Honor.  It may be.
17            THE COURT:  I suppose there ought to be perhaps an
18   additional one, beyond the one I tried to construct a few
19   moments ago, that relates to any witness that the plaintiffs
20   intend to depose or call at trial.  "Call at trial" I know
21   arguments can be made that those decisions haven't been made,
22   but, as we get closer to actual depositions, again there has to
23   be some decision making on the plaintiffs' side that in fact
24   generates the production of additional documents.  That's going
25   to be happen sooner rather than later.

                                                                    37

1CE3TERC

 1              MR. COTTREAU:  If I can add one subcategory, an
 2     affidavit or declaration from that witness if they intend on
 3     using that at any stage during the proceedings, that that
 4     witness be included as well.  Not just called at trial or
 5     deposed if they are --
 6              THE COURT:  Witness or declarant or deponent or
 7     affiant.  I think that's appropriate.
 8              MR. CARTER:  One of the caveats we'd like to have with
 9     regard to that is obviously the claims in this litigation have
10     to do what we allege the defendants did on a covert basis.  So
11     their documents in our view are the most likely source for
12     mining who the people with relevant knowledge are.  And so,
13     after we get those documents and we see who the witnesses are
14     on their end, we may very well go through a process of
15     collecting documents about that person.  So we can have some
16     understanding of who that person is.  So we can't go through
17     that process until we get their documents.
18              THE COURT:  You can't produce today something that you
19     don't yet have.  On the other hand, before you depose an
20     individual, to the extent you have documents that relate to
21     that individual, you're going to have to produce those
22     documents in advance.  And at some point we'll need to talk
23     about how far in advance.  Or be precluded, unless there is a
24     showing that the document couldn't have been gotten earlier.
25              MR. CARTER:  I do appreciate I'm stating the obvious.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

38

1CE3TERC

 1  I'm trying to avoid briefing on what I anticipate will be a
 2  motion that says you didn't produce these documents by the end
 3  of the rolling production deadline, when of course we could not
 4  have.  I think we should try and avoid that kind of motion
 5  practice.
 6          THE COURT:  That won't be an argument that I'll be
 7  sympathetic to unless there is some indication that you made
 8  efforts not to get the document that you knew was lurking out
 9  there so you wouldn't have to produce it.  In general,
10  obviously, I don't want either side to be sandbagged.
11          MR. CARTER:  That's fine, your Honor.
12          THE COURT:  Are there other document requests that we
13  ought to talk about now that I've made those two generic
14  rulings?
15          MR. COTTREAU:  I think at this stage, your Honor,
16  unless any of my counsel for the co-defendants who are also
17  moving parties in this have anything to say, my respectful
18  suggestion would be we take a look at what we get after those
19  requests have been fulfilled, and if there are holes we be
20  allowed to come back to your Honor and reevaluate.
21          THE COURT:  Sure.
22          MR. CARTER:  That's fine, your Honor.
23          THE COURT:  I said what I wanted to talk about in my
24  memo endorsement.  Is there anything else anybody else?
25          MR. KREINDLER:  One short thing we raised with your
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

