UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

In re:

    TERRORIST ATTACKS ON
    SEPTEMBER 11, 2001

-----------------------------------------------------------------X

03-MDL-1570 (GBD)(SN)

**REPORT AND RECOMMENDATION**

**SARAH NETBURN, United States Magistrate Judge.**

**TO THE HONORABLE GEORGE B. DANIELS:**

This document relates to: Continental Casualty Co. v. Al Qaeda Islamic Army, 04-CV-5970 (GBD)(SN).

On January 6, 2017, the Honorable George B. Daniels entered a default on behalf of Continental Casualty Company, Transcontinental Insurance Company, Transportation Insurance Company, Valley Forge Insurance Company, National Fire Insurance Company of Hartford, and American Casualty Company of Reading, Pennsylvania (collectively, "Plaintiffs") against the Islamic Republic of Iran ("Iran") on claims arising under 28 U.S.C. § 1605A, and referred the calculation of damages to my docket. ECF No. 3415. On June 19, 2017, Plaintiffs moved for an award of damages. ECF No. 3628. For the following reasons, I recommend that the Court grant in part and deny in part Plaintiffs' application and that a default judgment be entered in favor of Plaintiffs in the sum of $221,861,243.69, in addition to prejudgment interest.

## BACKGROUND

Plaintiffs are insurers who made payments to their insureds for property damage, business interruption, and other claims arising from the terrorist attacks on September 11, 2001. The state sponsor of terrorism exception of the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A(d), authorizes "actions [to] be brought for reasonably foreseeable property loss,

whether insured or uninsured, third party liability, and loss claims under life and property insurance policies" caused by acts of terror. Plaintiffs seek to recover several categories of damages against Iran.

The damages sought by Plaintiffs include $221,861,243.69 in claims paid out pursuant to insurance policies, $305,737,641 in claims paid out pursuant to reinsurance policies, $3,186,499.40 in claims paid to airline clients through the Associated Aviation Underwriters ("AAU") insurance program, $8,572,527.43 in adjustment costs and expenses incurred in connection with each covered claim under their insurance policies, $226,638 in attorneys' fees, and prejudgment interest from September 11, 2001, to the date of entry of judgment.

In support of their claims, Plaintiffs have submitted an affidavit by Lawrence Boysen, Senior Vice President and Corporate Controller of Continental Casualty Company. Boysen's affidavit reflects that he has personal knowledge of Plaintiffs' day-to-day operations, ECF No. 3629, Boysen Aff. ¶ 6, and describes the standards and procedures that an insured must follow throughout the adjustment process to receive compensation for a claim, id. ¶¶ 7–8. Boysen states that he has personally reviewed Plaintiffs' records to ensure that the payments reflected therein were properly made for losses suffered by their policy holders, insured, and reinsured for claims arising from the September 11 attacks. Id. ¶¶ 13–14. Boysen's affidavit is accompanied by four exhibits, which are schedules providing the payments made on Plaintiffs' (a) insurance policies; (b) reinsurance policies; (c) participation in the AAU insurance program; and (d) attorneys' fees. ECF No. 3629-1–4. As discussed further below, Boysen submitted a supplemental declaration in response to a specific inquiry by the Court.

# DISCUSSION

## I. Standard of Review

The Court of Appeals set forth the procedural rules applicable to the entry of a default judgment in City of New York v. Mickalis Pawn Shop, LLC:

> Federal Rule of Civil Procedure 55 is the basic procedure to be followed when there is a default in the course of litigation." Vt. Teddy Bear Co. v. 1–800 Beargram Co., 373 F.3d 241, 246 (2d Cir. 2004). Rule 55 provides a "two-step process" for the entry of judgment against a party who fails to defend: first, the entry of a default, and second, the entry of a default judgment. New York v. Green, 420 F.3d 99, 104 (2d Cir. 2005). The first step, entry of a default, formalizes a judicial recognition that a defendant has, through its failure to defend the action, admitted liability to the plaintiff. . . . The second step, entry of a default judgment, converts the defendant's admission of liability into a final judgment that terminates the litigation and awards the plaintiff any relief to which the court decides it is entitled, to the extent permitted by Rule 54(c).

