UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (GBD) (SN) <br><br> ECF Case |

This document relates to:
*Kathleen Ashton, et al v. Al Qaeda Islamic Army, et al.*, Case No. 02-cv-06977
*Federal Insurance Co., et al. v. Al Qaida, et al.*, Case No. 03-cv-06978
*Thomas Burnett, Sr., at al. v. Al Baraka Inv. & Dev. Corp., et al.*, Case No. 03-cv-09849
*Estate of John P. O'Neill, Sr., et al. v. Al Baraka, et al.*, Case No. 04-cv-01923
*Continental Casualty Co., et al. v. Al Qaeda, et al.*, Case No. 04-cv-05970
*Cantor Fitzgerald & Co., et al. v. Akida Bank Private Ltd., et al.*, Case No. 04-cv-07065
*Euro Brokers, Inc., et al. v. Al Baraka, et al.*, Case No. 04-cv-07279

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION TO COMPEL DEFENDANT YASIN ABUDULLAH KADI TO PROVIDE DOCUMENTS AND TESTIMONY CONCERNING HIS EFFORTS TO RESPOND TO PLAINTIFFS' REQUESTS FOR PRODUCTION OF DOCUMENTS**

**PRELMINARY STATEMENT**

The Plaintiffs' Executive Committees ("PECs") served Yasin Abdullah Kadi ("Kadi") with discovery requests on August 1, 2008, but Kadi did not respond to those requests until September 30, 2013.  In the interim between service of the discovery requests and his initial response, Kadi was dismissed from the case, plaintiffs appealed the dismissal, and the Second Circuit set aside the dismissal and remanded Kadi to the district court for jurisdictional discovery.  Plaintiffs served updated discovery demands on Kadi on August 15, 2013.  After Kadi's first production on September 30, 2013, Kadi produced additional documents on a rolling basis over the next four years.  Kadi characterized his December 15, 2014 production as his "fifth and final document production."  *See* Ex. 1, Letter from Kadi attorney Peter Salerno.

The PECs reviewed the 104,302 pages that Kadi produced to that point and challenged him over significant gaps in the production.  As part of plaintiffs' meet and confer with Kadi in May 2015, the PECs outlined gaps in the production in writing and added a supplemental request

based on information learned from earlier productions from Kadi and other defendants.  *See* Ex. 2, PEC May 6, 2015 letter to attorney Salerno.  Since Kadi's 2014 representation that he had made his final production, Kadi, with prodding, has produced an additional 171,061 pages, in other words, approximately 62% of his overall production of documents came after he stated he had given us everything he had, minus privileged material.

In total, Kadi served nine separate responses to document demands ending earlier this year on March 30, 2017.  Since the review of the last production and finding current gaps, the PECs and counsel for Kadi have had additional meet and confer communications in an attempt to narrow the issues, until they reached an impasse.  In short, Kadi claims, once again, that he has produced all responsive documents, save for the 277 documents listed on a privilege log and similar redactions made to approximately 429 other documents created before September 11, 2001.

Based on the circumstances and characterizations of missing documents, Plaintiffs contend that documents that clearly existed at some point in time are missing from Kadi's productions. Kadi does not allege that the documents were destroyed or that they exist somewhere outside of his control.  Nor does Kadi detail his efforts to comply with his production obligations.  The PECs contend additional responsive documents exist and that Kadi has the ability to produce or authorize production of the documents.  The PECs also take issue with some of the documents that Kadi withheld in whole or in part (i.e., Kadi's redactions to some of the documents) based on his assertion of privilege.

**FACTUAL BACKGROUND**

On October 12, 2001, the United States Department of Treasury's Office of Foreign Asset Controls ("OFAC") named Saudi national, Yasin Kadi as a Specially Designated Global Terrorist due to his support for al Qaeda and Osama Bin Laden ("OBL").  *See* Ex. 3, Treasury

Department Press Release of Oct 12, 2001, p.2.  The United Nations and European Union followed suit and the Kingdom of Saudi Arabia ("KSA"), itself, froze his assets.   Some two years later, the Treasury Department said

> [Kadi] a Saudi businessman whose companies span the Middle East, North America and South Asia, has been consistently identified as a financial supporter of Usama bin Laden and other known Islamic extremists for nearly a decade.

