

IN THE MATTER OF

YASSIN ABDULLAH KADI

and

THE OFFICE OF FOREIGN ASSETS CONTROL,
US DEPARTMENT OF THE TREASURY



---

INDEX TO
STATEMENT OF YASSIN ABDULLAH KADI

---



| Heading | Page No. |
|---|---|
| Personal background | 2 |
| Father's background | 5 |
| Mr Khalid bin Mahfouz | 6 |
| National Commercial Bank | 7 |
| Charitable and Commercial Activities | 9 |
| Muwafaq Charitable Foundation ("the Foundation") | 10 |
|    The Foundation's purposes | 10 |
|    The Foundation's Trustees and Constitution | 12 |
|    The Foundation's mode of operation | 14 |
|    Holland and Belgium | 15 |
|    USA | 16 |
|    The Foundation's offices in Africa | 16 |

| | | |
|---|---|---|
| | Chad | 17 |
| | Closure of the Foundation in other countries where it was operating | 17 |
| | The Foundation's programs | 17 |
| | Article in USA Today – October 29, 1999 | 18 |
| **Charitable activities in other countries, both through the Foundation and other charitable activities** | | 21 |
| | Sudan | 21 |
| | Pakistan | 27 |
| |    Amir Mehdi | 27 |
| |    Shifa International Hospitals Limited Islamabad | 29 |
| |    The arrest of Amir Mehdi | 31 |
| | Afghanistan | 32 |
| | Bosnia and Croatia | 33 |
| |    Chafiq Ayadi | 34 |
| |    FBIS Article dated July 31, 1995 | 36 |
| |    The Foundation's activities in Bosnia and Croatia | 38 |
| | Introduction and first visit to Albania | 43 |
| |    Dr Abdul Latif Saleh | 44 |
| |    Albania | 47 |
| |    Building and running community centers and mosques in Kukes, Krome and Tirana | 48 |
| |    Classes and seminars | 49 |
| |    School | 50 |
| | Kosovo | 52 |
| |    Waa'el Julaidan | 54 |
| |    Assistance provided to the SJRC | 56 |
| | Ethiopia | 59 |
| | Somalia | 60 |
| | Germany | 62 |
| | Austria | 62 |
| | UK | 62 |
| | Women's college and other humanitarian activities in Saudi Arabia | 63 |

| | |
|---|---|
| **Commercial activities** | 66 |
|    Saudi Arabia | 66 |
|    Sudan | 68 |
|    Albania | 73 |
|    Kazakhstan | 75 |
|    Bosnia | 76 |
|       Depozitna Bank | 76 |
|       Other investments in Bosnia | 78 |
| **Saudi Arabian Financiers** | 80 |
|    Al Barakah Bank | 80 |
|    Dar Al – Maal Al Islami Trust | 81 |
|    Bin Laden Group | 81 |
|    Mr Yahya bin Laden | 82 |
|    Mr Zuhair H Fayez | 82 |
|    Mr Qays Julaidan | 82 |
|    Mr Hussain Shobokshi | 82 |
|    Mr Saleh Kamel | 82 |
|    Dr Mohamed Abdu Yamani | 83 |
|    Mr Khalid bin Mahfouz | 83 |
|    Mr Abdul Rahman bin Mahfouz | 83 |
|    Mr Sultan Khalid bin Mahfouz | 83 |
|    Mr Rais bin Mahfouz | 83 |
|    Mr Talal Badkook | 84 |
|    Dr Mohamed El Gheiri | 84 |
|    Abdul Gani El Khereiji | 84 |
|    Mr Saleh Al-Turki | 84 |
| **Article in the Wall Street Journal dated November 26, 2002 by Glenn Simpson** | 85 |
|    Quranic Literary Institute of Chicago, Illinois (QLI) | 86 |
|    BMI, Inc. | 90 |
|    Abrar Investments Inc. | 93 |



| Summary | 94 |
|---|---|
|  QLI | 95 |
|  The Foundation | 95 |
|  Chafiq Ayadi | 96 |
|  FBIS Article | 96 |
|  USA Today Article | 97 |
|  Global Diamond Resources | 97 |
|  Shifa International Hospitals | 98 |
|  MM Badkook Co. for Catering & Trading | 98 |
|  Al-Abrar Group International | 98 |
|  Abrar Investments Inc. (Abrar USA) | 98 |
|  So-called brother "Omar Al-Qadi" and Mercy International | 98 |
| **Conclusion** | 99 |



