# **<u>Exhibit D</u>**

*In Re: Terrorist Attack on September 11, 2001* (03-MDL-1570) (GBD) (FM)

**Instances Where Defendant International Islamic Relief Organization Has Failed To Produce Documents In Response to Plaintiffs' Requests For Production of Documents**

| Request No. | Plaintiffs' First Set of Requests for Production of Documents Directed To The IIRO—Served December 13, 2005 |
| --- | --- |
| | Request |
| 8 | From the period beginning January 1990 through the present, please provide all documents relating to all filings submitted to any local, state, or federal agency by You, including without limitation, the Internal Revenue Service or the Securities Exchange Commission. Such documents shall include, but are not limited to, tax returns, tax records, Form 990's, Form 1023's, CMIR's, UCC filings, liens, judgments, and any correspondence concerning IIRO's tax-exempt status. |
| 13 | Please provide all documents relating to any understanding or agreement with any defendant named in the consolidated civil action, 03 MD 1570, whereby You have agreed to pay, indemnify, or reimburse their costs associated with defending this lawsuit, including legal fees and/or payments to satisfy part or all of a judgment that may be entered in this action against such defendant. Such documents shall include, but are not limited to, contracts, agreements, insurance policies, term sheets, or other records. |
| 14 | Please provide all documents relating to any understanding or agreement between the IIRO and any other individual, entity, and/or government, whereby such party has agreed to pay, indemnify, or reimburse the IIRO for all costs associated with defending this lawsuit, including legal fees and/or payments to satisfy part or all of a judgment that may be entered in this action against IIRO. Such documents shall include, but are not limited to, contracts, agreements, insurance policies, term sheets, or other records. |
| 15 | From the period beginning January 1990 through the present, provide any and all documents governing, describing, detailing, or otherwise relating to the relationship between the IIRO headquarters in Saudi Arabia and all United States branches of the IIRO ("IIRO USA"), including the organization registered as the International Relief Organization ("IRO") and which maintained its office at 360 S. Washington Street, Falls Church, VA, regardless of whether you acknowledge that entity as a subsidiary or affiliate of IIRO. |
| 16 | From the period beginning January 1990 through the present, please provide any and all documents exchanged between the IIRO headquarters in Saudi Arabia and all United States branches of the IIRO, including without limitation, all documents relating to the transfer of funds between the IIRO headquarters in Saudi Arabia and IIRO USA, including the organization registered as the International Relief Organization ("IRO") and which maintained its office at 360 S. Washington Street, Falls Church, VA, regardless of whether you acknowledge that entity as a subsidiary or affiliate of IIRO. |
| 17 | From the period beginning January 1990 through the present, please provide any and all directives, instructions, and/or communications sent by any officer, director, trustee, board member, committee member, manager, agent, employee, or representative of any IIRO office worldwide to IIRO USA, including the organization registered as the International Relief Organization ("IRO") and which maintained its office at 360 S. Washington Street, Falls Church, VA, regardless of whether you acknowledge that entity as a subsidiary or affiliate of IIRO. |
| 19 | From the period beginning January 1990 through the present, please provide any and all documents relating to the provision of funds or other material support from the Saudi Embassy in Washington D.C., and/or any official or agency of the KSA, to IIRO USA, including the organization registered as the International Relief Organization ("IRO") which maintained its office at 360 S. Washington Street, Falls Church, VA, regardless of whether you acknowledge that entity as a subsidiary or affiliate of IIRO. |
| 20 | From the period beginning January 1990 through the present, please provide any and all documents governing, describing, detailing, or otherwise relating to the relationship between Dr. Sulaiman bin Ali Al-Ali and the IIRO, IIRO USA, and/or the IRO. |

| 21 | From the period beginning January 1990 through the present, please provide any and all documents sent to, and/or received from Dr. Sulaiman bin Ali Al-Ali, including without limitation, all documents relating to the transfer of funds between Dr. Sulaiman bin Ali Al-Ali and the IIRO, IIRO USA, and/or the IIRO. |
| 25 | From the period beginning January 1990 through the present, please provide any and all documents identifying, describing, or otherwise relating to the transfer of funds between the IIRO and the MWL. |
| 26 | From the period beginning January 1990 through the present, please provide any and all documents relating to the role of any official, committee, or board of the MWL in the fundraising efforts of the IIRO's offices worldwide. |
| 27 | From the period beginning January 1990 through the present, please provide any and all documents governing, describing, detailing, or otherwise relating to the relationship between the IIRO and the Kingdom of Saudi Arabia, including without limitation, the following agencies of the KSA: the Supreme Council of Islamic Affairs, the Ministry for Islamic Affairs, Endowments, Dawa and Guidance, the Ministry of Foreign Affairs, Endowments, Dawa and Guidance, the Ministry of Defense and Aviation, Endowments, Dawa and Guidance, the Majlis al Shura (a/k/a the Shura Council), and the Ministry of Education. |
| 28 | From the period beginning January 1990 through the present, please provide any and all documents sent to and/or received from the Kingdom of Saudi Arabia, including without limitation, the following agencies of the KSA: the Supreme Council of Islamic Affairs, the Ministry for Islamic Affairs, Endowments, Dawa and Guidance, the Ministry of Foreign Affairs, Endowments, Dawa and Guidance, the Ministry of Defense and Aviation, Endowments, Dawa and Guidance, the Majlis al Shura (a/k/a the Shura Council), and the Ministry of Education. |
| 29 | From the period beginning January 1990 through the present, please provide any and all documents governing, describing, detailing or otherwise relating to the relationship between the IIRO and any embassy or consulate of the Kingdom of Saudi Arabia, including without limitation, the Islamic Affairs Division of the embassy or consulate. |
| 30 | From the period beginning January 1990 through the present, please provide any and all documents sent to and/or received from, any embassy or consulate of the Kingdom of Saudi Arabia, including without limitation, the Islamic Affairs Division of the embassy or consulate. |
| 33 | From the period beginning January 1990 through the present, please provide all documents relating to all accounts in any United States, Saudi Arabian, or foreign banking institution You hold or have held jointly with the KSA, any members of the Saudi royal family, and/or any Saudi official acting on behalf of the KSA ("KSA Joint Bank Accounts"), and/or any KSA Joint Bank Accounts over which You hold or have held signatory authority. |
| 34 | Provide all documents relating to the role of the KSA and/or members of the Saudi royal family, in the creation, organization, funding, oversight, supervision, operation, and/or management of the IIRO, including any subsidiary, affiliate, and/or branch office. |
| 35 | Provide all documents relating to the IIRO's initial capitalization and any subsequent funding provided by the KSA, members of the Saudi royal family, and/or any other individuals or entities, including without limitation, any funding provided by the KSA to IIRO through the MWL. |
| 37 | Provide all documents relating to any and all laws, statutes, regulations, ordinances, royal decrees, or directives issued by the KSA relating to the IIRO, including but not limited to, documents relating to the organization, funding, oversight, supervision, management, and/or control over the IIRO's operations, appointment and termination of personnel, accounting, banking and financial transactions, fundraising, determination of which charitable designees should receive support, and/or actual distribution of financial and non-monetary support to charitable designees. |
| 38 | Provide all documents relating to any fundraising events and/or conferences that were held for the benefit of the IIRO and were promoted, sponsored, organized, funded, managed, supervised, or attended by the KSA and/or members of the Saudi family. Such documents shall include, but are not limited to, those identified in Request #11. |
| 39 | From the period beginning January 1990 through the present, please provide any and all documents relating to any meeting between officers or representatives of the IIRO and any official or agency of the KSA. |

2

| | |
|---|---|
| 41 | From the period beginning January 1990 through the present, please provide any and all documents relating to any meeting between officers or representatives of the IIRO and any official or agency of the Islamic Republic of Pakistan. |
| 42 | From the period beginning January 1990 through the present, provide any and all documents governing, describing, detailing, or otherwise relating to the relationship between the IIRO (including any subsidiary, affiliate, or branch office) and the Taliban. |
| 43 | From the period beginning January 1990 through January 2002, provide any and all documents relating to the transfer of funds between the IIRO and the Taliban, including without limitation, the transfer of $60 million which was publicly announced by IIRO's Secretary-General Adnan Basha. |
| 48 | From the period beginning January 1990 through the present, please provide any and all documents governing, describing, detailing, or otherwise relating to the relationship between the IIRO and Hamas, including without limitation, the following Hamas-related entities: the Al Islah Foundation, the Al Salah Foundation-Gaza, the Islamic Heritage Committee-Jerusalem, the Zakat Committee-Ramallah, the Orphan Care Committee-Bethlehem, the Islamic Charity Foundation-Hebron, the Nablus Zakat Committee, the Zakat Committee Assira Shamaliah, the Tulkarm Zakat Committee, the Jenin Zakat Committee, the Islamic Integrity Association-Gaza, the Al Rahame Zakat Committee-Khan Yunes, the Islamic Society-Nussirat, the Islamic Center-Gaza, and the Zakat and Welfare Charity Committee-Rafiah.  In the event that any IIRO subsidiary, affiliate, and/or branch office shared office space with Hamas or any Hamas-related entities, please provide such documents. |
| 49 | From the period beginning January 1990 through the present, please provide any and all documents sent to, and/or received from Hamas, including without limitation, any Hamas-related entities such as: the Al Islah Foundation, the Al Salah Foundation-Gaza, the Islamic Heritage Committee-Jerusalem, the Zakat Committee-Ramallah, the Orphan Care Committee-Bethlehem, the Islamic Charity Foundation-Hebron, the Nablus Zakat Committee, the Zakat Committee Assira Shamaliah, the Tulkarm Zakat Committee, the Jenin Zakat Committee, the Islamic Integrity Association-Gaza, the Al Rahame Zakat Committee-Khan Yunes, the Islamic Society-Nussirat, the Islamic Center-Gaza, and the Zakat and Welfare Charity Committee-Rafiah.  Such documents shall include, but are not limited to, all documents relating to the transfer of funds between the IIRO and those entities. |
| 50 | From the date of IIRO's formation to the present, provide any and all documents relating to any business, financial, charitable, religious or other relationship between Osama Bin Laden, including any member of the Bin Laden family, and the IIRO. |
| 51 | From the period beginning January 1990 through the present, provide any and all documents sent to, and/or received from Osama Bin Laden or any member of the Bin Laden family, including without limitation, all documents relating to the transfer of funds between the IIRO and/or Sanabel Al Kheer and any member of the Bin Laden family. |
| 52 | From the period beginning January 1990 through the present, please provide any and all documents governing, describing, detailing, or otherwise relating to the relationship between the IIRO and Mohammed Al Zawahiri (brother of Dr. Ayman Al Zawahiri – Al Qaida's second-in-command). |
| 53 | From the period beginning January 1990 through the present, please provide any and all documents sent to, and/or received from Mohammed Al Zawahiri, including without limitation, all documents relating to the transfer of IIRO funds. |
| 55 | From the period beginning January 1990 through the present, please provide any and all documents sent to, and/or received from Mohammed Jamal Khalifa, including without limitation, all documents relating to the transfer of IIRO funds. |
| 58 | From the period beginning January 1990 through January 2002, please provide any and all documents relating to the IIRO's role in supporting training camps in Afghanistan, Pakistan, and Kashmir, including without limitation, the transfer of funds.  For purposes of this request, the term "support" includes any form of financial, logistical, administrative or other assistance, whether provided directly or indirectly |
| 59 | Please provide any and all documents governing, describing, detailing or otherwise relating to any relationship between the IIRO and Maktab al Khidmat (a/k/a the Office of |

3

| | Services). |
|---|---|
| 60 | Please provide any and all documents sent to, and/or received from the Maktab al Khidmat, including without limitation, all documents relating to the transfer of funds between the IIRO and Maktab al Khidmat. |
| 73 | From the period beginning January 1990 through the present, please provide any and all documents sent to and/or received from the Saudi Department of Zakat and Income Tax and the Saudi Arabian Monetary Authority. |
| 82 | From the period beginning January 1990 through the present, please provide any and all documents sent to, and/or received from, the Kingdom of Saudi Arabia, relating to any accusation that the IIRO, or any employee or person associated with the IIRO, was associated with or involved in any criminal, corrupt, or extremist activity, including without limitation any terrorist or radical religious, political or social activities. |
| 83 | From the period beginning January 1990 through the present, please provide any and all documents sent to, and/or received from, the Kingdom of Saudi Arabia, relating to any accusation that any Islamic charity or charities, or employee or person associated with any Islamic charity or charities, was associated with or involved in any criminal, corrupt, or extremist activity, including without limitation any terrorist or radical religious, political or social activities. |
| 85 | Provide all documents relating to the Republic of Kenya's investigation and subsequent determination to ban the IIRO in September 1998 following the bombings of the U.S. Embassies in Kenya and Tanzania. |
| 95 | Provide copies of any and all laws, statutes, regulations, ordinances, or royal decrees which would have prohibited any Islamic charity or benevolent association from: (i) engaging in conduct unrelated to their ostensible charitable or humanitarian purposes, including without limitation, diverting funds or otherwise providing material support or resources to Islamic radicals, fundamentalists, extremists or persons or organizations associated with international terrorism or domestic terrorism; and/or (ii) providing material support or resources to al Qaida, other terrorist organizations and/or individuals sympathetic to al Qaida or other terrorist organizations. |
| 98 | Provide all documents relating to any and all information or notification You received prior to September 11, 2001, that al Qaida aspired to conduct terrorist attacks: (i) against the United States and its interests abroad, (ii) against the United States within its borders, and/or (iii) against New York City and the World Trade Center complex, Washington D.C. or other U.S. landmarks. |
| 99 | From the period beginning January 1990 through the present, please provide an electronic or paper copy of all web-pages that were ever operated by the IIRO and/or or its worldwide subsidiaries, affiliates, or branch offices. Such documents shall include, but are not limited to, the e-mail server(s), webmaster(s), website designer(s), domain names, and registration of domain names. |
| 102 | Please provide all electronically-stored materials which relate to the subject matter of the documents and things described herein including: (i) data files created by a word processor, spreadsheet or other application software; (ii) databases and structural information about the databases, including network activity logs and audit trails; (iii) electronic calendars and telephone logs; whether this information exists on a network file server, main frame computer, mini-computer, stand-alone personal computer, network workstation, off-line data-storage media, including back-ups and archives, floppy diskettes, tapes and other removable electronic media. |

## Plaintiffs' First Set of Supplemental Requests for Production of Documents Directed To The IIRO — Served April 21, 2006

| Request No. | Request |
|---|---|
| 1 | Please provide any and all indexes, electronic databases or other documents that detail, describe, or catalog, either individually or generally, the documents and materials stored in any IIRO office, branch, subsidiary, and/or third-party facility used by the IIRO for storage. |
| 2 | Please provide any and all indexes, electronic databases or other documents that detail or describe, in whole or in part, any system(s) or methodologies pursuant to which |

| Request No. | Request |
|---|---|
| | documents or other materials in any IIRO office, branch, subsidiary, and/or third-party facility used by the IIRO for storage, are organized. |
| 3 | Please provide any and all documents relating to any individual currently detained or incarcerated in Cuba, Afghanistan, or elsewhere in connection with the global war on terrorism, including without limitation, all documents relating to any meetings, interviews, or dialogue with persons held at Guantanamo Bay. |
| 4 | Please provide any and all documents relating to any IIRO employee, representative, agent, or volunteer who has been arrested, detained, or incarcerated in connection with the global war on terrorism, including without limitation, any and all employment records for such individuals. |

**Plaintiffs' Second Set of Supplemental Requests for Production of Documents Directed To The IIRO – Served January 28, 2008**

| Request No. | Request |
|---|---|
| 7 | Please provide any and all documents relating to any investigations or inquiries conducted by the Kingdom of Saudi Arabia relating to You and/or the IIRO Designees' ties to terrorism. |
| 8 | Please provide any and all documents relating to any sanctions or restrictions imposed upon You and/or the IIRO Designees by the Kingdom of Saudi Arabia. |
| 9 | Please provide any and all documents sent to, and/or received from, the Kingdom of Saudi Arabia, relating to any accusation that the IIRO Designees, or any individual or entity employed by and/or affiliated with the IIRO Designees, were associated with or involved in any criminal, corrupt, deviant or extremist activity, including without limitation any terrorist or radical religious, political or social activities. |
| 10 | Please provide all documents relating to any and all information or notification You received that the IIRO Designees, or any individual or entity employed by and/or affiliated with the IIRO Designees, were associated with or involved in: (i) the sponsorship of any radical, extremist, or terrorist organization; (ii) criminal, corrupt or deviant activities; or (iii) any military, radical or terrorist activity, plot, or attack. |
| 14 | Please provide all documents relating to any disciplinary action taken by You, or any decision to terminate any relationship with the IIRO Designees, or any individual or entity employed by and/or affiliated with the IIRO Designees, as a result of financial irregularities, suspicious activities, investigations into possible links to the financing of terrorist organizations, and/or the support of violence or jihad, including without limitation, any such individuals or entities identified in response to Requests #9-13. In the event You have closed the IIRO branch offices in the Philippines and Indonesia, and/or terminated al Mujil from any and all positions he holds within the IIRO, please provide such documentation. |
| 15 | Please provide any and all documents relating to the IIRO Designees' role in providing material support or resources to al Qaida, the Abu Sayyaf Group, Jemaah Islamiyah, or other Islamic fighters in Indonesia, the Philippines, or elsewhere, including without limitation, the support of camps in and/or around those areas, recruitment, training, transportation, lodging, the acquisition, trafficking, and/or smuggling of weapons and arms such as rockets, mortars, rifles, dynamite and other bombs, and the provision of boots, tents, and uniforms. |
| 16 | Please provide any and all documents governing, describing, detailing, or otherwise relating to the relationship between the IIRO and Abd al Hamid Sulaiman al Mujil, including without limitation, all documents relating to al Mujil's appointment as IIRO's Executive Director of the IIRO Eastern Province Branch, and all other positions al Mujil has held and/or holds within the IIRO. Such documents shall include, but are not limited to, copies of al Mujil's resumes, curriculum vitaes, biographies, abstracts, media reports, digests, publications, summaries, employment contracts, and/or outlines. |
| 17 | Please provide any and all documents relating to al Mujil's supervision, management, control of, or distribution of IIRO funds, including without limitation, all documents relating to al Mujil's duties and responsibilities to determine and/or make recommendations as to which charities, individuals, or entities should receive financial and/or non-monetary support from the IIRO and the IIRO Eastern Province Branch, and the purpose for such disbursements. |

5

| 19 | Please provide any and all documents governing, describing, detailing, or otherwise relating to the relationship between al Mujil and the Kingdom of Saudi Arabia, including without limitation, the following agencies of the KSA: the Supreme Council of Islamic Affairs, the Ministry for Islamic Affairs, Endowments, Dawa and Guidance, the Ministry of Foreign Affairs, Endowments, Dawa and Guidance, the Ministry of Defense and Aviation, Endowments, Dawa and Guidance, the Majlis al Shura (a/k/a the Shura Council), the Ministry of Education, and any embassy or consulate of the KSA. Such documents shall include, but are not limited to, any official positions al Mujil held or holds within the government of the KSA. |
|---|---|
| 20 | Please provide any and all documents relating to any meeting al Mujil attended in his capacity as an official and/or representative of the IIRO with any official, representative, or agency of the KSA. |
| 21 | Please provide any and all documents relating to any investigation conducted by the IIRO into any alleged criminal, improper, unauthorized, deviant or terrorist activities of al Mujil, including but not limited to, al Mujil's ties to the following terrorists and terrorist organizations: Osama Bin Laden, Abdullah Azzam, Khalid Sheikh Mohammad, Muhammad Jamal Khalifa, Abdurajak Janjalani, al Qaida, Abu Sayyaf Group, and Jemaah Islamiyah. |
| 22 | Please provide any and all documents governing, describing, detailing, or otherwise relating to the relationship between or among You, the IIRO Designees, and the following individuals: Abd Al-Hadi Daguit and Mahmud Abd Al-Jalil Afif. Such documents shall include, but are not limited to, any positions those individuals held or hold within the IIRO. |

PHILADELPHIA\5962709\1 117430.000

6

# **<u>Exhibit E</u>**

*In Re: Terrorist Attack on September 11, 2001 (03-MDL-1570) (GBD) (FM)*

**A Majority Of The Documents Produced By The IIRO In Response To Plaintiffs' Requests For Production Of Documents Are Not Responsive To The Specific Discovery Request**

| | Plaintiffs' First Set of Requests for Production of Documents Directed To The IIRO – Served December 13, 2005 | |
|---|---|---|
| **Request No.** | **Request** | **Summary Of Documents Produced By The IIRO And Comments** |
| 6 | From the period beginning January 1, 1990 through September 11, 2002, please provide any and all statements for bank accounts held by the IIRO. | IIRO 00341-00353 – Letter to IIRO financial supervisor from Adnan Basha regarding new accounting methods. |
| | | IIRO 00766-00943 – IIRO Application to the Treasury Department's Office of Foreign Assets Control ("OFAC") to undesignate the Philippines and Indonesian branch offices and Abd al Hamid Sulaiman al Mujil (IIRO's Executive Director of the Eastern Province Branch). |
| | | IIRO 00969-00985 – "'Draft" audit report by a London accountant hired by the IIRO to review the activity of the IIRO's Indonesian branch office and determine if it is linked to financial support of terrorist organizations. Accountant concludes that remittances from the IIRO head office in Jeddah and placed in IIRO Indonesia's bank accounts were properly applied to charitable activities and there was no evidence that the branch supported extremist organizations or international terrorism. There are several problems with the report: (1) report is only a "draft;" (2) the report says the branch was established in 1992, but the report only covers the period from May 2005-July 2006; and (3) accountant did not conduct an analysis regarding how the IIRO prepares Annual Financial Statements, nor did he audit them. |
| | | IIRO 03079-03362 – Table; donations given by the IIRO to various entities. |
| | | IIRO 03363-03381 – Table; estimated budget for 1992-1993. |
| | | IIRO 03382-03395 – Table; estimated budget for 1993-1994. |
| | | IIRO 03396-03409 – Table; estimated budget for 1994-1995. |
| | | IIRO 03410-03421 – Table; estimated budget for 1995-1996. |
| | | IIRO 03422-03433 – Table; estimated budget for 1996-1997. |
| | | IIRO 03434-03443 – Table; estimated budget for 1997-1998. |
| | | IIRO 03444-03452 – Table; estimated budget for 1998-2000. |
| | | IIRO 03453-03461 – Table; estimated budget for 1998. |

|  |  |  |
|---|---|---|
|  |  | IIRO 03462-03472 – Table; estimated budget for 2000-2001.<br><br>IIRO 03473-03481 – Table; estimated budget for 2001-2002.<br><br>IIRO 04057-04069 – Audit report for IIRO Indonesia office (May 2005-July 2006).<br><br>**Comments:** IIRO has failed to produce statements for any bank account as specifically requested. The OFAC Application, audit reports, and estimated budgets are clearly not responsive and have no relevance to the issue articulated in the Plaintiffs' document request.<br><br>**IIRO's Own Documents Show That the Main Headquarters is in Possession of Bank Statements:** Plaintiffs respectfully direct the Court's attention to the following report produced by the IIRO which states: "Monthly bank reconciliation together with bank statements are sent on a monthly basis to the Head Office [in Jeddah]." See IIRO 04075-04069. IIRO-SA has bank statements for satellite offices, but has not produced them to the Plaintiffs. |
| 44 | From the period beginning January 1990 through the present, please provide any and all documents governing, describing, detailing, or otherwise relating to the relationship between the IIRO and the persons identified in Exhibit A. | IIRO 01227-01230 – Letters regarding IIRO humanitarian activities and Kenyan intelligence raiding al Haramain office (Adnan Basha, Zakaria al Sheikh).<br><br>IIRO 01299-01303 – Letters between Farid Yassin Qurashi and the director of a Saudi Arabian-German hospital regarding activities of the IIRO for the liberation of a Mansobela organization.<br><br>IIRO 01743-01744 – Interview with Farid Yassin Qurashi regarding IIRO and stating that the charity has no connections to jihad activities.<br><br>IIRO 01251-01751 – Interview with representative from Refugees Commission praising the IIRO and the Kingdom of Saudi Arabia for global aid to refugees.<br><br>IIRO 01753-01756 – IIRO calling for aid to save Kurds in Northern Iraq.<br><br>IIRO 01771-01771 – Details on IIRO in yearbook of international organizations; founded in 1979; gives aid in catastrophe areas.<br><br>**Comments:** Although there are a few documents produced by the IIRO that mention 2 persons identified in Exhibit A – Farid Yassin Qurashi and Zakaria M. Sheikh – the defendant has failed to produce any detailed information regarding the relationship between the IIRO and those persons as specifically requested.  In addition, the IIRO has simply failed to provide any information regarding a number of people identified in Exhibit A that have direct links to the defendant and global terrorism, including Wa'el Hamza Jelaidan (E.O. 13224 designee, co-founding member of al Qaeda, and head of IIRO's office in Pakistan), and Mohammed Jamal Khalifa (senior member of al Qaeda and head of IIRO-Philippines).<br><br>Moreover, documents relating to IIRO denials of links to jihad and terrorist activities, calls for aid to save the Kurds in Northern Iraq, and IIRO's aid activities in catastrophe areas are clearly not responsive and have no relevance to the issue articulated in the Plaintiffs' document request. |

| 45 | From the period beginning January 1990 through the present, please provide any and all documents sent to, and/or received from the persons identified in Exhibit A, including without limitation, all documents relating to the transfer of funds between the IIRO and those persons. | IIRO 01227-01230 – Letters regarding IIRO humanitarian activities, and Kenyan intelligence raiding al Haramain (Adnan Basha, Zakaria al Sheikh).

