In an interview with Middle East Newsfile, Dr Abdul Wahab Noorwali, Assistant Secretary General of WAMY, said, '**Saudi Arabia's support has been enormous since the establishment of WAMY in 1963**. The Kingdom provides us with a supportive environment that allows us to work openly within the society to collect funds and spread activities. **It also provides us with protection abroad through Saudi embassies and consulates, in addition to financial support**.'[211]

WAMY's leadership is also prominent in the Saudi Government establishment:

- At a November 2001 joint fundraiser for WAMY, the International Islamic Relief Organization (IIRO) and *Al-Haramain* Charitable Organization, "Riyadh governor Prince Salman contributed SR 1.5 million, while his deputy Prince Sattam donated SR1 million."[212]

  - Prince Salman also donated SR1.5 million to a 1999 fund-raiser conducted by the same three organizations.[213]

- WAMY is headed by Saudi minister of Islamic affairs Saleh al-Alshaikh.[214] "His Royal Highness" Prince Ghazi addressed the Eighth International Conference of the World Assembly of Muslim Youth in October 1998.[215] The following year, Crown Prince Abdallah bin Abd-al-Aziz, Deputy Premier and Commander of the National Guard, "received guests of the ninth international conference of the World Assembly of Muslim Youth and its officials who came to greet him on the occasion of the end of the conference, which was held here under the auspices of the crown prince."[216] The Prince told his visitors, 'Not only Saudi Arabia, Iraq, the Sudan or any other country... But rather Islam is the target."[217]

- Maneh ibn Hammad Al-Johani was Secretary-General of WAMY when he died in August 2002. He was a **member of the Shura Council**, and an "**active member of the 120-member consultative body**."[218] In an interview after al-Johani's death, WAMY's assistant Secretary-General Saleh Al-Wohaibi said he was "to **brief Prince Abdullah on the organization's activities**. He was going to update the regent on WAMY's upcoming ninth international..."[219]

- King Fahd bin Abdul Aziz is funding this year's WAMY Hajj drive.[220]

- Prince Abdul Majeed Bin Abdul Aziz, Governor of the Makkah Region of Saudi Arabia, "graced Monday evening the charity function held by the International Islamic Relief Organization (IIRO) in association with the World Assembly of

[211] Middle East Newsfile, "WAMY Team in Afghanistan Risks Life to Deliver Aid," November 20, 2001.

[212] MiddleEast Newsfile, "Fund Raising Event Generates SR6.5 million," November 29, 2001.

[213] MiddleEast Newsfile, "Salman donates SR1.5m in a Major Fund-Raising Event," December 16, 2001.

[214] http://www.saudiinstitute.org/hate.htm accessed July 27, 2003.

[215] Amman Jordan Times, "Jordan's Prince Ghazi Addresses Muslim Youth Conference," October 21, 1998.

[216] BBS, "Saudi Crown Prince Receives Dignitaries, says Islam Targeted," November 2, 2002.

[217] BBS, "Saudi Crown Prince Receives Dignitaries, says Islam Targeted," November 2, 2002.

[218] ArabNews, "WAMY chief Johani dies in car crash," August 5, 2002.

[219] ArabNews, "WAMY chief Johani dies in car crash," August 5, 2002.

[220] http://www.saudinf.com/main/y5346.htm accessed July 27, 2003.

Muslim Youth (WAMY) and the Haramain Charitable Organization (HCO) here.'[221]

- According to the Saudi Arabian Information Resource web page, "Custodian of the Two Holy Mosques King Fahd bin Abdul Aziz has issued directives to provide some of the governmental authorities and Saudi embassies and a number of Islamic organizations inside and outside the Kingdom of Saudi Arabia with 1.6 million copies of the Holy Quran and its meanings in various languages, published by the Madinah-based Custodian of the Two Holy Mosques King Fahd Complex for Printing the Holy Quran." The article continues, "The Minister of Islamic Affairs, Endowments, Call and Guidance, Sheikh Salih Al-Al-Sheikh, announced this in a statement to SPA. He noted that in line with monarch's directives…the World Assembly for Muslim Youth…will be provided with copies of the Holy Quran and its translations."[222]

- "There is growing evidence of Wahhabi activities in Iraq. Last month's issue of The Future of Islam, **a monthly [WAMY publication]…carried a cover interview with Saudi cleric Ayed al-Qarni. Al-Qarni, an adviser to Prince Abdel-Aziz bin Fahd, youngest son of Saudi Arabia's King Fahd, stated that he prays for the destruction of America several times a day. He also urged Saudi subjects to go and fight in Iraq or contribute money.**"[223]

- The Wall Street Journal has simply referred to WAMY as "a Saudi government-backed group."[224]

- In November 1999, the Institute of Islamic and Arabic Sciences in America (IIASA) held a Symposium on "One Hundred Years of the Kingdom of Saudi Arabia."[225]  In the invitation to that event, the **Saudi Government**, **Abdullah Naseef, Vice Chairman of the *Majlis as-Shura* of the Saudi Arabian Government, Vice Chairman of WAMY and former Secretary-General of the Muslim World League**, said "Praise is due to Allah SWT and then to the kings of of [sic] Saudi Arabia who supported this pioneering organization and other non-governmental bodies such as the Muslim World League in Makkah in 1962 and the World Assembly of Muslim Youth in Riyadh in 1973."[226]

The Saudi government also provides material support for WAMY. *Islamic Views* is an Arabic language book written by WAMY and printed by the **Saudi Government's Armed Forces Printing Press**. Under the heading "The Prophet asks for Jihad," Islamic Views says, "The Prophet Mohammad fought against the infidels and the Jews till he triumphed over them and conducted himself about twenty invasions and he sent tens of

---

[221] MiddleEast Newsfile, "Abdul Majeed launches IIRO charity drive; Emir donates SR300,000 to Three Organizations," November 20, 2002.
[222] http://www.saudinf.com/main/y2320.htm accessed July 27, 2003.
[223] Scotsman Publication, "Terror Alliance Targets US Forces in Iraq," June 15, 2003.
[224] Wall Street Journal, "Reports Link Charity to an *Al-Qaeda* Front," September 20, 2003.
[225] http://www.iiasa.org/researchcenter/symposium.htm accessed July 27, 2003.
[226] http://www.iiasa.org/researchcenter/symposium.htm accessed July 27, 2003.

regiments led by his companions for *Jihad*...**Damn from Allah to the Jews** who made graves of their prophets as Masjid."[227]

Later, *Islamic Views* says **Islam "is a religion of *Jihad*"** and that *Jihad* "was an answer for the Jews, the liars."

> **[T]each our children to love taking revenge on the Jews and the oppressors**, and teach them that our youngsters will liberate Palestine and al-Quds when they go back to Islam and make *Jihad* for the sake of Allah.[228]

*Islamic Views* exhorts Muslims to wage "*Jihad* against the Satan,"[229] and that "You should not back the Jews and the Christians and the Communists against the Muslims; the Communists, the Infidels, the Jews, and the Christians, those who do not believe in Mohammed. You should say they are infidels."[230]

WAMY also directly supports terrorist attacks. WAMY invited Khaled Mishal, Political Head[231] of Hamas to their "Muslim Youth and Globalization" conference on October 29, 2002.[232] According to Agence France Presse, "[Mishal] was hugged and kissed by hundreds of participants."[233]

The Arab News of April 12, 2002 reported, "The World Assembly of Muslim Youth (WAMY) has decided to raise its monthly contribution to Palestinian Intifada from SR3 million [$800,000] to SR10 million [$2.7 million]..."[234] The increase in monthly aid to the Intifada was "in addition to the over $70 million they had collected from donations through WAMY offices abroad and on special occasions."[235]

WAMY has been particularly active in Pakistan, both in support of Afghan warlords and Kashmiri terrorists. According to a Pakistani Government website,[236] WAMY is located at PO Box 1055 in Peshawar.[237] The Office of Foreign Assets Control (OFAC) lists PO Box 1055, Peshawar, Pakistan as an address of the Specially Designated Global Terrorist Organization, Benevolence International Foundation (BIF).[238]

The Associated Press and CBS News report that WAMY's Peshawar office was raided in November 2001 in a joint FBI-Pakistani intelligence operation.[239] A **WAMY employee**

---

[227] Islamic Views, Saudi Armed Forces Printing Press.
[228] Islamic Views, Saudi Armed Forces Printing Press.
[229] Islamic Views, Saudi Armed Forces Printing Press.
[230] Islamic Views, Saudi Armed Forces Printing Press.
[231] Christian Science Monitor, "King Charts New Mideast Course," September 24, 1999.
[232] Agence France Presse, "Muslim Youth Urged to Embrace 'Moderate Islam' at Riyadh Conference," October 29, 2002.
[233] Agence France Presse, "Muslim Youth Urged to Embrace 'Moderate Islam' at Riyadh Conference," October 29, 2002.
[234] Arab News, "WAMY to raise monthly contributions to Palestinian Intifada to SR10 million," April 12, 2002.
[235] Arab News, "WAMY to raise monthly contributions to Palestinian Intifada to SR10 million," April 12, 2002.
[236] www.epb.gov.pk/epb/isp/ngo.isp, as of December 12, 2002
[237] www.epb.gov.pk/epb/isp/ngo.isp, as of December 12, 2002.
[238] http://www.treas.gov/offices/enforcement/ofac/sanctions/terrorism.html, as of December 12, 2002.
[239] AP, "Pakistan Questions Sudan Man About Tape," December 9, 2002.

was subsequently questioned for hand delivering a recorded message from Osama bin Laden to local media.[240]  In that tape, bin Laden praised various terrorist attacks, including the Bali nightclub bombing that killed over 200 people, and the Chechen takeover of a theatre in Moscow that led to over 150 deaths.[241]

Nazir Qureshi is assistant Secretary-General of WAMY.  He has been accused by the Indian government of supplying money to Kashmiri terrorist groups headed by Syed Ali Shah Geelani.[242]  The Pakistani paper The News reported on March 25, 2001 that the Pakistani youth organization *Jamiat Taleba Arabia* is the only Pakistan-based member organization of WAMY.  The article continued, "WAMY is also involved in religious and *Jehadi* training for its member organizations."[243]  According to The News, *Jamiat Taleba Arabia*, the WAMY member-organization, was:

> involved in Afghanistan from the very beginning. It joined the *Jehad* in Kashmir as soon as the Kashmiris started their armed struggle in 1990 and was fully involved by 1993.  The members of the *Jamiat Taleba Arabia* fought under the umbrella of Gulbadin Hakmatyar's *Hizbe Islami* in Afghanistan and, in Occupied Kashmir, under the discipline of the *hizbul Mujahideen*[244]…Jehad has become the focus of the *Jamiat's* activities in the last two decades.[245]

According to the Indian magazine *Frontline*, Mohammed Ayyub Thukar, President of the World Kashmir Freedom Movement,[246] was a financier of *Hizbul Mujahideen*, a Kashmiri terror organization.[247]  During his exile in Saudi Arabia, Thukar was affiliated with MWL, WAMY, and the Muslim Brotherhood.[248]

Sardar Ija Afzal Khan, Amir of *Jamaat-e-Islami* since early June, 2002,[249] "highlighted [the] freedom struggle of the Kashmiris at the forums of World Assembly of Muslim Youth…"[250]

The Indian government contends that "90 percent of the funding [for Kashmir militants] is from other countries and Islamic organizations like the World Association of Muslim Youth…"[251]

Beyond the Middle East and India, WAMY works to immerse its students in its hateful ideology.  For example, Philippine resident Zam Amputan told the Christian Science

---

[240] AP, "Pakistan Questions Sudan Man About Tape," December 9, 2002.

