## MDL 1570 PLAINTIFFS' EXECUTIVE COMMITTEES
In re: Terrorist Attacks on September 11, 2001 (S.D.N.Y)

| Plaintiffs' Executive Committee for Personal Injury and Death Claims | Plaintiffs' Executive Committee for Commercial Claims |
|---|---|
| Ronald L. Motley, *Co-Chair*<br>MOTLEY RICE LLC<br>James P. Kreindler, *Co-Chair*<br>KREINDLER & KREINDLER LLP | Elliot R. Feldman, *Co-Chair*<br>Sean Carter, *Co-Chair*<br>COZEN O'CONNOR |
| Andrew J. Maloney III, *Co-Liaison Counsel*<br>KREINDLER & KREINDLER LLP<br>Paul J. Hanly, Jr., *Co-Liaison Counsel*<br>HANLY CONROY BIERSTEIN SHERIDAN FISHER & HAYES LLP | J. Scott Tarbutton, *Liaison Counsel*<br>COZEN O'CONNOR |

**VIA HAND DELIVERY**

April 21, 2011

The Honorable Frank Maas
United States District Court for the
Southern District of New York
Daniel Patrick Moynihan United States
Courthouse
500 Pearl Street, Room 740
New York, NY 10007-1312

    Re:    *In Re: Terrorist Attacks on September 11, 2001*, 03 MDL 1570 (GBD) (FM)

Dear Judge Maas:

    On behalf of the Plaintiffs' Executive Committees for all of the Plaintiffs, I write in reply to the April 11, 2011 letter brief of defendant International Islamic Relief Organization ("IIRO"), which was submitted in response to the Plaintiffs' March 24, 2011 motion to compel the defendant to produce documentation and information relating to certain categories of documents previously requested by the Plaintiffs. For the reasons set forth below, the defendant's burden arguments should be rejected for a third time and the IIRO should be compelled to immediately produce the requested materials identified in the Plaintiffs' March 24th submission.

**I.    Defendants Continue To Assert Burden Objections That Have Been Soundly Rejected By This Court**

    In the March 24, 2011 Motion to Compel, Plaintiffs identified several important categories of documents that defendant IIRO has failed to produce, including but not limited to:

- IIRO's relationship with, and employment of, al Qaeda members Wa'el Hamza Jelaidan and Mohammed Jamal Khalifa;

- the U.S. Department of the Treasury's Executive Order 13224 designations of the IIRO's Philippine and Indonesian branch offices, as well as the Executive Director of the IIRO's

The Honorable Frank Maas
April 21, 2011
Page 2

---

        Eastern Province Branch in Saudi Arabia, Abd al Hamid Sulaiman al Mujil, "for facilitating fundraising for al Qaida and affiliated terrorist groups;"

- IIRO's banking records;

- IIRO's financial and material support for al Qaeda fighters and their training camps; and

- the expulsion of IIRO personnel from Pakistan following the September 11, 2001 attacks.

        Rather than specifically address these focused discovery requests, the IIRO simply does not mention them at all. Instead, the defendant attempts to deflect attention away from these important issues and impose its own framework for discovery, arguing that the Plaintiffs are somehow better served by focusing their discovery efforts and resources on areas where the IIRO thinks best, such as: (i) traveling to Jeddah, Saudi Arabia to visit and inspect an "orphans" room; (ii) traveling to a variety of IIRO offices around the world to hunt for responsive documentation; and (iii) filing new lawsuits against other potential 9/11 co-conspirators such as Sun Trust Bank. Setting these distractions aside, it becomes clear that the basis for the defendant's objection to Plaintiffs' discovery is that it argues that the production of the requested materials "would prove unduly burdensome and oppressive," an argument the IIRO and MWL continue to raise despite being soundly rejected by this Court on multiple occasions.

        As set forth in the Plaintiffs' April 7, 2011 reply letter brief submitted to this Court, Judge Daniels considered, rejected, and struck the defendants' burden objections, holding that the appropriate temporal scope of discovery should reasonably begin in 1992, and further directing the defendants to respond to the Plaintiffs' discovery requests. *See* December 21, 2007 Order (MDL Docket Entry No. 2059). More recently, this Court rejected the defendants' very same burden arguments when Your Honor ordered the defendants to within 30 days produce the 8 categories of documents identified in the Plaintiffs' March 16, 2011 Motion to Compel. *See* April 12, 2011 Discovery Hearing Transcript, pp. 41-42.

        Even if this Court were to consider the defendant's burden objections in this instance, Plaintiffs submit they must be rejected for a third time. In support of the April 11th opposition, the IIRO and MWL submitted two affidavits from Sameer al Radhi, an employee of both the IIRO and MWL who purportedly has been tasked with working with counsel on discovery issues relating to this case. Although Mr. al Radhi details the thousands of hours he and other employees have allegedly invested in relation to the September 11 litigation, his affidavits do not even address the alleged burden and oppressiveness of responding to the discovery at issue here. Since the commencement of merits discovery with these defendants, the IIRO and MWL have consistently asserted that responsive documentation could not be produced without tremendous expense and inconvenience to the defendants and that both the IIRO and MWL would have to shut down their operations in order to produce the requested materials. While it should come as no surprise that any litigation of the magnitude of this case would entail large-scale document production – an occurrence not specifically uncommon in any multitude of civil litigation – Plaintiffs and this Court have yet to see any evidence in support of the IIRO's staggering allegation. *See Arias-Zeballos v. Tan*, 2007 U.S. Dist. Lexis 40245, *4 (S.D.N.Y. 2007) ("In

order to satisfy its burden, the resisting party must do more than simply inton[e the] familiar litany that the [discovery requests] are burdensome, oppressive or overly broad, and must clarify and explain its objections and provide support thereof.")

At best, Mr. al Radhi's affidavits confirm that the defendants' records are maintained in such an unwieldy and antiquated state (i.e., most records are in an inaccessible non-electronic format – paper copies; the indices alone are thousands of pages long; 99% of the records are in Arabic; and the defendants lack an electronic database to search for potentially responsive records), that it would be completely unreasonable and unproductive for the Plaintiffs to travel to Jeddah or other foreign locations to cull through mountains of unorganized documents in search of responsive documents. *See Standard Dyeing and Finishing Co. v. Arma Textile Printers Corp.*, 1987 U.S. Dist. LEXIS 868 at *5 (S.D.N.Y. 1987) (holding that when the responding party has failed to maintain its records in a reasonable manner, it must bear the burden of searching the available records for documents responsive to plaintiffs' document requests); *Chemtex, LLC v. St. Anthony Enterprises, Inc.*, 2004 U.S. Dist. LEXIS 6031 at *2 (S.D.N.Y. 2004) (holding that a party is not permitted to avoid its discovery obligations simply because it has failed to maintain its records in a manner that makes them easily retrievable); *Wagner v. Dryvit Systems, Inc.*, 208 F.R.D. 606, 610 (D. Neb. 2001) ("The fact that a corporation has an unwieldy record keeping system which requires it to incur heavy expenditures of time and effort to produce requested documents is an insufficient reason to prevent disclosure of otherwise discoverable information.").

It is impossible to reconcile the representations made in the al Radhi affidavits concerning the investment of time by the IIRO and MWL in responding to discovery with the actual record in this case. For instance, the affidavit submitted by al Radhi on behalf of the IIRO suggests that he and his assistants have logged more than 20,000 hours in relation to the IIRO's efforts to respond to Plaintiffs' document requests. Al Radhi's affidavit on behalf of the MWL indicates that he spent an additional 600 hours searching for documents on behalf of that organization, and that his assistants have logged an additional 6,600 hours. It is impossible to square these representations with the very limited production of documents made by these defendants thus far. Indeed, for its part, the IIRO has produced only 6,698 pages of documents, most of which are not responsive to Plaintiffs' document requests, but rather self-serving documents produced in an effort to bolster IIRO's own defenses – namely that it performs humanitarian functions (ignoring that it can, indeed, simultaneously support terrorism).