39

1CE3TERC

```
 1   Honor last, that's the order we're waiting for from Judge
 2   Daniels given the other proceedings.  We'll be in front of him
 3   tomorrow but if we can have a heads up.
 4            THE COURT:  I honored my commitment and I raised with
 5   him two matters.  One was the fact that my R and R with respect
 6   to al Qaeda have not yet been acted on.  And I forget what the
 7   other issue was but I know I raised it.  It was objections to
 8   something that was kicking around for a year or more.
 9            MR. KREINDLER:  Well, it is the al Qaeda one we're
10   anxious about, because days matter.
11            THE COURT:  I've raised that one with him.  He was
12   cognizant of it.  And I suggest you raise it with him again
13   tomorrow when you're there for that hearing on that one
14   particular claim.
15            MR. COTTREAU:  One clarification that my co-counsel in
16   the case has reminded me of, is there is this issue of the
17   documents that are collected from the dismissed defendants of
18   late from Mr. Berenson's clients and Ms. Lutky's clients.  The
19   whole notion of that discovery and why it went forth and led to
20   the depositions in Virginia that you are aware of because there
21   was a motion to delay them, is because those depositions and
22   documents were somehow relate to the remaining defendants.
23   We're still not exactly sure how, but we understand there has
24   been documents collected from by plaintiffs 22,000 or some
25   number of documents and we just ask they produce those to us as
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1CE3TERC
```
 1   well.
 2            MR. CARTER:  We went through a lengthy and difficult
 3   negotiation process to resolve the claims against those
 4   defendants under very specific terms, and there is an agreement
 5   in place which precludes us from simply voluntarily turning
 6   over the documents we took as a result of that process to the
 7   defendants.  And so, we're unable to act unilaterally --
 8            THE COURT:  I was about to interrupt you and say but
 9   why shouldn't I just direct you to produce those?
10            MR. CARTER:  Your Honor --
11            THE COURT:  You've had the benefit of them or lack of
12   benefit of them, and why shouldn't the defendants have the same
13   opportunity?
14            MR. CARTER:  Your Honor, I think what we did actually
15   is a little bit different.  We went through a vast sort of
16   warehouse of documents and decided what we as plaintiffs
17   thought would be important to us.
18            THE COURT:  Okay.  Those are the only documents you
19   possess?
20            MR. CARTER:  That's correct, your Honor.  I think what
21   we would say is what we decided to take out of the vast room
22   reflects our work product in terms of what we decided to select
23   and what we decided to leave behind.  The defendants haven't
24   gone the road of issuing a subpoena to try and get complete
25   access to the records themselves.
```

41

1CE3TERC

1           THE COURT:  But you did issue a subpoena.
2           MR. CARTER:  We did.  And we were compelled to
3   withdraw it after -- if you recall, we had lengthy argument and
4   there was a request that we pay many hundreds of thousands of
5   dollars for the defendants' counsel to go through the records.
6   And after a series of hearings on the issue, we worked out this
7   agreement.  And I think that what we prefer to see at this
8   point -- I'm sure counsel for those defendants wants to be
9   heard on this issue.  It was not on the agenda.  It hasn't been
10  briefed.
11          THE COURT:  We'll table it to the next session, but
12  you should share with counsel for those former defendants that
13  my inclination is to direct that the documents be produced.
14  And so that hopefully can lead to some letters discussing the
15  issue before the next conference.
16          MR. CARTER:  Thank you, your Honor.
17          THE COURT:  Anything else?
18          MR. KREINDLER:  No, your Honor.
19          THE COURT:  When is the next conference?
20          MR. CARTER:  That is the one issue, your Honor.  I
21  apologize.  The next conference is two days before the broader
22  case management conference before Judge Daniels.  We had
23  discussed previously perhaps moving the discovery conference to
24  the same day.  I think the conference before Judge Daniels is
25  on the 13th, if I'm not mistaken, of January.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

42

1CE3TERC

1              MR. KREINDLER:  That Friday.  The 14th.
2              THE COURT:  His conference is --
3              MR. KREINDLER:  It is that Friday -- my calendar and
4      my phone is checked downstairs.  So I can't --
5              THE COURT:  Friday the 13th of January?
6              MR. KREINDLER:  That's it.
7              MR. CARTER:  We're on schedule for the 11th.
8              THE COURT:  That makes no sense.  What time is the
9      conference with him?
10             (Discussion off the record)
11             THE COURT:  We'll try to accommodate you folks so that
12     you're not making two trips, and we'll let you know if we're
13     able to.  We can do that in the next few days.
14             MR. CARTER:  Thanks, your Honor.
15             THE COURT:  Have a good holiday, everyone.
16                              o0o
17
18
19
20
21
22
23
24
25