645 F.3d 114, 128 (2d Cir. 2011).

Where default has been entered against a defendant, courts are to accept as true all of the well-pleaded facts alleged in the complaint, except those concerning the amount of damages. See Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp., Div. of Ace Young Inc., 109 F.3d 105, 108 (2d Cir. 1997) (citing Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp., 973 F.2d 155, 158 (2d Cir. 1992)). Where, as in this case, a plaintiff's well-pleaded facts are sufficient to state a claim on which relief can be granted, the only remaining issue in an inquest is whether plaintiff has provided adequate support for its requested relief. See Gucci Am., Inc. v. Tyrrell-Miller, 678 F. Supp. 2d 117, 119 (S.D.N.Y. 2008) (citing Credit Lyonnais Sec. (USA), Inc. v. Alcantara, 183 F.3d 151, 155 (2d Cir. 1999)).

"[A] plaintiff seeking to recover damages against a defaulting defendant must prove its claim [through] the submission of evidence. . . ." <u>Malletier v. Carducci Leather Fashions, Inc.</u>, 648 F. Supp. 2d. 501, 503 (S.D.N.Y. 2009). A court may determine the amount, if any, a plaintiff is entitled to recover without holding a hearing as long as (1) the court determines the proper rule for calculating damages, and (2) the evidence submitted by the plaintiff establishes "with reasonable certainty" the basis for the damages. <u>Id</u>. (citing <u>Credit Lyonnais Sec. (USA), Inc.</u>, 183 F.3d at 155, and <u>Transatlantic Marine Claims Agency Inc.</u>, 109 F.3d at 111).

**II.     Damages**

Plaintiffs contend generally that they are entitled to "the amounts they were compelled to expend under applicable policies of insurance and reinsurance as the result of the September 11th Attacks." ECF No. 3631, Pls.' Mem. at 3. Plaintiffs are not entitled to compensatory damages, however, simply because they expended money as a result of the terrorist attacks. As Judge Maas explained when recommending an award of damages in <u>Federal Insurance Co. v. Al Qaida</u>, 03-CV-6978, a previous claim concerning insurers, insurers can only recover for the losses they expended under the doctrine of subrogation. ECF No. 2479 at 5 ("<u>Federal Insurance I</u>").[1]

---

[1] Judge Maas's discussion of the principles of subrogation is found in an October 14, 2011 Report and Recommendation that recommends that the <u>Federal Insurance</u> plaintiffs be granted damages against non-sovereign defendant al-Qaeda under the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2331. <u>See</u> ECF No. 2479. That statute provides that "[a]ny national of the United States injured in his or her . . . property . . . or business by reason of an act of international terrorism" may recover treble damages. 18 U.S.C. § 2333(a). In a December 28, 2015 Report and Recommendation, Judge Maas extended his analysis under the ATA to the <u>Federal Insurance</u> plaintiffs' claims against Iran under the state sponsor of terrorism exception of the FSIA at issue here, 28 U.S.C. § 1605A(d). <u>See</u> ECF No. 3175 at 4 ("<u>Federal Insurance II</u>") ("As the Federal Insurance Report establishes, the . . . policyholders clearly suffered [property] losses, for which they have been compensated, thereby entitling the Federal Insurance Plaintiffs to be subrogated."). Following these decisions, I do not perceive any reason why the subrogation analysis should be distinct under the FSIA, which refers to "reasonably foreseeable property loss," from the ATA.