*See* Ex., 4 Memorandum for Richard Newcomb, excerpts p.2

Prior to the September 11, 2001 Terror Attacks, Kadi controlled several entities connected to Osama bin Laden ("OBL") and al Qaeda.  One such entity was a charity known as Muwafaq that operated in Sudan, Pakistan, Afghanistan, and the Balkans with support offices elsewhere.  The U.S. Treasury Department found that

> [t]here is substantial and credible evidence that both Muwafaq as an entity, and many of the individuals charged with operating it and distributing its funds, were engaged in a longstanding pattern of supporting terrorist and extremist causes.

*See* Ex. 4, Memorandum for Richard Newcomb excerpts, p.3

Plaintiffs have pursued numerous avenues of investigation relating to Kadi, his companies, and Muwafaq's support to al Qaeda.  However, in the interest of expeditiously bringing document discovery to a close, the PECs have identified the remaining discrete and narrow topics in which we believe Kadi is withholding documents or has the ability to authorize their disclosure from a third party.

### Rowad Development & Investment

Rowad Development & Investment ("Rowad") was a joint venture in the Sudan between Kadi and al Qaeda.  Documents contained in Exhibit 5 are Sudanese Corporate Registry records of Rowad that lists shareholders including al Qaeda's holding company

Wadi al Aqiq and Muwafaq *Id.* at Kadi 89825-71.[1]  The Sudanese Corporate records for Rowad *Id.* at Kadi 89825-89878 were the only responsive records produced to the PECs Request #92 in their first set of Jurisdictional Document Requests to Yasin Kadi, dated August 22, 2013.  Request #92 read:

> Please provide all documents governing, describing, detailing, or otherwise relating to any relationship between You and/or the Muwafaq Foundation and the following entities: Wadi al Aqiq Company, Ltd.; Al Hijrah Construction and Development, Ltd.; Taba Investment Company, Ltd.; Al Timar al Mubarikah; Gum Arabic Company; Bin Ladin International; Al Qudarat Transport Company; Blessed Fruits Company; Al Ikhlas International Company; Al Samal al Mubaraka Company; Dahabshil Hawala Company (collectively referred to hereinafter as the "Bin Laden Businesses").

In testimony from the 1998 Embassy Bombings trial in the Southern District of New York, al Qaeda defector Jamal al Fadl described Wadi al Aqiq as al Qaeda's "mother company." *See* Ex. 6, *U.S. v Bin Laden,* Feb 6, 2001 transcript excerpt.  Wadi al Aqiq is also mentioned in a letter from Osama Bin Laden to his family recovered in the U.S. raid on his Abbottabad, Pakistani compound in 2011. *See* Ex. 7, Abbottabad Document p.2.

In the Rowad documents, the signature next to Wadi al Aqiq is that of OBL.  *See* Ex. 5 at Kadi 89843, Ex. 7, bottom of p.1 and Ex. 8, *U.S. v Bin Laden* GX 1610 bottom of p.1.  In addition to OBL, another shareholder of Rowad was al Shamal Islamic Bank, a Sudanese bank in which both OBL and Kadi held shares.  *See* Ex. 9, State Department Fact Sheet on Bin Laden and Ex. 5 at 20327-41 Kadi responses to Swiss questions. Several other wealthy Saudis invested with Kadi in Al Shamal Islamic Bank, including

---

[1] Exhibit 5 contains various documents produced by Kadi in Bates Stamp numerical order.

Prince Mohamed bin Faisal. *Id*. at Kadi 20341. OBL attended the same meeting as those investors. *See* Ex. 5 at Kadi 27078-27130, Jamal al Fadl responses to Swiss questions. Rowad's business was agriculture production, and the processing, marketing, and both import and export goods to and from the Sudan. Crops included sesame seeds, livestock and poultry, tanneries and veterinary medicines. *See* Ex. 5 at Kadi 89839-41, 89865.