IN THE MATTER OF

## YASSIN ABDULLAH KADI

and

## THE OFFICE OF FOREIGN ASSETS CONTROL, US DEPARTMENT OF THE TREASURY

---

### STATEMENT OF YASSIN ABDULLAH KADI

---

I, **YASSIN ABDULLAH KADI** of Farsi Center, West Tower, 11th Floor, Suite 1103, Waly Al-Ahd Street, Ruwais District, Jeddah 21411, Saudi Arabia, **SAY AS FOLLOWS:-**

1.  I make this statement further to the meeting held at the Office of Foreign Assets Control (OFAC), US Department of the Treasury, in Washington DC on August 1 2002 attended by Mr R Richard Newcomb, Director of OFAC, and several of his colleagues together with my legal representatives. Although I was not personally present at that meeting, and without in any way waiving legal privilege, I am informed by my lawyers that Mr Newcomb asked additional questions about my commercial and charitable activities in various locations. I am informed by my lawyers that in this context Mr Newcomb requested details of my commercial

140.6 I am a minority shareholder in **Saudi Najam Services and Development Company** which is a company incorporated in Saudi Arabia to carry on business in the travel and tourism sector, specifically for Muslim pilgrims, especially during the pilgrimage (Hajj) season and, throughout the year, for minor pilgrimages (Omrah)

140.7 I am a shareholder in **Jeddah Holding Company for Development** which is a contracting company for the development and maintenance of Jeddah City.

**Sudan**

141. In 1990 I learned that Al Shamal Islamic Bank was achieving much greater returns on Islamic-style investments than those institutions such as Faisal Finance SA with which my funds were then placed. I had not previously had any dealings with Al Shamal Islamic Bank (although it had been founded in, and followed Islamic precepts since, 1985) but I discovered that these higher returns were generated by the adoption of a more vigorous approach to investment. In some cases, Al Shamal Islamic Bank was able to achieve returns in excess of 15% through investment arrangements which complied with Islamic precepts. I also discovered, that in comparison with other institutions, Al Shamal Islamic Bank operated in a more transparent fashion, providing its investors with a more detailed picture of the projects and businesses in which their funds were invested. Both of these aspects were attractive to me and thus, for solely commercial reasons, and in order to obtain a better return on my money, I decided to make investments with Al Shamal Islamic Bank.

142. It was my intention that all the funds I transferred to Al Shamal be invested in strict accordance with Islamic precepts. This means that generally funds would be invested according to Islamic principles and procedures. These modes have a built-in element of profit (or risk) which replaces the interest that would be payable were the parties non-Muslim. At no stage did I ever transfer funds to Al Shamal Bank for any purpose connected with terrorism or to support Osama bin Laden, Al-Qaeda or any other terrorist group.

143. Before committing funds for investments with Al Shamal Islamic Bank, the bank provided me with a list of correspondent banks. A copy of this list is at pages 198 to 201. It will be seen that Al Shamal's correspondent banks included such names as American Express Bank, Commerz Bank and Credit Lyonnais (Suisse) SA. The correspondent banks also included Al Barakah Bank and others. At that time, none of these institutions had, so far as I am aware, ever been the subject of any official sanction relating to money laundering or other illegal activity. Whenever I wished to invest with Al Shamal Bank, they directed me to transfer my funds to the relevant correspondent bank nominated by them. This did not cause me any concern as it is quite usual in banking transactions to transfer monies to a bank via its correspondent bank. In this case I understood that there was no facility for the direct transfer of funds to Al Shamal Bank in Sudan. Upon the transfer being effected, Al Shamal would credit my US dollar investment account in Sudan.

144. The correspondent banks to which Al Shamal Bank instructed me to transfer funds were Credit Lyonnais (Suisse) S.A, and Al Barakah Bank in London. I

PCR1-180007.1                                    69

understand this is an issue because it has been alleged in the *Burnett* civil law suit that Osama bin Laden maintained one or more accounts at Al Shamal Bank, and that Al Barakah Bank has supported Al Haramain Charity and Osama bin Laden. I have no knowledge of whether these allegations are true; in any case I confirm that I never transferred funds to Al Shamal Bank or any of its correspondent banks including Al Barakah Bank to support Osama bin Laden, Al-Qaeda or any terrorist group or activity and I am not aware that any of these banks has ever engaged in financing or supporting any such terrorist group or activity. In all my dealings with Al Shamal Bank I never had any knowledge whatsoever of the identity of any other client or investor with that bank or any of its correspondent banks or any financial institution associated with it. Obviously, it follows from this that my reasons for investing with Al Shamal Bank had nothing whatever to do with the identity of any of its other clients or investors, none of whom were known to me.