IIRO 01299-01303 – Letters b/w Farid Yassin Qurashi and director of Saudi Arabian-German hospital re: activities of the IIRO for the liberation of a Mansobela organization.

IIRO 001743-01744 – Interview with Farid Yassin Qurashi regarding the IIRO and stating that the charity has no connections to jihad activities.

IIRO 01751-01751 – Interview with representative from Refugees Commission praising the IIRO and the Kingdom of Saudi Arabia for global aid to refugees.

IIRO 01753-01756 – IIRO calling for aid to save Kurds in Northern Iraq.

IIRO 01771-01771 – Details on IIRO in yearbook of international organizations; founded in 1979; gives aid in catastrophe areas.

**Comments:** IIRO has produced the same documents as identified in # 44 above.  The documents produced are clearly not responsive and have no relevance to the issue articulated in the Plaintiffs' document request. |
| 54 | From the period beginning January 1990 through the present, please provide any and all documents governing, describing, detailing, or otherwise relating to the relationship between the IIRO and Mohammed Jamal Khalifa, including without limitation, Khalifa's role in heading the IIRO's office in the Philippines. | IIRO 00766-00943 – IIRO Application to OFAC to undesignate the Philippines and Indonesian branch offices and Abd al Hamid Sulaiman al Mujil (IIRO's Executive Director of the Eastern Province Branch).

IIRO 01954-01955 – Letter regarding distinction between IIRO's "Dar al Imam" for orphans and Khalifa's "Dar" for preachers.

IIRO 02997-03019 – Documents regarding: Khalifa's deportation proceedings; Khalifa's San Francisco immigration lawyer; denials by IIRO officials that the Philippines office ever supported the Abu Sayyaf terrorist organization; and one IIRO document regarding background on Khalifa.

IIRO 03020-03037 – Newspaper articles from Arabic papers about Khalifa's conviction and acquittal in Jordan in relation to a terrorist bombing of a Jordanian cinema.

**Comments:** IIRO has failed to produce sufficient documentation detailing IIRO's relationship with Khalifa, particularly Khalifa's role in heading the IIRO's office in the Philippines as specifically requested.  The documents produced by the IIRO provide no information regarding Khalifa's supervision, control, or management over the Philippines branch, nor has any information been produced regarding his responsibilities or duties associated with the IIRO as a whole.

Interestingly, the IIRO has produced only documentation distancing itself from Khalifa and his support for global terrorist organizations and activities during his tenure with the IIRO.  The documents produced are clearly not responsive and have no relevance to the issue articulated in the Plaintiffs' document request. |

| | | |
|---|---|---|
| 57 | Please provide any and all documents relating to the IIRO's role in supporting the mujhadeen forces in Afghanistan in their struggle against Soviet occupation. For purposes of this request, the term "support" includes any form of financial, logistical, administrative or other assistance, whether provided directly or indirectly. | IIRO 04054-04056 – Affidavit of IIRO's "Million Dollar Man" Abd al Hamid Sulaiman al Mujil. Al Mujil states that he has never personally, or on behalf of IIRO-SA, contributed any funds to al Qaida "even when the support of the mujihadeen in their resistance against the Soviet occupation of Afghanistan was internationally approved with direct support from the U.S." … "even at the time when the resistance of the mujihadeen against the communist soviet occupation was internationally acceptable." |
| | | **Comments**: IIRO has failed to produce any documentation detailing IIRO's involvement in the struggle against the Soviets during the 1980s as specifically requested. Instead, the IIRO produces an affidavit from an Executive Order 13224 Specially Designated Global Terrorist denying any and all support for al Qaeda and Osama bin Laden. |
| | | Interestingly, IIRO's own documents produced in response to another document request clearly show that the IIRO and MWL were facilitating the transportation of foreign mujahideen to Afghanistan to fight side-by-side with Afghan mujihadeen against the Soviets. See IIRO 01272 (November 27, 1987 letter from IIRO Secretary General Qurashi to the MWL Secretary General referring to discounts given to those who are interested in traveling to Pakistan in order to volunteer together with the Afghan mujihadeen. Qurashi asks the MWL office in Mecca to handle the reduced flight tickets for the mujihadeen and IIRO will handle arrangements for teachers, doctors, and volunteers to examine the situation on the ground). |
| | | Additionally, documentation uncovered during the March 2002 raid of the Benevolence International Foundation offices in Sarajevo, Bosnia-Herzegovina by Bosnian authorities led to the discovery of a computer file named "Tareekh Osama" or "Osama's History." Those documents chronicle Osama bin Laden's activities in Afghanistan which led to the formation of al Qaeda in 1988, and were introduced by the United States Government in their criminal prosecution of al Qaida supporter Enaam Arnaout. *See* Government's Evidentiary Proffer Supporting the Admissibility of Coconspirator Statements, *United States v. Arnaout*, Case No. 02-CR-892, Northern District of Illinois. Several documents directly link the IIRO to bin Laden, including BOS000067 (discussing forming a committee to receive donations and maintain an account – "the Relief Agency [Hayaat al Ighata = IIRO]), and BOS000022-000023 (correspondence on IIRO/MWL letterhead, discussing attacks being launched from "League" offices and passports should not be kept with Saudi Red Crescent because Julaidan is returning to Saudi Arabia). |
| | | Despite credible evidence that the IIRO directly participated in the Afghan resistance against the Soviets during the 1980s, including correspondence on IIRO/MWL letterhead discussing attacks being launched from MWL offices, the IIRO has failed to produce the requested documentation. |
| | | The document produced is clearly not responsive and have no relevance to the issue articulated in the Plaintiffs' document request. |
| 87 | Provide all documents relating to any investigations conducted by the Islamic Republic of Pakistan and its subsequent determination to expel IIRO personnel after September 11, 2001. | IIRO 01139 – December 2003 letter from the Director General of Pakistan IIRO office stating that since he has taken charge of the Pakistan office, no employee has so far been arrested having a link with al Qaeda. |
| | | IIRO 01488-01493 – Two letters from 2007 from the Head of Shura Council in Indonesia and Minister of Religious Matters in Indonesia (To Whom It May Concern), stating the IIRO has |

4

worked in this region, respected its laws, and has no connections to non-humanitarian activity. Also 4 letters from Pakistani officials from 2007 stating IIRO operates within the law, provides humanitarian activities in Pakistan, and the government has no reservations as to the activity of the IIRO office in Pakistan.

Comments: IIRO has failed to produce any documentation relating to investigations conducted by the Islamic Republic of Pakistan as specifically requested. The 2003 and 2007 letters are not relevant and do not address the specific issue – the expulsion of IIRO personnel from Pakistan after the September 11ᵗʰ attack.

| Request No. | Request | Comments |
|---|---|---|
| | **Plaintiffs' Second Set of Supplemental Requests for Production of Documents Directed To The IIRO – Served January 28, 2008** | |
| 1 | Please provide any and all documents relating to the United States Treasury Department's investigation and August 3, 2006 designations of the IIRO's Philippine and Indonesian branch offices and Abd al Hamid Sulaiman al Mujil, the IIRO's Executive Director of the Eastern Province Branch (hereinafter, collectively referred to as the "IIRO Designees"), "for facilitating fundraising for al Qaida and affiliated terrorist groups." Such documents shall include, but are not limited to, any and all documents identifying all accounts, assets, and monies that were seized and/or frozen following the August 3, 2006 designations. | IIRO 00766-00943 – IIRO Application to the Treasury Department's Office of Foreign Assets Control ("OFAC") to undesignate the Philippines and Indonesian branch offices and Abd al Hamid Sulaiman al Mujil (IIRO's Executive Director of the Eastern Province Branch).

IIRO 00988-01004 – Documents regarding freezing of account in the Philippines; legal documents discussing service and the IIRO's failure to appear, selective media reports about IIRO accounts in the Philippines being frozen; and freeze order from Bank of Philippines to IIRO. (Documents are incomplete with missing pages).

IIRO 00209-00247 – Documents from 1994-95 regarding field trips, projects and oversight, protocols of meetings, identification of IIRO offices which will carry out and supervise projects in certain countries, and administrative decisions.

IIRO 00969-00985 – "Draft" audit report by a London accountant hired by the IIRO to review the activity of the IIRO's Indonesian branch office and determine if it is linked to financial support of terrorist organizations. Accountant concludes that remittances from the IIRO head office in Jeddah and placed in IIRO Indonesia's bank accounts were properly applied to charitable activities and there was no evidence that the branch supported extremist organizations or international terrorism. There are several problems with the report: (1) report is only a "draft;" (2) the report says the branch was established in 1992, but the report only covers the period from May 2005-July 2006; and (3) accountant did not conduct an analysis regarding how the IIRO prepares Annual Financial Statements, nor did he audit them.

Comments: Similar to its responses to Plaintiffs' First Set of Requests for Production of Documents, IIRO continues to produce documents that have no relevance whatsoever to the specific document request. A "draft" audit report and documents regarding field trips and IIRO projects are clearly not relevant to the Plaintiffs' specific discovery request seeking documents relating to investigations and the designations of the IIRO branch offices and al Mujil for supporting al Qaeda and other terrorist organizations.

IIRO's Responses Expose a Consistent and Disturbing Trend – Reviewing the discovery documents provided by the defendant, it is evident that the IIRO is merely re-circulating the same non-responsive documents in response to each request. There is obviously no intention on the part of the |

5

| | | |
|---|---|---|
| 2 | Please provide any and all documents relating to any investigations or inquiries conducted by the United Nations relating to allegations of the IIRO Designees' ties to terrorism, including without limitation, any and all documents relating to the U.N. Security Council Sanctions Committee's designations, dated August 4, 2006 and November 9, 2006, identifying the IIRO Designees as entities and individuals "belonging to or associated with the Al-Qaida organization." Such documents shall include, but are not limited to, any and all documents identifying all accounts, assets, and monies that were seized and/or frozen following the designations. | IIRO to produce responsive documentation, and the defendant's failure to do so only reinforces the Plaintiffs' position that the IIRO has completely disregarded its discovery obligations in this important litigation and is engaged in an orchestrated plan to delay and dodge discovery as long as it can.<br><br>IIRO 00209-00247 – Documents from 1994-95 regarding field trips, projects and oversight, protocols of meetings, identification of IIRO offices which will carry out and supervise projects in certain countries, and administrative decisions.<br><br>IIRO 01005-01006 – August 1995 letter to the IIRO advising that the Economic and Social Council decided to grant consultation status to the IIRO and may now designate official representatives to the U.N.<br><br>IIRO 01007-01014 – Partnership agreement b/w the IIRO and UNHCR.<br><br>Comments: IIRO has failed to produce any documentation relating to investigations or inquiries conducted by the United Nations in relation to the IIRO's ties to terrorism, including the U.N. Security Council Sanctions Committee's designations as specifically requested. Documents dating back to 1994-95 regarding IIRO field trips and projects, and documents regarding partnership agreements with the UNHCR are clearly not responsive and have no relevance to the issue articulated in the Plaintiffs' document request. |
| 3 | Please provide any and all documents relating to any investigations or inquiries conducted by the Republic of the Philippines and the Republic of Indonesia relating to allegations of the IIRO Designees' ties to terrorism, including without limitation, all documents identifying any and all accounts, assets, and/or monies seized and/or frozen by those governments. | IIRO 00988-01004 – Documents regarding freezing of account in the Philippines; legal documents discussing service and the IIRO's failure to appear; selective media reports about IIRO accounts in the Philippines being frozen; and freeze order from Bank of Philippines to IIRO. (Documents are incomplete with missing pages).<br><br>Comments: IIRO has failed to produce sufficient documentation relating to government investigations of the IIRO branch offices in the Philippines and Indonesia as specifically requested. Many of the documents produced relative to the Philippines branch are incomplete and missing pages. Moreover, IIRO has failed to produce anything regarding the IIRO Indonesian branch. |
| 4 | Please provide any and all documents relating to IIRO Account Nos. 0200100100000011145671 and 0200200100000012000472, held at the Bank of Philippine Islands ("BPI"). Such documents shall include, but are not limited to, correspondence, letters, memoranda, notes, and/or e-mails, that refer to, relate to, or reflect communications between or among the IIRO, the IIRO Designees and BPI, monthly account statements, annual account statements, account notices, deposits, withdrawals, deposit slips, check stubs, cleared or canceled checks, cashier checks, money orders, debit/credit memos, financial ledgers, journals, investment records, real estate records, records of assets, loan records, audit work papers, audit reports, wire transfers, and any documentation showing the source(s) and/or destination(s) of any funds deposited into or withdrawn from those accounts. | IIRO 00988-01004 – Documents regarding freezing of account in the Philippines; legal documents discussing service and the IIRO's failure to appear; selective media reports about IIRO accounts in the Philippines being frozen; and freeze order from Bank of Philippines to IIRO. (Documents are incomplete with missing pages).<br><br>Comments: IIRO has failed to produce any banking or financial documents for the two (2) bank accounts as specifically requested. The documents produced by the IIRO are clearly not responsive and have no relevance to the issue articulated in the Plaintiffs' document request. |
| 5 | Please provide all documents relating to any designation, sanction or restriction imposed upon You and/or the IIRO Designees by any agency, department or instrumentality of the United States, United Nations, or any | IIRO 00766-00943 – IIRO Application to OFAC to undesignate the Philippines and Indonesian branch offices and Abd al Hamid Sulaiman al Mujil (IIRO's Executive Director of the Eastern Province branch). |

| | | |
|---|---|---|
| | other nation or international body. | IIRO 00988-01004 – Documents regarding freezing of account in the Philippines; legal documents discussing service and the IIRO's failure to appear; selective media reports about IIRO accounts in the Philippines being frozen; and freeze order from Bank of Philippines to IIRO. (Documents are incomplete with missing pages).<br><br>IIRO 00209-00247 – Documents from 1994-95 regarding field trips, projects and oversight, protocols of meetings, identification of IIRO offices which will carry out and supervise projects in certain countries, and administrative decisions.<br><br>IIRO 00969-00985 – "Draft" audit report by a London accountant hired by the IIRO to review the activity of the IIRO's Indonesian branch office and determine if it is linked to financial support of terrorist organizations. Accountant concludes that remittances from the IIRO head office in Jeddah and placed in IIRO Indonesia's bank accounts were properly applied to charitable activities and there was no evidence that the branch supported extremist organizations or international terrorism. There are several problems with the report: (1) report is only a "draft;" (2) the report says the branch was established in 1992, but the report only covers the period from May 2005-July 2006; and (3) accountant did not conduct an analysis regarding how the IIRO prepares Annual Financial Statements, nor did he audit them.<br><br>Comments: IIRO has failed to produce sufficient documentation relating to any sanctions or restriction imposed upon the IIRO as specifically requested. A "draft" audit report and documents dating back to 1994-95 regarding IIRO field trips and projects are clearly not responsive and have no relevance to the issue articulated in the Plaintiffs' document request. |
| 6 | Please provide copies of any and all documents and things that have been seized by, or produced by You and/or the IIRO Designees to, any investigators, auditors, government officials or agencies, and/or international bodies concerning the IIRO Designees' alleged support for, or connections to, alleged terrorist, deviant or criminal organizations, groups, individuals, or activities. | IIRO 00766-00943 – IIRO Application to OFAC to undesignate the Philippines and Indonesian branch offices and Abd al Hamid Sulaiman al Mujil (IIRO's Executive Director of the Eastern Province Branch).<br><br>IIRO 00988-01004 – Documents regarding freezing of account in the Philippines; legal documents discussing service and the IIRO's failure to appear; selective media reports about IIRO accounts in the Philippines being frozen; and freeze order from Bank of Philippines to IIRO. (Documents are incomplete with missing pages).<br><br>IIRO 00209-00247 – Documents from 1994-95 regarding field trips, projects and oversight, protocols of meetings, identification of IIRO offices which will carry out and supervise projects in certain countries, and administrative decisions.<br><br>IIRO 00969-00985 – "Draft" audit report by a London accountant hired by the IIRO to review the activity of the IIRO's Indonesian branch office and determine if it is linked to financial support of terrorist organizations. Accountant concludes that remittances from the IIRO head office in Jeddah and placed in IIRO Indonesia's bank accounts were properly applied to charitable activities and there was no evidence that the branch supported extremist organizations or international terrorism. There are several problems with the report: (1) report is only a "draft;" (2) the report says the branch was established in 1992, but the report only covers the period from May 2005-July 2006; and (3) accountant did not conduct an analysis regarding how the IIRO prepares Annual Financial Statements, nor did he audit them. |

7

| | | |
|---|---|---|
| 11 | Please provide all documents relating to any and all information or notification You received that the IIRO Designees, or any individual or entity employed by and/or affiliated with the IIRO Designees, may have been or were diverting funds or otherwise providing material support or resources to the Abu Sayyaf Group and Jemaah Islamiyah. | **Comments:** IIRO has failed to produce sufficient documentation relating to any documents or things that have been seized by investigators as specifically requested. A "draft" audit report and documents dating back to 1994-95 regarding IIRO field trips and projects are clearly not responsive and have no relevance to the issue articulated in the Plaintiffs' document request.<br><br>IIRO 00765-00943 – IIRO Application to OFAC to undesignate the Philippines and Indonesian branch offices and Abd al Hamid Sulaiman al Mujil (IIRO's Executive Director of the Eastern Province Branch).<br><br>IIRO 00988-01004 – Documents regarding freezing of account in the Philippines; legal documents discussing service and the IIRO's failure to appear; selective media reports about IIRO accounts in the Philippines being frozen; and freeze order from Bank of Philippines to IIRO. (Documents are incomplete with missing pages).<br><br>IIRO 00209-00247 – Documents from 1994-95 regarding field trips, projects and oversight, protocols of meetings, identification of IIRO offices which will carry out and supervise projects in certain countries, and administrative decisions.<br><br>IIRO 00969-00985 – "Draft" audit report by a London accountant hired by the IIRO to review the activity of the IIRO's Indonesian branch office and determine if it is linked to financial support of terrorist organizations. Accountant concludes that remittances from the IIRO head office in Jeddah and placed in IIRO Indonesia's bank accounts were properly applied to charitable activities and there was no evidence that the branch supported extremist organizations or international terrorism. There are several problems with the report: (1) report is only a "draft;" (2) the report says the branch was established in 1992, but the report only covers the period from May 2005-July 2006; and (3) accountant did not conduct an analysis regarding how the IIRO prepares Annual Financial Statements, nor did he audit them.<br><br>**Comments:** IIRO has failed to produce any documentation relating to any information or notification the IIRO received that the Philippines and Indonesian branches and Abd al Hamid Sulaiman al Mujil were providing support to the Abu Sayyaf Group and Jemaah Islamiyah as specifically requested. A "draft" audit report and documents dating back to 1994-95 regarding IIRO field trips and projects are clearly not responsive and have no relevance to the issue articulated in the Plaintiffs' document request.<br><br>U.S. Department of Treasury Identifies IIRO Designees as "Major" Fundraisers for Abu Sayyaf and Jemaah Islamiyah – The August 3, 2006 Treasury Department press release announcing the IIRO designations provides detailed information that the Philippines and Indonesian branches and Abd al Hamid Sulaiman al Mujil were for many years serving as major sources of fundraising for Abu Sayyaf and Jemaah Islamiya. It is thus fair to conclude that the IIRO must have received some formal notification from investigators and/or government officials that it was under investigation for providing material support and resources to those terrorist organizations, and is in possession of documentation regarding the same. |
| 12 | Please provide all documents relating to any and all information or notification You received that the IIRO Designees, or any individual or entity employed by and/or affiliated with the IIRO Designees, may have been or | IIRO 00765-00943 – IIRO Application to OFAC to undesignate the Philippines and Indonesian branch offices and Abd al Hamid Sulaiman al Mujil (IIRO's Executive Director of the Eastern Province Branch). |

8

were diverting funds or otherwise providing material support or resources to: (i) Islamic radicals, fundamentalists, extremists or persons or organizations associated with international terrorism or domestic terrorism; and/or (ii) al Qaida, other terrorist organizations and/or individuals sympathetic to al Qaida, or other terrorist organizations, regardless of whether you believe such person(s) or entity(s) was acting within the scope of his employment in relation to any such activities.

IIRO 00988-01004 – Documents regarding freezing of account in the Philippines; legal documents discussing service and the IIRO's failure to appear; selective media reports about IIRO accounts in the Philippines being frozen; and freeze order from Bank of Philippines to IIRO. (Documents are incomplete with missing pages).

IIRO 00209-00247 – Documents from 1994-95 regarding field trips, projects and oversight, protocols of meetings, identification of IIRO offices which will carry out and supervise projects in certain countries, and administrative decisions.

IIRO 00969-00985 – "Draft" audit report by a London accountant hired by the IIRO to review the activity of the IIRO's Indonesian branch office and determine if it is linked to financial support of terrorist organizations. Accountant concludes that remittances from the IIRO head office in Jeddah and placed in IIRO Indonesia's bank accounts were properly applied to charitable activities and there was no evidence that the branch supported extremist organizations or international terrorism. There are several problems with the report: (1) report is only a "draft;" (2) the report says the branch was established in 1992, but the report only covers the period from May 2005-July 2006; and (3) accountant did not conduct an analysis regarding how the IIRO prepares Annual Financial Statements, nor did he audit them.

Comments: IIRO has failed to produce any documentation relating to any information or notification the IIRO received that the Philippines and Indonesian branches and Abd al Hamid Sulaiman al Mujil were providing support to al Qaida and/or Islamic extremists as specifically requested. A "draft" audit report and documents dating back to 1994-95 regarding IIRO field trips and projects are clearly not responsive and have no relevance to the issue articulated in the Plaintiffs' document request.

---

13

Please provide any and all documents relating to any internal investigations conducted by You, relating to any accusation that the IIRO Designees, including any individual or entity employed by and/or affiliated with the IIRO Designees, were associated with or involved in any criminal, corrupt, deviant or extremist activity, including without limitation any terrorist or radical religious, political or social activities.

IIRO 00766-00943 – IIRO Application to OFAC to undesignate the Philippines and Indonesian branch offices and Abd al Hamid Sulaiman al Mujil (IIRO's Executive Director of the Eastern Province Branch).

IIRO 00988-01004 – Documents regarding freezing of account in the Philippines; legal documents discussing service and the IIRO's failure to appear; selective media reports about IIRO accounts in the Philippines being frozen; and freeze order from Bank of Philippines to IIRO. (Documents are incomplete with missing pages).

IIRO 00209-00247 – Documents from 1994-95 regarding field trips, projects and oversight, protocols of meetings, identification of IIRO offices which will carry out and supervise projects in certain countries, and administrative decisions.