[241] AP, "Pakistan Questions Sudan Man About Tape," December 9, 2002.

[242] The Press Trust of India, "Two Detained for Passing on Fund to Geelani," June 12, 2002.

[243] The News, "By the Book, for the Book," March 25, 2001.

[244] The News, "By the Book, for the Book," March 25, 2001.

[245] The News, "By the Book, for the Book," March 25, 2001.

[246] http://www.flonnet.com/fl1913/19131120.htm, as of December 11, 2002.

[247] http://www.flonnet.com/fl1913/19131120.htm, as of December 11, 2002.

[248] Ethnic Newswatch, "India Zooms in on Kashmir Militancy's Chief Financier," July 5, 2002.

[249] Pakistan Newswire, "Sardar Ijaz Afzar elected as Amir JI, AJK," June 6, 2002.

[250] Pakistan Newswire, "Sardar Ijaz Afzar elected as Amir JI, AJK," June 6, 2002.

[251] http://www.hvk.org/articles/0402/133.html, as of December 11, 2002.

Monitor that WAMY paid for him to attend a *madrassah* in Peshawar in 1987. According to the Monitor, "There he was exposed to the Wahhabi ideology." Amputan told the Monitor he returned to the Philippines '**thinking of ways to create a separate Islamic state in the Southern Philippines.'**[252]  The Washington Quarterly reports that **"IIRO is not the only charitable organization in the Philippines suspected of financing terrorism  Manila is investigating five other Muslim charities active in the Philippines…[including] the World Alliance of Muslim Youth…"**[253]

Similarly, according to Professor S.V. Seshagiri Rao, the organization *Deendar Anjuman* "was involved in militant activity in Bosnia, Kosovo and Chechnya through the **World Association of Muslim Youth (WAMY), a Saudi Arabia based fundamentalist outfit**."[254]  *Deendar Anjuman* is banned by the Indian government.[255]

WAMY may also be tied to the 1993 World Trade Center bombing.  When Ahmed Ajaj was arrested in 1992[256] investigators confiscated his belongings.  Among them was an official WAMY envelope printed with the organization's return address in Saudi Arabia.[257]  After serving a six-month prison term for attempting to enter the U.S. with a false passport, Ajaj was released.[258]  Ajaj was rearrested and convicted in connection to the 1993 World Trade Center bombing on March 4, 1994.  He was sentenced to 240 years in prison on May 24, 1994.[259]

The envelope marked "WAMY" contained a manual titled "Military Lessons in the *Jihad* Against the Tyrants that detailed how to establish and maintain clandestine cells."[260]  The same manual, with several added sections, was found in the London apartment of African Embassy bomber Khalid al-Fawwaz in 1998.[261]  Fawwaz has since been indicted, and the United States is seeking his extradition from England.[262]

The Ajaj manual refers repeatedly to the role and importance of the "youth" in carrying out *Jihad* and re-establishing Muslim rule.[263]  The manual's "dedication" says, "what [the apostate regimes] know is the dialogue of bullets, the ideals of assassination, explosion and destruction, and the politics of the machine gun."[264]  It continues:

> An Islamic state has not and will not be formed through peaceful
> solutions or through the Assemblies of Polytheism.  It will be

---

[252] Christian Science Monitor, "The Tenets of Terror," October 18, 2001.

[253] Washington Quarterly, "Forging an Indirect Strategy in Southeast Asia," Spring 2002.

[254] http://groups.google.com/groups?q=wamy+bosnia&hl=en&lr=&ie=UTF-8&oe=UTF-8&selm=8le2ql%24cei%241%40nnrp1.deja.com&rnum=7.

[255] Times of India, "2 Deendar Activists held," May 11, 2002.  See also:
http://www.hinduonnet.com/thehindu/2001/05/04/stories/01040007.htm

[256] Newsday, "New Suspect Charged in WTC Blast," May 7, 1993.

[257] United States of America v. Usama Bin Laden, el al, S5 93 CR 180, Government Exhibit 2800-A.

[258] Washington Post, 'Retracing the Steps of a Terror Suspect; Accused Bomb Builder Tied to Many Plots," June 5, 1995.

[259] Chicago Sun-Times, "Trade Center Bombers Sentenced to 240 yrs," May 24, 1994.

[260] New York Times, "A Sixth Suspect Charged in Blast," May 7, 1993.

[261] Guardian Unlimited, "Crackdown on British Cell," September 23, 2001 AND United States of America v. Usama Bin Laden, el al, S5 93 CR 180, Government Exhibit 2800-A.

[262] Sunday Telegraph, "We Have Made a Paradise for Terrorists in Our Own Backyard," May 4, 2003.

[263] United States of America v. Usama Bin Laden, el al, S5 93 CR 180, Government Exhibit 2800-A.

[264] United States of America v. Usama Bin Laden, el al, S5 93 CR 180, Government Exhibit 2800-A.

> formed as it did through the written words and the gun, through
> the word and the bullet.

The manual instructs that "the principal mission for the military organization is to overthrow the atheist regimes and replace them with Islamic ones," and lists strategies such as kidnapping enemy soldiers, assassinating personnel and foreign tourists, spreading rumors, and blowing up, destroying, and sabotaging places of entertainment as secondary duties of the military organization. The ultimate goal, repeated over and over, is "get[ting] rid of people who stand in the way of the Islamic Call," and "establishing an Islamic State."[265]

The manual goes on to provide in-depth instructions for obtaining and storing false documents, finding housing, obtaining and storing weapons, conducting reconnaissance, planning attacks, carrying out attacks, avoiding detection, and using other tactics.[266]

When asked about accusations that WAMY is a funding front for terrorists, Secretary-General Dr. Saleh al-Wohaibi "blamed the Zionist-controlled media and anti-Islamic organizations in the US..."[267]

<u>WAMY in the United States</u>

WAMY has provided financial support to the US-based Council on American-Islamic Relations (CAIR), a civil rights organization which received some of its initial seed money from the Holy Land Foundation for Relief and Development (HLFRD). On December 4, 2001, the Treasury Department listed HLF as a Specially Designated Terrorist. According to Treasury Department, HLF 'raises millions of dollars annually that is used by HAMAS."

CAIR's founders Nihad Awad and Omar Ahmed came from leadership positions of the Islamic Association for Palestine (IAP).

An August 2002 court decision against the Holy Land Foundation states "the Islamic Association for Palestine has acted in support of Hamas."[268]

According to Steven Pomerantz, a retired FBI Assistant Director who also served as Chief of the FBI Counterterrorism section in the mid to late 1980's:

> "...CAIR has defended individuals involved in terrorist violence, including Hamas leader Musa Abu Marzouk, and he has embraced people who have engaged in promoting violence or hateful and bigoted rhetoric. The modus operendi has been to falsely tar as 'anti-Muslim' the U.S. government, counter-terrorist officials, writers, journalists and others who have investigated or exposed the threat of Middle East based terrorism..."[269]

---

[265] <u>United States of America v. Usama Bin Laden, el al.</u> S5 93 CR 180, Government Exhibit 2800-A.
[266] <u>United States of America v. Usama Bin Laden, el al.</u> S5 93 CR 180, Government Exhibit 2800-A.
[267] <u>Arab News</u>, "WAMY Keen to Boost its Activities Despite Smear Campaign: Wohaibi," August 27, 2002.
[268] Holy Land Foundation for Relief and Development vs. John Ashcroft in his official capacity as Attorney General of the United States. Civil Action # 02-422 (GK)
[269] Spring 1998 *Journal of Counterterrorism & Security International.*

Despite CAIR's statement in November 2001 that they "...do not support directly or indirectly, or receive support from, any overseas group or government,"[270] it appears that the Saudi-based WAMY has funded CAIR both before and after this proclamation.

According to a December 23, 1999 *Arab News* article, Dr. Hamid Shaygi, assistantSecretary General of WAMY announced at a Riyadh press conference, with Nihad Awad in attendance, that WAMY "was extending both moral and financial support to CAIR in its effort to construct headquarters at a cost of $3.5 million in Washington, DC." The article continued saying WAMY would also "introduce CAIR to Saudi philanthropists and recommend their financial support for the headquarters project."[271]

**In 1998, the *Saudi Gazette* reports that CAIR's Executive Director Nihad Awad addressed a press conference at the WAMY headquarters in Riyadh, Saudi Arabia. According to the report, "He [Awad] said CAIR needed funds to fight discrimination against Muslims, to promote the true image of Islam and to combat the anti-Islamic propaganda."[272]**

In 2002, the *Muslim World* reported that WAMY was extending its support to CAIR for its media campaign in the US.[273]

**CAIR has also received funds  in part by the International Islamic Relief Organization (IIRO).   The 1997 tax form 990 for the International Relief Organization (IRO) lists a grant to CAIR for $10,000.  The 1995 tax form 990 for the IRO lists a grant to CAIR for $2,172.**

### QATAR CHARITABLE SOCIETY (QCS)

Another humanitarian organization actively financing *Al-Qaeda* and other designated international terror groups is the **Qatar Charitable Society (QCS)**, the oldest and largest such group in Qatar.[274]  **QCS is a part of the Islamic Coordination Council (ICC)**, a coordinating body of Muslim charitable groups established in 1985 in Peshawar, Pakistan to maximize the financial assistance reaching Afghanistan.[275] **Shaykh Abdullah Azzam was a member of the ICC leadership prior to his assassination in Peshawar in 1989.[276] Other ICC members include the IIRO, the SRC, and WAMY.[277]**

Much like the various Saudi charities that have funded *Al-Qaeda* over the past decade, QCS draws much of its funding primarily from official sources, including the Qatari

[270] Press Release from CAIR National, *Islamaphobe Smear Campaign Goes Public,* November 8, 2001.
[271] "WAMY spends SR12m on new mosques," Arab News, December 23, 1999
[272] "Nike Violating agreement on Offensive Logo says CAIR, *Saudi Gazette*, July 3, 1998
[273] *The Muslim World*, page 1, "WAMY supports CAIR campaign against US anti-Islamic sentiment," November 29, 2002
[274] "Voluntary and Charitable Organizations." http://www.dohaislamicsummit.org/qatar/english/islamic-e.htm  March 1, 2003.
[275] http://www.yellowpages.liwal.net/asistance/icc.htm  March 1, 2003.
[276] Middle East Policy, "The new global threat: transnational Salafis and Jihad," December 1, 2001.
[277] http://www.yellowpages.liwal.net/asistance/icc.htm  March 1, 2003.

government itself. In October 2002, the Emir of Qatar, Shaykh Hamad bin Khalifa Al Thani, and the Qatari Foreign Minister, Shaykh Hamad bin Jassem bin Jabr Al Thani, invited the President of QCS, Shaykh Abdul Aziz bin Abdulrahman Al Thani, to join them in high-level meetings with the visiting United Nations High Commissioner for Relief, Ruud Lubbers.[278] An advertisement for QCS relief activities in Kosovo refers to a collaborative partnership with the state-supported Qatar Red Crescent Society.[279] Moreover, until recently, a WHOIS[280] lookup of the Qatar Charitable Society's website (www.qsociety.org) listed Hashem Hussein as both the Administrative and Billing Contact for the site. His corresponding e-mail address, "hashim@MMAA.GOV.QA," indicates that Mr. Hussein was an employee of the Qatari Ministry of Municipal Affairs and Agriculture.