Moreover, although the al Radhi affidavit is correct in noting that the MWL has produced 20 binders (containing primarily generic information about the MWL), it fails to disclose that those generic documents were produced at the outset of discovery nearly five years ago. The only other documents produced by the MWL were documents that had previously been seized by the FBI and later returned by the FBI to Mr. McMahon, and therefore did not involve any investment of time by MWL representatives in Saudi Arabia or elsewhere. Indeed, that set of documents was produced in Mr. McMahon's offices, where the FBI had returned the documents. It is therefore impossible to comprehend how the MWL employees have allegedly spent more than 7,000 hours searching for documents over the last few years, and yet produced nothing.

Further, since the meet and confer conducted in October 2007, both the MWL and IIRO have been keenly aware that Plaintiffs were demanding in the first instance the production of the eight categories of documents which were the subject of Plaintiffs' last motion to compel concerning these defendants. None of those documents were produced over the course of the last four years, despite the alleged investment of tens of thousands of man-hours.

The representations in the al Radhi affidavit must be considered in light of the other representations that have been made by these defendants in the course of discovery, in an effort to avoid their discovery obligations. For instance, in their opposition to Plaintiffs' March 16, 2011 motion to compel the production of eight specific categories of documents, the IIRO represented that its branch offices do not submit regular financial reports to the headquarters in Saudi Arabia, and that it would therefore be impossible for IIRO to produce any such documents. It was only after Plaintiffs produced to the Court an internal IIRO protocol requiring the field offices to submit regular financial reports to the headquarters that counsel for the IIRO withdrew that objection explicitly acknowledging his mistake. Similarly, although Plaintiffs have never requested that the IIRO produce its entire warehouse, it has now submitted at least four different estimates for copying the documents within that warehouse, as part of its effort to reformulate the discovery process.[1] In addition, the IIRO has at times represented that it has produced all annual reports for the relevant discovery period, when in fact Plaintiffs have received only a few such annual reports during the course of discovery to date.

For all of those reasons, Plaintiffs respectfully submit that the defendant's burden objections should be struck once again and the IIRO should be compelled to immediately produce the requested materials identified in the Plaintiffs' March 24th motion.

## II.     Defendants Continue To Produce Non-Responsive Documents

As this Court is aware, defendant IIRO served the Plaintiffs with over 2,600 pages of mostly Arabic documents on April 5, 2011. As set forth in the Plaintiffs' April 7, 2011 reply letter brief, a preliminary analysis revealed that much of the production consists of unresponsive, self-aggrandizing documents highlighting the humanitarian works of the IIRO around the globe. Plaintiffs' on-going review of that production continues to produce similar results. The following example is representative.

As set forth in the Plaintiffs' March 24th letter brief, defendant IIRO has failed to produce meaningful and responsive documents in response to Plaintiffs' document requests relating to Mohammed Jamal Khalifa (former senior member of al Qaeda who simultaneously served as the Regional Director for the IIRO in South-East Asia). *See* Plaintiffs' March 24 Motion to Compel, Exhibits H-M. Analyzing the defendant's April 5th production, Plaintiffs have discovered that there are a handful of documents relating to Khalifa. However, upon closer inspection, it is

---

[1] The initial photocopying estimate received from the defendant in June 2006 was for $500,000. Less than two weeks later that estimate jumped to $1 million. Two months later the IIRO provided an additional estimate for $3 million. Finally, it its April 1, 2011 submission to the Court, the defendant quoted a new estimate of $2.1 million.

apparent that the newly produced Khalifa documents suffer from the same problems as articulated in Plaintiffs' March 24th submission. For instance, the IIRO has once again produced: (i) self-serving correspondence from IIRO officials denying accusations that Khalifa was tied to terror groups al Qaeda or Abu Sayyaf Group; (ii) correspondence from IIRO officials stating that Khalifa was interested only in matters of education and the promotion of Islam while at the IIRO; and (iii) various newspaper clippings wherein Khalifa is quoted as denying any connections to terrorism. Moreover, Plaintiffs have identified several instances so far where the IIRO has provided the Plaintiffs with the duplicates of Khalifa-related documents it produced in prior document productions. In fact, on a broader scale, Plaintiffs are discovering that much of the IIRO's April 5th production is identical to documents previously produced to the Plaintiffs on October 30, 2008.

During the April 12, 2011 discovery hearing before Your Honor, Mr. McMahon stated the following:

> Your Honor, I think we have given you all the Jamal Khalifa files, just on our last production. We gave you whatever we have.

*See* April 12, 2011 Discovery Hearing Transcript, p. 40. In light of the Plaintiffs' document analysis, counsel's assertion is questionable. To date, the Plaintiffs have yet to receive responsive documentation regarding Khalifa's role as head of the IIRO's office in the Philippines, including his control over the IIRO's monies, bank accounts, and assets, his oversight of transfers of IIRO funds between IIRO-Saudi Arabia and IIRO-Philippines, and his authority to determine and/or make recommendations as to which charitable designees should receive financial and/or non-monetary support from the IIRO.

Nor has the defendant produced any of the relevant reporting from the IIRO-Philippines branch office to the Saudi headquarters which Khalifa would have approved and signed in his capacity as director of that office. *See* Plaintiffs' April 7, 2011 reply letter brief at pp. 2-6 (identifying the various reports that are required to be transmitted from the branch offices to the IIRO headquarters in Jeddah per the directives of the IIRO Secretary General).

Plaintiffs' respectfully request that the Court compel the defendant to produce immediately all responsive documents relating to Mohammed Jamal Khalifa.

### III. The MWL And IIRO Continue To Be The Focus Of The United States' Terror-Related Investigations

Despite the compelling evidence set forth in the Plaintiffs' March 24th motion that the IIRO and its employees (Wa'el Hamza Jelaidan, Mohammed Jamal Khalifa, and Abd al Hamid Sulaiman al Mujil), provided financial and material support to Osama bin Laden, al Qaeda, and related terror organizations for a period of many years, defense counsel takes the position that there is no proof that the MWL and IIRO funded international terrorism and that any investigations regarding the Saudi charities have been concluded.

The Honorable Frank Maas
April 21, 2011
Page 6

---

Beyond the fact that such self-serving assertions are particularly irrelevant at this stage of the litigation, Plaintiffs submit that the evidence set forth in their March 24th letter brief speaks for itself, and this Court need only look to the statements of the United States government and its leaders to see that the Saudi charities (such as the MWL, IIRO, and World Assembly of Muslim Youth ("WAMY")), continue to be a major focus of the United States' counter-terrorism investigations years after the September 11 attacks as a result of their on-going involvement in funding global terror groups and extremism. *See* New York Times, *Cash Flow to Terrorists Evades U.S. Efforts*, December 5, 2010 (reporting on the release of various State Department cables, including the December 2009 cable from Secretary of State Hillary Clinton which states that "Saudi Arabia remains a critical financial support base for al-Qa'ida, the Taliban, LeT [Lashkar e Taiba], and other terrorist groups, including Hamas," and that the IIRO, MWL, and WAMY continue to send money to "fund extremism overseas."), attached hereto as Exhibit A.