A. **Subrogated Insurance Claims**

To the extent that Plaintiffs seek to recover amounts paid to their insureds pursuant to their insurance policies, they are indeed subrogated to their policyholders' claims for property loss. "[T]he general rule is that upon payment of a loss the insurer is entitled to be subrogated *pro tanto* to any right of action which the insured may have against a third person whose negligence or wrongful act caused the loss." Redington v. Touche Ross & Co., 592 F.2d 617, 624 (2d Cir. 1978), rev'd on other grounds, 442 U.S. 560 (1979) (citation omitted). Under New York law, the equitable doctrine of subrogation "entitles an insurer to 'stand in the shoes' of its insured to seek indemnification from third parties whose wrongdoing has caused a loss for which the insurer is bound to reimburse." N. Star Reins. Corp. v. Cont'l Ins. Co., 82 N.Y.2d 281, 294 (1993); see also id. ("Subrogation allocates responsibility for the loss to the person who in equity and good conscience ought to pay it, in the interest of avoiding absolution of a wrongdoer from liability simply because the insured had the foresight to procure insurance coverage.").

Analyzing case law under the Clayton Act and the civil RICO statute, Judge Maas found in Federal Insurance I that the terms "business" and "property" were given a broad construction, and included "anything of material value owned or possessed" and money losses incurred by commercial enterprises. ECF No. 2479 at 6 (citing Reiter v. Sonotone Corp., 442 U.S. 330 (1979)). Following this analysis, Plaintiffs are subrogated to all but three of the claims of their insureds—whether for property damage or business interruption—found in Exhibit A of the Boysen Affidavit. ECF No. 3629-1.

Exhibit A lists three claims that are not obviously related to the terrorist attack. These claims are described as: (1) "burglary," with a paid loss net deductible of $305,403.47 (Claim No. RM00625111); (2) "alleged negligence," with a paid loss net deductible of $13,557.64

(Claim No. IA00114611); and "alleged negligence," with a paid loss net deductible of $36,314.18 (Claim No. IA00117211). Unsatisfied that these loss descriptions establish "with reasonable certainty" the basis for Plaintiffs' damages, the Court directed the Plaintiffs to file a sworn affidavit "explaining how these three claims were connected to the terrorist attacks." ECF No. 3778. In response, Plaintiffs submitted a supplemental declaration from Lawrence Boysen. ECF No. 3801. Boysen's testimony is not satisfactory. He explains only that the professional adjusters who reviewed these claims assigned them industry catastrophe codes that are associated with the terrorist attacks, and that the adjusted claims are reviewed by management and supervisory personnel to ensure accuracy. Boysen Supp. Decl. ¶ 3. He concludes that based on those codes alone he "believe[s] that these three claims arose out of the Terrorist Attacks." Id. at ¶ 4.

A plaintiff proceeding against a defaulting defendant must still *prove* its claim with evidence that establishes with reasonable certainty the basis for its damages. While the Court is willing to accept at face value that claims described as "Terrorist Attack/Fire" or "Loss of business due to WTC Attack" are for claims that they say they are for; absent some further details (such as the date of the loss, the location of the burglary or negligence, or the alleged negligent tortfeasor), claims for loss caused by "burglary" or "alleged negligence" should not be recovered against Iran. Accordingly, I recommend deducting these claims from the total and awarding Plaintiffs damages of $221,505,968.40.

### B. Associated Aviation Underwriters ("AAU") Program Claims

Plaintiffs also claim $3,186,499.40 for claims paid pursuant to their participation in the AAU insurance program, which "underwrote insurance for a full range of risks for a wide variety of aerospace clients, including domestic airlines." Id. ¶ 20. Plaintiffs claim that their financial

records show that the payments for insured losses were attributable to the September 11th Attacks. Id.

While information about the nature of the AAU insurance program is sparse in Plaintiffs' briefing and the Boysen Affidavit, it appears that, if the sums paid by Plaintiffs were properly documented, they could also subrogate to the claims of their insured aerospace clients. The documentation that Plaintiffs provide, however, is insufficient to support their claims for damages.