Several people and entities affiliated with Yasin Kadi held official positions with Rowad, including:

- Yassin Ali, was on the Board of Directors at Rowad. *See* Ex. 5 at Kadi 89835. Ali was later an owner/director with Kadi of Solano Ltd. *see below* and Ex. 5 at Kadi 12121 Solano Corporate Registry;

- Seraj al-Din Abdel Bary was also on the Board of Directors at Rowad. *See* Ex. 5 at Kadi 89835. Abdel Bary was the Muwafaq Sudan director. *See* Ex. 5 at Kadi 107858 Abdel Bary's business card. He previously worked for the KSA Embassy Washington DC. *See* Ex. 5 at Kadi 10789 Swiss Police Report excerpt;

- The Loxhall Corporation was a shareholder of Rowad. *See* Ex. 5 at Kadi 89843. Loxhall was a company owned by Kadi. *See* Ex 5 at Kadi 110226-39. Loxhall Isle of Man Corporate Registry;

- Moussa Sayid Moussa was chair of the Rowad liquidation committee. *See* Ex 5 at Kadi 89859. He also worked for Leemount, another Kadi owned company. *See* Ex. 5 at Kadi 89871. Leemount was active in the sesame seed marketing in Sudan and was a funder of Muwafaq. *See* Ex. 5 at Kadi 10790;

- Abdeljalil Fadl Hamid was also on the liquidation committee and affiliated with Muwafaq. *See* Ex. 5 at Kadi 89871.

The liquidation of Rowad was completed eight months after OBL left the Sudan in May 1996. Assets sold included tractors, vehicles, a sesame seed sheller, tankers, generators, mills, and machine tools etc. Muwafaq bought the sesame seed shelling machine. *See* Ex. 5 at Kadi 89865. Based on the extensive involvement of Kadi-related persons and entities, including that of Muwafaq, for a period of five years, and those Kadi employees who chaired the liquidation

committee, it is not credible that the only documents about Rowad in Kadi's possession would be the corporate registry documents of Rowad. Missing are;

- Minutes of corporate meetings of the directors and shareholders;

- Property records;

- Banking records including those from Rowad's account at al Shamal Islamic bank and Agricultural Bank;

- International commodity marketing records;

- The Corporation's accounts for 1992-1996by legal accountants at Adar & Associates as referenced at Ex. 5 at Kadi 89871;

- The final report on the Corporation's performance while working in South Darfur as referenced at Ex. 5 at Kadi 89871;

- Communications with the government of the State of South Darfur. as referenced at Ex. 5 at Kadi 89871; and

- Reports to the Board of Directors. as referenced at Ex. 5 at Kadi 89871.

Laundering Bin Laden's Money out of Sudan

Document Requests numbers 97 and 98 refer to the relationship and financial transactions between Kadi, Muwafaq, and a list of entities, including Solano Ltd.

As noted above, Rowad was involved in the production and marketing of sesame seeds and oil. In the early 1990s, via his investments in al Shamal bank in Sudan, Kadi traded in "a large quantity of sesame." *See* Ex. 10 at 71 Kadi Statement to OFAC excerpts. At that time, the trade in Sudanese sesame products was held as a 'near monopoly' by al Qaeda. *See* Ex. 9 at p.1. The al Qaeda export of sesame was assisted by Sudanese company Dan Fodio. *See* Ex. 11 FBI 302 Interview of Jamal al Fadl. OBL departed Sudan in May 1996, though his companies and his assets temporarily remained in the Sudan. Wadi al Aqiq remained active until at least 2000

and at least one Bin Laden company changed its name to avoid detection. *See* Ex. 12 at p.2, 8 State Dept. Cables 2000.

Solano Ltd. was founded in the Bahamas in May 1999 by Yasin Kadi and Yasin Ali, the former director of Rowad. *See* Ex. 5 at Kadi 12120 Solano Corporate Registry. Solano and Dan Fodio were active in the Sudanese sesame trade. *See* Ex. 5 at Kadi 104343-50. Between October 1999 and May 2000, Solano ran millions of dollars through its al Shamal Bank account in Sudan, on which Yasin Ali was the signator, as well as through accounts in Farmer's Commercial Bank, Dubai Islamic Bank and Faisal Finance in Geneva. *See* Ex. 5 at Kadi 101350-53 Solano transfer to al Shamal and Farmer's. The documentary trail produced by Kadi has large gaps in identifying the ultimate beneficiaries of these transactions. *See* Ex. 5 at Kadi 101351-53.