145. To the best of my knowledge none of the funds I transferred to Al Shamal Bank or any of its correspondent banks including Al Barakah Bank were ever used for any purpose connected with Osama bin Laden, Al-Qaeda or any terrorist group or activity. At all times I intended the funds I invested with Al Shamal Bank to be applied for one or more of the following purposes:

145.1 to enable Al Shamal Bank to issue a guarantee to the Sudanese Government in respect of a substantial scrap metal tender issued by the Sudanese Government, which I won after a contested bid in 1990 and which I considered to be a good business opportunity. The tender for this

contract expressly required payment to be made to the Sudanese Government in US dollars;

145.2 to make payment in US dollars, to the Sudanese Government of monies due to it under the scrap metal contract;

145.3 concurrently with the issuing of the guarantee I refer to above, Al Shamal Bank used the funds to invest in specific Islamic investments including the purchase of wheat for sale in Sudan and other commodities;

145.4 to meet the costs involved in cutting, transporting and exporting the scrap metal I had purchased from the Sudanese Government. Under the scrap metal contract it was agreed that I was to be responsible for these costs;

145.5 to invest in the manufacture and supply of construction rods by a Sudanese company called SMT Engineering Co.;

145.6 to invest in a contract with the Sudan Petroleum Corporation for the supply of gas oil;

145.7 to invest in shares in the Saudi - Sudanese Bank;

145.8 to invest in a large quantity of sesame;

145.9 to invest in the purchase of aircraft equipment for Sudanese Airlines from General Electric Company in the USA.;

145.10 to invest in duty free shops run by the Sudanese Government.

I add that I have not made any transfers to Al Shamal Bank since 1994.

146. Many of these investments achieved excellent rates of return. For example in the case of the aircraft equipment purchased for Sudanese Airlines, the rate of return was in excess of 30%, which I earned over a period of 1 year.

147. Many of my activities in Sudan were conducted through two companies associated with me: Leemount Limited and Solano Limited. Leemount Limited was a company registered on January 15 1992 in the Isle of Man (de-registered in March 2002). I owned shares in this company. Leemount maintained US dollar and Sudanese pound accounts with Al Shamal Islamic Bank. On May 19 1999, Solano Limited was incorporated in the Bahamas, a company in which I also had a shareholding until it was de-registered in April 2001. Solano Limited also had an account with Al Shamal Islamic bank. It engaged in the trading of commodities and agricultural products. Both these companies were registered in Sudan as foreign companies.

148. Finally, and for the sake of completeness, I add this: in 1991 I attended a convention of leading Saudi businessmen in Khartoum, Sudan, hosted by the Sudanese Government, which at the time was seeking to persuade foreign investors to invest in Sudan. I travelled to Khartoum with other leading Saudi businessmen, including, I recall, H.R.H. Prince Mohamed Al Faisal, Ibrahim Affendi, Saleh Kamel, representatives of Al Rahji Banking and Investment

Corporation along with other Arab businessmen. We attended at the invitation of the Sudanese Minister of Finance and Chairman of the Sudanese Economic Committee.

**Albania**

149. I have already explained how I met Dr Abdul Latif Saleh in 1993 at the 1st Muslim-Albanian International Investment Conference held in Tirana, Albania. At the conference, Dr Saleh outlined to me the business opportunities for foreign investors in Albania. He described Albania to me as an emerging market with excellent investment opportunities. He told me that there was no sugar in Albania and good returns were to be made from importing sugar provided the opportunity was seized quickly. Dr Saleh had no capital but he was able to offer to our joint enterprise his expertise and contacts within Albania. We agreed to share profits. We started trading activities, slowly and on a trial basis, importing sugar through a company called **Loks Holl Sh.P.K. ("Loks Holl")** registered in Albania. These transactions yielded exceptional returns. We then expanded our activities to rice, wheat and other food stuffs.

150. I also started other business activities in Albania sharing the profits with Dr Saleh:

150.1 **Real Estate:** Following the collapse of communism, for the first time in 40 years Albanian citizens were permitted to own real property. There was a shortage of liquidity in the real estate market, and many of the new land owners wished to sell. Dr Saleh and I decided to start a real estate business by arranging to purchase properties from new owners, who were keen to liquidate their assets, which resulted in good discounts