IIRO 00969-00985 – "Draft" audit report by a London accountant hired by the IIRO to review the activity of the IIRO's Indonesian branch office and determine if it is linked to financial support of terrorist organizations. Accountant concludes that remittances from the IIRO head office in Jeddah and placed in IIRO Indonesia's bank accounts were properly applied to charitable activities and there was no evidence that the branch supported extremist organizations or international terrorism. There are several problems with the report: (1) report is only a "draft;" (2) the report only covers the period from May 2005-July 2006; and (3) accountant did not conduct an analysis regarding how the IIRO prepares Annual Financial

| | | Statements, nor did he audit them. |
|---|---|---|
| 18 | Please provide any and all documents relating to the transfer of IIRO funds authorized by al Mujil and/or the IIRO Eastern Province Branch (and/or any IIRO official, employee, representative or agent working on al Mujil's or the IIRO Eastern Province Branch's behalf) for any IIRO branch office. | **Comments:** IIRO has failed to produce any documentation relating to any internal investigations conducted by the IIRO as specifically requested. A "draft" audit report and documents dating back to 1994-95 regarding IIRO field trips and projects are clearly not responsive and have no relevance to the issue articulated in the Plaintiffs' document request.<br><br>IIRO 00969-00985 – "Draft" audit report by a London accountant hired by the IIRO to review the activity of the IIRO's Indonesian branch office and determine if it is linked to financial support of terrorist organizations. Accountant concludes that remittances from the IIRO head office in Jeddah and placed in IIRO Indonesia's bank accounts were properly applied to charitable activities and there was no evidence that the branch supported extremist organizations or international terrorism. There are several problems with the report: (1) report is only a "draft," (2) the report says the branch was established in 1992, but the report only covers the period from May 2005–July 2006; and (3) accountant did not conduct an analysis regarding how the IIRO prepares Annual Financial Statements, nor did he audit them.<br><br>**Comments:** IIRO has failed to produce any documentation relating to the transfer of funds authorized by al Mujil and/or the IIRO Eastern Province Branch as specifically requested. A "draft" audit report is clearly not responsive and has no relevance to the issue articulated in the Plaintiffs' document request. |
| 23 | From the period beginning January 1990 through the present, please provide any and all documents identifying all individuals, both foreign and domestic, employed by the Philippine and Indonesian branch offices of the IIRO. Such documents shall include, but are not limited to, lists of all officers, directors, trustees, employees and agents, with dates of hire and termination, job title, job responsibilities, and place of employment. | IIRO 00944-00968 – IIRO Annual Report for 2001-2002.<br><br>IIRO 00969-00985 – "Draft" audit report by a London accountant hired by the IIRO to review the activity of the IIRO's Indonesian branch office and determine if it is linked to financial support of terrorist organizations. Accountant concludes that remittances from the IIRO head office in Jeddah and placed in IIRO Indonesia's bank accounts were properly applied to charitable activities and there was no evidence that the branch supported extremist organizations or international terrorism. There are several problems with the report: (1) report is only a "draft," (2) the report says the branch was established in 1992, but the report only covers the period from May 2005–July 2006; and (3) accountant did not conduct an analysis regarding how the IIRO prepares Annual Financial Statements, nor did he audit them.<br><br>**Comments:** IIRO has failed to produce sufficient documentation identifying all individuals, both foreign and domestic, employed by the Philippine and Indonesian branch offices of the IIRO as specifically requested. Although the "draft" audit report identifies a few employees in the 2005-2006 time frame, IIRO's response is grossly inadequate. The annual report is clearly not responsive and has no relevance to the issue articulated in the Plaintiffs' document request. |
| 24 | From the period beginning January 1990 through the present, please provide any and all documents relating to any grants, loans and investments made by the Philippine and Indonesian branch offices of the IIRO. Such investments shall include, but are not limited to, real estate, real estate ventures, stocks, government bonds, corporate bonds, municipal bonds, cash investments, pooled investments, equity funds, mutual funds, hedge funds, money market securities, annuities, commodities, options, futures, collectibles, diamonds, gold, IRAs, and/or municipal debt instruments. | IIRO 00944-00968 – IIRO Annual Report for 2001-2002.<br><br>IIRO 00969-00985 – "Draft" audit report by a London accountant hired by the IIRO to review the activity of the IIRO's Indonesian branch office and determine if it is linked to financial support of terrorist organizations. Accountant concludes that remittances from the IIRO head office in Jeddah and placed in IIRO Indonesia's bank accounts were properly applied to charitable activities and there was no evidence that the branch supported extremist organizations or international terrorism. There are several problems with report: (1) report is only a "draft," (2) the report says the branch |

10

| | | |
|---|---|---|
| | | was established in 1992, but the report only covers the period from May 2005-July 2006; and (3) accountant did not conduct an analysis regarding how the IIRO prepares Annual Financial Statements, nor did he audit them.<br><br>Comments: IIRO has failed to produce sufficient documentation relating to loans and investments made by the Philippine and Indonesian branch offices of the IIRO as specifically requested. A "draft" audit report is clearly not responsive and has no relevance to the issue articulated in the Plaintiffs' document request. |
| 25 | From the period beginning January 1990 through the present, please provide any and all documents detailing all contributions received and disbursements made by the Philippine and Indonesian branch offices of the IIRO. | IIRO 00944-00968 – IIRO Annual Report for 2001-2002.<br><br>IIRO 00969-00985 – "Draft" audit report by a London accountant hired by the IIRO to review the activity of the IIRO's Indonesian branch office and determine if it is linked to financial support of terrorist organizations. Accountant concludes that remittances from the IIRO head office in Jeddah and placed in IIRO Indonesia's bank accounts were properly applied to charitable activities and there was no evidence that the branch supported extremist organizations or international terrorism. There are several problems with the report: (1) report is only a "draft;" (2) the report says the branch was established in 1992, but the report only covers the period from May 2005-July 2006; and (3) accountant did not conduct an analysis regarding how the IIRO prepares Annual Financial Statements, nor did he audit them.<br><br>IIRO 00133-00137 – Receipts/memos regarding payments/donations for orphans in Yemen and transfers/visits to Chad and Cameroon.<br><br>IIRO 00138-00163 – Letters regarding procedures and decisions for selling IIRO valuable donations such as gold and silver; requests regarding transfers of food from Dubai to Croatia; rules regarding sale of IIRO real estate.<br><br>IIRO 00209-00247 – Documents from 1994-95 regarding field trips, projects and oversight, protocols of meetings, identification of IIRO offices which will carry out and supervise projects in certain countries, and administrative decisions.<br><br>Comments: IIRO has failed to produce any documentation relating to contributions received and disbursements made by the Philippine and Indonesian branch offices of the IIRO as specifically requested. A "draft" audit report, documents regarding orphans in Yemen, and other documentation relating to transfers of food and field trips are clearly not responsive and have no relevance to the issue articulated in the Plaintiffs' document request. |

11

# **Exhibit F**

# 01-1535-cr(L)

**01-1550-cr(CON), 01-1553-cr(CON), 01-1571-cr(CON), 05-6149-cr (CON), 05-6704-cr (CON)**

*To Be Argued By*: DAVID RASKIN LESLIE C. BROWN

## United States Court of Appeals

### FOR THE SECOND CIRCUIT

### Docket Nos. 01-1535-cr(L), 01-1550-cr(CON), 01-1553-cr(CON), 01-1571-cr(CON), 05-6149-cr(CON), 05-6704-cr(CON)





UNITED STATES OF AMERICA,

*Appellee,*

—v.—

FAZUL ABDULLAH MOHAMMED, also known as Harun Fazhl, also known as Fazhl Abdullah, also known as Fazhl Khan; USAMA BIN LADEN, also known as Usamah Bin-Laden, also known as Shaykh Usamah Bin-Ladin, also known as Mujahid Shaykh, also known as Hajj, also known as Qaqa, also known as the Director;

*(caption continued inside front cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

## SUPPLEMENTAL APPENDIX VOLUME II OF IV (Pages SA-577 to SA-1164)

MICHAEL J. GARCIA,
*United States Attorney for the Southern District of New York,
Attorney for the United States of America.*

## SA-577

**JAMAL AL-FADHL**

**VIDEOTAPE INTERVIEWS - VIDEOTAPE #3**

4    A:  (Through interpreter):  Well, he's hoping that you, the

5    person who, in light of all this (inaudible) you (and this end

6    before) you (asked) him to go the ███████(inaudible).  And he

7    hoping that you would talk to the group, as well, about his needs

8    and -

9    Q:  Always.

10   A:  (Through interpreter):  - and his concerns -

11   Q:  Always.

12   A:  (Through interpreter):  And, he's hoping.

3    Q:  Right, yeah.  That always happens -

14   Q:  Don and -

15   A:  I know Bin Laden has over there (Khadira).  [Speaking

16   Arabic].

17   A:  (Through interpreter):  Bin Laden is not an easy guy,

18   he's a big case.  And, if somebody's testifying in court against

19   him - it's not an easy thing, and it's not a small thing, either.

20   It's a huge thing.  Even the person that accompanies me, I'm

21   actually worried about him, now.

22   Q:  Okay.

23   A:  (Through interpreter):  Because, this Bin Laden guy is

24   very dangerous, and he's well-known for that, notorious for it.

     Q:  Okay.  All right.  Um, let's, uh, let's talk next week.

26   Make some of those phone calls, and just - we'll keep the process

02CR892                              WS002252

SA-894

1       A:  For experience, he's better than Madani al Tayyib.  But,

2   when Madani al Tayyib marriage Bin Laden uncle daughter, Madani

3   al Tayyib became higher than him.  But, for the experience, for

4   how to run people, and that, Majid is much better.

5       Q:  Okay.

6       MALE VOICE:  Should I add that?

7       MALE VOICE:  No.  That's okay.

8       MALE VOICE:  Okay.

9       Q:  Do you know of anything regarding Al-Qaeda or Bin Laden

10  opening up or operating a telecommunications company in Somalia?

11      A:  No.

12      Q:  Okay.

13      MALE VOICE:  (Inaudible)

14  (Laughing)

15      Q:  Are you familiar with the International Islamic Relief

16  Organization?  And, just translate that into Arabic for yourself.

17      A:  Say it again?

18      Q:  International.

19      A:  Okay.

20      Q:  Islamic.

21      A:  Okay.

22      Q:  Relief Organization.

23      A:  Well, we talk I think before about that.

24      Q:  Okay.  Okay.

25      A:  This is the - the - the one they got branch in Peshawar.

26      Q:  Okay.  (Inaudible) -

## SA-895

1    A: During the -

2    Q: What is called in Arabic?

3    A: (Hy-at Ali-rah-tah el Al-ah-meer).  And, that time it's

4    run by Saudi guy, his name Wael Jaladen.

5    MALE VOICE: Okay.  So just write I-I-R-O run by Wael

6    A: Wael.

7    MALE VOICE: "W"?

8    MALE VOICE: Wael.  "W", I think it's W-A-E-L.

9    MALE VOICE: Okay.  Wael?

10   MALE VOICE: Jaladen.  J-A-L-A-D-E-N.  Jaladen.  Okay.

11   MALE VOICE: Okay.

12   MALE VOICE: (Inaudible)

13   A: And, I remember -

14   Q: And he ran the Peshawar branch?

15   A: Yes.  And, I remember in - in '89, the Al-Qaeda people,

16   the (Abdullah Azam) people, the most - the most of Arab people,

17   when they were in Afghanistan, they make the ID card from this

18   relief.  They give you picture.  They make you, like, a teacher,

19   or helper, or, uh, or guide, like that.  So, that mean you can

20   enter the border between Pakistan, Afghanistan easily with - with

21   no problem.

22   Q: Right.  Okay.  But the (Moo-jah-deen) would use those ID

23   cards to cross the border.

24   A: Oh, no - this is only for Arab people.  The - the

25   Afghani people, they don't need that.  This is only for Arab

26   people.

SA-896

1   Q: Well, no, okay.  Okay.  For the Arab {Moo-jah-deen} -

2   A: Yes.

3   Q: - to go to Afghanistan.

4   A: Yes.

5   Q: So, they would go to the IIRO, and obtain ID cards to

6   get across the border.

7   A: Yes.  They got letter - they got letter from the Islamic

8   International Relief.  This letter go to Pakistan immigration.

9   And, the Relief told immigration, "Those guys they work with aid

10  with - under this Relief."  So, they got visa for staying in

11  Pakistan.  And the same time, they got ID card from the relief

12  organization.

13  Q: Now, that was everybody going through there.  Because

14  you said, uh, Azam -

15  A: Yes.

16  Q: - was sending his people there?  And who else?

17  A: And - and Bin Laden people.  Before the Al-Qaeda start,

18  Bin Laden people, because Abu Hamman al Saudi Bin Laden office.

19  They make letter to Wael Jaladen.  And, Wael Jaladen, he make

20  letter to immigration, Pakistan immigration, and he issue ID

21  card.

22  Q: So were they affiliated with the - what was it called -

23  Mektab al Khidemat?

24  A: Mektab al Khidemat, he don't - he don't issue this kind

25  of stuff.  Mektab al Khidemat just you go over there.  Take three

26  days.  They give you new clothes.  They give you direction, the

02CR892                                    WS002591

## SA-897

1    training, and the review.  But they don't give you documentation

2    for, like, immigration and like that stuff.  They have -

3        Q:  So, do they send people to IIRO?

4        A:  Yes.  You have to got letter from immigration from this

5    office.

6        Q:  Okay.

7        A:  And also, the - the - some money from people from Gulf

8    area to Bin Laden or to Azam go to this office.  And, after that,

9    they give it to Bin Laden or Azam.

10       Q:  Okay.  Now, with the IIRO, what was their cover?  What

11   kind of NGO was this?

12       A:  It's - I - I believe -

13       Q:  You said they were - they -

14       A:  Yes -

15       Q:  You said they were using ID cards for teachers.  What

16   else?  Aid workers -

17       A:  It's immigration - you know, if - if someone he's from

18   Egypt.  And, he can't travel around the world.  And, he got

19   Pakistan passport, or Afghani passport, or any other passport.

20   When he go to this office, they don't give him hard time to write

21   letter to any embassy in Pakistan.  Like, if you want to go to

22   England, or if you want to go to anywhere in the world.  Those

23   guys, they give him letter.  That letter, it show this guy he

24   work under this Relief.  So he can got visa easy.

25       Q:  Who ran that?  Who ran the IIRO?

26       MALE VOICE:  Jamal, you said Wael Jaladen.

# **<u>Exhibit G</u>**



**Enregistré**

**U.S. Department of Justice**

Federal Bureau of Investigation

In Reply, Please Refer to
File No.
315N-NY-259391

New York Office
June 2, 2004

### Co-operating Witness Interview

On 1/13/2004, a co-operating witness, hereafter referred to as "source", was interviewed about an individual named Yasin Al-Kadi. The source advised the following:

The source advised that Yasin Al-Kadi is from the Dosari (phonetic) tribe in Saudi Arabia and that he may use the alias Abu Khalid. Although the source never directly worked with Al-Kadi, he (source) saw Al-Kadi twice, circa 1993-94, at one of Osama Bin Laden's guesthouses located in the Riyadh City section of Khartoum, Sudan. The source believes that Al-Kadi in not a member of Al-Qaida, but was definitely a noteworthy individual who supported jihad.

The source advised that Al-Kadi was friends with two Al-Qaida members who were involved in the financial aspects of the group. These two individuals were Abu Unaith Al-Saudi (of Moroccan roots) and Abu Hammam Al-Saudi. The source advised that both these individuals purchased weapons for Al-Qaida during the war in Afghanistan and maintained an office in Peshawar, Pakistan circa 1989. According to the source, this office was located inside the offices of the Islamic Relief Organization (IRO). The source further advised that the manager and person who ran the IRO at the time was Wael Julidan whose alias was Abu Al-Hassan Al-Madani. According to the source, Julidan was one of Bin Laden's closest friends at the time. The source was told by Abu Fadl Al-Makki that Al-Kadi would bring donated money from the Gulf area, mainly Saudi Arabia, to Al-Qaida which was used to purchase weapons in Jalalabad, Afghanistan.

The source advised that Al-Kadi also brought money to Khartoum for Al-Qaida. According to the source, some of this money was used to help finance the building of the Damazin to Kurmuk road which was started at the end of 1989. Furthermore, the source advised that Abu Unaith and Abu Hammam were involved in establishing the Wadi Al-Aqiq company.

The source advised that Al-Kadi also supported Al-Baramain in Zagreb, Croatia during the conflict in Bosnia. Like

document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

Afghanistan and Sudan, Al-Kadi brought donations from Saudi
Arabia and other Gulf countries to Croatia to support the jihad.
The source was not sure if any of the money was from Al-Kadi
personally.  Aside from money, Al-Kadi was also responsible for
shipping tapes and books about jihad and Islam to Al-Haramain.
The source advised that these shipments were sent to Croatia and
forwarded to Bosnia for distribution.  According to the source,
some of the material remained in Croatia and was distributed to
Arab and Bosnian Muslims residing there.

Furthermore, the source advised that while he was in
Zagreb, Croatia, Abu Ayman Al-Sudani (not the Abu Ayman Al-Sudani
who is related to Mohamed Suliman Al-Nalfi) told him that Al-Kadi
was one of the individuals who financially supported Al-Haramain.
The source advised that Abu Ayman is originally from Kassalla,
Sudan and was one of the individuals who managed the Al-Haramain
office in Zagreb.  The source believes that Abu Ayman was not an
Al-Qaida member but did support the group.  To clarify the
management structure of Al-Haramain in Zagreb, the source advised
that the Emir of the office was a Saudi named Al-Sheikh Aqil
(phonetic) and under him was an individual named Al-Sheikh Adnan
Ar-Roor (phonetic).  According to the source, Abu Ayman worked
under Aqil, who he (source) described as having a wandering eye,
and Ar-Roor.  However, Abu Ayman told the source that the person
who actually ran Al-Haramain was Saudi Prince Fiasal Al-Turki.

The source advised that Ar-Roor was originally from
Syria and was also involved in financing jihad in Afghanistan and
Bosnia.  According to the source, Ar-Roor was not an Al-Qaida
member.  However, Ar-Roor is an Islamic scholar who gave a lot of
lectures about jihad and was good friends with Al-Kadi.

Finally, the source advised that the money that was
being sent to Pakistan by Al-Kadi was done through the Hawala
system and not traditional banks.  The source was not sure about
the method by which money was being sent to Croatia.

# **Exhibit H**



August 3, 2006
hp-45

### Treasury Designates Director, Branches of Charity Bankrolling Al Qaida Network

The U.S. Department of the Treasury today designated the Philippine and Indonesian branch offices of the Saudi-based International Islamic Relief Organization (IIRO) for facilitating fundraising for al Qaida and affiliated terrorist groups. Treasury additionally designated Abd Al Hamid Sulaiman Al-Mujil, the Executive Director of the Eastern Province Branch of IIRO in the Kingdom of Saudi Arabia.

"Abd Al Hamid Sulaiman Al-Mujil, a high-ranking IIRO official in Saudi Arabia, has used his position to bankroll the al Qaida network in Southeast Asia. Al-Mujil has a long record of supporting Islamic militant groups, and he has maintained a cell of regular financial donors in the Middle East who support extremist causes," said Stuart Levey, Treasury's Under Secretary for Terrorism and Financial Intelligence (TFI). "Today we are holding him to account."

The IIRO was established in 1978 and, according to its website, the organization has branch offices in over 20 countries in Africa, Europe, Asia, and the Middle East.

"It is particularly shameful when groups that hold themselves out as charitable or religious organizations defraud their donors and divert funds in support of violent terrorist groups," said Levey. "We have long been concerned about these IIRO offices; we are now taking public action to sever this link in the al Qaida network's funding chain."

Today's action was taken pursuant to Executive Order 13224, which is aimed at detecting and disrupting financial flows to terrorists. Under this authority, U.S. persons are prohibited from engaging in transactions with the designees, and any assets they may have under U.S. jurisdiction are frozen.

### IDENTIFIER INFORMATION

#### *Abd Al Hamid Sulaiman Al-Mujil*

Abd Al Hamid Sulaiman Al-Mujil (Al-Mujil) is the Executive Director of the IIRO Eastern Province (IIRO-EP) branch office in the Kingdom of Saudi Arabia. Al-Mujil has been called the "million dollar man" for supporting Islamic militant groups.

Al-Mujil provided donor funds directly to al Qaida and is identified as a major fundraiser for the Abu Sayyaf Group (ASG) and Jemaah Islamiyah (JI). Both ASG and JI are al Qaida-associated terrorist groups in Southeast Asia designated pursuant to the authorities of E.O. 13224. These terrorist groups are also on the United Nations 1267 Committee's consolidated list of individuals and entities associated with the Taliban, al Qaida and/or Usama Bin Ladin.

In 2004, Al-Mujil invited a Philippines-based JI supporter to Saudi Arabia under the cover of traveling for the hajj (the Muslim pilgrimage), and planned to provide him with cash to carry back to the Philippines to support organizations including JI.

Al-Mujil was also present in Afghanistan in the late 1990s and personally knew Usama Bin Ladin and deceased al Qaida co-founder Abdallah Azzam. Al-Mujil

traveled continuously to meet with members of Bin Ladin's organization in Arab countries. In the 1990s, Al-Mujil established a relationship with senior al Qaida operational planner Khalid Shaykh Muhammad.

Al-Mujil has a long history of providing support to terrorist organizations. He has contributed direct financial assistance to ASG leaders, including Abdurajak Janjalani (deceased).

The Indonesian and Philippines branches of IIRO have received support from IIRO-EP, which in turn is controlled by Al-Mujil. Indeed, he is often responsible for authorizing payment transfers for IIRO Philippines (IIRO-PHL) and IIRO Indonesia (IIRO-IDN).

**Name:** Abd al-Hamid Sulaiman Al-Mujil

**AKAs:**

- Dr. Abd al-Hamid Al-Mujal
- Dr. Abd Abdul-Hamid bin Sulaiman Al-Mu'jil
- Dr. Abd Al-Hamid Al-Mu'ajjal
- Abd al-Hamid Mu'jil
- A.S. Mujel
- Abu Abdallah

**DOB:** 28 April 1949
**Nationality:** Saudi Arabian

**International Islamic Relief Organization, Philippines Branch Offices**

The IIRO-PHL is a source of funding for the al Qaida-affiliated ASG. IIRO-PHL has served as a liaison for the ASG with other Islamic extremist groups. A former ASG member in the Philippines familiar with IIRO operations in the country reported that a limited amount of foreign IIRO funding goes to legitimate projects and the rest is directed to terrorist operations.

The Philippine branches of the IIRO were founded sometime in the late 1980s or early 1990s by Muhammad Jamal Khalifah, who is Usama bin Laden's brother-in-law and has been identified as a senior al Qaida member. IIRO-PHL's director, Abd al-Hadi Daguit, is a trusted associate of Khalifah.

While working as the director of IIRO-PHL, Khalifah maintained close connections with al Qaida through his relations with senior al Qaida supporters, including Specially Designated Global Terrorist (SDGT) Wa'el Hamza Julaidan. At the time Khalifah directed the IIRO-PHL, he employed an ASG intelligence officer as the provincial director of the IIRO-PHL in the Tawi-Tawi region of the Southern Philippines until that officer's death in 1994.

In the mid 1990s, a major ASG supporter, Mahmud Abd Al-Jalil Afif, served as the director of the IIRO-PHL and used the organization to funnel money to terrorist groups including the ASG. Afif was implicated in the assassination of Father Salvatore Carzeda in San Jose Gusu, Zamboanga City, Philippines on June 20, 1992.

**AKAs:**

- International Islamic Relief Agency
- International Relief Organization
- Islamic Relief Organization
- Islamic World Relief
- International Islamic Aid Organization
- Islamic Salvation Committee
- IIRO

- The Human Relief Committee of the Muslim World League
- World Islamic Relief Organization
- Al Igatha Al-Islamiya
- Hayat al-Aghatha al-Islamia al-Alamiya
- Hayat al-Igatha
- Hayat Al-`Igatha
- Ighatha
- Igatha
- Igassa
- Igasa
- Igase
- Egassa

**Address:** International Islamic Relief Organization, Philippines Offices
201 Heart Tower Building
108 Valero Street
Salcedo Village, Makati City
Manila, Philippines

**Other Locations:** Zamboanga City, Philippines
Tawi Tawi, Philippines
Marawi City, Philippines
Basilan, Philippines
Cotabato City, Philippines

**International Islamic Relief Organization, Indonesia Branch Office**
The IIRO Indonesia director has channeled money to two Indonesia-based, JI-affiliated foundations. Information from 2006 shows that IIRO-IDN supports JI by providing assistance with recruitment, transportation, logistics, and safe-havens. As of late 2002, IIRO-IDN allegedly financed the establishment of training facilities for use by al Qaida associates.

**AKAs:**

- International Islamic Relief Agency
- International Relief Organization
- Islamic Relief Organization
- Islamic World Relief
- International Islamic Aid Organization
- Islamic Salvation Committee
- IIRO
- The Human Relief Committee of the Muslim World League
- World Islamic Relief Organization
- Al Igatha Al-Islamiya
- Hayat al-Aghatha al-Islamia al-Alamiya
- Hayat al-Igatha
- Hayat Al-`Igatha
- Ighatha
- Igatha
- Igassa
- Igasa
- Igase
- Egassa

**Address:** International Islamic Relief Organization, Indonesia Office
Jalan Raya Cipinang Jaya No. 90
East Jakarta, 13410, Indonesia

P.O. Box 3654
Jakarta, Indonesia 54021

- 30 -

# Exhibit I

MUSLIM WORLD LEAGUE
MAKKAH AL MUKARRAMAH
INTERNATIONAL ISLAMIC RELIEF
ORGANIZATION



رابطــة العَالمالإسلامي
مكة المكرمة
هيـئة الإغاثةالإسـلاميةالعالميـة

الرقـم :    ٢٤٤ /هـ/ 2 ج
التاريخ :   ٢٦/١٥/١٤٠٨

## TO WHOM IT MAY CONCERN

The International Islamic Relief Organization (IIRO) , an affiliate of the Muslim World League, hereby certifies that Mr. Mohammed Jamal Khalifa a Saudi National, is the Regional Director for the IIRO in South - East Asia .

Please facilitate his important task and cooperate with him .

Thank you

Dir. Gen. IIRO

Dr. Farid Y. Qurashi

العنوان : ص. ب : ١٤٨٤٣ جدة ٢١٤٣٤ ـ ت : ٢١٥٥٤١١ / ٦٥٥٠٤١١ ـ فاكس : ٦٥١٨٤٩١ ـ تلكس : ٦٠٦٧٥٤ إغاثة إس جي
Address : P.O. Box : 14843 Jeddah 21434 - Tel. 6515411/6517844 - Fax : 6518491 - Telex : 606754 IGATHA SJ



**MUSLIM WORLD LEAGUE**
MAKKAH AL MUKARRAMAH
**INTERNATIONAL ISLAMIC RELIEF ORGANIZATION**

رابطة العالم الإسلامي
مكة المكرمة
هيئة الإغاثة الإسلامية العالمية

الرقم :
التاريخ :
الموضوع :

## TO WHOM IT MAY CONCERN

The International Islamic Relief Organization (IIRO) an affiliate of the Muslim World League, hereby certifies that Mr. Mohammed Jamal Khalifah a saudi National is the Regional Director for the IIRO in south-East Asia.

Therefore he is authorized to sign any agreement between the governments of south-East Asia Countries and the Muslim World League and the International Islamic Relief Organization.

We hope you help him to accomplish his noble task and to provide him with the assistant needed.

For
Dr.Abdullah Nasseef
General Secretary - MWL
and The Chairman - IIRO.



العنوان : ص.ب : ١٤٨٤٣ جدة ٢١٤٣٤ ـ ت : ٦٥١٥٤١١ ـ تلكس : ٦٠٦٧٥٤ ـ فاكس : ٦٥١٨٤٩١ ـ ٦٥٠١٧٥٤ إغاثة إس جي
Address : P. Box. 14843 Jeddah 21434 - Tel. 6515411 - Fax 6510491 - Tlx. 606754 IGATHA SJ.