More recently, a VIP social event was organized by QCS in Bosnia to inaugurate a new relief project ordered by a "Decree of His Excellency the Emir [of Qatar]." The party was attended by, among others, Ambassadors from Egypt, Saudi Arabia, Libya, and Iran.[281]

According to its website, the Qatar Charity Society "aims to offer relief and help to orphans, victims of war and disasters by supporting them financially, socially and culturally up to the age of eighteen. QCS aids widows to meet living expenses, particularly those who lost all relatives and friends."[282] By 1995, QCS claimed to have initiated over 250 projects worldwide in thirty-five countries including India, Pakistan, Bangladesh, Afghanistan, Somalia, Sudan, Bosnia, Palestine, Yemen, and the Philippines.[283] **In one fiscal quarter of 1997 alone, QCS was reportedly engaged in worldwide projects estimated at a total value of over 3 million Qatari Riyals.**[284] QCS advertised twenty numbered bank accounts in the Qatar Islamic Bank and the Qatar International Islamic Bank ready to receive wired donations from at home and abroad.[285]

QCS' charitable mission acted as a cover for its material support to terrorists. In trial proceedings surrounding the prosecution of individuals associated with the African Embassy bombings, **QCS was named as a major financial conduit for Al-Qaeda**. Former Al-Qaeda member and star government witness **Jamal Al-Fadl testified how he had worked closely with QCS in 1993**.[286] Al-Fadl was asked to discuss **Dr. Abdullah Mohamed Yousef, a fundamentalist veterinarian and director of QCS**. He explained:

> The guy [Yousef], he runs a group, **he is one of our membership, one of the Al-Qaeda group membership, and also he is [Sudanese] Islamic National Front membership,**

[278] "UNHCR briefing notes: Liberia, Côte d'Ivoire, Rwanda." http://www.reliefweb.int. Dated October 12, 2002.
[279] "Urgent Relief for the Muslems of Kosovo."
http://www.qcharity.org/qenglish/images/kosovo/new_page_2.htm  March 1, 2003.
[280] www.register.com
[281] "Qatar Relief Organization Builds 112 Houses for the Bosnian Returnees." *Al-Rayah*. August 31, 2002.
[282] http://www.qcharity.org/qenglish/index.html. March 1, 2003.
[283] Riyadh Daily, "Qatar organization carry out welfare projects," January 13, 1995.
[284] Middle East News Items, "Projects carried out by Qatar Charitable Society," September 8, 1997.
[285] http://www.qcharity.org/qenglish/banks.htm  March 1, 2003.
[286] United States of America v. Usama Bin Laden, el al. February 6, 2001. Testimony Transcript; Page 329.

and he was in Afghanistan. So he helped our people for the travel, documents, and also if some money come from the Gulf area to the organization, he gives the group some money from that money.[287]

In the Sudan, QCS actively aided radical quasi-official militias associated with the National Islamic Front (NIF) in fighting the Christian and animist groups of the South. In a fundraising brochure for the Sudan distributed by QCS in Qatar, **the Society appealed to its donors to help protect "our brotherly Sudan" from "wild savage invaders,"** who were accused of "destroying the Sudanese territorial integrity, security, stability, and unity." The brochure further noted, "Every tiny support is great and important especially in this holy month, Ramadan. It is the month of Allah [sic] blessings…and the month of 'Jihad' in one's person, one's wealth, and one's dwellings. Support for those brave heroes who are sacrificing their persons will be of great mercy, forgiveness and freeing from the Hell fire."[288] During one short period of 1999 alone, the chairman of the QCS reported the transfer of 1 million Qatari Riyals in the form of "emergency aid" to the Sudan.[289]

In 1995, **Osama bin Laden reportedly confirmed to Jamal Al-Fadl that $20,000 supplied by Dr. Abdullah Yousef through QCS was used by *Al-Qaeda* to bankroll the attempted assassination plot that year against Egyptian President Hosni Mubarak in Addis Ababa, Ethiopia.** At the time, **bin Laden sternly rebuked the financiers of the abortive terror plot for their carelessness in concealing the true source of the funds**, and expressed serious concerns that "*Al-Qaeda*'s abilities to use charities to fund operations might be compromised as a result."[290]

During the mid-1990s, Dr. Yousef used the Qatar Charitable Society's resources to serve the financial needs of the Eritrean Islamic Jihad Movement (EIJM).[291] At the time, **EIJM recruits, seeking to overthrow their own government and replace it with an Islamic regime, were receiving military training from senior *Al-Qaeda* lieutenants in the Sudan** after having been recruited to follow Osama bin Laden's international agenda. Several years later, the **Deputy Emir of EIJM, Abul Bara' Hassan Salman, confirmed in an interview, "As for the latest Christian onslaught which is being led by America…I say to the Muslim people everywhere: supporting Jihad and the *Mujahideen* is the way to remove the nightmare** of degradation and humiliation which has rested on the chests of our community in its various forms."[292]

---

[287] United States of America v. Usama Bin Laden, el al. February 6, 2001. Testimony Transcript; Page 330.
[288] http://www.qcharity.org/qenglish/helpsuda.htm. Dated December 27, 1997.
[289] Al-Rayah. August 16, 1999.
[290] "Government's Evidentiary Proffer Supporting the Admissibility of Co-Conspirator Statements." United States of America v. Enaam M. Arnaout. United States District Court Northern District of Illinois, Eastern Division. Case #: 02 CR 892. January 31, 2003. Page 103.
[291] United States of America v. Usama Bin Laden, el al. February 6, 2001. Testimony Transcript; Page 330.
[292] "'The Governing Regime is a Terrorist Regime Which Acts With Enmity Against the Eritrean People': An Interview with the Deputy Amir of the Eritrean Islamic Jihad Movement – Abul Bara' Hassan Salman." Nida'ul Islam. Issue 22; February-March 1998.

Outside of Africa, the Qatar Charitable Society was also extremely active in the Balkans and the turbulent Muslim republics of the Caucasus. In **November 1994, one Egyptian QCS "aid worker" was killed and another badly burned in a mysterious "gas explosion" in Sarajevo.**[293] QCS also helped distribute a collection of fundamentalist articles titled "Obstacles to the Islamic Resurgence" edited by former Bosnian President Alija Izetbegovic.[294] In the wake of September 11, Izetbegovic stepped down amid controversy that his administration had provided safe haven and travel documents to hundreds of Muslim militants loyal to *Al-Qaeda*.[295]

In October 2001, **the Azerbaijan Ministry of Justice forcibly closed down its own local QCS office for, "under the disguise of charity," conducting "damaging activities that violate our national interests, as well as [cooperating] with terrorist structures and [distributing] propaganda inciting radical sectarianism, religious hatred and fanaticism."**[296] In 1995, a QCS office founded in neighboring Daghestan (adjacent to Chechnya) dispensed 3 million Qatari Riyals in less than two years.[297] Russian intelligence became suspicious when they discovered that the QCS branch was being run by an Egyptian citizen named Yasir Ibrahim. **Daghestani state tax police initiated an inquiry into the organization, and uncovered forged documents and invoices detailing hundreds of thousands of dollars of illicit financial transactions. From the evidence they collected, investigators estimated that QCS had given perhaps as much as $1 million to unspecified "Chechen extremists."** The Russians found, **"most of the 'charitable contributions'...were not recorded anywhere. The same goes for how the money was distributed."**[298]

By liquidating charity bank accounts into untraceable cash withdrawals in war-torn states (often with no reliable banking systems), QCS was able to make this money simply disappear. Journalists confronted Qatari Foreign Minister Hamad Bin Jasim Bin Jabr Al-Thani with Russian allegations that QCS was openly and actively supporting "certain Arab individuals...fighting with the Chechen fighters." With little reflection, Al-Thani flatly admitted that, indeed, this might be the case:

> [W]e as a government cannot control the aid going abroad, some of which may go for humanitarian goals, and some may start as humanitarian but end up in another way. However, **there is no monitoring because people are sympathizing...We as a government may be able to control our sympathy, although in the end we are only human beings and**

[293] Agence France Presse, "Egyptian aid worker, injured in gas explosion, due for evacuation," November 26, 1994.
[294] http://www.qcharity.org/qenglish/book_1.jpg. March 1, 2003.
[295] http://www.aimpress.org/dyn/trae/archive/data/200110/11030-002-trae-sar.htm accessed July 30, 2003. See also: SRNA News Agency, "Muslim leader denies there are Bin-Ladin's supporters in Bosnia," Broadcast in Serbo-Croat language in Bijeljina, October 9, 2001.
[296] Interfax News Agency, "Azerbaijan closes offices of Arab relief organizations due to illegal activity," April 10, 2002. See also: Turan News Agency (Baku), "Azerbaijan shuts down Kuwaiti, Qatar charity organizations," Broadcast in Russian language, April 9, 2002.
[297] Al-Rayah, "Charity denies Russian charges of assisting Dagestan rebels," September 20, 1999.
[298] Segodnya (Moscow). November 16, 1999.

> Muslims…[t]herefore we cannot restrain the people's feelings in
> this regard.[299]

Even after the September 11 suicide hijackings, the Qatari regime has resisted to US efforts to curtail *Al-Qaeda* fundraising through religious charities, including the Qatar Charitable Society.[300] **In September 2001 QCS' official newsletter carried an article titled "Jihad is the Solution!"** The author urged faithful Muslims:

> The **only way to liberate Palestine is the holy Jihad** which
> mobilizes all potentialities in the Arab and Islamic countries, and
> in which all Muslims stand as one behind the *Mujahideen* and
> support them in their Jihad…**The time has come for Muslims
> to follow in the footsteps of Salahudeen and to restore
> Jerusalem and Palestine to the Arabs and the Muslims** . For
> Jerusalem is in your hands, Oh, Muslims. There is no solution to
> the matter save Jihad. 'You shall readily mobilize, light or
> heavy, and strive with your money and your lives in the cause of
> GOD. This is better for you, if you only knew.' (Quran 9:41)[301]

## Conclusion

Due to the release of the Joint Inquiry Report, the Saudi government's role in funding and supporting terrorism has taken center stage in the U.S. war on terror. Notwithstanding the decision to redact an embarrassing 28 pages from the report, the Saudis remain firmly under the microscope as prime engineers of Islamic radicalism throughout the globe. Since the 9/11 attacks, the U.S. has enjoyed some success in shutting down Saudi charities, such as the Benevolence International Foundation, that raised money for the violent terrorist group Hamas and Al-Qaeda, among others.