Accordingly, for the reasons explained herein and in Plaintiffs' letter of March 24, 2011 to Your Honor, Plaintiffs respectfully request that Your Honor direct the IIRO to produce the documents indicated in this letter and in the March 24 letter.

Respectfully submitted,

*Plaintiffs' Executive Committee*

THE MDL 1570 PLAINTIFFS' EXECUTIVE COMMITTEES

cc:  Sean P. Carter, Esq.
J. Scott Tarbutton, Esq.
Robert T. Haefele, Esq.
Jodi Westbrook Flowers, Esq.
John M. Eubanks, Esq.
James P. Kreindler, Esq.
Andrew J. Maloney, Esq.
Jerry S. Goldman, Esq.
Martin F. McMahon, Esq.
Alan Kabat, Esq.
The Honorable George B. Daniels

PHILADELPHIA\5995870\1 117430.000

# EXHIBIT A

**The New York Times** • Reprints

This copy is for your personal, noncommercial use only. You can order presentation-ready copies for distribution to your colleagues, clients or customers here or use the "Reprints" tool that appears next to any article. Visit www.nytreprints.com for samples and additional information. Order a reprint of this article now.



December 5, 2010

# Cash Flow to Terrorists Evades U.S. Efforts

**By ERIC LICHTBLAU and ERIC SCHMITT**

WASHINGTON — Nine years after the United States vowed to shut down the money pipeline that finances terrorism, senior Obama administration officials say they believe that many millions of dollars are flowing largely unimpeded to extremist groups worldwide, and they have grown frustrated by frequent resistance from allies in the Middle East, according to secret diplomatic dispatches.

The government cables, sent by Secretary of State Hillary Rodham Clinton and senior State Department officials, catalog a list of methods that American officials suspect terrorist financiers are using, including a brazen bank robbery in Yemen last year, kidnappings for ransom, the harvesting of drug proceeds in Afghanistan and fund-raising at religious pilgrimages to Mecca, where millions of riyals or other forms of currency change hands.

While American officials have publicly been relatively upbeat about their progress in disrupting terrorist financing, the internal State Department cables, obtained by WikiLeaks and made available to several news organizations, offer a more pessimistic account, with blunt assessments of the threats to the United States from money flowing to militants affiliated with Al Qaeda, the Taliban, Hamas, Lashkar-e-Taiba and other groups.

A classified memo sent by Mrs. Clinton last December made it clear that residents of Saudi Arabia and its neighbors, all allies of the United States, are the chief financial supporters of many extremist activities. "It has been an ongoing challenge to persuade Saudi officials to treat terrorist financing emanating from Saudi Arabia as a strategic priority," the cable said,

concluding that "donors in Saudi Arabia constitute the most significant source of funding to Sunni terrorist groups worldwide."

The dispatch and others offered similarly grim views about the United Arab Emirates ("a strategic gap" that terrorists can exploit), Qatar ("the worst in the region" on counterterrorism) and Kuwait ("a key transit point"). The cable stressed the need to "generate the political will necessary" to block money to terrorist networks — groups that she said were "threatening stability in Pakistan and Afghanistan and targeting coalition soldiers."

While President George W. Bush frequently vowed to cut off financing for militants and pledged to make financiers as culpable as terrorists who carried out plots, President Obama has been far less vocal on the issue publicly as he has sought to adopt a more conciliatory tone with Arab nations. But his administration has used many of the same covert diplomatic, intelligence and law enforcement tools as his predecessor and set up a special task force in the summer of 2009 to deal with the growing problem.

While federal officials can point to some successes — prosecutions, seizures of money and tightened money-laundering regulations in foreign countries — the results have often been frustrating, the cables show. As the United States has pushed for more aggressive crackdowns on suspected supporters of terrorism, foreign leaders have pushed back. In private meetings, they have accused American officials of heavy-handedness and of presenting thin evidence of wrongdoing by Arab charities or individuals, according to numerous cables.

Kuwaiti officials, for example, resisted what they called "draconian" measures sought by the United States against a prominent charity and dismissed allegations against it as "unconvincing," according to one cable.

The documents are filled with government intelligence on possible terrorist-financing plots, like the case of a Somali preacher who was reportedly touring Sweden, Finland and Norway last year to look for money and recruits for the Shabab, a militant group in Somalia, or that of a Pakistani driver caught with about $240,000 worth of Saudi riyals stuffed behind his seat. One memo even reported on a possible plot by the Iranians to launder $5 billion to $10 billion in cash through the Emirates' banks as part of a broader effort to "stir up trouble" among the Persian Gulf states, though it was not clear how much of the money might be channeled to

militants.

One episode that set off particular concern occurred in August 2009 in Yemen, when armed robbers stormed a bank truck on a busy downtown street in Aden during daylight hours and stole 100 million Yemeni riyals, or about $500,000. American diplomats said the sophistication of the robbery and other indicators had all the markings of a Qaeda mission. "This bold, unusual operation" could provide Al Qaeda "with a substantial financing infusion at a time when it is thought to be short of cash," a dispatch summarizing the episode said.

Al Qaeda's branch in Yemen, known as Al Qaeda in the Arabian Peninsula, is seen as a rising threat by the United States and was blamed for a parcel bomb plot in October and the failed attempt to blow up a jetliner last Dec. 25. The cables do not make clear whether the finances of the Yemen group are tied to Osama bin Laden's network.

American officials appear to have divided views on the bin Laden group's fund-raising abilities. A February cable to Richard C. Holbrooke, the administration's special representative for Afghanistan and Pakistan, said that "sensitive reporting indicates that al-Qaida's ability to raise funds has deteriorated substantially, and that it is now in its weakest state since 9/11."

But many other cables draw the opposite conclusion and cite the group's ability to generate money almost at will from wealthy individuals and sympathetic groups throughout the Middle East while often staying a step ahead of counterterrorism officials.

"Terrorists avoid money transfer controls by transferring amounts below reporting thresholds and using reliable cash couriers, hawala, and money grams," a recent cable warned. "Emerging trends include mobile banking, pre-paid cards, and Internet banking."

The documents suggest that there is little evidence of significant financial support in the United States or Europe for terrorist groups in Afghanistan and Pakistan, despite a string of deadly but largely low-budget attacks in London and other European cities in recent years, according to the documents.

"U.K. financing is important, but the real money is in the Gulf," a senior British counterterrorism official told a Treasury Department official, according to a cable last year from

the American Embassy in London.

In hundreds of cables focusing on terrorist financing, the problem takes on an air of intractability, as American officials speak of the seeming ease with which terrorists are able to move money, the low cost of carrying out deadly attacks, and the difficulty of stopping it. Interdictions are few, and resistance is frequent.

In Kuwait, for instance, American officials have voiced repeated concerns that Islamic charities — largely unregulated by the government there — are using philanthropic donations to finance terrorism abroad. But a Kuwaiti minister, in a meeting last year with the United States ambassador, "was as frank and pessimistic as ever when it came to the subject of apprehending and detaining terror financiers and facilitators under Kuwait's current legal and political framework," a memo summarizing the meeting said.

Saudi Arabia, a critical military and diplomatic ally, emerges in the cables as the most vexing of problems. Intelligence officials there have stepped up their spying on militants in neighboring Yemen, and they provided the tip that helped uncover the recent parcel bombs. But while the Saudis have made some progress, "terrorist funding emanating from Saudi Arabia remains a serious concern," according to a cable in February. Mrs. Clinton's memo two months earlier said Al Qaeda, the Taliban, Lashkar-e-Taiba and other groups "probably raise millions of dollars annually from Saudi sources, often during Hajj and Ramadan." Officials said they believed that fund-raisers for extremist groups had often descended on the pilgrims to seek money for their causes.