Unlike Exhibit A of the Boysen Affidavit, which lists the name of Plaintiffs' insured and the description of their losses, thus allowing the Court to verify that such losses were related to the September 11, 2001 attacks, Exhibit C, which substantiates Plantiffs' participation in the AAU program, provides only the names of the insured and total paid losses and expenses. ECF No. 3629-3. The only information provided is whether the sums were paid "prior to March 2011," "between April 2011 and April 2013," or "between May 2013 and February 2017." Id. Notwithstanding the general assertion in the Boysen Affidavit that all of these payments were attributable to the September 11 attacks, it is difficult to believe, absent more particularized evidence, that Plaintiffs were making payments over 15 years after the terrorist attacks that were solely attributable to those attacks. Accordingly, I recommend that Plaintiffs' claim for $3,186,499.40 stemming from their participation in the AAU program be denied without prejudice to a future, more particularized application adequately substantiating that the claims paid were sufficiently related to the terrorist attacks so as to satisfy generally accepted standards of proximate causation.

C. **Claims Adjustment Costs**

Plaintiffs also claim that they suffered losses in the amount of $8,572,527.43 because they needed to incur costs in the claims adjustment process. These costs included fees charged by outside consultants such as accountants and engineers, fees charged by legal counsel, and other administrative costs. Boysen Aff. ¶ 16. Plaintiffs neglect to mention, however, that in <u>Federal Insurance I</u>, Judge Maas already considered whether insurers could recover such "direct" costs, and determined that they could not.

As insurers, Plaintiffs did not sustain any direct property or business loss themselves. As subrogees of their insured policyholders, their rights are limited to those of their subrogors. <u>See</u> 16 Couch on Ins. § 222:5 (3d ed.). Plaintiffs' claim for the costs incidental to their processing and adjustment of their policyholders' claims implies not only that Iran would be liable to insurers to the same extent it would be to their policyholders, but also that, as a wrongdoer, it incurred the obligation to indemnify the insurers for all costs that *they* incurred as a result of the September 11 attacks. But, as Judge Maas found, "[t]here is not a single reported case . . . which holds that upon an insurance carrier's payment to its insured, the insurer becomes vested with a claim arising out of an implied contract of indemnity with the tortfeasor who caused the damage . . . . On the contrary, the authorities and the cases unanimously hold that the insurer's recovery is premised exclusively upon subrogation." ECF No. 2479 at 10 (quoting <u>Great Am. Ins. v. United States</u>, 575 F.2d 1031, 1033 (2d Cir. 1978)); <u>see also</u> <u>United States v. Munsey Tr. Co.</u>, 332 U.S. 234, 242 (1947) ("One who rests on subrogation stands in the place of one whose claim he has paid, as if the payment giving rise to the subrogation had not been made.").

Accordingly, because the adjustment costs would not be recoupable by the insured policyholders themselves, were they to have made a direct claim against Iran, Plaintiffs have not

8

demonstrated that they may recover such incidental costs on a subrogation theory, and I recommend that these claims be denied.

### D.     Reinsurance Claims

In addition to the insurance claims, Plaintiffs also seek compensatory damages for losses they incurred on account of the reinsurance contracts that they had with insurers that made payments in connection with the September 11 attacks, in the sum of $305,737,641. ECF No. 3629, Boysen Aff. ¶ 19.

Reinsurance is "the insurance of one insurer (the 'reinsured') by another insurer (the 'reinsurer') by means of which the reinsured is indemnified for loss under insurance policies issued by the reinsured to the public . . . . Essentially, it is a vehicle through which insurers distribute their insurance liabilities or risks." Matter of Liquidation of Union Indem. Ins. Co. of New York, 89 N.Y.2d 94, 105–06 (1996) (citations omitted). "The reinsurer does not assume liability for losses paid . . . its only obligation is to indemnify the primary insurer." Matter of Midland Ins. Co., 79 N.Y.2d 253, 258 (1992); see also Unigard Sec. Ins. Co. v. N. River Ins. Co., 79 N.Y.2d 576, 582 (1992) (noting that reinsurance was "not a contract under which the company agrees to indemnify the insured from losses up to a stated limit upon the happening of specified contingencies," but rather "a contract between two insurance companies in which the reinsured company agrees to cede part of its risk to the reinsurer in return for a percentage of the premium").