In 2003, Swiss authorities froze Kadi's twenty-three Swiss bank accounts, including that of entities such as Solano. When questioned, the bank employee who managed Kadi's account noted that the transactions and subsequent loss of $3.9 million from the Solano account was 'very curious.' *See* Ex. 5 at Kadi 29513, Swiss Police Interview of Rachid Teymour with unofficial translation. A document recovered from Abbottabad during the OBL raid, shows that, during the 1999-2000 period, OBL wrote about how he was in the midst of transferring his remaining millions out of the Sudan. *See* Ex. 7.

Gaps in the Kadi production include:

- The ultimate beneficiary(s) of the transactions noted in Solano's al Shamal Bank statements;

- The marketing, including broker(s) and purchaser(s) of Solano commodities exported from Sudan; and

- Communications and financial transactions between Solano and Dan Fodio and/or Dan Fodio subsidiaries.

KSA's Investigation of Yasin Kadi

Document Requests 57, 60, 66-68 and 71 relate to investigations of Kadi by the KSA after he was designated a global terror supporter shortly after September 11, 2001. Kadi produced less than one hundred pages of documents in this category, and nearly all were generated by Kadi or his attorneys. They are letters to the KSA Embassy in London and Washington DC, letters to the KSA Mission to the United Nations ("U.N.") and to the KSA Foreign Minister. The letters request KSA assistance in de-listing Kadi from the U.S. and U.N. terror designations. The letters often thank the KSA for previous assistance. *See* Ex. 5 at 65045-69745 Kadi Letters to the KSA excerpts. Some of the letters are to Prince Turki bin Faisal, the former head of Saudi Intelligence and during this period, the KSA Ambassador to the United Kingdom and later Ambassador to the United States. As noted above, one of Kadi's business partners in al Shamal Bank was Prince Turki's brother Prince Mohamed bin Faisal.

After the September 11 Attacks, the KSA froze Kadi's accounts at the request of the U.S. and U.N. There is, however, only scant evidence in Kadi's productions about the KSA investigation of Kadi. He produced a two-page letter from the Saudi Arabia Monetary Authority ("SAMA") that indicated that SAMA found no Kadi connections to terror financing in the Kadi accounts at Saudi banks. *See* Ex. 5 at Kadi 103317-19, SAMA Letter. No other documents relating to a KSA investigation of Kadi were produced. However, much is described in the few documents that were produced.

Gaps in the production include:

- Documents relating to the KSA investigation of Kadi, leading to the freezing of his assets and maintaining the freezing of his assets;

- Royal Orders of July 18, 2003 and August 15, 2004 creating a KSA Commission to seek Kadi's de-listing. Referenced at Ex. 5 at Kadi 66620;

- Responses by KSA London, Washington, U.N. or Riyadh to the letters Kadi sent to them;

- Request by Kadi to SAMA. Referenced at Ex. 5 at Kadi 101317;

- Telegram from HE the Finance Minister No. 1/1847, dated 8/2/1423 AH. Referenced at Ex. 5 at Kadi 101317;

- Telegram from the Foreign Minister No. 97/25/17083/1, dated 3/2/1423 AH. Referenced at Ex. 5 at Kadi 101317;

- SAMA letter No. 1976 MZ/MAT, dated 7/11/1424 AH. Referenced at Ex. 5 at Kadi 101317;

- "a file, (submitted by Kadi to SAMA) supported by the required documents, proving his innocence of these accusations." Referenced at Ex. 5 at Kadi 101317;

- Documents from *Yasin Abdullah Kadi (Plaintiff) V. Foreign Ministry (Defendant)* No. 3663/Q of 1425 AH. Referenced at Ex. 5 at Kadi 101319;

- Statement of Claim filed by the Plaintiff under No. 429/Q/804, dated 18/8/1425 AH. Referenced at Ex. 5 at Kadi 101319;