# **<u>Exhibit J</u>**

(US)

Jan '98

OF THE 250 LOCAL AND FOREIGN-BASED NONGOVERNMENTAL
CHARITABLE ORGANIZATIONS (NGOS) THAT OPERATE WORLDWIDE, OVER 50
ARE INTERNATIONAL ISLAMIC NGOS CONDUCTING HUMANITARIAN WORK.
AVAILABLE INFORMATION INDICATES THAT APPROXIMATELY ONE THIRD OF
THESE ISLAMIC NGOS SUPPORT TERRORIST GROUPS OR EMPLOY INDIVIDUALS
WHO ARE SUSPECTED OF HAVING TERRORIST CONNECTIONS.
THIS REPORT DESCRIBES THE TERRORIST-RELATED ACTIVITIES AND
LINKAGES AMONG 15 OF THESE NGOS OPERATING IN OTHER PART OF THE
WORLD.  INDIVIDUALS CONNECTED TO SOME OF THESE NGOS HAVE PLOTTED
TO KIDNAP OR KILL U.S. PERSONNEL.

      INTERNATIONAL ISLAMIC CHARITIES HAVE ESTABLISHED A PRESENCE
IN NEARLY EVERY COUNTRY AROUND THE WORLD THAT HAS A SUBSTANTIAL
MUSLIM POPULATION.  FOR BOTH TRADITIONAL AND MORE ACTIVIST
MUSLIMS, AIDING MUSLIMS IN DISTRESS IS A RELIGIOUS DUTY.  ISLAMIC
ACTIVISTS DOMINATE THE LEADERSHIP OF THE LARGEST CHARITIES, AND
PROMINENT MEMBERS OF SOME SMALLER ORGANIZATIONS HAVE BEEN
IDENTIFIED AS EXTREMISTS.  THE MAIN OBJECTIVES OF THESE
ORGANIZATIONS INCLUDE PROSELYTIZING, HELPING THE NEEDY, AND
DEFENDING MUSLIM COMMUNITIES FROM ENEMIES.  WHERE MUSLIMS ARE
ENGAGED IN ARMED CONFLICT, SOME ISLAMIC ORGANIZATIONS PROVIDE
MILITARY AID AS PART OF A "HUMANITARIAN" PACKAGE.

      THE MAIN ISLAMIC CHARITIES MAINTAIN HEADQUARTERS AND RAISE
MONEY IN A FEW REGIONAL CENTERS, THE MOST IMPORTANT BEING IN THE
ARABIAN PENINSULA AND SUDAN.  SMALLER ORGANIZATIONS -- IMPORTANT
BECAUSE OF THEIR SUPPORT TO EXTREMIST GROUPS -- OFTEN HAVE
HEADQUARTERS IN EUROPE AND OFFICES IN NORTH AMERICA.  PRIVATE
DONORS RETAIN A MAJOR INFLUENCE ON EACH GROUP'S POLICIES.

      GOVERNMENTS IN THE ISLAMIC WORLD GENERALLY SUPPORT THE MAJOR
CHARITIES' RELIGIOUS ACTIVITIES AND HELP FINANCE THEM, BUT ARE
UNABLE TO MONITOR THE GROUPS OR CONTROL HOW THEY USE THEIR MONEY.
THESE GOVERNMENTS RELY ON THE NGOS TO COLLECT AND DISTRIBUTE MUCH
OF THE HUMANITARIAN AID GIVEN TO REFUGEES AND DISPLACED PERSONS.
LEADERS OF COUNTRIES WHERE ISLAMIC NGOS ARE BASED OR OPERATE ARE
UNLIKELY TO TAKE MAJOR STEPS TO STOP THE ORGANIZATIONS'
ACTIVITIES UNLESS THEY BELIEVE THAT THESE GROUPS THREATEN THEIR
OWN STABILITY OR ARE DAMAGING IMPORTANT BILATERAL OR MULTILATERAL
RELATIONSHIPS.

1



ALL OF THE MAJOR AND MOST OF THE MINOR ISLAMIC CHARITIES ARE SIGNIFICANT PLAYERS IN THE FORMER YUGOSLAVIA, PARTICULARLY IN AIDING BOSNIAN MUSLIMS.  THEIR CONTRIBUTIONS REPRESENT A SIGNIFICANT PROPORTION OF HUMANITARIAN AID IN BOSNIA.  ACCORDING TO THE US EMBASSY IN RIYADH, SAUDI NATIONALS ALONE GAVE $150 MILLION THROUGH ISLAMIC NGOS FOR AID TO BOSNIA IN 1994.  MOST OF THE OFFICES OF NGOS ACTIVE IN BOSNIA ARE LOCATED IN ZAGREB, SARAJEVO, ZENICA, AND TUZLA.  THEIR FIELD OPERATIONS APPEAR TO BE CONFINED TO THE MUSLIM AREAS OF NORTHEASTERN AND CENTRAL BOSNIA.

-- THE NGOS' CHARITABLE ACTIVITIES INCLUDE DELIVERY OF FOOD, CLOTHING, AND MEDICINE; SUPPORT TO ORPHANAGES, SCHOOLS, HOSPITALS, AND REFUGEE CAMPS; AND HOUSING CONSTRUCTION, INFRASTRUCTURE SUPPORT, AND AGRICULTURAL PROJECTS.

-- MANY OF THESE ORGANIZATIONS ALSO SUPPORT FOREIGN MUJAHEDIN FIGHTERS IN BOSNIA.  COORDINATION COUNCILS BASED IN ZAGREB AND SARAJEVO COORDINATE THE ACTIVITIES OF THE MOST IMPORTANT ORGANIZATIONS.  THESE COUNCILS MAY FUNCTION LIKE A SIMILAR ONE ESTABLISHED IN PESHAWAR, PAKISTAN, WHICH ORGANIZES ARMS SHIPMENTS AND AID TO MILITARY TRAINING CAMPS, AND PROVIDES HUMANITARIAN AID TO REFUGEES, ACCORDING TO A CLANDESTINE SOURCE.

A GROWING BODY OF REPORTING INDICATES THAT SOME OF THESE CHARITIES ARE BEING USED TO AID ISLAMIC EXTREMIST GROUPS THAT ENGAGE IN TERRORISM.  WE HAVE INFORMATION THAT NEARLY ONE THIRD OF THE ISLAMIC NGOS IN THE BALKANS HAVE FACILITATED THE ACTIVITIES OF ISLAMIC GROUPS THAT ENGAGE IN TERRORISM, INCLUDING THE EGYPTIAN AL-GAMA'AT AL-ISLAMIYYA, PALESTINIAN HAMAS, ALGERIAN GROUPS, AND LEBANESE HIZBALLAH.  SOME OF THE TERRORIST GROUPS, SUCH AS AL-GAMA'AT, HAVE ACCESS TO CREDENTIALS FOR THE UN HIGH COMMISSION FOR REFUGEES AND OTHER UN STAFFS IN THE FORMER YUGOSLAVIA.

EFFORTS TO COUNTER NGOS

EFFORTS BY GOVERNMENTS TO COUNTER TERRORIST GROUPS' USE OF NGOS ARE COMPLICATED BY DOMESTIC AND INTERNATIONAL POLITICAL CONCERNS, LEGAL CONSTRAINTS, AND THE SIZE AND FLEXIBILITY OF THE INTERNATIONAL EXTREMIST NETWORK.  DOMESTIC ISLAMIC ORGANIZATIONS -- AND SOMETIMES FOREIGN GOVERNMENTS -- HAVE ACCUSED HOST

2

GOVERNMENTS OF ATTACKING LEGITIMATE ISLAMIC INSTITUTIONS AND
INTENTIONALLY HAMPERING RELIEF EFFORTS.  ALTHOUGH SOME
GOVERNMENTS HAVE PROVED WILLING TO ACT WHEN THEIR OWN INTERESTS
WERE AT STAKE AND WHEN LEGAL GROUNDS EXISTED FOR TARGETING
INDIVIDUAL NGO EMPLOYEES OR EVEN NGO BRANCH OFFICES, ONLY SOME
MEASURES HAVE PROVED EFFECTIVE AND ALL HAVE DRAWBACKS.  FOUR
APPROACHES HAVE BEEN USED.

CLOSED NGO OFFICES.  SEVERAL COUNTRIES -- INCLUDING ITALY,
AUSTRIA, ALBANIA, CROATIA, MACEDONIA, PAKISTAN, AND SAUDI ARABIA
-- HAVE CLOSED THE OFFICES OF NGOS WHOSE MEMBERS SUPPORTED
OPPOSITION GROUPS, OTHERWISE ATTACKED THE GOVERNMENT, OR
CONDUCTED CERTAIN ILLEGAL ACTIVITIES SUCH AS ARMS SMUGGLING.  IN
EACH CASE, SOME EMPLOYEES OF THE TARGETED OFFICES ESCAPED AND
JOINED OTHER NGOS, USUALLY IN NEIGHBORING COUNTRIES, WHERE THEY
CONTINUED THEIR ACTIVITIES.  IN SOME CASES, THE OFFICES REOPENED
LATER AT NEW ADDRESSES.

CONTROL FINANCES.  SAUDI ARABIA, KUWAIT, AND THE UNITED ARAB
EMIRATES HAVE TAKEN STEPS IN THE PAST TWO YEARS TO CONTROL THE
FLOW OF MONEY TO EXTREMISTS.  THEY HAVE PASSED LAWS MANDATING
THAT MAJOR DONATIONS GO ONLY TO GOVERNMENT-APPROVED CHARITIES OR
A CENTRAL COLLECTING AGENCY, AND THEY HAVE REMOVED STREET-CORNER
CHARITY BOXES PLACED BY SOME NGOS.

-- CENTRAL COLLECTING AGENCIES HAVE INCREASED THEIR
RESOURCES AND POWER, BUT WE HAVE NO EVIDENCE THAT THESE EFFORTS
HAVE PROVED EFFECTIVE IN CURBING THE ACTIVITIES OF NGOS.  MOST
MEASURES ARE ONE-TIME-ONLY ACTS WITH LITTLE FOLLOW-UP, AND
OVERSIGHT OF FIELD OPERATIONS HAS NOT INCREASED.

-- DONATIONS FROM CITIZEN'S OVERSEAS ACCOUNTS UNDOUBTEDLY
CONTINUE, AND SMALLER NGOS MAY BE BACKED BY POWERFUL INTEREST
GROUPS.

-- MOST GOVERNMENTS HAVE LITTLE OR NO AUTHORITY OVER NGOS
BASED ON THEIR TERRITORY.

CONTROL STAFFING.  GOVERNMENTS HAVE SOMETIMES EXERTED
GREATER CONTROL OVER PERSONNEL IN SEMIOFFICIAL NGOS, PARTICULARLY
WHEN PRESSURED BY FOREIGN GOVERNMENTS.  FOR EXAMPLE, SAUDI ARABIA
FIRED THE HEAD OF THE PESHAWAR, PAKISTAN BRANCH OF THE MUSLIM
WORLD LEAGUE, WHO WAS ILLICITLY SUPPLYING LEAGUE DOCUMENTATION

3



AND ARMS TO MILITANTS IN AFGHANISTAN AND TAJIKISTAN, AFTER COMING
UNDER PRESSURE TO DO SO FROM EGYPT, ALGERIA, AND OTHER STATES.
WE CONTINUE TO HAVE EVIDENCE THAT EVEN HIGH RANKING MEMBERS OF
THE COLLECTING OR MONITORING AGENCIES IN SAUDI ARABIA, KUWAIT,
AND PAKISTAN -- SUCH AS THE SAUDI HIGH COMMISSION -- ARE INVOLVED
IN ILLICIT ACTIVITIES, INCLUDING SUPPORT FOR TERRORISTS.

~~ARREST INDIVIDUAL MEMBERS.~~  SOME COUNTRIES HAVE CONTINUED TO
ALLOW SUSPECT NGOS TO OPERATE WHILE ARRESTING INDIVIDUAL MEMBERS
FOR TERRORISM OR OTHER ILLEGAL ACTS.  THIS TACTIC, WHEN APPLIED
CONSISTENTLY, APPEARS TO BE THE MOST SUCCESSFUL IN HALTING
ILLEGAL ACTIVITIES WITHIN NGOS.  FOR EXAMPLE, POLICE IN THE
PHILIPPINES HAVE BEEN INVESTIGATING PEOPLE AND ORGANIZATIONS,
INCLUDING NGOS, INVOLVED IN PLOTS AGAINST WESTERN AIRLINERS,
AMBASSADORS, THE POPE, AND PHILIPPINE OFFICIALS SINCE JANUARY
1995.  THESE INVESTIGATIONS HAVE LED TO PERIODIC ARRESTS AND
APPEAR TO HAVE PREVENTED SOME NGOS, INCLUDING THE INTERNATIONAL
ISLAMIC RELIEF ORGANIZATION, FROM CONTINUING TO BE USED AS COVER
FOR ILLICIT ACTIVITIES.  THE PHILIPPINE GOVERNMENT HAS ESCAPED
CONDEMNATION FOR ITS EFFORTS BY ALL BUT EXTREMIST ISLAMIC GROUPS
AND APPEARS TO HAVE FOILED, TO DATE, ANY ATTEMPTS BY THOSE GROUPS
TO EXACT REVENGE.

OTHER COUNTRIES HAVE FACED RETRIBUTION FROM EXTREMIST
ISLAMIC GROUPS FOR THE ARREST OF THEIR MEMBERS, HOWEVER.  FOR
EXAMPLE, ~~EGYPTIAN ISLAMIC EXTREMIST GROUPS CONDUCTED TERRORIST
ATTACKS IN BOTH CROATIA AND PAKISTAN THIS YEAR BECAUSE THOSE
GOVERNMENTS ARRESTED KNOWN TERRORISTS OPERATING WITHIN NGOS.~~  IN
BOTH CASES, THE GOVERNMENTS CLAIM THAT THE ATTACKS WERE
PERPETRATED WITH THE HELP OF EXTREMISTS OPERATING IN DIFFERENT
NGOS.

## PROFILES OF NGOS WITH EXTREMIST TIES IN BOSNIA

THE FOLLOWING 15 ORGANIZATIONS EMPLOY MEMBERS OR OTHERWISE
FACILITATE THE ACTIVITIES OF TERRORIST GROUPS OPERATING IN
BOSNIA.  ~~MANY OF THE ORGANIZATIONS BELONG TO COORDINATION
COUNCILS.  SOME ISLAMIC NGOS NOT INCLUDED IN THIS LIST HAVE
TERRORIST CONNECTIONS OUTSIDE OF THE BALKANS.~~

## AL-HARAMAYN ISLAMIC FOUNDATION

-- ARABIC NAME:  MU'ASSASAT AL-HARAMAYN AL-KHAYRIYYA.

4

-- AKA: THE CHARITABLE ESTABLISHMENT OF THE TWO HOLY MOSQUES.

-- OFFICES: ZAGREB, RIJEKA, OSIJEK, AND BELIKOJ GORICI, ALBANIA.

HAS HAD OFFICES IN MACEDONIA, SUDAN, AND SOMALIA.

-- EXTREMIST CONNECTIONS: AL-GAMA'AT AL-ISLAMIYYA.

-- SUPPORT FOR EXTREMIST/TERRORIST ACTIVITIES: AL-HARAMAYN HELPS FUEL AND SUPPORT THE MUJAHEDIN BATTALION IN ZENICA, ACCORDING TO A FOREIGN GOVERNMENT SERVICE. THE ZAGREB OFFICE HAS BEEN RAIDED OFTEN BY CROATIAN SECURITY FOR SMUGGLING ACTIVITIES. IN MACEDONIA, PRESS REPORTS HAVE ACCUSED THE ORGANIZATION OF ILLEGAL FUNDING THROUGH DRUGS AND PROSTITUTION.

-- LINKS TO OTHER NGOS: NO INFORMATION.

HUMAN APPEAL INTERNATIONAL (HAI)

-- ARABIC NAME: HAY'AT AL-A'MAL AL-KHAYRIYYA.

-- AKA: CHARITABLE WORKS ORGANIZATION/COMMITTEE, CHARITY ORGANIZATION (ORIGINAL NAME).

-- OFFICES: ZAGREB AND TUZLA. HEADQUARTERED IN DUBAI, UNITED ARAB EMIRATES. OTHER OFFICES IN SIDON, KHARTOUM, NOUAKCHOTT, MAURITANIA, AND ALSO IN DENMARK, TURKEY, AND THE UNITED KINGDOM.

-- EXTREMIST CONNECTIONS: HAMAS.

-- SUPPORT TO EXTREMIST/TERRORIST ACTIVITIES: AMONG OTHER ACTIVITIES, THIS ORGANIZATION PROBABLY ACTS AS A FUND-RAISER FOR HAMAS, ACCORDING TO A FOREIGN GOVERNMENT SERVICE.

-- LINKS TO OTHER NGOS: COORDINATION COUNCIL, HUMAN RELIEF INTERNATIONAL (HRI), MUWAFAQ, QATAR CHARITABLE SOCIETY.

HUMAN CONCERN INTERNATIONAL (HCI)

-- OFFICES: ZAGREB. HEADQUARTERS IN OTTAWA, CANADA WITH OTHER OFFICES IN PAKISTAN, LEBANON, AND SWEDEN.

5

-- EXTREMIST CONNECTIONS: AL-GAMA'AT AL-ISLAMIYYA, ALGERIAN GROUPS.

-- SUPPORT TO EXTREMIST/TERRORIST ACTIVITY: TWO FOREIGN GOVERNMENT SERVICES REPORT THAT HCI PROVIDES SUPPORT TO THE ALGERIAN ARMED ISLAMIC GROUP AND HAS CONTACTS WITH AL-GAMA'AT. ACCORDING TO ONE SERVICE, THE OFFICE IN SWEDEN MAY SMUGGLE WEAPONS TO BOSNIA. PAKISTANI PRESS REPORTS THAT THE HEAD OF THE

OFFICE IN PAKISTAN WAS ARRESTED RECENTLY FOR HIS SUSPECTED ROLE IN THE NOVEMBER 1995 BOMBING OF THE EGYPTIAN EMBASSY IN ISLAMABAD. OTHER PRESS REPORTS SAY THAT THE ENTIRE PESHAWAR OFFICE IS MADE UP OF GAMA'AT MEMBERS.

-- LINKS TO OTHER NGOS: NO INFORMATION.

HUMAN RELIEF INTERNATIONAL (HRI)

-- AKA: HUMAN RELIEF AGENCY (HRA), A SUBSIDIARY OF HRI.

-- OFFICES: ZAGREB, TUZLA, KOSOVO, DOBRINJA, AND PROBABLY LUKAVAC, ZIVINICE, KISELJAK, AND LONDON. SUBORDINATE TO THE EGYPTIAN DOCTOR'S UNION, WHICH IS DOMINATED BY MEMBERS OF THE MUSLIM BROTHERHOOD. A FOREIGN GOVERNMENT SERVICE REPORTS THAT THE ORGANIZATION HAS SPILT INTO TWO GROUPS, HRI AND HRA.

-- EXTREMIST CONNECTIONS: POSSIBLY HAMAS, ALGERIAN MILITANTS, AL-GAMA'AT AL-ISLAMIYYA.

-- SUPPORT TO EXTREMIST/TERRORIST ACTIVITY: IN 1993 MUHAMMAD SA'D DARWISH AL-SHAZY, A HRI EMPLOYEE AND MEMBER OF A RADICAL ISLAMIC EXTREMIST GROUP, POSSIBLY HAMAS, USED THE HRA'S ZAGREB OFFICE AND A MOSQUE TO PROMOTE IDEAS FOR TERRORIST ACTS, ACCORDING TO THE SERVICE. THE REPORTING CLAIMS THAT AL-SHAZY'S GROUP WAS CONSIDERING COMMITTING ANTI-JEWISH BOMBINGS THERE, AND INCLUDED THE HEADS OF THE ZAGREB OFFICES OF THE SAUDI HIGH COMMISSION AND THE KUWAITI JOINT RELIEF COMMITTEE, THE HEAD OF HRI'S VIENNA OFFICE, AND MEMBERS OF THE SAUDI-BASED INTERNATIONAL ISLAMIC RELIEF ORGANIZATION AND THE PRIVATELY-RUN QATAR CHARITABLE SOCIETY. AT A DECEMBER 1993 MEETING IN THE HRA OFFICE IN ZAGREB, ACCORDING TO THE SAME SOURCE, SOME OF THE GROUP DISCUSSED PLANS TO ASSASSINATE A FORMER ALGERIAN PRIME MINISTER

6



AND PLO CHIEF YASIR ARAFAT, AND TO CONDUCT BOMBINGS TO SUPPORT
THE "BROTHER ALGERIANS" IN CROATIA.  HRA'S OFFICE IN ALBANIA WAS
STAFFED BY GAMA'AT MEMBERS, INCLUDING THE LATE ANWAR SHABAN,
KILLED BY CROATIAN SECURITY FORCES IN DECEMBER, WHO WERE INVOLVED
IN THE 1993 SURVEILLANCE OF THE US EMBASSY IN TIRANA.  THE OFFICE
WAS CLOSED IN APRIL 1995 DUE TO PRESSURE FROM ALBANIAN
AUTHORITIES.

-- LINKS TO OTHER NGOS:  COORDINATION COUNCIL, INTERNATIONAL
ISLAMIC RELIEF ORGANIZATION, QATAR CHARITABLE SOCIETY, KUWAIT
JOINT RELIEF COMMITTEE, SAUDI HIGH COMMISSION.

INTERNATIONAL HUMANITAIRE HILFSORGANIZATION (IHH:

-- AKA:  INTERNATIONAL HUMANITARIAN RELIEF ORGANIZATION.

-- OFFICES:  ZAGREB AND SARAJEVO.  HEADQUARTERS IN GERMANY,
ESTABLISHED BY A MEMBER OF THE TURKISH REFAH PARTY.

-- EXTREMIST CONNECTIONS:  IRAN, ALGERIAN GROUPS.

-- SUPPORT FOR EXTREMIST/TERRORIST ACTIVITY:  THE SARAJEVO
OFFICE DIRECTOR HAS BEEN LINKED TO IRANIAN OPERATIVES.

-- LINKS TO OTHER NGOS:  NO INFORMATION.

-- INTERNATIONAL ISLAMIC RELIEF ORGANIZATION (IIRO)

-- ARABIC NAME:  HAY'AT AL-IGHATHA AL-ISLAMIYYA AL-'ALAMIYYA.

-- AKA:  IGHATHA OR IGASA.

-- OFFICES:  ZAGREB, SARAJEVO, SPLIT, LJUBLJANA, AND TUZLA; ALSO
IN VIENNA, AUSTRIA.  OPERATES IN CELIC, GRACANICA, ZIVINICE,
SREBRENIK, BANOVICI, KALESIJA, AND TEOCAK.  HEADQUARTERS IN
JIDDAH; SAUDI ARABIA.  THE IIRO IS AFFILIATED WITH THE MUSLIM
WORLD LEAGUE (MWL), A MAJOR INTERNATIONAL ORGANIZATION LARGELY
FINANCED BY THE GOVERNMENT OF SAUDI ARABIA.  LAST YEAR, THE HEAD
OF THE MWL, WHO IS APPOINTED BY KING FAHD, WAS ALSO CHAIRMAN OF
THE BOARD OF TRUSTEES OF THE IIRO, ACCORDING TO IIRO LITERATURE.
THE IIRO HAS OFFICES IN OVER 90 COUNTRIES.

-- EXTREMIST CONNECTIONS:  HAMAS, ALGERIANS, AL-GAMA'AT



AL-ISLAMIYYA.  RAMZI AHMED YOUSEF, WHO IS AWAITING TRIAL IN NEW
YORK FOR HIS SUSPECTED INVOLVEMENT IN THE WORLD TRADE CENTER
BOMBING.  USAMA BIN LADIN, A WEALTHY SAUDI-BORN BUSINESSMAN
CURRENTLY RESIDING IN SUDAN WHO SUPPORTS VARIOUS ISLAMIC
EXTREMIST GROUPS.

-- SUPPORT FOR EXTREMIST/TERRORIST ACTIVITY:  THE REGIONAL
FINANCIAL ACCOUNTANT FOR THE IIRO, AN EGYPTIAN NAMED HOSSAM
MEAWAD MOHAMMAD ALI, WAS DETAINED BY CROATIAN AUTHORITIES IN A
RAID IN ZAGREB IN APRIL 1995 AND HAS RELOCATED TO LJUBLJANA,
ACCORDING TO A FOREIGN GOVERNMENT SERVICE.  THE MACEDONIAN
GOVERNMENT CLOSED THE IIRO OFFICE IN SKOPJE IN MARCH 1995 FOR
AIDING ALBANIAN ETHNIC POLITICAL PARTIES AND THE ALBANIAN ISLAMIC
YOUTH ORGANIZATION.  THE FORMER HEAD OF THE IIRO OFFICE IN THE
PHILIPPINES, MOHAMMAD JAMAL KHALIFA, HAS BEEN LINKED TO MANILA-
BASED PLOTS TO TARGET THE POPE AND US AIRLINES; HIS BROTHER-IN-
LAW IS USAMA BIN LADIN.  ANOTHER HIGH-RANKING OFFICIAL IN THE
PHILIPPINES LEADS HAMAS MEETINGS, AND THE MAJORITY OF HAMAS
MEMBERS IN THE PHILIPPINES ARE EMPLOYED BY THE ORGANIZATION.  THE
IIRO HELPS FUND SIX MILITANT TRAINING CAMPS IN AFGHANISTAN,
ACCORDING TO A CLANDESTINE SOURCE.