Yet there needs to be a more comprehensive government investigation into Saudi conduits for terrorism and Islamic extremism, as evidenced by the evidence showing ties between WAMY, the Saudi Red Crescent, the *Al-Haramain* Foundation and a host of other Saudi-funded entities. Even greater scrutiny needs to be focused on these and all Saudi charities and organizations operating within the United States, regardless of their stated humanitarian goals.

The U.S. must demand the Saudis display the maximum amount of cooperation in rooting out and containing the terrorist threat. This means the immediate cessation of funding to any charitable group or organization that the U.S. deems a terrorist sponsor or front. The Saudis themselves must also do a much more efficient job of locating and apprehending *jihadists* within Saudi Arabia in order to prevent future attacks similar to 9/11.

---

[299] *Al-Jazeera* Television, Bin Qinnah, Khadijah. "Minister denies Russian report on funding for Chechen militants," Broadcast in Arabic language, November 22, 1999.

[300] Agence France Presse, "Noose tightens around Islamic charities in Gulf," October 3, 2001.

[301] Qatar Charitable Society Magazine, "Oh Muslims, Jerusalem is calling you! Jihad is the Solution!" September 2001.

If the United States is to prevent another 9/11 from happening again, our government must let evidence of Saudi fingerprints to terrorism be acted upon by law enforcement without any special treatment or exemptions from prosecution or investigations. If Saudi foundations or conduits are operating in the United States with evidence tying them to terrorist groups, then the principles of equal treatment under the law should apply. The Department of Justice, Treasury, and FBI ought to be fully empowered to investigate and prosecute suspected terrorist conduits and just as much as it prosecutes indigenous Americans who violate the law. Being outside the United States is no longer grounds for immunity from prosecution for terrorism; and being of foreign wealth should long ago have ended corrupt deals in which wealthy foreigners escape the reach of American justice.

The security of the American people should always come before any relationship governed by the accumulation of petrodollars.   The anti-Western, anti-Semitic vitriol found in state-sponsored Saudi textbooks and preached by high-ranking Saudi clerics is an indicator of just how far apart U.S. and radical Saudi interests presently lie. In the end, the very integrity of the Saudi regime is at stake as was demonstrated by the recent series of suicide bombings in Riyadh.

If Saudi money has been funneled to Al Qaeda and Hamas, and continues to fund much of the worldwide terror network, this information should be made available for public consumption. A candid reassessment of the U.S. relationship with Saudi Arabia, sorely needed in light of the Joint Inquiry Report, is impossible unless the United States puts aside its old loyalties to protecting the Kingdom of Saudi Arabia  and seriously confronts the nefarious influence posed by the flow of funds to terrorist conduits. Unless the terrorist connections are severed and unless Saudi institutions stop preaching and exporting the inflammatory Wahhabi Islamic doctrine, the war on terrorism will never be won; we will be permanently relegated to hopelessly trying to win a battle against smoke and mirrors where reality is inverted in a charade designed to protect special interests rather than unravel them. Two years after 9/11, the time has come to stop the charade.

# __Exhibit U__



# Pakistan Deporting 89 Arab Aid Workers

**Saturday , October 06, 2001**

Associated Press

PESHAWAR, Pakistan —

Pakistan's military regime ordered 89 Arab and other Muslims working for Islamic relief agencies deported, government and intelligence officials said Saturday.

The order appeared aimed at severing possible links to Usama bin Laden's Al Qaeda terrorist network in nearby Afghanistan. U.S. and other Western agencies have alleged that bin Laden's network uses some Islamic charities to channel money to terrorist cells.

A letter from the federal interior ministry, shown to The Associated Press by local officials, listed the individuals to be deported by name and nationalities. Most of them were from Saudi Arabia, Sudan, Egypt and Iraq.

The others were from Jordan, Somalia, Morocco, Algeria, Syria and Indonesia. All were working in Pakistan's Northwestern Frontier province along the border with Afghanistan.



ADVERTISEMENT

LET'S MAKE EXCELLENT HAPPEN.

NB MINIMUS ROAD
*Minimalist design. Near-barefoot experience.*
▶ Buy Now

One official, speaking on condition of anonymity, said the letter directed provincial administration to deport the 89 immediately.

However, provincial authorities refused to implement the order immediately and instead established a committee to investigate those on the list.

The committee was expected to complete its report in about two days, Pakistani officials said on condition of anonymity. However, the officials said many Arabs living in area have already left.

The order comes amid increasing speculation of an imminent attack on Afghanistan by the United States and its allies to try to flush out bin Laden, the key suspect in the Sept. 11 airborne assaults on the World Trade Center and the Pentagon.

Pakistan became a front-line state in Washington's war on terrorism when the military regime here promised its "unstinting" cooperation.

Pakistan is the only country that still recognizes Afghanistan's Taliban government and most importantly one of the few countries with strong intelligence information on the whereabouts of bin Laden's Al Qaeda training camps.

An emergency meeting of Islamic charities, headquartered in Peshawar and operating in Afghanistan, was held behind closed doors in Peshawar earlier Saturday. The meeting held behind closed doors.

At the Sudan-based Islamic Relief Agency (ISRA) several, Bashir Ahmed, administrator, said four of the five Sudanese working for the organization have already returned to Sudan with their families.

"Everybody was being harassed," he said, without specifying by whom. "Some had been here for two years, others for one year."

The letter sent from the federal government identified the following organizations: the Saudi Red Crescent, the Kuwait based Lajnat al-D'awa Al-Islamiah, International Islamic Relief Organization, Islamic Relief Agency (ISRA), Kuwait Red Crescent, Islamic coordination Council and Kuwait Red Crescent.

There was no indication of any wrongdoing by any of these organizations.

Last week President Bush froze the assets of a number of organizations and individuals believed to be financing bin Laden's global terrorist network.

On that list were two Pakistani-based organizations, Harakat-ul-Mujahedeen, a Kashmiri militant group and Al Rashid Trust, an Islamic charity that heavily backs the Taliban regime.

So far no reason for the order has been given and the Arab employees of the charities refused to comment when contacted.

An interior ministry spokesman said an investigation is being conducted into the credentials of all international aid workers operating in Pakistan.

"We are not discriminating against Arabs and non-Arabs," said Abdul Rashid, a spokesman for the interior ministry. "All foreigners present in Pakistan are having their documents verified."

SEARCH  [GO]

### Click here for FOX News RSS Feeds

### Advertise on FOX News Channel, FOXNews.com and FOX News Radio
Jobs at FOX News Channel.
Internships At Fox News (Summer Application Deadline is March 15, 2007)
Terms of use.  Privacy Statement.  For FOXNews.com comments write to
foxnewsonline@foxnews.com;  For FOX News Channel comments write to
comments@foxnews.com
© Associated Press. All rights reserved.
This material may not be published, broadcast, rewritten, or redistributed.

Copyright 2011 FOX News Network, LLC. All rights reserved.
All market data delayed 20 minutes.

# **<u>Exhibit V</u>**

22-DEC-2003  13:53   FROM  IIRO ISLAMABAD PAK        TO  0096626512885        P.01

Muslim World League

# INTERNATIONAL ISLAMIC RELIEF ORGANIZATION

In Saudi Arabia
Pakistan Office
Islamabad



رابطة العالم الإسلامي
هيئة الإغاثة الإسلامية العالمية
بالمملكة العربية السعودية
مكتب باكستان
إسلام آباد

الموضوع :

Ref : 385    الرقم :

Date : 22-12-2003    التاريخ :

To,

The Secretary General,
International Islamic Relief Organization,
Jeddah,
Saudi Arabia

Excellency,

This is to inform you that since I have taken the charge as the Director General of International Islamic Relief Organization (I.I.R.O.) office in Pakistan, no employee has so far been arrested having a link with Al-Qaida by Government of Pakistan or any other investigating agency in Pakistan/Afghanistan. The office is running quite smoothly and all the employees are dedicated and following the rules and regulations of I.I.R.O. and do not indulge any activities, political or otherwise.

With kind regards,

Yours sincerely,

Rahmat Ullah Nazir Khan,
Director General

Address: H-8/1 - Pirus Bukhari Road - Opp. Shifa International Hospital Islamabad - Pakistan
P.O. Box: (18.50) Tel: (0092 - 51) 4449347 - 4435113 - 4435114 Fax : (92-51) 4449247

العنوان: كابل۸/۱ شارع بيرس بخاري مقابل مستشفى الشفاء الدولي إسلام آباد - باكستان
ص.ب: (۱۸۵۰) إسلام آباد باكستان

TOTAL P.01

IIRO-001139



No. *1(1) MRA/2007*

**MINISTRY OF RELIGIOUS AFFAIRS,**
**ZAKAT & USHR**
**GOVERNMENT OF PAKISTAN**

*Islamabad, the  5th Nov. 2007*

### To Whom It May Concern

The Ministry of Religious Affairs of the Republic of  Pakistan , hereby  certifies that the International  Islamic Relief Organization of Saudi Arabia (IIROSA) Office in Islamabad is one of the many  international humanitarian aid and charity organizations which operates and carry out emergency  and humanitarian aid activities in Pakistan, and has been actively providing  humanitarian assistance .

2.	During the stated period and up to the present, the IIROSA  Office in Pakistan  has been exemplary in the carriage of its honourable role as provider of humanitarian assistance and services to the Pakistani people without discrimination and regardless of sect, religion or origin of the needy.

3.	We also confirm that the IIROSA Pakistani Office carries its activities in strict  abidance by the local laws, and strictly  limiting  itself to its declared charity and humanitarian role,  without any involvement in activities falling outside  its declared line of activity , and without,  in any manner or form, involving itself  in any non-humanitarian activity  which contradicts its stated humanitarians goals.

4.	It is to be noted that IIROSA had carried out a major humanitarian aid effort in the aftermath of  October,2005 earthquake and other flood disasters and we confirm  that the Pakistan Government  does not have any reservations on IIROSA's Pakistan Office which is known to have carrying its activities,  in an  exemplary and disciplined  manner, within  the bounds of law.