The American Embassy in Riyadh, Saudi Arabia, reported in February that the Saudis remained "almost completely dependent on the C.I.A." for leads and direction on terrorist financing.

So it was not surprising that a month earlier, the embassy reported in a separate cable that Treasury Department officials had provided information to the Saudi domestic intelligence service, the Mabahith, on three senior Taliban leaders — Tayyeb Agha, Mullah Jalil and Khalil Haqqani — who had made several fund-raising trips to the kingdom, the cable said. (Like a number of other suspected financiers identified in the cables, the three Taliban leaders do not appear on the Treasury Department's list of "banned" entities suspected of terrorism financing connections.)

The Americans shared phone numbers, e-mail addresses and passport information for the three men with the Saudis to cross check against Saudi customs databases. Saudi authorities said they were not familiar with the Taliban leaders but promised to pursue the tips.

Last week, American officials said steady pressure from the Bush and Obama administrations had led to significant improvements in fighting terrorist financing. They said, for example, Saudi Arabia was now taking actions that they had long hesitated to take or had resisted, including holding financiers accountable through prosecutions and making terrorist financing a higher priority. A leading Saudi religious scholar has issued an edict against terrorist financing, and the Saudis have created new financial intelligence unit.

"The U.S. government has been relentless in pursuing sources and methods of terrorist financing, including prioritizing this issue with all countries in the gulf region," said Stuart A. Levey, a senior Treasury official, who was speaking generally about American policy and not about anything in the leaked cables. "As a result, we have put Al Qaeda under significant financial pressure."

Behind the scenes at diplomatic encounters, tensions have occasionally flared. In 2007, a senior Bush administration official, Frances Fragos Townsend, told her Saudi counterparts in Riyadh that Mr. Bush was "quite concerned" about the level of cooperation from the Saudis, and she brought a personal letter on the subject from the president to King Abdullah, according to a cable summarizing the exchange.

Ms. Townsend questioned whether the kingdom's ambassador to the Philippines, Mohammed Ameen Wali, might be involved in supporting terrorism because of his involvement with two people suspected of being financiers, the summary said.

Prince Saud al-Faisal, the Saudi foreign minister, challenged the assertion, however, saying the ambassador might be guilty of "bad judgment rather than intentional support for terrorism," and he countered with an assertion of his own: an unnamed American bank handling the Saudi Embassy's money in Washington was performing unnecessary audits and asking "inappropriate and aggressive questions."

American diplomats said that while the Saudis appeared earnest in wanting to stanch the flow

Case 1:03-md-01570-GBD-SN   Document 3826-9   Filed 12/01/17   Page 13 of 20
WikiLeaks Archive - Arab States and Terror Funds - NYTimes.com
Page 6 of 6

of terrorist money, they often lacked the training and expertise to do it. "Their capabilities often fall short of their aspirations," a cable last November said.

Saudi leaders appear equally resigned to the situation, according to the cables. "We are trying to do our best," Prince Mohammed bin Nayef, who leads the Saudis' anti-terrorism activities, was quoted as telling Mr. Holbrooke, the special representative to the region, in a May 2009 meeting.

But, he said, "if money wants to go" to terrorist causes, "it will go."

*Andrew W. Lehren contributed reporting from New York.*

HOME PAGE | TODAY'S PAPER | VIDEO | MOST POPULAR | TIMES TOPICS          Subscribe to The Times | Log In | Register Now | Help

**The New York Times**                    **World**          Search All NYTimes.com

WORLD | U.S. | N.Y. / REGION | BUSINESS | TECHNOLOGY | SCIENCE | HEALTH | SPORTS | OPINION | ARTS | STYLE | TRAVEL | JOBS | REAL ESTATE
AFRICA  AMERICAS  ASIA PACIFIC  EUROPE  MIDDLE EAST

Premier Match — in getting the relationship started!
PREMIER MATCH          Click here to learn more!

UPDATED December 1, 2010

## A Selection From the Cache of Diplomatic Dispatches

Below are a selection of the documents from a cache of a quarter-million confidential American diplomatic cables released by WikiLeaks. A small number of names and passages in some of the cables have been removed by The New York Times to protect diplomats' confidential sources, to keep from compromising American intelligence efforts or to protect the privacy of ordinary citizens.

**STATE'S SECRETS**  *A cache of diplomatic cables provides a chronicle of the United States' relations with the world.*

UPDATED March 24, 2011

## A Selection From the Cache of Diplomatic Dispatches

Below are a selection of the documents from a cache of a quarter-million confidential American diplomatic cables released by WikiLeaks. A small number of names and passages in some of the cables have been removed (XXXXXXXXXXXX) by The New York Times to protect diplomats' confidential sources, to keep from compromising American intelligence efforts or to protect the privacy of ordinary citizens.

### Afghanistan
2009 Meeting with Ahmed Wali Karzai
2010 Meeting with Ahmed Wali Karzai
Cash Flows From Afghanistan
An Effective, but Allegedly Corrupt, Police Chief
An Injustice in Kabul
Afghan Insider Explains Corruption
Investigating an Afghan Money Exchange Network
Karzai Intervenes in Drug Cases
Ambassador Eikenberry Meets President Karzai
Karzai: Erratic Politician or Rational Leader?

### Canada
A Briefing on Canada for Bush
Anti-American Canadian TV
Canadian Spy Chief Talks
The U.S. and the Canadian Election
Obama Briefed for Canada Visit

### China
Chinese Government Singles Out Google
Chinese Press Controls Discussed
Chinese Warning about Google Earth
Cyber-Attacks and Other Security Threats
China's Ties to the World of Computer Hackers
Clash on Human Rights
Diplomats Clash Over Future Nobel Winner

### Commerce
A Turkish Astronaut for a Boeing Sale
Pressure on Boeing to Hire an Agent in Turkey
Special Request From the Saudi King
Airbus Wins Deal, Until U.S. Intervenes
Special Services for Turkmenistan
Tanzania and the Fight to Stop an Airbus Sale
Sanctions Against Syria, and Blocking an Airbus deal
Blocking a Sale in Nepal That Was Headed to Airbus
Political Fights Over Fighter Jets in Brazil
Lobbying Plan for Fighter Jet Contest in Brazil
Orchestrating a Boeing Sale to Jordan
Starting Off the Sales Pitch in Jordan

### Cuba
Analyzing the Weakness of Cuba's Dissidents
Raul Castro Reaches out to the Obama Administration
How Cuba Keeps Europeans from Meeting Dissidents
Fidel Castro's Mid-air Health Scare
What Happens After Fidel Dies?