A reinsurance contract operates solely between the reinsurer and the reinsured, and confers no rights on the insured. Unigard, 79 N.Y.2d at 582; see also Pink v. Am. Sur. Co. of New York, 283 N.Y. 290, 295 (1940) (holding that there was "no privity between the parties first insured by defendant and the reinsurer and no claim for loss could be maintained by those parties

against the latter"). Accordingly, because a reinsurer has no contractual obligation to the insured party who suffered the initial property loss or damage, it has no subrogation rights. See Reliance Ins. Co. v. Aerodyne Engineers Inc., 204 A.D.2d 944, 944–45 (3d Dep't 1994) (noting also that "the fact that a reinsurer pays a claim on behalf of the insured does not alter the relationships between the parties").

As regards Plaintiffs' reinsurance contracts, the "reasonably foreseeable property loss" was sustained not by their reinsured clients—insurance companies holding primary insurance contracts with their policy-holders—but by the insured policy holders who had no contractual privity with Plaintiffs. Therefore, Plaintiffs cannot equitably subrogate to and "stand in the shoes" of these policyholders' claims, and are not entitled to the $305,737,641 sought under their reinsurance contracts. Accordingly, I recommend that these claims be denied.

This recommendation is in tension with the prior recommendations of Judge Maas in Federal Insurance I, ECF No. 2479, and Federal Insurance II, ECF No. 3175, as well as Certain Underwriters at Lloyd's London v. Great Socialist People's Libyan Arab Jamahiriya, 811 F. Supp. 2d 53 (D.D.C. 2011), the only reported decision from outside this district that the Court could identify that awarded damages to insurers under 28 U.S.C. § 1605A(d), all of which recommended awards to reinsurers. The Federal Insurance cases, however, did not consider the distinction between insurance and reinsurance contracts, and Lloyd's did not conduct a subrogation analysis at all.

### E. Attorneys' Fees

Plaintiffs also seek an award of the attorneys' fees they have incurred from the commencement of their action through February 1, 2017. This claim fails for two reasons. First, Plaintiffs have not set forth any basis on which attorneys' fees are recoverable. While the ATA

explicitly discusses the recovery of attorneys' fees, Plaintiffs have cited to no comparable provision in 28 U.S.C. § 1605A. See Gill v. Islamic Republic of Iran, No. 15-CV-2272 (RBW), 2017 WL 1289938, at *10 n.8 (D.D.C. Apr. 6, 2017) (noting that § 1605A does not provide for attorneys' fees). Second, the documentation provided supporting this request, ECF No. 3629-4, consists solely of the hours billed by counsel Robert M. Kaplan going back to 2003, with no description of what tasks he was performing. "Any attorney . . . who applies for court-ordered compensation . . . must document the application with contemporaneous time records . . . specify[ing], for each attorney, the date, the hours expended, and the nature of the work done." N.Y. State Ass'n for Retarded Children v. Carey, 711 F.2d 1136, 1148 (2d Cir. 1983). Even if attorneys' fees were recoverable under the statute, Plaintiffs provide no indication of the "nature of the work done" so that the Court could analyze the reasonableness of the hours expended. Accordingly, I recommend that Plaintiffs' application for attorneys' fees be denied.

## III. Prejudgment Interest

Plaintiffs further seek prejudgment interest with respect to their damages. Pursuant to section 5001 and 5004 of the New York Civil Practice Law and Rules ("CPLR"), Plaintiffs claim they are entitled to a nine percent simple interest rate to the extent that their claims arise out of losses in New York State. In addition, Plaintiffs claim they are entitled to a 4.96 percent interest rate, compounded annually, to the extent that their claims arise elsewhere.