- High Order or Royal Decree No. 20168, dated 10/10/1422AH, creating the Saudi Permanent Counter-Terrorism Committee (PCTC). Referenced at Ex. 5 at Kadi 101320;

- Two files in English submitted by Kadi n 28/12/1422 AH, to the Foreign Ministry to be handed over to the United Nations. Referenced at Ex. 5 at Kadi 101322;

- Two files submitted by Kadi to the Foreign Ministry on 16/7/1423 AH. Referenced at Ex. 5 at Kadi 101322;

- Arabic translation of files submitted by Kadi on 2/7/1423 AH. Referenced at Ex. 5 at Kadi 101322;

- PCTC first report to the Supreme Authority on 15/6/1423 AH, endorsing the recommendation of the Foreign Ministry to support the case. Referenced at Ex. 5 at Kadi 101322;

- High Order dated 25/7/1423 AH approving the recommendation of the Foreign Ministry adopted by the PCTC. Referenced at Ex. 5 at Kadi 101322;

- Referral to the PCTC on 2/8/1423 AH. Referenced at Ex. 5 at Kadi 101322;

- The Supreme Counter-Terrorism Committee (SCTC) referral on 1/1/1424 AH to the Supreme Authority, with a recommendation to support the case of the Plaintiff even in the light of the new guidelines issued by the Security Council. Referenced at Ex. 5 at Kadi 101322;

- High Order of 19/5/1424 AH, endorsing this recommendation and stating: "We would like the Foreign Ministry to request the United States to clarify the reasons for adding the name of the Plaintiff on the lists of the Security Council. In light of this, removing his name from the terrorism financing list shall be requested in accordance with the established mechanism." Referenced at Ex. 5 at Kadi 101323;

- Telegraph sent by Foreign Ministry n 21/5/1424 AH, to the Kingdom's Embassy in Washington and the Kingdom's delegation in New York to act in accordance with the royal directive. Referenced at Ex. 5 at Kadi 101323;

- Telegraph from KSA Embassy Washington 8/6/1424 AH, a telegraph from the Kingdom's Embassy in Washington reported that a letter was sent to the U.S. Department of State to inquire about the reasons for adding the name of the Plaintiff to the U.N. lists. Referenced at Ex. 5 at Kadi 101323;

- Malaysian Report on Kadi referenced in a letter by Carter Ruck 3/25/11 to HRH Prince Mohamed bin Nayef. Referenced in Ex. 5 at KADI 69748;

- Any reports or documents concerning the KSA's discussion with the U.N. Security Council's al Qaeda and Taliban Sanctions Committee in 2010 and the KSA's decision to decline a de-listing of Kadi from the designated terrorist list. Referenced in Ex. 5 at KADI 69748;

- A reminder from the Foreign Ministry on 12/11/1424 AH sent to the Kingdom's Embassy in Washington and the Kingdom's delegation in New York to report on the results of their contacts with the US government regarding Yasin Kadi. Referenced at Ex. 5 at Kadi 101323;

- A KSA High Order issued on 11/4/1425 AH requiring the SCTC to examine a request from Kadi. Referenced at Ex. 5 at Kadi 101323;

- Letter from Prime Minister's Office dated 16/6/1425 AH, to His Highness the Minister of Interior in response to his inquiry about the Foreign Ministry's inquiring about the reasons for adding the name of the Plaintiff to the Security Council lists, and reported that no response has been received to date.  Referenced at Ex. 5 at Kadi 101323;

- Foreign Ministry letter dated 17/6/1425 AH, to the US Embassy in Riyadh about the request to report on the reasons for adding the name of Kadi to the Security Council lists. Referenced at Ex. 5 at Kadi 101323;

- Foreign Ministry letter dated 17/6/1425 AH, to the Kingdom's Embassy in Washington and the Kingdom's delegation in New York to update on its report on the reasons for the addition to the lists with the U.S. Department of State. Referenced at Ex. 5 at Kadi 101323;

- A KSA High Order of 29/6/1425 AH, endorsing the recommendation of the PCTC to support the request of the Plaintiff to deduct an amount from his frozen accounts to cover the expenses of his case. Referenced at Ex. 5 at Kadi 101323; and

- Memorandum from the US Embassy in Riyadh dated 11/8/1425 AH, regarding the Plaintiff and his suspicious actions. Referenced at Ex. 5 at Kadi 101324.