-- LINKS TO OTHER NGOS:  COORDINATION COUNCIL, HRA, THIRD WORLD
RELIEF AGENCY, QATAR CHARITABLE SOCIETY, KJRC, SAUDI HIGH
COMMISSION.

ISLAMIC RELIEF AGENCY (ISRA)

-- AKA:  IARA, YARA, AFRICAN ISLAMIC RELIEF AGENCY.

-- OFFICES:  SARAJEVO, ZAGREB, TIRANA, TUZLA, KALESIJA, AND
UNSPECIFIED CITIES IN GERMANY.  OPERATES IN KALESIJA, BANOVICI,
DOBOJ EAST, AND ZVORNIK.  BASED IN KHARTOUM, SUDAN.  OFFICES IN
30 COUNTRIES WORLDWIDE.

-- EXTREMIST CONNECTIONS:  SUDAN.

-- SUPPORT TO EXTREMIST/TERRORIST ACTIVITY:  THE ISRA OFFICE IN
ZAGREB PROVIDES WEAPONS TO THE BOSNIAN MILITARY, ACCORDING TO A
CLANDESTINE SOURCE.  THE SOURCE CLAIMED THE OFFICE WAS CONTROLLED
BY OFFICIALS OF SUDAN'S RULING PARTY, THE NATIONAL ISLAMIC FRONT.

-- LINKS TO OTHER NGOS:  THIRD WORLD RELIEF AGENCY.



KUWAITI JOINT RELIEF COMMITTEE (KJRC)

-- AKA:  GENERAL COMMITTEE FOR REFUGEE ASSISTANCE.

-- OFFICES:  ZAGREB, SARAJEVO, AND LJUBLJANA.  KJRC IS THE
OFFICIAL KUWAITI GOVERNMENT ORGANIZATION WHICH DISTRIBUTES FUNDS
TO OTHER NGOS.

-- EXTREMIST CONNECTIONS:  POSSIBLY HAMAS, ALGERIANS, AL-GAMA'AT
AL-ISLAMIYYA.

-- SUPPORT TO EXTREMIST/TERRORIST ACTIVITY:  THE ZAGREB OFFICE
DIRECTOR, PROFESSOR SHAIKH ABU ADIL UTHMAN AL-HAYDER, WAS
DESCRIBED BY AN ASSOCIATE AS A "POWERFUL HAMAS AND MUSLIM
BROTHERHOOD MEMBER," ACCORDING TO A FOREIGN GOVERNMENT SERVICE,
AND MEMBERS OF HIS OFFICE WERE INVOLVED IN MEETINGS INVOLVING
SEVERAL EXTREMIST GROUPS HELD AT THE HUMAN RELIEF AGENCY OFFICE
IN ZAGREB IN 1993 (SEE HRI FOR FURTHER DETAILS).

-- LINKS TO OTHER NGOS:  HRI (HRA), IIRO, QATAR CHARITABLE
SOCIETY, SAUDI HIGH COMMISSION.

LAJNAT AL-BIRR AL-ISLAMIYYA (LBI)

-- AKA:  ISLAMIC CHARITY COMMITTEE, PROBABLY A SUBSIDIARY OF THE
SAUDI-BASED MUSLIM WORLD LEAGUE.
OFFICES:  ZAGREB AND ZENICA.  HEADQUARTERS IN JIDDAH, SAUDI
ARABIA.

-- EXTREMIST CONNECTIONS:  AFGHAN VETERANS.

-- SUPPORT TO EXTREMIST/TERRORIST ACTIVITY:  ONE ZAGREB
EMPLOYEE, IDENTIFIED AS SYRIAN-BORN US CITIZEN ABU MAHMUD, WAS IN
PAKISTAN AT AN UNSPECIFIED TIME, ACCORDING TO A FOREIGN
GOVERNMENT SERVICE.  HE MATCHES THE DESCRIPTION, PROVIDED BY A
CLANDESTINE SOURCE, OF A MAN WHO WAS ALLEGEDLY INVOLVED IN THE
KIDNAPPING OF SIX WESTERNERS IN KASHMIR IN JULY 1995, AND WHO
LEFT PAKISTAN IN EARLY OCTOBER FOR BOSNIA VIA THE UNITED STATES.
THE SOURCE SAID THAT HE WORKED AT VARIOUS TIMES FOR LBI, MAKTAB
AL-KHIDMAT, AND BENEVOLENCE FOUNDATION INTERNATIONAL IN PAKISTAN.
LAJNAT AL-BIRR HAS PROVIDED SUPPORT TO A COMMANDER OF AT LEAST



ONE TRAINING CAMP IN AFGHANISTAN, ACCORDING TO A CLANDESTINE SOURCE.

-- LINKS TO OTHER NGOS: IIRO, POSSIBLY MAKHTAB AL-KHIDAMAT. PROBABLY A SUBSIDIARY OF THE SAUDI-BASED MUSLIM WORLD LEAGUE.

MAKHTAB AL-KHIDAMAT (MAK)

-- AKA: HUMAN SERVICES ORGANIZATION/OFFICE (HSO), AL-KIFAH.

-- OFFICES: ZAGREB AND SARAJEVO. HEADQUARTERS IN PESHAWAR, PAKISTAN.

-- EXTREMIST CONNECTIONS: ALGERIAN GROUPS, AFGHAN VETERANS, RAMZI YOUSEF, USAMA BIN LADIN, AND POSSIBLY HIZBALLAH, AND AL-GAMA'AT AL-ISLAMIYYA.

-- SUPPORT TO EXTREMIST/TERRORIST ACTIVITY: ACCORDING TO A FOREIGN GOVERNMENT SERVICE, THE FORMER DIRECTOR OF THE ZAGREB OFFICE OF HSO AND HIS DEPUTY WERE BOTH SENIOR MEMBERS OF ALGERIAN EXTREMIST GROUPS; FRENCH POLICE ARRESTED THE DEPUTY FOR WEAPONS SMUGGLING IN FRANCE IN JULY 1994, ACCORDING TO A FRENCH LAW ENFORCEMENT OFFICIAL. ANOTHER FOREIGN GOVERNMENT SERVICE REPORTED THAT AN ALGERIAN NATIONAL AFFILIATED WITH HSO AND A SENIOR COMMANDER OF THE MUJAHEDIN, ALSO ALGERIAN, WERE PREPARING FOR AN UNSPECIFIED TERRORIST ATTACK IN EUROPE IF SHAYKH UMAR ABD AL-RAHMAN, THEN ON TRIAL IN NEW YORK FOR COMPLICITY IN THE 1993 WORLD TRADE CENTER BOMBING, WERE CONVICTED. THE SHAYKH WAS CONVICTED IN OCTOBER 1995 OF CONSPIRACY TO COMMIT TERRORIST ACTS IN THE UNITED STATES. HE WAS SENTENCED TO LIFE IN PRISON WITHOUT PAROLE ON 17 JANUARY 1996. IN APRIL 1995 THE CROATIAN SERVICE DETAINED AN ALGERIAN EMPLOYEE OF THE HSO WHO HAD IN HIS POSSESSION PASSPORTS OF ARAB INDIVIDUALS IN BOSNIA, INCLUDING AN EMPLOYEE OF THE THIRD WORLD RELIEF AGENCY, ACCORDING TO THE SECOND SERVICE. THE PRESS HAS REPORTED THAT SOME EMPLOYEES OF MAK'S NEW YORK BRANCH WERE INVOLVED IN THE WORLD TRADE CENTER BOMBING. THE PESHAWAR OFFICE FUNDS AT LEAST NINE TRAINING CAMPS IN AFGHANISTAN, ACCORDING TO CLANDESTINE SOURCES.

-- LINKS TO OTHER NGOS: TWRA, IIRO. MAK IS SUSPECTED OF HAVING LINKS TO THE MUSLIM WORLD LEAGUE.

MUWAFAQ FOUNDATION



-- ARABIC NAME:  AL-MUWAFAQ.

-- AKA:  MUWAFAQ, MUWAFAQ FOUNDATION, AND MUWAFAQ AL-KHAYRIYYA BENEVOLENT FOUNDATION.

-- OFFICES:  ZAGREB, SARAJEVO, SPLIT, ZENICA, DOBRINJA, TIRANA, KONJIC, AND TUZLA.  PLANS TO ESTABLISH OFFICES IN KAKANJ, VISOKO, VITEZ, TRAVNIK, BUGOJNO, MAJLAJ, MOSTAR, JABLANICA, AND PAZARIC. ALSO OPERATES IN TARCIN AND SIPOVO AND HAS OTHER BOSNIA-RELATED OFFICES IN SIEGEN, GERMANY, AND VIENNA, AUSTRIA.  REGISTERED IN JERSEY, UNITED KINGDOM, BUT BASED IN KHARTOUM, SUDAN.

-- EXTREMIST CONNECTIONS:  AL-GAMA'AT AL-ISLAMIYYA.

-- SUPPORT FOR EXTREMIST/TERRORIST ACTIVITY:  THIS ORGANIZATION HELPS FUND THE EGYPTIAN MUJAHEDIN BATTALION IN BOSNIA, ACCORDING TO A FOREIGN GOVERNMENT SERVICE, AND IT ALSO FUNDS AT LEAST ONE TRAINING CAMP IN AFGHANISTAN.

-- LINKS TO OTHER NGOS:  NO INFORMATION.

QATAR CHARITABLE SOCIETY/COMMITTEE

-- AKA:  QATAR COMMITTEE TO SPONSOR ORPHANS.

-- OFFICES:  ZAGREB, SARAJEVO, MOSTAR, TUZLA, ZENICA, AND SPLIT. ALSO OPERATES IN KALESIJA, KLADANJ, ZIVINICE, AND LUKAVAC.  BASED IN DOHA, QATAR, AND FUNDED BY PRIVATE BUSINESSMEN.

-- EXTREMIST CONNECTIONS:  POSSIBLY HAMAS, ALGERIANS.

-- SUPPORT FOR EXTREMIST/TERRORIST ACTIVITY:  AN INDIVIDUAL IDENTIFIED BY THE SERVICE AS A HAMAS OFFICIAL IS LISTED AS A STAFF MEMBER IN BOTH QATAR AND THE HUMAN RELIEF AGENCY (SEE HRI), WHERE A HAMAS LEADER AND ALGERIANS MET IN 1993 TO DISCUSS TERRORIST OPERATIONS, ACCORDING TO A FOREIGN GOVERNMENT SERVICE.

-- LINKS TO OTHER NGOS:  HRI, IIRO, KJRC, SAUDI HIGH COMMISSION, HUMAN APPEAL INTERNATIONAL, COORDINATION COUNCIL.

11

RED CRESCENT, IRAN

-- ARABIC NAME: HELAL AHMAR.

-- AKA: IRANIAN RED CRESCENT SOCIETY, IRANIAN HUMANITARIAN AID ORGANIZATION.

-- OFFICES: SARAJEVO, SPLIT, TUZLA, AND ZENICA.

-- EXTREMIST CONNECTIONS: IRAN.

-- SUPPORT FOR EXTREMIST/TERRORIST ACTIVITY: OFTEN USED BY THE IRANIAN MOIS AS COVER FOR INTELLIGENCE OFFICERS, AGENTS, AND ARMS SHIPMENTS.

-- LINKS TO OTHER NGOS: MERHAMET (CROATIA).

SAUDI HIGH COMMISSION

THE OFFICIAL SAUDI GOVERNMENT ORGANIZATION FOR COLLECTING AND DISBURSING HUMANITARIAN AID.

-- OFFICES: ZAGREB, SARAJEVO, AND TUZLA. OPERATES IN ZENICA, MOSTAR, AND SPLIT.

-- EXTREMIST CONNECTIONS: HAMAS, ALGERIANS.

-- SUPPORT TO EXTREMIST/TERRORIST ACTIVITY: (SEE HUMAN RELIEF INTERNATIONAL FOR DETAILS ON CONNECTIONS OF INDIVIDUAL MEMBERS TO POSSIBLY HAMAS AND ALGERIAN MILITANTS.) THE OFFICES ARE STAFFED BY SAUDIS, SYRIANS, ALGERIANS, MOROCCANS, AND JORDANIANS, ACCORDING TO A FOREIGN GOVERNMENT SERVICE.

-- LINKS TO OTHER NGOS: HRI, IIRO, KJRC, QATAR CHARITABLE SOCIETY.

THIRD WORLD RELIEF AGENCY (TWRA)

-- OFFICES: ZAGREB, TUZLA, SARAJEVO, SPLIT, ISTANBUL, AND UNSPECIFIED CITIES IN GERMANY AND SWITZERLAND. HEADQUARTERED IN SUDAN, OFFICE IN TURKEY.

12



-- EXTREMIST CONNECTIONS: AL-GAMA'AT AL-ISLAMIYYA.

-- SUPPORT TO EXTREMIST/TERRORIST ACTIVITY: AN EMPLOYEE OF TWRA ALLEGED TO BE A MEMBER OF GAMA'AT CARRIED OUT A SUICIDE CAR BOMBING OF A CROATIAN POLICE FACILITY IN RIJEKA IN MID-OCTOBER, IN RETALIATION FOR THE CROATIANS' ARREST OF A SENIOR GAMA'AT MEMBER, ACCORDING TO A FOREIGN GOVERNMENT SERVICE. THE BOMBING WAS OVERSEEN BY ANWAR SHABAN, FORMER LEADER OF THE MUJAHEDIN IN ZENICA WHO WAS KILLED IN DECEMBER 1995 BY CROATIAN SECURITY FORCES. HE AND OTHER MUJAHEDIN LEADERS HAD BEGUN PLANNING TO ATTACK NATO FORCES WHICH WOULD BE SENT TO BOSNIA, ACCORDING TO A FOREIGN GOVERNMENT SERVICE. A CONFIDENTIAL CONTACT REPORTS THAT THE REGIONAL DIRECTOR OF THE ORGANIZATION, DR. MUHAMMAD FATYH HASANAYN, IS THE MOST INFLUENTIAL NGO OFFICIAL IN BOSNIA. HE IS A MAJOR ARMS SUPPLIER TO THE GOVERNMENT, ACCORDING TO CLANDESTINE AND PRESS REPORTING, AND WAS FORCED TO RELOCATE HIS OFFICE FROM ZAGREB IN 1994 AFTER HIS WEAPONS SMUGGLING OPERATIONS WERE EXPOSED. ACCORDING TO A FOREIGN GOVERNMENT SERVICE, HASANAYN SUPPORTS US MUSLIM EXTREMISTS IN BOSNIA. (ONE NGO IN BOSNIA THAT INCLUDES EXTREMIST US MUSLIMS IS TAIBAE INTERNATIONAL, WHICH HAS OFFICES IN ZAGREB, SPLIT, AND SARAJEVO.) IN AUGUST 1995, HASANAYN SENT HIS BROTHER TO ITALY TO ASSESS THE GAMA'AT NETWORK THERE AFTER THE RAIDS BY ITALIAN POLICE, ACCORDING TO A FOREIGN GOVERNMENT SERVICE. HASANAYN INTENDED TO RESUME FUNDING AL-GAMA'AT AND OTHER EXTREMISTS IN MILAN AND ROME WHEN THE NETWORK WAS REBUILT.

-- LINKS TO OTHER NGOS: MAK, ISRA, MWL.

THE ISLAMIC WORLD COMMITTEE OR COMMISSION

-- ARABIC: LAJNAT AL-'ALAM AL-ISLAMI
-- IS A SUBCOMMITTEE OF THE SOCIAL REFORM SOCIETY, WHICH IS A LEGALLY-REGISTERED CHARITY IN KUWAIT, RUN BY MEMBERS OF THE MUSLIM BROTHERHOOD (ALSO LEGAL IN KUWAIT). ACCORDING TO INFORMATION THE GROUP PROVIDED TO THE US EMBASSY IN KUWAIT, THE IWC CONTRIBUTED $2,427,235 IN AID TO MUSLIMS IN THE BALKANS IN 1994. ESTABLISHED IN 1982, AS OF LATE 1995 IT HAD OFFICES IN SARAJEVO, TUZLA, AND ZAGREB AS WELL AS IN ALBANIA, BULGARIA, AND AUSTRIA. THE COMMITTEE'S AREA OF RESPONSIBILITY ALSO INCLUDES SOUTH AND SOUTHEAST ASIA. THE IWC PRESIDENT IS 'ABD AL-'AZIZ AL-JIRAN. WE HAVE VERY LITTLE INFORMATION ON THE IWC'S ACTIVITIES, BUT IT PROBABLY SUPPORTED ARAB MUJAHIDIN IN BOSNIA AT LEAST

BEFORE THE DAYTON AGREEMENT.  OVERTLY, THE IWC SPONSORS
EDUCATIONAL AND MEDICAL AID AND PROSELYTIZES AN REFORMIST VERSION
OF ISLAM BASED ON MUSLIM BROTHERHOOD PRINCIPLES.  US MILITARY
REPORTING HAS LINKED A MEMBER OF THE ORGANIZATION WITH A FORMER
MUJAHIDIN CAMP IN MAGLAJ, AND SOURCES IN OTHER REGIONS OF THE
WORLD HAVE LINKED A FEW EMPLOYEES OF THE IWC WITH ARAB EXTREMIST
GROUPS, ALTHOUGH WE HAVE NO EVIDENCE THAT THE KUWAITI-BASED
LEADERSHIP HAS BEEN AWARE OF THESE LINKS.  ANOTHER SUBCOMMITTEE
OF THE SOCIAL REFORM SOCIETY APPEARS TO HAVE BEEN SUBSTANTIALLY
INVOLVED IN SUPPORTING ARAB MUJAHIDIN IN AFGHANISTAN.  WE HAVE NO
EVIDENCE OF DIRECT OR CONTINUING TIES BETWEEN THE IWC OR ITS
PARENT ORGANIZATION AND IRAN.

14

# Exhibit K

PTQ5308

# UNCLASSIFIED

**E5**

## RELEASED IN PART
## B1, 1.4(C), 1.4(D), B3, INA, B7(C)

SECRET          PTQ5308

PAGE 01      STATE   334954   201016Z
ORIGIN SCT-00

INFO  LOG-00    AF-01    CA-02    CIAE-00   OASY-00   DODE-00   DS-00
      FBIE-00   TEDE-00  INR-00   INSE-00   IO-16     JUSE-00   L-01
      ADS-00    NSAE-00  OCS-06   OIC-02    PPT-01    VO-06     DSCC-00
      /035R

DRAFTED BY: S/CT:MRKENNON
APPROVED BY:S/CT:FEMOSS
AF/EX:JLISHBEIN
                  -----------------9474FA  201017Z /38

O 201010Z DEC 94
FM SECSTATE WASHDC
TO AMEMBASSY KHARTOUM IMMEDIATE

S E C R E T STATE 334954


FOLLOWING STATE 334954 DATED 17 DEC 94 SENT ACTION AMMAN,
RIYADH, MANILA, JEDDAH. INFO:DOJ WASHDC AND INS WASHDC IS
BEING REPEATED FOR YOUR ACTION AT THIS TIME.

QUOTE S E C R E T STATE 334954

DELIVER TO DUTY OFFICER AT OOB

E.O. 12356: DECL:OADR
TAGS:  PTER,CVIS, CJAN, JO, US
SUBJECT:  ARREST IN US OF TERRORIST FINANCIER MUHAMMAD
KHALIFAH NOW UNDER INDICTMENT IN JORDAN.

SECRET




SECRET

PAGE 02      STATE   334954   201016Z


UNITED STATES DEPARTMENT OF STATE
REVIEW AUTHORITY: CHARLES L DARIS
DATE/CASE ID: 07 OCT 2008  200803300

# UNCLASSIFIED

UNCLASSIFIED

1. SECRET - ENTIRE TEXT

2.  SUMMARY:  THE INS ARRESTED MUHAMMAD JAMAL KHALIFAH,
A FINANCIER OF INTERNATIONAL TERRORISM UNDER INDICTMENT
IN JORDAN, IN CALIFORNIA ON 12/16/94.  WE ARE WORKING
CLOSELY WITH DOJ AND INS TO ENSURE THAT KHALIFAH IS
DETAINED UNTIL A WAY CAN BE FOUND TO DEPORT HIM TO
JORDAN, OR, IF THAT CANNOT BE DONE UNDER US LAW, TO A
COUNTRY THAT WILL SURRENDER HIM TO JORDAN FOR
PROSECUTION.  WE HAVE ALREADY REQUESTED DOCUMENTATION
FROM JORDAN AMBASSADOR TARAWNEH AND ARE SENDING A LETTER
FROM THE DEPARTMENT REQUESTING DENIAL OF BAIL FOR THE
PRELIMINARY HEARINGS BUT SEEK ADDITIONAL DOCUMENTATION
FROM EMBASSY AMMAN AND AMCONGEN JEDDAH AND INFORMATION
FROM ALL ADDRESSEES.   END SUMMARY.

3.  BACKGROUND:  ON DECEMBER 16 NEAR SAN FRANCISCO, INS
ARRESTED MUHAMMAD JAMAL KHALIFAH, A KNOWN FINANCIER OF
TERRORIST OPERATIONS, WHO ENTERED THE UNITED STATES A

FEW DAYS AGO.  KHALIFAH IS AN OFFICER OF AN ISLAMIC NGO
IN THE PHILIPPINES THAT IS A KNOWN HAMAS FRONT AND HAS
FINANCED TERRORIST OPERATIONS.  KHALIFAH IS REPORTED TO
BE THE BROTHER IN LAW OF USAMA BIN LADEN, THE
SUDAN-BASED FINANCIER OF ISLAMIC EXTREMISTS.   KHALIFAH
IS BELIEVED TO HAVE PROVIDED SUPPORT TO THE PHILIPPINE
TERRORIST GROUP ABU SAYYAF.

4. KHALIFA WAS INDICTED BY A JORDANIAN COURT FOR
TERRORIST ACTS ASSOCIATED WITH A SERIES OF CINEMA
BOMBINGS IN JORDAN IN 1994.  HE APPARENTLY TRAVELLED TO
                    SECRET



                    SECRET

PAGE 03        STATE   334954   201016Z
JORDAN IN JANUARY 1994.

5.  THE INS ARRESTED KHALIFAH FOR VIOLATING THE STATUS
OF HIS VISA AFTER THE DEPARTMENT OF STATE REVOKED IT.
IN ORDER TO HOLD KHALIFAH WITHOUT BOND AND TO PREVENT
HIS VOLUNTARY DEPARTURE FROM THE UNITED STATES  INS WILL
BE SEEKING AN ORDER TO DETAIN WITHOUT BOND SO THAT
DEPORTATION PROCEEDINGS CAN BE INITIATED.  THIS PROCESS
COULD BEGIN AS EARLY AS MONDAY, DECEMBER 19.  IN ORDER


UNCLASSIFIED

UNCLASSIFIED

TO HOLD KHALIFAH WITHOUT BOND THE USG MUST PROVIDE
EVIDENCE OF MORE SERIOUS CHARGES. WE WILL NEED
OFFICIAL, UNCLASSIFIED, DOCUMENTATION TO ASSIST THE INS.

6. DEPARTMENT HAS ASKED THE JORDANIAN AMBASSADOR, FAYIZ
TARAWNEH, TO PREPARE AS SOON AS POSSIBLE A FORMAL
COMMUNICATION TO THE DEPARTMENT AS TO THE EXISTENCE OF
THE INDICTMENT OF MUHAMMAD JAMAL KHALIFAH AND REQUESTING
THAT KHALIFAH BE DETAINED BY UNITED STATES
AUTHORITIES. FORTUITOUSLY, THE JORDANIAN ATTORNEY
GENERAL IS IN TOWN ON OTHER NEGOTIATIONS AND SHOULD BE
ABLE TO ASSIST TARAWNEH.

7. ACTION FOR AMMAN: IN ADDITION TO THE LETTERS FROM
THE DEPARTMENT AND THE JORDANIAN AMBASSADOR WHICH WE
MUST PRESENT TO THE IMMIGRATION JUDGE ON MONDAY,
DECEMBER 19, IN ORDER TO PREVENT KHALIFAH'S RELEASE ON
BOND, WE WOULD ALSO LIKE TO BE ABLE TO PRESENT THE TEXT
OF THE JORDANIAN INDICTMENT IN, AT LEAST, INFORMAL
TRANSLATION. PLEASE FAX THIS TO THE OPCENTER SLUGGED
FOR S/CTWILCOX, THEROS OR MOSS NLT DECEMBER 18 OR BY
UNCLASSIFIED MESSAGE.
                              SECRET



                              SECRET

PAGE 04        STATE   334954  201016Z

8. AMMAN ACTION CONTINUED: YOU SHOULD ALSO REQUEST
JORDANIAN GOVERNMENT PROVIDE CERTIFIED OR ATTESTED
COPIES OF THE INDICTMENT AND BACKGROUND INFORMATION ON
THE INDICTMENT IN AS MUCH DETAIL AS POSSIBLE, IDEALLY
TRANSLATED INTO ENGLISH. GOJ SHOULD SEND ORIGINALS BY
FASTEST MEANS POSSIBLE TO ITS EMBASSY IN WASHINGTON SO

THAT THEY CAN BE FORMALLY PASSED TO THE USG. WE PLAN TO
INTRODUCE THESE FORMAL DOCUMENTS AT THE DEPORTATION
HEARINGS LATER IN THE WEEK. EMBASSY SHOULD FAX COPIES
OF THE DOCUMENTS TO THE OPCENTER TO PASS TO S/CT.
REQUEST AMMAN ALSO VERIFY IF ANY OF THE VICTIMS OF THE
CINEMA BOMBINGS RELATED TO THE INDICTMENT MIGHT HAVE
BEEN AMCITS (INCLUDING DUAL NATIONALS)' OTHER FOREIGN
NATIONALS OR INTERNATIONALLY PROTECTED PERSONS SUCH AS
DIPLOMATS OR EMPLOYEES OF INTERNATIONAL ORGANIZATIONS,
E.G. UNRWA. THIS MAY GIVE US ANOTHER BASIS FOR HOLDING

UNCLASSIFIED

UNCLASSIFIED

KHALIFAH.