**(MUHAMMAD IJAZ-UL-HAQ)**

MUHAMMAD IJAZ UL HAQ
Minister for Religious Affairs
Zakat and Ushr
incharge Minorities Affairs
Government of Pakistan

Phone : 9214856, Fax: 9205833, Email : mrz@isb.pakn@.com.pk

IIRO-001488



No.4(17)NGO/95
GOVERNMENT OF PAKISTAN
MINISTRY OF FINANCE AND ECONOMIC AFFAIRS
(ECONOMIC AFFAIRS DIVISION)

SECTION OFFICER                                                 Islamabad, the October 26, 2007.
TELE NO.:  051-9201789

## TO WHOM IT MAY CONCERN

This is to certify that the International Islamic Relief Organization of Saudi Arabia (IIRO) office in Pakistan is one of the many international humanitarian aid and charity organizations which operates and carries out emergency and humanitarian aid activities in Pakistan, and has been actively providing humanitarian assistance since 1996.

During the said period and up to the present, the IIRO Office in Pakistan has been exemplary in the carriage of its honourable role as provider of humanitarian assistance and services to the Pakistan people without discrimination, regardless of sect religion or origin of the needy.

We also confirm that the IIRO Pakistan Office carries its activities in strict abidance by the local laws, and strictly limiting itself to its declared charity and humanitarian role, without any involvement outside its declared line of activity, and without in any manner or form intruding into or attaching itself to any non-humanitarian activity which contradict its humanitarian goals.

It is to be noted that IIRO had carried out a major humanitarian aid effort in the earthquake affected areas. We confirm that the Pakistan Government does not have any reservation on IIRO's Pakistan Office which is known to have been carrying its activities, in an exemplary and disciplined manner within the laws of land.

Yours sincerely,

*M. Sikandar Iqbal*
(M. Sikandar Iqbal)
**(M. SIKANDAR IQBAL)**
*Section Officer*
*Economic Affairs Division*
*Government of Pakistan*
*Islamabad*

IIRO-001489



**MINISTER**

**QARI MEHMOOD,**
**MINISTER FOR AGRICULTURE,**
**N.-W.F.P.**

D.O. No. *Per/2007*

Dated Peshawar, the *5th OCTOBER 2007*.

## TO WHOM IT MAY CONCERN

The Ministry of Agriculture, Live Stock & cooperative Government of NWFP hereby certifies that International Islamic Relief Organization Saudi Arabia (IIROSA) office in Islamabad Pakistan is one of the so many International Humanitarian aid, charity and welfare organization working in the field of social welfare, construction of mosque, digging of wells, health, orphanage, seasonal projects like Iftar u Saim and Qurbani projects and emergency relief projects etc. IIRO is a registered organization with Economic Affairs Division, Government of Pakistan and Chief Commissioner Afghan Refugees Govt. of Pakistan since 1990.

During the stated period and up to the present, the IIROSA office in Pakistan has been exemplary in the carriage of its honourable role as providing the humanitarian assistance and services to the poor and needy people of Pakistan without discrimination, regardless of sect and religion.

IIROSA office in Pakistan has a very good reputation among the NGOs for its contribution to relief & other humanitarian activities. Some of the projects were executed under my personal supervision in NWFP.

It is important to be noted that IIRO had carried out a major humanitarian aid efforts in the Earthquake disaster in NWFP and Azad Jammu and Kashmir. I confirm that the Government of NWFP does not have any reservations on IIROSA's Pakistan office which is known to have been carrying its activities, in an exemplary and disciplined manner. IIROSA Pakistan office carries its humanitarian services according to the local laws and limiting itself to its declared charter and Memorandum of Understanding signed between Government of Pakistan and IIROSA.

Qari Mahmood

Minister for Agriculture
**Live Stock & Cooperative**
**N.W.F.P Peshawar**

IIRO-001490



# MINISTER FOR FOOD, EXCISE & TAXATION, N.-W.F.P.

### TO WHOM IT MAY CONCERN

The Ministry of Food, Excise & Taxation Government of NWFP, Pakistan hereby certifies that International Islamic Relief Organization Saudi Arabia (IIROSA) office in Islamabad Pakistan is one of the famous International Humanitarian charitable and welfare organization. IIROSA is registered organization with Chief Commissioner Afghan Refugees Government of Pakistan since 1990 and had signed Memorandum of Understanding (MOU) with Economic Affairs Division Government of Pakistan in September 1996.

IIROSA office in Pakistan has been serving as model and its honorable role as providing the humanitarian assistance and services to the poor and needy people of Pakistan without discrimination, regardless of sect and religion.

IIROSA office in Pakistan has a very good reputation among the NGOs for its contribution to relief & other humanitarian activities. Some projects were executed under my personal supervision in NWFP, Pakistan. Like construction of Mosques, Digging of Wells and distribution of Iftar u Saim package and Qurbani Meat to real deserving families in remote areas and distribution of Relief goods to the victims of Earthquake and suffers of Flood disaster. IIROSA Pakistan office bears a valuable contribution to maintenance and education of one thousand orphans including boarding and lodging facilities.

It is confirmed that the Government of NWFP, Pakistan does not have any reservations on IIROSA's Pakistan office which is known to have been carrying out its activities, in an exemplary and disciplined manner. IIROSA Pakistan office carries its humanitarian services according to the local laws and limiting itself to its declared charter.

IIROSA Pakistan office has a very good reputation and record among the Government officials, Ministries as well as in people of Pakistan for its contribution to humanitarian and social care programmes especially its role in earthquake and upbringing the lives of flood victims.

Fazal-e- Rabbani

**Fazal-e-Rabbani**
*Advocate*
Minister for Food, Excise
& Taxation, N.W.F.P. 3-10-2008.

IIRO-001491



**KETUA**
**MAJELIS PERMUSYAWARATAN RAKYAT**
**REPUBLIK INDONESIA**

إلى من يهمه الأمر

إن الدكتور الحاج/ محمد هداية نور وحيد رئيس مجلس الشورى الشعبي بجمهورية إندونيسيا، يفيد أن مكتب هيئة الإغاثة الإسلامية العالمية في جاكرتا أحد أكبر المنظمات الخيرية غير حكومية العاملة في جمهورية إندونيسيا منذ ١٩٩٢ م وخلال فترة عمل هذه الهيئة كانت تقوم بالمساعدات الإنسانية وأعمال إغاثية بدرجة عالية من الأمانة والشفافية وقدمت خدمتها للشعب الإندونيسي دون أي تفرقة في الدين أو العرق أو المذهب .

ومن واقع التعامل مع هذا المكتب منذ نشأته يمكن التأكيد على احترام هذا المكتب لكافة قوانين وأنظمة بعيدا عن الإنحياز السياسي أو الديني أو المذهبي. كما أن هذه المنظمة بعيدة في أعمالها تماما عن تمويل أو تشجيع الإرهاب أو الدعوة إليه بل هي تمثل بحق الوجه المشرق للعمل الخيري السلمي، ومن أكبر الأعمال التي قامت بها مساعداتها الإنسانية والإغاثية أثناء كارثة تسونامي بأتشية. وحسب علمي ليس للدولة الإندونيسية أي ملاحظات سلبية عليها حيث أنها مثال على الانضباط والالتزام والتعاون .

وعليه جرى التوقيع.

رئيس مجلس الشورى الشعبي

بجمهورية إندونيسيا

د. محمد هداية نور وحيد

IIRO-001492



Reff : MA/ 03 /2007
Date : 10 Jan, 2007

**To Whom It May Concern**

The Ministry of Religious Affairs of the Republic of Indonesia, hereby certifies that the International Islamic Relief Organization of Saudi Arabia (IIROSA) Office in Jakarta is one of the many international humanitarian aid and charity organization, which operates and carry out emergency and humanitarian aid activities in Indonesia, and has been actively providing humanitarian assistance since 1992.

During the stated period and up to the present, the IIROSA Office in Indonesia has been exemplary in the carriage of its honorable role as provider of humanitarian assistance and services to the Indonesian people without discrimination, regardless of sect religion or origin of the needy.

We also confirm that the IIROSA Indonesia Office carries its activities in strict abidance by the local laws, and strictly limiting itself to its declared charity and humanitarian role, without any involvement outside its declared line of activity, and without in any manner or form intruding into or attaching itself to any non-humanitarian activity which contradict its humanitarian goals.

It is to be noted that IIROSA had carried out a major humanitarian aid effort in the Tsunami disaster, and the Ministry is now undertaking the necessary formalities to renew the humanitarian assistance agreement with IIROSA, and we confirm that the Indonesia Government does not have any reservations on IIROSA's Indonesia Office which is know to have been carrying its activities, in an exemplary and disciplined manner within the bounds of the law.

Minister of Religious Affairs
of the Republic of Indonesia,

Muhammad M. Basyuni.

IIRO-001493

# **Exhibit W**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case |

*This document relates to:*

*Federal Insurance Co. v. al Qaida*, Case No. 03-CV-6978 (RCC) (S.D.N.Y.)
*Kathleen Ashton  v. Al Qaeda Islamic Army*, Case No. 02-CV-6977 (RCC) (S.D.N.Y.)
*Thomas E. Burnett, Sr. v. Al Baraka Investment & Development Corp.*, Case No. 03-CV-9849 (RCC) (S.D.N.Y.)

**INTERNATIONAL ISLAMIC RELIEF ORGANIZATION'S RESPONSES TO
THE PLAINTIFFS' SECOND SET OF SUPPLEMENTAL REQUESTS FOR
PRODUCTION OF DOCUMENTS**

Martin F. McMahon, Esq.
MARTIN F. MCMAHON & ASSOCIATES
1150 Connecticut Avenue NW, Suite 900
Washington, DC 20036
Phone:       202-862-4343
Facsimile:    202-828-4130

*Attorney for Defendant*

Pursuant to the Federal Rules of Civil Procedure (hereinafter "FRCP"), Defendant International Islamic Relief Organization, Saudi Arabia (hereinafter "IIROSA"), by and through its undersigned attorneys, respond to Plaintiffs' second set of supplemental requests for production of documents.

In furnishing these responses and in producing documents in connection herewith, Defendant does not admit or concede the relevance, materiality, authenticity or admissibility in evidence of any such responses or documents. All objections to the use, at hearing or otherwise, of any of these responses or documents produced in connection herewith are expressly reserved.

## GENERAL OBJECTIONS

Defendant IIROSA incorporates by reference all objections previously invoked in its initial responses to Plaintiffs' First Request for Production of Documents (hereinafter referred to as "Production Requests"), and Defendant makes the following additional General Objections to Plaintiffs' Production Requests:

1.     Defendant objects to Plaintiffs' Production Requests to the extent that the requests seek information which is already in the custody, possession or control of the Plaintiffs.

2.     Defendant objects to Plaintiffs' Production Requests to the extent that the requests seek information which is equally or more readily accessible to the Plaintiffs and/or is readily obtainable independently from the public domain.

3.     Defendant objects to Plaintiffs' Production Requests to the extent that the requests are vague, ambiguous, unduly burdensome, do not specify information sought with sufficient particularity, are not limited to the subject matter of the litigation, and/or

2

are not reasonably calculated to lead to the discovery of admissible evidence.

      4.     Defendant objects to Plaintiffs' Production Requests to the extent that the requests call for Defendant to identify or produce documents or information not related to the 1992-2001 timeframe discovery limitation set in Judge Daniels' December 21, 2007 Order.