### Diplomacy

Blackwater Launches an Anti-Pirate Ship
Profile of the Libyan Leader
A Wild Wedding in Dagestan, Russia
Ambassador Reports on Zimbabwe's Leader
Analyzing a Coup in Honduras
Message From a Soon-to-Be Hostage in Iran
From Panama Before the U.S. Invasion
On the Eve of Nelson Mandela's Release
A Congressman, His Friends and a Pitch to Honduras
Threats and Hazards to Americans Abroad
A Threatening World
Diplomats Helping American Spies

### Drugs
A Well-Connected Drug Trafficker in Guinea
Faked Incineration of Seized Drugs Alleged in Guinea
In Sierra Leone, a Successful Narcotics Case
A Bribe to Sabotage a Drug Prosecution
Mexican Military Welcomes U.S. Help
Panama Wants U.S. to Wiretap Opponents
Pressure to Misuse D.E.A. Wiretaps in Panama
Mexican Drug Traffickers Attack Police With Grenades
Paraguay Presses for D.E.A. Eavesdropping

### Egypt
Mubarak Postures in Campaign
Briefing for F.B.I. Director
Mubarak Warns U.S. About Muslim Brotherhood
Domestic Troubles
Mubarak on Egyptian Food and His Son
'Change-Resistant' Defense Chief
A Disgruntled Officer Corps Under 'Mubarak's Poodle'
Egyptian Leaders' Dim View of U.S. Policy
Portrait of the Intelligence Chief
Mubarak's View of Iran as a Threat
The Rise of Bloggers
The Government and Human Rights
Mubarak on the Middle East
Intelligence Chief on the Threat of Radicalism
Portrait of Mubarak
Egyptian Leadership's World View
A Israeli View of Egyptian Leaders

### France
American Ambassador on Sarkozy
An Intimidating Boss
Sarkozy Portrayed as "Pro-American"

### Georgia
Adopting Georgia's Views
Siding With Georgia's Leader
Skepticism About Azerbaijan

### Guantánamo
Kuwaiti Has Doubts on Return of Detainees
Gauging Canada's Reaction to Release of Interrogation Video
Concerns Over Releasing Yemeni Detainees
Guantánamo Afghans Not Prosecuted at Home
Saudi Rehabilitation Program for Militants
Former Detainee Urges Europe to Accept Other Released Detainees

### Iran
Bahrain's King Says Iran Must Be Stopped
Treasury Official on Iran Sanctions
Abu Dhabi's Prince on Iranian Threat
Israeli Warning on Iran
Saudis Warn of Iranian Influence and Threat
Saudis Assure China on Oil Supply
An Arab Defense Chief on Strikes Against Iran

### Iraq
"The Great Game" in Iraq, Part 1
"The Great Game" in Iraq, Part 2
Iraqi Leader Worries About Saudi Interference
Iran's Role in Iraq
Political Intrigue Swirls Around Iraq
A Saudi's Dim View of Iraq's Leader

### Libya
Profile of the Libyan Leader
A Standoff Over Uranium in Libya
Libyan Uranium Finally Leaves for Russia
Department of Energy Team Inspects Uranium
Qaddafi's Son Complains About U.S.
A Project for the Leader's Son
A War of Qaddafi Siblings
Scandals of the Qaddafi Children

Upbeat Briefing on Libya and Its Leader
The Cabal That Runs Libya
Qaddafi's Generous Gift-Giving
'Coersion' and a Shakedown on Companies

**NATO**
NATO Agrees on Baltic Defense Plan
State Department Discourages Public Comment on Baltic Defense
Baltic Pressure for NATO Defense Plan
Russia-Georgia Clash Worries Baltic States

**Nicaragua**
Nicaragua Aims to Improve U.S. Ties
Aid for Nicaragua's Opposition
American Embassy in Nicaragua Attacked
Business Group Leader Wades Into Nicaragua's Politics
U.S. Business Interests in Nicaragua
U.S. Officials Uneasy With Nicaragua's Leader
Choosing Sides in Nicaragua

**North Korea**
High-Level North Korean Defections
U.S.-South Korea Relations
Chinese Scholar on North Korean Weapons
China-United States Talks on North Korea
American Ambassador on North Korea's Future
Chinese Complaints About North Korea
North Korea's Future

**Pakistan**
Biden Doubts Pakistan's Support for U.S. Goals
Pakistan's Leader Worries About Threat From Own Army
Ambassador's Concerns About Nuclear Material
Human Rights Abuses by Pakistani Army
Will Extra Aid Persuade Pakistan to Cut Ties to Extremists?
Closer Military Ties With Pakistan
U.S. Opposed A.Q. Khan's Release

**Russia**
American Official on Litvinenko Death
Did Russians Track Radioactive Material in London?
Speculation on Putin-Berlusconi Ties
Close Putin-Berlusconi Relationship
Russia Upset Over Polish Remarks
Russian Corruption
A Moscow Mayor and Corruption
Scant Russia-U.S. Military Cooperation
Intel Lobbies the Kremlin
Putin Disengaged?

**Tunisia**
Worries About American Ties to a "Sclerotic" Ally
Warnings About Corruption of Tunisia's First Family
A Lavish Dinner with Tunisian President's Son-in-law
Spurned by Tunisia, Arafat's Widow Criticizes President's Family
Tunisian President Praised by U.S. on Counterterrorism
Tunisian President's Family Takes Over a Bank
Mostly Rosy U.S. View of Tunisia in 2008
An Inside Account of Tunisian Corruption

**War on Terror**
U.S. Warns Germany on Bungled Rendition
U.S.-Macedonia Silence on Botched Rendition
Public Interest in Masri Rendition
Islamic Extremism in Germany
Seeking Saudi Help to Stop Terrorist Financing
Talking Counterterrorism With Kuwait
Robbery in Yemen Aids Al Qaeda
Clinton on Financing Terrorism
Assessing Saudi Counterterrorism Efforts
Conflict Over Money-Tracking Program

**Weapons**
American Concerns on Ukrainian Weapons
American Protest to Kenya on Ukrainian Arms
A Shipload of Tanks Captured by Pirates
Reports of Syrian Missiles for Hezbollah
Clinton Protests to Syria Over Missiles
Syria Denies Supplying Missiles to Hezbollah
American Embassy on Relations with Syria
Concerns on French Ship Sales to Russia
U.S. Concerns About French Warship Sale to Russia
Lithuania Questions French Ship Sale to Russia
Gates Objects to French Ship Sale to Russia

**Yemen**
Americans Arrested in Yemen for Militant Ties
Yemeni President on U.S. Missile Strikes

Yemeni President Gives U.S. Free Reign
Hunting for Dangerous Weapons in Yemen
Yemeni President on Guantánamo Prisoners

Summary Secretary of State Hillary Rodham Clinton assesses the efforts of several Middle Eastern and South Asian countries to stop the flow of money for terrorist activities, and she directs several embassies to press officials in those countries to do better. Related Article »

Date **2009-12-30 13:28:00**

Source **Secretary of State**

Classification **SECRET//NOFORN**

S E C R E T STATE 131801

NOFORN SIPDIS FOR TFCO

E.O. 12958: DECL: 12/28/2019 TAGS: EFIN, KTFN, PTER, PINR, PREL, PK, KU, AE, QA, SA SUBJECT: TERRORIST FINANCE: ACTION REQUEST FOR SENIOR LEVEL ENGAGEMENT ON TERRORISM FINANCE

REF: A. (A) STATE 112368 B. (B) RIYADH 1499 C. (C) KUWAIT 1061 D. (D) KUWAIT 1021 E. (E) ABU DHABI 1057 F. (F) DOHA 650 G. (G) ISLAMABAD 2799

Classified By: EEB/ESC Deputy Assistant Secretary Douglas C. Hengel for reasons 1.4 (b) and (d).

------
Summary
------

1. (U) This is an action request cable. Please see para 3.

2. (S/NF) Summary: In August 2009, Special Representative to the President for Afghanistan and Pakistan (S/SRAP) Ambassador Richard Holbrooke in coordination with the Department of Treasury established the interagency Illicit Finance Task Force (IFTF). The IFTF is chaired by Treasury A/S David Cohen. It focuses on disrupting illicit finance activities in Afghanistan and Pakistan and the external financial/logistical support networks of terrorist groups that operate there, such as al-Qa'ida, the Taliban, and Lashkar e-Tayyiba (LeT). The IFTF's activities are a vital component of the USG's Afghanistan and Pakistan (Af/Pak) strategy dedicated to disrupting illicit finance flows between the Gulf countries and Afghanistan and Pakistan. The IFTF has created a diplomatic engagement strategy to assist in the accomplishment of this objective. The strategy focuses on senior-level USG engagement with Gulf countries and Pakistan to communicate USG counterterrorism priorities and to generate the political will necessary to address the problem. The IFTF has drafted talking points for use by all USG officials in their interactions with Gulf and Pakistani interlocutors. These points focus on funding for terrorist groups threatening stability in Afghanistan and Pakistan and targeting coalition soldiers. These points have been cleared through the relevant Washington agencies.