### A. The Applicable Rate

Plaintiffs are entitled to the prejudgment interest rates that they seek. New York law mandates the recovery of the nine percent interest rates "upon a sum awarded because of a breach of performance of a contract, or because of an act or omission depriving or otherwise interfering with title to, or possession or enjoyment of, property." CPLR § 5001(a). The

11

September 11, 2001 terrorist attacks were an "act . . . depriving or otherwise interfering with title to, or possession or enjoyment of" the property of Plaintiffs' insured policyholders, to whose claims they equitably subrogated after making payments under their policies. Therefore, I recommend an award of prejudgment interest at the nine percent simple interest rate on all of Plaintiffs' claims arising out of losses in New York State.[2]

The prejudgment interest rate to be applied to the remainder of Plaintiffs' claims is a matter of the Court's discretion. See Gierlinger v. Gleason, 160 F.3d 858, 873 (2d Cir. 1998) (finding that trial court's discretion to award prejudgment interest is guided by "(i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court."). Consistent with Judge Maas's prior recommendations in Federal Insurance II, ECF No. 3175 at 9, and my own recommendations in other cases in this multidistrict litigation, I recommend that, for all claims arising outside of New York State, Plaintiffs be awarded the 4.96 percent average prime rate published by the Federal Reserve Board during the period from September 11, 2001, through January 1, 2013. Although that average interest rate could be recalculated to account for the passage of additional time, I recommend for the sake of consistency with earlier decisions in this multidistrict litigation that this same 4.96 percent rate be applied to all claims that are the subject of this Report and Recommendation.

---

[2] Because these claims concern a tortious interference with property rights, the Court's analysis in Hoglan v. Islamic Republic of Iran, ECF No. 3358, which recommended the denial of New York statutory prejudgment interest to personal injury claims as unsupported by CPLR § 5001(a), does not apply.

### B. The Date Interest Accrues

In addition, Plaintiffs claim that they are entitled to prejudgment interest for the period from September 11, 2001, to the date of entry of judgment. The Court ordered that Plaintiffs submit supplemental briefing "addressing the appropriate date from which prejudgment interest should be computed pursuant to Section 5001(b) of the New York Civil Practice Law and Rules and any other applicable law." ECF No. 3778 at 2–3. In their supplemental briefing, Plaintiffs suggest that federal law governs the date from which prejudgment interest should be computed, and thus they do not address the applicability of CPLR § 5001(b). But to the extent Plaintiffs claim they are entitled to nine percent interest pursuant to New York law, the date from which prejudgment interest begins to accrue likewise must be governed by New York law. See In re Sept. 11 Litig., 802 F.3d 314, 343 (2d Cir. 2015); Schwimmer v. Allstate Ins., 176 F.3d 648, 650 (2d Cir. 1999).

Under CPLR § 5001(b), "[i]nterest shall be computed from the earliest ascertainable date the cause of action existed, except that interest upon damages incurred thereafter shall be computed from the date incurred." In addition, "[w]here such damages were incurred at various times, interest shall be computed upon each item from the date it was incurred or upon all of the damages from a single reasonable intermediate date." CPLR § 5001(b). "Because '[a]n insurer's right of subrogation attaches, by operation of law, upon its payment of an insured's loss,' the date of payment is the earliest ascertainable date the cause of action existed" under New York law. Hartford Fire Ins. v. Jainulabdeen, No. 06-CV-2171, 2007 WL 1028930, at *6 (E.D.N.Y. Mar. 30, 2007) (quoting Allstate Ins. v. Mazzola, 175 F.3d 255, 260 (2d Cir. 1999)); accord St. Paul Fire & Marine Ins. v. Fox Insulation Co., No. 96-CV-0502, 1999 WL 782333, at *1 (W.D.N.Y. Sept. 30, 1999); Am. Home Assurance Co. v. Morris Indus. Builders, Inc., 597

N.Y.S.2d 27, 28 (1993). Thus, I recommend computing prejudgment interest from the dates of payment for claims arising out of losses in New York State.