These documents should be produced.

KA Stan and SHC to al Baraka Bank in Turkey

The Saudi High Commission for Relief of Bosnia Herzegovina (SHC), a defendant in this case, had offices in Saudi Arabia and in Bosnia Herzegovina.  In 2002, the U.S. State Department listed SHC as one of the "Dirty Dozen" terror-supporting organizations in Bosnia. *See* Ex. 13, State Department Cable of Dec 9. 2002.  The SHC offices in the Bosnian cities of Mostar and Sarajevo were under the control of al Qaeda. *See* Ex. 14, Declaration of Ali Hamad. The SHC offices in Mostar and Sarajevo contracted a company called "KA Stan" to do reconstruction work in post-war Bosnia in 1998 and transferred significant sums of money to KA Stan, ostensibly for those construction projects.  *See* Ex. 5 at Kadi 122337.  KA Stan had exorbitant after-cost profits on those contracts.  *See* Ex. 5 at Kadi 122337, p.6, lines 6, 9, 20, 21,

11

24, 26. Nonetheless, Kadi told the U.S. Treasury department that KA Stan went broke in 1998. *See* Ex. 15 at p.9, Kadi statement to OFAC excerpts. KA Stan was owned by Kadi, Chafiq Ayadi and Wael Jelaidan, who is a defendant in this litigation. *Id.* Kadi, Ayadi and Jelaidan were all named by the U.S. Government as Specially Designated Global Terrorists for their support to al Qaeda and OBL. *Id.* at p. 1, 4. Transfers were made to a Turkish Bank where both Ayadi and Kadi held accounts. *See* Ex. 5 at Kadi 145110, Transfers to Ayadi account at Al Baraka Turk Bank Istanbul. One of the transfers, for 50,000 Deutsche Marks was made by SHC's Engineer Hussain Jiffry. *See* Ex. 5 at Kadi 145111 and Ex. 16 ID Card of SHC employee Jiffry.

Plaintiffs seek all records of international transactions authorized by SHC to KA Stan, Ayadi, Kadi and Jelaidan including the final beneficiary of these funds.

Maram Travel of Turkey

Maram Travel Ltd. was a Turkish registered company established in 1996 by one of al Qaeda's founders, Mamdouh Mahmoud Salim. *See* Ex. 5 at Kadi 73767 Maram Turkish Registry and Kadi 10760 Swiss Police Report. In 1997, Salim sold his shares to al Qaeda co-founders Wael Jelaidan and Mohamed Bayazid. *See* Ex. 5 at Kadi 73767 Maram Turkish Registry and Kadi 10760 Swiss Police Report. In 1998, Jelaidan, Bayazid and Kadi used Maram to support a Yemen-based university, established and run by Abdlemajid Zindani, an early proponent and religious trainer of al Qaeda members. *See* Ex. 5 at Kadi 10759. In the process, Kadi transferred over $1 million dollars from his Swiss bank account that has not been accounted for. *Id*. In 1997-1998, the Benevolence International Foundation also used Maram as a vehicle to support al Qaeda. After investigating Maram, the Swiss Police stated, "Those who were involved in this operation all number amongst the trusted inner circle of Osama Bin Laden and

12

his Al-Qaeda organization." *See* Ex. 5 at KADI 10758. The United Kingdom's Treasury also held major suspicions regarding Maram and its connection to terrorists. *See* Ex. 5 at KADI 103026-29.