8.  ACTION FOR JEDDAH:  PLEASE PROVIDE OPCENTER BY FAX
SLUGGED FOR S/CT WILCOX, THEROS OR MOSS COPIES OF VISA
APPLICATION AND SUPPORTING DOCUMENTATION OF MUHAMMAD
JAMAL KHALIFAH, SAUDI NATIONAL,  PDOB MEDINA, SAUDI
ARABIA, FEBRUARY 1' 1957, SAUDI PPT NO. 19270131.

B3

10.  UNDER U.S. LAW, THE ABILITY OF THE USG TO DIRECT
THE DEPORTATION OF A DEPORTABLE ALIEN TO A PARTICULAR
COUNTRY IS LIMITED.  IN ANY EVENT, JUSTICE ADVISES THAT
THE PROCESS IS LENGTHY AND TEDIOUS AND COULD STRETCH
                         SECRET


                         SECRET

PAGE 05      STATE   334954   201016Z
INTO SEVERAL YEARS.  ALTHOUGH THE RESULTS OF OUR EFFORTS
CANNOT BE ASSURED, DEPT WILL WORK DILIGENTLY WITHIN THE
CONFINES OF US LAW, TO DEPORT KHALIFAH TO JORDAN.
AFTER INFORMATION REQUESTED ABOVE HAS BEEN PROVIDED,
EMBASSY IS ASKED TO CONFIRM WITH JORDANIAN GOVERNMENT
THE COUNTRIES WITH WHICH IT HAS EXTRADITION TREATIES AND
OTHER COUNTRIES THAT WOULD/COULD DEPORT KHALIFAH SHOULD
DEPORTATION TO JORDAN PROVE IMPOSSIBLE.

11. FOR RIYADH:  CAN YOU CONFIRM THAT KHALIFAH IS USAMA
BIN LADENS BROTHER IN LAW, IF THERE ARE ANY CHARGES
PENDING AGAINST HIM IN SAUDI ARABIA AND IF YOU BELIEVE
THAT THE SAUDIS MIGHT BE WILLING TO REVOKE HIS
CITIZENSHIP AS THEY DID FOR USAMA BIN LADEN.  WE WOULD
ALSO APPRECIATE EMBASSY'S VIEWS AS TO WHETHER THE SAUDI
GOVT WOULD EXTRADITE AN INDICTED TERRORIST SUCH AS
KHALIFAH TO JORDAN.

12.  FOR ALL ADDRESSEES:  REQUEST YOU RESEARCH YOUR OWN
FILES AND/OR APPROACH HOST GOVERNMENTS FOR ANY
FINGERPRINTS OF MUHAMMAD JAMAL KHALIFAH THAT MIGHT BE
AVAILABLE.  (FOR MANILA: WE UNDERSTAND THAT KHALIFAH MAY
HAVE LEGALLY ACQUIRED PHILIPPINO CITIZENSHIP.)  THESE
SHOULD BE TRANSMITTED TO DEPARTMENT (S/S-O FOR S/CT) BY
HIGH QUALITY FAX OR BY COMMERCIAL COURIER.

13.  FOR AMMAN:

B1

UNCLASSIFIED

UNCLASSIFIED

B1

SECRET

SECRET

PAGE 06          STATE    334954   201016Z
CHRISTOPHER
UNQUOTE CHRISTOPHER

SECRET

UNCLASSIFIED

UNCLASSIFIED

```
NNNN
@@@OASYS@@@<CONCATENATED>
PTQ9678
```

```
                        SECRET          PTQ9678

PAGE 01        STATE   334954  170600Z
ORIGIN SCT-01

INFO   LOG-00    AMAD-01   CA-02     CCO-00    CIAE-00   OASY-00   DODE-00
       DS-00     EAP-01    TEDE-00   INR-00    IO-16     L-01      ADS-00
       M-00      NEA-01    NSAE-00   OCS-06    OIC-02    PPT-01    SSO-00
       VO-06     DSCC-00   G-00      /038R

DRAFTED BY: S/CT:PNTHEROS:PJC
APPROVED BY:   NEA:RPELLETREAU
NEA/ARN:PMARTINEZ                      INR:JBIRD
FBI[            ]                       L/LEI:RHARRIS                          B7(C)
DOJ:RBLITZER                           S/S-O:RROBINSON
S/CT:PCWILCOX
DESIRED DISTRIBUTION:
NEA, S/CT, L/LEI, INR
                 ----------------93CA10   170602Z /38
O P 170558Z DEC 94 ZFF4
FM SECSTATE WASHDC
TO AMEMBASSY AMMAN NIACT IMMEDIATE
AMEMBASSY RIYADH NIACT IMMEDIATE
AMEMBASSY MANILA NIACT IMMEDIATE
AMCONSUL JEDDAH NIACT IMMEDIATE
INFO DOJ WASHDC PRIORITY
INS WASHDC PRIORITY
FBI WASHDC 0000

S E C R E T STATE 334954


DELIVER TO DUTY OFFICER AT OOB
                        SECRET
```

UNCLASSIFIED

# UNCLASSIFIED

SECRET

PAGE 02        STATE   334954   170600Z

E.O. 12356:  DECL:OADR                    —
TAGS:  PTER,CVIS, CJAN, JO, US
SUBJECT:  ARREST IN US OF TERRORIST FINANCIER MUHAMMAD
KHALIFAH NOW UNDER INDICTMENT IN JORDAN.

1. SECRET – ENTIRE TEXT

2. SUMMARY:  THE INS ARRESTED MUHAMMAD JAMAL KHALIFAH,
A FINANCIER OF INTERNATIONAL TERRORISM UNDER INDICTMENT
IN JORDAN, IN CALIFORNIA ON 12/16/94.  WE ARE WORKING
CLOSELY WITH DOJ AND INS TO ENSURE THAT KHALIFAH IS
DETAINED UNTIL A WAY CAN BE FOUND TO DEPORT HIM TO
JORDAN, OR, IF THAT CANNOT BE DONE UNDER US LAW, TO A
COUNTRY THAT WILL SURRENDER HIM TO JORDAN FOR
PROSECUTION.  WE HAVE ALREADY REQUESTED DOCUMENTATION
FROM JORDAN AMBASSADOR TARAWNEH AND ARE SENDING A LETTER
FROM THE DEPARTMENT REQUESTING DENIAL OF BAIL FOR THE
PRELIMINARY HEARINGS BUT SEEK ADDITIONAL DOCUMENTATION
FROM EMBASSY AMMAN AND AMCONGEN JEDDAH AND INFORMATION
FROM ALL ADDRESSEES.    END SUMMARY.

3. BACKGROUND:  ON DECEMBER 16 NEAR SAN FRANCISCO, INS
ARRESTED MUHAMMAD JAMAL KHALIFAH, A KNOWN FINANCIER OF
TERRORIST OPERATIONS, WHO ENTERED THE UNITED STATES A

FEW DAYS AGO.  KHALIFAH IS AN OFFICER OF AN ISLAMIC NGO
IN THE PHILIPPINES THAT IS A KNOWN HAMAS FRONT AND HAS
FINANCED TERRORIST OPERATIONS.  KHALIFAH IS REPORTED TO
BE THE BROTHER IN LAW OF USAMA BIN LADEN, THE
SUDAN-BASED FINANCIER OF ISLAMIC EXTREMISTS.    KHALIFAH
                        SECRET

SECRET

PAGE 03        STATE   334954   170600Z
IS BELIEVED TO HAVE PROVIDED SUPPORT TO THE PHILIPPINE
TERRORIST GROUP ABU SAYYAF.

4. KHALIFA WAS INDICTED BY A JORDANIAN COURT FOR

# UNCLASSIFIED

# UNCLASSIFIED

TERRORIST ACTS ASSOCIATED WITH A SERIES OF CINEMA
BOMBINGS IN JORDAN IN 1994.  HE APPARENTLY TRAVELLED TO
JORDAN IN JANUARY 1994.

5.  THE INS ARRESTED KHALIFAH FOR VIOLATING THE STATUS
OF HIS VISA AFTER THE DEPARTMENT OF STATE REVOKED IT.
IN ORDER TO HOLD KHALIFAH WITHOUT BOND AND TO PREVENT
HIS VOLUNTARY DEPARTURE FROM THE UNITED STATES  INS WILL
BE SEEKING AN ORDER TO DETAIN WITHOUT BOND SO THAT
DEPORTATION PROCEEDINGS CAN BE INITIATED.  THIS PROCESS
COULD BEGIN AS EARLY AS MONDAY, DECEMBER 19.  IN ORDER
TO HOLD KHALIFAH WITHOUT BOND THE USG MUST PROVIDE
EVIDENCE OF MORE SERIOUS CHARGES.  WE WILL NEED
OFFICIAL, UNCLASSIFIED, DOCUMENTATION TO ASSIST THE INS.

6.  DEPARTMENT HAS ASKED THE JORDANIAN AMBASSADOR, FAYIZ
TARAWNEH, TO PREPARE AS SOON AS POSSIBLE A FORMAL
COMMUNICATION TO THE DEPARTMENT AS TO THE EXISTENCE OF
THE INDICTMENT OF MUHAMMAD JAMAL KHALIFAH AND REQUESTING
THAT KHALIFAH BE DETAINED BY UNITED STATES
AUTHORITIES.   FORTUITOUSLY, THE JORDANIAN ATTORNEY
GENERAL IS IN TOWN ON OTHER NEGOTIATIONS AND SHOULD BE
ABLE TO ASSIST TARAWNEH.

7.  ACTION FOR AMMAN:  IN ADDITION TO THE LETTERS FROM
THE DEPARTMENT AND THE JORDANIAN AMBASSADOR WHICH WE
MUST PRESENT TO THE IMMIGRATION JUDGE ON MONDAY,
                        SECRET




                        SECRET

PAGE 04        STATE   334954  170600Z
DECEMBER 19, IN ORDER TO PREVENT KHALIFAH'S RELEASE ON
BOND, WE WOULD ALSO LIKE TO BE ABLE TO PRESENT THE TEXT
OF THE JORDANIAN INDICTMENT IN, AT LEAST, INFORMAL
TRANSLATION.  PLEASE FAX THIS TO THE OPCENTER SLUGGED
FOR S/CTWILCOX, THEROS OR MOSS NLT DECEMBER 18 OR BY
UNCLASSIFIED MESSAGE.

8.  AMMAN ACTION CONTINUED:  YOU SHOULD ALSO REQUEST
JORDANIAN GOVERNMENT PROVIDE CERTIFIED OR ATTESTED
COPIES OF THE INDICTMENT AND BACKGROUND INFORMATION ON
THE INDICTMENT IN AS MUCH DETAIL AS POSSIBLE, IDEALLY
TRANSLATED INTO ENGLISH.  GOJ SHOULD SEND ORIGINALS BY
FASTEST MEANS POSSIBLE TO ITS EMBASSY IN WASHINGTON SO

# UNCLASSIFIED

UNCLASSIFIED

THAT THEY CAN BE FORMALLY PASSED TO THE USG.  WE PLAN TO
INTRODUCE THESE FORMAL DOCUMENTS AT THE DEPORTATION
HEARINGS LATER IN THE WEEK.  EMBASSY SHOULD FAX COPIES
OF THE DOCUMENTS TO THE OPCENTER TO PASS TO S/CT.
REQUEST AMMAN ALSO VERIFY IF ANY OF THE VICTIMS OF THE
CINEMA BOMBINGS RELATED TO THE INDICTMENT MIGHT HAVE
BEEN AMCITS (INCLUDING DUAL NATIONALS)' OTHER FOREIGN
NATIONALS OR INTERNATIONALLY PROTECTED PERSONS SUCH AS
DIPLOMATS OR EMPLOYEES OF INTERNATIONAL ORGANIZATIONS,
E.G. UNRWA.  THIS MAY GIVE US ANOTHER BASIS FOR HOLDING
KHALIFAH.

8.  ACTION FOR JEDDAH:  PLEASE PROVIDE OPCENTER BY FAX
SLUGGED FOR S/CT WILCOX, THEROS OR MOSS COPIES OF VISA
APPLICATION AND SUPPORTING DOCUMENTATION OF MUHAMMAD
JAMAL KHALIFAH, SAUDI NATIONAL,  PDOB MEDINA, SAUDI
ARABIA, FEBRUARY 1' 1957, SAUDI PPT NO. 19270131.                    B3
                    SECRET


                    SECRET

PAGE 05        STATE   334954  170600Z


10.  UNDER U.S. LAW, THE ABILITY OF THE USG TO DIRECT
THE DEPORTATION OF A DEPORTABLE ALIEN TO A PARTICULAR
COUNTRY IS LIMITED.  IN ANY EVENT, JUSTICE ADVISES THAT
THE PROCESS IS LENGTHY AND TEDIOUS AND COULD STRETCH
INTO SEVERAL YEARS.  ALTHOUGH THE RESULTS OF OUR EFFORTS
CANNOT BE ASSURED, DEPT WILL WORK DILIGENTLY WITHIN THE
CONFINES OF US LAW, TO DEPORT KHALIFAH TO JORDAN.
AFTER INFORMATION REQUESTED ABOVE HAS BEEN PROVIDED,
EMBASSY IS ASKED TO CONFIRM WITH JORDANIAN GOVERNMENT
THE COUNTRIES WITH WHICH IT HAS EXTRADITION TREATIES AND
OTHER COUNTRIES THAT WOULD/COULD DEPORT KHALIFAH SHOULD
DEPORTATION TO JORDAN PROVE IMPOSSIBLE.

11. FOR RIYADH:  CAN YOU CONFIRM THAT KHALIFAH IS USAMA
BIN LADEN'S BROTHER IN LAW, IF THERE ARE ANY CHARGES
PENDING AGAINST HIM IN SAUDI ARABIA AND IF YOU BELIEVE
THAT THE SAUDIS MIGHT BE WILLING TO REVOKE HIS
CITIZENSHIP AS THEY DID FOR USAMA BIN LADEN.  WE WOULD
ALSO APPRECIATE EMBASSY'S VIEWS AS TO WHETHER THE SAUDI
GOVT WOULD EXTRADITE AN INDICTED TERRORIST SUCH AS

UNCLASSIFIED

UNCLASSIFIED

KHALIFAH TO JORDAN.

12.  FOR ALL ADDRESSEES:  REQUEST YOU RESEARCH YOUR OWN
FILES AND/OR APPROACH HOST GOVERNMENTS FOR ANY
FINGERPRINTS OF MUHAMMAD JAMAL KHALIFAH THAT MIGHT BE
AVAILABLE.  (FOR MANILA: WE UNDERSTAND THAT KHALIFAH MAY
HAVE LEGALLY ACQUIRED PHILIPPINO CITIZENSHIP.)  THESE
SHOULD BE TRANSMITTED TO DEPARTMENT (S/S-O FOR S/CT) BY
HIGH QUALITY FAX OR BY COMMERCIAL COURIER.

SECRET


SECRET

PAGE 06      STATE   334954   170600Z

13.  FOR AMMAN:                                                      B1

CHRISTOPHER

UNCLASSIFIED

UNCLASSIFIED

SECRET

NNNN

UNCLASSIFIED

# **<u>Exhibit L</u>**

UNCLASSIFIED

RELEASED IN FULL

United States Department of State

Washington, D.C. 20520

P950081-0017

INFORMATION MEMORANDUM
S.S

(E41)

CONFIDENTIAL
DECL:OADR

STARS-UP

MAY 2 2 1995

TO       :   The Secretary

FROM     :   S/CT - Philip C. Wilcox Jr.

SUBJECT  :   Deportation of Muhammad Jamal Khalifah

    Suspected terrorist Muhammad Jamal Khalifah was deported to
Jordan yesterday evening pursuant to a request from the
Jordanian government and your subsequent letter to Janet Reno
asserting that it was in the U.S. Government's foreign policy
interest for him to be deported to Jordan.  Accompanied by INS
agents and Jordanian authorities, Khalifah was placed aboard a
Royal Jordanian flight and flown to Amman.

    Khalifah, a Saudi national, was convicted of terrorist
crimes in absentia last year in Jordan.  We believe he is an
important financier for radical Islamic organizations,
including the Abu Sayyaf Group in the Philippines.  He obtained
a visa under fraudulent circumstances at the U.S. Consulate in
Jiddah last August, and was detained by INS in San Francisco on
charges of visa fraud in December 1994.  You sent a letter to
Janet Reno in January explaining that "the presence or
activities of Muhammad Khalifah in the United States would have
serious foreign policy consequences for the United States" and
requested that Justice take all steps possible to effect his
deportation to Jordan.  In April, Khalifah agreed to voluntary
deportation, but his return to Jordan was delayed while DOJ
considered whether to press other charges that might keep him
in the U.S. longer.  Justice eventually concluded that the case
was not strong enough to ensure that a magistrate would hold
Khalifah without bond.

    Khalifah will now be retried on terrorism charges in Jordan
since his first conviction was in absentia.  DOJ, which is
exploring indications of possible links between Khalifah and
World Trade Center bombing suspect Ramzi Ahmad Yousef, may
eventually request his extradition from Jordan to the United
States if their investigation connects Khalifah to the bombing
or other terrorist crimes prosecutable in the United States.

CONFIDENTIAL

UNCLASSIFIED

UNITED STATES DEPARTMENT OF STATE
REVIEW AUTHORITY: CHARLES L DARIS
DATE/CASE ID: 07 OCT 2008  200803300

# **Exhibit M**

FD–302 (Rev. 3–10–82)

**PARTICULARLY
SENSITIVE**

Al-Fadl
**3501-1**

- 1 -

### FEDERAL BUREAU OF INVESTIGATION

Date of transcription    11/10/96

On 11/4 - 11/5/96, SA's _____ FBI, NYO,
and _____ FBI, NYO, conducted an interview of
Gamal Ahmed Mohamed Al-Fedel in Europe. Also present during the
interview were Assistant United States Attorneys, Patrick
Fitzgerald and Ken Karas, Southern District of New York, as well
FBI Arabic translator _____ Gamal was advised of
the identities of the interviewing agents and provided the
following information.

Gamal explained that he was anxious to speak to the
interviewing agents in order to provide as many details as
possible with regard to certain terrorists and terrorist groups.
Gamal stated that he no longer believes in terrorism, and that it
is his decision to speak to the interviewing agents, and he is
doing so voluntarily.

During the period from 1987 to 1995, Gamal worked with
a terrorist group  most recently called the Islamic Army, run by
USAMA BIN LADIN. Gamal stated the he still has family members
working with the Islamic Army, but he wants to make a break with
his past.

According to Gamal, in 1985, BIN LADIN went to
Afghanistan to help the Afghan rebels fight against the Russians.
BIN LADIN went to Afghanistan with two other individuals, AL
MADINI SHAFAQ from Medina, Saudi Arabia, and OSAMA ASMURAI, a
Saudi resident born in Mecca, but who is from Southeast Asia.
These individuals met with ABU RASUL SAYYAF, a Pushtoon, who was
a leader of one of the Afghan resistance groups. BIN LADIN
provided financial support and spent four to five months a year
in Afghanistan.

Gamal stated that ABDULLAH AZZAM, a professor at the
Islamic University, went to Afghanistan and met with BIN LADIN.
In 1987, AZZAM and BIN LADIN established a "MEKTAB AL KHIDEMAT"
or "Service Office", which handled the documents, distribution
and logistics of all the newcomers to the war. The initial reason
for keeping the documents of the individuals sent to the war was
to notify the families if a soldier died in battle, but this

---

Investigation on   11/8/96         at   Europe

File #  _____  31 ...

by  _____   FBI, NYO
                          FBI, NYO        Date dictated  11/11/96

This document contains neither recommendations nor conclusions of the FBI  It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

SNY101-0024

FD-302a (Rev. 11-15-83)

**PARTICULARLY**
**SENSITIVE**

Continuation of FD-302 of  GAMAL _____ , On __11/8/96__ , Page __2__

objective later changed. In the early 1990's the documents of
dead soldiers were being used to falsify travel documents. Gamal
explained that the Islamic Army was very efficient in producing
false documents, and they actually had a separate unit that
handled this. The documents were not only forged, but background
documents collected from the soldiers, including high school
diplomas and birth certificates, would provide back up for false
travel documents.

Two of the individuals that were specialists in
manufacturing false documents were AHMED ALI MOHAMMAD ABU UBAIDA
from Alexandria, Egypt, and NAWAH AL MASRI, who was from the
Jihad group in Egypt, which is linked to the Islamic Army. In
order to become an expert in the manufacture of these documents,
you had to attend instructional courses.

Gamal stated that there are many divisions in the
Islamic Army with various names created to confuse governments if
a soldier was captured. This would make it difficult for these
groups to be traced back to BIN LADIN's Islamic Army.

Gamal advised that each cell has its own goals and
objectives, or services that they specialized in. These groups
would not go beyond what their specialty or goal was, i.e.
reconnaissance, operations, recruiting, etc. Gamal's not sure if
there is a recruiting group in the U.S., but it is possible since
BIN LADIN did work with MUSTAFA SHALABI in the U.S., at the Al
Farooq Mosque in Brooklyn. Gamal said that he worked with SHALABI
when he was in New York.

USAMA BIN LADIN's involvement in the war in Afghanistan
was mostly in financing, according to Gamal, and his connections
were with ABU SAYYAF. After meeting AZZAM, AZZAM suggested they
open the Services Office. AZZAM believed that this would provide
good connections in the Arab world and would help bring more
Arabs to fight in Afghanistan.

Gamal stated that SHALABI, in New York, worked directly
with AZZAM even before AZZAM met BIN LADIN. Gamal stated that
AZZAM was the father of the Services Office and the idea of
bringing Arabs and other Muslims from around the world to fight
in Afghanistan. Gamal said that it was his belief that AZZAM had
travelled to the U.S. on two occasions. Gamal said that BIN LADIN
had a relationship with the SHALABI organization while Gamal was
in New York, but Gamal did not learn of this relationship until
after he left New York.

SNY101-0025

FD-302a (Rev. 11-15-83)

**PARTICULARLY
SENSITIVE**

Continuation of FD-302 of GAMAL _____ . On __11/8/96__ . Page __3__

   There were other visitors to SHALABI while Gamal was in
New York including ADNAN TAMIMI, a deputy of AZZAM, who visited
often, a Saudi named AMAD AHMED MOHAMMAD, who studied in Georgia,
and IBRAHIM BADAOUD.

   Gamal believes that AZZAM was killed from within the
organization because there were many differences of opinion at
that time as to the spending of the money that had been
accumulated. AZZAM believed that all of the money and effort
should be focused on Afghanistan only, and not used for other
causes.

   When the dispute arose, BIN LADIN left the service
organization. Gamal stated that the Egyptians encouraged BIN
LADIN to leave AZZAM because BIN LADIN was more interested in the
Egyptians. BIN LADIN's objective was to utilize the Islamic Army
in, and out, of Afghanistan. AZZAM wanted all the attention and
money focused in Afghanistan. AZZAM actually lectured at a guest
house on Arbab Road in Peshawar, Pakistan, that it was illegal
under Islamic law to spend any jihad money meant for Afghanistan,
outside of Afghanistan. AZZAM believed that if people found out
that the money was being spent outside Afghanistan, financial
support would suffer. Gamal stated that BIN LADIN broke with
AZZAM in 1989, about a month before AZZAM was killed.

   In 1988 Gamal worked in New York with SHALABI trying to
raise money for the Afghan cause. Gamal was in the U.S. with a
cousin, and Gamal worked at the Al Farooq Mosque. Gamal said that
he also attended the Abu Bakr Mosque, and the Islamic Center in
New Jersey. Gamal stated that he did a lot of work on Eastern
Parkway where there are many Arabic stores. He would advise
people of the Afghan cause and would carry a card with him that
had SHALABI's name and the name of the Al Farooq Mosque. Gamal
had collected money from an individual named ISSAM, an owner of a
Key Food Store on Eastern Parkway in Brooklyn, as well as
MOHAMMAD (MIKE) and his father, who worked at another Key Food
along Eastern Parkway. Gamal stated that a substantial amount of
money was raised through the targeting of individuals and stores,
with most of the funds going to AZZAM in Pakistan, although some
of the funds were used to buy documents and tickets for people to
travel to Afghanistan from the United States. An individual by
the name of ABU BAKR from New Jersey went with Gamal to the
travel agent to purchase tickets for people travelling to
Afghanistan. Gamal does not remember the travel agent or its
location.

SNY101-0026

FD-302a (Rev. 11-15-83)

**PARTICULARLY**
**SENSITIVE**

Continuation of FD-302 of  GAMAL _____ , On  11/8/96 , Page  4 ____

      Gamal stated that there were two stories circulating in
the Sudan regarding the murder of MUSTAFA SHALABI. One story was
that SHALABI embezzled some of the money that was going through
his office. This caused a split which resulted in SHALABI's
murder. The second story is that a close aid of SHALABI was an
intelligence person. When SHALABI found this out he was murdered.
Gamal stated that most people believed the second story. Either
way, Gamal was certain that SHALABI was killed by a close
associate.