      5.     Defendant objects to Plaintiffs' Production Requests to the extent that the requests call for Defendant to identify or produce large quantities of cumulative information or "all documents" of a specific nature or type, because such a requirement makes that request overly broad, unduly burdensome, and oppressive.

      6.     Defendant objects to Plaintiffs' Production Requests to the extent that the requests seek information regarding "radical," "fundamentalist," "extremist," "corrupt," or "deviant" activities, individuals, groups, or organizations, as such categories are vague, ambiguous, overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.

## PRODUCTION REQUESTS

### REQUEST 1:

      Please provide any and all documents relating to the United States Treasury Department's investigation and August 3, 2006 designations of the IIRO's Philippine and Indonesian branch offices and Abd al Hamid Sulaiman al Mujil, the IIRO's Executive Director of the Eastern Province Branch (hereinafter, collectively referred to as the "IIRO Designees"), "for facilitating fundraising for al Qaida and affiliated terrorist groups." Such documents shall include, but are not limited to, any and all documents identifying all accounts, assets, and monies that were seized and/or frozen following the August 3,

2006 designations.

**RESPONSE:**

Defendant incorporates and asserts each of the General Objections identified above, specifically including General Objections 1, 2, 3, 4 and 5. Defendant further objects to this request to the extent it seeks documents protected by the attorney-client privilege, work product doctrine, or other privilege. Subject to, and without waiving the above objections, Defendant produces the following accompanying documents (by Bates number) on a disk entitled "IIRO CD Produced On 4.28.08":

>    IIRO-000766 - IIRO-000943
>
>    IIRO-000984 - IIRO-001004
>
>    IIRO-000209 - IIRO-000247
>
>    IIRO-000969 - IIRO-000985.

To the extent the specified accompanying documents are not fully responsive to this request, Defendant will make documents and information available for inspection at Defendant's warehouse and headquarters in Jeddah, Saudi Arabia, and, at Plaintiffs' expense, Defendant will endeavor to segregate responsive, non-privileged documents relating to the 1992-2001 timeframe for Plaintiffs' review.

Inasmuch as discovery is ongoing, Defendant reserves the right to supplement and/or revise this Answer.


**REQUEST 2:**

Please provide any and all documents relating to any investigations or inquiries conducted by the United Nations relating to allegations of the IIRO Designees' ties to terrorism, including without limitation, any and all documents relating to the U.N.

4

Security Council Sanction Committee's designations, dated August 4, 2006 and November 9, 2006, identifying the IIRO Designees as entities and individuals "belonging to or associated with the Al-Qaida organization." Such documents shall include, but are not limited to, any and all documents identifying all accounts, assets, and monies that were seized and/or frozen following the designations.

**RESPONSE:**

Defendant incorporates and asserts each of the General Objections identified above, specifically including General Objections 1, 2, 3, 4 and 5. Defendant further objects to this request to the extent it seeks documents protected by the attorney-client privilege, work product doctrine, or other privilege. Subject to, and without waiving the above objections, Defendant produces the following accompanying documents (by Bates number) on a disk entitled "IIRO CD Produced On 4.28.08":

IIRO-000209 - IIRO-000247

IIRO-001005 - IIRO-001006

IIRO-001007 - IIRO-001014.

To the extent the specified accompanying documents are not fully responsive to this request, Defendant will make documents and information available for inspection at Defendant's warehouse and headquarters in Jeddah, Saudi Arabia, and, at Plaintiffs' expense, Defendant will endeavor to segregate responsive, non-privileged documents relating to the 1992-2001 timeframe for Plaintiffs' review.

Inasmuch as discovery is ongoing, Defendant reserves the right to supplement and/or revise this Answer.

**REQUEST 3:**

      Please provide any and all documents relating to any investigations or inquiries conducted by the Republic of the Philippines and the Republic of Indonesia relating to allegations of the IIRO Designees' ties to terrorism, including without limitation, all documents identifying any and all accounts, assets, and/or monies seized and/or frozen by those governments.

**RESPONSE:**

      Defendant incorporates and asserts each of the General Objections identified above, specifically including General Objections 1, 2, 3, 4 and 5. Defendant further objects to this request to the extent it seeks documents protected by the attorney-client privilege, work product doctrine, or other privilege. Subject to, and without waiving the above objections, Defendant produces the following accompanying documents (by Bates number) on a disk entitled "IIRO CD Produced On 4.28.08":

               IIRO-000984 - IIRO-001004.

      To the extent the specified accompanying documents are not fully responsive to this request, Defendant will make documents and information available for inspection at Defendant's warehouse and headquarters in Jeddah, Saudi Arabia, and, at Plaintiffs' expense, Defendant will endeavor to segregate responsive, non-privileged documents relating to the 1992-2001 timeframe for Plaintiffs' review.

      Inasmuch as discovery is ongoing, Defendant reserves the right to supplement and/or revise this Answer.

**REQUEST 4:**

Please provide any and all documents relating to IIRO Account Nos. 020010010000011145671 and 020020010000012000472, held at the Bank of Philippine Islands ('BPI"). Such documents shall include, but are not limited to, correspondence, letters, memoranda, notes, and/or e-mails, that refer to, relate to, or reject communications between or among the IIRO the IIRO Designees and BPI, monthly account statements, annual account statements, account notices, deposits, withdrawals, deposit slips, check stubs, cleared or canceled checks, cashier checks, money orders, debit/credit memos, financial ledgers, journals,, investment records, real estate records, records of assets, loan records, audit work papers, audit reports, wire transfers, and any documentation showing the source's and / or destinations of any funds deposited into or withdrawn from those accounts.

**RESPONSE:**

Defendant incorporates and asserts each of the General Objections identified above, specifically including General Objections 1, 2, 3, 4 and 5. Defendant further objects to this request to the extent it seeks documents protected by the attorney-client privilege, work product doctrine, or other privilege. Subject to, and without waiving the above objections, Defendant produces the following accompanying documents (by Bates number) on a disk entitled "IIRO CD Produced On 4.28.08":

IIRO-000984 - IIRO-001004.

To the extent the specified accompanying documents are not fully responsive to this request, Defendant will make documents and information available for inspection at Defendant's warehouse and headquarters in Jeddah, Saudi Arabia, and, at Plaintiffs' expense, Defendant will endeavor to segregate responsive, non-privileged documents

7

relating to the 1992-2001 timeframe for Plaintiffs' review.

Inasmuch as discovery is ongoing, Defendant reserves the right to supplement and/or revise this Answer.

## REQUEST 5:

Please provide all documents relating to any designation, sanction or restriction imposed upon You and/or the IIRO Designees by any agency, department or instrumentality of the United Sates, United Nations, or any other nation or international body.

## RESPONSE:

Defendant incorporates and asserts each of the General Objections identified above, specifically including General Objections 1, 2, 3, 4 and 5. Defendant objects to this request as seeking duplicative and cumulative information. Defendant further objects to this request to the extent it seeks documents protected by the attorney-client privilege, work product doctrine, or other privilege. Subject to, and without waiving the above objections, Defendant produces the following accompanying documents (by Bates number) on a disk entitled "IIRO CD Produced On 4.28.08":

IIRO-000766 - IIRO-000943

IIRO-000984 - IIRO-001004

IIRO-000209 - IIRO-000247

IIRO-000969 - IIRO-000985.

To the extent the specified accompanying documents are not fully responsive to this request, Defendant will make documents and information available for inspection at

8

Defendant's warehouse and headquarters in Jeddah, Saudi Arabia, and, at Plaintiffs'
expense, Defendant will endeavor to segregate responsive, non-privileged documents
relating to the 1992-2001 timeframe for Plaintiffs' review.

Inasmuch as discovery is ongoing, Defendant reserves the right to supplement
and/or revise this Answer.

## REQUEST 6:

Please provide copies of any and all documents and things that have been seized
by, or produced by You and/or the IIRO Designees to, any investigators, auditors,
government officials or agencies, and/or international bodies concerning the IIRO
Designees' alleged support for, or connections to, alleged terrorist, deviant or criminal
organizations, groups, individuals, or activities.

## RESPONSE:

Defendant incorporates and asserts each of the General Objections identified
above, specifically including General Objections 1, 2, 3, 4, 5 and 6. Defendant objects to
this request as seeking duplicative and cumulative information. Defendant further objects
to this request to the extent it seeks documents protected by the attorney-client privilege,
work product doctrine, or other privilege. Subject to, and without waiving the above
objections, Defendant produces the following accompanying documents (by Bates
number) on a disk entitled "IIRO CD Produced On 4.28.08":

> IIRO-000766 - IIRO-000943
>
> IIRO-000984 - IIRO-001004
>
> IIRO-000209 - IIRO-000247

IIRO-000969 - IIRO-000985.

To the extent the specified accompanying documents are not fully responsive to this request, Defendant will make documents and information available for inspection at Defendant's warehouse and headquarters in Jeddah, Saudi Arabia, and, at Plaintiffs' expense, Defendant will endeavor to segregate responsive, non-privileged documents relating to the 1992-2001 timeframe for Plaintiffs' review.

Inasmuch as discovery is ongoing, Defendant reserves the right to supplement and/or revise this Answer.


**REQUEST 7:**

Please provide any and all documents relating to any investigations or inquiries conducted by the Kingdom of Saudi Arabia relating to You and/or the IIRO Designees' ties to terrorism.

**RESPONSE:**

Defendant incorporates and asserts each of the General Objections identified above, specifically including General Objections 2, 3, 4 and 5. Defendant specifically objects to this request as seeking information and documents which are publicly available and/or equally accessible to Plaintiffs as Defendant. Defendant specifically objects to this request to the extent it seeks information in the possession of the Kingdom of Saudi Arabia, a sovereign nation not subject to discovery in this case. Defendant further objects to this request to the extent it seeks documents protected by the attorney-client privilege, work product doctrine, or other privilege. Subject to, and without waiving the above objections, Defendant's counsel has not found or learned of any documents of

Defendant's thus far that are responsive to this Request.

Inasmuch as discovery is ongoing, Defendant reserves the right to supplement and/or revise this Answer.


**REQUEST 8:**

Please provide any and all documents relating to any sanctions or restrictions imposed upon You and/or the IIRO Designees by the Kingdom of Saudi Arabia.

**RESPONSE:**

Defendant incorporates and asserts each of the General Objections identified above, specifically including General Objections 2, 3, 4 and 5. Defendant specifically objects to this request as seeking information and documents which are publicly available and/or equally accessible to Plaintiffs as Defendant. Defendant specifically objects to this request to the extent it seeks information in the possession of the Kingdom of Saudi Arabia, a sovereign nation not subject to discovery in this case. Defendant further objects to this request to the extent it seeks documents protected by the attorney-client privilege, work product doctrine, or other privilege. Subject to, and without waiving the above objections, Defendant's counsel is still in the process of reviewing recently received documents and will be producing responsive documents therefrom (if any) shortly.