3. (SBU) Action request: Drawing on the background materials for respective countries, and in preparation for the upcoming visits by Ambassador Holbrooke and Treasury U/S Levey in January, the Department requests all action posts deliver the general talking points in paras 5-6 and country specific talking points contained in the following paras: (1) Saudi Arabia ) para 8, (2) Kuwait ) para 10, (3) UAE ) para 12, and (4) Pakistan ) para 13. The talking points should be delivered by Ambassadors/Charge D'Affaires.

4. (C) In response to State 112368, the Department has received responses from Embassies Riyadh, Kuwait, Abu Dhabi, Doha, and Islamabad regarding the resource capabilities devoted towards these efforts. The Department also received each Mission's evaluation of the effectiveness of host country institutions working on combating terrorism financing along with post's recommendations on ways forward.

------
General talking points for all Embassies
------

5. (SBU) Threat financing:

Cutting off the flow of funds to terrorist organizations and achieving stability in Af/Pak are top U.S. priorities.

These objectives require effective actions against terrorist fundraising in the Gulf by al-Qa'ida, the Taliban, LeT, and other Af/Pak-based violent extremist groups, all of which undermine the security of the entire international community. We will not succeed without your cooperation.

Long term success in combating terrorist financing requires a comprehensive, strategic approach that includes the following elements:

(1) aggressive action to identify, disrupt and deter terrorist donors, fundraisers and facilitators;

(2) appropriate legal measures, including effective prosecution, to hold terrorist financiers and facilitators publicly accountable and to send a strong message of deterrence to current and would-be donors that their actions face significant legal and social repercussions.

(3) strong oversight of charities, including their overseas branches, to ensure that these organizations are not supporting terrorist and extremist elements;

(4) strict enforcement of UN 1267 sanctions; and

(5) full compliance with international anti-money laundering and combating the financing of terrorism (AML/CFT) standards, including vigorous enforcement.

6. (SBU) Charities:

The United States strongly supports legitimate charitable activities and is a strong proponent of private charitable giving.

We recognize and admire the emphasis placed on charity within Islam and we seek to work cooperatively with governments and organizations in the Islamic world to ensure that legitimate charitable activities thrive.

At the same time, we want to increase our cooperative efforts to ensure that extremists and terrorists do not exploit charitable giving.

------
Country-specific background material and talking points
------

7. (U) Saudi Arabia background

(S/NF) While the Kingdom of Saudi Arabia (KSA) takes seriously the threat of terrorism within Saudi Arabia, it has been an ongoing challenge to persuade Saudi officials to treat terrorist financing emanating from Saudi Arabia as a strategic priority. Due in part to intense focus by the USG over the last several years, Saudi Arabia has begun to make important progress on this front and has responded to terrorist financing concerns raised by the United States through proactively investigating and detaining financial facilitators of concern. Still, donors in Saudi Arabia constitute the most significant source of funding to Sunni terrorist groups worldwide. Continued senior-level USG engagement is needed to build on initial efforts and encourage the Saudi government to take more steps to stem the flow of funds from Saudi Arabia-based sources to terrorists and extremists worldwide.

(S/NF) The USG engages regularly with the Saudi Government on terrorist financing. The establishment in 2008 of a Treasury attache office presence in Riyadh contributes to robust interaction and information sharing on the issue. Despite this presence, however, more needs to be done since Saudi Arabia remains a critical financial support base for al-Qa'ida, the

Taliban, LeT, and other terrorist groups, including Hamas, which probably raise millions of dollars annually from Saudi sources, often during Hajj and Ramadan. In contrast to its increasingly aggressive efforts to disrupt al-Qa'ida's access to funding from Saudi sources, Riyadh has taken only limited action to disrupt fundraising for the UN 1267-listed Taliban and LeT-groups that are also aligned with al-Qa'ida and focused on undermining stability in Afghanistan and Pakistan.

(S/NF) Saudi Arabia has enacted important reforms to criminalize terrorist financing and restrict the overseas flow of funds from Saudi-based charities. However, these restrictions fail to include &multilateral organizations8 such as the International Islamic Relief Organization (IIRO), Muslim World League (MWL) and the World Assembly of Muslim Youth (WAMY.) Intelligence suggests that these groups continue to send money overseas and, at times, fund extremism overseas. In 2002, the Saudi government promised to set up a &Charities Committee8 that would address this issue, but has yet to do so. The establishment of such a mechanism, however, is secondary to the primary U.S. goal of obtaining Saudi acknowledgement of the scope of this problem and a commitment to take decisive action.

(S/NF) Department note: The Department received post's comments regarding embassy staffing at Riyadh and recommendations for enhancing bilateral cooperation (ref B). The Department agrees with post's recommendation that the U.S. must reinforce, on a political level, the Saudi Arabia Government's recent acknowledgement that terrorist groups other than al-Qa'ida are a threat both to it and to regional stability. The Department also supports post's assessment that consistent engagement, including the exchange of actionable intelligence, by senior USG officials is paramount. We plan to discuss these issues with the SAG during upcoming senior-level USG visits.

8. (U) Saudi Arabia talking points

(S/REL USA, SAU) We recognize your government's efforts to disrupt al-Qa'ida networks in the Kingdom and we reaffirm our commitment to support the Saudi government in its actions on terror finance. We encourage your government to continue efforts against al-Qa'ida and stress the importance of sharing and acting on information related to terrorist financing.

(S/REL USA, SAU) We note your concerns with fundraising in the Kingdom by al-Qa'ida and other terrorist groups and urge decisive action to enforce the UN 1267-mandated asset freeze against Taliban and LeT fundraising similar to Saudi efforts to enforce UN 1267 sanctions and take other appropriate action to target al-Qa'ida.

(S/REL USA, SAU) We underscore that the Taliban and LeT are aligned with al-Qa'ida and that your government's support for disrupting the financing of these groups is critical to the stability of Afghanistan, Pakistan and the broader Central and South Asian region. We emphasize the need to prevent the Taliban from using the cover of reconciliation talks to raise funds.

(S/REL USA, SAU) We urge your government to assume responsibility for the overseas operations of charities and NGOs headquartered in the Kingdom. We encourage you to prevent terrorists and their supporters from exploiting religious events (Hajj, Umrah, Ramadan) to raise funds. We acknowledge the recent adoption of stricter financial controls on charities, but urge greater regulation and oversight of the Saudi charitable sector.

(S/REL USA, SAU) We would like to stress our interest in broadening and deepening this dialogue and information exchange as we still lack detailed information on the ultimate sources of terrorist financing emanating from the Kingdom. We commend your government for recent efforts to put terrorists and terrorist financiers on trial, and we encourage you to publicize details of prosecutions to maximize the deterrent effects.

(S/REL USA, SAU) You have had success in detaining and deterring financial facilitators. However, we encourage your government also to focus on the long-term and more fundamental goal of dissuading donors from funding violent extremism.

(S/REL USA, SAU) We commend your government's effort over the past several years to use the media, internet, and other forms of public outreach to discourage extremism. We emphasize that a critical component in this campaign is cutting off the flow of funds from Saudi Arabia to foreign religious, charitable, and educational organizations that propagate violent extremist ideologies to vulnerable populations.