With respect to those claims subject to the 4.96 percent interest rate, "[t]he Court has broad discretion" in determining "the correct date on which prejudgment interest should begin to accrue." Atl. Mut. Ins. v. Napa Transp., Inc., 399 F. Supp. 2d 523, 525 (S.D.N.Y. 2005), aff'd, 201 F. App'x 19 (2d Cir. 2006); accord Indep. Bulk Transp., Inc. v. Vessel Morania Abaco, 676 F.2d 23, 25 (2d Cir. 1982). Some courts have held that prejudgment interest should begin to accrue when the insured sustains the underlying injury for which the insured is compensated by the insurer. Atl. Mut. Ins. v. Napa Transp., Inc., 399 F. Supp. 2d 523, 526 (S.D.N.Y. 2005), aff'd, 201 F. App'x 19 (2d Cir. 2006); see Mitsui & Co. v. Am. Exp. Lines, Inc., 636 F.2d 807, 823 (2d Cir. 1981) (holding that the district court did not abuse its discretion by not deferring the accrual of interest until payment by the insurers). Others have noted that insurers receive an unfair windfall when they are awarded interest for dates prior to payment; thus, these courts have held that prejudgment interest should be calculated only from the date of payment. Am. Nat. Fire Ins. ex rel. Tabacalera Contreras Cigar Co. v. Yellow Freight Sys., Inc., 325 F.3d 924, 937 (7th Cir. 2003); Fireman's Fund Ins. v. Never Stop Trucking, Inc., No. 08-CV-3445, 2009 WL 3297780, at *2 (E.D.N.Y. Oct. 13, 2009); Sprague & Rhodes Commodity Corp. v. S.S. Toronto, 1977 A.M.C. 758, 770 n.1 (S.D.N.Y.), aff'd, 573 F.2d 1296 (2d Cir. 1977). To avoid giving Plaintiffs a windfall, and for the sake of consistency with the claims arising out of losses in New York State, I recommend awarding prejudgment interest from the dates of payment for the remaining claims.

These recommendations are in tension with the recommendation of Judge Maas in Federal Insurance II, ECF No. 3175, as well as Certain Underwriters at Lloyd's London, 811 F.

Supp. 2d at 76. But neither of those cases analyzed the date upon which prejudgment interest should begin to accrue.

## CONCLUSION

I recommend granting Plaintiffs' motion to assess damages against Iran. ECF No. 3628. Specifically, I recommend that Plaintiffs be awarded damages in the sum of $221,505,968.40, as well as prejudgment interest from the dates of payment to the date of judgment at the rates of (1) nine percent simple interest for all claims arising from losses in New York State; and (2) 4.96 percent per annum, compounded annually, for all claims arising from losses outside of New York State. Plaintiffs have not provided the Court with dates of payment for the claims for which they have subrogation rights. Accordingly, I recommend that, following Judge Daniels's action on my recommendation, he order that the Plaintiffs submit proposed judgments in line with his rulings.

Finally, I recommend that Plaintiffs' claims stemming from their reinsurance contracts, claims adjustment costs, and attorneys' fees be denied, and that their claims arising from their participation in the Associated Aviation Underwriters program be denied without prejudice to a further, more particularized application.

_____
SARAH NETBURN
United States Magistrate Judge

DATED:     November 27, 2017
           New York, New York

\*          \*          \*

## NOTICE OF PROCEDURE FOR FILING OBJECTIONS
## TO THIS REPORT AND RECOMMENDATION

The parties shall have fourteen days from the service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. See also Fed. R. Civ. P. 6(a), (d) (adding three additional days when service is made under Fed. R. Civ. P. 5(b)(2)(C), (D), or (F)). A party may respond to another party's objections within fourteen days after being served with a copy. Fed. R. Civ. P. 72(b)(2). Such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable George B. Daniels at the United States Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b). Any requests for an extension of time for filing objections must be addressed to Judge Daniels. The failure to file these timely objections will result in a waiver of those objections for purposes of appeal. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b); Thomas v. Arn, 474 U.S. 140 (1985).