In 2003, Kadi told Swiss authorities that Jelaidan turned over to Kadi's attorneys Maram corporate documents as well as Maram banking records and Jelaidan's personal banking records. *See* Ex. 5 at KADI 4272. Kadi produced to the Swiss authorities and to plaintiffs, records from Jelaidan's Swiss-based Faisal Finance account. Faisal Finance statements for Jelaidan's account from January 1997 to January 1999 are contained in Ex. 5 at KADI 4394-4400. Most of the transactions (labeled PPSC) relate to Jelaidan's term investments. The credits (aside from the PPSC) are clearly labeled (*e.g.*, FM Mr. Kadi – Ex. 5 at KADI 4396). The debits (aside from the PPSC) are also labeled (*e.g.*, TRF to FFI Turkey – Ex. 5 at KADI 4396). Kadi produced other banking records pertaining to these debits from Jelaidan's account. Faisal Finance Debit Advice for a May 1998 transfer of $50,000 is contained in Ex. 5 at KADI 4401. Jelaidan's client authorization for the $50,000 is reflected in Ex. 5 at KADI 4402, and KADI 4403 is a wire transfer record of the $50,000. KADI 4404-4406 in Ex. 5 contains similar records for a $300,000 transfer in June 1998.

Records from Faisal Finance Turkey of credits and debits from Jelaidan's account from June to December 1998 and Maram's account from March to December 1998 are contained in Ex. 5 at KADI 4408-4412. Kadi produced similar records contained in KADI 115163-196. Some of the credits to the accounts match up with the transfers from Jelaidan's Faisal Finance Swiss account. However, unlike the accounts for Faisal Finance Switzerland, the Faisal Finance Turkey banking records of Jelaidan and Maram do not include banking records such as Debit

Advice, client authorizations or wire transfers. Therefore, and perhaps intentionally, there is no way of determining the final beneficiary of the debits from these accounts.

Plaintiffs have the records of funds going into Kadi's Swiss accounts, funds going from Kadi's Swiss Accounts to Jelaidan's Swiss accounts, funds going from Jelaidan's Swiss accounts to Jelaidan and Maram's Turkish accounts. But that is where the trail stops. There had to be more records from Maram regarding what became of the money. Given that all the principals involved were either al Qaeda members and/or were Specially Designated Global Terrorists and that Kadi was given all the banking records by Jelaidan, Plaintiffs request the Court compel Kadi to produce all banking records in his possession, custody or control related to Jelaidan, Bayazid and Maram.

Privilege Log

Kadi served a privilege log with 277 documents listed as being withheld under the attorney-client privilege and he identified similar redactions to approximately 429 other documents. *See* Ex. 17 Kadi Privilege Log. These documents were created before September 11, 2001 and date back to at least 1993. The attorney – client privilege does not apply however, to routine personal or business communications by Kadi or employees of one of the Kadi entities merely because the communication identifies an attorney as one of the recipients or even author of the document. For privilege to apply, among other requirements, the document must seek or contain legal advice. The privilege only protects agents when the communications are for the purposes of rendering legal advice or services. *Upjohn Co. v. U.S., 449 U.S. 383, 393 (1981)*. Communications made between a defendant and counsel in the known presence of a third-party are not privileged. *People v. Osorio,* 75 N.Y.2d 80, 84 (1989). Attorney-client privilege in a confidential communication is destroyed when the document is carbon copied to a third party.

*Morgan v. New York State Dept. of Environmental Conservation*, 9 A.D.3d 586, 588 (3rd Dept. 2004). Therefore, Kadi cannot claim attorney-client privilege regarding documents sent to third parties merely because an attorney is included on them.

The party asserting the attorney-client privilege has the burden of establishing that the privilege applies and that it has not been waived. *See John Blair Commc'ns, Inc. v. Reliance Capital Group,* 182 A.D.2d 578, 579 (1st Dep't 1992). Such showings must be based on competent evidence, usually through affidavits, deposition testimony, or other admissible evidence. *See von Bulow by Auersperg v. von Bulow,* 811 F.2d 136, 147 (2d Cir.), *cert. denied,* 481 U.S. 1015, 107 S.Ct. 1891, 95 L.Ed.2d 498 (1987). The burden is not met by mere assertions made by an attorney. *See Id.* Therefore, if Kadi wants to argue that the documents or e-mails to third parties do not destroy privilege, then he must make an evidentiary showing why the privilege applies and why it has not been waived. There are dozens of documents listed on the privilege log that also appear to be have been disclosed to third parties. For example, items 11, 14-17 read:

- "Handwritten draft by [attorney] Djebbar to the Gulf Investment Islamic Company for a Draft funds transfer order"