      Gamal advised that while he was at the Farooq Mosque he
never heard of any training taking place. While he was back in
the Sudan, someone told him of training in the U.S., but he was
not specific. He was surprised when he heard about the U.S.
training because he never knew about while he was in New York.

      Gamal said that TEHAR, a black American who had been
in the Army in the U.S., helped target the black Muslim community
in New York. Gamal said that he was close with  and that they
were in the Afghani camps at the same time.  is now in the Sudan
and is a member of the Islamic Army. Gamal stated that around
1992, BIN LADIN became very interested in people with American
citizenship.

      TEHAR was first affiliated with the Tablir group in
the Medina Mosque, and that this group would meet at the Medina
or Farooq Mosque. He worked with another group run by IMAM SHEIK
LOQMAN, an American with a dark complexion. TEHAR wanted to be
involved in the struggle in Afghanistan but most of the others
did not. In order to participate in the Afghan cause, TEHAR and
some others from LOQMAN's group hooked up with SHALABI. Gamal
stated that he met TEHAR again in the Jaheen camp in Afghanistan.
was involved with training newcomers in martial arts, light arms,
and close confrontation fighting.

      Gamal met TEHAR again in the Sudan. TEHAR was bringing
his children to the Sudan. Gamal believed that TEHAR was very
nervous about the U.S. since TEHAR explained that he would not go
back to the U.S. Gamal does not know the reason behind TEHAR's
concern. Gamal advised that he never saw TEHAR carrying a gun in
New York, nor did he hear of TEHAR committing any crime while he
was in New York. He knows that TEHAR works for BIN LADIN but he
is unaware of what TEHAR is involved in for BIN LADIN.

      Gamal stated that when he saw TEHAR in Khartoum, TEHAR
was meeting with BIN LADIN and ABU UBAIDA AL BANSHIRI, the
military commander in the Islamic Army. TEHAR was escorted to

SNY101-0027

FD-302a (Rev. 11-15-83)

**PARTICULARLY
SENSITIVE**

Continuation of FD-302 of  GAMAL                                    , On   11/8/96   , Page   5

      Khartoum by MUSAB IBRAHIM ABDOU. Gamal stated that TEHAR is not
an advisor for BIN LADIN, but was more involved in military
matters. When Gamal went to BIN LADIN's guest house in Khartoum
with ABDOU, they saw TEHAR and AL BANSHIRI at the house studying
various maps. TEHAR asked Gamal to wait in the hallway. ABDOU
told Gamal that TEHAR was visiting camps in Markhirat Umm Durman.
This camp was for the training of special members of the Islamic
religion, who were tasked with the public defense. This camp was
formed when the Islamic Government took over in the Sudan, in
order to prepare the public for the civil defense.

      TEHAR supposedly visited other countries for BIN LADIN,
but Gamal was unsure of his specific tasking. Gamal stated that
TEHAR was more of a military planner who was not involved in the
actual operations. He had heard that TEHAR went to Somalia where
the Islamic Army eventually conducted an operation, but is unsure
how TEHAR was involved. This was about the time of Operation
Hope, when BIN LADIN wanted to send people to Somalia.

      A camp was established outside of Mogadishu by the
Islamic Army. Gamal stated that ABU HAFS and ABU TALHA went to
Mogadishu to provoke the various factions in Somalia against the
U.S. presence. Gamal stated that he understood that most of the
operations against U.S. forces in Somalia were planned by the
Islamic Army and that most of the operations involved provoking
the clans to act against the U.S. Gamal is unsure of any of the
specific assistance that may have been provided, i.e. money or
weapons.

      In 1992, BIN LADIN became interested in a different
type of Islamic jurisprudence, and became a believer in the Al
Daheri or "apparent" jurisprudence. An example of this type of
interpretation would be that according to the prophet Mohammad,
the Jewish people broke an agreement he had with them. Due to
this breach of the agreement Mohammad stated that there should be
no other religions in the Arab desert. As a result of this
statement by Muhammad, it is "apparent" that the Americans must
be removed from Saudi Arabia.

      Gamal was shown various photos numbered 1 - 77 (see
attached list). Gamal identified the individual in photo number 3
(WALI KHAN AMIN SHAH AKA OSAMA ASMURAI) as OSAMA ASMURAI. Gamal
stated that he met ASMURAI in Afghanistan and worked with him in
Jalalabad for about four months. ASMURAI, who was on the front,
would contact Gamal regarding the needs of the forces on the
front. Gamal would then send the request to BIN LADIN. Gamal
stated that when ASMURAI came to the Sudan, BIN LADIN sent him to

SNY101-0028

FD-302a (Rev. 11-15-83)

**PARTICULARLY
SENSITIVE**

Continuation of FD-302 of  GAMAL _____ , On   11/8/96  , Page   6

the Philippines to set up new camps. ASMURAI also worked on the
border of Afghanistan and Tajikistan, and he worked very closely
with BIN LADIN. Gamal's relative MOHAMMED NAFI AL SOLIMAN told
him that ASMURAI had been living at a guest house near Peshawar.
Gamal stated that ASMURAI is missing fingers on one of his hands.

Gamal explained that he became the intermediary between
ASMURAI and BIN LADIN as a result of the tasking by ABU TURAB AL
LIBY. At the Jaura camp, ABU MUSAB AL SAUDI was in charge of the
Islamic legal teaching in that area and he had Gamal teach a
legal session in 1989. Gamal had received such legal training
from MUSAB, who had a close relationship to LIBY.

Gamal stated that heard that ASMURAI was trying to
carry out an operation recently that failed, and some of
ASMURAI's people were arrested sometime in 1994. Gamal stated
that if ASMURAI was carrying out an operation, BIN LADIN must
have given him permission. Gamal stated that in 1993, one AHMED
AL RAHMAN met with ASMURAI, but he thinks that RAHMAN is
currently in jail in Lahore, Pakistan.

Gamal advised that he may have seen the person in photo
number 4 (CARL TAYLOR AKA ABU UBAIDAH) in the United States, but
he is not certain. Gamal identified photo number 26 (SHEIK OMAR
ABDEL RAHMAN) as SHEIK RAHMAN. Gamal stated that photo 27 (AMIR
ABDELGHANI) looked familiar and believes this person was a member
of SHEIK RAHMAN's group. Gamal could not remember the name of
Photo number 30 (CLEMENT HAMPTON-EL), but stated that this looked
like a black American he had met, and that this individual
accompanied TEHAR in Afghanistan. Photo number 31 (SAYFULLAH
MCNEIL) might be a member of TEHAR's group. Gamal identified
photo number 33 (EPHRON GILMORE AKA ) as TEHAR .

Gamal identified two individuals in photo number 76.
Gamal identified AHMAD ABID AL RAHMAN, AKA ABU MUAZ, a Sudanese,
as a member of the Islamic Army, who in 1993 was sent to
Afghanistan to penetrate the group of ABU HAMZA AL LIBI, who
broke with BIN LADIN in 1991. MUAZ was also responsible for a
battalion in Kashmir. Gamal also identified MUTAWAKIL, a Saudi,
as a member of the Islamic Army who was an Emir in Jalalabad in
Afghanistan. Gamal believes that he went to the Sudan in 1993 or
1994.

Gamal advised that the head of the International
Islamic Relief Organization (IIRO) in Peshawar is ABU HAMMAM.
HAMMAM is the manager in Peshawar. HAMMAM is from Jeddah, Saudi

FD-302a (Rev. 11-15-83)

**PARTICULARLY
SENSITIVE**

Continuation of FD-302 of __GAMAL__ _____ , On __11/8/96__ , Page __7__

Arabia, but was born in Aden, Yemen. HAMMAM is about 45 years old and is light skinned, average height and sometimes wears a light beard. He is unaware if HAMMAM is related to BIN LADIN, but believes that HAMMAM and ASMURAI are good friends.

Gamal stated that ABU ANIS, ABU HAMMAM, HASSAN AL MADANI, ABU HARON, and ABU RIDA, established the BIN LADIN company Wadi Al Aqiq. Gamal describes ABU ANIS as about 5'10", white, medium build, round face, speaks with a Saudi accent, and believes he fought in Afghanistan.

Prior to 1992, according to Gamal, BIN LADIN and HAMMAM were close. In 1992, when BIN LADIN started to create various cells, the rumor was that HAMMAM was no longer good friends with BIN LADIN. It is Gamal's belief that the rumor was sent out intentionally as disinformation, and that the relationship as between HAMMAM and BIN LADIN always remained good. The last time Gamal saw HAMMAM was in 1992 when HAMMAM and ANIS were sent on a mission, to which Gamal does not know the details. Gamal stated that the relationship between HAMMAM and BIN LADIN was so good that HAMMAM, which is a nickname, had the green light to make deals for BIN LADIN. Gamal does not know HAMMAM's real name. Gamal advised that he heard that HAMMAM had gone to the Philippines but he isn't certain of the information. HAMMAM also had a good relationship with many Non Governmental Organizations (NGO's), and would provide false IIRO identifications for people to travel. Gamal had heard that HAMMAM was in Bosnia in 1993. Gamal described HAMMAM as a facilitator, not an operations person, and that he would contribute funds or contacts to an operation.

Gamal stated that another good friend of HAMMAM was ADEL AL BITAL, a very rich Saudi. BITAL owns a relief organization and also has a good relationship with BIN LADIN. Gamal stated that HAMMAM may have gone to the U.S. in connection with his work with the relief organizations. HAMMAM also worked on outside business of BIN LADIN. HAMMAM, who was involved with the Al-Aqiq Company, had some dealing with a company called Premium. The Premium company dealt in sunflower seeds, and HAMMAM was going to try and market these seeds overseas.

Gamal advised that the BIN LADIN person in charge in Zagreb, Bosnia was AL FATEH ABU HASSANEN. The person running the office in Zagreb was ADEL AL BITAL. Gamal stated that he was surprised that HASSANEN was in Zagreb because he usually runs the relief organization in Vienna. Gamal believes that HASSANEN's office received money from the U.S.

SNY101-0030

FD-302a (Rev. 11-15-83)

**PARTICULARLY
SENSITIVE**

Continuation of FD-302 of  GAMAL _____ , On  11/8/96  , Page  8

    Gamal stated that BIN LADIN wanted an Islamic state in Bosnia, but believed that it would never happen in Europe. BIN LADIN believes that European Muslims are different, and that Western nations would never permit such an Islamic state to be formed in Bosnia. Gamal believes that BIN LADIN sent TAHER to Bosnia to report on the situation.

    Gamal does not know the relatives of BIN LADIN, and would never ask about any females in the family, as this is not done in the Muslim culture. Gamal does not know the name MOHAMMAD Gamal KHALIFAH, but stated that he knows of ABU BARA. Gamal says that ABU BARA is close to BIN LADIN, and that Gamal met him in the Sudan in 1993. Gamal described ABU BARA as 36-40 years old and of medium height, with prior military experience. Gamal stated that HAMMAM, BARA and BIN LADIN are part of the group the has been around along time.

    Gamal stated that he knows of a business in Malaysia run by ABU HAJIR AKA MANDOUR SALIM, that deals mostly in palm oil. SALIM is a member of the AL-Shurrah Council and is very close to BIN LADIN. He was told by MADANI AL TAYYIB that SALIM goes to Malaysia very often, and that BIN LADIN launders money through HAJIR. Gamal stated that SAID BIN LADIN, who could be a brother or uncle of BIN LADIN, is the father in law of TAYYIB. Gamal stated that TAYYIB has a relative who is an engineer for Saudi Airlines named ABU ABDEL AZIZ.

    Gamal advised that a ABU AKRUM (Jordanian) owns a farm in Jordan. Members of the AL Shurrah Council would go there for meetings.

    As for the Meir Kahane Murder, Gamal said that he heard that Kahane was killed by an Egyptian named NOSAIR, whom Gamal never met. Gamal stated that incidents like the Kahane murder were discussed within the community. Gamal stated that the talk at the time was that the killing was done by the Islamic Army of BIN LADIN. Gamal advised that he did not think NOSAIR was not part of SHEIK RAHMAN's battalion but that he was motivated to do it by the RAHMAN cell. Gamal believes that the group in New York took the responsibility upon themselves.

    Gamal had met on an occasion an individual named ABDELLAH HAMED YOUSEF, who said he was in charge of the Qatari Welfare Organization in Sudan. YOUSEF told Gamal that he was associated with ABU YASSER, the Egyptian, who was in charge of operations. Gamal stated that YASSER wanted to get people visas to the U.S. through YOUSEF.

SNY101-0031

FD-302a (Rev. 11-15-83)

**PARTICULARLY
SENSITIVE**

Continuation of FD-302 of  GAMAL _____ , On  11/8/96  , Page  9

Gamal said that on Thursday afternoons, Islamic Army
personnel would meet at BIN LADIN's Soba farm. The farm is
located outside Khartoum, about 2 miles from the hospital, near a
soap factory. People would come to discuss the latest news, have
general discussions and reinforce relationships.

Gamal stated that an ABU MAHMOUD AL MASRI travels in
and out of the U.S., and that he is an explosives specialist.
Gamal stated that when he previously heard that MASRI was in the
U.S., he assumed that he would organize there, but has not heard
about him since.

Gamal stated that when he was in Afghanistan there was
an organization called Al Qaida or "The Base". This organization
would train people, and the Emir would select certain individuals
based on their skills to participate in certain assignments.
There was a written contract made between the Emir and the person
being trained, and the contract would then be sworn to by putting
your hand on the Koran. The objectives and duties of The Base
were written within the contract, as well as the rules and
regulations. At the end of the contract there was a statement
that loyalties were to the Emir, as well as the leader BIN LADIN,
and the rules and regulations must be followed whether they like
it or not. Gamal stated that the contract was kept at Al Qaida.

Gamal advised that when he went to the Sudan, there was
a new contract that needed to be signed for the Islamic Army,
that was more detailed and comprehensive. Gamal stated that
HASSAN AL MEDINI was a member of the file committee and that each
persons file would contain the contract, credentials, mission,
heath, notes, etc. Gamal stated that his file number was A128.

The individuals involved in writing the contract were
SA-AD AL SHERIF, ABU AL FARAJ AL YEMENI, and ABU RAWHA (deputy of
SALMAN AL AUDA, who is in a Saudi prison). The contract would be
signed and the fingerprint of the signer would be placed on the
document. Gamal stated that the Islamic Army was very concerned
with infiltrators and believed that the contractual process would
help uncover such people.

The Al Qaida period in Afghanistan was considered phase
one, and phase two began in the Sudan in 1991. One of the
individuals involved in the discussions regarding phase two was
ABDUL MAJID ZINDANI. Gamal explained that Qaida was not a
physical place, it was just in the mind.

FD-302a (Rev. 11-15-83)

PARTICULARLY
SENSITIVE

Continuation of FD-302 of  GAMAL _____ . On __11/8/96__ . Page __10__

     Gamal mentioned that the war in Afghanistan did not accomplish the goal of the Islamic Army since it was not an ideal Islamic state. Since this goal was not attained in Afghanistan, the Islamic Army began looking for different places where such an Islamic State could exist.

     Gamal stated that BIN LADIN's assistance in Afghanistan was generally financial and that during the war many donations, including one from a very rich Saudi whose name he does not know, was sent to the IRO run by ABU HAMMAM. Gamal believes that all of the money was not spent in Afghanistan, and that BIN LADIN most likely used some of the funds for other Arab causes.

     Gamal has no knowledge of BIN LADIN receiving money from the U.S. government, but advised that money was received by donations from U.S. citizens, through groups like the one run by SHALABI. Gamal stated that the weapons they received came from Pakistan, not directly from the U.S. government. There was one occasion when they received some mortar pipes that were labeled from the U.S., but BIN LADIN believed that they were deliberately made defective because they kept falling apart. After that, BIN LADIN was very cautious as to American weapons. Gamal stated that he witnessed BIN LADIN dealing with a Pakistani Army middle man, and that he does not believe that BIN LADIN ever dealt directly with the Americans.

     Gamal stated that when BIN LADIN left Afghanistan for the Sudan in the spring of 1991, he travelled through Saudi Arabia first. When in Saudi, BIN LADIN was forbidden to travel. There were Islamic jurists in Saudi that stepped in on BIN LADIN's behalf, in order to convince the King to permit BIN LADIN to travel. BIN LADIN was not in jail, but his movement was restricted. When he was permitted to leave Saudi, he travelled back to Afghanistan. He soon became aware, through ABU UBAIDA AL BANSHIRI, of an assignation plot against him in Peshawar. At this point ABU HAMMAN arranged through the family of ABDUL LATIF AL JAMIL, to get a private plane for BIN LADIN to travel to the Sudan. Gamal states that ABU RIDA AL TUNISE and ABDU AL MUKHLAFI travelled with BIN LADIN to the SUDAN, and that Pakistani intelligence assisted BIN LADIN in his travel out of Pakistan.

     Gamal stated that BIN LADIN, while he was in Afghanistan, had mostly Egyptian bodyguards, but in the Sudan they were Yemeni. Two of his bodyguards were ABU KATADA UGANDA, a former member of IDI AMIN's security, and ABU OMAR ASWANI.

SNY101-0033

FD-302a (Rev. 11-15-83)

**PARTICULARLY
SENSITIVE**

Continuation of FD-302 of  GAMAL                                          . On   11/8/96   . Page   11

       When he arrived in Afghanistan, Gamal became a member
of Al Qaida. Gamal explained that when he left the U.S. in 1988,
he first went to the Services Office and then to the Khalid Bin
Al Waleed camp. The Emir of this camp was a Palestinian named ABU
AL SHAHEED AL PALASTINI. They do a day of screening at this camp
to better understand the backgrounds of the new arrivals. After
attending the Waleed camp, Gamal went to Teri Mingle village on
the Pakistan-Afghanistan border, this was an area under the
control of BIN LADIN. After a few months at the camps, Gamal
stated that he realized he was part of BIN LADIN's group.

       Gamal explained that during his time in the Sudan he
worked closely with MADANI AL TAYYIB. TAYYIB was involved with
finances in and out of the Sudan. TAYYIB and Gamal would
establish various companies and help recruit staff members for
the companies. Gamal stated that at times he acted as a middleman
between the National Islamic Front (NIF) and BIN LADIN. Gamal
stated that he was jailed for a couple of months one time but BIN
LADIN arranged for his release which was conditioned on his
contractual promise he would not work against the (NIF). Gamal
explained that when he was in Afghanistan he spoke out against
the NIF, but that the relationship with the NIF improved. Gamal
believes that BIN LADIN has a very good relationship with the
NIF.

       Gamal stated that the NIF wanted information on BIN
LADIN because they felt that BIN LADIN never really told them of
all his plans. He told the NIF of BIN LADIN's thoughts of the
future, his plans and ideals. Gamal then worked with the NIF when
they asked BIN LADIN for assistance in establishing a security
system to screen out intelligence personnel.

       Gamal stated that he became close to BIN LADIN, and at
times he stayed at BIN LADIN's guest house. It was through his
excellent relationship with TAYYIB that he became closer to BIN
LADIN. Gamal stated that he lived in the guest house for about 5
months after his return from Afghanistan. The guest house was
described as about 20 meters from BIN LADIN's house, three
stories high, containing about 15 rooms. Gamal stated that the
house is well protected by guards. Others who stayed in the guest
house include aides, guards, high commanders, and the big bosses
such as BANSHIRI, HAFS, and ASWAN. No cars except those belonging
to BIN LADIN are allowed in the compound.

       Gamal described BIN LADIN's day as prayers at 4:30 am,
when they all pray together at the guest house. BIN LADIN then
returns to his house and usually starts his day of work around

FD-302a (Rev. 11-15-83)

# PARTICULARLY
## SENSITIVE

Continuation of FD-302 of  GAMAL _____ , On ___11/8/96___ , Page ___12___

9:00 am. His day would consist of going to the various companies, or having meetings with regard to his companies or the Islamic Army.

Gamal stated that after he left the U.S., he spent a lot of time in the camps, and received some legal teaching from ABU MUSAB AL SAUDI. Gamal came from a rich family, and Gamal's father was a member of the National Party in the Sudan. Since his family had money and Gamal was going against his father's National Party, BIN LADIN trusted Gamal. Gamal explained that after some time he became somewhat disenchanted since he was never compensated for the things he did for BIN LADIN. Gamal stated that while he believed that others around him were compensated, he received nothing. As a result, Gamal admitted that he began to work for himself on the side, without the knowledge of BIN LADIN. Gamal embezzled money from BIN LADIN companies because he believed he had a right to do so. Gamal stated that when they found out, it was a big problem for him, so he left the Sudan without informing anyone.

Gamal stated that a NIF man, ABDEL AL SAAM SULIMAN SA-AD is head of the Dawa organization in the Sudan. His assistant was SHARIF AL DIN ALI MUHKTAR. These individuals helped BIN LADIN with the logistics of newcomers when they first went to the Sudan. At this time BIN LADIN began to establish companies, purchased a camp outside of Khartoum, and bought the Soba farm. BIN LADIN contracted with the NIF to build a road to support the war in the Sudan. Before BIN LADIN went to the Sudan, ABU HAMMAN was sent to find out some of the needs of the NIF. In one instance, BIN LADIN paid for 15 million dollars worth of weapons from the Chinese, of which BIN LADIN was able to keep a small portion.

Once established in the Sudan, there were many meetings and talk was of uniting people and improving the way of life for all Muslims. BIN LADIN said that they had to find a common objective and unite because the enemy was united. BIN LADIN stated that there were two enemies, one being Arab countries not living under Islamic law, and other countries preventing "us" from becoming an Islamic state. BIN LADIN complained that Arab wealth was not distributed for Muslims, but was kept in western banks. BIN LADIN also declared that economics is important, not only weapons and military power.

Gamal stated that by the beginning of 1992, all the basic rules for the Islamic Army were in place. At this time a fatwa was issued by the Islamic Army declaring that all foreign

SNY101-0035

FD-302a (Rev. 11-15-83)                    **PARTICULARLY**
                                           **SENSITIVE**


Continuation of FD-302 of __GAMAL__ _____ , On · 11/8/96 . Page __13__

forces must be fought, especially in Saudi and the Gulf. The
presence of forces in Mecca and Medina legitimized the fatwa. The
fatwa indicated that it was necessary to strike at American
forces because the American forces were like the "head of the
snake" If the Americans changed their policy and left, other
countries would follow. Gamal learned of this fatwa in a
pamphlet. The legal council distributed this pamphlet, its
contents based on the fatwa that was issued by the Al-Shurrah
Council.

     Gamal stated that BIN LADIN would usually speak about
the fatwas in general terms. After this fatwa was issued, BIN
LADIN sent a pamphlet and a cassette tape to the Saudi's urging
them to boycott all American products.

     Gamal explained that the beliefs of BIN LADIN were very
influential to the Al-Shurrah Council. BIN LADIN could not issue
a fatwa without the Council because he is not an Islamic jurist.

     Gamal advised that BIN LADIN wanted to strike against
the imperial powers in the Gulf. He never heard BIN LADIN speak
of the Americans, or of attacking Americans or American
interests, when he was in Afghanistan. The first time BIN LADIN
spoke of Americans was when they were in the Sudan. Gamal had
heard that BIN LADIN spoke about how the U.S. forces were
supposed to leave Saudi Arabia after the war with Iraq, but they
broke their agreement and will never leave unless they are
confronted with force.

     With regard to the Shiites and the Iranians, Gamal
stated that it was the work of HASSAN TURABI, not BIN LADIN, to
coordinate between the Shiite and Sunni. Gamal does not believe
BIN LADIN ever negotiated a deal with the Iranians. Gamal advised
that a Shiite from Iran by the name of NOMANI was in Khartoum.
Gamal contends that NIF was very effective in dealing with then
Shiites. USAMA BIN LADIN thought that the Shiites could be
helpful when it came to military matters. Gamal advised that
there were some defections from the Islamic Army because some
people did not like making agreements with the Shiites. In the
beginning of 1993, the relationship between the Shiites
(Hezballah) and BIN LADIN became very good. Gamal stated that
when BIN LADIN was questioned about agreements with the Shiites,
he responded by saying that our biggest enemy is ourselves, that
all Muslims must unite and defend ourselves. In the spring of
1993, Gamal had heard that BIN LADIN had been working with the
Shiites for about 6-7 months. Gamal advised that he heard that in
1993 some BIN LADIN people, ABU HAJIR, ABU AYOB AL IRAQI, ABU

SNY101-0036

FD-302a (Rev. 11-15-83)

**PARTICULARLY
SENSITIVE**

Continuation of FD-302 of ___GAMAL_____ , On ___11/8/96___ , Page ___14___

BANSHIRI, ASOURI ABU RIDA, all went to Iran. Gamal also heard
that in 1993, about 8 people went to south Lebanon to train and
obtain skills that the Islamic Army did not have.

Gamal stated that the Al-Shurrah Council consists of
five people; SHARIF, IBRAHIM AL IRAQI, ABU HAJIR, ABU HAFS AL
MURITARI, and DR. FADLE and they establish a fatwa, while the
military committee, run by BIN LADIN and BANSHIRI, execute the
fatwas.