Inasmuch as discovery is ongoing, Defendant reserves the right to supplement and/or revise this Answer.


**REQUEST 9:**

Please provide any and all documents sent to, and/or received from, the Kingdom

11

of Saudi Arabia relating to any accusation that the IIRO Designees, or any individual or entity employed by and/or affiliated with the IIRO Designees, were associated with or involved in any criminal, corrupt, deviant or extremist activity, including without limitation any terrorist or radical religious, political or social activities.

**RESPONSE:**

Defendant incorporates and asserts each of the General Objections identified above, specifically including General Objections 2, 3, 4, 5 and 6. Defendant specifically objects to this request as seeking information and documents which are publicly available and/or equally accessible to Plaintiffs as Defendant. Defendant specifically objects to this request to the extent it seeks information in the possession of the Kingdom of Saudi Arabia, a sovereign nation not subject to discovery in this case. Defendant further objects to this request to the extent it seeks documents protected by the attorney-client privilege, work product doctrine, or other privilege. Subject to, and without waiving the above objections, Defendant's counsel has not found or learned of any documents of Defendant's thus far that are responsive to this Request.

Inasmuch as discovery is ongoing, Defendant reserves the right to supplement and/or revise this Answer.

**REQUEST 10:**

Please provide all documents relating to any and all information or notification You received that the IIRO Designees, or any individual or entity employed by and/or affiliated with the IIRO Designees, were associated with or involved in: (i) the sponsorship of any radical, extremist or terrorist organization; (ii) criminal, corrupt or

12

deviant activities; or (iii) any military, radical or terrorist activity, plot or attack.

**RESPONSE:**

Defendant incorporates and asserts each of the General Objections identified above, specifically including General Objections 2, 3, 4, 5 and 6. Defendant specifically objects to this request as seeking information and documents which are publicly available and/or equally accessible to Plaintiffs as Defendant. Defendant further objects to this request to the extent it seeks documents protected by the attorney-client privilege, work product doctrine, or other privilege. Subject to, and without waiving the above objections, Defendant's counsel has not found or learned of any documents of Defendant's thus far that are responsive to this Request.

Inasmuch as discovery is ongoing, Defendant reserves the right to supplement and/or revise this Answer.

**REQUEST 11:**

Please provide all documents relating to any and all information or notification You received that the IIRO Designees, or any individual or entity employed by and/or affiliated with the IIRO Designees, may have been or were diverting funds or otherwise providing material support or resources to the Abu Sayyaf Group and Jemaah Islamiyah.

**RESPONSE:**

Defendant incorporates and asserts each of the General Objections identified above, specifically including General Objections 1, 2, 3, 4 and 5. Defendant further objects to this request to the extent it seeks documents protected by the attorney-client privilege, work product doctrine, or other privilege. Subject to, and without waiving the

13

above objections, Defendant produces the following accompanying documents (by Bates number) on a disk entitled "IIRO CD Produced On 4.28.08":

> IIRO-000766 - IIRO-000943
>
> IIRO-000984 - IIRO-001004
>
> IIRO-000209 - IIRO-000247
>
> IIRO-000969 - IIRO-000985.

To the extent the specified accompanying documents are not fully responsive to this request, Defendant will make documents and information available for inspection at Defendant's warehouse and headquarters in Jeddah, Saudi Arabia, and, at Plaintiffs' expense, Defendant will endeavor to segregate responsive, non-privileged documents relating to the 1992-2001 timeframe for Plaintiffs' review.

Inasmuch as discovery is ongoing, Defendant reserves the right to supplement and/or revise this Answer.

**REQUEST 12:**

Please provide all documents relating to any and all information or notification You received that the IIRO Designees, or any individual or entity employed by and/or affiliated with the IIRO Designees, may have been or were diverting funds or otherwise providing material support or resources to: (i) Islamic radicals, fundamentalists, extremists or persons or organizations associated with international terrorism or domestic terrorism; and/or (ii) al Qaida, other terrorist organizations and/or individuals sympathetic to al Qaida, or other terrorist organizations, regardless of whether you believe such person(s) or entity(s) was acting within the scope of his employment in

relation to any such activities.

**RESPONSE:**

Defendant incorporates and asserts each of the General Objections identified above, specifically including General Objections 2, 3, 4, 5 and 6. Defendant further objects to this request to the extent it seeks documents protected by the attorney-client privilege, work product doctrine, or other privilege. Subject to, and without waiving the above objections, Defendant produces the following accompanying documents (by Bates number) on a disk entitled "IIRO CD Produced On 4.28.08":

IIRO-000766 - IIRO-000943

IIRO-000984 - IIRO-001004

IIRO-000209 - IIRO-000247

IIRO-000969 - IIRO-000985.

To the extent the specified accompanying documents are not fully responsive to this request, Defendant will make documents and information available for inspection at Defendant's warehouse and headquarters in Jeddah, Saudi Arabia, and, at Plaintiffs' expense, Defendant will endeavor to segregate responsive, non-privileged documents relating to the 1992-2001 timeframe for Plaintiffs' review.

Inasmuch as discovery is ongoing, Defendant reserves the right to supplement and/or revise this Answer.

**REQUEST 13:**

Please provide any and all documents relating to any internal investigations conducted by You relating to any accusation that the IIRO Designees, including any

individual or entity employed by and/or assisted with the IIRO Designees, were associated with or involved in any criminal, corrupt deviant or extremist activity, including without limitation any terrorist or radical religious, political or social activities.

**RESPONSE:**

Defendant incorporates and asserts each of the General Objections identified above, specifically including General Objections 2, 3, 4, 5 and 6. Defendant further objects to this request to the extent it seeks documents protected by the attorney-client privilege, work product doctrine, or other privilege. Subject to, and without waiving the above objections, Defendant produces the following accompanying documents (by Bates number) on a disk entitled "IIRO CD Produced On 4.28.08":

> IIRO-000766 - IIRO-000943
>
> IIRO-000984 - IIRO-001004
>
> IIRO-000209 - IIRO-000247
>
> IIRO-000969 - IIRO-000985.

To the extent the specified accompanying documents are not fully responsive to this request, Defendant will make documents and information available for inspection at Defendant's warehouse and headquarters in Jeddah, Saudi Arabia, and, at Plaintiffs' expense, Defendant will endeavor to segregate responsive, non-privileged documents relating to the 1992-2001 timeframe for Plaintiffs' review.

Inasmuch as discovery is ongoing, Defendant reserves the right to supplement and/or revise this Answer.

**REQUEST 14:**

Please provide all documents relating to any disciplinary action taken by You, or any decision to terminate any relationship with the IIRO Designees, or any individual or entity employed by and/or affiliated with the IIRO Designees, as a result of financial irregularities, suspicious activities, investigations into possible links to the financing of terrorist organizations, and/or the support of violence or jihad, including without limitation, any such individuals or entities identified in response to Requests #9-13. In the event You have closed the IIRO branch offices in the Philippines and Indonesia, and/or terminated al Mujil from any and all positions he holds within the IIRO, please provide such documentation.

**RESPONSE:**

Defendant incorporates and asserts each of the General Objections identified above, specifically including General Objections 2, 3, 4 and 5. Defendant specifically objects to this request as seeking information and documents which are publicly available and/or equally accessible to Plaintiffs as Defendant. Defendant further objects to this request to the extent it seeks documents protected by the attorney-client privilege, work product doctrine, or other privilege. Subject to, and without waiving the above objections, Defendant's counsel has not found or learned of any documents of Defendant's thus far that are responsive to this Request.

Inasmuch as discovery is ongoing, Defendant reserves the right to supplement and/or revise this Answer.

**REQUEST 15:**

Please provide any and all documents relating to the IIRO Designees' role in

17

providing material support or resources to al Qaida, the Abu Sayyaf Group, Jemaah

Islamiyah, or other islamic fighters in Indonesia, the Philippines, or elsewhere, including

without limitation, the support of camps in and/or around those areas, recruitment,

training, transportation, lodging, the acquisition, trafficking, and/or smuggling of

weapons and arms such as rockets, mortars, rifles, dynamite and other bombs, and the

provision of boots, tents, and uniforms.

**RESPONSE:**

Defendant incorporates and asserts each of the General Objections identified

above, specifically including General Objections 2, 3, 4 and 5. Defendant specifically

objects to this request as seeking information and documents which are publicly available

and/or equally accessible to Plaintiffs as Defendant. Defendant further objects to this

request to the extent it seeks documents protected by the attorney-client privilege, work

product doctrine, or other privilege. Subject to, and without waiving the above

objections, Defendant's counsel has not found or learned of any documents of

Defendant's thus far that are responsive to this Request.

Inasmuch as discovery is ongoing, Defendant reserves the right to supplement

and/or revise this Answer.


**REQUEST 16:**

Please provide any and all documents governing, describing, detailing, or

otherwise relating to the relationship between the IIRO and Abd al Hamid Sulaiman al

Mujil, including without limitation, all documents relating to al Mujil's appointment as

IIRO's Executive Director of the IIRO Eastern Province Branch, and all other positions al

Mujil has held and/or holds within the IIRO. Such documents shall include, but are not limited to, copies of al Mujil's resumes, curriculum vitaes, biographies, abstracts, media reports, digests, publications, summaries, employment contracts, and/or outlines.

**RESPONSE:**

Defendant incorporates and asserts each of the General Objections identified above, specifically including General Objections 2, 3, 4 and 5. Defendant further objects to this request to the extent it seeks documents protected by the attorney-client privilege, work product doctrine, or other privilege. Subject to, and without waiving the above objections, Defendant's counsel is still in the process of reviewing recently received documents and will be producing responsive documents therefrom (if any) shortly.

Inasmuch as discovery is ongoing, Defendant reserves the right to supplement and/or revise this Answer.

**REQUEST 17:**

Please provide any and all documents relating to al Mujil's supervision, management, control of, or distribution of IIRO funds, including without limitation, all documents relating to al Mujil's duties and responsibilities to determine and/or make recommendations as to which charities, individuals, or entities should receive financial and/or non-monetary support from the IIRO and the IIRO Eastern Province Branch, and the purpose for such disbursements.

**RESPONSE:**

Defendant incorporates and asserts each of the General Objections identified above, specifically including General Objections 2, 3, 4 and 5. Defendant further objects

to this request to the extent it seeks documents protected by the attorney-client privilege, work product doctrine, or other privilege. Subject to, and without waiving the above objections, Defendant's counsel is still in the process of reviewing recently received documents and will be producing responsive documents therefrom (if any) shortly.

Inasmuch as discovery is ongoing, Defendant reserves the right to supplement and/or revise this Answer.

## REQUEST 18:

Please provide any and all documents relating to the transfer of IIRO funds authorized by al Mujil and/or the IIRO Eastern Province Branch (and/or any IIRO official, employee, representative or agent working on al Mujil's or the IIRO Eastern Province Branch's behalf) for any IIRO branch office.