9. (U) Kuwait background

(S/NF) The USG has consistently engaged the Government of Kuwait (GOK) about the specific activities of terrorist financiers in country, Kuwaiti charities financing terrorism abroad, and Kuwait's lack of a comprehensive anti-money laundering and counter-terrorist financing regime. While the GOK has demonstrated a willingness to take action when attacks target Kuwait, it has been less inclined to take action against Kuwait-based financiers and facilitators plotting attacks outside of Kuwait. Al-Qa'ida and other groups continue to exploit Kuwait both as a source of funds and as a key transit point.

(S/NF) The GOK has undertaken a number of initiatives to curb terrorist financing in the charitable sector (ending direct cash donations, increasing monitoring and supervising mosques and charitable organizations, and enhancing enforcement of regulations by a Ministry of Social Affairs task force). It also recently arrested some Kuwait-based al-Qa'ida facilitators, but it is too early to assess whether this marks a change in Kuwaiti policy of co-opting terrorists as a means of deflecting potential attacks against Kuwaiti interests.

(S/NF) Kuwait's law prohibits efforts to undermine or attack Arab neighbors, a basis for the prosecution of al-Qa'ida facilitators, Kuwait remains the sole Gulf Cooperation Council (GCC) country that has not criminalized terrorist financing. The GOK faces an uphill battle to implement comprehensive terror finance legislation due to a lack of parliamentary support. However the government is also not currently prepared to push hard on this issue. The GOK at times has obstructed or been slow to enforce UN-mandated asset freezes of Kuwait-based entities.

(S/NF) A particular point of difference between the U.S. and Kuwait concerns Revival of Islamic Heritage Society (RIHS). In June 2008 the USG domestically designated all RIHS offices RIHS under Executive Order 13224 for providing financial and material support to al-Qa'ida and UN 1267-listed al-Qa'ida affiliates, including Lashkar e-Tayyiba, Jemaah Islamiyah, and Al-Itihaad al-Islamiya. The United States nominated RIHS for listing under UNSCR 1267 but Indonesia placed a technical hold on the RIHS listing due concerns regarding RIHS's presence in Indonesia. Libya also placed a hold - probably at Kuwait's behest - citing insufficient information on RIHS's activities. Indonesia has rotated off the United Nation's Security Council so only Libya's hold on RIHS remains. (Department note: Libya's hold will drop in 2010 unless one of the newly elected UNSC Members places a hold on our request to list RIHS.) In Kuwait, RIHS enjoys broad public support as a charitable entity. The GOK to date has not taken significant action to address or shut down RIHS's headquarters or its branches, which is consistent with GOK tolerance of similar behavior by Kuwaiti citizens and organizations as long as the behavior occurs or is directed outside of Kuwait.

(S/NF) Department note: The Department appreciates postVs thorough description of the staffing situation at Mission Kuwait (ref B). The Department commends U.S. Embassy Kuwait for taking an active approach in proposing a strategy to build GOK capacity in combating financial crimes through training and seminars focused on legislation and law enforcement (ref C). The opportunity to engage the GOK on improving its capabilities to deal with financial crimes is enthusiastically welcomed by agencies in Washington. Washington agencies appreciate post's assessment and identification of several focal areas that deal with financial crimes. These goals closely track the work of the IFTF Capacity Building Working Group. The Department commends Embassy Kuwait's recent support of Kuwait's National Anti Money Laundering Committee's AML conference in early December 2009. In response to post's request, the Department will work with relevant members of the Washington inter-agency to provide comments and feedback to the draft of Kuwait's amended AML law.

10. (U) Kuwait talking points

(S/REL USA, KWT) We appreciate the breadth and depth of our strong bilateral relationship. We would like to see our cooperation on counter-terrorist financing improve to a level that matches our excellent cooperation in many other areas. In this respect, the recent Kuwait anti-money laundering conference held in Kuwait is a positive step forward.

(S/REL USA, KWT) Our information indicates that Kuwaiti donors serve as an important source of funds and other support for al-Qa'ida and other terrorist groups. The arrest in August of six Kuwaiti men who were plotting terrorist attacks on U.S. and Kuwait interests marks an important step in enhanced counterterrorism cooperation. We encourage you to keep up the positive momentum.

(S//REL USA, KWT) We underscore that the Taliban and LeT are aligned with al-Qaida and that your government's support for disrupting the financing of these groups is critical to the stability of Afghanistan, Pakistan and the broader Central and South Asian region. We emphasize the need to prevent the Taliban from using the cover of reconciliation talks to raise funds.

(S/REL USA, KWT) We appreciate your government's generosity for a wide range of important causes and for the positive contributions made by Kuwaiti charities. We commend Kuwait for some of the initiatives taken to enhance oversight of charitable donations, but we need you to do more to prevent the financing of terrorism abroad from Kuwaiti soil.

(S/REL USA, KWT) Our goal is to work more closely with your government to separate and protect legitimate charitable activity from those that fund terror. We have particular concerns about their foreign activities.

(S/REL USA, KWT) We remain concerned that the continued absence of counterterrorism legislation criminalizing terrorist financing will continue to prevent effective counterterrorist efforts.

(S/REL USA, KWT) We urge your government to prioritize the passage of counterterror finance legislation. Robust and comprehensive anti-money laundering and counterterror financing laws will enhance your government's ability to prosecute those seeking to undermine Kuwait's security, but will also enhance the reputation of Kuwait's financial sector as a whole.

(S/REL USA, KWT) If raised, Kuwait RIHS: We have shared our concerns with your government regarding RIHS on numerous occasions. We designated the organization in the United States as a specially designated terrorist entity based on information that RIHS funds have supported terrorist groups in various regions of the world. The USG is not alone in its concern; six other governments (Albania, Azerbaijan, Bangladesh, Bosnia-Herzegovina, Cambodia, and Russia) have taken enforcement action against RIHS branches in their countries.

(S//REL USA, KWT) We would welcome the opportunity to work more closely with you to ensure that RIHS and other charities cannot be used to support terrorists.

11. (U) United Arab Emirates background

(S/NF) UAE-based donors have provided financial support to a variety of terrorist groups, including al-Qa'ida, the Taliban, LeT and other terrorist groups, including Hamas. Washington agencies note, however, that they have limited information on the identity of Taliban and LeT donors and facilitators in the UAE. Hence there is limited information to be shared with local interlocutors. Nonetheless, the point can be emphasized that the UAE's role as a growing global financial center, coupled with weak regulatory oversight, makes it vulnerable to abuse by terrorist financiers and facilitation networks.

(S/NF) Department Note: The Department has received post's comments regarding personnel staffing at Mission UAE and the challenges post faces. The Department is supportive of the action plan laid out on engaging with the UAE on Taliban finance issues (ref E). The Department assesses that a bilateral commitment by the United States and the UAE to focus on weaknesses within its financial regulatory measures is an important step in making progress on strengthening UAE efforts to disrupt potential terrorist financing.

12. (U) United Arab Emirates talking points

(S/REL USA, ARE) We appreciate the depth and breadth of our bilateral relationship. Since 2001, we have developed a strong partnership with your government in countering financial support for al-Qa'ida, and more recently, in constricting Iran's ability to use UAE financial institutions to support its nuclear program.

(S/REL USA, ARE) We would like to extend our cooperation and partnership to efforts to deal with the threat represented by Taliban and LeT fundraising in the UAE. We believe that the United States and UAE, which both have troops in the field in Afghanistan, share a common interest in curtailing any Taliban or LeT fundraising activities and fully implementing UN 1267 sanctions on such activities on behalf of these groups in the UAE.