Communications concerning financial and/or business matters are protected only if the financial advisor or accountant's help is necessary for the effective legal consultation between client and lawyer. *U.S. v. Kovel*, 296 F. 2d 918, 921-22 (2d Cir. 1961). In Kadi's Privilege Log, Ex. 17 the below list a few examples where the communication appears to be regarding business affairs and shared with third parties:

- Item 9 a handwritten letter by Muhamed bin Mahfouz to attorneys regarding the founding members of Muwafaq;

- Item 50 an enclosure from Kadi lawyers to Ahmed Basodan, Kadi's agent describing properties in certain real estate transactions;

- Item 34-35 fax from counsel to Basodan regarding Abrar Group issues and Report on activities in Malaysia;

- Item 100 Inter Office Memo on Caravan Co. letterhead by Muhamed Abdullah to Kadi and Nasoden concerning Wan Hasni Sulaiman and Rahim Ghouse; and

- Item 175 handwritten letter "inferred" to be written by [attorney] Djebbar to Abdulbari [the Muwafaq Executive Manager in Sudan] requesting information about Muwafaq in the Sudan. Defendant "infers" that it is for the Africa Confidential litigation taking place elsewhere without any explanation.

These are only a few of the suspect communications listed on the log. While the majority of the documents list an attorney as one of the recipients or the author, approximately one third of all those identified do not appear to be privileged or at a minimum do not provide sufficient information to determine if the privilege is valid and not waived. These appear to be communications about business matters of interest to plaintiffs that do not appear to request or contain legal advice. Further, for documents created by, sent to or shared with third parties, the privilege has been waived and those documents should be produced.

Kadi bears the burden of showing that the document being withheld communicated a request for or contained legal advice and that disclosure to a third party did not waive the privilege. The information provided by Kadi thus far is insufficient to make such a showing.

## CONCLUSION

For the foregoing reasons, plaintiffs respectfully request that the Court enter an order directing defendant Yasin Al Kadi to: (1) promptly produce documents identified above, and for any document not produced, provide (2) an affidavit or testimony explaining what efforts he made and the results of those efforts, in obtaining documents concerning him and his entities related to the listing of him and his entities as a Specially Designated Global Terrorist and freezing his worldwide assets, including specific answers as to whether the documents were

destroyed and the circumstances surrounding the destruction, if they were lost and where their last known location was, or if they were seized where they are now or if the documents never existed; (3) provide a privilege log that properly evidences, as to each communication, that the communication was for legal advice and that the document contained legal questions or provided legal advice, rather than routine personal or business information and that an applicable privilege has not been waived by disclosure to a third party or produce the document; and (4) pay for the reasonable attorneys' fees for bringing this motion.

Dated:  December 1, 2017  	Respectfully Submitted,

/s/ Andrew J. Maloney, III
James P. Kreindler, Esq.
Andrew J. Maloney, III, Esq.
KREINDLER & KREINDLER, LLP
750 Third Avenue, 32nd Floor
New York, NY 10017
Tel:  (212) 687-8181

Sean P. Carter, Esq.
J. Scott Tarbutton, Esq.
COZEN O'CONNOR
1650 Market Street, Suite 2800
Philadelphia, PA 19103
Tel:  (215) 665-2000

Jodi Westbrook Flowers, Esq.
Robert T. Haefele, Esq.
MOTLEY RICE, LLC
28 Bridgeside Boulevard
P.O. Box 1792
Mount Pleasant, SC 29465
Tel:  (843) 216-9000

Jerry S. Goldman, Esq.
ANDERSON KILL P.C.
1251 Avenue of the Americas
New York, NY 10020
Tel:  (212) 278-1000

Robert M. Kaplan, Esq.

FERBER CHAN ESSNER & COLLER, LLP
60 East 42nd Street, Suite 2050
New York, New York 10165
Tel:  (212) 944-2200

Christopher T. Leonardo, Esq.
ADAMS HOLCOMB LLP
1001 Pennsylvania Ave., N.W.
Suite 740-South
Washington, D.C. 20004
Tel: (202) 580-8820

*Attorneys for Plaintiffs*