Gamal explained that he is aware of five fatwas issued
by the Al Shurrah Council. The first one he learned about by
reading a pamphlet that was distributed regarding the fatwa. This
was in the beginning of 1992, right after BIN LADIN got to the
Sudan. This fatwa was against Americans in Saudi Arabia and the
Gulf. Gamal stated that he also attended a lecture by ABU HAJJER
where the presence of Americans in Saudi was discussed in its
legal sense. HAJIR was saying that the Americans had no
legitimate right to be in Saudi. Gamal stated that BIN LADIN was
at the lecture, and answered some questions at its conclusion.

The second fatwa that Gamal recalls was issued against
President George Bush. The fatwa was issued because it was
believed that Pres. Bush was responsible for the situation in the
Gulf, and the American presence in Saudi. This was issued after
the Gulf War. Gamal explained that TAYYIB told him of the Fatwa
and he never attended a lecture or read a pamphlet with regard to
this fatwa.

The third fatwa was issued around the time of Operation
Hope. This fatwa was for the expulsion of U.S. forces from the
horn of Africa. Gamal stated that this was aimed at Somalia
because it was feared that the Americans in Somalia could affect
the whole area. Gamal did see a pamphlet on this fatwa, and
explained that the pamphlets are not signed. Gamal said that he
attended lectures on this fatwa by ABU TALHAR AL SUDANI. Gamal
also explained that ABU HAFS told him what was occurring in
Somalia because HAFS spent time there. Gamal heard BIN LADIN
speak about Somalia as he was giving a pep talk to some people
that were being sent there. This occurred in the guest house at
the farm. BIN LADIN argued that he predicted that the Americans
would not leave Saudi Arabia and the fact that the Americans
stayed in Saudi Arabia is proof that they will never leave
Somalia once they are entrenched. Gamal stated that he heard BIN
LADIN claim that it would be easier to expel the Americans from
Somalia, and that it needed to be done immediately.

PARTICULARLY
SENSITIVE

FD-302a (Rev. 11-15-83)

Continuation of FD-302 of __GAMAL__ _____ , On __11/8/96__ , Page __15__

      Gamal stated that the fourth fatwa may have been issued around the summer of 1992, but he is not certain. This fatwa was against the American forces only, in Saudi Arabia. Gamal was provided a pamphlet of this fatwa from HASSAN AL MEDINI, who is part of the information office. Gamal stated that there were many lectures, and much discussion regarding this fatwa. He heard talks by ABU HAFS and ABU IBRAHIM AL IRAQI, which centered around the justification of this fatwa in the Koran. The legal issues were discussed, with citations from the Koran. Gamal stated that some people felt that a fatwa against the Americans would bring too much trouble. Gamal heard BIN LADIN answer questions regarding this fatwa on one occasion. USAMA BEN LADIN was questioned that with all the work going on around the world, i.e. the Philippines, Somalia, Algeria, how would it be possible to conduct a fatwa against the Americans. BIN LADIN replied that the Saudi people can conduct the fatwa, but they will need assistance from outside Saudia Arabia. Gamal stated that BIN LADIN spoke in general terms, not in specifics.

      Gamal stated that he heard at some point about the possibility of the U.S. Embassy or U.S. Club being a target of a future attack, but he never heard much about it. There was a general discussion about the legality of attacking the Embassy or Club where innocent people, even Muslims, could be killed. It was explained that the fact that a Muslim would work with the Americans shows that the Muslim is a collaborator and it would be acceptable if they should die in an operation.

      Gamal stated that ABU BARA told him, and others, that it was necessary to evaluate military operations. This discussion was subsequent to the Riyadh bombing. BARA was saying that if you react too fast, it would lead to unsuccessful results. BARA stated that an operation should be conducted every five to six months.

      Gamal explained that the fifth fatwa he heard from his cousin NAFI. This fatwa was issued in late 1995 and was against American military personnel and U.S. government employees. Gamal said that at the time he heard of this fatwa, he was already involved in his dispute with BIN LADIN. Gamal said he never heard BIN LADIN speak of this fatwa, but he did hear MOHAMMAD ABU OBAIDA speak on the topic. Gamal said that he left the Sudan in February 1996, and believes that he heard of the fatwa in November or December 1995.

      Gamal advised of an additional fatwa that was issued in 1992. This fatwa was not against the U.S., but said that Islamic

FD-302a (Rev. 11-15-83)

**PARTICULARLY
SENSITIVE**

Continuation of FD-302 of __GAMAL_____ , On __11/8/96__ , Page __16__

countries should stop their cooperation with the United Nations.
Gamal said he heard ABU HAJIR speak of this. It was never clear
to Gamal that this was an Islamic Army fatwa, but that HAJJER
advised that it is against Islamic law for Islamic countries to
be members of the United Nations.

Gamal advised that he believes that the Riyadh bombing
was an Islamic Army operation, and his cousin NAFI told him that
it was an Islamic Army act, although he never heard BIN LADIN
speak directly about Riyadh. Gamal advised that TAYYIB told a
group of about twenty people that the Saudi government had no
evidence on HADI AL DOUSARI, who had been arrested in Saudi for
the Riyadh bombing. DOUSARI was also arrested once before in
Saudi Arabia. Gamal was told by HAMZA AL SUDANI that AL DOUSARI
is the Emir of an Islamic Army cell in the central region of
Saudi Arabia. Gamal stated that AL HAMZA was arrested in Saudi in
late 1995 but was later let go, so he fled to the Sudan. Gamal
heard that four people were arrested for the bombing in Riyadh,
but he did not recognize who they were.

Gamal advised that a AL KHALIFAH AL OMANI told him that
our people were involved in the World Trade Center bombing. Gamal
advised that he was surprised to hear that because he never heard
of a fatwa on that topic. Gamal stated that AL KHALIFAH AL OMANI
was in Afghanistan until 1990, at which time he travelled to the
Sudan. Gamal stated that OMANI travelled a lot since he was in
charge of the Gulf region.

In addition, the Islamic Army was involved in Somalia,
and if the Americans did not pull out, the Islamic Army was
prepared to stay. Gamal advised that there is a Yemen cell of the
Islamic Army called the South Islamic Sword. Members of this
group include SAIE AL ISLAM AL JANUBI (Emir), AL MUTHANA AL
HAITH, ISLAM YASLIM YAMAN AKA ABU GHAZWAN. Gamal heard of an
operation by this cell in Yemen, either in Sana or Aden. Gamal
stated that he heard of this when he was already in conflict with
BIN LADIN. The operation had something to do with a hotel, and
YAMAN told him that the operation was successful and that the
cell did a good job.

**PARTICULARLY
SENSITIVE**

Photofraphs for Display

```
#1 : AHMED AJAJ
#2 : SATTAR EL KADOMEY
#3 : WALI KHAN AMIN SHAH
#4 : CARL TAYLOR (AKA ABU UBAIDAH)
#5 : KHALID IBRAHIM
#6 : KHALID SHEIKH MOHAMMAD (W/O BEARD)
#7 : ABDUL HAKIM MURAD
#8 : WALI KHAN AMIN SHAH
#9 : RAYMOND MURTEZA
#10: MOHAMMED A SALEH
#11: ABDUL RAHMAN YASIN
#12: MUSAB YASIN
#13: AHMED YOUSEF
#14: SIRAJE YOUSEF
#15: ABDOU WALY ZINDANI
#16: MUSTAFA ELNORE (AKA MUSTAFA SAIF)
#17: TAREK KHATTERIA
#18: HUSSEIN SAAFAN
#19: BILAL ALKAISI (AKA ABU ANIS)
#20: NIDAL AYYAD
#21: MOHAMMED ABOUHALIMA
#22: SALIHOU DJABI
#23: RAMZI YOUSEF
#24: MOHAMED HUSSEIN
#25: EL SAYYID NOSAIR
#26: SHEIK OMAR ABDEL RAHMAN
#27: AMIR ABDELGHANI
#28: SIDDIG IBRAHIM SIDDIG ALI
#29: IBRAHIM EL GABROWNY
#30: CLEMENT HAMPTON EL (AKA DR RASHID)
#31: SAYFULLAH MCNEIL
#32: LIN ZAO (ABDUL)
#33: EPHRON GILMORE (AKA TEHAR / ABU KHITEL)
#34: ALI MOHAMED
#35: QUAZI HAQUE
#36: MOHAMMAD ABDEL FAHIM
#37: JUTLAND
#38: JUTLAND
#39: ABDULLAH ALI (AKA MIGEUL MEJIA)
#40: HANIFE MUHAMMAD
#41: OTHMAN ABDULLAH
#42: LAWRENCE EL KHIDR
#43: YAHYA ABDUL RAHIM
#44: ALAMIN LATIF
#45: ASIM MUHAMMAD (AKA ULYSSES FOSTER)
#46: ALI ABD KARIM (AKA VERNON LEWIS)
#47: MAHMUD ABOUHALIMA
#48: JOHN MISHOE (AKA YAYA)
#49: NASRELDIN MOHAMED AHMED
#50: MUSTAFA ASSAD MUHAMMAD (AKA JOHN RODRIGUEZ)
#51: MOHAMMAD HASSAN ABDOU
```

SNY101-0040

**PARTICULARLY**
**SENSITIVE**

```
#52: ALI EL SHINAWY
#53: SHAWKUT WEHIDY
#54: MOHAMMED SAIFUDEEN
#55: NASSER AHMED
#56: JAMIL ALAMIN (AKA H RAPP BROWN)
#57: SUBHI ELDER
#58: AHMED kATTERIA
#59: MUSTAFA SHAKABIE
#60: SIRAJ WAHHAJ
#61: TARIG EL HASSAN
#62: FARES KHALLA FALLA
#63: FADIL ABDELGHANI
#64: MOHAMMED SALAMEH
#65: KHALID SHEIKH MOHAMMED (WITH BEARD)
#66: ALMOUDI
#67: IBRAHIM AHMAD SULIMAN
#68: 3 MEN (ABU HAFS ON RIGHT)
#69: MOHAMMAD JAMAL KHALIFAH
#70: MOHAMMED AMEIN
#71: HABIB
#72: NONEEM
#73: ABDUL SHAKOOR
#74: NFI SITTING ON FLOOR
#75: NFI
#76: 11 MALES WITH GUNS
#77: EYAD ISMOIL NAJIM
```

SNY101-0041

# <u>Exhibit N</u>

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case |

*This document relates to:*

*Federal Insurance Co. v. al Qaida,* Case No. 03-CV-6978 (RCC) (S.D.N.Y.)
*Kathleen Ashton  v. Al Qaeda Islamic Army,* Case No. 02-CV-6977 (RCC) (S.D.N.Y.)
*Thomas E. Burnett, Sr. v. Al Baraka Investment & Development Corp.,* Case No. 03-CV-9849
(RCC) (S.D.N.Y.)
*Estate of John P. O'Neill, Sr. v. Al Baraka Investment and Development Corp.,* Case No. 04-CV-
1923 (S.D.N.Y.)

## PLAINTIFFS' SECOND SET OF SUPPLEMENTAL REQUESTS FOR PRODUCTION OF DOCUMENTS DIRECTED TO THE INTERNATIONAL ISLAMIC RELIEF ORGANIZATION

COZEN O'CONNOR
1900 Market Street
Philadelphia, PA  19103
Phone:  (215) 665-2000

### PLAINTIFFS' SECOND SET OF SUPPLEMENTAL REQUESTS FOR PRODUCTION OF DOCUMENTS DIRECTED TO THE INTERNATIONAL ISLAMIC RELIEF ORGANIZATION

Plaintiffs in <u>Federal Insurance Co. v. al Qaida</u>, Case No. 03-CV-6978 (RCC), <u>Kathleen Ashton v. al Qaeda Islamic Army</u>, Case No. 02-CV-6977 (RCC), <u>Thomas E. Burnett, Sr. v. Al Baraka Inv. & Dev. Corp.</u>, Case No. 03-CV-9849 (RCC), and <u>Estate of John P. O'Neill, Sr. v. Al Baraka Investment and Development Corp.</u>, Case No. 04-CV-1923 (S.D.N.Y.) (collectively "Plaintiffs"), propound and serve on the International Islamic Relief Organization, (hereinafter "IIRO" or "Defendant") the following Second Set of Supplemental Requests for Production of Documents to be answered fully and under oath, pursuant to Rule 34 of the Federal Rules of Civil Procedure, within 30 days of their receipt.

The "Instructions" and "Definitions" set forth in the Plaintiffs' First Set of Requests for Production of Documents Directed to the International Islamic Relief Organization are incorporated herein by reference, except that the following definition shall also apply:

1. The term "deviant activity" shall mean and refer to any activity related to or associated with deviant ideologies, deviant thinking or deviant interpretations of Islam. The terms "deviant ideologies," "deviant thinking," and "deviant interpretations of Islam" shall have the same meanings as when used by authorities of the government of the Kingdom of Saudi Arabia and/or Saudi religious authorities. See *Interior Minister Urges Imams to Confront Deviant Ideologies*, June 21, 2007, Website of the Royal Embassy of Saudi Arabia, Washington, D.C., http://www.saudiembassy.net/2007News/News/NewsDetail.asp?cIndex+7240; *Mosque Council Urges Confrontation of Deviant Thinking*, September 1, 2003, Website of the Royal Embassy of Saudi Arabia, Washington, D.C., http://www.saudiembassy.net/2003News/News/IslDetail.asp?cIndex=762.

2

## PLAINTIFFS' SECOND SET OF SUPPLEMENTAL REQUESTS FOR PRODUCTION OF DOCUMENTS DIRECTED TO THE INTERNATIONAL ISLAMIC RELIEF ORGANIZATION

1.     Please provide any and all documents relating to the United States Treasury Department's investigation and August 3, 2006 designations of the IIRO's Philippine and Indonesian branch offices and Abd al Hamid Sulaiman al Mujil, the IIRO's Executive Director of the Eastern Province Branch (hereinafter, collectively referred to as the "IIRO Designees"), "for facilitating fundraising for al Qaida and affiliated terrorist groups." Such documents shall include, but are not limited to, any and all documents identifying all accounts, assets, and monies that were seized and/or frozen following the August 3, 2006 designations.

**ANSWER:**

2.     Please provide any and all documents relating to any investigations or inquiries conducted by the United Nations relating to allegations of the IIRO Designees' ties to terrorism, including without limitation, any and all documents relating to the U.N. Security Council Sanctions Committee's designations, dated August 4, 2006 and November 9, 2006, identifying the IIRO Designees as entities and individuals "belonging to or associated with the Al-Qaida organization." Such documents shall include, but are not limited to, any and all documents identifying all accounts, assets, and monies that were seized and/or frozen following the designations.

**ANSWER:**

3

3.     Please provide any and all documents relating to any investigations or inquiries conducted by the Republic of the Philippines and the Republic of Indonesia relating to allegations of the IIRO Designees' ties to terrorism, including without limitation, all documents identifying any and all accounts, assets, and/or monies seized and/or frozen by those governments.

**ANSWER:**

4.     Please provide any and all documents relating to IIRO Account Nos. 0200100100000011145671 and 0200200100000012000472, held at the Bank of Philippine Islands ("BPI"). Such documents shall include, but are not limited to, correspondence, letters, memoranda, notes, and/or e-mails, that refer to, relate to, or reflect communications between or among the IIRO, the IIRO Designees and BPI, monthly account statements, annual account statements, account notices, deposits, withdrawals, deposit slips, check stubs, cleared or canceled checks, cashier checks, money orders, debit/credit memos, financial ledgers, journals, investment records, real estate records, records of assets, loan records, audit work papers, audit reports, wire transfers, and any documentation showing the source(s) and/or destination(s) of any funds deposited into or withdrawn from those accounts.

**ANSWER:**

5.     Please provide all documents relating to any designation, sanction or restriction imposed upon You and/or the IIRO Designees by any agency, department or instrumentality of the United States, United Nations, or any other nation or international body.

**ANSWER:**

 

6.      Please provide copies of any and all documents and things that have been seized by, or produced by You and/or the IIRO Designees to, any investigators, auditors, government officials or agencies, and/or international bodies concerning the IIRO Designees' alleged support for, or connections to, alleged terrorist, deviant or criminal organizations, groups, individuals, or activities.

**ANSWER:**

 

7.      Please provide any and all documents relating to any investigations or inquiries conducted by the Kingdom of Saudi Arabia relating to You and/or the IIRO Designees' ties to terrorism.

**ANSWER:**

 

8.      Please provide any and all documents relating to any sanctions or restrictions imposed upon You and/or the IIRO Designees by the Kingdom of Saudi Arabia.

**ANSWER:**

 

9.      Please provide any and all documents sent to, and/or received from, the Kingdom of Saudi Arabia, relating to any accusation that the IIRO Designees, or any individual or entity employed by and/or affiliated with the IIRO Designees, were associated with or involved in any

criminal, corrupt, deviant or extremist activity, including without limitation any terrorist or radical religious, political or social activities.

**ANSWER:**

10.     Please provide all documents relating to any and all information or notification You received that the IIRO Designees, or any individual or entity employed by and/or affiliated with the IIRO Designees, were associated with or involved in: (i) the sponsorship of any radical, extremist, or terrorist organization; (ii) criminal, corrupt or deviant activities; or (iii) any military, radical or terrorist activity, plot, or attack.

**ANSWER:**

11.     Please provide all documents relating to any and all information or notification You received that the IIRO Designees, or any individual or entity employed by and/or affiliated with the IIRO Designees, may have been or were diverting funds or otherwise providing material support or resources to the Abu Sayyaf Group and Jemaah Islamiyah.

**ANSWER:**

12.     Please provide all documents relating to any and all information or notification You received that the IIRO Designees, or any individual or entity employed by and/or affiliated with the IIRO Designees, may have been or were diverting funds or otherwise providing material support or resources to: (i) Islamic radicals, fundamentalists, extremists or persons or

6

organizations associated with international terrorism or domestic terrorism; and/or (ii) al Qaida, other terrorist organizations and/or individuals sympathetic to al Qaida, or other terrorist organizations, regardless of whether you believe such person(s) or entity(s) was acting within the scope of his employment in relation to any such activities.

**ANSWER:**


13.     Please provide any and all documents relating to any internal investigations conducted by You, relating to any accusation that the IIRO Designees, including any individual or entity employed by and/or affiliated with the IIRO Designees, were associated with or involved in any criminal, corrupt, deviant or extremist activity, including without limitation any terrorist or radical religious, political or social activities.

**ANSWER:**


14.     Please provide all documents relating to any disciplinary action taken by You, or any decision to terminate any relationship with the IIRO Designees, or any individual or entity employed by and/or affiliated with the IIRO Designees, as a result of financial irregularities, suspicious activities, investigations into possible links to the financing of terrorist organizations, and/or the support of violence or jihad, including without limitation, any such individuals or entities identified in response to Requests #9-13.  In the event You have closed the IIRO branch offices in the Philippines and Indonesia, and/or terminated al Mujil from any and all positions he holds within the IIRO, please provide such documentation.

**ANSWER:**


7

15.   Please provide any and all documents relating to the IIRO Designees' role in providing material support or resources to al Qaida, the Abu Sayyaf Group, Jemaah Islamiyah, or other Islamic fighters in Indonesia, the Philippines, or elsewhere, including without limitation, the support of camps in and/or around those areas, recruitment, training, transportation, lodging, the acquisition, trafficking, and/or smuggling of weapons and arms such as rockets, mortars, rifles, dynamite and other bombs, and the provision of boots, tents, and uniforms.

**ANSWER:**


16.   Please provide any and all documents governing, describing, detailing, or otherwise relating to the relationship between the IIRO and Abd al Hamid Sulaiman al Mujil, including without limitation, all documents relating to al Mujil's appointment as IIRO's Executive Director of the IIRO Eastern Province Branch, and all other positions al Mujil has held and/or holds within the IIRO.  Such documents shall include, but are not limited to, copies of al Mujil's resumes, curriculum vitaes, biographies, abstracts, media reports, digests, publications, summaries, employment contracts, and/or outlines.

**ANSWER:**


17.   Please provide any and all documents relating to al Mujil's supervision, management, control of, or distribution of IIRO funds, including without limitation, all documents relating to al Mujil's duties and responsibilities to determine and/or make recommendations as to which charities, individuals, or entities should receive financial and/or

8

non-monetary support from the IIRO and the IIRO Eastern Province Branch, and the purpose for such disbursements.

**ANSWER:**


18.      Please provide any and all documents relating to the transfer of IIRO funds authorized by al Mujil and/or the IIRO Eastern Province Branch (and/or any IIRO official, employee, representative or agent working on al Mujil's or the IIRO Eastern Province Branch's behalf) for any IIRO branch office.

**ANSWER:**


19.      Please provide any and all documents governing, describing, detailing, or otherwise relating to the relationship between al Mujil and the Kingdom of Saudi Arabia, including without limitation, the following agencies of the KSA: the Supreme Council of Islamic Affairs, the Ministry for Islamic Affairs, Endowments, Dawa and Guidance, the Ministry of Foreign Affairs, Endowments, Dawa and Guidance, the Ministry of Defense and Aviation, Endowments, Dawa and Guidance, the Majlis al Shura (a/k/a the Shura Council), the Ministry of Education, and any embassy or consulate of the KSA.  Such documents shall include, but are not limited to, any official positions al Mujil held or holds within the government of the KSA.

**ANSWER:**

20.     Please provide any and all documents relating to any meeting al Mujil attended in his capacity as an official and/or representative of the IIRO with any official, representative, or agency of the KSA.

**ANSWER:**


21.     Please provide any and all documents relating to any investigation conducted by the IIRO into any alleged criminal, improper, unauthorized, deviant or terrorist activities of al Mujil, including but not limited to, al Mujil's ties to the following terrorists and terrorist organizations:  Osama Bin Laden, Abdullah Azzam, Khalid Sheikh Mohammad, Muhammad Jamal Khalifa, Abdurajak Janjalani, al Qaida, Abu Sayyaf Group, and Jemaah Islamiyah.

**ANSWER:**


22.     Please provide any and all documents governing, describing, detailing, or otherwise relating to the relationship between or among You, the IIRO Designees, and the following individuals:  Abd Al-Hadi Daguit and Mahmud Abd Al-Jalil Afif.  Such documents shall include, but are not limited to, any positions those individuals held or hold within the IIRO.

**ANSWER:**


23.     From the period beginning January 1990 through the present, please provide any and all documents identifying all individuals, both foreign and domestic, employed by the Philippine and Indonesian branch offices of the IIRO.  Such documents shall include, but are not

10

limited to, lists of all officers, directors, trustees, employees and agents, with dates of hire and termination, job title, job responsibilities, and place of employment.

**ANSWER:**

24.     From the period beginning January 1990 through the present, please provide any and all documents relating to any grants, loans and investments made by the Philippine and Indonesian branch offices of the IIRO. Such investments shall include, but are not limited to, real estate, real estate ventures, stocks, government bonds, corporate bonds, municipal bonds, cash investments, pooled investments, equity funds, mutual funds, hedge funds, money market securities, annuities, commodities, options, futures, collectibles, diamonds, gold, IRAs, and/or municipal debt instruments.

**ANSWER:**

25.     From the period beginning January 1990 through the present, please provide any and all documents detailing all contributions received and disbursements made by the Philippine and Indonesian branch offices of the IIRO.

**ANSWER:**

Respectfully submitted,

Dated: January 28, 2008

BY: _____/s/_____

    Stephen A. Cozen, Esq.
    Elliott R. Feldman, Esq.
    Sean P. Carter, Esq.
    J. Scott Tarbutton, Esq.
    1900 Market Street
    Philadelphia, PA 19103
    Tele: (215) 665-2000
    Fax: (215) 665-2013

    Attorneys for *Federal Insurance* Plaintiffs

    Ronald L. Motley, Esq. (RM-2730)
    Jodi Westbrook Flowers, Esq.
    Robert Haefele, Esq.
    MOTLEY RICE LLC
    28 Bridgeside Boulevard
    P.O. Box 1792
    Mount Pleasant, South Carolina 29465
    Telephone: (843) 216-9000

    Paul J. Hanly, Jr., Esq. (PH-5486)
    Jayne Conroy, Esq. (JC-8611)
    Andrea Bierstein, Esq. (AB-4618)
    HANLY CONROY BIERSTEIN &
      SHERIDAN, LLP
    415 Madison Avenue
    New York, NY 100 17-11 1 1
    Telephone: (212) 401-7600

    Attorneys for *Burnett* Plaintiffs

James P. Kreindler, Esq. (JK7084)
Andrew J. Maloney III, Esq. (AM8684)
KREINDLER & KREINDLER LLP
100 Park Avenue
New York, NY  10017-5590
(212) 687-8181

Attorneys for *Ashton* Plaintiffs


Jerry S. Goldman, Esq. (JG8445)
LAW OFFICES OF JERRY S. GOLDMAN
   AND ASSOCIATES, P.C.
111 Broadway, Suite 1305
New York, New York 10006
Tel.: (212) 242-2232
Fax: (212) 346-4665

Attorney for *O'Neill* Plaintiffs

13

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the Plaintiffs' Second Set of Supplemental Requests for Production of Documents Directed to the International Islamic Relief Organization was served via electronic mail and U.S. first-class mail, postage prepaid, this 28th day of January 2008, upon:

Martin F. McMahon, Esq.
Lisa D. Angelo, Esq.
Martin F. McMahon & Associates
1150 Connecticut Avenue, N.W.
Suite 900
Washington, D.C. 20036

Alan R. Kabat, Esq.
Bernabei & Wachtel, PLLC
1775 T Street, N.W.
Washington, D.C.  20009-7124
(Defendants' Executive Committee's appointed representative to receive discovery requests and responses in 03-MDL-1570)

J. Scott Tarbutton, Esq.

PHILADELPHIA\2975128\1  117430.000