## RESPONSE:

Defendant incorporates and asserts each of the General Objections identified above, specifically including General Objections 2, 3, 4 and 5. Defendant specifically objects to this request as seeking information and documents which are publicly available and/or equally accessible to Plaintiffs as Defendant. Defendant further objects to this request to the extent it seeks documents protected by the attorney-client privilege, work product doctrine, or other privilege. Subject to, and without waiving the above objections, Defendant produces the following accompanying documents (by Bates number) on a disk entitled "IIRO CD Produced On 4.28.08":

IIRO-000969 - IIRO-000985.

To the extent the specified accompanying documents are not fully responsive to

this request, Defendant will make documents and information available for inspection at Defendant's warehouse and headquarters in Jeddah, Saudi Arabia, and, at Plaintiffs' expense, Defendant will endeavor to segregate responsive, non-privileged documents relating to the 1992-2001 timeframe for Plaintiffs' review.

Inasmuch as discovery is ongoing, Defendant reserves the right to supplement and/or revise this Answer.

### REQUEST 19:

Please provide any and all documents governing, describing, detailing, or otherwise relating to the relationship between al Mujil and the Kingdom of Saudi Arabia, including without limitation, the following agencies of the KSA: the Supreme Council of Islamic Affairs, the Ministry for Islamic Affairs, Endowments, Dawa and Guidance, the Ministry of Foreign Affairs, Endowments, Dawa and Guidance, the Ministry of Defense and Aviation, Endowments, Dawa and Guidance, the Majlis al Shura (aka the Shura Council), the Ministry of Education, and any embassy or consulate of the KSA. Such documents shall include, but are not limited to, any official positions al Mujil held or holds within the government of the KSA.

### RESPONSE:

Defendant incorporates and asserts each of the General Objections identified above, specifically including General Objections 2, 3, 4 and 5. Defendant specifically objects to this request to the extent it seeks information in the possession of the Kingdom of Saudi Arabia, a sovereign nation not subject to discovery in this case. Defendant further objects to this request to the extent it seeks documents protected by the attorney-

client privilege, work product doctrine, or other privilege. Subject to, and without waiving the above objections, Defendant's counsel has not found or learned of any documents of Defendant's thus far that are responsive to this Request.

Inasmuch as discovery is ongoing, Defendant reserves the right to supplement and/or revise this Answer.

**REQUEST 20:**

Please provide any and all documents relating to any meeting al Mujil attended in his capacity as an official and/or representative of the IIRO with any official, representative, or agency of the KSA.

**RESPONSE:**

Defendant incorporates and asserts each of the General Objections identified above, specifically including General Objections 2, 3, 4 and 5. Defendant specifically objects to this request as seeking information and documents which are publicly available and/or equally accessible to Plaintiffs as Defendant. Defendant specifically objects to this request to the extent it seeks information in the possession of the Kingdom of Saudi Arabia, a sovereign nation not subject to discovery in this case. Defendant further objects to this request to the extent it seeks documents protected by the attorney-client privilege, work product doctrine, or other privilege. Subject to, and without waiving the above objections, Defendant's counsel has not found or learned of any documents of Defendant's thus far that are responsive to this Request.

Inasmuch as discovery is ongoing, Defendant reserves the right to supplement and/or revise this Answer.

**REQUEST 21:**

Please provide any and all documents relating to any investigation conducted by the IIRO into any alleged criminal, improper, unauthorized, deviant or terrorist activities of al Mujil, including but not limited to, al Mujil's ties to the following terrorists and terrorist organizations: Osama Bin Laden, Abdullah Azzam, Khalid Sheikh Mohammed, Mohammed Jamal Khalifa, Abdurajak Jaljalani, al Quida, Abu Sayyaf Group, and Jemaah Islamiyah.

**RESPONSE:**

Defendant incorporates and asserts each of the General Objections identified above, specifically including General Objections 2, 3, 4, 5 and 6. Defendant specifically objects to this request as seeking information and documents which are publicly available and/or equally accessible to Plaintiffs as Defendant. Defendant further objects to this request to the extent it seeks documents protected by the attorney-client privilege, work product doctrine, or other privilege. Subject to, and without waiving the above objections, Defendant's counsel has not found or learned of any documents of Defendant's thus far that are responsive to this Request.

Inasmuch as discovery is ongoing, Defendant reserves the right to supplement and/or revise this Answer.

**REQUEST 22:**

Please provide any and all documents governing, describing, detailing, or otherwise relating to the relationship between or among You, the IIRO Designees, and

23

the following individuals: Abd Al-Hadi Daguit and Mahmud Abd Al-Jalil Afif. Such

documents shall include, but are not limited to, any positions those individuals held or

hold within the IIRO.

**RESPONSE:**

Defendant incorporates and asserts each of the General Objections identified

above, specifically including General Objections 2, 3, 4 and 5. Defendant specifically

objects to this request as seeking information and documents which are publicly available

and/or equally accessible to Plaintiffs as Defendant. Defendant further objects to this

request to the extent it seeks documents protected by the attorney-client privilege, work

product doctrine, or other privilege. Subject to, and without waiving the above

objections, Defendant's counsel has not found or learned of any documents of

Defendant's thus far that are responsive to this Request.

Inasmuch as discovery is ongoing, Defendant reserves the right to supplement

and/or revise this Answer.


**REQUEST 23:**

From the period beginning January 1990 thorough the present, please provide any

and all documents identifying all individuals, both foreign and domestic, employed by the

Philippine and Indonesian branch offices of the IIRO. Such documents shall include, but

are not limited to, lists of all officers, directors, trustees, employees and agents, with

dates of hire and termination, job title, job responsibilities, and place of employment,

**RESPONSE:**

Defendant incorporates and asserts each of the General Objections identified

24

above, specifically including General Objections 2, 3, 4 and 5. Defendant specifically objects to this request in so far as it seeks documents and information prior to the limited timeframe imposed on discovery in this case in Judge Daniels' December 21, 2007 Order. Defendant further objects to this request to the extent it seeks documents protected by the attorney-client privilege, work product doctrine, or other privilege. Subject to, and without waiving the above objections, Defendant produces the following accompanying documents (by Bates number) on a disk entitled "IIRO CD Produced On 4.28.08":

> IIRO-000944 - IIRO-000968

> IIRO-000969 - IIRO-000985.

To the extent the specified accompanying documents are not fully responsive to this request, Defendant will make documents and information available for inspection at Defendant's warehouse and headquarters in Jeddah, Saudi Arabia, and, at Plaintiffs' expense, Defendant will endeavor to segregate responsive, non-privileged documents relating to the 1992-2001 timeframe for Plaintiffs' review.

Inasmuch as discovery is ongoing, Defendant reserves the right to supplement and/or revise this Answer.


**REQUEST 24:**

From the period beginning January 1990 through the present please provide any and all documents relating to any grants, loans and investments made by the Philippine and Indonesian branch offices of the IIRO. Such investments shall include, but are not limited to, real estate, real estate ventures, stocks, government bonds, corporate bonds,

municipal bonds, cash investments, pooled investments, equity funds, mutual funds, hedge funds, money market securities, annuities, commodities, options, futures, collectibles, diamonds, gold, IRAs, and/or municipal debt instruments.

**RESPONSE:**

Defendant incorporates and asserts each of the General Objections identified above, specifically including General Objections 2, 3, 4 and 5. Defendant specifically objects to this request in so far as it seeks documents and information prior to the limited timeframe imposed on discovery in this case in Judge Daniels' December 21, 2007 Order. Defendant further objects to this request to the extent it seeks documents protected by the attorney-client privilege, work product doctrine, or other privilege. Subject to, and without waiving the above objections, Defendant produces the following accompanying documents (by Bates number) on a disk entitled "IIRO CD Produced On 4.28.08":

IIRO-000944 - IIRO-000968

IIRO-000969 - IIRO-000985.

To the extent the specified accompanying documents are not fully responsive to this request, Defendant will make documents and information available for inspection at Defendant's warehouse and headquarters in Jeddah, Saudi Arabia and, at Plaintiffs' expense, Defendant will endeavor to segregate responsive, non-privileged documents relating to the 1992-2001 timeframe for Plaintiffs' review.

Inasmuch as discovery is ongoing, Defendant reserves the right to supplement and/or revise this Answer.

**REQUEST 25:**

From the period beginning January 1990 through the present, please provide any

and all documents detailing all contributions received and disbursements made by the

Philippine and Indonesia branch offices of the IIRO.

**RESPONSE:**

Defendant incorporates and asserts each of the General Objections identified

above, specifically including General Objections 2, 3, 4 and 5. Defendant specifically

objects to this request in so far as it seeks documents and information prior to the limited

timeframe imposed on discovery in this case in Judge Daniels' December 21, 2007

Order. Defendant further objects to this request to the extent it seeks documents

protected by the attorney-client privilege, work product doctrine, or other privilege.

Subject to, and without waiving the above objections, Defendant produces the following

accompanying documents (by Bates number) on a disk entitled "IIRO CD Produced On

4.28.08":

>    IIRO-000944 - IIRO-000968
>
>    IIRO-000969 - IIRO-000985
>
>    IIRO-000133 - IIRO-000137
>
>    IIRO-000138 - IIRO-000163
>
>    IIRO-000209 - IIRO-000247.

To the extent the specified accompanying documents are not fully responsive to

this request, Defendant will make documents and information available for inspection at

Defendant's warehouse and headquarters in Jeddah, Saudi Arabia, and, at Plaintiffs'

expense, Defendant will endeavor to segregate responsive, non-privileged documents

relating to the 1992-2001 timeframe for Plaintiffs' review.

Inasmuch as discovery is ongoing, Defendant reserves the right to supplement and/or revise this Answer.

RESPECTFULLY SUBMITTED,

**MARTIN McMAHON & ASSOCIATES**

C. Hilou      (for Martin Mc Mahon w/p)
Martin F. McMahon, D.C. Bar # 196642
Martin F. McMahon & Associates
1150 Connecticut Ave. N.W.
Suite 900
Washington, DC  20036
(202) 862-4343
mfm@martinmcmahonlaw.com

28

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 28th day of April, 2008, a copy of the foregoing Responses to Plaintiffs' Second Set Of Supplemental Requests for Production Of Documents were emailed and mailed, postage pre-paid to:

Mr. Andrew J. Maloney III, Esq.
Kreindler & Kreindler
100 Park Ave.
New York, NY 10017-5590
amoloney@kreindler.com
*Attorney for Plaintiff Ashton*

Mr. Robert L. Motley, Esq.
Motley Rice LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Rmotley@motleyrice.com
*Attorney for Plaintiff Burnett*

Mr. Sean P. Carter, Esq.
Cozen O'Connor
1900 Market St.
Philadelphia, PA 19103-3508
Scarter1@cozen.com
*Attorney for Plaintiff Federal Insurance*

Mr. Jerry S. Goldman, Esq.
Anderson Kill & Olick, P.C.,
1251 Avenue of the Americas
New York, NY 10020
jgoldman@goldmanlawyers.com
*Attorney for Plaintiff O'Neill*

Christine Hilgeman, Esq.

29