(S/REL USA, ARE) However, we are pleased that concerns have been raised in the UAE regarding the Taliban and LeT fundraising. We also commend the calls for increased vigilance, information sharing, and enforcement actions to disrupt and deter this activity.

(S/REL USA, ARE) In our view, the alignment of the Taliban and LeT with al-Qa'ida means that our mutual efforts to disrupt the financing of these groups also is critical to the stability of Afghanistan and Pakistan.

(S/REL USA, ARE) We emphasize the need to prevent the Taliban from using the cover of reconciliation talks to travel and raise funds.

(S/REL USA, ARE) We appreciate your government's willingness to work with the USG on cash courier interdiction and note that such efforts are crucial to undermine al-Qa'ida, the Taliban, and other groups' ability to exploit the UAE as a fundraising and facilitation hub. We urge your government to strengthen its regulatory and enforcement regime to interdict cash couriers transiting major airports.

13. (U) Pakistan background

(S/NF) Pakistan's intermittent support to terrorist groups and militant organizations threatens to undermine regional security and endanger U.S. national security objectives in Afghanistan and Pakistan. Although Pakistani senior officials have publicly disavowed support for these groups, some officials from the Pakistan's Inter-Services Intelligence Directorate (ISI) continue to maintain ties with a wide array of extremist organizations, in particular the Taliban, LeT and other extremist organizations. These extremist organizations continue to find refuge in Pakistan and exploit Pakistan's extensive network of charities, NGOs, and madrassas. This network of social service institutions readily provides extremist organizations with recruits, funding and infrastructure for planning new attacks. On the international stage, Pakistan has sought to block the UNSCR 1267 listings of Pakistan-based or affiliated terrorists by requesting that China place holds on the nominations. China recently placed a technical hold on the designation of three Pakistan-based or affiliated terrorists nominated by India, although China did not prevent the most recent Pakistan-related U.S. designation nomination in June.

(S/NF) The Department has received post's comments regarding personnel staffing and the detailed description of the challenges faced by Embassy Islamabad in the area of terrorism finance (ref D). Department leaves it to post discretion to determine which departments within the host government should receive the points provided in para 16 so that Pakistan fully understands the priority the USG places on this issue.

14. (U) Pakistan talking points

(S/REL USA, PAK) Emphasize that Pakistan's support for disrupting financing to the Taliban and LeT obligatory pursuant to their obligations under UNSCR 1267 and successor resolutions, and is critical to achieving stability in Afghanistan and Pakistan.

(S/REL USA, PAK) We are deeply concerned that Pakistan has failed to enact an AML/CTF law that meets APG/FATF standards. As you may realize the FATF is currently engaged in a &International Co-Operation Review Group8 exercise, that is likely to have very negative multilateral repercussions if the Parliament does not pass an adequate AML/CTF law.

(S/REL USA, PAK) We stress your government's obligation, under UNSCR 1267, and successor resolutions to strictly enforce existing sanctions against the 142 Taliban, LeT leader Hafiz Saeed, LeT/JUD, al Rashid Trust, al Akhtar Trust and other individuals and entities on the UN 1267 Consolidated List.

(S/REL USA, PAK) We urge your government to support the international community's efforts to combat terrorist financing. Your government's views of UNSCR 1267 listing requests for LeT and other Pakistan-based terrorist groups should be made on the merits of the requests and not linked to politics, including what country made the nomination or which countries are referenced in the public statements of the cases.

(S/REL USA, PAK) We urge your government to comply with UN and domestic legal obligations to enforce sanctions on the Pakistan-based, UN-proscribed NGOs al Rashid Trust and al Akhtar Trust, and all successor organizations that continue to funnel money and provide other forms of support to the Taliban and LeT.

(S/REL USA, PAK) We emphasize that social services provided by NGO extremist organizations, such as Jamaat-ud Dawa (JUD) challenge the legitimacy of your government to provide for its people. This includes relief efforts in the Internally Displaced Person (IDP) camps of the Northwest Frontier Provinces by the new LeT/JUD charity Falah-e Insaniyat Foundation.

(S/REL USA, PAK) We stress that our governments must work together to ensure that there are moderate alternatives to terrorist-controlled social welfare networks upon which IDPs and other vulnerable populations currently rely. We must work together to develop and support NGOs not affiliated with terrorist groups, and establish a comprehensive oversight and enforcement mechanism for NGOs that is consistent with the Financial Action Task Force's international standard.

(S//REL USA, PAK) We urge your Government in the strongest possible terms to take action against the Haqqani network, which is funneling weapons and fighters across the border to fight U.S. and Coalition Forces in Afghanistan. This network, led by Sirajuddin Haqqani who was listed by the UN under UNSCR 1267, funds its activities through illicit activities,

including kidnapping, extortion, bank robbery, narcotics, smuggling, and fraud.

(S//REL USA, PAK) We urge your Government to replace the anti-money laundering decree recently promulgated by your Executive Branch with legislation fully consistent with the Financial Action Task Force (FATF) Recommendations and to ensure that the current decree can stand in court. The FATF Forty Plus Nine Recommendations are international standards, which Pakistan, by virtue of its membership in the Asia-Pacific Group, committed to.

15. (U) Qatar background

(S//NF) Department Note: Qatar is one of the four Gulf countries included in the IFTF, and accordingly, the IFTF developed the background information included in para 16 for inclusion in the diplomatic engagement strategy. However, given the current focus of U.S. engagement with the GOQ on terror finance related to Hamas, it would be counter-productive for Embassy Doha to engage the GOQ at this time on disrupting financial support of terrorist groups operating in Afghanistan and Pakistan.

(S/NF) Qatar has adopted a largely passive approach to cooperating with the U.S. against terrorist financing. Qatar's overall level of CT cooperation with the U.S. is considered the worst in the region. Al-Qaida, the Taliban, UN-1267 listed LeT, and other terrorist groups exploit Qatar as a fundraising locale. Although Qatar's security services have the capability to deal with direct threats and occasionally have put that capability to use, they have been hesitant to act against known terrorists out of concern for appearing to be aligned with the U.S. and provoking reprisals.

(S//NF) Department Note: The Department has received post's comments regarding personnel staffing and the thorough description of the coordination process on terrorist finance issues at Embassy Doha (ref F). Department appreciates post's assessment that GOQ definitions of what constitutes terrorism differs occasionally from those of the USG. Department agrees with post's suggested approach on this issue of engaging with direct discussions with host government officials.

---

Points of contact and reporting deadline

---

16. (U) Please direct any questions or comments on this request to EEB/ESC/TFS (Jay J. Jallorina or Linda Recht). Posts are requested to report back on responses from other governments by January 19, 2010. CLINTON

Destination

VZCZCXYZ0071
OO RUEHWEB
DE RUEHC #1801 3641337
ZNY SSSSS ZZH
O 301328Z DEC 09
FM SECSTATE WASHDC
TO RUEHAD/AMEMBASSY ABU DHABI IMMEDIATE 0000
RUEHIL/AMEMBASSY ISLAMABAD IMMEDIATE 0000
RUEHKU/AMEMBASSY KUWAIT IMMEDIATE 0000
RUEHRH/AMEMBASSY RIYADH IMMEDIATE 0000
INFO RUEHDO/AMEMBASSY DOHA IMMEDIATE 0000
RUEATRS/TREASURY DEPT WASHINGTON DC IMMEDIATE 0000

By ALAN McLEAN, SCOTT SHANE and ARCHIE TSE   |   Send Feedback

RECOMMEND

TWITTER

SIGN IN TO E-MAIL

SHARE